ORIGINAL

1  JOSH A. KREVITT (CA SBN 208552)      MICHAEL A. JACOBS (CA SBN 111664)
   jkrevitt@gibsondunn.com              mjacobs@mofo.com
2  H. MARK LYON (CA SBN 162061)         RICHARD S.J. HUNG (CA SBN 197425)
   mlyon@gibsondunn.com                 rhung@mofo.com
3  GIBSON, DUNN & CRUTCHER LLP          MORRISON & FOERSTER LLP
   1881 Page Mill Road                  425 Market Street
4  Palo Alto, CA  94304-1211            San Francisco, California 94105-2482
   Telephone: (650) 849-5300            Telephone: (415) 268-7000
5  Facsimile: (650) 849-5333            Facsimile: (415) 268-7522

6

7  *Attorneys for Plaintiff Apple Inc.*

Filed

8

9              UNITED STATES DISTRICT COURT   R 2012

10          NORTHERN DISTRICT OF CALIFORNIA   RICHARD W. WIEKING
                                              CLERK, U.S. DISTRICT COURT
11                                            NORTHERN DISTRICT OF CALIFORNIA
                 SAN JOSE DIVISION            SAN JOSE

12

13                                                              LHK

14  APPLE INC., a California corporation,    CASE NO.

15                     Plaintiff,            **MOTION AND MEMORANDUM IN
                                             SUPPORT OF APPLE INC.'S MOTION
16         v.                                FOR A PRELIMINARY INJUNCTION**

17  SAMSUNG ELECTRONICS CO., LTD., a        **REDACTED PUBLIC VERSION**
    Korean corporation; SAMSUNG
18  ELECTRONICS AMERICA, INC., a New        **Hearing:**
    York corporation; and SAMSUNG           Date:
19  TELECOMMUNICATIONS AMERICA,             Time:
    LLC, a Delaware limited liability company,   Place:
20                                           Judge:
                     Defendants.

21

22

23

24

25

26

27

28

10

1    TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

2       PLEASE TAKE NOTICE that on [_____] at [_____] a.m. / p.m., or as soon

3 thereafter as the matter may be heard, in the courtroom of the Honorable _____ at the

4 United States District Court for the Northern District of California, 280 South 1st Street, Courtroom

5 ___ San Jose, California, Plaintiff Apple Inc. shall and hereby does move the Court for a preliminary

6 injunction prohibiting Defendants Samsung Electronics Co., Ltd., Samsung Electronics America,

7 Inc., and Samsung Telecommunications America, LLC (collectively "Samsung" or "Defendants"),

8 from making, using, offering to sell, or selling within the United States, or importing into the United

9 States, the recently released Galaxy Nexus smartphone.  This motion is based on this notice of

10 motion and supporting memorandum of points and authorities; the supporting declarations and

11 exhibits of Dr. Ravin Balakrishnan, Dr. Todd C. Mowry, Dr. Nathaniel Polish, Dr. Karan Singh, Dr.

12 Christopher Vellturo, Arthur Rangel, Steven Sinclair; and such other written or oral argument as may

13 be presented at or before the time this motion is taken under submission by the Court.

14

Dated: February 8 , 2012         GIBSON DUNN & CRUTCHER LLP

15

16

By: _____

17                   H. Mark Lyon

18              *Attorneys for Plaintiff Apple Inc.*

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT..................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................................ 3

    A.    Apple's Groundbreaking and Patented Technology ..................................................... 3

    B.    Samsung Competes with Apple, and Takes Market Share from Apple, by Copying Its Technology and Infringing on Its Patents................................................. 4

    C.    The Unique Nature and State of the Smartphone Market ........................................... 7

        1.    The Smartphone Market Is at a Critical Juncture ........................................... 7

        2.    Consumers "Stick" with the Platform of Their First Smartphone..................... 8

ARGUMENT ............................................................................................................................... 10

I.    APPLE IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS............................ 10

    A.    U.S. Patent No. 5,946,647 (Links for Structures) ...................................................... 11

    B.    U.S. Patent No. 8,086,604 (Siri and Unified Search)................................................. 12

    C.    U.S. Patent No. 8,046,721 (Image Unlock) ............................................................... 13

    D.    U.S. Patent No. 8,074,172 (Word Recommendations)............................................... 14

II.    APPLE WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION ........................................................................................................................ 16

    A.    Apple Will Suffer Irreparable Injury in the Form of Long-Term Loss of Market Share Absent a Preliminary Injunction........................................................... 16

    B.    Apple Will Also Suffer Additional Irreparable Injury in Numerous Respects Beyond Loss of Smartphone Market Share ................................................................ 20

    C.    While Not Required, There Is a Clear Nexus Between Samsung's Infringement and the Irreparable Harm to Apple........................................................ 25

III.    THE BALANCE OF HARDSHIPS STRONGLY FAVORS A PRELIMINARY INJUNCTION ........................................................................................................................ 30

IV.    THE PUBLIC INTEREST SUPPORTS A PRELIMINARY INJUNCTION ......................... 31

CONCLUSION ........................................................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*02 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
No. 2011-1054, 2011 WL 5601460 (Fed. Cir. Nov. 18, 2011).................................... 17

*Abbott Labs. v. Andrx Pharm., Inc.,*
452 F.3d 1331 (Fed. Cir. 2006)................................................................................ 31

*Abbott Labs. v. Sandoz, Inc.,*
544 F.3d 1341 (Fed. Cir. 2008)......................................................................... 24, 31

*Acumed LLC v. Stryker Inc.,*
551 F.3d 1323 (Fed. Cir. 2008)................................................................................ 32

*AstraZeneca LP v. Apotex Corp.,*
633 F.3d 1042 (Fed. Cir. 2010).......................................................................... 10, 24

*Canon Inc. v. GCC Int'l Ltd.,*
263 F. App'x 57 (Fed. Cir. 2008)............................................................................. 20

*Celsis In Vitro, Inc. v. CelizDirect, Inc.,*
-- F.3d --, (Fed. Cir. 2012) ...................................................................................... 30

*Commonwealth Sci. and Indus. Research Org. v. Buffalo Tech. Inc.,*
492 F. Supp. 2d 600 (E.D. Tex. 2007)...................................................................... 26

*eBay Inc. v. MercExchange, LLC,*
547 U.S. 388 (2006) .......................................................................................... 25, 26

*H.H. Robertson Co. v. United Steel Deck, Inc.,*
820 F.2d 384 (Fed. Cir. 1987).................................................................................. 31

*Humanscale Corp.v. CompX Int'l, Inc.,*
2010 WL 1779963 (E.D. Va. Apr. 29, 2010)............................................................ 26

*Hybritech, Inc. v. Abbott Labs.,*
849 F.2d 1446 (Fed. Cir. 1988)................................................................................ 31

*Hynix Semiconductor Inc. v. Rambus Inc.,*
609 F. Supp. 2d 951 (N.D. Cal. 2009)...................................................................... 26

*i4i Ltd. P'ship v. Microsoft Corp.,*
598 F.3d 831 (Fed. Cir. 2010)............................................................................ 26, 30

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,*
22 F.3d 546 (4th Cir. 1994)...................................................................................... 17

*Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.,*
290 F.3d 578 (3d Cir. 2002)..................................................................................... 17

Gibson, Dunn &
Crutcher LLP

*Perfect 10, Inc. v. Google, Inc.*,
   653 F.3d 976 (9th Cir. 2011)......................................................................................26

*Pfizer, Inc. v. Teva Pharm. USA, Inc.*,
   429 F.3d 1364 (Fed. Cir. 2005)............................................................................17, 30

*PPG Indus., Inc. v. Guardian Indus. Corp.*,
   75 F.3d 1558 (Fed. Cir. 1996)..................................................................................30

*Quad/Tech. Inc. v. Q.I. Press Controls B.V.*,
   701 F. Supp. 2d 644 (E.D. Pa. 2010).........................................................................26

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
   659 F.3d 1142 (Fed. Cir. 2011)..........................................................17, 25, 30, 31

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ..............................................................................................10, 25

*z4Techs., Inc. v. Microsoft Corp.*,
   434 F. Supp. 2d 437 (E.D. Tex. 2006)........................................................................26

1

## PRELIMINARY STATEMENT

2          A preliminary injunction regarding Samsung's new Galaxy Nexus, which infringes multiple

3    key Apple patents, is essential to prevent immediate and irreparable harm to Apple.  While Apple

4    recognizes that this Court recently denied a preliminary injunction motion in another case between

5    the parties (concerning different patents and products), as explained below, absent preliminary relief

6    in this case at this time, sales of Samsung's new infringing device will harm Apple in a manner and

7    to an extent that cannot possibly be calculated, let alone compensated.

8          As this Court is aware, Apple revolutionized the market in personal computing devices.

9    Apple's iconic mobile devices, including the iPhone and iPad, are now among the most distinctive

10   and successful products in the world.  The revolutionary and patented design and user experience of

11   these products are the result of Apple's massive investment in innovation, and have contributed to the

12   extraordinary acclaim and success of these products.

13         Samsung, in contrast, has systematically copied Apple's innovative technology and products,

14   features and designs, and has deluged markets with infringing devices (at least eighteen new

15   infringing products in just the last eight months), all in an effort to usurp market share from Apple

16   *using Apple's own popular and patented technology*.  Apple has been forced to relentlessly pursue

17   Samsung all over the world, including in this Court, regarding products that infringe scores of Apple

18   patents.  Yet even while these cases progress—even *after* this Court found Apple likely to succeed on

19   its infringement claims against prior Samsung devices—Samsung continues to launch infringing

20   copycat products with impunity, all with the assumption that courts, *including this Court*, will not

21   stop Samsung before the gain to Samsung, and harm to Apple, is virtually irreversible.

