ORIGINAL

1  JOSH A. KREVITT (CA SBN 208552)          MICHAEL A. JACOBS (CA SBN 111664)
   jkrevitt@gibsondunn.com                   mjacobs@mofo.com
2  H. MARK LYON (CA SBN 162061)             RICHARD S.J. HUNG (CA SBN 197425)
   mlyon@gibsondunn.com                      rhung@mofo.com
3  GIBSON, DUNN & CRUTCHER LLP              MORRISON & FOERSTER LLP
   1881 Page Mill Road                       425 Market Street
4  Palo Alto, CA  94304-1211                San Francisco, California 94105-2482
   Telephone: (650) 849-5300                 Telephone: (415) 268-7000
5  Facsimile: (650) 849-5333                 Facsimile: (415) 268-7522

6

7

8  *Attorneys for Plaintiff Apple Inc*

FILED
RECEIVED

FEB - 8 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                  SAN JOSE DIVISION

12

13

14  APPLE INC., a California corporation,        CASE NO. 12-cv-

        Plaintiff,                          **DECLARATION OF CHRISTOPHER
15                                           VELLTURO, PH.D.**
        v.
16                                           **REDACTED PUBLIC VERSION**
    SAMSUNG ELECTRONICS CO., LTD., a
17  Korean corporation; SAMSUNG             **Hearing:**
    ELECTRONICS AMERICA, INC., a New        Date:
18  York corporation; and SAMSUNG           Time:
    TELECOMMUNICATIONS AMERICA,             Place:
19  LLC, a Delaware limited liability company,  Judge:

        Defendants.
20

21

22

23                  Volume 1 of 3

24

25

26

27

28

DECLARATION OF CHRISTOPHER VELLTURO,        HIGHLY CONFIDENTIAL –
Ph.D.  – CASE NO. 12-cv-                     ATTORNEYS' EYES ONLY



## I.   OVERVIEW AND SUMMARY

1.   I am the founder and president of Quantitative Economic Solutions, LLC, an economic consulting firm. I also teach economics and business strategy at the Graduate School of Management at Boston University. I received a Doctor of Philosophy degree (Ph.D.) in Economics from the Massachusetts Institute of Technology in Cambridge, Massachusetts in 1989.

2.   I have extensive experience in the valuation of intellectual property, including patents relating to telecommunications products and digital media products and services. More generally, I have studied digital media and telecommunications issues for more than 25 years along a variety of dimensions. Among my principal areas of research is the concept of differentiated products (products with similar but not identical product positioning) and the nature of competition between such products. A copy of my *curriculum vitae*, which identifies all of my publications as well as my deposition and trial testimony over the past four years, is provided as Attachment A to this Declaration.

3.   I was asked by counsel for Apple, Inc. ("Apple") to consider the likely economic outcomes for Apple if Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively "Samsung"), were permitted, absent the entry of a preliminary injunction ("PI"), to continue to import into the U.S., offer to sell, and sell a "smartphone" called the "Galaxy Nexus" during the pendency of this lawsuit, which I understand is likely to conclude sometime in 2013. As explained below, I understand the Galaxy Nexus to be a high end wireless smartphone that utilizes the newest version of Google's Android operating system, called "Ice Cream Sandwich."[1]  I further understand that Apple alleges the Galaxy

---

[1] *See, e.g.*, Exh. 1 (Hayley Tsukayama, *Galaxy Nexus Debuts with Ice Cream Sandwich, Facial Recognition*, Wash. Post, Oct. 19, 2011,

*(Cont'd on next page)*

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX                    1

Gibson, Dunn &
Crutcher LLP

Nexus infringes several of its patents. Furthermore, as I also explain below, based on information I have reviewed, it appears that Samsung and the Galaxy Nexus compete directly with Apple's iPhone products.

4.      I find that, absent the entry of a PI, the continued importation and sale after importation, through 2013, of the Galaxy Nexus will cause substantial and irreparable harm to Apple. More specifically, I find that, absent a PI, the following economic outcomes resulting from Samsung's importation, offer for sale, and sales of the Galaxy Nexus during the pendency of this lawsuit will likely occur, each of which is significantly difficult to measure reliably and thus compensate for through monetary damages:

- Sales of Apple's products during the period when Samsung's accused devices are sold will be substantially lower absent a PI, which will result in a loss of share to Apple during the pendency of this case;

- Due to the significance for market position of customer loyalty and network effects relating to smartphones and associated products, Apple would, upon the issuance of an injunction at the conclusion of this case, be unable to achieve the marketplace position it would have obtained in the presence of a PI. This additional harm would exist well into the future. These network effects, moreover, will cause harm that will radiate outward from just sales of products to include, for example, diminished incentive for software developers to support the smaller base of Apple smartphones and diminished incentive and funds for Apple to invest further in its products;

---

*(Cont'd from previous page)*

http://www.washingtonpost.com/business/technology/galaxy-nexus-debuts-with-ice-cream-sandwich-facial-recognition/2011/10/19/gIQA3gkWxL_story.html).

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-XXXXX-XXX            2

- Because of the demand complementarities between smartphones and related products, as well as the long-term effects associated with the loss of share in smartphones, there will be additional, incalculable harm to Apple in the form of both immediate and long-term reduced sales and profits with respect to related aspects of its business, including sales of digital media, applications and other devices/computers; and

- There will be further additional harm to the goodwill associated with Apple's products.

For these reasons, I find that Apple will sustain substantial and irreparable harm if Samsung is permitted to continue to import, offer to sell, and sell its Galaxy Nexus smartphone throughout the pendency of this lawsuit. At least in part, the incalculability associated with this irreparable harm arises because such harm would not be limited to the time Samsung was permitted to sell the Galaxy Nexus, but would also continue after the withdrawal of such devices (and even after a permanent injunction barring further infringement). While certain aspects of these damages may be calculated as they relate to actual sales of the Galaxy Nexus during the pendency of the case, a reliable calculation of long-term harm to Apple is, in my opinion, infeasible.

5.      There are several unique characteristics and conditions relating to: 1) the dynamics of the smartphone marketplace over the coming 18-24 months (and the implications such dynamics have for the future); 2) the form of competition presented by Samsung through its Galaxy Nexus within this critical phase; and 3) the dynamics of the related digital media and other device marketplaces, that render a fully compensatory assessment of harm to Apple infeasible along several key dimensions, and thus irreparable. I provide a comprehensive consideration of these characteristics and conditions below. At a broad level, they include:

- The smartphone marketplace is at a critical "inflection point" where large numbers of customers will be selecting their smartphone platform for the first time in the next 18-24 months;

- The smartphone marketplace is characterized by strong consumer "stickiness"/loyalty, wherein customers are highly likely to retain their existing smartphone platform through multiple subsequent purchases; these dynamics have entered a stage of critical impact on long run aspects of the smartphone marketplace, and their likely long-term ramifications are unknown and highly uncertain;

- The smartphone marketplace has lasting network effects – that is, a greater installed base of customers for one platform generates stronger incentives for other customers to join or shift to that platform – which means gains or losses of shares are long lasting and difficult to reverse, and these long-term impacts are difficult to quantify;

- Samsung's current position in the smartphone marketplace and apparent strategy (size of position, product strategy, products in waiting) render it particularly suited to inflict substantial and irreparable harm on Apple with the introduction (and continued sales over the period of this lawsuit) of the Galaxy Nexus smartphone, particularly since Samsung is the first Android-based smartphone manufacturer to offer the newest Android operating system, which, among other things, now offers interoperability across Android devices (*e.g.*, between an Android smartphone and Android-based tablets);

- This harm will extend to other related Apple products and services – most notably Apple's digital media, applications ("apps"), and related hardware businesses. The relationship between the smartphone and tablet industries generally (and the apps and

other products and services that support those industries), on the one hand, and iOS

devices such as iPod touches, on the other, is unknown and will become only more so

in the future.  This uncertainty increases, moreover, as one considers other products

associated with the iOS products, such as Apple's Macintosh computers.  The

uncertainty and incalculability associated with this harm arises because this harm

extends beyond just the immediate lost sales, which may be calculated in part, but also

includes sales well into the future in an unpredictable manner.

## II.  GENERAL FACTS RELATED TO THIS CASE AND MY ANALYSIS

### A. Apple's iPhone and Related Products

6.     The iPhone, first introduced by Apple in 2007, revolutionized mobile phones:  "As we

look toward the future of mobile, it's important to remember how quickly and completely things can

change. There's no better example of that than Apple's iPhone introduction in 2007, which totally

flipped the mobile industry upside down. It changed everything about phones, forever, at a crucial

point in their development."[2]  Apple's first generation iPhone, which ran the iOS operating system,

was user-friendly, intuitive and distinctive in how users interacted with the device.[3]

---

[2] Exh. 2 (Dan Frommer, *History Lesson: How the iPhone Changed Smartphones Forever*, Bus. Insider, June 6, 2011, http://www.businessinsider.com/iphone-android-smartphones-2011-6); *see also* Exh. 3 (Larry Magid, *Looking Back to the First Apple Mac*, San Jose Mercury News, Jan. 26, 2009); Exh. 4 (Charles Arthur, *Voice Recognition: Has It Come of Age?*, The Guardian, Nov. 20, 2011, http://www.guardian.co.uk/technology/2011/nov/20/voice-recognition-apple-siri) ("It's taken almost five years, but now multi-touch screens are everywhere . . ."); Exh. 5 (Chris Gaylord, *Steve Jobs Preparing to Revolutionize the Newspaper Business?*, Christian Sci. Monitor, Sept. 15, 2010, http://www.csmonitor.com/Innovation/2010/0915/Steve-Jobs-preparing-to-revolutionize-the-newspaper-business) ("iPhones changed cellphones forever"); Exh. 6 (Peter Burrows and Roger O. Crockett, *Turning Cell Phones on Their Ear*, BusinessWeek (Jan. 22, 2007), http://www.businessweek.com/print/magazine/content/07_04/b4018053.htm?chan=gl) (noting that the iPhone "is delivering the phone industry a wake-up call," and that it "should scare the daylights out of phone makers").

[3] *See, e.g.*, Exh. 7 (Walter S. Mossberg & Katherine Boehret, *Testing Out the iPhone*, Wall St. J., June 27, 2007, http://online.wsj.com/article/SB118289311361649057.html) ("'[S]mart phones' have
*(Cont'd on next page)*

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX          5

Gibson, Dunn &
Crutcher LLP

1

2

3

4

5

6

7

8

7.     In subsequent generations of the iPhone, Apple continued to develop novel and desirable features that captivate consumers and make the iPhone a device that is fun and easy to use for consumers.[4] I understand that the technology associated with the Asserted Patents (described below) in this matter, when incorporated into a smartphone, makes possible many such features and that they are an important contributor to the success of the products.  I also understand that Apple

9

*(Cont'd from previous page)*

10

11

12

13

14

15

16

17

18

19

20

21

had lousy software, confusing user interfaces and clumsy music, video and photo playback. And their designers have struggled to balance screen size, keyboard usability and battery life. . . . [T]he iPhone is, on balance, a beautiful and breakthrough handheld computer."); Exh. 8 (Lev Grossman, *Invention of the Year: The iPhone*, Time, Nov. 1, 2007, http://www.time.com/time/specials/2007/article/0,28804,1677329_1678542_1677891,00.html) (referring to the iPhone as "the phone that has changed phones forever" based on five reasons: (1) "The iPhone is pretty," (2) "It's touchy-feely," (3) "It will make other phones better," (4) "It's not a phone, it's a platform," and (5) "It is but the ghost of iPhones yet to come"); Exh. 9 (David Pogue, *The iPhone Matches Most of Its Hype*, N.Y. Times, June 27, 2007, http://www.nytimes.com/2007/06/27/technology/circuits/27pogue.html?pagewanted=2&_r=1&hp) ("[T]he iPhone is still the most sophisticated, outlook-changing piece of electronics to come along in years."); *see also* Exh. 10 (John Markoff, *Apple, Hoping for Another iPod Introduces Innovative Cellphone*, N.Y. Times, Jan. 10, 2007) at C6 ("[I]t was the ability to fuse [music player, camera, Web browser and e-mail tool as well as phone] with a raft of innovations and Apple's distinctive design sense that had the crowd here buzzing."); Exh. 11 (Jon Swartz, *Apple Unveils All-in-One iPhone: Combines Net, Music, Phone*, USA Today, Jan. 10, 2011) at 1 ("New technology, called Multi-Touch, lets consumers use their fingers to make calls, play content and troll the Web."); Exh. 12 (Li Yuan & Pui-Wing Tam, *Apple Storms Cellphone Field*, Wall St. J., Jan. 10, 2007) at A3 ("[T]he iPhone . . . allows users to download and play iTunes music, browse the Web, send email and make calls."). Moreover, consumer surveys at the time reflected the high demand for Apple's new offering. *See, e.g.*, Exh. 13 (Kelly Hill, *Apple's Show; AT&T's Details*, RCR Wireless News, June 18, 2007) at 1 (Mark Donovan, senior VP and senior analyst at M:Metrics observed that the "latent demand" for the iPhone "is something I don't think we've ever seen before.").

22

23

24

25

26

27

[4] Exh. 14 (John Cox, *Survey: iPhone 4S Owners Are Very Satisfied with the Device*, Network World, Dec. 1, 2011, http://www.macworld.com/article/163965/2011/12/survey_iphone_4s_owners_are_very_satisfied_with_the_device.html#lsrc.rss_main) ("Apple's bet on Siri has paid off: . . . it is the best-liked feature of the new phone. Siri was ranked as the best-liked feature by 49 percent of these owners."); *see also* Exh. 15 (*Apple Announces iPhone 4 Sold 1.7 Million in First Three Days*, AppleInsider (June 28, 2010), http://www.appleinsider.com/articles/10/06/28/apple_announces_iphone_4_sold_1_7_million_in_first_three_days.html) (reporting that it took Apple 74 days to sell 1 million units of the iPhone in 2007, but only 3 days to sell 1 million units of the iPhone 3G and only 3 days to sell 1.7 million units of the iPhone 4).

28

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX          6

Gibson, Dunn &
Crutcher LLP

highlights many of these features in its television advertisements and that Apple utilizes this patented technology in the iPhone.[5]

8.    Apple expanded the iPhone experience to a broader family of devices with the development of its latest generation of the iPod – the iPod touch (first released in 2007) – and the iPad (first released in 2010). These devices also run the iOS operating system and include many of the patented features that make these devices so distinctive.[6]  Since all of these devices use the same operating system, they create a seamless integration of a user's content and experience across devices.[7]

**B. Samsung's Galaxy Nexus Smartphone**

9.    Samsung released the first Galaxy smartphone in 2009.[8]  I understand that Apple contends that the Samsung Galaxy smartphone infringes several Apple patents.  I also understand that Samsung's latest smartphone model, the Galaxy Nexus, which Samsung recently began selling in the

---

[5] *See generally* Declaration of Steven Sinclair (Feb. 6, 2012) ("Sinclair Decl.").

[6] *See, e.g.,* Exh. 16 (Walter S. Mossberg, *Laptop Killer? Pretty Close*, Wall St. J., Apr. 1, 2010, http://online.wsj.com/article/SB10001424052702304252704575155982711410678.html) ("After spending hours and hours with [the iPad], I believe this beautiful new touch-screen device from Apple has the potential to change portable computing profoundly, and to challenge the primacy of the laptop. It could even help, eventually, to propel the finger-drive, multitouch user interface ahead of the mouse-driven interface that has prevailed for decades."); Exh. 17 (Dylan Tweney, *Why We Are Obsessed with the iPad,* Wired.com (Apr. 1, 2010), http://www.wired.com/gadgetlab/2010/04/apple-ipad-hands-on/) ("[T]here's something seriously different about Apple's tablet. . . . It's basically a screen. . . . On top of that, the screen is the most responsive touchscreen display I've ever had my hands on.").

[7] Interoperability has proven to be a significant factor in consumer purchasing decisions. *See, e.g.,* Exh. 18 (Chloe Albanesius, *Smartphone Loyalty Runs Deep, Especially Among the Apple Faithful.* PCMag.com (Nov. 25, 2011), http://www.pcmag.com/article2/0,2817,2396879,00.asp) ("About 72 percent of smartphone owners, meanwhile, felt that it was important that they could access all their content on different devices, like tablets and PCs. That jumps to 80 percent among those who own a tablet, PC, and smartphone.").

[8] *See* Exh. 19 (Samsung, *Samsung Launches I7500, the Company's First Android-Powered Mobile Phone,* Apr. 27, 2009, http://innovator.samsungmobile.com/bbs/tech/view.do?boardId=4&messageId=17461).

DECLARATION OF CHRISTOPHER VELLTURO, Ph.D. – CASE NO. 12-cv-XXXXX-XXX                7

U.S., through at least cellphone carrier Verizon,[9] includes a number of infringing features[10] and is the first Android smartphone to use an operating system that will allow the phone to be interoperable with other Android-based devices, such as tablets running the Android Ice Cream Sandwich operating system.[11]

## C. The Asserted Patents and Product Features They Cover

10.    I understand that Apple has based its motion on four of the patents asserted in this matter. In this subsection, I briefly describe my understanding of these patents and the features that they cover, which is based on my review of the declarations of Apple's technical experts.[12]   I understand that many of the patents at issue in this case relate directly to the distinctive Apple user interface and user experience, which has become closely associated with Apple and its innovations, or are otherwise important to the performance of the devices.[13]   I understand that the technology of these patents, individually and collectively, is extremely valuable to Apple, and that the infringing features and functions found in the Galaxy Nexus are also found in Apple's iPhone, iPod touch, and/or iPad2, which practice the Asserted Patents.[14]

11.    For the purposes of my analysis, I have assumed that the patents-in-suit are enforceable and not invalid.

---

[9] See Exh. 20 (Galaxy™ Nexus™ By Samsung Now Available On The Verizon Wireless 4G LTE Network, Dec. 15, 2011, http://news.verizonwireless.com/news/2011/12/pr2011-12-14m.html).

[10] Expert Declaration of Dr. Nathaniel Polish Concerning U.S. Patent No. 8,086,604, Feb. 7, 2012 ("Polish Decl."), ¶ 13; Expert Declaration of Dr. Ravin Balakrishnan Concerning U.S. Patent No. 8,046,721, Feb. 7, 2012 ("Balakrishnan Decl."), ¶ 44; Expert Declaration of Dr. Todd C. Mowry Concerning U.S. Patent No. 5,946,647, Feb. 7, 2012 ("Mowry Decl."), ¶ 21; Expert Declaration of Dr. Karan Singh Concerning U.S. Patent No. 8,074,172, Feb. 8, 2012 ("Singh Decl."), ¶ 39.

[11] See Exh. 21 (Emily Price, Ice Cream Sandwich: What to expect from Android 4.0, USA Today, Dec. 19, 2011, http://www.usatoday.com/tech/products/story/2011-12-19/google-android-ice-cream-sandwich/52075012/1).

[12] Polish Decl.; Balakrishnan Decl.; Mowry Decl.; Singh Decl.

[13] See, e.g., Sinclair Decl. ¶¶ 6-10.

[14] Polish Decl., ¶ 13; Balakrishnan Decl., ¶ 44; Mowry Decl., ¶ 21; Singh Decl., ¶ 39.

Gibson, Dunn &
Crutcher LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12. United States Patent No. 5,946,647, issued on August 31, 1999, is entitled "System and Method for Performing an Action on a Structure in Computer-Generated Data" ("the '647 patent").[15] I understand that the '647 patent issued from United States Patent Application No. 08/595,257, filed on February 1, 1996.[16]  I understand that this patent is generally directed to the feature that allows devices to recognize certain structures within documents and link those structures to certain user-selectable actions.  One example might include pressing on a phone number in a web page to call the number.[17]

13.    United States Patent 8,086,604, issued on December 27, 2011, is entitled "Universal Interface for Retrieval of Information in a Computer System," ("the '604 patent").[18]  The '604 patent dates back to an application filed on January 5, 2000.[19]  I understand that this patent is generally directed to a unified search that permits the use of a single search interface to search multiple sources of information, both on the device and on the Internet.  It allows a computer user "to find a needed or desired item of information from among all different types of information storage systems," through use of "a single . . . interface."[20]  I also understand that, as part of the "Siri" personal assistant that Apple introduced in the iPhone 4S, this feature is used to allow users to request information through their iPhone in a single unified search.[21]

---

[15] U.S. Patent No. 5,946,647 (filed Feb. 1, 1996).

[16] *Id.*

[17] Mowry Decl., ¶¶ 22-24, 87.

[18] U.S. Patent No. 8,086,604 (filed Dec. 1, 2004).

[19] *Id.*

[20] *See id.* at 2:11-13.

[21] Polish Decl., ¶¶ 77-78.

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX          9

Gibson, Dunn &
Crutcher LLP

14.     U.S. Patent No. 8,046,721, issued on October 25, 2011, is entitled "Unlocking a Device by Performing Gestures on an Unlock Image" ("the '721 patent").[22]  The '721 patent dates back to an application filed on December 23, 2005.[23]

15.     I understand that the '721 patent is directed to unlocking a touchscreen by sliding an image (such as the arrow used in iOS devices) from one position to another on the screen.[24]

16.     U.S. Patent No. 8,074,172, issued on December 6, 2011, is entitled "Method, System, and Graphical User Interface for Providing Word Recommendations" ("the '172 patent").[25]  The '172 patent dates back to an application filed on January 5, 2007.[26]  It is my understanding that this patent is generally directed to the suggestion of words while a user is typing on the touchscreen to allow the user to choose whether to replace what is being typed with a recommended word.[27]

## III.     INDUSTRY CHARACTERISTICS RELEVANT TO A CONSIDERATION OF IRREPARABLE HARM

### A.  The Current Environment

17.     Three characteristics of the current environment in smartphones are central to a consideration of the irreparable harm that Samsung's introduction (and sale during this lawsuit absent a PI) of the Galaxy Nexus could cause to Apple.  First, while Apple has had unprecedented success in revolutionizing the smartphone industry since 2007, there is still a large share of wireless customers

---

[22] U.S. Patent No. 8,046,721 (filed June 2, 2009).

[23] *Id.*

[24] Balakrishnan Decl., ¶¶ 47, 102-104.

[25] U.S. Patent No. 8,074,172 (filed Jan. 5, 2007).

[26] *Id.*

[27] Singh Decl., ¶¶ 43-48.

Gibson, Dunn &
Crutcher LLP

who continue to use a "feature phone,"[28] not a smartphone.  Second, despite a significant head start as a result of its pioneer status in the smartphone industry, Apple has recently seen significant inroads made by its competitors.  Apple's competitors, Samsung included, have made these inroads by targeting first-time smartphone buyers.[29]  As I explain below, because of loyalty that customers exhibit to their chosen operating system or platform, sales of smartphones to first-time buyers are particularly important at this time.  Third, as discussed below, Samsung is Apple's largest smartphone competitor worldwide and is rapidly becoming its largest smartphone competitor in the U.S.

18.     Industry data and analysts support and report on the shift in the mobile phone industry from feature phones to smartphones.  For example, using quarterly data from International Data Corporation ("IDC")[30] on shipments of mobile phones for the period 2004Q1 through 2011Q3, I calculate quarterly shares of total shipments for smartphones and feature phones.  Attachment B shows that smartphones accounted for approximately half of mobile phone shipments in the third quarter of 2011 and are currently in the midst of a high growth period while feature phone shipments are declining. This result confirms previous projections by other sources in the industry that smartphone sales would equal feature phone sales in 2011.  For example, a 2010 Nielsen Group report projected that shares of feature phones and smartphones would intersect in the third quarter of

---

[28] Yankee Group defines a "feature phone" as a "more advanced multimedia-capable phone distinguished from a basic phone by its ability to render HTML pages."  Exh. 22 (*Definitions*, Mobile Device Shipment Monitor and Forecast (Oct. 2011)).

[29] *See* Exh. 23 (Steve Kovach, *Samsung Is Going Right for Apple Fanboys' Jugular with Its Latest Commercial*, Bus. Insider, Nov. 22, 2011, http://articles.businessinsider.com/2011-11-22/tech/30428054_1_iphone-users-smartphone-market-android) (Samsung marketing executive explaining that recent television commercial targets "people entering the smartphone market for the first time").

[30] IDC is a "global provider of market intelligence, advisory services, and events for the information technology, telecommunications and consumer technology markets." Exh. 24 (IDC, *About IDC*, http://www.idc.com/about/about.jsp?t=1323967905115).

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-XXXXX-XXX                    11

2011.[31]  Furthermore, a more recent Nielsen Group report indicates that smartphones achieved a 43 percent share of U.S. mobile phone subscribers in the third quarter of 2011.[32]

19.    Data projections show that significant adoption of smartphones by current feature phone users will continue to take place over approximately the next 18-24 months, highlighting that the mobile phone industry is in the midst of a pivotal shift.  For example, data from the Yankee Group containing projections of U.S. smartphone and feature phone shares through 2015 show that smartphone shares of total mobile phone shipments have increased and will continue to increase rapidly from 33 percent in 2010 to a projected 88 percent in 2013, as illustrated in Attachment D. Similarly, IDC forecasts that U.S. smartphone shares of total mobile phone shipments will increase from 38 percent in 2010 to 73 percent in 2013 and 83 percent in 2015, as depicted in Attachment D.

20.    Shares of smartphones by operating system and brand demonstrate Apple's early leadership in smartphone adoption as well as the recent gains by Samsung. For instance, Attachment C shows that shortly after introducing the iPhone, Apple quickly acquired smartphone share, with 7 percent share of smartphones in the second quarter of 2007 (the quarter the iPhone was released). Apple's share increased to nearly 30 percent by the first quarter of 2011 before dropping back to 20 percent in the third quarter of 2011; in that same quarter (Q3 2011), Samsung also achieved nearly a 20 percent share of smartphones (even though Samsung had not launched its first Android-based smartphone until 2009).  PC Magazine recently reported that as of the end of 2011, moreover,

---

[31] Exh. 25 (Roger Entner, *Smartphones to Overtake Feature Phones in U.S. by 2011*, nielsenwire (Mar. 26, 2010), http://blog.nielsen.com/nielsenwire/consumer/smartphones-to-overtake-feature-phones-in-u-s-by-2011/).

[32] Exh.26 (*Generation App: 62% of Mobile Users 25-34 Own Smartphones*, nielsenwire (Nov. 3, 2011), http://blog.nielsen.com/nielsenwire/online_mobile/generation-app-62-of-mobile-users-25-34-own-smartphones/).

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-XXXXX-XXX             12

Gibson, Dunn &
Crutcher LLP

Samsung was the "top smartphone manufacturer" and enjoyed "an 'explosive' increase of 278 percent from 25 million [smartphones] in 2010."[33]

21.    Data on smartphone shares by operating system also demonstrate that, despite Apple's significant success, other smartphones, particularly those running the Android operating system, have made considerable inroads in acquiring share of smartphones. For example, as depicted in Attachment E, the Android operating system has the highest share of smartphones in the U.S. at 67.1 percent in the third quarter of 2011, followed by Apple's iOS with 20.4 percent, RIM's Blackberry operating system with 10 percent, and Windows Mobile with 2.2 percent.

22.    Despite introducing its first Galaxy smartphones two years after Apple introduced the iPhone, Samsung is the largest of the several mobile phone manufacturers that produce smartphones with the Android operating system.  In the third quarter of 2011, Samsung overtook Apple for the first time as the world's largest seller of smartphones.  As depicted in Attachment F, Samsung had a 20% share of worldwide smartphone shipments in the third quarter of 2011, while Apple's share was 14.5%.  As of the third quarter 2011, in the U.S., Samsung's smartphone share was approximately even with Apple's smartphone share.  Furthermore, even though Apple outsold Samsung in the fourth quarter of 2011, Samsung retained its position as the number one seller of smartphones for all of 2011 and completed the year with a 20% global share.[34]  Over the past two years, Apple's smartphone share in the U.S. has been in the range of 17.2% to 29.5%, and was 20.4% in the third

---

[33] Exh. 27 (Chloe Albanesius, *Samsung Beats Apple as 2011's No. 1 Smartphone Maker*, PCMag.com (Jan. 27, 2012), http://www.pcmag.com/article2/0,2817,2399445,00.asp).

