73

# VELLTURO
# EXHIBIT 73

- Subscribe: Home Delivery / Digital
- Log In
- Register Now

- 
- Technology
- Personal Tech
- Business Day

**Bits**

[ Go ]

# Windows Phone 7 Caught in Mobile App Catch -22

*By NICK BILTON*
| December 14, 2011, *10:35 am* 17 Comments

  

The New York Times Windows Phone 7, at left, has been praised for its unique design.

Designers and start-up tech firms seem to agree on two things when it comes to Microsoft's Windows Phone 7 mobile platform. First, it's gorgeous and uniquely designed. Second, they won't be building an app for it in the near future.

Why? Resources.

It's a typical and understandable rule for most bootstrapped start-ups: build for the platform that your customers are on. Yet for Microsoft, this poses a Catch-22.

Start-ups can't devote resources to building apps for Windows Phone 7 until more customers buy phones that run on the platform. But, customers will not flock to Windows Phone 7 until their favorite apps exist.

Leah Busque, founder and chief product officer at TaskRabbit, a San Francisco-based start-up that performs errands, said in an interview that building apps for Windows Phone 7 is not tied to how good Microsoft's mobile operating system is, but rather a struggle of where to focus TaskRabbit's scarce engineering resources.

"Over half of our users are on an iPhone, so we had to focus on that platform first, then Android is second," she said. "I'm not ruling out a Windows 7 app, but we have to follow our user base and provide solutions that makes sense for them."

According to a report issued last month by Nielsen, the market research firm, Google and Apple are both succeeding in the mobile smartphone race, and Windows Phone 7, although growing slowly in popularity, is still trailing far behind. Of Americans who own a smartphone, 71 percent own either an Android device or an iPhone. Microsoft's Windows Phone 7 only accounts for 1.3 percent of the market.

Alex Rainert, head of product at Foursquare, seemed to offer the same sentiment as Ms. Busque. "It's always going to be a question of resources and what people can spend their time on. As much as we might like the platform, we have to go where we have the users," he said. "For most start-ups, whatever you choose to work on, you are inevitably choosing not to work on something else."

Mr. Rainert, who also blogs about user interface design, noted that Microsoft has built a beautifully designed and vastly different mobile platform. While the design is refreshing, that unique interface makes it difficult for developers.

"When we're building for Android, the transfer cost from iPhone is lower because we can use about 60 percent of the design elements on both platforms," Mr. Rainert said. Building for Windows Phone 7 is more labor intensive because designers have to conform to the Windows 7, he said. Foursquare does have a Windows app, but the company's resources are primarily devoted to updating other platforms.

So what can Microsoft do to bridge this gap?

"Microsoft should continue meeting with developers, host MeetUps and publicly talk about how they are pushing the envelope in terms of what a user interface should be on a mobile phone," explained Dave Morin, founder of Path, a mobile social network. "One of the things that Microsoft has is it is really flush with resources and capital. Comparatively, most start-ups are not."

Mr. Morin said that he hopes to build a version of Path for Windows Phone 7 next year. "I think that Windows Phone 7 design is some of the most innovative user interface work that is being done right now," Mr. Morin said. "We're very interested in it as long as the user numbers continue to increase."

- Facebook
- Twitter
- Linkedin
- Share

74

100 LB Style   BLUEBIRDonline.com (888) 477 - 0700   100 LB Style

# VELLTURO
# EXHIBIT 74



## Apple 2.0 Covering the business that Steve Jobs built

# FaceTime's network effects

By Philip Elmer-DeWitt October 21, 2010: 8:20 AM ET                    comments

**Apple's video calling app, now on the Mac, is poised for exponential growth, says an analyst**

"We believe Apple is acutely aware of the power of networks (Metcalf's Law), and is applying this concept to accelerate adoption of its platform."

So writes Deutsche Bank's Chris Whitmore in a note issued Thursday, the day after Apple's (AAPL) Back to the Mac event.

Whitmore is talking about FaceTime, the video calling feature that first appeared on the iPhone 4 in June, was picked up by the iPod touch in September, and on Wednesday was made available to Macs running Snow Leopard, the latest version of OS X.



Source: Deutsche Bank. Click to enlarge.



That law he cites -- Metcalf's -- says that the value of a telecommunications network is proportional to the square of the number of connected users of the system.

Whitmore estimates that the number of FaceTime equipped devices will have grown from 19 million on Tuesday to nearly 300 million by the end of 2012. Applying Metcalf's formula, that would bring the number of possible unique connections to more than 40 trillion. See chart.

 "Facetime not only adds to the many features that makes Apple's current product offering the strongest in its history," Whitmore concludes. "But it also has the potential to increase the stickiness of the platform exponentially."

The next logical step, according to Kaufman Bros. Shaw Wu is to bring out a free FaceTime app for Microsoft (MSFT) Windows. "We believe," writes Wu, "that would make it a much more serious challenger to Skype and other video conferencing software."

"We believe the integrated approach that links software and apps to hardware is Apple's 'Secret Sauce' that competitors simply cannot match," writes Barclays' Ben Reitzes, speaking broadly about the way Mac OS is becoming more like iOS. "The truth is that there are far more active users of Apple's iOS devices (iPhone, iPads and iPod Touches) now than Macs, so the new strategy is pretty simple: Make Macs more like the devices that everyone is trained on and enjoys. As a result, new software and the Mac App store could help accelerate the halo effect, driving Mac adoption."

NOTE: **MacNotes.de** has stumbled on some security holes in the FaceTime beta released Wednesday that could compromise your Apple ID and allow others to change your password. Apparently caveat emptor applies, even if the product is free.

**Follow Philip Elmer-DeWitt**

Recommend    One recommendation. Sign Up to see what your friends recommend.



### About This Author

**Philip Elmer-Dewitt**
EDITOR, APPLE 2.0
FORTUNE

Philip Elmer-DeWitt has been covering Apple since 1982, first for Time Magazine, and now on the Web for Fortune.com.

Email Philip

### Featured Newsletters

**Today in Tech**
Every morning, discover the companies, deals and trends in tech that are moving markets and making headlines. SUBSCRIBE

**The Term Sheet**
Receive Fortune's newsletter on all the deals that matter, from Wall Street to Sand Hill Road. SUBSCRIBE

**Big Tech**
Covering the digital giants of Silicon Valley and beyond, an in-depth look at enterprise companies, and the startups disrupting them. Written by **Michal Lev-Ram** and emailed twice weekly. SUBSCRIBE

**Ask Annie**
Anne Fisher answers career-related questions and offers helpful advice for business professionals. SUBSCRIBE



# VELLTURO
# EXHIBIT 75

# BUSINESS
SAI **INSIDER**

Home > Collections > Gowalla

Ads by Google



## Check Out Those FaceTime Ads: Think Apple Understands The Network Effect?

Henry Blodget | July 12, 2010 |   2,504 |   23

Everyone is going nuts about the latest Apple iPhone ads, which feature normal people using FaceTime video chat to laugh and cry together.

As far as we're concerned, the jury is still out on whether Apple's new FaceTime iPhone video chat will be the next big thing or just another cool feature that no one uses (please weigh in with your thoughts here).

But there's no mystery as to what Apple is up to strategically.



Ads by Google

### AT&T® Official Site
It's Here! The Brand New iPhone 4S. Get Yours Now w/ Free Shipping.
att.com/iPhone4S

### Introducing Galaxy Nexus
The first phone with Android 4.0 Ice Cream Sandwich. Learn More.
google.com/nexus

**Find More Stories About**

Gowalla

Facetime

**Related Articles**

Foursquare Schmoresquare: MyTown Has Over 800,000 Users After 2 Months
February 4, 2010

How To Video Chat Between iPhone And Android
April 26, 2011

Yelp Enables Check-Ins On Its iPhone App
January 15, 2010

Right now, FaceTime is a closed system: Both parties need an iPhone 4 and WiFi to use it (that's a seriously limited pool). By hyping FaceTime in its ads, Apple is encouraging both parties to get iPhone 4s, so they can use it. If the pitch works and people like the service, FaceTime will be yet another major asset in Apple's desire to build a closed system that benefits from strong network effects and a huge barrier to entry.

Closed systems with network effects are hard to build because consumers and competitors prefer the convenience of open platforms. When you can successfully build closed systems, however, they make awesome businesses. The more people who use the product, the more valuable the product gets, and the harder it is for competitors to break in and offer another viable choice. Thus, as the network effects really kick in, the leader easily gains more and more market share.

The network effect is the magic that grew AOL into a juggernaut (AIM), gave eBay an early monopoly on auctions, and has powered Facebook and Twitter to global dominance in recent years. It is also the effect that is crowning Foursquare king of the "check-in" world and turning early competitor Gowalla into roadkill.

Apple is already benefiting from network effects with the iPhone thanks to the success of apps and the App Store, which offer a platform for third parties to build on. But the wholesale success of FaceTime would take this to a whole different level.

Thus far, Apple's network effect has made the iPhone more valuable to developers and users by virtue of there being more users, more developers, and more apps on the iPhone than on any other platform. These are powerful but indirect benefits. Widespread use of FaceTime, meanwhile, would instantly make the iPhone vastly more valuable to an iPhone owner, because it would allow you to simply and easily do video chat with your friends. This would encourage whole families and workplaces to adopt iPhones and only iPhones.

Obviously, Android will soon roll out a competitive solution that is available on multiple phones. And obviously there will quickly be apps that make this possible across multiple phones. But based on history thus far, Apple's

Registration on or use of this site constitutes acceptance FaceTime will be far simpler, easier, and more convenient that competing solutions for a long while—certainly for
* Copyright © 20 enough of time to build up a powerful network effect.

Index by Keyword | Index by Date

Ads by Google                                                                  Disclaimer

**Overstock iPhone4: $51.12**
Get an unlocked iPhone 4S for $51. 1 Per Customer. 30 Sold Per Month.
www.NoMoreRack.com/iPhone4

**Small Business Software**
The Leading Security and Backup Software From Symantec. Buy Now!
www.symantec.com/Store

So that's why Apple's hyping the heck out of FaceTime (that and the fact that, for now, it's a unique feature available only on the iPhone).

Now the question is whether anyone actually wants to use FaceTime.  (Again, you can weigh in here).

Ads by Google

**Iphone 4 Blowout Sale**
Iphone 4 Up To 53% Off 2011 Holiday Season Sale Has Begun!
BestPrices247.net/Xmas-Deals

**Free Cell Phones**
Get A Free Cell Phone With New Plan From Wirefly.com
Wirefly.com

### Featured Articles







If You Break The Rules On Google+, You Can Lose All Google Services

How To Hack Facebook In 51 Seconds

Here's The Old Bain Capital Photo Everyone Will Use To Attack Mitt Romney

### More:

Home Prices Will Continue To Plunge, And 2013 Will Be The Worst Year For Foreclosures In History

Getting Ice Cream Sandwich On Your Android Phone Isn't As Far Off As We Thought

Ron Paul Is Close To A Win In Iowa

The New National Defense Authorization Act Is Ridiculously Scary

Former Dutch Politician: The Euro Will Collapse, Get Ready For The 'Neuro'

Japan Is A Giant Madoff-Like Ponzi Scheme That Will Blow Up Starting In The Next Few Months

### The Water Cooler
23 comments

**Mike Bee** on Jul 12, 6:37 AM said:

"Closed systems with network effects are hard to build because consumers and competitors prefer the convenience of open platforms." Some consumers, mostly from the technical end. Most consumers don't care and prefer stuff to just work.

**jameswates** on Jul 12, 6:46 AM said:

I think Apple's big focus on FaceTime in its ads shows that it's not worried about Android stealing existing iPhone users. If they were worried, they'd be playing up multitasking, or the gyroscope, or the ultra-fine display or some other techie advantage over Android phones. Instead, they're aiming straight for mainstream America, the kind of people who maybe don't own smartphones yet. A very confident move.

**llo** on Jul 12, 6:48 AM said:

I googled " FaceTime open standard"  The first sentence of the first link is "Apple Chief Executive Steve Jobs announced his trademark "one more thing" on Monday by making a video call to the company's designer Jony Ive through a service called FaceTime, which Apple aims to make an open industry standard." Your article forgot to

76

# VELLTURO
# EXHIBIT 76

Confidential Attorneys' Eyes Only

Page 1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               SAN JOSE DIVISION

4   APPLE INC., a California

    corporation,

5

6          Plaintiff,

7   vs.                    Case No. 11-CV-01846-LHK

8   SAMSUNG ELECTRONICS CO., LTD.,

    a Korean business entity;

9   SAMSUNG ELECTRONICS AMERICA,

    INC., a New York corporation;

10  SAMSUNG TELECOMMUNICATIONS

    AMERICA, LLC, a Delaware

11  limited liability company,

12          Defendants.

    --------------------------------/

13

14

15               CONFIDENTIAL

16          ATTORNEYS' EYES ONLY

17            OUTSIDE COUNSEL

18   VIDEOTAPED DEPOSITION OF MICHAEL J. WAGNER, CPA

             San Francisco, California

19        Wednesday, September 14, 2011

20

21

22

23          Reported by:

    LORRIE L. MARCHANT, CSR No. 10523, RPR, CRR, CCRR, CLR

24          JOB NO. 41962

25

Confidential Attorneys' Eyes Only

Page 2

1              September 14, 2011

2                 9:33 a.m.

3

4        Videotaped Deposition of MICHAEL J.

5    WAGNER, held at the offices of

6    Morrison & Foerster, LLP, 425 Market

7    Street, 34th Floor, San Francisco,

8    California, before Lorrie L. Marchant,

9    a Certified Shorthand Reporter,

10   Registered Professional Reporter,

11   Certified Realtime Reporter,

12   California Certified Realtime Reporter

13   and Certified LiveNote Reporter.

14

15

16

17

18

19

20

21

22

23

24

25

Confidential Attorneys' Eyes Only

Page 3

1             A P P E A R A N C E S:

2

3    FOR THE PLAINTIFF APPLE INC.:

4         MORRISON & FOERSTER, LLP
          BY:  WESLEY OVERSON, ESQ.
5             GRANT L. KIM, ESQ.
          425 Market Street
6         San Francisco, California 94105-2482
          Phone:  (415)268-6538
7         Fax:  (415) 268-7522
          e-mail:  Woverson@mofo.com
8                  gkim@mofo.com

9

10   FOR THE DEFENDANTS SAMSUNG:

11        QUINN EMANUEL URQUHART & SULLIVAN, LLP
          BY:  HEATHER BELVILLE, ESQ.
12        555 Twin Dolphin Drive, 5th Floor
          Redwood Shores, California 94065
13        Phone:  (650) 801-5000
          Fax:  (650) 801-5100
14        e-mail:  heatherbelville@quinnemanuel.com

15   and

16        BY:  CARL G. ANDERSON, Ph.D., ESQ.
          50 California Street, 22nd Floor
17        San Francisco, California 94111
          Phone:  (415) 875-6600
18        Fax:  (415) 875-6700
          e-mail:  carlanderson@equinnemanuel.com

19

20   ALSO PRESENT:

21        Sean McGrath, Videographer

22                     ---oOo---

23

24

25

Confidential Attorneys' Eyes Only

Page 4

1                P R O C E E D I N G S

2          THE VIDEOGRAPHER:  Good morning.  This is the

3     start of the disk labeled No. 1 of the videotaped

4     deposition of Michael Wagner in the matter Apple

5     Incorporated versus Samsung Electronics Company,

6     Limited, in the Court -- U.S. District Court, Northern

7     District of California, San Jose Division.  Case No.

8     11-CV-01846-LHK.

