Confidential Attorneys' Eyes Only

Page 100

1    buy the cheaper version; right?

2            MR. ANDERSON:   Objection.   Vague as to "same

3    design."

4            THE WITNESS:   Well, if -- again, you asked me

5    to assume that the -- the only -- or the primary reason

6    for the purchase was design, the answer would be, yes.

7            But in this market, I think it's much more

8    complicated than that, and I think there's other

9    features that are driving that decision, including

10   price, as to why the purchase decisions are being made.

11           BY MR. OVERSON:

12   Q.    So you're fighting with "all things being

13   equal"?

14   A.    I certainly am.

15   Q.    Okay.   If those other things -- those other

16   things are equal, then what I said is correct?

17   A.    It is.

18   Q.    Okay.   And paragraph 23 of your declaration,

19   you're talking about the exceptionally strong sales of

20   Apple even following the release of the Samsung products

21   accused of infringement in this lawsuit.

22   A.    I do.

23   Q.    Now, Apple could, of course, have even stronger

24   sales than what they've had were it not for Samsung

25   products; right?

Confidential Attorneys' Eyes Only

Page 101

1          MR. ANDERSON:  Objection.  Calls for a legal

2     conclusion.

3          THE WITNESS:  That is possible.

4          BY MR. OVERSON:

5     Q.   So at least here you're not trying to say that

6     because Apple has strong sales that that means they're

7     not damaged?

8     A.   You'd be surprised.  There are very intelligent

9     people that I've opposed in litigation that have taken

10    that position.  I don't take that position.

11         I do believe that your client, if they prove

12    liability, has probably suffered some damages, which I

13    will quantify at some point in this case.  But I don't

14    think there's been any irreparable harm here.  That can

15    be quantified.

16         And your client is still the number one brand

17    in the world; is still the most successful smartphone

18    and tablet producer in the world.

19    Q.   And do they have to become the number two in

20    order to be irreparably harmed?

21    A.   I haven't studied that fact situation.  Even

22    then, I think -- may not think irreparably harmed.  If

23    they're dropping to four or five or out of the top

24    eight, clearly there would be irreparable harm.

25    Q.   But even if Apple dropped from number one to

Confidential Attorneys' Eyes Only

Page 102

1    number two --

2            (Discussion off the record.)

3            MR. OVERSON:   Strike that question.

4            BY MR. OVERSON:

5        Q.    Okay.   In paragraph 24, you talk about the

6    strength of Apple's brand and the negligible effect that

7    Samsung's devices have exerted on that strength.   And in

8    support of that statement, you cite to the release of

9    the iPad 2 and how there were lines outside of Apple

10   stores.

11           Are you with me?

12       A.    I am.

13       Q.    As of -- and those lines were forming on the

14   afternoon of March 11, 2011; right?

15       A.    They were.

16       Q.    And -- and when did the GALAXY Tab 10.1 get

17   released in the United States?

18       A.    I would need my memory refreshed.   I don't

19   know.

20       Q.    I'll represent to you it was June 8, 2011.

21           So at the time of the iPad 2 release, the

22   product that's at issue here was not even on the market;

23   is that right?

24       A.    If you ask me to assume those facts for the

25   tablet product, that's correct.

Confidential Attorneys' Eyes Only

Page 103

1        MR. ANDERSON:  Counsel, are you representing

2    that the GALAXY Tab 10.1 was the only product at issue

3    in the tablet space in this case?

4        MR. OVERSON:  My understanding in the -- in the

5    motion for preliminary injunction, that is the product

6    that was addressed.  And I think that's what we're

7    talking about here.

8        BY MR. OVERSON:

9    Q.    In paragraph 27 you discuss Apple's success in

10   charging consistently high prices for its products

11   relative to its competitors.  And you said, quote -- you

12   said that this success is, quote, likely due to Apple's

13   creation of the distinctiveness that the motion

14   describes along with Apple's success in maintaining that

15   distinctiveness in the face of competition, end quote.

16       How has Apple created the distinctiveness

17   that -- to your understanding, that's described in the

18   motion?

19   A.    Well, it's the combination of everything that

20   they do.  It's -- it's their innovation.  It's the

21   functionality that they offer their customers.  It's

22   their brand.  It's their reputation.  It's -- it's to

23   some extent their -- the designs of their products.

24   It's everything that they do.

25   Q.    Then on page 8 of your declaration, you have a

Confidential Attorneys' Eyes Only

Page 104

1    graphic showing the average selling price of smartphones

2    from Apple and from Samsung.

3         Do you know what Samsung -- what smartphones

4    was Samsung selling in 2008?

5         A.    I don't have that fact memorized.

6         Q.    What smartphones was Samsung selling before the

7    GALAXY S was released in the United States on July 15,

8    2010?

9         A.    They had a number of models.  I don't have

10   those model numbers memorized.

11        Q.    Would you agree that the GALAXY S phone's

12   design is closer to the iPhone than the designs of the

13   prior smartphones sold by Samsung?

14        MR. ANDERSON:  Objection.  Lacks foundation.

15        THE WITNESS:  Since I haven't looked at those

16   products, I can't answer the question.  But I assume

17   that if those other designs were what you consider to be

18   copies of Apple's designs, they would have been included

19   as products in this lawsuit.

20        BY MR. OVERSON:

21        Q.    If you look at your graph, after the GALAXY S

22   was released in the United States on July 15, 2010, you

23   see average selling price of the Samsung smartphones

24   increase.

25             Do you see that?

Confidential Attorneys' Eyes Only

Page 105

1    A.    It did over the immediate previous period.  It

2  reached the same level as their prices were in 2008 and

3  the first part of 2009.

4    Q.    Do you know -- do you have a view of what

5  caused the increase in the average selling price of

6  Samsung's -- Samsung's smartphones?

7    A.    I haven't studied it, but I would have my

8  educated beliefs.

9    Q.    Okay.  You haven't studied it, meaning what?

10  You haven't looked at the data?

11    A.    Right.  I have not looked at the data or read

12  information on the subject either from industry analysts

13  or from my client.

14    Q.    Do you have information that suggests or

15  detracts from the notion that design influenced the

16  value after the -- the average selling price value after

17  the GALAXY S was released?

18          MR. ANDERSON:  Objection.  Compound.

19          THE WITNESS:  No.

20          BY MR. OVERSON:

21    Q.    You don't have information one way or the

22  other?

23    A.    Well, I have some information, but not directly

24  on that particular model.  It appears that, again, even

25  on the Android products, that design as the driving

Confidential Attorneys' Eyes Only

Page 106

1    reason for a purchase is relatively small.  It's, in

2    fact, very small.  So I would -- I would not believe

3    that design was driving that.

4         I would believe that there are other things

5    that were driving it, like faster processors, clarity of

6    the screen, video capabilities, other things were

7    driving that.  But I haven't studied it in detail at

8    this point.

9         Q.   Do you know whether the other Android products

10   on the marketplace are more or less similar to the

11   iPhone 4 in design than the GALAXY S?

12             MR. ANDERSON:  Objection.  Vague.

13             THE WITNESS:  I don't know that.

14             BY MR. OVERSON:

15        Q.   Wouldn't you have to know that in order to make

16   an assessment about the Android marketplace and what's

17   being driven in general in the Android marketplace?

18        A.   No.

19             MR. ANDERSON:  Same objection.

20             BY MR. OVERSON:

21        Q.   It seems to me you are saying that, in general,

22   Android has -- Android sales have these characteristics,

23   but the other Android sales may not have similarity to

24   the iPhone's design.

25        A.   Well, maybe I confused you in my last answer.

Confidential Attorneys' Eyes Only

Page 107

1  My last answer was talking about the GALAXY S as to
2  why -- and -- and the Samsung prices of their phones
3  that are made up of this red-dotted line on the chart on
4  page 8 of my declaration.  I wasn't talking about
5  Android phones.  This is not a chart of Android prices.
6  This is Samsung prices.
7      Q.   This is a mix, if I understand correctly, of
8  all Samsung smartphones?
9      A.   That's true.
10     Q.   And so the GALAXY S phones would actually have
11 a higher average selling price than what is reflected on
12 this chart; right?
13     A.   No.
14     Q.   Why not?
15     A.   I asked my staff that, and they said, no, it's
16 pretty -- it's right about in the middle.
17     Q.   In other words, the -- the Samsung's -- strike
18 that.
19          The GALAXY S average selling prices are about
20 in the middle of the overall Samsung average selling
21 prices for smartphones?
22     A.   That is what my staff have told me, yes.
23 Because I asked the question, expecting you to ask me a
24 question like that.
25     Q.   And do you know what data they looked at to

Confidential Attorneys' Eyes Only

Page 108

1   answer that question?

2       A.   Yeah.   Yeah.   They -- they looked at some data

3   of individual product line prices.

4       Q.   Do you have any idea where that is?

5       A.   I don't.

6       Q.   Is it cited anywhere in your report?

7       A.   I don't believe it is.

8       Q.   Is it coming from a publicly available source?

9       A.   I -- I did not ask that question, whether it

10  was public estimates or it was Samsung data.

11           So to answer your question, I don't know.

12      Q.   Okay.   Looking at paragraph 29 of your report,

13  you wrote, I note that Apple's motion apparently

14  contradict public statements by itself and its key

15  personnel.

16           Are you with me?

17      A.   I am.

18      Q.   Then you wrote, Certainly, part of the

19  distinctiveness of these devices is in their aesthetic

20  design.

21           When you wrote "these devices," did you mean

22  the iPhones and iPads?

23      A.   Yes.

24      Q.   Then you reference that Apple's motion argues

25  that the differences between the GALAXY Tab 10.1 and

Confidential Attorneys' Eyes Only

Page 109

1    Apple's patented design are trivial legally and

2    insignificant; correct?

3        A.   I say that is what you said in your motion.

4        Q.   Yes.  Okay.  And then on paragraph 30, you note

5    that -- well, let me first note that Apple in your

6    paragraph 29 was pointing to the aspect ratio, the

7    thickness and edge profiles of the GALAXY Tab 10.1,

8    noting they're not absolutely identical to Apple's

9    patented design, but Apple said that these were minor

10   differences and do not affect substantial similarity.

11            I'm just summarizing it.

12       A.   Yes.

13       Q.   Okay.  And then you noted that Mr. Jobs of

14   Apple, Apple himself, had referred to the thickness or

15   thinness of design of products; right?

16       A.   He did.

17       Q.   And in talking about the iPad 2, he said,

18   quote, Not just a little thinner, but a third thinner

19   than Apple's first tablet.

20            Okay.  And you're using this statement by

21   Mr. Jobs as proof that the thinness of -- or thickness

22   of a tablet is not trivial; is that right?

23       A.   Yes.  A -- a -- a reduction of a third is not

24   trivial.  It's -- it's significant.

25       Q.   Okay.  And then on paragraph 31, you wrote that

Confidential Attorneys' Eyes Only

Page 110

1    Mr. Jobs and Apple's Web site speaks so highly of the

2    device's thickness and weight indicates that Apple

3    itself believes attributes as minor, end quote, as the

4    dimensions of a device are important to consumers.

5    Indeed, Samsung's GALAXY Tab 10.1 is even thinner and

6    lighter than iPad -- Apple's iPad 2 and significantly

7    thinner and lighter than Apple's iPad.  For that reason,

8    rather than causing consumer confusion, degrading

9    Apple's brand image and causing irreparable harm, the,

10   quote, minor differences, end quote, displayed by

11   Samsung's products noted in Apple's motion likely serve

12   to distinguish those mobile devices from Apple's in the

13   marketplace.

14           Okay.  Do you believe that the weight and the

15   thickness of Samsung's GALAXY 10.1 product distinguishes

16   from it Apple's products?

17           MR. ANDERSON:  Objection.  Compound.

18           THE WITNESS:  Yes.  Yes.  And -- and people

19   have so noted that they are both thinner and weigh less

20   than the iPad and the iPad 2.

21           BY MR. OVERSON:

22       Q.   And in paragraph -- I'm sorry, in Footnote 28,

23   you list the thicknesses and weights of the product.

24   And if you compare the GALAXY Tab 10.1 thickness of 8.6

25   to the thickness of the iPad 2 of 8.8, you'll see that

Confidential Attorneys' Eyes Only

Page 111

1    they're pretty close, aren't they?

2       A.   .2 millimeters is very close, and yet that is

3    being brought out as a difference.

4       Q.   So you are bringing it out as a difference;

5    right?

6       A.   I am.

7       Q.   It's -- I did the calculations, something like

8    2 percent different.

9       A.   Yeah.  But it's kind of like you run the

10   100-yard dash.  You know, 2/10 of a second is a huge

11   difference.

12          And people who want these mobile devices, even

13   though it really doesn't make any difference, they want

14   to have the smallest and the lightest in the

15   marketplace.  And --

16      Q.   Being number one --

17      A.   Even if it's only 2 percent lighter and

18   smaller, that can make a difference.

19      Q.   Being number one in a product -- in a feature

20   category is -- is significant to people?

21      A.   I agree with that.  Unless you're Avis.

22      Q.   Do you have a sense of what 0.2 millimeters is

23   in the real world?

24      A.   Not without you giving me a ruler with

25   millimeters.

Confidential Attorneys' Eyes Only

Page 112

1    Q.    Okay.

2    A.    It's very small.

3    Q.    If I told you a piece of paper or a human hair

4  is about 0.1 millimeters, does that sound like it could

5  give you a perspective?

6    A.    Well, there's paper and there's paper.  This is

7  very high quality paper, and there's real cheap stuff

8  that I buy at Costco.  They're different widths.

9          But if you tell me that's what it is, I'll

10  accept your representation.  But I thought human hair

11  was thinner than that, to be perfectly honest.

12    Q.    It probably depends on the human hair.

13    A.    That's true.

14    Q.    In any event, do you -- do you believe that the

15  2/10 of a millimeter difference in thickness

16  distinguishes GALAXY Tab 10.1 from the iPad 2?

17    A.    I do.

18    Q.    Okay.  Let's look at the weight.  The 10.1 is

19  595 grams, and the iPad 2 is 601 grams, according to

20  your footnote.

21          So that's about 1 percent different?

22    A.    It is.  You are good at math.

23    Q.    You know, those little raw sugar packets you

24  get at Starbucks to put in your coffee?

25    A.    No.  I don't drink coffee.

Confidential Attorneys' Eyes Only

Page 113

1    Q.    Those are about 5 grams.  So do you think a

2  user can actually tell the difference between 5 grams?

3    A.    Oh, I don't think they can.

4    Q.    They can't tell the difference?

5    A.    I don't think they can.  But, again, this is

6  all marketing hype and psychology, that the fact that it

7  is a bag of sugar lighter makes a difference to some

8  people.  To everybody, no.

9    Q.    Do you think the -- the 6 grams helps to

10  distinguish the product, Apple's product?

11    A.    It does because they can say it is lighter.

12          (Marked for identification purposes,

13          Exhibit 171.)

14          THE WITNESS:  And by the way, thank you for

15  doing everybody double-sided.  I'm an avid

16  environmentalist.

17          ·  BY MR. OVERSON:

18    Q.    So you mention that the minor differences

19  displayed are the, quote -- you know, so-called minor

20  differences displayed by Samsung's product noted in

21  Apple's motion likely serve to distinguish those devices

22  from Apple's in the marketplace.

23          And I've just handed you a -- an article from

24  fastcompany.com, dated March 22nd, 2011.  And it's --

25  the title is "Samsung's Anti-iPad 2 Policy:  Clone the

Confidential Attorneys' Eyes Only

Page 114

1    Heck Out of It."

2            And then if you look at the beginning of the

3    text, there's a picture of the Samsung 10-point --

4        A.    8.9, probably.

5        Q.    It looks like there's two.  There's both

6    tablets of Samsung pictured, I believe.

7            Is that right?  They're different sizes.

8        A.    Yeah, I believe so.

9        Q.    And then it states, In what maybe perfect,

10   quote, if you can't beat 'em, join 'em, end quote,

11   maneuver Samsung has just revealed its answer to the

12   iPad 2, a new set of GALAXY Tab tablets.  In terms of

13   spec, they're pretty much clones of Apple's offering.

14           So at least to -- this observer of the

15   marketplace did not see Samsung's GALAXY Tab 10.1 as

16   being distinguished from Apple's iPad 2; correct?

17           MR. ANDERSON:  Objection.  The document speaks

18   for itself.  Misrepresents the document.

19           THE WITNESS:  Well, it says in that sentence,

20   but if you read the second-to-the-last sentence on this

21   page, this author does admit that Samsung's positioning

22   it as the thinnest, lightest and most full-featured

23   large screen tablet there is.  So those are inconsistent

24   statements.

25           And -- but clearly the author is trying to make

Confidential Attorneys' Eyes Only

Page 115

1 a point with the title.  And then the author goes on to

2 really talk about functionality is what is really

3 important and what people want to hear about and read

4 about, of how the functionality of the different

5 products compare.

6          BY MR. OVERSON:

7      Q.    Okay.  And then the author here compares the

8 thickness and weight in the bottom of -- the 10.1, in

9 the bottom paragraph on the first page of the exhibit,

10 to the iPad 2 in the second paragraph on the second

11 page.

12          Do you see that?

13     A.    Yes.

14     Q.    And you see that he ends this -- that paragraph

15 with the -- I'm sorry.

16          In the third paragraph, he states, The machines

17 are close to being clones of the Apple device in terms

18 of specs.

19          Do you see that?

20     A.    No.  Which paragraph are you referring to?

21     Q.    The third paragraph on the second page, the

22 last sentence.

23     A.    Yes, he does say that.

24     Q.    He goes on to say, In other words, Samsung has

25 thrown in the towel on innovative tablet design and has

Confidential Attorneys' Eyes Only

Page 116

1    realized it has to match Apple's successful design and

2    pricing recipe (to the extent it's even tweaked its

3    design plans) to capture any meaningful market share.

4          Do you see that?

5    A.    I do.

6    Q.    So this author believes there's a design and

7    pricing recipe for success in the tablet market; right?

8    A.    Yes.  But design is not defined, and I don't

9    know whether it's the same design that's at issue in the

10   design patents in this case.  Because he talks about a

11   whole bunch more than just the dimensions and the

12   weight.  He talks about the things that I believe are

13   more important to consumers that are really the

14   functionality of these tablets.

15   Q.    The last sentence says, You can argue that this

16   is a victory for consumers who will now get an

17   aggressively priced Android tablet to rivals -- rival

18   Apple's iOS one for cheaper than the Motorola Xoom cost,

19   and this sort of market diversity is a good thing, end

20   quote.

21         Would you agree that Samsung aggressively

22   priced the Tablet 10.1?

23         MR. ANDERSON:  Objection.  Calls for

24   speculation.

25         THE WITNESS:  I haven't studied that, but I

Confidential Attorneys' Eyes Only

Page 117

1    believe that's a fair characterization.

2            (Marked for identification purposes,

3            Exhibit 172.)

4            BY MR. OVERSON:

5       Q.   Okay.  We've marked as Exhibit 172 a article

6    entitled "iPad 2 Sends GALAXY Tab Back to the Drawing

7    Board."  And it's from NBC Bay Area.  It appears to be

8    from April 19th, 2011.

9            And in this article it states, The iPad 2 is a

10   modest update, faster processor, more RAM, FaceTime

11   cameras jammed in a thinner body.  Even with a much more

12   powerful tablet, Samsung is already shaken.  It's

13   sending the recently announced 10.1 GALAXY Tab back

14   in-house for re-tweaking and reevaluation.

15           After feasting his eyes on the new iPad 2,

16   Samsung's mobile division VP, Lee Don-Joo went ahead and

17   called his company's 10.1-inch GALAXY Tab, quote,

18   inadequate, end quote, and that, quote, Apple made

19   iPad 2 very thin, end quote.

20           And that's the end of the quote from the

21   article.

22           Do you agree that thickness or thinness is a

23   design element?

24           MR. ANDERSON:  Objection.  Vague.

25           THE WITNESS:  Yes.

Confidential Attorneys' Eyes Only

Page 118

1        BY MR. OVERSON:

2        Q.   And do you agree that when Samsung -- well,

3    let's see.  Let's step back.

4             Samsung initially announced a 10.1 GALAXY Tab

5    that was thicker than the one that ultimately was sold

6    in the marketplace in the United States; true?

7        A.   I believe that's correct.

8        Q.   And then before Samsung actually started

9    selling that initial 10.1-inch GALAXY Tab, they saw the

10   iPad 2; correct?

11       A.   I believe that's correct.

12       Q.   And the iPad 2 was thinner than the GALAXY Tab

13   10.1 inch that was initially announced by Samsung;

14   right?

15       A.   Yes.

16       Q.   And in light of that, Samsung withdrew the

17   initially announced 10.1-inch GALAXY Tab; right?

18            MR. ANDERSON:  Objection.  Calls for

19   speculation.

20            THE WITNESS:  I believe that's correct.

21            BY MR. OVERSON:

22       Q.   And they redesigned the 10.1 GALAXY Tab to be

23   thinner; true?

24       A.   They did.

25       Q.   And the version that they started selling was

Confidential Attorneys' Eyes Only

Page 119

1    0.2 millimeters thinner than the iPad 2; correct?

2        A.   Yes.

3             MR. OVERSON:   Okay.   Shall we break for lunch?

4             MR. ANDERSON:   Sure.

5             THE WITNESS:   Sounds good to me.

6             THE VIDEOGRAPHER:   The time is 12:50 p.m., and

7    we are off the record.

8             (Recess taken, from 12:50 to 1:35.)

9             THE VIDEOGRAPHER:   The time is 1:35 p.m., and

10   we are on the record.

