100 LB    BLUEBIRDonline.com (888) 477 - 0700    100 LB Style

# VELLTURO
# EXHIBIT 102

# Los Angeles Times | BUSINESS

# Technology
THE BUSINESS AND CULTURE OF OUR DIGITAL LIVES,
FROM THE L.A. TIMES

## Galaxy Nexus: Still no U.S. release date, could sell for $299

*December 6, 2011 | 9:38 am*



The Galaxy Nexus smartphone, whenever it goes on sale in the U.S., may come with a $299.99 price tag on a

So far, Verizon hasn't said when the Samsung-built, Google-approved handset will hit stores or at what price

But, according to a Dow Jones report, unnamed sources "familiar with the matter" said the Galaxy Nexus wou
price of other top-tier Verizon smartphones, such as the Motorola Droid Bionic, the Motorola Droid Razr and

Apple's iPhone 4S, which many consider to be the Galaxy Nexus' main competitor, sells at a starting price of $

Unlike the iPhone, the Galaxy Nexus will run on Verizon's 4G LTE network (the iPhone is still 3G-only) and fo

The Galaxy Nexus will also be the first device to run Android Ice Cream Sandwich, the latest version of Googl
is also the first version of Android that is designed to work on both smartphones and tablets.

The new handset is already on sale in Britain and is launching in Canada on Thursday from Bell for $159.95 a respective data plans.

The new Samsung phone will also feature a resolution of 1280 x 720 pixels (same as the HTC Rezound), a 1.2-RAM, a 5-megapixel rear camera capable of shooting 1080p video and a 1.3-megapixel camera on the front fo

As soon as Verizon offers an official release date and price we'll let you know here on the Technology blog and soon as we can get our hands on the new phone.

**RELATED:**

Motorola Droid Razr, from Verizon, review [Video]

Carrier IQ disputes spying accusations; security researchers agree

Galaxy Nexus, Android Ice Cream Sandwich: U.S. launch on Dec. 8?

-- Nathan Olivarez-Giles

Nathan Olivarez-Giles on Google+

Twitter.com/nateog

*Photo: Models hold up Samsung's Galaxy Nexus smartphones that run the Google Android Ice Cream Sand*
*Credit: Jerome Favre / Bloomberg*

---

**MORE FROM THE TIMES**

Bachmann still steamed over Gingrich's conduct at debate

Rick Perry collects early retirement, owes student loan

First lady accepts Marine's invitation to military ball

Kobe Bryant's Wife, Vanessa, Hires Prominent Divorce Lawyer

Details of Edison rampage emerge as gunman's wife offers sympathy

Ads by Google
**Samsung Galaxy S2 vs HTC**
Compare features and specs. Wikidi makes it easy! wikidi.com/
**No Contract Phones**
Shop No Contract Phones Online Compare Features, Prices & Reviews. techrush.com

# Comments (6)

100 LB 🔶 ▲ BLUEBIRDonline.com (888) 477 - 0700 ♻ 100 LB Style

# VELLTURO
# EXHIBIT 103

U.S. Edition ■ Mobile   Most Popular   Topics   Archives                Make IBTimes Your Homepage  |   Log In  |   Register Now



Calling all sweet tooths
Introducing Android 4.0,
Ice Cream Sandwich


GALAXY NEXUS
Pure Google

# INTERNATIONAL BUSINESS TIMES   Tech

SEARCH IBTIMES                       FOLLOW IBTIMES         Like   44k

News | Markets | Careers | Life & Style | Opinion | Topics | TV | Research | Tools | Local

World | US | Economy | Companies | Tech | Gadgets | Internet Business | Tech & Trend | Analysis | Opinion | Science | Law | Real Estate | Sports | Slideshows | Picture This


Obama Approval Rating
2012 Reaches 50 Percent
Mark


Gingrich Wives, Ethics
Charges Details Edited by
Campaign Aide on Wikipedia


Josefina Vazquez Mota Gets
Party's Presidential Nod In
Mexico


HSBC Ana
Rally to Co
Market Un

## Samsung Galaxy S3 to Beat First ICS Smartphone?

2                                                       Text Size

January 12, 2012 10 21 AM EST

Samsung may have triggered tough competition in the smartphone arena by rolling out the first Ice Cream Sandwich phone - Samsung Galaxy Nexus - in 2011. But that hasn't stopped the Korean-based software titan from raising the bar even higher.  The company is reportedly gearing up to release another speed demon, Samsung Galaxy S3.

Is it time for Nexus to Step Down and Give Way to Galaxy S3?

**SHARE THIS STORY**

1        0        11

Like      Share      Tweet

**RELATED ARTICLES**

iOS 5 Untethered Jailbreak: iBooks Crashing Error Fixed, Jailbreak for iPhone 4S and iPad 2 Coming Soon

Homeowners in New
York are using this 1 Tip
to recieve a 2.5%
Refinance Rate

How this strange 62-cent
fruit is making Americans
skinny.

New York: The
bodybuilders insider
secret to get ripped fast...

Do not buy until you read
this 4 week study on the
results of using the E-
Cigarette to quit smoking.

Advertisement

Samsung's third generation Galaxy S3, which is expected to be released in the first half of the year, has already received an overwhelming amount of attention despite the mystery shrouding the widely-anticipated smartphone.

But how well will this forthcoming device fare against the Google-totting Galaxy Nexus, which by the way, got standing ovations for its lightning-fast processor and is a prime rival to Apple's iPhone 4S?

While keeping the Galaxy S3's leaked details in mind, here's a roundup of its specifications in comparison with Galaxy Nexus.

**Display:** Samsung Galaxy S3 is rumored to sport the same 4.6-inch HD Super AMOLED Plus capacitive touch-screen and 720x1280 pixel resolution as the Galaxy Nexus. However, some reports claim the Galaxy S3 will have a 3D display with TouchWiz 5.0 UI and Gorilla Glass fronting in addition.

Like us on Facebook

Like   44k   Send

**Camera:** According to reports, Galaxy S3 is expected to arrive with a primary 12 megapixel 4000x3000 pixels LED camera with HD video capabilities of 1080p. Other features the S3 is rumored to include are geo-tagging, touch-focus, face and smile detection, image stabilization and a front-facing 2 megapixel camera. Galaxy Nexus, on the other hand, sports a fairly standard 5-megapixel camera on its rear but lacks image-stabilization for video.

CHASE
APPLY

**Ink Bold™ for business.**
**Unlike American Express, only Ink has Jot℠, the mobile app that lets you track expenses every time you swipe.**

ADVERTISE WITH US

MORE



This advertisement was 3D se seconds

NYC Restaurant Week: Lyon, A French Bouchon
With A New York Twist

MOST VIEWED


Australian
Chronic
Migraine

Ouch!

After U.S. Oil
Snub,
Canada Now

MOST READ

Samsung Galaxy Note Pre-Order
Starts, Releasing on Feb. 19: Can
It Bulldoze iPhone 4S's
Dominance?

Like

Super Bowl 2012 Twitter
Statistics: Two New Records Set
After Giants vs. Patriots

Like

MUST READ


Apple Could Lose
$1.6 Billion in China
Trademark Lawsuit

Modem Portfolio
Confusion

Sponsorship Link

**Processor:** Galaxy Nexus runs on a dual-core 1.2 GHz Cortex-A9 CPU, TI-OMAP 4460 chipset with 1GB RAM. Rumor has it that Galaxy S3 will feature a quad-core Exynos 4212/ Exyos 5250 chipset that's clocked to a massive 1.8GHz with 2GB RAM.



How to make money from gold investment

**Operating System:** Galaxy Nexus is notably popular for its Android 4.0 Ice Cream Sandwich (ICS) OS, which makes it likely that Galaxy S3 will launch on the same platform. ICS with its advanced interface and user-friendly features is best of Honeycomb and Gingerbread combined in one unit.

**Memory:** According to the rumors, Galaxy S3 may come in 16/32/64GB variants with an external microSD card expandable up to 64GB. Galaxy Nexus, has a fixed 16 / 32GB of internal storage.

**Connectivity/Bluetooth/USB:** Galaxy Nexus supports Bluetooth 3.0 version with A2DP along with microUSB 2.0 version, Wi-Fi 802.11 a/b/g/n, dual-band, DLNA with Wi-Fi hotspot. The Nexus connects at HSDPA 21 Mbps, HSUPA 5.76 Mbps and comes along with NFC and 4G LTE support. Galaxy S3 is expected to arrive with more or less the same specifications.

If the rumored features of Galaxy S3 hold true, it could undoubtedly be a huge success when it is launched. It could be another potential challenger to the mighty iPhone.

This article is copyrighted by International Business Times, the business news leader

| 2 | Tweet ‹ 1 | Share | 0 | Like 1 |

**POPULAR MULTIMEDIA**






**Election 2012: The President's Money Men**

**Top 5 Most Expensive Cars Sold at Auction**

**Top 10 Largest Recipients of U.S. Aid**

**Rare Unseen Images of the RMS Titanic**

Sponsored Link:

How to make money from investing in Gold.

**NEWS FROM TECH**

**Technology Focus: Apple Shareholders – Calling Al Gore's Conscience**

IBM Opens Giant India Data Center for Tulip Telecom

Oracle Rejects Pact, Wants New Trial in SAP Copyright Dispute

Rogers, BCE in talks with Apple over iTV: report

**EDITOR'S PICK**


**Romney Turns from Moderate to Ultra Conservative to Win GOP Race**


**401k Fees Disclosure Rule May Spur Additional Creative Charges**


**Rare Unseen Images of the RMS Titanic Captured by Father Frank Browne [PHOTOS]**

**JOIN THE CONVERSATION**

  Type your comment here.

Login

Sort by newest first

**Romek**

I'm trying to see who actually wrote this article as there are many errors in it that need to be corrected. Unfortunately there is no information about the author so here it goes: The Galaxy Nexus has a Super AMOLED HD screen (not plus) while the SGSIII will probably have the Super AMOLED HD Plus screen (non pentile display). The SGSIII might have up to 64GB built in memory (though this is news to me) but it cannot have 64GB expanded as the MicroSD format


**Facebook Courts Madison Avenue Ahead of its IPO**
Like

MOST DISCUSSED


**Twitches Spread at New York School; Parents Urge More Tests**


**China Prohibits Its Airlines from Paying EU Carbon Tax**


**Did Madonna Lip Sync at Halftime Show for Super Bowl 2012? [VIDEO]**


Do not buy until you read this 4 week study on the results of using the E-Cigarette to quit smoking.


New York: Shocking report on e-cigarettes as the break through device for better living in 2011...


Homeowners in New York are using this 1 Tip to recieve a 2.5% Refinance Rate


Trading the Euro can be EASY
See how with a FREE TRIAL
CLICK HERE
INTERNATIONAL BUSINESS TIMES presents  FXCM
Education Center

ADVERTISE WITH US


This advertisement runs for 30 seconds

COMPANIES
**Chrysler Reports Full-Year Profit on Strong U.S. Sales**

2/7/2012

 max size is 32GB (this is a technical limitation) and the SGSIII will not use a new memory standard (that would be crazy). The SGSIII 3D rumours are looking more and more to be just that... rumours (very unlikely at this point). The SGSIII will have gorilla glass as both the SGS1 and SGS2 has gorilla glass (though it might have the new gorilla glass2). Some of the camera features listed (Touch Focus, Smile Detection, Geo-Tagging and 2MB front facing camera) are already on the SGS2 today so that wouldn't be an update. Please check your facts (and rumours) before posting specs which are wrong, or not upgrades.

E-Newsletters

3 weeks ago  2 Likes                                                                    Like  Reply

 **Galaxy SIII**
I've red enough about Galaxy S3 speculations. Samsung bring it on!

3 weeks ago  1 Like                                                                     Like  Reply

Enter Email  [ > ]

✉ Subscribe by email  📶 RSS

We value your privacy. Your email
address will not be shared.

**MOST POPULAR**                          EMAILED    DISCUSSED    VIEWED

Pink Slime and
Other Weird Food
Additives You
**Don't Know**
You're Eating
Pink slime - a mix of meat
trimmings washed in
ammonium hydroxide and used
in fast food burger patties -
churned consumer's s...

Giants Ticker-Tape Parade Route 2012: Tuesday Celebrations Begin at 11 a.m.

Antioch College in Ohio Offers $106,000 Education for Free: How to Get it

Did Madonna Lip Sync at Halftime Show for Super Bowl 2012? [VIDEO]

Raspberry Ketone Diet: What is it and What are the Benefits? [VIDEO]

Christina Aguilera Blood or Self-Tan Mishap on Leg at Etta James' Funeral? [PHOTOS & VIDEO]

China Prohibits Its Airlines from Paying EU Carbon Tax

**Home**
World
US
Economy
Companies
Tech
Science
Global Markets
Education
Real Estate
Forex

**More Sections**
Fashion
Auto
Travel
Health
Law
Entertainment
Sports
Luxury
Art
Books
Tech & Trend



US Edition

**Tools & Features**

Topics                     RSS Feeds              News Licensing
Blogs                      IBTimes on Twitter     Media Kit
Market Data                IBTimes on Facebook    Advertise with Us
Stock Watch List           E-Newsletters          About IBTimes
Investment Calculator                             Contact Us
Financial Glossary         **Services**           Terms of Service
Broker Center              Forex Newsfeed         Privacy Policy
World Business Headlines    Research
                           Press Release

© Copyright 2012 The International Business Times Inc. All Rights Reserved.

100 LB   BLUEBIRDonline.com (888) 477 - 0700   100 LB Style

# VELLTURO
# EXHIBIT 104

CES 2012: Sprint Ramps Up 4G with Galaxy Nexus, LTE Devices · Mobiledia

MOBILE | APPS | TABLETS | INTERNET TV

# MOBILEDIA

NEWS | EDITORIALS | SPECS | RECEPTION | RADIATION | FORUMS

Custom Search [Search]    Trending: Strategies & Solutions | Apple | Legal | Social Media | Google    Follow Us: 

Home > Mobile News > Featured News > CES 2012: Sprint Ramps Up 4G with Galaxy Nexus, LTE Devices

## CES 2012: Sprint Ramps Up 4G with Galaxy Nexus, LTE Devices




BY SANDY FITZGERALD | TUE JAN 10, 2012 10:58 AM

Sprint announced its first three LTE devices, including its own version of the Samsung Galaxy Nexus, as the company works to expand its LTE network capabilities.

👍 32   9   1
You
👍 Like   ✈ Tweet   +1

The carrier, making its announcement at CES, did not give the devices' release date, but they will likely go on sale by mid-year.





The Galaxy Nexus, considered the closest competition to Apple's iPhone 4S, is like Verizon's model with one important difference. Sprint's new Android 4.0 flagship phone is the only Nexus so far that has Google Wallet support, which will let owners use its near-field communications, or NFC, technology to pay at MasterCard's PayPass readers in the U.S.

Samsung Galaxy Nexus

Verizon's version also has the NFC hardware, but the carrier is blocking Google Wallet. Only a handful of phones so far have NFC capabilities, but with more people paying by smartphone in the next few years, shoppers may want phones that are already capable of using the systems.

**Top News**

**Apps Boost U.S. Jobs, But Benefits Mostly Overseas**

**Verizon to Spur LTE Sales with Double-Data Deal**

**Tech Hipsters Not So Cool Now**

**Cyber-Attacks to Surpass Terrorism Threat, FBI Says**

**Super Bowl Breaks Twitter Record**

More News >

In addition to the Galaxy Nexus, Sprint will add the LG Viper, a mid-tier smartphone to its 4G lineup. Like the Nexus, the Viper has a dual-core 1.2 gigahertz processor, but is smaller, with a 4.0-inch display, 5-megapixel back camera and VGA front camera. The Viper also features NFC, giving it the first Google Wallet support outside of a Nexus phone.

The Sierra Wireless Tri-Network Hotspot rounds out Sprint's new offerings. It combines

EDITORIALS & OPINION

## NUTS: Facebook Preps for IPO, Apple Edges Out Samsung

BY KATE KNIBBS



Facebook made waves as it prepared to file for its IPO, while Apple edged out Samsung for smartphone dominance, and RIM and Sony plotted comebacks under new leadership.

› The Score: Facebook Soars on IPO, But Air Gets Thin
› ITTO: Take College Classes for Free
› NUTS: Apple Dominates Smartphones, Google Sparks Criticism Over Privacy

Follow Us

**Mobiledia.com** on Facebook

👍 Like
You like this. · Admin
Page · Insights · Error
Confirm      You like
You like

✈ Follow @mobiledia    2,852 followers

Mobiledia News In Your Inbox

Your Email Address    [Sign Up]

AdChoices ▷

Most Popular

CES 2012: Sprint Ramps Up 4G with Galaxy Nexus, LTE Devic      iledia

3G and 4G technology, with 3G offered over EVDO, but has 4G on WiMAX and LTE, meaning its speeds won't often drop to 3G. The hotspot handles up to eight Wi-Fi users and supports up to 32-gigabytes of shared storage.

Sprint is pushing LTE as its next-generation 4G network. It had at one time led the way with Clearwire's WiMax network, but carriers are switching to the more modern LTE systems.

Verizon now leads the way in 4G, with several phones that have LTE capability and with a network that can support the devices, but AT&T is gaining ground, and Sprint is entering the race as well with its new phones.

Sprint will still need to work on expanding its LTE network. It planned to buy spectrum from LightSquared, and entered a deal last year that would allow the satellite provider to tie in with its cell tower network.

However, LightSquared's expansion plans are on hold because of government scrutiny over whether its signals interfere with the nation's GPS technology for airplanes, weather forecasting and other applications, leaving Sprint to explore other ways to offer LTE service.

The new devices announced Monday, though, signal Sprint's plans to expand LTE service -- with or without LightSquared -- and signal the carrier's commitment to remain competitive this year.



Posted in: Featured (562) | Gadgets & Gear (226) | Google (598) | Samsung (527) | Sprint (443) | Galaxy (87) | LTE (84) | CES (53)



Facebook social plugin

---

**Related News**



### Slimmer Galaxy S3 to Take on iPhone 5
MON FEB 06, 2012 12:09 PM | BY

Samsung's ultra-slim Galaxy S3's sleeker design and other rumored features could directly compete with Apple's iPhone 5 when released this spring.



ADVERTISEMENT                                    AdChoices ▷

Invalid action type

**Companies News**

› Apple News
› AT&T News
› Google News
› HP News
› HTC News
› LG News
› Microsoft News
› Motorola News
› Nokia News
› RIM News
› Samsung News
› Sony Ericsson News
› Sprint News
› T-Mobile News
› Verizon News

**Editorials & Opinion**

› Is This Thing On?
› News Under the Sun
› The Score

**Business News**

› Finance News
› Mergers & Acquisitions News
› Politics News
› Strategies & Solutions

CES 2012: Sprint Ramps Up 4G with Galaxy Nexus, LTE Devic       hiledia

News

## Gadgets & Gear News

› Innovations &
Inventions News
› Luxury News
› New Releases

## Legal News

› Patents News
› Policy News
› Regulation News

## Lifestyle News

› Arts & Entertainment News
› Health & Safety News
› Off-Beat News

## Mobile News

› Apps & Games News
› Mobile Payments News

## Problems & Issues News

› Crime & Punishment News
› Hacking News
› Viruses & Malware News

## Social Media News

› Facebook News
› Twitter News



### Google Fights Android Malware with Bouncer
FRI FEB 03, 2012 3 01 PM | BY

Google is beefing up security in the Android app market with its "Bouncer" software, aiming to fight malware and earn back consumer trust as competition with Apple heats up.

  



### Google to Delay Privacy Changes, Facebook Gains
FRI FEB 03, 2012 1 44 PM | BY

European regulators asked Google to delay its new privacy policy, throwing up a roadblock to the Internet giant's plan to consolidate its services to compete against Facebook.

  



### Apple, Samsung Escalate Patent Battle in Australia
FRI FEB 03, 2012 11:53 AM | BY

Apple is widening its patent case against Samsung in Australia, suggesting the lawsuit between the two competitors is going to intensify before any resolution.

  



### Microsoft Attacks Google Privacy Policy, Touts Own Services
WED FEB 01, 2012 4:01 PM | BY

Microsoft's ad campaign is using concern over Google's new privacy policies and search features to promote its own products, as the two companies battle for users.

  

## Related Phones

    

| RIM BlackBerry Bold (9930) | Samsung Transform Ultra | Motorola Admiral | HTC Evo Design 4G | Apple iPhone 4S |
|---|---|---|---|---|
| Sprint / Verizon | Sprint | Sprint | Sprint | AT&T / Sprint / Verizon |

More Phones: Sprint

## News by Date

| 2011 | | 2010 | |
|---|---|---|---|
| › Jan | › Jul | › Jan | › Jul |
| › Feb | › Aug | › Feb | › Aug |
| › Mar | › Sep | › Mar | › Sep |
| › Apr | › Oct | › Apr | › Oct |
| › May | › Nov | › May | › Nov |
| › Jun | › Dec | › Jun | › Dec · |

| 2009 | | 2008 | |
|---|---|---|---|
| › Jan | › Jul | › Jan | › Jul |
| › Feb | › Aug | › Feb | › Aug |
| › Mar | › Sep | › Mar | › Sep |
| › Apr | › Oct | › Apr | › Oct |
| › May | › Nov | › May | › Nov |
| › Jun | › Dec | › Jun | › Dec |

| 2007 | | 2006 | |
|---|---|---|---|
| › Jan | › Jul | › Jan | › Jul |
| › Feb | › Aug | › Feb | › Aug |
| › Mar | › Sep | › Mar | › Sep |
| › Apr | › Oct | › Apr | › Oct |
| › May | › Nov | › May | › Nov |
| › Jun | › Dec | › Jun | › Dec |

AdChoices

Search

Home | News | Reviews | Specs | Forums | Glossary | Shop

About Us | Contact Us | Jobs | Advertise | Feeds | Site Index

Mobiledia Network: Mobiledia.com [ 中文版 ] | CellReception.com | CellRisk.com | Appedia.com | Tabletedia.com [ 中文版 ] | iTVedia.com

©2002-2012 Mobiledia Corp. All Rights Reserved. Terms of Use | Privacy Policy

100 LB    BLUEBIRDonline.com (888) 477 - 0700    100 LB Style

# VELLTURO
# EXHIBIT 105

CNET Reviews

# Samsung Galaxy Nexus (Verizon Wireless)

## CNET Editors' Rating

4.5

[StartReview]
Outstanding

## Average User Rating

4.5

[http://www.cnet.com/smartphones/samsung-galaxy-nexus-verizon/4852-6452_7-35099738.html]

As shown: $649.99

Set price alert

From the top to the bottom of the main home screen, other ICS changes include a transparent search bar, a stylized clock, and a round icon denoting a folder that's been filled with Google services. You can create and name your own home screen folders by dragging app icons on top of one another. The implementation is easy to use and looks terrific.



## The new home screen is just gorgeous and clean, and we love the folders.

Resizable widgets are another Ice Cream Sandwich addition. You can drag and drop them onto the home screen from the app tray (more later), and press and hold the widget to surface the selection handles. Most of the time, a widget will resize when you drag it on the X or Y axis, but some widgets, like the one for the photo gallery, don't resize. Overall, the home screen's look is clean and familiar, but also new, and it pushes Android into edgier, less cutesy territory.

Sharp-eyed smartphone fans will notice that Google appears to have borrowed some touches from a few of its competitors. The main menu control (the only icon in the shortcut tray that isn't editable) looks very BlackBerry, for example. Also, in another touch from Honeycomb, the pop-up menu control disappears entirely and is replaced by a very cleanly designed menu button that looks like a triple-tiered colon (that's a page from the Windows Phone 7 design book). We have to gripe,

though, that this control moves to the top or bottom of many apps, which can be hard to track. It would be better if it were consistently at the top.



### The main menu has a simple, easy-to-use interface.

The apps launcher looks essentially the same as Gingerbread's, though it has a slightly different layout and a fancy graphical transition as you swipe horizontally through your apps. We really like that the Market app is persistently accessible on the top of the screen, and that the app launcher has expanded to include widgets. However, the "tiled look" for widgets that Google proudly showed off at the Ice Cream Sandwich launch event looks cluttered and confusing.

**Screenshots:** If you like this **screenshot tour of Ice Cream Sandwich [http://www.cnet.com/2300-6452_7-10010260.html]** , you can thank, well, Ice Cream Sandwich, and its new native screenshot capability in particular. Late to the game compared with Apple's iOS (and even some Android phones, like the **Samsung Galaxy S II [http://www.cnet.com/smartphones/samsung-galaxy-s-ii/4505-6452_7-35003060.html]** ), the feature is nevertheless a boon for app developers, for us journalist types, and for anyone who wants to diagnose an error or save a snap of a game for bragging rights.

The trick is pressing the hardware combination of the volume-down button and power button in the right way to trigger the native screenshot tool. Unfortunately, it took time to get the feel for it

on the Galaxy Nexus. The action was awkward, and not always successful, especially at first. The ease of snapping screenshots will vary by a handset's individual proportions.



