14

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before The Honorable Carl C. Charneski**
**Administrative Law Judge**

| |
|---|
| **In the Matter of** |
| **CERTAIN PERSONAL DATA AND MOBILE COMMUNICATIONS DEVICES AND RELATED SOFTWARE** |

**Inv. No. 337-TA-710**

**REBUTTAL EXPERT REPORT OF DR. TODD C. MOWRY**
**REGARDING VALIDITY OF U.S. PATENT NO. 5,946,647**

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................ 1

II.    BACKGROUND AND QUALIFICATIONS ............................................................ 1

III.   MATERIALS REVIEWED ....................................................................................... 1

IV.    SUMMARY OF OPINIONS ...................................................................................... 2

V.     PERSON OF ORDINARY SKILL IN THE ART ..................................................... 3

VI.    FURTHER BACKGROUND OF THE '647 PATENT AND RELATED TECHNOLOGY
       .................................................................................................................................... 3

   A.   Technology Background ....................................................................................... 4

   B.   State of the Art for Data Detection Software ....................................................... 6

   C.   State of the Art for User Interfaces in 1995 ......................................................... 8

   D.   '647 Patent ............................................................................................................ 9

   E.   '647 Patent Prosecution History ......................................................................... 11

VII.   FURTHER OPINIONS REGARDING CLAIM CONSTRUCTION ....................... 12

   A.   Legal Understanding ........................................................................................... 12

   B.   Undisputed '647 Patent Terms and Constructions ............................................. 12

   C.   Disputed '647 Patent Terms and Constructions ................................................. 13

VIII.  LEGAL PRINCIPLES ............................................................................................. 21

   A.   Presumption of Validity ...................................................................................... 21

   B.   Patentable Subject Matter ................................................................................... 22

   C.   Anticipation ........................................................................................................ 22

   D.   Obviousness ........................................................................................................ 23

   E.   Conception And Reduction To Practice .............................................................. 25

   F.   Indefiniteness ...................................................................................................... 26

IX.    CONCEPTION & REDUCTION TO PRACTICE .................................................. 26

i

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

A.    The Inventors Conceived of the Invention Claimed in the '647 Patent by September 25, 1994 and Actually Reduced the Claimed Invention to Practice By At Least September 1995.26

X.    THE '647 PATENT CLAIMS ARE NOT ANTICIPATED. ............................................. 39

A.    PenSoft Perspective "System" and Perspective Handbook............................................. 39

B.    NeXTSTEP "System" And "References" ........................................................................ 67

C.    U.S. Patent No. 5,859,636 ............................................................................................ 101

D.    European Patent Application EP 0458563A2 ("Nokia EPO Publication") ................. 115

E.    U.S. Patent No. 5,483,352 ("Fukuyama")................................................................... 126

F.    Larry Koved & Ben Shneiderman, Embedded Menus: Selecting Items in Context ("Koved")............................................................................................................................... 136

G.    U.S. Patent No. 5,437,036 ("Stamps")........................................................................ 147

H.    The Newton "System"................................................................................................... 158

XI.    THE '647 PATENT CLAIMS ARE NOT OBVIOUS. ............................................... 175

A.    PenSoft Perspective System and Perspective Handbook ............................................. 175

B.    NeXTSTEP System and References ............................................................................. 180

C.    The '636 Patent ............................................................................................................ 186

D.    Nokia EPO Publication ................................................................................................ 191

E.    Fukuyama Patent .......................................................................................................... 193

F.    Koved Reference............................................................................................................ 195

G.    Stamps Patent ............................................................................................................... 200

H.    Newton "System" And Guide ...................................................................................... 203

XII.    THE '647 PATENT CLAIMS ARE NOT AN OBVIOUS COMBINATION OF PRIOR ART ELEMENTS.............................................................................................................. 210

A.    The Combinations Identified By Dr. Olsen Were Not Predictable And Yielded Unexpected Results........................................................................................................... 215

B.    A Person Of Ordinary Skill Would Not Have Been Motivated To Pursue The Supposed Combinations Through Trends Or Market Forces................................................................ 217

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

C.      Objective Indicia Further Establish the Non-Obviousness of the '647 Patent............. 219

XIII.     ALLEGED MATERIALITY OF SELECTION RECOGNITION AGENT ............... 224

XIV.     REEXAMINATION ................................................................................................. 225

XV.     RESERVATION OF RIGHTS ...................................................................................... 225

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

## I.     INTRODUCTION

1.     I have been retained by the law firm of Kirkland & Ellis LLP as an independent technical expert in this action.

2.     I have been asked to review and evaluate the Expert Report of Dan R. Olsen Jr., Ph.D. Regarding Validity of U.S. Patent No. 5,946,647 ("Olsen Validity Report") and provide an opinion as to the validity of United States Patent No. 5,946,647 ("the '647 patent"), assigned to Apple, Inc. ("Apple").  My opinions are set forth below in this report.

3.     If called, I am prepared to testify at trial regarding my background, qualifications, and experience relevant to the issues in this action, the technical subject matter of the '647 patent, the state of the art at the time of the '647 patent invention, the conception and reduction to practice of the claimed invention of the '647 patent, and the validity of the '647 patent claims.

## II.    BACKGROUND AND QUALIFICATIONS

4.     I am the same Todd C. Mowry that submitted The Expert Report Of Dr. Todd C. Mowry Regarding Infringement And Domestic Industry For U.S. Patent No. 5,946,647 ("'647 Patent Opening Report").  I incorporate by reference the description of my background and qualifications from Section II of that report.  My *curriculum vitae* was attached as Exhibit 1 to that report.

## III.   MATERIALS REVIEWED

5.     In forming the opinions set forth in this report, I considered and relied upon my education, background, experience, and prior presentations and publications. I also reviewed and considered the '647 patent and its prosecution history, the Olsen Validity Report, the references cited within the Olsen Validity Report, as well as the other documents or reference materials cited or listed in this report. I incorporate by reference Exhibit 2 to my '647 Patent Opening

1

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

Report, which lists the materials I considered in preparing that report.  Exhibit A to this report includes a supplemental list of documents I have reviewed in preparing this report.

6.      This report is based on my study of the information available to me as of today.  I reserve the right to supplement my report to address any additional information or materials that may be provided to me, that form any additional arguments raised by HTC or its experts, or that are relied upon by any of HTC's experts or witnesses, to the extent permitted by the Court.

7.      I understand that the parties have reached a compromise regarding the scope of the Olsen Validity Report.  Specifically, HTC has agreed not to assert the following references, combinations, or arguments that the Olsen Validity Report discusses:

- HTC will not assert that the following references invalidate the asserted claims:  NeXTStep User's Guide, SNOBOL and PROLOG programming languages, Xerox Star, X Windows, Netscape Navigator 1.0/1.1.

- HTC will not assert indefiniteness arguments for claims 3 and 6.

- HTC will not assert that Salton in combination with the following references invalidates the asserted claims:  Pensoft Perspective System, NeXTSTEP System, NeXTSTEP vols 1&2, Pandit, Nokia EPO Publication, Koved and '036 Patent.

As such, I will not address those aspects of the Olsen Validity Report.

## IV.      SUMMARY OF OPINIONS

8.      I have reviewed the Olsen Validity Report and disagree with Dr. Olsen's opinions regarding the validity of the claims of the '647 patent.  It is my opinion that Claims 1, 3, 4, 8, 15, 17, 19, and 20 of the '647 patent are valid.[1]  In particular, it is my opinion that those claims are not anticipated or rendered obvious by any of the references cited by Dr. Olsen in his report and

---

[1] The Olsen Validity Report also addresses claims 6 and 22.  It is my understanding that Apple no longer asserts claims 6 and 22 against HTC or seeks to establish a domestic industry in these claims.  I therefore offer no opinion regarding the validity of Claims 6 and 22.

> CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

attached appendices and exhibits or by the "state of the art" at the time of the '647 patent invention.

9.    The evidence on which Dr. Olsen relies does not support his opinions. The analyses leading to my conclusions are set forth below.

## V.    PERSON OF ORDINARY SKILL IN THE ART

10.    A person of ordinary skill in the art relevant to the '647 patent is a person with at least a Bachelor's of Science degree in computer science or equivalent coursework and some academic or work experience in the field.

11.    I disagree with Dr. Olsen's opinion that the person of ordinary skill in the art "would have at least a Bachelor's degree in computer science plus three years of industry experience in the computer science field.   That person would be familiar with computer programming related to data detection and user interfaces generally used in the industry." Dr. Olsen does not explain how he arrived at three years of industry experience or what he means by a person "familiar with computer programming related to data detection[2] and user interfaces generally used in the industry."  Rather, as I stated above, I believe it is more appropriate that a person of ordinary skill in the art would have a general knowledge of computer science. Nonetheless, I have considered Dr. Olsen's proposed level of ordinary skill and it does not change my opinion that the asserted claims of the '647 patent are valid.

## VI.    FURTHER BACKGROUND OF THE '647 PATENT AND RELATED TECHNOLOGY

12.    I provided a general discussion of the '647 patent and related technology in my '647 Patent Opening Report and incorporate it here. To the extent Dr. Olsen's statements or

---

[2] As I explain in more detail in Section XII.A, "data detection" was not a commonly used phrase but instead was coined by Apple with its release of the original Apple Data Detectors.

3

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

opinions set forth in the Olsen Validity Report contradict my '647 Patent Opening Report, I disagree with those statements or opinions. I also specifically disagree with Dr. Olsen for the reasons described below.

### A.    Technology Background

13.    In paragraphs 19-34 of the Olsen Validity Report, Dr. Olsen provides opinions regarding the technology and "state of the art" relating to the '647 patent. I disagree with Dr. Olsen's descriptions for several reasons.

14.    Dr. Olsen continually misuses the term "structure" as that term is defined by the '647 patent and as the term is to be construed per the parties' agreement. As noted in my '647 Patent Opening Report, the parties have agreed that "structure" means an "an *instance of a pattern*, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc." ('647 Patent Opening Report, ¶ 27 (emphasis added); *see also* '647 patent, 1:31-32 ("The term 'structure' refers to an instantiation of a pattern in the document.").) Dr. Olsen's report contains an image of an email that he says contains "three structures flagged: the misspelled word "weekend", an address, and a phone number." (Olsen Validity Report, ¶ 22.) Put simply, a misspelled word is *not* a structure as it is not an *instance* of a pattern. In fact, a misspelled word is the exact opposite: it is the *non-instance* of a string. This is a fundamental problem with Dr. Olsen's report that we see repeated throughout his discussion on spell checkers. Notably lacking from Dr. Olsen's report is any mention or acknowledgement of the parties' agreed construction of "structure."

15.    Dr. Olsen also states that this example email contains additional structures such as "the sentence 'Looking forward to seeing you this weekend.'" (Olsen Validity Report, ¶ 22.)

4

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

This sentence can only constitute a "structure" if it matches a pattern such as a grammar or regular expression.  However, I find it very unlikely that such a pattern would exist as this type of sentence is more properly interpreted by a natural language parser, which "are designed to parse generalized sentence structures used in ordinary spoken or written language" and are "not designed to detect or parse [recognizable] structures." ('647 patent file history, 4/28/98 Response to Office Action at 5.)

16.     I also disagree with Dr. Olsen's statement that the '647 patent discloses actions "such as correcting the misspelled word 'weakend.'"     (Olsen Validity Report, ¶ 22.)  As I mentioned above, locating unrecognized words is not "detecting structures" and is not within the scope of the '647 patent.  Here, Dr. Olsen assumes the point he wishes to make – that misspelled words are "structures" and correcting a misspelled word is an "action."  Tellingly, not once does the '647 patent discuss misspellings or spellcheckers, a separate field of textual analysis that is not the same as the '647 patent.  The other examples of "actions" that Dr. Olsen provides, such as adding an address to a contact book and creating a new contact entry for a detected phone number, are the types of actions that the '647 patent contemplates.  Notably, these are very different from correcting a misspelled word.  Instead, the actions of the '647 patent all involve doing something with a "recognizable structure[] that [has] semantic significance." ('647 patent, col. 1:14-15.)

17.     Finally, I note that Dr. Olsen's discussion of string libraries contradicts his own opinion that misspellings are structures.   Dr. Olsen correctly states that "[p]arsing using a string library involves analyzing text to identify data that *matches* a specific string of data in the library." (Olsen Validity Report, ¶ 26 (emphasis added).)  Spellcheckers do not detect structures

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

as they ignore all words that match their dictionary and only inform the user of text does not match.

**B.      State of the Art for Data Detection Software**

18.      I do not disagree with Dr. Olsen that there were many "software packages and systems [that] included the ability to detect structures" by 1995.  (Olsen Validity Report, ¶ 27.) There were numerous examples of parsers that detected structures well before 1995.  That no one thought to use a parser or other pattern analysis unit to arrive at the unique and novel invention of the '647 patent for such a long period of time actually supports my opinion that the '647 patent was not an "obvious" combination of known elements (discussed in more detail later.)

19.      The remainder of Dr. Olsen's "State of the Art for Data Detection Software by 1995" section discusses various systems or references that I rebut in much more detail later in this report. Suffice to say, Dr. Olsen overstates the disclosures and/or capabilities of these systems and references.  For now, I will point out just some of these misstatements.

20.      For example, Dr. Olsen states that the Perspective software "used grammars, parsers, and string libraries to detect structures in data."  However, as I will describe later, Perspective did not contain or use grammars; instead, Perspective would only match names against its address book and words against a short list of keywords. Dr. Olsen is also incorrect to say that "[i]f the Perspective software recognized that the user entered the word 'call' into the handheld device, it may have presented a set of actions to the user related to calling one of the users contacts." (Olsen Validity Report, ¶ 28.)  Dr. Olsen's Appendix 4 on the Perspective system does not identify any such functionality, and my use of the Perspective software and analysis of its code indicates that it would not present a set of actions to a user after they wrote "call." Here Dr. Olsen has overstated Perspective's functionality.

6

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

21.     Moreover, the primary purpose of the Perspective software was to help the user "enter, track, and organize [their] information." (Perspective Handbook (HTC007286210-498) at HTC007286222.)   To this end, the Perspective software included a feature named the "Associate," which could automatically create a "relationship between two items." (*Id.* at HTC007286231.)  The "items" identified by Dr. Olsen are limited to address book entries; notably, Dr. Olsen refers to these relationships as "associate[ions]" to "distinguish from 'linking actions' as used by the '647 patent." (Appendix 4 at 2.)  The creation of these associations is very similar to the disclosures of the Vale patent considered in the prosecution of the '647 patent. The applicants distinguished the Vale patent because it *only* linked to a heading node (HN) within a document and not an action.  Even Dr. Olsen characterizes these heading nodes as defining "information such as the name of the heading and its *structural relationship to other headings*." (Appendix 4 at 47 (emphasis added).)   Similarly, the associations created by Perspective's Associate define information, such as a piece of text, and its relationship to an address book entry.

22.     The Newton's Intelligent Assistant "attempts to complete actions specified by the user's written input." (Newton 2.0 Programmer's Guide (HTC007283889-7284816) at 7284524.)  It does so by requiring the user to enter a "verb" such as 'call,' 'fax,' or 'find.'  To this end, if the user does not provide a verb, the Intelligent Assistant requires them to pick one. (*Id.* at HTC007284526-7.)  The Newton's Intelligent Assistant is similar to a command-line interpreter, allowing the user to specify a command to take and a target of that command. During prosecution of the '647 patent, the PTO actually considered a reference similar to Newton's Intelligent Assistant, U.S. Patent No. 5,115,390 (the "'390 patent.")  The '390 patent discloses parsing "words of a natural language representing a plurality of control commands" so

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

that the control commands can then be executed.  ('390 patent, abst.)  One example of the inputted natural language is "RECORD FROM 5 O'CLOCK IN AFTERNOON OF TODAY DURING 8 MINUTE." (*Id.* at 432-35.)  The '390 patent is similar to the Newton Intelligent Assistant in that each evaluates text containing a command from the user and performs the interpreted command.  The examiner of the application that led to the '647 patent did not rely upon the '390 patent for any rejections and only found its disclosure "pertinent." ('647 patent file history, 1/28/98 Office Action at 4.)

23.    Dr. Olsen finishes his description of the "state of the art of data detection software" with a discussion of spelling and grammar checkers, contending they "detect structures in data." (Olsen Validity Report at ¶ 30.)  As I have already explained, these systems do not detect structures and are not relevant to the '647 patent.  Such systems do not attempt to solve the same issues as the '647 patent.  For example, they do not recognize data of semantic significance and certainly do not detect instances of patterns.  Instead, spelling and grammar checkers identify potential errors.

C.    **State of the Art for User Interfaces in 1995**

24.    Dr. Olsen's opening statement that "[b]y 1995, user interfaces that allowed users to interact with a computer were well known" (Olsen Validity Report, ¶ 31) is beside the point; user interfaces are an entire field of study that encompasses a vast amount of information.  User interfaces that allowed users to interact with applications were indeed known for quite some time before the '647 patent.  For example, the '647 patent's specification itself states that there were user interfaces allowing a user to copy-and-paste a "structure from [an] e-mail message" into a field of an electronic address book application and closing the application. ('647 patent, 1:44-48.)

≻ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ≺

25.    Dr. Olsen next cites to U.S. patent No. 5,859,636 (the "'636 patent") as evidence of the "state of the art" at the time the '647 patent was filed.  However, as explained in detail below, I disagree with Dr. Olsen that the '636 patent reflects the "state of the art" as it is not prior art to the '647 patent.  And as explained below, I also disagree that the '636 patent "discloses highlighting detected structures" or that it even detects structures.

26.    Dr. Olsen is correct that the Newton and Perspective software allowed a user to "tap" on a screen to perform a specific task; however these systems did not, among other things, link actions to detected structures or enable the selection of a linked action.  User interfaces have allowed users to cause applications to perform tasks for a long time, but that does not mean they disclosed anything resembling the '647 patent.

27.    Dr. Olsen ends his discussion on user interfaces with reference to spell checking software, once again mistakenly stating that these allowed the user to "select the desired action to take on the detected structure." (Olsen Validity Report, ¶ 34.)  This is just another instance of Dr. Olsen using the term "structure" in a manner contrary to how the parties have agreed to construe the word.  In addition to this problem with Dr. Olsen's statement, spell checkers did not allow a user to select an "action" as the CPU did not perform a sequence of operations on a structure to which it is linked.  Spelling and grammar checkers only allowed a user to perform a small set of fixed tasks on an unrecognized word or potential error, such as ignoring or replacing the word.  Such tasks are very different to the actions of the '647 patent.

**D.    '647 Patent**

28.    In paragraphs 90-116 of the Olsen Validity Report, Dr. Olsen provides opinions regarding the disclosures of the '647 patent and prosecution history.  First, I note that in this section Dr. Olsen often describes the preferred embodiment of the '647 patent specification

9

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

rather than the invention as covered by the claims. For example, Dr. Olsen specifies that the analyzer server described in the specification receives recognizable structures from a "document" in a separate application. (*See, e.g.*, Olsen Validity Report, ¶¶ 94-96.) As I explain further below when I address Dr. Olsen's claim construction opinions, I disagree that the independent claims of the '647 patent are limited to receipt of data in the form of a document given that the specification and prosecution history make clear that the claimed system and method could operate on data from any of a number of sources.

29.     Further, I note that in other respects Dr. Olsen's description of the '647 patent and prosecution history are generally inconsistent with his anticipation and obviousness analyses, which attempt to improperly broaden the scope of the '647 patent claims. For example, in his description of the '647 patent specification, Dr. Olsen stresses that "structures in data include 'recognizable structures that have semantic significance such as phone numbers, e-mail addresses, post-office addresses, zip codes, and dates.'" (Olsen Validity Report, ¶ 94 (citing '647 patent, Col. 1:14-16).) I agree that the '647 patent claims cover the detection of *recognizable structures* with *semantic significance.* However, for purposes of anticipation, Dr. Olsen reverses course and contends that the NeXTSTEP spell checking functionality, which involves locating *unrecognizable structures* with *no semantic significance*, invalidates the asserted claims of the '647 patent. (*See, e.g.*, 11/23/2010 Dep. Tr. of S. Capps at 122:14-19 ("there's only one thing you're doing with a spell checker is -- trying to determine this word is, did you mean this word or that word or this word. *There's no -- there's no semantics. There's no -- there's nothing else there.*" (emphasis added).)

30.     As another example, in his description of the '647 patent, Dr. Olsen correctly states that the '647 patent invention allows a user to select an identified structure "(i.e., 'a

10

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

mouse-down operation over a structure'')."  (Olsen Validity Report, ¶ 103.)  However, as I describe below, Dr. Olsen ignores this limitation for purposes of invalidity, for which he contends that the NeXTSTEP spell checker and Perspective software, which prevent a user from selecting a detected structure, invalidates the patent.   Dr. Olsen's remaining invalidity contentions are marked by other similar examples of his attempt to broaden the invention to contend that unrelated and distinguishable references invalidate the '647 patent claims.

**E.**     **'647 Patent Prosecution History**

31.     In his report Dr. Olsen provides a section purporting to describe the file history of the '647 patent.  I note that Dr. Olsen omits several parts of the prosecution history in his description.  I describe these omitted sections below.

32.     For example, while Dr. Olsen is correct that the Applicants distinguished U.S. Patent No. 5,574,843 ("Gerlach") and U.S. Patent No. 5,369,575 ("Lamberti") in response to the Examiner's Non-Final Office Action on January 15, 1998, Dr. Olsen omits several points of distinction raised by the Applicants.  For instance, in response to the Examiner's rejection, Applicants made clear that the structures at issue in the '647 patent, unlike Gerlach, are *recognizable* and have *semantic significance*.  Specifically, Applicants noted that, although "*[t]he word 'structure' is a critical term* used by both Gerlach and Applicants," it is used in Gerlach to refer to "data structures that are added to the data in order to give the data a form to support the events and commands associated with icons in the multimedia editing system." (April 28, 1998 Response to Office Action at 2-3.)  Such data structures are distinguishable from the recognizable pattern having "semantic significance such as phone numbers email addresses, post-office addresses, zip codes and dates" at issue in the '647 patent. (*Id.* at 3.)

11

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

33.    Consistent with the Applicants' description of the structures at issue in the '647 patent invention, Applicants also distinguished Lamberti on the grounds that it involved a "natural language parser and therefore is very different from a *parser for regular expressions, email addresses, postal addresses or telephone numbers, the structures of which do not follow the rules of a natural language; instead, they have their own distinct, recognizable structure*." (*Id.* at 5 (emphasis added).)  Dr. Olsen further omits Applicants' distinction of Gerlach for failing to disclose the ability for a user to select such detected structures.  Specifically, Applicants stated that Gerlach "clearly shows that it is the icon, not a detected structure, that is selected and that the structure is generated in response to the icon selection." (*Id.* at 4.)   As I describe below, Dr. Olsen omits such statements by the Applicants because they are inconsistent with his attempt to broaden the claimed invention to contend that materially distinguishable references invalidate the '647 patent claims.

34.    Regarding Dr. Olsen's description of Applicants' distinction of U.S. Patent No. 5,164,899 ("Sobotka") and U.S. Patent No. 5,247,437 ("Vale"), I note that I disagree with Dr. Olsen's interpretation of the prosecution history to limit the construction of "linking actions to the detected structures" and "linking at least one action to the detected structures." I explain my disagreement with Dr. Olsen in detail below in rebuttal to his claim construction opinions regarding these terms.

## VII.    FURTHER OPINIONS REGARDING CLAIM CONSTRUCTION

### A.    Legal Understanding

35.    I incorporate by reference the description of my understanding of the legal principles governing claim construction from Section VII.A of my '647 Patent Opening Report.

### B.    Undisputed '647 Patent Terms and Constructions

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

36.     As set forth in Section VII.B of my '647 Patent Opening Report, I understand that the parties have agreed to constructions of certain terms in the asserted claims of the '647 patent which are provided in the table below. In evaluating Dr. Olsen's opinions regarding the validity of the '647 patent, I have applied these agreed constructions as a person of ordinary skill in the art would understand them. Should the ALJ modify these agreed constructions, I reserve the right to supplement my opinions in accordance with the ALJ's constructions.

| Claim Term | Agreed Construction |
|---|---|
| Detecting (claims 1, 8, 15, 19)<br><br>Detected (claims 1, 8, 15) | Finding and identifying<br><br>Found and identified |
| Structure (claims 1, 8, 15, 19) | An instance of a pattern, where a "pattern" refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document[3] such as dates, addresses, phone numbers, names, etc. |
| Application running concurrently (claim 3) | Application running during the same run time. |

**C.     Disputed '647 Patent Terms and Constructions**

37.     As I stated in Section VII.C of my '647 Patent Opening Report, it is my understanding that the parties dispute the meaning of certain claim terms.   I provided my opinions regarding the correct construction of these disputed terms in Section VII.C of my '647 Patent Opening Report.   Dr. Olsen also provided opinions regarding the meaning of these terms. I disagree with Dr. Olsen for the reasons set forth below.

---

[3] I have been informed that the parties have agreed that "document" includes, but is not limited to, emails, word documents, web pages, and text messages. (11/19 Email from S. Pak to C. Mizzo.)

13

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

1.    **"Input Device"**

| "Input Device" (Claims 1, 3) | | |
|---|---|---|
| **Staff** | **Apple** | **HTC** |
| plain and ordinary meaning | computer software or hardware | plain and ordinary meaning |

38.    As I stated in Section VII.C of my '647 Patent Opening Report, it is my opinion that Apple's construction of "input device" as meaning "computer software or hardware" is correct and reflects what a person of ordinary skill in the art in February 1996 would have understood when considering the term in the context of the '647 patent.

39.    In paragraphs 169-176 of the Olsen Validity Report, Dr. Olsen argues that the term "input device" is limited to hardware.  For the reasons set forth my '647 Patent Opening Report, I disagree with this opinion. While certain parts of the '647 patent specification refer to an "input device" as hardware, it is equally clear that other disclosures in the '647 patent claims and specification teach that an input device can be software.  For example, claim 3 of the '647 patent requires that an input device receive data from an application running concurrently.  In that context, it makes more sense to refer to a software input device as receiving data from an application than a hardware input device, such as a keyboard or a mouse.  This is consistent with disclosures in the specification. For example, the specification points out that data can be received via an e-mail such that the input device for receiving data would be the email program rather than a hardware input.  ('647 patent, col. 1:39-50.)  Similarly, the "preferred method" of the invention "starts by receiving 810 the content, or a portion of the content, from document 210." (*Id.*, col. 5:51-56.)  In this embodiment, the input device for receiving data is software, such as a word processing program. Dr. Olsen, however, omits these disclosures from his

14

≻ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ≺

discussion of this term and construes the term to exclude embodiments described in the specification and covered by dependent claims.

40.     Dr. Olsen argues that Figure 1 of the '647 patent "distinguish[es] software from hardware by demonstrating that software is not a device that can be connected or coupled to other devices." Dr. Olsen makes that argument based on his observation that input device 110 is in a "solid-line box," "software elements" 160, 165, 167, and 172 are in "dashed-line boxes," and there is "no connecting line to software elements from any other elements in the diagram."   First, Dr. Olsen is incorrect because there clearly are lines connecting the RAM that contains the software shown to the other elements of the computer system.   In fact, if the software elements, which include the Operating System 160, were not connected to the rest of the computer system, the computer system would not work. (*See, e.g.*, col. 3:34-36 ("Operating system 160 is a program that controls and facilitates the processing carried out by CPU 120, and is typically stored in RAM 170.").) Second, as I stated in my '647 Patent Opening Report, I understand that Figure 1 merely depicts an example of an input device and is not limiting.  Second, I note that in the same section of the specification that describes Figure 1, the '647 patent goes on to explain that software, such as a word processor or email, essentially receives the data which contain recognizable structures and which can then analyzed by the methods of the '647 invention. (*See id.* at col. 3:36-44, *see also id.* at col. 2:28.)   That description is consistent with my understanding that input device may include both hardware and software.   In addition, the applicants statement during the '647 patent's prosecution history that the structures "are generated *externally* to Applicants' system" evidences that the data may be received from

15

> CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER <

external sources, such as email servers, and not just a keyboard or mouse. (April 28, 1998 Response to Office Action at 3.)

41.     Third, I also believe that one cannot always distinguish input devices solely on a software versus hardware basis.  For example, many hardware inputs such as keyboards and touchscreens require some amount of software to interpret the user's inputs. Likewise, a software-based input device necessarily includes hardware such as memory.

42.     For the reasons stated herein and in my '647 Patent Opening Report, it is my opinion that a person of ordinary skill in the art would have understood the term "input device" in the context of the '647 patent to mean "computer hardware or software."

