➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

detected structure and what is the user interface enabling the selection of a linked action.  For this reason alone, Dr. Olsen has failed to show that Stamps discloses this claim element.  Beyond indicating that the list of corrected words may be presented to a user, there is no disclosure of selection of unrecognized text, that any "action" is linked to the unrecognized text, or how a user could select such an "action."  As is apparent from Dr. Olsen's cited portions, Stamps does not disclose enabling the selection of a piece of unrecognized text.  Nor does Stamps disclose taking an "action" based on the suggestion list, let alone disclose a user interface enabling the selection of such an "action."

<div align="center">

v.    **an action processor for performing the selected action linked to the selected structure;**

</div>

393.    Stamps does not disclose action processor program routines for performing the selected action linked to the selected structure for at least the reasons described above in Section X.G., including that replacing unrecognized text with a corrected spelling is not an action and this supposed action is not linked to a detected structure.

394.    For this claim element Dr. Olsen cites to a section of Stamps that discusses "ram cache lists" that "keep track of temporary parameters specified by a user" such as "'Ignore Always,' 'Change Always,' and 'Change Once.'"  However, Dr. Olsen did not identify these as actions linked by an analyzer server, so their alleged performance is irrelevant.

<div align="center">

vi.    **a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines.**

</div>

395.    It is my opinion that Stamps does not disclose "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines" for at least the reason that Stamps does not disclose the claimed program routines for

<div align="center">

152

</div>

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

the reasons described above. Consequently, Dr. Olsen has failed to show that Stamps discloses this limitation of claim 1.

      **b.    Claim 3: The system recited in claim 1, wherein the input device receives the data from an application running concurrently, and wherein the program routines stored in memory further comprise an application program interface for communication with the application.**

396.   It is my opinion that Stamps does not disclose claim 3 under any of the parties' proposed constructions for at least the reason that it does not disclose independent claim 1.

397.   In addition, Stamps does not practice claim 3 under HTC and the Staff's construction of "input device" to the extent they allege that the plain meaning of "input device" excludes software that can receive data and is limited to only hardware such as a keyboard or mouse. Dr. Olsen cites only to Stamps' discussion of an "input buffer" as the claimed "input device." (*Id.*) However, this input buffer is software that exists in the memory of the Stamps reference. (Stamps, abst.) Stamps' input buffer is not the type of hardware Dr. Olsen believes the input device to be limited to and it therefore does not disclose the input device of claim 3 under HTC's construction.

      **c.    Claim 4: The system recited in Claim 1, wherein the analyzer server includes grammars and a parser for detecting structures in the data.**

398.   It is my opinion that Stamps does not disclose claim 4 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 1 as described in Section X.G.

399.   In addition, Stamps does not disclose a "parser for detecting structures in the data." As explained above in Section X.G, Stamps only discloses locating unrecognized text, which are not instances of patterns.

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

400. Further, Stamps does not disclose grammars. On the contrary, spell checkers use a dictionary of strings. Dr. Olsen characterizes, contrary to the plain and ordinary meaning of "grammar" to one of ordinary skill in the art, string matching as a "finite state grammar." (Appendix 12 at 27.) In the field of Computer Science, "finite state grammar" is not a commonly used phrase. Instead, "grammar" as understood by one of ordinary skill at the time of the invention of the '647 patent is generally synonymous with "context-free grammar," such as a grammar that can be written in Backus-Naur Form. In fact, the standard textbook that has been used in university courses on compilers and parsing over the past couple decades, Alfred Aho et al.'s COMPILERS: PRINCIPLES, TECHNIQUES, AND TOOLS (also known as the "Dragon Book"), explicitly states that it considers the term "grammar" as shorthand for "context-free grammar." (ALFRED AHO ET AL., COMPILERS: PRINCIPLES, TECHNIQUES, AND TOOLS 26 (1st ed. 1986).) In contrast, this standard textbook makes little or no mention of the phrase "finite state grammar." In Computer Science, the expression "finite state" usually refers to either "finite state machines" or "finite state automata," which are state machines with a finite number of states, transitions between these states, and associated side effects. When Dr. Olsen refers to a "finite state grammar," he appears to be referring to string matching implemented through a finite state machine. Such string matching does not satisfy the plain and ordinary meaning of "grammar." In fact, the '647 patent explicitly distinguishes string matching, regular expressions, and grammars. ('647 patent, 1:28-29 ("'pattern' refers to data, such as a grammar, regular expression, string, etc."); see also '647 patent, cl. 4 ("includes grammars and a parser . . .") to cl. 6 ("includes a string library . . .").) In fact, even Dr. Olsen distinguishes a "grammar" from a list or table of specific strings. (Compare Olsen Validity Report at ¶ 25 to Olsen Validity Report at ¶ 26.)

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

401.     Dr. Olsen contends that "Stamps discloses grammar checking, which[] includes using grammar rules and a parser for detecting strings of words that potentially include grammatically incorrect phrases." (Appendix 12 at 27.)  But Stamps does not disclose that its grammar checking would include a grammar used for parsing.  Stamps' description of the grammar checker is extremely brief and need not express English-language grammar rules as a parsing grammar.  In fact, the only details Stamps provides of the grammar checker is that it consists of "a dictionary for grammar checking." (Stamps, 3:36-37.).

        **d.**     **Claim 8: The system recited in Claim 1, wherein the user interface highlights detected structures.**

402.     It is my opinion that Stamps does not disclose claim 8 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 1 as described in Section X.G.

403.     Further, Stamps does not disclose highlighting detected structures as it does not detect structures.  The highlighted words identified by Dr. Stamps are unrecognized text, which are not structures.

        **e.**     **Claim 15**

             **i.**     **In a computer having memory storing actions, a method for causing the computer to perform an action on a structure identified in computer data, comprising:**

404.     It is my opinion that Stamps does not disclose claim 15 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 1 as described in Section X.G.

             **ii.**     **detecting a structure in the data;**

155

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

405.   It is my opinion that Stamps does not disclose this element of claim 15 under any of the parties' proposed constructions for at least the reason that it does not disclose detecting a structure in the data, as described with regards to claim 1 in Section X.G above.

### iii.   linking at least one action to the detected structure

406.   It is my opinion that Stamps does not disclose this element of claim 15 under any of the parties' proposed constructions for at least the reason that it does not disclose linking at least one action to the detected structure, as described with regards to claim 1 in Section X.G above.

### iv.   enabling selection of the structure and a linked action

407.   It is my opinion that Stamps does not disclose this element of claim 15 under any of the parties' proposed constructions for at least the reason that it does not disclose enabling selection of the structure and a linked action, as described with regards to claim 1 in Section X.G above.

### v.   and executing the selected action linked to the selected structure.

408.   It is my opinion that Stamps does not disclose this element of claim 15 under any of the parties' proposed constructions for at least the reason that it does not disclose linking actions, detecting structures, or "performing the selected action linked to the selected structure" of claim 1, as described in Section X.G above.

### f.   Claim 17: The method recited in Claim 15, wherein the memory contains grammars, and wherein the step of detecting a structure further comprises the steps of retrieving a grammar and parsing the data based on the grammar.

156

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

409.    It is my opinion that Stamps does not disclose claim 17 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 15 as described in Section X.G.

410.    In addition, Stamps does not disclose a memory that contains grammars, and the step of detecting a structure does not further comprise the steps of retrieving a grammar and parsing the data based on the grammar for the same reasons discussed with regard to claim 4 above.

g.    **Claim 19: The method recited in Claim 15, wherein the memory contains strings, and wherein the step of detecting a structure further comprises the steps of retrieving a string from the memory and scanning the data to identify the string.**

411.    It is my opinion that Stamps does not disclose claim 19 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 15 as described in Section X.G.

412.    In addition, to the extent Stamps discloses scanning data, it does not disclose scanning data to "identify the string." As described with regards to claim 1 and 15, Stamps only disclosed finding data that did *not* match the string dictionary.

h.    **Claim 20: The method recited in Claim 15, further comprising after the step of detecting a structure, the step of highlighting the detected structure.**

413.    It is my opinion that Stamps does not disclose claim 20 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 15 as described in Section X.G.

157

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◁

414.    Further, Stamps does not disclose highlighting the detected structure as it does not detect structures.  The highlighted words identified by Dr. Olsen are unrecognized text, which are not structures.

**H.    The Newton "System"**

**1.    Overview**

415.    The Newton Operating System ("Newton") was developed by Apple and incorporated on various pen-based computers such as the MessagePad.  Newton included a feature called the Intelligent Assistant, which would "attempt[] to complete actions specified by the user's written input." (HTC007283889-007284816 (NEWTON PROGRAMMER'S GUIDE FOR NEWTON 2.0 ("Newton 2.0 Programmer's Guide")) at HTC007284525.)  The Intelligent Assistant was very similar to a command-line interpreter, requiring the user to specify a verb describing the task to perform and providing a "textual interface" to applications. (*Id.*; *see also* 11/23/2010 Dep. Tr. S. Capps at 145:7-9 ("Q. So is it fair to say that that's -- that's an alternative command line tool for Newton? A. Yeah, you could call it that."), 145:18-25 ("Q. What do you understand the term "textual interface" to mean here? A. It's similar to what I've been describing, in terms of it interprets the call Bob as a command to call Bob . . ."), 157:3-7 (". . . what it interpreted was a command -- the textual command . . ."), 157:16-22 ("Q. And are any of those steps considered a command line? . . . A. To me, is it a classic command line, no, but it's certainly much more of a command line or a command-line-like-interface than manipulating the graphical user interface.").)  The Intelligent Assistant was only able to evaluate, at most, 15 words of text. (Newton 2.0 Programmer's Guide at HTC007284526.)

416.    The user activated the Intelligent Assistant by selecting text and pressing the "Assist" button.  If the user did not select any text, the Intelligent Assistant evaluated the most

158

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

recent text input.  The user specified a task to perform by writing a verb such as "call" or "fax."

If the user did not write a verb, the Intelligent Assistant displayed the Assist Frame containing a

menu of verbs to choose from.  The selection of such a verb did not cause the Newton to perform

the task; instead, it only inserted the text of that verb onto a text line.  (*See, e.g.*, 11/23/2010 Dep.

Tr. of S. Capps at 102:15-20 ("Q. And what would happen if someone, for example, selected

'call' from this menu? A. I think it would just be if they wrote the word 'call' down where the --

the insertion carriage is shown there just to the right of the 'please' -- 'please' label.").)  The user

then had to press the "Do" button, which re-ran the Intelligent Assistant on the contents of the

text line.

417.   In the context of the '647 patent, the Intelligent Assistant was similar to U.S.

Patent No. 5,115,390 ("the '390 patent"), which was disclosed to the Patent & Trademark Office

during the prosecution of the application that led to the '647 patent.  The '390 patent discloses

parsing "words of a natural language representing a plurality of control commands" so that the

control commands can then be executed.  ('390 patent, abst.)  One example of the inputted

natural language is "RECORD FROM 5 O'CLOCK IN AFTERNOON OF TODAY DURING 8

MINUTE." (*Id.* at 432-35.)  The '390 patent is similar to the Newton Intelligent Assistant in that

each analyzes text containing a command from the user and performs the interpreted command.

The examiner of the application that led to the '647 patent did not rely upon the '390 patent for

any rejections and only found its disclosure "pertinent."  ('647 patent file history, 1/28/98 Office

Action at 4.)

418.   Dr. Olsen does not cite to or rely on a single Newton reference for his

"anticipation" opinion.  Rather, he defines the Newton "system" as described by "APPLE

COMPUTER, INC., 'NEWTON PROGRAMMER'S GUIDE FOR NEWTON 2.0,' 1996 . . . (to the extent

159

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

the Newton Programmer's Guide describes the functionality of the Newton 1.x system), the source code for the Newton operating system 2.0 and 2.1 (to the extent the source code describes the functionality of the Newton 1.x system), as well as the functionality of the MessagePad 110." (Olsen Validity Report at ¶ 37.)   As an initial matter, it is unclear what Dr. Olsen means by "1.x." The only "1.x" reference he cites to is a MessagePad 110 running Newton 1.2.

419.   I understand that in order for a patent claim to be anticipated, a single reference must describe every single claim element of the claimed invention.   It is also my understanding that it is improper for Dr. Olsen to contend that a combination of references purportedly describing a "system" anticipates a patent claim.   Here, Dr. Olsen attempts to combine three different versions of the Newton OS as described by three different sources (two of which are not prior art): a Programmer's Guide (Newton 2.0), "source code for the Newton operating system 2.0 and 2.1" ("1997 Newton source code"), and a physical device (Newton 1.2).   For at least the reason that Dr. Olsen seeks to combine three different references for purposes of anticipation, Dr. Olsen has not shown that a Newton "system" anticipates any claims of the '647 patent.

420.   Dr. Olsen admits that the Newton 2.0 Programmer's Guide was published in 1996 and he does not allege that it is prior art.   (Appendix 14 at 1.)   While Dr. Olsen states that the Guide "discloses the functionality described below and is relied upon to the extent that it describes functions that existed in the Newton system before January 31, 1995" (*Id.*), on numerous occasions Dr. Olsen cites to the Newton 2.0 Programmer's Guide as evidence of the operation of "Newton 1.x" for functionality that is not discernible from the MessagePad 110 itself.   Dr. Olsen provides no evidence that the portions of the Newton 2.0 Programmer's Guide he cites accurately describe the MessagePad 110 running the Newton 1.2 operating system.   Nor can he, as the Newton source code changed between the "only two major versions [of the

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

operating system], 1 and 2." (11/23/2010 Dep. Tr. of S. Capps at 118:9; 89:20-90:5 ("Q. What were the differences -- were there any differences in the Intelligent Assistant found on the Newton operating system 1.0 versus the Newton Operating System 2.0? . . . A. Since it's 2.0, and we always try to remove bugs, I can't imagine there weren't any bugs fixed or something added, but beyond that, it's kind of guilt by association. You know, we all worked to -- to better the product . . ."); *see also* Soup\NewtISA.f file (documenting 270 changes through 1997).)

421.    I disagree with Dr. Olsen's reliance on the Newton 2.0 Programmer's Guide to establish the inner-workings of the Intelligent Assistant as it existed in Newton 1.x. These are two different sources of information and do not describe the same system. Any disclosures that are not discernible from the MessagePad 110 itself cannot be inferred from this second, non-prior art reference.

422.    Dr. Olsen also cannot combine the MessagePad 110 running Newton 1.2 with the 1997 Newton source code. As stated by Apple's corporate designee on this source code, Mr. Engber, the code relates only to the "some 2.X version." (1/20/2011 Dep. Tr. of M. Engber at 252:10.) Mr. Engber further testified that this code has been modified since 1997 and is not from Newton 2.0. (*Id.* at 2-8.) Even if it were proper to combine different references and call it "anticipation," Dr. Olsen cannot do so between these two sources as the 1997 Newton code does not describe or reflect the MessagePad 110 running Newton 1.2. Notably, Dr. Olsen provides no evidence that the cited 1997 Newton source code was used in or accurately describes "Newton 1.x." Further, Dr. Olsen cannot combine the MessagePad 110 with the Newton 2.0 Programmer's Guide or the 1997 Newton source code because they are not prior art.

423.    Finally, I have used and analyzed a MessagePad running Newton 1.3. This device confirmed my descriptions of the functionality of "Newton 1.x" that follow.

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

2.   **No Aspects of the Newton "System" Anticipate Claims 1, 3, 4, 8, 15, 17, 19, or 20 of the '647 Patent.  (Appendix 14)**

     a.   **Claim 1**

          i.   **A computer-based system for detecting structures in data and performing actions on detected structures, comprising:**

424.   As I stated above, it is my opinion that the preamble of claim 1 is not a limitation of the claim.  Even if the preamble is considered a limitation, the Newton "system" does not comprise "[a] computer-based system for detecting structures in data and performing actions on detected structures."  The parties have agreed that the term "structure" means "an instance of a pattern, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc."  The parties have also agreed that "detecting" means "finding and identifying."  Under the parties' constructions, the Newton system does not disclose this preamble element.

425.   As will be explained in more detail below, Dr. Olsen has not shown that the Newton system performs actions on detected structures.  The Newton system does not disclose causing the CPU to perform a sequence of operations on a detected structure to which it is linked.

          ii.   **an input device for receiving data; an output device for presenting the data; a memory storing information including program routines including**

426.   For the reasons described below, the Newton system does not disclose "a memory storing information including program routines including," for at least the reason that the Newton system does not disclose the claimed program routines.

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

### iii.   an analyzer server for detecting structures in the data, and for linking actions to the detected structures

427.    It is my opinion that the Newton "system" does not disclose, under any of the parties' proposed constructions, an analyzer server for detecting structures in the data, and for linking actions to the detected structures.

428.    Dr. Olsen contends that the Newton "discloses an Intelligent Assistant feature that recogniz[es] the structures 'call,' 'fax,' and 'Bob' and links actions to these structures." While the Newton's Intelligent Assistant will recognize a small set of verbs, it does not link actions to any detected structures. The Intelligent Assistant "attempts to complete actions specified by the user's written input." (Newton 2.0 Programmer's Guide at HTC0072834524.) It does so by requiring the user to enter a "verb" such as 'call,' 'fax,' or 'find;'" if the user does not provide a verb, the Intelligent Assistant requires them to pick one. (*Id.* at HTC007283526-7.) In this way, the Newton's Intelligent Assistant is much like a command-line interpreter. (*See, e.g.*, Newton 2.0 Programmer's Guide at HTC007284525; *see also* 11/23/2010 Dep. Tr. of S. Capps at 145:7-9 ("Q. So is it fair to say that that's -- that's an alternative command line tool for Newton? A. Yeah, you could call it that."), 145:18-25 ("Q. What do you understand the term "textual interface" to mean here? A. It's similar to what I've been describing, in terms of it interprets the call Bob as a command to call Bob . . ."), 157:3-7 (" . . . what it interpreted was a command -- the textual command . . .").)

429.    Dr. Olsen identifies only three user inputs that supposedly evidence an analyzer server for detecting structures in the data, and for linking actions to the detected structures: (1) "Call Bob," (2) "Fax Bob," and (3) "Bob."

***Scenarios 1 and 2 - "Call Bob" and "Fax Bob"*** *(Olsen Validity Report at ¶¶ 244-46; Appendix 14 at 13-20)*

163

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

430.    The first two scenarios identified by Dr. Olsen are similar to each other - in each, the user has specified the verb to perform. Dr. Olsen contends that Newton's "call slip . . . links the detected structures with actions associated with making a call to Bob" and, after writing "fax Bob," the Intelligent Assistant will "link these detected structures to the actions associated with faxing Bob." (Appendix 14 at 16-17.) However, neither the call slip nor the fax slip links actions to detected structures.

431.    As an initial matter, Dr. Olsen incorrectly states that, after the Intelligent Assistant interprets "Call Bob," the user is given "the option of bringing up a 'call slip' or menu." (Appendix 14 at 16.)   The user is given no such option; instead the "call slip" is directly displayed.  This is logical, as the purpose of the Intelligent Assistant is to help perform a task specified by the user; it is not meant to find useful pieces of information in data and let the user take actions on that information.

432.    The call slip allows a user to place a phone call.  By writing "Call Bob" and hitting the "Assist" button, the user is telling the Intelligent Assistant to display the call slip:



(Appendix 14 at 17.)   Here the user can set certain "Options" before placing the call or cancelling out of the call.  Dr. Olsen contends that these are linked actions that the user can select. (*E.g.*, Appendix 14 at 32.)  Even assuming that the words "Call" and "Bob" are detected structures, neither the "Options" nor the "Call" buttons are actions linked to these supposedly

164

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

detected structures. The "Options" button allows the user to set certain options for the phone call, such as a country code or calling card, while the "Call" button performs the phone call.

433.    Similarly, after writing "Fax Bob" and hitting the "Assist" button, the Intelligent Assistant will display the fax slip:



The slip shows four buttons: Preview, Notes, Options, and Fax. The Preview button shows the user a preview of the item that will be faxed. The Notes button lets the user write a cover sheet for the fax. The Options button allows the user to set certain options, and the Fax button performs the fax. Just like the call slip, none of these buttons represent actions linked to the allegedly detected structures "Fax" or "Bob." For example, the fax slip in the 1997 Newton source code shows that the "Notes" button displays the current note and is not linked to any detected structures. (Soup\Print.f at lines 1868-89.)

434.    Although the parties dispute the correct construction of "linking actions," all the parties agree that a linked action must at least cause the CPU to perform a sequence of operations on the structure to which it is linked. Dr. Olsen contends that, in Scenarios 1 and 2, the detected structures are: "call," "fax," and "Bob." But, the "actions" identified by Dr. Olsen do not cause the CPU to perform a sequence of operations on "call," "fax," or "Bob." For example, the "Call" button in the call slip would not cause the Newton to dial the word "Bob" but would instead call a *number*. Likewise, the "Options" button is not linked to the words "Bob" or "Call" nor does it

165

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

cause a sequence of operations to be performed on those words. Nor would the "Fax" button in the fax slip cause the CPU to perform a sequence of operations on "fax" or "Bob."

435. Dr. Olsen contends that actions are linked to detected structures "by creating a task frame that includes 'Bob' and a pointer to the program subroutines that perform the act of faxing Bob." (Appendix 14 at 23.) Dr. Olsen is incorrect. There is no "action" linked to "call," "fax," or "Bob." As an initial matter, the task frame's "pointer" only references the postParse function. (*See* Soup\NewtISA.f at line 1880.) The postParse function does not "perform the act of faxing Bob" as Dr. Olsen contends (Appendix 14 at 32), it will only lead to the display of the fax slip. Once the fax slip is displayed, the user can cancel out of the fax operation or even change the name of the recipient.

436. Further, the "task frame" Dr. Olsen refers to is simply a data structure. (2/9/2010 Dep. Tr. of W. Luciw at 32:11-14, 43:9-21.) After the user enters "call Bob" or "fax Bob," the Newton Intelligent Assistant will store the verb command ("call" or "fax") in the task frame. (Newton 2.0 Programmer's Guide at HTC007284530; 1/20/2011 Dep. Tr. of M. Engber at 299:5-10.) The "target" of the command, here the word "Bob," is placed in a target template within the task frame. (Newton 2.0 Programmer's Guide at HTC007284530; 1/20/2011 Dep. Tr. of M. Engber at 299:5-10.) The task frame, and the templates it holds, is simply a *data* structure. (2/9/2010 Dep. Tr. of W. Luciw at 32:11-14, 43:9-21.) At this point, there is no phone number to dial or fax. The Newton Intelligent Assistant would still need to retrieve the phone number from Bob's address book entry. (*See, e.g.*, FillPhoneSlip function; 2/9/2010 Dep. Tr. of W. Luciw at 46:18-21 (". . . since you said 'to Bob,' you would have at least a Bob located in the card file, and the -- if -- if Bob existed in the card file.") If there is no "Bob" in the address book,

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◁

the Newton cannot call or fax[18] Bob.  Even Dr. Olsen admits that "faxing requires . . . a phone [number.]"  (Appendix 14 at 23; *see also* Appendix 14 at 23 ("As part of the postParse code the FillPhoneSlip function is called . . .").)

437.    While I do not believe that it is proper to rely on 1997, non-prior art source code, Dr. Olsen's selective citation to the code omits a few important points.  Notably, Dr. Olsen does not cite any code from the call slip or fax slip that demonstrate the displayed buttons cause the CPU to perform a sequence of operations on a detected structure.  For example, the fax slip that the "Notes" button displays the current note and is not linked to any detected structures.  (Soup\Print.f at lines 1868-89.)   Likewise, the fax slip's "Preview" button only displays a preview of the fax that will be sent; it does not cause the CPU to perform a sequence of operations on the words "fax" or "Bob."  (*Id.* at lines 1832-1853.)

*Scenario 3- "Bob" (Olsen Validity Report at ¶¶ 247-48; Appendix 14 at 20-23)*

438.    The third scenario described by Dr. Olsen is when the user writes just the word "Bob" (for whom a profile already exists) and hits the "Assist" button.  In this case, the Intelligent Assistant will "prompt[] the user to tap the Please picker" to specify a verb.  (Newton 2.0 Programmer's Guide at HTC007284527.)   Dr. Olsen contends, with an accompanying picture, that "the user is presented with the actions linked with the detected word 'Bob'" after tapping the Please picker.  (Appendix 14 at 22.)  However, what Dr. Olsen omits is that pressing the "call," "fax," "find," "mail," or "schedule" items only inserts that *text* onto the displayed text line.  (*See, e.g.*, 11/23/2010 Dep. Tr. of S. Capps at 102:15-20 ("Q. And what would happen if someone, for example, selected 'call' from this menu? A. I think it would just be if they wrote

---

[18] The Newton will allow the user to press the fax slip's "Fax" button without specifying a number to dial; the fax will be queued in the user's "out box" but will fail when the user later attempts to complete the operation.

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

the word 'call' down where the -- the insertion carriage is shown there just to the right of the 'please' -- 'please' label.").)  These Please picker items are not actions linked to a detected structure.  There is no disclosure that these items are linked to the supposedly detected word "Bob."  Nor would such functionality make sense, there is no reason for the Please picker items to be linked to a detected structure as they are simply inserted into the text line.

439.   Further, even if these Please picker items were linked to the word "Bob," they are not linked actions because their selection does not cause the CPU to perform a sequence of operations on the detected structure to which they are supposedly linked.  Selecting the Please picker item simply inserts its text onto the text line; it does nothing on the word "Bob."  In fact, the user has to push the "Do" button to re-run the intelligent assistant.  (Soup\AssistDrawer.f at L.438-442 (clicking "Do" button calls the "DoParse" method); L.217-221 ("DoParse" method calls "parseUtter.").)

440.   Under all three scenarios identified by Dr. Olsen, the Newton did not contain an "analyzer server" as HTC has construed that claim.  HTC's incorrect construction requires that the analyzer server receive data from a document where the "document is presented by a separate application."  Dr. Olsen does not actually opine that Newton discloses an analyzer server as construed by HTC, he only states that "[t]o the extent that Apple argues that a low level system service, such as a window manager, is an separate application that presents the document to the Intelligent Assistant, Newton also discloses this element."  (Appendix 14 at 29.)  However, I have not offered such an opinion.  Thus, the Newton does not disclose an analyzer server that receives data from a document presented by a separate application.

