# EXHIBIT A

# The Washington Post

[Back to previous page](#)

 The Secret to Getting Thin No Matter What You Eat

 How Cruise Lines Fill All Those Unsold Cruise Cabins

 How to Exercise Your Brain to Make It Strong

# Apple market value hits $600 billion, closing in on Microsoft record

### By Associated Press, Published: April 10

NEW YORK — Apple, already the world's most valuable company, hit the $600 billion level for the first time Tuesday.

Only one other company has been worth $600 billion — Apple's old sparring partner Microsoft Corp. It reached that valuation for 13 trading days around the turn of the millennium, at the peak of the technology stock mania.

At its highest level, on Dec. 30, 1999, Microsoft's valuation was $619 billion. It's now worth about $255 billion.

General Electric Co. came just short of reaching a $600 billion valuation in August 2000.

Apple shares hit $644 in morning trading, up 1.2 percent from Monday's close. At that price, the entire company was worth $600.4 billion. By midday, the shares had retreated. The stock closed at $628.44, down 1.2 percent from the day before, putting the value below $600 billion again.

Apple's stock is up nearly 60 percent since the start of the year, an indication that investors are catching up to what analysts have been saying for a while: Despite its enormous market capitalization, Apple's stock has been undervalued relative to its even more enormous profits.

The rally has also been fueled by the report of another blow-out holiday quarter, and the announcement that Apple will start putting its $97.6 billion cash hoard to use this summer by paying a dividend and buying back shares.

Apple's market capitalization hit $500 billion on Feb. 29. That, in itself, was a rare achievement: Only five other U.S. companies have ever been worth that much.

Apple's market capitalization is still well below Microsoft's 1999 record if inflation is taken into account. The $619 billion then becomes $846 billion.

Many analysts believe Apple can get there, though. Last week, Brian White of Topeka Capital Markets was the first to set a stock price target of more than $800, with a goal of $1,001. That target implies a market capitalization of $932 billion.

White believes Apple will expand its reach this year by starting to sell the iPhone through China Mobile, that country's largest phone company, and by launching a TV set. Apple hasn't confirmed either piece of speculation.

In a rare contrarian opinion, BTIG Research analyst Walter Piecyk downgraded Apple from "Buy" to "Hold" on Monday, saying its profit margins are unsustainable. Phone companies are seeing the profits sapped by the subsidies they pay for the iPhone, he notes, and are set to curb their upgrade policies and otherwise make it harder for people to trade up to the newest model. That effect will hardly be visible when Apple reports results for the most recent quarter in two weeks, Piecyk believes, but he said it will become more apparent later this year.

China's largest oil company, PetroChina, was briefly worth $1 trillion after it listed on the Shanghai stock exchange in 2007, but only based on its price on that exchange. Its shares also trade in Hong Kong and on the New York Stock Exchange. Based on trading there, its market capitalization has never reached $500 billion.

Copyright 2012 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

**Sponsored Links**

**iPAD NEVER Needs Charging**
OTCBB: DOMK launches amazing new solar charger sleeve for the iPad.
www.SolarWerks.com

**BlackBerry® Bold™ 9900**
Get more of the speed, style and performance you love. Learn more.
BlackBerry.com

**Google Apps - Free Trial**
Increase productivity with web-based email, calendar, and documents.
www.Google.com/Apps/Business

**Buy a link here**

© The Washington Post Company

# EXHIBIT B

Case 5:12-cv-00630-LHK   Document 115-3   Filed 04/23/12   Page 5 of 113

Mac
iPod
iPhone
iPad
iTunes
Support

## Apple Press Info

Press Releases          Product Images & Info          Apple Leadership

## Apple Reports First Quarter Results

### Highest Quarterly Revenue and Earnings Ever

### All–Time Record iPhone, iPad and Mac Sales



Data Summary
*Download*

CUPERTINO, California—January 24, 2012—Apple® today announced financial results for its fiscal 2012 first quarter which spanned 14 weeks and ended December 31, 2011. The Company posted record quarterly revenue of $46.33 billion and record quarterly net profit of $13.06 billion, or $13.87 per diluted share. These results compare to revenue of $26.74 billion and net quarterly profit of $6 billion, or $6.43 per diluted share, in the year–ago quarter. Gross margin was 44.7 percent compared to 38.5 percent in the year–ago quarter. International sales accounted for 58 percent of the quarter's revenue.

The Company sold 37.04 million iPhones in the quarter, representing 128 percent unit growth over the year–ago quarter. Apple sold 15.43 million iPads during the quarter, a 111 percent unit increase over the year–ago quarter. The Company sold 5.2 million Macs during the quarter, a 26 percent unit increase over the year–ago quarter. Apple sold 15.4 million iPods, a 21 percent unit decline from the year–ago quarter.

"We're thrilled with our outstanding results and record-breaking sales of iPhones, iPads and Macs," said Tim Cook, Apple's CEO. "Apple's momentum is incredibly strong, and we have some amazing new products in the pipeline."

"We are very happy to have generated over $17.5 billion in cash flow from operations during the December quarter," said Peter Oppenheimer, Apple's CFO. "Looking ahead to the second fiscal quarter of 2012, which will span 13 weeks, we expect revenue of about $32.5 billion and we expect diluted earnings per share of about $8.50."

Apple will provide live streaming of its Q1 2012 financial results conference call beginning at 2:00 p.m. PST on January 24, 2012 at www.apple.com/quicktime/qtv/earningsq112. This webcast will also be available for replay for approximately two weeks thereafter.

This press release contains forward–looking statements including without limitation those about the Company's estimated revenue and earnings per share. These statements involve risks and uncertainties, and actual results may differ. Risks and uncertainties include without limitation the effect of competitive and economic factors, and the Company's reaction to those factors, on consumer and business buying decisions with respect to the Company's products; continued competitive pressures in the marketplace; the ability of the Company to deliver to the marketplace and stimulate customer demand for new programs, products, and technological innovations on a timely basis; the effect that product introductions and transitions, changes in product pricing or mix, and/or increases in component costs could have on the Company's gross margin; the inventory risk associated with the Company's need to order or commit to order product components in advance of customer orders; the continued availability on acceptable terms, or at all, of certain components and services essential to the Company's business currently obtained by the Company from sole or limited sources; the effect that the Company's dependency on manufacturing and logistics services provided by third parties may have on the quality, quantity or cost of products manufactured or services rendered; risks associated with the Company's international operations; the Company's reliance on third–party intellectual property and digital content; the potential impact of a finding that the Company has infringed on the intellectual property rights of others; the Company's dependency on the performance of distributors, carriers and other resellers of the Company's products; the effect that product and service quality problems could have on the Company's sales and operating profits; the continued service and availability of key executives and employees; war, terrorism, public health issues, natural disasters, and other circumstances that could disrupt supply, delivery, or demand of products; and unfavorable results of other legal proceedings. More information on potential factors that could affect the Company's financial results is included from time to time in the "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" sections of the Company's public reports filed with the SEC, including the Company's Form 10–K for the fiscal year ended September 24, 2011 and its Form 10–Q for the fiscal quarter ended December 31, 2011 to be filed with the SEC. The Company assumes no obligation to update

any forward-looking statements or information, which speak as of their respective dates.

Apple designs Macs, the best personal computers in the world, along with OS X, iLife, iWork and professional software. Apple leads the digital music revolution with its iPods and iTunes online store. Apple has reinvented the mobile phone with its revolutionary iPhone and App Store, and is defining the future of mobile media and computing devices with iPad.

**Press Contact**:
Steve Dowling
Apple
dowling@apple.com
(408) 974-1896

**Investor Relations Contacts**:
Nancy Paxton
Apple
paxton1@apple.com
(408) 974-5420

Joan Hoover
Apple
hoover1@apple.com
(408) 974-4570

Apple, the Apple logo, Mac, Mac OS and Macintosh are trademarks of Apple. Other company and product names may be trademarks of their respective owners.

**Apple Inc.**
**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
(In millions, except number of shares which are reflected in thousands and per share amounts)

| | Three Months Ended | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2011 | | December 25, 2010 | |
| Net sales | $ | 46,333 | $ | 26,741 |
| Cost of sales [1] | | 25,630 | | 16,443 |
| Gross margin | | 20,703 | | 10,298 |
| Operating expenses: | | | | |
| Research and development [1] | | 758 | | 575 |
| Selling, general and administrative [1] | | 2,605 | | 1,896 |
| Total operating expenses | | 3,363 | | 2,471 |
| Operating income | | 17,340 | | 7,827 |
| Other income and expense | | 137 | | 136 |
| Income before provision for income taxes | | 17,477 | | 7,963 |
| Provision for income taxes | | 4,413 | | 1,959 |
| Net income | $ | 13,064 | $ | 6,004 |
| Earnings per common share: | | | | |
| Basic | $ | 14.03 | $ | 6.53 |
| Diluted | $ | 13.87 | $ | 6.43 |
| Shares used in computing earnings per share: | | | | |
| Basic | | 931,041 | | 919,294 |
| Diluted | | 941,572 | | 933,154 |
| [1] Includes share-based compensation expense as follows: | | | | |
| Cost of sales | $ | 63 | $ | 52 |
| Research and development | $ | 160 | $ | 113 |
| Selling, general and administrative | $ | 197 | $ | 134 |

**Apple Inc.**
**UNAUDITED CONDENSED CONSOLIDATED BALANCE SHEETS**
(In millions, except number of shares which are reflected in thousands)

|  | December 31, 2011 | September 24, 2011 |
|---|---|---|
| ASSETS: | | |
| Current assets: | | |
| Cash and cash equivalents | $  10,310 | $  9,815 |
| Short-term marketable securities | 19,846 | 16,137 |
| Accounts receivable, less allowances of $78 and $53, respectively | 8,930 | 5,369 |
| Inventories | 1,236 | 776 |
| Deferred tax assets | 1,937 | 2,014 |
| Vendor non-trade receivables | 7,554 | 6,348 |
| Other current assets | 4,958 | 4,529 |
| Total current assets | 54,771 | 44,988 |
| Long-term marketable securities | 67,445 | 55,618 |
| Property, plant and equipment, net | 7,816 | 7,777 |
| Goodwill | 896 | 896 |
| Acquired intangible assets, net | 3,472 | 3,536 |
| Other assets | 4,281 | 3,556 |
| Total assets | $  138,681 | $  116,371 |
| LIABILITIES AND SHAREHOLDERS' EQUITY: | | |
| Current liabilities: | | |
| Accounts payable | $  18,221 | $  14,632 |
| Accrued expenses | 11,500 | 9,247 |
| Deferred revenue | 4,886 | 4,091 |
| Total current liabilities | 34,607 | 27,970 |
| Deferred revenue – non-current | 2,187 | 1,686 |
| Other non-current liabilities | 11,833 | 10,100 |
| Total liabilities | 48,627 | 39,756 |
| Commitments and contingencies | | |
| Shareholders' equity: | | |
| Common stock, no par value; 1,800,000 shares authorized; 932,214 and 929,277 shares issued and outstanding, respectively | 13,961 | 13,331 |
| Retained earnings | 75,709 | 62,841 |
| Accumulated other comprehensive income | 384 | 443 |
| Total shareholders' equity | 90,054 | 76,615 |
| Total liabilities and shareholders' equity | $  138,681 | $  116,371 |

**Apple Inc.**
**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
(In millions)

| | Three Months Ended | |
| --- | --- | --- |
| | December 31, 2011 | December 25, 2010 |
| Cash and cash equivalents, beginning of the period | $      9,815 | $      11,261 |
| **Operating activities:** | | |
| Net income | 13,064 | 6,004 |
| Adjustments to reconcile net income to cash generated by operating activities: | | |
| Depreciation, amortization and accretion | 721 | 356 |
| Share-based compensation expense | 420 | 299 |
| Deferred income tax expense | 1,456 | 823 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable, net | (3,561) | (517) |
| Inventories | (460) | 166 |
| Vendor non-trade receivables | (1,206) | (433) |
| Other current and non-current assets | (962) | (558) |
| Accounts payable | 4,314 | 2,346 |
| Deferred revenue | 1,296 | 634 |
| Other current and non-current liabilities | 2,472 | 653 |
| Cash generated by operating activities | 17,554 | 9,773 |
| **Investing activities:** | | |
| Purchases of marketable securities | (40,175) | (19,575) |
| Proceeds from maturities of marketable securities | 3,038 | 3,279 |
| Proceeds from sales of marketable securities | 21,472 | 6,853 |
| Payments for acquisition of property, plant and equipment | (1,321) | (1,214) |
| Payments for acquisition of intangible assets | (108) | (49) |
| Other | (34) | (23) |
| Cash used in investing activities | (17,128) | (10,729) |
| **Financing activities:** | | |
| Proceeds from issuance of common stock | 91 | 208 |
| Excess tax benefits from equity awards | 333 | 454 |
| Taxes paid related to net share settlement of equity awards | (355) | (233) |
| Cash generated by financing activities | 69 | 429 |
| Increase/(decrease) in cash and cash equivalents | 495 | (527) |
| Cash and cash equivalents, end of the period | $      10,310 | $      10,734 |
| **Supplemental cash flow disclosure:** | | |
| Cash paid for income taxes, net | $      1,474 | $      826 |

Apple Media Helpline   (408) 974–2042   media.help@apple.com

# EXHIBIT C

Mac
iPod
iPhone
iPad
iTunes
Support

## Apple Press Info

Press Releases          Product Images & Info          Apple Leadership

# Apple Announces Plans to Initiate Dividend and Share Repurchase Program

### Expects to Spend $45 Billion Over Three Years

CUPERTINO, California—March 19, 2012—Apple® today announced plans to initiate a dividend and share repurchase program commencing later this year.

Subject to declaration by the Board of Directors, the Company plans to initiate a quarterly dividend of $2.65 per share sometime in the fourth quarter of its fiscal 2012, which begins on July 1, 2012.

Additionally, the Company's Board of Directors has authorized a $10 billion share repurchase program commencing in the Company's fiscal 2013, which begins on September 30, 2012. The repurchase program is expected to be executed over three years, with the primary objective of neutralizing the impact of dilution from future employee equity grants and employee stock purchase programs.

"We have used some of our cash to make great investments in our business through increased research and development, acquisitions, new retail store openings, strategic prepayments and capital expenditures in our supply chain, and building out our infrastructure. You'll see more of all of these in the future," said Tim Cook, Apple's CEO. "Even with these investments, we can maintain a war chest for strategic opportunities and have plenty of cash to run our business. So we are going to initiate a dividend and share repurchase program."

"Combining dividends, share repurchases, and cash used to net-share-settle vesting RSUs, we anticipate utilizing approximately $45 billion of domestic cash in the first three years of our programs," said Peter Oppenheimer, Apple's CFO. "We are extremely confident in our future and see tremendous opportunities ahead."

Apple will provide live streaming of a conference call to discuss its plans beginning at 6:00 a.m. PDT on Monday, March 19, 2012 at www.apple.com/quicktime/qtv/call31912. The Company will not be providing an update on the current quarter nor will any topics be discussed other than cash. This webcast will also be available for replay for approximately two weeks thereafter.

This press release contains forward-looking statements including without limitation those regarding future business outlook and plans for dividends and share repurchases. These statements involve risks and uncertainties, and actual results may differ. Risks and uncertainties include without limitation the effect of competitive and economic factors, and the Company's reaction to those factors, on consumer and business buying decisions with respect to the Company's products; continued competitive pressures in the marketplace; the ability of the Company to deliver to the marketplace and stimulate customer demand for new programs, products, and technological innovations on a timely basis; the effect that product introductions and transitions, changes in product pricing or mix, and/or increases in component costs could have on the Company's gross margin; the inventory risk associated with the Company's need to order or commit to order product components in advance of customer orders; the continued availability on acceptable terms, or at all, of certain components and services essential to the Company's business currently obtained by the Company from sole or limited sources; the effect that the Company's dependency on manufacturing and logistics services provided by third parties may have on the quality, quantity or cost of products manufactured or services rendered; risks associated with the Company's international operations; the Company's reliance on third-party intellectual property and digital content; the potential impact of a finding that the Company has infringed on the intellectual property rights of others; the Company's dependency on the performance of distributors, carriers and other resellers of the Company's products; the effect that product and service quality problems could have on the Company's sales and operating profits; the continued service and availability of key executives and employees; war, terrorism, public health issues, natural disasters, and other circumstances that could disrupt supply, delivery, or demand of products; and unfavorable results of other legal proceedings. More information on potential factors that could affect the Company's financial results is included from time to time in the "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" sections of the Company's public reports filed with the SEC, including the Company's Form 10-K for the fiscal year ended September 24, 2011 and its Form 10-Q for the fiscal quarter ended December 31, 2011. The Company assumes no obligation to update any forward-looking statements or information, which speak as of their respective dates.

Apple designs Macs, the best personal computers in the world, along with OS X, iLife, iWork and professional software. Apple leads the digital music revolution with its iPods and iTunes online store. Apple has reinvented the mobile phone with its revolutionary iPhone and App Store, and is defining the future of mobile media and computing devices with iPad.

**Press Contact**:
Steve Dowling
Apple
dowling@apple.com
(408) 974-1896

**Investor Relations Contacts**:
Nancy Paxton
Apple
paxton1@apple.com
(408) 974-5420

Joan Hoover
Apple
hoover1@apple.com
(408) 974-4570

Apple, the Apple logo, Mac, Mac OS and Macintosh are trademarks of Apple. Other company and product names may be trademarks of their respective owners.

Apple Media Helpline   (408) 974-2042   media.help@apple.com

# EXHIBIT D
# FILED UNDER SEAL

# EXHIBIT E

1               UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3               CASE NO. 12-CV-00630-LHK (PSG)

4      ----------------------------------------)

       APPLE INC., a California corporation,    )

5                                               )

                          Plaintiff,            )

6                                               )

                       vs.                      )

7                                               )

       SAMSUNG ELECTRONICS CO., LTD., a         )

8      Korean business entity; SAMSUNG          )

       ELECTRONICS AMERICA, INC., a New         )

9      York corporation; SAMSUNG                )

       TELECOMMUNICATIONS AMERICA, LLC, a       )

10     Delaware limited liability company,      )

                                                )

11                        Defendants.           )

       ----------------------------------------)

12

13

14


15        VIDEOTAPED DEPOSITION OF NATHANIEL POLISH

16                    New York, New York

17                     April 3, 2012

18

19

20

21

22

23     Reported by:

24     KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25     JOB NO. 47971

Page 2

```
1          April 3, 2012
2
3      VIDEOTAPED deposition of NATHANIEL
4   POLISH, held at Quinn Emanuel Urquhart &
5   Sullivan, LLP, 51 Madison Avenue, New York,
6   New York, before Kathy S. Klepfer, a Registered
7   Professional Reporter, Registered Merit
8   Reporter, Certified Realtime Reporter,
9   Certified Livenote Reporter, and Notary
10  Public of the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide     877-702-9580

Page 3

```
1
2              A P P E A R A N C E S :
3
4   GIBSON DUNN & CRUTCHER
5   Attorneys for Plaintiff
6      200 Park Avenue
7      New York, New York  10166
8   BY:  JOSHUA FURMAN, ESQ.
9   BY:  BRIAN M. BUROKER, ESQ.
10
11
12
13
14  MORRISON & FOERSTER
15  Attorneys for Plaintiff
16     425 Market Street
17     San Francisco, California  94105
18  BY:  DIANA B. KRUZE, ESQ.
19
20  QUINN EMANUEL URQUHART & SULLIVAN
21  Attorneys for Defendants
22     51 Madison Avenue
23     New York, New York  10010
24  BY:  ANASTASIA M. FERNANDS, ESQ.
25     ROBERT KANG, ESQ.
```

TSG Reporting - Worldwide     877-702-9580

Page 4

```
1
2
3
4   ALSO PRESENT:
5      MICHAEL PINEIRO, Videographer
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide     877-702-9580

