# EXHIBIT 5

1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Charles K. Verhoeven (Bar No. 170151)
2  charlesverhoeven@quinnemanuel.com
   Kevin A. Smith (Bar No. 250814)
3  kevinsmith@quinnemanuel.com
   50 California Street, 22nd Floor
4  San Francisco, California 94111
   Telephone: (415) 875-6600
5  Facsimile: (415) 875-6700

6  Kevin P.B. Johnson (Bar No. 177129)
   kevinjohnson@quinnemanuel.com
7  Victoria F. Maroulis (Cal. Bar No. 202603)
   victoriamaroulis@quinnemanuel.com
8  555 Twin Dolphin Drive 5th Floor
   Redwood Shores, California 94065
9  Telephone: (650) 801-5000
   Facsimile: (650) 801-5100
10

11 William C. Price (Bar No. 108542)
   williamprice@quinnemanuel.com
   Patrick M. Shields (Bar No. 204739)
12 patrickshields@quinnemanuel.com
   865 S. Figueroa St., 10th Floor
13 Los Angeles, California 90017
   Telephone: (213) 443-3000
14 Facsimile: (213) 443-3100

15 Attorneys for SAMSUNG ELECTRONICS
   CO., LTD., SAMSUNG ELECTRONICS
16 AMERICA, INC. and SAMSUNG
   TELECOMMUNICATIONS AMERICA, LLC

17

18                 UNITED STATES DISTRICT COURT

19      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| 20  APPLE INC., a California corporation, | CASE NO. 12-CV-00630-LHK |
| 21              Plaintiff, | **EXPERT DECLARATION OF JAIME CARBONELL, Ph.D., CONCERNING NON-INFRINGEMENT AND INVALIDITY OF U.S. PATENT NO. 8.086,604** |
| 22              vs. | |
| 23  SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG | |
| 24  ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG | Date: June 7, 2012 |
| 25  TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | Time: 1:30 p.m. Place: Courtroom 8, 4th Floor Judge: Hon. Lucy H. Koh |
| 26 | |
| 27              Defendants. | **FILED UNDER SEAL HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY** |

28

## I.     INTRODUCTION

1.     My name is Jaime G. Carbonell.   I have been retained to act as an expert for defendants Samsung Electronics Co., Ltd., Samsung Electronics America, inc. and Samsung Telecommunications America, LLC.   (collectively "Samsung").

2.     I have been asked to provide an expert opinion and analysis concerning United States Patent No. 8,086,604 ("the '604 patent").   My analysis includes how a person of ordinary skill in the art in 2000 would have understood claims 6 and 19 of the '604 patent, whether the accused Samsung Galaxy Nexus product ("SGN") infringes claim 6 or 19 of the '604 patent, and whether claims 6 and 19 of the '604 patent are valid.   In reaching the opinions set forth in this declaration, I have considered the Expert Declaration of Dr. Nathaniel Polish Concerning U.S. Patent No. 8.086,604 (the "Polish Declaration") and the materials identified in Exhibit ZZ to this declaration.

3.     I graduated from the Massachusetts Institute of Technology in 1975 with a degree in Physics and Mathematics.   I went on to Yale University where I received a Masters Degree in Computer Science in 1976 and a Ph.D. in Computer Science in 1979.

4.     In 1979, I became an Assistant Professor of Computer Science at Carnegie Mellon University.   Since 1995, I have been the Allen Newell Professor of Computer Science at Carnegie Mellon University.   Since 1996, I have also been the Director, Language Technologies Institute, Carnegie Mellon University.

5.     I have published some 300 technical and scientific articles, primarily in peer-reviewed journals and conferences in multiple computational fields including: computer science, computational linguistics, machine learning, information retrieval, computational biology, machine translation, mathematical and statistical foundations, and integrated systems applications. These reflect my active lines of research over the past 35 years.

6.      My research includes computational methods for analyzing text in order to organize it, retrieve it, summarize it, index it, parse it, and translate it. One of my shorter papers describing my invention, Maximum Marginal Reference for retrieval and summarization, is among the most highly cited in the Association for Computing Machinery's Special Interest Group in Information Retrieval (ACM-SIGIR:   The premier academic conference for search engines and related research).   I have researched mathematical, algorithmic and heuristic approaches to analyzing text, ranging from the statistical (machine learning approaches over textual corpus), to the hand-built linguistic/heuristic methods.

7.      A detailed description of my professional qualifications, including publications and professional, is contained in the CV attached as Exhibit A.

## II.      THE '604 PATENT AND ITS FILE HISTORY

8.      The application for the '604 patent, application No. 11/000,413, was a continuation of application No. 09/478,009, filed on January 5, 2000.

9.      The '604 patent generally describes methods and systems for searching for information using different heuristic algorithms.   A copy of the '604 patent is attached as Exhibit BB.

10.      I understand that Apple has asserted only apparatus claims 6 and 19 in its request for a preliminary injunction.   I will focus on those two claims in this declaration.

11.      Independent claim 6 of the '604 patent claims:

An apparatus for locating information in a network, comprising:

an interface module configured to receive an inputted information descriptor from a user-input device;

a plurality of heuristic modules configured to search for information that corresponds to the received information descriptor, wherein:

each heuristic module corresponds to a respective area of search and employs a different, predetermined heuristic algorithm corresponding to said respective area, and

the search areas include storage media accessible by the apparatus;

and a display module configured to display one or more candidate items of information located by the plurality of heuristic modules on a display device.

'604 Patent, Col. 8, lines 26-41.

12.     Dependent claim 19 of the '604 patent claims

The apparatus of claim 6, wherein the interface module is configured to receive portions of the information descriptor as the portions are being inputted, and

wherein the heuristic modules are configured to search for information that corresponds to the portions of the information descriptor as the portions are being received.

'604 Patent, Col. 10, lines 17-23.

13.     During prosecution of the '604 patent, there were five sets of amendments to claim 6.   *See* October 23, 2007 Amendment; April 23, 2008 Amendment; December 11, 2008 Amendment; April 27, 2009 Amendment and September 13, 2010 Amendment.    Exhibit EE.

14.     Also during prosecution, Applicants argued that certain prior art, including United States Patent No. 7,020,670 to Andreoli ("Andreoli") did not, in applicants' opinion, anticipate the purported invention.    For example, in response to the Office Action dated July 23, 2007 rejecting all then-pending claims, applicants argued:

Nowhere does <u>Andreoli</u> describe "providing said information descriptor to a plurality of heuristic modules, wherein each heuristic module employs a different heuristic algorithm to search an associated relevant area of search for information that corresponds to the received descriptor," as recited in amended claim 1.  In the portions of <u>Andreoli</u> referenced by the Office (see, final Office action at page 7), <u>Andreoli</u> describes a way for processing search requests that includes formulating the requests using logic as a common language.  (See, <u>Andreoli</u> at col. 8, lines 6-54).   In particular, <u>Andreoli</u> describes using logic fragments, called "feature constraints," and efficient constraint solving algorithms.  (See, <u>Andreoli</u> at col. 9, lines 1-22).  Then, as described herein, <u>Andreoli</u> teaches that the processor can use the solution to a constraint satisfaction algorithm <u>to formulate a search request</u> and employ any appropriate combination of local and remote search operations.  (See, <u>Andreoli</u> at col. 16, line 64 – col. 17, line 7).  <u>Andreoli</u> does not describe, however, that *each* of the local and remote search operations <u>employs a different heuristic algorithm to search an associated relevant area of search</u> for information that corresponds to the search request, in accordance with amended claim 1 (emphasis added).  That is, the algorithms described in <u>Andreoli</u> and referenced by the Office go to the formation of the search request and not to how the local and remote search operations employed by the processor perform a search of the repositories on the network.

October 23, 2007 Amendment and Remarks, Exhibit EE, pages 3-4.

15.     In response to an Office Action dated January 25, 2008, rejecting all then-pending claims, applicants again tried to distinguish Andreoli.   Applicants again emphasized the use of different heuristic algorithms and argued that the algorithms of Andreoli differed only ***logically*** not ***heuristically***.   April 23, 2008 Amendment and Remarks at 7-8.   Specifically, applicants argued:

EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604

Applicant traverses the rejection of claim 1 under Section 102(e) as allegedly being anticipated by U.S. Patent No. 7,020,670 to *Andreoli et al.* ("*Andreoli*"). Present claim 1 recites, *inter alia*, "a plurality of heuristic modules, wherein each heuristic module corresponds to a respective area of search and employs <u>a different heuristic algorithm corresponding to said respective area to search</u>" (emphasis added). *Andreoli* cannot support a rejection of claim 1 under Section 102 because it fails to teach, at least, these features of Applicant's claim 1.

*Andreoli* discloses brokers that process search requests. (*Andreoli*, col. 8:6-12.) A broker can release sub-requests to other brokers such that a search is performed by a collaboration of brokers. (*Id.* at col. 8:13-18.) Each broker can be specialized to perform search requests of appropriate repositories on a network. (*Andreoli*, col. 17, ll. 4-20.) In order to collaborate, search requests are formulated in a common language. (*Id.* at col. 8:28-50.) This is achieved by formulating all requests in a <u>logical format</u>. (*Id.*) Requests are expressed by a pair <x, P>, where x is a logical variable and P is a logical formula involving x, meaning "retrieve knowledge object x such that the property expressed by formula P holds." (*Id.*) The scope of brokers are defined using similar logic. (*Id.*) For example, a broker with scope <x, R> can only retrieve objects x that satisfy formula R. (*Id.*) Furthermore, the scope of a search to be performed by a broker may be logically split into two scopes. (*Id.* at cols: 9:26-10:59.) Scope-splitting relies on negation to create two brokers having exclusive scopes (e.g., P^F and P^¬F). (*Id.* at col. 9:26-50.) Based on the two scopes, different portions of a repository can be searched.

The Examiner apparently asserts that *Andreoli's* brokers, repositories, constraint satisfaction algorithms, and document constraint descriptor correspond to Applicant's claimed "heuristic modules," "area of search," "heuristic algorithm," and "information descriptor," respectively.  (Office Action, p. 8.)  Applicant respectfully disagrees.   As noted above, constraint satisfaction algorithms used by the brokers are based on the same search request and feature constraints.  But these algorithms only <u>logically differ</u> from one another - <u>not heuristically</u>.  As such, each broker does not employ "a different heuristic algorithm" for each repository searched.  Therefore, *Andreoli* does not teach or suggest Applicant's claimed "plurality of heuristic modules … employ[ing] a <u>different</u> heuristic algorithm <u>corresponding to said respective area to search</u>" (emphasis added) as recited in Applicant's claim 1.

