# EXHIBIT 13

1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Charles K. Verhoeven (Bar No. 170151)
2  charlesverhoeven@quinnemanuel.com
   Kevin A. Smith (Bar No. 250814)
3  kevinsmith@quinnemanuel.com
   50 California Street, 22nd Floor
4  San Francisco, California 94111
   Telephone: (415) 875-6600
5  Facsimile: (415) 875-6700

6  Kevin P.B. Johnson (Bar No. 177129)
   kevinjohnson@quinnemanuel.com
7  Victoria F. Maroulis (Cal. Bar No. 202603)
   victoriamaroulis@quinnemanuel.com
8  555 Twin Dolphin Drive 5th Floor
   Redwood Shores, California 94065
9  Telephone: (650) 801-5000
   Facsimile: (650) 801-5100
10
   William C. Price (Bar No. 108542)
11 williamprice@quinnemanuel.com
   Patrick M. Shields (Bar No. 204739)
12 patrickshields@quinnemanuel.com
   865 S. Figueroa St., 10th Floor
13 Los Angeles, California 90017
   Telephone: (213) 443-3000
14 Facsimile: (213) 443-3100

15 Attorneys for SAMSUNG ELECTRONICS
   CO., LTD., SAMSUNG ELECTRONICS
16 AMERICA, INC. and SAMSUNG
   TELECOMMUNICATIONS AMERICA, LLC
17

18                    UNITED STATES DISTRICT COURT

19         NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

20
   APPLE INC., a California corporation,          CASE NO. 12-CV-00630-LHK
21
              Plaintiff,                          **DECLARATION OF DR. MARTIN E.
22                                                KALISKI REGARDING U.S. PATENT
        vs.                                       NO. 8,074,172**
23
   SAMSUNG ELECTRONICS CO., LTD., a               Date: June 7, 2012
24 Korean business entity; SAMSUNG                Time: 1:30 p.m.
   ELECTRONICS AMERICA, INC., a New               Place: Courtroom 8, 4th Floor
25 York corporation; SAMSUNG                      Judge: Hon. Lucy H. Koh
   TELECOMMUNICATIONS AMERICA,
26 LLC, a Delaware limited liability company,     **FILED UNDER SEAL
                                                  HIGHLY CONFIDENTIAL –
27            Defendants.                          ATTORNEYS' EYES ONLY**

28

## I.      **INTRODUCTION**

1.      My name is Martin E. Kaliski, Ph.D.   I have been retained by Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC ("Samsung" or "Defendants") to respond to the Declaration of Dr. Karan Singh of February 8, 2012 regarding U.S. Patent 8,074,172 ("the '172 patent").

2.      In that Declaration, Dr. Singh provides an opinion on the infringement of certain claims of the '172 patent[1] by the Samsung Galaxy Nexus and also offers opinions on the validity of the patent.   I disagree with his conclusions for the reasons discussed below.

3.      I am being compensated for the time I have spent on this litigation at my customary rate of $300 per hour plus reasonable expenses.   My compensation does not depend in any way on the outcome of this litigation.

4.      In reaching my conclusions, I have considered the documents and materials identified in Exhibit A attached to this Declaration.   My opinions are also based upon my education, training, research, knowledge, and personal and professional experience.

## II.     **BASIS OF OPINIONS**

### A.      **Qualifications**

5.      A detailed record of my professional qualifications, including a list of publications, awards, and professional activities, is in my Curriculum Vitae which is attached as Exhibit B to this Declaration and summarized below.

6.      I hold a doctoral degree (PhD) in Electrical Engineering, granted by the Massachusetts Institute of Technology ("MIT") in 1971, as well as a Master's degree in Electrical

---

[1]   Plaintiff has accused the Samsung Galaxy Nexus of infringing claims 18, 19, and 27 of the '172 patent.

Engineering from MIT and two Bachelor's degrees (Electrical Engineering and Mathematics), also from MIT.

7.      I was the Chair of the Electrical Engineering Department at California Polytechnic State University, San Luis Obispo ("Cal Poly") for nine years (1989-92; 1995-2001), and after 36 years of teaching in the fields of Electrical Engineering, Computer Engineering and Computer Science, I retired in 2007.   I am now a Professor Emeritus in Electrical Engineering at Cal Poly.

8.      I have been active in research and consulting in the fields of computer science, computer engineering, software engineering, electrical engineering, systems design and design recovery, as well as in related algorithm development for over 35 years.

9.      I am the co-author of three textbooks and the author of numerous technical publications.  A representative list of these publications is included in my Curriculum Vitae, attached as Exhibit B.

10.      In forming the opinions set forth herein, I relied upon my background, education and experience as an educator in the areas of electrical engineering, computer engineering and computer software and my experience with computer systems and software.

**B.**      **Materials Considered**

11.      As part of my preparation for writing this declaration, I reviewed the materials listed in Exhibit A.  Those documents include, but are not limited to, the following: the '172 patent, the file history of the '172 patent, and copies of prior art references described in this declaration and in the attached Exhibits.   The '172 patent is attached as Exhibit C.

**C.**      **Level of Ordinary Skill in the Art**

12.      In paragraph 41 of his declaration, Dr. Singh opines that a person of ordinary skill of the art of the '172 patent "would have at least a bachelor's degree in computer science,

computer engineering or electrical engineering, or the equivalent, or at least four years of experience in designing and/or implementing systems that enable user interaction and input."

13.     First, Dr. Singh apparently is unaware of the filing date for the '172.   On several occasions he makes statements such as "The '172 patent was filed on January 5, 1997 and issued with 38 claims on December 6, 2011."   An example of this error can be found in paragraph 49 of his Declaration.   Accordingly, Dr. Singh is mistaken about the point in time at which the level of ordinary skill is determined.

14.     Further, he has not stated what he believes the art of the '172 patent is.   Before one can talk about what the *level* of skill in the art is, it is critical to understand what the *art* is.   It is apparent from the reading the '172 patent that the art is *not* specifically directed at determining the suggested replacement character strings themselves.   Such techniques are incorporated by reference into the specification but are not germane to claims 18, 19, and 27 of the '172 patent (the "'172 Asserted Claims").   The patent in reality is only concerned with the use of keystrokes and gestures in portable electronic devices to choose between a suggested replacement string and the originally entered "current string".

15.     In my opinion, as of January 5, 2007, a person of ordinary skill in the art of the '172 patent would have at least a bachelor's degree in computer science, computer engineering or electrical engineering, or the equivalent, or at least four years of experience in designing and/or implementing systems that enable user interaction and input.

16.     I understand that a person having ordinary skill in the art is a hypothetical person who is used to analyzing the prior art without the benefit of hindsight.   A person of ordinary skill in the art is presumed to be one who thinks along the lines of conventional wisdom in the art and is not one who undertakes to innovate, whether by extraordinary insights or by patient and often expensive systematic research.

## III.   UNDERSTANDING OF LEGAL STANDARDS

17.     In this section, I describe my understanding of certain legal standards.   Samsung's attorneys have informed me of these legal standards.   I am not an attorney, and I am relying only on instructions from Samsung's counsel for these standards.

### A.     Legal Standards For Infringement

18.     I understand that the determination of whether an accused product infringes a patent claim is a two-step process.   First, the language of the claim is construed as it would be understood by one of ordinary skill in the art at the time of the filing of the patent application.

19.     After the claim has been properly construed, the claim is compared with the accused product to determine whether all of the features of the claim are present literally or by a substantial equivalent.   The evaluation of literal infringement is a process of determining whether the accused product has each and every element specified in the properly construed claim.   If even one element is not present, literal infringement cannot be found.

20.     I understand that a patent's claims define what is covered by the patent.   In deciding the issue of infringement, it is improper to compare the alleged infringer's accused product to any of the patent holder's commercial products.   The patent holder's current commercial products are irrelevant in determining infringement: the only relevant inquiry is whether the properly construed claims read on the accused device(s).

21.     I understand that a device that does not literally infringe a claim may nonetheless infringe under the doctrine of equivalents if each and every limitation in the claim is "equivalently present" in the accused device.   The doctrine of equivalents must be applied to individual elements of the claim and not to the invention as a whole; thus it must not be applied broadly as to effectively eliminate an element of the claim in its entirety.   Each and every element in the claim is "equivalently present" in the accused device if only "insubstantial differences" distinguish the

missing claim element from the corresponding aspects of the accused device.  One test used to determine whether differences between a claim element and the feature of the accused device asserted to practice that element are insubstantial is known as the "function-way-result test."  A claim element is insubstantially different from an accused feature if they both perform substantially the same function in substantially the same way to obtain substantially the same result.

22.      I understand that equivalency is examined in the context of the prior art, the patent specification, and the prosecution history.  The range of equivalents is limited by the prior art to prohibit the patent owner from extending patent protection beyond the scope of a claim.  Thus, the range of equivalents cannot include what the prior art anticipates and/or renders obvious.

23.      The doctrine of equivalents is also subject to the doctrine of prosecution history estoppel, which acts to limit infringement by otherwise equivalent products or processes. Prosecution history estoppel bars the patentee from recapturing subject matter that was surrendered by the patentee during prosecution to promote allowance of the claims.

**B.      Legal Standard for Patentability**

24.      I understand that in order to receive a patent an inventor must invent or discover a new and useful process, machine, manufacture, or composition of matter.

25.      I understand that patent protection may be granted for any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof.

26.      I understand that a claim that recites no more than an abstraction—i.e., software, logic or a data structure—does not qualify for patent protection. I am informed that the recitation of generic all-purpose computing devices, including a "processor" or a "computer," may be insufficient to render abstract ideas patentable. Instead, I understand computer-enabled methods must disclose a sufficiently definite algorithm that limits the invention in a meaningful way. I

understand that the transfer of data from one disk to another, or the manipulation of electronically-stored data from one format or value to another format or value, does not qualify as "transformation" of an article.

