1   JOSH A. KREVITT (CA SBN 208552)
jkrevitt@gibsondunn.com
2   H. MARK LYON (CA SBN 162061)
mlyon@gibsondunn.com
3   GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
4   Palo Alto, CA  94304-1211
Telephone: (650) 849-5300
5   Facsimile: (650) 849-5333

MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

6

7   ***Attorneys for Plaintiff Apple Inc.***

8

9                 UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11                     SAN JOSE DIVISION

12

13   APPLE INC., a California corporation,

Plaintiff,

14

v.

15

16   SAMSUNG ELECTRONICS CO., LTD., a
Korean corporation; SAMSUNG
17   ELECTRONICS AMERICA, INC., a New
York corporation; and SAMSUNG
18   TELECOMMUNICATIONS AMERICA,
LLC, a Delaware limited liability company,

19                    Defendants.

CASE NO. 12-cv-

**DECLARATION OF DR. RAVIN
BALAKRISHNAN CONCERNING U.S.
PATENT NO. 8,046,721**

**Hearing:**
Date:
Time:
Place:
Judge:

20

21

22

23

24

25

26

27

28

DECLARATION OF DR. RAVAN
BALAKRISHNAN – CASE NO. 12-cv-

## INTRODUCTION

1.      I, Ravin Balakrishnan, Ph.D., have been asked by counsel for Apple Inc. ("Apple") to provide an opinion as to whether certain Samsung products, including the Galaxy Nexus, infringe United States Patent No. 8,046,721 ("the '721 patent"), which is assigned to Apple.  For this declaration I have limited my opinions to claims 7, 8, 12 and 15 of the '721 patent.  I have also been asked to provide an opinion as to whether the Apple iPhone 4S, Apple iPad 2 and Apple iPod touch practice the '721 patent.  My opinions are set forth below in this declaration.

2.      If I am called as an expert witness, I expect to testify regarding my background, qualifications and experience relevant to the issues in this action, the technical subject matter of the '721 patent, the accused Samsung products, and the Apple products that practice the claimed inventions.

## QUALIFICATIONS AND EXPERIENCE

3.      I am a tenured Professor in the Department of Computer Science at The University of Toronto, where I also hold the Canada Research Chair in Human-Centered Interfaces.

4.      I received my B.Sc. (1st Class Honours) degree in Computer Science at the University of New Brunswick in May 1993.  Subsequently, I received my M.Sc. and Ph.D. degrees in Computer Science in January 1997 and February 2001, respectively, both from the University of Toronto.

5.      Since 1993, I have either trained or worked in the field of computer science, specializing in human-computer interfaces, including inter alia interfaces for touch sensitive input devices, multi degree-of-freedom input devices, two-handed input, multi-touch input, haptic feedback interfaces, tablet-based input, large and small scale displays, and interactive 3D graphics.

6.      During my undergraduate studies at the University of New Brunswick, I worked as a research assistant in the human interface lab, working with different kinds of novel input technologies, including touch input systems for three dimensional data interaction.

DECLARATION OF DR. RAVIN
BALAKRISHNAN – CASE NO. 12-cv-XXXXX-
XXX                                          1

7.    Since my undergraduate years, I have continued to work in this and other related areas. I have published over 100 refereed journal and conference full-length papers in the field of human-computer interfaces. I have further presented numerous conference abstracts, posters, talks, and demonstrations in my field. I am a named inventor on fourteen issued patents in my area of work, plus an additional seven filed (though not yet issued) patents.

8.    I have also served on the organizing and paper reviewing committees of many leading conferences in my field, and have taken on editorial roles for leading technical journals in fields pertinent to my research. For example, I am currently an Associate Editor of the ACM Transactions on Computer-Human Interfaces (the premier journal in the field), and was until recently an Associate Editor of the IEEE Transactions on Visualization and Computer Graphics. Similarly, I have been the paper's chair for the ACM UIST Symposium on User Interface Software and Technology, and have served multiple times as an associate chair for the premier ACM CHI Conference on Human-Computer Interaction.

9.    I joined The University of Toronto in July 2001 as an Assistant Professor. In 2006, I was promoted to Associate Professor with tenure, and in 2011 was promoted to full Professor. I also hold the Canada Research Chair in Human-Centred Interfaces in the Department of Computer Science, University of Toronto and co-direct the Dynamic Graphics Project laboratory. As a professor, I have taught nine undergraduate computer science courses and nine computer science graduate courses in topics related to human-computer interaction and computer systems. Ten Ph.D. students and twenty research masters students have completed their degrees and research under my supervision, and seven postdoctoral fellows have completed their research training under my supervision. In addition to these graduated students and postdoctoral fellows, I currently supervise four Ph.D. and four master's students.

DECLARATION OF DR. RAVIN
BALAKRISHNAN – CASE NO. 12-cv-XXXXX-
XXX                                                     2

10.     My research at The University of Toronto has involved nearly every broad aspect of human-computer interaction and data visualization.  For instance, I have done significant work in the areas of input devices, sensing technologies, and interaction techniques, in particular touch and multi-touch interaction, gestural, sketching, and multi degree-of-freedom interaction, interfaces to small and/or mobile computers, and interfaces to displays of the future.  As another example, I have done work in the evaluation of user interfaces, including associated metrics and predictive models of human performance.  My research program has been funded by leading companies such as Microsoft, IBM and Hewlett-Packard and also organizations such as the National Sciences and Engineering Research Council of Canada and also the Sloan Foundation.

11.     I have also received major awards and honors in my field, including:

- Alfred P. Sloan Research Fellowship.
- Nine best paper awards and honorable mentions at the leading conferences in my field.
- Ontario Premier's Research Excellence Award, which included a $100,000 research grant.
- Election to the ACM SIGCHI Academy in 2011, which honors the principal leaders in the research field of human-computer interaction.

12.     A more detailed description of my work experience and other qualifications can be found in my Curriculum Vitae, which is attached as Exhibit 1 to this Report.

