# verdict

**DISTRICT COURT THE HAGUE**

Civil law sector

**Verdict in the summary proceedings of August 24, 2011 (in case of an earlier hearing date)**

for the case with case number / docket number: 396957 / KG ZA 11-

730 of the legal entity under foreign law
**APPLE INC.,**
based in Cupertino, California, United States of America, Plaintiff,
lawyer: Mr. P.J.M. von Schmidt auf Altenstadt in The Hague,

against

1.      the company under foreign law
        **SAMSUNG ELECTRONICS CO. LIMITED**,
        based in Suwon City, Kyungki-Do, South Korea,
2.      the private company with limited liability **SAMSUNG ELECTRONICS BENELUX B.V.**, based in Delft,
3.      the private company with limited liability
        **SAMSUNG ELECTRONICS EUROPE LOGISTICS B.V.**,
        based in Rijswijk,
4.      the private company with limited liability **SAMSUNG ELECTRONICS OVERSEAS B.V.**, based in
        Amsterdam,
defendants,
lawyer: Mr. B.J. Berghuis van Woortman in Amsterdam,

and for the case with case number / docket number 396959 / KG ZA 11-

731 of the legal entity of foreign law
**APPLE INC.,**
based in Cupertino, California, United States of America, Plaintiff,
lawyer: Mr. P.J.M. von Schmidt auf Altenstadt in The Hague,

against

1.      the company under foreign law
        **SAMSUNG ELECTRONICS CO. LIMITED**,
        based in Suwon City, Kyungki-Do, South Korea,
2.      the private company with limited liability
        **SAMSUNG ELECTRONICS BENELUX B.V.**,
        based in Delft,

396957 / KG ZA 11-730 and 396959 / KG ZA 11-731
August 24, 2011

2

_____   _

3.      the private company with limited liability **SAMSUNG
        ELECTRONICS EUROPE LOGISTICS B.V.**, based in
        Rijswijk,
4.      the private company with limited liability
        **SAMSUNG ELECTRONICS OVERSEAS B.V.**,
        based in Amsterdam,
defendants,
lawyer: Mr. B.J. Berghuis van Woortman in Amsterdam.

The cases are handled collectively. The parties will hereinafter also referred to as Apple
(plaintiff) and Samsung (collective defendants) For Apple, the cases handled by Mr. R.M.
Kleemans, Mr. ir. T.M. Blomme and Mr. A.A.A.C.M. van Oorschot, all lawyers in
Amsterdam For Samsung, the cases are handled by Mr. Berghuis van Woortman,
aforementioned, and Mr. A.F. Kupecz, Mr. Ch. Gielen and Mr. R.C. van Oerle, all lawyers in
Amsterdam as well

## 1.      The procedure

1.1.      The course of the procedure is evident from:
- the summons of June 27, 2011:
- exhibits 1 to 24 (KG ZA 11-730) and exhibits 1 to 30 (KG ZA 11-730)
of Apple:
- in both cases: counterstatements, also includes the counterclaim of July 20,
2011 of Samsung, with exhibits 1 to 21 (KG ZA 11-730) and exhibits 1 to 34 (KG ZA 11-
731);
- the letter of July 21, 2011 of Apple, where Apple objects to the demands in the
counterclaim, and the response hereto by letter dated July 22, 2011 of Samsung;
- the email of July 22, 2011, wherein the Magistrate makes his decision known that the
demands in the counterclaim in both cases will not be handled because - in short - these
were contrary to the due process;
- the notes on the exhibits from Samsung mailed on July 25, 2011;
- the letter of August 3, 2011 of Samsung, with additional exhibits 22 to 47 (KG ZA 11-
730) and additional exhibits 35 to 59 (KG ZA 11-731);
- the letter received on July 28, 2011 from Apple, with additional exhibit 31 to 44 (for the
two cases), in which Apple withdraws its claims regarding Community Design
1260624-15;
- the bookmark (in terms of the soft IP) of Samsung mailed on August 2, 2011;
- the bookmark (in terms of the prior art for patents) from Samsung mailed on August 4,
2011;
- the letter of August 5, 2011 from Apple, with additional exhibit 45;
- the letter of August 8, 2011 from Samsung, with additional exhibits 60 to 66;
- the letter of August 8, 2011 from Apple, with additional exhibits 46 to 50;
- the letter of August 9, 2011 from Samsung, with additional exhibit 67;
- the email of August 9, 2011 from Apple, with additional exhibit 51;
- the hearing, held on August 10 and 11, 2011, on the occasion of which the
counsels have presented the pleadings.

1.2.      the presented documents mailed on August 10, have been rejected at the hearing as being tardive. Furthermore, both parties in court have both filed a provisional claim against each other. After deliberation, the parties have expressed their wish to discuss this matter further. That deliberation has resulted that the provisional claims do not need to be decided, as communicated by the email from Mr. Kleemans of Augustus 12, 2011.

1.3.      Verdict is determined by September 15, 2011 at the latest, but will be pronounced at present in case of an earlier hearing date.


**2.      The facts**

2.1.      Apple is a global manufacturer and developer of computers, consumer electronics, operating systems and software. Its products include the iPhone, a type of *smartphone*, and the iPad, a *tablet computer.* Apple releases both products in different versions on the market.

2.2.      Apple is the proprietor of European Patent EP 2 059 868 (hereafter: EP 868) for a "*Portable electronic device for photo management*", issued on September 29, 2010 to an application dated August 31, 2007, claiming priority of seven U.S. patents applications: US 824.769 P (September 6, 2006), US 883.785 P (January 6, 2007), US 879.253 P (January 7, 2007), US 879.469 P (January 8, 2007), US 937.993 P and US 947.118 P (both June 29, 2007) and US 848.210 (August 30, 2007). The Netherlands is one of the designated countries. No opposition has been appointed for the granting of EP 868 up to the moment of summoning.

2.3.      The claims of EP 868 are listed in the original English language:

1.   A computer-implemented method, comprising:
     at a device (100) with a touch screen display (112):
     detecting (2402) a first movement (2310) of a physical object on or near the touch screen
     display (112);
     while detecting the first movement (2310), translating (2404) a first digital object (2300-1)
     displayed on the touch screen display (112) in a first direction, wherein the first digital object
     (2300-1) is associated with a set of digital objects; **characterized in that**:

          in response to display of a previously hidden edge (2312) of the first digital object (2300-
          1) and continued detection of the first movement (2310),
          displaying (2406) an area (2314) beyond the edge (2312) of the first digital object (2300-
          1);
          after the first movement (2310) is no longer detected, translating (2408) the first digital
          object (2300-1) in a second direction (2316) until the area (2314) beyond the edge (2312)
          of the first digital object (2300-1) is no longer displayed;
          detecting (2410) a second movement (2318) of the physical object on or near the touch
          screen display (112); and
          in response to detecting the second movement (2318) while the previously hidden edge
          (2312) of the first digital object (2300-1) is displayed, translating (2412) the first digital
          object (2300-1) in the first direction and displaying a second digital object (2300-2) in the
          set of digital objects.

2.  The computer-implemented method of claim 1, wherein, prior to the translating while detecting the first movement, at least one edge of the first digital object extends beyond the touch screen display in the first direction.

3.  The computer-implemented method of claim 1 or 2, wherein the first movement is a horizontal swipe gesture.

4.  The computer-implemented method of any one of claims 1 to 3, wherein the set of digital objects is a set of digital images, a set of web pages, or a set of electronic documents.

5.  The computer-implemented method of any one of claims 1 to 4, wherein the device is a portable electronic device.

6.  The computer-implemented method of any one of claims 1 to 5, wherein the physical object is a finger or a stylus.

7.  A computer program with software code adapted to perform the method of any one of claims 1 to 6.

8.  An electronic device (100), comprising:
    a touch screen display (112);
    one or more processors (120);
    memory (102); and
    a program, wherein the program is stored in the memory and configured to be executed by the one or more processors, the program including:

    instructions for detecting (2402) a first movement (2310) of a physical object on or near the touch screen display (112);
    instructions for, while detecting the first movement (2310), translating (2404) a first digital object (2300-1) displayed on the touch screen display (112) in a first direction, wherein the first digital object (2300-1) is associated with a set of digital objects;
    **characterized in that**:
    instructions for, in response to display of a previously hidden edge (2312) of the first digital object (2300-1) and continued detection of the first movement (2310), displaying (2406) an area (2314) beyond the edge (2312) of the first digital object;
    instructions for, after the first movement (2310) is no longer detected, translating (2408) the first digital object (2300-1) in a second direction (2316) until the area (2314) beyond the edge of the first digital object (2300-1) is no longer displayed;
    instructions for detecting (2410) a second movement (2318) of the physical object on or near the touch screen display (112); and instructions for, in response to detecting the second movement (2318) while the previously hidden edge (2312) of the first digital object (2300-1) is displayed, translating (2412) the first digital object (2300-1) in the first direction and displaying a second digital object (2300-2) in the set of digital objects.

9.  The electronic device of claim 8, wherein, prior to the translating while detecting the first movement, at least one edge of the first digital object extends beyond the touch screen display in the first direction.

396957 / KG ZA 11-730 and 396959 / KG ZA 11-731
August 24, 2011                                                                  5

10.   The electronic device of claim 8 or 9, wherein the first movement is a horizontal swipe
      gesture.

11.   The electronic device of any one of claims 8 to 10, wherein the set of digital objects is a set of
      digital images, a set of web pages, or a set of electronic documents.

12.   The electronic device of any one of claims 8 to 11, wherein the device is a portable electronic
      device.

13.   The electronic device of any one of claims 8 to 12, wherein the physical object is a finger or a
      stylus.

2.4.      In the undisputed Dutch translation, the claims of EP 868 state: [see source for
Dutch]

2.5.      The following images belong to EP 868.



396957 / KG ZA 11-730 and 396959 / KG ZA 11-731
August 24, 2011

6



2.6.     Apple is also proprietor of European Patent EP 2 098 948 (hereafter: EP 948) for a
"*Touch event model*", issued on February 9, 2011 to an application of March 4, 2009, under
claiming priority of the U.S. patent application U.S. 42 381 dated March 4, 2008. The
Netherlands is one of the designated countries. No opposition has been appointed for the
granting of EP 948 up to the moment of summoning.

396957 / KG ZA 11-730 and 396959 / KG ZA 11-731
August 24, 2011

7

2.7.    The claims of EP 948 are listed in the original English text:

1.    A method for handling touch events at a multi-touch device (200, 210), comprising:

> displaying one or more views (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312);
>
> executing one or more software elements, each software element being associated with a particular view (301, 302, 303, 304, 305, 306, 307, 308, 309,310,311,312);
>
> associating a multi-touch flag or an exclusive touch flag with each view (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312), said multi-touch flag indicating whether a particular view is allowed to receive multiple simultaneous touches and said exclusive touch flag indicating whether a particular view allows other views to receive touch events while the particular view is receiving a touch event;
>
> receiving one or more touches at the one or more views (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312); and
>
> selectively sending one or more touch events, each touch event describing a received touch, to one or more of the software elements associated with the one or more views (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312) at which a touch was received based on the values of the multi-touch and exclusive touch flags.

