# vonnis

**RECHTBANK 's-GRAVENHAGE**

Sector civiel recht

**Vonnis in kort geding van 24 augustus 2011 (bij vervroeging)**

in de zaak met zaaknummer / rolnummer: 396957 / KG ZA 11-730 van

de rechtspersoon naar buitenlands recht
**APPLE INC.**,
gevestigd te Cupertino, Californië, Verenigde Staten van Amerika,
eiseres,
advocaat: mr. P.J.M. von Schmidt auf Altenstadt te 's-Gravenhage,

tegen

1.    de vennootschap naar vreemd recht
      **SAMSUNG ELECTRONICS CO. LIMITED**,
      gevestigd te Suwon City, Kyungki-Do, Zuid-Korea,
2.    de besloten vennootschap met beperkte aansprakelijkheid
      **SAMSUNG ELECTRONICS BENELUX B.V.**,
      gevestigd te Delft,
3.    de besloten vennootschap met beperkte aansprakelijkheid
      **SAMSUNG ELECTRONICS EUROPE LOGISTICS B.V.**,
      gevestigd te Rijswijk,
4.    de besloten vennootschap met beperkte aansprakelijkheid
      **SAMSUNG ELECTRONICS OVERSEAS B.V.**,
      gevestigd te Amsterdam,
gedaagden,
advocaat: mr. B.J. Berghuis van Woortman te Amsterdam,

en in de zaak met zaaknummer / rolnummer 396959 / KG ZA 11-731 van

de rechtspersoon naar vreemd recht
**APPLE INC.**,
gevestigd te Cupertino, Californië, Verenigde Staten van Amerika,
eiseres,
advocaat: mr. P.J.M. von Schmidt auf Altenstadt te 's-Gravenhage,

tegen

1.    de vennootschap naar vreemd recht
      **SAMSUNG ELECTRONICS CO. LIMITED**,
      gevestigd te Suwon City, Kyungki-Do, Zuid-Korea,
2.    de besloten vennootschap met beperkte aansprakelijkheid
      **SAMSUNG ELECTRONICS BENELUX B.V.**,
      gevestigd te Delft,

3.      de besloten vennootschap met beperkte aansprakelijkheid
        **SAMSUNG ELECTRONICS EUROPE LOGISTICS B.V.**,
        gevestigd te Rijswijk,
4.      de besloten vennootschap met beperkte aansprakelijkheid
        **SAMSUNG ELECTRONICS OVERSEAS B.V.**,
        gevestigd te Amsterdam,
gedaagden,
advocaat: mr. B.J. Berghuis van Woortman te Amsterdam.

De zaken zijn gevoegd behandeld. Partijen zullen hierna ook Apple (eiseres) en Samsung
(gedaagden gezamenlijk) genoemd worden. Voor Apple zijn de zaken behandeld door
mr. R.M. Kleemans, mr. ir. T.M. Blomme en mr. A.A.A.C.M. van Oorschot, allen advocaat
te Amsterdam. Voor Samsung zijn de zaken behandeld door mr. Berghuis van Woortman,
voornoemd, en mr. A.F. Kupecz, mr. Ch. Gielen en mr. R.C. van Oerle, eveneens allen
advocaat te Amsterdam.

## 1.      De procedure

1.1.      Het verloop van de procedure blijkt uit:
- de dagvaardingen van 27 juni 2011;
- producties 1 tot en met 24 (KG ZA 11-730) en producties 1 tot en met 30 (KG ZA 11-730)
van Apple;
- in beide zaken: conclusies van antwoord, tevens houdende eis in reconventie, van 20 juli
2011 van Samsung, met producties 1 tot en met 21 (KG ZA 11-730) en producties 1 tot en
met 34 (KG ZA 11-731);
- de brief van 21 juli 2011 van Apple, waarin Apple bezwaar maakt tegen de eisen in
reconventie, en de reactie hierop bij brief van 22 juli 2011 van Samsung;
- de email van 22 juli 2011, waarbij de voorzieningenrechter zijn beslissing kenbaar maakt
dat de eisen in reconventie in beide zaken niet behandeld zullen worden omdat – kort
gezegd – deze in strijd waren met een goede procesorde;
- de toelichting bij producties van Samsung toegestuurd per email van 25 juli 2011;
- de brief van 3 augustus 2011 van Samsung, met aanvullende producties 22 tot en met 47
(KG ZA 11-730) en aanvullende producties 35 tot en met 59 (KG ZA 11-731);
- de op 28 juli 2011 ontvangen brief van Apple, met aanvullende producties 31 tot en met 44
(in beide zaken), waarin Apple haar vorderingen met betrekking tot Gemeenschapsmodel
1260624-15 intrekt;
- de leeswijzer (ten aanzien van de soft IP) van Samsung toegestuurd per email van 2
augustus 2011;
- de leeswijzer (ten aanzien van de prior art voor de octrooien) van Samsung toegestuurd per
email van 4 augustus 2011;
- de brief van 5 augustus 2011 van Apple, met aanvullende productie 45;
- de brief van 8 augustus 2011 van Samsung, met aanvullende producties 60 tot en met 66;
- de brief van 8 augustus 2011 van Apple, met aanvullende producties 46 tot en met 50;
- de brief van 9 augustus 2011 van Samsung, met aanvullende productie 67;
- de email van 9 augustus 2011 van Apple, met aanvullende productie 51;
- de mondelinge behandeling, gehouden op 10 en 11 augustus 2011, ter gelegenheid
waarvan de raadslieden pleitnotities hebben overgelegd.

1.2.     De bij email van 10 augustus en ter zitting overgelegde stukken zijn als tardief
geweigerd. Verder hebben beide partijen ter zitting over en weer een provisionele vordering
ingediend. Na beraad hebben partijen aangegeven hierover nader overleg te willen voeren.
Dat overleg heeft erin geresulteerd dat op de provisionele vorderingen niet hoeft te worden
beslist, zoals medegedeeld bij email van mr. Kleemans van 12 augustus 2011.

1.3.     Vonnis is bepaald op uiterlijk 15 september 2011 maar zal heden bij vervroeging
worden uitgesproken.


**2.       De feiten**

2.1.     Apple is een wereldwijd opererende producent en ontwikkelaar van computers,
consumentenelektronica, besturingssystemen en software. Haar producten omvatten onder
meer de iPhone, een zogenoemde *smartphone*, en de iPad, een *tablet computer*. Beide
producten worden door Apple in verschillende versies op de markt gebracht.

2.2.     Apple is houdster van Europees octrooi EP 2 059 868 (verder: EP 868) voor een
"*Portable electronic device for photo management*", verleend op 29 september 2010 op een
aanvrage van 31 augustus 2007, onder inroeping van prioriteit van zeven Amerikaanse
octrooiaanvragen: US 824.769 P (6 september 2006), US 883.785 P (6 januari 2007), US
879.253 P (7 januari 2007), US 879.469 P (8 januari 2007), US 937.993 P en US 947.118 P
(beide 29 juni 2007) en US 848.210 (30 augustus 2007). Nederland is een van de
gedesigneerde landen. Tegen de verlening van EP 868 is tot het moment van dagvaarden
geen oppositie ingesteld.

2.3.     De conclusies van EP 868 luiden in de oorspronkelijke Engelse taal:

1.   A computer-implemented method, comprising:
     at a device (100) with a touch screen display (112):
     detecting (2402) a first movement (2310) of a physical object on or near the touch screen
     display (112);
     while detecting the first movement (2310), translating (2404) a first digital object (2300-1)
     displayed on the touch screen display (112) in a first direction, wherein the first digital object
     (2300-1) is associated with a set of digital objects; **characterized in that**:

          in response to display of a previously hidden edge (2312) of the first digital object (2300-
          1) and continued detection of the first movement (2310),
          displaying (2406) an area (2314) beyond the edge (2312) of the first digital object (2300-
          1);
          after the first movement (2310) is no longer detected, translating (2408) the first digital
          object (2300-1) in a second direction (2316) until the area (2314) beyond the edge (2312)
          of the first digital object (2300-1) is no longer displayed;
          detecting (2410) a second movement (2318) of the physical object on or near the touch
          screen display (112); and
          in response to detecting the second movement (2318) while the previously hidden edge
          (2312) of the first digital object (2300-1) is displayed, translating (2412) the first digital
          object (2300-1) in the first direction and displaying a second digital object (2300-2) in the
          set of digital objects.

396957 / KG ZA 11-730 en 396959 / KG ZA 11-731                                                4
24 augustus 2011

2.  The computer-implemented method of claim 1, wherein, prior to the translating while detecting the first movement, at least one edge of the first digital object extends beyond the touch screen display in the first direction.

3.  The computer-implemented method of claim 1 or 2, wherein the first movement is a horizontal swipe gesture.

4.  The computer-implemented method of any one of claims 1 to 3, wherein the set of digital objects is a set of digital images, a set of web pages, or a set of electronic documents.

5.  The computer-implemented method of any one of claims 1 to 4, wherein the device is a portable electronic device.

6.  The computer-implemented method of any one of claims 1 to 5, wherein the physical object is a finger or a stylus.

7.  A computer program with software code adapted to perform the method of any one of claims 1 to 6.

8.  An electronic device (100), comprising:
    a touch screen display (112);
    one or more processors (120);
    memory (102); and
    a program, wherein the program is stored in the memory and configured to be executed by the one or more processors, the program including:

    instructions for detecting (2402) a first movement (2310) of a physical object on or near the touch screen display (112);
    instructions for, while detecting the first movement (2310), translating (2404) a first digital object (2300-1) displayed on the touch screen display (112) in a first direction, wherein the first digital object (2300-1) is associated with a set of digital objects;
    **characterized in that**:
    instructions for, in response to display of a previously hidden edge (2312) of the first digital object (2300-1) and continued detection of the first movement (2310), displaying (2406) an area (2314) beyond the edge (2312) of the first digital object;
    instructions for, after the first movement (2310) is no longer detected, translating (2408) the first digital object (2300-1) in a second direction (2316) until the area (2314) beyond the edge of the first digital object (2300-1) is no longer displayed;
    instructions for detecting (2410) a second movement (2318) of the physical object on or near the touch screen display (112); and instructions for, in response to detecting the second movement (2318) while the previously hidden edge (2312) of the first digital object (2300-1) is displayed, translating (2412) the first digital object (2300-1) in the first direction and displaying a second digital object (2300-2) in the set of digital objects.

9.  The electronic device of claim 8, wherein, prior to the translating while detecting the first movement, at least one edge of the first digital object extends beyond the touch screen display in the first direction.

10. The electronic device of claim 8 or 9, wherein the first movement is a horizontal swipe gesture.

11. The electronic device of any one of claims 8 to 10, wherein the set of digital objects is a set of digital images, a set of web pages, or a set of electronic documents.

12. The electronic device of any one of claims 8 to 11, wherein the device is a portable electronic device.

13. The electronic device of any one of claims 8 to 12, wherein the physical object is a finger or a stylus.

2.4. In de onbestreden Nederlandse vertaling luiden de conclusies van EP 868:

1. Door een computer uitgevoerde werkwijze, omvattende:
het bij een inrichting (100) met een display (112) met aanraakscherm:
detecteren (2402) van een eerste beweging (2310) van een fysiek object op of nabij het display (112) met aanraakscherm;
het tijdens het detecteren van de eerste beweging (2310) verplaatsen (2404) van een op het display (112) met aanraakscherm weergegeven eerste digitaal object (2300-1) in een eerste richting, waarbij het eerste digitale object (2300-1) samenhangt met een stel digitale objecten; **met het kenmerk, dat**
in reactie op het weergeven van een vooraf verborgen hoek[1] (2312) van het eerste digitale object (2300-1) en voortgezette detectie van de eerste beweging (2310), een gebied (2314) wordt weergegeven voorbij de rand (2312) van het eerste digitale object (2300-1);
nadat de eerste beweging (2310) niet langer gedetecteerd wordt, het verplaatsen (2408) van het eerste digitale object (2300-1) in een tweede richting (2316) totdat het gebied (2314) voorbij de rand (2312) van het eerste digitale object (2300-1) niet langer wordt weergegeven;
detecteren (2410) van een tweede beweging (2318) van het fysieke object op of nabij het display (112) met aanraakscherm; en
in reactie op het detecteren van de tweede beweging (2318) terwijl de daarvoor verborgen rand (2312) van het eerste digitale object (2300-1) wordt weergegeven, het verplaatsen (2412) van het eerste digitale object (2300-1) in de eerste richting en het weergeven van een tweede digitaal object (2300-2) in het stel digitale objecten.

2. Door een computer uitgevoerde werkwijze volgens conclusie 1, waarbij, voorafgaand aan het verplaatsen tijdens het detecteren van de eerste beweging, ten minste een rand van het digitale object zich in de eerste richting uitstrekt voorbij het display met aanraakscherm.

3. Door een computer uitgevoerde werkwijze volgens conclusie 1 of 2, waarbij de eerste beweging een horizontaal veeggebaar is.

4. Door een computer uitgevoerde werkwijze volgens willekeurig welke van de conclusies 1-3, waarbij het stel digitale objecten een stel digitale beelden, een stel webpagina's of een stel elektronische documenten is.

---

[1] Dit is een vertaalfout. "A previously hidden edge" is abusievelijk vertaald met "een vooraf verborgen hoek" in plaats van "rand".

5.    Door een computer uitgevoerde werkwijze volgens willekeurig welke van de conclusies 1-4,
      waarbij de inrichting een draagbare elektronische inrichting is.

6.    Door een computer uitgevoerde werkwijze volgens willekeurig welke van de conclusies 1-5,
      waarbij het fysieke object een vinger of een stift is.

7.    Computerprogramma met softwarecode, ingericht voor het uitvoeren van de werkwijze
      volgens willekeurig welke van de conclusies 1-6.

8.    Elektronische inrichting (100) omvattende:
      een display (112) met aanraakscherm;
      een of meer processoren (120);
      een geheugen (102); en
      een programma, waarbij het programma is opgeslagen in het geheugen en geconfigureerd is
      om to worden uitgevoerd door de een of meer processoren, waarbij het programma omvat:
      instructies voor het detecteren (2402) van een eerste beweging (2310) van een fysiek object
      op of nabij het display (112) met aanraakscherm;
      instructies voor het verplaatsen (2404), tijdens het detecteren van de eerste beweging (2310),
      van een eerste op het display (112) met aanraakscherm weergegeven digitaal object (2300-1)
      in een eerste richting, waarbij het eerste digitale object (2300-1) samenhangt met een stel
      digitale objecten; **gekenmerkt** door
      instructies voor het weergeven (2406), in reactie op het weergeven van een vooraf verborgen
      rand (2312) van het eerste digitale object (2300-1) en voortgezette detectie van de eerste
      beweging (2310), van een gebied voorbij de rand (2312) van het eerste digitale object;
      instructies voor het verplaatsen (2408), nadat de eerste beweging (2310) niet langer
      gedetecteerd wordt, van het eerste digitale object (2300-1) in een tweede richting (2316)
      totdat het gebied (2314) voorbij de rand (2312) van het eerste digitale object (2300-1) niet
      langer wordt weergegeven;
      instructies voor het detecteren (2410) van een tweede beweging (2318) van het fysieke object
      op of nabij het display (112) met aanraakscherm; en
      instructies voor het verplaatsen (2412), in reactie op het detecteren van de tweede beweging
      (2318) terwijl de daarvoor verborgen rand (2312) van het eerste digitale object (2300-1) wordt
      weergegeven, van het eerste digitale object (2300-1) in de eerste richting en het weergeven
      van een tweede digitaal object (2300-2) in het stel digitale objecten.

9.    Elektronische inrichting volgens conclusie 8, waarbij, voorafgaand aan het verplaatsen tijdens
      het detecteren van de eerste beweging, ten minste een rand van het eerste digitaal object zich
      in de eerste richting uitstrekt voorbij het display (112) met aanraakscherm.

10.   Elektronische inrichting volgens conclusie 8 of 9, waarbij de eerste beweging een horizontaal
      veeggebaar is.

11.   Elektronische inrichting volgens willekeurig welke van de conclusies 8-10, waarbij het stel
      digitale objecten een stel digitale beelden, een stel webpagina's of een stel elektronische
      documenten is.

12.   Elektronische inrichting volgens willekeurig welke van de conclusies 8-11, waarbij de
      inrichting een draagbare elektronische inrichting is.

396957 / KG ZA 11-730 en 396959 / KG ZA 11-731                                     7
24 augustus 2011

---

     13.   Elektronische inrichting volgens willekeurig welke van de conclusies 8-12, waarbij het
                fysieke object een vinger of een stift is.

2.5.      Bij EP 868 behoren onder meer onderstaande afbeeldingen.



2.6.      Apple is daarnaast houdster van Europees octrooi EP 2 098 948 (verder: EP 948)
voor een "*Touch event model*", verleend op 9 februari 2011 op een aanvrage van 4 maart
2009, onder inroeping van prioriteit van de Amerikaanse octrooiaanvrage US 42381 met
datum 4 maart 2008. Nederland is een van de gedesigneerde landen. Tegen de verlening van
EP 948 is tot het moment van dagvaarden geen oppositie ingesteld.

2.7.      De conclusies van EP 948 luiden in de oorspronkelijke Engelse tekst:

1.     A method for handling touch events at a multi-touch device (200, 210), comprising:

displaying one or more views (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311,
312);
executing one or more software elements, each software element being associated with a
particular view (301, 302, 303, 304, 305, 306, 307, 308, 309,310,311,312);
associating a multi-touch flag or an exclusive touch flag with each view (301, 302, 303,
304, 305, 306, 307, 308, 309, 310, 311, 312), said multi-touch flag indicating whether a
particular view is allowed to receive multiple simultaneous touches and said exclusive
touch flag indicating whether a particular view allows other views to receive touch events
while the particular view is receiving a touch event;
receiving one or more touches at the one or more views (301, 302, 303, 304, 305, 306,
307, 308, 309, 310, 311, 312); and
selectively sending one or more touch events, each touch event describing a received
touch, to one or more of the software elements associated with the one or more views
(301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312) at which a touch was
received based on the values of the multi-touch and exclusive touch flags.

2.     The method of claim 1, further comprising:

if a multi-touch flag is associated with a particular view, allowing other touch events
contemporaneous with a touch event received at the particular view to be sent to software
elements associated with the other views.

3.     The method of claim 1, wherein if a multi-touch flag is associated with a particular view, the
multi-touch flag indicates whether the software element associated with that particular view is
allowed to process multiple contemporaneous touches located in that view.

4.     The method of claim 1, wherein the exclusive touch flag prevents touch events from being
sent to software elements associated with views other than a view with an asserted exclusive
touch flag while a touch is being received at the view with the asserted exclusive touch flag.

