# EXHIBIT 7

1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Charles K. Verhoeven (Bar No. 170151)
2  charlesverhoeven@quinnemanuel.com
   Kevin A. Smith (Bar No. 250814)
3  kevinsmith@quinnemanuel.com
   50 California Street, 22nd Floor
4  San Francisco, California 94111
   Telephone: (415) 875-6600
5  Facsimile: (415) 875-6700

6  Kevin P.B. Johnson (Bar No. 177129)
   kevinjohnson@quinnemanuel.com
7  Victoria F. Maroulis (Cal. Bar No. 202603)
   victoriamaroulis@quinnemanuel.com
8  555 Twin Dolphin Drive 5th Floor
   Redwood Shores, California 94065
9  Telephone: (650) 801-5000
   Facsimile: (650) 801-5100
10
   William C. Price (Bar No. 108542)
11 williamprice@quinnemanuel.com
   Patrick M. Shields (Bar No. 204739)
12 patrickshields@quinnemanuel.com
   865 S. Figueroa St., 10th Floor
13 Los Angeles, California 90017
   Telephone: (213) 443-3000
14 Facsimile: (213) 443-3100

15 Attorneys for SAMSUNG ELECTRONICS
   CO., LTD., SAMSUNG ELECTRONICS
16 AMERICA, INC. and SAMSUNG
   TELECOMMUNICATIONS AMERICA, LLC
17

18              UNITED STATES DISTRICT COURT

19      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

20 APPLE INC., a California corporation,          CASE NO. 12-CV-00630-LHK

21              Plaintiff,                        **DECLARATION OF GEOFF A. COHEN,**
                                                  **Ph.D. CONCERNING U.S. PATENT NO.**
22      vs.                                       **8,046,721**

23 SAMSUNG ELECTRONICS CO., LTD., a               Date: June 7, 2012
   Korean business entity; SAMSUNG               Time: 1:30 p.m.
24 ELECTRONICS AMERICA, INC., a New               Place: Courtroom 8, 4th Floor
   York corporation; SAMSUNG                      Judge: Hon. Lucy H. Koh
25 TELECOMMUNICATIONS AMERICA, LLC,
   a Delaware limited liability company,          **FILED UNDER SEAL**
26                                                **HIGHLY CONFIDENTIAL –**
                Defendants.                        **ATTORNEYS' EYES ONLY**
27

28

02198.51981/4719770.1
                                                          Case No. 12-CV-00630-LHK
                     DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8.046.721

1.     I am Geoff A. Cohen of Newton Highlands, Massachusetts.  I have been retained by Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC ("Samsung") to provide expert opinions in the above-captioned litigation.

2.     As part of that engagement I have been asked to provide analysis and expert opinions on the following topics:  (a) the disclosure of United States Patent Number 8,046,721 ("the '721 Patent") and United States Patent Number 5,946,647 ("the '647 Patent"); (b) whether the Samsung Galaxy Nexus infringes claims 1 or 8 of the '647 Patent; (c) whether the Samsung Galaxy Nexus infringes claims 7, 8, 12, or 15 of the '721 Patent; and (d) whether the asserted claims of the '721 and '647 Patents are invalid.  In this declaration, I address the '721 patent.  My opinions concerning the '647 patent are set forth in a separate declaration.

3.     I am employed full-time as a Computer Scientist at Elysium Digital L.L.C. ("Elysium"), where my responsibilities include acting as a technical consultant to firms involved in computer science-related litigation.  My time is billed at my customary rate $405/hour for my work in preparing this declaration.  My compensation is not dependent on the content of my declaration or the outcome of this litigation.

4.     I have a Ph.D. in Computer Science from Duke University, where I studied experimental systems, operating systems, and software development methodology. While a student at Duke I received an IBM Graduate Fellowship.

5.     I have also been employed by Data General, where I worked on performance evaluation and engineering of multi-processor database servers. I have also been employed by IBM, where I worked on software development methodology, and automated analysis and generation of remote graphical user interfaces. I have also been employed by Cap Gemini Ernst & Young, where I provided strategic advice to companies on new technologies, including mobile computing, wireless technologies, and other emerging technologies. I have also been employed by the Congressional Budget Office, where I performed policy analysis of national security budgets.

6.     I have also acted as an independent consultant to the National Academy of Sciences, where I assisted in the research and production of a report on the intersection of

DECLARATION OF GEOFF A. COHEN, Ph.D. CONCERNING U.S. PATENT NO. 8,046,721

computer science and biology. I have also acted as an independent consultant to the

Communications Futures Program at the Massachusetts Institute of Technology, where I led the

working group on Internet security and privacy.

7.     I am a member of the Association for Computing Machinery (ACM). I have also

been a member of the ACM's Special Interest Group on Computer Human Interaction (SIGCHI). I

have served multiple times on the Program Committee, including as the Chair, for Onward!, an

Association of Computing Machinery conference on new directions in computer science. I also

serve on the USACM Public Policy Council, advising the ACM and the US Government on

technical matters of public policy. My professional experience has included software architecture

design, application programming and implementation, user interface design and review, and

system performance and evaluation. I hold 5 U.S. Patents for software inventions. I have attached

my Curriculum Vitae as Exhibit A to this declaration.

8.     It is my understanding that Apple has accused Samsung of infringing the '721

Patent and the '647 Patent, among others.  In particular, Apple has claimed that the manufacture,

sale, or use of the Samsung Galaxy Nexus phone infringes claims 1 and 8 of the '647 Patent and

claims 7, 8, 12, and 15 of the '721 Patent.

9.     Furthermore, I understand that Apple has moved for a preliminary injunction,

claiming that they are likely to win the respective counts of the legal complaint, and that they are

likely to prevail against Samsung's defenses, including invalidity of the patents.

## I.    MY UNDERSTANDING OF LEGAL PRINCIPLES

### A.    LEGAL UNDERSTANDINGS

10.     This section contains information provided to me by Samsung's attorneys for the

following legal standards.

#### 1.    Infringement

11.     I understand that the determination of whether an accused product infringes a

patent claim is a two-step process.  First, the language of the claim is construed as it would be

understood by one of ordinary skill in the art at the time of the filing of the patent application.

12.     I understand that a person having ordinary skill in the art is a hypothetical person. A person of ordinary skill in the art is presumed to be one who thinks along the lines of conventional wisdom in the art and is not one who undertakes to innovate, whether by extraordinary insights or by patient and often expensive systemic research.

13.     I further understand that the hypothetical person of ordinary skill is presumed to have knowledge of all references in the pertinent art and to have knowledge of all arts reasonably pertinent to the particular problem that the claimed invention addresses.

14.     I understand that after the claim has been properly construed, the claim is compared with the accused product to determine whether all of the features of the claim are present literally or by a substantial equivalent. The evaluation of literal infringement is a process of determining whether the accused product has each and every element specified in the properly construed claim. If even one element is not present, literal infringement cannot be found.

15.     I understand that a patent's claims define what is covered by the patent. In deciding the issue of infringement, it is improper to compare the alleged infringer's accused product to any of the patent holder's commercial products. The patent holder's current commercial products are irrelevant in determining infringement; the only relevant inquiry is whether the properly construed claims read on the accused device(s).

### 2.     Doctrine of Equivalents

16.     I understand that a device that does not literally infringe a claim may nonetheless infringe under the doctrine of equivalents if each and every limitation in the claim is "equivalently present" in the accused device. The doctrine of equivalents must be applied to individual elements of the claim and not to the invention as a whole; thus it must not be applied broadly as to effectively eliminate an element of the claim in its entirety. Each and every element in the claim is "equivalently present" in the accused device if only "insubstantial differences" distinguish the missing claim element from the corresponding aspects of the accused device. I understand that one test used to determine whether differences between a claim element and the feature of the accused device asserted to practice that element are insubstantial is known as the "function-way-result test." A claim element is insubstantially different from an accused feature if they both

perform substantially the same function in substantially the same way to obtain substantially the same result.

17.     I understand that another test for insubstantial differences is the "known interchangeability" test.  Two elements may be insubstantially different if a person of ordinary skill in the art at the time of invention would have known the two elements were interchangeable.

18.     I understand that equivalency is examined in the context of the prior art, the patent specification, and the prosecution history.  I understand that the range of equivalents is limited by the prior art to prohibit the patent owner from extending patent protection beyond the scope of a claim.  Thus, it is my understanding that the range of equivalents cannot include what the prior art anticipates and/or renders obvious.

19.     I understand that the doctrine of equivalents is also subject to the doctrine of prosecution history estoppel, which acts to limit infringement by otherwise equivalent products or processes.  It is my understanding that prosecution history estoppel bars the patentee from recapturing subject matter that was surrendered by the patentee during prosecution to promote allowance of the claims.

### 3.     Legal Standard for Prior Art

20.     I understand that a patent, another publication, a system, or a product, must first qualify as "prior art" before it can be used to invalidate a patent claim.

21.     I understand that Section 102 of the Patent Act provides the conditions by which prior art is determined.

22.     I understand that a system or product qualifies as prior art to an asserted patent if that system or product: (1) was known or used by others in the U.S. before the date of invention of the asserted patent, or (2) was in public use or on sale in the U.S. more than one year before the filing date of the asserted patent.

23.     I understand that a U.S. or foreign patent, or a printed publication such as a datasheet, article published on the Internet, or published patent application, qualifies as prior art to an asserted patent if that patent was issued or that publication was published: (1) before the

1    invention of the asserted patent, or (2) more than one year before the filing date of the asserted

2    patent.

3          24.    I understand that a patent application also qualifies as prior art to an asserted patent

4    if the application was filed in the U.S. before the invention of the asserted patent and is: (1)

5    published no more than 18 months after filing, or (2) is granted as a patent.  I further understand

6    that an international patent application filed under the Patent Cooperation Treaty (PCT) qualifies

7    as prior art as described in this paragraph if that application designated the United States and was

8    published in the English language.

9          25.    I further understand that if the claimed invention was made in the U.S. by another

10    inventor who had not abandoned, suppressed, or concealed the invention, that prior invention may

11    be invalidating prior art.

12          26.    I understand that documents and materials that qualify as prior art can be used to

13    invalidate a patent claim as anticipated or as obvious.

14          27.    I understand that invalidity must be shown by clear and convincing evidence.

15          **4.**     **<u>Legal Standard for Anticipation</u>**

16          28.    I understand that, once the claims of a patent have been properly construed, the

17    second step in determining anticipation of a patent claim requires a comparison of the properly

18    construed claim language to the prior art on a limitation-by-limitation basis.

