# EXHIBIT K
# FILED UNDER SEAL

Highly Confidential - Attorneys' Eyes Only

Page 1

1                   UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3                       SAN JOSE DIVISION

4

5   APPLE INC., a California
    corporation,

6

                   Plaintiff,

7

    vs.                           CASE NO.  11-cv-01846-LHK

8                                           12-cv-00630-LHK

    SAMSUNG ELECTRONICS CO.,

9   LTD., a Korean business
    entity; SAMSUNG ELECTRONICS

10  AMERICA,INC., a New York
    corporation; SAMSUNG

11  TELECOMMUNICATIONS AMERICA,
    LLC, a Delaware limited

12  liability company,

13                 Defendants.
    _____/

14

15

16          H I G H L Y   C O N F I D E N T I A L

17          A T T O R N E Y S'  E Y E S   O N L Y

18

19       VIDEOTAPED DEPOSITION OF STEVEN SINCLAIR

20             REDWOOD SHORES, CALIFORNIA

21             WEDNESDAY, APRIL 4, 2012

22

23  BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR

24  CSR LICENSE NO. 9830

25  JOB NO. 47582

Highly Confidential - Attorneys' Eyes Only

Page 2

1    WEDNESDAY, APRIL 4, 2012
2         10:04 A.M.
3
4
5
6    VIDEOTAPED DEPOSITION OF STEVEN SINCLAIR,
7    taken at QUINN EMANUEL URQUHART & SULLIVAN,
8    LLP, 555 Twin Dolphin Drive, Redwood Shores,
9    California, pursuant to Notice, before me,
10   ANDREA M. IGNACIO HOWARD, CLR, CCRR, RPR,
11   CSR License No. 9830.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1    A P P E A R A N C E S:
2
3
4         FOR APPLE INC.:
5         MORRISON & FOERSTER
6         By:  STUART C. PLUNKETT, Esq.
7         425 Market Street
8         San Francisco, California 94105
9
10
11
12
13        FOR APPLE INC.:
14        GIBSON DUNN
15        By:  ROD J. STONE, Esq.
16        333 South Grand Avenue
17        Los Angeles, California 90071
18
19
20
21
22
23
24
25

Page 4

1    A P P E A R A N C E S:  (Continued.)
2
3
4         FOR SAMSUNG ELECTRONICS CO. LTD:
5         QUINN EMANUEL URQUHART & SULLIVAN
6         By:  JOHN B. QUINN, Esq.
7            JOHN P. D'AMATO, Esq.
8            VALERIE LOZANO, Esq.
9            SCOTT L. WATSON, Esq.
10        865 S. Figueroa Street
11        Los Angeles, California 90017
12
13
14
15        ALSO PRESENT:  Benjamin Gerald, Videographer
16
17
          ---oOo---
18
19
20
21
22
23
24
25

Page 5

1         REDWOOD SHORES, CALIFORNIA
2         WEDNESDAY, APRIL 4, 2012
3            9:36 A.M.
4
5
6
7    THE VIDEOGRAPHER:  Good morning.
8    This marks the beginning of the disc labeled
9    No. 1 of the videotaped deposition of Steven Sinclair.
10   In the matter Apple Incorporated versus Samsung
11   Electronics Company LTD, et al.
12        Held in the United States District Court for
13   the Northern District of California.  Case
14   Nos. 11-cv-01846-LHK and 12-cv-00630.
15        This deposition is being held at 555 Twin
16   Dolphin Drive in the city of Redwood Shores,
17   California.  Taken on April 4th, 2012, at
18   approximately 9:36 a.m.
19        My name is Benjamin Gerald from
20   TSG Reporting, Incorporated, and I am the legal video
21   specialist.
22        The court reporter is Andrea Ignacio, in
23   association with TSG Reporting.
24        At this time, will counsel please identify
25   themselves for the record.

Highly Confidential - Attorneys' Eyes Only

Page 14

1    Q  So, sir, is it your --
2        MR. STONE:  Can you tell us which case these
3    questions relate to?
4        MR. QUINN:  I think they're relevant to both
5    cases.
6    Q  So sir, do you recall that in the year 2010,
7    you did have a question in your own mind during that
8    year at any point as to whether Apple could
9    legitimately claim to have been the first to implement
10   a particular feature in a phone?
11       MR. PLUNKETT:  Objection; vague; lacks
12   foundation.
13       THE WITNESS:  So again, I can't speak to a
14   year or a month.  I know that as we are releasing new
15   products, we do ask that question about the features
16   of those products.
17       MR. QUINN:  Q.  So is it true to say that as
18   you sit here now, you just don't recall one way or
19   another as to whether at any time in 2010 you had a
20   question in your mind as to what -- what features
21   Apple could claim to be the first to implement in a
22   phone?  Is that a true statement?
23       MR. STONE:  Object to the form; lacks
24   foundation; vague.
25       THE WITNESS:  So if I think of 2010 and the

