# EXHIBIT L
# FILED UNDER SEAL

Highly Confidential

Page 1

1           UNITED STATES DISTRICT COURT
2           NORTHERN DISTRICT OF CALIFORNIA
3                SAN JOSE DIVISION
4    APPLE INC., a California
     Corporation,
5
              Plaintiff,              Case No.
6
       vs.                           12-CV-00630-LHK
7
     SAMSUNG ELECTRONICS CO., LTD.,
8    a Korean business entity;
     SAMSUNG ELECTRONICS AMERICA,
9    INC., a New York corporation;
     SAMSUNG TELECOMMUNICATIONS
10   AMERICA, LLC, a Delaware
     limited liability company,
11
              Defendants.
12
13
14
15           HIGHLY CONFIDENTIAL
16      PURSUANT TO THE PROTECTIVE ORDER
17
18    VIDEOTAPED DEPOSITION OF GREG CHRISTIE
19         REDWOOD SHORES, CALIFORNIA
20          Friday, April 20, 2012
21
22
23   REPORTED BY:
24   CYNTHIA MANNING, CSR No. 7645, CLR, CCRR
25   JOB NO. 48335

Highly Confidential

|  | Page 2 |
|---|---|

1         Friday, April 20, 2012
2          10:01 a.m.
3
4
5       Deposition of GREG CHRISTIE, taken on
6 behalf of the Samsung Respondents, at 555 Twin
7 Dolphin Drive, Fifth Floor, Redwood Shores,
8 California, before Cynthia Manning, Certified
9 Shorthand Reporter No. 7645, Certified LiveNote
10 Reporter, California Certified Realtime Reporter.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

|  | Page 3 |
|---|---|

1 APPEARANCES:
2
3 FOR COMPLAINANT APPLE INC.:
4
    GIBSON DUNN & CRUTCHER, LLP
5    BY:  H. MARK LYON, ESQ.
      SARAH E. SIMMONS, ESQ.
6    1881 Page Mill Road
    Palo Alto, California 94304
7    650.849.5300
    mlyon@gibsondunn.com
8    ssimmons@gibsondunn.com
9
10 FOR RESPONDENTS SAMSUNG ELECTRONICS COMPANY,
    LTD., SAMSUNG ELECTRONICS AMERICA, INC..
11 SAMSUNG TELECOMMUNICATIONS AMERICA, LLC:
12    QUINN EMANUEL URQUHART & SULLIVAN, LLP
    BY:  SEAN S. PAK, ESQ.
13    50 California Street
    San Francisco, California 94111
14    415.875.6600
    seanpak@quinnemanuel.com
15
16
17
18 ALSO PRESENT:
19    Robert King
20    Benjamin Gerald, Videographer
21
22
23
24
25

|  | Page 4 |
|---|---|

1     REDWOOD SHORES, CALIFORNIA;
2    FRIDAY, APRIL 20, 2012, 10:01 A.M.
3
4     THE VIDEOGRAPHER:  Good morning.
5    This marks the beginning of the disk
6 labeled No. 1 of the videotaped deposition of
7 Greg Christie in the matter Apple Incorporated
8 versus Samsung Electronics Company Limited, et
9 al., held in the United States District Court for
10 the Northern District of California.  Case No. is
11 12-cv-00630-LHK.
12    This deposition is being held at 555
13 Twin Dolphin Drive, Redwood Shores, California,
14 taken on April 20th, 2012 at approximately 10:01
15 a.m.
16    My name is Benjamin Gerald, from
17 TSG Reporting, Incorporated, and I'm the legal
18 video specialist.
19    The court reporter today is Cynthia
20 Manning, in association with TSG Reporting.
21    Will counsel please identify themselves
22 for the record.
23    MR. PAK:  This is Sean Pak with Quinn
24 Emanuel representing Samsung.  And with me is
25 Robert King.

|  | Page 5 |
|---|---|

1     MR. LYON:  Mark Lyon of Gibson, Dunn &
2 Crutcher on behalf of Apple Inc.  And with me is
3 Sarah Simmons from Gibson, Dunn and Cyndi Wheeler
4 of Apple.
5    THE VIDEOGRAPHER:  Thank you.
6    Will the reporter please swear the
7 witness.
8     GREG CHRISTIE,
9    having first been duly sworn, testified
10    as follows:
11
12    THE VIDEOGRAPHER:  Thank you.
13    Please proceed.
14
15     EXAMINATION
16 BY MR. PAK:
17   Q.  Good morning.
18   A.  Good morning.
19   Q.  Can you please state your name for the
20 record?
21   A.  My full name?
22   Q.  Yes.
23   A.  Gregory Nicholas Christie.
24   Q.  And who's your current employer?
25   A.  Apple.

Highly Confidential

|  | Page 18 | | Page 19 |
|---|---|---|---|

**Page 18**

1  patent documents starting on the first page and
2  it continues to the next page?
3      A. I see those patents.
4      Q. And do you see that there is also a
5  listing of publications?
6      A. "Other Publications"?
7      Q. Yes.
8      A. Yes.
9      Q. I know it's a long list, so feel free to
10 take the time to scan through the list of both
11 the patents and the publications. And if you
12 could tell me whether any of these jump out at
13 you as something that you've seen before.
14     A. Well, I don't know patents by number. I
15 don't know what the "A1" numbers mean. None of
16 these documents jump out at me.
17     Q. So if you could take a look at the first
18 entry under "Other Publications." That's the
19 Neonode, Inc., document, titled "Welcome to the
20 N1 Guide."
21     A. Okay.
22     Q. Before today, have you heard of the
23 company Neonode?
24     A. No.
25     Q. Have you heard of a device called N1?

**Page 19**

1      A. Not to my recollection.
2      Q. Prior to today, do you recall ever
3  searching for prior art in the area of unlocking
4  an image?
5      A. Not that I recall.
6      Q. Do you recall whether any of your team
7  members were asked to do that type of search?
8      A. Not that I recall.
9      Q. When you were coming up with the ideas
10 that led to the filing of the '721 application,
11 do you recall whether you or any other team
12 member investigated what others were doing in the
13 area of unlocking an image?
14     A. Not that I recall.
15     Q. Take a look at another reference under
16 other publications. And this time it's toward
17 the bottom right-hand corner.
18     A. Okay.
19     Q. It's the second-to-the-last entry on the
20 right-hand side called Plaisant. And it's a
21 document titled, "Touchscreen Toggle Design."
22     A. Okay.
23     Q. Do you recall seeing that particular
24 document?
25     A. No.

**Page 20**

1      Q. Do you know who Dr. Plaisant is?
2      A. No.
3      Q. Do you recall ever visiting any
4  universities that had a program in human-computer
5  interaction?
6      A. I can't answer that question.
7      Q. Why not? Is there something that you
8  don't understand about my question?
9      A. Yeah. I mean, I may have visited
10 universities, but I don't necessarily know
11 whether they had had a program as you described.
12     Q. Do you recall ever attending a
13 university to visit a lab focused on user
14 interface design?
15     A. No.
16     Q. Do you recall ever visiting the
17 University of Maryland?
18     A. Yes, once.
19     Q. A long time ago?
20     A. Long time ago.
21     Q. I take it it doesn't relate to --
22     A. It does not relate to this work at
23 Apple.
24     Q. Do you know Professor Bederson?
25     A. Not that I recall, no.

**Page 21**

1      Q. How about Professor Shneiderman?
2      A. Not that I recall, no.
3      Q. In your work with the iPhone, have you
4  ever consulted with academic researchers to
5  assist you in your design?
6      A. Not knowingly, no.
7      Q. Have you ever been involved in the
8  providing of funds to academic researchers in
9  connection with user interface research?
10     A. Not to my knowledge, no.
11     Q. Going back to the 2009 time period when
12 the '721 patent -- actually, 2005, when the
13 original application for the '721 patent was
14 filed, how would you describe your level of
15 expertise in human-computer interaction?
16     A. It's what I do for a living. I wouldn't
17 characterize my expertise as one way or another.
18     Q. Prior to your work on the iPhone --
19     A. Mm-hmm.
20     Q. -- had you done any work on portable
21 devices in terms of user interface design?
22     A. Yes.
23     Q. Which ones?
24     A. There was a series of devices under the
25 name Newton at Apple.

