# EXHIBIT M
# FILED UNDER SEAL

Highly Confidential - Attorneys' Eyes Only

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                    SAN JOSE DIVISION
 4
 5   APPLE INC., a California
     corporation,
 6
                      Plaintiff,
 7
     vs.                         CASE NO.  12-cv-00630-LHK
 8
     SAMSUNG ELECTRONICS CO.,
 9   LTD., a Korean business
     entity; SAMSUNG ELECTRONICS
10   AMERICA,INC., a New York
     corporation; SAMSUNG
11   TELECOMMUNICATIONS AMERICA,
     LLC, a Delaware limited
12   liability company,
13                    Defendants.
     _____/
14
15
16           H I G H L Y   C O N F I D E N T I A L
17            A T T O R N E Y S'   E Y E S   O N L Y
18
19       VIDEOTAPED DEPOSITION OF KENNETH KOCIENDA
20              REDWOOD SHORES, CALIFORNIA
21                FRIDAY, APRIL 13, 2012
22
23   BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR
24   CSR LICENSE NO. 9830
25   JOB NO. 47976
```

Highly Confidential - Attorneys' Eyes Only

Page 2

1      FRIDAY, APRIL 13, 2012
2         9:30 A.M.
3
4
5
6   VIDEOTAPED DEPOSITION OF KENNETH KOCIENDA,
7   taken at QUINN EMANUEL URQUHART & SULLIVAN,
8   LLP, 555 Twin Dolphin Drive, Redwood Shores,
9   California, pursuant to Notice, before me,
10  ANDREA M. IGNACIO HOWARD, CLR, CCRR, RPR,
11  CSR License No. 9830.

Page 3

1   A P P E A R A N C E S:
2
3      FOR APPLE INC.:
4      GIBSON DUNN & CRUTCHER LLP
5      By:  BRIAN M. BUROKER, Esq.
6           JENNIFER RHO, Esq.
7      1050 Connecticut Avenue, N.W.
8      Washington, D.C. 20036
9      Phone:  (202) 955-8500
10     bburoker@gibsondunn.com
11
12
13     FOR SAMSUNG ELECTRONICS CO. LTD:
14     QUINN EMANUEL URQUHART & SULLIVAN, LLP
15     By:  SEAN PAK, Esq.
16     50 California Street, 22nd Floor
17     San Francisco, California 94111
18     Phone:  (415) 875-6600
19     seanpak@quinnemanuel.com
20
21
        ALSO PRESENT:  Benjamin Gerald, Videographer
22
           Lain Cunningham, Apple, Inc.
23
24         ---oOo---
25

Page 4

1         REDWOOD SHORES, CALIFORNIA
2            FRIDAY, APRIL 13, 2012
3               9:30 A.M.
4
5
6
7       THE VIDEOGRAPHER:  Good morning.
8       This marks the beginning of the disc labeled
9    No. 1 of the videotaped deposition of Kenneth
10   Kocienda.  In the matter Apple Incorporated versus
11   Samsung Electronics Company LTD, et al.
12      Held in the United States District Court for
13   the Northern District of California.  Case number is
14   12-cv-00630-LHK.
15      This deposition is being held at 555 Twin
16   Dolphin Drive in the city of Redwood Shores,
17   California.  Taken on April 13th, 2012, at
18   approximately 9:30 a.m.
19      My name is Benjamin Gerald from
20   TSG Reporting, Incorporated, and I am the legal video
21   specialist.
22      The court reporter is Andrea Ignacio, in
23   association with TSG Reporting.
24      At this time, will counsel please identify
25   themselves for the record.

Page 5

1       MR. PAK:  This is Sean Pak of Quinn Emanuel,
2    representing Samsung.
3       MR. BUROKER:  Brian Buroker and Jenny Rho of
4    Gibson Dunn, representing Apple, and also Ian
5    Cunningham of Apple.
6       THE VIDEOGRAPHER:  Thank you.
7       Would the reporter please swear the witness.
8
9          KENNETH KOCIENDA,
10      having been sworn as a witness
11     by the Certified Shorthand Reporter,
12         testified as follows:
13
14      THE VIDEOGRAPHER:  Thank you.
15      Please proceed.
16
17         EXAMINATION BY MR. PAK
18   MR. PAK:  Good morning.
19   THE WITNESS:  Good morning.
20   MR. PAK:  Q.  Will you please state your name
21   for the record.
22   A   Yes.
23       Kenneth Luke Kocienda.
24   Q   And can you please spell that.
25   A   Sure.

Highly Confidential - Attorneys' Eyes Only

Page 58

1  automatically suggest words based on user input;
2  correct?
3      A   Again, you know, if you're asking about the
4  details of how the Japanese text input system works,
5  I'm not a Japanese speaker.  I don't really under --
6  you know, know the details.  There's some -- again,
7  I'm -- I'm not really prepared to relate my work on
8  the iPhone to a different system.
9      Q   Not my question.  I'm not asking you to
10 compare that system to your work.
11     A   Uh-huh.
12     Q   I'm asking you about your understanding of
13 the Japanese text input system.
14     A   Uh-huh.  And again --
15         MR. BUROKER:  Wait.  What's the question?
16         MR. PAK:  Q.  So my question to you is the
17 same question:  The Japanese text input system that
18 existed on the Mac OS had the ability to automatically
19 suggest words as a user provided input; correct?
