# EXHIBIT 1

1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
    Charles K. Verhoeven (Bar No. 170151)
2   charlesverhoeven@quinnemanuel.com
    Kevin A. Smith (Bar No. 250814)
3   kevinsmith@quinnemanuel.com
    50 California Street, 22nd Floor
4   San Francisco, California 94111
    Telephone: (415) 875-6600
5   Facsimile: (415) 875-6700
6
    Kevin P.B. Johnson (Bar No. 177129)
7   kevinjohnson@quinnemanuel.com
    Victoria F. Maroulis (Cal. Bar No. 202603)
8   victoriamaroulis@quinnemanuel.com
    555 Twin Dolphin Drive 5th Floor
9   Redwood Shores, California 94065
    Telephone: (650) 801-5000
10  Facsimile: (650) 801-5100
11
    William C. Price (Bar No. 108542)
12  williamprice@quinnemanuel.com
    Patrick M. Shields (Bar No. 204739)
13  patrickshields@quinnemanuel.com
    865 S. Figueroa St., 10th Floor
14  Los Angeles, California 90017
    Telephone: (213) 443-3000
15  Facsimile: (213) 443-3100
16  Attorneys for SAMSUNG ELECTRONICS
    CO., LTD., SAMSUNG ELECTRONICS
17  AMERICA, INC. and SAMSUNG
    TELECOMMUNICATIONS AMERICA, LLC
18
19              UNITED STATES DISTRICT COURT
20      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation, | CASE NO. 12-CV-00630-LHK |
| Plaintiff, | **EXPERT DECLARATION OF GEOFF COHEN, Ph.D. CONCERNING U.S. PATENT 5,946,647** |
| vs. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | Date: June 7, 2012 Time: 1:30 p.m. Place: Courtroom 8, 4th Floor Judge: Hon. Lucy H. Koh |
| Defendants. | **FILED UNDER SEAL CONFIDENTIAL** |

1.      I am Geoff A. Cohen of Newton Highlands, Massachusetts.  I have been retained by Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC ("Samsung") to provide expert opinions in the above-captioned litigation.

2.      As part of that engagement I have been asked to provide analysis and expert opinions on the following topics:  (a) the disclosure of United States Patent Number 8,046,721 ("the '721 Patent") and United States Patent Number 5,946,647 ("the '647 Patent); (b) whether the Samsung Galaxy Nexus infringes claims 1 or 8 of the '647 Patent; (c) whether the Samsung Galaxy Nexus infringes claims 7, 8, 12, or 15 of the '721 Patent; (d) whether the asserted claims of the '721 and '647 Patents are invalid.   This declaration concerns the '647 patent.   I am submitting a separate declaration setting form my opinions concerning the '721 patent.

3.      I am employed full-time as a Computer Scientist at Elysium Digital L.L.C. ("Elysium"), where my responsibilities include acting as a technical consultant to firms involved in computer science-related litigation.  My time is billed at my customary rate $405/hour for my work in preparing this declaration.  My compensation is not dependent on the content of my declaration or the outcome of this litigation.

4.      I have a Ph.D. in Computer Science from Duke University, where I studied experimental systems, operating systems, and software development methodology. While a student at Duke I received an IBM Graduate Fellowship.

5.      I have also been employed by Data General, where I worked on performance evaluation and engineering of multi-processor database servers. I have also been employed by IBM, where I worked on software development methodology, and automated analysis and generation of remote graphical user interfaces. I have also been employed by IBM, Cap Gemini

Ernst & Young, where I provided strategic advice to companies on new technologies, including mobile computing, wireless technologies, and other emerging technologies. I have also been employed by the Congressional Budget Office, where I performed policy analysis of national security budgets.

6.      I have also acted as an independent consultant to the National Academy of Sciences, where I assisted in the research and production of a report on the intersection of computer science and biology. I have also acted as an independent consultant to the Communications Futures Program at  and the Massachusetts Institute of Technology, where I led the working group on Internet security and privacy.

7.      I am a member of the Association for Computing Machinery (ACM). I have also been a member of the ACM's Special Interest Group on Computer Human Interaction (SIGCHI). I have served multiple times on the Program Committee, including as the Chair, for Onward!, an Association of Computing Machinery conference on new directions in computer science. I also serve on the USACM Public Policy Council, advising the ACM and the US Government on technical matters of public policy. My professional experience has included software architecture design, application programming and implementation, user interface design and review, and system performance and evaluation. I hold 5 U.S. Patents for software inventions. I have attached my Curriculum Vitae as Exhibit A to this declaration.

8.      It is my understanding that Apple has accused Samsung of infringing the '721 Patent and the '647 Patent, among others. In particular, Apple has accused that the manufacture, sale, or use of the Samsung Galaxy Nexus phone infringes claims 1 and 8 of the '647 Patent and claims 7, 8, 12, and 15 of the '721 Patent.

02198.

9.      Furthermore, I understand that Apple has moved for a preliminary injunction, claiming that they are likely to win the respective counts of the legal complaint, and that they are likely to prevail against Samsung's defenses, including invalidity of the patents.

10.     This declaration sets forth my opinions concerning the '647 patent.   I am submitting a separate declaration setting forth my opinions concerning the '721 patent.   The materials that I relied on in preparing both declarations are listed in Exhibit B.

## I.      MY UNDERSTANDING OF LEGAL PRINCIPLES

### A.      LEGAL UNDERSTANDINGS

11.     This section contains information provided to me by Samsung's attorneys for these legal standards.

#### 1.      Infringement

12.     I understand that the determination of whether an accused product infringes a patent claim is a two-step process.   First, the language of the claim is construed as it would be understood by one of ordinary skill in the art at the time of the filing of the patent application.

13.     I understand that after the claim has been properly construed, the claim is compared with the accused product to determine whether all of the features of the claim are present literally or by a substantial equivalent.   The evaluation of literal infringement is a process of determining whether the accused product has each and every element specified in the properly construed claim.   If even one element is not present, literal infringement cannot be found.

14.     I understand that a patent's claims define what is covered by the patent.   In deciding the issue of infringement, it is improper to compare the alleged infringer's accused product to any of the patent holder's commercial products.   The patent holder's current commercial products are irrelevant in determining infringement: the only relevant inquiry is whether the properly construed claims read on the accused device(s).

## 1.    Doctrine of Equivalents

15.    I understand that a device that does not literally infringe a claim may nonetheless infringe under the doctrine of equivalents if each and every limitation in the claim is "equivalently present" in the accused device.  The doctrine of equivalents must be applied to individual elements of the claim and not to the invention as a whole; thus it must not be applied broadly as to effectively eliminate an element of the claim in its entirety.  Each and every element in the claim is "equivalently present" in the accused device if only "insubstantial differences" distinguish the missing claim element from the corresponding aspects of the accused device.  I understand that one test used to determine whether differences between a claim element and the feature of the accused device asserted to practice that element are insubstantial is known as the "function-way-result test."  A claim element is insubstantially different from an accused feature if they both perform substantially the same function in substantially the same way to obtain substantially the same result.

16.    I understand that another test for insubstantial differences is the "known interchangeability" test.  Two elements may be insubstantially different if a person of ordinary skill in the art at the time of invention would have known the two elements were interchangeable.

17.    I understand that equivalency is examined in the context of the prior art, the patent specification, and the prosecution history.  I understand that the range of equivalents is limited by the prior art to prohibit the patent owner from extending patent protection beyond the scope of a claim.  Thus, it is my understanding that the range of equivalents cannot include what the prior art anticipates and/or renders obvious.

18.    I understand that the doctrine of equivalents is also subject to the doctrine of prosecution history estoppel, which acts to limit infringement by otherwise equivalent products

1    or processes. It is my understanding that prosecution history estoppel bars the patentee from

2    recapturing subject matter that was surrendered by the patentee during prosecution to promote

3    allowance of the claims.

4                        2.        **Legal Standard for Prior Art**

5        19.    I understand that a patent, another publication, a system, or a product, must first

6    qualify as "prior art" before it can be used to invalidate a patent claim.

7

8        20.    I understand that Section 102 of the Patent Act provides the conditions by which

9    prior art is determined.

10       21.    I understand that a system or product qualifies as prior art to an asserted patent if

11   that system or product: (1) was known or used by others in the U.S. before the date of invention

12   of the asserted patent, or (2) was in public use or on sale in the U.S. more than one year before

13   the filing date of the asserted patent.

14

15       22.    I understand that a U.S. or foreign patent, or a printed publication such as a

16   datasheet, article published on the Internet, or published patent application, qualifies as prior art

17   to an asserted patent if that patent was issued or that publication was published: (1) before the

18   invention of the asserted patent, or (2) more than one year before the filing date of the asserted

19   patent.

20

21       23.    I understand that a patent application also qualifies as prior art to an asserted

22   patent if the application was filed in the U.S. before the invention of the asserted patent and is:

23   (1) published no more than 18 months after filing, or (2) is granted as a patent.  I further

24   understand that an international patent application filed under the Patent Cooperation Treaty

25   (PCT) qualifies as prior art as described in this paragraph if that application designated the

26   United States and was published in the English language.

27

28

24.     I further understand that if the claimed invention was made in the U.S. by another inventor who had not abandoned, suppressed, or concealed the invention, that prior invention may be invalidating prior art.

25.     I understand that documents and materials that qualify as prior art can be used to invalidate a patent claim as anticipated or as obvious.

26.     I understand that invalidity must be shown by clear and convincing evidence.

### 3.     Legal Standard for Anticipation

27.     I understand that, once the claims of a patent have been properly construed, the second step in determining anticipation of a patent claim requires a comparison of the properly construed claim language to the prior art on a limitation-by-limitation basis.

28.     I understand that a prior art reference "anticipates" an asserted claim, and thus renders the claim invalid, if all elements of the claim are disclosed in that prior art reference, either explicitly or inherently.  I understand an element may be inherently disclosed in a prior art reference when the element is necessarily present or implied.

29.     Further, I understand that a prior art device or system that was in public use or on sale under Section 102(b) of the Patent Act need not disclose the invention.  Rather, such a public use or sale need only relate to a device or system that embodies the invention.

30.     I have written this Declaration with the understanding that anticipation must be shown by clear and convincing evidence.

### 4.     Legal Standard for Obviousness

31.     I have been instructed by counsel on the law regarding obviousness. I understand that Section 103 of the Patent Act governs the determination of obviousness.

32.     I understand that even if a patent is not anticipated, it is still invalid if the differences between the claimed subject matter and the prior art are such that the subject matter

as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the pertinent art. I am informed by counsel that the standard for determining obviousness was clarified by the Supreme Court of the United States in KSR Int'l. Co. v. Teleflex Inc., 550 U.S. 298 (2007).

33. I understand that a person of ordinary skill in the art provides a reference point from which the prior art and claimed invention should be viewed. This reference point prevents one from using hindsight in deciding whether a claim is obvious.

34. I understand that the obviousness analysis is expansive and flexible. I also understand that a combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results, and that when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result.

35. I also understand that an obviousness determination includes the consideration of various factors such as (1) the scope and content of the prior art, (2) the differences between the prior art and the asserted claims, (3) the level of ordinary skill in the pertinent art, and (4) the existence of secondary considerations such as commercial success, long-felt but unresolved needs, failure of others, etc.

36. I understand that an obviousness evaluation can be based on a combination of multiple prior art references. I understand that the prior art references themselves may provide a suggestion, motivation, or reason to combine, but other times the nexus linking two or more prior art references is simple common sense. I further understand that obviousness analysis recognizes that market demand, rather than scientific literature, often drives innovation, and that a motivation to combine references may be supplied by the direction of the marketplace.

37.     I understand that if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.

38.     I also understand that practical and common sense considerations should guide a proper obviousness analysis, because familiar items may have obvious uses beyond their primary purposes.  I further understand that a person of ordinary skill in the art looking to overcome a problem will often be able to fit the teachings of multiple publications together like pieces of a puzzle.  I understand that the obviousness analysis therefore takes into account the inferences and creative steps that a person of ordinary skill in the art would employ under the circumstances.

39.     I understand that a particular combination may be proven obvious merely by showing that it was obvious to try the combination. For example, when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp because the result is likely the product not of innovation but of ordinary skill and common sense.

40.     I understand that the combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results. When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, Section 103 of the Patent Act likely bars its patentability.

41.     I understand that a proper obviousness analysis focuses on what was known or obvious to a person of ordinary skill in the art, not just the patentee. Accordingly, I understand

that any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.

42.     I understand that a claim can be obvious in light of a single reference, without the need to combine references, if the elements of the claim that are not found explicitly or inherently in the reference can be supplied by the common sense of one of skill in the art.

43.     In sum, my understanding is that prior art teachings are properly combined where a person of ordinary skill in the art having the understanding and knowledge reflected in the prior art and motivated by the general problem facing the inventor, would have been led to make the combination of elements recited in the claims.   Under this analysis, the prior art references themselves, or any need or problem known in the field of endeavor at the time of the invention, can provide a reason for combining the elements of multiple prior art references in the claimed manner.[1]

44.     I have been informed and understand that the obviousness analysis requires a comparison of the properly construed claim language to the prior art on a limitation-by-limitation basis.

45.     I understand that obviousness must be proven by clear and convincing evidence.

---

[1]     I am also informed by counsel that a showing of obviousness may be rebutted by showing "secondary considerations" of non-obviousness. I understand that these secondary considerations may include (1) a long felt but unmet need in the prior art that was satisfied by the invention of the patent; (2) commercial success or lack of commercial success of processes covered by the patent; (3) unexpected results achieved by the invention; (4) praise of the invention by others skilled in the art; (5) taking of licenses under the patent by others; and (6) deliberate copying of the invention. I also understand that there must be a relationship between any such secondary considerations and the invention. I also understand that contemporaneous and independent invention by others is a secondary consideration supporting an obviousness determination. I am informed by counsel, however, that it is Plaintiff's burden to make a showing of secondary considerations. Thus, I have not included any opinions on secondary considerations of non-obviousness in this declaration. If Plaintiff should attempt to show secondary considerations of non-obviousness, I hereby reserve my right to address those claims in a supplemental declaration or as otherwise appropriate.

02198.

46.     I have written this Declaration with the understanding that obviousness must be shown by clear and convincing evidence.

**5.     Indefiniteness**

47.     I understand that a patent specification must conclude with one or more claims particularly pointing out and distinctly claiming the subject matter that the applicant regards as his invention. Claims are indefinite if they do not reasonably apprise those skilled in the relevant art of the applicant's intended scope of the invention when read in light of the specification.

