1  JOSH A. KREVITT (CA SBN 208552)      MICHAEL A. JACOBS (CA SBN 111664)
    jkrevitt@gibsondunn.com                mjacobs@mofo.com
2  H. MARK LYON (CA SBN 162061)         RICHARD S.J. HUNG (CA SBN 197425)
    mlyon@gibsondunn.com                   rhung@mofo.com
3  GIBSON, DUNN & CRUTCHER LLP          MORRISON & FOERSTER LLP
    1881 Page Mill Road                    425 Market Street
4  Palo Alto, CA  94304-1211            San Francisco, California 94105-2482
    Telephone: (650) 849-5300              Telephone: (415) 268-7000
5  Facsimile: (650) 849-5333            Facsimile: (415) 268-7522

6  MARK D. SELWYN (CA SBN 244180)
    mark.selwyn@wilmerhale.com
7  WILMER CUTLER PICKERING
    HALE AND DORR LLP
8  950 Page Mill Road
    Palo Alto, CA 94304
9  Telephone: (650) 858-6000
    Facsimile: (650) 858-6100
10
    ***Attorneys for Plaintiff and Counterclaim Defendant Apple Inc.***
11
                    UNITED STATES DISTRICT COURT
12
                  NORTHERN DISTRICT OF CALIFORNIA
13
                         SAN JOSE DIVISION
14

15  APPLE INC., a California corporation,      CASE NO. 12-cv-00630-LHK  (PSG)

16                        Plaintiff,           **REPLY DECLARATION OF DR. RAVIN**
                                               **BALAKRISHNAN CONCERNING U.S.**
17          v.                                 **PATENT NO. 8,046,721**

18  SAMSUNG ELECTRONICS CO., LTD., a
    Korean corporation; SAMSUNG
19  ELECTRONICS AMERICA, INC., a New
    York corporation; and SAMSUNG
20  TELECOMMUNICATIONS AMERICA,
    LLC, a Delaware limited liability company,
21
                          Defendants.
22  SAMSUNG ELECTRONICS CO., LTD., a
    Korean corporation; SAMSUNG
23  ELECTRONICS AMERICA, INC., a New
    York corporation, and SAMSUNG
24  TELECOMMUNICATIONS AMERICA,
    LLC, a Delaware limited liability company,
25
                    Counterclaim-Plaintiffs,
26          v.

27  APPLE INC., a California corporation,

28                  Counterclaim-Defendant.

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................1

EXECUTIVE SUMMARY ....................................................................................................1

Overview of Infringement Analysis ....................................................................................3

Overview of Validity Analysis ...........................................................................................7

Overall Conclusion ............................................................................................................11

DETAILED ANALYSIS .....................................................................................................11

I.      The Samsung Galaxy Nexus Infringes the '721 Patent .........................................11

        A.      The Samsung Galaxy Nexus Meets the "Unlock Image" Limitation ..........11

        B.      The Samsung Galaxy Nexus Continuously Moves the Unlock Image
                In Accordance with the Detected Contact.....................................................17

        C.      The Samsung Galaxy Nexus Meets the "Unlock" Limitation of the
                '721 Patent .................................................................................................21

II.     The '721 Patent is Valid.......................................................................................22

                1.      Plaisant Fails to Disclose a Touchscreen on a "Hand-Held
                        Electronic Device" ..........................................................................26

                2.      Plaisant Fails to Disclose an Image to "Unlock" "the" Hand-
                        Held Electronic Device ...................................................................29

                3.      Plasaint Fails to Disclose a Single Unlock Image............................32

                4.      Plaisant Fails to Disclose an Unlock Image that Moves
                        Continuously with the Detected Contact..........................................36

        B.      Claims 7, 8, 12 and 15 of the '721 Patent are Not Obvious in View of
                the Neonode N1 and N1M Handsets.............................................................41

        C.      The Additional References Cited by Dr. Cohen Do Not Render the
                '721 Patent Obvious ...................................................................................44

                1.      Claims 7, 8, 12 and 15 of the '721 Patent are Not Obvious in
                        View of Tokkonen ...........................................................................44

                2.      Claims 7, 8, 12 and 15 of the '721 Patent are Not Obvious in
                        View of Keller.................................................................................45

3.      Claims 7, 8, 12 and 15 of the '721 Patent are Not Obvious in View of Chambers and Schrock..........................................................45

D.      Secondary Considerations of Non-Obvious Strengthen My Validity Opinion.....................................................................................................46

III.    Claims 7, 12 and 15 of the '721 Patent are Not Indefinite...........................................47

LEGAL STANDARDS APPLIED .................................................................................................51

MATERIALS CONSIDERED FOR THIS DECLARATION ..........................................................51

**INTRODUCTION**

1.  I, Ravin Balakrishnan, Ph.D., have been retained by Complainant Apple Inc. ("Apple") to evaluate the report of Dr. Geoff Cohen submitted on behalf of Samsung in this matter.  I have previously submitted a declaration in this matter on Apple's behalf.  I incorporate that declaration here as if set forth in full.

2.  My qualifications as an expert and my current resume were provided as part of my original expert declaration in this matter.

3.  If I am called as an expert witness, in addition to the matters identified in my original expert declaration, I also would expect to testify regarding the matters discussed below.

**EXECUTIVE SUMMARY**

4.  The '721 patent is directed to a method of unlocking a handheld device with a touchscreen, such as the Galaxy Nexus, so that inadvertent touches, taps, or gestures on the touchscreen do not accidentally activate functions such as dialing the phone.  An Apple team conceived of the '721 invention during the development of the first iPhone.  As one of the inventors, Mr. Greg Christie, stated during his deposition, Apple was "really, really concerned that the phone was going to unlock in your pocket or in a handbag. . . . I mean, we all had candy bar phones that were answering calls all the time whenever you sat down or, you know, called your most recent number.  We were trying to keep this thing from being operated accidentally."  (Christie Depo. at 159 (Ex. 1).)  Because the iPhone was to operate solely by touch, the concerns related to accidental operation were even greater than in prior keypad phones.

5.  Prior methods of unlocking a handheld device relied on entering passwords, typing patterns on the keys, or other mechanisms that relied on people's faulty memories or clumsy fingers.  As Mr. Christie explained, Apple was trying to achieve a balance between ensuring that the unlock gesture was "difficult enough so it wouldn't happen accidentally", but still "easy enough to do so it wouldn't become irritating."  (*Id.* at 160.)  Other methods, such as simple swipe gestures, didn't

provide enough protection from accidental activation, since even placing a device into a purse or pocket risked unintentional brushing of the touchscreen and an unwanted unlocking of the device.

6.      The '721 patent, however, provides a clever middle-ground between ease of unlocking a device and protection against unwanted activations by requiring that a user move an image on the touchscreen from one specific place to another in a single gesture.   As stated in the patent, "the user makes contact with the touch screen at a location corresponding to the unlock image and then performs the predefined gesture while maintaining continuous contact with the touch screen, dragging the image to the location that meets the predefined unlock criteria.  ('721 Patent 11:29-33.) A hand-held device using the claimed invention of the '721 patent is less likely to be inadvertently unlocked by a random action, such as brushing against the touchscreen while placing the device in a pocket, but does not require more complicated mechanisms, such as passcodes, that, over time, can degrade a user's experience and satisfaction with the device.

7.      In opposition to Apple's motion for a preliminary injunction, Samsung's expert Dr. Cohen makes a number of arguments in what appears to be an attempt to distract attention from the very clear use by Samsung of the claimed invention of the '721 patent.  First, Dr. Cohen adds requirements to the claims that otherwise do not exist in order to manufacture arguments that the Galaxy Nexus does not infringe.  However, taking the asserted claims of the '721 patent as they are actually written, he effectively concedes that the Galaxy Nexus is an infringing device.  Second, Dr. Cohen argues that the claims are invalid, but, in so doing, relies only on art that was before the Patent Office and considered as part of the prosecution of the '721 patent claims. As I discuss below, because the prior art on which Dr. Cohen relies does not disclose multiple claim elements, the Patent Office's previous decision to allow the claims over this prior art was clearly correct.  Finally, Dr. Cohen argues that certain claim terms are undefinable, despite the fact that Samsung itself uses these

Gibson, Dunn &
Crutcher LLP

same terms when educating users about the operation of the Galaxy Nexus.  As I discuss briefly

below, and in further detail in the sections that follow, Dr. Cohen is simply wrong on these counts.

<strong>Overview of Infringement Analysis</strong>

8.      With regard to the Galaxy Nexus's infringement, Dr. Cohen admits, as he must, that

the Galaxy Nexus has a slide to unlock feature.  Indeed, the Galaxy Nexus user guide explicitly

describes this slide to unlock feature, as I noted in my earlier declaration.  Dr. Cohen never argues

that the Galaxy Nexus does not infringe the actual limitations of the asserted claims of the '721

patent; instead, he first seeks to add two requirements to the asserted claims (relating to the unlock

image and how it is moved) and then contends that these additional requirements are not satisfied by

the Galaxy Nexus.  Because Dr. Cohen effectively concedes infringement under the actual language

of the asserted claims, there is no real dispute that the Galaxy Nexus is an infringing device.

