Highly Confidential - Attorneys' Eyes Only

Page 1

1           UNITED STATES DISTRICT COURT
2           NORTHERN DISTRICT OF CALIFORNIA
3               SAN JOSE DIVISION
4
5    APPLE INC., a California      Case No.
     corporation,
6                                  12-CV-00630-LHK
             Plaintiff,
7
     v.
8
     SAMSUNG ELECTRONICS CO.,
9    LTD., a Korean business
     entity; SAMSUNG ELECTRONICS
10   AMERICA, INC., a New York
     corporation; SAMSUNG
11   TELECOMMUNICATIONS AMERICA,
     LLC, a Delaware limited
12   liability company,
13           Defendants.
14
15
16     HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
17   VIDEOTAPED DEPOSITION GEOFFREY A. COHEN, Ph.D.
18                 Washington, D.C.
19                  May 3, 2012
20                  9:30 a.m.
21
22
     Ref. No. 49120
23
     Pages 1-302
24
     Reporter:  Linda S. Kinkade, RDR, CRR, RMR, CSR
25

Highly Confidential - Attorneys' Eyes Only

Page 2

1
2
3
4
5        The following is the videotaped deposition
6    of GEOFFREY A. COHEN, Ph.D. held at the offices
7    of:
8
9
10        Gibson, Dunn & Crutcher LLP
11        1050 Connecticut Avenue, N.W.
12        Washington, D.C.
13
14
15
16        Taken pursuant to applicable Rules of Civil
17    Procedure, before Linda S. Kinkade, Registered
18    Diplomate Reporter, Certified Realtime Reporter,
19    Registered Professional Reporter, Registered Merit
20    Reporter, Certified Shorthand Reporter (CA), and
21    Notary Public, in and for the District of
22    Columbia.
23
24
25

Page 3

1    APPEARANCES:
2
3        On Behalf of Plaintiff APPLE INC., a
4    California corporation:
5        JASON C. LO, ESQUIRE
6        SARAH E. SIMMONS, ESQUIRE
7        Gibson, Dunn & Crutcher LLP
8        333 South Grand Avenue
9        Los Angeles, California 90071
10        Telephone: 213.229.7153
11        Email: jlo@gibsondunn.com
12
13
14        On Behalf of Defendant SAMSUNG ELECTRONICS
15    CO.:
16        SEAN PAK, ESQUIRE
17        JOHN MCKEE, ESQUIRE
18        Quinn Emanuel Urquhart & Sullivan, LLP
19        50 California Street
20        22nd Floor
21        San Francisco, California 94111
22        Telephone: 415.875.6600
23        Email: seanpak@quinnemanuel.com
24
25    Videographer:  Conway Barker

Page 4

1        INDEX OF EXAMINATION
2    EXAMINATION OF GEOFFREY A. COHEN, Ph.D.    PAGE
3        BY JASON C. LO, ESQUIRE            7
4        BY SEAN PAK, ESQUIRE            294
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1            INDEX OF EXHIBITS
2            (Attached to transcript)
3    NO.        DESCRIPTION            PAGE
4    Exhibit 1    Declaration of Geoff A.        7
5            Cohen, Ph.D.
6    Exhibit 2    U.S. Patent No. 8,046,721    7
7    Exhibit 3    Motion and Memorandum in    245
8            Support of Apple, Inc.'s
9            Motion for a Preliminary
10            Injunction
11    Exhibit 4    Declaration of Christopher    247
12            Vellturo,  Ph.D.
13    Exhibit 5    Binder: Geoff Cohen        294
14            Deposition Prep
15
16
17
18
19
20
21
22
23
24
25

Highly Confidential - Attorneys' Eyes Only

Page 98

1    So in that case your question, would it cut    11:43:37
2  against indefiniteness, yes.  If it were something    11:43:41
3  else, then I think I would have to look at it.    11:43:45
4  BY MR. LO:    11:43:48
5    Q.  By the way, other than perhaps finding    11:44:01
6  the usage of the bright line test in the    11:44:02
7  extrinsic evidence, can you imagine any scenario    11:44:05
8  in which the extrinsic evidence supports a    11:44:08
9  conclusion that the unlocking claim term is    11:44:11
10  definite?    11:44:13
11    MR. PAK:  Objection, calls for    11:44:15
12  speculation, incomplete hypothetical.    11:44:17
13    THE WITNESS:  I'm trying to think of    11:44:20
14  something.  I can't -- you know as I sit here    11:44:22
15  now, I can't think of anything.  You know, I can    11:44:32
16  imagine a completely absurd example of, you    11:44:37
17  know, using the word predefined set and saying    11:44:39
18  the predefined set always means X, Y or Z, but I    11:44:42
19  don't think that's out there and I don't think    11:44:47
20  that's what you're asking.  I can't think of    11:44:48
21  anything.  I mean, like I said, I would be    11:44:49
22  interested to review additional evidence.    11:44:52
23  BY MR. LO:    11:44:54
24    Q.  Okay.  Would you turn to paragraph 84    11:44:54
25  of your declaration?    11:45:00

Page 99

1    A.  Yes.    11:45:08
2    Q.  In paragraph 84 and the subsequent    11:45:09
3  paragraphs you discuss what I think you refer to    11:45:15
4  as the image for the handler, correct?    11:45:18
5    A.  Handle.    11:45:22
6    Q.  Handle.  Yes.    11:45:23
7    A.  Yes.    11:45:24
8    Q.  And just so we're on the same page,    11:45:25
9  the handle is effectively the image or in your    11:45:27
10  view perhaps images that the user interacts with    11:45:31
11  in order to change the state of the device,    11:45:35
12  correct?    11:45:37
13    A.  Well, I would -- I would be a    11:45:38
14  little -- I would say it a little differently.    11:45:42
15  The handle is the representation in software.  I    11:45:43
16  should say the representation -- the handle is    11:45:50
17  an object within the software.    11:45:52
18    Q.  Right.    11:45:56
19    A.  You know, it has multiple images    11:45:56
20  associated with it.  It has a location on the    11:45:59
21  screen associated with it.  So that's -- that's    11:46:02
22  how I would say it.    11:46:07
23    Q.  Okay.    11:46:08
24    A.  So it is not the image or the images;    11:46:08
25  it's -- the handle is the software    11:46:12

Page 100

1  representation.    11:46:13
2    Q.  And one of the things that you discuss    11:46:16
3  in paragraph 85 is that, when the user touches    11:46:25
4  the screen, the image is changed from the locked    11:46:28
5  screen handle normal PNG to the locked screen    11:46:35
6  handle pressed PNG, correct?    11:46:40
7    A.  The image that's displayed on the    11:46:43
8  screen changes from normal to pressed, right,    11:46:48
9  that's correct.    11:46:50
10    Q.  I'm sorry.  And as a shorthand to help    11:46:51
11  the court reporter, when we're referring to the    11:46:55
12  two images that are discussed in paragraph 85,    11:46:59
13  can we just agree to shorthand it to say handle    11:47:02
14  normal and handle pressed?    11:47:10
15    A.  I think that's fair.  Let me just look    11:47:11
16  ahead to see what we talk about when -- excuse    11:47:13
17  me -- when we talk about the target because I    11:47:16
18  don't want to overload that.  Yeah, that's fine.    11:47:19
19  Yes, so normal and pressed will refer to images    11:47:26
20  associated with the handle.    11:47:29
21    Q.  Okay.  And it's my understanding that    11:47:30
22  you believe the unlock image claim limitation is    11:47:37
23  not met here because, in fact, the Samsung    11:47:42
24  Galaxy Nexus uses two images, the handle normal    11:47:47
25  and the handle pressed, correct?    11:47:50

Page 101

1    A.  Well, more specifically, that the same    11:47:53
2  image isn't meeting each usage of the unlock    11:47:59
3  image limitation in the multiple different claim    11:48:04
4  limitations.  So it's not solely in isolation    11:48:07
5  that there is two images and -- and the claim    11:48:10
6  requires one, but the claim has antecedents and    11:48:13
7  that the different accused functionalities are    11:48:18
8  actually pointing to different images.  So    11:48:21
9  that's how I would say it.    11:48:23
10    Q.  In reaching your noninfringement    11:48:34
11  conclusions did you look to see whether the    11:48:41
12  specification taught that the unlock image could    11:48:44
13  be an animation?    11:48:50
14    A.  Yeah, I looked at that as well.    11:48:51
15    Q.  Yeah.  And what does the patent teach    11:48:53
16  in terms of whether the unlock image claim    11:48:55
17  limitation can be an animation?    11:48:59
18    A.  It does describe the use of animated    11:49:02
19  arrows.  I don't -- I don't recall the specific    11:49:07
20  language and I don't remember exactly where it    11:49:12
21  is, but, yes, the patent does describe, you    11:49:15
22  know -- I should say the specification does    11:49:18
23  describe the use of animation.    11:49:20
24    Q.  Okay.  And what do you understand    11:49:22
25  generally animation to mean?    11:49:27

Highly Confidential - Attorneys' Eyes Only

1    A. Animation is a technique used in -- I      11:49:30
2  was going to say computers but obviously there   11:49:39
3  is noncomputers too -- but for now, in order to  11:49:41
4  represent something on a screen such that there  11:49:49
5  is an illusion of continuity between points in   11:49:55
6  time and different ways that something might     11:50:00
7  appear, from an implementation point of view     11:50:03
8  there is a lot of different ways that computers  11:50:07
9  implement animation, but I think the point of    11:50:11
10 animation is -- really speaks to user            11:50:15
11 perception, that there is an illusion of         11:50:20
12 sometimes motion or of change.                   11:50:22
13    Q. Okay. In your view, at least within        11:50:25
14 the context of the '721 patent, the unlock image 11:50:29
15 can be animated, correct?                        11:50:35
16    A. Uhm, the specification talks about         11:50:39
17 animation. I'm not sure whether all possible     11:50:43
18 uses of animation would fall within the scope of 11:50:52
19 the '721 especially given the statement in the   11:50:59
20 file history that the animation image -- I'm     11:51:03
21 sorry -- that the unlock image is singular. So   11:51:07
22 I think that that certainly informs my -- it's   11:51:10
23 certainly important for my understanding that    11:51:15
24 the -- in the interview summary -- that the      11:51:18
25 applicant had stated or at least the -- the      11:51:21

1  examiner reported that the applicant had stated  11:51:25
2  that the unlock image is singular.               11:51:28
3     Now, whether that rules out animation         11:51:31
4  entirely, I don't have an opinion on. I didn't   11:51:36
5  actually have to form an opinion because that's  11:51:41
6  not what's going on in the Samsung Galaxy Nexus  11:51:45
7  and that's not what's going on in the prior art. 11:51:48
8     Q. Again, can you limit your answer to my     11:51:50
9  questions, sir?                                  11:51:54
10    A. Well, I think I did answer your            11:51:54
11 question.                                        11:51:56
12    Q. Right, and then you went beyond it.        11:51:56
13 Would you mind just limiting your answer to my   11:51:59
14 question, sir?                                   11:52:01
15    A. To the extent to which I can, yeah.        11:52:02
16    Q. Does -- have you reached a conclusion      11:52:04
17 one way or the other whether the unlock image    11:52:06
18 claim limitation in asserted claims can be       11:52:10
19 animated? Do you have an opinion on that         11:52:13
20 subject matter?                                  11:52:15
21    MR. PAK: Objection, incomplete               11:52:16
22 hypothetical.                                    11:52:17
23    THE WITNESS: Yeah, I think it would          11:52:18
24 depend on how it was implemented and how it      11:52:20
25 appeared to be. So I would look at a particular  11:52:23

1  piece of prior art or look at a particular       11:52:27
2  accused product before I could determine whether 11:52:30
3  that particular animation was inside or outside  11:52:32
4  the scope given the file history.                11:52:35
5  BY MR. LO:                                       11:52:37
6     Q. Would you agree that there are at          11:52:37
7  least some forms of animation -- let me strike   11:52:40
8  that question.                                   11:52:43
9     Do you have an opinion as to whether the      11:52:44
10 unlock image claim limitation absolutely cannot be 11:52:54
11 an animation, that it precludes an animation?    11:52:58
12    A. I haven't come to a conclusion one way     11:53:04
13 or the other about whether it's precluded, but,  11:53:07
14 again, I would be more comfortable looking at a  11:53:09
15 particular implementation and then having an     11:53:12
16 open mind and deciding whether or not it was in  11:53:15
17 the scope.                                       11:53:17
18    Q. You have not drawn a bright line rule      11:53:17
19 in reaching your conclusions that no animation   11:53:20
20 can meet the unlock image claim limitation,      11:53:25
21 correct?                                         11:53:28
22    A. Correct.                                   11:53:28
23    Q. I take it you conclude that the handle     11:53:29
24 on the Galaxy Nexus that we've been talking      11:53:49
25 about, which is the combination of the handle    11:53:52

1  normal and handle pressed, is not an animation;  11:53:55
2  is that correct?                                 11:53:59
3     A. What I -- first, I wouldn't say that       11:54:00
4  it was a combination of the two, but that's -- I 11:54:04
5  would agree that that's not an animation, that   11:54:09
6  there is no -- I mean, by the standard I set     11:54:11
7  forth before, there is no illusion of continuity 11:54:14
8  between one image and the next. One, they look   11:54:17
9  different. One disappears; one appears at a      11:54:21
10 different location. I don't think a person of    11:54:24
11 ordinary skill in the art would understand that  11:54:27
12 to be an animation.                              11:54:28
13    Q. Let me break that down one at a time.      11:54:29
14 Why is it that you conclude that the two images  11:54:33
15 look different, and, therefore, do not give the  11:54:37
16 illusion of continuity?                          11:54:41
17    A. It's my analysis that a person of          11:54:43
18 ordinary skill in the art would understand that  11:54:48
19 a small circle and a padlock icon looks          11:54:49
20 different from a large circle without a padlock  11:54:54
21 icon, and I think also importantly there is no   11:54:56
22 transition between the two, no continuous        11:55:03
23 transition.                                      11:55:06
24    So, for example, if the circle grew          11:55:08
25 slowly, for example, through any implementation, 11:55:17

Highly Confidential - Attorneys' Eyes Only

Page 106

```
 1    I think that would -- that would argue more      11:55:20
 2    towards animation and we could have that debate   11:55:22
 3    at that point, but given that there is no        11:55:24
 4    transition in appearance between two, I think,    11:55:27
 5    inarguably different things, things that are     11:55:32
 6    certainly not identical, they differ in two      11:55:36
 7    important respects -- one is the size of the     11:55:40
 8    circle and one is the complete absence of really 11:55:42
 9    what I would describe as the dominant -- the     11:55:47
10    dominant visual element of the first image --    11:55:49
11    given that there is no transition in appearance, 11:55:54
12    no continuous transition in appearance between   11:55:57
13    the two, and given that there is no continuous   11:55:59
14    transition in location of the two, I certainly   11:56:02
15    don't consider that animation. I think our       11:56:06
16    sophisticated person of ordinary skill in the    11:56:09
17    art with three years experience would not        11:56:11
18    consider that an animation.            11:56:13
19        Q. Okay.                 11:56:16
20        A. And that's -- that's how I reach that     11:56:16
21    conclusion.                    11:56:18
22        Q. All right. Let's break this down a        11:56:18
23    little bit, and I'm going to hand to you         11:56:20
24    something that I'm sure you've seen before,      11:56:23
25    which is a Samsung Galaxy Nexus.          11:56:25
```

Page 107

```
 1        A. Okay.                   11:56:28
 2        Q. And you see on there that there are --   11:56:29
 3    right now it's in a -- in a what we'll call a    11:56:32
 4    locked state, but I know you'll probably         11:56:38
 5    disagree with the terminology, but essentially   11:56:40
 6    what you'll see right at the end of paragraph 86 11:56:42
 7    of your declaration.               11:56:45
 8        A. Yes.                    11:56:47
 9        Q. Other than I, of course, have changed    11:56:48
10    the wallpaper. Do you see that, sir?        11:56:50
11        A. Mm-hmm.                 11:56:52
12        Q. Now, right now what you're looking at,  11:56:53
13    if you press the power button, is you presumably 11:56:54
14    are looking at, among other things, the handle   11:56:57
15    normal image, correct?             11:57:00
16        A. That's correct.             11:57:01
17        Q. And that's got a circle and a padlock   11:57:02
18    on it?                      11:57:04
19        A. Yes.                    11:57:04
20        Q. And as I understand it, one of the      11:57:05
21    bases for you to conclude that there is no       11:57:06
22    continuity is that, when a user presses down on  11:57:09
23    the screen, the handle press image doesn't       11:57:11
24    contain a padlock in it, correct?         11:57:15
25        A. That's correct.             11:57:17
```

Page 108

```
 1        Q. All right. The padlock that's on the    11:57:17
 2    screen when it's not being pressed, would you    11:57:21
 3    say that that is bigger or smaller than the size 11:57:24
 4    of your fingers?                 11:57:28
 5        A. Uhm, I would say it's a little bit      11:57:30
 6    bigger than the point of contact of your finger  11:57:37
 7    against the screen and probably smaller than an  11:57:41
 8    average person's finger in entirety.        11:57:44
 9        Q. Okay. Would you agree that, even if    11:57:47
10    that padlock image didn't disappear if you press 11:57:49
11    down on the screen, your fingers would have      11:57:52
12    naturally covered most if not all of the padlock 11:57:54
13    image?                      11:57:58
14        A. It is -- I mean, it is completely       11:57:59
15    clear to me every time I've ever unlocked my     11:58:03
16    phone that that padlock disappeared. It         11:58:05
17    certainly wasn't something that surprised me.    11:58:08
18    So, no, I mean, I think it's very clear that it  11:58:11
19    disappears, that's --             11:58:15
20        Q. I'm not asking you whether it          11:58:16
21    disappeared or not.               11:58:17
22        A. Okay. Then I'm sorry.           11:58:18
23        Q. I'm asking you, as you press down your  11:58:19
24    finger in the normal manner, whatever normal     11:58:21
25    manner you use the device, is it your view that  11:58:23
```

Page 109

```
 1    the padlock had it remained on the screen would  11:58:29
 2    have been hidden under your fingers?        11:58:33
 3        A. I don't know. It's hard to tell.       11:58:36
 4        Q. Okay. You don't know one way or the    11:58:44
 5    other?                      11:58:46
 6        A. Certainly for someone with big fingers  11:58:47
 7    it might happen or it might not. Since that's    11:58:53
 8    actually not the way the phone operates, it's    11:58:55
 9    hard to do that test. I mean, perhaps we could   11:58:57
10    configure it differently where it doesn't        11:58:59
11    lock -- you know, you can configure it          11:59:02
12    differently so that it's the same -- uses the    11:59:04
13    same image and then we could test it. That      11:59:06
14    would be an interesting test although not        11:59:10
15    relevant to the infringement case of the phone   11:59:12
16    as shipped.                    11:59:14
17        Q. Would you mind handing me the phone?    11:59:15
18    We're still talking about your view that there   11:59:48
19    is no continuity because the padlock disappears. 11:59:50
20    If it turns out that the padlock happens to be   11:59:53
21    smaller than the average adult-sized finger such 11:59:56
22    that it would have been covered on a typical     11:59:59
23    touch by user, would that change or alter your   12:00:02
24    opinion that there is a lack of continuity in    12:00:05
25    the two images because the padlock disappears?   12:00:09
```

Highly Confidential - Attorneys' Eyes Only

Page 110

1     A. Well, so I would say a couple things.  12:00:13
2  One is it's not -- you characterize my opinion  12:00:16
3  as being because the padlock disappears, but  12:00:19
4  it's not solely that -- also because the circle  12:00:21
5  changes size.  12:00:23
6     Q. I'm focusing right now on one aspect.  12:00:25
7     A. Okay.  All right.  So I just didn't --  12:00:27
8  I just want that to be clear.  12:00:29
9     Q. Let me restate my question because I  12:00:31
10  want you to just answer my question.  12:00:33
11     A. Okay.  12:00:34
12     Q. Focusing on what you claim to be the  12:00:35
13  disappearance of the padlock upon a user  12:00:37
14  touching the screen, if it turns out that on  12:00:39
15  average use a user's finger would have covered  12:00:43
16  that padlock completely such that it is outside  12:00:45
17  the view of the user, does that change your view  12:00:50
18  as to whether the disappearance of the padlock  12:00:54
19  in a subsequent image breaks the continuity from  12:00:56
20  the user's visual perspective?  12:00:58
21     A. Well, I'm happy to entertain the  12:01:02
22  hypothetical, but I think it's important to  12:01:11
23  remember, you know, the charge I was given.  The  12:01:15
24  question is whether or not, of course, the  12:01:20
25  accused features meet the claim limitations, and  12:01:23

