JOSH A. KREVITT (CA SBN 208552)
jkrevitt@gibsondunn.com
H. MARK LYON (CA SBN 162061)
mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone: (650) 849-5300
Facsimile: (650) 849-5333

MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

MARK D. SELWYN (CA SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

*Attorneys for Plaintiff Apple Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | CASE NO. 12-cv-00630-LHK<br><br>**REPLY EXPERT DECLARATION OF DR. TODD C. MOWRY CONCERNING U.S. PATENT NO. 5,946,647**<br><br>**Hearing:**<br>Date:<br>Time:<br>Place:<br>Judge: |

1

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................................................. 1

    A.   Most Claim Elements are Not Disputed ................................................. 1

    B.   The Galaxy Nexus Infringes Under Any Set of Constructions.................................. 4

        1.   The Galaxy Nexus Infringes Under the ITC Constructions............................ 4

        2.   The Galaxy Nexus Infringes Under Judge Posner's Constructions ................. 5

        3.   Dr. Cohen's Analysis Conflicts With The PTO's Constructions..................... 8

        4.   Doctrine of Equivalents........................................................................ 8

    C.   Dr. Cohen Presents Essentially No New Invalidity Arguments ................................. 9

        1.   Newton .............................................................................................. 9

        2.   Perspective ....................................................................................... 10

        3.   Pandit .............................................................................................. 11

        4.   Nokia ............................................................................................... 12

        5.   Sidekick............................................................................................ 13

        6.   MHonArc + Mosaic Web Browser ...................................................... 14

II.   MATERIALS REVIEWED ............................................................................... 15

III.   U.S. PATENT NO. 5,946,647 ........................................................................... 16

IV.   CLAIM CONSTRUCTION ............................................................................... 17

    A.   "Analyzer Server" ................................................................................. 17

    B.   "Linking Actions to Detected Structures"................................................ 20

    C.   Reexamination .................................................................................... 21

V.   INFRINGEMENT.............................................................................................. 22

    A.   The Samsung Galaxy Nexus Code Has Already Been Found to Infringe the '647 Patent ......................................................................................... 22

    B.   Dr. Cohen Does Not Opine on Most Claim Elements ................................. 23

    C.   The Galaxy Nexus Contains an "Analyzer Server" under Any Construction ........... 23

D. The Galaxy Nexus "Links Actions to Detected Structures" under Any Construction ................................................................ 30

E. The Galaxy Nexus Contains "a user interface enabling the selection of a detected structure and a linked" ............................... 43

F. Infringement Of Claim 8 .................................................... 44

VI. VALIDITY ................................................................................ 44

A. Claims 1 and 8 Are Not Anticipated by SideKick ..................... 45

1. Claim 1: "A computer-based system for detecting structures in data and performing actions on detected structures:" .................. 45

2. "an input device for receiving data; an output device for presenting the data; a memory storing information including program routines including;" ................................................................ 49

3. "an analyzer server for detecting structures in the data, and for linking actions to the detected structures;" ............................... 49

4. "a user interface enabling the selection of a detected structure and a linked action; and;" ................................................... 53

5. "an action processor for performing the selected action linked to the selected structure; and;" ........................................... 55

6. "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines." ........ 56

7. Claim 8: "The system recited in claim 1, wherein the user interface highlights detected structures." ......................................... 56

B. Claims 1 and 8 Are Not Anticipated by Nor Rendered Obvious by Newton ..... 56

1. Claim 1: "A computer-based system for detecting structures in data and performing actions on detected structures:" .................. 57

**2.** "an input device for receiving data; **an output device for presenting the data; a memory storing information including program routines including;"** .................................................. 58

3. "an analyzer server for detecting structures in the data, and for linking actions to the detected structures;" ............................... 58

4. "a user interface enabling the selection of a detected structure and a linked action; and;" ................................................... 61

5. "an action processor for performing the selected action linked to the selected structure; and;" ........................................... 62

6. "a processing unit coupled to the input device, the output device, and

the memory for controlling the execution of the program routines." ............ 62

7.   Claim 8: "The system recited in claim 1, wherein the user interface highlights detected structures." ...................................................................... 62

C.   Claims 1 and 8 Are Not Anticipated By Nor Rendered Obvious By Pensoft Perspective ................................................................................................................. 62

1.   Claim 1: "A computer-based system for detecting structures in data and performing actions on detected structures, comprising:" ................................ 64

2.   "a memory storing information including program routines including" ........ 65

3.   "an analyzer server for detecting structures in the data, and for linking actions to the detected structures" ................................................................... 65

4.   "a user interface enabling the selection of a detected structure and a linked action;" ................................................................................................ 79

5.   "an action processor for performing the selected action linked to the selected structure;" ......................................................................................... 81

6.   "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines." ............. 82

7.   Claim 8: "The system recited in Claim 1, wherein the user interface highlights detected structures." ...................................................................... 82

D.   Claims 1 and 8 are Not Anticipated By Nor Rendered Obvious by Pandit ............... 82

1.   Claim 1: "A computer-based system for detecting structures in data and performing actions on detected structures, comprising:" ................................ 83

2.   "an input device for receiving data;  an output device for presenting the data;  a memory storing information including program routines including" ..................................................................................................... 83

3.   "an analyzer server for detecting structures in the data, and for linking actions to the detected structures;" ................................................................. 83

4.   "a user interface enabling the selection of a detected structure and a linked action;" ................................................................................................ 86

5.   "an action processor for performing the selected action linked to the selected structure; and" ............................................................................... 86

6.   "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines." ............. 86

7.   Claim 8: "The system recited in Claim 1, wherein the user interface highlights detected structures." ...................................................................... 87

E.   Claims 1 and 8 are Not Anticipated By or Rendered Obvious by Nokia .................. 87

1.     Claim 1: "A computer-based system for detecting structures in data and performing actions on detected structures, comprising:" .............................. 88

2.     "an input device for receiving data;  an output device for presenting the data;  a memory storing information including program routines including" ................................................................................................. 88

3.     "an analyzer server for detecting structures in the data, and for linking actions to the detected structures;" .............................................. 89

4.     "a user interface enabling the selection of a detected structure and a linked action; and" .................................................................. 91

5.     "an action processor for performing the selected action linked to the selected structure; and" ...................................................... 92

6.     "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines." ............. 92

7.     "Claim 8: The system recited in Claim 1, wherein the user interface highlights detected structures." ........................................................ 92

F.     Claims 1 and 8 are Not Obvious In Light of the Prior Art ......................................... 93

1.     MHonArc + Mosaic ........................................................................... 94

G.     Claim 1: "A computer-based system for detecting structures in data and performing actions on detected structures, comprising:" ........................................... 96

1.     "an input device for receiving data;   an output device for presenting the data;  a memory storing information including program routines including" ................................................................................................. 98

2.     Conventional Pointers ................................................................. 108

3.     Simultaneous Invention ................................................................ 108

4.     Secondary Considerations ......................................................... 109

1

2

3  **I.      INTRODUCTION**

4          1.      I have been asked by counsel for Apple, Inc. ("Apple") to provide a response to the

Expert Declaration of Geoff Cohen, Ph.D. Concerning U.S. Patent 5,946,647.  My opinions are set

forth below in this declaration.  In particular, below, I explain why, despite Dr. Cohen's assertions to

the contrary, the ITC's finding of infringement of the '647 patent covering an HTC Android phone

that used virtually the same code as the accused Galaxy Nexus phone should be respected.  I further

explain how Dr. Cohen improperly attempts to apply a narrow interpretation of a recent claim

construction by Judge Posner – one divorced from both the intrinsic record of the '647 patent and

Judge Posner's decision – to avoid infringement.  Finally, I explain why the prior art identified by Dr.

Cohen – most of which has already been considered by the either the ITC, the Patent Office, or both –

does not invalidate the asserted claims of the '647 patent.

        **A.      Most Claim Elements are Not Disputed**

        2.      Dr. Cohen's declaration was a response to the declaration I originally submitted in this

matter concerning infringement and validity of the '647 patent.  In response to my opinion that the

Samsung Galaxy Nexus infringes claims 1 and 8 of the '647 patent, Dr. Cohen did not challenge my

explanation of the '647 patent.  Briefly, and as I explained in my original declaration, the '647 patent

relates to a system and method for performing computer based actions on structures, *i.e.*, instances of

patterns such as a telephone number or email address, within various sources of computer data.  Such

sources of data include, for example, emails, web pages, and word-processing documents.  The patent

further claims a system and method of enabling selection of a structure, linking actions to the

structure (*e.g.*, storing or calling a telephone number), enabling selection of a linked action, and

automatically performing the selected action.

3.      Neither did Dr. Cohen contest my opinions about several limitations of claim 1.  In particular, Dr. Cohen did not dispute my opinions that the limitations[1] highlighted below are met:

✓  **1.**  A computer-based system for detecting structures in data and performing actions on detected structures, comprising:

✓  an input device for receiving data;

✓  an output device for presenting the data;

✓  a memory storing information including program routines including

an analyzer server for detecting structures in the data, and for linking actions to the detected structures;

a user interface enabling the selection of a detected structure and a linked action; and

✓  an action processor for performing the selected action linked to the selected structure; and

✓  a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines.

4.      Therefore, regarding claim 1, Dr. Cohen disputes only whether the "analyzer server" and the "user interface" limitations are found in Samsung Galaxy Nexus.  As I explained in my original declaration and further elaborate below, both of those limitations are present in the Galaxy Nexus.

5.      As illustrated below, the Galaxy Nexus detects "structures," such as telephone numbers and email addresses in a web page, and the user interface highlights detected structures when the structure is selected by the user.  Dr. Cohen does not dispute that the Galaxy Nexus "detects structures" in the data presented by a web page.

---

[1]  As stated in my original declaration, I do not believe the preamble is a claim limitation, but in my opinion the Galaxy Nexus satisfies the preamble, and Dr. Cohen did not rebut my analysis in his declaration.

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK                    2



**User begins a long-press on a detected phone number in a webpage**

6.      Once the user long-presses (presses and holds) the detected structure of interest on the Galaxy Nexus, such as a phone number, the user interface of the Galaxy Nexus presents a context or pop-up menu that includes a list of candidate actions associated with the chosen detected phone number:



**A context menu of linked actions is displayed**

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          3

7.     Once a user selects an "action" he or she wants to perform on the chosen phone number, such as Dial or Add Contact, the Galaxy Nexus causes the selected action to occur.  In other words, the user interface enables the selection of both a detected structure and linked actions associated with that structure.  For example, if a user selects "Dial," the Dialer is launched with the phone number as an input:



**The selected action is performed**

8.     As explained in my original declaration and further elaborated below, my analysis of the Samsung Galaxy Nexus—its source code and related documentation —showed that the code that drives the functionality described above, which functionality clearly matches claim 1, includes both the "analyzer server" and the "user interface" required of the asserted '647 claims.

**B.     The Galaxy Nexus Infringes Under Any Set of Constructions**

**1.     The Galaxy Nexus Infringes Under the ITC Constructions**

9.     As I discussed in my original declaration, the '647 patent was the subject of an investigation by the International Trade Commission, *In the matter of Certain Personal Data and Mobile Communications Devices and Related Software*, Investigation No. 337-TA-710.  The ITC found claims 1 and 8 of the '647 valid and infringed by certain HTC smartphones running Google's

Android source code that is identical in all relevant aspects to the Android code running on the Samsung Galaxy Nexus. I applied the ITC claim constructions and analysis in my original declaration and determined that the essentially identical Android code running on the Samsung Galaxy Nexus infringes claims 1 and 8 of the '647 patent.

10. In his declaration, Dr. Cohen asserts that the Samsung Galaxy Nexus does not infringe under the ITC's constructions. Dr. Cohen, however, fails to identify any elements of the Samsung Galaxy Nexus phone that differ materially from the HTC phones that the ITC found to infringe the '647 patent. In fact, Dr. Cohen's assertions do not materially differ from those raised by HTC in the ITC proceedings, which assertions the ITC rejected.

### 2. The Galaxy Nexus Infringes Under Judge Posner's Constructions

11. Since my original declaration, certain claim terms were construed in a case involving the '647 patent, *Apple Inc. et al. v. Motorola Inc., et al.*, Case No. 1:11-cv-08540, pending in the Northern District of Illinois. *See* Ex. 2. Judge Richard Posner, who is presiding in that case, issued a claim construction ruling in which he construed two terms—"analyzer server" and "linking actions to the detected structures"—differently than the constructions the ITC used for those terms. While Judge Posner's constructions differ from the ITC constructions that I applied in my original declaration, it is my opinion that the Samsung Galaxy Nexus infringes claims 1 and 8 of the '647 patent under Judge Posner's constructions also.

### a. "Analyzer Server"

12. In his declaration, Dr. Cohen narrowly applies Judge Posner's construction of "analyzer server" in a way that ignores the disclosure of the '647 patent and how one of skill in the art would understand the construction given the technology at issue. For example, while Judge Posner construed the term "analyzer server" to mean "a server routine separate from a client that receives data having structures from the client," Dr. Cohen, in at least his infringement analysis, asserts that the "analyzer server" must also be "a program separate from the application in question, running as a separate process, that provides services to client applications." Cohen Decl., ¶ 92. Contrary to Dr. Cohen's assertion, Judge Posner's construction simply requires a "routine" – not a

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          5

1    "program" "running as a separate process."  And, while Judge Posner's construction requires that the

2    server routine be separate from a client, Judge Posner does not require the server routine to be

3    separate from an "application" as Dr. Cohen asserts.

4    13.    In any event, the Android code that I identified as satisfying the "analyzer server"

5    limitation under the ITC construction also satisfies Judge Posner's construction.  First, the "server

6    routine" required by Judge Posner's construction includes the shared library subroutines that I

7    identified in my original declaration.  These shared libraries, which are generally available for

8    different applications to use, exist independently of – that is, they are "separate from" – the "client"

9    required by Judge Posner's construction.   As I also explain below, the Browser application calls the

10   shared libraries to perform the claimed functions of the analyzer server, *i.e*., detecting structures in

11   data and linking actions to the structures.  As in any client-server relationship, there must be interface

12   "glue code" in the client that calls to the server so that the two may cooperate; such "glue code" does

13   not detract from the fact that these are separate pieces of code.  Thus, while the Browser application

14   and these subroutines in the shared libraries include code that allows them to communicate, they are

15   separate as Judge Posner requires.  Thus, the subroutines I identify satisfy the "client-server"

16   requirement of Judge Posner's construction.

17   14.    In arguing against infringement, Dr. Cohen focuses on the use of subroutines to say

18   that no one analyzer server routine is present, as well as the "glue code" to assert that the server code

19   in the shared libraries are not separate from the client code in the Browser application.  By doing so,

20   however, Dr. Cohen applies an admittedly "strict" or "narrow" construction of Judge Posner's

21   construction of "analyzer server."  Cohen Decl., ¶ 171; Ex. 10 (Cohen Tr.), 176:22-177:5, 221:19-

22   222:5, 226:21-228:10, 234:24-235:9.

23   15.    But Judge Posner's constructions are not so narrow.  Indeed, in his claim construction

24   order Judge Posner specifically recognized that routine was a broad term that "is synonymous with

25   'module' or 'component,' all of which describe a piece of programming necessary to perform a

26   specific function."  Ex. 2, at 10.  And, with respect to the use of "glue code," Motorola recently

27   advanced this same non-infringement argument as Dr. Cohen in a motion for summary judgment of

28

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK            6

non-infringement, arguing that the Android code did not satisfy this strict "separateness" requirement.  In denying Motorola's motion, Judge Posner explained that although "some of the code responsible for each task is intertwined with the client applications, though much appears separate from and reused across the client applications."  Ex. 3, at 5.  Thus, Judge Posner explained that his construction does not require the strict separation Dr. Cohen requires.

### b.    "Linking Actions to Detected Structures"

16.    Judge Posner construed the phrase "linking actions to detected structures" to mean "creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on that detected structure."  Ex. 2, at 10-11.  As he did with "analyzer server," Dr. Cohen also improperly narrowed Judge Posner's construction of "linking actions to detected structures."  For example, despite the absence of any language in Judge Posner's construction – or the '647 patent – Dr. Cohen adds to the construction, at least for infringement purposes, that the "specified connection must be *explicitly* created."  Cohen Decl., ¶ 99 (emphasis added).  As I explain in detail below, Dr. Cohen's insertion of an "explicit" connection – as opposed to an implicit connection – improperly adds limitations to the claim that are neither discussed in the '647 patent nor Judge Posner's claim construction decision.  Thus, Dr. Cohen's narrowing of Judge Posner's construction is inconsistent with the '647 patent and the understanding of one of ordinary skill.

17.    The Galaxy Nexus does create a specified connection between detected structures and the actions to be performed on them using the Android code identified in my original declaration.  For each type of structure, (for example, a phone number), there are a specified number of actions that will be presented to the user.  In my initial report, I provided the example of an email structure, where the onCreateContextMenu() method adds Intent objects which, when passed to the startActivity() method, allow operations such as causing Android to launch the user's preferred email composition Activity with the detected email addressed already filled in in the "To" field.  Mowry decl., at  ¶ 120.  Thus, the Browser application in the Motorola Accused products creates a specified connection between detected structures such as email addresses and "at least one specific computer

subroutine which performs operations on that structure" – in this case, a computer subroutine (startActivity()) that performs operations such as causing Android to launch the user's preferred email composition application to begin composing an email message to the detected email address..

### 3.   Dr. Cohen's Analysis Conflicts With The PTO's Constructions

18.     Not only is Dr. Cohen's interpretation of Judge Posner's claim constructions at odds with the language of those constructions, Dr. Cohen's narrow constructions are also in conflict with the constructions applied by the Patent Office during reexamination.  As I explain below, Dr. Cohen misreads the reexamination history when he asserts that I have construed the "analyzer server" claim element too narrowly in an attempt to recapture claim scope denied by the Patent Office.  Cohen Decl., ¶ 84.  Dr. Cohen fails to appreciate that claim 1 is only "narrow" relative to other independent claims because claim 1 includes the term "analyzer server" while the other independent claims do not.   The PTO did not, as Dr. Cohen asserts, apply a "narrow" construction of "analyzer server"; in fact, the examiner explicitly agreed that the claims terms should be given their broadest reasonable scope.  *See* Ex. 6, at 2.  Moreover, Dr. Cohen admitted in his deposition that *his* construction of "analyzer server" is narrower than and inconsistent with that of the Patent Office, and that the Patent Office confirmed claims 1 and 8 under its broader interpretation.  Ex. 10 (Cohen Tr.), 236:4-237:19.

### 4.   Doctrine of Equivalents

19.     Of course, as explained in detail below, even if Dr. Cohen's improper limitations were read into the claims, the Galaxy Nexus would infringe at least under the doctrine of equivalents.  Dr. Cohen's invalidity arguments are informative on this point.  For example, Dr. Cohen argues for invalidity purposes that even though a particular prior art system's "analyzer server" element is not "separate" from the client under his narrow interpretation, such a distinction is a mere "design choice."  Cohen Decl., ¶ 171.  He also admitted in his deposition that there is no fundamental difference in the implementation of the "analyzer server" as separate processes versus the same process. Ex. 10 (Cohen Tr.), 224:18-225:21.  Similarly, for invalidity purposes, Dr. Cohen argues that "creating a specified connection" would have been obvious given one of ordinary skill in the art's familiarity with the use of "pointers," a "standard technique" at the time.  *See, e.g.,* Cohen Decl.,

¶ 128.  Dr. Cohen's invalidity analysis confirms that his non-infringement arguments rest entirely on substantially equivalent alternatives.

20.     Because Dr. Cohen's improper, and admittedly narrow, claim constructions infect his entire non-infringement analysis, I do not believe that he has provided any basis to rebut my showing that the Galaxy Nexus infringes claims 1 and 8 of the '647 patent.

### C.     Dr. Cohen Presents Essentially No New Invalidity Arguments

21.     When it comes to his invalidity arguments, Dr. Cohen takes numerous positions that are inconsistent with the way in which he applied the claims for purposes of infringement.  Indeed, during his deposition, Dr. Cohen appears to have retracted many of his anticipation arguments.  *See, e.g.,* Ex. 10 (Cohen Tr.), 196:2-198:14; 204:8-20; 225:22-227:3.  In any event, most of the prior art Dr. Cohen asserts has already been found not to invalidate claims 1 and 8 by the PTO, the ITC, or both.  Indeed, four of the five allegedly anticipatory prior art references or systems asserted by Dr. Cohen—the *Newton Programmer's Guide* ("Newton"), Pensoft Perspective ("Perspective"), U.S. Patent No. 5,859,636 to Pandit ("Pandit"), and EPO Publication 0 458 563 ("Nokia"), were asserted in the '710 ITC Investigation, reexamination, or both, and in both proceedings, claims 1 and 8 were deemed valid.

### 1.     Newton

22.     I understand that Samsung asserts in its brief that Newton was "not presented during the '710 Investigation."  Opp., at 6.  This is incorrect.  The expert for HTC asserted Newton in his invalidity expert report '710 Investigation, but he did not present Newton at the hearing.  I can only assume that Newton was dropped because it was not a strong prior art reference, as it does not disclose numerous claim elements.

23.     As Dr. Cohen notes, Newton was a handheld personal digital assistant ("PDA").  Dr. Cohen and Samsung rely on Newton's "Intelligent Assistant" functionality, which attempted to complete operations corresponding to commands written by a user on the Newton.  Newton does not anticipate or render obvious claims 1 and 8 of the '647 Patent for at least the following reasons:

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK                9

- Newton does not "link[] actions to detected structures" as required by claim 1 of the '647 Patent because Newton requires a user to write, or enter, the operation that the user wants Newton to perform at any given time. The '647 patent, by contrast, requires automatic linking of actions to structures, after which the user may select from multiple actions provided by the system that also are tailored to the particular structures detected by the system.

- Newton does not "link[] actions to the detected structures," as claimed by the '647 Patent because any alleged actions that Newton may perform are independent of the structures that Newton purportedly recognizes.

- Newton does not have "a user interface enabling the selection of a detected structure and a linked action." Instead, Newton relies upon the user to manually write the action that the user wishes Newton to perform. This is not "selection" of an action or structure as claimed by the '647 Patent.

- Newton does not have a user interface that "highlights detected structures", as required by claim 8 of the '647 Patent. Instead, Newton simply places allegedly detected structures in a dialog box. This is not consistent with the plain meaning of "highlights."

## 2. Perspective

24. The Perspective system or its associated publications were considered by both the ITC and by the PTO during reexamination. In both cases, claims 1 and 8 were deemed valid. Perspective is a personal information manager, or database organizer, that allows a user to keep track of contacts, appointments and notes. Perspective does not anticipate or render obvious claims 1 and 8 of the '647 Patent for at least the following reasons:

- Perspective does not "perform[] actions on detected structures" as required by claim 1 because Perspective merely displays a profile window connected to a particular name on the screen. This is not the performance of an "action[]" as claimed in the '647 Patent.

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          10

- Perspective does not "link[] actions to the detected structures." This is true even if Perspective were found to "perform[] actions" within the meaning of claim 1, because Perspective simply associates user profile information to a particular area of the screen, as opposed to any particular "structure" that might appear on the screen.

- Perspective further does not disclose "link[ed] actions" because the events that Dr. Cohen believes to be "actions" are merely gestures that a user must perform on Perspective's screen using a specially designed pen. Such gestures are not "actions" within the meaning of the '647 Patent.

- For similar reasons, Perspective does not disclose "a user interface enabling the selection of a detected structure and a linked action" because simply performing a gesture with a pen over a particular name displayed on Perspective's screen does not constitute "selection" of either a "structure" or an "action" within the meaning of the '647 Patent claims.

### 3.      Pandit

25.      Pandit was also considered by both the ITC and the PTO during reexamination. The ITC found Pandit did not render claims 1 and 8 invalid, and both the ITC and PTO found that the inventors of the '647 had conceived and reduced to practice the claimed invention before Pandit's priority date. As explained below, I agree that Pandit does not render the '647 patent invalid, and also is not prior art to the '647 patent.