22         With its latest infringing device—the Galaxy Nexus—Samsung once again blatantly copies

23   Apple's products and infringes Apple's patents.  Although for this motion Apple need only

24   demonstrate a likelihood of success, Apple does far more than that, and establishes that the Galaxy

25   Nexus infringes numerous Apple patents, covering key features that contribute to the iPhone's

26   natural, intuitive, and easy-to-use user interface—from how Siri, the iPhone 4S digital personal

27   assistant, searches for information, to the iPhone's iconic slide to unlock screen.  These and other

28

1   patented features make the iPhone unique, appealing and successful. And that is exactly why they

2   were included in Samsung's new phones.[1]

3          Sales of the Galaxy Nexus during this litigation will cause irreparable harm to Apple. The

4   smartphone market is at a critical juncture, as the overwhelming majority of consumers move to

5   smartphones, and consumers' long-term preferences and purchases may be determined to a great

6   extent by the operating system on their first smartphone. Thus, as this Court recognized, "the initial

7   decision regarding which product to purchase [is] even more important because the potential

8   customers that Apple loses to Samsung may have long-term effects that are difficult to calculate and

9   may not be recaptured."[2] This is precisely why Samsung copies Apple's products and incorporates

10  Apple's patented features, *i.e.*, in order to lure crucial first-time purchasers away from Apple.

11         Thus, absent preliminary relief, by the time Apple prevails in this case—and Samsung's

12  infringement is so clear there can be no serious dispute that Apple will prevail—Samsung will have

13  used the Galaxy Nexus, which misappropriates many patented features from the iPhone, to capture

14  market share from Apple that Samsung will be able to retain long into the future. Even worse, as

15  explained below and in the accompanying declarations, the full harm to Apple cannot be calculated,

16  making it impossible for Apple to be compensated by money damages. Samsung understands all this,

17  of course, but has calculated that the benefits it will reap—and the harm Apple will suffer—far

18  exceed any damages Samsung might later have to pay. Even a large damages award is a small price

19  for Samsung to pay to acquire a dominant market share, which Samsung could not otherwise attain

20  without relentlessly imitating Apple's products and infringing Apple's patents.

21         Samsung's recent launch of the infringing Galaxy Nexus is all the more egregious considering

22  that Samsung did so in the face of this Court's *prior* determination that Samsung's earlier devices

---

[1]  The Nexus infringes additional Apple patents, including those in the Complaint, but Apple limits this motion to key patents for which infringement is clear in order to facilitate expedited resolution of this motion.

[2]  *See* December 12, 2011, Order Denying Apple's Motion for a Preliminary Injunction Case No. 11-cv-01846 ("P.I. Order") (D.I. 452) at 32. The Court denied Apple's motion in part because it found that Apple could not show a nexus between Samsung's infringement of the particular patents at issue in that case and the harm to Apple. *Id.* at 33-34. Although Apple respectfully submits that such a nexus is not required, as explained below, Apple makes a strong showing of such a nexus in this case.

1  likely infringe certain Apple patents and that sales of such devices would likely cause Apple "to lose

2  market share to Samsung" that "could support a finding of irreparable harm." P.I. Order at 32-33.

3      As set forth in the Complaint, Apple has filed this suit to put an end to Samsung's serial and

4  brazen infringement. Given the strength of Apple's infringement case and the extent to which sales

5  of Samsung's infringing device will irreparably harm Apple, preliminary relief is clearly appropriate.

6                              **FACTUAL BACKGROUND**

7      **A.    Apple's Groundbreaking and Patented Technology**

8      Before Apple introduced the iPhone in 2007, mobile phones had limited capabilities and

9  difficult, confusing user interfaces. As one technology journalist wrote at the time, "most of these

10  'smart phones' have had lousy software, confusing user interfaces and clumsy music, video and

11  photo playback." Declaration of Christopher Vellturo ("Vellturo Decl.") Exh. 7 (*Testing Out the*

12  *iPhone*, June 27, 2007). Another journalist described the web browsers available at the time as

13  "stripped-down" and "claustrophobic." *See id.* Exh. 9 (*The iPhone Matches Most of Its Hype*, June

14  27, 2007). In short, as Steve Jobs explained, "the problem" with these previous "smartphones" was

15  that "they're not so smart and they're not so easy to use."[3]

16     Then, in 2007, Apple unveiled the first-generation iPhone, promising that it would "change

17  everything" for mobile phones just as the Macintosh had created a revolution in personal computing

18  two decades earlier. Apple faced tremendous skepticism, however, with many industry

19  commentators predicting that the iPhone was destined to fail.[4] Despite all of these doubts, the iPhone

20  was an astonishing success. Indeed, the iPhone was not just a commercial success; "[it] changed cell

21  phones forever."[5] With its large touchscreen, colorful graphics, advanced browsing capability, and a

22

---

[3]  Vellturo Decl. Exh. 6 (*Turning Cell Phones On Their Ear*, Jan. 22, 2007).

[4]  *See id.* Exh. 109 (*Perspective: The Apple Phone Flop*, Dec. 7, 2006); *id.* Exh. 110 (*Why the Apple Phone Will Fail, and Fail Badly*, Dec. 23, 2006); *id.* Exh. 111 (*Three Reasons Why the iPhone Won't Be As Mega As Some Think*, Jan. 9, 2007) (predicting that "the iPhone won't see the success that some think it will").

[5]  *See id.* Exh. 5 (*Steve Jobs Preparing To Revolutionize the Newspaper Business?*, Sept. 25, 2011). As one commentator wrote, the iPhone "revolutionized the smart-phone industry" and "remains the gold standard by which other smart-phones are judged." *Id.* Exh. 3 (*Looking Back to the First Apple Mac*, Jan. 26, 2009); *see also id.* Exh. 2 (*History Lesson: How the iPhone Changed Smartphones Forever*, June 6, 2011) (noting that the iPhone "totally flipped the mobile industry upside down").

large storage capacity for audio and video files, the iPhone put the equivalent of a personal computer in the pocket of every user. Apple incorporated into the iPhone hundreds of Apple-proprietary features that had never been seen on a phone before—functionality that has become closely associated with Apple and the experience of using Apple products. Subsequent generations of the iPhone have brought even more innovative features to consumers, such as HD video recording, video chat, and, most recently, the remarkable "Siri" personal assistant. *Id.* ¶ 13.[6]

The patents that Apple is asserting here cover a wide array of features and functions that contribute to the success and overall distinctiveness of the Apple products.[7] These patents are directed to such features as the ability to touch a phone number on a web page to dial the number; the innovative search functionality used by Siri; the ability to unlock the phone by simply sliding an image from one location to another on the touchscreen; and Apple's word replacement feature. All of these features contribute to the experience that defines what consumers have come to expect from—and love about—Apple products.[8]

**B.  Samsung Competes with Apple, and Takes Market Share from Apple, by Copying Its Technology and Infringing on Its Patents**

Despite Samsung's prior attempts to make inroads in the smartphone market, Samsung did not have a competitive smartphone on the market when Apple introduced the iPhone in 2007. Samsung's first smartphones, like those of other manufacturers, were unintuitive, difficult to use, and consequently gave Samsung very little position in the market. *Id.* ¶ 23

**REDACTED**

Two years after the launch of the iPhone, Samsung released the first Samsung Galaxy phone in 2009. *Id.* ¶ 9. Having been unsuccessful in its efforts to develop a smartphone product, when Samsung launched the Galaxy device, it embarked from the start on a strategy of imitation, not

---

[6]  *See also id.* Exh. 119 (*Is Siri Steve Jobs' Greatest Legacy?*, Oct. 9, 2011) (suggesting that Siri "could become [] Steve Jobs' greatest legacy" as an innovation that "changes everything. Again.").
[7]  Apple has asserted eight patents in this case against the Galaxy Nexus, four of which are the basis for this motion.
[8]  Many of these features have been the subject of advertisements and marketing efforts by Apple to educate users on how an iPhone, iPad, or iPod touch works and how fun and easy it is to use. *See* Declaration of Steven Sinclair ("Sinclair Decl.") ¶¶ 3-10.

1   innovation.  Samsung largely copied the iPhone, including the form and functionality that makes the

2   iPhone so distinctive, appealing and successful.  A simple comparison between Samsung's earliest

3   phones, the iPhone, and Samsung's later phones illustrates the great extent to which Samsung has

4   attempted to copy Apple's technology:

Samsung Smartphones
**BEFORE** iPhone

Apple's iPhone
(announced Jan. 2007)

Samsung Smartphones
**AFTER** iPhone






15   Samsung did not stop with just copying the design and form of the iPhone—Samsung also

16   misappropriated Apple's application images and icons, and aspects of the unique iPhone user

17   experience, all evidently in order to lure customers desiring the iPhone features and experience into

18   purchasing Samsung products.  *See id.* ¶ 67 & n.101.  Samsung has flooded markets around the world

19   with multiple different generations of its Galaxy smartphones, all of which closely imitate the iPhone.

20   The Galaxy Nexus at issue here is the latest example.

21   Through it all, Apple has assiduously sought to stop Samsung from copying the iPhone and

22   infringing Apple's patents

23

24

25   **REDACTED**

26

27   $^{9}$

28   **REDACTED**

APPLE INC.'S MOTION FOR A PRELIMINARY INJUNCTION
CASE NO.                                              5

**REDACTED**

As a result, Apple has been forced to chase Samsung from court to court on four continents in an effort to stop Samsung's clear and deliberate patent infringement. In the United States, for example, Apple filed the earlier patent case currently pending before this Court, as well as a complaint in the ITC regarding Samsung's smartphones that infringe seven Apple patents. Since June 2011, Apple has had to request injunctions in many other countries around the world, including Japan, Germany, Korea, the Netherlands, Australia, and the United Kingdom, all relating to Samsung's devices that closely copy Apple products and infringe Apple patents. All the while, as the courts consider Samsung's infringement, Samsung continues to flood markets with new products that infringe Apple's patents, including most recently the Galaxy Nexus.