[34] *Id.*

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-XXXXX-XXX              13

quarter of 2011. Over the same period, Samsung's smartphone share has risen from under 5% to almost 20%.[35]

23.   That Samsung's gains in the marketplace were achieved in substantial part at the expense of Apple's smartphones is also demonstrated by the change in shares that occurred when Samsung launched its first Galaxy smartphone

This shift in shares demonstrates that a significant portion of the growth in Samsung's smartphone sales occurred at Apple's expense.

24.   The intensity of competition between Apple and Samsung is also confirmed by numerous reports from industry analysts that identify the two companies as direct competitors:

- An October 2010 report states that Samsung "successfully positioned itself as a major alternative to Apple's iPhone series to telecom operators as well as end customers."[37]

- A June 2011 report attributes the higher sales of Samsung's Galaxy S2 phone in part to the delayed roll-out of the next Apple iPhone.[38]

- An August 2011 report states that "[c]ompetition with Apple in September will be a key determinant of [Samsung's] share performance . . . . Samsung Electronics will

---

[35] Exh. 28 (IDC Mobile Phone Tracker, IDC WW Mobile Phone Tracker_2011Q3 Top 10, "USA" Tab).

[36] Exh. 29

[37] Exh. 30 (Macquarie Equities Research, *Samsung Electronics*, Oct. 29, 2010) at 7.

[38] Exh. 31 (Woori Investment & Securities, *SEC (Handset)*, June 23, 2011) at 1.

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-XXXXX-XXX                    14

Gibson, Dunn &
Crutcher LLP

have to prove its smartphone competitiveness even after Apple launches its new product to sustain an upward trend in share price."[39]

- The author of a January 26, 2012 report by Strategy Analytics states that "[w]ith global smartphone shipments nearing half a billion units in 2011, Samsung is now well positioned alongside Apple in a two-horse race at the forefront of one of the world's largest and most valuable consumer electronics markets."[40]

25.   Other industry reports emphasize the competition between devices running Apple's iOS platform operating system and those adopting the Android platform, for which Samsung is one of the leading brands.  For example, a February 2011 report states that "[t]he US mobile market is looking more and more like a two-horse race between Apple and Android, as BlackBerry's lead slips away."[41]  Samsung's increasing prominence among Android-based smartphones means that, as commentators have more recently acknowledged, "Apple and Samsung have turned the smartphone war into a two-horse race."[42]

---

[39] Exh. 32 (Shinhan Investment Corp., *Samsung Electronics*, Aug. 1, 2011) at 3.

[40] Exh. 27 (Albanesius, *supra*, note 33).

[41] Exh. 33 (eMarketer, *Smart and Getting Smarter: Key Mobile Device Trends for Marketers*, Feb. 2011) at 2.

[42] Exh. 34 (Rolfe Winkler, *Apple Pulls Ahead of Samsung by a Nose*, http://blogs.wsj.com/overheard/2012/01/27/apple-pulls-ahead-of-samsung-by-a-nose/ (Jan. 27, 2012)); Exh. 35 (Sarah Perez, *Apple Overtakes Samsung as World's Largest Smartphone Vendor in Q4*, http://techcrunch.com/2012/01/27/apple-overtakes-samsung-as-worlds-largest-smartphone-vendor/ (Jan. 27, 2012) (relying on Strategy Analytics report to reach same conclusion, and noting that "Apple won the quarter, not the year")); *see also* Exh. 36 (Dwight Silverman, *Has Samsung Robbed Apple of Its Cool?*, Houston Chron. TechBlog (Dec. 15, 2011), http://blog.chron.com/techblog/2011/12/has-samsung-robbed-apple-of-its-cool-3/); Exh. 37 (Lance Whitney, *Samsung Outshines Apple in Smartphone Shipments, Market Share*, CNET News (Nov. 4, 2011), http://news.cnet.com/8301-13579_3-57318644-37/samsung-outshines-apple-in-smartphone-shipments-market-share/?tag=mncol;txt) ("Among all smartphone manufacturers, Samsung earned the top spot . . . . Samsung's strong lineup of Android phones drove overall demand . . . ."); Exh. 38 (Miyoung Kim, *Nimble Apple Rivals Building Momentum; Departure Opens Door to Samsung*, Ottawa Citizen, Aug. 26, 2011) at F3 ("Hong Won-pyo, executive vice president of Samsung's mobile division, told his team this week he was confident Samsung could soon overtake Apple in the smartphone market . . . ."); Exh. 39 (Ingrid Lunden, *Updated: Samsung Rules Smartphone*

*(Cont'd on next page)*

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX                15

Gibson, Dunn &
Crutcher LLP

26.    Finally, Samsung's marketing strategy demonstrates that it views Apple as a direct competitor.  A recent Samsung commercial directly compares the Samsung Galaxy S II smartphone to Apple's iPhone, and in particular the comparability of the user experience and product image.[43]  It is notable that this marketing campaign targets Apple's iPhone and not other Android devices.  Furthermore, there are numerous product reviews that do head-to-head comparisons of Apple and Android smartphones, such as a comparison of the iPhone 4S to the Galaxy Nexus.[44]

**B.  The Smartphone Marketplace is in the Midst of a Critical Phase**

27.    As the data identified above demonstrates, smartphone adoption is accelerating and has entered a critical phase wherein an unprecedented portion of mobile device customers will make their initial choice of a smartphone and associated operating system platform, a choice that will likely dictate their future purchases as well.  As the U.S marketplace for wireless service is largely saturated, first-time smartphone buyers will be replacing their previous feature phone models.  As noted above, Samsung has publicly acknowledged that it is targeting customers who are first time

---

*(Cont'd from previous page)*

*Shipments; Nokia Still Tops Overall in Q3*, paidContent.org (Oct. 28, 2011), http://paidcontent.org/article/419-strategy-analytics-samsung-has-taken-the-smartphone-crown-from-apple/).

[43] *See, e.g.*, samsungmobileusa, *Why Wait? The Next Big Thing Is Already Here* (Nov. 22, 2011), http://www.youtube.com/watch?v=X4VHzNEWIqA&feature=relmfu(showing young people waiting in line to buy the next iPhone, who become interested in a passerby's Samsung phone); samsungmobileusa, *The Next Big Thing—Movies & Music* (Dec. 9, 2011), http://www.youtube.com/user/samsungmobileusa#p/a/u/0/wwct7AvRuB4 (highlighting music on Samsung phones as compared to iPhone); samsungmobileusa, *The Next Big Thing Has the Best Apps* (Nov. 22, 2011), http://www.youtube.com/user/samsungmobileusa#p/u/4/kO5Il_rvZj8 (comparing app stores/availability); *see also* Exh. 40 (Ina Fried, *Samsung Mocks "Cult of Apple" in Ad for Galaxy S II*, All Things Digital (Nov. 23, 2011), http://allthingsd.com/20111123/samsung-mocks-the-cult-of-apple-in-ad-for-galaxy-s-ii/); Exh. 23 (Kovach, *supra* note 29).  Samsung has also targeted Apple in advertisements for its Galaxy Tab tablet product. *See* Exh. 41 (Christian Zibreg, *Samsung Markets Galaxy Tab As "The Tablet Apple Tried to Stop,"* 9to5Mac (Dec. 15, 2011), http://9to5mac.com/2011/12/15/samsung-markets-galaxy-tab-as-the-tablet-apple-tried-to-stop/).

[44] *See, e.g.*, Exh. 42 (Phil Nickinson, *Head to Head: Samsung Galaxy Nexus and the iPhone 4S*, Android Central (Nov. 28, 2011), http://www.androidcentral.com/head-head-samsung-galaxy-nexus-and-iphone-4s); *infra* note 102.

DECLARATION OF CHRISTOPHER VELLTURO, Ph.D. – CASE NO. 12-cv-XXXXX-XXX          16

Gibson, Dunn & Crutcher LLP

smartphone purchasers.[45] Samsung's approach has worked.   According to its Earnings Release for Q4 2011, "smartphones led market growth," which caused Samsung to record strong earnings through its enhancement of high-end and mass market smartphone line-ups, including the Galaxy Nexus.[46] Because purchases made by first time buyers will govern future purchases, the purchases made by these buyers during this critical phase will shape the smartphone marketplace structure well into the future.

### 1. Industry Assessments of Smartphone Marketplace Acceleration

28.   As previously noted, industry projections confirm that increased adoption, *i.e.,* first-time purchases, of smartphones will continue over the next few years.  IDC projects that the U.S. smartphone share of total mobile phone shipments will increase to 64% in 2012, 73% in 2013, 79% in 2014, and 83% in 2015 as more consumers continue to replace their feature phones with smartphones.[47]  Similarly, Oppenheimer Equity Research indicates that smartphone share of total mobile phone shipments in North America was 48% in 2010 and projects that it will reach 82% in 2014, while Jefferies reports that North American smartphone share of total mobile phone shipments was 38% in 2010, will be 51% in 2011 and will reach 80% in 2015.[48]  Furthermore, data on the share of wireless subscribers with feature phones demonstrate that approximately half of mobile phone subscribers still use feature phones and, thus, there are still a large number of wireless subscribers

---

[45] *See* Exh. 23 (Kovach, *supra* note 29) (Samsung marketing executive explaining that recent television commercial targets "people entering the smartphone market for the first time."); *see also* Exh. 43 (Victor Godinez, *Samsung Sees a Bright Future*, Dallas Morning News, Jan. 7, 2011) at D1 (Samsung chief strategy officer and senior vice president of products and services noted that "'[o]ver two-thirds of the U.S. population still has a basic feature phone . . . . There's a huge opportunity there.'").

[46] Exh. 44 (Samsung Electronics, *Earnings Release Q4* 2011, January 2012) at 6.  .

[47] *See* Attachment D.

[48] Exh. 45 (Oppenheimer Equity Research Industry Update, *2Q11 Wireless and Tablet Snapshot,* Aug. 2, 2011) at 15, 17; Exh. 46 (Jefferies, *Global Smartphone Outlook: Mid-Tier Under Pressure,* Nov. 3, 2011) at 23.

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-XXXXX-XXX          17

Gibson, Dunn &
Crutcher LLP

who can become new smartphone adopters.  For example, the Jefferies report estimates that 46% of non-prepaid (or "post-paid") wireless subscribers have smartphones, thereby leaving 54% of post-paid wireless subscribers as potential adopters of smartphones in the next 18-24 months.[49]

### 2.  Econometric Assessment of Smartphone Marketplace Acceleration

29.     Historical data on the dynamics of smartphone adoption provide an opportunity to assess the likely trajectory of future adoption, and in so doing, identify the periods in which the greatest new adoption activity has taken place or is expected to take place.  I perform a series of quantitative analyses in this section to assess where greatest smartphone adoption has/is likely to take place.  These studies return the same conclusion explained above – the key time period in which the greatest initial smartphone adoption will take place is upon us and will last for the next 18-24 months.

30.     Economists and other social scientists have developed statistical (econometric) models to study the adoption (or "diffusion") of new technologies into the market.  By and large, these models recognize and parameterize the sigmoidal ("S-shaped") nature common with such adoption.  The S-shaped curve shows an initial slow adoption of the new technology, followed by a period of rapid adoption, which is, in turn, followed by relatively flat growth because, in essence, the technology has been accepted and has saturated the marketplace. As explained below, I have prepared figures that illustrate this curve.

31.     In the present instance, I employ a Gompertz functional form.[50]  The Gompertz form has been used in the empirical study of technology adoption and sales growth in a wide range of

---

[49] Exh. 46 (Jefferies, *supra* note 48) at 5.

[50] In Attachments G and K, I also provide results using an alternate functional form – the logistic. The results are essentially indistinguishable from the Gompertz-based specification (further validating the sigmoidal approach).  In the text, I report only the result from the Gompertz specification for expositional clarity.

DECLARATION OF CHRISTOPHER VELLTURO, Ph.D.  – CASE NO. 12-cv-XXXXX-XXX          18

Gibson, Dunn & Crutcher LLP

fields, including the study of the diffusion of new products in the marketplace.[51] When illustrated, the Gompertz functional form shows the diffusion – or adoption of the smartphones in this case – to follow the growth I explained in the previous paragraph; namely, relatively slow growth, followed by a period of extreme, rapid growth, which is followed by relatively flat growth.

32.     I estimate the diffusion (adoption) path for smartphones into the future based on the best-fitting Gompertz-based curve as applied to reported historical smartphone sales.  The results of this statistical fitting are provided in Attachment G, and the associated forecasts for future periods derived from the estimated Gompertz curve for smartphone adoption are provided in Attachment H. I provide a base Gompertz model fitted to U.S. quarterly smartphone shipments.  The goodness-of-fit statistics (which measure how closely the curve estimated using the statistical analysis follows the actual data) provided in Attachment G indicate that the Gompertz specification is well suited to the smartphone data – the early adoption rates correspond well to a sigmoidal curvature, and the overall fit of the model is excellent.

33.     These models clearly indicate that: 1) initially smartphone adoption took place slowly, and began in earnest in 2007, the year Apple introduced the original iPhone; and 2) the time of greatest initial smartphone adoption is now upon us, with smartphone adoption taking place very rapidly.  The periods with greatest adoption rates in a diffusion model occur just before and just after the point of inflection – where the "S' shaped curve goes from convex to concave.  The estimates in Attachment H indicate the point of inflection will be reached in the last calendar quarter of 2011 or the first calendar quarter of 2012.  Thus, the greatest rates of smartphone adoption by previous users

---

[51] Exh. 47 (Vijay Mahajan & Robert A. Peterson, *Models for Innovation Diffusion*, Sage Univ. Paper 48, 19 (1985)) ("[T]he well-known Gompertz function . . . is widely used in technological forecasting . . . .").

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-XXXXX-XXX                     19

Gibson, Dunn &
Crutcher LLP

of feature phones are occurring now and will continue into 2012. While the rate of adoption is expected to decline thereafter, it will remain substantial for at least the ensuing 3-4 quarters.

34.    Ideally, data used in diffusion studies isolate new adopters from repeat purchasers as part of their analysis. The diffusion data presented in Attachment H include new purchasers as well as existing smartphone users who are replacing prior smartphones. However, these data can be adjusted to focus the analysis on first time buyers. To demonstrate the rate of rapid adoption of smartphones by first time purchasers, and hence the critical phase in which the smartphone marketplace finds itself, I have calculated the portion of the diffusion data attributable to first time buyers. Based on studies performed by the Yankee Group, the average wireless user replaces his/her smartphone every two years or eight calendar quarters. By subtracting smartphone sales as observed 8 quarters prior from the current quantum of sales, I estimate, for each quarter, the number of smartphones being purchased by first-time smartphone buyers. These estimates are provided in Attachment I. In 2010, about 36 million consumers purchased their first smartphone. This figure accelerated to almost 54 million new purchasers in 2011. My statistical analyses indicate 55 million wireless users will purchase their first smartphone in 2012, and 42 million will purchase their first smartphone in 2013. From that date forward, naturally, first time smartphone purchasers will represent a more modest group (e.g., a forecast of 23 million first-time smartphone purchasers in 2014). Thus, my statistical analyses confirm the trends identified by industry analysts – we are presently in the period of most critical new adoption of smartphones among wireless customers, and this new adoption will remain strong through 2013.

35.    In a related extension, I returned to the raw smartphone shipment data and performed an additional econometric analysis by transforming the data, pre-estimation, to estimated new purchasers only. As with the transformation undertaken above, I generate these revised data by taking the current period shipments and subtracting the number of shipments that occurred in the

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX                    20

quarter eight quarters prior (to capture the replacement phone cycle of every two years). With this transformation, the revised data capture estimates of shipments to new smartphone customers only, rather than to all customers. With these data, I can aggregate new smartphone customers on a rolling basis to identify the number of cumulative adopters of smartphones in any given period and, thus, estimate the cumulative diffusion curve – that is, the total of all users who have adopted the new technology at a given point in time (rather than focusing on only those who bought a phone in a particular period). Using these data and the cumulative version of the Gompertz specification, I perform an additional set of econometric analyses. These results are provided in Attachments J and K.

36.     These results again show an excellent fit between the model and the underlying data, and provide a very clear picture of the state of adoption of smartphones and the current trends. As with my original work, these results show that the marketplace is indeed in the critical phase of development where the highest number of end users is selecting smartphones for the first time. They estimate that 53 million users purchased their first smartphone in 2011, and that an additional 51 million will do so in 2012 and 41 million in 2013.

### 3.  Summary

37.     Industry estimates and my econometric models agree – the next 18-24 months represent a unique period in the smartphone industry, one during which more people will acquire their first smartphone than any other comparable period. By the end of 2013, fully 85% of handset customers will have adopted a smartphone platform. As I now demonstrate in the section below, the substantial majority of these customers will "lock-in" to their platform of choice, and therefore, the relative success that the various smartphone competitors have during this phase of competition – the phase during which smartphone adoption is at its greatest – will shape their future fortunes for many years to come.

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX                 21

Gibson, Dunn &
Crutcher LLP

## C. Key Characteristics of Smartphone Demand

38.     Smartphone demand exhibits a unique set of characteristics that will generate particularly strong and long lasting effects from the competition for first time smartphone buyers that will be waged in the next 18 to 24 months.  These characteristics, for example, include:

- Importance of user interface and user experience for adoption
- Customer loyalty
- Switching costs associated with shifting from one platform to another
- The network effects of smartphone ownership under a common platform
- The interrelation between the smartphone marketplace and other significant marketplaces, including digital media, tablets, personal computers, and others
- The indirect demand for smartphones as a complementary product provided in conjunction with wireless services providers (and often subsidized by them).

Considered collectively, these factors indicate the following:

- Customers will become entrenched in their platform of choice, and, thus, initial competition for them will have wide-ranging and long-lasting effects on future smartphone purchases;
- This entrenchment will be exacerbated by the "tippy" nature of customer participation under a given platform, which will result in inordinate volume shifts and demand builds on one platform relative to another;
- Related industries will see significant changes in their competitive dynamic as a result of changes realized in the smartphone marketplace.

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-XXXXX-XXX              22

Gibson, Dunn &
Crutcher LLP

1

### 1. Importance of User Interface and User Experience for Adoption

2

39.     A key technological distinction between smartphones and feature phones is in the much

3

greater sophistication of the operating systems used in smartphones.  Before Apple introduced the

4

iPhone, phones containing sophisticated operating systems were generally designed for business

5

users, and focused on voice calls, email, text messaging, voice mail, and applications such as

6

calendars.  The more advanced feature phones for consumers included basic cameras and Internet

7

access with limited graphics.  Digital audio and video capabilities were accessed mainly through

8

other handheld devices.

9

40.     The iPhone triggered the initial significant wave of adoption of smartphones by

10

consumers by bringing together, and enhancing, the multiple capabilities of smartphones, feature

11

phones, and other handhelds, and making these capabilities "accessible and exciting to normal people

12

for the first time."[52]  The materials that I have reviewed demonstrate that a key driver of this adoption

13

has been the user interface and distinctive user experience pioneered by Apple, which allows these

14

many capabilities to be accessed and used in combination in a user-friendly way.

15

41.     My review of the declarations of Apple's technical experts and businesspeople in this

16

matter, Apple's promotional materials, consumer surveys, reviews of the smartphone competitive

17

landscape, and product reviews shows that the smartphone features to which the Asserted Patents are

18

directed are important components of the user interface and user experience developed by Apple.

19

### 2. Importance of the Patented Features to the Distinctive Apple User Interface and User Experience

20

42.     As noted, I understand, from my review of the declarations of Apple's technical

21

experts, that the patents at issue in this case relate directly to the Apple user interface and user

22

experience components described above.  This distinctive user experience, which has become closely

23

[52] See Exh. 2 (Frommer, *supra* note 2).

24

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-XXXXX-XXX          23

Gibson, Dunn &
Crutcher LLP

associated with Apple and its innovation, is a vital manifestation of the value of these patents and the value they contribute to Apple.[53]

43.    The "slide-to-unlock" invention that I understand is taught by the '721 patent has similarly been widely highlighted as contributing to the easy and fun-to-use nature of the iPhone and other iOS devices and has been promoted by Apple since the launch of the original iPhone.[54]

44.    I understand that the unified search taught by the '604 patent is used by the Siri personal assistant, which can take spoken search terms and can provide information from both the device and the Internet.[55]  Siri has been hailed as "the standout feature" of the iPhone 4S that has to "be tried to be believed."[56]  I also understand that Siri was the best-liked feature of 49% of iPhone 4S owners.[57]

_____

[53] *See generally* Sinclair Decl.

[54] Exh. 48 (Walter Isaacson, *Steve Jobs* (2011)) ("[T]he team worried about how to prevent the device from playing music or making a call accidentally when it was jangling in your pocket. Jobs was congenitally averse to having on-off switches, which he deemed 'inelegant.' The solution was 'Swipe to Open,' the simple and fun on-screen slider that activated the device when it had gone dormant."). The slide to unlock feature was the first iPhone function consumers saw in early iPod advertisements. *See, e.g.,* AppleTvAds.com, http://appletvads.com/ads/iphone/apple-iphone-watered_down_480x376.mov; AppleTvAds.com, http://appletvads.com/ads/iphone/apple-iphone-surprised_480x376.mov; AppleTvAds.com, http://appletvads.com/ads/iphone/apple-iphone-never_been_640x496.mov; AppleTvAds.com, http://appletvads.com/ads/iphone/apple-iphone-calamari_640x496.mov; Sinclair Decl., ¶¶ 6, 10.  *See also,* Exh. 49 (Vincent Nguyen, *Complete Transcript of Steve Jobs, Macworld Conference and Expo,* Jan. 9, 2007 (Feb. 23, 2007), http://www.iphonebuzz.com/complete-transcript-of-steve-jobs-macworld-conference-and-expo-january-9-2007-23447.php ("[T]o unlock the phone I just take my finger and slide it across. . . . We wanted something that you couldn't do by accident in your pocket. Just slide it across. Boom.").

[55] Polish Decl., ¶¶ 77-78. *See also* Sinclair Decl., ¶ 9.

[56] Exh. 50 (Brian X. Chen, *Review: With Siri, the iPhone Finds Its Voice*, wired.com, Oct. 11, 2011, http://www.wired.com/reviews/2011/10/iphone4s/) ("Siri is the reason people should buy this phone."); Exh. 51 (Walt Mossberg, *The iPhone Finds Its Voice*, allthingsd.com, Oct. 11, 2011, http://allthingsd.com/20111011/the-iphone-finds-its-voice/) (labeling Siri the "standout feature" of the iPhone, which is so astonishing that it "has to be tried to be believed").

[57] *See* Exh. 14 (Cox, *supra* note 4).

DECLARATION OF CHRISTOPHER VELLTURO, Ph.D. – CASE NO. 12-cv-XXXXX-XXX          24

45.     I understand that the '647 and '172 patents both similarly increase the ease of use and improve the user experience with the iPhone.  In addition, I understand that the invention described in the '647 patent enhances customer access to capabilities of the smartphone relevant to a given piece of data such as an email address, phone number and postal address, and the ease with which they can store or use that data in the appropriate application.[58]  I understand that the invention described in the '172 patent makes it easier and faster for a user to enter words and other text using the touchscreen keyboard by recommending and allowing the user to select word and character string replacements for the text being entered.[59]

### 3.  Customer Loyalty

46.     Wireless customers exhibit a high degree of loyalty to the platform they have historically used: a customer who purchases a particular smartphone today is likely to purchase the same platform in the future when that customer replaces his or her smartphone.  At least in part, this loyalty arises from the familiarity that customers develop with a particular platform, fear of disruption to applications ("apps") and services available on that platform if they switch, and the difficulty of moving music, video, and books to a new platform.[60]  As a result, some current smartphone users have said it is easier to switch banks or utility services rather than learn a new phone.[61]  Thus, customers who purchase a Galaxy Nexus running on the Android platform are likely to remain loyal to the Android platform.  They will have become familiar with the Android platform and will typically have purchased numerous apps that operate only on the Android platform.  If they

---

[58] Mowry Decl., ¶¶ 22-24, 87.

[59] Singh Decl., ¶¶ 43-48, 114.

[60] Exh. 52 (Emma Woollacott, *iPhone Users Most Loyal (Now, There's a Surprise)*, TG Daily (Nov. 28, 2011), http://www.tgdaily.com/mobility-features/59873-iphone-users-most-loyal-now-theres-a-surprise).

[61] *Id.*

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX                25

were to switch to iOS and an Apple phone, they would have to purchase all new apps because Android apps and iOS apps are incompatible (*i.e.*, a customer that purchases an Android app cannot use that same app on an iOS phone).[62]

47.    This customer loyalty is particularly strong for users who choose the iOS or Android platform.  A recent study of U.S. iPhone owners found that the "iPhone scores high in measures of loyalty."[63]

⬛ Other industry studies have also found a high degree of loyalty for both iPhone and Android.  A Nielsen Company report from 2010 showed that 80% of iPhone owners and 70% of Android users said they would stick with that platform for their next purchase,[65] while a Yankee Group study from 2011 found that 88% of iPhone users and 78% of Android users would stick with that platform for future purchases.[66]

---

[62] The situation is similar to that of personal computers, where programs designed to run on the Windows operating system are incompatible with the Apple Mac operating system.

[63] Exh. 53 (Apple Market Research & Analysis, *iPhone Owner Study*, May 2011, at 72); *see also* Exh. 54 (Neil Hughes, *Apple's Recurring Revenue Stream: 77% of iPhone 4 Sales Were Upgrades*, Appleinsider.com (June 25, 2010), http://www.appleinsider.com/articles/10/06/25/apples_recurring_revenue_stream_77_of_iphone_4_s ales_were_upgrades.html) ("'Apple is effectively building a recurring revenue stream from a growing base of iPhone users that upgrade to the newest version every year or two.' It's the three years of brand loyalty that Apple has built in the market that has become key to its success."); Exh. 55 (Nick Bilton, *Android Phones Outpace Apple's*, N.Y. Times, Aug. 9, 2010) (noting iPhone customers have a loyalty rate of 90%). This relationship between different components of the Apple family of products has been amply demonstrated by studies of the market.  One April 2010 study, for example, concluded that of early iPad buyers, 74% owned Macintosh computers and 66% had iPhones. *See* Exh. 56 (Philip Elmer-DeWitt, *Piper Jaffray Survey of iPad Buyers: 74% Owned Macs; 66% Had iPhones*, CNNMoney (April 5, 2010), http://tech.fortune.cnn.com/2010/04/05/piper-jaffray-survey-of-ipad-buyers-74-owned-macs-66-had-iphones/).

[64]

[65] Exh. 57 (Don Kellogg, *iPhone vs Android*, nielsenwire (June 4, 2010), http://blog.nielsen.com/nielsenwire/online_mobile/iphone-vs-android/); *see also* Exh. 58 (*Android Soars, But iPhone Still Most Desired As Smartphones Grab 25% of U.S. Mobile Market*, nielsenwire (Aug. 2, 2010), http://blog.nielsen.com/nielsenwire/online_mobile/android-soars-but-iphone-still-most-desired-as-smartphones-grab-25-of-u-s-mobile-market) (reporting iOS loyalty as high as 90% and Android loyalty running over 70%).

[66] Exh. 59 (Yankee Group 2011 U.S. Consumer Survey, Dec.).