9          This deposition is being held at 425 Market

10    Street, San Francisco, California, on September 14th,

11    2011, at approximately 9:33 a.m.  My name is

12    Sean McGrath from TSG Reporting, Incorporated, and I am

13    the legal video specialist.  The court reporter is

14    Lorrie Marchant, in association with TSG Reporting.

15          Will counsel please introduce yourselves.

16          MR. OVERSON:  Wesley Overson and Grant Kim of

17    Morrison & Foerster, on behalf of Apple Inc., the

18    plaintiff.

19          MR. ANDERSON:  Carl Anderson of Quinn Emanuel

20    Urquhart & Sullivan, representing Samsung and the

21    witness.  And with me is Heather Belville, also of Quinn

22    Emanuel Urquhart & Sullivan.

23          THE VIDEOGRAPHER:  Will the court reporter

24    please swear in the witness.

25          THE REPORTER:  Do you solemnly swear or affirm

Confidential Attorneys' Eyes Only

Page 5

1   under the penalties of perjury that the testimony you

2   are about to offer will be the truth, the whole truth

3   and nothing but the truth?

4              THE WITNESS:  I do.

5              THE VIDEOGRAPHER:   You may proceed.

6                  EXAMINATION BY MR. OVERSON

7         BY MR. OVERSON:

8   Q.   Good morning.

9   A.   Good morning.

10   Q.   Please state your full name.

11   A.   Michael Joseph Wagner.

12              MR. OVERSON:  Okay.  First off, I'm going to

13   mark as Exhibits 160 and 161 your declaration from this

14   case and your CV.

15              (Marked for identification purposes,

16              Exhibits 160 and 161.)

17              BY MR. OVERSON:

18   Q.   Mr. Wagner, is -- is Exhibit 160 your

19   declaration in this case?

20   A.   It is.

21   Q.   And is Exhibit 161 your CV?

22   A.   It is.

23   Q.   Okay.  I note from your declaration that you're

24   a CPA; is that right?

25   A.   I am licensed as a CPA in the State of

Confidential Attorneys' Eyes Only

Page 6

1    California.

2        Q.   And is it true that you've specialized in the

3    computation of commercial damages over the last 35 years

4    of your career?

5        A.   Yes.

6        Q.   And I take it from your declaration and your CV

7    that you've testified literally hundreds of times?

8        A.   That's a fair statement.

9        Q.   Okay.  Looking at your CV, there's a listing of

10   the cases that you've worked on.  And it looks to go --

11   if I see this correctly, it goes in reverse chronology,

12   up to 123.

13           Is that the number of times you've testified in

14   cases?

15       A.   No.

16       Q.   Why do you have 123 here?

17       A.   Well, it should be 124, but if you said this is

18   the number of times you've testified as of the date this

19   CV was prepared, I would have said, yes.  Those are

20   trial testimonies.  And I've testified in one case since

21   this CV was prepared.

22       Q.   Okay.  What case was that?

23       A.   That was DuPont versus Kolon, K-O-L-O-N, in the

24   Eastern District of Virginia.

25       Q.   Okay.  And can you -- what side were -- were

Confidential Attorneys' Eyes Only

Page 7

1   you testifying on behalf of?

2       A.   Kolon.

3       Q.   And what -- what were the attorneys on the

4   Kolon side or who were they?

5       A.   Paul Hastings.

6       Q.   And can you tell me who the attorneys were on

7   the other side?

8       A.   It was Hunton & Williams.

9       Q.   Do you recall the specific attorney who

10  questioned you?

11      A.   It was the lead lawyer, but I'm blanking on his

12  name.

13      Q.   Okay.  So we see in your CV there's a --

14      A.   His last name is Riopelle, R-I-O-P-E-L-L-E.

15      Q.   Thank you.

16           So the -- there are 123 times here you've

17  testified in court, and then there's a listing of, it

18  looks like, 295 instances where you testified in

19  deposition; is that right?

20      A.   That is accurate.

21      Q.   Okay.  And can you tell me how many times --

22  well, first of all, let me note that in the right-hand

23  column of both of these lists, you have a description of

24  the work performed.

25           And if you look through that column, for the

Confidential Attorneys' Eyes Only

Page 8

1    123 times you testified in court, I only found two times

2    where it listed irreparable harm; is that correct?

3        A.    That is correct.

4        Q.    So of the 123 times you testified in court,

5    twice it had to do with irreparable harm; is that true?

6        A.    That is accurate.

7        Q.    Okay.  And do you happen to know how many times

8    you testified regarding irreparable harm in depositions?

9        A.    I don't have that fact memorized.  It would

10   be -- I would say maybe the same number, maybe one more

11   time.

12       Q.    Two or three times in depositions.  Is there

13   any way we can count them from your CV here?

14       A.    You should be.  Although I have to tell you,

15   I'm not always complete in my description of both the

16   causes of action or the work performed.  I kind of at

17   least list what I would consider the major causes of

18   actions and the major assignment.

19       Q.    Okay.  So out of the 400 times, approximately,

20   that you've testified, you believe you've testified two

21   or three times about irreparable harm?

22       A.    I think that's accurate.

23       Q.    Okay.  One of those is the Kinetic Concepts v.

24   Blue Sky Medical Group case.

25             Do you recall that case?

Confidential Attorneys' Eyes Only

Page 9

1      A.    Yes.  But it's really -- the defendant was

2  really Smith & Nephew.

3      Q.    I see.  Okay.

4            And so were you retained by the lawyers for

5  Smith & Nephew?

6      A.    Just so you know who I worked with in the case,

7  I underline the party who retained my services.  So,

8  yes, I -- I was retained by the defendant in that case.

9      Q.    Okay.  And in that case, did you testify that

10 there was no irreparable harm?

11     A.    Yes.

12     Q.    Can you tell me generally what the subject

13 matter of the case was?

14     A.     It was patent infringement, dealing with

15 medical devices.  In particular, it was negative

16 pressure wound therapy.

17     Q.    So you were testifying on the side of a

18 defendant that was accused of patent infringement;

19 right?

20     A.    That is correct.

21     Q.    And the plaintiffs were seeking a preliminary

22 injunction?

23     A.    They were.

24     Q.    And you testified in that case that a

25 preliminary injunction was not -- or you supported the

Confidential Attorneys' Eyes Only

Page 10

1    side that was arguing against the preliminary injunction

2    because there wasn't irreparable harm; right?

3        A.    That was one of the things I testified to, yes.

4        Q.    The other one I've seen here, the other case

5    I've seen, is No. 101, Broadcom v. Qualcomm.  And to the

6    right, on the last column, it says, Damages analysis and

7    irreparable harm.

8              Is that the other case that you're aware of

9    that you testified about irreparable harm?

10       A.    Yes.

11       Q.    And in that case you were testifying on the

12   side of Broadcom?

13       A.    I was.

14       Q.    And were they the patent holder?

15       A.    Yes.

16       Q.    And did you support a finding of irreparable in

17   that case?

18       A.    I did.

19       Q.    So Broadcom was seeking a preliminary

20   injunction against Qualcomm; is that right?

21       A.    I'm sorry.  Did you --

22       Q.    Broadcom sought a preliminary injunction

23   against Qualcomm?

24       A.    No.

25       Q.    No.  Okay.

Confidential Attorneys' Eyes Only

Page 11

1       What was the context in which you testified
2  about irreparable harm there?
3       A.   They were seeking a permanent injunction.  This
4  is after the trial.
5       Q.   Okay.  So I take it Broadcom was victorious at
6  trial?
7       A.   They were.  And the jury awarded my damage
8  number.
9       Q.   Okay.  And thereafter Qualcomm sought or
10  opposed a permanent injunction?
11       A.   They did.  They offered voluntarily to triple
12  the royalty rate that I testified to and the jury
13  awarded to not have a permanent injunction entered into,
14  but Broadcom wanted the permanent injunction.
15       Q.   Okay.  Was a permanent injunction issued?
16       A.   It was.
17       Q.   Do you recall who the attorneys were
18  representing Qualcomm?
19       A.   I don't.  I'm sorry.
20       Q.   In the Kinetic Concepts v. Smith & Nephew case,
21  was a preliminary injunction issued?
22       A.   No.
23       Q.   Did the case go on to trial?
24       A.   It did.
25       Q.   And was a finding of infringement made?

Confidential Attorneys' Eyes Only

Page 12

1    A.    Yes.

2    Q.    And did it go on to proceedings regarding an

3    injunction?

4    A.    I don't remember.  And if it did, I did not

5    testify at any hearing on that issue.

6    Q.    Okay.  So of the roughly 400 times you've

7    testified, you're only aware of one time you testified

8    about irreparable harm in the context of a preliminary

9    injunction; is that true?

10   A.    At least at trial, that's correct, or at court.

11   Q.    Okay.  What about in deposition?  Can you

12   recall another time?

13   A.    You know, I can't right now, but I can't

14   100 percent tell you that has not happened.  Because

15   I've been hired a number of times to address that issue,

16   and sometimes I testify and sometimes I don't.  But I'm

17   not recalling any other case sitting here right now.

18   Q.    Okay.  I just went through your work performed

19   column of your depositions.  And other than the Broadcom

20   case, I didn't see any others that said irreparable

21   harm.

22         Does that sound correct to you?

23   A.    You know, that sounds correct to me.

24   Q.    In your declaration you note that you have 28

25   professional publications, the majority of which deal

Confidential Attorneys' Eyes Only

Page 13

1   with the computation of commercial damages.

2          Do you have any publications that deal with the

3   subject of irreparable harm?

4      A.   I don't believe so.

5      Q.   Can you tell me how you are being compensated

6   for this case?

7      A.   Time and materials.

8      Q.   How are you compensated for your time?

9      A.   How am I compensated or how is my firm charging

10  for my time in this case?  They are really two different

11  issues.

12     Q.   Why don't you say -- ask -- please answer for

13  your firm.

14     A.   My time is billed at $795 an hour.

15     Q.   And how many people are working with you on

16  this matter?

17     A.   I would say there's two principal people.  But

18  I think if you asked me how many people charge time to

19  this project, I would say there are six or seven.

20     Q.   Can you estimate for me how much has been

21  billed on this project so far?

22     A.   I can.  $86,000.

23     Q.   And where does that take me up to?

24     A.   That would take you up to August 31st, the last

25  billing period.

Confidential Attorneys' Eyes Only

Page 14

1      Q.   So if we went up to today, we're going to be

2   over $100,000?

3      A.   I believe that would be correct.  Not much, but

4   it would be close to that.

5      Q.   Okay.  In paragraph 7 of your declaration, you

6   talk about what you or your staff have reviewed.

7           Are you with me?

8      A.   I am.

9      Q.   It first says that you reviewed Apple's motion

10  for a preliminary injunction and declaration and

11  exhibits submitted in support of that motion.

12          Did you personally review the motion and the

13  declaration and exhibits submitted?

14          MR. ANDERSON:  Objection.  Compound.

15          THE WITNESS:  To answer your compound question,

16  I did review the motion for preliminary injunction.  I'm

17  not certain I -- I personally reviewed all the

18  declarations and exhibits.  In fact, I don't believe

19  that I did.

20          BY MR. OVERSON:

21      Q.   Okay.  Did someone on your staff review those?

22      A.   Yes.

23      Q.   Okay.  And then how did you find out about what

24  was included -- what the content of those declarations

25  and exhibits were?

Confidential Attorneys' Eyes Only

Page 15

1     A.    Well, I think you've assumed a fact not in

2  evidence that someone disclosed to me what they learned

3  in those declarations and exhibits.

4         Sitting here, I don't -- I'm not recalling

5  anyone giving me any detail of what was included in

6  the -- in the declarations and exhibits attached to your

7  motion.  If -- they may have done it, but it's not clear

8  in my memory that they did.

9     Q.    You're an attorney, aren't you?

10    A.    I am an attorney.  And I will object to a

11 couple of your questions, but I will answer every one

12 unless I'm instructed not to by counsel representing me

13 here today.  I may have a lower bar number than you.

14    Q.    Sitting -- certainly you've been in more

15 depositions than I have.  I'll give you that one.

16         Sitting here today, you're not sure whether you

17 have even received reports of what the content was of

18 the declaration and exhibits that Apple submitted; true?

19    A.    No.  That was a compound question.

20         I have as far as the declaration, because I've

21 read the declaration myself.  But as far as -- oh, I'm

22 sorry.  You said declarations.  I stand corrected.

23         I do not recall myself personally reading those

24 documents or someone disclosing to me the content of

25 those documents.

Confidential Attorneys' Eyes Only

Page 16

1    Q.    Okay.  And then it goes on, and paragraph 7

2    says, I or my staff have also reviewed publicly

3    available documents discussed in this declaration and

4    the supporting exhibits.

5          So is this a reference simply to the exhibits

6    that are cited within the declaration itself?

7    A.    It's referring to the exhibits that are

8    actually attached to the declaration and all of the

9    documents that are cited in footnotes.

10   Q.    Okay.  Have you reviewed all of those?

11   A.    I have.

12   Q.    Did you review any other publicly available

13   information beyond what is cited in the report?

14   A.    Yes.

15   Q.    Can you tell me what information that was?

16   A.    The only thing that's coming quickly to mind

17   are the documents that you sent to counsel for Samsung

18   yesterday.  I reviewed those this morning.

19   Q.    Articles?

20   A.    Yes.  Those are articles.

21   Q.    Right.

22   A.    I believe they're public.  It's possible I

23   reviewed a couple of other public documents, but not

24   many.

25   Q.    And then, finally, it says, The depositions of

Confidential Attorneys' Eyes Only

Page 17

1   Richard Lutton and Sissie Twiggs.   Those were reviewed.

2         Did you personally review those?

3       A.   I did not read them in their entirety, but I've

4   read portions of the depositions.

5       Q.   Okay.   It also says that you or, I think, your

6   staff reviewed documents produced by Apple and Samsung

7   in discovery.

8         Can you tell me what you personally reviewed

9   out of Apple and Samsung's productions?