11            BY MR. OVERSON:

12       Q.   Good afternoon.

13       A.   Good afternoon.

14            MR. OVERSON:   I'm going to mark the next

15   exhibit.

16            (Marked for identification purposes,

17            Exhibit 173.)

18            BY MR. OVERSON:

19       Q.   Mr. Wagner, before the break we were talking

20   about whether Samsung had distinguished its tablet

21   product from the iPad products.   And this is an article,

22   173.   It says, LIVE FROM BARCELONA:   Check out the new

23   10-inch Samsung Gallery Tab [sic].   It's in a

24   publication called Business Insider, dated

25   February 13th, 2011.

Confidential Attorneys' Eyes Only

Page 120

1     At the top there's an amusing disclaimer that

2  the author wrote.  He says, Disclaimer:  Samsung was

3  generous enough to sponsor our trip to Barcelona, fly us

4  in posh business class and stuff us with tapas and

5  jamon.  Photos forthcoming.  So we're pretty -- feeling

6  pretty warm and fuzzy about Samsung right now.

7     If you look further down, when he discusses the

8  GALAXY Tab 10.1, it's maybe -- one, two, three -- fourth

9  paragraph, it says, The GALAXY Tab 10.1, as it's called,

10 is basically an iPad-sized version of the GALAXY Tab

11 running Google's new Android 3.0 Honeycomb software.

12     From the front it looks like an iPad, just made

13 out of high-end plastic instead of metal, and runs the

14 new Android, which is vastly improved for tablets, but

15 still feels less polished than Apple's iOS.

16     This is reference to the Samsung tablet that

17 came out before the iPad 2; is that right?

18 A.     In Spain, yes.

19 Q.     Was there a different release dates in Spain?

20 A.     I believe that this predates the release date

21 in the U.S.

22 Q.     He said that, This morning, we and several

23 other reporters briefly had access to Samsung's new

24 gadgets.

25     Does that indicate that it hadn't been released

Confidential Attorneys' Eyes Only

Page 121

1    to the public yet?

2        A.    Yes.

3        Q.    If you see on the second page -- actually, the

4    second page, the picture at the bottom, it says, It's a

5    little thinner and lighter than the original iPad.   No

6    idea what the iPad 2 will be like.

7             So this is with reference to the GALAXY Tab

8    10.1 that was announced but was not sold in the United

9    States?

10       A.    Correct.

11            (Marked for identification purposes,

12            Exhibit 174.)

13            BY MR. OVERSON:

14       Q.    Okay.  We're looking at Exhibit 174.   It's an

15   article entitled "Samsung Considers GALAXY Tab 10.1

16   Overhaul Following iPad 2 Unveiling."

17            And, again, this article discusses Samsung's

18   reaction to the -- to the unveiling of the iPod 2 [sic]?

19       A.    It does.

20       Q.    iPad 2.  Let me ask the question again.

21            This article discusses Samsung's reaction to

22   Apple's unveiling of the iPad 2; correct?

23       A.    Yes.

24       Q.    And the author states that the sleek, slender

25   result, meaning of the iPad 2, was so impressive that it

Confidential Attorneys' Eyes Only

Page 122

1    seemingly left Samsung scrambling to overhaul its

2    upcoming GALAXY Tab 10.1 slate.

3            And is it consistent -- do you believe that, in

4    fact, Samsung redesigned its GALAXY Tab 10.1 after it

5    saw the design of the iPad 2?

6            MR. ANDERSON:  Objection.  Lacks foundation.

7            THE WITNESS:  I think that's a fair assumption.

8            (Marked for identification purposes,

9            Exhibit 175.)

10           BY MR. OVERSON:

11       Q.   Exhibit 175 is an article entitled "Samsung

12   GALAXY Tab 10.1-inch:  The iPad 2 of Honeycomb Tablets."

13   It's dated May 10, 2011, and looks like it's published

14   in the Android Atlas, and we printed it off cnet.com.

15           MR. ANDERSON:  Counsel, based on the Bates

16   number, it's my understanding this is a document you

17   produced for the first time this morning.

18           Can you confirm that, whether it was produced

19   earlier?

20           MR. OVERSON:  I believe that's right.

21           BY MR. OVERSON:

22       Q.   So if you look, Mr. Wagner, on page 2 of

23   Exhibit 175, the author from CNET has a section heading

24   that says "Design and features."

25           Do you see that?

Confidential Attorneys' Eyes Only

Page 123

1    A.    I do.

2    Q.    And he wrote, The first thing that struck us

3  upon taking the Samsung GALAXY 10.1 out of its box was

4  its slight profile.  In fact, when lying next to the

5  iPad 2, we honestly can't tell which tablet is thicker

6  and unfortunately we don't have a micrometer handy to

7  get down into the business of microns.

8          So this is consistent with your testimony, I

9  believe, that a person who's looking with the naked eye

10 at the GALAXY Tab 10.1 and the iPad 2, they couldn't

11 tell the difference, right?

12   A.    At least these people could not, that's

13 correct.

14   Q.    Do you know, can the human eye see that

15 difference?

16         MR. ANDERSON:  Objection.  Lacks foundation.

17         THE WITNESS:  I don't know.

18         BY MR. OVERSON:

19   Q.    He also says, Weight-wise, the 10.1 is lighter

20 than the iPad 2, weighing 1.24 pounds compared with the

21 iPad 1.32 pounds.

22         So now we're dealing with pounds as opposed to

23 grams.  I assume those translate.  In any event, it's

24 0.08 pounds difference; is that right?

25   A.    That is correct.

Confidential Attorneys' Eyes Only

Page 124

1    Q.   Taking -- he goes on to say, Taking another pad

2    [sic] from iPad's 2 -- sorry.

3         He goes on to say, quote, Taking another page

4    from the iPad 2's school of sexy tablet building, the

5    10.1 has one of the cleanest designs we've seen on a

6    tablet.

7         Again, this -- this view -- reviewer thought

8    the 10.1 design was taking another page from the iPad 2

9    design?

10        MR. ANDERSON:   Objection.   The document speaks

11   for itself.   Vague.

12        THE WITNESS:   That's what this author stated,

13   yes.

14        (Marked for identification purposes,

15        Exhibit 176.)

16        MR. ANDERSON:   Again, I'd note, based on the

17   Bates number, I believe this was a document produced for

18   the first time this morning.

19        BY MR. OVERSON:

20   Q.   Okay.   What are we up to here, exhibit --

21   A.   176.

22   Q.   Thank you.

23        Okay.   Exhibit 176 is a GALAXY Tab 10.1 review.

24   It's dated April 21st, 2011.   And it seems to be from

25   the publication Ubergizmo.   And the author, on the

Confidential Attorneys' Eyes Only

Page 125

1    second page, the reviewer states, I have to admit that I

2    was noticeably surprised when I discovered the GALAXY

3    Tab 10.1 for the first time.  The device is sleek,

4    elegant, and its materials do not look cheap.  This

5    device is so different than the one I first saw at MWC.

6    The hardware has really improved.  Except for the

7    proportions ratio, the GALAXY Tab 10.1 looks very

8    similar to the iPad 2.  It is lighter, 1.31 pounds

9    versus 1.33 pounds.  And at 8.6 millimeters, it is now

10   the thinnest tablet in the world.  iPad 2:

11   8.8 millimeters.

12            Do you see that?

13   A.    I do.

14   Q.    Do you know what MWC is?

15   A.    I assume it was that show that we were talking

16   about earlier in Barcelona.

17   Q.    Okay.  And do you read this as saying that

18   the -- the Samsung GALAXY Tab 10.1 that actually came

19   out to be sold in the United States was much more

20   similar to the iPad 2 than the original version of the

21   GALAXY Tab 10.1 that the author had seen at a prior

22   show?

23            MR. ANDERSON:  Objection.  Lacks foundation.

24            THE WITNESS:  I don't know that, but I think

25   you could infer that from what was stated in the first

Confidential Attorneys' Eyes Only

Page 126

1   paragraph on page 2 of this exhibit.

2         BY MR. OVERSON:

3     Q.   If you turn to the page that's marked page 6 of

4   30, the author is comparing an iPad 2 and a GALAXY Tab

5   10.1 in direct sunlight, and they're looking at the

6   reflection.

7         But have you ever looked at the two together?

8     A.   I personally have not.  Except for in pictures.

9   But actual physical devices, I have not.

10    Q.   Do you agree that the GALAXY Tab 10.1 is a

11  direct competitor to the iPad 2?

12        MR. ANDERSON:  Objection.  Vague as to

13  "direct."

14        THE WITNESS:  Yes.

15        BY MR. OVERSON:

16    Q.   And do you agree that Samsung, in -- in

17  redesigning its GALAXY Tab 10.1 to be more similar to

18  the iPad 2, indicated that it was going right after the

19  Apple market for that tablet?

20        MR. ANDERSON:  Objection.  Lacks foundation.

21  Calls for speculation.

22        THE WITNESS:  Yeah.  I don't know whether

23  that's true or not.

24        (Marked for identification purposes,

25        Exhibit 177.)

Confidential Attorneys' Eyes Only

Page 127

1    BY MR. OVERSON:

2    Q.   Okay.  We've marked as Exhibit --

3         MR. ANDERSON:  Excuse me, Counsel.  Again, for

4    the record, based on the Bates number, I believe this is

5    a document produced for the first time this morning.

6    Thank you.

7         BY MR. OVERSON:

8    Q.   Exhibit 177 is an article entitled "Samsung

9    GALAXY Tab 10.1, Wi-Fi, 16GB."  That's what it says at

10   the top.  And then the article -- there's another title

11   further down.  It says, Galaxy Tab 10.1 Wi-Fi:  A worthy

12   rival to the iPad 2.  And it's dated June 8, 2011.

13        And it starts, the Samsung GALAXY Tab 10.1

14   Wi-Fi is the first Android tablet to mount an effective

15   challenge to Apple's iPad 2 in the area where Apple does

16   best, design.

17        Do you see that?

18   A.   I do.

19   Q.   Is that a true statement?

20        MR. ANDERSON:  Objection.  Vague.

21        THE WITNESS:  That's -- that's an opinion

22   statement.  I don't know whether it's true or not.

23   That's judgment.

24        BY MR. OVERSON:

25   Q.   Okay.  Do you agree that design is an area

Confidential Attorneys' Eyes Only

Page 128

1    where Apple does best?

2            MR. ANDERSON:  Objection.  Vague.

3            THE WITNESS:  I'd really like more information

4    around the statement, but I think if we're talking about

5    tablets, at least at this point in time, I think that

6    would be true.

7            BY MR. OVERSON:

8       Q.   And what about smartphones?

9            MR. ANDERSON:  Same objection.

10           THE WITNESS:  Probably the same answer, yes.

11           BY MR. OVERSON:

12      Q.   The author goes on to say, And let's face it,

13   where tablets are concerned, design occupies center

14   stage.

15           Do you see that?

16      A.   I do.

17      Q.   Do you agree with that?

18      A.   No, I don't agree with that.

19           MR. ANDERSON:  Objection.  Vague.

20           BY MR. OVERSON:

21      Q.   The second paragraph starts, quote, In my

22   hands-on testing, the Tab 10.1 achieved perhaps the best

23   design compliment an Android tablet could hope for,

24   often being mistaken by bypassers, including Apple iPad

25   users, for an iPad 2.  The confusion is understandable

Confidential Attorneys' Eyes Only

Page 129

1    when you see and hold the Tab 10.1 for the first time.

2    It has a slim profile of 8.6 millimeters, 0.34 inch, a

3    hair's breadth slimmer than the iPad 2's 8.4-millimeter

4    depth.

5           Would you agree that this -- this user did not

6    see the -- the thickness of the GALAXY Tab 10.1 as a

7    distinguishing factor versus the Apple 2 -- versus the

8    Apple iPad 2?

9    A.    I would -- I would believe, based on that

10   statement, that that was this reader's -- or this

11   author's judgment.

12   Q.    This author found -- the next sentence, From

13   the side, the two tablets look very similar.  This

14   author concluded that they were not -- that the

15   thickness was not a distinguishing characteristic,

16   rather that they looked very similar.

17          MR. ANDERSON:  Objection.  The document speaks

18   for itself.  Vague.

19          THE WITNESS:  It was clearly this author's

20   judgment based on that statement.

21          Although they did say that the edge is more

22   rounded in the 10.1, where the iPad is tapered.  And

23   they said the gray version was not confusing.

24          BY MR. OVERSON:

25   Q.    The author says, I prefer the gray version

Confidential Attorneys' Eyes Only

Page 130

1  which is less likely to be mistaken for Apple's

2  ultra-hip tablet -- tablet because I like the feel and

3  texture of the dark backing.  The white backing somehow

4  felt chintzier.

5        Is that what you're referring to?

6  A.   I am.

7  Q.   Okay.  If you turn to page 3 of the article,

8  there's a bottom -- line at the bottom.  The author

9  wrote, Whether you go Wi-Fi only or opt for a connected

10  version, the Samsung GALAXY Tab 10.1 is the first

11  Android tablet that makes a credible and successful run

12  at competing with Apple's iPad 2.

13        Do you agree that the GALAXY Tab 10.1 made a

14  credible and successful run at competing with Apple's

15  iPad 2?

16        MR. ANDERSON:  Objection.  Lacks foundation.

17  Vague.

18        THE WITNESS:  That's what this author is

19  stating.

20        BY MR. OVERSON:

21  Q.   Do you agree with the statement?

22        MR. ANDERSON:  Same objection.

23        THE WITNESS:  I think, based on the sales of

24  the 10.1 versus the other Android tablets, I think this

25  is a -- I think I agree with this statement.

Confidential Attorneys' Eyes Only

Page 131

1          BY MR. OVERSON:

2      Q.   Okay.   The author goes on to say, It matches

3   iPad 2 in design, price and even that intangible it

4   factor.

5          Do you see that?

6      A.   I do.

7      Q.   Do you agree that it matches iPad 2 in design?

8          MR. ANDERSON:   Objection.   Vague.

9          THE WITNESS:   That's a very broad word, but I

10   think it offers a lot of same functionality and -- that

11   the iPad 2 does.   So, yes, I would agree with that.

12   Although it does some things better.

13          (Marked for identification purposes,

14          Exhibit 178.)

15          BY MR. OVERSON:

16      Q.   Okay.   Exhibit 178 is another product review.

17   It looks like it's put out by PC Advisor.   It's dated

18   August 25th, 2011.   And it states -- the heading is

19   "Samsung GALAXY Tab 10.1 Review."

20          MR. ANDERSON:   Excuse me, Counsel.   May I state

21   for the record I believe, based on the Bates number,

22   this is another document that was produced for the first

23   time this morning.

24          BY MR. OVERSON:

25      Q.   Have you looked at this document before?

Confidential Attorneys' Eyes Only

Page 132

1    A.    I don't recognize this document.  So the answer

2  is, no.

3    Q.    There's a heading on the first page that says,

4  Sincere flattery?

5    A.    I see that.

6    Q.    If you go down about ten lines, there's a -- if

7  you look on the -- right at the beginning of the line,

8  it says, In short the Samsung GALAXY Tab 10.1 is about

9  as close as you can get to an iPad 2, short of handing

10 399 pounds to Apple.

11        Do you see that?

12   A.    I do.

13   Q.    This reviewer, again, thought the designs were

14 quite similar?

15        MR. ANDERSON:  Objection.  The document speaks

16 for itself.  Misstates the document.  Vague.

17        THE WITNESS:  The sentence doesn't state

18 design.  But it says it is about as close as you can

19 get.  And I don't know all the attributes that are in

20 the mind of author when they're making the statement.

21        BY MR. OVERSON:

22   Q.    Okay.  And then there's a heading, the

23 "Handling of the Samsung GALAXY Tab 10.1."  And then

24 there's a discussion that starts with "in real terms."

25 Do you see that?  It's about five lines down.

Confidential Attorneys' Eyes Only

Page 133

1     A.    Yes.

2     Q.    It says, In real terms, that 38 grams -- I

3   think that's the difference in weight between -- that

4   this author found between the iPad 2 and the GALAXY Tab

5   10.1.

6          In real terms, that 38 grams is impossible to

7   detect when judging the pair by hand.

8          Do you agree with that?

9          MR. ANDERSON:  Objection.  Lacks foundation.

10         THE WITNESS:  Well, I don't think I personally

11  could tell the difference, so I would agree with that.

12         BY MR. OVERSON:

13    Q.    And then he says, Laid down on a flat surface,

14  Tab 10.1 and iPad 2's thicknesses are indistinguishable

15  to the eye.

16         Do you see that?

17    A.    I do.

18    Q.    And would you agree that that would be your

19  experience?

20         MR. ANDERSON:  Objection.  Lacks foundation.

21  Calls for speculation.

22         THE WITNESS:  That I haven't done, so I don't

23  know.  But, I mean, I agree that it is a very small

24  difference.

25  ///

Confidential Attorneys' Eyes Only

Page 134

1      (Marked for identification purposes,

2      Exhibit 179.)

3      MR. ANDERSON:  For the record, Exhibit 179

4   appears, based on the Bates label, to be a document that

5   was produced for the first time this morning.

6      BY MR. OVERSON:

7      Q.   Exhibit 179 is entitled "Electronic House.

8   Hands On Review:  Samsung GALAXY Tab 10.1 Tablet."  And

9   it's dated August 30, 2011.

10      Under look and feel on the first page, it says,

11   The Samsung GALAXY Tab 10.1 looks very similar to the

12   iPad 2.  It sports a 16:9 screen shape, while the iPad 2

13   is a bit more boxy.  In fact, at a casual glance, it's

14   easy to get the two units confused.  The Samsung is a

15   hair thinner and lighter and the back is white, while

16   iPad 2's back is metallic gray.

17      Are you with me?

18      A.   I am.

19      Q.   This author, again, finds the -- the Samsung

20   GALAXY 10.1 Tablet to be quite similar to the iPad 2?

21      A.   The author does state that.

22      Q.   Okay.  And if you look on the last page -- I'm

23   sorry, page 3, of the article, the very last paragraph,

24   do you see the last sentence that says -- or the

25   second-to-last sentence, Last week for a brief period,

Confidential Attorneys' Eyes Only

Page 135

1    Samsung teased people with a Best Buy offer that tossed
2    in a free tablet with the purchase of a 3D plasma TV.
3         Do you see that?
4    A.   I do.
5    Q.   Were you ever aware of Apple making such an
6    offer?
7    A.   Yes.
8    Q.   What context?
9    A.   I was told that by attorneys for Samsung.
10   Q.   Okay.  And do you know anything more about it?
11   A.   I do not.
12   Q.   Do you know of a situation where Apple was
13   giving away free iPads?
14   A.   No.
15   Q.   Do you know a situation where Apple was giving
16   away iPads as part of a broader offer to buy Apple
17   products?
18   A.   I'm -- I'm not aware of that fact, whether
19   that's true or not.
20   Q.   Okay.  Sitting here today, you can't tell me
21   that -- what Apple did with such an offer?
22   A.   That's correct.
23   Q.   You've just been told, in general, that Apple
24   had some kind of an offer where they gave away free
25   iPads?

Confidential Attorneys' Eyes Only

Page 136

1    A.    Oh, no.   I guess I misunderstood your question.

2          I thought you asked me whether I was aware of

3    whether Samsung gave away some of their tablets with --

4    so that's -- I'm sorry.   That's what I thought I was

5    answering.

6    Q.    No.   I said Apple, so let me -- let me clarify.

7    A.    Okay.

8    Q.    So I was trying -- I was seeing if -- the --

9    the -- the document we're looking at, Exhibit 179, talks

10   about a Samsung Best Buy offer whereby a purchaser of a

11   3D plasma TV could get a Samsung Tablet 10.1 for free.

12         Are you aware that Apple has ever given away

13   any of its iPads for free?

14   A.    I apologize to you if I didn't listen to your

15   question properly before.   I have not heard of that

16   before.

17         But you also assume this is a 10.1.   It may not

18   be.   It just says a free tablet.

19   Q.    Okay.   Let's assume this is a 10.1 tablet.

20         Would you agree that Apple is -- the iPad 2 is

21   seen as a premium product?

22   A.    Yes.

23   Q.    There's a cache to that product?

24   A.    I would agree with that statement.

25   Q.    And would you agree that if another company was

Confidential Attorneys' Eyes Only

Page 137

1   giving away a product with the same design, that that

2   would undermine the cache of the product?

3        MR. ANDERSON:  Objection.  Incomplete

4   hypothetical.  Vague.

5        THE WITNESS:  It may or may not.  I would need

6   a lot more facts to know.

7        BY MR. OVERSON:

8    Q.   Well, here we have the facts of if you buy a 3D

9   plasma TV, then you get a free tablet, 10.1.

10        What other facts would you need?

11    A.   Do you have any idea how few 3D plasma TVs have

12   been sold?  So the quantity here could not possibly have

13   had the effect that you're suggesting in your previous

14   question.

15    Q.   Well, let's -- let's assume this offer was put

16   in a newspaper.  Okay.  So everyone saw it in the paper,

17   and they saw that you could get one of these Tablet

18   10.1s for free if you bought another product.

19        Doesn't that -- the fact that that same design

20   was being given away for free take away from the cache

21   of the premium Apple iPad 2?

22        MR. ANDERSON:  Objection.  Incomplete

23   hypothetical.  Vague.

24        THE WITNESS:  I would need a lot more

25   information to know.  But just based on my understanding

Confidential Attorneys' Eyes Only

Page 138

1   of the possible effects of this type of promotion, my

2   answer would be, no.

3        BY MR. OVERSON:

4        Q.   Because you're looking at how many people

5   actually went out and bought 3D TVs?