## The new panorama mode works well, but is it worth turning into its own mode?

**Cameras and video:** The panorama feature in the Ice Cream Sandwich camera was one of the first secrets to leak. Several Android-bearing phones have seen the feature before, but only as an addition to a Samsung or HTC camera, never as a blood-and-bones part of Android. Now, Google has made it front and center, one of your three camera "mode" choices, in addition to the standard camera and video.

As helpful as it is that the software instructs you as you shoot (telling you to slow down, for instance), we wonder how many people will take panorama shots often enough to warrant its prominence in the app. At any rate, the tool worked smoothly in our tests.

The joint photo and video gallery gets a few tweaks, most notably the "magazine tile" look we also saw with widgets. This time, the photos are even more cluttered, a barrage of thumbnails with little room between them to let your eyes take it in. In addition, when you open an image, you'll also see a ticker of other gallery images along the bottom. The utility of being able to scroll through them is nice, but the visual noise it creates is not.

Samsung Galaxy Nexus Review    Watch CNET's Video Review                    Page 5 of 13



**The newly redesigned calling screen puts contacts front and center, but may also make them blurry.**

**People and calling:** Google has completely reworked the look and feel of its Contacts app--down to the color and layout--and we like it. Photos are more prominent, a good thing so long as they're higher-resolution or you don't mind a little graininess. The drop-down menu lets you set the ringtone or send all calls to voice mail. Gone is the alphabet on the right-side rail, though if you touch the scroll bar while scrolling quickly through your contact list, you'll still be able to skip through your contacts.

When you place a call, the photo enlarges. The colors here are bold, with strong color blocking, a deliberately hipper look than what we've been seeing for the friendly green Android. While everything feels more open and breezier, it also doesn't feel like it visually mirrors the rest of the Ice Cream Sandwich design. This may not bother you on a day-to-day basis and it doesn't impede usability. Nevertheless, it's an oddity of (in)cohesion that shouldn't exist in a polished OS.



## The virtual keyboard is big and we like the clean design.

One thing that is missing is the ability to long-press a contact's name while you're in the phone view to see options for sending a text--something you could do in Gingerbread. Instead, Google has replaced this with a different kind of behavior. Now, to text, call, and even e-mail contacts from any native communications app, just tap the photo icon. The logic is easy to follow once you remember it, but it isn't immediately apparent.

Google+ integrates with ICS, of course. As a perk for your Google social network, contacts you have starred as "favorites" will show up with a high-resolution image, so long as "sync contacts" is enabled in the separate Google+ app. (Warning: using a lot of high-res photos can affect data usage.)

**E-mail:** Many small changes add up to a smarter, cleaner, more stylish, and overall improved Gmail experience. Fresh icons and space to read certainly help, but it's the new way that your contacts' e-mail addresses (and photos) pop up that we love, along with the ability to drag and drop highlighted text along the screen without first using onscreen controls to cut and paste. Gmail will now also let you search offline messages dating back to 30 days.

If you misspell a word, you'll have the usual options to let Android autocorrect, or to pick from an autosuggested word right below the composition window. With Ice Cream Sandwich, you can also tap the misspelled word (it'll be underscored in red) and choose from a selection of related choices, or even add a new word to the dictionary.



**Facial unlocking is the fun, but not particularly secure, way to unlock your ICS phone.**

**Facial unlocking:** We've known since last May that Google's facial-tracking software would make it into Ice Cream Sandwich one way or another, and here it comes in the form of Face Unlock, a security option that lets you unlock the phone by holding it up to your face for a few seconds. It's one of those quirky features that's fun to play with, but even Google's copywriters warn in the software that it's less secure than a PIN or pattern, adding that someone who looks like you may succeed in unlocking your phone.

In fact, we were able to hold up a photo of a face (taken with the **HTC Rezound [http://www.cnet.com/smartphones/htc-rezound-verizon-wireless/4505-6452_7-35023866.html]** ) to the Galaxy Nexus to unlock the phone. If the facial-recognition engine fails, however, you'll still have a four- to nine-digit PIN or a traceable pattern as a fallback.

We should note that neither a pattern nor facial unlocking works if your IT group requires a PIN in order for you to access your corporate e-mail. For security purposes, every time you disable Face Unlock, you'll have to set it up again in order to use it. It worked in the dozen times we used it.



© 2011 CBS Interactive

**The back of Galaxy Nexus has a 'hyperskin' material. The camera lens and flash sit up top.**

**Android Beam:** One of the most interesting new features in Ice Cream Sandwich, Android Beam uses NFC to transfer things like maps, contact information, and the name of a running game or app between two compatible phones within the same proximity. To make it work, go into the Settings, and find the More menu under Wi-Fi. Make sure NFC is enabled, and that Android Beam shows that it's ready to transmit. Learn more, and watch a video of **Android Beam in action [http://news.cnet.com/8301-19736_7-57335270-251/android-beam-in-action-ice-cream-sandwichs-flashy-nfc-feature/]** .

**Visual voice mail:** Remember the visual voice mail demo from the ICS launch event in Hong Kong? So do we. We have not been able to test this yet for the simple fact that the Google Voice app in Android Market does not yet use the compatible developer API. So stay tuned.

**Extra stuff:** Other ICS additions include the ability to swipe alert messages away one by one from the pull-down notifications menu, recent apps list, and Internet bookmarks (they call it "gestures"); double-tapping the clock on the home screen to set an alarm; new Gmail messages that flash the name of the sender in the notifications bar; and more options for deflecting unwanted incoming calls.



© 2011 CBS Interactive

**For now, at least, the Galaxy Nexus is a Verizon exclusive.**

### Where Ice Cream Sandwich soars, falls short

Nobody can accuse Google's Android team of putting forth a weak or insubstantial OS update. ICS has tweaked Android's style from head to toe, giving it a far bolder identity than ever before, often with a polished look. For the most part, Google has succeeded in splicing together Gingerbread and the tablet-centric Honeycomb OSes to create a single experience that can work identically on both phones and tablets. It can't have been easy merging two OSes with different identities, and unfortunately the seams sometimes show.

On the one hand, the OS *has* surfaced many previously buried features, like adding the Market icon on the top of each screen in the app tray, making the search bar persistent, making it easy to call up recent apps via a navigation control, and moving widgets to the app tray where they can be seen. The long-press will still unearth more features at times, but Google is moving away from that common complaint overall.

On the other hand, there's that recurring issue of cohesion and occasional clutter (which the tablet design will surely resolve for larger devices). Ice Cream Sandwich is a patchwork of visual themes, and one that lacks flow throughout the entire experience. The elegant home screen and notifications menu have one motif, the crowded photo and widget tiles another, and the high-contrast address book and calling screens a third. It's as if three separate groups of designers came together in the 11th hour. No, the sometimes disjointed look and feel don't detract from Android's usability (unless you find it confusing), but it's also not a problem you see in iOS, Windows Phone, or BlackBerry OS 7, as tame as it is.

Moreover, even as Ice Cream Sandwich simplifies some actions, it also adds other features that aren't obvious. True, Android always tucked aside hidden features to reward power users, and we're not talking about Easter eggs. For instance, there's no indication that you can swipe away notifications in the pull-down menu, and that action isn't persistent across the OS.



© 2011 CBS Interactive

**From left, the Galaxy Nexus, the Motorola Droid Razr, the iPhone 4, and the Samsung Galaxy S II.**

It also isn't clear that the grid numbers you see next to a widget in the app tray (1x1, 2x4) correspond to a grid that shows up on the home screens when you move around app icons and widgets. When you answer a phone call, it isn't until you press the incoming ring button that you can drag it to answer, hang up, or reply in a text. Our point is this: though Ice Cream Sandwich solves some problems with the learning curve, it also creates a few others.

The first piece of good news is that these are all issues that Google can tackle in successive updates, while also working to make the back end more powerful still. The second piece of good news is that there's plenty of room for invested hardware makers like Samsung, HTC, and Motorola to continue creating custom graphical shells to run on top of Android. Ice Cream Sandwich is no longer plain old vanilla, and we suspect its design will be more polarizing, not less.

At the end of the day, Ice Cream Sandwich does succeed in moving Google forward, and establishing it as having staying power in the mobile OS space. As conflicted as the OS' personality

may be, it's also emblematic of Google leaving less of its cultivation to the handset makers, and taking a stronger stand on defining its 'Droidy personality.

## Processor
The 1.2GHz dual-core processor is a big step above the Nexus S'. Menus opened instantly and most features took a couple of seconds to power up. Even the photo gallery, which took about 5 seconds to open on the Nexus S, was up and running in 2 seconds. The phone also kept up during a day of heavy use. We switched between applications quickly and without any hiccups.

When we tested the Galaxy Nexus next to the iPhone 4 we got varying results. Some apps, like messaging and maps, for example, opened faster on the Galaxy Nexus, while other features, such as the camera, opened faster on the iPhone. And to make things even more confusing, it was a tie between the phones for the settings menu. We'll dive deeper into the processor over the next few days.

## Call quality
We **tested [http://www.cnet.com/how-we-test/cell-phones/]** the dual-band (CDMA 800/1900) Samsung Galaxy Nexus in San Francisco using Verizon's network. Call quality was respectable on the whole. The volume was plenty loud and voices sounded natural, though a little garbled. At one point, volume temporarily dropped off on a call. However, we appreciated the otherwise clear line. On their end, callers said volume was great and the line was clear. Although we sounded a tad flat, we were easy to understand.

**Samsung Galaxy Nexus (Verizon) call quality sample Listen now:**

Speakerphone volume was slightly lower, but there was no background noise. Voices did acquire a tin can effect, however: a little hollow, echoey, and tinny. For their part, callers agreed about the slightly lower volume and unmistakeable speakerphone quality, but also thought it was a relatively positive experience, without any background noise.

## Data speeds
The Galaxy Nexus supports Verizon's 4G LTE network, which promises download speeds ranging from 5Mbps to 12Mbps. Speeds were impressive in our early tests, consistently ranging from 6Mbps up to 17Mbps using Ookla's Speedtest.net app. The New York Times' mobile-optimized site loaded in 7 seconds, with the full site arriving in just 6. CNET's own mobile site was ready to use after just over 8 seconds.

## Battery
We're still checking with Samsung to get the rated talk and standby **battery [http://www.cnet.com/2719-11288_7-290-13.html]** times. Of course, we'll also conduct official tests with CNET Labs. According to FCC radiation tests, the Galaxy Nexus has a **digital SAR [http://www.cnet.com/2719-6602_7-291-13.html]** of 0.63 watt per kilogram.

## Conclusion
The Samsung Galaxy Nexus is unmistakably an Android phone. It's powerful, you can tinker with it down to its core, and it offers some features the iPhone can't touch. Without a doubt, Android fans will see the Galaxy Nexus that way and they're likely to savor every morsel of Ice Cream Sandwich.

Without ICS, the phone is more or less just a Nexus device, but with it you're looking at a sleek and powerful smartphone that soars on Verizon's network.

As we said, ICS is a big leap forward in making Android friendlier to entry-level users while satisfying the pros. Google has struggled to find that balance in the past, with some devices being too simple and others being too geeky. The trouble is, though, that iOS and Windows Phone, with their manual-not-required interface and attention to the user experience, are waiting to scoop up consumers who find the new Android to be too much. By taking a step forward, ICS will win a few of them back, but it also keeps a foot in Android's cluttered past.

**Editors' note:** *This review has been updated with the FCC's digital SAR rating for the Galaxy Nexus.*

**Previous page [http://www.cnet.com/smartphones/samsung-galaxy-nexus-verizon/4505-6452_7-35099738.html]**



## Kent German [http://www.cnet.com/profile/KentGerman]

Kent German is a section editor for mobile device reviews at CNET. When he's not testing the newest handsets on the market, he's blogging about wireless news, appearing on the Dialed In podcast and watching planes land at the airport (yes, really). In his On Call column, he answers reader questions and gives his take on the rapidly changing mobile industry.



## Jessica Dolcourt [http://www.cnet.com/profile/J-Do]

Jessica Dolcourt pits phone against phone in the ongoing epic battle of the latest and greatest smartphones. Before that, she sat in judgment of smartphone and desktop apps. In her personal life, Jessica remains tireless in her quest for the world's most perfect cheese.

## Where to Buy

MSRP: **$649.99**

Set price alert

## Specifications

**See full specs [http://www.cnet.com/smartphones/samsung-galaxy-nexus-verizon/4507-6452_7-35099738.html]**

## Quick Specs

Service provider: Verizon Wireless

Cellular technology: CDMA / LTE

Combined with: With digital camera / digital player

© CBS Interactive. All rights reserved.

100 LB BLUEBIRDonline.com (888) 477 - 0700 100 LB Style

# VELLTURO
# EXHIBIT 106



Search                                               Login    Sign up

All Categories        Shop & Compare      Business Centre      Jobs      Forum

ile   Home   News   Reviews   Top Rated   Features   Gallery   Roundups   Videos

es:

Mobile Phones    News    Galaxy Nexus vs. iPhone 4S: Smartphone comparison                    Follow Us

# Galaxy Nexus vs. iPhone 4S: Smartphone comparison

Which is the better smartphone? Samsung's Galaxy Nexus or the Apple iPhone 4S?

Ross Catanzariti (Techworld Australia) — 01 December, 2011 15:03

Share    Tweet <1    Like                                        Comments  26



Samsung Galaxy Nexus vs. Apple iPhone 4S: Fight!

The Samsung Galaxy Nexus is the first smartphone to run the latest version of Google's Android platform, 4.0 or "Ice Cream Sandwich". It boasts a strikingly large 4.65in Super AMOLED HD screen and has a distinctive teardrop design. Naturally, its going to be compared to the popular Apple iPhone 4S. So, how does it stack up?

• Where can you buy the Galaxy Nexus?
• A first look at the Galaxy Nexus
• A word on the Galaxy Nexus: Battery life

The Galaxy Nexus has a bigger screen, a camera that claims to have zero shutter lag and runs Google's most advanced version of Android yet. Is it enough to compete with the iPhone 4S? Let's take a closer look.

## Galaxy Nexus vs. iPhone 4S: Specifications

| Feature | Samsung Galaxy Nexus | Apple iPhone 4S | Verdict |
|---|---|---|---|
| Operating system | Google Android 4.0 (Ice Cream Sandwich) | Apple iOS 5 | Draw |
| Display size | 4.65in | 3.5in | Galaxy Nexus |
| Display technology | Capacitive Super AMOLED HD | Capacitive LED-backlit IPS | Draw |
| Display resolution | 720x1280 | 640x960 | Galaxy Nexus |
| Pixel density | 316 ppi | 330 ppi | iPhone 4S |
| Multitouch | Yes | Yes | Yes |
| Front camera | 1.3-megapixels | VGA | Galaxy Nexus |
| Rear camera | 5 megapixels w/single-LED flash | 8 megapixels w/single-LED flash | iPhone 4S |
| Camera features | Autofocus, touch focus, geotagging, face detection, zero shutter lag | Autofocus, touch focus, geotagging, face detection, video stabilisation | Draw |
| Video recording | 1080p HD @ 30fps | 1080p HD @ 30fps | Draw |
| FM radio | No | No | Draw |



Now you can lead the way with the first phone on Android 4.0

### Latest Articles

LightSquared says GPS has to accept interference

Microsoft lowering its profile at CES after 2012

LibreOffice backers want community to join 'bug hunt'

Facebook commits to changes following critical Irish audit

PayPal tests mobile payments in Sweden

### Most Popular

Five things we hate about the Samsung Galaxy S II

How to get out of your mobile phone contract

Galaxy Nexus vs. iPhone 4S: Smartphone comparison

Nokia N9 vs. Apple iPhone 4S: Smartphone comparison

iOS 5 finally gets custom notification tones

### Resources

  Mobile Phones Product Finder
Find the product you're looking for with our Mobile Phones search tool.

### Most Commented

  Refurbished HP TouchPad fire sale is happening this Sunday

  Apple iPad 2 vs Samsung Galaxy Tab 10.1: Tablet showdown

  Galaxy Nexus vs. iPhone 4S: Smartphone comparison

  What's the difference between an Intel Core i3, i5 and i7?

  Five things we hate about the Samsung Galaxy S II

| | | | |
|---|---|---|---|
| GPS | Yes, with Google Maps navigation | Yes | Galaxy Nexus |
| Internal memory | 16GB or 32GB | 16GB, 32GB or 64GB | iPhone 4S |
| Expandable memory | None | None | Draw |
| Dimensions | 135.5 x 67.9 x 8.9 mm | 115.2 x 58.6 x 9.3 mm | iPhone 4S |
| Weight | 135g | 140g | Galaxy Nexus |
| Application Store | Google Android Market | Apple App Store | iPhone 4S |
| Processor | Cortex A9 dual-core (1.2GHz) | Apple A5 dual-core (800MHz) | Draw |
| RAM | 1GB | 512MB | Galaxy Nexus |
| Australian 3G networks | HSDPA 850/900/2100 | HSDPA 850/900/2100 | Draw |
| WI-FI | 802.11a/b/g/n | 802.11b/g/n | Draw |
| Bluetooth | 3.0 with A2DP | 4.0 with A2DP | Draw |
| HDMI-out | No (Yes with MHL adapter) | No (Yes with Apple Digital AV adapter) | Draw |
| Quoted battery life | Up to 8 hrs 20 min | Up to 8 hrs | Galaxy Nexus |
| Battery -capacity | 1750 mAh | 1420 mAh | Galaxy Nexus |
| Adobe Flash support | Yes (After Adobe update) | No | Galaxy Nexus |
| Carriers | Unknown | Telstra, Optus, Vodafone | Unknown |

## Galaxy Nexus vs. iPhone 4S: Display

The Galaxy Nexus has a strikingly large 4.65in Super AMOLED HD display — one of the biggest screens currently available on the market. The HD points to a high definition resolution of 1280x720; we can tell you that the Galaxy Nexus displays an ultra sharp and crisp image. The screen is bright, vivid and clear and text is crisp and smooth with minimal visible aberrations. The large size of the screen makes the Galaxy Nexus great for video playback but the best benefit of the screen is the experience it creates when reading and Web browsing. Our only complaint is that the automatic brightness setting is often erratic.

The iPhone 4S on the other hand has the same 3.5in sized display as the iPhone 4 it replaced. It looks TINY alongside the Galaxy Nexus but remains one of the best screens on any phone we've reviewed. The iPhone 4S display uses IPS technology and its 640x960 pixel resolution has been described as a "retina" display due to the human eye being unable to distinguish individual pixels. The iPhone 4S's screen has a pixel density of 330ppi — slightly higher than the 316ppi of the Galaxy Nexus.



**PC World Australia's Best Prices**



**Nokia 6700 Classic**

$279.00
Go to shop



**Apple iPhone 3GS - 8GB official Apple unlock**

$409.00
Go to shop



**HTC HD7 (Black) T9292 8GB Windows Mobile 7 SIM Free / Unlocked**

$331.95
Go to shop



**Sony Ericsson U1a Satio - NextG Compatible Factory Unlocked Phone**

$571.00
Go to shop



**LG Optimus 3D P920 Google Android Smartphone - Black (Australian Model, Unlocked)**

$499.50
Go to shop



**Verdict:** The iPhone 4S' screen remains one of the best ever produced on a mobile device, but we have to award the win here to the Galaxy Nexus. Not only does it dwarf the iPhone in size, its also the best screen we've ever seen on any Android phone. Text is crisp and clear making reading and Web browsing a delightful experience, while the size of the screen doesn't make handling the phone an awkward experience.

*Next page: Design, software, camera and more*

Page:   1   2   next >



Ross Catanzariti
Techworld Australia

Tweet < 1        Like  121

Print this article

Email this article

Topics:  smartphones, Samsung Galaxy Nexus, mobile phones, iPhone 4S, iOS 5, iOS, Ice Cream Sandwich, Galaxy Nexus, Apple iPhone 4S, Android 4.0, Android

## Comments

*1*  **maikai.guy**                                      Thu 01/12/2011 - 15:42

Apple store wins over Android Market? Really? Maybe last year. Isn't that a preference rather than a reality at this point?

Processors are a draw? The A5 is not a more advanced processor than an A9... and with the Nexus being clocked a full 50% faster... winner = Galaxy Nexus

*2*  **user**                                            Thu 01/12/2011 - 15:43

what about durability? if I have a two year contract, which will hold up better in the long run...

*3*  **Dianne**                                          Thu 03/11/2011 - 16:34

Please, please tell me that this was written to be a parody of spec-based comparison reviews.

# VELLTURO
# EXHIBIT 107

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN JOSE DIVISION

 4

 5      APPLE, INC.,              )  C-11-01846-LHK
                                  )
 6             PLAINTIFF,         )  JUNE 17, 2011
                                  )
 7                 V.             )
                                  )
 8      SAMSUNG ELECTRONICS       )  PAGES 1 - 39
        COMPANY LIMITED, ET       )
 9      AL.,                      )
                                  )
10             DEFENDANTS.        )
        ------------------------  )
11

12

13           THE PROCEEDINGS WERE HELD BEFORE

14         THE HONORABLE UNITED STATES DISTRICT

15                JUDGE LUCY H. KOH

16      A P P E A R A N C E S:

17

18

19      FOR THE PLAINTIFF:  MORRISON & FOERSTER
                            BY:  HAROLD J. MCELHINNY
20                               MICHAEL A. JACOBS
                                 GRANT L. KIM
21                          425 MARKET STREET
                            SAN FRANCISCO, CALIFORNIA 94105
22

23          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

24

25      OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
                                 CERTIFICATE NUMBER 8074
```

                                                         1

```
1     A P P E A R A N C E S:  (CONT'D)

2

3     FOR THE DEFENDANTS:  QUINN, EMANUEL, URQUHART &
                           SULLIVAN
4                          BY:   CHARLES K. VERHOEVEN
                                 MICHAEL T. ZELLER
5                                ERIK C. OLSON
                                 KEVIN P.B. JOHNSON
6                                VICTORIA F. MAROULIS
                           865 SOUTH FIGUEROA STREET
7                          10TH FLOOR
                           LOS ANGELES, CALIFORNIA 90017
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                              2
```

| | |
|---|---|
| 1 | SAN JOSE, CALIFORNIA                    JUNE 17, 2011 |
| 2 | |
| 3 | P R O C E E D I N G S |
| 4 | (WHEREUPON, COURT CONVENED AND THE |
| 5 | FOLLOWING PROCEEDINGS WERE HELD:) |
| 14:27:50  6 | THE CLERK:  CALLING CASE NUMBER |
| 14:27:56  7 | C-11-1846-LHK, APPLE VERSUS SAMSUNG ELECTRONICS |
| 14:27:59  8 | COMPANY LIMITED, ET AL. |
| 14:28:18  9 | MR. MCELHINNY:  GOOD AFTERNOON, YOUR |
| 14:28:21 10 | HONOR.  HAROLD MCELHINNY, MICHAEL JACOBS, AND GRANT |
| 14:28:22 11 | KIM FOR THE PLAINTIFFS APPLE. |
| 14:28:25 12 | THE COURT:  GOOD AFTERNOON. |
| 14:28:29 13 | MR. VERHOEVEN:  GOOD AFTERNOON, YOUR |
| 14:28:30 14 | HONOR.  CHARLES VERHOEVEN FOR QUINN EMANUEL ON |
| 14:28:33 15 | BEHALF OF THE SAMSUNG DEFENDANTS AND WITH ME IS MY |
| 14:28:37 16 | PARTNER KEVIN JOHNSON, MIKE ZELLER, VICKIE |
| 14:28:48 17 | MAROULIS. |
| 14:28:48 18 | THE COURT:  GOOD AFTERNOON.  PLEASE SIT |
| 14:28:49 19 | OR STAND, WHICHEVER IS MOST COMFORTABLE. |
| 14:28:52 20 | I HAVE QUESTIONS FOR ALL SIDES TODAY. |
| 14:28:58 21 | I'LL START FIRST WITH MR. VERHOEVEN. |
| 14:29:01 22 | WHEN WE HAD THE HEARING ON APPLE'S MOTION YOU HAD |
| 14:29:03 23 | SPECIFIED SOME EXPEDITED DISCOVERY THAT SAMSUNG |
| 14:29:06 24 | WOULD NEED, WHICH I THOUGHT WAS VERY REASONABLE, |
| 14:29:09 25 | BUT IT DOESN'T APPEAR THAT YOU'RE REQUESTING THAT |

3