      **2.**     **"Linking Actions To The Detected Structures / "Linking At Least One Action To The Detected Structure"**

| "linking actions to the detected structures" (Claim 1) | | |
|---|---|---|
| **Staff** | **Apple** | **HTC** |
| linking a detected structure to a computer subroutine that causes the CPU to perform a sequence of operations on that particular structure to which it is linked, rather than an informational structure | linking detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are linked | Same as the Staff's |

| "linking at least one action to the detected structures" (Claim 15) | | |
|---|---|---|
| **Staff** | **Apple** | **HTC** |

16

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

| | | |
|---|---|---|
| linking a detected structure to a computer subroutine that causes the CPU to perform a sequence of operations on that particular structure to which it is linked, rather than an informational structure | linking a detected structure to at least one computer subroutine that causes the CPU to perform a sequence of operations on the particular structure to which it is linked | Same as the Staff's |

43.     As I stated in Section VII.C of my '647 Patent Opening Report, it is my opinion that Apple's constructions of these terms as meaning "linking detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are linked" and "linking a detected structure to at least one computer subroutine that causes the CPU to perform a sequence of operations on the particular structure to which it is linked," are correct and reflect what a person of ordinary skill in February 1996 would have understood when considering the terms in the context of the '647 patent.

44.     In paragraphs 177-185 of the Olsen Validity Report, Dr. Olsen argues that the term should be construed as proposed by HTC and the Staff.  Notably, Dr. Olsen states that the "Staff and HTC construction differs from Apple's construction only in that the Staff and HTC add 'rather than an information structure' to the claim construction."  (Olsen Validity Report, ¶ 178.)  From this statement, I understand Dr. Olsen to agree with the analysis that I set forth in my '647 Opening Report that the terms at issue require linking one or more actions to a detected structure rather than a single action, consistent with Apple's construction.

45.     Thus, the only dispute regarding this phrase appears to be HTC's contention that Apple should add the phrase "rather than an information structure" to the end of its proposed construction.  For the reasons set forth my '647 Patent Opening Report, I disagree with this contention.  It is my opinion that the phrase "rather than an informational structure" introduces

17

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

ambiguity to the term since HTC does not offer a construction of the phrase "informational structure." Moreover, as I stated in my '647 Opening Report, the part of the prosecution history on which HTC relies for its proposed construction does not support its attempt to exclude informational structures from the proposed constructions. At most, in distinguishing the Vale reference, the Applicants stated that a detected structure cannot *only* be linked to an "informational structure," but not that it cannot *also* be associated with an informational structure. (March 15, 1999 Response to Office Action at 8-9.) Consequently, in my opinion, HTC's proposed construction improperly limits the phrases "linking actions to the detected structures" and "linking at least one action to the detected structures" to exclude any informational structures, which finds no support in the patent or prosecution history.

3.     "Analyzer Server"

| "analyzer server" (Claim 1) | | |
|---|---|---|
| **Staff** | **Apple** | **HTC** |
| a program sub-routine that receives data from a document having recognizable structures, and uses patterns to detect the structures | a program routine(s) that receives data, uses patterns to detect structures in the data, and links actions to the detected structure | a program sub-routine that receives data from a document having recognizable structures, and uses patterns to detect the structures, where the document is presented by a separate application |

46.     As I stated in Section VII.C of my '647 Patent Opening Report, it is my opinion that Apple's construction of this term as "a program routine(s) that receives data, uses patterns to detect structures in the data, and links actions to the detected structure" is correct and reflects

18

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

what a person of ordinary skill in the art in February 1996 would have understood when considering the term in the context of the '647 patent.

47.    In paragraphs 186-192 of the Olsen Validity Report, Dr. Olsen argues that the term "analyzer server" should be construed more narrowly than the construction proposed by Apple. First, Dr. Olsen contends that the analyzer server must receive data from a document. However, as I described in my '647 Patent Opening Report, such a construction limits the claim term to one embodiment of the invention. The specification describes receiving data from sources other than typical "documents," such as email messages. (*See, e.g.*, '647 patent, Col. 1:37-40 (describing structures in email messages); *see also* Col. 2:9-12 ("It will be appreciated that the system may operate on recognizable patterns for text, pictures, tables, graphs, voice, etc. So long as a pattern is recognizable, the system will operate on it."); April 28, 1998 Response at 3 ("These structures can appear in any document or file . . . .").) I disagree with HTC's attempt to exclude non-document data from the claims. Moreover, as I mentioned in my '647 Patent Opening Report, it is unclear why HTC seeks to add this limitation to the construction of "analyzer server" given that the parties have agreed that the term "document" includes web pages and text messages.

48.    Second, contrary to the Staff's construction, Dr. Olsen contends that the document received by the analyzer server must be presented by a separate application. For the reasons set forth my '647 Patent Opening Report, I disagree with this opinion. Specifically, Dr. Olsen argues that there are two separate programs—one containing the analyzer server and another application that is sending the document.   As an initial matter, I note that Dr. Olsen's construction of this term in fact supports my construction of "input device." Specifically, the '647 patent prosecution history excerpts that Dr. Olsen cites state that "structures . . . are

19

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

generated externally to Applicants' system" and that the "invention is a system-wide service that can be used to enable cooperating systems to detect recognizable structures in their data." (Olsen Validity Report, ¶ 190 (citing April 28, 1998 Response at 3).)  Dr. Olsen's analysis therefore highlights the fact that the claimed system can receive data from other applications rather than just a keyboard or mouse.

49.     Further, contrary to Dr. Olsen's opinion, there is no support that the analyzer server be a standalone program.  The references to the analyzer server being a system-wide service are inapt.  A system-wide service need not be a separate, standalone program.  Such a service can operate as part of the application that enables a user to select detected structures and select linked actions.  ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

50.     I disagree with Dr. Olsen's attempt to limit the claimed invention to an embodiment that only receives data from software.  Consistent with my construction of "input device" to mean "computer software *or hardware*," I also understand that the specification and prosecution history do not limit the invention to a system that receives data from other applications.  Rather, the claimed system and method would also cover an analyzer server that receives data directly from a keyboard and mouse and is part of an application with which a user interacts.  In fact, the language of claim 1, which specifies that an analyzer server is a program routine(s), clarifies that the analyzer server need not be a standalone program.  Moreover, as I explained in my '647 Patent Opening Report, the language of claims 3, 10, and 22 indicate that the Applicants knew how to claim an application separate from the analyzer server but chose not to in the case of claim 1. Specifically, independent claim 22 and dependent claims

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

3 and 10, which depend on claim 1, recite additional limitations that require two separate applications. With my understanding of the legal principle of claim differentiation, that the Applicants did not include such a limitation in claim 1 supports my opinion that the analyzer server need not be an application separate from the document.

51.     Finally, I note that Apple's construction of "analyzer server" is based on the language of claim 1, which requires that the analyzer server detect structures in data and link actions to the detected structures. (*See* '647 patent, claim 1 ("an analyzer server for detecting structures in the data, and for linking actions to the detected structures").) Without explanation, Dr. Olsen contends that the "linking action" requirement should be omitted from the definition of "analyzer server."  Apple's construction more accurately defines the "analyzer server" as that term is used in the '647 patent specification and claims.

## VIII.   LEGAL PRINCIPLES

52.     In Sections VII.A and VIII of my '647 Patent Opening Report, I set forth legal standards that I applied in forming my opinions.  I incorporate those sections of my '647 Patent Opening Report by reference here. I have also been informed of certain additional legal principles applicable to '647 patentability and set forth my understanding of these principles below.

### A.     Presumption of Validity

53.     I have been informed that in deciding whether to issue a patent, the U.S. Patent and Trademark Office ("PTO") examines the patent specification, its claims, and relevant prior art references to determine whether the patent application and its claims meet the requirements for patentability. I understand that if the PTO then issues the patent, it has determined that the claims are valid. I understand that the law recognizes that the PTO possesses special expertise to

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

conduct such determinations, and that, as a result, each claim of a patent issued by the PTO is presumed valid by law. This presumption of validity can only be overcome if the party seeking to invalidate a claim proves invalidity by clear and convincing evidence, which I understand to mean evidence that convinces the fact-finder that it is highly probable that the particular proposition is true.

### B.   Patentable Subject Matter

54.    I understand that a claim must be directed to a new and useful process, machine, manufacture, or composition of matter and that a claim cannot merely claim a mathematical algorithm or an abstract idea.   However, I understand that a claim drawn to new and useful subject matter does not become non-patentable simply because it uses a mathematical formula, computer program, or digital computer.  I further understand that in analyzing the patentability of a claim, one must consider the invention as a whole, rather than dissecting the claims into old and new elements and then ignoring the presence of the old elements in the analysis.

### C.   Anticipation

55.    I understand that a person cannot obtain a patent if someone else already has made an identical invention.  I further understand that to prove anticipation, Respondents must prove with clear and convincing evidence that the claimed invention is not new.

56.    I understand that to anticipate a claim, each and every element in the claim must be present in a single item of prior art.  In determining whether every one of the elements of the claimed invention is found in the prior art, I understand that one should take into account what a person of ordinary skill in the art would have understood from his or her examination of the particular prior art. I also understand that he prior art reference alleged to be anticipatory must

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

also enable one of ordinary skill in the art to make the claimed invention without undue experimentation.

57.     I understand that anticipation must be found in a *single* reference, device, or process.  In other words, anticipation does not allow an additional reference to supply a missing claim limitation.  I further understand that the prior art reference must disclose all elements of the claim within the four corners of the document and must also disclose those elements arranged as in the claim.

58.     Moreover, I understand that any differences between prior art reference and a claimed invention invoke the question of obviousness, not anticipation.  In other words, I understand it is not sufficient for a prior art reference to disclose part of a claimed invention or that it includes multiple, distinct teachings that one of ordinary skill in the art might somehow combine to achieve the claimed invention.  The prior art reference must disclose the claimed invention without any need for combining various disclosures not directly related to each other.

59.     I further understand that the burden of proving invalidity is especially difficult or particularly heavy when prior art reference was before the Examiner during prosecution. In other words, I understand there is an added burden of overcoming the deference due to the Patent Office.

**D.     Obviousness**

60.     I understand that a claimed invention is invalid as "obvious" if it would have been obvious to a person of ordinary skill in the art of the claimed invention at the time the invention was made.  Unlike anticipation, which allows consideration of only one item of prior art, I have been informed that obviousness may be shown by considering more than one item of prior art.

23

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

61.     I further understand that the following factors must be evaluated to determine whether Respondents have established that the claimed inventions are obvious: (1) the scope and content of the prior art; (2) the difference or differences, if any, between each claim of the asserted patent and the prior art; (3) the level of ordinary skill in the art at the time the invention of the asserted patent was made; and (4) the existence of secondary considerations that indicate that the invention was obvious or not obvious.

62.     I also understand that Respondents must prove obviousness by clear and convincing evidence.

63.     I have been informed that one should analyze whether there are any relevant differences between the prior art and the claimed invention from the view of a person of ordinary skill in the art at the time of the invention and that one must determine the impact, if any, of such differences on the obviousness or nonobviousness of the invention as a whole, and not merely some portion of it. Moreover, I understand that a patent claim composed of several requirements is not proved obvious merely by demonstrating that each of its requirements was independently known in the prior art. I understand that it is important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the requirements in the way the claimed new invention does. I understand that this is the case because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known. Therefore, I further understand that one may evaluate whether there was some teaching, suggestion, or motivation to arrive at the claimed invention before the time of the claimed invention. I also understand that one must be careful not to determine obviousness using hindsight and that one evaluating the

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

prior art should put oneself in the position of a person of ordinary skill in the field of the invention at the time the claimed invention was made.

64.    I understand that secondary considerations that should be taken into account include the following: 1) commercial success of a product due to the merits of the claimed invention; 2) a long-felt, but unsolved, need for the solution provided by the claimed invention; 3) unsuccessful attempts by others to find the solution provided by the claimed invention; 4) copying of the claimed invention by others; 5) unexpected and superior results from the claimed invention; 6) acceptance by others of the claimed invention as shown by praise from others in the field of the invention or from the licensing of the claimed invention; and 7) disclosures in the prior art that criticize, discredit, or otherwise discourage the claimed invention.

### E.    Conception And Reduction To Practice

65.    As I stated, I understand that Respondents can attempt to show that a patent claim was not new because the invention described was first made or invented by someone else. However, I further understand that if the '647 patent inventors first conceived of the claimed invention, even if they reduced it to practice second, the '647 patent inventors are considered the first inventors if they worked with reasonable diligence to reduce the invention to practice from a time just before the other party's conception. Moreover, I understand that if the '647 inventors conceived and reduced to practice before the other party's conception, but the other party's conception predates the filing of a patent by the '647 inventors, the '647 patent inventors maintain their right to obtain a patent if they worked with reasonable diligence to perfect their invention by making refinements and improvements that are reflected in the final patent application.

25

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

66.     In this context, I understand that conception is the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is to be applied in practice. I further understand that reduction to practice occurs either as of the filing of the patent application or when the invention was actually made and was shown to work for its intended purpose. I also understand that reasonable diligence means that the inventor worked continuously on reducing the invention to practice but that interruptions necessitated by the everyday problems and obligations of the inventor or others working with him or her do not prevent a finding of reasonable diligence.

**F.     Indefiniteness**

67.     I understand that the requirement that patent claims be definite means that patent claims must particularly point out and distinctly claim subject matter which the applicant regards as his invention.  I further understand that a claim is sufficiently definite to satisfy this requirement if one skilled in the art would understand the bounds of the claim when read in light of the specification.  I have also been informed that a claim is not indefinite unless it is not amenable to construction or is insolubly ambiguous.  I further understand that a claim is not indefinite merely because it poses a difficult issue of claim construction.

**IX.     CONCEPTION & REDUCTION TO PRACTICE**

**A.     The Inventors Conceived of the Invention Claimed in the '647 Patent by September 25, 1994 and Actually Reduced the Claimed Invention to Practice By At Least September 1995.**

68.     I have reviewed the materials, including source code, produced in this Investigation along with the deposition testimony of the inventors of the '647 patent. As a result of my review, I have reached the opinion that the inventors conceived of the '647 patent as early as September 25, 1994 as set forth in Apple's responses to HTC's interrogatories 17, 20, and 21.

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

69.     Further, from my review of those materials, including source code and testimony, I have concluded that the inventors of the '647 patent, Bonnie Nardi, Thomas Bonura, James Miller, and David Wright worked diligently from that date of conception to reduce their invention to practice by mid-to-late 1995.

70.     I have reached my opinion regarding conception with the understanding that in order to show conception of a claim of the '647 patent prior to the application filing date of February 1, 1996, each element or limitation of the claim was conceived as of the earlier date. In order to more clearly demonstrate that the '647 patent is entitled to an earlier conception date, I have prepared a claim chart that details, on a limitation-by-limitation basis, source code, documents and testimony of the inventors of the '647 patent that supports my opinion that the asserted claims of the '647 patent were conceived as early as September 25, 1994. (See Exhibit B.)

71.     Further, I have reached my opinion regarding the diligent actual reduction to practice of the invention of the '647 patent with the understanding that an invention is generally regarded as actually reduced to practice when it has been made and shown to work for its intended purpose. It is my further understanding that the filing of an application for patent will serve as a constructive reduction to practice of the invention described in that application. In order to more clearly demonstrate that Apple actually reduced the '647 patent to practice in late 1995, I have prepared a claim chart that details, on a limitation-by-limitation basis, source code, documents, and testimony of the inventors of the '647 patent that supports my opinion that the asserted claims of the '647 patent were reduced to practice by mid-to-late 1995. (See Exhibit C.)

72.     My review of documents produced in this case indicate that as early as mid-1993 at least three of the inventors of the '647 patent were actively engaged in research and

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

development of functionalities and user interfaces for processing text-based data. The inventors,

Bonnie Nardi, Thomas Bonura, Jim Miller, and by mid-1994, David Wright, were members of

the Intelligent Systems subgroup within the Apple Advanced Technology Group ("ATG"). ATG

comprised a research group within Apple at the time. (*See* Miller Tr. 71:20-25.) The Intelligent

Systems subgroup, also called the Knowledge-Based Systems subgroup, was focused on

artificial intelligence applications. (*See* Bonura Tr. 48:10-16 (". . . our direction, our focus, was

in identifying areas in which methodologies of AI, artificial intelligence, could be applied to

either to Apple products or Apple processes.").) Specifically, inventor Bonnie Nardi was

involved in research on how users used their computers for finding, retrieving and processing

documents and information and for ways to enhance productivity and overall user experience.

Dr. Nardi published the results of some of these user studies. (*See e.g.*, NARDI ET AL., AN

INVESTIGATION INTO FINDING AND FILING: IMPLICATIONS FOR STAMPS AND AGENTS, (Aug. 1994)

(APPNOK1174104-115); NARDI ET AL., FILING AND REMINDING: FILE ORGANIZATION FROM THE

DESKTOP (1995) (STAN00005800-815) (investigating how users might use stamps and the

implications of using stamps to assist users in filing and finding information on their

computers[4]).) The inventors subsequently referred to these studies as providing an impetus for

the research that they were performing at the time.[5]

---

[4] Stamps technology is a "you do the labeling" way of organizing information in documents. Action stamps "are scripts that users could apply to documents such as 'Route to Sam and Jane,' 'Archive,' 'Please sign.'" (FILING AND REMINDING: FILE ORGANIZATION FROM THE DESKTOP (1995) (STAN00005800-815).) Structure stamps allow users to retrieve structured parts of documents, such as: "'all the abstracts in my tech reports,' 'all the Q4 totals in the last 3 years of department budgets,' 'all the references in the ARPA proposals,'" etc. (*Id.*)

[5] "The general realization that came of the study was that users are often stymied by the myriad of possibilities available when dealing with everyday documents." (WRIGHT00000702-723 at WRIGHT00000704) Users used terms such as desperate, frustrated, and frantic to describe "the feeling of being thwarted by the computer when searching for a file." (STAN00005800-815 at STAN00005806) Further, users said that "it is important that they be able to get to the right place in a file, not just the right file. Users reported that they could usually find the right file, but sometimes not the information they wanted within the file." (*Id.* at STAN00005809 (emphasis in original))

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

73.     Inventor Tom Bonura holds a Ph.D in Biology and acquired his technical proficiency developing applications for DNA sequencing applications. (CV of T. Bonura, BONURA00000259-261). Dr. Bonura was proficient in the LISP programming language and used it to implement functionalities and architectures designed to enhance user productivity and efficiency. (*Id.* at BONURA00000260; Bonura Tr. 47:4-13, 47:19-48:16). Inventor James Miller headed the Intelligent Systems group from the beginning of 1993. (Miller Tr. 66:2-5) Dr. Miller held a Ph.D in cognitive psychology. (CV of James R. Miller, MILLER00001155-56.) He supervised the other inventors by coordinating and directing their research efforts. He was also deeply involved in discussions, asking question, and brainstorming with his fellow inventors. (*See* Bonura Tr. 72:15-73:10.) By mid-1994, inventor David Wright joined the Intelligent Systems group and worked closely with Miller, Nardi, and Bonura designing and implementing functionalities and user interfaces with an eye towards incorporation within the existing Apple OS framework. (*See e.g.*, Bonura Tr. 70:25-71:9; CV of David Wright, WRIGHT00005167-169.) From my review of documents and testimony, I understand these researchers to have been engaged in mid-1993 in various activities including the description of scenarios highlighting potentially desirable functionalities and capabilities to make available to computer users to enhance their document processing experiences; these activities included work related to the technical software coding and architecture of such systems and applications as well as towards aspects of compatible and effective human-machine interface design. By mid-1994, the multidisciplinary group of Nardi, Bonura, Miller and Wright were collaboratively engaged in research and development within the Intelligent systems subgroup of the Apple ATG leading to the conception of the '647 patent.

29

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

74.    For example, in a June 1, 1994 e-mail to Jim Miller and David Wright among others, Bonnie Nardi described a "scenario Dave Tom and I have been working on" involving a typical user of e-mail and describing potential solutions for streamlining the processing and sending of e-mails and specifically, for using an "Information Manager Agent" that, armed with knowledge of the kinds of information that the user typically receives, could be used to automate the recording and utilization of the information contained in the data.  (MILLER00000039-41; *see also* Nardi Tr. 140:18-23 (stating that in MILLER00000039, "Dave" most likely refers to Dave Wright, and "Tom" to Tom Bonura).)  It is my opinion that this e-mail describes at a high-level much, if not all, of the functionality that became part of the '647 invention.  For example, the e-mail refers to structured information, names and addresses, conference, seminar, and meeting announcements, all in the context of an "Information Manager Agent." (MILLER00000039-41 at 39.)  Nardi suggests that this agent "combines structure detectors with action stamps."  (*Id.* at 40.)  She further cites her "Finding and Filing study" as teaching "clear value" in the kind of information management she describes.  In closing, Nardi suggests a "growth path" forward towards implementation of these capabilities beyond the "highlight-and-drag" model of user selection of text and beyond an application specific model while concluding "let's work in one app now and make progress" as "email is easily rich enough to have many kinds of structured information critical to a user's day."  (*Id.*)  This email provides context that helps in understanding the inventors' subsequent activities in and around the relevant timeframe. It also shows that these inventors were closely collaborating in the months leading up to the conception of the '647 patent in September 1994. (*See e.g.*, Nardi Tr. 139:23-144:1)

75.    Throughout the latter part of 1994 the inventors communicated their thoughts and ideas regarding structure detector functionality and user interface considerations. (*See e.g.*,

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

MILLER00000062; MILLER00000026 (July 15, 1994 e-mail exchange between '647 inventors
Tom Bonura and Jim Miller, copying Bonnie Nardi and Dave Wright among others, regarding
high-level concept and generalizations relevant to system design for knowledge-based systems
using structure detectors that could "recognize time and date expressions in mail or some other
source of text." ).)

76.     In a July 25 email to the inventors among others, Jim Miller expands on these
concepts, and writes in terms of the high-level virtues of a structure detectors system.
(MILLER00000249)  Miller describes how the system would look for interesting information in
emails, most likely using parsing technology.  (*Id.*)  He states that there is a "huge amount of
stuff we might support" using such a system because it would be a "system-level support" which
users could expand upon  in much the same way as they would a "platform"-type architecture
using customized "task- and organization-specific grammars." (*Id.*)

77.     Throughout the Fall of 1994 the ideas of the inventors related to structure
detectors matured.  In fact, the idea was sufficiently developed that Jim Miller was involved in
gauging interest within Apple for incorporating the structure detectors functionality into soon-to–
be-released system and application software.  (*See e.g.*, Miller Tr. 120:24-121:18 (discussing
Apple Nautilus group).)  By September 25, 1994, Jim Miller had completed a write-up titled
"Agents and Nautilus" of ongoing projects within the Intelligent Agents subgroup that might add
value to the Nautilus software package being developed for Apple Powerbook laptop computers.
(MILLER00000243 ("It is easy to envision tasks related to the use of a portable machine that
would be enhanced by agents, such as allowing people to retrieve or distribute information
without having to deal with the details of where [sic] the information's location, and without
knowing and configuring the best communication path to that information.").)  In his write-up,

31

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

Miller describes structure detectors as "small bits of code that *identify interesting objects in user's documents, such as phone numbers, times, dates, conference rooms, and the like, and that initiate actions based on those identified objects.*   For instance, an email message that identifies a meeting could be identified as such, and directly entered into the user's calendar application.  This is some of our newest work, and so we may encounter some surprises and unanticipated questions as we begin to scale it up to product complexity. . . .  The remainder of our work is longer-term and architectural in nature."  (MILLER00000242-245 at 243 (emphasis added).)  In my opinion, Miller's write-up in support of his group's goal of incorporating the structure detectors concept into an Apple released product is consistent with the descriptions of the functionality the inventors envisioned in their communications as part of the Intelligent Agent group since mid-1994.  The write-up suggests that the inventors' ideas had coalesced around a framework and functionality whose description by Miller indicates the conception of the invention disclosed in '647 patent.

78.     In particular, Miller's description of the structure detectors work indicates that the proposed technology would be able to detect structures in a user's document and allow the initiation of actions on those structures.  It also indicates that the technology would be designed to enhance the ability of a user to "retrieve and distribute" information without knowing or concerning themselves with the details of where that information was located and "without knowing and configuring the best communication path to that information," suggesting that the capabilities envisioned would be system wide and available across applications.

79.     In my opinion, Dr. Miller's September 25, 1994 proposal to the Apple Nautilus group when viewed in context shows conception of the '647 patent.  In fact, three days later, Bonnie Nardi, in an email to her co-inventors, listed the detectors that the group could "build

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

*right now.*" (MILLER00000240 (emphasis added).)  Those detectors included phone numbers, street addresses and e-mail addresses.  (*Id.*; *see also* MILLER00000239 (inventor Dr. Bonura brainstorms potential mechanisms or paradigms for linking of actions to detected structures and considerations of extensibility that might impact architecture).)

80.     Further, it is my understanding that Jim Miller constructed a demonstration of the invention as the inventors conceived of it in September 1994 in the Apple SuperCard scripting language (the "Supercard demo" or "LiveDoc demo").  Jim Miller testified that it was his belief that this demonstration was in existence as of September 1994.  (Miller Tr. 117:17-118:4.)  I have reviewed and analyzed a LiveDoc Version 1.6 that is dated March 1995.  The LiveDoc demo includes a dialog that indicates Version 1.0 of the demo was created in January 1995.  It is my opinion that LiveDoc demo was created to illustrate the inventors' conception of the structure detectors invention and contains all the limitations of the invention claimed in the '647 patent.  I have attached as Exhibit B a claim chart containing my analysis of that demonstration showing, on a claim-by-claim basis, how the LiveDoc demo practices the '647 invention.

81.     For example, the LiveDoc demo shows several attributes and characteristics that confirm the presence of elements of the claimed inventions.  First, the LiveDoc demo shows that the structure detector or LiveDoc functionality of detecting structure and linking actions to those detected structures is available from within the Eudora e-mail application.  In my opinion, in 1995, this functionality, callable from within an application in which the user is actively working, would be implemented within a background process that would be called by the active application in order to use the structure detectors capability.  In my opinion, this functionality would involve interprocess communications and specifically the presence of an application programming interface that would enable the passing of textual data from the e-mail application

33

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

to structure detectors in a form of client-server relationship. This illustrates the presence of several limitations of the '647 invention, including the analyzer server which performs the actual detection of structure and linking of action as well as the passing of data to the analyzer server from a concurrently running application through the use of an application programming interface. My opinion that the LiveDoc demo contains this limitation is bolstered by documents from the inventors in late 1994 that indicate they regarded this as the preferred architecture. For example, on December 16, 1994, inventor Tom Bonura emailed co-inventor David Wright, Bonnie Nardi and Jim Miller, describing how the structure detectors engine is launched in the background to perform the actual detection of structures and linking of actions to those detected structures. (MILLER00000235.) In fact, Dr. Bonura specifically suggested "that we don't build the detector as an extension. One of my friends in AppleSoft tells me that extensions are being actively discouraged with the preference being to use background applications (processes, if you will)." (*Id.*)

82. Additionally, from my review of relevant documents and source code, as well as the testimony of the inventors, it is my understanding, that the term "LiveDoc" was used to describe various demonstration and prototyping activities by the inventors from late 1994 onwards. For example, as I have discussed, Dr. Miller's Supercard demo was referred to as LiveDoc. (Miller Tr. 82:12-18 (understanding one meaning of LiveDoc to refer to SuperCard demo).) Also, prototypes that practiced the '647 invention were being concurrently developed by inventor Tom Bonura using the LISP programming language. (*See* Exhibit C and discussion below.) These prototypes were referred to by the term "LiveDoc" as well. (Miller Tr. 85:19-86:1 (stating that "LiveDoc" was also used to describe demonstrations built by Tom Bonura).)

34

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

83.     It is my opinion from my review and analysis of the documents, source code, and executable code produced in this Investigation as well as from the testimony of the inventors of the '647 patent, that the '647 patent invention was conceived as early as September 1994. The details of my analysis are set forth, on a claim-by-claim basis, in Exhibit B.

84.     After conceiving the claimed inventions, it is my opinion the inventors actually reduced the '647 patented invention to practice. It is my opinion that the inventors reduced the claimed invention to practice when they built a LiveDoc prototype of the claimed invention as early as March 1995. My opinion is based on review of the deposition transcripts of the named inventors, as well as review of the source code for the LiveDoc prototype. I understand from reviewing the transcript of Thomas Bonura, for example, that a working version of the claimed invention, in the form of the LiveDoc prototype, was written in the LISP programming language and was implemented in early 1995. (*See, e.g.*, Bonura Tr. at 66:22-67:18.) Dr. Bonura's testimony is consistent with the dates on the LISP source code that I have reviewed, which was created between 1994 and early 1995. (*See, e.g.*, Livedoc-views.lisp (created on March 10, 1995 by Thomas Bonura).)