441.   Finally, under all three scenarios identified by Dr. Olsen, the Newton "system" does not disclose an analyzer server for linking actions to the detected structures because, even

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

assuming it did link an action, it did not link more than one action to a detected structure as required by claim 1.

<div align="center">

iv.     **a user interface enabling the selection of a detected structure and a linked action**

</div>

442.    It is my opinion that Newton does not disclose a user interface enabling the selection of a detected structure and a linked action for at least the reason that it does not disclose linking actions to detected structures as explained above. For example, the call slip and fax slip do not enable the selection of a linked action that causes the CPU to perform a sequence of operations on the structure to which it is linked.

443.    In addition, the Newton's Intelligent Assistant does not disclose enabling the selection of a detected structure. The Intelligent Assistant was not activated unless the user either (1) highlighted a block of text and hit the "Assist" button or (2) hit the "Assist" button, at which point it would retrieve any text the user recently wrote. Even assuming that the Intelligent Assistant detected structures in this text, at no point did it allow the user to select a detected structure. Instead, if the user specified the verb to perform (e.g. "call"), the Intelligent Assistant displayed the call slip. If the user did not specify a verb, the Intelligent Assistant displayed the Please picker and required the user to press the "Do" button.

444.    Dr. Olsen opines that the user could select a detected structure by "first clicking on the 'Do' or 'Please' icon." Dr. Olsen is incorrect to say that pressing either of these is the same as selecting a detected structure; not only is the user not selecting the words "Fax" or "Call" or "Bob," but none of that text has been found and identified yet.

<div align="center">

v.     **an action processor for performing the selected action linked to the selected structure;**

</div>

<div align="center">

169

</div>

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

445.   The Newton system does not practice performing the selected action linked to the selected structure for at least the reasons described above that it does not disclose linking actions to the detected structures or selecting a linked action.

> vi.   **a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines.**

446.   It is my opinion that the Newton system does not disclose "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines" for at least the reason that the Newton system does not disclose the claimed program routines for the reasons described above.  Consequently, Dr. Olsen has failed to show that the Newton system discloses this limitation of Claim 1.

> b.   **Claim 3: The system recited in claim 1, wherein the input device receives the data from an application running concurrently, and wherein the program routines stored in memory further comprise an application program interface for communication with the application.**

447.   It is my opinion that the Newton system does not practice claim 3 under any of the parties' proposed constructions for at least the reason that it does not practice claim 1 as described in Section X.H.

448.   Further, the Newton system does not practice an input device that "receives the data from an application concurrently."  Dr. Olsen appears to concede this point, only opining that "[t]o the extent that Apple argues that a low level system service, such as a window manager, is an application running concurrently that receives the data from a user, Newton also discloses such a service." (Appendix 14 at 45.)  I have not offered an opinion that such a low-level-system service is an application running concurrently.  Dr. Olsen's citation to the Newton 2.0 Programmer's Guide actually supports my opinion as it states that all applications actually

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

"run in a single operating system task, called the Application task." (Newton 2.0 Programmer's Guide at HTC007283937.)

449.    In addition, the Newton system does not practice claim 3 under HTC's and the Staff's construction of "input device" to the extent they allege that the plain meaning of "input device" excludes software that can receive data and is limited to only hardware such as a keyboard and mouse.  Dr. Olsen states that the Newton practices this claim element under his construction "[t]o the extent that Apple alleges that a display receives data to be detected from an application running concurrently by virtue of the display receiving the data to be presented to the user from a Newton application, then Newton also discloses this claim." (Appendix 14 at 45.) However, I have not offered an opinion that the display receives data from an application running concurrently.  In the context of claim 3, it makes more sense to refer to a software input device as receiving data from an application than a hardware input device such as a keyboard or a mouse.

450.    The Newton system also does not practice an application program interface for communicating with the application.  Dr. Olsen contends that the Newton "necessarily and inherently" includes an application program interface between a Newton application and the display and between the Intelligent Assistant and another application.  (Appendix 14 at 45.) First, the display does not contain an application program interface and does not receive data from a concurrently running application.  Second, Dr. Olsen has not shown that the Intelligent Assistant exists separately from any other Newton application, let alone that it contains an application program interface for communication with "a Newton application."

             **c.**      **Claim 4: The system recited in Claim 1, wherein the analyzer server includes grammars and a parser for detecting structures in the data.**

<div align="center">171</div>

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

451.   It is my opinion that the Newton system does not practice claim 4 under any of the parties' proposed constructions for at least the reason that it does not practice claim 1 as described in Section X.H.

452.   In addition, the alleged analyzer server of the Newton system does not include grammars for detecting structures in the data.  Dr. Olsen only cites to non-prior art source code and sections of the Newton 2.0 Programmer's Guide that relate to handwriting recognition.  For example, the Soup\corrector.f file is used to assist in translating the user's handwriting into text; it is not used by the Intelligent Assistant.  (*See, e.g.*, corrector.f at L.381-388.)  In addition, the Toolbox\Parse.c file is used to parse data based on lexical dictionaries used for the handwriting recognition.   (Newton 2.0 Programmer's Guide at HTC007284225.)   These handwriting recognition files are not used by the Intelligent Assistant.  Regardless, these source code files are from a pre-release version of Newton 2.1 and are not prior art; considering each of these files list numerous changes in their "Change History" (located in comments at the top of each file), Dr. Olsen has not shown that the cited code was present in any 1..0 - 1.3 version of Newton.

453.   Dr. Olsen does cite a single page from the Newton 2.0 Programmer's Guide that is related to the Intelligent Assistant.   (Appendix 14 at 47.)   However, as this relates to functionality not identified or described by Dr. Olsen with respect to claim 1, and because the Newton 2.0 Programmer's Guide is not prior art, this citation does not establish that the Newton system contained an analyzer server including a grammar for detecting structures.

        d.     **Claim 8: The system recited in Claim 1, wherein the user interface highlights detected structures.**

454.   It is my opinion that the Newton system does not practice claim 8 under any of the parties' proposed constructions for at least the reason that it does not practice claim 1 as described in Section X.H.

172

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

455.    In addition, the Newton system does not practice claim 8 as it does not highlight detected structures.  Dr. Olsen contends that the Newton highlights structures by placing the allegedly-detected structures into a slip (a.k.a. dialog box.)   However, the plain meaning of "highlights" is not satisfied by this functionality.

e.    **Claim 15**

i.    **In a computer having memory storing actions, a method for causing the computer to perform an action on a structure identified in computer data, comprising:**

456.    It is my opinion that the Newton system does not practice claim 15 under any of the parties' proposed constructions for at least the reason that it does not practice claim 1 as described in Section X.H.

ii.    **linking at least one action to the detected structure**

457.    It is my opinion that the Newton system does not practice this element of claim 15 under any of the parties' proposed constructions for at least the reason that it does not link at least one action to the detected structure, as described with regards to claim 1 in Section X.H above.

iii.    **enabling selection of the structure and a linked action**

458.    It is my opinion that the Newton system does not practice this element of claim 15 under any of the parties' proposed constructions for at least the reason that it does not enable selection of the structure and a linked action, as described with regards to claim 1 in Section X.H above.

iv.    **and executing the selected action linked to the selected structure.**

173

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

459.    It is my opinion that the Newton system does not practice this element of claim 15 under any of the parties' proposed constructions for at least the reason that it does not practice "performing the selected action linked to the selected structure" of claim 1 as described in Section X.H above.

f.    **Claim 17: The method recited in Claim 15, wherein the memory contains grammars, and wherein the step of detecting a structure further comprises the steps of retrieving a grammar and parsing the data based on the grammar.**

460.    It is my opinion that the Newton system does not practice claim 17 under any of the parties' proposed constructions for at least the reason that it does not practice claim 15 as described in Section X.H.

461.    In addition and as described above with regard to claim 4, the memory of the Newton system does not contain grammars, and the step of detecting a structure does not further comprise the steps of retrieving a grammar and parsing the data based on the grammar.

g.    **Claim 19: The method recited in Claim 15, wherein the memory contains strings, and wherein the step of detecting a structure further comprises the steps of retrieving a string from the memory and scanning the data to identify the string.**

462.    It is my opinion that the Newton system does not practice claim 19 under any of the parties' proposed constructions for at least the reason that it does not practice claim 15 as described in Section X.H.

h.    **Claim 20: The method recited in Claim 15, further comprising after the step of detecting a structure, the step of highlighting the detected structure.**

463.    It is my opinion that the Newton system does not practice claim 20 under any of the parties' proposed constructions for at least the reason that it does not practice claim 15 as described in Section X.H.

174

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

**XI.    THE '647 PATENT CLAIMS ARE NOT OBVIOUS.**

    **A.    PenSoft Perspective System and Perspective Handbook**

        **1.    The Combination of the Pensoft Perspective Handbook and Screenshots from the AT&T EO Personal Communicator Model 440 and 880 ("Screenshots") Does Not Render Claims 1, 3, 4, 8, 15, 17, 19, or 20 Obvious.  (Appendix 4)**

464.    The Perspective Handbook cited by Dr. Olsen is for the Business Edition of Perspective.  However, Dr. Olsen does not identify what version of Perspective his screenshots come from, though he does state that the "functionality demonstrated by the screenshots exist on an AT&T EO Personal Communicator model 440 and 800 running either Personal Perspective or the Perspective Business edition." (Appendix 4 at 1.)  To the extent these screenshots are from EO Personal Communicator models 440 and 800 running Personal Perspective, it would not have been obvious to a person of ordinary skill in the art to have combined the teachings of the Handbook with the operation and/or screenshots of a different version of Perspective.  As stated by Dr. Olsen himself, the Business Edition provided "additional functionality" that a user had to separately purchase. (Olsen Validity Report at ¶ 197.)

465.    A person of ordinary skill would not combine the disclosures in the Handbook and Dr. Olsen's screenshots from an EO Communicator.  As explained above, the cited disclosures in the sources discussed in Dr. Olsen's Appendices 4 and 5 do not disclose various elements of claims 1, 3, 4, 8, 15, 17, 19, and 20.  Further, Dr. Olsen does not provide a reason why a person of ordinary skill would combine these disparate sources.  As a result, even if a person of ordinary skill would combine the Handbook and the screenshots from the EO Communicators 440 and 880, one would still not arrive at the asserted claims of the '647 patent.

466.    For example, Dr. Olsen's quote from the Handbook that the Associate "automatically creates links between items in Perspective" simply discloses that Perspective

175

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ➤

creates associations between data items, a point that even Dr. Olsen states is different from the claimed linking. (Appendix 4 at 2, 37.) The Handbook defines "link" as a "relationship between two items." (Handbook at HTC007286231.)  The focus of Perspective's "Associate" is to "automatically create[] links between items in Perspective." (*Id.* at HTC007286257.)  These are not links to actions, but links between database items.

467.    Moreover, the Handbook directly refutes some of Dr. Olsen's own opinions.  For example, Dr. Olsen claims that Perspective detects proper names of people that are not in the user's Address Book, but page 41 of the Handbook states that it will not create a new profile unless the user specifies a verb like "Meet:"

| For example, if you are scheduling a meeting with John, who is not entered into your Address Book, you can schedule an appointment in the following ways: | |
| --- | --- |
| 12:00 John | No profile created or linking performed. |
| 12:00 Meet John | New profile created for John and linked to appointment. |

(Handbook at 41; Appendix 4 at 39.)  This indicates that, contrary to Dr. Olsen's opinion, Perspective does not have a grammar to match proper names.  If the user writes a name that is not in the Address Book, Perspective does not prompt the user to create a profile for that person. Only if the user indicates to Perspective that they are *going* to write a name, such as by specifying "Meet," will Perspective prompt the user to create a profile for the *unmatched text* that follows the keyword.  As shown above in Section X.A, if the user writes "Meet abcde," Perspective will ask if the user wants to create a profile for "abcde."  And even the Perspective source code notes that the text after these keywords is considered "unmatched." (MATCHER.C at line 732.)  The Handbook also indicates that Perspective is a *single application*, and what Dr. Olsen identifies as multiple applications (Olsen Validity Report at ¶ 200) are just documents within Perspective.  (Handbook at HTC0077286228.)

176

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

> 2.  **The Combination of the Perspective Code, Handbook, and Screenshots and the "State of the Art" Does Not Render Claims 4, 8, 17, 19, or 20 Obvious. (Appendix 4)**

468.   Dr. Olsen states in a single sentence in Appendix 4 that "claims 4, 6, 8, 17, 19, and 20 would have been obvious at the time of the invention in light of the state of the art, as described by the '647 patent." (Appendix 4 at 2.)  I disagree with Dr. Olsen and believe that claims 4, 8, 17, 19, and 20 were not obvious.  As an initial matter, it is not clear if Dr. Olsen is indeed limiting the "state of the art" to its description in the '647 patent's specification, or if he is incorporating his description of the supposed "state of the art" from paragraphs 27-34 and 356-371 of his report.  I incorporate my rebuttal to Dr. Olsen's description of the "state of the art" from Sections VI.B and VI.C.

469.   Dr. Olsen has failed to make any showing that the Perspective "system" in light of the "state of the art" renders claims 4, 8, 17, 19, and 20 obvious.  As explained above, the cited disclosures in the sources discussed in Dr. Olsen's Appendix 4 do not disclose various elements of claims 4, 8, 17, 19, and 20.  Further, instead of referring to disclosures of specific systems from the "state of the art," Dr. Olsen only cites to selected testimony from some of the named inventors.  He provides no explanation of why a person of ordinary skill in the art would combine the disclosures of the supposed "state of the art" with the Perspective "system."  As a result, even if a person of ordinary skill would combine the Perspective "system" with the "state of the art," one would still not arrive at claims 4, 8, 17, 19, and 20 of the '647 patent.

470.   For example, Dr. Olsen opines that it would have been obvious at the time of the invention "to use grammars and a parser for detecting structures in data." (Appendix 4 at 78.)  As noted by Dr. Olsen, the applicants disclosed the existence of grammars in the '647 patent's specification; yet the examiner did not reject claim 4 as obvious.  Further, Dr. Olsen provides no explanation for why a person of ordinary skill would combine the disclosures of the Perspective

177

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

"system" with grammars and a parser for detecting structures. Perspective was a very limited system that sought to assist the user in creating connections between their address book and calendar items. As this process was based in part on matching names already existing in the user's address book, there was no need for the user of grammars. Indeed, it would be difficult to write an efficient grammar to detect proper names given the unstructured nature of names.

471. Nor does Dr. Olsen explain why a person of ordinary skill would seek to combine highlighting text with the disclosures of the Perspective "system." For example, Dr. Olsen's Scenarios #1 and 2 occur only if the user turns on the "Let the Associate ask for help" feature; as the Associate automatically prompts the user regarding text the user just wrote, there would be no need to highlight that text.

472. Finally, Dr. Olsen provides no reason why a person of ordinary skill in the art would seek to combine the process of identifying strings in data with the disclosures of the Perspective "system."

        3.      **The Combination of the Perspective Handbook and the State of the Art Does Not Render Claims 4, 8, 17, 19, or 20 Obvious. (Appendix 5)**

473. Dr. Olsen states in a single sentence in Appendix 5 that "claims 4, 6, 8, 17, 19, and 20 would have been obvious at the time of the invention in light of the state of the art, as described by the '647 patent." (Appendix 5 at 2.)  I disagree with Dr. Olsen and believe that claims 4, 8, 17, 19, and 20 were not obvious. As an initial matter, it is not clear if Dr. Olsen is indeed limiting the "state of the art" to its description in the '647 patent's specification, or if he is incorporating his description of the supposed "state of the art" from paragraphs 27-34 and 356-371 of his report. I incorporate my rebuttal to Dr. Olsen's description of the "state of the art" from Sections VI.B and VI.C.

178

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

474.   Dr. Olsen has failed to make any showing that the Perspective Handbook in light of the "state of the art" rendered claims 4, 8, 17, 19, and 20 obvious.  As explained above, the cited disclosures in the sources discussed in Dr. Olsen's Appendix 5 do not disclose various elements of claims 4, 8, 17, 19, and 20.  Further, instead of referring to disclosures of specific systems from the "state of the art," Dr. Olsen only cites to selected testimony from some of the named inventors.  He provides no explanation of why a person of ordinary skill in the art would combine the disclosures of the supposed "state of the art" with the Perspective Handbook.  As a result, even if a person of ordinary skill would combine the Perspective Handbook with the "state of the art," one would still not arrive at claims 4, 8, 17, 19, and 20 of the '647 patent.

475.   For example, Dr. Olsen opines that it would have been obvious at the time of the invention "to use grammars and a parser for detecting structures in data."  (Appendix 5 at 36.)  As noted by Dr. Olsen, the applicants disclosed the existence of grammars in the '647 patent's specification; yet the examiner did not reject claim 4 as obvious.  Further, Dr. Olsen provides no explanation for why a person of ordinary skill would combine the disclosures of the Perspective Handbook with grammars and a parser for detecting structures.  Perspective was a very limited system that sought to assist the user in creating connections between their address book and calendar iteMs.  As this process was based in part on matching names already existing in the user's address book, there was no need for the user of grammars.  Indeed, it would be difficult to write an efficient grammar to detect proper names given the un-structured nature of names.

476.   Nor does Dr. Olsen explain why a person of ordinary skill would seek to combine highlighting text with the disclosures of the Perspective Handbook.  For example, Dr. Olsen's Scenarios #1 and 2 occur only if the user turns on the "Let the Associate ask for help" feature; as

≻ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ≺

the Associate automatically prompts the user regarding text the user just wrote, there would be no need to highlight that text.

477.    Finally, Dr. Olsen provides no reason why a person of ordinary skill in the art would seek to combine the process of identifying strings in data with the disclosures of the Perspective Handbook.

**B.      NeXTSTEP System and References**

**1.      The Combination of the NeXTSTEP References, NeXTSTEP 3.0, and NeXTSTEP 3.2 source code Does Not Render Claims 1, 3, 4, 8, 15, 17, 19 or 20 Obvious**

478.    I understand that Dr. Olsen classifies the NeXTSTEP "system" as a combination of the NeXTSTEP References, NeXTSTEP 3.2 source code, and the "functionality" of NeXTSTEP 3.0. I understand that it is improper for Dr. Olsen to contend that a combination of references purportedly describing a "system" anticipates a patent claim. I also understand that, while Dr. Olsen contends it would have been obvious to combine the NeXTSTEP References, he does not opine that it would have been obvious to combine the NeXTSTEP References, NeXTSTEP 3.2 source code, and NeXTSTEP 3.0 "functionality." I do not believe it would have been obvious to a person of ordinary skill to combine these three different sources for at least the reason that they describe different versions of NeXTSTEP. For example, the General Reference Volume 1 and General Reference Volume 2 were published in 1992 and describe functionality for the NeXTSTEP 3.0 release. The 3.2 version of NeXTSTEP corresponding to the source code on which Dr. Olsen relies, on the other hand, was not released until October 1993. (*See* Olsen Validity Report, ¶¶ 262, 265.) As explained above in Section X.B, Dr. Olsen has not shown that the relevant spell checking functionality in NeXTSTEP 3.0 and 3.2 operates in the same way.

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

479.    Finally, as I have already shown, not one of these sources disclose each limitation of any claim of the '647 patent; for example, none of the sources disclose detecting *structures* in data.  Thus, even if a person of ordinary skill were to combine these references, they would not arrive at claims 1, 3, 4, 8, 15, 17, 19, or 20.

2.    **The Combination of NeXTSTEP System and References and the Stamps Patent Does Not Render Claims 1 or 3 Obvious. (Appendices 6 and 7)**

480.    The only reason identified by Dr. Olsen for combining the NeXTSTEP system and References with the Stamps patent is that they both address the "same problem, the identification and correction of misspelled words in a computer system." (Appendix 6 at 1.) However, spell checking is a broad field comprising thousands of publications, that NeXTSTEP and Stamps are both related to spell checking is not enough to motivate or suggest to one of ordinary skill in the art to combine their disclosures.

481.    A person of ordinary skill would not combine the disclosures in the NeXTSTEP system and References with Stamps.  As explained above, the cited disclosures in the sources discussed in Dr. Olsen's Appendices 6, 7, and 12 do not disclose various elements of claims 1 and 3.  Further, Dr. Olsen does not provide a reason why a person of ordinary skill would combine these disparate sources.  As a result, even if a person of ordinary skill would combine the NeXTSTEP system and References with Stamps, one would still not arrive at claims 1 and 3 of the '647 patent.

482.    Dr. Olsen opines that, to the extent that the NeXTSTEP System and References do not disclose claim 1's "input device" under HTC's and the Staff's construction, Stamps does. (Appendix 6 at 7.)  Dr. Olsen cites only to Stamps' discussion of an "input buffer" as the claimed "input device." (*Id.*)  However, this input buffer is software that exists in the memory of the

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

Stamps reference. (Stamps, abst.)  Stamps' input buffer is not the type of hardware Dr. Olsen believes the input device to be limited to and it therefore does not disclose the input device of claim 1 under HTC's construction.  And regardless of Stamps' disclosure of an input buffer, NeXTSTEP did not practice and does not disclose other elements of claim 1, as described above in Section X.B.

483.   With regard to Claim 3, Dr. Olsen admits that, under HTC's and the Staff's constructions, NeXTSTEP does not disclose an "input device" that receives data from an application running concurrently as a "keyboard and mouse in 1992 would not have the ability to receive data to be detected from an application running concurrently." (Appendix 6 at 50.) However, Dr. Olsen then states that Stamps discloses the claimed "input device" under the Staff's and HTC's construction in the form of the "input buffer."  But as explained in the preceding paragraph, Stamps' input buffer was not the type of hardware that Dr. Olsen believes input device to be limited to and therefore does not disclose this element under his construction.

### 3.   The Combination of NeXTSTEP System and References and the State of the Art Does Not Render Claims 4, 8, 17, 19, or 20 Obvious. (Appendix 6)

484.   Dr. Olsen states in a single sentence in Appendix 6 that "claims 4, 6, 8, 17, 19, and 20 would have been obvious at the time of the invention in light of the state of the art, as described by the '647 patent." (Appendix 6 at 3.)  I disagree with Dr. Olsen and believe that claims 4, 8, 17, 19, and 20 were not obvious.  As an initial matter, it is not clear if Dr. Olsen is indeed limiting the "state of the art" to its description in the '647 patent's specification, or if he is incorporating his description of the supposed "state of the art" from paragraphs 27-34 and 356-371 of his report.  I incorporate my rebuttal to Dr. Olsen's description of the "state of the art" from Sections VI.B and VI.C.

182

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

485.     Dr. Olsen has failed to make any showing that the NeXTSTEP system in light of the NeXTSTEP References and "state of the art" rendered claims 4, 8, 17, 19, and 20 obvious. As explained above, the cited disclosures Instead of referring to disclosures of specific systems from the "state of the art," Dr. Olsen only cites to selected testimony from some of the named inventors.   He provides no explanation of why a person of ordinary skill in the art would combine the disclosures of the supposed "state of the art" with the NeXTSTEP system and NeXTSTEP References.   As a result, even if a person of ordinary skill would combine the NeXTSTEP system and NeXTSTEP References with the "state of the art," one would still not arrive at claims 4, 8, 17, 19, and 20 of the '647 patent.

486.     Dr. Olsen opines that it would have been obvious at the time of the invention "to use grammars and a parser for detecting structures in data." (Appendix 5 at 51.)  As noted by Dr. Olsen, the applicants disclosed the existence of grammars in the '647 patent's specification; yet the examiner did not reject claim 4 as obvious.  Further, Dr. Olsen provides no explanation for why a person of ordinary skill would combine the disclosures of the NeXTSTEP system and References with grammars and a parser for detecting structures.   The spell checker of the NeXTSTEP system was concerned only with locating unrecognized text.  This did not constitute detecting structures.  And even if it did, there would be no need to use a grammar to locate unrecognized text.

487.     Nor does Dr. Olsen explain why a person of ordinary skill would seek to combine highlighting detected structures with the disclosures of the NeXTSTEP system.  As I have already explained, the NeXTSTEP spell checker did not detect structures.   And as the NeXTSTEP spell checker brought the user to each misspelled word, there would be no need to highlight misspellings.

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

488.   Finally, Dr. Olsen provides no reason why a person of ordinary skill in the art would seek to combine the process of identifying strings in data with the disclosures of the NeXTSTEP system. The NeXTSTEP spell checker was concerned with informing the user of unrecognized text.

### 4.   The Combination of The NeXTSTEP References and the Stamps Patent Does Not Render Claims 1 or 3 Obvious. (Appendix 7)

489.   Dr. Olsen contends that the combination of the NeXTSTEP References and Stamps renders claims 1 and 3 obvious. However, as explained in Section X.B, with regards to the NeXTSTEP system, References, and Stamps, one of ordinary skill in the art would not combine the Stamps reference with the NeXTSTEP References. And as also explained in Section X.G, the Stamps patent does not disclose the additional limitations that Dr. Olsen identifies.

### 5.   The Combination of NeXTSTEP References and the State of the Art Does Not Render Claims 4, 8, 17, 19, or 20 Obvious. (Appendix 7)

490.   Dr. Olsen states in a single sentence in Appendix 7 that "claims 4, 6, 8, 17, 19, and 20 would have been obvious at the time of the invention in light of the state of the art, as described by the '647 patent." (Appendix 7 at 3.) I disagree with Dr. Olsen and believe that claims 4, 8, 17, 19, and 20 were not obvious. As an initial matter, it is not clear if Dr. Olsen is indeed limiting the "state of the art" to its description in the '647 patent's specification, or if he is incorporating his description of the supposed "state of the art" from paragraphs 27-34 and 356-371 of his report. I incorporate my rebuttal to Dr. Olsen's description of the "state of the art" from Sections VI.B and VI.C.