Page 5

```
1
2      IT IS HEREBY STIPULATED AND
3   AGREED, by and between the attorneys for
4   the respective parties herein, that the
5   filing and sealing be and the same are
6   hereby waived.
7      IT IS FURTHER STIPULATED AND
8   AGREED that all objections, except as to
9   the form of the question, shall be
10  reserved to the time of the trial.
11     IT IS FURTHER STIPULATED AND
12  AGREED that the within deposition may be
13  sworn to and signed before any officer
14  authorized to administer an oath, with
15  the same force and effect as if signed
16  and sworn to before the Court.
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide     877-702-9580

2 (Pages 2 to 5)

Page 22

1      I mean, the point of the whole system
2   was that you were looking at recent history to
3   change -- I see, okay.  So looking in column 5,
4   about line 7, "The system state is updated to
5   reflect the new conversation history and updates
6   the grammar weightings for the 'pick grammars'
7   phase of the model.  Updates to the system state
8   signal actions for the controlled unit to
9   execute.  For example, the navigation of a Web
10  browser or the operation of the VCR."
11     So the idea was that you would, as you
12  made progress through a conversation, you would
13  alter the weights to reflect greater likelihood
14  of certain follow-up queries being made.  So if
15  you were beginning a conversation about the
16  Beatles and you had something in the query that
17  would make it sound like you were -- you were
18  inquiring about the early Beatles, you might
19  have some different weights for that than for
20  later.  Or if you were having a conversation
21  about playing something on the VCR, you would
22  alter the weights of the grammars to reflect the
23  greater likelihood of those coming up next.
24     Q.   Was the Soliloquy system capable of
25  querying multiple SQL databases at the same

Page 23

1   time?
2      A.   No.  It was, I think -- in all the
3   systems we built, the database was very, very
4   tightly wedded to the rules we were using and
5   the grammars we were using.  So, I mean, you
6   could partition the database to run it on
7   multiple computers for efficiency, but the
8   database was a very tightly crafted piece of the
9   overall system.
10     So when you look at, you know, on the
11  front cover, the database 111, that was -- that
12  was all very, very tightly coupled to everything
13  else.  We would have loved to have been able to
14  access other people's databases and not have to
15  do the work, but in the work we contemplated
16  here, it was all just one big database.
17     Q.   Now, I'm back at column 4, where we
18  were before, toward the bottom of the column at
19  about line 64?
20     A.   Okay.
21     Q.   Do you see the reference to a "fuzzy
22  matching process"?
23     A.   Yes.
24     Q.   And how was a fuzzy matching process
25  used to refine an answer?

Page 24

1      MR. BUROKER:  Object to form.
2      A.   Right.  Well, the example that I
3   always used in something like that is mentioned
4   on line 65, which is to say searching
5   phonetically.  The example I always used was if
6   you, because you were taking text coming from a
7   dictation system, you'd get text and it might be
8   that there was some misunderstanding, and so
9   what you do is you would pass it through
10  something to convert it to a list of phonemes
11  and then you would do a phonetic search.
12     There were a number of technologies
13  around to do that, and so instead of looking
14  for, you know, say you got the word "beer," you
15  might also be looking for things that would
16  sound a bit like "beer," maybe "bin" or "bear"
17  or things that are not necessarily
18  typographically close, but phonetically close.
19     So that's what was generally meant by
20  the kind of a fuzzy search, not just looking --
21  you could look for things that were
22  typographically close, like small misspellings,
23  but you could also look for things that were
24  phonetically close that had a similar acoustic.
25     Q.   Were heuristic algorithms used in the

Page 25

1   fuzzy matching process in the Soliloquy system?
2      A.   I think that at least for some
3   definitions of "heuristic" phonetic searching
4   could well be referred to as a heuristic.  I
5   don't think I -- I don't think I thought of it
6   or referred to it as heuristic search in any of
7   this, in any of this work, but certainly some
8   people might refer to looking for phonetic
9   matches as being heuristic.
10     Q.   Your '531 patent was filed in 2000; is
11  that correct?
12     MR. BUROKER:  Object to form.
13     A.   I'm relying entirely upon the face of
14  the patent because it was a long time ago.  It
15  looks like the provisional was filed in '99 and
16  the -- the final was filed in February 2000.
17     Q.   Was there an ordinary meaning in
18  computer science for "heuristic" in 2000?
19     A.   Certainly heuristic was a well-known
20  artificial intelligence concept by 2000.
21     Q.   In your earlier answer, you had stated
22  that for some definitions of "heuristic" the
23  searches in the Soliloquy -- the phonetic
24  searches could be considered heuristic searches.
25     Under what definitions of "heuristic"?

Page 26

1      A.   Well, I taught computer science around
2    this time and I taught artificial intelligence,
3    and we taught something referred to as heuristic
4    search.  And I think when I looked at the file
5    history for the '604 patent, there was a
6    description in there of some definitions of
7    "heuristic" and I think they were all within the
8    range of what people would accept, which is
9    generally some kind of rule of thumb that helps
10   you find an answer.  I know it's a very vague
11   answer, but heuristic is kind of a broad
12   concept.
13      Q.   Now, you've reviewed the prosecution
14   history for the '604 patent in connection with
15   your work on this case?
16      A.   Yes.
17      Q.   And I believe you stated that you saw
18   some definitions for "heuristic" in there,
19   correct?
20      A.   Yes.
21      Q.   Is there anything that you saw in the
22   prosecution history that informed your
23   interpretation of the claims of the '604 patent?
24      A.   Well, I -- I mean, I learned a lot
25   looking at the prosecution history as to what --

Page 27

1    what the arguments were and why certain
2    approaches were taken.  I mean, I looked at a
3    range of documents that I have put in the
4    declaration that all informed my understanding
5    of the patent.  Certainly the prosecution
6    history did as well.
7      Q.   And you understand the prosecution
8    history should be considered in determining how
9    claims should be interpreted in the context of
10   the particular patent, correct?
11      A.   Yes, my understanding is the
12   prosecution history needs to be taken into
13   account.  There's different -- different aspects
14   of it have different -- have different weight
15   and different importance, but certainly it's
16   part of the record that's important.
17      Q.   In your declaration in this case, you
18   didn't identify any particular portion of the
19   prosecution history that informed your claim
20   interpretation, correct?
21        MR. BUROKER:  Object to form.
22      A.   I don't recall specifically and I
23   haven't got the declaration in front of me.  It
24   might be helpful if I had it.
25        (Polish Exhibit 3, Expert Declaration

Page 28

1    of Dr. Nathaniel Polish Concerning U.S.
2    Patent No. 8,086,604, marked for
3    identification, as of this date.)
4    BY MS. FERNANDS:
5      Q.   You now have what we marked as Polish
6    Exhibit 3.
7      A.   Okay.
8      Q.   Is this the declaration to which you
9    referred?
10      A.   Yes, it is.
11      Q.   And in this declaration, you did not
12   point to any particular portion of the
13   prosecution history that informed your
14   interpretation of the claims, correct?
15      A.   I believe I refer to the fact that
16   I -- that it's important and that I looked at
17   it.  I don't recall citing a particular spot.
18        Yes, I don't think I referred to any
19   particular spot on the prosecution history.
20      Q.   You also reviewed the prosecution
21   history for the parent application that resulted
22   in the '959 patent; is that correct?
23      A.   That's correct.
24      Q.   I think you said earlier you have
25   testified about 35 times; is that right?

Page 29

1      A.   Well, I think I've been deposed about
2    35 times.  If you consider those testimony, yes.
3      Q.   Were those all as an expert witness?
4      A.   I think one or two of those may have
5    been as a -- as a fact witness regarding patents
6    of mine that were being litigated.
7      Q.   Were the cases in which you were
8    testifying as an expert witness all in patent
9    cases?
10      A.   One or two of them involved copyright
11   issues or trade secret issues or contracts
12   issues.  They all I think generally involved
13   intellectual property, but most -- but the vast
14   majority are patent.
15      Q.   So you understand what it means to say
16   that a patent "claims" a certain invention,
17   correct?
18      A.   Generally speaking, yes.
19      Q.   And you understand that the language
20   of the claims controls the scope of the
21   invention?
22      A.   Yes.
23      Q.   In your analysis in connection with
24   this case for the '604 patent, you first
25   considered how you believe the claims would be

Page 30

1   interpreted by a person of skill in the art; is
2   that correct?
3       A.   Yes.
4       Q.   Do you have your declaration there,
5   which is Exhibit 3?
6       A.   Yes.
7       Q.   Could you turn to paragraph 19,
8   please, to start?
9       A.   Okay.
10      Q.   I just wanted to ask you about the
11  first sentence in paragraph 19 where you state,
12  "I understand that the parties dispute the
13  construction of several terms"?
14      A.   Yes.
15      Q.   On what is that understanding based?
16      A.   It would only have been based upon
17  what the lawyers I was working with would have
18  told me.
19      Q.   Are you aware of any dispute as to
20  claim terms that exist in this case right now?
21      A.   I'm not aware -- I don't think I'm
22  aware of particular claim construction arguments
23  that are going on.  I was focused in this -- in
24  this declaration on what I thought the claims
25  meant and not -- I wasn't -- I wasn't

Page 31

1   particularly looking at what the attorneys on my
2   side or the attorneys on the other side were
3   doing in terms of claim construction.
4       Q.   So in your declaration you haven't set
5   forth any proposed claim constructions; is that
6   correct?
7       A.   I believe in my -- in the declaration
8   I put forth everything should be ordinary
9   meaning, and that's how I was interpreting them.
10  And in the case of trying to understand how
11  to -- what some of these things meant in more
12  detail, I looked at the spec and I found some
13  support for particular ways I was looking at
14  what would have -- what one of ordinary skill
15  would have thought the terms meant.
16      Q.   If you look at page -- paragraph 48,
17  rather.  The last sentence of paragraph 48, you
18  state, "At present, my opinions are based on the
19  claims as I believe a person of ordinary skill
20  in the art would have understood them."  Is that
21  correct?
22      A.   Yes.
23      Q.   And is it your understanding that a
24  person of ordinary skill in the art would have
25  assigned a plain and ordinary meaning to the

Page 32

1   terms in the '604 patent?
2           MR. BUROKER:  Object to the form.
3       A.   I think, again, I didn't perform a
4   claim construction analysis as part of this.  I
5   looked at the claims, I looked at what I thought
6   the terms meant, and I looked at the spec to
7   help.  To the extent that that's plain and
8   ordinary meaning, yes.
9       Q.   So at the top of that page that we
10  were on, page 14, there are two claims, claim 6
11  and claim 19, do you see that?
12      A.   Yes.
13      Q.   And those were the two claims that you
14  analyzed in connection with this declaration; is
15  that correct?
16      A.   That's correct.
17      Q.   So let's start with some of the terms
18  of those claims.  You see the term "heuristic
19  modules" appears in claim 6?
20      A.   Yes.
21      Q.   Did the term "heuristic module" have a
22  plain and ordinary meaning in the art in 2000?
23      A.   Well, as I said, "heuristic" means a
24  lot of different things.  I think people would
25  have understood what -- what those modules were,

Page 33

1   and certainly in light of what's in the spec, it
2   was -- it was clear what they were.
3       Q.   So is the specification of the '604
4   patent necessary for an understanding of the
5   meaning of "heuristic module" as used in the
6   claims in your opinion?
7       A.   I think -- I think you have to read
8   the claims in light of what's in the spec, and I
9   think the spec is -- is very informative and
10  very important, and so I used the spec as part
11  of my understanding of -- of what -- of what the
12  claims meant.
13      Q.   And in forming your opinions you set
14  forth in this declaration, what was your
15  understanding of the meaning of "heuristic
16  module"?
17      A.   Well, my understanding was that it was
18  a -- it was a module of software that performed
19  a heuristic search on -- on data.  I mean, there
20  were -- I was informed largely by a discussion
21  in the claim spec -- in the patent spec that
22  made a list of examples of heuristic modules
23  and -- and what kinds of heuristics were being
24  used in those modules.
25          (Polish Exhibit 4, U.S. Patent No.

Page 42

1  equivalent training and course work and some
2  academic or work experience in computer
3  software.
4        So I think -- I think a bachelor's in
5  computer science is enough right there.  If
6  you're not going to have a bachelor's in
7  computer science -- and I don't have a
8  bachelor's in computer science.  I am largely
9  self-trained in this sort of thing.  I had
10  equivalent training and course work and some
11  academic and work experience in computer
12  software.
13       Q.   Let's go back to what we've marked as
14  Polish 4.  The '604 patent.
15       THE WITNESS:  Okay.  At your next
16  moment, I wouldn't -- a breakpoint, I
17  wouldn't mind a bathroom break.
18       MS. FERNANDS:  This is a fine point.
19       THE VIDEOGRAPHER:  This is the end of
20  the tape labeled number 1.  The time is
21  10:32.  Going off the record.
22       (Recess.)
23       THE VIDEOGRAPHER:  This is the start
24  of tape labeled number 2.  The time is
25  10:41.  We're back on the record.
TSG Reporting - Worldwide    877-702-9580

Page 43

1  BY MS. FERNANDS:
2       Q.   So if you could take out what we
3  marked as Exhibit 4.  It's the '604 patent.
4       A.   Okay.
5       Q.   And turn to column 8.
6       A.   Okay.
7       Q.   Claim 6 begins around line 26 of
8  column 8, correct?
9       A.   Yes.
10       Q.   And if you go down to about line 30,
11  do you see the claim element "a plurality of
12  heuristic modules"?
13       A.   Yes.
14       Q.   What is your understanding of what "a
15  plurality of heuristic modules" means?
16       A.   At least two.
17       Q.   Would you agree that a device that had
18  only one heuristic module would not satisfy the
19  claim limitation "a plurality of heuristic
20  modules"?
21       A.   I would agree with that, yes.
22       Q.   If you go down to -- it's about the
23  broken line, 34 to 35 in claim 6 still.
24       A.   Yes.
25       Q.   Do you see the heuristic algorithm
TSG Reporting - Worldwide    877-702-9580

Page 44

1  limitation?
2       A.   Yes.
3       Q.   In your opinion, did "heuristic
4  algorithm" have an ordinary meaning in the art
5  in 2000?
6       A.   Yes, as I said before, it -- it had a
7  lot of different meanings and I think people
8  generally understood what it meant, and the spec
9  helps you understand at least some of what it
10  meant.
11       Q.   How would a person of ordinary skill
12  in the art have understood -- what would a
13  person of ordinary skill in the art have
14  understood "heuristic algorithm" to mean in
15  2000?
16       MR. BUROKER:  Object to form.
17       A.   Well, I think -- I think somebody
18  would have understood it to mean that there was
19  some algorithm that would operate on a
20  particular -- on a particular area of data and
21  come up with a result that would be -- might not
22  be the definitive answer, but would be a
23  helpful -- would be helpful towards an answer,
24  and then they would have looked at the spec and
25  seen some examples that we've been talking about
TSG Reporting - Worldwide    877-702-9580

Page 45

1  before and they would have generally understood
2  what it meant.
3       Q.   I believe you said a couple of answers
4  ago that there were a lot of meanings to
5  "heuristic algorithm" in 2000; is that accurate?
6       A.   As I said, I think it's -- it's a
7  broad term that I think was described in the
8  file history a little bit.  People generally
9  understood it to be a rule of thumb that gave
10  you the -- that would give you an answer that
11  would -- it wouldn't necessarily give you the
12  definitive one answer, but it would give you a
13  result that would help you towards an answer.
14       Q.   How would a person of ordinary skill
15  in the art in 2000 have determined whether a
16  particular algorithm was a heuristic algorithm?
17       A.   I think they would have -- they would
18  have relied upon their computer science
19  background and examples from computer science
20  courses of heuristic searches and heuristic
21  algorithms to find examples of heuristic
22  searches, and those would have been distinct
23  from other kinds of, in some sense, more precise
24  search technologies that -- that might have been
25  alternatives.
TSG Reporting - Worldwide    877-702-9580

Page 46

1    Q.    Would the person of ordinary skill in
2  the art in 2000 looking to the examples of
3  heuristic algorithms have understood the full
4  scope of what is a heuristic algorithm?
5    A.    What exactly do you mean by "full
6  scope" there?
7    Q.    When we discussed earlier whether
8  there was an ordinary meaning in the art of
9  "heuristic algorithms," you said there were a
10 lot of meanings, correct?
11   A.    I think -- I don't know the exact
12 word, but it's possible, yes.
13   Q.    And in your opinion, do all of those
14 meanings apply in the context of the '604
15 patent?
16   A.    I don't think that there's a limit set
17 in terms of the meaning of "heuristic algorithm"
18 within the patent.  I think the patent at least
19 sets -- it sets it broad with the term
20 "heuristic algorithm," and then in column 4, you
21 at least have guidance as to three particular
22 examples that are at least included.  And I
23 think that's what would be the guide to know
24 what was meant by "heuristic algorithm."
25   Q.    Would a person of ordinary skill in

TSG Reporting - Worldwide    877-702-9580

Page 47

1  the art have understood that there could be
2  heuristic algorithms other than what the
3  examples are in column 4?
4    A.    Yes, certainly.
5    Q.    And how would the person of ordinary
6  skill in the art understand whether an algorithm
7  that they were working with was in fact a
8  heuristic algorithm under the broader meaning if
9  it did not fall within these examples?
10   A.    Well, I think -- I mean, I used to
11 teach a class in artificial intelligence and we
12 had -- we had several weeks we talked about
13 heuristic algorithms, heuristic searches, and
14 there were plenty of examples in a typical
15 course like that of heuristic algorithms.  And I
16 think people would have -- would have seen those
17 examples and understood that it's -- it's
18 something which might not be -- give you the
19 precise answer, but which would give you an
20 answer which would help you towards getting your
21 answer.
22   Q.    And in your opinion, do all algorithms
23 that might not give you the precise answer but
24 which would give you the answer which would help
25 you toward getting the answer qualify as a

TSG Reporting - Worldwide    877-702-9580

Page 48

1  heuristic algorithm?
2    A.    Depending on the context.  I think
3  they likely would.  It would depend on the
4  context.  I would have to see a particular -- a
5  particular example, but as I say, "heuristic" is
6  a pretty broad concept and it's a -- it's a
7  pretty broad concept in that -- but I mean,
8  most -- I would have to look at a particular
9  example, but I think most that would fit, what
10 we just said there, that performed an analysis
11 of a particular area of data and came back with
12 a result that helped you towards -- towards
13 getting your result, I think those would likely
14 be considered heuristics.
15   Q.    Is it possible that an algorithm could
16 be considered a heuristic algorithm in some
17 contexts but not in others?
18   A.    Probably.  I would have to think about
19 that, but probably.  Some people might call it
20 something different.  Some people might call it,
21 you know, have it by a different name in a
22 different context.
23   Q.    If it were called by a different name
24 in a different context, would the person of
25 ordinary skill in the art still understand it to

TSG Reporting - Worldwide    877-702-9580

Page 49

1  be a heuristic algorithm?
2       MR. BUROKER:  Object to form.
3    A.    Well, in the context of a system such
4  as this where you're -- where you're
5  implementing a search, I think you would view it
6  as being heuristic.  You might have the same
7  algorithm in a non-search context where it might
8  not be called a heuristic.
9       An example might be you might apply
10 something to a Web page and get a score, and
11 that score -- you might call that just some kind
12 of a Web page score.  In the context of
13 searching Web pages, that algorithm would be a
14 heuristic one, but somebody might just call it a
15 score if they were just doing it in the context
16 of scoring a document or scoring the page.
17   Q.    Why, in your opinion, would the
18 algorithm be a heuristic one when searching Web
19 pages?
20   A.    Well, again, if you had something
21 which scored the page and gave you a result and
22 it would help you towards some goal of
23 understanding the page, that would be a
24 heuristic, and certainly -- I would say it would
25 be a heuristic no matter what, but somebody

TSG Reporting - Worldwide    877-702-9580

1  might simply call it a score in other contexts.
2  In the context of searching, it would clearly be
3  a heuristic.
4      Q.   In your analysis concerning the '604
5  patent, what construction were you using for a
6  heuristic algorithm?
7      A.   Well, I didn't -- I didn't set forth a
8  claim construction analysis here. I viewed it
9  as plain and ordinary meaning and informed by
10  the spec. So I viewed it as -- as I think was
11  described in the file history at various points.
12        It was an algorithm that would -- it
13  was a rule of thumb or an algorithm that would
14  give you a result that would help you towards
15  your answer, and certainly in the context of the
16  spec, those three examples they give would fit
17  under that. And in my infringement analysis, I
18  found those specific examples in the accused
19  product.
20        So, for the purposes of coming up with
21  an infringement analysis, I didn't have to go
22  much further than look at what was in the spec
23  and what -- and what was generally discussed in
24  the file history.
25      Q.   When you say that you used plain and
TSG Reporting - Worldwide     877-702-9580

1  ordinary meaning as informed by the
2  specification, was there a plain and ordinary
3  meaning that was, in your opinion, altered by
4  the specification in some way?
5      A.   I wouldn't say it was altered. I
6  think the plain and ordinary meaning is, and I
7  don't want to do claim construction here, but
8  I -- plain and ordinary meaning as described in
9  the file history and I think generally is it's
10  a -- it's a rule or set of rules that provides
11  an answer that advances you towards -- towards
12  an understanding or a goal that the spec didn't
13  alter it, but it -- it said, well, it has to at
14  least include these three items, and then those
15  three items happened to be ones that were in the
16  accused product so I didn't have to go much
17  further.
18        I mean, I'm in the situation with the
19  declaration where I don't have a full-on claim
20  construction analysis, but I could still find
21  infringement because it was matching what was in
22  the spec so closely.
23      Q.   In your opinion, is "heuristic
24  algorithm" specifically defined in the
25  specification?
TSG Reporting - Worldwide     877-702-9580

1      MR. BUROKER: Object to form.
2      A.   There is not a definition and they're
3  certainly not acting as their own lexicographer
4  in the patent.
5      Q.   These examples that you pointed to in
6  column 4, these are examples of searches that
7  might be run with heuristic algorithms; is that
8  correct?
9      A.   Well, these are -- these are examples
10  that are heuristic, that these searches that are
11  done within the patent, these are examples of
12  what they consider to be heuristic modules or
13  heuristic algorithms.
14      Q.   The actual algorithms used are not set
15  forth in column 4; is that correct?
16      MR. BUROKER: Object to form.
17      A.   That's right. I don't think they set
18  forth what people would consider to be an
19  algorithm here.
20      Q.   In your opinion, what makes these
21  examples heuristic?
22      A.   You mean other than they say that
23  they're heuristic in the patent?
24      Q.   Other than your understanding in the
25  art of what is a heuristic, what makes these
TSG Reporting - Worldwide     877-702-9580

1  examples heuristic?
2      A.   Well, I think what they're -- what
3  they're getting to here and in other parts of
4  the patent is that you're doing -- you're
5  narrowing your search based upon certain
6  heuristics or criteria.
7        For example, in the -- in the last of
8  the three examples of list of recently accessed
9  files, applications and Websites, presumably the
10  list of all of your files and all of your
11  applications and all of the Websites on the
12  Internet is too big a list. So they are
13  offering results that are based upon the ones
14  you most recently looked at.
15        So it might be that that's wrong and
16  that -- and that in fact what you're looking for
17  is a Website you have never accessed before
18  and/or an application you have never used
19  before, but this heuristic will offer you the
20  ones that are most recent and so they -- they
21  might be the ones you're interested in. So, in
22  that sense, it's heuristic. It's giving you
23  something which will advance you towards the
24  goal of finding what you're looking for, but
25  isn't necessarily going to be giving you the
TSG Reporting - Worldwide     877-702-9580

1   precise answer.
2       Q.   In the second example here in column 4
3   at about line 17, the "module that may index and
4   search the contents of files on the local and/or
5   network storage volumes," how is that heuristic?
6       A.   Well, this would -- this would enable
7   you to, for example, find all the documents or
8   find -- find documents that contain a particular
9   word.  So if you were looking for documents that
10  contained the word "heuristic," it would give
11  you this list of documents that would have the
12  word in it and you'd have to figure out further
13  which is the one you're actually looking for.
14      So it wouldn't give you the exact file
15  you're looking for; it would give you a list
16  that would likely contain the file you're
17  looking for.  So, again, it would give you a
18  result which would advance you towards the goal
19  of finding the right file.  It wouldn't
20  necessarily find you the exact file, but would
21  say, well, these are likely to be the ones --
22  these are likely to be the file you're looking
23  for.
24      Q.   In your opinion, would a module that
25  indexes and searches contents of files

1   necessarily employ heuristic algorithms?
2       A.   Well, again, it would partly depend on
3   the context.  I think in the case of what
4   they're talking about here where you're looking
5   for a particular file and you're saying, well, I
6   know it contains the word "heuristic," that
7   would -- that would be a heuristic algorithm.
8       I suppose there could be other
9   contexts in which that might not be considered a
10  heuristic algorithm, but you'd have to come up
11  with some hypothetical for where that would be.
12      Q.   Now, as we've been going through this
13  today, we've used the term "heuristic" and the
14  term "heuristic algorithm."  Is there a
15  distinction between a "heuristic" and a
16  "heuristic algorithm"?
17      A.   Well, a heuristic algorithm is an
18  implementation of a heuristic.  The algorithm
19  might be a little bit, you know, might do a few
20  other things too, but generally speaking, the
21  heuristic algorithm is implementing a heuristic.
22      (Polish Exhibit 5, a document bearing
23      Bates Nos. APLNDC630-40547 through 558,
24      marked for identification, as of this date.)
25  BY MS. FERNANDS:

1       Q.   You have just been handed what we
2   marked as Polish Exhibit 5.  Do you recognize
3   this?
4       A.   I recognize this as being part of a
5   file history.  It looks like it's part of the
6   file history for this patent, but I'm --
7       Q.   If you look at the application number
8   at the top and the application number of the
9   '604 patent, I think you'll see that they are
10  the same.
11      A.   Okay.  I looked at this, at the file
12  history in its entirety.  It was a
13  400-and-some-odd-page document.  I, you know, I
14  can't exactly place this within it, but I'll
15  accept the notion that this is from somewhere
16  within those 400-and-some-odd pages.
17      Q.   It is.  I thought we would all be
18  better off if I didn't bring the whole thing.
19      A.   Sounds right.
20      Q.   You have reviewed this whole file
21  history, you said, in connection with your work
22  on this patent?
23      A.   Yes, I did.
24      Q.   So, although you don't necessarily
25  recognize this document, it -- if it's part of

1   the file history, it's something that you
2   reviewed?
3       A.   Yes, it's something that I certainly
4   would have seen.
5       Q.   And you referred earlier to
6   definitions of "heuristic" provided in the file
7   history.  If you look at page 10, you'll see
8   dictionary definitions of "heuristic."  Do you
9   see that?
10      A.   Yes.
11      MR. BUROKER:  Object to form.
12      Go ahead.
13      Q.   So on page 10, there are the
14  dictionary definitions of "heuristic," correct?
15      A.   Yes, I see that.  Let me just...
16      (Document review.)
17      A.   Yes, I see that.
18      Q.   Okay.  Are these dictionary
19  definitions of "heuristic" on page 10 of what we
20  marked as Exhibit 5 consistent with your
21  understanding of "heuristic" as it would have
22  been understood by a person of skill in the art
23  in 2000?
24      A.   I think so.  I'm not sure I
25  necessarily buy all of it, but it -- I think

1    these are not inconsistent with -- with my view
2    of it.
3        Q.   Which ones do you not necessarily buy?
4        A.   Well, I mean, these definitions that
5    are here are not necessarily even internally
6    consistent.  I mean, there's some -- there's --
7    I mean, they're describing here -- "used to
8    describe a computer program that can modify its
9    software response to the user."  Okay.
10   That's -- that's fine, but then there's also
11   "using or arrived at by means of process of
12   trial and error rather than set rules."  That is
13   not necessarily the same as or fully consistent
14   with the notion that it's -- that it's
15   self-modifying.
16       So there's -- there's a number of
17   the -- you would have to think real hard about
18   drawing the then diagrams of these different
19   definitions.  I wouldn't necessarily say that
20   they're all precisely describing the same thing.
21   I would have to, you know -- certainly when we
22   do claim construction in this case, I look
23   pretty carefully at it, and I don't, as I say, I
24   don't think it matters for the purposes of the
25   infringement of the accused product simply

1    because the spec lists those three and they
2    match what's in the accused product.
3        I do think that these definitions here
4    give you a pretty good sense of it, but I
5    wouldn't necessarily accept this paragraph as,
6    you know, fully controlling of what the word
7    means.
8        Q.   Leaving aside the three that you say
9    match the accused product, how would a person of
10   ordinary skill in the art understand, if they
11   did not match those three, whether their
12   algorithm was heuristic?
13       A.   I think the sense that you get from
14   this paragraph and I think the sense people
15   would have is if the heuristic -- if the
16   algorithm was designed to always give a single
17   precise answer, like -- a single precise answer,
18   that would likely not be a heuristic.  And this
19   sort of gets to it here about not having proven
20   performance bounds and valuable most of the time
21   but the results or performance cannot be
22   guaranteed.
23       I think if you have an algorithm that
24   always gives you the exact right answer all the
25   time in a fixed amount -- in a bounded amount of

1    time, that quite likely wouldn't be a heuristic.
2    Somebody somewhere might have some different
3    opinion there, but I think generally an
4    algorithm that is, you know, knowing that three
5    plus four is seven, that's not a heuristic.
6    There is one answer.  You can compute it.  It's
7    done.  There's no -- there's no ambiguity there.
8        So I think people would understand
9    there's classes of algorithms that are outside
10   of heuristic and somebody looking at the patent
11   would understand that.
12       Q.   Other than algorithms that always give
13   the precise right answer all of their time, are
14   there other classes of algorithms that are
15   outside of heuristic?
16       A.   Probably.  I'd have to think of some
17   examples, but generally, generally, "heuristic"
18   refers to algorithms that are -- that don't
19   always give you the precise right answer; that
20   give you -- that advance you towards your goal.
21   Some people call those heuristic, some people
22   have other words to describe them, but I think
23   certainly there are plenty of algorithms that
24   are not heuristic.
25       Q.   In your opinion, would an algorithm

1    that satisfied any one of these definitions be a
2    heuristic algorithm as used in the '604 patent?
3        MR. BUROKER:  Object to form.
4        A.   Well, I mean, these aren't all related
5    to search.  For example, "If the sky is cloudy,
6    then carry an umbrella," that's heuristic, but
7    it's not -- it's hard to see how you would
8    directly apply that in the 604.  It's a
9    heuristic in this example because it -- it might
10   be wrong, you might actually not need the
11   umbrella, but it's a -- it's a rule of thumb
12   that would generally work.
13       But I think -- let's see.  I think,
14   generally, if you could apply -- if you could
15   meaningfully apply these particular definitions
16   in here to the task at hand in the '604, that
17   would probably work.  Yes, I think that's -- I
18   think that's right.
19       Q.   If you look about I think it's seven
20   lines down in that paragraph that starts
21   "dictionary definitions," there is a sentence,
22   "Unlike algorithms, heuristics cannot have
23   proven performance bounds."  Do you see that
24   sentence?
25       A.   Yes.

Page 62

1    Q.   It seems to be distinguishing between
2  heuristic and algorithm.  What then is a
3  heuristic algorithm in your opinion?
4    A.   Oh, I think they're distinguishing
5  between -- I think they're -- the way I read
6  that sentence is that they're referring to
7  really a non-heuristic algorithm versus a
8  heuristic algorithm, and I think they're being a
9  little bit sloppy in their language, but I think
10  it's -- so, unlike algorithms, I would say,
11  unlike non-heuristic algorithms, heuristic
12  algorithms cannot have performance bounds.
13    I'm not sure I completely agree with
14  that, with that sentence, but I think that the
15  distinction they're making that you are asking
16  about between algorithms and heuristics is
17  simply that they're eliding out certain words in
18  how they're -- in how they're talking about it
19  here.
20    Q.   Are you aware of any search algorithms
21  that you would describe as non-heuristic
22  algorithms?
23    A.   Well, I think there are -- I mean,
24  I'll use the, in the context of artificial
25  intelligence, the -- there are classic searches

Page 63

1  people do.  There's what's called depth first
2  search and breadth first search and then there's
3  heuristic search, and in the first two, you are
4  ordering your search based upon going to the
5  deepest element of the tree first and working
6  from there and the ordering is absolute and
7  defined by the order of elements in your search