Because *Andreoli* does not describe the above-identified features of claim 1, it cannot anticipate claim 1 under section 102.  Accordingly, claim 1 is allowable over *Andreoli*.

Claims 11 and 16, although of different scope than claim 1, recite features similar to those recited in claim 1.  Thus, claims 11 and 16 are allowable over *Andreoli* for the same reasons presented above with regard to claim 1.

April 23, 2008 Amendment and Remarks at 7-8, Exhibit EE, pages 7-8.

16.      In response to a July 11, 2008 Office Action, again rejecting all then-pending claims, applicants argued that Andreoli does not disclose "heuristic modules" or "heuristic algorithms":

EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604

Furthermore, *Andreoli* does not disclose "heuristic modules" or "heuristic algorithms," as recited in claim 1.  During patent examination, a claim term should be given its broadest reasonable meaning consistent with the specification. (*Phillips v. AWH Corp*., 415 F.3d 1303, 75 USPQ2d 1321 (Fed. Cir. 2005); *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1364, 70 USPQ2d 1827 (Fed. Cir. 2004); *see also,* M.P.E.P. § 2111.)  Rather than give the term "heuristic" is broadest reasonable meaning, the Examiner has not afforded the term "heuristic" any weight whatsoever.  (Office Action, p. 9.)

By contrast, *Andreoli* describes logical algorithm for solving feature constraints – not heuristic algorithms.  For instance, *Andreoli* states:

> [A] set of constraints is equivalent to a set of logical relations *only if the constraints are only satisfied* when the logical relations are evaluated as true and the constraints are *only not satisfied* when the logical relations are evaluated as false.

> A "solution" of a constraint or a set of constraints is an item of data that *indicates whether the constraint or set of constraints is inconsistent or satisfiable* and, if satisfiable, indicates a less redundant version that is equivalent to the constraint or set of constraints. In this context, the solution is "equivalent" to the constraint or set of constraints if the solution can only be satisfied if the constraint or set of constraints is satisfied and vice versa.

> An operation "solves" a constraint or a set of constraints *if it obtains a solution* of the constraint or set of constraints.

> ****

> [L]ogic provides a common language in which requests, answers, and scopes can all be expressed.  Brokers then perform *logical operations* on these three components. The most important logical operation, from which all the others can be reconstructed, is *satisfiability checking, i.e. deciding whether some object could satisfy the property expressed by a formula, or, on the contrary, whether it is intrinsically contradictory.* Unfortunately, it is well known that this operation, for full classical logic, is not algorithmic, i.e. it is provably impossible to write a program which implements it and always terminates. *Given this limitation, a great deal of research in knowledge representation has been focused on identifying fragments of classical logic in which satisfiability is algorithmically decidable*

> (*Andreoli*, col. 6:4-19; 8:51-64.)

Because *Andreoli's* method is based on "classical logic" in which constraints are "algorithmically decidable," the patent cannot be considered to disclose "heuristics," as described in the exemplary definitions above.   Thus, each broker does not employ "a different heuristic algorithm" for each repository searched.   *Andreoli* does not, therefore, teach or suggest Applicant's claimed "plurality of *heuristic* modules … employ[ing] a different *heuristic* algorithm corresponding to said respective area to search," as recited in Applicant's claim 1.  (Emphasis added.)

Because *Andreoli* does not describe the above-identified features of claim 1, it cannot anticipate claim 1 under section 102.  Accordingly, claim 1 is allowable over *Andreoli*.

Claims 11 and 16, although of different scope than claim 1, recite features similar to those recited in claim 1.  Thus, claims 11 and 16 are allowable over *Andreoli* for the same reasons presented above with regard to claim 1.

December 11, 2008 Amendment and Remarks at 10-11, Exhibit EE, pages 12-13

17.    After another series of rejections and responses (*see, e.g.,* December 26, 2008 Office Action; April 27, 2009 Amendment and Remarks; July 8, 2009 Office Action; February 5, 2010 Appeal Brief; May 12, 2010 Office Action; September 13, 2010 Amendment and Remarks; November 29, 2010 Office Action), the PTO issued a Notice of Allowability on September 2, 2011.   The examiner set forth the reasons for allowance as follows:

EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604

Prior arts of record do not render obvious, nor anticipate the combination of claimed elements including the technique of "*receiving by the computer an inputted information descriptor from a user-input device; providing said information descriptor received from the user-input device to a plurality of heuristic modules, wherein: each heuristic module corresponds to a respective area of search and employs a different, predetermined heuristic algorithm corresponding to said respective area to search the area for information that corresponds to the received information descriptor, and the search areas include storage media accessible by the computer; searching by the heuristic modules, based on the received information descriptor, the respective areas of search using the predetermined heuristic algorithms corresponding to each respective area of search; providing at least one candidate item of information located by the heuristic modules as a result of said searching; and displaying by the computer a representation of said candidate item of information on a display device*" as recited in Claim 1. Thus, Claim 1 is allowed. Dependent Claims 7-10, 21 & 22 are allowed at least by virtue of their dependencies from Claim 1 as well as Independent Claims 11 & 16 and their dependencies.

The primary reason for the allowance of the claims in this case is the inclusion of "*searching by the heuristic modules, based on the received information descriptor, the respective areas of search using the predetermined heuristic algorithms corresponding to each respective area of search*", in combination with the other elements recited, which is not found in the prior art of records.

September 2, 2011 Notice of Allowability, Exhibit DD.

18.     The '604 patent issued on December 27, 2011.

## III.     THE ACCUSED SAMSUNG GALAXY NEXUS PRODUCT

EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604

19.     I understand that Apple has accused the Samsung Galaxy Nexus of infringing claims 6 and 19 of the '604 patent.

20.     I further understand that Apple contends that the Galaxy Nexus runs the Android 4.0 platform.   Polish Dec. at 20, fn. 1.   I also understand that, to the extent that Dr. Polish referred to source code, he relied on the source code found at http://source.android.com/source/downloading.html.   *Id.*

## IV.     UNDERSTANDING OF LEGAL STANDARDS

21.     In this section, I describe my understanding of certain legal standards.   Samsung's attorneys have informed me of these legal standards.   I am not an attorney, and I am relying only on instructions from Samsung's counsel for these standards.

### A.     Legal Standards For Infringement

22.     I understand that the determination of whether an accused product infringes a patent claim is a two-step process.   First, the language of the claim is construed as it would be understood by one of ordinary skill in the art at the time of the filing of the patent application.

23.     After the claim has been properly construed, the claim is compared with the accused product to determine whether all of the features of the claim are present literally or by a substantial equivalent.   The evaluation of literal infringement is a process of determining whether the accused product has each and every element specified in the properly construed claim.   If even one element is not present, literal infringement cannot be found.

24.     I understand that a patent's claims define what is covered by the patent.   In deciding the issue of infringement, it is improper to compare the alleged infringer's accused product to any of the patent holder's commercial products.   The patent holder's current commercial products are irrelevant in determining infringement: the only relevant inquiry is whether the properly construed claims read on the accused device(s).

25.     I understand that a device that does not literally infringe a claim may nonetheless infringe under the doctrine of equivalents if each and every limitation in the claim is "equivalently present" in the accused device.    The doctrine of equivalents must be applied to individual elements of the claim and not to the invention as a whole; thus it must not be applied broadly as to effectively eliminate an element of the claim in its entirety.    Each and every element in the claim is "equivalently present" in the accused device if only "insubstantial differences" distinguish the missing claim element from the corresponding aspects of the accused device.    One test used to determine whether differences between a claim element and the feature of the accused device asserted to practice that element are insubstantial is known as the "function-way-result test."    A claim element is insubstantially different from an accused feature if they both perform substantially the same function in substantially the same way to obtain substantially the same result.

26.     I understand that equivalency is examined in the context of the prior art, the patent specification, and the prosecution history.    The range of equivalents is limited by the prior art to prohibit the patent owner from extending patent protection beyond the scope of a claim.    Thus, the range of equivalents cannot include what the prior art anticipates and/or renders obvious.

27.     The doctrine of equivalents is also subject to the doctrine of prosecution history estoppel, which acts to limit infringement by otherwise equivalent products or processes. Prosecution history estoppel bars the patentee from recapturing subject matter that was surrendered by the patentee during prosecution to promote allowance of the claims.

**B.      Legal Standard for Patentability**

28.     I understand that in order to receive a patent an inventor must invent or discover a new and useful process, machine, manufacture, or composition of matter.

EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604

29.     I understand that patent protection may be granted for any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof.

30.     I understand that a claim that recites no more than an abstraction—i.e., software, logic or a data structure—does not qualify for patent protection. I am informed that the recitation of generic all-purpose computing devices, including a "processor" or a "computer," may be insufficient to render abstract ideas patentable. Instead, I understand computer-enabled methods must disclose a sufficiently definite algorithm that limits the invention in a meaningful way. I understand that the transfer of data from one disk to another, or the manipulation of electronically-stored data from one format or value to another format or value, does not qualify as "transformation" of an article.

### C.     Legal Standard for Prior Art

31.     I understand that a patent or other publication must first qualify as prior art before it can be used to invalidate a patent claim.

32.     I understand that a U.S. or foreign patent qualifies as prior art to an asserted patent claim under Section 102(a) of the Patent Act if the date of issuance of the patent is prior to the invention of the asserted patent claim. I further understand that a printed publication, such as an article published in a magazine or trade publication or a U.S. or foreign patent application, also qualifies as prior art under Section 102(a) to an asserted patent claim if the date of publication is prior to the invention of the asserted patent claim.

33.     I understand that a U.S. or foreign patent qualifies as prior art to an asserted patent claim under Section 102(b) of the Patent Act if the date of issuance of the patent is more than one year before the filing date of the asserted patent claim. I further understand that a printed publication, such as an article published in a magazine or trade publication or a U.S. or foreign

patent application, also qualifies as prior art under Section 102(b) to an asserted patent claim if the publication occurs more than one year before the filing date of the asserted patent.