### C.   Legal Standard for Prior Art

27.     I understand that a patent or other publication must first qualify as prior art before it can be used to invalidate a patent claim.

28.     I understand that a U.S. or foreign patent qualifies as prior art to an asserted patent claim under Section 102(a) of the Patent Act if the date of issuance of the patent is prior to the invention of the asserted patent claim. I further understand that a printed publication, such as an article published in a magazine or trade publication or a U.S. or foreign patent application, also qualifies as prior art under Section 102(a) to an asserted patent claim if the date of publication is prior to the invention of the asserted patent claim.

29.     I understand that a U.S. or foreign patent qualifies as prior art to an asserted patent claim under Section 102(b) of the Patent Act if the date of issuance of the patent is more than one year before the filing date of the asserted patent claim. I further understand that a printed publication, such as an article published in a magazine or trade publication or a U.S. or foreign patent application, also qualifies as prior art under Section 102(b) to an asserted patent claim if the publication occurs more than one year before the filing date of the asserted patent.

30.     I understand that a U.S. patent qualifies as prior art to an asserted patent claim under Section 102(e) of the Patent Act if the application for that patent was filed in the United State before the invention of the asserted patent claim.

31.     I understand that documents and materials that qualify as prior art can be used to invalidate a patent claim as anticipated or as obvious.

32.     I understand that, for a party to prove invalidity at trial, it must be shown by clear and convincing evidence.

33.     I understand that, for purposes of opposing Apple's motion for a preliminary injunction, Samsung must raise a substantial question of invalidity.

**D.     Legal Standard for Anticipation**

34.     I understand that, once the claims of a patent have been properly construed, the second step in determining anticipation of a patent claim requires a comparison of the properly construed claim language to the prior art on a limitation-by-limitation basis.

35.     I understand that a prior art reference "anticipates" an asserted claim, and thus renders the claim invalid, if all elements of the claim are disclosed in that prior art reference, either explicitly or inherently (i.e., necessarily present or implied).

36.     I understand that, for a party to prove anticipation at trial, it must be shown by clear and convincing evidence.

37.     I understand that, for purposes of opposing Apple's motion for a preliminary injunction, Samsung must raise a substantial question of invalidity.

**E.     Legal Standard for Obviousness**

38.     I have been instructed by counsel on the law regarding obviousness, and understand that even if a patent is not anticipated, it is still invalid if the differences between the claimed subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the pertinent art.

39.     I understand that a person of ordinary skill in the art provides a reference point from which the prior art and claimed invention should be viewed. This reference point prevents one from using his or her own insight or hindsight in deciding whether a claim is obvious.

40.     I also understand that an obviousness determination includes the consideration of various factors such as (1) the scope and content of the prior art, (2) the differences between the prior art and the Asserted Claims, (3) the level of ordinary skill in the pertinent art, and (4) the existence of secondary considerations such as commercial success, long-felt but unresolved needs, failure of others.

41.     I am informed that secondary indicia of non-obviousness may include (1) a long felt but unmet need in the prior art that was satisfied by the invention of the patent; (2) commercial success or lack of commercial success of processes covered by the patent; (3) unexpected results achieved by the invention; praise of the invention by others skilled in the art; (4) taking of licenses under the patent by others; and (5) deliberate copying the invention.  I also understand that there must be a relationship between any such secondary indicia and the invention. I further understand that contemporaneous and independent invention by others is a secondary consideration supporting an obviousness determination.

42.     I understand that an obviousness evaluation can be based on a combination of multiple prior art references. I understand that the prior art references themselves may provide a suggestion, motivation, or reason to combine, but other times the nexus linking two or more prior art references is simple common sense. I further understand that obviousness analysis recognizes that market demand, rather than scientific literature, often drives innovation, and that a motivation to combine references may be supplied by the direction of the marketplace.

43.     I understand that if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.

44.     I also understand that practical and common sense considerations should guide a proper obviousness analysis, because familiar items may have obvious uses beyond their primary

purposes. I further understand that a person of ordinary skill in the art looking to overcome a problem will often be able to fit the teachings of multiple publications together like pieces of a puzzle. I understand that obviousness analysis therefore takes into account the inferences and creative steps that a person of ordinary skill in the art would employ under the circumstances.

45.     I understand that a particular combination may be proven obvious merely by showing that it was obvious to try the combination. For example, when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp because the result is likely the product not of innovation but of ordinary skill and common sense.

46.     I understand that the combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results. When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, Section 103 of the Patent Act likely bars its patentability.

47.     I understand that when a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious. It is further my understanding that a proper obviousness analysis focuses on what was known or obvious to a person of ordinary skill in the art, not just the patentee. Accordingly, I understand that any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.

48.     I understand that a claim can be obvious in light of a single reference, without the need to combine references, if the elements of the claim that are not found explicitly or inherently in the reference can be supplied by the common sense of one of skill in the art.

49.     In sum, my understanding is that prior art teachings are properly combined where a person of ordinary skill in the art having the understanding and knowledge reflected in the prior art and motivated by the general problem facing the inventor, would have been led to make the combination of elements recited in the claims. Under this analysis, the prior art references themselves, or any need or problem known in the field of endeavor at the time of the invention, can provide a reason for combining the elements of multiple prior art references in the claimed manner.

50.     I have been informed and understand that the obviousness analysis requires a comparison of the properly construed claim language to the prior art on a limitation-by-limitation basis.

51.     I understand that, for a party to prove obviousness at trial, it must be shown by clear and convincing evidence.

52.     I understand that, for purposes of opposing Apple's motion for a preliminary injunction, Samsung must raise a substantial question of invalidity.

**F.      Indefiniteness**

53.     I understand that a patent specification must conclude with one or more claims particularly pointing out and distinctly claiming the subject matter that the applicant regards as his invention. Claims are indefinite if they do not reasonably apprise those skilled in the relevant art of the applicant's intended scope of the invention when read in light of the specification.

54.     I understand a claim is indefinite if it contains words or phrases whose meanings are unclear when read in light of the specification. Lack of proper antecedent basis results in a "zone of uncertainty" as to construction, and renders the claim insolubly ambiguous.

55.     I further understand that a claim is considered indefinite if it does not reasonably apprise those skilled in the art of its scope. I am informed that a claim reciting both an apparatus and a method of using that apparatus renders a claim indefinite. I understand that where it is unclear whether infringement occurs when one creates a system that allows the user to perform a function, or whether infringement occurs when the user actually uses the system to perform a function, the claim does not apprise a person of ordinary skill in the art of its scope, and it is invalid as indefinite.

56.     I understand that, for a party to prove indefiniteness at trial, it must be shown by clear and convincing evidence.

57.     I understand that, for purposes of opposing Apple's motion for a preliminary injunction, Samsung must raise a substantial question of invalidity.

### G.     Written Description and Enablement

58.     It is my understanding that a patent must contain a written description of the claimed invention. The written description must clearly convey to those skilled in the art that, as of the filing date sought, the applicant was in possession of the invention claimed.

59.     I have further been advised that a claimed invention must be enabled. A claimed invention is not enabled and, therefore, unpatentable if the specification does not teach those of ordinary skill in the art how to make and use the invention as it is claimed, without undue experimentation. Undue experimentation is based on the level of skill in the art as of the effective filing date of the patent.

60.     I understand that, for a party to prove lack of written description or lack of enablement at trial, it must be shown by clear and convincing evidence.

61.     I understand that, for purposes of opposing Apple's motion for a preliminary injunction, Samsung must raise a substantial question of invalidity.

**H.      Priority Date**

62.     I understand that the "critical date" for a patent is one year prior to its filing date. It is my understanding that the critical date is significant because patents, systems, or documents that are public prior to the critical date, if they disclose each and every limitation of the claims, will invalidate a patent regardless of whether the inventors invented the claim.

63.     I further understand that the "priority date" of a patent is the date on which it is filed. I further understand that the priority date is significant because patents, systems, or documents that are public less than one year prior to the priority date may invalidate the claims. My understanding is that, for such prior art references, a patentee may attempt to show that the claimed invention was conceived prior to the publication date of the prior art reference.

64.     I understand that a patent may be valid over prior art that was published or was publically available before the priority date but after the critical date. To do so, it is my understanding that a it must be shown that the named inventors conceived of the claimed invention before the prior art, and were diligent in reducing the claimed inventions to practice.

**I.      Claim Construction**

65.     I have been instructed by counsel on the law regarding claim construction and patent claims, and understand that a patent may include two types of claims, independent claims and dependent claims. An independent claim stands alone and includes only the limitations it recites. A dependent claim can depend from an independent claim or another dependent claim. I

understand that a dependent claim includes all the limitations that it recites in addition to all of the limitations recited in the claim from which it depends.

66.     I have been instructed by counsel that claim construction is a matter of law for the Court to decide. Claim terms should be given their ordinary and customary meaning within the context of the patent in which the terms are used, i.e., the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention in light of what the patent teaches.

67.     I understand that to determine how a person of ordinary skill would understand a claim term, one should look to those sources available that show what a person of skill in the art would have understood disputed claim language to mean. Such sources include the words of the claims themselves, the remainder of the patent's specification, the prosecution history of the patent (all considered "intrinsic" evidence), and "extrinsic" evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

68.     I understand that, in construing a claim term, one looks primarily to the intrinsic patent evidence, including the words of the claims themselves, the remainder of the patent specification, and the prosecution history.

69.     I understand that extrinsic evidence, which is evidence external to the patent and the prosecution history, may also be useful in interpreting patent claims when the intrinsic evidence itself is insufficient.