13.     I have previously testified as an expert during administrative proceedings before the International Trade Commission and by deposition in connection with those same proceedings. Specifically, I testified in Certain Video Game Machines and Related Three Dimensional Pointing Devices, ITC Inv. No. 337-TA-658, on behalf of respondent Nintendo. I also testified in the ITC Investigation Certain Electronic Devices with Multi-Touch Enabled Touchpads and Touchscreens, No. 337-TA-714, on behalf of respondent Apple. During that proceeding, the parties stipulated, and Chief Administrative Law Judge Paul J. Luckern acknowledged, that I was an expert in the field of

Gibson, Dunn &
Crutcher LLP

computer user input devices. Most recently, I testified in Certain Mobile Devices and Related Software, Inv. No. 337-TA-750 on behalf of complainant Apple.

14.     As set forth in my CV, I have over twenty years of experience studying and teaching computer programming, including systems level computer programming involving device drivers and operating systems. I have been a professor of computer science for over ten years. I can read and program using both procedural and object-oriented programming languages fluently, including the C, C++, Objective C and Java languages in which Apple's and other mobile device code is typically written.

**COMPENSATION**

15.     I am being compensated for my work in connection with this matter at my current standard rate of $500 per hour. I am being separately reimbursed for any out-of-pocket expenses. No part of my compensation is dependent upon the outcome of this litigation or the nature of the opinions that I express.

**MATERIALS CONSIDERED FOR THIS DECLARATION**

16.     In forming the opinions set forth in this report, I have considered and relied upon my education, knowledge of the relevant fields, and experience. I have also reviewed and considered the '721 patent and its prosecution history. My opinions are also based upon my review of the prior art, patents, and proceedings cited in these patents and prosecution histories. I have also studied Samsung's Galaxy Nexus and Apple's iPhone 4S, iPad 2 and iPod touch, and have further reviewed portions of the publically available Android 4.0 source code.[1] A list of materials I considered in preparing my declaration is attached as Exhibit 2.

---

[1]  All references to Android 4.0 source code, instructions, and/or modules are based on publicly available Android source code generally available at http://source.android.com/source/downloading.html. Where I describe source code that provides instructions or results in certain

*(Cont'd on next page)*

17.     I reserve the right to rely upon any additional information or materials that may be provided to me or that are relied upon by any of the proposed Respondents' experts or witnesses, if called to testify or to give additional opinions regarding this matter.

18.     I understand that discovery in this potential investigation has yet to begin, and I will consider additional facts and material produced through any discovery that takes place to determine whether such additional material has an impact on my opinions.  I may amend or supplement this report as necessary based on such additional information.

## LEGAL STANDARDS APPLIED

### I.     Claim Construction

19.     I am not a legal expert and offer no legal opinions.  However, I have been informed by counsel of the various legal standards that apply to the pertinent technical issues, and I have applied those standards in arriving at my conclusions expressed in this report.

20.     I understand that in construing claims of a patent one should first consider the intrinsic evidence, which includes the patent's claim language, its specification, and its prosecution history.  In particular, I should first consider the words of the claims themselves, giving those words their customary and ordinary meaning as understood by one of ordinary skill in the art.  I then must consider the patent specification to determine whether the inventor used any terms or words in a manner inconsistent with their plain and ordinary meaning.  In addition to the claims and the specification, I also must review the prosecution history, which is the complete record of all the

---

*(Cont'd from previous page)*

functionality, that source code is an excerpt of the relevant source code, and is not necessarily the exclusive source code for those instructions or functionality.  I have examined the Samsung Galaxy Nexus and the relevant software discussed herein and running on the Galaxy Nexus appears to be based on the publicly available source code.

DECLARATION OF DR. RAVIN
BALAKRISHNAN – CASE NO. 12-cv-XXXXX-
XXX                                                              5

proceedings before the United States Patent and Trademark Office.  This is because a patent applicant might have affirmatively, or by implication, limited claim scope during prosecution.

21.     If the intrinsic evidence is not conclusive, I understand I may consider extrinsic evidence to ensure that a claim construction is not inconsistent with clearly expressed and widely held understandings in the pertinent technical field.  Such extrinsic evidence may take the form of expert and/or inventor testimony, dictionaries, technical treatises, and articles.  I further understand that I may not rely on extrinsic evidence to contradict or vary the meaning of claims provided by the intrinsic record.

22.     I further understand that the claims should be construed from the standpoint of a hypothetical person of ordinary skill in the art as of the invention date of the asserted patent.  I understand that claim construction is a matter of law and will be determined by the Administrative Law Judge in this Investigation.

## II.     Infringement

23.     I understand that to determine whether there is infringement of a patent:  (1) the claims of the patent must be construed; and (2) the properly construed claims must then be compared with the accused products.

24.     I understand that the parties may dispute the construction of several terms.  Where no constructions have yet been proposed, I have interpreted the claims as one of ordinary skill in the art would have at the time the relevant patent was filed in light of the teachings of the patent and its prosecution history.

25.     As the second step in the infringement analysis, I understand that the properly construed claim must be compared to the accused products.  I understand that an accused product may infringe a claim either literally or equivalently.  I understand from counsel that literal infringement exists when the accused product embodies each and every limitation of a given asserted

DECLARATION OF DR. RAVIN
BALAKRISHNAN – CASE NO. 12-cv-XXXXX-
XXX

6

Gibson, Dunn &
Crutcher LLP

claim.  To literally infringe a method claim, the product must perform every step of the claim.  If a product does not literally perform a step of the claim, it can still infringe under the doctrine of equivalents if the step it performs is insubstantially different from the claimed step.

26.      I understand that one test for determining equivalence is to determine whether the differences between the claimed limitation and the accused product are insubstantial.  I understand that another test for determining equivalence is to examine whether the step used by the accused product performs substantially the same function in substantially the same way to achieve substantially the same result as the claimed step.

27.      I further understand that infringement of a method claim can be either direct or indirect.  I understand that direct infringement occurs when a party makes, uses, sells, offers for sale, or imports an article covered by the claims of a patent.  I understand that an indirect infringement occurs either through inducement, where a party induces another to engage in acts that constitute direct infringement, or through contributory infringement, where a party sells an article that is made for use in an infringement of the patent's claims or, put otherwise, is not a staple article of commerce that has substantial non-infringing uses.