2.    The method of claim 1, further comprising:

> if a multi-touch flag is associated with a particular view, allowing other touch events contemporaneous with a touch event received at the particular view to be sent to software elements associated with the other views.

3.    The method of claim 1, wherein if a multi-touch flag is associated with a particular view, the multi-touch flag indicates whether the software element associated with that particular view is allowed to process multiple contemporaneous touches located in that view.

4.    The method of claim 1, wherein the exclusive touch flag prevents touch events from being sent to software elements associated with views other than a view with an asserted exclusive touch flag while a touch is being received at the view with the asserted exclusive touch flag.

5.    The method of claim 1, wherein the multi -touch device (200, 210) is a mobile telephone.

6.    The method of claim 1, wherein the multi-touch device (200, 210) is a digital media player.

7.    The method of claim 1, comprising:

> associating a multi-touch flag with a first view;
>
> receiving a first touch at the first view, the first view being one of the one or more views;
>
> sending a touch event describing the first touch to a first software element,
>
> the first software element being one of the one or more software elements and associated with the first view; determining whether the multi-touch flag associated with the first view indicates that the first view is a 'multi-touch view; and
>
> if the first view is not a multi-touch view, blocking all touch events describing any other touches located in the first view until the first touch is no longer received.

8.    The method of claim 7, further comprising:

associating an exclusive touch flag with each of the one or more views;
determining whether the exclusive touch flag associated with the first view indicates that the first view is an exclusive touch view; and
if the first view is an exclusive touch view, blocking all touch events describing any other touches located in any view other than the first view until the first touch is no longer received.

9.    The method of claim 8, wherein the first view is not an exclusive touch view, the method further comprising:

receiving a second touch at the multi touch panel, the second touch located at a second view and associated with a second software element;
determining whether the exclusive touch flag associated with the second view indicates that the second view is an exclusive touch view; and
if the second view is an exclusive touch view, preventing a touch event associated with the second touch from being sent to the second software element until the first touch is no longer received.

10.   The method of claim 9, further comprising:

if the second view is not an exclusive touch view, sending a touch event describing the second touch to the second software element.

11.   A computer readable medium comprising a plurality of instructions configured for execution at a multi-touch device (200, 210), the instructions being configured to cause the multi-touch device (200, 210) to:

display one or more views (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312);
execute one or more software elements, each software element being associated with a particular view (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312);
associate a multi-touch flag or an exclusive touch flag with each view (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312) , said multi-touch flag indicating whether a particular view is allowed to receive multiple simultaneous touches and said exclusive touch flag indicating whether a particular view allows other views to receive touch events while the particular view is receiving a touch event;
receive one or more touches at the one or more views (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312); and
selectively send one or more touch events, each touch event describing a received touch, to one or more of the software elements associated with the one or more views (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312) at which a touch was received based on the values of the multi-touch and exclusive touch flags.

12.   The computer readable medium of claim 11, wherein the instructions are further configured to cause the multi-touch device (200, 210) to:

if a multi-touch flag is associated with a particular view, allowing other touch events contemporaneous with a touch event received at the particular view to be sent to software elements associated with the other views.

13.   The computer readable medium of claim 11, wherein if a multi-touch flag is associated with a particular view, the multi-touch flag indicates whether the software element associated with that particular view is allowed to process multiple contemporaneous touches located in that view.

14.   The computer readable medium of claim 11, wherein the exclusive touch flag prevents touch events from being sent to software elements associated with views other than a view with an asserted exclusive touch flag while a touch is being received at the view with the asserted exclusive touch flag.

15.   The computer readable medium of claim 11, wherein the multi-touch device (200, 210) is a mobile telephone.

16.   The computer readable medium of claim 11, wherein the multi-touch device (200, 210) is a digital media player.

17.   The computer readable medium of claim 11, wherein the instructions are further configured to cause the multi-touch device (200, 210) to:

associate a multi-touch flag with a first view;
receive a first touch at the first view, the first view being one of the one or more views;
send a touch event describing the first touch to a first software element, the first software element being one of the one or more software elements and
associated with the first view;
determine whether the multi-touch flag associated with the first view indicates that the first view is a multi-touch view; and
if the first view is not a multi-touch view, block all touch events describing any other touches located in the first view until the first touch is no longer received.

18.   The computer readable medium of claim 17, wherein the instructions are further configured to cause the multi-touch device (200, 210) to:

associate an exclusive touch flag with each of the one or more views;
determine whether the exclusive touch flag associated with the first view indicates that the first view is an exclusive touch view; and
if the first view is an exclusive touch view, blocking all touch events describing any other touches located in any view other than the first view until the first touch is no longer received.

19.   The computer readable medium of claim 18, wherein the first view is not an exclusive touch view and the instructions are further configured to cause the multi-touch device (200, 210) to:

receive a second touch at the multi touch panel, the second touch located at a second view and associated with a second software element;

determine whether the exclusive touch flag associated with the second view indicates that the second view is an exclusive touch view; and

if the second view is an exclusive touch view, prevent a touch event associated with the second touch from being sent to the second software element until the first touch is no longer received.

20.  The computer readable medium of claim 19, wherein the instructions are further configured to cause the multi-touch device (200, 210) to:

if the second view is not an exclusive touch view, send a touch event describing the second touch to the second software element.

21.  A multi-touch enabled device (200, 210) including a computer readable medium comprising a plurality of instructions configured for execution at the device (200, 210), the instructions being configured to cause the device (200, 210) to:

display one or more views (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 11, 312);
execute one or more software elements, each software element being associated with a particular view (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312);
associate a multi-touch flag or an exclusive touch flag with each view (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312) , said multi-touch flag indicating whether a particular view is allowed to receive multiple simultaneous touches and said exclusive touch flag indicating whether a particular view allows other views to receive touch events while the particular view is receiving a touch event;
receive one or more touches at the one or more views (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312); and
selectively send one or more touch events, each touch event describing a received touch, to one or more of the software elements associated with the one or more views (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312) at which a touch was received based on the values of the multi-touch and exclusive touch flags.

22.  The multi-touch enabled device (200, 210) of claim 21, wherein the multi-touch enabled device (200, 210) is a mobile telephone.

23.  The multi-touch enabled device (200, 210) of claim 21, wherein the multi-touch enabled device (200, 210) is a digital media player.

2.8.     In the undisputed Dutch translation, the claims of EP 948 state: [see source for Dutch]

2.9.     The following image belongs to EP 948.



Fig. 3

2.10.     Apple is also proprietor of European Patent EP 1 964 022 (hereafter: EP 022) for
"*Unlocking a device by performing gestures on an unlock image*", issued on March 10
, 2010 to an application dated November 30, 2006, under a claim to priority of U.S. patent
US 322549 with priority date December 23, 2005. The Netherlands is one of the designated
countries. No opposition has been appointed for the granting of EP 022.

2.11.     The claims of EP 022 are listed in the original English text:

1.     A computer-implemented method of controlling a portable electronic device (400, 1000)
comprising a touch-sensitive display (408, 1014), comprising:

detecting (308, 908) contact with the touch-sensitive display (408, 1014) while the device
is in a user-interface lock state;
transitioning (314, 914) the device (400, 1000) to a user-interface unlock state if the
detected contact corresponds to a predefined gesture; and
maintaining (312, 912) the device (400, 1000) in the user-interface lock state if the
detected contact does not correspond to the predefined gesture;
**characterized by**
moving an unlock image (402, 1002, 1008) along a predefined displayed path on the
touch-sensitive display (408, 1014) in accordance with the contact, wherein the unlock
image (402, 1002, 1008) is a graphical, interactive user-interface object with which a user
interacts in order to unlock the device (400, 1000).

2.     The computer-implemented method of claim 1, further comprising displaying (304) the
unlock image (402) and one or more visual cues on the touch-sensitive display (408) while the
portable electronic device (400) is in a user-interface lock state, wherein the one or more
visual cues indicate a movement of the unlock image (402) along the touch-sensitive display
(408) that will unlock the device (400).

396957 / KG ZA 11-730 and 396959 / KG ZA 11-731
August 24, 2011

3.   The computer-implemented method of claim 1, further comprising displaying (304) the
unlock image (402) on the touch-sensitive display (408) while the device (400) is in a user-
interface lock state; and wherein the predefined gesture corresponds to moving the unlock
image (402) along the predefined displayed path on the touch-sensitive display (408) to a
predefined location on the touch-sensitive display (408) .

4.   The computer-implemented method of claim 1, further comprising displaying (304) the
unlock image (402) on the touch-sensitive display (408) while the device (400) is in a user-
interface lock state; and wherein the predefined gesture corresponds to moving the unlock
image (402) across the touch-sensitive display (408) according to the predefined displayed
path on the touch-sensitive display (408).

5.   The computer-implemented method of claim 1, further comprising:

displaying (904) a first unlock image (1002) and a second unlock image (1008) on the
touch-sensitive display (1014) while the device (1000) is in a user-interface lock state;
and

wherein transitioning the device (1000) to a user-interface unlock state comprises:

transitioning (914) the device (1000) to a first active state corresponding to the first
unlock image (1002) if the detected contact corresponds to a predefined gesture with
respect to the first unlock image (1002); and
transitioning (914) the device (1000) to a second active state distinct from the first active
state if the detected contact corresponds to a predefined gesture with respect to the second
unlock image (1008).

6.   A portable electronic device (100, 400, 1000), comprising:

a touch-sensitive display (126, 408, 1014);
one or more processors (106);
memory (102); and
one or more programs (132 to 146), wherein the one or more programs (132 to 146) are
stored in the memory (102) and configured to be executed by the one or more processors
(106), the programs (132 to 146) including instructions for:

detecting (308, 908) contact with the touch-sensitive display (126, 408, 1014) while
the device (100, 400, 1000) is in a user-interface lock state;
transitioning (314, 914) the device (100, 400, 1000) to a user-interface unlock state
if the detected contact corresponds to a predefined gesture;
and
maintaining (312, 912) the device (100, 400, 1000) in the user-interface lock state if
the detected contact does not correspond to the predefined gesture;

**characterized in that**
the programs (132 to 146) further include instructions for moving an unlock image
(402, 1002, 1008) along a predefined displayed path on the touch-sensitive display
(126, 408, 1014) in accordance with the contact,

wherein the unlock image (402, 1002, 1008) is a graphical, interactive user-interface object with which a user interacts in order to unlock the device (100, 400, 1000).

7.    The portable electronic device of claim 6, wherein the device (100, 400, 1000) is a portable multifunction device.

8.    The portable electronic device of claim 6, further comprising instructions for preventing (302, 310, 312) the device (100, 400) from performing a predefined set of actions in response to detecting any contact with the touch-sensitive display (126, 408) that does not correspond to the predefined gesture while the device (100, 400) is in the user-interface lock state.

9.    The portable electronic device of claim 6, wherein the predefined displayed path is a channel (404).

10.   The portable electronic device of claim 6, wherein the detected contact is a movement of a point of contact across the touch-sensitive display (126, 408) while maintaining continuous contact with the touch-sensitive display (126, 408).

11.   The portable electronic device of claim 10, wherein the movement of the point of contact across the touch-sensitive display (126, 408) while maintaining continuous contact with the touch-sensitive display (126, 408) is a horizontal movement.