5.     The method of claim 1, wherein the multi -touch device (200, 210) is a mobile telephone.

6.     The method of claim 1, wherein the multi-touch device (200, 210) is a digital media player.

7.     The method of claim 1, comprising:

associating a multi-touch flag with a first view;
receiving a first touch at the first view, the first view being one of the one or more views;
sending a touch event describing the first touch to a first software element,
the first software element being one of the one or more software elements and associated
with the first view; determining whether the multi-touch flag associated with the first
view indicates that the first view is a 'multi-touch view; and
if the first view is not a multi-touch view, blocking all touch events describing any other
touches located in the first view until the first touch is no longer received.

8.     The method of claim 7, further comprising:

associating an exclusive touch flag with each of the one or more views;
determining whether the exclusive touch flag associated with the first view indicates that
the first view is an exclusive touch view; and
if the first view is an exclusive touch view, blocking all touch events describing any other
touches located in any view other than the first view until the first touch is no longer
received.

9.     The method of claim 8, wherein the first view is not an exclusive touch view, the method
further comprising:

receiving a second touch at the multi touch panel, the second touch located at a second
view and associated with a second software element;
determining whether the exclusive touch flag associated with the second view indicates
that the second view is an exclusive touch view; and
if the second view is an exclusive touch view, preventing a touch event associated with
the second touch from being sent to the second software element until the first touch is no
longer received.

10.    The method of claim 9, further comprising:

if the second view is not an exclusive touch view, sending a touch event describing the
second touch to the second software element.

11.    A computer readable medium comprising a plurality of instructions configured for execution
at a multi-touch device (200, 210), the instructions being configured to cause the multi-touch
device (200, 210) to:

display one or more views (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312);
execute one or more software elements, each software element being associated with a
particular view (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312);
associate a multi-touch flag or an exclusive touch flag with each view (301, 302, 303,
304, 305, 306, 307, 308, 309, 310, 311, 312) , said multi-touch flag indicating whether a
particular view is allowed to receive multiple simultaneous touches and said exclusive
touch flag indicating whether a particular view allows other views to receive touch events
while the particular view is receiving a touch event;
receive one or more touches at the one or more views (301, 302, 303, 304, 305, 306, 307,
308, 309, 310, 311, 312); and
selectively send one or more touch events, each touch event describing a received touch,
to one or more of the software elements associated with the one or more views (301, 302,
303, 304, 305, 306, 307, 308, 309, 310, 311, 312) at which a touch was received based on
the values of the multi-touch and exclusive touch flags.

12.    The computer readable medium of claim 11, wherein the instructions are further configured to
cause the multi-touch device (200, 210) to:

if a multi-touch flag is associated with a particular view, allowing other touch events contemporaneous with a touch event received at the particular view to be sent to software elements associated with the other views.

13.   The computer readable medium of claim 11, wherein if a multi-touch flag is associated with a particular view, the multi-touch flag indicates whether the software element associated with that particular view is allowed to process multiple contemporaneous touches located in that view.

14.   The computer readable medium of claim 11, wherein the exclusive touch flag prevents touch events from being sent to software elements associated with views other than a view with an asserted exclusive touch flag while a touch is being received at the view with the asserted exclusive touch flag.

15.   The computer readable medium of claim 11, wherein the multi-touch device (200, 210) is a mobile telephone.

16.   The computer readable medium of claim 11, wherein the multi-touch device (200, 210) is a digital media player.

17.   The computer readable medium of claim 11, wherein the instructions are further configured to cause the multi-touch device (200, 210) to:

associate a multi-touch flag with a first view;
receive a first touch at the first view, the first view being one of the one or more views;
send a touch event describing the first touch to a first software element, the first software element being one of the one or more software elements and
associated with the first view;
determine whether the multi-touch flag associated with the first view indicates that the first view is a multi-touch view; and
if the first view is not a multi-touch view, block all touch events describing any other touches located in the first view until the first touch is no longer received.

18.   The computer readable medium of claim 17, wherein the instructions are further configured to cause the multi-touch device (200, 210) to:

associate an exclusive touch flag with each of the one or more views;
determine whether the exclusive touch flag associated with the first view indicates that the first view is an exclusive touch view; and
if the first view is an exclusive touch view, blocking all touch events describing any other touches located in any view other than the first view until the first touch is no longer received.

19.   The computer readable medium of claim 18, wherein the first view is not an exclusive touch view and the instructions are further configured to cause the multi-touch device (200, 210) to:

receive a second touch at the multi touch panel, the second touch located at a second view and associated with a second software element;

determine whether the exclusive touch flag associated with the second view indicates that the second view is an exclusive touch view; and

if the second view is an exclusive touch view, prevent a touch event associated with the second touch from being sent to the second software element until the first touch is no longer received.

20. The computer readable medium of claim 19, wherein the instructions are further configured to cause the multi-touch device (200, 210) to:

if the second view is not an exclusive touch view, send a touch event describing the second touch to the second software element.

21. A multi-touch enabled device (200, 210) including a computer readable medium comprising a plurality of instructions configured for execution at the device (200, 210), the instructions being configured to cause the device (200, 210) to:

display one or more views (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 11, 312);
execute one or more software elements, each software element being associated with a particular view (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312);
associate a multi-touch flag or an exclusive touch flag with each view (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312) , said multi-touch flag indicating whether a particular view is allowed to receive multiple simultaneous touches and said exclusive touch flag indicating whether a particular view allows other views to receive touch events while the particular view is receiving a touch event;
receive one or more touches at the one or more views (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312); and
selectively send one or more touch events, each touch event describing a received touch, to one or more of the software elements associated with the one or more views (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312) at which a touch was received based on the values of the multi-touch and exclusive touch flags.

22. The multi-touch enabled device (200, 210) of claim 21, wherein the multi-touch enabled device (200, 210) is a mobile telephone.

23. The multi-touch enabled device (200, 210) of claim 21, wherein the multi-touch enabled device (200, 210) is a digital media player.

2.8.    In de onbestreden Nederlandse vertaling luiden de conclusies van EP 948:

1. Werkwijze voor het hanteren van aanraak-manifestaties op een multi-touch apparaat (200, 210) omvattende:
het weergeven van één of meer beelden (301, 302, 303, 304, 305,306, 307, 308, 309, 310, 311, 312);
het uitvoeren van één of meer software-elementen, waarbij elk software-element is geassocieerd met een specifiek beeld (301, 302, 303, 304, 305,306, 307, 308, 309, 310, 311, 312);
het associëren van een multi-touch markering of een exclusieve aanraakmarkering met elk beeld (301, 302, 303, 304, 305,306, 307, 308, 309, 310, 311, 312), waarbij de genoemde multi-touch markering aangeeft of een specifiek beeld meerdere gelijktijdige aanrakingen kan

ontvangen en de genoemde exclusieve aanraakmarkering aangeeft of een specifiek beeld het
voor andere beelden mogelijk maakt om aanraakmanifestaties to ontvangen terwijl het
specifieke beeld een aanraakmanifestaties ontvangt;
het ontvangen van één of meer aanrakingen aan de één of meer beelden (301, 302, 303, 304,
305,306, 307, 308, 309, 310, 311, 312); en
het selectief versturen van één of meer aanraakmanifestaties, waarbij elke aanraakmanifestatie
een ontvangen aanraking beschrijft, naar één of meer van de software-elementen geassocieerd
met de één of meer beelden (301, 302, 303, 304, 305,306, 307, 308, 309, 310, 311, 312)
waarop een aanraking werd ontvangen op basis van de waarden van de multi-touch en
exclusieve aanraakmarkeringen.

2.    Werkwijze volgens conclusie 1, verder omvattende:
als een multi-touch markering is geassocieerd met een specifiek beeld, het gelijktijdig toelaten
van andere aanraakmanifestaties met een aanraak-manifestatie ontvangen op een specifiek
beeld dat moet worden verstuurd naar de software-elementen geassocieerd met andere
beelden.

3.    Werkwijze volgens conclusie 1, waarbij als een multi-touch markering is geassocieerd met
en[2] specifiek beeld, de multi-touch markering aangeeft of het software-element geassocieerd
met het specifieke beeld meerdere gelijktijdige aanrakingen kan verwerken die in dat beeld
zijn gelokaliseerd.

4.    Werkwijze volgens conclusie 1, waarbij de exclusieve aanraakmarkering voorkomt dat
aanraakmanifestaties worden verstuurd naar de software-elementen geassocieerd met andere
beelden dan een beeld met een bevestigde exclusieve aanraakmarkering terwijl een aanraking
wordt ontvangen aan het beeld me[3] de bevestigde exclusieve aanraakmarkering.

5.    Werkwijze volgens conclusie 1, waarbij het multi-touch apparaat (200, 210) een mobiele
telefoon is.

6.    Werkwijze volgens conclusie 1, waarbij het multi-touch apparaat (200, 210) een digitale
mediaspeler is.

7.    Werkwijze volgens conclusie 1, omvattende:
het associëren van een multi-touch markering met een eerste beeld;
het ontvangen van een eerste aanraking aan het eerste beeld, waarbij het eerste beeld één van
de één of meer beelden is;
het versturen van een aanraakmanifestatie die de eerste aanraking beschrijft naar een eerste
software-element, waarbij het eerste software-element één van de één of meer software-
elementen is en is geassocieerd met het eerste beeld;
het bepalen of de multi-touch markering geassocieerd met het eerste beeld aangeeft dat het
eerste beeld een multi-touch beeld is; en
als het eerste beeld geen multi-touch beeld is, het blokkeren van alle aanraakmanifestaties die
andere aanrakingen beschrijven gelokaliseerd in het eerste beeld tot de eerste aanraking niet
meer wordt ontvangen.

---

[2] Bedoeld zal zijn "een"
[3] Bedoeld zal zijn "met"

8.   Werkwijze volgens conclusie 7, verder omvattende
     het associëren van een exclusieve aanraakmarkering met elk van de één of meer beelden;
     het bepalen of de exclusieve aanraakmarkering geassocieerd met het eerste beeld aangeeft dat
     het eerste beeld een exclusief aanraakbeeld is; en
     als het eerste beeld een exclusief aanraakbeeld is, het blokkeren van alle aanraakmanifestaties
     die andere aanrakingen beschrijven gelokaliseerd in elk ander beeld dan het eerste beeld tot de
     eerste aanraking niet meer wordt ontvangen.

9.   Werkwijze volgens conclusie 8, waarbij het eerste beeld geen exclusief aanraakbeeld is, de
     werkwijze verder omvattende:
     het ontvangen van een tweede aanraking aan het multi-touch paneel, waarbij de tweede
     aanraking is gelokaliseerd aan het tweede beeld en is geassocieerd met een tweede software-
     element;
     het bepalen of de exclusieve aanraakmarkering geassocieerd met het tweede beeld aangeeft
     dat het tweede beeld een exclusief aanraakbeeld is; en
     als het tweede beeld een exclusief aanraakbeeld is, het voorkomen dat een
     aanraakmanifestatie geassocieerd met de tweede aanraking wordt verstuurd naar het tweede
     software-element tot de eerste aanraking niet meer wordt ontvangen.

10.  Werkwijze volgens conclusie 9, verder omvattende:
     als het tweede beeld geen exclusief aanraakbeeld is, het versturen van een aanraakmanifestatie
     die een tweede aanraking beschrijft naar het tweede software-element.

11.  Computer leesbaar medium omvattende een aantal instructies geconfigureerd voor uitvoering
     op een multi-touch apparaat (200, 210), waarbij de instructies zijn geconfigureerd om het
     multi-touch apparaat (200, 210) aan te zetten tot:
     het weergeven van één of meer beelden (301, 302, 303, 304, 305,306, 307, 308, 309, 310,
     311, 312);
     het uitvoeren van één of meer software-elementen, waarbij elk software-element is
     geassocieerd met een specifiek beeld (301, 302, 303, 304, 305,306, 307, 308, 309, 310, 311,
     312);
     het associëren van een multi-touch markering of een exclusieve aanraakmarkering met elk
     beeld (301, 302, 303, 304, 305,306, 307, 308, 309, 310, 311, 312), waarbij de genoemde
     multi-touch markering aangeeft of een specifiek beeld meerdere gelijktijdige aanrakingen kan
     ontvangen en de genoemde exclusieve aanraakmarkering aangeeft of een specifiek beeld het
     voor andere beelden mogelijk maakt om aanraakmanifestaties te ontvangen terwijl het
     specifieke beeld een aanraakmanifestaties ontvangt;
     het ontvangen van één of meer aanrakingen aan de één of meer beelden (301, 302, 303, 304,
     305,306, 307, 308, 309, 310, 311, 312); en
     het selectief versturen van één of meer aanraakmanifestaties, waarbij elke aanraakmanifestatie
     een ontvangen aanraking beschrijft, naar één of meer van de software-elementen geassocieerd
     met de één of meer beelden (301, 302, 303, 304, 305,306, 307, 308, 309, 310, 311, 312)
     waarop een aanraking werd ontvangen op basis van de waarden van de multi-touch en
     exclusieve aanraakmarkeringen.

12.  Computer leesbaar medium volgens conclusie 11, waarbij de instructies verder zijn
     geconfigureerd om het multi-touch apparaat (200, 210) aan te zetten tot:

396957 / KG ZA 11-730 en 396959 / KG ZA 11-731 14
24 augustus 2011

als een multi-touch markering is geassocieerd met een specifiek beeld, het mogelijk maken dat andere aanraakmanifestaties gelijktijdig met een aanraakmanifestatie ontvangen op een specifiek beeld worden verstuurd naar software-elementen geassocieerd met de andere beelden.

13.   Computer leesbaar medium volgens conclusie 11, waarbij als een multi-touch markering is geassocieerd met een specifiek beeld, de multi-touch markering aangeeft of het software-element geassocieerd met het specifieke beeld meerdere gelijktijdige aanrakingen kan verwerken die in dat beeld zijn gelokaliseerd.

14.   Computer leesbaar medium volgens conclusie 11, waarbij de exclusieve aanraakmarkering voorkomt dat aanraakmanifestaties worden verstuurd naar de software-elementen geassocieerd met andere beelden dan een beeld met een bevestigde exclusieve aanraakmarkering terwijl een aanraking wordt ontvangen aan het beeld me de bevestigde exclusieve aanraakmarkering.

15.   Computer leesbaar medium volgens conclusie 11, waarbij het multi-touch apparaat (200, 210) een mobiele telefoon is.

16.   Computer leesbaar medium volgens conclusie 11, waarbij het multi-touch apparaat (200, 210) een digitale mediaspeler is.

17.   Computer leesbaar medium volgens conclusie 11, waarbij de instructies verder zijn geconfigureerd om het multi-touch apparaat (200, 210) aan te zetten tot:
het associëren van een multi-touch markering met een eerste beeld;
het ontvangen van een eerste aanraking aan het eerste beeld, waarbij het eerste beeld één van de één of meer beelden is;
het versturen van een aanraakmanifestatie die de eerste aanraking beschrijft naar een eerste software-element, waarbij het eerste software-element één van de één of meer software-elementen is en is geassocieerd met het eerste beeld;
het bepalen of de multi-touch markering geassocieerd met het eerste beeld aangeeft dat het eerste beeld een multi-touch beeld is; en
als het eerste beeld geen multi-touch beeld is, het blokkeren van alle aanraakmanifestaties die andere aanrakingen beschrijven gelokaliseerd in het eerste beeld tot de eerste aanraking niet meer wordt ontvangen.

18.   Computer leesbaar medium volgens conclusie 17, waarbij de instructies verder zijn geconfigureerd om het multi-touch apparaat (200, 210) aan te zetten tot:
het associëren van een exclusieve aanraakmarkering met elk van de één of meer beelden:
het bepalen of de exclusieve aanraakmarkering geassocieerd met het eerste beeld aangeeft dat het eerste beeld een exclusief aanraakbeeld is; en
als het eerste beeld een exclusief aanraakbeeld is, het blokkeren van alle aanraakmanifestaties die andere aanrakingen beschrijven gelokaliseerd in elk ander beeld dan het eerste beeld tot de eerste aanraking niet meer wordt ontvangen.

19.   Computer leesbaar medium volgens conclusie 18, waarbij het eerste beeld geen exclusief aanraakbeeld is en de instructies verder zijn geconfigureerd om het multi-touch apparaat (200, 210) aan te zetten tot:

het ontvangen van een tweede aanraking aan het multi-touch paneel, waarbij de tweede
aanraking is gelokaliseerd aan het tweede beeld en is geassocieerd met een tweede software-
element;
het bepalen of de exclusieve aanraakmarkering geassocieerd met het tweede beeld aangeeft
dat het tweede beeld een exclusief aanraakbeeld is; en
als het tweede beeld een exclusief aanraakbeeld is, het voorkomen dat een
aanraakmanifestatie geassocieerd met de tweede aanraking wordt verstuurd naar het tweede
software-element tot de eerste aanraking niet meer wordt ontvangen.

20.   Computer leesbaar medium volgens conclusie 19, waarbij de instructies verder zijn
      geconfigureerd om het multi-touch apparaat (200, 210) aan te zetten tot:
      als het tweede beeld geen exclusief aanraakbeeld is, het versturen van een aanraakmanifestatie
      die een tweede aanraking beschrijft naar het tweede software-element.

21.   Multi-touch geactiveerd apparaat (200, 210) omvattende een computer leesbaar medium
      omvattende een aantal instructies geconfigureerd voor uitvoering op het apparaat (200, 210),
      waarbij de instructies zijn geconfigureerd om het apparaat (200, 210) aan te zetten tot:
      het weergeven van één of meer beelden (301, 302, 303, 304, 305,306, 307, 308, 309, 310,
      311, 312);
      het uitvoeren van één of meer software-elementen, waarbij elk software-element is
      geassocieerd met een specifiek beeld (301, 302, 303, 304, 305,306, 307, 308, 309, 310, 311,
      312);
      het associëren van een multi-touch markering of een exclusieve aanraakmarkering met elk
      beeld (301, 302, 303, 304, 305,306, 307, 308, 309, 310, 311, 312), waarbij de genoemde
      multi-touch markering aangeeft of een specifiek beeld meerdere gelijktijdige aanrakingen kan
      ontvangen en de genoemde exclusieve aanraakmarkering aangeeft of een specifiek beeld het
      voor andere beelden mogelijk maakt om aanraakmanifestaties te ontvangen terwijl het
      specifieke beeld een aanraakmanifestaties ontvangt;
      het ontvangen van één of meer aanrakingen aan de één of meer beelden (301, 302, 303, 304,
      305, 306, 307, 308, 309, 310, 311, 312); en
      het selectief versturen van een of weer aanraakmanifestaties, waarbij elke aanraakmanifestatie
      een ontvangen aanraking beschrijft, naar één of meer van de software-elementen geassocieerd
      met de één of meer beelden (301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312)
      waarop een aanraking werd ontvangen op basis van de waarden van de multi-touch en
      exclusieve aanraakmarkeringen.