19          29.    I understand that a prior art reference "anticipates" an asserted claim, and thus

20    renders the claim invalid, if all elements of the claim are disclosed in that prior art reference, either

21    explicitly or inherently.  I understand an element may be inherently disclosed in a prior art

22    reference when the element is necessarily present or implied.

23          30.    Further, I understand that a prior art device or system that was in public use or on

24    sale under Section 102(b) of the Patent Act need not disclose the invention.  Rather, such a public

25    use or sale need only relate to a device or system that embodies the invention.

26          31.    I have written this Declaration with the understanding that anticipation must be

27    shown by clear and convincing evidence.

28

### 5.    Legal Standard for Obviousness

32.    I have been instructed by counsel on the law regarding obviousness.  I understand that Section 103 of the Patent Act governs the determination of obviousness.

33.    I understand that even if a patent is not anticipated, it is still invalid if the differences between the claimed subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the pertinent art.  I am informed by counsel that the standard for determining obviousness was clarified by the Supreme Court of the United States in KSR Int'l. Co. v. Teleflex Inc., 550 U.S. 298 (2007).

34.    I understand that a person of ordinary skill in the art provides a reference point from which the prior art and claimed invention should be viewed.  This reference point prevents one from using hindsight in deciding whether a claim is obvious.

35.    I understand that the obviousness analysis is expansive and flexible.  I also understand that a combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results, and that when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result.

36.    I also understand that an obviousness determination includes the consideration of various factors such as (1) the scope and content of the prior art, (2) the differences between the prior art and the asserted claims, (3) the level of ordinary skill in the pertinent art, and (4) the existence of secondary considerations such as commercial success, long-felt but unresolved needs, failure of others, etc.

37.    I understand that an obviousness evaluation can be based on a combination of multiple prior art references.  I understand that the prior art references themselves may provide a suggestion, motivation, or reason to combine, but other times the nexus linking two or more prior art references is simple common sense.  I further understand that obviousness analysis recognizes that market demand, rather than scientific literature, often drives innovation, and that a motivation to combine references may be supplied by the direction of the marketplace.

38.     I understand that if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.

39.     I also understand that practical and common sense considerations should guide a proper obviousness analysis, because familiar items may have obvious uses beyond their primary purposes.  I further understand that a person of ordinary skill in the art looking to overcome a problem will often be able to fit the teachings of multiple publications together like pieces of a puzzle.  I understand that the obviousness analysis therefore takes into account the inferences and creative steps that a person of ordinary skill in the art would employ under the circumstances.

40.     I understand that a particular combination may be proven obvious merely by showing that it was obvious to try the combination.  For example, when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp because the result is likely the product not of innovation but of ordinary skill and common sense.

41.     I understand that the combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results. When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one.  If a person of ordinary skill can implement a predictable variation, Section 103 of the Patent Act likely bars its patentability.

42.     I understand that a proper obviousness analysis focuses on what was known or obvious to a person of ordinary skill in the art, not just the patentee.  Accordingly, I understand that any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.

43.     I understand that a claim can be obvious in light of a single reference, without the need to combine references, if the elements of the claim that are not found explicitly or inherently in the reference can be supplied by the common sense of one of skill in the art.

44.     In sum, my understanding is that prior art teachings are properly combined where a person of ordinary skill in the art having the understanding and knowledge reflected in the prior art and motivated by the general problem facing the inventor, would have been led to make the combination of elements recited in the claims.  Under this analysis, the prior art references themselves, or any need or problem known in the field of endeavor at the time of the invention, can provide a reason for combining the elements of multiple prior art references in the claimed manner.[1]

45.     I have been informed and understand that the obviousness analysis requires a comparison of the properly construed claim language to the prior art on a limitation-by-limitation basis.

46.     I understand that obviousness must be proven by clear and convincing evidence.

47.     I have written this Declaration with the understanding that obviousness must be shown by clear and convincing evidence.

## 6.    Legal Standard for Indefiniteness

48.     I understand that a patent specification must conclude with one or more claims particularly pointing out and distinctly claiming the subject matter that the applicant regards as his invention.  Claims are indefinite if they do not reasonably apprise those skilled in the relevant art of the applicant's intended scope of the invention when read in light of the specification.

---

[1]   I am also informed by counsel that a showing of obviousness may be rebutted by showing "secondary considerations" of non-obviousness. I understand that these secondary considerations may include (1) a long felt but unmet need in the prior art that was satisfied by the invention of the patent; (2) commercial success or lack of commercial success of processes covered by the patent; (3) unexpected results achieved by the invention; (4) praise of the invention by others skilled in the art; (5) taking of licenses under the patent by others; and (6) deliberate copying of the invention. I also understand that there must be a relationship between any such secondary considerations and the invention. I also understand that contemporaneous and independent invention by others is a secondary consideration supporting an obviousness determination. I am informed by counsel, however, that it is Plaintiff's burden to make a showing of secondary considerations.  Thus, I have not included any opinions on secondary considerations of non-obviousness in this declaration.  If Plaintiff should attempt to show secondary considerations of non-obviousness, I hereby reserve my right to address those claims in a supplemental declaration or as otherwise appropriate.

49.     I understand that a claim is indefinite if it contains words or phrases whose meanings are unclear when read in light of the specification.  Lack of proper antecedent basis results in a "zone of uncertainty" as to construction, and renders the claim insolubly ambiguous.

50.     I further understand that a claim is considered indefinite if it does not reasonably apprise those skilled in the art of its scope.  I understand that where it is unclear whether infringement occurs when one creates a system that allows the user to perform a function, or whether infringement occurs when the user actually uses the system to perform a function, the claim does not apprise a person of ordinary skill in the art of its scope, and it is invalid as indefinite.

51.     I understand that indefiniteness must be proven by clear and convincing evidence.

52.     I have written this Declaration with the understanding that indefiniteness must be shown by clear and convincing evidence.

### 7.     Legal Standard for Written Description and Enablement

53.     It is my understanding that a patent must contain a written description of the claimed invention.  The written description must clearly convey to those skilled in the art that, as of the filing date sought, the applicant was in possession of the invention claimed.

54.     I have further been advised that a claimed invention must be enabled.  A claimed invention is not enabled if the specification does not teach those of ordinary skill in the art how to make and use the invention as it is claimed, without undue experimentation.  Undue experimentation is based on the level of skill in the art as of the effective filing date of the patent.

55.     I understand that invalidity for lack of adequate written description or enablement must be shown by clear and convincing evidence.

56.     I have written this Declaration with understanding that invalidity for lack of written description or enablement must be shown by clear and convincing evidence.

### 8.     Legal Standard for Conception and Reduction to Practice

57.     I further understand that many of the different categories of prior art refer to the date at which the inventor made the invention.  This is called the "date of invention."

58.     I understand that there are two parts to the making of an invention: "conception" and "reduction to practice."

59.     I have been advised that when the inventor first has the idea of the invention, this is referred to as "conception" of the invention.  Conception is the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is to be applied in practice.  A conception of an invention is complete when the inventor has formed the idea of how to make and use every aspect of the claimed invention, and all that is required is that it be made without the need for any further inventive effort.

60.     I am also informed that the actual making of the invention is referred to as "reduction to practice."  An invention is said to be "reduced to practice" when it is made and shown to work for its intended purpose.  I understand that the filing of a patent application serves as conception and constructive reduction to practice of the subject matter described in the application.

### 9.     <u>Priority Date</u>

61.     I understand that the "critical date" for a patent is one year prior to its filing date.  It is my understanding that the critical date is significant because patents, systems, or documents that are public prior to the critical date, if they disclose each and every limitation of a patent claim, will invalidate that claim.

62.     I further understand that the "priority date" of a patent is the date on which it is filed.  I further understand that the priority date is significant because patents, systems, or documents that are public less than one year prior to the priority date may invalidate the claims.  My understanding is that, for such prior art references, a patentee may attempt to show that the claimed invention was conceived prior to the publication date of the prior art reference.

63.     I understand that a patent may be valid over prior art that was published or was publically available before the priority date but after the critical date.  To do so, it is my understanding that Complainant must prove with corroborating evidence that the named inventors conceived of the claimed invention before the prior art, and were diligent in reducing the claimed inventions to practice.

## II.  THE '721 PATENT

64.  The '721 Patent is entitled "Unlocking a device by performing gestures on an unlock image."  It was filed by Imran Chaudhri, Bas Ording, Freddy Allen Anzures, Marcel Van Os, Stephen O. Lemay, Scott Forstall, and Greg Christie on June 2, 2009, as a continuation of U.S. Patent Application No. 11/322,549, filed December 23, 2005, which issued as U.S. Patent Number 7,657,849. Both patents share a common specification, disclose hand-held devices with touch-sensitive screens, and purport to solve the problem of inadvertent touches on the screen.

65.  Claims 7 and 12 are independent claims, and outside of the preamble, differ only in the particular wording of the claim limitations.  Otherwise they are identical, and my analysis of common claim elements applies to both claims.

66.  Claim 7 reads as follows (I have added letters to indicate separate claim elements):

> 7. A portable electronic device, comprising:
> (a) a touch-sensitive display;
> (b) memory;
> (c) one or more processors; and
> (d) one or more modules stored in the memory and configured for execution by the one or more processors, the one or more modules including instructions:
> (e) to detect a contact with the touch-sensitive display at a first predefined location corresponding to an unlock image;
> (f) to continuously move the unlock image on the touch-sensitive display in accordance with movement of the detected contact while continuous contact with the touch-sensitive display is maintained, wherein the unlock image is a graphical, interactive user-interface object with which a user interacts in order to unlock the device; and
> (g) to unlock the hand-held electronic device if the unlock image is moved from the first predefined location on the touch screen to a predefined unlock region on the touch-sensitive display.

67.  Claim 12 reads as follows (again, I have added letters to indicate separate claim elements):

> 12. A computer readable storage medium storing one or more programs, the one or more programs comprising instructions, which when executed by a portable electronic device with a touch-sensitive display, cause the portable electronic device to perform a method comprising:
> (a) detecting a contact with the touch-sensitive display at a first predefined location corresponding to an unlock image;
> (b) continuously moving the unlock image on the touch-sensitive display in accordance with movement of the contact while continuous contact with the touch screen is maintained, wherein the unlock image is a graphical, interactive user-interface object with which a user interacts in order to unlock the device; and

    (c) unlocking the hand-held electronic device if the moving the unlock image on the touch-sensitive display results in movement of the unlock image from the first predefined location to a predefined unlock region on the touch-sensitive display.