Page 15

1    products we were releasing, I can think of a few
2    features where that may have come up.
3        MR. QUINN:  Q.  And what ones are you
4    thinking of, the features that you recall in 2010 as
5    to which you address the issue, was Apple the first
6    to -- could Apple legitimately have claimed to have
7    been the first to have implemented them in a phone?
8    A  I think the question in 2010, if I recall,
9    the product that we were launching was the iPhone 4,
10   and we were discussing how thin the product was and
11   whether it was the thinnest phone.
12   Q  Can you recall any other features that in
13   2010 you were considering whether or not Apple could
14   legitimately claim to have been the first to implement
15   in a phone?
16   A  For that product, no.
17   Q  Okay.  But how about --
18   A  I don't recall.
19   Q  -- for any product in 2010?
20   A  Not off the top of my head, no.
21   Q  Would it be true that -- would it be true to
22   say that as of April 2010, deciding what Apple -- what
23   features Apple could legitimately claim to have been
24   the first to implement in a phone is something that
25   you would have to take some time to think about?

Page 16

1        MR. PLUNKETT:  Objection; vague; lacks
2    foundation.
3        THE WITNESS:  Some features we know or I
4    would know right away whether or not we could
5    legitimately claim that.  Other ones would take
6    certainly some more research in order to
7    substantiate -- substantiate the claim for marketing
8    purposes.
9        MR. QUINN:  Q.  Isn't it true that as of
10   April 2010, in order to identify any features that you
11   thought Apple could legitimately claim to be the first
12   to implement in a phone, you'd have to take some time
13   to think about it?  Is that a true statement?
14       MR. STONE:  Object to the form; lacks
15   foundation.
16       THE WITNESS:  I think for some features,
17   that's true.  For others, we would know the answer.
18       MR. QUINN:  Q.  So as of April 2010, what
19   features would you have known, without having to spend
20   some time to think about it, Apple could legitimately
21   claim to have been first?
22       MR. PLUNKETT:  Objection; vague; lacks
23   foundation.
24       THE WITNESS:  I don't think I can answer that
25   question.

Page 17

1        MR. QUINN:  Q.  As you sit here now, can you
2    identify any features as of April 2010 which you know
3    that Apple could then legitimately claim to have been
4    the first to implement in a phone?
5        MR. PLUNKETT:  Objection; vague; lacks
6    foundation; calls for a legal conclusion.
7        THE WITNESS:  Not without doing some research
8    and looking through my notes and looking through a
9    list of features.
10       MR. QUINN:  Let me enlarge the question to
11   2010 generally.
12       THE WITNESS:  Okay.
13       MR. QUINN:  Q.  As of at any point in 2010,
14   as of any point, are there any features that you
15   could -- that you could have identified at that time
16   as being features that Apple was the first to
17   implement in a phone?
18       MR. PLUNKETT:  Objection; vague --
19       MR. STONE:  Objection.
20       MR. PLUNKETT:  -- lacks foundation; calls for
21   a legal conclusion.
22       THE WITNESS:  Not without looking at a list
23   of specific features to jog my memory.
24       MR. QUINN:  Q.  So as you sit here now, you
25   can't think of any phone feature which in 2010 you

Highly Confidential - Attorneys' Eyes Only

Page 18

1    could have identified as being a feature that Apple
2    was the first to implement in a phone; is that a true
3    statement?
4         MR. STONE:  Objection; lacks foundation.
5         MR. PLUNKETT:  Misstates; calls for a legal
6    conclusion.
7         THE WITNESS:  So off the top of my head, no,
8    I'm not able to recall anything specific.
9         MR. QUINN:  Could we have the document.
10        Q   While she's -- while Ms. Lozano is getting a
11   document, let me just ask -- we've been provided with
12   a declaration signed by you.  And do you recall
13   signing a declaration --
14        A   I do.
15        Q   -- in connection with this matter?
16        A   I do.
17        Q   And do you recall roughly how long ago you
18   signed that declaration?
19        A   Sometime in the last three, four months, I
20   think.
21        Q   And is that a declaration that you wrote,
22   that you chose the words that went into the
23   declaration?
24        A   I worked with counsel on the declaration.
25        Q   So some of the words were yours; some of the

Page 19

1    words were counsel's?
2         A   I reviewed it and edited it.
3         Q   Is it true that some of the words were yours
4    and some of the words were counsel's?
5         A   I don't recall which words were mine and
6    which words were counsel's.
7         Q   Not my question.
8         A   Okay.
9         Q   Is it true that some of the words were yours
10   and some of the words were counsel's?
11        A   I would say most of the words were counsel's,
12   and I edited it.
13        Q   You -- did you contribute any words at all to
14   your declaration?
15        MR. STONE:  Objection.  I think we're getting
16   into privilege now in terms of communications with
17   counsel and how the declaration was prepared.
18        MR. QUINN:  I'll stick by my question.
19        Q   Did you contribute any words yourself to the
20   declaration, sir?
21        MR. STONE:  I'm going to -- I think you're --
22   I think you're getting into communications with
23   counsel.
24        MR. QUINN:  Let's not, please, have speaking
25   objections.  If you're going to instruct him not to

Page 20

1    tell me whether or not there are any of his own words
2    in there, let's just do that.
3         Q   Sir, are there any of your own words in that
4    declaration at all?
5         A   So some of the words that I edited are
6    mine --
7         Q   Okay.
8         A   -- as far as I know.
9         Q   Okay.  And if I were to show it to you, could
10   you identify to me the words that you personally added
11   to the statement?
12        A   No.
13        Q   Do you have any understanding about why you
14   were being asked to sign that declaration?
15        A   To the best of my knowledge, it's because I'm
16   the product marketing manager for iPhone.
17        Q   Did you understand that your declaration was
18   being obtained in connection with legal proceedings?
19        A   Yes.
20        Q   And did you understand it was going to be
21   filed with the Court?
22        A   I was told that, yes.
23        Q   And do you have any understanding as to what
24   type of legal proceedings it was going to be used in
25   connection with?