Highly Confidential

Page 22

1        MR. LYON:  Administratively, we'll mark
2   this highly confidential at this point since
3   we're getting into Apple information at this
4   point.  From here on.
5   BY MR. PAK:
6        Q.  And what was your role in the Newton
7   device?
8        A.  Can you rephrase that question?
9        Q.  Sure.
10       What was your role with respect to the
11  Newton device?
12       A.  That's what I hired into Apple to work
13  on.  I was a software engineer and then became a
14  manager of the applications team.
15       Q.  Did you develop code for the Newton
16  device?
17       A.  Yes.
18       Q.  And what types of code did you develop
19  for the Newton device?
20       A.  It was high-level application code.
21       Q.  And when you say "high-level application
22  code," what do you mean?
23       A.  I mean, you know, if you imagine a
24  typical diagram of software architecture and --
25  where the hardware is at the bottom and what

Page 23

1   draws to the screen is at the top, was higher
2   level.
3        Q.  So I take it you were not working on the
4   operating system or the kernel?
5        A.  No.
6        Q.  And you were not working on the device
7   drivers?
8        A.  No.
9        Q.  Were there specific applications that
10  you were developing for the Newton?
11       A.  It was a pretty small team when I
12  joined, so I worked on quite a few different
13  applications that went on the Newton.
14       Q.  I know it's been a while, but can you
15  tell me which applications you worked on?
16       A.  I recall working on the notepad app and
17  the address book and the calendar.  And there
18  were a couple of setup assistants that I worked
19  on.  I worked on the in-and-out box, maybe the
20  alarm clock.  I think -- I'm sure there are other
21  sections of the software I worked on, but I can't
22  recall exactly.
23       Q.  What type of programming language was
24  the Newton application written in?
25       A.  Language called Newton script.

Page 24

1        Q.  Is that object-oriented?
2        A.  Yes.
3        Q.  Is that derived from any common
4   programming languages?
5        A.  No.  No.
6        Q.  Were you familiar with that language
7   before you joined Apple?
8        A.  Yes.
9        Q.  How were you familiar with that
10  language?
11       A.  When the Newton came out, I bought a
12  copy of the developer kit and taught myself the
13  language, created a few apps for it.
14       Q.  So I take it you were not part of the
15  original design team for the Newton?
16       A.  No.  No.
17       Q.  Do you recall when the Newton device
18  shipped for the first time?
19       A.  Yes.
20       Q.  What was that date?
21       A.  It was early August 1993.
22       Q.  At some point in time, you transitioned
23  from a software engineer status to a manager for
24  the application team?
25       A.  Mm-hmm.

Page 25

1        Q.  And what were your responsibilities as
2   the manager of the application team?
3        A.  I had two people reporting to me in
4   addition to my engineering responsibilities.
5        Q.  Were you involved in designing the user
6   interface for the Newton?
7        A.  Yes.
8        Q.  In what ways?
9        A.  The structure of the team was such that
10  if you owned an app, you were responsible for the
11  user interface for that app.
12       Q.  So in addition to writing code, you
13  would also design the user interface for that
14  particular application?
15       A.  Mm-hmm.
16       Q.  For how long were you the manager of the
17  Newton application team?
18       A.  This is a very long time ago.  Probably
19  about a year.
20       Q.  Would you consider Newton to be a
21  commercial success?
22       A.  No.
23       Q.  Do you recall when the Newton was pulled
24  off the market?
25       A.  I don't know the exact date.

Highly Confidential

Page 26

1   Q. Can you estimate for me?
2   A. Well --
3   Q. Do you recall whether --
4   A. I think it was '97, '98, somewhere in
5   there. I don't know. When pulled off the market
6   occurs, I don't -- I don't know when products
7   disappear from lists.
8   Q. Were you continuing to work on the
9   Newton application team up to '97?
10  A. I can't remember when I transitioned out
11  of Newton. I couldn't put a date on it.
12  Q. Do you recall whether the Newton device
13  had a spell-checker?
14  A. I can't recall.
15  Q. Do you recall whether the Newton device
16  had the ability to identify certain types of
17  structures such as phone numbers or e-mails as
18  the user was typing them into the device?
19  A. What types of structures?
20  Q. Phone numbers or e-mails, data
21  structures.
22  A. I don't know when that processing took
23  place.
24  Q. Do you recall whether such processing
25  did take place as part of the Newton device?

Page 27

1   A. Which processing?
2   Q. The process of identifying certain types
3   of data structures.
4   A. Not entirely, no. I can recall one
5   circumstance where that could happen --
6   Q. And what circumstance --
7   A. -- but there may be others.
8   Q. Thank you.
9        And what's the circumstance that you
10  have in mind?
11  A. The Newton had an assist function --
12  Q. And --
13  A. -- where you could highlight text and
14  tap "assist" and it would do something correct
15  with regard to what you highlighted.
16  Q. First of all, which applications
17  supported this assist function?
18  A. It was -- it was a system-level
19  function.
20  Q. And when you say "system-level
21  function," does it indicate that the function was
22  available to multiple applications?
23  A. Yes.
24  Q. Do you recall whether any of your
25  applications that you worked on for the Newton

Page 28

1   device used the assist function?
2   A. Applications didn't use the assist
3   function; customers would.
4   Q. I see.
5        So as the customer was working on any
6   particular application, one of the system-level
7   functions available to the user was the assist
8   function; is that correct?
9   A. Yes.
10  Q. So how would the user invoke the assist
11  function on the Newton device?
12  A. There were several ways.
13  Q. What's the first way that you can
14  recall?
15  A. That I can recall would be that you
16  highlighted text, tapped "assist," which was an
17  icon on the screen, and then the device would do
18  it.
19  Q. Can you think of another way to invoke
20  assist?
21  A. If you just tapped "assist," it would
22  act on what you most recently wrote or typed.
23  Q. Any other ways to invoke assist?
24  A. If there was nothing that you had
25  written or typed recently and you had no

Page 29

1   selection, if you tapped "assist," a slip would
2   come up on screen with a blank line that you
3   could write or tap -- type into and perform an
4   action.
5   Q. Do you recall what the icon looked like
6   on the screen for the assist function?
7   A. It was a -- it was a lightbulb graphic.
8   Q. And was the icon for the assist function
9   always persistent on the screen on the Newton
10  device?
11  A. Depends on the device.
12  Q. Was there a particular Newton device
13  where the lightbulb icon for the assist function
14  would be persistent?
15  A. Yes.
16  Q. Which device is that?
17  A. The original MessagePad, the MessagePad
18  100, MessagePad 110, 120 and 130.
19  Q. And what are some of the Newton devices
20  where the lightbulb icon for the assist function
21  was not persistent on the screen?
22  A. It was optionally persistent.
23  Q. And what do you mean by "optionally
24  persistent"?
25  A. If I recall correctly, the customer

Highly Confidential

Page 30

1  could configure the button bar --
2      Q.  I see.
3      A.  -- on those devices.  At least that's
4  what I recall.
5      Q.  Do you recall what the default setting
6  was?
7      A.  Yes.
8      Q.  What was the default setting?
9      A.  That assist was on the button bar.
10     Q.  In terms of the layout, where was the
11 button bar positioned on the screen with respect
12 to the Newton devices?
13     A.  Depends on the device.
14     Q.  In the MessagePad, the original
15 MessagePad device, where would the button bar be
16 located?
17     A.  If you were holding the device in the
18 normal portrait orientation, the button bar was
19 below the screen.
20     Q.  When you say "below the screen," are you
21 talking about below the primary display area on
22 the screen?
23     A.  The only display area.
24     Q.  Was that button bar a physical bar?
25     A.  I don't know what you bean by