20         MR. BUROKER:  Objection; vague; asked and
21 answered repeatedly.
22         We need to move on.
23         THE WITNESS:  Yeah, again, you know, not
24 being a Japanese speaker, it's difficult for me to
25 relate my work, which I can speak to, and -- and make

Page 59

1  a judgment about how that system works or how it
2  doesn't work.
3         MR. PAK:  I'm going to ask you the question
4  until I get a response.  So with all due respect sir,
5  I need -- I need to know what you knew about the
6  Japanese system.
7         THE WITNESS:  Very little.
8         MR. PAK:  Okay.
9      Q   What do you know about the Japanese system?
10     A   I know that it helps users to input Japanese
11 text in a comfortable and easy fashion.  The specifics
12 of how the systems work is -- is really not known to
13 me.
14     Q   How did you come across the Japanese input
15 system?
16     A   My wife speaks Japanese.
17     Q   And she uses that software?
18     A   Yes.
19     Q   Fair to say that your wife had that system
20 running, and she was using that system prior to your
21 work on the iPhone keyboard?
22     A   Yes, I think so.
23     Q   Would she type input through a keyboard as
24 she was using the Japanese text input system?
25     A   Yes.

Page 60

1          MR. BUROKER:  Objection; form and foundation.
2          MR. PAK:  Q.  And as she was typing, how
3  would the suggestions appear on the screen?
4          MR. BUROKER:  Same objections.
5          THE WITNESS:  I -- I can't really comment on
6  the details of the system since I was not a user of
7  it.
8          MR. PAK:  Q.  Fair to say you were aware of
9  it?
10     A   I was aware of it.
11     Q   And you were aware of it before 2006?
12     A   Yes.
13     Q   Okay.  Did you disclose that system to the
14 United States Patent Office?
15         MR. BUROKER:  Objection to form.
16         THE WITNESS:  No.
17         MR. PAK:  Q.  Did you tell any lawyers about
18 that system for disclosure to the United States Patent
19 Office?
20         MR. BUROKER:  Well, let me read the question.
21         Objection; that's -- privileged
22 communications he had with his counsel are privileged.
23         I'm going to instruct you not to answer.
24         MR. PAK:  Q.  Did you provide information
25 relating to the Japanese input system that we talked

Page 61

1  about to anyone for disclosure to the United States
2  Patent Office?
3      A   I did not.
4      Q   Setting aside the Japanese input system, are
5  you aware of any other systems that existed prior to
6  your work on the iPhone that provided suggestions as a
7  user put keyboard input into the screen?
8          MR. BUROKER:  Objection; form.
9          THE WITNESS:  Yeah, could you ask your
10 question again.
11         MR. PAK:  Yeah.
12     Q   Setting aside the Japanese input system that
13 we talked about, are you aware of any other systems
14 that existed prior to your work on the iPhone that
15 automatically provided suggestions as the user
16 provided keyboard input?
17     A   I don't think so.
18     Q   And you've never researched that question;
19 correct?
20     A   No, no, I did no research.
21     Q   While your patent was being prosecuted -- the
22 '172 patent was being prosecuted with the United
23 States Patent Office, were you provided copies of any
24 of the prior art that was cited during prosecution?
25     A   Not to my knowledge, no.

Highly Confidential - Attorneys' Eyes Only

Page 62

1  Q  Were you asked to analyze any of the prior
2  art that was cited during the prosecution of the
3  '172 patent?
4      MR. BUROKER:  You can answer that "yes" or
5  "no."
6      THE WITNESS:  No.
7      MR. PAK:  Q.  Sitting here today, sir, are
8  you aware of any systems that predate your work on the
9  iPhone, setting aside the Japanese input system, which
10 had the ability to automatically suggest words as the
11 user provided keyboard -- keyboard input?
12     MR. BUROKER:  Objection; form.
13     THE WITNESS:  Not to my knowledge, no.
14     MR. PAK:  Q.  Sitting here today, sir, are
15 you aware of any spell checking systems that predate
16 your work on the iPhone?
17  A  I think so, yeah.
18  Q  Which ones?
19  A  Probably spell check systems which are
20 available on the Mac operating system.
21  Q  Any others?
22  A  Perhaps spell check systems that might be
23 available in word processing programs.
24  Q  In the 2005 time period, which word
25 processing systems were you aware of?

Page 63

1  A  During that time period, if I needed to write
2  a document, I probably would have used text edit on
3  the Mac.
4  Q  Any others?
5  A  Generally, no.
6  Q  Did you ever use the Word program from
7  Microsoft at that time?
8  A  I used it, but very sparingly.  At various
9  times I didn't have it available to me.
10 Q  Well, you know that the Word program for
11 Microsoft has a spell checking functionality?
12     MR. BUROKER:  Objection --
13     THE WITNESS:  I think --
14     MR. BUROKER:  -- objection; time.
15     Go ahead.
16     MR. PAK:  Q.  Back in 2005, you were aware
17 that the Word program from Microsoft had a spell
18 checking functionality?
19 A  I may have been aware.
20 Q  We talked about the spell checking systems on
21 the Mac OS.  Which ones were you familiar with?
22 A  There is a spell check feature built into the
23 text edit program I previously mentioned.
24 Q  And how did that spell checking feature work?
25 A  From a user perspective, you could ask to see

Page 64

1  if a word was misspelled and ask the system to provide
2  you with possible corrections.