48.     I understand that a claim is indefinite if it contains words or phrases whose meanings are unclear when read in light of the specification.  Lack of proper antecedent basis results in a "zone of uncertainty" as to construction, and renders the claim insolubly ambiguous.

49.     I further understand that a claim is considered indefinite if it does not reasonably apprise those skilled in the art of its scope.  I understand that where it is unclear whether infringement occurs when one creates a system that allows the user to perform a function, or whether infringement occurs when the user actually uses the system to perform a function, the claim does not apprise a person of ordinary skill in the art of its scope, and it is invalid as indefinite.

50.     I understand that indefiniteness must be proven by clear and convincing evidence.

51.     I have written this Declaration with the understanding that indefiniteness must be shown by clear and convincing evidence.

**6.     Written Description and Enablement**

52.     It is my understanding that a patent must contain a written description of the claimed invention. The written description must clearly convey to those skilled in the art that, as of the filing date sought, the applicant was in possession of the invention claimed.

EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647

02198.

53. I have further been advised that a claimed invention must be enabled. A claimed invention is not enabled if the specification does not teach those of ordinary skill in the art how to make and use the invention as it is claimed, without undue experimentation. Undue experimentation is based on the level of skill in the art as of the effective filing date of the patent.

54. I understand that invalidity for lack of adequate written description or enablement must be shown by clear and convincing evidence.

55. I have written this Declaration with understanding that invalidity for lack of written description or enablement must be shown by clear and convincing evidence.

### 7. Conception and Reduction to Practice

56. I further understand that many of the different categories of prior art refer to the date at which the inventor made the invention. This is called the "date of invention."

57. I understand that there are two parts to the making of an invention: "conception" and "reduction to practice."

58. I have been advised that when the inventor first has the idea of the invention, this is referred to as "conception" of the invention. Conception is the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is to be applied in practice. A conception of an invention is complete when the inventor has formed the idea of how to make and use every aspect of the claimed invention, and all that is required is that it be made without the need for any further inventive effort.

59. I am also informed that the actual making of the invention is referred to as "reduction to practice." An invention is said to be "reduced to practice" when it is made and shown to work for its intended purpose. I understand that the filing of a patent application serves as conception and constructive reduction to practice of the subject matter described in the application.

02198.

### 8.    Priority Date

60.    I understand that the "critical date" for a patent is one year prior to its filing date. It is my understanding that the critical date is significant because patents, systems, or documents that are public prior to the critical date, if they disclose each and every limitation of a patent claim, will invalidate that claim.

61.    I further understand that the "priority date" of a patent is the date on which it is filed.   I further understand that the priority date is significant because patents, systems, or documents that are public less than one year prior to the priority date may invalidate the claims. My understanding is that, for such prior art references, a patentee may attempt to show that the claimed invention was conceived prior to the publication date of the prior art reference.

62.    I understand that a patent may be valid over prior art that was published or was publically available before the priority date but after the critical date.   To do so, it is my understanding that Complainant must prove with corroborating evidence that the named inventors conceived of the claimed invention before the prior art, and were diligent in reducing the claimed inventions to practice.

## II.    THE '647 PATENT

63.    The '647 Patent is entitled "System and Method for Performing an Action on a Structure in Computer-Generated Data."   The named inventors are James R. Miller, Thomas Bonura, Bonnie Nardi, and David Wright.   The application that led to the '647 patent was filed on February 1, 1996.  See Exhibit J.

64.    Apple asserts that the Samsung Galaxy Nexus infringes claims 1 and 8 of the '647 patent.

65.    Claim 1 reads as follows (I have labeled the claim limitations for clarity):

A computer-based system for detecting structures in data and performing actions on detected structures, comprising:

(a) an input device for receiving data;

(b) an output device for presenting the data;

(c) a memory storing information including program routines including

(d) an analyzer server for detecting structures in the data, and for linking actions to the detected structures;

(e) a user interface enabling the selection of a detected structure and a linked action; and

(f) an action processor for performing the selected action linked to the selected structure; and

(g) a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines.

66.    Claim 8 reads as follows:

The system recited in claim 1, wherein the user interface highlights detected structures.

67.    The '647 patent specification describes systems that were available prior to the application for the '647 patent.  For example, the specification states that programmers could use "pattern analysis units, such as parsers, to automatically identify" structures in documents. Exhibit J at 1:24-26.

68.    The specification states that "the term 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document, such as dates, addresses, phone numbers, names, etc."   Id. at 1:26-31.   The specification further states that "[t]he term 'structure' refers to an instantiation of a patter in the document.  That is, a 'date' pattern will recognize the structure 'Oct. 31, 1995.'"  Id. at 31-34.

69.    The patent acknowledges that prior art systems could detect phone numbers and automatically dial those numbers.  The specification asserted that there were limitations to those

systems, such as, for example, that they could not automatically store the number in an address book.

> One type of system that has addressed this problem involves detecting telephone numbers. Such systems enable a user to select a telephone number and request that the application automatically dial the number. However, these systems do not recognize the selected data as a telephone number, and they generally produce an error message if the user selects invalid characters as a phone number. Also, they do not enable the performance of other candidate actions, such as moving the number to an electronic telephone book. That is, if a user wishes to perform a different action on an identified telephone number, such as storing the number in an address book, the user cannot automatically perform the action but must select and transfer the number to the appropriate data base as described above.

*Id.* at 1:52-64.

70.     The specification states that the invention provides "a computer system with . . . a memory that includes a program to identify structures in a document and perform selected computer-based actions on the identified structures."  Id. at 21-25.  The specification further states that the program "includes program subroutines that include an analyzer server, an application program interface, a user interface and an action processor."  Id. at 25-28.  "The analyzer server receives data from a document having recognizable structures, and uses patterns to detect the structures."  Id. at 28-30.

71.     The specification also states that "[e]ach action is a computer routine that causes the CPU to perform a sequence of operations on the particular structure to which it is linked."  Id at 31-34.  The specification goes on to identify some examples of actions:

it is linked. An action may specify opening another application, loading the identified structure into an appropriate field, and closing the application. An action may further include internal actions, such as storing phone numbers in an electronic phone book, addresses in an electronic address book, appointments on an electronic calendar, and external actions such as returning phone calls, drafting letters, sending facsimile copies and e-mail, and the like.

*Id.* 34-41.

72.    Figure 1 is a block diagram of the claimed system:



FIG. 1

73.    Figure 3 is a block diagram illustrating the analyzer server.

1
2
3
4
5
6
7
8
9
10
11
12
13



FIG. 3

14   74.   The specification describes linking in terms of conventional pointers.   For

15 example, "parser 310 retrieves from the grammar file 320 pointers attached to the grammar and

16 attaches the same pointes to the identified structure."  Id. at 4:66-5:2.

17   75.   Figure 4 is a block diagram illustrating the analyzer server:

18
19
20
21
22
23
24
25
26
27
28

16          Case No. 12-cv-00630
EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647



FIG. 4

## III.    CLAIM CONSTRUCTION OF THE '647 PATENT

76.    It is my understanding that certain claims terms from the '647 Patent have been construed in at least two different proceedings. These constructions include one in an administrative hearing at the U.S. International Trade Commission (case 337-TA-710, Apple v. HTC) ("ITC construction") and one issued by Judge Richard Posner, ruling in Federal Court (case ND-IL-08540, Apple v. Motorola) ("Posner construction"). I have reviewed the constructions from both of these proceedings and consider them both in my analysis below.

### A.    ANALYZER SERVER

77.    It is my opinion that Judge Posner correctly construed the terms of the asserted claims of the '647 Patent. Judge Posner ruled on two terms: "analyzer server" and "linking actions to the detected structures."

78.    Judge Posner construed "analyzer server" as "a server routine separate from a client that receives data having structures from the client." Apple proposed  that  "analyzer

server" be construed as a program routine(s) that receives data, uses patterns to detect structures in the data, and links actions to the detected structure." Judge Posner considered Apple's proposal and rejected it: "Under Apple's interpretation, any set of routines that performs structure detection and linking would be an analyzer server. But that is just a definition of an "analyzer." "Server" becomes superfluous, as Apple's expert implicitly acknowledges by stating that "the inventors used ['server'] in a generic sense intending to describe a service that includes various functionalities." That understanding renders any piece of code a "server.""

79.     The file history of the '647 confirms my understanding that the analyzer server is separate from the client: "In addition, Applicants' invention is a system-wide service that can be used to enable cooperating systems to detect recognizable structures in their data." 1998-05-01 statement, p. 3.  Thus, I agree with Judge Posner.

80.     The parties to the ITC Investigation, Apple and HTC, agreed upon a construction for "analyzer server":  "a program subroutine that receives data from a document having recognizable structures, and uses patterns to detect the structures.  Like Apple's proposal in the Northern District of Illinois, the ITC construction reads out the term "server." Someone of ordinary skill in the art would not understand a server to merely refer to any piece of code; they would understand it to refer to a program separate from the application in question, running as a separate process, that provides services to client applications.

**B.     "LINKING ACTIONS TO THE DETECTED STRUCTURES"**

81.     Judge Posner construed "linking actions to the detected structures" as "creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on that detected structure." ALJ Charneski construed the phrase as "linking detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are linked."

82.     In the NDIL-8540 case, Apple proposed "associating detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are associated," a construction similar to that adopted by ALJ Charneski. Again, I agree with Judge Posner's analysis and conclusion. The proper construction of "linking actions to the detected structures" is "creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on that detected structure." This is consistent with the intrinsic evidence. As Judge Posner noted in his order, "The '647 specification states that "upon detection of a structure, analyzer server links actions associated with the responsible pattern to the detected structure, using conventional pointers."

83.     Additionally, Dr. Mowry states that the validity of '647 Patent was upheld during re-examination, but fails to disclose that the Patent Office explicitly stated that claims 1 and 8 only survived the re-examination because the Patent Office understood the term "analyzer server" to be narrow.  The examiner stated that claims 1 and 8, among others, were "confirmed due to the narrow claim language of the term 'analyzer server' as defined in the Specification." March 27, 2012 Office Action at 2, Exhibit L.  The examiner went on to quote from a June 27, 2011 non-final office action as follows:

EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647

As excerpted from Non Final Office Action 06/27/2011, pp. 7-8 & 27-28:

An analyzer server is described ('647, 3: 55-67; 4: 59-64) as a subroutine within a program, which receives data from a document that has recognizable patterns. The analyzer server comprises one or more pattern analysis units, such as a parser and grammars (grammar file) or fast string search function and dictionaries (string library), which use patterns to parse a document for recognizable structures. "Parser retrieves a grammar from grammar file and parses text using the retrieved grammar." (Alternately, a fast string search function retrieves 1070 the contents of string library 420, detects [identifies] 1080 the strings in the data identical to those in the string library 420 and links 1090 actions associated with the library string to the detected string."

('647, 6: 43-47) The **analyzer server links actions associated with the responsible pattern** (as retrieved from grammar file/string library) **to the detected structure, using conventional pointers**: "Parser retrieves from grammar file 320 pointers attached to the grammar and attaches the same pointers to the identified structure." ('647, 4:67 - 5: 2) "...a parsing process retrieves 1030 grammars, detects 1040 structures in the data based on the retrieved grammars, and links 1050 actions associated with each grammar to each structure detected by that grammar." ('647, 6: 39-42) (emphasis added)

*Id.* at 2-3.

84.    For Dr. Mowry and Apple to now be claiming that the term should be given a broad scope is an attempt to recapture claim scope explicitly denied by the Patent Office.

## IV.   NON-INFRINGEMENT OF THE '647 PATENT

85.    Dr. Mowry asserts that the Samsung Galaxy Nexus infringes Claim 1 of the '647 Patent. I disagree.

86.     As an initial matter, some of Dr. Mowry's opening assumptions are false. Dr. Mowry states that "The same web browser that is found in the Galaxy Nexus was found to infringe claims 1 and 8 of the '647 Patent when used in HTC's devices during the ITC investigation…" (Mowry Decl., Para 53.) and "the applications found to infringe previously are identical in all relevant aspects to the version of the web browser application (Browser) found in Android installed on the Galaxy Nexus." (Mowry Decl., Para 54.).

87.     He is incorrect. The Browser on the Galaxy Nexus is not identical to the Browser at issue in 337-TA-710. For example, the Browser application offers a smaller set of options for detected structures.  When selecting an e-mail address, there is no longer a menu option for "Add to Contact".

A.     **THE SAMSUNG GALAXY NEXUS DOES NOT INFRINGE CLAIM 1 OF THE '647 PATENT**

1.     **The Samsung Galaxy Nexus does not include an "analyzer server"**

88.     The Galaxy Nexus does not satisfy the "analyzer server" element under the ITC construction.  The parties to the ITC investigation agreed to construe "analyzer server" as "A program subroutine that receives data from a document having recognizable structures, and uses patterns to detect the structures."  Pursuant to the claim language, the "analyzer server" is "for detecting structures in the data, and for linking actions to the detected structures."  That is, whatever element satisfies the "analyzer server" construction must both detect and link structures.

89.     Dr. Mowry agrees that the analyzer server is "a single claim element" and that one element must both detect and link.  (Mowry Decl., p. 66)  However, he fails to identify any singular subroutine that performs both detecting structures and linking actions.  He identifies a number of methods that detect structure (Mowry Decl. Paras. 67-68), and four methods that link actions.  He never identifies any single program subroutine that does both.

02198.

90.     Dr. Mowry's failure to identify any single subroutine that is the "analyzer server" is not surprising given that the Android solution is very different than the system described by the '647 Patent.  Since there is no routine that performs both limitations (even by calling other subroutines), there can be no "analyzer server" under the ITC construction.

91.     The Galaxy Nexus also does not satisfy the "analyzer server" element under the Posner construction.  Judge Posner construed "analyzer server" as "a server routine separate from a client that receives data having structures from the client."  Dr. Mowry's own description of the analyzer server as "The Browser application's analyzer server program routines" makes it clear that in Android, there is no separation between the application (in Dr. Mowry's infringement theory, the Browser), and the methods that Dr. Mowry identifies as part of the analyzer server, including methods of BrowserActivity and Controller, central components of the Browser application.  Dr. Mowry states that "[t]he Browser application links actions to the detected structure" (Mowry Decl., Para. 71).  This statement is at direct odds with the requirement of the Posner construction for analyzer server, which demands that the application (the client) is separate from the server.  Since the server must link actions to the detected structure, and the server must be separate from the client, Dr. Mowry's own statement that "The Browser application links actions" shows that there is no infringement under the Posner construction.