9.      ***Unlock Image.***  Dr. Cohen initially argues that the claims require a "single unlock

image" and there is no such "single unlock image." First, Dr. Cohen is incorrect that each of the

claims require a "single image" – this limitation only applies to asserted claim 15.  (*See* Ex. 4.)

Second, even for those claims requiring a "single image," the patent specification is clear, as Dr.

Cohen admits, that this describes an "unlock image manipulation [that] must refer to a single image"

in "a system that offer[s] multiple simultaneous different unlock images" as shown in the figure

below:



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(Cohen Decl. ¶ 90; '721 Patent Figure 11B.)

10.     Dr. Cohen contends that, on the Galaxy Nexus, the unlock image that a user moves (or "slides") to unlock the device is a circle; however, he also contends that this is not the same image that is initially displayed on the screen (a padlock and circle – left image below) before the user touches the device.  (Cohen Decl. ¶¶ 83-84.)  Dr. Cohen thus argues that, because the image that the user moves (circle – right image below) is not the same image that initially appears on the screen, there is no single unlock image and the Galaxy Nexus does not infringe.

 

11.     As I described above, Dr. Cohen's analysis is wrong because there is no requirement in the asserted claims that the unlock image be the same image that is displayed on the device before the user first makes contact with the touchscreen.  Instead, the asserted claims only require that the device "detect a contact with the touch-sensitive display at a first predefined location corresponding to an unlock image".   I do not dispute that when a user taps near a certain picture on the screen of the Galaxy Nexus (the boundaries of "near" being the predefined location"), the "image at the original location is replaced with a new image at the location of the contact."   (Miller Decl. ¶ 8; Cohen Decl. ¶ 84.)  It is this new image that appears at a pre-defined location that I believe corresponds to the "unlock image" as claimed in the '721 patent.

12.     Dr. Cohen agrees with me that when a user taps a predefined location, the Galaxy Nexus then displays an unlock image (the circle image that appears at the point of user contact).  In

addition, Dr. Cohen also agrees that this unlock image then moves with user contact in the same way as the '721 patent.  (Cohen Decl. ¶ 84; Miller Decl. ¶ 8, 11.)  That is all the claims require.  Dr. Cohen's arguments about whether the Galaxy Nexus uses a single unlock image are thus irrelevant to whether the Galaxy Nexus infringes the asserted claims.  There is but a single unlock image for the Galaxy Nexus, and it is the circle that appears when the user touches the screen at the predefined location.

13.     Yet even if we assume for the sake of argument that Dr. Cohen is correct and the unlock image must be the same image as that originally displayed on the device prior to user contact, Dr. Cohen's argument that the Galaxy Nexus does not infringe would still be wrong.  The '721 patent points out that the unlock image does not need to be static and unchanging.  Rather, the patent expressly states that the unlock image can change form as the user interacts with the touchscreen, with portions of the image being animated in some way, or even appearing or disappearing, as the user interacts with the device.  ('721 Patent 12:40-47.)  In the case of the Galaxy Nexus, this occurs when the circled padlock (which is the image displayed on the screen before user makes contact) changes form by having the padlock disappear and the circle expanding to a larger circle, which the user then moves to the unlock region.  It is thus clear that under either view of the unlock image, the Galaxy Nexus is infringing.

14.     ***Continuous Movement.***  Dr. Cohen next argues that there is not continuous movement of the unlock image, as required by the asserted claims.  While Dr. Cohen admits that the movement of the unlock image on the Galaxy Nexus is at least initially continuous, he argues that once the user moves the unlock image to a certain point on the touchscreen, the image suddenly "jumps" to its final location.  (Cohen Decl. ¶ 94.)  Again, however, Dr. Cohen is trying to read in a limitation that simply does not exist in the actual language of the asserted claim.

Gibson, Dunn &
Crutcher LLP

15.     The asserted claims both require that the user continuously move the unlock image, while maintaining contact with the touchscreen, from a first predefined location (at which the user initially made contact with the touchscreen) to "a predefined unlock *region*" at which point the device is unlocked.  ('721 Patent Claims 7 and 12.)  Thus, the asserted claims only require continuous movement up to the unlock region; whether movement remains continuous after reaching that unlock region does not matter from the perspective of the claim.  In other words, once the user reaches the unlock region, the claimed gesture is complete.  It does not matter from the claims' perspective whether additional animations, image movements, or other visual cues are subsequently displayed by the device.

16.     In fact, in the Galaxy Nexus, the "jump" that Dr. Cohen refers to only occurs after the user has moved the unlock image to the predefined unlock region.  As I discuss in more detail below, Dr. Cohen relies on Google engineer Jim Miller, to determine how the software in the Galaxy Nexus actually operates to achieve the slide to unlock functionality.  However, Mr. Miller's declaration and testimony in fact confirm my analysis that Galaxy Nexus unlock gesture is complete once the user has moved the unlock image to a particular unlock region.  Mr. Miller states that this unlock region is defined as the area on the touchscreen that is REDACTED (*See* Miller Decl. ¶ 16.)  Once the user of a Galaxy Nexus has moved the unlock image to that region of the touchscreen, the unlock gesture is complete such that the device will unlock if the user lifts their finger.  It is only *after* this has occurred that the movement of the unlock image "jumps" to the location of the "unlocked padlock" image on the display.  As a result, because Dr. Cohen admits that the movement of the unlock image is continuous up to point it is moved to the unlock region defined by REDACTED all of the limitations of the asserted claims are met by the Galaxy Nexus.

Gibson, Dunn & Crutcher LLP

**Overview of Validity Analysis**

17.     With regard to the validity of the asserted claims, Dr. Cohen relies entirely on prior art the PTO already considered during prosecution of the '721 patent.  In particular, Dr. Cohen's main arguments for the invalidity of the asserted claims revolve around the Plaisant reference and the NeoNode N1 and N1m devices.  (Cohen Decl. ¶¶ 110-160.)[1]  However, both the Plaisant reference and the user guide for the NeoNode devices were part of the prior art previously considered and passed on by the patent office.   As I discuss more fully below, I agree with the patent office's conclusion that the claims are valid over these references because all of the art relied on by Dr. Cohen lacks critical elements of the asserted claims of the '721 patent.

18.     ***Plaisant.***  As I understand anticipation, the prior art reference in question must disclose every limitation of the claim.  However, the Plaisant reference does not disclose numerous elements of the asserted claims, including: (1) a touchscreen on a "hand-held electronic device," (2) an image to "unlock," and (3) unlocking "the hand-held electronic device."

19.     Rather, what the Plaisant reference actually discloses is a large built-in computer screen used to turn on/off other devices.  (*See* Cohen Decl. Exs. H, J ("Users see the screen flushmounted into the wall or the cabinetry.").)  This is very different from the handheld touchscreen of the '721 patent, as such a large computer screen simply does not present the same risk of inadvertent activation as with devices such as the iPhone or the Galaxy Nexus.  No one is going to try to put the device of the Plaisant reference into a handbag or pocket.

20.     Moreover, nothing in the Plaisant reference is directed to unlocking a handheld device.  Instead, Plaisant discloses turning a *remote device*, such as an air conditioner, *on or off*.  Turning a device on or off is not synonymous with *unlocking* the device.  Further, the '721 patent has nothing to

---

[1]   Dr. Cohen attempts to combine prior art references such as the NeoNode N1 User's Guide with non-prior art videos.  (Cohen Decl. ¶ 138.)  This is improper, and in any event, that disclosure is not greater than that which is in the references before the Patent Office, as I show below in my detailed analysis.

Gibson, Dunn &
Crutcher LLP

do with controlling remote devices.  Rather, the patent discloses and claims unlocking the *touchscreen device*.  Controlling a remote device using a touchscreen presents an entirely different set of challenges than unlocking the touchscreen device itself.

21.     The Plaisant reference also fails to disclose *continuously moving* a *single unlock image*.  Dr. Cohen admits that Plaisant does not disclose any unlock image that is moved continuously.  (Cohen Depo. 159, 173-74, 178 (Ex. 2).)  Instead, Plaisant discloses a slider toggle that fails to move continuously.  Moreover, Plaisant repeatedly discloses a "system that offer[s] multiple simultaneous different unlock images," but never discloses a system where "the unlock image manipulation must refer to a single image," as required by claim 15.  (Cohen Decl. ¶ 90.)

22.     For at least these reasons, and as I discuss in more detail below, Dr. Cohen's reliance on the Plaisant reference is simply misplaced.

23.     ***NeoNode.***  Dr. Cohen's other primary references are the Neonode N1 and N1m.  As noted above, the user's guide for these devices was considered by the patent office during the prosecution of the '721 patent.   Like the Plaisant reference, the NeoNode devices also fail to disclose numerous limitations, including (1) moving an unlock image (2) from a first predefined location (3) to a predefined unlock region.

24.     For example, the NeoNode device does not disclose moving any image to unlock the device.  Further, while the device does disclose using a gesture to unlock the device, no reference demonstrates that there is any limitation on this gesture requiring it to either start or end in a predefined location.