Page 111

1  these are claim limitations that discuss code  12:01:26
2  modules and the functionality of those code  12:01:28
3  modules.  12:01:33
4     So although I think it can be interesting  12:01:34
5  to restrict ourselves for the moment to purely  12:01:37
6  what it looks like, and I think it can, in fact,  12:01:43
7  be helpful to look at what it looks like, and  12:01:47
8  obviously I included screenshots in my  12:01:49
9  declaration -- those are helpful, certainly  12:01:52
10  helpful to explain to someone without a  12:01:54
11  technical background -- the relevant inquiry for  12:01:56
12  this case has to be the claims cover code and we  12:02:01
13  need to see what the code does.  And so that  12:02:05
14  ultimately is important -- is more important of  12:02:08
15  what the code is, so --  12:02:12
16     Q. Wait a minute, sir.  Are you saying  12:02:13
17  that without the code you would not be able to  12:02:14
18  tell whether this device infringes the unlock  12:02:16
19  limitation -- unlock image limitation or not?  12:02:20
20     A. I'm not saying that, but I'm saying  12:02:22
21  that the -- the claims are directed to code, and  12:02:24
22  so we need to understand when doing an analysis  12:02:27
23  that we can't -- we need to understand the  12:02:33
24  code -- let me say this:  the code provides  12:02:41
25  extremely relevant data as well as how it works,  12:02:45

Page 112

1  and so we can't ignore that.  12:02:50
2     Q. What limitations, walk me through  12:02:51
3  them, of claim 8 requires one to take a look at  12:02:55
4  the code?  12:02:58
5     A. Claim 8.  12:02:58
6     Q. 7.  Sorry.  12:03:00
7     A. Oh.  Well --  12:03:01
8     Q. Let's just take it one at a time.  12:03:04
9     A. I would say one or more modules --  12:03:06
10     Q. One second.  12:03:09
11     A. Okay.  12:03:11
12     Q. We're on claim 7, correct?  12:03:12
13     A. Yes.  12:03:15
14     Q. All right.  And to save the reporter  12:03:15
15  time, don't read the whole thing, just point us  12:03:18
16  to where what particular limitations you  12:03:20
17  believe -- so that we're saving her some  12:03:26
18  strokes.  12:03:28
19     A. Okay.  Well, it's the limitation that  12:03:28
20  starts with one or more modules and ends with  12:03:30
21  modules including instructions, and then the  12:03:35
22  call, and then every other claim limitation is a  12:03:39
23  verb form that -- what is underneath that  12:03:45
24  calling.  12:03:52
25     Q. Understood.  And which of those  12:03:53

Page 113

1  limitations, if any, do you require assessment  12:03:54
2  of the underlying code in order to determine  12:03:58
3  whether there is infringement or not?  12:04:00
4     A. I wouldn't say that any of them  12:04:03
5  require it.  I think it is highly -- highly  12:04:07
6  relevant in doing the infringement analysis.  12:04:10
7  You know, the scope of the claim is the code.  12:04:13
8  Given that we have the code, the code is highly  12:04:17
9  relevant to look at.  It certainly -- if there  12:04:19
10  is evidence in the code that -- that contradicts  12:04:24
11  the language in this claim, I think that  12:04:28
12  that's -- that's evidence of noninfringement  12:04:32
13  that is as important or more important than a  12:04:35
14  superficial analysis of what something might  12:04:42
15  look like.  You know, that analysis might be  12:04:44
16  important, might be applicable to a patent that  12:04:46
17  disclosed a user interface, you know, a user  12:04:49
18  interface that appears as following and that  12:04:54
19  when users do something it looks like this, some  12:04:56
20  hypothetical patent that Apple might file.  But  12:04:59
21  that's not the claims at issue.  The claims at  12:05:02
22  issue, both 7 and 12, are talking about  12:05:05
23  modules -- or in 12 they are talking about  12:05:10
24  programs that -- that comprise instructions.  So  12:05:13
25  I just -- I would want to keep in mind that  12:05:18

Highly Confidential - Attorneys' Eyes Only

Page 114

```
 1   that's really the relevant -- that's a highly    12:05:22
 2   relevant inquiry.                    12:05:25
 3       Q.  Do you believe that it would be flawed    12:05:25
 4   to do an analysis of whether the Samsung Galaxy   12:05:27
 5   Nexus infringes claim 7 and claim 12 without     12:05:30
 6   looking at the source code?            12:05:34
 7       MR. PAK:  Objection, vague.        12:05:37
 8       THE WITNESS:  I think, given that the    12:05:40
 9   source code is available, that means you're not   12:05:41
10   looking at all the relevant materials.    12:05:43
11   BY MR. LO:                          12:05:46
12       Q.  Could one of ordinary skill in the art   12:05:46
13   determine that there is infringement with the    12:05:50
14   Samsung Galaxy Nexus without looking at the    12:05:55
15   source code?  Is that an impossible task in your   12:05:57
16   view?                              12:06:00
17       A.  Well, I think a person of ordinary    12:06:01
18   skill in the art could determine that it doesn't   12:06:03
19   infringe without looking at the source code.    12:06:06
20       Q.  Can they determine that it does    12:06:08
21   infringe without looking at the source code?    12:06:09
22       A.  Well, I don't believe it does    12:06:13
23   infringe.  If you're asking some other    12:06:17
24   hypothetical phone that I don't have an opinion    12:06:18
25   on, I guess it would depend on how that    12:06:20
```

Page 115

```
 1   hypothetical phone worked.  It's clear from the    12:06:25
 2   way the Samsung Galaxy Nexus works at a user    12:06:27
 3   level that it doesn't infringe, and I think the    12:06:30
 4   code is extremely persuasive evidence that    12:06:32
 5   confirms that.                    12:06:35
 6       Q.  You said you're not able to answer the   12:06:45
 7   question on infringement with respect to another   12:06:47
 8   hypothetical phone.  What -- in what    12:06:48
 9   circumstances would you feel necessary to have    12:06:52
10   the code in order to determine infringement?    12:06:54
11       MR. PAK:  Objection, incomplete    12:06:58
12   hypothetical.                    12:06:59
13       THE WITNESS:  I would have to look at    12:07:01
14   a particular device and see the way it worked,    12:07:09
15   and it might be that there is some ambiguity,    12:07:11
16   but I -- sitting here I don't know.  All I know    12:07:13
17   is that, I think, given that you have evidence    12:07:16
18   of -- in the form of source code, that you ought   12:07:20
19   to look at it, and in this case -- really all I    12:07:24
20   can speak of is this case.  I didn't perform    12:07:27
21   infringement analysis on other devices.    12:07:29
22   BY MR. LO:                          12:07:31
23       Q.  And if you have no analysis on other    12:07:31
24   devices, I'm fine -- that's fine, Dr. Cohen --    12:07:33
25   but you understand that I'm entitled to know if    12:07:36
```

Page 116

```
 1   you do have an opinion, correct?        12:07:37
 2       A.  Sure.                    12:07:39
 3       Q.  So my question is, sitting here right    12:07:39
 4   now, do you have a view of any specific    12:07:42
 5   circumstances where it would be impossible to    12:07:45
 6   determine infringement without having access to    12:07:48
 7   the source code?                    12:07:50
 8       A.  I can't think of any cases now, but,    12:07:52
 9   you know, again, I wouldn't be surprised if such   12:07:55
10   cases existed.                    12:07:57
11       Q.  Okay.  In this case you believe it    12:07:58
12   would be flawed to perform an infringement or    12:08:00
13   noninfringement analysis without looking at the   12:08:03
14   source code, correct?                12:08:05
15       A.  I think it would be flawed in the    12:08:07
16   sense that you're ignoring highly relevant and    12:08:09
17   available information, which is like in any case    12:08:12
18   if you looked at some of the evidence and you    12:08:17
19   said, well, turned out there were some    12:08:19
20   fingerprints in the room but we didn't look at    12:08:22
21   that because we looked at the camera, you know,    12:08:24
22   I think the -- the best way to proceed, and    12:08:27
23   certainly this is our standard operating    12:08:30
24   procedure, you know, mine, as a technical    12:08:32
25   consultant, which is what I spend most of my    12:08:35
```

Page 117

```
 1   time doing, is to look at all the evidence and    12:08:37
 2   consider the weight of all the evidence and    12:08:39
 3   understand the way in which some evidence might    12:08:41
 4   corroborate others, and sometimes they are in    12:08:44
 5   conflict and you need to understand why they    12:08:46
 6   might be in conflict.                12:08:48
 7       So I think it would be flawed in sort of a   12:08:49
 8   procedural sense to completely ignore available    12:08:51
 9   information that especially given that the scope   12:08:54
10   of the claims is directed towards code.  If you   12:08:59
11   have the code, I think -- I would certainly -- if   12:09:02
12   someone did an analysis on a claim that says, we   12:09:05
13   claim code, and they had the code available but    12:09:08
14   chose not to look at that, then I think I would    12:09:10
15   agree that that's a flawed analysis.    12:09:12
16       Q.  If in your view these claims relate to   12:09:16
17   code, how is it ever possible to find    12:09:21
18   infringement without looking at code?    12:09:24
19       A.  Oh, I think it's -- I didn't say it    12:09:26
20   was impossible.  I said that code is also    12:09:29
21   relevant, and it would be a flawed professional    12:09:30
22   job to not consider all the available evidence.    12:09:34
23   You know, in our hypothetical criminal case, if    12:09:37
24   there were no fingerprints behind, then    12:09:40
25   obviously you can't consider the fingerprints.    12:09:42
```

Highly Confidential - Attorneys' Eyes Only

Page 146

1  mean, maybe we could run that test, but I -- I        13:16:35
2  think it at that point -- target unlock is            13:16:38
3  replaced with target pressed -- I don't recall,       13:16:44
4  but some equivalent of target pressed, right.         13:16:48
5  Target looks different after the discontinuous        13:16:51
6  jump. And I think that that might be the only         13:16:53
7  image rendered on the screen, but I would have        13:16:55
8  to look both at the behavior and at the -- and        13:16:57
9  at the code. I don't recall right now.                13:17:00
10     Q. So let me just ask you about the               13:17:01
11  visual aspect of it, then.                           13:17:03
12     A. Okay.                                          13:17:05
13     Q. After the discontinuity that you              13:17:05
14  describe, as the handle pressed gets close to        13:17:08
15  unlock target, the open padlock has a circle         13:17:12
16  surrounding it, correct?                             13:17:17
17     A. Yeah, after it jumps.                         13:17:18
18     Q. Correct.                                      13:17:23
19     A. Yes.                                          13:17:23
20     Q. Okay.                                         13:17:24
21     A. That's correct.                              13:17:24
22     Q. And visually does that circle appear         13:17:25
23  to be the same size as the circle that's            13:17:28
24  depicted by handle pressed?                          13:17:32
25     A. I don't recall whether that's true.           13:17:36

Page 147

1     Q. I'll hand you --                               13:17:40
2     A. Perhaps it is.                                 13:17:42
3     Q. -- the phone itself so you can attempt         13:17:42
4  to answer that question.                              13:17:44
5     A. Right. So that does appear to be the          13:17:46
6  same. I just unlocked your camera. Right.            13:17:52
7  Okay.                                                 13:18:04
8     Q. It does appear to be the same size,           13:18:06
9  correct?                                              13:18:07
10     A. As far as I can tell from visual             13:18:08
11  inspection, yeah.                                     13:18:10
12     Q. Yes. And from your visual inspection,        13:18:11
13  after the circle appears on top of the open          13:18:13
14  padlock, does some portion of it still appear        13:18:16
15  under your finger?                                    13:18:19
16     A. Okay. I'll have to check again. Hard         13:18:20
17  to tell. Looks right on the edge, so it's --        13:18:31
18  it's possible, but it's certainly displaced a       13:18:35
19  great deal from what used to be the circle was      13:18:38
20  centered under the point of contact, and now,       13:18:42
21  you know, it might happen to overlap depending      13:18:45
22  on -- depending on the size of your touch.          13:18:48
23     Q. Okay. You certainly wouldn't be able         13:18:51
24  to look at the circle after it's on top of the      13:18:53
25  open padlock and say definitively that no           13:18:56

Page 148

1  portion of your finger is within the                  13:18:59
2  circumference of the circle, correct, as you're      13:19:00
3  using it right now?                                   13:19:03
4     A. Right. Yeah, I -- after the                    13:19:04
5  discontinuous jump, I can't say that there isn't     13:19:08
6  some portion that might overlap your finger          13:19:09
7  touch.                                                13:19:11
8     Q. In your prior usage of the Galaxy            13:19:12
9  Nexus did you have any instance in which after      13:19:16
10  the discontinuous jump and the circle appears       13:19:18
11  over the open padlock you noticed that no           13:19:21
12  portion of your finger was on top of the circle?    13:19:25
13     A. I don't think I was watching for             13:19:29
14  careful things before this case, so -- I don't      13:19:34
15  specifically recall that one way or the other.      13:19:36
16     Q. Do you own one of these, by the way,         13:19:38
17  personally?                                          13:19:40
18     A. I use one every day, yeah. It's my           13:19:40
19  everyday phone.                                      13:19:43
20     Q. Did you get it before or after your          13:19:44
21  involvement in this matter?                          13:19:45
22     A. Before.                                       13:19:46
23     Q. Let's talk a little bit about your           13:19:47
24  invalidity conclusions.                              13:20:49
25     A. Okay.                                         13:20:51

Page 149

1     Q. You understand based on your                   13:20:52
2  experience that there is a difference between        13:21:01
3  anticipation and obviousness, correct?               13:21:04
4     A. Correct.                                       13:21:06
5     Q. And in your declaration you've taken          13:21:07
6  opinions that certain of the prior art               13:21:12
7  anticipates the asserted claims while others in      13:21:16
8  combination render the asserted claims obvious,      13:21:21
9  correct?                                              13:21:24
10     A. Yes, that's correct.                          13:21:26
11     Q. Is it correct that the only prior art        13:21:30
12  you assert anticipates the asserted claims of       13:21:34
13  the '721 is the what we'll refer to as the          13:21:39
14  Plaisant prior art?                                  13:21:42
15     A. Well, the Plaisant video is the              13:21:44
16  position -- there is a Plaisant paper as well,      13:21:48
17  and, clearly, they are highly related and they      13:21:52
18  accompany each other, and so I can imagine a        13:21:58
19  separate legal argument that the lawyers will       13:22:01
20  get to whether it's a single reference, but I do    13:22:04
21  argue that the Plaisant video by itself             13:22:07
22  anticipates.                                         13:22:09
23     Q. Right. Is there any other prior art          13:22:10
24  disclosed in your declaration in which you argue    13:22:11
25  that that art alone anticipates any of the          13:22:14

Highly Confidential - Attorneys' Eyes Only

Page 150

1  asserted claims of the '721?                13:22:16
2      A. I don't believe so.                  13:22:19
3      Q. All right. Now, you understand that  13:22:20
4  in order to anticipate a claim it is a two-step  13:22:30
5  process, correct?                           13:22:36
6      A. Correct.                             13:22:38
7      Q. The first step being you must come up  13:22:38
8  with a claim construction, correct?         13:22:40
9      A. Correct.                             13:22:42
10     Q. And the second step being that you   13:22:43
11 must find that the prior art falls within the  13:22:45
12 scope of that claim construction, correct?  13:22:49
13     A. With the whole person of ordinary    13:22:50
14 skill in the art thing in there, yes.       13:22:56
15     Q. Yes. Assuming that you were from the  13:22:57
16 perspective of a person of ordinary skill in the  13:22:59
17 art would find that the claim limitation as  13:23:02
18 construed is satisfied by the prior art,    13:23:04
19 correct?                                    13:23:07
20     A. Well, I don't think -- just in case,  13:23:07
21 you know, my understanding is that claim    13:23:13
22 construction doesn't necessarily happen, that  13:23:17
23 the person of ordinary skill in the art     13:23:21
24 understands the claims that there isn't     13:23:22
25 necessarily a separate proceeding where a judge  13:23:24

Page 151

1  has to rule on the construction. I'm not sure  13:23:26
2  if that's the distinction you were --       13:23:28
3      Q. No, I'm not drawing that distinction.  13:23:29
4      A. Okay, then --                        13:23:31
5      Q. And I'm just looking at paragraph 28  13:23:32
6  of your declaration. Is it your understanding  13:23:34
7  that to find anticipation one must -- and I'm  13:23:43
8  not saying it has to be the court -- one must  13:23:47
9  first construe the claim, and then, second,  13:23:49
10 compare the properly construed claim to the  13:23:52
11 prior art on a limitation-by-limitation basis  13:23:54
12 from the perspective of a person of ordinary  13:23:56
13 skill in the art?                           13:23:59
14     A. Yes, it is.                          13:23:59
15     Q. Okay. And when you concluded that the  13:24:00
16 Plaisant video anticipated the claims of the  13:24:04
17 '721 patent, did you follow that procedure  13:24:07
18 exactly?                                    13:24:10
19     A. I believe so to the best of my       13:24:12
20 ability.                                    13:24:14
21     Q. Okay. You didn't deviate from that   13:24:15
22 procedure, correct?                         13:24:17
23     A. As far as I know I haven't.          13:24:18
24     Q. All right. Now, you were alluding to  13:24:19
25 this earlier. Obviously there has been no claim  13:24:32

Page 152

1  construction issued by the court, correct?  13:24:35
2      A. That's my understanding.             13:24:36
3      Q. And so in order to find anticipation  13:24:37
4  and applying the procedures that you set forth  13:24:41
5  in your declaration, I assume that you had in  13:24:43
6  your mind a specific construction of every claim  13:24:46
7  with which you were comparing the Plaisant video  13:24:49
8  against, every claim limitation with which you  13:24:52
9  were comparing the Plaisant video against; is  13:24:56
10 that correct?                               13:24:58
11     A. Yes.                                 13:24:59
12     Q. Now there is not a portion of your   13:24:59
13 declaration, correct, Dr. Cohen, in which you  13:25:02
14 set forth the specific constructions that you  13:25:05
15 utilized in your analysis?                  13:25:08
16     A. Well, my analysis was based on a     13:25:10
17 person of ordinary skill in the art giving all  13:25:13
18 the words in the claim their plain and ordinary  13:25:17
19 meaning as they would have understood at the  13:25:21
20 time the patent was filed, with the exception of  13:25:23
21 unlocking the device, which you and I have had  13:25:27
22 discussions about this morning.             13:25:30
23     Q. All right. And with respect to the   13:25:31
24 unlocking, what did you do with that claim   13:25:33
25 limitation?                                 13:25:36

Page 153

1      A. Well, if it's indefinite, then I     13:25:38
2  believe it's impossible for something to    13:25:44
3  anticipate in a definite claim, so I didn't  13:25:45
4  perform a separate analysis under the       13:25:48
5  alternative that the court finds it indefinite.  13:25:53
6      Q. One second. I want to make sure I    13:25:59
7  understand you. If the court finds the claim  13:26:01
8  limitation to be indefinite, then there is  13:26:05
9  really no need for you to do an anticipation  13:26:08
10 analysis, correct?                          13:26:10
11     A. That's my understanding of -- of the  13:26:11
12 law.                                        13:26:13
13     Q. Because the claim would be invalid.  13:26:13
14 All right. And, of course, if the claim is  13:26:15
15 indefinite, there would be, in your view at  13:26:18
16 least, no way to perform an analysis, correct,  13:26:20
17 because you would not know what falls within or  13:26:23
18 outside the scope of that limitation? Is that  13:26:25
19 correct?                                    13:26:27
20     A. Well, I'm not -- I'm not actually sure  13:26:27
21 that's true. My -- my testimony earlier, I  13:26:32
22 believe -- my testimony in my declaration -- is  13:26:42
23 that unlocking a device to the extent to which  13:26:45
24 it's indefinite, that doesn't mean that there is  13:26:49
25 no possible state that might satisfy the claims.  13:26:52