26.      Pandit discloses a method and apparatus for recognizing text that has already been marked by a user, associating that text with a predetermined "class", and performing an "operation" based on that class identification. Pandit does not anticipate or render obvious claims 1 and 8 of the '647 Patent for at least the following reasons:

- First, Pandit is not prior art. Based on a declaration submitted in reexamination, the Patent Office found that the inventors and conceived and reduced to practice the claimed invention before Pandit's priority date. *See* Exs. 4; 5, at 3-6. The ITC also found that the inventors and conceived and reduced to practice the claimed invention

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK                    11

before Pandit's priority date.  *See* Mowry Original Decl., Ex. 15, at 179; *see also* Ex. 9 (claim chart submitted in the '710 Investigation showing conceptions and reduction to practice).

- Pandit does not disclose "detecting structures" within the meaning of the '647 Patent claims because Pandit requires that a user manually locate and mark, or "accent," any text for which the user wishes to perform an operation.  This contrasts with the '647 Patent's use of an analyzer server that automatically finds structures within unstructured data.

- Pandit also does not disclose "detecting structures" within the meaning of the '647 Patent claims because the apparatus disclosed in Pandit operates on only a single piece of text manually identified by a user at any given time.  In other words, Pandit does not detect more than one structure in data.

- Pandit does not disclose "a user interface enabling the selection of a detected structure" because Pandit requires that a user manually select text ***before*** Pandit attempts to recognize that text as performing to a particular class.  This reverses the steps disclosed in the '647 patent in a material, and critical, way.

### 4.     Nokia

27.     Nokia's European Patent Publication No. 0 458 563 A2 ("Nokia") does not anticipate or render obvious claims 1 and 8 of the '647 Patent.  Nokia discloses a "telephone apparatus" capable of receiving text messages and isolating potential phone numbers that can be transferred to the phone's register for dialing.  Nokia does not anticipate or render obvious claims 1 and 8 of the '647 Patent for at least the following reasons:

- Nokia detects only one type of "structure", as that term is taught by the '647 Patent – a phone number.  By contrast, the '647 Patent requires that multiple different types of structures must be detected.

- Nokia does not disclose "linking actions to detected structures" as claimed in the '647 Patent.  Instead, Nokia teaches that when a user accepts a phone number displayed in a

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK              12

text message (by pressing a key on the phone's keypad), the phone apparatus eliminates extraneous text surrounding the phone number from the display so that the number is then present both in the phone's display and its register.  At that point, a user can initiate a call by additionally pressing a button on his or her telephone. Because this activity is, essentially, simply cutting and pasting a telephone number from a text message into the telephone's register, it does not involve "linking" any actions to phone numbers, or to any other piece of data that might be construed as a "detected structure".  For similar reasons, Dr. Cohen's reliance on Nokia's editing or storing of telephone numbers does not constitute "linking actions to detected structures."

- Nokia does not disclose "a user interface enabling the selection of . . . a linked action" because the telephone "keys" for calling (or modifying, or storing) a phone number are not linked to that phone number.  Dr. Cohen relies on the keys of the Nokia phone for linking, but the keys of the telephone disclosed in Nokia are not linked to telephone numbers (or anything else).

### 5.    Sidekick

28.     Sidekick, and in particular its so-called "Dialer" function, does not anticipate or render obvious claims 1 and 8 of the '647 Patent.  Sidekick's Dialer function highlights phone numbers that appear on Sidekick's screen after the user enters a series of keyboard prompts.  After a phone number is highlighted, a user may press "Enter" to begin dialing that number, or may press an arrow key to signal to Sidekick to highlight another phone number on the screen, if one is available.  Sidekick does not anticipate or render obvious claims 1 and 8 of the '647 Patent for at least the following reasons:

- Sidekick's Dialer feature does not automatically "detect[] structures in data," as required by claim 1 of the '647 Patent , but rather relies on user prompts to highlight a single phone number appearing on the screen at any given time.

- Even if Sidekick's Dialer could be said to perform automatic detection, it arguably detects only one type of "structure", as that term is claimed in the '647 Patent.  By

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          13

contrast, the '647 Patent requires that multiple different types of structures must be detected.

- Sidekick's Dialer feature links only one purported "action" – dialing – to any "structure" it allegedly recognizes.  Claim 1 of the '647 Patent, by contrast, requires that multiple actions must be linked to multiple detected structures.

- Sidekick's Dialer feature does not disclose "a user interface enabling the selection of a detected structure and a linked action", as required by claim 1, because the feature highlights only one phone number at a time; the user is never allowed to "select[]" one structure or one action from a set of structures or actions.

- Sidekick's Dialer feature does not have a user interface that "highlights detected structures", as required by claim 8 of the '647 Patent.  Instead, Sidekick only ever highlights a single phone number and prompts the user to command the system to find and highlight the next phone number, if one even exists.

### 6.    MHonArc + Mosaic Web Browser

29.    Finally, the combination of the Mosaic web browser and MHonArc program, which Dr. Cohen discusses in only a single paragraph of his declaration, does not render claims 1 and 8 obvious.  MHonArc combined with Mosaic allowed for the conversion of plain text emails into hypertext markup language (HTML), specifically converting any text appearing in an email header field into an email link, and any text containing certain prefixes (e.g., "http://", or "ftp://") into a URL recognizable by an internet browser.  The combination of MHonArc and Mosaic does not render obvious claims 1 and 8 of the '647 Patent for at least the following reasons:

- MHonArc combined with Mosaic does not "detect[]" any "structures" as required in the '647 Patent.  Instead, MHonArc simply converted anything that appeared in an email header (i.e., in the "To" or "From" fields) into an email link.  Similarly, MHonArc would convert any text containing specified prefixes (such as "http://" in the body of an email into a hyperlink.  Thus, MHonArc does not "detect" anything, but rather simply converts pre-marked (here by prefixes or by location in a header)

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK              14

data into hyperlinks.  Mosaic, in turn, merely recognizes the markings added by
MHonArc (HTML "tags" or "anchors").  This is in direct contrast to the '647 Patent's
teaching of the detection of data in patterns in otherwise unstructured data.

- MHonArc combined with Mosaic does not "link[] actions to detected structures"
  under any proposed construction of that limitation discussed by Dr. Cohen because the
  combination does not offer customized sets of associated actions based on the type of
  structure detected.  Instead, it presents only a single set of optional operations for all
  email header items and for all email body items allegedly detected.

- MHonArc and Mosaic do not present a "a user interface" that "highlights detected
  structures."  Instead, the Mosaic browser would merely indicate pre-marked data that
  had been converted to hyperlinks by the MHonArc system.

30.    Because Dr. Cohen advances essentially the same invalidity arguments rejected in the
ITC, in reexamination, or both, it is my opinion that he has not shown that claims 1 and 8 of the '647
patent are invalid.

## II.    MATERIALS REVIEWED

31.    In forming the opinions set forth in this declaration, I considered and relied upon my
education, background, experience, and prior presentations and publications.  I also reviewed and
considered the materials set forth in my prior declaration in this matter.  I also reviewed the Expert
Declaration of Geoff Cohen, Ph.D. Concerning U.S. Patent 5,946,647 and its exhibits, the
Declaration of Cary Clark, the Declaration of Dianne Hackborn, the Declaration of Michael W.
Schaffer Regarding Perspective, and the Declaration of Christopher Vellturo.  I also reviewed the
deposition transcripts of Dr. Cohen, Mr. Clark, and Ms. Hackborn, as well as David Wright, a named
inventor of the '647 patent, and Mr. Schaffer.  In addition, I reviewed orders related to the '647
patent issued the Northern District of Illinois case.  Specifically I have reviewed the March 19, 2012
Order construing certain claim terms of the '647 patent, as well as the April 9, 2012 Order denying
Motorola's motion for summary judgment of non-infringement related to the '647 patent.  A list of

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          15

1    the materials I reviewed in addition to those I reviewed for my original declaration is attached as

2    Exhibit 1.

3        32.    I understand that discovery in this investigation is ongoing, and I reserve the right to

4    supplement my opinions in this declaration should additional information become available to me.

5    **III.    U.S. PATENT NO. 5,946,647**

6        33.    I provided a description of the '647 patent in my original declaration.  Dr. Cohen also

7    provides a description of the '647 patent in his declaration; however, I do not agree with some of Dr.

8    Cohen's characterizations of the patent., and, in particular, as I explain below, I disagree with Dr.

9    Cohen's efforts to characterize embodiments depicted and described in the '647 patent's specification

10   as  the "claimed" system.  Based on my understanding of how patents are construed, as well as my

11   reading of the '647 patent and its claims, I disagree that the claims are limited to the disclosed

12   embodiments.

13       34.    For example, Dr. Cohen describes Figure 1 of the patent as "a block diagram of the

14   claimed system."  Cohen Decl., ¶ 72.  Nowhere does the '647 patent identify Figure 1 as a

15   representation of "the claimed system."  Rather, the patent characterizes Figure 1 as "a block diagram

16   of a computer system having a program stored in RAM, in accordance with the present invention."

17   '647 patent, 2:65-67.  While I acknowledge that Figure 1 thus depicts an embodiment of the

18   invention, it also contains several elements not required by the claims.  Indeed, Dr. Cohen conceded

19   this point in his deposition.  Ex. 10 (Cohen Tr.), 81:8-88:15.  This point is important, because Dr.

20   Cohen relies on Figure 1 and its accompanying description to narrowly construe the claims.  *See, e.g.*,

21   Ex. 10 (Cohen Tr.), 150:24-153:12.

22       35.    Similarly, Dr. Cohen describes Figure 3 a "illustrating the analyzer server."  Cohen

23   Decl., ¶ 73.  Dr. Cohen overstates Figure 3, which the '647 patent describes as "a block diagram

24   illustrating ***an*** analyzer server."  '647 patent, 4:58-59 (emphasis added).  Thus, while Figure 3 depicts

25   an embodiment of an analyzer server, nowhere does the patent limit the claims to the embodiment of

26   Figure 3.

27

28   REPLY EXPERT DECLARATION OF DR .TODD C.
     MOWRY CONCERNING U.S. PATENT NO.
     5,946,647 – CASE NO. 12-cv-0630-LHK          16

36.     Finally, Dr. Cohen states that "[t]he specification describes linking in terms of conventional pointers."  Cohen Decl., ¶ 74.  This statement is correct, but it omits the fact that the description of conventional pointers appears only in the Description of the Preferred Embodiment, which I understand is intended to provide examples of the invention, but not necessarily to limit the claims.   Indeed, the passage relied on by Dr. Cohen discusses the "grammar file 320 pointers attached to the grammar."  Cohen Decl., ¶ 74 (citing '647 patent, 4:66-5:2).  Grammars are depicted in Figure 3 as part of an embodiment of "an" analyzer server (as noted above) and are not necessarily required by the claims.  Indeed, in his deposition Dr. Cohen admits that grammars are not required by claim 1.  Ex. 10 (Cohen Tr.), 169:19-170:21.  As such, while "pointers" are used to describe the illustrative embodiment of Figure 3, they are not used in the claims and not required by claim 1.

37.     These examples are illustrative of Dr. Cohen's improper attempts to narrow the claims beyond their proper scope in an effort to avoid the clear infringement by the Galaxy Nexus.

## IV.   CLAIM CONSTRUCTION

38.     In my original declaration, I applied the construction adopted by the ITC in the '710 Investigation.   As noted above, after submitting my original declaration, Judge Poser issued constructions of two terms, "analyzer server" and "linking actions to detected structures."  Dr. Cohen discusses these two constructions in his declaration, but he does not provide an opinion on the construction of other claim terms construed by the ITC.  Before addressing Dr. Cohen's non-infringement arguments regarding these terms, I address both Judge Posner's construction of the terms and Dr. Cohen's interpretation of those constructions.

### A.     "Analyzer Server"

39.     Judge Posner construed "analyzer server" to mean "a server routine separate from a client that receives data having structures from the client."  Regarding the use of "a server routine" in his construction, Judge Posner stated that he was applying a "broad" understanding of the term "routine":

> Routines often consist of subroutines--and in fact the '647 patent describes the analyzer
> server as a subroutine (Column 2:26), indicating that the inventor had a broader conception of

the term "routine" than either party. In the present context "routine" is synonymous with "module" or "component," all of which describe a piece of programming necessary to perform a specific function; routines consist of subroutines, and I find nothing wrong with describing the analyzer server as one routine.

Ex. 2, at 10.

40.     In a later opinion addressing Motorola's motion for summary judgment of non-infringement, Judge Posner clarified what he meant by "separate from a client" as used in his construction.  Indeed, I understand that Motorola based this motion, in part, on the argument that the Android code accused in that case (which is essentially identical to the Android code accused in this case) was not "separate" from the client application (for example, the Browser) and so did not infringe.  *See* Ex. 3 at 5.  Judge Posner denied that motion, and explained:

> It appears that the Android system stores code to perform the pattern recognition and linking functions claimed by '647 in Android common libraries (the ContextMenu, CacheBuilder and Linkify libraries).  The client applications call on relevant code from the libraries to facilitate structure detection and linking.  In his supplemental infringement reports, Apple's expert has opined that calling code from a common library is the same as, or equivalent to, the '647 client and analyzer server system.  The "***separateness***" of the client application and the analyzer server required by my claim construction isn't an issue suitable for summary judgment; some of the code responsible for each task is intertwined with the client applications, though much appears separate from and reused across the client applications.

Ex. 3, at 5 (emphasis added).

41.     Although, as Judge Posner explained, "some of the code responsible for each task is intertwined with the client applications," this fact did not preclude a finding of infringement.  This agrees with the understanding of one of ordinary skill, who would understand that there must be some code that interfaces between the client and server so that they may interact.

42.     Despite Judge Poser's clarification of his construction, Dr. Cohen appears to argue that to be "separate" there can be no connection or interaction between the client and server elements of the system.  *See, e.g.,* Cohen Decl., ¶ 91.  The inconsistency between Dr. Cohen's understanding and that of Judge Posner is unsurprising, as Dr. Cohen did not rely on Judge Posner's recent order in his analysis. Ex. 10 (Cohen Tr.) 266:12-23.  As I explain below, not only is Dr. Cohen's

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          18

interpretation at odds with Judge Posner's construction order, but it is also at odds with client-server programming practices.

43.     I note that Dr. Cohen, when explaining his understanding of "analyzer server," also includes a new limitation not present in any construction of the term.  Dr. Cohen states, "Someone of ordinary skill in the art would not understand a server to merely refer to any piece of code; they would understand it to refer to a program separate from the ***application*** in question*, running as a separate process*, that provides services to client ***applications***."  Cohen Decl., ¶ 80 (emphasis added).

44.     Dr. Cohen first imposes a new requirement by asserting that the "client" must be an "application."  At his deposition, however, Dr. Cohen conceded that the "client" does not have to be an "application," but can simply be a "module."  Ex. 10 (Cohen Tr.), 98:14-104:6.  Given that Dr. Cohen premises his opinions on his understanding of Judge Posner's construction, this concession illustrates fundamental errors of his analysis as well as his conclusions.

45.     Dr. Cohen next imposes, without support, a new requirement by asserting that the server must be a program "running as a separate process."  I find no support in Judge Posner's claim construction order, and certainly not in the intrinsic record of the '647 patent, for this additional limitation on which Dr. Cohen bases much of his non-infringement analysis.  Dr. Cohen's unsupported and erroneous inclusion of this "requirement" as a part of his analysis further undercuts the validity of his analysis and conclusions.

46.     Dr. Cohen also asserts that the file history confirms his understanding that the analyzer server is separate from the client.  Cohen Decl., ¶ 79.  Dr. Cohen bases his opinion on a single sentence taken out of context that does not relate at all to whether or not the "analyzer server" is separate (or part of) a client application.  During the prosecution, the Examiner rejected several then-pending claims as being anticipated by U.S. Patent No. 5,574,843 to Gerlach et al. ("Gerlach").  *See* Ex. 8.at 2.  Gerlach described a computer system for editing multimedia presentations in which the user was able to select icons on the screen to control the order and content of a presentation that is produced as a result of the user's editing.  *Id.*  In response to the Examiner's rejection, Apple distinguished this piece of prior art by explaining repeatedly that the critical distinction between

Gerlach and the '647 specification was that "structures" detected by the '647 invention were entirely different from the "**data** structures" added to multimedia files in Gerlach.  *Id*. at 1-5.  The rejection over Gerlach had nothing to do with whether the analyzer server was separate from a client.  Indeed, to my knowledge, the word "client" does not appear a single time in the entirety of the intrinsic record, and his reliance on this passage to limit the claims is misplaced.  In any event, as discussed below, it is my opinion that the Galaxy Nexus infringes even under this construction.

### B.    "Linking Actions to Detected Structures"

47.    Judge Posner construed "linking actions to detected structures" to mean "creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on that detected structure."  While I believe that this construction improperly limits the claims to a disclosed embodiment, it is my opinion that the Galaxy Nexus infringes under this construction as well.

48.    As he does with "analyzer server," Dr. Cohen inserts additional limitations into Judge Posner's constructions contrary to the understanding of one of ordinary skill in the art.  In his declaration, Dr. Cohen appears to require that the "specified connection" be created by "conventional pointers."  *See, e.g.*, Cohen Decl., ¶¶ 74,82.  By way of background, a **"pointer"** is a data type whose value refers to or "points to" another value stored in the computer memory.  While Judge Posner discussed the specification's reference to "conventional pointers" in finding that a "specified connection" must be created, his construction is not limited to the specification's reference to conventional pointers.  I understand that even Dr. Cohen has conceded in his deposition that a "specified connection" does not require the use of pointers.  Ex. 10 (Cohen Tr.), 140:17-142:9.

49.    Dr. Cohen inserts other additional limitations into Judge Posner's construction, requiring that the "specified connection must be *explicitly* created."  Cohen Decl, ¶ 99 (emphasis added).  As discussed below, Dr. Cohen's insertion of "explicitly" in the construction is an attempt to create a non-infringement argument based on the Android code's use of "implicit" versus "explicit" Intent objects, which I also explain below, to perform the claimed linking.  I believe that Dr. Cohen's additional limitations are not how one of ordinary skill would understand the claims.

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK                20

**C.      Reexamination**

50.      Dr. Cohen ends his claim construction analysis by discussing the use of the term "analyzer server" in reexamination.  *See* Cohen Decl., ¶¶ 83-84.  I believe Dr. Cohen is mischaracterizing the reexamination record and ignoring explicit statements that contradict his analysis.

51.      Dr. Cohen argues that "the Patent Office explicitly stated that claims 1 and 8 only survived re-examination because the Patent Office understood the term 'analyzer server' to be narrow." Cohen Decl., ¶ 83.  This argument not only ignores the requirement that claims be given, as I understand the legal constraints of the examination process, their broadest reasonable scope in reexamination, it is not supported by the language upon which Dr. Cohen relies.  As made clear from the very sentence quoted by Dr. Cohen, the examiner stated that claim 1 was confirmed "due to the narrow *claim language* of the term 'analyzer server' as defined in the specification."  *Id.*  In making this statement, the examiner was comparing the *claim language* of claim 1, which contains the term "analyzer server," with the *claim language* of other independent claims, which do not contain that term.  While the addition of the term "analyzer server" may narrow claim 1 *as compared to other claims*, the PTO did not offer a narrow *construction* of the "analyzer server."

52.      Dr. Cohen also relies on an excerpt from a Non Final Action dated June 27, 2011, which discusses the analyzer server and contains bold emphasis on a description of a preferred embodiment, which included the use of conventional pointers.  *Id.*  But Dr. Cohen ignores the fact that in an interview after that June Office Action, the examiner agreed that such emphasis was misplaced:

> Patent Owner and the panel discussed the Examiner's emphasis on the description of conventional pointers in the specification with regard to a particular embodiment. Patent Owner noted that emphasizing portions of the text appeared to imply the adoption of a narrow definition of analyzer server, despite the several broader passages directed toward the analyzer server such as found at column 5, lines 6-37. After a substantial discussion, it was agreed that the emphasis was misplaced and should be disregarded.  The Examiner agreed that claim terms must be given their broadest reasonable interpretation and stated that she would thoroughly cite to the uses of the term analyzer server in the specification without emphasizing a particular embodiment.

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          21

Ex. 6, at 1-2.

53.     Based on his misplaced reliance on a particular embodiment and statements taken out of context in reexamination, Dr. Cohen argues that I and Apple "claim[] that the term ["analyzer server"] should be given a broad scope" in "an attempt to recapture scope explicitly denied by the Patent Office."  Cohen Decl., ¶ 84.  Other than his conclusory statement, Dr. Cohen provides no analysis regarding how my construction, Apple's construction, the ITC's construction, or any other construction is "broader" than the understanding applied in reexamination.  In fact, in his deposition, Dr. Cohen admitted that his construction was narrower than and inconsistent with the PTO's broader understanding of "analyzer server."  Ex. 10 (Cohen Tr.), 236:4-237:19.

## V.     INFRINGEMENT

### A.     The Samsung Galaxy Nexus Code Has Already Been Found to Infringe the '647 Patent

54.     As I explained in my original declaration, the Android code found to infringe claims 1 and 8 of the '647 Patent when used in HTC's devices is "identical in all relevant aspects" to the code running on the Galaxy Nexus.  Mowry Decl., ¶ 54.

55.     Dr. Cohen disagrees with this statement, but the only alleged difference he identifies is the fact that, in the case of selecting an email address, "there is no longer a menu option for 'Add to Contact.'"  Cohen Decl., ¶ 87.  This difference is not relevant to any of my opinions regarding infringement or validity, and Dr. Cohen fails to explain how, if at all, it is relevant to any of his opinions.  To my knowledge, no party asserts the fact that there may be a "smaller set of options" in a single instance affects any conclusion regarding infringement or validity in this case.

REDACTED

## B.     Dr. Cohen Does Not Opine on Most Claim Elements

57.     I note that Dr. Cohen does not dispute that the Galaxy Nexus satisfies most of the limitations of claim 1.  His non-infringement arguments are limited to his assertions that the Galaxy Nexus does not have an "analyzer sever"; that it does not "link actions to detected structures"; and that it does not have "a user interface enabling the selection of a detected structure and a linked action."  Given Dr. Cohen's silence regarding the other elements of claim 1, I assume he accepts that the Galaxy Nexus satisfies those elements, and I will not revisit the analysis contained in my original declaration.

## C.     The Galaxy Nexus Contains an "Analyzer Server" under Any Construction

58.     As I explained in my original declaration, it is my opinion that the Galaxy Nexus satisfies the "analyzer server" element under the ITC's construction.  The Android code accused in that investigation is identical in all relevant respects to that running on the Galaxy Nexus, and I see no reason to disturb the ITC's finding that this Android code infringes.

59.     Dr. Cohen appears to argue that the Galaxy Nexus does not infringe under the ITC's construction because there is not "any singular subroutine" that performs that detecting and linking functions of the analyzer server.  Cohen Decl., ¶ 89.  I believe this argument relies on a narrow conception of "subroutine" inconsistent with the understanding of one of ordinary skill as well as Judge Posner's claim construction order.

60.     Indeed, as discussed above, Judge Posner stated that the inventors had a "broad" conception of the term "routine," which is "synonymous with 'module' or 'component,' all of which describe a piece of programming necessary to perform a specific function ." Ex. 2, at 10.  In addition, the ITC found that essentially the same source code satisfied the "analyzer server" element, even though the construction required "*a* program subroutine…."  As such, one of skill in the art would understand "a piece of programming necessary to perform a specific function" to include all of the code needed to execute that function, regardless of how the code is organized.  It certainly does not require arbitrary characterizations of what is or is not included within the "routine," "module," or "component" found within the overall code.