Samsung's follower strategy is paying off. Apple and Samsung are now fierce rivals, and, as this Court has found, "compete in the same smartphone market." P.I. Order at 31-32. Samsung's infringement is also coupled with Samsung's advertising, which directly targets Apple and its products. *See* Vellturo Decl. ¶ 67.[11] In October 2010, one industry report noted that Samsung "successfully positioned itself as a major alternative to Apple's iPhone series to telecom operators as well as end customers." *Id.* ¶ 24 & Exh. 30, at 7. Although Samsung introduced its first Galaxy phone long after Apple entered the market, Samsung has rapidly acquired market share at Apple's expense. Indeed, the initial Galaxy, essentially an iPhone clone, served as an important catalyst for

---

**REDACTED**

[11]  *See also* Vellturo Decl. Exh. 23 (*Samsung Is Going Right for Apple Fanboys' Jugular with Its Latest Commercial*, Nov. 22, 2011).

Gibson, Dunn &
Crutcher LLP

1  Samsung, which previously had only an insignificant position in the smartphone market.

2
                                   **REDACTED**
3

4              *Id.* ¶ 23; *see also id.* Exh. 29, at 18.  In the third quarter of 2011,

5  Samsung overtook Apple for the first time as the world's largest seller of smartphones, accounting

6  for 20% of worldwide smartphone shipments, compared to 14.5% for Apple.  *Id.* ¶ 22.  Another

7  report from October 2011 attributed, at least in part, Apple's decrease in market share "to strong

8  competition from Samsung."  *Id.* Exh. 39 (*Updated: Samsung Rules Smartphone Shipments*, Oct. 28,

9  2011).  And, while Apple regained some market share in the last quarter of 2011, Apple no doubt

10 would have gained even more had Samsung's infringing devices not been in the market.  *Id.* ¶ 71.

11             The Galaxy Nexus at issue here is Samsung's first smartphone featuring the new Android

12 platform, known as "Ice Cream Sandwich," and has been characterized as "the most credible

13 competitor to the iPhone so far."  *Id.* ¶ 68 & Exh. 101.  The Galaxy Nexus launched in the United

14 States on December 15, 2011.  Apple promptly conducted an investigation of this phone and brought

15 the current action and accompanying motion

16     **C.     The Unique Nature and State of the Smartphone Market**

17             **1.     The Smartphone Market Is at a Critical Juncture**

18             The smartphone market is in the midst of a critical juncture in which a vast number of

19 consumers will purchase their first smartphone during the course of this litigation.  *See id.* ¶¶ 27-37.

20 Smartphones have been available for years, but have only recently started to see widespread adoption

21 in large part due to Apple's breakthrough iPhone.  *Id.*  There is wide agreement among industry

22 experts that this unique and decisive period in which most consumers will move away from feature

23 phones to smartphones will take place over the next two years, and largely wind down by the time

24 this case ends.  *Id.*

25             Indeed, Dr. Vellturo, a noted economist, has provided an analysis of this industry data, which

26 shows that the period of this litigation will see higher rates of adoption than ever before.  *Id.*  One

27 analyst, Yankee Group, estimated that while approximately 230 million smartphones were shipped in

28 North America since the inception of the smartphone market in 2003, a total of 311 million will ship

1   in just 2012-2013. *See id.* Attach. D. In other words, far more U.S. consumers will buy smartphones

2   *over the course of this litigation* than the *combined total* number of consumers who purchased

3   smartphones ever before. Moreover, as Dr. Vellturo explains in detail in his declaration, a large

4   portion of these purchases will be made by first-time adopters. *Id.* ¶¶ 27-37. By the end of 2013, the

5   vast majority of handset customers will have switched to a smartphone. *Id.* ¶ 37. Other industry

6   analysts predict that smartphones will account for 88% of the mobile phone market by 2013. *Id.*

7   ¶ 19. As Dr. Vellturo also explains, Samsung recognizes the importance of these first-time buyers; in

8   recent interviews, Samsung marketing executives have noted that Samsung is specifically targeting

9   first-time smartphone buyers. *Id.* ¶¶ 17, 27 & n.45.[12]

10              **2.    Consumers "Stick" with the Platform of Their First Smartphone**

11              Another important characteristic of the smartphone market is key to Samsung's follower

12  strategy in general and to the impact of the Galaxy Nexus in this case. Specifically, a consumer's

13  first purchase of a smartphone exerts substantial influence over subsequent purchases, locking in a

14  preference for the first-chosen platform long into the future.[13] This phenomenon, known as platform

15  "stickiness," renders an initial smartphone purchase critically important. In fact, platform stickiness

16  is what makes all the first-time purchases that Samsung takes from Apple during this pivotal

17  inflection point in the market (*i.e.*, during this litigation) so important and damaging.

18              Indeed, this Court recognized that brand loyalty in the smartphone market "creates customer

19  retention that potentially has long term implications for downstream purchases." P.I. Order at 32. A

20  wealth of independent industry data supports this conclusion.[14] Every new customer that Samsung

21

---

22  [12] *See also id.* Exh. 23 (*Samsung Is Going Right for Apple Fanboys' Jugular with Its Latest
    Commercial*, Nov. 22, 2011) (noting that Samsung is targeting "people entering the smartphone
23  market for the first time."); *id.* Exh. 43 (*Samsung Sees a Bright Future*, Jan. 8, 2011) (Samsung
    executive explaining that "'[o]ver two-thirds of the U.S. population still has a basic feature
24  phone . . . . There's a huge opportunity there.'").

25  [13] *See id.* ¶ 46 ("Wireless customers exhibit a high degree of loyalty to the platform they have
    historically used: a customer who purchases a particular smartphone today is likely to purchase the
26  same brand or platform [*e.g.*, Android] in the future when they replace their smartphone.").

27  [14] The Nielsen Company reported on stickiness last year, for example, and found that "70% of
    Android users said they would stick with that platform for their next purchase." *Id.* ¶ 47; *see also id.*
    Exh. 57. Similarly, a Yankee Group study reveals that 78% of Android users would stick with that
28  platform for future purchases. *Id.* ¶ 47 & Exh. 59. Apple customers show an even stronger loyalty to

1  lures away from experiencing an iPhone—doing so by selling devices that copy the iPhone—results

2  in the loss to Apple of a long-term loyal customer and repeat sales of iPhone and other iOS devices in

3  the future. There are a number of reasons why the platform of a consumer's first smartphone so

4  strongly affects future purchasing decisions.

5      *First*, consumers of Samsung devices become familiar with, and thus attached to, the Android

6  platform, and will, for that reason, be inclined against switching to an iOS device in the future.[15]

7      *Second*, there can be fairly significant "switching costs" when changing from one platform to

8  another. Those costs include transferring data, such as contacts, calendars, music files, and other

9  media content, to a new device. *See* Vellturo Decl. ¶ 49. Smartphone users pay for and download

10  digital apps onto their devices, which are typically easy to transfer among devices running the same

11  platform, but *cannot easily be transferred to a different platform*.[16] For example, once a consumer

12  has purchased a range of apps on a Galaxy Nexus device, that consumer is more likely to stick with

13  an Android device going forward rather than switching to the iPhone because these purchased apps

14  will likely not run on an iOS device. Even if iOS versions of those apps were available, the consumer

15  would have to purchase them anew. Thus, customers who have invested in apps and content for their

16  Android device will have a powerful incentive to stick with Android devices rather than switch to an

17  Apple device.

18

19

20  Apple products and the iOS operating system. *See id.* Exh. 57 (*iPhone vs. Android*, June 4, 2010)
    ("[W]hat sets iPhone and Android apart from the rest of the field of smartphones is operating system

21  loyalty."); *id.* Exh. 58 (*Android Soars, But iPhone Still Most Desired*, Aug. 2, 2010) (reporting iOS
    loyalty as nearly 90% and Android loyalty running over 70%); *cf.* Declaration of Arthur Rangel

22  ("Rangel Decl."). Exh. 1, at 30; *id.* Exh. 3, at 19.

23  [15]  *See* Vellturo Decl. Exh. 62 (*Loyalty to Smartphone Brand Increases with Greater Use of Digital
    Content*, Nov. 25, 2011) ("[M]oving from a smartphone that they are familiar with is the biggest

24  challenge to switching devices."); *id.* ¶ 49 & Exh. 52 (*iPhone Users Most Loyal*, Nov. 28, 2011); *cf.*
    Rangel Decl. Exh. 4, at 17      **REDACTED**                                    ; *id.* Exh. 2, at

25  41

26  [16]  *See* Vellturo Decl. ¶ 46 (explaining that Android user switching to an iPhone "would have to
    purchase all new apps because Android apps and iOS apps are incompatible."); *see also id.* ¶ 58 &

27  n.82 & Exh. 85 (*Think Really Different*, Apr. 15, 2010) ("The iPad arrives ready to run virtually all
    the 150,000 apps that have been created for the iPhone over the past two years."); *cf.* Rangel Decl.

28  Exh. 2, at 82                                **REDACTED**

*Third,* overall customer demand for a given platform, such as Android or iOS, is heavily influenced by what are known as "network effects," which cause the popularity of a platform to increase "as the number of other users on the platform increases." *Id.* ¶ 50. For example, software developers are more willing to write apps for platforms with more users; and, of course, users select platforms that have more apps.[17] The quantity and quality of apps is, in turn, an important factor in purchasing decisions for later customers. *Id.* ¶ 55 & Exh. 82. These network effects not only influence initial purchases, but encourage users to adhere to a platform as it gains in popularity. *Id.* ¶ 56 & Exh. 83.

Thus, as this Court explained, these market dynamics "make[] the initial decision regarding which product to purchase even more important because the potential customers that Apple loses to Samsung may have long-term effects that are difficult to calculate and may not be recaptured." P.I. Order at 32.