48.    Apple generated strong customer loyalty by developing innovative and high quality products that are intuitive and easy to use, and, as a result, Apple has become the most valuable brand in the world.[67]

### 4.  Switching Costs

49.    Once a customer has chosen and used a given smartphone platform, the likelihood that customers will consider alternative platforms depends on the costs associated with such a switch.  As identified above, with respect to switching from one smartphone platform to another, those costs include not only the costs of learning a new "look and feel" to the platform and the replacement of apps, but also the re-location of a user's "data" associated with one's existing platform (such as, music, contacts, calendars, media and other information stored within platform-specific applications, among others).  The results of a consumer survey on user experience and loyalty in the digital ecosystem by GfK Group confirm these switching costs:  "As consumers build digital ecosystems and their own world of content on handsets, the [GfK] study shows that their loyalty to their smartphone brand increases with the number of apps and services they use. The research reveals that the tipping point for loyalty is when a consumer uses seven or more services on their device," with consumers in the U.S. being the most likely to use seven or more services.[68]  Furthermore, this study

---

[67] Exh. 60 (*Lessons from Apple: What Other Companies Can Learn from California's Master of Innovation*, Economist, June 7, 2007); Exh. 61 (*BrandZ Top 100: Most valuable global brands*, Millward Brown, http://www.millwardbrown.com/Libraries/Optimor_BrandZ_Files/2011_BrandZ_Top100_Report.sfl b.ashx) at 41.

[68] Exh. 62 (Amanda Wheeler, *Loyalty to Smartphone Brand Increases with Greater Use of Digital Content*, GfK Group (Nov. 25, 2011), http://www.gfk.com/group/press_information/press_releases/009051/index.en.html); *see also* Exh. 63 (Allan Swann, *No Surprise That Smartphone Loyalty Is Tied to Apps and Services*, CBR Rolling Blog (Nov. 28, 2011), http://www.cbronline.com/blogs/cbr-rolling-blog/no-surprises-that-smartphone-loyalty-is-tied-to-apps-and-services28.11.11) ("Consumer 'lock in' through their app and service eco-system may do more to keep customers' loyalty than any other concern. . . . Apple users in particular have said they would find it harder to change their smartphones than it would be to change power companies . . . For users with both an iPhone and iPad, this figure was 19%.").

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX            27

Gibson, Dunn &
Crutcher LLP

1   indicates that 33 percent of respondents cited disruption to apps and services as a reason to stick with

2   their current platform, while 29 percent were worried about having to learn to use a different type of

3   smartphone and 28 percent did not want to have to move their music, video, books and apps from one

4   type of smartphone to another.[69]   Moreover, a number of commentators have noted that specific

5   iPhone features, such as iCloud and Siri, further enhance the stickiness of iOS.[70]

6   

### 5.  Network Effects

7   50.   Demand for smartphones exhibits what economists refer to as "platform effects" or

8   "network effects."[71]   What this term means is that customer demand for a given smartphone platform

9   increases as the number of other users on the platform increases.  Platforms with more users are more

10  valuable to their users than platforms with fewer users, and, correspondingly, customers of smaller

11  platforms are more likely to gravitate toward larger platforms.  This dynamic is referred to in

---

[69] Exh. 62 (Wheeler, *supra*, note 68); *see also* Exh. 63 (Swann, *supra* note 68) ("It also requires a measure of tech savvy-ness to convert video and music to another company's file format. . . . I know I have podcasts and music dating back to my first iPod in 2003 in Apple's AAC format. I am not going to spend an entire weekend converting them to MP3.").

[70] Exh. 64 (Don Reisinger, *Big Mo: In One Week, Apple iCloud Hits 20M Users; 25M Use iOS 5*, CNET News (Oct. 17, 2011), http://news.cnet.com/8301-13506_3-20121323-17/big-mo-in-one-week-apple-icloud-hits-20m-users-25m-use-ios-5) ("Because it stores user data, iCloud, along with iTunes is expected to enhance loyalty and stickiness of Apple's customers, helping defend against threats from Android, helping grow a defensible install base of users who continually upgrade to next generation Macs, iPhones, iPads, and iPods." (quoting RBC)); Exh. 65 (Gabriel Perna, *WWDC: "Stickiness" Factor Building iCloud Excitement*, International Business Times (June 7, 2011), http://www.ibtimes.com/articles/159025/20110607/apple-steve-jobs-icloud-stickiness-iphone-5.htm) ("We remain Positive on Apple as we believe the move to iCloud improves its competitive advantage as it syncs all consumer devices including Macs and increases the utility and stickiness of its ecosystem." (quoting Jeffrey Fidacaro, Susquehanna Financial Group)); Exh. 66 (Nigam Arora, *Siri is Apple's Post-Jobs Ticket to $1,000*, Forbes (Oct. 23, 2011), http://www.forbes.com/sites/greatspeculations/2011/10/23/siri-is-apples-post-jobs-ticket-to-1000/) ("Siri increases stickiness of Apple phones.  High stickiness means that once someone starts using Siri they are unlikely to switch.  When asked to call my wife, Siri responded with question wanting to know which one of my contacts was my wife.  After about 10 minutes, when I again asked Siri to call my wife, it knew who my wife was.  Imagine Siri learning about you and what you do for two years and then giving up Siri for an Android phone that does not know you!").

[71] Economists recognize platform effects to be an important competitive factor. *See generally*, *e.g.*, Exh. 67 (Jean-Charles Rochet and Jean Tirole, *Platform Competition in Two-Sided Markets*, 1 J. Eur. Econ. Ass'n 990 (2003)).

---

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX          28

Gibson, Dunn & Crutcher LLP

economics as "tipping,"[72] and captures a key aspect of competition between platform providers within a critical period of competition, such as when the greatest number of customers is available to be added to the platform.  By winning these customers, a platform extends its competitive position relative to its rivals non-linearly.  As demonstrated above (and discussed more fully below), with respect to the smartphone industry, this critical time has begun and will extend for the next 18 to 24 months.

51.     The role of network effects generally and the "tippy" nature of smartphone platforms is well recognized in the industry:

> As the history of the tech industry has demonstrated again and again, technology platform markets tend to standardize around a single dominant platform. Although several different platforms can co-exist while a market is developing, eventually a clear leader emerges. And as it does, the leader's power and "network effects" grow, while the leverage of the smaller platforms diminishes…
>
> But the better Android phones get, and the more market share Android gains, the more Android's network effects will increase, and the more Apple's leverage over the iPhone ecosystem will diminish.[73]

52.     The digital age offers numerous examples of significant network effects and the tippiness such effects can generate in product shares and success.  In social networking, Facebook represents a classic example of strong network effects, wherein Facebook launched, approached and quickly overtook social network rivals (e.g., MySpace, Friendster) as the size of the Facebook

---

[72] *See generally, e.g.,* Exh. 68 (Jean-Pierre Dubé, et al., *Tipping and Concentration in Markets with Indirect Network Effects*, 29 Marketing Sci. 216 (Mar.-Apr. 2010)).

[73] Exh. 69 (Henry Blodget, *ATTENTION APPLE FANS: Samsung Blowing Past Apple to Become the Biggest Smartphone Vendor Is Not Good News*, Bus. Insider (Oct. 29, 2011), www.businessinsider.com/samsung-apple-smartphone-market-share-2011-10); *see also* Exh. 70 (Fred Vogelstein, *How the Android Ecosystem Threatens the iPhone*, Wired, Apr. 14, 2011, http://www.wired.com/magazine/2011/04/mf_android/all/1) ("But once the market is saturated—say, in three to five years—sales will slow. Then the only growth opportunity will lie in poaching customers from other companies. The company with the largest and most loyal user base is likely to win that fight, and that's what both Apple and Google are currently trying to establish. But make no mistake: As is often the case in technology, only one platform will prevail.").

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-XXXXX-XXX                29

network expanded and thus became of greater value to non-participants.  In digital hardware, the long-standing tipping found in gaming consoles between Sony (PlayStation), Microsoft (Xbox) and Nintendo (GameCube/Wii) is well documented, with long term share shifts resulting from the indirect network effects that influenced game developers.[74]

53.   Unsurprisingly, the smartphone industry has had its share of tips toward and away from particular platforms.  RIM's Blackberry platform held a very large share of phone (or Personal Digital Assistant (PDA)) deployments until approximately 2010.  Absent sufficient technical innovation, many consumers shifted away from the Blackberry platform in large numbers, though the Blackberry is still reasonably strong in the business segment.[75]  At present, RIM is attempting to revive this decline with newer technologies (e.g., the QNX platform which will replace the legacy Blackberry OS),  but its share remains significantly depressed and the availability of Apps remains modest at 35,000 compared to 500,000 under iOS and 300,000 under Android.[76]

54.   To understand this phenomenon, it is important to dissect the nature of network effects generally and as they apply to smartphone platforms.  There are two kinds of network effects:  direct and indirect. Both are significantly present with respect to smartphones and their associated platforms.  Under direct effects, a customer (or potential customer) benefits directly from more and more people being connected to the network.  For example, in traditional landline telephones, a phone became more valuable to an individual as that individual could reach more people with

---

[74] See Exh. 68 (Dubé, *supra* note 72).

[75] See Exh. 71 (Adam Lashinsky, *Blackberry's Business Problem*, CNNMoney (Nov. 10, 2011), http://tech.fortune.cnn.com/2011/11/10/blackberrys-business-problem/).

[76] Exh. 72 (VisionMobile 2011, *supra* note 42) at 15-19, 24. This effect is bedeviling the Windows Phone platform as well. *See, e.g.*, Exh. 73 (Nick Bilton, *Windows Phone 7 Caught in Mobile App Catch-22*, N.Y. Times (Dec. 14, 2011). http://bits.blogs.nytimes.com/2011/12/14/windows-phone-7-caught-in-mobile-app-catch-22/) ("Start-ups can't devote resources to building apps for Windows Phone 7 until more customers buy phones that run on the platform. But, customers will not flock to Windows Phone 7 until their favorite apps exist.").

Gibson, Dunn &
Crutcher LLP

telephones. Smartphones have elements of similar direct network effects. The value of Apple's

FaceTime capability (by which individuals with devices running iOS can conduct real-time video

chats with other individuals running an Apple operating system) depends, naturally, on the number of

people who have the capability.[77]  Another example is iMessage, which allows users of Apple iOS

devices to communicate by text messages with other users of Apple iOS devices without incurring

texting fees charged by cellular carriers.[78]  Further, the ability to play games with friends or others

through a network, such as Apple's Game Center, has greater value to a given user as the number of

other users with that capability rises.[79]

---

[77] *See, e.g.,* Exh. 74 (Philip Elmer-DeWitt, *FaceTime's network effects*, CNNMoney (Oct. 21, 2010), http://tech.fortune.cnn.com/2010/10/21/facetimes-network-effects/) ("'Facetime not only adds to the many features that makes Apple's current product offering the strongest in its history,' Deutsche Bank analyst Whitmore concludes. 'But it also has the potential to increase the stickiness of the platform exponentially.'"); Exh.75 (Henry Blodget, *Check Out Those FaceTime Ads: Think Apple Understands the Network Effect?*, Bus. Insider (July 12, 2010), http://articles.businessinsider.com/2010-07-12/tech/30101506_1_facetime-iphone-app-store) ("The more people who use the product, the more valuable the product gets, . . . Thus, as the network effects really kick in, the leader easily gains more and more market share. . . . Apple is already benefiting from network effects . . . . But *the wholesale success of FaceTime would take this to a whole different level.* Thus far, Apple's network effect has made the iPhone more valuable to developers . . . . These are powerful but indirect benefits. Widespread use of FaceTime, meanwhile, would instantly make the iPhone vastly more valuable . . . because it would allow you to simply and easily do video chat . . . *This would encourage whole families and workplaces to adopt iPhones and only iPhones.*" (emphases added)); *see also* Exh. 76 (Transcript of Deposition of Michael J. Wagner, CPA, *Apple Inc. v. Samsung Electronics Co.*, No. 11-CV-01846, at 61:11-62:8 (N.D. Cal. Sept. 14, 2011)) (Samsung's own expert in a pending infringement case admitted that, when he bought an iPhone4 for himself, he bought six iPhones total for his children and his wife so that they could "communicate easier and use FaceTime"). Android also has its own video chat application that is comparable to Apple's FaceTime application. *See, e.g.,* Exh. 77 (*Video Chat on Your Android Phone*, Google Mobile Blog (Apr. 28, 2011), http://googlemobile.blogspot.com/2011/04/video-chat-on-your-android-phone.html); Exh. 78 (Davindra Hardawar, *Android finally gets its own FaceTime-like video chat, hitting Nexus S first*, Venture Beat (Apr. 28, 2011), http://venturebeat.com/2011/04/28/android-google-talk-video-chat/).

[78] *See* Exh. 79 (Apple, *Built-In Apps: Messages*, http://www.apple.com/iphone/built-in-apps/messages.html); *see also* Exh. 80 (Sascha Segan, *How the Carriers Can Fight iMessage*, PC Mag (June 7, 2011), http://www.pcmag.com/article2/0,2817,2386513,00.asp) ("The real purpose of these non-operable texting systems is to create network effects among friends.").

[79] *See, e.g.,* Exh. 81 (Apple, *Game Center*, http://www.apple.com/game-center/).

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX          31

Gibson, Dunn &
Crutcher LLP

55.     Smartphone demand is also driven by indirect network effects.  Under indirect network effects, the presence of a greater number of users generates incentives for third parties to enhance the value of the network, which thereby increases the value of the network further to actual and potential users.  One of the channels through which this effect operates is the applications (or "apps") that are written for smartphone platforms.  Software developers are more willing to write apps for platforms with more users, and users choose platforms with more apps.[80]

56.     The importance of indirect network effects with respect to smartphone platforms has also been recognized by industry analysts.  For example, a recent study finds that for both iOS and Android there is a strong correlation between the number of smartphones sold on a given platform and the number of apps available for that platform, and concludes:

> This is a clear and unambiguous illustration of the strong network effects that are in play in these platforms. As more devices are sold, the platform becomes more attractive to developers, who subsequently write more applications, hoping to reach a large user base. Likewise, as more applications become available, the platform gains more functionality for users, who will then be more inclined to buy a mobile phone that supports these apps. This becomes a virtuous cycle, a positive feedback loop which is so strong that it dominates all other aspects that might affect sales or app development, like promotions and advertisements, or the coolness of a particular technology for developers.[82]

---

[80] *See, e.g.*, Exh. 72 (VisionMobile 2011, *supra* note 42) at 8 ("When the number of developers, applications and users on a platform reaches critical mass, the platform begins to grow exponentially. This is because of positive feedback loops or 'network effects' between users and application developers. Applications attract users, which motivates developers to create more applications, which in turn attract more users... and so on.").

[81]

[82] Exh. 83 (Stijn Schuermans, *The Flywheel Effect of Android and iOS (And Why Their Rivals Are Grinding to a Halt)*, VisionMobile (Sept. 28, 2011), http://www.visionmobile.com/blog/2011/09/the-flywheel-effect-of-android-and-ios-and-why-their-rivals-are-grinding-to-a-halt/); *see also* Exh. 84 (Euromonitor International, *Apps, Apps, Apps: Does It Matter?*, Jan. 31 2011) ("The fact that there are multiple OS means that software developers have to write software codes for multiple OS platforms or choose an OS platform to support. Apple tends to be the beneficiary due to the

*(Cont'd on next page)*

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-XXXXX-XXX                32

Gibson, Dunn &
Crutcher LLP

**D. Interrelationships between Smartphone Demand and Demand for Related Products**

57.     Owners of a smartphone on a given platform generate additional revenues in products and services related to the platform. These complementary purchases are most evident in the meteoric rise of revenues earned on the iTunes Store offered by Apple as the installed base of iOS devices has risen.[83] For example, as of July 2011, over 15 billion apps had been downloaded from Apple iTunes App Store by worldwide iPhone, iPad and iPod touch users. As of that date, the iTunes App Store offered more than 425,000 apps, and Apple had paid developers more than $2.5 billion in revenues related to purchases of these apps.[84]

58.     Consumer surveys confirm these demand complementarities.

The importance of this revenue stream to Apple has also been recognized by industry analysts: "The popularity of the [iPhone] coupled with its restrictive user interface has maximised the post-sale revenue stream potential. This has sustained sales of the iTunes store despite

_____

*(Cont'd from previous page)*

popularity of its iPhones and app store."). Further, smartphone market share can help drive app development for the tablet market. *See, e.g.*, Exh. 85 (Daniel Lyons, *Think Really Different*, Newsweek, Apr. 5, 2010) ("The iPad arrives ready to run virtually all the 150,000 apps that have been created for the iPhone over the past two years.").

[83] *See* Exh. 86 (Pascal-Emmanuel Gobry, *Apple Will Generate $13 Billion in iTunes Revenue in 2013, Says Analyst*, BusinessInsider (July 5, 2011), http://articles.businessinsider.com/2011-07-05/tech/30072341_1_app-store-itunes-apple) (noting that the "main reason" for the growth in iTunes platform revenue is "[a]ll those iPhones and iPads Apple is selling").

[84] Exh. 87 (*Apple's App Store Downloads Top 15 Billion*, Apple Press Info (July 7, 2011), http://www.apple.com/pr/library/2011/07/07Apples-App-Store-Downloads-Top-15-Billion.html).

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX                33

Gibson, Dunn &
Crutcher LLP

1    slowing iPod sales and generated a revenue stream from sales of content and applications from the

2    company's App Store."[87]

3        59.    These demand complementarities extend beyond the digital media offerings found on

4    the iTunes store and the applications that are available in the iTunes App Store.

5

6

7

8                                          In addition, iOS features like iCloud

9    encourage iPhone buyers to buy other iOS products (*i.e.*, the iPad and iPod touch) because they

10   enhance the ability of these devices to share data and communicate with each other.[90]  Furthermore,

11   iPhone and Android users are loyal to their platform when choosing a tablet computer.[91]

12      **E.  Wireless Providers and Indirect Demand**

13       60.    As consumers turn with greater frequency to smartphones, these devices become an

14   important part of competition among wireless service providers, such as AT&T, Sprint, Verizon and

15   T-Mobile.  Consumer acquisitions of handsets are commonly subsidized in part under multi-year

16   wireless service plans.  In this context, indirect competition among smartphone providers develops as

17

18

19   ───────────────

     [87] Exh. 88 (Euromonitor International, *Mobile Phones: Winning Strategies and Pitfalls*, February
20   2011) at 13.
     [88]
21

22   [89]

23   [90] Exh. 89 (IB Times Staff Reporter, *Apple's iCloud To Provide Stickiness to Other 'Connected
     Devices'* (Sept. 20, 2011), http://www.ibtimes.com/articles/216898/20110920/apple-inc-icloud-
24   stickiness-iphone-ipad-ipod-mac-apple-tv-android-google-inc-microsoft-windows-black.htm) ("'We
     are becoming firm believers in Apple's iCloud initiative. . . .' says Scott Sutherland, an analyst at
25   Webbush Securities.  He . . . expects the iCloud to go full-throttle this fall.  He expects this to keep
     interest going for iPhones, iPads, Macs, and iPod Touches. . . . Apple already has sold 222 million
26   iOS devices, which he expects to grow robustly given the iCloud connectivity.").  *See supra* note 70.

27   [91] *See* Exh. 90 (*Smartphone, Tablet Owners Show Brand Loyalty*, Lenovo (Sept. 21, 2011),
     http://www.lenovo.com/articles/us/en/news/smartphone-tablet-owners-show-brand-loyalty.html).
28

     DECLARATION OF CHRISTOPHER VELLTURO,
     Ph.D.  – CASE NO. 12-cv-XXXXX-XXX          34

each seeks to provide competitive options for smartphone distribution through such bundled plans. Indeed, much of the early success of the Android platform came as an alternative for wireless providers other than AT&T (who had an exclusive contract for Apple's iPhone in the United States until 2011[92]).

61.     Indirect wireless demand introduces an additional complexity into the competitive dynamic between platform providers. Wireless service providers have incentives to steer customers to smartphones that afford them a competitive alternative vis-à-vis other wireless service providers but also allow for cost minimization in terms of smartphone subsidies paid to phone providers, such as Samsung, for the right to bundle smartphones with their services. Under this dynamic, high-end smartphones can be used to lure in customers to a given wireless provider, where more value-based smartphones may ultimately reflect a better deal for the end user and the wireless service provider (due to the lower subsidy payment to phone providers on the value-based smartphone relative to higher-end models). This leads to a complex interrelation of direct end user demand and indirect wireless service provider plan demand.

62.     The competitive dynamic introduced by increased end-user loyalty/network effects with platforms and the indirect demand fueled by wireless service providers is evident in the recently observed strategies among wireless service providers to expand their smartphone line across multiple platforms. Historically, wireless service providers have been satisfied and have remained

---

[92] Verizon began offering the iPhone in February 2011, while the iPhone became available on Sprint's network in October 2011. *See, e.g.*, Exh. 91 (*iPhone 4 From Verizon Wireless Is Here: Broadcast-Quality Video, High-Resolution Photos Available*, Verizon Wireless (Feb. 10, 2011), http://news.verizonwireless.com/news/2011/02/pr2011-02-10d.html); Exh. 92 (*Sprint Brings Unlimited Data Experience to iPhone on October 14*, Sprint (Oct. 6, 2011), http://newsroom.sprint.com/article_display.cfm?article_id=2063); Exh. 93 (*Sprint Statement on Launch Day Sales of iPhone 4S and iPhone 4*, Sprint (Oct. 14, 2011), http://newsroom.sprint.com/article_display.cfm?article_id=2073). Verizon is currently offering the Galaxy Nexus (Verizon, *Smartphones*, http://www.verizonwireless.com/b2c/store/controller?item=phoneFirst&action=viewPhoneOverviewByDevice&deviceCategoryId=1).

Gibson, Dunn &
Crutcher LLP

competitive by offering smartphones compatible with their service on a limited number of platforms. This dynamic has changed so that every major wireless carrier now offers smartphone models on every significant platform[93]:

**Operating Systems by Major Wireless Carrier**

| Platform | Wireless Carrier | | | |
|---|---|---|---|---|
| | AT&T | Verizon | Sprint | T-Mobile |
| Android | X | X | X | X |
| iOS | X | X | X | |
| Blackberry | X | X | X | X |
| Windows | X | X | X | X |
| WebOS | X | X | | |

Note:
Includes data as of November 30, 2011 for AT&T, Sprint, and T-Mobile, or December 1, 2011 for Verizon.

Source:
http://www.phonearena.com/phones/carriers

63.    The economic implications of this strategic shift are clear: wireless service providers recognize that their business is largely saturated and that organic growth of wireless service in the United States is limited.[94] Thus, the main competitive dynamic in place among wireless service providers is to take existing share away from rivals. By offering a full complement of smartphone

[93] The notable exception is the lack of an iPhone on T-Mobile. Since AT&T has dropped its bid for T-Mobile, T-Mobile may try to negotiate a deal with Apple to carry the iPhone, as Sprint recently did. *See, e.g.,* Exh. 92 (*Sprint Brings Unlimited Data Experience to iPhone on October 14, supra* note 92); Exh. 93 (*Sprint Statement on Launch Day Sales of iPhone 4S and iPhone 4, supra* note 92).

[94] *See, e.g.,* Exh. 95 (Jenna Wortham, *Fewer iPhone Activations Hamper Growth at AT&T,* N.Y. Times, Oct. 20, 2011, http://www.nytimes.com/2011/10/21/technology/att-profit-is-hit-by-slowing-iphone-demand.html) ("'This is a country that, for all purposes, is 100 percent saturated with wireless customers,' said Rick Franklin, an analyst at Edward Jones, a financial services firm."); *see also* Exh. 96 (Eric Savitz, *U.S. Wireless Voice Market Hits Saturation Point, Auriga Says,* Barron's (Mar. 30, 2010), http://blogs.barrons.com/techtraderdaily/2010/03/30/us-wireless-voice-market-hits-saturation-point-auriga-says/); Exh. 97 (Douglas A. McIntyre, *The Cellular Market in the US Is Saturated,* 24/7 Wall Street (Apr. 23, 2010), http://247wallst.com/2010/04/23/the-cellular-market-in-the-us-is-saturated/).

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX          36

Gibson, Dunn &
Crutcher LLP

platforms, these providers ensure that none of their potential customers will be encumbered by the switching costs associated with leaving their existing platform and starting again with a new platform as a condition for changing wireless service providers. This strategic decision on the part of wireless service providers thus confirms the relative importance of cross-platform switching costs in the overall smartphone and service decision-making process undertaken by wireless smartphone customers.

### F. Conclusion: Implications of Demand Characteristics

64.     As the analyses in this section demonstrate, the smartphone marketplace possesses a unique set of characteristics that make the acquisition of new customers under a platform now particularly valuable and, therefore, competition for such customers particularly intense. Once a customer chooses a smartphone platform, that customer is likely to stay with it for an extended period, during which time they will purchase additional phones, replace existing models with newer versions, acquire additional content for their devices and, in many cases, acquire related tablets, computers and other products compatible with their platform of choice. As noted above, network effects ensure that customer adoption of a particular platform will have a positive feedback effect, further extending the success of the platform. These dynamics are further complicated by the presence of wireless service providers, who offer an intermediate and indirect source of demand for the breadth of smartphones.

### IV.     APPLE WILL SUFFER SIGNIFICANT AND, TO A SUBSTANTIAL DEGREE, IRREPARABLE HARM IN THE ABSENCE OF A PI

65.     In the event the Samsung Galaxy Nexus was permitted to remain on the marketplace during the pendency of this lawsuit due to the absence of a preliminary injunction in this action,

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX          37

Apple would sustain significant irreparable harm.[95]  As explained below, that harm would arise through, at least: (1) the long term loss of iPhone market share; (2) the losses that radiate out from Samsung's acts of infringement well beyond the initial lost sales of iPhones including, lost future sales of iPhones, lost sales of digital media and applications, and lost sales of iPads, iPod touch devices, and Apple computers; and (3) lost goodwill.  These harms resulting from Samsung's infringement during this lawsuit would be substantial, would extend well into future years, long after a permanent injunction is entered and a damages award made, and cannot be fully quantified.[96]

### A.  Apple Would Suffer Irreparable Harm Due to Long-Term Loss of iPhone Market Share[97]

66.     Samsung is, at present, uniquely positioned to inflict substantial harm on Apple over the next 18 months.  This potential harm is further enhanced by the critical stage at which the smartphone industry presently sits, which I described above.

67.     As demonstrated above, Samsung has, even before the introduction of the Galaxy Nexus, established itself as Apple's most significant competitor in the smartphone market.  Indeed, since Samsung first entered the smartphone market, it has continually increased its share of smartphone sales at the expense of Apple's iPhone.[98]  Samsung's strategic direction clearly

---

[95] I refer to harm over the next 18 months because I understand that time to approximate the earliest that Apple could expect to obtain a permanent injunction in the event a preliminary injunction is not granted.  To the extent the period is longer, the irreparable harm to Apple would be even greater.

[96] The harm discussed below would be incalculable and irreparable regardless of the particular damages methodology used at trial (i.e., a lost profits or reasonable royalty theory).  Under either theory, to obtain damages for the substantial harms discussed in the previous section, Apple would need to provide a quantification of damages sustained to a reasonable degree of economic certainty.  That requirement is a rigorous one, and, for the reasons I explain below, one that would prevent Apple form obtaining anything approaching a fully compensatory damages award, under any framework.

[97] Throughout this declaration, I use the phrase "market share" in a colloquial sense to capture the general competitive environment in which smartphones compete.  I have not undertaken any formal analysis to define a "relevant market" as I understand that concept is used in an antitrust context.

[98] *See supra* at ¶ 22-24.