10      A.   I know I've read the operative pleadings that

11  you have filed in this case.   Of course I read this

12  motion.   I've reviewed -- I've read all the documents

13  that are cited in my declaration.   And I think that

14  would be it.

15      Q.   Are there any documents from Samsung cited in

16  your declaration?   I didn't see any, but I might be

17  wrong.

18      A.   There are documents that are cited that we

19  received from Samsung.   So by definition, is that a

20  Samsung document?   Yes.

21        But if you're talking about things like letters

22  or e-mails from Samsung, I'm not recalling citing or

23  seeing any such documents.

24      Q.   When you say you received documents from

25  Samsung, do you mean from Quinn Emanuel?

Confidential Attorneys' Eyes Only

Page 18

1     A.   Well, I think everything would have come

2  through Quinn Emanuel, but they were documents that are

3  produced to Quinn Emanuel by their client.

4     Q.   Okay.  Can you tell me which documents that you

5  cited in your declaration actually came from Samsung?

6     A.   Not easily without looking at them.  But a

7  number of them would be things like documents that cite

8  information about this market that they had in their

9  possession.

10     Q.   So I saw that there are market analyses by

11  third parties who are looking at, for example, the

12  smartphone market?

13          Is that the kind of document you're talking

14  about.

15     A.   Yes, generally.

16     Q.   Okay.  You're not aware of any

17  Samsung-generated document that you relied upon?

18     A.   You know, I -- I have some unrefreshed

19  recollection of seeing some, but I can't tell you what

20  they are without you showing me the documents themselves

21  to tell you whether I've seen them or not.

22     Q.   Sitting here today, you don't -- can you tell

23  me whether you've seen any Samsung-generated market

24  analysis?  In other words, a document created by Samsung

25  employees.

Confidential Attorneys' Eyes Only

Page 19

1    A.   No.   If you're talking about their internal

2  marketing department, I'm not recalling seeing any such

3  document.

4    Q.   Same question for customer surveys.

5         Have you seen any Samsung-generated customer

6  surveys?

7    A.   No, none that would have been generated

8  internally by staff at Samsung.

9    Q.   Okay.   Let me step back again and ask more

10  broadly.

11        Can you -- sitting here today, do you believe

12  you've seen any document generated by Samsung employees?

13    A.   Not without having my memory refreshed, I

14  cannot.

15    Q.   Did you speak with any Samsung employees?

16    A.   I did not.

17    Q.   Did you speak with any other experts in forming

18  your opinions on this matter?

19    A.   No.

20    Q.   Okay.   Apart from your own staff that you work

21  with at your firm and the attorneys at Quinn Emanuel,

22  have you spoken with anybody else about this case?

23    A.   I have not.   Except for you today.

24    Q.   Did you work on any cases previous to this case

25  that involved smartphones?

Confidential Attorneys' Eyes Only

Page 20

1    A.    Yes.

2    Q.    Okay.   Which case would that be?

3    A.    You know, I've worked on a lot.   I mean, it's

4    probably -- I've done more cases in that area in the

5    last five years than any other industry.

6          I've done at least six cases for AT&T Wireless.

7    I've done work previously against Samsung.   I've done

8    cases -- I've done a number of cases for Motorola

9    Mobility.   I've done cases against HTC.   I've done cases

10   against RIM.

11   Q.    Did any of those cases involve design patents?

12   A.    No.

13   Q.    Were all of those cases patent cases?

14   A.    Yes.

15   Q.    So they were all utility patents?

16   A.    Every one of them.

17         I've also done work for RIM as well, besides

18   against them.

19   Q.    Have you looked at the '381 patent at issue in

20   this case?

21   A.    I have not read the patents in this case,

22   except for the front page.   I saw the front page, but

23   that's it.

24   Q.    Of the '381 patent?

25   A.    Yes, I think so.

Confidential Attorneys' Eyes Only

Page 21

1    Q.   You have not looked at the claims?

2    A.   No.

3    Q.   What about of the design patents?  Have you

4  looked at those?

5    A.   I have not.

6    Q.   Have you worked on any cases involving tablets

7  before?

8    A.   Yes.

9    Q.   Which cases were those?

10   A.   I did a case -- actually, I guess it was a case

11 against Samsung.

12   Q.   Okay.  On which side did you testify?

13   A.   Well, I told you it was against, so it wasn't

14 for them.  It was for AMD.  And it had to do with chips

15 that went into tablets.

16   Q.   I see.  In all of the cases that you've

17 testified in regarding smartphones, were you testifying

18 about reasonable royalties?

19   A.   No.

20   Q.   What were you testifying about?

21   A.   Well, I testified as -- reasonable royalty is

22 the most common form of damages I've testified to, but

23 I've also testified about lost profits as well.

24   Q.   Fair enough.

25        So in all of the smartphone and tablet cases

Confidential Attorneys' Eyes Only

Page 22

1    that you've testified in, were you testifying as to the

2    computation of damages?

3        A.    I was.  And/or commercial success.  I've

4    testified about commercial success in -- in smartphone

5    cases, not in the tablet cases.

6        Q.    Do you have any particular expertise on product

7    design?

8        A.    No.

9        Q.    Do you have any particular expertise on product

10   advertising?

11       A.    I have some.

12       Q.    How -- what form does that expertise take?

13       A.    Well, it's only by studying marketing efforts

14   by hundreds, if not thousands, of companies that are

15   relevant to the computation of commercial damages.

16       Q.    From your experience as a damages expert,

17   you've been exposed to advertising campaigns?

18       A.    Many.

19       Q.    Okay.  But you don't hold yourself out as an

20   expert on advertising, do you?

21       A.    I do not.

22       Q.    And the same would be true for branding?

23       A.    That would be true.  I have valued brands, but

24   I would not consider myself an expert on branding.

25       Q.    Have you testified -- strike that.

Confidential Attorneys' Eyes Only

Page 23

1    Are you an expert or have you held yourself out

2  as an expert on how to use a product design to build a

3  brand?

4        MR. ANDERSON:  Objection.  Vague.

5        THE WITNESS:  And compound.  No and no.

6        BY MR. OVERSON:

7    Q.    Okay.  Can you turn to paragraph 18 of your

8  declaration.

9    A.    Yes.

10   Q.    You wrote, Notably absent in Apple's motion is

11 any evidence or analysis of any confusion by purchasers

12 of the Samsung products at issue.  Apple has not

13 presented any survey of customers that shows that any

14 purchaser of a Samsung product at issue was confused

15 about the manufacturer of that product.

16       Here are you talking about the kind of

17 confusion that we usually see in a trademark case?

18   A.    Yes.

19   Q.    And you've testified in trademark cases, I take

20 it?

21   A.    A number of them.

22   Q.    And is it your understanding that a -- a survey

23 showing confusion about the origin of a product is

24 required in a design patent case?

25   A.    I don't know what the -- you're asking me for a

Confidential Attorneys' Eyes Only

Page 24

1   legal conclusion.  I don't know what the legal standard

2   is.

3        It -- in my judgment as a damages expert, that

4   is a relevant inquiry and a relevant piece of

5   information.

6        Q.   Okay.  You don't know whether -- you're not

7   saying it's required; you're just saying it's -- it

8   would have been relevant to have that?

9        A.   Yes.  I think it would have been extremely

10  relevant to me if I had that information.

11       Q.   Do you agree that you can have erosion of the

12  distinct -- distinctiveness of a design without a

13  customer being confused about the origin of the product?

14       MR. ANDERSON:  Objection.  Incomplete

15  hypothetical.

16       THE WITNESS:  Well, I guess you knew my answer

17  because I -- my answer is, I would need more facts to

18  know.

19       BY MR. OVERSON:

20       Q.   So let's take it on a general level first, and

21  we can get more specific.

22       But if a company copies another company's

23  products and sells the copies on the market, but the

24  people who buy the product know that the copy is not the

25  original, they don't mistake that, couldn't that erode

Confidential Attorneys' Eyes Only

Page 25

1    the distinctiveness of the design?

2          MR. ANDERSON:  Objection.  Argumentative.

3    Incomplete hypothetical.

4          THE WITNESS:  Well, I assume anything is

5    possible.  But -- but I don't think it's probable based

6    on, at least, the limited hypothetical you just gave me.

7          BY MR. OVERSON:

8     Q.   So it's possible that in that hypothetical the

9    distinctiveness of the design would be eroded; right?

10    A.   I just said any --

11          MR. ANDERSON:  Same objections.

12          THE WITNESS:  -- anything is possible.  But I'd

13    need a lot more facts to know whether I think that is a

14    fact that would be relevant to any analysis I would do.

15          BY MR. OVERSON:

16    Q.   Okay.  What kind of facts would you need?

17    A.   I would -- again, would like to have someone

18    ask questions of those individuals who met the criteria

19    that you just gave me in your hypothetical and ask, Does

20    that diminish your -- your view of Apple and the

21    distinctiveness of their products?

22    Q.   Well, if there's a copy of the design, the

23    distinctiveness that's attributable to design is being

24    eroded; right?

25          MR. ANDERSON:  Same objections.

Confidential Attorneys' Eyes Only

Page 26

1    THE WITNESS:  Well, I told you that's possible.
2  And if it was what was driving demand for the product, I
3  would have a lot more ability to answer your question.
4  And if it's not, then I don't think it would have really
5  any impact in the marketplace.
6    BY MR. OVERSON:
7    Q.   Okay.  Your belief is that if design is not
8  driving the marketplace, then you won't erode the
9  distinctiveness of the design by selling copies of that
10  design; right?
11    MR. ANDERSON:  Objection.  Misstates the
12  witness's testimony.
13    THE WITNESS:  I think it's generally a fair
14  characterization of what I'm trying to say.  But what
15  I'm really trying to say is that there would be no --
16  any -- any economic impact as a result of that copying
17  on the plaintiff.
18    BY MR. OVERSON:
19    Q.   What if the design that -- the original design
20  is strongly associated with a particular brand --
21    MR. ANDERSON:  Objection.  Incomplete
22  hypothetical.
23    MR. OVERSON:  Objection.  I haven't finished my
24  question yet.
25    MR. ANDERSON:  I apologize.

Confidential Attorneys' Eyes Only

Page 27

1      BY MR. OVERSON:

2      Q.   Let's assume that the design -- the distinctive

3  design is -- is closely associated with a particular

4  brand.  If someone copies that design, doesn't the link

5  between the design and the brand start to weaken?

6          MR. ANDERSON:  Objection.  Incomplete

7  hypothetical.  Assumes facts not in evidence.

8          THE WITNESS:  Well, again, I told you -- it's

9  really the same answer.  You're asking, just a different

10  way, the same question.  It's possible it would, but I'd

11  need more facts to know whether it would or not.

12         BY MR. OVERSON:

13     Q.   Okay.  And what facts would you need?

14     A.   Again, I would need to know whether that had an

15  impact on these particular customers that bought the

16  copied product and what impact that had on their view of

17  the plaintiff in the case.

18     Q.   Well, what about the customers who haven't

19  bought any of the products yet?  Those customers who had

20  come to associated the -- associate the distinctive

21  design to the particular creator of that design and the

22  brand that goes with that company?  Once the copies

23  start showing up in the market, wouldn't that person who

24  hasn't bought anything yet start to not so -- not so

25  closely link the design to the originator of the design?

Confidential Attorneys' Eyes Only

Page 28

1          MR. ANDERSON:  Objection.  Incomplete
2     hypothetical.  Assumes facts not in evidence.
3          THE WITNESS:  Yeah.  You'd need to have a lot
4     more facts in the hypothetical.  Again, my answer is the
5     same, it's possible but I'd need more facts to know.
6          BY MR. OVERSON:
7     Q.   Well, you would agree that design is one factor
8     that influences persons' decisions who are considering
9     buying a smartphone or a tablet; true?
10         MR. ANDERSON:  Objection.  Compound.
11         THE WITNESS:  It may be, yes.
12         BY MR. OVERSON:
13    Q.   Okay.  Let me ask it separately.
14         Design is one -- you would agree -- would you
15    agree with me that one factor of customers considering
16    buying a smartphone is design?
17    A.   Yes.
18    Q.   And would you agree with me that one factor of
19    customers considering buying a tablet is design?
20    A.   Yes.
21    Q.   Can you turn to paragraph 84 of your
22    declaration, please.
23         In paragraph 84, you're citing to a June 2001
24    Nielsen survey?
25    A.   No.

Confidential Attorneys' Eyes Only

Page 29

1    Q.    You're not?

2    A.    I am not.  It's a 2011, not a 2001.

3    Q.    I don't know how 2001 came out.  Thank you.

4    I'll correct that.

5          In paragraph 84, you're citing to a June 2011

6    Nielsen survey; true?

7    A.    True.

8    Q.    Okay.  And that survey ranked touchscreen as

9    the most important factor in a smartphone; true?

10   A.    It did.

11   Q.    But it also said that other important decision

12   drivers were Internet access, apps -- A-P-P-S -- access

13   to e-mail, design, ease of use and price; true?

14         (Discussion off the record.)

15         THE WITNESS:  Yes.

16         BY MR. OVERSON:

17   Q.    And -- and you wrote that design is one of six

18   drivers of demand relating to smartphones; true?

19   A.    That was part of the sentence that I wrote,

20   yes.

21   Q.    Do you agree with it?

22   A.    I do agree with that.

23   Q.    Okay.  And you quoted a statement from the

24   publication.  I think it's called FierceWireless.  Maybe

25   it makes sense to show it to you.

Confidential Attorneys' Eyes Only

Page 30

1          MR. OVERSON:  We'll mark this as 162.

2          (Marked for identification purposes,

3          Exhibit 162.)

4          BY MR. OVERSON:

5     Q.    So I believe 162 is the document that you're

6     quoting on paragraph 84 of your report.

7     A.    It is.

8     Q.    Okay.  And if you look on the second page of

9     the article, which is entitled "Are touchscreens the

10    most important feature of smartphones?"  And it says,

11    It's from FierceWireless, the wireless industry's daily

12    monitor.  And the date is June 2nd, 2011.

13         But on page 2, there's a paragraph that has the

14    word "now" at the beginning.

15    A.    It does.  And I think that's the paragraph that

16    I quote for everything I have in paragraph 84.

17    Q.    Okay.  And the last sentence states, quote, I

18    think the conclusion to draw from this is that

19    smartphone users want a lot of different things out of

20    their device, which means that smartphone vendors will

21    need to cover all their bases to be successful in the

22    smartphone market.

23         You quoted that -- at least the end of that

24    sentence in your report; true?

25    A.    I did.

Confidential Attorneys' Eyes Only

Page 31

1    Q.   And you would agree with that statement?

2    A.   I wouldn't have put it in my declaration if

3  I -- I disagreed with it.  I do agree with it, yes.

4    Q.   So one of the bases that a smartphone vendor

5  has to cover to be successful is design; true?