6        A.   Correct.  And you're assuming how many people

7   even saw or read that ad.  We have no idea.  And what

8   markets was that run in?  I mean, I'd need a lot more

9   information to know whether this would have any material

10  impact on the cache of an iPad 2.

11       Q.   I don't think my question asked about a

12  material impact.  So --

13       A.   Well, that's all that's relevant.

14       Q.   Okay.  Let's -- let's assume that there was an

15  ad in The San Francisco Chronicle, since we're in the

16  Bay Area, you know, full-page ad says, Get a free Tablet

17  10.1 if you purchase a Samsung 3D plasma TV.  And

18  whoever subscribes to The Chronicle would, you know,

19  presumably -- a number of the people who subscribe to

20  The Chronicle would have seen that ad.

21       Would you think that would have had an impact

22  on the people's view of whether the design has its -- a

23  premium cache?

24       A.   No.

25       MR. ANDERSON:  Objection.  Incomplete

Confidential Attorneys' Eyes Only

Page 139

1    hypothetical.  Vague.

2          THE WITNESS:   I'd need a lot more information

3    to know the answer to that question.

4          BY MR. OVERSON:

5       Q.   Can you look at paragraph 31 of your

6    declaration, please.

7       A.   Yes.

8       Q.   The last sentence says, For that reason, rather

9    than causing consumer confusion, degrading Apple's brand

10   image and causing irreparable harm, the, quote, minor

11   differences, end quote, displayed by Samsung's products

12   noted in Apple's motion likely serve to distinguish

13   those mobile devices from Apple's in the marketplace,

14   end quote.

15         Did you mean to apply that statement to Apple's

16   iPhone and the GALAXY S iPhones -- or smartphones, or

17   were you only addressing tablets there?

18      A.   This paragraph only addresses tablets.

19      Q.   Do you believe that the differences displayed

20   by Samsung's GALAXY S and the other accused smartphones

21   are serving to distinguish those products from Apple's

22   in the marketplace?

23      A.   I'd need more information to know.  I wasn't

24   addressing that in this paragraph, and I did not address

25   that issue in another paragraph in this declaration.

Confidential Attorneys' Eyes Only

Page 140

1    Q.    One factor, I think, that -- well, let me ask.

2          Is it one factor that you would consider in

3    deciding the impact of the Samsung smartphones that are

4    accused in this case or in the preliminary injunction

5    motion?  Would one factor be how similar the market

6    perceives the Apple product to the Samsung product to

7    be?

8          MR. ANDERSON:  Objection.  Vague.

9          THE WITNESS:  I think that is a factor, yes.

10         BY MR. OVERSON:

11   Q.    Okay.  And have you looked at any reaction from

12   the market to see what people's reaction was?

13         MR. ANDERSON:  Same objection.

14         THE WITNESS:  Nothing besides seeing some

15   judgments of authors of reviews that you pointed out to

16   me here.  Besides that, I have not seen anything.

17         (Marked for identification purposes,

18         Exhibit 180.)

19         BY MR. OVERSON:

20   Q.    So this Exhibit 180 looks like a -- an article.

21   At the top it says, TalkAndroid.  The latest Android

22   news, application and forum discussion.  It's dated

23   February 11, 2011.  It says, Samsung GALAXY S II I9100

24   specs/price revealed on UK Web site.

25         And then they posted on the second page the

Confidential Attorneys' Eyes Only

Page 141

1   specifications of the -- of the phone.  You'll see on

2   that second page, it says, Mobile World Congress in

3   Barcelona.

4           Are you with me?

5       A.   I am.  It's the third time we've talked about

6   it.

7       Q.   So MWC that we saw earlier, that's -- just

8   to -- I think your hunch was correct.  It's the congress

9   that was in Barcelona?

10      A.   I believe so.

11      Q.   Okay.  And then you'll see there are some

12  responses to the posting.  And the first one is, Picture

13  looks like iPhone 4 with Samsung on it.

14          Do you see that?

15          MR. ANDERSON:  Objection.  Misstates the

16  document.

17          THE WITNESS:  I do see that.  And then the

18  author of this statement says further, Nice spec.  So

19  what they're really talking about are these seven bullet

20  points on page 2, which is what really would be causing

21  someone to buy a product or not.

22          BY MR. OVERSON:

23      Q.   The third comment from Cory of February 11,

24  2011 at 1:19 p.m. says, That just looks like an iPhone

25  all the way down to the icons.  Come on, Samsung.

Confidential Attorneys' Eyes Only

Page 142

1      This -- this viewer, again, thinks the Samsung

2  GALAXY S II I9100 looks very similar to the iPhone;

3  true?

4      MR. ANDERSON:  Objection.  Misstates the

5  statement.  Calls for speculation.

6      THE WITNESS:  It does.  But any author who

7  would say the screen is too big is someone who -- I

8  don't think I'd agree with any opinions they've got,

9  because that's what I want.  I want the biggest screen I

10 can get.

11     (Marked for identification purposes,

12     Exhibit 181.)

13     BY MR. OVERSON:

14 Q.   Exhibit 181 is an article that was printed from

15 wired.com.  It's dated July 15, 2010.  The title is

16 "First Look:  Samsung Vibrant Rips Off iPhone 3G

17 Design."  And it starts, Samsung's latest phone, the

18 Vibrant, has the body of an iPhone and the brains of an

19 Android.  The Vibrant's industrial design is shockingly

20 similar to the iPhone 3G:  The rounded curves at the

21 corners, the candy bar shape, the glossy black finish

22 and the chrome-colored metallic border around the

23 display.  The Vibrant even has its volume and ringer

24 buttons at almost the same spot as the iPhone 3G.

25     So this author found the Vibrant phone to be

Confidential Attorneys' Eyes Only

Page 143

1    very similar to the iPhone?

2                MR. ANDERSON:  Objection.  Vague.

3                THE WITNESS:  Yes.  But then the rest of the

4    article goes on to the real functionality.  That is why

5    this phone is worth of someone's consideration.

6                BY MR. OVERSON:

7        Q.   Okay.  If you flip to the next page, the last

8    page of the exhibit, the last paragraph says, Samsung's

9    Vibrant will cost $200 with a two-year contract on

10   T-Mobile.  The phone, which was originally scheduled to

11   launch on July 21st, will now be available starting

12   July 15.  But there's little to make the phone notable

13   apart from its striking similarity to the iPhone.

14   Without that, the Vibrant is then just another Android

15   phone, albeit one with a pretty good screen and

16   surprisingly light weight.

17               Do you see that?

18       A.   I do.

19       Q.   So at least this author found the Vibrant phone

20   to be strikingly similar to the iPhone?

21       A.   Yes.

22       Q.   And it listed a price of $200 with a two-year

23   contract.

24               Is that cheaper than the iPhone?

25       A.   Yeah.  But that's irrelevant.  Because you

Confidential Attorneys' Eyes Only

Page 144

1    couldn't get an iPhone at T-Mobile at this point in

2    time.  So anyone who's going to T-Mobile as their

3    carrier, there's not a choice between an Samsung phone

4    and an iPhone.

5        Q.   What about a person today who's in the market

6    for a smartphone, they could get Apple on AT&T or

7    Verizon; right?

8        A.   As of today, those are the only two carriers.

9        Q.   Right.  And they can get Samsung on AT&T or

10   Verizon; right?

11       A.   They can do that.

12       Q.   So the -- even within AT&T and Verizon, the

13   iPhone and the Samsung smartphones are competing

14   directly against each other?

15       A.   They are as of today.

16       Q.   And as of today, is the Samsung smartphones

17   that are -- sorry -- that issue in the preliminary

18   injunction motion, those are being sold cheaper than the

19   iPhones that are being sold at AT&T and Verizon; true?

20            MR. ANDERSON:  Objection.  Compound.

21            THE WITNESS:  They're clearly not more

22   expensive, and I think a number of the models are less

23   expensive.

24            BY MR. OVERSON:

25       Q.   So for the buyer who's buying from Verizon or

Confidential Attorneys' Eyes Only

Page 145

1    from AT&T, they will have the option of buying one of

2    the Samsung smartphones that are accused in the

3    preliminary injunction motion or the iPhone under the

4    same carrier -- under the plan of the same carrier?

5        A.    Yes.

6        Q.    And if -- if you assume that the designs are

7    strikingly similar -- I want you to assume that -- then

8    would you agree that one of the other main factors would

9    be price?

10        MR. ANDERSON:   Objection.   Vague.   Incomplete

11    hypothetical.

12        THE WITNESS:   I would.

13        BY MR. OVERSON:

14        Q.    And would you agree that Samsung has beaten

15    Apple on price?

16        A.    I believe on some of the models they have, yes.

17        Q.    So would you agree that for those customers,

18    Apple would have to do better than Samsung in other

19    relevant categories to convince a buyer to buy its

20    product over the Samsung phones?

21        MR. ANDERSON:   Objection.   Incomplete

22    hypothetical.

23        THE WITNESS:   As I said before, I think for

24    most informed purchasers who really do an analysis,

25    they're going to have a number of features that they

Confidential Attorneys' Eyes Only

1    think they need and put various weights on them and come

2    to a decision.

3            And I would say that the -- that buyer would

4    have to weight all the functionalities and differences

5    of the Apple product versus Samsung product and come up

6    with a decision to buy Apple versus Samsung.

7            And one advantage of the Samsung would be a

8    lower price, but that may not be the deciding criteria.

9            BY MR. OVERSON:

10   Q.    So some buyers might be very sophisticated and

11   come in with a list of criterion.  Other buyers might

12   just wander into the store and view all the phones and

13   then decide which one to buy without having such a list;

14   right?

15   A.    That's true.

16   Q.    And those buyers are more likely to be

17   influenced by price than other things; right?

18           MR. ANDERSON:  Objection.  Vague.

19           THE WITNESS:  No, not necessarily.

20           BY MR. OVERSON:

21   Q.    Would they be more -- are they more likely to

22   be influenced by design than other things?

23           MR. ANDERSON:  Objection.  Vague.

24           THE WITNESS:  Anything is possible.  But they

25   may or may not.

Confidential Attorneys' Eyes Only

Page 147

1      BY MR. OVERSON:

2      Q.   Would you agree that Samsung has been gaining

3  market share in the smartphone market?

4      A.   I think generally that's the direction.

5      Q.   And same would be true for the tablet market?

6      A.   Yes.

7      Q.   And would you agree that the market is now

8  projecting Samsung to take over the number one spot in

9  the smartphones market?

10     A.   No.

11     Q.   In other words, analysts are predicting that?

12     A.   I think there may be someone, but I wouldn't

13 say most analysts are predicting that, no.

14          (Marked for identification purposes,

15          Exhibit 182.)

16          BY MR. OVERSON:

17     Q.   Okay.  Exhibit 182 is an article printed from

18 reuters.com.  It's entitled "Insight:  Jobs' exit opens

19 door for nimble Apple rivals."  And it shows Seoul,

20 Korea, as the origin of the article.  And I believe it

21 was printed on August 25, 2011, as you see in the bottom

22 right corner.  It was certainly after Mr. Jobs announced

23 his resignation.

24     A.   Yes.

25     Q.   So if you look after noting Mr. Jobs'

Confidential Attorneys' Eyes Only

Page 148

1    resignation, there's -- let's see, one, two, three,

2    fourth paragraph down, it says, Samsung's fortunes are

3    most tied to Apple, both as a competitor and supplier of

4    components.  The group also has a scale and an ability

5    to act quickly that is rare in the sector.  Samsung's

6    GALAXY range of smartphones and tablet computers running

7    on Google's Android operating system are seen as the key

8    competitor to Apple's iPhone and iPad, products which

9    have changed the industry.

10           Do you agree that Samsung's GALAXY range of

11   smartphones are the key competitor to Apple's iPhone?

12           MR. ANDERSON:  Objection.  Vague.

13           THE WITNESS:  I'm not 100 percent sure that's

14   accurate.

15           BY MR. OVERSON:

16   Q.    What about --

17   A.    I think HTC would disagree with that.

18   Q.    Okay.  What about 50 percent or more?  You said

19   100 percent.  Should I pin you down to a percentage?

20           No.  With all kidding aside, in your view -- I

21   understand HTC might disagree, but in your view, is

22   Apple -- I'm sorry, is Samsung's GALAXY range of

23   smartphones the key competitor to Apple's iPhone?

24           MR. ANDERSON:  Objection.  Vague.

25           THE WITNESS:  I'm not sure what time you're

Confidential Attorneys' Eyes Only

Page 149

1    referring to.  But the way I look at this market, I

2    think it really is -- and the way I would describe it is

3    a battle of the operating systems.  And you have iOS and

4    you have Android, and I think the real competition is --

5    that is where it is being played out.

6         And I do believe that Samsung is one of the

7    stronger Android players.  That's how I'd answer your

8    question to the best of my ability.

9         BY MR. OVERSON:

10   Q.   Okay.  So would you say that Samsung's GALAXY

11   range of smartphones are some of the key competitors to

12   Apple's phone?

13        MR. ANDERSON:  Objection.  Vague.

14        THE WITNESS:  I would just -- I would just use

15   the change the word "the" to "a."  I think they are a

16   key competitor.  I don't think they are the key

17   competitor.

18        And you have just a few minutes left on the

19   disk.

20        BY MR. OVERSON:

21   Q.   Okay.  Would you agree that Samsung's GALAXY

22   tablet computers are the key competitor to Apple's iPad?

23        MR. ANDERSON:  Objection.  Vague.

24        THE WITNESS:  If you talk about as of today,

25   yes.

Confidential Attorneys' Eyes Only

Page 150

1        BY MR. OVERSON:

2        Q.    And I meant to as of today, as the iPhones.

3              Does that change your testimony?

4        A.    It does not.

5        Q.    Under the heading "Booming Market," it says,

6   Samsung this week unveiled four new cheaper smartphones,

7   targeting fast-growing emerging markets -- again setting

8   it on a collision course with Apple, which sources say

9   is readying a cheaper 8-gigabyte iPhone.

10             Hong Won-Pyo, executive vice president of

11  Samsung's mobile division, told his team this week he

12  was confident Samsung could soon overtake Apple in the

13  smartphone market soon, according to a person at the

14  meeting.  Hong was speaking just hours before Jobs made

15  his announcement to quit.

16             So have you seen that Samsung has stated that

17  it's its aim to overtake Apple in the smartphone market

18  soon?

19             MR. ANDERSON:  Objection.  Misstates --

20  misstates the evidence.

21             THE WITNESS:  I don't know if that's hearsay or

22  not.

23             MR. ANDERSON:  Objection.  Hearsay.

24             THE WITNESS:  I have seen this document before,

25  since you were generous to produce it last night and I

Confidential Attorneys' Eyes Only

Page 151

1    read it this morning.  So I've seen this statement here

2    before.

3            And I do notice that the sentence right above

4    the sentence you're referring to is really talking about

5    markets that are totally irrelevant to the case.

6    They're talking about emerging markets.  The U.S.A. is

7    not an emerging market.

8            And so I think this is competition that may

9    have relevance between these parties in other lawsuits.

10   I think you're taking the next statement out of context

11   and you're talking about the worldwide market, not

12   U.S.A. market.

13           BY MR. OVERSON:

14       Q.   If you go on to the next paragraph, it says,

15   Apple and Samsung now scrap for top spot in the

16   smartphone market, having overtaken the market leader

17   for the last decade, Finland's Nokia, in the second

18   quarter.

19           Do you see that?

20       A.   I do.

21       Q.   Samsung's smartphone sales soared more than

22   500 percent in the second quarter, easily eclipsing

23   Apple's 142 percent growth, though Apple sold about

24   1 million more phones.

25           Do you agree that Samsung is catching up to

Confidential Attorneys' Eyes Only

Page 152

1   Apple in terms of smartphone sales in 2011?

2          MR. ANDERSON:  Objection.  Vague.  Lacks

3   foundation as to what market you're talking about.

4          THE WITNESS:  And this is a very typical

5   reporter misleading use of figures.

6          When Samsung has significant lower starting

7   point than Apple, a 500 percent increase may not be as

8   good as a 142 percent increase.  And it says during that

9   period of time, that Apple sold a million more phones

10  than Samsung.  I don't think they're close, based on

11  this information.

12         BY MR. OVERSON:

13  Q.   Do you agree that Apple and Samsung are now

14  scrapping for the top spot in the smartphone market?

15         MR. ANDERSON:  Objection.  Vague.

16         THE WITNESS:  I need more information to

17  refresh my recollection.  But I don't think, again, HTC

18  would agree with this.  But I would think HTC, Samsung

19  and Apple are.

20         BY MR. OVERSON:

21  Q.   Would you agree that Samsung's stock went up

22  after the announcement of Mr. Jobs' resignation?

23  A.   I understand that fact occurred.

24         MR. OVERSON:  Okay.  We have to take a break

25  for the CD.

Confidential Attorneys' Eyes Only

Page 153

1           THE VIDEOGRAPHER:   This marks the end of

2   Volume I, Disk 2, in the deposition of Michael Wagner.

3   The time is 2:33 p.m. and we are off the record.

4           (Recess taken, from 2:33 to 2:44.)

5           THE VIDEOGRAPHER:   This marks the beginning of

6   Volume I, Disk 3, in the deposition of Michael Wagner.

7   The time is 2:44 p.m., and we are on the record.

8           (Marked for identification purposes,

9           Exhibit 183.)

10          BY MR. OVERSON:

11      Q.    Okay.   Mr. Wagner, we've marked as Exhibit 183

12  an article entitled "Smartphone Politics by Nielsen:

13  Google and Apple embroiled in fight for 'undecideds.'"

14          And then the article talks about the undecideds

15  being the ones who haven't decided whether they want to

16  go for an Android or an Apple operating system; is that

17  right?

18      A.    That's correct.

19      Q.    And according to this article, smartphones make

20  up 40 percent of all mobile phones in the United States.

21          Do you see that?

22      A.    It does.

23      Q.    And that's in the range that you discussed

24  earlier?

25      A.    It was.

Confidential Attorneys' Eyes Only

Page 154

1    Q.   And so there's 60 percent in the category that

2    this article calls "feature phones" who would fall into

3    the undecided category; is that right?

4         MR. ANDERSON:   Objection.   Misstates the

5    document.

6         THE WITNESS:   Say that again.

7         BY MR. OVERSON:

8    Q.   The first lines of the article say, Like

9    politics, smartphone wars come down to two major

10   parties -- Google and Apple -- embroiled in a

11   never-ending fight for consumers, especially those who

12   have not made up their mind as to which operating system

13   they'd like in their next smartphone.   According to

14   July 2011 data from Nielsen survey, quote, these

15   undecideds will be the ones device makers will be hoping

16   to win over, end quote.

17        Interestingly, the late adopters among likely

18   smartphone upgraders are the ones most likely to be

19   undecided about their next phone platform.

20        Do you see that?

21   A.   I do.

22   Q.   Are the undecideds particularly important in

23   that once you lose a customer to -- if you're Apple and

24   you lose a customer to the Android phones, it will be

25   hard to get them back?

Confidential Attorneys' Eyes Only

Page 155

1          MR. ANDERSON:  Objection.  Lacks foundation.

2          THE WITNESS:  It's -- it's harder to get them

3     back than to retain them if they're an original Apple

4     purchaser.

5          BY MR. OVERSON:

6     Q.    And that goes both ways for the -- if you start

7     off with Apple, it's harder to get them to come over to

8     Android?

9     A.    It is even harder.

10    Q.    If you look at second -- let's see, the page

11    that says, Page 3 of 11 in the upper right-hand corner.

12         At the top it says, Four out of ten Americans

13    now wield smartphones, Nielsen says.  Smartphones will

14    continue eating into feature phones and dump phones

15    until eventually all phones become smartphones, as

16    predicted by Asymco's Horace D-E-D-I-U.

17         And then there's a quote saying, I don't see

18    non-smart devices being interesting to vendors in the

19    near term.  Each additional dumb phone added to a

20    portfolio decrease a company's operating margin.  The

21    market dynamics are such that I think non-smartphones

22    will disappear entirely from branded portfolios in three

23    to five years.

24         Do you see that?

25    A.    I do.

Confidential Attorneys' Eyes Only

Page 156

1    Q.   So there is a window in the next three to five

2  years to try and win over those people who don't have

3  smartphones yet; is that correct?

4          MR. ANDERSON:  Objection.  Vague.  Lacks

5  foundation.

6          THE WITNESS:  Based on the author of this

7  article's view, yes.

8          BY MR. OVERSON:

9    Q.   And because the -- because it's so difficult to

10 win a customer over from one system -- operating system

11 to the other, it's very important to get as many

12 customers now as you can into your operating system in

13 this window of the next three to five years; right?

14         MR. ANDERSON:  Same objections.

15         THE WITNESS:  Assuming those facts are correct,

16 yes.

17         BY MR. OVERSON:

18   Q.   Okay.  Can I have you -- direct your attention

19 back to your declaration, and specifically to the

20 graphic that you have on page 11, which is a chart

21 entitled "Market Share of U.S. Smartphone Sales to End

22 Users, First Quarter 2008 through First Quarter of

23 2011."

24         And let me go through -- well, first of all,

25 what's on this chart, in the left-hand column, there are

Confidential Attorneys' Eyes Only

Page 157

1  percentages.

2       Is that the percentage market share of U.S.

3  smartphone sales?

4       A.   It is.

5       Q.   Is this based on when the phones were shipped

6  to the -- from the manufacturers to the stores or

7  purchased by customers?  Do you know?

8       A.   I'd have to go back to Gartner to answer that

9  question specifically.