```
14:29:11   1      NOW.
14:29:11   2            WHY IS THAT?
14:29:16   3            MR. VERHOEVEN:  WELL, YOUR HONOR, WHEN WE
14:29:18   4      WERE AT THE HEARING WE WERE GOING OVER THE SCOPE OF
14:29:19   5      THE DISCOVERY THAT THE PLAINTIFF WAS SEEKING, AND
14:29:21   6      THEY HAD SOUGHT BROADER DISCOVERY THAN WHAT YOUR
14:29:28   7      HONOR ACTUALLY ORDERED.
14:29:29   8            AND SO WE ACTUALLY THOUGHT THAT WE WOULD
14:29:31   9      PARE BACK AND TRY TO BE AS RECIPROCAL AS POSSIBLE
14:29:35  10      IN THE DISCOVERY WE WERE SEEKING.
14:29:36  11            SO OUR MOTION IS THE EXACT RECIPROCAL
14:29:40  12      DISCOVERY THAT YOUR HONOR ORDERED.
14:29:41  13            AND THAT'S BASICALLY THE EXPLANATION.
14:29:45  14            THE COURT:  SO DO YOU NOT NEED THE THINGS
14:29:47  15      THAT YOU SPELLED OUT AT THE HEARING, YOU DON'T NEED
14:29:53  16      THAT ANYMORE?
14:29:54  17            MR. VERHOEVEN:  WELL, IT SOMEWHAT DEPENDS
14:29:56  18      ON THE SCOPE AND THE NATURE OF THESE POTENTIAL
14:29:58  19      PRELIMINARY INJUNCTION MOTIONS THEY FILED, YOUR
14:30:00  20      HONOR.
14:30:00  21            SO IF THEY FILE A PRELIMINARY INJUNCTION
14:30:02  22      MOTION, WE'RE NOT SURE AT THIS POINT WHAT PRODUCTS
14:30:06  23      THEY'RE GOING TO FILE ON, WE'RE NOT SURE THEY'RE
14:30:08  24      EVEN GOING TO FILE IT.
14:30:09  25            AND I THINK IN FULL DISCLOSURE, YOUR
```

4

14:30:11  1    HONOR, ONCE WE SEE A MOTION, WE PROBABLY WILL MEET

14:30:15  2    AND CONFER WITH THE OTHER SIDE, ONCE WE SEE THE

14:30:18  3    SCOPE OF IT, AND TRY TO WORK OUT SOME SORT OF

14:30:20  4    ARRANGEMENT IF THEY FILE A MOTION SO THAT BOTH

14:30:23  5    SIDES CAN HAVE SOME SORT OF A RECIPROCAL DISCOVERY.

14:30:28  6    FOR EXAMPLE, IF THEY HAVE DECLARANTS OR EXPERT

14:30:31  7    DECLARATIONS OR THEY DO A SURVEY OR SOMETHING, THEN

14:30:34  8    WE WOULD NEED TO DO A CERTAIN AMOUNT OF DISCOVERY.

14:30:36  9         HOWEVER, IF THEY DIDN'T DO THAT AND THEY

14:30:38 10    DON'T HAVE DECLARATIONS, THEN IT WOULD BE SLIGHTLY

14:30:40 11    DIFFERENT.

14:30:40 12         SO WHAT WE TRIED TO DO, YOUR HONOR, IS

14:30:44 13    YOUR HONOR HAD INDICATED AT THE HEARING -- YOU KNOW

14:30:46 14    WE OPPOSED THIS VERY DISCOVERY AND OF FUTURE

14:30:49 15    PRODUCTS.

14:30:52 16         BUT YOUR HONOR WAS PERSUADED THAT THAT

14:30:54 17    LIMITED DISCOVERY SHOULD BE -- SHOULD PROCEED AND

14:30:57 18    SO WE WENT BACK AND TRIED TO MAKE OUR REQUEST AS

14:31:00 19    RECIPROCAL AND AS LIMITED AS WHAT YOUR HONOR

14:31:04 20    ORDERED.

14:31:08 21         NOW, IT MAY BE THAT IF THEY LATER TRY TO

14:31:10 22    FILE SOMETHING, WE'LL HAVE TO REVISIT THE ISSUE OF

14:31:13 23    ANY FURTHER DISCOVERY THAT MIGHT BE NEED TO BE

14:31:16 24    TAKEN.

14:31:16 25         BUT ESSENTIALLY WHAT WE'RE SEEKING HERE

5

| | |
|---|---|
| 14:31:18 | 1 |
| 14:31:22 | 2 |
| 14:31:25 | 3 |
| 14:31:28 | 4 |
| 14:31:31 | 5 |
| 14:31:34 | 6 |
| 14:31:37 | 7 |
| 14:31:40 | 8 |
| 14:31:43 | 9 |
| 14:31:45 | 10 |
| 14:31:49 | 11 |
| 14:31:53 | 12 |
| 14:31:57 | 13 |
| 14:31:59 | 14 |
| 14:32:03 | 15 |
| 14:32:05 | 16 |
| 14:32:07 | 17 |
| 14:32:11 | 18 |
| 14:32:13 | 19 |
| 14:32:16 | 20 |
| 14:32:19 | 21 |
| 14:32:25 | 22 |
| 14:32:28 | 23 |
| 14:32:30 | 24 |
| 14:32:33 | 25 |

1    IS RECIPROCAL FAIR PARITY IN DISCOVERY.

2         THEY HAVE SAID TO YOUR HONOR, WE NEED

3    THESE -- THE DISCOVERY OF THESE FUTURE PRODUCTS,

4    FOR EXAMPLE, THE GALAXY S2 WHICH IS NOT GOING TO BE

5    RELEASED UNTIL THE FALL.

6         YOUR HONOR ORDERED THAT TO BE PRODUCED.

7    AND WHAT WE'RE SIMPLY TRYING TO DO IS, AND THEIR

8    BASIS FOR THAT, YOUR HONOR, QUICKLY, I'LL TRY TO BE

9    QUICK, IS THEY NEED TO GET PREPARED SO THAT IF THIS

10   COMES OUT, THERE'S NO FURTHER DELAY AND WHATNOT.

11        WHAT WE'RE SIMPLY ASKING IS FOR PARITY

12   HERE.  WE SHOULD BE ABLE TO GET PREPARED, TOO.  IF

13   THERE'S GOING TO BE MOTION PRACTICE AND PRELIMINARY

14   INJUNCTION ON THE GALAXY S2 IN THE FALL OF 2011,

15   THEN THE PRODUCT THAT IS GOING TO BE OUT THERE IN

16   THE MARKETPLACE WITH IS VERY, VERY LIKELY, YOUR

17   HONOR, GOING TO BE A NEW VERSION OF THE IPHONE AND

18   SO WE SHOULD BE ABLE TO, IF YOU LOOK AT, FOR

19   EXAMPLE, THE SLEEKCRAFT FACTORS, YOUR HONOR, WE

20   SHOULD BE ABLE TO BE LOOKING AT THE -- NO PUN

21   INTENDED -- APPLES TO APPLES, THE S2 VERSUS THE NEW

22   VERSION OF THE IPHONE IN THE FALL OF 20000.

23        ACCORDING TO THE ELEMENTS, FOR EXAMPLE,

24   THE SIMILARITY OF THE MARKS, WE SHOULD BE ABLE TO

25   LOOK AT THE ACTUAL PRODUCTS AND BE ABLE TO COMPARE

6

| | |
|---|---|
| 14:32:36 1 | THEM SO THAT WE COULD, FOR EXAMPLE, ONE THING YOU |
| 14:32:38 2 | DO, SO SLEEKCRAFT HAS EIGHT FACTORS, BUT THE EIGHT |
| 14:32:42 3 | FACTORS ARE DESIGNED FOR ONE -- TO ANSWER ONE LEGAL |
| 14:32:45 4 | QUESTION:  THE LIKELIHOOD OF CONFUSION. |
| 14:32:47 5 |      AND SO WHAT PEOPLE DO IN THESE KINDS OF |
| 14:32:50 6 | CASES IS THAT THEY DO SURVEYS. |
| 14:32:57 7 |      SO WE SHOULD BE ABLE TO -- TO HAVE PARITY |
| 14:33:00 8 | AND BE IN THE SAME POSITION AS THEM.  THEY'RE GOING |
| 14:33:02 9 | TO BE ABLE TO DO WHATEVER THEY WANT WITH OUR |
| 14:33:04 10 | ADVANCED PRODUCTS AND WE SHOULD BE ABLE TO DO THE |
| 14:33:07 11 | SAME THING, FOR EXAMPLE, GET READY SO WE HAVE THAT |
| 14:33:10 12 | PRODUCT AVAILABLE, WE CAN SEE AND DO A SURVEY AND |
| 14:33:13 13 | SEE, DO PEOPLE THINK THAT THESE ARE SIMILAR?  ARE |
| 14:33:16 14 | PEOPLE CONFUSED? |
| 14:33:18 15 |      YOU KNOW, ANOTHER FACTOR IS STRENGTH OF |
| 14:33:20 16 | THE MARKS. |
| 14:33:21 17 |      IF THEIR NEW PRODUCT IS SUBSTANTIALLY |
| 14:33:26 18 | DIFFERENT IN DESIGN, AND THEY PUT $100 MILLION |
| 14:33:30 19 | MARKETING CAMPAIGN INTO IT THIS FALL AND -- BUT |
| 14:33:34 20 | IT'S A DIFFERENT DESIGN, AND YOUR HONOR IS |
| 14:33:38 21 | ADDRESSING IRREPARABLE -- THE LIKELIHOOD OF |
| 14:33:41 22 | IRREPARABLE HARM AND IT TURNS OUT THAT THE THINGS |
| 14:33:44 23 | THAT THEY'RE COMPLAINING ABOUT DON'T EVEN APPLY TO |
| 14:33:46 24 | THIS NEW PRODUCT THAT THEY'RE PUTTING $100 MILLION |
| 14:33:50 25 | OF A MARKETING CAMPAIGN INTO, THAT IS GOING TO |

7

14:33:53 1    SIGNIFICANTLY AFFECT, FOR EXAMPLE, THE LIKELIHOOD

14:33:55 2    OF HARM IN THE MARKETPLACE IF THEY'RE NOT EVEN

14:33:57 3    USING THAT STUFF ANYMORE IN THEIR NEW MARKETING

14:34:00 4    CAMPAIGN.

14:34:00 5         IT'S GOING TO SIGNIFICANTLY AFFECT THE

14:34:02 6    BALANCE OF HARMS IF THEY'RE ASKING THIS COURT TO

14:34:05 7    ENJOIN SAMSUNG FROM SELLING BASICALLY ITS ENTIRE

14:34:08 8    SMART PHONE AND TAB LINE IN THE UNITED STATES.

14:34:11 9         SO THIS STUFF IS HIGHLY RELEVANT IF THEY

14:34:15 10   DO FILE A P.I., YOUR HONOR, AND ALL WE'RE ASKING

14:34:22 11   FOR IS THE EXACT SAME DISCOVERY THAT YOUR HONOR

14:34:24 12   ALREADY ORDERED WITH RESPECT TO THE DEFENDANTS.

14:34:27 13        AND WE THINK THAT IT'S REASONABLE, AND AS

14:34:32 14   I SAID AT THE LAST HEARING, WHAT IS GOOD FOR THE

14:34:35 15   GOOSE IS GOOD FOR THE GANDER AND WE SHOULD BE

14:34:37 16   ENTITLED TO THE SAME DISCOVERY THAT THEY GOT, YOUR

14:34:40 17   HONOR.

14:34:40 18        THE COURT:  LET ME ASK THE PLAINTIFFS,

14:34:42 19   WHAT IS YOUR, IF YOU DO END UP FILING A P.I.

14:34:46 20   MOTION, IS IT GOING TO BE JUST THE TRADEMARK AND

14:34:48 21   THE TRADE DRESS OR IS IT ALSO GOING TO BE DESIGN

14:34:52 22   PATENTS?

14:34:53 23        I'M REALLY HOPING IT'S NOT GOING TO BE

14:34:55 24   UTILITY PATENTS, BECAUSE AS I SAID, THAT'S NOT

14:34:59 25   REALLY I THINK FEASIBLE TO DO A FULL CLAIM

8

14:35:02  1    CONSTRUCTION AND A FULL ANALYSIS ON A P.I. BASIS.

14:35:05  2              SO TELL ME WHAT YOU'RE CURRENT THINKING

14:35:07  3    IS.

14:35:07  4              MR. MCELHINNY:  MY CURRENT THINKING IS

14:35:08  5    THAT I INTEND TO, IF NECESSARY, CHANGE YOUR MIND

14:35:12  6    ABOUT THE UTILITY PATENTS, BUT THE DIRECT ANSWER TO

14:35:16  7    YOUR QUESTION IS WE'RE GOING TO REVIEW THE RIGHTS

14:35:22  8    THAT WE HAVE ASSERTED.

14:35:23  9              AND WE'RE GOING TO MOVE -- IF WE MOVE, WE

14:35:25  10   ARE GOING TO MOVE ONTO SOME KIND OF COMBINATION OF

14:35:27  11   THE RIGHTS THAT WE HAVE ASSERTED, YOUR HONOR.

14:35:29  12             BUT I CAN'T TELL YOU RIGHT NOW THAT WE

14:35:31  13   HAVE DECIDED TO MOVE, MUCH LESS WHICH OF OUR MANY

14:35:34  14   CLAIMS WE'RE GOING TO MOVE ON.

14:35:35  15             THE COURT:  WELL, LET ME ASK ACTUALLY OF

14:35:37  16   BOTH PARTIES AND IT SOUNDS LIKE BOTH OF YOU ARE

14:35:41  17   INTERESTED IN GETTING -- ESPECIALLY IF YOU WANT TO

14:35:43  18   LITIGATE UTILITY PATENTS, THEN LET'S JUST SET AN

14:35:47  19   EXPEDITED SCHEDULE FOR THE WHOLE CASE.

14:35:49  20             I WOULD RATHER US JUST START NOW AND I

14:35:51  21   WANT TO HEAR FROM BOTH SIDES WHETHER YOU WOULD

14:35:54  22   AGREE WITH IT RATHER THAN EVERY SIX WEEKS HAVING AN

14:35:57  23   EXPEDITED DISCOVERY MOTION.

14:35:59  24             IF YOU REALLY FEEL THIS ANXIOUS, SET THE

14:36:02  25   SCHEDULE NOW AND I'LL GIVE YOU A TRIAL IN

9

```
14:36:04  1    EIGHT MONTHS, SIX MONTHS, WHATEVER YOU WANT, MY
14:36:07  2    SCHEDULE IS OPEN.  ONE YEAR?  YOU TELL ME.
14:36:11  3              WHAT ARE YOUR THOUGHTS ON THAT?
14:36:18  4              MR. MCELHINNY:  THE ANSWER -- WELL, THE
14:36:19  5    ANSWER TO YOUR QUESTION IS THAT WE WOULD LIKE THAT,
14:36:21  6    YOUR HONOR.  WE WOULD LIKE AN EXPEDITED TRIAL DATE.
14:36:24  7              IN TERMS OF THE SPECIFIC MONTHS, I WOULD
14:36:26  8    NEED TWO MINUTES TO CONSULT WITH MY CLIENT TO GET
14:36:29  9    MORE DIRECT INFORMATION ABOUT THAT.
14:36:31 10              THE COURT:  WELL, LET ME HEAR FROM -- IS
14:36:33 11    THAT SOMETHING THAT SAMSUNG WOULD BE INTERESTED IN
14:36:35 12    RATHER THAN US INCREMENTALLY GETTING DISCOVERY
14:36:39 13    PIECEMEAL?  WHY DON'T WE JUST GET STARTED ON THE
14:36:41 14    CASE?
14:36:42 15              MR. VERHOEVEN:  WELL, I THINK I, TOO,
14:36:43 16    WOULD HAVE TO CONFER.  IT'S SORT OF COMING OUT NOT
14:36:47 17    ON THE SUBJECT OF THIS PARTICULAR MOTION.
14:36:49 18              THE COURT:  I UNDERSTAND.
14:36:49 19              MR. VERHOEVEN:  AND IT'S A VERY
14:36:51 20    COMPLICATED CASE.  AS YOU KNOW, YOUR HONOR RELATED
14:36:53 21    THE OTHER CASE TOGETHER WITH IT AND IF WE'RE GOING
14:36:56 22    TO BE PROCEEDING ON UTILITY PATENTS, WE SHOULD
14:36:58 23    PROCEED IN TOTAL.
14:37:01 24              AND SO WE WOULD NEED TO TRY TO DO A
14:37:05 25    SIGNIFICANT ASSESSMENT BECAUSE OFF THE TOP OF -- AT
```

10

14:37:10  1    LEAST OFF THE TOP OF MY HEAD, I'LL LET

14:37:12  2    MR. MCELHINNY SPEAK FOR HIMSELF, BUT AT LEAST OFF

14:37:15  3    THE TOP OF MY HEAD IT'S IMPORTANT THAT WE GET IT

14:37:18  4    RIGHT IN TERMS OF THE SCHEDULE AND WE WOULD HAVE TO

14:37:20  5    SIT DOWN AND FIGURE OUT HOW MANY EXPERTS ARE WE

14:37:21  6    TALKING ABOUT?  YOU KNOW, HOW ARE WE GOING TO DO

14:37:24  7    THE MARKMAN HEARING WITH ALL OF THESE PATENTS?  YOU

14:37:27  8    KNOW, WHAT ARE YOUR HONOR'S LIMITS, IF ANY, ON THE

14:37:30  9    NUMBER OF TERMS FOR CONSTRUCTION PER PATENT?  IS IT

14:37:35 10    FOR THE WHOLE CASE?

14:37:36 11          THOSE ARE THE THINGS I THINK WOULD BE

14:37:37 12    MORE INVOLVED THAN ME JUST TELLING YOU RIGHT OFF

14:37:42 13    THE TOP OF MY HEAD.

14:37:43 14          THE COURT:  I'M NOT ASKING YOU TO TELL ME

14:37:45 15    OFF THE TOP OF YOUR HEAD, AND I DON'T THINK THAT'S

14:37:48 16    FAIR TO YOU ALL SINCE THIS IS REALLY NOT EVEN A

14:37:50 17    CMC.

14:37:50 18          MR. VERHOEVEN:  MAY I SAY ONE OTHER THING

14:37:52 19    REALLY QUICKLY, YOUR HONOR?

14:37:54 20          LAST NIGHT I THINK IT WAS APPLE FILED AN

14:37:57 21    AMENDED COMPLAINT.

14:37:57 22          THE COURT:  I KNOW.

14:37:58 23          MR. VERHOEVEN:  AND ADDED NEW PATENTS.

14:38:00 24    SO WE HAVEN'T EVEN HAD A CHANCE TO GO THROUGH THAT

14:38:03 25    YET, YOUR HONOR.

                                                              11

```
14:38:03  1          SO THAT WOULD OBVIOUSLY IMPACT US AS

14:38:06  2   WELL.

14:38:06  3          THE COURT:  SURE.  LET ME ASK, THE

14:38:07  4   SAMSUNG VERSUS APPLE CASE, IT HAS BEEN RELATED BUT

14:38:10  5   IT HASN'T BEEN CONSOLIDATED.

14:38:12  6          ARE YOU ALL GOING TO SEEK TO CONSOLIDATE

14:38:14  7   IT OR ARE YOU JUST GOING TO THEN ASSERT THE PATENTS

14:38:18  8   THAT YOU ASSERTED IN THAT CASE AS COUNTERCLAIMS IN

14:38:20  9   THIS CASE AND IT IS RESPECTIVELY THE SAME CASE

14:38:21 10   ANYWAY, OR WHAT IS GOING TO HAPPEN?

14:38:24 11          MR. VERHOEVEN:  WE THINK IT SHOULD BE

14:38:26 12   CONSOLIDATED, YOUR HONOR, AND WE THINK IT SHOULD BE

14:38:28 13   CONSOLIDATED AND SHOULD PROCEED AS A SINGLE CASE.

14:38:29 14          THE COURT:  NOW, WHEN YOU -- I THINK YOUR

14:38:31 15   ANSWER DATE IS NOT FOR A LITTLE WHILE, RIGHT?  I

14:38:33 16   KNOW YOU STIPULATED TO A DATE.  WHEN WAS THAT?

14:38:37 17          MR. VERHOEVEN:  JULY 15TH.

14:38:42 18          MS. MAROULIS:  YOUR HONOR, JULY 5TH.

14:38:43 19   IT'S GOING TO BE CHANGED BECAUSE OF THE FILING

14:38:48 20   YESTERDAY.

14:38:48 21          THE COURT:  I SEE.  OKAY.  ARE YOU

14:38:49 22   ANTICIPATING THEN FILING COUNTERCLAIMS THAT WOULD

14:38:53 23   ASSERT YOUR OWN -- WHATEVER COMBINATION OF UTILITY

14:38:57 24   PATENTS?