85.     Dr. Bonura's efforts are consistent with documents showing that the head of the group developing structure detectors at the time and a named inventor of the '647 patent, Jim Miller, charged his fellow inventors on January 25, 1995 with building a shippable version of LiveDoc within twelve months. (MILLER00000059-61 at 60.) The development of a prototype in the LISP programming language by March 1995 would be consistent with that effort. Consequently, it is my opinion that the claimed invention was reduced to practice as early as March, 1995.

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

86.     The inventors' actual reduction to practice is further exemplified by their continued work on a prototype program called LiveSimpleText.  The inventors created and developed LiveSimpleText through early-to-late 1995.  This program is contained on digital media produced in this Investigation.  (*See* MILLER00001154 CD)  The particular version that I reviewed, the LiveDoc 0.7.sea file, is dated September 27, 1995 and contained in the LiveDoc folder on the MILLER00001154 CD.  I extracted the file on a Macintosh PowerBook running Mac OS 9.2[6] as shown in the following picture:



I followed the instructions in the "Read me!" file for installation of LiveSimpleText.  Namely, I placed the contents of the "Put in Preferences" folder into Macintosh's System Folder\Preferences folder.  I then opened the "Demo text" file in the "LiveSimpleText 8/24/95" program, clicked on the "Edit" menu, and selected "LiveDoc."  Next I opened the "SD

------

[6] Many of the files on the MILLER00001154 CD are only viewable in the Macintosh "Classic" environment.

36

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

Background PPC" folder and double-clicked on the "SD Background PPC 7/24/95" file.   To detect structures, I returned to the "Demo text" file (displayed in LiveSimpleText 8/24/95) and pressed the <Option> key.

87.     It is my understanding that the actual source code for the LiveSimpleText prototype has not been located.   Thus, I base my opinions in part on, and will describe herein the functionalities of the LiveSimpleText program that I observed when using the program on an Apple PowerBook laptop computer.

88.     The LiveSimpleText prototype detected structures in data and performed actions on detected structures.   (*See e.g.*, Bonura Tr. at 68:24-70:4 ("LiveSimpleText would analyze the contents of the document that you were creating – continually analyze the contents of the document you were creating, I should say, and show the user those element that it discovered and provide the user a way of acting on those elements.").   In fact, the LiveSimpleText results looked like the LiveDoc demo.   (*See* Miller Tr. 95:23-96:9 ("From a user perspective, it worked very much like the live doc demo, Text could be entered into a text window and things like Internet addresses and URL's and the like could be recognized by data detector software and then highlighted on the screen by LiveSimpleText.   At that time if you clicked the mouse on one of those highlighted region [sic] a pop up menu of things that could be done with that piece of information then appeared and you could select one and cause the application to do what you had asked it to do.").)

89.     It is my understanding and opinion that a version of this LiveSimpleText prototype was implemented by June 2, 1995 and referred to in an e-mail from inventor Mr. Wright.   (MILLER00000096, (stating "Finally - working code!"   "[W]e have a version of Simple Text running that uses Structure Detectors to hilite [sic] structures found within the text.

37

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

The user can then click on one of the hilited structures and a pop-up menu appears displaying choices of actions."); *see also* Miller Tr. 131:13-132:16.)   Additionally, it is my understanding and opinion that the LiveSimpleText prototype was based on the LISP prototypes (source code for at least one version of which is described herein) coded by Thomas Bonura.   (Bonura Tr. 66:14-20)   The LiveSimpleText program was coded in the C and C++ programming language. (*Id.* at 68:7-13)

90.    In June 22, 1995, Dr. Miller sent an email discussing a working version of LiveDoc (Version 0.5).   He discussed highly confidential source code for LiveSimpleText.   He explained that the user could double-click on LiveSimpleText to use it.   He then states that "[t]his document contains a bunch of patterns that will trigger scripts described below. 'LiveDoc mode' is turned on via a menu item in the Edit menu.   Hold down the Option key to present the highlighting, and mouse down on highlighted terms to see the available actions." (MILLER00000089.)   Dr. Miller noted that "[s]tarting up LiveDoc mode will launch SD Background 68K – Dave's structure detector engine – if it's not running already."[7]  (*Id.*)   Dr. Miller also indicated that LiveSimpleText used grammars and associated actions. (*Id.*)

91.    In my opinion, the inventors continued to work on reducing their claimed invention to practice as reflected by subsequent correspondence.   For example, in an August 11, 1995 email, Jim Miller discussed "possible interfaces to Structure Detectors" and "focused primarily on the two interfaces we've built so far: ... and LiveDoc." (MILLER00000836-852 at MILLER00000845-846.)   Dr. Miller's discussion of the functionality of the LiveDoc interface

---

[7] This description comports with my review of the LiveSimpleText 8/24/95 program.   The only difference is that I had to start the "SD Background PPC 7/24/95" file after starting LiveDoc mode.   It is my opinion that the reason for this difference is simply that I reviewed LiveSimpleText on a PowerBook with a PowerPC processor ("PPC"), while "[s]tarting up LiveDoc mode [would] launch SD Background 68K;" 68K refers to a different type of processor in older Macintosh computers. (MILLER00000089.)

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

that the inventors had built demonstrates that the inventors had actually reduced the '647 patent invention to practice.

92.     It is my opinion from my review and analysis of the documents, source code, and executable code produced in this Investigation as well as from the testimony of the inventors of the '647 patent, that the '647 patent invention was actually reduced to practice by at least mid-to-late 1995.  The details of my analysis are set forth, on a claim-by-claim basis, in Exhibit C.

## X.     THE '647 PATENT CLAIMS ARE NOT ANTICIPATED.

### A.     PenSoft Perspective "System" and Perspective Handbook

#### 1.     Overview of Perspective

93.     I understand that Pensoft's Perspective software came in two versions, Personal and Business.  Dr. Olsen's opinion on the Perspective software focuses on its "Associate" feature, which is, simply put, a database organizer.  The feature allows a user to write appointments and create associations with a person's profile.  Dr. Olsen identifies four different user scenarios that supposedly anticipate the '647 patent.  (Olsen Validity Report at ¶¶ 202-208.) These four scenarios are also discussed in Dr. Olsen's accompanying Appendix 4.

94.     I understand that in order for a patent claim to be anticipated, a single reference must describe every single claim element of the claimed invention.  Dr. Olsen does not cite to or rely on a single Perspective reference. Rather, Dr. Olsen defines the Perspective "system," charted in his Appendix 4, as the AT&T EO Personal Communicator models 440 and 880 running either Personal Perspective or the Perspective Business Edition, the Perspective Business Edition Handbook (HTC007286210-498), and the Personal Perspective[8] source code.  (Olsen

---

[8] Dr. Olsen's report does not identify whether the source code he cites came from Personal Perspective or the Business edition.  However, I understand that the parties have exchanged the materials relied on by each expert; in this exchange, HTC provided the ███████████████████████.  The Perspective source code is

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

Validity Report at ¶ 37.)  It is also my understanding that it is improper for Dr. Olsen to contend that a combination of references purportedly describing a "system" anticipates a patent claim. For example, Dr. Olsen combines the disclosures of the Perspective Business Edition Handbook and source code from Personal Perspective.  Dr. Olsen cannot allege anticipation by combining these two sources as each relates to a difference piece of software.

95.     Dr. Olsen separately opines on the Perspective Handbook, stating that it alone anticipates the '647 patent.  (*See* Appendix 5.)  As Dr. Olsen defines the Perspective "system" as inclusive of the Handbook and as Dr. Olsen's citations to the Handbook in Appendix 5 are nearly identical to those in Appendix 4, I will respond to each Appendix in this single section of my report.  To be clear, this Section of my report establishes that neither Appendix 4 nor Appendix 5 evidences anticipation of the asserted claims of the '647 patent

96.     I have personally operated an EO Communicator model 440 running Personal Perspective, an EO Communicator model 440 running the Business Edition, and an EO Communicator model 880 running Personal Perspective.  I have verified that neither the Personal nor the Business Editions of Perspective anticipates any claims of the '647 patent.

97.     Dr. Olsen contends that Perspective consists of multiple applications such as the "Perspective Day Planner." (Olsen Validity Report at ¶ 200.)  Dr. Olsen is incorrect.  The Perspective software is a single application, as evidenced by this screenshot of the "installed applications" on an EO Communicator 440:

---

located within this PenPoint Source Code folder.  As Dr. Olsen states that the EO Communicator models 440 and 880 ran the PenPoint OS and came with Personal Perspective, I presume the provided source code is from Personal Perspective.  Should Dr. Olsen later specify that the source code corresponds to the Business edition, I reserve the right to supplement my report.

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄



Dr. Olsen's picture of an EO Communicator 440 purportedly showing multiple Perspective applications (Olsen Validity Report at ¶ 200) is just a "Contents" listing from the Communicator's notebook. The "Perspective Notebook contains six standard documents," including a Day Planner, Month Planner, Address Book, To Do List, Topic Index, and Note Index. (Handbook at 8 (HTC007286228).)

> **2. No Aspects of the Perspective "system" Anticipate Claims 1, 3, 4, 8, 15, 17, 19, or 20 of the '647 Patent (Appendices 4 and 5)**
>
> > **a. Claim 1**
> >
> > > **i. A computer-based system for detecting structures in data and performing actions on detected structures, comprising:**

98.     As I stated above, it is my opinion that the preamble of claim 1 is not a limitation of the claim. Even if the preamble is considered a limitation, the Perspective "system" and

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◀

Perspective Handbook do not comprise "[a] computer-based system for detecting structures in data and performing actions on detected structures."  The parties have agreed that the term "structure" means "an instance of a pattern, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc."  The parties have also agreed that "detecting" means "finding and identifying."  Under the parties' constructions, neither the Perspective "system" nor Perspective Handbook discloses this preamble element.

99.    As will be explained in more detail below, Dr. Olsen has not shown that the Perspective "system" or Handbook disclose a computer-based system for performing actions on detected structures.  Of the four scenarios described by Dr. Olsen, none disclose or practice causing the CPU to perform a sequence of operations on a detected structure to which it is linked.

ii.    **an input device for receiving data; an output device for presenting the data; a memory storing information including program routines including**

100.    For the reasons described below, neither the Perspective "system" nor the Perspective Handbook practice or disclose "a memory storing information including program routines including . . . ." for at least the reason that Perspective does not contain the claimed program routines.

iii.    **an analyzer server for detecting structures in the data, and for linking actions to the detected structures**

101.    It is my opinion that neither the Perspective "system" nor the Perspective Handbook practice or disclose this element of claim 1 under any parties' construction.

42

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

102.    As an initial matter, I note that Dr. Olsen acknowledged that Perspective's "Associate" is a "tool that includes a collection of *database services* that are tailored to organize and manage information typically found in a *database*." (Appendix 4 at 16 (emphasis added).) Dr. Nardi, one of the named inventors of the '647 patent, explained that "[a] database has a huge amount of structure" and "that's not what [our invention was] talking about." (12/1/2010 Dep. Tr. of B. Nardi at 62:12-14.)

103.    Similarly, Dr. Olsen states that the "links" discussed in the Perspective "system" and Handbook are not links to *actions* but instead links between a name and a profile:

> Handbook discloses creating "links" between items . . . . For clarity, and to distinguish from "linking actions" as used by the '647 patent, this chart will use the term "associate" instead of "link" when referring to the link between items.

(Appendix 4 at 17; Appendix 5 at 3.)  Indeed, the Associate merely "links" database entries to assist the user in maintaining his or her contacts.

104.    Dr. Olsen contends that Perspective detects "structures such as proper names, dates, and a set of recognized verbs (e.g., 'call' and 'meet')." (Appendix 4 at 17; *see also* Olsen Validity Report at ¶¶ 201-202; Appendix 5 at 11.) First, whether Perspective recognizes dates is irrelevant as Dr. Olsen does not opine that any actions are linked to recognized dates. Second, while Perspective can recognize names already entered in the user's address book, Perspective cannot generally recognize "proper names."

105.    Further, the Perspective software does not disclose the claimed analyzer server as HTC has (incorrectly) construed this term. The "analyzer server" identified by Dr. Olsen does not receive data from a document that is displayed by a separate application; instead, the Associate is a component of the single application entitled Perspective. Dr. Olsen appears to

43

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

concede this point, arguing only that Perspective discloses an analyzer server under his claim construction "[t]o the extent that Apple argues that a low level system service, such as a window manager, is an separate application that presents the document." (Appendix 4 at 45.)  However, I do not argue that a low-level-system server, such as a window manager, is a separate application that presents a document.

106.    Even assuming that the Perspective "system" and Handbook discloses detecting structures, they do not disclose an analyzer server that links actions to the detected structures. Dr. Olsen identifies four separate scenarios that he contends demonstrate linking actions to detected structures.

***Scenario #1 - "When a proper name is detected (e.g., Bob) and more than one profile exists with the same proper name" (Appendix 4 at 17; Appendix 5 at 12; Olsen Validity Report at ¶ 208)***

107.    The Perspective "system" and Handbook do not disclose detecting structures in Scenario 1. First, Perspective is not detecting a "proper name" but is only recognizing a word as matching an address book entry.  That is, Perspective does not know that the text is a proper name.  For example, Perspective prompted me to associate a profile for a person named "Q" because I created a profile with the "name" of "#?!Q"

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄



108.    Dr. Olsen states that the Associate asks the user what profile to associate with the "detected" proper name "Bob." He states that Perspective discloses four "actions:" [1] selecting the profile of Bob Smith to associate with the name, [2] selecting the profile of Bob Jones to associate with the name, . . . [3] not associating a profile with the name"(Appendix 4 at 17; *see also* Appendix 5 at 12) and (4)[9] choosing to "create a new profile." (Olsen Validity Report at ¶ 208.) None of these are actions linked to the allegedly-detected structure.

_____

[9] While Dr. Olsen's report acknowledges the option to create a new profile, his Appendices 4 and 5 do not contend that this comprises a linked action. (*Compare* Olsen Validity Report at ¶ 208 *to* Appendix 4 at 17.) For this reason I understand Dr. Olsen to not opine that the "Create & Link" button constitutes a linked action. However, to the extent that Dr. Olsen does allege that the "Create & Link" button comprises a linked action, I disagree for at least the reason that Dr. Olsen has failed to provide any explanation for his opinion and for the additional reasons stated in this section of my report.

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

109.   As an initial matter, the third "action" identified by Dr. Olsen is not an action at all.  Instead, the user is telling the system to *not* create a profile or associate a profile with the word "Bob".  That is, the user is performing *no* action as the CPU does not perform a sequence of operations on the word "Bob."

110.   The remaining "actions" identified by Dr. Olsen are not actions because their selection does not cause the CPU to perform a sequence of operations on the allegedly-detected structure to which they are allegedly-linked.  The '647 patent discloses performing actions linked to detected structures such that the structure is a part of the action.  For example, the '647 patent discloses a telephone number as a detected structure.  The invention allows a user to take an action on this structure, such as place a call using that phone number, rather than having to copy the phone number, open the phone application, and paste the phone number into the phone application in order to use the phone number.  (*See, e.g.*, '647 patent, Col. 5:38-50.)  On the other hand, selecting the profile of Bob Smith only associates Bob Smith's profile with the word "Bob."  ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████   Once the user has pressed the "Link" button, the actual contents of that text location (here, "Bob") is irrelevant to the process.  Dr. Olsen does not explain how associating a database entry, Bob Smith's profile, with a *text range* constitutes performance of a sequence of operations on the allegedly-detected word "Bob."  If anything, this is only associating the location of the word "Bob" to an informational structure, the database entry of Bob's profile.  Tellingly, Dr. Olsen found it necessary to "***distinguish from 'linking actions' as used by the '647 patent . . .*** [by using] ***the term 'associate' instead of 'link' when referring to the linking between items***."  (Appendix 4 at 2 (emphasis added); Appendix 5 at 3

46

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

(same).)  This process of associating a text location to an item does not comprise causing the CPU to perform a sequence of operations on the detected structure to which it is linked.

***Scenario #2 – "When a proper name is detected (e.g., Bob) and no profile exists with the same proper name"*** *(Appendix 4 at 21; Appendix 5 at 12; Olsen Validity Report at ¶ 207)*

111.    Dr. Olsen contends that in Scenario 2 "[i]f the 'Let the Associate ask for help' option is turned on, the Associate will ask the user to select whether or not a profile should be created." (Appendix 4 at 21; Appendix 5 at 12.)  Dr. Olsen goes on to state that "Perspective enables the user to select[] the linked actions either creating a new profile in the ProfileBook or not." (Appendix 4 at 21; Appendix 5 at 33.)  As an initial matter, choosing to *not* create a profile is not an action that causes the CPU to perform a sequence of operations on the allegedly-detected structure.  On the contrary, it is a decision by the user to not perform an action.

112.    Second, even assuming that creating a profile is an "action," that action is not linked to a detected structure.  The Perspective Handbook explicitly says as much, noting that it cannot create a profile for an unknown person unless the user first enters a command verb such as "Meet:"

> For example, if you are scheduling a meeting with John, who is not entered into your Address Book, you can schedule an appointment in the following ways:
>
> 12:00 John          No profile created or linking performed.
>
> 12:00 Meet John     New profile created for John and linked to appointment.
>
> Remember, using the keywords when Let the Associate ask for Help is On, helps you build your contact list and adds value to every entry, because the Associate is automatically tying together all information. If you prefer not to use the keywords, you can also create a profile for a new name using the Create menu before you write in the appointment. See "Creating a new item anywhere" in Chapter 3 on page 32.

(Handbook at HTC007286261.)  Contrary to Dr. Olsen's opinion, Perspective does not detect the name "Bob Jones" but instead is recognizing the word "meet."  If the user writes just a name, and no profile already exists for that name, then no profile is created and no associating to a

47

⮞ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ⮜

profile is performed. Only if the user writes certain keywords such as "meet" or "call" does the Perspective "system" give the user an option of creating a profile. Dr. Olsen's pictures of the Perspective "system" during Scenario 2 uses "meet" as the keyword. (Appendix 4 at 22-23; Olsen Validity Report at ¶ 207.)

113.     To further illustrate this point, I wrote the name "Bob" (where no profiles existed for a "Bob") in Perspective on an EO Communicator 440. As can be seen in the below image, the Associate did not prompt me to create a profile for Bob:



And to illustrate that the Associate is not detecting proper names after the word "meet," I wrote "Meet abcde" and the Associate prompted me to create a profile for "abcde:"

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄



This demonstrates that the Associate is simply letting the user create a profile for the unmatched characters found after the word "meet."

114.    In fact, the code cited by Dr. Olsen for this Scenario supports my opinion and not his. Dr. Olsen states that:



is, Perspective treats characters found after certain keywords, such as "meet," as

49

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

*unrecognized text* that it prompts the user to create a profile for. Dr. Olsen does not cite to any "grammars" that find proper names. Therefore, Perspective does not detect the word "Bob" and there are no actions linked to detected structures in Scenario #2.

115.    Finally, even if Dr. Olsen is correct that the "Create" prompt constitutes an action linked to a detected structure, the Perspective "system" and Handbook do not disclose an analyzer server for linking actions to the detected structures. Claim 1 requires that at least two actions are linked to the detected structure. In Scenario 2, only a single action, at most, is linked to unmatched text.

*Scenario #3 – "When a proper name is detected (e.g., Bob) and only one profile exists with the same proper name (e.g., Bob Smith) . . . the Associate links the detected name with the action of opening the profile associated with the detected name." (Appendix 4 at 29; Appendix 5 at 13; Olsen Validity Report at ¶ 206)*

116.    Dr. Olsen contends that in Scenario #3, "the Associate links the detected name with the action of opening the profile associated with the detected name." (Appendix 4 at 29; Appendix 5 at 13.) Even assuming that Perspective has "detected" the name Bob based on an existing profile for a "Bob," the Perspective "system" and Handbook do not disclose linking any actions to the detected structure.

117.    As described above, an "action" is computer subroutines that cause the CPU to perform a sequence of operations *on the particular structures* to which they are linked. The alleged-action of opening Bob's profile is not linked to the detected structure and the alleged-action does not perform a sequence of operations on the detected structure.

118.    While Perspective can associate the word "Bob" with a profile (Appendix 4 at 29), opening Bob's profile does not cause the CPU to perform a sequence of operations on the word "Bob."

50

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄



This process is only concerned with the profile that is associated with the location of the word "Bob;" the value "Bob" is irrelevant.  Thus, the user's double-tap does not perform a sequence of operations on a detected structure.

119.    Finally, even if "the Associate links the detected name with the action of opening the profile," (Appendix 4 at 29) the Perspective "system" and Handbook do not disclose an analyzer server for linking actions to the detected structures.  Claim 1 requires that at least two actions are linked to the detected structure.  Dr. Olsen only contends that a single action is linked to a single structure in Scenario 3.

***Scenario #4 – "When a proper name is detected (e.g., Bob) and only one profile exists with the same proper name (e.g., Bob Smith) . . . the Associate links the detected name with the action of making a telephone call with the number associated with the detected name." (Appendix 4 at 31-32; Olsen Validity Report at ¶¶ 202-205)***

120.    Dr. Olsen contends that the "Associate links the detected name with the action of making a telephone call with the number associated with the detected name." (Appendix 4 at 32.)  First, I note that the Perspective Handbook does not discuss or otherwise disclose this scenario.  Even assuming that Perspective has "detected" the name Bob based on an existing profile for a "Bob," Perspective does not link any actions to the detected structure.

51

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

121.    The alleged-action of calling a phone number in Bob's profile is not an action linked to a detected structure.  More specifically, the "Dial" button that Dr. Olsen identifies as the (selectable) linked action (Appendix 4 at 56) is not linked to the word "Bob" and is not an "action" as that term has been construed.    Instead, the "Dial" button causes the EO Communicator to dial the phone number within Bob's profile; it does not dial with the allegedly-detected structure "Bob."  Likewise, selection of the "Dial" button does not cause the CPU to perform a sequence of operations on the structure to which it is linked.  While the parties dispute the correct interpretation of "linking actions to the detected structures," each party's construction at least requires that a detected structure be linked to a computer subroutine that causes the CPU to perform a sequence of operations on the particular structure to which it is linked.  The "Dial" button only dials Bob's phone number; it does not cause the CPU to perform a sequence of operations on the allegedly detected structure "Bob."    Therefore, the "Dial" button cannot constitute a linked action under any of the parties' constructions.

122.    Finally, even if the "Dial" button allows the user to select a linked action, the Perspective "system" does not disclose an analyzer server for linking actions to the detected structures.  Claim 1 requires that at least two actions are linked to the detected structure.  Dr. Olsen only contends that a single action is linked to a single structure.

123.    Dr. Olsen also identifies alleged "descriptive files that define syntactic pattern" in the Perspective source code as evidence of an analyzer server. (Appendix 4 at 43.) ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ However, Dr. Olsen does not identify any actions that are linked to any structures allegedly detected by these "patterns." That is, even if Dr. Olsen is correct that these files define patterns, he has not shown that these

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

patterns are used in any of the above described Scenarios or in a different scenario that would practice all of claim 1's elements.

> iv.    **a user interface enabling the selection of a detected structure and a linked action**

124.    It is my opinion that the Perspective "system" and Perspective Handbook do not disclose a user interface enabling the selection of a detected structure and a linked action.

125.    Dr. Olsen identifies four different scenarios that allegedly disclose this element of claim 1. I will address each in turn.

***Scenario #1 - "When a proper name is detected (e.g., Bob) and more than one profile exists with the same proper name" (Appendix 4 at 48; Appendix 5 at 22; Olsen Validity Report at ¶ 208)***

126.    Scenario 1 does not practice or disclose this claim element. Dr. Olsen's opinion is ambiguous on how Scenario 1 satisfies this claim element, simply stating that "[t]he dialog box where the user is allowed to select the correct profile to associate with the detected structure is the user interface that enables selection of the detected structure and linked action." (Appendix 4 at 48; Appendix 5 at 22.) Dr. Olsen does not identify what part of this dialog enables the selection of a detected structure and what part enables the selection of a linked action. For this reason alone, Dr. Olsen has not shown that Scenario 1 practices or discloses this claim element.

127.    In addition, the Perspective Handbook does not disclose the dialog box Dr. Olsen refers to in Appendices 4 and 5. The Handbook only states that "If there is more than one possible link, the Associate asks for your help if Let the Associate ask for Help is On." (Appendix 5 at 25; Handbook at HTC007286260.) The Handbook provides no description of *how* the Associate will ask the user for help, let alone disclose "the Associate will ask the user

53

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

which profile to associate with the detected name" as Dr. Olsen states.  (Appendix 5 at 22.)  For this additional reason, the Handbook does not disclose this claim element.

128.    My own use of the Perspective software on an EO Communicator Model 440 and Model 880 confirms that Perspective does not disclose this claim element.  After writing the words "Meet Bob," the Associate automatically prompted me with the dialog box shown on page 49 of Appendix 4; there is no selection of a detected structure.  Thus, the Perspective "system" further does not disclose enabling the selection of a detected structure.

129.    To the extent that it is Dr. Olsen's opinion that selection of the profile (e.g. "Bob Smith" or "Bob Jones") constitutes enabling the selection of a detected structure, I disagree.  Even if the word "Bob" is a detected structure, the profiles listed in the dialog box found on page 49 of Appendix 4 are not detected structures.  Nowhere in this dialog box is the user given an opportunity to select the word "Bob."  By its plain and ordinary language, "a user interface enabling the selection of a detected structure and a linked action" requires the user interface program routines enable the separate selection of a detected structure and a linked action.[10]

130.    To the extent that it is Dr. Olsen's opinion that selection of the "Link" button is selection of a linked action, I disagree.  (*See* Appendix 4 at 21; Appendix 5 at 22.)  As stated in Section X.A.2.a.iii above, this is not an action linked to a detected structure.

***Scenario #2 – "When a proper name is detected (e.g., Bob) and no profile exists with the same proper name" (Appendix 4 at 51; Appendix 5 at 22; Olsen Validity Report at ¶ 207)***

131.    Once again Dr. Olsen does not clearly identify what aspect of Scenario 2 meets this claim limitation.  Instead, he opines that "the Associate will present the user with a user interface to select whether or not to create a new profile for the detected structure.  Therefore,

_____

[10] The same is true with claim 15's "enabling selection of the structure and a linked action."

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ➤

Perspective discloses a user interface for enabling selection of the detected structure and linked action." (Appendix 4 at 51; Appendix 5 at 22.)   As I noted above, the plain and ordinary language of "user interface enabling the selection of a detected structure and a linked action" requires the user interface to enable the separate selection of a detected structure and a linked action.  It is my opinion that, as Dr. Olsen has not identified what enables the selection of a detected structure and what enables the selection of a linked action, he has not demonstrated by that Scenario 2 in Perspective discloses this claim element.   Thus, the Perspective "system" further does not disclose enabling the selection of a detected structure.

132.   In addition, the Handbook does not disclose the dialog box shown by Dr. Olsen in Appendix 4 at page 53. (*See also* Appendix 5 at 22.)  Instead, the Handbook only states that "If Let the Associate ask for Help is On, you can use one of the keywords below when you write in a description to have the Associate help you create a new profile." (Handbook at HTC007286261.)  The Handbook provides no description of how it will help the user create a new profile nor does it disclose that "the Associate will present the user with a user interface to select whether or not to create a new profile for the detected structure" as Dr. Olsen contends. (Appendix 5 at 22.)  For this additional reason the Handbook does not disclose this claim element.

133.   My own use of the Perspective software on an EO Communicator Model 440 and Model 880 confirms that Perspective does not disclose this claim element.  After writing the words "Meet Bob," the Associate automatically prompted me with the dialog box shown on page 53 of Appendix 4; there is no selection of a detected structure.  To the extent that Dr. Olsen contends that the user's selection of the "Create" button is the selection of a detected structure, I disagree.  The "Create" button is not a detected structure.  To the extent that Dr. Olsen contends

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◀

that the user's selection of the "Create" button is the selection of a linked action, I disagree for the reasons stated above with regards to Scenario 2 that the Perspective "system" and Handbook do not disclose an analyzer server for detecting structures in data, and linking actions to the detected structures.