491.   Dr. Olsen has failed to make any showing that the NeXTSTEP References in light of the "state of the art" rendered claims 4, 8, 17, 19, and 20 obvious. Instead of referring to disclosures of specific systems from the "state of the art," Dr. Olsen only cites to selected

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

testimony from some of the named inventors.  He provides no explanation of why a person of ordinary skill in the art would combine the disclosures of the supposed "state of the art" with the NeXTSTEP References.  As a result, even if a person of ordinary skill would combine the NeXTSTEP References with the "state of the art," one would still not arrive at claims 4, 8, 17, 19, and 20 of the '647 patent.

492.    Dr. Olsen opines that it would have been obvious at the time of the invention "to use grammars and a parser for detecting structures in data." (Appendix 7 at 31.)  As noted by Dr. Olsen, the applicants disclosed the existence of grammars in the '647 patent's specification; yet the examiner did not reject claim 4 as obvious.  Further, Dr. Olsen provides no explanation for why a person of ordinary skill would combine the disclosures of the NeXTSTEP References with grammars and a parser for detecting structures.  The spell checker of the NeXTSTEP References was concerned only with locating unrecognized text.  This did not constitute detecting structures.  And even if it did, there would be no need to use a grammar to find unrecognized text word.

493.    Nor does Dr. Olsen explain why a person of ordinary skill would seek to combine highlighting detected structures with the disclosures of the NeXTSTEP References.  As I have already explained, the NeXTSTEP spell checker did not detect structures.   And as the NeXTSTEP spell checker brought the user to each misspelled word, there would be no need to highlight misspellings.

494.    Finally, Dr. Olsen provides no reason why a person of ordinary skill in the art would seek to combine the process of identifying strings in data with the disclosures of the NeXTSTEP References.   The NeXTSTEP spell checker was concerned with locating unrecognized text.

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

     **6.**    **The Combination of NeXTSTEP General Reference Volume 1 and NeXTSTEP General Reference Volume 2 Does Not Render Claims 1, 3, 4, 8, 15, 17, 19, or 20 Obvious. (paragraphs 272-274)**

495.    Dr. Olsen asserts that the NeXTSTEP Reference Volumes 1 and 2 should be considered a single publication but that, in the alternative, they render the asserted claims of the '647 patent obvious.  As I explained in Section X.B, neither of the NeXTSTEP References disclose various elements of the asserted claims of the '647 patent and they therefore do not anticipate or render obvious any claims of the '647 patent.  Further, Dr. Olsen has not identified a reason why a person of ordinary skill in the art would combine the NeXTSTEP References.

    **C.**    **The '636 Patent**

     **1.**    **The Combination of the '636 Patent and the Stamps Patent Does Not Render Claim 3 Obvious. (Appendix 8)**

496.    One of ordinary skill in the art would not have combined the '636 patent and Stamps. The '636 patent is aimed at a system that will recognize a text selection as belonging to a "predetermined class" and make available "operations relevant to the recognized text" ('636 patent, abst.), while Stamps is aimed at an application programming interface in a spell checker that tests words "for correctness." (Stamps, abst.)  Like all spell checkers, Stamps ignores *recognized* words. Thus, the two references attempt to solve very different probleMs.

497.    The motivations behind the '636 patent and Stamps are also different.  One of the motivations for the application program interface of Stamps is to minimize the amount of "memory intensive" text checking functions that need to be stored on a computer.  (Stamps, 1:27-29.)  But the '636 patent does not concern such "memory intensive" text checking functions as it only operates on a small amount of text "accented" by the user.  (*See, e.g.*, '636 patent, col. 2:8.)

186

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

498.    Dr. Olsen contends that a person of ordinary skill would combine Stamps'
disclosure of an application program interface with the '636 patent to arrive at claim 3.
However, the application program interface of Stamps is used to receive text so it can identify
"problem portion[s] of text." (Stamps, 4:43.)  There is no reason that a person of ordinary skill
would look towards spell checker references, let alone Stamps, for combination with the '636
patent's recognition of text.  I also note that Dr. Olsen does not contend that Stamps should be
combined with the '636 patent to make up for the elements of claim 1 that the '636 patent is
missing.

499.    Moreover, the '636 patent and Stamps take different approaches on how to allow
more than one application to access the programs disclosed in each reference.  For example,
while Stamps discloses an application program interface for receiving text to be spell checked,
the '636 patent discloses using Dynamically Linked Libraries ("DLLs") that an application must
be written to work with.  ('636 patent, 4:32-55; fig. 3.)  Thus, the system described in the '636
patent does not receive text from a concurrently running application but instead allows
applications to use the recognition libraries compiled into DLLs.  This is a markedly different
approach then Stamps' spell checker that runs externally to word processing applications.

500.    Dr. Olsen also opines that a person of ordinary skill would combine Stamps and
the '636 patent to arrive at the input device of claim 3 because the '636 patent and Stamps
"related to systems that detect structures in data and link actions to the detected structures."
(Appendix 6 at 32.)  However, as I already explained in Sections X.C and X.G, neither the '636
patent nor Stamps detect structures.   And while the '636 patent does disclose recognizing
accented text as belonging to a predetermined class, the Stamps patent is focused on spelling and
grammar checking.  Further, the "input buffer" of Stamps that Dr. Olsen cites does not disclose

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

an "input device" as HTC has construed that term. The input buffer is software that exists in memory (Stamps, abst.), and is not the type of hardware Dr. Olsen believes the input device to be limited to. As a result, even if a person of ordinary skill would combine the '636 patent and Stamps, one would still not arrive at claim 3 of the '647 patent.

2.     **The Combination of the '636 Patent and the Mogilevsky Patent Does Not Render Claims 8 or 20 Obvious. (Appendix 8)**

501.     It would not have been obvious to one of ordinary skill in the art to combine the '636 patent and Mogilvesky. For example, the two references are concerned with very different issues. The '636 patent is aimed at a system that will recognize a text selection as belonging to a "predetermined class" and make available "operations relevant to the recognized text" ('636 patent, abst.), while Mogilevsky is aimed at a method of "background spell checking." (Mogilevsky, title.) It was not the goal of Mogilevsky to "simplify the number of steps taken by a user" (Olsen Validity Report at ¶ 336), but instead to allow for spell checking to occur during "idle periods of the word processor." (Mogilevsky, abst.)

502.     Dr. Olsen does not provide a reason why a person of ordinary skill would combine these two references. The two references also take different approaches to solving these different issues, with the '636 patent operating only on a user's accented text and Mogilevsky operating on an entire document of text. Further, as the '636 patent only operates on the user's accented text there is no need to draw the user's attention to the text by highlighting it as the user has already made a selection.

503.     Dr. Olsen's citation to the '636 patent's discussion of spell checkers does not help his case. Notably, the '636 patent states that "in the event the accented text is *not recognized* . . . a menu bar . . . of default operations can be made to appear" including spell-checkers. ('636 patent, 3:24-30.)     Claims 8 and 20 both require highlighting of *detected structures*.

188

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

Mogilevsky's disclosure of highlighting unrecognized text is not relevant to claims 8 or 20 of the
'637 patent.

### 3.   The Combination of the '636 Patent and the Koved Reference Does Not Render Claims 8 or 20 Obvious.  (Appendix 8)

504.   It would not have been obvious to one of ordinary skill in the art to combine the
'636 patent and Koved.   For example, the two references are concerned with very different
issues.  The '636 patent is aimed at a system that will recognize a text selection as belonging to a
"predetermined class" and make available "operations relevant to the recognized text" ('636
patent, abst.), while Koved is concerned with the benefits and disadvantages of embedded and
explicit menus.  (Koved at HTC007290668.)  Koved contains a half-page discussion on the use
of embedded menus in spell checkers.  (*Id.* at HTC007290670.)  It was not the goal of Koved to
"simplify the number of steps taken by a user" (Olsen Validity Report at ¶ 336), but instead to
discuss using embedded menus to provide context for a user during the spell checking process.
(Koved at HTC007290670.)  The two references are thus concerned with different topics and
both seek to solve different probleMs.  Further, as the '636 patent only operates on the user's
accented text, there is no need to draw the user's attention to the text by highlighting it as the
user has already made a selection.

505.   Dr. Olsen's citation to the '636 patent's discussion of spell checkers does not help
his case.  Notably, the '636 patent states that "in the event the accented text is ***not recognized*** . . .
a menu bar . . . of default operations can be made to appear" including spell-checkers.  ('636
patent, 3:24-30.)  Claims 8 and 20 both require highlighting of ***detected structures***.  Koved's
disclosure of highlighting unrecognized text is not relevant to claims 8 or 20 of the '647 patent.

### 4.   The Combination of the '636 Patent and the State of the Art Does Not Render Claims 4, 8, 17, 19, or 20 Obvious.  (Appendix 8)

189

⪢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ⪡

506.    Dr. Olsen states in a single sentence in Appendix 4 stating that "claims 4, 6, 8, 17, 19, and 20 would have been obvious at the time of the invention in light of the state of the art, as described by the '647 patent." (Appendix 8 at 3.)  I disagree with Dr. Olsen and believe that claims 4, 8, 17, 19, and 20 were not obvious.  As an initial matter, it is not clear if Dr. Olsen is indeed limiting the "state of the art" to its description in the '647 patent's specification, or if he is incorporating his description of the supposed "state of the art" from paragraphs 27-34 and 356-371 of his report.  I incorporate my rebuttal to Dr. Olsen's description of the "state of the art" from Sections VI.B and VI.C.

507.    Dr. Olsen has failed to make any showing that the '636 patent in light of the "state of the art" rendered claims 4, 8, 17, 19, and 20 obvious.  Instead of referring to disclosures of specific systems from the "state of the art," Dr. Olsen only cites to selected testimony from some of the named inventors  He provides no explanation of why a person of ordinary skill in the art would combine the disclosures of the supposed "state of the art" with the '636 patent.  As a result, even if a person of ordinary skill would combine the '636 patent with the "state of the art," one would still not arrive at claims 4, 8, 17, 19, and 20 of the '647 patent.

508.    Dr. Olsen opines that it would have been obvious at the time of the invention "to use grammars and a parser for detecting structures in data." (Appendix 8 at 33.)  As noted by Dr. Olsen, the applicants disclosed the existence of grammars in the '647 patent's specification; yet the examiner did not reject claim 4 as obvious.  Further, Dr. Olsen provides no explanation for why a person of ordinary skill would combine the disclosures of the '636 patent with grammars and a parser for detecting structures.  As I described earlier, the '636 patent does not disclose the detection of structures.

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

509.    Nor does Dr. Olsen explain why a person of ordinary skill would seek to combine highlighting detected structures with the disclosures of the '636 patent.  Even if the '636 patent detected structures, it first required the user to "accent" a potential structure.  There would be no need to highlight the text since the user has already found and accented it.

510.    Finally, Dr. Olsen provides no reason why a person of ordinary skill in the art would seek to combine the process of identifying strings in data with the disclosures of the '636 patent.

**D.    Nokia EPO Publication**

**1.    The Combination of the Nokia EPO Publication and the Stamps Patent Does Not Render Claim 3 Obvious.  (Appendix 9)**

511.    It would not have been obvious to one of ordinary skill in the art to combine the disclosures of the Nokia EPO Publication and Stamps.  These references are concerned with vastly different issues; the Nokia EPO Publication is concerned with retrieving a telephone number from a pager-like text message while Stamps is aimed at an application programming interface with a spell checker that tests words "for *correctness*." (Stamps, abst.  (emphasis added).)   The Nokia EPO Publication addressed the particular scenario where old cellular telephones could not receive incoming calls and required the user to carry a pager so they could be informed when someone wished to get in contact with them.  (Nokia EPO Publication, 4:31-46.)  A person of ordinary skill would not look towards any spell checker references, let alone Stamps, as such references would not assist in retrieving telephone numbers.

512.    Finally, Dr. Olsen provides no support for his statement that Stamps is concerned with "simplify[ing] the number of steps taken by a user." (Olsen Validity Report at ¶ 339.)  The Nokia EPO Publication, aimed at old "telephone apparatus[es]," would not have a need for the

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

input device of claim 1 to receive data from a concurrently running application as nothing in the reference discloses that the telephone apparatus could support multitasking.

### 2. The Combination of the Nokia EPO Publication and the State of the Art Does Not Render Claims 4, 8, 17, 19, or 20 Obvious. (Appendix 9)

513. Dr. Olsen states in a single sentence in Appendix 9 that "claims 4, 6, 8, 17, 19, and 20 would have been obvious at the time of the invention in light of the state of the art, as described by the '647 patent." (Appendix 9 at 2.) I disagree with Dr. Olsen and believe that claims 4, 8, 17, 19, and 20 were not obvious. As an initial matter, it is not clear if Dr. Olsen is indeed limiting the "state of the art" to its description in the '647 patent's specification, or if he is incorporating his description of the supposed "state of the art" from paragraphs 27-34 and 356-371 of his report. I incorporate my rebuttal to Dr. Olsen's description of the "state of the art" from Sections VI.B and VI.C.

514. Dr. Olsen has failed to make any showing that the "state of the art" rendered claims 4, 8, 17, 19, and 20 obvious. Instead of referring to disclosures of specific systems from the "state of the art," Dr. Olsen only cites to selected testimony from some of the named inventors. He provides no explanation of why a person of ordinary skill in the art would combine the disclosures of the supposed "state of the art" with the Nokia EPO Publication. As a result, even if a person of ordinary skill would combine the Nokia EPO Publication with the "state of the art," one would still not arrive at claims 4, 8, 17, 19, and 20 of the '647 patent.

515. Dr. Olsen opines that it would have been obvious at the time of the invention "to use grammars and a parser for detecting structures in data." (Appendix 9 at 25.) As noted by Dr. Olsen, the applicants disclosed the existence of grammars in the '647 patent's specification; yet the examiner did not reject claim 4 as obvious. Further, Dr. Olsen provides no explanation for

192

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

why a person of ordinary skill would combine the disclosures of the Nokia EPO Publication with grammars and a parser for detecting structures.

516.    Nor does Dr. Olsen explain why a person of ordinary skill would seek to combine highlighting detected structures with the disclosures of the Nokia EPO Publication.  The Nokia EPO Publication describes a system that brings the user to a phone number in a text message; there would therefore be no need to highlight that phone number.

517.    Finally, Dr. Olsen provides no reason why a person of ordinary skill in the art would seek to combine the process of identifying strings in data with the disclosures of the Nokia EPO Publication.  The Nokia EPO Publication had no need for identifying strings as it was only concerned with finding text that might be a phone number.

**E.     Fukuyama Patent**

**1.     The Combination of the Fukuyama Patent and the Salton Reference Does Not Render Claim 19 Obvious.  (Appendix 10)**

518.    Dr. Olsen opines that it would have been obvious to one of ordinary skill to combine Fukuyama with AUTOMATIC TEXT PROCESSING: THE TRANSFORMATION, ANALYSIS, AND RETRIEVAL OF INFORMATION BY COMPUTER, GERALD SALTON, (Michael A. Harrison ed., Addison-Wesley 1989) ("Salton") because both are "directed at the same problem, performing a string search" (Appendix 10 at 1.)  I disagree with Dr. Olsen and believe that claim 19 was not obvious.

519.    Fukuyama is not directed at string searching.  Fukuyama's primary focus is to combine "electronic mail functions with telephone functions." (Fukuyama, title.)  In that process, Fukuyama discloses that one can identify phone numbers within emails.  Such identification does not utilize string matching; instead Fukuyama discloses "[a]n algorithm for retrieving the telephone number of the sender of the electronic mail." (Fukuyama, 9:39-40.)  One of ordinary

193

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

skill would not seek to add string matching to Fukuyama as that would necessitate the system contain a large dictionary of possible phone numbers. Such a dictionary would not be able to extract new or unexpected phone numbers. In short, there is no reason or motivation for a person of ordinary skill in the art to combine Fukuyama and the string matching of Salton. And, even if a person of ordinary skill would combine Fukuyama with Salton, one would still not arrive at claim 19 of the '647 patent.

> **2.** **The Combination of the Fukuyama Patent and the State of the Art Does Not Render Claims 4, 8, 17, 19, or 20 Obvious.  (Appendix 10)**

520.   Dr. Olsen states in a single sentence in Appendix 10 that "claims 4, 6, 8, 17, 19, and 20 would have been obvious at the time of the invention in light of the state of the art, as described by the '647 patent." (Appendix 10 at 1.)  I disagree with Dr. Olsen and believe that claims 4, 8, 17, 19, and 20 were not obvious.  As an initial matter, it is not clear if Dr. Olsen is indeed limiting the "state of the art" to its description in the '647 patent's specification, or if he is incorporating his description of the supposed "state of the art" from paragraphs 27-34 and 356-371 of his report.  I incorporate my rebuttal to Dr. Olsen's description of the "state of the art" from Sections VI.B and VI.C.

521.   Dr. Olsen has failed to make any showing that the "state of the art" rendered claims 4, 8, 17, 19, and 20 obvious.  Instead of referring to disclosures of specific systems from the "state of the art," Dr. Olsen only cites to selected testimony from some of the named inventors.  He provides no explanation of why a person of ordinary skill in the art would combine the disclosures of the supposed "state of the art" with Fukuyama.  As a result, even if a person of ordinary skill would combine Fukuyama with the "state of the art," one would still not arrive at claims 4, 8, 17, 19, and 20 of the '647 patent.

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

522.    Dr. Olsen opines that it would have been obvious at the time of the invention "to use grammars and a parser for detecting structures in data." (Appendix 10 at 24.)  As noted by Dr. Olsen, the applicants disclosed the existence of grammars in the '647 patent's specification; yet the examiner did not reject claim 4 as obvious.  Further, Dr. Olsen provides no explanation for why a person of ordinary skill would combine the disclosures of Fukuyama with grammars and a parser for detecting structures.

523.    Nor does Dr. Olsen explain why a person of ordinary skill would seek to combine highlighting detected structures with the disclosures of Fukuyama.  Fukuyama describes a system that finds a phone number in an email; it does not allow or enable the user to select that phone number but instead automatically extracts the number.  There would therefore be no need to highlight that phone number.

524.    Finally, Dr. Olsen provides no reason why a person of ordinary skill in the art would seek to combine the process of identifying strings in data with the disclosures of Fukuyama.  Fukuyama had no need for identifying strings as it was only concerned with finding text that might be a phone number.

**F.    Koved Reference**

**1.    The Combination of the Koved Reference and the Stamps Patent Does Not Render Claims 1, 3, or 15 Obvious. (Appendix 11)**

525.    It would not have been obvious to a person of ordinary skill to combine the Koved reference and Stamps.  While both discuss spell checking, Koved's focus is on explicit and embedded menus in a variety of contexts.  (Koved at HTC007290668.)  Conversely, Stamps is concerned with use of an application program interface between a word processor and spell checker.  (Stamps, abst.)  Dr. Olsen does not provide any reason why one of ordinary skill in the art would combine these references beyond the fact that they both discuss spell checking.  Spell

195

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

checking is a broad field that encompasses thousands of references and, by itself, would not motivate a person of ordinary skill in the art to combine Stamps and Koved. Koved does not discuss any of the types of issues that Stamps identifies with the prior art, such as eliminating the need for duplicative storage of spell checkers for multiple word processor programs.

526.   Dr. Olsen opines that it would have been obvious to combine Koved and Stamps to arrive at the input device of claim 1 and the method of receiving computer data of claim 15. However, even if a person of ordinary skill would combine Koved and Stamps, one would still not arrive at claims 1 and 15 of the '647 patent. For example, even if one of ordinary skill in the art would combine these references, the "input buffer" of Stamps is software that exists in memory and is not the type of hardware Dr. Olsen believes the input device to be limited to. (Stamps, abst.)  Therefore, under Dr. Olsen's and HTC's incorrect interpretation of "input device," neither Koved nor Stamps discloses the claimed input device.

527.   Nor would one of ordinary skill combine Koved and Stamps to arrive at the analyzer server of claim 1 as that term has been construed by any of the parties. Dr. Olsen is correct that "Stamps discloses a spell checking engine," however a spell checker does not detect structures from a "document having recognizable structures." (Appendix 11 at 9.)  As I have stated throughout this report, a spell checker only locates unrecognized text.   Therefore, regardless of whether one of ordinary skill would combine Koved and Stamps, these references do not result in the claimed analyzer server.

528.   Dr. Olsen next opines that it would have been obvious to one of ordinary skill to combine Koved and Stamps to arrive at the additional language of claim 3. However, Dr. Olsen has not identified any reason or motivation for a person of ordinary skill to combine these references beyond the mere fact that they both involve spell checking.  As I explained earlier in

196

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◁

this section, it is my opinion that a person of ordinary skill would not combine these two references.

529.    In addition, Koved and Stamps do not disclose claim 3 under HTC and the Staff's construction of "input device" to the extent they allege that the plain meaning of "input device" excludes software that can receive data and is limited to only hardware such as keyboards and mice.  Dr. Olsen admits that he cannot explain how a keyboard or mouse in Stamps or Koved would receve data from an application concurrently. In the context of claim 3, it makes more sense to refer to a software input device as receiving data from an application than a hardware input device such as a keyboard or a mouse.

> 2.    **The Combination of the Koved Reference and the NeXTSTEP References Does Not Render Claims 1, 3, or 15 Obvious.  (Appendix 11)**

530.    It would not have been obvious to a person of ordinary skill to combine the Koved reference and the NeXTSTEP References. While both do discuss spell checking, Koved's focus is on explicit and embedded menus in a variety of contexts.  (Koved at HTC007290668.) Conversely, the NeXTSTEP References describe for programmers a built-in spell checker and its extensibility.  Dr. Olsen does not provide any reason why one of ordinary skill in the art would combine these references beyond the fact that they both discuss spell checking.  Spell checking is a broad field that encompasses thousands of references and, by itself, would not motivate a person of ordinary skill in the art to combine Koved and the NeXTSTEP References.

531.    It would not have been obvious to one of ordinary skill to combine Koved and the NeXTSTEP References to arrive at claims 1, 3, and 15 of the '647 patent. For example, while the "NeXTSTEP spell checking service disclosed in Reference checks a text string for misspelled words," (Appendix 11 at 10), neither Koved nor the References disclose detecting

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

structures. A spell checker only locates unrecognized text, which is *unmatched* text. Regardless of whether one of ordinary skill would combine Koved and the NeXTSTEP References, these references do not result in the claimed analyzer server of claim 1 or method of claim 15.

532. Dr. Olsen further opines that "Koved in combination with the NeXTSTEP spell checking service disclosed" in the NeXTSTEP References render obvious claim 1's analyzer server for linking actions to detected structures and claim 15's method of linking at least one action to the detected structure. However, as I explained in Section X.B, NeXTSTEP's spell checker as disclosed in the NeXTSTEP References did not detect structures and did not link actions to detected structures.

533. Dr. Olsen next opines that it would have been obvious to one of ordinary skill to combine Koved and the NeXTSTEP References to arrive at the additional language of claim 3. However, Dr. Olsen has not identified any reason or motivation for a person of ordinary skill to combine these references beyond the mere fact that they both involve spell checking. As I explained earlier in this section, it is my opinion that a person of ordinary skill would not combine these two references.

### 3. The Combination of the Koved Reference and the State of the Art Does Not Render Claims 4, 8, 17, 19, or 20 Obvious. (Appendix 11)

534. Dr. Olsen states in a single sentence in Appendix 11 that "claims 4, 6, 8, 17, 19, and 20 would have been obvious at the time of the invention in light of the state of the art, as described by the '647 patent." (Appendix 11 at 2.) I disagree with Dr. Olsen and believe that claims 4, 8, 17, 19, and 20 were not obvious. As an initial matter, it is not clear if Dr. Olsen is indeed limiting the "state of the art" to its description in the '647 patent's specification, or if he is incorporating his description of the supposed "state of the art" from paragraphs 27-34 and 356-

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

371 of his report. I incorporate my rebuttal to Dr. Olsen's description of the "state of the art" from Sections VI.B and VI.C.

535. Dr. Olsen has failed to make any showing that Koved in light of the "state of the art" rendered claims 4, 8, 17, 19, and 20 obvious. Instead of referring to disclosures of specific systems from the "state of the art," Dr. Olsen only cites to selected testimony from some of the named inventors. He provides no explanation of why a person of ordinary skill in the art would combine the disclosures of the supposed "state of the art" with Koved. As a result, even if a person of ordinary skill would combine Koved with the "state of the art," one would still not arrive at claims 4, 8, 17, 19, and 20 of the '647 patent.

536. Dr. Olsen opines that it would have been obvious at the time of the invention "to use grammars and a parser for detecting structures in data." (Appendix 11 at 25.) As noted by Dr. Olsen, the applicants disclosed the existence of grammars in the '647 patent's specification; yet the examiner did not reject claim 4 as obvious. Further, Dr. Olsen provides no explanation for why a person of ordinary skill would combine the disclosures of Koved with grammars and a parser for detecting structures. The spell checker of Koved was concerned only with locating unrecognized text. This does not constitute detecting structures. And even if it did, there would be no need to use a grammar to locate unrecognized text.

537. Nor does Dr. Olsen explain why a person of ordinary skill would seek to combine highlighting detected structures with the disclosures of Koved. As I have already explained, the spell checker of Koved did not detect structures.

538. Finally, Dr. Olsen provides no reason why a person of ordinary skill in the art would seek to combine the process of identifying strings in data with the disclosures of Koved. The Koved spell checker was concerned with locating unrecognized text and not string matches.

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

G.      **Stamps Patent**

1.      **The Combination of the Stamps Patent and the NeXTSTEP References Does Not Render Claims 1, 3, or 15 Obvious.  (Appendix 12)**

539.    The only reason identified by Dr. Olsen for combining the Stamps patent and the NeXTSTEP References is that they both address the "same problem, spell checking." (Appendix 12 at 1.)  However, spell checking is a broad field comprising thousands of publications, that NeXTSTEP and Stamps are both related to spell checking is not enough to motivate or suggest to one of ordinary skill in the art to combine their disclosures.  For example, Stamps is concerned with the use of an application program interface between a word processor and spell checker (Stamps, abst.), while the NeXTSTEP References seek to describe features of NeXTSTEP to assist developers creating applications for NeXTSTEP computers.  (NeXTSTEP Reference Vol. 1 at HTC007229721.)