8  tree, and in breadth first, you're going to --
9  you're covering everything that's one step away
10  from you before you cover everything that's two
11  steps away from you, et cetera.  So, in those
12  two cases, the ordering of the search is
13  precisely defined by the order of the nodes.
14    In the case of heuristic search, what
15  you do is you apply a heuristic to each node and
16  you -- you search in the place that has the
17  highest heuristic value first.  So breadth first
18  search and depth first search in that context
19  would be non-heuristic search algorithms.
20    Q.   So is it the case that the algorithm
21  itself that is conducting the search is not the
22  heuristic; it's the ordering of how this --
23  where the search is taking place?
24    A.   Well, in the hypothetical I just gave
25  you of -- of searching of a tree, there you'd

Page 64

1  have the searching is the searching, but the
2  heuristic algorithm part of it is the part that
3  would give you, in effect, the score or the
4  heuristic for each node.
5    So there what makes it heuristic or
6  not is a particular portion of the search
7  algorithm that would have a heuristic within it.
8    Q.   Looking back at the amendment that
9  we've marked as Polish 5.
10    A.   Okay.
11    Q.   Still on page 10 of that, the last --
12  the partial paragraph at the bottom starts, "By
13  contrast, Andreoli describes logical algorithms
14  for solving feature constraints -- not heuristic
15  algorithms."  Do you see that?
16    A.   Yes.
17    Q.   What's the distinction between the
18  logical algorithm and a heuristic algorithm?
19    A.   Again, that's like -- that to me
20  that's -- that's -- means non-heuristic.  I
21  think they're saying, by "logical algorithm,"
22  they're simply saying that it -- that they're
23  looking for a very precise set of logical
24  constraints and so there's nothing -- there's no
25  rule of thumb about it, there's nothing

Page 65

1  uncertain about it, there's nothing --
2  there's -- something is what it is because it's
3  what it is.
4    So they're saying that -- I guess they
5  don't -- they're staying with some high-level
6  language here.
7    If you were to have a piece of data
8  that had certain attributes to it and you were
9  simply coming up with a logical relationship
10  that was precisely defined, then that would be a
11  logical algorithm and would simply give you a
12  result, just like with the -- with the breadth
13  first or depth first search, choosing which node
14  to expand next would be logically defined just
15  because the order in which the nodes appear.
16    Q.   Are you familiar with something called
17  the Needleman-Wunsch algorithm?
18    A.   I don't think I am.  I may know it by
19  some other name.  I'm not sure that name comes
20  to mind.
21    (Polish Exhibit 6, a document bearing
22  Bates Nos. APLINDC630-40667 through 40686,
23  marked for identification, as of this date.)
24  BY MS. FERNANDS:
25    Q.   So you have just been handed what we

Page 66

1    have marked as Exhibit 6.
2        A.   Okay.
3        Q.   And if you look at what is page 6, the
4    second full paragraph, you say there,
5    "Generally, Tang searches the multigrid search
6    tree using a non-heuristic method (i.e. the
7    Needleman-Wunsch algorithm)."
8        A.   Okay.
9        Q.   Let's mark this as 7.
10           (Polish Exhibit 7, printout from
11           Wikipedia, marked for identification, as of
12           this date.)
13    BY MS. FERNANDS:
14        Q.   And we have just marked as Polish
15    Exhibit 7 what is a Wikipedia page.  I will not
16    attest to whether it's the correct
17    Needleman-Wunsch, but perhaps this will refresh
18    your memory as to whether you're familiar with
19    it.
20        A.   Give me a minute to read this.
21           (Document review.)
22        A.   Okay.  Okay.  I'm not sure I've seen
23    this particular algorithm before.  I certainly
24    am quite familiar with what's referred to as
25    dynamic programming and what -- what they're

TSG Reporting - Worldwide     877-702-9580

Page 67

1    trying to do here.  It's not unlike what's done
2    in computer speech in systems I've looked at.
3        Q.   Would you agree with the applicants
4    that the Needleman-Wunsch algorithm is a
5    non-heuristic method?
6        MR. BUROKER:  Object to the form.
7        A.   I'd have to -- I'd have to look at
8    this more closely to decide whether I agree with
9    them or not.  I accept that they viewed this as
10    non-heuristic.  There might well be -- there
11    might well be characteristics of -- I would say
12    that dynamic programming in general might well
13    have heuristic qualities to it.
14           This particular algorithm I'm not sure
15    why they're saying is -- I mean, they're making
16    it very clear they don't view it as being
17    heuristic, but I'd need to -- I'd need to
18    understand a little bit more to be -- to fully
19    sign up to their argument.  Yes.
20        Q.   Other than the specification and
21    prosecution history, did you review any other
22    sources in coming to your understanding of
23    heuristic algorithm for purposes of your
24    analysis for your declaration?
25        A.   Other than what's in my list of

TSG Reporting - Worldwide     877-702-9580

Page 68

1    considered documents, I don't think so, no.
2           (Polish Exhibit 8, List of Materials
3           Considered, marked for identification, as of
4           this date.)
5    BY MS. FERNANDS:
6        Q.   You have just been handed what has
7    been marked as Polish Exhibit 8.  Do you
8    recognize that?
9        A.   Yes, I do.
10        Q.   And what is that?
11        A.   That's my list of considered
12    documents.
13        Q.   And is this a complete and accurate
14    list of the materials that you considered in
15    connection with preparing your declaration?
16        A.   Yes, I believe it is.
17        Q.   You didn't look back at any dictionary
18    definitions or other sources from the time to
19    see whether there was a commonly understood
20    meaning to "heuristic algorithm" in 2000?
21        A.   Not that I recall, no.  I mean, I read
22    a lot of stuff, but I certainly don't, in the
23    context of preparing the declaration, I don't
24    think -- I don't recall going to any one in
25    particular, no.

TSG Reporting - Worldwide     877-702-9580

Page 69

1           (Polish Exhibit 9, and excerpt from
2           Modern Dictionary of Electronics, Seventh
3           Edition, marked for identification, as of
4           this date.)
5    BY MS. FERNANDS:
6        Q.   You've just been handed a few pages
7    from the Modern Dictionary of Electronics,
8    Seventh Edition, and copyright of 1999.  We've
9    included the page that has the definition of
10    "heuristic."
11           Is that definition of "heuristic" on
12    what is the third page of Polish Exhibit 9
13    consistent with your understanding of
14    "heuristic" as it would have been understood in
15    2000?
16        MR. BUROKER:  Objection.
17        A.   No, I think -- I think there's parts
18    of this that -- that I disagree with and that I
19    think a computer scientist wouldn't -- wouldn't
20    necessarily buy.
21           I mean, it's interesting to see
22    "heuristic" defined in the electronics
23    dictionary.  I generally don't think of
24    heuristic as something that one sees in
25    electronics, but there's certainly some parts of

TSG Reporting - Worldwide     877-702-9580

Page 70

1 this definition that wouldn't fit what some very
2 commonly accepted heuristic algorithms in
3 computer science.
4    **Q.   Which parts of the definitions**
5 **wouldn't fit the commonly accepted definitions**
6 **of heuristic algorithm?**
7    A.   Well, in particular, it says, "Unlike
8 an algorithm, the heuristic approach does not
9 guarantee a solution."  There's, I mean, one of
10 the -- one of the classic algorithms in
11 artificial intelligence is referred to as -- as
12 A* and that is using a particular kind of
13 heuristic known as an admissible heuristic that
14 does guarantee you a search result, and that's
15 routinely used in -- in what's called
16 optimization.  It's routinely used in -- in game
17 programs like chess programs, and at least the
18 A* algorithm would give you a guarantee of a
19 solution and it clearly is a heuristic, as
20 people would understand it in a, you know,
21 undergraduate computer science course on
22 artificial intelligence.  And that wouldn't -- I
23 don't believe that would fit this definition
24 here.
25    **Q.   Are there any other parts of this**
   TSG Reporting - Worldwide    877-702-9580

Page 71

1 **definition in the Dictionary of Electronics we**
2 **have marked as Exhibit 9 that you think a**
3 **computer scientist in 2000 would disagree with?**
4    A.   Well, I think -- I think this is -- I
5 think whoever is doing this dictionary has
6 something in particular in mind that isn't
7 necessarily computer science.  I mean, there's
8 empirical, period.  So that's one definition,
9 it's just empirical.
10    I think clearly one develops
11 heuristics because they work, but there
12 certainly can be heuristics that work for
13 reasons that you know.  So when you think of
14 empirical, like I could say that, you know, that
15 when I dress nicely, people treat me better,
16 that's an empirical observation, but I also know
17 why.  So it's not entirely empirical.
18    I mean, the heuristic of you dress
19 better, you get treated better, that may be a
20 heuristic, but -- but I know why that's the
21 case, so it's not strictly empirical.  I know
22 that people are making rapid judgments and
23 that's one of the cues they use to make a
24 judgment about me.  So I think that use of the
25 term -- that part of the definition of
   TSG Reporting - Worldwide    877-702-9580

Page 72

1 "heuristic" wouldn't really fit this definition
2 of "empirical."
3    So I think this, being from
4 electronics, probably takes it from a
5 different -- in a different area, and they're
6 probably -- there's probably some other point of
7 view in mind in this dictionary than would be
8 meant by computer science.
9    (Polish Exhibit 10, an excerpt from
10 Dictionary of Computer Science, Engineering,
11 and Technology, marked for identification,
12 as of this date.)
13 BY MS. FERNANDS:
14    **Q.   We've handed you what has been marked**
15 **as Polish Exhibit 10.  This is a Dictionary of**
16 **Computer Science, Engineering, and Technology,"**
17 **copyright of 2001.  See in the third page of the**
18 **exhibit there's a definition of "heuristic"?**
19    A.   Yes.
20    **Q.   And is that definition of "heuristic"**
21 **more consistent with your understanding of how a**
22 **person of ordinary skill in computer science**
23 **would have understood "heuristic" in 2000?**
24    MR. BUROKER:  Object to form.
25    A.   I think that's -- I think this is
   TSG Reporting - Worldwide    877-702-9580

Page 73

1 closer.  There's -- it's not just heuristic, but
2 heuristic approximation and search.  Let me look
3 at these.
4    (Document review.)
5    A.   I think these are better definitions.
6 I think it's, as we've discussed, it's a
7 difficult thing to define precisely, but I think
8 this is better.
9    **Q.   Let's go back to the patent, which we**
10 **have marked as Exhibit 4.**
11    A.   Okay.
12    **Q.   Going back to claim 6, which is in**
13 **column 8, starting at about line 33, the element**
14 **of claim 6, there is a note that says, "Each**
15 **heuristic module corresponds to a respective**
16 **area of search and employs a different,**
17 **predetermined heuristic algorithm corresponding**
18 **to said respective area."  Do you see that?**
19    A.   Yes.
20    **Q.   And what is your understanding of the**
21 **claim limitation that "each heuristic module**
22 **corresponds to a respective area of search and**
23 **employs a different, predetermined heuristic**
24 **algorithm"?**
25    MR. BUROKER:  Object to form.
   TSG Reporting - Worldwide    877-702-9580

Page 74

1    Go ahead.
2    A.  Could you ask that again, please?
3    **Q.  Did you form an understanding of this**
4  **claim element before rendering your opinions**
5  **that are in your declaration?**
6    A.  Yes.
7    **Q.  And what was your understanding of**
8  **this claim element?**
9    A.  My understanding was that -- that each
10  of the -- of the plurality of heuristic modules
11  had a different, predetermined heuristic
12  operating on their area.  So the idea was that
13  you had to have at least two different heuristic
14  modules that were -- that were doing different
15  things, doing different heuristics.  That's --
16  that's what I thought this limitation meant.
17    **Q.  So if there were -- if the plurality**
18  **of modules were two modules, then there would be**
19  **two different heuristic algorithms?**
20    A.  Yes, there would need to be two
21  different heuristic algorithms.  You couldn't
22  have two modules that were doing the same thing.
23  That wouldn't satisfy the plurality requirement.
24    **Q.  If you had three modules, would there**
25  **have to be three different algorithms?**
TSG Reporting - Worldwide    877-702-9580

Page 75

1    MR. BUROKER:  Object to form.
2    A.  Well, my understanding is that if you
3  had three modules, only two of them would have
4  to be different, because in the case if there
5  were three, you would need to have a plurality
6  of different modules.  So you would at least
7  have to have two different ones.
8    If you had a third, it might not be
9  relevant for infringement, but it wouldn't --
10  you would need to have at least two that were
11  different.
12    **Q.  So what is your understanding where**
13  **the claim element says that "each heuristic**
14  **module corresponds to a respective area of**
15  **search and employs a different, predetermined**
16  **heuristic algorithm"?  Do you not understand**
17  **that to mean that each module must have a**
18  **different algorithm?**
19    A.  Well, each module must have a
20  different algorithm.  I guess what I would say
21  is you could have a system where there are lots
22  of different modules and relevant for
23  infringement would just be that two of them
24  would have to be different.
25    So you could have several modules that
TSG Reporting - Worldwide    877-702-9580

Page 76

1  would not be -- that would -- that would -- that
2  would satisfy the plurality part, the plurality
3  clause there, but that, in order to -- but to
4  satisfy the next one, you would have to have --
5  you would only be considering the ones that are
6  different.
7    I don't know that I'm saying this
8  terribly deep there.  I'm just saying that there
9  would be parts of the system that are modules --
10  the fact that you have might have two modules
11  that are the same wouldn't get you out of the
12  infringement.  You would have to have all the
13  modules would have to be the same.  You would
14  have to have only one, one heuristic algorithm.
15    **Q.  So, in your opinion, the element that**
16  **requires that "each heuristic module corresponds**
17  **to a respective area of search and employs a**
18  **different, predetermined heuristic algorithm,"**
19  **the -- strike that.**
20    **In your opinion, in order to avoid**
21  **infringement, all of the modules have to be the**
22  **same?**
23    A.  I think that's right.  I think that's
24  what I said.  I think that the claim requires
25  that at least two of the modules be different.
TSG Reporting - Worldwide    877-702-9580

Page 77

1    **Q.  Now, you would agree that reading this**
2  **"each heuristic module" referred -- seems to**
3  **refer to the plurality of heuristic modules**
4  **previously in the claim, correct?**
5    A.  Yes.
6    **Q.  And if a device has eight heuristic**
7  **modules, then each of those is a heuristic**
8  **module; is that correct?**
9    A.  It might have eight heuristic modules
10  and they could all -- you could have eight
11  heuristic modules within a system, sure.
12    **Q.  And if each of those eight heuristic**
13  **modules did not have the same heuristic**
14  **algorithm, it would not satisfy the requirement**
15  **that each module must have a different heuristic**
16  **algorithm; is that correct?**
17    MR. BUROKER:  Object to form.
18    A.  I'm not sure I -- the last part of
19  your question.
20    **Q.  So if --**
21    A.  I didn't get --
22    **Q.  We have eight modules, correct?  In my**
23  **hypothetical, there are eight modules?**
24    A.  Okay.
25    **Q.  And there's -- and each of those is a**
TSG Reporting - Worldwide    877-702-9580

20  (Pages 74 to 77)

1 software routine performing a search on metadata
2 for the same files, the same database, is that
3 respective areas of search?
4        MR. BUROKER:  Same objection.
5    A.   I think -- I mean, it probably depends
6 on how that's being implemented.  I think that,
7 generally speaking, searching file names is a
8 different area than searching contents of the
9 files.  If -- you could imagine a situation
10 where file names were part of the metadata, in
11 which case it might be -- you might be
12 searching -- you might be searching fields of
13 metadata would be an area, but generally, file
14 names are not the same thing as file contents.
15 It's not the same area.
16    Q.   What if the first routine searched for
17 one particular field in metadata and a second
18 routine searches all metadata, including the
19 first field, would those routines be searching
20 respective areas of search?
21        MR. BUROKER:  Same objection.
22    A.   Again, I would have to look at the
23 particular system.  I think that it's possible
24 under some circumstances they would be the same
25 area, but -- but in general, it sounds like to
        TSG Reporting - Worldwide    877-702-9580

1 me like -- like they would at least in some ways
2 be different areas.
3    Q.   Moving on in claim 6.
4    A.   Yes.
5    Q.   The next element.  "The search areas
6 includes storage media accessible by the
7 apparatus."  Did you reach an understanding of
8 that claim limitation in connection with your
9 opinions?
10    A.   Yes.
11    Q.   And what's your understanding of that
12 limitation?
13    A.   My understanding is that they're --
14 they're making sure that included in this, in
15 the data that can be searched, is some data
16 local to the device, local to the -- to the
17 computer.
18        So they're talking about they're
19 locating information in a network, but they're
20 also talking about that there's got to be at
21 least some, so search areas include some local
22 storage that's being searched as well.
23    Q.   In your opinion, what -- what aspect
24 of this claim limitation requires that local
25 storage exist?
        TSG Reporting - Worldwide    877-702-9580

1    A.   Well, when I see "includes storage
2 media accessible by the apparatus," I view that
3 as being local storage.
4    Q.   Why?
5    A.   Because -- well, several reasons.  To
6 say that that would mean storage media that
7 could be accessed over a network would be
8 pointless because clearly you are already
9 talking about systems that can be -- data that
10 can be accessed over a network.
11        There is in back to the column 4
12 examples, they talk about, in each example, they
13 have, for example, line 15, "For instance, one
14 module may search the names of files stored on
15 the local media and the LAN storage volume."  So
16 they're clearly making a distinction.
17        Then on the next one you've got, "A
18 second module may index and search the contents
19 of files on the local and/or network storage
20 volumes."  Again, they're making the distinction
21 of local versus network.  And then on the third
22 one, again, they go back to list of files,
23 applications and Websites, so I -- so that I'm
24 thinking of list of files, those are going to be
25 local and applications that are local and
        TSG Reporting - Worldwide    877-702-9580

1 Websites that are on the network.
2        So I think, generally, it may be a
3 little bit awkwardly put in the claim, this
4 limitation simply says that you can't just be
5 accessing network-attached things or
6 network-accessed things.  You got to have some
7 things that are local.
8    Q.   You would agree that, for instance,
9 that the LAN storage media is, in the example,
10 accessible by the apparatus?
11    A.   Well, it depends what one means by
12 "accessible."  I mean, "accessible," very
13 broadly construed, would mean anything on the
14 Internet that could be accessed, and I think
15 that's clearly not what's meant there.
16        So I think -- I view "accessible" as
17 being -- and I'm sure we'll have a claim
18 construction debate about it later in the
19 case -- I think "accessible" means item 12 in
20 figure 1, local storage media.
21    Q.   And other than what you've pointed to
22 in column 4, is there anything else in the
23 specification that you believe supports your
24 interpretation that "accessible" is limited to
25 local storage media?
        TSG Reporting - Worldwide    877-702-9580

Page 106

1  outlined "People" in blue, correct?
2    A.   Yes.
3    Q.   And that's one of the items that you
4  analyzed specifically?
5    A.   Uh-huh.
6    Q.   And is your opinion that "People"
7  represents a heuristic module?
8    A.   Yes.
9    Q.   What makes "People" a heuristic
10 module?
11   A.   Well, again, it's -- it's searching
12 names of contacts. It's a -- it's looking for
13 matches of names of contacts that are stored
14 locally on the phone.
15   Q.   Is it necessarily the case that a
16 search of contacts would be a heuristic search?
17      MR. BUROKER: Object to form.
18   A.   I think, I mean, as it's implemented,
19 there's -- it's looking for -- it's looking for
20 matches of -- of names and subparts of names
21 within your list of contacts.
22      I suppose it's possible one could
23 implement that in a non-heuristic manner, but
24 certainly it was implemented within the phone as
25 a -- as a heuristic search.

TSG Reporting - Worldwide    877-702-9580

Page 107

1    Q.   What did you review to determine that
2  the search was implemented in the Samsung Galaxy
3  Nexus as a heuristic search?
4    A.   I don't recall specifically. I know I
5  looked at source code for -- for these and I
6  would have looked at source code in that case as
7  well.
8    Q.   Did you cite any specific source code
9  in your declaration?
10   A.   I think that I do.
11   Q.   Let me narrow that. Did you cite any
12 specific source code that would explain why the
13 Samsung -- the people search in your opinion is
14 a heuristic search?
15   A.   I don't think in that case I did. I
16 was mostly using the people search as an example
17 of the contacts being stored in the local media,
18 which I talk about in paragraph 70, but I don't
19 think I referred to specific source code. I
20 know I looked at source code for all of it, but
21 there were limitations in how much of the detail
22 I was going to provide here.
23   Q.   Was there a reason that you chose not
24 to provide detail as to what characteristics of
25 the search made it a heuristic search?

TSG Reporting - Worldwide    877-702-9580

Page 108

1    A.   I think it was -- no, I didn't feel it
2  was necessary to prove it. I think that it was
3  clear that this was operating in a heuristic
4  manner; that it wasn't requiring a precise
5  match; that it was -- it was looking for -- it
6  gave you candidate matches. So I didn't feel
7  like it was necessary to ground it in source
8  code, at least for this purpose.
9    Q.   To what area of search does "People"
10 correspond?
11   A.   To your contacts.
12   Q.   And then the last one on the screen
13 shot on page 22 is "Videos," correct?
14   A.   Yes.
15   Q.   And is that also a heuristic module in
16 your opinion?
17   A.   I believe so, yes.
18   Q.   And to what area of search does that
19 one correspond?
20   A.   It searches through metadata for --
21 for videos that are downloaded to the phone.
22 I'm not sure that they're downloaded in those
23 cases. It's metadata associated with videos
24 that you have somehow got connected to the
25 phone.

TSG Reporting - Worldwide    877-702-9580

Page 109

1    Q.   So, in your opinion, are each of these
2  eight items on paragraph -- in, sorry, on page
3  22 representative of separate heuristic modules
4  that correspond to separate areas of search?
5    A.   I believe they are, but as I said,
6  that my detailed analysis was on the three that
7  I called out.
8    Q.   Now, on paragraph 65 of your
9  declaration, you state that, "Each heuristic
10 module shown above employs a different,
11 predetermined heuristic algorithm corresponding
12 to the respective area of search." Do you see
13 that?
14   A.   Yes.
15   Q.   And is it your opinion that each of
16 the eight modules that we just discussed
17 employed a different, predetermined heuristic
18 algorithm corresponding to the respective area
19 of search?
20   A.   Well, certainly the three that I
21 called out are different. I can't say that I --
22 that I'm -- I can't say for certain that each of
23 the other ones are different. They may or may
24 not be. They likely are, but I have -- I
25 don't -- I haven't looked at them enough to be

TSG Reporting - Worldwide    877-702-9580

Page 110

1    certain.
2        Q.   You don't know whether the other five
3    use different heuristic algorithms, the five
4    that you did not specifically discuss?
5        A.   I think they likely do, but I don't
6    know for sure.
7        Q.   For the three that you do discuss, you
8    don't identify the algorithms corresponding to
9    those searches, do you?
10           MR. BUROKER:  Object to the form.
11       A.   No, I don't think I do.
12       Q.   Why not?
13       A.   It -- it didn't seem necessary to
14   prove the point.  They are -- they are
15   corresponding to what's called out in -- in
16   column 4.  They are those kinds of searches of
17   those -- in those kinds of areas, and I looked
18   at the code and it -- and it -- it was, in my
19   opinion, they were, in my opinion, heuristic
20   searches.  I have not in this declaration laid
21   it out in more detail than that.
22       Q.   You agree that, even under your
23   opinion as to the meaning of the claims, at
24   least two of the algorithms have to be different
25   for there to be infringement, correct?

TSG Reporting - Worldwide    877-702-9580

Page 111

1        A.   Two of the heuristic algorithms must
2    be different.
3        Q.   You don't identify any of the
4    heuristic algorithms in your declaration, do
5    you?
6            MR. BUROKER:  Object to form.
7        A.   Well, I identify these three heuristic
8    modules as being -- as having -- as being three
9    different heuristic modules in the system.
10       Q.   But the heuristic algorithms
11   corresponding to the modules are not set forth
12   in your declaration?
13       A.   I don't lay out what the algorithms
14   are, no.
15       Q.   Do you know what the algorithm is that
16   corresponds to the search area of Google Search
17   suggestions?
18       A.   I'd have to look at the code.  Sitting
19   here, I can't -- I can't lay out for you what it
20   is.  I mean, certainly the algorithm that you're
21   using for searching Google suggestions is going
22   to be very different from the ones that you're
23   going to use to search a bunch of contacts.
24           So, you know, at the very least, they
25   are different -- they're searching very

TSG Reporting - Worldwide    877-702-9580

Page 112

1    different sets of data and the algorithms are
2    going to be at least different in that regard,
3    but the individual algorithms I don't recall off
4    the top of my head.  I know I looked at them at
5    the time I looked at the code.
6        Q.   Did you determine the nature of the
7    individual algorithms was different?
8        A.   Yes, I think I did.
9        Q.   Did you determine each of the
10   original -- each of the algorithms differed
11   heuristically instead of simply logically?
12       A.   Yes, I think I did.
13       Q.   What were the heuristic differences in
14   the algorithms?
15       A.   I -- I don't recall sitting here.  I'd
16   have to look at source code and make a
17   comparison.
18       Q.   And you didn't set that -- set forth
19   the differences in your declaration, correct?
20       A.   That's correct.
21       Q.   And you didn't set forth the
22   differences in the algorithms in your claim
23   chart that was attached to your declaration?
24       A.   No, I did not set them forth.  I
25   described what -- what they were doing, and I

TSG Reporting - Worldwide    877-702-9580

Page 113

1    think it was pretty clear that they were -- that
2    they were different from each other, but I
3    didn't -- I didn't take the proof further than
4    that.
5        Q.   How did you determine that the
6    different algorithms were different?
7        A.   I looked at the source code.
8        Q.   And you compared the algorithms to
9    each other?
10       A.   Well, I looked at the source code and
11   they were -- the source code for the different
12   pieces were pretty different.  I don't -- I
13   don't think I lined them up next to each other,
14   but they were performing different operations.
15       Q.   And the algorithms for these three
16   functions, the search suggestions, bookmark and
17   Web history and dates of your contacts were in
18   the source code that you reviewed?
19       A.   I believe so.
20       Q.   Do you recall specifically whether the
21   algorithms were present in the source code you
22   reviewed?
23       A.   I'm pretty sure they were.  I know
24   that I -- that I had publicly available code and
25   that I believe all of the search functionality

TSG Reporting - Worldwide    877-702-9580

Page 118

1    A.   For this --
2    Q.   **For this analysis?**
3    A.   For this analysis, no.
4    Q.   **You didn't look to see whether the**
5    **search algorithms in any of those applications**
6    **were heuristic search algorithms?**
7    A.   As I say, I didn't look at any -- any
8    third-party developer search modules for this --
9    for this analysis.
10   Q.   **And what's your understanding of the**
11   **purpose of this document we've marked as Polish**
12   **Exhibit 13, the "Creating a Search Interface"**
13   **document?**
14   A.   What's the purpose of it?
15   Q.   **Yes.**
16   A.   The purpose of it is they're trying --
17   the purpose of it it's a guide to developers for
18   creating plug-in search modules to plug into
19   the -- the Android search framework, and I
20   think, in general, Google is trying to encourage
21   developers to, for any given application, create
22   modules that would make them searchable.  So
23   that would make the -- the applications feel
24   better integrated into the system.
25   Q.   **What's the significance of this**
     TSG Reporting - Worldwide    877-702-9580

Page 119

1    **document, Polish 13, to your analysis if you did**
2    **not analyze any of the third-party developer**
3    **applications?**
4    A.   The significance of it is this
5    outlines the architecture of the search system,
6    which includes the ones that I called out,
7    the -- the three that I -- the three modules
8    that I called out obey this particular
9    structure.  So this is a nice -- this is an
10   easier-to-understand thing than going through
11   piles of code.  So this lays out the
12   architecture and it also suggests that others
13   are encouraged to use that architecture.
14   Q.   **In the section we were looking at in**
15   **the developer document at page 4.**
16   A.   Yes.
17   Q.   **At the bottom, the parenthetical**
18   **states "using FTS3 rather than a LIKE query,"**
19   **correct?**
20   A.   Yes.
21   Q.   **What's your understanding of a "LIKE**
22   **query"?**
23   A.   I don't know specifically here what
24   exactly they're referring to.  Usually things --
25   things of that sort would be referring to some
     TSG Reporting - Worldwide    877-702-9580

Page 120

1    kind of a -- a fuzzy query, a non-exact match.
2    I think what they're -- what they're
3    trying to do is encourage people to use FTS3
4    rather than "LIKE" as part of their searches.
5    It's just sort of their way of suggesting that
6    using FTS3 is likely to give you better results
7    than other approaches.
8    Q.   **Do you know whether using a LIKE query**
9    **would involve a heuristic algorithm?**
10   A.   Again, I don't know the details of the
11   algorithm implied by the LIKE query.  My strong
12   suspicion is that it would be heuristic.
13        (Discussion off the record.)
14        THE VIDEOGRAPHER:  The time is 12:58.
15   We're going off the record.
16        (Luncheon recess.)
17
18
19
20
21
22
23
24
25
     TSG Reporting - Worldwide    877-702-9580

Page 121

1         AFTERNOON SESSION
2         THE VIDEOGRAPHER:  This is the started
3    of tape labeled number 4.  The time is 1:47.
4    We're back on the record.
5    NATHANIEL POLISH, resumed and
6         testified further as follows:
7    EXAMINATION BY (Cont'd.)
8    MS. FERNANDS:
9    Q.   **Before we broke for lunch, we were**
10   **talking about what we have marked as Exhibit 13.**
11   A.   Okay.
12   Q.   **And in particular, on page 4, the**
13   **discussion of the full text search using FTS --**
14   **FTS3, rather?**
15   A.   Yes.
16   Q.   **Correct?**
17   A.   Uh-huh.
18   Q.   **Now, I believe you said that you**
19   **weren't familiar with the exact algorithm used**
20   **for FTS3; is that correct?**
21   A.   That's correct.
22   Q.   **Are you familiar with full text**
23   **searching, generally?**
24   A.   Yes.
25   Q.   **And is it possible that a full text**
     TSG Reporting - Worldwide    877-702-9580

Page 122

1  search could be accomplished without a heuristic
2  algorithm?
3      A.   I think it could be, but full text
4  searching without using a heuristic would be
5  combinatorially explosive, would take a very
6  long time.  So usually you use heuristic
7  algorithms for full text searching to make it --
8  to make it perform in a reasonable way.
9      Q.   So, for instance, if a full text
10 search asked for a particular whole word in a
11 document and that whole word was searched for
12 throughout everything, would that be a heuristic
13 search?
14         MR. BUROKER:  I'll object to form.
15         Go ahead.
16     A.   Again, if you -- if you simply did a
17 naïve search, front to back, looking at every
18 word, matching everything, that probably
19 wouldn't be considered a heuristic.
20     Q.   Is there a way to determine whether
21 that would be considered a heuristic, the naïve
22 search, just looking at every word, front to
23 back?
24     A.   I'd have to think about it a little
25 bit, but I think a simple -- a simple looking at
         TSG Reporting - Worldwide    877-702-9580

Page 123

1  every single word, front to back, would, by most
2  people's definitions, would not be a heuristic
3  search.
4      Q.   Do you think that it would be a
5  heuristic search under some people's definition
6  of "heuristic search"?
7      A.   I don't know.  I don't think so.
8      Q.   Why is that not a heuristic search in
9  the way you understand heuristic search?
10     A.   Because it's just like with the -- the
11 examples I gave from searching trees of depth
12 first or breadth first search; it's completely
13 deterministic, simply processing through all the
14 data in a completely deterministic way.  It
15 wouldn't be -- it wouldn't be any -- there would
16 be no -- there would be no heuristic there.
17     Q.   Now, if the same algorithm were used
18 in two different search areas, would it be a
19 different heuristic algorithm?
20         MR. BUROKER:  Objection to form.
21     A.   So just give me a little more on that
22 hypothetical.  What are you asking there?
23     Q.   So if you have the exact same
24 algorithm, but you used that algorithm to search
25 in two different search areas corresponding to
         TSG Reporting - Worldwide    877-702-9580

Page 124

1  different data, is that a different heuristic
2  algorithm?
3      A.   If it's -- if it's the same algorithm
4  with just two different inputs, that I think
5  would be the same -- would be the same thing,
6  would be the same algorithm.  It wouldn't be
7  different if you had the same -- if you had the
8  same algorithm with two different inputs, that
9  would be the same area.  That would be -- it
10 would be doing the same thing.  I think I
11 understand what you're asking.
12     Q.   So the nature of the data being
13 searched does not change an algorithm?  If it --
14 if the content of the algorithm otherwise
15 remains the same, the nature of the data being
16 searched doesn't make it a different algorithm?
17     A.   So the nature of the data, if you have
18 a search of -- if you had a heuristic search of
19 contacts and you had -- and you applied it
20 against one contact database and you applied it
21 against another contact database, a different
22 contact database, but they're both contact
23 databases, I think that would not be -- those
24 wouldn't be different.
25     Q.   Those would not be different?
         TSG Reporting - Worldwide    877-702-9580

Page 125

1      A.   Right.
2      Q.   What if you had a heuristic algorithm
3  that you were able to use the same algorithm to
4  search both, for instance, contacts and music?
5      A.   Well, I think that's why in the patent
6  they talk about associated with a particular