34.     I understand that a U.S. patent qualifies as prior art to an asserted patent claim under Section 102(e) of the Patent Act if the application for that patent was filed in the United State before the invention of the asserted patent claim.

35.     I understand that documents and materials that qualify as prior art can be used to invalidate a patent claim as anticipated or as obvious.

36.     I understand that, for a party to prove invalidity at trial, it must be shown by clear and convincing evidence.

**D.     Legal Standard for Anticipation**

37.     I understand that, once the claims of a patent have been properly construed, the second step in determining anticipation of a patent claim requires a comparison of the properly construed claim language to the prior art on a limitation-by-limitation basis.

38.     I understand that a prior art reference "anticipates" an asserted claim, and thus renders the claim invalid, if all elements of the claim are disclosed in that prior art reference, either explicitly or inherently (i.e., necessarily present or implied).

39.     I understand that, for a party to prove anticipation at trial, it must be shown by clear and convincing evidence.

**E.     Legal Standard for Obviousness**

40.     I have been instructed by counsel on the law regarding obviousness, and understand that even if a patent is not anticipated, it is still invalid if the differences between the claimed subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the pertinent art.

41.     I understand that a person of ordinary skill in the art provides a reference point from which the prior art and claimed invention should be viewed. This reference point prevents one from using his or her own insight or hindsight in deciding whether a claim is obvious.

42.     I also understand that an obviousness determination includes the consideration of various factors such as (1) the scope and content of the prior art, (2) the differences between the prior art and the Asserted Claims, (3) the level of ordinary skill in the pertinent art, and (4) the existence of secondary considerations such as commercial success, long-felt but unresolved needs, failure of others.

43.     I am informed that secondary indicia of non-obviousness may include (1) a long felt but unmet need in the prior art that was satisfied by the invention of the patent; (2) commercial success or lack of commercial success of processes covered by the patent; (3) unexpected results achieved by the invention; praise of the invention by others skilled in the art; (4) taking of licenses under the patent by others; and (5) deliberate copying of the invention.    I also understand that there must be a relationship between any such secondary indicia and the invention. I further understand that contemporaneous and independent invention by others is a secondary consideration supporting an obviousness determination.

44.     I understand that an obviousness evaluation can be based on a combination of multiple prior art references. I understand that the prior art references themselves may provide a suggestion, motivation, or reason to combine, but other times the nexus linking two or more prior art references is simple common sense. I further understand that obviousness analysis recognizes that market demand, rather than scientific literature, often drives innovation, and that a motivation to combine references may be supplied by the direction of the marketplace.

45.     I understand that if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.

46.     I also understand that practical and common sense considerations should guide a proper obviousness analysis, because familiar items may have obvious uses beyond their primary purposes. I further understand that a person of ordinary skill in the art looking to overcome a problem will often be able to fit the teachings of multiple publications together like pieces of a puzzle. I understand that obviousness analysis therefore takes into account the inferences and creative steps that a person of ordinary skill in the art would employ under the circumstances.

47.     I understand that a particular combination may be proven obvious merely by showing that it was obvious to try the combination. For example, when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp because the result is likely the product not of innovation but of ordinary skill and common sense.

48.     I understand that the combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results. When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, Section 103 of the Patent Act likely bars its patentability.

49.     I understand that when a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious. It is further my understanding that a proper obviousness analysis focuses on what was known or obvious to a person of ordinary skill in the art,

Case No. 12-CV-00630-LHK
EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604

not just the patentee. Accordingly, I understand that any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.

50.     I understand that a claim can be obvious in light of a single reference, without the need to combine references, if the elements of the claim that are not found explicitly or inherently in the reference can be supplied by the common sense of one of skill in the art.

51.     In sum, my understanding is that prior art teachings are properly combined where a person of ordinary skill in the art having the understanding and knowledge reflected in the prior art and motivated by the general problem facing the inventor, would have been led to make the combination of elements recited in the claims. Under this analysis, the prior art references themselves, or any need or problem known in the field of endeavor at the time of the invention, can provide a reason for combining the elements of multiple prior art references in the claimed manner.

52.     I have been informed and understand that the obviousness analysis requires a comparison of the properly construed claim language to the prior art on a limitation-by-limitation basis.

53.     I understand that, for a party to prove obviousness at trial, it must be shown by clear and convincing evidence.

**F.     Indefiniteness**

54.     I understand that a patent specification must conclude with one or more claims particularly pointing out and distinctly claiming the subject matter that the applicant regards as his invention. Claims are indefinite if they do not reasonably apprise those skilled in the relevant art of the applicant's intended scope of the invention when read in light of the specification.

55.     I understand a claim is indefinite if it contains words or phrases whose meanings are unclear when read in light of the specification. Lack of proper antecedent basis results in a "zone of uncertainty" as to construction, and renders the claim insolubly ambiguous.

56.     I further understand that a claim is considered indefinite if it does not reasonably apprise those skilled in the art of its scope. I am informed that a claim reciting both an apparatus and a method of using that apparatus renders a claim indefinite. I understand that where it is unclear whether infringement occurs when one creates a system that allows the user to perform a function, or whether infringement occurs when the user actually uses the system to perform a function, the claim does not apprise a person of ordinary skill in the art of its scope, and it is invalid as indefinite.

57.     I understand that, for a party to prove indefiniteness at trial, it must be shown by clear and convincing evidence.

**G.      Written Description and Enablement**

58.     It is my understanding that a patent must contain a written description of the claimed invention. The written description must clearly convey to those skilled in the art that, as of the filing date sought, the applicant was in possession of the invention claimed.

59.     I have further been advised that a claimed invention must be enabled. A claimed invention is not enabled and, therefore, unpatentable if the specification does not teach those of ordinary skill in the art how to make and use the invention as it is claimed, without undue experimentation. Undue experimentation is based on the level of skill in the art as of the effective filing date of the patent.

60.     I understand that, for a party to prove lack of written description or lack of enablement at trial, it must be shown by clear and convincing evidence.

**H.      Priority Date**

EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604

61.     I understand that the "critical date" for a patent is one year prior to its filing date. It is my understanding that the critical date is significant because patents, systems, or documents that are public prior to the critical date, if they disclose each and every limitation of the claims, will invalidate a patent regardless of whether the inventors invented the claim.

62.     I further understand that the "priority date" of a patent is the date on which it is filed. I further understand that the priority date is significant because patents, systems, or documents that are public less than one year prior to the priority date may invalidate the claims. My understanding is that, for such prior art references, a patentee may attempt to show that the claimed invention was conceived prior to the publication date of the prior art reference.

63.     I understand that a patent may be valid over prior art that was published or was publically available before the priority date but after the critical date. To do so, it is my understanding that a it must be shown that the named inventors conceived of the claimed invention before the prior art, and were diligent in reducing the claimed inventions to practice.

**I.     Claim Construction**

64.     I have been instructed by counsel on the law regarding claim construction and patent claims, and understand that a patent may include two types of claims, independent claims and dependent claims. An independent claim stands alone and includes only the limitations it recites. A dependent claim can depend from an independent claim or another dependent claim. I understand that a dependent claim includes all the limitations that it recites in addition to all of the limitations recited in the claim from which it depends.

65.     I have been instructed by counsel that claim construction is a matter of law for the Court to decide. Claim terms should be given their ordinary and customary meaning within the context of the patent in which the terms are used, i.e., the meaning that the term would have to a

person of ordinary skill in the art in question at the time of the invention in light of what the patent teaches.

66.    I understand that to determine how a person of ordinary skill would understand a claim term, one should look to those sources available that show what a person of skill in the art would have understood disputed claim language to mean. Such sources include the words of the claims themselves, the remainder of the patent's specification, the prosecution history of the patent (all considered "intrinsic" evidence), and "extrinsic" evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

67.    I understand that, in construing a claim term, one looks primarily to the intrinsic patent evidence, including the words of the claims themselves, the remainder of the patent specification, and the prosecution history.

68.    I understand that extrinsic evidence, which is evidence external to the patent and the prosecution history, may also be useful in interpreting patent claims when the intrinsic evidence itself is insufficient.

69.    I understand that words or terms should be given their ordinary and accepted meaning unless it appears that the inventors were using them to mean something else. In making this determination, however, of paramount importance are the claims, the patent specification, and the prosecution history. Additionally, the specification and prosecution history must be consulted to confirm whether the patentee has acted as its own lexicographer (i.e., provided its own special meaning to any disputed terms), or intentionally disclaimed, disavowed, or surrendered any claim scope.

70.    I understand that the claims of a patent define the scope of the rights conferred by the patent. The claims particularly point out and distinctly claim the subject matter which the patentee regards as his invention. Because the patentee is required to define precisely what he

EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604

claims his invention to be, it is improper to construe claims in a manner different from the plain import of the terms used consistent with the specification. Accordingly, a claim construction analysis must begin and remain centered on the claim language itself. Additionally, the context in which a term is used in the asserted claim can be highly instructive. Likewise, other claims of the patent in question, both asserted and unasserted, can inform the meaning of a claim term. For example, because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims.   Differences among claims can also be a useful guide in understanding the meaning of particular claim terms.

71.     I understand that the claims of a patent define the purported invention. I understand that the purpose of claim construction is to understand how one skilled in the art would have understood the claim terms at the time of the purported invention.

72.     I understand that a person of ordinary skill in the art is deemed to read a claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification. For this reason, the words of the claim must be interpreted in view of the entire specification. The specification is the primary basis for construing the claims and provides a safeguard such that correct constructions closely align with the specification. Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim as set forth in the patent itself.

73.     I understand that the role of the specification is to describe and enable the invention. In turn, the claims cannot be of broader scope than the invention that is set forth in the specification. Care must be taken lest word-by-word definition, removed from the context of the patent, leads to an overall result that departs significantly from the patented invention.

EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604

74.     I understand that claim terms must be construed in a manner consistent with the context of the intrinsic record. In addition to consulting the specification, one should also consider the patent's prosecution history, if available. The prosecution file history provides evidence of how both the Patent Office and the inventors understood the terms of the patent, particularly in light of what was known in the prior art. Further, where the specification describes a claim term broadly, arguments and amendments made during prosecution may require a more narrow interpretation.