70.     I understand that words or terms should be given their ordinary and accepted meaning unless it appears that the inventors were using them to mean something else. In making this determination, however, of paramount importance are the claims, the patent specification, and the prosecution history. Additionally, the specification and prosecution history must be consulted to confirm whether the patentee has acted as its own lexicographer (i.e., provided its own special

DECLARATION OF DR. MARTIN E. KALISKI REGARDING U.S. PATENT NO. 8.074.172

meaning to any disputed terms), or intentionally disclaimed, disavowed, or surrendered any claim scope.

71.     I understand that the claims of a patent define the scope of the rights conferred by the patent. The claims particularly point out and distinctly claim the subject matter which the patentee regards as his invention. Because the patentee is required to define precisely what he claims his invention to be, it is improper to construe claims in a manner different from the plain import of the terms used consistent with the specification. Accordingly, a claim construction analysis must begin and remain centered on the claim language itself. Additionally, the context in which a term is used in the asserted claim can be highly instructive. Likewise, other claims of the patent in question, both asserted and unasserted, can inform the meaning of a claim term. For example, because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims.   Differences among claims can also be a useful guide in understanding the meaning of particular claim terms.

72.     I understand that the claims of a patent define the purported invention. I understand that the purpose of claim construction is to understand how one skilled in the art would have understood the claim terms at the time of the purported invention.

73.     I understand that a person of ordinary skill in the art is deemed to read a claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification. For this reason, the words of the claim must be interpreted in view of the entire specification. The specification is the primary basis for construing the claims and provides a safeguard such that correct constructions closely align with the specification. Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim as set forth in the patent itself.

74.    I understand that the role of the specification is to describe and enable the invention. In turn, the claims cannot be of broader scope than the invention that is set forth in the specification. Care must be taken lest word-by-word definition, removed from the context of the patent, leads to an overall result that departs significantly from the patented invention.

75.    I understand that claim terms must be construed in a manner consistent with the context of the intrinsic record. In addition to consulting the specification, one should also consider the patent's prosecution history, if available. The prosecution file history provides evidence of how both the Patent Office and the inventors understood the terms of the patent, particularly in light of what was known in the prior art. Further, where the specification describes a claim term broadly, arguments and amendments made during prosecution may require a more narrow interpretation.

76.    I understand that while intrinsic evidence is of primary importance, extrinsic evidence, e.g., all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises, can also be considered. For example, technical dictionaries may help one better understand the underlying technology and the way in which one of skill in the art might use the claim terms. Extrinsic evidence should not be considered, however, divorced from the context of the intrinsic evidence. Evidence beyond the patent specification, prosecution history, and other claims in the patent should not be relied upon unless the claim language is ambiguous in light of these intrinsic sources. Furthermore, while extrinsic evidence can shed useful light on the relevant art, it is less significant than the intrinsic record in determining the legally operative meaning of claim language.

77.    I understand that in general, a term or phrase found in the introductory words of the claim, the preamble of the claim, should be construed as a limitation if it recites essential structure or steps, or is necessary to give life, meaning, and vitality to the claim. Conversely, a

preamble term or phrase is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention. In making this distinction, one should review the entire patent to gain an understanding of what the inventors claim they actually invented and intended to encompass by the claims.

78.     I understand that language in the preamble limits claim scope (i) if dependence on a preamble phrase for antecedent basis indicates a reliance on both the preamble and claim body to define the claimed invention; (ii) if reference to the preamble is necessary to understand limitations or terms in the claim body; or (iii) if the preamble recites additional structure or steps that the specification identifies as important.

79.     I understand that claims of a patent may be written in what is known as a "means-plus-function" form.   I understand that a claim element is in means-plus-function form when it is expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support of the function.   I understand that such claims are construed to cover the corresponding structure, material, or acts described in the specification and their equivalents. I also understand that in a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.   Absent any such algorithm, the claim lacks sufficient disclosure of structure and is therefore indefinite.

80.     I understand that the claims have not been construed by the Court at this preliminary phase of the litigation.

IV.     **CLAIM CONSTRUCTIONS**

81.     Dr. Singh states in the first paragraph of his Declaration that he is providing opinions on the infringement of certain claims of the '172 patent and on whether or not "the Apple

DECLARATION OF DR. MARTIN E. KALISKI REGARDING U.S. PATENT NO. 8.074.172

iOS" products use the technology of this patent.   In my view he has not provided convincing arguments for either of these opinions, for the reasons discussed below.

82.     Regarding the construction of claim terms of the '172 patent, Dr. Singh states that he applied the understanding of the claims from the perspective of one of ordinary skill in the art.

83.     But, Dr. Singh does not state what any of his constructions are.   He implicitly uses certain constructions to argue infringement of the asserted claims of the patent, the overall validity of the patent, and its practice by Apple's iOS devices, but he never explicitly states what the claim terms mean.   The problem with this approach is that these terms have many reasonable alternate constructions, and it is unclear which of these constructions Dr. Singh is using for infringement and validity analysis.   In at least the following examples, even after reading Dr. Singh's declaration and deposition transcript, it is unclear to me which of these meanings Dr. Singh believes is the correct one.

84.     Dr. Singh was unable to identify the understanding of one of ordinary skill in the art of "replace a character string", stating "you can talk about replacing a string at a visual level on – on a screen, as well as you can talk about taking a string variable and – and replacing that string variable."   (Singh. Dep. at 63:21 – 64:4.)   Dr. Singh further agreed that replacing a current character string with another input string was different from keeping the current character string.   (*Id.* at 242:6-14.)   In fact, Dr. Singh says that this difference was not a trivial one, because "in the area of interface design, small changes, small differences can – can have a substantial impact." (*Id.* at 242:15-21.)

85.     Dr. Singh went on to describe an example of a particular algorithm for replacing a character string:

```
17      Q   So based on what you read, please tell me the
18   algorithm that you have in mind for performing a
19   replacement of a current character string with another
20   character string.
21          MR. BUROKER:  Objection; foundation; form;
22   incomplete hypothetical.
23          THE WITNESS:  Well -- sorry.  Yeah.
24          Depending on -- depending on the system I was
25   working with, one algorithm that a person of ordinary

 1   skill in the art might use is to take the string that
 2   one wished to replace and use that string to -- to
 3   change the string that was being currently displayed,
 4   wherever it was currently being displayed.
 5          However, the -- however, the -- the display
 6   of the current character string in -- in the first
 7   area, as -- as the claim language says, it would
 8   essentially take that string and -- and replace it.
 9   That's the algorithm.
10          You would use essentially string manipulation
11   instructions to do that.
```

(*Id.* at 62:17 – 63:11.)   Dr. Singh admitted that performing string manipulation was well known to one of ordinary skill in the art in 2007.   (*Id.* at 63:12-15.)

86.      In another instance, Dr. Singh admitted "replacing" and "appending" can refer to both "a visual – the visual result" as well as to "one particular way – of doing things" at an algorithmic level.  (*Id.* at 245:8-14; 245:15-20.)   He explained: "[o]ne way might be to a string manipulation where you replace the string and then append to that string a punctuation, but another potential embodiment might be to append a punctuation mark to the replacement string, and then perform a string replacement."   (*Id.* at 245:24 – 246:5.)

87.      It is my opinion, from just these few examples, that even from the perspective of a person of ordinary skill in the art, at least the claim terms identified above are capable of many

DECLARATION OF DR. MARTIN E. KALISKI REGARDING U.S. PATENT NO. 8.074.172

reasonable alternative meanings.  Specifically, many of the claim terms are capable of multiple interpretations, even at an algorithmic level.

88.     I understand that the claims of a patent must be construed before infringement can be determined.  As there are outstanding issues of claim construction, I am unable to fully understand what Apple alleges infringes the asserted claims, and I am equally unable to fully evaluate Apple's infringement allegations.  This problem is compounded by the fact that Dr. Singh has not analyzed any of the source code or algorithms of the accused product, and does not provide any description of source code or algorithms in his declaration, even though many of the claim limitations recite code "instructions for" performing certain functions.

## V.     APPLE'S USE OF THE PATENTED TECHNOLOGY

89.     Dr. Singh's entire discussion of Apple's "Use of the Patented Technology" is limited to a single paragraph (paragraph 114).  He states that "Each of these Apple products provides functionality to enable each of input through use of punctuation marks, delimiters like the space bar and selecting the suggested replacement string or the current replacement string through a bar that is provide [sic] in the middle of the user interface between the text input area and the keyboard, as described and claimed in the '172 patent."

90.     However, the '172 patent does not disclose a "bar that is provide [sic] in the middle of the user interface" and it is unclear how he is mapping the functionality of the Apple products to what is disclosed in the patent, nor is it clear which Apple products he is specifically referring to.

91.     In addition, Dr. Singh is simply incorrect when he states that "Each of the Apple products provides functionality ... as described and claimed in the '172 patent."  The original iPhone software for auto-correction did not display the word entered by the user in two different places (Kocienda Dep. at 95:10-20), and neither did any later English-language iPhones (*Id.* at

107:15-21).   The software for iPads, insofar as auto-correction is concerned, behaves the same way.   (*Id.* at 172:4-11.)   Thus, Apple's iOS products do not have the functionality claimed in Claims 18 and 19 of the '172 patent, Dr. Singh's comments notwithstanding.   Indeed, Dr. Singh admitted in his deposition that the English language version of the iPhone does not include this functionality, and that he was aware of this missing functionality when his declaration was filed. (Singh Dep. at 237:21 – 238:3.)   Dr. Singh also admitted that he is relying on only the English versions of the Galaxy Nexus and the iPhone for his declaration.   (*Id.* at 99:9-24.)