## III.    Validity

### A.    Presumption of Validity

28.      I have been informed that in deciding whether to issue a patent, the U.S. Patent and Trademark Office ("PTO") examines the patent specification, its claims, and relevant prior art references to determine whether the patent application and its claims meet the requirements for patentability.  I understand that if the PTO then issues the patent, it has determined that the claims are valid. I understand that the law recognizes that the PTO possesses special expertise to conduct such determinations, and that, as a result, each claim of a patent issued by the PTO is presumed valid by law. This presumption of validity can only be overcome if the party seeking to invalidate a claim

DECLARATION OF DR. RAVIN
BALAKRISHNAN – CASE NO. 12-cv-XXXXX-
XXX                                              7

proves invalidity by clear and convincing evidence, which I understand to mean evidence that convinces the fact-finder that it is highly probable that the particular proposition is true.

29.     I also understand that the burden to prove invalidity by clear and convincing evidence is even higher when the allegedly invalidating prior art was already considered by the PTO or is cumulative of the prior art that the PTO considered so any attempt to invalidate a claim using that type of information will not likely succeed.

### B.     Patentable Subject Matter

30.     I understand that a claim must be directed to a new and useful process, machine, manufacture, or composition of matter and that a claim cannot merely claim a mathematical algorithm or an abstract idea. However, I understand that a claim drawn to new and useful subject matter does not become non-patentable simply because it uses a mathematical formula, computer program, or digital computer. I further understand that in analyzing the patentability of a claim, one must consider the invention as a whole, rather than dissecting the claims into old and new elements and then ignoring the presence of the old elements in the analysis.

### C.     Anticipation

31.     I understand that a person cannot obtain a patent if someone else already has made an identical invention. I further understand that to prove anticipation, Respondents must prove with clear and convincing evidence that the claimed invention is not new.

32.     I understand that to anticipate a claim, each and every element in the claim must be present in a single item of prior art. In determining whether every one of the elements of the claimed invention is found in the prior art, I understand that one should take into account what a person of ordinary skill in the art would have understood from his or her examination of the particular prior art. I also understand that he prior art reference alleged to be anticipatory must also enable one of ordinary skill in the art to make the claimed invention without undue experimentation.

Gibson, Dunn &
Crutcher LLP

33.     I understand that anticipation must be found in a single reference, device, or process. In other words, anticipation does not allow an additional reference to supply a missing claim limitation. I further understand that the prior art reference must disclose all elements of the claim within the four corners of the document and must also disclose those elements arranged as in the claim.

34.     Moreover, I understand that any differences between prior art reference and a claimed invention invoke the question of obviousness, not anticipation. In other words, I understand it is not sufficient for a prior art reference to disclose part of a claimed invention or that it includes multiple, distinct teachings that one of ordinary skill in the art might somehow combine to achieve the claimed invention. The prior art reference must disclose the claimed invention without any need for combining various disclosures not directly related to each other.

35.     I further understand that the burden of proving invalidity is especially difficult or particularly heavy when prior art reference was before the Examiner during prosecution. In other words, I understand there is an added burden of overcoming the deference due to the Patent Office.

**D.     Obviousness**

36.     I understand that a claimed invention is invalid as "obvious" if it would have been obvious to a person of ordinary skill in the art of the claimed invention at the time the invention was made. Unlike anticipation, which allows consideration of only one item of prior art, I have been informed that obviousness may be shown by considering more than one item of prior art.

37.     I further understand that the following factors must be evaluated to determine whether Respondents have established that the claimed inventions are obvious: (1) the scope and content of the prior art; (2) the difference or differences, if any, between each claim of the asserted patent and the prior art; (3) the level of ordinary skill in the art at the time the invention of the asserted patent

DECLARATION OF DR. RAVIN
BALAKRISHNAN – CASE NO. 12-cv-XXXXX-
XXX

Gibson, Dunn &
Crutcher LLP

was made; and (4) the existence of secondary considerations that indicate that the invention was obvious or not obvious.

38.     I also understand that Respondents must prove obviousness by clear and convincing evidence.

39.     I have been informed that one should analyze whether there are any relevant differences between the prior art and the claimed invention from the view of a person of ordinary skill in the art at the time of the invention and that one must determine the impact, if any, of such differences on the obviousness or nonobviousness of the invention as a whole, and not merely some portion of it. Moreover, I understand that a patent claim composed of several requirements is not proved obvious merely by demonstrating that each of its requirements was independently known in the prior art. I understand that it is important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the requirements in the way the claimed new invention does. I understand that this is the case because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known. Therefore, I further understand that one may evaluate whether there was some teaching, suggestion, or motivation to arrive at the claimed invention before the time of the claimed invention.  I also understand that one must be careful not to determine obviousness using hindsight and that one evaluating the prior art should put oneself in the position of a person of ordinary skill in the field of the invention at the time the claimed invention was made.

40.     I understand that secondary considerations that should be taken into account include at least the following: 1) commercial success of a product due to the merits of the claimed invention; 2) a long-felt, but unsolved, need for the solution provided by the claimed invention; 3) unsuccessful attempts by others to find the solution provided by the claimed invention; 4) copying of the claimed

Gibson, Dunn &
Crutcher LLP

invention by others; 5) unexpected and superior results from the claimed invention; 6) acceptance by others of the claimed invention as shown by praise from others in the field of the invention or from the licensing of the claimed invention; and 7) disclosures in the prior art that criticize, discredit, or otherwise discourage the claimed invention.

### E.   Conception and Reduction to Practice

41.     I understand that the proposed Respondents can attempt to show that a patent claim was not new because the invention described was first made or invented by someone else. However, I further understand that if the '721 patent inventors first conceived of the claimed inventions, even if they reduced it to practice second, the '721 patent inventors are considered the first inventors if they worked with reasonable diligence to reduce the invention to practice from a time just before the other party's conception. Moreover, I understand that if the '721 inventors conceived and reduced to practice before the other party's conception, but the other party's conception predates the filing of a patent by the '721 inventors, the '721 patent inventors maintain their right to obtain a patent if they worked with reasonable diligence to perfect their invention by making refinements and improvements that are reflected in the final patent application.