12.   The portable electronic device of claim 6, wherein the one or more programs (132 to 146) further comprise instructions for displaying (304) the unlock image (402) and one or more visual cues on the touch-sensitive display (126, 408) while the portable electronic device (100, 400) is in a user-interface lock state, wherein the one or more visual cues indicate a movement of the unlock image (402) along the touch-sensitive display (126, 408) that will unlock the device (100, 400).

13.   The portable electronic device of claim 12, wherein the one or more visual cues include an arrow.

14.    The portable electronic device of claim 12, wherein the one or more visual cues include text.

15.   The portable electronic device of claim 6, wherein the one or more programs (132 to 146) further comprise instructions for displaying (304) the unlock image (402) on the touch-sensitive display (126, 408) while the device (100, 400) is in a user-interface lock state; and wherein the predefined gesture corresponds to moving the unlock image (402) along the predefined displayed path on the touch-sensitive display (126, 408) to a predefined location on the touch-sensitive display (126, 408).

16.   The portable electronic device of claim 6, wherein the one or more programs (132 to 146) further comprise instructions for displaying (304) the unlock image on the touch-sensitive display while the device is in a user-interface lock state; and wherein the predefined gesture corresponds to moving the unlock image (402) across the touch-sensitive display (126, 408) according to a predefined displayed path on the touch-sensitive display (126, 408).

17.   The portable electronic device of claim 6, wherein the one or more programs further comprise instructions for displaying (904) a first unlock image (1002) and a second unlock image

(1008) on the touch-sensitive display (1014) while the device (1000) is in a user-interface lock state; and

wherein the instructions for transitioning the device to a user-interface unlock state comprise:

instructions for transitioning the device (1000) to a first active state corresponding to the first unlock image (1002) if the detected contact corresponds to a predefined gesture with respect to the first unlock image (1002), and

instructions for transitioning the device (1000) to a second active state distinct from the first active state if the detected contact corresponds to a predefined gesture with respect to the second unlock image (1008).

18. A computer program product with instructions configured for execution by one or more processors (106), which when executed by a portable electronic device (100, 400, 1000) with a touch-sensitive display (126, 408, 1014), cause the device (100, 400, 1000) to perform the method of any of claims 1 to 5.

2.12.    In the undisputed Dutch translation, the claims of EP 022 state: [see source for Dutch]

2.13.    The following images belong to EP 022.



Figure 5A          Figure 5B



2.14.    Finally, Apple is proprietor of the following design rights:

-    Community Design 181607-0001 filed on May 24, 2004 with priority of March
     17, 2004 and registered on August 10, 2004 for "handheld computers";
-    Community Design Right 748280-0006, filed on June 28, 2007 with
     priority of January 5, 2007 and registered on August 28, 2007 for
     "device for the recording or reproducing of sound or images";
-    Community Design Right 888920-0018, filed on February 29, 2008 with
     priority of August 31, 2007 and registered on May 13, 2008 for "electronic
     devices";
-    Community Design Right 748694-0003, filed on June 28, 2007 with
     priority of June 23, 2007 and registered on December 5, 2007 for
     "graphical user interfaces";
-    Community Design Right 1236590-0011, filed on September 24, 2010 with
     priority of April 19, 2010 and registered on February 4, 2011 for
     "electronic devices";
-    Community Design Right 1260624-0015, filed on February 16, 2011 with
     priority of August 16, 2010 and registered on April 8, 2011 for "electronic
     devices". [Apple no longer claims this model]

The images at the model depots will be displayed during the evaluation.

2.15.    Defendant sub 1, Samsung Electronics Co. Limited, is part of the global
operative Samsung Group and produces and markets products in the field of
(consumer) electronics, including smartphones and tablet computers.

2.16.    Samsung provides the following smartphones, among others:

-    Galaxy S GT-19000;
-    Galaxy Ace GT-S5830;
-    Galaxy S II GT-19100;

and the following tablet computers:

-    Galaxy Tab GT-P1000;
-    Galaxy Tab 10.1v GT-P7100;
-    Galaxy Tab 10.1 GT-P7510.

396957 / KG ZA 11-730 and 396959 / KG ZA 11-731
August 24, 2011

16

2.17.    Defendant sub 2, Samsung Electronics Benelux B.V., has defendant sub 1 as a sole shareholder and is, according to the trade register, a general trading company and wholesaler of computer and electronics equipment. It is the owner of the website of the Netherlands www.samsung.nl. Through this website, Samsung offers smartphones and tablet computers in the Netherlands, which are the subject of these proceedings.

2.18.    Defendant sub 3, Samsung Electronics Logistics Europe B.V., also has defendant sub 1 as a sole shareholder and is focused on the storage, distribution and logistics (among others) Samsung electronics products within Europe. In addition, it utilizes departments in Tilburg and Breda.

2.19.    Defendant sub 4, Samsung Electronics Overseas B.V., has the following target definition according to the trade register: to trade, to manufacture, to (re)sell, to import and export, to distribute electronic equipment.

## 3.      The dispute

3.1.    Apple seeks, after reduction of the demand[4], sentencing by a verdict, enforceable with respect to the tablet computers of Samsung (KG 11-730) to:

Primary prohibition claim:

(A)    Prohibit the defendants, with immediate effect after adoption of the verdict to be delivered, in any manner, directly or indirectly, by its manufacture, availability in stock, offer, import, circulation, sale and/or any trade in tablet computers, to infringe the Dutch parts of EP 2.059.868, EP 2.098.948 and EP 1.964.022;

(B)    Prohibit the defendants sub 2-4, with immediate effect after adoption of the verdict to be delivered, in any manner, directly or indirectly, by its manufacture, availability in stock, offer, import, circulation, sale and/or any trade in tablet computers, to infringe the foreign parts of EP 2.059.868, EP 2.098.948 and EP 1.964.022;

(C)    Prohibit the defendant sub 1 with immediate effect after adoption of the verdict to be delivered, in any manner, directly or indirectly, by its manufacture, availability in stock, offer, import, circulation, sale and/or any trade in tablet computers, to infringe the Community Design Right in the Netherlands with the number 181607-0001;

(D)    Prohibit the defendants sub 2-4 with immediate effect after adoption of the verdict to be delivered, in any manner, directly or indirectly, by its manufacture, availability in stock, offer, import, circulation, sale and/or any trade in tablet computers, to infringe the Community Design Right in the European Union with the number 181607-0001;

(E)    Prohibit the defendants with immediate effect after adoption of the verdict to be delivered, in any manner, to infringe the copyrights of the plaintiff in the Netherlands in regards to the iPad 1 and the iPad 2;

[4] The claims regarding the Community Design Right 1260624-0015 have arrived by letter at the Registry on July 28, 2011 and withdrawn, as previously mentioned.

Subsidiary prohibition claim:

(F)   Prohibit the defendants, with immediate effect after adoption of the verdict to be delivered, to manufacture, stock, offer, circulate, sell and/or otherwise trade the Galaxy Tab, the Galaxy Tab 10.1v and/or the Galaxy Tab 10.1 in the Netherlands.

Additional claims:

(G)   Order the defendants, within 30 calendar days after service of this verdict and to be delivered to the counselors of the plaintiff, to provide a statement of the revenues and gross profits that have been made with the infringing products, certified by an independent chartered accountant, and supply any other information that might be relevant for the calculation of earnings and/or remuneration;

(H)   Order the defendants, within a period of 7 days after service of this verdict to be delivered, to request their customers in writing, where these customers are located within the European Union, or at least in the countries where the claimed patent rights are in force, or at least in the Netherlands, to return the infringing products within two weeks and offer to compensate the invoice and transportation costs, by only using the following text (i.e. without a offering letter or other additional text): for Dutch customers:
  *"Dear [name buyer],*
  *Some time ago we supplied tablet computers from the Galaxy range to you. More in particular this concerns the Galaxy Tab (GT-P1000) and Galaxy Tab 10.1v (GT-P7100) [to be completed with other infringing tablet computers].*
  *By judgment of [date judgment] the Judge in Interlocutory Proceedings of the Court The Hague, the Netherlands, ruled that the production, storing, offering, selling and/or supplying of these products COMMITS INFRINGEMENT of the patent rights, design rights and/or copyrights of Apple Inc, in any event that we have acted unlawfully towards Apple Inc.*
  *We request you to return to us the Galaxy tablet computers supplied to you, insofar as you still have these in stock, within 14 days after the date of signing of this letter. We will of course compensate the price paid by you as well as the transport costs.*
  *For the record we would like to mention the fact that by storing, offering and/or selling of the above mentioned Galaxy tablet computers, you commit infringement of the intellectual property rights of Apple Inc."*
  at least a letter with content to be determined in good justice by the magistrate, and simultaneously sending copies of this letter and a list of recipients with full addresses to the counsels of the plaintiff;

(I)   Order the defendants to inform the market within a period of 48 hours after service of the verdict to be delivered, concerning the infringement of patent rights, design rights and/or copyrights of the plaintiff, at least through a message of the unlawful acts on the homepage of their Dutch website www.samsung.nl and to post this message for a subsequent period of four weeks at the homepage without any further comment displayed in writing or

in image, with only the following content in neutral and conventional typography with a font that does not deviate from the other text on the homepage:

*"We recently have offered and sold the tablet computers from the Galaxy range in the Netherlands. In particular, this concerns the tablet computers Galaxy Tab (GT-P1000) and Galaxy Tab 10.1v (GT-P7100).*

*Upon verdict of [date of verdict] the magistrate of the District Court in The Hague has ruled that the sale of the said tablet computers infringes the patent rights, design rights and copyrights of Apple Inc., at least, that we have otherwise acted unlawfully against Apple Inc., and has forbidden us to continue to trade the said Galaxy tablet computers on the Dutch market."*

at least a message with content to be determined by the magistrate in good justice, where the message will be placed in a "pop-up window" that automatically appears when an internet user visits the Dutch website of the defendants and the message shall be of such magnitude that is will at least cover one quarter of the visible portion of the homepage without having to scroll down the homepage and where the text of the message is designed as such that the area of the pop-up window is fully utilized and the message can be read well;

(J)   Order the defendants to reward an immediate claimable fine of EUR 100,000 to the plaintiff, for each day or part thereof, or, at will of the plaintiff, for each product in infringement, that the defendants can be attributed to the prohibitions contained in (A) - (F) and the demands contained in (G) - (I) are not fully or properly respected;

(K)   The period in which the demand of the main case must be established as specified in Art. 1019i Code of Civil Procedure (Rv) to be determined at six (6) months after the verdict to be delivered in this case, or a period to be determined by the magistrate in good justice;

(L)   Condemn the defendants with the costs according to Art. 1019h Code of Civil Procedure (Rv) .