22.   Multi-touch geactiveerd apparaat (200, 210) volgens conclusie 21, waarbij het multi-touch
      geactiveerde apparaat (200, 210) een mobiele telefoon is.

23.   Multi-touch geactiveerd apparaat (200, 210) volgens conclusie 21, waarbij het multi-touch
      geactiveerde apparaat (200, 210) een digitale mediaspeler is.

2.9.    Bij EP 948 behoort onder meer navolgende afbeelding.

396957 / KG ZA 11-730 en 396959 / KG ZA 11-731                                    16
24 augustus 2011



Fig. 3

2.10.    Apple is voorts houdster van Europees octrooi EP 1 964 022 (verder: EP 022) voor "*Unlocking a device by performing gestures on an unlock image*", verleend op 10 maart 2010 op een aanvrage van 30 november 2006, onder een inroeping van prioriteit van het Amerikaanse octrooi US 322549 met prioriteitsdatum 23 december 2005. Nederland is een van de gedesigneerde landen. Tegen de verlening van EP 022 is geen oppositie ingesteld.

2.11.    De conclusies van EP 022 luiden in de oorspronkelijke Engelse tekst:

1.    A computer-implemented method of controlling a portable electronic device (400, 1000) comprising a touch-sensitive display (408, 1014), comprising:

detecting (308, 908) contact with the touch-sensitive display (408, 1014) while the device is in a user-interface lock state;
transitioning (314, 914) the device (400, 1000) to a user-interface unlock state if the detected contact corresponds to a predefined gesture; and
maintaining (312, 912) the device (400, 1000) in the user-interface lock state if the detected contact does not correspond to the predefined gesture;
**characterized by**
moving an unlock image (402, 1002, 1008) along a predefined displayed path on the touch-sensitive display (408, 1014) in accordance with the contact, wherein the unlock image (402, 1002, 1008) is a graphical, interactive user-interface object with which a user interacts in order to unlock the device (400, 1000).

2.    The computer-implemented method of claim 1, further comprising displaying (304) the unlock image (402) and one or more visual cues on the touch-sensitive display (408) while the portable electronic device (400) is in a user-interface lock state, wherein the one or more visual cues indicate a movement of the unlock image (402) along the touch-sensitive display (408) that will unlock the device (400).

3.  The computer-implemented method of claim 1, further comprising displaying (304) the
    unlock image (402) on the touch-sensitive display (408) while the device (400) is in a user-
    interface lock state; and wherein the predefined gesture corresponds to moving the unlock
    image (402) along the predefined displayed path on the touch-sensitive display (408) to a
    predefined location on the touch-sensitive display (408) .

4.  The computer-implemented method of claim 1, further comprising displaying (304) the
    unlock image (402) on the touch-sensitive display (408) while the device (400) is in a user-
    interface lock state; and wherein the predefined gesture corresponds to moving the unlock
    image (402) across the touch-sensitive display (408) according to the predefined displayed
    path on the touch-sensitive display (408).

5.  The computer-implemented method of claim 1, further comprising:

    displaying (904) a first unlock image (1002) and a second unlock image (1008) on the
    touch-sensitive display (1014) while the device (1000) is in a user-interface lock state;
    and

    wherein transitioning the device (1000) to a user-interface unlock state comprises:

    transitioning (914) the device (1000) to a first active state corresponding to the first
    unlock image (1002) if the detected contact corresponds to a predefined gesture with
    respect to the first unlock image (1002); and
    transitioning (914) the device (1000) to a second active state distinct from the first active
    state if the detected contact corresponds to a predefined gesture with respect to the second
    unlock image (1008).

6.  A portable electronic device (100, 400, 1000), comprising:

    a touch-sensitive display (126, 408, 1014);
    one or more processors (106);
    memory (102); and
    one or more programs (132 to 146), wherein the one or more programs (132 to 146) are
    stored in the memory (102) and configured to be executed by the one or more processors
    (106), the programs (132 to 146) including instructions for:

    detecting (308, 908) contact with the touch-sensitive display (126, 408, 1014) while
    the device (100, 400, 1000) is in a user-interface lock state;
    transitioning (314, 914) the device (100, 400, 1000) to a user-interface unlock state
    if the detected contact corresponds to a predefined gesture;
    and
    maintaining (312, 912) the device (100, 400, 1000) in the user-interface lock state if
    the detected contact does not correspond to the predefined gesture;

    **characterized in that**
    the programs (132 to 146) further include instructions for moving an unlock image
    (402, 1002, 1008) along a predefined displayed path on the touch-sensitive display
    (126, 408, 1014) in accordance with the contact,

---

wherein the unlock image (402, 1002, 1008) is a graphical, interactive user-interface object with which a user interacts in order to unlock the device (100, 400, 1000).

7.    The portable electronic device of claim 6, wherein the device (100, 400, 1000) is a portable multifunction device.

8.    The portable electronic device of claim 6, further comprising instructions for preventing (302, 310, 312) the device (100, 400) from performing a predefined set of actions in response to detecting any contact with the touch-sensitive display (126, 408) that does not correspond to the predefined gesture while the device (100, 400) is in the user-interface lock state.

9.    The portable electronic device of claim 6, wherein the predefined displayed path is a channel (404).

10.   The portable electronic device of claim 6, wherein the detected contact is a movement of a point of contact across the touch-sensitive display (126, 408) while maintaining continuous contact with the touch-sensitive display (126, 408).

11.   The portable electronic device of claim 10, wherein the movement of the point of contact across the touch-sensitive display (126, 408) while maintaining continuous contact with the touch-sensitive display (126, 408) is a horizontal movement.

12.   The portable electronic device of claim 6, wherein the one or more programs (132 to 146) further comprise instructions for displaying (304) the unlock image (402) and one or more visual cues on the touch-sensitive display (126, 408) while the portable electronic device (100, 400) is in a user-interface lock state, wherein the one or more visual cues indicate a movement of the unlock image (402) along the touch-sensitive display (126, 408) that will unlock the device (100, 400).

13.   The portable electronic device of claim 12, wherein the one or more visual cues include an arrow.

14.   The portable electronic device of claim 12, wherein the one or more visual cues include text.

15.   The portable electronic device of claim 6, wherein the one or more programs (132 to 146) further comprise instructions for displaying (304) the unlock image (402) on the touch-sensitive display (126, 408) while the device (100, 400) is in a user-interface lock state; and wherein the predefined gesture corresponds to moving the unlock image (402) along the predefined displayed path on the touch-sensitive display (126, 408) to a predefined location on the touch-sensitive display (126, 408).

16.   The portable electronic device of claim 6, wherein the one or more programs (132 to 146) further comprise instructions for displaying (304) the unlock image on the touch-sensitive display while the device is in a user-interface lock state; and wherein the predefined gesture corresponds to moving the unlock image (402) across the touch-sensitive display (126, 408) according to a predefined displayed path on the touch-sensitive display (126, 408).

17.   The portable electronic device of claim 6, wherein the one or more programs further comprise instructions for displaying (904) a first unlock image (1002) and a second unlock image

(1008) on the touch-sensitive display (1014) while the device (1000) is in a user-interface
lock state; and
wherein the instructions for transitioning the device to a user-interface unlock state comprise:
    instructions for transitioning the device (1000) to a first active state corresponding to the
    first unlock image (1002) if the detected contact corresponds to a predefined gesture with
    respect to the first unlock image (1002), and
    instructions for transitioning the device (1000) to a second active state distinct from the
    first active state if the detected contact corresponds to a predefined gesture with respect to
    the second unlock image (1008).

18.    A computer program product with instructions configured for execution by one or more
    processors (106), which when executed by a portable electronic device (100, 400, 1000) with
    a touch-sensitive display (126, 408, 1014), cause the device (100, 400, 1000) to perform the
    method of any of claims 1 to 5.

## 2.12.    In de onbestreden Nederlandse vertaling luiden de conclusies van EP 022:

1.    Computer-geïmplementeerde werkwijze voor het besturen van een draagbare elektronische
    inrichting (400, 1000) die een aanraakgevoelig beeldscherm (408, 1014) omvat, omvattend:
        detecteren (308, 908) van contact met het aanraakgevoelige beeldscherm (408, 1014)
        terwijl de inrichting zich in een gebruikersinterface-vergrendeltoestand bevindt;
        overbrengen (314, 914) van de inrichting (400, 1000) naar een gebruikersinterface-
        ontgrendeltoestand indien het gedetecteerde contact correspondeert met een vooraf
        gedefinieerd gebaar; en
        houden (312, 912) van de inrichting (400, 1000) in de gebruikersinterface-
        vergrendeltoestand indien het gedetecteerde contact niet correspondeert met het vooraf
        gedefinieerde gebaar;

    **gekenmerkt** door

        bewegen van een ontgrendelbeeld (402, 1002, 1008) langs een vooraf gedefinieerd
        weergegeven pad op het aanraakgevoelige beeldscherm (408, 1014) in overeenstemming
        met het contact, waarbij het ontgrendelbeeld (402, 1002, 1008) een grafisch, interactief
        gebruikersinterface-object is waarmee een gebruiker in wisselwerking staat om de
        inrichting (400, 1000) te ontgrendelen.

2.    Computer-geïmplementeerde werkwijze volgens conclusie 1, verder omvattend weergeven
    (304) van het ontgrendelbeeld (402) en één of meer visuele aanwijzingen op het
    aanraakgevoelige beeldscherm (408) terwijl de draagbare elektronische inrichting (400) zich
    in een gebruikersinterface-vergrendeltoestand bevindt, waarbij de één of meer visuele
    aanwijzingen een beweging van het ontgrendelbeeld (402) langs het aanraakgevoelige
    beeldscherm (408) aanduiden, die de inrichting (400) zal ontgrendelen.

3.    Computer-geïmplementeerde werkwijze volgens conclusie 1, verder omvattend weergeven
    (304) van het ontgrendelbeeld (402) op het aanraakgevoelige beeldscherm (408) terwijl de
    inrichting (400) zich in een gebruikersinterface-vergrendeltoestand bevindt; en
    waarbij het vooraf gedefinieerde gebaar correspondeert met bewegen van het ontgrendelbeeld
    (402) langs het vooraf gedefinieerde weergegeven pad op het aanraakgevoelige beeldscherm
    (408) naar een vooraf gedefinieerde locatie op het aanraakgevoelige beeldscherm (408).

4.    Computer- geïmplementeerde werkwijze volgens conclusie 1, verder omvattend weergeven
       (304) van het ontgrendelbeeld (402) op het aanraakgevoelige beeldscherm (408) terwijl de
       inrichting (400) zich in een gebruikersinterface-vergrendeltoestand bevindt; en
       waarbij het vooraf gedefinieerde gebaar correspondeert met bewegen van het ontgrendelbeeld
       (402) over het aanraakgevoelige beeldscherm (408) in overeenstemming met het vooraf
       gedefinieerde weergegeven pad op het aanraakgevoelige beeldscherm (408).

5.    Computer-geïmplementeerde werkwijze volgens conclusie 1, verder omvattend:

       weergeven (904) van een eerste ontgrendelbeeld (1002) en een tweede ontgrendelbeeld
       (1008) op het aanraakgevoelige beeldscherm (1014) terwijl de inrichting (1000) zich in
       een gebruikersinterface-vergrendeltoestand bevindt; en
       waarbij het overbrengen van de inrichting (1000) in een gebruikersinterface-
       ontgrendeltoestand omvat:
       overbrengen (914) van de inrichting (1000) in een eerste actieve toestand die
       correspondeert met het eerste ontgrendelbeeld (1002) indien het gedetecteerde contact
       correspondeert met een vooraf gedefinieerd gebaar met betrekking tot het eerste
       ontgrendelbeeld (1002); en
       overbrengen (914) van de inrichting (1000) in een tweede actieve toestand die anders is
       dan de eerste actieve toestand indien het gedetecteerde contact correspondeert met een
       vooraf gedefinieerd gebaar met betrekking tot het tweede ontgrendelbeeld (1008).

6.    Draagbare elektronische inrichting (100, 400, 1000), omvattend:
       een aanraakgevoelig beeldscherm (126, 408, 1014);

       één of meer processoren (106);
       geheugen (102); en
       één of meer programma's (132 — 146), waarbij het ene of de meerdere programma's (132
       — 146) zijn opgeslagen in het geheugen (102) en zijn geconfigureerd om uitgevoerd te
       worden door de ene of meerdere processoren (106), waarbij de programma's (132 — 146)
       instructies omvatten voor:
       detecteren (308, 908) van contact met het aanraakgevoelige beeldscherm (126, 408, 1014)
       terwijl de inrichting (100, 400, 1000) zich in een gebruikersinterface-vergrendeltoestand
       bevindt;
       overbrengen (314, 914) van de inrichting (100, 400, 1000) in een gebruikersinterface-
       ontgrendeltoestand indien het gedetecteerde contact correspondeert met een vooraf
       gedefinieerd gebaar; en
       houden (312, 912) van de inrichting (100, 400, 1000) in de gebruikersinterface-
       vergrendeltoestand indien het gedetecteerde contact niet correspondeert met het vooraf
       gedefinieerde gebaar;

       **met het kenmerk** dat

       de programma's (132 — 146) verder instructies omvatten voor het bewegen van een
       ontgrendelbeeld (402, 1002, 1008) langs een vooraf gedefinieerd weergegeven pad op het
       aanraakgevoelige beeldscherm (126, 408, 1014) in overeenstemming met het contact,
       waarbij het ontgrendelbeeld (402, 1002, 1008) een grafisch, interactief

gebruikersinterface-object is waarmee een gebruiker in wisselwerking staat om de inrichting (100, 400, 1000) te ontgrendelen.

7.   Draagbare elektronische inrichting volgens conclusie 6, waarbij de inrichting (100, 400, 1000) een draagbare multifunctie-inrichting is.

8.   Draagbare elektronische inrichting volgens conclusie 6, verder omvattend instructies om te verhinderen (302, 310, 312) dat de inrichting (100, 400) een vooraf gedefinieerde reeks van acties uitvoert als reactie op het detecteren van enig contact met het aanraakgevoelige beeldscherm (126, 408) dat niet correspondeert met het vooraf gedefinieerde gebaar terwijl de inrichting (100, 400) zich in de gebruikersinterface-vergrendeltoestand bevindt.

9.   Draagbare elektronische inrichting volgens conclusie 6, waarbij het vooraf gedefinieerde weergegeven pad een kanaal (404) is.

10.   Draagbare elektronische inrichting volgens conclusie 6, waarbij het gedetecteerde contact een beweging van een contactpunt over het aanraakgevoelige beeldscherm (126, 408) is, terwijl continu contact met het aanraakgevoelige beeldscherm (126, 408) wordt gehouden.

11.   Draagbare elektronische inrichting volgens conclusie 10, waarbij de beweging van het contactpunt over het aanraakgevoelige beeldscherm (126, 408), terwijl continu contact wordt gehouden met het aanraakgevoelige beeldscherm (126, 408), een horizontale beweging is.

12.   Draagbare elektronische inrichting volgens conclusie 6, waarbij het ene of meerdere programma's (132 — 146) verder instructies omvatten voor het weergeven (304) van het ontgrendelbeeld (402) en één of meer visuele aanwijzingen op het aanraakgevoelige beeldscherm (126, 408) terwijl de draagbare elektronische inrichting (100, 400) zich in een gebruikersinterface-vergrendeltoestand bevindt, waarbij de ene of meerdere visuele aanwijzingen een beweging van het ontgrendelbeeld (402) langs het aanraakgevoelige beeldscherm (126, 408) aanduiden die de inrichting (100, 400) zal ontgrendelen.

13.   Draagbare elektronische inrichting volgens conclusie 12, waarbij de ene of meerdere visuele aanwijzingen een pijl omvatten.

14.   Draagbare elektronische inrichting volgens conclusie 12, waarbij de ene of meerdere visuele aanwijzingen tekst omvatten.

15.   Draagbare elektronische inrichting volgens conclusie 6,

waarbij het ene of de meerdere programma's (132 — 146) verder instructies omvatten voor het weergeven (304) van het ontgrendelbeeld (402) op het aanraakgevoelige beeldscherm (126, 408) terwijl de inrichting (100, 400) zich in een gebruikersinterface-vergrendeltoestand bevindt; en
waarbij het vooraf gedefinieerde gebaar correspondeert met het bewegen van het ontgrendelbeeld (402) langs het vooraf gedefinieerde weergegeven pad op het aanraakgevoelige beeldscherm (126, 408) naar een vooraf gedefinieerde locatie op het aanraakgevoelige beeldscherm (126, 408).

16. Draagbare elektronische inrichting volgens conclusie 6,

waarbij het ene of de meerdere programma's (132 — 146) verder instructies omvatten voor het weergeven (304) van het ontgrendelbeeld op het aanraakgevoelige beeldscherm terwijl de inrichting zich in een gebruikersinterface-vergrendeltoestand bevindt; en
waarbij het vooraf gedefinieerde gebaar correspondeert met het bewegen van het ontgrendelbeeld (402) over het aanraakgevoelige beeldscherm (126, 408) in overeenstemming met een vooraf gedefinieerd weergegeven pad op het aanraakgevoelige beeldscherm (126, 408).

17. Draagbare elektronische inrichting volgens conclusie 6, waarbij het ene of de meerdere programma's verder instructies omvatten voor het weergeven (904) van een eerste ontgrendelbeeld (1002) en een tweede ontgrendelbeeld (1008) op het aanraakgevoelige beeldscherm (1014) terwijl de inrichting (1000) zich in een gebruikersinterface-vergrendeltoestand bevindt; en

waarbij de instructies voor het overbrengen van de inrichting in een gebruikersinterface-ontgrendeltoestand omvatten:
instructies voor het overbrengen van de inrichting (1000) in een eerste actieve toestand die correspondeert met het eerste ontgrendelbeeld (1002) indien het gedetecteerde contact correspondeert met een vooraf gedefinieerd gebaar met betrekking tot het eerste ontgrendelbeeld (1002), en
instructies voor het overbrengen van de inrichting (1000) in een tweede actieve toestand die anders is dan de eerste actieve toestand indien het gedetecteerde contact correspondeert met een vooraf gedefinieerd gebaar met betrekking tot het tweede ontgrendelbeeld (1008).