## B.    <u>CLAIMS 7, 12 AND 15 OF THE '721 PATENT ARE INDEFINITE</u>

68.    As discussed above, I understand that when claim definitions rely solely on the subjective opinion of a particular individual or company, the claim does not apprise a person of ordinary skill in the art of its scope, and it is invalid as indefinite. As an initial matter, it is my opinion that Claims 7 and 12 of the '721 patent are invalid because they are indefinite.

### 1.    <u>The "unlocking" limitation in Claims 7 and 12 is indefinite.</u>

69.    Both claims 7 and 12 of the '721 Patent require "unlocking the hand-held device if moving the unlock image on the touch sensitive display results in movement of the unlock image from the first predefined location to a predefined unlock region on the touch sensitive display." Both claims are indefinite, because the patent provides no guidance in determining whether a particular device is locked or unlocked.

    (i)    <u>Apple's expert testified that Claims 7 and 12 cover unlocking a device, rather than particular applications.</u>

70.    Apple's expert testified that claims 7 and 12 cover unlocking a device, rather than an application. At deposition, Dr. Balakrishnan explicitly stated that the claim covers unlocking a device, which is a different operation from unlocking applications such as the web browser. However, Dr. Balakrishnan was unable to articulate the difference between unlocking a device and an application:

DECLARATION OF GEOFF A. COHEN, Ph.D. CONCERNING U.S. PATENT NO. 8,046,721

> Q.    So when we look at unlocking as
> claimed in the '721 patent, do you believe
> that unlocking is broad enough in the context
> of the claim language to include both
> embodiments, where one embodiment is
> unlocking the device and the other embodiment
> is unlocking a particular application?
> A.    So for claim seven, the first
> asserted claim, the last limitation is to
> unlock the handheld electronic device.  I
> would believe that's different from unlocking
> an application where -- unless the
> application is the notion of the lock
> application, in contrast with, say, a web
> browser, for example.

(Balakrishnan Dep. At 109:1-15.)

> Q.    You would agree with me that the
> concept of unlocking an application is also
> disclosed in the '721 patent?
> A.    Yes.
> Q.    But you believe that the claims,
> the asserted claims of the '721 patent does
> not cover that particular embodiment?
>       MR. LYON:  Objection.  Vague.
> A.    The set of claims, the last
> limitation of claim 7 and 12 talk about
> unlocking the device, not a particular app,
> but as I said earlier, if the app, unlocking
> the app involves unlocking the device, then
> it would amount to the same.

(*Id.* At 110:14 to 111:2.)

> (ii)    Dr. Balakrishnan was unable to articulate an objective framework
> for determining whether a device is locked or unlocked.

71.    Dr. Balakrishnan also testified that the analysis of whether a device is in the "user

interface locked state" or "unlocked state" turns on whether a "predefined set of operations" is

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8,046,721

accessible in the device's current operating state. The specification of the '721 Patent states, "In the user-interface lock state (hereinafter the 'lock state'), the device 100 is powered on and operational but ignores most, if not all, user input. That is, the device 100 takes no action in response to user input and/or the device 100 is prevented from performing a predefined set of operations in response to the user input. The predefined set of operations may include navigation between user interfaces and activation or deactivation of a predefined set of functions." (Exhibit B at 7:64-8:4). Therefore, according to Apple's expert, whether a device may access a "predefined set of operations" is dispositive in the determination of its current state, regardless of the number of applications or functions that are accessible in the current operating state:

```
20      Q.     But, again, if I had 99
21   applications on a smartphone, they are
22   operational in a locked state, one
23   application is not, would you consider that
24   to satisfy the locked state of the '721
25   patent?
2       A.     If that one unlocked application
3    is the one that falls in the predefined set
4    that is supposed to be locked, then yes, it
5    would satisfy it.
```

(Balakrishnan Dep. At 124:20-125:5.)¶

72.     However, the specification is silent on what functions comprise the "predefined set of operations." Dr. Balakrishnan similarly struggled to articulate an objective standard for the predefined set of operations. Dr. Balakrishnan admitted he could not think of an objective standard for categorizing functions within the predefined set of operations, and stated that such a decision was likely made at the time of programming:

```
10        Q.    Is there an objective criteria
11   that you can tell me?
12        A.    I don't have one off the top of
13   my head.  As I said before, I think it would
14   depend on the particular applications, and
15   it's up to the designers of the phone to
16   decide whether some -- what particular things
17   may be left unlocked in a locked state, as
18   the patent clearly contemplates a predefined
19   set of operations.  That set is predefined,
20   so it is not arbitrary, but something that
21   one makes a decision on.  Presumably at the
22   time of writing the code for the phone.
```

(Balakrishnan Dep. At 123:10-22.)

73.     Dr. Balakrishnan also asserted that the determination of the operations in the predefined set, and therefore, the operating state of a device, depended not only on the subjective perception of the device developers, but the collective, subjective understanding of the users of the device:

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8.046.721

16          Q.    Really, what I am trying to drive

17    at, Doctor, is, does the definition of locked

18    state, according to the '721 patent, depend

19    on the designer's definition of a predefined

20    set of operations that are associated with

21    that state?

22          A.    I think at some point there has

23    to be some determination as to what

24    constitutes a locked state in the patent.

25    The paragraph I just read out earlier clearly

1    contemplates a predefined set that

2    constitutes that.  Somebody would have to

3    make that decision and inform the user about

4    that, too.  It is not just you the designer

5    decides and no communication to users as to

6    what is a locked state or what is an unlocked

7    state.

(Balakrishnan Dep. At 129:16-130:7.)

74.    Dr. Balakrishnan also stated that the determination of the number of types of

functions that make up the "predefined set" is a subjective interpretation that includes a

reasonableness requirement, further muddling the determination of whether a device is locked or

unlocked:

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8.046.721

22    Q.    That's what I am getting at, sir.

23  Which criteria do we use to determine whether

24  something is in a locked state according to

25  the '721 patent?  Do we look at the

1   designer's intent?  Do we look at the user's

2   intent or understanding?  Do we look at the

3   number of applications?  Is there some kind

4   of criteria that you can use?

5     A.    I think you are trying to put a

6   hard number on something that maybe requires

7   a little bit of subjective interpretation.

8   The 99 to 1, I don't think that would be

9   arbitrary.  I think a designer would state it

10  is locked, the entire phone, the entire

11  device is locked.

12          But only one application is

13  locked and 99 that are active, I don't think

14  that's a reasonable choice of applications to

15  put in the sets that the patent is

16  contemplating.  When the patent is

17  contemplating predefined set, I'm assuming

18  it's contemplating reasonable choices as to

19  what goes into those sets.

20    Q.    So you are reading a reasonable

21  requirement into the claims?

22          MR. LYON:  Objection.

23  Mischaracterizes testimony.

24    A.    No.  I'm reading a reasonable

25  requirement into the choice of what is a

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8.046.721

```
1    prede:
2    or un]
```

(Balakrishnan Dep. At 139:20-140:2.)

75.     Thus, Apple's own expert was unable to provide any sort of objective framework for determining whether a device is locked or unlocked.  By contrast, Dr. Balakrishnan explicitly stated that there is no bright-line objective test, and that the determination of a device's operating state depends both on the subjective understanding of both the designer and the users of the device.  Finally, Dr. Balakrishnan concluded that the number and type of functions included in the predefined set of functions that ultimately determine the locked/unlocked state of a device is subject to a reasonableness requirement.  It is my understanding that claim terms whose definitions rely solely on subjective opinion of individuals are indefinite as a matter of law.  By Dr. Balakrishnan's own standards, the claims are hopelessly indefinite; a person of ordinary skill in the art cannot determine whether a device is locked or unlocked, and therefore, cannot determine if moving an image continuously from a first location to a second region "unlocks the portable electronic device."

(iii)     The file history of the '849 patent confirms the patent claims are indefinite.

76.     The file history of the parent application that resulted in the issuance of the '849 Patent further highlights the lack of definiteness of the term "unlocking."  The examiner in the '849 prosecution applied US 5,821,933 to Keller (discussed in section 163 below) to reject the claims of the '849 Patent.  Keller discloses dragging and dropping particular code icons to a particular region to access a restricted function, an operation that Dr. Balakrishnan asserted would apparently practice the claims of the '721 Patent as long as the application functionality was "predefined".  However, in an amendment filed May 7, 2008 (Exhibit E), the applicant distinguished this operation from the patent claims, stating, "Unlocking the device is not the same as unlocking a restricted function on the device.  Indeed, unlocking a restricted function in Keller occurs when the computer is already in an unlocked state." (emphasis added).  As noted earlier,

during his deposition, Dr. Balakrishnan was unable to identify an objective criteria for distinguishing between unlocking a device (as claimed) versus unlocking a predefined set of applications (admittedly in the prior art).

                (iv)    <u>The inventor of the '721 patent was unable to articulate an objective method of determining the state of a device.</u>

77.    Even the inventor himself, Greg Christie, could not articulate an objective method for determining whether a device is locked or unlocked, despite repeated attempts to do so. When presented with a number of hypothetical devices, Mr. Christie was able to conclusively state whether the device was locked or unlocked, but when asked what principle he was applying to determine the hypothetical devices were locked or unlocked, Mr. Christie testified that there is no objective criteria for making the determination, which depends on subjective interpretation of the user:

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8,046,721

Q.  And is there some type of objective criteria that we can use in your mind to distinguish between the types of function that you identified, such as changing the volume, which would cause --

A.  Wholly objective?  I don't believe that we could agree on wholly objective terms.

Q.  Let me --

A.  You may be a person that doesn't care about accidental operation of things.  You don't care whether you answer the phone accidentally or place a call accidentally.  You just want -- you know, you don't think there should be a lock screen, right?  So that's your subjective opinion, right, whereas somebody, you know, may not ever, under any circumstances, want a volume to change accidentally ever, to the point where you have to unlock the phone to even change the volume, even if the media is playing.

So I don't believe that there is an objective set of criteria for determining locked versus unlocked.  It has to do with what -- there is a tug of war between convenience and accident prevention.

(Christie Dep. At 145:5-146:3.)

78.    Based on my review of the patent specification, claims, prosecution history, and the deposition testimony of Apple's expert witness and the inventor of the '721 patent, I conclude that the determination of whether a device is locked or unlocked rests completely on the subjective

opinion of the device designer and users of the device, and as such, it is impossible for a person of ordinary skill in the art to determine whether a particular device "unlocks" in response to a particular gesture. Therefore, I conclude that claims 7 and 12 of the '721 Patent are invalid due to indefiniteness.