Page 21

1         A   I did not have a lot of detail except for the
2    patents that were mentioned in the declaration.
3         Q   Okay.  When you say "the patents," could you
4    describe those to me.
5         A   The patents that are in there?
6         Q   Yes, please.
7         A   So the description of functionality related
8    to features such as slide to unlock, what we call data
9    detectors, and some voice -- voice recognition and
10   voice control capabilities.
11        Q   Okay.  I've got -- in terms of the patents
12   that you understand that your declaration was to
13   address, I've got slide to unlock, data detection,
14   voice recognition and voice control.
15        A   Well, voice recognition and control are
16   combined.
17        Q   All right.
18        As --
19        A   Those are -- those are what I remember.
20        Q   All right.
21        Anything other than those three patents?
22        A   I can't remember if there was a fourth off
23   the top of my head or not.
24        Q   All right.
25        And what did you understand the purpose of



Page 38

1     MR. PLUNKETT:  Objection; vague; lacks
2 foundation; mischaracterizes.
3     THE WITNESS:  Well, certainly, you know, I'm
4 the phone product manager, so I'd be thinking about
5 features for the phone.
6     MR. QUINN:  Q.  Sir, my question is:  At the
7 time that you wrote this sentence that I just read to
8 you, did you have in mind some features that Apple was
9 first to implement on a phone?
10    MR. PLUNKETT:  Same objections.
11    THE WITNESS:  I -- again, I'm the iPhone
12 product marketing manager, so I'd be focused on phone
13 features.
14    MR. QUINN:  Right.
15

Page 39

Highly Confidential - Attorneys' Eyes Only

Page 42



Highly Confidential - Attorneys' Eyes Only



Page 46

Page 47

Page 48

1   Q  So would you say that it would be true to say
2  that every feature contributes to ease of use?
3      MR. PLUNKETT:  Objection; vague.
4      MR. STONE:  Argumentative.
5      THE WITNESS:  I can say -- we're talking
6  software -- software features for the most part, yes,
7  contribute to ease of use; not every -- not every
8  feature.  There are certain features that can -- can
9  degrade ease of use, but you still have to do them.
10      MR. QUINN:  All right.
11      THE WITNESS:  So security feature, for
12  example --
13      MR. QUINN:  Okay.
14      THE WITNESS:  -- might -- might make ease of
15  use harder.  But you do your best to minimize its
16  impact on ease of use.
17      MR. QUINN:  Q.  Can you identify any features
18  of Apple products other than this security feature you
19  just identified which in your own mind do not
20  contribute to this phenomenon of ease of use?
21      MR. PLUNKETT:  Objection; vague.
22      THE WITNESS:  Well, certainly there are a lot
23  of settings that you have to put into the device to
24  give customers choice on how to -- how the product
25  functions.  And the more settings you add, the more

Page 49

1  complicated it gets, and so that does not contribute
2  to ease of use.
3      MR. QUINN:  Q.  Anything else?  Any other
4  features which in your own mind are not included in
5  this phenomenon of ease of use?
6      MR. PLUNKETT:  Objection; vague.
7      THE WITNESS:  So I'd probably have to put
8  some more thought into it.  I'm sure there are others.
9      MR. QUINN:  Q.  But as of -- the only ones
10  you can think of right now are security and settings;
11  is that true?
12      A  Those are the two I can think of right now.
13  And I'm sure in two minutes' time I'll probably think
14  of a couple more.
15      Q  If you do, will you let me know?
16      A  Sure.
17

Highly Confidential - Attorneys' Eyes Only



Highly Confidential - Attorneys' Eyes Only

Page 54



Page 55

```
1
2    Q  All right.
3       We've heard of a -- you've told me that you
4    understood your -- your declaration was going to be
5    submitted in connection with -- related to some
6    patents as well.
7       You're -- you're familiar with an issue
8    regarding a patent regarding linking structures to
9    actions?  Is that a phrase you've heard before?
10   A  I think that would be data detectors.
11   Q  All right.
12      So when you told me data detectors earlier --
13   A  That's what I -- that's my nomenclature for
14   that feature.
15   Q  So in other words, like, if there is a phone
16   number that's embedded in an e-mail, you can click on
17   that or swipe it or touch it or something and make a
18   phone call?
19   A  That's -- that would be an example of a data
20   detector.
21   Q  All right.
22      Or linking structures to actions?
23   A  I suppose so, if that's the lingo.
24   Q  And would another example of that be if there
25   were, like, a web address that was in the body of a
```