Page 31

1  "physical."
2      Q.  Was it a virtual representation of a bar
3  or did it actually have physical buttons?
4      A.  Can you be more specific?
5      Q.  Sure.
6          When you say that the button bar was
7  below the display area on the original
8  MessagePad, what do you mean by that exactly?
9  Can you describe that for us?
10     A.  There were legends on -- it was not part
11 of the display area on the original MessagePad.
12 It was below the display area, and there were
13 legends with functions on them.
14     Q.  And were those legends configurable?
15     A.  No, they were, you know, printed.
16     Q.  And one of those functions could be the
17 lightbulb icon?
18     A.  On the original MessagePad it was, yeah.
19     Q.  Okay.  So the user could associate or
20 configure that particular icon through some type
21 of setting on the device?
22     A.  No.
23     Q.  No.
24         So for the original MessagePad, the
25 lightbulb icon was always present, and it was

Page 32

1  always configured to invoke the assist function?
2      A.  Tapping on that would invoke the assist
3  function.
4      Q.  For which -- can you give me an example
5  of a device that allowed the user to configure
6  the lightbulb function for that assist?
7      A.  No.
8      Q.  Well, you knew that there was some type
9  of configuration possible for some of the
10 devices?
11     A.  You could configure the button bar on
12 some of the devices.
13     Q.  So let's go to the original MessagePad
14 configuration --
15     A.  Okay.
16     Q.  -- with the lightbulb icon in the button
17 bar.
18         And as an example, we can take the
19 address book application that you worked on.
20     A.  Okay.
21     Q.  So I take it if the user was using the
22 address book on the original MessagePad device,
23 the user had the ability to tap on the lightbulb
24 icon to invoke the assist function; true?
25     A.  Yes.

Page 33

1      Q.  So if I were typing an e-mail address in
2  the address book -- was that something that was
3  possible on the MessagePad?
4      A.  Yes.
5      Q.  And as I was typing the e-mail address,
6  I pushed or tapped on the lightbulb icon to
7  invoke the assist function, what would happen
8  next?
9      A.  To the best of my recollection, if you
10 had just typed or written an e-mail address into
11 an address book entry, if you tapped "assist,"
12 that e-mail address would be copied into the
13 assist slip, which is like a dialogue box,
14 And you would have a -- what's called a pop-up,
15 and it would let you choose an action that was
16 appropriate for an e-mail address.  And in this
17 case in particular, I believe the only action
18 would have been to e-mail that, so that would be
19 the only choice.
20     Q.  And was that option presented to the
21 user based on a recognition by the system that
22 this was an e-mail address?
23     MR. LYON:  Objection; vague.
24     THE WITNESS:  I didn't write the
25 software for the assistant, but that's my

Highly Confidential

---

Page 34

1 understanding.
2 BY MR. PAK:
3 Q. So in the same address book application,
4 if the user was typing a phone number --
5 A. Mm-hmm.
6 Q. -- and typed on the assist icon --
7 A. Tapped on the assist.
8 Q. Type -- or tapped, sorry.
9 So let me rephrase my question.
10 So in the address book application, if
11 the user was typing a phone number and then
12 tapped on the assist icon --
13 A. Mm-hmm.
14 Q. -- what would happen next?
15 A. Well, the same basic thing that I just
16 described, a slip would appear on the screen and
17 there the range of choices, I think, in that case
18 would have been "call" or "fax," this being the
19 1990s when faxing was pretty hot stuff.
20 Q. In each of those scenarios, would the
21 original character string that you typed remain
22 in the display area, the primary display area?
23 A. There is only one display area.
24 Q. I see. In each of those scenarios,
25 would the original character string appear twice,

---

Page 35

1 one in the dialogue box and also in the
2 application itself?
3 A. Well, this is a hypothetical situation,
4 right? I don't know -- I don't recall whether
5 there would be an overlap of those two views so
6 that only one was visible at a time or not,
7 but...
8 Q. Do you recall whether the system would
9 delete the character string in the primary
10 application display area?
11 A. No.
12 I'm sorry, can you rephrase that
13 question? You asked me if I recall. Yes, I
14 recall.
15 Q. Okay. Did the system delete the
16 character string in the primary application
17 display area when the assist dialogue box was
18 invoked?
19 A. No, it did not.
20 Q. So in the first example, the e-mail
21 address, if I clicked on the action associated
22 with that e-mail address through the dialogue
23 box, what would happen next?
24 A. I'm not sure you characterized what I
25 said accurately.

---

Page 36

1 Q. Let me see if I can try that again.
2 In the first example of the e-mail
3 address, after the user has invoked the assist
4 function --
5 A. Okay.
6 Q. -- you indicated that the e-mail address
7 would appear in a slip line --
8 A. Mm-hmm.
9 Q. -- and that there would also be a pop-up
10 menu that would present an action to the user?
11 A. Yeah, in the e-mail case, I said there
12 was only one choice.
13 Q. I understand.
14 So in that particular instance, the
15 action would be to e-mail?
16 A. Mm-hmm.
17 Q. So if the user clicked on that action --
18 A. You didn't have to click on the action.
19 Q. I see.
20 A. There is only one choice.
21 Q. And how would the user indicate to the
22 system that he wanted to perform that action?
23 A. There was a button.
24 Q. Do you recall --
25 A. An on-screen button that labeled -- I

---

Page 37

1 think it was labeled "do."
2 Q. So if the user, after seeing the e-mail
3 address in the dialogue box for the assist
4 function clicked on the "do" button, the system
5 would launch the e-mail application?
6 A. Yes.
7 Q. And would the e-mail application place
8 the e-mail address into a new message in the "to"
9 field?
10 A. Yes. Yeah, an e-mail would be -- yeah.
11 There was no e-mail application per se. There
12 was an inbox and an outbox. So this is dead
13 software technology, so I understand that you're
14 not completely familiar with it.
15 Q. Would you call that inbox application or
16 inbox function? What would be the right
17 terminology?
18 A. It was the -- it was the I/O box app,
19 the same app handled the inbox and the outbox.
20 Q. I understand.
21 So if the user pushes the "do" button
22 after an e-mail address has been displayed on the
23 dialogue box of the assist function, the I/O box
24 application or app would be launched and the
25 e-mail address would be part of the e-mail

---

Highly Confidential

| Page 38 | Page 39 |
|---|---|

Page 38

1  message being created?
2      A. Not -- not exactly, no.
3      Q. Can you describe what would happened?
4      A. Yes, I can.
5      Q. Please do that for me.
6      A. So after tapping "do" in the assist
7  slip, you would get another slip, which was like
8  the e-mail slip, pre-addressed to that e-mail
9  address.
10      Q. When you are talking about the word
11  "slip," what do you mean by "slip"?
12      A. Yeah, Newton used the word "slip"
13  instead of "dialogue box."
14      Q. It's referring to the same concept?
15      A. Same rough concept, yeah.
16      Q. And in the second example of a phone
17  book, a phone number that we discussed --
18      A. Yeah.
19      Q. -- if the user clicks on the assist icon
20  after typing a phone number --
21      A. Mm-hmm.
22      Q. -- there would be a slip --
23      A. Mm-hmm.
24      Q. -- with the phone number and several
25  options would be presented to the user; is that

Page 39

1  correct?
2      A. A customer would have to tap the pop-up
3  menu to see the range of options.
4      Q. And what were the specific range of
5  options that would be presented in the case of a
6  phone number?
7      A. So this was an extensible feature of the
8  device. So depending on the applications you had
9  installed, I was -- in my description so far,
10  I've been describing just what was built into the
11  device.
12      Q. I see.
13          So I take it in the phone book example,
14  the default set of options that would be
15  presented once the user taps on the pop-up menu
16  would be "call" and "fax"?
17      A. To my recollection, yes.
18      Q. But it's possible that if the user had
19  installed other applications, another option
20  could also present?
21      A. That could be.
22      Q. In the default situation were the two
23  options "call" and "fax" are presented to the
24  user, would there be a "do" button or would the
25  user have to tap on one of those actions?