3  Q  And that spell check -- checking
4  functionality for the Mac OS text editor existed prior
5  to your work on the iPhone; correct?
6      MR. BUROKER:  Objection; form and foundation.
7      THE WITNESS:  I think so.
8      MR. PAK:  Q.  And you were aware of that
9  feature prior to your work on the iPhone?
10 A  Yes.
11 Q  You had used it a number of times?
12 A  I -- I used that program to write documents,
13 sure.
14 Q  And what are some of the options that are
15 available for the spell checking functionality on the
16 Mac OS?
17 A  You can spell check an entire document.  I
18 also believe that it will highlight a word it believes
19 was spelled incorrectly.
20 Q  Give me a scenario where that will happen.
21     MR. BUROKER:  Objection; form.
22     THE WITNESS:  If I was typing a -- a word
23 and -- and I spelled it incorrectly, when I was
24 finished spelling that word, it would indicate that it
25 believed the word was spelled incorrectly.

Page 65

1      MR. PAK:  Q.  And it would do that
2  automatically?
3  A  It would -- it would do that when I was
4  finished typing the word.
5  Q  Automatically?
6  A  It could, yes.
7  Q  So the spell checker for the Mac OS operating
8  system in the 2005 time period could be configured so
9  that when the user finished typing a word, it would
10 automatically highlight that word if it was determined
11 to be misspelled; fair?
12 A  I believe it could do that at the time, yeah.
13 Q  Okay.  And you were aware of that
14 functionality in 2005?
15 A  Again, the -- the -- relating the times is --
16 is perhaps difficult, but I do believe that it was
17 available at that time, yes.
18 Q  And so then what would happen?  If you saw a
19 word that you typed being highlighted in the Mac OS
20 spell checker program, what would happen next?
21 A  Nothing.
22 Q  Could the user then click on something to see
23 what options were available?
24 A  Yes.
25 Q  When -- how would the user perform that

Page 66

1  action?
2  A   You could hold down the control key on your
3  keyboard and -- and click on the word with your mouse.
4  Q   And at that point, what would happen?
5  A   At that point, the system would display
6  possible spelling corrections for that word.
7  Q   So there would be a -- a list of words that
8  the system determined as possible words based on the
9  input provided by the user; fair?
10 A   Yes.
11 Q   And then would the user have the ability to
12 select one of those possible words in the spell
13 checking program?
14 A   Yes.
15 Q   And how would the user do that?
16 A   Perhaps by clicking on one with their mouse.
17 Q   And what would happen next if the user
18 performed that action?
19 A   That spelling correction would be made.
20 Q   When you say "spelling correction would be
21 made," what do you mean exactly?
22 A   It means that the word you selected would now
23 be in your text document.
24 Q   Let me see if I can summarize what I heard.
25     So if I were a user in 2005 working with the

Page 67

1  text editor with the spell checking functionality on
2  the Mac OS, I could type a word, and if the word that
3  I was typing was misspelled, the system would
4  automatically highlight that misspelled word.
5      Then I could click on that word with the
6  control function key pressed down, a menu of different
7  spellings for that word would appear, and I could
8  select the word that I desired.  And when I made that
9  selection, the correct spelling of that word would
10 replace what I had typed in the document; fair?
11     MR. BUROKER:  Objection; form; compound.
12     THE WITNESS:  Now, specifically, when you
13 would control click on the word, that word would be
14 selected.  And so when you eventually suggest -- chose
15 a spelling replacement, that spelling replacement
16 would replace the selection.
17     MR. PAK:  Thank you.
18 Q   And with that correction, would you agree
19 with my characterization?
20     MR. JACOBS:  Objection; vague.
21     THE WITNESS:  No, I would -- I would go with
22 what I said.
23     MR. PAK:  Okay.
24 Q   So in your words, could you explain to me the
25 sequence of events that would cause the misspelled

Page 68

1  word to be replaced in the 2005 --
2  A   Sure.
3  Q   -- version of the text editor --
4  A   Sure.
5  Q   -- for Mac OS.
6  A   To the best of my knowledge, if you had a
7  misspelled word and then control clicked on that word,
8  that word would be selected, and then a -- a list of
9  possible spelling corrections for that word would be
10 displayed.  If you clicked on one of those selections
11 with your mouse, that correction would replace the
12 selection in the document.
13 Q   Thank you.
14     So did you disclose the spell checking
15 feature of the text editor for Mac OS as it existed in
16 the 2005 time period to the United States Patent
17 Office?
18     MR. BUROKER:  Objection; form.
19     THE WITNESS:  I did not, no.
20     MR. PAK:  Q.  Did you provide information
21 regarding the spell checking feature of the text
22 editor for the Mac OS as it existed in the 2005 time
23 period to anyone for disclosure to the United States
24 Patent Office?
25 A   I did not.

Page 69

1  Q   But you were aware of that functionality in
2  the 2005 time period; correct?
3  A   Yes.
4  Q   Okay.
5      MR. PAK:  Let's take our break.
6      MR. BUROKER:  Okay.
7      MR. PAK:  Okay.
8      THE VIDEOGRAPHER:  This marks the end of Disc
9  No. 1 in the deposition of Kenneth Kocienda.
10     The time is 11:16 a.m., and we are off the
11 record.
12     (Recess taken.)
13     THE VIDEOGRAPHER:  This marks the beginning
14 of Disc No. 2 in the deposition of Kenneth Kocienda.