92.     Dr. Mowry's declaration contains no analysis of whether the routines for detecting structures or linking actions to structures are separate from the application.  A person of ordinary skill in the art would understand a "server" to mean a program separate from the application in question, running as a separate process, that provides services to client applications.  All of the code that Dr. Mowry identifies as meeting the analyzer server claim limitation runs in the same application process as the Browser; it is, in fact, a single application.

This is in direct conflict with the plain language of the '647 Patent, which envisions that "The analyzer server receives from an application running concurrently..." ('647 Patent, Abstract). Since even in Dr. Mowry's analysis there is no routine separate from the application that performs the step of linking actions to detected structures, this claim element cannot be satisfied under the Posner construction.

93.     In his deposition, Dr. Mowry opined that there are "external" shared libraries that act as a "server routine separate from a client", and that these are server routines because they are "reused by other parts of the system" and that "other applications call in to Web Kit routines." He elaborates that a server routine "is designed to be used by a wide variety of different applications" and is "a utility meant to be used by many applications." (Mowry Deposition, pg 117:11 - 119:8)  However, as I have explained above, this is not how a person of ordinary skill in the art would understand a "server". The classes that Dr. Mowry accuses of being part of shared libraries, CacheBuilder, WebView, and MenuItemImpl (Mowry Decl., Paras. 67, 70), are all executed as part of the client application, in the same process as the application. The other classes that Dr. Mowry cites as performing linking, BrowserActivity and Controller, are ones that Dr. Mowry himself admits are part of the client application. (Mowry Deposition, pp. 117, 119).

94.     Furthermore, in an apparent attempt to reconcile his opinions that are in conflict with the Posner construction for "analyzer server", Dr. Mowry appears to be backing away from some of the classes that he previously relied upon for the step of "linking actions to the detected structures". In paragraph 70 of his declaration, Dr. Mowry stated that the analyzer server includes the onCreateContextMenu() methods of the BrowserActivity and Controller classes. However in his deposition, since these routines are indisputably part of the client application, he now refers to this as merely "interface glue code" that is not part of the analyzer server. (Mowry

23                                        Case No. 12-cv-00630
EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647

Deposition, 119:20 - 120:9). In fact, to the extent one can understand the phrase "interface glue code" which Dr. Mowry appears to have created, he seems to be asserting that the onCreateContextMenu() methods are merely an interface to some other server.  However, the onCreateContextMenu() methods themselves create the Intent objects and specify the "action" and "data" parameters of those Intent objects that Dr. Mowry relies upon as part of the accused linking operation. (Mowry Decl., Paras. 71-72). Thus, it is not correct that the onCreateContextMenu() methods (which are not separate from the client, nor do they operate as server routines) are "interface glue code"; they are fundamental parts of the accused linking process.

95.     I also note that Dr. Mowry's opinion that a shared library would be considered a "server routine" is inconsistent with the lecture slides from his own course at CMU.  In fact, in these lecture slides, Dr. Mowry and his co-instructor teach that clients and servers are separate processes, where the server process receives requests from client processes and the server "manages some resource" and "provides service by manipulating resource for clients". (Mowry & Rowe Lecture Slides, April 4, p. 52). In this context, a "process" is "an instance of a running program" with its own "[p]rivate virtual address space". (Mowry & Rowe Lecture Slides, Feb 28, p. 153, emphasis added). The lecture slides continue by explaining that "[s]ervers are long-running processes (daemons)" that are "[c]reated at boot-time", "[r]un continuously until the machine is turned off", and that each "waits for requests to arrive" from client processes. ". (Mowry & Rowe Lecture Slides, April 4, p. 8).  This understanding is consistent with how a person of ordinary skill in the art would have understood the client-server relationship at the time

---

[2] Lecture slides for 21st lecture, April 4, 2012, downloaded from: http://www.cs.cmu.edu/~213/lectures/21-network-programming-1up.pdf, Exhibit P.

[3] Lecture slides for 13th lecture, Feb. 28, 2012, downloaded from: http://www.cs.cmu.edu/~213/lectures/13-exceptions-1up.pdf, Exhibit O.

of the '647 patent and today.  It is inconsistent with the way shared libraries work, where a shared library is "loaded and linked into an application" during execution. (Mowry & Rowe Lecture Slides, Feb 23, p. 364).

96.     In his deposition, Dr. Mowry asserts that the server routine receives data having structures from the client by sending a note parameter to the BuildFrame() method, and that this method is separate from the server. (Mowry Deposition, pp. 120, 122). I disagree. During execution, when the data is supposedly sent to the BuildFrame() method, that method is running as part of the application, within the application's process. Therefore, the data is never sent from a client to a separate server routine, since the data never leaves the client application's process.

## 2.     The Samsung Galaxy Nexus does not satisfy the "linking actions to the detected structures" limitation

97.     The ITC construction of "linking actions to the detected structures" is "linking detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are linked." The Posner construction is "creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on that detected structure." The Galaxy Nexus does not infringe under either construction.

98.     The ITC construction of "linking actions" requires detected structures to be linked to computer subroutines. Dr. Mowry does not identify a single instance of a subroutine that is actually linked to a detected structure. He cannot do so, as Android does not link subroutines to detected structures.  Instead, Dr. Mowry appears to accuse the Galaxy Nexus of linking to abstract descriptions of actions (e.g., Intent objects). As I explain below, Intent objects are not themselves subroutines, nor do they specify or refer to any subroutines. Furthermore, the

---

[4] Lecture slides for 12th lecture, Feb. 23, 2012, downloaded from http://www.cs.cmu.edu/~213/lectures/12-linking-1up.pdf, Exhibit N.

subroutines identified by Dr. Mowry in paragraph 70 of his declaration are those that allegedly perform the linking step, and thus cannot also be the linked actions.  For example, in paragraphs 71-73 of his declaration, Dr. Mowry opines only that these subroutines (e.g., onCreateContextMenu() and setIntent()) perform the linking step by creating Intent objects and adding them to a context menu.

99.     Judge Posner's construction of "linking actions to detected structures" requires a "specified connection" to a "computer subroutine."  In his claim construction order, Judge Posner specifically rejected Apple's proposed construction of "associating detected structures to computer subroutines..." (Exhibit K at 10, emphasis added), making it even clearer that an actual specified connection must be explicitly created.

100.     Dr. Mowry has not identified what element of Android he believes meets the claim limitation of an "action." However, he does spend the majority of his section on this claim element discussing "Intents." As I describe below, Intents cannot satisfy the claim element "actions." Under either construction, actions must be "computer subroutines that cause the CPU to perform a sequence of operations."[5]

101.     Dr. Mowry admits that an Intent is an object (which is not a subroutine) and is a "description of an operation to be performed."  I note that his selective quotation from the Android Developers Reference for Intent is highly misleading.  The complete quote is "An intent is an *abstract* description of an operation to be performed." (Android Developers Reference – Intent, emphasis added). It continues, later: "It is basically a passive data structure holding an abstract description of an action to be performed." (id.) Dr. Mowry tries to make much of the fact that the Android documentation on Intents use the word "action" to refer to a string that

---

[5]     The ITC construction states that the subroutines operate on "the particular structures to which they are linked," while the Posner construction states that they operate on "that detected structure." I do not consider that difference significant.

02198.

describes an abstract action. However, under either construction, an "action" in the context of the '647 Patent cannot merely be an abstract description of an operation to be performed held in a "passive data structure," but must be an actual computer subroutine.[6]   A computer subroutine that performs the operation of sending an email is very different than the abstract idea of "send an email".

102.    These arguments all apply to the general use of Intents. However, the particular Intents called out by Dr. Mowry fail to be actions as properly construed for an even more fundamental reason; they do not specify which class is to receive the Intent, which means that they do not refer to specific subroutines. The Android Developers Reference states:

> There are two primary forms of intents you will use.
>
> ⚔    **Explicit Intents** have specified a component (via setComponent(ComponentName) or setClass(Context, Class)), which provides the exact class to be run. Often these will not include any other information, simply being a way for an application to launch various internal activities it has as the user interacts with the application.
>
> ⚔    **Implicit Intents** have not specified a component; instead, they must include enough information for the system to determine which of the available components is best to run for that intent." (id.)

103.    All of the Intents that Dr. Mowry identifies in his discussion of the "actions" limitation are "implicit" intents.  There is no call to setComponent or setClass in the code that Dr. Mowry has identified. Since these implicit Intents do not specify a component, they cannot specify a subroutine. All the implicit Intents do is provide an abstract description of an operation. This is not enough information for the system to determine which code may ultimately execute; it must rely on additional information such as application properties and user preferences. That is, an implicit Intent (of the type described by Dr. Mowry) is insufficient to identify a particular

---

[6]    It is my understanding that the applications explicitly disclaimed the claim scope of pointing to "an informational data structure." (See '647 file history, Mar. 15, 1999 Amendment at 9).

subroutine.   In fact, Android can create implicit Intents which cannot be handled by any subroutine on the device. Moreover, after the accused "linking" has occurred, a user can change application preferences, or even install a new application with the ability to handle a specific type of implicit Intent, thus changing the software component which may eventually execute without changing the accused "link".   These examples demonstrate that a specific subroutine is not identified at the time an implicit Intent object is created, but rather only at a later time when that Intent object is evaluated (e.g., some time after the user has selected an option from the context menu).

104.   Dr. Mowry also mentions the Android method "startActivity()" in passing in this section.   It is not clear whether, in his declaration, he intended to identify "startActivity()" as satisfying the claim element of "action." If so, however, startActivity cannot satisfy the claim element under either construction.   First, startActivity() is explicitly identified by Dr. Mowry as being the "action processor" of the claim.   It is nonsensical for a single subroutine to be both the action and the action processor that executes that action. Second, nothing in the accused functionality that Dr. Mowry identifies as the analyzer server actually links detected structures to startActivity. If startActivity is called, it is only because the underlying Android code already has invocations to it, long before any data is ever analyzed (or, indeed, received) by the device. Finally, under Judge Posner's construction, there is no specified connection to startActivity.   In his deposition, Dr. Mowry states that the code for a Context Menu "will necessarily call" the Invoke() method and the startActivity() method, and thus the code he calls the analyzer server has created a specified connection to startActivity() at the time of linking. His conclusion is a non sequitur. Even if it were true that the Context Menu "will necessarily call" startActivity(), that does not in any way demonstrate that there is a specified connection from the detected structure to StartActivity(). Indeed, such language argues that it is, at best, implicit, rather than

02198.

1    specified. Furthermore, the invocation of startActivity only happens *after* the user selects a menu

2    option, and thus this describes behavior of startActivity() as the action processor.

3        105.    The Posner construction also requires that "each" detected structure is linked to at

4    least one computer subroutine. However, as Dr. Mowry's analysis makes it clear, this does not

5    happen in Android. "The onCreateContextMenu() method in the BrowserActivity class is called

6    *after the user has selected a detected structure...*" (Mowry Decl., Para. 71). That is, the alleged

7    step of linking detected structures to actions does not happen for each detected structure, as is

8    required by the Posner construction; it only happens for those structures that are selected.

9

10       106.    In their review of the Initial Determination of the 337-TA-710 case, the

11   Commission found that the link from the detected structure to the action "must exist prior to the

12   user interface's enablement of selection because the user interface enables selection of a "linked

13   action," i.e., an action that has already been linked." (Commission, p. 29).  This requirement is

14   not met by the Galaxy Nexus.  In Dr. Mowry's only purported example of linking actions to

15   detected structures, he explicitly admits that such linking happens in response to a user selection

16   of a detected structure. ("The onCreateContextMenu() method in the BrowserActivity class is

17   called *after the user has selected a detected structure...*" Mowry Decl., Para. 71, *emphasis*

18   *added*).  Since of course the enabling selection step must have already occurred at that time, this

19   example could not meet the requirement that the link exist prior to the user interface's

20   enablement of selection.

21

22       107.    Dr. Mowry's logic fails for another reason, as well. The Context Menu that he

23   identifies as linking to the actions is not itself something that the detected structure is linked to.

24   The claim language – under any construction – requires that the detected structure be linked to

25   the actions; it is not sufficient merely to identify an arbitrary link to the actions, as Dr. Mowry

26   has done. Even accepting all of his other positions, the Context Menu is not the detected

27

28

structure, and so any alleged links within it to alleged actions still cannot satisfy the claim. The detected structure is unaware of the Context Menu, remains unlinked to it, and has no relationship to the Context Menu other than the user interface copied the value during the process of creating the menu.

108.    Dr. Mowry identifies three types of structures that can be detected: Addresses, Email addresses, and phone numbers. However, the Galaxy Nexus only offers a single option (aside from "select" or "copy", which as I wrote above, were not considered linking actions by the inventors) for each of addresses ("map") and email addresses ("send email"). To the extent that either construction is understood as requiring more than one action for a particular detected structure, neither addresses nor emails satisfies this requirement. And to the extent that different types of structures need to be detected and linked to multiple actions, the Galaxy Nexus does not perform this, as the only type of detected structure that Dr. Mowry has identified that offers multiple options is a phone number.

109.    For at least all of the above reasons, the Galaxy Nexus does not satisfy the claim limitations of "an analyzer server" and "linking actions to the detected structures" and thus does not infringe either independent claim 1 or dependent claim 8.

**3.     The Samsung Galaxy Nexus does not contain "a user interface enabling the selection of a detected structure and a linked action"**

110.    Dr. Mowry points at the CacheBuilder class as meeting this claim element.  Yet Dr. Mowry also identified CacheBuilder as a portion of what makes up the "analyzer server" in his opinion.  To the extent that the analyzer server and the user interface must be separate, CacheBuilder cannot be a user interface enabling the selection of a detected structure and a linked action.

111.    As noted above, in their review of the Initial Determination of the 337-TA-710 case, the Commission found that the link from the detected structure to the action "must exist prior to the user interface's enablement of selection because the user interface enables selection of a "linked action," i.e., an action that has already been linked."  (Commission, p. 29).  Since even in Dr. Mowry's analysis, the user interface does not enable selection of a detected structure and an already linked action, the Galaxy Nexus does not meet this claim element.

4.    **Claim 8**

112.    Claim 8 reads "The system recited in Claim 1, wherein the user interface highlights detected structures." It is my understanding that no construction of "highlights" has been adopted in either the ITC 710 investigation or the NDIL-8540 case in Federal Court.

113.    The Galaxy Nexus does not infringe Claim 8, at least because it does not infringe Claim 1 under either set of constructions. However, even if the Galaxy Nexus were found to infringe Claim 1, it would not infringe claim 8 for the additional reasons set forth below.