25.     Interestingly, Dr. Cohen does not allege that these devices anticipate any claim.  Instead, Dr. Cohen argues that the devices disclose the claim elements except for "mov[ing] an unlock image in accordance with the detected contact." (Cohen Decl. ¶ 146.)  While the quoted language is not directly from any of the claims, Dr. Cohen appears to be arguing that NeoNode meets

Gibson, Dunn &
Crutcher LLP

all of the claim limitations of the asserted claims other than those that require a user to move an unlock image.  However, moving an unlock image in order to unlock the device is a very important part of the claimed invention.  In effect, Dr. Cohen is arguing that, if one ignores the crux of the invention of the '721 patent, the NeoNode art could be considered to be the same.  As I discuss in more detail below, NeoNode only requires a swipe gesture to unlock, without the need to maintain contact with an unlock image and move it from one regions to an unlock region.  Thus, such disclosures are entirely lacking and do not invalidate the asserted claims.

26.     To fill this apparent void, Dr. Cohen relies on "prior art" materials that post-date the '721 patent's 2005 priority date.  In particular, Dr. Cohen cites a 2006 review of the Neonode N1 and a 2007 YouTube video of the device, as well two additional undated and unauthenticated videos.  (Cohen Decl. ¶ 138.)   While none of these items seem to be prior art in and of themselves, even if one takes these non-prior art materials together with the N1 User Guide cited during the prosecution of the '721 patent, the combination still does not disclose the key limitations I have noted above (and which I discuss in more detail below).

27.     As a result, Dr. Cohen's contention that the asserted claims are invalid due to the NeoNode devices is incorrect.

28.     ***Obviousness.***  Dr. Cohen incorrectly argues that the '721 patent is obvious in light of Plaisant and the NeoNode devices.  This argument fails first because one of ordinary skill in the art would not be motivated to combine Plaisant and NeoNode in the context of solving the problem addressed by the '721 patent.  The '721 patent deals with the challenges unlocking a handheld touchscreen device.  Although the NeoNode is such a device, the Plaisant system is a wall-mounted screen used to control remote devices, and contains no indication that it was ever intended to be made portable.  Thus, when addressing the unique problems related to unlocking a device that will be

placed in a pocket or purse, one of skill in the art would not look to the wall-mounted system of Plaisant that would have no need to address the complications of a handheld device.

29.     Dr. Cohen's obviousness analysis further fails because even if one were to combine NeoNode and Plaisant, the two references together do not disclose every element of the asserted '721 patent claims.  For example, the NeoNode device does not disclose an unlock image at all, and Plaisant fails to disclose an unlock manipulation that refers to a single image.

30.     My opinion that the '721 patent is not obvious is further strengthened by secondary considerations of non-obviousness.  The discussions in Dr. Vellturo's declaration and reply declaration discuss such secondary considerations as Samsung's competition with Apple, the iPhone's commercial success, the marketing of the iPhone using the slide-to-unlock feature, and the consumer surveys pointing to the slide-to-unlock's usability as a factor in the iPhone's success.  It is therefore my opinion that the secondary considerations all lead to the conclusion that the asserted claims are not obvious.

31.     ***Indefiniteness.***  Finally, Dr. Cohen argues that claims 7 and 12 of the '721 patent are rendered indefinite by use of the term "unlock" and "unlocking."  (Cohen Decl. ¶ 69.)  Dr. Cohen argues that it is not possible to understand what is meant by unlocking a device because the patent does not specify an objective test for determining the exact operations that are unavailable to the user in the locked state.  (Cohen Decl. ¶ 78.)

32.     However, it is my understanding that for a claim term to be indefinite, it must be insolubly ambiguous.  Yet Dr. Cohen admits that the concept of locking and unlocking a hand-held device, like the iPhone or the Galaxy Nexus, has a plain and ordinary meaning.  (Cohen Depo. at 156.)  Samsung, too, appears to admit this plain and ordinary meaning by its use of the terms "lock" and "unlock" in its Galaxy Nexus User's Guide.  (Ex. 3 at 100.)  Thus, it is clear that the terms are not indefinite as both parties agree the terms are easily understood.

**Overall Conclusion**

33.     As a result, it remains my opinion that claims 7, 8, 12 and 15 of the '721 patent are valid and infringed by the Galaxy Nexus.  I have briefly discussed above the main reasons why I believe Dr. Cohen's opinions to the contrary are incorrect.  However, below, I provide a more detailed analysis of why Dr. Cohen's analysis is wrong, along with additional reasons for my conclusions.

**DETAILED ANALYSIS**

**I.      The Samsung Galaxy Nexus Infringes the '721 Patent**

34.     As I noted above, the Samsung Galaxy Nexus infringes at least claims 7, 8, 12 and 15 of the '721 patent.

35.     I have reviewed Mr. Miller's declaration, which states that there are multiple versions of Android Ice Cream Sandwich code.  (Miller Decl. ¶ 3.)  However, I understand that these versions are the same for purposes of the slide to unlock feature at issue here.  I reviewed the same open source version of Android Ice Cream Sandwich that Dr. Cohen reviewed, and do not disagree with Dr. Cohen's factual description of how the Samsung Galaxy Nexus operates.  It is Dr. Cohen's application of this factual description to the '721 patent claims that is so clearly incorrect.

**A.      The Samsung Galaxy Nexus Meets the "Unlock Image" Limitation**

36.     Dr. Cohen explains that there are two "unlock images" REDACTED

███████████████  (Cohen Decl. ¶ 87.)  Dr. Cohen goes on to explain why, in his view, the first image (the circle around a padlock in the left figure below) does not meet the "unlock image" limitation of the '721 claims.  (Cohen Decl. ¶¶ 83-87.)  However, Dr. Cohen fails to explain why the second image (the circle in the right figure below) does not meet the "unlock image" limitation.



37.    From a comparison with the claim language, the circle image does satisfy the "unlock image" limitation of the '721 patent.  Claims 7 and 12 require that the device "detect a contact with the touch-sensitive display at a first predefined location corresponding to an unlock image". Samsung confirms that when a user taps near a certain picture on the screen (the boundaries of "near" being the predefined location"), the "image at the original location is replaced with a new image at the location of the contact."   (Miller Decl. ¶ 8; Cohen Decl. ¶ 84.)  Thus, it is this new image that appears at a pre-defined location corresponding to where contact is detected that is the "unlock image" as claimed in the '721 patent.

38.    Dr. Cohen incorrectly asserts that "subsequent actions on unlock images must be on the same unlock image that the user initially touched."  (Cohen Decl. ¶ 83.) However, the '721 claims have no requirement that the unlock image be the same as an image on the device before contact as Dr. Cohen implies.  Rather, the claims 7 and 12 only require "detect[ing] a contact with the touch-sensitive display at a first predefined location corresponding to an unlock image."  Dr. Cohen's referenced initial "unlock image that the user initially touche[s]" merely serves as a visual image cue

directing the user where to make initial contact to unlock the device.  On the Samsung Galaxy Nexus, once the user makes contact with the lockscreen, the appearance of the claimed unlock image corresponds to the predefined location.  It is this image that the user then moves to unlock the device.

39.     Dr. Cohen and Mr. Miller concede that when a user taps a predefined location (an area near, but not necessarily on, the padlock and circle), an unlock image is shown (the circle image) at the point of user contact (a predefined location corresponding to an unlock image.)  (Miller Decl. ¶ 8; Cohen Decl. ¶ 84 "After a contact is detected, the image at the original location is replaced with a new image at the location of the contact. REDACTED

REDACTED

REDACTED.")  They further concede that this circle unlock image then moves continuously in accordance with user contact in the same way as required by the claims of the '721 patent.  (Miller Decl. ¶ 11 "If the user maintains contact with the touchscreen, among the results can be REDACTED

REDACTED   Some of the time, these REDACTED cause the Samsung Galaxy Nexus to display the second picture REDACTED roughly centered on the user's finger.")  Thus, it is clear that the circle image satisfies the requirement for an "unlock image" that moves with the user contact.

40.     However, even if the unlock image originally displayed on the device (the padlock with circle) had to be the unlock image, the Galaxy Nexus still infringes because the patent explicitly discloses that the unlock image need not be a static, unchanging image, but rather may change in form:

40    In some embodiments, the arrows **406** and the arrow on the unlock image **402** may be animated. For example, the arrow on the unlock image **402** may appear and disappear in a pulse-like manner and the arrows **406** may emanate from one end of the channel **406** in sync with the pulsing of the arrow
45    on the unlock image **402**. As shown in FIG. **4**B, the arrow **406** may move along the channel **404** and disappear when it moves to the end of the channel **404**.

('721 Patent, Col. 12.)

41.    Thus, the disclosure noted above in which a portion of the unlock image (the arrow) disappears or pulses makes clear that disappearance of the padlock of the REDACTED from the depiction in the REDACTED of the Galaxy Nexus still fits the definition of an "unlock image." Similarly, the appearance of a portion of the unlock image (the arrow) through pulsing or animation as described in the '721 patent also makes clear that enlarging the circle of the REDACTED to the REDACTED of the Galaxy Nexus nevertheless results in the same "unlock image" of the asserted claims.  Both of these changes to the original image are simply animations that provide more optional visual feedback to the user.