Highly Confidential - Attorneys' Eyes Only

Page 154

```
 1    Earlier I referred to a bright line test.  So    13:26:58
 2    even if the entirety of the term unlocking the   13:27:00
 3    device is indefinite, I think there are points   13:27:03
 4    that would clearly fall within or fall without   13:27:05
 5    the scope of the claim.                          13:27:09
 6         So, for example, a device that's completely  13:27:10
 7    off or unavailable to user input, I think we, you 13:27:14
 8    know, Dr. Balakrishnan and the embodiment and I  13:27:20
 9    all agree that that does fall within the scope   13:27:23
10    even if it's indefinite.  The problem with the   13:27:26
11    indefiniteness is there is no bound -- no bright 13:27:29
12    line test other than that.  So if that's not the 13:27:32
13    bright line test, if it's a continuum -- somewhere 13:27:34
14    on the point of the continuum in between no       13:27:37
15    features at all are available and every feature is 13:27:40
16    available, I think everyone would agree on those  13:27:43
17    endpoints that the first endpoint is within the  13:27:45
18    scope and the second endpoint is outside the     13:27:47
19    scope, so --                                     13:27:50
20         Q.  Let me see if I understand your          13:27:51
21    opinions, then.  If the court accepts all of     13:27:54
22    your opinions with respect to indefiniteness and 13:27:56
23    Judge Koh were to ask you, Dr. Cohen, having     13:28:01
24    accepted all your things, are there certain      13:28:04
25    things that are definitively without -- outside  13:28:05
```

Page 155

```
 1    the scope of the unlocking limitation and        13:28:09
 2    unambiguously inside the unlocking claim         13:28:12
 3    limitation, would you tell Judge Koh that there  13:28:16
 4    still are things that fit those categories?      13:28:20
 5         A.  Yes, I think that's right.               13:28:23
 6         Q.  Okay.  And so it is your opinion that,   13:28:24
 7    even though there are specific things that are   13:28:31
 8    within and without -- strike that.               13:28:35
 9         It's your opinion that, even though a person 13:28:39
10    of ordinary skill in the art might find certain  13:28:42
11    things to be inside the scope of the unlocking   13:28:45
12    limitation and outside the scope of the unlocking 13:28:48
13    limitation, that you, nevertheless, conclude the 13:28:51
14    unlocking claim limitation is indefinite; is that 13:28:53
15    correct?  Can you answer that yes or no?         13:28:56
16         A.  Yes, it's still indefinite.              13:29:00
17         Q.  Okay.  And you believe, by the way,      13:29:02
18    that this particular limitation, the unlocking   13:29:06
19    limitation, does have certain things that a      13:29:09
20    person of ordinary skill in the art would        13:29:11
21    unambiguously know is within the scope of that   13:29:14
22    limitation; is that correct?                     13:29:17
23         A.  Yes, the embodiment in which no input    13:29:19
24    at all is accepted, I think that that's          13:29:22
25    unambiguously within the scope.                  13:29:24
```

Page 156

```
 1         Q.  Sure.  And the reverse of that, of       13:29:26
 2    course, is that even this claim limitation, the  13:29:30
 3    unlocking claim limitation, a person of ordinary 13:29:33
 4    skill in the art would be able to read the claim 13:29:37
 5    and read the patent and know that there are at   13:29:38
 6    least certain things that are unambiguously      13:29:40
 7    outside the scope of that claim limitation; is   13:29:43
 8    that correct?                                    13:29:46
 9         A.  If -- yes, that's -- that's correct.     13:29:46
10         Q.  All right.  Now, when you conducted      13:29:51
11    your anticipation analysis with respect to the   13:30:00
12    Plaisant video, what construction of the         13:30:03
13    unlocking claim limitation did you apply?        13:30:16
14         A.  I applied a plain and ordinary meaning   13:30:21
15    of unlock the device, you know, without making   13:30:30
16    the assumption that it was indefinite.           13:30:34
17         Q.  And what was the plain and ordinary      13:30:36
18    meaning?                                         13:30:38
19         A.  I don't think in my declaration that     13:30:40
20    I -- I spelled it out, I mean, in some sense,    13:30:46
21    what the plain, ordinary meaning means is that   13:30:50
22    the plain, ordinary meaning are those words      13:30:53
23    themselves.  I'm not sure I have a separate      13:30:55
24    different construction of unlock the device, but 13:30:57
25    I think it's -- it's that meaning disclosed by   13:30:59
```

Page 157

```
 1    the specification, you know, the weight of the   13:31:02
 2    intrinsic evidence, that, when a device is       13:31:06
 3    locked, it is effectively off, that the user     13:31:11
 4    input is ignored.  When it is unlocked, it is -- 13:31:17
 5    the full range of functionality is -- is         13:31:22
 6    available to it.                                 13:31:24
 7         Q.  So the construction you apply to find    13:31:25
 8    anticipation in the locked state no functions    13:31:30
 9    are available other than unlocking, correct?     13:31:34
10         A.  Correct.                                 13:31:38
11         Q.  And in the unlocked state, well, a       13:31:39
12    bunch of functions are available at that time,   13:31:44
13    correct?                                         13:31:46
14         A.  Well, the complete range of functions    13:31:46
15    would be available.                              13:31:48
16         Q.  All right.  On that particular device.  13:31:49
17         A.  Sure.                                    13:31:53
18         Q.  Using this construction, what portion   13:31:54
19    of your declaration describes the device         13:32:23
20    depicted in the Plaisant video in a completely   13:32:29
21    locked state?                                    13:32:31
22         A.  That would be where something was off,   13:32:34
23    where, you know, a device is off.                13:32:40
24         Q.  And can you point me to the portion of  13:32:43
25    your declaration where you describe or you show  13:32:46
```

Highly Confidential - Attorneys' Eyes Only

Page 158

1  the Plaisant video disclosing that limitation?   13:32:53
2      A.  Well, I think the pictures from the   13:33:02
3  video show the word "off," and, you know, I   13:33:05
4  think a person of ordinary skill in the art in   13:33:11
5  2005 viewing that video would understand that a   13:33:13
6  disclosure that an off switch that's used to   13:33:21
7  control devices, that that discloses locking a   13:33:23
8  system in a way that user input is no longer   13:33:31
9  accessible.   13:33:34
10     Q.  Slow down one second for the reporter.   13:33:35
11  When you're saying "pictures," let's just say   13:33:37
12  which pictures you're looking at so that we have   13:33:39
13  that on the record.   13:33:42
14     A.  Okay.  So every one of the Plaisant   13:33:43
15  screenshots in my report shows some form of a   13:33:49
16  toggle that shows on and off, and the Plaisant   13:33:56
17  video describes them as controlling the state of   13:34:07
18  a device --   13:34:09
19     Q.  Sir, sir, the question was, when we're   13:34:13
20  talking about the pictures, so that we have it   13:34:15
21  on the transcript, which pictures are we talking   13:34:16
22  about?   13:34:19
23     A.  So there's a picture above paragraph   13:34:19
24  117 showing an an on and off slider toggle.   13:34:23
25  There's a picture below paragraph 117 showing   13:34:29

Page 159

1  switch-type toggles.  There is a picture in   13:34:39
2  paragraph 118 showing those switch-like toggles   13:34:42
3  again.  There is a picture above paragraph 120   13:34:47
4  showing switch-like toggles.  And then in   13:34:49
5  paragraph -- well, were you just asking about   13:34:52
6  pictures or were you asking about statements in   13:34:56
7  the declaration --   13:34:58
8      Q.  I'm asking -- I'm asking about   13:34:59
9  pictures that you put in there.   13:35:01
10     A.  Okay.  So those were the pictures that   13:35:02
11  I put in about --   13:35:04
12     Q.  All right.  You would agree,   13:35:06
13  Dr. Cohen, that in every one of the pictures you   13:35:08
14  utilized the screening includes more than one   13:35:11
15  on/off switch or toggle?   13:35:15
16     A.  Yes, that's correct.   13:35:18
17     Q.  And you would agree that the operation   13:35:18
18  at least as taught in the video of any one of   13:35:20
19  those switches would not turn completely --   13:35:22
20  would not completely lock or unlock the device   13:35:24
21  the user is operating, meaning the touchscreen.   13:35:27
22     MR. PAK:  Objection, vague.   13:35:32
23     THE WITNESS:  I think the Plaisant   13:35:35
24  video discloses that clearly, and I -- I agree   13:35:36
25  that there is not a picture in my report, but   13:35:41

Page 160

1  since I attached the entire video as an exhibit,   13:35:45
2  I think to the extent to which the exhibit is   13:35:48
3  part of the report, I think it does fairly   13:35:51
4  clearly disclose an operation that locks that   13:35:53
5  device itself for sure.   13:35:58
6  BY MR. LO:   13:36:00
7      Q.  Okay.  The -- and we'll get to that.   13:36:00
8  The pictures that you disclose in your report,   13:36:03
9  do any of them show the ability to lock and   13:36:08
10  unlock the device itself?   13:36:13
11     MR. PAK:  Objection, vague.   13:36:15
12     THE WITNESS:  They show --   13:36:16
13  BY MR. LO:   13:36:19
14     Q.  Can you answer that question yes or   13:36:19
15  no?   13:36:20
16     A.  Yes, I think it does.   13:36:20
17     Q.  Okay.  Would you tell me -- point me   13:36:21
18  to the picture that you believe shows the   13:36:23
19  locking and unlocking of the device itself.   13:36:25
20     A.  I think any single one of those on/off   13:36:29
21  switches teaches to a person of ordinary skill   13:36:33
22  in the art locking and unlocking a device that   13:36:36
23  is a portion of a system that -- that's being   13:36:41
24  disclosed here.   13:36:44
25     Q.  Do any of these pictures in 116, 117   13:36:45

Page 161

1  and 118 show the ability to turn on and off the   13:36:49
2  device that the user is actually operating, in   13:36:54
3  other words, the touchscreen?   13:36:56
4      MR. PAK:  Objection, vague, assumes   13:36:57
5  facts not in evidence.   13:36:59
6      MR. LO:  Actually let me strike that   13:37:00
7  question.   13:37:01
8  BY MR. LO:   13:37:02
9      Q.  Do any of the pictures that you've   13:37:03
10  referenced in your testimony show the ability to   13:37:04
11  turn to lock or unlock the device that the user   13:37:11
12  is interfacing with?   13:37:17
13     A.  In the sense of the '721 patent,   13:37:19
14  absolutely.   13:37:22
15     Q.  Okay.  In the sense of the claim   13:37:25
16  construction that you've applied to the locking   13:37:30
17  and unlocking -- well, the unlocking term, do   13:37:32
18  any of the photographs -- strike that.   13:37:35
19     Using the construction that you've applied   13:37:39
20  as to what unlocking means, do any of these   13:37:42
21  photographs show the locking and unlocking of the   13:37:46
22  touchscreen device being interfaced with by the   13:37:50
23  user?   13:37:53
24     A.  In the sense that what the '721 patent   13:37:58
25  discloses that -- I mean, let's -- you know --   13:38:01

Highly Confidential - Attorneys' Eyes Only

Page 162

1    Q. Actually let me --    13:38:07
2    A. Okay.    13:38:08
3    Q. Let me see if I can clarify. Is your    13:38:09
4 construction in your view the one that is    13:38:13
5 mandated by the '721 patent? Are they one and    13:38:17
6 the same? Because I keep asking you about your    13:38:20
7 construction and you keep going back to the    13:38:24
8 '721. Are they one and the same in your mind?    13:38:26
9    MR. PAK: Objection, vague.    13:38:29
10    THE WITNESS: I think I apply for my    13:38:30
11 Plaisant analysis the understanding of that    13:38:32
12 claim that a person of ordinary skill in the art    13:38:33
13 would have given the intrinsic evidence and the    13:38:35
14 plain meaning and the words of the claim. And I    13:38:39
15 think it applies either to a bright line test if    13:38:42
16 that's how the court would construe it or to    13:38:48
17 Dr. Balakrishnan's proposed subjective test    13:38:53
18 construction, really independent of which way it    13:38:58
19 construes -- my opinions on Plaisant wouldn't    13:39:04
20 change.    13:39:06
21 BY MR. LO:    13:39:06
22    Q. Okay. But did you actually apply both    13:39:06
23 of those? Did you apply the bright line test    13:39:09
24 and Dr. Balakrishnan's, what you call his    13:39:11
25 subjective test, in order to determine whether    13:39:13

Page 163

1 the Plaisant video anticipates the '721 patent?    13:39:15
2    A. Yes.    13:39:18
3    Q. Okay. So you are able to apply both    13:39:19
4 tests.    13:39:22
5    A. Because Plaisant satisfies the bright    13:39:23
6 line test, it necessarily satisfies a softer    13:39:26
7 version in which the bright line test -- let me    13:39:30
8 try again.    13:39:36
9    Dr. Balakrishnan agrees that the bright line    13:39:37
10 test falls within the scope of his test. Since    13:39:40
11 the Plaisant satisfies that stronger, you know,    13:39:45
12 narrower construction, it necessarily is going to    13:39:49
13 satisfy Dr. Balakrishnan's as well.    13:39:52
14    Q. And the person of ordinary skill in    13:39:54
15 the art looking at Plaisant and looking at the    13:39:56
16 '721 patent would have no question that what it    13:40:01
17 discloses satisfies the unlocking claim    13:40:05
18 limitation in claim 7 of the '721 patent; is    13:40:09
19 that correct?    13:40:12
20    A. That's correct.    13:40:12
21    Q. There would be no question in the mind    13:40:13
22 of the person of ordinary skill in the art that    13:40:15
23 that unlocking limitation has been satisfied by    13:40:16
24 Plaisant, correct?    13:40:19
25    A. To a clear and -- no question. I    13:40:20

Page 164

1 mean, to a clear and convincing evidence    13:40:23
2 standard, yes.    13:40:25
3    Q. Okay. And the person of ordinary    13:40:26
4 skill in the art would have -- would be    13:40:29
5 satisfied to a clear and convincing standard    13:40:32
6 that the Neonode prior art that you discuss in    13:40:37
7 your declaration satisfies the unlocking    13:40:41
8 limitation in the '721 patent; is that correct?    13:40:46
9    A. Just the unlocking limitation.    13:40:50
10    Q. Yeah.    13:40:51
11    A. Yes, absolutely.    13:40:52
12    Q. Okay.    13:40:54
13    A. Under either construction, either sort    13:40:56
14 of notional construction of a bright line test,    13:40:59
15 narrow construction or Dr. Balakrishnan's    13:41:02
16 subjective test. I mean, because the Neonode --    13:41:04
17 no input is possible except for the unlock    13:41:09
18 gesture, which is the narrow -- the narrower    13:41:12
19 embodiment disclosed in the '721.    13:41:15
20    So certainly if the Neonode meets the    13:41:17
21 limitation under the narrow exception, no input,    13:41:20
22 it must meet a broader construction that says    13:41:23
23 somewhere between zero and N minus 1    13:41:26
24 applications are available since zero is the    13:41:31
25 endpoint that's identified in the bright line    13:41:33

Page 165

1 test -- the only case for the bright line    13:41:35
2 test -- and the endpoint or the beginning point    13:41:37
3 for the Balakrishnan.    13:41:39
4    Q. What is your basis for stating that on    13:41:41
5 the Neonode no other input is accepted?    13:41:55
6    A. That's my understanding based on the    13:41:59
7 review of the materials, the user manual, the    13:42:02
8 views, the videos that I was provided by    13:42:07
9 counsel, publicly available videos.    13:42:10
10    Q. And in any of the videos that you    13:42:13
11 reviewed, did the user attempt to --    13:42:16
12    A. It's a noisy day here in D.C.    13:42:28
13    Q. -- to give input to the device other    13:42:31
14 than the unlock region, so to speak?    13:42:34
15    A. I don't specifically recall but I    13:42:39
16 think so. I remember the YouTube video, I    13:42:41
17 recall the person doing it, trying a lot of    13:42:45
18 things. I would want to go back and look again    13:42:47
19 to see whether that particular test was done,    13:42:49
20 but I certainly remember demonstration of the    13:42:50
21 unlock feature, and that it was -- the phone    13:42:53
22 was, in fact, locked in that state, but -- I'm    13:42:57
23 sorry. I just need to watch it again to be    13:43:00
24 completely sure.    13:43:03
25    Q. Sure. And that was going to lead to    13:43:03

Highly Confidential - Attorneys' Eyes Only

Page 166

1  my next question.  Is there a portion of your          13:43:06
2  declaration that describes that aspect of the          13:43:08
3  video?                                        13:43:11
4      A.  Let me look to see.  In paragraph 140          13:43:16
5  quotes the user manual referring to the what           13:43:37
6  they refer to as the key lock feature to make          13:43:40
7  sure no unintentional calls were made.  And the        13:43:47
8  pictures in the user manual and the operation          13:43:50
9  that I've seen confirm my understanding, and          13:43:55
10  certainly I think to a person of ordinary skill       13:43:59
11  in the art they would understand that that           13:44:03
12  disclosed the idea of a fully locked device.         13:44:05
13      Q.  Okay.  What do you -- when you use the        13:44:09
14  term "fully locked device," what exactly renders      13:44:16
15  a device fully locked in your view or in the          13:44:19
16  view of a person of ordinary skill in the art?        13:44:22
17  I'm sorry.                                    13:44:23
18      A.  I think a person of ordinary skill in         13:44:24
19  the art reading the '721 patent would understand      13:44:27
20  that a device that in which no applications or        13:44:29
21  functions are available and that the -- all user     13:44:34
22  input is ignored except for the unlock gesture,       13:44:38
23  you know -- I may have -- that was paraphrasing        13:44:44
24  the embodiment, but to the extent the embodiment      13:44:48
25  discloses an embodiment -- I'm sorry -- the           13:44:50

Page 167

1  specification discloses an embodiment like that,      13:44:52
2  that's the sense in which I mean fully locked as      13:44:56
3  opposed to some functions are available, others      13:44:59
4  need an additional unlock gesture to be made          13:45:03
5  available.                                    13:45:07
6      Q.  All right.  So would you turn to              13:45:08
7  paragraph 117 of your declaration?  And at the        13:45:09
8  bottom of that paragraph there is a screenshot        13:45:13
9  depicting three toggles, two in the off              13:45:16
10  position, one in the on position.  Do you see        13:45:19
11  that, sir?                                    13:45:20
12      A.  I do.                                 13:45:21
13      Q.  And I take it just, you know, this is        13:45:22
14  obviously an excerpt, but the bottom toggle          13:45:25
15  relates to an air conditioner, correct?             13:45:28
16      A.  Correct.                              13:45:30
17      Q.  The middle one refers to a heater?          13:45:30
18      A.  Yes.                                  13:45:32
19      Q.  Do you know what the top one is?  Fan        13:45:33
20  mode?                                        13:45:38
21      A.  You know, I've watched those videos so       13:45:38
22  many times.  I think I would remember.              13:45:41
23      Q.  We'll look -- I'll take a look at            13:45:44
24  it --                                        13:45:47
25      A.  Yeah, I don't specifically recall as I      13:45:47

Page 168

1  sit here now what that controls -- some kind of      13:45:49
2  mode clearly.                                13:45:51
3      Q.  And each of those functions have a          13:45:52
4  toggle associated with it; is that correct?          13:45:57
5      A.  Correct.                              13:46:00
6      Q.  All right.  Based on your                    13:46:00
7  understanding, the understanding of a person of      13:46:04
8  ordinary skill in the art, watching the Plaisant    13:46:07
9  video, would the person of ordinary skill in the    13:46:08
10  art understand that, as long as the air             13:46:12
11  conditioner was in the off mode, the toggles for    13:46:13
12  the other two functions would be ignored?           13:46:17
13      A.  No.                                   13:46:28
14      Q.  Okay.  In fact, all three of those          13:46:29
15  toggles could be operated at any time regardless    13:46:33
16  of whether the other two were in an on or off       13:46:38
17  position.  That's your understanding, correct?      13:46:41
18      A.  For those three particular                  13:46:42
19  applications, yes.                            13:46:44
20      Q.  So turning off the air conditioner          13:46:45
21  doesn't cause the device to ignore input on the     13:46:52
22  heater and whatever mode functionality is on        13:46:57
23  that first toggle; is that correct?                13:47:00
24      A.  Right, but, you know, my testimony is       13:47:02
25  not on the Plaisant system, right.  I'm not         13:47:06