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          23

61.     It is also my opinion that the Galaxy Nexus satisfies the "analyzer server" element under Judge Posner's construction.  Again, Judge Posner construed "analyzer server" to mean "a server routine separate from a client that receives data having structures from the client."  The analyzer server performs two functions:  (1) detecting structures, and (2) linking actions to the detected structures.

62.     As I explained in my original declaration, the analyzer server code for the first function, detecting structures, comprise the FindPartialAddress(), FindPartialEMail(), FindPartialNumber(), and isFocusableText() methods of the CacheBuilder class.  CacheBuilder is found in one of the shared libraries, which applications, such as the Browser application on the Galaxy Nexus, may call.  As I described in my initial declaration, CacheBuilder is an object class provided in the Android platform, generally available for any number of applications to use to detect structures in data and perform actions on those structures.  For example, CacheBuilder's FindAddress() method may be called by any Android application that uses the Linkify class's addLinks() method to detect postal addresses (via the gatherMapLinks() method in the Linkify class calling the findAddress() method in the WebView class, which ultimately calls FindAddress() in CacheBuilder via a call to the nativeFindAddress() method in the WebViewCore class).  In other words, CacheBuilder is a part of the "routine," "module," or "component" of the code, separate from the client, that performs the "analyzer server" function of detecting structures..

63.     Also, as I explained in my original declaration, the analyzer server code for the second function, linking actions to the detected structures, consist of the onCreateContextMenu() of the BrowserActivity class, the onCreateContextMenu of the Controller class, the getHitTestResult() and hitTestResult() methods of the WebView class, and the setIntent() method of the MenuItemImpl class.

64.     Like CacheBuilder, the WebView and MenuItemImpl classes are shared libraries that are available for any number of applications.  For example, these shared libraries are called by the Browser application to perform the claimed linking.  In addition, the following "stock" applications in the Android 4.0 public source code release (under the packages/apps directory) also call the

1    setIntent() method of the MenuItemImpl class: Contacts, Launcher2, Mms, QuickSearchBox, and

2    Settings. Similarly, the following "stock" applications in the Android 4.0 public source code release

3    (under the packages/apps directory) call methods within the WebView class: Email and Settings.  The

4    onCreateContextMenu() method of the BrowserActivity class calls into the onCreateContextMenu()

5    method of the Controller class, which in turn calls into the shared libraries to perform the claimed

6    linking.  Similar to a traditional distributed client/server framework, these shared libraries perform

7    their requested operations on behalf of the calling methods (i.e. the client software), passing back

8    result values where appropriate

9           65.     The accused functionality in Samsung's Galaxy Nexus exists as shared libraries which

10   are separate from applications, but which can be invoked by applications if needed.  Thus, the

11   analyzer server is "a server routine separate from a client that receives data having structures from the

12   client."

13          66.     Dr. Cohen argues that because the onCreateContextMenu() method of the

14   BrowserActivity class and the onCreateContextMenu() method of the Controller class are "part of the

15   client application," they cannot form part of the analyzer serer.  This argument in inconsistent with

16   the understanding of one of ordinary skill as well as Judge Posner's rulings.

17          67.     In any client-server relationship, there must be code in the client that calls to the

18   server.  I used the phrase "glue code" in my deposition to describe this relationship; there must be

19   code that "glues" the client and server together, otherwise they could not communicate.  Dr. Cohen

20   seems to believe that I invented the term "glue code."  Cohen Decl., ¶ 94.  To the contrary, this is a

21   term well-known in the field of computer science, and I am surprised that Dr. Cohen is not familiar

22   with it.  In fact, the phrase "glue code" is used on the Android developer's website.  *See* Ex. 16

23   (http://developer.android.com/resources/articles/glsurfaceview.html).

24          68.     This is precisely the relationship that exists between the onCreateContextMenu()

25   method of the BrowserActivity class and the onCreateContextMenu() method of the Controller class

26   and the shared libraries WebView and MenuItemImpl classes.  As I explained in my original

27   declaration, the onCreateContextMenu() method of the BrowserActivity class calls the

28

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          25

1  onCreateContextMenu() method of the Controller class, which in turn calls the methods of the

2  WebView and MenuItemImpl classes.  It is these latter methods which enable the claimed linking.

3         69.     I also note that Dr. Cohen's apparent argument that no portions of the claimed

4  analyzer server can be inside of the application ignores the very portion of the file history on which

5  he relies.  Dr. Cohen relies on the following sentence from the file history to conclude that "the

6  analyzer server is separate from the client":  "In addition, Applicants' invention is a system-wide

7  service that can be used to enable cooperating systems to detect recognizable structures in their data."

8  Cohen Decl., ¶ 79.   The shared libraries, such as CacheBuilder **can be used** by any **cooperating**

9  application that chooses to refer to them; specifically, the applications "cooperate" by making use of

10  the libraries.

11         70.     The fact that these applications are able to invoke portions of the shared libraries, *e.g.,*

12  CacheBuilder, does not remove their functionality from the scope of the invention.  Dr. Cohen's

13  argument that each client application implements its own analyzer server for detecting structures and

14  linking actions is wrong; he disregards the fact that these shared libraries exist independently of the

15  applications that call them..  One of skill in the art would understand that the generally available

16  shared libraries work as a "system wide service."

17         71.     I also note that Dr. Cohen relies on certain lecture slides used in a course that I co-

18  taught at Carnegie Mellon University.  Cohen Decl., ¶ 95.   Dr. Cohen believes that these slides

19  support his narrow interpretation that the analyzer server must be "running as a separate process."

20  Cohen Decl., ¶ 92.   In particular, the bulk of Dr. Cohen's quotations are from a lecture entitled

21  "Network Programming" that my colleague (Dr. Rowe) presented on April 4, 2012[2], since this is the

22  lecture that discusses "clients" and "servers".  Cohen Decl., Exhibit P.  What Dr. Cohen fails to

23  acknowledge is that the entire purpose of this "Network Programming" lecture is to teach the students

24  how to write software that is *distributed across separate machines* that communicate only via a

25  _____

26  [2] My name only appears on these slides because Dr. Rowe and I listed both of our names on all of the
27      lectures, even though we divided up the preparation and delivery of the lectures.

28  REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK      26

1   network, whereby the client and server software run on *different machines*.  For example, Dr. Cohen

2   selectively quotes from slides 5[3] and 8 of the "Network Programming" lecture slides, but he fails to

3   mention the context of the surrounding slides: slide 2 (entitled "A Programmers's View of the

4   Internet") says, "A process on one Internet host can communicate with a process on another Internet

5   host over a *connection*"; slide 3 (entitled "Internet Connections") says, "Clients and servers

6   communicate by sending streams of bytes over *connections*"; slide 4 (entitled "Anatomy of an

7   Internet Connection") illustrates a "Client" and "Server" running on separate machines (with Internet

8   addresses of 128.2.194.242 and 208.216.181.15, respectively), with a "Connection socket pair"

9   connecting them over the Internet; slide 5 (entitled "A Client-Server Transaction") says immediately

10  before Dr. Cohen's selective quotes that, "Most *network* applications are based on the client-server

11  model" [emphasis added]; slide 6 (entitled "Clients") says, "How does a client find the server?  The

12  IP address in the server socket address identifies the host (more precisely, an adaptor on the host)";

13  slide 7 (entitled "Using Ports to Identify Services") illustrates a "Client" communicating with either a

14  "Web server" or an "Echo server" on a separate machine (via the Internet); and slide 8 (entitled

15  "Servers") not only contains the quotes mentioned by Dr. Cohen, but it also says, "A machine that

16  runs a server process is also often referred to as a 'server'".  Cohen Decl., Exhibit P. Therefore, given

17  that the purpose of this lecture was to illustrate software that is running in a distributed fashion across

18  multiple machines, with each machine running its own instance of an operating system, by definition

19  the pieces of software running on separate machines would *have to be* running in separate processes,

20  since a single process cannot be spread across two different machines that are each running separate

21  instances of operating systems.  In other words, Dr. Cohen has the cause-and-effect backwards: the

22  *starting assumption* for this lecture was that the software was distributed across separate machines

23  (running separate operating systems) and therefore *must* be running across separate processes;

24

25  ──────────────

[3] There appears to be a typo in Dr. Cohen's declaration where he refers to slide "52" in the lecture
26   slides, which does not exist.  The actual quotes were from slide 5 of the "Network Programming"
     lecture slides.

27

28  REPLY EXPERT DECLARATION OF DR .TODD C.
    MOWRY CONCERNING U.S. PATENT NO.
    5,946,647 – CASE NO. 12-cv-0630-LHK            27

starting with that assumption, a traditional (distributed) client/server software model was used to illustrate how one might program such a distributed system that communicates via the Internet. Hence Dr. Cohen's attempt to invert the direction of causality and argue that these "Network Programming" lecture notes imply that the analyzer server in the '647 patent must "run as a separate process" is incorrect and entirely without basis.  Indeed, these lecture notes illustrate why I believe that it was no accident that the word "client" never appeared in either the '647 patent nor the prosecution history, which is that a person of ordinary skill would associate the combination of the terms "client" and "server" with the traditional distributed "client/server" software model described in these "Network Programming" slides, where the client and server run on *separate machines* and communicate over a network.  In contrast, Figure 1 of the '647 patent shows the analyzer server, application, and the other relevant parts of the system on one computer.

72.     In addition to meeting the limitation of an "analyzer server" literally, the Galaxy Nexus also meets this limitation under the doctrine of equivalents.  There is, at most, an insubstantial difference between the operation of the CacheBuilder class and a server routine "running as a separate process" in accordance with Dr. Cohen's narrow construction.   The CacheBuilder class perform substantially the same function, in substantially the same way, to achieve substantially the same result.

73.     The functions of the "analyzer server" are to detect structures – such as telephone numbers, e-mail addresses, Internet URLs, and postal addresses – in data received by a device, and to allow a user to select structures in an application and launch a desired linked action on the structure. '647 patent, at 2:28-31; 3:57-67.  As I explained in my initial declaration, the Browser application uses CacheBuilder and the onCreateContextMenu() and related methods to perform this function. Whether implemented as in the Galaxy Nexus or "running as a separate process" as Dr. Cohen requires, these functions are the same.

74.     The way that the '647 invention performs the above mentioned function is by locating instances of e-mail addresses, telephone numbers, Internet URLs, and postal addresses in data, and allowing a user to select these structures and candidate linked actions to launch using the structures.

See e.g., '647 patent, at 6:14-18; 6:24-37.  As I explained in my initial report, the Browser application uses CacheBuilder and the onCreateContextMenu() and related methods to perform this function. The availability of the CacheBuilder class and its related methods as shared libraries is insubstantially different from code "running as a separate process" because: (i) in both cases, the analyzer server software receives a request from the application, it performs the corresponding operation on behalf of the application, and returns its response back to the application; and (ii) the analyzer server software has been written such that exactly the same code will be used to perform this functionality for all requesting applications.

75.     The result of the '647 analyzer server limitation is the detection of instances of data patterns (structures) on which a user may want to perform actions, and associating with the structures linked actions to perform on them.  '647 patent, at 6:14-18; 6:24-37.  The CacheBuilder class exist as shared libraries to allow applications that call these classes to achieve substantially this result.  Dr. Cohen agrees that each of these classes perform parsing of received data for structures with semantic significance and upon selection of a message or a structure by a user, presenting a context menu of candidate actions a user may perform on the data.  To the extent that this functionality is performed using libraries that are available to the accused applications as well as other applications in the system, there is an insubstantial difference, if any, between each of these libraries and code "running as a separate process."

76.     Indeed, Dr. Cohen effectively concedes that there is no substantial difference in implementing the analyzer server code as "running in a separate process" from the client.  In his invalidity analysis regarding Perspective, for example, he admits that Perspective does not anticipate because the code he asserts satisfies the "analyzer server" element is not "separate" from the client under his narrow interpretation.  Cohen Decl., ¶ 171.  Dr. Cohen refers to this distinction as a mere "design choice."  Id.  He also admitted in his deposition that there is no fundamental difference in the implementation of these different options.  Ex. 10 (Cohen Tr.), 224:18-225:21.  Thus, even under Dr. Cohen's narrow construction, the Galaxy Nexus infringes under at least the doctrine of equivalents.

### D.     The Galaxy Nexus "Links Actions to Detected Structures" under Any Construction

77.     As I explained in my original declaration, it is my opinion that the Galaxy Nexus satisfies the "linking actions to detected structures" element under the ITC's construction.  The Android code accused in that investigation is identical in all relevant respects to that running on the Galaxy Nexus, and I see no reason to disturb the ITC's finding that this Android code infringes.  It is also my opinion that the Galaxy Nexus satisfies this element under Judge Posner's construction.

78.     Dr. Cohen's arguments rely at least in part on a misunderstanding of my analysis.  So that my opinions are clear, I discuss in detail below how the Galaxy Nexus links actions to detected structures.  Because my discussion of this limitation includes discussing Intent objects, I am therefore first providing a general, high-level description of Intent objects including their purpose and functionality.  As described in the '647 patent, examples of candidate "actions" that are linked to detected structures may involve launching other applications with the value of the detected structure as input.  '647 patent, at 2:36-41.  For example, a linked candidate action for a detected phone number might be to launch the phone dialer with the detected phone digits already filled in.  For a detected email address, an example of a linked candidate action may be to launch the email composer with the detected email address already filled in as the destination address.  Hence the ability for one application to launch another application (with the detected structure as input) is fundamental to these types of linked candidate actions.

79.     **startActivity().**  Android provides a specific mechanism for one application to launch another application: the startActivity() and startActivityForResult() methods.  These methods are nearly identical: startActivity() simply calls startActivityForResult() with the second input parameter set to -1.  The only difference is that startActivityForResult() is used when an application expects a value to be returned from the application that it launches, and startActivity() is used when it does not.

80.     While startActivity() is a general-purpose mechanism for launching other activities, in order for it to launch another activity corresponding to "Call 415-555-1234", or "Email Jdoe@work.com", it needs to be given further details.  For example, to launch an activity

corresponding to "Call 415-555-1234", startActivity() needs to know that it should launch the appropriate activity for "Call" (as opposed to "Email"), and that it should fill in the digits "415-555-1234" as the phone number when that preferred phone dialer is launched.

81.     The mechanism in Android for conveying this additional detail to startActivity() is to place those details in an Intent object, and pass the Intent as the input parameter to startActivity() when it is called.  (Intent objects are similarly used for conveying these details to startActivityForResult().)

82.     **Contents of an Intent object.**  Conceptually, an Intent object is a very close match to what is displayed to the user in the popup menu of linked candidate actions: e.g., "Call 415-555-1234", or "Email Jdoe@work.com".  More specifically, its two most relevant fields are called "data" and "action."  The "data" field stores the value of the detected structure (e.g., the digits in the detected phone number, or the characters in the email address), with an extra set of "prefix" characters at the front such as "tel:" for a telephone number, and "mailto:" for an email address.  The "Call" or "Email" component of the linked candidate action is captured through a combination of the Intent's "action" field plus the prefix at the front of the "data" field.  For example, the combination of an Intent object's "action" field being set to "Intent.ACTION_VIEW" and the prefix of its "data" field being set to "tel:" corresponds to launching the appropriate activity for the "Call …" linked candidate action.  Similarly, the combination of an Intent object's "action" field being set to "Intent.ACTION_VIEW" and the prefix of its "data" field being set to "mailto:" corresponds to launching the appropriate activity for the "Email …" linked candidate action.

83.     Hence it is the act of executing the startActivity() method with a specific Intent object as input that corresponds to performing a linked action in the context of the '647 patent.

84.     As I explained in my declaration, the analyzer server links detected structures, such as phone numbers or email addresses, to computer subroutines such as startActivity().  Mowry Decl., ¶ 73.  Those subroutines cause the central processing unit ("CPU") to perform a sequence of operations on the particular structures to which they are associated (*e.g.*, launching the dialer with the phone number filled in, launching the email composition window with the detected email address in

the "To" field, etc.).  The sequence of operations includes the body of the startActivity() method in the ContextImpl class as well as the methods that it calls, the methods that they call, etc.  For example, the startActivity() method in the ContextImpl class calls the execStartActivity() method in the Instrumentation class (passing along the Intent object as the fifth input parameter), which in turn calls the startActivity() method in the Activity class (passing along the Intent object as the second input parameter), which in turn copies the detected structure value (among other things) from the Intent object into a Parcel object (called "data"), and passes this Parcel object as the second input parameter to the transact() method on the IBinder class (with "START_ACTIVITY_TRANSACTION" as the first input parameter), thereby causing the Android operating system to launch the appropriate Activity with the detected structure as an input value.

85.     The link (or "specified connection") exists because during the construction of the pop-up menu (a ContextMenu object) that is to be showed to the user to indicate the choices of linked candidate actions for the detected structures, the setIntent() method (in the MenuItemImpl class) is called with a customized Intent object that describes that particular linked candidate action and contains the value of the particular detected structure such that when the user later clicks on a particular choice of linked candidate action, the corresponding code and data is already in place such that the invoke() method in the MenuItemImpl class will necessarily call startActivity() with that specific Intent object as input, thereby causing a sequence of operations to be performed on the detected structure.  The link between the detected structures and the multiple candidate actions is clearly evident because the user is presented with the multiple choices in the pop-up menu shown on the touchscreen.

86.     Under the ITC construction, the Galaxy Nexus links actions to detected structures for the reasons described above.  In particular, when the onCreateContextMenu() method of the Controller class (which is called by the onCreateContextMenu() method of the BrowserActivity class) calls the setIntent() method of the MenuItemImpl class with an appropriately-constructed Intent object as the input parameter, the "mIntent" instance variable within that MenuItemImpl object (which corresponds to a particular choice in the context menu) is set to point to the input Intent

object; as a result, if the user selects that particular option from the context menu, when the invoke() method is executed on that particular MenuItemImpl object, it will necessarily call startActivity() with the Intent object stored in mIntent as its input parameter, thereby performing the linked action.

87.     Under Judge Posner's construction, the Galaxy Nexus also links actions to detected structures.  The "specified connection" is created when the setIntent() method is called, since this sets the pointer that implements the "mIntent" variable to point to the Intent object that will be passed as input to startActivity(), and also because this assignment to the "mIntent" variable also causes the conditional test that is later performed inside the invoke() method of the MenuItemImpl class (i.e. "if (mIntent != null)") to succeed such that startActivity() will necessarily be called with mIntent as its input parameter.

88.     While I do not believe that a "specified connection" requires the use of "pointers," this limitation is met in the Galaxy Nexus to the extent pointers are required.  The setIntent() method of the MenuItemImpl class sets the instance variable "mIntent" to be equal to the "intent" parameter. Since the mIntent instance variable within the MenuItemImpl class is declared as being of type "Intent" it is "reference type" in Java (as opposed to a "primitive type"), which means that it is implemented within the Java language using a pointer.  Hence the assignment to mIntent within the setIntent() method causes a pointer to be set (*i.e.* mIntent), which completes the linking process by creating the specified connection between the detected structure and a computer subroutine that causes the CPU to perform a sequence of operations on that detected structure.  In addition to the mIntent instance variable, some other pointers that are involved in creating the "specified connection" include the mMenu instance variable in the MenuItemImpl class, which is also a reference type (of type MenuBuilder), and the mContext instance variable in the MenuBuilder class (another reference type, this one of type Context).  When a user selects a candidate linked action from the context menu, the invoke() method in the MenuItemImpl class executes "mMenu.getContext().startActivity(mIntent);" [MenuItemImpl.java, line 155] given that mIntent is a non-null pointer (due to the earlier call to setIntent()).  mMenu is implemented within the Java language as a pointer (since it is a reference type), and it points to "The menu to which this item

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK                33

belongs" [MenuItemImpl.java, line 63].  When "mMenu.getContext().startActivity(mIntent);" is executed, the mMenu pointer is first dereferenced to call the getContext() method within corresponding MenuBuilder object (that mMenu points to), which in turn returns a pointer (i.e. a reference type) of type Context by returning the value of the mContext pointer, which in turn is dereferenced to invoke the startActivity() method (with the mIntent pointer as the input parameter).

89.     Dr. Cohen argues that the Galaxy Nexus does not link actions to detected structures under the ITC construction because he states that I do not identify any subroutine that is linked to a detected structure.  Specifically, Dr. Cohen erroneously states that I accuse the Galaxy Nexus of linking to only "abstract descriptions of actions (*e.g.*, Intent objects)."  Cohen Decl., ¶ 98.  Dr. Cohen mischaracterizes my analysis.

90.     Dr. Cohen wrongly states that I assert that the Intent is the "action" required by claim 1, and then accuses me of quoting the Android Developer's Reference in a "highly misleading" way to support this non-position.  Cohen Decl., ¶ 101.  I do not assert that the abstract description of the action in the Intent is the "action," because an "action" is "a computer subroutine that causes the CPU to perform a sequence of operations on the particular structure to which it is linked."  '647 patent, 2:31-34.  Rather, when startActivity() is called, it uses the data in the Intent to launch a particular activity using the detected structure.  Dr. Cohen relies on a mischaracterization of my analysis to argue that there is no infringement under the ITC construction.  Again, the ITC found that my analysis, properly understood, demonstrates infringement under the ITC constructions.

91.     Dr. Cohen argues that it is "nonsensical" for the startActivity() method to be "both the action and the action processor that executes that action." Cohen Decl., ¶ 104.  Again, Dr. Cohen mischaracterizes my analysis.  To be clear, in paragraph 78 of my Declaration, I identified *three* methods (not simply startActivity()) that comprise the action processor in the Galaxy Nexus: "The action processor is the startActivity() method of the Context[4] class (Ex. 6L - Context.java, L:813-

---

[4]   These methods are implemented in the ContextImpl.java file.  This file was misidentified as ApplicationContext.java in my original declaration.

833),  the resolveActivity() method of the Intent class (Ex. 6M - Intent.java, L:4180-4194), and the resolveActivity() method of the PackageManager class (Ex. 6N - PackageManager.java, L:1617-1645)."  Dr. Cohen mischaracterizes my analysis when he states that, "First, startActivity() is explicitly identified by Dr. Mowry as being the 'action processor' of the claim." Cohen Decl., ¶ 104.

92.     Although the term "action" has arguably been construed as part of the phrase "linking actions to detected structures" by both the ITC (a "computer subroutine that causes the CPU to perform a sequence of operations on the particular structure to which it is linked") and Judge Posner (a "computer subroutine which performs operations on the structure"), in contrast, the term "action processor" has not been subject to claim construction.  In both the Abstract and the Summary of the Invention, the '647 patent uses similar language to describe the "action processor": "Upon selection of an action, the action processor *performs the action on the detected structure*." ('647 patent Abstract, emphasis added); "When a candidate action is selected, the action processor *performs the selected action on the selected structure*." ('647 patent, 2:51-53).  In other words, the "action processor" is a software *mechanism* that is capable of performing *any* of the candidate actions.  It is a static concept, meaning that you can identify it by pointing only to code and not to run-time data. In the case of the Galaxy Nexus, the action processor is comprised of the three methods that I identified above and in my Declaration (*i.e.* startActivity() of the Context class, resolveActivity() of the Intent class, and resolveActivity of the PackageManager class).

93.     In contrast, an "action" is a dynamic concept that refers to a specific sequence of operations performed on a particular detected structure: *e.g.*, corresponding to "Call 415-555-1234", or "Email Jdoe@work.com".  Hence, although "action" certainly involves a computer subroutine, it also implicitly includes any input data that is needed to exercise that computer subroutine such that it performs the appropriate sequence of operations on the appropriate detected structure (which at bare minimum would include the value of the structure itself).  In the case of the Galaxy Nexus, the "action" is the startActivity() method of the Context class when it is invoked at run-time (via the invoke() method of the MenuItemImpl class) with a specific Intent object (the "mIntent" instance variable) as its input parameter.  Once startActivity() begins to execute with specific input data, it

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          35

"causes the CPU to perform a sequence of operations on the particular structure to which it is linked", and it "performs operations on the structure."