## ARGUMENT

## APPLE IS ENTITLED TO A PRELIMINARY INJUNCTION

As explained below and in the accompanying declarations, a preliminary injunction is necessary in this case at this time because Apple is likely to succeed on the merits and would suffer irreparable harm in the absence of preliminary relief. *AstraZeneca LP v. Apotex Corp.*, 633 F.3d 1042, 1050 (Fed. Cir. 2010) (citing *Winter v. NRDC*, 555 U.S. 7, 20 (2008)).

## I.    APPLE IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

The patents at issue in this motion relate to some of Apple's fundamental innovations, which have contributed to the popularity and success of the iPhone and other iOS devices. The patents cover functionality closely associated with Apple products—and loved by Apple users—from unlocking the device by sliding an image across the screen, to searching for information with the amazing new Siri personal assistant, to providing word suggestions while typing on an on-screen

---

[17] *See, e.g.*, Vellturo Decl. ¶ 55 & n.80 & Exh. 72, at 8 (*Mobile Platforms: The Clash of Ecosystems*, Nov. 2011) ("When the number of developers, applications and users on a platform reaches critical mass, the platform begins to grow exponentially. This is because of positive feedback loops or 'network effects' between users and application developers. Applications attract users, which motivates developers to create more applications, which in turn attract more users . . . and so on.").

keyboard.  Samsung's Galaxy Nexus misappropriates all of these patented features (and others).
While Samsung's infringement extends beyond the patents at issue here, these patents illustrate the
breadth of Samsung's infringement.

The proof of Samsung's infringement with respect to each of these patents is straightforward
and unassailable, and in most instances is confirmed by simple use of the Galaxy Nexus.  The patents
are also unlikely to be subject to serious validity challenges.  These patents have been through
rigorous prosecution; indeed, the International Trade Commission has already affirmed the validity of
one of these patents.

Of course, for purposes of this motion, Apple need only show that it is substantially likely to
prevail on the merits of its claims.  Apple does far more than that.  In fact, in support of this motion,
Apple has submitted thorough expert declarations that establish clearly and conclusively that
Samsung's device infringes each of Apple's patents.

### A.   U.S. Patent No. 5,946,647 (Links for Structures)

In general, the '647 patent is directed to a computer-based system and method for detecting
structures, such as phone numbers, post-office addresses, and dates, and performing actions on the
detected structures.  The '647 patent enables an ease-of-use feature found in Apple's iPhone and iPad
devices, on which users have come to depend.  Previously, when a user found information such as a
telephone number on a web page,
the user would have to write
down the telephone number, open
a phone application, and then
manually punch the number into
the phone application before
being able to call the number.
Declaration of Todd Mowry
("Mowry Decl.") ¶¶ 22-24.
Instead, an iPhone or iPad user




can initiate a call directly from a web page or save information to her contacts by simply touching the

1  screen at the location of the information on the web page on the screen and then selecting the desired

2  action. *Id.* ¶¶ 22-24, 84-87.

3  　　As explained by Dr. Todd Mowry, an expert in computer architecture and object-oriented

4  programming, the Galaxy Nexus phones infringe at least claims 1 and 8 of the '647 patent by

5  enabling a user to perform actions on detected structures, including storing information from a web

6  page in the user's contacts or dialing a telephone number, or sending an email, simply by selecting

7  the information on a web page. *Id.* ¶¶ 3-11, 53-83 & Exhs. 1, 17. This can be seen in the

8  accompanying figure comparing Figure 7 of the '647 patent to a screen capture of the web browser

9  on the Galaxy Nexus where, upon selection of a phone number found in a web page, a user is

10  presented with actions to dial the number or add it as a contact.

11  　　Significantly, a similar analysis was recently conducted by the International Trade

12  Commission, which found that a feature on HTC devices that was identical in all relevant respects to

13  that of the Galaxy Nexus infringed claims 1 and 8 of the '647 patent. *Id.* ¶¶ 53-56. The International

14  Trade Commission also confirmed a finding of the validity of claims 1 and 8 of the '647 patent. *Id.*

15  ¶¶ 88-89 & Exh. 15, at 165-191; *id.* Exh. 16, at 28-29.

16  　　**B.　　U.S. Patent No. 8,086,604 (Siri and Unified Search)**

17  　　The '604 patent enables a key component of Apple's revolutionary Siri computerized

18  personal assistant. Siri, recently released with much fanfare and acclaim on the iPhone 4S, allows a

19  user to ask the iPhone questions and to receive accurate, helpful answers. To do so, Siri must search

20  various resources to find a set of useful information to present to the user. The teachings of the '604

21  patent allow a user to perform a search request (such as by asking Siri a question) that can search

22  multiple sources of information both on the device (such as the user's contacts) and off the device

23  (such as the worldwide web), all with a single interface. Declaration of Nathaniel Polish ("Polish

24  Decl.") ¶¶ 77-78. While Siri achieves this unified search using a voice request, the invention of the

25  '604 patent is not limited to only voice search. The claims are also directed to a unified text search

26  using text entered in a search box, which is then passed to modules that permit searching both locally

27  on a computer system and to the Internet. *See id.* ¶¶ 38-46. Furthermore, such searches may occur

28  even as the text is being entered into the search box. *Id.*

1   As explained by Dr. Nathaniel Polish, an expert in artificial intelligence and computer speech,

2   the Galaxy Nexus infringes at least claims 6 and 19 of the '604 patent. *See id.* ¶¶ 3-9, 13, 49-76 &

3   Exhs. 1, 3. This infringement can be seen by using the Quick Search Box on the Galaxy Nexus, in

4   which a single search can be made of multiple information sources both on the phone and through the

5   web using various heuristic modules

6   each employing a different heuristic

7   algorithm. *Id.* ¶¶ 49-76 & Exh. 3. The

8   accompanying figure shows screen

9   captures of the search selection menu

10   from the Galaxy Nexus displaying

11   various heuristic modules and a search

12   for "app" displaying results from the

13   multiple heuristic modules.

 

14   In addition to being infringed,

15   claims 6 and 19 of the '604 patent are substantially likely to survive any validity challenges. *See id.*

16   ¶¶ 79-88. The '604 patent was subject to a rigorous prosecution and provides a novel and

17   unprecedented use of heuristic algorithms in connection with information descriptors provided by a

18   user, particularly with respect to conducting a single search of multiple locations. *Id.*

19       **C.       U.S. Patent No. 8,046,721 (Image Unlock)**

20   The '721 patent enables a touchscreen device user to "unlock" the device by performing a

21   gesture on an "unlock image," which moves on the screen according to the user's gesture.

22   Declaration of Ravin Balakrishnan ("Balakrishnan Decl.") ¶¶ 47-51. Apple has used this innovation

23   in all iOS devices since the devices were first introduced—users can simply "slide to unlock." *Id.*

24   ¶¶ 102-104; *see also* Sinclair Decl. ¶ 6. Apple has repeatedly highlighted this feature in its

25   advertising, to the point that the "slide to unlock" feature is very well known and associated with the

26   way iPhones, iPads, and iPod touches operate. Sinclair Decl. ¶¶ 6-7. It is a part of the fun, easy-to-

27   use interface that has made iOS devices so popular with customers. *Id.* ¶ 10.

28

As explained by Dr. Balakrishnan, the Galaxy Nexus infringes at least claims 7, 8, 12, and 15 of the '721 patent. Balakrishnan Decl. ¶¶ 44, 52-96 & Exh. 3. While there are other ways that a touchscreen device can be unlocked, Samsung has chosen to blatantly infringe Apple's patented way of doing so, no doubt because Samsung knows that Apple's solution is more elegant and fun for users. In fact, while there are other methods of unlocking the phone available on the Galaxy Nexus, Samsung selected the "slide to unlock" feature as the default on the Galaxy Nexus. *See id.* The accompanying figure shows Figures 5A and 5C of the '721 patent compared to screen captures of the Galaxy Nexus slide to unlock feature.



In addition, there is a substantial likelihood that the '721 patent will survive any validity challenge. Compared to the prior art, Apple's invention was unique, as it relied on the use of a specified gesture using an image on a touchscreen to unlock the user's phone, saving the user from performing complex key pushes and/or remembering passwords and codes. *See, e.g., id.* ¶¶ 97-101.

**D.    U.S. Patent No. 8,074,172 (Word Recommendations)**

The '172 patent discloses and claims an invention that in part provides for the suggestion of character strings (*e.g.*, words) while characters are being entered into the touchscreen keyboard. Singh Decl. ¶¶ 43-50, 52-54. Upon the detection of a particular gesture or action, the characters that are being entered are replaced with one of the suggested character strings. *Id.* Upon detection of a different gesture or action, the characters being entered are not replaced. *Id.*

1    Apple has long incorporated this innovation into applications in its iOS devices. *Id.* ¶ 114.

2    The innovation of the '172 patent makes typing

3    information into an iOS device easier and faster

4    by suggesting words that a user is likely

5    intending to type and accepting those as inputs

6    upon selection of the space key or a

7    punctuation mark even before the user

8    completes typing the word. *Id.* ¶¶ 43-50, 52-

9    54, 114. This provides for a faster, easier way

10   for the user to input information. *See id.*

 

 

11   Samsung's Galaxy Nexus infringes at

12   least claims 18, 19, and 27 of the '172 patent.

13   *See id.* ¶¶ 39, 56-113 & Exh. 6. Based simply

14   on operation of the device it is evident that all

15   of the claim limitations are met, and the Galaxy

16   Nexus provides for the suggestion and

17   replacement of character strings in the manner

18   claimed as characters are being entered into the

19   touchscreen keyboard. *Id.* For example, when the text "messaf" is entered, the Galaxy Nexus

20   provides an option to replace the character string with "message" or "messages" by either pressing

21   the space key or pressing one of the character strings directly above the keyboard representing the

22   corrected word or leave it as is by pressing another of the character strings directly above the

23   keyboard representing the misspelled word. *Id.* The accompanying Figure above shows Figures 4D

24   and 4E of the '172 patent compared to screen captures from the Galaxy Nexus.