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-XXXXX-XXX            38

Gibson, Dunn &
Crutcher LLP

demonstrates an aggressive push to displace Apple's iPhone.[99]  Commentators have noted that

"Samsung is Going Right for Apple Fanboys' Jugular" through its advertising campaigns comparing

Samsung's prior Galaxy S II smartphone to Apple's iPhone.[100]  Others have noted that Samsung's

past Galaxy phones closely mimic the iPhone.[101]

68.    The Galaxy Nexus, like Samsung's prior Galaxy phones, will cause Apple to lose

iPhone sales and market share.  In fact, current market indicators suggest that the Galaxy Nexus may

have an even greater impact on Apple's iPhone sales than prior Samsung phones.  Commentators

have recognized the Galaxy Nexus as the iPhone's "main competitor" and "the most credible

competitor to the iPhone so far."[102]  Others have referred to the Galaxy Nexus' operating system as a

---

[99] *See supra* at ¶ 25-27.

[100] *See, e.g.*, samsungmobileusa, *The Next Big Thing Has the Best Apps* (Nov. 22, 2011),
http://www.youtube.com/user/samsungmobileusa#p/u/3/kO5ll_rvZj8; *see also* Exh. 40 (Fried, *supra*
note 43); Exh. 23 (Kovach, *supra* note 29).

[101] *See, e.g.*, Exh. 98 (Miyoung Kim, *Special Report: Can Samsung Change with the Tech Times?*,
Reuters (Feb. 5, 2011), http://www.reuters.com/article/2011/01/27/us-samsung-special-report-
idUSTRE70Q33H20110127) ("The Galaxy S is an imitation iPhone that runs on Google's Android
operating system."); Exh. 99 (Eric Auchard, *Analysis: Copying the iPhone is No Way to Beat It*,
Reuters (Feb. 20, 2009), http://www.pcmag.com/article2/0,2817,2341426,00.asp) ("Copying a few
pages from the playbook of Apple Inc's iPhone strategy, which brings many of the powers of the
Internet to mobile phones, is no way to beat the computer interloper at its game. But that's exactly
what many of the world's biggest handsets makers are trying to do with new copycat phones and
services that ape key features of the iPhone... The giants of the phone industry . . . Samsung
Electronics Co Ltd, . . . are humbling themselves to copy a company whose phones account for only
1 percent of handsets. A year ago, phone makers with quick-acting design teams came out with the
first touchscreen iPhone look-alikes. This year, they are going further by seeking to duplicate the
iPhone's user interface software."); Exh. 100 (Brian Caulfield, *Attack of the iPhone Killers*, Forbes,
June 16, 2008, http://www.forbes.com/2008/06/16/iphone-competitors-rim-tech-wireless08-
cx_bc_0616killer.html) ("Samsung's iPhone killer . . . isn't about to amaze anyone . . . . The phone is
little more than an iPhone knockoff, right down to the blank black face and chrome trim . . . .").

[102] Exh. 101 (Hayley Tsukayama, *Report: Galaxy Nexus to cost $299*, Wash. Post (Dec. 6, 2011),
http://www.washingtonpost.com/business/technology/report-galaxy-nexus-to-cost-
299/2011/12/06/gIQAeWlOZO_story.html); *see also* Exh. 102 (Nathan Olivarez-Giles, *Galaxy
Nexus: Still No U.S. release date, could sell for $299.99*, L.A. Times (Dec. 6, 2011),
http://latimesblogs.latimes.com/technology/2011/12/galaxy-nexus-still-no-release-date-could-sell-
for-300.html) (describing "Apple's iPhone 4S" as "the Galaxy Nexus' main competitor"); Exh. 103
(*Samsung Galaxy S3 to Beat First ICS Smartphone?*, International Business Times (Jan. 12, 2012),
http://www.ibtimes.com/articles/280852/20120112/samsung-galaxy-s3-beat-first-ics-smartphone.htm
(describing Galaxy Nexus as "a prime rival to Apple's iPhone 4S")); Exh. 104 (Sandy Fitzgerald,
*(Cont'd on next page)*

---

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX          39

"big leap forward."[103]   There are many product reviews that compare the iPhone 4S to Samsung's

Galaxy Nexus, which report that the Galaxy Nexus will compete significantly with Apple's iPhone[104]

and deprive Apple of iPhone sales and market share.

69.   Because the Galaxy Nexus has been reported as the iPhone's main and most credible

competitor, it is not reasonable to assume that potential Galaxy Nexus customers would simply

purchase a different Android device, from possibly another manufacturer, should the Galaxy Nexus

be unavailable.  Indeed, I am not aware of other Android devices having recently been identified as

such a threat to the iPhone.  This threat is exacerbated, moreover, because the acquisition of first-time

buyers is so crucial to the future success of Apple's products.

70.   While other platforms are also in place in the smartphone segment, it appears less

likely that they would take sales from the iPhone if Samsung's infringing product were not on the

market, particularly in the short to intermediate term.  As explained above, Android and iOS are the

two major platforms for smartphones both in the U.S. and abroad.  In the U.S., their combined share

of smartphone sales is close to 90%.[105]  Samsung's aggressive marketing and serial, rapid

---

*(Cont'd from previous page)*

*CES 2012: Sprint Ramps up 4G with Galaxy Nexus, LTE Devices* (Jan. 10, 2012),
http://www.mobiledia.com/news/123276.html ("The Galaxy Nexus [is] considered the closest
competition to Apple's iPhone 4S").

[103] *See, e.g.*, Exh. 105 (Kent German & Jessica Dolcourt, *Samsung Galaxy Nexus (Verizon Wireless)*,
CNET Reviews, http://reviews.cnet.com/smartphones/samsung-galaxy-nexus-verizon/4505-6452_7-
35099738-2.html?tag=mncol;rvwBody) ("Without a doubt, Android fans will see the Galaxy Nexus
that way and they're likely to savor every morsel of Ice Cream Sandwich. . . . As we said, ICS is a big
leap forward in making Android friendlier to entry-level users while satisfying the pros.").

[104] *See, e.g.*, Exh. 42 (Nickinson, *supra* note 44); Exh. 106 (Rose Catanzariti, *Galaxy Nexus vs.
iPhone 4S: Smartphone Comparison*, PC World Australia (Dec. 1, 2011),
http://www.pcworld.idg.com.au/article/409013/galaxy_nexus_vs_iphone_4s_smartphone_compariso
n/).

[105] *See* Attachment E. Samsung's own counsel concedes that its products "have a shelf life . . . like
cabbage," "six months to a year max." Exh. 107 (Trial Transcript (June 17, 2011)) at 32.  Samsung's
competitor HTC has similarly explained that the "average time smartphones spend on the market is
*(Cont'd on next page)*

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX                    40

Gibson, Dunn &
Crutcher LLP

introduction of phones, along with its strategy of mimicking the iPhone, has enabled it to grasp a significant portion of that Android share, which, in turn, has enabled it to whittle away at Apple's iPhone shares. The Galaxy Nexus is yet another example of this serial, aggressive introduction of new phones by Samsung. There is every reason to expect that the Galaxy Nexus, like Samsung's past phones, will continue to erode Apple's market share.

71.     Apple's success in the market, moreover, does not mean that Samsung's infringement does not cause and has not caused Apple harm. Indeed, as explained above, while Apple sold a significant number of iPhones in the fourth quarter of 2011, Samsung nonetheless became the largest manufacturer of smartphones in the world. It is inappropriate to assert that just because Apple has been successful, Samsung's infringement does not detract from even greater success. Moreover, since Samsung launched the Galaxy Nexus late in the quarter, sales data from the fourth quarter of 2011 has limited relevance for evaluating the effect that Samsung's Galaxy Nexus will have on iPhone sales going forward.

72.     The losses to market share suffered by Apple, moreover, will be long lasting. As explained above, the smartphone market is in a period of transition. Feature phone users are for the first time purchasing smartphones.[106] By the time this case concludes, there will be considerably more people in the U.S. using smartphones than feature phones.[107] As both Samsung and Apple have

---

*(Cont'd from previous page)*

now just six to nine months," and that "the pace of development continues to speed up and product lifetimes have grown shorter." Exh. 108 (Brief for HTC, No. 337-TA-710).

[106] *See supra* at ¶ 28.

[107] *See supra* at ¶ 19.

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX          41

1    recognized, capturing these first-time smartphone buyers is critical to maintain market and grow

2    share.[108]

3        73.    As I have also explained above, it is not only the critical juncture at which the

4    smartphone industry finds itself that will cause the iPhone's loss of market share to be long-lasting, it

5    is also the long-term ramifications associated with a consumer's first purchase.[109]  Industry data

6    demonstrates that smartphone customers are extremely loyal to the operating system or platform

7    installed on their smartphone.[110]  Familiarity, switching costs, and investments in the ecosystem

8    associated with the operating system and platforms contribute to this loyalty.[111]

9        74.    This loss of market share, moreover, will be sustained by Apple's iPhone well beyond

10   the date when Samsung may be prohibited from importing infringing devices under a permanent

11   injunction after a full adjudication of this matter, which I understand will likely be sometime in mid-

12   to-late 2013.  Apple will not be able to retrieve that market share because Samsung's infringing

13   activity during the pendency of this action will have provided Samsung with an opportunity to

14   acquire those important first-time buyers and thereby remain a major competitive force in the

15   marketplace.  Indeed, should Samsung be permitted, through the Galaxy Nexus, to capture those first

16   time buyers, it will, at the conclusion of this case and beyond, be in a position to retain those first-

17   time buyers when they purchase subsequent smartphones, infringing or not.  Importantly, given that

18   Samsung's installed base at the conclusion of this lawsuit will have developed significant loyalty to

19   the platform and may experience significant switching costs with respect to a movement to an

20   iPhone, it is highly likely that Samsung will be able to retain these customers (and cause further

---

[108] *See supra* at ¶ 27.
[109] *See supra* at ¶ 38.
[110] *See supra* at ¶ 47-48.
[111] *See supra* at ¶ 50-57.

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-XXXXX-XXX                42

Gibson, Dunn &
Crutcher LLP

losses to Apple's share), even where the devices Samsung sells to replace the Galaxy Nexus offer relatively less competitive features when compared to Apple's offering at the time.

75.    In sum, because (1) Samsung has rapidly acquired smartphone market share in the short time since it entered the market, (2) Samsung has specifically targeted the iPhone as the benchmark phone against which Samsung's phones, including the Galaxy Nexus, are to be compared, (3) Samsung and Apple directly compete for shares in the smartphone segment, and particularly for first-time smartphone buyers, (4) the market is at a critical juncture where vast numbers of consumers will by their first smartphone, and (5) there is considerable stickiness associated with a purchaser's first smartphone purchase, Samsung's introduction of the Galaxy Nexus will enable Samsung to continue to acquire market share from Apple's iPhone and the acquisition of such market share will be long lasting.

76.    Furthermore, the impact of this long-term loss of market share could never be fully calculated or assessed in final judgment in this case. Apple's long-term loss of market share in this case, moreover, would be amplified by the network effects discussed above, both before and after the issuance of a permanent injunction. Although it may be possible to quantify certain of the damages sustained by Apple for each sale of the Galaxy Nexus, it would not be feasible to reasonably quantify the value of the loss of market share attributable to the sales of the Galaxy Nexus. Indeed, the non-linearity of network effects, combined with the stickiness/loyalty associated with each customer's initial smartphone purchase, would render any attempt to compute damages sustained by Apple as a result of its long-term lost market share, whether under a lost profits or reasonable royalty computation, substantially incomplete. For these reasons, absent a PI, Apple would be irreparably harmed.

**B. Samsung's Infringement During this Lawsuit Would Have Irreparable Radiating Effects, Causing Apple to Lose Incalculable Sales Well Beyond the Initial Lost Sales of iPhones**

77.    In addition to its long-term loss of market share in the smartphone market, Apple would suffer myriad forms of harm absent a PI. Apple's losses would extend far beyond the initial lost sales of iPhones due to Samsung's infringement, and would, due to significant platform loyalty and network effects described above, radiate out to harm Apple's sales of many other products. Below I provide specific examples of the types of irreparable indirect harm that would result from Samsung's infringement. Although very real, these indirect harms would be extremely difficult to fully quantify, particularly as they radiate unpredictably across different Apple products, different customers, and out into the future. For that reason Apple could not be fully compensated for these harms through a damages award in this case.

78.    In addition, this case presents a quintessential example of irreparable harm because so much of the harm to Apple, resulting from Samsung's infringement during the period of this lawsuit, would extend far into the future, in ways that could never be calculable or reachable in a damages award in this case. In those patent cases where an award of damages can be sufficiently calculated, the harm caused by infringement typically occurs during the period of infringement and ends with the cessation of infringement. That is not true here. As discussed below, a full quantification of damages cannot be done in this case, even with respect to harm realized during the period of the lawsuit, due to inherent uncertainties introduced by platform loyalty and network effects. Those uncertainties are even further exacerbated, however, with respect to the harm to Apple that would continue into the future, beyond judgment. Any complete award of damages at such a trial would need to include an estimate of harm that Apple would sustain in the future as a result of Samsung's present infringement. That assessment would necessarily require assumptions about how the smartphone market would have behaved in the future, and how Apple would have been positioned in

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX                44

Gibson, Dunn & Crutcher LLP

that market, had Samsung never infringed.  Because industry analysts find it very difficult to accurately predict how different competitors will position themselves in the market, even in the near future, these assumptions would be unreliable.[112]  As such I would not expect, given my years of experience as a patent damages expert, that Apple would have any success in quantifying the far-reaching future impact of a significant and long-term loss of market share, or unpredictable radiating harms.

### 1. Injury to Apple Resulting from Loss of iPhone Sales to Purchases of Samsung Smartphones after Entry of a Permanent Injunction

79.     Absent a preliminary injunction, Apple will lose sales of iPhones as a result of customer's purchasing Samsung's Galaxy Nexus phone.  As explained above, Samsung's rapid acquisition of market share coupled with the immediate, favorable reviews of the Galaxy Nexus, all demonstrate that such losses will occur during this lawsuit.  As a result of those Galaxy Nexus sales that occur before the entry of a permanent injunction, Apple would lose an additional, unquantifiable number of smartphone sales in the future to Samsung.  Indeed, even in the event that Samsung were subject to a permanent injunction after this lawsuit, and removed the infringing features from its phones, Samsung would undoubtedly still retain customers due to both (1) the very strong platform loyalty inherent in the smartphone industry and (2) the network effects discussed above.  I discuss the incalculable nature of each aspect of this harm below.

---

[112] *See* Attachment L.  Many industry commentators, for example, concluded that the original iPhone would fail, a projection that, of course, history has proven wrong. *See, e.g.*, Exh. 109 (Michael Kanellos, *Perspective: The Apple Phone Flop*, CNET News (Dec. 7, 2006), http://news.cnet.com/The-Apple-phone-flop/2010-1041_3-6141607.html) (predicting that the iPhone "will largely fail" and will "take its place on the shelves with the random video cameras, cell phones, wireless routers and other would-be hits"); Exh. 110 (Bill Ray, *Why the Apple phone will fail, and fail badly*, The Register (Dec. 23, 2006), http://www.theregister.co.uk/2006/12/23/iphone_will_fail/) (predicting that "sales will stagnate" and concluding that "[t]he only question remaining is if, when the [iPhone] fails, it will take the iPod with it"); Exh. 111 (Allan Stern, *Three reasons why the iPhone won't be as mega as some think*, Center Networks (Jan. 9, 2007), http://www.centernetworks.com/three-reasons-why-the-iphone) (predicting that "the iPhone won't see the success that some think it will").

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX                45

Gibson, Dunn &
Crutcher LLP

80.   *Platform Loyalty.*  As explained above, first-time smartphone customers who purchase infringing Samsung smartphones while this case is pending will develop an affinity for the Android platform, while second or third-time customers will develop a further affinity to the platform.  Those customers become accustomed to the Android platform and place their personal content on their devices.  Switching costs incurred in learning a new platform and transferring content to a new platform mean that these customers will likely choose Samsung smartphones in their subsequent purchases, even after a permanent injunction is entered.  Thus, Samsung's initial capture (and retention) of these customers through its infringement, will cause these customers to have either developed or strengthened their affinity to the Android platform.  These strong platform loyalty effects will allow Samsung to retain these customers to a substantial degree for their subsequent smartphone purchases – after the entry of a permanent injunction.  Harm for these lost sales after the entry of the permanent injunction in eighteen months (or more) would be irreparable because it would be very difficult for Apple to quantify, with the certainty required in a patent case, the number of these subsequent Samsung sales Apple would have made but for Samsung's initial sales of the infringing Galaxy Nexus devices during this lawsuit.  The difficulty arises, in part, because quantification of such lost sales would require an assessment of platform loyalty that requires analysis of many future factors regarding the market that are not yet known.

81.   *Network Effects.*  As a result of Samsung's infringement and the resulting growth in the Android platform due to the associated "network effects" discussed above, Samsung's sales of the Galaxy Nexus phone will cause Apple to have a smaller iOS installed base and will cause the Android platform to have a greater installed base.  As a result, more customer and developer attention will be focused on the Android platform, which will, in turn, result in more rapid growth of the Android platform at Apple's expense.  Thus, this growth in the Android platform due to Samsung's infringement would result in a further reduction of Apple sales beyond those lost to Samsung

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX                46

initially. As demonstrated above, feedback effects lead to greater incremental demand for the product generated by a larger installed base. Correspondingly, weaker demand has the countervailing non-linear effect by which a smaller installed base leads to additional losses as the perceived value of the network to marginal potential users drops. In my experience, such losses in sales due to network effects have not been the subject of historical damages awards in patent infringement actions because they are inherently very difficult to assess with any reasonable certainty, particularly as the damages assessment period extends further out in time and into the future.

82.     As an example to illustrate that such harm is unquantifiable, assume that, in the absence of a PI, Samsung were to make 20 million infringing phone sales in the 18 months prior to a permanent injunction, and that these sales would have come entirely at Apple's expense. As a result of infringement, assume that, at the time of the permanent injunction, Apple's installed base would be 80 million iPhones, and Androids, 130 million. Had the 20 million infringing phones originally belonged to Apple during this period (with a PI in place), Apple's installed base at the date corresponding to the permanent injunction would actually be greater than 100 million units (Apple's observed 80 million units sold in the period with no PI, plus Samsung's 20 million infringing sales, plus an additional amount that would have resulted from network effects). This results from the feedback loop generated under network effects. With its 80 million installed users, and an additional 20 million users from Samsung, the iOS platform would be more attractive to other potential adopters, since the large user base allows for greater inter-communication through iOS with more users and provides incentives for a broader and higher quality set of Apps for the iOS platform. Thus, more than the 20 million adopters of the Samsung infringing phones (in this example) would shift to Apple because of these well recognized network effects. However, the magnitude of these effects are unknown since these network effects will coincide with other industry dynamics (e.g.,

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-XXXXX-XXX          47

Gibson, Dunn &
Crutcher LLP

1  technical change, shifts in suppliers, changes in pricing, etc.) that will also be transpiring during the

2  relevant period.

### 2. Injury to Apple Resulting from Loss of iPhone sales to Purchases of non-Samsung Android Smartphones

83.    If a PI is not entered here, in addition to losing iPhone sales to Samsung's Galaxy Nexus and other Samsung devices, as described above, Apple will also suffer a loss of sales to other (non-Samsung) producers of Android smartphones which are sold to customers who buy a Galaxy Nexus during the pendency of this litigation.  Like the loss of iPhone sales to purchases of Samsung devices, these losses from non-Samsung, Android phones are attributable to Samsung's infringement, are caused by platform loyalty and network effects, and are incalculable.

84.    *Platform Loyalty.*  Platform loyalty to Android is not limited to just Samsung devices. For that reason, when Samsung's Galaxy Nexus customers are ready to purchase a subsequent phone, they are more likely to purchase another Android phone over an iPhone, such as a phone made by Motorola.  Thus, because of Samsung's initial infringement, Apple will lose sales to other producers of Android devices above and beyond Apple's losses to Samsung. Even though these sales would cause additional harm to Apple, it would be infeasible to identify with a reasonable degree of accuracy those sales of future Android smartphones that would have been Apple's future sales but for Samsung's infringement.

85.    The difficulty with assessing damages attributable to these subsequent, non-Samsung, Android phone purchases will be exacerbated if customers purchase phones that do not infringe Apple's patents.  Indeed, Apple will have lost sales to the Android platform because customers developed an affinity for that platform as a result of the Galaxy Nexus.  However, even if Apple could, with a reasonable degree of certainty, quantify the sales of the non-Samsung Android phones, it would be even more difficult to collect damages for sales of non-infringing phones, despite the fact

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX              48

Gibson, Dunn &
Crutcher LLP

that the iPhone sales lost to these non-Samsung Android phones resulted from Samsung's infringement.

86.     *Network Effects.* Apple will also lose iPhone sales to other, non-Samsung, producers of Android smartphones when customers decide to purchase a non-Samsung Android device because of the growth in the Android platform due to the network effects associated with Samsung's initial infringement.  This harm too would be incalculable; as discussed above, the precise number of additional sales lost due to a platform loyalty as well as the non-linearity of network effects, make a damages calculation covering these lost sales exceedingly difficult to quantify.

### 3.  Irreparable Injury due to Long-Term Loss of Collateral Sales of iOS Devices that Apple would have sold to lost iPhone customers

87.     Samsung's infringement would also cause Apple to lose sales of other iOS devices.

Indeed, iPhones are specifically designed to work seamlessly with other iOS devices, with a view that this functionality will encourage customers that buy one iOS device (e.g., an iPhone) to later purchase complementary iOS devices (e.g., an iPad2 and /or iPod touch) or other Apple products.

These intra-platform purchases are a direct result of a customer's loyalty to his or her platform and the network effects associated with that loyalty, *i.e.*, the more people who become tied to a platform, the more

Gibson, Dunn &
Crutcher LLP

people who seek out the platform. Because the Galaxy Nexus is the first Android phone to feature seamless operation across devices similar to that found in Apple's ecosystem, it is even more likely that Apple will lose sales of complementary products, such as the iPad and iPod touch, to Galaxy Nexus customers; those customers will be incentivized to purchase other Android-based products that work with, and in the same manner as, the Galaxy Nexus.[115]

88.    As a result of Samsung's infringement, Apple would certainly lose sales of these other iOS devices that would have been associated iPhone sales but instead were lost to either Samsung or non-Samsung Android devices, as described above. While some portion of the lost collateral sales of iOS devices associated with the lost iPhone sales during the period of this lawsuit may be ascertainable, the total losses attributable to these lost derivative sales, including those resulting from future sales of either Samsung or non-Samsung Android devices, would be very difficult to fully quantify. There is no reliable way to estimate how many collateral devices a lost iPhone user might have purchased had the user not purchased a Galaxy Nexus (or other Android) device instead. Calculating such an estimate would also be infeasible, because the number of lost iPhone sales is unknowable for the reasons discussed above. These complementary sales, which are driven in large measure by platform loyalty, contribute to network effects that will cause the smartphone marketplace to swing even more in favor of Android-based devices, which will further exacerbate the irreparable harm to Apple. Because one cannot quantify with precision the associated network effects, these share losses would be irreparable.

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-XXXXX-XXX                50

**4.  Irreparable Injury due to Lost Sales of iOS Devices to Lost iPhone Users' Social Networks**

89.     As discussed above, iPhones include features that encourage iPhone users to have their friends and family purchase iOS devices.[116]  As a result of Samsung's infringement, Apple would certainly lose sales of these other iOS devices as well.

90.     The losses associated with this form of derivative sale, which would in many cases not have been made until some future time after the initial lost sale, would be very difficult to fully quantify.  There is no reliable way to determine whether a particular lost iPhone customer would have persuaded his friends or family to purchase additional iOS devices.  Any estimation of that sort would involve a degree of speculation that would not pass the rigorous requirements of proof in a patent case.  Moreover, because the number of sales of iPhones lost as a result of Samsung's infringement is unknowable, there would be no way to begin to estimate the number of lost sales to friends and family resulting from those lost sales of iPhones.  Finally, corresponding sales of Android devices, sold to the social network of these lost customers, would further contribute to network effects that will cause the smartphone marketplace to swing even further in favor of Android-based devices, in turn further exacerbating the irreparable harm to Apple.  Because one cannot quantify with precision the associated network effects, these share losses would be irreparable.

**5.  Irreparable Injury Due to Lost Sales of Other Apple Products**

91.     Apple would also suffer irreparable injury in the form of an unquantifiable number of sales of other Apple products besides the iOS devices discussed above.  Many iPhone customers go on to buy Mac computers,[117] as demonstrated by internal Apple customer surveys.  For example, one

---

[116] *See supra* at ¶ 54.

[117] Exh. 113 (Charles Jade, *Apple Q2 2011: Macs and iPhone Up, Apple 'Also Sold' 4.69 Million iPads*, gigaom.com, Apr. 20, 2011, http://gigaom.com/apple/apple-q2-2011-macs-and-iphone-up-
*(Cont'd on next page)*

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-XXXXX-XXX          51

Gibson, Dunn &
Crutcher LLP

survey indicates that iPhone owners are approximately twice as likely to report that they may

purchase an Apple computer over the next six months as a Windows computer.[118]  Likewise,

corporate customers who have accommodated Apple iPhones may be more open to enabling use of

other Apple products.[119]  Sales of iOS devices may lead to increased Apple TV sales as well.[120]

92.     These sales, like sales of other Apple products that would be lost if no PI is entered,

would not be reasonably estimable at the conclusion of the lawsuit.

### 6. Irreparable Injury due to Long-Term Loss of Collateral Sales of Digital Content That Would Otherwise Have Been Downloaded to iPhones and Collateral iOS Devices but for Samsung's Infringement

93.     As discussed above, Apple earns significant revenue from the sale of digital content,

such as apps and digital entertainment (e.g., music, movies, etc.), through the iTunes store.  Apple

will unquestionably lose some portion of this digital content revenue as a direct result of iPhone sales

lost to the Galaxy Nexus during this case.  Recall, as explained above, what originally made the

iPhone so unique – and what has continued to sustain its popularity – is the built-in functionality that

permits users to download, store, and enjoy music, movies, and other digital content on one device.

---

*(Cont'd from previous page)*

apple-also-sold-4-69-million-ipads/) ("In fact, we are likely seeing the third-generation of 'halo effect,' where first the iPod, then the iPhone, and now the iPad increase Mac sales by affection.").

[118] Exh. 53 (*iPhone Owner Study, supra* note 63) at 109 (at least 15% of iPhone owners report that they are likely to purchase an Apple computer in the next 6 months, while only 6-9% of iPhone owners report that they are likely to purchase a Windows computer).

[119] Exh. 114 (Larry Dignan, *Apple's Enterprise Halo: Bausch & Lomb goes iPhone, iPad to Mac Pilots*, zdnet.com, Sept. 2, 2011, http://www.zdnet.com/blog/btl/apples-enterprise-halo-bausch-lomb-goes-iphone-ipad-to-mac-pilots/57174) ("First, the iPhone was supported by the IT department – sometimes reluctantly.  The iPhone paved the way for execs to quickly give the iPad a spin.  Now Macs are entering the fray.").

[120] Exh. 115 (Tim Carmody, *Apple Redefines Remote Control—Now, It's Your Cellphone*, Sept.1, 2010), http://www.wired.com/gadgetlab/2010/09/remote-without-a-screen/all/1 (suggesting that only iOS device owners are likely to buy Apple TVs); Exh. 116 (Apple website, http://www.apple.com/iphone/features/airplay.html) ("With AirPlay, you can wirelessly stream what's on your iPhone, iPad, or iPod touch to your HDTV and speakers via Apple TV. Or mirror your iPad 2 or iPhone 4S screen. That's gonna go over big.").

Revenue attributable to such digital content, as also noted above, is significant, which is demonstrated by Apple having paid app developers more than $2.5 billion in revenues related to app purchases.[121]  In addition to digital content revenue lost to the Galaxy Nexus, or other Samsung or non-Samsung Android phones purchased subsequent to or because of a Galaxy Nexus purchase, Apple will also lose digital content revenue as a direct result of downloads made on complementary devices, such as tablets, that were purchased because a customer had purchased the Galaxy Nexus, or other Android device because of the original Galaxy Nexus purchase.  But for Samsung's infringement, this digital content would have been downloaded to Apple's collateral iOS devices.