6    A.   I think that's correct.

7    Q.   If a smartphone maker doesn't have a [sic]

8  attractive design, they will have a hard time competing

9  in the marketplace; true?

10       MR. ANDERSON:   Objection.   Incomplete

11  hypothetical.

12       THE WITNESS:   I'd need more information to know

13  to answer that question.

14       BY MR. OVERSON:

15   Q.   Well, just from your own paragraph, design is

16  one of the decision drivers on purchases for

17  smartphones; true?

18   A.   It is.

19   Q.   And a maker of smartphones will have to cover

20  that base, that base being the design, in order to be

21  competitive; true?

22   A.   If -- if they are off the scale on the other

23  features and those are the features that a consumer

24  buys, that consumer could probably care less about the

25  design.  But in some circumstances, someone -- another

Confidential Attorneys' Eyes Only

Page 32

1   consumer may put a higher emphasis on design.  In that

2   case, then they would need to have a good design.

3       Q.   So a minute ago you said you agreed with the

4   statement that the vendors would have to cover all their

5   bases to be successful, which included all six of the

6   factors; right?

7       A.   Oh, I do.  I do.  But, I mean, there's other

8   documentation here -- I think it's a study done by your

9   client -- that shows that at least for the products at

10  issue in this case, the design's -- is only -- only

11  drives 1 percent of the purchases of their product.  So,

12  yes.  Is it important?  Yes.  But is it one that really

13  drives the majority of their purchases?  No.

14       So, yeah, I need a lot more facts to answer the

15  question.  In generalities, I agree that design is one

16  of the drivers of demand.

17       Q.   The study that you're talking about asked the

18  question of what was the main reason why people were

19  buying a smartphone; right?

20       A.   That's correct.

21       Q.   And over 40 percent, in the case of Apple, said

22  brand; right?

23       A.   I don't remember it being that high, but it

24  could be.  I didn't think it was quite that high, but it

25  was very high in that study.

Confidential Attorneys' Eyes Only

Page 33

1          (Marked for identification purposes,

2          Exhibit 163.)

3          THE WITNESS:  You're right.  It's actually

4    44 percent for brand/model.

5          BY MR. OVERSON:

6      Q.    Okay.  Can you tell me what page you're looking

7    at?

8      A.    Page 23.

9      Q.    And I take it you're looking at the -- of the

10   four graphs, you're looking at the upper right graph?

11     A.    I am.

12     Q.    Okay.  And in -- in this study they ask for the

13   reason of choice by OS, ownership share in Q4 2010;

14   correct?

15     A.    That is correct.

16     Q.    And the OS is operating system?

17     A.    It is.

18     Q.    Okay.  And in the iOS column, I take it that's

19   the Apple operating system?

20     A.    It is.

21     Q.    There is 44 percent in green, which is the

22   brand/model.

23     A.    Yes.

24     Q.    So 44 percent of the respondents listed the

25   brand/model as the main reason for choosing the Apple

Confidential Attorneys' Eyes Only

Page 34

1  product?

2      A.   I would say that's correct.

3      Q.   And just so we're clear, can you -- can you

4  tell me what exhibit number you're looking at?

5      A.   163.

6      Q.   And what's the first Bates number on that

7  exhibit?

8      A.   APLNDC00010809.

9      Q.   And I think, for the record, it goes to .54.

10      A.   It does.

11      Q.   Okay.  Okay.  So 44 percent of the Apple users

12  said the reason for choice was brand/model.

13      Do you think the brand/model has to do with the

14  design?

15      A.   No.  Because that's called out separately in

16  the blue, which is the design/color.

17      Q.   Do you think that users of Apple products

18  associate the brand with the design?

19      A.   I'd need a survey to tell me that, but I think

20  some may.

21      Q.   Is Apple known as a company that pays

22  particular attention to design?

23      MR. ANDERSON:  Objection.  Calls for

24  speculation.

25      THE WITNESS:  I believe that's true.

Confidential Attorneys' Eyes Only

Page 35

1   BY MR. OVERSON:

2       Q.   You see that there is a 1 percent there for

3   design/color.  And, for example, the Windows operating

4   system, they have 8 percent for design/color.

5            Is that because there's -- the design and color

6   of the Windows products is so much superior to the Apple

7   product?

8            MR. ANDERSON:   Objection.  Calls for

9   speculation.

10            THE WITNESS:   No.  I wouldn't -- I wouldn't

11   draw that conclusion.

12            BY MR. OVERSON:

13       Q.   Why not?

14       A.   Because I don't think these are comparative

15   among the bars.  I think they're looking at the -- at

16   the customers who purchase that particular product and

17   the reason they bought that product.  I don't think you

18   can then compare that to Apple's purchase decisions.

19       Q.   In any event, the -- the -- the listing -- the

20   users are asked to list one thing for the reason for

21   their choice; right?

22       A.   I believe that was the basis for this survey.

23       Q.   And the number one reason in the Apple column

24   was brand/model; true?

25       A.   It was.

Confidential Attorneys' Eyes Only

Page 36

1      Q.    If you add the design and the brand/model

2   together, it's 45 percent for Apple.  That's higher than

3   those two combined factors with any other operating

4   system; true?

5      A.    It is.

6      Q.    If design was the second choice of any of the

7   respondents to the survey that we're looking at, they

8   just wouldn't show up on this chart; right?

9      A.    That is correct.  This only asked for the

10  reason for purchase, which I would -- my belief would be

11  is they could only list one attribute.

12     Q.    Okay.  This -- does this chart show us anything

13  about Samsung customers?

14     A.    Only as a subset of the Android operating

15  system.

16     Q.    Okay.  Do you think a survey asking customers

17  how important each factor would be would be relevant,

18  how important each of these factors would be?

19     A.    I think that would give me relevant

20  information, yes.

21     Q.    Okay.  Can I ask you to turn back to paragraph

22  21 of your declaration.

23     A.    I'm there.

24     Q.    I'm sorry.  Let me ask you to turn back one

25  page, to paragraph 19.

Confidential Attorneys' Eyes Only

Page 37

1        You wrote, Indeed, the very distinctiveness

2    that Apple describes in its motion is a reason that

3    Apple would not be impacted by new entrants and why its

4    distinctiveness would not be eroded.

5        Do you agree that Apple's iPhone and iPad

6    products are distinctive?

7        MR. ANDERSON:  Objection.  Compound.

8        THE WITNESS:  Yes and yes.

9        BY MR. OVERSON:

10   Q.    You wrote, According to its motion, Apple has

11   spent in the range of a half a billion dollars on

12   advertising in each of the last three years to market

13   its, quote, focused product offering, end quote, of

14   iPhones, iPad, iPods, computers and software.

15       Do you agree that Apple has, in fact, spent

16   that money.

17   A.    I don't know that, but I believe that you would

18   have cited that information correctly.  And I think I've

19   seen in Ms. Twiggs' deposition that she confirmed those

20   numbers.

21   Q.    You don't dispute those numbers?

22   A.    I do not dispute those numbers.

23   Q.    Okay.  In paragraph 20 you wrote, The

24   distinctiveness created by advertising of such a focused

25   product offering would serve to prevent the type of

Confidential Attorneys' Eyes Only

Page 38

1   confusion -- consumer confusion that could lead to

2   irreparable harm.

3           And I'll read the rest.  It says, Especially

4   considering the sophisticated nature of consumers that

5   are paying hundreds of dollars for the iPhone and iPad

6   and often -- often entering into multiple-year contracts

7   with a cellular provider.

8           Can you describe for me how the advertising on

9   the iPad and iPhone created the distinctiveness of those

10  products?

11      A.   Well, I don't know if it created the

12  distinctiveness.  I think probably the product itself

13  had to create the distinctiveness.

14      Q.   The design of the product created the

15  distinctiveness, didn't it?

16      A.   Well, that -- no, not alone.  It's -- if it was

17  just the design, you'd be hanging it on a wall, like

18  this TV.  But the real purpose of that TV isn't what I'm

19  looking at now.  It's to do a function.

20          And if the Apple products did not perform their

21  functions extremely well, no one would buy it, except

22  for a few people who wanted to hang it on their wall.

23  So, no, I don't agree with that characterization.

24      Q.   Well, will you agree that the design is at

25  least one of the factors that made the product

Confidential Attorneys' Eyes Only

Page 39

1   distinctive?

2      A.   Yes, I will agree with that.

3      Q.   But you wrote here, The distinctiveness created

4   by advertising.

5      Is that a mistake?

6      A.   That's -- the word "created" probably is a poor

7   choice of words by me.

8      I would say that it just made the

9   distinctiveness public to a large potential set of

10   purchasers and exposed the distinctiveness to the

11   consumers.

12      Q.   And through advertising the products'

13   distinctiveness, Apple has built up the value of its

14   brand?

15      A.   Yes.

16      Q.   And is that what accountants put in the

17   category of goodwill?

18      A.   If it was on the balance sheet, it would be in

19   goodwill, yes.  But I don't think that's the typical

20   type of goodwill that accountants talk about.  But it's

21   related.

22      Q.   When Apple advertises its smartphone and iPad

23   products, the advertisements emphasize the design

24   element, don't they?

25      MR. ANDERSON:  Objection.  Lacks foundation.

Confidential Attorneys' Eyes Only

Page 40

1          THE WITNESS:  I would say some that I've seen

2    do and some do not.

3          (Marked for identification purposes,

4          Exhibit 164.)

5          BY MR. OVERSON:

6     Q.    Okay.  We've marked as 164 an advertisement for

7    the iPad 2.  The advertisement, as you'll see, shows a

8    hand -- or, actually, two fingers picking up an iPad 2.

9    And apart from the two fingers and the iPad 2, there's

10   just an Apple and an iPad 2 notation in the upper

11   right-hand corner.

12          Do you see that?

13    A.    No.  Because I think there's more than two

14   fingers.  I see three.

15    Q.    Oh, okay.  In any event, there's some fingers

16   on the left-hand side, and then they're showing kind of

17   the side view of the iPad 2.  And other than that, it

18   just shows the Apple symbol with a bite out of it, an

19   iPad 2; correct?

20    A.    That is correct.  But it's more than just a

21   side view.  It's kind of a profile -- what I call a

22   profile view.  It's -- it has a side, and you can also

23   see the front.

24    Q.    Would you agree that this advertisement focuses

25   on design?

Confidential Attorneys' Eyes Only

Page 41

1    A.   I would.

2    Q.   And just for the record, I see that this has

3  a mare -- a court filing notation of Document 89-18,

4  filed July 10, 2011, page 2 of 2.

5    A.   You don't do well with numbers.  It's July 1st,

6  2011.  You said July 10th.

7    Q.   Oh, thank you.  I'm good at math, but not good

8  at reading numbers.

9         Okay.  And I'm informed this is the Twiggs

10  declaration, Exhibit 18.

11        Okay.  Let me show you another advertisement

12  for the iPad.

13        (Marked for identification purposes,

14        Exhibit 165.)

15        BY MR. OVERSON:

16    Q.   This has been marked as Exhibit 165.  And I'm

17  informed this was Twiggs Exhibit 11.

18        Here it shows an iPad being held by a user and

19  kind a view down towards the user's shoes.

20        Would you agree with me that this advertisement

21  emphasizes design?

22    A.   Yes.  And just like the last one, clearly this

23  page of the ad does.

24        I do note that both of these exhibits are only

25  page 2 of 2.  Page 1 of 2, I may have a different

Confidential Attorneys' Eyes Only

Page 42

1   opinion.  But at least the second page, I would say

2   these emphasize design.

3        Q.   I can tell you that page 1 was an exhibit cover

4   sheet.

5        A.   Then thank you for that clarification.   And

6   then these both clearly focus on design.

7             (Marked for identification purposes,

8             Exhibit 166.)

9             BY MR. OVERSON:

10       Q.   Handing you what we've marked as Exhibit 166.

11  This was Twiggs Exhibit 1 -- Twiggs declaration

12  Exhibit 1.

13            This is an iPhone advertisement.  It has the

14  Apple logo and iPhone in the upper right-hand corner.

15  It shows an iPhone, with a finger touching the screen.

16  And then underneath it says, Touching is believing.  The

17  revolutionary new iPhone is now available at Apple and

18  AT&T retail stores.

19            Do you agree that this advertisement is

20  focusing on design?

21       A.   No.

22            MR. ANDERSON:  Objection.

23            THE WITNESS:  I do not.

24            BY MR. OVERSON:

25       Q.   Do you agree that -- I'll only ask you what do

Confidential Attorneys' Eyes Only

Page 43

1   you think this advertisement is emphasizing?

2        A.   Well, by the message on the bottom, touching is

3   believing, that's dealing with function.  And it's

4   actually not just showing a finger touching; it's

5   showing time lapse movement, where you're actually, you

6   know, doing something, performing some action with a

7   phone.  To me this is more substance than design.

8        Q.   So the movement across the screen of the -- of

9   the phone to you doesn't emphasize the design of the

10  phone with the screen shaped the way it is?

11       A.   No.  It doesn't -- that's not the focus that I

12  get from the message.

13       Q.   Okay.  What's the function that you get out of

14  this?

15       A.   Well, it looks like they're scrolling.  It's

16  scrolling down a screen.  And there is a picture, and I

17  don't know whether that picture has just appeared or

18  they're moving away from the picture to something else.

19       Q.   Okay.  Let's assume that the emphasis of this

20  ad is scrolling.  Nonetheless, the design of the phone

21  is shown in this ad; right?

22       A.   Oh, I agree with that, yes.  But that's not

23  emphasis that I see.

24       Q.   And by showing the design to potential

25  customers and putting the Apple logo next to the design,

Confidential Attorneys' Eyes Only

Page 44

1    Apple is creating a link between the design and its

2    logo; right?

3            MR. ANDERSON:   Objection.   Assumes facts not in

4    evidence.

5            THE WITNESS:   I don't know what their intention

6    is from the ad.   I'd need to talk to the designer of the

7    ad.

8            BY MR. OVERSON:

9        Q.   One goal of -- of companies doing advertising

10   is to associate their designs with their brand; true?

11       A.   I agree with that.

12       Q.   And would you agree that this advertisement is

13   doing that?

14       A.   To some extent I do.

15           (Marked for identification purposes,

16           Exhibit 167.)

17           BY MR. OVERSON:

18       Q.   Okay.   We've marked as 167 a color copy of

19   Apple's motion for preliminary injunction.

20           If you turn to page 26, you'll see an

21   advertisement for an iPhone 3G.   You've seen this

22   before; right?

23       A.   I have.

24       Q.   And the advertisement shows the iPhone 3G, what

25   the user would see from the touchscreen, the face of it

Confidential Attorneys' Eyes Only

Page 45

1  and then from a side view, what you called a profile

2  view?

3    A.   This would be a side view.  No, there's no

4  profile here.  Well, you can call it profile.