10       Q.   Is Gartner a third-party industry analyst?

11       A.   It is.

12       Q.   Okay.  Okay.  And then on the bottom, at the

13  X-axis, we see quarters, and then the solid line is

14  Apple and the dotted line is Samsung.

15       So as of the second quarter 2008, is that where

16  we see Apple at around -- it looks, like, nine, nine and

17  a half percent?

18       A.   Yes.

19       Q.   Okay.  And then the iPhone 3G was released, and

20  Apple went up to around 25 percent?

21       A.   In the next quarter, yes.

22       Q.   So there was a 15 percent increase?

23       A.   There was.

24       Q.   And when the iPhone 3GS was released, Apple

25  went from something, like, 18 percent to around

Confidential Attorneys' Eyes Only

Page 158

```
 1   30 percent?

 2       A.   In two quarters --

 3            MR. ANDERSON:   Objection.  Misstates the

 4   evidence.

 5            THE WITNESS:   In two quarters they did, yes.

 6   In one quarter they went up about 7 percent, and then

 7   they went up 5 percent the next quarter as well.

 8            BY MR. OVERSON:

 9       Q.   Okay.  So over a two-quarter period, they went

10   up 12 percent?

11       A.   Yes.

12       Q.   Okay.  And then when the iPhone 4 was released,

13   it looks like they were at 22 percent; is that right?

14   Apple.

15       A.   That's fair.

16       Q.   And they went up to 27 percent in the third

17   quarter and then the following quarter, they went down

18   to 20 percent?

19       A.   Yes.

20       Q.   And in that same quarter, the GALAXY S was

21   released?

22       A.   It was.

23       Q.   Was it actually released for sale in the United

24   States on July 15, 2010?

25       A.   That's my understanding.
```

Confidential Attorneys' Eyes Only

Page 159

1    Q.    And so then the third quarter results for

2    Samsung were -- let's go over to the second quarter of

3    2010.   It looks like about 5 percent?

4    A.    Yes.

5    Q.    And they went up to about, I don't know, what

6    would you call that?

7    A.    Between 13 and 14 percent.

8    Q.    Okay.   So they increased by 8 to 9 percent?

9    A.    Between those two numbers would be fair.

10    Q.    And would you agree that the iPhone 4 market

11    share did not go up as much over its initial release as

12    did the iPhone 3G?

13         MR. ANDERSON:   Objection.   Vague.

14         THE WITNESS:   That is correct.   It went up

15    about the same as the 3GS, but not as much as the 3G.

16         But you have to realize that it's a much bigger

17    market now, so it would be almost impossible to get that

18    type of increase now.   It's a -- it's a more mature

19    market.   There's a lot more phones out there already in

20    the marketplace, so market share increases, I think, are

21    more difficult to achieve.

22         BY MR. OVERSON:

23    Q.    Going from the second quarter to the third

24    quarter, it looks like the iPhone 4, you wrote here

25    released June 24th, 2010, but I take it the sales

Confidential Attorneys' Eyes Only

1  wouldn't really kick into until the third quarter, right
2  because that's almost --
3      A.   Correct.
4      Q.   So the GALAXY S and the iPhone 4 were both
5  having their initial full quarter in the third quarter
6  of 2010?
7      A.   That is correct.
8      Q.   And the GALAXY S went from 5 percent to 13 to
9  14 percent and the iPhone 4 went from 22 to around 27, I
10 think we said?
11     A.   That's fair.
12     Q.   Okay.  And would you agree that the release of
13 the GALAXY S in that same quarter had an impact on the
14 overall percentage of the market that the iPhone 4
15 achieved?
16         MR. ANDERSON:  Objection.  Lacks foundation.
17 Vague.
18         THE WITNESS:  To some limited extent, yes.  But
19 you've got to appreciate the fact that I believe the
20 majority of these sales that are being achieved by
21 Samsung are the carriers who don't carry the iPhone.  So
22 they aren't taking away sales from Apple.
23         But since they're growing the market for
24 smartphones, of course their market share is increasing.
25 They being Samsung.

Confidential Attorneys' Eyes Only

Page 161

1        BY MR. OVERSON:

2        Q.   Are you assuming that all the buyers are

3    staying with whatever existing carrier they were with?

4        A.   Not all, but a significant number of people

5    stay with the same carrier.  It's that same stickiness

6    that you talk about with the actual phone manufacturers.

7        Q.   There are a lot of people who see an iPhone and

8    like it and switch to the carrier that the iPhone is on;

9    right?

10       A.   That does happen.

11       Q.   How much of the market now does AT&T and

12   Verizon make up in the United States?

13       A.   The majority.

14       Q.   So Apple is covered in that majority of the

15   market?

16       A.   It is today.  If T-Mobile acquisition goes

17   through.

18       Q.   So some people who are using T-Mobile and saw

19   the Samsung GALAXY S, they might have been considering

20   buying an iPhone and switching over to AT&T, but because

21   the GALAXY S was there, they might have decided to stay

22   with their existing carrier and go with the GALAXY S?

23       A.   It's possible there could be some customers

24   that would meet that definition.

25       Q.   Could you turn to Exhibit 163, please, and look

Confidential Attorneys' Eyes Only

Page 162

1   at page 17.

2           And I think you have used this document in your

3   report; correct?

4       A.   I did.

5       Q.   And on page 17 there's a manufacturers' share

6   graphic showing Q2 2010, Q3 2010 -- oh, I'm sorry.

7   I'm -- this is one showing all mobile phones.

8           So I think on the next page, you'll see the one

9   that's for smartphones.

10      A.   Thank you, Grant.

11      Q.   And you'll see here there's manufacturer share

12  percentages for Q2 2010, Q3 2010 and Q4 2010.

13      A.   Yes.  And this is some data that confirms my

14  earlier point that HTC may be much stronger or bigger

15  player than Samsung in the U.S. market for smartphones.

16  They have a larger market share by fourth quarter 2010.

17      Q.   And this data comes from ComTech United States.

18  Do you know who they are?

19      A.   I don't.

20          MR. OVERSON:  Okay.  Okay.  In any event,

21  there's colorful bar graphs, but I'm going to mark as

22  next in order -- I've taken the data in those graphs and

23  compared them in a table.

24          (Marked for identification purposes,

25          Exhibit 184.)

Confidential Attorneys' Eyes Only

Page 163

1      BY MR. OVERSON:

2      Q.   It makes it a little easier to see the

3  differences.

4           So Exhibit 184 is a document that my firm

5  prepared based on the data on page 18 of the exhibit.

6  And what you'll see is basically we just took the

7  numbers from this color bar graph and put them into a

8  regular table format and showed the changes between the

9  third quarter of 2010 to the fourth quarter of 2010.

10          So, for example, according to the chart in the

11  third quarter of 2010, Samsung was at 3 percent of the

12  U.S. smartphone market, and the fourth quarter of 2010

13  they were at 16 percent.

14          Do you see that?

15     A.   I do.

16     Q.   And Apple was at 33 percent, and then they went

17  down to 22 percent in the fourth -- in the third quarter

18  they are at 33 percent.  In the fourth quarter, they

19  went down to 22 percent.  And then it lists the other

20  manufacturers there.

21          Do you see that Samsung had a gain of

22  13 percent in the fourth quarter of 2010?

23     A.   I do.

24     Q.   And do you know what that's due to?

25     A.   I would assume at least a significant portion

Confidential Attorneys' Eyes Only

Page 164

1    of it is due to the release and success of the GALAXY S.

2        Q.    So it went from 3 to 16 percent.  Apple went

3    from 33 to 22 percent.  So it lost 11 percent share.

4            Do you see that?

5        A.    I do.  And the proper comparison is to compare

6    Apple to the first quarter or the second quarter of this

7    chart, where they've actually increased market share in

8    that period.

9            But the 33 percent is because that was --

10   appeared where they really were experiencing the success

11   of the release of the iPhone 4.  But then as other

12   people come out and generate, you know, better products

13   and their product starts getting old, yeah, they're not

14   going to do as well.

15       Q.    And in this case between Q3 2010 and Q4 2010,

16   Samsung gained 13 percent due to its release of new

17   GALAXY products?

18       A.    It did.

19       Q.    And you would agree that some of that

20   percentage was taken from Apple?

21       A.    I believe some of it was yes.

22       Q.    In fact, if you add together all of the other

23   subtractions, so to speak, all the other lost market

24   shares for that quarter, of BlackBerry minus four,

25   Motorola minus one, others minus one, Nokia minus two.

Confidential Attorneys' Eyes Only

Page 165

1    That's only 8 percent; right?

2        A.    It is.

3        Q.    So if Samsung gained 13 percent, and all other

4    rivals other than Apple only lost 8 percent, at least

5    5 percent of the market was taken from Apple; right?

6        A.    From this data, one could draw that conclusion.

7        Q.    That the GALAXY S took 5 percent of Apple's

8    market share in the fourth quarter of 2010; right?   At

9    least.

10        MR. ANDERSON:   Objection.   Lacks foundation.

11   Assumes facts not in evidence.

12        THE WITNESS:   But you've got to understand,

13   it's not really taking sales away from Apple.   The

14   market is expanding dramatically in this time period.

15   More people buying smartphones, many from carriers that

16   Apple doesn't even serve.   So that's a misleading

17   statistic, because you really should look at are they

18   taking sales away, not market share.

19        BY MR. OVERSON:

20        Q.    Let me focus still on market share because

21   that's the data we have in front of us.

22            You agree that according to this data, the

23   GALAXY S product took away at least 5 percent of Apple's

24   market share for the fourth quarter of 2010 as compared

25   to the third quarter of 2010?

Confidential Attorneys' Eyes Only

Page 166

1    MR. ANDERSON:  Objection.  Lacks foundation.
2  Assumes facts not in evidence.
3    THE WITNESS:  Yes.  Based on my belief that --
4  particularly the Android products are addressing a
5  unaddressed market for smartphones that Apple is not
6  able to penetrate because of its lack of carriers and
7  its high price.
8    So they're expand -- these other players are
9  expanding the market.  So by definition, Apple's market
10  share is going to go down, although there was record
11  sales of Apple during this time period.  So it's only
12  half of the picture.  And it's a misleading half the way
13  it's characterized in your Exhibit 184.
14    BY MR. OVERSON:
15    Q.   Well, Samsung went up 13 percent in one
16  quarter, from 3 percent to 16 percent.  That's -- that's
17  pretty dramatic?
18    A.   I agree with that.
19    Q.   HTC went up 4 percent, from 15 to 19 percent.
20    Does HTC have a smartphone that looks similar
21  to the iPhone?
22    MR. ANDERSON:  Objection.  Vague.  Calls for
23  speculation.  Lacks foundation.
24    THE WITNESS:  The last objection is the best.
25  I don't know.  If they did I assume you'd be suing them.

Confidential Attorneys' Eyes Only

Page 167

1    BY MR. OVERSON:

2        Q.    To your knowledge, we're not suing them?

3        A.    To my knowledge, you are not.  I haven't heard

4    about that case in IP Law 360.

5        Q.    Okay.  And needless to say, you know that we

6    are suing the GALAXY S or accusing the GALAXY S of being

7    substantially similar to the iPhone; right?

8        A.    I think that's why I'm here.

9        Q.    And the incredible growth -- I mean, you would

10   agree with me, going from 3 percent to 16 percent in one

11   quarter is incredible growth, isn't it?

12       A.    I agree with that.

13       Q.    So the product that fueled the incredible

14   growth is the product that's accused of infringing in

15   this case?

16            MR. ANDERSON:  Objection.  Lacks foundation.

17   Assumes facts not in evidence.

18            THE WITNESS:  No -- yeah.  I'd need more

19   information to really be able to answer that question.

20   I believe Samsung has many additional models of

21   smartphones not being accused that have been successful

22   as well, and I'd need to extract that out to answer your

23   question.

24            BY MR. OVERSON:

25       Q.    Apart from the GALAXY S phones, do you know of

Confidential Attorneys' Eyes Only

Page 168

1   any other phones that fueled the growth from 3 percent

2   to 16 percent in the fourth quarter of 2010?

3       A.   No, because I haven't studied that.  I know

4   they have more than 30 models of smartphones, and you're

5   not accusing the majority of them.

6       Q.   Okay.  Can we look at the next page, page 19,

7   of the exhibit.

8       A.   Yes, we may.

9       Q.   And what you'll see there is a chart showing

10  mobile phone churn.  And I can tell you that there's a

11  definitions page on page 6 that tells you what "mobile

12  phones churn" means, and it's probably worth reading

13  that into the record.

14          So now I'm at APLNDC10809.6.  And it says,

15  Churn and loyalty last 6/12 months.  Churn and loyalty

16  analysis is run in a similar way to switching on a

17  continuous panel and identifies the proportion of a

18  brand's owners that have churned/left OA from the brand

19  over the course of the last year.  Loyalty is the

20  inverse of this figure.  For churn, loyalty and

21  switching, base size depends on the brand and is

22  representative of how many panelists have switched or

23  churned from it relative to the brand size.

24          Okay.  So can you turn back to page 19 of the

25  exhibit.  So it has mobile phone churn, past six months.

Confidential Attorneys' Eyes Only

Page 169

1    And for Apple it shows 98 percent in blue and 2 percent

2    in green.  So 2 percent of Apple users left the brand?

3         A.   That would be the churn figure.

4         Q.   And for Samsung, 89 percent are in blue and

5    12 percent left the brand.  So 89 percent stayed with

6    Samsung and 12 percent left?

7         A.   Right.  But someone is not doing their rounding

8    right because that's 101 percent, but, yes.

9         Q.   Well, they were rounding both numbers?

10        A.   But they didn't round them right.

11        Q.   Okay.  Can you turn to page 24.

12        A.   Yes.

13        Q.   This page says, Switchers into iOS past six

14   months.  iOS is Apple's operating system.  And then

15   there's a graph -- a bar on the left that shows, in

16   blue, 77 percent and in green, 23 percent.  And the

17   green represents switch to iOS.  The blue is already

18   owned.  And then it goes on to show you the breakout of

19   the 23 percent that switched to the Apple operating

20   system.

21             Do you see that?

22        A.   I do.

23        Q.   So this is -- is an effort to analyze who are

24   the people who are switching over to the Apple system?

25        A.   I believe that's what this page is trying to

Confidential Attorneys' Eyes Only

Page 170

1    display.

2         Q.    Okay.  So it shows percent -- the top circle or

3    pie chart to the right of the 23 percent, it says,

4    Percent share of iOS owners, and it shows 73 percent of

5    those were non-smartphone.

6         Do you see that?

7         A.    I do.

8         Q.    Okay.  So 73 percent of the people who switched

9    to the Apple operating system didn't have a smartphone

10   before they bought Apple?

11        A.    That is correct.

12        Q.    And just -- if I do my math right, and there is

13   not a rounding problem, it looks to me like about

14   1 percent of those people who switched to the Apple

15   operating system came from Android.

16        A.    If my recollection is right, it's 0.7 percent.

17        Q.    Very little?

18        A.    Yeah.

19        Q.    Where did you get that number from?

20        A.    I think from this document, if my recollection

21   is correct.  I don't remember, sitting here right now,

22   but that number is in my head.

23        Q.    Once a consumer is choosing an Android phone,

24   Apple was having very, very little success getting them

25   to switch to the Apple operating system; true?

Confidential Attorneys' Eyes Only

Page 171

1      A.    In this six-month period that is correct.

2      Q.    Okay.  And do you have any reason to think that

3   that has changed?

4      A.    No.  I -- I -- that makes sense to me, because

5   my understanding is that Android has a lot of features

6   and is a terrific operating system --

7                 (Interruption.)

8            MR. OVERSON:  Shall we take a break?

9            THE VIDEOGRAPHER:  The time is 3:14 p.m., and

10  we are off the record.

11               (Recess taken, from 3:14 to 3:18.)

12           THE VIDEOGRAPHER:  The time is 3:18 p.m., and

13  we are on the record.

14           BY MR. OVERSON:

15     Q.    Okay.  I think we were looking at page

16  APLNDC10809.24 and talking about where the switchers

17  came from, the people who switched to the iOS Apple

18  system.  And I think you told me that it was 0.7 percent

19  came from Android environment.

20     A.    That's my recollection.  I was looking at the

21  break in this document to see if it was in this

22  document, and it appears not to be.  So I -- that

23  recollection is from some other source.

24     Q.    Okay.  Well, that looks consistent with the pie

25  chart, in any event.  And if you look at the numbers

Confidential Attorneys' Eyes Only

Page 172

1    added up, it's around 1 percent.  Okay.

2        A.    .7 rounds to one.

3        Q.    So now let's look -- if you look at the next --

4    well, I'll do the other pie chart first before we go to

5    the next page.

6            They also broke down the data by the source of

7    the switchers by carrier, and they found 69 percent of

8    the switchers came from upgraders.  So in other words,

9    those are people who were already on the same carrier

10   and upgrading; is that right?

11       A.    That's correct.

12       Q.    And then the 31 percent of the people who

13   switched to Apple had switched carriers; right?

14       A.    Right.  Kind of like the T-Mobile example you

15   were trying to give me earlier.

16       Q.    Right.

17            Okay.  Can you turn to the next page.  It's

18   page 25 now.  We have switchers into Android, and there

19   we saw the breakdown of -- or we see the breakdown of

20   the switchers from 34 percent already owned Android and

21   67 percent -- again, the rounding issue -- is -- are

22   people who switched into Android.

23            And then if you look in the pie chart to the

24   right, it says where those 67 percent came from.

25   71 percent were from non-smartphone sources.

Confidential Attorneys' Eyes Only

Page 173

1           Do you see that?

2      A.    I do.

3      Q.    And it looks like less than 1 percent came from

4  Apple?

5      A.    I believe that's correct as well.

6      Q.    Okay.  So at least in this study, in both the

7  case of the people who switched to Apple and the people

8  who switched to Android, in each case there was only

9  less -- 1 percent or less that came from the rival?

10     A.    That's correct.  And that's my understanding.

11  And that's why one of the reasons I don't think there's

12  irreparable harm here.  Your client lost very few

13  customers as a result of what has happened in the

14  marketplace.

15     Q.    Well, let's see.  They -- 71 percent of the

16  Android customers are coming from non-smartphone users;

17  right?

18     A.    Correct.  So by definition, that is not an

19  Apple user.

20     Q.    But those are people that might have opted for

21  an Apple phone had they not opted for a Samsung phone?

22          MR. ANDERSON:  Objection.  Lacks foundation.

23          THE WITNESS:  That is a possibility.  I agree

24  with that.

25  ///

Confidential Attorneys' Eyes Only

Page 174

1    BY MR. OVERSON:

2    Q.    So I would say as to Apple and as to Android,

3    over 70 percent of the new customers are coming from

4    people who had no smartphone?

5    A.    Right.  And that's why -- or one of the reasons

6    that I thought that your market share analysis is

7    flawed, because the market is growing.  Most of the

8    purchasers are just growing the market size, and that's

9    really distorting using a market share as an approach to

10   analyze what's happening.

11   Because a smaller market share of a bigger

12   market, you may still be doing significantly better than

13   you did in the past.

14   Q.    But if you are getting a lesser share of the

15   market, you're missing out on more sales than you were

16   before because the market is growing; right?

17   MR. ANDERSON:  Objection.  Incomplete

18   hypothetical.  Lacks foundation.

19   THE WITNESS:  I agree with your logic.

20   BY MR. OVERSON:

21   Q.    Okay.  Can you turn into your declaration to

22   paragraph 37, please.

23   A.    Yes.

24   Q.    Okay.  Here you note that the iPhone 4 was

25   released on June 24, 2010, and that Samsung released 23

Confidential Attorneys' Eyes Only

Page 175

1   smartphones since the launch of iPhone 4.  And then I'm

2   going to read the second-to-last sentence of the

3   paragraph.

4           Quote, thus the situation has been such that

5   Apple's aging technology is forced to compete

6   continuously with Samsung's latest offering with various

7   superior features.  In addition, Apple's -- has also had

8   to compete with the most recent releases from every

9   other handset manufacturer, end quote.

10          So what you're saying here, if I understand you

11  correctly, is that the iPhone 4, because it's a year and

12  four months old or a year and three months old is aging

13  technology?

14      A.   It is in this market, absolutely.

15      Q.   And it's being forced to compete with Samsung's

16  latest offering.  You mean the 23 smartphones Samsung

17  has issued in the last year and three months?

18      A.   Yes.

19      Q.   Okay.  In paragraph 38, you note, Other

20  competitors, HTC, LG and Hu- -- Huawei -- I'm not sure

21  how to pronounce that.  H-U-A-W-E-I.

22          And you state, Each of these businesses

23  markedly increased its presence in recent quarters,

24  making the marketplace for smartphones all the more

25  competitive.

Confidential Attorneys' Eyes Only

Page 176

1    Do you see that?

2    A.    I do.

3    Q.    Do you think the market for smartphones is more

4    competitive than ever now?

5    A.    I do.

6    Q.    And in that kind of a marketplace, a company

7    needs to take any advantage it can over its competition;

8    right?

9    A.    I would agree with that statement.

10    Q.    And one edge that a company could have is

11    distinctive design; right?

12    A.    It is.

13         MR. ANDERSON:  Objection.  Vague.

14         BY MR. OVERSON:

15    Q.    Okay.  I'm going to direct your attention to

16    page 14 of your declaration.  It shows a graphic of

17    market share of worldwide smartphone sales to end users,

18    first quarter 2008 through first quarter 2011.

19         And this, again, shows Apple v. Samsung; in

20    other words, Apple's market share versus Samsung's

21    market share?

22    A.    The top chart does do that, yes.

23    Q.    Do you see on the Samsung chart that it goes

24    from 4 and -- maybe 4.25 percent to something like

25    12 percent between the second quarter of 2010 and the

Confidential Attorneys' Eyes Only

Page 177

1   fourth quarter of 2010?