14:38:57 25          MR. VERHOEVEN:  WE'RE STILL EVALUATING
```

                                                              12

|  |  |
|---|---|
| 14:38:59 | 1 |
| 14:39:01 | 2 |
| 14:39:02 | 3 |
| 14:39:02 | 4 |
| 14:39:04 | 5 |
| 14:39:05 | 6 |
| 14:39:07 | 7 |
| 14:39:08 | 8 |
| 14:39:09 | 9 |
| 14:39:11 | 10 |
| 14:39:13 | 11 |
| 14:39:16 | 12 |
| 14:39:19 | 13 |
| 14:39:22 | 14 |
| 14:39:26 | 15 |
| 14:39:29 | 16 |
| 14:39:30 | 17 |
| 14:39:34 | 18 |
| 14:39:36 | 19 |
| 14:39:40 | 20 |
| 14:39:42 | 21 |
| 14:39:46 | 22 |
| 14:39:49 | 23 |
| 14:39:51 | 24 |
| 14:39:54 | 25 |

OUR OPTIONS, AND I REALLY CAN'T SPEAK TO THAT AT

THIS POINT.

       THE COURT:  OKAY.

       MR. VERHOEVEN:  WE ARE EVALUATING THOSE

OPTIONS THOUGH, YOUR HONOR.

       MR. MCELHINNY:  IF I MAY, YOUR HONOR?

       THE COURT:  YES.

       MR. MCELHINNY:  TWO OF THE SUBJECTS THAT

HAVE BEEN TOUCHED ON, WE DO, THE REASON WE'RE

TALKING ABOUT AN INJUNCTION, IS THAT WE DO FEEL

THAT THERE IS INJURY GOING ON.

       WE DO SEEK TO EXPEDITE A RESOLUTION OF

THIS CASE.  WE DO THINK THAT -- WE WILL OPPOSE

CONSOLIDATION SIMPLY BECAUSE ADDING A TEN-UTILITY

PATENT ONTO THE CASE THAT WE HAVE WE THINK IS A

DELAYING TACTIC.

       BUT IN CONNECTION I THINK I CAN SAY

COUNSEL, ALL OF THE COUNSEL WHO ARE IN THE CASE,

WILL OPPOSE CONSOLIDATING THAT ON APPLE'S SIDE.

       AS YOU KNOW FROM THE DECLARATIONS, I

MEAN, I SAT IN FRONT OF YOU AND YOU SAID, YOU CAN

EXPEDITE DISCOVERY AND WE KNOW FROM THE

DECLARATIONS, WE CALLED THEM UP AND WE WENT THROUGH

THE LIST THAT MR. VERHOEVEN HAD STATED AND HE SAID

EXACTLY YOUR POINT, WHICH WAS THAT THERE IS GOING

13

14:39:57  1    TO HAVE TO BE SOME DISCOVERY RELATIVE TO THIS

14:39:59  2    INJUNCTION IF IT IS FILED, CAN'T WE AGREE ON A

14:40:02  3    PROCESS FOR THAT?  CAN'T WE DECIDE IF DECLARANTS

14:40:06  4    ARE TO BE DEPOSED, ALL OF THE STUFF THAT I

14:40:07  5    MENTIONED TO YOU?

14:40:08  6            AND TODAY THEY WILL NOT ENGAGE WITH US.

14:40:12  7            AND, AGAIN, I THINK AS COUNSEL HAS SAID,

14:40:14  8    THE LIKELY PROCEDURE HERE IS THAT THEY FILED THIS

14:40:17  9    SORT OF WHAT WE WOULD CALL IT A "GOTCHA MOTION" AND

14:40:21 10    IF IT DOESN'T SUCCEED THEN WE'RE GOING TO START

14:40:24 11    OVER THE PROCESS ABOUT NOW WHAT DISCOVERY DO YOU

14:40:27 12    REALLY NEED THAT IS RELEVANT TO THE INJUNCTION AND

14:40:30 13    HOW LONG WOULD IT TAKE, AND I THINK WE WILL SEE AN

14:40:33 14    ENGAGEMENT AND PROBABLY A DRAWN-OUT DISCOVERY

14:40:36 15    PERIOD.

14:40:36 16            MR. VERHOEVEN:  YOUR HONOR, MAY I

14:40:37 17    BRIEFLY?

14:40:37 18            MR. MCELHINNY:  JUST LET ME FINISH.

14:40:39 19            THE OTHER THING IS ALL OF THE CLAIMS THAT

14:40:41 20    WE WILL BE PURSUING, WHATEVER THEY ARE IN THE

14:40:43 21    PRELIMINARY INJUNCTION, AS WE POINTED OUT TO YOUR

14:40:47 22    HONOR BEFORE, AND AS WE POINTED OUT CLEARLY IN OUR

14:40:49 23    AMENDED COMPLAINT, WILL BE BASED ON PRODUCTS THAT

14:40:51 24    ARE CURRENTLY IN THE MARKET.  THEY WILL NOT BE

14:40:54 25    BASED ON OUR FUTURE PRODUCTS.

                                                        14

| | |
|---|---|
| 14:40:55 1 | MR. VERHOEVEN TALKED ABOUT THE |
| 14:40:57 2 | POSSIBILITY THAT HE WAS TAKING SURVEYS WITH |
| 14:41:00 3 | WHATEVER THEY GET TOGETHER BUT IF THAT REACHED THE |
| 14:41:04 4 | CONFIDENTIALITY ORDER, WE JUST CAN'T. |
| 14:41:08 5 | THE COURT:  I KNOW YOU ADDED A BUNCH OF |
| 14:41:11 6 | DESIGN PATENTS, UTILITY PATENTS AND YOU CHANGED |
| 14:41:15 7 | YOUR TRADE DRESS ALLEGATION AND YOU ADDED A CLAIM |
| 14:41:20 8 | FOR RELIEF. |
| 14:41:28 9 | WHY DID YOU AMEND THIS?  WAS THAT IN |
| 14:41:31 10 | ANTICIPATION OF THIS MOTION TO MAKE IT MORE TIED TO |
| 14:41:33 11 | SPECIFIC CURRENTLY AVAILABLE IPHONES AND IPADS |
| 14:41:35 12 | OR -- |
| 14:41:36 13 | MR. MCELHINNY:  I THINK THERE ARE A |
| 14:41:38 14 | COUPLE OF REASONS THAT WE HAVE DONE IT. |
| 14:41:39 15 | THE COURT:  UH-HUH. |
| 14:41:40 16 | MR. MCELHINNY:  ONE, AS PART OF THEIR |
| 14:41:41 17 | INTENTIONAL STRATEGY, SAMSUNG KEEPS RELEASING |
| 14:41:48 18 | ADDITIONAL INFORMATION ABOUT THE PRODUCTS. |
| 14:41:49 19 | SO IN THE TIME THAT WE WERE LAST IN FRONT |
| 14:41:51 20 | OF YOU BEFORE, WE HAVE BEEN ABLE TO GET THE SAMPLES |
| 14:41:53 21 | AND THE S2 PHONE AND WHICH IS BEING MARKETED |
| 14:41:56 22 | OUTSIDE OF THE UNITED STATES, AND WE WERE ABLE TO |
| 14:41:58 23 | DRAFT A COMPLAINT THAT WAS MORE CLOSELY DRAWN TO |
| 14:42:01 24 | THE PRODUCTS THAT WE WERE GOING TO BE ATTACKING AND |
| 14:42:03 25 | WE WANTED TO MAKE SURE THAT THAT COMPLAINT WAS ON |

15

14:42:05  1    FILE BEFORE WE ACTUALLY GOT THE PRODUCTION DUE DATE

14:42:09  2    BECAUSE WE WANTED TO MAKE SURE THAT THAT WAS DONE

14:42:11  3    COMPLETELY WITH PUBLIC INFORMATION.  SO THERE'S NO

14:42:15  4    QUESTION ABOUT HOW WE WOULD USE THE PRODUCTS THAT

14:42:17  5    ARE BEING PROVIDED TO US TODAY.

14:42:19  6             BUT BASICALLY IT'S A TAILORING OF -- I

14:42:22  7    MEAN, APPLE, AS YOU KNOW, IT HAS A LOT OF

14:42:26  8    INTELLECTUAL PROPERTY RIGHTS AND IT'S A TAILORING

14:42:28  9    OF THOSE PRODUCTS.

14:42:30  10            THE COURT:  LET ME ASK IF THE PARTIES --

14:42:34  11   IF YOU ALL -- UNDERSTANDING LAST TIME YOU WERE

14:42:37  12   HERE, YOU SAID THAT YOU HAD A BUSINESS

14:42:39  13   RELATIONSHIP, I FORGET WHAT THE NUMBER WAS, EIGHT

14:42:44  14   MILLION, EIGHT BILLION?

14:42:44  15            MR. MCELHINNY:  I THINK IT WAS IN EXCESS

14:42:45  16   OF SEVEN BILLION.

14:42:47  17            THE COURT:  SEVEN BILLION.  CAN WE ALL

14:42:49  18   JUST GET ALONG HERE AND CAN I SEND YOU OUT TO ADR?

14:42:53  19            IS THERE ANY -- YOU NAME IT WHO YOU WANT

14:42:55  20   TO GO TO?  I WILL SEND YOU WITH BOXES OF

14:43:00  21   CHOCOLATES.  I MEAN, WHATEVER.

14:43:01  22            IS THERE ANYTHING THAT WOULD BE POSSIBLE

14:43:04  23   HERE IN TERMS OF AT LEAST EXPLORING?

14:43:06  24            I KNOW YOU SAID YOU ALREADY ENGAGED IN A

14:43:09  25   BIT OF DISCUSSION BEFORE FILING THIS CASE, BUT IS

                                                              16

14:43:12  1    THERE ANYTHING NOW?

14:43:13  2              MR. VERHOEVEN:  WE'RE ALWAYS WILLING TO

14:43:14  3    DO THAT, YOUR HONOR.

14:43:17  4              THERE HAS BEEN DISCUSSIONS BETWEEN THE

14:43:18  5    PARTIES AND --

14:43:22  6              THE COURT:  YOU MEAN SINCE THE LAWSUIT

14:43:24  7    WAS FILED OR ARE YOU TALKING ABOUT THE PRE --

14:43:27  8              MR. VERHOEVEN:  BEFOREHAND.

14:43:27  9              THE COURT:  OKAY.  BUT WHAT ABOUT

14:43:29 10    POST-LAWSUIT, IS THERE ANYTHING THAT WE SHOULD BE

14:43:31 11    TRYING RIGHT NOW?

14:43:32 12              MR. VERHOEVEN:  I MEAN, FRANKLY, WHAT HAS

14:43:33 13    HAPPENED POST-LAWSUIT IS THAT APPLE'S PATENT

14:43:36 14    COUNSEL HAS BEEN LITIGATING IN THE PRESS AND THAT'S

14:43:38 15    WHERE THEY HAVE BEEN DEVOTING THEIR EFFORTS.

14:43:44 16              MR. MCELHINNY:  WELL, HOLD ON.  WE HAVE

14:43:45 17    NEVER SPOKEN TO THE PRESS, YOUR HONOR.

14:43:48 18              THE COURT:  I DON'T WANT TO GET INTO --

14:43:50 19    OKAY.  WHAT WOULD BE FEASIBLE RIGHT NOW?  ARE YOU

14:43:52 20    WILLING TO GO TO SOME FORM OF ADR NOW?

14:43:57 21              MR. MCELHINNY:  MY UNDERSTANDING --

14:43:58 22              THE COURT:  YES.

14:43:58 23              MR. MCELHINNY:  -- I HAVE NOT BEEN

14:44:00 24    INVOLVED IN THESE TALKS, BUT MY UNDERSTANDING IS

14:44:01 25    THAT THIS CASE OBVIOUSLY HAS GOT THE ATTENTION OF

                                                              17

14:44:05 1     PEOPLE AT THE HIGHEST LEVELS, LITERALLY AT THE

14:44:06 2     HIGHEST LEVELS AT BOTH COMPANIES.

14:44:07 3              THE COURT:  CAN WE GET THEM TOGETHER?

14:44:09 4              MR. MCELHINNY:  THAT THEY ARE, IN FACT,

14:44:10 5     MEETING AND TALKING AND THAT'S MY UNDERSTANDING.

14:44:12 6     AND I DON'T THINK INTRODUCING A MEDIATOR INTO THAT

14:44:15 7     WOULD BE HELPFUL, YOUR HONOR, IS MY READ.

14:44:17 8              I CAN ANSWER YOUR EARLIER QUESTION.  WE

14:44:20 9     WOULD BE PREPARED TO TRY THIS CASE IN SIX MONTHS.

14:44:27 10             MR. VERHOEVEN:  YOUR HONOR, MAY I SPEAK

14:44:29 11    BRIEFLY TO THE ACTUAL MOTION?

14:44:30 12             THE COURT:  YES, I'M GOING TO GET BACK TO

14:44:32 13    THE MOTION.

14:44:37 14             MR. VERHOEVEN:  OH.

14:44:38 15             THE COURT:  I'M SORRY.  I'M JUST GETTING

14:44:40 16    DISTRACTED HERE.

14:44:41 17             LET ME GO TO MR. MCELHINNY.  IT LOOKS

14:44:46 18    LIKE BASED ON THE RELEASE OF IPHONE, IPHONE 3G,

14:44:50 19    IPHONE 3GS, IPHONE 4, IT LOOKS LIKE YOU'RE DUE FOR

14:44:55 20    A RELEASE OF AT LEAST A PHONE.

14:44:56 21             I AGREE WITH THE -- THAT THE TABLET

14:44:59 22    COMPUTER, YOU RELEASED ONE IN MARCH OF LAST YEAR

14:45:02 23    AND OF THIS YEAR AND IT COMES OUT WITHIN A YEAR, IT

14:45:05 24    SEEMS A LITTLE PREMATURE THAT YOU HAVE HAD LESS

14:45:07 25    THAN THREE MONTHS OF DEVELOPMENT ON THE TABLET

                                                          18

14:45:10  1   COMPUTER.

14:45:11  2            BUT ON THE IPHONE IT LOOKS LIKE YOU'RE

14:45:13  3   DUE ON ONE, ALTHOUGH THE RELEASE DATES IN THE PAST

14:45:16  4   FOUR YEARS HAVE ALL BEEN IN JUNE.

14:45:18  5            WHY SHOULDN'T THEY BE ABLE TO FIND OUT?

14:45:21  6   I MEAN, IF YOU'RE GOING TO RELEASE A PRODUCT IT

14:45:23  7   LOOKS LIKE PROBABLY BEFORE YOUR P.I. MOTION IS

14:45:26  8   FILED, WHY SHOULDN'T THEY BE ABLE TO GET SOME

14:45:28  9   INFORMATION ON THAT?

14:45:29 10            MR. MCELHINNY:  I THINK THERE ARE TWO

14:45:31 11   ANSWERS TO THAT.

14:45:32 12            ONE, YOUR HONOR, IN FAIRNESS, IS ENGAGING

14:45:35 13   IN THE EXACT SAME SPECULATION THAT THEY ARE.  WE DO

14:45:37 14   NOT ISSUE PRERELEASES.  WE DON'T GIVE INFORMATION

14:45:42 15   TO THE PRESS.

14:45:42 16            THERE'S NOT A FACT IN THEIR PAPERS THAT'S

14:45:47 17   NOT SIMPLY HISTORICAL ABOUT WHEN WE'RE GOING TO

14:45:49 18   RELEASE SOMETHING, WHAT IT'S LIKELY TO BE, AND

14:45:52 19   THAT'S BECAUSE OF THE NATURE -- WE DO BUSINESS A

14:45:55 20   DIFFERENT WAY AND SO THERE'S NO WAY IN FAIRNESS TO

14:45:57 21   PREDICT WHENEVER WE'RE GOING TO DO A RELEASE OF

14:46:00 22   ANYTHING.

14:46:01 23            THE COURT:  WHAT ABOUT THEIR ARGUMENT

14:46:02 24   THAT THERE NEEDS TO BE CO-EXISTENCE IN THE MARKET

14:46:05 25   IN ORDER FOR YOU TO -- AND, AND IF YOU STOP

                                                        19

|  |  |
|---|---|
| 14:46:10 | 1 |
| 14:46:12 | 2 |
| 14:46:16 | 3 |
| 14:46:18 | 4 |
| 14:46:20 | 5 |
| 14:46:21 | 6 |
| 14:46:23 | 7 |
| 14:46:24 | 8 |
| 14:46:25 | 9 |
| 14:46:26 | 10 |
| 14:46:29 | 11 |
| 14:46:34 | 12 |
| 14:46:39 | 13 |
| 14:46:41 | 14 |
| 14:46:45 | 15 |
| 14:46:47 | 16 |
| 14:46:51 | 17 |
| 14:46:53 | 18 |
| 14:46:57 | 19 |
| 14:47:01 | 20 |
| 14:47:02 | 21 |
| 14:47:05 | 22 |
| 14:47:07 | 23 |
| 14:47:09 | 24 |
| 14:47:12 | 25 |

SELLING, YOU KNOW, AND MAKE IT A LEGACY VERSION, I
MEAN, TELL ME ABOUT THE LEGACY VERSION?  WHAT -- DO
THEY, IN FACT, STOP BEING SOLD RIGHT BEFORE THE
RELEASE OF THE NEXT GENERATION?

      MR. MCELHINNY:  THEY DO NOT, YOUR HONOR.

      IN FAIRNESS, LET ME JUST ANSWER YOUR
QUESTION DIRECTLY.

      THE COURT:  YES.

      MR. MCELHINNY:  WHICH IS A LOT OF CASES
GOT CITED.  I'M SURE YOU LOOKED AT THEM ALL.  THERE
IS NOT A CASE THAT HAS EVER ORDERED THE PLAINTIFF
TO PRODUCE FUTURE PRODUCT PLANNING DESIGNS IN ORDER
TO BE ABLE TO ASSERT ITS INTELLECTUAL PROPERTY
RIGHTS.  IT HAS NEVER HAPPENED.

      AND WE WOULD ARGUE THAT IT WOULD BE SUCH
A BURDEN ON PLAINTIFFS.  THE PEOPLE WHO DRAFTED THE
LANHAM ACT WHO WERE TRYING TO PROTECT INVESTORS
WOULD FIND THAT, WOULD FIND THAT A TERRIBLE
DISADVANTAGE TO A PLAINTIFF IF THAT WAS GOING TO BE
ONE OF THE COSTS.

      AND THE REASON FOR IT IS THE LOGIC OF
THESE ACTS.  IF YOU LOOK AT TRADE DRESS, TO BE
CLEAR, THEY'RE NOT SAYING THEY NEED IT FOR A PATENT
CASE.  THEY'RE NOT SAYING THEY NEED IT FOR A
TRADEMARK CASE.

                                               20

14:47:14  1          ALL OF THEIR ARGUMENTS GO TO TRADE DRESS.

14:47:16  2          AND EVERY CASE THAT HAS BEEN CITED TO

14:47:18  3     YOU, EVERY CASE THAT EXISTS ON TRADE DRESS LOOKS AT

14:47:21  4     THE HISTORICAL BEHAVIOR OF THE PERSON WHO WAS

14:47:24  5     ASSERTING THE TRADE DRESS.

14:47:25  6          IT GOES BACK, BECAUSE WHAT WE HAVE TO

14:47:28  7     PROVE IS, ONE, THAT WE HAVE DONE SOMETHING

14:47:30  8     DISTINCTIVE; AND, TWO, THAT THE MARKET HAS REACTED

14:47:34  9     TO IT IN A WAY THAT IT'S GOT AN ACQUIRED

14:47:36 10     DISTINCTIVENESS AND THAT THAT THEN BECOMES OUR

14:47:39 11     LEGAL RIGHT THAT WE CAN ASSERT.

14:47:41 12          BUT THAT IS ENTIRELY HISTORICAL.

14:47:45 13          AND SO ALL OF THE CASES THAT HAVE BEEN

14:47:47 14     CITED TO YOUR HONOR RELY ON -- AND PARTICULARLY IN

14:47:51 15     THE AREA IN WHICH THEY TALKED ABOUT WHICH IS

14:47:54 16     WHETHER OR NOT THERE IS THIS CONTINUITY, IT LOOKS

14:47:58 17     AT THE HISTORICAL PRODUCTS THAT HAVE BEEN MARKETED.

14:48:00 18          NO ONE HAS EVER SAID IN ORDER TO GET AN

14:48:03 19     INJUNCTION IN A TRADE DRESS CASE YOU HAVE TO

14:48:06 20     PROMISE THAT YOU WILL NOT CHANGE THIS IN THE FUTURE

14:48:08 21     OR THAT YOU WILL LOOK AT YOUR FUTURE PLANNING OR

14:48:11 22     ANYTHING LIKE THAT.

14:48:13 23          THEY LOOK AT THE FACTS THAT EXIST AS OF

14:48:15 24     THE TIME OF THE INJUNCTION.  THE ROSE ART CASE

14:48:17 25     SPECIFICALLY SAYS THAT THE PLAINTIFF CAN PICK THE

                                                              21

| | |
|---|---|
| 14:48:19 1 | PRODUCTS THAT THEY ARE ALLEGING ARE THE TRADE |
| 14:48:22 2 | DRESS, WHICH IS WHAT WE HAVE DONE. |
| 14:48:23 3 | AND THE ANSWER TO YOUR HONOR'S QUESTION, |
| 14:48:25 4 | QUITE SIMPLY, IS IF AT THE TIME THAT THIS |
| 14:48:28 5 | INJUNCTION CAME OUT WE WERE NOT COMPETING WITH |
| 14:48:31 6 | THEM, THAT WOULD BE A DEFENSE. |
| 14:48:35 7 | BUT TO SPECULATE ABOUT WHETHER IT MIGHT |
| 14:48:37 8 | HAPPEN OR WHATEVER HAPPENS AND TO GIVE THEM |
| 14:48:39 9 | LITERALLY WHAT IS THE MOST SECRETLY REGARDED |
| 14:48:42 10 | INFORMATION IN OUR COMPANY, TO SPECULATE ABOUT WHAT |
| 14:48:44 11 | THE MARKET IS GOING TO LOOK LIKE A MONTH FROM NOW |
| 14:48:48 12 | LITERALLY WOULD BE PRECEDENT SETTING AND HUGELY |
| 14:48:52 13 | DAMAGING TO US. |
| 14:48:53 14 | THE COURT:  OKAY.  SO WHEN IS THE END OF |
| 14:48:55 15 | LIFE FOR THE PRODUCTS? |
| 14:49:01 16 | OKAY.  YOU'RE SAYING IT'S NOT BEFORE THE |
| 14:49:03 17 | RELEASE OF THE NEXT GENERATION, BUT HOW LONG IS THE |
| 14:49:06 18 | PREVIOUS GENERATION SOLD? |
| 14:49:08 19 | MR. MCELHINNY:  WE'RE SAYING ALL OF THE |
| 14:49:09 20 | PRODUCTS THAT WE HAVE ASSERTED AS THE BASIS OF OUR |
| 14:49:12 21 | TRADE DRESS ARE TODAY IN THE MARKET AND COMPETE |
| 14:49:15 22 | AGAINST SAMSUNG'S PRODUCTS. |
| 14:49:21 23 | AND OBVIOUSLY IN ORDER TO WIN OUR |
| 14:49:23 24 | PRELIMINARY INJUNCTION, WE WILL HAVE TO PROVE THAT. |
| 14:49:33 25 | THE COURT:  WHY DID YOUR -- YOUR |

22

U.S. COURT REPORTERS

14:49:37  1    DISCOVERY LETTER SAYS, YOU KNOW, WE'LL BE HAPPY TO

14:49:40  2    GIVE YOU DISCOVERY THAT YOU NEED, SAMSUNG, FOR THE

14:49:46  3    P.I. MOTION AFTER WE FILE OUR MOTION.

14:49:48  4         THAT JUST SEEMS TO BE UNREASONABLE TO ME.

14:49:51  5         MR. MCELHINNY:   IT WAS INTENDED TO BE

14:49:52  6    REASONABLE, YOUR HONOR.

14:49:53  7         JUST TO TAKE, IN MY EXPERIENCE, THE WAY

14:49:55  8    THESE THINGS WORK IS THAT THE MOTION GETS FILED.

14:49:58  9    THE DEFENDANT DECIDES WHAT DISCOVERY THEY NEED.

14:50:00 10    THERE'S AN AGREEMENT AS TO WHAT DISCOVERY THEY GET

14:50:02 11    AND WHAT THE SYMMETRICAL DISCOVERY.

14:50:04 12         JUST NOW WHEN YOU ASKED COUNSEL WHAT HIS

14:50:07 13    FUTURE DISCOVERY WOULD BE, HE LAID OUT EXACTLY THAT

14:50:11 14    PATTERN.  HE SAID WE NEED TO SEE THE MOTION, THEN

14:50:13 15    WE'LL SEE WHO THE DECLARANTS WERE.

14:50:15 16         AND SO WE -- THE LETTER ASSUMES THAT, BUT

14:50:19 17    I BELIEVE THERE'S A FOLLOW-UP LETTER THAT SAID, YOU

14:50:21 18    KNOW, IF YOU WANT TO START EARLIER, YOU SAID THIS,

14:50:24 19    WE AGREED THAT WE WILL EXPEDITE THE RELEVANT

14:50:27 20    DISCOVERY AND THE ANSWER TO THAT WAS WE DON'T WANT

14:50:29 21    TO TALK ABOUT THAT.  WE DON'T WANT TO TALK ABOUT

14:50:32 22    ANY DISCOVERY EXCEPT THIS PARTICULAR MOTION.

14:50:37 23         AND WE REMAINED, AS I TOLD YOU THE LAST

14:50:39 24    TIME, YOUR HONOR, IT IS IN OUR INTEREST TO EXPEDITE

14:50:41 25    THE DISCOVERY IN ORDER TO GET OUR PRELIMINARY

                                                              23

14:50:43  1    INJUNCTION AND WE'RE -- WE REMAIN OPEN TO THOSE

14:50:47  2    MEET AND CONFER.

14:50:47  3              THE COURT:  WHAT, YOU KNOW, ABOUT

14:50:52  4    SAMSUNG'S ARGUMENT THAT, WELL, A HIGHLY

14:50:54  5    CONFIDENTIAL OUTSIDE COUNSEL EYES ONLY DESIGNATION

14:50:57  6    WAS SUFFICIENT TO AVOID PREJUDICING SAMSUNG IN

14:51:01  7    RELEASE OF PRERELEASE PRODUCTS BUT THAT DOESN'T

14:51:04  8    APPLY TO APPLE.  THAT'S INSUFFICIENT TO AVOID ANY

14:51:07  9    SUBSTANTIAL PREJUDICE TO APPLE?

14:51:10 10              MR. MCELHINNY:  WHAT IS FAIR IS APPLYING

14:51:11 11    THE SAME THREE STANDARDS TO US THAT YOUR HONOR

14:51:13 12    APPLIED IN THE MOTION.  AND WHAT YOU LOOKED AT WAS

14:51:16 13    IMMINENCE OF RELEASE, WHAT YOU LOOKED AT WAS

14:51:22 14    DIRECT -- RELEVANCE WASN'T ENOUGH.  YOU ASKED FOR

14:51:24 15    DIRECT RELEVANCE OF THE PRELIMINARY INJUNCTION

14:51:26 16    MOTION, AND THEN UNDER PREJUDICE, YOU LOOKED AT

14:51:29 17    EXACTLY THIS ISSUE.

14:51:31 18              AND WHAT YOU SAID WAS, SAMSUNG'S CLAIMS

14:51:34 19    OF PREJUDICE WERE UNDERCUT BECAUSE THEY ARE DOING

14:51:37 20    THEIR OWN PRERELEASES, THEY ARE PUTTING OUT THE

14:51:40 21    SAMPLES IN THE MARKET.

14:51:42 22              WE SHOWED YOU THE PICTURES AND YOU SAID

14:51:44 23    THE CONCLUSION WAS FOR THEM TO BE CLAIMING THIS IS

14:51:47 24    CONFIDENTIAL AT THE SAME TIME THAT THEY ARE SEEDING

14:51:50 25    THE MARKET WITH THIS STUFF UNDERCUT THEIR CLAIMS OF

                                                            24

```
14:51:53  1    PREJUDICE.

14:51:54  2              THE COURT:  LET ME ASK --

14:51:55  3              MR. MCELHINNY:  I NEED TO ANSWER YOUR

14:51:57  4    QUESTION DIRECTLY.

14:51:57  5              THE COURT:  GO AHEAD.

14:51:58  6              MR. MCELHINNY:  INFORMATION ABOUT WHAT

14:51:59  7    APPLE'S FUTURE PRODUCTS LOOKED LIKE CANNOT BE

14:52:03  8    POLICED.  WE WILL BE DEALING WITH EXPERTS.  THE

14:52:08  9    FIRM ON THE OTHER SIDE IS IN FOUR OTHER LAWSUITS,

14:52:10 10    SAME LAWYERS AGAINST APPLE FOR OTHER CLIENTS.

14:52:13 11              THE KNOWLEDGE OF WHAT THESE PRODUCTS LOOK

14:52:16 12    LIKE CANNOT BE POLICED.  A PROTECTIVE ORDER, MORE

14:52:21 13    PEOPLE AT APPLE WILL HAVE TO GET IT.  I'LL GET IT.

14:52:24 14    I DON'T HAVE IT RIGHT NOW.

14:52:25 15              THERE'S JUST A UNIVERSE OF PEOPLE THAT

14:52:27 16    WOULD GET ACCESS TO THIS INFORMATION, ANY ONE OF

14:52:30 17    WHOM WOULD HAVE THE POWER TO LEAK IT IN A WAY THAT

14:52:33 18    WOULD BE COMPLETELY UNTRACEABLE.