***Scenario #3 - "When a proper name is detected (e.g., Bob) and only one profile exists with the same proper name (e.g., Bob Smith) . . . the Associate links the detected name with the action of opening the profile associated with the detected name." (Appendix 4 at 53; Appendix 5 at 22; Olsen Validity Report at ¶ 206)***

134.   Dr. Olsen does not appear to contend that Scenario 3 practices a user interface enabling the selection of a detected structure and a linked action. Instead, he simply states that "Perspective discloses selecting the detected structure by performing a double-tap with the pen. Perspective then opens the profile associated with the detected name." (Appendix 4 at 54; Appendix 5 at 22.) As noted above, the plain and ordinary language of "user interface enabling the selection of a detected structure and a linked action" requires the user interface enable the separate selection of a detected structure and a linked action. Dr. Olsen does not identify what enables the selection of a detected structure and what part enables the selection of a linked action. For this reason alone, Dr. Olsen has not established that Scenario #3 discloses this claim element.

135.   To the extent that Dr. Olsen contends that double-tapping on a profile enables the selection of a detected structure, I disagree. The user's double-tap only causes Perspective to look for a "link" attribute on the characters the user double-tapped. If such an attribute exists, Perspective then obtains the index of that link and retrieves the associated profile. The user is not selecting the supposed structure "Bob," but is performing a gesture meant to open the profile associated with "Bob."

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

136.   Further, neither the Perspective "system" nor the Perspective Handbook discloses enabling the selection of a linked action.  The user's double-tap cannot satisfy both the selection of a detected structure and the selection of a linked action.  The clear language of this claim element requires that the user interface enable the *separate* selection of a detected structure and a linked action.  Even if opening "Bob's" profile can be considered a linked action, the user does not select this supposed action as Perspective automatically opens the profile.  And as I stated above, under Scenario 3 the Perspective "system" and Handbook do not disclose detecting structures in data, and linking actions to the detected structures.

137.   To the extent that Dr. Olsen contends that double-tapping on a profile enables the selection of a linked action, I disagree

***Scenario #4 – "When a proper name is detected (e.g., Bob) and only one profile exists with the same proper name (e.g., Bob Smith) . . . the Associate links the detected name with the action of making a telephone call with the number associated with the detected name." (Appendix 4 at 55; Olsen Validity Report at ¶¶ 202-205)***

138.   Dr. Olsen opines that "Perspective discloses selecting the detected structure by writing a "D" over the detected structure with the pen. Perspective then enables the user to select the action of dialing the phone number associated with the detect structure." (Appendix 5 at 56.)  It is my opinion that Scenario 4 does not disclose this claim element.

139.   Even assuming that "Bob" is a detected structure, Scenario 4 does not disclose user interface program routines enabling the selection of a detected structure.  The user's "D" gesture only causes Perspective to look for a "link" attribute on the characters the user gestured over.  If such an attribute exists, Perspective then obtains the index of that link and retrieves the associated profile.  The user is not selecting the supposed structure "Bob," but is performing a gesture specifically intended to retrieve the phone number in the profile associated with "Bob."

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◁

140.   Moreover, selecting the "Dial" button does not practice the selection of a linked action.  As explained above in Section X.A.2.a.iii, the alleged-action of calling a phone number in Bob's profile is not an action linked to a detected structure.  The "Dial" button is not linked to the word "Bob" and is not an "action" as that term has been construed.  The "Dial" button causes the EO Communicator to dial the phone number within Bob's profile; it does not dial *with* the allegedly-detected structure "Bob."  Likewise, the "Dial" button only dials Bob's phone number; it does not cause the CPU to perform a sequence of operations on the allegedly detected structure "Bob."  This can be seen in the following picture from an EO Communicator 440 taken after I wrote a "D" over "Bob:"



Therefore, the "Dial" button cannot constitute an "action" under any of the parties' construction.

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ≺

> v.   **an action processor for performing the selected action linked to the selected structure;**

141.   It is my opinion that the Perspective "system" and Perspective Handbook do not disclose an action processor for performing the selected action linked to the selected structure. Dr. Olsen identifies the following alleged action processor program routines:

- For Scenario 1, "the action processor is the code that performs the selected action of associating the detect structure with the correct profile." (Appendix 4 at 65.)

- For Scenario 2, "the action processor is the code that performs the selected action of creating a new profile." (Appendix 4 at 65.)

- For Scenario 3, "the action processor is the code that performs the . . . selected action of opening the profile associated with the detected structure." (Appendix 4 at 65.)

- For Scenario 4, "the action processor is the code that performs the . . . selected action of opening the dialer application for dialing the phone number" (Appendix 4 at 65-66.)

142.   As an initial matter, Dr. Olsen fails to identify an action process for each of the alleged "linked actions" he identifies with respect to claim 1's "an analyzer server for detecting structures in the data, and for linking actions to the detected structures" and "a user interface enabling the selection of a detected structure and a linked action."

143.   For example, with regards to Scenario 1, Dr. Olsen states that "[i]f the user selects the action of associating with either "Bob" profile, then the selected item is saved ████████ ████) and the association is added to the database ██████████████████)." (Appendix 4 at 71.) However, Dr. Olsen does not identify for Scenario 1 an action process program routine for the alleged action of "creat[ing] a new profile." (Olsen Validity Report at ¶ 208.) Moreover, with respect to Scenario 4, Dr. Olsen only identifies the function ████████████ as constituting "a computer subroutine with a sequence of operations that performs an action associated with the user's 'D' gesture on a recognized structure (i.e., a proper name)."

59

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◁

(Appendix 4 at 72.)   However, he does not identify an action process program routine that "enables the user to select the action of dialing the phone number associated with the detect structure." (Appendix 4 at 56.)   That is, while Dr. Olsen contends that the selectable linked action is the "Dial" button of the phone dialog, he does not identify an action processor program routine that performs the supposed "Dial" action.   For these additional reasons Dr. Olsen has failed to show that Perspective discloses the claimed action processor program routine for creating a new profile in Scenario 1 and dialing a number in Scenario 4.

> vi.   **a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines.**

144.   It is my opinion that the Perspective "system" and Perspective Handbook do not disclose "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines" for at least the reason that Perspective does not include the claimed program routines for the reasons described above.   Consequently, Dr. Olsen has failed to show that the Perspective "system" and Perspective Handbook disclose this limitation of claim 1.

> b.   **Claim 3: The system recited in claim 1, wherein the input device receives the data from an application running concurrently, and wherein the program routines stored in memory further comprise an application program interface for communication with the application.**

145.   It is my opinion that the Perspective "system" and Handbook do not disclose claim 3 under any of the parties' proposed constructions for at least the reason that they do not disclose claim 1 as described in Section X.A.

146.   Further, the Perspective "system" and Handbook do not disclose an input device that "receives the data from an application concurrently."   As I explained in my Overview of

60

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

Perspective, it is a single application. Dr. Olsen appears to agree that Perspective does not disclose this claim element, stating only that "[t]o the extent that Apple argues that a low level system service, such as a window manager, is an application running concurrently." (Appendix 4 at 77; Appendix 5 at 36.) However, I do not argue that a low-level-system service, such as a window manager, is an application running concurrently.

147.    Moreover, the Perspective "system" and Handbook do not disclose program routines including an application program interface for communication with the application. Dr. Olsen only states that "an application program interface necessarily and inherently exists between another application and the Associate." (Appendix 4 at 77; Appendix 5 at 36.) However, the Associate is a part of the Perspective application, and as I have already established, Perspective was a single application. Therefore, it is not clear what "application" Dr. Olsen is referring to. Perspective does not disclose an application program interface for communicating with a concurrently running application.

148.    Dr. Olsen next states that "[t]o the extent that Apple alleges that a display receives data to be detected from an application running concurrently by virtue of the display receiving the data to be presented to the user from a Perspective application, then Perspective also discloses this claim." (Appendix 4 at 77-78.) However, I do not contend that a display receives data from an application running concurrently for presentation to the user. Further, even if a display did receive data from an application running concurrently, the display does not contain the program routines of claim 1.

149.    In addition, the Perspective "system" and Handbook do not practice claim 3 under HTC and the Staff's construction of "input device" to the extent they allege that the plain meaning of "input device" excludes software that can receive data and is limited to only

61

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

hardware such as keyboards and mice.  In the context of claim 3, it makes more sense to refer to a software input device as receiving data from an application than a hardware input device such as a keyboard or a mouse.

> **c.** **Claim 4: The system recited in Claim 1, wherein the analyzer server includes grammars and a parser for detecting structures in the data.**

150.    It is my opinion that the Perspective "system" and Handbook do not disclose claim 4 under any of the parties' proposed constructions for at least the reason that they do not disclose claim 1 as described in Section X.A.

151.    In addition, the Perspective "system" and Handbook do not disclose containing grammars for detecting structures in the data.  Dr. Olsen opines that "the Associate recognizes keywords paired with proper names to create new profiles." (Appendix 4 at 78; Appendix 5 at 36.)  But, as I established above, Perspective considers any characters after a keyword as unmatched text; it does not contain a grammar for detecting proper names.

152.    Dr. Olsen opines that the ▇▇▇▇▇▇▇▇▇▇ contains a parser with a grammar for finding numbers, names, and times.  (Appendix 4 at 80.)  However, even if Perspective contains a grammar for finding numbers and times, Dr. Olsen has not alleged that Perspective practiced claim 1 through any detected numbers and times.  That is, these supposed grammars are irrelevant to claim 4 because Dr. Olsen does not opine that Perspective uses them in a manner that practiced *any* element of claim 1.

153.    Moreover, the Perspective "system" and Handbook do not disclose a grammar for detecting proper names.  As I have already shown, Perspective can only find names of people that are already entered in the address book; this is, at most, string matching.  A list of strings is not a finite state grammar as claimed by Dr. Olsen.  (Appendix 4 at 80.)  The '647 patent

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

distinguishes between strings and grammars. ('647 patent, col. 1:28-29 ("such as a grammar, regular expression, string, etc.").) The claims of the '647 patent further distinguish between a library of strings and a grammar. (*Compare* '647 patent, cl. 4 ("includes grammars and a parser . . .") *to* cl. 6 ("includes a string library . . .").) Dr. Olsen characterizes, contrary to the plain and ordinary meaning of "grammar" to one of ordinary skill in the art, string matching as a "finite state grammar." (*See, e.g.*, Appendix 6 at 51.) In the field of Computer Science, "finite state grammar" is not a commonly used phrase. Instead, "grammar" as understood by one of ordinary skill at the time of the invention of the '647 patent is generally synonymous with "context-free grammar," such as a grammar that can be written in Backus-Naur Form. In fact, the standard textbook that has been used in university courses on compilers and parsing over the past couple decades, Alfred Aho et al.'s COMPILERS: PRINCIPLES, TECHNIQUES, AND TOOLS (also known as the "Dragon Book"), explicitly states that it considers the term "grammar" as shorthand for "context-free grammar." (ALFRED AHO ET AL., COMPILERS: PRINCIPLES, TECHNIQUES, AND TOOLS 26 (1st ed. 1986).) In contrast, this standard textbook makes little or no mention of the phrase "finite state grammar." In Computer Science, the expression "finite state" usually refers to either "finite state machines" or "finite state automata," which are state machines with a finite number of states, transitions between these states, and associated side effects. When Dr. Olsen refers to a "finite state grammar," he appears to be referring to string matching implemented through a finite state machine. Such string matching does not satisfy the plain and ordinary meaning of "grammar." In fact, the '647 patent explicitly distinguishes string matching, regular expressions, and grammars. ('647 patent, 1:28-29 ("'pattern' refers to data, such as a grammar, regular expression, string, etc.").)

63

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◀

154.   Dr. Olsen next infers the presence of a grammar based on the existence of a parser in the Perspective source code; Dr. Olsen's inference is incorrect.   (Appendix 4 at 79.)   While true that Perspective contains a parser, it does not contain a context-free LL(1) grammar, as stated by Dr. Olsen, or any other grammar for that matter.   LL(1) refers to a parser that looks one token ahead when parsing data; in the case of Perspective, the token is simply a word.   Dr. Olsen opines that (a) the Perspective source code contains a recursive descent parser, (b) recursive descent parsers are commonly used in implementing context-free LL(1) grammars, therefore, (c) Perspective contains a context-free LL(1) grammar.   However, the mere presence of a recursive descent parser does not prove or indicate the existence of a grammar.   The Perspective source code does not contain a grammar for detecting any of the structures identified by Dr. Olsen with respect to claim 1.

155.   Finally, Dr. Olsen contends that certain "descriptive files" in the Perspective source code "define syntactic patterns to be used in discovery structures."   (Appendix 4 at 80.) However, the only supposed grammars he identifies are, in fact, strings.   (e.g. "appointment.") Dr. Olsen does not identify a grammar used for detecting any of the structures he asserts with respect to claim 1.

>
d.      **Claim 8: The system recited in Claim 1, wherein the user interface highlights detected structures.**

156.   It is my opinion that the Perspective "system" and Handbook do not disclose claim 8 under any of the parties' proposed constructions for at least the reason that they do not disclose claim 1 as described in Section X.A.

>
e.      **Claim 15**

64

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

> **i.    In a computer having memory storing actions, a method for causing the computer to perform an action on a structure identified in computer data, comprising:**

157.    Similar to my opinion with respect to claim 1, it is my opinion that the preamble of claim 15 is not a limitation of the claim.  Even if the preamble is considered a limitation, the Perspective "system" and Handbook do not disclose "a method for causing the computer to perform an action on a structure identified in computer data."  The parties have agreed that the term "structure" means "an instance of a pattern, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc."  The parties have also agreed that "detecting" means "finding and identifying."  Under the parties' constructions, neither the Perspective "system" nor the Handbook disclose the preamble.

158.    As will be explained in more detail below, Dr. Olsen has not shown that the Perspective "system" or Handbook disclose a method for causing the computer to perform an action on a structure identified in computer data.  For example, of the four scenarios described by Dr. Olsen, none disclose or practice causing the CPU to perform a sequence of operations on a detected structure to which it is linked.

> **ii.    linking at least one action to the detected structure**

159.    It is my opinion that the Perspective "system" and Handbook do not disclose this element of claim 15 under any of the parties' proposed constructions for at least the reason that they do not link at least one action to the detected structure, as described with regards to claim 1 in Section X.A above.

> **iii.    enabling selection of the structure and a linked action**

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

160.   It is my opinion that the Perspective "system" and Handbook do not disclose this element of claim 15 under any of the parties' proposed constructions for at least the reason that they do not enable selection of the structure and a linked action, as described with regards to claim 1 in Section X.A above.

> iv.   **and executing the selected action linked to the selected structure.**

161.   It is my opinion that the Perspective "system" and Handbook do not disclose this element of claim 15 under any of the parties' proposed constructions for at least the reason that they do not disclose "performing the selected action linked to the selected structure" of claim 1 as described in Section X.A above.

> f.   **Claim 17: The method recited in Claim 15, wherein the memory contains grammars, and wherein the step of detecting a structure further comprises the steps of retrieving a grammar and parsing the data based on the grammar.**

162.   It is my opinion that the Perspective "system" and Handbook do not disclose claim 17 under any of the parties' proposed constructions for at least the reason that they does not practice or disclose claim 15 as described in Section X.A.

163.   In addition, the Perspective "system" and Handbook do not disclose a memory containing grammars, and the step of detecting a structure does not further comprise the steps of retrieving a grammar and parsing the data based on the grammar.  As described with regard to claim 4 above, Perspective does not use grammars to detect proper names for any of the four scenarios identified by Dr. Olsen.  Therefore, Perspective does not disclose claim 15 where the step of detecting a structure further comprises the steps of retrieving a grammar and parsing the data based on the grammar.

66

> CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER <

        g.      **Claim 19: The method recited in Claim 15, wherein the memory contains strings, and wherein the step of detecting a structure further comprises the steps of retrieving a string from the memory and scanning the data to identify the string.**

164.    It is my opinion that the Perspective "system" and Handbook do not disclose claim 19 under any of the parties' proposed constructions for at least the reason that they do not disclose claim 15 as described in Section X.A.

        h.      **Claim 20: The method recited in Claim 15, further comprising after the step of detecting a structure, the step of highlighting the detected structure.**

165.    It is my opinion that the Perspective "system" and Handbook do not disclose claim 20 under any of the parties' proposed constructions for at least the reason that they do not practice claim 15 as described in Section X.A.

    **B.**      **NeXTSTEP "System" And "References"**

        **1.**      **Overview Of The NeXTSTEP "System" And "References"**

166.    I have reviewed Dr. Olsen's opinions regarding NeXTSTEP at paragraphs 210-216 and 262-276 and Appendices 6 and 7 of the Olsen Validity Report.  The only aspect of NeXTSTEP on which Dr. Olsen relies is the NeXTSTEP spell checker functionality.  For the reasons that I described in my Technology Background section, spell checkers do not practice the invention of the '647 patent and are in fact directed to a fundamentally different technology than the '647 patent invention.

167.    As I describe in detail below, the spell checkers described in any of the NeXTSTEP references on which Dr. Olsen relies similarly do not practice the invention.  For example, rather than identifying a recognizable pattern in a document, the NeXTSTEP spell checking functionality determines whether a word is *not recognizable* by checking whether a word in a document *does not match* an entry in an assigned dictionary.  Further, instead of

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

allowing a user to select an unrecognized word, such as a misspelling, in a document, the NeXTSTEP spell checking functionality precludes user selection of the unrecognized words by employing a spelling panel to move from unrecognized word to unrecognized word. In addition, rather than linking an "action" to a detected structure to be taken on that structure (such as dialing a detected telephone number), the NeXTSTEP spelling panel either takes no action on the unrecognized word (ignoring the word) or replacing it entirely with a different word (*e.g.*, correcting the misspelling). For these reasons and the additional reasons I provide below, it is my opinion the NeXTSTEP spell checking functionality does not anticipate claims 1, 3, 4, 8, 15, 17, 19, and 20 under any party's constructions.

168.    I understand that in order for a patent claim to be anticipated, a single reference must describe every single claim element of the claimed invention. Dr. Olsen does not cite to or rely on a single NeXTSTEP reference. Rather, Dr. Olsen cites two categories of references regarding the NeXTSTEP spell checking functionality, which he refers to as "NeXTSTEP system" and "NeXTSTEP References." I will provide a brief overview of these references here and address the substance of his contentions in detail below.

169.    Dr. Olsen contends that the NeXTSTEP system anticipates certain '647 patent claiMs. For this contention, Dr. Olsen defines NeXTSTEP system to cover several different references. For example, Dr. Olsen includes NeXTSTEP General Reference Volume 1 and NeXTSTEP General Reference Volume 2 (collectively, NeXTSTEP References) within the "NeXTSTEP System." (Appendix 6 at 2-3; Olsen Validity Report, ¶ 265.) Dr. Olsen also states that source code for the NeXTSTEP 3.2 system is part of the "NeXTSTEP System." (Appendix 6 at 2-3; Olsen Validity Report, ¶ 265.) Dr. Olsen also relies on the "functionality" of the NeXTSTEP 3.0 system, an ambiguous term that ultimately appears to refer exclusively to the

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

deposition testimony of Mr. Bertrand Serlet and, to a lesser extent, Mr. Blaine Garst. (Olsen Validity Report, ¶ 265; *see also generally* Appendix 6.) It is my understanding that Mr. Blaine Garst was designated by Apple to testify regarding the operation of NeXTSTEP spell checkers and therefore has some knowledge regarding this functionality. It is also my understanding that Mr. Bertrand Serlet, on the other hand, is a former NeXT employee who did not work on the NeXTSTEP spell checking functionality and did not claim to be knowledgeable about its operation. I have reviewed the transcripts of both Mr. Garst and Mr. Serlet, and, for the reasons discussed below, disagree that their testimony supports Dr. Olsen's opinions.

170.    As I described above, it is also my understanding that it is improper for Dr. Olsen to contend that a combination of references purportedly describing a "system" anticipates a patent claim.  Here, Dr. Olsen attempts to combine documents, source code, and testimony related to different versions of NeXTSTEP.  For example, the General Reference Volume 1 and General Reference Volume 2 were published in 1992 and describe functionality for the NeXTSTEP 3.0 release.  The 3.2 version of NeXTSTEP corresponding to the source code on which Dr. Olsen relies, on the other hand, was not released until October 1993. (*See* Olsen Validity Report, ¶¶ 262, 265.)

171.    Dr. Olsen has not shown that the relevant spell checking functionality in NeXTSTEP 3.0 and 3.2 operates in the same way.  Dr. Olsen attempts to argue that the lack of a description of differences between 3.0 and 3.2 spell checkers in the 3.2 Release Notes indicates that *no relevant changes* were made between these versions. (Appendix 6 at 3).  However, the 3.2 Release Notes are not comprehensive in their listing of changes between NeXTSTEP versions.  (*See* Exhibit 10 to Olsen Validity Report.)  Dr. Olsen also acknowledges that the change logs and comments within files show that some changes were made to the relevant files.

69

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

(Appendix 6 at 3 ("the change logs found at the beginning of each filed [sic] cited below as well as the comments in these files indicate that only minor changes were made to the files as they existed in the NeXTSTEP 3.0 operating system.").)   I also understand from reading the transcripts of former NeXT employees that it was not general practice to make an entry in the change log entry every time someone modified source code. (*See, e.g.*, Garst Tr. at 73:24-74:11.) Consequently, there very likely could have been additional changes made between versions 3.0 and 3.2 of the NeXTSTEP spell checkers that the change logs do identify.  Therefore, it is my opinion that it is improper for Dr. Olsen to consider the different references as a single reference for purposes of an anticipation analysis.  Nonetheless, as I describe below, it is my opinion that even if the references cited by Dr. Olsen could be considered to be a single reference, the sources on which Dr. Olsen relies do not disclose each and every limitation of claims 1, 3, 4, 8, 15, 17, 19, and 20 of the '647 patent and thus do not anticipate these claims under any party's constructions.

172.    Dr. Olsen's second anticipation argument regarding NeXTSTEP relies only on the NeXTSTEP References.  (Appendix 7 at 2; Olsen Validity Report, ¶ 275.)  As he did with the "NeXTSTEP System," Dr. Olsen treats separate references as a single reference.  (Olsen Validity Report, ¶ 271 ("I have therefore treated these two volumes as a single reference . . . .").) However, Dr. Olsen offers no reason and I am unaware of any reason why these two separate volumes should be treated as a single reference.  The very fact that they exist as two separate volumes shows that they address different subject matter.  Therefore, in my opinion, it is inaccurate to treat two separate volumes as a single reference.

173.    Nonetheless, as I describe below, it is my opinion that even if the two references cited by Dr. Olsen could be considered to be a single reference, the sources on which Dr. Olsen

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

relies do not disclose each and every limitation of claims 1, 3, 4, 8, 15, 17, 19, and 20 of the '647

patent and thus do not anticipate these claims under any party's constructions.

> 2.    **Neither The NeXTSTEP System Nor The NeXTSTEP References Anticipate Claims 1, 3, 4, 8, 15, 17, 19, or 20 of the '647 Patent. (Appendices 6 and 7)**
>
> > a.    **Claim 1**
> >
> > > i.    **A computer-based system for detecting structures in data and performing actions on detected structures, comprising:**

174.    As I stated above, it is my opinion that the preamble of claim 1 is not a limitation

of the claim.  Even if the preamble is considered a limitation, the NeXTSTEP system and

NeXTSTEP References do not comprise "[a] computer-based system for detecting structures in

data and performing actions on detected structures."  The parties have agreed that the term

"structure" means "an instance of a pattern, where a 'pattern' refers to data, such as a grammar,

regular expression, string, etc., used by a pattern analysis unit to recognize information in a

document such as dates, addresses, phone numbers, names, etc."  The parties have also agreed

that "detecting" means "finding and identifying."  Under the parties' constructions, neither the

NeXTSTEP system nor NeXTSTEP References disclose this preamble element.

175.    The NeXTSTEP system and NeXTSTEP References only disclose finding

unrecognized words, such as misspellings, and not *structures*.  As explained above, the parties

agree that "structure" means "an *instance of a pattern*, where a 'pattern' refers to data, such as a

grammar, regular expression, string, etc., used by a pattern analysis unit to *recognize*

*information* in a document such as dates, addresses, phone numbers, names, etc." (emphasis

added).  Most notably, a "structure" is an *instance* of a pattern.  Thus, a detected structure

matches a pattern.  The NeXTSTEP spell checkers, by their very nature, ignore instances of

71

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ≺

patterns.  (*See, e.g.*, nextspell.m)  Rather, they only find words that do *not* match its dictionary.

Moreover, the NeXTSTEP spell checkers do not recognize information in a document; instead,

they only inform a user of information that it does *not* recognize.  (*See, e.g.*, nextspell.m)  I have

also reviewed the transcript of the witness designated by Apple to testify regarding the operation

of the NeXTSTEP spell checkers, Blaine Garst.  Mr. Garst confirmed my understanding that the

NeXTSTEP spell checker does not detect structures in data.  (*See* Garst Tr. at 97:15-18 (Q. "My

first question is: To your knowledge, does the spell checker in NeXTSTEP detect structures in

data? A. It does not.").)  Consequently, the NeXTSTEP spell checker is not "A computer-based

system for detecting structures in data . . ."

176.    In addition, the NeXTSTEP system and NeXTSTEP References do not disclose

"performing actions on" the unrecognized text.  The '647 patent discloses performing actions

linked to detected structures such that the structure is a part of the action.  For example, the '647

patent discloses a telephone number as a detected structure.  The invention allows a user to take

an action on this structure, such as place a call using that phone number, rather than having to

copy the phone number, open the phone application, and paste the phone number into the phone

application in order to use the phone number.  (*See, e.g.*, '647 patent, Col. 5:38-50.)  The

NeXTSTEP spell checkers, on the other hand, do not take actions on words they do not

recognize.  Rather, the NeXTSTEP spell checkers allow a user to ignore an unrecognized word

or replace the word altogether and thus change the unrecognized word into another sequence of

letters.  (*See, e.g.*, `_correct` method of NXSpellChecker.m; `changeSpelling` method of

textSpell.m.)  This functionality is fundamentally different than the invention claimed by the

'647 patent.  It is my opinion that this is not performing actions on detected structures.

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

177.   Dr. Olsen's opinion regarding disclosure of the preamble relies only on excerpts from the NeXTSTEP References. (Appendix 6 at 4-6; Appendix 7 at 3-5.) These excerpts do not support Dr. Olsen's opinion that the NeXTSTEP spell checkers disclose "A computer-based system for detecting structures in data." Rather, these excerpts describe the NXSpellServer class, the NXChangeSpelling protocol, and the NXIgnoreMisspelledWords protocol. As described in the excerpt from Dr. Olsen, the NXSpellServer class makes a spell checking engine available to different prograMs. It does not detect structures or perform actions on detected structures as those terms are used in the '647 patent. The NXChangeSpelling protocol defines how an unrecognized word is replaced entirely with a word and the NXIgnoreMisspelledWords protocol defines how the NeXTSTEP spell checker tracks a document's list of ignored words. Neither suggests that the NeXTSTEP spell checker detects structures in data, as that phrase has been construed by the parties. Nor does this class and these protocols describe performing actions on unrecognized words—as I mentioned earlier, the unrecognized word is either ignored, such that there is no action taken, or replaced entirely with a different word. Consequently, Dr. Olsen has failed to show that this element is disclosed by the NeXTSTEP system or References.

ii.   **an input device for receiving data; an output device for presenting the data; a memory storing information including program routines including**

178.   The parties dispute the meaning of "input device." I agree with Apple that the term means "computer hardware or software" in light of its use in the '647 patent specification and claiMs. HTC and the Staff contend that the phrase should be given its plain and ordinary meaning. Dr. Olsen agrees with HTC and opines that the plain and ordinary meaning of "input device" is "hardware that receives input," such as a keyboard or mouse. (Olsen Validity Report, ¶ 170; *see also* Appendix 6 at 7.) Dr. Olsen contends that the NeXTSTEP system and

73

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

NeXTSTEP References disclose "an input device for receiving data" in the form of a keyboard or mouse. (Appendix 6 at 7, Appendix 7 at 6.) However, the sole excerpt relied on by Dr. Olsen for both Appendices from the NeXTSTEP References does not describe such an input device. (*See id.*) And as the NeXTSTEP source code does not include an input device, Dr. Olsen has not shown that the NeXTSTEP system and NeXTSTEP References disclose "an input device for receiving data."

179.   Dr. Olsen also contends that the NeXTSTEP system and NeXTSTEP References disclose an "output device for presenting data." However, the sole excerpt relied on by Dr. Olsen from the NeXTSTEP References for both combinations does not describe such an output device. (*See id.* at Appendix 6 at 9, Appendix 7 at 7.) Consequently, Dr. Olsen has not shown that the NeXTSTEP system and NeXTSTEP References disclose "an output device for presenting data."

180.   And, for the reasons described below, neither the NeXTSTEP system nor NeXTSTEP References disclose "a memory storing information including program routines including..." for at least the reason that the NeXTSTEP spell checkers do not contain the claimed program routines.