540.    It would not have been obvious to combine Stamps with the NeXTSTEP References.  And, even if a person of ordinary skill would combine Stamps with the NeXTSTEP References, one would still not arrive at claims 1, 3, and 15 of the '647 patent.  For example, Dr. Olsen opines that "Stamps in combination with the NeXTSTEP spell checking service of Reference discloses linking a detected structure to a computer subroutine that causes the CPU to perform a sequence of operations on that particular structure to which it is linked, rather than an informational structure." (Appendix 12 at 12, 34-35.)  Even assuming that one of ordinary skill would combine these two references, such a combination would not render this claim element obvious as the NeXTSTEP References do not disclose this element as described above in Section X.B.

541.    Dr. Olsen further opines that the combination of Stamps and the NeXTSTEP References disclose enabling the selection of a detected structure and a linked action.  (Appendix

200

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

12 at 14, 35.)  Even assuming that one of ordinary skill would combine these two references, such a combination would not render this claim element obvious as the NeXTSTEP References do not disclose this element as described above in Section X.B.

542.    Dr. Olsen also states that Stamps in combination with the NeXTSTEP References discloses the additional limitations of claim 3.  (Appendix 12 at 22.)  However, even assuming that one of ordinary skill would combine these references (a point I dispute above), the combination of Stamps and the NeXTSTEP References does not disclose an input device that receives data from an application running concurrently under HTC's and the Staff's construction to the extent they allege that the plain meaning of "input device" includes only hardware such as a keyboard or mouse.  Dr. Olsen admits as much in his Appendix 6, stating that NeXTSTEP does not disclose an "input device" that receives data from an application running concurrently as a "keyboard and mouse in 1992 would not have the ability to receive data to be detected from an application running concurrently." (Appendix 6 at 50.)  In the context of claim 3, it makes more sense to refer to a software input device as receiving data from an application than a hardware input device such as a keyboard or a mouse.

### 2.      The Combination of the Stamps Patent and the Koved Reference Does Not Render Claims 1 or 8 Obvious.  (Appendix 12)

543.    The only reason identified by Dr. Olsen for combining the Stamps patent and the Koved reference is that they both "relate to text checking programs." (Appendix 12 at 6.) However, spell checking is a broad field comprising thousands of publications, that Stamps and Koved are both related to spell checking is not enough to motivate or suggest to one of ordinary skill in the art to combine their disclosures.

544.    It would not have been obvious to combine Stamps with Koved.  And, even if a person of ordinary skill would combine Stamps with Koved, one would still not arrive at claims

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

1 and 8 of the '647 patent. For example, Dr. Olsen opines that the combination of Stamps and Koved disclose enabling the selection of a detected structure and a linked action. (Appendix 12 at 14, 35.) Even assuming that one of ordinary skill would combine these references, such a combination would not render this claim element obvious as Koved does not disclose enabling the selection of a detected structure and a linked action as described above in Section X.F.

545. Dr. Olsen also opines that the combination of Stamps and Koved disclose highlighting detected structures. (Appendix 12 at 33.) Even assuming that one of ordinary skill would combine these references, such a combination would not render this claim element obvious as Koved does not disclose detecting structures as stated above in Section X.F.

### 3. The Combination of the Stamps Patent and the State of the Art Does Not Render Claims 4, 8, 17, 19, or 20 Obvious. (Appendix 12)

546. Dr. Olsen states in a single sentence in Appendix 4 that "claims 4, 6, 8, 17, 19, and 20 would have been obvious at the time of the invention in light of the state of the art, as described by the '647 patent." (Appendix 12 at 3.) I disagree with Dr. Olsen and believe that claims 4, 8, 17, 19, and 20 were not obvious. As an initial matter, it is not clear if Dr. Olsen is indeed limiting the "state of the art" to its description in the '647 patent's specification, or if he is incorporating his description of the supposed "state of the art" from paragraphs 27-34 and 356-371 of his report. I incorporate my rebuttal to Dr. Olsen's description of the "state of the art" from Sections VI.B and VI.C.

547. Dr. Olsen has failed to make any showing that the "state of the art" rendered claims 4, 8, 17, 19, and 20 obvious. Instead of referring to disclosures of specific systems from the "state of the art," Dr. Olsen only cites to selected testimony from some of the named inventors. He provides no explanation of why a person of ordinary skill in the art would combine the disclosures of the supposed "state of the art" with Stamps. As a result, even if a

202

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

person of ordinary skill would combine Stamps with the "state of the art," one would still not arrive at claims 4, 8, 17, 19, and 20 of the '647 patent.

548.    Dr. Olsen opines that it would have been obvious at the time of the invention "to use grammars and a parser for detecting structures in data." (Appendix 12 at 27.)  As noted by Dr. Olsen, the applicants disclosed the existence of grammars in the '647 patent's specification; yet the examiner did not reject claim 4 as obvious.  Further, Dr. Olsen provides no explanation for why a person of ordinary skill would combine the disclosures of Stamps with grammars and a parser for detecting structures.  Stamps was primarily concerned with locating unrecognized text. This did not constitute detecting structures.  And even if it did, there would be no need to use a grammar to locate unrecognized text.  While Stamps does mention a grammar checker, it is referring to finding English-language grammar mistakes; this does not necessitate the need for a "grammar" as that term is used by the '647 patent.

549.    Nor does Dr. Olsen explain why a person of ordinary skill would seek to combine highlighting detected structures with the disclosures of Stamps.  As I have already explained, Stamps does not disclose detecting structures.

550.    Finally, Dr. Olsen provides no reason why a person of ordinary skill in the art would seek to combine the process of identifying strings in data with the disclosures of the Stamps patent.  Stamps was concerned with locating unrecognized text, not finding string matches.

    **H.**    **Newton "System" And Guide**

        **1.**    **The Combination of the Newton Guide and Screenshots from the MessagePad 110 Running Newton 1.2 Operating System ("Screenshots") Does Not Render Claims 1, 3, 4, 8, 15, 17, 19, or 20 Obvious. (Appendix 14)**

203

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

551.    Dr. Olsen opines that it would have been obvious to a person of ordinary skill to combine the disclosures of the Newton 2.0 Programmer's Guide with screenshots taken from the MessagePad 110 running Newton OS 1.2 because "they addressed the use and functionality of Newton." (Appendix 14 at 1.)  I disagree with Dr. Olsen's opinion.  Even if a person of ordinary skill would combine the Newton 2.0 Programmer's Guide with screenshots taken from the MessagePad 110 running Newton OS 1.2, one would still not arrive at the asserted claims of the '647 patent.

552.    Dr. Olsen does not describe a reason why a person of ordinary skill in the art would combine these references.  As an initial matter, Dr. Olsen admits that the Newton 2.0 Programmer's Guide was not published until 1996 (Appendix 14 at 2).  Dr. Olsen has not shown, or even contended, that the guide was published before the '647 patent's filing on February 1, 1996.  Thus, Dr. Olsen has not established that the Newton 2.0 Programmer's Guide is prior art to the '647 patent and it therefore should not be considered in any obviousness combinations.

553.    Moreover, the fact that the Newton 2.0 Programmer's Guide describes a different operating system then the MessagePad 110 indicates that a person of ordinary skill would not have looked towards the Newton 2.0 Programmer's Guide for teachings with regard to the MessagePad 110.  Dr. Olsen states that it is his "***understanding*** that for the sections cited below, Guide describes the functionality that existed in both the version of Newton that existed in 1994, as well as in 1996." (Appendix 14 at 2 (emphasis added).)  First, it is not clear if this is Dr. Olsen's opinion or an assumption.  Second, while it is true that the Newton 2.0 Programmer's Guide describes the Intelligent Assistant feature *as it existed in Newton 2.0*, Dr. Olsen has not shown that the Intelligent Assistant in Newton 1.0 - 1.3 operated in the same fashion.  To the extent that the Newton 2.0 Programmer's Guide describes features not present or identical in

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

Newton 1.2, it would not have been obvious to a person of ordinary skill in the art to combine the different disclosures from these two sources.

> 2.     **The Combination of the Newton Guide and Screenshots and the Perspective Handbook Does Not Render Claims 1, 3, 8, 15, or 20 Obvious.  (Appendix 14)**

554.    Dr. Olsen opines that it would have been obvious to a person of ordinary skill to combine the Newton 2.0 Programmer's Guide and MessagePad 110 screenshots with the Perspective Handbook simply because each relate to personal digital assistants. (Appendix 14 at 2.)  I disagree with Dr. Olsen's opinion.  Personal digital assistants, or PDAs, are an entire submarket of computers and encompass a wide variety of different systems and sources of information.  There were many different references regarding PDAs, simply because Newton and Perspective relate to such devices is not enough reason for a person of ordinary skill to combine these references.

555.    Moreover, the Newton's Intelligent Assistant and the Perspective software have very different goals.  The Newton's Intelligent Assistant is similar to a command-line interpreter, providing a "textual interface" to applications.    (Newton 2.0 Programmer's Guide at HTC007284525.)  Conversely, Pensoft's Perspective is a single application that "help[s] track a user's daily information, such as meetings, people, companies and notes." (Olsen Validity Report at ¶ 195.)  With such disparate purposes, there is no reason a person of ordinary skill would look towards the Perspective Handbook when considering the Intelligent Assistant system service.  Nor has Dr. Olsen articulated *how* the Newton system could be combined with the Perspective Handbook.

556.    Dr. Olsen contends that it would have been obvious to a person of ordinary skill to combine the disclosures of the Newton system and the Perspective Handbook to arrive at the

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

claimed analyzer server. (Appendix 14 at 29.) However, neither the Perspective Handbook nor the Newton system disclose the claimed analyzer server under any parties' constructions, as explained above in Sections X.A and X.H. And even assuming that a person of ordinary skill would have combined these references, a point I dispute above, such a combination does not disclose the claimed analyzer server under HTC's construction. Perspective is a single application that consists of multiple "documents." HTC's incorrect construction of "analyzer server" requires that the document be presented by a separate application. Since the Perspective software is a single application that encompasses both the Associate and presentation of the document(s), it does not disclose this claim element under HTC's construction.

557.    Dr. Olsen next states that a person of ordinary skill in the art would combine the disclosures of the Newton system and Perspective Handbook to arrive at the claimed "user interface enabling the selection of a detected structure and a linked action." (Appendix 14 at 32, 51 (incorporating his discussion of claim 1 for claim 15).) However, Dr. Olsen does not provide a single citation to the Perspective Handbook to support his opinion. For this reason alone, Dr. Olsen has failed to demonstrate the obviousness of this claim element. To the extent Dr. Olsen meant to cite to the same sections of the Perspective Handbook he cited in Appendices 4 and 5, I incorporate my responses to those appendices. Further, Dr. Olsen has not identified *how* one would combine the disclosures of the Newton system and Perspective Handbook to arrive at this claim element. As the Newton Intelligent Assistant only operates on a small selection of text and does not enable the selection of a detected structure, there is no obvious manner to incorporate the gestures of the Perspective Handbook with the Intelligent Assistant. Notably, the Newton allowed for various types of user gestures but did not incorporate them into the Intelligent

206

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

Assistant; I consider this to weigh against any reason to combine the Newton system with the Perspective handbook.

558.    Dr. Olsen next contends that it would have been obvious to one of ordinary skill to combine the Newton system with the Perspective Handbook to arrive at claim 3.   (Appendix 14 at 43.)  Dr. Olsen is incorrect.  Beyond the fact that one of ordinary skill would not combine these references, the Perspective Handbook itself does not disclose any of the elements of claim 3 as I described above in Section X.A.

559.    Dr. Olsen cites only to the glossary of the Handbook to support his opinion on claim 3.  The glossary states that the Perspective Day Planner, Perspective Month Planner, Perspective List Paper, and Perspective Profilebook "applications" are installed.  However, this statement is contradicted in the introduction to the Handbook, which states that the Perspective Day Planner, Perspective Month Planner, Perspective List Paper, and Perspective Profilebook are just "six standard documents." (Handbook at HTC007286228.)  And I showed above in Section X.A, the EO Communicator 440 identifies Perspective as a single application.

560.    Even if Perspective does consist of multiple applications, that does not mean the Handbook discloses an input device that receives data from an application running concurrently.  First, Dr. Olsen does state what he considers to be the input device disclosed by the Perspective Handbook.   Assuming the Associate contains an input device, Dr. Olsen has provided no evidence that the Associate receives data from an application running concurrently.  In addition, Dr. Olsen never contends that the Perspective Month Planner, Perspective List Paper, and Perspective Profilebook "applications" provide data containing structures to be detected.

561.    Moreover, Dr. Olsen does not identify where the Handbook supposedly discloses an application program interface for communicating with the application.  Such a disclosure

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ≺

would require not just that the Perspective "system" comprises multiple applications, but also that the program routines of claim 1 exist outside of the Perspective Day Planner "application." However, Dr. Olsen has not contended, let alone proven, that the Associate exists external to the Perspective Day Planner "application." Therefore, the Handbook does not disclose this element of claim 3.

562.    Finally, Dr. Olsen opines that a person of ordinary skill would combine the Newton system and the Perspective Handbook to arrive at claim 8. However, even assuming one of ordinary skill would attempt such a combination, Dr. Olsen does not describe *how* this combination would take place. The Newton's Intelligent Assistant operates on only a small portion of text; if it has enough information to perform the user-specified command, it does so. Dr. Olsen does not identify at what point the Newton Intelligent Assistant would highlight an allegedly detected structure.

### 3.    The Combination of the Newton Guide and Screenshots and the Salton Reference Does Not Render Claim 19 Obvious. (Appendix 14)

563.    Dr. Olsen opines that it would have been obvious to one of ordinary skill to combine the Newton system with Salton because both are "directed at the same problem, performing a string search" (Appendix 14 at 3.) I disagree. It would not have been obvious to combine the Newton Guide and Screenshots with Salton. And, even if a person of ordinary skill would combine the Newton Guide and Screenshots with Stamps, one would still not arrive at claim 19 of the '647 patent.

564.    For example, the Newton system is not directed towards the problem of finding a string. The primary purpose of Newton's Intelligent Assistant is to "attempt[] to complete actions specified by the user's written input." (Newton 2.0 Programmer's Guide at HTC007284525.)   In this process, the Intelligent Assistant does attempt to match verb

208

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

commands in the user's input. But this does not require the Intelligent Assistant actively search for such strings as the user must press the "Assist" button before sending the Intelligent Assistant a maximum of 15 words.

565. In addition, the portion of Salton cited by Dr. Olsen relates to "fast string matching." Here, Salton teaches away from using "elemental" string matching and discusses a more efficient manner of matching strings. However, the Newton's Intelligent Assistant has no need for such fast string matching as it can only operate on, at most, 15 words. A person of ordinary skill would not seek to combine Newton with the fast string matching of Salton.

**4.    The Combination of the Newton Guide and Screenshots and the State of the Art Does Not Render Claims 4, 8, 17, 19, or 20 Obvious. (Appendix 14)**

566. Dr. Olsen states in a single sentence in Appendix 14 that "claims 4, 6, 8, 17, 19, and 20 would have been obvious at the time of the invention in light of the state of the art, as described by the '647 patent." (Appendix 14 at 3.) I disagree with Dr. Olsen and believe that claims 4, 8, 17, 19, and 20 were not obvious. As an initial matter, it is not clear if Dr. Olsen is indeed limiting the "state of the art" to its description in the '647 patent's specification, or if he is incorporating his description of the supposed "state of the art" from paragraphs 27-34 and 356-371 of his report. I incorporate my rebuttal to Dr. Olsen's description of the "state of the art" from Sections VI.B and VI.C.

567. Dr. Olsen has failed to make any showing that the "state of the art" rendered claims 4, 8, 17, 19, and 20 obvious. Instead of referring to disclosures of specific systems from the "state of the art," Dr. Olsen only cites to selected testimony from some of the named inventors. He provides no explanation of why a person of ordinary skill in the art would combine the disclosures of the supposed "state of the art" with the Newton system. As a result,

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

even if a person of ordinary skill would combine the Newton system with the "state of the art," one would still not arrive at claims 4, 8, 17, 19, and 20 of the '647 patent.

568.    Dr. Olsen opines that it would have been obvious at the time of the invention "to use grammars and a parser for detecting structures in data." (Appendix 14 at 45.)  As noted by Dr. Olsen, the applicants disclosed the existence of grammars in the '647 patent's specification; yet the examiner did not reject claim 4 as obvious.  Further, Dr. Olsen provides no explanation for why a person of ordinary skill would combine the disclosures of the Newton system with grammars and a parser for detecting structures.  The Newton Intelligent Assistant allowed the user to specify a command to perform by entering a verb such as "call" or "fax."  Dr. Olsen has not identified a need for Newton's Intelligent Assistant to contain a grammar.

569.    Nor does Dr. Olsen explain why a person of ordinary skill would seek to combine highlighting text with the disclosures of the Newton system.  The Newton Intelligent Assistant operated on only a small amount of text selected by the user; there was no need to bring that text to the user's attention through highlighting.

570.    Finally, Dr. Olsen provides no reason why a person of ordinary skill in the art would seek to combine the process of identifying strings in data with the disclosures of the Newton system.

## XII.   THE '647 PATENT CLAIMS ARE NOT AN OBVIOUS COMBINATION OF PRIOR ART ELEMENTS

571.    In addition to his description of the supposed "state of the art" (Olsen Validity Report at ¶¶ 27-34), Dr. Olsen opines that the '647 patent is an obvious "combination of prior art elements." (*Id.* at ¶¶ 356-89.)  In so opining, Dr. Olsen cites to, among other things, the '647 patent specification and testimony of the inventors of the '647 patent.  I disagree with Dr.

210

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◁

Olsen's opinion and believe that claims 1, 3, 4, 8, 15, 17, 19, and 20 were not obvious to one of ordinary skill in the art.

572.    Dr. Olsen selectively discusses the '647 patent specification for the proposition that the inventors did not invent certain elements of the asserted claims.  For example, Dr. Olsen refers to conventional systems that could identify structures in data.  (*Id.* at ¶ 357.)  But Dr. Olsen omits that those systems "d[id] not enable automatic performance of an action on an identified structure" and, therefore, if a user wanted to perform an action on a structure, such as moving a telephone number to an electronic telephone book, the user would have to engage in the "tedious and cognitively disruptive" process of having to copy the telephone number, opening the electronic telephone book application, pasting the telephone number into the appropriate field, and closing the application program.  ('647 patent, col. 1:36-50.)  As another example, Dr. Olsen misreads the '647 patent specification to suggest that the prior art showed highlighted detected structures.  (Olsen Validity Report ¶ 357 (citing col. 6:11-13).)  On the contrary, that portion of the specification simply states that highlighting is a presentation mechanism that could be used – not that it was used in earlier technology to identify detected structures.

573.    I have reviewed the '647 patent specification.   It describes the technological background against which the inventors overcame the "limitations and deficiencies of previous systems" and conceived of the claimed invention.  (*See, e.g.*, col. 2:5-10.)  The patent examiner granted the '647 patent over this background, as well as the art considered during prosecution.  I understand that, when an examiner has already considered cited prior art, the burden for Dr. Olsen to prove invalidity is "particularly heavy."

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

574.    Dr. Olsen next selectively quotes from the deposition of Dr. Nardi for the proposition that the inventors did not invent many of the elements of claims 1, 8, and 15. (Olsen Validity Report at ¶¶ 359-364.) First, I note that the questions posed to Dr. Nardi misstate the claimed invention. Dr. Nardi testified that she was confused by the questions Dr. Olsen cites because, contrary to her understanding that a claim must be considered in its entirety, the questions ask whether she had invented isolated elements of the claims. (12/1/2010 Dep. Tr. of B. Nardi at 132:10-24.) Second, Dr. Nardi also testified that the claims of the '647 patent, considered in their entirety, "absolutely" set forth something new. (*Id.* at 133:12-17, 134:21-135:5, 135:11-136:7, 137:20-23.) And while Dr. Olsen quotes Dr. Nardi as stating that they did not invent "linking actions to detected structures," earlier in her deposition Dr. Nardi made clear that the prior art did not link actions to structures in an "ordinary document" or allow a user to access linked actions. (*Id.* at 61:23-62:13 ("Q.  I mean, earlier you said that there were applications that could link actions to structures; correct? . . . A. I said that you can program a computer to do that anytime you want to, but there wasn't this kind of end user capability, and the capability to take an ordinary document and make that easy. That was not there, to my knowledge.").)

575.    Dr. Olsen next opines on various isolated elements of the independent claims.  I will similarly take each in turn.

576.    **Receiving Computer Data**: Dr. Olsen generally states that the prior art disclosed methods of receiving computer data.  To the extent that he cites any particular examples of receiving computer data, he discusses art that I have addressed above:  Perspective, the NeXTSTEP operating system, Pandit, Koved, and Stamps. (Olsen Validity Report ¶ 367.)

212

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

577.    Dr. Olsen also refers to the '647 patent specification's discussion of receiving data. For example, he quotes the '647 patent's discussion of receiving computer data from an application: "[i]n a typical day . . . a user may receive extensive files from word processing programs and e-mail that contain several of these structures." (*Id.* at ¶ 368; col. 1:16-19.) That quotation supports my opinion regarding the proper construction of "input device." The inventors of the '647 patent expressly disclosed that software, such as word processors and email programs, and hardware, such as keyboards and mice, existed and received data. That the examiner found the claims of the '647 patent non-obvious presents an additional hurdle that Dr. Olsen cannot overcome. Dr. Olsen has not proven that the combination of an input device for receiving data with the other elements of the claims of the '647 patent were obvious.

578.    **Detecting structures in data**: As mentioned above, the inventors disclosed within the '647 patent's specification that conventional systems allowed users to identify structures in data. This disclosure did not prevent the examiner from allowing the patent. Further, in discussing detecting structures in data, Dr. Olsen omits the "limitations and deficiencies of previous systems." Further, Dr. Olsen misstates the scope of the invention by discussing and relying on "[s]ystems that find patterns and replace them with other text" and "[c]ompiling computer programs so that they can be executed on a machine," as neither concern the finding and identifying claimed by the '647 patent. (Olsen Validity Report ¶ 369.)

579.    And although parsers and grammars have been around for a while, I note that in all that time no one combined the detection of structures with the other claim elements of the '647 patent. The fact that parsers and grammars had been around a while supports my opinion that the '647 patent were not obvious.

213

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

580.   **Linking actions to detected structures**: Dr. Olsen provides only two examples that supposedly indicate that linking actions to detected structures was known in the art:  (1) "search and replace" and (2) recognition of program code by a parser.  Neither example, however, functions like the claimed invention.

581.   As I have explained above with regard to spell checkers, "search and replace" does not link an action to a detected structure.  Such an operation does not cause the CPU to perform a sequence of operations on a detected structure (even assuming it is a detected structure), but instead replaces that detected structure.  Even if it does constitute a linked action, one of ordinary skill would not be motivated to combine it with other prior art elements as search and replace is an extremely limited "action."  For example, it does not allow for differentiation of actions based on the type of detected structure.  Further, Dr. Olsen acknowledges that "search and replace" had been around for "more than a decade."  That search and replace had been around for such a long period of time and no one used it in a combination claimed by the '647 patent evidences the non-obviousness of the '647 patent.

582.   The recognition of program code by a parser also fails to link actions to detected structures.  During the compilation of a program, a parser does analyze computer source code and create the appropriate machine code.  But parsing computer source code is not the claimed "detecting;" source code is already in a structured format and is not free text.  Matching source code statements such as "if" and "switch" is not the same as finding recognizable structures of semantic significance.  Moreover, machine code is created automatically and does not allow for selectability.  In fact, it would not make sense for a compiler to allow the programmer to "select" the "action" of creating machine code – the entire reason for having high-level computer

214

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◁

programming languages is to alleviate the need of having a programmer write low-level assembly code.

583.   **Selecting a detected structure and linked action**:   Dr. Olsen misstates the background to the invention of the '647 patent.  In this section, he discusses the use of a menu of choices merely as a selection mechanism.  Dr. Olsen does not, however, demonstrate that a menu of choices was used in any previous system that involved "selecting a detected structure and linked action."  And, for the reasons discussed above with regard to the various references that Dr. Olsen relies on in his expert report, Dr. Olsen has not identified any such reference or combination of references.

### A.   The Combinations Identified By Dr. Olsen Were Not Predictable And Yielded Unexpected Results.

584.   I disagree with Dr. Olsen's statement that "[a] person of ordinary skill in the art would appreciate that nothing unpredictable results from combining the elements of the '647 patent in the manner claimed in the '647 patent."  As an initial matter, for the reasons stated above, I disagree with Dr. Olsen that the elements of the claimed invention were known in the prior art or that a person of ordinary skill in the art would have had a reason to combine the different references Dr. Olsen identified in an attempt to obtain the claimed invention.  Further, Dr. Olsen has not identified *how* one would combine the prior art elements to arrive at the '647 patent.  For instance, despite referring to compilers that generate machine code from source code, Dr. Olsen does not identify how a person of ordinary skill in the art could adapt that mechanism to include the other claim elements.  Dr. Olsen's omissions demonstrate the asserted claims were not obvious and yielded unpredictable results.

585.   Dr. Olsen opines that the '647 patent's "claim elements apply the well-known principles of *data detection* and user interfaces."  (Olsen Validity Report at ¶ 372 (emphasis

215

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

added); *see also id.* at ¶ 377.)  "Data detection" was not a well known phrase, let alone principle, at the time of the '647 patent's filing; if anything, Apple *coined the phrase* with its release of Apple's Data Detectors. (*See, e.g.*, "Show of Potential Apple Breaks New Ground by Displaying What's on its Drawing Board - 'Innovation is at the Heart of what we do," MILLER00000520-521.)  Apple's first Data Detectors project was based on what became the '647 patent. (*See, e.g.*, 11/3/2010 Dep. Tr. of D. Wright at 14:25-15:11.)  Apple's newer version of Data Detectors on the iPhone 3GS also practices the '647 patent.