7  area.  So there those would be -- that would be
8  associated with two different areas.  So music
9  and contacts are different areas.
10     Q.   But would the algorithm be a different
11 heuristic algorithm?
12     A.   Heuristic algorithm, just by itself,
13 no.  It would be the same heuristic algorithm.
14 Might be the same heuristic algorithm applied to
15 different areas, though.
16     Q.   Let's go back to your declaration and
17 back to the screen shot that's on page 22.
18     A.   Okay.
19     Q.   We were talking about this.  I think I
20 omitted a couple of questions on the first bar.
21         So we have that Google in the red at
22 the top, the Google Search suggestions?
23     A.   Yes.
24     Q.   And in your analysis, did you review
25 the algorithm that is used for Google Search
         TSG Reporting - Worldwide    877-702-9580

1  work within the global search system within
2  Android, but that's from a developer side rather
3  than from a consumer side.  I don't think I've
4  looked at the consumer side of that equation.
5      **Q.   Did you do any analysis as to whether**
6  **the features that make Siri -- the features of**
7  **the '604 patent incorporated into Siri that are**
8  **important to Siri are those that are distinct**
9  **from the prior art?**
10     A.   Well, as I said, I think that a lot of
11  Siri's value comes from its comprehensiveness
12  and that the claimed features of the '604 are
13  important to achieving that comprehensiveness.
14  So there may well be other aspects of Siri such
15  as its ability to do speaker independent speech
16  recognition that's very important or handle
17  noisy microphones, but I think to -- I think
18  comprehensiveness is very -- is very important
19  to the -- to the success of it as an interface
20  and the '604 patented features are very
21  important to that comprehensiveness.
22         MS. FERNANDS:  Let's take a break.
23         THE VIDEOGRAPHER:  The time is 2:49.
24     We're going off the record.
25     (Recess.)
       TSG Reporting - Worldwide    877-702-9580

1         THE VIDEOGRAPHER:  The time is 2:59.
2  We are back on the record.
3         MS. FERNANDS:  Thank you for your time
4  today.  I have nothing further in connection
5  with your declaration in support of the PI.
6         MR. BUROKER:  No further questions.
7  The witness would like to read and sign, but
8  other than that, we're done too.
9      And -- yes, nothing needs to be
10  confidential.  Okay.
11     THE WITNESS:  Yes.  Thank you.
12     MS. FERNANDS:  Thank you.
13     THE VIDEOGRAPHER:  The time is 2:59
14  P.M.  That's the end of today's deposition.
15  We are going off the record.
16         oOo
17
18     _____
       NATHANIEL POLISH
19
20  Subscribed and sworn to
    before me this      day
21  of            2012.
22
    _____
23
24
25
       TSG Reporting - Worldwide    877-702-9580

1
2         CERTIFICATE
3  STATE OF NEW YORK )
           : ss
4  COUNTY OF NEW YORK)
5     I, Kathy S. Klepfer, a Registered
6  Merit Reporter and Notary Public within and
7  for the State of New York, do hereby
8  certify:
9      That NATHANIEL POLISH, the witness
10  whose deposition is herein before set forth,
11  was duly sworn by me and that such
12  deposition is a true record of the testimony
13  given by such witness.
14     I further certify that I am not
15  related to any of the parties in this action
16  by blood or marriage and that I am in no way
17  interested in the outcome of this matter.
18     In witness whereof, I have hereunto
19  set my hand this 3rd day of April, 2012.
20
21  -------------------------------
       KATHY S. KLEPFER, RPR, RMR, CRR, CLR
22
23
24
25
       TSG Reporting - Worldwide    877-702-9580

1         INDEX
2  TESTIMONY OF N. POLISH:           PAGE
3  Examination by Ms. Fernands          6
4
5  POLISH EXHIBITS:            PAGE
6  Exhibit 1, CV of Nathaniel Polish, Ph.D.    16
7  Exhibit 2, U.S. Patent No. 6,430,531    20
8  Exhibit 3, Expert Declaration of Dr. Nathaniel    28
9  Polish Concerning U.S. Patent No. 8,086,604
10  Exhibit 4, U.S. 8,086,604          33
11  Exhibit 5, a document bearing Bates Nos.    55
12  APLNDC630-40547 through 558
13  Exhibit 6, a document bearing Bates Nos.    65
14  APLINDC630-40667 through 40686
15  Exhibit 7, printout from Wikipedia    66
16  Exhibit 8, List of Materials Considered    68
17  Exhibit 9, and excerpt from Modern Dictionary    69
18  of Electronics, Seventh Edition
19  Exhibit 10, an excerpt from Dictionary of    72
20  Computer Science, Engineering, and Technology
21  Exhibit 11, a document bearing Bates Nos.    80
22  APLNDC630-40504 through 512
23  Exhibit 12, Infringement Claim Chart    95
24  Exhibit 13, Exhibit 7 to Declaration of    114
25  Nathaniel Polish, Ph.D.
       TSG Reporting - Worldwide    877-702-9580

Page 160

1

2                    CERTIFICATE

3      STATE OF NEW YORK )

                          :   ss

4      COUNTY OF NEW YORK)

5          I, Kathy S. Klepfer, a Registered

6      Merit Reporter and Notary Public within and

7      for the State of New York, do hereby

8      certify:

9          That NATHANIEL POLISH, the witness

10     whose deposition is herein before set forth,

11     was duly sworn by me and that such

12     deposition is a true record of the testimony

13     given by such witness.

14         I further certify that I am not

15     related to any of the parties to this action

16     by blood or marriage and that I am in no way

17     interested in the outcome of this matter.

18         In witness whereof, I have hereunto

19     set my hand this 3rd day of April, 2012.

20

21     ---------------_Kathy S. Klepfer_---------------

            KATHY S. KLEPFER, RPR, RMR, CRR, CLR

22

23

24

25

# EXHIBIT F

Highly Confidential - Attorneys' Eyes Only

Page 1

1   UNITED STATES DISTRICT COURT NORTHERN
    DISTRICT OF CALIFORNIA SAN JOSE DIVISION
2   -------------------------------------------X
    APPLE INC., a California corporation,
3                         PLAINTIFF,
4        -against-
5   SAMSUNG ELECTRONICS CO., LTD., a Korean
    business entity; SAMSUNG ELECTRONICS AMERICA,
6   INC., a New York corporation; SAMSUNG
    TELECOMMUNICATIONS AMERICA, LLC, a Delaware
7   limited liability company,
8   CASE NO. 12-CV-00630-LHK
                          DEFENDANTS.
9   -------------------------------------------X
10                ***HIGHLY CONFIDENTIAL
11                ATTORNEYS' EYES ONLY***
12
13
14         DEPOSITION OF RAVIN BALAKRISHNAN
15              New York, New York
16           Friday April 6th, 2012
17
18
19
20  Reported by:
21  Rebecca Schaumloffel, RPR, CLR
22  Job No:  47974
23
24
25

Highly Confidential - Attorneys' Eyes Only

Page 2

1           April 6, 2012
2           9:59 a.m.
3
4
5
6       Deposition of RAVIN BALAKRISHNAN,
7   held at the offices of QUINN EMANUEL URQUHART
8   & SULLIVAN, LLP, 51 Madison Avenue, New York,
9   New York, before Rebecca Schaumloffel, a
10  Registered Professional Reporter, Certified
11  Livenote Reporter and Notary Public of the
12  State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1   A P P E A R A N C E S :
2
3
4
5       GIBSON DUNN & CRUTCHER
            Attorneys for the plaintiff
            1881 Page Mill Road
6           Palo Alto, CA 94304
            BY:  H. MARK LYON, ESQ.
7
8
            2100 McKinney Avenue
9           Dallas, Texas 75201
            BY:  SARAH E. SIMMONS, ESQ.
10
11
12
13      QUINN EMANUEL
            Attorneys for the Defendant
14          Apple Inc.
            50 California Street
15          San Francisco, CA 94111
            BY: ROBERT KANG, ESQ
16             SEAN PAK, ESQ.
17
18      ALSO PRESENT:
19
20          Dale Swindell, videographer
21
22          *      *      *
23
24
25

Page 4

1       THE VIDEOGRAPHER:  This is the start of
2   media labeled number one of the videotaped
3   deposition of Ravin Balakrishnan in the
4   matter of Apple Inc. versus Samsung
5   Electronics Company Limited.  The case
6   number is 12-CV-00630-LHK.
7       This deposition is being held at
8   51 Madison Avenue, New York, New York,
9   on April 6, 2012, at approximately
10  9:59 a.m.
11      My name is Dale Swindell from
12  TSG Reporting, Incorporated.  I am the
13  Certified Legal Video Specialist.  The
14  Court Reporter is Rebecca Schaumloffel
15  in association with TSG Reporting.
16      Counsel, please introduce
17  yourselves.
18      MR. KANG:  Robert Kang with
19  Quinn Emanuel.
20      MR. LYON:  Mark Lyon, with
21  Gibson Dunn & Crutcher, on behalf of
22  Apple, and with me is Sarah Simmons.
23      THE VIDEOGRAPHER:  Court
24  Reporter, can you swear in the
25  witness.

Page 5

1
2   R A V I N   B A L A K R I S H N A N, called
3   as a witness, having been first duly sworn by
4   a Notary Public of the State of New York, was
5   examined and testified as follows:
6   EXAMINATION BY
7   MR. KANG:
8       Q.   Dr. Balakrishnan, thank you for
9   taking the time to come out today.
10      A.   You are welcome.
11      Q.   I'm just going to go over some of
12  the guidelines for a deposition.  I
13  understand you have just deposed before, but
14  try to speak slowly and carefully, and we
15  will try not to talk over each other, and if
16  you don't understand the question, please
17  stop me and ask for clarification.
18      Do you understand these basic
19  guidelines?
20      A.   Yes, I do.
21      Q.   Can you please state your full
22  name for the record?
23      A.   It is Ravin Balakrishnan.
24      Q.   I would like to introduce as
25  Exhibit 1, your CV that you attached to your

Highly Confidential - Attorneys' Eyes Only

Page 38

1    Q.   So in your opinion, what is the
2    difference between the '849 and '721 claim
3    one?
4        MR. LYON:  Objection.  Lacks
5    foundation.
6        A.   As I said, I haven't studied the
7    '849 yet.  So whatever answer I give now
8    would be based on my current quick review of
9    it.
10       Q.   All right.  Are you aware that
11   the '849 patent has a counterpart European
12   patent?
13       A.   I am not aware -- I am aware
14   there are European patents related to the
15   same concept.  I am not sure of the
16   relationship between the '849 versus the '721
17   necessarily.
18       Q.   Have you ever read patent -- I
19   will just introduce it.
20       (Whereupon, European Patent
21       EP 1964022 B1 document was marked as
22       Exhibit 4 for identification as of
23       this date by the Reporter.)
24       MR. KANG:  This is Exhibit 4.
25       Q.   Have you ever seen this document?

Page 39

1    A.   I believe I have.  At least the
2    number looks familiar.  It is hard to say it
3    is exactly the same document.
4    Q.   Can you tell me what this
5    document is?
6    A.   It's a patent, I believe a
7    European patent that relates to the similar
8    subject matter of unlocking a device using a
9    gesture.
10   Q.   Turning to page 12 and 13 of this
11   document, do you see any difference between
12   claim one of the Exhibit 4 and claim one of
13   the '849 patent?
14       MR. LYON:  Objection.  The
15   document speaks for itself.
16   A.   Well, right off the bat, the
17   preamble alone is worded differently.
18   Q.   Can you tell me if claim one of
19   the European patent includes the term
20   "predefined display path"?
21       MR. LYON:  Objection.  The
22   document speaks for itself.
23   A.   Yes, it does.
24   Q.   Are you aware of this patent --
25   this European patent being asserted in any

Page 40

1    litigation?
2    A.   Yes, I am.
3    Q.   Do you know the outcome of -- or
4    what litigation are you aware of?
5    A.   I am aware of the litigation in
6    the Netherlands, Hague.
7    Q.   Are you aware of the outcome of
8    that litigation with respect to this European
9    patent?
10   A.   I believe that litigation is
11   still ongoing.
12   Q.   So you are unaware that the Dutch
13   judge declared this patent obvious?
14       MR. LYON:  Objection.
15   Counsel -- objection, vague.
16   Mischaracterizes the facts.
17   A.   I am not aware that the judge
18   declared it obvious.
19   Q.   You stated earlier that you
20   reviewed the file wrapper of the '721 patent;
21   is that correct?
22   A.   You said the file wrapper?
23   Q.   The prosecution history.  It's
24   the same thing.
25   A.   Yes, I did.

Page 41

1    Q.   Did you review the prior art that
2    are cited on the face of the patent?
3    A.   No, I did not.
4    Q.   Why not?
5    A.   There is a lot of material there.
6    I did not see it necessarily pertinent to my
7    infringement analysis.
8    Q.   What about your validity
9    analysis?
10   A.   I have not done a validity
11   analysis in detail against any invalidity
12   assertions.
13   Q.   You state -- sorry, I am going to
14   introduce an exhibit -- this is going to be
15   Exhibit 5.
16       (Whereupon, the Declaration of
17       Dr. Ravin Balakrishnan was marked as
18       Exhibit 5 for identification as of
19       this date by the Reporter.)
20   Q.   Do you recognize this exhibit?
21   A.   Yes, I do.
22   Q.   What is it?
23   A.   This is the Declaration I
24   submitted in conjunction with this case.
25   Q.   Can you turn to page 31, please?

Highly Confidential - Attorneys' Eyes Only

Page 46

1    A.   The basis of the opinion is in
2  reading the claims of the patent,
3  specification and a review of the prosecution
4  history of the '721 patent.
5    Q.   Sir, you have been involved in
6  patent cases before, correct?
7    A.   As an expert witness, yes.
8    Q.   And what kind of steps do you
9  typically undertake in assessing the validity
10  of a patent?
11    A.   Typically, I have responded to
12  invalidity assertions by the other side and
13  considered those assertions step by step and
14  looked at that and then considered those
15  issues and rebutted them appropriately.
16    Q.   So you have acted as an expert on
17  behalf of defendants, including Apple,
18  correct?
19    A.   On behalf of defendants?  Yes.
20    Q.   And what steps would you
21  typically undertake as an expert for a
22  defendant in dealing with validity challenges
23  to a patent?
24    A.   As a defendant?  In other words,
25  I would be putting forward the invalidity

Page 47

1  arguments.  I would -- I would look at the
2  asserted claims and look at the prior art and
3  see how the prior art might match up with
4  those asserted claims.
5    Q.   And you have done that analysis
6  on behalf of defendants, correct?
7    A.   In other cases, yes.
8    Q.   Have you ever searched for prior
9  art with respect to patents?
10    A.   Not in this case, but in the
11  past, yes.
12    Q.   And how many times, as an expert?
13    A.   I don't think I can put a number
14  on it.  Probably each time I have worked on a
15  case on the defendant side, yes.
16    Q.   Is it fair to say that you know
17  how to do that type of analysis?
18    A.   I think that's fair to say, yes.
19    Q.   And when you are searching for
20  prior art, what steps would you take as an
21  expert?
22    A.   I would -- based on my expertise
23  in the area, I would look first from -- at
24  the work that I know is in the related art,
25  not necessarily exactly prior art, and from

Page 48

1  there, I would look at other -- through the
2  references from there and look at other art
3  that might also have been related.
4        Similarly, counsel often does
5  patent searches.  I believe they may hire
6  search firms for doing those kind of searches
7  and often I'm presented a bunch of related
8  patents that may have come out of those
9  searches and asked to consider those as well.
10    Q.   Have you ever searched the United
11  States Patent Trademark Office database for
12  prior art?
13    A.   I have in other cases but not
14  exhaustively.  Typically the patent searches
15  are done by counsel with the party firms.
16    Q.   Have you ever searched
17  publications for prior art?
18    A.   I have in other cases, yes.
19    Q.   Sir, does your approach to how
20  you form opinions differ as an expert for a
21  plaintiff versus as an expert for a
22  defendant?
23    A.   I am not sure the -- I am not
24  sure I completely understand the question.
25  The approach would be slightly different in

Page 49

1  one case on rebutting a -- if you are talking
2  about validity issues.  In one case I am
3  rebutting assertions by another expert.  In
4  the other case, as a defendant, I am putting
5  forth those assertions.  So they --
6  necessarily, the approach would be somewhat
7  different, in the one case putting forth the
8  assertions.
9        But in terms of assessing whether
10  it is valid or not, I would say ultimately it
11  is the same process.
12    Q.   You understand that the laws of
13  validity do not change whether you are acting
14  as an expert for a defendant versus a
15  plaintiff?
16    A.   That is correct, yes.
17    Q.   And sir, I take it that you bring
18  to bear the same level of preparation and
19  carefulness in forming your opinions
20  regardless of whether you are acting as an
21  expert for a plaintiff versus a defendant?
22    A.   I would be, yes.
23    Q.   Sir, you understand that the --
24  this Declaration that you prepared is an
25  important document?

Highly Confidential - Attorneys' Eyes Only

Page 50

1    A.   Of course.
2    Q.   So why don't I have you read into
3  the record paragraph 98 of your Declaration,
4  which is Exhibit 5.
5    A.   "In reaching this opinion, I have
6  considered the claims, specification and
7  prosecution history of the '721 patent,
8  including the prior art references identified
9  by the U.S. PTO as being the closest prior
10  art, and I have relied on my knowledge of and
11  expertise regarding computer science, human
12  computer interaction and interactive computer
13  graphics.  I have also relied on the legal
14  standards regarding the validity discussed."
15    Q.   Do you stand by that opinion?
16    A.   Yes, I do.
17    Q.   Sir, if you can take out the '721
18  patent.  Do you have that in front of you?
19    A.   Yes, I do.
20    Q.   Do you see that there is a
21  section dealing with references cited?
22    A.   Yes.
23    Q.   Which of these references did you
24  consider in forming your opinions regarding
25  validity of the '721 patent?

Page 51

1        MR. LYON:  Asked and answered.
2    A.   As I answered before, I believe I
3  looked at the Rytivaara reference, one or two
4  of the Tokkonen references.  I believe I
5  looked at the Robertson reference.  And I
6  looked at the Neonode Guide.
7        They're at least the ones I
8  recall of that.
9    Q.   Is it fair to say you didn't
10  consider everything that is listed as
11  references cited in forming your opinions on
12  the validity of the '721 patent?
13        MR. LYON:  Objection.  Vague.
14    A.   Everything that is cited there
15  would be the references in the patent, yes.
16    Q.   No, no.  I said, it's fair to say
17  you didn't consider everything that is cited
18  as references cited under the '721 patent in
19  forming your opinions regarding the validity
20  of that patent, correct?
21        MR. LYON:  Objection.  Vague.
22    A.   You said I did not?
23    Q.   You did not.
24    A.   I did not look at all of those
25  references, 100-odd references.  I did not.

Page 52

1    Q.   You did not, right?  So with
2  respect to the references that you did not
3  look at, I take it that you have no idea what
4  those references disclose or do not disclose?
5    A.   I have not read them, so I would
6  not know the specifics.  But my understanding
7  is the Patent Office considered them, and if
8  the Patent Office considered them and still
9  issued the patent, then there's a presumption
10  of validity unless decided otherwise.
11    Q.   Certainly.  But I mean, you have
12  been acting as an expert on behalf of
13  defendants in prior cases, correct?
14    A.   Yes.
15    Q.   So you understand that just
16  because a patent has issued doesn't mean that
17  the patent is ultimately valid?
18    A.   Whether it is ultimately valid or
19  not, it is my understanding it is up to the
20  court to decide.  But I understand -- my
21  understanding is there is a presumption of
22  validity unless the court decides otherwise.
23    Q.   You understand that presumption
24  of validity could be overcome?
25    A.   By a court, yes.

Page 53

1    Q.   And, in fact, you have rendered
2  opinions in other cases where you have looked
3  at prior art that was not considered by the
4  Patent Office and issued opinions regarding
5  the invalidity of a patent that's been issued
6  by the United States Patent Office, correct?
7    A.   That is correct, yes.
8    Q.   And you have also issued opinions
9  in other cases regarding the invalidity of a
10  patent based on references that were cited
11  during the prosecution of a particular
12  patent, correct?
13    A.   I have -- I would have to check
14  my past cases as to whether the publications
15  I asserted as being invalidating were cited
16  or not.  I can't recall offhand whether they
17  were cited or not.
18    Q.   Sir, you were involved in the
19  Elan case?
20    A.   Yes, I was.  I'm assuming you
21  mean the Apple-Elan case.
22    Q.   And I take it that you researched
23  the prior art carefully in that case as well?
24    A.   I would have, yes.
25    Q.   Besides looking at a select

Highly Confidential - Attorneys' Eyes Only

Page 94

1  devices.
2      Q.   Yes.
3          So you're not opining today that
4  Samsung copied the same identical unlocking
5  gesture as the iPhone in developing the
6  Samsung Nexus phone, correct?
7      MR. LYON:  Objection.  Lacks
8      foundation.  Assumes facts not in
9      evidence.  Calls for a legal
10     conclusion.
11     A.   I am not alleging that it is 100%
12 identical equivalent, given the differences
13 that we just talked about.
14     Q.   Thank you.
15         Do you have any opinion, sitting
16 here today, as to whether any of the
17 different embodiments we discussed for
18 unlocking a smartphone is commercially more
19 valuable than the other embodiments?
20     A.   We have already gone through this
21 issue.  I have not done that analysis as to
22 commercial value.
23     Q.   For example, there are phones
24 that do not practice the '721 patent in terms
25 of unlocking, correct?

Page 95

1      A.   Yes.  For example, if you enter a
2  password.
3      Q.   Also, the phones that have an
4  unlock image which does not move with the
5  user's finger, you would agree those
6  embodiments do not practice the '721 patent,
7  correct?
8      A.   If they do not move, if the
9  unlock image does not move, then it would not
10 practice the asserted claims in the '721.
11     Q.   In fact, if the unlock image does
12 not move continuously in accordance with the
13 user's finger movement, the embodiment would
14 not practice the '721 patent, correct?
15     A.   Give me a second.
16     Q.   Sure.
17     A.   I have to think about that a
18 little bit.  You added a little wrinkle into
19 the question.
20         The claims require the notion of
21 a continuous movement of the unlock image.
22     Q.   So if there is a smartphone that
23 had an unlock image which did not move
24 continuously with the user's finger, then
25 such an embodiment or smartphone would not

Page 96

1  practice the '721 patent, correct?
2      A.   It would not meet that particular
3  limitation to continuously move the unlock
4  image.
5      Q.   And you are an expert, sir, you
6  know that in order to practice a patent
7  claim, you have to practice each and every
8  element of that claim, correct?
9      A.   That's correct.
10     Q.   So you would agree that if there
11 is a smartphone that had an unlock image
12 which did not move continuously with the
13 user's finger, then such an embodiment or
14 smartphone would not practice the '721 patent
15 claims, correct?
16     A.   For the asserted claims, I
17 believe that would be correct, yes.
18     MR. LYON:  Are we at a good
19     point for a break?
20     MR. KANG:  I will ask a few more
21     questions and then we will wrap up.
22     Q.   We talked about this idea of a
23 movement and continuous movement.  Besides
24 continuous movement, what are other types of
25 movement that are possible in the context of

Page 97

1  a user-interface gesture?
2      A.   You could have a movement to
3  remove, for example, if I moved the icon and
4  say, for example, it flew to the end of the
5  screen, that may not match the movement of my
6  finger or my whatever it is, the pen,
7  whatever it is that is moving.  It may not
8  match that movement of the input in a
9  continuous manner.  So there may be a
10 disconnect between the input and the movement
11 of the image.
12     Q.   And that would be a form of a
13 discontinuous movement, in your opinion?
14     MR. LYON:  Objection.  Vague.
15     A.   I am not sure it is
16 discontinuous.  It would be a different form
17 of movement.
18     Q.   Not continuous?
19     MR. LYON:  Objection.  Vague.
20     A.   Probably not continuous as meant
21 by this particular set of claims that have
22 been asserted.
23     Q.   What are some -- what are some
24 examples of other types of movement that you
25 can think of which are not continuous in the

Highly Confidential - Attorneys' Eyes Only

Page 98

1  context of the '721 patent?
2      A.   I can think of hypotheticals.  I
3  am not sure that they would be particularly
4  usable or useful.  For example, you can
5  imagine an icon jumping every five seconds to
6  catch up with where your finger is.  That
7  could be continuous in some sense but not
8  continuous in time.  It rebounds in space all
9  the time and it may catch up.
10     Q.   Do you believe that type of
11  embodiment would be covered by what's claimed
12  in the '721 patent?
13     A.   That might be covered, yes.
14     Q.   Do you think it is?
15     A.   It is continuous in space.  It
16  might be covered.
17     Q.   Do you think it is covered?
18     A.   I would have to study that in
19  more detail, because I haven't considered
20  that.  I just thought of the example in
21  response to your question.  I would consider
22  the ramifications of whether that would be
23  covered or not in the claims.
24     Q.   Can you think of other examples
25  that you believe would not be continuous

Page 99

1  movement in the context of the '721 patent?
2      A.   But whether it is movement
3  nonetheless?  So I gave you the flight
4  example, if it went from A to B.
5          Not off the top of my head.  I
6  think once you have movement, it is generally
7  continuous in some fashion.  Except for maybe
8  these kind of discrete fling actions.
9      Q.   If you were to define the word
10  "continuous" in the context of movement in
11  the '721 patent, how would you describe it?
12     A.   I haven't -- you know, I've been
13  getting the claim construction issues here.
14  I haven't come up with a definition of the
15  term.  The ordinary meaning that I am
16  referring to, as I understand the claim, is
17  that it would follow my finger generally, or
18  follow my contact, the movement of the
19  contact.
20     Q.   And that's the understanding that
21  you used in analyzing the '721 patent for the
22  purposes of your Declaration?
23     A.   That is correct.
24         MR. KANG:  Why don't we take our
25  break.

Page 100

1          THE VIDEOGRAPHER:  The time is
2  1:23; we are going off the record.
3          (Whereupon, a recess was held.)
4          THE VIDEOGRAPHER:  The time is
5  1:34; we are back on the record.
6  BY MR. PAK:
7      Q.   Welcome back.  Did you discuss
8  the substance of your testimony during your
9  break?
10     A.   I am not sure what you mean by
11  substance of the testimony.
12     Q.   Did you discuss the questions and
13  answers?
14     A.   Just the general tenor of it,
15  yes.
16     Q.   What did you discuss?
17     A.   We discussed the general
18  direction which the questions were leading;
19  that's pretty much it.
20     Q.   Did counsel for Apple instruct
21  you on how to answer questions?
22     A.   Not in the break.
23     Q.   Ever?
24     A.   They have given me general advice
25  on how to approach depositions, yes.

Page 101

1      Q.   So we talked earlier about the
2  HCI research that was done at the University
3  of Maryland with Dr. Plaisant and others.
4          Do you remember that?
5      A.   Yes.
6      Q.   How would you characterize that
7  program in terms of user interface research?
8      A.   You mean the research group at
9  Maryland or Dr. Plaisant's work?
10     Q.   Let's start with the group in
11  general.
12     A.   Are you asking about quality?
13     Q.   How would you rank it
14  academically?
15     A.   I would say it is one of the
16  stronger groups worldwide historically.
17     Q.   How would you characterize
18  Dr. Plaisant's work?
19     A.   She is one of the stronger
20  researchers.
21     Q.   Are you familiar with
22  Dr. Schneiderman?
23     A.   Yes, I am.
24     Q.   And who is he?
25     A.   He is a researcher in the HCI

Highly Confidential - Attorneys' Eyes Only

Page 106

1  would continue to move even after the finger
2  has been lifted in a fling gesture; is that
3  correct?
4          MR. LYON: Objection. Vague.
5      A.  If you make that assumption, yes.
6      Q.  And, in fact, in both Apple and
7  Android platforms, you could execute a fling
8  gesture in the manner that I described where
9  the image is moved along with the finger for
10 a period of time, the finger lifts from the
11 screen and the object or image continues to
12 move after the finger has been lifted?
13     A.  Are you asking if I have seen
14 that? Yes, but not in the context of
15 unlocking -- unlocking a device.
16     Q.  Just talking generally about
17 gesture.
18     A.  Yes.
19     Q.  And that type of fling gesture is
20 different than a drag gesture where the image
21 moves continuously with the finger at all
22 times while the finger is still on the
23 screen, correct?
24     A.  It would differ at the point when
25 the finger is lifted up. But while the

Page 107

1  finger is still on the screen and if the
2  image is still -- in the fling case, is still
3  moving along with the finger, it would match
4  up with the drag until the lift up of the
5  finger.
6      Q.  So in terms of the algorithm that
7  you talked about before, to distinguish
8  between a fling and a drag gesture, one needs
9  to look at what happens to the image after
10 the finger has been lifted, correct?
11     A.  Given the assumptions in the
12 hypothetical, yes.
13     Q.  So if the image or icon continues
14 to move after the finger has been lifted,
15 that would be a fling versus a drag gesture,
16 where the image or the icon would not move
17 after the finger has been lifted, correct?
18         MR. LYON: Objection. Vague.
19     A.  In that particular definition of
20 a drag. I have also seen the word "drag"
21 used for in lieu of a fling, so where you
22 lift up and the drag continues. So if we
23 define "drag" as it stops when the finger is
24 lifted up, then fling it continues when the
25 finger is lifted up, then yes, that would be

Page 108

1  the difference.
2      Q.  That's the definition that you
3  have been using before in this deposition,
4  correct?
5          MR. LYON: Objection. Vague.
6  Misstates testimony.
7      A.  In the last few minutes, yes.
8      Q.  Well, earlier today when you were
9  talking about flings, that was the concept
10 that you had in mind, correct?
11         MR. LYON: Same objections.
12     A.  In general, yes.
13     Q.  We have been talking a lot about
14 unlocking. What is your understanding of the
15 concept of unlocking in the context of the
16 '721 patent?
17     A.  In the context of the '721, the
18 notion of unlocking is, the device is locked,
19 in other words, it doesn't respond to general
20 user input, and you unlock it to make it open
21 to responding.
22         I believe the patent also talks
23 about unlocking particular applications. In
24 other words, not just the device. So they're
25 different embodiments.

Page 109

1      Q.  So when we look at unlocking as
2  claimed in the '721 patent, do you believe
3  that unlocking is broad enough in the context
4  of the claim language to include both
5  embodiments, where one embodiment is
6  unlocking the device and the other embodiment
7  is unlocking a particular application?
8      A.  So for claim seven, the first
9  asserted claim, the last limitation is to
10 unlock the handheld electronic device. I
11 would believe that's different from unlocking
12 an application where -- unless the
13 application is the notion of the lock
14 application, in contrast with, say, a web
15 browser, for example.
16     Q.  What about claim 12?
17     A.  Okay, the same. The last
18 limitation, unlocking handheld electronic
19 device, is the same as claim seven.
20     Q.  Thank you, Doctor.
21         So you believe that the words
22 "unlock the handheld electronic device"
23 denotes the concept of unlocking the entire
24 device as opposed to a particular application
25 on that device?

Highly Confidential - Attorneys' Eyes Only

Page 110

1    A.   If it unlocked a particular
2  application, which in turn resulted in the
3  device being unlocked, then that would amount
4  to the same thing.  For example, in the Nexus
5  phone, you can unlock by swiping to the
6  right, which unlocks the phone directly, or
7  swipe to the left, which gets you the camera
8  application.
9        But in effect, the phone is also
10  unlocked at the same time, so those would do
11  the same thing.  It would unlock the device.
12  The path to the unlocking is slightly
13  different.
14    Q.   You would agree with me that the
15  concept of unlocking an application is also
16  disclosed in the '721 patent?
17    A.   Yes.
18    Q.   But you believe that the claims,
19  the asserted claims of the '721 patent does
20  not cover that particular embodiment?
21      MR. LYON:  Objection.  Vague.
22    A.   The set of claims, the last
23  limitation of claim 7 and 12 talk about
24  unlocking the device, not a particular app,
25  but as I said earlier, if the app, unlocking

Page 111

1  the app involves unlocking the device, then
2  it would amount to the same.
3    Q.   When you say unlocking the
4  device, what do you mean?
5    A.   Making it operational again.
6    Q.   Isn't it true, sir, that in the
7  Samsung Nexus phone, one could interact with
8  the phone even while it is in an unlocked --
9  or sorry.
10        Isn't it true, sir, that in the
11  Samsung Nexus phone, one could interact with
12  the phone even while it is in a locked state?
13    A.   While it is locked, yes, you can
14  do some things.
15    Q.   What are some of the things you
16  can do?
17    A.   You can press some of the buttons
18  to shut the phone down.  I believe if a call
19  comes in, you can respond to the call, as
20  examples.
21    Q.   So you would agree with me that
22  in the Samsung Nexus phone, there are user
23  applications and interactions which are
24  possible even while the phone is still in a
25  locked state?

Page 112

1    A.   When the touchscreen is in a
2  locked state, yes.
3    Q.   So I am trying to understand the
4  boundary that you are drawing between
5  unlocking a phone versus unlocking
6  applications.  Are you stating on the record
7  that unlocking a phone means taking the
8  device from a state where no user application
9  is allowed to a state where at least one
10  application is allowed to interact with the
11  user?  Is that your testimony?
12    A.   Where it is user initiated, yes.
13  If I am trying out the phone, I can't do
14  anything on the touchscreen without first
15  unlocking it, except in the scenario
16  potentially, and I haven't studied this for
17  that particular phone, but like on the
18  iPhone, if a call comes in, I can answer the
19  call without first unlocking it.
20        But that's initiated by an
21  outside party.  The call comes in.  I am not
22  initiating the call.
23    Q.   Shutting down the phone is user
24  initiated, correct?
25    A.   Right.

Page 113

1    Q.   That's something that one can do
2  with the Samsung Nexus phone while it is
3  still in a locked state, correct?
4    A.   Actually, let me correct that.  I
5  may have misspoken.  I believe you have to
6  actually lock it before you can actually shut
7  down.
8    Q.   Do you know if that is true?
9    A.   I would have to double-check
10  that.  I haven't considered that in detail
11  for this particular work.
12    Q.   Let's say I have a smartphone
13  that allows at least one application to be
14  initiated by the user while it is in a,
15  quote, locked state, and if the user unlocks
16  the phone, additional applications are
17  enabled.  Do you have that example in mind?
18    A.   Yes.
19    Q.   Do you believe that scenario
20  would be covered by what's claimed in the
21  '721 patent?
22    A.   I haven't thought about that
23  particular scenario in detail, so I would
24  want to study that and the spec again in
25  detail to answer that.  Because whether

Highly Confidential - Attorneys' Eyes Only

Page 114

1    unlocked -- whether the device has to be
2    completely locked or not is something I
3    haven't considered.
4        Q.   I need your best answer to that
5    today, sir, on that issue.
6        MR. LYON:  Objection.  Asked and
7    answered.
8        A.   So I would have to say I would
9    have to study it to give a definite answer.
10       Q.   Well, the reason why I need an
11   answer to that, sir, is, the question that I
12   asked earlier was, do you see a difference
13   between unlocking a phone versus unlocking an