75.     I understand that while intrinsic evidence is of primary importance, extrinsic evidence, e.g., all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises, can also be considered. For example, technical dictionaries may help one better understand the underlying technology and the way in which one of skill in the art might use the claim terms. Extrinsic evidence should not be considered, however, divorced from the context of the intrinsic evidence. Evidence beyond the patent specification, prosecution history, and other claims in the patent should not be relied upon unless the claim language is ambiguous in light of these intrinsic sources. Furthermore, while extrinsic evidence can shed useful light on the relevant art, it is less significant than the intrinsic record in determining the legally operative meaning of claim language.

76.     I understand that in general, a term or phrase found in the introductory words of the claim, the preamble of the claim, should be construed as a limitation if it recites essential structure or steps, or is necessary to give life, meaning, and vitality to the claim. Conversely, a preamble term or phrase is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention. In making this distinction, one should review the entire patent to gain an understanding of what the inventors claim they actually invented and intended to encompass by the claims.

77.     I understand that language in the preamble limits claim scope (i) if dependence on a preamble phrase for antecedent basis indicates a reliance on both the preamble and claim body to define the claimed invention; (ii) if reference to the preamble is necessary to understand limitations or terms in the claim body; or (iii) if the preamble recites additional structure or steps that the specification identifies as important.

78.     I understand that the claims have not been construed by the Court at this preliminary phase of the litigation.

## V.     PERSON OF ORDINARY SKILL IN THE ART

79.     In my opinion, a person of ordinary skill would have had a Master's degree in Computer Science or a Bachelor's Degree in computer science and approximately two years of academic or industry experience in computer software including experience concerning processing of text and/or processing of data, for instance employing, populating or otherwise using a data base.

80.     I understand that a person having ordinary skill in the art is a hypothetical person. A person of ordinary skill in the art is presumed to be one who thinks along the lines of conventional wisdom in the art and is not one who undertakes to innovate, whether by extraordinary insights or by patient and often expensive systemic research.

81.     I further understand that the hypothetical person of ordinary skill is presumed to have knowledge of all references in the pertinent art and to have knowledge of all arts reasonably pertinent to the particular problem that the claimed invention addresses.

## V.     CLAIM INTERPRETATION

82.     As discussed in the legal standards section, above, I understand that claim interpretation is an issue of law for the Court.    I further understand that, at this preliminary stage, the Court has not yet construed any claim terms.

83.    I have considered claims 6 and 19 of the '604 patent in light of the understanding of a person of ordinary skill in the art in the year 2000 and in the context of the specification and the prosecution history.    I have reviewed the Polish Declaration in which Dr. Polish states that his opinions are based on how he believes a person of ordinary skill in the art would have understood the claims.    Polish Dec. ¶ 48.    I note that Dr. Polish did not set forth his understanding of any claim terms in his declaration.    I have also reviewed the transcript of Dr. Polish's deposition in which he explained his understanding of certain claim limitations.    Set forth below is my opinion concerning the meaning of certain claim limitations, based on my present understanding.

84.    **"Heuristic Module"** and **"Heuristic Algorithm"**: Based on his deposition testimony, Dr. Polish appears to assign a very broad meaning to "heuristic algorithm," and it is not entirely clear what he believes defines a "heuristic algorithm."    *See ,e.g.,* Polish Dep. at 44:3-48:22; 50:4-52:19.    To the extent that Dr. Polish's understanding of "heuristic algorithm" is limited to algorithms that employ a "rule of thumb" or some prior specific human knowledge, or one of several items of human judgment embedded in the algorithm, then we appear to have a similar understanding of the term.    To the extent that Dr. Polish's interpretation of heuristic algorithm is broader than my understanding and/or could apply to search algorithms that can be designed without any specific, human knowledge, then I disagree with his interpretation.

85.    "**A plurality of heuristic modules . . . wherein: each heuristic module corresponds to a respective area of search and employs a different, predetermined heuristic algorithm . . .**":    In my opinion, this element requires that however many heuristic modules are contained in the apparatus, **each** separate module must employ a different, predetermined heuristic search algorithm.    In my opinion, my interpretation is consistent with the plain meaning of the

phrases "a plurality of heuristic modules" wherein "each heuristic module . . . employs a different, predetermined heuristic algorithm."

86.     Dr. Polish appears to believe that he can simply define the apparatus to exclude any modules using the same algorithms.   *See* Polish Dep. at 75:12-79:13.   According to Dr. Polish, "you could pick and choose what aspects of a system you were accusing of infringement in general . . ."   *Id.* at 79:5-7.   In the context of the specific language of claim 6 of the '604 patent, I disagree.

87.     Claim 6 claims "An apparatus for locating information in a network" comprising various elements.   Those elements include "a plurality of heuristic modules" wherein "each heuristic module" employs a different heuristic algorithm.   The claim also requires search areas including "storage media accessible by "the apparatus."   This claim language makes clear that however many "heuristic modules" are in "the apparatus", each must be different.

88.     My interpretation of this claim limitation is also consistent with the specification. The specification describes a "plurality of plug-in modules" where "[e]ach plug-in module has an associated heuristic."   4:11-15.   "The heuristic of each plug-in module is different."   5:13-14 The specification consistently discusses the invention in terms of numerous plug-in modules, identified as 1 thorugh "n."   *See, e.g.,* 4:11-12; 5:10-14.   Figure 2 illustrates an exemplary embodiment of the invention:



*FIG. 2*

Case No. 12-CV-00630-LHK
EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604

1    Under Dr. Polish's interpretation of the claim term, if plug-in module $22_2$ employed the same

2    algorithm of plug-in module $22_1$, then one could decide not to consider plug-in module $22_2$ as part

3    of the apparatus and the requirement that each module employ a different heuristic algorithm

4    would still be satisfied.

5          89.    In my opinion, Dr. Polish's opinion concerning this limitation is inconsistent with

6    the language of the claim and the teachings of the specification.

7

8          90.    "**Storage media accessible by the apparatus**":    During his deposition, Dr. Polish

9    testified that he views this limitation of claim 6 as requiring local storage.    Polish Dep. at 87:11-

10   88:3; 89:8-20.    I disagree.    The claim language itself – "storage media accessible by the

11   apparatus" – is not limited to local storage media.    In addition, as Dr. Polish testified,

12   "accessible" could mean "anything on the Internet that could be accessed."    Polish Dep. at 89:8-

13   20.    In my opinion, "accessible" also includes servers in a local area network, or remote servers

14   or server clouds, so long as they provide storage that may be accessed

15

16         91.    Claim 6 claims "[a]n apparatus for locating information *in a network*,

17   comprising: . . ."    Dr. Polish's interpretation that "storage media accessible by the apparatus"

18   must be local storage media located on the device is inconsistent with the preamble's statement

19   that the apparatus is for locating information in a network.

20         92.    Dr. Polish testified at deposition that, in his opinion, "accessible" as used in claim 6

21   means "item 12 in figure 1, local storage media."    Polish Dep. at 89:8-20.    In my opinion,

22   nothing in the specification supports Dr. Polish's opinion.

23

24         93.    According to the specification, Figure 1 "illustrates the hardware components of a

25   networked computer system of a type in which exemplary embodiments of the present invention

26   can be implemented."    '604 Patent, Col. 3, lines 4-6.    Figure 1 shows both local and remote

27   storage:

28

EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604

**FIG. 1**

94.     The specification describes various possible storage locations, including remote locations, as "accessible" to the apparatus:

> In general, the present invention provides a universal interface that enables the user to readily retrieve an item of desired information located on any of the various storage media that are accessible to the user's computer system, with minimal effort. The desired information could be an application that is stored on the local storage media 12, a file stored on the LAN storage volume 8, or a web page available through the Internet router 11.

'604 Patent, Col. 3:55-62.

95.     In my opinion, Dr. Polish's opinion concerning this limitation is inconsistent with both the claim language and the specification.

## VI.     NON-INFRINGEMENT

96.     As set forth in more detail above, I understand that an infringement analysis is a two step process.    First, the language of the claim is construed as it would be understood by one of ordinary skill in the art at the time of the filing of the patent application.    Then the properly

EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604

1  construed claim is compared with the accused product to determine whether all of the features of

2  the claim are present literally or by a substantial equivalent.

3       97.     I have reviewed Dr. Polish's Declaration and deposition transcript.   Dr. Polish

4  fails to identify where or how several claim elements are present in the accused Samsung Galaxy

5  Nexus.

6

7       98.     Claim 6 requires "a plurality of heuristic modules . . .   wherein: each heuristic

8  module corresponds to a respective area of search and employs a different, predetermined heuristic

9  algorithm corresponding to said respective area."   Broken down, this claim limitation requires at

10  least "heuristic modules," "heuristic algorithm(s)", and that *each* heuristic algorithm be

11  "different."   Dr. Polish has not shown now any of these limitations are present in the Samsung

12  Galaxy Nexus.

13

14       99.     **Heuristic:**   Dr. Polish has not explained how or why any of the search areas that

15  he identifies as "heuristic modules" using "heuristic algorithms" are heuristic in his opinion.   *See*

16  *generally* Polish Declaration.   At deposition, Dr. Polish testified:

17       Q. Was there a reason that you chose not to provide detail as to what
        characteristics of the search made it a heuristic search?

18

19       A. I think it was -- no, I didn't feel it was necessary to prove it. I
        think that it was clear that this was operating in a heuristic manner;
        that it wasn't requiring a precise match; that it was -- it was looking

20       for – it gave you candidate matches. So I didn't feel like it was
        necessary to ground it in source code, at least for this purpose.

21

22  Polish Dep. at 107:23-108:8.

23       100.     **Heuristic Algorithm:**   Dr. Polish did not identify a single heuristic algorithms

24  used in any search in the Samsung Galaxy Nexus.   *See generally*, Polish Decl.   Dr. Polish

25  testified at deposition that

26

27       Q. For the three that you do discuss, you don't identify the
        algorithms corresponding to those searches, do you?

28

-27-                    Case No. 12-CV-00630-LHK
                        EXPERT DECLARATION OF DR. JAIME CARBONELL
                        CONCERNING U.S. PATENT NO. 8,086,604

1    MR. BUROKER: Object to the form.

2    A.     No, I don't think I do.

3    Q. Why not?

4    A. It -- it didn't seem necessary to prove the point. They are -- they
5    are corresponding to what's called out in – in column 4. They are
     those kinds of searches of those -- in those kinds of areas, and I
6    looked at the code and it -- and it -- it was, in my opinion, they were,
     in my opinion, heuristic searches. I have not in this declaration laid
7    it out in more detail than that.