## VI.   <u>NON-INFRINGEMENT</u>

92.      It is my opinion that the Samsung Galaxy Nexus does not infringe any of the '172 Asserted Claims.

93.      Claims 18 and 19 require that the current character string be "kept" if the user performs a certain gesture (Claim 18) or that there are instructions for "keeping" it if the user performs a certain gesture (Claim 19).   But Dr. Singh has provided no evidence that the Samsung Galaxy Nexus has either functionality.   Indeed, Dr. Singh has provided no examination of the source code, and he admits he does not have a detailed understanding of the algorithms implemented in the Galaxy Nexus.   (Singh Dep. at 37:16 – 39:6.)

94.      Without looking at the source code for the accused products there is simply no way that Dr. Singh, or anyone else for that matter, can empirically tell how the current character string is "kept" or "replaced".   Nor is there a way to tell how the system "replac[es]" and "append[s]" when a punctuation key it is pressed.

95.      In particular, Claims 19 and 27 recite programs including instructions for doing certain things (e.g., replacing, keeping, appending).   However, nowhere in his analysis does Dr. Singh discuss or point to the Samsung Galaxy Nexus software that actually does this.   He is at best inferring that the software *must* do this.   And as noted above, Dr. Singh admits that he does

DECLARATION OF DR. MARTIN E. KALISKI REGARDING U.S. PATENT NO. 8.074.172

1    not have any detailed understanding of any of the algorithms implemented in the Galaxy Nexus.

2    (*Id.*)   Dr. Singh has thus failed to indicate what, in particular, he believes infringes these claims.

3        **A.     The Galaxy Nexus does not infringe claim 18 because the current character**
4             **string is never "kept"**

5        96.     Claim 18 contains a limitation that recites "the current character string in the first

6    area is kept if the user performs a gesture in the second area on the current character string or the

7    portion thereof displayed in the second area."

8        97.     In paragraph 70 of his declaration, Dr. Singh states that "[i]f the user performs a

9    second gesture of pressing on the current string, the current character string is kept."   Dr. Singh

10   has not adequately shown that the Galaxy Nexus does, in fact, allow a string to be "kept" when the

11   user performs a gesture.

12

13       98.     ███████████████████████████████████████████████

14   ████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████

22   Therefore, the Galaxy Nexus does not include the claimed functionality wherein a current

23   character string is "kept."   Thus, the Galaxy Nexus does not infringe Claim 18 of the '172 patent

24   because it does not include the limitation "the current character string in the first area is kept if the

25   user performs a gesture in the second area on the current character string or the portion thereof

26   displayed in the second area."

27

28

DECLARATION OF DR. MARTIN E. KALISKI REGARDING U.S. PATENT NO. 8.074.172

99.     Dr. Singh does not address the doctrine of equivalents with respect to this claim. Regardless, it is my opinion that the Galaxy Nexus is not equivalent to the claimed invention of the '172 patent.   First, I understand that the doctrine of equivalents must not be applied broadly as to effectively eliminate an element of the claim in its entirety.   However, the Galaxy Nexus does not contain the "the current character string in the first area is kept" limitation; therefore, it cannot be equivalent.   Even if the doctrine of equivalents does apply, Dr. Singh has not provided an argument under the Doctrine of Equivalents that this is insubstantially different from the string being "kept".   Regardless, it is my opinion that the Samsung Devices are not equivalent because they do not practice substantially the same function in substantially the same way to achieve substantially the same result. ███████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████     In addition, as Dr. Singh admitted during his deposition, algorithms that replace a character string and algorithms that keep a character string can have a different impact on system performance and system resources.   (*Id.* at 244:8-15.)

100.     Accordingly, the Galaxy Nexus does not practice this limitation literally, nor does it perform substantially the same function in substantially the same way to achieve the substantially same result as the claimed invention.

**B.     The Galaxy Nexus does not infringe claim 19 because it has no instructions for "keeping"**

101.     Claim 19 contains a limitation that recites "instructions for keeping the current character string in the first area if the user performs a second gesture in the second area on the current character string or the portion thereof displayed in the second area."

102.     Just as in paragraph 70, in paragraph 91 of his declaration, Dr. Singh again states in a conclusory fashion that "[i]f the user performs a second gesture of pressing on the current

string, the current character string is kept."   Dr. Singh has not adequately shown that the Galaxy

Nexus does, in fact, contain instructions for "keeping" a string when a user performs a gesture.

103.   ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Therefore, the Galaxy Nexus does not include the claimed functionality for "keeping" a current

character string.   Thus, the Galaxy Nexus does not infringe Claim 19 of the '172 patent because it

does not include the limitation "instructions for keeping the current character string in the first area

if the user performs a second gesture in the second area on the current character string or the

portion thereof displayed in the second area."

104.   Dr. Singh does not address the doctrine of equivalents with respect to this claim.

Regardless, it is my opinion that the Galaxy Nexus is not equivalent to the claimed invention of

the '172 patent.   The Galaxy Nexus does not contain the "instructions for keeping" limitation;

therefore, it cannot be equivalent.   Even if the doctrine of equivalents does apply, Dr. Singh has

not provided an argument under the Doctrine of Equivalents that this is insubstantially different

from "keeping" the string.   Regardless, it is my opinion that the Samsung Devices are not

equivalent because they do not practice substantially the same function in substantially the same

way to achieve substantially the same result.   ████████████████████████

████████████████████████████████████████████████

DECLARATION OF DR. MARTIN E. KALISKI REGARDING U.S. PATENT NO. 8.074.172

███████████████████████████████   Also, as noted above, Dr. Singh admitted during his deposition that algorithms that replace a character string and algorithms that keep a character string can have a different impact on system performance and system resources.  (*Id.* at 244:8-15.)

105.    Accordingly, the Galaxy Nexus does not practice this limitation literally, nor does it perform substantially the same function in substantially the same way to achieve the substantially same result as the claimed invention.

## VII.    THE PROSECUTION HISTORY AND THE LONGE REFERENCE

106.    Dr. Singh's Declaration addresses the validity of the '172 patent in a cursory fashion, essentially repeating material presented in the Prosecution History.  It is clear from Dr. Singh's Declaration that he has not closely reviewed the Prosecution History, and has not given much thought to the validity of the '172 patent.   In my view – as will be seen below – the United States Patent and Trademark Office ("USPTO") considered art that discloses all the limitations of the '172 Asserted Claims, and there is additional prior art not considered by the USPTO that invalidates the three asserted claims of the '172 patent.

107.    It is my understanding that Claims 18, 19, and 27 of the '172 patent correspond to originally numbered claims 23, 24, and 32, as seen in the Prosecution History.

108.    In a February 18, 2011 Office Action, attached as Exhibit D, the Examiner rejected claims 27-43 as anticipated by US Patent Publication 2006/0274051 ("Longe"), attached as Exhibit F.  The Examiner did not apply Longe to asserted claims 18 and 19.  The Examiner stated that Longe, in paragraph [0179], discloses a current character string in two places, and also a suggested replacement string.  Citing to paragraph [0227], the Examiner further indicated that Longe discloses accepting a suggested string, replacing a current string, and appending

1   punctuation by "input associated with a key for a punctuation mark."  The Examiner indicated

2   this same rationale applied to asserted claim 27.

3           109.    In a July 18 Amendment, attached as Exhibit E, the applicant amended the

4   rejected claims to recite a "punctuation mark key" instead of a "key associated with a punctuation

5   mark".  The applicant noted that the cited section in Longe does not reference a "punctuation

6   mark key of the keyboard".  The applicant did not speak to any other aspects of Longe's

7   disclosure.  Indeed, the applicant did not deny the Examiner's assertions that Longe discloses a

8   current character string which is displayed twice, that Longe discloses selecting a word from a

9   word choice list to cause a replacement, and that Longe discloses an alternate keyboard for

10  punctuation.

11          110.    Longe has a broader disclosure than recognized by the Examiner.  In paragraph

12  [0180], not relied upon by the Examiner, Longe discloses an alternate "keyboard of punctuation

13  and symbols", wherein "the selection of any character from the displayed alternate keyboard

14  causes the Default word of the previously displayed word choice list to be output to the output text

15  region 104 prior to outputting the selected character."  Longe thus discloses all the limitations of

16  Claim 27.  Indeed, Dr. Singh admitted that paragraph [0180] discusses a selection of a suggested

17  word based on input of a punctuation mark.   (Singh Dep. at 150:20 – 151:1; 152:11-17.)

18          111.    In his deposition, Dr. Singh repeatedly asserted that an alleged difference between

19  Longe and Claim 27 of the '172 patent is that Longe does not disclose "replacin[ing] the current

20  character string with a selected alternative."  (*Id.* at 219:24 – 220:5.)  However, Dr. Singh agreed

21  that step 41032 of Figure 4J of Longe discloses replacing an input sequence.  (*Id.* at 183:4-14.)

22  Dr. Singh was unable to identify any other differences between Longe and Claim 27.  (*Id.* at

23  220:6-15.)  Because Dr. Singh is incorrect on this single point of distinction, it is my opinion that

24  Longe discloses all the limitations of Claim 27 of the '172 patent.

112.     Despite Dr. Singh's assertion that Longe does not disclose "a first and second area both of which display the current character string" (Singh Decl. Para 123), Longe discloses these limitations as well.   Longe discloses in paragraph [0169] an "upper output text region 104 [that] displays the text entered by the user and serves as a buffer for text input and editing."   Further, Longe discloses specific embodiments in paragraph [0181] for displaying text entry in the output text region 104 as the user is typing on the keyboard.   Longe also discloses in paragraph [0232] a horizontal word-choice list, placed at the top of a virtual keyboard, and indicating to the user that a word or word stem may be completed through a selection list.   An element-by-element comparison of Longe to the asserted claims is attached as Exhibit K.   Longe thus also discloses all the limitations of Claims 18 and 19.