42.     In this context, I understand that conception is the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is to be applied in practice. I further understand that reduction to practice occurs either as of the filing of the patent application or when the invention was actually made and was shown to work for its intended purpose. I also understand that reasonable diligence means that the inventor worked continuously on reducing the invention to practice but that interruptions necessitated by the everyday problems and obligations of the inventor or others working with him or her do not prevent a finding of reasonable diligence.

DECLARATION OF DR. RAVIN
BALAKRISHNAN – CASE NO. 12-cv-XXXXX-
XXX

11

## F.     Indefiniteness

43.     I understand that the requirement that patent claims be definite means that patent claims must particularly point out and distinctly claim subject matter which the applicant regards as his invention. I further understand that a claim is sufficiently definite to satisfy this requirement if one skilled in the art would understand the bounds of the claim when read in light of the specification. I have also been informed that a claim is not indefinite unless it is not amenable to construction or is insolubly ambiguous. I further understand that a claim is not indefinite merely because it poses a difficult issue of claim construction.

## SUMMARY OF OPINIONS

44.     Based on information currently available to me, it is my opinion that:

a.     The Accused Samsung Products infringe at least claims 7, 8, 12 and 15 of the '721 patent;

b.     The '721 patent is valid; and

c.     The Apple iPhone 3GS, 4 and 4S, Apple iPad 2 and Apple iPod Touch incorporate the features claimed in the '721 patent.

## LEVEL OF ORDINARY SKILL IN THE ART

45.     I may offer testimony regarding the level of ordinary skill in the art of the '721 patent, and specifically the qualifications of such a person at the time of the invention of the '721 patent.  In my opinion a person of ordinary skill in the art of the '721 patent would have a Bachelor of Science degree in Computer Science, and at least two to three years' experience in designing and/or implementing computer user interface systems, or the equivalent.

46.     I meet these criteria and consider myself a person with at least ordinary skill in the art pertaining to the '721 patent and I would have been such a person at the time of invention of the '721 patent.

DECLARATION OF DR. RAVIN
BALAKRISHNAN – CASE NO. 12-cv-XXXXX-
XXX                                                              12

**TECHNICAL ANALYSIS**

**I.     Apple's '721 Patent**

   **A.     Description and Background of Apple's '721 Patent**

47.     The inventions of the '721 patent relate to a user's interaction with a portable electronic device that has a touch-sensitive display or touch screen.  The specification describes how such a device may be locked to prevent a user from unintentionally activating functions through inadvertent contact with the touch screen.  *See* '721 Patent at 1:38-45.  Conventional methods of unlocking a locked device included "pressing a predefined set of buttons (simultaneously or sequentially) or entering a code or password."  *Id.* at 1:46-55.  The goal of the invention was to provide more "efficient, user-friendly procedures for unlocking such devices, touch screens, and/or applications" without the need for memorizing passwords or pass codes.  *Id.* at 1:56-67.

   **B.     Asserted Claims**

48.     Claim 7 of the '721 patent claims:

   A portable electronic device, comprising:

   a touch-sensitive display;

   memory;

   one or more processors; and

   one or more modules stored in the memory and configured for execution by the one or
      more processors, the one or more modules including instructions:

   to detect a contact with the touch-sensitive display at a first predefined location
      corresponding to an unlock image;

   to continuously move the unlock image on the touch-sensitive display in accordance
      with movement of the detected contact while continuous contact with the touch-
      sensitive display is maintained, wherein the unlock image is a graphical, interactive
      user-interface object with which a user interacts in order to unlock the device; and

   to unlock the hand-held electronic device if the unlock image is moved from the first
      predefined location on the touch screen to a predefined unlock region on the touch-
      sensitive display.

49.     Claim 8 of the '721 patent claims:

Gibson, Dunn &
Crutcher LLP

The device of claim 7, further comprising instructions to display visual cues to communicate a direction of movement of the unlock image required to unlock the device.

50.     Claim 12 of the '721 patent claims:

A computer readable storage medium storing one or more programs, the one or more programs comprising instructions, which when executed by a portable electronic device with a touch-sensitive display, cause the portable electronic device to perform a method comprising:

  detecting a contact with the touch sensitive display at a first predefined location corresponding to an unlock image;

  continuously moving the unlock image on the touch-sensitive display in accordance with movement of the contact while continuous contact with the touch screen is maintained, wherein the unlock image is a graphical, interactive user-interface object with which a user interacts in order to unlock the device; and

  unlocking the hand-held electronic device if the moving the unlock image on the touch-sensitive display results in movement of the unlock image from the first predefined location to a predefined unlock region on the touch-sensitive display.

51.     Claim 15 of the '721 patent claims:

The computer readable storage medium of claim 12, wherein the unlock image is a single image.

**C.     Infringement**

52.     I understand that the '721 patent has not been previously asserted in litigation, and that the claims of the '721 patent have not previously been construed by any court or other adjudicator. I reserve the right to consider any claim construction orders in the future with respect to my opinions regarding infringement and validity. At present, my opinions are based on the claims as I believe a person of ordinary skill in the art would have understood them. I will now walk through the elements of claims 7, 8, 12 and 15 of the '721 patent and will explain my opinion regarding infringement of each element.

Gibson, Dunn &
Crutcher LLP

### 1.     Infringement of Claim 7 of the '721 Patent

53.     It is my opinion that the Samsung Galaxy Nexus infringes claim 7 of the '721 patent. My analysis is set forth in the claim chart attached as Exhibit 3, and a summary of my element-by-element analysis is further provided below.

### (i)     A portable electronic device, comprising:

54.     To the extent that the preamble is found to be a limitation, the Samsung Galaxy Nexus is a portable electronic device, as reflected by its size.  It is 67.94mm x 135.5mm x 9.47mm and has a CPU, memory devices, a display device, has a 1850mAh battery.  Exhibit 4 (Galaxy Nexus Specifications).

### (ii)     a touch-sensitive display

55.     The Samsung Galaxy Nexus comprises a touch-sensitive display.  The Samsung Galaxy Nexus User Guide states that to use the Galaxy Nexus, you "[u]se your fingers to manipulate icons, buttons, menus, the onscreen keyboard, and other items on the touchscreen."  Exhibit 5, at 9.