**and with respect to the smartphones of Samsung (KG 11-731) to:**

<u>Primary prohibition claim:</u>

(A)   Prohibit the defendants, with immediate effect after service of the verdict to be delivered in any manner, directly or indirectly, by its manufacture, availability in stock, offer, import, circulation, sale and/or any trade in smartphones, to infringe the Dutch parts of EP 2.059.868, EP 2.098.948 and EP 1.964.022;

(B)   Prohibit the defendants sub 2-4, with immediate effect after service of the verdict to be delivered, in any manner, directly or indirectly, by its manufacture, availability in stock, offer, import, circulation, sale and/or any trade in smartphones, to infringe the foreign parts of EP 2.059.868, EP 2.098.948 and EP 1.964.022;

(C)   Prohibit the defendant sub 1 with immediate effect after service of the verdict to be delivered, in any manner, directly or indirectly, by its manufacture, availability in stock, offer, import, circulation, sale and/or any trade in smartphones, to infringe the Community Design Right in the Netherlands with the numbers: 748280-0006, 888920-0018, 1236590-0001 and 748694-0003;

(D)   Prohibit the defendants sub 2-4 with immediate effect after service of the verdict to be delivered in any manner, directly or indirectly, by its manufacture, availability in stock, offer, import, circulation, sale and/or any trade in smartphones, to infringe the Community Design Right in the European Union with the numbers: 748280-0006, 888920-0018, 1236590-0001 and 748694-0003;

(E)   Prohibit the defendants with immediate effect after service of the verdict to be delivered in any manner, to infringe the copyrights of the plaintiff in the Netherlands in regards to the iPhone 3G and the iPhone 4;

396957 / KG ZA 11-730 and 396959 / KG ZA 11-731
August 24, 2011

_

Subsidiary prohibition claim:

(F)   Prohibit the defendants, with immediate effect after service of the verdict to be delivered, to manufacture, stock, offer, circulate, sell and/or otherwise trade the Galaxy S, the Galaxy Ace and/or the Galaxy S II in the Netherlands;

Additional claims:

(G)  Order the defendants, within 30 calendar days after service of this verdict and to be delivered to the counselors of the plaintiff, to provide a statement of the revenues and gross profits that have been made with the infringing products, certified by an independent chartered accountant, and supply any other information that might be relevant for the calculation of earnings and/or remuneration;

(H)  Order the defendants, within a period of 7 days after service of this verdict to be delivered, to request their customers in writing, if these customers are located within the European Union, or at least in the countries where the claimed patent rights are in force, or at least in the Netherlands, to return the infringing products within two weeks and offer to compensate the invoice and transportation costs, by only using the following text (i.e. without a offering letter or other additional text):
for Dutch customers:
  *"Dear [name buyer],*
  *Some time ago we supplied mobile phones from the Galaxy range to you. More in particular this concerns the Galaxy S (GT-I9000), the Galaxy S II (GT-I99100) and the Galaxy Ace (GT-S5830) [to be completed with other infringing smartphones].*
  *By judgment of [date judgment] the Judge in Interlocutory Proceedings of the Court The Hague, the Netherlands, ruled that the production, storing, offering, selling and/or supplying of these products COMMITS INFRINGEMENT of the patent rights, design rights and/or copyrights of Apple Inc, in any event that we have acted unlawfully towards Apple Inc.*
  *We request you to return to us the Galaxy smartphones supplied to you, insofar as you still have these in stock, within 14 days after the date of signing of this letter. We will of course compensate the price paid by you as well as the transport costs.*
  *For the record we would like to mention the fact that by storing, offering and/or selling of the above mentioned Galaxy smartphones, you commit infringement of the intellectual property rights of Apple Inc."*
  at least a letter with content to be determined in good justice by the magistrate, and simultaneously sending copies of this letter and a list of recipients with full addresses to the counsels of the plaintiff;

(I)   Order the defendants to inform the market within a period of 48 hours after service of the verdict to be delivered concerning the infringement of patent rights, design rights and/or copyrights of the plaintiff, at least through a message of the unlawful acts on the homepage of their Dutch website www.samsung.nl and to post this message for a subsequent period of four weeks at the homepage without any further comment displayed in writing or in image, with only the following content in neutral and conventional typography with a font that does not deviate from the other text on the homepage:

396957 / KG ZA 11-730 and 396959 / KG ZA 11-731
August 24, 2011

20

in image, with only the following content in neutral and conventional typography with a font that does not deviate from the other text on the homepage:

*"We recently have offered and sold the mobile phones from the Galaxy range in the Netherlands. In particular, this concerns the smartphones of Galaxy S (GT-I9000), Galaxy S II (GT- I9100) and Galaxy Ace (GT-S5830).*

*Upon verdict of [date of verdict] the magistrate of the District Court in The Hague has ruled that the sale of the said smartphones infringe the patent rights, design rights and copyrights of Apple Inc., at least, that we have otherwise acted unlawfully against Apple Inc., and has forbidden us to continue to trade the said Galaxy smartphones on the Dutch market."*

at least a message with content to be determined by the magistrate in good justice, where the message will be placed in a "pop-up window" that automatically appears when an internet user visits the Dutch website of the defendants and the message shall be of such magnitude that is will at least cover one quarter of the visible portion of the homepage without having to scroll down the homepage and where the text of the message is designed as such that the area of the pop-up window is fully utilized and the message can be read well;

(J)  Order the defendants to reward an immediate claimable fine of EUR 100,000 to the plaintiff, for each day or part thereof, or, at will of the plaintiff, for each infringing product, that the defendants can be attributed to the prohibitions contained in (A) - (F) and the demands contained in (G) - (I) are not fully or properly respected;

(K) The period in which the demand of the main case must be established as specified in Art. 1019i Code of Civil Procedure (Rv) to be determined at six (6) months after the verdict to be delivered in this case, or a period to be determined by the magistrate in good justice;

(L) Condemn the defendants with the costs according to Art. 1019h Code of Civil Procedure (Rv) .

3.2.    Apple argues in short that Samsung infringes their intellectual property rights according to the diagrams below. Concerning the Samsung Galaxy tablets:

|  | Tab | Tab 10.1v | Tab 10.1 |
|---|---|---|---|
| EP '868 | X | X | X |
| EP '948 |  | X | X |
| EP '022 | X | X | X |
| CDR 181607-0001 |  | X | X |

396957 / KG ZA 11-730 and 396959 / KG ZA 11-731
August 24, 2011

21

Concerning the Samsung Galaxy smartphones:

|  | S | S II | Ace |
|---|---|---|---|
| EP '868 | X | X | X |
| EP '948 |  | X |  |
| EP '022 | X | X | X |
| CDR 888920-0018 | X |  |  |
| CDR 748280-0006 | X |  |  |
| CDR 1236590-0011 |  |  | X |
| CDR 1260624-0015 |  | X* |  |
| CDR 748694-0003 | X |  |  |

*Revoked claim

In addition, Apple argues that Samsung infringes their copyrights concerning the iPad 1, 2 and iPhone 3, 4 and slavishly imitating its style.

3.3.     In short, Samsung claims in defense, that the matters are too complicated for summary proceedings, that there is abuse of process right, that there is absence of a compelling interest, that patents and models are invalid, that they are not in infringement thereof, that there is an absence of copyright protection in the Netherlands or infringement of those rights or a slavish imitation of their style.

3.4.     The claims of the parties are, where relevant, defined hereafter.

## 4.     The evaluation

### Competence

4.1.     Although not contested, the cross-border jurisdiction of the court regarding the defendants sub 2-4 is considered officially, given the fact that the claimed patents are countered with an invalidity defense. This court, upon verdict of December 22, 2010 in the case Solvay/Honeywell (LJN BP6970), has a prejudicial question about the exclusive jurisdiction regulation in Article 22 paragraph 4 Brussels I Regulation to the Court of Justice of the European Union in connection with the authority for a provisional measure (pending with case number C-616/10). As long as the Court of Justice has not decided otherwise, it can however be assumed that a cross-border jurisdiction may be adopted in the summary proceedings, even though an invalidity defense was in order (according to the District Court of The Hague, July 12, 2011, LJN BR1364, Yellow Page/Yell). Thus, a cross-border jurisdiction exists in relation to the claimed patent rights. Concerning the claimed design rights, it is applicable that

---

Articles 82 paragraph 1, 83 paragraph 1 and 90 paragraph 3 Claim (EG) no. 6/2001 of the Counsel of December 12, 2001 in respect to the Community Designs (Community Designs Regulation) (hereafter GmodVo) grant authority to the defendants 2-4 based in the Netherlands. Concerning the defendant sub 1, a cross-border provision has not been requested.

*Compelling interest*

4.2.     Apple has a compelling interest in its claims, as now it argues that a continued act of infringement is in order. The fact that some Samsung products have already been on the market since 2010, taking into account that this is not applicable for other Samsung products, such as the Galaxy Tablet 10.1, which will be launched shortly[5], is insufficient in this conclusion. Moreover, negotiations have been taken place between the parties and some rights are, such as EP 948 and Community Design Rights 36590-0011 and 1260624-0015 have been granted first in 2011 (February/April). In this current state of affairs, Samsung has made it insufficiently clear against which products Apply has acted insufficiently compelling or in terms of which rights.

4.3.     Restraint is appropriate in order to assume, as desired by Samsung, that its interests are so large, that the already claimed provisions in this matter should be denied. The mirrored interests for Apple are equally to be considered significant at first. Furthermore, in terms of the patents, it has been stated on behalf of Samsung, that it is relatively easy to update the software of their products in such way, that infringement is no longer the case.

4.4.     The evaluation of the (compelling) interests on both sides, has led that the magistrate already appointed a possible ban that will be granted for a period until at least October 13, 2011. The fact that consultation took place between parties regarding the granting of licenses, has especially been taken into account, where it also concerns patent rights of Samsung that are used by Apple to market its iPhone and iPhone. These negotiations should not be placed unnecessarily burdensome and unilaterally (the counterclaims based on two of the patents still to be claimed by Samsung have since been declined) under pressure by an immediate ban.

*Complicity*

4.5.     Although undeniably complex, this case is not too complicated for summary proceedings. The magistrate preconceives that restraint is appropriate to deny an interim provision on the ground that a case is too complicated. Furthermore, the claimed patents in this procedure do not concern an overly complicated technique. The dispute, in terms of the design rights and copyrights, is also of such nature and scope as regularly seen between large companies with large interests. Such companies must also be considered capable of organizing a team of lawyers and patent agents in order to realize a fair procedure in a short period of time. Similar arguments object

---

[5] Upon pronouncing this verdict, the Galaxy tab 10.1 has apparently already been launched in the Netherlands.

396957 / KG ZA 11-730 and 396959 / KG ZA 11-731
August 24, 2011

23

_____  —

to the assertion that Samsung, especially where it concerns the patent rights claimed by Apple, have not been able to adequately prepare their case or that (procedural) law is abused for that reason.

*Patent infringement*

4.6.   For each patent, a brief introduction of the relevant technology will be given hereinafter. This introduction is taken from the - undisputed - explanation of Apple.

*EP 868*

Introduction

4.7.   EP 868 applies to a user interface for scrolling and moving digital objects, such as photos or electronic documents, on a device with a touchscreen display. EP 868 applies to an interface that can be used so that a user can scroll within images from a digital photo gallery and can navigate between various images.

4.8.   More in particular, EP 868 claims protection for a method that visualizes a second object (for example, a photo) from a first object that has been, for example, zoomed in, during the subsequent viewing of two or more digital objects (photos), as well as for an electronic device in which the method is performed.