18.   Computerprogrammaproduct met instructies die zijn geconfigureerd voor uitvoering door één of meer processoren (106), die, wanneer ze worden uitgevoerd door een draagbare elektronische inrichting (100, 400, 1000) met een aanraakgevoelig beeldscherm (126, 408, 1014), de inrichting (100, 400, 1000) ertoe aanzetten om de werkwijze volgens één van de conclusies 1 - 5 uit te voeren.

2.13.   Bij EP 022 behoren onder meer de volgende figuren.





2.14.    Apple is tot slot houdster van de volgende modelrechten:

- Gemeenschapsmodel 181607-0001 ingediend op 24 mei 2004 met prioriteit van 17 maart 2004 en ingeschreven op 10 augustus 2004 voor "zakcomputers";
- Gemeenschapsmodelrecht 748280-0006, ingediend op 28 juni 2007 met prioriteit van 5 januari 2007 en ingeschreven op 28 augustus 2007 voor "apparatuur voor het opnemen of weergeven van geluid of beeld";
- Gemeenschapsmodelrecht 888920-0018, ingediend op 29 februari 2008 met prioriteit van 31 augustus 2007 en ingeschreven op 13 mei 2008 voor "electronische toestellen";
- Gemeenschapsmodelrecht 748694-0003, ingediend op 28 juni 2007 met prioriteit van 23 juni 2007 en ingeschreven op 5 december 2007 voor "graphical user interfaces";
- Gemeenschapsmodelrecht 1236590-0011, ingediend op 24 september 2010 met prioriteit van 19 april 2010 en ingeschreven op 4 februari 2011 voor "electronische toestellen";
- Gemeenschapsmodelrecht 1260624-0015, ingediend op 16 februari 2011 met prioriteit van 16 augustus 2010 en ingeschreven op 8 april 2011 voor "electronische toestellen". [Apple doet niet langer een beroep op dit model]

De afbeeldingen bij de modeldepots zullen bij de beoordeling worden weergegeven.

2.15.    Gedaagde sub 1, Samsung Electronics Co. Limited, maakt deel uit van de wereldwijd opererende Samsung Group en produceert en verhandelt producten op het gebied van (consumenten)elektronica, waaronder smartphones en tabletcomputers.

2.16.    Samsung voert onder meer de volgende smartphones:

- Galaxy S GT-19000;
- Galaxy Ace GT-S5830;
- Galaxy S II GT-19100;

en de volgende tabletcomputers:

- Galaxy Tab GT-P1000;
- Galaxy Tab 10.1v GT-P7100;
- Galaxy Tab 10.1 GT-P7510.

2.17.     Gedaagde sub 2, Samsung Electronics Benelux B.V., heeft als enige aandeelhouder gedaagde sub 1 en is blijkens het handelsregister een algemene handelsmaatschappij en groothandel in computer- en elektronica-apparatuur. Zij is houdster van de op Nederland gerichte website www.samsung.nl. Via deze website biedt Samsung in Nederland de smartphones en tabletcomputers aan die onderwerp zijn van deze procedure.

2.18.     Gedaagde sub 3, Samsung Electronics Logistics Europe B.V., heeft eveneens als enige aandeelhouder gedaagde sub 1 en houdt zich bezig met opslag, distributie en logistiek van (onder meer) Samsungs elektronicaproducten binnen Europa. Daarbij maakt zij gebruik van warenhuizen in Tilburg en Breda.

2.19.     Gedaagde sub 4, Samsung Electronics Overseas B.V., heeft als doelomschrijving volgens het handelsregister onder meer: verhandelen, vervaardigen, (ver) kopen, in- en uitvoeren, distribueren van elektronische apparatuur.

## 3.      Het geschil

3.1.     Apple vordert, na vermindering van eis[4], veroordeling bij vonnis, uitvoerbaar bij voorraad met betrekking tot de tabletcomputers van Samsung (KG 11-730):

<u>Verbodsvorderingen primair:</u>

(A)   Gedaagden te verbieden om met onmiddellijke ingang na betekening van het te wijzen vonnis op enigerlei wijze, direct dan wel indirect, door het vervaardigen, in voorraad hebben, aanbieden, invoeren, in het verkeer brengen, verkopen en/of anderszins verhandelen van tablet computers, inbreuk te maken op de Nederlandse delen van EP 2.059.868, EP 2.098.948 en EP 1.964.022;

(B)   Gedaagden sub 2-4 te verbieden om met onmiddellijke ingang na betekening van het te wijzen vonnis op enigerlei wijze, direct dan wel indirect, door het vervaardigen, in voorraad hebben, aanbieden, invoeren, in het verkeer brengen, verkopen en/of anderszins verhandelen van tablet computers, inbreuk te maken op de buitenlandse delen van EP 2.059.868, EP 2.098.948 en EP 1.964.022;

(C)   Gedaagde sub 1 te verbieden om met onmiddellijke ingang na betekening van het te wijzen vonnis op enigerlei wijze, door het vervaardigen, in voorraad hebben, aanbieden, invoeren, uitvoeren, in het verkeer brengen, verkopen en/of anderszins verhandelen van tablet computers, in Nederland inbreuk te maken op het Gemeenschapsmodelrecht met het nummer 181607-0001;

(D)   Gedaagden sub 2-4 te verbieden om met onmiddellijke ingang na betekening van het te wijzen vonnis op enigerlei wijze, door het vervaardigen, in voorraad hebben, aanbieden, invoeren, uitvoeren, in het verkeer brengen, verkopen en/of anderszins verhandelen van tablet computers, in de Europese Unie inbreuk te maken op het Gemeenschapsmodelrecht met het nummer 181607-0001;

(E)   Gedaagden te verbieden om met onmiddellijke ingang na betekening van het te wijzen vonnis op enigerlei wijze in Nederland inbreuk te maken op de auteursrechten van eiseres met betrekking tot de iPad 1 en de iPad 2;

---

[4] De vorderingen ten aanzien van Gemeenschapsmodelrecht 1260624-0015 zijn bij brief binnengekomen ter griffie op 28 juli 2011 ingetrokken, zoals hiervoor gemeld.

Verbodsvordering subsidiair:

(F)   Gedaagden te verbieden om met onmiddellijke ingang na betekening van het te wijzen vonnis de Galaxy
      Tab, de Galaxy Tab 10.1v en/of de Galaxy Tab 10.1 in Nederland te vervaardigen, in voorraad te hebben,
      aan te bieden, in te voeren, in het verkeer te brengen, te verkopen en/of anderszins te verhandelen.

Nevenvorderingen:

(G)   Gedaagden te gebieden om aan de raadslieden van eiseres binnen 30 kalenderdagen na betekening van het
      ten dezen te wijzen vonnis opgave te doen van de omzetten en bruto winsten die met de inbreukmakende
      producten gerealiseerd zijn, gecertificeerd door een onafhankelijk registeraccountant, alsmede opgave te
      doen van alle overige voor de berekening van de winst en/of schadevergoeding van belang zijnde
      informatie;

(H)   Gedaagden te gebieden binnen een periode van 7 dagen na betekening van het in deze zaak te wijzen
      vonnis al hun afnemers, voor zover deze afnemers gevestigd zijn in de Europese Unie, althans in de
      landen waarin de ingeroepen octrooirechten van kracht zijn, althans in Nederland, schriftelijk te
      verzoeken de inbreukmakende producten binnen twee weken te retourneren met het aanbod de
      factuurprijs en transportkosten te vergoeden, met gebruikmaking van uitsluitend de volgende tekst (d.w.z.
      zonder een aanbiedingsbrief of andere toegevoegde tekst):
      voor Nederlandse afnemers:
      *"Geachte [naam koper],*
      *Enige tijd geleden hebben wij u tablet computers uit de Galaxy range geleverd. In het bijzonder betreft*
      *het tablet computers van het type Galaxy Tab (GT-P1000) en Galaxy Tab 10.1v (GT-P7100) [aan te*
      *vullen met andere inbreukmakende tablet computers].*
      *Bij vonnis van [datum vonnis] heeft de voorzieningenrechter van de rechtbank te 's-Gravenhage*
      *geoordeeld dat het vervaardigen, in voorraad houden, aanbieden, verkopen en/of leveren van deze*
      *producten INBREUK MAAKT op de octrooirechten, modelrechten en/of auteursrechten van Apple Inc,*
      *althans dat wij anderszins onrechtmatig hebben gehandeld jegens Apple Inc.*
      *Wij verzoeken u de aan u geleverde Galaxy tablet computers, voor zover u deze nog in voorraad heeft,*
      *binnen 14 dagen na dagtekening van deze brief aan ons te retourneren.*
      *Uiteraard zullen wij u de door u betaalde prijs evenals de transportkosten vergoeden.*
      *Voor de goede orde maken wij melding van het feit dat u, door het in voorraad houden, het aanbieden*
      *en/of het verkopen van genoemde Galaxy tablet computers, inbreuk maakt op de intellectuele*
      *eigendomsrechten van Apple Inc."*
      voor buitenlandse afnemers:
      *"Dear [name buyer],*
      *Some time ago we supplied tablet computers from the Galaxy range to you. More in particular this*
      *concerns the Galaxy Tab (GT-P1000) and Galaxy Tab 10.1v (GT-P7100) [to be completed with other*
      *infringing tablet computers].*
      *By judgment of [date judgment] the Judge in Interlocutory Proceedings of the Court The Hague, the*
      *Netherlands, ruled that the production, storing, offering, selling and/or supplying of these products*
      *COMMITS INFRINGEMENT of the patent rights, design rights and/or copyrights of Apple Inc, in any*
      *event that we have acted unlawfully towards Apple Inc.*
      *We request you to return to us the Galaxy tablet computers supplied to you, insofar as you still have these*
      *in stock, within 14 days after the date of signing of this letter. We will of course compensate the price*
      *paid by you as well as the transport costs.*
      *For the record we would like to mention the fact that by storing, offering and/or selling of the above*
      *mentioned Galaxy tablet computers, you commit infringement of the intellectual property rights of Apple*
      *Inc."*
      althans een brief met een door de voorzieningenrechter in goede justitie te bepalen inhoud, onder
      gelijktijdige toezending van kopieën van deze brief alsmede een lijst van geadresseerden met volledige
      adresgegevens aan de raadslieden van eiseres;

(I)   Gedaagden te gebieden om de markt binnen een periode van 48 uur na betekening van het te wijzen
      vonnis te informeren met betrekking tot de inbreuk op de octrooirechten, het modelrecht en/of de
      auteursrechten van eiseres, althans de onrechtmatige handelingen, door een boodschap op de homepage
      van hun  Nederlandse website www.samsung.nl te plaatsen en deze boodschap onafgebroken gedurende
      een periode van vier weken op de homepage te laten staan, zonder enig verder commentaar in woord of in

beeld, met slechts de volgende inhoud en in neutrale en gangbare typografie met een lettergrootte die niet
afwijkt van de overige tekst op de homepage:
*"Onlangs hebben wij in Nederland tablet computers uit de Galaxy range te koop aangeboden en
geleverd. In het bijzonder betreft het tablet computers van het type Galaxy Tab (GT-P1000) en Galaxy
Tab 10.1v (GT-P7100).*
*Bij vonnis van [datum vonnis] heeft de voorzieningenrechter van de rechtbank te 's-Gravenhage
geoordeeld dat met de verkoop van genoemde tablet computers inbreuk wordt gemaakt op de
octrooirechten, modelrechten en auteursrechten van Apple Inc, althans dat wij anderszins onrechtmatig
hebben gehandeld jegens Apple Inc, en ons verboden om de genoemde Galaxy tablet computers nog
langer op de Nederlandse markt te verhandelen."*
althans een boodschap met een door de voorzieningenrechter in goede justitie te bepalen inhoud, waarbij
de boodschap in een "pop-up window" geplaatst zal worden die automatisch verschijnt wanneer een
internetgebruiker de Nederlandse website van gedaagden bezoekt en welke boodschap een zodanige
omvang zal hebben dat deze tenminste een kwart van het zichtbare gedeelte van de homepage bedekt,
zonder deze homepage omlaag te hoeven scrollen en waarbij de tekst van de boodschap zo ontworpen is
dat de ruimte van het pop-up window volledig gebruikt wordt en de boodschap goed leesbaar is;

(J)   Gedaagden te gebieden aan eiseres een onmiddellijk opeisbare dwangsom te betalen van EUR 100.000
      voor elke dag of gedeelte daarvan of, zulks ter keuze van eiseres, per inbreukmakend product, waarop het
      aan gedaagden kan worden toegerekend dat de verboden zoals opgenomen onder (A) - (F) en de geboden
      zoals opgenomen onder (G)-(I) niet geheel of niet deugdelijk worden nageleefd;

(K)   De termijn waarbinnen de eis in de hoofdzaak moet zijn ingesteld als bedoeld in art. 1019i Rv te bepalen
      op zes (6) maanden na het in deze zaak te wijzen vonnis, dan wel een door de voorzieningenrechter in
      goede justitie te bepalen termijn;

(L)   Gedaagden te veroordelen in de proceskosten overeenkomstig art. 1019h Rv.


# en met betrekking tot de smartphones van Samsung (KG 11-731):

Verbodsvorderingen primair:

(A)   Gedaagden te verbieden om met onmiddellijke ingang na betekening van het te wijzen vonnis op enigerlei
      wijze, direct dan wel indirect, door het vervaardigen, in voorraad hebben, aanbieden, invoeren, in het
      verkeer brengen, verkopen en/of anderszins verhandelen van smartphones, inbreuk te maken op de
      Nederlandse delen van EP 2.059.868, EP 2.098.948 en EP 1.964.022;

(B)   Gedaagden sub 2-4 te verbieden om met onmiddellijke ingang na betekening van het te wijzen vonnis op
      enigerlei wijze, direct dan wel indirect, door het vervaardigen, in voorraad hebben, aanbieden, invoeren,
      in het verkeer brengen, verkopen en/of anderszins verhandelen van smartphones, inbreuk te maken op de
      buitenlandse delen van EP 2.059.868, EP 2.098.948 en EP 1.964.022;

(C)   Gedaagden sub 1 te verbieden om met onmiddellijke ingang na betekening van het te wijzen vonnis op
      enigerlei wijze, door het vervaardigen, in voorraad hebben, aanbieden, invoeren, uitvoeren, in het verkeer
      brengen, verkopen en/of anderszins verhandelen van smartphones, in Nederland inbreuk te maken op de
      Gemeenschapsmodelrechten met de nummers: 748280-0006, 888920-0018, 1236590-0001 en 748694-
      0003;

(D)   Gedaagden sub 2-4 te verbieden om met onmiddellijke ingang na betekening van het te wijzen vonnis op
      enigerlei wijze, door het vervaardigen, in voorraad hebben, aanbieden, invoeren, uitvoeren, in het verkeer
      brengen, verkopen en/of anderszins verhandelen van smartphones, in de Europese Unie inbreuk te maken
      op de Gemeenschapsmodelrechten met de nummers: 748280-0006, 888920-0018, 1236590-0001 en
      748694-0003;

(E)   Gedaagden te verbieden om met onmiddellijke ingang na betekening van het te wijzen vonnis op enigerlei
      wijze in Nederland inbreuk te maken op de auteursrechten van eiseres met betrekking tot de iPhone 3G en
      de iPhone 4;

Verbodsvordering subsidiair:

(F)    Gedaagden te verbieden om met onmiddellijke ingang na betekening van het te wijzen vonnis de Galaxy
       S, de Galaxy Ace en/of de Galaxy S II in Nederland te vervaardigen, in voorraad te hebben, aan te bieden,
       in te voeren, in het verkeer te brengen, te verkopen en/of anderszins te verhandelen;

Nevenvorderingen:

(G)    Gedaagden te gebieden om aan de raadslieden van eiseres binnen 30 kalender dagen na betekening van
       het ten dezen te wijzen vonnis opgave te doen van de omzetten en bruto winsten die met de
       inbreukmakende producten gerealiseerd zijn, gecertificeerd door een onafhankelijk registeraccountant,
       alsmede opgave te doen van alle overige voor de berekening van de winst en/of schadevergoeding van
       belang zijnde informatie;

(H)    Gedaagden te gebieden binnen een periode van 7 dagen na betekening van het in deze zaak te wijzen
       vonnis al hun afnemers, voor zover deze afnemers gevestigd zijn in de Europese Unie, althans in de
       landen waarin de ingeroepen octrooirechten van kracht zijn, althans in Nederland, schriftelijk te
       verzoeken de inbreukmakende producten binnen twee weken te retourneren met het aanbod de
       factuurprijs en transportkosten te vergoeden, met gebruikmaking van uitsluitend de volgende tekst
       (d.w.z. zonder een aanbiedingsbrief of andere toegevoegde tekst):
       voor Nederlandse afnemers:
       *"Geachte [naam koper],*
       *Enige tijd geleden hebben wij u mobiele telefoons uit de Galaxy range geleverd. In het bijzonder betreft*
       *het smartphones van het type Galaxy S (GT-I9000), Galaxy SII (GTI9100) en Galaxy Ace (GT-S5830)*
       *[aan te vullen met andere inbreukmakende telefoons] .*
       *Bij vonnis van [datum vonnis] heeft de voorzieningenrechter van de rechtbank te 's-Gravenhage*
       *geoordeeld dat het vervaardigen, in voorraad houden, aanbieden, verkopen en/of leveren van deze*
       *producten INBREUK MAAKT op de octrooirechten, modelrechten en/of auteursrechten van Apple Inc,*
       *althans dat wij anderszins onrechtmatig hebben gehandeld jegens Apple Inc.*
       *Wij verzoeken u de aan u geleverde Galaxy smartphones, voor zover u deze nog in voorraad heeft, binnen*
       *14 dagen na dagtekening van deze brief aan ons te retourneren.*
       *Uiteraard zullen wij u de door u betaalde prijs evenals de transportkosten vergoeden.*
       *Voor de goede orde maken wij melding van het feit dat u, door het in voorraad houden, het aanbieden*
       *en/of het verkopen van genoemde Galaxy smartphones, inbreuk maakt op de intellectuele*
       *eigendomsrechten van Apple Inc."*
       voor buitenlandse afnemers:
       *"Dear [name buyer],*
       *Some time ago we supplied mobile phones from the Galaxy range to you. More in particular this*
       *concerns the Galaxy S (GT-I9000), the Galaxy S II (GT-I99100) and the Galaxy Ace (GT-S5830) [to be*
       *completed with other infringing smartphones].*
       *By judgment of [date judgment] the Judge in Interlocutory Proceedings of the Court The Hague, the*
       *Netherlands, ruled that the production, storing, offering, selling and/or supplying of these products*
       *COMMITS INFRINGEMENT of the patent rights, design rights and/or copyrights of Apple Inc, in any*
       *event that we have acted unlawfully towards Apple Inc.*
       *We request you to return to us the Galaxy smartphones supplied to you, insofar as you still have these in*
       *stock, within 14 days after the date of signing of this letter. We will of course compensate the price paid*
       *by you as well as the transport costs.*
       *For the record we would like to mention the fact that by storing, offering and/or selling of the above*
       *mentioned Galaxy smartphones, you commit infringement of the intellectual property rights of Apple*
       *Inc."*
       althans een brief met een door de voorzieningenrechter in goede justitie te bepalen inhoud, onder
       gelijktijdige toezending van kopieën van deze brief alsmede een lijst van geadresseerden met volledige
       adresgegevens aan de raadslieden van eiseres;