### C. NON-INFRINGEMENT OF THE '721

79. Apple is asserting that the Galaxy Nexus infringes at least claims 7, 8, 12, and 15 of the '721 Patent. For the reasons I set forth below, I do not believe that the Galaxy Nexus infringes any asserted claim.

80. I have reviewed the Declaration of Dr. Ravin Balakrishnan, in which he sets forth his opinions on the alleged infringement by the Galaxy Nexus of the asserted claims. In particular, he identifies portions of the source code of Android 4.0 (also known as Ice Cream Sandwich) as satisfying many of the claim elements.

81. Generally, the accused code involves code that controls the user interface to allow a user to manipulate a "handle", and to display a number of "targets." A "handle" is an object with multiple graphical representations, and "targets" are locations of a display that represent different functionalities available to the user.

82. As an initial matter, Dr. Balakrishnan does not appear to understand the source code at issue. For example, his discussion of claim 15, which applies to the "unlock image," examines code in the Galaxy Nexus that controls the targets. The targets represent the places to which the handle (the alleged "unlock image") is dragged, and thus cannot be considered unlock images even given Apple's other accusations.

### D. CLAIMS 7 AND 12

#### 1. The Samsung Galaxy Nexus does not "continuously move" the same "unlock image."

83. The claim term "unlock image" shows up 4 times each in claims 7 and 12. It is my understanding that when a claim term reappears with an antecedent basis, it must refer to the same instance as its antecedent. The applicant's use of the term "the unlock image" signals his intent that all further instances of the term "unlock image" be the same instance as the unlock image

claimed in the limitation: "detecting a contact with the touch-sensitive display at a first predefined location corresponding to an unlock image." Thus, subsequent actions on unlock images must be on the same unlock image that the user initially touched.

84. In fact, the Galaxy Nexus does not use the same image for the handle throughout the unlock process. Before there is a contact, a first image is displayed at the start location. After a contact is detected, the image at the original location is replaced with a new image at the location of the contact. The method trySwitchToFirstTouchState, once it has determined that a contact is within a radius of the handle center, calls SwitchToState, which in turn will call setState on the mHandleDrawable object that represents the handle. That method, defined in the file TargetDrawable.java, selects a new image from a list of images.

85. In the Galaxy Nexus, that list of images is set to the values contained in the resource file frameworks/base/core/res/res/drawable/ic_lockscreen_handle.xml, which in turn refers to the files frameworks/base/core/res/res/drawable-xhdpi/ic_lockscreen_handle_normal.png and frameworks/base/core/res/res/drawable-xhdpi/ic_lockscreen_handle_pressed.png. These are two discrete images, stored on the phone as separate files that are considered by the Android software and displayed as separate images.

86. Screencaptures from the Galaxy Nexus clearly demonstrate this behavior. As shown below, the alleged "unlock image" in the first photograph on the left, consisting of a padlock icon surrounded by a small circle, is the file ic_lockscreen_handle_normal.png.

 

87.     The "unlock image" in the second photograph on the right, consisting of a large circle with no padlock, is the file ic_lockscreen_handle_pressed.png.  Dr. Balakrishnan accuses detecting a contact with the touch-sensitive display at a first predefined location corresponding to ic_lockscreen_handle_normal.png, but continuously moving ic_lockscreen_handle_pressed.png. As is evident from an examination of the Ice Cream Sandwich source code, to the extent that these two png files are "unlock images," they are not the same "unlock image."

88.     Additionally, the applicants relinquished claim scope covering multiple unlock images for a single state during the prosecution of the '721 Patent.  It is my understanding that Apple is contending that claims 13-15, which claim "the unlock image is a single image," imply that claims 1, 7, and 12 must be broader through the doctrine of claim differentiation.  I have been informed that the doctrine of claim differentiation is not an absolute.

89.     Furthermore, I understand that in the prosecution of the '721 Patent, the applicants disclaimed scope of non-singular images.  The examiner suggested that the Applicant "modify the claim language of the unlock image to further clarify that the unlock image is singular and not multiple images" in an Examiner Interview conducted April 22, 2011:

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8.046.721

1  Substance of Interview
   reached, or any other

2  of record. Examiners
   Image along a predefi

3  further clarify that the

4  (Exhibit C.)

5      90.      Finally, my reading of the '721 specification shows that when the applicants

6  envisioned multiple unlock images, they meant multiple images at the same time (see Fig. 9 and

7  related discussion at Exhibit B, 16:52-17:66). This section discusses an embodiment that contains

8  "a plurality of unlock images." But even in this embodiment, "The device becomes unlocked...

9  upon performance of the unlock action with respect to the particular unlock image." (Id. at 17:42-

10 46, emphasis added.) Thus, a person of ordinary skill in the art would understand that claims 1, 7,

11 and 12 would – absent the applicants' clear disclaimer to the Patent Office – encompass a system

12 that offered multiple simultaneous different unlock images, but that the unlock image

13 manipulation must refer to a single image.

14         **2.    The Samsung Galaxy Nexus does not "continuously move the unlock**

15                **image."**

16     91.      Claims 7 and 12 both require that the unlock image be moved continuously in

17 accordance with movement of the detected contact. Limitation f of claim 7 requires a device

18 having instructions "to continuously move the unlock image on the touch-sensitive display in

19 accordance with movement of the detected contact," and limitation f of claim 12 requires a

20 computer readable media comprising instructions to "continuously moving the unlock image on

21 the touch-sensitive display in accordance with movement of the contact."

22     92.      Dr. Balakrishnan presents no evidence that the Samsung Galaxy Nexus performs

23 these limitations. He shows that the alleged unlock image -- the "handle" -- moves, but he does

24 not show that it moves continuously.

25     93.      Even assuming ic_lockscreen_handle_pressed.png is the same unlock image as

26 ic_lockscreen_handle_normal.png, a contention with which I disagree above, the handle does not

27 move continuously. As also described above, after a contact is detected, the image at the original

28

1   location is replaced with a new image at the location of the contact. For example, if the method

2   trySwitchToFirstState, has determined that a contact is within a certain radius of the center of

3   ic_lockscreen_normal.png, it calls the method moveHandleTo(). MoveHandleTo() simply sets the

4   location of the handle to a new x, y location and replaces the handle with

5   ic_lockscreen_pressed.png without any animation. The motion is not continuous in space; the old

6   handle image is removed and the new image appears at the new location the instant the device

7   detects contact.

8       94.     Finally, when ic_lockscreen_pressed.png is dragged to within a given radius of one

9   of the target images, the image again snaps discontinuously. The Galaxy Nexus performs this

10  snapping by simply rendering ic_lockscreen_pressed.png at the x,y location of the target the

11  instant the png is dragged within a particular radius of the target. Thus the movement of

12  ic_lockscreen_pressed.png is not spatially continuous, it disappears from the location of the touch

13  and reappears at the new location instantaneously without any animation.

14          **3.    The Samsung Galaxy Nexus does not move the unlock image "in**

15          **accordance with movement of the contact."**

16      95.     As I have discussed above, the Samsung Galaxy Nexus does not move

17  ic_lockscreen_pressed.png spatially continuously. The image simply vanishes and is re-drawn at

18  a new location. In this scenario, to the extent ic_lockscreen_pressed.png is "moved", it is not

19  moved "in accordance with movement of the contact." As the user brings his or her finger toward

20  one of the targets, as soon as the touch crosses a radius outside the target image,

21  ic_lockscreen_pressed.png is redrawn centered on the target image. Even if the user keeps his or

22  her finger down, ic_lockscreen_pressed.png is now rendered at a location separate and distinct

23  from the detected contact. Thus the Samsung Galaxy Nexus does not move the unlock image

24  continuously "in accordance with movement of the contact."

25      96.     Furthermore, if the user contact moves beyond a certain region, the handle no

26  longer moves with it. The Samsung Galaxy Nexus renders a large circle segment after the device

27  detects contact within a radius of ic_lockscreen_normal.png. After replacing

28  ic_lockscreen_normal.png with ic_lockscreen_pressed.png at the center of the user's touch,

ic_lockscreen_pressed.png follows the user's touch only within the area of the large semicircle. The movement of ic_lockscreen_pressed.png is constrained to this large semicircle.



97.     In the example above, the user's touch is positioned at the "10" in the time "10:01" displayed at the top of the screen. The image loaded from the file, ic_lockscreen_pressed.png is constrained to the region inside the faint circle segment, and does not follow the detected contact. Thus, the movement of ic_lockscreen_pressed.png is not "in accordance with the movement of the detected contact," as required by the claims.

### 4.     <u>The Samsung Galaxy Nexus does not "unlock the hand-held electronic device."</u>

98.     I have discussed the indefiniteness of the "unlock state" above in Section II.B.1. above. However, to the extent that the specification provides any definition of the "unlocked state," I do not believe the Samsung Galaxy Nexus is in an "unlocked state" in the state accused by Apple. Therefore, I do not believe it performs the step of "unlocking the hand-held electronic device if the moving the unlock image on the touch-sensitive display results in movement of the unlock image from the first predefined location to a predefined unlock region on the touch sensitive display." The specification explicitly states that navigation between user interfaces is

DECLARATION OF GEOFF A. COHEN, Ph.D. CONCERNING U.S. PATENT NO. 8,046,721

prohibited in a user interface locked state. (Exhibit B at 8:12-34). This definition of the "unlocked state" is consistent with the definition of the inventor, Greg Christie:

```
18        Q.   Okay.  So after having taken a look at
19   the '721 patent, do you now have an understanding
20   of what the patent is describing as a locked
21   state versus an unlocked state?
22        A.   I have my understanding.
23        Q.   And what is your understanding?
24        A.   My understanding is, in a locked state,
25   the device remains on and can respond to other
1    events; but in terms of user actions, the only
2    events that it really responds to are those that
3    will allow it to be unlocked.  There are
```

(Christie Dep. At 69:18-70:3.)

99.     Mr. Christie further clarified that the determination of an unlocked or locked state depends on "allow input versus not allowing input at the most highest level." Id. at 139.

100.    In the state that Dr. Balakrishnan alleges is locked, it is possible to reach the full functionality of the phone. For example, if a notification that an event, such as a new email, has occurred, a notification will appear on the notification bar. While still in the state alleged by Dr. Balakrishnan as "locked", the user can pull down the notification screen and tap on the item, which will take the user to the application. Such an operation transitions the device between user interfaces.