Page 56

```
1    text, and you could, you know, touch on that, swipe
2    that, activate that, and it would go to the web
3    address?  Would that be another example of a data
4    detector, in your mind?
5    A  It could be, although we generally use it to
6    imply things that aren't -- aren't necessarily just
7    web addresses, because web addresses are really easy.
8    It's much harder to figure out a person's correct
9    phone number, an address, a date.  That's usually what
10   we mean by data detector.
11   Q  I mean, we'll get to that.  My question --
12   A  Okay.
13   Q  -- at this point isn't, like, which is the
14   hardest and which is the easiest.
15   A  Okay.
16   Q  The question really is kind of before that.
17      Is another example of a linking structure to
18   action or data detector the ability to click on or
19   touch an embedded web address and go to that address?
20   A  That would be a simplified version of that.
21   Q  Right.
22      And I think you've already told me going to a
23   phone number and making a call, that's an example?
24   A  That would be an example.
25   Q  And another example would be -- I've got some
```

Page 57

```
1    notes here -- like, you could click on an e-mail
2    address or swipe or touch an e-mail address and go
3    right to composing an e-mail to that address; would
4    that be another example?
5    A  That could be another example.
6
7
```



15

Highly Confidential - Attorneys' Eyes Only

Page 58

1    MR. STONE: John, we've been going over an
2

22       Can you give me a complete list of all the
23  features that fall under ease of use.
24     A  I could go through a phone and -- and point
25  to many, many, many different features.

Page 59

1     Q  Would it be fair to say that there are more
2  than five features that would be included within this
3  concept of ease of use?
4     A  I think that's fair to say.
5     Q  Would it be fair to say that there are more
6  than ten?
7     A  There are a lot of features that contribute
8  to ease of use, and if not done correctly, those
9  features can detract from ease of use.
10     Q  When you say there are many, many features
11  that are included under the category of ease of use,
12  can you give me an approximation of how many features
13  there are.
14     A  No, I can't.
15     MR. QUINN:  Okay.  Let's break.
16     THE VIDEOGRAPHER:  This marks the end of Disc
17  No. 1 in the deposition of Steven Sinclair.
18     The time is 10:36 a m., and we are off the
19  record.
20     (Recess taken.)
21     THE VIDEOGRAPHER:  This marks the beginning
22  of Disc No. 2 in the deposition of Steven Sinclair.
23     The time is 10:47 a m., and we are back on
24  the record.
25     MR. QUINN: Q.  For how long have you worked

Page 60

1  in the marketing profession or occupation?
2     A  About seven or eight years.
3     Q  Do you have any professional training in that
4  area?
5     A  I have an MBA where I took a class.
6     Q  And where is your MBA from?
7     A  University of Michigan.
8     Q  You're aware that there are particular -- let
9  me start over again.
10       It's true, isn't it, that if a manufacturer
11  of a product wants to find out specifically what
12  features caused a consumer to purchase the product,
13  there are techniques by which a manufacturer could do
14  that?
15     A  Sure.
16     Q  And -- and what would some of those be?
17     A  Primary one would be to -- to ask customers,
18  "Why did you buy the product?"
19     Q  And if Apple wanted to find out what specific
20  features caused consumers to purchase Apple products,
21  that's something that Apple could presumably do by
22  doing those types of surveys?
23     A  That's true.
24     Q  So if Apple wanted to find out whether, you
25  know, a particular feature like slide to unlock or,

Page 61

1  you know, the ability to suggest words in composing a
2  message, or the ability to search across multiple
3  databases and applications, or -- what's the fourth
4  one -- linking structures to actions or detectors, if
5  Apple wanted to find out specifically whether any of
6  those features caused consumers to purchase a product,
7  that -- or contributed to the purchase decision,
8  that's something that Apple could do?
9     A  We could.  In those specific examples, we
10  know that they contribute to ease of use, so we don't
11  have to ask that question of, "Did this contribute to
12  ease of use which caused you to buy this product?"
13     Q  So let me go back and ask the question then
14  specifically.
15     A  Okay.
16     Q  Apple could specifically ask about those
17  features, that is to say, slide to unlock, linking
18  structures to actions, or detectors, word
19  recommendations, or unified search, that is to say,
20  the ability to search across applications or
21  databases.
22       Apple could survey consumers and find out
23  whether specifically those features contributed to the
24  decision to make purchases; true?
25     A  We could, if that was the question.

Highly Confidential - Attorneys' Eyes Only

Page 62

1    Q   All right.
2        And what you're telling me is, Apple knows or
3    Apple has the view that all those features contribute
4    to ease of use; correct?
5    A   They all do.
6    Q



Highly Confidential - Attorneys' Eyes Only



Page 66

1 ability to -- of the software to make word

21   Q   Based on your experience, your professional
22 experience, are there ways that companies that engage
23 in advertising can determine how effective their
24 advertising has been?
25   A   I'm not an advertising person, and I don't

Page 67

1 dabble in that or spend any time looking at the
2 effectiveness of our advertising, so I don't feel
3 confident in answering that question.
4   Q   So you do not regard yourself as being
5 knowledgeable about advertising; is that true?
6   A   I'm knowledgeable about the content within
7 the advertising, because I'm the product person, but
8 not about techniques or methods for either producing
9 it or measuring it, the effectiveness.
10   Q   Well, I mean, do you have any knowledge at
11 all about whether or not there are techniques that
12 exist by which companies that engage in advertising
13 can determine whether advertising has been effective?
14   A   I sure hope so, but that's not my job to
15 know.
16   Q   So you just don't know whether that --
17   A   I don't know anything about that.
18   Q   All right.
19       And you -- you don't have any information
20 concerning how effective Apple's advertising has been;
21 is that true?
22   A   I have never been given that information.
23   Q   So my statement is correct, that you have no
24 information concerning how effective Apple's
25 advertising has been?