Page 40

1          MR. LYON: Objection; form.
2          THE WITNESS: Would there be a "do"
3  button or would they have to -- yeah, that's two
4  questions.
5  BY MR. PAK:
6      Q. Let me see if I can simplify my
7  question.
8          In the default situation where the two
9  options of "call" and "fax" are presented to the
10  user, how would the user select one of those
11  actions in the Newton device?
12      A. Well, if they were -- if the default was
13  what they wanted to do, they didn't have to do
14  any further action. They would just tap "do."
15  If they wanted to change what the system thought
16  it should do -- I'm using "thought" in be a very
17  colloquial term -- they would tap the pop-up
18  indicator, which was a diamond, and they would
19  see the list of alter alternatives.
20      Q. And once they saw the list of
21  alternatives in the Newton device, how would the
22  user select one of those alternatives?
23      A. They would, you know, tap on it with
24  their stylus.
25      Q. For example, they could tap on the fax

Page 41

1  icon?
2      A. It wasn't an icon; it was a word.
3      Q. Word.
4      A. Maybe there were icons, I don't recall.
5      Q. Okay. Let me see if I can try to
6  accommodate both scenarios.
7          In the phone book phone number example
8  we were discussing, if the user tapped on either
9  the fax word or icon, whatever the case may be,
10  what would happen next?
11      A. Similar to the e-mail list that would
12  come up -- well, they would have to tap the "do"
13  button, and similar to the e-mail case that was
14  described earlier, they would get a -- a fax
15  slip.
16      Q. And would the phone number be part of
17  the fax slip?
18      A. Yeah, it would be the number that would
19  be dialed.
20      Q. And was there some type of fax app on
21  the Newton device?
22      A. It was part of the I/O box. It could
23  send and receive faxes if plugged into a modem.
24      Q. Was the Newton architecture a
25  multitasking architecture?

Highly Confidential

Page 46

1  graphics architectures consider themselves client
2  server, even if it's processing on the same
3  machine, so...
4      Q. And can you give me an example of that?
5      A. No.
6      Q. Have you ever seen processes within the
7  iPhone being referred to as a server process?
8      A. Not to my knowledge, no.
9      Q. Have you ever seen processes within the
10  iPhone being referred to as a client process?
11      A. Not to my recollection, no.
12      Q. So we talked a bit about the assist
13  functionality on the Newton. Do you recall
14  whether the assist functionality could check the
15  spelling of a word?
16      A. Not that I recall.
17      Q. Do you recall whether the assist
18  functionality on the Newton could be used to
19  complete the spelling of a word?
20      A. Not that I recall.
21      Q. Do you recall whether any applications
22  either developed by Apple or third parties for
23  the Newton device had a spell checking
24  functionality?
25      A. You asked me that earlier. Not that I

Page 47

1  recall.
2      Q. Just to be clear, this time I'm asking
3  about also third-party applications that you may
4  be familiar with.
5      A. Not that I recall.
6      Q. When's the first time you came across a
7  spell checking function on a computer system?
8          MR. LYON: Objection; vague.
9          THE WITNESS: I can't remember when.
10  Maybe sometime in college.
11  BY MR. PAK:
12      Q. Have you ever used the text editor in
13  Mac OS?
14      A. What text editor are you referring to?
15      Q. Do you recall whether the Mac operating
16  system had a built-in text editor in the 2005
17  time period?
18      A. Yes.
19      Q. Do you recall using that particular text
20  editor?
21      A. I don't have specific recollection, but
22  I'm sure I have.
23      Q. Do you know whether that text editor as
24  it existed on the Mac OS in the 2005 time period
25  had a spell checking functionality?

Page 48

1      A. I know that there is a spell checking
2  function. I'm not a software architect, so I
3  can't tell you whether that spell checking
4  function is part of the application or whether
5  it's a system service that's provided.
6      Q. But you were aware that in the 2005 time
7  period, the Mac OS had a spell checking
8  functionality?
9      A. Can you repeat that question?
10      Q. Sure.
11          Were you aware in the 2005 time period
12  that the Mac operating system had a spell
13  checking functionality?
14      A. I find your question a little difficult
15  to answer. The Mac operating system had a spell
16  checking functionality. Do you mean the
17  operating system itself? Do you mean
18  applications that run on the operating system?
19      Q. Thank you for that clarification.
20          Were you aware in the 2005 time period
21  that applications --
22      A. Okay.
23      Q. -- running on the Mac OS had a spell
24  checking functionality?
25      A. Yes.

Page 49

1      Q. Do you recall utilizing those functions?
2      A. Yes.
3      Q. And which specific applications do you
4  have in mind?
5      A. Probably Mail, Microsoft Word, TextEdit.
6  I'm sure there are others.
7      Q. When you were using TextEdit, how would
8  the TextEdit program provide a spell checking
9  functionality to the user?
10          MR. LYON: Objection; vague.
11          THE WITNESS: I'm sure that the visual
12  appearance of a misspelled word has changed over
13  the years with different versions of the
14  operating system, so I can't -- I can't put
15  myself backwards in time to 2005 and tell you
16  exactly what something looked like there.
17          Does that make sense?
18  BY MR. PAK:
19      Q. It does make sense.
20          Do you have a recollection of any
21  scenario where the misspelled words -- misspelled
22  word was being checked in TextEdit?
23      A. Yes.
24      Q. So I understand that this may not
25  necessarily correspond to the 2005 time period,

Highly Confidential

Page 50

1 but can you please describe for me how TextEdit
2 would provide the spell checking functionality in
3 the scenario that you have in mind?
4     A. In the scenario I have in mind, I
5 mistype a word or I misspell a word, you know, my
6 typing is correct but my knowledge of the
7 spelling of that word is incorrect, then there
8 would be some sort of on-screen indication
9 associated with that word.
10     Q. And when you say on-screen indication,
11 what do you mean?
12     A. That's the part that I can't remember
13 exactly, what the visual appearance in 2005 was.
14 Common might be some sort of underline or
15 outlining or something like that around the word
16 in question.
17     Q. And what would happen next?
18     A. Typically you would click on that and --
19     Q. And when you say "that," you're talking
20 about the indication?
21     A. The indication, yes.
22         And again, I can't remember precisely
23 what the contents of the menu -- you know, the
24 menu you would get, but typically there would be
25 a list of alternate spellings, corrections, and

Page 51

1 some other options typically.
2     Q. And how would the user select one of
3 those alternatives?
4     A. There were several ways the user could
5 select an option there.
6     Q. What was one way?
7     A. You could click on it with a mouse.
8     Q. What's another way?
9     A. You could use the arrow keys on a
10 keyboard.
11     Q. Is there a third way?
12     A. Maybe, I don't know.  I am sure there
13 are some accessibility solutions that are
14 alternates.
15     Q. And once a user has made a selection of
16 one of the alternative spellings through the
17 spell checking functionality, what would happen
18 next?
19     A. The user's choice would replace the
20 underlined word.
21         MR. LYON:  A good point for a break here
22 or coming up on one?
23         MR. PAK:  Yeah, let's take our break.
24         MR. LYON:  Thank you.
25         THE VIDEOGRAPHER:  The time is 11:13

Page 52

1 a.m., and we're are off the record.
2         (Recess taken)
3         THE VIDEOGRAPHER:  The time is 11:27
4 a.m., and we are back on the record.
5 BY MR. PAK:
6     Q. Welcome back, sir.
7         When did you join Apple?
8     A. I hired into Apple in January of 1996.
9     Q. So we spent some time this morning
10 talking about the Newton work that you did for
11 Apple.  What happened -- what was your next
12 project after you left the Newton team?
13     A. After I left the Newton team, I went to
14 a team that did system configuration software for
15 the Mac and some security software as well.
16     Q. And did you have a supervisor at the
17 time?
18     A. Yes.
19     Q. Who was your supervisor?
20     A. I can't recall his name.
21     Q. Were you managing others at the time?
22     A. No.
23     Q. And how long were you doing work in the
24 area of system configuration and security?
25     A. I can't recall exactly.  A year or two,

Page 53

1 something along those lines.
2     Q. Do you recall how long you were working
3 on the Newton team?
4     A. I worked on the Newton team -- I told
5 you I can't remember exactly when I left that
6 team.
7     Q. Estimate?
8     A. Again, that was somewhere around the
9 late '97, early '98 time frame.
10     Q. And after you transitioned out of the
11 system configuration and security development
12 team, which project did you join?
13     A. I was on a team called CPU software.
14     Q. And what is that team responsible for
15 doing?
16     A. That team is responsible for -- the team
17 is responsible for the pieces of software that
18 most directly relate to the hardware of a
19 particular machine.  We also did the work for the
20 first versions of airport wireless networking.
21     Q. Were you working with device drivers at
22 the time?
23     A. Was I working with device drivers?
24     Q. Or was the team?
25     A. I don't know.