15     The time is 11:27 a.m., and we are back on
16 the record.
17     MR. PAK:  Welcome back.
18 Q   So we were talking about the spell checker in
19 Mac OS in the 2005 time period before your break.
20     Do you recall whether there was some type of
21 dictionary of words that was being used to look up the
22 spellings?
23 A   I'm not familiar with how the spell checker
24 is implemented.
25 Q   Do you recall whether you could, as a user,

Highly Confidential - Attorneys' Eyes Only

Page 94

1  area that may help me?  I find the question to be very
2  broad and difficult to answer.
3      MR. PAK:  Okay.
4   Q  For example, if I look at what happens in
5  Figure 4-D as the user types in the sequence C-A-E, do
6  you see any significant differences between what's
7  being depicted in Figure 4-D and what the iPhone did
8  as it shipped in 2007?
9   A  You know, one obvious thing is that the
10 keyboard didn't look this way.  The details of how
11 text input is displayed is -- are different.
12  Q  How so?
13  A  The patent diagram doesn't look very much
14 like the real iPhone.
15  Q  I'm setting aside -- that's why I asked for
16 significant differences.
17  A  Yeah.
18  Q  I'm setting aside visual differences in the
19 UI and the font and the actual portions.  I'm really
20 looking at the core functionality of what's being
21 depicted in Figure 4-D as to suggesting replacement
22 words and allowing the user to make selections.
23     Do you see any significant differences in the
24 process with respect to the iPhone as it shipped in
25 2007?

Page 95

1      MR. BUROKER:  Objection; form.
2      THE WITNESS:  Again, I find this difficult to
3  answer because it's -- you know, again, my layperson's
4  understanding is that the -- the diagrams are
5  illustrative of the -- of the text, and so describe,
6  you know, the way the feature works to best underscore
7  the way that the -- the patent is written.
8      MR. PAK:  That's fair, and I -- I encourage
9  you to look at the text necessary.
10  Q  All I'm getting at is:  Are there significant
11 differences between the word suggestion auto
12 correction mechanism that you describe in your patent,
13 the '172 patent, versus what you actually shipped as
14 part of the iPhone when it comes to the process of
15 suggesting words and replacing them?
16     MR. BUROKER:  Objection; vague.
17     THE WITNESS:  I would say that looking at
18 the -- the diagrams, one difference would be that the
19 user's typing was not displayed twice in the original
20 iPhone.
21     MR. PAK:  Q.  Can you elaborate on that.
22 What do you mean by that?
23  A  If I look at Figure 4-B, for instance, the
24 supposition is that the user typed C-A-E, and I see
25 C-A-E displayed twice in -- by the text entry system.

Page 96

1     Whereas in the iPhone as we released it
2  originally in 2007, the user's typing would not be
3  displayed twice.
4   Q  To be clear on the record, if I look at
5  Figure 4-B of your '172 patent, the current character
6  string C-A-E is depicted twice on that screen:  Once
7  as C-A-E in the box labeled 220, and also a second
8  time in the right-hand side corresponding to the
9  Element No. 226; do I have that right?
10  A  Yeah, I think that's roughly right.  Exactly
11 which numbers relate to which areas, I mean -- but
12 yes, that's -- that's close enough.
13  Q  And what you're telling us on the record is
14 that the iPhone 2007 version did not have this
15 capability or feature of displaying the current
16 character string twice on the same screen?
17  A  For the original iPhone release, I believe
18 that to be correct.
19  Q  For the iPhone 2007 release, if the user
20 wanted to retain the current spelling as illustrated
21 by the current character string, how would the user
22 make that selection?
23  A  It depends.
24  Q  Just go through the different scenarios for
25 me, if you can.

Page 97

1   A  Let's assume that the user was intending to
2  type car, C-A-R, and they correctly typed the letters
3  C-A-R.  They would need to do nothing to retain those
4  characters.
5   Q  Okay.  What's another way for the user to
6  retain the current character string?
7   A  Again, as we shipped the original iPhone in
8  2007, if the -- the user intended to type C-A-R and
9  instead typed C-A-E by mistake and -- no, scratch
10 that.  Let me go back to the beginning.
11     Assuming that the user meant to type C-A-E --
12 perhaps it's a word that is familiar to the user in
13 some context which we're not familiar with here.  The
14 user types C-A-E exactly.  They would then type --
15 excuse me -- tap on the word in the text entry area to
16 retain it.
17  Q  Okay.  Got it.
18     So if I look at Figure 4-B, in the original
19 iPhone 2007 release, if I typed in C-A-E in the larger
20 box 218, but I meant to type C-A-E, then I can retain
21 that current character string by simply tapping on the
22 letters C-A-E in the box labeled 218; right?
23  A  Yes.
24  Q  Okay.  I imagine, given all the
25 perfectionists within -- within Apple, that the iPhone

Page 102

1  the best of my recollection, in January of 2007, and
2  then first shipped to customers six months later.
3      Q  Okay. So for the particular version that
4  shipped with the first generation iPhone, I take it
5  that you worked on your keyboard design from at least
6  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7      A  Again, the work was continuous. Exactly when
8  we stopped is -- I don't recall the date.
9          MR. BUROKER: Just before I forget, I want to
10  make sure I get on the record that we did designate
11  this "Highly Confidential - Attorneys' Eyes Only."