114.    Dr. Mowry claims that that claim 8 is infringed by the Galaxy Nexus because a structure is highlighted when it is pressed by the user. (Mowry Decl., Para. 83). But Dr. Mowry's photograph disproves his very point; the detected structures are not highlighted; only a single selected structure is highlighted.

115.    A person of ordinary skill in the art would understand the phrase "the user interface highlights detected structures" to refer to the fact that those structures that are detected are highlighted before the selection of a detected structure by a user.  This is implied, at the very least, by the plain language of the claim which refers to structures rather than a single structure. Furthermore, the specification of the patent is consistent that highlighting applies to all detected structures, and happens before user input. Fig. 6 shows every detected structure highlighted, as explained in the specification: "FIG. 6 illustrates a window with the identified structures in the

example document of FIG. 5 highlighted based on the analyzer server of FIG. 4."  (Col. 3:8-10.)

"Application program interface 230 then transmits this location information to user interface 240, which highlights the detected structures, although other presentation mechanisms can be used. User interface 240 enables selection of an identified structure by making the presentation regions mouse-sensitive, i.e. aware when a mouse event such as a mouse-down operation is performed while the cursor is over the region."  (Col. 4:8-15.)  "User interface 240 then highlights the identified structures in document 210, and makes the identified structures mouse-sensitive.  (Col. 5:35-37.)   Fig 9 shows a "request for display of linked actions" (step 920), which the specification indicates is satisfied by highlighting: "Referring also to FIG. 9, when a request for the display of detected structures is received 860, the regions are displayed 910 using presentation mechanisms such as highlighting the presentation region around each detected structure…."  (Col. 6:9-12.)  Fig. 9 shows that "action selected" happens after that step.  The value of highlighting in the '647 Patent is that it indicates to the user that there are available actions to perform on that detected structure.  If the highlighting only happened after the user has selected an item, then it could not serve its purpose of suggesting such a selection to the user. (*See also* col. 1:19-21.)

116.    For all these reasons, I conclude that the Galaxy Nexus does not infringe claim 8.

## V.    CLAIMS 1 AND 8 OF THE '647 PATENT ARE INVALID

117.    Claims 1 and 8 of the '647 Patent are anticipated and/or rendered obvious by a variety of references.  By February 1, 1996, the application date of the '647 patent, nothing disclosed in the patent was new.  As described in more detail below and in the attached claim charts, detecting structures and linking actions to detected structures were well known in computer programming, and it would have been routine for persons of ordinary skill in the art to

use known methods to detect structures, link actions to those structures, and provide a way to perform the action.

## A. CLAIMS 1 AND 8 ARE ANTICIPATED BY SIDEKICK

118.    Sidekick was a software utility sold in the United States by Borland International beginning in 1983; by 1985, when it introduced a Macintosh version, it had sold at least 400,000 copies.[7]  It was, as the name implies, a utility that ran alongside the user's main application program.  It ran in "Terminate and Stay Resident" ("TSR") mode, which allowed it to continue to run (or be available to run) despite returning control to the main application program. TSRs were reached from the application program through an interrupt that pointed to an "interrupt service routine."[8]

119.    My analysis of the Sidekick system is based on the Sidekick 1.5 Owner's Handbook, 1985 by Borland International ("Handbook"), Exhibit GG, as well as observing the functionality of the original program running on a computer with Windows version 3.1.  The bases for my opinions are summarized below and are set forth in greater detail in the claim chart attached as Exhibit D.

120.    It is my opinion that Sidekick, in particular the Dialer feature, anticipates or renders obvious Claims 1 and 8 of the '647 Patent.  Sidekick, as disclosed in the 1985 Handbook, included all of the limitations of claims 1 and 8 of the '647 patent.

121.    "**A computer-based system for detecting structures in data and performing actions on detected structures**:"  To the extent that the preamble is limiting, Sidekick was a computer-based system for detecting structures in data and performing actions on detected

---

[7]     "Borland Introduces Macintosh Sidekick," InfoWorld Sep 9, 1985, available at http://books.google.com/books?id=eS8EAAAAMBAJ&pg=PA27#v=onepage&q&f=false

[8]     Generally, see http://en.wikipedia.org/wiki/Terminate_and_Stay_Resident for a discussion of this technology.

structures. The Handbook describes that Sidekick is "Software for your IBM PC, XT, AT, jr. and true compatibles."  Handbook, Front Cover. Sidekick detected structures in data and performed actions on those detected structures, as described further below.

122.  "**An input device for receiving data**"  Sidekick contained an input device for receiving data. IBM PC computers had keyboards for entering user data. The Handbook indicates that use of the Dialer required a modem. "The Dialer turns your computer into an automatic dialer provided that you have a modem connected to your computer."  Handbook, p. 29. Modems were used to connect to other computers through a phone connection and sending data to and receiving data from those computers.

123.  "**An output device for presenting the data**"  As described above, Sidekick ran on IBM PC computers, which had monitors. Sidekick in particular would present data on the monitor:

> These are the things you should know about your computer when you install Sidekick:
>
> **Which monitor adapter(s) are installed?**
> Monochrome Monitor Adapter
> Color Monitor Adapter
> Both Monitor Adapters
>
> **What is your default display mode?**
> Monochrome display
> Color display 80x25
> B/W display 80x25
>
> **Which asynchronous communications port does your modem use?**
> COM1
> COM2

Handbook, p. 94

02198.

124.   "**A memory storing information including program routines**:"  Sidekick ran on IBM PC computers as described above, which inherently would have had memory. Sidekick's program routines were stored in that memory:

> Sidekick is a *resident program*, which means that it is loaded into memory and stays there until you switch off the computer. Sidekick is therefore running even while you run other programs such as a word processor or a spreadsheet.

Handbook, p. 8

125.   "**An analyzer server for detecting structures in the data, and for linking actions to the detected structures**:"  Sidekick included an analyzer server under either construction.  Judge Posner construed "analyzer server" as "a server routine separate from a client that receives data having structures from the client."  The ITC construction of analyzer server was "a program subroutine that receives data from a document having recognizable structures, and uses patterns to detect the structures."

126.   Sidekick is a program routine that is a separate routine from the client (that is, the application that is running).

> Sidekick is a lot of things, but first and foremost **it is always there when you need it**. That's because it is right there in your computer's memory all the time until you turn the power off or reset your machine. No matter which other program you are using - word processor, data base, spreadsheet, TURBO Pascal, BASIC, or whatever - Sidekick is always present 'underneath' it and may be activated immediately with a single keystroke. What's more: your other program continues as if nothing happened when you return from Sidekick.

Handbook, p. 1.

127.   The analyzer server in Sidekick detects structures.  Sidekick receives data from a document having recognizable structures. When invoked, the Dialer routine receives data from the document in the current application, and recognizes phone numbers according to their structure.

## Dialer

The Dialer turns your computer into an automatic dialer provided that you have a modem connected to your computer. It must be a Hayes modem or compatible, or a PcJr modem on the IBM PC jr. The VOAD Keyboard Phone is also supported.

*'My communications package does the same thing'* you might say. Sure, but does it do it while you are in the middle of your database, word processor, spreadsheet, or BASIC? Or does it pick phone numbers from any other program and dial them for you? Since we know the answers, we know you will use the Sidekick Dialer a lot.

Before using the Dialer, you must tell Sidekick which communications port your modem is on. This is done with the installation program SKINST, see page 99 .

With Sidekick's main selection window on the screen, press [Alt][D] (or [D] or [F5] , if you prefer) to activate the Dialer. The first phone number on the screen is pointed out, and you can make the call by pressing [↵].

Handbook p. 29.

A telephone number is unique because it contains certain special characters. The default setup assumes either a left or right parenthesis and/or a hyphen, but this may be changed by the Dialer installation. Further, telephone numbers must not contain commas, periods, slashes, or other characters which are used in dates, amounts, and other numeric information.

Handbook, p. 75

128.    It is my understanding that the parties do not have possession of the source code for Sidekick. To the extent that Sidekick does not satisfy the "linking actions to the detected structures" limitation under Judge Posner's construction, it would have been obvious to a person of ordinary skill in the art to modify it to do so.  Judge Posner construed "linking actions to the detected structures" as "creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on that detected structure."  Dialer recognized multiple instances of phone numbers in the data. For each detected phone number, it provided a user action. As detailed below in my report, the use of

function pointers to implement user actions in a menu was a standard technique known to people of ordinary skill in the art, and it would have been obvious to use this well-known technique in Sidekick.

129. The ITC construction of  "linking actions to the detected structures" as "linking detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are linked."  To the extent that either construction requires either multiple types of structures or linking multiple actions to detected structures, it would have been obvious to a person of ordinary skill in 1996 to detect additional types of structures and/or to link multiple actions to the detected structures.  Adding either detection of other types of structures or linking of additional actions to detected structures would have required nothing more than the combination of methods that were known in the art to achieve a predictable result.

130. "**A user interface enabling the selection of a detected structure and a linked action**:"  Sidekick had program routines including a user interface that enabled the selection of a detected structure and a linked action:

> Sidekick "knows" a phone number, because it must contain special characters. These are usually parentheses or hyphens, but you can choose other characters with the installation program.
>
> To make things very clear: in order to distinguish a phone number from dates, amounts, and other numeric information, the phone number must not contain commas, periods, or slashes.
>
> If you have more than one number on the screen that looks like a phone number, the first one will be chosen. You can then move to the next one by pressing ⊡. If you don't want to dial the number on the screen, but use the Dialer's own phone directory, you just press the space bar.
>
> If the Dialer cannot find a valid phone number on the screen, it will load its own phone directory file if it is present on your disk.

Handbook, p. 30.

EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647

02198.

131.   By pressing the right arrow key, the user can select the detected structure. By pressing enter, the user selects the linked action for "Dial."



Sidekick, screenshot.

132.   "**An action processor for performing the selected action linked to the selected structure**:"  This element is inherent in Sidekick because, considering that the selected action was performed, it necessarily contained an element that performed the selected action.

133.   "**A processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines**:"  Sidekick ran on IBM PC computers. A processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines would necessarily have been present.

134.   Dependent claim 8 claims **"[t]he system recited in Claim 1, wherein the user interface highlights detected structures**."  As shown in the above screen shot, the user interface highlights detected phone numbers.

### B.     CLAIMS 1 AND 8 OF THE '647 ARE ANTICIPATED OR RENDERED OBVIOUS BY NEWTON

135.   In my opinion, the *Newton Programmer's Guide* discloses each and every limitation of claims 1 and 8 of the '647 patent under both the ITC and Posner claim constructions.  I understand that the *Newton Programmer's Guide* was a printed publication by at least 1994.

🍎 Apple Computer, Inc.
© 1993, 1994, Apple Computer, Inc.
All rights reserved.

(*See Newton Programmer's Guide*).  The Newton operating system was offered on products sold by Apple, Inc.

136.   Similar to Perspective, Newton devices were handheld products designed to operate as personal digital assistants ("PDAs").  Generally, PDAs are portable, handheld computers, sometime including a touch screen, that act as personal organizers.  Among its many features, the Newton features the Intelligent Assistant, which recognized words input by the user and presented possible actions for the user to take based on the detected word.  The Assistant knows how to complete several built-in tasks, and can access data from any application. (*Newton Programmer's Guide* at 1-9 – 1-10.)

137.   "**A computer-based system for detecting structures in data and performing actions on detected structures, comprising:**"  I understand that this element of claim 1 is called the "preamble."  As discussed above, I also understand that the preamble of a patent claim may or may not be limiting depending on certain legal principles as well as the court's construction of the claim.  understand that the court determines whether or not the preamble is limiting.  I further understand that Apple has argued in previous litigations in which this claim was asserted that the

02198.

preamble is not limiting.   In any event, as set forth below, it is my opinion that Newton

Programmer's Guide discloses the language set forth in the preamble.

138.   *Newton Programmer's Guide* discloses a computer-based system for detecting

structures in data and performing actions on detected structures.   Newton Programmer's Guide

describes the Newton as having a "sophisticated multiple-recognizer architecture" that can

recognize text, in addition to gestures and shapes.   (*Id.* at 1-8.)   "Intelligent Assistant", which

deduces the task a user is performing and provides assistance to a user.   *Newton Programmer's*

*Guide* describes this functionality:

## Intelligent Assistant

A key part of the Newton information architecture is the Intelligent
Assistant. The Intelligent Assistant is a system service that attempts to
complete actions for the user according to deductions it makes about the task
that the user is currently performing. The Assistant is always instantly
available to the user through the Assist button, yet remains non-intrusive.

The Assistant knows how to complete several built-in tasks; they are
Scheduling (adding meetings), Finding, Reminding (adding Todo items),
Mailing, Faxing, Printing, Calling, and getting time information from the
Time Zones map. Each of these tasks has several synonyms; for example, the
user can write "call," "phone," "ring," or "dial" to make a phone call.

Applications can add new tasks so that the Assistant supports their special
capabilities and services. The Newton unified data model makes it possible
for the Assistant to access data stored by any application, thus allowing the
Assistant to be well-integrated in the system.

(*Id.* at 1-9 – 1-10.)

139.   "**An input device for receiving data:**"   *Newton Programmer's Guide* discloses

an input device for receiving data.   The Newton is designed to use a handwriting recognition

system, for use with an electronic ink display.   (*Id.* at 1-3.)   The Newton can also display an on-

EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647

02198.

screen virtual keyboard. (*Id.* at 4-21.) The *Newton Programmer's Guide* describes this functionality:

> Most recognition events are handled automatically by the system view classes so you don't need to do anything in your application to handle recognition events unless you want to do something special. For example, when a user writes a word in a `clParagraphView`, that view automatically passes the strokes to the recognizer, accepts the recognized word back, and displays the word. In addition, the view automatically handles correction for you. (The user can double-tap on a word to get a list of the top five recognition matches for it, or to use the keyboard to correct it.)

(*Id.* at 6-2.)

## Keyboard View (clKeyboardView)

The `clKeyboardView` class is used to display keyboard-like arrays of buttons that can be pressed (tapped with the pen) to perform an action. Here is an example:



(*Id.* at 4-21.)

140. "**An output device for presenting the data:**" *Newton Programmer's Guide* discloses an output device for presenting the data. The Newton uses a system of "Views" that map applications to a screen. (*Id.* at 1-7.) The *Newton Programmer's Guide* describes this functionality:

02198.

## View System

**Views** are the basic building blocks of most applications. A view is simply a rectangular area mapped onto the screen. Nearly every individual visual item you see on the screen is a view. Views display information to the user in the form of text and graphics, and the user interacts with views by tapping on them, writing in them, dragging them, and so on. A view is defined by a frame that contains slots specifying view attributes such as its bounds, fill color, alignment relative to other views, and so on.