42.    In seeking to add a new limitation to the asserted claims, Dr. Cohen relies heavily on an incorrect reading of the prosecution history.   Dr. Cohen asserts that the unlock image must be a single image in all claims because "in the prosecution of the '721 Patent, the applicants disclaimed scope of non-singular images."  (Cohen Decl. ¶ 89.)  For this proposition, Dr. Cohen relies on a portion of an interview summary from the ''721 prosecution:

21    sorry -- that the unlock image is singular.  So
22    I think that that certainly informs my -- it's
23    certainly important for my understanding that
24    the -- in the interview summary -- that the
25    applicant had stated or at least the -- the

1   examiner reported that the applicant had stated

2   that the unlock image is singular.

(Cohen Depo. at 102-103.)

43.     However, Dr. Cohen's reliance on this interview summary is misplaced.  Dr. Cohen's

quotes and relies heavily on the first paragraph of this interview summary, copied below, (*see* Cohen

Decl. ¶ 89.), but appears to completely ignore the second paragraph stating that a "fuller description"

of the interview summary "must be attached."

Substance of Interview including description of the general nature of what was agreed to if an agreement was
reached, or any other comments: *Examiners discussed the difference between the claimed invention and the prior art
of record.  Examiners agreed that the prior art of record does not explicitly disclose "continuously moving an unlock
image along a predefined path."  Applicant further suggested to modify the claim language of the unlock image to
further clarify that the unlock image is singular and not multiple images.* .

(A fuller description, if necessary, and a copy of the amendments which the examiner agreed would render the claims
allowable, if available, must be attached.  Also, where no copy of the amendments that would render the claims
allowable is available, a summary thereof must be attached.)

44.     Dr. Cohen clearly failed to read this "fuller description."  If he had, he would realize

that the amendment to "clarify that the unlock image is singular and not multiple images," upon

which he relies for his non-infringement argument that the unlock image must be a single image, only

applies to claims 13-15:

**C.     New claims 13-15**

Claims 13-15 depend from claims 1, 7, and 12 respectively.  As discussed in Section
A above, the combination of Tokkonen and Gauthey fails to teach multiple limitations of
claims 1, 7, and 12.  Thus, claims 13-14 are patentable over the cited references for at least
the same reasons as those given above for claims 1, 7, and 12.

In additional, claims 13-15 require that "the unlock image is a single image."
Tokkonen, Gauthey, and Astheimer, taken together or separately, do not teach or suggest an
"unlock image" that "is a single image."  Therefore, for this additional reason, there is no
prima facie case of obviousness for claims 13-15.

(Ex. 4.)

45.     Based on the above portion of the '721 prosecution history, it is clear that only claims

13-15 require the unlock image to be a single image.

46.     In addition, even for claim 15 that requires a single unlock image, it is not true that any "single image" requirement would refer to a REDACTED or a single static unlock image; rather, it refers to having only a single image on the screen as opposed to a screen that displays multiple unlock images at the same time.[2]  In other words, some embodiments display multiple unlock images at a time to allow a user to choose from different functions that can be immediately available when the device is unlocked (*see, e.g.*, Figures 11A-11D) while others only have a single unlock image at any given time.  Dr. Cohen would appear to agree.  (Cohen Decl. ¶ 90 "[M]y reading of the '721 specification shows that when the applicants envisioned multiple unlock images, they meant multiple images at the same time (see Fig. 9 and related discussion at Exhibit B, 16:52-17:66). This section discusses an embodiment that contains 'a plurality of unlock images.'  But even in this embodiment, 'The device becomes unlocked . . . upon performance of the unlock action with respect to the particular unlock image.'  Thus, a person of ordinary skill in the art would understand that claims 1, 7 and 12 would . . . encompass a system that offered multiple simultaneous different unlock images, but that the unlock image manipulation must refer to a single image' in claims 13-15." (citation omitted).)

47.     Dr. Cohen further ignores claim differentiation so that he can give claim 15 an identical scope to claim 12 from which claim 15 depends:

---

[2]     While not directly at issue in the preliminary injunction motion, it is worth nothing that a review of the screen shots from the Galaxy Nexus clearly shows only a single unlock image at any given time within the meaning of claim 15.  This is the same unlock image that I have previously described in this declaration.

Gibson, Dunn &
Crutcher LLP

10          Q.  You believe -- under your construction

11   you believe claim 12 and claim 15 are identical

12   in scope?

13          A.  I do.  I believe that that was the

14   scope that's claimed during prosecution.

(Cohen Depo. at 182.)

48.      Dr. Cohen's analysis is thus improper in that it construes an independent and

dependent claim as being identical in scope, especially in light of the prosecution history's statement

that the "singular" unlock image limitation only applies to claims 13-15, rather than properly viewing

claim 15 as being a subset of the scope of claim 12.  Instead, claim 12 allows the use of multiple

unlock images as discussed above, but is not, as Dr. Cohen contends, limited in some way to the use

of a single .png file or a single static, unchanging, unlock image.

49.      For the above reasons, and those stated in my original declaration, the Samsung

Galaxy Nexus meets the "unlock image" limitation of the '721 patent.

**B.      The Samsung Galaxy Nexus Continuously Moves the Unlock Image In
         Accordance with the Detected Contact**

50.      Similarly, the Samsung Galaxy Nexus "continuously" moves the unlock image in

accordance with the detected contact as required in the '721 patent.[3]  In arguing to the contrary, Dr.

Cohen raises two arguments, the first of which being really nothing more than a rehash of his

argument that there is not a single unlock image.

51.      Dr. Cohen's first non-infringement argument with respect to the "continuously" move

limitation is that "after a contact is detected, the image at the original location is replaced with a new

image at the location of the contact" and so the "motion is not continuous in space."  (Cohen Decl. ¶

---

[3]    I agree with Dr. Cohen that although a digital image consists of pixels that are turned on and off and so in a sense can never be continuous, this is not a basis for a non-infringement analysis in the terms of the '721 patent.  (Cohen Depo. at 259.)

93.)  In essence, Dr. Cohen is arguing that because there is no single unlock image, there cannot be continuous movement of the unlock image.  Initially, this argument fails for all of the reasons noted above.  There is nothing in the claims that precludes using a different image for the unlock image from that displayed by the device prior to contact.  However, in arguing that the replacement of this image results in a "jump" rather than continuous movement, Dr. Cohen is again adding a non-existent requirement to the '721 claim elements.  The '721 patent merely requires the device "to continuously move the unlock image on the touch-sensitive display in accordance with movement of the detected contact."  Taking Dr. Cohen's view, at the time that the original image is replaced with a new image, there still has been no "movement of the detected contact."  Rather, there has only been contact.  As such, the device cannot have failed to "continuously move the unlock image" "in accordance with movement of the detected contact" when there has as yet been no "movement of the detected contact."  Thus, even under Dr. Cohen's view, his argument wouldn't be sufficient to avoid infringement.

52.     Following this "redrawing" of the unlock image, Dr. Cohen admits that the unlock image moves continuously with the movement of the detected contact:

> 3          Q.   I see.  And we talked earlier, of
> 4     course, about the two the jumps that you say
> 5     give rise to noninfringement, and you agree that
> 6     in between those two jumps the movement is
> 7     continuous, correct?
> 8          A.   Yes.

(Cohen Depo. at 259.)

53.     Dr. Cohen's next argument is that the unlock image's movement is not continuous because "when **REDACTED** is dragged to within a given radius of one of the target

images, the image again snaps discontinuously." (Cohen Decl. ¶ 94.) Mr. Miller's declaration confirms, however, that this "snap" occurs only *after* the user has already moved the unlock image to the "predefined unlock region." (Miller Decl. ¶¶ 16-17 "*The Samsung Galaxy Nexus computes the geometric distance between the position of the second picture* REDACTED ████████████████████████ and the center of the picture representing an unlocked padlock REDACTED If the computed distance is less than the dimension REDACTED . . . if the user releases his or her finger from the touchscreen . . . the Samsung Galaxy Nexus will . . . return the user to the Activity that was previously frontmost on the device.")

54.    Once the unlock image has hit the edge of the unlock region REDACTED the user has moved the unlock image from the "first pre-defined location to a predefined unlock region on the touch-sensitive display" as required by claims 7 and 12. Thus, the patented action is complete and the user merely needs to lift their finger to unlock the device. (*See* Cohen Depo. at 289 ("I could imagine going other ways in which case that final snap wouldn't be relevant . . . .").) Because the patented action is complete, any subsequent snap of the unlock image is irrelevant to the continuous movement of the unlock image to the predefined unlock region.

55.    Further, Dr. Cohen admitted in his deposition that in his invalidity analysis, unlike his non-infringement analysis, he did not require that the unlock image move with a user's finger after reaching the unlock region:

15          Q.   Okay.   So when you were analyzing the

16     prior art for invalidity purposes, you deemed

17     the limitation to be satisfied as soon as the

18     unlock image got to the predefined unlock

19     region, correct?

20          A.   Let me think about the art that I

21     looked at --

22          Q.   -- and what construction you applied

23     in terms of your methodology.

24          A.   I think that's -- I think that's

25     right.

(Cohen Depo. at 285.)

56.     Despite these admissions, Dr. Cohen incorrectly based his non-infringement analysis on a claim construction (different from the one he applied in his invalidity analysis) requiring the unlock image to follow the user's finger even after reaching the unlock region:

17          Q.   Okay.   So in your view, as properly

18     construed, this claim requires the unlock image

19     to continuing following the user's fingers even

20     after the image has moved to the predefined

21     location, correct?