Page 169

1  claiming that the Plaisant system anticipates.      13:47:10
2  I'm claiming the Plaisant video as a reference       13:47:14
3  discloses to a person of ordinary skill in the      13:47:16
4  art.  I mean, even Plaisant says, these are just    13:47:17
5  examples meant explicitly to teach people in the    13:47:20
6  user interface field what some functionality is.   13:47:24
7      So when a person of ordinary skill in the       13:47:30
8  art watches a Plaisant video and they hear her      13:47:32
9  say, this applies to any device, it's for          13:47:35
10  controlling two state devices.  That discloses to   13:47:37
11  a person of ordinary skill in the art to turn       13:47:42
12  devices on or off.                            13:47:44
13      Now in the Plaisant video and there is not a   13:47:45
14  screenshot in it, but that's why we included the   13:47:49
15  whole video.  One of the things that's turning on   13:47:52
16  and off is password protect, which certainly,      13:47:54
17  unquestionably, to a person of ordinary skill in    13:47:58
18  the art they know that that's referring to the     13:48:00
19  interface, the touchscreen itself.  And a person   13:48:03
20  of ordinary skill in the art, knowing that there   13:48:07
21  is a disclosure of password protect, that there is  13:48:09
22  disclosure of two state devices, either on or off,  13:48:12
23  understanding the specification of the '721 patent  13:48:17
24  as, you know, not merely a touchscreen but an       13:48:20
25  entire system that encompasses a touchscreen and a  13:48:24

Highly Confidential - Attorneys' Eyes Only

Page 170

1  number of functions, would understand the totality  13:48:27
2  of that disclosure to include locking a device --  13:48:29
3    Q.  Okay.  13:48:34
4    A.  -- in the sense that the '721 says  13:48:34
5  other things aren't available.  Now, I -- one  13:48:38
6  more thing that you mentioned that I want to  13:48:40
7  also respond to is that the fact that there are  13:48:43
8  multiple different components of this security  13:48:46
9  system here that could be turned on and off  13:48:51
10  independently is that portion of the Plaisant  13:48:53
11  disclosure that also matches the Balakrishnan  13:48:55
12  construction, where different -- where a gesture  13:49:01
13  would make some things available but other  13:49:05
14  things were already available.  So I think that  13:49:07
15  it's, you know, it's a broad disclosure that  13:49:09
16  teaches many different techniques that include  13:49:11
17  the different embodiments of the '721.  13:49:14
18    Q.  So even under what you would call the  13:49:16
19  more subjective Balakrishnan test for whether  13:49:18
20  something is locked or unlocked, you were able  13:49:22
21  to apply that test with respect to the Plaisant  13:49:25
22  video; is that correct?  13:49:29
23    MR. PAK:  Objection, vague.  13:49:31
24    THE WITNESS:  Yeah, I don't think I  13:49:32
25  applied that test.  I'm saying that the Plaisant  13:49:33

Page 171

1  video discloses, not just what I'd call the  13:49:37
2  bright line test embodiment, but in another what  13:49:40
3  I think is probably unclaimed embodiment but is  13:49:43
4  support for the Balakrishnan construction that  13:49:46
5  some things are already available and other  13:49:50
6  things are not available until a gesture makes  13:49:52
7  them available.  13:49:55
8  BY MR. LO:  13:49:56
9    Q.  Does the Plaisant video disclose a  13:49:56
10  single unlocked image?  13:49:59
11    MR. PAK:  Objection, vague.  13:50:08
12    THE WITNESS:  To -- yes, I think it  13:50:10
13  does.  13:50:12
14  BY MR. LO:  13:50:12
15    Q.  Okay.  And would you point out --  13:50:13
16  let's just use the one on paragraph 117 since  13:50:14
17  we're there -- what you would consider to be a  13:50:16
18  single unlocked image?  13:50:19
19    A.  Well, so I would -- I'm not sure if  13:50:21
20  you -- if you meant 117, the one above 117.  13:50:25
21    Q.  No, the one that follows 117.  13:50:29
22    A.  Right, but I think the one above 117  13:50:31
23  is a better disclosure.  13:50:34
24    Q.  All right.  Let me start with my  13:50:35
25  question, sir.  Does the picture that appears at  13:50:36

Page 172

1  the end of paragraph 117 disclose a single  13:50:41
2  unlock image?  Yes or no.  13:50:45
3    A.  In the sense of the '721 patent, yes,  13:50:47
4  I believe it does.  13:50:50
5    Q.  It does.  Okay.  You agree that in --  13:50:50
6  when you watch the video of the toggle, of the  13:50:55
7  use of the toggle that's disclosed, that's  13:50:58
8  depicted at the bottom of paragraph 117, when  13:51:00
9  that toggle changes, the word off changes to on  13:51:03
10  or vice versa, correct?  13:51:06
11    A.  Correct.  13:51:07
12    Q.  And notwithstanding that the word  13:51:08
13  changes, you believe that video discloses  13:51:11
14  or that portion of the video discloses a single  13:51:15
15  unlock image; is that correct?  13:51:18
16    A.  I'm not so sure.  You know, I think  13:51:19
17  you raise a good question and I would have to  13:51:27
18  think about that some more.  I mean, certainly  13:51:31
19  there is a great deal of continuity in the  13:51:33
20  images.  The images appear to be the same thing.  13:51:35
21  There is certainly, again, this illusion of  13:51:38
22  continuity I discussed.  It looks like you're  13:51:40
23  manipulating a single individual object.  But I  13:51:44
24  think I would say that the 116 photograph is the  13:51:46
25  one that discloses a single unlock image.  13:51:48

Page 173

1    Q.  All right.  We'll get to that, sir,  13:51:53
2  but I want to get your opinion, sitting here  13:51:54
3  today, if you can, now, does the disclosure  13:51:57
4  that's depicted in paragraph 117 disclose a  13:52:00
5  single unlock image by clear and convincing  13:52:04
6  standard?  13:52:08
7    A.  I don't -- I'm not sure -- as I sit  13:52:10
8  here now, I don't know that it does, so I would  13:52:12
9  want to reserve, you know -- maybe someday I'll  13:52:15
10  have another opinion, but I don't know.  13:52:19
11    Q.  Does -- does the disclosure, the  13:52:20
12  toggles, that are shown in paragraph 117, meet  13:52:24
13  the unlock image limitations in claim 7 of the  13:52:29
14  '721 patent by clear and convincing standard?  13:52:36
15    A.  No, I don't think so.  I think that  13:52:38
16  the thing that discloses it is the picture 116  13:52:42
17  is the slider toggle, and that's -- you know, I  13:52:45
18  think these other images are helpful and are  13:52:49
19  illustrative, but the portion of the Plaisant  13:52:54
20  disclosure that I think teaches the person of  13:52:57
21  ordinary skill in the art each and every element  13:53:00
22  of the '721, the graphical description is at  13:53:01
23  least -- her words as well -- but what she calls  13:53:07
24  the slider toggle, and that's what I want to  13:53:10
25  identify.  13:53:12

Highly Confidential - Attorneys' Eyes Only

Page 174

```
1    Q.  That's fine.  And, like I said, don't      13:53:12
2  worry, I will go there because I know that's      13:53:14
3  your opinion, but I just wanted to make sure you  13:53:16
4  understand that part of what I'm entitled to do   13:53:18
5  here is to determine the scope of your opinions   13:53:20
6  and that part of that is trying to figure out     13:53:22
7  what you claim anticipates and what you claim     13:53:25
8  doesn't anticipate.  You understand that, right?  13:53:27
9    A.  Sure.                                        13:53:29
10   Q.  Okay.  So you're saying that what we         13:53:29
11 should be focusing on when we're talking about    13:53:32
12 anticipation is the slider functionalities, one   13:53:34
13 of which is depicted at the tail end of           13:53:38
14 paragraph 116, correct?                           13:53:42
15   A.  Right, that's my position.                  13:53:43
16   Q.  That's what your opinion is based on,       13:53:44
17 correct?                                          13:53:46
18   A.  Well, my opinion is based on the            13:53:47
19 weight of the entire disclosure.                  13:53:49
20 Dr. Balakrishnan argued in his deposition that    13:53:53
21 he thought that the -- what are called the lever  13:53:56
22 toggles, he seemed to think that that was         13:54:01
23 continuous, so I might be correct that that's     13:54:03
24 continuous and would meet that claim limitation.  13:54:05
25   Q.  Okay.  Then that's what we'll talk          13:54:07
```

Page 175

```
1  about after we take a break.                      13:54:09
2    VIDEOGRAPHER:  This is the end of tape          13:54:11
3  3.  Off the record at 1:54.                       13:54:12
4    (Proceedings recessed.)                         13:54:15
5    VIDEOGRAPHER:  This is the beginning            14:06:02
6  of tape 4 in the deposition of Dr. Cohen.  On     14:06:09
7  the record at 2:06.                               14:06:12
8  BY MR. LO:                                        14:06:14
9    Q.  Dr. Cohen, before we took a break we        14:06:16
10 were talking about the Plaisant video.  Do you    14:06:19
11 recall that?                                       14:06:22
12   A.  I do.                                        14:06:22
13   Q.  And in your declaration and as              14:06:23
14 exhibits to your declaration you also considered  14:06:26
15 two different written references by Plaisant; is  14:06:35
16 that correct?                                      14:06:42
17   A.  That's correct.                             14:06:42
18   Q.  In your analysis of the papers and the      14:06:42
19 video did you find anything between those three   14:06:47
20 that were inconsistent in terms of their          14:06:51
21 teachings?                                         14:06:56
22   A.  I don't recall anything right now.          14:06:58
23   Q.  That's -- would that be something that      14:07:00
24 you would have noted in your declaration had you  14:07:03
25 found that?                                        14:07:05
```

Page 176

```
1    A.  Hard to know without knowing what it        14:07:06
2  was.  If it was material, I think I probably      14:07:12
3  would, but I don't specifically recall.           14:07:14
4    Q.  Sure.  Before we took a break we were       14:07:17
5  talking -- we were about to get to paragraph      14:07:22
6  116, and in that paragraph, at the tail end of    14:07:25
7  that paragraph, you've cut out a screenshot from  14:07:29
8  a portion of the Plaisant video; is that          14:07:33
9  correct?                                          14:07:35
10   A.  That's correct.                             14:07:35
11   Q.  And for purposes of this deposition         14:07:36
12 can we just refer to that as a -- as the slider   14:07:39
13 toggle?                                           14:07:42
14   A.  Yes.                                        14:07:43
15   Q.  Okay.  And I understand from watching       14:07:44
16 the video and reading your declaration that you   14:07:49
17 -- you believe that this portion of the video     14:07:53
18 teaches that the user can put his or her hand on  14:07:55
19 the screen and move the slider toggle from on to  14:07:58
20 off and off to on; is that correct?               14:08:02
21   A.  That's not the only portion that            14:08:04
22 teaches that, but I do think that that's a        14:08:07
23 characterization of that portion of the video.    14:08:11
24   Q.  Sure.  And that portion satisfies at        14:08:12
25 least the claim limitations of continuous -- to   14:08:16
```

Page 177

```
1  continuously move the unlock image, and          14:08:21
2  obviously you know it goes on at the tail end of  14:08:26
3  column 19 of claim 7, correct?                    14:08:29
4    A.  Yes.                                        14:08:33
5    Q.  Okay.  And it satisfies the entirety        14:08:34
6  of that claim limitation, that subparagraph that  14:08:38
7  starts with, to continuously move the unlock      14:08:41
8  image?                                            14:08:43
9    A.  Yes.                                        14:08:49
10   Q.  All right.  And so obviously it's your      14:08:50
11 view, then, that that portion of the video        14:08:54
12 discloses an unlock image as required by claim    14:08:57
13 7, correct?                                        14:09:00
14   A.  I -- I mean, again, I just want to be       14:09:02
15 clear that my position is that the Plaisant       14:09:06
16 video as a reference teaches a person of          14:09:09
17 ordinary skill in the art each and every word of  14:09:13
18 that claim limitation, not necessarily that the   14:09:15
19 Plaisant system, if such a system exists,         14:09:18
20 necessarily operated in that way.                 14:09:20
21   Q.  Correct.  What I'm asking you is, have      14:09:22
22 you depicted in paragraph 116 the portion of the  14:09:24
23 video that discloses the claim limitation that    14:09:28
24 starts to continuously move the unlock image?     14:09:31
25   A.  Obviously it's impossible for a still       14:09:36
```

Highly Confidential - Attorneys' Eyes Only

Page 178

1    photograph to disclose continuous, but to the        14:09:39
2    extent to which, you know -- the portion of the      14:09:41
3    video that that is -- this still is shot from is     14:09:44
4    one part of the video that discloses that to a       14:09:49
5    person of ordinary skill in the art, yes.            14:09:51
6        Q.  Right.  The portion of the video at          14:09:52
7    about two minutes and 56 seconds in.                 14:09:54
8        A.  Correct.                  14:09:56
9        Q.  And using just this screenshot as a          14:09:57
10   reference, what is it that you allege to be the      14:10:02
11   unlock image here?                    14:10:04
12       A.  It's what I believe she refers to as        14:10:06
13   the pointer, which is the thing that looks like      14:10:08
14   a little tablet that is in the off position in       14:10:12
15   the first one and on in the second and it has        14:10:17
16   her finger on it in the third.  So she refers to     14:10:20
17   that as the pointer of the slider, I believe.        14:10:26
18       Q.  And that pointer is the unlock image?        14:10:28
19       A.  Yes.                   14:10:31
20       Q.  Each one of them is separately an            14:10:32
21   unlock image?                   14:10:34
22       A.  Each one of the three different             14:10:36
23   toggles, I think, is an unlock image.                14:10:38
24       Q.  Okay.  So then, if that's true, you          14:10:41
25   would agree, wouldn't you, that paragraph --         14:10:44

Page 179

1    that claim 15 is not anticipated at least by         14:10:50
2    this portion of the video?                 14:10:54
3        A.  No, I would not agree with that.            14:10:57
4        Q.  Okay.  And how is it that you               14:10:59
5    reconcile claim's 15 requirement for a single        14:11:02
6    image with what's depicted at the tail end of        14:11:05
7    paragraph 116?                   14:11:08
8        A.  So -- well, perhaps I misunderstood         14:11:10
9    your question.  So my understanding is that the      14:11:20
10   disclosure -- well, okay.  There's a lot that I      14:11:23
11   used to reach that conclusion.                14:11:28
12       So, first, is that there is a disclosure        14:11:30
13   of an embodiment in the '721 patent that refers      14:11:37
14   to multiple unlock images, and that's in, I          14:11:40
15   think, approximately columns 16 and 17.  And         14:11:44
16   that refers to multiple simultaneous images, not     14:11:49
17   that the images are changing over time, for          14:11:58
18   example, or morphing some way, but the               14:12:00
19   disclosure is talking about one unlock image         14:12:05
20   used to control one -- one piece of                 14:12:07
21   functionality, a different unlock image             14:12:09
22   controlling a different piece of functionality.      14:12:13
23       So I believe that that's what the claims 13,    14:12:16
24   14 and 15 are directed to is -- is distinguishing    14:12:27
25   from that embodiment, but that to satisfy the        14:12:31

Page 180

1    claim in 15 -- sorry.  Let me back up.              14:12:38
2        Q.  Let me -- let me me --                14:12:50
3        A.  Yeah.  Okay.                 14:12:52
4        Q.  -- try to guide you along this              14:12:53
5    discussion.  You and I agree that step one of an     14:12:56
6    anticipation analysis is claim construction,         14:13:06
7    correct?                    14:13:07
8        A.  Correct.                  14:13:08
9        Q.  All right.  Now, for purposes of            14:13:09
10   analyzing claim 15, how did you construe the         14:13:11
11   phrase, wherein, the unlock image is a single        14:13:15
12   image?  What construction did you apply?             14:13:18
13       A.  I applied -- let me think about that        14:13:39
14   because I don't specifically recall a wording        14:13:42
15   that I used in my head.                 14:13:44
16       Q.  Let me back up one second, then.            14:13:47
17       A.  Okay.                   14:13:49
18       Q.  Is there a portion in your declaration      14:13:49
19   in which you set forth the construction of the       14:13:51
20   phrase, wherein the unlock image is a single         14:13:54
21   image, as used in claim 15?                14:13:58
22       A.  Let me look for a moment.  I do recall      14:14:01
23   that I -- I thought I recalled doing an analysis     14:14:37
24   of the multiple claim embodiment.  Maybe it's        14:14:43
25   just been a long day, but I don't -- I just          14:14:49

Page 181

1    don't recall where in my declaration I said          14:14:52
2    that.  Perhaps I didn't and it was just an           14:14:55
3    analysis I performed on my own.                14:15:00
4        Q.  Well, if you're not able to find it         14:15:02
5    now, that's fine.  So then let me ask the next       14:15:05
6    question, which is, sitting here today do you        14:15:08
7    recall what construction you applied to that         14:15:11
8    phrase for purposes of anticipation?                14:15:15
9        A.  It's my understanding of the -- of          14:15:19
10   claim 15 and -- well, never -- of claim 15, is       14:15:22
11   that it's controlled by the statement made in        14:15:27
12   the file history and that the -- that part of        14:15:32
13   the intrinsic evidence that would govern claim       14:15:35
14   construction was that the file history --            14:15:37
15       Q.  Dr. Cohen, I don't actually need you        14:15:40
16   to justify the construction at this point.  I        14:15:42
17   just want to know what the construction is.  I'm     14:15:43
18   not needing a justification for it.  I won't         14:15:45
19   challenge you on that just yet.  Are you able        14:15:49
20   sitting here right now to tell me what                14:15:55
21   construction of the phrase, wherein the unlock       14:15:57
22   image is a single image, you applied for the         14:15:59
23   purposes of your anticipation analysis?  Yes or      14:16:02
24   no.                    14:16:06
25       A.  I believe what I applied was something      14:16:06

Highly Confidential - Attorneys' Eyes Only

Page 182

1  like where a -- a single -- you know, a singular      14:16:10
2  image is a -- a single image is manipulated, you      14:16:15
3  know, to -- throughout the scope of the -- of         14:16:21
4  the claim or throughout the process of the            14:16:29
5  claim, something like that.                 14:16:33
6      Q. Okay. And using that construction           14:16:34
7  what is the narrowing that claim 15 adds to           14:16:39
8  claim 12?                           14:16:46
9      A. I don't believe there is a narrowing.        14:16:47
10      Q. You believe -- under your construction       14:16:49
11  you believe claim 12 and claim 15 are identical       14:16:51
12  in scope?                           14:16:54
13      A. I do. I believe that that was the          14:16:55
14  scope that's claimed during prosecution.            14:16:59
15      Q. Okay. Did you consider any other           14:17:09
16  constructions of claim 15 that would give it          14:17:10
17  a scope that would be narrower than the scope of      14:17:14
18  claim 12?                           14:17:16
19      A. Yes. So as I was talking about            14:17:17
20  earlier, I think there is an embodiment, which        14:17:21
21  in my view is not claimed, that was discussed by      14:17:24
22  the examiner that they amended to, to not claim,      14:17:29
23  in which there are multiple simultaneous unlock       14:17:34
24  images but only one is being manipulated, and         14:17:38
25  that's disclosure in columns 16 and 17 of the         14:17:41

Page 183

1  patent. So that's -- that's another possible         14:17:44
2  interpretation that would make claim 15 narrower      14:17:47
3  than claim 12, for example.                 14:17:52
4      Q. But you chose not to apply that            14:17:53
5  construction and instead to apply construction        14:17:55
6  which would render claim 15 meaningless             14:17:58
7  vis-a-vis claim 12; is that correct?              14:18:04
8      A. My conclusions wouldn't be different        14:18:08
9  even under that construction. So I -- I believe       14:18:10
10  I applied both potential constructions in that I      14:18:15
11  think even under that construction the Plaisant      14:18:19
12  video in its entirety would disclose to a person     14:18:22
13  of ordinary skill in the art a single image.         14:18:24
14      Q. Dr. Cohen, I'm not asking about your        14:18:27
15  conclusion. I'm asking if you chose not to          14:18:28
16  apply claim limitation that would give claim 15      14:18:33
17  a narrower scope than claim 12 and instead to        14:18:37
18  apply a construction to claim 15 that renders it     14:18:41
19  meaningless vis-a-vis claim 12; is that correct?     14:18:44
20      A. No, I think I considered both possible      14:18:48
21  interpretations.                       14:18:51
22      Q. And you chose the latter one, the one       14:18:51
23  that would render claim 15 meaningless, correct?     14:18:54
24      A. No, I think I considered both in my        14:18:58
25  anticipatory analysis.                    14:19:03