94.     The '647 patent does not prohibit overlap between subroutines that comprise the action processor and subroutines that are the action.  One reason why we observe some overlap between code involved in the action processor and the code involved in the action in the Samsung Galaxy is that one of the key principles of object-oriented programming (which is used extensively in Android, and which was far less common back in the mid-1990's) is to achieve differentiated behavior not by writing a new subroutine, but rather by having the same subroutine (or "method") behave differently based upon runtime data.  The startActivity() method is a prime example of good object-oriented programming style: this same method can be used to launch any type of external activity by simply configuring the data in its input parameter (an Intent object) accordingly.  While it would also be possible to implement the '647 invention with disjoint subroutines comprising the action processor and the actions, the object-oriented programming style in Android leads to there being overlap.

95.     Dr. Cohen argues that the Galaxy Nexus does not "create a specified connection" as required by Judge Posner's constructions because an "implicit" Intent object (rather than an "explicit" Intent object) is passed as the input parameter to startActivity().  Cohen Decl., ¶¶ 102-104.  An "explicit" Intent is an Intent object where the "component" field has been set to indicate a specific class (usually internal to the same application) that is to be launched when startActivity() is called.  In contrast, "implicit" intents are typically used to launch external applications; they do not specify a class to launch, but rather they use the resolveActivity() method (which I identified as being part of the action processor) to determine the preferred activity to be launched.

96.     I disagree with Dr. Cohen's argument that the Galaxy Nexus does not "create a specified connection" for several reasons.  First, the "computer subroutine that causes the CPU to perform a sequence of operations on that detected structure" in the Galaxy Nexus is startActivity(), which uses the data in its input parameter (an implicit Intent object) along with a call to resolveActivity() to perform the following sequence of operations on that detected structure:  First, it

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK            36

causes the Android system to *launch* the user's preferred application  (aka "activity") for performing the operation that was described in the context menu, and, second, it passes the value of the detected structure as input to that application.  Hence the act of "creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on that detected structure" is satisfied because there is a specified connection between the detected structures and startActivity().  Dr. Cohen fails to account for this sequence that comes directly from the code.

97.     Second, Dr. Cohen fails to appear to understand that the implicit Intent objects that are passed to startActivity() in the Galaxy Nexus do in fact correspond exactly to the level of detail that is presented to the user in the context menu of linked candidate actions as required by claim 1.  For example, when the user selects a detected email address in the Galaxy Nexus, the context menu asks whether the user would like to "Send email."  Although the context menu does not ask whether the user would like to "Send email with Gmail" or "Send email with Email" such level of detail is not required by the "linking actions" limitation of claim 1.  Indeed, by choosing to "Send email", the user selects the candidate action of launching their preferred email application (whatever that may be) to start composing an email message to the detected email address.  If the user has multiple email applications installed on their phone and has not chosen a default application for composing email messages, the fact that the user may be prompted to select which email application to launch does not alter the fact that the implicit Intent object that is passed as input to startActivity() is indeed causing startActivity() to accurately perform the candidate action of "Send email" that was advertised to the user.  In other words, startActivity() is "linked" as required by claim 1.  The same reasoning is true for other linked candidate actions that are presented to the user in the Galaxy Nexus for other types of detected structures: e.g., for a detected phone number, the linked candidate actions are described in the context menu simply as "Dial," "Add Contact," etc.  They do not specify a particular Android activity that is to be used to perform those operations.  Hence the implicit Intent object faithfully represents the level of detail that the user has requested when it is passed as input to startActivity(), which satisfies claim 1.

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK                37

Gibson, Dunn &
Crutcher LLP

98.     In asserting that implicit Intents, as opposed to explicit Intents, cannot satisfy the claimed "linking," Dr. Cohen fails to appreciate that one of ordinary skill in the art would understand an implicit Intent as a form of "linking."

99.     Chapter 7 of the textbook "Computer Systems: A Programmer's Perspective (2nd Edition)", by Bryant and O'Hallaron, is entitled "Linking".[5]  See below the first two sentences from that chapter:

> Linking is the process of collecting and combining various pieces of code and data into a single file that can be *loaded* (copied) into memory and executed.  Linking can be performed at *compile time*, when the source code is translated into machine code; at *load time*, when the program is loaded into memory and executed by the *loader*, and even at *run time*, by application programs."

Ex. 12, p. 654 (emphasis in original).

100.    Section 7.2 of this chapter is entitled "Static Linking", and it begins with the following sentence: "*Static linkers* such as the Unix ld program take as input a collection of relocatable object files and command-line arguments and generate as output a fully linked executable object file that can be loaded and run."  Section 7.10 of this chapter is entitled "Dynamic Linking with Shared Libraries", and it begins with the following paragraph:

> "The static libraries that we studied in Section 7.6.2 address many of the issues associated with making large collections of related functions available to application programs.  However, static libraries still have some significant disadvantages.  Static libraries, like all software, need to be maintained and updated periodically.  If application programmers want to use the most recent version of a library, they must somehow become aware that the library has changed, and then explicitly relink their programs against the updated library."

Ex. 12, p. 681.

101.    After discussing another disadvantage of static linking in the second paragraph (i.e. wasted memory space), the third paragraph of this section then says: "*Shared libraries* are modern innovations that address the disadvantages of static libraries.  A shared library is an object module

---

[5]  I note that this textbook (and its 1st edition, which has a nearly identical Chapter 7, also entitled "Linking") has been widely adopted at many universities, including Carnegie Mellon University and Princeton University, for use in undergraduate courses that explain how computer systems work (http://csapp.cs.cmu.edu/public/adoptions.html).

that, *at run time*, can be loaded at an arbitrary memory address and linked with a program in memory. This process is known as *dynamic linking* and is performed by a program called a *dynamic linker*." Ex. 12, p. 682 (emphasis in original).  In section 7.11 of this chapter (entitled "Loading and Linking Shared Libraries from Applications"), it goes on to say: "Linux systems provide a simple interface to the dynamic linker that allows application programs to load and link shared libraries at run time." Ex. 12, p. 684 (emphasis in original).  After an illustration that includes the interface code: "void *dlopen(const char *filename, int flag);", the book goes on to say: "The dlopen function loads and links the shared library filename.  The external symbols in filename are resolved using libraries previously opened with the RTLD_GLOBAL flag.  If the current executable was compiled with the –rdynamic flag, then its global symbols are also available for symbol resolution.  The flag argument must include either RTLD_NOW, which tells the linker to resolve references to external symbols immediately, or the RTLD_LAZY flag, which instructs the linker to defer symbol resolution until code from the library is executed.  Either of these values can be or'd with the RTLD_GLOBAL flag." Ex. 12, at. p. 684 (emphasis in original).

102.     In other words, Linux, which is one of the most widely-used operating systems in the world (and which is also an internal component of the Android operating system), supports both "static linking" and "dynamic linking."  With dynamic linking, when the RTLD_LAZY flag is set, external symbol resolution (*i.e.* for calls to subroutines in shared libraries) does not occur until the moment that the application actually attempts to call that library function.

103.     The use of an *explicit* Intent object (which statically specifies the target application to be launched) as input to startActivity() in Android is directly analogous to the *static linking* described in Chapter 7 of the Bryant and O'Hallaron textbook: in both cases, the target is resolved before the application even begins to execute.  The use of an *implicit* Intent object as input to startActivity() in Android, however, is directly analogous to the *dynamic linking* (with the RTLD_LAZY flag set) described in Chapter 7 of the Bryant and O'Hallaron textbook: in both cases, the target is resolved at *run time* by the system at the moment that the invocation of the target is performed.  Implicit Intents have the same motivation relative to explicit Intents that Bryan and O'Hallaron described for

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          39

dynamic versus static linking: it gives the system the flexibility to modify the target software without having to statically re-link the application.  Thus, just as both "static linking" and "dynamic linking" would be recognized by a person of ordinary skill in the art as forms of "linking", one of skill in the art would recognize that calling startActivity() with both explicit and implicit Intent objects would be considered to be "linking".

104.     Dr. Cohen argues that "nothing in the accused functionality that Dr. Mowry identifies as the analyzer server actually links detected structures to startActivity.  If startActivity is called, it is only because the underlying Android code already has invocations to it, long before any data is ever analyzed (or, indeed, received) by the device."  Cohen Decl., ¶ 104.  I disagree.  As I described in my Declaration and earlier in this report, the creation of a pop-up menu (*i.e.* a ContextMenu object) specific to a particular detected structure in response to the user long-pressing that particular detected structure includes calling the setIntent() method of the MenuItemImpl class, the result of which is to alter the code path in the invoke() method of the MenuItemImpl class (by making the "if (mIntent != null)" conditional test succeed) such that startActivity() will be called (when the invoke() method is called) in the event that the user selects that particular candidate action in the ContextMenu.  Dr. Cohen is incorrect when he says that the analyzer server does not link detected structures to startActivity(): these links are created via the calls to setIntent(), as described above.  Dr. Cohen is also incorrect when he states that the only reason why startActivity() is called is due to events that occurred long before any data is analyzed by the device: startActivity() is only called because setIntent() is called while constructing a ContextMenu option for a particular detected structure.

105.     Dr. Cohen argues that "under Judge Posner's construction, there is no specified connection to startActivity. In his deposition, Dr. Mowry states that the code for a Context Menu 'will necessarily call' the Invoke() method and the startActivity() method, and thus the code he calls the analyzer server has created a specified connection to startActivity() at the time of linking. His conclusion is a non sequitur. Even if it were true that the Context Menu 'will necessarily call' startActivity(), that does not in any way demonstrate that there is a specified connection from the detected structure to StartActivity(). Indeed, such language argues that it is, at best, implicit, rather

than specified." Cohen Decl., ¶ 104.  I disagree, and I must say that I have difficulty parsing Dr. Cohen's argument.  As I have described in detail earlier, the analyzer server does create a "specified connection" to startActivity() in the Galaxy Nexus under Judge Posner's construction.  Dr. Cohen appears to be attempting to argue that although there may be a specified connection from Context Menu option to startActivity(), that this somehow does not satisfy having specified connection from a detected structure to startActivity().  If this is what Dr. Cohen is attempting to argue, then he is incorrect: the Context Menu is created *specifically* for a particular detected structure in response to the user long-pressing on it, and the value of that detected structure is copied into each Intent object that is stored (via the call to setIntent()) in the mIntent instance variables in the MenuItemImpl objects that correspond to each choice of linked candidate action in the Context Menu; hence there is clearly a specified connection from a detected structure to startActivity() for each candidate action.

106.    When Dr. Cohen argues that "the invocation of startActivity only happens after the user selects a menu option, and thus this describes behavior of startActivity() as the action processor," he is conflating the *execution* of an action (i.e. when startActivity() is actually invoked) with *linking* to an action (which I have described above in detail).  Cohen Decl., ¶ 104.  Hence I disagree for the reasons that I have described above regarding how linking actions occurs in the Galaxy Nexus.

107.    Dr. Cohen argues that "the alleged step of linking detected structures to actions does not happen for each detected structure, as is required by the Posner construction; it only happens for those structures that are selected." Cohen Decl., ¶ 105.  I disagree.  First of all, the code for creating the appropriate ContextMenu with linked candidate actions is in place (and will execute) for all detected structures that the user might select.  It is not the case that analyzer server only links actions for certain detected structures and not others: the linking occurs for any detected structure that the user selects.  Second, postponing some of the work involved with completing the linking until after the user selects a particular detected structure is simply good coding practice (it avoids wasted computation and energy), and it is indistinguishable to the user from performing all of this work

1    before the user selects any detected structures: the user can only select one detected structure at a

2    time, and they may choose to not select any detected structures.

3        108.    Dr. Cohen argues that based upon language in the ITC Commission Opinion regarding

4    linking and the user interface, "Since of course the enabling selection step must have already

5    occurred at that time, this example could not meet the requirement that the link exist prior to the user

6    interface's enablement of selection."  Cohen Decl., ¶ 106.  I disagree.  What the Commission was

7    clearly saying is that the link for the linked action must exist before "the user interface enables

8    selection of a 'linked action,' i.e., an action that has already been linked."  In other words, linking

9    must be completed before the user interface enables the user to select a linked action.  This timing

10   requirement described by the Commission is clearly satisfied by the Galaxy Nexus: the ContextMenu

11   object is not displayed to the user until after it has been constructed (i.e. after the

12   onCreateContextMenu() method in the Controller class finishes executing), and setIntent() is called

13   during the construction of the ContextMenu object.  Hence linking is completed before the user

14   interface enables selection of a linked action.  I would also like to note that the ITC Commission

15   determined that an earlier version of the same Browser application and the corresponding analyzer

16   server (which are identical in all relevant aspects to the ones in the Galaxy Nexus) infringed Claims 1

17   and 8 of the '647 patent, given the same analysis that I presented during that case regarding how

18   linking occurred and how the user interface enabled selection of a linked candidate action.  Hence the

19   timing requirement that Dr. Cohen refers to is clearly satisfied by the Browser application and the

20   analyzer server in the Galaxy Nexus.

21       109.    Dr. Cohen argues that "Even accepting all of his other positions, the Context Menu is

22   not the detected structure, and so any alleged links within it to alleged actions still cannot satisfy the

23   claim. The detected structure is unaware of the Context Menu, remains unlinked to it, and has no

24   relationship to the Context Menu other than the user interface copied the value during the process of

25   creating the menu." Cohen Decl., ¶ 107.  I disagree.  The Context Menu is created *specifically* for a

26   particular detected structure in response to the user *long-pressing on that detected structure*.  The

27   Context Menu is customized specifically to that detected structure, and the value of the detected

28

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          42

1   structure is copied into the "data" fields of each Intent object that is stored with each candidate action

2   option in the Context Menu.  The Context Menu behaves exactly as illustrated in Figure 7 of the '647

3   patent, presenting the user with choices of candidate actions that are customized to that specific

4   detected structure.  Dr. Cohen's argument that the linked actions are not linked to detected structures

5   is without merit, for the reasons described above.

6          110.      Finally, Dr. Cohen points out that while the Galaxy Nexus can detect at least three

7   types of structures—addresses, email addresses, and phone numbers—the Galaxy Nexus only offers a

8   single optoin for each of addresses ("map") and email addresses ("send email").  Cohen Decl., ¶ 108.

9   He then states that "[t]o the extent that either construction is understood as requiring more than one

10  action for a particular detected structure, neither addresses nor emails satisfies this requirement."  *Id.*

11  Of course, if more than one action is required a particular detected structure, phone numbers satisfies

12  this element, and the fact that emails and addresses may not is irrelevant.  Dr. Cohen also states that

13  "to the extent that different types of structures need to be detected and linked to multiple actions, the

14  Galaxy Nexus does not perform this, as the only type of detected structure that Dr. Mowry has

15  identified that offers multiple options is a phone number."  *Id.*  It is unclear whether Dr. Cohen is

16  actually taking the position that "different types of structures need to be detected and linked to

17  multiple actions."  If so, it would be a position contrary to my own, the ITC's, and Judge Posner's.

18         **E.      The Galaxy Nexus Contains "a user interface enabling the selection of a detected
              structure and a linked"**

19

20         111.      As I explained in my original declaration, once the FindPartialAddress(),

21  FindPartialEmail(), and/or FindPartialNumber() methods of the CacheBuilder class detect structures

22  in the webpage, the BuildFrame() method of the CacheBuilder class enables the selection of those

23  structures.  Mowry Decl., ¶ 75.  In addition, the show() method of the MenuDialogHelper class and

24  the AlertDialog class are user interface program routines that enable the selection of a linked action

25  by displaying a context menu.  *Id.*, ¶ 76.  Dr. Cohen states that "[t]o the extent that the analyzer

26  server and the user interface must be separate, CacheBuilder cannot be a user interface enabling the

27  selection of a detected structure and a linked action."  As Dr. Cohen has not actually taken the

28  REPLY EXPERT DECLARATION OF DR .TODD C.
    MOWRY CONCERNING U.S. PATENT NO.
    5,946,647 – CASE NO. 12-cv-0630-LHK          43

position that "the analyzer server and the user interface must be separate," I will not respond to this hypothetical non-infringement argument, other than to say that I identify separate methods in the CacheBuilder class for the analyzer server than for the user interface.

112.     Dr. Cohen again argues that there is no infringement under the ITC's construction. Cohen Decl., ¶ 111.  For the reasons stated above, I believe the ITC correctly found infringement of this element.

### F.     Infringement Of Claim 8

113.     In my opinion, Dr. Cohen's arguments that the Galaxy Nexus does not infringe claim 8 rely on limitations not present in the claim language.

114.     Claim 8 recites: "The system recited in Claim 1, wherein the user interface highlights detected structures."  Dr. Cohen first argues that the Galaxy Nexus does not infringe claim 8 because when a user selects a detected structure, only that particular structure is highlighted.  Cohen Decl., ¶ 114.  In addition, he requires that the user interface highlight each detected structure "before the selection of a detected structure by a user."  *Id.*, ¶ 115.  Even he admits that his limitations are "implied," rather than explicitly set forth in claim 8.  *Id.*

115.     Essentially, Dr. Cohen construes the claim language "the user interface highlights detected structures" to mean "the user interface *simultaneously* highlights *each* detected structure *before the selection of a detected structure by the user*."  I disagree that the claim language would be so understood by one of ordinary skill.  I believe the claim language would be understood as written, under which construction the Galaxy Nexus infringes.

## VI.     VALIDITY

116.     As I explained in my opening expert declaration, my opinion that claims 1 and 8 of the '647 patent are valid has been confirmed by both the ITC ALJ and the Commission in *In the Matter of Certain Personal Data and Mobile Communications Devices and Related Software,* Investigation No. 337-TA-710.  *See* Mowry Decl., Ex. 15 (Initial Determination), at 165-191; Ex. 16 (Commission Opinion), at 28-29.  In addition, the PTO has confirmed claims 1 and 8 during reexamination of the '647 patent.  *See* Ex. 5 (Office Action of June 27, 2011), at 1, 27-28.

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          44

117.     Nonetheless, Dr. Cohen argues that claims 1 and 8 of the '647 Patent are invalid on the basis of a handful of purported prior art references, most of which have already been considered, and found to present no anticipation or obviousness issues for the '647 Patent, in other actions. Indeed, that Dr. Cohen has merely recycled prior invalidity arguments from other cases involving the '647 Patent shows that the patent stands on solid ground.

### A.     Claims 1 and 8 Are Not Anticipated by SideKick

118.     Dr. Cohen argues that Sidekick, in particular Sidekick's Dialer feature, anticipates or renders obvious Claims 1 and 8 of the '647 Patent.  Cohen Decl., ¶ 120.  However, Dr. Cohen fails to recognize that Sidekick's Dialer function is merely an instance of the non-anticipating background art systems expressly discussed in the '647 Patent that can detect *only one type* of structure and that allow only limited functionality.  Thus, claims 1 and 8 are not anticipated by the Sidekick Dialer feature for the same reasons that the '647 patent was allowed over similar non-anticipating prior art.

### 1.     Claim 1: "A computer-based system for detecting structures in data and performing actions on detected structures:"

119.     As I have previously explained, I understand that the preamble to a claim typically does not limit the scope of the claim, except under certain circumstances.  *See* Mowry Decl., ¶ 59. While I do not believe those circumstances are present here, if the preamble is considered a limitation, the Sidekick system does not comprise "[a] computer-based system for detecting structures in data and performing actions on detected structures."

120.     At the outset, claim 1 of the '647 Patent describes a computer-based system for detecting "structures", i.e, more than one type of structure.  Accordingly, the '647 Patent discloses the use of multiple saved "patterns" to detect different types of structures (e.g., phone numbers, email addresses, etc.), each of which being associated with candidate actions that a user would normally perform on such a structure.  '647 Patent at 1:25-35.  In this way, the invention disclosed in the '647 patent had "significant advantages over previous systems, in that [it] may incorporate an open-ended number and type of recognizable patterns, an open-ended number and type of pattern analysis units, and further that the system may enable an open-ended number and type (i.e. scripts, macros, code

fragments, etc.) of candidate actions to associate with, and thus perform, on each identified structure." '647 Patent at 2:12-20.

121.    As Dr. Cohen describes it, the Dialer function of Sidekick recognizes only a single type of data – phone numbers – and allows only one type of action associated with each phone number, as discussed further below.  Cohen Decl., ¶ 127.  Dr. Cohen nowhere claims, nor do the selected Sidekick materials that he appends to his declaration state, that the Sidekick Dialer recognizes any type of data other than phone numbers.  Accordingly, the Sidekick system does not "detect[] structures in data" as required in the preamble to Claim 1.

122.    As explained in above, the '647 Patent teaches that the system itself detects structures in data prior to linking those structures to candidate actions (i.e., actions that a user would normally perform on those structures).  *See* '647 Patent at 2:49-53 ("Upon selection of a detected structure, the user interface presents and enables selection of candidate actions.").  Dr. Cohen fails to address the fact that, unlike the system disclosed in the '647 Patent, the computer-based system of Sidekick does not itself perform any detection.

123.    Instead, Sidekick's Dialer feature requires a user to enter various prompts to enable a single telephone number to be highlighted at any given time.  Specifically, after installing the Sidekick application on a computer and opening a document, a user must enter a series of keystrokes – specifically, "Ctrl" and "Alt" – in order to activate Sidekick.  *See* Cohen Exh. GG, Sidekick 1.5 Owner's Handbook, 1985, Borland International ("Sidekick Handbook"), at 13.  Then, the user must activate the Dialer feature in particular by pressing, e.g., "Alt" and "D".  Sidekick Handbook, at 29.  Only then does the Sidekick Dialer highlight a single item – the first telephone number appearing in a document.  Sidekick Handbook, at 30 ("If you have more than one number on the screen that looks like a phone number, the first one will be chosen.").

124.    Thus, unlike the '647 Patent, the Sidekick system requires user prompts to highlight a single piece of data, as shown in the Sidekick screenshots below:

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          46



**Figure 2-7: Dialer Window**

**Sidekick Handbook, at 29.**



**Cohen Decl., ¶ 131.**

125.     This is contrary to both the '647 Patent's teaching of a system that itself detects multiple structures in data, without a user having to prompt additional detection, and the preamble claim language "detect[] structures in data."  ('647 Patent at Claim 1 ("A computer-based system for detecting structures in data and performing actions on detected structures"), 5:29-31 ("As illustrated in Fig. 6, analyzer server 220 identifies the phone number, post-office address, e-mail address and name.").  This functionality is shown in Figure 6 of the '647 Patent, in which multiple data structures have been detected and presented to the user automatically:



FIG. 6

**Fig. 6 from '647 Patent**

126.     Further, Sidekick does not "perform[] actions on detected structures" because only one action – dialing – is available to a Sidekick user for a single phone number at any given time.  As the Sidekick Handbook explains, once a single telephone number is highlighted by the Dialer feature, the user may press "Enter" to dial that number, or an arrow key to move to another phone number on the screen, if one was available.  Sidekick Handbook, at 30.  The Sidekick Handbook mentions no other actions that can be performed on a highlighted phone number, nor does Dr. Cohen point to any.

127.     The Sidekick Dialer is therefore precisely the type of background art that the '647 Patent improved upon.  As the Patent explains in its "Description of the Background Art" at column 1, lines 52 to 65:

> "One type of system that has addressed this problem involves detecting telephone numbers.  Such systems . . . do not enable the performance of other candidate actions such as moving the number to an electronic telephone book.   That is, if a user wishes to perform a different action on an identified telephone number, such as storing the number in an address book, the user cannot automatically perform the action but must select and transfer the number to the appropriate data base."

128.     As the above discussion shows, the '647 Patent discloses the use of multiple saved patterns to detect different types of structures (e.g., phone numbers, email addresses, etc.), each associated with candidate actions that a user would normally perform on such a structure.  Sidekick's Dialer feature, on the other hand, discloses only the ability to detect, after the user enters various prompts, a single type of structure (a phone number), and allow only a single alleged action to be performed on that structure.  The Sidekick Dialer is therefore not "[a] computer-based system for detecting structures in data and performing actions on detected structures."