25   In addition, there is a substantial likelihood that the '172 patent will survive any validity

26   challenge. The invention of the '172 patent provides a unique, simple method of improving the speed

27   and ease of typing on a touchscreen keyboard that is a significant departure from prior art teachings.

28   *See id.* ¶¶ 48-50, 115-126. Thus, claims 18, 19, and 27 are very likely valid. *Id.* ¶¶ 115-126.

## II.  APPLE WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION

Absent preliminary relief, Samsung's continued sale of the Galaxy Nexus during the pendency of this case will inflict substantial and irreparable harm on Apple. The Galaxy Nexus incorporates key patented features, and sales of the Galaxy Nexus, especially to first-time smartphone customers, will permanently reduce Apple's market share in the smartphone market. Such loss of market share constitutes irreparable harm as a matter of law and warrants preliminary relief.[18]

Moreover, the harm to Apple would extend far beyond the loss of market share, and would radiate out in a multitude of other ways, impacting other products and aspects of Apple's business, long into the future. Because these harms cannot even be calculated, Apple cannot later fully be compensated by money damages. For these reasons, too, the harm to Apple would be irreparable.

In fact, this Court recently concluded that Samsung's sale of past Galaxy phones would likely cause injury to Apple that would be both difficult to calculate and possibly unrecoverable. *See* P.I. Order at 32-33. These findings, which the Court concluded "could support a finding of irreparable harm," apply here as well. *Id.* Significantly, while the Court ultimately denied Apple's prior motion because Apple had not shown a nexus between the patented features and irreparable harm, Apple does make that showing in this motion.[19]

### A.  Apple Will Suffer Irreparable Injury in the Form of Long-Term Loss of Market Share Absent a Preliminary Injunction

There is no dispute that the Galaxy Nexus is designed to compete with, *and take sales from,* the iPhone. And it does so by incorporating features that have long been hallmarks of the iPhone. The harm to Apple's market share will be permanent, serious, and irreparable if Samsung continues to sell the Galaxy Nexus.

---

[18]  Notably, even with preliminary relief, Apple will suffer serious and intractable harm, not capable of full compensation later, from the first sale of the infringing Galaxy Nexus until entry of the preliminary injunction. Every day the Galaxy Nexus is sold, Apple's business suffers, and Samsung secures irreversible gains. Thus, while a preliminary injunction is essential to mitigate the irreparable harm to Apple, it will be insufficient to eliminate all of the harm.

[19]  As discussed below, Apple respectfully submits that a showing of nexus is not required under Federal Circuit and Supreme Court precedent, and has appealed this ruling on that basis.

APPLE INC.'S MOTION FOR A PRELIMINARY INJUNCTION
CASE NO.                    16

1    It is well-established that loss of market share to a competitor constitutes irreparable harm.

2    *See Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1151 (Fed. Cir. 2011); *see also 02 Micro*

3    *Int'l Ltd. v. Beyond Innovation Tech. Co.*, No. 2011-1054, 2011 WL 5601460, at *8-9 (Fed. Cir. Nov.

4    18, 2011) (plaintiff had "demonstrated an irreparable injury because it directly competes with

5    [defendant], causing a loss in [plaintiff's] market share"). Indeed, as the Federal Circuit recently

6    explained that a court "commit[s] a clear error of judgment" when it fails to find irreparable harm in

7    the face of "evidence of . . . the parties' direct competition" and "loss in market share and access to

8    potential customers resulting from [the defendant's] introduction of infringing" products. *Robert*

9    *Bosch*, 659 F.3d at 1151.[20]

10    It is also "well-established that the 'fact that other infringers may be in the marketplace does

11    not negate irreparable harm.'" *Robert Bosch*, 659 F.3d at 1151 (quoting *Pfizer, Inc. v. Teva Pharm.*

12    *USA, Inc.*, 429 F.3d 1364, 1381 (Fed. Cir. 2005)). Thus, the fact that there may be other infringing

13    Android devices on the market, sold by other infringers not a party to this proceeding, does not

14    negate the harm to Apple caused by the Galaxy Nexus. *See id.* Indeed, while Apple does in fact have

15    other proceedings pending against other infringers, the law is clear that "a patentee need not sue all

16    infringers at once," and "[p]icking off one infringer at a time is not inconsistent with being

17    irreparably harmed." *Id.* (internal quotation marks and citations omitted).

18    Although "the party seeking an injunction bears the burden of showing lost market share, this

19    showing need not be made with direct evidence." *Id.* at 1154. Rather, Apple need only make "a

20    prima facie showing of lost market share" and is entitled to relief if Samsung proffers insufficient

21    evidence to rebut that showing. *Id.*

22

23    ────────────────

[20]    That is particularly true where, as in the present case, loss of market share will be long-term due

24    to the effects of brand loyalty. *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable*

      *Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) ("[W]hen the failure to grant preliminary relief

25    creates the possibility of permanent loss of customers to a competitor . . . the irreparable injury prong

      is satisfied." (citation omitted)); *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck*

26    *Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) ("In a competitive industry where

      consumers are brand-loyal, we believe that loss of market share is a potential harm which cannot be

27    redressed by a legal or an equitable remedy following a trial." (internal quotation marks and citation

28    omitted)).

1    Here, Apple has made far more than a prima facie showing of harm due to the Galaxy Nexus.

2    Apple has provided a detailed, expert analysis of the smartphone market, demonstrating conclusively

3    that Apple will lose market share to Samsung during the pendency of this case if the Court does not

4    enter a preliminary injunction. *See* Vellturo Decl. ¶ 4.

5    In fact, consistent with this Court's prior ruling, the record establishes that Samsung's

6    infringing Galaxy Nexus products also will cause long-term erosion of Apple's market share. Apple

7    and Samsung are fierce competitors, and have been at least ever since Samsung introduced its first

8    Galaxy smartphone in 2009. *See id.* ¶¶ 9, 20, 22-26. Samsung is now Apple's largest smartphone

9    competitor worldwide and is rapidly becoming its largest smartphone competitor in the U.S. *Id.*

10   ¶¶ 24-25. Samsung also has launched a pervasive ad campaign designed to capture market share

11   from Apple, focusing much less (if at all) on competing Android devices. *Id.* ¶ 26. And Samsung

12   already has seized critical market share from Apple with its unrelenting infringement and prior

13   copycat products                           **REDACTED**

14

15                           *Id.* ¶ 23 & Exh. 29, at 8, 18.

16   Just as Samsung was able to capture and increase critical market share with its prior infringing

17   smartphones, Samsung undoubtedly will do so again now with the new infringing Galaxy Nexus,

18   which independent commentators have characterized as "the most credible competitor to the iPhone

19   so far." *Id.* ¶ 68 & Exh. 101. Absent preliminary relief, sales of the Galaxy Nexus will allow

20   Samsung to take yet more market share from Apple *using Apple's patented and popular technology*

21   *to do so.* Notably, even if Apple's overall market share *increased* while the Galaxy Nexus was sold,

22   lost iPhone sales due to sales of the Galaxy Nexus would result in Apple losing some additional

23   portion of market share that Apple would have enjoyed but for Samsung's infringement.

24   Moreover, given the unique market dynamics now shaping the smartphone industry, Apple's

25   loss of market share due to the Galaxy Nexus will be long-term and largely irreversible. As

26   explained above, consumers most often "stick" with the operating system on their first smartphone,

27   and thus initial smartphone purchases largely determine subsequent purchases (of smartphones and

28   other devices). *Id.* ¶¶ 46-47. Capturing first-time smartphone users, therefore, is critical for both

1    Apple and Samsung to obtain and retain market share. And, because the smartphone market is now

2    in a critical juncture in which most consumers will switch to smartphones—and make their all-

3    important initial smartphone purchases—*during this litigation*, the loss of market share due to sales

4    of the Galaxy Nexus before trial alone will be severe and permanent. *Id.* ¶¶ 72-76.

5        Samsung has built its strategy around these very market dynamics, copying Apple's products

6    (while attacking Apple and its products) in order to lure first-time customers away from Apple,

7    thereby locking them into the Android platform.[21] Samsung knows that any award of damages it

8    might have to pay could not possibly account for the benefit it gains by taking Apple's market share

9    at this critical time, and being able to keep it for the long haul. Apple's permanent loss of market

10   share constitutes irreparable harm precisely because it cannot be calculated or fully compensated.

11       Indeed, as noted above, this Court recently reached many of these conclusions with respect to

12   other Samsung Galaxy phones. Specifically, this Court found that Apple and Samsung compete

13   "particularly in the market for first-time smartphone buyers," and that the "stickiness" described

14   above "discourages" smartphone "purchasers from switching to other brands, [and] creates customer

15   retention that potentially has long term implications for downstream purchases." P.I. Order at 31-32.

16   The court emphasized that initial smartphone selections are critical to long-term market share, stating

17   that the platform loyalty associated with first-time purchases:

18           makes the initial decision regarding which product to purchase even more important
             because the potential customers that Apple loses to Samsung may have long-term
19           effects *that are difficult to calculate and may not be recaptured.*

20   *Id.* at 32 (emphasis added). And, because Apple's market share loss is not only difficult to calculate,

21   but also may not be recoverable, the court concluded that "the evidence presented by both Samsung's

22   and Apple's experts regarding potential lost customers and lost market share, could support a finding

23   of irreparable harm." *Id.* at 33. The same is true here, and warrants temporary relief.