94.     Network effects particularly influence the development of digital content, which is confirmed by a review of the volume of apps available for the different operating systems.  In the VisionMobile 2011 Strategic Assessment "Mobile Platforms: The Clash of Ecosystems," it was reported that the iOS operating system and Android platform enjoy substantial leads in app availability – 500,000 under iOS and 300,000 under Android, compared to 35,000 for BlackBerry OS and 30,000 for Windows Mobile.[122]  Further, the VisionMobile Report states:

> Today, smartphone competition is a two-horse race between Apple iOS and the growing camp of Android device makers.  The Android camp is able to produce hundreds of device models at a wide range of price points, from high-end superphones like the $755 Samsung Galaxy SII with NFC support, to low-cost models such as the Huawei U8100 at $100 (pre-tax and pre-subsidies).[123]

Thus, Samsung's implementation, during the pendency of this suit, of the newest Android platform in the Galaxy Nexus will contribute further to the popularity of the Android platform, and thereby

---

[121] See supra at ¶ 58.

[122] Exh. 72 (VisionMobile 2011, supra note 42) at 4. It should be noted that while the Android platform now enjoys a larger share than iOS, the difference in available apps between the two systems likely derives from Apple's headstart in the smartphone business.  Network effects account for the rapid expansion of the Android library.

[123] Exh. 72 (VisionMobile 2011, supra note 42) at 8.

DECLARATION OF CHRISTOPHER VELLTURO, Ph.D. – CASE NO. 12-cv-XXXXX-XXX          53

Gibson, Dunn & Crutcher LLP

provide further incentives to developers to create more apps for that platform.  All of this will contribute to an increase in the popularity of Samsung and other non-Samsung Android devices and to Apple's sustained loss of sales and market share.

95.     This harm to Apple would not be fully compensable at trial.  Some portion of this lost revenue, such as that revenue associated with the initial lost sale of an iPhone, could be quantified at the damages phase of this case.  However, a great deal of other lost digital content revenue, such as that associated with the incalculable future lost sales of subsequent iPhones and iOS devices, particularly those lost after the initial act of infringement, could not be quantified, because, as described above, platform loyalty and network effects limit the ability to quantify the number of lost device sales.  For these reasons, much of this harm would be irreparable.

### 7.     Irreparable Injury Due to the Harm to Apple's Goodwill Resulting from Samsung's Infringement

96.     Absent a PI, Samsung will continue to import and sell in the United States allegedly infringing smartphones that offer a similar user experience to the iPhone and a similar experience (in certain other aspects) to Apple's digital media product line more generally (*e.g.*, seamless interoperability between smartphone and tablet).  The distinctive user experience Apple created and nurtured through its line of portable devices (iPod, iPhone, iPad, *etc.*) is a critical determinant in the value of the Apple brand and the associated goodwill Apple has built with end users.

⬛ This goodwill will be eroded as a result of Samsung's sales of its allegedly infringing phones if a PI is not granted.

97.     The distinctive/differentiated nature of Apple's product offerings is reflected in consumer surveys and brand valuations.  In *Bloomberg BusinessWeek*'s annual ranking of the world's

⬛

DECLARATION OF CHRISTOPHER VELLTURO, Ph.D.  – CASE NO. 12-cv-XXXXX-XXX                54

Gibson, Dunn & Crutcher LLP

most innovative firms, Apple consistently ranks first, including in each of the last two years.[125]
Apple is credited with "consistently combin[ing] clever technology with simplicity and ease of use"
and "inspir[ing] an almost religious fervour among its customers."[126]  As a result of a history of
innovations, inventions, marketing, and building a reputation for dependable, high quality products,
Apple has developed one of the most valuable brands in the world.  In 2011, Apple became the most
valuable brand in the world – surging ahead of Google and IBM.[127]  Samsung has avowed a desire to
"'change people's attention'" so they are no longer "'obsessed with Apple,'" as Samsung describes
U.S. customers.[128]

98.    Through the use of key Apple patents, Samsung will endeavor to position its
smartphones in feature/user experience "space" very close to the iPhone.  This intent is evident in the

---

[125] *See* Exh. 117 (Michael Arndt & Bruce Einhorn, *The 50 Most Innovative Companies 2010*, Bloomberg BusinessWeek (Apr. 15, 2010), http://www.businessweek.com/interactive_reports/innovative_companies_2010.html?chan=magazine+channel_special+report).

[126] Exh. 60 (*Lessons from Apple, supra* note 67).  In 2001, industry analysts wrote that "Apple still stands above the crowd with its fantastic product design and killer software applications." Exh. 118 (Conan J. Laughlin, *et al., Apple Computer, Inc.; Initiated Coverage with a Market Perform Rating*, Deutsche Banc Alex Brown, Nov. 6, 2001) at 4. Similarly, "…the Apple experience is about simplifying the way we interact with machines and making them natural and more intuitive." Exh. 119 (*Is Siri Steve Jobs' Greatest Legacy?*, Image Mechanics Thinking Aloud (Oct. 9, 2011), http://imagemechanics.com.au/#!/blog/2011/is-siri-steve-jobs-greatest-legacy/).

[127] *See* Exh. 61 (*BrandZ Top 100, supra* note 67) at 41. Apple is widely admired as the most innovative company in the world, and its brand is tied up with that fact. *See, e.g.,* Exh. 117 (Arndt & Einhorn, *supra* note 125) (naming Apple as the most innovative company in the world)).  Indeed, the U.S. Patent and Trademark Office is currently sponsoring an exhibit focused on the patents of Steve Jobs, and its director has described the exhibit as commemorating "'the far-reaching impact of Steve Jobs' entrepreneurship and innovation on our daily lives.'" Exh. 120 (Suzanne Choney, *Exhibit honors Steve Jobs patents, trademarks*, Digital Life, Nov. 30, 2011, available at http://digitallife.today.msnbc.msn.com/_news/2011/11/29/9096767-exhibit-honors-steve-jobs-patents-trademarks).

[128] Exh. 121 (Ina Fried, *Samsung's Marketing Chief Aims to Stir Passion for Korea's Electronics Giant*, http://allthingsd.com/20120130/samsungs-marketing-chief-aims-to-stir-passion-for-koreas-electronics-giant/ (Jan. 30, 2012).

DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D. – CASE NO. 12-cv-XXXXX-XXX          55

Gibson, Dunn &
Crutcher LLP

pre-launch marketing and advertising put forward by Samsung.[129] By encroaching on the distinctive user experience developed by Apple, Samsung will erode Apple's brand value and associated goodwill.[130] Such harm to goodwill is, in my experience, virtually impossible to quantify, and is thus irreparable.

## V.   CONCLUSION

For all of the reasons given above, it is my opinion that absent a PI, Apple would be incalculably and irreparably harmed by Samsung's importation of the Galaxy Nexus phone. I find that Apple would be irreparably harmed even if a permanent injunction were entered in mid-2013, even if Samsung removed the infringing features from the Galaxy Nexus at that time, and even if Apple later obtained a damages award for the infringement that occurred during the pendency of this suit. Although Apple may be able to recoup some of the harm resulting from Samsung's infringement in the form of damages, these damages would not approach the true harms sustained by Apple during the infringement period or for the period extending beyond a final resolution of this case. The resulting non-recoverable harms would be substantial and irreparable.

---

[129] As mentioned above, *see, e.g.*, samsungmobileusa, *The Next Big Thing Has the Best Apps* (Nov. 22, 2011), http://www.youtube.com/user/samsungmobileusa#p/u/3/kO5Il_rvZj8; *see also* Exh. 40 (Fried, *supra* note 43); Exh. 23 (Kovach, *supra* note 29).

[130] *See, e.g.*, Exh. 122 (Ted Marzilli, *iPhone scores drop as Samsung Galaxy ads mock Apple fanboys,* YouGov (Dec. 14, 2011), http://today.yougov.com/news/2011/12/14/iphone-scores-drop-samsung-galaxy-ads-mock-apple-f/ ("Samsung has just edged past the iPhone in consumer perception in the US (adults 18+), likely powered by their new set of ads bashing the Apple fanboys who camp out for hours to buy the new iPhone."); *see also* Exh. 36 (Silverman, *supra* note 42).

Gibson, Dunn & Crutcher LLP

1
2
3      I declare under penalty of perjury that the foregoing is true and correct.
4
5   Dated:   February 8, 2012
6                                          Christopher Vellturo
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
     DECLARATION OF CHRISTOPHER VELLTURO,
     Ph.D. – CASE NO. 12-cv-XXXXX-XXX

# Attachment A



**quantitative economic solutions, LLC**
Microeconomic Consultants

50 Church Street
3rd Floor South
Cambridge, MA 02138

main dial   617.995.7676
facsimile   617.995.7677

# CHRISTOPHER A. VELLTURO
## President

Over the course of his career, Dr. Vellturo has performed a wide variety of economic and econometric analyses and provided expert testimony in the context of mergers and acquisitions, antitrust litigation, intellectual property litigation and numerous other matters spanning a broad array of industries. Dr. Vellturo has testified on economics-related matters in numerous U.S. District Courts, as well as at the Canadian Competition Bureau, and the American Arbitration Association. He has appeared before the U.S. Department of Justice, the Federal Trade Commission, various states' Attorneys General offices, the Federal Reserve Bank Board of Governors, and numerous other regulatory agencies on merger-related issues and other antitrust matters. Dr. Vellturo has also made appearances at hearings before the European Commission, and other antitrust enforcement agencies around the world. To date, he has performed economic analyses in over one hundred merger matters, in excess of seventy antitrust actions and well over one hundred intellectual property actions.

Dr. Vellturo currently teaches graduate-level economics at Boston University's School of Management.

Prior to forming Quantitative Economic Solutions, LLC (QES), Dr. Vellturo was a Principal at Analysis Group/Economics (AG/E) and a Senior Vice President and member of the Board of Directors at National Economic Research Associates (NERA).

Dr. Vellturo has published on a variety of topics, including merger and acquisition-related efficiencies, price discrimination, differentiated product analysis and market definition. His research has appeared in leading academic journals, including *Antitrust*, the *Antitrust Law Journal*, and the *Journal of Economics and Management Strategy*. Dr. Vellturo is a recipient of the Bradley Fellowship in Public Economics and has served as a referee for *American Economic Review* and *Rand Journal of Economics*.

A Ph.D. graduate in Economics from the Massachusetts Institute of Technology, Dr. Vellturo also holds a Sc.B. in Applied Mathematics and Economics from Brown University, where he graduated *magna cum laude* and *Phi Beta Kappa*.

*Christopher A. Vellturo, page 2*

## EDUCATION

1989    Ph.D. in Economics, Massachusetts Institute of Technology
        *Primary Fields:* Econometrics, Industrial Organization
        *Secondary Fields:* Public Finance, Game Theory, Law and Economics

1983    Sc.B. in Applied Mathematics and Economics (*magna cum laude*), Brown University


## PROFESSIONAL EXPERIENCE

2008-Present    **Boston University, School of Management**
                *Adjunct Professor* – Department of Finance & Economics

2002-Present    **Quantitative Economic Solutions, LLC**
                *President/Manager* – Direct research on microeconomic issues in litigation and non-litigation
                matters. Areas of particular focus include: antitrust, regulation, and damages assessment in
                intellectual property and contract matters.

2000-2002       **Analysis Group/Economics**
                *Principal* - Direct research and provide expert testimony on a variety of microeconomic
                issues with particular emphasis on antitrust, intellectual property, and mergers and
                acquisitions. Expert reports and testimony presented in U.S. District Court. Presented
                antitrust economic analyses to Federal Trade Commission, U.S. Department of Justice,
                Federal Reserve Bank Board of Governors and the European Commission.

1996-2000       **National Economic Research Associates, Inc.**
                *Senior Vice President* (1999-2000)
                *Vice President* (1996-1999)

1991-1996       **Cambridge Economics, Inc.**
                *Director* - Directed research and provided expert testimony on a variety of microeconomic
                issues with particular emphasis on antitrust, intellectual property, and mergers and
                acquisitions. Prior expert testimony provided in U.S. District Court and before the
                American Arbitration Association. Presented antitrust economic analyses to U.S.
                Department of Justice, Federal Trade Commission (Antitrust Division), state Attorneys
                General offices, and the Federal Reserve Bank Board of Governors.

1989-1991       **National Economic Research Associates, Inc.**
                *Senior Consultant* - Directed and performed research relating to issues of antitrust,
                intellectual property, mergers and regulation.

1987            **Department of Economics, M.I.T.**
                *Teaching Assistant* - Undergraduate econometrics.

1985-1989       **Dean Ann F. Friedlaender, M.I.T.**
                *Research Associate* - Participated in research relating to transportation pricing and capital
                allocation responses to regulatory changes.

*Christopher A. Vellturo, page 3*

1983-1985     **National Economic Research Associates, Inc.**
              *Research Associate* - Conducted research on a wide variety of issues including antitrust,
              railroad rate setting, optimal landfill pricing, and PCB and asbestos abatement strategies.


## AWARDS AND PROFESSIONAL ACTIVITIES

1987-1989     Recipient, Bradley Fellowship in Public Economics

1986          M.I.T. Departmental Fellowship

1983          Phi Beta Kappa, Brown University

1983          Sigma Xi, Brown University

Present       Journal Referee for *American Economic Review* and *Rand Journal of Economics*

Present       Member, American Economic Association

Present       Member, American Bar Association


## TESTIFYING HISTORY

- *Uniloc USA, Inc. and Uniloc Singapore Private Ltd. v. Microsoft Corporation*
  District of Rhode Island, Civil Action No. 03-CV-440 (WES).

- *Schering Corporation v. Apotex Inc. and Apotex Corp.*
  U.S. District Court, District of New Jersey, Civil Action No. 09-6373 (PGS)(TJB).

- *Hoffmann-LaRoche Inc. v. Apotex Inc. and Apotex Corp.; Hoffmann-LaRoche Inc. v. Watson Laboratories, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., Cobalt Pharmaceuticals Inc. and Cobalt Laboratories, Inc.; Hoffmann-LaRoche Inc. v. Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc.; Hoffmann-LaRoche Inc. v. Orchid Chemicals & Pharmaceuticals Ltd., Orchid Healthcare, Orchid Pharmaceuticals Inc. and Orgenus Pharma Inc.; Hoffmann-LaRoche Inc. v. Mylan, Inc., Myland Pharmaceuticals Inc., Genpharm ULC (f/k/a Genpharm Inc.) and Genpharm, L.P.*
  U.S. District Court, District of New Jersey, Civil Action Nos. 10-6241 (SRC)(MAS) (consolidated with 07-4417 for all purposes)/10-6206 (SRC)(MAS) (consolidated with 07-4539 for all purposes)/10-5623 (SRC)(MAS) (consolidated with 07-4516 for all purposes); 10-4050 (SRC)(MAS) (consolidated with 07-4582 for all purposes)/11-0579 (SRC)(MAS) (consolidated with 07-4661 for all purposes).

- *Genzyme Corporation v. Seikagaku Corporation, Zimmer Holdings, Inc., Zimmer, Inc., and Zimmer U.S., Inc.,*
  U.S. District Court, District of Massachusetts, C.A. No.: 1:11-cv-10636-DPW.

- *Hoffman—La Roche Inc. v. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceuticals Industries Ltd.; Hoffman—La Roche Inc. v. Roxane Laboratories, Inc. and Boehringer Ingelheim Roxane, Inc.*
  U.S. District Court, District of New Jersey, Civil Action Nos. 09-5283-(ES)(CLW)/09-6335(ES)(CLW).

*Christopher A. Vellturo, page 4*

- *Multimedia Patent Trust v. DIRECTV, INC., et al.*
  U.S. District Court, Southern District of California, Case No. 09-CV-00278-H (CAB).

- *Pfizer Inc., Warner-Lambert Company LLC, C.P. Pharmaceuticals International C.V. and Northwestern University v. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceuticals Industries, Ltd., et al.*
  U.S. District Court, District of Delaware, C.A. No. 09-307 (GMS) (Consolidated).

- *Affinity Labs of Texas, LLC v. Apple Inc.*
  U.S. District Court, Northern District of California, Oakland Division, Case No. CV09-4436-CW.

- *Merck & Co., Inc. and Merck Sharp & Dohme Corp. v. Sandoz Inc.*
  U.S. District Court, District of New Jersey, Civil Action Nos.: 10-cv-01625-SRC-PS and 10-cv-02308-SRC-PS.

- *Bayer Schering Pharma AG and Bayer HealthCare Pharmaceuticals Inc. (Plaintiffs/Counterdefendants) v. Lupin Ltd. and Lupin Pharmaceuticals, Inc. (Defendants/Counterclaimants)*
  U.S. District Court, District of Nevada, No. 2:10-cv-01166(RCJ)(ECS).

- *Hoffman–La Roche Inc., v. Mylan Pharmaceuticals Inc. and Mylan Inc.*
  U.S. District Court, District of New Jersey, Civil Action No. 09-01692.

- *ACQIS LLC v. Appro International, Inc., ClearCube Technology, Inc., Dell Inc., Fujitsu America, Inc., Hitachi America, Ltd., Hewlett-Packard Co., International Business Machines Corp., NEC Corp. of America, Nex Computers, Inc., Sun Microsystems, Inc. and Super Micro Computer, Inc. (Defendant International Business Machines Corp.)*
  U.S. District Court, Eastern District of Texas, Tyler Division, Case No. 6:09-cv-00148.

- *Bayer Schering Pharma AG and Bayer HealthCare Pharmaceuticals Inc. (Plaintiffs/Counterdefendants) v. Sandoz, Inc., Watson Pharmaceuticals, Inc., and Watson Laboratories, Inc. (Defendants/Counterclaimants)*
  U.S. District Court, District of Nevada, No. 2:08-cv-00995-KJF-(GWF)/No. 2:07-cv-01472-KJD-(GWF).

- *Kaye Scholer LLP v. CNA Holdings, Inc. and Celanese Americas Corporation and CNA Holdings, Inc. and Celanese Americas Corporation v. Kaye Scholer LLP, Robert B. Bernstein and Michael D. Blechman*
  U.S. District Court, Southern District of New York, No. 08-CV-5547 (NRB).

- *ZapMedia Services, Inc. v. Apple Inc.*
  U.S. District Court, Eastern District of Texas, Marshall Division, Civil Action No. 2:08-CV-104-DF-CE.

- *Metso Minerals, Inc. v. Powerscreen International Distribution Limited, Terex Corporation, Powerscreen New York, Inc., and Emerald Equipment Systems, Inc.*
  U.S. District Court, Eastern District of New York, Civil Action No. 06cv01446 (ADS)(ETB).

- *Intel Corporation (Plaintiff/Counterclaim Defendant) v. NVIDIA Corporation (Defendant/Counterclaim Plaintiff)*

*Christopher A. Vellturo, page 5*

Court of Chancery, State of Delaware, C.A. No. 4373-VCS.

- *Hoffman-La Roche Inc. v. Cobalt Pharmaceuticals Inc. and Cobalt Laboratories, Inc.*
  U.S. District Court, District of New Jersey, Civil Action Nos. 07-4539 (SRC) (MAS), 07-4540 (SRC) (MAS), 08-4054 (SRC) (MAS).

- *In Re: Payment Card Interchange Fee and Merchant Antitrust Litigation*
  U.S. District Court, Eastern District of New York, Master File No. 05-MD-1720.

- *Kinetic Concepts, Inc., KCI Licensing, Inc., KCI USA, Inc., KCI Medical Resources, Medical Holdings Limited, KCI Manufacturing and Wake Forest University Health Sciences v. Convatec Inc., Boehringer Wound Systems, LLC, and Boehringer Technologies, LP*
  U.S. District Court, Middle District of North Carolina, Civil Action No. 1:08-CV-00918-WO-LPA.

- *Sonoran Scanners, Inc. and Joseph P. Donahue v. PerkinElmer, Inc.*
  U.S. District Court, District of Massachusetts, Civil Action No. 06-12090-WGY.

- *Marine Polymer Technologies, Inc. v. Hemcon,Inc.*
  U.S. District Court, District of New Hampshire, Civil Action No. 06-CV-100-JD.

- *Ronald A. Katz Technology Licensing L.P. v. Comcast Corporation, et al.; GEICO Corporation, et al.; XM Satellite Radio Holdings Inc.* (Defendants GEICO Corporation, Government Employees Insurance Company, GEICO General Insurance Company, GEICO Indemnity Company and GEICO Casualty Company)
  U.S. District Court, Central District of California, Case No. 07-ML-1816-C RGK (FFMx)/Case No. 2:07-CV-06996 RGK (FFMx).

- *Canadian National Railway Company v. Union Pacific Railroad Company*
  In Arbitration Proceedings.

- *Hoffmann-LaRoche Inc. v. Apotex Inc. and Apotex Corp.; Hoffmann-LaRoche Inc. v. Cobalt Pharmaceuticals Inc. and Cobalt Laboratories, Inc.; Hoffmann-LaRoche Inc. v. Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc.; Hoffmann-LaRoche Inc. v. Genpharm Inc. and Genpharm, L.P.; Hoffmann-LaRoche Inc. v. Orchid Chemicals & Pharmaceuticals Ltd., Orchid Healthcare, Orchid Pharmaceuticals Inc. and Orgenus Pharma Inc.*
  U.S. District Court, District of New Jersey, Civil Action Nos. 07-4417 (SRC)(MAS)/08-3065 (SRC)(MAS)/08-4053 (SRC)(MAS); 07-4539 (SRC)(MAS)/07-4540 (SRC)(MAS)/08-4054 (SRC)(MAS); 07-4516 (SRC)(MAS)/08-3607 (SRC)(MAS)/08-4055 (SRC)(MAS); 07-4661 (SRC)(MAS)/08-4052 (SRC)(MAS); 07-4582 (SRC)(MAS)/08-4051 (SRC)(MAS).

- *Saxon Innovations, LLC v. Nokia Corp., et al.*
  U.S. District Court, Eastern District of Texas, Civil Action No. 6:07-cv-490-LED-JDL.

- *NewPage Wisconsin System, Inc. v. Canadian National Railway Company and Wisconsin Central Ltd.*
  In Arbitration Proceedings.

- *Owens-Illinois, Inc. v. BTR plc*

*Christopher A. Vellturo, page 6*

U.S. District Court, Southern District of New York, Case No. 05 CV 2873 (LLS).

- *Realtime Data, LLC d/b/a/ IXO v. Packeteer, Inc., Citrix Systems, Inc., Expand Networks, Inc., F5 Networks, Inc., 7-Eleven, Inc., ABM Industries, Inc., ABM Janitorial Services-South Central, Inc., Averitt Express Inc., Build-A-Bear Workshop, Inc., DHL Express (USA), Inc., Interstate Battery System of America, Inc., O'Reilly Automotive, Inc., and Blue Coat Systems, Inc.*
  U.S. District Court, Eastern District of Texas, Tyler Division, Case No. 6:08cv144 LED.

- *Medtronic, Inc., Medtronic USA, Inc., Medtronic Vascular, Inc. v. AGA Medical Corporation*
  U.S. District Court, Northern District of California, San Francisco Division, Case No. C07-00567 MMC.

- *Schering Corporation and MSP Singapore Company, LLC v. Glenmark Pharmaceuticals, Inc. and Glenmark Pharmaceuticals Ltd.*
  U.S. District Court, District of New Jersey, Civil Action No.: 07-CV-01334 (JLL)(CCC).

- *AstraZeneca LP and AstraZeneca AB v. Apotex, Inc. and Apotex Corp.*
  U.S. District Court, District of New Jersey, Civil Action No. 1:09 CV 01518 (RMB)(AMD).

- *Gyrus Group, PLC, Ethicon, Inc., and DePuy Mitek, Inc. and ArthroCare Corp.*
  CPR Institute for Dispute Resolution, Case No. G-08018, JAMS Ref. No. 1100055345.

- *OPTi, Inc. v. Apple Inc.*
  U.S. District Court, Eastern District of Texas, Marshall Division, Civil Action No. 2:07-CV-00021 (CE).

- *Merck Sharp & Dohme Pharmaceuticals SRL v. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries, Ltd.*
  U.S. District Court, District of New Jersey, Civil Action No.: 07-1596 (GEB).

- *Cancer Research Technology Limited and Schering Corporation v. Barr Laboratories, Inc. and Barr Pharmaceuticals, Inc.*
  U.S. District Court, District of Delaware, C.A. No. 1:07 cv 00457 SLR.

- *Ronald A. Katz Technology Licensing L.P. v. Continental Airlines, Inc., et al.* (Defendants Teligence (US), Inc., Teligence Holdings (US), Inc. and Utel Networks Inc.)
  U.S. District Court, Eastern District of Texas, Marshall Division, Case No. 2:07-cv-232.

- *Ronald A. Katz Technology Licensing L.P. v. Citizens Financial Group, Inc., et al.*
  U.S. District Court, Central District of California, Case No. 07-ML-1816-C RGK (FFMx)/Case No. 07-CV-04964 RGK (FFMx).

- *Ronald A. Katz Technology Licensing L.P. v. Continental Airlines, Inc., et al.* (Defendant United Parcel Service, Inc.)
  U.S. District Court, Central District of California, Western Division, Case No. 07-ML-01816 RGK (FFMx)/Case No. 07- CV-4965 ABC (FFMx).

- *Medtronic, Inc., Medtronic USA, Inc. and Medtronic Vascular, Inc. v. W.L. Gore & Associates, Inc.*
  U.S. District Court, Northern District of California, San Francisco Division, Civil Action No. 06-04455 JSW.

- *Moët Hennessy SNC (Claimant) and Phillips Beverage Company (Respondent/Counterclaimant) and Moët Hennessy SNC, et al. (Counterclaim Defendants)*
  American Arbitration Association, Arbitration Case No. 50 181 T 0005908.

- *Ronald A. Katz Technology Licensing L.P. v. Humana, Inc. and Humana Military Healthcare Services, Inc.* (Defendants Humana, Inc. and Humana Military Healthcare Services, Inc.)
  U.S. District Court, Eastern District of Texas, Lufkin Division, Case No. 9:06-cv-199.

- *Ronald A. Katz Technology Licensing L.P. v. U.S. Bancorp and U.S. Bank, NA* (Regarding Defendants U.S. Bancorp and U.S. Bank, NA)
  U.S. District Court, Eastern District of Texas, Lufkin Division, Case No. 9:06-cv-203.

- *Ronald A. Katz Technology Licensing L.P. v. American Airlines, et al.* (Regarding Defendant FedEx)
  U.S. District Court, Central District of California, Case No. 07-ML-1816-B-RGK (FFMx)/ Case No. CV 07-2196 RGK (FFMx).

- *Ronald A. Katz Technology Licensing L.P. v. Chevron Corporation, et al.* (Regarding Defendant General Motors)
  U.S. District Court, Central District of California, Western Division, Case No. 9:06-cv-00178-RHC.

- *Ronald A. Katz Technology Licensing L.P. v. American Airlines, et al.* (Regarding Defendant American Airlines)
  U.S. District Court, Central District of California, Case No. 07-ML-1816-B-RGK (FFMx)/Case No. CV 07-2196 RGK (FFMx).

- *Merit Industries, Inc. v. JVL Corporation*
  U.S. District Court, Eastern District of Pennsylvania, Civil Action No. 03-CV-01618-TJS.

- *Loislaw.com, Inc. (Plaintiff/Counter-Defendant) v. JurisDictionUSA, Inc. (Defendant/Counter-Claimant) and JurisDictionUSA, Inc. v. Aspen Publishers, Inc., et al.*
  Arkansas Circuit Court for Crawford County, No. CV2002-115.