5        The other one, you know, had views of both the

6  side and the front.  This is just the side on one side

7  and just the front of the other.

8    Q.   Okay.  The front of the -- of the product and

9  then the side view.

10        Would you agree this ad is emphasizing design?

11    A.   No.  It does -- it is associated with the

12  design.  But I think the real message is that if you buy

13  this particular product, the 3G, it's twice as fast as

14  the late -- the last edition, and it costs you half as

15  much.  I think that's the main focus.

16        And then the -- the print at the bottom is

17  emphasizing that.  It says, The new iPhone is here.

18  Surfs the webs and downloads data twice as fast.  Now

19  just $199.

20        I think that's the main focus.  But I will

21  agree with you that there is design elements in this ad.

22    Q.   And they're showing you the side view on --

23  above "half the price" to emphasize that it's thin;

24  right?

25    A.   You know, I think that a -- an efficient and

Confidential Attorneys' Eyes Only

Page 46

1    creative advertiser is trying to draw that association.

2    I would agree with you.

3        Q.  Would you agree that they're doing two things

4    here; they're trying to convey some information -- twice

5    as fast, half the price -- and they're also trying to

6    show off the design?

7        A.    Yes.

8        Q.    And would you agree that they're also trying to

9    associate that design with the Apple brand?

10       A.    I do.

11            (Marked for identification purposes,

12            Exhibit 168.)

13            BY MR. OVERSON:

14       Q.    Okay.  We've handed you what we've marked as

15    Exhibit 168.  It's Twiggs Exhibit 4.  It shows two

16    iPhone 4s.  And underneath it it says, Introducing

17    FaceTime video calling.  Smile.  Then it shows the Apple

18    signal [sic] and iPhone 4.

19            Would you agree this advertisement emphasizes

20    the design of the phone?

21       A.    No.  Again, I think the main purpose of this ad

22    is to introduce FaceTime video calling, and they're

23    showing, you know -- it looks to me like a grandpa

24    talking to his granddaughter.  And someone who has

25    personal experience with talking to his grandson using

Confidential Attorneys' Eyes Only

Page 47

1    FaceTime on an iPhone 4, that's a great feature.

2         I didn't buy the iPhone for the design.   I

3    bought it, one of the reasons, for that feature.   That's

4    a substantive feature.

5    Q.   The way the ad is structured, it's all white in

6    the background, and then it just shows the two iPhones

7    next to each other, and then it shows the FaceTime

8    function on each of them.

9    A.   It does.

10   Q.   And certainly the design is one of the featured

11   elements in this ad; true?

12   A.   Certainly.

13   Q.   And Apple is trying to tie that design to their

14   brand; right?

15   A.   Among other things in this ad, yes.

16   Q.   You've used FaceTime?

17   A.   I have.

18   Q.   And if you want to use FaceTime on your end, do

19   you have to talk with someone else using an Apple

20   product on the other end?

21   A.   You do.

22   Q.   So if I sell an Apple iPhone 4 to you and you

23   want to use it with your grandson, you're going to have

24   to buy one for your grandson, aren't you?

25   A.   No.   I would buy one for his father.   My

Confidential Attorneys' Eyes Only

Page 48

1    grandson is two years old.  I would not buy him an

2    iPhone.

3        Q.   And do you know -- can you use the Apple iPhone

4    4 with an iPad?

5        A.   You certainly can.  And that's even better.

6        Q.   You can do FaceTime between a phone and an

7    iPad?

8        A.   You can.

9        Q.   iPhone and an iPad?

10       A.   Yes.

11       Q.   And you could use FaceTime between an iPhone

12   and an iMac; right?

13       A.   I believe that you can.

14       Q.   And can you use FaceTime with any non-Apple

15   products?

16       A.   I thought you already asked me that.  The

17   answer is, no.

18           MR. OVERSON:  I think we've been going about an

19   hour.  Shall we take a break?

20           THE WITNESS:  Thank you.

21           THE VIDEOGRAPHER:  The time is 10:41 a.m., and

22   we are off the record.

23           (Recess taken, from 10:41 to 10:51.)

24           THE VIDEOGRAPHER:  The time is 10:51 a.m. and

25   we are on the record.

Confidential Attorneys' Eyes Only

Page 49

1        BY MR. OVERSON:

2        Q.    Okay.  I'm looking at paragraph 21 of your

3    declaration.

4        A.    So am I.

5        Q.    And you note that Apple passed Google as the

6    top brand in the world.

7              Do you see that?

8        A.    I do.

9        Q.    And when discussing the drivers behind Apple's

10   growth, the CEO of the company that is doing these brand

11   rankings was quoted as saying, quote, Apple had such a

12   big hit with the iPhone 4 and the iPad, and that has

13   contributed to its extraordinary growth, end quote.

14             Do you see that?

15       A.    I do.

16       Q.    Do you agree that the iPhone 4 and the iPad

17   have been the drivers of Apple's extraordinary growth?

18       A.    Well, they're significant contributors to it.

19   There are other reasons as well.  They have other good

20   products.

21       Q.    But certainly two of the significant reasons

22   were those two products?

23       A.    I agree with that statement.

24       Q.    And it doesn't say iPad 2, but you agree that

25   iPad 2 has contributed to its growth as well?

Confidential Attorneys' Eyes Only

Page 50

1      A.    Probably more than the iPad.

2      Q.    Why do you think the iPad 2 has contributed

3   more than the iPad?

4      A.    Well, number one, just because of its success.

5   What -- the demand for that product was even greater

6   than the demand for the iPad.  And it's -- and it's,

7   again, due to the features -- the better features in

8   iPad 2 would be the principal reason.

9      Q.    And they improved the design as well, didn't

10  they?

11     A.    I believe that Apple would take that position,

12  yes.

13     Q.    For example, it's thinner?

14     A.    It is thinner, but that has nothing to do with

15  the design patent that's at issue in this case.

16     Q.    So this -- in paragraph 21, the BrandZ rankings

17  are finding that particular products contributed to the

18  growth of the brand; right?

19     A.    Correct.

20     Q.    And there are other, you know, with other

21  companies, and maybe even in other industries, you could

22  have incredible sales and not contribute to the brand at

23  all; right?

24          MR. ANDERSON:   Objection.   Incomplete

25  hypothetical.

Confidential Attorneys' Eyes Only

Page 51

1          THE WITNESS:  Well, again, anything is

2   possible.  But I would assume if they had incredible

3   sales, that it would enhance their brand as well.

4          BY MR. OVERSON:

5      Q.   What if it's incredible sales of a very generic

6   product?

7          MR. ANDERSON:  Same objection.

8          THE WITNESS:  I would still say that it would

9   probably help the brand of that company.  That's a

10  different type -- they'd never get to the top of a brand

11  survey in the world, but -- but if they are the best at

12  making a commodity product, and that is why they have

13  more sales than any other manufacturer of a commodity

14  product, I think that would enhance their brand and

15  their goodwill.

16         BY MR. OVERSON:

17     Q.   Does being number one in sales enhance the

18  brand?

19     A.   Yes.

20         MR. ANDERSON:  Objection.  Incomplete

21  hypothetical.

22         BY MR. OVERSON:

23     Q.   How does that --

24     A.   Everything else being equal, yes.

25     Q.   How does that happen?  Why is being number one

Confidential Attorneys' Eyes Only

Page 52

1    enhancing of the brand?

2        A.    Because it proves whatever it is you're doing,

3    you're doing right, and you're successful economically.

4        Q.    You said that if you're selling a commodities

5    product and -- and you're making a lot of sales, that's

6    still helping your brand, but you'd never make it to

7    number one.  Why not?

8        A.    Because I think that to really have a large

9    value to your brand, you do have to have a distinctive

10   set of products.  You have to distinguish yourself away

11   from the rest to get that additional value.

12       Q.    And would you agree that at least one way Apple

13   has tried to distinguish itself from other smartphone

14   makers is the design of its iPhones?

15       A.    That is one of the factors, among a number.

16       Q.    Okay.  And would you agree that one other way

17   it's tried to distinguish itself in the tablet market is

18   its design?

19       A.    Yes.

20            MR. OVERSON:  I'm going to mark the article

21   that you cite to, and then I have a blown-up version of

22   the article.

23            THE WITNESS:  Thank you.

24            BY MR. OVERSON:

25       Q.    And I think what we should do is mark them as

Confidential Attorneys' Eyes Only

Page 53

1    two different exhibits, just to make it simple.

2              (Marked for identification purposes,

3              Exhibits 169 and 170.)

4              BY MR. OVERSON:

5         Q.    Okay.  Looking at what we've marked as 169,

6    that is the full article in a publication called "Global

7    Brands."  Well, actually, it's a Financial Times Special

8    Report; is that right?

9         A.    I believe that's correct.

10        Q.    It is from the Financial Times of London?

11        A.    It is.

12        Q.    And the Global Brands is a periodic segment in

13   that newspaper?

14        A.    I believe that that's correct.

15        Q.    Okay.  And it's dated Thursday, May 19th, 2011.

16   And the title is "Big names fly high despite the gloom."

17             And in this article they're reporting on

18   rankings of brands across the globe; is that right?

19        A.    They do.

20        Q.    Okay.  If you look in the left-hand column

21   of -- maybe we should look now at 170.  Is that right,

22   170 is what you're holding?

23        A.    It is.

24        Q.    Okay.  And that's the blown-up, easier-to-read,

25   version of the article.

Confidential Attorneys' Eyes Only

Page 54

1      Let me read from the second or the third
2  paragraph down.  It says, But as this year's BrandZ
3  survey shows, the reality is more nuanced.  Some brands
4  have gained traction - or even a second wind - on the
5  back of new growing markets such as China.  Others owe
6  their renaissance or continued growth trajectory to
7  visionary leaders, new products or a booming
8  marketplace.  In the case of newly minted most-valuable
9  brand, Apple, all three at once.
10      Do you see that?
11  A.    I do.
12      And you should have read the second paragraph
13  because that was the third reason why Apple has been
14  successful.
15  Q.    Okay.  Tell me what you -- what's the third
16  reason.
17  A.    That they invested in their brands through the
18  recessionary downturn.  They didn't stop spending.
19  Q.    What did you mean by investing in brand?  What
20  do you mean by that?
21  A.    What you've been showing me as exhibits, they
22  continued to advertise extensively, even though there
23  was recessionary economies around the globe.
24  Q.    And would you agree that was a risk?
25  A.    It clearly was a risk.

Confidential Attorneys' Eyes Only

Page 55

1   Q.   If you look in the second column, the second

2   full paragraph, it says, The technology sector continues

3   to hog the limelight, but Google, the top-ranking brand

4   four years running has been usurped by Apple.  The maker

5   of the iPhone and iPad has seen its brand value increase

6   859 percent since 2006 or by 137 billion of value.

7        Okay.  And the iPhone, I believe, came out in

8   2007; is that right?

9   A.   It did.

10  Q.   And the iPad came out, was it 2010?

11  A.   Yes.

12  Q.   And Apple's other products aren't mentioned

13  here, are they; just iPhone and iPad?

14  A.   Those are the only two products that I remember

15  seeing in this article.  Well, actually, they don't talk

16  about it.  And to some extent it is part of these

17  products, but they do talk about music and Apple music.

18  So that could imply the iPod as well.  At least iTunes.

19  iTunes.

20  Q.   Although music runs on the iPhone as well,

21  doesn't it?

22  A.   It certainly does.  I listened to it on the

23  plane back from Panama two days ago.

24  Q.   Okay.  The article goes on.  It quotes

25  Eileen Campbell, MBO's global chief executive, and she

Confidential Attorneys' Eyes Only

Page 56

1    says, The big story in this year's rankings is the power

2    of the tablet.

3         Do you see that?

4    A.   Yes.

5    Q.   And so at least the -- the people who run the

6    brand ranking, at least the chief executive of the

7    person -- of the company running the brand ranking

8    thought that the tablet drove Apple's rise to the top;

9    is that true?

10   A.   I would say -- I would have to -- I'm guessing

11   what she meant, but I would -- I would expect that's

12   what she means in this paragraph.

13   Q.   She goes on to say, Apple had a such a big hit

14   with the iPhone 4 and the iPad, and that has contributed

15   to its extraordinary growth.

16        Do you see that?

17   A.   Yes.  That's -- those are two products that are

18   profiled in this article and, on top of all the other

19   successful products Apple has, vaulted it to number one

20   position.

21   Q.   Do you agree that the iPhone 4 and the iPad

22   contributed to Apple's extraordinary growth over the

23   last few years?

24   A.   Yes.

25   Q.   They go on to quote a -- a person named

Confidential Attorneys' Eyes Only

Page 57

1    Steve Centrillo, cofounder and managing partner of

2    Smiths, a branding agency in New York.

3            Have you ever heard of these companies, these

4    branding company, as part of your background?   In other

5    words -- let me ask you the question.

6            Have you ever heard of Millward Brown Optimor

7    before?

8        A.    I have.

9        Q.    Have you heard of Smiths before?

10       A.    No.

11       Q.    Is Millward Brown a well-known branding-related

12    company?

13       A.    It is.

14       Q.    And do you know what their -- in general, what

15    do they do, other than rankings?

16       A.    Well, I think they consult with companies to

17    help them enhance their brands.

18       Q.    Okay.   There's a quote here from

19    Steve Centrillo in the right-hand column, about four

20    paragraphs up from the bottom.

21            It says, Apple has radicalized two industries

22    in which it had no expertise.   It shows that companies

23    willing to buck the trend can be very successful.

24            Do you agree that Apple -- that Apple is

25    willing to buck the trend in its industry -- in the iPad

Confidential Attorneys' Eyes Only

Page 58

1    and the iPhone industries?

2           MR. ANDERSON:   Objection.   Misstates the

3    document.

4           THE WITNESS:   I'm not sure what he means by

5    that, to be honest.

6           BY MR. OVERSON:

7    Q.   Well, in the case of the iPad, they were --

8    they created a new -- new area, a new product, didn't

9    they?

10   A.   And I wouldn't call it bucking the trend.   So,

11   I would not use those words.   I would use the words that

12   they created a new industry.

13   Q.   With the iPad?

14   A.   The iPad.

15   Q.   What about with the iPhone?   Would you agree

16   that they created a new industry there?

17   A.   No.

18   Q.   Why not?

19   A.   There were smartphones before the iPhone.   And

20   some that were actually relatively successful.   I think

21   that they produced, when they came out with that

22   product, a significant boost to that segment of the

23   cellular phone business.

24   Q.   And why, in your view, did it boost the

25   cellular phone business?

Confidential Attorneys' Eyes Only

Page 59

1    A.    Because now people -- more and more people

2  since then have been converting to smartphones rather

3  than just functional phones in the cellular marketplace.

4  There's a converged device.  They can do a whole bunch

5  more things than just make voice telephone calls.