2       A.   Yes.

3       Q.   And what do you attribute that to?

4       A.   The introduction of all the phones that they

5   introduced in that time period and their market

6   acceptance of those phones.

7       Q.   And was the -- you note here the GALAXY S was

8   released July 15th, 2010.

9            Is that the biggest release that Samsung had?

10           MR. ANDERSON:  Objection.  Vague.  Calls for

11  speculation.  Lacks foundation.

12           THE WITNESS:  I would say in the U.S., it is.

13  But, again, it's a little misleading because this is

14  worldwide data.  And of course they introduced, I think,

15  similar models in other countries.  And I don't know all

16  the release dates.

17           BY MR. OVERSON:

18      Q.   But the GALAXY S is the biggest smartphone that

19  Samsung sells in the U.S.?

20           MR. ANDERSON:  Objection.  Vague as to "the

21  biggest."

22           THE WITNESS:  I think it's the largest volume

23  of sales.

24           BY MR. OVERSON:

25      Q.   Okay.  And was that the -- and the most

Confidential Attorneys' Eyes Only

Page 178

1    impactful in terms of market share?

2            MR. ANDERSON:  Same objection.

3            BY MR. OVERSON:

4    Q.    That would make sense?

5            MR. ANDERSON:  Sorry.  Objection.  Vague as to

6    "impactful."

7            THE WITNESS:  I would expect that it was.

8            BY MR. OVERSON:

9    Q.    Yeah.  Because these are -- these are measured

10   in units, aren't they?  Or is it measured in dollars?  .I

11   don't know.

12   A.    Good question.  I'll have to go back to the

13   data to confirm whether it's units or dollars.  I

14   believe it's units.

15   Q.    Okay.  Can you turn to page 17 of your

16   declaration.  And I'm going to turn now to the section

17   of your report that says, Tablet market.

18           And on paragraph 44 you write, At the time of

19   its release on January 27th, 2010, the Apple iPad was

20   described by some as creating an entirely new product

21   category.

22           And would you agree that as of the time of the

23   Apple iPad's release, it had created an entirely new

24   product category?

25   A.    Yes.

Confidential Attorneys' Eyes Only

Page 179

1      Q.    So at that point it had 100 percent of the

2   market?

3      A.    It did.

4      Q.    And then you have a graphic on page 18 of your

5   declaration that shows Apple's market share going down

6   to something like 61 percent as of the second quarter of

7   2011?

8      A.    That's accurate.

9      Q.    And the Android market share at almost exactly

10   30 percent as of the second quarter of 2011?

11      A.    Yes.

12      Q.    Do you know how much of that is Samsung?

13      A.    Not precisely.  I think the two biggest

14   providers are Samsung and HTC.  But what exactly their

15   percentages are of that, I don't know.  I think I've

16   seen some data, but it's nothing I've committed to

17   memory.

18      Q.    So looking at this chart -- let's just, first

19   of all, make clear that the GALAXY Tab 10.1 sales of

20   Samsung would be in the Android line; correct?

21      A.    Clearly.

22      Q.    And how many sales is Samsung making of the --

23   I think it was called the 8.9-inch?

24      A.    I don't have that information.  I don't know.

25      Q.    And you recall that that 10.1 was not issued in

Confidential Attorneys' Eyes Only

Page 180

1    the United States until June 2011; right?

2        A.   That is correct.

3        Q.   Was it -- was it selling abroad?

4        A.   For some reason I have some recollection it was

5    introduced in other markets earlier, but I don't know

6    that for certain because it wasn't relevant to my work

7    in this case.

8            (Marked for identification purposes,

9            Exhibit 185.)

10           BY MR. OVERSON:

11       Q.   Okay.  Exhibit 185 is a Wall Street Journal

12   article, and it is dated August 25th, 2011.

13           And if you look, the second-to-last paragraph,

14   it says, However, Samsung is quickly challenging that

15   dominance.  And there's a reference -- and the line

16   before has to do with the iPad dominating the tablet

17   market.

18           It goes on to say, Its global smartphone market

19   share was 17.5 percent in the second quarter, just

20   1 percentage point behind Apple, according to Strategy

21   Analytics.  In the last three months of 2010, the

22   earlier version of Samsung's Tab took 17 percent of the

23   10.1 million tablets shipped globally, reducing Apple's

24   share to 73 percent from 93 percent in the previous

25   quarter, according to IDC.

Confidential Attorneys' Eyes Only

Page 181

1          Okay.  So there's different concepts going

2    here.  The first one, it says its global -- Samsung's

3    global smartphone's market share was 17.5 percent in the

4    second quarter -- I think they're reading 2011.  It's

5    just one percentage point behind Apple.

6          Is that your understanding?

7    A.    Yes.

8    Q.    So Samsung is only 1 percent behind Apple

9    globally on smartphones?

10   A.    Yes.

11   Q.    So they are neck and neck right now?

12   A.    As far as units, yes.

13   Q.    And then they talk about the earlier version of

14   Samsung's Tab took 17 percent of the tablet market,

15   reducing Apple's share from 93 percent to 73 percent.

16         Do you see that?

17   A.    I do.

18   Q.    They're attributing that all to the -- or

19   17 percent of that to the older Tab.

20         Do you understand that?

21   A.    I do.

22   Q.    Okay.  And have you seen any numbers for the --

23   a newer Tab, the Tablet 10.1, that was released in June

24   of 2011 in the United States?

25   A.    I have not.

Confidential Attorneys' Eyes Only

Page 182

1    Q.    But you recall, that is the tablet that is more

2    similar to the iPad 2?

3          MR. ANDERSON:  Objection.  Lacks foundation.

4    Mischaracterizes the evidence.

5          THE WITNESS:  At least based on the judgment of

6    one industry observer who we've discussed earlier in

7    this deposition.

8          BY MR. OVERSON:

9    Q.    Okay.  The end of this article is, In other

10   words, if there is any company that is ready now to take

11   on Apple, it's Samsung.  That means this battle will be

12   ongoing.

13         Do you see that?

14   A.    I do.

15   Q.    And do you agree that Samsung is now Apple's

16   principal competitor in the smartphone and -- and tablet

17   markets?

18         MR. ANDERSON:  Objection.  Vague.

19         THE WITNESS:  I would need more information to

20   know.  I think I would be more in agreement with this

21   statement in the tablet market than in the smartphone

22   market.  I don't think it's -- I don't think it's that

23   clear in the smartphone market.

24         BY MR. OVERSON:

25   Q.    So you agree that Samsung is Apple's principal

Confidential Attorneys' Eyes Only

Page 183

1    competitor in the tablet market?

2        A.    I think as of today, I would agree with that

3    assessment.

4        Q.    And in the smartphone market, you see -- I

5    believe it was HTC.  Was that the other one that you

6    saw?

7        A.    Yeah.  They're bigger in the United States.

8    The market that's relevant to why we're here.

9        Q.    They're -- they're close to Samsung, though,

10   aren't they?

11            MR. ANDERSON:  Objection.  Vague.

12            THE WITNESS:  It depends what you mean by

13   "close."  But I think they are four or five percentage

14   points higher.

15            BY MR. OVERSON:

16       Q.    As of now?

17       A.    Yes.

18       Q.    What data are you relying on for as of now?

19       A.    Data that you showed me in that graph in

20   Exhibit 163.

21       Q.    This exhibit (indicating)?

22       A.    Yes.

23       Q.    So that graph -- this data is, I think, not

24   dated as of now.

25       A.    Yeah.  That's the most recent data that I have.

Confidential Attorneys' Eyes Only

Page 184

1   Q.   It goes up to Q4, 2010.

2   A.   Correct.

3   Q.   So you don't have any more recent data than

4   that?

5   A.   I don't.  If I did you would have seen it in my

6   declaration.

7   Q.   Okay.  Can you turn to paragraph 52 of your

8   declaration, please.

9   A.   Yes.

10   Q.   In paragraph 52 you're talking about a Retrevo

11   study and state that, not every tablet consumer is in

12   the market for an iPad.  For that reason, it could very

13   well be the case that increases in market share earned

14   by other tablet manufacturers are simply sales to

15   consumer segment outside of that to which Apple sells.

16        So you're -- you're -- I think what you're

17   saying is some people may want, for example, a Android

18   operating system on their tablet; is that --

19   A.   That's one possibility, yes.

20   Q.   Okay.  Have you ever seen -- let me ask you

21   this:  What tablets have you looked at?

22   A.   Personally?

23   Q.   Yes.

24   A.   I've seen the iPad 2, and I've seen the Samsung

25   10.1.  I think those are the only two I've ever touched

Confidential Attorneys' Eyes Only

Page 185

1    myself.  But not in connection with my work on this

2    case.

3         Q.   Have you seen any tablet made by another

4    manufacturer?

5         A.   I believe I've seen some other ones --

6         Q.   Okay.

7         A.   -- like on an airplane.

8         Q.   And do you recall whether they looked more --

9    do they look different from what the Samsung Tablet 10.1

10   looks like?

11        A.   I'm not remembering it enough to answer your

12   question.

13        Q.   The Retrevo study, I see that on page 22 you

14   have a pie chart where 21 percent answered the question,

15   Are you planning to buy a tablet this year?  And, Yes,

16   an Android tablet.

17             And is that -- I mean, that -- those are people

18   who have seen the GALAXY Tab 10.1; right?

19             MR. ANDERSON:  Objection.  Lacks foundation.

20             THE WITNESS:  I have no idea what the

21   respondents to this survey know or don't know.  I have

22   not seen the survey questionnaire or how it was

23   conducted.

24             I do recall looking at the information where I

25   took this from that the results are statistically

Confidential Attorneys' Eyes Only

Page 186

1  significant.  But how the survey was designed and what

2  was asked, I don't know.

3       BY MR. OVERSON:

4       Q.   It could be that people are saying, Yes, an

5  Android tablet because they've seen the design of

6  Samsung's tablet and they liked it; right?

7       A.   That is possible.

8       Q.   Okay.  On paragraph 54 you talk about rare --

9  some -- one of the rare delays of Apple having to do

10  with the product -- having to do with the deliveries of

11  iPad 2s.

12       Are you with me?

13       A.   I am.

14       Q.   Okay.  Do you have any evidence that there are

15  any delays with iPad 2s today?

16       A.   I don't.

17       Q.   As far as you know, you can walk in the store

18  and buy one?

19       A.   I'm pretty sure you can, because I think people

20  are waiting for the iPad 3 at this point.  So I think

21  there's probably plenty of iPad 2s.

22       Q.   Do you have any information about when iPad 3

23  is coming out?

24       A.   I have seen rumors.

25       Q.   If you look at paragraph 57, you state that,

Confidential Attorneys' Eyes Only

Page 187

1   Further supporting the proposition that Apple would not

2   suffer irreparable harm if Samsung's products at issue

3   were found to infringe is that Apple did not appear to

4   suffer irreparable harm (or any demonstrable harm) when

5   previous versions of the Samsung's products at issue

6   were released into the market.  Since Samsung's products

7   were launched, sales of the corresponding iPhone and

8   iPad have continued to increase.

9            So you're not saying that because sales

10  increased there was no harm, are you?

11       A.   Asked and answered.  I am not.

12       Q.   You're not.

13            Okay.  I guess I don't understand, if that's

14  not your point, what is the point of this paragraph?

15       A.   Well --

16       Q.   I don't mean to be argumentative.  I'm just

17  trying to get -- I'm trying to understand, you're

18  pointing to the fact that sales are increasing, but it's

19  a growing market.  We've gone over that.  And Apple

20  could definitely be harmed by Samsung's infringing

21  products that we're assuming to infringe while still

22  increasing their sales; right?

23       A.   I agree with everything you said.

24       Q.   So is it that you're saying there could be

25  harm, but it's not irreparable?

Confidential·Attorneys' Eyes Only

Page 188

1    A.    Exactly.   These are -- this is harm -- there's

2    no harm, in my professional judgment, to their brand, to

3    their reputation at all from what I've seen.   From the

4    evidence that I have considered.

5           Have they lost sales?   Possibly.   Once I get

6    enough information from both parties, can I compute

7    damages?   You bet I can.   And that will make your client

8    whole.

9    Q.    And you say that because you think the only

10   damage that Apple has suffered is the loss of sales of

11   its products or the -- sorry.   Strike that.

12          You're saying you could make them whole because

13   you can compensate for the lost profits on the initial

14   sales and any kind of conveyed sales and future sales

15   and any other kind of sales that result from

16   infringement?

17   A.    It's my experience I can do that.

18   Q.    And you don't -- you don't think that they've

19   suffered any kind of harm to their goodwill?

20   A.    I don't.

21   Q.    You don't think it's harmful that they have to

22   face competition against a design that they have an

23   exclusive right to?

24          MR. ANDERSON:   Objection.   Assumes facts in

25   evidence.   Vague.

Confidential Attorneys' Eyes Only

Page 189

1    THE WITNESS:   I think if you prevail on
2  liability, that my client has harmed Apple by their
3  presence in the marketplace, I believe I can reasonably
4  calculate what that harm is in lost profits to your
5  client.

6        BY MR. OVERSON:
7    Q.   If Samsung becomes the number one smartphone
8  seller as a result of infringement, just take that --
9  let's assume that -- do you think there is no harm other
10  than the specific lost sales involved?

11        MR. ANDERSON:   Objection.   Incomplete
12  hypothetical.

13        THE WITNESS:   No.   I think there's additional
14  harm, and that is, as you've made me admit to you, that
15  there are accessory sales where they make profits, and
16  there's some loss of future sales that may occur.   So I
17  think those are all harm that could be measured.

18        But, again, it's patently clear to everyone in
19  the world that you've taken the position that Samsung is
20  copying your products.   Everybody who is any --
21  knowledgeable at all in the tech world knows that.

22        I don't see how -- what my client did is
23  harming the reputation of your client at all.

24        BY MR. OVERSON:
25    Q.   I think my question went to if Samsung becomes

Confidential Attorneys' Eyes Only

Page 190

1   number one in smartphone sales worldwide --

2        A.   Oh, I'm sorry.  I was not responsive.

3        Q.   -- there would be additional harm beyond the

4   lost sales-type calculation?

5        A.   Only if you can link it to the infringement in

6   this case, which I don't think you're going to be able

7   to do.  Because I think the reason why Samsung is going

8   to become number one has nothing to do with copying

9   these three design patents and infringing the one

10  utility patent that's asserted in this case.  They're

11  successful because of other things.

12            Unless you can prove that the primary cause of

13  their success is due to the infringement contentions in

14  this case, no, I think the fact they're number one is

15  because they're competing in the marketplace with better

16  technology.

17       Q.   Based on that answer, if you could -- if there

18  could be a link established between Samsung's increased

19  sales and the infringement, then there would be

20  irreparable harm; right?

21       A.   No.

22            MR. ANDERSON:  Objection.  Incomplete

23  hypothetical.  Calls for speculation.

24            THE WITNESS:  No.  Then I think you could prove

25  lost profits.  If you can't -- if you can't establish

Confidential Attorneys' Eyes Only

Page 191

1    that linkage, all you're entitled to is a reasonable

2    royalty, which, again, will make your client whole.

3              BY MR. OVERSON:

4         Q.   Well, what if they dropped that number one

5    sale -- seller to number two seller, there would be an

6    additional harm there beyond the reasonable royalty;

7    right?

8              MR. ANDERSON:  Same objections.

9              THE WITNESS:  It may be.  But it may not be

10   harm that's caused by what's alleged in this case, and

11   that's not compensable, and it's not irreparable harm

12   for a preliminary injunction.  In fact, that would be an

13   injustice if that's what happened.

14             BY MR. OVERSON:

15        Q.   It's not compensable why?

16        A.   Because the reason why you fell to number two

17   is for reasons unrelated to the alleged infringement in

18   this case.

19        Q.   But if Apple could establish that Samsung's

20   increase in sales related to the infringement in this

21   case, then it would be irreparable harm; right?

22             MR. ANDERSON:  Objection.  Asked and answered.

23   Lacks foundation.  Incomplete hypothetical.

24             THE WITNESS:  Yeah.  It is incomplete.  I'd

25   need more facts to know.  Under some sets of

Confidential Attorneys' Eyes Only

Page 192

1   circumstances, it's possible, although I think unlikely.

2   But it depends on a lot of things that need to happen

3   that I don't have that information today.

4           I think a lot of your arguments go to a

5   permanent injunction, not to a preliminary injunction.

6           BY MR. OVERSON:

7   Q.   If at the end of the case Apple shows that

8   Samsung's increase in sales is linked to its use of

9   Apple's design, would you then agree that Apple would be

10  suffering irreparable harm?

11          MR. ANDERSON:  Objection.  Lacks foundation.

12  Incomplete hypothetical.

13          THE WITNESS:  I'm not sure what you mean by

14  "linked."  If you prove the proximate cause is what's

15  alleged in this case, then, yes.  Of their success.

16  That is why Samsung has become a leader and your client

17  is no longer the leader.  If you could establish that

18  proximate causation, then, yes.  Otherwise, no.

19          And that's not a legal opinion.  That's my

20  opinion as a damage expert.

21          (Marked for identification purposes,

22          Exhibit 186.)

23          BY MR. OVERSON:

24  Q.   Okay.  We've marked as Exhibit 186 the 2010

25  Samsung Electronics Annual Report.  And I'm going to

Confidential Attorneys' Eyes Only

Page 193

1    direct your attention to page 17 of the annual report.

2        A.    I'm there.

3        Q.    And there's a heading on this page, "Mobile

4    Communications," and then it says, Broadening the

5    horizon for smart living with a wide range of smart

6    mobile devices.

7            Underneath that it says, In 2010 Samsung

8    Electronics reinforced our market leadership by

9    achieving sales of 280 million mobile phones worldwide,

10   up 23 percent over 2009, and a double-digital increase

11   in operating profits.

12           Is it your understanding that that is the total

13   phones, not just smartphones?

14       A.    Yes.

15       Q.    Okay.  It goes on to say, Our flagship GALAXY S

16   model posted sales of 10 million units, while the GALAXY

17   Tab also led the Android tablet PC market, earning

18   glowing customer reviews.  Our leadership in full touch

19   and messaging mobile phones continued in both advanced ·

20   and emerging markets.  In 2011 we plan to aggressively

21   challenge a market that grows ever more competitive.  By

22   launching GALAXY S2, our flagship strategy smartphone,

23   we will emphasize our category leadership and provide

24   readily available lineup options for global customers.

25   We are expanding and improving Samsung's unique mobile

Confidential Attorneys' Eyes Only

Page 194

1    solutions as we strengthen our competitive lead in both

2    services and content.

3              Okay.  Did I read the whole paragraph there?

4    A.    You did.  And you read it correctly.

5    Q.    That's rare.

6              Okay.  In 2011, did -- did -- based on your

7    review, have you seen that using the GALAXY S model and

8    the GALAXY Tab, Samsung has aggressively challenged the

9    market in the United States?

10             MR. ANDERSON:  Objection.  Lacks foundation.

11             THE WITNESS:  I don't have a lot of information

12   on 2011 at this stage, but clearly that is the intent of

13   Samsung.  And I think they have been largely successful

14   in what they are planning on doing.

15             BY MR. OVERSON:

16   Q.    Okay.  If you look on page 4 of the exhibit,

17   which is, again, the 2010 Samsung annual report, there's

18   another mention of mobile phones.

19             If you look in the left-hand column, the

20   heading is "Strengthening Leadership Through

21   Differentiation."  And then in the second paragraph,

22   four lines down, you'll find the following sentence:  We

23   will -- We will bolster our leadership in mobile phones

24   as we aim to become the world's number one handset

25   producer.

Confidential Attorneys' Eyes Only

Page 195

1          Do you see that?

2     A.    I do.

3     Q.    So in 2011, Samsung set for itself the goal --

4  I'm sorry.

5          In 2010 it set for itself the goal to become

6  the world's number one handset producer?

7          MR. ANDERSON:  Objection.  Lacks foundation.

8          THE WITNESS:  Yes.  It -- for all mobile

9  phones, yes.

10          BY MR. OVERSON:

11     Q.    Do you understand that one of the challenges

12  that Apple faces is keeping the developers of software

13  apps for its products interested in its product line?

14     A.    I do.

15     Q.    And if Apple is no longer the number one seller

16  of smartphones, would you agree that it will be a bigger

17  challenge for Apple to keep the focus of software

18  developers on its products rather than on the Android

19  system?

20          MR. ANDERSON:  Objection.  Vague.  Assumes

21  facts not in evidence.  Incomplete hypothetical.

22          THE WITNESS:  I see no reason why that would

23  happen as long as they are one of the top two suppliers

24  in the world.

25

Confidential Attorneys' Eyes Only

Page 196

1      BY MR. OVERSON:

2      Q.    Would you agree, though, that when you're the

3  leading seller in the world, it's easier to keep people

4  focused on you for further development of software apps

5  than if you're not number one?

6          MR. ANDERSON:   Same objections.

7          THE WITNESS:   Generally, everything else being

8  equal, I would agree with that.

9          BY MR. OVERSON:

10     Q.    Okay.  Can you turn to paragraph 66 of your

11  declaration, please.

12          Here you're talking about an article.   It's

13  "The Smartphone Operating System Shootout:   Android

14  versus iOS versus Windows Phone."

15          And you state, According to the same article,

16  the three top platforms are, unsurprisingly, iOS,

17  Android and Microsoft's Windows Phone 7.   Ultimately,

18  the author concludes, any one of these platforms will

19  serve you well, each catering to the preference of a

20  certain audience.