14:52:34 19              BUT YOUR HONOR KNOWS FROM THE ARTICLES

14:52:36 20    THAT YOU HAVE SEEN THAT THERE'S A WHOLE BLOGOSPHERE

14:52:39 21    OF PEOPLE OUT THERE DOING EVERYTHING THEY CAN TO

14:52:42 22    FIND OUT ABOUT APPLE'S PRERELEASE.  THAT IS OUR

14:52:42 23    CHARISMA.

14:52:47 24              AND IT'S POLICED, AS YOU KNOW FROM THE

14:52:49 25    DECLARATIONS, THOROUGHLY WITHIN APPLE AND THIS
```

25

14:52:52  1    WOULD PUT IT IN A WAY THAT WE COULDN'T PROVE IT

14:52:55  2    HAPPENED, LEAKS WOULD SHOW, AND YOUR HONOR WOULD

14:52:57  3    NEVER TO BE ABLE TO TELL.  TOO MANY PEOPLE WOULD

14:53:01  4    HAVE HAD ACCESS.

14:53:03  5          THE COURT:  AND YOU'RE SAYING WEEKS OF

14:53:06  6    SAMSUNG'S PRERELEASES DOESN'T MATTER BECAUSE THEY

14:53:10  7    ARE LEAKING IT ANY WAY?  IS THAT YOUR POSITION?

14:53:10  8          MR. MCELHINNY:  I'M SAYING YOUR HONOR DID

14:53:13  9    A BALANCE AND WHAT WAS -- SAMSUNG DIDN'T HAVE

14:53:17 10    DECLARATIONS THAT WE HAD THAT SAID THE PRODUCT

14:53:18 11    INFORMATION IS PROTECTED WITHIN THEIR COMPANY.  IT

14:53:20 12    DIDN'T HAVE ANY DECLARATIONS AT ALL ABOUT HOW

14:53:22 13    CLOSELY IT WAS PROTECTED.

14:53:23 14          BUT WHAT WE SHOWED YOU WAS THAT THEY WERE

14:53:26 15    FLYING REPORTERS TO SPAIN AND HANDING THE PRODUCTS

14:53:28 16    OUT.

14:53:29 17          THREE OF THE FIVE PRODUCTS OF THE RESULTS

14:53:31 18    OF YOUR ORDER HAVE ALREADY BEEN RELEASED.  THEY'RE

14:53:33 19    NOT SECRET NOW AT ALL.

14:53:35 20          AND THE OTHER TWO HAVE BEEN A SAMPLE.

14:53:39 21          SO THE DIFFERENCE -- I MEAN, YOUR HONOR'S

14:53:41 22    ORDER OF THE RELEASE IS IMMINENT AND SAMSUNG IS

14:53:46 23    ALREADY WELL INTO A MARKETING CAMPAIGN WHICH IS

14:53:48 24    WHERE THEY DO BUSINESS DIFFERENTLY AS YOUR

14:53:50 25    JUSTIFICATION FOR GIVING US THE PART OF WHAT WE

                                                        26

14:53:52  1    ASKED FOR THAT YOU GAVE US.

14:53:54  2            AND ALL I'M SAYING IS IF YOU APPLY

14:53:56  3    EXACTLY -- SAUCE FOR THE GOOSE AND SAUCE FOR THE

14:54:00  4    GANDER AND IF YOU APPLY EXACTLY THAT SAME TEST, YOU

14:54:02  5    COME UP TO A CONCLUSION IN OUR CASE BECAUSE THE

14:54:05  6    FACTS ARE HERE.

14:54:06  7            THE COURT:  LET ME ASK, IF THIS DOES GO

14:54:11  8    BY WAY OF A P.I. MOTION, WHAT IS THE HARM GOING TO

14:54:13  9    BE?  IT SEEMS UNLIKELY THAT ANYBODY WOULD ACTUALLY

14:54:16 10    BUY A SAMSUNG PRODUCT AND BE CONFUSED AND THINK, IN

14:54:19 11    FACT, THAT THEY ARE BUYING AN APPLE PRODUCT.

14:54:21 12            SO I FIND LOST SALES TO BE REALLY HARD TO

14:54:24 13    BELIEVE HERE.

14:54:24 14            SO WHAT IS IT GOING TO BE?

14:54:26 15            MR. MCELHINNY:  IT WILL BE A COMBINATION

14:54:28 16    OF THINGS.  IT WILL, IN FACT, BE LOST SALES.  BUT

14:54:31 17    IT ALSO WILL BE A --

14:54:33 18            THE COURT:  YOU'RE GOING TO ASSERT THAT

14:54:35 19    PEOPLE BOUGHT A SAMSUNG PRODUCT THINKING THAT IT

14:54:37 20    WAS ACTUALLY AN APPLE PRODUCT?

14:54:40 21            MR. MCELHINNY:  I BELIEVE IN GENERAL IT'S

14:54:42 22    GOING TO FALL INTO THREE AREAS:  EITHER THAT'S

14:54:44 23    GOING TO BE PART OF IT.

14:54:45 24            THE COURT:  OKAY.

14:54:47 25            MR. MCELHINNY:  TWO, THAT PEOPLE ARE

                                                              27

14:54:48  1    GOING TO BELIEVE THAT SAMSUNG HAD AUTHORITY FROM

14:54:52  2    APPLE TO USE APPLE'S IP, AND, THEREFORE, THERE WAS

14:54:55  3    AN ENDORSEMENT.

14:54:56  4         AND, THREE, WE'RE GOING TO DEMONSTRATE

14:54:59  5    THAT ONE WAY TO ATTACK APPLE IS BY MAKING ITS

14:55:06  6    DESIGNS GENERIC BY BROADENING THEM TO THE POINT OF

14:55:09  7    THE UNIQUENESS AND THE SPECIAL APPLICATION TO APPLE

14:55:11  8    NO LONGER APPLIES BECAUSE YOU CAN'T TELL THE

14:55:14  9    DIFFERENCE ANY MORE.

14:55:18 10         AND THAT OBVIOUSLY WILL BE IRREPARABLE.

14:55:28 11         THE COURT:  WITH REGARD TO THE VALIDITY,

14:55:31 12    IF WE END UP HAVING IN THE P.I. MOTION LOOK AT

14:55:36 13    VALIDITY OF THE MARKS, THE DESIGN PATENTS, WHAT ARE

14:55:40 14    YOU GOING TO DO?  ARE YOU GOING TO HAVE EXPERTS?

14:55:42 15         MR. MCELHINNY:  WE WILL CERTAINLY --

14:55:44 16    AGAIN, THERE'S A LONG WAY TO GO BETWEEN THIS AND

14:55:49 17    THE MOTION, BUT OBVIOUSLY WE'RE GOING TO TRY TO

14:55:52 18    CRAFT, IF WE FILE THE PRELIMINARY INJUNCTION, A

14:55:55 19    MOTION THAT IS DIRECT, SORT OF PARED DOWN AND GIVES

14:56:01 20    US THE LARGEST -- WE'RE NOT GOING TO ASSERT ALL OF

14:56:04 21    OUR RIGHTS OBVIOUSLY.

14:56:05 22         AND SO THERE ARE INSTANCES WITH THE

14:56:08 23    TRADEMARKS WHERE WE WILL HAVE PRESUMPTIONS OF

14:56:10 24    VALIDITY, WE HAVE DESIGN PATENTS THAT WILL HAVE

14:56:13 25    PRESUMPTIONS OF VALIDITY, BUT THERE WILL BE EXPERTS

                                                          28

| | | |
|---|---|---|
| 14:56:16 | 1 | AS WELL BOTH IN TERMS OF THE LIABILITY ISSUES AND |
| 14:56:18 | 2 | THE IRREPARABLE INJURY. |
| 14:56:20 | 3 | THE COURT:  LET ME ASK MR. VERHOEVEN, NOW |
| 14:56:23 | 4 | THAT THE IPAD 2 WAS JUST RELEASED IN MARCH, ISN'T |
| 14:56:28 | 5 | IT A BIT SPECULATIVE TO SAY -- I MEAN, YOU YOURSELF |
| 14:56:33 | 6 | SAY THEY SEEM TO DO LIKE ONE A YEAR.  WHY SHOULD WE |
| 14:56:37 | 7 | BELIEVE THAT THEY ARE GOING TO DO TWO THIS YEAR? |
| 14:56:39 | 8 | MR. VERHOEVEN:  THERE'S AN ARTICLE IN THE |
| 14:56:40 | 9 | "WALL STREET JOURNAL" THIS MORNING SAYING THAT THEY |
| 14:56:42 | 10 | THINK THAT THE ANALYSTS ARE EXPECTING THEM TO |
| 14:56:46 | 11 | RELEASE ANOTHER PAD IN THE FALL. |
| 14:56:48 | 12 | THE POINT IS THAT WE SHOULD BE ENTITLED |
| 14:56:50 | 13 | TO DISCOVERY SO IT'S RECIPROCAL SO THAT WE CAN |
| 14:56:55 | 14 | PREPARE JUST LIKE THEY'RE ALLEGEDLY PREPARED FOR |
| 14:56:57 | 15 | THEIR PRELIMINARY INJUNCTION MOTION. |
| 14:56:59 | 16 | SO THE PHONE IS DUE OUT ANY DAY NOW, |
| 14:57:01 | 17 | ACCORDING TO FORECASTS.  THEY WON'T TELL US AND |
| 14:57:05 | 18 | THEY WON'T EVEN TELL YOUR HONOR.  THEY KNOW WHEN |
| 14:57:06 | 19 | THEY'RE COMING OUT WITH THEIR NEW PRODUCT AND THEY |
| 14:57:08 | 20 | WON'T TELL YOU AND THEY WON'T TELL US EITHER. |
| 14:57:11 | 21 | IF I MIGHT, YOUR HONOR, I REALLY WOULD |
| 14:57:13 | 22 | LIKE TO ADDRESS SOME OF THESE POINTS THAT |
| 14:57:15 | 23 | MR. MCELHINNY MADE AS WELL. |
| 14:57:17 | 24 | SHOULD I DO THAT NOW? |
| 14:57:18 | 25 | THE COURT:  YES.  I'M JUST GOING TO GIVE |

29

```
14:57:20  1      YOU A VERY QUICK, IF YOU COULD, TIMEFRAME.  I WANT
14:57:23  2      YOU SPECIFICALLY TO ADDRESS THEIR POINT WHICH IS,
14:57:27  3      LOOK, IF THE APPLE PRODUCTS ARE NOT BEING SOLD AT
14:57:30  4      THE TIME, THEN THE P.I. MOTION LOSES OR LET'S SAY
14:57:33  5      HYPOTHETICALLY A P.I. WAS ACTUALLY ISSUED, THE
14:57:37  6      MOMENT THEY STOPPED SELLING THE PRODUCT THAT IS,
14:57:41  7      YOU KNOW, ALLEGEDLY BEING CONFUSED WITH YOURS, THEN
14:57:44  8      THE P.I. IS GOING TO EXPIRE AND BE TERMINATED.
14:57:47  9              MR. VERHOEVEN:  EXACTLY.  I'LL ADDRESS
14:57:48 10      THAT RIGHT NOW.
14:57:49 11              THE COURT:  GO AHEAD.
14:57:49 12              MR. VERHOEVEN:  YOUR HONOR, BASICALLY THE
14:57:50 13      MAIN POINT THAT THEY MAKE ON RELEVANCE IN THEIR
14:57:53 14      MOTION IS THAT, OH, THIS WAS ABOUT THE FUTURE AND
14:57:56 15      THE FUTURE IS NOT RELEVANT.
14:57:57 16              WELL, THAT IS 180 DEGREES OPPOSITE OF THE
14:58:02 17      POSITION THAT THEY TOOK WHEN THEY SOUGHT EXPEDITED
14:58:06 18      DISCOVERY OF SAMSUNG'S FUTURE PRODUCTS.
14:58:08 19              AND I MADE THE POINT, YOUR HONOR, AT THAT
14:58:09 20      HEARING, THE RECIPROCAL POINT WHICH IS IF WE HAVE
14:58:13 21      NOT RELEASED THE PRODUCT YET AS A MATTER OF BLACK
14:58:16 22      LETTER LAW, IT CAN'T CONSTITUTE ANY SORT OF TRADE
14:58:19 23      DRESS OR INFRINGEMENT AND IT'S NOT RELEASED AND
14:58:21 24      IT'S NOT ON THE MARKET.
14:58:22 25              BUT THEY CAME BACK AND SAID WE NEED TO
```

30

```
14:58:24  1    GET READY FOR A PRELIMINARY INJUNCTION MOTION AND
14:58:26  2    WE KNOW THAT THEY'RE GOING TO RELEASE A FUTURE
14:58:30  3    PRODUCT AND WE WANT TO SEE IT IN ADVANCE SO WE CAN
14:58:32  4    GET READY AND ALL WE'RE SEEKING HERE IS THE SAME
14:58:35  5    THING SO WE CAN GET READY.
14:58:36  6              NOW, IF THEY FILED THEIR P.I. MOTION
14:58:39  7    BEFORE THE GALAXY S2, WHICH IS ACTUALLY RELEASED
14:58:44  8    WHICH WON'T BE UNTIL THE FALL OF 2011, THEY CAN'T
14:58:47  9    ACCUSE THE GALAXY S2.
14:58:50 10              BUT YOUR HONOR HAS ORDERED US TODAY TO
14:58:52 11    PRODUCE THE GALAXY S2 FOR THEM SO THEY CAN GET
14:58:56 12    READY FOR THEIR PRELIMINARY INJUNCTION MOTION.  ALL
14:58:58 13    WE'RE SEEKING IS PARITY.
14:59:00 14              THEY'RE GOING TO RELEASE A NEW PHONE IN
14:59:02 15    THE FALL.  THEY WON'T TELL US THAT, BUT I THINK BY
14:59:04 16    THE FALL THEY'RE GOING TO HAVE A NEW PHONE AND
14:59:07 17    THERE'S ALL KINDS OF SPECULATION AS TO WHAT IT'S
14:59:09 18    GOING TO BE.
14:59:10 19              WE KNOW THE IPHONE 4 IS DRAMATICALLY
14:59:13 20    DIFFERENT IN DESIGN AND LOOK THAN THE IPHONE 3.
14:59:16 21              WE KNOW THAT THE IPAD 2 IS DRAMATICALLY
14:59:19 22    DIFFERENT IN SCOPE AND SHAPE AND FORM AND DESIGN
14:59:23 23    THAN THE FIRST PAD.
14:59:25 24              AND WE SUSPECT THAT THESE NEW PRODUCTS
14:59:29 25    THAT ARE GOING TO BE COMPETING ON THE MARKETPLACE
```

31

14:59:32  1    WITH THESE FUTURE PRODUCTS, NOT CURRENT PRODUCTS,

14:59:37  2    FUTURE PRODUCTS OF SAMSUNG ARE GOING TO HURT THEIR

14:59:40  3    CASE BECAUSE THEY'RE GOING TO BE A LOT DIFFERENT

14:59:42  4    AND THAT'S GOING TO BE THE SUBJECT OF THEIR

14:59:43  5    MARKETING CAMPAIGN IN THE FALL.

14:59:45  6         AND THAT'S GOING TO BE VERY CRITICAL TO

14:59:47  7    ANY PRELIMINARY INJUNCTION MOTION, BOTH ON THE

14:59:49  8    MERITS, ARE THESE THINGS GOING TO CONFUSE THE

14:59:52  9    CONSUMER?  AND ALSO AS TO IRREPARABLE HARM AND

14:59:55 10    BALANCE OF HARM.

14:59:56 11         IF THEY'RE -- IF THEIR FOCUS IN THE

14:59:59 12    MARKETPLACE, YOU KNOW, THESE PHONES, THEY HAVE A

15:00:01 13    SHELF LIFE, THEY'RE LIKE CABBAGE, YOU HAVE A SHELF

15:00:04 14    LIKE OF SIX MONTHS TO A YEAR MAX.

15:00:07 15         THE NOTION THAT THEY'RE GOING TO BE

15:00:10 16    IRREPARABLY HARMED BECAUSE OF THE IPHONE 3 WHICH

15:00:14 17    SELLS FOR 59 BUCKS AND IS GOING TO A COMPLETELY

15:00:17 18    DIFFERENT MARKET SEGMENT THAN THE 4G TURBO CHARGED

15:00:26 19    VERY EXPENSIVE IPHONES IS LUDICROUS.

15:00:28 20         THE ONLY WAY THEY'RE GOING TO BE ABLE TO

15:00:30 21    SHOW ANY SORT OF HARM IS BY COMPARING THEIR

15:00:32 22    CURRENTLY ON-THE-MARKET PRODUCTS TO THE CURRENTLY

15:00:35 23    ON-THE-MARKET PRODUCTS IN THE FALL THAT SAMSUNG

15:00:37 24    HAS.

15:00:38 25         SO THAT'S WHY WE NEED -- IF YOU, IF YOU

                                                          32

```
15:00:41  1    GIVE THEM THE ARGUMENT THAT, HEY, WE NEED YOU TO
15:00:44  2    GET READY, EVEN THOUGH THEY'RE NOT FUTURE, THE SAME
15:00:47  3    ARGUMENT APPLIES TO US AND THAT'S REALLY THEIR ONLY
15:00:50  4    ARGUMENT ON RELEVANCE, YOUR HONOR.
15:00:51  5         IF WE ASSUME THAT THE APPLE PHONE NEXT
15:00:58  6    GENERATION IS ON THE MARKET AND IS WHAT THEY'RE
15:01:00  7    FILING THEIR P.I. ON, AND IS BEING COMPARED TO, FOR
15:01:04  8    EXAMPLE, THE GALAXY S2 PHONE, THEN THERE'S
15:01:09  9    ABSOLUTELY NO ARGUMENT THAT THEY COULD MAKE THAT AS
15:01:11 10    TO RELEVANCE OF THE NEXT GENERATION IPHONE.
15:01:14 11         THEY'RE NOT -- THEY CITE, YOUR HONOR,
15:01:17 12    THE -- A COUPLE OF CASES WHERE THEY SAY THEY GET TO
15:01:20 13    PICK AND CHOOSE WHAT TRADE DRESS THEY ASSERT.
15:01:24 14         WELL, THOSE CASES, YOUR HONOR, ARE CASES
15:01:26 15    ABOUT PAST PRODUCTS AND ABOUT THE SITUATION WHERE A
15:01:29 16    PLAINTIFF HAS FIVE MODELS AND THEY SUED FOR TRADE
15:01:33 17    DRESS INFRINGEMENT OF ONE OF THE FIVE MODELS AND IS
15:01:38 18    IT OKAY FOR THEM TO JUST PICK THAT ONE MODEL AND
15:01:40 19    NOT THE OTHERS?
15:01:41 20         THE ANALOGY TO THIS CASE, YOUR HONOR,
15:01:43 21    WOULD BE IF THEY SUED US ON THE IPHONE 3 BUT NOT
15:01:45 22    THE IPHONE 4 ALREADY IN THE MARKETPLACE, AND WE
15:01:48 23    WERE SAYING THEY DON'T HAVE THE DISTINCTIVE TRADE
15:01:53 24    DRESS ON THE IPHONE 3 BECAUSE THE IPHONE 4 IS
15:01:55 25    DIFFERENT, THAT'S WHAT THOSE CASES ARE ABOUT.
```

33

15:01:57 1          THEY HAVE NOTHING TO DO WITH THIS

15:01:59 2     SITUATION.  APPLE IS CERTAINLY NOT SAYING WE HAVE

15:02:02 3     MADE A DECISION AND WE'LL REPRESENT TO THE COURT

15:02:04 4     THAT WE WILL NOT SUE AND ASSERT OUR INTELLECTUAL

15:02:08 5     PROPERTY ON THE NEXT GENERATION IPHONE AGAINST

15:02:10 6     SAMSUNG.  OF COURSE NOT.

15:02:16 7          THEY PLAINLY INTEND TO.  SO THOSE CASES

15:02:18 8     HAVE NO MERIT TO THIS PARTICULAR CASE.

15:02:20 9          SO WHEN YOU LOOK AT WHAT IS THE COURT

15:02:24 10    REQUIRED TO DO IF THEY FILE A P.I. MOTION AS TO

15:02:27 11    THESE FUTURE PRODUCTS?  THE COURT IS GOING TO --

15:02:31 12    WHAT WE'LL HAVE TO DO TO DEFEND OURSELVES IS GO OUT

15:02:35 13    AND DO SURVEYS AND DO A COMPARISON OF THE CURRENT

15:02:37 14    PHONES ON THE MARKETPLACE PROBABLY IN THE FALL.

15:02:40 15         AND THEY HAVE GOT -- THEY'RE GOING TO GET

15:02:43 16    A HEAD START BY GETTING THE SAMSUNG ADVANCED PHONES

15:02:47 17    TODAY UNDER THEIR MOTION FOR EXPEDITED DISCOVERY

15:02:50 18    AND ALL WE'RE ASKING IS FOR PARITY.  WE SHOULD GET

15:02:53 19    THE SAME THING.

15:02:54 20         NOW, IF THEY FILE A MOTION AND THE

15:02:57 21    SAMSUNG PHONE IS NOT ON THE MARKET, THEY WON'T BE

15:03:00 22    ABLE TO SUE FOR TRADE DRESS.  THEY'RE MAKING THE

15:03:03 23    INVERSE POINT.

15:03:04 24         IF THEY MAKE THE POINT AND THEN THEIR

15:03:07 25    NEXT GENERATION IPHONE IS ON THE MARKET, THEN THAT

                                                      34

15:03:09 1   WON'T BE A RELEVANT FACTOR.  BUT YET THEY CLAIM

15:03:12 2   THAT THEY'RE ENTITLED TO GET FUTURE PRODUCTS THAT

15:03:14 3   ARE NOT ON THE MARKET IN ADVANCE, AND WE ARE NOT.

15:03:19 4   THAT'S NOT PARITY.

15:03:20 5        I'M NOT FINISHED.  THAT'S NOT PARITY AND

15:03:23 6   THAT'S NOT RECIPROCITY AND YOUR HONOR PUT THEM ON

15:03:28 7   NOTICE THAT YOUR HONOR WOULD GIVE THEM RECIPROCITY.

15:03:32 8        A COUPLE OF BRIEF POINTS.

15:03:34 9        THE COURT:  VERY BRIEF.

15:03:35 10        MR. VERHOEVEN:  HE SAID, WELL, WE

15:03:36 11  SHOULDN'T BE ENTITLED TO ANYTHING UNTIL THEY FILE

15:03:39 12  THEIR MOTION.  180 DEGREES THE OPPOSITE OF WHAT HE

15:03:39 13  REPRESENTED TO THIS COURT.

15:03:41 14        I WAS THE ONE AT THE LAST HEARING SAYING

15:03:43 15  TO YOUR HONOR THEY HAVEN'T FILED THE MOTION AND

15:03:45 16  THEY SHOULDN'T GET ANY DISCOVERY BEFORE THEY FILE

15:03:47 17  THE MOTION AND THEY SAID, WELL, WE NEED IT IN

15:03:49 18  ADVANCE.

15:03:49 19        OKAY.  WELL, BY THE SAME TOKEN WE NEED A

15:03:52 20  VERY LIMITED RECIPROCAL AND EXACTLY RECIPROCAL

15:03:57 21  DISCOVERY IN ADVANCE.  THEY SHOULD NOT BE HEARD NOW

15:04:00 22  AFTER HAVING SUCCESSFULLY MADE THE ARGUMENT THAT WE

15:04:03 23  NEED IT IN ADVANCE ARGUMENT TO OBTAIN EXPEDITED

15:04:05 24  DISCOVERY AND GOT IT BASED ON THAT THE ARGUMENT TO

15:04:09 25  MAKE THE DIAMETRICALLY OPPOSITE ARGUMENT NOW TO

35

15:04:13  1    PREVENT US FROM ACHIEVING PARITY AND DISCOVERY.

15:04:15  2              REALLY BRIEFLY ON THE CONFIDENTIALITY

15:04:21  3    ISSUE.   A COMPLETE MISCHARACTERIZATION OF YOUR

15:04:23  4    HONOR'S ORDER.

15:04:24  5              YOUR HONOR DID NOTICE THAT IN OUR IN PART

15:04:30  6    OUR CLAIMS OF CONFIDENTIALITY DON'T CARRY THAT MUCH

15:04:35  7    WEIGHT BECAUSE WE'RE DISCLOSING SOME OF OUR

15:04:37  8    PRODUCTS OR THEY'RE ABOUT TO BE RELEASED.

15:04:40  9              BUT YOUR ORDER COVERS PRODUCTS THAT ARE

15:04:42 10    NOT GOING TO BE RELEASED TO THE EARLIEST IN THE

15:04:45 11    FALL AND YOUR HONOR ORDERED THOSE PRODUCED.

15:04:47 12              YOUR HONOR NEVER SAID THAT, AS FAR AS I

15:04:49 13    CAN RECALL, THAT CONFIDENTIALITY CONCERNS OF

15:04:52 14    SAMSUNG DON'T MATTER BECAUSE SAMSUNG IS, QUOTE,

15:04:55 15    "WELL INTO ITS AD CAMPAIGN."   THAT'S JUST NOT IN

15:04:58 16    THE ORDER.

15:04:58 17              APPARENTLY APPLE THINKS IT'S A DOUBLE

15:05:01 18    STANDARD AND APPLE'S CONFIDENTIAL INFORMATION IS

15:05:04 19    MORE CONFIDENTIAL THAN SAMSUNG'S CONFIDENTIAL

15:05:08 20    INFORMATION AND THAT'S JUST NOT THE WAY THE LAW

15:05:10 21    WORKS.

15:05:11 22              APPARENTLY APPLE SAYS ITS CONFIDENCE

15:05:14 23    CAN'T BE POLICED BUT SAMSUNG'S CAN.

15:05:16 24              IT'S A DOUBLE STANDARD.   WE OPPOSED THEIR

15:05:20 25    MOTION FOR EXPEDITED DISCOVERY BUT PUT A PLACE

                                                              36

15:05:23 1    HOLDER IN THAT WHAT WE -- WHAT IN FAIRNESS, IF YOUR

15:05:26 2    HONOR ORDERED IT, THEN THAT DISCOVERY SHOULD BE

15:05:30 3    RECIPROCAL, AND THAT'S ALL WE'RE ASKING FOR.

15:05:32 4         OUR REQUESTS ARE NARROW AND THEY'RE

15:05:34 5    LIMITED TO EXACTLY TO THE UNIVERSE OF WHAT YOUR

15:05:36 6    HONOR GRANTED FOR THE PLAINTIFF, AND WE HAVE AGREED

15:05:38 7    TO A PROTECTIVE ORDER FOR DEALING WITH THE

15:05:43 8    CONFIDENTIAL INFORMATION OF SAMSUNG'S CRITICAL

15:05:45 9    PRODUCTS THAT ARE NOT PUBLIC YET AND THAT SHOULD BE

15:05:48 10   JUST AS GOOD FOR APPLE.

15:05:49 11        NOBODY IS GOING TO SEE IT EXCEPT OUTSIDE

15:05:52 12   COUNSEL AND IT'S VERY LIMITED AND THERE'S A

15:05:54 13   PROSECUTION -- AND IT'S JUST LIKE YOUR HONOR TOLD

15:05:56 14   US.  WE HAVE GOT THAT SIGNED AND IT'S AGREED TO.

15:05:59 15   SO THERE SHOULD BE NO PROBLEM THERE.

15:06:01 16        SO IN SUMMARY, YOUR HONOR, ALL WE WANT IS

15:06:04 17   FAIRNESS AND RECIPROCITY HERE AND WE THINK WE

15:06:08 18   SHOULD BE ENTITLED TO IT.

15:06:09 19        MR. MCELHINNY:  THREE BRIEF --

15:06:11 20        THE COURT:  LET ME ASK, WHAT IS THE

15:06:12 21   TIMING OF THE P.I.?

15:06:14 22        MR. MCELHINNY:  IF WE FILE A P.I., WE

15:06:17 23   EXPECT TO DO IT WITHIN THE NEXT 30 DAYS, YOUR

15:06:20 24   HONOR.

15:06:20 25        JUST THREE VERY BRIEFLY.

37