### iii.   an analyzer server for detecting structures in the data, and for linking actions to the detected structures;

181.   Neither the NeXTSTEP system nor NeXTSTEP References include "an analyzer server for detecting structures in the data, and for linking actions to the detected structures" under any of the parties' constructions. The parties have agreed on the meaning of the following terms in this limitation:

74

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

- **Structure:** An instance of a pattern, where a "pattern" refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document[11] such as dates, addresses, phone numbers, names, etc.

- **Detecting / detected:** finding and identifying / found and identified

182.   The parties dispute the meaning of "analyzer server." I agree with Apple that this term means "a program routine(s) that receives data, uses patterns to detect structures in the data, and links actions to the detected structure." The Staff construes the term to mean "a program sub-routine that receives data from a document having recognizable structures, and uses patterns to detect the structures." HTC construes the term to mean "a program sub-routine that receives data from a document having recognizable structures, and uses patterns to detect the structures, where the document is presented by a separate application."

183.   The parties also dispute the meaning of "linking actions to the detected structures." I agree with Apple that the term means "linking detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are linked." HTC and the Staff construe the term to mean "linking a detected structure to a computer subroutine that causes the CPU to perform a sequence of operations on that particular structure to which it is linked, rather than an informational structure." Neither the NeXTSTEP system nor the NeXTSTEP References disclose, under any party's proposed constructions, this limitation.

184.   As I described above, the NeXTSTEP spell checkers do not "detect structures in data" and thus do not have an analyzer server for detecting structures in data. As explained, the

---

[11] I have been informed that the parties have agreed that "document" includes, but is not limited to, emails, word documents, web pages, and text messages. (11/19 Email from S. Pak to C. Mizzo.)

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

parties have construed "structure" to mean "an *instance of a pattern*, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to *recognize information* in a document such as dates, addresses, phone numbers, names, etc." (emphasis added). Dr. Olsen contends that unrecognized text is a "structure in data." (*See, e.g.*, Appendix 6 at 14.) I disagree. As the parties' agreed-upon construction highlights, a "structure" must be an *instance* of a pattern, meaning the detected structure matches a pattern. The NeXTSTEP spell checkers, on the other hand, locate unrecognizable text in a document by determining if a string does *not* match a word in its dictionary. (*See, e.g.*, nextSpell.m at L.89.) That is to say, NeXTSTEP spell checkers find unrecognized text, such as a misspelled word, by determining that the word *does not match any string in the dictionary*; a misspelled word in NeXTSTEP is a *non-instance* of any pattern. Stated differently, the NeXTSTEP spell checkers do not *recognize information* in a document, as required by the agreed-upon definition of "structure."

185.   For similar reasons, the NeXTSTEP spell checkers do not "detect" misspelled words, under the parties' agreed-upon construction of detect to mean "find[] *and* identify[]." The '647 patent provides several examples of "detecting structures." For example, the patent describes an analyzer server that finds a phone number, post-office address, e-mail address, and name in a document and identifies the text as particular types of "recognizable structures." (*See, e.g.*, '647 Patent, Col. 5:19-37, Fig. 5; *see also id.*, Col. 2:11 (stating that the invention operates on "recognizable structures").) While NeXTSTEP finds unrecognized texts by determining that a string does not match any entry in its dictionary, it does not contain an analyzer server for detecting structures as it does not *identify* text as any *recognizable structure*. Quite the opposite, when the NeXTSTEP spell checkers locate unrecognized text, it is because the text did not match

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

its dictionary. This is a fundamental difference between the invention claimed in the '647 patent and the different spell checker references cited by Dr. Olsen. Before the invention of the '647, users faced the difficulty of easily acting on "recognizable structures that have semantic significance such as phone numbers, e-mail addresses, post-office addresses, zip codes, and dates." ('647 patent, Col.1:14-16.) The NeXTSTEP spell checkers did not attach "semantic significance" to potential misspellings that were located in a document.

186.    The NeXTSTEP 3.2 source code evidences that the NeXTSTEP 3.2 spell checker does not "detect structures in data." For example, the method in the NeXTSTEP 3.2 source code that checks for a misspelled word is spellServer:findMisspelledWord:length:inLanguage:inTextStream:startingAt:wordCount:countOnly() implemented in the NeXTEnglishSpellChecker class in the nextspell.m file. Lines 89-92 of this method show that it sets the location of the misspelled word if the word is *not* in the Dictionary. In other words, the NeXTSTEP 3.2 spell checker finds misspellings by determining if a word *does not match any string in the dictionary*. The testimony of Mr. Garst, the Apple employee designated to testify regarding the operating of NeXTSTEP spell checkers, confirms my understanding. (Garst Tr. at 97:15-22 ("Q. My first question is: To your knowledge, does the spell checker in NeXTSTEP detect structures in data? A. It does not. Q. To your knowledge, does spell checker in NeXTSTEP parse data to determine if words are misspelled? A. It does not. It does not.").)

187.    I have reviewed Dr. Olsen's opinions regarding this limitation, and it is my opinion that Dr. Olsen has not shown that the NeXTSTEP system discloses this limitation. For his opinion that the NeXTSTEP system includes an analyzer server for detecting structures in data, Dr. Olsen relies on NeXTSTEP 3.2 source code, the testimony of Mr. Bertrand Serlet, and

≻ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ≺

the NeXTSTEP References. However, none of these references support Dr. Olsen's opinion. As
I discussed above, the NeXTEnglishSpellChecker class in the nextspell.m file in the NeXTSTEP
3.2 source code (a) determines if a word is *not in the Dictionary*; and (b) sets the location of the
unrecognized word but does not attach any semantic significance to the word. (*See* nextspell.m.)
Consequently, the NeXTSTEP 3.2 source code does not support Dr. Olsen's opinions.

188.    Dr. Olsen also contends that Mr. Bertrand Serlet testified that the NeXTSTEP
spell checker detects structures in text. I have reviewed the portion of the transcript cited by Dr.
Olsen and understand that, at the time of his deposition, Mr. Serlet had not been informed of the
parties' agreed-upon constructions of "structure" and "detecting." As I have explained, one of
ordinary skill in the art would not consider the NeXTSTEP spell checker to include an analyzer
server for "detecting structures in data" under the agreed-upon constructions for those terMs.
Moreover, I understand that Mr. Serlet did not write the source code for the NeXTSTEP spell
checker and did not recall the spell checker functionality in NeXTSTEP 3.0 or 3.2 at the time of
his deposition. (Serlet Tr. at 179:21-24 ("Q. Do you recall seeing a spelling panel as part of the
user interface for the NeXTSTEP system? A. No, I don't recall that."); 177:12-17 ("Q. So I
want a description of how the Spell Checker would work from a user interface perspective. If
you had in an instance of Spell Checker running on the NeXTSTEP system, what would the user
see as they were typing a word? A. Sorry, I do not recall how it works.").) For at least these
reasons, it is my opinion that Mr. Serlet's testimony does not support Dr. Olsen's opinions.

189.    Regarding the NeXTSTEP References, Dr. Olsen is again wrong that these
documents support his contention that the NeXTSTEP spell checkers detect structures in data.
The portion of the NeXTSTEP References cited by Dr. Olsen in fact specifically identifies the
spellServer:findMisspelledWord:length:inLanguage:inTextStream:startingAt:wordCount:countO

78

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

nly() method.  (Appendix 6 at 16-18; Appendix 7 at 9-11.)  This method, as I discussed above, does not find and identify structures in data.  Rather, it locates unrecognized text by determining if there is not a match in the NeXTSTEP Spell Checker dictionary. (*See* nextspell.m.)  For this reason, Dr. Olsen has failed to show that the NeXTSTEP system and NeXTSTEP References disclose "an analyzer server for detecting structures in data."

190.    Neither the NeXTSTEP system nor NeXTSTEP References disclose an analyzer server for linking actions to the detected structures.  As I discussed, the parties dispute the meaning of "linking actions to the detected structures." However, I agree with all three parties that the term at least requires "linking [a] detected structure[s] to [a] computer subroutine[s] that cause[s] the CPU to perform a sequence of operations on the [that] particular structures to which [it is] they are linked . . ."  The NeXTSTEP system and NeXTSTEP References do not disclose this limitation.  On top of the fact that the NeXTSTEP system and NeXTSTEP References do not disclose detecting structures, they also do not disclose subroutines that cause a sequence of operations on the unrecognized text.

191.    Dr. Olsen claims that "replacing the misspelled word with the alternative spelling or choosing to mark [the misspelled word] as ignored" is a linked action. (Appendix 6 at 13-14; Appendix 7 at 7.)  However, ignoring unrecognized text is not an "action" as its performance does not cause the CPU to perform a sequence of operations on the particular structure to which it is linked.  On the contrary, selecting the "Ignore" button instructs the CPU *not* to perform a sequence of operations on the unrecognized text.  Moreover, as I discussed above, replacing unrecognized text is not performing an action on the text—rather, the unrecognized text is replaced and the user views an entirely new string.  This is fundamentally different than the linked actions in the '647 patent, which involves using the selected structure to perform the

79

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

action, such as dialing a selected phone number or copying it into an address book. (*See, e.g.*, '647 patent, Col. 5:38-50.)  I have also reviewed the transcript of the witness designated by Apple to testify regarding the operation of the NeXTSTEP spell checkers, Blaine Garst. Mr. Garst confirmed that the spell checking program did not link actions to misspelled words. (Garst Tr. at 97:23-25 ("Q. Does the spell checker in NeXTSTEP link actions to misspelled words? A. No, it does not."); *see also id.* at 67:1-10.)

192.    Even assuming that unrecognized text can be considered a structure, the NeXTSTEP source code supports my opinion that NeXTSTEP's replacement of unrecognized text does not cause the CPU to perform a sequence of operations on the particular structure. When the user initiates the NeXTSTEP spell checker, the text processing application calls the checkSpelling:of:wordCount    method    of    NXSpellChecker.m,    which    calls    the findMisspelledWord:length:inLanguage:inTextStream:startingAt:learnedDictionaries:forgottenDictionaries:wordCount:CountOnly method of NXSpellServer.m. (NXSpellChecker.m at L.1063.) This method provides only the *location* of the unrecognized word and not the text of the unrecognized word.    (*See* NXSpellChecker.m at L.1094 (passing pointers &start and &length); *see also* Dr. Olsen's Ex. 10 ("The return value for findMisspelledWord: is whether or not a misspelled word was found.  If one was found, then start (and length) should be set to the start (and length) of the misspellled word in the textStream.")    The checkSpelling:of:wordCount method then highlights the position of the unrecognized text. (NXSpellChecker.m at L.1134-1149.)[12]    Once the user chooses a suggested spelling, the changeSpelling method simply replaces the highlighted text with the corrected word; this process

---

[12] While true that the checkSpelling:of:wordCount method does extract the characters of the text selection so they can be passed to the suggestGuessesForWord:inLanguage method, the text's value is not used in the replacement process.

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

does *not* depend or rely on the value of the unrecognized text. (textSpell.m at L.147.) Thus, the change spelling operation does not cause the CPU to perform a sequence of operations on the unrecognized text; instead, it causes the CPU to replace the *position* of the unrecognized text with new text. As explained above, the '647 patent consistently describes actions that operate *on* the detected structure as using the structure in some manner during performance of the action. NeXTSTEP's spell checker, in replacing the location of the unrecognized text with another word, does not use or otherwise employ the unrecognized text during the replacement process.

193.    I have reviewed Dr. Olsen's opinions regarding this limitation, and it is my opinion that Dr. Olsen has not shown that the NeXTSTEP system or References disclose an analyzer server for linking actions to detected structures. As an initial matter, Dr. Olsen is at best ambiguous in his identification of the software that constitutes an "analyzer server." Dr. Olsen first contends that the NeXTSTEP 3.2 spell checker engine (implemented in nextspell.m) is the analyzer server that performs the alleged "detecting" and that the NXSpellChecker class is a separate entity that the analyzer server "uses." (Appendix 6 at 10.) However, for the "linking" limitation Dr. Olsen changes his analysis and identifies the NXSpellChecker class as part of the analyzer server for performing the alleged linking. (*See* Appendix 6 at 14 ("NXSpellChecker creates the link between the misspelled word and the action (i.e. replacing the misspelled word with an alternative spelling) by identifying the possible alternative spelling.").)

194.    Moreover, Dr. Olsen has failed to show that the NXSpellChecker class links actions to detected structures. Dr. Olsen does not appear to point to specific NeXTSTEP 3.2 source code methods that perform the linking of actions in the NXSpellChecker class.[13] Rather, Dr. Olsen relies on the testimony of Bertrand Serlet and the NeXTSTEP References to support

---

[13] If Dr. Olsen attempts to rely on source code at a later time, I also note that the NeXTSTEP 3.2 source code fails to identify linking actions to detected structures.

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

his contention that the NXSpellChecker links actions to detected structures. Regarding Mr. Serlet's testimony, as I discussed above, I understand that Mr. Serlet did not write the source code for the NeXTSTEP spell checker and did not recall the spell checker functionality in NeXTSTEP 3.0 or 3.2 at the time of his deposition.  (Serlet Tr. at 179:21-24 ("Q. Do you recall seeing a spelling panel as part of the user interface for the NeXTSTEP system? A. No, I don't recall that."); 177:12-17 ("Q. So I want a description of how the Spell Checker would work from a user interface perspective. If you had in an instance of Spell Checker running on the NeXTSTEP system, what would the user see as they were typing a word? A. Sorry, I do not recall how it works.").)   Moreover, I note that Dr. Olsen selectively omits the portion of Mr. Serlet's testimony where he is asked directly about whether the NeXTSTEP spell checkers link actions to detected structures.  In response to that question, Mr. Serlet stated that he did not know because he did not know the meaning of the term "link" in the context of NeXTSTEP spell checkers:

```
16        Q.  And those are user interface actions that
17     have been linked to the detected structure, correct?
18            THE REPORTER:  Linked to?
19            MR. PAK:  Detected structure.
20            THE REPORTER:  Okay.
21            THE WITNESS:  I'm not sure I understand the
22     word "linked" here.                           15:26:54
```

(Serlet Tr. at 185:16-22.)  Consequently, it is my opinion that the testimony of Mr. Serlet does not support Dr. Olsen's opinions regarding this limitation.

195.   Regarding the NeXTSTEP References, Dr. Olsen's contentions are not supported by the disclosures in the documents.  The portions of the NeXTSTEP References cited by Dr. Olsen identify replacing, transforming, or ignoring unrecognized text. (Appendix 6 at 18-20;

82

> CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER <

Appendix 7 at 12-14.)  Replacing, transforming, or ignoring unrecognized text is not performing actions on that word as those terms are used in the '647 patent. Consequently, Dr. Olsen has failed to show that the NeXTSTEP system and NeXTSTEP References disclose this limitation of claim 1.

<center>

iv.    a user interface enabling the selection of a detected structure and a linked action; and
</center>

196.    Neither the NeXTSTEP system nor the NeXTSTEP References disclose "a user interface enabling the selection of a detected structure and a linked action." As I have stated, the parties have agreed on the meaning of the following terms in this limitation:

- **Structure:**  An instance of a pattern, where a "pattern" refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document[14] such as dates, addresses, phone numbers, names, etc.

- **Detecting / detected:** finding and identifying / found and identified

Under these proposed constructions, neither the NeXTSTEP system nor the NeXTSTEP References disclose this limitation.

197.    First, as I described above, the NeXTSTEP spell checkers do not detect structures or link actions to detected structures.  For at least these reasons the NeXTSTEP system and NeXTSTEP References do not disclose a user interface enabling the selection of a detected structure and a linked action.

198.    Moreover, the NeXTSTEP spell checkers do not contain program routines constituting a user interface enabling the selection of a detected structure.  Dr. Olsen contends that the NeXTSTEP Guess panel "enables the user to select a detected structure by clicking on

---

[14] I have been informed that the parties have agreed that "document" includes, but is not limited to, emails, word documents, web pages, and text messages. (11/19 Email from S. Pak to C. Mizzo.)

<center>83</center>

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

the 'Find Next' button." (*See, e.g.*, Appendix 6 at 27, Appendix 7 at 17.) I disagree. The Find

Next button is shown in HTC's 11/24/10 Suppl. Resp. to Interrog. No. 8:



(11/24/10 Suppl. Resp. to Interrog. No. 8, Exhibit 647-8 at 17.) Selection of the "Find Next"

button does not enable the selection of a detected structure because the user does not *select*

unrecognized text when the Find Next button is pressed. In fact, when the Guess panel is active,

the user does not select any text at all. Rather, the spell checker functionality navigates from

unrecognized word to unrecognized word without user selection of a word. The plain and

ordinary meaning of claim 1's "user interface" program routines is that the *user* must be able to

select the detected structure. (*See also*, '647 patent, Col. 4:12-17 (describing user selection of a

structure by a "mouse-down operation" or use of a touch screen); Fig. 7.) The NeXTSTEP spell

checkers do not allow a user to select text for checking. In fact, activation of the Guess panel

precludes selection of unrecognized text by the user; rather, the NeXTSTEP spell checkers

perform the spell checking automatically without user selection. Nor has the NeXTSTEP spell

checker even located the next piece of unrecognized text when the user selects the "Find Next"

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

button.  When pressing "Find Next," the user is asking to be brought to a yet-to-be-determined location in the text without any specification or "selection" of a misspelling.  The NeXTSTEP 3.2 source code supports my opinion that the NeXTSTEP spell checkers do not support selection of a detected structure.  For example, NXSpellChecker's checkSpelling:of:wordCount method is called by the _findNext method; at the time of this call, the next spell has not been found. (NXSpellChecker.m at L.1051-7.)

199.  I have reviewed Dr. Olsen's opinions regarding this limitation and it is my opinion that he has failed to show that the NeXTSTEP system discloses "a user interface enabling the selection of a detected structure and a linked action."  For his opinions regarding the NeXTSTEP System, Dr. Olsen relies on NeXTSTEP 3.2 source code, release notes, the testimony of Mr. Bertrand Serlet and Mr. Blaine Garst, and the NeXTSTEP 3.0 References to support his contention that the "Find Next" button selects a misspelled word.  These references do not support Dr. Olsen's contention.  As I discussed above, the NeXTSTEP 3.2 source code confirms that a user does not select unrecognized text when the Guess panel is active.  The source code cited by Dr. Olsen confirms my opinion and does not support his view that the NeXTSTEP spell checkers include a user interface enabling the selection of a detected structure and a linked action.  In fact, Dr. Olsen appears to contend that in NeXTSTEP "selection" of a misspelled word occurs upon locating unrecognized text. (*See* Appendix 6 at 33 ("If misspelled words are located in the text stream they are marked as selected and the selection is made visible. If the guess pane is enabled, that panel si [sic] shown.").)  However, this contention conflates the two separate claim 1 requirements of detecting a structure and selecting that detected structure. It is my opinion that the plain language of the claim requires the "selection" of a structure occur after "detection" of that structure, and Dr. Olsen's attempt to argue that a misspelled word is

85

> CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER <

"selected" when it is located by the spell checker program does not satisfy the requirements of the claim.[15]

200.    Dr. Olsen also contends that Mr. Bertrand Serlet testified that the NeXTSTEP spell checker allows a user to select a misspelled word.  I have reviewed the portion of the transcript cited by Dr. Olsen and it is my opinion that Mr. Serlet was not asked and did not testify about a user's selection of a misspelled word during a spell checking operation, which, as I have discussed, does not occur in the NeXTSTEP spell checkers.  Dr. Olsen appears to argue that Mr. Serlet testified that the NeXTSTEP spell checker allows selection of an action linked to a detected structure.  While Mr. Serlet testified that a user may select buttons for correcting or ignoring a misspelled word, these do not represent actions linked to detected structures for the reasons I stated above.  Moreover, I understand that Mr. Serlet did not write the source code for the NeXTSTEP spell checker, was not familiar with the claim terminology of the '647 patent, and did not recall the spell checker functionality in NeXTSTEP 3.0 or 3.2 at the time of his deposition.  (Serlet Tr. at 179:21-24 ("Q. Do you recall seeing a spelling panel as part of the user interface for the NeXTSTEP system? A. No, I don't recall that.");  177:12-17 ("Q. So I want a description of how the Spell Checker would work from a user interface perspective. If you had in an instance of Spell Checker running on the NeXTSTEP system, what would the user see as they were typing a word? A. Sorry, I do not recall how it works.").)  Consequently, it is my opinion that Mr. Serlet's testimony does not support Dr. Olsen's opinions.

201.    Regarding the "NeXTSTEP References," it is my opinion that the disclosures in these documents do not support Dr. Olsen's argument.   The portions of the NeXTSTEP

---

[15] Dr. Olsen also states that "NeXTSTEP also discloses a setAccessoryView that allows applications to add additional 'controls' (i.e. buttons) to the Guess panel to provide additional actions." (Appendix 6 at 27, Appendix 7 at 17.)  However, Dr. Olsen does not attempt to show how adding additional buttons to the Guess panel would satisfy this limitation.

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

References cited by Dr. Olsen do not describe selection of unrecognized text. The cited portions of the References merely describe the NeXTSTEP spell checkers' location of unrecognized text and ignoring or replacing that text. (Appendix 6 at 32-33; Appendix 7 at 17-19.) As I have described, ignoring or replacing unrecognized text are not actions performed on the unrecognized text. Consequently, Dr. Olsen has failed to show that the NeXTSTEP system and NeXTSTEP References disclose this limitation of claim 1.

<div align="center">

**v.    an action processor for performing the selected action linked to the selected structure; and**

</div>

202.    Neither the NeXTSTEP system nor NeXTSTEP References disclose an "action processor program routines for performing the selected action linked to the selected structure." As I described above, the NeXTSTEP spell checkers do not detect "structures" or enable the selection of a detected structure or linked actions. For at least these reasons the NeXTSTEP system and NeXTSTEP References do not disclose this limitation.

203.    It is my opinion that Dr. Olsen has failed to show that the NeXTSTEP system includes "an action processor for performing the selected action linked to the selected structure." Dr. Olsen relies on NeXTSTEP 3.2 source code and the NeXTSTEP References to support his contention. However, Dr. Olsen does not provide any explanation as to how the sole NeXTSTEP 3.2 source code citation he cites discloses "an action processor for performing the selected action linked to the selected structure." (Appendix 6 at 38.)

204.    As for the NeXTSTEP References, Dr. Olsen cites to portions of the documents relating to ignoring or changing the unrecognized text using the Guess panel. (Appendix 6 at 34-37, Appendix 7 at 19-22.) For the reasons stated above, these are not linked actions to structures that have been detected or selected. Consequently, the NeXTSTEP system and NeXTSTEP References do not disclose this limitation of claim 1.

<div align="center">87</div>

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

> vi.    **a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines.**

205.    It is my opinion that the NeXTSTEP system and NeXTSTEP References do not disclose "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines" for at least the reason that the NeXTSTEP spell checkers did not include the claimed program routines for the reasons described above. Consequently, Dr. Olsen has failed to show that the NeXTSTEP system and NeXTSTEP References disclose this limitation of claim 1.

> b.    **Claim 3: The system recited in claim 1, wherein the input device receives the data from an application running concurrently, and wherein the program routines stored in memory further comprise an application program interface for communication with the application.**

206.    It is my opinion that neither the NeXTSTEP system nor NeXTSTEP References include an "input device receives the data from an application running concurrently, and wherein the program routines stored in memory further comprise an application program interface for communication with the application." The parties have agreed that the term "application running concurrently" means "application running during the same run time." The parties dispute the meaning of the term "input device." I agree with Apple that it should be construed to mean "computer software or hardware." HTC and the Staff contend that the term should be given its plain and ordinary meaning and limited to hardware. Under any of the party's proposed constructions, neither the NeXTSTEP system nor NeXTSTEP References practice this limitation.

207.    First, it is my opinion that the NeXTSTEP system and NeXTSTEP References do not practice claim 3 under any of the party's proposed constructions for at least the reason that

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

they do not practice claim 1 as described above. In addition, the NeXTSTEP system and NeXTSTEP References do not practice claim 3 under HTC's and the Staff's construction of "input device" to the extent they allege that the plain meaning of "input device" excludes software that can receive data and is limited to only hardware such as keyboards and mice. Such input devices would not "receive the data from an application running concurrently" and thus would not meet the limitations of claim 3.

208.    I have reviewed Dr. Olsen's opinions regarding the NeXTSTEP System, and it is my opinion that Dr. Olsen has failed to show that the NeXTSTEP system practices claim 3. In fact, Dr. Olsen appears to concede that the NeXTSTEP system does not practice this claim under HTC's or the Staff's construction:

> *Generally*, a keyboard and mouse in 1992 *would not have the ability to receive data to be detected from an application running concurrently*. However, to the extent that Apple argues that an input device, like a mouse or keyboard, could receive any data from the computer, NeXTSTEP also discloses this claim under the Staff and HTC's construction.

(Appendix 6 at 50 (emphasis added).) It is not my opinion that a mouse or keyboard can receive data from an application, and Dr. Olsen identifies no evidence that this occurred in NeXTSTEP.[16] Dr. Olsen identifies the NXSpellServer class as obtaining text data from a Text editor object, but Dr. Olsen does not identify how a keyboard or mouse would receive data from the Text editor object. (Appendix 6 at 40, Appendix 7 at 24.) Consequently, Dr. Olsen has failed to show that the NeXTSTEP system practices claim 3 under HTC's or the Staff's construction.

---

[16] On the contrary, Dr. Olsen's statement supports my opinion regarding the correct construction of "input device" - it simply makes better sense to say that software, as well as hardware, or a combination of the two, can receive data from an application.

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

209.    Dr. Olsen also contends that Mr. Bertrand Serlet testified that the NeXTSTEP system spell checker is a service available to multiple applications. I have reviewed the portion of the transcript cited by Dr. Olsen and disagree that it supports his opinion for at least the reason that I understand that Mr. Serlet did not write the source code for the NeXTSTEP spell checker, was not familiar with the claim terminology of the '647 patent, and did not recall the spell checker functionality in NeXTSTEP 3.0 or 3.2 at the time of his deposition.  (Serlet Tr. at 179:21-24 ("Q. Do you recall seeing a spelling panel as part of the user interface for the NeXTSTEP system? A. No, I don't recall that.");  177:12-17 ("Q. So I want a description of how the Spell Checker would work from a user interface perspective. If you had in an instance of Spell Checker running on the NeXTSTEP system, what would the user see as they were typing a word? A. Sorry, I do not recall how it works.").)

210.    Dr. Olsen has also failed to show that the NeXTSTEP References anticipate claim 3. In fact, Dr. Olsen concedes that the NeXTSTEP References do not disclose claim 3 under HTC's or the Staff's construction.  (Olsen Validity Report, ¶ 275; *see also* Appendix 7 at 31.)  Moreover, the portions of the NeXTSTEP References cited by Dr. Olsen do not support his contention that NeXTSTEP includes hardware that receives data from an application running concurrently.  (*See, e.g.*, Appendix 7 at 24-31.)   Consequently, Dr. Olsen has failed to show that the NeXTSTEP References disclose claim 3 under HTC's or the Staff's construction.

           c.    **Claim 4: The system recited in Claim 1, wherein the analyzer server includes grammars and a parser for detecting structures in the data.**

211.    It is my opinion that neither the NeXTSTEP system nor NeXTSTEP References disclose an "analyzer server includes grammars and a parser for detecting structures in the data." The parties have agreed that the terms "detecting" and "structure" should mean "finding and

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

identifying" and "an instance of a pattern, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc.," respectively. The parties dispute the meaning of "analyzer server." I agree with Apple that this term means "a program routine(s) that receives data, uses patterns to detect structures in the data, and links actions to the detected structure." The Staff construes the term to mean "a program sub-routine that receives data from a document having recognizable structures, and uses patterns to detect the structures." HTC construes the term to mean "a program sub-routine that receives data from a document having recognizable structures, and uses patterns to detect the structures, where the document is presented by a separate application." Under any of the party's proposed constructions, the NeXTSTEP 3.0 and 3.2 Spell Checkers do not have practice this limitation.

212.    First, it is my opinion that the NeXTSTEP system and NeXTSTEP References do not disclose claim 4 under any of the party's proposed constructions for at least the reason that the NeXTSTEP spell checkers do not practice claim 1 as described above.