586.    The success of the '647 patent and its vast improvement in user experience was not predictable.  One can envision many different ways of improving a user's experience.  In fact, many areas of computer science focus on just this topic.  However, the invention of the '647 patent provided a significant benefit to computer users.  This is evidenced not just in HTC's copying of the '647 patent (as described below), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The '647 patent saves the user many steps that would otherwise be time consuming and cognitively disruptive.

587.    Dr. Olsen opines that "there is nothing unpredictable about highlighting a detected structure and using a user interface to enable selection of a detected structure and linked action." (Olsen Validity Report at ¶ 375.)  However, the way in which that structure became highlighted, without the user having to manually search for it, the types of structures that are detected, and the

216

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

fact that useful actions are linked to these structures, was both novel, not obvious, and not predictable. My opinion is supported by my experience, review of the literature, and the fact that Dr. Olsen has not identified a reason for one of ordinary skill to combine the "state of the art" to arrive at the '647 patent.

588.   Dr. Olsen's statement that "user interfaces that allow users to interact with a computer system are generally designed to avoid unpredictability and confusion for the user" is inapposite. (Olsen Validity Report at ¶ 375.) Of course user interfaces are not designed to confuse the user or appear unpredictable, but that does not mean a well-designed user interface is predictable or even easy to design. To this day many computer systems contain confusing and, to the user, unpredictable user interfaces. Yet, as I have explained, James Miller, Bonnie Nardi, Tom Bonura, and David Wright were the first persons to create the claimed invention of the '647 patent.

589.   I believe that Dr. Olsen's opinion that the "combination" of the '647 patent produced "completely predictable result[s]" inappropriately suffers from hindsight bias. As I have explained, the elements of the claimed invention were not known. For example, no one had linked actions to detected structures so that the user could choose from a menu of these actions. Thus, a person of ordinary skill in the art would not have predicted the results from an unknown combination.

### B.   A Person Of Ordinary Skill Would Not Have Been Motivated To Pursue The Supposed Combinations Through Trends Or Market Forces.

590.   I disagree with Dr. Olsen's opinion that "a person of ordinary skill would have been motivated to pursue the claimed combination of elements based on trends in industry and research." (Olsen Validity Report ¶ 382.) In forming that opinion, Dr. Olsen wrongly opines that there were "a finite number of identified, predictable solutions" to increasing a user's

217

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ⊰

experience. (*See id.* at ¶¶ 381, 386-89.) Dr. Olsen has no support for that opinion. As I have already mentioned, the elements of the claimed invention of the '647 patent were not known. For example, no one had linked actions to detected structures so that the user could choose from a menu of these actions. Thus, there was no identified let alone predictable solution to a person of ordinary skill in the art.

591.    The "trends" identified by Dr. Olsen were present for many years, if not decades, before the invention of the '647 patent. Yet in all that time, a person of ordinary skill had not arrived at the claimed invention. "Improving the computer user's experience" has indeed been a motivation for the evolution of computer systems since their inception. The interaction between human and computer is an entire field within computer design. Dr. Olsen understates the long history of "simplifying and improving the computer user's experience" by associating this goal to just the early 1990s. (Olsen Validity Report at ¶ 383.)

592.    While one sub-focus of user experience design was to "decreas[e] the number of steps that had to be performed by a user," Dr. Olsen misstates that there was a trend of "automatically detecting structure in data and performing actions on these detected structures." (*Id.* at ¶ 384.) Dr. Olsen's statement inaccurately reduces all of the user interface and user experience work of the '80s and early '90s to the single mechanism of automatically detecting structures in data and performing actions. Further, Dr. Olsen's selective citation to four alleged prior art references (Koved, Nokia, Perspective Handbook, and Mogilevsky), does not constitute evidence of a market trend. I further disagree with Dr. Olsen's attempt to rely on this "market trend" to provide a reason to combine these references that address different technologies. As discussed above, a person of ordinary skill in the art would not have had a reason to combine these references.

218

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

593.    Dr. Olsen improperly attempts to narrow the '647 patent to an "email storing example" and finds a "predictable solution to the problem of reducing the number of steps to store an email in the address book would be to allow the computer to perform those steps instead of the user." (Olsen Validity Report at ¶ 388.)  However, realizing such a goal is not as simple (or predictable) as Dr. Olsen contends.  As I have explained, no other system had thought of detecting an email address and linking actions, such as storing the email in an address book or creating an email addressed to that person's email address, to the detected structure.

594.    At its core, Dr. Olsen's opinion suggests that because computers will become more powerful over time and transfer more responsibility for tasks from the user to the computer, all inventions that relate in some way to computers present a finite number of predictable solutions that must be obvious.  I disagree with Dr. Olsen, especially as it pertains to the claimed invention of the '647 patent.  Again, Dr. Olsen is incorrect that there were a "finite number of identified" solutions.  As I have shown throughout this report, there was no single prior art reference that identified all elements of a single claim of the '647 patent.  The design needs and market pressures that Dr. Olsen has identified were at operation for many years before the invention of the '647 patent; that no person came up with the novel invention claimed in the '647 patent during this time is strong evidence that Dr. Olsen is wrong.

## C.    Objective Indicia Further Establish the Non-Obviousness of the '647 Patent

595.    As explained above, I understand certain objective factors can evidence the non-obviousness of a patent.  Such objective factors include, but are not limited to, copying of the claimed invention, industry acceptance or recognition of the claimed invention, and a long-felt but unsolved need.  While it is my opinion that, regardless of these objective factors, Dr. Olsen has failed to show that the asserted claims of the '647 were obvious ████████████████

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

████████████████████████████████████████████████████
████████████████████████████████████

### 1.   Copying of the '647 Patent by HTC and Others

596.   I have reviewed Dr. Olsen's opinion regarding Apple's evidence of copying and disagree with his conclusion.

597.   Apple has long been known for its simple, easy-to-use user interfaces.  This reputation for innovative user interface design has extended to the original iPhone and was continued in the iPhone 3GS. ████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████
██  ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████  ██████  ████████████

---

[19] I note that Dr. Olsen did not opine that any of the objective factors tends to support a showing of obviousness of the patent.



➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

[REDACTED]

For instance, after Apple announced the pending release of Data Detectors, a company named MacSpigot released a software package called "Data Ratchet." (MILLER00000897-900; MILLER00001070-75.) Data Ratchet "automatically and instantaneously extracts critical information from web pages, email, or any other text document" and claimed to be "an implementation of the 'Apple Data Detectors' information extraction design currently in development at Apple."

   2.   **Acceptance by others of the claimed invention as shown by praise from others in the field**

601.   I have reviewed Dr. Olsen's opinion regarding Apple's evidence of industry praise and recognition and disagree with his conclusion.

602.   It is my opinion that acceptance by others of the '647 patent as evidenced by praise and recognition from the industry strongly supports non-obviousness. Such recognition

221

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

has taken many forms, ███████████████████████████

███████████████████████████████████████

███████████████████

█     ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

██████████████████████████
██████████████████████████
██████████████████████████
██████████████████████████
██████████████████████████
██████████████████████████
██████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

604.    HTC's encouragement of its customers' infringement of the '647 patent further evidences industry acceptance and recognition of the patent.  One example is HTC's User Guide for the Aria phone, which instructs a user on using the HTC Messages application to select a phone number contained in a text message and choose an action to take on that number such as dialing it or adding it to the contacts. (HTC000629261-629467 (HTC Aria User Guide) at 629333.)  The HTC Droid Incredible's User Guide provides almost identical instructions. (HTC000000623-827 at HTC000000694.)  The HTC T-Mobile G1 User Guide also describes selecting phone numbers and email addresses in web pages and selecting a linked action to perform such as sending an email, calling the number, or adding the number to your contact list. (HTC000005423-563 (T-Mobile G1 User Guide) at 489.)  The HTC Droid Incredible and HTC Aria's User Guides further state that the Browser application recognizes phone numbers and addressees and allows the user to press and hold the link to perform various actions. (HTC000000623-827 at HTC000000755; HTC000629261-629467 (HTC Aria User Guide) at 629394.)

605.    Before Apple's full release of the original Apple Data Detectors, Apple sought testers for prototype versions.  After posting its need for such testers, Apple received well over 200 responses from consumers and programmers wishing to participate. (*See* WRIGHT00001033-1296.)  People such as the Systems Administrator of the NASA Ames Research Center (WRIGHT00001055), and university professors (WRIGHT00001033; WRIGHT00001062), all praised the technology.

### 3.    Long-felt but unsolved need

606.    Dr. Olsen opines that the '647 patent was an obvious "combination of prior art elements" that were "well-known." (Olsen Valdity Report at ¶¶ 356, 364.)  While I disagree with

➤ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

Dr. Olsen's conclusion and many of his examples of "elements of the asserted claims that were well-known," Dr. Olsen statements regarding the state of the art actually support the non-obviousness of the '647 patent.

607.    For example, parsers for identifying structures in data were present in the art well before the invention of the '647 patent.  So too were user interface menus.  And since the advent of the graphical user interface, the computer industry has sought to improve user experience. Yet, in all that time, no one had invented the solution claimed in the '647 patent.  In my opinion, this evidences a long-felt but unsolved need for the '647 patent.

## XIII.   ALLEGED MATERIALITY OF SELECTION RECOGNITION AGENT

608.    I understand that Dr. Olsen opines on the alleged "materiality" of a 1997 publication by Miland Pandit et al. ("1997 Pandit publication") to the subject matter of the '647 patent.   It is my further understanding that Dr. Olsen does not allege that the 1997 Pandit publication constitutes prior art to the '647 patent and that HTC has admitted that it is not.  I am further aware that before Dr. Olsen signed his report, HTC sought leave to assert a claim of inequitable conduct in the prosecution of the '647 patent.  It is my understanding that the Judge rejected HTC's motion and prevented HTC from making such an assertion.  (*See* Order 75.)   I understand that as a result of the Judge's order, the 1997 Pandit publication is no longer relevant to any issue in this Investigation.  As Dr. Olsen's opinions on materiality of the 1997 Pandit publication are not relevant, I offer no opinion on them.   To the extent the 1997 Pandit publication or the functionality described therein becomes relevant to this Investigation in any way, I reserve the right to offer an opinion regarding either or both.

➢ CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER ◄

## XIV. REEXAMINATION

609.   I am aware that the '647 patent is the subject of an reexamination proceeding in the United State Patent and Trademark Office.  In the most recent Office action in that reexamination, it is my understanding that the examiner rejected all claims of the '647 patent as anticipated/obvious in view of the '636 patent.  I have considered the examiner's comments in support of his rejection and I do not agree with them.  For the reasons stated above in Section X.C, it is my opinion that the claimed invention of the '647 patent is patentably distinguishable from the '636 patent.

## XV. RESERVATION OF RIGHTS

610.   I reserve the right to supplement or amend my opinions in response to any critique of my report or alternative evidence or opinions advanced by or on behalf of Respondent HTC. For example, it may be necessary for me to modify or supplement my opinions as a result of ongoing expert discovery, ALJ rulings, deposition, or trial testimony. Finally, I reserve the right to create visual aids and demonstrative exhibits that may help me in explaining the technical matters that I expect to testify about. Examples of these visual aids and demonstrative exhibits may include, for example, charts, diagrams, videos, models, and animated or computer-generated video presentations describing the technology related to the asserted claims and the prior art.

CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

Dated: February 14, 2011

_____

Dr. Todd C. Mowry

226

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing REBUTTAL EXPERT REPORT OF DR. TODD C. MOWRY REGARDING VALIDITY OF U.S. PATENT NO. 5,946,647 was served on the parties, in the manner indicated below, this 14th day of February, 2011 (or as otherwise noted):

The Honorable Carl C. Charneski
Administrative Law Judge
U.S. INTERNATIONAL TRADE COMMISSION
500 E Street, S.W., Room 3170
Washington, DC 20436
(BY HAND DELIVERY ON 2/15 – 2 COPIES)

Erin D. Joffre
Office of Unfair Import Investigations
U.S. INTERNATIONAL TRADE COMMISSION
500 E Street, S.W., Suite 401Q
Washington, DC 20436
(BY E-MAIL)

### COUNSEL FOR RESPONDENTS NOKIA CORPORATION AND NOKIA, INC.

Paul F. Brinkman
Alan L. Whitehurst
ALSTON & BIRD LLP
950 F Street, N.W.
Washington, DC 20004
(BY E-MAIL)

Patrick J. Flinn
Keith E. Broyles
John D. Haynes
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
(BY E-MAIL)

### COUNSEL FOR RESPONDENTS HIGH TECH COMPUTER CORP. A/K/A HTC CORP., HTC AMERICA, INC. AND EXEDEA, INC.

James B. Coughlan
PERKINS COIE LLP
607 Fourteenth Street, N.W.
Washington, DC 20005-2003
(BY E-MAIL)

Jonathan M. James
PERKINS COIE BROWN & BAIN P.A.
2901 North Central Avenue, Suite 2000
Phoenix, AZ 85012
(BY E-MAIL)

Robert A. Van Nest
Asim Bhansali
Steven K. Taylor
Matthias A. Kamber
KEKER & VAN NEST LLP
710 Sansome Street
San Francisco, CA 94111
(BY E-MAIL)

Charles K. Verhoeven
Amy H. Candido
Sean S. Pak
Todd Kennedy
QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(BY E-MAIL)

Wendy K. Adams
Senior Legal Assistant, Kirkland & Ellis LLP

# Exhibit A

# Supplemental List of Materials Considered

**Expert Reports**
Expert Report of Dan R. Olsen Jr., Ph.D. Regarding Validity of U.S. Patent No. 5,946,647, filed on January 27, 2011, and all references cited therein
Everything listed in Appendix 1 in Expert Report of Dan R. Olsen Jr., Ph.D. Regarding Validity of U.S. Patent No. 5,946,647

**HTC Production Documents**
HTC000566608-HTC000566625
HTC000667680-HTC000667681
HTC006510272-HTC006510275

**Third-Party Production Documents**
WRIGHT00001033
WRIGHT00001055
WRIGHT00001062

**Publications**
COMPILERS: PRINCIPLES, TECHNIQUES, AND TOOLS, 1ST EDITION, by Alfred V. Aho, Monica S. Lam, Ravi Sethi, and Jeffrey D. Ullman (Addison Wesley 1986)

**HTC Source Code**
HTC_SC0009315-HTC_SC0009323

**Other**
AT&T EO Personal Communicator model 880
MessagePad running Newton 1.3

# Exhibit B

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Conception of the Claimed Invention |
|---------|-------------------------------------|
| A computer-based system for detecting structures in data and performing actions on detected structures, comprising: | It is my opinion that the preamble of claim 1 is not a limitation of the claim.  Even if the preamble is considered a limitation, the inventors conceived of the preamble by September 25, 1994.  The parties have agreed that the term "structure" means "[a]n instance of a pattern, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc." and that the term "detecting" means "finding and identified."<br><br>Under these constructions, it is my opinion that the named inventors of the '647 patent, Thomas Bonura, James Miller, Bonnie Nardi, and David Wright, conceived of the claimed invention of the '647 patent by September 25, 1994.  My opinion is based on a review of documents produced by the named inventors describing their invention, the deposition testimony of the inventors, and computer demonstrations or "demos" produced by inventor James Miller in and around the relevant timeframe.<br><br>For example, on September 25, 1994, James Miller submitted a proposal to the Nautilus Group at Apple describing the conceived invention as it might be implemented in a software package being developed for bundling with the next generation of Apple Powerbooks laptop computers. (MILLER00000242-245 at MILLER00000244; Miller Tr. 120:24-121:12.)  Miller wrote that "it is easy to envision tasks related to the use of a portable machine that would be enhanced by agents, such as allowing people to retrieve or distribute information without having to deal with the details of where [sic] the information's location, and without knowing and configuring the best communication path to that information." (MILLER00000242-245 at 243.)  In his proposal, Miller further and specifically detailed his group's current work on "structure detectors," which involved detecting structures and performing actions on detected structures: |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Conception of the Claimed Invention |
|---------|-------------------------------------|
|  | Another project within our program is working on "structure detectors": small bits of code that identify interesting objects in users' documents, such as phone numbers, times, dates, conference rooms, and the like, and that initiate actions based on those identified objects. For instance, an e-mail message that announces a meeting could be identified as such, and directly entered into the user's calendar application. This is some of our newest work, and so we may encounter some surprises and unanticipated questions as we begin to scale it up to product complexity. However, it currently has the promise of a small, well-contained set of capabilities, and a simple version of this might be brought to product rather quickly. It depends on nothing more than what is available in System 7.5, although it could benefit from the presence of Drawers. I would suggest we talk about this work and see how it might fit into the Nautilus plans.<br><br>(*Id.* at 243-244.) In response to the Nautilus Group's favorable response to the structure detectors proposal, Mr. Miller wrote that "we all believe the idea to be sound, and something of alpha quality by July [1995] may not be unreasonable—much of the attractiveness of the idea is that there is probably a scalable version that COULD be done in that time frame, with bigger-and-better stuff coming later." (*Id.* at MILLER00000242; *see also* MILLER00000248 (July 27, 1994 email from J. Miller to D. Wright and others regarding "intelligent menus" and "kicking off structure detectors").)<br><br>An August 4, 1994 email from Tom Bonura to James Miller and others further describes a specific example of the claimed invention that would detect a date and time and link a calendaring application for allowing an action such as scheduling a meeting to be linked to the date and time. As described in the email, Mr. Miller requested that Mr. Bonura create a demonstration of this idea: |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Conception of the Claimed Invention |
|---|---|
| | OK thanks for the update.  Yesterday, I showed Jim what I currently have running.  He suggested that we include a demonstration of using the agent form in an application specific manner - e.g., in calendaring.  There would be a form associated with the calendaring task and selecting it would bring up a form allowing the user to schedule a meeting.  Again, the relevant grammar would be date&time.<br><br>(MILLER00000024.)<br><br>Moreover, additional documents and inventor testimony show that work on structure detectors was ongoing beginning in mid-1994. (*See e.g.*, Miller Tr. 121:13-24 (prior to September 24, 1994 '647 named inventors were working on structure detectors), *see also* 2006 Affidavit of J. Miller (MILLER00001157-67) at ¶ 17 ("Apple Data Detectors were developed in July, 1994"), Nardi Tr. 163:16-20 (In September 1994 work on structure detectors was ongoing in group), MILLER00000242-245 at 242 ("First off, I'm very pleased with how the structure detector work is going, and equally pleased that the Nautilus folks think well of it.").)<br><br>Further, by January 25, 1995 at the latest, the inventors had prepared a demonstration of the invention in the Apple SuperCard scripting language to illustrate both the technical capabilities of the invention as well as the desired user interface characteristics.  The demo was informally referred to as the LiveDoc demo (also referred to in documents and testimony as the "SuperCard demo") in communications between the inventors. (*See* Miller Tr. 82:12-18 (Miller understood one meaning of "LiveDoc" to refer to SuperCard demo), 83:5-14 (the SuperCard demo was built by Miller based on collaboration with Nardi, Bonura, and Wright).)  My opinion is that the LiveDoc demo was in existence as of January 25, 1995 and in similar form likely prior to that date based in part on the testimony of inventor James Miller that a version of this demo existed in September 1994. (*See* Miller Tr. 117:17-118:4)  The demonstration was also referenced in a January 25, 1995 email from James Miller to Bonnie Nardi, David Wright, and Thomas Bonura, among others, regarding the status of team's projects, including the structure detectors project implemented in LiveDoc: |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Conception of the Claimed Invention |
| --- | --- |
| | Direction 1: LiveDoc. **You've seen the demo.** The intent here is to provide a home and a platform for several of our individual efforts, particularly Structure Detectors, WordWeb, and the object/knowledge architecture. Based on conversations with you folks, others in ATG, and others in product groups, our goal here should be to tie LiveDoc very closely to OpenDoc and to work with the appropriate product groups to build and ship version 1 of LiveDoc within the next twelve months.<br><br>As such, this will serve as the groundwork and delivery vehicle for our research activities for the next few years: the end-user creation of structure detectors and associated actions; knowledge-intensive representation and processing of actions; and increasingly powerful textual analysis (directions, by the way, which are highly sought after by the product people I've spoken to). But we have to ship the first one, first, to give ourselves the base for the future work, and to establish credibility with the product groups. This means we will have to make hard choices about what's in Version 1 and what's not, and we will have to work in very close collaboration with these product groups, especially AppleSoft, for the design, positioning, definition of the product, and for the underlying technology of the work. We will need technical help in this area; I believe that the best use of our open req is to bring in someone able to play a major role in the design and implementation of LiveDoc as an OpenDoc part. We may not feel very researchy at times, but, again, we're setting the groundwork for our future research, and, in addition, we stand a very good chance of fundamentally changing how millions of people use computers.<br><br>(MILLER00000059-61 at MILLER00000060.) |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Conception of the Claimed Invention |
|---------|-------------------------------------|
| | I have reviewed a LiveDoc demonstration (Version 1.6) produced by Mr. Miller in this case.  As shown below, this file has a "Date Modified" of March 4, 1995.  The "About LiveDoc Demo" dialog states that Version 1.0 of the demo was created January 1995, consistent with the disclosures in the email excerpt above.<br><br>As shown in the below screenshots, the demonstration was made on a computer and illustrates how structure detectors could be implemented in LiveDoc to detect recognizable structures, link actions to the detected structures, and allow users to select actions to perform using the detected structures.  The existence of this demo in early 1995 along with inventor testimony that a version of the SuperCard demo existed in September 1994, is further basis for my opinion that the invention of the '647 patent was conceived by September 25, 1994.  (*See e.g.*, Miller Tr. 117:17-118:4 (SuperCard demo existed as of September 1994).) The SuperCard demo illustrates automatic detection of structures, user selection of detected structures, and a pop-up menu that appear next to the selected structure which allows the user to select an action.  When the user selects the action, the action, such as launching of an email application, is performed immediately.<br><br>**<ins>LiveDoc demo program launches</ins>**<br>For example, the LiveDoc demo begins by showing the user a simulated Apple Macintosh desktop (comprising the peach-colored desktop below.) Like a conventional desktop, icons are present on the desktop including one for the Eudora 2.1 email program – a third party email client application. |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Conception of the Claimed Invention |
|---------|-------------------------------------|
|  | <br><br>**LiveDoc demo program highlights detected structures in an email document**<br>When the user clicks on the Eudora 2.1 icon, a window is opened showing the user's inbox containing two emails.  If the user clicks one of the listed emails, a window is opened showing the contents of the email.  For example, as illustrated below, the user has clicked on the email from Terry Winograd dated January 4, 1995 in order to view its contents.  From this window, the user can invoke the LiveDoc functionality by pressing the <Option> button on the computer keyboard.  When the user does this, structures that the LiveDoc functionality has detected in the email are highlighted as shown below. |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Conception of the Claimed Invention |
|---|---|
|  |  |

**LiveDoc demo allows user to select detected structure and a linked action**

From the example illustrated below, the inventors contemplated the capability of detecting time and date expressions, URLs, email addresses, dates, and names in a document, such as an email, received by the user. Additionally, the inventors contemplated that the functionality provided by their invention would be available to applications that a user would use to access and display documents (here the Eudora 2.1 email client).

The user can then use the demo to select one of the detected structures using the mouse pointer. When the user clicks on the detected structure (here the URL http://www-pcd.stanford.edu/hci.html), a menu appears listing actions that the user can

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Conception of the Claimed Invention |
|---------|-------------------------------------|
|         | perform using the selected structure (here actions linked to the URL structure include: (1) "surf to" the url and (2) "add to Interesting Places.").<br><br><br><br>**The selected action is performed**<br>The picture below shows that as a result of the user's selection of the "surf to" action, a web browser has been opened and directed to the http://www-pcd.stanford.edu/seminar.html website. |

6

| Claim 1 | Conception of the Claimed Invention |
|---|---|
| an input device for receiving data; | I agree with Apple that the term "input device" means "computer hardware or software" in light of its use in the '647 patent specification and claims. HTC and the Staff contend that the phrase should be given its plain and ordinary meaning. Dr. Olsen agrees with HTC and opines that the plain and ordinary meaning of "input device" is "hardware that receives input," such as a keyboard or mouse.<br><br>Under any party's construction of the term "input device," it is my opinion that the inventors conceived of this limitation as early as September 25, 1994 but no later than January 25, 1995. My opinion is based on review of the deposition transcripts of |

Alternatively, the user can select the "Add to Interesting Places" action.



CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Conception of the Claimed Invention |
|---------|-------------------------------------|
|  | the named inventors, as well as review of documents produced by the named inventors describing their invention.<br><br>For example, on September 25, 1994, James Miller submitted a proposal to the Nautilus Group at Apple describing the conceived invention as it might be implemented in a software package being developed for bundling with the next generation of Apple Powerbooks laptop computers. (MILLER00000242-245 at MILLER00000244; Miller Tr. 120:24-121:12).  In 1995 a computer system generally, and the Apple Powerbooks specifically, would have included a hardware input device such as a keyboard and trackpad for receiving data.  Additionally, the inventors conceived that their invention would have included computer hardware and software for receiving data such as an email.  In his proposal, Jim Miller described the structure detectors work:<br><br>Another project within our program is working on "structure detectors": small bits of code that identify interesting objects in users' documents, such as phone numbers, times, dates, conference rooms, and the like, and that initiate actions based on those identified objects.  For instance, an e-mail message that announces a meeting could be identified as such, and directly entered into the user's calendar application.  This is some of our newest work, and so we<br><br>(MILLER00000242-245 at 243.)<br><br>Because the users of computer systems in 1995 would be receiving emails from other users via a computer network including the internet, the inventor's contemplated that their invention would include computer software input devices that would receive documents such as emails for processing and display by their invention.  (*See also* MILLER00000062, July 15, 1994 email from J. Miller to T. Bonura, B. Nardi, D. Wright, and others. ("I can also imagine a structure detector that recognizes time and date expressions *in mail messages or some other source of text*") (emphasis added).)  Additionally,  the invention illustrated by the SuperCard demo referred to by Jim Miller as early as January 25, 1995, contemplated that the invention would be invoked by the user to receive data from an interface with the Eudora 2.1 email client.  Presumably, the Eudora email client would pass the contents of an email message to the invention which would process that data and direct the display of detected structures to the user.  In 1995, this would be implemented using an application programming interface between the Eudora email client and the program of the invention.  Such an interface is consistent with a form of software input device as properly construed. |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Conception of the Claimed Invention |
|---|---|
| |  |
| an output device for presenting the data; | It is my opinion that the inventors conceived of this limitation as part of their invention by September 25, 1994.<br><br>For example, the inventors contemplated the implementation of their invention on a personal computer system. In 1994-1995, such a computer system would include an output device for presenting data and allowing the user to interact with the program, such as a computer display or monitor.  For example, the LiveDoc demo presents a simulated desktop environment (mimicking the existing Macintosh desktop environment) containing an email client window that is used to display the data to the user (in this case, an email message) including the results of the processing by the invention of that data: |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Conception of the Claimed Invention |
|---------|-------------------------------------|
|  |  |
| a memory storing information including program routines including | It is my opinion that the inventors conceived of this limitation as part of their invention by September 25, 1994.