14   application or applications.  And your
15   testimony was that you saw a difference.
16       A.   Yes.
17       Q.   Correct?  And so I am trying to
18   understand the basis for that difference that
19   you testified about.
20           So, again, if I had a phone that
21   had at least one application which could be
22   initiated by the user in a locked state, and
23   unlocking that phone would result in
24   additional applications being enabled, is
25   that scenario covered by claim seven and

Page 115

1    claim 12 of the '721 patent as you understand
2    it?
3        A.   So as I said, I would have to
4    think about that scenario.  Because when I
5    drew the distinction between unlocking the
6    application and unlocking a phone in response
7    to your earlier question, I was thinking of a
8    situation where the phone was generally
9    unlocked and a particular application may
10   have been locked.  And there is a slide to
11   unlock gesture done to unlock that particular
12   locked application.
13           Now I think the scenario is quite
14   different, where the phone is generally
15   locked, and you are saying one application
16   happens to be unlocked, if I understand what
17   you are saying correctly.
18       Q.   Well, really the issue I think
19   you understand very well is the definiteness
20   of a claim.  You know that a claim must be
21   definite to be valid, correct?
22       A.   Yes.
23       Q.   So one must be able to determine
24   whether something is infringing or not based
25   on the claim language, correct?

Page 116

1        A.   And the specification, yes.
2        Q.   And in other cases you have
3    opined that certain claims, although issued
4    by the United States Patent Office, were
5    invalid because the claim was not definite?
6        A.   That is true in other cases.
7        Q.   In the Elan case, for example?
8        A.   I would have to go back and
9    recall that, but it is possible.
10       Q.   You know that's a legal
11   requirement that a claim must be definite in
12   order to be valid?
13       A.   Yes.
14       Q.   So one must know whether a
15   particular device or prior art reference
16   practices a claim or not based on the claim
17   language?
18       MR. LYON:  Objection.
19   Mischaracterizes.
20       Q.   Correct?
21       A.   The claim language in the context
22   of the specification, yes.
23       Q.   So that's why I am asking you
24   these questions, sir.  I am trying to
25   understand, from your perspective as an

Page 117

1    expert that submitted a Declaration in this
2    case, what is the difference, in your mind,
3    between unlocking a phone versus unlocking an
4    application or applications?
5        MR. LYON:  Asked and answered.
6        A.   I think I just -- I believe I
7    clarified that already, but I will repeat
8    that answer.
9            When I drew the division between
10   unlocking an application and unlocking a
11   phone, I was -- in a case where I am
12   unlocking an application, I was taking -- I
13   had in mind the situation where the phone was
14   generally unlocked and one application may
15   have been locked for whatever reason, and
16   the -- the slide to unlock type of gesture
17   would have been used to unlock that
18   application.
19           I think what you have put in
20   front of me as this follow-up question is
21   kind of almost the inverse of that, where you
22   have said the phone is locked in general and
23   there happens to be one application that
24   happens to be unlocked.  And you are asking
25   if that meets the claims.

Highly Confidential - Attorneys' Eyes Only

Page 118

1    I am saying I have not studied
2 that particular scenario, haven't considered
3 that particular scenario in detail, and I
4 would have to do that carefully before I
5 answer your question with any certainty.
6 Because I think this is different from the
7 scenario, the earlier scenario where the
8 phone is generally unlocked and there happens
9 to be one app that's locked.
10    Q.   So you have been using the word
11 "generally" in answering my questions.  What
12 do you mean by that?  How many applications?
13 Is there an objective criteria for defining
14 "generally"?
15    A.   I have not put a number on that,
16 no.
17    Q.   So sitting here today, you can't
18 tell me whether it is one application or two
19 applications or ten applications that must be
20 unlocked?
21    A.   No, I can't give you a number.  I
22 am thinking of a special case where one or
23 two applications may be specially locked when
24 the phone is generally available for use or
25 being unlocked.

Page 119

1    Q.   Can you give me an objective
2 criteria today that would distinguish a phone
3 that you could consider to be unlocked -- or,
4 sorry, can you give me an objective criteria
5 today that would distinguish a phone that you
6 would consider to be locked versus a
7 situation where the phone is unlocked but
8 certain applications are locked?
9    A.   So you are asking me is there a
10 difference where -- how I draw the
11 difference?  Well, one criteria I would use
12 is that there would be a special case where
13 you lock a particular application despite the
14 rest of the phone being unlocked.
15    So, for example, if I have, say,
16 a folder that has particularly sensitive
17 information, I mean my default is to always
18 keep that locked.
19    Q.   What if I had a phone where the
20 contacts information was unlocked while the
21 phone was in a locked state; would you
22 consider that to be something that would be
23 covered by the claims in the '721 patent?
24    A.   I have to think about that.
25 That's another hypothetical here.

Page 120

1    Q.   So it would depend on the type of
2 application?
3    A.   Well, I think it would depend on
4 what the specs say about that particular
5 situation.  I haven't studied -- I haven't
6 studied the spec in light of that particular
7 issue.  So I don't want to give you an answer
8 that I haven't -- on an issue I haven't
9 studied in detail.
10    Q.   Besides the patent, what else
11 would you need to consider to be able to
12 answer that question?
13    A.   I would probably also want to see
14 how that term is used, if indeed the patent
15 draws a distinction, whether that distinction
16 has been drawn elsewhere potentially.
17    Q.   I want to give you the
18 opportunity, because this is an important
19 question for us about the definiteness of the
20 claim, so I would like to give you the
21 chance -- I know you have studied the patent
22 in detail in preparing your Declaration.  But
23 please take time, if you need it, to look
24 through the patent and tell me when you are
25 ready to answer the question.

Page 121

1    MR. LYON:  Counselor, I have one
2 objection to this.  That is that we
3 asked in interrogatories that you
4 define what your validity positions
5 were, and Samsung has refused to do
6 so.  Had this been something you
7 wanted us to consider, that would have
8 been the right time to have raised it.
9 Now you are asking him to on the fly
10 give you his complete analysis.  I
11 think that's unfair.
12    MR. PAK:  Sir, with all due
13 respect, I am going to ask my
14 questions.  I note your objection for
15 the record.
16    Q.   Please go ahead and take the
17 time?
18    A.   Okay.
19    Okay, I think I have the partial
20 answer to your questions.  Just going through
21 the spec, specification, in light of your
22 question, on column seven, line 64, the
23 patent contemplates the notion that the
24 device in the locked state, it says, "In the
25 user-interface locked state, herein after the

Highly Confidential - Attorneys' Eyes Only

Page 122

1  locked state, the device 100 is powered on
2  and operational but ignores most, if not all
3  user input.  That is the device 100 takes no
4  action in response to user input and/or the
5  device 100 is prevented from performing a
6  predefined set of operations in response to
7  the user input."
8        And then it says, "The predefined
9  set of operations may include navigation
10 between user interfaces and activation or
11 deactivation of a predefined set of
12 functions."
13       It goes on to give examples of
14 what the locked state may be used to prevent.
15 But that paragraph or the section of the
16 paragraph that I just read out, for example,
17 clearly shows that it contemplates the notion
18 of -- the claims contemplate, or the patent
19 contemplates the notion of some parts of it
20 being locked and other parts not being
21 locked, as one example.
22       I can go on with other places in
23 the spec, if you want.
24    Q.   Really, that's -- thank you.
25 That's what I am getting at, Doctor.  I am

Page 123

1  trying to understand, when you say some parts
2  are locked and some parts are not locked in
3  this locked state as described in the '721
4  patent, what is the objective criteria for
5  determining when a device is locked with
6  respect to the number or quality or type of
7  applications?
8        MR. LYON:  Objection.  Assumes
9  facts.
10    Q.   Is there an objective criteria
11 that you can tell me?
12    A.   I don't have one off the top of
13 my head.  As I said before, I think it would
14 depend on the particular applications, and
15 it's up to the designers of the phone to
16 decide whether some -- what particular things
17 may be left unlocked in a locked state, as
18 the patent clearly contemplates a predefined
19 set of operations.  That set is predefined,
20 so it is not arbitrary, but something that
21 one makes a decision on.  Presumably at the
22 time of writing the code for the phone.
23    Q.   So are you telling me that it --
24 the decision or determination as to whether a
25 device is in a locked state versus unlocked

Page 124

1  state depends on whether the designer of that
2  phone selected certain applications to be
3  operational in a locked state?
4    A.   I believe the patent is
5  contemplating that there is a predefined set
6  that is prevented from being used, a
7  predefined set of operations that is
8  prevented from being used when the state is
9  in a locked state.
10    Q.   I am trying to understand exactly
11 what you understand that to mean.  So for
12 example, I have two applications on a phone.
13 Are you with me?
14    A.   Yes.
15    Q.   Okay.  Assuming the locked state
16 application is operational, the other
17 application is not operational, is the phone
18 in a locked state as contemplated in the '721
19 patent?
20    A.   If the one application
21 constitutes the predefined set of operations
22 that is to be prevented, yes.
23    Q.   If I have three applications on a
24 smartphone, two of those applications are
25 operational in the locked state, one

Page 125

1  application is not, does that scenario
2  satisfy the locked state of the '721 patent?
3    A.   Okay.  It would depend on if that
4  one application is the predefined set that
5  has been chosen not to accept user input,
6  then it would be locked.
7    Q.   If I have 100 applications on the
8  smartphone, 99 of those applications are
9  operational in the locked state, one
10 application is not, does that scenario
11 satisfy the locked state of the '721 patent?
12    A.   From just reading the claims, the
13 asserted claims and the section of the specs
14 that I just read out and a few other sections
15 I have marked out in my just recent review
16 right here, that set is definable.  It would
17 depend on how you define the set of locked
18 versus unlocked.  To me, that's what the
19 patent is contemplating, these two sets.
20    Q.   But, again, if I had 99
21 applications on a smartphone, they are
22 operational in a locked state, one
23 application is not, would you consider that
24 to satisfy the locked state of the '721
25 patent?

Highly Confidential - Attorneys' Eyes Only

Page 126

1     MR. LYON:  Asked and answered.
2     A.   If that one unlocked application
3  is the one that falls in the predefined set
4  that is supposed to be locked, then yes, it
5  would satisfy it.
6        Again, all these answers, I
7  haven't had a full amount of time to digest
8  it.  I realize you recognize you gave me the
9  time to look at it here.  But normally I
10 digest these things over days.
11    Q.   I understand, and I appreciate
12 you can't contemplate every one of my
13 questions for the deposition.
14       Having said that, I know you took
15 careful time and diligence in assessing the
16 '721 patent, correct?
17    A.   That's right.  So based on what I
18 have assessed to date, yes, but I haven't
19 considered -- I hadn't considered those
20 questions.  And should more thinking come up,
21 I will respond appropriately.
22    Q.   Would the type or the nature of
23 the applications factor into the question of
24 whether a device is in a locked state versus
25 unlocked state according to the '721 patent?

Page 127

1     A.   Give me one second to quickly go
2  over the other sections I just marked out
3  here.
4        So the patent doesn't explicitly
5  say a specific type would fall under one
6  category or another, but it gives examples.
7  For example, in column 13, lines 54 onwards,
8  it gives examples of specific applications
9  that may be locked or unlocked, but doesn't
10 say they have to fall under -- in one
11 category or the other.  So it leaves it --
12    Q.   It's fair to say there is no
13 bright-line rule or guidance provided in the
14 '721 patent for considering the type or
15 nature of the applications in deciding
16 whether the device is in a locked or in an
17 unlocked state?
18       MR. LYON:  Objection.
19    Q.   Fair?
20       MR. LYON:  The document speaks
21 for itself.
22    A.   Based on my review of the
23 document, I haven't seen a clear delineation
24 that a particular type has to fall in one of
25 those sets.

Page 128

1     Q.   What if the user or the designer
2  of the phone -- let me go back to my example
3  again of 99 applications running on the
4  smartphone.  If the designer of that phone
5  determined that to be in an unlocked state
6  and the user's sweeping or sliding gesture
7  results in additional applications being
8  unlocked, would that scenario satisfy the
9  '721 patent definition of locked state?
10       MR. LYON:  Objection; vague.
11    A.   If the understood definition for
12 that device is when the 99 is unlocked, then
13 the device would be unlocked.  So that goes
14 back to my first example, I believe, where
15 the device is generally unlocked based on the
16 set of one or two applications that are
17 locked.
18    Q.   So really, what you are saying,
19 Doctor, is that the difference between a
20 locked state and unlocked state, according to
21 the '721 patent, ultimately rests on the
22 definition of a predefined set of
23 applications that are associated with the
24 locked state versus unlocked state; is that
25 your understanding?

Page 129

1     A.   What I am saying is the patent is
2  saying that there is a predefined set of
3  operations and that would have to be chosen
4  at some point.
5     Q.   But if the designer of the phone
6  considered the phone to be in an unlocked
7  state prior to the sliding gesture of an
8  image on the screen, regardless of the number
9  of applications that may be operational or
10 not, as long as there is some predetermined
11 set of operations that are possible after the
12 unlock gesture, would you consider that to be
13 a locked state?
14    A.   You have several negatives.  So
15 maybe you can get that read back.
16    Q.   Really, what I am trying to drive
17 at, Doctor, is, does the definition of locked
18 state, according to the '721 patent, depend
19 on the designer's definition of a predefined
20 set of operations that are associated with
21 that state?
22    A.   I think at some point there has
23 to be some determination as to what
24 constitutes a locked state in the patent.
25 The paragraph I just read out earlier clearly

Highly Confidential - Attorneys' Eyes Only

Page 130

1  contemplates a predefined set that
2  constitutes that. Somebody would have to
3  make that decision and inform the user about
4  that, too. It is not just you the designer
5  decides and no communication to users as to
6  what is a locked state or what is an unlocked
7  state.
8      Q.  I have two companies. They
9  design two different smartphones. Company A
10 designs a smartphone with three applications,
11 two of which are operational before the user
12 moves an icon on the screen, and one is not.
13 Do you understand that example?
14     A.  Let me write this down. Three
15 operational, one not, okay. This is the
16 unlocked state?
17     Q.  Well, I am going to get to that.
18 Company A designs a smartphone. There are
19 three applications. Two of those
20 applications are operational before the user
21 moves an icon on the screen, and one is not.
22 Do you understand that example?
23     A.  Yes.
24     Q.  I have a different company,
25 Company B designs a smartphone. There are

Page 131

1  three applications on that phone as well.
2  Two of those applications are operational
3  before the user moves an icon on the screen
4  and one is not. Okay?
5      A.  Okay.
6      Q.  Company A defines the scenario
7  before the user moves an icon on the screen
8  as an unlocked state. Okay? Company B
9  defines the same scenario before the user
10 input moves an icon on the screen as a locked
11 state.
12        The question for you is, the
13 scenario involving Company A, does that
14 satisfy a locked state according to the '721
15 patent?
16     A.  If that's the -- so that's the
17 one where the two are operational but defined
18 as unlocked? The device, if it is generally
19 understood by the company definition and
20 people who use that device, that that's the
21 unlocked state, it would be unlocked.
22     Q.  And focusing on the scenario
23 involving Company B, does the scenario
24 involving Company B before the user moves the
25 icon satisfy the locked state according to

Page 132

1  the '721 patent?
2      A.  That would be locked, yes.
3      Q.  So really, the difference between
4  a locked state and an unlocked state,
5  according to the '721 patent, depends on how
6  the designer of the phone defines a locked
7  state versus an unlocked state, correct?
8      A.  To some extent. I want to bring
9  it back to the -- bring the discussion back
10 to the overall goal of this patent is to
11 prevent inadvertent activation, for example.
12 So when I say predefined set of operations,
13 it needs to be read in the context of what is
14 this locking trying to achieve. If I
15 arbitrarily just toss any set of applications
16 into locked and unlocked and call it locked
17 and unlocked state, it may not fit in the
18 overall aim of this patent, where you are
19 trying to prevent inadvertent application, or
20 I'm sorry, inadvertent activation of the
21 phone.
22        So I wouldn't classify it
23 necessarily as completely arbitrary. I think
24 there is still the overriding goal -- you're
25 unlocking -- the purpose of locking is to

Page 133

1  prevent this thing from being usable
2  inadvertently, as one example of why you
3  would want a lock.
4         And I think if you remove that
5  overarching goal, then it becomes somewhat
6  arbitrary. I am not sure that fits the
7  spirit of the patent.
8      Q.  That's what I am getting at,
9  Doctor. Because I don't see a purpose
10 requirement in the claim language. Do you
11 agree?
12     A.  I am not sure I completely
13 understand what you mean by "purpose
14 requirement."
15     Q.  Well, I don't see a statement in
16 the claim language that says locked state
17 corresponds to a particular purpose. There's
18 no explicit definition of a locked state.
19        MR. LYON:  Objection; vague.
20     A.  In the claim language, that's
21 correct.
22     Q.  In the claim language.
23        So what I am trying to
24 understand, Doctor, based on your expert
25 analysis and review of the patent, is there

Highly Confidential - Attorneys' Eyes Only

Page 134

1   an objective criteria, setting aside the
2   designer's intent or pre-definition of
3   applications, is there an objective standard
4   that one could use to decide whether a
5   particular phone is in a locked state versus
6   unlocked state depending on the type or
7   number of applications?
8         MR. LYON:  Objection.  Asked and
9   answered.
10        A.   I am not sure I can give you an
11  objective based on number, but I think the
12  overriding goal of the patent is to deal with
13  this inadvertent activation issue.  That's
14  the spirit of the patent.
15        And while the claims, asserted
16  claims do not explicitly state the
17  inadvertent activation as the issue that the
18  claims are addressing, the claims are read in
19  light of the spec, and the rest of the
20  patent, including the patent, contemplates
21  the field or the topic that it's trying to
22  solve, that inadvertent issue.
23        Q.   I have two applications running
24  on a smartphone.  One is not operational
25  before the user moves an icon on the screen

Page 135

1   and the other application is operational in
2   that state.  Can you tell me whether that
3   scenario constitutes a locked state according
4   to the '721 patent?
5         MR. LYON:  Objection.
6         Incomplete hypothetical.
7         A.   That would depend on whether it
8   falls in this predefined set of operations.
9         Q.   And the predefined set of
10  operations would depend on the designer of
11  the phone's intent?
12        A.   Taking into -- I'm sorry.
13        MR. LYON:  Objection; vague.
14        A.   Taking into context -- it is not
15  an arbitrary set.  It would be taking into
16  context the notion of inadvertent activation,
17  trying to prevent that, as opposed to
18  randomly putting applications into one set or
19  the other.
20        Q.   There are two applications in
21  this example.
22        A.   Right.
23        Q.   So one application is operational
24  before the user moves the icon on the screen,
25  the other is not.  Based on that

Page 136

1   hypothetical, can you tell me whether the
2   locked -- the phone is in a locked state or
3   not, without considering the designer's
4   intent in predefining the set of operations
5   associated with the locked state?
6         MR. LYON:  Objection.
7         Incomplete hypothetical.
8         A.   Not in every case, no.
9         Q.   You would have to look at the
10  designer's definition of what he considers to
11  be the locked state or not, correct?
12        A.   Or the manual, for example.
13        Q.   Or the manual.
14        A.   In some cases it is maybe
15  completely obvious.  If there are 100 things
16  that are locked and only one is unlocked, it
17  may be more clear to the user right off the
18  bat as to what is locked and what isn't and
19  whether the state is generally locked or the
20  device is generally locked.
21        But when you do a one --
22  two-example scenario, which is an extreme
23  example, the two-application scenario like
24  you did, I think it becomes more difficult.
25        Let me give you an example to

Page 137

1   elaborate on that.  For example, if I had 99
2   applications and they were all locked, and
3   the only application that was generally
4   unlocked maybe is the -- I can dial 911 or
5   something like that; then I think most users
6   would generally see that as the device is
7   locked without consulting the manual.
8         But if you go to an extreme
9   example where it is two applications and the
10  two arbitrary applications have no inherent
11  meaning to the user, then sure, you may need
12  some guidance.  You would need some guidance
13  as to whether it is locked or unlocked under
14  that definition.
15        Q.   In that same example of 99
16  applications and one being unlocked -- sorry.
17        In the example that you gave
18  where you have 99 applications that are
19  operational and one application is not
20  operational --
21        A.   Sorry.  I had it the other way
22  around.  99 was inoperational and one was
23  operational.
24        Q.   I see.
25        A.   The one that was operational had

Highly Confidential - Attorneys' Eyes Only

Page 138

1    a particular feature to it, for example, an
2    emergency dialing example.  That was, I
3    believe, the example I just gave.  Then I
4    think most users would see that the device
5    was in a locked state without having to
6    consult the designer on that.
7        Q.   You could also contemplate a
8    scenario where 99 applications are not
9    operational and one application is
10   operational before the user moves the icon on
11   the screen where based on the pre-definition
12   of what is a locked versus unlocked state,
13   that scenario would constitute a locked state
14   according to the '721 patent, correct?
15       MR. LYON:  Objection as to form.
16       A.   I believe that is technically
17   possible.  I think it would be highly
18   improbable.  Most designers would not do
19   that.  Most users would probably see the
20   system as unlocked, except for the one
21   application.
22       Q.   That's what I am getting at, sir.
23   Which criteria do we use to determine whether
24   something is in a locked state according to
25   the '721 patent?  Do we look at the

Page 139

1    designer's intent?  Do we look at the user's
2    intent or understanding?  Do we look at the
3    number of applications?  Is there some kind
4    of criteria that you can use?
5        A.   I think you are trying to put a
6    hard number on something that maybe requires
7    a little bit of subjective interpretation.
8    The 99 to 1, I don't think that would be
9    arbitrary.  I think a designer would state it
10   is locked, the entire phone, the entire
11   device is locked.
12           But only one application is
13   locked and 99 that are active, I don't think
14   that's a reasonable choice of applications to
15   put in the sets that the patent is
16   contemplating.  When the patent is
17   contemplating predefined set, I'm assuming
18   it's contemplating reasonable choices as to
19   what goes into those sets.
20       Q.   So you are reading a reasonable
21   requirement into the claims?
22       MR. LYON:  Objection.
23   Mischaracterizes testimony.
24       A.   No.  I'm reading a reasonable
25   requirement into the choice of what is a

Page 140

1    predefined set of operations that are locked
2    or unlocked.
3        Q.   That predefined set of operations
4    you just talked about is the basis for
5    determining whether something is in a locked
6    state versus unlocked state according to the
7    '721 patent, correct?
8        MR. LYON:  Objection.
9    Mischaracterizes testimony.  The
10   document speaks for itself.
11       A.   The document -- the specification
12   or the parts I read out says that those
13   predefined operations are undefined.
14       Q.   So the answer to my question is
15   yes, correct, according to the specification?
16       MR. LYON:  Same objections.
17       A.   According to that part of the
18   specification, yes.
19       MR. PAK:  Let's take our next
20   break.
21       MR. LYON:  Thanks.
22       THE VIDEOGRAPHER:  The time is
23   2:30; we are going off the record.
24       (Whereupon, a recess was held.)
25       THE VIDEOGRAPHER:  The time is

Page 141

1    2:37; we are back on the record.
2    BY MR. PAK:
3        Q.   Welcome back, Doctor.
4            Going back to the '721 patent
5    specification, did you come across an
6    embodiment where the user is able to unlock
7    the phone without some type of unlock image?
8    And I will just direct your attention to the
9    bottom of column nine, if that helps you.
10       A.   I just want to ask clarification.
11   When you say without an unlock image, you
12   mean unlock image in general, or the unlock
13   image moving with the content?
14       Q.   Unlock image moving with the
15   content.
16       A.   Where, nine?  Sorry.
17       Q.   At the bottom of column nine.
18       A.   Yes.  So -- if you are asking if
19   there are embodiments that do not require the
20   movement of the image, the answer is yes, of
21   course.
22       Q.   And what specific embodiment do
23   you have in mind?
24       A.   Well, for example, one where just
25   the gesture is swiped, where the image does

Highly Confidential - Attorneys' Eyes Only

Page 142

1 not move. But there may still be a static
2 image.
3         The patent, I believe, uses the
4 word "unlock image" to also refer to a static
5 image that gives you the cue to unlock.
6     Q.    And that particular embodiment
7 where the gesture is swiped but the image
8 does not move, that embodiment is not an
9 embodiment claimed in the asserted claims of
10 the '721 patent, correct?
11     A.    In the asserted claims it
12 requires that the unlock image move -- to
13 continuously move, yes.
14     Q.    So that's a non-infringing
15 design, correct?
16     A.    That would not be covered by
17 these claims, the asserted claims.
18     Q.    Correct? Yes?
19     A.    Yes.
20     Q.    Have you done any analysis as to
21 the relative benefit or value of that
22 particular non-infringing design where the
23 unlock image does not move with the finger
24 versus the claimed designs that require
25 movement of the unlock image?

Page 143

1     A.    Analysis as to what?
2     Q.    The relative benefit.
3     A.    Oh, sorry.
4     Q.    Or value.
5     A.    I haven't considered that
6 explicitly, but just from my expertise in my
7 field, I would say that giving appropriate
8 visual feedback is generally a good thing.
9 So in this case, visual feedback is more
10 comprehensive than simply a static issue.
11 Generally that would be a good thing.
12     Q.    So what about a situation where I
13 have an unlock image on the screen, the user
14 drags his finger across the screen, but the
15 unlock image does not move; do you have that
16 example in mind?
17     A.    Yes.
18     Q.    Instead, other visual cues are
19 presented. Do you have that scenario in
20 mind?
21     A.    Okay.
22     Q.    For example, arrows, change in
23 color.
24     A.    Okay.
25     Q.    Have you considered the relative

Page 144

1 benefit or value of such a design versus the
2 claimed invention of the '721 patent that
3 requires the unlock image to move?
4     A.    I haven't considered that in
5 detail explicitly, that particular scenario.
6 There is, however, again, from general
7 principles in the interface field, the notion
8 that if the feedback is related to what it is
9 you are moving as opposed to unrelated or not
10 directly attributable feedback, the closer
11 the correspondence, generally the better the
12 feedback is deemed to be. But again, that's
13 a general principle.
14     Q.    You would agree with me, sir,
15 that there are other ways of providing visual
16 feedback to the user with respect to an
17 unlock gesture other than moving the unlock
18 image, correct?
19     A.    Yes.
20     Q.    We talked about one example where
21 you could display arrows; that's one example?
22     A.    Sure. Assuming the arrow is not
23 the unlock image.
24     Q.    What are some of the other
25 examples that you can think of where the

Page 145

1 phone could provide visual feedback to the
2 user as he performs an unlock gesture without
3 moving the unlock image?
4     A.    I can imagine a color transition
5 of some -- a non-arrow-like blob of color
6 moving from one direction to the other, for
7 example.
8     Q.    Anything else?
9     A.    I can imagine the unlock region
10 being highlighted, for example.
11     Q.    Anything else?
12     A.    Not off the top of my head. I
13 can sit here and think for a while if you
14 want me to.
15     Q.    Besides spending some time
16 thinking about these ideas, what else would
17 you need to do in order to come up with
18 non-infringing designs with respect to the
19 '721 patent and unlocking?
20         MR. LYON: Objection. Vague.
21     A.    So you are asking me if I was
22 hired to do a redesign, what would I do? I
23 think, again, it would depend on what -- what
24 the capabilities of a particular device were;
25 was audio an appropriate feedback mechanism,

Highly Confidential - Attorneys' Eyes Only

Page 146

1 for example; vibration may be another
2 example.  It really depends on the
3 constraints that are being considered.
4     Q.    You have said something earlier
5 about this idea of a general principle in HCI
6 where the closer the feedback is to the
7 user's movement, the better experience the
8 user could have.  Do you recall that
9 discussion?
10     A.    Yes.
11     Q.    Do you have a name for that
12 principle in HCI?
13     A.    There is a general concept of a
14 term called affordances.  It was coined, I
15 believe, by somebody called Don Norman a long
16 time ago, that relates to the notion does the
17 object, the thing you are manipulating
18 suggest its use without having to be taught.
19     So for example, a door handle
20 that clearly is a lever, somebody is not
21 likely to push on it because it suggests that
22 it is a lever, and the usage suggests it.
23     So that would be one overarching,
24 very general principle.  It is not always
25 that obvious in many designs, as we're

Page 147

1 probably painfully aware of in a lot of lousy
2 things we use.
3     Q.    Would you agree with me the
4 principle of affordance was a well-known
5 concept in 2005?
6     A.    Sure.
7     Q.    How about the concept of direct
8 manipulation; are you familiar with that
9 concept?
10     A.    As generally used in the field,
11 yes.
12     Q.    What's your understanding of
13 that?
14     A.    The graphical object moves or has
15 the -- is perceived by the user as moving in
16 correspondence to some input the user
17 provides.  And the distinction would be in
18 contrast to a command line interface, for
19 example, where you typed in a command and
20 something happens.  So still a perception of
21 something happening in response to my input,
22 but not quite as graphically direct as
23 dragging an object around, for example.
24     Q.    You would agree with me this
25 concept of direct manipulation was well known

Page 148

1 in 2005?
2     A.    Yes.
3     Q.    And you would agree that the
4 concept of moving an object in response to
5 user input to provide visual feedback to the
6 user was also well known in 2005?
7     A.    Yes.
8     Q.    What are some examples you can
9 think of that predate 2005 where that
10 principle was carried out?
11     A.    Dragging an object on a desktop
12 graphical interface, for example.  Dragging
13 an icon to the trash can.  Those kinds of
14 things were examples of direct manipulation
15 where the object, the graphical object was
16 directly or fairly directly connected to the
17 movement of the user.
18     Now, I say fairly directly
19 because it doesn't have to be a touchscreen.
20 A mouse, for example, is indirect in the
21 sense that it is moving a cursor, and the
22 cursor moves the object.  But it's still
23 generally thought of as direct manipulation.
24     Q.    You are certainly aware and have
25 written about direct manipulation in the

Page 149

1 context of touchscreens before 2005, correct?
2     A.    Yes.
3     Q.    For example, you are familiar
4 with the SmartSkin system where the user can
5 manipulate objects on the screen by moving
6 those objects directly?
7     A.    Yes.
8     Q.    You are also familiar with a
9 touch table product from Mitsubishi?
10     A.    Yes.
11     Q.    Diamond Touch, correct?
12     A.    Yes.
13     Q.    That predates 2005?
14     A.    I believe the table does predate
15 2005.  I should double-check that.
16     Q.    And that table allowed the user
17 to manipulate objects directly on the screen
18 by moving objects?
19     A.    That's right.
20     Q.    And this concept of direct
21 manipulation by moving objects on the screen
22 is a concept that you have taught in your
23 classes for a long time, correct?
24     A.    Yes.
25     Q.    You have taught that before 2005?

Highly Confidential - Attorneys' Eyes Only

Page 170

1  slide to unlock method described in the '721
2  patent.
3      Q.   I am trying to understand what's
4  unpredictable about that result.
5          MR. LYON:  Objection.  Asked and
6      answered.
7      A.   What's unpredictable to me is
8  nobody had tried it.  Nobody put together a
9  swipe with a moving image underneath the
10  user's content.  It had never been done in
11  this context.
12     Q.   My question is different, sir.
13  My question is about predictability and
14  whether the result is predictable or
15  surprising.
16         Do you have any basis to suggest
17  that the result of combining direct
18  manipulation with an unlock sweep gesture on
19  a smartphone resulted in unpredictable or
20  surprising results?
21         MR. LYON:  Objection.  Vague.
22     Assumes facts.  Lacks foundation.
23     A.   I think it is surprising that
24  this is a technique that happens to work very
25  well.  How well it works or -- it would be

Page 171

1  necessarily -- not necessarily known a priori
2  until we try it.
3          If you are asking is it
4  predictable if we add it, the motion of the
5  image to the swipe, that it would be a
6  movement of the image while I swipe,
7  obviously the outcome of that, that it is
8  moving while I swipe, that's obviously
9  predictable.  It is code.
10     Q.   Actually, do you have the --
11  Dr. Plaisant's paper in front of you?
12     A.   No, I don't believe so.
13         MR. PAK:  This would be
14     Exhibit 8.
15         (Whereupon, the 1990 paper by
16     Plaisant and Wallace was marked as
17     Exhibit 8 for identification as of