8                                          * * *

9    Q. You don't identify any of the heuristic algorithms in your
10   declaration, do you?

11   MR. BUROKER: Object to form.

12   A. Well, I identify these three heuristic modules as being -- as
     having -- as being three different heuristic modules in the system.
13
     Q. But the heuristic algorithms corresponding to the modules are not
14   set forth in your declaration?

15   A. I don't lay out what the algorithms are, no.

16   Polish Dep. at 110:7-11; 111:3:15.

17       101.   **Different, Predetermined Heuristic Algorithm:**    Dr. Polish has not identified
18   any differences between any algorithms used in the Samsung Galaxy Nexus.    *See generally*,
19   Polish Decl.; *see also* Polish Dep. at 112:18-113:4.    When testifying at deposition, Dr. Polish did
20   not even seem certain that he had identified differences between the algorithms.    Polish Dep. at
21   112:6-12 (Q. "Did you determine the nature of the algorithms was different?"    A. "Yes, I think I
22   did."    Q.   "Did you determine that each of the original – each of the algorithms differed
23   heuristically instead of just logically?"    A. "Yes, I think I did.")    Dr. Polish also was not able to
24   identify any of the supposed differences in the algorithms.    Polish Dep. at 112:13-17.    He
25   testified that he reviewed source code, but in his declaration he did not identify any specific
26
27   modules or lines of code that we reviewed in arriving at his opinions concerning the search
28

EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604

1    algorithms used in the Samsung Galaxy Nexus.    *See* Polish Dep. at 113:5-7; *see generally* Polish

2    Decl. and attachments.

3        102.    **Each Heuristic Module . . . Employs a Different Predetermined Heuristic**

4    **Algorithm:**    As discussed in the claim construction section above, I disagree with Dr. Polish's

5    interpretation of this claim limitation.    Using what I believe to be the correct interpretation of this

6    limitation, Dr. Polish has not even attempted to show that each of the eight items that he identifies

7    as heuristic modules on pages 20 through 22 of his declaration employ different algorithms.    *See*

8    Polish Dec. at 20-21.    Dr. Polish testified that he does not know whether each of those modules is

9    different:

10

11            Q. Now, on paragraph 65 of your declaration, you state that, "Each
12            heuristic module shown above employs a different, predetermined
13            heuristic algorithm corresponding to the respective area of search."
              Do you see that?

14            A. Yes.

15            Q. And is it your opinion that each of the eight modules that we just
16            discussed employed a different, predetermined heuristic algorithm
17            corresponding to the respective area of search?

18            A. Well, certainly the three that I called out are different. I can't say
             that I --that I'm -- I can't say for certain that each of the other ones
19           are different. They may or may not be. They likely are, but I have –
             I don't -- I haven't looked at them enough to be certain.

20

21            Q. You don't know whether the other five use different heuristic
             algorithms, the five that you did not specifically discuss?

22            A. I think they likely do, but I don't know for sure.

23    Polish Dep. 109:8-110:6.

24        103.    Even using Dr. Polish's interpretation of this claim limitation, he has not

25    demonstrated that this limitation is satisfied by the accused device.    As discussed above, Dr.

26    Polish he has not identified any search algorithms used in the Samsung Galaxy Nexus and his not

27    explained how any algorithms differ.

28

                                            -29-                    Case No. 12-CV-00630-LHK
                                                          EXPERT DECLARATION OF DR. JAIME CARBONELL
                                                          CONCERNING U.S. PATENT NO. 8,086,604

104.   I have been informed that, at this preliminary injunction stage, Apple must show that it is likely to succeed on the merits.   I have also been informed that it will ultimately be Apple's burden to prove infringement.   Even so, I have reviewed elements of the publicly available source code that Dr. Polish identifies as the code he understands is running on the Samsung Galaxy Nexus.   *See* Polish Decl. at 20, n. 1.   Having reviewed that code, it is my opinion that the Samsung Galaxy Nexus does not infringe claims 6 or 19 of the '604 patent.

105.   **Heuristic Modules/Heuristic Algorithm**:   In his declaration, Dr. Polish identifies eight different search areas as "heuristic modules:"   (1) Google: Google Search suggestions;[1]  (2) Apps:   Names of installed applications; (3) Books:   Books in your library; (4) Browser: Bookmarks and web history; (5) Messaging:   Text in your message; (6) Music:   Artists, albums and tracks: (7) People:   Names of your contacts; and (8) Videos:   Rented Movies.   *See* Polish Dec. at 21-22.   I have reviewed portions of the publicly available Android 4.0 source code associated with five of the search areas that Dr. Polish identifies as "modules":   Apps, Browser, Messaging, Music and People.[2]   I have also reviewed the declaration of Björn Bringert, a software engineer for Google.   In my opinion, the search areas that Dr. Polish identified as modules do not satisfy the claim elements "heuristic modules" wherein "each heuristic module . . . employs a different, predetermined heuristic algorithm."

106.   With the exception of Google search suggestions, each of the "modules" identified by Dr. Polish search the particular user's information.   For example, Apps searches "installed" applications.   Books searches books in "your," the user's, library.   Similarly,

---

[1]   I understand that, for the Google Search suggestions module, the phone sends a query to Google servers and gets a result back from those servers.

[2]   Portions of source code concerning the Apps, Browser, Messaging, Music and People searches are attached as Exhibits L-N, O-R, S-W, X-AA, and F-J, respectively.

EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604

Browser searches the user's bookmarks and recent history, text searches in the user's messages, and contacts searches in the user's contacts. ████████████████████

████████████████████████████████████

████████████████████████

107.    Based on my own review of the source code ████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████ These searches do not incorporate a rule of thumb or any particular human knowledge specific to the problem or the data or to the user, and they are not heuristic.    According, in my opinion these searches satisfy neither the "heuristic module" nor "heuristic algorithm" limitations of claim 6.

108.    In addition, as set forth in the Bringert declaration and confirmed by my review of portions of source code, even if these searches were using heuristic algorithms, which they are not in my opinion, they are not using **different** heuristic algorithms, and therefore do not satisfy the "each heuristic module . . employs a different, predetermined heuristic algorithm . . ." limitation.

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████

## VII.   INVALIDITY

109.    In my opinion, nothing in claims 6 and 19 the '604 patent was novel or non-obvious in 2000.    Searching over a network was not new in 2000.    Using an apparatus such as a computing device that included a user input and a display for such searches was not new.

Devising modular searches to search different locations was not new, and using heuristic

algorithms to search was not new.

110.     In my opinion, claims 6 and 19 of the '604 patent are anticipated and/or rendered

obvious by at least the Wide Area Information Server protocol ("WAIS"), United States Patent No.

6,005,565 to Legall ("Legall"), United States Patent No. 6,324,534 to Neal ("Neal") and "The

MetaCrawler Architecture for Resource Aggregation on the Web," Selberg and Etzioni (1996)

("MetaCrawler"),alone or in combination with the general knowledge in the art and/or with

specific prior art as identified below and in the claim charts attached as Exhibits B-E.

### A.     WAIS Anticipates and/or Renders Obvious the Asserted Claims

111.     WAIS was a client-server search system that was in use by the early 1990s.

112.     I have reviewed various materials concerning WAIS as set forth in Exhibit B,

including background materials, requests for comments (RFCs), and user guides on the Wide Area

Information Server (WAIS) protocol.   *See* Exhibits K, GG-LL, and TT-XX.   I understand the

communications protocol, system architecture, and capabilities of systems communicating via the

WAIS protocol prior to the priority date of the '604 Patent.

113.     I have also examined the source code of FreeWAIS-sf release 2.2.12, an update to

the WAIS server software released by CNDIR in 1999.   Excerpts attached as Exhibit LL.

FreeWAIS-sf added key functionality to the WAIS server software, such as the ability to define

searchable fields in document databases.

114.     I have also viewed an operational system assembled by Lyle Bickley, and described

in his declaration.   I have witnessed the result of performing a search from a MacWAIS

Macintosh client to a server having two separate databases, each having a separate and different

synonym file.   In the demonstration, I witnessed a Macintosh client selecting two database

sources and issuing a single query to both databases substantially simultaneously.   I have

witnessed the server return matching documents to the client in response to the query.    I have additionally viewed Lyle demonstrate local search from the server terminal; the server is capable of searching its own internal databases from a command line.

115.    In my opinion, WAIS systems prior to January 5, 2000 were capable of practicing, and actually practiced every single limitation of claims 6 of the '604 Patent.    In my opinion, claim 19 of the '604 patent would have been obviousness to a person of ordinary skill in the art in 2000 based on WAIS in combination with EMACS, WordPerfect 5.2 or Siitonen.    The bases for my opinions are summarized below and are set forth in greater detail in the claim chart attached as Exhibit B.

116.    **An apparatus for locating information in a network, comprising:**    A Macintosh computer running the WAIStation client software is an apparatus for locating information in a network.    Additionally, the Macintosh running the MacWAIS client in the demonstration described in paragraph 131 was connected to the Linux server via an Ethernet switch (Bickley Decl. At ¶ 9.)

## 1.2  Client Server Architecture

A WAIS System consists of clients talking to a server via an TCP/IP network using the WAIS protocol. Servers answer search requests using auxiliary data structures called the *index*. These are created for the original documents by the **waisindex** program. Retrieve-requests are answered by the server fetching (parts of) the original files. As set of documents together with their associate index is called a *WAIS database*.



(Exhibit JJ at p. 1.)

117.   **An interface module configured to receive an inputted information descriptor from a user-input device:**    The WAIStation user interface included a "questions" window that allowed a user to type in a query in free-form text.    This query constitutes an "inputted information descriptor."    A user typically utilized a keyboard and mouse to input questions into the WAIStation user interface, and as such, the WAIStation client receives the inputted information descriptor via a user-input device.

Case No. 12-CV-00630-LHK
EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604



(Exhibit YY)

118.     The MacWAIS client demonstrated by Mr. Bickley contained a similar user interface.    After selecting database sources, the user may enter a query into the "Tell me about" window in plain text, via natural language or Boolean logic:



(Exhibit KK at 11.    (MACWAIS USER MANUAL)

119.     **A plurality of heuristic modules configured to search for information that corresponds to the received information descriptor:**    The WAIStation client permits a user to select one or more sources for simultaneous search, as shown below.

EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604

others.  Once you start up the WAIS client, you specify what's called a
source to search upon.  [A `source' specifies a server of information and
how the client can contact it, along with some other information.]  You can
ask multiple sources for information.  Then, you ask the source(s) a
question/query.  A question consists of a phrase.  With the current sample

("sketch of an overview doc" Exhibit HH at ¶1.).



(Exhibit YY.)

120.    Similarly, the MacWAIS client I have seen demonstrated included such a user

interface as well.   It permitted Mr. Bickley to select a first database of RFCs on the server, a

second database of usenet frequently asked questions on the server, or both for simultaneous

search.

(Exhibit KK at 10.)

121.    Each selected source, or server, runs a WAIS server program, such as WAISserver or FreeWAIS-sf.   Each selected server is configured to search its own stored database of information with the received search query.   Thus each server comprises a separate heuristic module configured to search for information that corresponds to the received information descriptor.

```
How does WAIS work?
        The servers take a users question and do their best to find
relevant documents.   The servers, at this point, do not "understand" the
users english language question, rather they try to find documents that
contain those words and phrases and ranks then based on heuristics.   The
```

(Exhibit GG at ¶ 3.)

122.    Furthermore, in the demonstration I viewed, each database located on a single server could be searched independently.   Therefore, the instructions to search each individual database on a single server also constitute a heuristic module.

123.    **Wherein each heuristic module corresponds to a respective area of search and employs a different, predetermined heuristic algorithm corresponding to said respective area to search the area for information that corresponds to the received information descriptor:**

124.    Because WAIS commits only to a protocol, theoretically, each source, or server, could have implemented its own search algorithm or indexing method.   Exhibit HH states, "since WAIS really just specifies the protocol for the client and server to use for communication, the underlying search on the server could just as well use various natural language queries upon its information."   (*Id.* At ¶ 2.)   However, even assuming that all servers ran conventional WAIS server programs, each server still utilizes different heuristic algorithms.

125.    Each server administrator may configure his or her server to perform the search by a certain number of heuristic algorithms.   One such heuristic algorithm is the use of synonym

searching.    A server administrator may construct synonym files that will also search particular

synonyms for an input query.    These synonym files import human knowledge, as an algorithm

cannot determine that a synonym for "programming," for example, may be "hacking."    Thus, the

use of different synonym files by different server administrators constitutes each server, or

heuristic module, employing a different predetermined heuristic algorithm corresponding to the

server's internal WAIS databases with the input query.

> The *optional* synonym file contains multiple lines with synonym terms separated by
> spaces.
>
>         wais freewais
>         programming hacking

(Exhibit JJ at 19.)

126.    In the demonstration I viewed, Mr. Bickley demonstrated searches of terms that

were included in his synonym files, but not in the actual documents.    For example, Mr. Bickley

performed a search for the term "freewais", which he had associated with "wais."    The server

returned all documents including the term "wais."    (Bickley Decl. at ¶ 7.)    These synonym files

are not generally built algorithmically and import human knowledge, often the specific knowledge

of the database administrator.    As such, the local file search also employs a predetermined

heuristic algorithm.

127.    Using Dr. Polish's interpretation of this claim limitation, this limitation would be

satisfied if any two modules used different heuristic algorithms.    Because at least the two servers

used different synonym files, and therefore heuristic algorithms, this element is necessarily

satisfied using Dr. Polish's claim interpretation.

128.    Furthermore, the demonstration I viewed satisfies the claim limitations by Dr.

Polish's interpretation.    Mr. Bickley demonstrated that the synonym files were, in fact, different

for each of the RFC and FAQ databases.    (Bickley Decl. at ¶ 8.)    Therefore, the search of each

of the two databases utilized different heuristic algorithms by Dr. Polish's interpretation.

EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604

129.    Furthermore, freeWAIS-SF permits users to define structured fields in their databases.    These structured fields may be defined, and therefore searched, via TEXT, SOUNDEX, and PHONIX.    SOUNDEX and PHONIX are heuristic algorithms that attempt to capture the sound of particular words such that exact spelling is unnecessary.

Index types currently supported are 'TEXT', 'SOUNDEX' and 'PHONIX'.

Consider the following example:

```
region: /^AU: /
        au "author names" SOUNDEX LOCAL TEXT BOTH
end: /^[A-Z][A-Z]:/
```

To the indexer this means:

For all words starting with 'AU: ' at the beginning of a line up to a line which starts with two capital letters followed by a colon and a blank, put the word in the default and the 'au' category and its soundex code only in the 'au' category.

Thus an author name can be found in the created database in the default category or the 'au' category if the exact spelling is known. If the name is misspelled, it might be found using the query 'au=(soundex misspelled-name)'. See Appendix A [Sample Format], page 37, Appendix B [Query Syntax], page 41.

(Exhibit JJ at 19.)

130.    I understand that SOUNDEX is a heuristic algorithm implemented by the census bureau in the mid 1900's and PHONIX is an improvement of PHONIX developed by T.N. Gadd and published in 1988.    I have viewed the source code of freeWAIS-SF Version 2.2.12, particularly the file, SOUNDEX.C, and attest that both these methods are heuristic rather than algorithmic.

131.    **The search areas include storage media accessible by the apparatus:**

132.    WAIStation permits a user to search databases stored remotely on WAIS servers. The databases are stored on storage media.    Because the WAIStation client can access data from these server storage media, WAIStation's search areas include "storage media accessible by the apparatus."

133.    To the extent that Apple asserts that "storage media accessible by the apparatus" must be limited to "local storage media" (see Polish deposition at 88:3; 89:8-20 ), a contention with which I disagree, the WAIStation client also permits the user to search his or her own local files.

> WAIStation enables users to retrieve information from the DowQuest document retrieval system at Dow Jones News/Retrieval, the Connection Machine Document Retrieval System, your local Macintosh, and any other database server that supports the WAIS protocol.

(Waistation User Guide Exhibit II at ¶ 10.)

134.    A user may index a collection of files and search them with a search of selected WAIS servers.   The local database may be stored on the hard disk of the same Macintosh machine running the WAIStation client software.   Thus, WAIStation permits the searching of local storage media.   I understand that other implementations of WAIS clients permitted searching locally stored index files, such as MacWAIS:

## Improvements made from version 1.23 to 1.24:

> MacWAIS 1.24 includes two important new capabilities. First, it is no longer dependent on Color QuickDraw (which it was only by oversight) so it now runs on ``Classic'' QuickDraw Systems (i.e., PB100, SE, etc.). Second, it now can search Local sources (i.e., indexes that reside locally). (The documentation doesn't reflect the local search capability (sorry, Ann!) -- I'm going to change the Source interface to incorporate this new

(Exhibit K at page 4.)

135.    Additionally, each WAIS server is capable of searching its local index files and databases.   I have viewed such functionality from a terminal command line in Mr. Bickley's Linux server.   Furthermore, my review of the freeWAIS-sf documentation indicates that FreeWAIS was capable of generating index files for search by other clients, such as MacWAIS:

> 3.2.2.5 LOCAL_SEARCH
>
> You can compile and link the clients with the capability to search index files directly. So you need not to install a server, for local searches. The clients will be greater, but faster with local searches.

(Exhibit JJ at page 8.)

EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604

136.     Therefore, to the extent that the claim limitation "storage media accessible to the apparatus" requires local storage media, a contention with which I disagree, WAIS protocol clients and servers were capable of and commonly performed searches of local databases or index files, and therefore anticipate the claim.

137.     **A display module configured to display one or more candidate items of information located by the plurality of heuristic modules on a display device:**     The WAIStation client includes a display module configured to display one or more candidate items of information located by the plurality of heuristic modules on a display device.    Upon executing a search, a ranked list of document headlines is returned from each of the plurality of sources selected for searching.

138.     In my opinion, claim 19 is rendered obvious by WAIS in combination with the general knowledge in the art as of 2000.    The added element of claim 19 concerns searching as portions of the information descriptor are added.    This functionality requires high speed processing and/or high speed connections.    WAIStation and WAIS systems were popular in the early 1990s before high-speed modems were available.    Consumer modem data rates in 1991 peaked at 14.4 kilobits per second.    At such data rates, providing real-time, or incremental, search results was pointless due to the fact that results would not return prior to the user finishing the entry of his or her complete query.    By 2000, when these hardware limitations no longer constrained the ability to search as information was being entered.    Below are merely a couple of examples of prior art that, in combination with WAIS, would have made claim 19 obvious to a person of ordinary skill in 2000.

139.     **The apparatus of claim 6, wherein the interface module is configured to receive portions of the information descriptor as the portions are being inputted:**     The WAIStation client discloses an interface module configured to receive portions of the information

1    descriptor as the portions are being inputted.   The WAIStation client permits the user to enter

2    search terms one character at a time, and the characters are displayed on the Questions window as

3    the characters are being inputted by the user.

4        140.   **And wherein the heuristic modules are configured to search for information**

5    **that corresponds to the portions of the information descriptor as the portions are being**

6    **received.**   As discussed above and in the chart attached as Exhibit B, it would have been obvious

7    to combine WAIS with incremental search functionality.   The first documented use of

8    incremental search of which I am aware was in EMACS text-editors, such as EMACs for ITS.   In

9    EMACS, as the user typed particular search strings suggested search results pulled from a local

10   database on a character-by-character basis.   A 1978 document from the MIT Artificial Intelligent

11   Laboratory, AI Memo No. 447 entitled "An Introduction to the EMACS Editor," describes the

12   incremental search functionality of EMACS on page 12.   Exhibit MM.   "[Control+] X will

13   describe one or all [Control +X]-commands, depending on the character typed next:   if you type

14   '*', all the [Control+X] commands are listed and briefly described; if you type another character

15   that [Control+x] command is describe in detail."   Exhibit MM at 12.   I personally used this

16   EMACS editor in the late 1970s and early 1980s, including incremental search.

17       141.   The incremental search feature was also implemented in the GNU Emacs text

18   editor.   Exhibit NN at paragraphs 4-6 describe the operation of such a function when searching a

19   document or memory buffer:   "An incremental search begins searching as soon as you type the

20   first character of the search string. As you type in the search string, Emacs shows you where the

21   string (as you have typed it so far) would be found... C-s starts an incremental search. C-s reads

22   characters from the keyboard and positions the cursor at the first occurrence of the characters that

23   you have typed. If you type C-s and then F, the cursor moves right after the first `F'. Type an O,

24   and see the cursor move to after the first `FO'. After another O, the cursor is after the first `FOO'

-42-

after the place where you started the search. At each step, the buffer text that matches the search string is highlighted, if the terminal can do that; at each step, the current search string is updated in the echo area."