113.     I understand that Longe is a continuation-in-part of the application that issued as U.S. Patent No. 7,030,863, which is itself a continuation-in-part of the application that issued as U.S. Patent No. 6,801,190 to Robinson *et al.* ("Robinson").   As will be discussed in more detail below and in the attached claim charts, Robinson contains the relevant language from Longe's disclosure.   It is my opinion that Robinson, like Longe, discloses all the limitations of the '172 Asserted Claims, and therefore also anticipates those claims.

## VIII.   DESCRIPTION OF PRIOR ART

### A.     Longe

114.     U.S. Patent Publication No. 2006/0274051 to Longe *et al.* ("Longe") is primarily concerned with the problem of correcting words that might be mistyped on the kinds of small keyboards found on portable electronic devices, and presenting a user interface for performing such corrections.   The claim chart in Exhibit K provides an element-by-element analysis of Longe in comparison to the '172 Asserted Claims.

115.     Figures 5A-5E show the display of a current character string, along with suggested replacements and how, through user actions, the desired character string can be selected.   Figure 1B illustrates a virtual keyboard, Exact Type word 154 (current character string), Default word 160 (replacement character string), output text region 104 (first area), and word choice list region 150 (second area):



116.     Longe also discloses that the current character string is shown in both the first area and the second area.   Longe discloses that the output text region 104 "displays text entered by the user and serves as a buffer for text input and editing."   (*Id.* at ¶ [0178].)   In addition to this disclosure, Longe describes an Edit Word key 114 which creates a word choice list on a selected word, which is already in the first area:

> When no current input sequence exists, an interaction on the Edit Word key 114 causes the system to establish a current input sequence consisting of the coordinate locations associated with the letters of the word that contains the insertion point cursor 107 or is immediately to the left of this cursor in the output text region 104. The result is that this word is pulled in to the system creating a word

DECLARATION OF DR. MARTIN E. KALISKI REGARDING U.S. PATENT NO. 8,074,172

choice list in which the word appears both as the Default word 160 and the Exact Type word 154.

(*Id.* at ¶ [0181].)   Furthermore, Longe explains that, in certain situations, it would be preferable that "key strokes in the auto-correcting keyboard are not matched to characters in isolation, but rather entire sequences of keystrokes corresponding to completed words are matched against a lexicon of candidate words that includes frequency of use information."   (*Id.* at ¶ [0172].) These disclosures make it clear to one of ordinary skill in the art that Longe teaches disclosing the current character string twice, in both the first and second areas as claimed in certain claims of the '172 patent.

117.   Another embodiment in Longe describes a word-choice list which is developed from word stems.   These word stems correspond to a current character string, and present a user with an indication that the user can select the word or word stem to create a pop-up word choice list that indicates further completions:

> In another embodiment, the word-choice list is horizontal with words placed side-by-side in one or more lines, displayed in a convenient area such as along the bottom of the application text area or projected along the top of the virtual keyboard.  In another embodiment, an indication near each word or word stem in the list may cue the user that completions based on that word stem may be displayed and selected by means of a designated selection input applied to the list entry.  The subsequent pop-up word choice list shows only words incorporating the word stem and may, in turn, indicate further completions.  A word may be selected or extended via any of the methods described herein, adjusting appropriately for the horizontal versus vertical orientation.

(*Id.* at ¶ [0232].)   The word stems constitute a current character string in a first area, which are also displayed in a second area described as the "subsequent pop-up word choice list."   Dr. Singh explained that the word stem is displayed to the user on the screen (Singh Dep. at 233:13-17), that the indication near each word or word stem might involve "word completions being shown in a different color from word alternatives", (*Id.* at 233:21 – 234:4), and that the system described in Longe would treat the words in the pop-up word choice list "the same . . . [as] suggested alternatives" (*Id.* at 234:5-14).

118.     Longe also discloses that the words in the word choice list region can be selected "in the usual manner by, for example, touching it in the word selection list" (performing a gesture as claimed in certain '172 patent claims).  (Longe at ¶ [0178].)  Longe further discloses, "if a word choice list was displayed prior to contacting the Space key 110 or the Return key 118, the Default word 160 is flushed to the output text region 104 prior to generating a single space or carriage return character, respectively" (replacing a current character string by activating a key on the keyboard associated with a delimiter as claimed in certain '172 patent claims).  (*Id.* at ¶ [0180].)

119.     Longe also discloses an alternate keyboard of punctuation and symbols.  "If a word choice list was displayed prior to displaying such an alternate keyboard, the selection of any character from the displayed alternate keyboard causes the Default word of the previously displayed word choice list to be output to the output text region 104 prior to outputting the selected character from the alternate keyboard" (replacing the current character string with the suggested replacement character string, and appending a punctuation mark).  (*Id.* at ¶ [0180].)

**B.     <u>Robinson</u>**

120.     U.S. Patent No. 6,801,190 to Robinson *et al.* ("Robinson"), attached as Exhibit G, is primarily concerned with the problem of correcting words that might be mistyped on the kinds of small keyboards found on portable electronic devices, and presenting a user interface for performing such corrections.  The claim chart in Exhibit L provides an element-by-element analysis of Robinson in comparison to the '172 Asserted Claims.

121.     Figures 5A-5E show the display of a current character string, along with suggested replacements and how, through user actions, the desired character string can be selected.  Figure 1B illustrates a virtual keyboard, Exact Type word 154 (current character string), Default word

1   160 (replacement character string), output text region 104 (first area), and word choice list region

2   150 (second area):



16  122.    Robinson also discloses that the current character string is shown in both the first

17  area and the second area.  Robinson discloses that the output text region 104 "displays text

18  entered by the user and serves as a buffer for text input and editing."  (*Id.*, col. 16:56-58.)   In

19  addition to this disclosure, Robinson describes an Edit Word key 114 which creates a word choice

20  list on a selected word, which is already in the first area:

> When no current input sequence exists, a contact on the Edit Word
> key 114 causes the system to establish a current input sequence
> consisting of the coordinate locations associated with the letters of
> the word that contains the insertion point cursor 107 or is
> immediately to the left of this cursor in the output text region 104.
> The result is that this word is 'pulled in' to the system creating a
> word choice list in which the word appears both as the Default word
> 160 and the Exact Type word 154.

(*Id.*, col. 19:48-56.)   Furthermore, Robinson explains that, in certain situations, it would be

preferable that "keystrokes on the auto-correcting keyboard are not matched to characters in

isolation, but rather entire sequences of keystrokes corresponding to completed words are matched against a lexicon of candidate words that includes the relative frequency with which each word appears in a representative corpus of usage."   (*Id.*, col. 17:44-50.)   These disclosures make it clear to one of ordinary skill in the art that Robinson teaches disclosing the current character string twice, in both the first and second areas as claimed in certain claims of the '172 patent.

123.     Robinson also discloses that the "user may also directly select any word from the [word choice] list" (performing a gesture as claimed in certain '172 patent claims).   (*Id.* at Fig. 5E.)   Robinson further discloses, "if a word choice list was displayed prior to contacting the Space key 110 or the Return key 118, the Default word 160 is flushed to the output text region 104 prior to generating a single space or carriage return character, respectively" (replacing a current character string by activating a key on the keyboard associated with a delimiter as claimed in certain '172 patent claims).   (*Id.*, col. 19:33-37.)

124.     Robinson also discloses an alternate keyboard of punctuation and symbols.   "If a word choice list was displayed prior to displaying such an alternate keyboard, the selection of any character from the displayed alternate keyboard causes the Default word of the previously displayed word choice list to be output to the output text region 104 prior to outputting the selected character from the alternate keyboard" (replacing the current character string with the suggested replacement character string, and appending a punctuation mark).   (*Id.*, col. 19:22-33.)

**C.     TextPlus User's Guide**

125.     *TextPlus[TM] for the Palm OS Version 5.5 Users Guide* (Aug. 31, 2004) ("*TextPlus User's Guide*"), attached as Exhibit H, describes version 5.5 of the TextPlus software.   The claim chart in Exhibit M provides an element-by-element analysis of *TextPlus User's Guide* in comparison to the '172 Asserted Claims.

126.     TextPlus is an example of text completion software. As *TextPlus User's Guide* explains on page 4:

DECLARATION OF DR. MARTIN E. KALISKI REGARDING U.S. PATENT NO. 8.074.172

> TextPlus supports intelligent dictionary-based suggestion of words and phrases to speed up your text entry.  When you enter one or more letters of a word or a phrase in any Palm application, a list of words and phrases that start with these letters is displayed.  When you tap on any of the words or any of the phrases, your choice is automatically inserted at the current cursor location.

127.    *TextPlus User's Guide* discloses a text field for displaying the text of a composition (first area), a Phrase List and Word List (second area), letters of a word or phrase entered by a user (current character string) and suggested words and phrases (suggested replacement string):



(*Id.* at 9.)   It discloses more than one way to select a word: "tap on the word or phrase and it will be automatically inserted at the current cursor location" (gesture), and "enter a space or any punctuation marks and the word is automatically entered" (delimiter and punctuation).   (*Id.*)

128.    An older version of TextPlus is described in *Comparison of three leading text completion software* (Nov. 12, 1999),  http://www.deepwave.net/articles/palm/palm_textcomp/ ("*Comparison* article"), attached as Exhibit I.   The *Comparison* article further illustrates a current character string in both a first and a second area:

DECLARATION OF DR. MARTIN E. KALISKI REGARDING U.S. PATENT NO. 8.074.172



**D.**     **King**

129.     U.S. Patent No. 5,953,541 to King *et al.* ("King"), attached as Exhibit J is primarily concerned with the problem of correcting words that might be mistyped on the kinds of small keyboards found on portable electronic devices, and presenting a user interface for performing such corrections.   The claim chart in Exhibit N provides an element-by-element analysis of King in comparison to the '172 Asserted Claims.