56.     Furthermore, the Samsung Galaxy Nexus has a color Super AMOLED display. Exhibit 4 (Galaxy Nexus Specifications).

57.     The '721 specification makes clear that a touch screen display is the same as a touch-sensitive display:  "Touch-sensitive displays (also known as 'touch screens' or 'touchscreens') are well known in the art."  '721 Patent, at 1:25-26.

### (iii)     (b) memory

58.     The Samsung Galaxy Nexus comprises memory.  The Samsung Galaxy Nexus has two forms of memory:  "Storage: 32 GB" and "Memory: 1 GB RAM."  Exhibit 4 (Galaxy Nexus Specifications).

Gibson, Dunn &
Crutcher LLP

### (iv)    one or more processors

59.    The Samsung Galaxy Nexus comprises one or more processors.  The Samsung Galaxy Nexus has a 1.2 GHz dual core processor.  *Id*.

### (v)    one or more modules stored in the memory and configured for execution by the one or more processors, the one or more modules including instructions:

60.    The '721 specification discloses many types of modules that exist in the Samsung Galaxy Nexus.  One such module disclosed in the '721 specification and also included in the Samsung Galaxy Nexus is the contact/motion module.  The '721 specification discloses:

> "The contact/motion module 138 detects contact with the 35 touch screen 126, in conjunction with the touch-screen controller 122.  The contact/motion module 138 includes various software components for performing various operations related to detection of contact with the touch screen 122, such as determining if contact has occurred, determining if there is movement of the contact and tracking the movement across the touch screen, and determining if the contact has been broken (i.e., if the contact has ceased)."

'721 Patent, at 6:34-42.

61.    The Samsung Galaxy Nexus contains, among other modules, a contact/motion module in its memory that is configured for execution by the Galaxy Nexus's processor.  This module allows the Samsung Galaxy Nexus to detect contact with the touch screen.  The Samsung Galaxy Nexus User Guide discloses some of these contacts that the contact/motion module detects:

DECLARATION OF DR. RAVIN
BALAKRISHNAN – CASE NO. 12-cv-XXXXX-
XXX                                            16

## Touch & type

Use your fingers to manipulate icons, buttons, menus, the onscreen keyboard, and other items on the touchscreen. You can also change the screen's orientation.

To select or activate something, touch it.

To type something, such as a name, password, or search terms, just touch where you want to type. A keyboard pops up that lets you type into the field.

Other common gestures include:

► **Touch & hold**: Touch & hold an item on the screen by touching it and not lifting your finger until an action occurs.

► **Drag**: Touch & hold an item for a moment and then, without lifting your finger, move your finger on the screen until you reach the target position. For example, you can drag to reposition shortcuts on the Home screen.

► **Swipe or slide**: Quickly move your finger across the surface of the screen, without pausing when you first touch (so you don't drag something instead). For example, you can slide a Home screen left or right to view the other Home screens.

► **Double-tap**: Tap quickly twice on a webpage, map, or other screen to zoom. For example, double-tap a webpage in Browser to zoom in, and double-tap again to zoom out.

► **Pinch**: In some apps (such as Maps, Browser, and Gallery), you can zoom in and out by placing two fingers on the screen at once and pinching them together (to zoom out) or spreading them apart (to zoom in).

Exhibit 5, at 9.

62.     As an example of one of the Samsung Galaxy Nexus modules, instructions for a slide to unlock functionality within the Android 4.0's lock screen program include, but are not necessarily limited to, those contained in the file frameworks/base/core/java/com/android/internal/widget/multiwaveview/MultiWaveView.java. This file contains a class named "MultiWaveView" that implements the various behaviors of the slide to unlock functionality.  The comments from the Android 4.0 code describe the overall functionality of the MultiWaveView:

```
/**
 * A special widget containing a center and outer ring. Moving the center
ring to the outer ring
 * causes an event that can be caught by implementing OnTriggerListener.
 */
```

**(vi)    to detect a contact with the touch-sensitive display at a first predefined location corresponding to an unlock image**

63.    The Samsung Galaxy Nexus's default setting is set such that the Galaxy Nexus's home screen, when locked, contains an unlock image at a predefined location in the bottom center of the screen (*see* image below).

64.    The Samsung Galaxy Nexus's contact/motion module contains instructions that allow the Galaxy Nexus to detect a user's contact with the touch-sensitive display at the unlock image (below).



(Image of Samsung Galaxy Nexus, demonstrating detecting contact on the unlock image.)

65.    The Samsung Galaxy Nexus's contact/motion module contains instructions including, but not necessarily limited to, those contained in MultiWaveView.java within the methods onTouchEvent(), handleDown() and trySwitchToFirstTouchState() to detect contact with the unlock image on the touch-sensitive display.  The method onTouchEvent() calls handleDown()  when it receives a motion event that corresponds to a contact on the touch-sensitive display, which in turn

DECLARATION OF DR. RAVIN
BALAKRISHNAN – CASE NO. 12-cv-XXXXX-
XXX                                                        18

calls trySwitchToFirstTouchState(). The trySwitchToFirstTouchState() method has instructions that

determines whether a contact with the touch-sensitive display hits the unlock image.

> **(vii)    to continuously move the unlock image on the touch-sensitive display in accordance with movement of the detected contact while continuous contact with the touch-sensitive display is maintained, wherein the unlock image is a graphical, interactive user-interface object with which a user interacts in order to unlock the device**

66.     The Samsung Galaxy Nexus's contact/motion module further contains instructions

directing that (1) when the user places their finger on the Samsung Galaxy Nexus's unlock image and

(2) then moves their finger on the screen while maintaining continuous contact with the screen, (3)

the Samsung Galaxy Nexus continuously moves the unlock image in accordance with the movement

of the user's finger.  The images below demonstrate this movement.



Continuous contact with an interactive
user-interface object

(Images of Samsung Galaxy Nexus, demonstrating continuous movement of the unlock image in

accordance with continuous contact movement of the user's finger.)