4.9.   The patent explains that the ever-shrinking screen sizes of portable electronic devices entail restrictions regarding the user interface and how users control the device (paragraph [0002]). For portable devices that are controlled by finger touch (or other means, such as a stylus) on a touchscreen (such as a smartphone or tablet computer), the user interface is already much improved (paragraph [0008]), however, the use of such touchscreens also creates new challenges.

4.10.   EP 868 learns to use the various movements of the user for an easy and intuitive navigation within and between different photos in an album. For example, when an individual image within the collection is viewed, the size of the image may be larger than can be displayed on the screen, due to the limited size of the touchscreen, because the image is zoomed-in, for example. Therefore, it is convenient to provide the user with an intuitive way in order to navigate within the image, and to indicate when the edge of the image has been reached. It is also conceivable that a user would want to view the next image after viewing an image in the collection. Therefore, it would be useful if the user could proceed from viewing one image to viewing the next image.

4.11.   Paragraphs [0140] to [0144] of the patent describe, based on Figures 23A to 23H, an embodiment of the claimed functionality. Furthermore, this is based on a situation where a touchscreen photo (2300-1) displays two male figures (2302-1 and 2302-2) (Figure 23A):

396957 / KG ZA 11-730 and 396959 / KG ZA 11-731
August 24, 2011

24



Figure 23A

4.12.    EP 868 concerns the situation in which the photo is viewed and where it exceeds the edges of the screen, i.e., that one or more of the edges of the image are not visible. For example, this may be the case when the user has zoomed in on a portion of the image, as shown in Figure 23 B below, where the user has zoomed in on the right-hand male figure in the photo of Figure 23A:



Figure 23B

4.13.    Because of the zoom action, the right edge of the zoomed image is no longer visible on the screen of the device. When a first movement is made, such as a horizontal swipe 2310, from right to left on the zoomed picture (Figure 23C), the picture is slightly shifted to the left so that subsequently: the initially hidden right edge 2312, and the region 2314 beyond that edge 2312 becomes visible (Figure 23D) due to the zoom action:

396957 / KG ZA 11-730 and 396959 / KG ZA 11-731
August 24, 2011



4.14.    At the time that the <u>first</u> (sweeping) movement is interrupted (e.g. because the finger from is removed the touchscreen), the zoomed picture slides back in the opposite direction 2316 back so that the previously made visible area 2314 is no longer visible (Figure 23E):



4.15.    With a <u>second</u> movement, such as a horizontal swipe 2318, from right to left across the picture, the zoomed picture will be shifted again in the direction of the second movement 2318 (Figure 23F):



4.16.     By performing the second movement 2318, the hidden edge 2312 of the image and the area 2314 the area is displayed beyond the edge 2312, as well as a new photo 2300-2 (Figure 23G), after which the first (zoomed) the photo disappears of the screen in the direction of the second (sweeping) movement, and the second photo appears on the screen (Figure 23H):



4.17.     The patent defines that it is also possible to make the first photo disappear from the screen, immediately after the first (sweeping) movement 2310 and to show a second photo, for example, in the situation that the first photo on the screen was completely visible and was thus not zoomed in (paragraph [0155]).

Infringement/validity
4.18.     Upon preliminary evaluation, the method applied to the Galaxy S, S II and Ace falls under the protection of EP 868 but not the method as implemented in the Galaxy Tab, Tab 10.1 and 10.1v.

4.19.     Samsung has taken the position that EP 868 is void in terms of WO 03/081458, published on October 2, 1993 (hereafter WO 458). Therefore, the following is considered. In terms of the technique, it was not known to make one swipe first (first movement) and then to "bounce" back the digital object and subsequently show the next photo after a second swipe (second movement) is performed. Upon preliminary evaluation, this neither follows an obvious method from WO 458. That document indeed reveals the swiping through columns (upon preliminary evaluation, one column is a first digital object within the meaning of EP 868. It is applicable here, that, if a "horizontal motion threshold" (p. 15, r. 9 WO 458) is exceeded, the next column is shown, but if the threshold is not exceeded and the column will bounce back again, and "snap into alignment with the logical column" (p. 15, r. 20 WO 458). The required bouncing back after the first movement of EP 868 is not found in 458 WO, nor is there any indication of this. The other technique as mentioned by Samsung stands further away from the invention. EP 868 is therefore provisionally considered valid.

396957 / KG ZA 11-730 and 396959 / KG ZA 11-731
August 24, 2011

27

4.20.     Concerning the aforementioned, it is essential to EP 868 that a (required) bounce back after a first movement takes place, as described in claim 1. For the Samsung smartphones Galaxy S, S II and Ace, this happens at the time that a photo has been zoomed. A second swipe is then needed in order to go to the next photo, exactly as described in paragraphs 140 to 144 and Figures 23A-H of EP 868. This embodiment is in line with the undisputed benefit of EP 868 as claimed by Apple, namely to avoid the problem of disorientation when navigating (that is strongest present upon zooming in). This means that all elements of claim 1 are met when the user zooms in on a photo in the gallery on the Galaxy S, S II or Ace and then makes swipe movements with the finger. It nevertheless remains that the bounce back after a first swipe does not take place when the photo hasn't been zoomed in. This embodiment of the Galaxy S, S II and Ace corresponds to what is described in paragraph 0155 of EP 868 (see 4.17 above) so that an average person skilled in the art will understand that the bounce back after a first swipe does not always necessarily takes place, namely when zoom-in hasn't been performed. Similarly, this person skilled in the art will understand, other than argued by Samsung, that the second movement should be long or fast enough to drag the picture over the threshold. On the one hand, the logic of the EP 868-method dictates this, and secondly, it shows from the fact that the first photo of Figure 23F must be dragged halfway towards the next photo (Figure 23G and 23H). Although it is conceivable that some movements have not been performed long or fast enough, this does not detract from the fact that the application of Samsung can distinguish a second move after the first movement at some point that is sufficient for a transition to the next photo.

4.21.     Upon preliminary evaluation however, this is different for the Galaxy Tab 10.1 and 10.1v. Also when zooming in on the photo in the gallery, the tabs can be used to immediately scroll to the next photo. Therefore, there is no such case of a "first movement" with the Galaxy tabs, where the bounce back can be performed in the sense of EP 868. In fact, the tabs can always perform a "second movement", regardless of a zoom-in in the sense of EP 868, as long as this second movement is long or fast enough. That is substantially different from the understanding of the average person skilled in the art regarding the system of EP 868. Although some sweeping movements are conceivable where a bounce back does take place because these movements are too short or too slow, this does not mean that infringement took place because the average person skilled in the art has not interpreted the distinction between the first and second movement as such. He will understand from the EP 868-system that, at least when zoom-in has taken place, a first movement with a bounce back must always take place before the user can scroll to the next photo. This is not the case for the Galaxy tabs, as the average person skilled in the art will recognize. The passage in paragraph 153 of EP 868, as indicated by Apple, does not provide the person skilled in the art with the thought that the first and second movement should be seen entirely independent of each other in the patented system (and a first move is therefore required in order to go to the second), especially if the person skilled in the art is aware of where EP 868 is different from WO 458.
In fact, the Galaxy tabs application is also nothing more or less than that which WO 458 issued, that is, the paging through or "snapping" back and "aligning" of the digital object, according to when a horizontal threshold value is exceeded (meaning: long or fast enough will be wiped away).

4.22.     Given that the summary trial judge finds that a procedure, whereby also in zoomed-in position, paging can be performed with one movement (such as with the Galaxy

396957 / KG ZA 11-730 and 396959 / KG ZA 11-731
August 24, 2011

28

Tablets), does not fall under the patent, Samsung's plea that the reading of EP 868 is too broad and not reproducible no longer needs a review.

*EP 948*

Introduction

4.23.     EP 948 regards a device with a touch screen that can receive and process multiple touches simultaneously: a multi-touch touch screen.

4.24.     The user interface of a (multi-touch) touch screen can, according to the patent, contain various views, where a view represents a specific graphic element of the user interface that is utilized by a software element (paragraph [0023] of the patent). Such a software element can be a software application, but also a specific component of a software application.

4.25.     When a user touches the touch screen, data related to that touch (including information about when and where this occurred on the screen) is generated and transferred to the software element. This data - defined by the patent as touch input data - is processed by the software and transmitted to the software element that corresponds to the touched view, so that the relevant software element can respond in the proper manner. The processed touch input data from one touch is defined by EP 948 as a touch event (paragraph [0023]).

4.26.     Normally, control software within a device transmits information regarding a touch event to the software element that is associated with the view touched by the user. If the touch takes place, for example, on a bar or key, information regarding the touch event is sent to the software that is responsible for the bar or key and for the response when it is pressed upon.

4.27.     The use of a multi-touch screen leads to two possibilities, that there are either multiple finger touches within the same view, or that one finger will touch a view (for example, a key), and a second finger will touch another view (for example, a menu or a photo).

4.28. The patent explains that a multi-touch screen, in principle, makes it possible that simultaneous multiple touch events will be transmitted to the different software application(s) (elements), which therefore, must also be processed simultaneously by the software. This possibility makes it, in principle, necessary to develop complex and expensive software for, and to use in, a device with a multi-touch screen (paragraph [0006]).

4.29.     Although a multi-touch screen can simultaneously process data from different touches, there can be circumstances where, for individual views, it is no longer necessary to process a multi-touch input, or that is not desired. Here, one can think of a single virtual button (a view) that can be controlled with a single touch. In the case of a user (whether intentional or not) who touches that button with two fingers, the underlying software would be burdened with more than one touch event (paragraph [0038]). This is, for example, different with a digital

396957 / KG ZA 11-730 and 396959 / KG ZA 11-731
August 24, 2011

_____

photo on which zooming in and out can be performed by a respective spread and pinch
movement of two fingers.

4.30.    A user of a multi-touch screen can also touch the screen simultaneously in different
places (multiple views). And so it is desirable, for example, with most video games, to
simultaneously operate virtual control buttons (paragraph [0038]). However, when playing
such a video game, it can at the same time also be undesirable to allow a possible touch by
the user, for example, of the status bar, to be processed because it would unexpectedly
disturb or interrupt the user's game.

4.31.    EP 948 provides a solution for the problems mentioned above by sometimes
allowing, for a device with a multi-touch display screen, that different views on the screen
respond to (multi-)touch events. EP 948 describes a system that can determine if each
specific view can receive multi-touch events, and if a view that receives a touch event will
allow other views to also receive touch events.

4.32.    The patent defines two different flags[6] for that purpose, which can be used in
combination or not. A multi-touch flag that indicates whether or not a specific view can
receive multiple touches simultaneously, and an exclusive touch flag that indicates, while a
specific view receives a touch, whether that view will allow other views to also be able to
receive touches (paragraph [0040]).

4.33.    For the rest, it can be derived from the patent that the invention is not limited to
cases in which the multi-touch flag, as well as the exclusive touch flag, are applied. That
appears, among others, from paragraph [0040], which states that the multi-touch flag and/or
the exclusive touch flag can be used, paragraph [0050], which states that the two flags can be
combined and paragraph [0052], which states that some forms of implementation have only
one of the two flags (and the corresponding functionality).