(I)    Gedaagden te gebieden om de markt binnen een periode van 48 uur na betekening van
       het te wijzen vonnis te informeren met betrekking tot de inbreuk op de octrooirechten, modelrechten en/of
       auteursrechten van eiseres, althans de onrechtmatige handelingen, door een boodschap op de homepage
       van hun Nederlandse website www.samsung.nl te plaatsen en deze boodschap onafgebroken gedurende
       een periode van vier weken op de homepage te laten staan, zonder enig verder commentaar in woord of in

396957 / KG ZA 11-730 en 396959 / KG ZA 11-731                                    28
24 augustus 2011

beeld, met slechts de volgende inhoud en in neutrale en gangbare typografie met een lettergrootte die niet
afwijkt van de overige tekst op de homepage:
*"Onlangs hebben wij in Nederland mobiele telefoons uit de Galaxy range te koop aangeboden en
geleverd. In het bijzonder betreft het smartphones van het type Galaxy S (GT-I9000), Galaxy S II (GT-
I9100) en Galaxy Ace (GT-S5830).
Bij vonnis van [datum vonnis] heeft de voorzieningenrechter van de rechtbank te 's-Gravenhage
geoordeeld dat met de verkoop van genoemde smartphones inbreuk wordt gemaakt op de octrooirechten,
modelrechten en auteursrechten van Apple Inc, althans dat wij anderszins onrechtmatig hebben
gehandeld jegens Apple Inc, en ons verboden om de genoemde Galaxy smartphones nog langer op de
Nederlandse markt te verhandelen."*
althans een boodschap met een door de voorzieningenrechter in goede justitie te bepalen inhoud, waarbij
de boodschap in een "pop-up window"geplaatst zal worden die automatisch verschijnt wanneer een
internetgebruiker de Nederlandse website van gedaagden bezoekt en welke boodschap een zodanige
omvang zal hebben dat deze tenminste een kwart van het zichtbare gedeelte van de homepage bedekt,
zonder deze homepage omlaag te hoeven scrollen en waarbij de tekst van de boodschap zo ontworpen is
dat de ruimte van het pop-up window volledig gebruikt wordt en de boodschap goed leesbaar is;

(J)     Gedaagden te gebieden aan eiseres een onmiddellijk opeisbare dwangsom te betalen van EUR 100.000
        voor elke dag of gedeelte daarvan of, zulks ter keuze van eiseres, per inbreukmakend product, waarop het
        aan gedaagden kan worden toegerekend dat de verboden zoals opgenomen onder (A) - (F) en de geboden
        zoals opgenomen onder (G) - (I) niet geheel of niet deugdelijk worden nageleefd;

(K)     De termijn waarbinnen de eis in de hoofdzaak moet zijn ingesteld als bedoeld in art. 1019i Rv te bepalen
        op zes (6) maanden na het in deze zaak te wijzen vonnis, dan wel een door de voorzieningenrechter in
        goede justitie te bepalen termijn;

(L)     Gedaagden te veroordelen in de proceskosten overeenkomstig art. 1019h Rv.


3.2.     Apple voert daartoe kort gezegd aan dat Samsung inbreuk maakt op haar
voormelde intellectuele eigendomsrechten volgens onderstaande schema's.
Aangaande de Samsung Galaxy tablets:

|                    | Tab | Tab 10.1v | Tab 10.1 |
|--------------------|-----|-----------|----------|
| EP '868            | X   | X         | X        |
| EP '948            |     | X         | X        |
| EP '022            | X   | X         | X        |
| CDR 181607-0001    |     | X         | X        |

Aangaande de Samsung Galaxy smartphones:

|                   | S | S II | Ace |
|-------------------|---|------|-----|
| EP '868           | X | X    | X   |
| EP '948           |   | X    |     |
| EP '022           | X | X    | X   |
| CDR 888920-0018   | X |      |     |
| CDR 748280-0006   | X |      |     |
| CDR 1236590-0011  |   |      | X   |
| CDR 1260624-0015  |   | X*   |     |
| CDR 748694-0003   | X |      |     |

*Ingetrokken vordering

Daarnaast voert Apple aan dat Samsung inbreuk maakt op haar auteursrechten ter zake de iPad 1, 2 en iPhone 3, 4 alsmede slaafs haar stijl nabootst.

3.3.     Samsung voert verweer, kort gezegd stellende dat de zaken te gecompliceerd zijn voor kort geding, sprake is van misbruik van procesrecht, dat er geen sprake is van een spoedeisend belang, dat de octrooien en modellen ongeldig zijn, dat zij daarop geen inbreuk maakt, dat er geen sprake is van auteursrechtelijke bescherming in Nederland of van inbreuk op die rechten dan wel slaafse stijlnabootsing.

3.4.     Op de stellingen van partijen wordt hierna, voor zover van belang, nader ingegaan.

## 4.     De beoordeling

### *Bevoegdheid*

4.1.     Hoewel niet bestreden wordt ambtshalve als volgt ter zake de grensoverschrijdende bevoegdheid van de rechtbank ten aanzien van gedaagden sub 2-4 overwogen, gelet op het feit dat de ingeroepen octrooien met een nietigheidsverweer worden begroet. Deze rechtbank heeft bij vonnis van 22 december 2010 in de zaak Solvay/Honeywell (LJN BP6970) een prejudiciële vraag over de exclusieve bevoegdheidsregel van artikel 22 lid 4 EEX-verordening aan het Hof van Justitie van de Europese Unie gesteld in verband met de bevoegdheid voor een provisionele maatregel (aldaar aanhangig met zaaknummer C-616/10). Zolang het Hof van Justitie niet anders heeft beslist, is er evenwel vanuit te gaan dat er in kort geding grensoverschrijdende bevoegdheid kan worden aangenomen, ook al is er sprake van een nietigheidsverweer (vgl. Gerechtshof 's-Gravenhage 12 juli 2011, LJN BR1364, Yellow Page/Yell). Zodoende is er grensoverschrijdende bevoegdheid ten aanzien van de ingeroepen octrooirechten. Voor wat betreft de ingeroepen modelrechten geldt dat

artikelen 82 lid 1, 83 lid 1 en 90 lid 3 Verordening (EG) nr. 6/2001 van de Raad van 12
december 2001 betreffende Gemeenschapsmodellen (Gemeenschapsmodellenverordening)
(hierna GmodVo) ten aanzien van de in Nederland gevestigde gedaagden 2-4 bevoegdheid
verlenen. Ten aanzien van gedaagde sub 1 wordt geen grensoverschrijdende voorziening
gevraagd.

*Spoedeisend belang*

4.2.      Apple heeft spoedeisend belang bij haar vorderingen, nu zij stelt dat sprake is van
voortdurend inbreukmakend handelen. De omstandigheid dat sommige Samsung-producten
reeds sedert 2010 op de markt zijn doet, mede gelet daarop dat dit voor weer andere
Samsung-producten niet geldt, zoals de Galaxy Tablet 10.1 die binnenkort gelanceerd zal
worden[5], daar onvoldoende aan af. Bovendien is er sprake geweest van onderhandelingen
tussen partijen en zijn sommige rechten, zoals EP 948 en Gemeenschapsmodelrechten
36590-0011 en 1260624-0015 eerst in 2011 (februari/april) verleend. Bij deze stand van
zaken heeft Samsung onvoldoende inzichtelijk gemaakt tegen welk van haar producten ten
aanzien van welke rechten Apple onvoldoende voortvarend zou hebben opgetreden.

4.3.      Terughoudendheid is op zijn plaats om aan te nemen, zoals Samsung wil, dat de
belangen aan haar zijde dusdanig groot zijn dat reeds daarom de gevorderde voorzieningen
geweigerd moeten worden. De spiegelbeeldige belangen aan de zijde van Apple zijn
voorshands evenzeer aanzienlijk te achten. Hierbij komt dat, waar het de octrooien betreft,
namens Samsung ter zitting is verklaard dat het relatief eenvoudig is om de software van
haar producten zodanig aan te passen dat niet langer inbreuk wordt gemaakt.

4.4.      De afweging van de (spoedeisende) belangen over en weer heeft de
voorzieningenrechter wel ertoe geleid om reeds ter zitting aan te geven dat aan een
eventueel verbod een uitlooptermijn tot minimaal 13 oktober 2011 zal worden verleend.
Hierbij is vooral gelet op de omstandigheid dat er overleg tussen partijen plaatsvindt en
heeft plaatsgevonden aangaande het verlenen van licenties, waarbij tevens octrooirechten
van Samsung zijn betrokken waarvan Apple gebruik zou maken bij de verhandeling van
haar iPad en iPhone. Deze onderhandelingen dienen niet onnodig zwaar en eenzijdig (de
tegenvorderingen gebaseerd op een tweetal van de door Samsung in te roepen octrooien is
immers geweigerd) onder druk te worden gezet door een onmiddellijk ingaand verbod.

*Ingewikkeldheid*

4.5.      Hoewel ontegenzeggelijk complex, is deze zaak niet te ingewikkeld voor kort
geding. De voorzieningenrechter stelt voorop dat terughoudendheid gepast is om een
voorlopige voorziening te weigeren op de grond dat een zaak te gecompliceerd is. De
octrooien die in deze procedure aan de orde worden gesteld, hebben bovendien geen
betrekking op al te ingewikkelde techniek. Ook het geschil voor zover betrekking hebbend
op modelrechten en auteursrechten is van een aard en omvang zoals deze wel vaker wordt
gezien tussen grote bedrijven met grote belangen. Dergelijke bedrijven moeten voorts in
staat worden geacht een team van advocaten en octrooigemachtigden te verzamelen om een
reële procesgang op korte termijn mogelijk te maken. Vergelijkbare argumenten verzetten

---

[5] Bij het uitspeken van dit vonnis is de Galaxy tab 10.1 kennelijk reeds in Nederland gelanceerd.

zich tegen de stelling van Samsung dat zij haar zaak, vooral waar het betreft de door Apple
ingeroepen octrooirechten, onvoldoende heeft voor kunnen bereiden of dat er om die reden
sprake zou zijn van misbruik van (proces)recht.

*Octrooi-inbreuk*

4.6.     Bij elk octrooi zal in het navolgende een korte inleiding worden gegeven van de
aan de orde zijnde techniek. Deze inleiding is ontleend aan de – onbestreden – toelichting
door Apple.

*EP 868*

Inleiding
4.7.     EP 868 heeft betrekking op een gebruikersinterface voor het scrollen in en het
verplaatsen van digitale objecten, zoals foto's of electronische documenten, op een apparaat
met een touchscreen beeldscherm. EP 868 heeft onder andere betrekking op een interface
die zo gebruikt kan worden dat een gebruiker binnen afbeeldingen in een digitale fotogalerij
kan scrollen en tussen verschillende afbeeldingen kan navigeren.

4.8.     Meer in het bijzonder claimt EP 868 bescherming voor een methode voor het
zichtbaar maken van een tweede object (bijvoorbeeld een foto) vanuit een eerste object dat
zich bijvoorbeeld in ingezoomde toestand bevindt, tijdens het achtereenvolgens bekijken
van twee of meer digitale objecten (foto's), alsmede voor een electronisch apparaat waarin
die methode wordt uitgevoerd.

4.9.     Het octrooi legt uit dat het steeds kleiner worden van de beeldschermen van
draagbare electronische apparaten beperkingen met zich brengt ten aanzien van de
gebruikersinterface en de wijze waarop gebruikers het apparaat besturen (alinea [0002]).
Voor draagbare apparaten die door middel van vingeraanraking (of een ander middel,
bijvoorbeeld een stylus) op een touchscreen bestuurd worden (zoals die van een smartphone
of tablet computer) is de gebruikersinterface al sterk verbeterd (alinea [0008]), maar ook het
gebruik van een dergelijke touchscreen zorgt weer voor nieuwe uitdagingen.

4.10.    EP 868 leert het gebruik van verschillende bewegingen om de gebruiker op een
gemakkelijke en intuïtieve manier te laten navigeren binnen een tussen verschillende foto's in
een album. Wanneer bijvoorbeeld een individuele afbeelding binnen de collectie bekeken
wordt, kan de omvang van de afbeelding vanwege de beperkte afmetingen van het
touchscreen groter zijn dan op het scherm getoond kan worden, bijvoorbeeld omdat op de
afbeelding is ingezoomd. Daarom is het handig om de gebruiker een intuïtieve manier te
verschaffen om binnen de afbeelding te navigeren en aan te geven wanneer de rand van de
afbeelding bereikt is. Evengoed is denkbaar dat een gebruiker na het bekijken van een
afbeelding in de verzameling naar de volgende afbeelding zou willen kijken. Het is daarom
nuttig als de gebruiker na het bekijken van de ene afbeelding over zou kunnen gaan naar het
bekijken van de volgende afbeelding.

4.11.    Alinea's [0140] t/m [0144] van het octrooi beschrijven aan de hand van figuren
23A t/m 23H een uitvoeringsvorm van de geclaimde functionaliteit. Daarbij wordt uitgegaan
van een situatie waarin op een touchscreen weergegeven foto (2300-1) twee mannetjes
(2302-1 en  2302-2) worden getoond (figuur 23A):



Figure 23A

4.12.    EP 868 betreft de situatie waarin de foto die bekeken wordt, zich buiten de randen van het scherm uitstrekt; d.w.z. dat een of meer van de randen van de foto niet zichtbaar zijn. Dit kan bijvoorbeeld het geval zijn wanneer de gebruiker ingezoomd heeft op een deel van de foto, zoals hieronder in figuur 23 B te zien is, waar de gebruiker ingezoomd heeft op het rechter mannetje in de foto van figuur 23A:



Figure 23B

4.13.    Door de zoomactie is de rechter zijrand van de ingezoomde foto niet meer op het scherm van het toestel te zien. Wanneer een eerste beweging, zoals een horizontale veegbeweging 2310, van rechts naar links over de ingezoomde foto wordt gemaakt (figuur 23C), wordt de foto een stukje naar links verschoven zodat achtereenvolgens de door de zoomactie aanvankelijk verborgen rechter zijrand 2312, alsmede het gebied 2314 voorbij die rand 2312 zichtbaar worden (figuur 23D):



4.14.    Op het moment dat de <u>eerste</u> (veeg)beweging wordt onderbroken (bijvoorbeeld omdat de vinger van de touchscreen wordt afgehaald), verschuift de ingezoomde foto vanzelf weer in tegengestelde richting 2316 terug zodat het eerder zichtbaar gemaakte gebied 2314 niet langer is te zien (figuur 23E):



4.15.    Met een <u>tweede</u> beweging, zoals een horizontale veegbeweging 2318, van rechts naar links over de foto wordt de ingezoomde foto nogmaals in de richting van de tweede beweging 2318 verschoven (figuur 23F):



4.16.    Door het uitvoeren van de tweede beweging 2318 worden achtereenvolgens
opnieuw de verborgen zijrand 2312 van de foto en het gebied 2314 voorbij de rand 2312
getoond, alsmede nu ook een nieuwe foto 2300-2 (figuur 23G), waarna de eerste
(ingezoomde) foto in de richting van de tweede (veeg)beweging van het scherm verdwijnt
en de tweede foto op het scherm verschijnt (figuur 23H):



4.17.    Het octrooi legt uit dat het in de praktijk ook mogelijk is dat de eerste
(veeg)beweging 2310 onmiddellijk de eerste foto van het scherm laat verdwijnen en een
tweede foto doet verschijnen, bijvoorbeeld in de situatie dat de eerste foto volledig op het
scherm was te zien en daarop dus niet was ingezoomd (alinea [0155]).

Inbreuk/geldigheid
4.18.    Naar voorlopig oordeel valt de in de Galaxy S, S II en Ace toegepaste werkwijze
onder de bescherming van EP 868 maar niet de werkwijze als geïmplementeerd in de
Galaxy Tab, Tab 10.1 en 10.1v.

4.19.    Samsung heeft zich op het standpunt gesteld dat EP 868 nietig zou zijn met het oog
op WO 03/081458, gepubliceerd op 2 oktober 1993 (hierna WO 458). Dienaangaand wordt
als volgt overwogen. In de stand van de techniek was niet bekend om eerst één swipe (first
movement) te maken en dan het digitale object terug te laten "bouncen" om daarna de
volgende foto pas te tonen zodra er een tweede swipe (second movement) wordt uitgevoerd.
Voorshands oordelend volgt dit evenmin op voor de hand liggende wijze uit WO 458. Dat
document openbaart weliswaar het swipen door kolommen (een kolom is naar voorlopig
oordeel een first digital object in de zin van EP 868). Hierbij geldt dat als een "horizontal
motion threshold" (p. 15, r. 9 WO 458) wordt overschreden de volgende kolom wordt
getoond maar als de drempelwaarde niet wordt overschreden dat de kolom weer terug zal
veren en "snap into alignment with the logical column" (p. 15, r. 20 WO 458). Het verplicht
terugveren na de first movement van EP 868 valt in WO 458 niet terug te vinden noch enige
aanwijzing daartoe. De andere door Samsung genoemde stand van de techniek staat verder
weg van de uitvinding. EP 868 wordt derhalve voorshands voor geldig gehouden.