101.    As a second example, when the user is playing music, the music player appears on the alleged "unlock screen," allowing the user to pause or play music, or advance or reverse tracks, as shown below:

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8,046,721



102. During deposition, Mr. Christie specifically identified changing a song playing in a music application as a function which would cause the phone to be classified as in an "unlocked state:"

```
  --
  23   lock
  24
  25
```

```
   9    were
  10
  11
  12
  13   lock
```

(Christie Dep. At 142:4-143:18.)

103.   As previously stated, I believe claims 7 and 12 are indefinite for failure to point out and distinctly claim unlocking a device, because it is impossible to determine whether a device is in a "locked state." However, to the extent that the specification, and the testimony of the inventor, Greg Christie, provide specific examples of functions that are inaccessible during a locked state, the Galaxy Nexus is never "locked" in the sense of the '721 patent.

### E.   CLAIM 8

104.   Claim 8 is not infringed, at least in part because claim 7 is not infringed.

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8,046,721.

### F.  CLAIM 15

105.    Claim 15 of the '721 Patent reads "The computer readable storage medium of claim 12, wherein the unlock image is a single image."  I do not believe that Claim 15 is infringed, at least in part because Claim 12 is not infringed.

106.    Dr. Balakrishnan cites the function updateTargetPositions as support for his position that the Galaxy Nexus infringes this claim.  (Balakrishnan Decl. At ¶ 96.)

107.    However, this citation is either irrelevant, as it deals with the targets and not the functionality of the handle, or supports a finding of noninfringement. The "target" is the icon that indicates the final position, not the image that is moving.  The claim limitation under discussion is "unlock image" (that is, the one that is moved by the user), not a separate image that indicates a target. Therefore, this code is irrelevant.

108.    However, even if we were to accept Dr. Balakrishnan's logic that these "target positions" were somehow understood to be "unlock images," the code that Dr. Balakrishnan cites plainly indicates that there is an array of target positions, and the code iterates through this array, updating each one in turn.  In the Galaxy Nexus, there are two such targets: the unlocked padlock icon and the camera icon. This is defined by the array lockscreen_targets_with_camera, initialized in the resource file frameworks/base/core/res/res/values/arrays.xml to contain the images found at frameworks/base/core/res/res/drawable-xhdpi/ic_lockscreen_unlock.png and frameworks/base/core/res/res/drawable-xhdpi/ic_lockscreen_camera.png.  I disagree with Dr. Balakrishnan's conclusion that this somehow indicates that there is only one such image.

109.    Furthermore, my own analysis indicates that the Galaxy Nexus does not infringe claim 15, even if it were found to infringe claim 12 (which I disagree with). The claim requires a single unlock image, and the Galaxy Nexus uses two, as described above.

### G.  ANTICIPATION OF THE ASSERTED CLAIMS

110.    It is my opinion that all of the '721 asserted claims are anticipated by Plaisant.

1.  **The Plaisant Video.**

111.     I believe Claims 7, 8, 12, and 15 are anticipated by a video made by Catherine Plaisant of the University of Maryland Human-Computer Interaction Lab in 1991 to demonstrate her research into toggle design for touchscreens. (Exhibit H).

112.     I conclude that the Plaisant Video discloses each and every claim limitation of Claims 7, 8, 12, and 15 of the '721 Patent.

        (i)     "A portable electronic device"

113.     To the extent that the preamble is limiting, the Plaisant Video teaches the use of touchscreens in any computer device, which inherently includes portable devices, even as early as 1991.

        (ii)     "a touch-sensitive display"

114.     The Plaisant Video discloses a touch-sensitive display. The video is entitled "Touchscreen Toggle Design." Catherine Plaisant says that "I will be discussing the design of touchscreen toggle switches." The '721 Patent discloses that touch-sensitive displays and touchscreens are synonymous ("Touch-sensitive displays (also known as "touch screens" or "touchscreens")..." '721 Patent, 1:25-26.

        (iii)     "memory; one or more processors; one or more modules stored in the memory and configured for execution by the one or more processors, the one or more modules including instructions"

115.     The video clearly shows that the touchscreen toggles are on a computer. Memory, processors, and modules configured for execution, including instructions are inherently present.

        (iv)     "to detect a contact with the touch-sensitive display at a first predefined location corresponding to an unlock image"

116.     The Plaisant Video discloses detecting a contact with the touch-sensitive display at a first predefined location corresponding to an unlock image. For example, the Plaisant Video shows a "slider toggle, the slider has move from one side to the other." Plaisant also discloses rocker and lever toggles that are used by contacting the touchscreen at a particular location corresponding to an image.

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8,046,721



117.  Plaisant also discloses a lever toggle that is used by contacting the touchscreen at a particular location corresponding to an image.  In the first photo below, the "heater" lever toggle is in the "ON" position, with the image, the tip of the lever, on the left side.



118.    In the next screen capture of the Plaisant video, the user makes contact with a predefined location corresponding to the tip of the lever image:



(v)    "to continuously move the unlock image on the touch-sensitive display in accordance with movement of the detected contact while continuous contact with the touch-sensitive display is maintained, wherein the unlock image is a graphical, interactive user-interface object with which a user interacts in order to unlock the device"

119.    The Plaisant Video shows the unlock image (the slider) moving continuously in accordance with her finger. The slider is a graphical, interactive user-interface object with which she interacts to turn a device on or off. Additionally, the Plaisant Video depicts the unlock image of the lever type toggle, moving continuously in accordance with the user's fingertip, as shown below:

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8.046.721

120. During deposition, Dr. Balakrishnan admitted that, upon viewing the Plaisant video demonstrating the operation of the lever type toggle, the toggle moved continuously with the user's finger:

```
19        Q.    Doctor, what about the last
20   example of the lever toggle; would you
21   consider that movement to be continuous as
22   shown in the video?
23        A.    Sorry, I was distracted by the
24   sign over there.
25             The animation as I saw in the
1    video seemed to be continuous.  I -- again,
2    it is really hard to tell without analyzing
3    it more closely.
```

(Balakrishnan dep. At 202:19-203:3.)

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8,046,721

(vi)   "to unlock the hand-held electronic device if the unlock image is moved from the first predefined location on the touch screen to a predefined unlock region on the touch-sensitive display."

121.   The Plaisant Video discloses that the toggles are used to "control devices," to turn them on or off.  She specifically mentions "security" as one of the applications.  The Plaisant Video specifically contemplates the control of any two-state device, and therefore discloses a two-state device with a locked and unlocked state.

122.   My analysis of Claim 7 applies to Claim 12 as well.

(vii)   Claim 8. "The device of claim 7, further comprising instructions to display visual cues to communicate a direction of movement of the unlock image required to unlock the device."

123.   The Plaisant Video discloses instructions to display visual cues to communicate a direction of movement of the unlock image required to unlock the device.  The shape of the slider track and the initial position of the pointer are visual cues to communicate a direction of movement of the unlock image required to unlock the device.

(viii)   Claim 15. "The computer readable storage medium of claim 12, wherein the unlock image is a single image."

124.   The Plaisant Video discloses that the yellow pointer of the slider toggle, the "unlock image," is a single image.

**H.   CLAIMS 7, 8, 12, AND 15 OF THE '721 PATENT ARE INVALID DUE TO OBVIOUSNESS.**

125.   As discussed above, it is my opinion that one or more of the '721 asserted claims are anticipated by the Plaisant Video.  To the extent there are any differences between the Plaisant Video and the '721 asserted claims, it is my opinion that these differences are trivial, and therefore the references discussed above also render the claims obvious.

126.   It is also my opinion that the '721 Asserted Claims are rendered obvious in light of the references set forth below, alone or in combination.  In the following sections, I provide a narrative of my opinions.

127.    I have been informed of the legal standards as recited previously in Section I, as well as the other legal understandings set out in this declaration, in reaching my opinions regarding obviousness.

### 1. Claims 7, 8, 12, and 15 of the '721 Patent are invalid due to obviousness in view of the Plaisant Video and Paper.

128.    Dr. Plaisant also published a number of papers relating to her video. One such paper, "Touchscreen Toggle Design," Catherine Plaisant and Daniel Wallace ("Plaisant") was presented at the Association of Computing Machinery (ACM) Human-Computer Interaction ("CHI") conference in May of 1992. The paper is attached hereto as Exhibit J. ACM is a preeminent association of computer professionals, and CHI is a major conference. In addition to presentations made to attendees, the proceedings of the conference would have been made available to members of the Special Interest Group on Human-Computer Interaction (SIGCHI).

129.    Plaisant, both by itself and in combination with the Plaisant Video, discloses each and every claim limitation of Claims 7, 8, 12, and 15 of the '721 Patent.

(i)    "A portable electronic device, comprising:".

130.    Plaisant discloses "computer-based toggle switches." Plaisant, p. 667. To the extent that the preamble is limiting, Plaisant's paper teaches the use of touchscreens in any computer device. Even if Plaisant is found to not explicitly disclose portable electronic devices, it would have been obvious to combine Plaisant with a portable electronic device, as portable computers are portable electronic devices. See also my discussion in the following section on Neonode.

(ii)    "a touch-sensitive display;"

131.    Plaisant discloses a touch-sensitive display: "This video describes and compares six different *touchscreen* based toggle switches to be used by novice or occasional users to control two state (on/off) devices in a touchscreen environment." Plaisant, p. 667, emphasis added. The '721 Patent discloses that touch-sensitive displays and touchscreens are synonymous ("Touch-sensitive displays (also known as "touch screens" or "touchscreens")..." '721 Patent, 1:25-26.

(iii)     "memory; one or more processors; one or more modules stored in the memory and configured for execution by the one or more processors, the one or more modules including instructions:"

132.    "The color, graphical screen displays are implemented under MS-DOS in VGA mode." (Plaisant, p. 667, emphasis added).  Plaisant ran on computers, and memory, processors, and modules configured for execution, including instructions are inherently present.

(iv)     "to detect a contact with the touch-sensitive display at a first predefined location corresponding to an unlock image;"

133.    Plaisant discloses detecting a contact with the touch-sensitive display at a first predefined location corresponding to an unlock image.  For example, Plaisant discloses a "slider-type" toggle, in which a "yellow pointer" (the unlock image) must be "grabbed" at one side of the slider. (Plaisant, p. 668). This initial position is the first predefined location corresponding to an unlock image.



134.    "Slider toggle: In this toggle a sliding/dragging movement is required to change the position of the yellow pointer from one side of the toggle to the other.  A simple three step animation shows the movement of the pointer along the slide.  If the device is ON the pointer is on the ON side. *Users can then grab the pointer and slide it to the other side*."  Plaisant, p. 668, emphasis added.