Page 68

1   A   I don't recall ever getting any kind of
2 information like that.
3   Q   I mean, do you, you know, is there any information
4 or data that you can share with me at all regarding
5 the extent to which Apple's advertising has
6 contributed to its sales?
7   A   I've not seen anything that's been published
8 internally about that.  So nothing -- nothing that I
9 could trust or -- or, you know, hang my hat on and
10 state under oath that I believe in.
11   Q   You have no -- you have no such information?
12   A   I don't.  I don't share information with the
13 advertising group unless it's regarding product.
14   Q   I mean, do you -- I mean, in your
15 declaration, you refer to some advertisements, and I
16 think there are YouTube addresses given for some
17 advertisements --
18   A   That's correct.
19   Q   -- do you recall that?
20   A   I recall that.
21   Q   I mean, have you actually looked at those
22 advertisements yourself?
23   A   I've seen all of those at one time or
24 another.
25   Q   And do you have any information at all that

Page 69

1 you can share with me as to how effective those
2 advertisements have been?
3       MR. STONE:  Objection; vague.
4       THE WITNESS:  I don't have any direct
5 correlation between the -- those ads and the ultimate
6 sales of product.
7       MR. QUINN:  Q.  Do you have any information
8 at all that you can share with me concerning how
9 effective those advertisements have been?
10       MR. STONE:  Objection; vague; asked and
11 answered.
12       THE WITNESS:  I don't have any data that --
13 that points to that.
14       MR. QUINN:  Q.  And why did you include those
15 particular advertisements and not others in your
16 declaration?
17   A   So if I recall correctly, those ads show
18 features that were pertinent to the declaration, so
19 slide to unlock, for example.
20   Q   I mean, is it your understanding that those
21 advertisements reflect all four of the patents that
22 you referred to?
23   A   I don't recall if it shows all four.  I can't
24 remember if we had a Siri ad in that list or not, for
25 example.  But certainly they -- they -- they basically

Highly Confidential - Attorneys' Eyes Only



Page 70

1  demonstrate the concept of the product as the hero,
2  and ease of use is a key component of -- of -- of what
3  makes the product desirable.
4      Q  So you say you -- that they do.  You recall
5  it shows slide to unlock?
6      A  I think so.  It's been a while since I've
7  seen it.
8      Q  Do you recall whether or not any of those
9  advertisements reflect detectors or linking structures
10  to actions?
11     A  I can't remember if they did or not.
12     Q  Or word recommendations in composing the
13  message?
14     A  I can't remember if they did or not.
15     Q  I think you told me you can't recall whether
16  any of those advertisements reflect the Siri.
17     A  That's correct, I don't remember.
18



Highly Confidential - Attorneys' Eyes Only



Page 78

Page 79

9     Q  Do you know, for any given model of the
10 iPhone, do you know how many Apple patents are
11 embodied or practiced in that iPhone?
12     MR. STONE:  Objection; lacks foundation.
13     THE WITNESS:  No.
14     MR. QUINN:  Q.  You would expect that there
15 would be dozens, if not hundreds?
16     MR. STONE:  Objection; lacks foundation.
17     THE WITNESS:  I would expect there to be a
18 lot.  I don't know what that number is.
19     MR. QUINN:  Q.  Do you know how many, you
20 know, patented features have been the subject of
21 advertisements that Apple has run?
22     MR. STONE:  Objection; lacks foundation.
23     THE WITNESS:  No.
24     MR. QUINN:  Q.  Do you know of any Apple
25 patented features which have not been the subject of

Page 80

1 advertisements?
2     MR. STONE:  Objection; vague; lacks
3 foundation.
4     THE WITNESS:  Can you repeat that?
5     MR. QUINN:  Q.  Do you know how many patented
6 Apple features have not been the subject of
7 advertisements?
8     MR. STONE:  Same objections.
9     THE WITNESS:  No.
10     MR. QUINN:
11

Page 81

Highly Confidential - Attorneys' Eyes Only



**Page 94**

**Page 95**

1  use this feature? Daily? Weekly? Monthly?" Sort

8   Q  If I were to go through each of these
9  advertisements with you that are referenced in your
10 declaration, would you be able to tell me how many
11 Apple patents or the functioning of how many different
12 Apple patents are illustrated in the advertisement?
13   A  I doubt that I would be able to do that.