Highly Confidential

Page 66

1  condition; like you might lock your door at home
2  to keep others out.
3      Or you might lock a device to disable
4  input, regardless of any privacy or security
5  concerns you have.
6      Q. As the inventor of the '721 patent, when
7  the patent discusses locking and unlocking a
8  device --
9      A. Mm-hmm.
10     Q. -- which of these notions of lock do you
11 believe is being referenced in the '721 patent?
12     A. My understanding, I would believe it to
13 be the -- the availability-to-use or
14 unavailability-to-use sense.
15     Q. And would you consider that to be
16 different than the notion of some type of privacy
17 condition?
18     A. Yeah. It's more security than privacy
19 really.
20     Q. You talked about making available to use
21 in the unlocking sense, and then you talked about
22 disabling input for the locking?
23     A. Yeah.
24     Q. Are those similar concepts or different
25 concepts?

Page 67

1      A. Yes. Make...
2      Q. Can you be clear on the record?
3      A. Yes, I can.
4      When I say make available to use, that
5  presumes you have the ability to, you know, have
6  a full range of input into the device. And if I
7  say input is -- is disabled, associated with that
8  disabling of input would be an inability to use
9  the device.
10     Q. So do you think there is a difference in
11 your mind between locking a device and locking an
12 application?
13     MR. LYON: Objection; vague.
14     THE WITNESS: I don't know what you mean
15 by "locking an application."
16 BY MR. PAK:
17     Q. Do you have any notion of what it means
18 to lock an application?
19     A. Not particularly.
20     Q. In your '721 patent, when the electronic
21 device is in a locked state, what are the things
22 that the user can do with that device and what
23 are the things that the user cannot do with that
24 device?
25     A. In the patent?

Page 68

1      Q. In the patent.
2      A. I don't know.
3      Q. As an inventor of the '721 patent, based
4  on your understanding of the locked state that we
5  talked about, what would you expect the device to
6  do when it's in a locked state versus an unlocked
7  state?
8      MR. LYON: Objection; incomplete
9  hypothetical.
10     THE WITNESS: I can't guess what might
11 be in the remainder of this patent with regard to
12 what you're asking.
13 BY MR. PAK:
14     Q. Okay. Since you are being deposed here
15 as the inventor of the '721 patent -- I
16 understand that you haven't necessarily prepared
17 by reviewing the patent, but I do need to give
18 you the opportunity to look at the patent because
19 I have questions related to the patent.
20     A. That's fine.
21     Q. So please take the time now to review
22 whatever you need to review from the patent,
23 whether it's figures or the specification, and
24 let me know when you think you've ascertained a
25 sufficient understanding of what it means to lock

Page 69

1  versus unlock a device in the patent so we can
2  proceed with our questioning.
3      A. Well, I'm happy to do that.
4      My reading and understanding of what's
5  in the patent may be different than a specific
6  legal and intent of vocabulary and terms and
7  phrases that are common in terms of patent
8  proceedings, but not necessarily that -- the same
9  as how I use things in everyday language.
10     Q. We understand that. And we understand
11 that you're not a lawyer.
12     A. (Witness reviewing document.)
13     Excuse me.
14     Q. Sure.
15     A. (Witness reviewing document.)
16     Okay. I have at least scanned through
17 the...
18     Q. Okay. So after having taken a look at
19 the '721 patent, do you now have an understanding
20 of what the patent is describing as a locked
21 state versus an unlocked state?
22     A. I have my understanding.
23     Q. And what is your understanding?
24     A. My understanding is, in a locked state,
25 the device remains on and can respond to other

Page 70

1    events; but in terms of user actions, the only
2    events that it really responds to are those that
3    will allow it to be unlocked.  There are
4    exceptions with regard to the power switch and
5    the ringer profile toggle switch.
6         In the unlocked state, my understanding
7    of what the patent describes is that the device
8    is fully usable and available for input.
9         Q.  Is that understanding of locked versus
10   unlocked state that you just described on the
11   record consistent with your understanding of
12   those states in the iPhone?
13        A.  Generally speaking.
14        Q.  So with that understanding in mind, sir,
15   have you worked on any type of user interface
16   design for locking versus unlocking a device
17   prior to your work on the iPhone?
18        A.  Yes.
19        Q.  And which work do you have in mind?
20        A.  I have in mind work regarding the
21   presentation of a sleep state or a screensaver on
22   a desktop computer or a laptop running a Mac
23   operating system.
24        Q.  Any other examples?
25        A.  Not to my recollection at this time.

Page 71

1         Q.  When the Mac operating system device is
2    in a sleep state or a screensaver state, how
3    would the user unlock the device and transition
4    to an unlocked state?
5             MR. LYON:  Objection; vague.
6             THE WITNESS:  Those are two different
7    states.
8    BY MR. PAK:
9         Q.  Okay.  So let's see if we can address
10   each one.
11        So when the Mac operating system device
12   is in a sleep state, how would the user unlock
13   the device and transition to an unlocked state?
14            MR. LYON:  Objection; vague.
15            THE WITNESS:  Typically, they would
16   press a key or a power button.  On some models,
17   you could click a mouse button.  On some models,
18   opening the lid on a portable might wake it up;
19   on others, you would have to do one of those
20   events in addition to opening a lid.
21   BY MR. PAK:
22        Q.  And when the Mac operating system device
23   is in a screensaver state, how would the user
24   unlock the device and transition to an unlocked
25   state?

Page 72

1             MR. LYON:  Objection; vague.
2             THE WITNESS:  They could unlock it by
3    performing one of those actions.  In addition,
4    moving the mouse should perform the same goal.
5    BY MR. PAK:
6         Q.  Sitting here today, are you aware of any
7    portable devices that existed before the iPhone
8    which had the ability to lock and unlock that
9    device?
10            MR. LYON:  Objection; vague.
11            THE WITNESS:  What do you mean by
12   "portable" electronic devices?  That's a very
13   broad --
14   BY MR. PAK:
15        Q.  Yes, it is.
16        So devices that could be carried with
17   the user.
18        A.  Okay.
19        Q.  So my question is:  Sitting here today,
20   are you aware of any portable devices that
21   existed before the iPhone which had the ability
22   to lock and unlock that device?
23        A.  Yes.
24        Q.  Which ones?
25        A.  I'm sure that there are portable music

Page 73

1    players that would allow you to lock the
2    controls.  I believe even the first iPod did
3    that.  Cell phones with -- in particular candy
4    bar-style phones with physical buttons would
5    usually have a key sequence, I recall star zero
6    being a common one, that would lock the key pad,
7    keep you from pressing buttons accidentally.
8         I don't recall whether flip phones had
9    that function also, since by closing the device
10   you're preventing input there.
11        Those are ones that I recall.
12        Q.  Prior to working on the iPhone, had you
13   worked on any type of device that had a
14   touch-sensitive display?
15        A.  I think it depends what you mean by
16   "touch-sensitive."
17        Q.  Here for purposes of our question, let's
18   say it's a display that can respond to touch
19   input.
20        A.  Touch of what?
21        Q.  By either a pen or finger.
22        A.  I see those as two completely different
23   things.
24        Q.  And why -- why is that, in your mind?
25        A.  Because you have your fingers with you,