12  We'll go back later and de-designate at the
13  appropriate time.
14         MR. PAK: Okay.
15         MR. BUROKER: Getting into some details in
16  the production area here.
17         MR. PAK: Q. So going back to the original
18  design for the iPhone that did not display the current
19  character string twice on the same screen, did you
20  feel that at the time you shipped the iPhone, that
21  that was a -- a suitable design that you felt
22  comfortable shipping?
23     A  Are you asking my -- my personal opinion
24  or -- I'm -- I'm --
25     Q  Yes. We'll get into what others may have

Page 103

1  thought, but my initial question is focused on you
2  personally.
3         Did you feel that the original design on the
4  iPhone, that did not have the current character string
5  presented twice on the same screen, was an acceptable
6  design from a user interface perspective?
7     A  I personally believed that it was a good
8  design.
9     Q  And how did the others who looked at that
10  design react to that particular design?
11     A  I can't speak to what they may have been
12  thinking.
13     Q  What did they tell you?
14     A  At some point, I was directed to make the
15  software work the way it eventually appeared to users.
16     Q  What I'm getting at is when the first
17  generation iPhone user interface for the keyboard was
18  presented, which did not have the current character
19  string presented twice on the same screen to others,
20  what did those others tell you about that design? Did
21  they like it? Did they think it was okay? Did anyone
22  express concern about that design?
23         MR. BUROKER: Objection; compound.
24         THE WITNESS: I -- it's -- it's hard to say.
25  It's -- you know, it's a long time ago, and I spoke to

Page 104

1  many people.
2         MR. PAK: Fair.
3     Q  I guess what we do know is this: That the
4  original user interface design for the iPhone
5  keyboard, which did not have the current character
6  string presented twice on the same screen, survived
7  the vetting process as it shipped; fair?
8     A  Yes.
9     Q  So at least as of 2007, the appropriate folks
10  within Apple felt that it was an acceptable design,
11  ready for shipping; fair?
12     A  I accept that, sure.
13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ -
15         MR. BUROKER: Objection; vague.
16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮e?
18     A  You're asking, is there a point in -- could
19  you ask your question again.
20     Q  Sure.
21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 105

[lines 1–18 redacted]

19         MR. BUROKER: Objection; form; foundation.
20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[lines 23-24 redacted]

Highly Confidential - Attorneys' Eyes Only

Page 106

```
 6       MR. BUROKER: Objection; form and foundation.

15                                    ?
16       MR. BUROKER: Objection; foundation.
```

Page 107

```
 5    Q  And in what way was it different?
 6    A  Well, some languages require a different type
 7  of assistance in order to, you know, refer users to
 8  enter text comfortably and efficiently.
 9    Q  I want to focus on English --
10    A  Okay.
11    Q  -- versions of the iPhone; okay?
12    A  For English, no, I don't think this was --
13  no, we did eventually provide a word suggestion
14  feature.
15    Q  In which -- so let me be clear.
16       Was there some point in time where the
17  English version of the iPhone would display the
18  current character string twice on the same screen?
19       MR. BUROKER: Objection to form.
20       THE WITNESS: Not in the way that's been
21  depicted in the figures, no.
22       MR. PAK: Okay.
```

Page 108

```
 2       MR. BUROKER: Objection; form.

 6       MR. PAK:  Q.  What's the current version of
 7  the iPhone today?  I'm only asking about what's
 8  shipping.
 9    A  To the best of my knowledge, I believe
10  version 5.1 is the current shipping version.
11    Q  Okay.  In that currently shipping-version of
12  the iPhone, how is that system different, if at all,
13  than what's being depicted in Figure 4-B in terms of
14  the word suggestion and replacement process?
15    A  Well, for one thing, the original iPhone
16  supported English only, whereas the current iPhone
17  supports dozens of languages.
18    Q  And again, I'm focusing my question on the
19  English.
20    A  Okay.  Just the English.
21       Then -- then could you ask your question --
22    Q  Sure.
23    A  -- again.  I'm sorry.
24    Q  Focusing on the currently English-shipping
25  versions of the iPhone, how is that system different,
```

Page 109

```
 1  if at all, than what's being depicted in Figure 4-B in
 2  terms of the word suggestion and replacement process?
 3    A  Well, we stepped through before different --
 4  the -- the elements of the algorithms which are
 5  employed to make the word suggestions,
 6
 7    Q  Thank you.
 8       Setting aside what's under the hood in terms
 9  of how the algorithm works to suggest words, in terms
10  of what the user sees as the process for having
11  suggestions of words and replacing the currently typed
12  word with a suggested word, is there any major
13  difference between what we see in Figure 4-B and
14  what's shipping with the iPhone?
15       Let me see if I can be more precise --
16    A  Yeah.
17    Q  -- because I know there are --
18    A  Yeah.  Thank you.
19    Q  -- probably a lot of things going on in your
20  mind.
21    A  There are.
22    Q  Okay.  In the currently English-shipping
23  versions of the iPhone, when the user is presented
24  with suggested words, does the current character
25  string appear twice on the screen?
```

Highly Confidential - Attorneys' Eyes Only

Page 110

1     MR. BUROKER: Object as vague.
2     THE WITNESS: I don't think that it does, no.
3     MR. PAK: Q. So in that way, the current
4  shipping iPhone is similar to the original 2007
5  version of the iPhone with respect to that particular
6  aspect?