The view system comprises that part of the system that you work with to manipulate views. There are routines to open, close, animate, scroll, highlight, and lay out views, to name just a few of the kinds of things you can do. Refer to the chapter "Views" for basic information about views and descriptions of all the routines you can use to interact with the view system.

(*Id.*)

141.   **"A memory storing information including program routines including:"** *Newton Programmer's Guide* discloses a memory storing information including program routines.  Newton devices store data in an object called a "frame".  (*Id.* at 7-1 – 7-2.)  A frame is broken down into "slots", which store individual data records.  (*Id.*)  This is a memory, which includes the running programs, such as the Intelligent Assistant.  The *Newton Programmer's Guide* describes this functionality:

The basis of data storage on the Newton is an object called the **frame.** Like a database record, a frame stores data items. Frames are dynamic; in other words, they can grow and shrink as necessary. Thus the frame offers an extremely flexible and efficient means of storing data.

Individual data items in the frame are stored in **slots,** which may be thought of as the fields of the database record. Slots can store data directly, using predefined data types to represent strings, numeric formats, arrays, and binary objects. These system-supplied data types, in conjunction with the frames-based data storage model, allow Newton applications to share data directly. A single slot can store items of dissimilar data types.

(Id.)

EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647

142.   **"An analyzer server for detecting structures in the data, and for linking actions to the detected structures:"**   The *Newton Programmer's Guide* discloses an analyzer server for detecting structures in the data, and for linking actions to the detected structures under either construction.  Judge Posner construed "analyzer server" as "a server routine separate from a client that receives data having structures from the client."  The ITC construction of analyzer server was "a program subroutine that receives data from a document having recognizable structures, and uses patterns to detect the structures."

143.   Newton Programmer's Guide discloses an analyzer server as part of an "Intelligent Assistant" system service.  This service is always running, so that it is instantly available to the user.  The Assistant attempts to complete actions for a user based on deductions about the task the user is currently performing.  (*Id.* at 11-1 – 11-2)

144.   The Assistant detects structures in the data input by the user.  When a user requests assistance, the Assistant parses the phrase that the user entered on the Newton screen, creates associated data structures, and matches the parsed "action frames" to task templates, to identify the correct action.  (*Id.* at 11-8)  For example, after detecting the words "Call" and "Bob," the Newton Intelligent Assistant would present a menu of actions that could be taken on the phone number associated with "Bob," including dialing the number as well as other "options."  The screen shot of the a Newton MessagePad 110 shows the choices "options" and "call."

EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647



(Screenshot from the MessagePad 110)

145.    Similarly, upon receiving the input "Fax Bob," the Newton Intelligent Assist would present a menu of actions that could be taken on the phone number associated with "Bob," including "preview" "notes" "options" and "fax."

(Screenshot from the MessagePad 110)

146.    Greg Christie, an Apple employee who was manager of the Newton applications team at Apple, confirmed that Newton Assist detected structures and linked actions to those detected structures.  For example, Mr. Christie testified that:

> 10 So in the address book application, if
>
> 11 the user was typing a phone number and then
>
> 12 tapped on the assist icon --
>
> 13 A. Mm-hmm.
>
> 14 Q. -- what would happen next?
>
> 15 A. Well, the same basic thing that I just

EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647

1      16 described, a slip would appear on the screen and

2      17 there the range of choices, I think, in that case

3      18 would have been "call" or "fax," this being the

4      19 1990s when faxing was pretty hot stuff.

5  (Christie Depo. at 34:10-19; *see also* Christie Depo. at 36:1-41:23.)  The *Newton Programmer's*

6  *Guide* describes this functionality:

7
8      The Intelligent Assistant (IA) is a system service that attempts to complete
       actions for the user according to deductions it makes about the task that the
9      user is currently performing. The Assistant is always instantly available to
       the user, yet remains non-intrusive. It can be thought of as an alternate
10     interface to Newton that allows the user to invoke services fluidly, according
       to current context.

11     The Assistant knows how to complete several built-in tasks; they are
12     Scheduling (adding meetings), Finding, Reminding (adding Todo items),
       Mailing, Faxing, Printing, Calling, and getting time information from the
13     WorldClock.

14     This chapter describes how you can add IA support to your application. It
       discusses the capabilities and limitations of the Assistant, summarizes the IA
15     architecture, and dissects a typical code example. The chapter concludes with
       a summary list of steps one must take to implement IA support in a Newton
16     application.

17
18     When the user taps the Assist button, the Assistant attempts to complete a
       task specified by the user. If the Assistant does not have sufficient informa-
19     tion to complete an action, it attempts to fill in the missing information
       according to deductions it makes using the current context. If necessary, the
20     Assistant prompts the user to clarify ambiguities by choosing items from the
       Assist pop-up menu or by writing one of several synonyms that the Assistant
21     understands. For example, the Assistant invokes the Find task if the user
22     writes any of these phrases: "find", "find it", "locate", or "locate it".

23  (*Newton Programmer's Guide* at 11-1 – 11-2.)

24     147.    The ITC construed "analyzer server" as "A program subroutine that receives data

25  from a document having recognizable structures, and uses patterns to detect the structures."

26  *Newton Programmer's Guide* includes an analyzer server under this construction.  As explained

27  above, the Newton includes software (i.e., program routines) that receive data entered by a user.

The Assistant then uses patterns, such as context, to detect structures in the data.  Thus, *Newton Programmer's Guide* discloses an analyzer server under the ITC construction, because *Newton Programmer's Guide* includes a "program subroutine that receives data from a document having recognizable structures, and uses patterns to detect the structures."

148.   Judge Posner construed "analyzer server" as "a server routine separate from a client that receives data having structures from the client."  *Newton Programmer's Guide* discloses an analyzer server under this construction as well.  The Assist functionality of Newton was separate from the client applications.  Mr. Christie testified that Newton was a "system-level function" and that it was available to multiple applications.  (*See* Christie Depo. at 22:10-14; 26:15-28:1.)  Thus, *Newton Programmer's Guide* discloses an analyzer server under the Posner construction, because *Newton Programmer's Guide* discloses "a server routine separate from a client that receives data having structures from the client."

149.   The ITC construed "linking actions to the detected structures" as "linking detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are linked."  *Newton Programmer's Guide* discloses linking actions to the detected structures under this construction.  As discussed above, detected structures are linked to computer subroutines through built-in tasks.  Those subroutines perform an operation on the particular structures, for example "call", "phone", "ring", or "dial".  (*Newton Programmer's Guide* at 1-9 – 1-10.)  Thus, *Newton Programmer's Guide* discloses "linking actions to the detected structures" under the ITC construction, because *Newton Programmer's Guide* describes "linking detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are linked."

150.   Judge Posner construed "linking actions to the detected structures" as "creating a specified connection between each detected structure and at least one computer subroutine that

causes the CPU to perform a sequence of operations on that detected structure."  *Newton Programmer's Guide* discloses linking actions to the detected structures under this construction as well.  The Assistant can perform several built-in tasks, such as mailing, faxing, printing, or calling.  (*Id.*)  These tasks are matched to a specific action through parsing the phrase the user entered, as described above  (*Id.* at 11-8.)  A specified connection is created by matching an action frame with a primary action slot in a task template registered by the Assistant.  (*See id.*)  Thus, *Newton Programmer's Guide* discloses "linking actions to the detected structures" under the Posner construction, because *Newton Programmer's Guide* describes "linking actions to the detected structures" as "creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on that detected structure."

151.   **"A user interface enabling the selection of a detected structure and a linked action:"**  The *Newton* Programmer's *Guide* discloses a user interface enabling the selection of a detected structure and a linked action.  *Newton Programmer's Guide* describes that the user can invoke the Assistant through an Assist button.  Pressing the Assist button causes the Assistant to resolve the phrase the user had entered, resulting in an action.  (*Id.* at 11-1 – 11-2.)  *Newton Programmer's Guide* describes this functionality:

> Depending on the amount of information the user has provided at the time the Assistant is invoked, a variety of scenarios may be played out. This section describes how the Assistant reacts in various situations.
>
> When the user taps the Assist button, Newton passes the current selection to the Assistant, which attempts to determine what the user wants to do. If the user has fully specified the actions Newton is to perform, the Assistant either completes the task or displays an optional task slip before taking further action. A sample task slip is shown in Figure 11-2.
>
> The task slip is one means by which the Assistant resolves ambiguity—for example, the user can correct the task slip if the Assistant chooses the wrong Bob from the Names soup, or the user can write Bob's fax number on the slip

(*Id.*)

EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647

02198.

152.    **"An action processor for performing the selected action linked to the selected structure:"**  The *Newton Programmer's Guide* discloses an action processor for performing the selected action linked to the selected structure.  As discussed above, the action processor is software that is invoked to handle the user's selected action.  In a Newton device, the action processor is invoked by the Intelligent Assistant.  (*Id.* at 11-1.)

153.    **"A processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines:"**  *Newton Programmer's Guide* discloses a processing unit coupled to the input device, the output device and the memory for controlling the execution of the program routines.  Newton devices, as described in *Newton Programmer's Guide*, contained a processing unit and a memory by definition.  A Newton device has a touch screen display coupled to the processing unit and memory.

154.    **"The system recited in claim 1, wherein the user interface highlights detected structures:"**  *Newton Programmer's Guide* discloses the system recited in claim 1, wherein the user interface highlights detected structures.  *Newton Programmer's Guide* discloses a post parse method for structures that were not detected automatically.  The Newton parses sentences for context, and then displays a "task slip view" that provides a user with an opportunity to confirm, modify, or dismiss the matched action.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## The Postparse Method

After the Assistant has stored all of the objects that were created when matching object types specified in the signature array of the task template, it invokes the postparse method.

The postparse method commonly acts as a dispatching method that invokes the subtasks comprising the primary action—one such subtask might be the display of a task slip view to the user. The postparse method can also perform additional parsing (surprise!) to retrieve information that the Assistant was unable to find on its own.

For example, if the user input phrase is "Call to Bob" and the word "Bob" does not match any entries in the Names soup, the target of the action "call" is still unknown to the Assistant. However, because the word "to" appears in the call action template's lexicon, the postparse method can find the word that appears after "to" in the original phrase and use it as the target of the action. Because this word, "Bob," does not currently match an existing entry in the soup, the postparse method uses this information to fill out a task slip rather than to actually call Bob. After the user supplies the information missing from the task slip, the postparse method takes care of actually performing the primary action specified in the task frame.

**IMPORTANT**
Once your postparse method is invoked, it is in complete control of Newton. This means that your postparse method must include any code necessary to complete the primary action, such as that required to display a task slip, validate input, and handle errors. ▲

(*Id.* at 11-23)

## The postparse Slot

The postparse slot stores a reference to an action template that is invoked after the Assistant parses the user input. Frequently, the task template's primary action is actually invoked by a postparse method—for example, if the user asks to "fax Bob" and Newton cannot do so until the Assistant has retrieved Bob's fax number, the primary action of sending the fax would correctly be invoked after the parseUtter function returns the task frame.

Another common use for the postparse method is to display a task slip view that provides the user with an opportunity to confirm, modify or dismiss the primary action before it is executed.

(*Id.* at 11-19)

C.    **CLAIMS 1 AND 8 ARE ANTICIPATED OR RENDERED OBVIOUS BY PENSOFT PERSPECTIVE**

155.    In my opinion, Perspective discloses each and every limitation of claims 1 and 8 of the '647 patent under both the ITC and Posner claim constructions.  I understand that the Perspective software (both Personal Perspective and Perspective Business Edition), PenPoint operating system software, and AT&T EO Personal Communicator models 440 and 880, which ran both pieces of software, were in public use, sold, and offered for sale in 1993. My understanding is based on conversations with, and the declaration of, Michael Schaffer.  Michael Schaffer was one of the principal authors of the Perspective source code.

156.    As I discussed above, it is my understanding that the public use, sale, or offer for sale of a prior art device or system may anticipate the claims of a patent.  I also understand that when a system anticipates a patent because it was used by others before the invention of the patent, or because it was in public use more than one year prior to the date of the application for patent, multiple references may be used to understand the functions and features of the system.

157.    It is my opinion that Perspective, as described in PENSOFT CORPORATION, PERSPECTIVE HANDBOOK (1992) ("*Handbook*"), attached as Exhibit Q, Lookup Guide To the EO Personal Communicator (1992, 1993) ("*Lookup Guide*"), attached as Exhibit R, AT&T EO Travel Guide ("*EO Travel Guide*"), attached as Exhibit S, and the source code for the Perspective software (both Personal Perspective and Perspective Business Edition), attached as Exhibits T-FF, describes each and every limitation of claims 1 and 8 of the '647 patent, under both the ITC and Posner claim constructions for the disputed terms/phrases, and therefore the public use, sale, or offer for sale of Perspective anticipates those claims.

158.    Dr. Mowry asserts in his declaration that the validity of Claims 1 and 8 of the '647 Patent was upheld by ALJ Charneski and the Commission.  He does not mention, however, that

EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647

the Commission found that Pensoft Perspective anticipated claims 15 and 19.  The Commission based its analysis of Claim 1 on an interpretation of the claim limitation of "linking actions to the detected structures" that requires that each detected structure link to more than one action.  Since it additionally found that HTC had not presented evidence that Perspective met the construction under that understanding, they found that Perspective did not invalidate claims 1 and 8.  Judge Posner's construction for "linking actions to the detected structures" -- "creating a specified connection between each detected structure and *at least one computer subroutine* that causes the CPU to perform a sequence of operations on that detected structure" (emphasis added) explicitly rejects the basis for the Commission's finding of non-anticipation.  Thus, under the Posner construction Perspective anticipated claims 1 and 8, in addition to 15 and 19.

159.    I understand that the *Handbook* was before the examiner during the reexamination of the '647 patent.  However, I also understand that the examiner did not have the device itself or the source code in front of him during the reexamination.  I have examined the source code of Perspective, and it is my opinion that Perspective anticipates claims 1 and 8 under both the ITC construction and the Posner construction.  The bases for my opinions are summarized below and are set forth in greater detail in the claim chart attached as Exhibit C.

160.    "**A computer-based system for detecting structures in data and performing actions on detected structures, comprising:**"  I understand that this element of claim 1 is called the "preamble."  As discussed above, I also understand that the preamble of a patent claim may or may not be limiting depending on certain legal principles as well as the court's construction of the claim.  understand that the court determines whether or not the preamble is limiting.  I further understand that Apple has argued in previous litigations in which this claim was asserted that the preamble is not limiting. In any event, as set forth below, it is my opinion that Perspective discloses the language set forth in the preamble.