22          A.   I think that's the proper construction

23     given the while continuous contact.

        *        *        *

Gibson, Dunn &
Crutcher LLP

```
12          A.   For that one element, if while con --

13     while continuous contact is maintained is

14     construed as requiring continuous -- the image

15     to be moved as long as continuous contact is

16     maintained, all other things aside, under that,

17     then that provides one noninfringement position,

18     that under --

19          Q.   Hold on.  Is that the construction you

20     applied?

21          A.   That's the construction I applied to

22     that single limitation.
```

(Cohen Depo. at 264-265.)

57.    For at least the above reasons, it is clear that the unlock image on the Galaxy Nexus moves continuously in accordance with the movement of the contact, as required by the '721 claims.

**C.    The Samsung Galaxy Nexus Meets the "Unlock" Limitation of the '721 Patent**

58.    Dr. Cohen briefly argues that because the Galaxy Nexus allows the user to "transition between user interfaces" or play music while in a "locked" state, that the Galaxy Nexus is never "locked" in the terms of the '721 patent.  (Cohen Decl. ¶¶ 100-101.)

59.    This argument is incorrect.  The patent states that "navigation between user interfaces" *may* be in the predefined set of operations the user is prevented from performing in a lock state, but the permissive use of the word *may* does not require this:

> In the user-interface lock state (hereinafter the "lock state"), the device **100** is powered on and operational but ignores most, if not all, user input. That is, the device **100** takes no action in response to user input and/or the device **100** is prevented from performing a predefined set of operations in response to the user input. The predefined set of operations may include navigation between user interfaces and activation or deactivation of a predefined set of functions. The lock state may be used to prevent unintentional or unauthorized

('721 Patent, Cols. 7-8.)

60.    Similarly, nothing in the patent states that a user cannot pause or play music when the device is in the locked state.

61.    Rather, what is important is whether there is a predefined set of operations (whether or not this set includes playing music or transitioning between user interfaces) that does not respond to user input in the "device locked state," and that this set of operations encompasses "most" user input. The Galaxy Nexus has such a predefined set of operations, which includes most user input.  (*See* Ex. 3.)

62.    For the above reasons, the Samsung Galaxy Nexus is capable of being "locked" and "unlocked" according to the meaning of these terms in the '721 patent.

## II.    The '721 Patent is Valid

63.    As previously noted, Dr. Cohen makes a number of assertions regarding prior art references and deficiencies in the claim language that render the asserted claims invalid.  As discussed in detail below, each of these arguments fails.  However, as an aside before I turn to the specifics of each of Dr. Cohen's arguments, I note that Dr. Cohen's validity analysis is inconsistent with his own view on the level of detail that needs to go into any analysis of whether an accused device (or prior art reference) is within the scope of the asserted claims.

Gibson, Dunn & Crutcher LLP

64. In particular, Dr. Cohen has asserted that the '721 patents cover code, such that an infringement opinion cannot be reached without a detailed code analysis:

```
 4          So although I think it can be interesting
 5     to restrict ourselves for the moment to purely
 6     what it looks like, and I think it can, in fact,
 7     be helpful to look at what it looks like, and
 8     obviously I included screenshots in my
 9     declaration -- those are helpful, certainly
10     helpful to explain to someone without a
11     technical background -- the relevant inquiry for
12     this case has to be the claims cover code and we
13     need to see what the code does.  And so that
14     ultimately is important -- is more important of
15     what the code is, so --
```

      *     *     *

Gibson, Dunn & Crutcher LLP

7     You know, the scope of the claim is the code.

8     Given that we have the code, the code is highly

9     relevant to look at.  It certainly -- if there

10    is evidence in the code that -- that contradicts

11    the language in this claim, I think that

12    that's -- that's evidence of noninfringement

13    that is as important or more important than a

14    superficial analysis of what something might

15    look like.  You know, that analysis might be

16    important, might be applicable to a patent that

17    disclosed a user interface, you know, a user

18    interface that appears as following and that

19    when users do something it looks like this, some

20    hypothetical patent that Apple might file.  But

21    that's not the claims at issue.  The claims at

22    issue, both 7 and 12, are talking about

23    modules -- or in 12 they are talking about

24    programs that -- that comprise instructions.  So

(Cohen Depo. at 111, 113.)

65.     While I disagree that a detailed code analysis is required for the '721 patent, because
Dr. Cohen acknowledges that he should conduct an anticipation analysis just as he would his
infringement analysis, his anticipation analysis should, under Dr. Cohen's view, also include a review
of the code underlying the references:

```
10          Q.  All right.  Let me ask you this.

11   Watching that video do you -- can you also reach

12   a conclusion that it discloses a machine that

13   infringes claim 7 of the '721 patent?

14          A.  My understanding is that anticipation

15   and infringement are mirror analysis, you know,

16   that which before anticipates after infringes,

17   or whatever the -- the useful phrase is.
```

(Cohen Depo. at 196.)

66.     However, Dr. Cohen reached his anticipation conclusion without reviewing the underlying source code for any of the prior art references on which he relies:

```
4           Q.  Okay.  All right.  And having watched

5    entirety of the video, obviously it is your

6    conclusion that the video discloses the unlock

7    image claim limitations even without needing to

8    look at the source code, correct?

9           A.  Yes.
```

(Cohen Depo. at 196.)

67.     It thus seems clear that Dr. Cohen's analysis for infringement and validity is internally inconsistent, and is based on whatever analysis is most convenient for Dr. Cohen to advance the arguments he seeks to make.  As a result, I believe that Dr. Cohen's opinions are inherently flawed.

**A.     Plaisant Does Not Anticipate Claims 7, 8, 12 or 15 of the '721 Patent**

68.     Turning to the first of the references on which Dr. Cohen relies to argue invalidity, the Plaisant reference (both the paper and the video) fails to disclose each element of the '721 patent claims as is required for anticipation.

69.     First, the Plaisant reference is prior art that the PTO already considered during prosecution of the '721 patent.[4]  It is my understanding that this makes it even more difficult for Samsung to demonstrate invalidity by clear and convincing evidence.

70.     Second, the Plaisant reference fails to disclose numerous elements, including: (1) a touchscreen on a "hand-held electronic device," (2) an image to "unlock" (as opposed to turn on/off), (3) that is both a single image and that moves continuously with the detected contact and (4) that unlocks "*the* hand-held electronic device" (as opposed to a remote device).

**1.      Plaisant Fails to Disclose a Touchscreen on a "Hand-Held Electronic Device"**

71.     Plaisant discloses a touchscreen on a computer, but not a hand-held electronic device, as Dr. Cohen admits:

```
20          Q.   My question is different.   The device

21     that is actually depicted in the video, is it in

22     your view a portable electronic device?

23          A.   She doesn't, you know -- she doesn't

24     use those words.

25          Q.   Would you use those words to describe

1     what you see in the Plaisant video?

2          A.   No.
```

---

[4]   While Samsung argues that the Plaisant video was not before the examiner, the Plaisant paper makes clear – with its first sentence – that the disclosure of the video is commensurate with the disclosure of the paper.  (Cohen Decl. Ex. J; *see* Cohen Depo. at 149 (the Plaisant video and paper "are highly related and they accompany each other").)

1       *       *       *

10      Would you use the words handheld electronic

11      device to describe the device that you see with

12      your eyes in the Plaisant video?

13             A.  No.

(Cohen Depo. at 271-272.)

72.    Dr. Cohen incorrectly asserts that disclosure of a touchscreen on a computer "inherently discloses portable devices." (Cohen Decl. ¶ 113.)  It is my understanding that an element can only be inherently disclosed if the disclosure would necessarily include the element.  Dr. Cohen incorrectly failed to consider this question when applying his inherency analysis:

1             Q.  And you agree that obviously handheld

2       electronic devices and portable electronic

3       devices are not explicitly disclosed in the

4       Plaisant video, correct?

5             A.  That's correct.

6             Q.  Is it your view, Dr. Cohen, that in

7       the 1991 time frame, if somebody taught the use

8       of something on a desktop computer, they

9       necessarily disclosed to a person of ordinary

10      skill in the art the same technology in a

11      handheld or portable device?

12            A.  I didn't consider that broad question.

(Cohen Depo. at 277.)

73.     Contrary to the position espoused by Dr. Cohen, a disclosure related to a desktop computer does not inherently disclose a hand-held or portable device.  It is simply not true that a disclosure that applies to a desktop computer necessarily applies to a hand-held or portable device.

74.     This is especially true as hand-held electronic devices present different problems from computers:

```
14          Q.  As a -- from the perspective of a
15     person of ordinary skill in the art, would you
16     agree or disagree that there are certain
17     problems associated with handheld devices that
18     are not associated with large devices?
19          A.  You know, broadly speaking, I would
20     agree with that.
```

(Cohen Depo. at 272.)

75.     For at least the above reasons, Plaisant fails to disclose a touchscreen on a "hand-held device" and so cannot anticipate the '721 patent.