Page 184

1      Q. But you believe the correct             14:19:04
2  construction is the one that renders claim 15         14:19:05
3  meaningless, correct?                     14:19:08
4      A. I believe that the file history shows       14:19:09
5  that claim differentiation in this case doesn't       14:19:12
6  apply. Even if it were to apply, I think my          14:19:16
7  analysis of Plaisant remains unchanged.             14:19:19
8      Q. Okay. Do you believe that the -- I'm       14:19:22
9  sorry. Did you call it a point? Let's get our        14:19:33
10  terminology straight. You -- you made reference      14:19:38
11  to whatever the user is supposed to be touching      14:19:41
12  in paragraph 116. What did you use to              14:19:43
13  characterize that?                       14:19:45
14      A. I believe Plaisant refers to that as       14:19:46
15  the pointer.                          14:19:47
16      Q. The pointer. All right. So now we          14:19:48
17  have our terminology straight. You believe that      14:19:51
18  the pointer disclosed in the Plaisant video          14:19:58
19  satisfies the unlock image claim limitations,        14:20:01
20  correct?                            14:20:05
21      A. I do -- one of many things.             14:20:05
22      Q. And the pointer is in that video, each      14:20:07
23  pointer, is a single image, correct?              14:20:12
24      A. Yes.                         14:20:16
25      Q. Right. Because that's, in your view,       14:20:17

Page 185

1  under the correct construction, that's what the      14:20:19
2  claims all require, correct --                14:20:21
3      A. Yes.                         14:20:23
4      Q. -- that the unlock image has to be a        14:20:24
5  single image, correct?                    14:20:26
6      A. Yes.                         14:20:27
7      Q. All right. Looking at the depiction        14:20:28
8  in paragraph 116, is it correct that the first       14:20:33
9  option is on off and the second and the third        14:20:37
10  options are at on? Do you see that?              14:20:40
11      A. I understand that these pictures show      14:20:48
12  three things. My argument is not that the           14:20:50
13  Plaisant system anticipates that the weight of      14:20:53
14  the disclosure shows a person of ordinary skill     14:20:56
15  in the art. So that's my, you know -- I             14:20:59
16  understand your question, and I think it's clear     14:21:01
17  that there is three different toggles shown in       14:21:03
18  this single screenshot.                    14:21:06
19      Q. Right.                        14:21:07
20      A. I don't think that that changes my        14:21:08
21  conclusion.                          14:21:09
22      Q. Sure. Now, now, in the toggle that is      14:21:09
23  in the -- the pointer that is in the off           14:21:16
24  position, do you see how that's in a slightly        14:21:18
25  darker color --                        14:21:20

Highly Confidential - Attorneys' Eyes Only

Page 194

1    Q. Correct.  And so even as to this          14:30:00
2   portion of the video, at about 256, you were   14:30:02
3   able to determine that the video discloses the  14:30:05
4   unlock image claim limitation without access to  14:30:09
5   the source code, correct?                        14:30:12
6      A. Yes, the reference discloses to a         14:30:15
7   person of ordinary skill in the art to unlock   14:30:17
8   image claim limitation.                         14:30:19
9      Q. This portion of the reference -- this     14:30:22
10  portion of the video.  Sorry.                    14:30:23
11     A. You know, I didn't do an analysis of      14:30:24
12  just this portion of the video.  I did an       14:30:26
13  analysis of the entirety of the disclosure and  14:30:27
14  that's what my opinion is.                       14:30:29
15     Q. All right.  Well, are you able to tell    14:30:30
16  me sitting here today whether this portion of   14:30:32
17  the video that's actually recreated in your     14:30:34
18  declaration satisfies the unlock image claim    14:30:36
19  limitation?  If you don't have an opinion on    14:30:41
20  that, then you can tell me you don't have an    14:30:44
21  opinion on that subject.                         14:30:46
22     A. I think it's likely, but I didn't do      14:30:47
23  an analysis of just a couple seconds of -- I did  14:30:49
24  it on the full weight of the entirety of the    14:30:52
25  disclosure.                                      14:30:53

Page 195

1      Q. Okay.  In your declaration do you        14:30:54
2   consider any slider toggle mechanisms from the  14:30:57
3   Plaisant video other than one that is -- shows  14:31:03
4   that the pointer changes colors?                 14:31:08
5      A. I remember I talk about the lever, you    14:31:10
6   know, I quote Dr. Balakrishnan, who is also     14:31:22
7   talking about the lever.  He seemed to think    14:31:24
8   that it was continuous.  And I think those are  14:31:26
9   the things that I analyzed.                      14:31:28
10     Q. Okay.  So the portions of your           14:31:29
11  declaration related to the Plaisant video only  14:31:31
12  deal with a pointer that appears to change      14:31:35
13  colors as one moves it, correct?                 14:31:37
14     A. I'm sorry.  Could you ask the question    14:31:39
15  again?                                           14:31:41
16     Q. Sure.  When it comes to the slider       14:31:41
17  toggle of the Plaisant video, the only instances  14:31:45
18  of that which you discuss in your declaration   14:31:49
19  are ones in which the pointer changes colors,   14:31:51
20  correct?                                         14:31:54
21        MR. PAK: Objection, mischaracterizes     14:31:54
22  the report.                                      14:31:56
23        THE WITNESS:  You know, I think what I   14:31:57
24  discussed was that the toggle that is disclosed  14:32:00
25  in the video and not merely an illustrative     14:32:04

Page 196

1   example that I took a screenshot of.  My        14:32:09
2   analysis is based on the entirety of the video.  14:32:10
3   BY MR. LO:                                       14:32:12
4      Q. Okay.  All right.  And having watched     14:32:12
5   entirety of the video, obviously it is your     14:32:19
6   conclusion that the video discloses the unlock  14:32:22
7   image claim limitations even without needing to  14:32:27
8   look at the source code, correct?                14:32:31
9      A. Yes.                                       14:32:32
10     Q. All right.  Let me ask you this.          14:32:34
11  Watching that video do you -- can you also reach  14:32:39
12  a conclusion that it discloses a machine that   14:32:44
13  infringes claim 7 of the '721 patent?           14:32:47
14     A. My understanding is that anticipation    14:32:50
15  and infringement are mirror analysis, you know,  14:32:56
16  that which before anticipates after infringes,  14:33:01
17  or whatever the -- the useful phrase is.        14:33:03
18     Q. So having watched the video, you         14:33:05
19  could, as an expert, reach the conclusion that  14:33:09
20  the device that is depicted in that video or    14:33:11
21  what is taught in that video infringes the '721  14:33:14
22  patent, correct?                                 14:33:17
23     A. I think I could reach a certain level    14:33:18
24  of -- of -- well, the entirety of the Plaisant  14:33:23
25  video teaches a number of different things and  14:33:39

Page 197

1   not necessarily in the same way.  So            14:33:42
2   reference -- my understanding is that references  14:33:46
3   can't infringe, right.  The scope of the claims  14:33:48
4   are devices with code that does X.  So I think  14:33:52
5   it is possible, even though that which          14:33:57
6   anticipates earlier after infringes, that no one  14:33:59
7   device shown in the Plaisant video necessarily  14:34:06
8   infringes even if the weight of the entire      14:34:11
9   disclosure teaches each and every limitation.   14:34:14
10  If someone took the Plaisant video and built it  14:34:17
11  now somehow, then I think we could do an        14:34:24
12  infringement analysis of it, but I don't --     14:34:27
13     Q. Again, you're going beyond --            14:34:30
14     A. -- I don't think that's true.            14:34:31
15     Q. You're going beyond the scope of my      14:34:32
16  question.                                        14:34:34
17     A. Okay.                                     14:34:34
18     Q. In watching -- you have an               14:34:35
19  understanding, don't you, that the Plaisant     14:34:36
20  video depicts a video of certain people using   14:34:38
21  certain machines?                                14:34:42
22     A. Sure.  And in a number of different      14:34:44
23  ways.                                            14:34:47
24     Q. In any of those ways did you observe a   14:34:47
25  machine in which you could conclude, ah, that   14:34:51

Highly Confidential - Attorneys' Eyes Only

Page 198

1  machine definitely infringes the '721 patent?  14:34:55
2  I'm not asking you to mix and match. I'm asking  14:34:58
3  you in any instance of that video did you  14:35:00
4  observe the use of a machine that infringes the  14:35:03
5  '721 patent?  14:35:06
6      MR. PAK: Objection, vague.  14:35:07
7      THE WITNESS: You know, I -- I didn't  14:35:09
8  do an analysis looking at any one instance of  14:35:19
9  it.  14:35:23
10  BY MR. LO:  14:35:23
11    Q. Okay. So sitting here today you have  14:35:24
12  no opinion one way or the other whether there is  14:35:26
13  any portion of the Plaisant video that shows a  14:35:29
14  device that would anticipate any claim of the  14:35:32
15  '721 patent; is that correct?  14:35:35
16      MR. PAK: Objection, mischaracterizes  14:35:36
17  the testimony and mischaracterizes the report.  14:35:38
18      THE WITNESS: Yeah, I'm not sure that  14:35:41
19  that's correct. I think the Plaisant video  14:35:43
20  shows a number of different configurations of a  14:35:46
21  device, of potential configurations of a device  14:35:50
22  that meet each and every claim limitation one at  14:35:53
23  a time, but I don't -- I haven't looked to see  14:35:56
24  whether there is, you know, a single frame  14:36:00
25  somewhere or segment that shows a device  14:36:03

Page 199

1  that's -- that's infringing, you know, at that  14:36:07
2  moment in time. So I would -- I would have to  14:36:11
3  do a different kind of analysis.  14:36:13
4  BY MR. LO:  14:36:15
5    Q. If I simply put you in a room,  14:36:38
6  Dr. Cohen, with the Plaisant video and gave you  14:36:40
7  all the time you needed, is that an analysis you  14:36:42
8  could conduct, in other words, finding if there  14:36:45
9  is any segment of the video that shows the use  14:36:48
10  of a device that infringes the '721 patent?  14:36:50
11    A. I'd have to try to know.  14:36:55
12    Q. Sitting here right now do you believe  14:36:59
13  you would need any additional information other  14:37:01
14  than what's in the video?  14:37:03
15    A. Well, as we discussed earlier in the  14:37:04
16  infringement theory portion, I think there  14:37:08
17  are -- there are certainly preliminary  14:37:13
18  conclusions you can reach based on the behavior  14:37:15
19  of a system and that obviously source code helps  14:37:19
20  in confirming that those conclusions were  14:37:24
21  correct. So I think if I were doing an  14:37:27
22  infringement analysis of the Plaisant system, it  14:37:30
23  would be helpful to have the source code to  14:37:33
24  confirm an analysis based on observation. I  14:37:35
25  don't think it's necessary, just as we discussed  14:37:39

Page 200

1  with the infringement, I don't think it's  14:37:41
2  necessary to reach noninfringement positions,  14:37:43
3  but looking at the source code helped me confirm  14:37:47
4  that those noninfringement positions I  14:37:51
5  identified were correct, and I think precisely  14:37:53
6  the same framework applies to Plaisant. I think  14:37:55
7  I could reach a determination of infringement  14:37:58
8  potentially. As I said, I haven't done the  14:38:02
9  analysis, but if it was me locked in a room with  14:38:05
10  the video, I think I could do an infringement  14:38:08
11  analysis, reach certain conclusions to certain  14:38:10
12  levels of confidence. If I had the source code,  14:38:13
13  that would increase my level of confidence or,  14:38:16
14  hypothetically, decrease my level of confidence.  14:38:20
15    Q. Would you need the source code to  14:38:22
16  determine by what you believe is a preponderance  14:38:26
17  of the evidence that any portion of the video  14:38:28
18  depicts a device that infringes a claim of the  14:38:31
19  '721 patent?  14:38:36
20    A. Well, that's my understanding that  14:38:37
21  infringement analysis needs to be shown by a  14:38:39
22  preponderance of the evidence, so --  14:38:41
23    Q. Can you answer that question yes or  14:38:46
24  no?  14:38:48
25    A. Uhm, I would really have to look at  14:38:48

Page 201

1  the video with an eye towards doing this  14:38:51
2  analysis and see how strong the analysis was and  14:38:53
3  whether it met the preponderance of the evidence  14:38:56
4  standard. I think -- I can't rule out the  14:38:58
5  possibility that, if I watch the video with this  14:39:03
6  eye towards this task that you've sent me, it  14:39:07
7  could be possible. So it's -- I'm not -- I'm  14:39:09
8  not going to take the position that it would be  14:39:12
9  impossible to do it without the source code.  14:39:14
10  Again, speaking hypothetically, I think it's  14:39:16
11  possible to do. Whether that, in fact, would be  14:39:18
12  my conclusion, I don't know without saying.  14:39:20
13    Q. You render a conclusion that the  14:39:24
14  asserted claims are also rendered -- are also  14:39:50
15  obvious in view of the Neonode N1 and N1M  14:39:54
16  handsets, correct?  14:39:59
17    A. That's correct.  14:40:01
18    Q. And obviously when you say that  14:40:02
19  something is obvious, that means that at least  14:40:05
20  in your view or in the view of a person of  14:40:08
21  ordinary skill in the art, at least one  14:40:10
22  limitation is not explicitly disclosed, correct?  14:40:12
23    A. That's correct.  14:40:15
24    Q. And what limitation is that?  14:40:16
25    A. I don't think that under an  14:40:17

Highly Confidential - Attorneys' Eyes Only

Page 202

```
 1  anticipatory analysis that the Neonode phones    14:40:23
 2  show an unlock image that is moved continuously   14:40:27
 3  in accordance with the detected contact,         14:40:33
 4  et cetera.                              14:40:38
 5      Q.  And -- okay.  Now, and other than that   14:40:38
 6  limitation, you believe every other one is       14:40:50
 7  satisfied by the N1 and the N1M handsets,        14:40:52
 8  correct?                                14:40:56
 9      A.  Well, it -- it depends a lot on what     14:40:58
10  the granularity of what you mean by             14:41:01
11  "limitation."  So each limitation -- or I should 14:41:04
12  say each of the -- of the code limitations, the  14:41:09
13  ones that are written as if they are methods,    14:41:11
14  you know, to detect, to move, to unlock, each of 14:41:14
15  those has a lot of words in it, some of which    14:41:19
16  talk about a moving an unlock image.  So I think 14:41:22
17  that the Neonode discloses, you know, 80% of     14:41:28
18  each one of those limitations, in that a finger  14:41:33
19  is moving continuously, the finger contact is    14:41:36
20  detected, it starts at a predefined location, it 14:41:39
21  ends at a predefined region, and, if so, it's    14:41:44
22  unlocked.                               14:41:47
23      So most of the words of each -- now the      14:41:48
24  unlock image limitation shows up in each one of  14:41:51
25  those, so there is at least one hole in each of  14:41:53
```

Page 203

```
 1  these limitations because of the Neonode of the  14:41:58
 2  unlock image, but all you need to add is the     14:42:00
 3  moving unlock image to render all of the         14:42:03
 4  limitations wholly met.                 14:42:04
 5      Q.  By the way, going back to the Plaisant   14:42:06
 6  video and paragraph 116 where you depict a       14:42:23
 7  slider toggle, does that pointer move           14:42:29
 8  continuously in accordance with the movement of  14:42:36
 9  the detected contact?                   14:42:43
10      A.  It appears to in the video, so I think   14:42:45
11  to a person of ordinary skill in the art        14:42:47
12  watching that video that limitation is fully     14:42:49
13  disclosed.                              14:42:52
14      Q.  Would a person of ordinary skill in      14:42:53
15  the art watching that video be able to determine 14:43:00
16  on an infringement basis that that limitation is 14:43:02
17  met?                                    14:43:05
18      A.  I would have to do that analysis.  My    14:43:06
19  analysis was based on the full weight that she   14:43:12
20  clearly disclosed the idea of continuous         14:43:16
21  movement, the way she described it, and the fact 14:43:18
22  that these are meant to be analogs of physical   14:43:21
23  objects which clearly move continuously and the  14:43:24
24  idea that it appears, you know, to be moving     14:43:28
25  continuously.                           14:43:31
```

Page 204

```
 1      Now, we talked about earlier in our          14:43:32
 2  noninfringement section that, of course, no      14:43:34
 3  computer's motion is never fully continuous,     14:43:36
 4  it's always to the limit of the technology at a  14:43:38
 5  certain time.  A person of ordinary skill in the 14:43:41
 6  art watching the video is going to understand    14:43:43
 7  that's continuous motion to the ability of       14:43:45
 8  technology at a certain time.           14:43:48
 9      Q.  You are aware that at least the          14:43:50
10  Plaisant paper describes this movement as        14:43:54
11  noncontinuous, correct?                 14:43:59
12      MR. PAK:  Objection, mischaracterizes        14:44:00
13  the paper.                              14:44:01
14      THE WITNESS:  Yeah, I don't think she        14:44:02
15  describes it that way.  She describes it, as I    14:44:03
16  recall, as a three-step animation.      14:44:07
17  BY MR. LO:                              14:44:08
18      Q.  Correct.  And in your view what --       14:44:09
19  well, what did you understand her to mean when   14:44:13
20  she said a three-step animation?        14:44:15
21      A.  Well, I think she meant there's, you     14:44:16
22  know, at least three stages that is being        14:44:19
23  represented.  There's, clearly, all the way over 14:44:24
24  on the left, there is an all the way over on the 14:44:27
25  right, and there is some intermediate            14:44:29
```

Page 205

```
 1  representations.                        14:44:31
 2      Q.  Well, did she say there was three or     14:44:32
 3  at least three stages?                  14:44:34
 4      A.  She described it as a three-step        14:44:35
 5  animation.                              14:44:37
 6      Q.  Okay.  And so what did you understand    14:44:37
 7  to be the three steps?                  14:44:39
 8      A.  All the way to the left, all the way     14:44:40
 9  to the right, somewhere in the middle that's not 14:44:45
10  either all the way to the left or all the way to 14:44:47
11  the right.                              14:44:49
12      Q.  Okay.  And in your view is a            14:44:50
13  three-stage animation consistent or inconsistent 14:44:53
14  with the claim's requirement of continuous       14:44:55
15  movement?                               14:44:59
16      A.  I think continuous movement means        14:45:00
17  continuous to the level of technology available. 14:45:02
18  Clearly, as we talked about before, it can't     14:45:04
19  mean actually physically a hundred percent       14:45:06
20  continuous or that word would never -- that word 14:45:09
21  would always be indefinite for any computer      14:45:13
22  claim, so I wouldn't want to read that          14:45:16
23  limitation in.  So to a person of ordinary skill 14:45:18
24  in the art, the video or the video in            14:45:21
25  combination with the paper, which are the two    14:45:25
```

Highly Confidential - Attorneys' Eyes Only

Page 206

1 things that I analyzed for purposes of my          14:45:27
2 report, there is a clear disclosure of             14:45:29
3 continuous movement.                               14:45:31
4       Q.  You were a person of ordinary skill in   14:45:33
5 the art as of 2005, correct?                       14:45:35
6       A.  Yes.                                      14:45:36
7       Q.  All right.  In 2005 would a person of     14:45:37
8 ordinary skill in the art and did the technology   14:45:42
9 permit an animation of the toggle slider that      14:45:44
10 was smoother than a three-step animation?          14:45:48
11      A.  In 2005?                                  14:45:53
12      Q.  Yes.                                      14:45:54
13      A.  Yes.                                      14:45:55
14      Q.  Okay.  And, in fact -- okay.  Strike      14:45:56
15 that.                                              14:46:04
16      Is there a portion of your declaration in     14:46:25
17 which you set forth the evidence as to when the    14:46:27
18 Neonode N1 was released?                           14:46:30
19      A.  No, I don't have any personal             14:46:33
20 knowledge about that.  I relied on counsel's       14:46:36
21 representation to me.  I relied on counsel's       14:46:39
22 representation to me that there are early and I    14:46:45
23 relied on the disclosure on the face of the -- I   14:46:49
24 should say page 2 of the '721 patent, where the    14:46:54
25 N1 guide is dated July 2004.                       14:46:59