> **2.     "an input device for receiving data;**
> **an output device for presenting the data;**
> **a memory storing information including program routines including;"**

129.     The Sidekick Dialer feature does not practice or disclose "a memory storing information including program routines . . ." for at least the reason that the Sidekick system does not disclose the claimed program routines (for which claim elements (c), (d), and (e) must be satisfied) for the reasons described below.

> **3.     "an analyzer server for detecting structures in the data, and for linking**
> **actions to the detected structures;"**

130.     Dr. Cohen claims that the Sidekick system "included an analyzer server under either" of two different constructions for this claim term applied by the ITC and by Judge Posner, respectively.  Cohen Decl., ¶ 125.  As Dr. Cohen indicates, and as explained above, Judge Posner construed "analyzer server" as "a server routine separate from a client that receives data having structures from the client," while the ITC construed "analyzer server" as "a program subroutine that receives data from a document having recognizable structures, and uses patterns to detect the structures."  Cohen Decl., ¶ 125.  Whether or not the Court in this case accepts either of these constructions, I disagree with Dr. Cohen that this claim limitation is met by the Sidekick system.

131.     First, the Sidekick system does not receive "data having structures" (in Judge Posner's formulation) or "data from a document having recognizable structures" (in the ITC's formulation) because the Sidekick system only recognizes a single type of structure – a telephone number.  *See* Cohen Decl., ¶ 127 ("When invoked, the Dialer routine receives data from the document in the

current application, and recognizes phone numbers according to their structure."); Sidekick

Handbook, at 30 ("Sidekick 'knows' a phone number, because it must contain special characters.

These are usually parentheses or hyphens, but you can choose other characters within the installation

program."). The Sidekick Handbook even warns users to format phone numbers in a particular way

so as to avoid confusing the system with other types of data that it cannot recognize or take action

upon. *See* Sidekick Handbook, at 30 ("To make things very clear: in order to distinguish a phone

number from dates, amounts, and other numeric information, the phone number must not contain

commas, periods, or slashes."). For this same reason, as discussed above, the Sidekick system does

not "detect structures" in the plural sense, as required by the asserted claims. Notably, although Dr.

Cohen points to Judge Posner's construction as Judge Posner described in his claim construction

decision, the '647 patent discloses, and claim 1 claims, a system able to detect multiple types of

structures in data.

132.    Second, the Sidekick system does not have an analyzer server "for linking actions to

the detected structures" because, as discussed above, the Sidekick system can perform only one

action (dialing) on only one type of structure capable of being detected (a phone number). Sidekick

Handbook, at 30. Thus, the Sidekick system fails to meet this claim element under either

construction Dr. Cohen discusses.

133.    For example, as Dr. Cohen notes, Judge Posner construed "linking actions to the

detected structures" to mean "creating a specified connection between each detected structure and at

least one computer subroutine that causes the CPU to perform a sequence of operations on that

detected structure." Cohen Decl., ¶ 128. However, Dr. Cohen fails to mention that in his claim

construction order, Judge Posner expressly acknowledged that the patent refers to "structures" and

"actions" in the plural sense. *See* Posner Claim Construction Order at 10-11 ("the ability to link a

structure to a single action still comports with the patent's plural reference, so long as other structures

are linked to other actions. An analyzer that links dates to the calendar and phone numbers to the

phone book still 'links structures to actions.'")). Dr. Cohen's only explanation for how the Sidekick

system anticipates this claim element as construed by Judge Posner is that "Dialer recognized

multiple instances of phone numbers in the data" and that "[f]or each detected phone number, it provided a user action."  Cohen Decl., ¶ 128.  Yet this explanation flies in the face of Judge Posner's caution that "the ability to link a structure to a single action still comports with the patent's plural reference, *so long as other structures are linked to other actions.*  An analyzer that links dates to the calendar and phone numbers to the phone book still 'links structures to actions.'"  Ex. 2, at 10-11 (emphasis added).  Because the Sidekick Dialer can identify only a single type of structure and allow only a single operation to be performed on that structure, the system requires no "linking" or "specific connection" between different structures and actions.

134.     Sidekick also fails to disclose this limitation because Sidekick does not "creat[e] a specified connection" to any "action", i.e., "computer subroutine that causes the CPU to perform a sequence of operations *on the particular structure to which it is linked*."  '647 Patent at 2:31-34 (emphasis added).  Indeed, Dr. Cohen has not pointed out any statement in the Sidekick Handbook that discloses that software is actually operating on a telephone number structure.  Rather, systems such as Sidekick that enable the dialing of a telephone number would simply send the string of numbers it had identified to a hardware modem.  *See*, *e.g.*, Sidekick Handbook at 29 ("The Dialer turns your computer into an automatic dialer provided you have a modem connected to your computer.").  In my opinion, sending a string of digits to a piece of hardware, such as a modem, does not constitute an "action" as understood in light of Judge Posner's construction or the disclosure of the '647 Patent.

135.     After discussing Judge Posner's construction, Dr. Cohen simply notes, without elaboration or analysis, that the ITC construed "linking actions to detected structures" to mean "linking detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are linked."  Cohen Decl., ¶ 129.  Nonetheless, as with Judge Posner's construction, the ITC's construction does not alter the fact that the Sidekick system must logically detect *multiple types of structures* in data and link those structures to actions in order to anticipate the '647 patent.  But as is evident from the Sidekick Handbook, Sidekick is able

to recognize **only a single type of structure**, and has available only a single function related to all instances of that structure type that it detects.

136.     This is yet another reason that systems such as Sidekick are specifically discussed in the '647 Patent as background art over which the patent invented.  As the patent describes, these systems "do not enable the performance of other candidate actions such as moving the [phone] number to an electronic telephone book.  That is, if a user wishes to perform a different action on an identified telephone number, such as storing the number in an address book, the user cannot automatically perform the action but must select and transfer the number to the appropriate data base."  '647 Patent at 1:52-65.  One of the many reasons the '647 Patent was novel was that it enabled the linking and performance of multiple actions for different data structures, which Sidekick does not do.

137.     Finally, Dr. Cohen contends, without evidence or explanation, that "it would have been obvious to a person of ordinary skill in 1996 to detect additional types of structures and/or to link multiple actions to the detected structures."  Cohen Decl., ¶ 129.  I disagree.  The patent specifically teaches linking to a detected structure "candidate actions" that a user would normally perform on that structure.  '647 Patent, 2:4-9 ("The present invention overcomes the limitations and deficiencies of previous systems with a system that identifies structures in computer data, *associates candidate actions with each detected structure*, enables the selection of an action, and automatically performs the selected action on the identified structure." (emphasis added)).   It is my opinion that at least as of the time of invention, it was novel to provide a system to detect multiple structures and associate with those structures different actions that are also tailored to those structures.  Further, one of skill in the art reading the patent would understand this novel limitation to require linking **multiple** candidate actions to each structure detected.  I find Dr. Cohen's unsupported obviousness statement particularly unpersuasive given the fact that the Patent Office has twice considered and allowed claim 1 and that the ITC also found claim 1 valid over various references, including Sidekick.

138.     Ultimately, Dr. Cohen's assessment of the Sidekick system, and specifically its Dialer functionality, ignores the fact that the '647 Patent inventors specifically informed the PTO about

prior art references similar to Sidekick by including in the body of the patent a discussion of the limited functionality of these systems.  '647 Patent at 1:52-65.  Indeed, the patentees gave the specific example of systems only able to detect telephone numbers, and only able to allow dialing of those numbers, as prior art systems over which they were inventing.  '647 Patent at 1:52-65.  The patent was therefore granted over background art that was functionally identical to Sidekick.[6]

### 4.    "a user interface enabling the selection of a detected structure and a linked action; and;"

139.    The Sidekick Dialer does not disclose a "user interface enabling the selection of a detected structure and a linked action."

140.    The "selection of a detected structure," as written in the claim limitation, necessarily requires that a particular detected structure can be chosen from a set of detected structures.  Sidekick, however, highlights only one structure at a time.  Cohen Decl., ¶ 131.  Should the user then hit an arrow key on his or her keyboard, Sidekick will detect the next structure, to the extent one exists in the document.  Cohen Decl., ¶ 131.  At no point does Sidekick allow a user to select from a multitude of detected structures.  This can be seen from the screenshot that Dr. Cohen relies upon in paragraph 131 of his declaration, wherein only one phone number has been identified by Sidekick and highlighted for the user, with no indication that Sidetrack has recognized, or will recognize, a second phone number appearing further down on the screen (beneath the name "John Smith"):

---

[6]  Notably, claims 1 and 8, among others, were recently reaffirmed in reexamination as well.

**Sidekick Screenshot**

141.     Thus, at any given time, the Sidekick system detects and selects only one telephone number, and chooses to present that number to the user.  Sidekick Handbook, at 30 ("If you have more than one number on the screen that looks like a phone number, the first one will be chosen."). This, again, is contrary to the teachings of the '647 Patent, in which multiple structures are detected, after which a user can choose any one on which to perform an operation via the user interface.  '647 Patent at 3:5-14 ("In a display-type environment, application program interface 230 retrieves the locations in document 210 of the presentation regions for the detected structures from application 167.  Application program interface 230 then transmits this location information to user interface 240, which highlights the detected structures, although other presentation mechanisms can be used. User interface 240 enables selection of an identified structure by making the presentation regions mouse-sensitive, i.e. aware when a mouse event such as mouse-down operation is performed while the cursor is over the region.").

142.     Similarly, Sidekick does not perform the claim limitation of a "user interface enabling the selection of . . . a linked action."  As with the selection of a detected structure, the selection of an action requires that there be a set of multiple actions from which to select.  When the Sidekick Dialer recognizes a telephone number, however, only a single operation – using the computer's modem to

make a telephone call to the number – is available.  Cohen Decl., ¶ 131 ("By pressing enter, the user selects the linked action for 'Dial.'").[7]  In addition, the '647 Patent teaches that when a user selects a portion of detected data, the system presents to the user a context menu of actions to perform on the data selected.  '647 Patent at 4:23-31 ("Upon selection of this structure, user interface 240 presents and enables selection of the linked candidate actions using any selection mechanism, such as a conventional pull-down or pop-up menu.")).  It is from that menu that a user will then be able to "select" a particular action.  Sidekick does not perform this functionality, but instead has a single menu that is persistently present to the user at the bottom of the screen when the Sidekick software is running, both before and after a particular phone number is highlighted.

### 5. "an action processor for performing the selected action linked to the selected structure; and;"

143.    Dr. Cohen essentially offers no reason for finding that Sidekick anticipates this claim limitation, stating only that the element is somehow "inherent" in Sidekick because "considering that the selected action was performed, it necessarily contained an element that performed the selected action".  (Cohen Decl., ¶ 132)  It is my opinion that the Sidekick system does not disclose "an action processor for performing the selected action linked to the selected structure" for at least the reason that the Sidekick system does not allow the performance of a "selected" linked action.  Instead, as discussed above, Sidekick allows only a single operation – calling a telephone number – to be performed relative to any information that has been highlighted in a document.  This is contrary to the teachings of the '647 Patent of presenting a menu of candidate actions to be performed on a specific type of data detected.  '647 Patent at 4:23-31 ("Upon selection of this structure, user interface 240 presents and enables selection of the linked candidate actions using any selection mechanism, such as a conventional pull-down or pop-up menu.").

---

[7]  As shown in the screenshot above, the user may also hit an arrow key to move to another number, if one can be identified by Sidekick, as well as hit other keys to bring up a "Help" menu, visit a general telephone directory, or exit the program.  However, none of these are actions that can be said to be "linked" to a particular detected "structure", or phone number.

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          55

### 6.   "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines."

144.     It is my opinion that the Sidekick system does not disclose "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines" for at least the reason that the Sidekick system does not include the claimed program routines for the reasons described above.  Dr. Cohen does not address this infirmity, claiming only that because "Sidekick ran on IBM PC computers," "[a] processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines would necessarily have been present."  Cohen Decl., ¶ 133.

### 7.   <u>Claim 8</u>: "The system recited in claim 1, wherein the user interface highlights detected structures."

145.     It is my opinion that the Sidekick Handbook does not disclose claim 8 for at least the reason it does not disclose each element of claim 1, as discussed in detail above.  Further, the Sidekick system does not highlight a set of "detected structures", but instead only ever highlights a single structure (a phone number), and prompts the user to command the system to find the next structure (if one exists).  Where there are multiple structures in a document, claim 8 requires highlighting of those structures.  In my opinion, searching for one structure at a time, and highlighting a single structure at a time, does not meet this limitation.

### B.   Claims 1 and 8 Are Not Anticipated by Nor Rendered Obvious by Newton

146.     I disagree with Dr. Cohen's opinion that the *Newton Programmer's Guide* ("Newton") discloses each limitation of claims 1 and 8 of the '647 Patent.  Dr. Cohen in particular calls out the Newton Intelligent Assistant, which, he claims, "recognized words input by the user and presented possible actions for the user to take based on the detected word."  Cohen Decl., ¶ 136.  I disagree with Dr. Cohen.  It is my opinion that the New Intelligent Assistant, and the technology disclosed in the *New Programmer's Guide* more generally, do not anticipate or render obvious claims 1 and 8 of the '647 Patent.

147.     According to Dr. Cohen, the Newton Intelligent Assistant "attempts to complete actions for the user according to deductions it makes about the task that the user is currently

performing." Cohen Decl., Exhibit PP (Newton), at 1-9. He asserts that it does so, in part, by requiring the user to write certain verbs, such as "call," "phone," "ring," or "dial." Cohen Decl., Exhibit PP (Newton), at 1-10. This feature of, the Newton Intelligent Assistant is cumulative of command-line interpreters that allowed the user to specify a command to take and a target of that command, which interpreters were considered during prosecution of the '647 patent.

148.    During prosecution of the '647 patent, for instance, the PTO considered a reference similar to Newton's Intelligent Assistant, U.S. Patent No. 5,115,390 (the "'390 patent."). As explained in its abstract, the '390 patent discloses parsing "words of a natural language representing a plurality of control commands" so that the control commands can then be executed. '390 patent, abst. One example of the inputted natural language understood by the '390 Patent is "RECORD FROM 5 O'CLOCK IN AFTERNOON OF TODAY DURING 8 MINUTES." '390 Patent, at 4:32-34. Thus, the '390 patent is similar to the Newton Intelligent Assistant in that each evaluates text containing *a command from the user* and performs the interpreted command. Although the examiner found the '390 patent "pertinent" to the '647 application, he did not use the '390 patent to support any rejections of the pending claims. Ex. 7, at 4.

      **1.**   **Claim 1: "A computer-based system for detecting structures in data and performing actions on detected structures:"**

149.    As stated above, it is my opinion that the preamble of claim 1 is not a limitation of the claim. Even if the preamble is considered a limitation, the Newton "system" does not comprise "[a] computer-based system for detecting structures in data and performing actions on detected structures." As the '647 Patent makes clear, the term "structure" means "an instantiation of a pattern in the document," where a "pattern" "refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document, such as dates, addresses, phone numbers, names, etc." '647 Patent, 1:27-32. As I explain in more detail below, Dr. Cohen has not shown that the Newton system performs "actions" on "detected structures". In particular, the Newton system does not disclose causing a CPU to perform a sequence of operations on a detected

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          57

structure to which it is linked. *See* '647 Patent, 2:31-34 ("Each action is a computer subroutine that causes the CPU to perform a sequence of operations on the particular structure to which it is linked.")

> **2.** **"an input device for receiving data;**
> **an output device for presenting the data;**
> **a memory storing information including program routines including;"**

150.     For the reasons described below with respect to claim limitations (c) through (e), the Newton system does not disclose "a memory storing information including program routines . . .," for at least the reason that the Newton system does not disclose the claimed program routines.

> **3.** **"an analyzer server for detecting structures in the data, and for linking**
> **actions to the detected structures;"**

151.     It is my opinion that the Newton system does not disclose "an analyzer server for detecting structures in the data, and for linking actions to the detected structures."

152.     Dr. Cohen contends that the Newton Intelligent Assistant recognizes "structures," such as "Call" and "Bob," and then presents a menu of "action that could be taken on the phone number associated with 'Bob'." Cohen Decl., ¶ 144.  However, while the Newton Intelligent Assistant will recognize a small set of verbs, it does not link actions to any detected structures within the meaning of the '647 Patent.  Instead, the Intelligent Assistant "attempts to complete a task specified by the user." Cohen Decl., ¶ 146 (citing Newton, at 11-2.)  It does so by requiring the user to enter a verb, such as "call" or "fax," and then pressing a button marked "Assist" on the device running the Newton operating system.  Cohen Decl., ¶¶ 144-46; Newton, at 1-9-10.  If the user does not provide a verb that the Intelligent Assistant understands, the Intelligent Assistant requires them to pick one.  Cohen Decl., ¶ 146 (citing Newton, at 11-2.)  In this way, Newton's Intelligent Assistant is much like a command-line interpreter, or a program that is designed simply to read lines of text entered by a user. This is not the functionality disclosed in the '647 Patent.

153.     Dr. Cohen identifies only two user inputs that supposedly evidence an "analyzer server" for detecting structures in the data, and for linking actions to the detected structures: (1) "Call Bob," and (2) "Fax Bob."  Cohen Decl., ¶¶ 144-45.

154.     These two scenarios identified by Dr. Cohen are similar to each other – in each, the user has specified the verb to perform.  Dr. Cohen contends that "after detecting the words 'Call' and 'Bob,' the Newton Intelligent Assistant would present a menu of actions that could be taken on the phone number associated with 'Bob,' including dialing the number as well as other 'options.'" Cohen Decl., ¶ 144.  Dr. Cohen thus asserts that this constitutes "detecting structures in the data, and for linking actions to the detected structures."  He uses the same reasoning for a scenario involving the user's input of the commands "fax" and "Bob".  *See* Cohen Decl., ¶ 145.  However, neither the call function nor the fax function links "actions" to "detected structures".

155.     By writing "Call Bob" and hitting the "Assist" button, the user instructs the Intelligent Assistant to display the following call slip:



**Newton Screenshot.  Cohen Decl., ¶ 144.**

Through these user actions the Intelligent Assistant provides a menu that allows the user to place a phone call.

156.     When prompted with the menu, the user can select certain "Options" before placing the call or cancelling out of the call (by pressing the "X" button).  Dr. Cohen erroneously contends that these are linked actions that the user can select.  Cohen Decl., ¶ 144.  However, even assuming that the words "Call" and "Bob" are detected structures (I do not agree that they are given that they are commands input by the user), neither the "Options" nor the "Call" buttons are actions linked to those supposedly detected structures.  The "Options" button merely allows the user to set certain options for the phone call, such as entering a country code or calling card number, while the "Call" button performs the phone call.

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          59

157.     Similarly, after writing "Fax Bob" and hitting the "Assist" button, the Intelligent Assistant will display the following screen:



**Newton Screenshot, Cohen Decl., ¶ 145.**

158.     Here there are four buttons:  "Preview," "Notes," "Options," and "Fax."  The "Preview" button shows the user a preview of the item that will be faxed.  The "Notes" button lets the user write a cover sheet for the fax.  The "Options" button allows the user to set certain options, and the "Fax" button performs the fax.  Just like the call menu, none of these buttons represent actions linked to the allegedly detected structures "Fax" or "Bob."

159.     Dr. Cohen relies on the claim constructions issued by both the ITC and Judge Posner to argue that the above process discloses "linking actions to the detected structures."  However, both constructions require that a linked action must at least cause the CPU to perform a sequence of operations ***on*** the structure to which it is linked."  Cohen Decl., ¶¶ 149-50 (The ITC construed "linking actions to the detected structures" as "linking detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are linked," while Judge Posner's construction was "creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on that detected structure").  Dr. Cohen contends that, in the above examples, the detected structures are "Call," "Fax," and "Bob."  Putting aside, again, the important fact that these are commands input by the user, not structures detected by the system, the "actions" identified by Dr. Cohen do not cause the CPU to perform a sequence of operations on "Call," "Fax," or "Bob."  For example, the "Call" button in the call slip would not cause the Newton to dial the word "Bob" but

would instead call a **number**.  Likewise, the "Options" button is not linked – as required by the claim – to the words "Bob" or "Call" nor does it cause a sequence of operations to be performed on those words.  Nor would the "Fax" button in the fax slip cause the CPU to perform a sequence of operations on "fax" or "Bob."

160.    Finally, under the two examples identified by Dr. Cohen, the Newton "system" does not disclose an analyzer server for linking actions to the detected structures because, even assuming Netwon did link an action, it did not link more than one action to a detected structure as required by claim 1.

### 4.    "a user interface enabling the selection of a detected structure and a linked action; and;"

161.    It is my opinion that Newton does not disclose a user interface enabling the selection of a detected structure and a linked action for at least the reason that it does not disclose linking actions to detected structures, as explained above.  For example, neither the call menu nor the fax menu enable the selection of a linked action that causes the CPU to perform a sequence of operations on the structure to which it is linked.

162.    In addition, Newton does not disclose enabling the selection of a detected structure.  In the examples above, the Intelligent Assistant was not activated unless the user hit the "Assist" button, at which point the Intelligent Assistant would retrieve any text the user recently wrote.  Cohen Decl., ¶ 144.  Even assuming that the Intelligent Assistant detected structures in this text, at no point did it allow the user to "select" a detected structure.  At most, if the Assistant does not understand a particular command entered by the user, it will prompt the user to resolve the ambiguity.  *See* Cohen Decl., ¶ 151 (citing Newton at 11-2) ("The task slip is one means by which the Assistant resolves ambiguity – for example, the user can correct the task slip if the Assistant chooses the wrong Bob from the Names soup, or the user can write Bob's fax number on the slip.")  Asking a user to clarify which person he or she intended to contact (i.e., which entry might pertain to the single word, "Bob") is clearly not the same as "enabling the selection of a detected structure" among multiple detected structures, pulled from the text of a document, as taught by the '647 patent.

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          61

### 5. "an action processor for performing the selected action linked to the selected structure; and;"

163.     The Newton system does not practice "performing the selected action linked to the selected structure" for at least the reasons described above that it does not disclose linking actions to the detected structures or selecting a linked action.

### 6. "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines."

164.     It is my opinion that the Newton system does not disclose "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines" for at least the reason that the Newton system does not disclose the claimed program routines for the reasons described above relating to claim elements (c) through (e).  Consequently, Dr. Cohen has failed to show that the Newton system discloses this limitation of Claim 1.

### 7. Claim 8: "The system recited in claim 1, wherein the user interface highlights detected structures."

165.     It is my opinion that the Newton system does not practice claim 8 for at least the reason that it does not practice claim 1, as described above.

166.     In addition, the Newton system does not practice claim 8 as it does not "highlight[] detected structures."  Dr. Cohen contends that Newton highlights structures by placing the allegedly-detected structures into a "task slip view" (in other words, a simple dialog box).  Cohen Decl., ¶ 154. However, the plain meaning of "highlights" is not satisfied by copying a word or words into a separate dialog box.

### C. Claims 1 and 8 Are Not Anticipated By Nor Rendered Obvious By Pensoft Perspective

167.     As explained in greater detail below, I have reviewed the source code to the Pensoft Perspective system software, which came in two versions, Personal and Business, and I have used the PenPoint operating system ("OS") on AT&T's EO Personal Communicator versions 440 and 880.  I have also reviewed the materials submitted by Michael Schaffer.  Based on my review of the materials, as well as my personal experience with Pensoft Perspective, I believe that it neither

1    anticipates nor renders obvious claims 1 and 8 of the '647 Patent, and Dr. Cohen has failed to show

2    otherwise.