24

25   [21] *See, e.g.*, Vellturo Decl. ¶ 67 & Exh. 23 (*Samsung Is Going Right for Apple Fanboys' Jugular
     *with its Latest Commercial*, Nov. 22, 2011); *id.* Exh. 43 (*Samsung Sees a Bright Future in Smart
26   *Phones*, Tablet Computers, Jan. 7, 2011); *id.* Exh. 98 (*Special Report: Can Samsung Change with the
     *Tech Times?*, Jan. 27, 2011) (noting that Samsung's business model is based on being "the first you'll
27   see in the market with a copycat product," and that "[t]he Galaxy S is an imitation iPhone that runs
28   on Google's Android operating system." (internal quotation marks omitted)).

1    In short, Samsung's sales of the Galaxy Nexus during the pendency of this case will

2 permanently and irreparably injure Apple's market share, necessitating a preliminary injunction.

3       **B.    Apple Will Also Suffer Additional Irreparable Injury in Numerous Respects
              Beyond Loss of Smartphone Market Share**

4
        In addition to the long-term loss of market share, sales of the infringing Galaxy Nexus *just*
5
*during the course of this litigation* would injure Apple in numerous incalculable ways, precluding
6
adequate compensation by money damages. Such an injury would constitute irreparable harm
7
because the harm suffered by Apple "could not be sufficiently compensated by money damages or
8
avoided by a later decision on the merits." *Canon Inc. v. GCC Int'l Ltd.*, 263 F. App'x 57, 62 (Fed.
9
Cir. 2008).
10
        Specifically, given the market dynamics discussed above, harm to Apple would emanate out
11
in many ways beyond initial sales of the Galaxy Nexus, including the following:
12
            1. Galaxy Nexus users will be far *more likely to purchase additional Samsung devices*
13    *in the future*, even if infringing features are removed, instead of iPhones;

14            2. Galaxy Nexus users *will purchase other Android phones* in the future (whether
      infringing or not) made by other manufacturers (such as Motorola or HTC), instead of
15    iPhones;

16            3. Galaxy Nexus users will be *less likely to purchase other iOS devices*, such as the
      iPad or iPod touch, and instead will purchase other Android devices (whether made by
      Samsung or other manufacturers);
17
            4. Galaxy Nexus users will be *less likely to purchase iMacs, MacBooks, and other
18    Apple products* than they would have had they purchased an iPhone;

19            5. Galaxy Nexus users *will not download untold amounts of digital content* (*e.g.*, apps
      and music) to Apple devices because they purchased (and will continue to purchase) Android
      devices instead;
20
            6. Samsung's infringing products such as the Galaxy Nexus will *erode the
21    distinctiveness of, and goodwill associated with, Apple's products*; and

22            7. Apple's entire iOS ecoystem will suffer given "network effects" in the smartphone
      market.

23 Although the impact of these radiating harms is substantial and would be long-lasting, it also would

24 be incalculable, and thus Apple cannot be fully compensated.

25        ***Sales Lost Due to Future Samsung Smartphone Sales.*** Apple would suffer long-term loss of

26 future rounds of Samsung smartphone sales attributable to sales of the Galaxy Nexus. A significant

27 but impossible-to-estimate number of consumers who purchase the infringing Galaxy Nexus instead

28 of iPhones would later purchase new Samsung phones when the time came for them to replace their

1   current phones. It is impossible to calculate with reasonable certainty the damages suffered by Apple

2   with respect to those second and subsequent rounds of smartphone purchases, even though it is

3   incontrovertible that the loss of those sales to Apple would be caused by Samsung's initial

4   infringement during this litigation. *See* Vellturo Decl. ¶¶ 79-82.

5          Moreover, the incalculable harm to Apple caused by infringing sales during this case would

6   continue even *after* Apple prevails in this case. With a permanent injunction in place, Samsung

7   would no longer be permitted to sell devices that infringe the patents asserted in this case.[22] Apple,

8   however, would continue to be harmed even by sales of redesigned, allegedly non-infringing

9   Samsung devices. *Id.* ¶ 79. Having used the infringing Galaxy Nexus to "lock in" consumers to the

10  Android platform during the pendency of this case, Samsung would retain those consumers in the

11  future even when it is forced to remove infringing features. The harm to Apple is the same:

12  incalculable lost sales due to the Galaxy Nexus, resulting in irreparable harm that could not be

13  compensated by an award of damages.

14         ***Sales Lost Due to Future Android Smartphone Sales by Other Manufacturers.*** The long-

15  term harm due to Samsung's infringement would not be limited to the lost future iPhone sales

16  displaced by *Samsung* phone sales. Consumers who purchase a Galaxy Nexus now will become

17  accustomed to the Android platform, and will purchase apps and other devices compatible only with

18  the Android platform. These consumers will be much more likely to purchase other Android models

19  later, even if produced by other manufacturers, such as devices produced by HTC and Motorola. *Id.*

20  ¶ 84. Even though this would "cause additional harm to Apple," *id.*, it would be impracticable for a

21  court to identify with reasonable accuracy which sales of future devices by the entire group of

22  Android-phone producers displaced Apple's future potential sales as a result of the initial purchase of

23  a Galaxy Nexus. Moreover, Apple would have difficulty recovering damages from other Android

24  manufacturers to the extent those manufacturers' phones do not infringe, even though some sales

25

26

27  [22]  Samsung's recidivist pattern of copying Apple's products and infringing Apple's patents suggests
      that even with a permanent injunction, Samsung's future devices will infringe additional Apple
28    patents.

1  would never have been made but for sales of the infringing Galaxy Nexus. Once again, Apple would

2  be indisputably harmed, but the harm would be incalculable.

3       ***Lost Sales of Other iOS products, Such As iPad and iPod touch.*** The irreparable harm from

4  sales of the Galaxy Nexus also would not be limited to lost future smartphone sales, but would extend

5  out to include sales of other Apple iOS products, such as the iPad and iPod touch. Purchasers of the

6  Galaxy Nexus are more likely to purchase additional Android-based devices, now and in the future.

7  *See id.* ¶¶ 87-88. Having grown accustomed to, and purchased apps compatible with, the Android

8  platform, some number of consumers likely will stick with it—and not just for smartphones, but other

9  devices as well, such as tablets. This risk is especially great now that the same version of Android

10  (Ice Cream Sandwich), with its interactive features, will be installed on both smartphones and tablets.

11       As a result, with sales of the infringing Galaxy Nexus, Apple loses not only market share in

12  the smartphone market, but also an untold number of sales in the broader mobile device market. As

13  this Court previously recognized, Apple customers are extremely loyal, and iPhone users are very

14  likely also to use an iPad or iPod touch, which run on the same iOS operating system, support the

15  same apps, and allow for the same innovative, unique, and exceptional user experience. Features that

16  allow different iOS devices to share data and interact with each other (like iCloud) encourage iPhone

17  users to purchase other iOS products. *See id.* ¶¶ 49, 54, 59 & Exhs. 64-65, 89. Sales of the Galaxy

18  Nexus, rather than the iPhone, eliminate sales of these additional iOS devices that would have been

19  made to iPhone users. *Id.* ¶ 88.[23] Although it is a virtual certainty that there will be lost sales of

20  other Apple products closely related to the iPhone attributable to Galaxy Nexus purchases, the

21  amount of damages cannot be determined with sufficient accuracy. *See id.*

22       ***Loss Sales of Other Apple Products, Such As iMacs, MacBooks, and Apple TVs.*** Apple

23  would also lose an incalculable number of sales of iMacs, MacBooks, and Apple TVs due to sales of

24  the Galaxy Nexus. Users of the iPhone are far more likely to purchase these additional Apple

25

26  [23] *See also* Velluro Decl. ¶¶ 4-5. Those are the same consumers who are most likely to purchase

27  related devices such as tablet computers, and their purchase of an Android-based phone will
    incentivize them to purchase non-Apple devices (just as their purchase of an iPhone would have

28  incentivized them to purchase other iOS devices).

1    products.[24]  iPhone users quickly develop a deep appreciation of, and loyalty to, Apple products, and

2    this loyalty strongly incentivizes them to purchase other Apple products.[25]  Consequently, Samsung's

3    initial act of infringement extends beyond lost sales of iPhones and other mobile devices, and would

4    deprive Apple of some unknowable number of future sales of Apple computers.  Vellturo Decl.

5    ¶¶ 91-92.

6          *Lost Sales of Digital Media Tied to Lost Sales of Apple Products.*  Samsung's infringement

7    would also deprive Apple of revenue that it would have earned through consumer purchases via the

8    iTunes Media and App Store on iOS devices.  That lost revenue, too, cannot be fully calculated even

9    though it clearly will be material.

10         Apple designed the iOS platform to facilitate the easy download of apps and media files from

11   the iTunes store, but those services are not as compatible with Android devices.  Revenue derived

12   from these downloads is revenue attributable to the iPhone, iPad, and iPod touch products.

13   Samsung's infringement causes Apple to lose this type of iTunes store revenue because fewer people

14   have iOS devices with which to access those services.  It would not be possible to quantify the total

15   lost revenue associated with these lost downloads attributable to Galaxy Nexus purchases.  *Id.* ¶ 95.

16   Indeed, the harm would extend not just to lost revenue from apps and other downloads that customers

17   might have purchased during the time they were using their Galaxy Nexus phone, but would also

18   include lost revenue during the time they were using their next devices (which would also likely be

19   Android devices).  *Id.* ¶¶ 93-95.  Indeed, because the total number of Apple's sales of iOS devices

20

21   _____

22   [24]  *See* Vellturo Decl. ¶ 91 & Exh. 114 (*Apple's Enterprise Halo: Bausch & Lomb Goes iPhone,
     iPad to Mac Pilots*, Sept. 2, 2011); *id.* Exh. 113 (*Apple Q2 2011: Macs and iPhone Up*, April 20,

23   2011) ("In fact, we are likely seeing the third-generation of 'halo effect,' where first the iPod, then
     the iPhone, and now the iPad increase Mac sales by affection"); *id.* Exh. 115 (*Apple Redefines*

24   *Remote Control—Now, It's Your Cellphone*, Sept. 1, 2010) (noting that only iOS device owners are
     likely to buy Apple TVs); *id.* Exh. 116 (Apple website) ("With AirPlay, you can wirelessly stream

25   what's on your iPhone, iPad, or iPod touch to your HDTV and speakers via Apple TV. Or mirror
     your iPad 2 or iPhone 4S screen . . . .").