- *AstraZeneca LP and AstraZeneca AB v. Ivax Phamaceuticals, Inc.*
  U.S. District Court, District of New Jersey, Civil Action No. 05 CV 05142 (RMB)(AMD).

- *U.S. Philips Corporation, (Plaintiffs/Counterclaim-Defendants) v. Pantech Wireless, Inc. (Defendant/Counterclaim-Plaintiff)*
  U.S. District Court, Southern District of New York, Civil Action No. 08-CV-02526.

- *Alloc, Inc., Berry Finance, N.V. and Välinge Aluminum AB v. Norman D. Lifton Co., Inc., Balta U.S. Inc. and Balterio N.V.*

*Christopher A. Vellturo, page 8*

U.S. District Court, Southern District of New York, No. 03 Civ. 4419 (PAC) (DF).

- *Akamai Technologies, Inc. and Massachusetts Institute of Technology v. Limelight Networks, Inc.*
  U.S. District Court, District of Massachusetts, Civil Action No.: 06-CV-11109 RWZ consolidated with Civil Action No.: 06-11585 RWZ.

- *Fastenetix, LLC. v. Medtronic Sofamor Danek, Inc and Medtronic Sofamor Danek U.S.A., Inc. and DOES 1 through 10*
  U.S. District Court, District of New Jersey, Civil Action No. 06-2070 SRC-MAS.

- *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc and Medtronic Sofamor Danek U.S.A. and Medtronic Sofamor Danek, Inc., Medtronic Sofamor Danek U.S.A. and SDGI Holdings, Inc. v. Cross Medical Products, Inc.*
  U.S. District Court, Central District of California, Southern Division, Case No. SACV 03-110 GLT (ANx).

- *Sandata Technologies, Inc. v. Infocrossing, Inc.*
  U.S. District Court, Southern District of New York, Civil Action No. 05-CV-9546.

- *DePuy AcroMed, Inc. and Biedermann Motech GMBH v. Medtronic Sofamor Danek, Inc., f/k/a Sofamor Danek Group, Inc. and Medtronic Sofamor Danek, U.S.A. Inc.*
  U.S. District Court, District of Massachusetts, Civil Action No. 01-CV-10165 (EFH).

- *TV Guide Online, Inc. and TV Guide Online, LLC v. Tribune Media Services, Inc.*
  U.S. District Court, District of Delaware, Civil Action No. 05-CV-725-KAJ.

- *In Re: Polyester Staple*
  U.S. District Court, Western District of North Carolina, Charlotte Division, MDL Docket No. 3:03-CV-1516.

- Testimony before the Texas House of Representatives Committee on Regulated Industries in connection with Senate Bill 896.

- *Rochester Medical Corporation v. C.R. Bard Inc., Tyco International (US) Inc., Tyco Healthcare Group LP, Novation LLC, VHA Inc., Premier Inc., and Premier Purchasing Partners*
  U.S. District Court, Eastern District of Texas, Texarkana Division, C.A. No. 504-CV-060.

- *Smith Kline & French Laboratories, Ltd. and SmithKline Beecham Corp. d/b/a GlaxoSmithKline v. Teva Pharmaceuticals USA, Inc.*
  U.S. District Court, District of Delaware, Civil Action No. 05-197.

- *Massachusetts Institute of Technology v. Harman International Industries, Inc.*
  U.S. District Court, District of Massachusetts, Civil Action No. 05-10990-DPW.

- *Tessera, Inc. v. Micron Technology, Inc., Micron Semiconductor Products, Inc., Infineon Technologies AG, Infineon Technologies Richmond, LP, Infineon Technologies North America Corp., Qimonda AG*
  U.S. District Court, Eastern District of Texas, Marshall Division, Civil Action No. 2-05cv-94.

- *Gary D. Carter and Mary Elaine Carter v. CSX Transportation, Inc.*
  U.S. District Court, Western District of Kentucky, Louisville Division, Case No. 3:04-CV-487-S.

- *Anthony Park, Individually on Behalf Of Himself and On Behalf of All Others Similarly Situated v. The Thomson Corporation and Thomson Legal and Regulatory, Inc.*
  U.S. District Court, Southern District of New York, Case No. 05 Civ. 2931 (WHP).

- *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*
  U.S. District Court, District of Delaware, Civil Action No. 04-939.

- *Wavetronix, LLC v. Electronic Integrated Systems, Inc*
  U.S. District Court, District of Utah, Central Division, Civil Action No. 2:05 CV 00073 BJS.

- *Richard Lee Young and Tonja Young v. CSX Corporation, CSX Transportation, Inc., Dick Spatafore, and Bobby Ambrose*
  Circuit Court of Kanawha County, West Virginia, Civil Action No. 03-C-2837.

- *WeddingChannel.com Inc. v. The Knot, Inc. and The Knot, Inc. v. WeddingChannel.com Inc.*
  U.S. District Court, Southern District of New York, Civil Action No. 03 CV 7369 (RWS).

- *Advanced Technology Materials, Inc. v. Praxair, Inc. and Praxair, Inc. v. Advanced Technology Materials, Inc. and Praxair, Inc. and Praxair Technology, Inc. v. ATMI, Inc. and Advanced Technology Materials, Inc.*
  U.S. District Court, Southern District of New York, Civil Action No. 03 CV 5161 (RO) and U.S. District Court, District of Delaware, Civil Action No.: 03-1158-SLR.

- *In the Matter of the Arbitration Between Celanese LTD., et al., and JO Tankers AS, et al.*

- *Robert Bosch GMBH v. TRW Automotive, Inc., TRW Vehicle Safety Systems Inc., and TRW Automotive U.S. LLC*
  U.S. District Court, District of Arizona, Case No.: CIV-03-0045 PHX FJM.

- *Honeywell International Inc. against The GetPaid Corporation, a/k/a/ GetPaid Software, a/k/a Software Experts, Inc.*
  American Arbitration Association, Case No: 18 133 00073 03.

- *Samsung Electronics Co., Ltd. v. Tessera Technologies, Inc. and Tessera, Inc. and Tessera Technologies, Inc. v. Samsung Electronics Co., Ltd., Samsung Electronics America and Samsung Semiconductor, Inc.*
  U.S. District Court, Northern District of California, Oakland Division, Case No. C 02-05837 CW.

- *Merck & Co., Inc. and Merck Frosst Canada & Co. v. The Minister of Health and Novopharm Ltd.*
  Canada Federal Court, Federal Court File No. T-1627-03.

- *Verizon California Inc., a California Corporation v. Ronald A. Katz Technology Licensing, L.P., a California limited partnership*
  U.S. District Court, Central District of California, Case No. 01 CV-09871 RGK (RCx).

- *Massachusetts Eye and Ear Infirmary v. Novartis Ophthalmics, Inc. and QLT, Inc., QLT, Inc. v. Massachusetts Eye and Ear Infirmary, Evangelos S. Gragoudas, M.D. and Joan W. Miller, M.D., The General Hospital Corporation v. Massachusetts Eye and Ear Infirmary, Evangelos S. Gragoudas, M.D. and Joan W. Miller, M.D.*
  U.S. District Court, District of Massachusetts, Civil Action No. 01-10747-EFH.

- *Milliken & Company v. Mohawk Industries, Inc., et al. / Shaw Industries Group, Inc., et al. / Interface, Inc., et al.*
  U.S. District Court, District of South Carolina, Spartanburg Division, Civil Action Nos. 7-02-3631-20/7-02-3632-20/7-02-3633-2.

- *Torah Soft, Ltd. v. Michael Drosnin*
  U.S. District Court, Southern District of New York, 2000 Civ.: 0676 (JCF).

- *Dresses for Less, Inc., DFL Management Inc., The DFL Apparel Group, an unincorporated association, Allison-Che' Fashions, Inc., Bicci Studio Ltd., Garden City Dresses for Less, Inc., Donald Weiner and Barbara Weiner, individually and derivatively as shareholder of Stella N. Bishop Fashion Corp., and I.S.B. Fashions Corp. v. CIT Group/Commercial Services, Inc. and The Uptown Credit Group, Inc.*
  U.S. District Court for the Southern District of New York, C.A. No. 01 CIV. 2669 (WHP).

- *First Citizens Bank and Trust Company of South Carolina, as Conservator for Alex Compton, a minor and Alex Reid Compton and Lisa Compton, in their individual capacity, as the natural parents of Alex Compton, a minor v. CSX Transportation Inc.*
  U.S. District Court, District of South Carolina, Anderson Division, Civil Action File No. 8-01-4613-20.

- *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*
  U.S. District Court, District of Delaware, Civil Action No. 01-0048 –JJF.

- *The Toro Company v. White Consolidated Industries, Inc. and WCI Outdoor Products, Inc*
  U.S. District Court, District of Minnesota, Civil Action No. 4-95-656.

- *In Re: Vitamins Antitrust Litigation*
  U.S. District Court for the District of Columbia, Misc. No. 99-197 (TFH) MDL No. 1285.

- *Jack Webb vs. CSX Transportation, Inc., South Carolina Department of Transportation and Anderson County*
  South Carolina Court for Common Pleas, Anderson County, C/A No: 01-PC-04-504 and C/A No: 01-CP-04-505

- *Syndia Corporation v. The Gillette Company and The Lemelson Medical, Educational & Research Foundation, L.P., Involuntary Plaintiff*
  U.S. District Court for the Northern District of Illinois, Eastern Division, Case No. 01 C 2485

- *Arthur D. Little Enterprises, Inc. and The Gillette Company*
  American Arbitration Association, Northeast Case Management Center, Arbitration No. 11 133 00735 00

- *Roll Off Service v. Waste Management of Arkansas, Inc. d/b/a Waste Management of Northwest Arkansas*

*Christopher A. Vellturo, page 11*

U.S. District Court, Western District of Arkansas, Fayetteville Division, Civil No. 01-5059

- *VLT, Inc. and Vicor Corporation v. Lucent Technologies Inc. and Tyco Electronics Power Systems, Inc.*
  U.S. District Court, District of Massachusetts, C.A. No. 00-11049 PBS

- *Texas Instruments, Incorporated v. Tessera, Inc.*
  U.S. District Court, Northern District of California (Oakland Div), No. C-00-02114 CW

- *The Commissioner of Competition v. Canadian Waste Services Holdings Inc, Canadian Waste Services Inc. and Waste Management, Inc.*
  Competition Tribunal of Canada (CT-2000/002)

- *Massachusetts Businessman's Association Inc. v. Blue Cross and Blue Shield of Massachusetts, Inc.*
  Superior Court of the Commonwealth of Massachusetts, (C.A. No. 97-02279)

- *Union Carbide Chemicals & Plastics Technology Corp. and Union Carbide Corp. v. Shell Oil Company, Shell Chemical Company and CRI Catalyst Company*
  U.S. District Court, District of Delaware, C.A. No. 99-274 (SLR)

- *Bio-Rad Laboratories Inc and Cornell Research Foundation Inc. v. Carl Zeiss Jena GMBH and Carl Zeiss Inc.*
  U.S. District Court, Southern District of New York, C.A. 98 CIV 8012

- *L'Oreal S.A. and Cosmair, Inc. v. Revlon Consumer Products Corp., Charles Revson, Inc., and Almay, Inc.*
  U.S. District Court, District of Delaware, (Civil Action No. 98-424 SLR)

- *Sulzer Intermedics, Inc. v. Medtronics, Inc., et al.*
  U.S. District Court, Southern District of Texas, (C.A. H-97-3526)

- *Joseph E. Seagram & Sons, Inc., The Seagram Company Ltd. and JDC S.A. de C.V. v. St Maarten Spirits, Ltd., and St. Maarten Spirits Limited*
  Superior Court of the State of California, for the County of Los Angeles, (No. BC 191 681)

- *General Electric Capital Corporation v. DirecTV, Inc., Hughes Electronics Corporation and General Motors Corporation*
  U.S. District Court, District of Connecticut, 3:97 CV 01901 (PCD)

- *Bristol Technology, Inc. v. Microsoft Corporation*
  U.S. District Court, District of Connecticut, C.A. No. 398-CV-1657 (JCH)

- *America Online, Inc. v. AT&T Corporation*
  U.S. District Court, Eastern District of Virginia, C.A. No. 98-1821-A

- *Forty-Niners Truck Plaza, Inc. v. Unocal Corporation*
  Superior Court in and for the County of Sacramento, California, Case No. 531830

- *Dade Behring Marburg Gmbh, Syva Company v. Biosite Diagnostics, Inc.*

*Christopher A. Vellturo, page 12*

U.S. District Court, Southern District of New York, C.A. No. 97-501 MMS

■ *CBS Broadcasting Inc., et al. v. PrimeTime 24 Joint Venture*
U.S. District Court, Southern District of Florida, C.A. No. 96-3650-CIV-Nesbitt

■ *Becton Dickinson and Company v. Syntron Bioresearch, Inc.*
U.S. District Court, Southern District of California, C.A. No. 97-CV-1634K (POR)

■ *Hard Rock Café International (USA), Inc. (f/k/a Rank Licensing, Inc.) v. Peter A. Morton and Hard Rock Hotel, Inc.*
U.S. District Court, Southern District of New York, C.A. No. 97-CIV-9483 (RPP)

■ *Wang Laboratories, Inc. v. FileNet Corporation*
U.S. District Court, District of Massachusetts, C.A. No. 94-12141

■ *Neles-Jamesbury, Inc. v. Fisher Controls International, Inc. and Fisher Service Company*
U.S. District Court, District of Massachusetts, C.A. No. 94-40200

■ *Polo Ralph Lauren, L.P. v. The Magnin Company, Inc.*
American Arbitration Association Commercial Arbitration Tribunal, Case No. 74-181-1094-96

■ *Roll Systems, Inc. v. Wallace Computer Services Inc.*
U.S. District Court, District of Massachusetts, C.A. No. 94-10372-MEL

■ *Black & Decker (U.S.), Inc. and Black & Decker, Inc. v. The Coleman Co., Inc.*
U.S. District Court, Eastern District of Virginia, C.A. No. 96-656-A

■ *Century Wrecker Corporation v. Chevron, Inc.*
U.S. District Court, Western District of Pennsylvania, C.A. No. 89-1452

■ *Federal Trade Commission v. New Balance Athletic Shoe, Inc.*
Boston, Massachusetts, File No. D9268

■ *Minnesota Mining and Manufacturing Co. v. Avery Dennison Corp.*
U.S. District Court, District of Minnesota, C.A. No. 4-93-1070

■ *Becton Dickinson and Co. and Becton Dickinson Vascular Access Inc. v. Critikon Inc.*
American Arbitration Association, Arbitration No. 13 133 00388 93

■ *Minnesota Mining and Manufacturing Co. v. Norton v. Bay State Abrasives Co.*
U.S. District Court, District of Delaware, C.A. No. 89-533 (JJF)


**AFFIDAVITS**

*Christopher A. Vellturo, page 13*

- Expert Report in connection with *Altana Pharma AG and Wyeth v. Teva Pharmaceuticals USA, Inc., et al. and Sun Pharmaceuticals Industries, Ltd., et al.*, January 2012, U.S. District Court, District of New Jersey, Consolidated Civil Action Nos. 04-2355 (JLL) (MAH)/05-1966 (JLL) (MAH)/05-3290 (JLL) (MAH)/06-3672 (JLL) (MAH).

- Expert Report in connection with *Uniloc USA, Inc. and Uniloc Singapore Private Ltd. v. Microsoft Corporation*, December 2011, U.S. District Court, District of Rhode Island, Civil Action No. 03-CV-440 (WES).

- Expert Report in connection with *Wyeth Holdings Corporation, Wyeth-Ayerst Lederle LLC and Wyeth LLC v. Sandoz Inc.*, November 2011, U.S. District Court, District of Delaware, Civil Action No. 09-955-JJF.

- Responsive Expert Report in connection with *Hoffmann-LaRoche Inc. v. Apotex Inc. and Apotex Corp.*, October 2011, U.S. District Court, District of New Jersey, Civil Action No. 10-6241 (SRC)(MAS) (consolidated with 07-4417 for all purposes).

- Responsive Expert Report in connection with *Hoffmann-LaRoche Inc. v. Watson Laboratories, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., Cobalt Pharmaceuticals Inc. and Cobalt Laboratories, Inc.*, October 2011, U.S. District Court, District of New Jersey, Civil Action No. 10-6206 (SRC)(MAS) (consolidated with 07-4539 for all purposes).

- Responsive Expert Report in connection with *Hoffmann-LaRoche Inc. v. Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc.*, October 2011, U.S. District Court, District of New Jersey, Civil Action No. 10-5623 (SRC)(MAS) (consolidated with 07-4516 for all purposes).

- Responsive Expert Report in connection with *Hoffmann-LaRoche Inc. v. Orchid Chemicals & Pharmaceuticals Ltd., Orchid Healthcare, Orchid Pharmaceuticals Inc. and Orgenus Pharma Inc.*, October 2011, U.S. District Court, District of New Jersey, Civil Action No. 10-4050 (SRC)(MAS) (consolidated with 07-4582 for all purposes).

- Responsive Expert Report in connection with *Hoffmann-LaRoche Inc. v. Mylan, Inc., Myland Pharmaceuticals Inc., Genpharm ULC (f/k/a Genpharm Inc.) and Genpharm, L.P.*, October 2011, U.S. District Court, District of New Jersey, Civil Action No. 11-0579 (SRC)(MAS) (consolidated with 07-4661 for all purposes).

- Expert Report in connection with *Schering Corporation v. Apotex Inc. and Apotex Corp.*, October 2011, U.S. District Court, District of New Jersey, Civil Action No. 09-6373 (PGS)(TJB).

- Expert Report regarding Defendant DIRECTV, Inc. in connection with *Multimedia Patent Trust v. DIRECTV, INC., et al.*, October 2011, U.S. District Court, Southern District of California, Case No. 09-CV-00278-H (CAB).

- Expert Report regarding Defendant Vizio, Inc. in connection with *Multimedia Patent Trust v. DIRECTV, INC., et al.*, October 2011, U.S. District Court, Southern District of California, Case No. 09-CV-00278-H (CAB).

- Expert Report in connection with *Hoffman–La Roche Inc. v. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceuticals Industries Ltd.; Hoffman–La Roche Inc. v. Roxane Laboratories, Inc. and Boehringer Ingelheim Roxane, Inc.*, September 2011, U.S. District Court, District of New Jersey, Civil Action Nos. 09-5283-(ES)(CLW)/09-6335(ES)(CLW).

- Opening Expert Report in connection with *Hoffmann-LaRoche Inc. v. Apotex Inc. and Apotex Corp.; Hoffmann-LaRoche Inc. v. Watson Laboratories, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., Cobalt Pharmaceuticals Inc. and Cobalt Laboratories, Inc.; Hoffmann-LaRoche Inc. v. Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc.; Hoffmann-LaRoche Inc. v. Orchid Chemicals & Pharmaceuticals Ltd., Orchid Healthcare, Orchid Pharmaceuticals Inc. and Orgenus Pharma Inc.; Hoffmann-LaRoche Inc. v. Mylan, Inc., Myland Pharmaceuticals Inc., Genpharm ULC (f/k/a Genpharm Inc.) and Genpharm, L.P.*, September 2011, U.S. District Court, District of New Jersey, Civil Action Nos. 10-6241 (SRC)(MAS) (consolidated with 07-4417 for all purposes)/10-6206 (SRC)(MAS) (consolidated with 07-4539 for all purposes)/10-5623 (SRC)(MAS) (consolidated with 07-4516 for all purposes); 10-4050 (SRC)(MAS) (consolidated with 07-4582 for all purposes)/11-0579 (SRC)(MAS) (consolidated with 07-4661 for all purposes).

- Expert Report in connection with *Juxtacomm-Texas Software, LLC v. Axway, Inc., et al.*, September 2011, U.S. District Court, Eastern District of Texas, Tyler Division, Civil Action No. 6:10-CV-011-LED.

- Expert Report and Rebuttal and Supplemental Expert Report in connection with *Koninklijke Philips Electronics N.V. (Plaintiff/Counterclaim Defendant ) v. Coby Electronics Corporation (Defendant, Counterclaim Plaintiff)*, July 2011 and August 2011, Supreme Court of the State of New York, County of Westchester, Index No. 14936-2010.

- Expert Report, Supplemental Expert Report and Second Supplemental Expert Report Regarding Defendant International Business Machines Corp. in connection with *ACQIS LLC v. Appro International, Inc., ClearCube Technology, Inc., Dell Inc., Fujitsu America, Inc., Hitachi America, Ltd., Hewlett-Packard Co., International Business Machines Corp., NEC Corp. of America, Nex Computers, Inc., Sun Microsystems, Inc. and Super Micro Computer, Inc.*, September 2010, January 2011 and June 2011, U.S. District Court, Eastern District of Texas, Tyler Division, Case No. 6:09-cv-00148.

- Expert Report Regarding Commercial Success in connection with *Novartis Corporation, Novartis Pharmaceuticals Corporation, and Novartis International AG v. Teva Pharmaceuticals USA, Inc.*, June 2011, U.S. District Court, District of New Jersey, Civil Action Nos. 04:4473 and 08-0686 (GEB) (ES).

- Expert Report in connection with *Mount Sinai School of Medicine v. Shire HGT, Inc.*, June 2011, Federal Patent Court in Germany, Case No. 3Li 1-10 (EP).

- Expert Report in connection with *Leviton Manufacturing Co., Inc. v. Greenberg Traurig LLP, Paul J. Sutton, Barry G. Magidoff, and Claude R. Narcisse*, June 2011, U.S. District Court, Southern District of New York, Case No. 09-CV-8083 (BGD).

- Expert Report in connection with *Merck & Co., Inc. and Merck Sharp & Dohme Corp. v. Sandoz Inc.*, May 2011, U.S. District Court, District of New Jersey, Civil Action Nos.: 10-cv-01625-SRC-PS and 10-cv-02308-SRC-PS.

- Expert Report in connection with *Affinity Labs of Texas, LLC v. Apple Inc.*, May 2011, U.S. District Court, Northern District of California, Oakland Division, Case No. CV09-4436-CW.

- Expert Report in connection with *Pfizer Inc., Warner-Lambert Company LLC, C.P. Pharmaceuticals International C.V. and Northwestern University v. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceuticals Industries, Ltd., et al.*, April 2011, U.S. District Court, District of Delaware, C.A. No. 09-307 (GMS) (Consolidated).

- Expert Report Regarding Damages in connection with *Novartis Corporation, Novartis Pharmaceuticals Corporation, and Novartis International AG v. Teva Pharmaceuticals USA, Inc.*, February 2011, U.S. District Court, District of New Jersey, Civil Action Nos. 04:4473 and 08-0686 (GEB) (ES).

- Expert Report in connection with *Hoffman–La Roche Inc., v. Mylan Pharmaceuticals Inc. and Mylan Inc.*, February 2011, U.S. District Court, District of New Jersey, Civil Action No. 09-01692.

- Expert Report in connection with *Bayer Schering Pharma AG and Bayer HealthCare Pharmaceuticals Inc. (Plaintiffs/Counterdefendants) v. Lupin Ltd. and Lupin Pharmaceuticals, Inc. (Defendants/Counterclaimants)*, February 2011, U.S. District Court, District of Nevada, No. 2:10-cv-01166(RCJ)(ECS).

- Expert Report in connection with *Bayer Schering Pharma AG and Bayer HealthCare Pharmaceuticals Inc. (Plaintiffs/Counterdefendants) v. Sandoz, Inc., Watson Pharmaceuticals, Inc., and Watson Laboratories, Inc. (Defendants/Counterclaimants)*, November 2010, U.S. District Court, District of Nevada, No. 2:08-cv-00995-KJF-(GWF)/No. 2:07-cv-01472-KJD-(GWF).

- Expert Report and Rebuttal Expert Report in connection with *Kaye Scholer LLP v. CNA Holdings, Inc. and Celanese Americas Corporation and CNA Holdings, Inc. and Celanese Americas Corporation v. Kaye Scholer LLP, Robert B. Bernstein and Michael D. Blechman*, September 2010 and October 2010, U.S. District Court, Southern District of New York, No. 08-CV-5547 (NRB).

- Expert Report Regarding Defendant Dell, Inc. in connection with *ACQIS LLC v. Appro International, Inc., ClearCube Technology, Inc., Dell Inc., Fujitsu America, Inc., Hitachi America, Ltd., Hewlett-Packard Co., International Business Machines Corp., NEC Corp. of America, Nex Computers, Inc., Sun Microsystems, Inc. and Super Micro Computer, Inc.*, September 2010, U.S. District Court, Eastern District of Texas, Tyler Division, Case No. 6:09-cv-00148.

- Expert Report Regarding Defendant Hewlett-Packard Co. in connection with *ACQIS LLC v. Appro International, Inc., ClearCube Technology, Inc., Dell Inc., Fujitsu America, Inc., Hitachi America, Ltd., Hewlett-Packard Co., International Business Machines Corp., NEC Corp. of America, Nex Computers, Inc., Sun Microsystems, Inc. and Super Micro Computer, Inc.*, September 2010, U.S. District Court, Eastern District of Texas, Tyler Division, Case No. 6:09-cv-00148.

- Expert Report Regarding Defendant Sun Microsystems, Inc. in connection with *ACQIS LLC v. Appro International, Inc., ClearCube Technology, Inc., Dell Inc., Fujitsu America, Inc., Hitachi America, Ltd., Hewlett-Packard Co., International Business Machines Corp., NEC Corp. of America, Nex Computers, Inc., Sun Microsystems, Inc. and Super Micro Computer, Inc.*, September 2010, U.S. District Court, Eastern District of Texas, Tyler Division, Case No. 6:09-cv-00148.

- Expert Report in connection with *ZapMedia Services, Inc. v. Apple Inc.*, September 2010, U.S. District Court, Eastern District of Texas, Marshall Division, Civil Action No. 2:08-CV-104-DF-CE.

- Expert Report in connection with *Intel Corporation (Plaintiff/Counterclaim Defendant) v. NVIDIA Corporation (Defendant/Counterclaim Plaintiff)*, September 2010, Court of Chancery, State of Delaware, C.A. No. 4373-VCS.

- Expert Report and Supplemental Expert Report in connection with *Kinetic Concepts, Inc., KCI Licensing, Inc., KCI USA, Inc., KCI Medical Resources, Medical Holdings Limited, KCI Manufacturing and Wake Forest University Health Sciences v. Convatec Inc., Boehringer Wound Systems, LLC, and Boehringer Technologies, LP*, March 2010 and June 2010, U.S. District Court, Middle District of North Carolina, Civil Action No. 1:08-CV-00918-WO-LPA.

- Expert Report and Reply Report in connection with *In Re: Payment Card Interchange Fee and Merchant Antitrust Litigation*, July 2009 and June 2010, U.S. District Court, Eastern District of New York, Master File No. 05-MD-1720,.

- Rebuttal Expert Report and Supplemental Rebuttal Expert Report in connection with *Sonoran Scanners, Inc. and Joseph P. Donahue v. PerkinElmer, Inc.*, March 2010 and May 2010, U.S. District Court, District of Massachusetts, Civil Action No. 06-12090-WGY.

- Expert Report, Supplemental Expert Report, Second Supplemental Expert Report and Third Supplemental Expert Report in connection with *Marine Polymer Technologies, Inc. v. Hemcon,Inc.*, May 2007, June 2007, March 2010 and April 2010, U.S. District Court, District of New Hampshire, Civil Action No. 06-CV-100-JD.

- Expert Report in connection with *Schering Corporation and MSP Singapore Company LLC v. Glenmark Pharmaceuticals, Inc. and Glenmark Pharmaceuticals Ltd.*, April 2010, U.S. District Court, District of New Jersey, Case No. 07-CV-01334 (JLL) (CCC).