6    Q.    Do you know what percentage of phone users in

7  the United States have smartphones versus

8  pre-smartphones?

9    A.    I think the highest statistic I've seen is

10  40 percent.  I've also seen 35 percent.  But it's in

11  that range.

12    Q.    That's the percentage that have smartphones?

13    A.    Yes.  In the United States.

14    Q.    And the other 60 to 65, somewhere in that

15  range, have phones that are not smart?

16    A.    Correct.  They don't have operating systems in

17  them.

18    Q.    And have you seen any studies that have shown

19  whether those customers who don't have a smartphone yet,

20  whether they actually add more value in their

21  acquisition than customers who already have a

22  smartphone?

23    MR. ANDERSON:  Objection.  Incomplete

24  hypothetical.

25    THE WITNESS:  I don't know whose value you're

Confidential Attorneys' Eyes Only

Page 60

1   referring to.

2         BY MR. OVERSON:

3    Q.    Okay.  Let me -- let me rephrase it.

4         If -- if you get a customer who has never used

5   a smartphone before and -- and they come to Apple, is it

6   likely that that customer is going to stick with Apple

7   over time?

8         MR. ANDERSON:  Same -- same objection.

9         THE WITNESS:  Based on the surveys I've seen,

10   yes.

11         BY MR. OVERSON:

12    Q.    And if a customer buys a Samsung smartphone,

13   like the GALAXY S, is it likely that that customer is

14   going to stick with Samsung?

15         MR. ANDERSON:  Same objection.

16         THE WITNESS:  It's less likely they'll stick

17   with Samsung than the Apple purchaser will stick with

18   Apple.  But a significant number will stick.

19         BY MR. OVERSON:

20    Q.    Apple has the highest loyalty of any brand; is

21   that true?

22    A.    That's true.

23    Q.    And once a customer has an Apple product, it's

24   much more likely that they're going to buy another Apple

25   product, isn't it?

Confidential Attorneys' Eyes Only

Page 61

1      A.    I prefer to have actual survey data on that,

2   but I think, generally, they're -- the tendency would

3   be, true, that they would buy other Apple products.

4      Q.    Kind of like if you buy your iPhone 4 and you

5   want to talk with your grandson, that you might want to

6   buy another Apple product; right?

7      A.    If you're talking about that I would like my

8   son to have an iPhone 4, yes.   In fact, I bought six

9   iPhone 4s when I bought mine.

10      Q.    Why did you buy so many?

11      A.    I have four children and a wife.

12      Q.    And why did you want them all to have the same

13   phone?

14      A.    So that we can communicate easier and use

15   FaceTime.

16      Q.    And you could communicate easier because the --

17   because why?

18      A.    Because I can't use FaceTime with any other

19   provider.   And, actually, it was a group decision as to

20   what we would go -- we were going to go with a common

21   platform, because that just makes things easier.   And

22   there were dissenting votes to go with Apple.

23          But I live in a democracy and the democracy

24   won.   And I stopped with my fifth edition of a

25   BlackBerry and bought an iPhone.   But I did not buy it

Confidential Attorneys' Eyes Only

Page 62

1    for the design.   I bought it for function.

2         Q.   And you bought it, in part, so that you could

3    communicate well with the rest of your family members

4    who have the same device?

5         A.   Yes.

6         Q.   And be working within the same operating

7    system?

8         A.   Yes.

9         Q.   And have you seen, from your review of the

10   documents in this case, that -- that once a user is in a

11   particular operating system, they're likely to buy their

12   next product, in other words, their next phone, in that

13   same operating system?

14        A.   The majority will.   Not all, but the majority

15   will.   And it depends on the operating system.   And,

16   again, the most loyal group are people who use the iOS

17   operating system.

18        Q.   The Apple operating system?

19        A.   Apple operating system.

20        Q.   So it's the most likely -- if people buy an

21   Apple product, that means they're using -- well, first

22   of all, let's get the basics down.

23             If they buy an Apple product, they have to use

24   the Apple operating system; right?

25        A.   They do.

Confidential Attorneys' Eyes Only

Page 63

1    Q.   That's the only choice; it's the only one?

2    A.   Unless they bought it for design and hung it on

3   their wall.

4    Q.   And so once they're in that Apple operating

5   system, in other words, they bought an Apple product,

6   they're using the Apple operating system, it is very

7   likely that when they buy their next smartphone product,

8   if they bought the iPhone 4, it's very likely that

9   they're going to buy another Apple product; true?

10    A.   Again, I've seen statistics on that.  I'd

11   rather use the exact numbers, but I think more than

12   50 percent will.  In fact, I think -- my unrefreshed

13   recollection is, like, 80 percent will.

14    Q.   Okay.  And if they buy an Apple smartphone, is

15   it quite likely that they're going to buy apps or

16   software applications for that phone?

17    MR. ANDERSON:  Objection.  Lacks foundation.

18   Vague.

19    THE WITNESS:  Yes.

20    BY MR. OVERSON:

21    Q.   Have you made any effort to quantify the value

22   of -- of the apps that purchasers of iPhones go on to

23   purchase?

24    A.   I've seen no data on that, so I've made no

25   attempt.  I'd need information from Apple, and I don't

Confidential Attorneys' Eyes Only

Page 64

1    think that's been produced in this case.

2         Q.   And a person who buys an iPad, are -- are they

3    also likely to buy apps for that iPad?

4              MR. ANDERSON:   Objection.   Lacks foundation.

5    Vague.

6              THE WITNESS:   I believe that if they want apps,

7    they have to buy it through iTunes, so, yes.

8              BY MR. OVERSON:

9         Q.   But you understand that Apple would make money

10   not just from selling the iPhone and the iPad to

11   customers, but that -- but also from the apps that they

12   purchase afterwards?

13        A.   I understand how they make money from those

14   apps.

15        Q.   Do you know what the -- their margins are on

16   those apps?

17        A.   I have not seen that information.

18        Q.   Have you made any effort to quantify how much

19   Apple loses in app revenue per customer or makes per

20   customer that it receives -- that buys an iPhone?

21        A.   No.   But I assume if this case continues, I

22   will eventually see that information.   But I have not

23   seen it to date.

24        Q.   Same thing for iPad; you have not seen it?

25        A.   I have not.

Confidential Attorneys' Eyes Only

Page 65

1      Q.    Okay.  If someone buys an iPhone, are they more

2   likely to buy an iPad?

3          MR. ANDERSON:  Objection.  Lacks foundation.

4   Vague.

5          THE WITNESS:  I haven't seen information on --

6   on that.  I would have a guess that it would, but I'd

7   want to see more hard data, if it's more likely than

8   someone who doesn't have an iPhone would buy an iPad.

9          BY MR. OVERSON:

10     Q.    What kind of data would you want to see?

11     A.    Data from your client as to what percentage of

12  their customers have what devices and in what order

13  they're purchased.

14     Q.    If I go the other way, if anyone buys an iPad,

15  are they more likely to buy an iPhone?

16     A.    It would --

17          MR. ANDERSON:  Objection.  Lacks foundation.

18  Vague.

19          THE WITNESS:  I could give you the exact same

20  answer going the other way.  I'd like to see the data.

21  I don't know whether it would or would not.

22          BY MR. OVERSON:

23     Q.    Do you know whether the data exists to show

24  that?

25     A.    I don't -- I expect that it does, because I

Confidential Attorneys' Eyes Only

Page 66

1  would expect that your client would have data on at

2  least those customers who fill out their warranties, and

3  they could use that data to answer the question that

4  you've been asking me.

5      Q.   So if Apple had warranties that -- for iPad

6  buyers, and they checked -- you're assuming that there's

7  a box there where they check whether they already have

8  an iPhone or not?

9      A.   No, no.  The customer who has a warranty has to

10  give you their name and address.  And it's a pretty easy

11  sort in databases to put the two together and find out

12  how many people have both an iPhone and an iPad and a

13  MacBook Air and when they made those purchases.

14      Q.   So if -- if someone bought an iPad after they

15  already bought an iPhone, could you make the inference

16  that the iPhone purchase led them to buy the iPad?

17      MR. ANDERSON:  Objection.  Incomplete

18  hypothetical.  Assumes facts not in evidence.

19      THE WITNESS:  You could make that inference.

20  But a much better source would be to ask them the

21  question, whether that had an influence on that purchase

22  decision or not.

23      They very well just as likely have -- would

24  have bought the iPad whether they had ever bought the

25  iPhone or not.

Confidential Attorneys' Eyes Only

Page 67

1      BY MR. OVERSON:

2          Q.    So you're saying you'd have to go to the

3      individuals who bought the iPad after the iPhone and ask

4      them what influenced their decision?

5          A.    Well, that's the most direct and best way to

6      get that information, yes.  You wouldn't then be making

7      inferences; you'd have the data.

8          Q.    Let's assume that we can't do that, that we

9      can't go to each individual person and ask them the

10     question.

11              What other data would you use to make the

12     inference?

13         A.    The data that I just described to you earlier.

14     I would use warranty data.  And also possibly point of

15     purchase in Apple stores may have some information on

16     that, but it probably wouldn't be very complete.

17         Q.    If I understand correctly, the warranty data

18     would just show what was purchased on what date and by

19     whom.

20         A.    Correct.

21         Q.    It wouldn't show anything about the reasons

22     behind the purchase?

23         A.    Oh, I agree with that.  Like I say, it wouldn't

24     be -- it wouldn't exclusively prove it.  You could make

25     inferences, and you could do some statistical analysis

Confidential Attorneys' Eyes Only

Page 68

1  if you had enough data.  But you wouldn't -- you

2  wouldn't be guaranteed with 100 percent certainty that

3  you had the right answer.

4      Q.   Do you know how many people send in their

5  warranties for Apple products?

6      A.   I don't.

7      Q.   So if the number -- what -- would a certain

8  percentage of the people need to send those in for you

9  to view it as reliable?

10     A.   Yes.

11     Q.   What percentage would you --

12     A.   That's a statistical question.  I'd need to

13 know the universe and a bunch of other information

14 before I could answer the question.  I don't know,

15 sitting here right now.

16          It's not a lot to make it a statistically valid

17 sample.  Although there is selection bias because it is

18 only the people that fill out warranty cards.

19     Q.   So if we get -- if we look at all this warranty

20 information and we see, let's say, half the people who

21 bought an iPad already had an iPhone and half the people

22 we can't show that they had an iPhone, there's not

23 warranty information that shows they had an iPhone, what

24 would that mean to you?

25          MR. ANDERSON:  Objection.  Incomplete

Confidential Attorneys' Eyes Only

Page 69

1    hypothetical.

2            THE WITNESS:   I think that if your population

3    was that high, that you had 50 percent of Apple's

4    customers, that you could draw inferences to the part of

5    the population that you did not have information on.

6            BY MR. OVERSON:

7       Q.   Would that be sufficient to draw the inference

8    that the purchase of the iPhone caused the purchase of

9    the iPad?

10           MR. ANDERSON:   Same objection.

11           THE WITNESS:   No.   I don't think statistics can

12   give you causal relationship.   It can tell you there is

13   a relationship.

14           BY MR. OVERSON:

15      Q.   Well, you've worked a lot on damages cases,

16   certainly hundreds of cases.

17           In your damages analysis, would you look at

18   if -- if -- I'm just throwing out half.   If half the

19   people had warranties on iPhones before they had

20   warranties on iPads, could you then assume that a lost

21   sale on an iPhone led to also a loss on an iPad half the

22   time?

23           MR. ANDERSON:   Same objection.

24           THE WITNESS:   It's possible you could do that.

25   ///

Confidential Attorneys' Eyes Only

Page 70

1      BY MR. OVERSON:

2      Q.   Would you agree with that analysis?

3      A.   I'd have to look at the data and the analysis,

4   but I would consider doing an analysis like that if I

5   was a damage expert, looking at that issue.

6      Q.   And I take it you -- you brought up the Mac

7   Air.  I didn't bring up -- but the Mac Air would be a

8   further inquiry.

9           So if someone buys an iPhone, do you have any

10  view as to whether they're more likely to buy a Mac Air?

11     A.   I don't without studying it and having data.

12     Q.   Same kind of data that we discussed?

13     A.   Yes.

14     Q.   Do you see any continuity in the design between

15  the iPhone, the iPad and the Mac Air?

16          MR. ANDERSON:  Objection.  Compound.  Lacks

17  foundation.  The witness lacks personal knowledge.

18          THE WITNESS:  Well, and he lacks expertise.

19  You already asked me if I'm an expert on design.

20   .        But as a layperson, I see some similarities

21  between those products.

22          BY MR. OVERSON:

23     Q.   So Apple, at least, has attempted to have kind

24  of an overarching look to their products that connects

25  the products together; true?

Confidential Attorneys' Eyes Only

Page 71

1          MR. ANDERSON:  Objection.  Lacks foundation.

2     The witness has testified he's not an expert on design.

3          THE WITNESS:  I don't know what Apple's

4     intentions are, but that's a -- a possible scenario that

5     they've tried to develop.

6          BY MR. OVERSON:

7     Q.    We were talking earlier about the article that

8     said Apple was the number one brand in the world.

9     A.    You're pulling your mike.

10    Q.    I'd better start over.

11    A.    I know where you are.

12    Q.    We were looking at an article that said Apple

13    was the number one brand in the world, and then we

14    talked about, you know, some other company that might be

15    doing more of a commoditized type of product.

16         Is there a spectrum between companies that --

17    that really rely on their brand to sell products versus

18    companies that rely on other factor -- functional

19    factors to sell the product?

20    A.    Yes.  There are companies that do not focus on

21    their brand as to a strong contributor to their success.

22    Q.    Can you give me an example of such a company?

23    A.    Well, I'll give you an example that's in this

24    industry, at least at one point in time.  HTC.  For a

25    while they had no brand image.  They just -- they were

Confidential Attorneys' Eyes Only

Page 72

1   just an OEM and an ODM for other cellular phone

2   manufacturers and carriers.

3          But now they've changed that, and now I would

4   say that they are a company that is focused on brand.

5   And the HTC brand has been growing as a result.

6      Q.   And the HTC sales have been growing as a result

7   too?

8      A.   They have.

9      Q.   And what have they done to emphasize brand?

10     A.   To develop a reputation of being an innovator.

11  They have a lot of patents.  They do a lot of R&D.  They

12  are first with a number of features.  They do what they

13  do very well.  So I think it's those types of things

14  that have led to their success.

15         And also, then, once they started doing those

16  things, they've advertised to make people aware that

17  they're doing those things.

18     Q.   Has Apple also advertised that they have

19  innovative products?

20     A.   They do.

21     Q.   And has the fact that Apple has been an

22  innovator in the area of design helped to increase its

23  sales?