21          If the platforms -- and have you seen that --

22  is this reflective of a general view that the platforms

23  both have their advantages and disadvantages?

24     A.    I would agree with that statement.

25     Q.    So that neither one is superior to the other?

Confidential Attorneys' Eyes Only

Page 197

1          MR. ANDERSON:  Objection.  Vague.

2          THE WITNESS:  Oh, no.  I think certain -- for

3    certain requirements, one operating system is superior

4    to the other, but there isn't one that's universally

5    better than the other.  At this point.

6          BY MR. OVERSON:

7     Q.   For a regular consumer, not your "techie

8    reading CNET and Wired all the time" people, but your

9    regular consumer who goes in and buys a phone, would you

10   agree that each of the platforms will serve them well?

11         MR. ANDERSON:  Objection.  Assumes facts not in

12   evidence.  Counter to facts.  Hypothetical.  Incomplete

13   hypothetical.

14         THE WITNESS:  I'd probably need more facts to

15   know.  But generally I think these three platforms and

16   it's -- time will tell whether Windows Phone 8 will

17   be -- will have that characteristic, because I

18   understand it's moving away from icons, and that's going

19   to be very interesting.

20         BY MR. OVERSON:

21    Q.   At least with respect to the two leading

22   systems, iOS, the Apple system, and Android, which

23   Samsung is using, for your regular purchaser who doesn't

24   have any special requirements, both of those serve as --

25   both of those platforms would serve them well, as stated

Confidential Attorneys' Eyes Only

Page 198

1   in this article; isn't it true?

2          MR. ANDERSON:  Objection.  Assumes facts not in

3   evidence.  Incomplete hypothetical.

4          THE WITNESS:  I believe I agree with this

5   assessment as of today.

6          BY MR. OVERSON:

7      Q.   And you're a customer and you're looking at

8   these operating systems and they both serve you well,

9   you're going to start focusing on other characteristics

10  to decide which one of them to buy; right?

11         MR. ANDERSON:  Same objections.

12         THE WITNESS:  I think if the operating system

13  is perceived to be equivalent by the purchaser, they're

14  going look more at the particular features of the phone

15  that is running that operating system and its price to

16  make a decision.

17         BY MR. OVERSON:

18     Q.   And another one of the features to look at is

19  design?

20         MR. ANDERSON:  Objection.  Vague.

21         BY MR. OVERSON:

22     Q.   Right?

23     A.   Yes.  I believe that's correct.

24     Q.   Okay.  Here I'm looking at page 66 of your

25  declaration.  It goes on -- you continue the quote, and

Confidential Attorneys' Eyes Only

Page 199

1   you -- and the quote is, For its features, customization
2   options and openness, Android has no peer.  And then --
3   that's the end of the quote.
4        And then you wrote, But -- and then it
5   continues the quote -- if you are looking for the most
6   elegant, simplest-to-use phone with the best integration
7   of hardware and software and with the biggest number of
8   apps to choose from, you'll likely opt for iOS and the
9   iPhone, end quote.
10       And the "most elegant" refers to the design of
11  the iPhone, doesn't it?
12       MR. ANDERSON:  Objection.  Calls for
13  speculation.
14       THE WITNESS:  I don't know.
15       BY MR. OVERSON:
16   Q.   You don't know whether the author was trying to
17  say that Apple had the most elegant design?
18   A.   The author doesn't say that.  So, no, I don't
19  know.  That's an ambiguous statement.  It could mean a
20  couple of things.
21   Q.   One interpretation of that "most elegant" would
22  be that the design of the product is the most elegant;
23  true.
24   A.   That's true.
25   Q.   And what would be the other interpretation?

Confidential Attorneys' Eyes Only

Page 200

1          MR. ANDERSON:   Objection.   Calls for

2   speculation.

3          THE WITNESS:   That this is a converged device;

4   that the converged device integrates all this different

5   functionality in the best way.   I think that's probably

6   what I would read from this sentence.

7          BY MR. OVERSON:

8   Q.    Okay.   And if you look on to paragraph 67,

9   you're discussing an article published by PC World.   And

10  they talk about the war between Android and iOS.

11         And the last sentence of your paragraph says,

12  Reaching a similar conclusion, this article noted that,

13  quote, there is -- there's a lot to love about both

14  platforms, but feature for feature, it's often hard to

15  distinguish which platform is superior, especially when

16  you factor in third-party apps.   End quote.

17         Do you see that?

18  A.    I do.

19  Q.    So that's consistent with what we saw above,

20  that either one of these platforms would serve you well?

21  A.    I think that statement is consistent.

22  Q.    So, again, unless a customer has a particular

23  need for a particular function, if they can't

24  distinguish which platform is superior, would you agree

25  that they're going to look at other factors to decide

Confidential Attorneys' Eyes Only

Page 201

1    which phone to buy?

2         A.    Yes.

3         Q.    Okay.   Then we're -- I'm going turn to

4    paragraph 69.

5              There you're talking about a survey from

6    Business Insider.   And one of the questions asked was,

7    What might make you buy an iPhone instead?   And more

8    than 55 of the survey responses indicated that they

9    would not buy an iPhone instead of their Android.

10             So I guess my first issue here is this is in --

11   this survey is taking into a world where there's Samsung

12   GALAXY S phones, so this is not a survey where they're

13   saying you don't get to have the design of the iPhone.

14   This is assuming that the GALAXY S is in the market of

15   the Android -- I'm sorry, on the Android side of the

16   market?

17        A.    Well, clearly, I think that this is a

18   real-world survey, that some of the respondents probably

19   had a accused phone in this case, but clearly not the

20   majority or all of them.

21             (Marked for identification purposes,

22             Exhibit 187.)

23             BY MR. ANDERSON:

24        Q.    Okay.   Exhibit 187 is a article in Business

25   Insider, and the -- there's a couple of things that

Confidential Attorneys' Eyes Only

Page 202

1   could be read as the title.

2          There's -- at the top of the page, it's

3   "Smartphone Survey:  Why people choose Android versus

4   iPhone."  Then underneath the Business Insider logo, it

5   says, The truth about smartphones:  Our exclusive survey

6   on iPhone versus Android.

7          And the -- the people were asked what might

8   make you buy an iPhone instead.  And then there were

9   four choices they had to respond to; right?

10      A.    Yes.

11      Q.    And one of them was, Nothing, I hate Apple.

12            Do you see that?

13      A.    I do.

14      Q.    And that had 55 percent?

15      A.    55.7 percent.

16      Q.    Do you think this is a representative sample of

17   the general public?

18      A.    I understand that this survey was done of both

19   Android and iOS users.  I don't recall this being a

20   statistically significant survey.

21      Q.    Do --

22      A.    So I don't know whether it's biased or not.

23      Q.    We saw earlier that Apple was valued as the

24   most valuable brand in the world?

25      A.    Yes.

Confidential Attorneys' Eyes Only

Page 203

1    Q.    Wouldn't that indicate that most people have a

2    positive view of Apple?

3           MR. ANDERSON:  Objection.  Lacks foundation.

4           THE WITNESS:  I think Apple is one of those

5    companies that you either love them or hate them.  I

6    think a lot of people love Apple.  But I also think

7    there are a significant number of people that hate Apple

8    and, no matter how good their products are, would never

9    buy an Apple product.

10          BY MR. ANDERSON:

11    Q.    So if you look, there's some commentary, and

12   some of it might be more pertinent than your average

13   commentary on these surveys.

14    A.    I wouldn't agree with that.  Again, people

15   really are an extreme at one of these love/hates are the

16   people who write these responses.  But I've read some of

17   them.  They are humorous.

18    Q.    Okay.  The first response is simply, You should

19   go back and look at the choices for that question.  The

20   hate Apple option wasn't what I wanted to pick.  There

21   just was no actual answer that matched my response.

22           Do you see that?  That's the first commentary.

23    A.    I do.

24    Q.    Look at the second one.  Would you?  It's from

25   Oakley, Los Angeles, California, April 19th, 7:27 a.m.

Confidential Attorneys' Eyes Only

Page 204

1    Did you even look at the survey?  The whole
2  thing was written on a slant.  The original title was
3  "Why would anyone ever buy an Android phone?  Take our
4  smartphone survey and tell us."
5    Do you see that?
6    A.   M-hm.
7    Q.   So --
8    A.   I do.  I'm sorry.
9    Q.   -- do you know whether that's correct about
10  this survey; that the way they attracted people to take
11  it was with the question, Why would anybody ever buy an
12  Android phone?
13    A.   I did read that that was what they originally
14  titled the survey, and then when they had too many
15  Android respondents, they changed the title, yes.
16    Q.   Would you agree with me that if you write a
17  title that's provocative, like, "Why Would Anybody Ever
18  Buy an Android Phone?" you might get a more vigorous
19  pro-Android response than otherwise?
20    A.   I think you would.  Again, as part of
21  this thing that -- there's part of the world that's
22  Android and part of the world Apple, and no matter what
23  happens in this case, the technology are never going
24  cross the line.  And those are the type of people that
25  are going to respond with these statements in these

Confidential Attorneys' Eyes Only

Page 205

1   blogs.  It's not vast majority of people.

2       Q.   So by having the survey -- advertisement for

3   the survey say, Why would anyone ever buy an Android

4   phone, aren't you more likely to attract the more

5   adamant Android supporters than if you just had it be a

6   more neutral title?

7       A.   I think you're going to attract both the Apple

8   lovers and the Android lovers.  I think you'd attract

9   both.

10      Q.   So this is a group of people who had bought

11  Android already, and the question was, What would make

12  you buy an iPhone instead; is that right?

13      A.   You'd have to refresh my recollection whether

14  that's true or not.  I don't remember that.

15      Q.   If you look above the chart on the first page,

16  it says, Among Android users, most say they will never

17  buy an iPhone because they hate Apple.

18      A.   Right.  But then the next sentence talks about

19  other people that responded to the survey.  So, no, I

20  don't think your characterization was correct.

21           See, my recollection was a third of the

22  respondents were Apple users and about half were Android

23  users.

24      Q.   So I'll give you an alternative explanation and

25  see if you agree with me.

Confidential Attorneys' Eyes Only

Page 206

1    A.    Okay.

2    Q.    When it said, Most of the rest, I think they're

3  saying most of the rest of the respondents.  They're all

4  Android users, but most of the rest of the responses

5  said that they would buy an iPhone if it worked better

6  with non-Apple products.

7         Do you see what I'm saying?

8    A.    I see what you're saying.  But where do you get

9  from this document that only Android users responded to

10 the survey?

11   Q.    Well, because it says, Among Android users,

12 most say they will never buy an iPhone because they hate

13 Apple, and then they have 55 percent on the I hate

14 Apple.  So that would be most.

15   A.    That still doesn't tell me that that's

16 exclusively Android users responding to the survey.

17   Q.    Do you know anything else about this survey

18 other than what's in this document?

19   A.    I don't.

20   Q.    So can you tell me whether or not -- whether it

21 was just of Android users or not?

22   A.    I'm not finding it right now.  But, again I

23 thought that somewhere I had the belief that half the

24 respondents were Android users, a third were Apple

25 users, and the balance were one of the other platforms,

Confidential Attorneys' Eyes Only

Page 207

1    but I don't know where I got that belief, sitting here

2    right now.

3        Q.    Okay.   Let's turn back to your declaration.

4    And then you present a -- in paragraph 70 on page 33 of

5    your declaration, you present some survey results to the

6    question, What is the most important factor to you in

7    choosing a particular smartphone?

8            Do you see that?

9        A.    I do.

10       Q.    And then the -- the respondents were given

11   seven choices.

12       A.    They were.

13       Q.    One of them is features.

14           Do you see that?

15       A.    Yes.

16       Q.    And that could include design features; right?

17       A.    It could.

18       Q.    That was the second choice after platform

19   features?

20       A.    Right.   But I don't think that would be

21   ornamental design features.   If it was -- if it was a

22   design, it would be functional design.   It would only

23   fit into that character -- that category, in my opinion.

24       Q.    If you ask somebody, If you don't give them --

25   a choice of design is not -- was one of the possible

Confidential Attorneys' Eyes Only

Page 208

1    selections, and one of the selections is features, you

2    don't think people would think of design features as

3    falling in there?

4        A.    Again, functional design features, yeah.

5              Features are things like what kind of camera

6    does it have?  What size screen does it have?  What is

7    resolution?  You know, can I do e-mail?  That's what

8    we're talking about.  That's what I think of when I

9    think of features.

10       Q.    The screen -- what size screen there is, that's

11   not a design feature?

12       A.    Well, I could see that as a design feature.

13       Q.    And how thick it is, that's not a -- that's a

14   design feature, isn't it?

15             MR. ANDERSON:  Objection.  Vague.

16             THE WITNESS:  To some extent it is, yes.

17             BY MR. ANDERSON:

18       Q.    And then when asked -- the second chart on

19   your -- page 34 of your report, What are other factors

20   that are important to you in choosing a smartphone,

21   check all that apply, the number one selection was

22   features.

23             Do you see that?

24       A.    I do.

25       Q.    Okay.  I'm looking at paragraph 74 of your

Confidential Attorneys' Eyes Only

Page 209

1   declaration.  Let's look at 73 first.

2          You say, A multi-country survey published by

3   GFK, a German market research company, during third

4   quarter 2010, quote, found that 56 percent of smartphone

5   owners in key global markets were keeping their options

6   open about which phone they would buy next, with only

7   Apple commanding a significant degree of loyalty.

8          Do you agree with that statement?

9   A.    I do.

10  Q.    Didn't we see, though, that the Android

11  switchers were less than 1 percent?  In other words, the

12  people who had switched from their Android system to

13  buying an Apple phone was less than 1 percent of the

14  people who switched to Apple?

15  A.    Yeah.  But what does that have to do with

16  loyalty?  They can't be loyal to Apple until they are

17  already a customer of Apple.

18         Now, are you asking me what do I think -- when

19  those small group of people come over to the iOS

20  operating system, that they're going to stick there?

21         Maybe.  Probably.  But that doesn't give me any

22  information about loyalty.

23  Q.    Well, my point was actually different, and I'll

24  try it again.

25         It said, Only Apple commanded a significant

Confidential Attorneys' Eyes Only

Page 210

1   degree of loyalty.  What we saw when we looked at the

2   numbers in the study earlier was that of the people who

3   switched to Apple, only -- less than 1 percent came from

4   Android?

5        A.   Agree with that, yes.

6        Q.   So those people -- that would suggest that the

7   people are loyal to Android?

8        A.   Yes, I agree with that.  That survey is

9   inconsistent with this statement here.  I agree with

10   that.  I think that there is a lot of loyalty to

11   Android.  It is not as high as the loyalty to Apple.

12        Q.   Is customer loyalty a form of goodwill?

13        A.   Yes.  That's almost the classic definition.

14   It's the expectation of future patronage.  If you go way

15   back in time, that's how goodwill was defined.

16        Q.   In paragraph 74, you have a quote from

17   Dr. Hannu Verkasalo, the CEO of Zokem, Z-O-K-E-M.  And

18   he noted that, quote, the figures suggest clearly that

19   iPhone is the top-performing platform in terms of user

20   loyalty and, therefore, it is an increasingly likely

21   pick for a repurchase.

22        And did you understand that to mean that a

23   person using an iPhone is increasingly likely to pick

24   another iPhone when they decide to pick -- pick --

25   purchase the next phone?

Confidential Attorneys' Eyes Only

Page 211

1    A.    Yes.

2          MR. OVERSON:    Shall we take a little break?

3          THE WITNESS:    Thank you.

4          THE VIDEOGRAPHER:    This marks the end of

5    Volume I, Disk 3, in the deposition of Michael Wagner.

6    The time is 4:24 p.m. and we are off the record.

7          (Recess taken, from 4:24 to 4:37.)

8          THE VIDEOGRAPHER:    This marks the beginning of

9    Volume I, Disk 4, in the deposition of Michael Wagner.

10   The time is 4:37 p.m., and we are on the record.

11         BY MR. OVERSON:

12   Q.    I'm looking at your declaration.   It's

13   paragraph 77 on page 38.

14         In this paragraph you state, In addition, as

15   demonstrated by the figure on page 8 above, Samsung's

16   smartphone products are priced significantly below

17   Apple's iPhone, suggesting the products compete in

18   different market subsegments.

19         Do you see that?

20   A.    I do.

21   Q.    Another explanation for the pricing of

22   Samsung's smartphone -- smartphone products

23   significantly below Apple's iPhone is that Samsung is

24   aggressively trying to take market share away from them;

25   true?

Confidential Attorneys' Eyes Only

Page 212

1     A.    It's possible, but not probable.

2     Q.    We saw that Samsung said they were going to

3  aggressively pursue the number one role in smartphones;

4  right?

5     A.    They did.

6     Q.    And a consistent -- consistent with that -- it

7  would be consistent with that strategy to price your

8  smartphones significantly below the market leader of the

9  iPhone; true?

10    A.    Some companies behave that way, yes.

11    Q.    Looking at paragraph 81 of your declaration --

12 excuse me, declaration, you're talking about a survey

13 that we already touched on.  This is one that had

14 design/color, brand/model, et cetera.  We're already

15 discussed it.

16        You wrote, According to Apple's summary, only

17 1 percent of iOS users and 5 percent of Android users

18 indicated that design/color was the reason for choice.

19        So did -- do you really think that Android

20 users are way more interested in design than Apple

21 users.

22    A.    Well, I don't think there's a big difference

23 between 1 and 5 percent.  No.  I think both of those

24 customer bases do not consider that to be an important

25 driver of why they make their purchase decision.

Confidential Attorneys' Eyes Only

Page 213

1    Q.   You don't think it's strange that the Apple

2    users would be 80 percent lower than the Android users

3    on that -- on that particular point?

4         MR. ANDERSON:   Objection.   Mischaracterizes the

5    document.

6         THE WITNESS:   I don't know whether I would call

7    it strange.   I would want to investigate that further if

8    I had the opportunity.

9         BY MR. OVERSON:

10   Q.   I apologize if we've covered this already, but

11   I'm not sure if I did.

12        You agree with me, in general, that Apple, in

13   general, is famous for its design; right?

14        MR. ANDERSON:   Objection.   Vague.

15        THE WITNESS:   And you did ask me before, and I

16   agreed with you before, and I'll agree with you again.

17        BY MR. OVERSON:

18   Q.   It will save me showing you ten articles saying

19   Apple's -- has a gorgeous design.   Thank you.

20        Okay.   Let me direct your attention to

21   paragraph 85 on page 40 of your declaration.

22        You wrote, Samsung seems to have designed the

23   four mobile devices specifically mentioned in Apple's

24   motion with a similar assessment of its customers in

25   mind.

Confidential Attorneys' Eyes Only

Page 214

1        And when you said "a similar assessment of its

2   customers," were you referring above to the quote about

3   covering all their bases?

4        Let me read the sentence above it.

5        It says, The variety of features deemed

6   important by the Nielsen survey prompted FierceWireless,

7   a publication that monitors the wireless industry, to

8   make the assessment that smartphone users want a lot of

9   different things out of their device, which means that

10  smartphone vendors will need to cover all their bases to

11  be successful in the smartphone market.

12       So in paragraph 85, were you attempting to

13  convey that smart -- Samsung realized that it needed to

14  cover all of its bases on the factors that smartphone

15  buyers are interested in?

16  A.    Yes.

17  Q.    You wrote, on paragraph 85, second-to-last line

18  on page 40, Design innovation also seems to play an

19  important role for Samsung.  Specifically, the thickness

20  of the devices.

21       And, again, this is where we saw that, I think,

22  the GALAXY Tab 10.1 was 0.2 millimeters thinner than the

23  iPad 2?

24  A.    Yes.

25  Q.    Did you have anything else in mind other than

Confidential Attorneys' Eyes Only

Page 215

1  that?

2      A.   Well, it was also much thinner than the picture

3  in the patent that's at issue here.  It was half the

4  size of the thickness of that -- the design patent that

5  it's being accused of infringing.

6      Q.   So you're comparing the GALAXY Tab 10.1, the

7  actual product, to a picture that's in the -- one of the

8  Apple design patents?

9      A.   I think it's actually in -- in your motion,

10  yes.

11      Q.   And you're talking about -- you mean it's

12  thicker in terms of the actual measurement, looking at

13  the page, versus the product?

14      A.   Well, I assume that you guys are -- are putting

15  everything to scale, so, yes.

16      Q.   I think our motion is there in front of you

17  somewhere.

18      A.   I believe that it is.  It is Exhibit 167.

19      Q.   Okay.  And then if you'd turn to page 14, there

20  is a comparison of the 'D889 patent to the GALAXY Tab

21  10.1, and there's a -- there's a comparison on the

22  thickness.

23          Do you see that?

24      A.   Yes.  Between lines 10 and 12.

25      Q.   Is that what you were talking about?

Confidential Attorneys' Eyes Only

Page 216

1    A.    It is.

2    Q.    And your view was that the patents are supposed

3    to be to scale in terms of the thinness?

4    A.    I believe they are, yes.

5    Q.    Okay.  Apart from the -- the thinness of --

6    okay.

7          And that's, again, looking at the GALAXY Tab

8    10.1.

9          What about the other accused products?  Did you

10   have -- do any analysis of the thinness or thickness of

11   those?

12   A.    I did not.

13   Q.    Okay.  Apart from the thickness, was there

14   anything else that you were thinking of when you said,

15   Design innovation also seems to play an important role

16   for Samsung?

17   A.    No.  It was -- it had to do with what we talked

18   about earlier, that when Samsung did see a very thin

19   iPad 2, that they went back and had to redesign a whole

20   bunch of the functionality in their product to come out

21   with an even thinner design.