```
15:06:23  1              THE COURT:  I DO HAVE OTHER CASES AND
15:06:26  2     THEY ARE VERY PATIENTLY WAITING.
15:06:27  3              MR. MCELHINNY:  LET ME SAY TWO THINGS.
15:06:29  4              THE COURT:  VERY SHORT TWO THINGS.
15:06:30  5              MR. MCELHINNY:  IF WE FILE A PRELIMINARY
15:06:32  6     INJUNCTION IT WILL BE BASED ON OUR PRODUCTS
15:06:34  7     CURRENTLY IN THE MARKET AND ONLY THOSE PRODUCTS.
15:06:38  8              AND, TWO, ON THE DISCOVERY POINT, KIM
15:06:42  9     EXHIBIT 2 IS OUR LETTER WHERE WE SAID WE WILL TALK
15:06:44 10     TO YOU ABOUT DISCOVERY NOW OR FOLLOWING THE FILING
15:06:48 11     OF THE PRELIMINARY INJUNCTION.
15:06:49 12              THANK YOU, YOUR HONOR.
15:06:49 13              THE COURT:  OKAY.  THANK YOU ALL VERY
15:06:51 14     MUCH.
15:06:52 15              (WHEREUPON, THE PROCEEDINGS IN THIS
         16     MATTER WERE CONCLUDED.)
         17
         18
         19
         20
         21
         22
         23
         24
         25
```

38

U.S. COURT REPORTERS