213.    In addition, the NeXTSTEP spell checkers do not contain "grammars and a parser for detecting structures in the data." As explained above, the NeXTSTEP spell checkers only find unrecognized words, which are not instances of patterns—the agreed-upon construction of "structure." Further, the NeXTSTEP spell checkers do not contain "grammars" or a "parser." On the contrary, the spell checkers contain a dictionary of strings. (*See, e.g.*, nextspell.m.) The '647 patent specification distinguishes between such strings and grammars. ('647 patent, col. 1:28-29 ("such as a grammar, regular expression, string, etc.").) The claims of the '647 patent further distinguish between such a library of strings and a grammar. (*Compare* '647 patent, cl. 4 ("includes grammars and a parser . . .") *to* cl. 6 ("includes a string library . . .").) The testimony

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

of Mr. Garst, the witness designated by Apple to testify regarding the NeXTSTEP spell checkers, supports my opinion that the NeXTSTEP spell checking functionality did not use grammars and a parser for detecting structures. (Garst Tr. at 97:15-22 ("Q. My first question is: To your knowledge, does the spell checker in NeXTSTEP detect structures in data? A. It does not. Q. To your knowledge, does spell checker in NeXTSTEP parse data to determine if words are misspelled? A. It does not. It does not.").)

214. I have reviewed Dr. Olsen's opinions regarding this limitation. It is my opinion that Dr. Olsen has failed to show that the NeXTSTEP system discloses the limitations of claim 4. Dr. Olsen characterizes, contrary to the plain and ordinary meaning of "grammar" to one of ordinary skill in the art, string matching as a "finite state grammar." (See, e.g., Appendix 6 at 51.) In the field of Computer Science, "finite state grammar" is not a commonly used phrase. Instead, "grammar" as understood by one of ordinary skill at the time of the invention of the '647 patent is generally synonymous with "context-free grammar," such as a grammar that can be written in Backus-Naur Form. In fact, the standard textbook that has been used in university courses on compilers and parsing over the past couple decades, Alfred Aho et al.'s COMPILERS: PRINCIPLES, TECHNIQUES, AND TOOLS (also known as the "Dragon Book"), explicitly states that it considers the term "grammar" as shorthand for "context-free grammar." (ALFRED AHO ET AL., COMPILERS: PRINCIPLES, TECHNIQUES, AND TOOLS 26 (1st ed. 1986).) In contrast, this standard textbook makes little or no mention of the phrase "finite state grammar." In Computer Science, the expression "finite state" usually refers to either "finite state machines" or "finite state automata," which are state machines with a finite number of states, transitions between these states, and associated side effects. When Dr. Olsen refers to a "finite state grammar," he appears to be referring to string matching implemented through a finite state machine. Such string

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

matching does not satisfy the plain and ordinary meaning of "grammar." In fact, the '647 patent explicitly distinguishes string matching, regular expressions, and grammars. ('647 patent, 1:28-29 ("'pattern' refers to data, such as a grammar, regular expression, string, etc.").)

215.    Dr. Olsen also contends that the NeXTSTEP 3.2 source, the testimony of Mr. Bertrand Serlet, and the NeXTSTEP References support his argument that the NeXTSTEP system discloses claim 4. However, as I have already described, the NeXTSTEP 3.2 source code does not support Dr. Olsen's position and only shows that the NeXTSTEP spell checkers did not use grammars or a parser. Regarding the testimony of Mr. Serlet, I have reviewed the portion of the transcript cited by Dr. Olsen and disagree that it supports his opinion for at least the reasons that Mr. Serlet did not testify that "NeXTSTEP discloses grammars and a parser" and, in any event, I understand that Mr. Serlet did not write the source code for the NeXTSTEP spell checker, was not familiar with the claim terminology of the '647 patent, and did not recall the spell checker functionality in NeXTSTEP 3.0 or 3.2 at the time of his deposition. (Serlet Tr. at 179:21-24 ("Q. Do you recall seeing a spelling panel as part of the user interface for the NeXTSTEP system? A. No, I don't recall that."); 177:12-17 ("Q. So I want a description of how the Spell Checker would work from a user interface perspective. If you had in an instance of Spell Checker running on the NeXTSTEP system, what would the user see as they were typing a word? A. Sorry, I do not recall how it works.").)

216.    Regarding the NeXTSTEP References, the portions of the documents cited by Dr. Olsen do not support his contention that NeXTSTEP spell checkers used grammars or a parser. Rather, the citations to the NeXTSTEP References describe general spell-checking functionality without any reference to grammars or parsers. (Appendix 6 at 51-53; Appendix 7 at 31-33.)

93

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◀

Consequently, Dr. Olsen has failed to show that the NeXTSTEP system or NeXTSTEP References disclose claim 4.

> **d.    Claim 8: The system recited in Claim 1, wherein the user interface highlights detected structures.**

217.    It is my opinion that neither the NeXTSTEP system nor NeXTSTEP References disclose a "user interface [that] highlights detected structures."  The parties have agreed that the terms "detected" and "structure" should mean "found and identified" and "an instance of a pattern, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document  such as dates, addresses, phone numbers, names, etc.," respectively. Under any of the party's proposed constructions, the NeXTSTEP system and NeXTSTEP References do not disclose this limitation.

218.    First, it is my opinion that the NeXTSTEP spell checkers do not practice claim 8 under any of the party's proposed constructions for at least the reason that the NeXTSTEP spell checkers do not practice claim 1, as described above.  Further, the NeXTSTEP spell checkers do not highlight detected structures because they do not detect structures, for the reasons described in connection with claim 1.

219.    I have reviewed Dr. Olsen's opinions regarding this limitation and disagree with them. Dr. Olsen contends that "[w]hen NeXTSTEP detects a misspelled word, NXSpellChecker highlights the word in the display." (Appendix 6 at 56, Appendix 7 at 34.)  But the highlighted words identified by Dr. Olsen are unrecognized text, which are not structures and are not detected for the reasons described above.  Dr. Olsen contends that the NeXTSTEP 3.2 source code and the NeXTSTEP References support his argument.  However, neither the source code nor the References disclose detecting "structures" and therefore do not support Dr. Olsen's

94

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

opinions. Consequently, Dr. Olsen has failed to show that the NeXTSTEP system and NeXTSTEP References disclose claim 8.

### e.    Claim 15

#### i.    In a computer having memory storing actions, a method for causing the computer to perform an action on a structure identified in computer data, comprising:

220.    It is my opinion that the preamble of claim 15 is not a limitation of the claim. Even if the preamble is considered a limitation, the NeXTSTEP system and NeXTSTEP References do not disclose "a method for causing the computer to perform an action on a structure identified in computer data." The parties have agreed that the term "structure" means "an instance of a pattern, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc." Under the parties' construction, neither the NeXTSTEP system nor NeXTSTEP References discloses this preamble element, for the reasons stated above in connection with the preamble element of claim 1.

221.    Dr. Olsen incorporates his analysis for claim 1 and provides no additional opinions regarding his contention that NeXTSTEP system and NeXTSTEP References disclose this element. Consequently, for the reasons stated with respect to claim 1, it is my opinion that Dr. Olsen has not shown that this element is met.

#### ii.    receiving computer data; detecting a structure in the data;

222.    The NeXTSTEP system and NeXTSTEP References do not disclose the step of detecting structures in the data. The parties have agreed that the terms "detecting" and "structure" should mean "finding and identifying" and "an instance of a pattern, where a

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document  such as dates, addresses, phone numbers, names, etc.," respectively. Under these proposed constructions, neither the NeXTSTEP system nor NeXTSTEP References discloses this limitation for the reasons stated above in connection with claim 1, including the reason that the NeXTSTEP spell checkers do not detect structures in data.

223.    Dr. Olsen incorporates his analysis for claim 1 and provides no additional opinions regarding his contention that the NeXTSTEP system and NeXTSTEP References disclose this limitation.  Consequently, for the reasons stated with respect to claim 1, it is my opinion that Dr. Olsen has not shown that this limitation is met.

### iii.    linking at least one action to the detected structure;

224.    The NeXTSTEP system and NeXTSTEP References do not disclose the step of "linking at least one action to the detected structure."  The parties have agreed that the terms "detected" and "structure" should mean "found and identified" and "an instance of a pattern, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document  such as dates, addresses, phone numbers, names, etc.," respectively. The parties also dispute the meaning of "linking at least one action to the detected structures." I agree with Apple that the phrase means "linking a detected structure to at least one computer subroutine that causes the CPU to perform a sequence of operations on the particular structure to which it is linked."  HTC and the Staff construe the phrase to mean "linking a detected structure to a computer subroutine that causes the CPU to perform a sequence of operations on that particular structure to which it is linked, rather than an informational structure."  Under any party's proposed constructions, neither the NeXTSTEP

96

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

system nor NeXTSTEP References disclose this limitation for the reasons stated above in connection with claim 1.

225.   Dr. Olsen incorporates his analysis for claim 1 and provides no additional opinions regarding his contention that the NeXTSTEP system and NeXTSTEP References disclose this limitation. Consequently, for the reasons stated with respect to claim 1, it is my opinion that Dr. Olsen has not shown that this limitation is met.

> iv.    enabling selection of the structure and a linked action;

226.   The NeXTSTEP system and NeXTSTEP References do not disclose the step of "enabling selection of the structure and a linked action." As I have stated, the parties have agreed on that "structure" means "an instance of a pattern, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc." Under this construction, neither the NeXTSTEP system nor NeXTSTEP References discloses this limitation for the reasons stated above with respect to claim 1.

227.   Dr. Olsen incorporates his analysis for claim 1 and provides no additional opinions regarding his contention that the NeXTSTEP system and NeXTSTEP References disclose this limitation. Consequently, for the reasons stated with respect to claim 1, it is my opinion that Dr. Olsen has not shown that this limitation is met.

> v.    and executing the selected action linked to the selected structure.

228.   The NeXTSTEP system and NeXTSTEP References do not disclose the step of "executing the selected action linked to the selected structure." As I have stated, the parties have agreed on that "structure" means "an instance of a pattern, where a 'pattern' refers to data, such

97

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc." Under this construction, neither the NeXTSTEP system nor NeXTSTEP References discloses this limitation for the reasons stated above with respect to claim 1.

229.   Dr. Olsen incorporates his analysis for claim 1 and provides no additional opinions regarding his contention that the NeXTSTEP system and NeXTSTEP References discloses this limitation.  Consequently, for the reasons stated with respect to claim 1, it is my opinion that Dr. Olsen has not shown that this limitation is met.

f.   **Claim 17: The method recited in Claim 15, wherein the memory contains grammars, and wherein the step of detecting a structure further comprises the steps of retrieving a grammar and parsing the data based on the grammar.**

230.   It is my opinion that the NeXTSTEP system and NeXTSTEP References do not disclose a "memory [that] contains grammars" or perform the "step of detecting a structure [that] further comprises the steps of retrieving a grammar and parsing the data based on the grammar." The parties have agreed that the terms "detecting" and "structure" should mean "finding and identifying" and "an instance of a pattern, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc.," respectively. Under these proposed constructions, the NeXTSTEP system and NeXTSTEP References do not disclose this limitation for at least the reasons that the NeXTSTEP system and NeXTSTEP References do not disclose claims 4 and 15, as described above.

231.   Dr. Olsen incorporates his analysis for claim 4 and provides no additional opinions regarding his contention that NeXTSTEP system and NeXTSTEP References disclose

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

this limitation.  Consequently, for the reasons stated with respect to claim 4, it is my opinion that Dr. Olsen has not shown that this limitation is met.

> g.  **Claim 19: The method recited in Claim 15, wherein the memory contains strings, and wherein the step of detecting a structure further comprises the steps of retrieving a string from the memory and scanning the data to identify the string.**

232.    It is my opinion that the NeXTSTEP system and NeXTSTEP References do not disclose the claimed method "wherein the memory contains strings, and wherein the step of detecting a structure further comprises the steps of retrieving a string from the memory and scanning the data to identify the string."  The parties have agreed that the terms "detecting" and "structure" should mean "finding and identifying" and "an instance of a pattern, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document  such as dates, addresses, phone numbers, names, etc.," respectively.   Under any of the party's proposed constructions, the NeXTSTEP system and NeXTSTEP References do not disclose this limitation.

233.    First, it is my opinion that the NeXTSTEP system and NeXTSTEP References do not disclose claim 19 under any of the party's proposed constructions for at least the reason that the NeXTSTEP system and NeXTSTEP References do not disclose the limitations of claim 15, as described above. In addition, to the extent that the NeXTSTEP spell checkers scanned data, they did not scan data to "identify the string."  Dr. Olsen contends that "spell checking consists of matching a string against a set of strings in a dictionary. This dictionary of strings is stored in computer data."   (Appendix 6 at 53, Appendix 7 at 33-34.)  However, as described above in connection with claim 1, the NeXTSTEP spell checkers did not match strings to identify unrecognized text.  Rather, unrecognized text is located when a word *does not match* an entry in a dictionary. (*See, e.g.*, nextspell.m.)

99

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

234.   I have reviewed Dr. Olsen's opinions regarding this limitation, and it is my opinion that Dr. Olsen has failed to show that the NeXTSTEP system and NeXTSTEP References disclose claim 19.  Dr. Olsen contends that the testimony of Mr. Serlet and Mr. Garst as well as the NeXTSTEP References support his argument.   However, I have reviewed the testimony of Mr. Serlet and disagree that it supports Dr. Olsen's opinion for at least the reason that Mr. Serlet did not testify that NeXTSTEP used string-matching to locate misspelled words and, in any event, I understand that Mr. Serlet did not write the source code for the NeXTSTEP spell checker, was not familiar with the claim terminology of the '647 patent, and did not recall the spell checker functionality in NeXTSTEP 3.0 or 3.2 at the time of his deposition.  (Serlet Tr. at 179:21-24 ("Q. Do you recall seeing a spelling panel as part of the user interface for the NeXTSTEP system? A. No, I don't recall that.");   177:12-17 ("Q. So I want a description of how the Spell Checker would work from a user interface perspective. If you had in an instance of Spell Checker running on the NeXTSTEP system, what would the user see as they were typing a word? A. Sorry, I do not recall how it works.").)  I have also reviewed the testimony of Mr. Garst and disagree with Dr. Olsen's suggestion that Mr. Garst's testimony supports his opinion.   The testimony Dr. Olsen cites from Mr. Garst only describes NeXTSTEP's use of dictionaries and does not support Dr. Olsen's contention that NeXTSTEP used string-matching to locate misspelled words.   In fact, Mr. Garst testified that NeXTSTEP did not attempt to detect structures in data. (Garst Tr. at 97:15-22 ("Q. My first question is: To your knowledge, does the spell checker in NeXTSTEP detect structures in data? A. It does not. Q. To your knowledge, does spell checker in NeXTSTEP parse data to determine if words are misspelled? A. It does not. It does not.").)

100

235. Regarding the "NeXTSTEP References," the portions of the NeXTSTEP References cited by Dr. Olsen merely describe locating unrecognized text and do not support his contention that NeXTSTEP practices the step of "retrieving a string from the memory and scanning the data to identify the string" in doing so. (Appendix 6 at 53, 58; Appendix 7 at 34.) Consequently, it is my opinion that Dr. Olsen has failed to show that the NeXTSTEP system and NeXTSTEP References disclose this claim.

**h. Claim 20: The method recited in Claim 15, further comprising after the step of detecting a structure, the step of highlighting the detected structure.**

236. It is my opinion that the NeXTSTEP system and NeXTSTEP References do not disclose the step of "after the step of detecting a structure, the step of highlighting the detected structure." The parties have agreed that the terms "detecting" and "structure" should mean "finding and identifying" and "an instance of a pattern, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc.," respectively. Under these proposed constructions, the NeXTSTEP system and NeXTSTEP References do not disclose this limitation for at least the reasons that the NeXTSTEP system and NeXTSTEP References do not disclose the limitations of claims 8 and 15, as described above.

237. Dr. Olsen incorporates his analysis for claim 8 and provides no additional opinions regarding his contention that the NeXTSTEP system and NeXTSTEP References disclose this limitation. Consequently, for the reasons stated with respect to claim 8, it is my opinion that Dr. Olsen has not shown that this limitation is met.

## C. U.S. Patent No. 5,859,636

### 1. The '636 Patent Is Not Prior Art

> CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER <

1.      Dr. Olsen opines that U.S. Patent No. 5,859,636 (the "'636 patent") anticipates claims 1, 3, 4, 6, 8, 15, 17, 19, 20, and 22 of the '647 patent.  The '636 patent was filed on December 27, 1995, only 5 weeks before the '647 patent.  It is my opinion that the inventors of the '647 patent conceived and reduced to practice their claimed invention well before the filing of the '636 patent, as described in Section IX.  As such, it is my opinion that the '636 patent is not prior art to the '647 patent.  Regardless, it is also my opinion that the '636 patent does not anticipate any claims of the '647 patent as described in detail below.

## 2.      Overview

238.    Dr. Olsen states that it is his "understanding that the inventors of the '647 patent also considered Pandit[, the '636 patent,] to be at least similar to the alleged invention of the '647 patent." (Olsen Validity Report at ¶220.)  Dr. Olsen quotes from a March 23, 1995 email from co-inventor Dr. Nardi as supposed support for this statement.  As an initial matter, it is not clear if it is Dr. Olsen's *opinion* that this email, attached as Exhibit 1 to his report, evidences that the '647 inventors believed the '636 patent was similar to their invention or if he simply "understand[s]" that to be the case.  Further, there is no evidence that the statements made by Pandit at the CHI conference were similar to what became the '636 patent; in fact, Dr. Nardi clearly states that Pandit was "a long way from productization." (*Id.*)  Finally, Dr. Olsen's belief that this email is relevant to the '647 patent directly refutes his opinion regarding the inventors' conception of the '647 patent.  The email's comparison of "structure detectors" to a conversation with Pandit is only relevant to the '647 patent if the mentioned "structure detectors" were similar to the invention claimed in the '647 patent; in such a case, the inventors must have conceived of the claimed invention by at least the date of this email.  If the inventors had not conceived of the claimed invention as of this email, then the "structure detectors" software referenced by Dr.

102

> CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER <

Nardi must not relate to the '647 patent. Dr. Olsen's very reliance on this document establishes that the inventors at least conceived of the '647 patent by May 1995.

239.    Dr. Olsen also refers to an April 1997 article by inventors Dr. Nardi, Mr. Miller, and Mr. Wright, titled *Collaborative, Programmable Intelligent Agents*, and states that this article compares the "technology of the '647 patent to the technology of Pandit." However, the *Collaborative, Programmable Intelligent Agents* article makes only a single comparison between Apple Data Detectors and a 1997 publication by Milind Pandit and Sameer Kalbag entitled *The Selection Recognition Agent: Instance Access to Relevant Information and Operations*, **not** the '636 patent. (MILLER00000325-33 at 327-28 ("We designed Apple Data Detectors to be invisible until needed (a butler only when you want a butler). Thus there is nothing like a 'swiveling eyeball' watching the user as in the Selection Recognition Agent or a character as in Microsoft's Bob.").) Nowhere does the *Collaborative, Programmable Intelligent Agents* article state that the 1997 *Selection Recognition Agent: Instance Access to Relevant Information and Operations*, let alone the '636 patent, discloses any elements of the '647 patent. Nor does Dr. Olsen ever compare the '636 patent to the 1997 Pandit & Kalbag publication.

240.    Dr. Olsen also contends that Dr. Nardi "confirmed that many of the claim limitations of the Claims at Issue were disclosed" by the '636 patent. (Olsen Validity Report at ¶ 219.) I have reviewed the portion of the transcript cited by Dr. Olsen and understand that Dr. Nardi, at the time of her deposition, been informed of the parties' agreed-upon constructions of "structure" and "detecting." I also note that Dr. Nardi testified that she had "never see [the '636 patent] before" the night of her deposition, she "didn't really look at it" and was "not really familiar with it," and did not "feel comfortable" comparing it to the '647 patent. (12/1/2010 Dep. Tr. of B. Nardi at 97:6-13, 160:5-20.) Dr. Nardi further stated that she "know[s] there are

103

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

technical things [in the '636 patent] that I would not be able to pronounce on." (*Id.* at 162:9-14.) In the testimony Dr. Olsen cites, Dr. Nardi was only shown a single paragraph from the '636 patent. (*Id.* at 99:7-8.)  As I have already shown, the '636 patent did not, for instance, detect structures in data.  For at least these reasons, it is my opinion that Dr. Nardi's testimony does not support Dr. Olsen's opinions.

        3.       **The '636 Patent Does Not Anticipate Claims 1, 3, 4, 8, 15, 17, 19, or 20 of the '647 Patent.  (Appendix 8)**

            a.     **Claim 1**

                i.     **A computer-based system for detecting structures in data and performing actions on detected structures, comprising:**

241.    As I stated above, it is my opinion that the preamble of claim 1 is not a limitation of the claim.  Even if the preamble is considered a limitation, the '636 patent does not comprise "[a] computer-based system for detecting structures in data and performing actions on detected structures."  The parties have agreed that the term "structure" means "an instance of a pattern, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc."  The parties have also agreed that "detecting" means "finding and identifying."  Under the parties' constructions, the '636 patent does not disclose this preamble element.

242.    As will be explained in more detail below, Dr. Olsen has not shown that the '636 patent discloses detecting structures.  In fact, the '636 patent requires the user to manually locate and accent text that the user wishes to act upon.  And as the '636 patent does not disclose detecting structures, it also does not disclose performing actions on detected structures.

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

> ii.   **an input device for receiving data; an output device for presenting the data; a memory storing information including program routines including**

243.   For the reasons described below, the '636 patent does not disclose "a memory storing information including program routines including," for at least the reason that the '636 patent does not disclose the claimed program routines.

> iii.   **an analyzer server for detecting structures in the data, and for linking actions to the detected structures**

244.   The '636 patent does not disclose, under any parties' constructions, an analyzer server for detecting structures in the data, and for linking actions to the detected structures.

245.   The '636 patent does not disclose detecting structures in data as the parties have construed those terMs.  I understand the parties have agreed to construe "detecting" as "finding and identifying."  The '636 patent does not disclose detecting structures in the data but instead requires the user to first manually find text that may contain a structure.  The '636 patent repeatedly states that the user must first "accent," or find, a piece of text *before* the '636 patent's system operates on that piece of text.  (*See, e.g.*, '636 patent, col. 1:8 ("The invention recognizes the accented text . . ."), cl. 1 ("recognizing the selected text as belonging to . . .").)  Figure 2 of the '636 patent makes clear that the user must select a piece of text before any potential recognition occurs:

105

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄



('636 patent, fig. 2 (annotated).)  Further evidencing that the '636 patent is limited to the user manually finding unrecognized text, as opposed to program routines finding and identifying instances of a pattern that have semantic significance, is a preferred embodiment of the patent:

> In a preferred embodiment, ***in the event the accented text is not recognized***, i.e., the text is not of the specific type or class recognizable by any of the libraries provided, a menu bar having a list of one or more menu names of default operations can be made to appear (step 27).

('636 patent, col. 3:23-27 (emphasis added).)  Dr. Olsen appears to admit this point, stating that "the user interface enables the user to select the text *to be analyzed*." (Appendix 8 at 22 (emphasis added); *see also* Olsen Validity Report at ¶ 218.)

246.    Further, the '636 patent consistently states that it attempts to recognize "*the accented text*" and not structures *within* the accented text.  ('636 patent, col. 2:8; *see also* '636 patent, col. 2:33-35 ("The pull-down menus . . . relate to the class of text accented, highlighted, or otherwise indicated."), col. col. 2:36-7 ("FIG. 1*a* where date **11** has been accented and recognized by the invention . . .), col. 3:19-20 ("in response to accenting and subsequent

106

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

recognition of a URL . . ."), col. 3:23-7 ("in the event the accented text is not recognized, i.e., the text is not of the specific type or class recognizable by any of the libraries provided . . .), cl. 1 ("recognizing the selected text as belonging to a predetermined class . . ."), figs. 1a-f.) The "finding" aspect of detecting requires that the alleged prior art locate structures within a body of text that includes more than just the single structure itself. In the case of the '636 patent, the user must manually find a single, yet-to-be-recognized "structure." As the '636 patent does not disclose finding structures within data, the patent does not disclose detecting structures.

247.    Additionally, the '636 patent does not disclose "detecting *structures* in the data." The plain and ordinary meaning of "structures" in claim 1 requires the analyzer server to be capable of detecting more than one structure in the data. As mentioned in the previous paragraph, the '636 patent discloses that either the entire selected text is recognized or not; it therefore cannot detect more than one structure in the data.

248.    The '636 patent does not disclose "an analyzer server for . . . for linking actions to the detected structures" for at least the reason that structures are not detected in the accented text as described in the preceding paragraphs of this section.

249.    In addition, I note that Dr. Olsen's opinion that the '636 patent discloses an analyzer server for linking actions is contrary to HTC's contentions regarding "linking actions." I understand that HTC asserts that the iPhone 3GS does not practice this element of claim 1 because it uses "integer action numbers and action tags for linking rather than conventional pointers."[17] (Oct. 29, 2010 Suppl. Resp. to Interrog. No. 14 at 151.) While I disagree with HTC's claim construction and understanding of Apple Data Detectors' functionality, I note that the allegedly detected structure of the '636 patent is "linked" to the actions by an integer value:

---

[17] To be clear, it is my opinion that the Apple iPhone practices this element of claim 1 of the '647 patent. Nor is it accurate to say that the iPhone only use "integer action numbers and action tags for linking."

> CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER <

> Subroutine d (**34**) of Library A identifies the particular
> number of operations which can be performed on the date
> text and correlates to the number of operations implemented
> by subroutine b. ***Each operation is identified by a number***
> between and including 1 ***and the value returned by subroutine
> d.***
>
> . . .
>
> Given a number identifying an operation, ***subroutine b***
> (32) of Library A ***performs the identified operation*** on the
> 15 recognized text data. For example, subroutine b can call
> scheduling programs, writable calendar databases, writable
> to-do list databases, anniversary book databases and any
> other number of programs or operations relevant to dates.

('636 patent, col.4:1-6 (emphasis added).)

> iv. **a user interface enabling the selection of a detected structure and a linked action**

250.   The '636 patent does not disclose, under any party's construction, a user interface

enabling the selection of a detected structure and a linked action.

251.   First, the '636 patent does not disclose this element of claim 1 for at least the

reasons that it does not detect structures, as explained above in Section X.C.

252.   Moreover, even if the '636 patent does disclose detecting structures, it does not

disclose user interface program routines enabling the selection of a detected structure. Dr. Olsen

appears to admit as much, stating that "the user interface enables the user to select the text *to be*

*analyzed*." (Appendix 8 at 22 (emphasis added); *see also* Olsen Validity Report at ¶ 218.)

Instead, Dr. Olsen contends that the '636 patent discloses user interface program routines

enabling the selection of a detected structure because, "[i]n the case where the selected text is

recognized by the system, the selected text and the detected structure would be the same."

(Appendix 8 at 22 (emphasis added).)  This simply proves that the '636 patent does not disclose

selection of a detected structure.  The plain and ordinary meaning of "a user interface enabling

108

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

the selection of a detected structure" requires the user interface to enable selection of a structure that has *already been detected*. Dr. Olsen appears to be arguing that this element of claim 1 is satisfied when the user selects undetected text and, after such selection, structures are detected in the text. This is the antithesis of the plain and ordinary meaning of "a user interface enabling the selection of a detected structure." Nor does it help Dr. Olsen that the '636 patent discloses that the text remains "accented" while the system attempts to recognize the accented text. The plain and ordinary meaning of "selection" requires the user to pick or choose a detected structure; the '636 patent does not disclose picking or choosing a detected structure but accenting undetected text.

> **v.      an action processor for performing the selected action linked to the selected structure;**

253.    The '636 patent does not disclose action processor program routines for performing the selected action linked to the selected structure for at least the reasons described above that it does not disclose selecting a detected structure.

> **vi.     a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines.**

254.    It is my opinion that the '636 patent does not disclose "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines" for at least the reason that the '636 patent does not disclose the claimed program routines for the reasons described above. Consequently, Dr. Olsen has failed to show that the '636 patent discloses this limitation of Claim 1.

> **b.      Claim 3: The system recited in claim 1, wherein the input device receives the data from an application running concurrently, and wherein the program routines stored in**

109

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

> **memory further comprise an application program interface for communication with the application.**

255.    It is my opinion that the '636 patent does not disclose claim 3 under any of the parties' constructions for at least the reasons that it does not disclose claim 1 as described above.

256.    In addition, the '636 patent does not disclose the "input device" of claim 3 under HTC and the Staff's construction of "input device" to the extent they allege that the plain meaning of "input device" excludes software that can receive data and is limited to only hardware such as keyboards and mice.  Dr. Olsen appears to concede that under his construction, the '636 patent does not anticipate claim 3:

> ***Generally***, a keyboard and mouse in 1992 ***would not have the ability to receive data to be detected from an application running concurrently***. However, ***to the extent*** that Apple argues that an input device, like a mouse or keyboard, could receive any data from the computer, Pandit also discloses this claim under the Staff and HTC's construction.