For example, the source code for implementing the conceived invention would have to be compiled and executed on a computer. In 1994-1995, such a computer system would include a memory for storing program routines. As described below, the inventors conceived of these program routines as including an analyzer server, a user interface, and an action processor as claimed. |
| an analyzer | The parties have agreed that the term "structure" means "[a]n instance of a pattern, where a 'pattern' refers to data, such as a |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Conception of the Claimed Invention |
|---|---|
| server for detecting structures in the data, and for linking actions to the detected structures; | grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc." and that the term "detecting" means "finding and identifying."<br><br>The parties dispute the meaning of "analyzer server."  I agree with Apple that this term means "a program routine(s) that receives data, uses patterns to detect structures in the data, and links actions to the detected structure."  The Staff construes the term to mean "a program sub-routine that receives data from a document having recognizable structures, and uses patterns to detect the structures."  HTC construes the term to mean "a program sub-routine that receives data from a document having recognizable structures, and uses patterns to detect the structures, where the document is presented by a separate application."<br><br>The parties also dispute the meaning of "linking actions to the detected structures."  I agree with Apple that the term means "linking detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are linked."  HTC and the Staff construe the term to mean "linking a detected structure to a computer subroutine that causes the CPU to perform a sequence of operations on that particular structure to which it is linked, rather than an informational structure."<br><br>Under any party's constructions, it is my opinion that the inventors conceived of this limitation as part of their invention by September 25, 1994.<br><br>For example, on September 25, 1994, James Miller submitted a proposal to the Nautilus Group at Apple describing the conceived invention as it might be implemented in a software package being developed for bundling with the next generation of Apple Powerbook laptop computers. (MILLER00000242-245 at MILLER00000244; Miller Tr. 120:24-121:12.)  Miller wrote that "it is easy to envision tasks related to the use of a portable machine that would be enhanced by agents, such as allowing people to retrieve or distribute information without having to deal with the details of where [sic] the information's location, and without knowing and configuring the best communication path to that information." (MILLER00000242-245 at 243.)  Miller further and specifically detailed his group's current work on "structure detectors": |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Conception of the Claimed Invention |
|---------|-------------------------------------|
| | Another project within our program is working on "structure detectors": small bits of code that identify interesting objects in users' documents, such as phone numbers, times, dates, conference rooms, and the like, and that initiate actions based on those identified objects. For instance, an e-mail message that announces a meeting could be identified as such, and directly entered into the user's calendar application. This is some of our newest work, and so we

(MILLER00000242-245 at 243)

As a further example, on December 16, 1994, inventor Tom Bonura described, in my opinion, a form of client-server architecture for the structure detectors functionality:

- If there is a sd background launched, don't let another sd background be launched. By the way, I suggest that we *don't* build the detector as an extension. One of my friends in AppleSoft tells me that extensions are being actively discouraged with the preference being to use background applications (processes, if you will).

(MILLER0000235)

By running in the background, the structure detectors "engine" detecting structures and linking actions would have the capability of serving various client applications. This architecture is consistent with the disclosure of the LiveDoc demo referred to by Jim Miller in January 1995. In the demo, the Eudora email client utilizes the capabilities of the structure detectors engine in order to implement the LiveDoc functionality. The structure detectors analyzer server detects structures in the user's email and links actions to those detected structures as illustrated below: |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Conception of the Claimed Invention |
|---|---|
| |  |
| a user interface enabling the selection of a detected structure and a | The parties have agreed that the term "structure" means "[a]n instance of a pattern, where a "pattern" refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, address/es, phone numbers, names, etc." and that the term "detected" means "found and identified."<br><br>Under any party's constructions, it is my opinion that the inventors conceived of this limitation as part of their invention by September 25, 1994.<br><br>For example, an August 4, 1994 email from Tom Bonura to Jim Miller and others further describes a specific example of user |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Conception of the Claimed Invention |
|---|---|
| linked action; and | interface capabilities of the claimed invention that would detect a date and time and link a calendaring application for allowing an action such as scheduling a meeting to be linked to the detected date and time.<br><br>OK thanks for the update.  Yesterday, I showed Jim what I currently have running.  He suggested that we include a demonstration of using the agent form in an application specific manner - e.g., in calendaring.  There would be a form associated with the calendaring task and selecting it would bring up a form allowing the user to schedule a meeting.  Again, the relevant grammar would be date&time.<br><br>(MILLER00000024.)<br><br>By way of further example, on September 25, 1994, James Miller submitted a proposal to the Nautilus Group at Apple describing the conceived invention as it might be implemented in a software package being developed for bundling with the next generation of Apple Powerbooks laptop computers. (MILLER00000242-245 at MILLER00000244; Miller Tr. 120:24-121:12)  In that proposal, he contemplated the user interface capabilities of such a system.<br><br>I would be very interested in pursing Nautilus as a release vehicle for some of our work on intelligent systems and agents.  It is easy to envision tasks related to the use of a portable machine that would be enhanced by agents, such as allowing people to retrieve or distribute information without having to deal with the details of where the information's location, and without knowing and configuring the best communication path to that information.  Delegating<br><br>(MILLER00000242-245 at 243)<br><br>These capabilities were illustrated in the SuperCard demo referred to by Jim Miller in January 1995.  The demo clearly illustrated a user interface that allows the user to select detected structures and, from a menu appearing after such selection, the subsequent selection of an action linked to that detected structure: |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Conception of the Claimed Invention |
|---------|-------------------------------------|
|  |  |
| an action processor for performing the selected action linked to the selected | The parties have agreed that the term "structure" means "[a]n instance of a pattern, where a"'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, address/es, phone numbers, names, etc."

Under this construction, it is my opinion that the inventors conceived of this limitation as part of their invention as early as September 25, 1994, but no later than January 25, 1995.

For example, the LiveDoc demo referred to by Jim Miller in 1995 exhibited the capability of performing the action selected by |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Conception of the Claimed Invention |
|---|---|
| structure; and | the user that was linked to the detected structure.  The demo allows the user to select one of the detected structures using the mouse pointer.  When the user clicks on the detected structure (here the URL http://www-pcd.stanford.edu/hci.html), a menu appears listing actions that the user can perform using the selected structure (here actions linked to the URL structure include: (1) "surf to" the url and (2) "add to Intereesting Places.").<br><br><br><br>The user can select one of these linked actions which cause the action processor of the invention to perform the linked action. The picture below shows that as a result of the user's selection of the "surf to" action, a web browser has been opened and directed to the http://www-pcd.stanford.edu/seminar.html website. |

19

| Claim 1 | Conception of the Claimed Invention |
|---|---|
| a processing unit coupled to the input device, the | I agree with Apple that the term ''input device'' means ''computer hardware or software'' in light of its use in the '647 patent specification and claims. HTC and the Staff contend that the phrase should be given its plain and ordinary meaning. Dr. Olsen agrees with HTC and opines that the plain and ordinary meaning of ''input device'' is ''hardware that receives input,'' such as a keyboard or mouse.<br><br>Under any party's constructions, it is my opinion that the inventors conceived of this limitation as part of their invention as by |

Alternatively, the user can select the ''Add to Interesting Places'' action.



CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Conception of the Claimed Invention |
|---|---|
| output device, and the memory for controlling the execution of the program routines. | September 25, 1994.<br><br>For example, any implementation of the inventors' conceived invention would use source code that would have been compiled and executed on a computer.  In 1994-1995, such a computer would include a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines. |

| Claim 3 | Conception of the Claimed Invention |
|---|---|
| The system recited in claim 1, wherein the input device receives the data from an application running concurrently, and wherein the program | The parties have agreed that the term "application running concurrently" means "application running during the same run time." The parties dispute the meaning of the term "input device."  I agree with Apple that it should be construed to mean "computer software or hardware."  HTC and the Staff contend that the term should be given its plain and ordinary meaning.<br><br>Under any party's construction, it is my opinion that the inventors conceived of this limitation as part of their invention as early as September 25, 1994, but no later than January 25, 1995.<br><br>For example, the inventors conceived that their invention would have received data, such as an email, from a currently running email application.  In proposing the structure detectors concept to the Nautilus group, Jim Miller described: |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 3 | Conception of the Claimed Invention |
|---|---|
| routines stored in memory further comprise an application program interface for communicating with the application. | Another project within our program is working on "structure detectors": small bits of code that identify interesting objects in users' documents, such as phone numbers, times, dates, conference rooms, and the like, and that initiate actions based on those identified objects. For instance, an e-mail message that announces a meeting could be identified as such, and directly entered into the user's calendar application. This is some of our newest work, and so we <br><br> As an additional example, the invention illustrated by the SuperCard demo referred to by Jim Miller as early as January 25, 199? contemplated that the invention would be invoked by the user to receive data from an interface with the Eudora 2.1 email client. Presumably, the Eudora email client would pass the contents of an email message to the invention which would process that data and direct the display of detected structures to the user. In 1995, this would be implemented using an application programming interface between the Eudora email client and the program of the invention that would allow the processing of the data contained in received emails as well as the appropriate display of processed data to allow the selection of detected structures and linked actions. |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 3 | Conception of the Claimed Invention |
|---|---|
| |  |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 4 | Conception of the Claimed Invention |
|---|---|
| The system recited in claim 1, wherein the analyzer server includes grammars and a parser for detecting structures in the data. | The parties have agreed that the term "structure" means "[a]n instance of a pattern, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc." and that the term "detecting" means "finding and identifying."<br><br>The parties dispute the meaning of "analyzer server." I agree with Apple that this term means "a program routine(s) that receives data, uses patterns to detect structures in the data, and links actions to the detected structure." The Staff construes the term to mean "a program sub-routine that receives data from a document having recognizable structures, and uses patterns to detect the structures." HTC construes the term to mean "a program sub-routine that receives data from a document having recognizable structures, and uses patterns to detect the structures, where the document is presented by a separate application."<br><br>Under any party's constructions, it is my opinion that the inventors conceived of this limitation as part of their invention by September 25, 1994.<br><br>For example, an August 4, 1994 email from Tom Bonura to James Miller and others further describes a specific example of detecting a date and time where the "relevant *grammar* would be date&time."<br><br>OK thanks for the update. Yesterday, I showed Jim what I currently have running. He suggested that we include a demonstration of using the agent form in an application specific manner - e.g., in calendaring. There would be a form associated with the calendaring task and selecting it would bring up a form allowing the user to schedule a meeting. Again, the relevant grammar would be date&time.<br><br>(MILLER00000024.)<br><br>For example, James Miller's September 25, 1994, proposal to the Nautilus group describing the conceived invention specifically detailed his group's current work on "structure detectors": |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 4 | Conception of the Claimed Invention |
|---------|-------------------------------------|
| | Another project within our program is working on "structure detectors": small bits of code that identify interesting objects in users' documents, such as phone numbers, times, dates, conference rooms, and the like, and that initiate actions based on those identified objects. For instance, an e-mail message that announces a meeting could be identified as such, and directly entered into the user's calendar application. This is some of our newest work, and so we<br><br>(MILLER00000242-245 at 243)<br><br>In my opinion, the capabilities for identifying phone numbers, times, and dated as described in Mr. Miller's description would be implemented using parsers. As a further example, on September 28, 1994, Bonnie Nardi wrote by email to her fellow inventors describing the currently implemented detection capabilities of the structure detectors functionality:<br><br>Here's a list of detectors we can build right now. I'll talk to Aggie and generate some others.<br><br>1. phone number<br>2. street address (specializable to home address, university address, etc.)<br>3. email address<br>4. fax number<br>5. signature (combines above)<br>6. bibliography item<br>7. abstract<br>8. forms (of various kinds) e.g. travel expense form, travel verification<br>9. seminar announcement<br>10. project meeting<br>11. lunch date<br><br>Let's see if we can detect these! |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 4 | Conception of the Claimed Invention |
|---------|-------------------------------------|
|  | (MILLER00000240)<br><br>My review of documents makes clear that the inventors were well aware that parsers were capable of detecting the kind of information specified by Dr. Nardi in 1994.  For example, a July 27, 1994 Jim Miller email with Subject line "drop zones for structure detectors" discusses the use of a document parser.  (MILLER00000248) |

| Claim 8 | Conception of the Claimed Invention |
|---------|-------------------------------------|
| The system recited in claim 1, wherein the user interface highlights detected structures. | The parties have agreed that the term "structure" means "[a]n instance of a pattern, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc." and that the term "detected" means "found and identified."<br><br>Under these constructions, it is my opinion that the inventors conceived of this limitation as part of their invention by January 25, 1995.  By this date, at the latest, the inventors had prepared a demonstration of the invention in the Apple SuperCard scripting language to illustrate both the technical capabilities of the invention as well as the desired user interface characteristics.<br><br>For example, the LiveDoc 1.6 SuperCard demo clearly illustrates a user interface highlighting detected structures: |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 8 | Conception of the Claimed Invention |
|---|---|
|  |  |

| Claim 15 | Conception of the Claimed Invention |
|---|---|
| In a computer having a memory storing actions, a method for causing the computer to perform an | It is my opinion that the preamble of claim 1 is not a limitation of the claim.  Even if the preamble is considered a limitation, the inventors conceived of the preamble by September 25, 1994. My analysis for the preamble of Claim 1 illustrates how the invention conceived by September 25, 1994 included "a computer having a memory storing actions, a method for causing the computer to perform an action on a |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 15 | Conception of the Claimed Invention |
|---|---|
| action on a structure identified in computer data, comprising the steps of: | structure identified in computer data." |
| receiving computer data; | My analysis for the "an input device for receiving data" limitation of Claim 1 illustrates how the invention conceived by September 25, 1994 practiced the step of "receiving computer data." |
| detecting a structure in the data; | My analysis for the "an analyzer server for detecting structures in the data, and for linking actions to the detected structures" limitation of Claim 1 illustrates how the invention conceived by September 25, 1994 practiced the step of "detecting a structure in the data." |
| linking at least one action to the detected structure; | My analysis for the "an analyzer server for detecting structures in the data, and for linking actions to the detected structures" limitation of Claim 1 illustrates how the invention conceived by September 25, 1994 practiced the step of "linking at least one action to the detected structure." |
| enabling selection of the structure and a linked action; and | My analysis for the "a user interface enabling the selection of a detected structure and a linked action" limitation of Claim 1 illustrates how the invention conceived by September 25, 1994 practiced the step of "enabling selection of the structure and a linked action." |
| executing the selected action linked to the selected structure. | My analysis for the "an action processor for performing the selected action linked to the selected structure" limitation of Claim 1 illustrates how the invention conceived by September 25, 1994 practiced the step of "executing the selected action linked to the selected structure." |

| Claim 17 | Conception of the Claimed Invention |
|---|---|
| The method recited in claim 15, wherein the memory contains grammars, and wherein the step of detecting a structure further comprises | My analysis for Claim 4 illustrates how the invention conceived by September 25, 1994 included a method "wherein the memory contains grammars, and wherein the step of detecting a structure further comprises the steps of retrieving a grammar and parsing the data based on the grammar." |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 17 | Conception of the Claimed Invention |
|---|---|
| the steps of retrieving a grammar and parsing the data based on the grammar. | |

| Claim 19 | Conception of the Claimed Invention |
|---|---|
| The method recited in claim 15, wherein the memory contains strings, and wherein the step of detecting a structure further comprises the steps of retrieving a string from the memory and scanning the data to identify the string. | The parties have agreed that the term "structure" means "[a]n instance of a pattern, where a 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc." and that the term "detecting" means "finding and identifying."<br><br>Under any party's constructions, it is my opinion that the inventors conceived this limitation by September 25, 1994 included a "memory [that] contains strings, and wherein the step of detecting a structure further comprises the steps of retrieving a string from the memory and scanning the data to identify the string."<br><br>For example, James Miller's September 25, 1994, proposal to the Nautilus group describing the conceived invention specifically detailed his group's current work on "structure detectors":<br><br>Another project within our program is working on "structure detectors": small bits of code that identify interesting objects in users' documents, such as phone numbers, times, dates, conference rooms, and the like, and that initiate actions based on those identified objects. For instance, an e-mail message that announces a meeting could be identified as such, and directly entered into the user's calendar application. This is some of our newest work, and so we<br><br>(MILLER00000242-245 at 243)<br><br>In my opinion, the capabilities for identifying "conference rooms" as described in Mr. Miller's description would be implemented using string matching algorithms among other forms of data detection. As a further example, on September 28, 1994, Bonnie Nardi wrote by email to her fellow inventors describing |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 19 | Conception of the Claimed Invention |
|---|---|
| | the currently implemented detection capabilities of the structure detectors functionality:<br><br>Here's a list of detectors we can build right now. I'll talk to Aggie and generate some others.<br><br>1. phone number<br>2. street address (specializable to home address, university address, etc.)<br>3. email address<br>4. fax number<br>5. signature (combines above)<br>6. bibliography item<br>7. abstract<br>8. forms (of various kinds) e.g. travel expense form, travel verification<br>9. seminar announcement<br>10. project meeting<br>11. lunch date<br><br>Let's see if we can detect these!<br><br>(MILLER00000240)<br><br>In my opinion, the capabilities to detect the kind of information specified by Dr. Nardi in 1994 and in particular items 7, 8, 9, and 10 would include string matching algorithms among other forms of data detection. |

| Claim 20 | Conception of the Claimed Invention |
|---|---|
| The method recited in claim 15, further comprising after the step of detecting a structure, the step of | My analysis for Claim 8 illustrates how the invention conceived by September 25, 1994 included a method with the step of highlighting the detected structure. |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 20 | Conception of the Claimed Invention |
|---|---|
| highlighting the detected structure. | |

# Exhibit C

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---|---|
| A computer-based system for detecting structures in data and performing actions on detected structures, comprising: | It is my opinion that the preamble of claim 1 is not a limitation of the claim.  Even if the preamble is considered a limitation, the inventors actually reduced the preamble to practice by at least September 1995.<br><br>*LiveDoc*<br><br>It is my opinion that the inventors reduced the claimed invention to practice when they built a LiveDoc prototype of the claimed invention as early as March 1995.  My opinion is based on review of the deposition transcripts of the named inventors, as well as review of the source code for the LiveDoc prototype.  I understand from reviewing the transcript of Thomas Bonura, for example, that a working version of the claimed invention, in the form of the LiveDoc prototype, was written in the LISP programming language and was implemented in early 1995.  (*See, e.g.*, Bonura Tr. at 66:22-67:18.)  Dr. Bonura's testimony is consistent with the dates on the LISP source code that I have reviewed, which was created between 1994 and early 1995. (*See, e.g.*, Livedoc-views.lisp (created on March 10, 1995 by Thomas Bonura).)<br>Dr. Bonura's efforts are consistent with documents showing that the head of the group developing structure detectors at the time and a named inventor of the '647 patent, Jim Miller, charged his fellow inventors on January 25, 1995 with building a shippable version of LiveDoc within twelve months.  (MILLER00000059-61 at 60.)  The development of a prototype in the LISP programming language by March 1995 would be consistent with that effort.  Consequently, it is my opinion that the claimed invention was reduced to practice as early as March, 1995.<br><br>It is my opinion that the LiveDoc prototype was "a computer-based system for detecting structures in data and performing actions on detected structures."  A working LiveDoc prototype would require the LISP code to have been compiled and executed on a computer.  As I describe below, it is my opinion that the working prototype detected structures in data and performed actions on detected structures.<br><br>*LiveSimpleText*<br><br>Additionally, I have reviewed a working prototype of a program called LiveSimpleText created and developed by the inventors of the '647 patent through early-to-late 1995.  This program is contained on digital media produced in this Investigation.  (See MILLER00001154 CD)  I have included screenshots herein of a particular version of this program dated September 27, 1995 and titled "LiveSimpleText 8/24/95" (see below).  It is my understanding that the actual source code for the LiveSimpleText prototype has not been located.  Thus, I base my opinions in part on, and will describe herein the functionalities of the LiveSimpleText program that I observed when using the program on an Apple PowerBook laptop computer.  It is my understanding and opinion that a version of this LiveSimpleText prototype was implemented by June 2, 1995 and referred to in an e-mail from '647 inventor D. Wright.  (MILLER00000096, (stating "Finally - working |

1

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---|---|
|  | code!" "[W]e have a version of Simple Text running that uses Structure Detectors to hilite [sic] structures found within the text. The user can then click on one of the hilited structures and a pop-up menu appears displaying choices of actions."), *see also* Miller Tr. 131:13-132:16) Additionally, it is my understanding and opinion that the LiveSimpleText prototype was based on the LISP prototypes (source code for at least one version of which is described herein) coded by Thomas Bonura. (Bonura Tr. 66:14-20) The LiveSimpleText program was coded in the C and C++ programming language. (*Id.* at 68:7-13)<br><br><br><br>**Contents of "LiveDoc v. 0.7" Folder showing "LiveSimpleText 8/24/95" executable program running**<br><br>It is my opinion that the LiveSimpleText prototype is "a computer-based system for detecting structures in data and performing actions on detected structures." |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---------|-----------------------------------------------|
| | As I describe below, the LiveSimpleText prototype detects structures in data and performs actions on detected structures. (*See e.g.*, *id.* at 68:24-70:4 ("LiveSimpleText would analyze the contents of the document that you were creating – continually analyze the contents of the document you were creating, I should say, and show the user those element that it discovered and provide the user a way of acting on those elements."), Miller Tr. 95:23-96:9 ("From a user perspective, it worked very much like the live doc demo, Text could be entered into a text window and things like Internet addresses and URL's and the like could be recognized by data detector software and then highlighted on the screen by LiveSimpleText. At that time if you clicked the mouse on one of those highlighted region [sic] a pop up menu of things that could be done with that piece of information then appeared and you could select one and cause the application to do what you had asked it to do."). ) |
| an input device for receiving data; | I agree with Apple that the term "input device" means "computer hardware or software" in light of its use in the '647 patent specification and claims.  HTC and the Staff contend that the phrase should be given its plain and ordinary meaning.  Dr. Olsen agrees with HTC and opines that the plain and ordinary meaning of "input device" is "hardware that receives input," such as a keyboard or mouse. |
| | In my opinion, the inventors actually reduced this limitation to practice by at least September 1995. |
| | *LiveDoc* |
| | Under any party's construction of the term "input device," it is my opinion that the LiveDoc prototype included "an input device for receiving data" and that the inventors therefore reduced to practice this limitation of Claim 1 by March 1995. |
| | A working LiveDoc prototype would require the LISP code to have been compiled and executed on a computer.  In 1995, such a computer system would include a hardware input device, such as a keyboard or mouse. |
| | The LiveDoc prototype also included computer software for receiving data.  For example, the LiveDoc prototype allowed a user to analyze the text of a document created in another application.  When working with a document in TextEdit, for instance, a LiveDoc window would be created within TextEdit in order to analyze the document. When the LiveDoc window was created, the LiveDoc program would receive text from TextEdit via the INITIALIZE-INSTANCE method. |
| | Specifically, the livedoc-views.lisp file defines the "liveDocWindow" class.  This class "[d]efines a class of windows |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---------|-----------------------------------------------|
| | which allows for hypertext-like functionality.  The window is a viewer onto arbitrary text." (*See* livedoc-views.lisp.)<br><br>The liveDocWindow class includes the INITIALIZE-INSTANCE method, which is called to create the LiveDoc window from the TextEdit application.  As shown below in the bolded and highlighted portion of the text, the INITIAL-INSTANCE method receives the text file from the other application.  Moreover, LiveDoc can also be called directly to analyze a string when the INITIAL-INSTANCE where it is passed a string instead of a file.<br><br><pre>          (defmethod INITIALIZE-INSTANCE ((win liveDocWindow) &rest initargs)<br>          (declare (ignore initargs))<br>          (call-next-method)<br>          (setf (viewer win)<br>                (make-instance 'livedocviewer<br>                   :view-position (make-point 0 (subviews-v-offset win))<br>                   :view-size (make-point<br>                        (point-h (view-size win))<br>                        ;; 3/4 the v of the window<br>                        (- (point-v (view-size win)) (subviews-v-offset win))<br>                        ))))<br>          <b>(when (filename win)</b><br><br>            <b>(buffer-insert-file (fred-buffer (viewer win))</b><br>                        (filename win) 0)<br>          (fred-update (viewer win)))<br>          (when (palette win)<br>           (setf (palette win)<br>                (make-assistant-palette  (make-point<br>                                (+ (point-h (view-position win))<br>                                   (point-h (view-size win)))<br>                                (point-v (view-position win)))))<br>          )<br>          (add-subviews win (viewer win))<br>          )</pre><br>(*See, e.g.*, livedoc-views.lisp.)<br><br>Once created, the LiveDoc window includes a set of text processing options displayed in a menu. When a user selects the |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---|---|
| | menu option "Analyze Text," the function ld-analyze-text is invoked, which calls ld-analyze, which, as I explain in more detail below, is used to detect structures in the document.<br><br>    (defun ld-analyze-text ()<br>     ;; called by the analyze menuitem when a livedoc window is the frontmost window<br>     (let ((w (front-window)))<br>      (when (member (class-of w) (class-descendants (find-class 'livedocwindow) t)<br>       :test #'eq)<br><br>      **(ld-analyze** w))))<br><br>(*See, e.g.*, livedoc-menus.lisp.)<br><br>***LiveSimpleText***<br><br>Under any party's construction of the term "input device," it is my opinion that the LiveSimpleText prototype included "an input device for receiving data."<br><br>The LiveSimpleText prototype runs on a computer.  In 1995, such a computer system would include a hardware input device, such as a keyboard or mouse.<br><br>The LiveSimpleText prototype also included computer software for receiving data.  For example, the LiveDoc prototype allowed a user to analyze the text of a document created in another application and imported into the LiveSimpleText editor window by either a cut and paste operation or by using the File Open command from the menu to open the text file to be analyzed. |
| an output device for presenting the data; | In my opinion, the inventors actually reduced this limitation to practice by at least September 1995.<br><br>***LiveDoc***<br><br>It is my opinion that the LiveDoc prototype included "an output device for presenting data."<br><br>For example, a working LiveDoc prototype would require the LISP code to have been compiled and executed on a computer.  In 1995, such a computer system would include a output device for presenting data and allowing the user to |

5

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---------|-----------------------------------------------|
| | interact with the program, such as a computer monitor or display.<br><br>***LiveSimpleText***<br><br>It is my opinion that the LiveSimpleText prototype included "an output device for presenting data."<br><br>The LiveSimpleText prototype runs on a computer.  In 1995, such a computer system would include a output device for presenting data and allowing the user to interact with the program, such as a computer monitor or display. |
| a memory storing information including program routines including | In my opinion, the inventors actually reduced this limitation to practice by at least September 1995.<br><br>***LiveDoc***<br><br>It is my opinion that the LiveDoc prototype included "a memory storing information including program routines."<br><br>For example, a working LiveDoc prototype would require the LISP code to have been compiled and executed on a computer.  In 1995, such a computer system would include a memory for storing program routines.  As described below, these program routines included an analyzer server, a user interface, and an action processor as claimed.<br><br>***LiveSimpleText***<br><br>It is my opinion that the LiveSimpleText prototype included "a memory storing information including program routines."<br><br>The LiveSimpleText prototype runs on a computer.  In 1995, such a computer system would include a memory for storing program routines.  As described below, these program routines included an analyzer server, a user interface, and an action processor as claimed. |
| an analyzer server for detecting structures in the data, and | In my opinion, the inventors actually reduced this limitation to practice by at least September 1995.<br><br>The parties have agreed that the term "structure" means "[a]n instance of a pattern, where a "pattern" refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document  such as dates, address/es, phone numbers, names, etc." and that the term "detecting" means "finding and identifying." |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---------|------------------------------------------------|
| for linking actions to the detected structures; | The parties dispute the meaning of "analyzer server." I agree with Apple that this term means "a program routine(s) that receives data, uses patterns to detect structures in the data, and links actions to the detected structure." The Staff construes the term to mean "a program sub-routine that receives data from a document having recognizable structures, and uses patterns to detect the structures." HTC construes the term to mean "a program sub-routine that receives data from a document having recognizable structures, and uses patterns to detect the structures, where the document is presented by a separate application." |

The parties also dispute the meaning of "linking actions to the detected structures." I agree with Apple that the term means "linking detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are linked." HTC and the Staff construe the term to mean "linking a detected structure to a computer subroutine that causes the CPU to perform a sequence of operations on that particular structure to which it is linked, rather than an informational structure."