18     this date by the Reporter.)
19         MR. PAK:  And I will also
20     introduce my next exhibit, which is
21     Exhibit 9.
22         (Whereupon, a document, Bates
23     stamped 667-668, was marked as Exhibit
24     9 for identification as of this date
25     by the Reporter.)

Page 172

1      Q.   Sir, I have handed you two
2  exhibits.  Exhibit 8 is an 1990 paper by
3  Dr. Plaisant and Danielle Wallace, and that's
4  Katherine Plaisant, P-L-A-I-S-A-N-T.
5          And I have also handed you
6  Exhibit 9, which is a 1992 paper titled
7  "Touchscreen Toggle Design" by the same two
8  authors.
9          Do you have that in front of you?
10     A.   Yes, I do.
11     Q.   First of all, have you considered
12  Exhibit 8 prior to this deposition?
13     A.   I don't believe I have seen
14  Exhibit 8.
15     Q.   So this is your first time seeing
16  it?
17     A.   I believe so.
18     Q.   How about Exhibit 9?
19     A.   I have seen Exhibit 9.
20     Q.   In reviewing the prosecution
21  history, did you come across Exhibit 8?
22     A.   I don't believe so, no.
23     Q.   Can you just confirm for me by
24  looking at the references cited section that
25  Exhibit 8 is not cited as prior art in the

Page 173

1  '721 patent?
2      A.   So what -- this is a technical
3  report; is that correct?
4      Q.   Correct.
5      A.   So it is not a patent.  So it
6  would not be in this patent list.
7      Q.   Correct.
8      A.   This is not in alphabetical
9  order, so I have to go through it.  Just
10  looking at page 2 and 3 of the patent, I only
11  see the Exhibit 9 cite.
12     Q.   You did consider Exhibit 9 in
13  preparation of your Declaration in this case?
14     A.   I looked at number 9, but not
15  Exhibit 8.
16     Q.   Looking at 9, Exhibit 9, sir, you
17  would agree with me that the Plaisant paper
18  discloses a touchscreen display, correct?
19     A.   A touchscreen display, yes,
20  absolutely.
21     Q.   You would also agree with me,
22  sir, that the Plaisant article describes,
23  quote, the touchscreen used returns a
24  continuous flow of coordinates, allowing the
25  dragging of objects, the identification of

Highly Confidential - Attorneys' Eyes Only

Page 198

1  inadvertent touches or gestures on the screen
2  by using the slider mechanism?
3      A.   I just want to make sure that it
4  was the slider she was referring to.  Because
5  I believe she also talked about the concept
6  with regards to the rocker switch.  So if we
7  have to replay that, it might be a good idea.
8  Just replay that little section.
9      Q.   Sure.
10     A.   Or you can represent to me that
11 that's what was in the video.
12     Q.   Well, let me see if I can just
13 address it by my question.
14     A.   Okay.
15     Q.   You would agree with me in her
16 video, Dr. Plaisant discusses the avoidance
17 of inadvertent touches or gestures through
18 the use of either a slider or a rocker
19 mechanism?
20     A.   Yes.
21     Q.   The other thing that you saw in
22 the video that you can't tell easily from the
23 paper, according to you, was the actual
24 movement of the toggles as the user uses the
25 toggle; you saw the movement, correct?

Page 199

1      A.   That's correct.
2      Q.   You would agree with me that the
3  movement of the toggle was continuous as a
4  user interacts with the various toggles?
5          MR. LYON:  Objection; vague.
6      A.   For the slider toggle, that was
7  very hard to see.  It may well have been
8  doing what the paper is suggesting it was
9  doing, which is a three-step animation.  It
10 was a pretty small toggle.  It was hard to
11 tell whether it was completely continuous as
12 it was stepping through.  The person moved
13 pretty fast.
14         If the paper is describing what's
15 in the video, then I would assume it is a
16 three-step animation as opposed to continuous
17 animation.
18     Q.   How many steps -- let me step
19 back.
20         When you say a three-step
21 animation is not continuous, what do you mean
22 by that?
23     A.   It seems to discretize the
24 motion, and I would assume the first step is
25 on the left side, and the last step, the

Page 200

1  third step is in the right side, and the
2  middle step, the second step is in the
3  middle.
4          For a very small toggle like
5  that, it is hard to tell just from the video
6  whether that is actually happening.  The
7  paper seems to say explicitly that's what is
8  happening.
9      Q.   But you would at least agree with
10 me, with respect to the rocker toggle, the
11 movement was continuous?
12         MR. LYON:  Objection, vague.
13     A.   The rocker toggle, yes.  But it's
14 a very different type of movement from the
15 sliding.  It is pivoting about a particular
16 axis.
17     Q.   You would also agree with me that
18 the lever toggle was also continuous in
19 movement?
20         MR. LYON:  Objection.
21     A.   Just from looking at the video,
22 it is hard to tell.  It is happening pretty
23 fast, and in that case the paper doesn't
24 provide any additional clarification on like
25 the slider -- the slider toggle.

Page 201

1      Q.   Let's see if we can replay the
2  video for this section dealing with the
3  actual movement, and I would like to have you
4  take a closer look.
5          (Whereupon, the video was
6  played.)
7      Q.   So, Doctor, having taken a second
8  closer look at the movement of these toggles,
9  let's see if we can run through the questions
10 again.
11         With respect to the rocker
12 toggle, would you agree the movement is
13 continuous as the user interacts with that
14 toggle?
15     A.   It seemed continuous in that when
16 the user moved from one side to the other
17 side, that it flipped.  Now, there was no --
18 in the video, it did not show the user
19 hovering in the middle, for example.  So it
20 is hard to tell if it is truly continuous,
21 and if it's purely what's happening.
22     Q.   And with respect to the slider
23 toggle, would you agree with me the movement
24 was also continuous with respect to that
25 toggle?

Highly Confidential - Attorneys' Eyes Only

Page 202

1  A.   Actually, I would not agree with
2  that.  The second time I looked at it much
3  more closely, and I saw a snap to the middle
4  and then to the end.  Again, it was very
5  fast, but I was looking for that snap, and it
6  seemed to be snapping in the middle of that.
7  So it seems to be three discrete stages.
8  Q.   You would consider that to be not
9  continuous?
10  A.   That's right.  It is visible as
11  three separate stages.
12  Q.   So a movement that has stages,
13  discrete stages, in terms of the visual
14  output, you would not consider to be
15  continuous?
16  A.   I believe that's not what the
17  patent is contemplating when it says
18  continuous.
19  Q.   Doctor, what about the last
20  example of the lever toggle; would you
21  consider that movement to be continuous as
22  shown in the video?
23  A.   Sorry, I was distracted by the
24  sign over there.
25      The animation as I saw in the

Page 203

1  video seemed to be continuous.  I -- again,
2  it is really hard to tell without analyzing
3  it more closely.
4  Q.   It would be helpful to see the
5  source code?
6  A.   The source code would be useful,
7  or the video maybe played back in slow --
8  slower frame.
9  Q.   By the way, Doctor, in assessing
10  infringement of the '721 claims, the claim
11  seven and claim 12, is source code analysis
12  required?
13  A.   I think if I am looking at the
14  phone itself, I think it is very clear it
15  matches up to the claim.  But I did look at
16  the source code as well.
17  Q.   So it was helpful but not
18  necessary to make the determination of
19  infringement?
20  A.   Not absolutely necessary, given
21  it's pretty obvious from just using the
22  phone.
23  Q.   So it's fair to say you can take
24  a look at a device based on the visual
25  output, and sufficient information was

Page 204

1  provided to make a determination of
2  infringement of claim seven and claim 12 of
3  the '721 patent without looking at the source
4  code?
5  A.   In this particular instance, yes,
6  because the device very clearly matches up.
7  Should the animation have been choppy, for
8  example, like in the Plaisant video, then I
9  think the source code analysis would have
10  been an absolute necessity.
11  Q.   I want to look at claim seven and
12  claim 12, and please keep the Plaisant
13  article in front of you.
14      I want to ask a specific
15  question, which is, would you agree with me
16  that the Plaisant article discloses an image
17  which is moved from a predefined location on
18  the touchscreen to another predefined region
19  in order to change the state of the device?
20  A.   It did move an image from one
21  location to another location in order to
22  change some -- the state of some device, but
23  not necessarily a portable electronic device
24  comprising all these things that the claim
25  requires.

Page 205

1  Q.   And sir, if we look at the bottom
2  of figure two --
3  A.   Of?
4  Q.   -- in the touchscreen toggle
5  design paper, Exhibit 9, would you agree with
6  me that the rocker toggle is one way in which
7  an image can be moved from a first predefined
8  location to a second predefined location on a
9  touchscreen device to change the state of
10  that device?
11  A.   When you say the rocker, the
12  middle one on the right-hand side?
13  Q.   Correct.
14  A.   I don't think it quite meets up
15  the continuously move the unlock image.
16  Because, for example, it could press down the
17  right-hand side, where it says off, and right
18  at the tip of that, press down, and my motion
19  will be a downward press, and it would
20  still -- it would toggle, and that would not
21  meet the moving of the unlock image in
22  accordance with the movement of the detected
23  content.  So not getting the continuous
24  sliding motion.
25      So I think there are differences

Highly Confidential - Attorneys' Eyes Only

Page 222

1     Q.    You didn't call her up as you saw
2  her work being cited in the '721 patent?
3     A.    No.
4     Q.    Do you think it would be helpful
5  to talk to her about her work in
6  understanding what she was doing at the time?
7     A.    It might be --
8        MR. LYON:  Objection.  Calls for
9     speculation.
10     A.    I am not sure if I am even
11  allowed to do that, now that these things are
12  prior art.  I need legal advice as to what
13  was allowed and not allowed.
14     Q.    I am just saying, as an expert in
15  this investigation, do you think her
16  testimony about what she did with respect to
17  her toggle switch work would be relevant to
18  your analysis?
19        MR. LYON:  Objections.  Calls
20     for a legal conclusion.  Calls for
21     speculation.
22     Q.    With regard to the validity of
23  the '721 patent?
24        MR. LYON:  Same objections.
25     A.    I am not, actually not sure it

Page 223

1  would be, because her testimony would now be
2  20, 20-something years post the publication.
3  So there's a lot of hindsight.  And I think a
4  lot of people invent things and then assume
5  that it would apply to all kinds of future
6  things.
7        In hindsight, she might think it
8  is relevant to the '721.  But I don't think
9  she would be able to say with certainty
10  whether in 1992 that they contemplated doing
11  a portable phone that way.  Maybe she has
12  documents to that which could be produced.
13     Q.    Sir --
14     A.    I am not sure it is all that
15  necessarily relevant.
16     Q.    Sir, you do understand that the
17  relevant time period for assessing the
18  validity of the '721 patent is 2005?
19     A.    Yes, of course.  But the article
20  is in 1992.
21     Q.    You also understand as an expert
22  that you are to consider all relevant prior
23  art leading up to the priority date of the
24  patent?
25     A.    Yes.

Page 224

1     Q.    You also understand it is
2  possible to combine prior art references from
3  different time periods to assess whether a
4  particular patent claim is valid or not?
5        MR. LYON:  Objection.  Lacks
6     foundation.
7     Q.    Fair?
8     A.    For obviousness, yes.  But not
9  anticipation.
10     Q.    In fact, in prior cases, you have
11  done a similar analysis of different prior
12  art references from different time periods to
13  form opinions that a particular patent claim
14  was invalid?
15     A.    Due to obviousness, yes.
16     Q.    In fact, you did that in the Elan
17  litigation, correct?
18     A.    Probably did, but I have to
19  double-check.  It's been a while since I
20  wrote that report.
21     Q.    You recall providing invalidity
22  opinions in that case, correct?
23     A.    Yes.
24     Q.    Sitting here today, do you have
25  any reason to disavow the opinions and

Page 225

1  analysis that you set forth in the Elan
2  litigation?
3     A.    No.  Not at all.
4     Q.    How about in any of your other
5  prior cases?
6     A.    No.
7     Q.    In the claims of the '721 patent,
8  there is the phrase "in accordance with."  Do
9  you see that?
10     A.    Yes.
11     Q.    What does that phrase mean to
12  you?
13     A.    In the context of this patent,
14  the claims and the spec, it would be where
15  the movement tracks -- the movement of the
16  image would track the movement of the -- of
17  the detected content.
18     Q.    Do you believe that a fling
19  animation for unlocking a device would be
20  covered by claim seven and 12 of the '721
21  patent?
22        MR. LYON:  Objection.  Vague and
23     incomplete hypothetical.
24     A.    So you are saying just -- are you
25  talking about a particular limitation or the

Highly Confidential - Attorneys' Eyes Only

Page 226

1  whole claim?
2      Q.   Talking about the whole claim,
3  and with the understanding that in order to
4  practice the claim, you have to meet each and
5  every limitation.
6      MR. LYON:  Same objections.
7      A.   So if I -- in the hypothetical,
8  if I flung, if I picked up the -- if I
9  touched the unlock image and flung it to the
10 predefined unlock region, it would not
11 necessarily meet this -- I guess the
12 second-to-last limitation of claim seven,
13 which says, "in accordance with movement of
14 the detected contact while continuous contact
15 with the touch-sensitive display is
16 maintained."
17     So the part -- if the image
18 continues to move and there's no longer
19 continuous contact with the touch-sensitive
20 display, then that part would not be met,
21 so -- but if I had -- if the image continued
22 to move and my finger remained down, some
23 other implementation of the fling, that might
24 well still meet the claim foundation.
25     Q.   How about claim 12?

Page 227

1      MR. LYON:  Same objections.
2      A.   That would be the same answer.
3      Q.   I will give you a more specific
4  scenario.  If I had a device where the user
5  first dragged the unlock image for a short
6  distance, but then flung that image towards a
7  predefined unlock region on that device
8  touchscreen, do you believe that such a
9  device would satisfy claim seven and 12 of
10 the '721 patent?
11     MR. LYON:  Same objections.
12     A.   I have already answered that, and
13 the answer is, to meet the claim, you would
14 have to have this continuous contact.
15     Q.   That continuous contact -- go
16 ahead.
17     A.   Sorry, I am just thinking through
18 this thing here.
19     As long as the continuous contact
20 is maintained until the image is moved to the
21 predefined unlock region, that could still
22 meet the claim.  If the image continued to
23 move after that, it doesn't really matter.
24     Q.   But if the continuous contact was
25 not maintained all the way to the point where

Page 228

1  the image reaches the predefined unlock
2  region, such a device would not meet the
3  limitations of claim seven and 12, fair?
4      MR. LYON:  Same objections.
5      A.   Reading this again, I just want
6  to be careful, because I haven't done that
7  level of contortion on the language.  It says
8  here, "to continuously move the unlock image
9  of the touch-sensitive display in accordance
10 with movement of the detected contact while
11 continuous contact with the touch-sensitive
12 display is maintained."
13     So as long as I have maintained
14 contact and moved the unlock image in
15 accordance with that.  In many ways, it is
16 silent about what happens when I lift my
17 finger, so it may well be if you study this
18 carefully, should the image continue to move,
19 it would not necessarily not meet the claims.
20     Q.   What do you -- what is your
21 understanding of the word "continuous" --
22     MR. LYON:  Objection.
23     Q.   -- movement in the context of the
24 finger?
25     MR. LYON:  Objection.  Asked and

Page 229

1  answered.
2      A.   To move it continuously.  To move
3  it not in a discrete fashion.
4      Q.   And what is your understanding of
5  while in the context of that?
6      A.   The movement occurs as long as I
7  have continuous contact with the display.
8      Q.   Besides the Samsung Nexus phone,
9  have you studied other phones with respect to
10 the '721 patent?
11     A.   I don't believe I have
12 specifically.
13     Q.   Now, if you can bring out the
14 '721 patent, and also, I believe there is an
15 earlier '864.
16     A.   '849?
17     Q.   849.
18     A.   What do you want me to do?
19     Q.   If you can bring those two
20 patents out.
21     A.   I have them here.
22     Q.   You understand that these two
23 patents are related?
24     A.   That's right.  I believe the '849
25 is the earlier incarnation of the patent, of

Highly Confidential - Attorneys' Eyes Only

Page 234

1 are asking?
2   Q.   Do you see that?
3   A.   Of the '849?
4   Q.   '849.
5   A.   Sorry.
6        MR. LYON:  Objection.  Lacks
7 foundation.
8   A.   Just from looking at the claim
9 language alone, I haven't contrasted it with
10 all of the spec of the '849, it says an
11 electronic device.  It doesn't explicitly say
12 handheld in claim one of the '849, or the
13 claim language.
14   Q.   The other claims, for example,
15 claim 12, that requires a portable electronic
16 device, correct?
17   A.   In the '849?
18   Q.   Yes.
19   A.   Yes, in the claim language.
20   Q.   Thank you.
21        So looking at claim one of the
22 '849 patent, since the claim language is not
23 limited to a portable electronic device, you
24 would agree with me other types of electronic
25 devices could practice claim one?

Page 235

1        MR. LYON:  Objection.  Lacks
2 foundation.
3   A.   Just by reading the claim
4 language, that appears to be the case, yes.
5   Q.   And you understand that the '849
6 patent shares the same specification or
7 substantially the same specification as the
8 '721?
9   A.   I haven't done a word-for-word
10 comparison, but "substantially" is a
11 reasonable characterization.
12   Q.   You understand that the '721 is a
13 continuation application of the '849 patent?
14   A.   I am not sure what the legal
15 definition is, but I believe, yes, it
16 continues.
17   Q.   Do you believe that the
18 specification of the '721 and the '849
19 patents discuss the idea of using this unlock
20 sliding gesture on devices other than
21 portable electronic devices?
22        MR. LYON:  Objection.  Vague.
23   A.   I have to go through the '721
24 carefully to answer that question.  In
25 general, I believe it contemplates an

Page 236

1 electronic device in general.  For example,
2 the abstract says a device, it doesn't say
3 necessarily a portable electronic device.
4   Q.   Do you recall opining in other
5 cases that it would have been obvious to one
6 of ordinary skill in the art to take
7 teachings about gestures in the context -- in
8 the context of touch table systems and apply
9 it to understand the validity of claims in
10 the context of portable devices?
11   A.   I don't recall the specifics.
12 But in general terms, I probably have done
13 that, yes.
14   Q.   And do you recall stating that
15 one of ordinary skill in the art, generally,
16 in the 2003 to 2007 time period, would have
17 considered prior art in the area of
18 non-portable devices in understanding the
19 validity of patent claims directed towards
20 portable devices with respect to gestures?
21        MR. LYON:  Objection.  Vague.
22   A.   So the question is whether I have
23 opined that that is a relevant prior art?  I
24 think the answer is yes.
25   Q.   And you stand by that opinion?

Page 237

1   A.   Yes.
2   Q.   Sitting here today, do you have
3 any reason to challenge the combination of
4 Plaisant's paper and video with the Neonode
5 manual and video for purposes of determining
6 the validity of the '721 patent?
7        MR. LYON:  Counsel, I am going,
8 again, to make an objection, because
9 this again goes exactly to the
10 interrogatory we asked Samsung.  You
11 clearly had this combination in mind,
12 and you're now asking him to opine on
13 something that you refused to provide
14 to us as part of discovery.
15        And so, that is not appropriate
16 and you're taking -- this is total
17 gamesmanship at this point.
18        I object to lack of foundation.
19 He hasn't had time to consider this
20 until just today when you presented it
21 to him.  That's not sufficient.
22        MR. PAK:  Objection noted.
23        I will also note on the record
24 that Dr. Balakrishnan specifically
25 stated on the record that he did

Highly Confidential - Attorneys' Eyes Only

Page 238

1    consider the Neonode device manual and
2    Dr. Plaisant's paper in forming his
3    validity opinions stated in his
4    Declaration.
5          But I understand your objection.
6    Q.    So with that, I want to
7    understand from you, sitting here today,
8    whether you have any basis to challenge the
9    combination of Dr. Plaisant's work and the
10   Neonode device in assessing the validity of
11   the '721 patent claims?
12   A.    So I would really have to think
13   about that more carefully, because I had not
14   looked at the video of the Neonode or the
15   video of Dr. Plaisant's toggle switch work
16   prior to arriving at this deposition.
17         And I think that informs somewhat
18   these two references that I did consider,
19   which is the published article and the
20   Neonode user guide.  So I don't think I can
21   answer that with any level of certainty just
22   sitting here without giving it considerable
23   extra thought.
24   Q.    Fair to say that the video has
25   added some additional content for you to

Page 239

1    consider with respect to these two prior
2    references?
3    A.    I think they illuminated the two
4    prior art references, yes.
5    Q.    Beyond what is stated in the
6    manual and the paper alone?
7          MR. LYON:  Objection.  Vague.
8    A.    I am not sure it is beyond.  But
9    certainly provided clarifications and
10   illuminations.
11   Q.    We discussed at least a few
12   points where you were not clear on a
13   particular issue based on reading the paper
14   alone, yet it became clearer to you after you
15   saw the video?
16   A.    Yes, we have already gone through
17   that.
18   Q.    How much work did you do in
19   forming your validity opinions set forth in
20   your Declaration?
21         MR. LYON:  Objection.  Asked and
22   answered.
23   A.    I don't know how to quantify
24   that.  Certainly looked at the patent.
25   Looked at the prior art we already talked

Page 240

1    about.  And given the presumption of
2    validity, there were no assertions of
3    invalidity that I was aware of provided by
4    Samsung or another expert to rebut per se.
5          So I haven't considered all the
6    possible invalidity assertions that might
7    come up, some of which I think you have
8    asserted here today.  So I haven't had that
9    chance to do a thorough validity analysis in
10   rebuttal.
11   Q.    That's fair.  That's really what
12   I am getting at.  Because I did notice a
13   paragraph or two about your validity opinions
14   in your Declaration.  But I think the record
15   is clear that you have not done a thorough
16   investigation on that issue at this point.
17         MR. LYON:  Objection.  Vague.
18   Mischaracterizes the testimony.
19   A.    I have not done the full-blown
20   investigation, and I reserve the right to do
21   that in response to assertions made by
22   Samsung.
23   Q.    Dr. Balakrishnan, have you
24   considered any other declarations of other
25   witnesses in the context of this PI motion

Page 241

1    besides your own Declaration?
2    A.    For this particular case?  I
3    don't think so.
4    Q.    Did you speak to any Apple
5    employees with respect to the preliminary
6    injunction motion?  And I am setting aside
7    any privileged communications that you may
8    have had with counsel.  In-house counsel as
9    well.
10         MR. LYON:  To the extent you
11   spoke with any technical engineers or
12   anything like that, I think that's
13   what he is asking for.
14   A.    Not in relation to this
15   particular case, no.  I have spoken with
16   other engineers in relation to other
17   Apple-Samsung matters that I'm also involved
18   in.
19   Q.    Fair to say that you're not
20   relying on any discussions with technical or
21   marketing employees of Apple as a basis for
22   your opinions in this preliminary injunction
23   issue?
24   A.    That is correct.
25   Q.    Have you been provided with any

Highly Confidential - Attorneys' Eyes Only

Page 242

1    marketing materials relating to the subject
2    matter of the '721 patent from Apple?
3        A.   The reason I am pausing is
4    because I am involved in some of the other
5    cases where such material has been provided.
6    But I don't believe it's been provided in
7    this case.
8        Q.   Again, I know you are involved in
9    quite a few lawsuits.  So just to be clear on
10   the record, when I am asking these questions,
11   I am asking them with the purpose of this
12   preliminary injunction motion in mind.
13       A.   The reason I am pausing is
14   because I am seeing lots of documents in a
15   lot of cases.  I want to be clear in my own
16   mind what I have seen.
17       Q.   You haven't seen any usability
18   studies from Apple regarding the specific
19   unlocking gesture described in the '721
20   patent, correct?
21       A.   That's correct.
22       Q.   Have you seen any analysis on
23   whether changing the unlocking gesture would
24   have any impact on the sales of the iPhone?
25       A.   I am not sure I have seen

Page 243

1    analysis in the way I would define a thorough
2    analysis, but I think I have seen web
3    postings and so forth, and we have talked
4    about different features of the interface of
5    the iPhone, and I believe the toggle has been
6    mentioned as part of that overall suite of
7    what makes the iPhone interface great.  So
8    I've definitely seen that.
9        Q.   My question is different.  My
10   question is, have you seen any analysis on
11   whether changing the unlocking gesture would
12   have any impact on the sales of the iPhone?
13       A.   I have not seen such specific
14   analysis, no.
15       Q.   Have you formed any opinions on
16   whether changing the unlocking gesture would
17   have any impact on the sales of the iPhone?
18       A.   In general, I would say that is
19   one part.  The unlock, slide to unlock
20   feature is one part of the overall iPhone
21   user experience.  I think if you change that,
22   you would probably see some degradation of
23   the user experience, and my understanding is
24   the user experience is a large part of why
25   people like the iPhone.  So therefore, it

Page 244

1    could impact sales.
2        Q.   Have you done a detailed analysis
3    on that issue other than the general comments
4    you have provided?
5        A.   I have not done a detailed
6    analysis.
7        Q.   For example, have you researched
8    the issue of whether not moving an unlock
9    image would have a material impact on the
10   sales of the iPhone?
11       A.   I have not done a detailed
12   analysis on that particular issue.
13       Q.   Have you analyzed the impact of
14   providing other types of visual feedback to
15   the user other than moving the unlock image,
16   would have a material impact on the sales of
17   the iPhone?
18       A.   I have not done that analysis.
19   But beyond, again, my general statement that
20   I think this is one part of the overall good
21   user experience that the iPhone provides.
22       Q.   Have you analyzed the impact of
23   providing motion that is not continuous with
24   respect to the unlock image --
25       A.   With the unlock -- I'm sorry.

Page 245

1        Q.   Unlock image on the sales of the
2    iPhone?
3        A.   Not that specific issue, no.
4        Q.   In fact, it is fair to say you
5    have not analyzed all the potentially
6    non-infringing designs to determine whether
7    those designs would be commercially
8    acceptable or not?
9            MR. LYON:  Objection.  Vague.
10   Lacks foundation.
11       A.   I have not analyzed all the
12   potentially non-infringing designs.
13       Q.   You don't have any opinions on
14   that issue sitting here today?
15       A.   Not right now, because I haven't
16   done that analysis.  Beyond my general
17   statement, again, of the overall usability of
18   the iPhone, the unlock, slide to unlock being
19   part of that overall suite.
20       Q.   Have you done any analysis of the
21   impact of the specific unlocking mechanism
22   used in the Samsung Galaxy Nexus phone on the
23   sales of that phone?
24       A.   Not on the sales.
25       Q.   Do you have any opinions in that

Highly Confidential - Attorneys' Eyes Only

Page 274

1
2      Q.   Thank you for your time, Doctor.
3      A.   Thank you.
4          MR. LYON:  Thank you.
5          THE VIDEOGRAPHER:  The time is
6    5:37; we are going off the record.
7          (Whereupon, at 5:37 p.m., the
8    Examination of this Witness was
9    concluded.)
10
11
12    _____
         RAVIN BALAKRISHNAN
13
      Subscribed and sworn to before me
14    this _____ day of _____, 2012.
15    _____
         NOTARY PUBLIC
16
17
18
19
20
21
22
23
24
25

Page 275

1              E X H I B I T S
2
3    DEFENDANT'S EXHIBITS:
4
5    EXHIBIT   EXHIBIT                PAGE
6    NUMBER     DESCRIPTION
7
8    Exhibit 1  Dr. Balakrishnan's CV      6
9    Exhibit 2  '721 patent          22
10   Exhibit 3  '849 patent          23
11   Exhibit 4  European Patent        38
12      EP 1964022 B1
13   Exhibit 5  Declaration of        41
14      Dr. Balakrishnan
15   Exhibit 6  Neonode N1 Guide      154
16   Exhibit 7  Video of Neonode      161
17   Exhibit 8  1990 paper by Plaisant and  171
18      Wallace
19   Exhibit 9  Document with Bates 667-668  171
20   Exhibit 10  Plaisant video      197
21   Exhibit 11  Article entitled "Multi-  256
22      Finger and Whole Hand
23      Gestural Interaction
24      Techniques for Multi-User
25      Table-Top Displays"

Page 276

1
2
3    EXHIBIT   EXHIBIT            PAGE
4    NUMBER     DESCRIPTION
5
6    Exhibit 12  Article entitled "The    257
7      PadMouse:  Facilitating
8      Selection and Spatial
9      Positioning for the
10      Non-Dominant Hand"
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 277

1              I N D E X
2
3    EXAMINATION BY            PAGE
4
5    MR. KANG          5
6    MR. PAK          45
7
8
9
10
11    INFORMATION AND/OR DOCUMENTS REQUESTED
12
13    INFORMATION AND/OR DOCUMENTS    PAGE
14
15       (None)
16
17
18
19    QUESTIONS MARKED FOR RULINGS
20
21       PAGE    LINE
22       (None)
23
24
25

Highly Confidential - Attorneys' Eyes Only

Page  278

<pre>
 1                C E R T I F I C A T E

 2

 3     STATE OF NEW YORK        )
                          :  SS.:
 4     COUNTY OF NASSAU         )

 5

 6          I, REBECCA SCHAUMLOFFEL, a Notary

 7     Public for and within the State of New York,

 8     do hereby certify:

 9          That the witness whose examination

10     is hereinbefore set forth was duly sworn and

11     that such examination is a true record of the

12     testimony given by that witness.

13          I further certify that I am not

14     related to any of the parties to this action

15     by blood or by marriage and that I am in no

16     way interested in the outcome of this matter.

17          IN WITNESS WHEREOF, I have hereunto

18     set my hand this 6th day of April, 2012.

19     _____

20          REBECCA SCHAUMLOFFEL

21

22

23

24

25
</pre>

# EXHIBIT G
# FILED UNDER SEAL

# EXHIBIT H
# FILED UNDER SEAL

# EXHIBIT I

# FILED UNDER SEAL

# EXHIBIT J
# FILED UNDER SEAL

# EXHIBIT K
# FILED UNDER SEAL

# EXHIBIT L

# FILED UNDER SEAL

# EXHIBIT M
# FILED UNDER SEAL

# EXHIBIT N

Page 1

1   NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

2           CASE NO. 12-CV-00630-LHK

3   ----------------------------------------)

    APPLE INC., a California corporation,    )

4                                            )

                    Plaintiff,               )

5                                            )

            vs.                              )

6                                            )

    SAMSUNG ELECTRONICS CO., LTD., a         )

7   Korean business entity; SAMSUNG          )

    ELECTRONICS AMERICA, INC., a New         )

8   York corporation; SAMSUNG                )

    TELECOMMUNICATIONS AMERICA, LLC, a       )

9   Delaware limited liability company,      )

                                             )

10                  Defendants.              )

    ----------------------------------------)

11

12

13

14      VIDEOTAPED DEPOSITION OF TODD MOWRY

15             New York, New York

16              April 4, 2012

17

18

19

20

21  Reported by:

22  KATHY S. KLEPFER, RMR, RPR, CRR, CLR

23  JOB NO. 47972

24

25

Page 2

1       April 4, 2012
2
3       VIDEOTAPED deposition of TODD
4   MOWRY, held at Quinn Emanuel Urquhart &
5   Sullivan, LLP, 51 Madison Avenue, New York,
6   New York, before Kathy S. Klepfer, a Registered
7   Professional Reporter, Registered Merit
8   Reporter, Certified Realtime Reporter,
9   Certified Livenote Reporter, and Notary
10  Public of the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              A P P E A R A N C E S :
2
3   GIBSON DUNN & CRUTCHER
4   Attorneys for Plaintiff
5       2100 McKinney Avenue
6       Dallas, Texas  75201
7   BY:  MARK REITER, ESQ.
8       ROBERT A. VINCENT, ESQ.
9
10  QUINN EMANUEL URQUHART & SULLIVAN
11  Attorneys for Defendants
12      51 Madison Avenue
13      New York, New York  10010
14  BY:  ANASTASIA M. FERNANDS, ESQ.
15
16
17  ALSO PRESENT:
18      MICHAEL PINEIRO, Videographer
19
20
21
22
23
24
25

Page 4

1
2       IT IS HEREBY STIPULATED AND
3   AGREED, by and between the attorneys for
4   the respective parties herein, that the
5   filing and sealing be and the same are
6   hereby waived.
7       IT IS FURTHER STIPULATED AND
8   AGREED that all objections, except as to
9   the form of the question, shall be
10  reserved to the time of the trial.
11      IT IS FURTHER STIPULATED AND
12  AGREED that the within deposition may be
13  sworn to and signed before any officer
14  authorized to administer an oath, with
15  the same force and effect as if signed
16  and sworn to before the Court.
17
18
19
20
21
22
23
24
25

Page 5

1       THE VIDEOGRAPHER:  This is the start
2   of tape labeled number 1 in the videotaped
3   deposition of Dr. Todd Mowry in the matter
4   Apple, Inc. versus Samsung Electronics
5   Company Limited.
6       Today is April 4, 2012.  The time is
7   approximately 10:08 A.M.  Appearances have
8   already been noted by the court reporter.
9       Will the court reporter please swear
10  in the witness.
11          * * *
12      (Witness sworn.)
13      MS. FERNANDS:  Before we start, I
14  would like to state on the record that a
15  colleague and partner at this firm, Rich
16  Erwine, had requested to sit in on this
17  deposition which is based on a publicly
18  filed declaration and was told -- we were
19  told by counsel for Apple that they would
20  leave with the witness if Mr. Erwine stayed,
21  so Mr. Erwine has left.
22      MR. REITER:  And in response to that,
23  I want the record to be clear that Mr.
24  Erwine is a -- is counsel for Motorola, not
25  counsel for Samsung.  I asked Mr. Erwine if

Page 70

1   for performing the action, including the action
2   processor, the existence of the action processor
3   and the fact that it has to perform the action
4   on the detected structure.
5          So there are some important mechanisms
6   along the way that are needed in order for it to
7   be considered to be proper associating in the
8   context of the '647 patent. If those mechanisms
9   didn't exist, then it would not necessarily be
10  proper linking in the context of a patent.
11     Q.   What are those important mechanisms?
12     A.   There has to be an action processor
13  and it has to operate on the detected structure.
14     Q.   And if there are both an action
15  processor and the -- I'm sorry, when you say "it
16  has to operate on the detected structure,"
17  that's the action processor?
18     A.   The action processor, yes, that's
19  right.
20     Q.   If there's an action processor that
21  operates on the detected structure in my
22  scenario, is it then linked, in your opinion,
23  for purposes of the '647 patent?
24     A.   I think that's oversimplifying things.
25  There's a -- the description of the user

Page 71

1   interface presents a description of a candidate
2   action and there has to be a complete mechanism