142.   Another early implementation of incremental search was WordPerfect 5.2 for Windows, released November 30, 1992.   Exhibit PP. As the user typed in characters in the "edit" box, the Speller plug-in would suggest words beginning with the letters entered, as shown below:



143.   U.S. Patent No. 6,049,796 to Siitonen, filed February 24, 1997 and issued April 11, 2000 (Siitonen) provides yet another example of incremental search.   Exhibit OO.   Siitonen expressly describes incremental search used in a personal digital assistant ("PDA").

144.   By the time of invention, consumer access to broadband Internet connections was widespread.   It would have been obvious to one of ordinary skill in the art at the time of invention to include in WAIS a method of displaying incremental search results or real-time

EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604

1  search results as the user types his or her query.    Such a modification would provide user

2  instantaneous feedback as to whether his or her query is correct.

3          **B.      Legall Anticipates and/or Renders Obvious the Asserted Claims**

4          145.    Legall is an issued United States Patent entitled "Integrated Search of Electronic

5  Program Guide, Internet and Other Information Resources."    Legall describes a "power search

6  tool that enables a user to search an electronic program guide and other information resources with

7  one search."    *See* Exhibit FF at Abstract.

8

9          146.    I understand that Legall was filed on March 25, 1997 and issued on December 21,

10 1999.   In my opinion, Legall anticipates each claim 6 of the '604 patent.    In my opinion, claim

11 19 of the '604 patent would have been obvious to a person of ordinary skill in the art in 2000

12 based on Legall in combination with general knowledge in the art and/or in combination with

13 EMACS for ITS, WordPerfect 5.2 or Siitonen.    The bases for my opinions are summarized below

14 and are set forth in greater detail in the claim chart attached as Exhibit C.

15

16         147.    **An apparatus for locating information in a network, comprising:**    Legall

17 discloses a search tool for searching broadcast information and Internet information using a single

18 user-initiated search in col. 1, lines 32-34.    The Internet is a network of computing servers.    FIG.

19 3A, reproduced below, illustrates the network environment of the power search tool that is capable

20 of searching Internet 312.

21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11



FIG. 3A

12   148.   **An interface module configured to receive an inputted information descriptor**

13   **from a user-input device:**   Legall discloses that a user may enter a query via a keyboard, mouse,

14   or remote control.   (Col. 2, lines 26-28).   Legall also discloses that the search tool includes a

15   window 375 which includes a topic area 340, that permits the user to input, via the keyboard,

16   mouse, or remote control, a search query, or "topic."   This topic is an "information descriptor" as

17   that term is used in claim 6.   FIG. 3B below illustrates an example user interface of the power

18   search tool, including a topic area 340.

19

20

21

22

23

24

25

26

27

28

EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604



## FIG. 3B

149.    **A plurality of heuristic modules configured to search for information that corresponds to the received information descriptor:**   Legall discloses at least two modules, one that searches an electronic program guide (EPG), and one that searches the Internet via a search engine.   Legall discloses that the Internet search may utilize search engines Yahoo, AltaVista, Excite, and Infoseek.   (FIG. 3B).   Each search engine at the time used its own internal heuristics to maximize relevance of retrieved web pages and to rank said retrieved web pages with respect to the user's query, popularity and other factors.   Legall also discloses that a script may be generated that executes a sequence of commands needed to perform the search using the aforementioned search engines, or a specially created search engine (col. 4, lines 28-31). Legall also discloses that the EPG search may be performed via a search tool, which may be a database search tool or a tool specifically written for searching the EPG. (col. 4, lines 28-34).

150.    **Wherein each heuristic module corresponds to a respective area of search and employs a different, predetermined heuristic algorithm corresponding to said respective**

**area to search the area for information that corresponds to the received information**

**descriptor:**   Legall discloses at least two search modules, one for searching the Internet via the

aforementioned search engines or a specially created search engine, and another module for

searching an EPG.   Thus, these modules each correspond to a respective area of search.

151.   To the extent that Dr. Polish's interpretation of "heuristic algorithm" includes any

of the algorithms used in the applications modules on the Galaxy Nexus, it is necessarily broad

enough to include the algorithms that were used in search engines such as Yahoo, AltaVista,

Excite, and Infoseek at the time of the Legall filing.

152.   Furthermore, to the extent that Dr. Polish's interpretation of "heuristic algorithm"

includes any of the algorithms used in the applications modules on the Galaxy Nexus, it is also

necessarily broad enough to include the algorithms the algorithms that Legall discloses for

searching the EPG.   In Column 4, lines 31-32, Legall states, "the search is performed on the EPG

using a search tool.   The search tool may be a simple text search tool or database search tool, or a

tool specifically written for searching the EPG."   Legall contrasts a simple text search tool, a

deterministic, non-heuristic algorithm, with a database search tool, which would have been

understood by a person of ordinary skill in the art at the time of the Legall filing to utilize heuristic

algorithms.   Legall contrasts both the text search tool and database search tool with a tool

"specifically written for searching the EPG."   A specialized tool written specifically for searching

the EPG necessarily implies the importation of heuristic knowledge; otherwise, a simple algorithm

such as a text search tool would be sufficient.

153.   The Internet search module, when configured to search using one of the selectable

commercial search engines, employs a different heuristic search algorithm than the algorithm

utilized by the EPG search tool.   Because the search algorithm of Yahoo, AltaVista, Infoseek,

and Excite were proprietary and non-public information at the time of the Legall filing, it

1    necessarily follows that the search tool search algorithm is different than one of these Internet

2    search algorithms.

3          154.    Moreover, using Dr. Polish's interpretation of this claim limitation, the limitation

4    would be satisfied if any two modules use different heuristic algorithms.    Because at least the

5    Internet Search and EPG search modules used different heuristic algorithms, this element is

6    necessarily satisfied using Dr. Polish's claim interpretation.

7

8          155.    **The search areas include storage media accessible by the apparatus:**    The

9    Legall reference permits searching of content stored on Internet servers.    This content is

10   necessarily stored on storage media.    Moreover, the results of the search by each search engine

11   must be stored locally in order to display to the user, and in order to seek the documents

12   corresponding to user selections of search results.    Hence, there is both remote and local storage

13   media in accessed.    Additionally, search engines cannot crawl, or pre-search, storage media that

14   is non-public.    Thus, Legall discloses searching storage media accessible by the apparatus.

15

16         156.    To the extent that Apple asserts "storage media accessible by the apparatus" is

17   limited to "local storage media" (see Polish Dep. at 87:11-88:3; 89:8-20), a contention with which

18   I disagree, the Legall reference also discloses local storage media.    As previously discussed,

19   Legall discloses a search tool that may search and filter the EPG.    In Column 2, lines 17-24,

20   Legall discloses, "Receiver 105 in one embodiment is a satellite receiver for receiving satellite

21   transmissions of broadcasts and programming information through antenna 106.    Using the

22   programming information received through receiver 105, the system 100 can generate an

23   electronic program guide (EPG) on the display 120.    As will be described below, the EPG can be

24   modified or filtered according to the searching performed by the user."    Thus, it is my opinion

25   that the EPG is stored locally on system 100, because it is generated by the system 100.    When a

26   user searches the EPG using the search tool, it searches the EPG that has already been generated

27

28

by system 100 and resident on some local storage media in system 100.    Thus, it is my opinion that Legall discloses searching local storage media.

157.    Legall also repeatedly discloses that the invention contemplates searching of local databases.    See Col. 2, lines 35-37 ("it is readily apparent that the system is not limited to Internet access and can access a variety of external or internal resources including third party databases.").

158.    **A display module configured to display one or more candidate items of information located by the plurality of heuristic modules on a display device.**    Legall discloses a display module that is configured to display one or more candidate items of information located by the plurality of heuristic modules on a display device.    FIG. 2 depicts an example search results screen of the power search tool, including at least three suggested websites from the Internet search heuristic module, and one movie result from the EPG search heuristic module.    Legall also discloses, "once the search has been performed, the results are presented to the user… the result 604 of any web searches 605 are presented in an HTML frame 610 on the display."    Therefore, Legall discloses a display module configured to display one or more candidate items of information located by the plurality of heuristic modules on a display device. Figure 2, reproduced below, illustrates an example power search result including both web results 215 and EPG results 220.



FIG. 2

159.    In my opinion, claim 19 is rendered obvious by Legall in combination with the general knowledge in the art as of 2000 for the same reasons that a combination of WAIS and the knowledge in the art render claim 19 obvious.

160.    **The apparatus of claim 6, wherein the interface module is configured to receive portions of the information descriptor as the portions are being inputted:**    Legall discloses an interface module configured to receive portions of the information descriptor as the portions are being inputted.    In column 3, lines 62-64, Legall states, "text strings 401 are entered or selected for the topic list which indicate the topic or terms to be used to perform the search. FIG. 3 also illustrates an example search window, in which Power search window includes topic field 340 for displaying a search string as the user types it in:

161.   **And wherein the heuristic modules are configured to search for information that corresponds to the portions of the information descriptor as the portions are being received.**   Incorporating incremental search functionality in the invention described in Legall would have been obvious to a person of ordinary skill in the art in 2000.   As discussed above, incremental searching was well known, including in MIT's EMACs work, WordPerfect 5.2, and patents such as Siitonen.   A person of ordinary skill in the art in 2000 would have combined the disclosures of Legall with known techniques for incremental search to achieve predictable results.

162.   It would have been obvious to one of ordinary skill in the art at the time of invention to include in Legall a method of displaying incremental search results or real-time search results as the user types his or her query.   Such a modification would provide user instantaneous feedback as to whether his or her query is correct.

C.   **Neal Anticipates and/or Renders Obvious the Asserted Claims**

163.   Neal is an issued United States Patent entitled "Sequential Subset Catalog Search." Neal describes an electronic search engine for catalog searching that is configured to optimize the search process.