130.     Figures 5A-5K show the display of a current character string, along with suggested replacements and how, through user actions, the desired character string can be selected. Because King uses a reduced keyboard, keystroke sequences are ambiguous as to their meaning. (King, col. 9:56-58.)   Figure 1A illustrates the most likely interpretation of a key sequence 78 (current character string) in a text region 66 (first area) and a selection list 76 (second area):



The selection list 76 also displays other possible interpretations 79 and 80 (suggested replacement string).

131.   King discloses an alternative Symbols mode keyboard, and the effect of a user acting on a delimiter or punctuation key in that keyboard:

> Choosing a character from Symbols mode generates an explicit and unambiguous character.   Generating such a character has the effect of implicitly accepting the current provisionally accepted text for output at the insertion point.

(*Id.*, col. 22:30-33.)   According to King, this "allows the user to easily generate a word and immediately follow it with a character such as a comma, period, or hyphen." (*Id.*, col. 22:36-38.)

132.   Any of the strings in selection list 76 can be selected with a gesture.   King discloses "the user may select the desired word from the selection list simply by touching it." (*Id.*, col. 11:20-23.)

## IX.   SUMMARY OF INVALIDITY OPINIONS

133.   It is my opinion that claims 18, 19, and 27 of the '172 patent are anticipated and/or rendered obvious in light of the prior art specifically discussed below.

134.    Nowhere in his Declaration did Dr. Singh make any explicit statements about the date of conception of the inventions of the '172 patent.   It is thus not clear what he views this date to be.   Accordingly, I will make the assumption the date of conception for the '172 patent is the correct filing date, January 5, 2007.

135.    It is my opinion that certain prior art references anticipate and/or render obvious the '172 Asserted Claims.   Specifically, based on my analysis, I conclude that Longe and Robinson anticipate claims 18, 19, and 27, and *TextPlus User's Guide* anticipates claim 27.  I further conclude that all of the Asserted Claims are rendered obvious by at least Longe, Robinson, *TextPlus User's Guide* and King, standing alone.

136.    Further, for the '172 Asserted Claims for which the above references do not anticipate, it is my opinion that it would have been obvious for a person of ordinary skill in the art to combine the teachings of these references with the teachings of one or more of the other references discussed herein to invalidate these remaining claims

137.    I further conclude that '172 Asserted Claims are also invalid for indefiniteness.

## X.    ANTICIPATION OF THE ASSERTED CLAIMS

138.    As discussed above, it is my opinion that all of the '172 Asserted Claims are anticipated by Longe and Robinson, and at least claim 27 of the '172 patent is anticipated by *TextPlus User's Guide*.   In the following sections, I provide a narrative of my opinions.

### A.    Longe

139.    In my opinion, Longe discloses each and every limitation of every one of the '172 Asserted Claims, and therefore anticipates those claims.

140.    I have been informed by counsel that in order for a patent or printed publication such as Robinson to anticipate the '172 patent, it must contain an enabling disclosure that allows

one of ordinary skill in the art at the time of the alleged invention to practice the claims without undue experimentation.

141.    I have reviewed Longe from the perspective discussed above.

142.    Longe was filed on April 17, 2006, and was published on December 7, 2006.   It lists as inventors Michael R. Longe and Pim Van Meurs, is assigned to Tegic Communications, Inc.   Given these dates, I understand that it qualifies as prior art to the '172 patent.   As discussed above, it was cited during prosecution of the '172 patent.

143.    In my opinion, Longe discloses to one of ordinary skill in the art at the time of the alleged invention how to practice or carry out the claims in sufficient detail, without requiring undue experimentation.   I incorporate by reference the claim chart in Exhibit K, which provides an element-by-element analysis of Longe in comparison to the '172 Asserted Claims.

**B.    <u>Robinson</u>**

144.    In my opinion, Robinson discloses each and every limitation of every one of the '172 Asserted Claims, and therefore anticipates those claims.

145.    I have been informed by counsel that in order for a patent or printed publication such as Robinson to anticipate the '172 patent, it must contain an enabling disclosure that allows one of ordinary skill in the art at the time of the alleged invention to practice the claims without undue experimentation.

146.    I have reviewed Robinson from the perspective discussed above.

147.    Robinson issued on October 5, 2004.   It lists as inventors B. Alex Robinson and Michael R. Longe, is assigned to America Online Incorporated, and was filed on May 26, 2000. Given these dates, I understand that it qualifies as prior art to the '172 patent.   It is not cited in the '172 patent.

148.     In my opinion, Robinson discloses to one of ordinary skill in the art at the time of the alleged invention how to practice or carry out the claims in sufficient detail, without requiring undue experimentation.   I incorporate by reference the claim chart in Exhibit L, which provides an element-by-element analysis of Robinson in comparison to the '172 Asserted Claims.

   **C.     TextPlus User's Guide**

149.     In my opinion, *TextPlus User's Guide* discloses every limitation of claim 27 of the '172 patent, and therefore anticipates that claim.

150.     I have been informed by counsel that in order for a patent or printed publication such as *TextPlus User's Guide* to anticipate the '172 patent, it must contain an enabling disclosure that allows one of ordinary skill in the art at the time of the alleged invention to practice the claims without undue experimentation.

151.     I have reviewed *TextPlus User's Guide* from the perspective discussed above.

152.     *TextPlus User's Guide* was a printed publication at least by August 31, 2004.[2] Given this date, I understand that it qualifies as prior art to the '172 patent.   It is not cited in the '172 patent.   It describes version 5.5 of the TextPlus add-on software for Palm devices.   This software allows for auto-correction of entered text data on a display screen.

153.     In my opinion, *TextPlus User's Guide* discloses to one of ordinary skill in the art at the time of the alleged invention how to practice or carry out the claim in sufficient det*ail, without requirin*g undue experimentation.   I incorporate by reference the claim chart in Exhibit M, which provides an element-by-element analysis of *TextPlus User's Guide* in comparison to the '172 Asserted Claims.

---

[2]   TextPlus for Palm OS Version 5.5 is available for download at http://download.cnet.com/TextPlus/3000-2072_4-10186495.html.   *TextPlus User's Guide* is contained within the downloadable archive, and is dated August 31, 2004.

XI.   **THE ASSERTED CLAIMS ARE ALL INVALID AS OBVIOUS**

154.   As discussed above, it is my opinion that one or more of the '172 Asserted Claims are anticipated by certain prior art references.  To the extent there are any differences between this art and the '172 Asserted Claims, it is my opinion that these differences are trivial, and that therefore the references discussed above also render the claims obvious.

A.   **Invalidity Under Obviousness in Light of the Prior Art**

155.   It is my opinion that the '172 Asserted Claims are rendered obvious in light of the references set forth below, alone or in combination.  In the following sections, I provide a narrative of my opinions.

156.   I have been informed of the legal standards as recited previously in Section III, as well as the other legal understandings set out in this declaration, in reaching my opinions regarding obviousness.

1.   **King**

157.   In my opinion, King, by itself, renders obvious the '172 Asserted Claims.

158.   I have been informed by counsel that in order for a patent or printed publication such as King to be a prior art reference to the '172 patent, it must contain an enabling disclosure that allows one of ordinary skill in the art at the time of the alleged invention to practice the claims without undue experimentation.

159.   I have reviewed King from the perspective discussed above.

160.   King issued on September 14, 1999.  It lists as inventors Martin T. King, Dale L. Grover, Clifford A. Kushler and Cheryl A. Grunbock, is assigned to Tegic Communications and was filed on January 24, 1997.  Given these dates, I understand that it qualifies as prior art to the '172 patent.   It is not cited in the '172 patent.

161.   In my opinion, King discloses to one of ordinary skill in the art at the time of the alleged invention how to practice or carry out the claims in sufficient detail, without requiring

DECLARATION OF DR. MARTIN E. KALISKI REGARDING U.S. PATENT NO. 8,074,172

undue experimentation.   I incorporate by reference the claim chart in Exhibit N, which provides an element-by-element analysis of King in comparison to the '172 Asserted Claims.

### 2.    TextPlus User's Guide with earlier versions of TextPlus

162.    The combination of *TextPlus User's Guide* in view of the *Comparison* article renders invalid all of the '172 Asserted Claims.   It would have been obvious to one of ordinary skill in the art to combine the disclosures of *TextPlus User's Guide* with features of earlier versions of the TextPlus software, as described in the *Comparison* article.   A person of ordinary skill in the art would have been motivated to combine these references because both relate features of the same software product.   It would have been obvious to a person of ordinary skill to consult both references and combine the disclosures in each.

### 3.    Longe with TextPlus User's Guide

163.    The combinations of Longe in view of *TextPlus User's Guide* and *TextPlus User's Guide* in view of Longe both render invalid all '172 Asserted Claims.   It would have been obvious to a person of ordinary skill in the art to combine the disclosures of Longe and *TextPlus User's Guide*.   A person of ordinary skill in the art would have been motivated to combine these references because both relate to text entry on portable devices with a touchscreen.   It would have been obvious to a person of ordinary skill to consult both references and combine the disclosures in each.

### 4.    Robinson with TextPlus User's Guide

164.    The combinations of Robinson in view of *TextPlus User's Guide* and *TextPlus User's Guide* in view of Robinson both render invalid all '172 Asserted Claims.   It would have been obvious to a person of ordinary skill in the art to combine the disclosures of Robinson and *TextPlus User's Guide*.   A person of ordinary skill in the art would have been motivated to combine these references because both relate to text entry on portable devices with a touchscreen.

It would have been obvious to a person of ordinary skill to consult both references and combine the disclosures in each.

### 5. King with TextPlus User's Guide

165. The combinations of King in view of *TextPlus User's Guide* and *TextPlus User's Guide* in view of King both render invalid all '172 Asserted Claims. It would have been obvious to a person of ordinary skill in the art to combine the disclosures of King and *TextPlus User's Guide*. A person of ordinary skill in the art would have been motivated to combine these references because both relate to text entry on portable devices with a touchscreen. It would have been obvious to a person of ordinary skill to consult both references and combine the disclosures in each.