67.     This unlock image that the user moves on the touch-sensitive display is a graphical,

interactive user-interface object with which the user may interact in order to unlock the Samsung

Galaxy Nexus.  By moving this unlock image in the manner shown in the pictures above, the user

may unlock the Samsung Galaxy Nexus.  The Samsung Galaxy Nexus User Guide briefly describes this unlock mechanism as "Slide":

You can choose among these lock options, listed in approximate order of strength:

- **Slide** provides no protection, but lets you get to the Home screen quickly, or open Camera and start taking pictures immediately.
- **Face Unlock** lets you unlock your phone by looking at it. This is the least secure lock option.
- **Pattern** lets you draw a simple pattern with your finger to unlock the phone. This is slightly more secure than Face Unlock.
- **PIN** requires four or more numbers. Longer PINs tend to be more secure.
- **Password** requires four or more letters or numbers. This is the most secure option, as long as you create a strong password.

Exhibit 5, at 103.

68.     Instructions for tracking the movement of the detected contact and to in turn continuously move the unlock image is found in, but not necessarily limited to, the file MultiWaveView.java within the onTouchEvent() and  handleMove() methods. The method onTouchEvent() calls handleMove() when it receives a motion event that corresponds to a movement of a contact on the touch-sensitive display. The method handleMove() tracks the movement of the detected contact and continuously moves the unlock image.

> **(viii)   to unlock the hand-held electronic device if the unlock image is moved from the first predefined location on the touch screen to a predefined unlock region on the touch-sensitive display**

69.     The Samsung Galaxy Nexus's contact/motion module contains additional instructions directing that (1) when the Samsung Galaxy Nexus detects contact with the user's finger, (2) a second image appears at a predefined unlock region on the lower right potion of the screen (*see* center image below), directing the user to the location of required movement to unlock the Galaxy Nexus, and (3) when the user moves the first (originally centered) unlock image to the second (right-hand) image at a predefined unlock region on the touch-sensitive display, the Samsung Galaxy Nexus unlocks.



Continuous contact with an interactive
user-interface object

(Images of Samsung Galaxy Nexus, demonstrating unlocking the Galaxy Nexus by moving the unlock image from a first predefined location to a second predefined unlock region.)

70.     The instructions for unlocking the Samsung Galaxy Nexus by sliding the unlock image to the unlock region on the right of the screen include, but are not necessarily limited to, that contained in the MultiWaveView.java file, which contains the following methods that are executed when the unlock image is moved to the predefined unlock region: doFinish() and setGrabbedState().

71.     The file frameworks/base/policy/src/com/android/internal/policy/impl/ LockScreen.java contains code including, but not necessarily limited to, instructions for using the MultiWaveView class to unlock the screen.  The class is called "LockScreen", which in turn has a class called "MultiWaveViewMethods" that determines what to do, including but not limited to when to unlock the Galaxy Nexus, when the unlock image is moved to the predetermined unlock region. In particular, the onTrigger() method specifies when and how to unlock the Galaxy Nexus.

### 2.     Infringement of Claim 8 of the '721 Patent

72.     It is my opinion that the Samsung Galaxy Nexus infringes claim 8 of the '721 patent. My analysis is set forth in the claim chart attached as Exhibit 3, and a summary of my element-by-element analysis is further provided below.

DECLARATION OF DR. RAVIN
BALAKRISHNAN – CASE NO. 12-cv-XXXXX-
XXX                                                    21

**(i)**     **The device of claim 7, further comprising instructions to display visual cues to communicate a direction of movement of the unlock image required to unlock the device**

73.     It is my opinion that the Samsung Galaxy Nexus infringes claim 8 of the '721 patent. When the locked Samsung Galaxy Nexus detects contact with the user's finger on the first unlock image, a second unlock image appears on the lower right potion of the screen (*see* center image below), communicating to the user that the first unlock image must be moved to the right to unlock the Galaxy Nexus:



Furthermore, when the unlock image first appears on the unlock screen of the locked Samsung Galaxy Nexus, an animation of "chevrons" moving from the unlock image to the right of the screen is played, which are visual cues which communicate a direction of movement of the unlock image required to unlock the device. This is illustrated in the following images:

DECLARATION OF DR. RAVIN
BALAKRISHNAN – CASE NO. 12-cv-XXXXX-
XXX                                                        22

1
2
3
4
5



(Images demonstrating that after the user touches the unlock image, cheverons move to the right as a cue toward the direction of movement to unlock the Samsung Galaxy Nexus)

This animation is also replayed if the user touches the unlock image and releases the touch without moving the unlock image to the predetermined unlock region. The instructions for this animation is found in, but not necessarily limited to, the method startChevronAnimation() in the file MultiWaveView.java.

### 3.      Infringement of Claim 12 of the '721 Patent

74.      It is my opinion that the Samsung Galaxy Nexus infringes claim 12 of the '721 patent. My analysis is set forth in the claim chart attached as Exhibit 3, and a summary of my element-by-element analysis is further provided below.

> **(i)      A computer readable storage medium storing one or more programs, the one or more programs comprising instructions, which when executed by a portable electronic device with a touch-sensitive display, cause the portable electronic device to perform a method comprising:**

75.      To the extent that the preamble is found to be a limitation, the Samsung Galaxy Nexus contains two forms of memory, including computer readable storage:  "Storage: 32 GB" and "Memory: 1 GB RAM."  Exhibit 4 (Galaxy Nexus Specifications).  The '721 specification describes

computer readable storage medium as "e.g., one or more magnetic disk storage devices, flash memory devices, or other non-volatile solid state memory devices." '721 Patent, at 2:58-60.

76.     As is standard for computing devices, the Galaxy Nexus's computer readable storage medium contains programs comprising instructions that the Galaxy Nexus's processor can execute, causing the Galaxy Nexus to perform various methods.  This is evident by the fact that a user can run programs such as the browser program on the Galaxy Nexus, and there is no way to do so other than executing the program on the Galaxy Nexus's processor.

77.     The Samsung Galaxy Nexus is a portable electronic device, as reflected by its size.  It is 67.94mm x 135.5mm x 9.47mm and has a CPU, memory devices, a display device, has a 1850mAh battery.  Exhibit 4 (Galaxy Nexus Specifications).

78.     The Samsung Galaxy Nexus comprises a touch-sensitive display.  The Samsung Galaxy Nexus User Guide states that to use the Galaxy Nexus, you "[u]se your fingers to manipulate icons, buttons, menus, the onscreen keyboard, and other items on the touchscreen."  Exhibit 5, at 9.