4.34.    With the EP 948 system, depending on the flag setting of a specific view (whether
or not multi-touch and/or whether or not exclusive), it is possible for that view and/or other
views to be able to process or ignore designated touch events. Ignored touches (touch events)
are not transmitted to the software element concerned. By ignoring selective touches (and the
corresponding touch events) in this manner, some applications can suffice with simpler and
cheaper software that does not support multi-touch, while other applications can be provided
with it (paragraph [0008]). With that, the simultaneous processing of touch events for
different applications can be limited to a minimum.

Infringement
4.35.    For the present, it is deemed that the Samsung products in question do not fall
under EP 948's extent of protection. After all, the invoked conclusions require that an
"exclusive touch flag" is associated with "each view". The reference that Apple

_____

[6] In computer programming language, a "flag" usually refers to one bit or multiple bits that will be used in order
to store a code (for example, 1 or 0) with a specific meaning.

396957 / KG ZA 11-730 and 396959 / KG ZA 11-731
August 24, 2011

30

made again to paragraph 27 of EP 948 is not applicable. That paragraph states the following:

*"In some embodiments, touch events are processed at the lowest level of the view hierarchy. Thus, for example, if a user touches title bar view 302, the touch event need not be directly processed by the software element associated with the title bar view, but instead can be processed by a software element associated with a view included within the title bar view where the touch occurred (i.e., a software element associated with one of views 310, 311 and 312). In some embodiments, some higher level views can also handle touch events."*
(underlining Apple, paragraph [0027], r. 12-16)

From the current judgment, it does not appear that, according to the EP 948 method, multiple views per "exclusive touch flag" would also be allowed. In addition, this part of the description does not refer so much to the patented solution (which is described in detail starting from paragraph 38) as it does to what is possible with a multi-touch screen and how that works in terms of software. The interpretation that Apple wants to give to this passage would also come into conflict with the already clearly cited phrases in the conclusion "associating an exclusive touch flag with each view" and "said exclusive touch flag indicating whether a particular view(…)", as well as with, for example, paragraph 40 of EP 948, "The exclusive touch flag can indicate whether a particular view is to allow other views(…) (underlining summary trial judge).

4.36.    As already previously briefly described, a "view", according to paragraph 23 of EP 948, is a graphic user interface element that is linked to a separate software element. Examples of such views are, according to EP 948, numbers 301-312, which are the status bar, title view, song title views and various buttons. See figure 3 of the patent shown below:



Fig. 3

396957 / KG ZA 11-730 and 396959 / KG ZA 11-731
August 24, 2011

4.37.    However, in the Samsung products running Android 2.3 or higher, an exclusivity flag (so-called Flag_Split_Touch) is linked to a window. The Android windows, however, almost always contain, Apple also admits, multiple views in the EP 948 sense. That means that in Android, unlike with EP 948, there cannot be an exclusivity flag set per ("each") view. It does not make any difference that there is a possibility of one view when there is a pop-up window, so that the exclusivity per view can be differentiated. The other windows that are open next to the pop-up do not recognize that differentiation per view anyhow, so that also with a possible pop-up window, every ("each") view next to it also does not recognize an exclusivity flag.

4.38.    The next, figure[7], was utilized by Apple at the hearing and illustrates the Android operation.



In the figure to the left is the screen that the user sees and to the right, next to the dotted line, is its associated software, whereby that association is shown through the colors (red for the back and forward buttons; green for the image of a camera). Since there is one ViewRoot per window with Android, the "Flag_Split_Touch" in the Input Dispatcher only guarantees the exclusivity for the entire window. That means that this flag determines if, when the light blue window is touched, outside of that, touches at the same time will also be allowed (there are no views shown outside the window in the above figure but a status bar, for example, is possible). Multiple views in the EP 948 sense are seen, however, in the light blue window: the green displayed image and the two red arrow keys. The "Flag_Split_Touch" therefore provides exclusivity to a <u>window</u> (as a whole) but not to a specific <u>view</u>. Therefore, for this reason, the "Flag_Split_Touch" does not conform to the EP 948 exclusivity flag. In other words, the "Flag_Split_Touch" does not guarantee, such as the (activated) EP 948 exclusivity flag would, that when, for example, one of the red arrow keys is touched, the other red key or the green image cannot also be touched at the same time.

---

[7] Trial Brief Mrs. Kleemans, Blomme and van Oorschot no. 78

4.39.    The "splitMotionEvents" flag, with Android 3.0 and higher, that runs on the Galaxy
Tabs, also does not conform. This last flag guarantees the exclusivity of Views within a
ViewGroup (see paragraph 48 Nieh declaration, Apple production 36). The previous figure
therefore guarantees the "splitMotionEvents" flag that either the one or the other red arrow
key has exclusive touch <u>within</u> the ViewGroup. It may, however, be clear that with the
"splitMotionEvents" flag, no exclusivity is guaranteed in terms of views <u>outside</u> the
ViewGroup, such as the green image in the figure. In other, simple, words, even though the
"splitMotionEvents" flag is already set to exclusive for one of the two red arrow keys, it is
still possible at the same time to, for example, "pinch" or "depinch" (zoom in or out) on the
green image. A possible view lying outside of this Window (not shown in the figure) can
also be touched when the "Flag_Split_Touch" is not set to exclusive.

4.40.    Even when both flags are observed together, there is no exclusivity per view such as
in EP 948. When both flags are set to exclusive, so that one of the two red arrow keys in
above figure has exclusive touch, then – just as before – the green image can still be touched.

4.41.    Therefore, for now, the operation of Android 2.3 or 3.0 or higher does not conform
to EP 948. Apple has not contended that there are equivalent measures, so that such has also
not been subject of debate and for that reason, cannot be attained. The summary trial judge
also notes that there can be the slightest amount of doubt whether the result and/or the
manner in essence are the same, now that there is still no question of exclusivity with
Android 2.3 or 3.0 at view-level, but that the exclusivity is arranged at a higher level (not
per view but per window or view group). With this status, Samsung's contention that EP 948
would be invalid no longer requires any discussion.

*EP 022*

Introduction
4.42.    The patent views portable electronic devices that are equipped with a touchscreen
display screen. Touchscreen devices often have a limited number of physical keys. The
functions of and applications on the device can be controlled by means of virtual keys that
are displayed on the touchscreen and can be operated by means of the touchscreen.

4.43.    Paragraph [0003] of the patent notes that a problem with touchscreens is
that functions can be activated or deactivated unintentionally. That is why in most
tablet computers, a touchscreen can be locked when the touchscreen is not touched
during a specific time or when a user manually locks the touchscreen. The locking of
a touchscreen ensures that the screen does not respond to further touches until the
screen is unlocked.

4.44.    The invention in the patent regards the situation in which, assuming a locked
touchscreen in which the user interface is inaccessible, the touchscreen must be unlocked
in order to allow user input.

396957 / KG ZA 11-730 and 396959 / KG ZA 11-731
August 24, 2011

33

Validity/infringement

4.45.   After provisional judgment, there exists a clear chance that EP 022 will be held as invalid in an applied civil law procedure so that for this reason, the requested provisions regarding EP 022 must be declined. With the parties, the nearest technology status is to consider the Neonode N1m, where the manner of "unlocking" is described as follows (after pressing a button):









4.46.    This Neonode telephone shows all the characteristics from conclusion 1 preceded by the words, "characterized by", such as also admitted by Apple (these are the a-c characteristics indicated by Apple). The difference with EP 022, according to Apple – briefly stated – is that (d) an "unlock image" is moved over a "predefined displayed path" and (e) which "unlock image" is a graphic object with which the user displays interaction. Samsung, however, correctly states that the Neonode N1m also has a predefined displayed path for unlocking in the form of the red transparent arrow[8]. In addition, from that telephone, it is also clear that when it is swiped incorrectly, the telephone remains locked. Thus, there is also already a definite type of feedback (interaction) with this telephone. That means that, in fact, only the use of an "unlock image" is to be viewed as a differential measure. The problem statement was then in line with paragraph 5 of EP 022 to be formulated when there is a more user-friendly procedure for the unlocking of a touchscreen. For now, the summary trial judge considers the application of such an "unlock image" to be obvious. It is, in fact, nothing more than letting one or another graphic element slide over the arrow with the Neonode. Thus, the application of such a graphic element (with feedback/interaction) is not completely trivial without creative thinking to release the already long familiar virtual on/off slider buttons from Plaisant et al., "Touchscreen Toggle Design" article, CHI 3-7 May 1992 (production 6.8 Samsung, displayed to the left and then especially the button to the left below) or even sliding the virtual equalizer of the Guitar Rig (production 31 Samsung, to the right):




4.47. With both advance publications, a graphic element (the virtual gate) must be slid over a specific path. With the Plaisant slider, a person skilled in the art will understand that if the slide does not go far enough, the switch is released too early or the path is not be followed, then the switch will not go from off to on (or vice versa). Therefore, interaction with the user here is also just as with EP 022. To this, it does not matter that Plaisant found that this slider was less preferred in her research. Anyhow, it may be clear to a person skilled in the art that the buttons for unlocking a touchscreen for a portable device are not well suited because with them, a significant chance always exists that unlocking will occur by accident. It is also not relevant to think that Plaisant touchscreen was not unlocked itself by means of the

---

[8] Just visible on the images is a red arrow located under the little lock.

switches but that it was used in order to turn an external device on and off. Anyhow, by virtue of the problem statement also utilized by Apple, there has already been research into a better way to unlock a touchscreen. In addition, the summary trial judge finds it likely that an average person skilled in the art will never let himself/herself be prevented from consulting Plaisant's article just because an external device is being operated. Comparable considerations apply with regard to the Guitar Rig.

4.48.    Since EP 022 is to be regarded for now as not inventive, the claims on it must be relinquished and do not need to be evaluated to determine if there is infringement.

_Model infringement_

4.49.    For now, the summary trial judge is of the opinion that there is no question of infringement on any Apple copyright for which there is consideration as follows. In this framework it is determined foremost that – unlike Apple has contended – only the visual characteristics, such as those appearing from the model registration, may be considered. It appears incorrect to the summary trial judge that with the infringement question, a possible concrete realization of the registered models can also be included, such as AG Mengozzi appears to support in the Pepsico Pogs case (r.o. 83)[9]. A different judgment anyhow would come in conflict with the model registration system (and the distinction in the GModVo between registered and unregistered models) and also the legal certainty for third parties. It would also at the same time call up important, legal uncertainty-creating questions that do not appear to be from the regulation. Examples of such questions are which criterion would need to be utilized in order to evaluate whether a model is embodied in a product being on the market, at what moment (at registration request, registration or after) would a product need to be able to weigh its will on the market and what is to be done if there are several, mutual, somewhat different products on the market that qualify and so forth. Not for nothing does article 19 paragraph 1 GModV then also provide to the holder of the registered (see article 1 paragraph 2 under b GModV: registered according to the regulation) Community model, an exclusive right for a period longer than 3 years (article 12: maximum 25 years). A concrete realization obviously does play a role when there is an appeal on an unregistered Community model, but that is not (open) for discussion in this case.