4.20.      Gelet op het voorgaande is wezenlijk voor EP 868 dat er een (verplicht) terugveren
na een eerste beweging plaatsvindt, zoals omschreven in conclusie 1. Bij de Samsung
smartphones Galaxy S, S II en Ace gebeurt dit op het moment dat er op een foto is
ingezoomd. Er is dan een tweede swipe nodig om naar de volgende foto te gaan, precies
zoals beschreven in paragrafen 140 tot en met 144 alsmede figuren 23A-H van EP 868.
Deze uitvoeringsvorm is in lijn met het door Apple onweersproken gestelde voordeel van
EP 868, namelijk het probleem van desoriëntatie bij het navigeren (dat het sterkst opgeld
zou doen bij inzoomen) te voorkomen. Dat betekent dat aan alle elementen van conclusie 1
wordt voldaan zodra op de Galaxy S, S II of Ace wordt ingezoomd op een foto in de galerij
en vervolgens met de vinger veegbewegingen worden gemaakt. Daaraan doet niet af dat het
terugveren na een eerste veegbeweging niet plaatsvindt als er niet is ingezoomd op de foto.
Die uitvoeringsvorm van de Galaxy S, S II en Ace stemt overeen met hetgeen is beschreven
in paragraaf 0155 van EP 868 (zie 4.17 hiervoor) zodat een gemiddelde vakman zal
begrijpen dat het terugveren na een eerste swipe niet altijd hoeft plaats te vinden, namelijk
niet als er niet is ingezoomd. Evenzeer zal die vakman, anders dan Samsung nog heeft
aangevoerd, begrijpen dat de tweede beweging lang of snel genoeg moet zijn om de foto
over de grenswaarde heen te trekken. Enerzijds dicteert de logica van de methode van EP
868 dit en anderzijds blijkt het uit het feit dat de eerste foto van figuur 23F over de helft
heen naar de volgende foto moet worden getrokken (figuur 23G en 23H). Dat er na de eerste
beweging derhalve bewegingen denkbaar zijn die niet lang of snel genoeg zijn, doet er niet
aan af dat er in de applicatie van Samsung op enig moment een tweede beweging is te
onderscheiden die wel voldoende is voor overgang naar de volgende foto.

4.21.      Anders ligt dit echter voorshands oordelend bij de Galaxy Tab 10.1 en 10.1v. Ook
bij inzoomen op de foto in de galerij kan er bij de tabs direct naar de volgende foto worden
doorgebladerd. Er is derhalve bij de Galaxy tabs geen sprake van een "first movement"
waarna wordt teruggeveerd in de zin van EP 868. In feite kan derhalve bij de tabs altijd,
ongeacht of er is ingezoomd, meteen een "second movement" in de zin van EP 868 worden
uitgevoerd, zolang die tweede beweging maar lang of snel genoeg is. Dat is wezenlijk
anders dan zoals de gemiddelde vakman het systeem van EP 868 zal begrijpen. Dat er
veegbewegingen denkbaar zijn waarbij wel wordt teruggeveerd, omdat die beweging te kort
of niet snel genoeg is, maakt niet dat sprake is van inbreuk omdat een gemiddelde vakman
het onderscheid tussen de eerste en tweede beweging niet zodanig zal opvatten. Hij zal uit
het systeem van EP 868 begrijpen dat er, in ieder geval als er is ingezoomd, altijd een eerste
beweging met terugveren moet plaatsvinden, voordat naar de volgende foto kan worden
doorgebladerd. Dat is bij de Galaxy tabs niet het geval zo zal de gemiddelde vakman
onderkennen. De passage in alinea 153 van EP 868 waarop Apple nog heeft gewezen,
brengt die vakman niet tot de gedachte dat in het geoctrooieerde systeem de eerste en
tweede beweging geheel los van elkaar zouden moeten worden gezien (en er dus niet een
eerste beweging zou behoeven vooraf te gaan aan de tweede), zeker niet als de vakman zich
rekenschap geeft van waarin EP 868 verschilt van WO 458.
In feite is de applicatie van de Galaxy tabs ook niet meer of anders dan hetgeen WO 458
openbaart, namelijk het doorbladeren of terug "snappen" en "alignen" van het digitale
object, al naar gelang een horizontale drempelwaarde wordt overschreden (lees: lang of snel
genoeg wordt geveegd).

4.22.      Aangezien de voorzieningenrechter oordeelt dat een werkwijze waarbij er, ook in
ingezoomde toestand, met één beweging kan worden doorgebladerd (zoals bij de Galaxy

Tablets), niet onder het octrooi valt, behoeft het betoog van Samsung dat EP 868 zo gelezen te ruim en niet nawerkbaar zou zijn geen beoordeling meer.

*EP 948*

Inleiding
4.23.      EP 948 heeft betrekking op een apparaat met een touchscreen dat meerdere aanrakingen tegelijkertijd kan ontvangen en verwerken: een multi-touch touchscreen.

4.24.      De gebruikersinterface van een (multi-touch) touchscreen kan volgens het octrooi diverse views bevatten, waarbij een view een bepaald grafisch element van de gebruikersinterface vertegenwoordigt dat wordt gehanteerd door een software element (alinea [0023] van het octrooi). Zo'n software element kan een software applicatie zijn, maar ook een bepaald onderdeel van een software applicatie.

4.25.      Wanneer een gebruiker het touchscreen aanraakt, worden aan die aanraking gerelateerde data (inclusief informatie over wanneer en waar op het scherm dit gebeurde) gegenereerd en overgebracht naar het software element. Deze data - door het octrooi aangeduid als touch input data - worden door de software verwerkt en doorgegeven aan het software element dat bij de aangeraakte view hoort, zodat het betreffende software element op de juiste manier kan reageren. De verwerkte touch input data van één aanraking worden door EP 948 aangeduid als een touch event (alinea [0023]).

4.26.      Normaal gesproken stuurt besturingssoftware binnen een apparaat informatie betreffende een touch event door naar het software element dat is geassocieerd met de door de gebruiker aangeraakte view. Als de aanraking bijvoorbeeld op een balk of toets plaats vindt, wordt informatie met betrekking tot het touch event verzonden naar de software die verantwoordelijk is voor de balk of toets en voor het reageren wanneer daarop gedrukt wordt.

4.27.      Het gebruik van een multi-touch scherm leidt tot twee mogelijkheden, ofwel dat er meerdere vingeraanrakingen zijn binnen dezelfde view, of dat een vinger een view zal aanraken (bijvoorbeeld een toets), en een tweede vinger tegelijkertijd een andere view zal aanraken (bijvoorbeeld een menu of een foto).

4.28.      Het octrooi legt uit dat een multi-touch scherm het in beginsel mogelijk maakt dat tegelijkertijd meerdere touch events aan de verschillende software applicatie(s)(elementen) worden doorgegeven, die dus ook tegelijkertijd door de software moeten worden verwerkt. Dat maakt het in beginsel noodzakelijk om complexe en dure software te ontwikkelen voor en te gebruiken in een apparaat met een multitouch scherm (alinea [0006]).

4.29.      Hoewel een multi-touch scherm data van verschillende aanrakingen tegelijkertijd kan verwerken, kunnen er omstandigheden zijn waarbij er voor individuele views geen noodzaak meer bestaat voor het verwerken van een multi-touch input, of dat dat niet wenselijk is. Men kan hierbij denken aan een enkele virtuele knop (een view) die met een enkele aanraking bestuurd kan worden. Voor het geval een gebruiker (al of niet opzettelijk) die knop met twee vingers zou aanraken, zou de onderliggende software onnodig met meer dan één touch event belast worden (alinea [0038]). Dit is bijvoorbeeld anders bij een digitale

foto waarop door een spreid- en knijpbeweging van twee vingers respectievelijk in- en uitgezoomd kan worden.

4.30.     Een gebruiker van een multi-touch scherm kan ook het scherm tegelijkertijd op verschillende plaatsen aanraken (meerdere views). Zo is het bij bijvoorbeeld de meeste videospelletjes gewenst om tegelijkertijd virtuele besturingsknoppen te bedienen (alinea [0038]). Echter, bij het spelen van zo een videospel kan het tegelijkertijd ook ongewenst zijn om toe te staan dat een eventuele aanraking door de gebruiker van bijvoorbeeld de statusbalk verwerkt wordt, omdat deze onverwachts het spel van de gebruiker zou verstoren of onderbreken.

4.31.     EP 948 verschaft een oplossing voor bovengenoemde problemen door voor een apparaat met een multi-touch beeldscherm al dan niet toe te staan dat verschillende views op het scherm reageren op (multi-)touch events. EP 948 beschrijft een systeem dat kan bepalen of iedere specifieke view multi-touch events kan ontvangen, en of een view die een touch event ontvangt, andere views zal toestaan om ook touch events te ontvangen.

4.32.     Het octrooi definieert voor dat doel twee verschillende flags[6] die al dan niet in combinatie kunnen worden gebruikt. Een multi-touch flag die aangeeft of een bepaalde view tegelijkertijd meerdere aanrakingen kan ontvangen of niet, en een exclusive touch flag die aangeeft of, terwijl een bepaalde view een aanraking ontvangt, die view het toestaat dat andere views ook aanrakingen kunnen ontvangen (alinea [0040]).

4.33.     Overigens kan uit het octrooi worden afgeleid dat de uitvinding niet beperkt is tot gevallen waarin zowel de multi-touch flag als de exclusive touch flag worden toegepast. Dat blijkt onder meer uit alinea [0040] waarin staat dat de multi-touch flag en/of de exclusive touch flag kan worden gebruikt, alinea [0050] waarin staat dat de twee flags kunnen worden gecombineerd en alinea [0052], waarin wordt beschreven dat sommige uitvoeringsvormen slechts over één van beide flags (en de bijbehorende functionaliteit) beschikken.

4.34.     Met het systeem van EP 948 wordt bereikt dat, afhankelijk van de flag instelling van een bepaalde view (al dan niet multi-touch en/of al dan niet exclusief), voor die view en/of andere views bestemde touch events kunnen worden verwerkt of genegeerd. Genegeerde aanrakingen (touch events) worden niet doorgeven aan het desbetreffende software element. Door op die manier selectief aanrakingen (en de daarbij horende touch events) te negeren, kan voor sommige applicaties worden volstaan met eenvoudigere en goedkopere software die geen multi-touch ondersteunt, terwijl voor andere toepassingen daarin wél wordt voorzien (alinea [0008]). Ook kan daarmee de gelijktijdige verwerking van touch events voor verschillende applicaties tot een minimum worden beperkt.

Inbreuk
4.35.     Voorshands oordelend vallen de aangevallen Samsung-producten niet onder de beschermingsomvang van EP 948. De ingeroepen conclusies schrijven immers voor dat met "each view" een "exclusive touch flag" wordt geassocieerd. De verwijzing die Apple nog

---

[6] In computer programmeertaal refereert een "flag" doorgaans aan één bit of meerdere bits die worden gebruikt om een code (bijvoorbeeld 1 of 0) met een bepaalde betekenis op te slaan.

heeft gedaan naar paragraaf 27 van EP 948 gaat niet op. In die paragraaf is het volgende opgenomen:

*"In some embodiments, touch events are processed at the lowest level of the view hierarchy. Thus, for example, if a user touches title bar view 302, the touch event need not be directly processed by the software element associated with the title bar view, but instead can be processed by a software element associated with a view included within the title bar view where the touch occurred (i.e., a software element associated with one of views 310, 311 and 312). In some embodiments, some higher level views can also handle touch events."*
(onderstreping Apple, par. [0027], r. 12-16)

Naar voorlopig oordeel blijkt hieruit niet dat volgens de methode van EP 948 ook meerdere views per "exclusive touch flag" zouden worden toegestaan. Bovendien ziet dit deel van de beschrijving niet zozeer op de geoctrooieerde oplossing (die vanaf alinea 38 in detail wordt beschreven) als wel op wat er zoal mogelijk is bij een multi-touch scherm en hoe dat softwarematig werkt. De interpretatie die Apple aan deze passage wil geven zou voorts in tegenspraak komen met de reeds aangehaalde duidelijke bewoordingen van de conclusie "associating an exclusive touch flag with <u>each</u> view" en "said exclusive touch flag indicating whether a <u>particular</u> view(…)" alsmede met bijvoorbeeld alinea 40 van EP 948 "The exclusive touch flag can indicate whether a <u>particular</u> view is to allow other views(…)" (onderstr. Vzr).

4.36.    Zoals hiervoor reeds kort weergegeven, is volgens paragraaf 23 van EP 948 een "view" een grafisch gebruikersinterface element dat is verbonden aan een separaat software element. Voorbeelden van dergelijke views zijn volgens EP 948 nrs. 301-312, dat wil zeggen de status bar, titel view, zang titel views en diverse knoppen. Zie figuur 3 van het octrooi hieronder weergegeven:



Fig. 3

396957 / KG ZA 11-730 en 396959 / KG ZA 11-731                39
24 augustus 2011

4.37.    In het op de Samsung producten draaiende Android 2.3 of hoger wordt echter een
exclusiviteitsvlag (zogenaamde Flag_Split_Touch) gekoppeld aan een window. De windows
van Android bevatten echter nagenoeg altijd, zo geeft ook Apple toe, meerdere views in de
zin van EP 948. Dat betekent dat er in Android, anders dan bij EP 948, niet een
exclusiviteitsvlag kan worden ingesteld per ("each") view. Dat bij een popup-window
mogelijk sprake is van één view, en zo wel de exclusiviteit per view kan worden
gedifferentieerd, maakt dit niet anders. De andere windows die naast de popup open staan kennen
kennen die differentiatie per view immers niet zodat ook bij een eventueel popup-window
niet elk ("each") view daarnaast ook een exclusiviteitsvlag kent.

4.38.    De volgende, door Apple ter zitting gehanteerde figuur[7] moge de werking van
Android illustreren.



Links is in de figuur te zien het scherm dat de gebruiker ziet en rechts naast de stippellijn de
daarmee samenhangende software, waarbij die samenhang door de kleuren wordt
weergegeven (rood voor de terug en vooruit knop; groen voor het plaatje van een camera).
Aangezien er bij Android één ViewRoot is per window, garandeert de "Flag_Split_Touch"
in de Input Dispatcher slechts de exclusiviteit voor het gehele window. Dat betekent dat
deze vlag bepaalt of, als het lichtblauwe window wordt aangeraakt, er tegelijkertijd ook
daarbuiten aanrakingen zullen worden toegestaan (er zijn geen views buiten het window
weergegeven in bovenstaande figuur maar denkbaar is bijvoorbeeld een statusbalk). In de
lichtblauwe window zijn echter meerdere views in de zin van EP 948 te zien: het groen
weergegeven plaatje en de twee rode pijltjestoetsen. De "Flag_Split_Touch" verleent
derhalve exclusiviteit aan een <u>window</u> (als geheel) maar niet aan een specifieke <u>view</u>. Om
die reden voldoet derhalve de "Flag_Split_Touch" niet aan de exclusiviteitsvlag van
EP 948. Anders gezegd, de "Flag_Split_Touch" garandeert niet, zoals de (geactiveerde)
exclusiviteitsvlag van EP 948 wel zou doen, dat als bijvoorbeeld één van de rode
pijltjestoetsen wordt aangeraakt, niet tegelijkertijd ook de andere rode toets of het groene
plaatje kan worden aangeraakt.

[7] Pleitnota mrs. Kleemans, Blomme en van Oorschot nr. 78

4.39.    Evenmin voldoet bij Android 3.0 en hoger, dat op de Galaxy Tabs draait, de
"splitMotionEvents"-vlag. Die laatste vlag garandeert immers de exclusiviteit van Views
binnen een ViewGroup (zie paragraaf 48 verklaring Nieh, productie 36 Apple). In de figuur
hiervoor derhalve garandeert de "splitMotionEvents"-vlag dat ofwel de ene ofwel de andere
rode pijltjestoets exclusieve aanraking heeft <u>binnen</u> de ViewGroup. Het moge echter
duidelijk zijn dat bij de "splitMotionEvents"-vlag geen exclusiviteit is gegarandeerd ten
opzichte van views <u>buiten</u> de ViewGroup, zoals in de figuur het groene plaatje. Anders en
eenvoudig gezegd, ook al staat de "splitMotionEvents"-vlag op exclusief voor één van beide
rode pijltjestoetsen, dan nog kan tegelijkertijd op het groene plaatje bijvoorbeeld
"gepinched" of "gedepinched" (in- of uitgezoomd) worden. Ook kan een eventueel nog
buiten deze Window liggende view (niet weergegeven in de figuur) worden aangeraakt als
de "Flag_Split_Touch" niet op exclusief staat.

4.40.    Zelfs als beide vlaggen tezamen worden bezien, is geen sprake van exclusiviteit per
view zoals in EP 948. Als beide vlaggen op exclusief staan, zodat één van beide rode
pijltjestoetsen in bovenstaande figuur exclusieve aanraking heeft, dan nog kan – net als
hiervoor – het groene plaatje worden aangeraakt.

4.41.    Zodoende voldoet voorshands oordelend de werking van Android 2.3 of 3.0 of
hoger niet aan EP 948. Apple heeft niet betoogd dat sprake zou zijn van equivalente
maatregelen, zodat zulks ook niet onderwerp van debat is geweest en om die reden daaraan
niet kan worden toegekomen. De voorzieningenrechter tekent daarbij aan dat minst
genomen betwijfeld kan worden of het resultaat en/of de wijze in wezen dezelfde zijn, nu er
bij Android 2.3 danwel 3.0 nog steeds geen sprake is van exclusiviteit op view-niveau maar
de exclusiviteit op een hoger niveau (niet per view maar per window of viewgroup) wordt
geregeld. Bij deze stand van zaken behoeft het betoog van Samsung dat EP 948 ongeldig
zou zijn geen bespreking meer.

*EP 022*

Inleiding
4.42.    Het octrooi ziet op draagbare elektronische inrichtingen die voorzien zijn van een
touchscreen beeldscherm. Touchscreen inrichtingen hebben vaak een beperkt aantal fysieke
toetsen. De functies van en toepassingen (applicaties) op de inrichting kunnen worden
bestuurd door middel van virtuele toetsen die op het touchscreen worden weergegeven en
door middel van het touchscreen kunnen worden bediend.

4.43.    In alinea [0003] van het octrooi wordt opgemerkt dat een probleem met
touchscreens is dat functies onbedoeld kunnen worden geactiveerd of gedeactiveerd.
Daarom kan een touchscreen in de meeste tablet computers worden vergrendeld wanneer het
touchscreen gedurende een bepaalde tijd niet is aangeraakt of wanneer een gebruiker het
touchscreen handmatig op slot doet. Het "vergrendelen" (locking) van een touchscreen zorgt
ervoor dat het scherm niet reageert op verdere aanrakingen totdat het scherm ontgrendeld
wordt.

4.44.    De uitvinding in het octrooi heeft betrekking op de situatie waarin, uitgaande van
een vergrendeld touchscreen waarin de gebruikersinterface niet toegankelijk is, het
touchscreen moet worden ontgrendeld om gebruikersinvoer toe te staan.