135.    Plaisant describes how the finger has to "land" (that is, contact the touch-sensitive display) at a precise spot: "Another advantage of the sliding movement is that it is less likely to be

done inadvertently therefore making the toggle very secure (*the finger has to land on* and lift off *the right locations*)." Plaisant, p. 668, emphasis added.

136. Plaisant also discloses rocker toggles and lever toggles that require a user to touch at a particular location corresponding to unlock images, for example, the tip of the lever toggle.

> (v) <u>"to continuously move the unlock image on the touch-sensitive display in accordance with movement of the detected contact while continuous contact with the touch-sensitive display is maintained, wherein the unlock image is a graphical, interactive user-interface object with which a user interacts in order to unlock the device"</u>

Plaisant describes how the user has to "grab the pointer and slide it to the other side," (Plaisant, p. 668), that is, the system continuously moves the unlock image (the pointer) in accordance with movement of the detected contact. Plaisant describes "If the finger is released before reaching the other side the pointer springs back to its previous position." (Exhibit J, p. 668). The unlock image, the pointer, is a graphical, interactive user-interface object with which a user interacts in order to unlock the device.

> (vi) <u>"to unlock the hand-held electronic device if the unlock image is moved from the first predefined location on the touch screen to a predefined unlock region on the touch-sensitive display."</u>

Plaisant discloses that the toggles are used to "control two state (on/off) devices." (Plaisant, p. 667). Additionally, Plaisant discloses that slider toggles are used for "security": "Another advantage of the sliding movement is that it less likely to be done inadvertently therefore making the toggle very secure (the finger has to land on and lift off the right locations). This advantage can be pushed further and controls can be designed to be very secure by requiring more complex gestures (e.g. a U or W shape slider can be used for a 2 or 3 setting control respectively)." (Plaisant, p. 668).

Even if Plaisant is found to not explicitly anticipate this claim element, it would have been obvious to combine Plaisant with a handheld device as an unlocking mechanism. My analysis of Claim 7 applies to Claim 12 as well.

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8.046.721

(vii)    Claim 8. "The device of claim 7, further comprising instructions to display visual cues to communicate a direction of movement of the unlock image required to unlock the device."

Plaisant discloses instructions to display visual cues to communicate a direction of movement of the unlock image required to unlock the device. The shape of the slider track and the initial position of the pointer are visual cues to communicate a direction of movement of the unlock image required to unlock the device.



(viii)    Claim 15. "The computer readable storage medium of claim 12, wherein the unlock image is a single image."

137.    Plaisant discloses the unlock image of the slider, the yellow pointer, is a single image



## 2.    Claims 7, 8, 12, and 15 are invalid due to obviousness in view of the Neonode N1 and N1M handsets.

138.    The Neonode N1 and N1M ("Neonode phones") were mobile phones with touchscreens, released in 2004-2005, that ran Microsoft Windows CE.NET. I've considered the specifications of those phones, the Neonode N1 User's Guide, a video of the operation of the Neonode N1M available on the Internet at http://www.youtube.com/watch?v=Tj-KS2kfIr0 (Exhibit L, "Youtube video"), and a PenComputing review of the Neonode N1 (Exhibit K). Additionally, I have been provided two videos that represent the operation of a Neonode N1M (Exhibits M and N). Based on my review of these materials, I believe that the Claims 7, 8, 12, and 15 are obvious in view of the Neonode phones.

(i)    "A portable electronic device, comprising: a touch-sensitive display; memory; one or more processors; one or more modules stored in the

memory and configured for execution by the one or more

processors, the one or more modules including instructions:"

139. Neonode phones were portable electronic devices, comprising touch-sensitive displays, memory, a processor, and one or more modules stored in memory and configured for execution by the one or processors, including instructions. Attached are specifications of the Neonode phones. (Exhibit Q.)

(ii) "to detect a contact with the touch-sensitive display at a first predefined location corresponding to an unlock image;"

140. The Neonode N1 and N1M could be placed into a locked state, in which inadvertent contact could not cause the phone to perform functions. "The keylock turns on automatically, to save battery and to make sure no unintentional calls are made. If you want to lock your Neonode manually, tap the padlock icon in the start menu." (Exhibit O at page 7.) Additionally, a publicly-available video on Youtube demonstrates that the locked phone does not perform any function nor respond to any user input. (Exhibit L at 4:01-4:20.)

141. The Neonode phones used a gesture-based interface to control the phone. An "accept sweep" was a left-to-right gesture starting near the bottom of the screen.



142. To unlock the Neonode phones, the user had to perform an "accept sweep" (a gesture) on the touch-sensitive screen:

143. The Neonode also included an image of an arrow below the padlock icon indicating the direction of the sweep necessary to unlock the device:

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8.046.721

1
2
3
4
5
6
7
8
9
10
11
12
13



14    144.    As such, the Neonode phones contain modules including instructions "to detect a

15  contact with the touch-sensitive display at a first predefined location corresponding to an unlock

16  image," satisfying claim elements 7(e) and 12(a).

17    145.    Unlocking the Neonode phones requires that the user contact continuously move

18  from the first predefined location (the left edge) to an unlock region (the right edge), as evidenced

19  by Exhibit L.

20                        (iii)    "to continuously move the unlock image on the touch-sensitive

21                                display in accordance with movement of the detected contact while

22                                continuous contact with the touch-sensitive display is maintained,

23                                wherein the unlock image is a graphical, interactive user-interface

24                                object with which a user interacts in order to unlock the device"

25    146.    While the Neonode phones do not explicitly move an unlock image in accordance

26  with the detected contact, it would have been obvious to combine the slider widget of Plaisant

27  with the unlock gesture of the Neonode phones.

28

147.    Both the Neonode phone and the Plaisant toggle are directed toward controlling the state of a two-state electronic device via a touchscreen. Both Neonode and Plaisant disclose the use of a sliding, or sweeping gesture. Plaisant states that "another advantage of the sliding movement is that it is less likely to be done inadvertently therefore making the toggle very secure (the finger has to land on and lift off the right locations)." (Exhibit J at page 2.) Neonode precisely applies this principle; portable touchscreen devices are prone to inadvertent activation, and the requirement that a contact start at a particular location, traverse in a particular direction, and end at a particular location. Neonode also includes a static indicator that instructs users of the direction to make a sweep to unlock a device, but otherwise provides little feedback during the sweep. Plaisant discloses a slider mechanism for controlling a touchscreen two-state device that gives visual feedback as to whether the state has been changed during the sweep. Therefore, it would have been obvious at the time of invention to one of ordinary skill in the art to include in Neonode a slider toggle as taught by Plaisant to provide the user feedback during the unlock gesture.

148.    Furthermore, the Neonode phones themselves contain touchscreen slider controls as described by Plaisant. As shown in the image below, the Neonode phones include a menu for adjusting the call volume level:



DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8,046.721

149.     The Neonode phones detect a contact at a predetermined location corresponding to an image in the middle figure, and continuously move the image in accordance with detected movement while the finger is in continuous contact with the touchscreen display (right image). Thus, the lockscreen of Neonode may be combined with the call volume adjustment menu of Neonode to teach every single limitation of Claim 7.

### 3.     Claim 8

150.     Claim 8 reads "The device of claim 7, further comprising instructions to display visual cues to communicate a direction of movement of the unlock image required to unlock the device."

151.     The Neonode phones displayed visual cues to communicate a direction of movement of the unlock image required to unlock the device. For example, as pictured above, the Neonode phones unlock screen display a faint arrow denoting where the user should start and end his or her sweep gesture to unlock the device.

### 4.     Claim 12

152.     My analysis of Claim 7, above, applies to Claim 12 as well.

### 5.     Claim 15

153.     Claim 15 reads "The computer readable storage medium of claim 12, wherein the unlock image is a single image." The unlock image on the Neonode phones, of the three small triangles, is a single image.

### 6.     The Plaisant and Neonode Videos raise a substantial new question of patentability.

154.     The presumption of validity of the '721 Patent is severely undermined in view of the prior art not before the examiner. The examiner did cite the '91 Plaisant Paper (Exhibit J) and the Neonode user's guide (Exhibit O), as evidenced from the prosecution history of the '721 Patent and the face of the patent itself. However, there is no indication that the examiner had access to a Neonode device, ever viewed a Neonode device, or considered either the publicly-available Neonode video (Exhibit L) or the N1M videos provided by counsel (Exhibits M and N). Similarly, there is no evidence that the examiner accessed or reviewed the Plaisant Video (Exhibit

H).  Both of these videos contribute insight to the operation of the Neonode and Plaisant references that is not contained in the Neonode user guide or the '91 Plaisant Paper.  Apple's own expert admitted as much after viewing the  videos during deposition:

> 6        Q.    So with that, I want to
> 7   understand from you, sitting here today,
> 8   whether you have any basis to challenge the
> 9   combination of Dr. Plaisant's work and the
> 10  Neonode device in assessing the validity of
> 11  the '721 patent claims?
> 12       A.    So I would really have to think
> 13  about that more carefully, because I had not
> 14  looked at the video of the Neonode or the
> 15  video of Dr. Plaisant's toggle switch work
> 16  prior to arriving at this deposition.
> 17            And I think that informs somewhat
> 18  these two references that I did consider,
> 19  which is the published article and the
> 20  Neonode user guide.  So I don't think I can
> 21  answer that with any level of certainty just
> 22  sitting here without giving it considerable
> 23  extra thought.
> 24       Q.    Fair to say that the video has
> 25  added some additional content for you to

1    consider with respect to these two prior

2    references?

3        A.    I think they illuminated the two

4    prior art references, yes.

5        Q.    Beyond what is stated in the

6    manual and the paper alone?

7            MR. LYON:  Objection.  Vague.

8        A.    I am not sure it is beyond.  But

9    certainly provided clarifications and

10   illuminations.

11       Q.    We discussed at least a few

12   points where you were not clear on a

13   particular issue based on reading the paper

14   alone, yet it became clearer to you after you

15   saw the video?

16       A.    Yes, we have already gone through

17   that.

(Balakrishnan Dep. At 238-239.)

155.    Apple's own expert admitted that the prior art of record provides clarification that was not available to the examiner, and therefore raises a substantial new question of patentability. Apple cannot prove a likelihood of success on the merits in light of this new question of patentability.