**Page 96**

5   Q  So you -- you think the Apple name does
6  contribute to sales?
7   A  I think that we've built great products that
8  have bolstered the Apple name, and it's synonymous
9  with great products, so that sells products.
10   Q  In your declaration, you refer to some number
11 of advertisements, six, eight, ten, whatever the
12 number is.
13     Do you have any idea how many different
14 television advertisements Apple has run for any of the
15 models of its phones or tablets?
16   A  No, I couldn't answer any specifics on how
17 many.
18   Q  But, I mean, you referred what -- the
19 advertisements that are referred to in your
20 declaration are a very small subset of the total
21 number of television advertisements that Apple has run
22 for its products; is that true?
23   A  I don't know the total, so I can't say if
24 it's small or a portion or, you know, what percentage
25 that would be.  I can't say if it's 5, 10, or 20 or

**Page 97**

1  50 percent.
2   Q  What would be your best estimate as to how
3  many different television advertisements Apple has
4  created for iPhones?
5   A  It would be pure speculation.  You know,
6  we've done four or five, six per model, times, you
7  know, four or five models for iPhone.  So it could be
8  in the 30 -- 30 range or so.
9   Q  Is that your understanding, that for each
10 model, Apple has produced less than ten television
11 advertisements?
12   A  That's probably true.  I don't know for sure.
13     MR. STONE:  Just in the United States, or are
14 you -- I mean --
15     MR. QUINN:  That's a good point.
16   Q  I mean, do -- do you have any information
17 about outside the United States?
18   A  We do create it for five or six other
19 markets, and certainly there are advertisements on
20 occasion that are created by some of our carrier
21 partners related to iPhone.  So I'm not including
22 those in -- in the numbers you're talking about.
23   Q  So within the United States, you think it's
24 probably less than ten television advertisements per
25 model.  And then outside the United States in various

Highly Confidential - Attorneys' Eyes Only

Page 98

1  jurisdictions, there would be some number of
2  additional --
3      A  We'd have to look that up.
4      Q  -- additional TV advertisements; is that
5  true?
6      A  We'd have to look that up.  I can't --
7      Q  You're just not sure?
8      A  I'm just not sure.
9      Q  Okay.  So you -- just to be clear on what --
10  to be certain about what you're not sure of -- only a
11  lawyer would ask you that --
12      A  I know.
13      Q  -- you're just not sure whether the total
14  number of advertisements done in the United States for
15  each model of phone is less than ten; is that true?
16      A  That is true.  I am not sure.
17      Q  I mean, do you know whether or not there's
18  ever been an advertisement -- a television
19  advertisement run that shows the functioning of the
20  word suggestions for completing messages?
21      A  I believe that it has shown up in context of
22  the ad, but I can't remember, you know, specifically
23  which one or what word was suggested or what the --
24  the exact situation was.
25      Q  So you believe that was illustrated in a --

Page 99

1  in a TV advertisement, but you just can't recall the
2  advertisement; is that true?
3      A  Yeah.  I haven't watched them in a while.
4      Q  And do you know whether or not there's ever
5  been a -- Apple has ever run an advertisement that
6  illustrates the functioning of detectors or linking
7  structures to actions?
8      A  I believe that there has.  I just don't
9  recall exactly which one.
10      Q  When you say that you think there has -- have
11  been advertisements run that illustrate the use of
12  detectors, has there been one run that shows a -- a
13  web address, and then a swipe or a clicking on the web
14  address, and then going to that particular address?
15  Has that appeared in a television advertisement?
16      A  I don't recall if that was the example.
17      Q  Or how about swiping or touching a telephone
18  number and making a call?  Did that appear in a
19  television advertisement?
20      A  I don't recall.
21      Q  When you say you believe that there was an
22  advertisement reflecting the use of detectors, can you
23  recall exactly what the detector was or what the
24  functioning was that you think might have appeared in
25  a TV advertisement?

Page 100

1      A  No, not off the top of my head.
2      Q  Now, is the -- you talked about the slide to
3  unlock, and you can't operate the phone without doing
4  the slide to unlock.
5          I mean, do you regard that as being part of
6  the security feature of the phone?
7      A  It's a -- it's the end step of the security
8  feature, but it's not the security feature itself.
9  The security feature itself is if you enable a pass
10  code that needs to be entered.  So whether you have a
11  pass code or not, you still have to slide to unlock.
12  So the pass code is the security feature.
13      Q  When you say it's the end of the security
14  feature, what do you mean by that?
15      A  I mean, it's the last step to getting to the
16  home screen so that you can actually perform whatever
17  function it is that you're -- you're looking to
18  perform.
19      Q  I mean, is it true that if in an
20  advertisement you're going to show the operation of
21  the iPhone, you know, from the beginning, the
22  initializing of the device through various features,
23  you're going to necessarily begin by illustrating the
24  slide to unlock?
25      A  You're either going to show it there, or