Highly Confidential

Page 74

1    and a stylus is an additional device or
2    amplifier.
3        Q.  Let me see if I can ask both scenarios
4    of you.
5        A.  Okay.
6        Q.  Prior to working on the iPhone, had you
7    worked on any type of device that could respond
8    to touch inputs from a stylus or a pen?
9        A.  I don't characterize stylus input as
10   being touch input.
11       Q.  See if I can use a different word.
12           Prior to working on the iPhone, had you
13   worked on any type of device that would respond
14   to a contact input from a stylus or a pen?
15       A.  Yes.
16       Q.  Which devices?
17       A.  I already mentioned that I worked on the
18   Newton.
19       Q.  Any others?
20       A.  That's it.
21       Q.  What type of display technology was used
22   in the Newton?
23       A.  I don't know.
24       Q.  Do you know whether it was capacitive?
25       A.  To my knowledge, capacitive is not a

Page 75

1    display technology.
2        Q.  Never heard of capacitive touchscreens?
3        A.  Touchscreen is not a display.
4        Q.  When you say a touchscreen is not a
5    display, what do you mean by that?
6        A.  I mean that a touchscreen is not a
7    display.
8        Q.  Can a touchscreen be used to display
9    images?
10       A.  Can a touchscreen be used to display
11   images.  It might.
12       Q.  It's a screen, correct, the form of a
13   screen?
14       A.  I would agree that it contains a screen.
15   I would not agree that it is just a screen.
16       Q.  So going back to the Newton device, do
17   you know what type of display technology was
18   actually used?
19       A.  No, I do not.
20       Q.  Okay.  And prior to your work on the
21   iPhone, sir, did you work on any device that
22   responded to touch inputs on the screen from a
23   human finger?
24   ███████████████████████████████████████████████

Page 76

1    ███████████████████████████████████████████████
     ███████████████████████████████████████████████
     ███████████████████████████████████████████████
     ███████████████████████████████████████████████
     ███████████████████████████████████████████████
     ███████████████████████████████████████████████
     ███████████████████████████████████████████████
     ███████████████████████████████████████████████
     ███████████████████████████████████████████████
     ███████████████████████████████████████████████
     ███████████████████████████████████████████████
     ███████████████████████████████████████████████
16       Q.  Sitting here today, are you aware of any
17   preexisting devices that could respond to touch
18   inputs on the screen from a human finger?
19       MR. LYON:  Objection; vague.
20   BY MR. PAK:
21       Q.  Prior to the iPhone.
22       A.  I'm not aware of devices that that was
23   the intent -- I'm sorry, can you repeat the
24   question.  I want to answer it accurately.
25       Q.  Sitting here today, are you aware of any

Page 77

1    preexisting devices that could respond to touch
2    inputs on the screen from a human finger?
3        A.  Yes.
4        Q.  Which ones?
5        A.  ATM machines is a common example.
6        MR. PAK:  Okay.  We're running out of
7    tape, so we'll take our next break.
8        THE VIDEOGRAPHER:  This marks the end of
9    Disk No. 1 in the deposition of Greg Christie.
10   The time is 12:15 and we're off the record.
11       (Lunch recess taken)
12   //
13   //
14
15
16
17
18
19
20
21
22
23
24
25

Highly Confidential

Page 78

1    AFTERNOON SESSION
2
3         THE VIDEOGRAPHER:  This marks the
4    beginning of Disk No. 2 in the deposition of Greg
5    Christie.  The time is 1:19 p.m., and we are back
6    on the record.
7    BY MR. PAK:
8         Q.  Welcome back, Mr. Christie.
9             So before the break we were talking
10   about systems that can respond to touch inputs to
11   a human finger.
12            Do you recall that?
13        A.  Okay.
14        Q.  Besides ATM machines, are you familiar
15   with any other types of devices that existed
16   prior to 2005 which accepted input from a human
17   finger on the touchscreen?
18        A.  Not really, to my recollection.
19        Q.  Were you familiar with any work that was
20   done on touchscreen tables prior to 2005?
21        A.  Not in particular, no.
22        Q.  Have you ever researched that issue?
23        A.  No.
24        Q.  Are you familiar with the system called
25   Smart Skin?

Page 79

1        A.  No.
2        Q.  Diamond Table?
3        A.  It doesn't ring a bell.
4        Q.  Did the Newton device have some type of
5    lock/unlock mechanism?
6        A.  As I recall, there was a power on/off.
7    It was like an on/off switch.
8        Q.  Setting aside the on and off switch, can
9    you think of any other mechanism that existed in
10   the Newton device for locking and unlocking that
11   device?
12        A.  No.
13        Q.  Do you attend conferences on user
14   interface design?
15        A.  No, I do not.
16        Q.  Have you ever presented at any such
17   conference?
18        A.  I don't attend them.
19        Q.  Have you ever published papers on user
20   interface design?
21        A.  Last time I published any papers was in
22   and around 1995.  There was a series of articles
23   in a small journal about programming the Newton.
24   I'm sure that some user interface concepts came
25   up in some of those articles.  I have not

Page 80

1    published since then.
2        Q.  To your knowledge, have you or anyone
3    else listed as an inventor on the '721 patent
4    received any awards in connection with that
5    patent?
6        A.  What do you mean by "award"?
7        Q.  I'm not talking about the bonus that you
8    get for filing a patent application, but have you
9    received any recognition from others outside of
10   Apple?
11        A.  Yes, we --
12            MR. LYON:  Objection to the form.
13            THE WITNESS:  Yes, we get called to
14   depositions.
15   BY MR. PAK:
16        Q.  That's the highest degree of
17   recognition.
18        A.  Apparently.
19        Q.  But besides the privilege of being
20   deposed --
21        A.  Yeah.
22        Q.  -- have you ever received --
23        A.  No.  No.
24        Q.  -- awards or recognition?
25        A.  No.

Page 81

1        Q.  Have you ever conducted any usability
2    studies on different versions of the unlocking
3    mechanism?
4        A.  What do you mean by "usability study"?
5        Q.  Have you ever conducted any type of
6    usability study in the past?
7        A.  Yes.  I'd like to come to an
8    agreement --
9        Q.  Sure.
10        A.  -- first, though, with regard to what
11   you mean by "usability study."
12        Q.  Why don't you tell me what you would
13   consider to be a usability study and we can see
14   if that's a reasonable basis to move forward on.
15        A.  When I hear "usability study," it brings
16   to mind a certain methodology in design where
17   there is, you know, rigorous testing and
18   observation under controlled circumstances.
19   There are different -- differing kinds of testing
20   protocols, some with a person in a room, others
21   with the voice of God protocol, but it's
22   typically subjects are asked to perform some task
23   or series of tasks and they're observed,
24   measured, and then that data is compiled and
25   usually presented in some form.

Highly Confidential

Page 138

1  lock it manually.
2  BY MR. PAK:
3      Q.  And based on what you've seen so far, is
4  this consistent with your understanding of
5  locking a device as we talked about previously?
6      A.  There is no -- there is not enough
7  information in this document for me to answer
8  that.  I don't know what was possible or what was
9  not possible.
10     Q.  What additional information would you
11 need?
12     A.  I would need to see the device.
13     Q.  Have you ever seen a Neonode device?
14     A.  No.
15     Q.  Have you ever seen videos of the Neonode
16 device?
17     A.  No.
18     Q.  Until today, were you aware that there
19 was such a thing as a Neonode device?
20     A.  No.
21     Q.  If I were to hand you a Neonode device,
22 what types of information would you want to
23 ascertain from using that device in order to
24 answer my question about whether locking the
25 Neonode description here corresponds to your

Page 139

1  understanding of locking the device in the
2  context of the '721 patent?
3      A.  Well, if I recall when we were talking
4  about locking, it was talking about allowing
5  input versus not allowing input at the most
6  highest level of that conversation.
7      Q.  So if I were to hand you a Neonode
8  device today, what types of functions would you
9  experiment with in order to determine whether
10 what's described as locking your Neonode on page
11 7 corresponds to your understanding of locking?
12     A.  I would see if the -- if it responded to
13 input or didn't respond to input.  That's what I
14 just said.
15     Q.  So you would put the device in what's
16 called key lock state here and see if as you
17 punched or performed gestures on the screen,
18 whether the system was responding to those
19 inputs?  Is that fair?
20     A.  Hypothetically, yes.
21     Q.  What other types of functions or
22 experiments would you perform?
23     A.  I don't know.
24     Q.  Okay.  Do you see that the -- well, let
25 me ask:  If the Neonode device in the key lock

Page 140

1  state did not respond to user input, would you
2  consider the device to be in lock mode?
3      A.  Can you repeat that question, please?  I
4  was reading.
5      Q.  Sure.
6          If the Neonode device in what's
7  described as the key lock state --
8      A.  Okay.
9      Q.  -- did not respond to user input on the
10 touchscreen, would you consider the device in
11 that scenario to be in a locked state?
12         MR. LYON:  Objection; improper
13 hypothetical.
14         THE WITNESS:  There seem to be other
15 buttons, too, in addition to the touchscreen, so
16 not necessarily.
17 BY MR. PAK:
18     Q.  Would you --
19     A.  I don't know what the other buttons do.
20 I don't...
21     Q.  So would you want to experiment with the
22 other buttons as well?
23     A.  If we were deciding whether a device was
24 locked in terms of how I understand it to be
25 locked, I would say we'd have to.