7     A  As we were saying, I -- I -- it -- the -- the
8  typed text does not appear twice on the screen.
9     Q  That's true for both the iPhone 2007 as well
10 as the latest iPhone version 5.1?
11    A  To the best of my knowledge, that's -- that's
12 true, yes.
13    MR. PAK: Let's take our lunch break. Thank
14 you.
15    MR. VIDEOGRAPHER: The time is 12:39 p.m.,
16 and we're off the record.
17    (Lunch break taken at 12:39 p.m.)
18         ---oOo---

Page 111

1        A F T E R N O O N   S E S S I O N
2               1:39 P.M.
3
4
5
6     THE VIDEOGRAPHER: The time is 1:39 p.m., and
7  we are back on the record.
8     MR. PAK: So welcome back, Mr. Kocienda.
9
...
20    MR. BUROKER: Objection; vague.

Page 112



Page 113

13    MR. PAK: Why don't we quickly go off the
14 record.
15    THE VIDEOGRAPHER: The time is 1:43 p.m., and
16 we are off the record.
17    (Recess taken.)
18    THE VIDEOGRAPHER: The time is 1:44 p.m., and
19 we are back on the record.
20    MR. PAK: Q. Your coinventor, Mr. Ording,
21 what was his role in the development of the technology
22 that led to the '172 patent?
23    A  Generally speaking, his role, as I understand
24 it, was to develop human interface for the iOS iPhone.
25    Q  And what was his particular role with respect

Highly Confidential - Attorneys' Eyes Only

Page 130

1  investigations.
2  Q  Do you recall seeing any type of marketing
3  studies or usability studies from the human computer
4  interaction group on this point?
5  A  No.
6  [redacted]
7  [redacted]
8  [redacted]
9
10  Q  To your knowledge, are there any studies
11  within Apple that evaluated different keyboard designs
12  and word recommendation designs to determine their
13  relative impact on the sales of iPhone?
14  A  I'm not aware of any such studies.
15  Q  Have you investigated that issue?
16  A  I personally have not.
17  Q  Sitting here today, do you have any personal
18  opinions on that issue?
19  A  No.
20  Q  Have you ever analyzed competing products
21  with respect to their keyboard design?
22  A  No, I haven't.
23  Q  Have you ever seen an Android phone?
24  A  Have I ever seen an Android phone?  Yes.
25  Q  Have you ever operated an Android phone?

Page 131

1       MR. BUROKER:  I'll just say this is outside
2  the scope for which he's been designated, but he can
3  answer in his personal capacity.
4       THE WITNESS:  If I have, it was a very brief
5  interaction.
6       MR. PAK:  Q.  When did you use the Android
7  phone?
8  A  I don't even -- I can't even recall a
9  specific instance, but I can't really discount it and
10  say "no."  I may have.
11  Q  Do you know anything about the keyboard
12  design on the Android phones?
13  A  I know nothing specific about their keyboard
14  designs.
15  Q  Do you know anything about the word
16  recommendation design of the Android phones?
17  A  I know nothing about it.
18  Q  Do you know anything about the spell checking
19  functionality of the Android phones?
20  A  I don't.
21  Q  Same questions for Microsoft phones; do you
22  know anything about the keyboard designs?
23  A  No; same answers.
24  Q  Okay.  So have you ever been given any type
25  of award for your work on the '172 patent?

Page 132

1  A  I don't know.
2  Q  Do you receive -- do you -- do you recall
3  [redacted]
14  Q  Have you ever published papers on the design
15  work that is described in the '172 patent?
16  A  No.
17  Q  Have you ever presented to people outside
18  Apple your work on the '172 patent?
19  A  Never.
20  Q  Sitting here today, can you think of any
21  accolades that you have received with respect to your
22  keyboard design work for the '172 patent?
23  A  No.
24  Q  After having prepared for today's deposition
25  as a company witness, can you tell me what's new about

Page 133

1  the '172 patent.
2       MR. BUROKER:  Objection; calls for a legal
3  conclusion.
4       THE WITNESS:  That -- that sort of question
5  makes me uncomfortable because I'm not a patent
6  lawyer.
7       MR. PAK:  I understand that.
8       THE WITNESS:  Yeah.
9       MR. PAK:  Q.  I'm asking as an inventor and
10  as a company witness, what is new or novel about the
11  '172 patent?
12       MR. BUROKER:  Same objections.
13       THE WITNESS:  Again, I have to give the same
14  answer.  It's how my work gets cast into.  The form of
15  a patent is not an area that I'm expert in.
16       MR. PAK:  Q.  Can you tell me, setting aside
17  the patent, have you ever analyzed what is different
18  or new about your keyboard design that ended up in the
19  iPhone compared to what may have existed before the
20  iPhone?
21  A  No, not specifically.
22  Q  So it's -- sitting here today, you just can't
23  tell me whether there's anything new because you
24  haven't looked at the prior art; right?
25  A  That was not my responsibility.

Highly Confidential - Attorneys' Eyes Only

Page 138

1    THE WITNESS: Thank you.
2    MR. PAK: Q. Have you received any training
3  on patent prosecution?
4    A  No.
5    Q  Do you know anything about patent law?
6    A  No.
7    Q  Have you ever been asked to consider the
8  meaning of a word that appears in a patent claim?
9    A  No.
10   Q  When you were being deposed on the prior
11 occasions, what were you being deposed about?  What
12 was the subject matter of your deposition?