02198.

161.    Perspective discloses a computer-based system for detecting structures in data and performing actions on detected structures.  Perspective includes the Perspective software, which includes multiple applications, and the computer on which Perspective was designed to operate, including those running the PenPoint operating system (e.g., the AT&T EO Personal Communicator Model 440 and 880).  Perspective allows users to enter text strings using a pen and display screen.  In Perspective, the Associate software program analyzes the data input by the user for recognizable structures such as contact names.

162.    The documentation describes this functionality:

> The Associate is Personal Perspective's behind-the-scenes information linker. Whenever information is entered into linked detail items, the Associate will attempt to link the information to a corresponding item. If the Associate cannot find a corresponding item, it will ask you if you want to create a new one.
>
> The Associate links everything back to a Names Item profile. If you are scheduling a meeting with someone named Bob and enter "Bob" into an Appointment profile, the Associate will look at all of the people named Bob in your Address Book. Should you know several Bobs, the Associate will pop up a list of the different Bobs and ask which one you want linked to the Appointment item or to create a new Person profile. If the Associate can not find a profile to link, it will ask if you want to create a new one. Figure 5.6 shows the Associate asking which Bob to use while an appointment is being scheduled.
>
> After you have chosen the correct Bob, he is entered into the Appointment profile and the name Bob is displayed in bold text. Bold text indicates that the name is linked to an item in the Address Book. By double tapping ✓ on the name Bob, the Person profile for Bob will automatically open. Figure 5.7 shows the name Bob in the Appointment list with Bob's profile floating in front.

(*Travel Guide* at 5-169)

1

2

3

4

> Another aspect of the EO that differentiates it from traditional computers is how all the EO's communications capabilities are combined in a single unit. With an EO you have built-in E-mail, fax, telephone, networking, and data communications capabilities all in a single unit.
>
> Despite the differences, when talking about the EO, terms like hardware, software, RAM, ROM, and other computer terms are all going to be used. This is because the EO uses existing computer technology as its base and the features that make the EO a communicator are in addition to, not instead of, existing computer technology.
>
> This chapter looks at the physical aspects of the EO. In doing so, the EO will be described using the same terms used to describe computers. The EO's physical components (disk drives, memory, etc.) make it easy to discuss it as if it were just a computer—part of what makes the EO more than a computer is the fundamental integration of all its hardware and software.

(*Id.* at 1-2)

163.    "**An input device for receiving data:**"  Perspective discloses an input device for receiving data.  Perspective is designed to operate with products running the PenPoint operating system, such as the AT&T EO Communicator 440 or 880.  Data is received by Perspective via a display screen in combination with a pen. User input is performed by writing on the screen with a pen.

164.    The documentation describes this functionality:

> With Perspective, you can use the pen to write information on the screen just as you do with pen and paper. You can enter information anywhere in Perspective — in a document, in a profile or in a note. Your writing can be kept in your own handwriting (*ink*) or translated to printed characters (*text*). If you write in text, the Associate recognizes names and automatically files and cross-references information for you. When you enter information, it is stored in the ProfileBook so all documents can display it.

(*Handbook* at 3-27)

> Your EO Personal Communicator is easy to use, but to use it successfully you need to learn a new way of using a pen. The gestures you use on the EO represent a new "alphabet." Printing and writing by hand on the screen represent a new way of adding information. Most people need a little time to become accustomed to these new skills.

EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647

(*Lookup Guide* at 2-31)

165.   "**An output device for presenting the data:**"   Perspective discloses an output device for presenting the data.  Perspective presents data to the user on the display screen, such as the screen on the AT&T EO Communicator 440 or 880.

166.   The documentation describes this functionality.  For the EO 440:

> Display        7.5 inch diagonal, 640 X 480 pixels, 8 levels of gray, 110 dots per inch, 0.23 dot pitch, high-contrast reflective supertwist LCD. The screen response time is 250 ms and the refresh rate is 70 Hz.

(*Travel Guide* at 1-16).  And for the EO 880:

> Display        9.4 inch diagonal, 640 X 480 pixels, 8 levels of gray, 85 dots per inch, 0.30 dot pitch, transmissive backlit supertwist LCD. The screen response time is 150 ms and the refresh rate is 70 Hz.

(*Id.* at 1-19)

167.   "**A memory storing information including program routines including:**"  Perspective discloses a memory storing information including program routines.  A computer running the PenPoint operating system, like all digital computers, has a memory that contains information and program routines.  For instance, when installing software such as Perspective on a computer, program routines are stored in the memory of the computer.  As an example, an AT&T EO Personal Communicator model 880 includes 4 MB of RAM.

168.   The documentation describes this functionality.  For the EO 440:

> Internal Storage   20 megabyte internal hard drive. 2.5, 5, 10, and 20
> options               megabyte SunDisks.

(*Id.* at 1-16.)  And for the EO 880:

> Internal Storage   64 megabyte internal hard drive. 2.5, 5, 10, and 20
> options               megabyte SunDisks.

EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647

(*Id.* at 1-19.)

169.    "**An analyzer server for detecting structures in the data, and for linking actions to the detected structures:**"   Perspective discloses an analyzer server for detecting structures in the data, and for linking actions to the detected structures.  Perspective included an analyzer server under the ITC construction of that term.

170.    Judge Posner construed "analyzer server" as "a server routine separate from a client that receives data having structures from the client." Dr. Mowry seems to interpret "separate" as requiring only that the code for the routines somehow be distinguishable from the application.  (Mowry Dep. at 121:23-122:7)   Under this understanding, Perspective has an analyzer server. The "OREO" and "RECO" code is separate from the PenPoint applications, such as Daily view or Itemnb.

171.    Under a stricter definition that comported with the plain meaning of "server" to one of ordinary skill in the art, Perspective does not expressly disclose an analyzer server as that term was construed by Judge Posner, but it would have been obvious to one of ordinary skill in the art to use a separate process to implement the routines that detected structure and linked actions. Each itemnb database ran as a separate process in PenPoint (*See* PenPoint API Reference, Vol. I, pp. 19, 39-42, attached as Exhibit SS).   PenPoint offered two calling conventions: ObjCall and ObjPost. With ObjCall, the code executed in the local (calling) process; with ObjPost, the code executed in the receiving (server) process. While the Perspective programmers chose to implement their analysis/detection/linking functionality using ObjCall, it would have been obvious to select the other design choice, with the expected result that the identical code would have executed in the itemdb process rather than in the application process. Making such a change would involve only editing that single word.

172.    Perspective has an analyzer server located in the "Associate" software program, which is a tool that includes a collection of database services that are tailored to organize and manage information typically found in a database used for a Personal Information Manager ("PIM"), such as the one found in Perspective.

173.    The Associate detects structures in the data input by the user.  The Associate looks for information the user writes in text and whenever possible, creates an association between a detected structure and other items in Perspective, such as profiles.   Perspective discloses that the Associate processes strings of text input by the user to detect structures such as proper names, dates, and a set of recognized verbs.  For example, when the user enters a new appointment by writing text in the Day Planner application with the Associate turned on, the Associate will detect names and dates in the text.  Thus, a separate client application is sending data to the Associate.

174.    Upon detecting names and dates, the Associate links actions to the detected structure.  For example, when a proper name is detected and only one profile exists with the same proper name, the Associate will automatically associate the detected name with that profile.  Once the detected proper name is associated with a profile, it is highlighted in bold.  Perspective discloses that the Associate links the detected name with the action of opening the profile associated with the detected name.  When a user performs a "double tap" gesture over the bolded name, the associated profile is opened.

175.    As discussed above, once the detected proper name is associated with a profile, it is highlighted in bold.  Perspective discloses that the Associate also links the detected name with the action of opening the EO phone dialer application to make a telephone call with the number associated with the detected name, just like what the '647 specification illustrates in Figure 4.  When a user performs a "D" gesture over the bolded name, the telephone call process is initiated.

02198.

The "D" gesture initiates the phone dialer action on the linked structure by looking up the associated information in the Profilebook, finding the phone number for associated profile and bringing up the phone dialog with the option of calling the profile's phone number. The user can then call that contact by tapping "Dial" to cause the EO Phone application to dial the number. Below is a screen shot of an actual EO device showing the "Dial" choice in the darker menu button at the right.



(Screenshot from AT&T EO Personal Communicator model 440.)

176.    The documentation describes this functionality:



## Linking and the Associate

A *link* represents a relationship between two items. For example, people are employed by a company, so there is a relationship between person and company. Links tie related information together. For example, while looking at an appointment it is useful to know the phone number of the person with whom you are meeting, so you can call to confirm the meeting. Links can also track the history of all your interactions. While looking at the information for a person, you can also see a list of all the meetings with that person.

Links can be established several ways. The *Associate* is a part of Perspective that automatically establishes links by recognizing the names of people, companies, etc. you write. It looks within the ProfileBook to see if you have previously entered the name, and creates the link. You can also manually link two items. To get information from those links, you can open the profile for any linked item. Links are displayed as bold text in documents and profiles, so you can find them easily.

(*Handbook* at 1-11.)

## Notes

You can create notes in Perspective and retrieve them from several places. The Associate can automatically file the note by recognizing names you enter and creating links, or you can manually link the note to other items. Within Perspective, each note is an item. Notes can be easily retrieved at any time.

(*Id.* at 1-12.)

02198.

EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647

**Topics**

In addition to establishing links between related items, you can also cross-reference or group items using the Topic category. Once you have entered topics such as marketing, proposal ideas, or financials, you can quickly link all related items to the topic. The Associate automatically creates the links whenever you write the topic name in an appointment, to do, note, etc. You can also float the Topic Index and manually link the items. The Topic Index gives you quick access to all items related to the topic.

(*Id.*)

The Associate also recognizes names not previously entered when you use keywords. The Associate creates profiles for the new names, and automatically links them. If Let the Associate ask for Help is On, you can use one of the keywords below when you write in a description to have the Associate help you create a new profile:

- about          • brkfst         • meeting         • with
- appointment    • call           • mtg             • w/
- appt           • dinner         • phone
- at             • lunch          • re
- breakfast      • meet           • regarding

For example, if you are scheduling a meeting with John, who is not entered into your Address Book, you can schedule an appointment in the following ways:

| | |
|---|---|
| 12:00 John | No profile created or linking performed. |
| 12:00 Meet John | New profile created for John and linked to appointment. |

(*Id.* at 3-41.)

the category of an item" in Chapter 4 on page 58. When writing an appointment or event, include the scheduled time, and it is displayed in the Day Planner and the Month Planner. To do's are put on today's to do list. Objectives are scheduled for this month. Therefore, you can write the following descriptions in any Calendar Items detail:

| | |
|---|---|
| Meet Dan on December 15, 1992 at 2:00 | Appointment is scheduled On December 15, 1992 at 2:00. |

(*Id.* at 3-42.)

177.   The source code for Perspective confirms the presence of an analyzer server for detecting structures in the data, and for linking actions to the detected structures.

Case No. 12-cv-00630
EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647

184.    The ITC construed "analyzer server" as "A program subroutine that receives data from a document having recognizable structures, and uses patterns to detect the structures." Perspective includes an analyzer server under this construction.  As explained above, Perspective includes software (i.e., program routines) that receive data entered by a user.  Perspective then uses patterns to detect structures in the data.  For example, the Associate software discussed above detects structures in the data input by the user.  The Associate looks for information the user writes in text and whenever possible, creates an association between a detected structure and other items in Perspective, such as profiles.  Perspective discloses that the Associate processes strings of text input by the user to detect structures such as proper names, dates and a set of recognized verbs.  Thus, Perspective discloses an analyzer server under the ITC construction, because Perspective includes a "program subroutine that receives data from a document having recognizable structures, and uses patterns to detect the structures."

185.    Judge Posner construed "analyzer server" as "a server routine separate from a client that receives data having structures from the client."  Perspective includes an analyzer server under what appears to be Apple's interpretation of this construction.  The Perspective

source code discloses that the Associate is a server routine separate from the client.   Each Perspective program contains many OREO ("Object Rendering and Editing Objects") objects that each render text in a single part of the application.   Each Perspective program has a single instance of the RECO object that will be shared by all of these OREO clients.   The RECO components are the part of the Associate that performs detection of structures and linking to actions.   Indeed, both the "OREO" and "RECO" code are separate from the Perspective applications, such as Daily view.

186.   The ITC construed "linking actions to the detected structures" as "linking detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are linked."   Perspective discloses linking actions to the detected structures under this construction.   As discussed above, detected structures are linked to computer subroutines through a UserNavigateMsg.   Those subroutines perform a sequence of operations on the particular structures, for example opening a profile or dialing an associated phone number.   Thus, Perspective discloses "linking actions to the detected structures" under the ITC construction, because Perspective describes "linking detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are linked."

187.   Judge Posner construed "linking actions to the detected structures" as "creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on that detected structure."   Perspective discloses linking actions to the detected structures under this construction as well.   The UserNavigateMsg, mentioned above, includes a specified connection in the form of its return value.   A UserNavigateMsg is stored in the variable navMsg.   That variable holds a conventional pointer to a computer subroutine that causes the CPU to perform a sequence of operations on that

02198.

detected structure, and is linked to the detected structure.  Thus, Perspective discloses "linking actions to the detected structures" under the Posner construction, because Perspective describes "linking actions to the detected structures" as "creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on that detected structure."

188.   **"A user interface enabling the selection of a detected structure and a linked action:"**  Perspective discloses a user interface enabling the selection of a detected structure and a linked action. Its user interface enables the user to select a detected structure by touching the pen to the screen at the spot where the structure appears: the user may, for example, select the detected structure from among all the detected structures on the screen. The user interface also allows the user to select a linked action by choosing which gesture to perform with the pen; the user may, for example, write a "D" to initiate a phone call to an associated profile, or do a double tap to call up his profile. Each of these gestures both selects the detected structure and the appropriate linked action (e.g., either initiating a phone call or calling up the profile.) Accordingly, Perspective's user interface enables "the selection of a detected structure and a linked action" as required by the claim.

189.   The documentation describes this functionality:

02198.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

## Topic Index

Tracking appointments, to do's, contacts, and notes by *topic* lets you organize diverse information. If you create a topic for each area of interest or responsibility such as financial, forecasting or marketing, you can use the Topic Index to track all meetings, notes and people related to each topic. The Topic Index lists your topics, along with notes, embedded documents and other information related to the topics.