76.     It is further my opinion that it would not have been obvious to make portable the built-in terminal in the Plaisant video that was connected to large devices such as heaters and home security systems.  Whether such a change to Plaisant would be obvious depends on the application scenario.  Different problems arise for table-top or large devices, such as that in the Plaisant reference, and those of hand-held mobile devices.  You wouldn't put a table in your handbag or pocket.  Thus, in the context of the Plaisant reference, the entire notion of accidental activation because as users places the device in their pocket or a handbag doesn't arise.  The problems faced are simply different.

### 2.    Plaisant Fails to Disclose an Image to "Unlock" "*the*" Hand-Held Electronic Device

77.    Plaisant also fails to disclose both the "unlock" element of the '721 patent and the limitation that the unlocking occur on *the same* hand-held device containing the touchscreen.

78.    Dr. Cohen, without analysis, simply declares that "[t]he Plaisant Video specifically contemplates the control of any two-state device, and therefore discloses a two state device with a locked and unlocked state."  (Cohen Decl. ¶ 121.)  However, a disclosure to turn a remote device on and off, as in the Plaisant reference, does not disclose unlocking a device, let alone unlocking the touchscreen device.

79.    Dr. Cohen even admits that when a user turns off one remote device using the touchscreen, that one of ordinary skill in the art would not expect the ability to control whether the other remote devices are locked:

```
 6        Q.  All right.  Based on your

 7   understanding, the understanding of a person of

 8   ordinary skill in the art, watching the Plaisant

 9   video, would the person of ordinary skill in the

10   art understand that, as long as the air

11   conditioner was in the off mode, the toggles for

12   the other two functions would be ignored?

13        A.  No.
```

(Cohen Depo. at 168.)

80.    Dr. Cohen incorrectly asserts that the disclosure for locking/unlocking and for locking the *touchscreen* itself is found in Plaisant's disclosure of a password function.  Dr. Cohen incorrectly asserts that one of ordinary skill in the art would understand the password function to be a lock/unlock function, and that this would necessarily disclose locking the touchscreen itself:

13          Now in the Plaisant video and there is not a

14     screenshot in it, but that's why we included the

15     whole video.  One of the things that's turning on

16     and off is password protect, which certainly,

17     unquestionably, to a person of ordinary skill in

18     the art they know that that's referring to the

19     interface, the touchscreen itself.  And a person

20     of ordinary skill in the art, knowing that there

21     is a disclosure of password protect, that there is

22     disclosure of two state devices, either on or off,

23     understanding the specification of the '721 patent

24     as, you know, not merely a touchscreen but an

25     entire system that encompasses a touchscreen and a

1     number of functions, would understand the totality

2     of that disclosure to include locking a device --

(Cohen Depo. at 169-170.)

81.     Dr. Cohen is simply wrong.  The Plaisant video *in fact* discloses a system in which, even when the password protect is turned on, the touchscreen remains unlocked and the other devices can still be turned on and off. In the video, the user turns on all devices, including password protect, and then proceeds to turn each device off, leaving password protect on.  The screenshots below demonstrate this Plaisant disclosure that after the password protect function has been turned on (top image), a user can still use the touchscreen to turn off each device, even as the password protect remains on.

Gibson, Dunn &
Crutcher LLP





82.    In addition, even if the password protect somehow locked the Plaisant computer, the

'721 patent specifically teaches *avoiding* password-locked systems:

Devices with touch screens and/or applications running on
such devices may be unlocked by any of several well-known
unlocking procedures, such as pressing a predefined set of
buttons (simultaneously or sequentially) or entering a code or
password. These unlock procedures, however, have draw- 50
backs. The button combinations may be hard to perform.
Creating, memorizing, and recalling passwords, codes, and
the like can be quite burdensome. These drawbacks may
reduce the ease of use of the unlocking process and, as a
consequence, the ease of use of the device in general.      55

Accordingly, there is a need for more efficient, user-
friendly procedures for unlocking such devices, touch
screens, and/or applications. More generally, there is a need

('721 Patent Col. 1.)

83.    For the above reasons,  the Plaisant reference fails to disclose either (1) "unlocking" a device or, unlocking "the hand-held electronic device" that contains the touchscreen, both of which are required elements of the '721 patent.

### 3.    Plasaint Fails to Disclose a Single Unlock Image

84.    When conducting his analysis, Dr. Cohen concluded that the level toggle disclosed in Cohen Decl. ¶ 117 is a single unlock image:

```
24            Q.  All right.  Let me start with my
25       question, sir.  Does the picture that appears at
```

Gibson, Dunn &
Crutcher LLP

1    the end of paragraph 117 disclose a single

2    unlock image?  Yes or no.

3         A.  In the sense of the '721 patent, yes,

4    I believe it does.

5         Q.  It does.  Okay.  You agree that in --

6    when you watch the video of the toggle, of the

7    use of the toggle that's disclosed, that's

8    depicted at the bottom of paragraph 117, when

9    that toggle changes, the word off changes to on

10   or vice versa, correct?

11        A.  Correct.

12        Q.  And notwithstanding that the word

13   changes, you believe that that video discloses

14   or that portion of the video discloses a single

15   unlock image; is that correct?

16        A.  I'm not so sure.  You know, I think

17   you raise a good question and I would have to

18   think about that some more.  I mean, certainly

(Cohen Depo. at 171-172.)

85.    However, during his deposition, Dr. Cohen recanted, and asserted that, in his opinion,

the lever toggle disclosed in Plaisant does not include a single unlock image:

Q.  All right.  We'll get to that, sir,
but I want to get your opinion, sitting here
today, if you have one, does the disclosure
that's depicted in paragraph 117 disclose a
single unlock image by clear and convincing
standard?

A.  I don't -- I'm not sure -- as I sit
here now, I don't know that it does, so I would
want to reserve, you know -- maybe someday I'll
have another opinion, but I don't know.

Q.  Does -- does the disclosure, the
toggles, that are shown in paragraph 117, meet
the unlock image limitations in claim 7 of the
'721 patent by clear and convincing standard?

A.  No, I don't think so.  I think that
the thing that discloses it is the picture 116
is the slider toggle, and that's -- you know, I
think these other images are helpful and are
illustrative, but the portion of the Plaisant
disclosure that I think teaches the person of
ordinary skill in the art each and every element
of the '721, the graphical description at
least -- her words as well -- but what she calls
the slider toggle, and that's what I want to
identify.

34

10          Q.  Okay.  So you're saying that what we

11    should be focusing on when we're talking about

12    anticipation is the slider functionalities, one

13    of which is depicted at the tail end of

14    paragraph 116, correct?

15          A.  Right, that's my position.

(Cohen Depo. at 173-174.)

86.    Turning to the slider toggle disclosed in Cohen Decl. ¶ 116, Dr. Cohen incorrectly asserted that "[t]he Plaisant Video discloses that the yellow pointer of the slider toggle, the 'unlock image,' is a single image" with respect to Claim 15.  (Cohen Decl. ¶ 124.)

87.    As I explained previously, the "single image" limitation of claim 15 refers to "a system that offered multiple simultaneous different unlock images, but that the unlock image manipulation must refer to a single image."  (Cohen Decl. ¶ 90.)  Plaisant, in contrast, discloses multiple different unlock images:

12          Q.  All right.  You would agree,

13    Dr. Cohen, that in every one of the pictures you

14    utilized the screening includes more than one

15    on/off switch or toggle?

16          A.  Yes, that's correct.

                *     *     *

9          Q.   And using just this screenshot as a

10    reference, what is it that you allege to be the

11    unlock image here?

12          A.   It's what I believe she refers to as

13    the pointer, which is the thing that looks like

14    a little tablet that is in the off position in

15    the first one and on in the second and it has

16    her finger on it in the third.  So she refers to

17    that as the pointer of the slider, I believe.

18          Q.   And that pointer is the unlock image?

19          A.   Yes.

20          Q.   Each one of them is separately an

21    unlock image?

22          A.   Each one of the three different

23    toggles, I think, is an unlock image.

(Cohen Depo at 159, 178.)

     88.     Because neither of the Plaisant disclosures relied upon by Dr. Cohen as being anticipatory contain a single unlock image, the Plaisant disclosure does not anticipate claim 15 of the '721 patent.

         **4.**     **Plaisant Fails to Disclose an Unlock Image that Moves Continuously with the Detected Contact**

     89.     As noted previously, Dr. Cohen explained that for his anticipation analysis, he is relying on the slider toggle depicted at Cohen Decl. ¶ 116:

```
10          Q.   Okay.  So you're saying that what we

11   should be focusing on when we're talking about

12   anticipation is the slider functionalities, one

13   of which is depicted at the tail end of

14   paragraph 116, correct?

15          A.   Right, that's my position.
```

(Cohen Depo. at 173-174.)

90.    However, the slider toggle depicted at Cohen Decl. ¶ 116 does not "move continuously in accordance with movement of the detected contact" as required by the '721 patent. Dr. Cohen incorrectly states that "[t]he Plaisant Video shows the unlock image (the slider) moving continuously in accordance with her finger."  (Cohen Decl. ¶ 119.)  In fact, the Plaisant Video shows a three step animation in which the toggle jumps from the left of the slider to the center and then to the far right:

```
4           A.   She described it as a three-step

5    animation.

6           Q.   Okay.  And so what did you understand

7    to be the three steps?

8           A.   All the way to the left, all the way

9    to the right, somewhere in the middle that's not

10   either all the way to the left or all the way to

11   the right.
```

(Cohen Depo. at 205.)