Page 207

1       Q.  So do you have a professional opinion     14:47:02
2 sitting here as to when the N1 was released?        14:47:06
3       A.  The only opinion I have is that the       14:47:11
4 user manual was available in July of 2004, and,    14:47:15
5 other than that, I don't have an opinion.          14:47:19
6       Q.  Do you have a professional opinion        14:47:20
7 sitting here today as to when the N1M was          14:47:22
8 released?                                           14:47:26
9       A.  I don't.                                  14:47:27
10      Q.  Have you -- beyond what you just          14:47:28
11 referenced in terms of seeing a reference to the   14:47:39
12 N1 user guide on the face of the patent or the     14:47:42
13 page 2 of the patent, have you seen any other      14:47:46
14 evidence relating to when the N1 -- the Neonode    14:47:48
15 N1 was released?                                   14:47:57
16      A.  Well, I cited some specifications.        14:47:58
17 The N1M specifications on this Web page            14:48:04
18 described it as Q1 2005.                            14:48:08
19      Q.  And does that say that it was in the      14:48:17
20 United States?  Actually let me back up.  Let me   14:48:19
21 strike that question.                              14:48:25
22      Focusing just on the N1, Dr. Cohen, have      14:48:26
23 you seen any evidence as to when it was released   14:48:30
24 in the United States?                              14:48:32
25      A.  I -- no, not as far as I know.            14:48:41

Page 208

1       Q.  Okay.  Now moving on to the N1M, have     14:48:43
2 you seen any evidence as to when it was released   14:48:46
3 in the United States?                              14:48:48
4       A.  No.                                       14:48:49
5       Q.  And you have not personally used          14:48:49
6 either of the Neonode devices described in your    14:49:09
7 declaration, correct?                              14:49:12
8       A.  Correct.  I've used an N2 in the past,    14:49:15
9 which I understand was similar in some ways, but   14:49:19
10 not the N1 or N1M.                                 14:49:21
11      Q.  So in reaching your conclusion that       14:49:25
12 the Neonode N1 and N1M renders obvious the         14:49:33
13 claims of the '721 patent, what prior art are     14:49:41
14 you referring to, in other words, the devices,    14:49:48
15 the guide, a video?  What is the art that you     14:49:51
16 are relying on?                                    14:49:55
17      A.  I'm relying on the handsets as systems    14:49:56
18 and I'm using all the other references as          14:50:01
19 information that revealed how those systems        14:50:05
20 operated.                                          14:50:08
21      Q.  Okay.  So the art which you would tell    14:50:09
22 Judge Koh anticipates the asserted claims are     14:50:14
23 the devices themselves, correct?                  14:50:17
24      A.  That's correct.                           14:50:19
25      Q.  Okay.  And is it either device or is     14:50:20

Page 209

1 it them in combination with each other?           14:50:22
2       A.  It's either device.                      14:50:24
3       Q.  Okay.  So in your opinion either         14:50:26
4 device would help render obvious the claims of    14:50:29
5 the '721 patent, correct?                         14:50:34
6       A.  Yes.                                     14:50:35
7       Q.  All right.                               14:50:35
8       A.  I believe so.  I mean, perhaps I've      14:50:36
9 misremembered -- without consulting my            14:50:39
10 declaration -- but I think that's right, both on   14:50:43
11 their own and also in combination with Plaisant   14:50:46
12 was my declaration.                               14:50:48
13      Q.  Well, on their own they don't render     14:50:49
14 obvious claims of the '721 patent, right?         14:50:53
15      A.  Oh, no, I think they do.  That's my      14:50:56
16 testimony in my declaration.                      14:50:59
17      Q.  Well, what -- wouldn't that be           14:51:01
18 anticipation, Dr. Cohen?                          14:51:03
19      A.  I mean, if you say so, that's fine,      14:51:04
20 but my testimony was that it renders obvious      14:51:10
21 because a separate feature available on the       14:51:13
22 Neonode handsets showed a moving slider, and I    14:51:18
23 think it would have been obvious to a person of   14:51:23
24 ordinary skill in the art to take the volume      14:51:26
25 slider and use it as an unlock slider even        14:51:27

Highly Confidential - Attorneys' Eyes Only

Page 210

```
 1   though the handsets themselves didn't actually      14:51:30
 2   make that decision.                   14:51:32
 3      So there's a -- there's an obviousness        14:51:34
 4   just in that box, but I'm not claiming that's --    14:51:36
 5   that that actually happened.  There is some      14:51:39
 6   pictures in paragraph 148 showing a what we      14:51:42
 7   might call a volume image, moving continuously    14:51:48
 8   in accordance with the detected contact, and if    14:51:51
 9   you take that volume image that meets all those   14:51:56
10   motion limitations and you drop it into the ways   14:52:00
11   in which I describe the Neonode already meeting   14:52:02
12   every other portion of the limitations,         14:52:05
13   detecting a finger to unlock the device, then at  14:52:06
14   that point I think you're complete.  And I think  14:52:09
15   that that's an obviousness combination that      14:52:12
16   would be very easy for our sophisticated person   14:52:14
17   of art with three years of user interface        14:52:17
18   design.  They would look at it, they would look   14:52:21
19   at the range of UI elements available on the      14:52:23
20   phone, and they would say, oh, well, if I were    14:52:27
21   wanting to do a phone just like this and compete  14:52:29
22   with Neonode, you know, perhaps people actually  14:52:31
23   did that analysis in 2005 when they were coming   14:52:34
24   out with a new touchscreen phone.  I think they   14:52:37
25   would easily combine those -- those pieces.       14:52:39
```

Page 211

```
 1   And, you know, and given that the volume --      14:52:43
 2   obviously it's very useful, this technique of     14:52:46
 3   tracking and actually showing how the -- the      14:52:48
 4   value is changing, I think that that's -- you     14:52:51
 5   know, that well-known technique, it would have    14:52:54
 6   been obvious, you know, someone would have been   14:52:57
 7   motivated to import that to another place where   14:53:00
 8   the finger contact needs to be detected across    14:53:02
 9   an entire gesture.                 14:53:05
10      Q.  Take a look at paragraph 13 of your       14:53:06
11   declaration, sir.                 14:53:20
12      A.  Yes.                    14:53:30
13      Q.  In that paragraph you say that a         14:53:31
14   hypothetical person of ordinary skill is          14:53:39
15   presumed to have knowledge of all references in   14:53:40
16   the pertinent art and to have knowledge of all    14:53:43
17   arts reasonably pertinent to the particular      14:53:46
18   problem that the claimed invention addresses,     14:53:48
19   correct?                      14:53:50
20      A.  Correct.                  14:53:52
21      Q.  All right.  Now, that statement          14:53:53
22   appears under the section relating to            14:53:56
23   infringement, but you understand that the same    14:53:59
24   assumption applies with respect to obviousness    14:54:04
25   and anticipation, correct?               14:54:07
```

Page 212

```
 1      A.  Yes, that's my understanding.          14:54:09
 2      Q.  That for both of those tests the         14:54:10
 3   person of art is assumed to have all of the       14:54:12
 4   relevant materials in front of them, and the      14:54:15
 5   question is, had the person of art had those,     14:54:16
 6   would they have been motivated to combine them,  14:54:20
 7   correct?                      14:54:22
 8      A.  That's my understanding of the law.      14:54:22
 9      Q.  Okay.  Now, when it comes to the         14:54:24
10   obviousness of the Neonode, you would agree,      14:54:27
11   wouldn't you, that the combination you propose    14:54:33
12   is one in which all of the features you alleged   14:54:37
13   satisfy the claim limitations exist on a single   14:54:43
14   device just not all at once?              14:54:46
15      A.  Yes.                    14:54:48
16      Q.  And you would agree that, even though     14:54:48
17   all of those separate elements exist separately,  14:54:52
18   no one did, in fact, combine them in the Neonode  14:54:57
19   device, correct?  That's why there is no         14:55:01
20   anticipation.                   14:55:04
21      A.  Right.  Exactly.  That's why there is    14:55:04
22   a separate analysis for anticipation and         14:55:06
23   obviousness, so I'm not claiming that the        14:55:08
24   Neonode actually did that.               14:55:10
25      Q.  Now, your factual premise for your       14:55:12
```

Page 213

```
 1   obviousness argument is that somewhere in        14:55:18
 2   different places in the Neonode devices each of   14:55:20
 3   the separate limitations are disclosed, correct?  14:55:25
 4      A.  Yes.                    14:55:28
 5      Q.  All right.  And notwithstanding that,    14:55:29
 6   you would agree that the designers of the        14:55:32
 7   Neonode did not, in fact, combine all of those   14:55:34
 8   elements into a single feature, correct?         14:55:37
 9      A.  That's true.                14:55:40
10      Q.  All right.  The fact that those          14:55:40
11   features were all present and the designers of    14:55:42
12   the Neonode mobile phone did not combine them    14:55:45
13   into a single functionality, did that factor     14:55:48
14   into your analysis at all as to whether how that  14:55:51
15   impacts your obviousness conclusion?           14:55:58
16      MR. PAK:  Objection, vague.            14:56:01
17      THE WITNESS:  I thought about that         14:56:02
18   actually, and as someone who has been          14:56:05
19   programming for 30 years, there are a lot of     14:56:12
20   reasons why you don't necessarily do every      14:56:15
21   possible feature that you might have thought of.  14:56:18
22   And so I can think of a host of reasons,         14:56:21
23   including time or budget or limited constraints   14:56:23
24   on size of code or factorization or even -- the   14:56:28
25   most common explanation in my experience is      14:56:34
```

Highly Confidential - Attorneys' Eyes Only

Page 258

```
1       Q. Okay.  Yeah, so -- so even though it,    16:01:59
2    in fact, from a source code perspective jumped    16:02:03
3    from the off to the middle to the on position,    16:02:07
4    only three positions, so long as it appears    16:02:09
5    visually to be continuous, you believe that the    16:02:12
6    slider would satisfy the continuously move claim    16:02:16
7    limitation, correct?                    16:02:23
8       A. Yeah, I -- I generally think that    16:02:27
9    that's right.                    16:02:31
10      Q. Take a look at paragraph 92 of your    16:02:40
11   declaration, please.                16:03:30
12      A. Yes.                    16:03:37
13      Q. Uhm, the second sentence you say that    16:03:39
14   Dr. Balakrishnan shows that the unlock image,    16:03:46
15   the handle moves, but he does not show that it    16:03:49
16   moves continuously.  Do you see that?        16:03:52
17      A. I do.                    16:03:55
18      Q. What in your view is it that        16:03:55
19   Dr. Balakrishnan failed to show or needs to show    16:03:58
20   to show that it moves continuously?        16:04:00
21      A. My recollection of the Balakrishnan    16:04:03
22   declaration is that he just doesn't address that    16:04:06
23   word as a limitation.  He shows it's one place,    16:04:09
24   he shows it's in another place.  I just don't    16:04:13
25   think he entered evidence one way or another    16:04:17
```

Page 259

```
1    saying that he considered that to be continuous    16:04:20
2    movement.                    16:04:23
3       Q. I see.  And we talked earlier, of    16:04:23
4    course, about the two jumps that you say    16:04:26
5    give rise to noninfringement, and you agree that    16:04:29
6    in between those two jumps the movement is    16:04:33
7    continuous, correct?                16:04:35
8       A. Yes.                    16:04:36
9       Q. There's no dispute there.  Now, we    16:04:37
10   also talked earlier about the fact that in    16:04:56
11   computers, of course, pixels are always turned    16:04:58
12   off and on and therefore nothing is truly    16:05:01
13   continuous, correct?                16:05:06
14      A. That's correct.                16:05:06
15      Q. And it's my understanding that you're    16:05:07
16   not saying that that gives rise to a        16:05:08
17   noninfringement position with respect to        16:05:10
18   continuously, correct?                16:05:13
19      A. That's correct.                16:05:14
20      Q. And, in particular, I just want to    16:05:14
21   make sure that, when you make the observation    16:05:17
22   you do in the first two sentences of paragraph    16:05:19
23   95, that they are observations and not opinions    16:05:23
24   as to noninfringement.                16:05:28
25      A. Well, they are observations and they    16:05:41
```

Page 260

```
1    are the basis of one of my noninfringement    16:05:42
2    arguments.                    16:05:45
3       Q. The -- they are the basis of        16:05:46
4    noninfringement arguments insofar as you believe    16:05:50
5    the image ultimately snaps or starts off at a    16:05:52
6    different location but not in between those two    16:05:55
7    points, correct?                16:05:57
8       A. Well, they are -- they are part of the    16:06:02
9    evidence that I use to reach the conclusion that    16:06:05
10   a person of ordinary skill in the art would not    16:06:09
11   conclude that in its entirety the code that is    16:06:12
12   accused doesn't meet the limitation of code that    16:06:18
13   operates in a certain way.            16:06:21
14      Q. So if the code -- if the code has an    16:06:35
15   image vanish and then redraws it at a new    16:06:49
16   location, a pixel or two away, it's your view    16:06:53
17   that that image would not be moving continuously    16:06:56
18   as required by the claim?            16:06:58
19      A. No, that -- that's not my position.    16:07:02
20   I'm not taking a discontinuous argument based on    16:07:05
21   single pixels.  I'm taking an argument that my    16:07:09
22   understanding of the scope of claims 7 and 12    16:07:12
23   requires the code in its entirety to show        16:07:16
24   continuous movement, and the fact that there are    16:07:18
25   at least two instances of discontinuous    16:07:21
```

Page 261

```
1    movement -- not pixel-based discontinuous, but    16:07:24
2    perceptible to the user, clear discontinuous    16:07:28
3    movement -- is enough to disqualify it.        16:07:31
4       So I'm essentially rejecting a box drawing    16:07:33
5    argument that says, as long as you can draw a    16:07:36
6    box around some portion of the movement, that    16:07:38
7    that's enough to meet the continuous element.    16:07:40
8    And I'm saying I don't think that's how...reads    16:07:42
9    the claim.  They read the claim as describing    16:07:45
10   the entire functionality of the module.        16:07:48
11      Q. Is there any element of claim 7 that    16:08:07
12   requires the unlock image to remain steady, to    16:08:11
13   not jump, once it has reached a predefined    16:08:19
14   location on the touchscreen?            16:08:23
15      A. Only in that the limitations as the    16:08:31
16   plain language of limitations describe a module    16:08:38
17   that includes instructions to move continuously    16:08:40
18   in accordance with the movement of the contact.    16:08:48
19   So if in my view at any point while there is    16:08:52
20   continuous movement, if it doesn't -- if it    16:08:57
21   snaps, as long as that snap is not in accordance    16:08:59
22   with the movement, that it's not satisfying    16:09:05
23   that -- that claim.                16:09:11
24      Q. Do you agree -- sorry.  Do you agree    16:09:11
25   or disagree that the claims permit the unlocking    16:09:14
```

Highly Confidential - Attorneys' Eyes Only

Page 262

1  image at some point to disappear from the      16:09:18
2  screen?                          16:09:21
3      A. Let me think about that.          16:09:23
4      MR. PAK: Objection, incomplete         16:09:30
5  hypothetical.                      16:09:31
6      THE WITNESS: I don't know. I           16:09:34
7  would -- I didn't do an analysis of a system     16:09:34
8  where it disappeared at some point. I don't     16:09:37
9  recall specific embodiment -- I guess I would    16:09:42
10 want to look at the spec again and think about   16:09:46
11 whether that was in the claim's scope or not.    16:09:48
12 BY MR. LO:                        16:09:52
13     Q. Do you have -- so sitting here today    16:09:52
14 you don't have -- you have not formed an opinion 16:09:54
15 that these claims required the unlock image to   16:09:56
16 be present even after the user has dragged it to 16:09:59
17 the predefined location, correct?          16:10:03
18     A. Only in that there it says         16:10:09
19 continuously movement while continuous contact   16:10:12
20 is maintained. So I know that while can be a     16:10:16
21 problematic word in patent claims. To the       16:10:21
22 extent to which while is interpreted or         16:10:24
23 potentially in the future construed as requiring 16:10:26
24 as long as continuous contact is maintained --   16:10:32
25 so if that's what while means, if while means as 16:10:35

Page 263

1  long as in all circumstances -- in order to meet 16:10:39
2  the limitation of while continues contact, that  16:10:42
3  there can be no contact that operates         16:10:45
4  differently, then, in that sense, I think, if    16:10:47
5  something disappeared, it would no longer be     16:10:49
6  true, that the unlock image is being moved while 16:10:53
7  continuous contact is maintained.          16:10:57
8  BY MR. LO:                        16:10:59
9      Q. The claims, as you understand them,    16:11:00
10 even after the unlock image has been moved to    16:11:03
11 the predefined location, must they still        16:11:05
12 continue to follow the user's movement after     16:11:08
13 that point?                      16:11:11
14     A. If that's what while means and that    16:11:13
15 while applies to -- as -- is a limitation on the 16:11:17
16 module code, right. If this were a method       16:11:23
17 claim, I would -- it would have a slightly       16:11:25
18 different -- potentially different          16:11:28
19 interpretation.                    16:11:29
20     Q. I'm asking for your construction,      16:11:30
21 Doctor.                         16:11:32
22     A. I, you know, I -- I think that        16:11:34
23 that's -- I think that's a possible         16:11:45
24 construction. I didn't restrict myself to just   16:11:49
25 that understanding.                  16:11:51

Page 264

1      Q. Okay.                      16:11:52
2      A. But under that construction, I think,  16:11:53
3  then the Samsung Galaxy Nexus wouldn't meet that 16:11:57
4  element.                        16:12:01
5      Q. You're getting ahead of me, Doctor.   16:12:01
6  In performing your noninfringement analysis did  16:12:04
7  you have a construction in mind that requires    16:12:09
8  the unlock image to continue to follow the       16:12:12
9  user's movement even after it has been moved to  16:12:17
10 the first predefined location? Yes or no.       16:12:21
11     A. That's one construction that I        16:12:25
12 considered during my analysis, and --        16:12:28
13     Q. And did you believe that that was the  16:12:30
14 correct construction?                 16:12:32
15     A. I do think that that's the correct    16:12:33
16 construction.                     16:12:35
17     Q. Okay. So in your view, as properly    16:12:36
18 construed, this claim requires the unlock image  16:12:40
19 to continuing following the user's fingers even  16:12:42
20 after the image has moved to the predefined      16:12:47
21 location, correct?                  16:12:51
22     A. I think that's the proper construction 16:12:58
23 given the while continuous contact.         16:13:01
24     Q. Okay. That's fine.             16:13:02
25     A. I can -- I can see a different       16:13:03

Page 265

1  construction that wouldn't require that, and,    16:13:07
2  you know, I would have to look at two specific   16:13:11
3  constructions to understand whether something    16:13:13
4  was -- was correct or not.             16:13:16
5      Q. Well, Dr. Cohen, we talked about      16:13:18
6  earlier that the first step of infringement or   16:13:20
7  noninfringement is a claim construction, and     16:13:23
8  what I'm asking you is which construction did    16:13:26
9  you apply in reaching your conclusion that the   16:13:29
10 Samsung Galaxy Nexus does not satisfy the claim  16:13:33
11 limitations of the '721 patent?           16:13:36
12     A. For that one element, if while con --  16:13:38
13 while continuous contact is maintained is       16:13:44
14 construed as requiring continuous -- the image   16:13:47
15 to be moved as long as continuous contact is     16:13:48
16 maintained, all other things aside, under that,  16:13:51
17 then that provides one noninfringement position, 16:13:56
18 that under --                     16:13:59
19     Q. Hold on. Is that the construction you  16:13:59
20 applied?                        16:14:02
21     A. That's the construction I applied to   16:14:03
22 that single limitation.               16:14:04
23     Q. Thank you. Using that construction,   16:14:06
24 did you form an opinion on whether the Neonode   16:14:29
25 handheld devices satisfies that claim limitation 16:14:33

Highly Confidential - Attorneys' Eyes Only

Page 266

1    of the unlock image going to the predefined    16:14:37
2    location?    16:14:44
3        A. Under the obviousness argument of    16:14:45
4    Neonode by itself?    16:14:48
5        Q. Sure.    16:14:50
6        A. According to my analysis of the videos    16:14:52
7    that I've shown, under either construction that    16:15:00
8    was true, so the construction wouldn't matter    16:15:04
9    because since it met the stronger standard of    16:15:07
10   while the finger was in contact, the pointer    16:15:11
11   always moved in accordance. Whether or not    16:15:13
12   that's the construction wouldn't affect how it    16:15:17
13   met that claim element.    16:15:21
14       Q. Doctor, I don't need your alternative    16:15:22
15   constructions. I only want you to apply the    16:15:24
16   construction you applied for infringement that    16:15:26
17   you just disclosed. Is that -- are we on the    16:15:28
18   same page?    16:15:31
19       MR. PAK: Objection, mischaracterizes    16:15:31
20   the witness's prior testimony.    16:15:33
21       THE WITNESS: My analysis considered    16:15:35
22   that construction and the other construction and    16:15:40
23   my results are the same.    16:15:42
24   BY MR. LO:    16:15:44
25       Q. Correct. I don't need to know all of    16:15:44