3        168.      At the outset, I note that the ITC has already ruled that the Pensoft Perspective system

4    does not render claims 1 or 8 invalid.  Mowry Decl., Ex. 16 (Commission Opinion), at 29.  Dr. Cohen

5    attempts to sidestep this point by claiming that the ITC's determination would have been different

6    had the ITC employed Judge Posner's claim construction for "linking actions to the detected

7    structures."  Cohen Decl., ¶ 158.  Specifically, Dr. Cohen claims that the ITC found the claims valid

8    because Pensoft Perspective was not found to link each detected structure to more than one action,

9    whereas Judge Posner's claim construction order states that "linking" requires "creating a specified

10   connection between each detected structure and at least one computer subroutine . . . ."  Cohen Decl.,

11   ¶ 158.  There are two problems with Dr. Cohen's argument.

12       169.      Dr. Cohen's application of Judge Posner's construction fails to account for the

13   differences between '647 claims 1 and 15.  Whereas claim 1 states "an analyzer server for detecting

14   structures in the data, and for <u>linking actions</u> to the detected structures," claim 15 requires "<u>linking at

15   least one action</u> to the detected structure."  In other words, claim 15 states "at least one action," while

16   claim 1 requires "linking actions" – plural.  Dr. Cohen ignores Judge Posner's further admonition that

17   "the ability to link a structure to a single action still comports with the patent's plural reference, ***so

18   long as other structures are linked to other actions***."  Ex. 2, at 10-11 (emphasis added).  Clearly,

19   Judge Posner recognized that claim 1, unlike claim 15, requires linking multiple actions.  Contrary to

20   claim1's requirement, the Pensoft system includes only one "action" that is arguably "linked" to any

21   piece of data in a document – the opening of a profile associated with a name.  *See* Cohen Decl.,

22   ¶ 162 ("The Associate links everything back to a Names Item Profile."); Mowry Decl., Ex. 16

23   (Commission Opinion), at 28 ("Perspective's automatic linking necessarily results in linking to one

24   action – pulling up the contact information for that contact.")   Although I disagree that this single

25   action is "linked" to a particular detected structure in the sense of the '647 Patent, even accepting that

26   fact it still does not anticipate under even Judge Posner's construction because under these

27   circumstances, Pensoft does not disclose "other structures . . . linked to other actions".

28   REPLY EXPERT DECLARATION OF DR .TODD C.
     MOWRY CONCERNING U.S. PATENT NO.
     5,946,647 – CASE NO. 12-cv-0630-LHK         63

170.     Dr. Cohen's opinion on the Perspective software focuses largely on its "Associate" feature, which is, unlike the system claimed in the '647 patent, a database organizer. The Perspective software program can "associate" a proper name, such as "Bob", to a profile for Bob that exists in a "ProfileBook" application. (Cohen Decl., Exhibit C, at 4.) In other words, it simply associates information with a name, in, for example, an index of names. Although it creates this association, Perspective does not perform any operations or actions on detected names themselves as claim 1 requires. Further, in some cases Perspective does not even detect a name, but instead detects saved user-specified operators such as "meet" or "call." Dr. Cohen has not described any scenario in which the Perspective software performs linked actions on detected structures, as those terms are used in the '647 patent.

171.     Dr. Cohen uses four references to define what he calls the Perspective system, namely, PENSOFT CORPORATION, PERSPECTIVE HANDBOOK (1992) ("Perspective Handbook"), "Lookup Guide To the EO Personal Communicator" (1992, 1993) ("Lookup Guide"), the "AT&T EO Travel Guide" ("EO Travel Guide"), and the Perspective source code. Cohen Decl., ¶ 157. I have not only reviewed these materials, but I also personally operated an EO Communicator model 440 running Personal Perspective, an EO Communicator model 440 running the Perspective Business Edition, and an EO Communicator model 880 running Personal Perspective. As I explain below, neither individually nor collectively do these materials demonstrate that either the Personal or the Business Editions of Perspective anticipate claims 1 and 8 of the '647 patent.

        **1.**     **Claim 1: "A computer-based system for detecting structures in data and performing actions on detected structures, comprising:"**

172.     As I stated above, it is my opinion that the preamble of claim 1 is not a limitation of the claim. Even if the preamble is considered a limitation, Dr. Cohen has not shown that the Perspective software discloses a computer-based system for performing actions on detected structures.

173.     Dr. Cohen identifies three examples of the Perspective software supposedly performing detection and linking actions. In one example, the Perspective software purportedly

detects when a user writes a name that is also saved in a profile and then allows the user to perform operations, such as opening that profile or dialing a related telephone number.  Cohen Decl., ¶ 173-74.   In another example, Dr. Cohen asserts that the Perspective software purportedly recognizes dates, but he does not explain what action the user can select after selecting a particular date in a document.  Cohen Decl. ¶ 173-74.  Finally, Dr. Cohen claims that Perspective can also detect "a set of recognized verbs," as structures.  Cohen Decl., ¶ 173.  None of these examples however, disclose "detecting structures in data and performing actions on detected structures," as discussed in more detail under claim element (c) below.

### 2.     "a memory storing information including program routines including"

174.     As described below with regards to at least elements (c)-(e) of claim 1, the Perspective software does not practice or disclose "a memory storing information including program routines . . ." for at least the reason that Perspective does not contain the claimed program routines.

### 3.     "an analyzer server for detecting structures in the data, and for linking actions to the detected structures"

175.     Perspective does not practice or disclose this element of claim 1 at least because the Perspective software does not link *detected structures* (whether names, dates, or otherwise) to a particular operation or even a user profile; instead, the Perspective software links only the screen area in which a name appears to, e.g., a profile entry in an address book.  In addition, the only connection between this screen area and the profile entry is an integer index number: at no point are the actual characters in the name used to retrieve a profile (as I will demonstrate below through a scenario where double-tapping on an area of the screen that says "Bob" results in opening a profile not for the only "Bob" in the system, but rather for "Amy").

176.     Dr. Cohen contends that Perspective detects "structures such as proper names, dates, and a set of recognized verbs" (e.g., "call" and "meet") and that "[u]pon detecting names and dates, the Associate links actions," to them, such as "opening the profile associated with the . . . name."  Cohen Decl., ¶¶ 173-174.  Opening of a profile through Perspective, however, is not an "action" that is "link[ed] . . . to the detected structures," i.e., names, dates, or even verbs, as is required by this

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK                    65

claim element.[8]   This is no different than opening a contact, i.e., name, address, phone number, saved in Microsoft Outlook – no action is offered or performed when the contact is opened; rather, the information saved in the contact is merely displayed to the user.

177.     Dr. Cohen further asserts that "when a proper name is detected and only one profile exists with the same proper name, the Associate will automatically associate the detected name with that profile. . . . Perspective discloses that the Associate links the detected name with the action of opening the profile associated with the detected name." Cohen Decl., ¶ 174.  However, as explained below, to the extent Perspective creates any links to operations such as opening a profile, or dialing a phone number as Dr. Cohen elsewhere asserts (Cohen Decl., ¶ 175), these links are ***not to the actual name written by the user, but rather they simply associate a profile entry index to an area of the screen on the device running Perspective***.  As the example I provide below demonstrates, utilizing a particular area of a device's screen is not the same a "detected structure" within the meaning of the '647 Patent, given that the characters of the name are never actually used in any way during the course of the alleged actions.  This fact regarding Perspective's operation is a critical flaw in Dr. Cohen's analysis, and eliminates Perspective's challenge to the '647 Patent's validity.

178.     I was able to confirm the above during my own use of the EO Communicator running Perspective software.  In my demonstration, I first created user profiles in Perspective's database for two friends: Bob Jones, whose telephone number is (111) 111-1111, and Bob Wilson, whose telephone number is (222) 222-2222, as seen in the screenshots below:

---

[8]   In addition the reasons for which I disagree with Dr. Cohen as set out below, I note the Perspective software does not even recognize all proper names; instead, it recognizes only character strings appearing in data that match character strings that a user has entered into a database – an address book – on the device.  *See* Cohen Declaration, Exhibit C, at 4 ("If you are scheduling a meeting with someone named Bob and enter 'Bob,' into an Appointment profile, the Associate will look at all of the people named Bob in your Address Book. . . . If the Associate can not find a profile to link, it will ask if you want to create a new one.").

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK                66

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19 **Creating an address book profile in Perspective for "Bob Jones", whose telephone
20 number is "(111) 111-1111."**

21
22
23
24
25
26
27
28

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          67



**Creating an address book profile in Perspective for "Bob Wilson," whose telephone number is "(222) 222-2222."**

179.    I then created a calendar appointment in Perspective in which I entered "Bob", as shown below, and directed the Perspective Associate to link this appointment to Bob Jones' profile.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Creating a calendar entry in Perspective for "Bob"**

180.     Next, as seen in the following screenshots, I went to the "J" tab in the address book to find Bob Jones' profile, and I opened it directly.  I tapped on the name in the profile (i.e., "Bob Jones"), pressed the "Clear" button, and entered the name "Amy Smith":

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18



**Opening Bob Jones' address book profile in Perspective**

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



**Editing the name associated with Bob Jones' address book profile
so that the name is instead "Amy Smith."**

181.    I then tapped on the phone number, pressed the "Clear" button to erase the number

(i.e., (111) 111-1111), and entered Amy Smith's phone number: (333) 333-3333:

18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17

**Editing the phone number originally associated with Bob Jones' address book profile to instead match the phone number for Amy Smith: "(333) 333-3333."**

18

19    182.    After I saved these changes, the address book contained profiles for Amy Smith and

20    Bob Wilson with their correct telephone numbers, but contained no profile for Bob Jones.  After

21    performing the operations described above, I then returned to the calendar entry that I created earlier

22    with the letters "Bob", which were still bolded.  I then performed each of the gestures described by

23    Dr. Cohen in paragraphs 174-75 of his Declaration (i.e., a double-tap and a "D"-shaped gesture).

24    183.    According to Dr. Cohen, "[w]hen a user performs a 'double tap' gesture over the

25    bolded name, the associated profile is opened."  Cohen Decl., ¶ 174.  However, *when I performed*

26    *the double-tap gesture over "Bob", Perspective displayed Amy Smith's profile*, showing the name as

27    "Amy Smith" and the phone number as "(333) 333-3333", as seen in the screenshots below:

28

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          72



**Double-tapping on the area of the calendar screen in which "Bob" appears**

**Following the double-tapping shown above, Perspective displays
the address book profile for "Amy Smith", instead of "Bob Jones."**

184.     Similarly, Dr. Cohen contends that "[t]he 'D' gesture initiates the phone dialer action *on the linked structure* by looking up the associated information in the Profilebook, finding the phone number for associated profile and bringing up the phone dialog with the option of calling the profile's phone number."  Cohen Decl., ¶ 175.  However, as shown in the screenshots below, ***when I performed the "D" gesture over "Bob" in the calendar entry, Perspective displayed the phone dialer with Amy Smith's phone number***, i.e., (333) 333-3333 (displayed as "1333333-3333").  It did not initiate the dialer using either Bob Jones' phone number or even Bob Wilson's phone number.

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          74

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Drawing a "D" gesture over the name "Bob" on Perspective's calendar screen.**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Following the drawing of a "D" gesture over "Bob,"**
**Perspective opens an address book profile.**

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          76

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Following the drawing of a "D" gesture over "Bob", Perspective displays the phone number for Amy Jones ("1333333-3333") as opposed to the phone number of either Bob Jones (which has been deleted) or even Bob Wilson (whose information remains in Perspective's address book).**

185.    Thus, as shown by my operation of Perspective software, the purportedly "detected structure" in this instance, the proper name "Bob," was ***not*** used to link to a profile – instead, profiles were linked only to a particular area of the device's screen (which at various points in my demonstration included "Bob" or "Amy").  Despite the fact that the name "Bob" was still displayed in this screen area, the device presented a profile for "Amy" where the profile had been changed to include only her information.

186.     Dr. Cohen's failure to understand that the Perspective software utilize location on the screen, rather than a structure, i.e., "a pattern in the document" ('647 patent, 1:32-33), conflicts with the teaching of the patent, which states, for example, that an "[a]ction processor 250 retrieves the sequence of operations that constitute the selected action, and performs the sequence *using the selected structure as the object of the selected action*." ' 647Patent, 4:54-57.  In my demonstration, Perspective did not use the alleged structure, "Bob," as the object to either open a profile entry in an address book or dial a phone number.   If Perspective used the pattern of characters "Bob" to look up a profile for "Bob" when the user performed the double-tap gesture over "Bob" in the calendar appointment, then Perspective should have displayed the profile for Bob Wilson, who was the only "Bob" in the address book at that point.  Instead, Perspective displayed neither the profile for Bob Wilson nor Bob Jones, but rather the profile information for Amy Smith.  The same is true with respect to the dialer operations initiated by making a "D" gesture on the device running Perspective. The fact that Perspective behaves the way that it does in both of these scenarios proves that Perspective does not perform linked actions based on structures as claimed in the '647 patent.

187.     Thus, contrary to Dr. Cohen's assertions at paragraph 175 of his report, Perspective does *not* allow a user to perform actions on the information (structure) that is detected (e.g., "Bob"). Instead, the user's double tap using the PenPoint Perspective software's Associate with the EO Communicator performs a function based on the location of the screen.

188.     Further, instead of a "linked action" occurring when I performed a double tap on the name "Bob," Perspective merely displayed a linked profile, which, again, was linked simply to the screen area in which "Bob" appeared, and not to the actual data.  This association of an area on the screen with a database entry corresponding to a certain contact is significantly different from the performance of actions on a detected structure, as disclosed in the '647 patent.

189.     The Perspective software therefore does not disclose an "analyzer server" for "linking actions to the detected structures" because no actions are actually linked to any structures being detected in a document.

1      190.      Finally, to the extent Dr. Cohen or Samsung argue that the "link[ed] actions" present

2 in the Perspective system include the acts of either double-tapping on the screen or performing a "D"

3 gesture, such gestures are not "actions" within the meaning of the '647 Patent because they are not

4 computer subroutines. *See* 647' Patent, 2:31-34 ("Each action is a computer subroutine that causes

5 the CPU to perform a sequence of operations on the particular structure to which it is linked.")[9]

6            **4.     "a user interface enabling the selection of a detected structure and a linked action;"**

7

8      191.      It is my opinion that the Perspective software does not disclose a "user interface

9 enabling the selection of a detected structure and a linked action."

10      192.      Dr. Cohen alleges that the ability to write gestures over a name (such as a double-tap

11 on a name to open a profile, or a "D" gesture on a name to open a dialer with a telephone number)

12 constitutes the selection of both a "detected structure" and a "linked action".  Cohen Decl., ¶¶ 188

13 ("Each of these gestures both selects the detected structure and the appropriate linked action (e.g.,

14 either initiating a phone call or calling up the profile.).").  I disagree because (1) the user interface

15 does not actually enable the "selection of a detected structure", (2) the user interface does not actually

16 enable the "selection of . . . a linked action," and (3) because performing gestures does not constitute

17 "selection of . . . a linked action".

18      193.      First, as discussed above with respect to claim element (c), the structure that Dr.

19 Cohen alleges Perspective detects (e.g., a proper name like "Bob") is not actually used to perform an

20 operation specified by the user.  This is illustrated by my example above: Amy Smith's profile

21 information – not Bob's information – appeared when I double-tapped on "Bob" during my above

22

23     ───────────────────

24 [9]  I note that the Administrative Law Judge in the prior ITC action involving the '647 Patent reached these same conclusions.  *See* [[Mowry Declaration, Exhibit 15, Initial Determination, at 167-68]] ("HTC alleges that in Perspective the detected structure is the text "Bob" and the "double-tap" and "D" gestures invoke linked actions.  But neither of these gestures links actions or is itself an action linked to the text Bob because (1) they are simply gestures and not computer subroutines and (2) neither gesture invokes code that is associated with or operates on the text "Bob." . . . Both operations invoke the database record number at the location of the gesture without knowledge of or performing operations on the detected name.").

25

26

27

28 REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK       79

demonstration.  Similarly, when I made a "D" gesture over "Bob," Amy Smith's phone number – not Bob's phone number – appeared in Perspective's dialer window.  A user of Perspective is therefore unable to "select" the "structure" that Dr. Cohen alleges would be "detected", e.g., "Bob".  Instead, the integer that was stored with the location on the screen in which "Bob" appeared is what actually was being used by Perspective to blindly retrieve a profile or initiate a dialer operation, regardless of whether that profile or phone number had anything to do with the original information displayed.  As a result, the act of making either a double-tap or "D" gesture on the screen does not constitute a "selection" of a particular "detected structure" and a corresponding "linked action".

194.     Second, the "user interface" identified by Dr. Cohen – the screen on which a user may perform a gesture such as double-tapping or drawing a "D" (*see* Cohen Decl., ¶ 188) – never actually displays potential selections for linked candidate actions, as described in the '647 Patent.  As the Patent discloses, "[u]pon selection of [a detected] structure, user interface 240 ***presents*** and enables selection of the linked candidate actions using any selection mechanism, such as a conventional pull-down or pop-up menu." '647 patent, 4:27-31 (emphasis added).  Even in embodiments described in the '647 Patent that are not visually based (which Perspective clearly is), the user interface still "***present[s]*** the structures ***and associated actions*** to the user" using, e.g., voice synthesis. '647 patent, 4:34-38 (emphases added).  Thus, Perspective does not disclose a "user interface" that "enable[es] the selection of . . . a linked action" in a manner disclosed in the '647 patent.

195.     Third, Dr. Cohen's opinion conflicts with the meaning of the term "selected".  The plain and ordinary language of the limitation "user interface enabling the selection of a detected structure and a linked action" requires that the user interface enable the *independent* selection of a detected structure and a linked action.  This selection must be separate because the system of the '647 Patent links candidate actions that are specifically customized to the type of data that has been detected (e.g., a "Dial" action may be unique to detecting a telephone number, a "Navigate to" option may be unique to detecting a postal address, etc.).  The selection of the structure must therefore be performed first, before the user interface of the '647 patent can present to the user candidate actions to perform using the selected structure.  As described in the '647 Patent:

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK                80

1

> "Referring also to FIG. 9, . . . if a request is received 920, the actions linked in block 825 are displayed 930. This request for display of candidate actions can be performed using a selection mechanism, such as a mouse-down operation over a detected structure, **which causes the candidate actions linked to the structure to be displayed 930**. Display 930 of candidate actions may be implemented using a pop-up menu, although alternative presentation mechanisms can be used such as pull-down menus, dialog boxes and voice synthesizers."

'647 Patent, 6:9-25 (emphasis added).  *See also* '647 Patent, 4:27-31 (noting that only "[u]pon selection of [a detected] structure," does the "user interface 240 present[] and enable[] selection of the linked candidate actions").

196.     As shown above, Dr. Cohen wrongly assumes that a detected structure and a linked action can be "selected" simultaneously via the performance of one of two gestures on a screen.  This does not comport with the asserted claims of the '647 Patent.

### 5.    "an action processor for performing the selected action linked to the selected structure;"

197.     It is my opinion that the Perspective system does not disclose "an action processor for performing the selected action linked to the selected structure."

198.     As the '647 Patent makes clear, a detected structure must be linked to an action, i.e., "a computer subroutine that causes the CPU to perform a sequence of operations **on the particular structure to which it is linked**."  '647 Patent, 2:31-34 (emphasis added).  In paragraph 191 of his report, Dr. Cohen states that "the action processor is the code that performs the selected action of opening the profile **associated with** the detected structure (based on the double-tap), and the selected action of opening the dialer application for dialing the phone number (based on the 'D' gesture)." (Emphasis added).  The difference in wording between Dr. Cohen's statement and the '647 Patent's language mentioned above is significant.  To the extent Perspective detects a structure (e.g., a proper name such as "Bob"), a linked action must be performed on that structure – not on other data or information that might be "associated" with the structure, in Dr. Cohen's parlance.  Yet as my demonstration above showed, Perspective does not perform operations on a detected structure itself; rather, it performs operations on an area of the screen in which the detected structure appeared.  This leads to the situation in which the operations performed by Perspective may not even be "associated",

in Dr. Cohen's loose terminology, in any way with the detected structure, such as in my example where performing a gesture over the structure "Bob" performed operations using entirely unrelated information concerning Amy.  Thus, Dr. Cohen's interpretation of this claim element is not only incorrect as a matter of the plain language of the patent, but also incapable of describing the actual operation of the Perspective system.  Hence it is my opinion that the code to which Dr. Cohen refers is not an "action processor for performing the selected action linked to the selected structure."

>**6.** **"a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines."**

199.    It is my opinion that the Perspective system does not disclose "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines" for at least the reason that Perspective does not include the claimed program routines for the reasons described above in subsections (c) through (e).  Consequently, Dr. Cohen has failed to show that the Perspective software discloses this limitation of claim 1.

>**7.** **Claim 8: "The system recited in Claim 1, wherein the user interface highlights detected structures."**

200.    It is my opinion that the Perspective software does not disclose claim 8 for at least the reason that it does not disclose claim 1, as described above.

>**D.** **Claims 1 and 8 are Not Anticipated By Nor Rendered Obvious by Pandit**

201.    Dr. Cohen asserts that U.S. Patent No. 5,859,636, naming Milind S. Pandit as inventor, (the "'636 Patent", or "Pandit") anticipates claims 1 and 8 of the '647 patent.  The '636 Patent was filed on December 27, 1995, only 5 weeks before the '647 patent.

202.    Based on a declaration submitted in reexamination, the Patent Office found that the inventors and conceived and reduced to practice the claimed invention before Pandit's priority date. *See* Exs. 4;6, at 3-6.  The ITC also found that the inventors and conceived and reduced to practice the claimed invention before Pandit's priority date.  *See* Mowry Decl., Ex. 15 (Initial Determination), at 179; *see also* Ex. 9 (claim chart submitted in the '710 Investigation showing conceptions and reduction to practice).

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          82

203.     As both the Patent Office and the ITC found, the inventors of the '647 patent conceived and reduced to practice their claimed invention well before the filing of the '636 patent, and, as such, concluded that the '636 patent is not prior art to the '647 patent.  Based on the facts that I have reviewed, and my understanding of the law, I agree with this conclusion.

204.     It is also my opinion that the '636 patent does not anticipate claims 1 and 8 of the '647 patent as described in detail below.

> **1.     Claim 1: "A computer-based system for detecting structures in data and performing actions on detected structures, comprising:"**

205.     As I stated above, it is my opinion that the preamble of claim 1 is not a limitation of the claim.  Even if the preamble is considered a limitation, Pandit does not comprise "[a] computer-based system for detecting structures in data and performing actions on detected structures."   As the '647 Patent states, the term "structure" means "an instantiation of a pattern in the document," where a "'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc." ('647 Patent, 1:24-32.)  As I explain below, Dr. Cohen has not shown that Pandit discloses detecting, i.e., finding and identifying, "structures".  In fact, Pandit requires the user to manually locate and accent text that the user wishes to act upon.  Because Pandit does not disclose detecting structures, it also does not disclose performing actions on detected structures.

> **2.     "an input device for receiving data;
> an output device for presenting the data;
> a memory storing information including program routines including"**

206.     As I explain in my discussion of claim elements (c), (d) and (e), Pandit does not disclose "a memory storing information including program routines . . ." because it lacks, at least, "program routines."

> **3.     "an analyzer server for detecting structures in the data, and for linking actions to the detected structures;"**

207.     Pandit does not disclose "an analyzer server for detecting structures in the data, and for linking actions to the detected structures."

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          83

1

208.      First, Pandit does not disclose "detecting structures in the data".  Rather, than detect

structures, Pandit teaches that a user must manually find text that may contain a structure.  Indeed,

Pandit repeatedly states that the user must "accent," i.e., find/select, the relevant text **before** the

system operates on that piece of text.  *See, e.g.*, '636 Patent, 2:5-8 ("a date 11 in text appearing on a

video monitor is **accented** (step 21 of FIG. 2) *for example by shading, underlining or pointing to

and clicking on the text*.  The invention recognizes the accented text . . . .") (emphasis added); cl. 1

("A computer-implemented method for processing a selected text, comprising the steps of: (a)

recognizing the selected text as belonging to . . .").)  Figure 2 of Pandit further makes clear that the

user must **first** manually select a piece of text before any potential recognition occurs:



**Fig. 2 of Pandit.**

209.      In one of the examples, the '636 patent similarly explains that the user must manually

find and "accent" otherwise undetected text, as opposed to computer program routines finding and

identifying instances of a pattern that have semantic significance:

> "In a preferred embodiment, ***in the event the accented text is not recognized***, i.e., the
> text is not of the specific type or class recognizable by any of the libraries provided, a
> menu bar having a list of one or more menu names of default operations can be made
> to appear (step 27)."