26   [25]  Moreover, Mr. Wagner, Samsung's economic expert in the earlier case before this Court,
     admitted that Apple customers have unparalleled brand loyalty. Declaration of Michael Wagner in

27   Opposition to Apple's Motion for a Preliminary Injunction in Case No. 11-cv-01846 ("Wagner

28   Decl.") (D.I. 173) ¶ 73.

1   lost due to Samsung's infringement would be impossible to predict, the total number of lost

2   downloads would also be impossible to fully calculate. *Id.* ¶ 95.

3       ***Harm to Apple Caused by Loss of Goodwill.*** Samsung's infringement would also erode

4   Apple's goodwill. Such loss of goodwill from infringing sales during the pendency of litigation

5   constitutes irreparable harm. *See, e.g., Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir.

6   2008); *AstraZeneca*, 633 F.3d at 1062-63.

7       Based on its history of pioneering innovations and inventions—culminating with some of the

8   most distinctive, imaginative and popular products in the world—Apple has developed enormous

9   goodwill with consumers, and has devoted immense resources to maintaining that goodwill. Velltturo

10  Decl. ¶ 96. By flooding the market with infringing products, Samsung not only steals market share

11  from Apple, but also erodes Apple's hard-earned goodwill. *See id.* ¶¶ 96-98. Samsung's Galaxy

12  Nexus copies key distinguishing features from the iPhone, diluting the critical distinctiveness of

13  Apple's products and goodwill associated with those products. In fact, while Samsung sells products

14  copying the features that make the iPhone distinct, Samsung has simultaneously embarked on an

15  advertising campaign designed to tarnish Apple and mock its consumers for considering Apple's

16  products distinctive and, for that reason, valuable. *Id.* ¶ 98.

17      The harm resulting to Apple's goodwill from Samsung's conduct and infringing products is

18  "virtually impossible to quantify, and is thus irreparable." *Id.* ¶ 98.

19      ***Harm to Apple's "Ecosystem" Due to Network Effects.*** The "network effects" discussed

20  above, through which a smartphone platform becomes more attractive to new customers as its base of

21  existing customers grows, mean that infringing sales of the Galaxy Nexus today and over the

22  pendency of this case will make Apple's later generations of products less attractive to consumers,

23  including first-time smartphone purchasers. Those future purchasers will be drawn toward the

24  platform with the most preexisting users, and with the broadest available range of apps.

25      Indeed, the harm in this case will be particularly acute. Given that the Galaxy Nexus is the

26  flagship phone for the Android platform, as the Galaxy Nexus contributes to the adoption and traction

27  of the Android platform, it will also exacerbate the wide-ranging network effects that, in turn,

28  enhance the appeal of that platform to the detriment of the Apple iOS. As this Court found, such

1    "network effect[s]" constitute "another form of potential lost sales." P.I. Order at 32. Indeed, the

2    resulting additional lost sales of Apple devices as well as apps and other digital content are all

3    impossible to calculate with reasonable certainty, but will be the inevitable result of Samsung's

4    infringement. Vellturo Decl. ¶¶ 82, 86, 88, 94.

### C.    While Not Required, There Is a Clear Nexus Between Samsung's Infringement and the Irreparable Harm to Apple

By establishing that sales of the Galaxy Nexus during this litigation will cause irreparable
harm, Apple has met its burden. *See Winter v. NRDC*, 557 U.S. at 20 (plaintiff need only establish it
"is likely to suffer irreparable harm in the absence of preliminary relief"); *Robert Bosch*, 659 F.3d at
1149.

In the earlier case involving the parties, however, this Court denied Apple's motion for a
preliminary injunction in part because it held that Apple was *also* required (but failed) to establish
that the patented features are "necessary to, or a core functionality of, the products" at issue, and
drive consumers' purchases. P.I. Order at 63-64. Apple respectfully disagrees with that "nexus"
requirement, which is the subject of Apple's appeal to the Federal Circuit. *See* Fed. Cir. Appeal No.
2012-1105. As explained in Apple's brief on appeal, well-established precedent of the Supreme
Court and the Federal Circuit requires a party seeking a preliminary injunction to show *only* that in
the absence of preliminary relief sales of infringing *products* (not the patented *features*) will cause
irreparable harm. *See* Apple's Opening Brief at 46-47.

Nor do the cases cited by this Court support a nexus requirement. For example, although this
Court cited Justice Kennedy's concurrence in the *eBay* case, Justice Kennedy actually addressed *non-practicing entities* that use patents (sometimes covering trivial features) to extract licensing
payments. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 396-97 (2006) (Kennedy, J.,
concurring). Justice Kennedy explained that such non-practicing entities may not be irreparably
harmed considering that all they want is money in the first place, and so can be compensated by
money damages later:

> For these firms, an injunction . . . can be employed as a bargaining tool to charge
> exorbitant fees to companies that seek to buy licenses to practice the patent. When
> the patented invention is but a small component of the product the companies seek to
> produce and the threat of an injunction is employed simply for undue leverage in

negotiations, legal damages may well be sufficient to compensate for the infringement and an injunction may not serve the public interest.

*Id.* Here, of course, Apple sells products embodying its patents, and Samsung is aggressively seeking to steal market share away from Apple by using Apple's patented technology and copying Apple's products.[26] Injunctions also have long been available even in cases where the patented features were far from "core" to the overall accused product. *See, e.g., i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831 (Fed. Cir. 2010) (affirming an injunction in a case involving a little-used XML editing feature embedded in Microsoft Word).[27]

In any event, even if a "nexus" requirement were applied here, Apple would satisfy it. The patents at issue in this motion relate to core functionalities of the Galaxy Nexus and are very likely to drive consumer purchasing decisions. The patents cover important features that enable the "smart" behavior of cutting-edge smartphones that have helped make Apple's products successful. Samsung

---

[26]   Similarly, the other decisions that this Court relied upon do not require a feature-specific showing of nexus. In *Commonwealth Scientific and Industrial Research Organization v. Buffalo Technology Inc.*, 492 F. Supp. 2d 600 (E.D. Tex. 2007), the plaintiff was a non-practicing entity who could not establish lost sales or market share, and yet the court granted injunctive relief anyway—suggesting at most that nexus can weigh *in favor* of a finding of irreparable harm, not that a lack of nexus *forecloses* a finding of harm.  In *Quad/Tech. Inc. v. Q.I. Press Controls B.V.*, 701 F. Supp. 2d 644, 657 (E.D. Pa. 2010), the plaintiff did not practice its patents, and the district court denied relief because it found an "absence of any evidence of lost sales or business" to the plaintiff of its own non-patented products.  In *z4Technologies, Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 441 (E.D. Tex. 2006), the harm was calculable and thus not irreparable.  And in *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976 (9th Cir. 2011), there was no harm at all.  In its responsive appellate brief, Samsung also cites two post-*eBay* opinions that Samsung claims denied injunctions for lack of nexus.  But Samsung is again incorrect.  In *Humanscale*, the court found no irreparable harm because the plaintiff "ha[d] not provided evidence showing that it will lose sales" if an injunction were denied—just the opposite of the situation here—and because the patents-in-suit were about to expire anyway, such that "the infringing activity will necessarily end within six weeks." *Humanscale Corp. v. CompX Int'l, Inc.*, 2010 WL 1779963, at *4 (E.D. Va. Apr. 29, 2010).  And in *Hynix v. Rambus*, the court did not deny an injunction on nexus grounds, but rather largely because the plaintiff was a non-practicing entity who could not make the showing of lost sales that Apple has made here. *See Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 981-84 (N.D. Cal. 2009) (holding that Rambus "will not lose sales or market share of the different generations of accused memory devices because Rambus does not make or sell such products," and instead could claim only a "slight irreparable harm" in the form of "the loss of a possible design win" for a marginal supplier, such that "the weight of such harm is small").

[27]   To the extent an infringer like Samsung truly believes that a patented feature is minor or unimportant, that fact, if anything, may weigh in favor of an injunction, because it suggests the infringer would not suffer undue hardship having to remove it.

---

APPLE INC.'S MOTION FOR A PRELIMINARY INJUNCTION
CASE NO.                                                                                    26

1 | knows this, and has incorporated these features into the Galaxy Nexus precisely because they are core

2 | functionality and will enable Samsung to gain market share by misappropriating Apple technology.

3 |     *Unified Search and Siri.* Samsung has incorporated the unified search features of the '604

4 | patent into the Galaxy Nexus because Samsung knows that these features have been highly valued by

5 | consumers, as demonstrated by the reception of this feature when Apple first introduced it along with

6 | the iPhone 4S. With the release of this phone, Apple again revolutionized the interface between

7 | human and phone by introducing Siri, a computerized personal assistant. Using the invention of the

8 | '604 patent, Siri can exhibit sophisticated, context-sensitive behavior by searching through many

9 | different sources of information (*e.g.*, calendar appointments, contacts, and web search results) to

10 | provide the particular information sought by an iPhone user. *See* Polish Decl. ¶¶ 13, 77-78

11 | (explaining how Siri incorporates features claimed in the '604 patent).

12

13

14

15

16 | **REDACTED**

17

18

19

20

21 |     Likewise, reviews of the iPhone 4S in the media have confirmed that the Siri feature, enabled

22 | by the '604 patent, is an important driver of consumer demand. For example, one review by a

23 | popular technical publication states that "Siri is the reason people should buy this phone."[31] Another

24 | widely-read review touts Siri as "[t]he standout feature" of the iPhone 4S, and explains that Siri is so

---

[28] Rangel Decl. Exh. 3, at 26
      *see also* Vellturo Decl. ¶ 44.       **REDACTED**

[29] Rangel Decl. Exh. 3, at 27.