- Expert Report and Supplemental Expert Report Regarding Defendants GEICO Corporation, Government Employees Insurance Company, GEICO General Insurance Company, GEICO Indemnity Company and GEICO Casualty Company in connection with *Ronald A. Katz Technology Licensing L.P. v. Comcast Corporation, et al.; GEICO Corporation, et al.; XM Satellite Radio Holdings Inc.*, December 2009 and April 2010, U.S. District Court, Central District of California, Case No. 07-ML-1816-C RGK (FFMx)/Case No. 2:07-CV-06996 RGK (FFMx).

- Expert Report and Rebuttal Expert Report in connection with *Canadian National Railway Company v. Union Pacific Railroad Company*, November 2009 and December 2009, In Arbitration Proceedings.

- Expert Report in connection with *Saxon Innovations, LLC v. Nokia Corp., et al.*, November 2009, U.S. District Court, Eastern District of Texas, Civil Action No. 6:07-cv-490-LED-JDL.

- Expert Report in connection with *Owens-Illinois, Inc. v. BTR plc*, September 2009, U.S. District Court, Southern District of New York, Case No. 05 CV 2873 (LLS).

- Opening Expert Report and Responsive Expert Report in connection with *Hoffmann-LaRoche Inc. v. Apotex Inc. and Apotex Corp.*, July 2009 and September 2009, U.S. District Court, District of New Jersey, Civil Action Nos. 07-4417 (SRC)(MAS)/08-3065 (SRC)(MAS)/08-4053 (SRC)(MAS).

- Opening Expert Report and Responsive Expert Report in connection with *Hoffmann-LaRoche Inc. v. Cobalt Pharmaceuticals Inc. and Cobalt Laboratories, Inc.*, July 2009 and September 2009, U.S. District Court, District of New Jersey, Civil Action Nos. 07-4539 (SRC)(MAS)/07-4540 (SRC)(MAS)/08-4054 (SRC)(MAS).

- Opening Expert Report and Responsive Expert Report in connection with *Hoffmann-LaRoche Inc. v. Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc.*, July 2009 and September 2009, U.S. District Court, District of New Jersey, Civil Action Nos. 07-4516 (SRC)(MAS)/08-3607 (SRC)(MAS)/08-4055 (SRC)(MAS).

- Opening Expert Report and Responsive Expert Report in connection with *Hoffmann-LaRoche Inc. v. Genpharm Inc. and Genpharm, L.P.*, July 2009 and September 2009, U.S. District Court, District of New Jersey, Civil Action Nos. 07-4661 (SRC)(MAS)/08-4052 (SRC)(MAS).

- Opening Expert Report and Responsive Expert Report in connection with *Hoffmann-LaRoche Inc. v. Orchid Chemicals & Pharmaceuticals Ltd., Orchid Healthcare, Orchid Pharmaceuticals Inc. and Orgenus Pharma Inc.*, July 2009 and September 2009, U.S. District Court, District of New Jersey, Civil Action Nos. 07-4582 (SRC)(MAS)/08-4051 (SRC)(MAS).

- Expert Report, Supplemental and Corrected Expert Report and Second Supplemental Expert Report Regarding Defendant Expand Networks, Inc. in connection with *Realtime Data, LLC d/b/a/ IXO v. Packeteer, Inc., Citrix Systems, Inc., Expand Networks, Inc., F5 Networks, Inc., 7-Eleven, Inc., ABM Industries, Inc., ABM Janitorial Services-South Central, Inc., Averitt Express Inc., Build-A-Bear Workshop, Inc., DHL Express (USA), Inc., Interstate Battery System of America, Inc., O'Reilly Automotive, Inc., and Blue Coat Systems, Inc.*, June 2009, July 2009 and August 2009, U.S. District Court, Eastern District of Texas, Tyler Division, Case No. 6:08cv144 LED.

- Expert Report, Conformed Expert Report and Supplemental and Corrected Expert Report Regarding Defendant Citrix Systems, Inc. in connection with *Realtime Data, LLC d/b/a/ IXO v. Packeteer, Inc., Citrix Systems, Inc., Expand Networks, Inc., F5 Networks, Inc., 7-Eleven, Inc., ABM Industries, Inc., ABM Janitorial Services-South Central, Inc., Averitt Express Inc., Build-A-Bear Workshop, Inc., DHL Express (USA), Inc., Interstate Battery System of America, Inc., O'Reilly Automotive, Inc., and Blue Coat Systems, Inc.*, June 2009 and July 2009, U.S. District Court, Eastern District of Texas, Tyler Division, Case No. 6:08cv144 LED.

- Expert Report and Supplemental and Corrected Expert Report Regarding Defendants Packeteer, Inc. and Blue Coat Systems, Inc. in connection with *Realtime Data, LLC d/b/a/ IXO v. Packeteer, Inc., Citrix Systems, Inc., Expand Networks, Inc., F5 Networks, Inc., 7-Eleven, Inc., ABM Industries, Inc., ABM Janitorial Services-South Central, Inc., Averitt Express Inc., Build-A-Bear Workshop, Inc., DHL Express (USA), Inc., Interstate Battery System of America, Inc., O'Reilly Automotive, Inc., and Blue Coat Systems, Inc.*, June 2009 and July 2009, U.S. District Court, Eastern District of Texas, Tyler Division, Case No. 6:08cv144 LED.

- Expert Report, Conformed Expert Report and Supplemental and Corrected Expert Report Regarding Defendant F5 Networks, Inc. in connection with *Realtime Data, LLC d/b/a/ IXO v. Packeteer, Inc., Citrix Systems, Inc., Expand Networks, Inc., F5 Networks, Inc., 7-Eleven, Inc., ABM Industries, Inc., ABM Janitorial Services-South Central, Inc., Averitt Express Inc., Build-A-Bear Workshop, Inc., DHL Express (USA), Inc., Interstate Battery System of America, Inc., O'Reilly Automotive, Inc., and Blue Coat Systems, Inc.*, June 2009 and July 2009, U.S. District Court, Eastern District of Texas, Tyler Division, Case No. 6:08cv144 LED.

- Expert Report in connection with *Individual Network, LLC v. Apple Inc.*, April 2009, U.S. District Court, Eastern District of Texas, Marshall Division, Civil Action No. 2:07CV158 (LED).

- Expert Report in connection with *Schering Corporation and MSP Singapore Company, LLC v. Glenmark Pharmaceuticals, Inc. and Glenmark Pharmaceuticals Ltd.* , April 2009, U.S. District Court, District of New Jersey, Civil Action No.: 07-CV-01334 (JLL)(CCC).

- Expert Report, Rebuttal Expert Report, Supplemental Expert Report and Second Supplemental Expert Report in connection with *Gyrus Group, PLC, Ethicon, Inc., and DePuy Mitek, Inc. and ArthroCare Corp.*, January 2009, February 2009 and March 2009, CPR Institute for Dispute Resolution, Case No. G-08018, JAMS Ref. No. 1100055345.

- Expert Report in connection with *OPTi, Inc. v. Apple Inc.*, February 2009, U.S. District Court, Eastern District of Texas, Marshall Division, Civil Action No. 2:07-CV-00021 (CE).

- Expert Report in connection with *Medtronic, Inc., Medtronic USA, Inc., Medtronic Vascular, Inc. v. AGA Medical Corporation*, January 2009, U.S. District Court, Northern District of California, San Francisco Division, Case No. C07-00567 MMC.

- Expert Report, Supplemental Expert Report and Second Supplemental Expert Report Regarding Defendant Citizens Financial Group, Inc. in connection with *Ronald A. Katz Technology Licensing L.P. v. Citizens Financial Group, Inc., et al.*, September 2008, November 2008 and December 2008, U.S. District Court, Central District of California, Case No. 07-ML-1816-C RGK (FFMx)/Case No. 07-CV-04964 RGK (FFMx).

- Expert Report in connection with *Cancer Research Technology Limited and Schering Corporation v. Barr Laboratories, Inc. and Barr Pharmaceuticals, Inc.*, December 2008, U.S. District Court, District of Delaware, C.A. No. 1:07 cv 00457 SLR.

- Expert Report in connection with *Merck Sharp & Dohme Pharmaceuticals SRL v. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries, Ltd.*, October 2008, U.S. District Court, District of New Jersey, Civil Action No.: 07-1596 (GEB).

- Expert Report and Second Expert Report in connection with *Metso Minerals, Inc. v. Powerscreen International Distribution Limited, Terex Corporation, Powerscreen New York, Inc., and Emerald Equipment Systems, Inc.*, September 2008 and October 2008, U.S. District Court, Eastern District of New York, Civil Action No. 06cv01446 (ADS)(ETB).

- Expert Report Regarding Defendants Teligence (US), Inc., Teligence Holdings (US), Inc. and Utel Networks Inc. in connection with *Ronald A. Katz Technology Licensing L.P. v. Continental Airlines, Inc., et al.*, October 2008, U.S. District Court, Eastern District of Texas, Marshall Division, Case No. 2:07-cv-232.

- Expert Report Regarding Defendant United Parcel Service, Inc. in connection with *Ronald A. Katz Technology Licensing L.P. v. Continental Airlines, Inc., et al.*, September 2008, U.S. District Court, Central District of California, Western Division, Case No. 07-ML-01816 RGK (FFMx)/Case No. 07- CV-4965 ABC (FFMx).

- Report in connection with *NewPage Wisconsin System, Inc. v. Canadian National Railway Company and Wisconsin Central Ltd.*, September 2008, In Arbitration Proceedings.

- Expert Report Regarding Defendant American Airlines in connection with *Ronald A. Katz Technology Licensing L.P. v. American Airlines, et al.*, May 2008, U.S. District Court, Central District of California, Case No. 07-ML-1816-B-RGK (FFMx)/Case No. CV 07-2196 RGK (FFMx).

- Expert Report Regarding Defendant National Railroad Passenger Corporation ("Amtrak") in connection with *Ronald A. Katz Technology Licensing L.P. v. American Airlines, et al.*, May 2008, U.S. District Court, Central District of California, Case No. 07-ML-1816-B-RGK (FFMx)/ Case No. CV 07-2196 RGK (FFMx).

- Expert Report Regarding Defendant FedEx in connection with *Ronald A. Katz Technology Licensing L.P. v. American Airlines, et al.*, May 2008, U.S. District Court, Central District of California, Case No. 07-ML-1816-B-RGK (FFMx)/ Case No. CV 07-2196 RGK (FFMx).

- Expert Report Regarding Defendant General Motors in connection with *Ronald A. Katz Technology Licensing L.P. v. Chevron Corporation, et al.*, May 2008, U.S. District Court, Central District of California, Western Division, Case No. 9:06-cv-00178-RHC.

- Expert Report and Supplemental Expert Report Regarding Defendants Humana, Inc. and Humana Military Healthcare Services, Inc. in connection with *Ronald A. Katz Technology Licensing L.P. v. Humana, Inc. and Humana Military Healthcare Services, Inc.*, May 2008 and July 2008, U.S. District Court, Eastern District of Texas, Lufkin Division, Case No. 9:06-cv-199.

- Expert Report and Supplemental Regarding Defendants U.S. Bancorp and U.S. Bank,NA in connection with *Ronald A. Katz Technology Licensing L.P. v. U.S. Bancorp and U.S. Bank,NA*, May 2008 and July 2008, U.S. District Court, Eastern District of Texas, Lufkin Division, Case No. 9:06-cv-203.

- Expert Report Regarding Defendant Whirlpool Corporation in connection with *Ronald A. Katz Technology Licensing L.P. v. American Electric Power Company, Inc., et al.*, May 2008, U.S. District Court, Central District of California, Western Division, Case No. 2:07-ML-1816-B-RGK (FFMx)/Case No. 2:07-CV-2257-RGK (FFMx).

- Expert Report in connection with *U.S. Philips Corporation, (Plaintiffs/Counterclaim-Defendants) v. Pantech Wireless, Inc. (Defendant/Counterclaim-Plaintiff)*, April 2008, U.S. District Court, Southern District of New York, Civil Action No. 08-CV-02526.

- Expert Report and Second Expert Report in connection with *Olympus Corp., Olympus Medical Systems Corp. and Olympus America Inc., (Plaintiffs/Counterclaim-Defendants) v. Given Imaging Ltd. and Given Imaging, Inc. (Defendant/Counterclaim-Plaintiffs)*, February 2008 and March 2008, U.S. District Court, Eastern District of Pennsylvania, Civil Action No. 06 CV 02132 (JKG).

- Expert Report in connection with *U.S. Philips Corporation, (Plaintiffs/Counterclaim-Defendants) v. Konica Minolta Holdings, Inc., Konica Minolta Photo Imaging, Inc., Konica Minolta Photo Imaging U.S.A., Inc., LG Electronics Inc., and LG Electronics Mobilecomm U.S.A. Inc. (Defendanst/Counterclaim-Plaintiffs)*, March 2008, U.S. District Court, Southern District of New York, Civil Action No. No. 06 CV. 1402 (BSJ) (THK).

- Expert Report in connection with *AstraZeneca LP and AstraZeneca AB v. Ivax Phamaceuticals, Inc.*, February 2008, U.S. District Court, District of New Jersey, Civil Action No. 05 CV 05142 (RMB)(AMD).

- Expert Report in connection with *Alloc, Inc., Berry Finance, N.V. and Välinge Aluminum AB v. Norman D. Lifton Co., Inc., Balta U.S. Inc. and Balterio N.V.*, February 2008, U.S. District Court, Southern District of New York, No. 03 Civ. 4419 (PAC) (DF).

- Expert Report in connection with *Fastenetix, LLC. v. Medtronic Sofamor Danek, Inc and Medtronic Sofamor Danek U.S.A., Inc. and DOES 1 through 10*, December 2007, U.S. District Court, District of New Jersey, Civil Action No. 06-2070 SRC-MAS.

- Expert Report in connection with *Akamai Technologies, Inc. and Massachusetts Institute of Technology v. Limelight Networks, Inc.*, December 2007, U.S. District Court, District of Massachusetts, Civil Action No.: 06-CV-11109 RWZ consolidated with Civil Action No.: 06-11585 RWZ.

- Expert Report, Rebuttal Expert Report, Supplemental Expert Report, Supplemental Rebuttal Expert Report, Second Supplemental Expert Report and Second Supplemental Rebuttal Expert Report in connection with *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc and Medtronic Sofamor Danek U.S.A. and Medtronic Sofamor Danek, Inc., Medtronic Sofamor Danek U.S.A. and SDGI Holdings, Inc. v. Cross Medical Products, Inc.*, July 2004, August 2004, October 2004, September 2007 and October 2007, U.S. District Court, Central District of California, Southern Division, Case No. SACV 03-110 GLT (ANx).

- Expert Report in connection with *Apple Computer, Inc. v. Burst.Com, Inc.*, October 2007, U.S. District Court, Northern District of California, San Francisco Division, Case No. C06-00019 MHP.

- Expert Report in connection with *QRG, LTD. d/b/a Quantum Research Group v. Apple Computer, Inc., Cypress Semiconductor Corp., Cypress Microsystems and Fingerworks, Inc.*, October 2007, U.S. District Court, District of Maryland, Baltimore Division, Case No. 1:05-cv-03408-WMN.

- Expert Report, Supplemental Statement, Second Supplemental Statement, Third Supplemental Statement, Fourth Supplemental Expert Report and Fifth Supplemental Expert Report in connection with *DePuy AcroMed, Inc. and Biedermann Motech GMBH v. Medtronic Sofamor Danek, Inc., f/k/a Sofamor*

*Danek Group, Inc. and Medtronic Sofamor Danek, U.S.A. Inc.*, December 2002, January 2003, October 2003, September 2004, July 2007 and September 2007, U.S. District Court, District of Massachusetts, Civil Action No. 01-CV-10165 (EFH).

- Expert Report, Supplemental Expert Report, Second Supplemental Expert Report and Supplemental Statement in connection with *TV Guide Online, Inc. and TV Guide Online, LLC v. Tribune Media Services, Inc.*, December 2006, June 2007 and August 2007, U.S. District Court, District of Delaware, Civil Action No. 05-CV-725-KAJ.

- Expert Report in connection with *Sandata Technologies, Inc. v. Infocrossing, Inc.*, July 2007, U.S. District Court, Southern District of New York, Civil Action No. 05-CV-9546.

- Expert Report and Rebuttal Expert Report in connection with *In Re: Polyester Staple*, June 2007 and July 2007, U.S. District Court, Western District of North Carolina, Charlotte Division, MDL Docket No. 3:03-CV-1516.

- Expert Report and Supplemental Expert Report in connection with *Rochester Medical Corporation v. C.R. Bard Inc., Tyco International (US) Inc., Tyco Healthcare Group LP, Novation LLC, VHA Inc., Premier Inc., and Premier Purchasing Partners*, December 2006 and July 2007, U.S. District Court, Eastern District of Texas, Texarkana Division, C.A. No. 504-CV-060.

- Expert Report in connection with *Merit Industries, Inc. v. JVL Corporation*, May 2007, U.S. District Court, Eastern District of Pennsylvania, Civil Action No. 03-CV-01618-TJS.

- Expert Report in connection with *CCC Information Services v. Mitchell International*, December 2006, U.S. District Court, Northern District of Illinois, Eastern Division, Case No. 03 C 2695.

- Expert Report in connection with *Smith Kline & French Laboratories, Ltd. and SmithKline Beecham Corp. d/b/a GlaxoSmithKline v. Teva Pharmaceuticals USA, Inc.*, September 2006, U.S. District Court, District of Delaware, Civil Action No. 05-197.

- Expert Report in connection with *Massachusetts Institute of Technology v. Harman International Industries, Inc.*, August 2006, U.S. District Court, District of Massachusetts, Civil Action No. 05-10990-DPW.

- Expert Report in connection with *Tessera, Inc. v. Micron Technology, Inc., Micron Semiconductor Products, Inc., Infineon Technologies AG, Infineon Technologies Richmond, LP, Infineon Technologies North America Corp., Qimonda AG*, June 2006, U.S. District Court, Eastern District of Texas, Marshall Division, Civil Action No. 2-05cv-94.

- Expert Report in connection with *Aerotel, Ltd. v. Verizon Communications, et al.*, May 2006, U.S. District Court, Southern District of New York, Case No. 05 CV-00120 (TPG).

- Expert Report and Supplemental Expert Report in connection with *Anthony Park, Individually on Behalf Of Himself and On Behalf of All Others Similarly Situated v. The Thomson Corporation and Thomson Legal and Regulatory, Inc.*, May 2006 and May 2006, U.S. District Court, Southern District of New York, Case No. 05 Civ. 2931 (WHP).

- Expert Report in connection with *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, March 2006, U.S. District Court, District of Delaware, Civil Action No. 04-939.

- Expert Report in connection with *Gary D. Carter and Mary Elaine Carter v. CSX Transportation, Inc.*, February 2006, U.S. District Court, Western District of Kentucky, Louisville Division, Case No. 3:04-CV-487-S.

- Expert Report in connection with *Cephalon, Inc. and University of Utah Research Foundation v. Barr Laboratories, Inc., Cephalon Inc. and University of Utah Research Foundation, Inc.*, January 2006, U. S. District Court, District of Delaware, Case No. 05-29 (JJF).

- Expert Report in connection with *Wavetronix, LLC v. Electronic Integrated Systems, Inc.*, November 2005, U.S. District Court, District of Utah, Central Division, Civil Action No. 2:05 CV 00073 BJS.

- Expert Report in connection with *Richard Lee Young and Tonja Young v. CSX Corporation, CSX Transportation, Inc., Dick Spatafore, and Bobby Ambrose*, June 2005, Circuit Court of Kanawha County, West Virginia, Civil Action No. 03-C-2837.

- Expert Report and Revised Expert Report in connection with *WeddingChannel.com Inc. v. The Knot, Inc. and The Knot, Inc. v. WeddingChannel.com Inc.*, April 2005 and May 2005, U.S. District Court, Southern District of New York, Civil Action No. 03 CV 7369 (RWS).

- Expert Report in connection with *Advanced Technology Materials, Inc. v. Praxair, Inc. and Praxair, Inc. v. Advanced Technology Materials, Inc.*, April 2005, U.S. District Court, Southern District of New York, Civil Action No. 03 CV 5161 (RO).

- Expert Report in connection with *Praxair, Inc. and Praxair Technology, Inc. v. ATMI, Inc. and Advanced Technology Materials, Inc.*, April 2005, U.S. District Court, District of Delaware, Civil Action No.: 03-1158-SLR.

- Expert Report in connection with *Bangor & Aroostook Railroad Company*, U.S. Bankruptcy Court, District of Maine, Chapter11 Case No. 01-11565 and *James E. Howard, Chapter 11 Trustee, Bangor & Aroostook Railroad Company and Canadian American Railroad Company v. Canadian National Railway Company and Waterloo Railway Company*, April 2005, U.S. Bankruptcy Court, District of Maine, Adv. No. 04-01136.

- Expert Report and Rebuttal Expert Report in connection with *In the Matter of the Arbitration Between Celanese LTD., et al., and JO Tankers AS, et al.*, February 2005 and April 2005.

- Expert Report in connection with *Antor Media Corporation v. Apple Computer, Inc., Microsoft Corporation and RealNetworks, Inc.*, November 2004, U.S. District Court, Eastern District of Texas, Marshall Division, Civil Action No: 2-03CV-320.

- Preliminary Expert Report and Supplemental Expert Report in connection with *Robert Bosch GMBH v. TRW Automotive, Inc., TRW Vehicle Safety Systems Inc.,and TRW Automotive U.S. LLC*, July 2004 and August 2004, U.S. District Court, District of Arizona, Case No.: CIV-03-0045 PHX FJM.

*Christopher A. Vellturo, page 23*

- Expert Report and Supplemental Expert Report in connection with *Samsung Electronics Co., Ltd. v. Tessera Technologies, Inc. and Tessera, Inc. and Tessera Technologies, Inc. v. Samsung Electronics Co., Ltd., Samsung Electronics America and Samsung Semiconductor, Inc.*, June 2004 and August 2004, U.S. District Court, Northern District of California, Oakland Division, Case No. C 02-05837 CW.

- Expert Report, Revised Expert Report, Supplement Expert Report and Second Supplemental Expert Report in connection with *Milliken & Company v. Mohawk Industries, Inc., et al./ Shaw Industries Group, Inc., et al./ Interface, Inc., et al.*, July 2003, October 2003, February 2004 and May 2004, U.S. District Court, District of South Carolina, Spartanburg Division, Civil Action Nos. 7-02-3631-20/7-02-3632-20/7-02-3633-2.

- Expert Report, Supplemental Expert Report and Second Supplemental Report in connection with *Verizon California Inc., a California Corporation v. Ronald A. Katz Technology Licensing, L.P., a California limited partnership*, March 2003, June 2003 and April 2004, U.S. District Court, Central District of California, Case No. 01 CV-09871 RGK (RCx).

- Expert Reports and Revised Expert Report in connection with *Honeywell International Inc. against The GetPaid Corporation, a/k/a/ GetPaid Software, a/k/a Software Experts, Inc.*, December 2003, February 2004 and March 2004, American Arbitration Association, Case No: 18 133 00073 03.

- Expert Report and Revised Expert Report in connection with *The GetPaid Corporation, a/k/a/ GetPaid Software, a/k/a Software Experts, Inc. v. Helix-Systems, Inc., James Anderson, Scott Caudill, James V. Gelly, Six Sigma Academy, Inc., Keesah Software Company, Balaji Prakash-Rao and Ruth Lozano*, February 2004 and March 2004, U.S. District Court, District of New Jersey, Civil No: 02-1512 (AET).

- Expert Report and Rebuttal Report in connection with *Ino Therapeutics, Inc. AGA AB and the General Hospital Corporation d/b/a Massachusetts General Hospital v. SensorMedics Corporation and Pulmonix Medical, Inc., SensorMedics Corporation and Pulmonix Medical, Inc. v. Ino Therapeutics, Inc. AGA AB and the General Hospital Corporation d/b/a Massachusetts General Hospital*, December 2003 and January 2004, U.S. District Court, District of New Jersey, Civil Action No.: 00-6033 (AET).

- Expert Report and Revised Expert Report in connection with *Massachusetts Eye and Ear Infirmary v. Novartis Ophthalmics, Inc. and QLT, Inc., QLT, Inc. v. Massachusetts Eye and Ear Infirmary, Evangelos S. Gragoudas, M.D. and Joan W. Miller, M.D., The General Hospital Corporation v. Massachusetts Eye and Ear Infirmary, Evangelos S. Gragoudas, M.D. and Joan W. Miller, M.D.*, September 2003 and January 2004, U.S. District Court, District of Massachusetts, Civil Action No. 01-10747-EFH.

- Affidavit in connection with *Merck & Co., Inc. and Merck Frosst Canada & Co. v. The Minister of Health and Novopharm Ltd.*, December 2003, Canada Federal Court, Federal Court File No. T-1627-03.

- Verified Statement before the Surface Transportation Board in connection with *Canadian National Railway Company — Adverse Discontinuance — Line of Montreal, Main and Atlantic Railway LTD. and Waterloo Railway Company — Adverse Abandonment — Line of Montreal, Main and Atlantic Railway LTD.*, December 2003, Finance Docket Nos. AB-279 (Sub-No. 3) and AB-124 (Sub-No. 2).

- Verified Statement before the Surface Transportation Board in connection with *Kansas City Southern — Control - The Kansas City Southern Railway Company, Gateway Eastern Railway Company, And The Texas Mexican Railway Company*, August 2003, Railroad Control Application, Finance Docket No. 34342.

- Expert Report in connection with *Torah Soft, Ltd. v. Michael Drosnin*, April 2003, U.S. District Court, Southern District of New York, 2000 Civ.: 0676 (JCF).

- Expert Report and Rebuttal Expert Report (with Laura G. Boothman) in connection with *The Eurotrain Consortium vs. Taiwan High Speed Rail Corporation*, July 2002 and April 2003, International Chamber of Commerce, International Court of Arbitration, Case No. 11 375/BWD/SPB.

- Expert Report in connection with *First Citizens Bank and Trust Company of South Carolina, as Conservator for Alex Compton, a minor and Alex Reid Compton and Lisa Compton, in their individual capacity, as the natural parents of Alex Compton, a minor v. CSX Transportation Inc.*, December 2002, U.S. District Court, District of South Carolina, Anderson Division, Civil Action File No. 8-01-4613-20.

- Expert Report in connection with *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, November 2002, U.S. District Court, District of Delaware, Civil Action No. 01-0048 —JJF.

- Expert Report in connection with *The Toro Company v. White Consolidated Industries, Inc. and WCI Outdoor Products, Inc.*, November 2002, U.S. District Court, District of Minnesota, Civil Action No. 4-95-656.

- Expert Report in connection with *Dresses for Less, Inc., DFL Management Inc., The DFL Apparel Group, an unincorporated association, Allison-Che' Fashions, Inc., Bicci Studio Ltd., Garden City Dresses for Less, Inc., Donald Weiner and Barbara Weiner, individually and derivatively as shareholder of Stella N. Bishop Fashion Corp., and I.S.B. Fashions Corp. v. CIT Group/Commercial Services, Inc. and The Uptown Credit Group, Inc.*, November 2002, U.S. District Court for the Southern District of New York, C.A. No. 01 CIV. 2669 (WHP).

- Expert Report in connection with *In Re: Vitamins Antitrust Litigation*, June 2002, U.S. District Court for the District of Columbia, Misc. No. 99-197 (TFH) MDL No. 1285.

- Expert Report in connection with *Syndia Corporation v. The Gillette Company and The Lemelson Medical, Educational & Research Foundation, L.P., Involuntary Plaintiff*, February 2002, U.S. District Court for the Northern District of Illinois, Eastern Division, Case No. 01 C 2485.

- Expert Report in connection with *Arthur D. Little Enterprises, Inc. and The Gillette Company*, December 2001, American Arbitration Association, Northeast Case Management Center, Arbitration No. 11 133 00735 00.