24     A.   I would say that it has.

25     Q.   And I think we covered this, but Apple has used

Confidential Attorneys' Eyes Only

Page 73

1    its distinctive design to differentiate itself from its

2    competitors in the marketplace; right?

3        A.    It has.

4        Q.    And -- and to the extent that competitors are

5    using the same design as Apple is using, that

6    differentiator is weakened; right?

7            MR. ANDERSON:  Objection.  Lacks foundation.

8    Incomplete hypothetical.

9            THE WITNESS:  And asked and answered.  We've

10   dealt with this earlier, where I said I'd need a lot

11   more facts to know.  It's all related to what are the

12   reasons why someone is buying a product.

13           And if you give me a hypothetical that is a

14   major driver of the decision is the design, then I would

15   say, yes.

16           And if you tell me -- or if I see data that

17   says the design is not the major driver, it's

18   functionality, it's other things, I would say, no.

19           BY MR. OVERSON:

20       Q.    Okay.  This is -- may sound like a tautology to

21   you, but I'm a little -- let me strike that and start

22   over.

23           If a company is relying on design to

24   differentiate itself from others, then the others start

25   using the design, that differentiator is no longer

Confidential Attorneys' Eyes Only

Page 74

1    effective; right?

2         MR. ANDERSON:   Objection.   Incomplete

3    hypothetical.   Lacks foundation.   Asked and answered.

4         THE WITNESS:   To answer the incomplete

5    hypothetical, to the extent you said it so far, yes.

6    But I'd need a lot more facts to explain my answer.

7         BY MR. OVERSON:

8    Q.   Okay.   What are the facts that you need?

9    A.   That, again, if -- if the design is the reason

10   people are buying the product, the real driver of

11   demand, then I would say it is a yes.

12        If design is just a feature, one of the

13   reasons, but not the principal reasons that drive demand

14   for the product, then I would say it probably doesn't

15   have much economic impact on the designer of that

16   product.

17   Q.   What about its effect on the brand?   If the

18   brand is being built by this design differentiation, if

19   that goes away, the brand is weakened; right?

20        MR. ANDERSON:   Same objections.

21        THE WITNESS:   You know, not necessarily.   I

22   mean, imitation is one of the greatest forms of

23   flattery.   If people aren't confused, they still

24   understand who the innovator is.   They still understand

25   who -- who really is the designer.   And I don't think it

Confidential Attorneys' Eyes Only

Page 75

1    has an impact.

2         But I need a lot more facts to know, and I'd

3    like an survey to inform me of that type of judgment.

4         BY MR. OVERSON:

5    Q.   When companies -- let's talk a little bit about

6    design patents.

7         When people apply for a design patent, they're

8    trying to get the exclusive right to use the design;

9    right?

10   A.   That's their intention.

11   Q.   Right.  And --

12   A.   For a limited period of time.

13   Q.   Yes.  How long is that period of time?

14   A.   I used to know that.  For some reason, I used

15   to think it was 14 years.  But it's different than

16   utility patents, at least it used to be.

17        I haven't -- I haven't done a design patent

18   case in a number of years, and I haven't focused on that

19   because I haven't done a damage calculation for a while

20   for a design patent.

21   Q.   How many design patent cases have you worked

22   on?

23   A.   Just a couple.  And I think I've only testified

24   at trial on one that I can remember.

25   Q.   Do you remember what it was called?

Confidential Attorneys' Eyes Only

Page 76

1    A.    Yes, I do remember it distinctly, even though

2    it was a long time ago.  It's Precor versus Life

3    Fitness.

4    Q.    And what was the technology?

5    A.    It was a design of treadmills, commercial grade

6    treadmills that you see in -- in high-end hotels,

7    exercise facilities, gyms.

8    Q.    Okay.  So the -- if a design patent issues, the

9    holder of the patent can exclude others from using the

10   same design; right?

11   A.    That's the purpose of the patent laws.

12   Q.    And --

13   A.    I'm not trying to give you a legal opinion.

14   Q.    So the person who owns the design pattern --

15   patent is not looking for flattery in the form of

16   imitation of the design, are they?

17         MR. ANDERSON:  Objection.  Assumes facts not in

18   evidence.

19         THE WITNESS:  Probably not.

20         BY MR. OVERSON:

21   Q.    Yeah.  They got the patent because they're

22   trying to stop everyone else from using the design;

23   right?

24   A.    That is their right, and I believe their

25   intention.

Confidential Attorneys' Eyes Only

Page 77

1    Q.   And owning a design --

2    A.   Let me take that back.

3         If they're planning on using the design.  If

4    they're not, then their purpose might be to license

5    others to use that design.

6    Q.   Okay.  Let's assume they're going to use the

7    design themselves, and they want to keep it for

8    themselves.

9         Having a design patent allows the company to --

10   let me strike that.

11        If -- if a company does not have a design

12   patent and they advertise the design, other companies

13   can come in and copy that design without a problem;

14   right?

15        MR. ANDERSON:  Objection.  Calls for a legal

16   conclusion.  Incomplete hypothetical.

17        THE WITNESS:  I don't think I understood the

18   question, because it -- it seemed illogical to me.  So

19   you'd better restate it.

20        (Reporter clarification.)

21        THE WITNESS:  I'm sorry.

22        Your question seemed illogical to me so, can

23   you restate the question so I'm sure I was listening

24   correctly.

25   ///

Confidential Attorneys' Eyes Only

Page 78

1      BY MR. OVERSON:

2      Q.   Sure.  If a company has a -- it's a new

3   question.

4           If a company has a design patent, they can

5   advertise the design and have the confidence that that

6   advertisement will benefit them because they can exclude

7   others from using the design; right?

8           MR. ANDERSON:   Objection.  Assumes facts not in

9   evidence.  Incomplete hypothetical.

10           THE WITNESS:  If you also assume that the owner

11   of the design patent is using the design in its

12   products, if you add that to your hypothetical, I agree

13   with you.

14      BY MR. OVERSON:

15      Q.   And if you -- if you spend hundreds of millions

16   dollars -- let's assume they're spending hundreds of

17   millions of dollars advertising a design, they -- a

18   company would not want that investment to be supporting

19   another company's product that has the same design;

20   right?

21           MR. ANDERSON:   Same objections.

22           THE WITNESS:  If you ask me to accept that

23   those are facts in your hypothetical, the answer is,

24   yes.

25

Confidential Attorneys' Eyes Only

Page 79

BY MR. OVERSON:

Q.   Well, in -- in your analysis, I believe you're assuming that Samsung is, in fact, infringing the Apple design patents; right?

A.   My work is irrelevant otherwise, so, yes, I'm making that assumption.

Q.   Right.  And so if -- you would accept that Apple invested hundreds of millions of dollars in advertising particular designs, in part, in reliance on the idea that those designs were theirs, that they owned them; right?

MR. ANDERSON:  Objection.  Calls for speculation.

THE WITNESS:  Well, as you showed me, a number of their ads look like it was just design.  At least half the ads you showed me, I think the bigger message was function, not design.

How to break out the total that they've spent between design and function, I don't know.  But if you ask me to assume that it is in the hundreds of millions of dollars, then I agree with your -- your question.

BY MR. OVERSON:

Q.   And if a company is advertising a design and other companies are copying the same design, the advertisement by the company that owns the design is

Confidential Attorneys' Eyes Only

Page 80

1   then benefiting the company that -- that copied it;

2   right?

3           MR. ANDERSON:   Objection.   Assumes facts not in

4   evidence.   Incomplete hypothetical.

5           THE WITNESS:   That's possible.

6           MR. OVERSON:   I think we're at the end of

7   our -- I used to say "tape," but now I have to say

8   "disk."   So can we take a break.

9           THE VIDEOGRAPHER:   This marks the end of

10  Volume I, Disk 1, in the deposition of Michael Wagner.

11  The time is 11:35 a.m., and we are off the record.

12          (Recess taken, from 11:35 to 11:50.)

13          THE VIDEOGRAPHER:   This marks the beginning of

14  Volume I, Disk 2, in the deposition of Michael Wagner.

15  The time is 11:50 a.m. and we are on the record.

16          MR. ANDERSON:   Counsel, for the record is

17  anyone outside this room monitoring the deposition?

18          MR. OVERSON:   I seriously doubt it.

19          MR. ANDERSON:   You don't know?

20          MR. OVERSON:   I don't think so.   I don't think

21  these feeds go anywhere else, do they, Madam Court

22  Reporter?

23          THE REPORTER:   I can't write and talk at the

24  same time.   No, there's no Internet feed.

25          MR. OVERSON:   Okay.   Then there is none.

Confidential Attorneys' Eyes Only

Page 81

1        MR. ANDERSON:   Thanks.

2        BY MR. OVERSON:

3    Q.   Mr. Wagner, do you agree that Samsung and Apple

4  are avowed competitors in the smartphone and tablet

5  markets?

6    A.   I will say I agree they're competitors.   I

7  don't know about avowed competitors.

8    Q.   I took that from a Samsung pleading.

9        But they're -- put it this way:   They're direct

10  competitors?

11    A.   They are direct competitors.

12    Q.   And we saw earlier, I think there were six --

13  what are they called?   I think market drivers in the

14  cell phone industry that -- that kind of drive the

15  consumer's choices.

16        Do you recall that?

17        MR. ANDERSON:   Objection.   Misstates prior

18  testimony.

19        THE WITNESS:   That one industry observer

20  mentioned six.   I don't think those are the only six.

21        BY MR. OVERSON:

22    Q.   You have it there.   Can you tell me the exhibit

23  number for that article?

24    A.   Yes.   It's Exhibit 162.

25    Q.   And can you read the line where the -- the

Confidential Attorneys' Eyes Only

Page 82

1    author talks about the six drivers of the market?

2          MR. ANDERSON:  Objection.  Misrepresents the

3    document.

4          THE WITNESS:  Well, in the middle of the third

5    paragraph on the second page, it starts, With the second

6    most important characteristic of smartphones is a

7    toss-up among Internet access, apps, access to e-mail,

8    design, ease of use and price.

9          BY MR. OVERSON:

10   Q.    And then the first characteristic was the

11   touchscreen; right?

12   A.    Yes.

13   Q.    Yeah.  Okay.

14         So would you agree that Apple and Samsung are

15   competing in -- in all of those seven areas that we --

16   that this author discusses?

17   A.    Those and other areas, yes.

18   Q.    And if you assume that Samsung has copied

19   Apple's designs of the iPhone and the iPad, then the

20   design element of the competition has been taken out of

21   the -- it's been taken out of the competition; right?

22         MR. ANDERSON:  Objection.  Incomplete

23   hypothetical.  Assumes facts not in evidence.

24         THE WITNESS:  I don't know if I'd agree with

25   that statement, that it's taken out.

Confidential Attorneys' Eyes Only

Page 83

1    BY MR. OVERSON:

2    Q.   Well, if they're competing on these seven

3    characteristics of smartphones and they're copying the

4    design, which I think you have to assume for your study,

5    that means they're not competing on design anymore;

6    right?

7         MR. ANDERSON:  Same objection.  Also vague.

8         THE WITNESS:  Only if you ask me to assume that

9    the -- the design patents at issue in this case cover

10   100 percent of the design of a phone, then the answer

11   would be, yes.  But I didn't believe that was the case.

12        BY MR. OVERSON:

13   Q.   And you haven't looked at the design patents;

14   correct?

15   A.   I have not.

16   Q.   Okay.

17   A.   Just the way you've described them in your

18   pleadings.

19   Q.   Let's assume that -- that the overall design of

20   the phone is covered by those patents.  And so the

21   overall design of the phone is -- if -- if Samsung is

22   copying the overall design of the phone, then that

23   element of the competition is no longer there; true?

24        MR. ANDERSON:  Objection.  Vague.  Incomplete

25   hypothetical.  Assumes facts not in evidence.

Confidential Attorneys' Eyes Only

Page 84

1      THE WITNESS:  If you ask me to assume what you

2  said in your hypothetical, yes.

3      BY MR. OVERSON:

4      Q.   And that means that to win over customers,

5  Apple would have to beat Samsung in the other six areas;

6  right?

7      MR. ANDERSON:  Same objections.

8      THE WITNESS:  Falling on your previous

9  hypothetical by definition, yes.

10      BY MR. OVERSON:

11      Q.   And some customers will believe that design is

12  an important factor in their decision; right?

13      MR. ANDERSON:  Objection.  Lacks foundation.

14  Incomplete hypothetical.  Assumes facts not in evidence.

15      THE WITNESS:  Some will.  But based on the

16  evidence I've seen in this case, that some is very few.

17      BY MR. OVERSON:

18      Q.   Okay.  If -- if design is taken out of the

19  competition between Samsung and Apple, Apple will lose

20  some customers because they won't have the

21  differentiated design; correct?

22      MR. ANDERSON:  Same objections.

23      THE WITNESS:  That's a possibility, but not

24  necessarily.

25  ///

Confidential Attorneys' Eyes Only

Page 85

1    BY MR. OVERSON:

2        Q.   So what if a customer values design as one of

3    the main factors, but not the primary factor?  And let

4    me give you a hypothetical.  Maybe someone loves the

5    design of the phone, but wants to use an open source

6    Android system.  And those are both fact -- both

7    important factors.  Okay.

8            If you take the design element out of the

9    competition, then the customer would be more likely to

10   buy the Samsung phone; right?

11           MR. ANDERSON:  Objection.  Incomplete

12   hypothetical.  Vague.

13           THE WITNESS:  Well, by definition, based on

14   your hypothetical, he'll buy the Samsung because he

15   wants open source operating system.  So regardless of

16   the design, based on your criteria in your hypothetical,

17   he's going to buy Samsung.

18           BY MR. OVERSON:

19       Q.   Well, if Apple has the design that the customer

20   wants and Samsung does not, then he might buy the Apple

21   for the design; right?

22           MR. ANDERSON:  Objection.  Incomplete

23   hypothetical.  Vague.

24           THE WITNESS:  I hate to try to restate your

25   hypothetical, but if you're asking me there's two things

Confidential Attorneys' Eyes Only

Page 86

1  that are driving this customer to make a purchase

2  decision.  One is the design of the phone, and one is

3  they would like to have their phone have an open source

4  operating system.

5        And the only way they can get the design is if

6  the Apple phone was the only one offering that design.

7  And the only way they can get open source is Samsung or

8  one of Samsung's other competitors, I don't know what

9  that -- that -- that customer is going to do.  He's

10  going to have a quandary.  It may be a coin flip.

11        So maybe some they would lose and some they

12  wouldn't.  But they'd have to make, then, a decision

13  which is more important to them, the design or the open

14  source operating system.

15        BY MR. OVERSON:

16    Q.    But if the -- the Samsung phone has the same

17  design as the Apple phone, then they don't have the make

18  that decision that way; right?