22   Q.    Okay.  And apart from that redesign in response

23   to seeing the iPad 2, can you say -- can you tell me any

24   design innovation that you're aware of with respect to

25   the accused Samsung products?

Confidential Attorneys' Eyes Only

Page 217

1    A.    Not sitting here right now, without having my

2    memory refreshed.

3    Q.    There's a utility patent involved in the

4    preliminary injunction process.  It's the '381 patent.

5          We talked -- you said you think you looked at

6    the cover sheet?

7    A.    That's my recollection, yes.

8    Q.    Do you have any understanding as to what the

9    functionality in dispute is or the covered functionality

10   is?

11   A.    I have some limited understanding at this stage

12   of the case.

13   Q.    Okay.  What's your understanding?

14   A.    There's this bounce-back feature that if -- for

15   example, you're at the last photo in a group of photos

16   and you try to scroll past the end of that photo, it

17   will bounce back, as an example.

18   Q.    The photos, is that what -- your understanding,

19   it has to do with photos?

20   A.    Well, as -- the example that you put in your

21   motion is a photo were of -- of Prince Charles and

22   Princess Kate, and I think it's an oversized photo, that

23   you -- based on the functionality, you can see different

24   parts of the photo.

25   Q.    I see what you're saying.

Confidential Attorneys' Eyes Only

Page 218

1          In the motion there is an example of a photo,
2   and you can scroll around within the photo.  The photo
3   is bigger than what's on the screen?
4          A.    Right.
5          Q.    And you can scroll beyond the edge of the
6   photo.  And then if you get beyond the edge and lift
7   your finger, it will come back --
8          A.    Correct.
9          Q.    -- to fill the screen?
10         A.    Correct.
11         Q.    Have you seen the Samsung products and how
12  they -- whether they perform that function or not?
13         A.    I don't.
14         Q.    And have you seen any -- any indication about
15  market reaction to that feature?
16         A.    No.  I've seen no evidence that that's a
17  desired or important feature to customers.
18         Q.     I noted that in the production of documents,
19  the Wagner production that we received, I think we -- we
20  did receive a few of your old depositions.
21          Is that right?
22         A.    I hope you did.
23         Q.    Where did it come from?
24         A.    I don't keep any old files.  The only time I
25  will keep any, quote, testimony, depositions

Confidential Attorneys' Eyes Only

Page 219

1  particularly, is if I have a case that is still pending.

2  As an example, it's been stayed or it's -- it's a

3  current case or it's under appeal, and I've been told to

4  retain my file.

5       Normally my work is done under protective

6  order, so I have very few cases that I can produce.  And

7  I went through my files and produced to you all the

8  testimony that I had in my files that were not covered

9  by a protective order.  But that's a very limited

10 number.

11      Q.   And do you have the --

12      A.   And also -- I'm sorry, I paused -- but I think

13 maybe two or three times in my career of my 124 trial

14 testimonies I've received copies of my trial transcript.

15 My work is done after I testify in a case.

16      I submit a final bill, and no one ever sends me

17 a copy of the transcript to my trial testimony.  An

18 example that I did have for a while was the i4i versus

19 Microsoft case.  But at some point I was asked by my

20 client to completely destroy my file, which I did

21 pursuant to my agreement with my client.

22      So for a while I had that, and the trial

23 testimony was not under seal, and I could have produced

24 it to you.  I'm sure you can find it on the Internet.

25 But I don't have it in my possession.

Confidential Attorneys' Eyes Only

Page 220

1   Q.   So are the depositions that we received the

2   only ones that you're -- that you have?

3   A.   That I have and I have not covered -- that are

4   not covered by a protective order.  I have far more than

5   I produced to you, but they're all covered by protective

6   orders.  Just like if someone asked me for the

7   deposition in this case, I wouldn't give it to them.

8   Q.   What do you have from the Broadcom case?

9   A.   Nothing.  That was one or two firms ago.  And

10  if there were any files that still exist in the case,

11  they would be at Charles River Associates.  But I don't

12  have custody of those.

13  Q.   Were you working with Charles River Associates

14  at the time?

15  A.   That's my recollection.  It actually could be a

16  different firm.  If you tell me the date of the case.  I

17  don't have those types of facts memorized.  But I think

18  I was with CRA at that time.

19  Q.   Okay.  We'll ask an associate to look for

20  the -- anything we can get from open records from

21  Broadcom.  I got a redacted version of the declaration.

22  That's the best I could do.

23  A.   Really?

24  Q.   Yeah, today I just got it.

25  A.   I testified both at trial and at the

Confidential Attorneys' Eyes Only

Page 221

1    preliminary injunction hearing.  And I'm not recalling

2    those testimonies are under seal.  It's possible they

3    were, but I'm not recalling that.

4        Q.   So at the permanent injunction hearing, you

5    would have testified about irreparable harm?

6        A.   I did, among other of the factors that are

7    relevant.  I don't think it was only irreparable harm,

8    but --

9        Q.   And to your knowledge, that testimony is not

10   under seal?

11       A.   You know, I'm not -- I really don't know, but

12   I'm not recalling that the courtroom was cleared when I

13   testified.  But it may have been.  I just don't

14   remember.

15           MR. OVERSON:  Okay.  I'm going to go ahead and

16   mark what we got of the redacted public version from the

17   Broadcom declaration -- or direct testimony of

18   Michael J. Wagner.

19               (Marked for identification purposes,

20               Exhibit 188.)

21           BY MR. OVERSON:

22       Q.   Okay.  So let's just look on the front page.

23   There's a listing of Irell & Manella and Wilmer Cutler

24   Pickering Hale and Dorr on the front cover.  They're

25   attorneys for Broadcom.

Confidential Attorneys' Eyes Only

Page 222

1          This is a case in the Central District of

2     California, United States District Court.   And it says,

3     Direct Testimony of Michael J. Wagner in Support of

4     Broadcom Corporation's Request for Entry of Permanent

5     Injunction, Hearing Date August 14, 2007.

6          Is this the case you testified in?

7     A.    It is.   And this has refreshed my recollection

8     that my actual direct testimony was in written form, and

9     I was only cross-examined at trial, at the hearing.

10    Q.    Okay.   So -- and if you look on page 7 here of

11    your -- of the document, is that something that's

12    scribbled there, is that your signature?

13    A.    It certainly is.

14    Q.    Okay.   So this is a -- this is direct testimony

15    under penalty of perjury, only in writing as opposed to

16    in open court?

17    A.    That is correct.

18    Q.    And the issue there was whether Qualcomm's

19    continued infringement of Broadcom's patent would cause

20    irreparable harm; true?

21    A.    Yes.   But it also covered consumer demand, but

22    irreparable harm is part of this as well.   And I think

23    that was the principal for -- purpose of my testimony.

24    Q.    Okay.   Let's look on page 4 of your testimony

25    in that case.   There's a heading that says, Irreparable

Confidential Attorneys' Eyes Only

Page 223

1    harm.  And on paragraph 17, underneath irreparable harm,

2    it says, Although I was able to determine a reasonable

3    royalty for the technology of the patents in suit at the

4    time of the hypothetical negotiation and apply that

5    royalty to determine damages that Broadcom incurred

6    through March 31st, 2007, there are injuries to Broadcom

7    that result from infringement of the patents that cannot

8    easily be quantified and for which money damages are

9    inadequate.

10           Do you see that?

11    A.    I do.

12    Q.    Okay.  And so that was your testimony -- that

13    was one of the paragraphs of your testimony in that

14    case?

15    A.    It was.

16    Q.    Okay.  Paragraph 18, Broadcom is harmed by

17    having to compete against Qualcomm baseband chips that

18    incorporate Broadcom's patented technologies; that is,

19    Broadcom is currently facing a competitor and will

20    continue to face a competitor with products that should

21    not be in the marketplace with the patented features

22    because they infringe one or more of the patents in

23    suit.

24           Okay.  The same -- so here, if Samsung is

25    competing against Apple, using Apple's patented

Confidential Attorneys' Eyes Only

Page 224

1    technologies, Apple would be facing a competitor and

2    will continue to face a competitor with products that

3    should not be in the marketplace with the patented

4    features; true?

5             MR. ANDERSON:  Objection.  Lacks foundation.

6             THE WITNESS:  I need more facts to know.

7    Again, here my opinion was that the patent infringement

8    was the core of the products at issue.  I'm not of that

9    same view here.

10            So if those are the facts here, I would have

11   the same opinion.  So if they're not the fact here, I

12   would have a different opinion.

13            BY MR. OVERSON:

14        Q.   If -- if the fact-finder here finds that the

15   design patents and the utility patent asserted are going

16   to the -- the core of the products, then the same

17   principle would apply as you applied in paragraph 18 of

18   this Broadcom declaration?

19        A.   Yes.  At the permanent injunction stage.  I'll

20   agree with that.

21        Q.   Well, and if they find it at the preliminary

22   injunction stage, you would agree with it too?

23        A.   No, not with all the uncertainties.  Unless my

24   client was adjudicated to be an infringer, that you both

25   have valid patents and they infringe, I don't think the

Confidential Attorneys' Eyes Only

Page 225

1   same -- I would have the same opinion.  There's too much

2   chance of harm if you're not right.

3       Q.   Is irreparable harm standard the same in a

4   preliminary injunction proceeding as it is in a

5   permanent injunction proceeding?

6           MR. ANDERSON:  Objection.  Calls for a legal

7   opinion and a legal conclusion.

8           BY MR. OVERSON:

9       Q.   To your understanding.

10      A.   Yeah.  Not trying to give you a legal opinion,

11  but from a damage expert, I think they're different

12  inquiries.

13      Q.   You don't think it's the same standard?

14      A.   I do not.  I wouldn't apply the same standard

15  as a damage expert.

16      Q.   Paragraph 19 says, Additionally, through its

17  infringement, Qualcomm has also taken market share away

18  from Broadcom and will continue to take market share

19  away from Broadcom.  It is unclear whether, in light of

20  Qualcomm's infringement, Broadcom will be able to

21  capture the market share it would have captured had

22  Qualcomm not been able to offer the infringing chips,

23  much less how long it would take Broadcom to reach that

24  level.  Further, by offering a product having features

25  only Broadcom -- Broadcom is entitled to have,

Confidential Attorneys' Eyes Only

Page 226

1   Qualcomm's infringement has resulted in its gaining

2   goodwill from Broadcom's knowledge.  This, too, is

3   difficult to quantify.

4            So what was the technology that Broadcom

5   patented in that case?

6       A.   I'd have to have my memory refreshed.  It's --

7   there have been too many cases between then and now.

8   I'm not remembering any of the details.

9       Q.   Do you know what type of products Qualcomm had?

10      A.   Yes.

11      Q.   What kind of chips were they?

12      A.   CDMA chips.  C-D-M-A, all caps.

13      Q.   And what -- what -- what were the function of

14  those chips?

15      A.   That's what I'm not remembering.  I don't

16  remember.

17      Q.   What was the amount of damages that you

18  quantified?

19      A.   I don't have any idea.  It was -- I want to say

20  between 10 and $20 million, but that's just a guess.  I

21  really don't remember.

22      Q.   And you said the jury returned with your

23  number?

24      A.   They did.

25      Q.   Is it your view that you have to show that

Confidential Attorneys' Eyes Only

Page 227

1    patents go to the core of the accused product in order

2    to get lost profits?

3            MR. ANDERSON:   Objection.   Calls for a legal

4    conclusion.

5            THE WITNESS:   Yes.   Generally, yes.

6            BY MR. OVERSON:

7        Q.   Yeah.   So you're saying that in the context of

8    irreparable harm, you should be looking at that same

9    go-to-the-core analysis?

10       A.   I would agree with that.

11           MR. ANDERSON:   Same objection.

12           BY MR. OVERSON:

13       Q.   And would you agree that if, here, Samsung has

14   taken market share away from Apple and will continue to

15   do so by using its design, if that is proven, then

16   monetary damages would be inadequate?

17       A.   If it was for a long period of time going into

18   the future, yes.   That's possible.   It would be my

19   opinion.   Again, given all of the other facts that would

20   be necessary, that really the use of the infringing

21   technology is what was driving demand for the

22   infringer's products.

23       Q.   Then do you --

24       A.   You know, I'm -- excuse me one second.   I'm

25   sorry.   I'm trying to respond to an earlier question.

Confidential Attorneys' Eyes Only

Page 228

1      I'm starting to recall, although I may be

2  wrong, that it had something to do with radio capability

3  in the phones.  But I may be wrong.

4      Q.   Now you're talking about the chips that

5  Qualcomm -- the accused chips?

6      A.   Well, there -- there were a number of accused

7  chips.  One of them was related to radio functionality.

8      Q.   You wrote here, Further, by offering a product

9  having features only Broadcom is entitled to have,

10  Qualcomm's infringement has resulted in its gaining

11  goodwill from Broadcom's technology.  This, too, is

12  difficult to quantify.

13      Now, you have assumed, I think, in your

14  analysis that -- that Samsung is selling a product, or

15  products, four products, that features that only Apple

16  is entitled to have; true?

17      A.   True.

18      Q.   And if, in fact, Samsung is selling the product

19  having features only Apple is entitled to have in its

20  products, then Samsung's infringement would result in it

21  gaining good from Apple's technology; true?

22      MR. ANDERSON:  Objection.  Lacks foundation.

23  Assumes facts not in evidence.

24      THE WITNESS:  And incomplete hypothetical.

25  The -- if you add to that and the reason why consumers

Confidential Attorneys' Eyes Only

Page 229

1    are buying Samsung phones is because of the infringement

2    of these three design patents and the one utility

3    patent, then I agree with you.  Otherwise, I do not.

4         BY MR. OVERSON:

5         Q.    You didn't make the point in your direct

6    testimony in the Broadcom case that the reason Qualcomm

7    was able to sell the infringing chips and take market

8    share was away -- or the primary reason was that -- the

9    technology in the Broadcom patents, did you?

10        A.    That what?

11        Q.    You didn't -- in your direct testimony that was

12   submitted to the Court in the Broadcom versus Qualcomm

13   case, you didn't say Qualcomm's infringement goes to the

14   core of its product such that it is capturing market

15   share away from Broadcom and, therefore, it's difficult

16   to quantify the damages; that's not what you said?

17        A.    No.  Because it wasn't necessary.

18             You have to understand is that was the position

19   that both the technical expert and I took in the

20   underlying case at chief.  And since the jury agreed

21   with our infringement contentions and the awarded the

22   damage number that I said that came out of that type of

23   infringement, it wasn't necessary to repeat that to the

24   judge.

25        Q.    You did a reasonable royalty calculation there?

Confidential Attorneys' Eyes Only

Page 230

1    A.    I did.

2    Q.    You didn't do lost profits?

3    A.    I did not do lost profits in that case.

4    Q.    So reasonable royalty would be -- why didn't

5  you do lost profits in that case?

6    A.    I don't remember.

7    Q.    They are competitors; right?

8    A.    They were direct -- they're direct competitors.

9    Q.    And in any kind of infringement case, a

10  reasonable -- and if there's infringement found by the

11  jury, a reasonable royalty should be established, right,

12  or should be found?

13    A.    If you don't seek lost profits.

14    Q.    Right.  And I take it -- did they seek lost

15  profits?

16    A.    No.

17    Q.    Broadcom did not?

18    A.    No.  My recollection is I did not do a lost

19  profits calculation.

20    Q.    And you don't remember, though, why that was

21  the case?

22    A.    I don't.

23    Q.    And to decide reasonable royalty -- strike

24  that.

25          For a reasonable royalty to apply after a

Confidential Attorneys' Eyes Only

Page 231

1    finding of infringement, there's no need for a finding

2    of -- finding that the patented features are the core of

3    the accused product; true?

4             MR. ANDERSON:  Objection.  Calls for a legal

5    conclusion.

6             THE WITNESS:  I don't believe it's absolutely

7    necessary, no.

8             BY MR. OVERSON:

9        Q.   In fact, it could be -- the patented feature

10   could be a barely noticeable feature to the customers of

11   the accused product, but they would still have

12   entitlement to reasonable royalty if, in fact, the

13   accused product was using the patented technology;

14   right?

15       A.   I agree with that.

16       Q.   In that case, how did Qualcomm's infringement

17   result in its gaining goodwill from Broadcom's

18   technology?

19       A.   That it captured a significant portion of the

20   market is my recollection.  But I'd need my memory

21   refreshed.

22       Q.   But your recollection is that Qualcomm

23   gained -- Qualcomm's infringement of the Broadcom patent

24   resulted in them capturing more market share, and

25   thereby they gained goodwill from Broadcom's technology?

Confidential Attorneys' Eyes Only

Page 232

1    A.   Yes.  My recollection is that causation was

2  established at trial.

3    Q.   What is the causation that you're referencing?

4  The causation being the market share resulted in the

5  gain of goodwill, or is it that -- go ahead.

6    A.   No.  That's not --

7    Q.   Let me step back.

8        In your last answer you said, That -- that

9  causation was established at trial.

10       What causation were you talking about?

11   A.   That the infringement was either the primary or

12  one of the primary reasons that Qualcomm was successful

13  in the marketplace.

14   Q.   So if the infringement of a product is one of

15  the primary reasons for gaining market share, then you

16  can infer that the infringer is gaining goodwill from

17  the patentee's technology; true?

18       MR. ANDERSON:  Objection.  Vague as to

19  "reasons."

20       THE WITNESS:  Generally, I would agree with

21  that statement.

22       BY MR. OVERSON:

23   Q.   In paragraph 20, there is a redaction.  I'll

24  grant you that, on lines 13 and 14.  So I don't want you

25  to tell me what's in the redaction.

Confidential Attorneys' Eyes Only

Page 233

1    A.    Well, I don't remember anyway.

2    Q.    But I think you're making the point there that

3    Broadcom lost a design win to Qualcomm's competing

4    chipsets.  And I take it you're -- you're saying there

5    that the -- these were chipsets that were infringing?

6    A.    Yes.

7    Q.    You wrote, This is an additional example of

8    damage or harm to Broadcom.  If Qualcomm was not in the

9    marketplace or was prevented from being in the

10   marketplace, then that design opportunity and other

11   design opportunities in sales would be available to

12   other competitors, including Broadcom.

13        And this is in the irreparable harm section;

14   right?

15   A.    It is.

16   Q.    So if potential sales are taken away from the

17   patent holder, in this case it was Broadcom, that that

18   patent holder might have a shot at, an opportunity at,

19   were it not for the infringement, then that supports

20   irreparable harm; true?

21   A.    Yes.

22   Q.    Okay.  Paragraph 21.

23        Even if Broadcom does not have a chip that

24   directly competes with a Qualcomm chip for a particular,

25   quote, socket, end quote, for example, where Qualcomm

Confidential Attorneys' Eyes Only

Page 234

1    offers a CDMA2000-only chip, Broadcom is, nonetheless,

2    harmed because Qualcomm, as an incumbent supplier, is in

3    a much better position to compete for the next socket.

4            Was this a situation where the Qualcomm chip

5    you're discussing in -- in paragraph 21 was an

6    infringing chip?

7        A.    Yes.

8        Q.    So there -- there was a chip that was

9    infringing where the patent holder didn't have an

10   equivalent chip to offer.  Is that that situation?

11       A.    Yes.  But the next generation -- as an example,

12   Motorola is designing a new phone, and they're -- it's

13   an open design.  And in that next chance to get a design

14   win with this new Motorola phone, it is possible that

15   Broadcom could at that time have a chip that they could

16   have offered to Motorola.

17           But if Samsung had provided the chip in the

18   previous generation of Motorola phone, there's already

19   that relationship.  And that's what I'm trying to talk

20   about in this paragraph.

21       Q.    You said "Samsung."  I think you meant

22   Qualcomm; right?

23       A.    I'm -- I'm -- yeah.  You're right.  I didn't

24   mean Samsung.  I meant Broadcom.

25       Q.    So let's take this to -- I'm looking at

Confidential Attorneys' Eyes Only

1  paragraph 21 here in your declaration, and I want to ask

2  you a question, though, about the Apple v. Samsung

3  matter.

4       If a customer -- I think we raised this

5  hypothetical earlier.  A customer that was at T-Mobile

6  and -- but they liked the iPhone design and they

7  decided -- and they may have decided ultimately to

8  switch over and buy an iPhone because they like the

9  design, but at T-Mobile they had the opportunity buy a

10  Samsung design which we're assuming is infringing on

11  Apple's patent, in that case that consumer could decide

12  to buy the Samsung GALAXY S phone that has the design

13  he's looking for, and then that consumer would be in the

14  Android operating system and be very unlikely that Apple

15  would win that customer back; true?

16       MR. ANDERSON:  Objection.  Vague.  Incomplete

17  hypothetical.  Assumes facts not in evidence.

18       THE WITNESS:  We've already talked about the

19  loyalties and the value of incumbency here.  To some

20  extent --

21       (Reporter clarification.)

22       THE WITNESS:  The -- the loyalties and the

23  value of incumbency already in this deposition.

24       And I agree that in some respects it's similar

25  to paragraph 21, but that's a much different

Confidential Attorneys' Eyes Only

Page 236

1  relationship between a chip supplier and a phone

2  manufacturer than between a phone manufacturer and an

3  ultimate consumer in the marketplace.  I think those are

4  very different fact situations.

5        BY MR. OVERSON:

6     Q.   And, in fact, the -- the loyalty of the

7  consumer within the operating system that they elect for

8  when they get their first smartphone is even higher than

9  it is with chip suppliers, isn't it?

10        MR. ANDERSON:  Objection.  Calls for

11  speculation.  Lacks foundation.