```
 1

 2

 3

 4                    CERTIFICATE OF REPORTER

 5

 6

 7

 8           I, THE UNDERSIGNED OFFICIAL COURT

 9   REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13           THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23           /S/
             _____
24           IRENE RODRIGUEZ, CSR, CRR
             CERTIFICATE NUMBER 8074
25
             DATED:  JUNE 20, 2011
                                                    39
```

100 LB  BLUEBIRDonline.com (888) 477 - 0700  100 LB Style

# VELLTURO
# EXHIBIT 108

PUBLIC VERSION

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of: | |
| | |
| CERTAIN PERSONAL DATA AND MOBILE COMMUNICATIONS DEVICES AND RELATED SOFTWARE | Investigation No. 337-TA-710 |

**THE HTC RESPONDENTS' REPLY TO THE BRIEFS OF COMPLAINANT AND THE OFFICE OF UNFAIR IMPORT INVESTIGATIONS ON REMEDY, BONDING AND THE PUBLIC INTEREST**

**PUBLIC VERSION**

**TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................................................1

II.    IF A VIOLATION OF SECTION 337 WERE TO BE FOUND, PUBLIC
       INTEREST CONSIDERATIONS REQUIRE THAT THE COMMISSION ISSUE
       A MODIFIED LIMITED EXCLUSION ORDER ............................................................4

       A.    Adequate Alternative Devices Do Not Exist, Especially In the Short Term ..........4

             1.    No Suitable Alternatives Exist for HTC's 4G Products .............................5

             2.    Alternative Devices Will Not Be Readily Available for Customers .........10

             3.    U.S. Production of Alternatives Will Not Increase Given a LEO .............12

       B.    Innovation and U.S. Economy Will be Hindered By An Exclusion Order ...........15

             1.    Continued Access to 4G devices is crucial to continued innovation. ........15

             2.    Exempting 4G Devices from a LEO Will Not Hinder Innovation ............16

       C.    Lack of New Generation Handsets will Harm Competition, Consumers,
             Public Health ............................................................................................................18

             1.    Competition ...............................................................................................18

             2.    Consumers ..................................................................................................21

             3.    Public Health and Welfare .........................................................................22

       D.    Public Interest Is Best Served Through Issuing a Narrower LEO .........................24

III.   THE COMMISSION SHOULD NOT ISSUE A CEASE AND DESIST ORDER .........27

IV.    THE COMMISSION SHOULD NOT IMPOSE ANY BOND .........................................30

V.     CONCLUSION ...............................................................................................................32

i

**PUBLIC VERSION**

<u>**TABLE OF AUTHORITIES**</u>

**CASES**

*Apple Inc. v. Samsung Electronics,*
No. 11-cv-01846 LHK, Brief of Amicus Curiae Cellco Partnership
(N.D. Cal., September 23, 2011) .......................................................................10, 11

*Certain Abrasive Products Made Using a Process for Powder Preforms, and
Products Containing Same, Commission Opinion on Remedy, the Public
Interest, and Bonding,*
Inv. No. 337-TA-449 U.S.I.T.C. Pub. 3530 (Aug. 2002).........................................29

*Certain Automated Mechanical Transmission Systems for Medium-Duty and
Heavy-Duty Trucks, and Components Thereof,* USITC Pub. No., 3934,
Inv. No. 337-TA-503, Comm'n Op. (April 7, 2005) ................................................26

*Certain Baseband Processor Chips and Chipsets,*
Inv. No. 337-TA-543, Comm'n Op. (June 2007) .....................................................24

*Certain Biometric Scanning Devices, Components Thereof, Associated Software,
And Products Containing The Same,*
Inv, No. 337-TA-720, Final Initial And Recommended Determinations, 2011
WL 2907232, (June 17, 2011) .................................................................................31

*Certain Electronic Programmable Read-only Memories,*
Inv. No. 337-TA-395, 2000 WL1810084 Comm'n Op. (July 9, 1998)....................28

*Certain Hardware Logic Emulators Systems and Components Thereof,*
Inv. No. 337-TA-383, U.S.I.T.C. Pub. 2089, Comm'n Op. (Mar. 1998)..................29

*Certain Integrated Circuit Telecommunication Chips and Products Containing
Same Including Dialing Apparatus,*
Inv. No. 337-TA-337, USITC Pub. No. 2670, Commission Opinion on the
Issues Under Review and on Remedy, the Public Interest, and Bonding (Aug.
3, 1993) ...................................................................................................................24

*Certain Integrated Telecommunication Chips and Products Containing Same,
Including Dialing Apparatus,*
Inv. No. 337-TA-337, Comm'n Op. (1995) ..............................................................30

*Certain Liquid Crystal Display Devices and Products Containing the Same,*
Inv. No. 337-TA-631, Comm'n Op. (July 15, 2009)................................................30

*Certain MEMS Devices & Products Containing The Same,*
Inv. No. 337-TA-700, Initial Determination On Violation Of Section 337 And
Recommended Determination On Remedy And Bond, 2010 WL 5646142
(Dec. 23, 2010) ........................................................................................................32

*Certain Mobile Telephones and Wireless Communication Devices,*
Inv. No. 337-TA-703, Respondent Apple Inc.'s Brief on the Issues Under
Commission Review  (April 8, 2011).................................................................10, 11

ii

**PUBLIC VERSION**

## TABLE OF AUTHORITIES
### (continued)

*Certain Portable Electronic Devices and Related Software,*
    Inv. No. 337-TA-721, Notice of Commission Determination Not To Review
    An Initial Determination Granting Complainant's Motion for Summary
    Determination Granting Complainant's Motion for Summary Determination
    (April 5, 2011) ............................................................................................................13

*Certain Rubber Antidegradants, Components Thereof, and Products Containing*
    *Same,* Inv. No. 337-TA-533, Comm'n Op. (July 21, 2006) ....................................30

*Certain Sortation Systems, Parts Thereof, and Products Containing Same,*
    Inv. No. 337-TA-460, USITC Pub No. 3588, Comm'n Op. (Jan. 23, 2003)..........26

*Certain Systems for Detecting and Removing Viruses or Worms,*
    Inv. No. 337-TA-51O, Comm'n Op. (Aug. 23, 2005) ...........................................26

*Certain Two-Handle Centerset Faucets and Escutcheons, and Components*
    *Thereof,* Inv. No. 337-TA-422, Comm'n Op. (July 2002) .................................30, 31

*Certain Voltage Regulators, Components Thereof, and Products Containing the*
    *Same,* Inv. No. 337-TA-564, 2007 WL 1794681, Recommended Det. (May
    30, 2007) ................................................................................................................28

*Kinik Co. v. International Trade Comm'n,*
    362 F.3d 1359 (Fed. Cir. 2004).............................................................................29

*United States of America v. AT&T, Inc.,*
    No. 1:11-cv-1560 (D.D.C. August 31, 2011) ........................................................18


**STATUTES**

19 U.S.C. § 1337....................................................................................................12


**REGULATIONS AND RULES**

19 C.F.R. § 210.50 ...................................................................................................1

19 C.F.R. § 210.46 ...................................................................................................1

584832.03

**PUBLIC VERSION**

Respondents HTC Corp. and Exedea, Inc. (collectively, "HTC") hereby submit this
reply brief on remedy, bonding and the public interest in connection with the above-captioned
investigation, pursuant to the Commission's September 15, 2011 Notice of Review ("Notice")
and in accordance with Commission Rules 210.46(a) and 210.50 (19 C.F.R. §§ 210.46(a) and
210.50).

## I.    INTRODUCTION

Apple's proposed remedies, should the Commission find a violation in this investigation,
are overreaching, unsupportable, and contrary to the public interest.  Apple contends that
effective relief requires a Limited Exclusion Order ("LEO") against all HTC Android devices, a
Cease and Desist Order, and setting a bond of 100% of the value of the imported goods.  In each
instance, Apple's position lacks factual support, would give Apple far more "remedy" than it
proved it requires, and misconstrues the applicable law and precedent.  Given the facts presented,
if the Commission finds that a violation of Section 337 occurred in this investigation, it should
issue a remedy that is narrowly tailored to provide relief and protect the public interest by issuing
a narrow limited exclusion order, issuing no cease and desist order, and imposing no bond.

### *Public Interest*

The submissions of Apple and the OUII rely heavily on the fundamental but incorrect
premise that there are sufficient suitable alternatives to HTC's Android smartphones.  Apple's
analysis – which terms the supply "endless" – is at once overbroad and incomplete.  Apple
ignores that a broad LEO would exclude the vast majority of next generation 4G smartphones for
the 4G networks currently under development.  The impact of a broad LEO on 4G would

1

**PUBLIC VERSION**

substantially harm the public interest, jeopardizing billions of dollars in investments, millions of consumers, and hundreds of thousands of U.S. jobs.

Specifically, four fundamental errors undermine Apple's position, and counsel against issuing a LEO that excludes all HTC Android devices:

*First*, there are not suitable alternative devices to HTC's Android 4G smartphones, and alternative devices could not be produced quickly. Carriers, analysts, and consumers all agree that currently available options could not replace the 60% of 4G phones that HTC currently supplies or the 4G phones provided by other Android manufacturers. Development of additional phones will take considerable time. And Apple provides no current 4G product, including its latest iteration of iPhone – the 4S – which was announced on October 5.

*Second*, exclusion of 4G phones would critically harm innovation and investment in 4G. Instead of fueling the development of the next generation of faster and better wireless networks, which will support an array of applications and functions, eliminating HTC's Android 4G smartphones would impede and prevent technological advancement, limit broadband access and undermine U.S. policies.

*Third*, eliminating a major competitor would hinder competitive conditions in the U.S. economy, to the determinant of consumers, and public health and welfare. Competition in the fast growing wireless industry is a significant concern as the Department of Justice demonstrates. An overbroad LEO, in conjunction with Apple's other efforts, would limit innovation, reduce competition among device manufacturers and carriers, and harm consumers.

*Finally*, broadly excluding all HTC Android 4G devices would overly weigh Apple's interests in protecting the intellectual property at issue here—20 years old in many cases and

2

PUBLIC VERSION

developed for non-mobile platforms – compared to the public interest in the continued rapid development and expansion of 4G technology.

While HTC disagrees that any such violation has been shown, any "effective" relief should not harm the public interest. Halting the advancing technology of its competitors, Apple seeks to gain a dominant position, under the guise of "effective relief." Apple's concern here is its self-interest, not the public interest. The Commission should not assist Apple, but should narrowly tailor a remedy. As was the case in *Baseband Processors*, a broad LEO here would significantly harm the public interest as it relates to the availability of next-generation wireless devices. As there, a modification of the order would balance remedying the violation with preserving the public interest found in the next generation of wireless technology.

### Cease and Desist Order

Apple's request for a Cease and Desist Order lacks basis in law and in fact. Apple cannot establish, as it must, that HTC maintains a "commercially significant inventory" of accused devices in the United States. Quite simply, the undisputed facts demonstrate that HTC maintains no such inventory – as the ALJ noted in his RD. And Apple's argument that products already sold to consumers can constitute "commercially significant inventory" while in transit to a customer lacks any basis in law. Because Apple cannot establish any commercially significant inventory, and thus cannot show any need for the broad cease and desist provisions it seeks, the Commission should not issue a cease and desist order.

### Bond

Apple failed entirely to offer evidence at the hearing relating to any type of bond calculation at the hearing. This failure is fatal to Apple's request. Apple's attempt now to declare a calculation "impossible" and thus to request a bond of 100% fails entirely. Not only

3

PUBLIC VERSION

does Apple ignore that it held the burden of supporting a bond calculation, Apple ignores that it has the burden of producing evidence to show that such a calculation is impossible. Apple provided no such evidence. And Apple's position flies in the face of Commission precedent, which has consistently addressed the pricing situation here by employing a weighted average. Apple cannot confuse its failure to meet its burden with actual impossibility of calculating the proper bond. As a result, there should be no bond set in this investigation.

II.    **IF A VIOLATION OF SECTION 337 WERE TO BE FOUND, PUBLIC INTEREST CONSIDERATIONS REQUIRE THAT THE COMMISSION ISSUE A MODIFIED LIMITED EXCLUSION ORDER**

A.    **Adequate Alternative Devices Do Not Exist, Especially In the Short Term**

Apple relies heavily on speculation and generalized statements that the industry is "highly competitive" to incorrectly suggest that ample alternatives exist to HTC's cutting edge smartphones. These inaccurate and incorrect generalizations do not comport with the facts, especially concerning the next generation of smartphones and mobile devices, 4G.

Unquestionably, 4G is the future of wireless communications. Investment in 4G is fueling the next stage of wireless innovation, will create jobs, and promises to provide a realm of new opportunities not met by the current offerings of 3G networks and devices.[1] Wireless carriers are spending tens of billions of dollars building out their 4G networks – most investing in building networks for the LTE standard[2] – to provide dramatically faster connections speeds.[3]

---

[1] *See* Statement of Vincent E. O'Brien In Support of Respondent HTC's Opening Brief on Commission Review ("O'Brien Stmt."), filed October 6, 2011, ¶¶ 39-45.

[2] O'Brien Stmt. ¶¶ 4, 45-49.

[3] *Id.* ¶¶ 4, 45-49 .

4

**PUBLIC VERSION**

This investment is projected to lead to the creation of between 371,000 and 771,000 new jobs, and GDP growth of around $100 billion.[4]

Yet because 4G networks are useless without cutting edge devices, the development and adoption of 4G currently relies heavily on HTC and on Android, which Apple is attempting to block.[5] A LEO will directly impact this technology, and the impact will be felt throughout the U.S. economy.  As T-Mobile stated, an exclusion order prohibiting import of HTC's Android devices would:

> consequently impede the growth of wireless carriers' high-speed next-generation networks.  T-Mobile has heavily invested in developing and deploying its next-generation 4G HSPA+ network. These investments, however, depend on consumers having access to devices that can take advantage of that technology.[6]

A LEO that excludes HTC devices would have this very effect – precluding consumers from having access to sufficient numbers of 4G devices for some time.

### 1.    No Suitable Alternatives Exist for HTC's 4G Products

Apple's position that there exist an "almost endless number" of alternatives for consumers contradicts the facts relating to 4G.  HTC and Android smartphones comprise nearly all the current 4G smartphone offerings.  Suitable alternatives for these smartphones do not currently exist.

HTC is the leading smartphone manufacturer of 4G devices, providing 60% of 4G smartphones as of mid-summer this year.[7]  Indeed, of the thirty-seven 4G smartphones currently

---

[4]  *Id.* ¶¶ 4, 45.

[5]  *See* Third-Party T-Mobile USA, Inc.'s Statement Regarding the Public Interest, filed October 6, 2011 ("T-Mobile Br.") at 3-5.

[6]  *Id.* at 8.

[7]  O'Brien Stmt. ¶ 53.

5

584832.03

**PUBLIC VERSION**

available, Android accounts for thirty-four of those models.[8]  And HTC's innovation continues at

a blistering pace. ████████████████████████████████████████████████

████████████████  Says T-Mobile, "[c]onsumers would lose access to T-Mobile's fastest

technology if HTC's Android smartphones were removed from the marketplace."[10]  HTC is

fueling the migration to 4G.

Not one of the alternatives identified by Apple or the OUII can supply the 4G phones

Apple seeks to exclude.  First, the OUII's suggestion that other Android manufacturers could be

considered as alternatives runs contrary to Apple's own statements.[11]  Even Apple does not claim

that Android devices from other major manufacturers could provide alternatives for HTC's

Android devices[12], undoubtedly because Apple is currently attempting to exclude or shut down

the production of Android devices from the top three manufacturers (HTC, Samsung, Motorola)

both before this Commission and in district court.[13]  These manufacturers constitute 85% of

---

[8] O'Brien Stmt. ¶ 31.  Since Dr. O'Brien compiled the data for his report, additional Android 4G devices have been released; *see* Wireless Carrier websites
https://www.verizonwireless.com/b2c/store/controller?item=phoneFirst&action=viewPhoneOverviewByDevice&deviceCategoryId=1; http://www.wireless.att.com/cell-phone-service/cell-phones/pda-phones-smartphones.jsphttp://shop.sprint.com/mysprint/shop/phone_wall.jsp?INTNAV=ATG:HE:Phones;

http://www.t-mobile.com/shop/phones/?features=371e5c4a-3dc6-4404-86d0-c59f8d8baa3b&shape=smp;
http://www.cincinnatibell.com/wireless/phones/by-type/4g/;
http://www.metropcs.com/Shop/PhoneList.aspx?styles=&features=1&manufacturers=&applications=.

[9] O'Brien Stmt. ¶ 52.

[10] *See* T-Mobile Br. at 4.

[11] *See* OUII Br. at 14-15.

[12] In its Statement Regarding the Public Interest, or in its Opening Brief does Apple does not argue that other manufacturers Android devices could provide adequate alternatives to HTC's Android devices.  *See* Apple's Statement Regarding the Public Interest, filed August 25, 2011 at 2; Complainants Written Submission on Remedy, The Public Interest, and Bonding, ("Apple Remedy Br."), filed October 6, 2011, at 12-13.

[13] Apple is aggressively attacking Android.  Beyond the present investigation, Apple is currently seeking to exclude Android devices from Samsung and Motorola before this Commission and is seeking a preliminary injunction against certain of HTC, Samsung and Motorola's Android devices in litigation in District Court.  *See Certain Personal Data and Mobile Communications Devices and Related Software*, 337-TA-710, (Apple v. HTC); *Certain Mobile Devices And Related Software*, 337-TA-750, (Apple v. Motorola);*Certain Electronic Digital Media Devices and Components Thereof*, 337-TA- 796, (Apple v. Samsung); *Certain Portable Electronic Devices And Related Software*, 337-TA- 797, (Apple v. HTC); *Apple Inc. v. HTC Corp.*, No. 10-CV-00166 GMS (D. Del. filed March 2,

6

**PUBLIC VERSION**

Android smartphones, and supply nearly all 4G smartphones.[14] And by attacking the major

Android manufacturers, Apple hopes to chill production by those remaining Android producers.

As Apple recognizes, consumers (and the Commission) cannot look to Android devices to

replace HTC's excluded devices.

Second, Apple's contention that its iPhone products could replace HTC's devices ignores

that Apple offers no 4G product.[15] The maximum speed of the newest most advanced iPhone

runs well below the minimum speed to be considered "4G", and does not operate on AT&T,

Verizon or Sprint's 4G networks.[16] Indeed, though AT&T, Verizon, and Sprint are all building

and rolling out LTE networks, Apple has no announced or even rumored plans to release an LTE

device.[17] A common and public criticism of Apple's newly announced iPhone 4S is the lack of

4G functionality.[18] Apple will be *at least* 18 months behind HTC in offering a 4G device, if not

much longer[19] If Apple releases a 4G phone next summer, that will be over 2 years after HTC

released the EVO 4G.

---

2010); *Apple Inc. v. HTC Corp.*, No. 10-CV-00167 GMS (D. Del. filed March 2, 2010); *Apple Inc. v. HTC Corp.*, No. 10-CV-00544 GMS (D. Del. filed June 21, 2010); *Apple Inc. v. HTC Corp.*, No. 11-CV-00611 GMS (D. Del. filed July 11, 2011); *Apple Inc. v. Motorola Inc., and Motorola Mobility Inc.*, No. 10-CV-661 (W.D. Wis. filed October 29, 2010); *Apple Inc. v. Motorola Inc. and Motorola Mobility Inc.*, No. 10-CV-662 (W.D. Wis. filed October 29, 2010); *Apple Inc. v. Samsung Electronics Co.*, Case No. 5:11-CV-1846 (N.D. Cal. filed April 15, 2011); *see also* O'Brien Stmt. ¶ 29.

[14] O'Brien Stmt. ¶ 29.

[15] O'Brien Stmt. ¶ 5.

[16] *See* O'Brien Stmt. ¶ 55.

[17] *See* O'Brien Stmt. ¶¶ 47-49, 55.

[18] *Id.; see e.g.,* Eric Zeman, "iPhone 4S: 5 Missing Features," InformationWeek, 4-Oct-2011; *available at* http://www.informationweek.com/news/personal-tech/smart-phones/231700255 ("No 4G: The iPhone 4S does not introduce HSPA+ at 4G speeds, LTE, or WiMax. In fact, its HSPA+ radio isn't nearly as fast as many had hoped. Rather than go for the gusto and support AT&T's fastest HSPA+ network, it supports a middle-of-the-road HSPA+ network at 14.4 Mbps on the downlink. Sure that's twice as fast as the iPhone 4, but with a huge percentage of Android smartphones already packing HSPA+ at 21 Mbps and 42 Mbps, or WiMax or LTE, 14.4 Mbps in the iPhone simply isn't going to cut it.").

[19] O'Brien Stmt. ¶ 55.

7

**PUBLIC VERSION**

Third, the remaining non-Android manufacturers identified by Apple do not provide alternatives to HTC's 4G products. The two (of only 4) currently available non-Android 4G smartphones produced by RIM have not proved successful,[20] do not measure up to iOS or Android products, and offer little competition.[21]   RIM continues to rapidly lose customers[22] and RIM users want to replace their 3G devices with Android or iOS products.[23]  Carriers do not believe that these devices could provide alternatives for the consumer-oriented HTC Android smartphones.[24]  Nor does the analyst community.[25]  Further, analysts have little hope for RIM's QNX operating system, which Apple's expert relies upon,[26] deeming it a likely failure.[27]  These are hardly signs that consumers could consider these devices "adequate alternatives."[28]

---

[20] O'Brien Stmt. ¶ 31, 35.

[21] O'Brien Stmt. ¶ 33-35.

[22] O'Brien Stmt. ¶ 34. RIM's monthly share of sales between December 2010 and April 2011 has not exceeded 5%; down from 40% in prior years. *Id.*

[23] O'Brien Stmt. ¶ 34.

[24] *See* T-Mobile Br. at 6.

[25] *See* O'Brien ¶ 35, fn. 44-45, citing Matthew S. Robison, "RIMM: Expect Churn Down to Hard Core Downgrade to Hold With Target Revision to $46 From $76," Wunderlich Securities, 24-May-2011 ("[W]e no longer anticipate Research in Motion (RIMM) recovering to participate in the mainstream of smartphone industry growth."); Colin W. Gillis, "RIMM Earnings Review", BGC Partners, 17-June-2011, p. 4.

[26] *See* Confidential Declaration of Stephen D. Prowse on Behalf of Complainants Apple, Inc. and NeXT Computer ("Prowse Decl.") ¶ 26. According to the same article relied on by Mr. Prowse, "RIM says the platform will compete with iPhone and Android powered devices, but with Blackberry OS 7 devices selling poorly, the company's bridge to QNX may be collapsing..." *See* http://www.forbes.com/sites/mobiledia/2011/09/16/rim-bets-it-all-on-qnx/.

[27] *See* "RIM Blackberry's QNX Phones Expected to Underwhelm Users, PC World, August 9, 2011, *available at* http://www.pcworld.com/article/237594/rim_blackberrys_qnxbased_phones_expected_to_underwhelm_users.html ("[i]f you were keeping your hopes up for a BlackBerry superphone running the QNX OS, you will be disappointed. Research In Motion is set to launch an underwhelming range of QNX-based phones next year, according to a BGR report, that will be as good as dead on arrival.").

[28] After a recent widespread service blackout, some analysts question whether RIM can even remain viable for corporate or enterprise customers, where its support formerly remained stronger. http://www.marketwatch.com/story/rim-outage-may-threaten-remaining-value-2011-10-12?link=MW_latest_news.

8

**PUBLIC VERSION**

Windows devices do not provide adequate alternatives either. No currently available Windows offering has 4G capability.[29] Says T-Mobile "[c]onsumers likewise do not view Windows-based smartphones as a comparable substitute."[30] Further, Apple's highly touted statement that Windows could provide 20% of smartphones is simply incorrect.[31] By Apple's own admission, that 20% figure by 2015 is *worldwide*, not in the United States.[32] Apple's own evidence shows much smaller percentages: 3.7% for 2011, 5.7% for 2012, and 7.3% for 2013, which assumes that manufacturers can offer compelling Windows products.[33] Thus, even though HTC manufactures phones that run Windows, those products are not viable alternatives to supply the significant loss of HTC's Android devices. Plus, the infirmity of Apple's suggestion that Nokia and its adoption of Windows 7 might intensify competition can be seen in the title of the blog cited by Apple: "Great Speculations."[34]

Moreover, Apple's recitation of other device providers (like Huawei, Kyocera, Pantech and ZTE) ignores that these manufacturers (who together provide very few smartphones, let alone 4G smartphones[35]) produce *Android* devices, and thus could be affected by Apple's campaign against Android manufacturers.

Finally, as HTC demonstrated in its opening submission, the purported non-Android alternatives do not offer HTC's Sense, nor are they designed to run Android, or Android

---

[29] O'Brien Stmt. ¶¶ 5, 31.

[30] *See* T-Mobile Br. at 6.

[31] *See* Apple Remedy Br. at 13, Prowse Dec. ¶ 26, *citing* http://www.forbes.com/sites/greatspeculations/2011/09/06/microsoft-to-snatch-20-smartphone-market-shareby-2015.

[32] Apple Remedy Br. at 13, Prowse Decl. ¶ 26.

[33] Apple Remedy Br. Exhibit 10, at Table 3.

[34] *See* Apple Remedy Br. at 13 *citing* http://www.forbes.com/sites/greatspeculations/2011/09/06/microsoft-to-snatch-20-smartphone-market-shareby-2015.

[35] O'Brien Stmt ¶ 29.

9

**PUBLIC VERSION**

applications.[36]  Because of these factors, as Apple itself said in the 703 investigation, "no other

smartphone device can be considered directly competitive to Apple's iPhones."[37]  The same is

true for HTC's Android devices.  Even Apple agrees, Apple's purported "alternatives" are not

acceptable to consumers.

> ### 2.      Alternative Devices Will Not Be Readily Available for Customers

Beyond its false suggestion that "endless" alternatives exist (which include almost no 4G

phones) Apple suggests that other manufacturers could "readily meet consumer demand" for

HTC's Android devices citing Apple, Nokia, and RIM as examples.  Again, Apple's speculation

contravenes facts.

Replacing HTC's Android smartphones could not happen rapidly.  As T-Mobile states,

"it would be nearly impossible for other suppliers to fulfill the demand in the short term,

particularly since other carriers would request that those suppliers fill the HTC void at the same

time."[38]  For each network, devices must be developed and configured specifically to work to the

specifications of that network.[39]  Developing alternatives, even for HTC, involves a lengthy

process that requires chip makers, smartphone manufacturers, and carriers to work together to

design, build, test, manufacturer in large quantities, and release new products.[40]  Said Verizon,

---

[36] *See* HTC Br. at 161-165.

[37] *See Certain Mobile Telephones and Wireless Communication Devices*, Inv. No. 337-TA-703 ("*Mobile Telephones*"), Respondent Apple Inc.'s Brief on the Issues Under Commission Review ("Apple Commission Brief"), April 8, 2011, at 82-83 (citations omitted).

[38] *See* T-Mobile Br. at 5-6.

[39] *See Apple Inc. v. Samsung Electronics*, 11-cv-01846 LHK, Brief of Amicus Curiae Cellco Partnership, ("Verizon Amicus") (N.D. Cal., September 23, 2011) at 4.

[40] *Id.*

10

**PUBLIC VERSION**

"[i]t takes considerable time and effort to develop any 4G product – normally much longer than a year."[41]

Additionally, Apple's conculsory and speculatory statements that it could provide ample alternatives to HTC's 4G phones should find no purchase. Apple currently offers no 4G phone, and would have to develop one to provide an alternative to excluded 4G devices.[42] And Apple cannot even fill the demand of its phones with the current volume of sales of HTC devices. Indeed, when faced with an exclusion order of its own iPhones, Apple readily admitted that "Apple, AT&T and Verizon have struggled to meet the demand of iPhone customers."[43] If Apple cannot meet the supply for its own products, it cannot be heard to claim that it could supply alternatives for HTC's 4G products.

As to RIM, Apple has no basis other than wishful thinking to suggest that RIM could supply suitable alternative 4G devices.[44] RIM's customer base is vanishing.[45] Consumers have rejected RIM products as suitable alternatives to Android smartphones.[46] That Apple contends this rejection demonstrates RIM's excess capacity to provide 4G alternatives contradicts reality. The same can be said for Nokia, who had become but a minor smartphone provider in the U.S. by mid-2011.[47] Nothing indicates that these companies could rapidly provide acceptable alternatives in substantial quantities upon issuance of a LEO against HTC's Android phones.

---

[41] *See* Verizon ▮▮▮▮▮

[42] O'Brien Stmt. ¶¶ 5, 55.
[43] *Mobile Telephones*, No. 337-TA-703, Apple Commission Brief at 83.
[44] *See* Apple Remedy Br. at 15.
[45] O'Brien Stmt. ¶¶ 33-35.
[46] O'Brien Stmt ¶ 34.
[47] O'Brien Stmt. ¶ 29.

11

**PUBLIC VERSION**

### 3.    U.S. Production of Alternatives Will Not Increase Given a LEO

Finally, Apple argues that exclusion or HTC devices (and presumably other Android devices through its additional campaigns against Android) will *encourage* U.S. production or investment in alternative devices.[48]  This too has no basis.

For starters, an exclusion order will have no impact on the "*production* of like or directly competitive articles in the United Sates." *See* 19 U.S.C. § 1337(d) (*emphasis added*).  No smartphone or mobile communications device – let alone one that could be considered an acceptable alternative for HTC's excluded 4G smartphones – is manufactured in the United States.  That should end the analysis.

Yet Apple attempts to argue that an exclusion order would generate greater investment by particular companies with U.S. operations, dismissing HTC as a "foreign" company.  This is irrelevant and incorrect.  Whether or not an exclusion order might theoretically benefit particular companies is not part of the determination of whether the LEO would impact the "production of like or directly competitive articles in the United States." *See* 19 U.S.C. § 1337(d).

Moreover, Apple distorts the record in labeling HTC a "foreign" company with "minimal presence" in the United States devoted to "marketing to U.S. customers and field testing", while speculating that "several other smartphone manufacturers…maintain a significant presence in the United States."[49]  These statements flatly contradict the evidence.

Apple itself acknowledges that HTC has research and design facilities in the United States.[50]  These facilities include advanced and strategic product development, software design

---

[48] Apple Remedy Br. at 16.

[49] Apple Remedy Br. at 16-18.

[50] *See* Apple's brief claims that "HTC's primary domestic presence is through its subsidiary HTC America, which is only responsible for marketing to U.S. customers and field testing" but in a footnote concedes that HTC has research and development activities in the United States relating to software and industrial design.  Apple Remedy Br. at 17,

12

**PUBLIC VERSION**

and development, and industrial design.[51]  Moreover, as Apple well knows, these operations are

not "miniscule" as it is fond of stating.[52]  In Investigation No. 337-TA-721, where Apple is the

respondent, the Commission found on summary determination that HTC's research and

development operations (non-sales and non-marketing) satisfied the economic prong of the

domestic industry requirement for HTC's Android smartphone products.[53]  Apple did not even

oppose that motion.[54]  In fact, the ALJ recognized that HTC set forth in detail the extensive

research, development, design, and strategy operations occurring in the United States for its U.S.

targeted smartphones.[55]  Implying, as Apple does, that these operations consist of only

"marketing and field testing" with "minimal" research and development is simply false.

Moreover, the non-Apple smartphone manufacturers Apple identifies as potential

alternative suppliers are headquartered outside of the United States, and many have no or limited

U.S. operations.[56]  Apple's implication that these companies are somehow more "domestic" than

HTC and thus domestic operations would gain from a LEO strains credulity.

---

fn. 31; *see also* Prowse Decl. ¶¶ 16-17 (stating that HTC has "essentially no domestic operations" limited to "marketing and domestic field testing" with "limited domestic R&D activities.").

[51] Tr. 901:14-902:6.

[52] Apple Remedy Br. at 16-17; Prowse Decl. ¶ 17.

[53] *See Certain Portable Electronic Devices and Related Software*, Inv. No. 337-TA-721 ("*Portable Electronic Devices*"), Notice of Commission Determination Not To Review An Initial Determination Granting Complainant's Motion for Summary Determination Granting Complainant's Motion for Summary Determination, April 5, 2011 at 2.

[54] *Id.*

[55] *See Portable Electronic Devices*, Order No. 40, March 15, 2011, at 4.

[56] Pantech's headquarters are in South Korea, , Kyocera's headquarters are in Japan, and ZTE and Huawei are located in China. *See* http://www.pantechusa.com/about/;
http://global.kyocera.com/company/summary/company_profile.html;
http://wwwen.zte.com.cn/en/about/investor_relations/announcement/201109/P020110907648790951877.pdf;
http://en.wikipedia.org/wiki/Huawei.

13

**PUBLIC VERSION**

Finally, for the U.S. companies Apple identifies (Apple and Microsoft), there is no evidence that they would increase their U.S. research and development spend as a result of an exclusion order. For its own activities, Apple produces no evidence or witness that backs up this conjecture. In fact, given Apple's potential gain in the wake of a LEO, it is just as likely that Apple would cut back on research in development.[57] Lacking the competitive threat posed by HTC and others against which it seeks exclusion orders, Apple's incentive to spend would be significantly diminished.

As to Microsoft, Apple speculates on what Microsoft might do and what impact that might have. Microsoft does not manufacture or sell smartphones – it supplies the operating systems for others to use in their devices. Moreover, in suggesting that Microsoft's domestic research and development might increase if a LEO were issued, Apple ignores the substantial benefits Microsoft gains from the sale of Android devices. Microsoft receives substantial license revenues from the sale of Android products from HTC and Samsung, which could total nearly $500 million in the next fiscal year.[58] Microsoft would *lose* revenues in the event of an LEO, and that lost revenue could actually result in cutbacks to, rather than increases in, Microsoft's research and development. Apple's speculation of a "shift" is irrelevant and baseless and should be disregarded.

There are not adequate alternatives for HTC's 4G Android devices. Apple's proffered alternatives rely on little more than speculation, and run counter to established facts. This lack of alternatives is critical to understanding the harm that a LEO would do to the development and adoption of 4G technologies, and ultimately to consumers.

---

[57] *See* Submission of Google Inc. In Response to Commission's Request for Written Submissions On The Issues of Remedy, The Public Interest and Bonding, ("Google Br.") filed October 6, 2011 at 10-11.
[58] *See* Business Insider, September 29, 2011, Goldman: Microsoft Is Getting $444 Million Annually From Android Patent Licenses *available at* http://www.businessinsider.com/goldman-microsoft-android-2011-9?op=1

**PUBLIC VERSION**

B.      **Innovation and U.S. Economy Will be Hindered By An Exclusion Order**

1.      **Continued Access to 4G devices is crucial to continued innovation.**

Relying on Apple's false premise that manufacturers who have to date failed to provide successful 4G products could provide ready alternatives to HTC's 4G successful phones, Apple claims that exclusion will *promote* innovation. Built on a false foundation, this argument also fails in its own right.

Few can dispute the connection between the development of 4G networks and innovation. U.S. has officially declared it a national policy to promote the rapid deployment and use of next-generation wireless networks and smartphones.[59] President Obama recognized the link between rapid deployment of these networks and innovation, stating that high-speed wireless service will "spark new innovation, new investment, and new jobs."[60] The U.S. Government has invested $5 billion for the build out of 4G networks in rural areas, and each major U.S. carrier has invested billions of dollars of its own to the same end.[61]

Yet these networks will not continue to be built out, and 4G services will not be offered, if 4G devices are not available.[62] And because 4G devices are at an early stage of adoption, any decrease in the number of available devices may delay large numbers of consumers from adopting these technologies.[63] As T-Mobile said:

> [a]n Exclusion Order would prohibit some of the newest, most
> advanced wireless devices sold today, and consequently impede

---

[59] *See* White House Press Release, *President Obama Details Plan To Win The Future Through Expanded Wireless Access* (Feb. 10, 2011), *available at* http://www.whitehouse.gov/the-press-office/2011/02/10/president-obama-details-plan-win-future-through-expanded-wireless-access; *see also* Obama Pushed Broadband Expansion Proposal, CNN (Feb. 10, 2011).

[60] *Id.*

[61] *Id.*; O'Brien Stmt. ¶¶ 4, 45.

[62] Verizon Br. at 7, T-Mobile Br. at 8.

[63] Verizon Br. at 7;

15

**PUBLIC VERSION**

the growth of wireless carriers' high-speed next generation networks. T-Mobile has heavily invested in developing and deploying its next-generation 4G HSPA+ network. These investments, however, depend on consumers having access to devices that can take advantages that technology.[64]

A LEO covering 4G devices would hinder 4G adoption and innovation. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

The effects would be felt beyond network carriers and providers. Apple's efforts against Android here – and in additional investigations and litigation – would threaten the only open mobile platform developed and distributed in the U.S.[66] Open generative platforms are key engines of innovation, called by some the "backbone of the technological revolution that created the modern U.S. information economy."[67] Losing this open platform in favor of only closed platform, like Apple's, could have substantial and devastating consequences to innovation in the rapidly changing mobile wireless industries.[68]

### 2. Exempting 4G Devices from a LEO Will Not Hinder Innovation

In the face of these facts, Apple argues that *failure to issue a broad exclusion order* could chill Apple's innovation. Again, this statement does not comport with the facts. Apple offers no device that operates on any of the four national wireless carriers' 4G networks.[69] Lacking

---

[64] T-Mobile Br. at 8.

[65] O'Brien Stmt. ¶ 52.

[66] Google Br. at 10.

[67] Google Br. at 10-11.

[68] *Id.*

[69] O'Brien Stmt. ¶¶ 55-56. Nor does any such device appear forthcoming. In its first product launch in 15 months, Apple announced the iPhone 4S, which debuts many new software features, but does *not* operate on 4G networks. *Id.*

16

**PUBLIC VERSION**

competition from Android manufacturers – its largest competitors – Apple would have no incentive to produce a 4G device.

Moreover, Apple's patents asserted here have nothing to do with 4G, or even with smartphones. Permitting importation of 4G phones would likely promote Apple's innovation. Indeed, Apple's use of old patents claiming inventions made in developing personal computers to stop competition in the new field of smartphones – competition that would otherwise force Apple to make a product offering that incorporates 4G technology.

None of the patents Apple seeks to enforce arise from investments that Apple made in its mobile-device business, or for that matter, an investment Apple has made in any business in the last 16 years. Instead, the patents relate generally to purported inventions for personal computers and software, and were not developed for any product competing with HTC's mobile devices.[70] Indeed, Apple did not assert a single mobile device as the domestic industry for '721, '983, or '263 patents. Rather, it asserted only Macintosh computers, with which HTC's products do not compete, as a domestic industry. Although Apple did assert the iPhone 3GS (which is now two iPhone generations old) running mobile mail as the domestic industry products for the '647 Patent, the features covered by the '647 long pre-date the development of the iPhone.[71]

---

[70] The '647 and '263 were developed in connection with Apple's personal computer business. (See, e.g., JX-3 at 3:20-26 ('647); Tr. 213:3-214:20 ('263)). The '721 was developed at claimant Next Computer, Inc. (See, e.g., JX-1, at 1 ('721). No product that would be competitive to Next is the subject of the Investigation, and ▮▮▮▮▮▮▮ Apple PreHB at 74-75.

[71]  Apple itself claims to have conceived of the '647 Patent as early as September 1994. (ID at 182.) Moreover, the Perspective prior art, which the ALJ found not anticipatory—a finding HTC challenges on review—nonetheless undisputedly discloses similar user functions. (*Id.* at 166-74.)

17

**PUBLIC VERSION**

And none of the patents reflects investment leading up to or during the vast growth in mobile devices over the past 5 years. In fact, all four patents claim inventions nearly two decades old or older.[72]

### C.   Lack of New Generation Handsets will Harm Competition, Consumers, Public Health

Ignoring the consequences on innovation, and drawing on its false conclusion that substantial alternatives exist to HTC's Android 4G products, Apple claims that remedial orders would have "no material effect on competitive conditions."[73] Again Apple's argument lacks basis. A broad LEO against all HTC Android devices would have a substantial and harmful impact on competitive conditions in the U.S. economy, to the detriment of consumers.

### 1.   Competition

Eliminating competitors does not promote competition. This basic and fundamental fact should end Apple's claim that a LEO could be pro-competitive. Indeed, as the Department of Justice makes clear in the network carrier context "vigorous competition is essential to ensuring continued innovation and maintaining low prices."[74] Yet Apple maintains that threatening the viability of Android, crippling the largest manufacturers of devices running that operating system (HTC, Samsung, Motorola), and curtailing the parties responsible for delivering the 4G services would somehow *benefit* competition. Wrong. It would benefit only Apple.

---

[72] Apple asserted a 1988 conception date for the '983 Patent, Apple PreHB at 74, and the '721 Patent claims priority to a 1991 patent application. (JX-1, at 1 ('721 Patent). The '263 and '647 patent are not much newer: Apple claims May 1992 and as early as September 1994 as the '263 and '647 patents' conception dates, respectively. (ID at 75, 182.)

[73] Apple Remedy Br. at 11.

[74] *See United States of America v. AT&T, Inc.*, Case No. 1:11-cv-1560 (D.D.C. August 31, 2011), ("*U.S. v. AT&T*"), Complaint, ¶ 1.

**PUBLIC VERSION**

HTC launched the first Android device, and has been instrumental in establishing the open system Android platform as an alternative to the closed and proprietary iOS platform[75] Eliminating HTC's smartphones would remove a key factor preventing Apple from making iOS the sole viable mobile platform and thus "locking in" consumers and application developers to that platform.[76] The damage to competition of Apple eliminating HTC's Android devices – given HTC's lead in technological innovation in 4G – is evident. The Commission should not credit Apple's claim that a LEO would be "pro-competitive."

Nor should the Commission be misled by Apple's effort to characterize HTC's presence as "minimal." Apple's statistics are misleading at best  Apple derides HTC as providing a small percentage of the "mobile communications devices" – which devices Apple defines as "handheld computing device[s], including, but not limited to, handsets, PDAs, portable media players and smartphones."[77] That those numbers might be low in this broad category in is no wonder, HTC does not sell "handsets, PDAs or portable media players" and those products have no bearing on the issues here.

Further, Apple's statistics look backward, not forward. HTC is leading the way in producing and selling 4G smartphones; accounting for 60% of the 4G smartphones.[78] Given their innovation and growth , Apple's effort to characterize HTC as a bit player fails. Even Steve Jobs recognized that HTC's Sense will "cost the Apple mobile iOS considerable market share.'"[79]

---

[75] Google Br. at 7.

[76] *Id.* at 7-8.

[77] *See* Apple Remedy Br. at 13-14, Prowse at ¶ 34.

[78] O'Brien Stmt ¶ 53.

[79] O'Brien Stmt .¶ 62.

19

**PUBLIC VERSION**

Beyond smartphone manufacturers, Apple ignores entirely the substantial adverse consequences a broad exclusion order would have on network carriers.[80] Wireless devices, unlike other consumer products, are purchased primarily through a particular network carrier, and must be designed to operate on that particular carrier's network. These purchases come with binding multi-year contracts, so that a consumer is tied to that carrier, and that carriers' selection of phones, for some time. Wireless carriers make investments in their networks that depend on the devices that they can offer.

A LEO excluding HTC's 4G devices will substantially affect the national carriers. As T-Mobile stated, "at a time when the market increasingly demands Android devices, an Exclusion Order would harm U.S. consumers and T-Mobile."[81] In the short term, current T-Mobile customers would suffer from an LEO, and T-Mobile cannot readily replace the majority of T-Mobile's smartphone sales that come from HTC.[82] And as Apple does not supply T-Mobile with any product, Apple cannot provide any alternative. Other national carriers will be harmed as well. Faced with Apple's effort to enjoin Samsung's sale of 4G LTE devices, Verizon explained how an injunction would significantly harm Verizon, in terms of its investment in 4G, its customer commitments, and its future offerings.[83]

Not only that, Apple disregards any impact an LEO might have on rural or regional carriers (to whom Apple does not supply iPhones either).[84] Smaller regional and rural carriers

---

[80] For his part, Apple's expert, Dr. Prowse states that he has "seen no evidence suggesting that network carriers' revenues would be affected, and, in fact, as discussed previously, there would be no impact on carriers." *See* Prowse at ¶ 45.

[81] T-Mobile Br. at 5.

[82] *Id.* at 4-5.

[83] Verizon Br. at 6.

[84] Apple's expert implies that because the 4 national networks (AT&T, Verizon, Sprint, T-Mobile) dominate the market for wireless service, the significant impact on the remaining carriers (to whom Apple does not offer the

20

**PUBLIC VERSION**

perform an essential function of providing wireless services to underserved communities.[85]
Often customers of these services use their wireless devices as the primary, or even only, means
of connecting to the Internet. Of primary concern to these carriers is the difficulty in obtaining
high performance devices for these uses – a concern that HTC historically has addressed.[86]
Eliminating HTC and Android phones without any alternative would seriously jeopardize the
health of these carriers.

### 2. Consumers

Part and parcel with the harm to wireless carriers and device manufacturers caused by a
broad LEO is the harm to the consumers who use those devices on those networks. Here again,
Apple's broad claims that consumers would feel no effect of an LEO fails the facts.

HTC's current customers in need of a replacement left without one. As replacement
devices are sourced from HTC or third party repair facilities, and many of those facilities lie
outside of the United States, a customer, guaranteed a replacement device by HTC and/or the
carriers would find that the replacement device is subject to a LEO.[87]

Moreover, any consumer wishing to purchase a 4G phone would be left wanting.
Immediately, a broad exclusion order will preclude HTC"s continued importation of its
substantial number of 4G devices, and Apple's further efforts against Samsung and Motorola

---

iPhone), is irrelevant. Prowse ¶¶ 9, 45. Rural and regional carriers and their customers would undoubtedly
disagree.

[85] O'Brien Stmt. ¶ 102.

[86] O'Brien Stmt. ¶¶ 8, 81-83, 102; Press Release, Rural Cellular Association, Educating Congress on Rural Realities
(May 19, 2010), *available at* http://rca-usa.org/press/rca-in-the-news/educating-congress-on-rural-realities/911560;
*see also* Rural Cellular Association, Consumers Want Smartphones and Should Be Allowed Device of Choice (Oct.
22, 2010), *available at* http://rca-usa.org/press/rca-press-releases/consumers-want-smartphones-and-should-be-
allowed-device-of-choice/912880.

[87] *See* O'Brien Stmt. ¶ 100; T-Mobile Br. at 5.

21

**PUBLIC VERSION**

will sufficiently threaten even more, so as to render those devices unavailable as alternatives.[88] Customers seeking a 4G device after issuance of the LEO will find only limited and lower quality options. And when the 50% of current smartphone owners seek to upgrade their phones in the near future to the next generation of devices, the most popular, the most advanced, and the most widely available devices they too will be disappointed.[89] This situation is especially harmful for T-Mobile customers (where Android comprises 90% of smartphone stock and HTC accounts for a majority of smartphone sales) and those of regional carriers, whose plight will be compounded by the fact that Apple has chosen not to offer them an iPhone as a potential replacement.[90]

Finally, the lack of competition from Android could lead to price increases.[91] Basic economics suggests that removing a substantial number of devices decreases competition and can lead to higher prices. And Apple's expert's suggestion that Apple's recent actions in lowering iPhone prices to match HTC's wide range supports HTC, not Apple.[92] Unable, or unwilling, to offer a 4G phone, Apple needed to lower its prices to compete with Android offerings like HTC's. Lacking this price pressure, Apple could have, and likely would have, kept its prices high, or even raised them higher.[93]

### 3.    Public Health and Welfare

The lack of 4G alternatives will impede important public health and welfare considerations. Apple's broad LEO undermines fundamental U.S. policy. The U.S. is

---

[88] *See* O'Brien Stmt. ¶ 53; *see also supra* at 14-16.

[89] *See* Verizon Br. at 7; T-Mobile Br. at 4.

[90] *See* T-Mobile Br. at 4.

[91] *See* O'Brien Stmt. ¶¶ 99-101.

[92] *See* Prowse ¶ 51.

[93] O'Brien Stmt. ¶ 101

22

**PUBLIC VERSION**

committed to building out 4G wireless networks. This expansion is critical to America's ability to compete globally, as only 65% of American households subscribe to high-speed broadband.[94] Part of the U.S. government's plan to further broadband access has been a $5 billion investment to build out wireless broadband in rural areas.[95] Yet this investment depends on the supply of 4G devices.[96]

The lack of 4G alternatives would impact U.S. jobs. Slowed consumer acceptance of 4G technologies, like LTE or HSPA+ 21 or 42, will affect investments in applications, and investments in infrastructure.[97] The HTC Android smartphones and other Android smartphones drive a rapidly growing market for applications and other support services. Mobile applications revenues were approximately $2.2 billion in 2010, and are predicted to rise to more than $37 billion by 2015, assuming availability of devices that can access high-speed networks.[98]

Finally, while Apple suggests that alternatives exist that provide the services identified by HTC as implicating the public interest, cannot dispute that the LEO will remove a (significant) percentage of devices that offer these services, especially in rural areas. That other phones may offer these services is not the issue: that Apple is keeping the majority of phones with these capabilities out of customers hands is the issue. Moreover, a LEO would restrict the supply of Android devices to U.S. consumers and threaten Android's viability, which could eliminate the

---

[94] *See* Verizon Br. at 9; T-Mobile Br. at 7-8.

[95] *Id.*

[96] *Id.*, *see also* Google Br. at 8.

[97] Google Br. at 5-6

[98] *Id.*.

**PUBLIC VERSION**

wide variety of public health and safety applications that are currently being used, and those that

are in development. [99]

D.     **Public Interest Is Best Served Through Issuing a Narrower LEO**

The public interest is not always served by issuing a LEO, nor by excluding all

potentially infringing products.  Indeed, as Apple recognizes, the Commission has found that the

consideration of the public interest outweighs a complainant's interest in receiving relief.  *See*

*Certain Baseband Processor Chips and Chipsets*, Inv. No. 337-TA-543, Comm'n Op. at 148-153

(June 2007).  Yet Apple incorrectly posits that any exceptions to an exclusion order are

unwarranted, because this case does not constitute "exceptional circumstances" as in the three

occasions where the Commission declined to issue any remedy based on the public interest.[100]

While HTC agrees that the Commission has only precluded *any* remedy in these three instances,

the Commission has also issued narrow remedies that address the violation and balance the

public interest and the needs of consumers.  *See Id.* at 148-153;  *See also Certain Integrated*

*Circuit Telecommunication Chips and Products Containing Same Including Dialing Apparatus*,

Inv. No. 337-TA-337, USITC Pub. No. 2670, Commission Opinion on the Issues Under Review

and on Remedy, the Public Interest, and Bonding at 29-34 (Aug. 3, 1993).

In *Baseband Processors*, the Commission recognized that substantial public interest

considerations were implicated by an exclusion order that impeded migration from 2.5G to 3G

wireless networks.  *Baseband Processors* at 148, 149.  Those public interests ranged from the

interests of wireless network carriers, who invested in building out the 3G networks, to those of

wireless device manufacturers who make the devices, to consumers who would purchase the

---

[99] *Id.* at 11-14.

[100] Apple Remedy Br. at 8.

**PUBLIC VERSION**

devices, to first responders and emergency personnel, who would use the devices and networks for public health and safety purposes. *Id.* The Commission determined that the impact on the public interest warranted granting an exemption to the limited exclusion order. *Id.*

As in *Baseband Processors*, Apple's proposed LEO threatens development and deployment of the next generation of wireless network technology. Without suitable 4G alternatives, an exclusion order proposed by Apple would severely impact wireless carriers, consumers, application developers and other third parties. It would contravene established U.S. policies of *expanding* wireless coverage and promoting technological advancements to keep pace with the rest of the world. And it would have a disproportionate impact on traditionally underserved communities, including rural, low-income and minority consumers. This significant impact requires tailoring the remedy here to address protect the public interest.

Further, Apple's asserted patents are not directed to smartphones, or to 4G technology. Apple does not currently produce a 4G phone. Nor has Apple announced any intention of doing so any time soon. Apple's own interest in protecting the intellectual property in the patents asserted in this case does not warrant a LEO excluding all HTC Android 4G phones.

Given these interests, the Commission could strike the appropriate balance by issuing a narrower LEO that permits continued importation of 4G devices. The Commission could thus ameliorate the profound harm to competition, to consumers, and to public health and welfare of immediately excluding all HTC Android 4G devices. Additionally, the Commission should recognize the significant impact that a broad LEO could have on current consumers with HTC devices, who could not obtain a replacement device if a current device requires service, despite being contractually guaranteed such a replacement.

25

**PUBLIC VERSION**

Apple seeks "effective" relief.[101]  Excluding HTC's non-4G Android devices would effectively remedy the violation of Apple's patents, without threatening the development, growth and use of the 4G networks that is vital to our national welfare, and to competition in the wireless industry. *See Baseband Processors*, Inv. No. 337-TA-543, Comm'n Op. at 148-153. Further, the Commission should permit importation of devices to fulfill contractual agreements for current HTC customers who require a replacement devices for those that malfunction within the warranty period. *Certain Sortation Systems, Parts Thereof, and Products Containing Same*, Inv. No. 337-TA-460, USITC Pub. No. 3588, Comm'n Op. (Jan. 23, 2003) at 18; *Certain Automated Mechanical Transmission Systems for Medium-Duty and Heavy-Duty Trucks, and Components Thereof*, USITC Pub. No., 3934, Inv. No. 337-TA-503, Comm'n Op. (April 7, 2005) at 4, 7.

In conjunction with these exemptions, and considering HTC's product portfolio, any remedy issued by the Commission must allow HTC to certify that articles being imported by HTC do not infringe the claims of the patent. *See Certain Systems for Detecting and Removing Viruses or Worms*, Inv. No. 337-TA-51O, Comm'n Op. at 14 (Aug. 23, 2005).  Not all HTC products would be subject to an exclusion order.  HTC's Android products that do not include any features or functions that infringe the claims at issue, or HTC's non-Android products, are indisputably non-infringing devices that should not be excluded.  HTC's 4G devices, as well as devices necessary to supply repair or replacement contracts, likewise should not be excluded.  In its September 15 Notice, the Commission directed Complainants and the Staff to submit proposed remedial orders.[102]  Apple's proposal does not address the importation of non-

---

[101] Apple Remedy Br. at 16.
[102] *See* Commission Notice Granting Review, September 21, 2011, at 6.

584832.03

**PUBLIC VERSION**

infringing devices. HTC submits that in view of the above, any LEO should include a standard certification provision as proposed by the OUII in Ex. H to its recent submission, which would authorize agents of the U.S. Department of Customs and Border Protection to allow importations of HTC products not covered by the LEO.[103]

## III.   THE COMMISSION SHOULD NOT ISSUE A CEASE AND DESIST ORDER

Apple seeks a cease and desist order stating that HTC "shall not (A) import or sell for importation into the United States Covered Products; (B) market, distribute, warehouse for distribution, offer for sale, sell, license, or otherwise transfer; advertise, demonstrate, or use imported Covered Products in the United States; (D) solicit U.S. agents, resellers, or distributors for imported Covered Products; or (E) aid or abet other entities in the importation, sale for importation, sale after importation, transfer (except for exportation), or distribution of Covered Products." *See* Ex. B to Apple 10/6/2011 Remedy Brief. However, Apple's request for a cease and desist order lacks any factual or legal support and is contrary to common sense. As the ALJ found in his Recommended Determination, and as the OUII agrees, Apple failed entirely to establish any facts that would establish the need for a Cease and Desist Order here because HTC does not maintain a commercially significant inventory of products in the United States. Simply put, in the event the Commission finds a violation, Apple has not carried its burden in establishing any facts that would support finding that a Cease and Desist Order is necessary or warranted here. Further, Apple's efforts to now twist the facts otherwise fails muster.

Commission precedent is clear: the purpose of a cease and desist orders is to prevent a respondent from undercutting an exclusion order by, for example, selling infringing products

---

[103] *See* OUII Br. Exh. H.

27

**PUBLIC VERSION**

kept in inventory in the U.S. after an exclusion order has issued. *See Certain Voltage Regulators, Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-564, 2007 WL 1794681, Recommended Det. at 9 (May 30, 2007)). As a result, the Commission has only issued cease and desist orders where the complainant can show that the respondent maintains a commercially significant inventory of accused devices in the U.S. *See Certain Electronic Programmable Read-only Memories*, Inv. No. 337-TA-395, 2000 WL1810084 Comm'n Op. (July 9, 1998). This makes sense. If a respondent does not maintain such an inventory, then a cease and desist order is not necessary to make effective an exclusionary remedy. HTC does not maintain such an inventory.

Apple agrees that HTC does not maintain a commercially significant domestic inventory of its devices through, for example, warehousing products for later sale or distribution. Indeed, as the very testimony Apple cites demonstrates, when HTC's devices arrive in the U.S., they are delivered to HTC's customers, who assume title to the products. Apple Remedy Brief, at 4. Nevertheless, Apple attempts to craft an "inventory" by arguing that accused products that might be in transit to customers at the time an exclusion order goes into effect constitute a "commercially significant inventory." This is incorrect for a number of reasons.[104]

First, Apple cites no authority, and HTC is aware of none, holding that products in transit to a customer when an exclusion order issues constitute a commercially significant inventory. Indeed, such products are already the subject of an agreed upon contract for sale and, logically, would not be part of HTC's "inventory." Preventing HTC from completing the delivery of products that **have already been sold** and are in transit to customers would needlessly harm U.S.

---

[104] Apple previously argued to the ALJ that certain products owned by HTC that are not authorized by for sale by the U.S. government, and are used for testing purposes only, are a "commercially significant inventory." It is unclear whether Apple is maintaining this frivolous argument in its most recent submission to the Commission. *See* Apple Remedy Submission at 4, n. 3.

28

**PUBLIC VERSION**

customers. Presumably, there is no cited precedent for the relief Apple now seeks against sold products already in transit because any further deliveries of the accused products would be halted once an exclusion order issues. In other words, if an exclusion order issues, then this fictitious "inventory" would be depleted within a matter of days once the current deliveries are completed. Thus, a cease and desist order is not necessary to prevent any exclusion order from being subverted.

Moreover, Apple failed to present any evidence to explain how products in that have been sold and are transit to U.S. customers constitute a commercially significant inventory under any analyses set forth by the Commission in prior investigations. For example, Apple did not provide evidence relating to: 1) the quantity of accused products that might be in transit as compared to the monetary value of the accused product, *Certain Hardware Logic Emulators Systems and Components Thereof*, Inv. No. 337-TA-383, U.S.I.T.C. Pub. 2089, Comm'n Op. at 26 (Mar. 1998); 2) the length of time HTC would be able to continue selling accused products in the U.S. market until its purported domestic "inventories" are exhausted,[105] *Certain Abrasive Products Made Using a Process for Powder Preforms, and Products Containing Same, Commission Opinion on Remedy, the Public Interest, and Bonding*, Inv. No. 337-TA-449 U.S.I.T.C. Pub. 3530 (Aug. 2002), *rev'd on other grounds sub. nom Kinik Co. v. International Trade Comm'n*, 362 F.3d 1359 (Fed. Cir. 2004); or 3) the number of products HTC might have in transit when the exclusion order issues as compared to Apple's expected annual sales of competing devices. *Id.*

---

[105] As noted in HTC's initial submission, HTC customers are primarily service providers. Apple presented no evidence relating to the distance the accused products are shipped during delivery to HTC's customers. However it is well known that numerous product warehouses are located directly adjacent to U.S. ports of entry. Thus, it is not unreasonable to assume that in many instances, HTC maintains title to the products in the U.S. for a matter of minutes.

29

**PUBLIC VERSION**

Lacking any support in fact, law or common sense, Apple's request for a cease and cesist order based on products that may be in transit to a customer's warehouse when an exclusion order issues should be denied.  Apple has failed to adduce any facts or law that support its request or otherwise meet its burden of proof.

## IV.    THE COMMISSION SHOULD NOT IMPOSE ANY BOND

Similarly, Apple fails entirely to support its claim for a bond of 100%.  Apple bears the burden of proof to present evidence relating to the appropriate level of bond.  *Certain Rubber Antidegradants, Components Thereof, and Products Containing Same*, Inv. No. 337-TA-533, Comm'n Op. at 39- 40 (July 21, 2006).  As the ALJ and OUII both agree, Apple can point to no evidence to support its bond request.  The parties agree that the level of bond imposed during the 60 day Presidential review period is typically based on the price differential between the accused, imported products and the domestic products or a reasonable royalty where the patents at issue have been licensed previously at a particular royalty rate.  *See Certain Two-Handle Centerset Faucets and Escutcheons, and Components Thereof*, Inv. No. 337-TA-422, Comm'n Op. at 9-10 (July 2002); *Certain Integrated Telecommunication Chips and Products Containing Same, Including Dialing Apparatus*, Inv. No. 337-TA-337, Comm'n Op. at 41 (1995); Apple Remedy Brief, at 6.  Where a complainant fails to meet this burden, the Commission will set the bond at zero.  *See Certain Liquid Crystal Display Devices and Products Containing the Same*, Inv. No. 337-TA-631, Comm'n Op. at 28 (July 15, 2009) (holding with respect to the level of bond that a complainant "should not benefit from a lack of any effort" and "is required to do more than just assert a lack of 'meaningful price comparison.").  Apple failed to meet this burden.

30

**PUBLIC VERSION**

Recognizing this failure, Apple asked the ALJ to recommend a bond of 100% of the entered value of the accused products because Apple claimed that it was impossible to calculate the correct level of bond where there is more than one accused product, and they are not all sold at the same price. Apple Remedy Brief, at 5-7. Yet Apple never provided any evidence to support even this assertion. Instead, it offered no evidence relating to any type of bond calculation at the hearing and then declared the task to be impossible.[106]  *Id.*  As noted above, Apple must prove, based on evidence in the record, that it is impossible to calculate the appropriate level of bond and should not be rewarded for failing to do so.

Even more, Apple's assertion that a price comparison is not possible under the present circumstances is directly contrary to the facts and Commission precedent. The pricing situation in the present investigation is not unusual and has been addressed previously by the Commission. Specifically, where there are a number of products sold at different prices, the Commission has used a weighed average of the prices to calculate at the level of bond. *See e.g., Certain Biometric Scanning Devices, Components Thereof, Associated Software, And Products Containing The Same,* Inv, No. 337-TA-720, Final Initial And Recommended Determinations, 2011 WL 2907232, (June 17, 2011) citing *Certain Two-Handle Centerset Faucets and Escutcheons, and Components Thereof,* Inv. No. 337-TA-422, Commission Opinion at 9-11 (July 21, 2000). Apple's assertion that it is impossible to calculate the level of bond because there are different accused products sold at different prices is simply false. Apple presented no evidence to explain why a weighted average could not have been used here, and no reasonable explanation exists.

---

[106]  Indeed, Apple never questioned any witnesses about the ability to conduct a price comparison and never called its economic expert, Dr. Prowse, to testify at the hearing.

31

**PUBLIC VERSION**

In view of Apple's failure to present any evidence either to support a bond calculation or prove that such a calculation is not possible, the ALJ correctly recommended that the bond be zero. *See Certain MEMS Devices & Products Containing The Same*, Inv. No. 337-TA-700, Initial Determination On Violation Of Section 337 And Recommended Determination On Remedy And Bond, 2010 WL 5646142 (Dec. 23, 2010) (recommending a bond of zero where the complainant failed to present evidence supporting a bond analysis), *Commission Notice Adopting ALJ's Recommendation of Zero Bond*, 76 Fed. Reg. 28809 (May 18, 2011).

**V.     CONCLUSION**

For the reasons set forth above, if the Commission determines that a remedy is necessary in this Investigation, it should issue a modified LEO but should not issue a cease and desist order or impose a bond on HTC's accused products during the 60 day Presidential review period.

Dated:  October 17, 2011                       Respectfully submitted,

Charles K. Verhoeven
Amy H. Candido
Sean Pak
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California  94111
(415) 875-6600
(415) 875-6700 facsimile

James M. Glass
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7000
(212) 849-7100 facsimile

32

584832.03

**PUBLIC VERSION**

Matthew S. Warren
QUINN EMANUEL URQUHART &
 SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
(213) 443-3100 facsimile

James B. Coughlan
PERKINS COIE LLP
700 Thirteenth Street N.W.
Washington, D.C. 20005
(202) 434-1670
(202) 654-9948 facsimile

Jonathan M. James
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2700
(602) 351-8000
(602) 648-7000 facsimile

Ryan J. Mc Brayer
PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 359-8000
(206) 359-9000 facsimile

Robert A. Van Nest
Asim Bhansali
Steven K. Taylor
Matthias A. Kamber
KEKER & VAN NEST LLP
710 Sansome Street
San Francisco, California 94111
(415) 391-5400
(415) 397-7188 facsimile

*Attorneys for Respondents HTC Corp., HTC
America, Inc., and Exedea, Inc.*

33

**Certain Personal Data and Mobile Communications**           **Inv. 337-TA-710**
**Devices and Related Software**

## CERTIFICATE OF SERVICE

    I, Yu-Ing Huang, hereby certify that on this 17th day of October, 2011 copies of foregoing document were filed and served upon the following parties as indicated:

| | |
|---|---|
| James. R. Holbein<br>Secretary to the Commission<br>U.S. International Trade Commission<br>500 E Street, S.W., Room 112<br>Washington, D.C. 20436 | ☐ Via First Class Mail<br>☒ Via Hand Delivery<br>☐ Via Overnight Courier<br>☐ Via Electronic Filing |
| Sidney Rosenzweig<br>Office of the General Counsel<br>U.S. International Trade Commission<br>500 E Street, S.W.<br>Washington, D.C. 20436<br>Email: sidney.rosenzweig@usitc.gov | ☐ Via First Class Mail<br>☒ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail |
| Erin Joffre<br>Thomas S. Fusco<br>Office of Unfair Import Investigations<br>U.S. International Trade Commission<br>500 E Street, S.W., Room 401-Q<br>Washington, D.C. 20436<br>Email: Erin.Joffre@usitc.gov<br>       Thomas.Fusco@usitc.gov | ☐ Via First Class Mail<br>☒ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail |

**On Behalf of Complainants Apple Inc. and NeXT Software, Inc.**

| | |
|---|---|
| Edward C. Donovan<br>F. Christopher Mizzo<br>Kirkland & Ellis LLP<br>655 Fifteenth St., N.W.<br>Washington, D.C. 20005<br>Email: 710-apple-htc@kirkland.com | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail |
| Gregory S. Arovas<br>Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>Email: 710-apple-htc@kirkland.com | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail |

| | |
|---|---|
| Bryan S. Hales<br>Marcus E. Sernel<br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, IL 60654<br>Email: 710-apple-htc@kirkland.com | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail |
| Kenneth H. Bridges<br>Michael T. Pieja<br>Brian C. Kwok<br>Lawrence Lien<br>Bridges & Mavrakakis LLP<br>540 Cowper Street, Suite 100<br>Palo Alto, CA 94301<br>Email: Apple-ITC-710@bridgesmav.com | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail |
| V. James Adduci II<br>Jonathan J. Engler<br>David H. Hollander, Jr.<br>Evan H. Langdon<br>**Adduci, Mastriani & Schaumberg, LLP**<br>1200 Seventeenth Street, N.W., Fifth Floor<br>Washington, DC 20036<br>Email: Adduci@adduci.com<br>      engler@adduci.com<br>      hollander@adduci.com<br>      langdon@adduci.com | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail |

_____
Yu-Ing Huang

2

**Certain Personal Data and Mobile Communications**                    **Inv. 337-TA-710**
**Devices and Related Software**

## CERTIFICATE OF SERVICE

    I, Yu-Ing Huang, hereby certify that on this 27th day of October, 2011 copies of foregoing document were filed and served upon the following parties as indicated:

| | |
|---|---|
| James. R. Holbein<br>Secretary to the Commission<br>U.S. International Trade Commission<br>500 E Street, S.W., Room 112<br>Washington, D.C. 20436 | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via Electronic Filing |
| Sidney Rosenzweig<br>Office of the General Counsel<br>U.S. International Trade Commission<br>500 E Street, S.W.<br>Washington, D.C. 20436<br>Email: sidney.rosenzweig@usitc.gov | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail |
| Erin Joffre<br>Thomas S. Fusco<br>Office of Unfair Import Investigations<br>U.S. International Trade Commission<br>500 E Street, S.W., Room 401-Q<br>Washington, D.C. 20436<br>Email: Erin.Joffre@usitc.gov<br>      Thomas.Fusco@usitc.gov | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail |

**On Behalf of Complainants Apple Inc. and NeXT Software, Inc.**

| | |
|---|---|
| Edward C. Donovan<br>F. Christopher Mizzo<br>Kirkland & Ellis LLP<br>655 Fifteenth St., N.W.<br>Washington, D.C. 20005<br>Email: 710-apple-htc@kirkland.com | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail |
| Gregory S. Arovas<br>Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>Email: 710-apple-htc@kirkland.com | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail |

| | |
|---|---|
| Bryan S. Hales<br>Marcus E. Sernel<br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, IL  60654<br>Email: 710-apple-htc@kirkland.com | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail |
| Kenneth H. Bridges<br>Michael T. Pieja<br>Brian C. Kwok<br>Bradford J. Black<br>Lawrence Lien<br>Bridges & Mavrakakis LLP<br>540 Cowper Street, Suite 100<br>Palo Alto, CA  94301<br>Email:  Apple-ITC-710@bridgesmav.com | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail |
| V. James Adduci II<br>Jonathan J. Engler<br>David H. Hollander, Jr.<br>Evan H. Langdon<br>**Adduci, Mastriani & Schaumberg, LLP**<br>1200 Seventeenth Street, N.W., Fifth Floor<br>Washington, DC 20036<br>Email: Adduci@adduci.com<br>        engler@adduci.com<br>        hollander@adduci.com<br>        langdon@adduci.com | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail |

Yu-Ing Huang