(Appendix 8 at 33 (emphasis added.)  Thus, under Dr. Olsen's overly limiting construction, the '636 patent does not disclose claim 3.  Further, Dr. Olsen's statement supports my opinion regarding the correct construction of "input device" as it makes more sense to refer to a software input device receiving data from an application than a hardware input device such as a keyboard or mouse.

        c.      **Claim 4: The system recited in Claim 1, wherein the analyzer server includes grammars and a parser for detecting structures in the data.**

257.    It is my opinion that the '636 patent does not disclose claim 4 under any of the parties' proposed constructions for at least the reason that it did not disclose claim 1 as described in Section X.C.

110

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◀

258.    In addition, the '636 patent does not disclose an analyzer server that includes a parser for detecting structures in the data as it does not disclose detecting structures, as explained above in Section X.C.

<p style="text-align:center"><b>d.    Claim 8: The system recited in Claim 1, wherein the user interface highlights detected structures.</b></p>

259.    It is my opinion that the '636 patent does not disclose claim 8 under any of the parties' proposed constructions for at least the reason that it did not disclose claim 1 as described in Section X.C.

260.    Further, even if the user-accented text contains text that is recognizable, Dr. Olsen does not cite to any disclosure in the '636 patent where the user interface highlights detected structures.  Instead, Dr. Olsen only identifies highlighting of a menu bar.  (Appendix 8 at 36 ("In U.S. Patent 5,859,636, the menu bar highlights for the user that a particular type of structure has been detected.").)  The menu bar referred to by Dr. Olsen is labeled "13" in Fig. 1a of the '636 patent:

<p style="text-align:center">111</p>

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄



('636 patent, fig. 1a.)  As is clear from Dr. Olsen's statement and this figure, the allegedly

detected structure (11) is not highlighted by user interface program routines.

     **e.**  **Claim 15**

        **i.**  **In a computer having memory storing actions, a method for causing the computer to perform an action on a structure identified in computer data, comprising:**

  261.  It is my opinion that the '636 patent does not disclose claim 15 under any of the

parties' proposed constructions for at least the reason that it does not disclose claim 1 as

described in Section X.C.

        **ii.**  **detecting a structure in the data;**

112

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◀

262.    It is my opinion that the '636 patent does not disclose this element of claim 15 under any of the parties' proposed constructions for at least the reason that it does not detect a structure in the data, as described with regard to claim 1 in Section X.C above.

### iii.    linking at least one action to the detected structure

263.    It is my opinion that the '636 patent does not disclose this element of claim 15 under any of the parties' proposed constructions for at least the reason that it does not disclose linking at least one action to the detected structure, as described with regard to claim 1 in Section X.C above.

### iv.    enabling selection of the structure and a linked action

264.    It is my opinion that the '636 patent does not disclose this element of claim 15 under any of the parties' proposed constructions for at least the reason that it does not disclose enabling selection of the structure and a linked action, as described with regard to claim 1 in Section X.C above.

### v.    and executing the selected action linked to the selected structure.

265.    It is my opinion that the '636 patent does not disclose this element of claim 15 under any of the parties' proposed constructions for at least the reason that it does not disclose executing the selection action linked to the selected structure, as described with regard to "performing the selected action linked to the selected structure" of claim 1 in Section X.C above.

### f.    Claim 17: The method recited in Claim 15, wherein the memory contains grammars, and wherein the step of detecting a structure further comprises the steps of retrieving a grammar and parsing the data based on the grammar.

113

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

266.   It is my opinion that the '636 patent does not disclose claim 17 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 15 as described in Section X.C.

267.   In addition, the '636 patent does not disclose the step of detecting a structure further comprising the steps of retrieving a grammar and parsing the data based on the grammar for at least the reason that it does not disclose detecting a structure as explained above in Section X.C.

       g.    **Claim 19: The method recited in Claim 15, wherein the memory contains strings, and wherein the step of detecting a structure further comprises the steps of retrieving a string from the memory and scanning the data to identify the string.**

268.   It is my opinion that the '636 patent does not disclose claim 19 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 15 as described in Section X.C.

269.   In addition, the '636 patent does not disclose "scanning the data to identify the string" as it only analyzes the accented text, which cannot have more then one instance of a string. (*See, e.g.*, '636 patent, col. 2:8, col. 2:33-35 ("The pull-down menus . . . relate to the class of text accented, highlighted, or otherwise indicated."), col. col. 2:36-7 ("FIG. 1*a* where date **11** has been accented and recognized by the invention . . .), col. 3:19-20 ("in response to accenting and subsequent recognition of a URL . . ."), col. 3:23-7 ("in the event the accented text is not recognized, i.e., the text is not of the specific type or class recognizable by any of the libraries provided . . .), cl. 1 ("recognizing the selected text as belonging to a predetermined class . . ."), figs. 1a-f.)

114

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

        **h.**     **Claim 20: The method recited in Claim 15, further comprising after the step of detecting a structure, the step of highlighting the detected structure.**

270.    It is my opinion that the '636 patent does not disclose claim 20 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 15 as described in Section X.C.

271.    Further, the '636 patent does not disclose the step of highlighting the detected structure for the same reasons it does not disclose a user interface highlighting detected structures with respect to claim 8.

     **D.**    **European Patent Application EP 0458563A2 ("Nokia EPO Publication")**

       **1.**     **Overview**

272.    The Nokia EPO Publication concerns a "telephone apparatus" capable of receiving text messages. (Nokia EPO Publication (HTC007290337-46), 1:1-9).) The Nokia EPO Publication was motivated by the fact that old cellular telephones could not receive incoming calls and required the user to carry a pager (or a phone with the capability of receiving a text message) so the user could be informed when someone wished to get in contact with them. (Nokia EPO Publication, 4:31-46.) The Nokia EPO Publication thus discloses a phone with *circuits* that can extract a phone number from a text message so that the user can operate on the number just as if "the user [had] *fed in the telephone number in its entirety and conventionally, by means of the number keys.*" (Nokia EPO Publication, 8:6-10 (emphasis added).) Such functionality was explicitly disclosed in the '647 patent's specification. (*See, e.g.*, '647 patent, 1:24-26 ("To help facilitate searching a document for these structures, programmers can create or employ pattern analysis units, such as parsers, to automatically identify the structures.") The Nokia EPO Publication did not disclose, among other things, linking actions to the extracted

115

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

phone number; to the contrary, the user could only operate on the phone number manually through traditional key strokes.

> **2.** **The Nokia EPO Publication Does Not Anticipate Claims 1, 3, 4, 8, 15, 17, 19, or 20 of the '647 Patent.  (Appendix 9)**
>
> **a.** **Claim 1**
>
> > **i.** **A computer-based system for detecting structures in data and performing actions on detected structures, comprising:**

273.    As I stated above, it is my opinion that the preamble of claim 1 is not a limitation of the claim.  Even if the preamble is considered a limitation, the Nokia EPO Publication does not comprise "[a] computer-based system for detecting structures in data and performing actions on detected structures."  The parties have agreed that the term "structure" means "an instance of a pattern, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc."  The parties have also agreed that "detecting" means "finding and identifying."  Under the parties' constructions, the Nokia EPO Publication does not disclose this preamble element.

274.    As will be explained in more detail below, Dr. Olsen has not shown that the Nokia EPO Publication discloses performing actions on detected structures.  In fact, the Nokia EPO Publication does not disclose causing the CPU to perform a sequence of operations on a detected structure to which it is linked.  Instead, the Nokia EPO Publication requires the user to manipulate phone numbers through a traditional keyboard.

> > **ii.** **an input device for receiving data; an output device for presenting the data; a memory storing information including program routines including**

116

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

275.   For the reasons described below, the Nokia EPO Publication does not disclose "a memory storing information including program routines including," for at least the reason that Nokia EPO Publication does not disclose the claimed program routines.

### iii.   an analyzer server for detecting structures in the data, and for linking actions to the detected structures

276.   It is my opinion that the Nokia EPO Publication does not disclose, under any of the parties' proposed constructions, an analyzer server for detecting structures in the data, and for linking actions to the detected structures.

277.   Dr. Olsen contends that the Nokia EPO Publication discloses "linking detected telephone numbers to actions, such as calling, modifying, or storing the detected structure." (Appendix 9 at 9.)   Tellingly, Dr. Olsen does not cite to any portion of the Nokia EPO Publication that discloses *linking* these supposed actions to a telephone number.   On the contrary, the system described in the Nokia EPO Publication simply brings into the display a phone number from a text message.   The user must then manually press key(s) on the phone's keyboard to "start[] the placing of a call." (Nokia EPO Publication, 8:14-15.) Dr. Olsen provides no explanation of how this comprises "linking" a phone number to an action.   In fact, the Nokia EPO Publication makes clear that the purpose of its invention "is that the register and the display of the telephone are now precisely the same as they *would be upon the user having fed in the telephone number in its entirety and conventionally, by means of the number keys*." (Nokia EPO Publication, 8:6-10 (emphasis added).)   That is to say, there is no linking because the "keys" for calling, modifying, or storing a phone number are not linked to that phone number.

278.   Nor does the user's modification of the phone number constitute an action linked to a detected structure.   After the system in the Nokia EPO Publication finds and displays a phone number, "[t]he user may correct the telephone number by adding or eliminating digits . . .

117

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

by pressing a number key." (Nokia EPO Publication, 7:40-45.)   Dr. Olsen provides no explanation of how this constitutes linking an action to a detected structure.  Simply put, pressing a number key on a cellular phone to edit the display is not an action that is linked to a detected structure; this was a well-known text editing process and is not similar to the actions of the '647 patent.

279.    Similarly, the Nokia EPO Publication does not disclose linking the action of storing the detected structure.  Assuming that storing a detected structure in an address book is an action, Dr. Olsen provides no explanation of how the Nokia EPO Publication discloses linking such an action to a detected structure.  On the contrary, the Nokia EPO Publication requires the user first manually search for a person's name in the text message.  (Nokia EPO Publication, 8:34-36 ("With the subsequent name search keyings the text will be moved forward in the display one word at a time.").)  Once the user has located the name, they press a "store key[]" so the number and name will be stored in their directory.  (*Id.* at 8:36-54.)  The Nokia EPO Publication then states that this "resembles a *'conventional' method of feeding name & number pairs into the . . . directory.*" (*Id.* at 8:55-57.)  Again, none of these actions are linked to a detected structure but instead are manual keystrokes for conventional cell phone use.

280.    In addition, the Nokia EPO Publication does not disclose an "analyzer server" as HTC has construed that claim.  HTC's incorrect construction requires the analyzer server to receive data from a document where the "document is presented by a separate application."  The Nokia EPO Publication does not disclose, and Dr. Olsen provides no citations that show otherwise, an analyzer server that receives data from a document, here a text message, that is presented by a separate application.  Instead, Dr. Olsen opines that the text message of the Nokia EPO Publication is created by "producers of data, such as a mobile device or network operator.

118

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

These producers of data inherently include applications for sending the text message." (Appendix 9 at 13.) As an initial matter, even if Dr. Olsen is correct that a "mobile device or network operator" inherently includes applications for sending the text message, the Nokia EPO Publication would still not disclose an analyzer server under HTC's construction; whether an application exists for sending text messages is irrelevant to whether the analyzer server receives data from a document that is *presented by a separate application*. Also, the "inherent" application Dr. Olsen refers to would be on a device or phone that is *separate from* that described in the Nokia EPO publication and would therefore not disclose claim 1's system comprising memory storing information including program routines.

281.    Further, Dr. Olsen is incorrect to say that the Nokia EPO Publication includes an inherent disclosure of an application that can send text messages. In fact, the Nokia EPO Publication is limited to the situation where "calls cannot be made to wireless telephones," requiring the user to have "both a wireless telephone apparatus and a pager" (or a device that integrates the two) so they can be notified when someone wishes to talk with them. (Nokia EPO Publication, 4:31-46.) One can send messages to a pager through mechanisms that do not involve an application. Thus, the Nokia EPO Publication does not inherently include an *application* for sending text messages.

282.    Finally, regardless of whether the Nokia EPO Publication discloses detecting structures in the data and linking actions to the detected structures (which it does not), the Nokia EPO Publication does not disclose a program routine(s) constituting an analyzer server. The Nokia EPO Publication instead discloses *circuits* "to recognize characters indicating the beginning and/or end of a telephone number." (Nokia EPO Publication, 9:22-24.)

iv.    **a user interface enabling the selection of a detected structure and a linked action**

119

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

283.    It is my opinion that the Nokia EPO Publication does not disclose, under any of the parties' proposed constructions, program routines constituting a user interface enabling the selection of a detected structure and a linked action.

284.    The Nokia EPO Publication does not disclose a user interface enabling the selection of a linked action for at least the reason that the Nokia EPO Publication does not disclose linking actions to detected structures, as explained above in Section X.D.

285.    Further, the Nokia EPO Publication does not disclose a user interface enabling the selection of a linked action because the "keys" for calling, modifying, or storing a phone number are not linked to that phone number.  The Nokia EPO Publication discloses a set of fixed keys for interacting with the phone.  (Nokia EPO Publication, 5:52-53 ("'keying' denotes a command given by means of the keyboard . . ."), 8:10-24 ("A call to a number also takes place in the same manner as in a 'normal' call . . . some call keying is, of course, necessary for starting the placing of a call."), 7:40-43 ("The user may correct the telephone number by adding or eliminating digits at the beginning of the telephone number . . .").)  A person of ordinary skill in the art at the time of the invention of the '647 patent would understand the plain meaning of "linking" to mean associating.  The fixed keys of the Nokia EPO Publication are not associated with, or linked to, the telephone number when the user presses the keys.

286.    Regardless of whether the Nokia EPO Publication discloses detecting structures in the data and linking actions to the detected structures (which it does not), the Nokia EPO Publication does not disclose user interface program routines enabling the selection of a linked action.  The Nokia EPO Publication instead discloses an "electrical circuit for forming an outgoing telephone call." (Nokia EPO Publication, 5:5-6.)

            v.      **an action processor for performing the selected action linked to the selected structure;**

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

287.   The Nokia EPO Publication does not disclose action processor program routines for performing the selected action linked to the selected structure for at least the reason described above that it does not disclose linking actions to the detected structures or selecting a linked action.

> vi.   **a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines.**

288.   It is my opinion that the Nokia EPO Publication does not disclose "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines" for at least the reason that the Nokia EPO Publication does not disclose the claimed program routines for the reason described above.  Consequently, Dr. Olsen has failed to show that the Nokia EPO Publication discloses this limitation of claim 1.

> b.   **Claim 3: The system recited in claim 1, wherein the input device receives the data from an application running concurrently, and wherein the program routines stored in memory further comprise an application program interface for communication with the application.**

289.   It is my opinion that the Nokia EPO Publication does not disclose claim 3 under any of the parties' constructions for at least the reasons that it does not disclose claim 1 as described above.

290.   Dr. Olsen opines that the text message of the Nokia EPO Publication is created by "producers of data, such as a mobile device or network operator.  These producers of data inherently include applications for sending the text message." (Appendix 9 at 22.)  First, even if Dr. Olsen's statement is true, that would only mean there is an application running on a different or remote device; there is no reason to believe that such an application would be running concurrently with the system of claim 1.  Nor would such a remote application satisfy claim 3's

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

"application running concurrently."  The parties have agreed that this language should be construed as an "application running during the same run-time."  The plain and ordinary mean of "during the same run-time" requires that the two applications be on the same machine.  Dr. Olsen's "inherently include[d] application" does not satisfy this requirement.

291.    Further, Dr. Olsen is incorrect to say that the Nokia EPO Publication includes an inherent disclosure of an application that can send text messages.  In fact, the Nokia EPO Publication is limited to the situation where "calls cannot be made to wireless telephones," requiring the user to have "both a wireless telephone apparatus and a pager" so they can be notified when someone wishes to talk with them.  (Nokia EPO Publication, 4:31-46.)  One can send messages to a pager through mechanisms that do not involve an application.  Therefore, the Nokia EPO Publication does not inherently disclose an application for sending text messages.

292.    In addition, the Nokia EPO Publication does not disclose an application program interface for communicating with the supposed-application identified by Dr. Olsen.  There is no disclosure of an application program interface.  Instead, Dr. Olsen opines that an "application program interface inherently exists between the email application in the receiving computer and the hardware for receiving the email message."  (Appendix 9 at 25.)  Assuming that by email application Dr. Olsen means text message application, the Nokia EPO Publication does not disclose a text messaging application.  Even if it did, an application communicating with "the hardware for receiving the email message" is irrelevant as claim 3 requires the application comprise an "application program interface for communicating with the application."  The alleged program routines of the Nokia EPO Publication do not communicate with a concurrently running application; they *only* communicate with the telephone network.  Moreover, the plain and ordinary meaning of an "application program interface for communication with the

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◁

application" is a set of program routines that enable the system of claim 1 to communicate with an application running on the same machine.  Application program interfaces are not used for communication with remote machines.

<blockquote>

    c.    **Claim 4: The system recited in Claim 1, wherein the analyzer server includes grammars and a parser for detecting structures in the data.**

</blockquote>

293.    It is my opinion that the Nokia EPO Publication does not disclose claim 4 under any of the parties' proposed constructions for at least the reason that it did not disclose claim 1 as described in Section X.D.

294.    In addition, the Nokia EPO Publication does not disclose an analyzer server that includes a parser for detecting structures in the data.  The Nokia EPO Publication only discloses searching the contents of a short text message.  (Nokia EPO Publication, 5:28-29.)  Dr. Olsen does not cite to any disclosure of a parser.

<blockquote>

    d.    **Claim 8: The system recited in Claim 1, wherein the user interface highlights detected structures.**

</blockquote>

295.    It is my opinion that the Nokia EPO Publication does not disclose claim 8 under any of the parties' proposed constructions for at least the reason that it did not disclose claim 1 as described in Section X.D.

296.    In addition, the Nokia EPO Publication does not disclose user interface program routines that highlight detected structures.

297.    Dr. Olsen contends that the Nokia EPO Publication discloses two forms of highlighting: (1) "displaying an asterisk * on each end of the number" and (2) "removing all characters from the display except for the detected phone number." (Appendix 9 at 29.)  Neither of these comprises highlighting detected structures.  The plain meaning of "highlights" does not

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◁

include placing asterisks at the beginning and end of text. And as made clear in Dr. Olsen's own citation to the Nokia EPO Publication, the asterisks he refers to existed "at the time of transmitting the message;" the user interface did not add the asterisks to highlight detected structures. (Nokia EPO Publication, 6:51-52.) Further, the plain meaning of "highlights" does not include "removing all characters from the display except for the detected phone number."

    e.    **Claim 15**

        i.    **In a computer having memory storing actions, a method for causing the computer to perform an action on a structure identified in computer data, comprising:**

298.    It is my opinion that the Nokia EPO Publication does not disclose claim 15 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 1 as described in Section X.D.

        ii.    **linking at least one action to the detected structure**

299.    It is my opinion that the Nokia EPO Publication does not disclose this element of claim 15 under any of the parties' proposed constructions for at least the reason that it does not disclose linking at least one action to the detected structure, as described with regards to claim 1 in Section X.D above.

        iii.    **enabling selection of the structure and a linked action**

300.    It is my opinion that the Nokia EPO Publication does not disclose this element of claim 15 under any of the parties' proposed constructions for at least the reason that it does not disclose enabling selection of the structure and a linked action, as described with regards to claim 1 in Section X.D above.

        iv.    **and executing the selected action linked to the selected structure.**

124

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

301.    It is my opinion that the Nokia EPO Publication does not disclose this element of claim 15 under any of the parties' proposed constructions for at least the reason that it does not disclose executing the selected action linked to the selected structure, as described with regards to "performing the selected action linked to the selected structure" of claim 1 in Section X.D above.

> f.    **Claim 17: The method recited in Claim 15, wherein the memory contains grammars, and wherein the step of detecting a structure further comprises the steps of retrieving a grammar and parsing the data based on the grammar.**

302.    It is my opinion that the Nokia EPO Publication does not disclose claim 17 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 15 as described in Section X.D.

303.    In addition, the Nokia EPO Publication does not disclose the step of detecting a structure further comprising the steps of retrieving a grammar and parsing the data based on the grammar for at least the reason that it does not disclose grammars and a parser for detecting structures in the data as explained above in Section X.D with respect to claim 4.

> g.    **Claim 19: The method recited in Claim 15, wherein the memory contains strings, and wherein the step of detecting a structure further comprises the steps of retrieving a string from the memory and scanning the data to identify the string.**

304.    It is my opinion that the Nokia EPO Publication does not disclose claim 19 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 15 as described in Section X.D.

305.    In addition, the Nokia EPO Publication does not disclose a memory containing strings, and wherein the step of detecting a structure further comprises the steps of retrieving a string from the memory and scanning the data to identify the string.  Dr. Olsen only cites to a

125

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

section of the Nokia EPO Publication that discloses searching for data delimited by asterisks. (Figure 9 at 27-28.)  Dr. Olsen does not explain how this constitutes a memory containing strings; indeed, the Nokia EPO Publication does not disclose a memory containing strings let alone scanning the data to identify the string.

> **h.     Claim 20: The method recited in Claim 15, further comprising after the step of detecting a structure, the step of highlighting the detected structure.**

306.     It is my opinion that the Nokia EPO Publication does not disclose claim 20 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 15 as described in Section X.D.

307.     Further, the Nokia EPO Publication does not disclose the step of highlighting the detected structure for the same reasons it does not disclose a user interface highlighting detected structures with respect to claim 8 as described above.

> **E.     U.S. Patent No. 5,483,352 ("Fukuyama")**

> **1.     Overview**

308.     Fukuyama relates to a computer that can receive email and dial the sender of the email by either requiring the recipient to manually find a telephone number in the email or use an algorithm to extract the number.  (Fukuyama, abst.; 6:64-7:8.)  Fukuyama is primarily concerned with disclosing a manner by which a computer can dial a telephone number.  (*See, e.g.,* Fukuyama, Fig. 2 (describing the prior art); 4:34-38 ("The computer of the present invention realizes a connection between the telephones of the receiver of the electronic mail and of the sender of the electronic mail automatically when the receiver of the electronic mail wants to reply to the sender of the same.")

126

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

**2.  Fukuyama Does Not Anticipate Claims 1, 3, 4, 8, 15, 17, 19, or 20 of the '647 Patent.  (Appendix 10)**

      **a.  Claim 1**

            **i.  A computer-based system for detecting structures in data and performing actions on detected structures, comprising:**

309.   As I stated above, it is my opinion that the preamble of claim 1 is not a limitation of the claim.  Even if the preamble is considered a limitation, Fukuyama does not comprise "[a] computer-based system for detecting structures in data and performing actions on detected structures."  The parties have agreed that the term "structure" means "an instance of a pattern, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc."  The parties have also agreed that "detecting" means "finding and identifying."   Under the parties' constructions, Fukuyama does not disclose this preamble element.

310.   As will be explained in more detail below, Dr. Olsen has not shown that Fukuyama discloses performing actions that cause the CPU to perform a sequence of operations on a detected structure to which it is linked.

            **ii.  an input device for receiving data; an output device for presenting the data; a memory storing information including program routines including**

311.   For the reasons described below, Fukuyama does not disclose "a memory storing information including program routines including," for at least the reason that Fukuyama does not disclose the claimed program routines.

            **iii.  an analyzer server for detecting structures in the data, and for linking actions to the detected structures**

127

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

312.    It is my opinion that, under any of the parties' proposed constructions, Fukuyama does not disclose an analyzer server for detecting structures in the data, and for linking actions to the detected structures.

313.    Fukuyama does not disclose analyzer server program routines for linking actions to the detected structures.  Dr. Olsen contends that Fukuyama discloses linking two actions, "dialing the detected phone number or selecting a new phone number from the email." (Appendix 10 at 10.)  Neither of these comprises the claimed linked actions.

314.    The supposed action of "dialing the detected phone number" is not an action linked to a detected structure.  Instead, Fukuyama requires the "receiver of the electronic mail" to initiate a "telephone connection request . . . to the computer." (Fukuyama, abst.)  Only after the user enters this command does the computer retrieve a telephone number contained in the email.  (Fukuyama, 9:56-64.)  After retrieving the telephone number, the computer attempts to dial the number.  (*Id.* at 10:5-6.)  The only task selected by the user is to dial a yet-to-be-identified phone number.  But, claim 1 of the '647 patent requires that the analyzer server link actions that are selectable.  ('647 patent, cl. 1 ("a user interface enabling the *selection* of a detected structure and *a linked action*") (emphasis added).)  Further, Dr. Olsen effectively admits that Fukuyama does not disclose linking actions to a detected structure under HTC's and the Staff's construction. (Appendix 10 at 18 (stating that Fukuyama discloses linking actions to detected structures under the Staff and HTC's constructions on "to the extent that Apple alleges that a link to a sequence of operations in a computer program inherently involves linking to actions.").)

315.    Further, the supposed action of "selecting a new phone number from the email" is not a linked action nor is such an operation disclosed by Fukuyama.  Fukuyama only discloses a

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

"step" that "determine[s] whether or not the retrieved number is a telephone number. If the retrieved number is not a telephone number, step 1202 [retrieval] is repeated." (Fukuyama, 9:65-67.) Fukuyama does not disclose that the user "selects" a new phone number as Dr. Olsen contends. (Appendix 10 at 11.) Even if Fukuyama did disclose "selecting a new phone number from the email," such an operation is not a linked action. The user would only be telling the computer to locate the next possible phone number; that operation is not linked to an already detected structure nor does it cause the CPU to perform a sequence of operations on a detected structure.

316.   In addition, Fukuyama does not disclose an "analyzer server" as HTC has construed that claim. HTC's incorrect construction requires the analyzer server receive data from a document where the "document is presented by a separate application." Fukuyama does not disclose an analyzer server that receives data from a document that is presented by a separate application. Dr. Olsen contends that "the email message received by the computer system is sent from another computer and would inherently include another email application." (Appendix 10 at 15.) However, whether there is another email application on a different computer has no relevance to whether Fukuyama discloses an analyzer server that receives data from a document that is *presented by* a separate application. Under HTC's construction, Dr. Olsen focuses on the wrong email application. Fukuyama discloses that the recipient's email application displays the email document to the user, but does not disclose that there exists an analyzer server in an application separate from that particular email application.

        iv.    **a user interface enabling the selection of a detected structure and a linked action**

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

317.   It is my opinion that Fukuyama does not, under any of the parties' proposed constructions, disclose a user interface enabling the selection of a detected structure and a linked action.

318.   Dr. Olsen's citation to column 6, line 64 through column 7, line 8 of Fukuyama does not support his opinion that Fukuyama discloses a user interface enabling the selection of a detected structure. The Fukuyama embodiment that Dr. Olsen cites is where the system does *not retrieve* a telephone number in an email. That is, Dr. Olsen is citing to Fukuyama's "first embodiment" that requires "the receiver of the electronic mail . . . to select the telephone number of the sender of the email" as opposed to the third embodiment that "automatically retriev[es]" the telephone number. (Fukuyama, 9:31-38.)   Fukuyama does not disclose selection of a *detected* structure. Quite the opposite, Fukuyama "*retrieves* the telephone number of the sender of the electronic mail." (Fukuyama, 9:62-63 (emphasis added).) Nor does Fukuyama disclose that the user can "select[] the next detected phone number" as contended by Dr. Olsen. (Appendix 10 at 19.)   The part of Fukuyama cited by Dr. Olsen only states that the computer "determine[s] whether or not the retrieved number is a telephone number. If the retrieved number is not a telephone number, step 1202 is repeated." (Fukuyama, 9:65-67.)   This does not disclose the user selecting a detected structure.

319.   Fukuyama does not disclose user interface program routines enabling the selection of a linked action for at least the reason that it does not link actions to the detected structures, as described above. Even assuming that Fukuyama does disclose linking actions, it does not disclose user interface program routines enabling the selection of a linked action. As explained above, Fukuyama discloses that the user must first request the computer to dial a yet-to-be-identified phone number. (Fukuyama, abst.; 9:56-64.)   After the computer retrieves the

130

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

phone number, it attempts to dial the number. (*Id.* at 10:5-6.) Fukuyama does not disclose a user interface that enables the selection of a linked action; instead, the only user interaction occurs before a number has been retrieved.

> **v.     an action processor for performing the selected action linked to the selected structure;**

320.    It is my opinion that Fukuyama does not disclose, under any of the parties' proposed constructions, an action processor for performing the selected action linked to the selected structure for at least the reason that it does not disclose linking actions, selecting a linked action, or selecting a detected structure.

> **vi.    a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines.**

321.    It is my opinion that Fukuyama does not disclose "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines" for at least the reason that Fukuyama does not disclose the claimed program routines for the reasons described above. Consequently, Dr. Olsen has failed to show that Fukuyama discloses this limitation of claim 1.