***LiveDoc***

Under any party's constructions, it is my opinion that the LiveDoc prototype included "an analyzer server for detecting structures in the data, and for linking actions to the detected structures" and that the inventors therefore reduced to practice this limitation of Claim 1 by March 1995.

Specifically, the analyzer server of the LiveDoc prototype includes the LD-ANALYZE method in the liveDocViewer class, the TAG-TO-VIEWER-NODE function, the Action class, and the Semantic-Category class. Together these subroutines detect structures in the data passed to the LiveDoc program and link actions to the detected structures.

When the user selects the menu option "Analyze Text," for example, the LD-ANALYZE method parses the document to finds the recognizable structures (also referred to as tags) and identifies the specific semantic significance of each detected structure. The LD-ANALYZE method also highlights the detected structures on the user interface by calling update-cursor, as shown below.

```
(defmethod LD-ANALYZE ((view liveDocViewer))
;;  now analyze the text
(declare (special *last-tag*))
```

7

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---------|------------------------------------------------|
|  | <pre>(let ((buf (fred-buffer view))
     (temp nil))
  (setq *last-tag* nil)
  (ld-reset view)
  (with-egc-off
    (with-ld-cursor *spinning-yin-yang*
      ;; note that I changed speech::parse-text to call update cursor.
      ;; Naturally, this slows things down an itty bit but it allows the
      ;; spinning cursor stuff to work.  New definition in casper-text-patch.lisp
      (analyze-text
       (buffer-substring buf 0 (buffer-size buf))
       :return
       #'(lambda (tag)
           (declare (special *last-tag*))
           ;; compare the current tag to the last identified.  If they are of
           ;; the same semantic category then set the last tag to be the
           ;; longer of the two (this may be pretty brittle). If the current
           ;; tag and the last one are not of the same type, it means we are
           ;; done with the previous structure and we make a node for it,
           ;; moving on.
           (cond ((null *last-tag*)
                  (setq *last-tag* tag))
                 ((and (eql (get-semantic-category tag)
                            (get-semantic-category *last-tag*))
                       (setq temp (tags-overlap-p tag *last-tag*)))
                  (setq *last-tag* temp)
                  )
                 (t
                  ;; last tag is different than the current tag, make the last
                  ;; tag be a node
                  (tag-to-viewer-node view *last-tag*)
                  (setq *last-tag* tag)))

           (pushnew tag (view-tags view) :test #'eq)

           (set-selection-range view
                                (tag-start tag)
                                (tag-end tag))</pre> |

8

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---|---|
| | <br><br>```<br>                    ;(fred-update view)<br><br>                    (update-cursor)<br><br>                    ))<br>                (setf (last-mod-count view) (buffer-modcnt (fred-buffer view)))<br>                ;; cleanup for a dangling last tag<br>                (when *last-tag*<br>                  (tag-to-viewer-node view *last-tag*)<br>                  (setq *last-tag* nil)))<br>                ;; finally null out the selection<br>                (set-selection-range view 0 0)<br>                (fred-update view)<br>                )))<br>```<br><br>(*See, e.g.*, livedoc-views.lisp (highlighting and bold-italics added).)<br><br>The FRED-UPDATE method highlights the detected structure or, in later implementations, highlights the detected structure by calling reveal-node method, which invokes methods for drawing the detected node such as the DRAW-NODES, DRAW-ALL-NODES, NODE-DRAW, AND LD-HILITE methods.  The ld-hilite method performs the actual highlighting of the text.<br><br>```<br>        (defmethod FRED-UPDATE :AROUND ((v fred-mixin))<br>          (call-next-method)<br>          (cond ((eq (class-of (view-container v))<br>                     (find-class 'livedocviewer))<br>                 (draw-nodes (view-container v) (node-type (view-container v))))<br>                ((eq (class-of (view-container v))<br>                     (find-class 'term-viewer))<br>                 (draw-all-nodes (view-container v))<br>                 ))<br>          )<br><br>        (defmethod DRAW-NODES ((view liveDocViewer) &optional (of.class nil) (invert nil))<br>``` |

9

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---------|------------------------------------------------|
|         | ```lisp
"Draw all the nodes of a class. if of.class is nil then just draw all the
nodes otherwise draw all the types of nodes in the list passed into of.class"
(when (show-nodes view)
  (if of.class
    ;; collect all the nodes of a class
    (loop for type in of.class
        do
        (loop for node in (anchorlist view)
            if (eql (name (semantic-category node))
                 type)
            do
            (node-draw node invert)))
     (draw-all-nodes view invert))
  )
)


(defmethod DRAW-ALL-NODES ((view liveDocViewer) &optional (invert nil))
  (dolist (node (anchorlist view))
    ;(update-node-position node)
      (node-draw node invert)))

(defmethod NODE-DRAW ((node anchor-node) &optional (invert nil))
  (let ((lastpos (node-position node)))
    (update-node-position node)
    (unless (minusp (node-position node))
      ;; a node-position is negative if it is not in the view so don't redraw.
      (let* ((my-view (my-view node))
             (theRect (node-rect node))
             )
        (if (or (minusp lastpos)
               invert)
          (node-invert node))
        (with-focused-view (fred-item my-view)
          (with-fore-color *anchor-frame-color*
            (rlet ((r :rect))
              (copy-record theRect :rect r)
              (inset-node-rect r
``` |

10

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---|---|
|  | (LD-HILITE r<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>(*See* livedoc-views.lisp (highlighting and emphases added).)<br><br>For each detected structure, the **LD-ANALYZE** method also calls **TAG-TO-VIEWER-NODE**.  The **TAG-TO-VIEWER-NODE** method retrieves the semantic class of the detected structure and then creates an instance of that specific semantic class using the corresponding class definitions in semantic-categories.lisp. "A semantic category describes the class of things that the identified text purportedly represents.  The intention is to define the behaviors appropriate for the anchor node in the document by looking at the semantic category of the text the node encloses.  When a node is created a pop-up-menu is created for that node whose menu-items are derived from the behaviors of the semantic category associated with the node." (*See* semantic-categories.lisp.)<br><br>(defun **TAG-TO-VIEWER-NODE** (viewer tag)<br>  "Take a tag and generate a node with its semantic category in the viewer, returning the node"<br>  (push tag (view-tags viewer))<br>  (let* ((termviewer (term-viewer (view-container viewer)))<br>      (meaning (tag-meaning tag))<br>      ;; the string<br>      (str (tag-text tag))<br>      ;;  the semantic class<br>      (sem-class (intern (symbol-name<br>                    (obj-name<br>                    (inst-parent meaning)))<br>                  :cl-user))<br>      (inst<br>      (if (find-class sem-class nil)<br>        (make-instance sem-class |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---|---|
|  | ```
                    :text str)
                       (make-instance 'default-semantics
                          :text str)))
                 )
          ;; add to the termviewer if there is one (there may not be one for the
          ;; opendoc-livedocwindow)
          (if termviewer
            (add-index-term termviewer sem-class))
          ;; only build 1 node per term - no duplicates!
          (build-node viewer inst str nil)
          )
       )
```<br><br>(*See, e.g.*, livedoc-views.lisp (creating an instance of a semantic class associated with the detected structure) (highlighting added).)<br><br>```
    #|
    Some reasonable semantic categories
      Likely proper names - actions:  find in rolodex, email to, video link with,
    dial up, arrange meeting with.
      likely corporate names
      likely geographical names - actions:  find on map, contacts in city (region)
      phone numbers - actions:  whose number, add to rolodex, dial up
      dates / date-time - actions:  block off this date, what's scheduled?, open
    calendar here.
      more structured objects:
          - stock market listings watch this quotation, what's this trading at?
              - email addresses  actions:  add to address book, find person, notify on
    receipt from,
              - url add to bookmarks, lookup

    |#
```<br><br>(*See* semantic-categories.lisp (describing "reasonable semantic categories" and actions associated with those categories) (emphases added).) |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---|---|
| | Initialization of the semantic class associated with a detected structure also creates "behaviors" which are instances of an ACTION class.  These "behaviors" define certain actions that can be taken on the detected structure as behavior-classes. When a behavior class is initialized, an AppleScript Record is created for each action. Once the behavior-classes are created, they are linked to the detected structure when the semantic-category is initialized by creating a menu item associated with a each of these behavior-classes.  The entire data structure is stored in the node created by **TAG-TO-VIEWER NODE**, so that when a user clicks on a detected structure the corresponding menu options are available from which to select.<br><br>defclass semantic-category ()<br>  ((name :initarg :name :initform NIL :accessor name)<br>  ;; text - the portion of the text which was associated with a semantic category<br>  (text :initarg :text :initform NIL :accessor text)<br>  ;;  behavior classes - these must be supplied on the class<br>  (behavior-classes :initarg :behavior-classes :initform '() :accessor behavior-classes)<br>    ;; behaviors -  instances of one of the classes of ACTION - these are<br>      ;;  created on initialization<br>  (behaviors :initarg :behaviors :initform nil :accessor behaviors)<br>  ;;  the menu holds a pop up menu whose menu items define the behavior foro<br>    ;; the category.<br>  (menu :initarg :menu :initform NIL :accessor menu)<br><br>  )<br>  )<br><br>(*See* semantic-categories.lisp.)<br><br>Creating an instance of the Action class also creates an AppleScript record for the linked action, which defines how the action is to be executed when selected by the user.<br><br>(DEFCLASS **ACTION** (standard-object)<br>  (;; a short string which would appear in a pop up menu<br>  (description :initarg :description :initform "" :accessor description)<br>  ;;  service is the provider of the functionality to do the action this will<br>    ;;  actually be an applescript applet<br>  (service :initarg :service :initform nil :accessor service) |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---|---|
| | ;; applescript-record holds a string which will be compiled into a script<br>   ;; record.  THis will be passed to the open handler on the service (the applet)<br>(applescript-record :initarg :applescript-record :initform nil :accessor<br>                    applescript-record )<br>;; the category relevant to this action<br>(semantic-category :initarg :semantic-category :initform nil :accessor semantic-category)<br>;;<br>(script-instance :initarg :script-instance :initform (make-instance<br>                                          'as-record)<br>               :accessor script-instance)<br>)<br>)<br><br>(DEFMETHOD **INITIALIZE-INSTANCE** ((act action) &rest initargs)<br>(declare (ignore initargs))<br>(call-next-method)<br>(save-clause `(instanceOf ,(class-name (class-of act)) ,act) 'instances)<br>;; set the script of the as-record to be the value of the applescript-record slot<br>(**make-applescript-record act** (text (semantic-category act)))<br>)<br><br>Actions associated with "semantic category terms" are of the Simple-Action class, which is a sub-class of the Action class. "For example, these are behaviors which appear on names, venues, phone numbers and so forth -- essentially the things which are recognized by the parser." (behaviors.lisp.)   When initialized, the Simple-Action class calls MAKE-MENUITEM method, which creates the menu of actions that are linked to the detected structure and creates a lambda expression that defines how each action should be carried out when selected by the user. (*See id.*)  The sequence of operations defined in this method for a particular action will be automatically executed when that action is selected by the user.<br><br>;; Simple actions associated with semantic category terms.  For example, these are<br>;; behaviors which appear on names, venues, phone numbers and so forth -<br>;; essentially the things which are recognized by the parser.  In order to<br>;; compose a complex action associated with reasoning on the blackboard, there<br>;; needs to be a different abstraction.  See the file |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---------|------------------------------------------------|
|         | ;; livedoc:agent-behaviors.lisp

```
(defclass SIMPLE-ACTION (ACTION)
  (;; menuitem encapsulates the appropriate behavior - add to pop up menu
   (menuitem :initarg :menuitem :initform nil :accessor menuitem))
  (:default-initargs
   :service "no-op"")
  )

(DEFMETHOD INITIALIZE-INSTANCE ((act SIMPLE-ACTION) &rest initargs)
  (apply #'call-next-method act initargs)
  (make-menuitem act)
  )

(DEFMETHOD MAKE-MENUITEM ((act SIMPLE-ACTION))
  ;; just call as-launch-script
  (let ((as-record (script-instance act))
        (applet (service act)))

    (flet ((make-behavior (record applet)
             #'(lambda ()
                 (execute-applet-event record)
                 (if (pointerp (script-aedesc record))
                     (as-launch-script record applet)
                     (error "script aedesc is not a pointer")))
           ))
      (setf (menuitem act)
            (make-instance 'menu-item
                           :menu-item-title (description act)
                           :menu-item-action
                           (make-behavior as-record applet))))
      )
    )
```

_(See_ behaviors.lisp (highlighting added).) |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---|---|
| | Once the actions are created and initialized, the Semantic-Category class creates a menu item for the behavior.  When a user selects the detected structure, a pop-up menu will appear allowing the user to select the action the user wants performed using the detected structure.<br><br>```\n(defmethod initialize-instance ((category semantic-category) &rest initargs)\n  (call-next-method)\n  )\n\n(defmethod initialize-instance :after ((category semantic-category) &rest ignore)\n  (declare (ignore ignore))\n  ;;  make instances of all the behaviors passing them the semantic category\n  (dolist (behavior (behavior-classes category))\n    (push (make-instance behavior\n             :semantic-category category)\n          (behaviors category)))\n  (make-behavior-menu category)\n  )\n\n(defmethod make-behavior-menu ((cat semantic-category))\n  (setf (menu cat) (make-popper-menu ()))\n  (apply #'add-menu-items (menu cat) (mapcar #'menuitem (behaviors cat))))\n```<br>(*See* semantic-categories.lisp.)<br><br>The LiveDoc prototype included several categories of recognizable structures and linked actions associated with those structures.  For example, the LiveDoc prototype could detect phone numbers in data and link actions to the detected phone numbers that a user could select.  In this case, the TAG-TO-VIEWER-NODE would create an instance of the phone class as a subclass of semantic-category.  Once created, the "phone" object defines the "phone-lookup", "dialup", and "add-to-rolodex" behaviors and creates a simple-action class for each of these behaviors, which will appear in a pop-up menu when a user selects the detected phone number:<br><br>```\n(defclass phone (semantic-category)\n  ()\n  (:default-initargs\n``` |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---|---|
| | :name 'phone<br>:behavior-classes '(phone-lookup dialup add-to-rolodex)<br>)<br>)<br><br>(*See* semantic-categories.lisp (highlighting added).)<br><br>;; do-phone-lookup do-dialup do-add-to-rolodex<br><br>(defclass **PHONE-LOOKUP (SIMPLE-ACTION)**<br>()<br>(:default-initargs<br>:description "Lookup number"<br>)<br><br>;;;<br>;;<br><br>;; do-dialup do-add-to-rolodex<br><br>(defclass **DIALUP (SIMPLE-ACTION)**<br>()<br>(:default-initargs<br>:description "Dial number"<br>)<br><br>;;;<br>;;<br><br>;; do-add-to-rolodex<br><br>(defclass **ADD-TO-ROLODEX (SIMPLE-ACTION)**<br>()<br>(:default-initargs<br>:description "Add number to rolodex" |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---|---|
| | )<br>)<br>(*See* behaviors.lisp.)<br><br>***LiveSimpleText***<br><br>Under any party's constructions, it is my opinion that the LiveSimpleText prototype included "an analyzer server for detecting structures in the data, and for linking actions to the detected structures."<br><br>For example, the LiveSimpleText prototype is able to detect structures such as email addresses, and web site URLs that appear in a user's document displayed in the SimpleText editor window:<br><br>**File   Edit   View   Window   Special   Help**<br>**Demo text**<br>You can find more information about Apple Computer at http://www.apple.com/default.html or by asking  spindler@apple.com. Also, log into atg.apple.com, see what's new in AOL:Finance, browse around in mirror.apple.com, and pick up the file ftp://mirror.apple.com/mirrors/Info-Mac.Archive/comm/change-signature-100-as.hqx. It might also be fun to check the latest on rec.humor.funny and see if structure detectors are working properly.<br><br>**LiveSimpleText user interface without detected structure highlighted.** |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---|---|
| | <br><br>**LiveSimpleText user interface with detected structure highlighted.**<br><br>The user can then click on one of the detected structures and a pop-up menu will appear next to the detected structure that contains actions that the user can take on the detected structure: |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---|---|
|  | <br><br>*LiveSimpleText user interface showing menu of linked actions.*<br><br>If a user selects one of the items in the menu, the action described by the menu item will be directly performed.  For example, if the user selects the "Send message to…" menu item linked to the selected structure (here, the email address spindler@apple.com), the Eudora email client application is launched and a new message window is displayed with splindler@apple.com in the email. |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---------|-----------------------------------------------|
| |  **The result of selecting the "Send Message to..." action linked to the detected structure spindler@apple.com** |
| a user interface enabling the selection of a detected structure and a linked action; and | In my opinion, the inventors actually reduced this limitation to practice by at least September 1995.<br><br>The parties have agreed that the term "structure" means "[a]n instance of a pattern, where a "pattern" refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc." and that the term "detected" means "found and identified."<br><br>**_LiveDoc_**<br><br>Under any party's constructions, it is my opinion that the LiveDoc prototype included "a user interface enabling the selection of a detected structure and a linked action" and that the inventors therefore reduced to practice this limitation of |

21

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---------|------------------------------------------------|
|  | Claim 1 by March 1995.<br><br>As I described above, the LiveDoc prototype highlighted detected structures and defined pop-up menus listing the actions linked to each detected structure.  (*See, e.g.*, livedoc-views.lisp, semantic-categories.lisp, behaviors.lisp.)<br><br>The LiveDoc prototype also enabled the user to click on the detected and highlighted structure, and, subsequently, to select from the actions linked to that structure.  For example, at any time when a user clicks on a document in LiveDoc window, the method VIEW-CLICK-EVENT-HANDLER in the liveDocViewer class is called.  If the user clicks on a detected structure within the LiveDoc window, VIEW-CLICK-EVENT-HANDLER calls DELEGATE-CLICK, which in turn determines which node was clicked and calls NODE-CLICK-EVENT-HANDLER in the Anchor-Node class:<br><br><pre>        (defmethod VIEW-CLICK-EVENT-HANDLER ((view liveDocViewer) where)<br>          (if (point-in-content-region view where)<br>            (unless (delegate-click view where)<br>              ;;  if we don't successfully delegate the click then do the regular thing<br>                 ;;  with the click.<br>              (call-next-method))))<br><br>        (defmethod DELEGATE-CLICK ((view liveDocViewer) where &aux node)<br>          ;;  see if there is a node at the where and if so, call its<br>          ;;  node-click-event-handler<br>          (if (setf node (node-at-position view where))<br>            (node-click-event-handler node where)<br>            )<br>            )</pre>(*See* livedoc-views.lisp; *see also id.* ("the VIEW-CLICK-EVENT-HANDLER which now either dispatches to a NODE-CLICK-EVENT-HANDLER if a node is clicked or just  calls the next method if not.").)<br><br>As shown below, NODE-CLICK-EVENT-HANDLER then looks up the semantic category associated with that node and calls POP-POPPER-MENU to display the actions associated with the semantic category of the detected structure.  The POP-POPPER-MENU method allows the user to select one of the actions and extracts the action from the menu-item data structure for execution.<br><br><pre>        (defmethod NODE-CLICK-EVENT-HANDLER ((node anchor-node) mouse-pos)</pre> |

22

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---------|-----------------------------------------------|
| | <br><br>```lisp<br>                    (cond<br>                    ((shift-key-p )<br>                    (if (selected-p node)<br>                      (deselect-node node)<br>                      (select-node node)))<br>                    (t<br>                    (format t "~%A ~a " (semantic-category node))<br>                    (pop-popper-menu (menu (semantic-category node)))<br>                      ))<br>                    )<br>```<br><br>(*See* livedoc-views.lisp.)<br><br>```lisp<br>            (defun pop-popper-menu (popper-menu)<br>            (catch 'popper-menu-return<br>              (let ((point (view-mouse-position nil)))<br>                (let ((selection (with-cursor *arrow-cursor*<br>                                (#_PopUpMenuSelect<br>                                 :ptr (menu-handle popper-menu)<br>                                 :word (+ (point-v point) -4)<br>                                 :word (+ (point-h point) -7)<br>                                 :word 0<br>                                 :long))))<br>                  (let ((menu-item (logand #x0000FFFF selection)))<br>                    (if (= menu-item 0)<br>                      (values)<br>                    (menu-item-action<br>                      (nth (- menu-item 1)<br>                        (menu-items popper-menu)))))))))<br>```<br><br>(livedoc-menus.lisp.)<br><br>**_LiveSimpleText_**<br><br>Under any party's constructions, it is my opinion that the LiveSimpleText prototype included "a user interface enabling the selection of a detected structure and a linked action." |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---|---|
|  | For example, the LiveSimpleText prototype is able to detect structures such as email addresses, and web site URLs that appear in a user's document displayed in the SimpleText editor window:<br><br>**File  Edit  View  Window  Special  Help**<br>**Demo text**<br><br>You can find more information about Apple Computer at http://www.apple.com/default.html or by asking  spindler@apple.com. Also, log into atg.apple.com, see what's new in AOL:Finance, browse around in mirror.apple.com, and pick up the file ftp://mirror.apple.com/mirrors/Info-Mac.Archive/comm/change-signature-100-as.hqx. It might also be fun to check the latest on rec.humor.funny and see if structure detectors are working properly.<br><br>**LiveSimpleText user interface without detected structure highlighted.** |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---------|------------------------------------------------|
|  |  *LiveSimpleText user interface with detected structure highlighted.*<br><br>The user can then click on one of the detected structures and a pop-up menu will appear next to the detected structure that contains actions that the user can take on the detected structure: |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
| --- | --- |
| | <br><br>**LiveSimpleText user interface showing menu of linked actions.**<br><br>If a user selects one of the items in the menu, the action described by the menu item will be directly performed.  For example, if the user selects the "Send message to…" menu item then  on the selected structure (here, the email address spindler@apple.com) then the Eudora email client application is launched and a new message window is displayed with splindler@apple.com in the |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---|---|
|  |  |

**The result of selecting the "Send Message to..." action linked
to the detected structure spindler@apple.com**

Moreover, inventor Jim Miller testified that LiveSimpleText provided a user interface that allowed the selection of a detected structure and a linked action. (Miller Tr. 99:22-10:12 ("Q. And how did LiveSimpleText, from your understanding, from your understanding present a list of –I believe we called it things that an application could do to that structure? A. In a pop-up menu. Q. And how did it present that pop-up menu or how did it cause that pop-up menu to be presented? A. If the user pressed the mouse button on one of the highlighted regions, the system would present a pop-up menu of those things to the user." A. And when you say the system would present a pop-up menu, are you referring to a specific application? A. LiveSimpleText."), *see also* Bonura Tr. 69:23-70:4.)

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---|---|
| an action processor for performing the selected action linked to the selected structure; and | In my opinion, the inventors actually reduced this limitation to practice by at least September 1995.<br><br>The parties have agreed that the term "structure" means "[a]n instance of a pattern, where a "pattern" refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, address/es, phone numbers, names, etc."<br><br>***LiveDoc***<br><br>Under this construction, it is my opinion that the LiveDoc prototype included "an action processor for performing the selected action liked to the selected structure " and that the inventors therefore reduced to practice this limitation of Claim 1 by March 1995.<br><br>As I described above, the NODE-CLICK-EVENT-HANDLER and POP-POPPER-MENU functions alert users of the LiveDoc prototype to the presence of detected structures in their data and provide a list of customized actions for each detected structure, thereby allowing a user to select a detected structure and an associated action. Each action has an associated AppleScript-record, which defines the sequence of operations that will be automatically performed when the user selects the Action from the pop-up menu. (*See, e.g.*, behaviors.lisp ("Many changes here - after a parse and generating the node, there should be an applescript record associated with the node . . . When an action is initialized, it creates an applescript record. The method make-applescript-record is supposed to generate a specific script for a particular applet (which in turn does a specific thing like making a new message in Eudora).").)<br><br>Creating an instance of the Action class also creates an AppleScript record for the linked action, which defines how the action is to be executed when invoked by the user.<br><br><pre>(DEFCLASS ACTION (standard-object)<br>  (;; a short string which would appear in a pop up menu<br>  (description :initarg :description :initform "" :accessor description)<br>  ;; service is the provider of the functionality to do the action this will<br>      ;; actually be an applescript applet<br>  (service :initarg :service :initform nil :accessor service)<br>  ;; applescript-record holds a string which will be compiled into a script<br>      ;; record. THis will be passed to the open handler on the service (the applet)</pre> |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---------|-----------------------------------------------|
| | ```
(applescript-record :initarg :applescript-record :initform nil :accessor
                                applescript-record )
;; the category relevant to this action
(semantic-category :initarg :semantic-category :initform nil :accessor semantic-category)
;;
(script-instance :initarg :script-instance :initform (make-instance
                                'as-record)
            :accessor script-instance)
)
)

(DEFMETHOD INITIALIZE-INSTANCE ((act action) &rest initargs)
  (declare (ignore initargs))
  (call-next-method)
  (save-clause `(instanceOf ,(class-name (class-of act)) ,act) 'instances)
  ;; set the script of the as-record to be the value of the applescript-record slot
  (make-applescript-record act (text (semantic-category act)))
)
```