3   in place such that that is what will occur, and
4   included in that is exercising the action
5   processor with the detected structure.
6      Q.   Let's go back to the term "specified
7   connection." I believe you said that -- is it
8   the case that you believe "specified connection"
9   is no different than "associating" for purposes
10  of the claimed construction from the Northern
11  District of Illinois?
12     A.   In my own mind, I think that
13  associating and a specified connection can mean
14  the same thing. It's my opinion that they
15  can -- that there's -- they're not necessarily
16  incompatible.
17     Q.   Do they necessarily mean the same
18  thing?
19     A.   I don't know what Motorola has in mind
20  exactly when they chose those terms, so I -- I
21  don't know whether it's the same as associating
22  or not, in their opinion.
23     Q.   If a specified connection is no
24  different than associating, why do you disagree
25  with the claim construction for linking actions

Page 72

1   to the detected structure that Motorola
2   proposed?
3      A.   I think that "associating" is a better
4   term. It's a term that's used in the patent
5   itself.
6      Q.   And we've discussed that it doesn't --
7   that for a term to be appropriate for claim
8   construction, it doesn't necessarily have to
9   appear in the patent itself, correct?
10     A.   That's correct, but I think that
11  "associating" is -- is a good term to use. It,
12  in fact, it was used synonymously with "linking"
13  in the patent specification.
14     Q.   Outside of the context of the '647
15  patent, is "linking" synonymous with
16  "associating" in computer science?
17          MR. REITER: Objection. Vague.
18     A.   Speaking broadly, the terms "linking"
19  and "associating" can both mean many different
20  things. So I wouldn't say that for all people
21  they would be synonyms.
22     Q.   Is it your opinion that the patentees
23  in the '647 patent defined "linking" as
24  associating?
25     A.   It's my opinion that they used the

Page 73

1   words interchangeably in the patent
2   specification. They did not include a glossary
3   and say, for example, the definition of
4   "linking" is that it is associating, but they
5   used the words interchangeably. There are many
6   examples of that in the patent specification.
7      Q.   Now, for the construction of linking
8   actions to the detected structures from the
9   Northern District of Illinois, part of it is
10  creating a specified connection, then it says
11  "between each detected structure and at least
12  one computer subroutine. Do you see that?
13     A.   Yes.
14     Q.   And what is your understanding of --
15  "and at least one computer subroutine that
16  causes a CPU to perform a sequence of
17  operations," that's the action, correct?
18     A.   I just want to make sure that I caught
19  your entire question. The "at least one
20  computer subroutine that causes the CPU to
21  perform a sequence of operations on the detected
22  structures," that's the action, yes.
23     Q.   That's the action, okay. I was just
24  trying to come up with a way to make this
25  question shorter.

Page 78

1    only opining as to the Galaxy Nexus?
2        A.   That's what I wrote here in paragraph
3    21.  I mean, the analysis that I did would be
4    equally valid for another phone running the same
5    version of the software, but I have not -- I
6    have not provided analysis of other phones.
7        Q.   Can you describe for me what you did
8    for your infringement analysis of the Galaxy
9    Nexus?
10       A.   Yes.  I examined the phone itself.  I
11   operated various applications on the phone,
12   including the browser.  I also looked at the,
13   using the control panel, I inspected the phone
14   to see what version of the Android operating
15   system it was running and also which version of
16   applications it was running, including the
17   browser, and I also turned on the debug logging
18   feature and connected it to, through USB cable,
19   to my computer so that I could look at the
20   debugging traces of the phone to confirm that it
21   is running the standard open source version of
22   the browser application, and I analyzed the
23   browser software as well as the Android software
24   involved with the '647 patent and for that
25   specific version of Android and that specific

Page 79

1    version of the browser, and I confirmed that the
2    behavior that I observed with the user interface
3    of the phone with -- and with the debugging
4    logs, that that was consistent with the software
5    that I analyzed.
6        Q.   You said you used the "debug logging
7    feature to look at the debugging traces and in
8    order to confirm that the standard open source
9    version of the browser application was used"; is
10   that correct?
11       A.   I said that that was one of several
12   things that I did.  That's -- that was one of
13   the things, correct.
14       Q.   And how, by using the debugging
15   traces, how are you able to confirm that the
16   standard open source version is being used?
17       A.   Well, you can't do it with that alone.
18   You have to actually understand -- you have to
19   first have -- understand at a fairly deep level
20   how the code works, but what is included in
21   those logs is, when you turn on the verbose
22   logging mode, you see information about lots of
23   events that are occurring in the phone and many
24   of them include the full path of the software
25   that's executing.

Page 80

1        So, for example, you can see it -- the
2    phone launching an activity and it will tell you
3    the full path of the application that it's
4    launching so you can see, for example, that it's
5    launching the browser and you can see where the
6    browser is in the -- within the software
7    structure and you can see other actions that
8    happened while the browser is running, and based
9    on the context of understanding the open source
10   code and seeing the version number and watching
11   the logging, you can confirm that it's -- that
12   that's what you're seeing.
13       Q.   So on page 17 of your declaration?
14       A.   Yes.
15       Q.   Under the heading Infringement?
16       A.   Yes.
17       Q.   First, there's a subheading that
18   states, "The Web Browser On The Samsung Galaxy
19   Nexus Has Already Been Found to Infringe the
20   '647 Patent."  Do you see that?
21       A.   Yes, I see that.
22       Q.   What are you referring to as the Web
23   browser on the Samsung Galaxy Nexus?
24       A.   The Android system contains certain
25   stock or standard applications.  One of them is

Page 81

1    called browser, and that's what I'm referring
2    to.
3        Q.   And what version of the Android Web
4    browser do you believe is being run on the
5    Samsung Galaxy Nexus?
6        A.   The one that I looked at, it was 4.1,
7    Android 4.1, I believe.  I can look here to
8    refresh my memory on that, but that's my
9    recollection.
10       Q.   So this section with the heading that
11   the Web browser has already been found to
12   infringe, in this section you discuss the HTC
13   710 investigation, correct?
14       A.   Correct.
15       Q.   And you would agree that a different
16   version of Android was running on the HTC
17   accused devices than was running on the Galaxy
18   Nexus, correct?
19       A.   It is a different version, that's
20   correct.  So what I did, I had done a detailed
21   analysis of the HT -- the version of Android
22   running on the HTC phones, it's an earlier
23   version of Android, and I also did an identical
24   analysis on the Android 4.0 version of browser
25   and confirmed that, for the purposes of the '647

1  patent, that they were functionally the
2  identical.  The only change, as I recall, is
3  that there was a particular method that got
4  split apart into two parts where, in the new
5  version of the code, one of them calls the other
6  method, but functionally, it's the same.
7      Q.   The actual Web browser that's running
8  in the Samsung Galaxy Nexus was not in fact
9  found to infringe, was it?
10         MR. REITER:  Objection.  Vague.
11     A.   The --
12     Q.   The Version 4.0 Web browser that you
13  analyzed in connection with the Galaxy Nexus was
14  not found to infringe in the HTC investigation,
15  correct?
16     A.   The HTC investigation was looking at
17  the stock browser in Android for HTC phones.  It
18  was for an earlier version of Android, so that's
19  why I did the comparison to make sure that all
20  of the relevant parts with respect to my
21  infringement analysis were the same for the 4.0,
22  for the 4.0 version, which is running on the
23  Samsung phone.
24     Q.   I understand that you compared the
25  Android versions being run by HTC with the 4.0,

1  but the Android Version 4.0 that's being accused
2  in this cases was not actually found to infringe
3  in the HTC investigation, correct?
4          MR. REITER:  Objection.  Vague.
5      A.   The HTC investigation did not look at
6  Android 4.0, but the, from a functionality
7  perspective, the browser in Android 4.0 is
8  functionally the same as the browser that was in
9  the HTC case, based on my comparison.
10     Q.   There were -- only HTC devices were at
11  issue in the HTC investigation, right?
12     A.   Yes, that's correct.
13     Q.   And the only device at issue for
14  purposes of this current declaration is the
15  Samsung Galaxy Nexus, correct?
16     A.   That's correct.
17     Q.   Which is not an HTC device?
18     A.   That's correct.
19     Q.   So in paragraph 54 of your declaration
20  on page 18, you refer to stock Google Android
21  applications?
22     A.   Yes.
23     Q.   What do you mean by stock Android
24  applications?
25     A.   There are -- the open source

1  distribution of Android includes a number of
2  applications under the packages subdirectory.
3  There are more than a dozen of them, I believe,
4  and one of them is the browser.  So that's --
5  that's what I was referring to as these are the
6  open source applications as opposed to a
7  custom-built application.
8      Q.   And how do you know -- in the HTC
9  investigation, assuming that you won't be
10  disclosing any confidential information, was the
11  stock browser application at issue?
12     A.   Yes, it was.
13     Q.   Was it only what you refer to as the
14  stock browser application or were there other
15  elements that you analyzed in connection with
16  the '647 patent with respect to infringement?
17         MR. REITER:  In the HTC case or this?
18         MS. FERNANDS:  In the HTC case.
19     A.   Are you limiting your question to the
20  browser?  I'm not sure.
21     Q.   No, I'm not limiting my question to
22  the browser.  When you -- you opined in the HTC
23  case that HTC devices infringed the '647 patent,
24  correct?
25     A.   Yes, that's correct.

1      Q.   Was your opinion of infringement as to
2  HT -- with respect to HTC devices limited to the
3  browser functionality?
4      A.   No, it was not limited.  The browser
5  was not the only piece of functionality in that
6  investigation.
7      Q.   And were pieces of functionality that
8  were accused, without disclosing anything
9  confidential, were pieces of functionality that
10  were accused in HTC proprietary to HTC?
11     A.   I'm not a hundred percent sure whether
12  answering that question is consistent with the
13  confidentiality agreement in that case, but I --
14  I'm happy to answer it if it's not a problem.
15     Q.   I would defer to your counsel.  All
16  I'm looking for is a yes or no, whether it was
17  all based on public information or not.
18         MR. REITER:  Well, I wasn't involved
19  in that case.  I'm not under the Protective
20  Order in that case.  So I have no idea.
21         MS. FERNANDS:  Whether or not he can
22  even answer that question under the
23  Protective Order?
24         MR. REITER:  Yes.  Right.  Right.
25         MS. FERNANDS:  Okay.

Page 86

1      MR. REITER:  So it's probably safe,
2  I'm not instructing you not to answer, I'm
3  just saying to use your best judgment as to
4  whether or not you can or cannot.
5  BY MS. FERNANDS:
6      Q.   So let's go back to my -- your
7  analysis in HTC was not limited to the browser?
8      A.   That's correct, it was not -- it was
9  not limited to the browser.
10     Q.   Was your analysis in HTC limited to
11  the publicly available Google source code, the
12  open source?
13     A.   Again, I don't know -- I haven't
14  spoken to the attorneys involved with that case.
15  I'm not entirely sure whether answering that
16  question is consistent with the confidentiality
17  agreement with that case, but I -- if I could
18  get clarification on that, I -- I don't know
19  what the boundaries are for the confidential --
20  what I'm allowed to discuss with respect to that
21  case.
22     Q.   I don't either, not being involved in
23  it.  I can't -- I'm trying to ask questions that
24  I couldn't imagine running afoul of any
25  Confidentiality Order, but if you're not

Page 87

1  comfortable with them, then, you know, I
2  understand the position that you're taking.
3      A.   Well, I believe that a redacted
4  version of the minutes from the trial is
5  available, so to the extent that there's
6  information that's in the public version,
7  presumably that's within bounds, but I don't
8  know whether I can answer that question within
9  bounds of the Protective Order or not.
10     Q.   Okay.  Well, let's move on from that
11  and just address this -- perhaps at the lunch
12  break I'll see whether we can figure that out.
13     So in paragraph -- I've lost --
14     MR. REITER:  54.
15     Q.   54.  Thank you.
16     In paragraph 54, the last sentence of
17  your declaration, you state that "the
18  applications found to infringe previously are
19  identical in all relevant aspects to the version
20  of the Web browser application (Browser) found
21  in Android installed on the Galaxy Nexus."  Do
22  you see that?
23     A.   Yes.
24     Q.   And is it your opinion that with
25  respect to the browser information, that in the

Page 88

1  HTC accused devices and your analysis of the
2  Samsung Galaxy Nexus, that the -- that they're,
3  for all relevant aspects, they're identical?
4      A.   Yes, that's correct.  I think that's
5  what that sentence says, yes.
6      Q.   And HTC, your analysis of HTC -- and
7  it's in paragraph 55 if you need to be
8  reminded --
9      A.   Right.
10     Q.   -- is that running Android 2.1 or 2.2?
11     A.   Correct.
12     Q.   So, in your opinion, for with respect
13  to the browser, Android 2.1 and 2.2 is, in all
14  relevant aspects, nearly identical to Android
15  4.0?
16     A.   I went through -- yes.  I went through
17  the code line-by-line more or less through the
18  different -- all the relevant parts regarding
19  the '647 patent to confirm that they were
20  identical from -- in terms of infringement in
21  the '647 patent.
22     Q.   And in paragraph 56 you discuss this a
23  little further where you state that your
24  analysis of the Browser application running on
25  the Samsung Galaxy Nexus phone is virtually

Page 89

1  identical to your analysis in the ITC 710
2  investigation of the browser application running
3  on HTC"?
4      A.   Yes.
5      Q.   Do you see that?  And then, "because
6  the differences between the version of the
7  browser application in Android 4.0 (on the
8  Samsung Galaxy Nexus) and the version of the
9  browser on Android 2.1 and 2.2 (on the accused
10  HTC Android phone) are insignificant with
11  respect to the '647 patent," do you see that?
12     A.   Yes.
13     Q.   And it's your opinion that, for
14  purposes of your analysis for the '647 patent,
15  there is no substantial difference between 2.1
16  and 2.2 on the one hand and 4.0 that you
17  analyzed here?
18     A.   That's correct.  As I go on to say in
19  that paragraph, the onCreateContextMenu got
20  split apart and into two parts, although the
21  combination of these two new parts has the same
22  functionality as the original, and there was
23  some what we call refactoring, which just means
24  little tweaks and cleaning up things here and
25  there, but none of those changes affected the

1  analysis for -- with respect to infringement of
2  the '647 patent.  It changes some line numbers
3  and source code, but that's -- that's basically
4  it.
5      Q.   So, for purposes of your infringement
6  analysis, that the functionality in your opinion
7  of the 4.0 code that you reviewed was
8  essentially the same as the 2.2 and 2.1 code
9  that you had previously reviewed?
10     A.   Yes, that's correct.
11     Q.   And in fact, I think that if you look
12 at the very end of paragraph 56 on page 19, in
13 your parenthetical you refer to the Galaxy Nexus
14 phone as "running essentially the same browser
15 application on an updated version of Android."
16 Is that correct?
17     A.   Yes, that's right.
18     Q.   And for that reason, because of the
19 similarities with 2.1 and 2.2 which you had
20 previously analyzed in the ITC, it's one reason
21 you believed that the 4. -- that use of the 4.0
22 browser infringes; is that correct?
23     A.   The same -- well, the -- that's one of
24 the reasons, yes.  The same code analysis that I
25 had done, when updated appropriately given the

1  small amount of tweaking of the code, the code
2  analysis is the same, and applying appropriate
3  claim construction, that's -- I believe that the
4  infringement, my infringement opinions would
5  be -- are the same.  That was definitely part of
6  my analysis, yes.
7      Q.   Now, the claim construction in HTC is
8  the claim construction that we discussed earlier
9  that you have on page 11 of your report,
10 correct?
11     A.   Yes.  From the 710 case, yes.
12     Q.   And you understand that infringement
13 was found using that claim construction in HTC?
14     A.   Yes.
15     Q.   So if, for instance, a different claim
16 construction were applied, then the same
17 infringement, the infringement analysis would be
18 different, correct?
19     A.   It would depend on what the claim
20 construction was.  So I would need to -- you
21 know, I reserve the right to review for my
22 opinions based on whatever claim construction is
23 adopted, but I would be speculating to beyond
24 that.  However, the -- the final determination
25 for the ITC case upheld the decisions here with

1  respect to infringement for the HTC version of
2  the browser, so that -- that was part of the
3  context for my opinion.
4      Q.   So -- it's bad when you can't even
5  follow your own notes.  My apologies for the
6  delay.
7          (Mowry Exhibit 5, Expert Report of Dr.
8      Todd C. Mowry Regarding Infringement and
9      Domestic Industry For U.S. Patent No.
10     5,946,647, marked for identification, as of
11     this date.)
12 BY MS. FERNANDS:
13     Q.   So you have just been handed what's
14 marked as Mowry Exhibit 5.
15     A.   Yes.
16     Q.   And this is a redacted version of your
17 report in, I believe, in the 710 investigation;
18 is that correct?
19     A.   That's what it appears to be, yes.
20     Q.   And this was attached in redacted form
21 to your declaration in this case as Exhibit 13,
22 correct?
23     A.   I believe so.  I don't remember the
24 number exactly, but that sounds correct.
25     Q.   I believe I have that right, but...

1          But it was attached, this version was
2  attached to the report -- the declaration
3  submitted in this case?
4      A.   I believe so.
5      Q.   And if you look at page 3, page 3
6  jumps from there to page 71, do you see that?
7      A.   Yes.
8      Q.   And it appears that all of the
9  analysis of the HTC product has been redacted?
10     A.   I see that in -- I see that here, yes.
11     Q.   And so if you -- so there's only,
12 beginning at page 71, there's a discussion of
13 Apple's products and practices of the '647
14 patent, correct?
15     A.   Yes.
16     Q.   In analyzing the Android 2.1 and 2.2
17 code for the HTC investigation, did you use the
18 open source version of the code?
19     A.   That was part of what I used, yes.
20     Q.   Was your analysis for the browser
21 application limited to the open source version
22 of the code?
23     A.   Yes, it was for the browser.
24     Q.   There is no confidential HTC
25 information that you were relying on for your

1    A.   Yes, that's correct.
2    Q.   And I will assume based on the
3  extensive redaction that at least for some of
4  those there was proprietary information
5  involved, but if you -- I don't know whether you
6  can even answer that in your understanding of
7  the Protective Order.
8    A.   I'm not sure whether I can answer that
9  or not.  There's redaction, obviously, so...
10    Q.   How did you select the portions of the
11  publicly available open source code that you
12  relied on in connection with your opinion in
13  this case?
14    A.   Well, I followed the -- the
15  functionality.  So I -- the browser itself
16  calls, makes calls and accesses various parts of
17  the Android system, so I traced through the full
18  code path to see what was being called where and
19  anything that was relevant to the '647 patent.
20    Q.   You say you traced through the code
21  path?
22    A.   Yes.
23    Q.   When you traced through the code path,
24  that is in the open source version of the code?
25    A.   That's correct, yes.

1    Q.   And what did you do with respect to
2  the actual Samsung Galaxy Nexus to confirm -- I
3  know you described your process, but for each
4  section of the code, how did you confirm that
5  that code was being used on the Samsung Galaxy
6  Nexus?
7    A.   So, method-by-method, how did I
8  confirm that it was on the Galaxy Nexus?
9    Q.   Well, let me ask you a better
10  question.  With respect to each section of the
11  source code that you obtained through the
12  publicly available open source, for each section
13  did you do the same process to attempt to
14  determine whether that code was being used in
15  that form on the Galaxy Nexus?
16    A.   I did it for an entire release of
17  Android.  So, in a particular version of
18  Android, it comes with a set of corresponding
19  stock applications, and I analyzed the
20  functionality through wherever -- whichever part
21  of the Android system it touched when it went
22  through the software, and then through the
23  combination of using the phone and observing how
24  it behaved -- and I think I forgot to mention
25  that before -- I, in addition to looking at the

1  version number on the phone, I interacted with
2  the phone and used the debug logging between all
3  of that, and knowing what the code did, that was
4  how I confirmed that it was behaving as I
5  expected it to behave.
6         (Mowry Exhibit 7, a document with the
7      heading Infringement by Samsung Galaxy Nexus
8      of U.S. Patent No. 5,946,647, marked for
9      identification, as of this date.)
10  BY MS. FERNANDS:
11    Q.   You have just been handed what we
12  marked as Mowry Exhibit 7, claim chart with the
13  title Infringement by Galaxy -- Samsung Galaxy
14  Nexus of U.S. Patent No. 5,946,647.  Do you
15  recognize this?
16    A.   Yes.
17    Q.   What is this?
18    A.   This is the claim chart that was
19  attached as an appendix to my declaration, I
20  believe, yes.
21    Q.   So in the first row after the heading
22  on the right-hand side, you state, "To the
23  extent that the preamble may be construed to be
24  limiting, the Samsung Galaxy Nexus is a
25  computer-based system for detecting structures

1  in data and performing actions on detected
2  structures."  Do you see that?
3    A.   Yes.
4    Q.   Do you have an opinion as to whether
5  the preamble is limiting in the '647 patent?
6    A.   My opinion is it is not limiting.
7    Q.   Why is that?
8    A.   Well, the only part of the preamble
9  that's distinct from the claim language after it
10  is that it says that this is running on a
11  computer-based system and that the Galaxy Nexus
12  is a computer-based system that detects
13  structures and data, performs actions on
14  detected structures.
15    Q.   Let's go back to your report, if you
16  would.  I'm sorry, your declaration, Mowry
17  Exhibit 1, and let's look at the analyzer server
18  for detecting structures in the data and linking
19  actions to detected structures element.  It's on
20  page 22 that it begins.
21    A.   Okay.
22    Q.   So, in paragraph 66, your last
23  sentence there, is it the case that in your
24  opinion the element "analyzer server for
25  detected structures in the data and for linking

Page 102

1    actions to the detected structures" is a single
2    claim element?
3        A.   Yes, that's correct.
4        Q.   And so the analyzer server must do
5    both of those things, the detecting structures
6    in the data and linking actions to the detected
7    structures?
8        A.   Yes, the analyzer server must both
9    detect structures in the data and link actions
10   to the detected structures, that's correct.
11       Q.   In your opinion, what is the analyzer
12   server in the Samsung Galaxy Nexus?
13       A.   Well, there, as described in paragraph
14   67 and paragraph 70 and possibly 71, there are a
15   number of things here.  So for the -- I broke
16   this apart into both a detecting and the linking
17   aspects of what the analyzer server does for --
18   for detecting structures.  It's the
19   FindPartialAddress, FindPartialEMail,
20   FindPartialNumber, and isFocusableText methods
21   of the CacheBuilder class, which is in Web Kit,
22   and the -- for the linking aspect, it is the
23   onCreateContextMenu method in the Browser
24   Activity class, onCreateContext method of the
25   Controller Class, getHitTestResult and

Page 103

1    hitTestResult of Web View class, setIntent of
2    the MenuItemImpl class and the things that they
3    call, of course.
4        Q.   Let's start with the ones in the
5    detecting portion, FindPartialAddress,
6    FindPartialEMail, FindPartialNumber and
7    isFocusableText, correct?
8        A.   Yes.
9        Q.   And those are all methods of the
10   CacheBuilder class, correct?
11       A.   Yes, that's correct.
12       Q.   Would you describe each of those as
13   separate subroutines?
14       A.   Well, they are -- they are all
15   connected to each other.  IsFocusableText calls
16   FindPartialAddress, FindPartialEMail,
17   FindPartialNumber.  So, although they are
18   implemented as different components or different
19   methods within this object, they are all part of
20   the same coherent functionality.
21       Q.   Are different methods within the same
22   object typically referred to as different
23   subroutines?
24       A.   They're typically referred to as
25   methods, so "subroutine" could be used to refer

Page 104

1    to a method.  That's -- that's a possibility.
2        Q.   Now, in paragraph 70, you refer to
3    onCreatContextMenu of the Browser Activity class
4    and then the onCreateContextMenu -- method --
5    sorry.  Strike that one.  OnCreateContextMenu
6    method of Browser Activity class and
7    onCreateContextMenu method of Controller Class,
8    correct?
9        A.   Yes.
10       Q.   What is the difference between the
11   onCreateContextMenu method of Browser Activity
12   class and onCreateContextMenu method of
13   Controller Class?
14       A.   The difference is that onCreate -- the
15   onCreateContextMenu method of the Browser class
16   simply calls onCreateContextMenu of the
17   Controller Class.  As I recall, that's all that
18   it does.
19       Q.   And then there are also in paragraph
20   70, you refer to the getHitResult and HitResult
21   methods of the Web View class and the setIntent
22   method of the MenuItemImpl class, correct?
23       A.   Yes, although the first one is
24   getHitTestResult.  I think you said
25   getHitResult.

Page 105

1        Q.   Oh.
2        A.   But, yes, that's correct.
3        Q.   Thank you.  So, and are each of these,
4    the onCreateContextMenu, the getHitTestResult,
5    the hitTestResult and the MenuItemImpl
6    subroutines?
7        A.   They are all methods and one might
8    refer to them as subroutines.  They are all
9    related to each other because the onCreate --
10   they all -- there's a -- when the code executes,
11   all of these methods get called all together.
12   So they're all again different components of the
13   same functionality.
14       Q.   Are those methods -- could those
15   methods also be referred to as separate
16   routines?
17       A.   I wouldn't refer to them as separate
18   routines.  I think that they are all -- they are
19   all -- well, routine and subroutine, it's -- the
20   more accurate term is "method."  So "routine"
21   sounds like something big, and to the extent
22   that I would identify something as a routine, I
23   would say it would have to be the sum-total of
24   this functionality rather than picking off
25   little parts of this and calling them routines.

Page 106

1    Q.   Why would you -- if you were to refer
2  to something as a routine, why would it have to
3  be the sum-total of the functionality?
4    A.   Well, I was responding in the context
5  of you mentioning subroutine.  So if
6  subroutine -- if we -- these are not really very
7  well-defined terms, to be honest, "routine" and
8  "subroutine."
9         So, but to the extent that we're
10 discussing routine and subroutine in the same
11 sentence, "subroutine" sounds like a part of a
12 routine, and if I was going to interpret it that
13 way, then these, you know, this routine would be
14 a larger thing made up of smaller components.
15        If we're thinking of things that way,
16 then I would say the collection of all of these
17 things is the larger coherent piece which has
18 different components in it.
19   Q.   You said that routine and subroutine
20 aren't particularly well-defined.  Is it the
21 case that they're often used interchangeably by
22 computer scientists?
23   A.   I don't think that we're taught a
24 clear definition of what routine and subroutine
25 are.  We more typically use terms like

Page 107

1  "procedure" or "method."
2    Q.   Have you ever known of "routine" and
3  "subroutine" being used interchangeably?
4    A.   I can't think of -- to be honest,
5  people -- I don't encounter people using those
6  terms terribly often, so I can't think of
7  examples of people doing that.
8    Q.   So the -- we were discussing earlier
9  that the analyzer server requires both detecting
10 structures and linking actions, right?
11   A.   That's correct, yes.
12   Q.   And how did the "methods" -- is that
13 the word that you would use?
14   A.   Sure, methods.
15   Q.   How did the methods that you have
16 identified accomplish the linking structure --
17 detecting structures and linking actions?
18   A.   Sure.  The detected structures is
19 performed by the -- that aspect of the
20 functionality is performed by the methods in
21 paragraph 67.  So isFocusableText is called
22 within the BuildFrame method inside a
23 CacheBuilder and it then goes off and calls
24 FindPartialAddress, FindPartialEMail and
25 FindPartialNumber.

Page 108

1         Each of those does what we refer to as
2  parsing to try to find, in this case, a mailing
3  address, an e-mail address or a phone number,
4  and it looks for -- that's where the detection
5  occurs.
6         And the -- regarding the linking, in
7  paragraph 70, onCreateContext method -- the
8  onCreateContextMenu method and
9  onCreateContext -- there's an
10 onCreateContextMenu method both in Browser
11 Activity and in Controller.  The one in Browser
12 Activity simply calls the one in Controller, and
13 then the one in Controller is just the interface
14 code that calls into -- it calls into
15 getHitTestResult to recognize whether something
16 that has been long-pressed is indeed a detected
17 structure or not; and if it -- if it is, then it
18 uses setIntent to take Intent objects that have
19 been populated and attach them to individual
20 options in a Context Menu.  I believe that's
21 described in more detail here in paragraph 71,
22 and then the Context Menu will be displayed to
23 the user, and by virtue after setIntent is
24 called, it completes this process of linking the
25 actions to the detected structures.

Page 109

1    Q.   So what is setIntent?
2    A.   SetIntent is a method within the
3  MenuItemImpl class, and by Menu Item, Android
4  has a built-in mechanism for pop-up menus so
5  that if you press on part of the screen, it can
6  show you a pop-up menu and that pop-up menu is
7  called a Context Menu.  That's the name of the
8  class.  And MenuItemImpl is a particular option
9  in the pop-up menu.
10        When you call setIntent, it takes a --
11 an Intent object, which has been created, which
12 contains, among other things, a copy of the
13 detected structure, for example, a phone number
14 or an e-mail address, and it also describes
15 the -- the action, for example, to open the
16 dialer or to open the e-mail composition window,
17 and that gets stored with that particular choice
18 in the Context Menu such that if the user
19 chooses that and presses on that option, the
20 code will necessarily call a method called
21 Invoke within -- within MenuItemImpl, which will
22 then call startActivity and pass to it the
23 Intent object as input, and that's what
24 performed the action.
25   Q.   And you say that's what performs the

Page 110

1  action, is that startActivity?
2      A.    StartActivity is the action processor,
3  that's correct.
4      Q.    There was a lot built into that.
5  Let's take it in some bites.  First, what is an
6  Intent object?
7      A.    An Intent object is a message.  It is
8  a part, a key part of the Android system.  It is
9  used to, for example, launch -- allows one
10  activity to launch another activity by passing
11  that as the input parameter to a method called
12  startActivity.
13      Q.    Are there different types of intents
14  within Android?
15      A.    Yes, there are.
16      Q.    And what are they?
17      A.    Well, you can -- an Intent has several
18  different fields in it and you can populate the
19  different fields in different ways.  There's a
20  data field, for example, an action field, and
21  other fields.  Sometimes people refer to
22  implicit and explicit intents.
23      Q.    And in your discussion of the use of
24  Intent, are they implicit or explicit intents in
25  connection with this?

Page 111

1      A.    They're implicit intents.
2      Q.    What's the difference between an
3  implicit and explicit attempt -- strike that.
4  What is the difference between an implicit and
5  explicit Intent?
6      A.    The difference is very analogous to
7  the difference between static, what's called
8  static and dynamic linking in terms of calling
9  subroutines, which is described, for example, in
10  I believe it's Chapter 7 of the textbook that
11  I'm using in my undergraduate class this
12  semester, where, in the case of an explicit
13  Intent, it actually specifies the specific
14  activity to be launched by name, whereas in an
15  implicit Intent, it describes the functionality
16  of that activity.  So it has a name, a type of
17  name for it, but if, for example, if the -- if
18  you want to open your e-mail composition, an
19  e-mail composition window to start composing
20  e-mail to somebody, if the user has installed
21  multiple e-mail programs, then it's possible at
22  run time to choose which is -- to select the
23  preferred one as opposed to hardwiring a
24  specific choice.  And that's become best
25  practice.

Page 112

1          For example, in library call linking,
2  the industry has moved from what we call static
3  to dynamic linking, which is directly analogous
4  to the difference between explicit and implicit
5  Intent.
6      Q.    If you could go to paragraph 71 of
7  your declaration.
8      A.    Yes.
9      Q.    And just, again, break this down a
10  little bit.  The -- the 71 pertains to your
11  opinion concerning how actions are linked to
12  detected structures, correct?
13      A.    Yes.
14      Q.    And in your second sentence, you state
15  that, "The onCreateContextMenu method in the
16  Browser Activity class is called after the user
17  has selected a detected structure through a
18  long-press"; is that correct?
19      A.    Yes, that's correct.
20      Q.    And is the calling of the
21  onCreateContextMenu in the Browser class, that's
22  the first step in the linking, in your opinion,
23  correct?
24      A.    Well, the code has already been -- is
25  already in place so that if you, because of how

Page 113

1  Context Menus work, once the -- once the
2  detected structures become links, then if the
3  user long-presses on a detected structure, then
4  it will necessarily call onCreateContextMenu.
5          So I have identified it here as -- as
6  this is where linking begins, but, I mean, you
7  could also view it that, you know, the code is
8  already in place so that if the user is going to
9  long-press a detected structure, they will see
10  this linked menu.  But in my analysis, that's --
11  I did begin what I described as linking at this
12  point here in paragraph 71.
13      Q.    What do you mean "if the code is
14  already in place"?  What code?
15      A.    The code that will call the -- the
16  user interface code for Android supports Context
17  Menus, meaning that if you -- if you long-press
18  on certain things, like a link, basically, then
19  it knows to call certain methods, in particular,