164.   I understand that Neal was filed on September 10, 1999 and issued on November 27, 2001.   In my opinion, Neal anticipates each claim 6 of the '604 patent.   In my opinion, claim 19 of the '604 patent would have been obviousness to a person of ordinary skill in the art in 2000 based on Neal in combination with general knowledge in the art and/or in combination with

EMACS for ITS, WordPerfect 5.2 or Siitonen.    The bases for my opinions are summarized below and are set forth in greater detail in the claim chart attached as Exhibit E.

165.    **An apparatus for locating information in a network, comprising:**    Neal discloses a system and method for cascading search methodologies.    *See, e.g.,* Neal at 1:6-10. Neal discloses searching over a network.    *See, e.g.,* Neal Figure 1.



**FIG. 1**

166.    **An interface module configured to receive an inputted information descriptor from a user-input device:**    Neal inherently discloses an interface module to receive an inputted information descriptor.    Neal discloses that a user inputs search terms to a user interface.    *See, e.g.,* Neal at 3:35-36; 3:63-67.

FIG. 3

167.   **A plurality of heuristic modules configured to search for information that corresponds to the received information descriptor:**   Neal discloses at least two heuristic modules.   Neal discloses searching different data sets with different search strategies.   *See, e.g.,* Neal at 3:25-34.   Figure 2 illustrates that the input search terms are used to search different data sets, or modules, are searched with different search methodologies.   *See, e.g.,* Figure 2.



168.    **Wherein each heuristic module corresponds to a respective area of search and employs a different, predetermined heuristic algorithm corresponding to said respective area to search the area for information that corresponds to the received information descriptor:**    Neal discloses at least two search modules used to search different data sets with different search methodologies.   *See, e.g.,* Neal at 3:25-34; 4:47-57; Figure 2.

> The present invention is a system and method for cascading search methodologies on preselected segments, or sets, of data. Each data set is paired with one or more search strategies so that the overall effect is to supply the user with the most advantageous match to a keyword search. Search strategies may include one or more of the following: exact search, stem search, soundex search, and fuzzy logic search. Data sets may be preselected based on source, shipping availability, or any other business reason for choosing, one supplier or source over another.

Neal discloses the use of heuristic algorithms, such as use of synonyms, natural adjectives, and fuzzy logic.   *See, e.g.,* Neal 4:13-17; 8:37-58.

1

2

3

4

5

6

7

8

9

10

11

12

13

        In the preferred embodiment of the invention, the algo-
rithm **200** will have a list of synonyms for each attribute. The
search algorithms can replace individual search terms with
appropriate synonyms for purposes of matching data
records. The attributes are normally used as part of an
algorithm for finding matches, and the use of synonyms for
the attributes gives additional flexibility to the range of
search strings that will produce meaningful matches.

        Another way to increase the flexibility of the search
algorithms is to allow natural adjectives in the search string
to help select certain attributes. For example, if there is a
category for computers, and the category has an attribute for
processor speed, then the adjective "fastest" in the search
string could be used to select the fastest computer. Slower
computers would be eliminated from the display list **302**.

        Yet another way to increase the flexibility of the search
algorithms is to assign categories alternative roles such as,
but not limited to, problem spaces and applications. In this
embodiment, the items found by the query are actually
predefined queries that generate lists of actual data records
from the database. Thus, selecting a category becomes
equivalent to submitting a predefined query to the database.

14

Neal Col. 8:37-58.

15      169.    **The search areas include storage media accessible by the apparatus:**    Neal

16   discloses search areas accessible by the apparatus, including search of a database.    *See, e.g.,* Neal

17   at 5:20-29; 5:53-64.

18      170.    **A display module configured to display one or more candidate items of**

19   **information located by the plurality of heuristic modules on a display device.**    Neal

20   inherently discloses a display module as it discloses a user page that is displayed to the user.    *See,*

21   *e.g.,* Neal at Abstract; 8:11-17.

22

23      171.    **The apparatus of claim 6, wherein the interface module is configured to**

24   **receive portions of the information descriptor as the portions are being inputted:**    Neal

25   inherently discloses an interface module to receive an inputted information descriptor.    Neal

26   discloses that a user inputs search terms to a user interface.    *See, e.g.,* Neal at 3:35-36; 3:63-67.

27

28

172.   **And wherein the heuristic modules are configured to search for information that corresponds to the portions of the information descriptor as the portions are being received.**   Incorporating incremental search functionality in the invention described in Neal would have been obvious to a person of ordinary skill in the art in 2000.   As discussed above, incremental searching was well known, including in MIT's EMACs work, WordPerfect 5.2, and patents such as Siitonen.   A person of ordinary skill in the art in 2000 would have combined the disclosures of Neal with known techniques for incremental search to achieve predictable results.

173.   It would have been obvious to one of ordinary skill in the art at the time of invention to include in Legall a method of displaying incremental search results or real-time search results as the user types his or her query.   Such a modification would provide user instantaneous feedback as to whether his or her query is correct.

### D.   MetaCrawler Anticipates and/or Renders Obvious the Asserted Claims

174.   MetaCrawler was a Web search service that was available at the University of Washington beginning in 1995 and was described in various articles, including "The MetaCrawler Architecture for Resource Aggregation on the Web" ("MetaCrawler"), the article on which I rely for my opinions in this declaration.   Exhibit RR.   MetaCrawler was merely one of many "metasearch" engines.   There were a number of "metasearch" engines in use before 2000, including SavvySearch, Dogpile, and Ixquick.

175.   The MetaCrawler article on which I rely in this declaration was published in November 8, 1996.   In my opinion, MetaCrawler anticipates each claim 6 of the '604 patent.   In my opinion, claim 19 of the '604 patent would have been obvious to a person of ordinary skill in the art in 2000 based on MetaCrawler in combination with general knowledge in the art and/or in combination with EMACS for ITS or WordPerfect 5.2.   The bases for my opinions are summarized below and are set forth in greater detail in the claim chart attached as Exhibit D.

176.   **An apparatus for locating information in a network, comprising:**
MetaCrawler disclosed a Web search service that provided users with a single interface that
allowed them to query multiple Web search services.    MetaCrawler at 1.

177.   **An interface module configured to receive an inputted information descriptor**
**from a user-input device:**    MetaCrawler disclosed an interface module that allowed users to
input searches then refine their query with various choices.



Figure 2: MetaCrawler Architecture

MetaCrawler at 5-6.

178.   **A plurality of heuristic modules configured to search for information that**
**corresponds to the received information descriptor:**    MetaCrawler disclosed a searching a
plurality of modules, each of which represented a particular service, using a single query.    The
"Harness" element of MetaCrawler is implemented as a collection of modules, where each module
represents a particular service:

> The Harness is the crux of the design; it's where the service-specific information is kept. The Harness receives
> control information detailing which references to obtain; it then formats the request properly and sends the
> reference to the Parallel Web Interface, which then returns a page to the Aggregation Engine. It also sends
> some status information back to the Aggregation Engine that is used to measure progress. The Harness is
> implemented as a collection of modules, where each module represents a particular service. It is designed so
> that modules can be added, modified, and removed without impacting the rest of MetaCrawler.

MetaCrawler at 6.

Case No. 12-CV-00630-LHK
EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604

179.   **Wherein each heuristic module corresponds to a respective area of search and employs a different, predetermined heuristic algorithm corresponding to said respective area to search the area for information that corresponds to the received information descriptor:**   MetaCrawler disclosed that each Module searched an associated search engine. Those search engines, in turn, search their own internal index.   Therefore, each search module in the MetaCrawler Softbot searches a corresponding area of search.   MetaCrawler further disclosed that each search engine used a different ranking algorithm, and returned different documents for the same query, in essence each search engine employed different heuristics:

> We found that each service returns different documents for the same query. Also, there is an inherent time lag in each services' results — one service may have an index of a document that is only a day or two old, whereas another may have an index that is a month old. Thus, you never know if the references returned are fresh references, or stale references that were once appropriate. A final complication is that each service uses a different ranking algorithm. One service might rank pages that are highly relevant to a given query in the top positions, whereas another may not. In practice, each ranking algorithm tends to work well for certain classes of queries, but performs poorly in others. Taken all together, each service has an extremely disparate set of documents in their index, not only in terms of which documents are indexed, but also in terms of *when* each document was indexed. We previously demonstrated that by relying exclusively on a single search engine instead of the MetaCrawler, users could miss over 77% of the references they would find most relevant[10].

MetaCrawler at 2.

To the extent that Dr. Polish's interpretation of "heuristic algorithm" includes any of the algorithms used in the applications modules on the Galaxy Nexus, it is necessarily broad enough to include the algorithms that were used in the various search engines identified in MetaCrawler.

180.   **The search areas include storage media accessible by the apparatus:** MetaCrawler discloses searching storage media accessible by the apparatus.   For example, each search engine's index is stored on storage media.   *See, e.g.,* MetaCrawler at 6.

181.   **A display module configured to display one or more candidate items of information located by the plurality of heuristic modules on a display device.**   MetaCrawler inherently discloses a display module as it discloses returning the results of the query to the user. *See, e.g.,* MetaCrawler at 2.

182.    **The apparatus of claim 6, wherein the interface module is configured to receive portions of the information descriptor as the portions are being inputted:** MetaCrawler disclosed an interface module that allowed users to input searches then refine their query with various choices.    MetaCrawler at 5-6.

183.    **And wherein the heuristic modules are configured to search for information that corresponds to the portions of the information descriptor as the portions are being received.**    Incorporating incremental search functionality in the invention described in Neal would have been obvious to a person of ordinary skill in the art in 2000.    As discussed above, incremental searching was well known, including in MIT's EMACs work, WordPerfect 5.2, and patents such as Siitonen.    A person of ordinary skill in the art in 2000 would have combined the disclosures of MetaCrawler with known techniques for incremental search to achieve predictable results.

184.    It would have been obvious to one of ordinary skill in the art at the time of invention to include in MetaCrawler a method of displaying incremental search results or real-time search results as the user types his or her query.    Such a modification would provide user instantaneous feedback as to whether his or her query is correct.


I declare under penalty of perjury that the foregoing is true and correct.


Dated:    ___23 April 2012

Jaime G. Carbonell

EXPERT DECLARATION OF DR. JAIME CARBONELL
CONCERNING U.S. PATENT NO. 8,086,604