### 6. King with Robinson

166. The combinations of King in view of Robinson and Robinson in view of King both render invalid all '172 Asserted Claims. It would have been obvious to a person of ordinary skill in the art to combine the disclosures of King and Robinson. A person of ordinary skill in the art would have been motivated to combine these references because both relate to the problem of text input for small devices with limited space. It would have been obvious to a person of ordinary skill to consult both references and combine the disclosures in each.

### 7. King with Longe

167. The combinations of King in view of Longe and Longe in view of King both render invalid all '172 Asserted Claims. It would have been obvious to a person of ordinary skill in the art to combine the disclosures of King and Longe. A person of ordinary skill in the art would have been motivated to combine these references because both relate to the problem of text input for small devices with limited space. It would have been obvious to a person of ordinary skill to consult both references and combine the disclosures in each.

DECLARATION OF DR. MARTIN E. KALISKI REGARDING U.S. PATENT NO. 8,074,172

8.    **Additional references**

168.    I have also looked at the following references, each of which appears to disclose predictive text and/or word completion systems that are prior art to the '172 patent.   It would have been obvious to a person of ordinary skill in the art to combine the disclosures of Longe, Robinson, King, and *TextPlus User's Guide* with the following references.   A person of ordinary skill in the art would have been motivated to combine these references because all relate to implementation of predictive text and/or word completion systems.   It would have been obvious to a person of ordinary skill to consult these references and combine the disclosures with the other references discussed herein.

- Jacob Wobbrock & Brad Myers, *From Letters to Words: Efficient Stroke-based Word Completion for Trackball Text Entry*, Assets '06 (Oct. 2006)
- *TOSHIBA Pocket PC e570 Instruction Manual*, 1st Ed. (Sept. 2001)
- U.S. Patent Publication No. 2005/0188330 to Griffin
- U.S. Patent Publication No. 2005/0192802 to Robinson *et al.*
- U.S. Patent Publication No. 2005/0283358 to Stephanick *et al.*
- U.S. Patent Publication No. 2006/0063558 to Scott
- U.S. Patent Publication No. 2006/0149551 to Ganong, III *et al.*
- U.S. Patent Publication No. 2006/0167676 to Plumb
- U.S. Patent Publication No. 2006/0176283 to Suraqui
- U.S. Patent Publication No. 2006/0206815 to Pathiyal *et al.*
- U.S. Patent Publication No. 2006/0269138 to Williamson *et al.*
- U.S. Patent No. 5,623,406 to Ichbiah
- U.S. Patent No. 6,002,390 to Masui
- U.S. Patent No. 6,085,206 to Domini *et al.*
- U.S. Patent No. 6,377,965 to Hachamovitch *et al.*
- U.S. Patent No. 6,405,060 to Schroeder *et al.*

- U.S. Patent No. 6,583,798 to Hoek *et al.*

- U.S. Patent No. 6,724,370 to Dutta *et al.*

- U.S. Patent No. 7,030,863 to Longe *et al.*

- U.S. Patent No. 7,098,896 to Kushler *et al.*

- U.S. Patent No. 7,185,271 to Lee *et al.*

- U.S. Patent No. 7,277,088 to Robinson *et al.*

- U.S. Patent No. 7,296,019 to Chandrasekar *et al.*

- U.S. Patent No. 7,403,888 to Wang *et al.*

- U.S. Patent No. 7,486,277 to Kong

- U.S. Patent No. 7,584,093 to Potter *et al.*

- U.S. Patent No. 7,584,426 to Chang *et al.*

- U.S. Patent No. 7,599,828 to Fontenelle *et al.*

- U.S. Patent No. 7,636,083 to Aoki *et al.*

- U.S. Patent No. 7,996,589 to Schultz *et al.*

- U.S. Patent No. 8,136,050 to Sacher *et al.*

169.     I have performed a more in-depth review of several of these listed references from the perspective of one of ordinary skill in the art, and as set forth below I have generally identified aspects of the disclosures of those references that correspond to limitations of the '172 Asserted Claims.  These examples demonstrate that the limitations claimed in the '172 Asserted Claims were well-known in the art.

170.     U.S. Patent 6,724,370, attached as Exhibit O, issued on April 20, 2004 and lists Rabindranath Dutta and Robert J. Kamper as inventors.  This patent discloses a touchscreen display with a configurable keyboard, and, more importantly, teaches what the inventors refer to as "entry prediction technology".  Based upon what the user has entered it "determines which letter or letters are likely to be entered next and highlights these letters or characters" (col. 5:30-

1   32).  "The user may select one of these suggestions ... by tapping or double tapping the display"

2   (col. 6:35-37), or the user may continue entering characters "if none of these endings form the

3   word desired by the user" (col. 6, 38-39).

4       171.    US Patent Publication 2005/0283358, attached as Exhibit P, was published on

5   December 22, 2005 and lists as inventors James Stephanick, Ethan R. Bradford, Pim Van Meurs,

6   Richard Eyraud and Michael R. Longe.   It deals with character ambiguity in wireless

7   communication devices having limited keypads, such as those devices having telephone-like

8   keypads, where the depression of a numeric key could be interpreted as pressing one of three

9   letters.   Through various embodiments shown in its many figures, it discloses the originally

10  entered character string and various suggestions for aiding the user in displaying what the intended

11  word really is.   It describes in paragraph [0040] how the user can interact directly with the device

12  and select the desired character for each set of ambiguous characters.   Such selection may involve

13  having the user "tap on the desired letter."   Further discussion discloses the use of gestures

14  (paragraph [0055]).

15      172.    U.S. Patent Publication 2006/0063558, attached as Exhibit Q, was published on

16  March 23. 2006 and the listed inventor is Sherryl Lee Lorraine Scott.   It deals with mobile

17  devices and their limited keyboards – and   the use of predictive word entry to make the entering

18  of data much simpler than the conventional multiple pressing of individual keys.   As illustrated in

19  Figure 3, the currently typed word in displayed, along with suggested replacements for that word

20  (these replacements may include apostrophes and commas).   Paragraphs [0029] and [0032]

21  describe how the user can select either the currently typed word or a suggested replacement by

22  moving a scroll wheel to the desired word and pressing or, or by pressing the return key.

23      173.    US Patent Publication 2006/0206815, attached as Exhibit R, titled "Handheld

24  Electronic Device Having Improved Word Correction, and Associated Method", was published on

DECLARATION OF DR. MARTIN E. KALISKI REGARDING U.S. PATENT NO. 8.074.172

September 14, 2006 and lists Krishna K. Pathynal and Jason T. Griffin as inventors.  This publication discloses a text disambiguation approach towards suggesting words entered into a handheld device whose keyboard keys may represent more than one symbol.  A list of suggested "intended" words is displayed and the user has the opportunity to either keep the word they entered (as originally interpreted by the device) or to select by a thumb wheel one of the displayed suggested alternatives.  Figures 5 and 6 show two embodiments where the word "us" has been entered and is replaced by "is", drawn from a list of suggested words (the list including "us" in case the user wishes to keep it.)

174.    US Patent Publication 2006/0269138, attached as Exhibit S, titled "Method and System for Handling the Selection of Alternates for Recognized Words" has a publication date of November 30, 2006 and lists as inventors Peter H. Williamson, Charlton E. Lui and Dan W. Altman.  Its focus is on suggesting alternates in handwriting recognition systems.  As Figure 6 illustrates, when the word "hand" is written in cursive script, a number of suggested alternatives are displayed, including the word "hand" itself. As explained in paragraph [0036], the user can then select which of these alternates he or she fees is correct.

### B.    The '172 Patent is a Combination of Prior Art Elements

175.    As set out in this declaration and in the charts attached, it is my opinion that each and every element of the '172 Asserted Claims was present in the prior art.  I incorporate herein my discussion of these elements in the attached claim charts in Exhibits K-N.

176.    Even Kenneth Kocienda, the first named inventor of the '172 patent, when asked whether he was the first to invent the individual elements of the asserted claims, was repeatedly unable to answer in the affirmative.   For example:

```
21        Q    Do you know whether you are the first person
22   in the world to have come up with the idea of having a
23   first area of a touch screen display that displays a
24   current character string being input by a user with a
25   keyboard?

 1        A    I -- I can't say.
```

(Kocienda Dep. at 141:10-17.)   Kocienda even admitted that he was aware of spell check systems which were available on the Mac operating system prior to his work on the iPhone.   (*Id.* at 62:14-20).   He provided a description of how this spell checker implemented displaying a current character string, and replacing that string with a selected replacement character string:

```
12        THE WITNESS:  Now, specifically, when you
13   would control click on the word, that word would be
14   selected.  And so when you eventually suggest -- chose
15   a spelling replacement, that spelling replacement
16   would replace the selection.
```

(*Id.* at 67:12-16.)

177.    This replacement functionality was further verified by another Apple employee, Greg Christie, who supervises the human interaction group at Apple and is familiar with the spell checking systems on the Mac operating system.   (Christie Dep. at 49:24 – 51:20.)

178.    Dr. Singh was similarly unable to identify what was new about individual claim elements.   When asked to confirm whether the individual limitations were well known in the 2007 time period, Dr. Singh responded that the "individual elements or individual concepts … may be known" and that he "cannot dispute it."   (Singh Dep. at 69:15-23; 70:4-22.)

179.    These statements reinforce my opinion that each and every element of the '172 Asserted Claims was well-known.

**1.    The combination of elements in the '172 patent is predictable**

180.    I understand that the combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.   A person of

ordinary skill in the art would appreciate that it was predictable to combine the elements within each claim of the '172 patent in the manner claimed.   There is nothing unpredictable about this particular combination because, in part, numerous examples of such elements existed in the art.