79.     Furthermore, the Samsung Galaxy Nexus has a color Super AMOLED display.  Exhibit 4 (Galaxy Nexus Specifications).

80.     The '721 specification makes clear that a touch screen display is the same as a touch-sensitive display:  "Touch-sensitive displays (also known as 'touch screens' or 'touchscreens') are well known in the art."  '721 Patent, at 1:25-26.

> (ii)     **detecting a contact with the touch sensitive display at a first predefined location corresponding to an unlock image**

81.     The Samsung Galaxy Nexus User Guide explains that the Galaxy Nexus detects at least the following types of contacts:

## Touch & type

Use your fingers to manipulate icons, buttons, menus, the onscreen keyboard, and other items on the touchscreen. You can also change the screen's orientation.

To select or activate something, touch it.

To type something, such as a name, password, or search terms, just touch where you want to type. A keyboard pops up that lets you type into the field.

Other common gestures include:

- ▶ **Touch & hold**: Touch & hold an item on the screen by touching it and not lifting your finger until an action occurs.

- ▶ **Drag**: Touch & hold an item for a moment and then, without lifting your finger, move your finger on the screen until you reach the target position. For example, you can drag to reposition shortcuts on the Home screen.

- ▶ **Swipe or slide**: Quickly move your finger across the surface of the screen, without pausing when you first touch (so you don't drag something instead). For example, you can slide a Home screen left or right to view the other Home screens.

- ▶ **Double-tap**: Tap quickly twice on a webpage, map, or other screen to zoom. For example, double-tap a webpage in Browser to zoom in, and double-tap again to zoom out.

- ▶ **Pinch**: In some apps (such as Maps, Browser, and Gallery), you can zoom in and out by placing two fingers on the screen at once and pinching them together (to zoom out) or spreading them apart (to zoom in).

Exhibit 5, at 9.

82.     The Samsung Galaxy Nexus detects these contacts with the touch-sensitive display, including contacts on the unlock image described above.

83.     As an example of instructions contained in the Samsung Galaxy Nexus programs, instructions for a slide to unlock functionality within the Android 4.0's lock screen program are included in, but not necessarily limited to, those contained in the file frameworks/base/core/java/com/android/internal/widget/multiwaveview/MultiWaveView.java. This file contains a class named "MultiWaveView" that implements the various behaviors of the slide to unlock functionality.  The comments from the Android 4.0 code describe the overall functionality of the MultiWaveView:

```
/**
 * A special widget containing a center and outer ring. Moving the center
ring to the outer ring
 * causes an event that can be caught by implementing OnTriggerListener.
 */
```

1

2

3

4

5

84.     The Samsung Galaxy Nexus's default setting is set such that the Galaxy Nexus's home screen, when locked, contains an unlock image at a predefined location in the bottom center of the screen (*see* image below).



(Image of Samsung Galaxy Nexus, demonstrating detecting contact on the unlock image.)

85.     The Samsung Galaxy Nexus's programs contains instructions that allow the Galaxy Nexus to detect a user's contact with the touch-sensitive display at the unlock image (*see* above).

86.     The Samsung Galaxy Nexus's programs contain instructions including, but not necessarily limited to, those contained in MultiWaveView.java within the methods onTouchEvent(), handleDown() and trySwitchToFirstTouchState() to detect contact with the unlock image on the touch-sensitive display.  The method onTouchEvent() calls handleDown()  when it receives a motion event that corresponds to a contact on the touch-sensitive display, which in turn calls trySwitchToFirstTouchState(). The trySwitchToFirstTouchState() method has instructions that determines whether a contact with the touch-sensitive display hits the unlock image.

(iii) **continuously moving the unlock image on the touch-sensitive display in accordance with movement of the contact while continuous contact with the touch screen is maintained, wherein the unlock image is a graphical, interactive user-interface object with which a user interacts in order to unlock the device**

87.     When the user places their finger on the Samsung Galaxy Nexus's unlock image and then moves their finger on the screen while maintaining continuous contact with the screen, the Samsung Galaxy Nexus continuously moves the unlock image in accordance with the movement of the user's finger.  The images below demonstrate this movement.



Continuous contact with an interactive user-interface object

(Images of Samsung Galaxy Nexus, demonstrating continuous movement of the unlock image in accordance with continuous contact movement of the user's finger.)

88.     This unlock image that the user moves on the touch-sensitive display is a graphical, interactive user-interface object with which the user may interact in order to unlock the Samsung Galaxy Nexus.  By moving this unlock image in the manner shown in the pictures above, the user may unlock the Samsung Galaxy Nexus.  The Samsung Galaxy Nexus User Guide briefly describes this unlock mechanism as "Slide":

DECLARATION OF DR. RAVIN
BALAKRISHNAN – CASE NO. 12-cv-XXXXX-
XXX

You can choose among these lock options, listed in approximate order of strength:

- **Slide** provides no protection, but lets you get to the Home screen quickly, or open Camera and start taking pictures immediately.
- **Face Unlock** lets you unlock your phone by looking at it. This is the least secure lock option.
- **Pattern** lets you draw a simple pattern with your finger to unlock the phone. This is slightly more secure than Face Unlock.
- **PIN** requires four or more numbers. Longer PINs tend to be more secure.
- **Password** requires four or more letters or numbers. This is the most secure option, as long as you create a strong password.

Exhibit 5, at 103.

89.      Instructions for tracking the movement of the detected contact and to in turn continuously move the unlock image is found in, but not necessarily limited to, the file MultiWaveView.java within the onTouchEvent() and  handleMove() methods.  The method onTouchEvent() calls handleMove() when it receives a motion event that corresponds to a movement of a contact on the touch-sensitive display.  The method handleMove() tracks the movement of the detected contact and continuously moves the unlock image.

> **(iv)      unlocking the hand-held electronic device if the moving the unlock image on the touch-sensitive display results in movement of the unlock image from the first predefined location to a predefined unlock region on the touch-sensitive display**

90.      When the Samsung Galaxy Nexus detects contact with the user's finger, a second unlock image appears at a predefined location on the lower right potion of the screen (*see* center image below), directing the user to the location of required movement to unlock the Galaxy Nexus.

91.      When the user moves the first (originally centered) unlock image to the second (right-hand) unlock image on the touch-sensitive display, the Samsung Galaxy Nexus unlocks.