_Galaxy Tab 10.1 and 10.1v_

4.50.    Assuming that Apple's Community model 181607-0001 is valid, Samsung has, for now, sufficiently distanced itself from it. In this framework, it is of importance that, in fact, it is only the front of the Galaxy Tab 10.1 and 10.1v that show this conformity. The characteristic elements on the front of the model, as described, that is, the rectangular shape with rounded corners, minimalistic design, passe-partout behind a completely transparent ("glass") front, were nonetheless already familiar for everyone on the priority date of the registration request (17 March 2004). Thus, the HP Compaq TC1000 was already rectangular with rounded corners and it had an almost completely transparent surface with a (gray) passe-partout under that surface (see following image).

[9] Conclusion from 12 May 2011 by C-281/10



4.51.    It does not matter that the appearance as shown above was known and that this device folds open to show a keyboard. Indeed, the TC1000 also has a second darker/black passe-partout within the gray, but the "minimalistic" concept of only one passe-partout (whose frame, for that matter, does not stick out) was already present in the Knight-Ridder tablet PC from 1994 (see below).



4.52.    Apple has provided inadequate substantiation in contesting that the Knight Ridder tablet PC was known in the relevant circles. The only circumstance that this tablet PC ultimately

did not come into production, does not, for now, mean that the model was not known in the relevant circles.

4.53.     Therefore, the front of the Apple model regards a combination of known elements that, in essence, are not deserving of a large degree of protection. The summary trial judge considers hereby that after provisional judgment, what is necessary also appeared technically established. After all, if one wants to prevent filth from accumulating visibly on the edges of the touchscreen and also make it easy to touch the borders of the touchscreen with the finger (and therefore be able to fully utilize the screen), a "glass" touch plate running over the entire front seems to be a logical choice.

4.54.     The summary trial judge also considers the following with regard to the attractive "minimalistic" or "smoothly" shaped appearance stated by Apple. It is indisputably a current trend to give products a "minimalistic" appearance. In many cases, it also looks beautiful, such as with the iPad. Considering that beautiful appearance, there can also then be an inclination to give such models wide protection. Nevertheless, it must be remembered that "minimalistic" design, in fact, means that the design follows the contours, as much as possible, as dictated by the device's technology and ergonomics. From provisional judgment, that holds as well for the model in question. Thus, the rounded corners are a result of the fact that a device with sharp corners does not feel in a person's hands and can damage clothing and upholstery, certainly when it involves a business computer for which the model is registered. The same holds, as previously considered, to an important extent for the continuous "glass" touch plate. Therefore, a copyright on a "minimalistic" design inherently contains the problem in itself that competitors will, in fact, be forced to make less optimal choices (meaning: they must, in fact, add unnecessary frills to their design in order to stay outside of the model protection), which provides a competitive advantage for a model holder who (coincidentally) outwitted its competitors by registering a model for a specific product segment, such as the tablet computer. That competitive advantage is unjustified from a copyright viewpoint because it is not so much a result of design work as it is a consequence of the fact that the holder concerned was the first to register the (constrictive) appearance of a new product segment. Possibly this does not mean that the model is invalid but that the protection to be provided to it may not be large and must be limited to the actual design elements of the model. That is difficult because precisely with a "minimalistic" or "smooth" design model, the general impression of the appearance will now be determined exactly in an elaborate manner through the technology and practical/ergonomic considerations. Nevertheless, there must be abstracted from the elements of the model that are not able to be protected because these are determined technologically or otherwise practically/ergonomically.

4.55.     In addition to significant similarities, there are still a few less prominent differences to be seen on the front side. To be mentioned are the camera lens with the Galaxy tabs, the somewhat wider passe-partout with the Galaxy tabs (in relation to the effective screen) and the brand SAMSUNG below middle with the Galaxy 10.1. See the following images (to the left is the picture of the model, to the right are the Galaxy Tabs pictured with the 10.1v above and the 10.1 below).

396957 / KG ZA 11-730 and 396959 / KG ZA 11-731                    46

| CDR000181607-0001 | Samsung Tab 10.1v (above) and 10.1 (below) |
|---|---|
| 0001.2  |  |
| 0001.1  |  |



0001.3

4.56.      Prominent differences on the back contrast with the similarities in appearance on the front.
The Galaxy Tab 10.1 has a darker back bordered with a light gray edge that is a few millimeters wide. The top edge of this border protrudes and contains a conspicuous camera lens with a second lens incorporated next to it. The main telephone connection is also plainly visible and a few protruding buttons are just visible on the top. The brand SAMSUNG is displayed prominently in the middle.
The differences are even greater with the Galaxy Tab 10.1v. There, the back is no longer flat, but it has a round bulge in the middle, which gives the back an entirely different look. The brand SAMSUNG on the prominent round circle also gives the back of this tablet a completely different look from the simple, rounded but further flat and unadorned back of the model.



4.57.    The sides of the Galaxy 10.1 and 10.1v tabs also distinguish themselves significantly from the model. Both tabs have a clearly visible separation between the light gray edging and the darker back plate. The shape of the edge is also considerably different. The side edge of the 10.1 is bulb-shaped, that is, the top edge is narrower, then bulges out widely and then is narrower again below, approximately analogous to a "(". The side of the 10.1v is mainly flat with a faceted, sloping bottom shell. The side edges of the model, however, follow the contours of a quarter circle. In addition, the sides have visually dominant connections, buttons and speakers, all of which are actually positioned differently on the Galaxy tabs. To name a few striking examples, there is by both Galaxy tabs a conspicuous flat connection (for connecting to the PC) applied on the long side that is not to be seen on the long side (pictures 0001.6 and 0001.7) of the model. Only one short side of the model is pictured (picture 0001.4, so that it is assumed that the short sides are the same). On the Galaxy Tab 10.1, the openings for the speakers are not located in the middle but positioned on the side, on one quarter of the short sides. The speakers on the 10.1v are interrupted by a prominent closed circle. For as far as the models all having a thin appearance (indicated by expert Woodring with "thin form factor", Apple production 39), the Galaxy Tabs 10.1 and 10.1v are still noticeably much thinner. Furthermore, Samsung has correctly stated that now such products must be as flat and thin as possible and the technology also – the summary trial judge adds this as a fact of general familiarity – gradually makes more possible. See the following images.



4.58.    If abstracted from the technical/practical and ergonomically determined elements and only the features to be protected by copyright are considered, then for now, the conclusion can be none other than that the Galaxy Tabs 10.1 and 10.1v invoke a different general impression than the model, especially considering the conspicuous differences on the back and sides. This finding applies even if more consideration must be given to the front than to the back and sides as Apple has contended.

4.59.    The previous finding detracts insufficiently from market research performed by Apple that would seem that a large portion of the public is of the opinion that the model and the Galaxy Tab 10.1 and 10.1v have too many similarities. Firstly, the research is faulty on the problem definition. The question asked is whether the general impression of the model and the Galaxy Tab was the same. However, it should have included an indication of which elements of the "minimalistic" model were actually able to be protected in order to come to a realistic evaluation. In addition, for now it appears incorrect that the persons surveyed did not have the possibility to look back at the one picture after having viewed a different picture. The research was rather a memory test than a test of similarity, taking into account elements to be protected.

*Galaxy S*

4.60.    With regard to the appearance of the Galaxy S, Apple appeals to two Community model registrations, 748280-0006 and 888920-0018. In addition, Apple appeals to Community model registration 748694-0003 with regard to the Galaxy S user interface.

Galaxy S versus GM 748280-0006

4.61.    Provisional judgment is that the general impression of Galaxy S and model 748280-0006 is not the same. It must be considered hereby that the Korean LG model registration with number 30-0418547 (Samsung production 53H) and the iHolic HTV 200 (Samsung production 53J) were already known in the relevant circles. Regarding the iHolic, Apple has provided inadequate substantiation in contesting that this information was known by insiders in the relevant sector.

          

GM 748280-0006                LG-model 30-0418547              iHolic HTV

4.62.    This means that regarding the front, the model's own character is provided mainly by the conspicuous round button at the bottom of the screen. It is also clearly visible that the model – different from aforementioned already known designs – has a screen that covers the full width of the telephone. Characteristic of the sides is the convex rounding more or less in the shape of a semi-circle or ")". The LG model also already had a visible edge but on the GM 748280-0006, the edge is more pronounced on the front.

4.63.    Indeed, the front of the Galaxy S also has a screen that takes up the full width but, different from the model, has a rectangular button. Now that the model's round button is an important and obvious difference in relation to the prior known models, an informed user will interpret this as a prominent difference. In addition, the slot for the Galaxy S loudspeaker is somewhat thinner and wider, there is a camera lens next to the slot, the SAMSUNG brand is placed prominently under the loudspeaker and there are buttons on both sides of the rectangular central button.

396957 / KG ZA 11-730 and 396959 / KG ZA 11-
731

51

| GM 748280-0006 | Samsung Galaxy S |
|---|---|
| 0006.5 | |
| 0006.7 | |



4.64.    It should also be taken into consideration that the sides of the Galaxy S, in addition to various connections and buttons, displays a somewhat sharper corner instead of the completely convex sides of the model. The back of the Galaxy S has a pronounced bulge at the bottom of the device, which is also visible from the side. The Galaxy S – apart from this bulge – is also somewhat thinner than the model.

| 0006.4 | |
|---|---|
| 0006.2 | |



396957 / KG ZA 11-730 and 396959 / KG ZA 11-731                                                    52



4.65.    In addition, the back has a conspicuous camera lens at the top left that is square-shaped and outlined in chrome. The SAMSUNG brand and "with Google" are also visible there, while the back of the model is unadorned.

396957 / KG ZA 11-730 and 396959 / KG ZA 11-      53
731



4.66.    The entire examination must conclude that the model and the Galaxy S invoke a
different impression by the informed user. As already previously considered, the results
from the market research do not detract from this conclusion.

Galaxy S versus GM 888920-0018
4.67.    Provisional judgment is that the general impression of Galaxy S and model
888920-0018 is also not the same. Firstly, the summary trial judge considers that Samsung
rightfully appeals that the priority invoked by Apple is incorrect. Apple refers to priority of
US D 604,297 (Samsung Production 19) and US D 602,014 (Samsung Production 20),
where it is immediately noted that neither of the two registration requests have the
rectangular menu button at the bottom, but a round one. This can be diagrammed as follows,
with the differences summarized to the right:



| GM 888920-0018 | US D 604,297 | - containsone round menu button; |
| | US D602,014 | - contains one round menu button;<br><br>- front contains one square screen that is not encircled; |

4.68.    Parties have discussed the question according to which criterion must be established whether a model has right to priority or not. Article 41 paragraph 1 GModVo establishes that it must regard the same model. Article 4 Unieverdrag van Parijs (Treaty of Paris) does not prescribe any binding measure in this regard but from the context of 4C under 4, it can be derived that the priority request must have "the same subject". It occurs to the summary trial judge that in this framework, to utilize a minimal test of originality in the sense of article 5 GMoV, therefore whether the priority model is identical to the registration request that invokes that priority. This is in line with stable jurisprudence with regard to priority by patent rights, where essentially a test of originality (disclosure test) is also set up. In other words, when the model is to be regarded new in relation to the priority model, it does not make for any appeal to priority. Provisional judgment is that the conspicuous rectangular menu button of the model does not make it identical to the priority requests, so that the appeal to priority cannot be applicable and must be assumed from the actual request date of GM 888920-0018 (29 February 2008). It does not regard a difference in only unimportant detail.