396957 / KG ZA 11-730 en 396959 / KG ZA 11-731                    41
24 augustus 2011

Geldigheid/inbreuk
4.45.      Naar voorlopig oordeel bestaat er een gerede kans dat EP 022 in een daartoe
strekkende bodemprocedure voor ongeldig zal worden gehouden zodat om die reden de
gevraagde voorzieningen ten aanzien van EP 022 moeten worden geweigerd. Met partijen is
als de meest nabije stand van de techniek is te beschouwen de Neonode N1m waarbij de
wijze van "unlocken" als volgt is weer te geven (na indrukken van een knop):









4.46.    Deze Neonode telefoon openbaart alle kenmerken uit conclusie 1 voorafgaand aan
de woorden "characterized by", zoals ook Apple toegeeft (dit zijn de door haar aangeduide
kenmerken a-c). Het verschil met EP 022 zit volgens Apple – kort gezegd – daarin dat (d)
een "unlock image" over een "predefined displayed path" wordt bewogen en (e) welk
"unlock image" een grafisch object is, waarmee de gebruiker interactie vertoont.  Samsung
stelt echter terecht dat de Neonode N1m ook een predefined displayed path voor het
unlocken kent in de vorm van de rode transparante pijl[8]. Verder is uit die telefoon tevens
duidelijk dat als er niet op juiste manier geswiped wordt, de telefoon gelocked blijft. Er is
dus ook bij die telefoon al een zekere vorm van feedback (interactie). Dat betekent dat
feitelijk slechts als verschilmaatregel is aan te merken het gebruik van een "unlock image".
De probleemstelling ware dan in lijn met paragraaf 5 van EP 022 te formuleren als het
verschaffen van een meer gebruiksvriendelijke procedure voor het ontgrendelen van een
touch screen. De toepassing van zo een "unlock image" acht de voorzieningenrechter
voorshands voor de hand liggend. Het is in feite niet meer dan bij de Neonode nog een of
ander grafisch element mee over de pijl laten schuiven. Zo al niet volkomen triviaal dan
volgt de toepassing van een dergelijk grafisch element (met feedback/interactie) zonder
inventieve denkarbeid te halen uit de reeds lang bekende virtuele on/off slider knoppen van
Plaisant et al., artikel "Touchscreen Toggle Design", CHI 3-7 mei 1992 (productie 6.8
Samsung, links weergegeven en dan vooral de knop linksonder) of zelfs de virtuele
equalizer schuiven van de Guitar Rig (productie 31 Samsung, rechts):

 

4.47.    Bij beide voorpublicaties moet een grafisch element (het virtuele schuifje) over een
specifiek pad worden geschoven. Bij de slider van Plaisant zal een vakman begrijpen dat als
er niet ver genoeg door wordt geschoven, de schakelaar te vroeg los wordt gelaten of van
het pad wordt afgeweken, de schakelaar niet van off naar on (of vice versa) zal gaan.
Zodoende is ook hier interactie met de gebruiker net als bij EP 022. Hieraan doet niet af dat
Plaisant heeft bevonden dat die slider minder geprefereerd werd in haar onderzoek. Het
moge immers duidelijk zijn voor een vakman dat de drukknoppen voor het ontgrendelen van
een touchscreen voor een draagbaar apparaat niet goed geschikt zijn omdat daarmee nog
steeds een aanzienlijke kans bestaat dat er per ongeluk ontgrendeld wordt. Evenmin is
relevant te achten dat de touchscreen van Plaisant niet zelf werd ontgrendeld door de

---

[8] Net zichtbaar op de afbeeldingen bevindt zich onder het slotje een rode pijl.

396957 / KG ZA 11-730 en 396959 / KG ZA 11-731                                43
24 augustus 2011

schakelaars maar dat deze werd gebruikt om een extern apparaat aan en uit te zetten. Er
wordt immers krachtens de ook door Apple gehanteerde probleemstelling al gezocht naar
een betere manier van ontgrendelen van een touchscreen. Bovendien acht de
voorzieningenrechter het aannemelijk dat een gemiddelde vakman zich geenszins zal laten
weerhouden het artikel van Plaisant te raadplegen enkel omdat een extern apparaat wordt
bediend. Vergelijkbare overwegingen gelden ten aanzien van de Guitar Rig.

4.48.    Aangezien EP 022 voorshands niet inventief is te achten, moeten de vorderingen
daarop stranden en behoeft niet te worden beoordeeld of sprake is van inbreuk.

_Modelinbreuk_

4.49.    Voorshands is de voorzieningenrechter van oordeel dat geen sprake is van inbreuk
op enig modelrecht van Apple waartoe als volgt wordt overwogen. In dit kader wordt
voorop gesteld dat – anders dan Apple heeft betoogd – uitsluitend de uiterlijke kenmerken
zoals deze blijken uit de modelinschrijving mogen worden meegewogen. Het komt de
voorzieningenrechter onjuist voor dat bij de inbreukvraag ook een eventuele concrete
verwezenlijking van de geregistreerde modellen kan meetellen, zoals AG Mengozzi lijkt
voor te staan in de Pepsico Pogs-zaak (r.o. 83)[9]. Een ander oordeel zou immers in strijd
komen met het registratiesysteem van modellen (en het onderscheid in de GModVo tussen
geregistreerde en ongeregistreerde modellen) en de rechtszekerheid voor derden daarbij. Het
zou bovendien tegelijkertijd belangrijke, rechtsonzekerheid scheppende, vragen oproepen
die niet uit de verordening blijken. Voorbeelden van dergelijke vragen zijn welk criterium
zou moeten worden gehanteerd om te beoordelen of een model is belichaamd in een op de
markt zijnd product, op welk moment (bij depot, registratie of nadien) een product op de
markt zou moeten zijn wil het kunnen meewegen en wat is te doen als er meerdere,
onderlinge weer enigszins verschillende, producten op de markt zijn die in aanmerking
komen en ga zo door. Niet voor niets verleent artikel 19 lid 1 GModV dan ook aan de
houder van het ingeschreven (zie artikel 1 lid 2 onder b GModV: ingeschreven volgens de
verordening) Gemeenschapsmodel een uitsluitend recht voor een periode langer dan 3 jaar
(artikel 12: maximaal 25 jaar). Een concrete verwezenlijking speelt vanzelfsprekend wel een
rol bij een beroep op een niet-ingeschreven Gemeenschapsmodel, maar dat is in deze zaak
niet aan de orde (gesteld).

_Galaxy Tab 10.1 en 10.1v_

4.50.    Ervan uitgaande dat het Gemeenschapsmodel 181607-0001van Apple geldig is,
heeft Samsung daarvan voorshands voldoende afstand genomen. In dit kader is van belang
dat het in feite slechts de voorkant zijn van de Galaxy Tab 10.1 en 10.1v die
overeenstemming vertonen. De kenmerkende elementen van de voorzijde van het model
zoals ingeschreven, dat wil zeggen de rechthoekige vorm met afgeronde hoeken,
minimalistische design, passe-partout achter een geheel transparante ("glazen") voorkant,
waren evenwel ieder voor zich reeds bekend op de prioriteitsdatum van het depot (17 maart
2004). Zo was de HP Compaq TC1000 reeds rechthoekig met afgeronde hoeken en had deze
een vrijwel geheel transparant oppervlak met een (grijze) passe-partout onder dat oppervlak
(zie afbeelding hierna).

[9] Conclusie van 12 mei 2011 bij C-281/10

396957 / KG ZA 11-730 en 396959 / KG ZA 11-731                44
24 augustus 2011



4.51.    Dat dit apparaat openklapt en zo een toetsenbord laat zien, maakt niet dat het uiterlijk zoals hierboven weergegeven bekend was. Weliswaar kent de TC1000 tevens een tweede donkerder/zwart uitgevoerd passe-partout binnen het grijze maar het "minimalistische" concept van slechts één passe-partout (welk frame overigens niet uitsteekt) was reeds te vinden in de tablet PC van Knight-Ridder uit 1994 (zie hieronder).



4.52.    Apple heeft onvoldoende gemotiveerd bestreden dat de Knight Ridder tablet PC in de betreffende kringen bekend was. De enkele omstandigheid dat deze tablet PC uiteindelijk

niet in productie zou zijn gekomen, maakt voorshands niet dat het model niet bekend was in
de betrokken kringen.

4.53.      De voorkant van het model van Apple betreft zodoende een combinatie van
bekende elementen die niet op zichzelf een grote mate van bescherming toekomt. De
voorzieningenrechter weegt hierbij mee dat er naar voorlopig oordeel ook het nodige
technisch bepaald lijkt. Als men immers wil voorkomen dat vuil zich zichtbaar aan de
randen van het aanraakscherm ophoopt en voorts het met de vinger gemakkelijk is ook
aanrakingen te doen aan de grenzen van het aanraakscherm (en zo het scherm ten volle te
kunnen benutten), lijkt een over de gehele voorkant doorlopende "glazen" touch plaat een
logische keuze.

4.54.      Ten aanzien van het door Apple gestelde aantrekkelijke "minimalistisch" of "strak"
vormgegeven uiterlijk overweegt de voorzieningenrechter nog het volgende.
Ontegenzeggelijk is het in de huidige tijd een trend om producten een "minimalistisch"
uiterlijk te geven. Dit ziet er in veel gevallen ook fraai uit, zoals bij de iPad. Gelet op dat
fraaie uiterlijk zal er dan een neiging kunnen zijn om aan dergelijke modellen een ruime
bescherming te verlenen. Niettemin moet in het achterhoofd worden gehouden dat
"minimalistisch" vormgeven in feite betekent dat het ontwerp zoveel mogelijk de contouren
volgt zoals deze door de techniek en ergonomie van het apparaat worden gedicteerd. Dat is
naar voorlopig oordeel ook bij het model aan de hand. Zo zijn de afgeronde hoeken een
uitvloeisel van het feit dat een apparaat met scherpe hoeken niet prettig in de hand ligt en
(be)kleding kan vernielen, zeker als het een zakcomputer betreft waarvoor het model is
ingeschreven. Hetzelfde geldt zoals hiervoor werd overwogen in belangrijke mate voor de
doorlopende "glazen" aanraakplaat. Een modelrecht op een "minimalistisch" ontwerp bergt
zodoende inherent het probleem in zich dat concurrenten in feite gedwongen worden om
minder optimale keuzes te maken (lees: zij moeten feitelijk onnodige franje aan hun
ontwerp toevoegen om buiten de bescherming van het model te blijven), hetgeen een
concurrentievoordeel oplevert voor een modelhouder die (toevallig) zijn concurrenten de
loef af stak met registratie van een model voor een bepaald segment producten, zoals de
tablet computer. Dat concurrentievoordeel is vanuit modelrechtelijk oogpunt
ongerechtvaardigd omdat het niet zozeer een gevolg is van ontwerpersarbeid als wel een
gevolg van het feit dat de betrokken houder als eerste het (nauwsluitende) uiterlijk van een
nieuw segment producten weet te registreren. Dit betekent wellicht niet dat het model
ongeldig is maar wel dat de daaraan te verlenen bescherming niet groot mag zijn en beperkt
moet zijn tot de werkelijke ontwerpelementen van het model. Dat is lastig omdat juist bij
een "minimalistisch" of "strak" vormgegeven model de algemene indruk van het uiterlijk nu
juist op verregaande wijze bepaald wordt door de techniek en praktische/ergonomische
overwegingen. Niettemin moet er geabstraheerd worden van de elementen van het model
die niet beschermbaar zijn omdat deze technisch of anderszins praktisch/ergonomisch
bepaald zijn.

4.55.      Naast aanzienlijke overeenkomsten zijn nog enkele minder opvallende verschillen
aan de voorzijde te ontwaren. Te noemen zijn het camera-oog bij de Galaxy tabs, het in
verhouding tot het effectieve scherm wat dikker uitgevoerde passe-partout bij de Galaxy
tabs en, bij de Galaxy 10.1, het merk SAMSUNG middenonder. Zie de hierna opgenomen
afbeeldingen (links het plaatje van het model, rechts de Galaxy Tabs met telkens de 10.1v
boven en de 10.1 onder afgebeeld).

396957 / KG ZA 11-730 en 396959 / KG ZA 11-731                46
24 augustus 2011

| CDR000181607-0001 | Samsung Tab 10.1v (boven) en 10.1 (onder) |
|---|---|
| 0001.2  |  |
| 0001.1  |  |

| | |
|---|---|
| 0001.3  |   SAMSUNG |

4.56. Tegenover de uiterlijke overeenkomsten aan de voorzijde staan opvallende verschillen aan de achterkant.
De Galaxy Tab 10.1 heeft een donkere achterkant met daaromheen een lichtgrijze rand van enkele millimeters dik. Aan de bovenkant is die rand uitgestulpt en is daarin een opvallend cameraoog met daarnaast een tweede oogje opgenomen. Ook is nog goed zichtbaar de hoofdtelefoonaansluiting en nog net zijn enkele uitstekende knoppen zichtbaar aan de bovenzijde. In het midden is prominent het merk SAMSUNG weergegeven.
Bij de Galaxy Tab 10.1v zijn de verschillen nog groter. Daar is de achterkant niet langer plat maar heeft deze een ronde welving in het midden, die de achterkant een geheel ander aangezicht geeft. Ook het merk SAMSUNG op de prominente ronde cirkel geeft de achterkant van deze tablet een volkomen ander aanzicht dan de eenvoudige, afgeronde maar verder platte en ongeornamenteerde achterkant van het model.

396957 / KG ZA 11-730 en 396959 / KG ZA 11-731                    48
24 augustus 2011



4.57.    Ook de zijaanzichten van de Galaxy 10.1 en 10.1v tabs onderscheiden zich aanzienlijk van het model. Bij beide tabs is duidelijk zichtbaar een scheiding tussen de lichtgrijze omranding en de donkere achterplaat. Ook is de vorm van de rand beduidend anders. De zijrand van de 10.1 is bolvormig, dat wil zeggen bij de bovenkant smaller, dan breed uitbollend en dan weer onderin smaller, enigszins analoog aan een "(".  Bij de 10.1v is de zijkant in hoofdzaak plat met een in facet aflopende onderschelp. De zijranden van model volgen echter de contouren van een kwart cirkel. Verder zijn de voor de zijkanten beeldbepalende aansluitingen, knoppen en speakers eigenlijk alle anders gepositioneerd bij de Galaxy tabs. Om hiervan enkele in het oog springende voorbeelden te noemen is er bij beide Galaxy tabs een opvallende platte aansluiting (voor de verbinding met de PC) in de lange zijde aangebracht die niet in de lange zijde (plaatjes 0001.6 en 0001.7) van het model is te zien. Bij het model is slechts één korte zijde afgebeeld (plaatje 0001.4, zodat ervan is uit te gaan dat de korte zijden hetzelfde zijn). Bij Galaxy Tab 10.1 zitten de spleten voor de speakertjes niet in het midden maar excentrisch op een kwart van de korte zijden. De speakertjes bij de 10.1v worden onderbroken door een opvallende dichte cirkel. Voor zover de modellen al een dunne uitstraling zouden hebben (door deskundige Woodring wel aangeduid met "thin form factor", productie 39 Apple), zijn de Galaxy Tabs 10.1 en 10.1v nog opvallend veel dunner. Bovendien heeft Samsung terecht gesteld dat nu eenmaal dergelijke producten zo plat en dun mogelijk moeten zijn en de techniek dit – zo vult de voorzieningenrechter aan als feit van algemene bekendheid – dit allengs ook meer mogelijk maakt. Zie de navolgende afbeeldingen.



4.58.     Indien wordt geabstraheerd van de technisch/praktisch en ergonomisch bepaalde elementen en uitsluitend de modelrechtelijk te beschermen trekken worden meegewogen, kan de conclusie voorshands geen andere zijn dan dat de Galaxy Tabs 10.1 en 10.1v een andere algemene indruk wekken dan het model, vooral gelet op de opvallende verschillen in de achterkant en zijkanten. Dit geldt zelfs als aan de voorzijde meer aandacht moet worden gegeven dan aan de achter- en zijkanten zoals Apple heeft betoogd.

4.59.     Aan het voorgaande doet onvoldoende af dat uit door Apple gehouden marktonderzoek zou blijken dat een groot deel van het publiek van oordeel is dat het model en de Galaxy Tab 10.1 en 10.1v te veel overeenstemmen. Het onderzoek gaat ten eerste mank op de vraagstelling. De vraag is gesteld of de algemene indruk van het model en de Galaxy Tab hetzelfde was. Daarbij had echter tevens moeten worden aangegeven welke elementen van het "minimalistische" model daadwerkelijk beschermbaar waren om tot een reële beoordeling te komen. Verder komt het voorshands onjuist voor dat de onderzochte personen niet de mogelijkheid hadden om bij het zien van het ene plaatje weer terug te gaan naar het andere plaatje. Het onderzoek werd zo veeleer een geheugentest dan een test van overeenstemming, rekening houdend met te beschermen elementen.

*Galaxy S*

4.60.     Ten aanzien van het uiterlijk van de Galaxy S doet Apple een beroep op een
tweetal Gemeenschapsmodelregistraties, 748280-0006 en 888920-0018. Verder doet Apple
ten aanzien van de gebruikersinterface van de Galaxy S een beroep op
Gemeenschapsmodelregistratie 748694-0003.

Galaxy S versus GM 748280-0006
4.61.     Voorshands oordelend is geen sprake van een zelfde algemene indruk van Galaxy
S en model 748280-0006. Hierbij dient in acht te worden genomen dat reeds in de betrokken
kringen bekend was de Koreaanse modelinschrijving van LG met nummer 30-0418547
(productie 53H Samsung) en de iHolic HTV 200 (productie 53J Samsung). Wat de iHolic
betreft heeft Apple onvoldoende gemotiveerd bestreden dat deze bekend was bij ingewijden
in de betrokken sector.



GM 748280-0006                     LG-model 30-0418547              iHolic HTV

4.62.     Dit betekent dat waar het de voorkant betreft het eigen karakter aan het model
vooral wordt verleend door de opvallende ronde knop onder het scherm. Ook is goed
zichtbaar dat het model – anders dan voornoemde reeds bekende ontwerpen – een scherm
heeft dat de volle breedte van de telefoon bestrijkt. Kenmerkend aan de zijkanten is de bolle
afronding in de vorm van min of meer een halve cirkel of ")". Ook bij het LG-model was al
een rand zichtbaar maar bij het GM 748280-0006 is de rand om de voorzijde heen
geprononceerder.

4.63.     De voorzijde van de Galaxy S heeft weliswaar eveneens een scherm dat de volle
breedte beslaat maar, anders dan het model, een rechthoekige knop. Nu de ronde knop van
het model een belangrijk en opvallend verschil is ten opzichte van de daarvoor bekende
modellen, zal een geïnformeerde gebruiker dit als een prominent verschil opvatten. Verder
is de sleuf voor de luidspreker bij de Galaxy S wat dunner en breder uitgevoerd, zit er een
camera-oogje naast de sleuf, staat het merk SAMSUNG prominent onder het luidsprekertje
en zijn er knoppen aan weerszijde van de rechthoekige centrale knop.

| GM 748280-0006 | Samsung Galaxy S |
|---|---|
| 0006.5 | |
| 0006.7 | |

4.64.      Tevens dient in ogenschouw te worden genomen dat de zijkanten van de Galaxy S,
naast diverse aansluitingen en knoppen, een wat scherpere hoek vertonen in plaats van de
geheel bolle zijkanten van het model. De achterkant Galaxy S heeft een geprononceerde
welving onderaan het toestel, die ook van de zijkant zichtbaar is. Ook is de Galaxy S –
afgezien van deze welving – wat slanker dan het model.