156.    Furthermore, Apple cannot rebut this question of patentability because Apple's own expert has not conducted a thorough review of the prior art.  In fact, during deposition, Dr. Balakrishnan admitted that he had not even reviewed the prior art *of record*.

1    Q.   Did you review the prior art that

2    are cited on the face of the patent?

3    A.   No, I did not.

4    Q.   Why not?

5    A.   There is a lot of material there.

6    I did not see it necessarily pertinent to my

7    infringement analysis.

8    Q.   What about your validity

9    analysis?

10    A.   I have not done a validity

11    analysis in detail against any invalidity

12    assertions.

(*Id.* at 41:1-12.)

23    Q.   Which of these references did you

24    consider in forming your opinions regarding

25    validity of the '721 patent?

A.    As I answered before, I believe I
looked at the Rytivaara reference, one or two
of the Tokkonen references.  I believe I
looked at the Robertson reference.  And I
looked at the Neonode Guide.

They're at least the ones I
recall of that.

Q.    Is it fair to say you didn't
consider everything that is listed as
references cited in forming your opinions on
the validity of the '721 patent?

MR. LYON:  Objection.  Vague.

A.    Everything that is cited there
would be the references in the patent, yes.

Q.    No, no.  I said, it's fair to say
you didn't consider everything that is cited
as references cited under the '721 patent in
forming your opinions regarding the validity
of that patent, correct?

MR. LYON:  Objection.  Vague.

A.    You said I did not?

Q.    You did not.

A.    I did not look at all of those
references, 100-odd references.  I did not.

*(Id.* at 50:23-51:25.)

157.    When pressed, Dr. Balakrishnan only identified 6 (Rytivaara, Tokkonen, Gillespie, Moravsik, Plaisant, Baurisch, and Neonode) of the 100-plus references, foreign references, non-patent literature documents, office actions, and search reports listed on the face of the patent.

Thus, Apple has not even performed a review of the prior art of the record, and cannot provide any evidence or analysis to rebut the new question of patentability raised by the Neonode and Plaisant Videos.

### 7. Claims 7, 8, 12, and 15 are obvious in view of Tokkonen (US 2005/0289476).

158.    Tokkonen discloses a portable electronic device including a touchscreen 110 that displays a data object 302 such as an icon.



FIG. 3A          FIG. 3B          FIG. 3C

159.    In Paragraph 0023, Tokkonen discloses detecting a touch or selection of data object 302 by touching or clicking a location corresponding to the data object 302, and in paragraph 0024 discloses continuously moving data object 302 in accordance with the user input, either a mouse or a touch input.  When the user drags data object 302 to a particular predefined region, such as the border 306 of the portable electronic device, the device's controlling means performs a predetermined action on the basis of the detected action, such as saving the data object, printing the data object, copying the data object, or deleting the data object.

160.    Although Tokkonen does not expressly disclose that one of the predetermined actions is unlocking a device, it would have been obvious at the time of invention to one of ordinary skill in the art to unlock a device based on a detected action as taught by Tokkonen. Traditional unlocking prior art references or Neonode suggest this modification.

### 8. Claims 7, 8, 12, and 15 are anticipated by or obvious in view of Keller (U.S. 5,821,933).

161.    Keller was discussed during the prosecution of the parent application that resulted in the issuance of the '849 Patent.

DECLARATION OF GEOFF A. COHEN, Ph.D. CONCERNING U.S. PATENT NO. 8,046,721

162.    Keller discloses a graphical user interface that is capable of running on any general purpose computer or computer controlled by a GUI.  Thus Keller discloses a portable electronic device.  Keller also discloses that the GUI may be manipulated through touch input.

163.    Keller discloses a series of code icons that may be dragged into a particular region, another icon, or area, to unlock a particular application, or access a particular function.



164.    To the extent that Apple argues the claims cover unlocking a particular predefined set of functions or applications, Keller anticipates the claims.  Keller expressly taught detecting a touch at a predefined location corresponding to a code icon, continuously moving the code icon in accordance with the detected movement, and unlocking a restricted function on a device when the code icon is moved into a predefined region.

165.    It is my opinion that it would have been obvious to one of ordinary skill in the art at the time of invention to combine any of these references with Plaisant or Neonode to obtain the invention of claims 7, 8, 12, and 15.

### 9.    Additional References

166.    I have also looked at the following references, each of which appears to disclose gesture-based operations or graphical password systems that are prior art to the '721 patent.  It

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8.046.721

would have been obvious to a person of ordinary skill in the art to combine the disclosures of Plaisant, Neonode, Keller, and Tokkonen with the following references. It would have been obvious to a person of ordinary skill in the art to consult these references and combine the disclosures with the other references discussed herein:

- US 2005/134578 to Chambers.

- US 5,923,908 to Schrock.

167.    I have reviewed these references from the perspective of one of ordinary skill in the art, and as set forth below I have generally identified aspects of the disclosures of those references that correspond to limitations of the '721 Asserted Claims. These examples demonstrate that the limitations claimed in the '721 Asserted Claims were well-known in the art.

168.    US 2005/134578 to Chambers, attached as Exhibit T, was published on June 23, 2005. Chambers discloses a touchscreen display with a central target that, when moved to various target areas, performs the function associated with the particular target area. Chambers also discloses a user interface locked state, wherein a first user interface is displayed and the touchscreen device only responds to a particular set of commands. Chambers discloses that unlocking the device may be achieved through an initial gesture on the touchscreen device.

169.    US 5,923,908 to Schrock, attached as Exhibit X was patented July 13, 1999. It discloses a touchscreen portable electronic device, in this case, a camera, with a touchscreen graphical user interface element representing a shutter button. When a user touches the shutter icon at a first location and drags it to a second location, the shutter function is actuated. Schrock also discloses a touchscreen zoom bar that utilizes a slider mechanism.

### 10.    The '721 Patent is a Combination of Prior Art Elements

170.    As set out in this declaration and in the charts attached, it is my opinion that each and every element of the '721 Asserted Claims was present in the prior art. I incorporate herein my discussion of these elements in the attached claim charts in Exhibits Z and AA.

171.    Devices that could be locked or unlocked were well-known at the time of invention to those of ordinary skill in the art. Even outside of the mobile realm, locked-state devices could be found in password-protected devices, devices that could enter a sleep mode to save battery life,

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8.046.721

or devices that entered a screen-saver mode to prevent monitor-burn in or to reduce power consumption. During his deposition, Mr. Christie likened all of these modes to a "locked state:"

```
20
21      prese
22      a des
23      opera
```

(Christie Dep. at 70:14:23.)

172.    In the mobile, or portable device space, Mr. Christie also admitted that devices with lock and unlock states were common and well-known:

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8.046.721

19      Q.   So my question is:  Sitting here today,

20   are you aware of any portable devices that

21   existed before the iPhone which had the ability

22   to lock and unlock that device?

23      A.   Yes.

24      Q.   Which ones?

25      A.   I'm sure that there are portable music

1   players that would allow you to lock the

2   controls.  I believe even the first iPod did

3   that.  Cell phones with -- in particular candy

4   bar-style phones with physical buttons would

5   usually have a key sequence, I recall star zero

6   being a common one, that would lock the key pad,

7   keep you from pressing buttons accidentally.

(*Id.* at 72:19-73:7.)

173.   Furthermore, Mr. Christie admitted that he and the other inventors of the '721 patent had performed no industry research, had not assessed the state of the art in touchscreen devices, and in fact were not even aware of any of the popular gesture-based touch devices of the era when they filed for their patent.

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8.046.721

Q. As you were working on the iPhone, did you or your team members research preexisting devices that could respond to touch inputs on the screen from a human finger?

A. Not to my knowledge.

Q. Sitting here today, are you aware of any preexisting devices that could respond to touch inputs on the screen from a human finger?

A. Yes.

Q. Which ones?

A. ATM machines is a common example.

(*Id.* at 76:11-77:5.)

174. When questioned about preexisting gestural-input devices such as the Fingerworks multi-touch surfaces and the DiamondTouch table, Mr. Christie was completely unaware of their existence:

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8.046.721

14      Q.  Besides ATM machines, are you familiar

15  with any other types of devices that existed

16  prior to 2005 which accepted input from a human

17  finger on the touchscreen?

18      A.  Not really, to my recollection.

19      Q.  Were you familiar with any work that was

20  done on touchscreen tables prior to 2005?

21      A.  Not in particular, no.

22      Q.  Have you ever researched that issue?

23      A.  No.

24      Q.  Are you familiar with the system called

25  Smart Skin?

1      A.  No.

2      Q.  Diamond Table?

3      A.  It doesn't ring a bell.

(*Id*. at 78:19-79:3.)

175.    Furthermore, Mr. Christie admitted during deposition that he had not performed even the most cursory of prior art searches, nor was he aware of the state of user interface design at the time of filing:

13

14      inte

15

16

17      conf

18

(*Id*. at 79:13-18.)

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8.046.721

176. Finally, Mr. Christie, despite testifying that he was unaware of any portable touchscreen devices that unlocked via gestural input, was unsurprised when he was told of the existence of the Neonode N1.

```
23            Are you surprised that there was a phone
24    in 2004 prior to the iPhone that used a
25    touchscreen capable of accepting human finger
1     contact input?
2             MR. LYON:  Same objections.
3             THE WITNESS:  I'm not surprised by that
4     statement.  Having never seen such a device, I
5     can't tell you how good it was, how responsive it
6     was, what the characteristics of that touch
7     surface were.  I mean, we all use ATMs.  We're
8     not surprised that you can trigger software
9     events by using parts of your body.
```

(*Id*. at 151 :23-152:9.)

```
20            Q.  Are you surprised to see that there was
21    a phone prior to 2004 prior to the iPhone that
22    allowed a user to perform certain gestures by
23    contacting the touchscreen?
1             THE WITNESS:  Not particularly.
```

(*Id*. at. 152:20-153:1.)

177. Mr. Christie's response is particularly telling of the obviousness of the '721 patent claims; he focuses on the responsiveness and quality of the implementation, rather than the actual idea of unlocking a touchscreen device via gestural interaction. He admits that touchscreen technology was well-known, at least in the realm of ATMs, and that triggering events via touchscreens was well-known at the time of invention.

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8,046,721

178.     The Neonode teaches every single element of the independent claims of the '721 Patent, except continuously moving an image with the user's finger as he or she makes the sweep gesture to unlock the device.  Adding such a feature, even absent Neonode's own volume slider or Plaisant, would have been an obvious modification to one of ordinary skill in the art at the time of invention.  The idea of moving an icon or image in accordance with user input was a well-known and general theory in HCI well before the date of invention.  Dr. Balakrishnan admitted as much during his deposition:

```
           princ
     8     that
     9     you a
    10     direc
    11     the c
    12     feedb
    13     a gen
```

(Balakrishnan Dep. at 144:6-13.)