Page 101

1  you're going to show it if a phone call comes in and
2  you're sliding to unlock to answer the phone call.  So
3  yeah, it's generally the first step.
4          You could start in the middle if you wanted
5  to, but it's the experience, especially when
6  iPhone was new.  It was a pretty -- I can't claim it
7  to be the first, but I can claim it to be a pretty
8  unique way to turn on the phone and to access its home
9  screen.
10      Q  But if you're going to show the operation of
11  the device, starting with the initializing of the
12  device, you'd necessarily begin with slide to unlock?
13      A  You wouldn't have to, but we did.
14      Q  If you're going to show its -- how could you
15  show its operation, beginning with the initialization
16  of the device, that is to say, powering up and using
17  the device, without showing slide to unlock?
18      A  Oh, if we're talking about powering on the
19  device?
20      Q  Yeah.
21      A  Then yeah, that's generally the first step
22  you'd see.
23      Q  I mean, you'd have to do that -- you'd have
24  to show slide to unlock if you're going to show
25  continuously the powering up of the device and then

Highly Confidential - Attorneys' Eyes Only

Page 102

1 show various features being used?
2    A  Yeah.  We have a couple of features that you
3 can do without sliding to unlock.  It's a very limited
4 number.  But in general, you're correct.
5    Q  Are you -- are you aware -- can you now tell
6 me about any advertisement that Apple has ever run
7 where the focus of the advertisement was on the slide
8 to unlock feature itself?
9    A  I don't believe that to be the case.
10    Q  Same question with respect to linking
11 structures to actions or detectors.
12    A  Not specific to that.  It was more about the
13 ease of use of the product, and those illustrate that.
14 So if we tapped on some link to launch another app, it
15 was to show off how easy that was to use.  It was
16 probably in context of several other features that we
17 were using, showing off how easy iPhone is to use.
18    Q  But do I understand correctly that you cannot
19 recall an advertisement that Apple ever ran where the
20 focus of the advertisement was linking structures to
21 actions or the use of detectors, that feature?
22    MR. STONE:  Objection; vague.
23    THE WITNESS:  So focus is probably too strong
24 of a word.  It was one of the steps in the
25 advertisements showing off how easy it is to use

Page 103

1 iPhone, and so that's one of the things that
2 contributes to that.  So we probably showed three or
3 four things or five, depending on the -- how long the
4 ad was.
5    MR. QUINN:  Right.
6    Q  And then the same question regarding word
7 recommendations.  Was there ever an advertisement
8 where that was the focus of the advertisement?
9    A  So I don't remember if we had word
10 recommendation in one.  Again, it would be in the
11 context of other -- other features that contribute to
12 ease of use.
13    Q  Do you know whether or not the Siri feature
14 incorporates features in addition to those that are
15 described in the patent --
16    MR. STONE:  Objection; lacks foundation.
17    MR. QUINN:  Q. -- which is the subject of
18 your declaration?
19    A  So I'm sure there are other capabilities that
20 are not specifically covered by the patent, but -- so
21 I'm not sure exactly what you're asking.
22    Did I answer your question?
23    Q  I think so.
24

Page 104



Page 105

1 Siri that make it successful.  And if any one of those
2

11    Q  Do you know whether that search capability,
12 the -- you know, you just described the ability to
13 search across different applications and databases --
14 existed in the iPhone 4?
15    A  I don't know that answer.
16    Q  Do you know of any advertisement that Apple
17 has run for -- which features Siri which has in any
18 way referenced or focused on the particular
19 application or database that was searched for Siri to
20 provide an answer?
21    A  I'd have to see the advertisements to
22 speculate on what was being done behind the scenes.
23    But one of the beautiful things about Siri is
24 as an end user, you don't need to know what it's
25 doing.  It just -- it comes up with the right answer

Highly Confidential - Attorneys' Eyes Only

Page 106

1  because it understands what you meant.
2    Q  So my question really was focusing on the
3  content of an advertisement.
4    A  Sure.
5    Q  Do you recall any advertisement which
6  actually focused on or identified what database or
7  applications were being searched in order to come up
8  with the answer?
9    A  I don't think that that would have been
10  exposed to a customer on which ones were being -- you
11  see the end result.
12    Q  I understand.
13    A  And it could have come from one of many.  But
14  we don't put up on the screen or have any small text
15  or anything else that says, "And this search went to
16  this database, this database and this database."
17    Q  Right.
18    A  So is that your question?
19    Q  I think so.
20    A  Okay.
21    Q  I think you've answered the question.
22       And in fact, you're not aware of any
23  advertisement where Apple in any way referenced or
24  called attention to the applications that -- or
25  databases that were searched to come up with the

Page 107

1  answer; is that true?
2    A  Yeah.  We show the feature working.
3    Q  And you're not aware of any advertisement
4  where Apple called -- specifically called attention to
5  the fact that multiple databases or applications were
6  being searched in order to come up with the answer; is
7  that true?
8       MR. STONE:  Objection; vague.
9       THE WITNESS:  So as part of conveying ease of
10  use, we wouldn't get into the details of why it comes
11  up with the right answer.  We would show that it does.
12  And, you know, again, it comes back to if it hadn't
13  done that in the background, we wouldn't be able to
14  show that off.
15       MR. QUINN:  Q.  Have you looked at any
16  Samsung advertisements?
17    A  I've seen Samsung ads.
18    Q  Have you seen any Samsung advertisements that
19  reference features or functions similar to these four
20  patents which are the subject of your declaration?
21    A  I don't recall any.  Most of Samsung's ads
22  are -- don't show off features, per se.
23    Q  How many Samsung ads do you believe you've
24  seen?
25    A  I have no idea.