Page 141

1      Q.  And if it turned out that some of the
2  other buttons were functional, would you consider
3  the device to be in a locked state?
4          MR. LYON:  Objection; incomplete -- or
5  improper hypothetical.
6          THE WITNESS:  It depended on what those
7  buttons do.
8  BY MR. PAK:
9      Q.  Can you elaborate on that?  What would
10 you look for?
11     A.  What would I look for with regard to
12 what?
13     Q.  To this process of experimenting with
14 these physical buttons.
15     A.  Well, I mean, as we observed in the
16 claim language here, there are certain things
17 which still can be done even if the device is in
18 a locked state.
19     Q.  And what are those things?
20     A.  If music is playing, volume can be
21 raised or lowered.  You can press the power
22 button or the home button to light up the screen.
23 And you can choose between the ringer profiles.
24     Q.  So if the buttons that you saw which
25 were functional could do one of these things, you

Highly Confidential

Page 142

1  would still consider the device to be in a locked
2  state?
3      A. Well, I --
4      MR. LYON: Objection; improper
5  hypothetical.
6      THE WITNESS: It depends on what all of
7  the buttons did. I mean, just because you could
8  raise and lower the volume doesn't mean that I
9  would consider the phone to be locked. If there
10 was another button that did some action, I might
11 not consider the phone to be locked.
12 BY MR. PAK:
13     Q. Can you give me an example of what you
14 would consider to be a button function which
15 would cause the phone to be in an unlocked state?
16     A. Sure.
17     Q. Please do.
18     A. What if one of the buttons redialed the
19 last number you called? Would you consider that
20 phone to be locked?
21     Q. Would you, as the inventor?
22     A. I would not consider that phone to be
23 locked.
24     Q. What are some other examples?
25     A. I'm sure there is any number of examples

Page 143

1  that we could come up with. If I could delete an
2  incoming e-mail by the press of a button, I would
3  not consider the phone to be locked. If I
4  could -- there is an infinite number of things
5  that we can enumerate here that some hypothetical
6  button could perform that would cause me to think
7  that the phone was not locked.
8      Q. What about changing the song that you
9  were listening to?
10     A. On the basis of a single button press?
11     Q. Yes.
12     A. I would consider the phone to not be
13 locked.
14     Q. And so what I'm trying to understand is,
15 is there a principle way in your mind as the
16 inventor of the '721 patent that you're
17 distinguishing from functions which would cause
18 the phone to be no longer in a locked state?
19     A. Well, I don't believe the principles
20 are, you know, necessarily embodied in a patent.
21 Again, you know, I don't have the experience to
22 be able to tell you whether this patent fully
23 embodies the principles of what we would consider
24 locked or unlocked to be. I'm just calling
25 attention to the things that you asked me to read

Page 144

1  and recall.
2      Q. I really appreciate that. And the
3  reason why I'm asking you these questions and
4  I've asked similar questions of Apple's expert is
5  for us to try to understand from your perspective
6  in this case as Apple's inventor on this patent
7  whether you have a criteria in your mind that
8  you're using to distinguish between functions
9  that cause the phone to be in a locked state
10 versus functions that will cause the phone to be
11 in an unlocked state.
12     MR. LYON: Objection; argumentative,
13 improper.
14 BY MR. PAK:
15     Q. Really I'm not trying to argue with you.
16 I'm trying to understand if you have a criteria
17 in mind, and if so, please -- if you could
18 elaborate on that criteria?
19     MR. LYON: Objection that it calls for a
20 legal conclusion.
21     THE WITNESS: I think in an ideal
22 system, a locked phone wouldn't do anything
23 unintentionally -- wouldn't let you do anything
24 unintentionally.
25 I'm sure that there are situations where our

Page 145

1  shipping products do not meet that ideal, and I'm
2  sure that there are situations where our shipping
3  products do meet that ideal.
4  BY MR. PAK:
5      Q. And is there some type of objective
6  criteria that we can use in your mind to
7  distinguish between the types of function that
8  you identified, such as changing the volume,
9  which would cause --
10     A. Wholly objective? I don't believe that
11 we could agree on wholly objective terms.
12     Q. Let me --
13     A. You may be a person that doesn't care
14 about accidental operation of things. You don't
15 care whether you answer the phone accidentally or
16 place a call accidentally. You just want -- you
17 know, you don't think there should be a lock
18 screen, right? So that's your subjective
19 opinion, right, whereas somebody, you know, may
20 not ever, under any circumstances, want a volume
21 to change accidentally ever, to the point where
22 you have to unlock the phone to even change the
23 volume, even if the media is playing.
24     So I don't believe that there is an
25 objective set of criteria for determining locked

Highly Confidential

| Page 146 |
| --- |

1  versus unlocked.  It has to do with what -- there
2  is a tug of war between convenience and accident
3  prevention.
4      Q.  I appreciate that.  Thank you.
5          If you go back to the Neonode device
6  manual?
7      A.  Yes.
8      Q.  Under the "Key lock" section --
9      A.  Yes.
10     Q.  -- on page 7, do you see that there's a
11 description of, quote, unlock the screen?
12     A.  I see that there are the words "unlock
13 the screen."
14     Q.  And it says:
15         "Press the on/off button for a second."
16     A.  Yes.
17     Q.  "And a picture of a padlock will
18 appear."
19     A.  I see that.
20     Q.  And to unlock, you make an accept sweep?
21     A.  I see that.
22     Q.  And there is an arrow indicating the
23 direction of the sweep?
24     A.  Is that arrow on screen?
25     Q.  I believe the arrow is not on the

| Page 147 |
| --- |

1  screen.
2      A.  So you don't know?
3      Q.  I'll represent to you that the big arrow
4  is not on the screen on this device.
5      A.  What about those three little arrows,
6  are they on the screen?
7      Q.  It's been a while since I looked at the
8  phone.  So I honestly don't remember.  Let me see
9  if I can see the...
10     A.  I don't believe they are personally.
11     Q.  I don't believe they are either.
12     A.  Because they're indicated on the
13 other -- of course, I'm just guessing.  But
14 they're indicated in the diagrams of the sweep
15 sections, whatever page that was on.
16     Q.  For the purpose of today's deposition,
17 sir, why don't we assume that the arrows do not
18 appear?  I think that's a fair --
19     A.  Okay.
20     Q.  -- assumption that I have.
21     A.  Where was the description of the sweeps?
22     Q.  They were on page 8.
23     A.  So this manual tells you to do a sweep
24 before it tells you what a sweep is?
25     Q.  I believe them came from Europe, so I'm

| Page 148 |
| --- |

1  not going to try to explain the order.
2      A.  Okay.  All right.
3      Q.  So assuming that the arrows do not
4  appear --
5      A.  Okay.
6      Q.  -- on the screen --
7      A.  Mm-hmm.
8      Q.  -- do you see that there would be a
9  picture of a padlock that appears when the on/off
10 button is pressed for at least a second?
11     A.  For a second.
12     Q.  For a second.  And to unlock, you make
13 an accept sweep?
14     A.  I see that.
15     Q.  After the padlock image is presented to
16 the user?
17     A.  I see that.
18     Q.  Is that your understanding?
19         Okay.
20     A.  Can I ask you another question about
21 this phone?
22     Q.  Sure.
23     A.  You see those three icons on the bottom
24 black area?
25     Q.  Yes.

| Page 149 |
| --- |

1      A.  Are those part of the screen or are
2  those, you know, silk screened on the -- on the
3  device?
4      Q.  I believe they're part of the screen.
5      A.  So that's a display showing those three
6  icons?
7      Q.  I believe that's true.
8      A.  And are those three icons responsive to
9  touch when the phone is in the key lock state?
10     Q.  I don't know the answer to that
11 question.
12     A.  Okay.
13     Q.  Would that be important for you to
14 determine whether it was in a locked state or
15 not?
16     A.  Just get back to your earlier question
17 as to whether I would consider the device to be
18 locked or not.
19     Q.  Thank you.  I appreciate that.
20         So if I understand you correctly, you
21 would be looking at at least three things on the
22 Neonode device.  One would be whether the device
23 is reacting to user input on the touchscreen in a
24 lock state, or the key lock state?
25     A.  Mm-hmm.