13   A  Much -- much like today, about the -- it's
14 about the work that I did and how that work may have
15 been described in a patent.
16   Q  Do you recall whether any of your testimony
17 in the prior cases involved this specific word
18 replacement, auto suggestion ideas described in the
19 '172 patent?
20   A  I don't think it did, no.
21   Q  They were related to different technologies?
22   A  Yes.
23   Q  If I were to ask you, turning to the back of
24 this patent, to define various terms that appear in
25 Claim 18 of the '172 patent, as an inventor, are you

Page 139

1  able to do that for me today?
2    A  I may be able to give you a layperson's or,
3  you know, my person -- my engineer's notion of what
4  these words might mean, which may or may not be what
5  those words mean in a patent.
6    Q  So let's see if we can explore that a bit.
7       So looking at the touch screen display, what
8  is your understanding of that term?
9       MR. BUROKER: Objection; calls for a legal
10 conclusion, but he can answer.
11      THE WITNESS: Yeah.  Again, in my -- my
12 layperson's view of that term, it's a -- a display
13 which is sensitive to touches.
14      MR. PAK: Q. Do you know anything about the
15 actual technologies that are involved in making such a
16 touch screen display?
17   A  That's not my area of expertise.
18   Q  Do you know whether Mr. Ording has that kind
19 of expertise?
20   A  I can't say what Mr. Ording knows or doesn't
21 know.
22   Q  By the way, what was Mr. Ording's
23 contribution to the inventions that are described in
24 the '172 patent?
25      MR. BUROKER: Objection; vague.

Page 140

1       THE WITNESS: Generally speaking, Bas and I
2  worked together very closely on developing keyboard
3  technology.
4       MR. PAK: Q. Can you be more precise than
5  that.
6    A  As we've already -- already discussed,
7  development of this sort relies on iteration after
8  iteration.  And the collaboration between me and --
9  and Bas was focused primarily on those incremental
10 iterations.
11   Q  Thank you.
12      Going to the first element of Claim 18, do
13 you see that it recites:
14      "A first area of the touch screen display
15 that displays a current character string being input
16 by a user with the keyboard."
17      Do you see that?
18   A  Yes.
19   Q  What's your understanding of that?
20      MR. BUROKER: Same objections; legal
21 conclusion.
22      But you can answer.
23      THE WITNESS: Again, in my -- my layperson's
24 view, this would be an indication to the user of the
25 text that they're trying to type.

Page 141

1       MR. PAK: Q. Looking at Figure 4-B of your
2  '172 patent, can you identify for me what you believe
3  corresponds to the first area of the touch screen
4  display in Claim 18.
5       MR. BUROKER: Same objections.
6       THE WITNESS: My best judgment, based on my
7  layperson's reading, again, would be the area pointed
8  to by 220 in Figure 4-B.
9       MR. PAK: Thank you.
10   Q  Do you know whether you are the first person
11 in the world to have come up with the idea of having a
12 first area of the touch screen display that displays a
13 current character string being input by a user with
14 the keyboard?
15   A  I -- I can't say.
16   Q  You haven't researched that issue?
17   A  I haven't researched that.
18   Q  Going to the next element, which recites:
19      "A second area of the touch screen display
20 separate from the first area that displays the current
21 character string or a portion thereof and a suggested
22 replacement character string for the current character
23 string."
24      Do you see that?
25   A  Yes.

Page 170

1  Newton product?
2  A  To be honest, my recollection of my
3  interactions with the Newton are very, very sketchy at
4  this point. I didn't use it very much.
5  Q  Do you know whether you still have the Newton
6  product somewhere?
7  A  Doubtful.
8  Q  How about the user manuals that came with the
9  Newton product?
10  A  I doubt it.
11  Q  Do you recall using the Newton product to
12  input key -- keyboard inputs into the device?
13  A  Again, my recollection of using the Newton is
14  very vague.
15  Q  Do you recall using the spell checking
16  functionality of Newton?
17  A  I have no such recollection.
18  Q  Did you tell anyone about the Newton product
19  during the 2005 time period for disclosure to the
20  United States Patent Office in connection with the
21  '172 application?
22  A  No, not that I can recall.
23  Q  Do you recall discussing the Newton product
24  within Apple regarding the keyboard design?
25     MR. BUROKER: You can -- just don't disclose

Page 171

1  communications you may have had with counsel. If you
2  can answer without that, then you can answer.
3     THE WITNESS: I don't remember any such
4  communications.
5     MR. PAK: Okay.
6  Q  Having gone through the specific claims of
7  the '172 patent, 18, 19 and 27, are you able to tell
8  me today which specific limitations you worked on
9  versus which limitations Mr. Ording worked on?
10  A  I would say that our work was so close and
11  collaborative that in many respects, it's difficult to
12  separate out.
13  Q  Have you spoken to Dr. Singh? Do you know
14  who that is?
15  A  I don't.
16     MR. PAK: Okay. Why don't we take our next
17  break.
18     THE VIDEOGRAPHER: The time is 3:13 p.m., and
19  we are off the record.
20     (Recess taken.)
21     THE VIDEOGRAPHER: The time is 3:30 p.m., and
22  we are back on the record.
23     MR. PAK: So Mr. Kocienda, we talked earlier
24  about your work on the iPhone.