For example, if you want to keep track of information for an article you are writing, create a topic called *Article*. Jot down related information and ideas at any time: in phone conversations, when you read articles in the paper, or at the weekly staff meeting. Perspective's Associate automatically links any item that mentions *Article* to the topic. In addition, you can manually link other relevant items even though they do not explicitly mention the word *Article*. When you begin to write the article, use the Topic Index to see all related ideas and information including embedded documents such as an analysis you performed in Numero™. For more information on linking, see "Linking Information" in Chapter 3 on page 36.



Use the Topic Index to:

- track diverse pieces of information linked to your topics,

- look at notes or embedded documents related to each topic, and

- jot down ideas or information about a topic.

For information on how to use and customize a Topic Index, see Chapter 7, "Listing Information" on page 123. For information on linking notes to topics, see Chapter 8, "Notes & Embedded Documents" on page 145.

17  (*Handbook* at 2-19.)
18
19
20
21
22
23
24
25
26
27
28

EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



(*Handbook* at 4-54.)

17      190.    The source code for Perspective also discloses a user interface enabling the

18  selection of a detected structure and a linked action.  As described above, detected structures are

19  marked with a  kfLink.  These structures are represented in a link font, and can receive gestures.

20  The user selects a detected structure by choosing which detected structure to perform a gesture

21  on, and chooses a linked action by deciding which gesture to perform, e.g., double-click for open

22  profile, "D" for dial.

23

24      191.    **"An action processor for performing the selected action linked to the selected**

25  **structure:"**  Perspective discloses an action processor for performing the selected action linked

26  to the selected structure.  As discussed above, the action processor is software that is invoked to

27  handle the user's selected action.  For example, as described above, the action processor is the

28

code that performs the selected action of opening the profile associated with the detected structure (based on the double-tap), and the selected action of opening the dialer application for dialing the phone number (based on the "D" gesture).

192.    The documentation describes this functionality:



(*Id.* at 3-38.)

193.    The source code for Perspective also discloses an action processor for performing the selected action linked to the selected gesture.  The ObjCallWarn function will dispatch a selected action and cause the CPU to perform the action.  (OREOUSER.C line 1310-1311).

194.    **"A processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines:"**   Perspective discloses a processing unit coupled to the input device, the output device and the memory for controlling the execution of the program routines.  A computer running the Perspective software, such as the

AT&T EO Communicator 440 or 880, contains a processing unit and a memory by definition. A computer running the Perspective software is coupled to the display. The AT&T EO Communicator 440 and 880 has a touch screen display coupled to the processing unit and memory.

195. The documentation describes this functionality:

> One of the things you'll notice about the EO is that it is not called a computer. It is a personal communicator. This does not mean that it does not perform computing functions, it means that it was designed first and foremost as a device to enhance and enable person to person communications. It is a cousin to the computer, but it is more than a computer.

(*Travel Guide* at 1-1.)

> Another aspect of the EO that differentiates it from traditional computers is how all the EO's communications capabilities are combined in a single unit. With an EO you have built-in E-mail, fax, telephone, networking, and data communications capabilities all in a single unit.
>
> Despite the differences, when talking about the EO, terms like hardware, software, RAM, ROM, and other computer terms are all going to be used. This is because the EO uses existing computer technology as its base and the features that make the EO a communicator are in addition to, not instead of, existing computer technology.
>
> This chapter looks at the physical aspects of the EO. In doing so, the EO will be described using the same terms used to describe computers. The EO's physical components (disk drives, memory, etc.) make it easy to discuss it as if it were just a computer—part of what makes the EO more than a computer is the fundamental integration of all its hardware and software.

(*Id.* at 1-2.)

196. Moreover, the EO Travel Guide discloses that the EO Personal Communicator, running the Perspective software on top of the PenPoint Operating System, contains a CPU that controls the EO, including the execution of program routines such as the Perspective application:

| Table 1.1 | The EO 440's technical specifications | |
|---|---|---|
| Microprocessor | | AT&T 92010 Hobbit 20 MHz RISC based processor. This processor runs 2.5 times faster than a 20 MHz 386SL CPU and at .7 times the speed of a 33 MHz 486SX CPU. |
| Memory | RAM | 4 megabytes, expandable to 20. Currently the EO can only be upgraded to 12 megabytes because the memory cards to expand it to 20 are not available. RAM upgrades come on 88 pin JEDEC cards. |
| | ROM | 8 megabytes. The ROM are upgradeable and will be made available as new versions are developed. |
| Modem | Data | High-speed 14,400 bps (38,400 bps with data compression) internal modem. Protocols supported are Bell 103, 212, v.22bis, v.32, v.32bis, v.42, v.42bis, MNP 2-5, MNP10, AXCELL external cell-phone support. |
| | Fax | 9600 bps Group 3 send/receive fax modem. Supports v.27ter and v.29 protocols. |
| Display | | 7.5 inch diagonal, 640 X 480 pixels, 8 levels of gray, 110 dots per inch, 0.23 dot pitch, high-contrast reflective supertwist LCD. The screen response time is 250 ms and the refresh rate is 70 Hz. |
| Internal Storage options | | 20 megabyte internal hard drive. 2.5, 5, 10, and 20 megabyte SunDisks. |
| Power and Batteries | | Operating power 3.3 volts. Custom battery pack using NiCad batteries. Standard (2–4 hrs.) and extended life (4–6 hrs.) batteries are available. The extended life batteries add about five ounces. |
| Input/Output | Parallel AT | 8 bit bi-directional port. |
| | Serial | Mini DIN 8 port requires special cable, maximum speed 230.4 Kbits/sec. |
| | Keyboard | Standard PS/2, PC AT keyboard will work with an adapter. |
| | PCMCIA | Two Type II slots that can also be used as one Type III. |

(*Travel Guide* at 1-16.)

02198.

Case No. 12-cv-00630
EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647

| Table 1.2 | The EO 880's technical specifications | |
|---|---|---|
| Microprocessor | | AT&T 92010 Hobbit 30 MHz RISC-based processor. This processor runs at 3.5 times faster than a 20 MHz 386SL CPU and at the same speed as 33 MHz 486SX CPU. |
| Memory | RAM | 4 megabytes, expandable to 20. Currently the EO can only be upgraded to 12 megabytes because the memory cards to expand it to 20 are not available. RAM upgrades come on 88 pin JEDEC cards. |
| | ROM | 8 megabytes. The ROM are upgradeable and will be made available as new versions are developed. |
| Modem | Data | High-speed 14,400 bps (38,400 bps with data compression) internal modem. Protocols supported are Bell 103, 212, v.22bis, v.32, v.32bis, v.42, v.42bis, MNP 2-5, MNP10, AXCELL external cellphone support. |
| | Fax | 9600 bps Group 3 send/receive fax modem. Supports v.27ter and v.29 protocols. |
| Display | | 9.4 inch diagonal, 640 X 480 pixels, 8 levels of gray, 85 dots per inch, 0.30 dot pitch, transmissive backlit supertwist LCD. The screen response time is 150 ms and the refresh rate is 70 Hz. |
| Internal Storage options | | 64 megabyte internal hard drive. 2.5, 5, 10, and 20 megabyte SunDisks. |
| Power and Batteries | | Operating power 5 volts. Custom battery pack using NiCad batteries with a two-hour battery life. |
| Input/Output | Parallel AT | 8 bit bi-directional port. |
| | Serial | Mini DIN 8 port requires special cable, maximum speed 230.4 Kbits/sec. |
| | Keyboard | Standard PS/2, PC AT keyboard will work with an adapter. |
| | SCSI | 50 Pin standard, SCSI I or II port. |
| | VGA Monitor | Standard 66 Mhz VGA Port. |
| | PCMCIA | Two Type II slots that can also be used as one Type III. |

(*Id.* at 1-19.)

197. **"The system recited in claim 1, wherein the user interface highlights detected structures:"** Perspective discloses the system recited in claim 1, wherein the user interface highlights detected structures. Perspective discloses indicating detected` structures by rendering them in a different bold font, a form of highlighting.

198. The documentation describes this functionality:

Links can be established several ways. The *Associate* is a part of Perspective that automatically establishes links by recognizing the names of people, companies, etc. you write. It looks within the ProfileBook to see if you have previously entered the name, and creates the link. You can also manually link two items. To get information from those links, you can open the profile for any linked item. Links are displayed as bold text in documents and profiles, so you can find them easily.

Case No. 12-cv-00630
EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647

02198.

(*Handbook* at 1-11.)

199. 

**D.      CLAIMS 1 AND 8 OF THE '647 ARE ANTICIPATED OR RENDERED OBVIOUS BY PANDIT**

200.    U.S. Patent 5,859,636, entitled "Recognition of and Operation on Text Data," ("Pandit") issued from an application filed on December 27, 1995.  *See* Exhibit QQ.  Pandit issued on January 12, 1999.  The sole named inventor is Milind S. Pandit.  The bases for my opinions are summarized below and are set forth in greater detail in the claim chart attached as Exhibit I.

201.    I understand that Dr. Mowry has previously stated his opinion that the '647 Patent was conceived of and diligently reduced to practice before the filing of the Pandit Patent.  (See Mowry Declaration Exhibit 14.) I note that Dr. Mowry did not include any opinion concerning dates of conception and reduction to practice in his declaration in this matter.  I have reviewed his opinion from the 710 investigation, which was attached to his declaration in this matter, and did not see any description or identification of the date of conception of using specified connections, including conventional pointers, to computer subroutines, or any evidence that there was diligent reduction to practice of that claim limitation as construed by Judge Posner.

202.   I also understand that the U.S. Patent Office reviewed the Pandit Patent in the re-examination proceedings, and concluded that it anticipated multiple claims of the '647 Patent, including claims 1 and 8 (See re-examination file history, 12/10/2010 Office Action).  I further understand that the examiner accepted Apple's evidence of prior invention in connection with the reexamination and therefore determined that Apple's other arguments concerning Pandit were moot.  (See re-examination file history, June 27, 2011 Office Action at 6).  As noted above, Dr. Mowry did not expressly offer an opinion as to earlier dates of conception and reduction to practice in his declaration, and to the extent that he tries to rely on his opinion from the 710 investigation, it does not establish conception or reduction to practice of the full scope of the claims as construed by Judge Posner.

203.   In my opinion, Pandit anticipates claims 1 and 8 of the '647 patent.  At a minimum, as discussed below, Pandit supports that the subject matter of claims 1 and 8 was obvious to a person of ordinary skill in the art in 1996 considering that the Pandit application was filed in 1995.

204.   "**A computer-based system for detecting structures in data and performing actions on detected structures**:"  To the extent that the preamble is limiting, Pandit was a computer-based system for detecting structures in data and performing actions on detected structures:

> "The present invention can be embodied in the form of computer-implemented processes and apparatuses for practicing those processes.  The present invention also can be embodied in the form of computer program code embodied in tangible media, such as floppy diskettes, CD-ROMS, hard drives, or any other computer-readable storage medium, wherein, when the computer program code is loaded into and executed by a computer, the computer becomes an apparatus for practicing the invention.  The present invention can also be embodied in the form of computer program code, for example, whether stored in a storage medium, loaded into and/or executed by a computer, or transmitted over some

02198.

> transmission medium, such as over electrical wiring or cabling, through fiber optics, or via electromagnetic radiation, wherein, when the computer program code is loaded into and executed by a computer, the computer becomes an apparatus for practicing the invention."

Pandit at 5:26-43.

205.    Pandit detected structures in data and performed actions on those detected structures:

> Text of a predetermined class is recognized in a body of text. After recognition, operations relevant to the recognized text may be performed. For example, text such as telephone numbers, telefax numbers, and dates can be recognized in a body of text. Options are provided for selecting and running operations and programs relevant to the recognized text, such as, telephone dialers, telefaxing programs, writable databases etc.

Pandit at Abstract.

206.    "**An input device for receiving data**;"  Pandit contained an input device for receiving data. "Any text appearing on a video monitor can be operated on by the invention, whether the text is within an Email message, World-Wide Web site..." (Pandit, 5:18-20).  If there the content of email messages or web sites is on the computer, the computer must have a network or modem connection used to receive that data.

207.    "**An output device for presenting the data**:"  Pandit contained an output device, a video monitor, for presenting the data: "Any text appearing on a video monitor can be operated on by the invention..." (Pandit, 5:18-19).

208.    "**A memory storing information including program routines**"  Pandit had memory storing information including program routines.  Pandit discloses that "[t]he present invention can be embodied in the form of computer-implemented processes and apparatuses for practicing those processes.  The present invention also can be embodied in the form of computer program code embodied in tangible media, such as floppy diskettes, CD-ROMS, hard drives, or

any other computer-readable storage medium, wherein, when the computer program code is loaded into and executed by a computer, the computer becomes an apparatus for practicing the invention.  The present invention can also be embodied in the form of computer program code, for example, whether stored in a storage medium, loaded into and/or executed by a computer, or transmitted over some transmission medium, such as over electrical wiring or cabling, through fiber optics, or via electromagnetic radiation, wherein, when the computer program code is loaded into and executed by a computer, the computer becomes an apparatus for practicing the invention." (Pandit, 5:26-43).

209.   "**An analyzer server for detecting structures in the data, and for linking actions to the detected structures**" Under either construction of "analyzer server," Pandit disclosed an analyzer server.

210.   Pandit disclosed implementation of the invention using subroutines:  "Referring now to FIG. 3, the invention is implemented in one or more modular libraries of subroutines. The libraries can be Dynamically Linked Libraries as understood by those skilled in the art with "MICROSOFT" operating systems." (Pandit, 3:36-39, emphasis added).

211.   Pandit disclosed a structure in which the analyzer server was separate from the application.  "For example, by implementing libraries as "MICROSOFT" Component Object Model Servers or by using equivalent standards known to those skilled in the art, each library is recognized and utilized using the same programming interface..." (Pandit, 4:37-41, emphasis added).  "This invention does not require that the text be embedded in any document created on or by a particular application program. Any text appearing on a video monitor can be operated on by the invention, whether the text is within an EMail message, World-Wide Web site, created by a word processing or database program, etc." (Pandit, 5:15-21, emphasis added).

212.   Pandit disclosed "detecting structures in the data":

EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647

"Furthermore, by using parsers as the subroutines for detecting certain types of data, the invention is able to recognize data appearing in a number of formats, rather than a single defined format." Pandit, 5:21-25.

"For example, text such as telephone numbers, telefax numbers, and dates can be recognized in a body of text." (Pandit, Abstract)

213.    The analyzer server disclosed in Pandit satisfied the limitation "... and for linking actions to the detected structures"

214.    Judge Posner construed "linking actions to the detected structures" as "creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on that detected structure." ALJ Charneski construed it as "linking detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are linked."