91.     The Plaisant paper confirms that this slider toggle moves in a three step animation, rather than continuously.  (Cohen Decl. ¶ 134 "'Slider toggle: In this toggle a sliding/dragging movement is required to change the position of the yellow pointer form one side of the toggle to the other.  A simple three step animation shows the movement of the pointer along the slide. . .' Plaisant, p. 668".)

92.     In addition, Dr. Cohen erroneously failed to apply the same claim construction that he used in his non-infringement analysis to the "continuous" limitation in Plaisant:

```
12          Q.  You -- earlier on you gave me what you
13     believe was the correct construction of the
14     while continuous contact limitation, correct?
15          A.  If I had to choose, I think that's the
16     construction I would choose.  I considered
17     multiple constructions.
18          Q.  Did you apply that construction to the
19     Plaisant video to determine whether that claim
20     limitation was nevertheless met?
21          A.  I don't think I considered that.  I
22     think that Plaisant --
23          Q.  That's fine.
24          A.  -- meets it under a -- construction
25     that doesn't require it to affect in all states.
```

(Cohen Depo. at 270.)

93.     Upon applying his non-infringement claim construction to his anticipation analysis, Dr. Cohen admitted that Plaisant fails to disclose the "continuous" element of the '721 patent:

Gibson, Dunn &
Crutcher LLP

14        Q.   Okay.   What does the video disclose,

15   if anything, happens if the user continues to

16   move her finger left past the on switch as

17   depicted in paragraph 116 of your declaration?

18        A.   I don't recall the video, whether the

19   video addressed that question.

20        Q.   All right.   Do you have any basis to

21   conclude by a clear and convincing standard

22   that, if the user continues to drag her finger

23   to the left after it's reached the on position,

24   that the pointer would continue to follow the

25   finger?

```
 1          A.  I don't -- no, I don't think that
 2     Plaisant video disclosed what would happen in
 3     that case.
 4          Q.  Okay.  Now let's talk about the
 5     Plaisant paper that you were talking about.
 6          A.  Okay.
 7          Q.  Do you have any basis to conclude on a
 8     clear and convincing burden that the paper
 9     teaches that, if the user kept moving her finger
10     to the left after reaching the on stage, that
11     the pointer would continue to track the movement
12     of the finger?
13          A.  No.
```

(Cohen Depo. at 268-269.)

94.   Additionally, because the Plaisant references do not disclose a single unlock image that also moves continuously, the Plaisant reference cannot anticipate the '721 patent, even if the Plaisant reference discloses such elements separately:

9        Q.   Okay.   Now, when it comes to the

10   obviousness of the Neonode, you would agree,

11   wouldn't you, that the combination you propose

12   is one in which all of the features you alleged

13   satisfy the claim limitations exist on a single

14   device just not all at once?

15        A.   Yes.

16        Q.   And you would agree that, even though

17   all of those separate elements exist separately,

18   no one did, in fact, combine them in the Neonode

19   device, correct?   That's why there is no

20   anticipation.

21        A.   Right.   Exactly.   That's why there is

22   a separate analysis for anticipation and

23   obviousness, so I'm not claiming that the

24   Neonode actually did that.

(Cohen Depo. at 213.)

95.     For at least the above reasons, the Plaisant reference does not disclose continuously moving an unlock image in accordance with the detected contact, and so does not anticipate the '721 patent.

**B.     Claims 7, 8, 12 and 15 of the '721 Patent are Not Obvious in View of the Neonode N1 and N1M Handsets**

96.     Like Plaisant, the Neonode N1 User's Guide was cited art in the prosecution of the '721 patent.

97.     Nevertheless, Dr. Cohen argues that "Claims 7, 8, 12, and 15 are obvious in view of the Neonode phones" (Cohen Decl. ¶ 138), even though these phones do not disclose "mov[ing] an unlock image in accordance with the detected contact" from a first predefined location to a predefined unlock region – the heart of the '721 patent. (Cohen Decl. ¶ 146.)

98.     However, Dr. Cohen has never actually used either the Neonode N1 or N1M that he relies upon as prior art:

```
 5          Q.  And you have not personally used
 6      either of the Neonode devices described in your
 7      declaration, correct?
 8          A.   Correct.  I've used an N2 in the past,
 9      which I understand was similar in some ways, but
10      not the N1 or N1M.
```

(Cohen Depo. at 208.)

99.     Because Dr. Cohen has never used either of the devices he relies upon as prior art, Dr. Cohen relies on *unauthenticated* material *after* the '721 patent's *2005* priority date to inform him of the devices' operations. This material a *2006* review of the Neonode N1, an undated online N1m specification guide that states "Disclaimer. We can not guarantee that the information on this page is 100% correct," an undated N1 quickstart guide, a *2007* YouTube video of the device, as well two additional *undated, unauthenticated* videos of unknown origin. (Cohen Decl. ¶ 138, Cohen Decl. Exs. K, Q, L, M, N and P.) It is my understanding that Samsung is required to establish the authenticity of the information on which it relies in order to prove its invalidity defenses by clear and convincing evidence.

Gibson, Dunn &
Crutcher LLP

100.     Dr. Cohen inexplicably states that the Neonode videos, which unquestionably are not prior art, raise a substantial new question of patentability.  (Cohen Decl. ¶ 154.)  It is my understanding that only prior art references can raise such a question.

101.     Dr. Cohen further has no knowledge of whether the materials he reviewed describe Neonode devices on sale in the US prior to the '721 priority date:

```
22          Focusing just on the N1, Dr. Cohen, have
23    you seen any evidence as to when it was released
24    in the United States?
25          A.  I -- no, not as far as I know.
1           Q.  Okay.  Now moving on to the N1M, have
2     you seen any evidence as to when it was released
3     in the United States?
4           A.  No.
```

(Cohen Depo. 207-208.)

102.     Dr. Cohen has no way to confirm that the materials he reviewed accurately describe the full functionality of the Neonode devices.  For example, although the Neonode materials show that the device can be unlocked by a left to right sweep, they do not disclose whether this sweep begins at a predefined location or ends at a predefined unlock region.  Without testing the device to determine whether a sweep from any location or to any location on the device would unlock it, Dr. Cohen cannot know that the "predefined location" and "predefined unlock region" limitations exist.

103.     Dr. Cohen also cannot know the extent of user input available to the Neonode's "locked state" without testing all possible user inputs on the device – an analysis that Dr. Cohen made clear is critical to his non-infringement analysis.  (Cohen Decl. ¶¶ 98-103.)

104.     Dr. Cohen further admits that "the Neonode phones do not explicitly move an unlock image in accordance with the detected contact."  (Cohen Decl. ¶ 146.)

105.     For at least the above reasons, the '721 patent is not obvious in view of the Neonode, as the Neonode (1) is not confirmed as prior art, and does not disclose, (2) moving an unlock image in accordance with user input (3) from a predefined location (4) to a predefined location, or (5) under Dr. Cohen's analysis, "unlocking" the device.

106.     It further would not have been obvious to one of ordinary skill in the art to combine the built-in terminal in the Plaisant video that was connected to large devices such as heaters and home security systems with the Neonode phone that would likely be put into a pocket or a purse, as these two devices would face very different touchscreen challenges.  To argue otherwise is simply applying a hindsight view of the world to seek to recreate the claimed invention of the '721 patent after the fact.

107.     Even if Plaisant and Neonode were combined, because the Neonode device does not disclose moving a single unlock image continuously in accordance with user contact – an element that is undisputedly missing from both Neonode and Plaisant, these two references in combination also do not render the '721 patent obvious.

**C.     The Additional References Cited by Dr. Cohen Do Not Render the '721 Patent Obvious**

108.     Dr. Cohen cites a handful of additional references, and briefly asserts without a detailed analysis that these references render the '721 patent obvious.  (Cohen Decl. ¶¶ 158-169.) None of these references adds any strength to Dr. Cohen's obviousness analysis.

**1.     Claims 7, 8, 12 and 15 of the '721 Patent are Not Obvious in View of Tokkonen**

109.     Dr. Cohen admits that "Tokkonen does not expressly disclose that one of the predetermined actions is unlocking a device."  (Cohen Decl. ¶ 160.)  Dr. Cohen incorrectly states,

however, that "it would have been obvious at the time of invention to one of ordinary skill in the art to unlock a device based on a detected action."  (*Id.*)

110.     Tokkonen teaches moving an object in order to perform an action *on that object*. (Cohen Decl. ¶ 159 "When the user drags data object 302 to a particular predefined region, . . . the device's controlling means performs a predetermined action on the basis of the detected action, such as saving the data object, printing the data object, copying the data object, or deleting the data object.")  This is a very different action than moving a data object to unlock a hand-held device. Thus, it would not be obvious to one of skill in the art to combine Tokkonen with Plaisant or NeoNode to move a data object *in order to act on/unlock the device*, based just on a disclosure in Tokkonen of moving the data object *to act on the data object*.  Dr. Cohen fails to provide any reasons to the contrary, and thus has not established that any of the asserted claims are obvious.