Page 267

1    your constructions because I'm trying to get you    16:15:46
2    guys out of here on time. I'm only asking you    16:15:47
3    questions with the construction of the -- of the    16:15:50
4    while continuous contact that you believe is the    16:15:55
5    correct one. Do you understand that?    16:15:59
6        A. Yes.    16:16:01
7        Q. Okay. Using that construction, does    16:16:01
8    the Plaisant video anticipate or satisfy this    16:16:04
9    particular claim limitation?    16:16:09
10       A. I think it discloses a person of    16:16:12
11   ordinary skill in the art that limitation, yes.    16:16:16
12       Q. Does it disclose it inherently or does    16:16:17
13   it disclose it explicitly?    16:16:20
14       A. I think it discloses it explicitly to    16:16:22
15   -- in the sense that the visual appearance is    16:16:27
16   that, while contact is maintained, it moves.    16:16:29
17       Q. When the -- do you have an    16:16:33
18   understanding of what would happen if the user    16:16:35
19   went past the on stage -- let's just do it --    16:16:41
20   strike that question.    16:16:46
21       Take a look at paragraph 116. In the    16:16:47
22   screenshot that's depicted in 116, the user's    16:16:58
23   finger is on the pointer and it's at the on    16:17:02
24   position. Do you see that?    16:17:05
25       A. Yes.    16:17:06

Page 268

1        Q. Do you have an understanding of what    16:17:06
2    would happen if the user kept touching the    16:17:09
3    screen but moving her finger to the left?    16:17:12
4        A. The Plaisant paper does talk about    16:17:17
5    what happens in some cases where the pointer    16:17:28
6    snaps back. So I -- I recall that. I don't    16:17:33
7    recall whether she specifically disclosed other    16:17:38
8    behaviors.    16:17:43
9        Q. Well, I'm trying to ask you about your    16:17:43
10   anticipation analysis, which is, as you    16:17:46
11   understand, is based solely on the video,    16:17:48
12   correct?    16:17:51
13       A. That's correct.    16:17:52
14       Q. Okay. What does the video disclose,    16:17:53
15   if anything, happens if the user continues to    16:17:56
16   move her finger past the on switch as    16:17:59
17   depicted in paragraph 116 of your declaration?    16:18:02
18       A. I don't recall the video, whether the    16:18:06
19   video addressed that question.    16:18:11
20       Q. All right. Do you have any basis to    16:18:13
21   conclude by a clear and convincing standard    16:18:15
22   that, if the user continues to drag her finger    16:18:18
23   to the left after it's reached the on position,    16:18:21
24   that the pointer would continue to follow the    16:18:24
25   finger?    16:18:26

Page 269

1        A. I don't -- no, I don't think that    16:18:30
2    Plaisant video disclosed what would happen in    16:18:36
3    that case.    16:18:39
4        Q. Okay. Now let's talk about the    16:18:40
5    Plaisant paper that you were talking about.    16:18:44
6        A. Okay.    16:18:48
7        Q. Do you have any basis to conclude on a    16:18:48
8    clear and convincing burden that the paper    16:18:52
9    teaches that, if the user kept moving her finger    16:18:56
10   to the left after reaching the on stage, that    16:19:00
11   the pointer would continue to track the movement    16:19:02
12   of the finger?    16:19:05
13       A. No.    16:19:06
14       Q. In fact, the paper suggests the    16:19:06
15   opposite, correct, that the pointer would then    16:19:10
16   snap back into the off position?    16:19:13
17       A. I recall the paper saying, if the    16:19:16
18   finger was lifted halfway, it would snap back.    16:19:20
19   I don't recall what else she said.    16:19:22
20       Q. Under the construction view applied    16:19:35
21   for noninfringement, the construction that you    16:19:38
22   believe is the correct construction, does the    16:19:40
23   Plaisant video satisfy the while continuous    16:19:45
24   contact claim limitation?    16:19:50
25       MR. PAK: Objection, mischaracterizes    16:19:53

Highly Confidential - Attorneys' Eyes Only

Page 270

```
 1  the witness's prior testimony.          16:19:55
 2     THE WITNESS: I think the Plaisant    16:19:57
 3  video discloses to a person of ordinary skill in   16:20:11
 4  the art continuous motion, but if -- under --      16:20:23
 5  you know, certainly under a broad construction     16:20:32
 6  where that -- that requirement wasn't met, uhm,    16:20:35
 7  and if it required the pointer to move off of      16:20:41
 8  the track, then I don't think I have an opinion    16:20:46
 9  whether it would anticipate, but I think it        16:20:51
10  certainly, you know, would render that obvious.    16:20:57
11  BY MR. LO:                              16:21:00
12     Q. You -- earlier on you gave me what you       16:21:00
13  believe was the correct construction of the        16:21:03
14  while continuous contact limitation, correct?      16:21:05
15     A. If I had to choose, I think that's the       16:21:08
16  construction I would choose. I considered          16:21:11
17  multiple constructions.                 16:21:13
18     Q. Did you apply that construction to the       16:21:14
19  Plaisant video to determine whether that claim     16:21:19
20  limitation was nevertheless met?        16:21:21
21     A. I don't think I considered that. I          16:21:24
22  think that Plaisant --                  16:21:30
23     Q. That's fine.                      16:21:32
24     A. -- meets it under a -- construction          16:21:32
25  that doesn't require it to affect in all states.   16:21:35
```

Page 271

```
 1     Q. Sure. You -- did you apply what you          16:21:40
 2  believed to be the correct construction of the     16:21:45
 3  while continuous contact limitation to determine   16:21:47
 4  whether any of the prior arts that you cite in     16:21:50
 5  your declaration satisfies that claim    16:21:54
 6  limitation?                             16:21:57
 7     MR. PAK: Objection, mischaracterizes   16:21:57
 8  the witness's prior testimony.           16:21:59
 9     THE WITNESS: I think under            16:22:00
10  obviousness, yes, that under obviousness that      16:22:02
11  difference is immaterial and would easily be       16:22:05
12  accomplished by our sophisticated person of        16:22:09
13  ordinary skill in the art.               16:22:12
14  BY MR. LO:                              16:22:13
15     Q. In watching the Plaisant video, you         16:22:29
16  agree, do you not, that what is depicted in the    16:22:33
17  video is not a portable electronic device as       16:22:36
18  that term is used in the claims?         16:22:39
19     A. Plaisant video describes any device.        16:22:42
20     Q. My question is different. The device        16:22:49
21  that is actually depicted in the video, is it in   16:22:52
22  your view a portable electronic device?  16:22:55
23     A. She doesn't, you know -- she doesn't        16:22:58
24  use those words.                        16:23:04
25     Q. Would you use those words to describe       16:23:06
```

Page 272

```
 1  what you see in the Plaisant video?      16:23:07
 2     A. No.                              16:23:11
 3     Q. Okay. Would you use the words       16:23:15
 4  handheld electronic device to describe the         16:23:17
 5  device you see in the Plaisant video?    16:23:20
 6     A. I think portable and handheld devices       16:23:23
 7  are instances of the any device that she  16:23:26
 8  discusses.                              16:23:28
 9     Q. Will you please answer my question?         16:23:29
10  Would you use the words handheld electronic        16:23:31
11  device to describe the device that you see with    16:23:33
12  your eyes in the Plaisant video?         16:23:37
13     A. No.                              16:23:38
14     Q. As a -- from the perspective of a          16:23:39
15  person of ordinary skill in the art, would you     16:23:49
16  agree or disagree that there are certain  16:23:51
17  problems associated with handheld devices that     16:23:53
18  are not associated with large devices?   16:23:56
19     A. You know, broadly speaking, I would        16:24:01
20  agree with that.                        16:24:03
21     Q. Sure. So, for example, there can be        16:24:03
22  technological barriers to making a large device    16:24:06
23  a small device, correct?                 16:24:09
24     A. Sure. At any given point in time           16:24:10
25  that's going to be true.                 16:24:13
```

Page 273

```
 1     Q. And, for example, you've probably          16:24:14
 2  never misplaced a desktop computer, but you may    16:24:17
 3  have forgotten where you left or not been able     16:24:22
 4  to find your laptop computer, correct?   16:24:25
 5     A. Sure.                            16:24:27
 6     Q. And you and I are probably from            16:24:27
 7  roughly the same era. We once had landlines,       16:24:30
 8  correct?                                16:24:34
 9     A. Sure.                            16:24:34
10     Q. People like my colleagues next to me       16:24:35
11  are too young for that. You would agree that,      16:24:38
12  when it comes to landlines, you and I never        16:24:41
13  really dealt with a problem of having lost a       16:24:43
14  phone somewhere in the house, correct?   16:24:46
15     A. Sure.                            16:24:48
16     Q. And that is a problem when we have         16:24:48
17  mobile phones, correct?                  16:24:51
18     A. That's -- that's true.             16:24:52
19     Q. Occasionally people will misplace         16:24:53
20  them, correct?                          16:24:56
21     A. Sure.                            16:24:57
22     Q. And you would agree that in the days       16:24:57
23  of the landline you and I didn't accidentally      16:25:01
24  call somebody without realizing we made a call,    16:25:04
25  correct?                                16:25:06
```

Highly Confidential - Attorneys' Eyes Only

Page 274

```
 1        A.  Well, I certainly remember there were    16:25:09
 2    redial buttons, and, if you accidentally hit      16:25:16
 3    that button, it would often dial an entire phone  16:25:19
 4    number.  In fact, I'm sure that happened to me    16:25:21
 5    on a number of occasions.                16:25:24
 6        Q.  Sure.  But you never dialed a number    16:25:25
 7    without realizing you were dialing some number,    16:25:27
 8    correct, when it came to a landline telephone?    16:25:29
 9        MR. PAK:  Objection, incomplete      16:25:33
10    hypothetical.                    16:25:35
11        THE WITNESS:  Yeah, I -- I don't      16:25:35
12    specifically recall.  I think it could very well  16:25:37
13    have happened, hit the redial button without      16:25:39
14    knowing when you put the phone down.      16:25:41
15    BY MR. LO:                16:25:43
16        Q.  Okay.  But you would agree that, when  16:25:43
17    it comes to handheld devices, you probably have    16:25:44
18    been the recipient of it, there are instances    16:25:49
19    where people will accidentally dial somebody      16:25:51
20    without even realizing that their phone was      16:25:53
21    calling out, correct?            16:25:55
22        A.  Sure.                16:25:56
23        Q.  And that happens, for example, because  16:25:57
24    you're able to put a handheld phone into your    16:25:59
25    pocket or somebody's purse, correct?      16:26:02
```

Page 275

```
 1        A.  Yes.                16:26:04
 2        Q.  And that problem, of course, is not a  16:26:05
 3    problem that is associated with larger devices    16:26:08
 4    that obviously you can't put into a purse or      16:26:10
 5    a -- or your pocket, correct?          16:26:13
 6        A.  You know, as -- as -- narrowly      16:26:15
 7    speaking, the problem of putting it in the      16:26:21
 8    pocket, not, but the problem of inadvertent      16:26:23
 9    touches was explicitly identified by Plaisant as  16:26:25
10    being a motivation for the slider toggle.  So I  16:26:28
11    disagree with the characterization that      16:26:31
12    inadvertent touches on a touchscreen wasn't      16:26:33
13    known.  The extent to which that was a problem    16:26:36
14    she explicitly identified it and she explicitly  16:26:39
15    identified the slider toggle as a solution to    16:26:41
16    that you're talking about specific ways in which  16:26:43
17    an inadvertent touch might happen, and, sure,    16:26:45
18    there is a whole set of potential ways that      16:26:49
19    inadvertent touch might happen to Plaisant or to  16:26:51
20    a phone, but she knew that there was a problem    16:26:55
21    of inadvertent touches.  She identified that    16:26:58
22    problem and she proposed a solution that a      16:27:01
23    person of ordinary skill in the art would      16:27:04
24    understand.                16:27:05
25    BY MR. LO:                16:27:06
```

Page 276

```
 1        Q.  Would you turn to paragraph 113 of    16:27:26
 2    your declaration?              16:27:27
 3        A.  Yes.                16:27:34
 4        Q.  You used the term there inherently    16:27:35
 5    includes portable devices, do you see that?      16:27:51
 6        A.  Yes.                16:27:56
 7        Q.  And you're probably familiar that    16:27:56
 8    inherently is one of the terms of art that's    16:27:58
 9    used in patent construction.          16:28:00
10        A.  Yes.                16:28:01
11        Q.  Okay.  And what is to your      16:28:02
12    understanding the meaning of inherently in this  16:28:04
13    context?                16:28:06
14        A.  That it must necessarily have been    16:28:07
15    disclosed or -- or implied.          16:28:12
16        Q.  Is it your understanding that it's, by  16:28:27
17    definition, implied?  In other words, it's not    16:28:29
18    explicit, right?              16:28:31
19        A.  That was the legal understanding      16:28:32
20    provided to me by counsel.          16:28:33
21        Q.  Sure.  The legal foundation on which    16:28:35
22    you conducted your analysis was that, if      16:28:40
23    something is inherently disclosed, it is not    16:28:43
24    explicitly disclosed, correct?        16:28:45
25        A.  Right, that those are -- yes.      16:28:48
```

Page 277

```
 1        Q.  And you agree that obviously handheld  16:28:51
 2    electronic devices and portable electronic      16:28:54
 3    devices are not explicitly disclosed in the      16:28:56
 4    Plaisant video, correct?          16:29:00
 5        A.  That's correct.            16:29:01
 6        Q.  Is it your view, Dr. Cohen, that in    16:29:02
 7    the 1991 time frame, if somebody taught the use  16:29:16
 8    of something on a desktop computer, they      16:29:19
 9    necessarily disclosed to a person of ordinary    16:29:23
10    skill in the art the same technology in a      16:29:27
11    handheld or portable device?          16:29:28
12        A.  I didn't consider that broad question.  16:29:33
13    I think the Plaisant video, in my opinion, would  16:29:36
14    have taught a person of ordinary skill in the    16:29:40
15    art that any device for the techniques she      16:29:41
16    disclosed would include handheld devices.      16:29:44
17        Q.  And is that because they say the words  16:29:48
18    "any device" or is there something else?      16:29:51
19        A.  Well, because they use the words "any  16:29:54
20    device" and because of my analysis of -- my    16:29:56
21    understanding of a person of ordinary skill in    16:30:00
22    the art watching that video, that those things    16:30:02
23    together would -- would lead that person of      16:30:06
24    ordinary skill in the art to know based on their  16:30:08
25    experience and knowledge that that was a      16:30:10
```

Highly Confidential - Attorneys' Eyes Only

Page 278

| | | |
|---|---|---|
| 1 | technique that would translate.  There may be | 16:30:12 |
| 2 | other techniques in hypothetical situations that | 16:30:15 |
| 3 | wouldn't. | 16:30:17 |
| 4 | My analysis of the Plaisant video is that | 16:30:18 |
| 5 | the things she disclosed would translate.  They | 16:30:20 |
| 6 | were -- they were not specific to large | 16:30:23 |
| 7 | computers.  Nothing she said implies, and, in | 16:30:25 |
| 8 | fact, quite the opposite, that it could only be | 16:30:28 |
| 9 | practiced on a big, nonportable computer.  I | 16:30:32 |
| 10 | think she says any device.  I understand, a | 16:30:34 |
| 11 | person of ordinary skill in the art understands, | 16:30:39 |
| 12 | those were techniques that could be translated | 16:30:40 |
| 13 | without difficulty to a handheld device and that | 16:30:43 |
| 14 | would be one of the any devices that she is | 16:30:47 |
| 15 | interested in. | 16:30:49 |
| 16 | Q.  And because this is a inherent | 16:30:50 |
| 17 | disclosure, it's something that a person of | 16:30:54 |
| 18 | ordinary skill in the art would necessarily know | 16:30:57 |
| 19 | by viewing the Plaisant video, correct? | 16:31:00 |
| 20 | A.  Certainly our sophisticated person of | 16:31:03 |
| 21 | art as laid forth in the Balakrishnan standard. | 16:31:06 |
| 22 | Q.  So under your analysis the person of | 16:31:10 |
| 23 | ordinary skill in the art, watching a video from | 16:31:13 |
| 24 | 1991, necessarily, without having to jump to any | 16:31:16 |
| 25 | conclusions, necessarily would have known | 16:31:18 |

Page 279

| | | |
|---|---|---|
| 1 | everything they needed to know to put into | 16:31:21 |
| 2 | effect the disclosures of the claimed invention | 16:31:27 |
| 3 | of the '721 patent, correct? | 16:31:30 |
| 4 | A.  Yeah.  Sure. | 16:31:33 |
| 5 | Q.  And the first instance that you're | 16:31:36 |
| 6 | aware of at least in which somebody actually put | 16:31:42 |
| 7 | in place the inventions disclosed in the '721 | 16:31:47 |
| 8 | patent is the Apple iPhone in -- well, is the | 16:31:50 |
| 9 | '721 patent application, correct? | 16:31:55 |
| 10 | MR. PAK:  Objection, assumes facts not | 16:31:58 |
| 11 | in evidence, mischaracterizes the witness's | 16:32:00 |
| 12 | testimony. | 16:32:02 |
| 13 | MR. LO:  I'm sorry.  Let me strike my | 16:32:03 |
| 14 | question. | 16:32:04 |
| 15 | BY MR. LO: | 16:32:05 |
| 16 | Q.  To your knowledge the first instance | 16:32:05 |
| 17 | in which somebody put into practice in a | 16:32:06 |
| 18 | physical handheld device every element of claim | 16:32:09 |
| 19 | 7 of the '721 patent was the Apple iPhone in | 16:32:13 |
| 20 | 2007, correct? | 16:32:17 |
| 21 | MR. PAK:  Same. | 16:32:18 |
| 22 | THE WITNESS:  I didn't perform a | 16:32:20 |
| 23 | historical analysis.  That wasn't what I was | 16:32:22 |
| 24 | requested.  I think there is lots of reasons to | 16:32:25 |
| 25 | choose one thing or another.  The fact is | 16:32:27 |

Page 280

| | | |
|---|---|---|
| 1 | Plaisant disclosed the technique.  It was known. | 16:32:29 |
| 2 | At some point someone made a decision to use it. | 16:32:34 |
| 3 | BY MR. LO: | 16:32:38 |
| 4 | Q.  At least sitting here today you have | 16:32:39 |
| 5 | no basis to challenge that it was a 16-year gap | 16:32:40 |
| 6 | between the Plaisant video and the Apple iPhone | 16:32:47 |
| 7 | before somebody put into practice claim 7 of the | 16:32:50 |
| 8 | '721 patent, correct? | 16:32:55 |
| 9 | MR. PAK:  Same objection. | 16:32:57 |
| 10 | THE WITNESS:  You know, what I did was | 16:32:59 |
| 11 | identify a piece of prior art that anticipated | 16:33:02 |
| 12 | it.  I didn't look for other things that might | 16:33:05 |
| 13 | have practiced it or not. | 16:33:08 |
| 14 | BY MR. LO: | 16:33:09 |
| 15 | Q.  Is the answer to my question, yes? | 16:33:09 |
| 16 | A.  I don't specifically know of any | 16:33:11 |
| 17 | devices that -- that practiced it. | 16:33:15 |
| 18 | Q.  Is the answer to my question yes, | 16:33:17 |
| 19 | then? | 16:33:20 |
| 20 | A.  If that's the way you asked the | 16:33:20 |
| 21 | question, then, yes. | 16:33:21 |
| 22 | MR. LO:  Let's take a break. | 16:33:34 |
| 23 | VIDEOGRAPHER:  This is the end of tape | 16:33:35 |
| 24 | 5.  Off the record at 4:33. | 16:33:36 |
| 25 | (Proceedings recessed.) | 16:33:38 |