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          84

'636 Patent, 3:23-27 (emphasis added).

210.     Pandit also consistently states that the system attempts to recognize "*the* accented text," not structures *within* the accented text.  '636 patent, 2:8 (emphasis added); *see also* '636 patent, 2:33-35 ("The pull-down menus provided by the invention identify the operations and/or programs which relate to the class of text accented, highlighted, or otherwise indicated."); 3:23-27 ("in the event the accented text is not recognized, i.e., the text is not of the specific type or class recognizable by any of the libraries provided . . .); cl. 1 ("recognizing the selected text as belonging to a predetermined class . . ."); Figs. 1a-f.

211.     Pandit therefore teaches a computer-based method that requires, as input, text that has been manually selected by a user.  '636 Patent, claim 1 ("A computer-implemented method for processing *selected* text . . .") (emphasis added).  This is precisely the type of background art that the '647 Patent teaches over.  '647 Patent, 1:19-22 ("visually searching data files or documents to find these structures is laborious and cognitively disruptive, especially if the document is lengthy and hard to follow.").

212.     By contrast, "detecting" as taught by the '647 Patent involves an analyzer server that automatically locates structures within a body of text.  *See, e.g.*, '647 Patent, 3:61-64 ("Analyzer server 220 comprises one or more pattern analysis units, such as a parser and grammars or a fast string search function and dictionaries, which uses patterns to parse document 210 for recognizable structures.")  Because Pandit does not disclose automatically finding structures within data, the patent does not disclose "detecting structures".

213.     Additionally, Pandit does not disclose "detecting *structures* [i.e., more than one structure] in the data."  The plain and ordinary meaning of "structures" in claim 1 requires the analyzer server to be capable of detecting more than one structure in the data.  As mentioned in the previous paragraph, Pandit only discloses manually selecting text, wherein the entirety of what is manually selected is either that either recognized or not.  '636 Patent, claim 1 ("A computer-implemented method for processing a selected text, comprising the steps of: (a) recognizing the select text . . .").  Pandit therefore does not detect more than one structure in data as required by claim 1.

214.     Pandit also does not disclose "an analyzer server for . . . for linking actions to the detected structures" for at least the reason that structures are not "detected" in text as described in the preceding paragraphs of this section.

### 4.     "a user interface enabling the selection of a detected structure and a linked action;"

215.     Pandit does not disclose a user interface enabling the selection of a detected structure and a linked action.

216.     First, Pandit does not disclose this element of claim 1 for at least the reason that it does not detect structures, as explained above.

217.     Pandit also does not disclose "user interface" program routines "enabling the selection of a detected structure."  The plain and ordinary meaning of "a user interface enabling the selection of a detected structure" requires the user interface to enable selection of a structure, by the user, *after* the structure has already been detected.  Pandit, by contrast, reverses these steps.  For example, Dr. Cohen cites to one portion of Pandit that discusses the invention "recogniz[ing]" text that the user has previously "accented", or selected.  Cohen Decl., ¶ 217 (quoting '636 Patent 2:3-23).  Dr. Cohen thus argues that the above element of claim 1 is satisfied when (1) the user first selects undetected text and, (2) *after* such selection, structures are detected in that text.  This argument makes no sense in view of the plain language of claim 1, which, as explained, requires that the user be able to pick or choose a detected structure *after* the system identifies such structures for the user.  Pandit, therefore, does not disclose picking or choosing a detected structure but rather accenting (i.e., manually selecting) undetected text.

### 5.     "an action processor for performing the selected action linked to the selected structure; and"

218.     Pandit does not disclose "action processor" program routines for "performing the selected action linked to the selected structure" because, as explained above, it does not disclose selecting a detected structure.

### 6.     "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines."

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK                    86

219.     Pandit also does not disclose "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines" because it fails to disclose requisite "program routines".  Dr. Cohen has failed to show that Pandit discloses this limitation of Claim 1.

### 7.     Claim 8: "The system recited in Claim 1, wherein the user interface highlights detected structures."

220.     It is my opinion that Pandit does not disclose claim 8 for at least the reason that it did not disclose claim 1 as described above.

221.     Moreover, even if the user-accented text of Pandit contains text that is recognizable, Dr. Cohen does not cite to any disclosure in Pandit wherein the user interface highlights detected structures.  Instead, Dr. Cohen identifies only the highlighting of a menu bar.  Cohen Decl., ¶ 220, citing '636 Patent, Fig. 1b (The menu bar referred to by Dr. Cohen is labeled "13" in Fig. 1b.).

### E.     Claims 1 and 8 are Not Anticipated By or Rendered Obvious by Nokia

222.     Nokia's European Patent Publication No. 0 458 563 A2 ("Nokia") concerns a "telephone apparatus" capable of receiving text messages.  Nokia, 1:1-9.  The Nokia Publication was motivated by the fact that old cellular telephones could not receive incoming calls and required the user to carry a separate pager (or a phone with the capability of receiving a text message) so that the user would know when someone wished to contact them.  Nokia, 4:31-46.  Nokia thus discloses a phone with circuits that can extract a phone number from a text message so that the user can operate on the number just as if "the user [had] fed in the telephone number in its entirety and conventionally, by means of the number keys." Nokia, 8:6-10 (emphasis added).  This type of functionality is explicitly disclosed in the '647 Patent's specification as background art that contained limitations solved by invention disclosed and claimed in the '647 Patent. (*See, e.g.*, '647 Patent, 1:24-26, 1:52-58 ("One type of system that has addressed this problem involves detecting telephone numbers.  Such systems enable a user to select a telephone number and request that the application automatically dial the number.  However, these systems do not recognize the selected data as a telephone number, and they generally produce an error message if the user selects invalid characters as a phone number.")

Further, Nokia did not disclose, among other things, linking actions to the extracted phone number; to the contrary, the user could operate on the phone number only manually, by entering traditional key strokes.

### 1.   Claim 1: "A computer-based system for detecting structures in data and performing actions on detected structures, comprising:"

223.   As stated above, it is my opinion that the preamble of claim 1 is not a limitation of the claim.  Even if the preamble is considered a limitation, Nokia does not comprise "[a] computer-based system for detecting structures in data and performing actions on detected structures."

224.   At the outset, and as discussed above in the context of other purported prior art identified by Dr. Cohen, claim 1 of the '647 Patent describes a computer-based system for detecting "structures", i.e, more than one type of structure.  Accordingly, the '647 Patent discloses the use of multiple saved "patterns" to detect different types of structures (e.g., phone numbers, email addresses, etc.), each of which being associated with candidate actions that a user would normally perform on such a structure.  '647 Patent at 1:25-35.  In this way, the invention disclosed in the '647 patent had "significant advantages over previous systems, in that [it] may incorporate an open-ended number and type of recognizable patterns, an open-ended number and type of pattern analysis units, and further that the system may enable an open-ended number and type (i.e. scripts, macros, code fragments, etc.) of candidate actions to associate with, and thus perform, on each identified structure."  '647 Patent at 2:12-20.

225.   By contrast, Dr. Cohen has identified only a single type of possible structure in Nokia – a telephone number.  Cohen Decl., ¶¶ 224, 228-29.

226.   In addition, as will be explained in more detail below, Dr. Cohen also has not shown that Nokia discloses a system for "performing actions on detected structures".  Instead, Nokia requires the user to manipulate phone numbers through a traditional keyboard.

### 2.   "an input device for receiving data; an output device for presenting the data; a memory storing information including program routines including"

227.     Nokia does not disclose "a memory storing information including program routines . . ." because, as explained below, it does not disclose the claimed "program routines."

### 3. "an analyzer server for detecting structures in the data, and for linking actions to the detected structures;"

228.     It is my opinion that Nokia does not disclose "an analyzer server for detecting structures in the data, and for linking actions to the detected structures".

229.     First, as stated above, the only type of structure Dr. Cohen cites as being detected by the system disclosed in Nokia is a telephone number.  Cohen Decl., ¶¶ 224, 228-29.  However, as explained above, the '647 Patent requires the detection of multiple types of structures, as well as the subsequent linking of candidate actions to each of those structure types.

230.     Second, Nokia does not disclose "linking actions to detected structures" as understood in the '647 Patent.  Dr. Cohen contends that Nokia discloses "linking detected telephone numbers to actions, such as calling, modifying, or storing the detected structure."  Cohen Decl., Exhibit E, at 8.  However, Dr. Cohen does not cite to any portion of Nokia that actually discloses "linking," as required by claim 1 of the '647 Patent, these supposed actions to a telephone number.  For example, the action of placing a phone call is not "linked" to a phone number that is detected by Nokia.  Instead, Nokia teaches that when a user "accepts" a phone number displayed in a text message by pressing a key on the phone's keypad, the phone eliminates extraneous text surrounding the phone number from the display so that the number is then present both in the phone's display and its "register".  Nokia, 7:32-39.  ("If the user accepts the number he performs an acceptance keying, whereupon the RPK [i.e., telephone] will eliminate from the display any characters following the number and any non-numeric characters inside the number.  Now there is visible in the display only a 'pure' telephone number, and this number is also in the number register, according to which further procedures are possible.").  At that point, a user can then press a key on the phone's keypad to, for example, initiate a call.  Nokia 8:10-11 ("A call to a number also takes place in the same manner as in a 'normal call'.")  Clearly, all that the Nokia system does through the above steps is to extract a phone number from a text message, based on user key prompts, so that it is the only piece of

1   information contained in the phone's display and "register".  At that point, the user must press an

2   additional key to initiate a call in the same way as required by the user when the user manually types

3   a phone number with the keypad.  Nokia, 8:6-10 ("The objective is that the register and the display of

4   the telephone are now precisely the same as they would be upon the user having fed in the telephone

5   number in its entirety and conventionally, by means of the number keys.")  There is nothing about the

6   action of call initiation disclosed in Nokia that is "linked" to a phone number cut from a text message.

7       231.    Similarly, a user's modification of a phone number does not constitute an action

8   linked to a detected structure.  After the system in Nokia finds and displays a phone number, "[t]he

9   user may correct the telephone number by adding or eliminating digits . . . by keying delete [or] . . .

10  by pressing a number key."  Nokia, 7:40-45.  Dr. Cohen provides no explanation of how this

11  constitutes "linking actions" to a detected structure.  Simply put, pressing a number key on a cellular

12  phone to edit a phone number in the phone's display does not constitute an action that is "linked" to a

13  detected structure; this was simply a well-known text-editing feature and is not similar to the actions

14  of the '647 patent.

15      232.    Nokia also does not disclose linking the action of "storing" to the detected structure.

16  Assuming that storing a detected structure in an address book is an action, Dr. Cohen provides no

17  explanation of how Nokia discloses linking such an action to a detected structure.  On the contrary, in

18  order to store a phone number that has been identified in a text message, Nokia first requires the user

19  to manually search for a person's name within the text message.  Nokia, 8:32-38 ("The user performs

20  a name search keying, whereupon the RPK [or telephone] will display the beginning of the present

21  message. With the subsequent name search keyings the text will be moved forward in the display one

22  word at a time. When the correct name is at the beginning of the display, the user performs an

23  acceptance keying.")  Once the user has located a name, the user must then press a key to store the

24  number.  Nokia, 8:50-54 ("After step (4) the number to be used is in the RPK register and the name is

25  in the display.  The user performs a store keying, whereupon the number will be stored under the

26  name in the short-selection directory").  Nokia then states that this "resembles a 'conventional'

27  method of feeding name & number pairs into the . . . directory."  Nokia, 8:55-57.  Again, such a

28

method of storing a phone number is not in any sense "linked" to that phone number.  Instead, this purported "action", like calling a number or modifying a number, merely involves manually entering various keystrokes incidental to conventional cell phone use.

233.      Finally, regardless of whether Nokia discloses detecting structures in the data and linking actions to the detected structures (which it does not), Nokia does not disclose a program routine(s) constituting an analyzer server, as required by claim limitations (b) and (c).  Nokia instead discloses *circuits* "to recognize characters indicating the beginning and/or end of a telephone number." Nokia, 9:22-24.

> **4.    "a user interface enabling the selection of a detected structure and a linked action; and"**

234.      Nokia does not disclose program routines constituting "a user interface enabling the selection of a detected structure and a linked action" because, as explained above, it does not disclose linking actions to detected structures.

235.      In addition, Nokia does not disclose a user interface enabling the selection of a linked action because the "keys" for calling, modifying, or storing a phone number are not linked to that phone number.  Indeed, the keys of the phone disclosed in Nokia are not linked to telephone numbers (or anything else).  Instead, Nokia discloses a set of fixed keys for performing all interactions with the phone.  Nokia, 5:52-53 ("'keying' denotes a command given by means of the keyboard . . ."); 8:10-24 ("A call to a number also takes place in the same manner as in a 'normal' call . . . some call keying is, of course, necessary for starting the placing of a call."); 7:40-43 ("The user may correct the telephone number by adding or eliminating digits at the beginning of the telephone number . . .").)  Thus, regardless of whether Nokia discloses detecting structures in the data or linking actions to the detected structures (which it does not), Nokia does not disclose user interface program routines enabling the selection of a linked action.  Nokia instead merely discloses an "electrical circuit for forming an outgoing telephone call." Nokia, 5:5-6.

**5.    "an action processor for performing the selected action linked to the selected structure; and"**

236.    Nokia does not disclose "action processor" program routines for "performing the selected action linked to the selected structure" because, as described above, it does not disclose linking actions to the detected structures or selecting a linked action.

**6.    "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines."**

237.    It is my opinion that Nokia does not disclose "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines" for at least the reason that Nokia does not disclose the claimed program routines for the reason described above.  Consequently, Dr. Cohen has failed to show that Nokia discloses this limitation of claim 1.

**7.    "Claim 8: The system recited in Claim 1, wherein the user interface highlights detected structures."**

238.    It is my opinion that Nokia does not disclose claim 8 for at least the reason that it did not disclose claim 1 as described above.

239.    In addition, Nokia does not disclose user interface program routines that highlight detected structures.  I note here that Dr. Cohen has not substantively addressed claim 8 with respect to the Nokia reference at all, stating only that "[i]t would have been obvious to a person of ordinary skill in the art to employ highlighting . . . to indicate that structures have been detected."  Cohen Decl., ¶ 235.  However, Dr. Cohen is incorrect that highlighting would have been an obvious addition to Nokia's phone-based method of isolating a phone number in text (following a user's keystroke indicating that a number has been "accepted") by deleting all other text surrounding it so that only the phone number is displayed.  Nokia, 7:32-39 ("If the user accepts the number he performs an acceptance keying, whereupon the RPK will eliminate from the display any characters following the number and any non-numeric characters inside the number.  Now there is visible in the display only a 'pure' telephone number, and this number is also in the number register, according to which further procedures are possible.")  In particular, Dr. Cohen offers no explanation for why it would be obvious to highlight any discrete piece of text – whether a phone number or otherwise – that is the only thing

1   visible on a phone's display.  Indeed, the very fact that, according to Dr. Cohen's explanation, Nokia

2   arguably detects only a single phone number at any given time obviates the need for any highlighting

3   at all.

4     **F.**  **Claims 1 and 8 are Not Obvious In Light of the Prior Art**

5     240.  As discussed above, it is my opinion that none of the references cited by Dr. Cohen

6   anticipate or render obvious claims 1 and 8 of the '647 Patent.  It is also my opinion that the two

7   additional combinations of references Dr. Cohen cites at paragraphs 240 to 244 of his declaration do

8   not render obvious claims 1 and 8.

9     241.  As I mentioned in my earlier declaration, I understand that a claimed invention is

10  invalid as "obvious" if it would have been obvious to a person of ordinary skill in the art of the

11  claimed invention at the time the invention was made.

12    242.  I further understand that the following factors must be evaluated to determine whether

13  a defendant has established that a claimed invention is obvious: (1) the scope and content of the prior

14  art; (2) the difference or differences, if any, between each claim of the asserted patent and the prior

15  art; (3) the level of ordinary skill in the art at the time the invention of the asserted patent was made;

16  and (4) the existence of secondary considerations, such as commercial success, copying of the

17  claimed invention by others in the industry and praise of the invention, that indicate that the invention

18  was obvious or not obvious.

19    243.  I also understand that Defendants must prove obviousness by clear and convincing

20  evidence.

21    244.  I have been informed that one should analyze whether there are any relevant

22  differences between the prior art and the claimed invention from the view of a person of ordinary

23  skill in the art at the time of the invention and that one must determine the impact, if any, of such

24  differences on the obviousness or nonobviousness of the invention as a whole, and not merely some

25  portion of it.  Moreover, I understand that a patent claim composed of several requirements is not

26  proved obvious merely by demonstrating that each of its requirements was independently known in

27  the prior art.  I understand that it is important to identify a reason that would have prompted a person

28

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK   93

of ordinary skill in the relevant field to combine the requirements in the way the claimed new invention does.  I understand that this is the case because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.  Therefore, I further understand that one may evaluate whether there was some teaching, suggestion, or motivation to arrive at the claimed invention before the time of the claimed invention.  I also understand that one must be careful not to determine obviousness using hindsight and that one evaluating the prior art should put oneself in the position of a person of ordinary skill in the field of the invention at the time the claimed invention was made.

### 1.    MHonArc + Mosaic

245.    I disagree with Dr. Cohen's assertion that the combination of the MHonArc system and the Mosaic web browser render the invention of the '647 Patent obvious.  In my opinion, neither MHonArc nor Mosaic, nor the combination of the two, disclose finding and detecting instances of patterns with semantic significance, i.e., structures, and linking to those structures a number of candidate actions that users would normally perform using such structures.

246.    MHonArc version 1.0.0 ("MHonArc") was UNIX software that was available in the late 1994 time period that a computer user could use to convert plain text emails into hypertext markup language (HTML) documents readable by web browsers at the time.  *See* Cohen Decl. ¶ 240 ("MHonArc was a program for converting e-mail messages to HTML.").  This conversion entailed changing email addresses in the header of an email, as well as internet addresses in the body of an email, into HTML hyperlinks recognizable by a web browser.  *See* Cohen Decl., Exhibit F, at 8.  Specifically, MHonArc adds HTML tags and anchors to this data so that web browsers can recognize the data and indicate that it can be selected by the user.  *See* Cohen Decl., Exhibit F, at 12.  After the conversion, a user could save the resulting HTML files to disk.  The user could also open a web browser, such as Mosaic, in order to view the HTML files.  However, to be clear, the accused functionality in the MHonArc software did not involve communication with the Mosaic browser; the

MHonArc software would simply convert a file into an HTML document that might later be read by a browser such as Mosaic.

247.     To analyze the MHonArc software, I reviewed the materials cited by Samsung, and downloaded and reviewed the software.

248.     Based on my review, I have concluded that neither the MHonArc software nor any combination of the software with the Mosaic browser performs detection of "structures" in data and linking of candidate actions to detected structures, as taught by the '647 Patent.

249.     As described in the '647 Patent, a "structure" is an instance of a pattern in a document, where a "pattern" "refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc." '647 Patent, 1:28-31.  For example, Figure 6 in the '647 Patent shows the structure "(415) 555-1234", which has been recognized as a positive match for a particular pattern, e.g., "(NNN) NNN-NNNN" (where "N" is a digit between 0 and 9).  As another example, Figure 6 in the '647 Patent shows "1 Hilly Street, San Francisco, CA 94105" as a structure that would be a positive match to a pattern describing a postal address (comprised of a street address, city name, state abbreviation, and zip code digits).  In all of the examples of structures described in the '647 Patent and in all examples of structures that I have observed being detected in embodiments of the '647 Patent, the detected structures have been semantically-significant "nuggets", or pieces, of data that positively match a pattern that can be described by, for example, a context-free grammar, a regular expression, or string matching.  *See also* '647 Patent, 1:27-31 ("the term 'pattern' refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document, such as dates, addresses, phone numbers, names, etc.").  The MHonArc system, and likewise a combination of that system with the Mosaic browser, would fail to detect such nuggets in data visible to the user.

250.     In addition, the combination of MHonArc and Mosaic proposed by Samsung and Dr. Cohen requires a cumbersome set of steps by the user to operate, and does not solve the problems addressed by the '647 Patent.  Using this combination, a user would have to open a plain-text email

or a set of plain-text documents in MHonArc and then prompt MHonArc to search for data, using the computer's command line. *See, e.g.*, MHonDoc.  MHonArc would then add specific HTML source code – anchors and tags – to the data so that the data would appear as a hyperlink in any web browser – as email addresses or web URLs.  To be clear, ***MHonArc does not link or associate any actions or computer operations to the data***; MHonArc only converts certain data into hyperlinks to be recognized by web browsers.  After saving the file, the user would then have to open a web browser, such as Mosaic, locate the converted email file, open the converted file, and find the hyperlinked information of interest.  This does not comprise or teach a system that looks for semantically significant data and associates candidate actions to perform on the detected data.  As described below, even at the end of this laborious process, Mosaic fails to associate any actions to the hyperlinks created by MHonArc.  Instead, Mosaic presents a common context menu for any type of hyperlink.

251.     Dr. Cohen asserts that MHonArc could be used with a web browser such as Mosaic to perform the detection of e-mail addresses and internet URLs in its conversion of documents to HTML files.  *See* Cohen Decl., Exhibit F, at 9 ("Through [MHonArc's] processing, an email is converted to an HTML file that can be processed by Mosaic.").  However, what MHonArc does is not detection in the context of the '647 Patent.  Instead, MHonArc simply converts text (mail or news messages) already marked with URL-linked text into HTML documents.  *See* MHonArc at doc/mhonarc_intro.doc.html, "Why Use MHonArc?".

### G.     <u>Claim 1</u>: "A computer-based system for detecting structures in data and performing actions on detected structures, comprising:"

252.     As stated above, I do not believe that the preamble is a limitation to claim 1.  Even if the preamble is considered a limitation, however, the combination of MHonArc with Mosaic does not comprise "[a] computer-based system for detecting structures in data and performing actions on detected structures."

253.     The combination of an application hosting a document and program routines that would analyze the document to make certain things actionable was part of the novelty of the '647

1    Patent, allowing easily accessible functionality in an application hosting a document and link specific

2    actions to usable data such as telephone numbers, e-mail addresses, etc.  *See* '647 Patent, 2:4-20.

3         254.    Dr. Cohen contends that MHonArc "detects three different types of structures in the

4    input data (unstructured email text): untagged email address, HTTP URLs, and mailto URLs."

5    Cohen Decl., Exhibit F, at 7.  However, MHonArc does not "detect" anything, as that term is used in

6    the '647 Patent.  Instead, MHonArc simply looks for data that include specific prefixes, and adds to

7    that data HTML anchor elements that can be used by any web browser to display the information as a

8    hyperlink.  Cohen Decl., Exhibit F, at 8 ("In the process of conversion, MHonArc detects certain

9    structures [read: "looks for data with specific prefixes"] in the email and marks those structures in the

10   HTML output such that the individual structures may be selected in Mosaic.").

11        255.    Although I discuss MHonArc's failure to "detect[] structures" in greater detail in

12   subsection (c) below, as a preface to that discussion, it is important to note that MHonArc simply

13   converts email addresses appearing in mail header fields of an email into hyperlinks.  *See* Cohen

14   Decl., Exhibit F, at 8.  This conversion is done not as a result of any detection of semantically

15   significant information, but because MHonArc is programmed to convert ***any*** entries in certain fields

16   of a document (here, email) header into "mailto:" hyperlinks.  Beyond that, MHonArc then finds only

17   text that has already been marked with prefixes corresponding to URL (universal resource locator)

18   code, such as "mailto:" and "http://", and converts them into hyperlinks using a simple text

19   replacement function.  Thus, in the body of emails, MHonArc will recognize only text that already

20   appears as a URL.  *See, e.g.*, Cohen Decl., Exhibit F, at 8-9 (discussing recognition of internet URLs

21   appearing as "http://", "ftp://", etc.).