[30] *Id.* at 31.

[31] Vellturo Decl. Exh. 50 (*Review: With Siri, iPhone Finds Its Voice*, Oct. 12, 2011).

1    astonishing that it "has to be tried to be believed."[32]  Yet another article calls Siri "the biggest

2    technological leap forward Apple ha[s] ever given us."[33]

3          Samsung is infringing the '604 patent by using the patented unified search to allow users to

4    search across sources including contacts and the web via a single interface, depriving Apple of its

5    exclusive right to reap the benefit of this invention through Siri.  The '604 patent, thus, covers a "core

6    functionality" and will drive consumer demand.

7          **_Linking Structures to Actions._**  The '647 patent covers yet another core portable-device

8    technology that, like the inventions described above, has been key to Apple's success.  The '647

9    patent, entitled "System and Method for Performing an Action of a Structure in Computer-Generated

10   Data," allows devices to recognize certain structures within documents such as web pages, and link

11   those structures to certain user-selectable actions.  For example, when a smartphone user comes

12   across a telephone number in a web page, the invention of the '647 patent allows the user to call the

13   number, or add it to the user's contacts database, merely by tapping on the number.

14         This invention is a "core technology" of Apple's iOS devices, and (as misappropriated by

15   Samsung) also of the Galaxy Nexus, in that it links—both literally and figuratively—the computer

16   side of these devices to the communication side, yielding synergistic performance that would not

17   have been possible on an ordinary phone or computer.  _See_ Mowry Decl. ¶¶ 21, 84-87 (explaining

18   how iOS devices incorporate features claimed in the '647 patent).  In other words, the '647 patent

19   helps put the "smart" in smartphone.  Users no longer have to remember a phone number as they

20   come across it, nor write it down nor even dial it into the phone.  They can instead simply tap on the

21   number to place a call or save it into memory

22

23

24                              **REDACTED**

25

26

27   [32]  _Id._ Exh. 51 (_The iPhone Finds Its Voice_, Oct. 11, 2011).

28   [33]  _Id._ Exh. 119 (_Is Siri Steve Jobs' Greatest Legacy?_, Oct. 9, 2011).

**REDACTED**

1    The invention of the '647 patent lies right at the intersection of these selling

2   points.

3    *Apple's Touchscreen User Interface.* The features claimed in the '172, and '721 patents

4   form part of the critically acclaimed touchscreen user interface at the core of Apple's iOS technology

5   and provide the ease of use and intuitive design that is the hallmark of Apple products. The word-

6   suggestion invention of the '172 patent helps make the iPhone's touchscreen user interface

7   remarkably easy to use, as it allows users to type on the touchscreen quickly (by automatically

8   completing words) and accurately (by correcting misspellings). *Id.* ¶¶ 104-109, 175. Likewise, the

9   "slide to unlock" feature protected by the '721 patent—which allows a user to "unlock" his or her

10  device simply by sliding a finger to drag an image across a portion of the screen—is very well known

11  and associated with the way the iPhone and other iOS devices operate, as evidenced by the fact that

12  Apple has repeatedly highlighted this feature in its advertising. *See* Sinclair Decl. ¶¶ 6-7;

13  Balakrishnan Decl.¶¶ 47, 102-104.

14   Both of these user-interface inventions are very important to the success of Apple's devices

15  and to Samsung's efforts to misappropriate that success. Indeed, Samsung's choice to infringe these

16  patents—even implementing Apple's iconic "slide to unlock" method as the default unlock method

17  on the Galaxy Nexus—shows a conscious attempt to mimic the iOS interface. Samsung knows that

18  consumers who are choosing a new phone want a fun, easy-to-use touchscreen interface like the one

19  Apple provides,[35] and that these patented features are an integral part of that interface. Thus it is

20  clear that Samsung's continued infringement of the '172 and '721 patents would contribute directly

21  to the irreparable harm that would befall Apple if the Court does not grant injunctive relief now.

22                              *            *            *

23   In short, absent preliminary relief, sales of the Galaxy Nexus during this litigation will

24  immediately, seriously, and irreparably harm Apple.

25

26

27  [34]   Rangel Decl. Exh. 1, at                **REDACTED**

28  [35]   *See, e.g.,* Vellturo Decl. ¶¶ 6-7, 42-43, 45.

III.   **THE BALANCE OF HARDSHIPS STRONGLY FAVORS A PRELIMINARY INJUNCTION**

The irreparable harm to Apple's domestic industry absent preliminary relief far outweighs any potential harm to Samsung, which willfully infringes Apple's patents. The balance of hardships, thus, strongly favors entry of a preliminary injunction.

The Federal Circuit has recognized that where a strong showing of irreparable harm and likelihood of success exists, the balance of the hardships favors the patentee. *See, e.g., Celsis In Vitro, Inc. v. CelizDirect, Inc.,* -- F.3d --, 2012 WL 34381, *8 (Fed. Cir. 2012); *PPG Indus., Inc. v. Guardian Indus. Corp.,* 75 F.3d 1558, 1567 (Fed. Cir. 1996). Apple is highly likely to succeed in this case, and, absent preliminary relief, will be irreparably and seriously harmed by Samsung's infringement. Indeed, as the Federal Circuit recognized in *Robert Bosch*, Apple suffers "substantial hardship" by having to "compete against its own patented invention." *Robert Bosch*, 659 F.3d at 1156.

In contrast, Samsung will not suffer any legitimate hardship. Any harm to Samsung stems from its own conscious choice to craft its business plan on a strategy of infringement, and thus does not outweigh the harm to Apple. "Simply put, an alleged infringer's loss of market share and customer relationships . . . does not rise to the level necessary to overcome the loss of exclusivity experienced by a patent owner due to infringing conduct." *Pfizer*, 429 F.3d at 1382.[36] The "commercial success" of Samsung's infringing products also is not a legitimate consideration; Samsung "is not entitled to continue infringing simply because it successfully exploited its infringement." *i4i*, 598 F.3d at 863 (citations omitted); *see also Robert Bosch*, 659 F.3d at 1156 ("A party cannot escape an injunction simply because its primary product is an infringing one."). Nor is it relevant that Samsung might have to expend resources to redesign its products to remove the

---

[36]   Although the Court determined that the balance of the hardships favored Samsung in the last case, the reasoning behind that decision does not apply here, because the Court based that determination in part on the Court's finding that Apple did not demonstrate *both* a likelihood of success on the merits *and* irreparable harm for any one of the four patents at issue in that motion. P.I. Order at 37-38, 50, 65. That is not so here because Apple has demonstrated a likelihood of success, irreparable harm, and a strong nexus with respect to all of the asserted patents.

1    infringing functionality; such expenditures are "irrelevant" because they are "consequences" of

2    Samsung's decision to use Apple's patented technology in the first place. *Id.*

3        Given "[t]he magnitude of the threatened injury" to Apple and "the strength of the showing of

4    likelihood of success" by Apple, the balance of hardships strongly favors preliminary relief. *H.H.*

5    *Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed. Cir. 1987), *overruled on other*

6    *grounds Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995).

7    **IV.    THE PUBLIC INTEREST SUPPORTS A PRELIMINARY INJUNCTION**

8        The public interest also would be advanced by, and strongly militates in favor of, a

9    preliminary injunction. In contrast, no public interest considerations weigh against temporary relief.

10        As discussed above, Apple would suffer myriad harms from Samsung's unfair conduct. The

11    public suffers, too, from Samsung's disregard of Apple's innovation and legal rights. Indeed,

12    Samsung launched its infringing Galaxy Nexus device just two weeks *after* this Court determined

13    that its prior devices likely infringed Apple patents and that Apple was likely to suffer irreparable

14    harm as a result of Samsung's infringement. Samsung's serial infringement and disregard of Apple's

15    rights also does violence to the public's strong interest in promoting innovation and protecting

16    intellectual property rights. The public interest is served by rewarding Apple's innovation, not

17    Samsung's imitation.

18        Indeed, public policy strongly favors preliminary relief here because Apple has established a

19    likelihood of success on the merits. *See Abbott Labs. v. Andrx Pharm., Inc.*, 452 F.3d 1331, 1348

20    (Fed. Cir. 2006) ("Although the public interest inquiry is not necessarily or always bound to the

21    likelihood of success on the merits, in this case absent any other relevant concerns, we agree with the

22    district court that the public is best served by enforcing patents that are likely valid and infringed.");

23    *see also Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1363 (Fed. Cir. 2008) ("The patent laws

24    promote . . . progress by offering a right of exclusion for a limited period as an incentive to investors

25    to risk the often enormous costs in terms of time, research, and development." (citation omitted)).

26        Not only will preliminary relief advance the public interest, but there is no "critical public

27    interest that would be injured by the grant of preliminary relief." *Hybritech, Inc. v. Abbott Labs.*, 849

28    F.2d 1446, 1458 (Fed. Cir. 1988) (footnote omitted). Smartphones are widely available consumer

1  electronics, and there is no public health or safety issue implicated by an injunction. Moreover, there

2  are many competing devices that could more than adequately satisfy the demand for smartphones,

3  including Apple's own iPhones. *See, e.g., Acumed LLC v. Stryker Inc.*, 551 F.3d 1323, 1331 (Fed.

4  Cir. 2008) (considering existence of non-infringing alternatives in the marketplace). A preliminary

5  injunction against the Galaxy Nexus presents no threat of any kind to any public interest.

6  **CONCLUSION**

7  For the foregoing reasons, Apple respectfully requests that this Court grant Apple's motion

8  for a preliminary injunction.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Dated:  February 8, 2012                    GIBSON DUNN & CRUTCHER LLP

2

3                                                By: _____

4                                                     H. Mark Lyon

5                                                *Attorneys for Plaintiff Apple Inc.*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28