- Expert Report in connection with *Roll Off Service v. Waste Management of Arkansas, Inc. d/b/a Waste Management of Northwest Arkansas*, December 2001, U.S. District Court, Western District of Arkansas, Fayetteville Division, Civil No. 01-5059.

- Affidavit and Expert Report in connection with *The Commissioner of Competition v. Canadian Waste Services Holdings Inc, Canadian Waste Services Inc. and Waste Management, Inc.* (CT-2000/002) before the Competition Tribunal of Canada, May 2001.

- Expert Report and Supplemental Expert Report in connection with *Texas Instruments, Incorporated v. Tessera, Inc.*, May 2001, U.S. District Court, Northern District of California (Oakland Div), No. C-00-02114 CW.

- Expert Report and Amended and Supplemental Expert Report in connection with *Omniglow Corporation v. Unique Industries, Inc.*, November 1999 and May 2001, U.S. District Court, District of Massachusetts, (C.A.No. 99-30052-MAP).

- Verified Statement before the Surface Transportation Board in connection with *Canadian National Railway Co., et al. Control Application regarding Wisconsin Central Transportation Corp., et al*, Railroad Control Application, Finance Docket No. 34000, April, 2001.

- Expert Report In Connection With *Union Carbide Chemicals & Plastics Technology Corp. and Union Carbide Corp. v. Shell Oil Company, Shell Chemical Company and CRI Catalyst Company*, October 2000, U.S. District Court, District of Delaware, C.A. No. 99-274 (SLR).

- Expert Report in connection with *Carl Zeiss Jena GmbH, Carl Zeiss Inc. v. Bio-Rad Laboratories, Inc., Cornell Research Foundation Inc., and Bio-Rad Laboratories, Inc., Cornell Research Foundation Inc. v. Carl Zeiss Jena GmbH, Carl Zeiss Inc.*, May 2000, U.S. District Court, Southern District of New York, (98 CIV. 8012 RCC (DFE)).

- Verified Statement before the Surface Transportation Board in connection with *Canadian National Railway Company, Grand Trunk Western Railroad Incorporated, Illinois Central Railroad Company, Burlington Northern Santa Fe Corporation, and The Burlington Northern and Santa Fe Railway Company*-- Railroad Control Application, Finance Docket No. 33842, March 2000.

- Expert Report in connection with *L'Oreal S.A. and Cosmair, Inc. v. Revlon Consumer Products Corp., Charles Revson, Inc., and Almay, Inc.*, February 2000, U.S. District Court, District of Delaware, (Civil Action No. 98-424 SLR).

- Expert Report in connection with *Joseph E. Seagram & Sons, Inc., The Seagram Company Ltd. and JDC S.A. de C.V. v. St Maarten Spirits, Ltd., and St. Maarten Spirits Limited*, August 1999, Superior Court of the State of California, for the County of Los Angeles, (No. BC 191 681).

- Expert Report in connection with *General Electric Capital Corporation v. DirecTV, Inc., Hughes Electronics Corporation and General Motors Corporation*, August 1999, U.S. District Court, District of Connecticut, (3:97 CV 01901 (PCD)).

- Expert Report in connection with *America Online, Inc. v. AT&T Corporation*, March 1999, U.S. District Court, Eastern District of Virginia, C.A. (98-1821-A).

- Expert Report in connection with *Bristol Technology, Inc. v. Microsoft Corporation*, February 1999 – U.S. District Court, District of Connecticut, C.A. (No. 398-CV-1657 (JCH)).

- Expert Report in connection with *Ashraf M. Dahod v. Bay Networks, Inc. and LanCity Corporation, Inc.*, September 1998, U.S. District Court, District of Massachusetts, C.A. (No. 96-11907 REK).

- Expert Report in connection with *Dade Behring Marburg Gmbh, Syva Company v. Biosite Diagnostics, Inc.*, August 1998 – U.S. District Court, Southern District of New York, C.A. No. 97-501 MMS

- Expert Report in connection with *Harris Corporation, et. al v. Atmel Corporation*, June 1998, U.S. District Court, Eastern District of Virginia, C.A. (No. 98-98-A).

- Expert Report in connection with *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, June 1998, U.S. District Court, District of Delaware, C.A. (No. 93-108 (JJF)).

- Expert Report in connection with *CBS Broadcasting Inc., et al. v. PrimeTime 24 Joint Venture*, May 1998, U.S. District Court, Southern District of Florida, C.A. No. 96-3650-CIV-Nesbitt.

- Expert Report in connection with *Becton Dickinson and Company v. Syntron BioResearch, Inc.*, May 1998, U.S. District Court, Southern District of California, C.A. No. 97-CV-1634K.

- Expert Report in connection with *Luigino's, Inc. v. Pezrow Company, Inc. and Pezrow Company of New Jersey, Inc.*, October 1997, U.S. District Court, District of Minnesota Fifth Division, C.A. No. 5-96-244.

- Supplemental Expert Report in connection with *Neles-Jamesbury, Inc. v. Fisher Controls International, Inc. and Fisher Service Company*, October 1997, U.S. District Court, District of Massachusetts, C.A. No. 94-40200).

- Expert Report in connection with *Neles-Jamesbury, Inc. v. Fisher Controls International, Inc. and Fisher Service Company*, August 1997, U.S. District Court, District of Massachusetts, C.A. No. 94-40200.

- Expert Report in connection with *The Toro Company v. White Consolidated Industries, Inc., et al.*, May 1997, U.S. District Court, District of Minnesota, C.A. No. 4-95-656.

- Supplemental Expert Report in connection with *Century Wrecker Corporation v. Chevron, Inc.*, May 1997, U.S. District Court, Western District of Pennsylvania, C.A. No. 89-1452.

- Supplemental Rebuttal Expert Report in connection with *Polo Ralph Lauren, L.P. v. The Magnin Company, Inc.*, May 1997, American Arbitration Association Commercial Arbitration Tribunal, C.A. No. 74-181-1094-96.

- Rebuttal Expert Report in connection with *Polo Ralph Lauren, L.P. v. The Magnin Company, Inc.*, May 1997, American Arbitration Association Commercial Arbitration Tribunal, C.A. No. 74-181-1094-96.

- Expert Report in connection with *Wang Laboratories, Inc. v. FileNet Corporation*, April 1997, U.S. District Court, District of Massachusetts, C.A. No. 94-12141 RLC.

- Expert Report and Supplemental Expert Report in connection with *Roll Systems, Inc. v. Wallace Computer Services Inc.*, July 1996 and December 1996, U.S. District Court, District of Massachusetts, C.A. No. 94-10372-MEL.

- Affidavit in Support of Ag-Chem Equipment Co. Inc. and Soil Teq, Inc.'s Motion For Summary Judgment, August 1996, U.S. District Court, District of Minnesota, C.A. No. 4-93-1228.

- Expert Report in connection with *Dynamic Manufacturing Inc., et al. v. Chevron Inc.*, April 1996, U.S. District Court, Eastern District of Virginia, C.A. No. 2:95CV947.

- Expert Report in connection with *Century Wrecker Corp. v. Chevron Inc.*, March 1996, U.S. District Court, Western District of Pennsylvania, C.A. No. 89-1452.

- Expert Report in connection with *Medtronic v. Pacesetter and St. Jude Medical Inc.*, February 1996, American Arbitration Association.

- Expert Report in connection with *Cedar Ridge Trailer Sales, et al. v. National Community Bank of New Jersey, et al.*, December 1995, Superior Court of New Jersey , C.A. No. BER-L-09277-92.

- Expert Report in connection with *Federal Trade Commission v. New Balance Athletic Shoe, Inc.*, 1995, Boston, Massachusetts, File No. D9268.

- Expert Report in connection with *Minnesota Mining and Manufacturing Co. v. Avery Dennison Corp.*, 1995, U.S. District Court, District of Minnesota, C.A. No. 4-93-1070.

- Expert Report in connection with *Minnesota Mining and Manufacturing Co. v. Norton v. Bay State Abrasives Co.*, 1994, U.S. District Court, District of Delaware, C.A. No. 89-533 (JJF).

## PUBLICATIONS AND PRESENTATIONS

"Understanding How the Patent Cliff Will Re-Define the Endgame." Presented at the 12th Annual Maximizing Pharmaceutical Patent Life Cycles Conference, New York, NY, October 4, 2011.

"Differentiated Products" in *Issues in Competition Law and Policy, Volume I*, ed. D. Wayne Collins, Section of Antitrust Law of the American Bar Association, 2008.

"When Fraud on the Patent Office Violates Section 2: A Mock Trial." Presented at the 52nd Annual Spring Meeting of the ABA Section of Antitrust Law, Washington, DC, April 1, 2004.

"What Drives Consolidation?" Presented at the 28th Semiannual Members Meeting MIT/CRE, Cambridge, MA, May 14, 1998.

"Proving Unilateral Effects and Efficiencies in Merger Cases:  A Demonstration." Presented at the 46th Annual Spring Meeting of the ABA Section of Antitrust Law, Washington, DC, April 1, 1998.

*Christopher A. Vellturo, page 28*

"Creating An Effective Diversion:  Evaluating Mergers With Differentiated Products," *Antitrust*, Spring 1997.

"Economic Battles in the Antitrust Wars:  Network Industries and Their Relevance to Antitrust in the Computer Industry." Presented at the Washington State Bar Association's Thirteenth Annual Antitrust, Consumer Protection and Unfair Business Practices Conference, November 8, 1996.

"Differentiated Products:  New Tools for New Methods." Presented at NERA's Seventeenth Annual Antitrust & Trade Regulation Seminar, Santa Fe, NM, July 5, 1996.

"Market Definition Under Price Discrimination" (with J. A. Hausman and G. K. Leonard), Antitrust Law Journal, Vol. 64, No. 2 (Winter 1996).

"Learning-by-Doing in the Context of Antitrust Analysis" (with J. Hausman), April 1995.

"An Economic Analysis of ATM Surcharging," prepared for Southeast Switch Inc., October 5, 1995.

"Cost Effects of Mergers and Deregulation in the U.S. Rail Industry" (with Berndt, *et al.*), Productivity Issues in Services at the Micro Level, ed. Zvi Griliches and Jacques Mairesse, Kluwer Academic Publishers, 1993.

"Cost Effects of Mergers and Deregulation in the U.S. Rail Industry" (with Berndt, *et al.*), Journal of Productivity Analysis, 4, 127-144, 1993.

"Rail Costs and Capital Adjustments in a Quasi-Regulated Environment" (with Friedlaender, *et al.*), Journal of Transport Economics and Policy, 131-152, May 1993.

"Deregulation, Mergers and Cost Savings in Class I U.S. Railroads, 1974-1986" (with Berndt, *et al.*), Journal of Economics and Management Strategy, Vol. 1, No. 2, 1992.

"Observations on Pre-Trial Bargaining Models," MIT Mimeo, September 1989.

"The Deregulation of the U.S. Rail Industry: Efficiency and Equity in Attaining Rail Viability," Ph.D. Dissertation, Department of Economics, MIT, 1989.

"Achieving Cost Efficiency Through Merger: Evidence from the U.S. Rail Industry," Presented at the American Economic Association Symposium on Mergers and Acquisitions, New York, December 29, 1988.



**Attachment B**
**US Feature Phone and Smartphone Shares of Quarterly Mobile Phone Shipments**
**Q1 2004 - Q3 2011**

Feature Phones   Smartphones

Sources:   IDC Worldwide Quarterly Mobil Phone Tracker: Q1 2011 Forecast Data:
           IDC WW Mobile Phone Tracker 2011Q3 Top 10

quantitative economic solutions, LLC



Attachment B.1
US Feature Phone and Smartphone Quarterly Shipments
Q1 2004 - Q3 2011

Sources:   IDC Worldwide Quarterly Mobil Phone Tracker: Q1 2011 Forecast Data:
           IDC WW Mobile Phone Tracker 2011Q3 Top 10

quantitative economic solutions, LLC



**Attachment C**
**Apple and Samsung Share of US Smartphone Shipments**
**Q1 2004 - Q3 2011**

**Sources:** IDC Worldwide Quarterly Mobil Phone Tracker: Q1 2011 Forecast Data;
IDC WW Mobile Phone Tracker 2011Q3 Top 10

quantitative economic solutions, LLC

**Attachment D**
**Actual and Projected US Market Share by Mobile Phone Type**
**2003 - 2015**
*(units in millions)*

| Source/Phone Type | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Yankee Group** | | | | | | | | | | | | | |
| Sold-through Units[1] | | | | | | | | | | | | | |
| Basic/Feature Phones[2] | 57.9 | 75.6 | 88.0 | 87.1 | 113.4 | 137.8 | 130.4 | 109.9 | 58.0 | 31.3 | 22.2 | 19.5 | 18.9 |
| Smartphones[3] | 0.8 | 1.8 | 4.2 | 5.5 | 11.4 | 15.1 | 21.7 | 54.4 | 115.7 | 144.3 | 156.7 | 162.3 | 165.6 |
| Unit Share | | | | | | | | | | | | | |
| Basic/Feature Phones[2] | 99% | 98% | 95% | 94% | 91% | 90% | 86% | 67% | 33% | 18% | 12% | 11% | 10% |
| Smartphones[3] | 1% | 2% | 5% | 6% | 9% | 10% | 14% | 33% | 67% | 82% | 88% | 89% | 90% |
| **IDC** | | | | | | | | | | | | | |
| Units | | | | | | | | | | | | | |
| Feature Phones[4] | | 138.5 | 144.8 | 156.7 | 161.8 | 141.5 | 134.2 | 113.4 | 83.9 | 65.4 | 49.1 | 38.4 | 32.5 |
| Smartphones[5] | | 4.3 | 5.2 | 8.4 | 20.1 | 34.0 | 45.8 | 69.8 | 101.6 | 118.8 | 135.3 | 147.3 | 154.2 |
| Unit Share | | | | | | | | | | | | | |
| Feature Phones[4] | | 97% | 97% | 95% | 89% | 81% | 75% | 62% | 45% | 36% | 27% | 21% | 17% |
| Smartphones[5] | | 3% | 3% | 5% | 11% | 19% | 25% | 38% | 55% | 64% | 73% | 79% | 83% |

Notes:
1. Sold-through represents new units sold to end-customers, regardless of the distribution channel. Only sales of newly manufactured units (i.e., excludes gray market and refurbished market).
2. A basic phone is defined as one capable of voice, texting and non-HTML browsing (e.g., WAP).  A feature phone is a more advanced multimedia-capable phone distinguished from a basic phone by its ability to render HTML pages.
3. Yankee defines smartphones as phones with one of the mobile operating systems: iPhone OS, Symbian S60, Windows Mobile, Linux, Android or BlackBerry OS.
4. To be classified as a feature phone in IDC's taxonomy, the device must run a proprietary or real-time operating system (RTOS).
5. Per IDC, smartphones contain a high-level operating system such as Android, BlackBerry OS, webOS, iOS, Windows Phone 7, and Symbian in addition to telephony capabilities.

Sources:
Yankee Group, Mobile Device Shipment Monitor & Forecast, 2Q11 Update
IDC Worldwide Quarterly Mobile Phone Tracker Q1 2011 Forecast Data

quantitative economic solutions, LLC



**Attachment E**
**US Share of Smartphones by Operating System**
**Q1 2004 - Q3 2011**

quantitative economic solutions, LLC

□ Others   ■ Windows Phone 7/Windows Mobile   ■ BlackBerry OS   ■ iOS   ■ Android

**Sources:**   IDC Worldwide Quarterly Mobil Phone Tracker: Q1 2011 Forecast Data;
IDC WW Mobile Phone Tracker 2011Q3 Top 10

**Attachment F**
**Smartphone Share by Manufacturer**
**Q4 2009 - Q3 2011**

| Manufacturer | Q4 09 | Q1 10 | Q2 10 | Q3 10 | Q4 10 | Q1 11 | Q2 11 | Q3 11 |
|---|---|---|---|---|---|---|---|---|
| **Worldwide** | | | | | | | | |
| Samsung | 3.3% | 4.2% | 5.6% | 8.8% | 9.4% | 11.3% | 16.4% | 20.0% |
| Apple | 16.2% | 15.8% | 13.0% | 17.1% | 15.9% | 18.3% | 19.0% | 14.5% |
| Nokia | 38.6% | 38.8% | 37.2% | 32.0% | 27.5% | 23.8% | 15.5% | 14.3% |
| HTC | 4.5% | 4.8% | 6.8% | 7.1% | 8.6% | 8.9% | 10.8% | 10.7% |
| Research In Motion | 19.9% | 19.1% | 17.5% | 15.0% | 14.3% | 13.5% | 11.6% | 10.0% |
| Sony Ericsson | 0.4% | 1.0% | 2.7% | 4.6% | 4.5% | 3.9% | 4.3% | 5.3% |
| Huawei | 0.0% | 0.1% | 0.2% | 0.2% | 1.4% | 2.8% | 2.6% | 4.6% |
| Motorola | 4.9% | 4.7% | 4.3% | 4.6% | 4.8% | 4.0% | 4.1% | 4.1% |
| LG | 0.6% | 1.1% | 1.7% | 2.0% | 4.4% | 4.9% | 5.8% | 3.9% |
| ZTE | 0.2% | 0.1% | 0.2% | 0.8% | 1.0% | 1.2% | 1.9% | 3.3% |
| Others | 11.3% | 10.4% | 10.8% | 7.9% | 8.2% | 7.4% | 8.0% | 9.4% |
| **US** | | | | | | | | |
| HTC | 8.0% | 8.9% | 14.2% | 13.2% | 15.4% | 16.7% | 18.9% | 22.5% |
| Apple | 18.2% | 20.2% | 19.3% | 23.7% | 17.2% | 29.5% | 24.7% | 20.4% |
| Samsung | 3.3% | 5.7% | 5.0% | 14.2% | 12.5% | 10.1% | 14.8% | 19.5% |
| Research In Motion | 43.0% | 37.8% | 33.1% | 26.0% | 21.7% | 13.8% | 9.7% | 10.0% |
| Motorola | 14.0% | 12.9% | 14.0% | 12.0% | 13.6% | 8.6% | 6.9% | 7.9% |
| LG | 0.7% | 0.6% | 2.1% | 3.1% | 8.8% | 10.5% | 13.2% | 7.7% |
| Huawei | 0.0% | 0.0% | 0.7% | 0.2% | 0.6% | 5.1% | 3.3% | 5.5% |
| Pantech | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 1.2% | 3.2% |
| T-Mobile | 5.0% | 2.8% | 4.6% | 3.3% | 5.4% | 1.5% | 0.7% | 1.4% |
| Sony Ericsson | 0.0% | 0.0% | 0.1% | 1.0% | 1.5% | 1.2% | 1.2% | 0.7% |
| Others | 7.7% | 11.2% | 6.9% | 3.4% | 3.3% | 3.0% | 5.4% | 1.1% |

Source:
IDC WW Mobile Phone Tracker 2011Q3 Top 10

quantitative economic solutions, LLC



**Attachment G**
**Smartphone Actual and Estimated Shipments**
**Q1 2004 - Q3 2011**

**Source:** Output of Stata program "diffusion.do" which reads data from Attachment I

quantitative economic solutions, LLC



**Attachment H**
**Smartphone Actual and Estimated Shipments**
**Q1 2004 - Q4 2017**

Shipments (millions)

Units ——Gompertz Estimation

quantitative economic solutions, LLC

**Source:** Output of Stata program "diffusion.do" which
reads data from Attachment I

**Attachment I**
**Estimate of Smartphones Purchased**
**by First-time Smartphone Buyers**

| Quarter | Shipments | Shipments Corresponding to First-time Buyers | Cumulative Shipments Corresponding to First-time Buyers |
|---------|-----------|----------------------------------------------|---------------------------------------------------------|
|         | [A]       | [B]                                          | [C]                                                     |
| Q1 2004 | 1,057,997 | 1,057,997 | 1,057,997 |
| Q2 2004 | 969,341 | 969,341 | 2,027,338 |
| Q3 2004 | 1,083,926 | 1,083,926 | 3,111,264 |
| Q4 2004 | 1,170,420 | 1,170,420 | 4,281,684 |
| Q1 2005 | 931,983 | 931,983 | 5,213,667 |
| Q2 2005 | 1,110,896 | 1,110,896 | 6,324,563 |
| Q3 2005 | 1,380,590 | 1,380,590 | 7,705,153 |
| Q4 2005 | 1,751,714 | 1,751,714 | 9,456,867 |
| Q1 2006 | 1,807,944 | 749,947 | 10,206,814 |
| Q2 2006 | 1,958,220 | 988,879 | 11,195,693 |
| Q3 2006 | 2,000,994 | 917,068 | 12,112,761 |
| Q4 2006 | 2,654,508 | 1,484,088 | 13,596,849 |
| Q1 2007 | 2,888,117 | 1,956,134 | 15,552,983 |
| Q2 2007 | 3,863,014 | 2,752,118 | 18,305,101 |
| Q3 2007 | 5,435,669 | 4,055,079 | 22,360,180 |
| Q4 2007 | 7,907,648 | 6,155,934 | 28,516,114 |
| Q1 2008 | 6,717,573 | 4,909,629 | 33,425,743 |
| Q2 2008 | 7,341,600 | 5,383,380 | 38,809,123 |
| Q3 2008 | 10,346,223 | 8,345,229 | 47,154,352 |
| Q4 2008 | 9,548,365 | 6,893,857 | 54,048,209 |
| Q1 2009 | 9,280,349 | 6,392,232 | 60,440,441 |
| Q2 2009 | 10,682,967 | 6,819,953 | 67,260,394 |
| Q3 2009 | 12,306,662 | 6,870,993 | 74,131,387 |
| Q4 2009 | 13,535,507 | 5,627,859 | 79,759,246 |
| Q1 2010 | 12,652,647 | 5,935,074 | 85,694,320 |
| Q2 2010 | 14,359,080 | 7,017,480 | 92,711,800 |
| Q3 2010 | 20,806,372 | 10,460,149 | 103,171,949 |
| Q4 2010 | 21,935,460 | 12,387,095 | 115,559,044 |
| Q1 2011 | 23,158,409 | 13,878,060 | 129,437,104 |
| Q2 2011 | 25,346,720 | 14,663,753 | 144,100,857 |
| Q3 2011 | 23,585,288 | 11,278,626 | 155,379,483 |
| Q4 2011 | 27,354,102 | 13,818,595 | 169,198,078 |
| Q1 2012 | 29,004,662 | 16,352,015 | 185,550,093 |
| Q2 2012 | 30,548,240 | 16,189,160 | 201,739,253 |
| Q3 2012 | 31,953,790 | 11,147,418 | 212,886,671 |
| Q4 2012 | 33,195,466 | 11,260,006 | 224,146,677 |
| Q1 2013 | 34,255,268 | 11,096,859 | 235,243,536 |
| Q2 2013 | 35,125,156 | 9,778,436 | 245,021,972 |
| Q3 2013 | 35,808,148 | 12,222,860 | 257,244,832 |
| Q4 2013 | 36,318,028 | 8,963,926 | 266,208,758 |
| Q1 2014 | 36,677,488 | 7,672,826 | 273,881,584 |
| Q2 2014 | 36,914,952 | 6,366,712 | 280,248,296 |
| Q3 2014 | 37,060,660 | 5,106,870 | 285,355,166 |
| Q4 2014 | 37,142,884 | 3,947,418 | 289,302,584 |

Sources:
[A] Through Q3 2011 from IDC Worldwide Quarterly Mobile Phone
Tracker Q1 2011 Final Data and
IDC Worldwide Quarterly Mobile Phone Tracker Q1 2011 Forecast Data.
Q4 2011 on are projections output from diffusion.do
[B] = [A] for Q1 04 - Q4 05, [A] - ([A] from 8 quarters prior) thereafter
[C] = cumulation of [B]



**Attachment J**

**Smartphone Actual and Estimated Cumulative Net Shipments**

**Q1 2004 - Q4 2017**

quantitative economic solutions, LLC

Note: Net shipments are calculated as quarterly shipments minus shipments executed eight quarters prior.

Source: Output of Stata program "diffusion.do" which reads data from Attachment I



**Attachment K**
**Smartphone Actual and Estimated Cumulative Net Shipments**
**Q1 2004 - Q3 2011**

Note: Net shipments are calculated as quarterly shipments minus
shipments executed eight quarters prior.
Source: Output of Stata program "diffusion.do" which reads data from Attachment I

quantitative economic solutions, LLC

**Attachment L**
**Smartphone Shipments: IDC Forecasts vs. Actuals**
**2010 - 2011**

| | Full Year 2010 | | | | | |
|---|---|---|---|---|---|---|
| | Worldwide | | | US | | |
| | Projection (Q4 09) | Actual | % Difference | Projection (Q4 09) | Actual | % Difference |
| | [A] | [B] | [C] | [A] | [B] | [C] |
| Symbian | 89,034,300 | 110,795,251 | 24.4% | 1,170,000 | 2,036,542 | 74.1% |
| BlackBerry OS | 42,005,191 | 48,782,320 | 16.1% | 24,540,000 | 19,705,279 | -19.7% |
| Android | 28,586,990 | 71,099,594 | 148.7% | 18,280,000 | 28,778,566 | 57.4% |
| iOS | 32,333,372 | 47,515,333 | 47.0% | 11,680,000 | 14,021,500 | 20.0% |
| Windows Mobile | 22,200,456 | 14,969,839 | -32.6% | 7,560,000 | 3,581,278 | -52.6% |
| Linux | 8,373,156 | 9,159,634 | 9.4% | 640,000 | 14,350 | -97.8% |
| webOS | 3,442,061 | 1,749,659 | -49.2% | 3,100,000 | 1,607,466 | -48.1% |
| Maemo/MeeGo | 705,220 | 670,960 | -4.9% | 11,500 | 2,500 | -78.3% |
| Palm OS | 78,221 | 18,067 | -76.9% | 12,500 | 6,078 | -51.4% |
| Total | 226,758,967 | 304,760,657 | 34.4% | 66,994,000 | 69,753,559 | 4.1% |

| | Full Year 2011 | | | | | |
|---|---|---|---|---|---|---|
| | Worldwide | | | US | | |
| | Projection (Q4 09) | Projection (Q1 11) | % Difference | Projection (Q4 09) | Projection (Q1 11) | % Difference |
| Symbian | 101,350,123 | 97,091,222 | -4.2% | 1,350,000 | 1,715,486 | 27.1% |
| BlackBerry OS | 49,793,396 | 67,220,718 | 35.0% | 27,910,000 | 16,840,262 | -39.7% |
| Android | 42,468,074 | 183,544,940 | 332.2% | 22,650,000 | 48,801,777 | 115.5% |
| iOS | 36,729,651 | 86,001,837 | 134.1% | 12,960,000 | 28,170,200 | 117.4% |
| Windows Mobile | 32,575,399 | 18,065,269 | -44.5% | 13,740,000 | 3,710,684 | -73.0% |
| Linux | 7,867,253 | 17,514,527 | 122.6% | 720,000 | 30,000 | -95.8% |
| webOS | 4,280,365 | 2,686,774 | -37.2% | 3,590,000 | 2,335,000 | -35.0% |
| Maemo/MeeGo | 2,142,576 | 130,902 | -93.9% | 15,900 | 0 | N/A |
| Palm OS | 16,758 | 100 | -99.4% | 0 | 0 | N/A |
| Total | 277,223,595 | 472,256,289 | 70.4% | 82,935,900 | 101,603,409 | 22.5% |

Sources:
[A] IDC_WWSmartphone_Forecast_by_OS_Q4_2009.pdf
[B] IDC, Worldwide Quarterly Mobile Phone Tracker Q1 2011 Forecast Data
[C] = percentage change between [A] and [B]

**quantitative economic solutions, LLC**