19    A.    I agree with that question.

20    Q.    I want to make sure I understand your position.

21  I think I do.

22        But earlier you were saying that if design is

23  not the primary driver of the market, then Samsung

24  having the same design would not have an effect on

25  Apple's -- sales, was it?

Confidential Attorneys' Eyes Only

Page 87

1    A.    Yes.

2    Q.    So what if design is number two out of five

3    factors?  You're saying that means it doesn't have any

4    effect?

5          MR. ANDERSON:  Objection.  Incomplete

6    hypothetical.  Misstates witness testimony.

7          THE WITNESS:  No, I can't be that strong.

8          BY MR. OVERSON:

9    Q.    Okay.  What do you mean by "primary driver" of

10   the customer's decision, then?

11   A.    That it really is one of the features of the

12   phone that is going to sway the ultimate decision of

13   what phone to purchase.

14   Q.    Okay.  So it could be one of the features as

15   opposed to the primary feature?

16   A.    Yes.  I mean, often it's not a binary decision,

17   that there is just one feature, like in that survey that

18   we discussed earlier in my deposition, that you have to

19   just answer with one answer, with one feature, or one

20   function.  It's normally more complicated than that.

21   And then it's a balancing of them as to how the ultimate

22   decision is made.

23   Q.    Okay.  So if design is one of the main factors,

24   then -- then copying the Apple design, in fact, would be

25   hurting Apple; right?

Confidential Attorneys' Eyes Only

Page 88

1          MR. ANDERSON:  Objection.  Incomplete

2     hypothetical.  Assumes facts in evidence.  Vague.

3          THE WITNESS:  It could lead to a customer

4     purchasing a Samsung phone versus an Apple phone.  That

5     is possible.

6          BY MR. OVERSON:

7     Q.   Once a customer purchases a Samsung phone

8     instead of an Apple phone, then Apple loses that -- that

9     one sale, first of all; right?

10    A.   They do.

11    Q.   And I think that you're experienced at

12    calculating lost profits in that situation?

13    A.   I have done so.

14    Q.   Right.  And then Apple would further lose

15    whatever other apps that buyer might buy; right?

16         MR. ANDERSON:  Objection.  Calls for

17    speculation.  Assumes facts not in evidence.

18         THE WITNESS:  Yes.

19         BY MR. OVERSON:

20    Q.   And you can calculate that amount?

21    A.   If the data is produced to me, I could, yes.

22    Q.   How would you do it?

23    A.   Again, I would want to see -- it's kind of like

24    a convoyed sales analysis in the part of the case I

25    normally deal with, which is damages.

Confidential Attorneys' Eyes Only

Page 89

1      And if you can prove that a certain percentage

2  of iPhone customers or iPad customers purchase apps,

3  then that would be an additional element of damage to

4  Apple.  And you can quantify it.

5      Q.   Okay.  And Apple would -- if Apple loses that

6  sale of an iPhone to Samsung, they would also lose the

7  other sales of iPhone products to that person's family

8  member who might be interested in doing FaceTime with

9  them; right?

10     MR. ANDERSON:  Objection.  Incomplete

11  hypothetical.  Assumes facts not in evidence.

12     THE WITNESS:  That is a possibility, that some

13  additional sales would be lost.  Again, that can

14  probably be quantified.

15     BY MR. OVERSON:

16     Q.   How would you do that?

17     A.   Again, through, I would hope, customer

18  information that Apple has in its possession.  And what

19  the behavior is of those customers after they make an

20  acquisition.  How many buy one phone versus more than

21  one.

22      Again, how many buy other Apple products after

23  they -- they've never bought an Apple product before,

24  but now they buy some additional.  You know, looking at

25  those types of pieces of information, I could come up

Confidential Attorneys' Eyes Only

Page 90

1    with some reasonable estimates.

2        Q.   Are you, again, talking about warranty

3    information?

4        A.   Well, it could be warranty, and it also can be

5    point-of-sale information at Apple stores.  And there

6    may be other databases where they have that information.

7             I haven't seen any Apple financial information

8    in this case yet.  So I'll be asking for what's

9    available to make these calculations, I assume, at some

10   point in the future.  But I can't tell you what it is

11   because I haven't seen what's available yet.  But

12   normally that type of information is available.

13       Q.   Sitting here today, you can't tell me one way

14   or another whether sufficient information exists to make

15   that kind of estimate about the convoyed sales; true?

16       A.   True, since you have not produced that

17   information yet to me.  But based on 35 years of doing

18   it and knowing of the types of systems I expect Apple

19   has in the way of their ERP system, I would expect that

20   information is there and can be sorted and used

21   appropriately.

22       Q.   So if that customer who bought the Samsung

23   phone instead of the Apple phone, if they had bought an

24   Apple phone, I think we've agreed that it's very likely

25   they would buy the next-generation Apple phone, or

Confidential Attorneys' Eyes Only

Page 91

1    whatever is available, when they buy their next phone;
2    right?
3        A.   I didn't use the word "very likely."  I think
4    you used that earlier, and I said likely, because I
5    think it's more than 50 percent.  But it's not
6    100 percent.
7        Q.   Okay.  And so maybe if that person -- if they
8    buy a phone today, it would probably the iPhone 4.  In a
9    couple of years, when they're up for their renewal and
10   they want to buy another phone, it might be an iPhone 6,
11   perhaps?
12       A.   That is a reasonable possibility.
13       Q.   And so it's more likely than not Apple is not
14   only losing that initial sale, but they're losing that
15   subsequent sale of the -- in my hypothetical, I'm saying
16   the iPhone 6; right?
17           MR. ANDERSON:  Objection.  Assumes facts not in
18   evidence.  Incomplete hypothetical.
19           THE WITNESS:  No, not necessarily.  It all
20   depends on what the market looks like two years from now
21   when the two-year contract expires and what's available
22   in the marketplace.
23           I think there is information in the documents I
24   produced to you that says except for Apple, there's not
25   a whole lot of brand loyalty in this market.  So it

Confidential Attorneys' Eyes Only

Page 92

1   depends on the competitive situation then.  And it's

2   just as likely that that person who went to Samsung for

3   one generation will go back to Apple for that next

4   purchase.  If Apple has a competitive product at that

5   point in time.

6           BY MR. OVERSON:

7       Q.   You said just as likely.  I think earlier we

8   agreed that once a person is in the Android operating

9   system, they're likely to stay with that system; right?

10      A.   Well, based -- again, I don't have all the

11  facts memorized in the documents that I have used to

12  inform my opinion, but my recollection is that there's

13  not as much loyalty to the Android manufacturers.  I do

14  think, unrefreshed, it's greater than 50 percent.

15  But --

16      Q.   Greater than 50 percent loyalty; in other

17  words, Android users, when they buy another phone, are

18  more than 50 percent likely to buy another Android

19  phone?

20      A.   Correct.

21      Q.   Right.  And so sitting here today, you cannot

22  say how to quantify the loss to Apple of the next sale

23  of the iPhone 6 in my hypothetical because there are

24  other factors and uncertainties in the marketplace over

25  the next couple of years; right?

Confidential Attorneys' Eyes Only

Page 93

1    A.    I disagree with that.  If that was the case,

2    then I wouldn't have the business I've had for the last

3    35 years.  I often have to calculate the effects of

4    legal violations on future behavior.  I do that every

5    day.  So, no, I disagree with that.

6         I -- I am certain that I can come up with a

7    reasonable estimate of what Apple's damages would be.

8    And I believe you'll hire an expert who will do the

9    same.

10   Q.    And when you're on your side of the fence, as

11   you are in this case, you often have argued in the past

12   that the damages that the other side's expert have

13   calculated into the future are too speculative; right?

14   A.    You know, as you know, and particularly now it

15   would be even worse in the future, that lawyers often

16   put their hands on the language in expert reports.

17        And even my more junior staff who model their

18   behavior based on what they see our clients do use words

19   like that.

20        I try to not use words like that.  Every once

21   in a while, I will, when it truly is speculative.

22   There's no basis for another expert's.

23        I will just say that I disagree with the

24   calculation made by the other expert, and I will come up

25   with an alternative which I think is a more realistic

Confidential Attorneys' Eyes Only

Page 94

1   calculation.

2       Q.    Have you looked at all of the profit margins

3   that Apple has on the iPhone now?

4       A.    No, I haven't had any of that information

5   produced to me at this stage.  I mean, I've seen some

6   overall estimates, but not model and product specific.

7       Q.    And how would you look at what the profit

8   margin would be on the to-be-developed iPhone 6 in my

9   hypothetical?

10      A.    I would use history.  I will get information

11  on -- on the trend and profitability of Apple.  I have

12  noticed -- and there's a graph in my declaration where

13  it seems like their profit margins are staying steady.

14  I would probably assume that it will continue to do so.

15          But if there's a trend either increasing or

16  decreasing, I would normally model that trend into my

17  estimates.

18      Q.    Okay.  Once that customer has an iPhone 6,

19  they're likely to buy whatever is out when that -- after

20  those two years and -- I'm using two years because

21  typically people buy on these plans and they're locked

22  in for a couple of years.  So then there maybe is an

23  iPhone 8.  Are they still likely to buy the iPhone 8 at

24  that point?

25          MR. ANDERSON:  Objection.  Asked and answered.

Confidential Attorneys' Eyes Only

Page 95

1  Incomplete hypothetical.

2       THE WITNESS:  If Apple is able to maintain the

3  loyalty that they have engendered in their customers

4  into the future, yes, it is likely.  Now, maybe with

5  Steve Jobs gone, they won't be able to do that.  But I

6  hope they do.

7       BY MR. OVERSON:

8       Q.   So in your view, they would be able to -- Apple

9  should be able to -- if they're -- if it's found that

10  Samsung has taken a sale from Apple of the iPhone 4,

11  they should be able to claim damages for the iPhone 6 in

12  my hypothetical, and then also for the iPhone 8?

13       MR. ANDERSON:  Objection.  Calls for

14  speculation.  Assumes facts not in evidence.

15       THE WITNESS:  It's possible if you control

16  properly for all the variables you should control for,

17  yes.

18       BY MR. OVERSON:

19       Q.   Okay.  And what are those variables?

20       A.   Those variables are, again, the loyalty

21  factors.  And you control for the advancing technology.

22  And -- and the estimated advance in technology of all

23  the different competitors in the marketplace.

24       And you control for the competition of the

25  operating systems, where the real competition is, and

Confidential Attorneys' Eyes Only

Page 96

1    that's really between Google and Apple.  Not between

2    Samsung and Apple.  And you control for all those

3    things, you could make some reasonable estimates.

4        Q.   Okay.  Where -- where do you stop?  I mean, we

5    could go on to iPhone 10, 12?  Where do you stop them?

6            MR. ANDERSON:  Objection.  I'm going to state

7    for the record that Mr. Wagner offered a declaration

8    regarding irreparable harm.  He did not provide any

9    opinion on the amount of monetary damages.

10           THE WITNESS:  That's a question of judgment.

11   And I haven't thought through those issues enough to

12   give you an informed answer, sitting here today.

13           BY MR. OVERSON:

14       Q.   You agree it gets harder to calculate as you go

15   out into the future?

16       A.   Oh, clearly it does.  That's by definition.

17   And normally account for that through a discount rate.

18       Q.   And do you agree it also gets harder to

19   calculate as you move away from the primary sale of the

20   phone and you start talking about the family members and

21   the other apps and the convoyed sales?

22       A.   Not necessarily.  And you also have to -- I

23   also have to assume whether there's a permanent

24   injunction granted or not.  I mean, all this may be moot

25   if there's a permanent injunction granted.

Confidential Attorneys' Eyes Only

Page 97

1    Q.   As you move further out in the future, the
2    number of unknowns increase in the marketplace; right?
3    A.   Always.
4    Q.   You brought up one, that, you know, maybe
5    Mr. Jobs is not going to be running the company.  We
6    know that already.  That's an unknown.
7    A.   Based on using history to predict the future,
8    that is an unknown.
9    Q.   And if -- you said an unknown would be whether
10   Apple can keep the loyalty with its customers out into
11   the future; right?
12   A.   At the same level they've had in the past.
13   Q.   If the other players in the smartphone
14   marketplace are using the same designs as Apple, that
15   will be more difficult, won't it?
16   MR. ANDERSON:  Objection.  Incomplete
17   hypothetical.  Assumes facts not in evidence.
18   THE WITNESS:  To some degree.  But, again,
19   based on the evidence I've seen right now, that's not
20   where the game is being played.  The game is being
21   played on other functionality of these converged devices
22   than just the cosmetic design of the phone.
23   BY MR. OVERSON:
24   Q.   Certainly there is a -- the game is being
25   played as to those functionalities.  I understand that.

Confidential Attorneys' Eyes Only

Page 98

1        But the game is also being played on the design

2    front; right?  That's one of the areas that these

3    companies compete in?

4            MR. ANDERSON:  Objection.  Vague.

5            THE WITNESS:  I agree with that.  Otherwise,

6    none of us would be sitting in this room.

7            BY MR. OVERSON:

8        Q.   And the loyalty of Apple's customers is, in

9    part, based on Apple's ability to continue to produce

10   distinctive designs; true?

11           MR. ANDERSON:  Objection.  Assumes facts not in

12   evidence.  Argumentative.

13           THE WITNESS:  To some extent, yes.

14           BY MR. OVERSON:

15       Q.   Okay.  In your declaration, at paragraph 20, at

16   the end of the paragraph, you're talking about consumers

17   who are paying hundreds of dollars for the iPad and the

18   iPhone.

19           And then in paragraph 22 you mention, on the

20   last line, that this type of consumer -- I think you

21   mean the more affluent and well-educated consumer,

22   coupled with a powerful brand like Apple is not likely a

23   recipe for product confusion, especially in a

24   marketplace that has long been characterized by a

25   diverse product offering.

Confidential Attorneys' Eyes Only

Page 99

1           Is the product confusion that you're talking

2      about there the confusion as to origin of the product?

3           A.    Yes.

4           Q.    Like you talk about often in trademark cases?

5           A.    Correct.

6           Q.    A well-educated consumer would see that they

7      can buy the Samsung GALAXY S smartphone for hundreds of

8      dollars cheaper than the Apple iPhone; is that true?

9                 MR. ANDERSON:   Objection.   Assumes facts not in

10     evidence.

11                THE WITNESS:   Yes.

12                BY MR. OVERSON:

13          Q.    And same question for the Tab 10.1 versus the

14     iPad 2?

15                MR. ANDERSON:   Same objection.

16                BY MR. OVERSON:

17          Q.    A consumer -- a well-educated consumer could

18     see that you could buy the 10.1 from Samsung cheaper

19     than the iPad 2?

20                MR. ANDERSON:   Objection.   Assumes facts not in

21     evidence.

22                THE WITNESS:   I believe that's true.

23                BY MR. OVERSON:

24          Q.    And all things being equal, if you could buy

25     the same design for cheaper, the educated consumer would