12        THE WITNESS:  I don't know that.

13        BY MR. OVERSON:

14     Q.   And we saw that with the -- I think from the

15  data that you were citing in the surveys, we saw that

16  it's in the 99 percentile range of the odds that someone

17  will switch over once they elect one operating system;

18  right?

19     A.   No.  That's not a proper characterization.

20  You're talking about going from one particular operating

21  system to another.  But it's -- there's a much greater

22  opportunity to go to someone else besides 1 percent.

23  There's not 99 percent loyalty on -- even at Apple.

24     Q.   Okay.  But you don't know whether the loyalty

25  of an incumbent -- the loyalty to an incumbent supplier

Confidential Attorneys' Eyes Only

Page 237

1    in the chip situation is greater or lesser than the

2    loyalty of a -- of a phone customer once they're in an

3    operating system?

4         A.    You know, I may have had some information on

5    that at some point, but I don't remember it now.  So the

6    answer is, I don't know.

7         Q.    Okay.  And then here in paragraph 22, it says,

8    Qualcomm's public filings, 2004 annual report -- and

9    there's a citation -- have confirmed that it has used

10   its position as an incumbent supplier to gain market

11   share in WCDMA.

12             And there's a quotation, Leveraging our proven

13   success in integrating a variety of multimedia

14   activities into our CDMA2000 chipsets, we have

15   established ourselves as a significant provider of 3G

16   WCDMA technology for wireless devices.  We have the

17   competitive advantage as pioneers of CDMA and of sharing

18   many advanced features on our WCDMA and CDMA2000

19   chipsets.

20             Do you see that?

21        A.    I do.

22        Q.    So here the -- the point here, I think, is that

23   Qualcomm, once they get in -- their foot in the door

24   with the infringing chipsets, they were able to leverage

25   that initial sale and into further business; true?

Confidential Attorneys' Eyes Only

Page 238

1      MR. ANDERSON:  Objection.  Misstates testimony.

2      THE WITNESS:  They did.

3      BY MR. OVERSON:

4      Q.   And you'll agree with me that once a phone or

5  tablet manufacturer can get a new buyer onto their

6  system, they are able to leverage that customer into

7  additional products that that manufacturer makes; right?

8      MR. ANDERSON:  Objection.  Compound.

9  Incomplete hypothetical.

10      THE WITNESS:  That's possible.  And

11  quantifiable.

12      BY MR. OVERSON:

13      Q.   Okay.  And then look on paragraph 24.  It says,

14  Finally, unlike Qualcomm, Broadcom does not have a

15  licensing program that seeks to monetize or

16  commercialize its patent portfolio.  Broadcom uses its

17  patents to protect its ability to sell products, thereby

18  protecting the revenues it can obtain from sales of its

19  own products.

20      Okay.  First of all, I'll stop there.

21      Are you aware of any Apple licenses of any of

22  its design products -- patents, design patents?

23      A.   I haven't seen any license agreements in this

24  case yet, so, no.  But I have seen information from

25  Apple that it was interested and willing to license

Confidential Attorneys' Eyes Only

Page 239

1   Samsung, all of its patents, which would include its
2   design patents.  Which is different than this fact
3   situation.
4       Q.   Your understanding is that Apple offered
5   Samsung to use its design patents at issue in the
6   preliminary injunction; true?
7       A.   Yes.
8       Q.   You've never seen a document that says that,
9   have you?
10      A.   No.  It's not that specific.  I think it was
11  all of their patents they're willing to license.
12      Q.   Have you heard that they are only willing to
13  license the patent if they -- Samsung changed the
14  design?  You never heard that?
15      A.   I am not recalling hearing that, no.
16      Q.   Okay.  It goes on to state that -- the next
17  line of your declaration, paragraph 24, says, To the
18  extent that Broadcom has licensed its patents or patent
19  portfolio, it has been in an effort to settle litigation
20  with a particular competitor in very limited
21  circumstances.
22           Okay.  So do you understand that Samsung and
23  Apple are in litigation at the moment?
24      A.   I believe in a number of places in the world.
25      Q.   And is it your understanding that when they

Confidential Attorneys' Eyes Only

Page 240

1   talked about licensing of Apple's patent portfolio --

2   whatever the extent of that discussion was, it was in

3   the context of settling litigation?

4       A.    That was not my understanding.

5       Q.    Do you understand that there's litigation going

6   on around the world?

7       A.    There is today.

8       Q.    So apart from Apple's discussions with Samsung

9   about a potential license, are you aware of any other

10  licensee to Apple's design patents?

11      A.    No.

12      Q.    Are you aware of any other licensee to any of

13  Apple's patents that are at -- that are at issue in this

14  case?

15      A.    I believe in other cases that I have seen some

16  Apple licenses, but I can't recall -- even if I did

17  know, I probably couldn't tell you.  I know they've

18  licensed patents before.  Generally, in cross licenses.

19  And I can't tell you whether the patents at issue in

20  this case would be included in those licenses or not.

21      Q.    Okay.  If you assume that Apple has refused

22  to -- to license any of its design patents at issue

23  here, would you agree that Apple would be harmed and

24  forced to grant a compulsory royalty-bearing license to

25  Samsung --

Confidential Attorneys' Eyes Only

Page 241

1          MR. ANDERSON:  Objection.

2          BY MR. OVERSON:

3     Q.   -- under those patents?

4     A.   Everything else being equal, yes.

5          MR. ANDERSON:  Incomplete hypothetical.

6          BY MR. OVERSON:

7     Q.   And would you agree, under those circumstances,

8  assuming those -- that hypothetical that I put to you,

9  that Samsung's infringement here would harm Apple in a

10 way it would not harm a company that engages in

11 licensing of its intellectual property for revenue?

12         MR. ANDERSON:  Objection.  Incomplete

13 hypothetical.

14         BY MR. OVERSON:

15    Q.   I'm reading from 25.  Paragraph 25 of your

16 declaration.

17    A.   Yes.

18    Q.   And would you agree if all -- if my

19 hypothetical holds and I'm positing a hypothetical, that

20 that additional harm to Apple would be difficult to

21 quantify?

22         MR. ANDERSON:  Same objection.

23         THE WITNESS:  Over the long term at a permanent

24 injunction phase, yes.

25

Confidential Attorneys' Eyes Only

Page 242

1        BY MR. OVERSON:

2        Q.   And you're -- you're saying at a permanent

3    injunction phase because, in your view, the state of the

4    record now doesn't give you enough information?

5        A.   Correct.   If it ends up that we do go to trial

6    and you prevail on liability and you're awarded damages,

7    during this entire time period, I think both your expert

8    and I can figure out what is enough money to make your

9    client whole.

10       Q.   But here in paragraph 25, that -- that

11   proceeding had already happened; right?  There had

12   already been a damages phase and a jury trial, right?

13       A.   Right.   And my client was fully compensated for

14   their loss during that time period.

15       Q.   And even after that, you wrote in paragraph 25

16   that Qualcomm's infringement here harmed Broad- -- harms

17   Broadcom in a way it would not harm a company that

18   engages in licensing of its intellectual property for

19   revenue, and this additional harm to Broadcom is also

20   difficult to quantify.

21            Do you see that?

22       A.   Yes.

23       Q.   Okay.   So even after the damages were fully

24   calculated, you found that there was additional harm to

25   Broadcom that was difficult to quantify; true?

Confidential Attorneys' Eyes Only

Page 243

1    A.    I did at the permanent injunction phase.

2    Q.    And that additional harm that's discussed in

3 paragraph 25 related to the fact that Broadcom did not

4 engage in licensing of intellectual property at issue

5 for revenue; true?

6    A.    True.

7    Q.    Okay.  The last section has to do with

8 Broadcom's proposed form of injunction.

9         So does this refresh -- paragraph 26 of your

10 declaration, does this refresh your recollection that

11 you proposed a 6 percent royalty rate on the infringing

12 chips?

13   A.    Yes.  And to allow them to continue to market

14 for another 18 months, you know, which, again, makes

15 this fact situation very different than what you're

16 seeking here, where you want Samsung out of the market

17 now.

18   Q.    Is it true that in the Broadcom v. Qualcomm

19 case, you proposed a 6 percent royalty rate on the price

20 of chips that infringed the '686 patent at issue in that

21 case?

22   A.    Yes.  For this intermediate period where, even

23 after the injunction is entered into, it would be stayed

24 for an 18-month period.

25   Q.    Isn't it true that you proposed a 6 percent

Confidential Attorneys' Eyes Only

Page 244

1    royalty rate on the infringing chips at trial?

2        A.   See, I'm not remembering that.  I think it was

3    2 percent at trial is my recollection.  But I may be

4    wrong.  I just don't have all these facts in my head.  I

5    think the royalty rate at trial was 2 percent, and I

6    think the royalty rate post verdict was 6 percent that I

7    proposed.

8            MR. OVERSON:  If -- if I would have your

9    indulgence, I'd like to have a short break.  I think I'm

10   almost done.

11           THE WITNESS:  Terrific.  Thank you.  Do you

12   want us to leave so you can talk?

13           THE VIDEOGRAPHER:  The time is 5:28 p.m., and

14   we are off the record.

15           (Recess taken, from 5:28 to 5:38.)

16           THE VIDEOGRAPHER:  The time is 5:38 p.m., and

17   we are on the record.

18           MR. OVERSON:  Okay.  Mr. Wagner, I don't have

19   any further questions at this time.

20           I understand that further documents are being

21   produced, even like last night, today, not just by us,

22   by you, by both sides.  Other issues could come up, but

23   I don't have any further questions at this time.

24           We do have a -- a -- do you have any questions,

25   Counsel?

Confidential Attorneys' Eyes Only

Page 245

1          MR. ANDERSON:  Yes, I do.

2          MR. OVERSON:  Okay.  Shall we do that first

3    before we talk about confidentiality?

4          MR. ANDERSON:  Okay.

5               EXAMINATION BY MR. ANDERSON

6          BY MR. ANDERSON:

7      Q.   Mr. Wagner, do you understand the word "design"

8    to encompass functional design?

9          THE WITNESS:  Among other things, yes.

10         MR. ANDERSON:  So you understand the word

11   "design" to include elements that are not merely

12   ornamental; is that correct?

13         THE WITNESS:  That's my understanding.

14         MR. ANDERSON:  No further questions.

15         MR. OVERSON:  Do you wish to change any of your

16   earlier answers today in light of your understanding of

17   "design"?

18         THE WITNESS:  I do not.

19         MR. OVERSON:  Okay.  I have no further

20   questions.

21         Okay.  There was an issue we talked about off

22   the record, and that is confidentiality.

23         For the Apple side we are designating the

24   transcript confidential to the extent -- because there

25   are some -- highly confidential, because there's some

Confidential Attorneys' Eyes Only

Page 246

1   Apple-produced highly confidential information.

2            We will get back to you, Counsel, promptly,

3   about what segments of the deposition that would apply

4   to.  Our understanding that -- is that in terms of

5   Samsung confidential information, there was Strategy

6   Analytics, Exhibits D and E to the declaration of

7   Mr. Wagner, and Exhibit B, Schedules 1 and 5, at

8   paragraphs 42 and 45, and we exchanged some e-mails on

9   this.

10           And apart from that, we do not believe that

11  there's any other Samsung highly confidential or

12  confidential material.  And so -- I believe I mentioned

13  paragraphs 42 and 45.

14           So we will obviously not share anything with

15  Apple from the declaration or from the testimony that

16  relates to those documents or that information that I

17  just mentioned.

18           I mean, I'm also willing to work with you on

19  the schedule for getting back to each other on

20  dedesignating, if that works.  But the schedule would

21  have to work in a matter of a day or two because of the

22  time pressures of the case.

23           MR. ANDERSON:  If I -- I appreciate that.

24           My understanding is that the declaration,

25  including the exhibits, does contain some material

Confidential Attorneys' Eyes Only

Page 247

1    designated by Samsung as highly confidential, and,

2    therefore, to the extent that this transcript refers to

3    or incorporates that information, we have to keep that

4    confidential.  But it's not clear to me.

5         Are you -- are you proposing we prepare a

6    redacted form of this transcript?  Is that what you're

7    aiming at?

8         MR. OVERSON:  I think that we're going to have

9    to redact out -- in order to share this transcript

10   beyond our two firms, we're going to have to redact out

11   the parts that have confidential information of the

12   opposing party.

13        MR. ANDERSON:  Agreed.

14        MR. OVERSON:  And so I'm just pointing out that

15   we have already kind of gone part of the way down the

16   path with respect to the declaration.  I don't think

17   there was anything else confidential that was raised

18   today apart from what was discussed in the context of

19   the declaration.

20        And so we just need to look at the testimony --

21   I mean at least from the Apple side, I think what we

22   need to do is look at the testimony and redact out the

23   Samsung analytic -- Samsung confidential information

24   before we pass it on to Apple.

25        MR. ANDERSON:  Yes, please do that.

Confidential Attorneys' Eyes Only

Page 248

1    And, likewise, we will redact out the Apple

2  confidential information, of which there was some in the

3  declaration and which there was some in other exhibits,

4  I noted, before we share a transcript.

5    MR. OVERSON:  Okay.  And we'll exchange -- when

6  we give it to our clients, we'll exchange with each

7  other so with know what we did.

8    MR. ANDERSON:  That's agreeable.

9    MR. OVERSON:  Okay.  Thank you.

10    THE VIDEOGRAPHER:  This marks the end of

11  Volume I, Disk 4, and concludes the deposition of

12  Michael Wagner.  The time is 5:43 p.m. and we are off

13  the record.

14    (Deposition concluded at 5:43 p.m.)

15    ---oOo---

16

17

18    _____

    MICHAEL J. WAGNER

19

20  Subscribed and sworn to

    before me this    day

21  of          2011.

22

    _____

23

24

25

Confidential Attorneys' Eyes Only

Page 249

1                          CERTIFICATE

2

   STATE OF CALIFORNIA   )

3                         :  ss

   COUNTY OF SONOMA       )

4

5      I, Lorrie L. Marchant, a Certified Shorthand

6   Reporter, a Registered Professional Reporter, a

7   Certified Realtime Reporter, and a Certified Realtime

8   Professional within and for the State of California, do

9   hereby certify:

10     That MICHAEL J. WAGNER, the witness whose

11  deposition is herein set forth, was duly sworn/affirmed

12  by me and that such deposition is a true record of the

13  testimony given by such witness.

14     I further certify that I am not related to any of

15  the parties to this action by blood or marriage and that

16  I am in no way interested in the outcome of this matter.

17     In witness whereof, I have hereunto set my hand

18  this 14th day of September, 2011.

19

20

21

22     ----------------------------------------------

       LORRIE L. MARCHANT, CSR, RPR, CRR, CLR, CCRR

23     CSR No. 10523

24

25

Confidential Attorneys' Eyes Only

Page 250

1                        I N D E X
2                   INDEX OF EXAMINATION
3                                              PAGE
4    MR. OVERSON                                 5
     MR. ANDERSON                              245
5
6                     ---oOo---
7                 INDEX OF EXHIBITS
8              DESCRIPTION                      PAGE
9    Exhibit 160   Declaration of Michael J.      5
                   Wagner in Support of Samsung's
10                 Opposition to Apple's Motion for a
                   Preliminary Injunction (48 pages)
11
     Exhibit 161 Curriculum Vitae of Michael J.   5
12                 Wagner (53 pages)
13   Exhibit 162   FierceWireless article         30
                   entitled "Are touchscreens the most
14                 important feature of smartphones?"
                   (Production Nos. WAGNER0000001 -
15                 WAGNER0000006)
16   Exhibit 163   Apple document entitled        33
                   "ComTech United States Report Q410"
17                 (Production Nos. APLNDC00010809-
                   APLNDC00010809.54)
18
     Exhibit 164   Color copy of advertisement    40
19                 for the iPad 2 (1 page)
20   Exhibit 165   Color copy of advertisement    41
                   for the iPad (1 page)
21
     Exhibit 166 Color copy of advertisement for  42
22                 the iPhone (1 page)
23   Exhibit 167   Apple Inc.'s Motion for a      44
                   Preliminary Injunction (37 pages)
24
     Exhibit 168   Color copy of advertisement    46
25                 for the iPhone 4 (1 page)

Confidential Attorneys' Eyes Only

Page 251

1                    INDEX OF EXHIBITS (Continued)
2                    DESCRIPTION                         PAGE
3     Exhibit 169  Global Brands article entitled         53
                   "Big names fly high despite the gloom"
4                  (Production Nos. WAGNER0000334 –
                   WAGNER0000341)
5

      Exhibit 170  Enlarged article entitled "Big        53
6                  names fly high despite the gloom"
                   (2 pages)
7

      Exhibit 171  Fast Company.com article              113
8                  entitled "Samsung's Anti-iPad 2
                   Policy:  Clone the Heck Out of It"
9                  (2 pages)
10    Exhibit 172  NBC Bay Area article entitled          117
                   "iPad 2 Sends Galaxy Tab Back to
11                 the Drawing Board" (2 pages)
12    Exhibit 173  Business Insider article               119
                   entitled "LIVE FROM BARCELONA:
13                 Check Out The New 10-Inch Samsung
                   Galaxy Tab" (4 pages)
14

      Exhibit 174  Article entitled "Samsung             121
15                 considers Galaxy Tab 10.1 overhaul
                   following iPad 2 unveiling" (2
16                 pages)
17    Exhibit 175  CNET article entitled "Samsung         122
                   Galaxy Tab 10.1-inch:  The iPad 2
18                 of Honeycomb tablets" (Production
                   Nos. APLNDC0000036126 –
19                 APLNDC0000036129)
20    Exhibit 176  Google offers article entitled         124
                   "Galaxy Tab 10.1 Review"
21                 (Production Nos. APLNDC09000036130
                   – APLNDC0000036159)
22

      Exhibit 177  PCWorld article entitled              126
23                 "Samsung Galaxy Tab 10.1 Wi-Fi:  A
                   Worthy Rival to the iPad 2"
24                 (Production Nos. APLNDC0000036160 –
                   APLNDC0000036162)
25

Confidential Attorneys' Eyes Only

Page 252

1                    INDEX OF EXHIBITS  (Continued)
2                    DESCRIPTION                                  PAGE
3    Exhibit 178  PC Advisor article entitled                     131
              "Samsung Galaxy Tab 10.1 review"
4             (Production Nos. APLNDC0000036163 -
              APLNDC0000036167)
5

     Exhibit 179  Electric House article                          134
6             entitled "Hands On Review:  Samsung
              Galaxy 10.1 Tablet" (Production
7             Nos. APLNDC0000036168 -
              APLNDC0000036171)
8

     Exhibit 180  Web article entitled "Samsung                   140
9             Galaxy S2 i9100 specs, price
              revealed on UK website" (3 pages)
10

     Exhibit 181  First Look article entitled                     142
11            "First Look:  Samsung Vibrant Rips
              Off iPhone 3G Design" (2 pages)
12

     Exhibit 182  Reuters.com article entitled                    147
13            "Insight:  Jobs exit opens door for
              nimble Apple rivals" (Production
14            Nos. APLNDC0000036110 -
              APLNDC0000036111)
15

     Exhibit 183  Article entitled "Smartphone                    153
16            politics by Nielsen:  Google and
              Apple embroiled in fight for
17            'undecides'" (Production Nos.
              APLNDC0000036115 -
18            APLNDC0000036123)
19   Exhibit 184  Document entitled                               162
              "Demonstrative table from
20            APLNDC00010809 at
              APLNDC00010809.18" (1 page)
21

     Exhibit 185  The Wall Street Journal                         180
22            article entitled "Samsung, Apple
              Decision Delayed Until September"
23            (Production No. APLNDC0000036112)
24   Exhibit 186  2010 Samsung Electronics                        192
              Annual Report (48 pages)
25

Confidential Attorneys' Eyes Only

Page 253

1         INDEX OF EXHIBITS (Continued)

2         DESCRIPTION                          PAGE

3    Exhibit 187  Business Insider article      201
              entitled "The Truth About
4             Smartphones:  Our Exclusive Survey
              On iPhone vs. Android" (Production
5             Nos. WAGNER0000092 - WAGNER0000101)

6    Exhibit 188  Direct Testimony of Michael J.   221
              Wagner in Support of Broadcom
7             Corporation's Request for Entry of
              Permanent Injunction" (10 pages)

8

9                    ---oOo---

10      QUESTIONS INSTRUCTED NOT TO ANSWER

11           Page           Line

12                    (None.)

13

14                    ---oOo---

15

16

17

18

19

20

21

22

23

24

25

Confidential Attorneys' Eyes Only

Page 254

1   NAME OF CASE:  Apple v. Samsung
2   DATE OF DEPOSITION:  9/14/2011
3   NAME OF WITNESS:  Michael J. Wagner
4   Reason Codes:
5       1.  To clarify the record.
        2.  To conform to the facts.
6       3.  To correct transcription errors.
7   Page _____  Line _____   Reason _____
    From _____   to  _____
8

    Page _____  Line _____   Reason _____
9   From _____   to  _____
10  Page _____  Line _____   Reason _____
    From _____   to  _____
11

    Page _____  Line _____   Reason _____
12  From _____   to  _____
13  Page _____  Line _____   Reason _____
    From _____   to  _____
14

    Page _____  Line _____   Reason _____
15  From _____   to  _____
16  Page _____  Line _____   Reason _____
    From _____   to  _____
17

    Page _____  Line _____   Reason _____
18  From _____   to  _____
19  Page _____  Line _____   Reason _____
    From _____   to  _____
20

    Page _____  Line _____   Reason _____
21  From _____   to  _____
22  Page _____  Line _____   Reason _____
    From _____   to  _____
23

24                              _____
                                MICHAEL J. WAGNER
25