> **b.     Claim 3: The system recited in claim 1, wherein the input device receives the data from an application running concurrently, and wherein the program routines stored in memory further comprise an application program interface for communication with the application.**

322.    It is my opinion that Fukuyama does not disclose claim 3 under any of the parties' constructions for at least the reason that it does not disclose claim 1 as described above.

323.    Dr. Olsen opines that "[t]he email message received by the computer system [of Fukuyama] is necessarily sent from another computer, which would inherently include another

131

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

email application." (Appendix 10 at 23.)    But Fukuyama does not disclose that an email application on another computer would run concurrently to the email application on Fukuyama's machine.    And, such a remote application does not satisfy claim 3's "application running concurrently."    The parties have agreed that this language should be construed as an "application running during the same run-time."    The plain and ordinary mean of "during the same run-time" requires that the two applications be on the same machine.    The remote email application identified by Dr. Olsen does not satisfy this requirement.

324.    In addition, Fukuyama does not disclose an application program interface for communication with the application.    To the contrary, Fukuyama discloses that a sender of email transmits the message to a "computer communication company via the telephone exchange." (Fukuyama, 2:15-16.)    The recipient connects to their "computer communication company" and the "electronic mail is transmitted via the modem" to the recipient from that company. (Fukuyama, 2:20-25.)    Nowhere does Fukuyama disclose that the recipient's computer communicates with a concurrently running application, let alone disclose an application program interface for communicating with a concurrently running application.

325.    In addition, Fukuyama does not disclose the "input device" of claim 3 under HTC and the Staff's construction of "input device" to the extent they allege that the plain meaning of "input device" excludes software that can receive data and is limited to only keyboards and mice. Dr. Olsen does not explain how a keyboard or mouse would receive data in Fukuyama's system. In the context of claim 3, it makes more sense to refer to a software input device as receiving data from an application than a hardware input device such as a keyboard or a mouse.

             **c.**     **Claim 4: The system recited in Claim 1, wherein the analyzer server includes grammars and a parser for detecting structures in the data.**

132

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

326.    It is my opinion that Fukuyama does not disclose claim 4 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 1 as described in Section X.E.

327.    In addition, Fukuyama does not disclose an analyzer server that includes a parser for detecting structures in the data.  Fukuyama only discloses the existence of "[a]n algorithm for retrieving the telephone number of the sender of the electronic mail."  (Fukuyama, 9:39-40.) Fukuyama provides no additional information regarding this "algorithm" and does not disclose a parser for detecting structures in the data.

> d.      **Claim 8: The system recited in Claim 1, wherein the user interface highlights detected structures.**

328.    It is my opinion that Fukuyama does not disclose the system of claim 1, wherein the user interface highlights detected structures, for at least the reason that it does not disclose the system of claim 1.

329.    In addition, Fukuyama does not disclose highlighting detected structures.  Dr. Olsen states that Figure 5A of Fukuyama discloses "underlining the detected phone number." However, while Figure 5A does depict an underlined phone number, it does not disclose user interface program routines highlighting detected structures.  The phone number is underlined not by Fukuyama's invention, but to draw the attention of the reader of the patent.  (Fukuyama, 2:59-63 ("FIG. 5A shows the enlarged terminal display . . .  The sender's telephone number is underlined in FIG 5A . . . the receiver selects the telephone number by using a cursor on the terminal display . . .").)  Since, at the point of the snapshot of Fig. 5A, the system of Fukuyama has not attempted to extract the telephone number from the email, the user interface is not highlighting a detected structure.

133

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

    **e.**  **Claim 15**

        **i.**  **In a computer having memory storing actions, a method for causing the computer to perform an action on a structure identified in computer data, comprising:**

  330.  It is my opinion that Fukuyama does not disclose claim 15 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 1 as described in Section X.E.

        **ii.**  **linking at least one action to the detected structure**

  331.  It is my opinion that Fukuyama does not disclose this element of claim 15 under any of the parties' proposed constructions for at least the reason that it does not disclose linking at least one action to the detected structure, as described with regards to claim 1 in Section X.E above.

        **iii.**  **enabling selection of the structure and a linked action**

  332.  It is my opinion that Fukuyama does not disclose this element of claim 15 under any of the parties' proposed constructions for at least the reason that it does not disclose enabling selection of the structure and a linked action, as described with regards to claim 1 in Section X.E above.

        **iv.**  **and executing the selected action linked to the selected structure.**

  333.  It is my opinion that Fukuyama does not disclose this element of claim 15 under any of the parties' proposed constructions for at least the reason that it does not disclose executing the selected action linked to the selected structure, as described with regards to "performing the selected action linked to the selected structure" of claim 1 in Section X.E above.

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

        **f.**      **Claim 17: The method recited in Claim 15, wherein the memory contains grammars, and wherein the step of detecting a structure further comprises the steps of retrieving a grammar and parsing the data based on the grammar.**

334.   It is my opinion that Fukuyama does not disclose claim 17 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 15 as described in Section X.E.

335.   In addition, Fukuyama does not disclose the step of detecting a structure further comprising the steps of retrieving a grammar and parsing the data based on the grammar for at least the reason that it does not disclose grammars and a parser for detecting structures in the data as explained above in Section X.E with respect to claim 4.

        **g.**      **Claim 19: The method recited in Claim 15, wherein the memory contains strings, and wherein the step of detecting a structure further comprises the steps of retrieving a string from the memory and scanning the data to identify the string.**

336.   It is my opinion that Fukuyama does not disclose claim 19 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 15 as described in Section X.E.

337.   In addition, Fukuyama does not disclose a memory containing strings, and wherein the step of detecting a structure further comprises the steps of retrieving a string from the memory and scanning the data to identify the string.  Dr. Olsen opines that Fukuyama discloses claim 19 because it could "us[e] a string of four digit numbers and scan data to detect the string."  However, he cites only to Fukuyama's disclosure of using an algorithm based on "a row of numerals having four or more digits, and no characters are inserted between the digits '-' or ',.'" (Fukuyama, 9:40-42.)  Nowhere does Fukuyama disclose a memory containing strings and retrieving the string from memory and scanning the data to identify the string.

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

> **h.   Claim 20: The method recited in Claim 15, further comprising after the step of detecting a structure, the step of highlighting the detected structure.**

338.   It is my opinion that Fukuyama does not disclose claim 20 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 15 as described in Section X.E.

339.   Further, Fukuyama does not disclose the step of highlighting the detected structure for the same reasons it does not disclose a user interface highlighting detected structures with respect to claim 8 as described above.

## F.   Larry Koved & Ben Shneiderman, Embedded Menus: Selecting Items in Context ("Koved")

### 1.   Overview

340.   Koved is a brief publication discussing explicit and embedded menus in a variety of contexts. (Koved at HTC007290668.) Koved describes an explicit menu as an "explicit enumeration of menu items," much like one sees at the top of most programs (via a menu bar). (*Id.*) An embedded menu is "embedded within the information being displayed on the screen." (*Id.*) Koved discusses the use of embedded menus in, among other things, an interactive encyclopedia and spell checkers. Koved is not focused on the underlying operations of these systeMs. (*See, e.g.*, Koved at HTC007290672.)

### 2.   Koved Does Not Anticipate Claims 1, 3, 4, 8, 15, 17, 19, or 20 of the '647 Patent. (Appendix 11)

#### a.   Claim 1

##### i.   A computer-based system for detecting structures in data and performing actions on detected structures, comprising:

136

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

341.    As I stated above, it is my opinion that the preamble of claim 1 is not a limitation of the claim.  Even if the preamble is considered a limitation, Koved does not comprise "[a] computer-based system for detecting structures in data and performing actions on detected structures."  The parties have agreed that the term "structure" means "an instance of a pattern, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc."  The parties have also agreed that "detecting" means "finding and identifying."  Under the parties' constructions, Koved does not disclose this preamble element.

342.    As will be explained in more detail below, Dr. Olsen has not shown that Koved detects structures in data or performs actions on detected structures.  Koved only discloses finding unrecognized text that may be a misspelled word; this does not comprise detecting an instance of a pattern.  As Koved does not disclose detecting structures, it also does not disclose performing actions on detected structures.

> ii.    **an input device for receiving data; an output device for presenting the data; a memory storing information including program routines including**

343.    For the reasons described below, Koved does not disclose "a memory storing information including program routines including," for at least the reason that Koved does not disclose the claimed program routines.

> iii.    **an analyzer server for detecting structures in the data, and for linking actions to the detected structures**

344.    It is my opinion that Koved does not disclose an analyzer server for detecting structures in the data, and for linking actions to the detected structures.

137

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◀

345.   First, the spell checker disclosed in Koved only locates unrecognized text and not *structures*.  As explained above, the parties have construed "structure" to mean "an *instance of a pattern*, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to *recognize information* in a document such as dates, addresses, phone numbers, names, etc." (emphasis added).  Most notably, a "structure" is an *instance* of a pattern, meaning it must match a pattern.  A spell checker, by its very nature, only locates unrecognized text that does *not* match its dictionary.  That is to say, a spell checker ignores instances of patterns.  Moreover, a spell checker does not recognize information in a document; instead, it only informs a user of information that it does *not* recognize.

346.   This is a fundamental difference between the invention claimed in the '647 patent and every spell checker reference cited by Dr. Olsen.  Before the invention of the '647, users faced the difficult task of acting on "recognizable structures that have semantic significance such as phone numbers, e-mail addresses, post-office addresses, zip codes, and dates." ('647 patent, col.1:14-16.)  On the other hand, spell checkers simply look for potential errors in a user's document that they may wish to correct.

347.   As evidenced by Koved's 1986 publication date, spell checkers were a well-known technology at the time of filing the '647 patent.  I believe the examiner of the application that led to the '647 patent would have known about spell checkers, particularly as the specification mentions Microsoft Word, an application that contained a spell checker.

348.   Further, even if unrecognized text can be considered a "structure," Koved's spell checker did not contain an analyzer server for detecting structures as it did not find and identify structures.  At most, Koved's spell checker "found" unrecognized text; it did not *identify* misspelled words as being of a particular type or class of text.  Quite the opposite, the spell

138

≻ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ≺

checker only knows that the text does not match its dictionary and is an unknown. Therefore, even if the spell checker did "find" structures, it did not "identify" structures.

349.    Dr. Olsen also cites to Koved's brief discussion of "language-based editors" being able to "locate and display the declarations of an identifier" as disclosure of an analyzer server for detecting structures in the data, and for linking actions to the detected structures. More specifically, Dr. Olsen contends that Koved discloses detecting structures by its statement "[i]f a user points to a variable in a program, the editor can search through the syntax tree, using the language's scoping rules, to locate the declaration of the variable in the current context." (Appendix 11 at 9.)   However, Koved's language-based editor does not disclose an analyzer server for detecting structure in the data, and for linking actions to the detected structures. As admitted in Koved, "[i]n a language-based editor, the program is maintained as a syntax tree." (Koved at HTC007290670.) That is to say, the document is written and stored in a highly-structured format from its inception. This pre-structuring of the information means language-based editors do not contain an analyzer server for detecting structures in data. For example, the *result* of a parser is to create syntax tree; as documents in language-based editors are stored as syntax trees, they have no need for a parser or any other program routines for detecting structures.   The language-based editor's syntax tree already stored the "declaration of the variable" in its appropriate and pre-determined place; it is not detected by analyzer server program routines.

350.    In addition, Koved's spell checker does not disclose an analyzer server for linking actions to the detected structures for at least the reason that its spell checker does not detect structures. Even assuming that the spell checker does detect structures, the spell checker does not link actions to the detected structures because, as I described in Section X.B with respect to

139

> CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER <

NeXTSTEP, replacing unrecognized text word is not an "action." (*See, e.g.*, 1/21/2011 Dep. Tr. of B. Garst at 97:23-25 ("Q. Does the spell checker in NeXTSTEP link actions to misspelled words? A. No, it does not.").)

351.    In addition, Koved does not disclose an "analyzer server" as HTC has construed that claim.   HTC's incorrect construction requires the analyzer server receive data from a document where the "document is presented by a separate application." Koved does not disclose an analyzer server that receives data from a document where the document is presented by a separate application.   While Dr. Olsen is correct that Koved states that the "document is displayed to the user as it was given to the spelling program," that does not indicate that the alleged analyzer server is separate from the application presenting the document.   (Koved at HTC007290670.)  If anything, this quote indicates that the spell checker program is displaying the document to the user.

### iv.    a user interface enabling the selection of a detected structure and a linked action

352.    It is my opinion that Koved does not disclose a user interface enabling the selection of a detected structure and a linked action.

353.    Koved does not disclose a user interface enabling the selection of a detected structure and a linked action for at least the reason that it does not disclose detecting structures or linking actions to the detected structures as explained above.

### v.    an action processor for performing the selected action linked to the selected structure;

354.    Koved does not disclose action processor program routines for performing the selected action linked to the selected structure for at least the reason that it does not disclose

140

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

linking actions to detected structures, including that replacing unrecognized text with a different word is not an action and this supposed action is not linked to a detected structure.

> vi.   **a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines.**

355.    It is my opinion that Koved does not disclose "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines" for at least the reason that Koved does not disclose the claimed program routines for the reasons described above. Consequently, Dr. Olsen has failed to show that Koved discloses this limitation of claim 1.

> b.   **Claim 3: The system recited in claim 1, wherein the input device receives the data from an application running concurrently, and wherein the program routines stored in memory further comprise an application program interface for communication with the application.**

356.    It is my opinion that Koved does not disclose claim 3 under any of the parties' proposed constructions.

357.    Koved does not disclose claim 3 for at least the reason that it does not disclose independent claim 1.  Further, Koved does not disclose that its spell checker receives data from an application running concurrently.   While Dr. Olsen cites to page HTC007290670 as disclosing this claim element, this page simply states that there is a "spelling program" that does the spell checking.  This does not disclose that the spelling program is a separate application or that it receives the text from an application running concurrently.  Dr. Olsen states that "[i]t would have been obvious for this application to be running concurrently," but he provides no reason for why this is the case or how that supports his opine that Koved "anticipates" claim 3. For example, the spell checking may occur before the editor begins to display the document.

141

▷ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◁

358.     Dr. Olsen states that Koved "inherently discloses an application program interface between the spell checking application and program running concurrently," but he provides no basis for why such a disclosure is inherent to Koved.  It is my opinion that an application program interface is not inherent to Koved. Even assuming Koved discloses two separate, concurrently running applications, it does not disclose an application program interface for communicating with the application.  For instance, the system described in Koved may have required the user to copy-and-paste the text into the spell checking program; an application program interface is not necessary to its disclosure.  While Dr. Olsen is correct that Koved states that the "document is displayed to the user as it was given to the spelling program," that does not indicate that the alleged analyzer server is separate from the application presenting the application.  (Koved at HTC007290670.)  If anything, this quote indicates that the spell checker program is displaying the document to the user.

359.     In addition, Koved does not disclose the "input device" of claim 3 under HTC's and the Staff's construction.  Koved does not disclose an input device like a "keyboard or mouse" receiving data from an application running concurrently.  (Appendix 11 at 25.)  In the context of claim 3, it makes more sense to refer to a software input device as receiving data from an application than a hardware input device such as a keyboard or a mouse.  Nor does Dr. Olsen identify an "input device" that satisfies Apple's construction of the term.  (*Id.* at 24.)

> **c.     Claim 4: The system recited in Claim 1, wherein the analyzer**
> **server includes grammars and a parser for detecting structures**
> **in the data.**

360.     It is my opinion that Koved does not disclose claim 4 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 1 as described in Section X.F.

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

361.    In addition, Koved does not disclose a "parser for detecting structures in the data."  As explained above in Section X.F, Koved only discloses locating unrecognized text, which are not instances of patterns.

362.    Further, Koved does not disclose grammars.  On the contrary, spell checkers use a dictionary of strings.  Dr. Olsen characterizes, contrary to the plain and ordinary meaning of "grammar" to one of ordinary skill in the art, string matching as a "finite state grammar." (Appendix 11 at 25.)  In the field of Computer Science, "finite state grammar" is not a commonly used phrase.  Instead, "grammar" as understood by one of ordinary skill at the time of the invention of the '647 patent is generally synonymous with "context-free grammar," such as a grammar that can be written in Backus-Naur Form.  In fact, the standard textbook that has been used in university courses on compilers and parsing over the past couple decades, Alfred Aho et al.'s COMPILERS: PRINCIPLES, TECHNIQUES, AND TOOLS (also known as the "Dragon Book"), explicitly states that it considers the term "grammar" as shorthand for "context-free grammar." (ALFRED AHO ET AL., COMPILERS: PRINCIPLES, TECHNIQUES, AND TOOLS 26 (1st ed. 1986).)  In contrast, this standard textbook makes little or no mention of the phrase "finite state grammar." In Computer Science, the expression "finite state" usually refers to either "finite state machines" or "finite state automata," which are state machines with a finite number of states, transitions between these states, and associated side effects.  When Dr. Olsen refers to a "finite state grammar," he appears to be referring to string matching implemented through a finite state machine.  Such string matching does not satisfy the plain and ordinary meaning of "grammar." In fact, the '647 patent explicitly distinguishes string matching, regular expressions, and grammars.  ('647 patent, 1:28-29 ("'pattern' refers to data, such as a grammar, regular expression, string, etc."); *see also* '647 patent, cl. 4 ("includes grammars and a parser . . .") *to* cl.

143

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

6 ("includes a string library . . .").) In fact, even Dr. Olsen distinguishes a "grammar" from a list or table of specific strings. (*Compare* Olsen Validity Report at ¶ 25 *to* Olsen Validity Report at ¶ 26.)

363.    Dr. Olsen contends that Koved's "style checker . . . detects possible misuses of a word in a given context" and "would include grammars and a parser." (Appendix 11 at 25.) Again, this "style checker" does not disclose detecting instances of a pattern and therefore does not disclose detecting structures. I note that Dr. Olsen did not opine that this style checker was relevant to or anticipated claim 1 of the '647 patent. Even if the style checker detects structures, Koved does not disclose that the checker will inform the user of a suggested correction, let alone disclose linking actions to the allegedly detected structure.

364.    Nor does Dr. Olsen provide any support for his statement that a style checker would include a grammar. Koved's description of the style checker is extremely brief and does not disclose how the style checking occurs. A style checker need not express English-language grammar rules as a parsing grammar. As such, Dr. Olsen has not shown that Koved discloses claim 4.

> d.    **Claim 8: The system recited in Claim 1, wherein the user interface highlights detected structures.**

365.    It is my opinion that Koved does not disclose claim 8 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 1 as described in Section X.F.

366.    Further, Koved does not disclose highlighting detected structures as it does not detect structures. The highlighted words identified by Dr. Olsen are unrecognized text, which are not structures.

144

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

e.      **Claim 15**

i.      **In a computer having memory storing actions, a method for causing the computer to perform an action on a structure identified in computer data, comprising:**

367.    It is my opinion that Koved does not disclose claim 15 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 1 as described in Section X.F.

ii.     **detecting a structure in the data;**

368.    It is my opinion that Koved does not disclose this element of claim 15 under any of the parties' proposed constructions for at least the reason that it does not disclose detecting a structure in the data, as described with regards to claim 1 in Section X.F above.

iii.    **linking at least one action to the detected structure**

369.    It is my opinion that Koved does not disclose this element of claim 15 under any of the parties' proposed constructions for at least the reason that it does not disclose linking at least one action to the detected structure, as described with regards to claim 1 in Section X.F above.

iv.     **enabling selection of the structure and a linked action**

370.    It is my opinion that Koved does not disclose this element of claim 15 under any of the parties' proposed constructions for at least the reason that it does not disclose enabling selection of the structure and a linked action, as described with regards to claim 1 in Section X.F above.

v.      **and executing the selected action linked to the selected structure.**

145

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

371.   It is my opinion that Koved does not disclose this element of claim 15 under any of the parties' proposed constructions for at least the reason that it does not disclose linking actions, detecting structures, or "performing the selected action linked to the selected structure" of claim 1, as described in Section X.F above.

        f.      **Claim 17: The method recited in Claim 15, wherein the memory contains grammars, and wherein the step of detecting a structure further comprises the steps of retrieving a grammar and parsing the data based on the grammar.**

372.   It is my opinion that Koved does not disclose claim 17 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 15 as described in Section X.F.

373.   In addition, Koved does not disclose a memory that contains grammars, and the step of detecting a structure does not further comprise the steps of retrieving a grammar and parsing the data based on the grammar. Koved only discloses a dictionary of strings.  As explained above with respect to claim 4, a string is not a grammar.  Nor does Koved disclose parsing data based on a grammar; instead it uses a dictionary of strings and parses the data based on non-matches to that dictionary.  Finally, I incorporate my discussion regarding Koved and claim 4 from above.

        g.      **Claim 19: The method recited in Claim 15, wherein the memory contains strings, and wherein the step of detecting a structure further comprises the steps of retrieving a string from the memory and scanning the data to identify the string.**

374.   It is my opinion that Koved does not disclose claim 19 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 15 as described in Section X.F.

146

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

375.   In addition, to the extent Koved discloses scanning data, it does not disclose scanning data to "identify the string."  As described with regards to claim 1 and 15, Koved only disclosed finding data that did *not* match the string dictionary.

> ### h.   Claim 20: The method recited in Claim 15, further comprising after the step of detecting a structure, the step of highlighting the detected structure.

376.   It is my opinion that Koved does not disclose claim 20 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 15 as described in Section X.F.

377.   Further, Koved does not disclose highlighting the detected structure as it does not detect structures.  The highlighted words identified by Dr. Olsen are unrecognized text, which are not structures.

> ## G.   U.S. Patent No. 5,437,036 ("Stamps")

> ### 1.   Overview of Stamps

378.   The Stamps patent, filed in 1992 and assigned to Microsoft, describes an interface "for providing functionality between a program and a text checking engine that test words from the program for correctness." (Stamps, abst.)  As a spell checking reference, Stamps suffers from, among other things, the same flaw as all spell checkers - spell checkers do not detect *structures* in data.

> ### 2.   Stamps Does Not Anticipate Claims 1, 3, 4, 8, 15, 17, 19, or 20 of the '647 Patent.  (Appendix 12)

> #### a.   Claim 1

> ##### i.   A computer-based system for detecting structures in data and performing actions on detected structures, comprising:

147

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

379.    As I stated above, it is my opinion that the preamble of claim 1 is not a limitation

of the claim.  Even if the preamble is considered a limitation, Stamps does not comprise "[a]

computer-based system for detecting structures in data and performing actions on detected

structures."  The parties have agreed that the term "structure" means "an instance of a pattern,

where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a

pattern analysis unit to recognize information in a document such as dates, addresses, phone

numbers, names, etc."  The parties have also agreed that "detecting" means "finding and

identifying."  Under the parties' constructions, Stamps does not disclose this preamble element.

380.    As will be explained in more detail below, Dr. Olsen has not shown that Stamps

detects structures in data and performs actions on detected structures.  Stamps, a spell checker

reference, does not detect structures or perform actions linked to detected structures.

ii.    **an input device for receiving data; an output device for presenting the data; a memory storing information including program routines including**

381.    Dr. Olsen, HTC, and the Staff propose that "input device" should be given its

plain meaning.  Stamps does not disclose this limitation to the extent Dr. Olsen contends that the

plain meaning of "input device" is limited to only hardware such as a keyboard or mouse.  Dr.

Olsen cites to Stamps' discussion of an "input buffer" as evidence of an input device.  (Appendix

12 at 5.)  However, this input buffer does not satisfy Dr. Olsen's construction of "input device"

because it is software existing in memory, not a keyboard or mouse.  Dr. Olsen also states that

the system described in Stamps inherently includes an input device such as a mouse or keyboard.

However, Dr. Olsen does not explain why a keyboard or mouse would be necessary to Stamps'

disclosure.

148

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

382.    Dr. Olsen only cites to Stamps' disclosure of a return buffer to satisfy claim 1's output device for presenting data. (Appendix 12 at 6.)  However, the return buffer simply "stores information to be passed to the program" and does not present the data.  (Stamps, 2:28-29.) Therefore, Dr. Olsen has not established that Stamps discloses this element of claim 1.

383.    In addition, Stamps does not disclose, for the reasons described below, "a memory storing information including program routines including," for at least the reason that Stamps does not disclose the claimed program routines.

### iii.    an analyzer server for detecting structures in the data, and for linking actions to the detected structures

384.    It is my opinion that Stamps does not disclose an analyzer server for detecting structures in the data, and for linking actions to the detected structures.

385.    First, the spell checker disclosed in Stamps only locates unrecognized text and not *structures*.  Dr. Olsen appears to admit as much, stating that "Stamps discloses detecting *incorrect* words or phrases."  (Appendix 12 at 8.)  As explained above, the parties have construed "structure" to mean "an *instance of a pattern*, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to *recognize information* in a document such as dates, addresses, phone numbers, names, etc." (emphasis added).  Most notably, a "structure" is an *instance* of a pattern, meaning it must match a pattern. A spell checker, by its very nature, only locates unrecognized text that does *not* match its dictionary.  That is to say, a spell checker ignores instances of patterns.  Moreover, a spell checker does not recognize information in a document; instead, it only informs a user of information that it does *not* recognize.  Nor has Dr. Olsen shown that Stamps detects structures when it locates "incorrect . . . phrases." (Appendix 12 at 8.)  Presumably Dr. Olsen's statement is referring to Stamps' brief discussion of a grammar checker; however, nowhere does Stamps

149

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

disclose how the grammar checker functions. As I explained with respect to Koved's style checker, a grammar checker need not detect structures.

386. This is a fundamental difference between the invention claimed in the '647 patent and every spell checker reference cited by Dr. Olsen. Before the date of the '647 patent invention, users faced the difficult task of acting on "recognizable structures that have semantic significance such as phone numbers, e-mail addresses, post-office addresses, zip codes, and dates." ('647 patent, col.1:14-16.) On the other hand, spell checkers simply look for errors in a user's document that they may wish to correct. (*See, e.g.,* 11/23/2010 Dep. Tr. of S. Capps at 123:14-19 ( "there's only one thing you're doing with a spell checker is -- trying to determine this word is, did you mean this word or that word or this word. There's no -- *there's no semantics.* There's no -- there's nothing else there.") (emphasis added).)

387. As evidenced by Koved's 1986 publication date, spell checkers were a well-known technology at the time of filing the '647 patent. I believe the examiner of the application that led to the '647 patent would have known about spell checkers, particularly as the specification mentions Microsoft Word, an application that contained a spell checker.

388. Further, even if unrecognized text word can be considered a "structure," Stamps' spell checker did not contain an analyzer server for detecting structures as it did not find and identify structures. At most, Stamps' spell checker "found" unrecognized text; it did not *identify* misspelled words as being of a particular type or class of text. Quite the opposite, the spell checker only knows that the text does not match its dictionary and is an unknown. Therefore, even if the spell checker did "find" structures, it did not "identify" structures.

389. In addition, Stamps' does not disclose an analyzer server for linking actions to the detected structures for at least the reason that its spell checker does not detect structures. Even

150

⯈ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ⯇

assuming that the spell checker does detect structures, the spell checker does not link actions to the detected structures because, as I described above in Section X.B with respect to NeXTSTEP, replacing unrecognized text is not an "action." Stamps only discloses the "generation of a suggestion list of possible replacements," which is "passed to the return buffer, from where it is read by the program and displayed to the user." (Stamps, 5:25, 5:33-34.) Stamps does not disclose taking actions based on this suggestion list. For example, Stamps could only allow the user to look at the list and require the user to manually edit the document. Similarly, Stamps does not disclose taking any actions after "finding uncapitalized sentences, or finding missing or extra spaces." (Appendix 8 at 8.)

### iv. a user interface enabling the selection of a detected structure and a linked action

390.    It is my opinion that Stamps does not disclose a user interface enabling the selection of a detected structure and a linked action.

391.    Stamps does not disclose a user interface enabling the selection of a detected structure and a linked action for at least the reason that it does not disclose detecting structures or linking actions to the detected structures as explained above.

392.    Even assuming unrecognized text can be considered a detected structure, Stamps does not disclose a user interface enabling selection of a detected structure. For this claim element, Dr. Olsen cites to only two sections of Stamps: (1) a discussion on generating a suggestion list, "rating the suggestions in the suggestion list, finding uncapitalized sentences, finding missing or extra spaces, etc." and (2) a statement that "[w]hen the text checking engine detects an error . . . control returns to the calling program . . . [which can] then request . . [the] text checking engine to generate a suggestion list." (Appendix 8 at 14-15.) As an initial matter, Dr. Olsen does not clearly state what he contends is the user interface enabling the selection of a

151