As I described above, actions associated with "semantic category terms" are of the Simple-Action class, which is a sub-class of the Action class. "For example, these are behaviors which appear on names, venues, phone numbers and so forth -- essentially the things which are recognized by the parser." (behaviors.lisp.)  When initialized, the Simple-Action class calls MAKE-MENUITEM method, which creates the menu of actions linked to the detected structure and creates a lambda expression that defines how each action should be carried out when selected by the user. (*See id.*)  The sequence of operations defined in this method for each action associated with a detected structure will be automatically executed when the associated action is selected by the user.

```
;; Simple actions associated with semantic category terms.  For example, these are
;; behaviors which appear on names, venues, phone numbers and so forth -
;; essentially the things which are recognized by the parser.  In order to
;; compose a complex action associated with reasoning on the blackboard, there
;; needs to be a different abstraction.  See the file
;; livedoc;agent-behaviors.lisp
``` |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---|---|
| | ```
(defclass SIMPLE-ACTION (ACTION)
  (;;  menuitem encapsulates the appropriate behavior - add to pop up menu
   (menuitem :initarg :menuitem :initform nil :accessor menuitem))
  (:default-initargs
   :service "no-op")
  )

(DEFMETHOD INITIALIZE-INSTANCE ((act SIMPLE-ACTION) &rest initargs)
  (apply #'call-next-method act initargs)
  (make-menuitem act)

  )

(DEFMETHOD MAKE-MENUITEM ((act SIMPLE-ACTION))
  ;;  just call as-launch-script
  (let ((as-record (script-instance act))
        (applet (service act)))

    (flet ((make-behavior (record applet)
             #'(lambda ()
                 (execute-appleevent record)
                 (if (pointerp (script-aedesc record))
                     (as-launch-script record applet)
                   (error "script aedesc is not a pointer")))
             ))
      (setf (menuitem act)
            (make-instance 'menu-item
              :menu-item-title (description act)
              :menu-item-action
              (make-behavior as-record applet))))
    )
    )
``` |
| | (*See* behaviors.lisp (highlighting added).) |
| | ***LiveSimpleText*** |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---|---|
| | Under this construction, it is my opinion that the LiveSimpleText prototype included "an action processor for performing the selected action liked to the selected structure ". <br><br> When a user selects an action from the list of action linked to the detected structure, the action is directly performed. <br><br>  <br><br> **LiveSimpleText user interface showing menu of linked actions.** <br><br> If a user selects one of the items in the menu, the action described by the menu item will be directly performed.  For example, if the user selects the "Send message to…" menu item then a new email message addressed to the selected structure (here, spindler@apple.com) is created and opened. |

31

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---------|------------------------------------------------|
| |  **The result of selecting the "Send Message to…" action linked to the detected structure spindler@apple.com** |
| a processing unit coupled to the input device, the output device, and the memory for controlling | In my opinion, the inventors actually reduced this limitation to practice by at least September 1995.<br><br>I agree with Apple that the term "input device" means "computer hardware or software" in light of its use in the '647 patent specification and claims.  HTC and the Staff contend that the phrase should be given its plain and ordinary meaning.  Dr. Olsen agrees with HTC and opines that the plain and ordinary meaning of "input device" is "hardware that receives input," such as a keyboard or mouse.<br><br>***LiveDoc*** |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 1 | Reduction to Practice of the Claimed Invention |
|---------|------------------------------------------------|
| the execution of the program routines. | Under any party's construction, it is my opinion that the LiveDoc prototype included "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines." <br><br> For example, a working LiveDoc prototype would require the LISP code to have been compiled and executed on a computer.  In 1995, such a computer would include a processing unit coupled to the input device, the output device, and the *memory* for controlling the execution of the program routines. <br><br> ***LiveSimpleText*** <br><br> Under any party's construction, it is my opinion that the LiveDoc prototype included "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines." <br><br> The LiveSimpleText prototype runs on a computer.  In 1995, such a computer system would include a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines. |

| Claim 3 | Reduction to Practice of the Claimed Invention |
|---------|------------------------------------------------|
| The system recited in claim 1, wherein the input device receives the data from an application running concurrently, and wherein the program routines stored in | In my opinion, the inventors actually reduced this claim to practice by at least September 1995. <br><br> The parties have agreed that the term "application running concurrently" means "Application running during the same run time."   The parties dispute the meaning of the term "input device."  I agree with Apple that it should be construed to mean "computer software or hardware." HTC and the Staff contend that the term should be given its plain and ordinary meaning. <br><br> ***LiveDoc*** <br><br> Under any party's constructions, it is my opinion that the LiveDoc prototype included an "input device [that] receives the data from an application running concurrently, and wherein the program routines stored in memory further comprise an application program interface for communicating with the application." <br><br> As I described above, the LiveDoc prototype allowed a user to analyze the text of a document created in another |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 3 | Reduction to Practice of the Claimed Invention |
|---|---|
| memory further comprise an application program interface for communicating with the application. | application. When working with a document in TextEdit, for instance, a LiveDoc window would be created within TextEdit in order to analyze the document. When the LiveDoc window was created, the LiveDoc program would receive text from TextEdit via the INITIALIZE-INSTANCE method.<br><br>Specifically, the livedoc-views.lisp file in the LiveDoc prototype source code defines the "liveDocWindow" class. This class "Defines a class of windows which allows for hypertext-like functionality. The window is a viewer onto arbitrary text." (*See* livedoc-views.lisp.)   The liveDocWindow class includes the INITIALIZE-INSTANCE method, which is called to create the LiveDoc window from the TextEdit application. As shown below in the highlighted portion of text, the INITIAL-INSTANCE method receives the text from the other application.<br><br>Livedoc-views.lisp existed by March 10, 1995 by Thomas Bonura, one of the '647 patent inventors. From reviewing the change log in the file, livedoc-views.lisp was modified at least until June 8, 1995.<br><br><pre>(defmethod INITIALIZE-INSTANCE ((win liveDocWindow) &rest initargs)<br>  (declare (ignore initargs))<br>  (call-next-method)<br>  (setf (viewer win)<br>      (make-instance 'livedocviewer<br>        :view-position (make-point 0 (subviews-v-offset win))<br>        :view-size (make-point<br>                (point-h (view-size win))<br>                ;; 3/4 the v of the window<br>                (- (point-v (view-size win)) (subviews-v-offset win))<br>                ))))<br>  (when (filename win)<br>    (buffer-insert-file (fred-buffer (viewer win))<br>                (filename win) 0)<br>    (fred-update (viewer win)))<br>  (when (palette win)<br>    (setf (palette win)<br>        (make-assistant-palette  (make-point<br>                  (+ (point-h (view-position win))<br>                    (point-h (view-size win)))<br>                  (point-v (view-position win)))))))<br><br>  )</pre> |

34

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 3 | Reduction to Practice of the Claimed Invention |
|---------|------------------------------------------------|
|         | (add-subviews win (viewer win))<br>)<br><br>(*See, e.g.*, livedoc-views.lisp.)<br><br>The livedoc-menus.lisp and livedoc-views.lisp files provide the application program interface (API) for invoking the program routines from an application running concurrently in memory.      Specifically, as described above, the liveDocWindow class defined in the livedoc-views.lisp file includes the INITIALIZE-INSTANCE method, which is called to create the LiveDoc window from the TextEdit application.  The livedoc-menus.lisp file provides additional menu options for the user interacting with the TextEdit application, for example, to invoke and use the LiveDoc program to analyze text.<br><br>***LiveSimpleText***<br><br>Under any party's constructions, it is my opinion that the LiveSimpleText prototype included an "input device [that] receives the data from an application running concurrently, and wherein the program routines stored in memory further comprise an application program interface for communicating with the application."<br><br>I have reviewed the "Read me!" file that accompanied the "LiveDoc v. 0.7" folder produced in this Investigation.  The file clearly refers to and SD background that will be initiated when the user selects "LiveDoc mode" from the edit menu. |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 3 | Reduction to Practice of the Claimed Invention |
|---------|------------------------------------------------|
|         | **How do I make it work?**<br><br>(1) Installation is completely manual.  The files in the Put in System Folder should be put in the indicated locations.  The other files – LiveSimpleText and the appropriate version of SD Background – can go anywhere.<br><br>(2) Launch the Demo Text document by dragging it onto LiveSimpleText.<br><br>(3) Start LiveDoc mode in LiveSimpleText by selecting it from the Edit menu.  This will launch SD Background if it is not already running.<br><br>(4) Hold down the Option key.  Patterns found by Structure Detectors will be highlighted, and mouse clicks on them will present menus of options relevant to that object.<br><br>**Notes:**<br><br>  • We made up the America Online keyword syntax (AOL:Finances), but it's a believable one.  America Online was used because a scriptable version of it was available early on in the project, but a comparable launching of eWorld via an eWorld shortcut syntax is under development.<br><br>  • If SD Background should hang, run the appropriate "SD Background Quit" applet, and restart SD Background.<br><br>For example, according to testimony of inventor Tom Bonura, the LiveSimpleText application was an implementation of Bonura's LiveDoc prototyping in LISP (as described herein) which was in working form in early 1995  (Bonura Tr. 66:14-20, 66:22-67:18)   In August of 1995, inventor Jim Miller described the prototypical LiveDoc interface and architecture: |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 3 | Reduction to Practice of the Claimed Invention |
|---|---|
| | **(2) LIVEDOC**<br><br>**DEFINITION:**<br>    A background process grabs the text currently visible in the application/document window and passes it to the Structure Detector engine<br>    The user holds down a command/option-type key or key combination (or does some other transitory thing).<br>    While that key is held down, the identified structures are highlighted in place, in the document.<br>    A mouse-down over one of the highlighted regions produces a pop-up menu containing actions relevant to the selected structure; picking one causes the corresponding action to be fired.<br><br>**PLUSES:**<br>    Clear visual indication of what structures have been recognized by the system<br>    Unambiguous visual indication of what action the user wants to have carried out on a structure.<br><br>**MINUSES:**<br>    Modification of the application is needed: the LiveDoc API has to be called by the application.<br>    Is there undesirable screen clutter from the (albeit temporary) highlighting of the structures?<br>    Command/option key or key combination must be reserved for this purpose (use the "helium key" combination from Maxwell?)<br>    Holding down the special key and selecting a structure's menu item with the mouse makes this a two-handed interface.<br>    Parser speed is important; we don't want users to have to wait a long time for relevant structures to be found and highlighted.<br><br><br>**(3) OTHER RELATED (but not prototyped) DESIGNS**<br><br>(MILLER00000836-852 at 846) |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 3 | Reduction to Practice of the Claimed Invention |
|---|---|
|  | Miller's description suggests that the "LiveDoc API" had been prototyped.   (*Id.* ("(3) OTHER RELATED (***but not prototyped***) Designs") (emphasis added).)  Miller states that the "structure detectors engine" is accessed via a background process and accepts input from the concurrently running foreground process having a visible "application/document window."  In my opinion, the LiveSimpleText program I tested has been implemented with the architecture that Miller described in August 1995 in this email. |

| Claim 4 | Reduction to Practice of the Claimed Invention |
|---|---|
| The system recited in claim 1, wherein the analyzer server includes grammars and a parser for detecting structures in the data. | In my opinion, the inventors actually reduced this limitation to practice by at least September 1995.<br><br>The parties have agreed that the term "structure" means "[a]n instance of a pattern, where a "pattern" refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document  such as dates, address/es, phone numbers, names, etc." and that the term "detecting" means "finding and identifying."<br><br>The parties dispute the meaning of "analyzer server."  I agree with Apple that this term means "a program routine(s) that receives data, uses patterns to detect structures in the data, and links actions to the detected structure."  The Staff construes the term to mean "a program sub-routine that receives data from a document having recognizable structures, and uses patterns to detect the structures."  HTC construes the term to mean "a program sub-routine that receives data from a document having recognizable structures, and uses patterns to detect the structures, where the document is presented by a separate application."<br><br>***LiveDoc***<br><br>Under any party's constructions, it is my opinion that the LiveDoc prototype included an "analyzer server [that] includes grammars and a parser for detecting structures in the data."<br><br>The ANALYZE-TEXT function invoked in LD-ANALYZE in livedoc-views.lisp, calls code for defining grammars and for parsing text. (*See* livedocs-views.lisp (importing speech:analyze-text).)  The grammar is provided in ld-grammar-1.lisp and the parsing code that uses this grammar is in parse.lisp.  The top-level of the parser is given below in the casper-text-patch.lisp. |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 4 | Reduction to Practice of the Claimed Invention |
|---|---|
| | <br>```<br>(defun parse-text (sentence &key (grammar *domain*)<br>                    (start (grammar-start grammar))<br>                    (tokenizer #'tokenize-text)<br>                    (evaluator #'phrase-structure)<br>                    (debug *debug*)<br>                    (return #'(lambda (v x1 x2)<br>                                 (format t "~a-~a:~{ ~a~}~%"<br>                                    x1 x2<br>                                    (subseq sentence x1 x2))<br>                                 (pps v))))<br>```<br><br>"This function effectively tries to parse every subsequence of the input sentence. If the input is a string rather than a list of tokens, it is broken into tokens with 'tokenizer', a function taking a string and  returning a list of strings.  The grammar and start symbol can be specified with 'grammar' and 'start'.  The value returned is determined by 'evaluator', which defaults to a function which produces the phrase structure of the parsed input.  'return' is called for each result, with three arguments, the value, the starting index in the input, and the ending index."<br><br>```<br>  (when (stringp sentence)<br>    (setq sentence (funcall tokenizer sentence)))<br>  (let ((ps (make-pstate :grammar grammar<br>                         :start start<br>                         :sentence sentence<br>                         :evaluator evaluator))<br>        (n (length sentence))<br>        (*debug* debug))<br>    (setq *parse-state* ps)<br>    (init-slots ps)<br>    (when *debug*<br>      (debug *debug* :start-parse ps))<br>    (dotimes (j (1+ n))<br>      (update-cursor)          ; 4/26/95 TB added to make the animated<br>                               ; cursor stuff work<br>      (when (< j n)<br>        (setup-rules ps j))<br>      (parse-word ps j return)<br>      ;; hack to free up memory<br>      (setf (slot-completed (get-slot ps j)) nil))))<br>``` |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 4 | Reduction to Practice of the Claimed Invention |
|---|---|
| | (*See* casper-text-patch.lisp.)<br><br>***LiveSimpleText***<br>Under any party's constructions, it is my opinion that the LiveSimpleText prototype included an "analyzer server [that] includes grammars and a parser for detecting structures in the data."<br><br>The LiveSimpleText prototype is capable of detecting a variety of different structures in data.  For example, it is my opinion that the prototypes demonstrated ability to detect e-mail addresses is implemented using code that parses the data and applies patterns, such as grammers, regular expressions and strings, to the data in order to recognize specific instances of the pattern (i.e. structures) in the data. |

| Claim 8 | Reduction to Practice of the Claimed Invention |
|---|---|
| The system recited in claim 1, wherein the user interface highlights detected structures. | In my opinion, the inventors actually reduced this claim to practice by at least September 1995.<br><br>The parties have agreed that the term "structure" means "[a]n instance of a pattern, where a "pattern" refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document  such as dates, address/es, phone numbers, names, etc." and that the term "detected" means "found and identified."<br><br>***LiveDoc***<br>Under any party's constructions, it is my opinion that the LiveDoc prototype included a "user interface [that] highlights detected structures."<br><br>As I described above in the context of Claim 1, the FRED-UPDATE method in LD-ANALYZE highlights the detected structure or, in later implementations, highlights the detected structure by calling reveal-node method, which invokes |

40

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 8 | Reduction to Practice of the Claimed Invention |
|---------|------------------------------------------------|
|         | methods for drawing the detected node such as the DRAW-NODES, DRAW-ALL-NODES, NODE-DRAW, AND LD-HILITE methods.  The ld-hilite method performs the actual highlighting of the text. |

```
(defmethod FRED-UPDATE :AROUND ((v fred-mixin))
  (call-next-method)
  (cond ((eq (class-of (view-container v))
             (find-class 'livedocviewer))
         (draw-nodes (view-container v) (node-type (view-container v))))
        ((eq (class-of (view-container v))
             (find-class 'term-viewer))
         (draw-all-nodes (view-container v))
        ))
                                         )
(defmethod DRAW-NODES ((view liveDocViewer) &optional (of.class nil) (invert nil))
  "Draw all the nodes of a class. if of.class is nil then just draw all the
nodes otherwise draw all the types of nodes in the list passed into of.class"
  (when (show-nodes view)
    (if of.class
      ;;  collect all the nodes of a class
      (loop for type in of.class
          do
            (loop for node in (anchorlist view)
                if (eql (name (semantic-category node))
                        type)
                do
                (node-draw node invert)))
      (draw-all-nodes view invert))
    )
  )

(defmethod DRAW-ALL-NODES ((view liveDocViewer) &optional (invert nil))
  (dolist (node (anchorlist view))
    ;(update-node-position node)
    (node-draw node invert)))
(defmethod NODE-DRAW ((node anchor-node) &optional (invert nil))
  (let ((lastpos (node-position node)))
    (update-node-position node)
```

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 8 | Reduction to Practice of the Claimed Invention |
|---|---|
| | <pre>                    (unless (minusp (node-position node))
                    ;; a node-position is negative if it is not in the view so don't redraw.
                    (let* ((my-view (my-view node))
                            (theRect (node-rect node))
                            )
                    (if (or (minusp lastpos)
                            invert)
                        (node-invert node))
                    (with-focused-view (fred-item my-view)
                        (with-fore-color *anchor-frame-color*
                        (rlet ((r :rect))
                            (copy-record theRect :rect r)
                            (inset-node-rect r)
                            (LD-HILITE r )

                            )
                            )
                            )
                        )
                        )
                        )
                        )</pre>(*See* livedoc-views.lisp (highlighting and emphases added).)<br><br>***LiveSimpleText***<br><br>Under any party's constructions, it is my opinion that the LiveSimpleText prototype included a "user interface [that] highlights detected structures."  Below is a screenshot of the LiveSimpleText prototype showing the highlighting of detected structures: |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 8 | Reduction to Practice of the Claimed Invention |
|---|---|
| | 

**LiveSimpleText user interface with detected structures highlighted.**

Moreover, Inventor James Miller confirmed that LiveSimpleText highlighted detected structures.  (Miller Tr. 99:10-16, ("Q.  From your understanding how did LiveSimpleText provide the functionality of indicating to a user that it had detected some structures?  A.  What the user saw was the highlighting of the relevant regions on the screen…").) |

| Claim 15 | Reduction to Practice of the Claimed Invention |
|---|---|
| In a computer having a memory storing actions, a method for causing the computer to perform an action on a structure identified in computer data, comprising the steps of: | It is my opinion that the preamble of claim 15 is not a limitation of the claim.  Even if the preamble is considered a limitation, in my opinion, the inventors actually reduced the preamble and the other limitations of claim 15 to practice by at least September 1995.

My analysis for the preamble of Claim 1 illustrates how the LiveDoc and LiveSimpleText prototypes each included "a computer having a memory storing actions, a method for causing |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 15 | Reduction to Practice of the Claimed Invention |
|---|---|
| | the computer to perform an action on a structure identified in computer data." |
| receiving computer data; | My analysis for the "an input device for receiving data" limitation of Claim 1 illustrates how the LiveDoc and LiveSimpleText prototypes each practiced the step of "receiving computer data." |
| detecting a structure in the data; | My analysis for the "an analyzer server for detecting structures in the data, and for linking actions to the detected structures" limitation of Claim 1 illustrates how the LiveDoc and LiveSimpleText prototypes each practiced the step of "detecting a structure in the data." |
| linking at least one action to the detected structure; | My analysis for the "an analyzer server for detecting structures in the data, and for linking actions to the detected structures" limitation of Claim 1 illustrates how the LiveDoc and LiveSimpleText prototypes each practiced the step of "linking at least one action to the detected structure." |
| enabling selection of the structure and a linked action; and | My analysis for the "a user interface enabling the selection of a detected structure and a linked action" limitation of Claim 1 illustrates how the LiveDoc and LiveSimpleText prototypes each practiced the step of "enabling selection of the structure and a linked action." |
| executing the selected action linked to the selected structure. | My analysis for the "an action processor for performing the selected action linked to the selected structure" limitation of Claim 1 illustrates how the LiveDoc and LiveSimpleText prototypes each practiced the step of "executing the selected action linked to the selected structure." |

| Claim 17 | Reduction to Practice of the Claimed Invention |
|---|---|
| The method recited in claim 15, wherein the memory contains grammars, and wherein the step of detecting a structure | In my opinion, the inventors actually reduced this claim to practice by at least September 1995. |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 17 | Reduction to Practice of the Claimed Invention |
|---|---|
| further comprises the steps of retrieving a grammar and parsing the data based on the grammar. | My analysis for Claim 4 illustrates how the LiveDoc and LiveSimpleText prototypes each included a method "wherein the memory contains grammars, and wherein the step of detecting a structure further comprises the steps of retrieving a grammar and parsing the data based on the grammar." |

| Claim 19 | Reduction to Practice of the Claimed Invention |
|---|---|
| The method recited in claim 15, wherein the memory contains strings, and wherein the step of detecting a structure further comprises the steps of retrieving a string from the memory and scanning the data to identify the string. | In my opinion, the inventors actually reduced this limitation to practice by at least September 1995.<br><br>The parties have agreed that the term "structure" means "[a]n instance of a pattern, where a "pattern" refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document  such as dates, addresses, phone numbers, names, etc." and that the term "detecting" means "finding and identifying."<br><br>***LiveDoc***<br><br>Under any party's constructions, it is my opinion that the LiveDoc prototype included a "memory [that] contains strings, and wherein the step of detecting a structure further comprises the steps of retrieving a string from the memory and scanning the data to identify the string."<br><br>The LiveDoc prototype used strings to detect structures.  For example, the LiveDoc prototype stored strings for names, days of the week, and months of the year. (*See, e.g.*, ld-grammar-1.lisp.)<br><br>***LiveSimpleText***<br><br>Under any party's constructions, it is my opinion that the LiveSimpleText prototype included a "memory [that] contains strings, and wherein the step of detecting a structure further comprises the steps of retrieving a string from the memory and scanning the data to identify the string."<br><br>The LiveSimpleText prototype I reviewed is able to detect proper names such as "Apple Computer": |

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

| Claim 19 | Reduction to Practice of the Claimed Invention |
|----------|------------------------------------------------|
|  |  |

**LiveSimpleText user interface with detected structures highlighted.**

In my opinion, the ability of the LiveSimpleText prototype to recognize proper names would be implemented using strings to detect matching structures in the data. Testimony of inventor Thomas Bonura supports my opinion. (*See e.g.*, Bonura Tr. 122:5-14 (LiveSimpleText contained a separate detector for "company names"), 126:20-127:5 ("Q. You mentioned a second detector to identify company names. How did that detector work? A. I don't know. Q. Did it use regular expressions? . . . A. It did not. Q. What did it use? A. A dictionary of strings.") (objection omitted).)

| Claim 20 | Reduction to Practice of the Claimed Invention |
|----------|------------------------------------------------|
| The method recited in claim 15, further comprising after the step of detecting a structure, the step of highlighting the detected structure. | In my opinion, the inventors actually reduced this claim to practice by at least September 1995.<br><br>My analysis for Claim 8 illustrates how the LiveDoc and LiveSimpleText prototypes included a method with the step of highlighting the detected structure. |