20  onCreateContextMenu gets called and that's --
21  that code is already there in the system before
22  any of this has been invoked.
23      Q.    The code to call
24  onCreateContextMenu --
25      A.    Yes.

Page 114

1    Q.   -- exists in the system?
2    A.   That's right.
3    Q.   And once you call onCreateContextMenu,
4  that in turn calls the onCreateContextMenu
5  method of the Controller Class; is that correct?
6    A.   That's right.
7    Q.   And at that point, what happens?
8    A.   It then calls getHitTestResult to see
9  whether the thing that you have long-pressed is
10 something that it considers to be a detected
11 structure in the context of -- of the '647
12 patent, and if it believes that it is, then it
13 will then call setIntent to populate this pop-up
14 menu properly so that the user will see this
15 pop-up menu with these choices of candidate
16 linked actions.
17   Q.   You said that there are choices of
18 candidate linked actions.  What in your opinion
19 is the link between the action at that pop-up
20 menu and the structure at that point when the
21 menu shows up?
22   A.   The link is that if the user chooses
23 one of those choices or the things in the pop-up
24 menu such as dial a phone number or add a phone
25 number to your contact list, if they do choose

Page 115

1  one of them by pressing on it, then it will --
2  the system will then necessarily call
3  startActivity and pass into it an input
4  parameter that includes not only the information
5  about what it's supposed to do, for example,
6  open the dialer, but also the detected
7  structure.
8        So the linking to the detected
9  structure is there, because if they choose the
10 linked action, the detected structure will be
11 passed along to the action, which then causes
12 the CPU to perform a sequence of operations on
13 that detected structure.
14   Q.   You said "if they choose the linked
15 action," at the point that they choose the
16 action, what is the link between the action and
17 the structure?  If, for instance, if they do not
18 choose the action, is there a link?
19   A.   Yes, there is a link already.  The
20 linkage -- the link -- well, I would -- I tend
21 to think of the link being from the structure to
22 the action.  You said from the action to the
23 structure, but that's fine.
24        But the link is that because setIntent
25 has been called, which means that an Intent

Page 116

1  object has been stored with each choice in the
2  Context Menu data structure, and because the
3  code is already there in the invoke method in
4  MenuItemImpl, then whether or not -- the user
5  may not choose any of these linked actions, but
6  everything is in place so that if they did
7  choose one of them, it will necessarily cause
8  the system to then perform the action.  So
9  that's -- that's the link.
10   Q.   So all of this discussion we've been
11 having is part of the analyzer server, correct?
12 The analyzer server detects structures and links
13 actions to the detected structure?
14   A.   That's correct.
15   Q.   And you'll recall we were discussing
16 earlier that the Northern District of Illinois
17 construed the analyzer server element as a
18 server routine separate from a client that
19 receives data having structures from the client,
20 right?
21   A.   Yes, that is what the -- my
22 understanding of the ruling, yes, that's
23 correct.
24   Q.   And I believe that you said, even
25 though you disagree with that claim

Page 117

1  construction, that it is still your opinion that
2  the Samsung Galaxy Nexus infringes; is that
3  correct?
4    A.   That's correct.
5    Q.   Under the Northern District of
6  Illinois' construction, what is the client in
7  the Samsung Galaxy Nexus?
8    A.   The client is the -- is the browser
9  application code, which is -- yes, the Browser
10 Activity code.
11   Q.   And in the Samsung Galaxy Nexus, using
12 the Northern District of Illinois' claim
13 construction, what is the server routine?
14   A.   It is the -- it is the code that I
15 have described here in paragraph 67 and 70 that
16 performs the detection and the linking of
17 actions.
18   Q.   So that's 67 and 70?
19   A.   Yes.
20   Q.   That includes CacheBuilder, correct?
21   A.   Yes, that's right.
22   Q.   And CacheBuilder is a part of browser,
23 right?
24   A.   No, CacheBuilder is a part of Web Kit.
25 It's an external library that's not part of the

Page 118

1   Browser Activity. It's reused by other parts of
2   the system. Other -- other applications call in
3   to Web Kit routines other than the browser that
4   you see on -- that pops up on your screen.
5       Q.   So, actually, let me first be clear.
6   When you said that the server routine, you're
7   saying that it is all of the code you have
8   identified in both 67 and 70?
9       A.   Yes. I mean, and also the methods
10  that they call, and for object-oriented code,
11  you need to include the methods that they
12  inherent from their parent classes.
13      Q.   And so you said and CacheBuilder is
14  part of a shared library?
15      A.   Yes, it's part of the Web Kit. It's
16  part of Web Kit, which is a shared library.
17      Q.   And is a shared library a server
18  routine?
19      A.   Yes. It is in this case, yes.
20      Q.   How is the shared library a server
21  routine?
22      A.   It is something that is designed to be
23  used by a wide variety of different
24  applications. It is not something that is --
25  that a programmer custom-builds for their own

Page 119

1   application, but instead it's a utility meant to
2   be used by many applications, and that's the
3   case here.
4       Q.   Then the code that's identified in
5   paragraph 70 you just said also is part of the
6   server, the server routine, correct, in your
7   opinion?
8       A.   Yes, that's right.
9       Q.   OnCreateContextMenu method of the
10  Browser Activity class, that is part of the
11  browser, correct?
12      A.   The -- in adopting the -- since we're
13  discussing the claim construction that discusses
14  clients and servers, in any client/server
15  architecture, the client has to exercise the
16  interface into the server. There has to be some
17  code in the client that calls into it. So that
18  is the code here for onCreateContextMenu and
19  Browser Activity and Controller, for example.
20      Q.   Okay. So, in your opinion, the
21  onCreateContextMenu method of Browser Activity
22  and the onCreateContextMenu method of the
23  Controller Class are the code calling from the
24  client to the server?
25      A.   Yes, that's right. That's -- that

Page 120

1   code is -- they're the bulk of the functionality
2   for the linking is -- I mean, the analyzer
3   server is separate, but it's the server, but
4   anytime you interact with a server, the client
5   has to call into the server. So there has to be
6   some interface glue code, as we might call it,
7   that hooks the application -- the client into
8   the server, and that's -- that's what's in
9   onCreateContextMenu.
10      Q.   Still using the Northern District of
11  Illinois' claim construction, how does the
12  server routine receive data having structures
13  from the client in the Samsung Galaxy Nexus?
14      A.   Yes, it is through -- let's see. It
15  is -- I believe it's the -- I'm not sure if I
16  wrote that in my -- in my declaration, but it
17  receives it through, as I recall, a parameter
18  called node, which is passed -- I believe it's
19  the third input parameter to BuildFrame. I
20  might be wrong about that, its relative order,
21  but one of the input parameters to BuildFrame, I
22  believe, is -- is the -- is the data of the Web
23  page. So that's how the analyzer server
24  receives the data.
25      Q.   Now, is data that's sent to the server

Page 121

1   routine separate from the application that's
2   being executed?
3       A.   I'm not sure that I fully understood
4   the question. You said the data that's being
5   sent is separate from the application? Can
6   you -- can you --
7       Q.   So is -- portions of the routine that
8   you have identified as the server routine are
9   part of the browser application, correct?
10          MR. REITER: Objection. Misstates
11      testimony.
12      A.   I don't believe I said that. I think
13  I said that the analyzer server is separate
14  other than the fact that a client needs to
15  interface with its server and that there's --
16  that that's what the onCreateContextMenu is
17  doing.
18      Q.   So it's your opinion, then, that the
19  data -- the data is being sent from the client,
20  a client that is separate from the server
21  routine?
22      A.   Yes.
23      Q.   And why, in your opinion, is the
24  client that is sending the data separate from
25  the server routine, as you understand them?

## Page 122

1    A.   Well, the functionality for the server
2  has been written to be part of the -- of general
3  shared libraries that are accessed across a
4  number of different applications in Android.
5  The part that's custom-built for browser
6  specifically is -- is separate from the analyzer
7  server.
8    Q.   We were talking a little bit earlier
9  about the imprecision of the use of routine.  If
10 you could go back to Mowry 4.
11   A.   Yes.
12   Q.   And in the first full paragraph about
13 halfway through, the court --
14   A.   Page 10?
15   Q.   I'm sorry, page 10.  I apologize, page
16 10 in Mowry 4.  The court notes that, "In the
17 present context, 'routine' is synonymous with
18 'module' or 'component.'"  Do you see that?
19   A.   I see that.
20   Q.   And then it goes on, "all of which
21 describe a piece of programming necessary to
22 perform a specific function; routines consist of
23 subroutines, and I find nothing wrong with
24 describing the analyzer server as one routine."
25      Do you see that?

## Page 123

1    A.   I see that.
2    Q.   Do you agree with the court's
3  statement that, in the context of the '647
4  patent, "routine" is synonymous with "module" or
5  "component"?
6    A.   I don't know that I would choose to
7  use any of those words if I was describing the
8  analyzer server myself.  So this isn't -- this
9  isn't language that I put forward myself, but I
10 wasn't proposing a definition of "routine."
11   Q.   In your understanding of how "routine"
12 is used in the art, is it incorrect to use
13 "routine" as synonymous with "module" or
14 "component"?
15   A.   That's -- there's not -- that's not a
16 terribly incorrect way to.  I mean, I don't see
17 a major problem with thinking of it that way.
18 It's still not how I would choose to
19 characterize the analyzer server, but that's
20 one -- that's not an unreasonable way to think
21 about routine.
22   Q.   And thinking about routine in that way
23 as a module or component, in your opinion, is
24 there any single routine in the Samsung Galaxy
25 Nexus that detects structures and links actions

## Page 124

1  to those detected structures?
2    A.   Yes.  Well, in -- as the -- in the
3  court's interpretation here, this thing we were
4  just looking at, it mentions that a routine
5  consists of subroutines.  So my opinion is that
6  the routine is the functionality described in
7  aggregate that I identified for detecting and
8  linking -- detecting structures and linking
9  actions to structures, and that would be the
10 analyzer server routine.
11   Q.   Would you describe that aggregate of
12 those various functionalities as being a module?
13   A.   I'm not exactly sure that I would -- I
14 would -- I would prefer probably the word
15 "component" over "module" because I am not sure
16 what "module" means exactly.  It seems like it
17 may have a specific meaning to some people in
18 some cases.  I don't really have a good
19 definition of "module" in mind.
20   Q.   So why do you prefer "component"?
21   A.   Oh, I think that "component" just
22 has -- it means a collection of things or a
23 piece of some overall system.  I don't know that
24 I've heard people misuse the word "component"
25 and I'm not exactly sure what people -- how

## Page 125

1  "module" might be used.
2       "Module" might be the same as
3  "component," but I think that some programming
4  languages actually use the word "module" and
5  have a very specific meaning for it, and I don't
6  want to attach some -- accidentally attach some
7  specific meaning to it that's not appropriate.
8    Q.   So, in your opinion, the single
9  routine in the Samsung Galaxy Nexus consists of
10 the code that you have identified in both 67 and
11 70, paragraphs 67 and 70 of your declaration?
12   A.   Yes.
13   Q.   Is there anything else that is part of
14 that routine?
15   A.   As I said earlier, it's the code --
16 the methods and subroutines or pieces of
17 software that those things in turn call
18 themselves, and also for object-oriented code, a
19 class inherits code from its parent classes.
20   Q.   So there was additional code in
21 connection with the parent classes of each of
22 these methods that you would include in the
23 routine, as you define it?
24   A.   I would have to go back and look to
25 see whether there were constructers for those

Page 134

1  system or to -- it's intended that you would do
2  something with it, and in fact, that's the
3  purpose of startActivity.
4        The one input parameter to
5  startActivity is an Intent and that, that exists
6  explicitly as a way that you launch other
7  activities in Android, allows one application to
8  launch another application.
9      Q.  So the Intent carries the information
10  that's necessary for startActivity to launch?
11     A.  Yes, an Intent concludes the data that
12  is needed for startActivity to launch something,
13  and it then, yes, as I describe in the report,
14  for an implicit Intent, it then queries the
15  PackageManager to figure out exactly what thing
16  it's going to launch.
17     Q.  The Intent itself can't do anything
18  unless it goes to startActivity, is that
19  correct?
20     A.  As is true of any data structure, when
21  the data structure is just -- I mean, all data
22  structures are passive.  They just sit somewhere
23  until you use execute code to do something with
24  them.  So it is a data structure that is
25  intended to be passed to certain methods like

Page 135

1  startActivity.
2      Q.  Is it fair to say that data structures
3  are purely informational?
4      A.  Well, the word "informational" has a
5  specific meaning in the prosecution history of
6  the '647 patent because it came up in the
7  context of the Vale patent.  So I can discuss
8  that context, but I prefer to call it data
9  rather than calling it informational because of
10  that specific history of this patent.
11     Q.  What's the difference between data and
12  information, as you understand them?
13     A.  Well, for many people, they might
14  consider them to be synonyms, but as I said, in
15  the discussion of the Vale patent, there was a
16  very specific meaning assigned to "information"
17  and that's -- that's the -- since we're talking
18  about the '647 patent, that's why I wanted to be
19  just careful about how we use that word.
20     Q.  What was the specific meaning assigned
21  to "information" in discussion of the Vale
22  patent?
23     A.  The Vale patent contains a description
24  of how an electronic table of contents could be
25  represented as a -- with a tree-like data

Page 136

1  structure, and there were -- the patent examiner
2  mentioned this at one stage in the prosecution
3  of the patent as related work because it
4  contains a link-list-type of structure where
5  there is a pointer from one node into another
6  node, but the applicants and the term
7  "information" only appeared in this context
8  because the applicants pointed out that although
9  there is a pointer here and this is a type of
10  data structure, this, you know, again, as I
11  said, linking can mean different things in
12  different contexts.
13        In this context, the linking as in
14  link list, only leads you to information because
15  it's simply an index and there's nothing in
16  Vale that leads you to an action, and the
17  important thing about linking in the '647 patent
18  is that you link to an action.
19        It means that when you choose
20  candidate action, such as one presented in a
21  pop-up menu, that it will then necessarily
22  perform that action.  So that's what
23  "informational" means.
24     Q.  So, in your opinion, is the Intent the
25  link between the structure and the action?

Page 137

1      A.  No.  As I think I've -- I think I
2  described this in my declaration, but the Intent
3  is one -- one component of the linking, but the
4  link is only there because of the code that is
5  also there.
6        In particular, after calling
7  setIntent, it records the input Intent object in
8  an instance variable called M intent within the
9  MenuItemImpl class, and it is the invoke method
10  within MenuItemImpl.
11        That method is called when the user
12  clicks on a particular Context Menu choice, and
13  because that code tests to see whether M intent
14  has been set already, and if it has, it will
15  then necessarily call startActivity.  It is all
16  of that that is part of the linking.
17        It happens to be that -- that that
18  invoke code is always sitting there, but it
19  doesn't follow that code path until you call
20  setIntent.
21     Q.  And is that whole grouping of code
22  that you have just described, is that, in your
23  opinion, a specified connection between the
24  structure and the action?
25     A.  Yes.  Indeed, when you call -- after

1  setIntent has been called, the coding data is
2  there so that it is now necessarily the case
3  that when you click on an option in the Context
4  Menu, it will definitely call startActivity with
5  the Intent, and since it's been formed properly,
6  it will perform -- cause the CPU to perform a
7  sequence of operations on the detected
8  structure.  So it performs the action.
9       Q.   Before setIntent is called, is there a
10 specified connection between the structure and
11 the action?
12      A.   The -- the last piece of the puzzle
13 has not been put in place yet until setIntent is
14 called, but the code is there such that, before
15 the user -- before the user, for example, has
16 even long-pressed on a detected structure, on
17 create -- the code that will then necessary call
18 onCreateContextMenu and cause this whole
19 sequence to happen is already there, but the way
20 I prefer to think of it is that setIntent is --
21 puts that last piece of the jigsaw puzzle into
22 place.
23      Q.   Okay.  You say "setIntent puts the
24 last piece of the jigsaw puzzle into place."
25 What do you mean by that?

1       A.   What I mean is that there's already
2  been a large amount of mechanism that is built
3  into the system that will cause the entire
4  linking -- the entire specified connection to
5  occur, and the very last bit that needs to be
6  plugged in is to call setIntent with the Intent
7  object, and at that point the -- the actions in
8  the Context Menu become live.
9            Now, before the user has long-pressed
10 on a detected structure, there is no Context
11 Menu to display so there's no reason to show
12 anything or build it, so it's good coding
13 practice to not do work that's unnecessary.
14           So that's the reason why those Intent
15 objects are created after you actually
16 long-press a detected structure, but the code is
17 already there such that it will necessarily all
18 happen when you press on a detected structure.
19      Q.   So is it the case that until setIntent
20 is called, there is not what you would consider
21 a specified connection in the Samsung Galaxy
22 Nexus?
23      A.   I think I may not -- I may be missing
24 how the question is different from the previous
25 one, and since I gave a long answer, I can give

1  a long answer again, but I don't know if you
2  changed something in the question that I missed.
3       Q.   Well, you gave a long answer to the
4  last one, which is why I asked it again.
5            In your earlier answer you said that
6  after setIntent is called --
7       A.   Okay.
8       Q.   -- there is a specified connection; is
9  that correct?
10      A.   Yes.
11      Q.   Okay.  Before setIntent is called, is
12 there a specified connection, in your opinion?
13      A.   I still view that there is a specified
14 connection in that the code is in place even
15 before the user even presses on the -- even
16 before setIntent is called, the code is there
17 such that if the user does press a particular
18 detected structure, setIntent will necessarily
19 be called and it will complete this entire
20 process.  So I view that also as a specified
21 connection.
22      Q.   But the user has to press the
23 structure for setIntent to be called?
24      A.   The user does have to press the
25 structure, although if they don't press on the

1  structure, then they will never be even able to
2  think about selecting a linked action.  So there
3  would be no point in creating one.
4       MS. FERNANDS:  Shall we break for
5  lunch?
6       MR. REITER:  Sure.
7       THE VIDEOGRAPHER:  The time is 1:34.
8  We're going off the record.
9       (Luncheon recess.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 166

1  patent," do you see that?
2      A.   Yes.
3      Q.   What do you mean when you say it
4  "incorporates features claimed"?
5      A.   Well, it practices claims 1 and 8, so
6  maybe "features" wasn't the best word choice.
7  What I -- I guess, put more precisely, it
8  practiced -- they practiced claims 1 and 8 of
9  the '647 patent.
10     MS. FERNANDS:  Let's go off the
11  record.
12         THE VIDEOGRAPHER:  The time is 2:39.
13  We're going off the record.
14     (Recess.)
15         THE VIDEOGRAPHER:  The time is 2:50.
16  We're back on the record.
17     MS. FERNANDS:  Dr. Mowry, thank you
18  very much for your time today.  We are done
19  with this deposition concerning your
20  declaration in connection with the '647
21  patent for this case.
22     (Continued on the next page to include
23  the jurat.)
24
25

Page 167

1      THE WITNESS:  Okay, thank you.
2      MR. REITER:  And I have no questions
3  at this time.
4      THE VIDEOGRAPHER:  The time is 2:51.
5  That's the end of today's deposition.  We're
6  going off the record.
7         oOo
8
9
10
11
12
13
14
15
16
17  _____
       TODD MOWRY
18
19  Subscribed and sworn to
    before me this     day
20  of        2012.
21
    _____
22
23
24
25

Page 168

1
2          CERTIFICATE
3  STATE OF NEW YORK )
            : ss
4  COUNTY OF NEW YORK)
5      I, Kathy S. Klepfer, a Registered
6  Merit Reporter and Notary Public within and
7  for the State of New York, do hereby
8  certify:
9      That TODD MOWRY, the witness whose
10  deposition is herein before set forth, was
11  duly sworn by me and that such deposition is
12  a true record of the testimony given by such
13  witness.
14     I further certify that I am not
15  related to any of the parties to this action
16  by blood or marriage and that I am in no way
17  interested in the outcome of this matter.
18     In witness whereof, I have hereunto
19  set my hand this 4th day of April, 2012.
20
21     -------------------------------
       KATHY S. KLEPFER, RPR, RMR, CRR, CLR
22
23
24
25

Page 169

1          INDEX
2  TESTIMONY OF T. MOWRY:              PAGE
3  Examination by Ms. Fernands         6
4
5  MOWRY EXHIBITS:              PAGE
6  Exhibit 1, Declaration of Todd Mowry      7
7  Exhibit 2, List of Materials Considered   12
8  Exhibit 3, U.S. Patent No. 5,946,647      14
9  Exhibit 4, Judge Posner's Order of March 19,   20
10  2010
11  Exhibit 5, Expert Report of Dr. Todd C. Mowry   92
12  Regarding Infringement and Domestic Industry
13  For U.S. Patent No. 5,946,647
14  Exhibit 6, Initial Determination from the 710   96
15  Investigation
16  Exhibit 7, a document with the heading      100
17  Infringement by Samsung Galaxy Nexus of U.S.
18  Patent No. 5,946,647
19  Exhibit 8, Curriculum Vitae of Todd C. Mowry   142
20  Exhibit 9, Commission Opinion         154
21  Exhibit 10, portion of the reexamination   158
22  proceeding regarding the '647 patent
23  Exhibit 11, office action in the         160
24  reexamination proceedings of the '647 patent
25

Page 168

1

2                    CERTIFICATE

3    STATE OF NEW YORK )

                      :   ss

4    COUNTY OF NEW YORK)

5         I, Kathy S. Klepfer, a Registered

6    Merit Reporter and Notary Public within and

7    for the State of New York, do hereby

8    certify:

9         That TODD MOWRY, the witness whose

10   deposition is herein before set forth, was

11   duly sworn by me and that such deposition is

12   a true record of the testimony given by such

13   witness.

14        I further certify that I am not

15   related to any of the parties to this action

16   by blood or marriage and that I am in no way

17   interested in the outcome of this matter.

18        In witness whereof, I have hereunto

19   set my hand this 4th day of April, 2012.

20

21      ------------- _Kathy S. Klepfer_ ------

          KATHY S. KLEPFER, RPR, RMR, CRR, CLR

22

23

24

25

# EXHIBIT O
# FILED UNDER SEAL

# EXHIBIT P
# FILED UNDER SEAL

# EXHIBIT Q
# FILED UNDER SEAL

# EXHIBIT R
# FILED UNDER SEAL

# EXHIBIT S
# FILED UNDER SEAL

# EXHIBIT T
# FILED UNDER SEAL

# EXHIBIT U
# FILED UNDER SEAL

# EXHIBIT V
# FILED UNDER SEAL

# EXHIBIT W
# FILED UNDER SEAL

# EXHIBIT X

Mac
iPod
iPhone
iPad
iTunes
Support

# iPhone

Features
Built-in Apps
From the App Store
iOS
iCloud
Tech Specs



Learn more
about Siri.

## What is Siri?

Siri is the intelligent personal assistant that helps you get things done just by asking. It allows you to use your voice to send messages, schedule meetings, place phone calls, and more. But Siri isn't like traditional voice recognition software that requires you to remember keywords and speak specific commands. Siri understands your natural speech, and it asks you questions if it needs more information to complete a task.

Siri uses the processing power of the dual-core A5 chip in iPhone 4S, and it uses 3G and Wi-Fi networks to communicate rapidly with Apple's data centers. So it can quickly understand what you say and what you're asking for, then quickly return a response.

Siri is currently in beta and we'll continue to improve it over time.

## Using Siri

### How do I ask Siri something?

To talk to Siri, hold down the Home button on your iPhone 4S. You'll hear two quick beeps and see "What can I help you with?" on the screen. Just begin speaking. The microphone icon lights up to let you know that Siri hears you talking. Once you've started a dialogue with Siri, tap the microphone icon to talk to it again.

There's more than one way to talk to Siri. When the screen is on, simply bring iPhone 4S up to your ear. You'll hear two quick beeps to indicate that Siri is listening to you.

Siri also works with headphones and Bluetooth headsets. When you're using headphones with a remote and microphone, you can press and hold the center button to talk to Siri. With a Bluetooth headset, press and hold the call button to bring up Siri.

Siri waits for you to stop talking, but you can also tap the microphone icon to tell Siri you're done talking. This is useful when there's a lot of background noise.

### What happens after I ask Siri a question or ask it to do something?

When you finish speaking, Siri displays the text of what you said and provides a response. If Siri needs more information to complete a request, it will ask you a question. For example, if you say "Remind me to call my mom," Siri will ask "What time would you like me to remind you?"

When you use earphones or a headset, Siri reads back text messages and email messages that you've dictated before you send them, and it reads back the subjects of reminders before you create them. This is especially helpful when you're driving and can't see the iPhone 4S screen.

### Do I have to say things a certain way to get Siri to respond?

No. You can speak to Siri as you would to a person — in a natural voice with a conversational tone. If you want to know what the weather will be like tomorrow, simply say "What will the weather be like tomorrow?" Or "Does it look like rain tomorrow?" Or even "Will I need an umbrella tomorrow?" No matter how you ask, Siri will tell you the forecast.

### Does Siri work out of the box, or do I have to teach it?

Siri works right out of the box, without any work on your part. And the more you use Siri, the better it will understand you. It does this by learning about your accent and other characteristics of your voice. Siri uses voice recognition algorithms to categorize your voice into one of the dialects or accents it understands. As more people use Siri and it's exposed to more variations of a language, its overall recognition of dialects and accents will continue to improve, and Siri will work even better.

Siri also uses information from your contacts, music library, calendars, and reminders to better understand what you say. So it responds more accurately when you ask to make a phone call, play music, or create an appointment or reminder.

If you like, you can reset what Siri has learned about your voice by turning Siri off and then back on in **Settings > General > Siri.**

## What Siri Can Do For You

### What types of things can I ask Siri about or ask it to do?

You can ask Siri to make a call, find a business and get directions, schedule reminders and meetings, search the web, and more. You can even ask Siri "What can you do for me?" or tap the "i" in the right corner of the screen when you bring Siri up. You'll see examples of things Siri can do, along with ways you can ask for things.

### Which apps does Siri work with?

Siri works with almost all the built-in apps on iPhone 4S. And it's smart enough to figure out which apps to use to provide you with answers. It also uses Search and Location Services to help you with your requests. Here's a list of apps and services that Siri works with worldwide:



| | | |
|---|---|---|
| Phone | Reminders | Find My Friends |
| FaceTime | Notes | Alarms, World Clock and Timer |
| Music | Contacts | Wolfram\|Alpha (English only) |
| Mail | Weather | Wikipedia search |
| Messages | Stocks | |
| Calendar | Web Search | |

Siri can also assist you using these apps and services in the U.S. in English:

- Maps
- Local search with Yelp!

Maps and local search support will be available in additional countries in 2012.

### How does Siri learn who I am?

If Siri knows who you are, it can use your information to help you. To make sure Siri knows who you are, select your contact information in **Settings > General > Siri > My Info**.

Your information is used for questions like "How do I get home?" or "What good restaurants are near work?"

### How does Siri learn about my key relationships?

Siri also helps you by learning about the key people in your life. The first time you ask Siri to call your sister, it will ask you who your sister is. That information is stored in Contacts along with other relationship information like "mom," "husband," and "grandma."

### How do location-based reminders work?

Because Siri knows your current location and other locations like "home" and "work," it can remind you to do a certain task when you leave a location or arrive at a location. So if you tell Siri,"Remind me to call my wife when I leave the office," Siri does just that.

To turn off the ability for Siri to use your location, go to **Settings > Location Services** and set the switch for Siri to Off. Regardless of how Locations Services is set for Siri, information about your location is not tracked or stored outside the phone.

### Does iPhone 4S take dictation?

Yes. iPhone 4S supports dictation in any app that has a keyboard. So instead of typing, you can speak and your words will be entered as text.

To start dictation, tap the microphone button on your keyboard and start talking. When you're finished, tap Done and your words will be turned into text. Dictation for each language is built into the keyboard for that language.

### Is Siri accessible to blind and visually impaired users?

Yes. VoiceOver, the screen reader built into iOS, can speak any text that's displayed in responses from Siri. You can navigate through the responses and have each one read to you. This includes the days of a weather forecast, the body of an email, the details of an answer from Wolfram|Alpha, and more.

## Language Support and Availability

Siri works exclusively on iPhone 4S. Siri understands and can speak the following languages:

- English (United States, United Kingdom, Australia)
- French (France)
- German (Germany)
- Japanese (Japan)

In 2012, Siri will support additional languages, including Chinese, Korean, Italian, and Spanish.

### Can I use Siri in any of these languages in other countries?

Yes. Siri can be enabled in any country, and you can choose to speak to it in English, French, or German. However, Siri is designed to recognize the specific accents and dialects of the supported countries listed above. Since every language has its own accents and dialects, the accuracy rate will be higher for native speakers.



**iPhone 4 S**

On AT&T, Sprint, and Verizon.

Starting at $199*

**Shop online.**
Order your iPhone online and get it delivered to your door. It ships free and ready to use.

 **Visit a store.**
Buy iPhone at the Apple Retail Store and we'll activate it and set it up just the way you want.

 **Call Apple.**
Get answers before you buy. Call 1–800–MY–APPLE to talk with a knowledgeable

 **Apple Store app.**
It's the easiest way to buy iPhone 4S — right from your current iPhone. Download now

iPhone    Features    Siri    Frequently Asked Questions

*Qualified customers only.* Shop the Apple Online Store (1–800–MY–APPLE), visit       Buy online now.          Find a store.                    Specialist.
an Apple Retail Store, or find a reseller.

Apple Info  │  Site Map  │  Hot News  │  RSS Feeds  │  Contact Us  │  🇺🇸

Copyright © 2012 Apple Inc. All rights reserved.

Terms of Use  │  Privacy Policy

# EXHIBIT Y
# FILED UNDER SEAL

# EXHIBIT Z
# FILED UNDER SEAL

# EXHIBIT AA
# FILED UNDER SEAL

# EXHIBIT BB
# FILED UNDER SEAL

# EXHIBIT CC
# FILED UNDER SEAL

# EXHIBIT DD
# FILED UNDER SEAL

# EXHIBIT EE



**InformationWeek**
THE BUSINESS VALUE OF TECHNOLOGY

# iPhone Top Seller At AT&T, Sprint, And Verizon

Apple's iPhone 4S is the number-one selling handset at the nation's three largest network operators, outselling all other smartphones combined.

By Eric Zeman,  InformationWeek
April 02, 2012
URL: http://www.informationweek.com/news/mobility/smart_phones/232800138



10 Top iOS 5 Apps
(click image for larger view and for slideshow)
The Apple iPhone 4S is the undisputed smartphone champ, according to data collected by Canaccord Genuity. The firm examined individual handset sales across the top four wireless network operators in the U.S. between December 2011 and March 2012. The iPhone leads at AT&T, Sprint, and Verizon, although not at T-Mobile USA, where it isn't available.

"Our March checks indicated the iPhone continues to extend its market share gains," wrote Canaccord Genuity analyst Mike Walkley in a note to clients today. "In fact, we believe iPhones are outselling all other smartphones combined at Sprint and AT&T and selling at roughly equal volume to all Android smartphones at Verizon."

Given the number of other smartphones that are available from both AT&T and Sprint, that's quite an impressive feat. AT&T alone sells more than two dozen smartphone models. Some of the most notable models are the Samsung Galaxy Note (which has reached 5 million units sold all by itself), the HTC Vivid, and the Samsung Galaxy S II Skyrocket. The iPhone 4S alone is selling more units than those two dozen smartphones' sales figures combined. At Sprint, its non-iPhone device lineup is aging a bit, as the company has slowed down the rate at which it introduces new products.

[ **Verizon was right on target, despite initial doubts about the iPhone 4's success. See Verizon Wireless CEO Claims Strong iPhone Sales. ]**

The top three handsets by carrier for the month of March are as follows:

-- AT&T: Apple iPhone 4S, Samsung Galaxy S II, Samsung Galaxy Note.
-- Sprint: Apple iPhone 4S, Samsung Galaxy S II, Apple iPhone 4.

-- T-Mobile. Samsung Galaxy S II, HTC Amaze, Samsung Galaxy S Blaze.
-- Verizon: Apple iPhone 4S, Motorola RAZR/RAZR MAXX, and Samsung Galaxy Nexus.

Despite the iPhone 4S's leadership at the top three carriers, Samsung is obviously hot on Apple's trail with its own models. Samsung isn't popular just in the U.S., notes Canaccord.

"Our global checks also indicated another quarter of strong market share gains for Samsung, particularly in Europe and Asia," wrote Walkley. "In fact, we believe Samsung's strong smartphone portfolio across all price tiers will result in Samsung's smartphone shipments increasing a remarkable 15%-plus sequentially during the seasonally weak March quarter."

The iPhone 4S led at AT&T, Sprint, and Verizon in every month between December and March. Only time will tell what effect the next generation of Android devices will have on the iPhones 4S's sales lead in the months to come.

*iPhones, iPads, and Android devices are opening a new gateway for malware that old security tools can't completely close. Security pros must combine education, policy development, and the use of existing tools and new mobile device management systems to effectively balance mobile device risk with productivity rewards. Find out more in our Stop Mobile Device-Borne Malware report. (Free registration required.)*



Copyright © 2012 United Business Media LLC, All rights reserved.