181.   Specifically, as shown in the attached claim charts and elsewhere in this declaration, prior art systems and publications not only foreshadow these combinations, but in fact actually practice them.

182.   And the predictability of this particular combination was understood by the inventors of the '172 patent as well.   For example:

```
 7        Q   Is there anything unpredictable or surprising
 8    about choosing to display the current character string
 9    twice versus displaying it only once on the display?
10        A   I don't think so.
11        Q   Just a user interface design choice?
12        A   I think so.
```

(Kocienda Dep. at 113:7-12.)   Even Dr. Singh admitted that different designs were acceptable. (Singh Dep. at 96:14-16.)

### 2.   The combination of elements in the '172 patent does not yield any unpredictable or unexpected results

183.   In my opinion, there is nothing unpredictable that results from combining the elements within the '172 patent.   The claim elements simply implement well-known word recommendation techniques using well-known functions of a touch-screen device.   This combination produces a completely predictable result.   The '172 patent uses each element for the exact purpose it was designed to provide, in the exact manner it was designed to operate.

184.   In my opinion the combination of elements seen in each '172 Asserted Claim adds nothing to the nature and quality of each individual element on its own as it was understood and already used prior to January 5, 2007.

185.    I further note that the result is an entirely predictable combination of known elements in user interface design.   In my opinion, the result of the combination in the '172 Asserted Claims is precisely the result that one would expect when combining elements of a predictive text or word completion algorithm and a user interface for a touch-screen device.

### 3.    A person of ordinary skill in the art would have been motivated to pursue the claimed combinations

186.    I understand from counsel that where there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp.   If this leads to the anticipated successful solution to that problem, it is likely the product not of innovation but of ordinary skill and common sense.   In that instance the fact that a combination was "obvious to try" can demonstrate that the combination was obvious.

187.    In my opinion, a person of ordinary skill would have been motivated to pursue the claimed combinations of elements based on industry trends, as demonstrated by the prior art described above.

188.    As the previously discussed prior art references show, trends in the field of user interface design in the mid-2000s provided a strong motivation to combine the different elements present in the '172 Asserted Claims.   As those references illustrate, the trend towards increased functionality of portable electronic devices along with the trend towards the decreased size of a text input area made the combination of these different features (two areas, delimiter keys and punctuation keys to accept a suggested string) obvious as the field evolved.

189.    In my opinion, at the time of filing, there was ample motivation to simplify user interfaces for predictive text and word completion, as confirmed by the numerous prior art devices and references that I discussed above.   There were a finite number of identified, predictable solutions, and a person of ordinary skill would have had good reason to pursue the known options

DECLARATION OF DR. MARTIN E. KALISKI REGARDING U.S. PATENT NO. 8.074.172

1   within his or her technical grasp.   Therefore, the invention described in the '172 patent is not the

2   result of innovation but of ordinary skill and common sense.

3        **C.**     <u>**Secondary Considerations**</u>

4        190.   I have been informed that certain secondary considerations may be examined to

5   determine whether a certain invention would have been obvious to one of ordinary skill in the art.

6   Below, I address the basis upon which, in my opinion, these secondary considerations likewise

7   lead to a conclusion that the Asserted Claims would have been obvious to those of ordinary skill

8   before the filing date.

9

10        191.   This patent has won no awards.   (Kocienda Dep. at 132:9-13.)   No papers have

11   been published on the design work described in the '172 patent (*Id.* at 132:14-16), and it has never

12   been presented to people outside Apple (*Id.* at 132:17-19).   In fact, one of the inventors can think

13   of no accolades that he has received with respect to his keyboard design work for the '172 patent.

14   (*Id.* at 132:20-23.)

15

16        192.   The patent did not resolve a long felt but unmet need.   The '172 patent states that

17   it is directed to "more efficient ways of entering text into portable devices."   (Col. 1:36-37.)   But

18   as mentioned above, the English versions of Apple's devices do not even practice the claimed

19   invention for Claims 18 and 19.   According to the inventor, it was felt that the design actually

20   implemented in Apple's devices is "simpler."   (Kocienda Dep. at 106:2-8.)   Further, as of 2007 a

21   design that did not present the current character string twice on the same screen was thought to be

22   "acceptable."   (*Id.* at 104:3-12.)

23

24        **D.**     <u>**Indefiniteness**</u>

25        193.   As discussed above, I understand that where it is unclear whether infringement

26   occurs when one creates a system that allows the user to perform a function, or whether

27

28

infringement occurs when the user actually uses the system to perform a function, the claim does not apprise a person of ordinary skill in the art of its scope, and it is invalid as indefinite.

194.    It is my opinion that Claims 18 and 27 of the '172 patent are invalid because they are indefinite.

### 1.    Claim 18 is indefinite because it is an apparatus claim that includes method steps

195.    Claim 18 contains various actions, such as "the current character string … is replaced" or "the current character string … is kept" if "the user activates a key" or "the user performs a gesture."

196.    One of ordinary skill would be unable to ascertain when infringement of Claim 18 occurs, because one of ordinary skill would be unable to ascertain whether it is a method claim or an apparatus claim.   Although the claim is directed to a "graphical user interface", it is apparently not infringed unless and until a user performs an action, such as activating a key or performing a gesture.   This confusing requirement of user action renders it unclear when infringement occurs, since method steps are apparently incorporated into a claim to a graphical user interface.

197.    It is therefore my opinion that Claim 18 does not properly apprise a person of ordinary skill in the art of its scope, and is invalid as indefinite.

### 2.    Claim 27 is indefinite because it is an apparatus claim that includes method steps

198.    Claim 27 contains "receiving a plurality of user inputs", "receiving a further user input", and "replacing the current character string" in response to that further user input.

199.    One of ordinary skill would be unable to ascertain when infringement of Claim 27 occurs, because one of ordinary skill would be unable to ascertain whether it is a method claim or an apparatus claim.   Although the claim is directed to a "portable electronic device", it is apparently not infringed unless and until a user provides inputs which generate a response.   This

1   confusing requirement of user action renders it unclear when infringement occurs, since method

2   steps are apparently incorporated into a claim to a device.

3       200.    Further, the general language of the claim, which recites a "portable electronic

4   device, comprising … instructions that … perform operations", is of no help.  One of ordinary

5   skill in the art would be unable to determine whether the claim is limited to portable electronic

6   devices with certain instructions that are thereafter performed by a user, or whether the presence of

7   the operable instructions themselves would be sufficient for infringement.

8

9       201.    It is therefore my opinion that Claim 27 does not properly apprise a person of

10  ordinary skill in the art of its scope, and is invalid as indefinite.

11

12          3.      **Claims 19 and 27 are indefinite because the '172 patent does not
                    provide a corresponding algorithm to the "instructions" limitations**

13      202.    Claim 19 recites "instructions for" doing certain things, and Claim 27 recites

14  "instructions that … perform" certain operations.  In my opinion, these claim limitations are

15  indefinite, because nowhere in the specification of the '172 patent is an algorithm described for

16  implementing these instructions.

17

18      203.    In my opinion, taking one of the Claim 19 limitations as an example, the phrase

19  "instructions for replacing the current character string in the first area with the suggested

20  replacement character string" does not have a plain and ordinary meaning to one of ordinary skill

21  in the art.   Nor is the phrase a term of art with a specialized meaning in the field of user interface

22  design.  Furthermore, the context of "instructions" in this claim is as follows: "one or more

23  programs, wherein the one or more programs are stored in the memory and configured to be

24  executed by the one or more processors, one or more programs including: . . . instructions for

25  replacing . . . ."  It is my opinion that in this context, "instructions" means computer code such as

26  statements in a programming language.   There is no computer code of any kind anywhere in the

27  '172 patent.

28

204.     In my opinion, one of ordinary skill in the art in 2007 would not have been able to identify the corresponding structure for "instructions for replacing the current character string in the first area with the suggested replacement character string" in the specification of the '172 patent because the specification fails to disclose the corresponding structure for performing this function.   Each time the '172 patent refers to this limitation, the patent discusses the functions of the limitation but does not identify or describe the components needed to perform those functions. For example, the specification provides:   "If the user action is activation of a key on the keyboard associated with a delimiter (306—Activate a key . . . ), the current character string in the first area of the touch screen is replaced with the suggested replacement (308)."   A person of ordinary skill in the art cannot discern the structure of the limitation from the specification of the '172 patent. Nor can a person of ordinary skill in that art determine whether a particular product or method infringes this limitation.

205.     Replacing a character string requires some form of string manipulation, as Dr. Singh recognized in his deposition.   (Singh Dep. at 62:17 – 63:11.)   Many different algorithms are available to manipulate strings.   As Dr. Singh admitted, selecting the appropriate algorithm requires knowledge of the particular configuration of the system the algorithm will apply to.   (*Id.* at 46:10-15.)   In my opinion, the '172 patent specification fails to disclose any structure or algorithm to replace a character string.

206.     It is also my opinion that the specification fails to disclose any structure or algorithm for the other "instructions for" and "instructions that" limitations of Claims 19 and 27.

207.     I have reviewed the file history of the '172 patent.   I found nothing in the file history to change my opinion of the meaning of these term to a person of ordinary skill in the art at the time of the invention.

## XII.   **OTHER COMMENTS**

208.    My opinions are subject to change based on additional opinions that Plaintiff's experts may present and information I may receive in the future or additional work I may perform. With this in mind, based on the analysis I have conducted and for the reasons set forth, I have preliminarily reached the conclusions and opinions in this declaration.

DECLARATION OF DR. MARTIN E. KALISKI REGARDING U.S. PATENT NO. 8,074,172

1    I declare under penalty of perjury that the foregoing is true and correct.

2

3    Dated:   4/23/2012

4

5                                    Martin E. Kaliski

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28