DECLARATION OF DR. RAVIN
BALAKRISHNAN – CASE NO. 12-cv-XXXXX-
XXX                                                                 28



Continuous contact with an interactive user-interface object

(Images of Samsung Galaxy Nexus, demonstrating unlocking the Galaxy Nexus by moving the unlock image from a first predefined location to a second predefined location.)

92.     The instructions for unlocking the Samsung Galaxy Nexus by sliding the unlock image to the unlock region on the right of the screen include, but are not necessarily limited to, that contained in the MultiWaveView.java file, which contains the following methods that are executed when the unlock image is moved to the predefined unlock region: doFinish() and setGrabbedState().

93.     The file frameworks/base/policy/src/com/android/internal/policy/impl/ LockScreen.java contains code including, but not necessarily limited to, instructions for using the MultiWaveView class to unlock the screen.  The class is called "LockScreen", which in turn has a class called "MultiWaveViewMethods" that determines what to do, including but not limited to when to unlock the Galaxy Nexus, when the unlock image is moved to the predetermined unlock region. In particular, the onTrigger() method specifies when and how to unlock the Galaxy Nexus.

#### 4.    Infringement of Claim 15 of the '721 Patent

94.    It is my opinion that the Samsung Galaxy Nexus infringes claim 15 of the '721 patent. My analysis is set forth in the claim chart attached as Exhibit 3 and a summary of my element-by-element analysis is further provided below.

> **(i)    The computer readable storage medium of claim 12, wherein the unlock image is a single image.**

95.    The graphical unlock image that appears on the bottom-center of the Samsung Galaxy Nexus screen when the locked Galaxy Nexus detects the user's finger on the unlock image, is a single image (*see* images below):



ect)

96.    An excerpt of the relevant code for the graphical unlock image is below, where each "targetIcon" is a reference to a single icon:

```
private void updateTargetPositions() {
    // Reposition the target drawables if the view changed.
    for (int i = 0; i < mTargetDrawables.size(); i++) {
        final TargetDrawable targetIcon =
mTargetDrawables.get(i);
        double angle = -2.0f * Math.PI * i /
```

DECLARATION OF DR. RAVIN
BALAKRISHNAN – CASE NO. 12-cv-XXXXX-
XXX                                                    30

```
mTargetDrawables.size();
                float xPosition = mWaveCenterX + mOuterRadius * (float)
Math.cos(angle);
                float yPosition = mWaveCenterY + mOuterRadius * (float)
Math.sin(angle);
                targetIcon.setX(xPosition);
                targetIcon.setY(yPosition);
            }
        }
```

### D.     Validity

97.     It is my opinion that claims 7, 8, 12 and 15 of the '721 patent are valid.

98.     In reaching this opinion, I have considered the claims, specification, and prosecution history of the '721 patent, including the prior art references identified by the USPTO as being the closest prior art, and I have relied on my knowledge of and expertise regarding computer science, human computer interaction, and interactive computer graphics.   I have also relied on the legal standards regarding validity discussed above.

#### 1.     Novelty and Non-obviousness of Apple's Invention

99.     In my experience as a professor of computer science and human-centered interfaces, and in my experience as a consultant in the computer and portable electronic device industry and to companies in litigation regarding such devices, I have seen, used, and read about a wide variety of portable electronic devices, including cellular telephones, portable digital assistants, and other computing devices.  To the best of my recollection, however, I have not seen any disclosures or actual devices that meet the elements of the claims of the '721 patent, including claims 7, 8, 12 and 15 and that also pre-date the December 23, 2005 priority date of the '721 patent, or the 2007

introduction of the Apple iPhone.   My experience thus supports my opinion that the invention of the '721 patent was novel, and not anticipated by any device or publication in the prior art.

100.     Further, the slide-to-unlock invention of the '721 patent was a departure, in my opinion, from the devices in existence at the time, and the invention would not have been obvious to a person of ordinary skill in the art.  As the '721 patent itself explains, and as is consistent with my experience in this field, devices in the prior art may have allowed for users to unlock their phones, but did so only through complex actions involving physical keys, codes or passwords.

101.     Against this background, Apple's invention was unique, as it relied on the use of detection of an unlock gesture on a touch screen to unlock the user's phone, saving the user from performing complex key pushes and/or remembering passwords and codes.  The Apple iPhone, which in my opinion was the first device to utilize this invention, is widely recognized as having revolutionized the portable electronic device industry, and the invention of the '721 patent contributed to this revolution.

### E.     Apple's Use of the Patented Technology

102.     It is my understanding, based on a review of the Apple iPhone 3GS, 4 and 4S, iPad 2, and iPod Touch, that these Apple devices each incorporates the claimed features of the '721 patent.

103.     I am familiar with these touch screen devices and the iOS software, including iOS 5.0.1, as well as earlier iPhone hardware models and earlier versions of the iOS software, and am of the opinion that they all work in substantially the same way with respect to this claim.  For example, these devices, such as the iPhone 4S, have a home screen that, when locked, contain a slide-to-unlock image with a button to slide at a predefined location in the bottom center of the screen.  The user may unlock such devices by placing a finger on that slide-to-unlock button image on the devices' touch-sensitive displays, and then moving the finger to the right along the screen's button-channel image; the devices continuously move the slide-to-unlock button to a pre-defined unlock region in

DECLARATION OF DR. RAVIN
BALAKRISHNAN – CASE NO. 12-cv-XXXXX-XXX

Gibson, Dunn &
Crutcher LLP

accordance with that finger movement as long as the finger maintains continuous contact with the screen.

104.    It is my opinion that iPhones including the original iPhone, iPhone 3G, iPhone 3GS, iPhone 4, and iPhone 4S, running any version of the iOS operating system (formerly known as the iPhone OS operating system), practice the '721 patent.  Additionally, I am familiar with the iPad 1, iPad 2, and iPod Touch, which also work in substantially the same way with respect to this claim, and it is further my opinion that these devices running any version of the iOS operating system also practice the '721 patent.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:    February 6 , 2012                          _____
                                                                          Ravin Balakrishnan, Ph. D.

Gibson, Dunn &
Crutcher LLP