4.69.    The latter means that at the time of the registration request, the following were already known in the relevant circles: the Samsung SGH-F700, which came on the market in the Netherlands on 9 October 2007 (Samsung production 64) and Samsung's Community model 00718770-0007 (Samsung production 23).






GM 888920-0018              Samsung SGH-F700              GM 00718770-0007

4.70.    After provisional judgment, the front of the Samsung SGH-F700 anticipates all the important elements of the front of GM 888920-0018. Anyhow, the SGH-F700 also has a completely transparent "glass" front with a rectangular menu button and a wide border. The side views of that device are otherwise significantly different from the model; the device is noticeably thicker and has a different rounding of the sides. The back also has a conspicuous camera.

4.71.    Assuming that GM 888920-0018 is still new and has its own character, it must be understood that considering the SGH-F700, any possible similarity on the front of the model and Galaxy S can be given little value. Apart from that, upon comparison on the front, there are indeed differences to be found. Thus, by the Galaxy S, there is a conspicuous slot for the loudspeaker and there is a camera lens next to the slot, the SAMSUNG brand is placed prominently under the loudspeaker and there are buttons on both sides of the rectangular central button. The framing of the screen is striped in GM 888920-0018, which according to the – undisputed by Apple

396957 / KG ZA 11-730 and 396959 / KG ZA 11-                                    55
731

_____  —

   − conventions means that before no protection is requested.[10] Therefore, with a possible
similarity of model and the Galaxy S, no consideration can be made in terms of that
aspect.

| GM 888920-0018 | Samsung Galaxy S |
|---|---|
| 0018.5  | |

   4.72.    Then there must also be taken into consideration that the back of the Galaxy S has
a pronounced bulge underneath the device, which is also visible from the side.

[10] See also 11.4 of the Examination Guidelines Community Design from the OHIM at
Alicante, located on http://oami.europa.eu/en/office/aspects/pdf/ExamGuidelines.pdf

396957 / KG ZA 11-730 and 396959 / KG ZA 11-731
August 24, 2011

56

| 0018.4 |  |
| 0018.2 |  |
| 0018.1 |  |
| 0018.3 |  |

396957 / KG ZA 11-730 and 396959 / KG ZA 11-731
August 24, 2011

57

4.73.    In addition, the back has a conspicuous camera lens that is square-shaped and outlined in chrome. The model has a completely different opening/ornament at top left. The SAMSUNG brand and "with Google" are also visible on the back.



4.74. The entire examination must conclude that the model and the Galaxy S invoke a different impression by the informed user. As already previously considered, the results from the market research do not detract from this conclusion.

GUI Galaxy S
4.75.    Provisional judgment is that the general impression of the graphical user interface (GUI) of the Galaxy S and model 748694-0003 is also not the same. The summary trial judge states foremost that the model as registered must be evaluated. In the absence of any indication in the model registration that in fact no protection will be necessary for the specific content of the icons as shown in

the registration request, it must also be considered in the evaluation. Apple also has not, for example, invoked a model in which the square contours of the icons are incorporated without content. In addition, it must be presumed that only
the Galaxy S screens, as sold by Samsung, can be evaluated on infringement. A possible rearrangement of the icons by a user may not play a role because this cannot be deemed as a qualified handling in the sense of article 19 GMoV.

4.76.    At the time of registration request, the GUI of the Nokia 7710 (Samsung production 7.56) was already known in the relevant circles.

 

GM 748694-0003                                        Nokia 7710

After provisional judgment, the GUI of the Nokia 7710 anticipates a number of important elements of the GM 748694-0003. Anyhow, the GUI of the Nokia 7710 also has multi-colored icons set up in rows of four. The Nokia 7710 icons also have a square shape with rounded corners. There is also a short text located under the icons. The background is also of one color. However, there are also differences, of which probably the most obvious are the different icon content, having just three rows instead of four, where the lowest row in the model leaves open a black band and the lowest row is located in a gray bar. For now, no protection is warranted for the difference in color because Samsung has stated indisputably that the technology is fixed (in order to save the battery and the screen itself is black).

4.77.    The considered screen prints from the Galaxy S, sold by Samsung, pictured next to the model look like the following:



GM 748694-0003



Galaxy S opening screen



Galaxy S Menu screen 1



Galaxy S Menu screen 2



Galaxy S Menu screen 3

4.78.    There is indeed minimal argumentation needed that the opening screen of the Galaxy S, due to the colorful desert image as background, the Google search bar above the icons and the arrangement of the icons (three rows underneath, no open black row, a missing icon below to the right), invokes a different general impression by the informed user than the model.

4.79.    The menu screens are closer to those in the model. it concerns the same multi-colored icons in rows of four with rounded corners. This was, however, as such already known from the GUI of the Nokia 7710 described previously. Of the aspects in which the model differs from the Nokia 7710, in fact, only the light gray bar by the lowest row was incorporated. The content of the icons, however, differs significantly. In addition, in the model, one row is "skipped", that is to say that it is black, which is missing in menu screens 1 and 2 of the Galaxy S. After provisional judgment, these screens then also invoke a significantly different general impression by the informed user. Samsung, however, also takes sufficient distance with screen 3, now that there – besides the clearly different content of the icons – is also another skipped icon in the 3ᵈ row.

4.80.    Considering the preceding, it can remain in the middle whether the model is valid (for example, in connection with the GUI of the Meizu 8, of which Apple has stated that this

was made public due to misuse) and whether it must be based on the black/white version
of the model, as Samsung had argued because the model was initially published in
black/white, but was later rectified to a color version as shown above.

*Galaxy Ace*

4.81.    Provisional judgment is that the general impression of Galaxy Ace and model
1236590-0011 from 2010 is not the same. It should hereby be taken into consideration that
all the previously discussed device models were already known in the relevant circles.
Therefore, the appearance of the front view was known completely. Samsung then also
rightfully takes the standpoint that the protection mainly concerns a combination of known
elements with the look of the edge. This edge is equipped all around with a flat "band" lying
on top and also with a few round, flat buttons. The summary trial judge notes that the back
shell, for as far as it protrudes above the band, is shown striped again so that apparently no
rights will be claimed.

4.82.    The first thing that stands out on the front is that the Galaxy Ace, different from the
model, has a rectangular button instead of a round button. That rectangular look of the button
is accentuated further by a chrome edge. In addition, the slot for the loudspeaker on the
Galaxy Ace, also chrome-accented, is somewhat thinner and wider, the small slot above it is
missing and the camera lens and the
SAMSUNG brand is stated prominently under the loudspeaker.

| GM 1236590-0011 | Samsung Galaxy Ace |
|---|---|
| 0011.1  | |



4.83.    Then there must also be taken into consideration that the sides of the Galaxy Ace look significantly different. The "band" does not lie on top of the edge, but is recessed. In addition to this band, on the top of the Galaxy Ace there is no part of another material different from the "band", while the back shell – that is not protected due to the dotted lines – is indeed the case. The buttons also look completely different. (See figures below.)



396957 / KG ZA 11-730 and 396959 / KG ZA 11-731                                      62



4.84.    Furthermore, the back has a second lens (probably for a flash or small light) that is
not next to, but under the camera lens. There, the SAMSUNG brand and another little grid
(probably for a loudspeaker) are also prominently visible. (See figures below.)



4.85.    The entire examination must conclude that the model and the Galaxy Ace invoke a different impression by the informed user. As already previously considered, the results from the market research do not detract from this conclusion.

*Copyright infringement and precise imitation*

4.86.    Samsung has stated indisputably that the relevance of the look of the Apple products has the United States as country of origin and that works there have no copyright protection, so that based on the reciprocity principle set down in article 2 paragraph 7 of the Berner Convention, no copyright protection is also deserving in the Netherlands. Samsung has also demonstrated such with substantiation in the matter of the user interface, under presentation of a contributing opinion from professor Ralph Oman. Now Apple, on the other hand, has stated nothing, in these brief proceedings there must be presumed that no copyright protection in the matter of one of the invoked works is deserving and the claims based on them must be relinquished.

4.87.    On the unlawful style imitation mentioned in the petition, Apple did not return to the session so that it is presumed that that basis will no longer be upheld. For as far as Apple still appealed at the session to precise imitation of its products, this basis was presented after expiration of the time limit and will be left to the side as in violation of a proper process order.

*Conclusion and process costs*

4.88.    The conclusion is that Samsung infringes EP 868 with the smartphones of Galaxy S, S II and Ace, but not with the tablet computers. Samsung does not infringe EP 948, while for now, EP 022 is to be held null and void. There is no infringement by Samsung on the model rights or copyrights introduced by Apple. At least with this status there exists a reasonable chance that in a proceeding on the merits, consequently there will be an evaluation. This means that an infringement prohibition can be allocated in the matter of EP 868, though limited to the Galaxy S and Ace smartphones. For the others, the claims must be rejected. Apple has stated no specific urgent interests with its other claims and now that just infringement will be accepted for one patent, that which apparently can be easily remedied technologically by Samsung, these claims will be rejected. Due to the apparent simple adjustment to be executed by Samsung, the security claimed by Samsung is not shown to be regarded. The damage to be possibly suffered by Samsung in this matter, if the given prohibition would not be determined in a proceeding on the merits, seems not great anyhow in that light, apart from the (presumed by Samsung non-)creditworthiness of Apple. For the same reason and considering the exit time to be provided, a feasible inventory declaration from the prohibition to be provided is in place.

4.89.    Now that parties from both sides have been wronged, the process costs will be compensated.

**5.      The decision**

The summary trial judge

5.1.      Forbids defendants from, after a course of seven weeks and one day after the
signing of this verdict, in any manner, directly or indirectly, through the manufacture,
having in inventory, offering, importing, bringing into circulation, selling and/or otherwise
marketing Galaxy S, S II and Ace smartphones, infringing on the Dutch part of
EP 2.059.868;

5.2.      Forbids defendants sub 2-4 from, after a course of seven weeks and one day after
the signing of this verdict, in any manner, directly or indirectly, through the manufacture,
having in inventory, offering, importing, bringing into circulation, selling and/or otherwise
marketing Galaxy S, S II and Ace smartphones, infringing on the foreign parts of EP
2.059.868;

5.3.      Orders defendants to pay to claimant an immediately claimable penalty of EUR
100,000 for each day or portion thereof or, as chosen by claimant, of EUR 10,000 per
infringing product, on which it can be imputed to the defendants that the prohibitions as
recorded under 5.1 and 5.2 have not been completely or properly complied with;

5.4.      declares this verdict thus far feasible at inventory;

5.5.      compensates the costs of the procedures between parties in the sense that each
party carries its own costs,

5.6.      determines the term intended in article 1019i Rv tp be six months, to be
calculated as of the day of this verdict;

5.7.      rejects the more or otherwise claimed.

This verdict was pronounced by Mr. E.F. Brinkman and announced in public on 24 August
2011.