396957 / KG ZA 11-730 en 396959 / KG ZA 11-731                                         52
24 augustus 2011

| 0006.1 |  |
| --- | --- |
| 0006.3 |  |

4.65.    De achterzijde kent bovendien een opvallende, linksboven en in vierkant met
chroom omgeven camera-oog. Ook zijn daar zichtbaar het merk SAMSUNG en "with
Google" terwijl het model een ongeornamenteerde achterkant heeft.



0006.6

4.66. Het geheel overziende moet de conclusie zijn dat de het model en de Galaxy S bij de geïnformeerde gebruiker een andere indruk wekken. Zoals hiervoor reeds overwogen, doen de resultaten van het marktonderzoek daaraan niet af.

Galaxy S versus GM 888920-0018
4.67. Voorshands oordelend is er evenmin sprake van een zelfde algemene indruk van Galaxy S en model 888920-0018. In de eerste plaats overweegt de voorzieningenrechter dat Samsung terecht er een beroep op doet dat de door Apple ingeroepen prioriteit onjuist is. Apple beroept zich op prioriteit van US D 604,297 (Productie 19 Samsung) en US D 602,014 (Productie 20 Samsung), waarbij onmiddellijk opvalt dat geen van beide depots de rechthoekige menuknop onderaan hebben maar een ronde. Schematisch is dit als volgt weer te geven, met rechts opgesomd de verschillen:



| GM 888920-0018 | US D 604,297 | - bevat een ronde menuknop; |
| | US D602,014 | - bevat een ronde menuknop;<br><br>- voorzijde bevat een vierkant scherm dat niet gestippeld is; |

4.68.    Partijen hebben gediscussieerd over de vraag volgens welk criterium moet worden bepaald of een model recht heeft op prioriteit of niet. Artikel 41 lid 1 GModVo bepaalt dat het moet gaan om hetzelfde model. Artikel 4 Unieverdrag van Parijs schrijft in dit verband geen dwingende maatstaf voor maar uit de context van 4C onder 4 kan worden afgeleid dat de prioriteitsaanvrage "hetzelfde onderwerp" moet hebben. Het komt de voorzieningenrechter voor dat in dit kader als minimale toets ware te hanteren die van nieuwheid in de zin van artikel 5 GMoV, derhalve of het prioriteitsmodel identiek is aan het depot dat die prioriteit inroept. Dit is in lijn met bestendige jurisprudentie ten aanzien van prioriteit bij octrooirechten, waar ook in wezen een toets van nieuwheid (disclosure-test) wordt aangelegd. Anders gezegd, als het model nieuw is te achten ten opzichte van het prioriteitsmodel, komt het geen beroep op prioriteit toe. Voorshands oordelend maakt de opvallende rechthoekige menuknop van het model deze niet identiek aan de prioriteitsaanvragen, zodat het beroep op prioriteit niet kan opgaan en moet worden uitgegaan van de daadwerkelijke aanvraagdatum van GM 888920-0018 (29 februari 2008). Het betreft niet een verschil in een slechts onbelangrijk detail.

4.69.    Het voorgaande betekent dat ten tijde van depot reeds in de betrokken kringen bekend was de Samsung SGH-F700, die in Nederland op 9 oktober 2007 op de markt kwam (productie 64 Samsung) en Samsung's Gemeenschapsmodel 00718770-0007 (productie 23 Samsung).






GM 888920-0018            Samsung SGH-F700            GM 00718770-0007

4.70.    Naar voorlopig oordeel anticipeert de voorkant van de Samsung SGH-F700 alle belangrijke elementen van de voorkant van GM 888920-0018. De SGH-F700 heeft immers eveneens een volledig transparante "glazen" voorkant met een rechthoekige menuknop en een dikke omranding. De zijaanzichten van dat toestel zijn overigens aanzienlijk verschillend met het model; het toestel is aanmerkelijk dikker en kent een andere afronding van de zijkanten. Op de achterzijde zit verder een opvallende camera.

4.71.    Veronderstellenderwijs ervan uitgaande dat GM 888920-0018 nog wel nieuw is en een eigen karakter heeft, moet worden onderkend dat gelet op de SGH-F700 aan eventuele overeenstemming van de voorzijden van model en Galaxy S maar weinig waarde kan worden toegekend. Aan de voorzijde zijn bij vergelijking overigens wel verschillen te ontdekken. Zo is er bij de Galaxy S een opvallende sleuf voor de luidspreker en zit er een camera-oogje naast de sleuf, staat het merk SAMSUNG prominent onder het luidsprekertje en zijn er knoppen aan weerszijden van de rechthoekige centrale knop. De omkadering van het scherm is in GM 888920-0018 gestreept uitgevoerd wat volgens de – door Apple

396957 / KG ZA 11-730 en 396959 / KG ZA 11-731      55
24 augustus 2011

onbestreden – conventies betekent dat daarvoor geen bescherming wordt gevraagd.[10] Met een eventuele overeenstemming van model en de Galaxy S kan ten aanzien van dat aspect derhalve geen rekening worden gehouden.

| GM 888920-0018 | Samsung Galaxy S |
|---|---|
| 0018.5  | |

4.72.    Vervolgens dient ook in ogenschouw te worden genomen dat de achterkant van de Galaxy S een geprononceerde welving onderaan het toestel kent, die ook van de zijkant zichtbaar is.

[10] Zie ook 11.4 van de Examination Guidelines Community Design van het OHIM te Alicante, te vinden op http://oami.europa.eu/en/office/aspects/pdf/ExamGuidelines.pdf

396957 / KG ZA 11-730 en 396959 / KG ZA 11-731          56
24 augustus 2011

| | |
|---|---|
| 0018.4 | |
| 0018.2 | |
| 0018.1 | |
| 0018.3 | |

4.73.    De achterzijde kent bovendien een opvallend in vierkant met chroom omgeven camera-oog. Het model heeft linksboven een geheel andere uitsparing/ornament. Ook zijn zichtbaar op de achterzijde het merk SAMSUNG en "with Google".



4.74.    Het geheel overziende moet de conclusie zijn dat het model en de Galaxy S bij de geïnformeerde gebruiker een andere indruk wekken. Zoals hiervoor reeds overwogen, doen de resultaten van het marktonderzoek daaraan niet af.

GUI Galaxy S
4.75.    Voorshands oordelend is er evenmin sprake van een zelfde algemene indruk van de graphical userinterface (GUI) van de Galaxy S en model 748694-0003. De voorzieningenrechter stelt voorop dat het model zoals ingeschreven moet worden beoordeeld. Bij gebreke aan enige aanwijzing in de modelregistratie dat feitelijk geen bescherming wordt verlangd voor de specifieke inhoud van de icoontjes als weergegeven in

het depot, dient ook die in de beoordeling te worden meegewogen. Apple heeft bijvoorbeeld ook niet een model ingeroepen waarin de vierkante contouren van de icoontjes zijn opgenomen zonder inhoud. Verder dient te worden vooropgesteld dat slechts kunnen worden beoordeeld op inbreuk de schermen van de Galaxy S zoals deze door Samsung wordt verkocht. Een eventuele herschikking van de icoontjes door een gebruiker mag geen rol spelen, omdat dit niet kan worden aangemerkt als een voorbehouden handeling in de zin van artikel 19 GMoV.

4.76.    Ten tijde van depot was reeds in de betrokken kringen bekend de GUI van de Nokia 7710 (productie 7.56 Samsung).

    

GM 748694-0003                              Nokia 7710

Naar voorlopig oordeel anticipeert de GUI van de Nokia 7710 een aantal belangrijke elementen van de GM 748694-0003. De GUI van de Nokia 7710 kent immers eveneens veelkleurige icoontjes opgesteld in rijen van 4. De icoontjes van de Nokia 7710 hebben voorts een vierkante vorm met afgeronde hoeken. Onder de icoontjes staat verder een korte tekst. Ook is de achtergrond in één kleur uitgevoerd. Verschillen zijn er echter evenzeer, waarvan wellicht de meest opvallende zijn de andere inhoud van de icoontjes, het hebben van maar drie rijen in plaats van 4 waarbij de onderste rij in het model een zwarte baan openlaat en dat de onderste rij in een grijzige balk staat. Voorshands komt er aan het verschil in kleur geen bescherming toe omdat Samsung onweersproken heeft gesteld dat het technisch bepaald is (om batterij te besparen en het scherm van zichzelf zwart is).

4.77.    De overgelegde schermafdrukken van de door Samsung verkochte Galaxy S afgebeeld naast het model zien er als volgt uit:



GM 748694-0003



Openingsscherm Galaxy S



Menu-scherm 1 Galaxy S



Menu-scherm 2 Galaxy S



Menu-scherm 3 Galaxy S

4.78.     Weinig betoog behoeft het dat het openingsscherm van de Galaxy S, dankzij de
kleurrijke woestijnafbeelding als achtergrond, de Google-zoekbalk boven de icoontjes en de
opstelling van de icoontjes (drie rijen onderaan, geen open zwarte rij, er ontbreekt een
icoontje rechtsonder) stellig een andere algemene indruk wekt bij de geïnformeerde
gebruiker dan het model.

4.79.     De menu-schermen komen dichter in de buurt van het model. Het betreffen
evenzeer veelkleurige icoontjes in rijen van vier met afgeronde hoeken. Dit was echter als
zodanig al bekend uit de GUI van de Nokia 7710 hiervoor weergegeven. Van de aspecten
waarin het model afwijkt van de Nokia 7710, wordt in feite alleen overgenomen de
lichtgrijze balk rond de onderste rij. De inhoud van de icoontjes is echter aanzienlijk
verschillend. Daarbij komt dat bij het model een rij is "overgeslagen" dat wil zeggen zwart
is, wat bij menuschermen 1 en 2 van de Galaxy S ontbreekt. Naar voorlopig oordeel wekken
die schermen dan ook een aanzienlijk andere algemene indruk bij de geïnformeerde
gebruiker. Ook met scherm 3 neemt Samsung echter voldoende afstand, nu er – naast de
duidelijk andere inhoud van de icoontjes – ook nog een icoontje is overgeslagen op de 3ᵉ rij.

4.80.     Gelet op het voorgaande kan in het midden blijven of het model geldig is
(bijvoorbeeld in verband met de GUI van de Meizu 8, waarvan Apple heeft gesteld dat deze

dankzij misbruik openbaar is geworden) en of moet worden uitgegaan van de zwart/wit
versie van het model, zoals Samsung had betoogd omdat het model aanvankelijk in
zwart/wit gepubliceerd was maar later gerectificeerd naar een kleurenversie als hierboven
weergegeven.

*Galaxy Ace*

4.81.     Voorshands oordelend is geen sprake van een zelfde algemene indruk van Galaxy
Ace en model 1236590-0011 uit 2010. Hierbij dient in acht te worden genomen dat reeds in
de betrokken kringen bekend waren alle hiervoor besproken toestelmodellen. Zodoende was
het uiterlijk van het vooraanzicht geheel bekend. Samsung neemt dan ook terecht het
standpunt in dat de bescherming vooral ziet op een combinatie van bekende elementen met
het uiterlijk van de rand. Die rand is rondom voorzien van een platte, daarbovenop liggende
"band" en voorts met enkele ronde, platte knopjes. De voorzieningenrechter merkt op dat de
achterschaal, voorzover die uitsteekt boven de band, wederom gestreept is weergegeven
zodat daarvoor kennelijk geen rechten worden geclaimd.

4.82.     Het eerste dat opvalt aan de voorzijde is dat de Galaxy Ace, anders dan het model,
een rechthoekige knop in plaats van een ronde knop heeft. Dat rechthoekige uiterlijk van de
knop wordt nog een geaccentueerd door een chromen rand. Verder is de eveneens in chroom
geaccentueerde sleuf voor de luidspreker bij de Galaxy Ace wat dunner en breder
uitgevoerd, ontbreekt het kleine sleufje daarboven en het cameraoogje en staat het merk
SAMSUNG prominent onder het luidsprekertje.



| GM 1236590-0011 | Samsung Galaxy Ace |
|---|---|
| 0011.1 | |



4.83.     Vervolgens dient ook in ogenschouw te worden genomen dat de zijkanten van de
Galaxy Ace er belangrijk anders uitzien. De "band" ligt niet als het ware bovenop de rand
maar is verzonken. Naast die band is aan de bovenzijde van de Galaxy Ace geen sprake van
een deel van weer ander materiaal dan de "band", terwijl dat bij de achterschaal – die niet
beschermd wordt vanwege de stippellijnen – weer wel het geval is. Ook zien de knoppen er
heel anders uit. Zie onderstaande figuren.





396957 / KG ZA 11-730 en 396959 / KG ZA 11-731                           63
24 augustus 2011

4.84.    De achterzijde kent bovendien niet naast maar onder het camera-oog een tweede
oogje (voor waarschijnlijk een flitser of lampje). Ook is daar prominent zichtbaar het merk
SAMSUNG en nog een roostertje (voor waarschijnlijk een luidspreker). Zie onderstaande
figuren.



4.85.     Het geheel overziende moet de conclusie zijn dat het model en de Galaxy Ace bij
de geïnformeerde gebruiker een andere indruk wekken. Zoals hiervoor reeds overwogen,
doen de resultaten van het marktonderzoek daaraan niet af.

*Auteursrechtinbreuk en slaafse nabootsing*

4.86.     Samsung heeft onweersproken gesteld dat ter zake het uiterlijk van de producten
van Apple de Verenigde Staten als land van oorsprong hebben te gelden en die werken
aldaar geen auteursrechtelijke bescherming hebben zodat op basis van het in artikel 2 lid 7
van de Berner Conventie neergelegde reciprociteitsbeginsel daaraan evenmin
auteursrechtelijke bescherming in Nederland toekomt. Samsung heeft zulk tevens
gemotiveerd betoogd ter zake de gebruikersinterface, onder overlegging van een daartoe
strekkende opinie van professor Ralph Oman. Nu Apple daartegenover niets heeft gesteld,
moet er in dit kort geding van uit worden gegaan dat haar geen auteursrechtelijke
bescherming ter zake van één van de ingeroepen werken toekomt en moeten de daarop
gebaseerde vorderingen stranden.

4.87.     Op de in de dagvaarding nog genoemde ongeoorloofde stijlnabootsing is Apple ter
zitting niet teruggekomen zodat ervan uit wordt gegaan dat die grondslag niet langer
gehandhaafd wordt. Voor zover Apple nog ter zitting een beroep heeft gedaan op slaafse
nabootsing van haar producten is die grondslag tardief voorgesteld en wordt deze als in
strijd met een goede procesorde ter zijde gelaten.

*Conclusie en proceskosten*

4.88.     De slotsom van het voorgaande luidt dat Samsung met de smartphones Galaxy S,
S II en Ace inbreuk maakt op EP 868 maar niet met de tablet computers. Op EP 948 maakt
Samsung geen inbreuk, terwijl EP 022 voorshands voor nietig is te houden. Er is geen
sprake van inbreuk door Samsung op de door Apple gestelde modelrechten of
auteursrechten. Althans bestaat er bij deze stand van zaken een gerede kans dat in een
bodemprocedure aldus zal worden geoordeeld. Dit betekent dat een inbreukverbod kan
worden toegewezen ter zake van EP 868 doch beperkt tot de smartphones Galaxy S en Ace.
Voor het overige moeten de vorderingen worden afgewezen. Apple heeft geen specifieke
spoedeisende belangen gesteld bij haar overige vorderingen en nu slechts inbreuk wordt
aangenomen voor één octrooi, hetgeen kennelijk technisch eenvoudig door Samsung kan
worden verholpen, zullen deze vorderingen worden afgewezen. Vanwege de kennelijk
eenvoudig door haar uit te voeren aanpassing, is de door Samsung gevorderde
zekerheidsstelling niet geïndiceerd te achten. De ter zake door Samsung mogelijk te lijden
schade indien het gegeven verbod niet in een bodemprocedure zou worden bestendigd, lijkt
in dat licht immers niet groot, daargelaten de (door Samsung gestelde on)kredietwaardigheid
van Apple. Om dezelfde reden en gelet op de te verlenen uitlooptermijn, is een uitvoerbaar
bij voorraadverklaring van het te verlenen verbod op haar plaats.

4.89.     Nu partijen over en weer in het ongelijk zijn gesteld zullen de proceskosten worden
gecompenseerd.

## 5.    De beslissing

De voorzieningenrechter

5.1.    Verbiedt gedaagden om na verloop van 7 weken en één dag na betekening van dit vonnis op enigerlei wijze, direct dan wel indirect, door het vervaardigen, in voorraad hebben, aanbieden, invoeren, in het verkeer brengen, verkopen en/of anderszins verhandelen van smartphones Galaxy S, S II en Ace, inbreuk te maken op het Nederlandse deel van EP 2.059.868;

5.2.    Verbiedt gedaagden sub 2-4 om na verloop van 7 weken en één dag na betekening van het te wijzen vonnis op enigerlei wijze, direct dan wel indirect, door het vervaardigen, in voorraad hebben, aanbieden, invoeren, in het verkeer brengen, verkopen en/of anderszins verhandelen van smartphones Galaxy S, S II en Ace, inbreuk te maken op de buitenlandse delen van EP 2.059.868;

5.3.    Gebiedt gedaagden aan eiseres een onmiddellijk opeisbare dwangsom te betalen van EUR 100.000 voor elke dag of gedeelte daarvan of, zulks ter keuze van eiseres, van EUR 10.000 per inbreukmakend product, waarop het aan gedaagden kan worden toegerekend dat de verboden zoals opgenomen onder 5.1 en 5.2 niet geheel of niet deugdelijk worden nageleefd;

5.4.    verklaart dit vonnis tot zover uitvoerbaar bij voorraad;

5.5.    compenseert de kosten van de procedures tussen partijen in die zin dat iedere partij de eigen kosten draagt,

5.6.    bepaalt de in artikel 1019i Rv bedoelde termijn op zes maanden, te rekenen vanaf de dag van deze uitspraak;

5.7.    wijst het meer of anders gevorderde af.

Dit vonnis is gewezen door mr. E.F. Brinkman en in het openbaar uitgesproken op 24 augustus 2011.