179.     Dr. Balakrishnan also opined on other well-known principles of HCI during his deposition, such as affordances and direct manipulation:

13      A.    There is a general concept of a

14  term called affordances.  It was coined, I

15  believe, by somebody called Don Norman a long

16  time ago, that relates to the notion does the

17  object, the thing you are manipulating

18  suggest its use without having to be taught.

19          So for example, a door handle

20  that clearly is a lever, somebody is not

21  likely to push on it because it suggests that

22  it is a lever, and the usage suggests it.

23          So that would be one overarching,

24  very general principle.  It is not always

25  that obvious in many designs, as we're

1   probably painfully aware of in a lot of lousy

2   things we use.

(*Id*. at 146:13-147:2.)

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8.046.721

23    dragg

24

25    conce

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8.046.721

```
15    where
16    direc
17    movem
```

(Balakrishnan Dep. At 147:3-148: 17.)

180.    These statements reinforce my opinion that each and every element of the '721 Asserted Claims was well-known.  It would have been obvious to one of ordinary skill in the art to include in Neonode a moving unlock image in accordance with well-established, commonly known principles of direct manipulation.

**11.    The combination of elements in the '721 patent is predictable**

181.    I understand that the combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.  A person of ordinary skill in the art would appreciate that it was predictable to combine the elements within each claim of the '172 patent in the manner claimed.  There is nothing unpredictable about this particular combination because, in part, numerous examples of such elements existed in the art.

182. Specifically, as shown in the attached claim charts and elsewhere in this declaration, prior art systems and publications not only foreshadow these combinations, but in fact actually practice them. Unlocking a device utilizing direct manipulation with a mouse, as in Keller, creates a completely predictable result when the input device is transitioned to a touchscreen display. Similarly, unlocking a device with a swipe action, as taught by Neonode, does not create an unpredictable result when an image moves in conjunction with the input.

183. Dr. Balakrishnan admits that the operation of the system is completely predictable, but the fact that no one had tried it before somehow renders the result unpredictable:

```
 3        Q.    I am trying to understand what's
 4   unpredictable about that result.
 5             MR. LYON:  Objection.  Asked and
 6        answered.
 7        A.    What's unpredictable to me is
 8   nobody had tried it.  Nobody put together a
 9   swipe with a moving image underneath the
10   user's content.  It had never been done in
11   this context.

 3             If you are asking is it
 4   predictable if we add it, the motion of the
 5   image to the swipe, that it would be a
 6   movement of the image while I swipe,
 7   obviously the outcome of that, that it is
 8   moving while I swipe, that's obviously
 9   predictable.  It is code.
```

(Balakrishnan Dep. At 171:3-9¶

184. Such reasoning is facially erroneous; if the fact that a patent applicant was the first to combine well-known elements to yield a predictable result was sufficient to secure an exclusive right to the combination, no application would ever be rejected as obvious. The reasoning

1  proffered by Dr. Balakrishnan eviscerates all purpose from 35 U.S.C. 103 and directly contradicts

2  the Supreme Court's teachings in KSR v. Teleflex, 550 U.S. 398, 421 ("When there is a design

3  need or market pressure to solve a problem and there are a finite number of identified, predictable

4  solutions, a person of ordinary skill in the art has good reason to pursue the known options within

5  his or her technical grasp.  If this leads to the anticipated success, it is likely the product not of

6  innovation but of ordinary skill and common sense.")

### 12.   The combination of elements in the '721 patent does not yield any unpredictable or unexpected results

9   185.   In my opinion, there is nothing unpredictable that results from combining the

10  elements within the '721 patent.  The claim elements simply implement well-known direct

11  manipulation techniques using well-known methods of unlocking devices.  This combination

12  produces a completely predictable result.  The '721 patent uses each element for the exact purpose

13  it was designed to provide, in the exact manner it was designed to operate.

14  186.   In my opinion the combination of elements seen in each '721 Asserted Claim adds

15  nothing to the nature and quality of each individual element on its own as it was understood and

16  already used prior to January 23, 2005.

17  187.   I further note that the result is an entirely predictable combination of known

18  elements in user interface design.  In my opinion, the result of the combination in the '721

19  Asserted Claims is precisely the result that one would expect when combining elements of a

20  moving unlock image with a mobile device that is unlocked via gestures.

### 13.   A person of ordinary skill in the art would have been motivated to pursue the claimed combinations

23  188.   I understand from counsel that where there is a design need or market pressure to

24  solve a problem and there are a finite number of identified, predictable solutions, a person of

25  ordinary skill has good reason to pursue the known options within his or her technical grasp.  If

26  this leads to the anticipated successful solution to that problem, it is likely the product not of

27  innovation but of ordinary skill and common sense.  In that instance the fact that a combination

28  was "obvious to try" can demonstrate that the combination was obvious.

189.    In my opinion, at the time of filing, there was ample motivation to provide user feedback via moving an unlock image, as confirmed by the numerous prior art devices and references that I discussed above.  There were a finite number of identified, predictable solutions, and a person of ordinary skill would have had good reason to pursue the known options within his or her technical grasp.  During his deposition, Mr. Christie gave a small number of methods to provide feedback to a user of a device that permitted unlocking via gestural input, such as the Neonode:

14

15      answ

16

17      othe

(Christie Dep. At 103:1-17.)

190.    Mr. Christie gives four potential methods of providing visual feedback or instruction to a user to slide his or her finger across a touchscreen to unlock a display outside of moving an image:  instructional text, a static arrow, chasing arrows, and no on-screen image at all.  Arguably, Neonode practices all but text and chasing an arrow.  Thus, there existed a finite

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8.046.721

number of predictable solutions for the problem of providing visual feedback to the user. Therefore, the invention described in the '721 patent is not the result of innovation but of ordinary skill and common sense.

## I. <u>SECONDARY CONSIDERATIONS</u>

191.    I have been informed that certain secondary considerations may be examined to determine whether a certain invention would have been obvious to one of ordinary skill in the art. Below, I address the basis upon which, in my opinion, these secondary considerations likewise lead to a conclusion that the Asserted Claims would have been obvious to those of ordinary skill before the filing date.

192.    This patent has won no awards.  (Christie Dep. at 80:2-25.)  To my knowledge, no papers have been published on the design work described in the '721 patent.  In fact, one of the inventors can think of no accolades that he has received with respect to slide to unlock outside of being called for deposition.

2      Q.  To your knowledge, have you or anyone
3    else listed as an inventor on the '721 patent
4    received any awards in connection with that
5    patent?
6      A.  What do you mean by "award"?
7      Q.  I'm not talking about the bonus that you
8    get for filing a patent application, but have you
9    received any recognition from others outside of
10   Apple?
11     A.  Yes, we --
12         MR. LYON:  Objection to the form.
13         THE WITNESS:  Yes, we get called to
14   depositions.
15   BY MR. PAK:
16     Q.  That's the highest degree of
17   recognition.
18     A.  Apparently.
19     Q.  But besides the privilege of being
20   deposed --
21     A.  Yeah.
22     Q.  -- have you ever received --
23     A.  No.  No.
24     Q.  -- awards or recognition?
25     A.  No.

(Christie Dep. At 80:2-25.)

193.    Additional secondary considerations weigh against a finding of nonobviousness. There was no "failure of others." Other phones and devices had lock screens to prevent inadvertent access; touchscreen devices such as the Neonode and numerous non-infringing designs were present prior to the time of invention and today. Furthermore, both Dr. Balakrishnan and Mr.

Christie have performed zero analysis or studies as to the benefits of the '721 implementation in comparison to gesture-based unlocking that does not move an unlock image.

> 9    Q.    My question is different.  My
> 10   question is, have you seen any analysis on
> 11   whether changing the unlocking gesture would
> 12   have any impact on the sales of the iPhone?
> 13   A.    I have not seen such specific
> 14   analysis, no.

(Balakrishnan Dep. At 243:9-14.)

> 14   Q.    Thank you.
> 15        Do you have any opinion, sitting
> 16   here today, as to whether any of the
> 17   different embodiments we discussed for
> 18   unlocking a smartphone is commercially more
> 19   valuable than the other embodiments?
> 20   A.    We have already gone through this
> 21   issue.  I have not done that analysis as to
> 22   commercial value.

(*Id.* At 94:14-22.)

7    Q.    For example, have you researched

8    the issue of whether not moving an unlock

9    image would have a material impact on the

10   sales of the iPhone?

11   A.    I have not done a detailed

12   analysis on that particular issue.

13   Q.    Have you analyzed the impact of

14   providing other types of visual feedback to

15   the user other than moving the unlock image,

16   would have a material impact on the sales of

17   the iPhone?

18   A.    I have not done that analysis.

(*Id.* At 244: 7-18.)

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8.046.721

```
 9        Q.  Let me be more precise.
10            Have you ever seen any studies that
11   compared or evaluated the impact of sales by
12   companies other than Apple --
13        A.  Okay.
14        Q.  -- on the sales of the iPhone device?
15        A.  Not that I recall, no.
```

```
21        Q.  Do you recall whether you or other team
22   members have ever analyzed the relative ranking
23   of the specific unlock gesture compared to the
24   other features of the iPhone?
25        A.  No.
```

(Christie Dep. At 171-172.)¶

194.    Nor was there a "long-felt need," as the problem was well-known and had been solved in a number of different fashions at the time of invention. While undoubtedly the iPhone has been a commercial success, I know of no analysis connecting its success with the slide-to-unlock feature, and Apple's own experts and inventors cannot point to a single study they have performed or read that attributes the iPhone's commercial success to the practice of the '721 Patent. Apple's particular implementation is merely that, a particular design choice one of a finite number of combinations of well-known concepts in HCI for touchscreen phones.

## III.   OTHER COMMENTS

195.    My opinions are subject to change based on additional opinions that Plaintiff's experts may present and information I may receive in the future or additional work I may perform.

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8,046,721

1   With this in mind, based on the analysis I have conducted and for the reasons set forth, I have

2   preliminarily reached the conclusions and opinions in this declaration.

3        I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

4   23rd day of April 2012.

_____

Geoff A. Cohen, Ph.D.

DECLARATION OF GEOFF A. COHEN. Ph.D. CONCERNING U.S. PATENT NO. 8.046.721