Page 108

Page 109



Highly Confidential - Attorneys' Eyes Only

Page 114

1    Q  Yes.
2    A  -- Samsung?
3    Q  Yes.
4    A  Okay.  I don't believe that those four
5  features would have been listed.  Again, they'd fall
6  under the category of ease of use.
7    Q  All right.
8      And you're not saying that Apple is the only
9  one that can make a phone that's easy to use; are you?
10     MR. STONE:  Objection; vague; argumentative.
11     THE WITNESS:  I'm saying we're the best.
12     MR. QUINN:  Q.  You're saying -- are you
13  saying that Apple is the only one that should be
14  permitted to make a phone that's easy to use?
15     A  I'm not saying that others can't try to do
16  that.  I'm saying that we're the best.
17     Q  All right.  I understand that.
18     But are you saying that in terms of ease of
19  use, that only Apple should have -- be permitted to
20  make a phone that's easy to use?
21     MR. STONE:  Objection; argumentative.
22     THE WITNESS:  Others can -- can do their --
23  do their homework to make products easy to use.  They
24  should try and do their own work.
25     MR. STONE:  It's about noon, John.  Do you

Page 115

1  want to take lunch or --
2      MR. QUINN:  Sure, sure.  Let's go off the
3  record.
4      THE VIDEOGRAPHER:  This marks the end of
5  Disc No. 2 in the deposition of Steven Sinclair.
6      The time is 11:56 a.m., and we're off the
7  record.
8      (Lunch break taken at 11:56 a.m.)
9          ---oOo---

Page 116

1        A F T E R N O O N   S E S S I O N
2              12:39 P.M.
3
4
5
6      THE VIDEOGRAPHER:  This marks the beginning
7  of Disc No. 3 in the deposition of Steven Sinclair.
8      The time is 12:39 p m., and we're back on the
9  record.
10

Page 117



Highly Confidential - Attorneys' Eyes Only

## Page 206

1      MR. PLUNKETT:  That's acceptable.
2      MR. D'AMATO:  -- of learning of any from the
3  witness.
4      If the transcript is needed in the meantime,
5  a copy may be used in lieu of the original.  In fact,
6  a copy may be used in lieu of the original, I think --
7      MR. PLUNKETT:  That's acceptable.
8      MR. D'AMATO:  -- in practice.
9      MR. PLUNKETT:  That's acceptable.
10     MR. D'AMATO:  Okay?
11     MR. STONE:  Yes.
12     MR. D'AMATO:  Anything else we need?
13     MR. PLUNKETT:  Nope.
14     MR. D'AMATO:  Okay.
15     MR. VIDEOGRAPHER:  This marks the end of
16  Disc No. 4 of 4 and concludes today's deposition of
17  Steven Sinclair.
18     The time is 3:00 p.m., and we are off the
19  record.
20     (WHEREUPON, the deposition ended at
21     3:00 p.m.)
22     ---oOo---

## Page 207

J U R A T

I, STEVEN SINCLAIR, do hereby certify under Penalty of perjury that I have read the foregoing transcript of my deposition taken on April 4, 2012; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

DATED this ____ day of _____, 2012, at _____, California.

_____
SIGNATURE OF WITNESS

## Page 208

CERTIFICATE OF REPORTER

I, ANDREA M. IGNACIO HOWARD, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings which took place;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I have hereunto set my hand this 4th day of April 2012.

_____
ANDREA M. IGNACIO HOWARD, RPR, CCRR, CLR, CSR No. 9830

## Page 209

I N D E X

DEPOSITION OF STEVEN SINCLAIR

EXAMINATION                    PAGE
BY MR. QUINN                     6
BY MR. D'AMATO          128

E X H I B I T S
EXHIBIT                          PAGE
Exhibit 1   4-14-2010 E-Mail String, Subject:   28
         Re: IPhone "firsts,: Bates Nos.
         APL-ITC796-0000119763 - '67;
         5 pgs.
Exhibit 2   Declaration of Steven Sinclair;   73
         5 pgs.
Exhibit 3   Colored Photocopy of LG Prada;   140
         1 pg.
///

Highly Confidential - Attorneys' Eyes Only

Page 208

1               CERTIFICATE OF REPORTER

2

3

4          I, ANDREA M. IGNACIO HOWARD, hereby certify

5     that the witness in the foregoing deposition was by me

6     duly sworn to tell the truth, the whole truth, and

7     nothing but the truth in the within-entitled cause;

8

9          That said deposition was taken in shorthand

10    by me, a Certified Shorthand Reporter of the State of

11    California, and was thereafter transcribed into

12    typewriting, and that the foregoing transcript

13    constitutes a full, true and correct report of said

14    deposition and of the proceedings which took place;

15

16         That I am a disinterested person to the said

17    action.

18

19         IN WITNESS WHEREOF, I have hereunto set my

20    hand this 4th day of April 2012.

21

22    _____

23    ANDREA M. IGNACIO HOWARD, RPR, CCRR, CLR, CSR No. 9830

24

25