Highly Confidential

Page 150

1    Q.  You would also look at the types of
2  functions that were enabled through the physical
3  keys or buttons?
4    A.  Yeah, there seems to be several of
5  those.
6    Q.  In the key lock state, and you would
7  also take a look at these three icons at the
8  bottom of the screen to see whether they were
9  accepting user input or not?
10    A.  That's on the basis of the pictures I've
11  looked at so far.
12    Q.  Thank you.
13    Now, going back to this unlocking the
14  screen gesture, you understand that the user
15  could unlock the screen by making what is
16  described as an accept sweep gesture shown in
17  this particular picture as a swipe from the
18  left-hand side to the right-hand side?
19    A.  I see --
20    MR. LYON:  Objection --
21    THE WITNESS:  -- that that's what this
22  document says.
23    MR. LYON:  Objection; improper
24  hypothetical, lacks foundation, document speaks
25  for itself.

Page 151

1  BY MR. PAK:
2    Q.  Does it find -- let me step back.
3    A.  Mm-hmm.
4    Q.  Are you surprised that such a document
5  existed that described a phone in which the user
6  was able to perform a sweep gesture to unlock the
7  screen?
8    MR. LYON:  Objection; lacks foundation,
9  vague.
10  BY MR. PAK:
11    Q.  And again, the time frame is 2004.
12    A.  Not in particular.
13    Q.  Are you surprised that there was a phone
14  in 2004 other than the iPhone that had a
15  touchscreen capable of accepting human finger
16  contact inputs?
17    MR. LYON:  Objection; vague, lacks
18  foundation, document speaks for itself.
19    THE WITNESS:  Can you repeat your
20  question.
21  BY MR. PAK:
22    Q.  Sure.
23    Are you surprised that there was a phone
24  in 2004 prior to the iPhone that used a
25  touchscreen capable of accepting human finger

Page 152

1  contact input?
2    MR. LYON:  Same objections.
3    THE WITNESS:  I'm not surprised by that
4  statement.  Having never seen such a device, I
5  can't tell you how good it was, how responsive it
6  was, what the characteristics of that touch
7  surface were.  I mean, we all use ATMs.  We're
8  not surprised that you can trigger software
9  events by using parts of your body.
10  BY MR. PAK:
11    Q.  Through some type of touchscreen
12  technology?
13    A.  Sure.
14    Q.  Are you -- are you surprised that there
15  was a phone in 2004, prior to the iPhone, which
16  presented a graphical display of a keyboard that
17  the user could touch in order to make phone
18  calls?
19    A.  No.
20    Q.  Are you surprised to see that there was
21  a phone prior to 2004 prior to the iPhone that
22  allowed a user to perform certain gestures by
23  contacting the touchscreen?
24    MR. LYON:  Objection; lacks foundation,
25  document speaks for itself, vague.

Page 153

1    THE WITNESS:  Not particularly.
2  BY MR. PAK:
3    Q.  And just to be clear on the record,
4  you're not surprised to see a touchscreen phone
5  in 2004 which had the ability to unlock the
6  screen through a touch gesture in the form of a
7  sweep?
8    MR. LYON:  Objection; lacks foundation
9  and asked and answered, document speaks for
10  itself, vague.
11    THE WITNESS:  I've answered that
12  question.
13  BY MR. PAK:
14    Q.  So you're not surprised, sir?
15    MR. LYON:  Same objection.
16    THE WITNESS:  Well -- and there is so
17  much wrong with that question.  I mean, I'm
18  presuming that the sweep behaves the way it is in
19  this document.  You're asking me if I'm
20  surprised.  Nothing surprises me.
21  BY MR. PAK:
22    Q.  Okay.
23    A.  You know...
24    Q.  And again, sir, let me just explain
25  myself.

Highly Confidential



Page 170

1   record.
2
3

Page 173

1        MR. PAK:  Just check my notes.  I may be
2   done.
3        THE VIDEOGRAPHER:  The time is
4   3:58 p.m., and we are off the record.
5        (Pause in the proceedings)
6        THE VIDEOGRAPHER:  The time is 3:58
7   p.m., and we are back on the record.
8        MR. PAK:  One last question.
9   BY MR. PAK:
10

14        MR. PAK:  Thank you for your time and
15   your patience, sir.
16        MR. LYON:  I have no questions.
17        THE VIDEOGRAPHER:  This marks the end of
18   Disk No. 3 of 3 and concludes today's deposition
19   of Greg Christie.  The time is 3:59 p.m., and we
20   are off the record.
21         (Time noted:  3:59 p.m.)
22
23
24
25

Highly Confidential

Page 174

1      DECLARATION UNDER PENALTY OF PERJURY

2

3      I, GREG CHRISTIE, do hereby certify under

4  penalty of perjury that I have read the foregoing

5  transcript of my deposition taken on April 20,

6  2012; that I have made such corrections as appear

7  noted herein in ink, initialed by me; that my

8  testimony as contained herein, as corrected, is

9  true and correct.

10

11      DATED this      day of

12  2012, at        , California.

13

14

15

16

17      GREG CHRISTIE

18

19

20

21

22

23

24

25

Page 175

1  IN THE MATTER OF: Apple Inc v.

2      Samsung Electronics Company Limited

      (Case No: 12-CV-00630-LHK)

3

4  DATE:  Friday, April 20, 2012

5  WITNESS:  GREG CHRISTIE

6  Reason codes:

7    1.  To clarify the record.

    2.  To conform to the facts.

8    3.  To correct transcription errors.

9

  Page    Line      Reason

10

11  From      to

12

  Page    Line      Reason

13

14  From      to

15

  Page    Line      Reason

16

17  From      to

18

  Page    Line      Reason

19

20  From      to

21

22

23      GREG CHRISTIE

24

25

Page 176

1  STATE OF CALIFORNIA  )

2    :ss

3  COUNTY OF SAN MATEO  )

4      I, CYNTHIA MANNING, a Certified Shorthand

5  Reporter of the State of California, do hereby

6  certify:

7      That the foregoing proceedings were taken

8  before me at the time and place herein set forth;

9  that any witnesses in the foregoing proceedings,

10  prior to testifying, were placed under oath; that

11  a verbatim record of the proceedings was made by

12  me using machine shorthand which was thereafter

13  transcribed under my direction; further, that the

14  foregoing is an accurate transcription thereof.

15      I further certify that I am neither

16  financially interested in the action, nor a

17  relative or employee of any attorney of any of

18  the parties.

19

20      IN WITNESS WHEREOF, I have subscribed my

21  name this 20th day of April, 2012.

22

23

24      CYNTHIA MANNING, CSR No. 7645, CCRR, CLR

25

Page 177

1      I N D E X

2  FRIDAY, APRIL 20, 2012

3  DEPOSITION OF GREG CHRISTIE

4

5  EXAMINATION        PAGE

6    BY MR. PAK        5

7

8  QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

9      Page 128, line 16

10      * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25