25     THE WITNESS: Uh-huh.

Page 172

1     MR. PAK: Q. Did you also work on the
2  keyboard design for the iPad?
3  A  Yes, I did.
4  
5  
6  
7  
8     MR. BUROKER: Objection -- objection; vague.
9  
10  
11  
12     MR. PAK: Q. Sir, did you discuss the
13  substance of your testimony during any of the breaks?
14  A  No.
15     MR. PAK: Okay. With that, I think I'm
16  finished with this witness.
17  
18     EXAMINATION BY MR. BUROKER
19     MR. BUROKER: I've got a few questions.
20  Q  Mr. Kocienda, do you recall Mr. Pak asking
21  you questions about files you reviewed yesterday that
22  were on your computer?
23  A  Yes.
24  Q  Do you recall if those files had dates
25  associated with them on your computer?

Page 173

1  A  Yes.
2  Q  Do you -- what do you understand that those
3  dates represent?
4  A  I filed these -- I organized these files
5  in -- in folders which had dates on them just to show
6  a progression -- you know, work progression, you know,
7  over time.
8  Q  Would the dates associated with those files
9  help you determine more specifically when you
10  developed certain features in the keyboard project?
11     MR. PAK: Objection; lacks foundation.
12     THE WITNESS: I -- those dates were intended
13  to show when I was working on that particular content
14  or idea.
15     MR. BUROKER: Q. Do you believe those dates
16  would help you to identify more specifically when you
17  worked on certain features?
18     MR. PAK: Same objections.
19     THE WITNESS: That was the intention of
20  dating the files in this fashion.
21     MR. BUROKER: Q. And did you keep a notebook
22  
23  A  Yes.
24  Q  Would reviewing that notebook assist you in
25  determining more specifically when you worked on

Page 178

1       J U R A T
2
3
4    I, KENNETH KOCIENDA, do hereby certify under
5    Penalty of perjury that I have read the
6    foregoing transcript of my deposition taken
7    on April 13, 2012; that I have made such
8    corrections as appear noted herein in ink,
9    initialed by me; that my testimony as
10   contained herein, as corrected, is true and
11   correct.
12
13
14   DATED this ____ day of _____, 2012,
15   at _____, California.
16
17
18
19   _____
20       SIGNATURE OF WITNESS
21
22
23
24
25

Page 179

1           CERTIFICATE OF REPORTER
2
3
4      I, ANDREA M. IGNACIO HOWARD, hereby certify
5    that the witness in the foregoing deposition was by me
6    duly sworn to tell the truth, the whole truth, and
7    nothing but the truth in the within-entitled cause;
8
9       That said deposition was taken in shorthand
10   by me, a Certified Shorthand Reporter of the State of
11   California, and was thereafter transcribed into
12   typewriting, and that the foregoing transcript
13   constitutes a full, true and correct report of said
14   deposition and of the proceedings which took place;
15
16       That I am a disinterested person to the said
17   action.
18
19       IN WITNESS WHEREOF, I have hereunto set my
20   hand this 13th day of April, 2012.
21
22   _____
23   ANDREA M. IGNACIO HOWARD, RPR, CCRR, CLR, CSR No. 9830
24
25

Page 180

1              I N D E X
2
3    DEPOSITION OF KENNETH KOCIENDA
4
5           EXAMINATION
6                     PAGE
7       BY MR. PAK         5, 174
8       BY MR. BUROKER        172
9
10          E X H I B I T S
11   EXHIBIT                  PAGE
12   Exhibit 1   Samsung's First 30(b)(6)      7
13           Deposition Notice to Apple, Inc.;
14           6 pgs.
15   Exhibit 2   U.S. Patent No. 8,704,172 B2;   19
16           24 pgs.
17
18            ---oOo---
19
20
21
22
23
24
25

Page 181

1          E R R A T A  S H E E T
2
3      I, KENNETH KOCIENDA, make the following
4    changes to my deposition taken in the matter of Apple,
5    Inc., vs. Samsung Electronics, taken on April 13,
6    2012:
7
8    DATE:_____    _____
9                Signature of Witness
10   Page    Line   Change
11   ____    ____   _____
12   ____    ____   _____
13   ____    ____   _____
14   ____    ____   _____
15   ____    ____   _____
16   ____    ____   _____
17   ____    ____   _____
18   ____    ____   _____
19   ____    ____   _____
20   ____    ____   _____
21   ____    ____   _____
22   ____    ____   _____
23   ____    ____   _____
24   ____    ____   _____
25   ____    ____   _____

1          CERTIFICATE OF REPORTER

2

3

4          I, ANDREA M. IGNACIO HOWARD, hereby certify

5   that the witness in the foregoing deposition was by me

6   duly sworn to tell the truth, the whole truth, and

7   nothing but the truth in the within-entitled cause;

8

9          That said deposition was taken in shorthand

10  by me, a Certified Shorthand Reporter of the State of

11  California, and was thereafter transcribed into

12  typewriting, and that the foregoing transcript

13  constitutes a full, true and correct report of said

14  deposition and of the proceedings which took place;

15

16         That I am a disinterested person to the said

17  action.

18

19         IN WITNESS WHEREOF, I have hereunto set my

20  hand this 13th day of April, 2012.

21

22         _____

23  ANDREA M. IGNACIO HOWARD, RPR, CCRR, CLR, CSR No. 9830

24

25