215.    Under either the ITC construction or Dr. Mowry's interpretation of the Posner construction, Pandit linked actions to the detected structure.   "The invention recognizes the accented text (step 22), and provides a menu bar 13 in which the name of menu 12 corresponding to the class of text accented is highlighted or shown in bold type, thereby showing that the menu is enabled (step 23).   In the example of FIG. 1a, the Date menu 12 is shown in bold type, signifying that the invention includes a menu of operations and/or programs which are relevant to dates." (Pandit 2:8-15, emphasis added).  These links go to multiple computer subroutines that cause the CPU to perform a sequence of operations on that detected structure. "Subroutines b, d and e are concerned with the operations performed by the Library on the recognized text." (Pandit, 3:47-49).

216.    To the extent that Pandit does not disclose that it used conventional pointers as the mechanism to establishing the specified connection, the use of conventional pointers to point at

subroutines was a standard technique known to a person of ordinary skill in the art, as described further below.

217.   "**A user interface enabling the selection of a detected structure and a linked action**:"   Pandit disclosed a user interface enabling the selection of a detected structure and a linked action. For example, see:

> "The invention selectively recognizes text and performs relevant operations based on the recognition. Referring to FIG. 1a and FIG. 2, for example, a date 11 in text appearing on a video monitor is accented (step 21 of FIG. 2) for example by shading, underlining or pointing to and clicking on the text. The invention recognizes the accented text (step 22), and provides a menu bar 13 in which the name of menu 12 corresponding to the class of text accented is highlighted or shown in bold type, thereby showing that the menu is enabled (step 23).  In the example of FIG. 1a, the Date menu 12 is shown in bold type, signifying that the invention includes a menu of operations and/or programs which are relevant to dates. A user can "click" on the Date menu name 12 or otherwise call the menu by one or more keystrokes on a keyboard associated with the video monitor to display or pull down the contents of the menu (step 24). A view of an embodiment of a pulled-down Date menu 18 is shown in FIG. 1b. A user may directly call a calender or appointment database program from pulled-down menu 18. Other programs may be included in pulled-down date menu 18 as discussed below."

Pandit 2:3-23.

218.   "**An action processor for performing the selected action linked to the selected structure**:"   Pandit disclosed an action processor for performing the selected action linked to the selected structure. For example, Pandit states "[g]iven a number identifying an operation, subroutine b (32) of Library A *performs the identified operation on the recognized text data*. For example, subroutine b can call scheduling programs, writable calendar databases, writable to-do list databases, anniversary book databases and any other number of programs or operations relevant to dates." Pandit, 4:15-19, emphasis added.

219.   **"A processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines:"**   Pandit disclosed a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines.   Pandit ran on a computer (see preamble), and a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines were necessarily present.

> The present invention can be embodied in the form of computer-implemented processes and apparatuses for practicing those processes. The present invention also can be embodied in the form of computer program code embodied in tangible media, such as floppy diskettes, CD-ROMS, hard drives, or any other computer-readable storage medium, wherein, when the computer program code is loaded into and executed by a computer, the computer becomes an apparatus for practicing the invention. The present invention can also be embodied in the form of computer program code, for example, whether stored in a storage medium, loaded into and/or executed by a computer, or transmitted over some transmission medium, such as over electrical wiring or cabling, through fiber optics, or via electromagnetic radiation, wherein, when the computer program code is loaded into and executed by a computer, the computer becomes an apparatus for practicing the invention.

Pandit, 5:26-43.

220.   **"The system recited in Claim 1, wherein the user interface highlights detected structures**:"   Pandit disclosed highlighting detected structures.

1
2
3
4
5
6
7
8
9
10



FIG. 1b

11

221.   To the extent that Pandit did not disclose any of the above claim limitations, it would have been obvious to a person of ordinary skill in the art in 1996 to combine Pandit, or the techniques disclosed by it, with a similar program that accomplished similar goals, such as Sidekick or Perspective.

**E.     CLAIMS 1 AND 8 ARE ANTICIPATED OR RENDERED OBVIOUS BY NOKIA**

222.   Claims 1 and 8 are also invalid as anticipated and/or obvious based on European Patent Publication Number 0 458 563 A2, entitled "A multi-function telephone apparatus" ("Nokia").  Exhibit HH.  The named inventor is Pekka Lahtinen and the applicant is Nokia Mobile Phones, Ltd.  The Nokia application was published on November 27, 1991.  The bases for my opinions concerning Nokia are summarized below and are set forth in greater detail in the claim chart attached as Exhibit E.

223.   In my opinion, Nokia anticipates or renders obvious Claims 1 and 8 of the '647 Patent.  To the extent that Nokia does not expressly disclose any element of Claim 1 and 8, or does not disclose any element under a particular claim construction, it would have been obvious

EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647

1   to a person of ordinary skill in the art in 1996 to use combine known technology to arrive at the

2   subject matter of the claims.

3      224.   "**A computer-based system for detecting structures in data and performing**

4   **actions on detected structures**:"  To the extent that the preamble is limiting, Nokia disclosed

5   computer-based system for detecting structures in data and performing actions on detected

6

7   structures.

8      It can be deemed to be the most important advan-
tage of the invention that the apparatus is capable of
9      interpreting as a telephone number a character string
included in an arbitrary text message, either automati-
10     cally or aided by the user, and this number can, when
necessary, be modified, and the apparatus according
11     to the invention is capable of calling this number,
when necessary. It is a further advantage of the inven-
12     tion that such use of the apparatus does not require
significant concentration by the user, such as reading
13     a number from a display and memorizing it, or a con-
siderable quantity of key operations, and that the
14     apparatus can be made so small in size that it can be
connected to telephone apparatuses available, with-
15     out substantially increasing their size.

16   (Col. 2:23-37.)

17

18      225.   "**An input device for receiving data; an output device for presenting the**

19   **data**:"  Nokia disclosed an input device for receiving data, referred to as the "receiver," and a

20   "display" for presenting the data:

21

22   ⑤⑦   A telephone apparatus which is made up of a radio telephone part comprises a memory unit, a circuit
for forming an outgoing call, a display and a keyboard, and of a receiver part for receiving alphanumeric
23     messages and for displaying them in the said display. The telephone apparatus additionally includes a
memory for storing an alphanumeric message and a circuit for displaying in the display a telephone
number, contained in this present message, and a circuit, connected to the keyboard, for transferring
24     the telephone number in the display at each given time to the register for the forming of a telephone call.

25   (Abstract.)

26      226.   "**A memory storing information including program routines**:"   Nokia

27   discloses a memory storing information including program routines:

28

02198.

3. A third circuit, connected to the keyboard, for transferring the telephone number in the display at each given time to the memory for forming a call and/or for further processing.

4. A fourth circuit, which can be pre-programmed to recognize characters indicating the beginning and/or end of a telephone number possibly included in the alphanumeric present message or, alternatively, to recognize from the alphanumeric present message a character string which, according to the programmed algorithm, is probably a telephone number, this fourth circuit then transferring the found number, or character string, to the display for the purpose of being assessed by the user.

(Col. 9:9-32.)

227. To the extent that Nokia does not explicitly disclose the use of program routines, it would have been obvious to a person of ordinary skill in the art in 1996 to use software, specifically program routines, to implement this functionality.

228. "**An analyzer server for detecting structures in the data, and for linking actions to the detected structures**;" The ITC construction of analyzer server is "a program subroutine that receives data from a document having recognizable structures, and uses patterns to detect the structures." Under the ITC construction, Nokia discloses an analyzer server that detects structures in data.

While the present message is being displayed, the user performs a number search keying, whereupon the RPK will search, starting from the beginning of the message, for the first point at which there is, for example, a numeral and the numeral is followed by at least four of any of the characters included in the following set: numerals, -, /, (, ), space. At least three of these first five characters must be numerals. In other words, the RPK searches for a point which could be a telephone number. Generally, the RPK thus searches from the message a character string which could be a telephone number. There may be various criteria for the character string, and they are not discussed separately in the present application; it is only stated that character string criteria can be formed. They depend, for example, on the country, the language, the practice, etc.

(Col. 6:14-30.)

229.     The analyzer server then links the detected phone number to an action for "accepting" the number; that subroutine allows for editing or calling the number: "If the user accepts the number he performs an acceptance keying, whereupon the RPK will eliminate from the display any characters following the number and any non-numeric characters inside the number. Now there is visible in the display only a "pure" telephone number, and this number is also in the number register, according to which further procedures are possible."  (Col. 7:32-39.)

230.     If "analyzer server" is construed with Judge Posner's construction, the claim is obvious.  It would have been obvious to a person of ordinary skill in the art to implement the functionality of detecting structures and linking actions using the well-known technique of implementing it as a separate process from the client.

231.     To the extent that a construction requires multiple actions per detected structure, it would have been obvious to a person of ordinary skill in the art to add support for multiple actions, as that was a well-known technique in the field at the time.

232.   "**A user interface enabling the selection of a detected structure and a linked action**"   Nokia discloses a user interface enabling the selection of a detected structure and a linked action.

> Typically an RPK has a display D, which is capable of displaying at one time at minimum about twenty characters of a text message and through which a text message can be scrolled. Also, an RPK has a keyboard K, and the user can give commands to the RPK by pressing the keys in the keyboard.
> Hereinafter, 'keying' denotes a command given by means of the keyboard K – it may be the pressing of an individual key, a sequence of pressings of keys, or the pressing of several keys simultaneously, or possibly a command spoken aloud, if the RPK supports voice recognition, or any other method of giving a command. According to the invention, the user may select one text message received, or stored for that purpose in the temporary memory, for display at one time and for processing in the manner according to the present invention. The message thus selected is called 'present message'.

(Col. 5:46-6:5.)

233.   **"An action processor for performing the selected action linked to the selected structure**:"   Nokia necessarily included an action processor that performed the selected action.

234.   "**A processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines**:"   Nokia was a computer-based system, and had input devices, output devices, and memory as described above.   It necessarily would have included a processor.

235.   "**The system recited in Claim 1, wherein the user interface highlights detected structures:**"   It would have been obvious to a person of ordinary skill in the art to

EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647

employ highlighting, a well-known technique in the field of user interface design to indicate that structures have been detected.

### F.     CLAIMS 1 AND 8 ARE ALL OBVIOUS IN LIGHT OF THE PRIOR ART

236.    As discussed above, my opinion is that claims 1 and 8 are both anticipated by several prior art references.  To the extent that there are any differences between the references that I identify as anticipatory and claim 1 and 8, it is my opinion that any such differences are trivial and that those references also render the claims obvious.

237.    As discussed in the legal standards section, above, I also understand that a combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.  Claims 1 and 8 of the '647 patent describe nothing more than known methods of accomplishing known functionality to achieve predictable results. A person of ordinary skill would have known how to detect structures in data in 1996 and there was nothing unpredictable about it.  The person of ordinary skill would have also been familiar with user interfaces and client/server system structures.  There was nothing unpredictable about the combination.  There was also nothing unpredictable about the added element of claim 8 – wherein the user interface highlights the detected structure.

238.    In my opinion, a person of ordinary skill would have been motivated to arrive at the combination of elements disclosed in claim 1 and 8 based on trends in  industry.  The numerous references, and wide range of references, identified in this declaration support my opinion that trends in the industry and research would have motivated the combination.

239.    Set forth below are two additional, specific combinations that render claim 1 and 8 obvious.  Also set forth below are additional details concerning known technologies prior to 1996 and certain secondary indicia that support my opinion that, to the extent claims 1 and 8 were not anticipated, they would have been obvious to a person of ordinary skill in the art.

02198.

1.    **Claims 1 and 8 of the '647 are rendered obvious by MHonArc + Mosaic**

240.    Claims 1 and 8 are obvious based on the combination of the Mosaic web browser and MHonArc.   Mosaic was a web browser developed at the National Center for Supercomputing Applications.   I have relied on materials dated 1994 and earlier describing Mosaic.  MHonArc was a program for converting e-mail messages to HTML.  The MHonArc materials on which I rely are all dated January 31, 1995 or earlier.  In my opinion, claims 1 and 8 of the '647 patent would have been obvious to a person of ordinary skill in the art in 1996 based on the combination of MHonArc and Mosaic.  The bases for my opinions concerning MHonArc and Mosaic are set forth in greater detail in the claim chart attached as Exhibit F.

2.    **Conventional Pointers**

241.    To the extent that any of the above pieces of art is found not to anticipate the '647 Patent because it fails to disclose or use specified connections to actions as required by the Posner construction, it would have been obvious to use function pointers to computer subroutines to implement a set of options, such as in a pop-up menu of available actions. This was a well-known, indeed standard, technique for user interface programming.  As Judge Posner recognizes in his claim construction order, conventional pointers certainly satisfy the claim limitation. Exhibit K at p. 10.

242.    "Function Pointers" are conventional pointers, that is, pointers that point to an address in memory representing the beginning of a function. This is a standard technique taught in introductory programming classes, and would have been known to anyone of ordinary skill in the art at the time.

243.    For example, Jim Conger, Microsoft Foundation Class Primer (Waite Group Press) (1993) ("*MFC Primer*"), discloses the use of function pointers to implement the actions linked to by a set of options of a pop-up menu.  Microsoft Foundation Classes (MFC) was a

84

standard set of classes and techniques used to program most applications that ran on Windows, the dominant operating system of the time.  "The MFC approach to processing messages is to divert each message that the program will process to a separate function.  The function does whatever action is appropriate in the program for that one message, and then returns.  The diversion of messages to individual functions is done with a 'message map'.  The message map specifies which function gets called for specific messages, and then lets any other messages pass on to the default message processing logic.  Figure 3-4 shows how the message map diverts functions."  (*MFC Primer* at 76).

244.    *MFC Primer* illustrates this functionality:



**Figure 3-4** Message Mapping

(*MFC Primer* at 77.)

3.    <u>**Simultaneous Invention**</u>

245.    I understand that simultaneous invention by others can be an indication of

obviousness.  As discussed in detail above and in the attached claim charts, the subject matter of claims 1 and 8 was known and widely disclosed prior to February 1, 1996.  The documents indicate that Apple knew about at least invention by Pandit prior to Apple's application.  In an internal Apple e-mail dated May 23, 1995, named inventor Bonni Nardi stated that she met "a guy," Milind Pandit, ██████████████████████████████████████████████ ████████████████████████████████  See Exhibit TT.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  April 23, 2012

_____
Geoff A. Cohen, Ph.D.

EXPERT DECLARATION OF GEOFF A. COHEN, Ph.D.
CONCERNING U.S. PATENT NO. 5,946,647

02198.