### 2.     Claims 7, 8, 12 and 15 of the '721 Patent are Not Obvious in View of Keller

111.     As Dr. Cohen admits, "Keller was discussed during the prosecution of the parent application that resulted in the issuance of the '849 Patent."  (Cohen Decl. ¶ 161.)  Given that Keller, Plaisant and NeoNode were all cited during the prosecution of the '721 patent, Dr. Cohen's argument that the asserted claims are obvious in light of Keller is particularly weak.  Just as was stated during the prosecution of the '849 patent (the parent to the '721 patent), "[u]nlocking the device is not the same as unlocking a restricted function on the device.  Indeed, unlocking a restricted function in Keller occurs when the computer is already in an unlocked state."  (Cohen Decl. Ex. E at 15-16.)  As a result, Dr. Cohen's argument is simply incorrect.

### 3.     Claims 7, 8, 12 and 15 of the '721 Patent are Not Obvious in View of Chambers and Schrock

112.     Dr. Cohen briefly discusses, without a detailed analysis, combining the Chambers and Schrock references with the references I have discussed above.  (Cohen Decl. ¶¶ 166-169.)

113.     Like NeoNode, both Chambers and Schrock fail to disclose moving an unlock image in order to unlock the device.  Dr. Cohen further does not identify any claim element that Chambers or Schrock disclose that are missing from the references I have discussed above.  Chambers and Schrock are therefore merely cumulative of the references I have previously discussed.

**D.     Secondary Considerations of Non-Obvious Strengthen My Validity Opinion**

114.     In addition to the above reasons why Dr. Cohen has not established the obviousness of any of the asserted claims, so-called "secondary considerations of non-obviousness," such as Samsung's competition with Apple, the iPhone's commercial success, the marketing of the iPhone using the slide-to-unlock feature, the consumer surveys pointing to the slide-to-unlock's usability as a factor in the iPhone's success, and the 16-year gap between the Plaisant reference and the iPhone slide-to-unlock solution, all are factors that must be considered and strengthen my opinion that the asserted claims of the '721 patent are valid.  (*See, e.g.*, Preliminary Injunction Brief, D.I. 11 at 4; Vellturo Decl. ¶¶ 3, 47; Cohen Depo. at 280.)

1.     It is my opinion that numerous Apple products include the slide to unlock invention of claims 7, 8, 12 and 15, including the iPhone 3GS, the iPhone 4, the iPhone 4S, the iPad, the iPad 2, the New iPad, and the iPod Touch.

2.     My opinion that the claimed inventions are implemented in the above-mentioned Apple products is based upon my use and examination of an iPhone 3GS, the iPhone 4, the iPhone 4S, the iPad, the iPad 2, the New iPad, and the iPod Touch.

3.     I have reviewed the Declaration of Christopher Vellturo, and from his declaration, I understand the Apple products that incorporate the claimed inventions to be incredibly commercially successful.

**III.     Claims 7, 12 and 15 of the '721 Patent are Not Indefinite**

115.     In his report, Dr. Cohen claims that Claims 7 and 12 of the '721 patent "are indefinite, because the patent provides no guidance in determining whether a particular device is locked or unlocked."  (Cohen Decl. ¶ 69.)   However, I understand that only claims "not amenable to construction" or "insolubly ambiguous" are indefinite. Claims 7 and 12 of the '721 patent are thus not indefinite.

116.     With respect to the definition of a locked state, the patent gives the following guidance:

> In the user-interface lock state (hereinafter the "lock state"), the device **100** is powered on and operational but ignores most, if not all, user input. That is, the device **100** takes no action in response to user input and/or the device **100** is prevented from performing a predefined set of operations in response to the user input. The predefined set of operations may include navigation between user interfaces and activation or deactivation of a predefined set of functions. The lock state may be used to prevent unintentional or unauthorized use of the device **100** or activation or deactivation of functions on the device **100**. When the device **100** is in the lock state, the device **100** may be said to be locked. In some embodiments,

('721 Patent, Col. 7-8.)

117.     From this guidance,  one of ordinary skill in the art would understand a device to be locked when it either (1) ignores all input, or (2) prevents a user from performing a predefined set of operations on the device in response to user input.

118.     In fact, during his deposition, Dr. Cohen admitted that one of ordinary skill in the art would unambiguously know what is inside and outside of this first category:

17        Q.   Okay.   And you believe, by the way,

18    that this particular limitation, the unlocking

19    limitation, does have certain things that a

20    person of ordinary skill in the art would

21    unambiguously know is within the scope of that

22    limitation; is that correct?

23        A.   Yes, the embodiment in which no input

24    at all is accepted, I think that that's

25    unambiguously within the scope.

1         Q.   Sure.   And the reverse of that, of

2    course, is that even this claim limitation, the

3    unlocking claim limitation, a person of ordinary

4    skill in the art would be able to read the claim

5    and read the patent and know that there are at

6    least certain things that are unambiguously

7    outside the scope of that claim limitation; is

8    that correct?

9         A.   If -- yes, that's -- that's correct.

(Cohen Depo. at 155-156.)

119.     It is also the case that one of ordinary skill in the art is capable of determining whether or not a device has a "locked state" in which a predefined set of the device's operations does not respond to user input.  According to the '721 patent, the user will know that the device is locked when it "ignores most, if not all, user input."  ('721 Patent 7:64-66.)

Gibson, Dunn &
Crutcher LLP

120.     Dr. Cohen attempts to add a requirement that the patent must define "what functions comprise the 'predefined set of operations.'"  (Cohen Decl. ¶ 72.)  However, a user does not need to know an exact list of such functions in order to determine whether a device falls inside or outside the scope of the patent's claims.  Rather, the user merely needs to be able to determine that there exists a predefined set of operations that the user cannot operate when the device is "locked."

121.     Samsung, too, appears to hold the opinion that its users can determine when the Galaxy Nexus is locked or unlocked, as Samsung uses these exact terms in its own description of the Galaxy Nexus's slide to unlock function in the Galaxy Nexus user's guide:

You can choose among these lock options, listed in approximate order of strength:

● **Slide** provides no protection, but lets you get to the Home screen quickly, or open Camera and start taking pictures immediately.

● **Face Unlock** lets you unlock your phone by looking at it. This is the least secure lock option.

● **Pattern** lets you draw a simple pattern with your finger to unlock the phone. This is slightly more secure than Face Unlock.

● **PIN** requires four or more numbers. Longer PINs tend to be more secure.

● **Password** requires four or more letters or numbers. This is the most secure option, as long as you create a strong password.

(Ex. 3 at 100.)

122.     Even Dr. Cohen eventually admitted in his deposition that "unlocking the device" has a plain and ordinary meaning that one of skill in the art can apply to the '721 claim terms.  Dr. Cohen then proceeded to apply this plain and ordinary meaning in his anticipation analysis:

Gibson, Dunn &
Crutcher LLP

49

```
10          Q.  All right.  Now, when you conducted

11     your anticipation analysis with respect to the

12     Plaisant video, what construction of the

13     unlocking claim limitation did you apply?

14          A.  I applied a plain and ordinary meaning

15     of unlock the device, you know, without making

16     the assumption that it was indefinite.
```

(Cohen Depo. at 156.)

123.     I have been informed by counsel that when a claim term is susceptible to a plain and ordinary meaning, then it is not indefinite.

124.     A user can further distinguish when a device, rather than a particular application (which is not covered by the patent's claims) is locked, from the patent specification's definition of the "lock state" as preventing either "most" or "all" user input.  In contrast to locking the device, locking a single application would *allow* most user input even when the *application* is in a "lock state."

125.     This is consistent with how the Keller reference was distinguished during the prosecution history of the '721 parent's patent (the '849 patent).  There, the applicant explained that "[u]nlocking the device is not the same as unlocking a restricted function on the device.  Indeed, unlocking a restricted function in Keller occurs when the computer is already in an unlocked state." (Cohen Decl. Ex. E at 16.)

126.     For at least the above reasons, claims 7 and 12 of the '721 patent are not indefinite.

**LEGAL STANDARDS APPLIED**

127.    I am not a legal expert and offer no legal opinions in this matter.  However, I have been informed by counsel of the various legal standards that apply to the pertinent technical issues, and I have applied those standards in arriving at my conclusions expressed in this report.

128.    The legal standards that I have previously applied were provided as part of my expert declaration in this matter.  Additional standards upon which I have relied in this rebuttal declaration are set forth below.

**MATERIALS CONSIDERED FOR THIS DECLARATION**

129.    In forming the opinions set forth in this declaration, I have relied on the materials listed in my previous declaration, information disclosed as part of discovery in this matter, as well as my review of the brief, reply declaration of Dr. Vellturo, and declarations of Dr. Cohen, Dr. Plaisant, Mr. Miller, and Dr. Vellturo, and the exhibits thereto, submitted in connection with Samsung's Opposition to the Motion for Preliminary Injunction.  In addition, I have reviewed and considered the transcripts and exhibits from the depositions of Mr. Christie, Dr. Cohen and Mr. Miller that were taken in this case.

130.    I reserve the right to rely upon any additional information or materials that may be provided to me or that are relied upon by any of the proposed Respondents' experts or witnesses, if called to testify or to give additional opinions regarding this matter.

I declare under penalty of perjury that the foregoing is true and correct:

Dated: 14 May 2012         _____
                                            Ravin Balakrishnan, Ph.D.