Page 281

| | | |
|---|---|---|
| 1 | VIDEOGRAPHER:  This is the beginning | 16:40:37 |
| 2 | of tape 6 in the deposition of Dr. Cohen.  On | 16:40:45 |
| 3 | the record at 4:40. | 16:40:48 |
| 4 | BY MR. LO: | 16:40:52 |
| 5 | Q.  Dr. Cohen, before the previous break | 16:40:52 |
| 6 | you and I were talking about the claim | 16:40:55 |
| 7 | limitation that's continuously move the unlock | 16:40:59 |
| 8 | image while continuous contact, and obviously | 16:41:01 |
| 9 | you and I are cutting out a few words to save | 16:41:04 |
| 10 | the reporter some strokes.  With respect to the | 16:41:07 |
| 11 | continuous contact limitation, what construction | 16:41:10 |
| 12 | did you apply when you performed your | 16:41:12 |
| 13 | anticipation analysis? | 16:41:16 |
| 14 | A.  For continuous I looked at whether or | 16:41:19 |
| 15 | not the contact had lifted from the -- from the | 16:41:30 |
| 16 | screen. | 16:41:39 |
| 17 | Q.  Okay.  Did you assume when you were | 16:41:39 |
| 18 | performing your anticipation analysis that the | 16:41:44 |
| 19 | contact had to be continuous even after the | 16:41:48 |
| 20 | unlock image had moved to the predefined | 16:41:51 |
| 21 | location? | 16:41:54 |
| 22 | A.  I don't recall an instance where that | 16:41:56 |
| 23 | difference would matter, so I don't remember | 16:42:01 |
| 24 | whether I made that assumption or not. | 16:42:04 |
| 25 | Q.  But it's your view that only the | 16:42:08 |

Highly Confidential - Attorneys' Eyes Only

Page 282

1    correct construction, the unlocking image,        16:42:14
2    should continue to follow the finger even after   16:42:18
3    reaching the predefined location, correct?        16:42:20
4          MR. PAK:  Objection, mischaracterizes       16:42:23
5    the witness's prior testimony.                    16:42:24
6          THE WITNESS:  I think that that's a         16:42:25
7    construction that was one element of my           16:42:26
8    noninfringement analysis.  I think in the         16:42:29
9    absence of that construction still doesn't        16:42:30
10   infringe for other reasons and the prior art      16:42:35
11   anticipates.                                      16:42:37
12   BY MR. LO:                                        16:42:38
13         Q.  Right.  But do you have a view as to    16:42:38
14   which one is the correct construction?            16:42:40
15         MR. PAK:  Objection, goes beyond the        16:42:41
16   scope.                                            16:42:43
17         THE WITNESS:  Yeah, I didn't -- you         16:42:43
18   know, I didn't specifically disclose in my        16:42:50
19   declaration claim construction opinions other     16:42:54
20   than I tried to read the claims as they were one  16:42:58
21   of a person of ordinary skill in the art.  So I   16:43:05
22   considered multiple potential constructions.  I   16:43:08
23   have an opinion which way it ultimately should    16:43:10
24   go, but I considered different interpretations    16:43:12
25   as I analyzed the accused device and each piece   16:43:14

Page 283

1    of prior art.                                     16:43:20
2    BY MR. LO:                                        16:43:21
3          Q.  Right.  And I'm just asking which way   16:43:21
4    you think it should go because I want to try to   16:43:24
5    understand what you believe to be the correct     16:43:26
6    construction.                                     16:43:29
7          MR. PAK:  Same objections.                  16:43:30
8    BY MR. LO:                                        16:43:31
9          Q.  And under that construction the unlock  16:43:31
10   image should continue to follow the finger even   16:43:33
11   after reaching the predefined unlock region,      16:43:37
12   correct?                                          16:43:45
13         MR. PAK:  Mischaracterizes the prior        16:43:48
14   testimony.                                        16:43:50
15         THE WITNESS:  I think that that's one       16:43:51
16   potential construction.  I -- I don't know that   16:43:52
17   that's the only way that you could construe it,   16:43:57
18   and, you know, I think I would want to sit down   16:44:00
19   again with the specification and the file         16:44:03
20   history and -- and consider support for that.  I  16:44:06
21   certainly think it's one possible construction    16:44:10
22   that could be correct.                            16:44:12
23   BY MR. LO:                                        16:44:14
24         Q.  So you don't have a view as to whether  16:44:15
25   that's the correct construction, correct?         16:44:17

Page 284

1          A.  If I had to guess now, I think that     16:44:19
2    that's likely that's correct, but, again, I       16:44:23
3    think to come to a final conclusion I would       16:44:25
4    really want to do more specific analysis of the   16:44:27
5    intrinsic evidence.                               16:44:34
6          Q.  And -- and that construction that the   16:44:35
7    unlock image has to continue to follow the        16:44:38
8    user's finger even after reaching the predefined  16:44:40
9    unlock region, it is not a construction you use   16:44:42
10   when determining whether the Plaisant video       16:44:46
11   anticipates, correct?                             16:44:48
12         A.  I think the Plaisant video does         16:44:50
13   follow -- that the pointer does follow the        16:45:03
14   finger when it reaches the unlock region.  So     16:45:05
15   whether or not that construction applies, I       16:45:09
16   think Plaisant would meet that claim limitation.  16:45:11
17   So when I did the analysis it didn't seem         16:45:13
18   important whether that construction was adopted   16:45:17
19   or -- or hypothetical broader construction, if    16:45:20
20   the pointer, you know, as you said, if the        16:45:24
21   pointer reaches the -- the predefined region,     16:45:27
22   the unlock region.                                16:45:36
23         Q.  Then maybe I'm just misunderstanding    16:45:37
24   you, then.  I thought you said earlier that even  16:45:39
25   after reaching the predefined unlock region       16:45:43

Page 285

1    under the proper construction the unlock image    16:45:46
2    should continue to follow the finger.  Is that    16:45:48
3    incorrect?                                        16:45:50
4          MR. PAK:  Objection, mischaracterizes       16:45:51
5    the witness's prior testimony.                    16:45:53
6          THE WITNESS:  Uhm, perhaps I                16:45:55
7    misunderstood the question.  Let me -- if I said  16:45:57
8    that before -- you know, before I was focusing    16:46:01
9    on the claim limitation of really the word while  16:46:10
10   and the things that it modifies, so I -- I don't  16:46:17
11   recall now that I did a specific analysis of the  16:46:28
12   prior art beyond the point at which you unlock    16:46:32
13   the device.                                       16:46:40
14   BY MR. LO:                                        16:46:42
15         Q.  Okay.  So when you were analyzing the   16:46:42
16   prior art for invalidity purposes, you deemed     16:46:44
17   the limitation to be satisfied as soon as the     16:46:49
18   unlock image got to the predefined unlock         16:46:52
19   region, correct?                                  16:46:56
20         A.  Let me think about the art that I       16:46:57
21   looked at --                                      16:47:04
22         Q.  -- and what construction you applied    16:47:07
23   in terms of your methodology.                     16:47:11
24         A.  I think that's -- I think that's        16:47:15
25   right.                                            16:47:18

Page 286

1    Q. Okay. When you were analyzing the          16:47:19
2  Galaxy Nexus for infringement, did you also end   16:47:25
3  your analysis as soon as the unlock image         16:47:30
4  reached the predefined unlock region?             16:47:34
5    A. I considered both cases, either when        16:47:37
6  it reached it or when it did not reach it.        16:47:41
7    Q. What did you define -- what did you         16:47:44
8  assume to be the predefined unlock region when    16:47:50
9  you were performing your infringement analysis?   16:47:52
10    A. Let me look in my report. Uhm, you          16:47:55
11  know, I didn't -- I didn't explicitly say -- I    16:48:33
12  could see a couple different alternatives. One    16:48:39
13  would be the region bounding the image, you       16:48:42
14  know, and that that would be the region           16:48:49
15  associated with the unlock -- the target image.   16:48:50
16  It's possible that it could be broader given the  16:48:56
17  spec disclosure that region could be broad. And   16:48:59
18  in that case I think that noninfringement         16:49:03
19  argument wouldn't apply, that that last snap at   16:49:05
20  that point wouldn't apply. And then under that    16:49:09
21  standard that infringement argument wouldn't      16:49:11
22  apply and then the prior art would anticipate.    16:49:14
23    So, under that broader construction, which     16:49:20
24  I could imagine, then that region would be        16:49:22
25  equivalent to the radius where the snap happens,  16:49:28

Page 287

1  and so that's certainly one possible              16:49:31
2  construction that I envisioned.                   16:49:36
3    Q. Okay. Is there -- to your knowledge         16:49:37
4  is there any reason why a construction that       16:49:40
5  defines the mHitRadius as the predefined unlock   16:49:46
6  region would be an improper read?                 16:49:51
7    A. Well, certainly I don't think the           16:49:55
8  construction should refer to a feature of the     16:49:59
9  accused -- I mean, the mHitRadius is a feature    16:50:02
10  of the accused product, so that couldn't          16:50:07
11  possibly be the construction. If what you mean    16:50:08
12  is a radius, a fixed radius -- construction is a  16:50:10
13  fixed radius, I think that's one -- I mean, that  16:50:17
14  seems unlikely specific, but I could imagine      16:50:21
15  construction that was something like that.        16:50:24
16    Q. Sitting here today do you have any          16:50:26
17  opinion as to whether there is -- strike that.    16:50:29
18    Do you have an opinion as to whether the       16:50:38
19  proper construction of the predefined unlock      16:50:41
20  region would exclude the possibility that that    16:50:44
21  region would be the entirety of the mHitRadius?   16:50:49
22    A. Just to understand your question, do I      16:50:53
23  have reason to believe that the construction      16:50:56
24  would exclude a radius?                           16:50:58
25    Q. Let me just rephrase my question.           16:51:05

Page 288

1    A. Okay.                                        16:51:07
2    Q. Do you have an opinion as to whether         16:51:09
3  the proper construction of the predefined unlock  16:51:15
4  region -- I don't need to know for the purpose    16:51:20
5  of this question what that construction is --     16:51:23
6  does the proper construction exclude the          16:51:25
7  possibility that the predefined unlock region in  16:51:28
8  the Galaxy Nexus is the mHitRadius?               16:51:33
9    A. No, I don't have an opinion on that          16:51:36
10  right now.                                        16:51:45
11    Q. So under the proper construction of         16:51:52
12  the predefined unlock region, this claim could    16:51:58
13  be satisfied as soon as the unlock image hits     16:52:04
14  the mHitRadius, correct?                          16:52:08
15    A. I'm sorry. Did you say what the             16:52:10
16  construction was or are you asking about my       16:52:12
17  opinion? I thought you said regardless of what    16:52:14
18  the construction is.                              16:52:15
19    Q. No, I asked regardless of -- I'm            16:52:16
20  asking you under what you believe to be the       16:52:19
21  proper construction.                             16:52:20
22    A. Oh. Uhm, I -- I think it's certainly        16:52:22
23  possible that the proper construction of that     16:52:31
24  would include a radius.                           16:52:35
25    Q. Okay. Do you agree or disagree that,        16:52:37

Page 289

1  under the proper construction of claim 7 of the   16:52:40
2  '721 patent, what you call the second snap of     16:52:46
3  the unlock image, does not give rise to a         16:52:52
4  noninfringement argument?                         16:52:55
5    A. Uhm, for that claim limitation, I            16:52:57
6  think that's -- that's certainly a possible       16:53:03
7  construction. I think that that doesn't           16:53:05
8  necessarily reflect on the while, but I'll        16:53:08
9  accept that statement that you made.              16:53:11
10    Q. Oh, so you think that, under the            16:53:13
11  proper construction of the entirety of the       16:53:15
12  claim -- of all of the terms within the claim,   16:53:18
13  it would still require the unlock image to        16:53:21
14  follow the user's fingers after it has hit the    16:53:24
15  predefined unlock region?                         16:53:27
16    MR. PAK: Objection, mischaracterizes           16:53:28
17  the witness's testimony.                          16:53:30
18    THE WITNESS: Uhm, I don't think I'm            16:53:31
19  prepared, as I sit here now, that that -- to say  16:53:33
20  that that's the proper construction. I think      16:53:36
21  that's one possible construction that would give  16:53:38
22  rise to a noninfringement position for that one   16:53:40
23  claim element, but I could imagine going other    16:53:43
24  ways, in which case that final snap wouldn't be   16:53:46
25  relevant and then the prior art would             16:53:48

Highly Confidential - Attorneys' Eyes Only

Page 290

1  anticipate.                          16:53:50
2  BY MR. LO:                           16:53:50
3      Q.  Right.  And, again, I'm not trying to   16:53:50
4  lock you down on something that you haven't     16:53:52
5  considered, but if you have an opinion I'd like  16:53:54
6  to know it.                          16:53:56
7      So, my question is, do you have an opinion  16:53:56
8  as to whether the claim 7 as properly construed  16:53:58
9  requires the unlock image to continue to track   16:54:03
10 the user's movement after it has been in the     16:54:06
11 predefined unlock region?             16:54:11
12     A.  No, I don't think I have an opinion   16:54:13
13 what the proper construction is.  I think I -- I  16:54:15
14 looked at different alternatives.     16:54:18
15     Q.  Okay.  You understand that, even    16:54:20
16 though you're working with Quinn Emanuel in this  16:54:29
17 case, that you've been ultimately retained by    16:54:32
18 Samsung, correct?                    16:54:34
19     A.  Yes.                        16:54:35
20     Q.  And have you done any work for Samsung  16:54:35
21 in the past?                         16:54:38
22     A.  I have not.                  16:54:39
23     Q.  Okay.  Have you ever received any    16:54:40
24 grants or anything from Samsung in the past?     16:54:43
25     A.  I don't think so.             16:54:45

Page 291

1      Q.  You've served as an expert in other  16:54:48
2  cases in other matters before, correct?   16:54:52
3      A.  That's correct.               16:54:54
4      Q.  To your knowledge has there ever been  16:54:55
5  a Daubert challenge to your credentials as an    16:54:57
6  expert?                              16:55:00
7      A.  Not that I'm aware of.          16:55:00
8      Q.  Okay.  What percentage of your income  16:55:01
9  right now is derived from work such as you're    16:55:08
10 doing for Samsung here, litigation consulting?   16:55:13
11     A.  Litigation consulting including    16:55:15
12 non-testimony?  Nearly all of it.     16:55:19
13     Q.  Okay.  To the extent that your income  16:55:24
14 is not from litigation consulting, what is it    16:55:31
15 that you do to earn money?            16:55:34
16     A.  Sometimes I write papers or, you     16:55:35
17 know -- there may be other things as well, but,  16:55:41
18 I mean, my salary is based on my employment as a  16:55:43
19 consultant.                          16:55:46
20     Q.  And does the time you spend track your  16:55:47
21 salary, in other words, is it then true that     16:55:51
22 almost all of your working time is in connection  16:55:53
23 with your work as a litigation consultant?   16:55:56
24     A.  I'm not sure almost all.  I spend a   16:55:59
25 fair amount of my time doing internal work for   16:56:06

Page 292

1  the company.  So not everything is for a client,  16:56:08
2  but, you know, I am a full-time consultant,   16:56:14
3  full-time employee for a consulting company.   16:56:17
4      Q.  Putting -- in other words, putting    16:56:19
5  aside the administrative tasks that you must do   16:56:22
6  as a full-time consultant, your primary working  16:56:24
7  hours are spent in connection with litigation    16:56:30
8  matters, correct?                    16:56:32
9      A.  That's generally correct.        16:56:33
10     Q.  Do you have any patents granted to    16:56:35
11 you?                                 16:56:37
12     A.  Yes.                         16:56:38
13     Q.  How many?                     16:56:38
14     A.  I believe the number is five.       16:56:39
15     Q.  Okay.  When was the most recent one  16:56:41
16 issued?  Roughly.                    16:56:44
17     A.  Yeah, a while ago, it was based on   16:56:47
18 work I did when I was at IBM, so quite sometime  16:56:49
19 ago, but I don't remember how long things were   16:56:53
20 stuck in the Patent Office before they issued.   16:56:55
21     Q.  What generally do those patents relate  16:56:57
22 to?                                  16:56:59
23     A.  Uhm, mostly program methodology,   16:57:00
24 client server, distributed systems, analysis of  16:57:09
25 user interfaces in ways to distribute them   16:57:17

Page 293

1  across systems, things like that.     16:57:20
2      Q.  Is it accurate to say that none of    16:57:22
3  your patents have dealt with handheld devices?   16:57:24
4      A.  Well, in fact, that one I just      16:57:28
5  discussed where you take a user interface and    16:57:31
6  you -- what you'd like to do is customize that   16:57:34
7  user interface for different kinds of devices,   16:57:39
8  so it may be that a desktop can support a very   16:57:42
9  rich user interface and maybe that a phone or a  16:57:46
10 Palm, handheld device, doesn't have the      16:57:48
11 computational power, so really it would be   16:57:52
12 advantageous to have a tool that can take a   16:57:54
13 given specification and say for this device   16:57:57
14 here's the appropriate thing.  So that was a     16:57:58
15 problem that I worked at at IBM that resulted --  16:58:01
16 there was a broader project, and one of the      16:58:03
17 outcomes of that project was a patent        16:58:05
18 application that we filed.            16:58:07
19     MR. LO:  Okay.  I see that it is 5:00,   16:58:08
20 and certainly, as a courtesy to both the witness  16:58:11
21 and as to counsel, I will end my questioning.  I  16:58:14
22 appreciate your time today, Dr. Cohen.   16:58:16
23     THE WITNESS:  Thank you.           16:58:19
24     MR. PAK:  Thank you very much,        16:58:19
25 counselor, for accommodating my schedule.  I     16:58:20

Highly Confidential - Attorneys' Eyes Only

Page 298

1          VIDEOGRAPHER:  This concludes the        17:02:53
2    deposition of Dr. Cohen.  Off the record at 5:03        17:02:54
3    and it consists of six tapes.              17:02:59
4
5          //
6          (Signature having not been waived, the
7    deposition of GEOFFREY COHEN, Ph.D. concluded at
8    5:03 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 299

1          ACKNOWLEDGMENT OF DEPONENT
2
3          I, GEOFFREY COHEN, Ph.D., do hereby
4    acknowledge that I have read and examined the
5    foregoing testimony, and the same is a true,
6    correct and complete transcription of the
7    testimony given by me, with the exception of the
8    noted corrections, if any, appearing on the
9    attached errata sheet signed by me, to the best of
10   my knowledge and belief.
11
12
13
14   _____  _____
15   (Date)        (Signature)
16
17
18       Subscribed and sworn to before me this _____
19   day of _____, 20__.
20       My commission expires _____.
21       Notary Public _____
22
23
24
25

Page 300

1        E R R A T A   S H E E T
2    APPLE, INC. v. SAMSUNG ELECTRONICS CO.
3    RETURN BY:
4    _____
5
6    PAGE  LINE     CORRECTION and REASON
7    _____ _____ _____
8    _____ _____ _____
9    _____ _____ _____
10   _____ _____ _____
11   _____ _____ _____
12   _____ _____ _____
13   _____ _____ _____
14   _____ _____ _____
15   _____ _____ _____
16   _____ _____ _____
17   _____ _____ _____
18   _____ _____ _____
19   _____ _____ _____
20   _____ _____ _____
21   _____ _____ _____
22
23   _____
24   (DATE)        (SIGNATURE)
25

Page 301

1        E R R A T A   S H E E T
2    APPLE, INC. v. SAMSUNG ELECTRONICS CO.
3    RETURN BY:
4    _____
5
6    PAGE  LINE     CORRECTION and REASON
7    _____ _____ _____
8    _____ _____ _____
9    _____ _____ _____
10   _____ _____ _____
11   _____ _____ _____
12   _____ _____ _____
13   _____ _____ _____
14   _____ _____ _____
15   _____ _____ _____
16   _____ _____ _____
17   _____ _____ _____
18   _____ _____ _____
19   _____ _____ _____
20   _____ _____ _____
21   _____ _____ _____
22
23   _____
24   (DATE)        (SIGNATURE)
25

Highly Confidential - Attorneys' Eyes Only

Page 302

1           CERTIFICATE OF SHORTHAND REPORTER
2                  NOTARY PUBLIC
3
4           I, Linda S. Kinkade, RDR, CRR, RMR, CSR,
5    the notarial officer before whom the foregoing
6    proceedings were taken, do hereby certify that the
7    foregoing transcript is a true and correct record
8    of the proceedings; that said proceedings were
9    taken by me stenographically, to the best of my
10   ability, and thereafter reduced to typewriting;
11   and that I am neither counsel for or related to,
12   nor employed by any of the parties to this case
13   and have no interest, financial or otherwise, in
14   its outcome.
15
16          IN WITNESS WHEREOF, I have hereunto set my
17   hand and affixed my notarial seal this 3rd day of
18   May 2012.
19       My commission expires:  July 14, 2012
20   _____
21   Linda S. Kinkade
     NOTARY PUBLIC IN AND FOR
22   THE DISTRICT OF COLUMBIA
23
24
25