22        256.    Thus, MHonArc does not "detect" anything, but rather simply converts pre-marked

23   (here by prefixes or by location in a header) data into hyperlinks.  Mosaic, in turn, merely recognizes

24   the markings added by MHonArc (HTML "tags" or "anchors").  This is in direct contrast to the '647

25   Patent's teaching of the detection of data in patterns in otherwise unstructured data.

26        257.    Because the MHonArc system, either independently or combined with the Mosaic web

27   browser, does not "detect[] structures" as understood by the '647 Patent, it also cannot "perform[]

28
REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK              97

actions on detected structures." The '647 Patent teaches that the system itself detects structures in data and links candidate actions (actions that a user would normally perform on those structures) to those same structures. '647 Patent, 2:49-53 ("Upon selection of a detected structure, the user interface presents and enables selection of candidate actions. When a candidate action is selected, the action processor performs the selected action on the selected structure."). Without detecting structures in the first place, there is no way that the system can associate candidate actions with a particular structure or set of structures. Thus, MHonArc and Mosaic fail to satisfy this aspect of the preamble as well.

**1.**    "an input device for receiving data;
an output device for presenting the data;
**a memory storing information including program routines including"**

258.    For the reasons described with regards to at least elements (a) and (c)-(e) of this claim, the MHonArc system does not practice or disclose "a memory storing information including program routines. . . " because the MHonArc system does not contain the claimed "program routines."

**a.    "an analyzer server for detecting structures in the data, and for linking actions to the detected structures;"**

259.    It is my opinion that the combination of MHonArc with the Mosaic browser does not practice or disclose this element of claim 1.

260.    Dr. Cohen is incorrect that the combination of MHonArc and Mosaic discloses an "analyzer server for detecting structures in the data" under the ITC's or Judge Posner's claim constructions. Cohen Decl., Exhibit F, at 7.

261.    First, Judge Posner construed "analyzer server" to mean "a server routine separate from a client that receives data having structures from the client." Posner Order, at 10.[10] Under this construction, one of skill in the art would understand "server" to imply a "client-server" relationship between the analyzer server and the "client" applications with which it interfaces. Dr. Cohen has not

_____

[10]  The ITC employed the following construction of "analyzer server": "[a] program subroutine that receives data from a document having recognizable structures, and uses patterns to detect the structures." Initial Determination, [[Orig. Ex. 15]], at 126 n.35.

1    explained what he would allege to be the "client" or the "server" in this combination.  Indeed, in the

2    combined application of MHonArc and Mosaic, the MHonArc application receives data from a user's

3    system, converts the data into an HTML document, and saves the HTML document to memory.  The

4    web browser (Mosaic) is then used to open the saved HTML file stored somewhere on the user's

5    system.  However, the MHonArc and web browser applications do not send or receive data to or from

6    one another at any time.  Thus, in my opinion, the "analyzer server" limitation under Judge Posner's

7    construction is not met by the combination.

8        262.    As required by this claim element, and correspondingly either Judge Posner's or the

9    ITC's constructions of it, the "analyzer server" in the computer system disclosed by the '647 Patent

10   "detect[s] structures in the data," and "link[s] actions to the detected structures."  By contrast,

11   MHonArc, even when combined with the Mosaic browser, performs only a limited recognition

12   function – which is more akin to a "find-and-replace" function in contrast to the '647 Patent's

13   teaching of identifying text with semantic significance (i.e., structures).  Further, no aspects of

14   MHonArc combined with Mosaic link or associate any actions to the data that is detected.

15       263.    The combination does not "detect[] structures in the data," as taught by the '647

16   Patent, because it requires data to be pre-marked, either by appearing in certain fields of an email

17   header or by containing URL prefixes (such as "http://"), in order to be found.  *See* Cohen Decl.,

18   Exhibit F, at 8-9; [[MHonArc at mhonarc main script, lines 116-117]].  Performing simple search-and-

19   replace operations on two very limited types of data that are effectively pre-marked, such as those

20   listed at page 9 of Cohen Decl., Exhibit F, is vastly different from detecting instances of interesting

21   patterns in data (such as for phone numbers or email addresses), and requires less sophistication in a

22   system.

23       264.    The operation of MHonArc that is relevant to this discussion is as follows:  First,

24   MHonArc converts separate entries in portions of the header of an e-mail – the "To:", "From:" "CC:"

25   and "Sender" fields – into "mailto:" hyperlinks.  *See* Cohen Decl., Exhibit F, at 8.  Someone

26   reviewing the converted document could then select these hyperlinks to send email to these

27   addresses, or perform whatever operation the reviewing application – e.g., Mosaic – might allow

28

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          99

1  them to perform on mailto: hyperlinks.  *See* Cohen Decl., Exhibit F, at 13-15.  However, searching a

2  header portion of an email does not require or constitute "detection" as used in the '647 Patent,

3  because the location being searched has *only* the type of data that would be converted to mailto: links

4  – e-mail addresses.  In other words, since the "To:" "From:" "CC:" and "Sender:" fields could

5  contain only email structures, no detection is necessary – MHonArc simply converts anything with an

6  "@" symbol (e.g., even "1@2," or "not-an-email-address@nowhere") to a hyperlinked email.

7      265.      Second, the MHonArc system detects URLs in the body of an e-mail – but only very

8  specific types of URLs that begin with certain prefixes.  *See* Cohen Decl., Exhibit F, at 9.  Where the

9  '647 Patent discloses searching raw, unmarked data for instances of saved patterns, or things that

10  look like interesting pieces of data, MHonArc instead only detects and converts things specifically

11  marked with certain tags.

12      266.      Regarding URL marking, at page 8 of Exhibit F to his Declaration, Dr. Cohen states

13  only that "MHonArc detects and marks http:, and other, URL references in the plaintext email body

14  by converting them to hyperlinks."  Cohen Decl., Exhibit F, at 8.  The MHonDoc excerpt Dr. Cohen

15  includes, in turn, identifies only the following types of URLs that can be marked:

16        • http://...
         • ftp://...
17        • afs://...
         • wais://...
18        • telnet://...
         • gopher://...
19        • news:...
         • nntp:...
20        • mid:...
         • cid:...
21        • mailto:...
22        • prospero:...

23  Cohen Decl., Exhibit F, at 9 (citing MHonDoc, lines 1451-1467).

24      267.      Below, I demonstrate the MHonArc operations relied upon by Dr. Cohen in his

25  Exhibit F in order to show why they do not meet the limitation of "an analyzer server for detecting

26  structures in the data, and for linking actions to the detected structures."  To begin, below is a sample

27  plain text email that can be imported into MHonArc that includes email addresses in the header,

28  REPLY EXPERT DECLARATION OF DR .TODD C.
    MOWRY CONCERNING U.S. PATENT NO.
    5,946,647 – CASE NO. 12-cv-0630-LHK          100

email addresses in the body with and without URL prefixes, and internet addresses in the body with and without URL prefixes.  The figure below shows this e-mail after MHonArc conversion.

```
To: jane.doe@work.com
cc: not-an-email-address@nowhere, 1@2
Subject: how MHonArc works
Date: Sun, 26 Nov 2000 10:49:24 -0500
From: john.doe@work.com

Dear Jane,

Here is a proper email address in the body of the email message (note that MHonArc
does not detect these): john.doe@work.com

Here is a string of garbage characters that MHonArc thinks is an email address (simply
because it begins with "mailto:"): mailto:$%#^

Here is a proper web address, which MHonArc cannot detect: www.yahoo.com

Here is a string of garbage characters that MHonArc thinks is a web address: http://$%#^
```

**Example email message, prior to conversion by MHonArc.**

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK           101

```
<HTML>
<HEAD>
<TITLE>how MHonArc works</TITLE>
</HEAD>
<BODY>
<H1>how MHonArc works</H1>
<HR>
<UL>
<LI>
<em>To</em>: <A HREF="mailto:jane.doe@work.com">jane.doe@work.com</A>
</LI>
<LI>
<em>Subject</em>: how MHonArc works
</LI>
<LI>
<em>From</em>: <A HREF="mailto:john.doe@work.com">john.doe@work.com</A>
</LI>
<LI>
<em>Date</em>: Sun, 26 Nov 2000 10:48:24-0500
</LI>
<LI>
<em>cc</em>: <A HREF="mailto:not-an-email-address@nowhere">not-an-email-address@nowhere</A>, <A
HREF="mailto:1@2">1@2</A>
</LI>
</UL>
<HR>
<PRE>
Dear Jane,

Here is a proper email address in the body of the email message (note that MHonArc
does not detect these): john.doe@work.com

Here is a string of garbage characters that MHonArc thinks is an email address (simply
because it begins with "mailto:"): <A HREF="mailto:$%#^">mailto:$%#^</A>

Here is a proper web address, which MHonArc cannot detect: www.yahoo.com

Here is a string of garbage characters that MHonArc thinks is a web address: <A HREF="http://$%#^">http://$%#^</A>
```

**Example email message, after conversion to HTML by MHonArc.**

268.      As can be seen above, MHonArc blindly accepts any sequence of characters between one of the above-listed prefixes and an obvious delimiter (such as white space) when attempting to identify a URL.  For example, if the body of an email message contains the nonsensical character sequence "http://$%#^", then MHonArc will wrap an anchor tag to it, mistakenly thinking that it is a proper URL simply because it begins with the characters "http://".  *See* Figure above.  Similarly, as also shown above, MHonArc thinks that "mailto:$%#^" is a URL, simply because it begins with the

1    character sequence "mailto:".  Additionally, MHonArc fails to recognize a straightforward URL that

2    does not begin with one of these prefixes (e.g., "www.yahoo.com" in Figures above) or an email

3    address in the body of the message that is not preceded by a "mailto:" prefix  (e.g.,

4    "john.doe@work.com" in Figures above).  This contrasts with the teachings of the '647 Patent, which

5    illustrates the detection of a normal email address in unstructured text without a special hyperlink

6    prefix (e.g., "Jdoe@work.com" in Figures 5 and 6 of the '647 Patent).

7         269.    MHonArc's search-and-replace operation on email addresses in certain header fields

8    of an email is also contrary to the teachings of the '647 Patent regarding detecting structures.  The

9    motivation for detecting structures in the '647 Patent was to recognize useful "nuggets" of data that

10   might easily be missed by the user in a large body of unstructured text: for example, in the body of an

11   email message.  '647 Patent at 1:19-22 ("However, visually searching data files or documents to find

12   these structures is laborious and cognitively disruptive, especially if the document is lengthy and hard

13   to follow.").  Hence Figures 5-7 of the '647 Patent show the invention being applied to the *body* of an

14   email message, since this is the portion of an email message that may contain a large amount of

15   unstructured text.  In contrast, the *header* fields of an email message that contain the "From", "CC",

16   and "To" information are designed specifically to contain email addresses; that is indeed their sole

17   purpose.  Hence, they are an example of *structured* text, since it is known ahead of time that their

18   contents consist of email addresses.  Although a user may overlook an email address that is buried

19   somewhere inside the body of an email message, there is no guesswork regarding the fact that email

20   header fields that are designed to contain email addresses (e.g., "From", "To", "CC") do in fact

21   contain email addresses.  Therefore MHonArc's recognition of email addresses in the structured

22   fields of email messages where email addresses are known to be located does not satisfy the

23   limitation of "detecting structures in data".

24        270.    The Mosaic web browser also fails to disclose the limitation of "detecting structures in

25   data" because Mosaic recognizes only HTML tags or anchors specifically marked to be detected by a

26   web browser.  *See* Cohen Decl., Exhibit F, at 12 ("Once MHonArc has detected and marked

27   structures [i.e., simply "found and replaced" structured text, as discussed above], Mosaic colors the

28

structures blue to identify them as being selectable.").  This is in stark contrast to the '647 Patent's teaching of the detection of data in patterns in otherwise unstructured data.  Thus, even when MHonArc is combined with Mosaic, the combination still fails to meet the limitation of "detecting structures in data."

271.    It is also my opinion that the combination does not meet this claim limitation under Judge Posner's or the ITC's constructions of "linking actions to the detected structures."

272.    The ITC, agreeing with Apple, construed "linking actions to the detected structures" to mean "linking detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are linked."   (Mowry Decl., Ex. 15 (Initial Determination), at 128.  Judge Posner construed "linking actions to the detected structures" to mean "creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on that detected structure."  Dr. Cohen provides no analysis as to whether or how the MHonArc system and/or Mosaic meets this limitation under either construction.  Nonetheless, it is worth noting that, as mentioned above, neither the MHonArc system nor Mosaic (nor the two in combination) detect "structures".  Instead, to the extent these systems recognize anything, it is only HTML markup strings previously added to data.

273.    Further, even if Mosaic did encounter "detected structures" of some kind, it does not offer customized sets of associated actions based on the type of structure detected, but instead presents only a single set of optional operations for all structures allegedly detect.  This does not constitute a "specified connection" between structures and actions because the available actions are not "candidate" actions for performance on the particular structure selected.  *See* Posner Order, at 8-9 ("After the analyzer server recognizes structures in a document, it links each structure to operations (called 'actions') commonly performed on data of that type (such as linking phone numbers to the functions for calling or storing phone numbers).").

274.    In particular, when a user encounters a marked email link in Mosaic, he or she may "right-click" on that link in order to view a pop-up window listing only two options: "Load Anchor to

Disk" and "Create Internet Shortcut", as shown in the following screenshot from Dr. Cohen's Declaration, Exhibit F, at page 14:



**Mosaic Screenshot.  Cohen Decl., Exhibit F, at 14.**

As Dr. Cohen describes, clicking on "Load Anchor to Disk" will bring up an email window with the blue text selected by the user populated in the "To:" field of the email header.  *See* Cohen Decl., Exhibit F, at 16.  Similarly, clicking on "Create Internet Shortcut" saves a "shortcut" file on the user's system that contains a "mailto" URL with the selected email address.  *See* Cohen Decl., Exhibit F, at 16.  But Dr. Cohen points to no other options that could conceivably be presented through Mosaic for any other data identified in an email header.   Thus, instead of customizing sets of associated actions based on the type of data, Mosaic (even when coupled with MHonArc) can find only one type of data within email headers (namely, what is identified as an email address, whether or not it is one), and perform only a static set of operations for that data.

275.     Similarly, when clicking on a URL in the body of an email, a user is presented with the same two options as before – "Load Anchor to Disk" and "Create Internet Shortcut" – as well as two additional options called "Anchor Information" and "Spawn Mosaic from Anchor".  *See* Cohen Decl., Exhibit F, at 19.  Notably, these four options allow only what are essentially the same two

Gibson, Dunn &
Crutcher LLP

operations that are presented for data found in an email header:  either saving to a disk or opening a new window with the data populated in a certain field (in this case, the address bar of a web browser).[11]  *See* Cohen Decl., Exhibit F, at 18-19.

276.     According to Dr. Cohen's own description of Mosaic's operation, Mosaic provides only this single set of static actions to a user for ***every type of URL*** it detects in the body of the document, no matter what the URL is (e.g., "http://," "ftp://," etc.); i.e., the options provided are not meaningfully customized to any type of data that is allegedly detected.  Thus, the Mosaic Browser does not "creat[e] a specified connection" between each structure and applicable actions, in the words of Judge Posner's construction.  *See* Posner Order, at 8-9.   Nor does it meaningfully "link[]" particular actions to particular detected structures in the words of this claim limitation or the '647 Patent more broadly.  *See, e.g.,* '647 Patent, 2:30-34 ("Upon detection of a structure, the analyzer server links actions to the detected structure.  Each action is a computer subroutine that causes the CPU to perform a sequence of operations on the particular structure to which it is linked.")  As noted above, because there are no "detected structures" in Mosaic at all, there are no structures to which actions can even be linked.  But even if one were to consider Mosaic's finding of URLs in an email body as "detecting structures", there is no linking of actions to ***particular*** structures, as taught by the '647 Patent.  Instead, all alleged structures found in the body of an email are subject to the same list of operations.

277.     Notably too, the addition of MHonArc to Mosaic does not add relevant functionality regarding "linking actions to the detected structures."  MHonArc performs only the functionality of converting text into HTML documents (documents with hyperlinks recognizable by an HTML

---

[11]  Dr. Cohen refers to what he deems a third "action", obtaining "Anchor Information", as simply "display[ing] information about the HTML file specified by the URL structure (URL, Size, Last Modified, Type, Server Type, Mime)".  Cohen Declaration, Exhibit F, at 19.  However, in my opinion, simply viewing information about a particular link, such as its name or type, is not an "action" in the context of the '647 Patent.

reading application), and does not associate or connect any computer operations with the data that it converts.

### b. "a user interface enabling the selection of a detected structure and a linked action; and"

278.     Dr. Cohen alleges that this claim limitation is satisfied simply because after Mosaic opens a document containing what Dr. Cohen wrongly considers to be "structures", "Mosaic colors the structures blue to identify them as being selectable. Each of these structures is selectable via the cursor." Cohen Decl., Exhibit F, at 12.  However, I disagree that Mosaic meets the claim limitation of "a user interface enabling the selection of a detected structure and a linked action," because, as described above, Mosaic and MHonArc do not "detect[] structures" that can then be selected via a "user interface," nor do they "link[] action[s]" to any detected structures.

### c. "an action processor for performing the selected action linked to the selected structure; and"

279.     It is my opinion that the combination of MHonArc and Mosaic does not disclose an "action processor for performing the selected action linked to the selected structure" for at least the reasons that the combination does not detect structures, nor does the combination link actions to particular data, whether or not that data could be said to constitute "structures".

### d. "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines."

280.     It is my opinion that the combination of MHonArc and Mosaic does not disclose "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines" for at least the reason that the combination does not include the claimed program routines (for which claim elements (c), (d), and (e) must be satisfied) for the reasons described above.

### e. "<u>Claim 8</u>: The system recited in Claim 1, wherein the user interface highlights detected structures."

281.     It is my opinion that the combination of MHonArc with Mosaic does not disclose claim 8 for at least the reason that the combination does not disclose claim 1, as discussed above.

1    Specifically, the combination does not detect "structures" within the meaning of the patent, nor does

2    it allow for actions to be linked to particular structures.  Further, the combination of MHonArc with

3    Mosaic would not highlight "detected structures."  Instead, the Mosaic browser would highlight only

4    pre-marked data that had been converted to hyperlinks by the MHonArc system.

### 2.    Conventional Pointers

6    282.    Dr. Cohen asserts that "[t]o the extent that any of the above pieces of art is found not

7    to anticipate the '647 Patent because it fails to disclose or use specified connections to actions as

8    required by the Posner construction, it would have been obvious to use function pointers to computer

9    subroutines to implement a set of options, such as in a pop-up menu of available actions."  Cohen

10   Decl., ¶ 241.  While "creating a specified connection" through pointers was well known, the '647

11   patent discloses detecting structures and linking actions to detected structures, elements not present in

12   the prior art.

13   283.    As none of the prior art references disclose "linking actions to detected structures,"

14   one of ordinary skill's familiarity with the use of "pointers" to create a specified connection is

15   irrelevant.  Dr. Cohen's  analysis, however, does demonstrate that "creating a specified connection"

16   through the use of pointers differs only insubstantially to other forms of "linking."

### 3.    Simultaneous Invention

18   284.    Dr. Cohen claims that the subject matter of claims 1 and 8 were known and widely

19   disclosed by February 1, 1996 (the date on which the '647 Patent application was filed), and that

20   "Apple knew about at least invention by Pandit," i.e., U.S. Patent 5,859,636, prior to that date.

21   Cohen Decl., ¶ 245.  Dr. Cohen then points to a single internal Apple email, dated May 23, 1995,

22   from '647 Patent inventor Bonnie Nardi, which states that REDACTED

23

24   Cohen Decl., ¶ 245.  As an initial matter, it is not clear if Dr. Cohen's opinion

25   is that this email, attached as Exhibit TT to his declaration, evidences that the '647 inventors believed

26   the '636 patent was similar to their invention.  Nonetheless, Dr. Cohen presents no evidence that

27

28

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK                108

1  REDACTED (Cohen

2  Decl., Exhibit TT).

3      285.    Finally, Dr. Cohen's belief that this email is relevant to the '647 patent directly refutes

4  his opinion regarding the inventors' conception of the '647 patent. REDACTED

5

6                                                                          If that were the case,

7  then the '647 inventors must have conceived of the claimed invention by at least the date of this

8  email, or Dr. Nardi would not have REDACTED

9                          Dr. Cohen's very reliance on this document establishes that the inventors at

10  least conceived of the '647 patent by May 1995.

11          **4.**    Secondary Considerations

12      286.    While I do not believe that Dr. Cohen has demonstrated obviousness as to either of

13  claims 1 or 8, my opinion as to nonobviousness is further supported by various of the secondary

14  considerations.  It is my opinion that numerous iOS Apple products include the inventions of claims 1

15  and 8, including, for example, the iPhone 3GS, the iPhone 4, the iPad, and the iPad 2.  For example,

16  the Mail application in all of these Apple products includes the claimed inventions. Apple generally

17  refers to the functionality covered by the asserted claims as "data detectors," and that term has also

18  been used in numerous reviews and discussions of Apple products to describe this functionality.

19      287.    My opinion that the claimed inventions are implemented in the above-mentioned

20  Apple products is based upon the following.  As part of my work in the ITC Investigation No. 337-

21  TA-710, I personally reviewed the Apple source code for the "data detectors" that runs in the Mail

22  and Mobile Safari applications on the iPhone 3GS and the iPhone 4.  I personally own an iPhone 4,

23  an iPad, and an iPad 2.  Not only have I extensively used and examined the Apple products that I

24  own, but I have also personally used and examined all of the above-mentioned Apple products and

25  have confirmed that all of them provide the functionality of the claimed inventions.

26      288.    I have also reviewed the Declaration of Christopher Vellturo regarding the importance

27  of the technology patented and claimed in the '647 patent to the products at issue in this case.  Based

28

REPLY EXPERT DECLARATION OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-0630-LHK          109

1   on the review of Dr. Vellturo's declaration I understand that the '647 patent leads to the commercial

2   success of the products at issue.  Additionally, I understand from Dr. Vellturo's declaration that

3   Samsung reviewed the iPhone and its implementation of the '647 patent when designing its own

4   devices.

5        289.     There are also examples of copying.  For example, after Apple announced the pending

6   release of Data Detectors, a company named MacSpigot released a software package called "Data

7   Ratchet." Exs. 13, 14.  Data Ratchet "automatically and instantaneously extracts critical information

8   from web pages, email, or any other text document" and claimed to be "an implementation of the

9   'Apple Data Detectors' information extraction design currently in development at Apple."

10       290.     In addition, the Data Detectors functionality has received praise. *See e.g.* Ex. 11

11  (Wright Tr.), 80:18-81:10.  Data detection was not a well known principle at the time of the '647

12  patent's filing; if anything, Apple coined the phrase with its release of Apple's Data Detectors. *See,*

13  *e.g.*, "Show of Potential Apple Breaks New Ground by Displaying What's on its Drawing Board -

14  'Innovation is at the Heart of what we do.'" Ex. 15.  In my opinion, the overall area of functionality

15  created by this claimed invention is further evidence as to its nonobviousness.

1

2          I declare under penalty of perjury that the foregoing is true and correct.

3     · Dated:    May 14, 2012

4                                                      Todd C. Mowry

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
     REPLY EXPERT DECLARATION OF DR .TODD C.
     MOWRY CONCERNING U.S. PATENT NO.
Gibson, Dunn &   5,946,647 – CASE NO. 12-cv-0630-LHK          111
Crutcher LLP