JOSH A. KREVITT (CA SBN 208552)
jkrevitt@gibsondunn.com
H. MARK LYON (CA SBN 162061)
mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone: (650) 849-5300
Facsimile: (650) 849-5333

MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

MARK D. SELWYN (CA SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

***Attorneys for Plaintiff and Counterclaim
Defendant Apple Inc.***

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | CASE NO. 12-cv-00630-LHK<br><br>**REPLY DECLARATION OF DR. KARAN SINGH REGARDING U.S. PATENT NO. 8,074,172**<br><br>**Hearing:**<br>Date:  June 7, 2012<br>Time:  1:30 p.m.<br>Place: Courtroom 8, 4th Floor<br>Judge:  Honorable Lucy H. Koh<br><br>CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION OF THIRD PARTY GOOGLE, INC. |

**CONTENTS**

INTRODUCTION ................................................................................................................ 1

SUMMARY OF OPINIONS .............................................................................................. 1

    A.   EXECUTIVE SUMMARY ................................................................................ 1

    B.   OVERVIEW OF THE '172 PATENT ............................................................. 3

    C.   OVERVIEW OF INFRINGEMENT ANALYSIS ......................................... 6

    D.   OVERVIEW OF VALIDITY ANALYSIS ................................................... 9

INFRINGEMENT ............................................................................................................. 11

    A.   The Galaxy Nexus Infringes The Asserted '172 Patent Claims.................................... 11

    B.   Dr. Kaliski's Noninfringement Position Is Based On Incorrect Interpretations Of My Testimony ................................................................................................................ 13

APPLE'S USE OF THE PATENTED TECHNOLOGY ............................................... 16

VALIDITY .......................................................................................................................... 17

    A.   Longe And Robinson Do Not Anticipate Or Render Claims 18, 19, Or 27 Obvious ... 18

    B.   TextPlus Does Not Anticipate Or Render Claims 18, 19, Or 27 Obvious .................... 24

    C.   King Does Not Render Claims 18, 19, Or 27 Obvious ................................................. 29

    D.   Claims 18, 19, And 27 Are Not Obvious Combinations Of Known Elements ............. 31

    E.   The Technology Claimed In The '172 Patent Has Led To The Commercial Success Of The Devices At Issue. ........................................................................................... 35

Gibson, Dunn &
Crutcher LLP

F.   Claims 18 And 27 Describe How The System Responds To User Actions.................35

G.   Claims 19 And 27 Contain Algorithms That Enable A Person Of Ordinary Skill In The Art To Practice The Instructions Described In The Claims....................................35

LEVEL OF ORDINARY SKILL IN THE ART .........................................................................37

QUALIFICATIONS AND EXPERIENCE ...............................................................................37

COMPENSATION ...............................................................................................................37

MATERIALS CONSIDERED FOR THIS DECLARATION .....................................................37

LEGAL STANDARDS APPLIED ...........................................................................................38

CONCLUSION ...................................................................................................................38

**INTRODUCTION**

1.      I, Dr. Karan Singh, have been asked to provide a reply declaration in further support of my Declaration of February 8, 2012 (D.I. 15) ("Singh Decl."), in which I provided my opinion that the Samsung Galaxy Nexus infringes claims 18, 19 and 27 of United States Patent No. 8,074,172 (the "'172 Patent"), which is assigned to Apple, and that those claims are valid.

2.      I have reviewed the Declaration of Dr. Martin E. Kaliski, dated April 23, 2012 (D.I. 128) ("Kaliski Decl."), and disagree with the opinions offered therein.

3.      As explained in my February 8, 2012 Declaration, if I am called as an expert witness, I expect to testify regarding my background, qualifications and experience relevant to the issues in this action, the technical subject matter of the '172 Patent, the invalidity arguments and the prior art that Samsung has asserted against the '172 Patent, the accused Samsung products, and the Apple products that practice the claimed invention.

**SUMMARY OF OPINIONS**

4.      Based on information currently available to me and contrary to the Kaliski Declaration, it is still my opinion that:

        a.      The Samsung Galaxy Nexus infringes claims 18, 19, and 27 of the '172 Patent;

        b.      Claims 18, 19, and 27 of the '172 Patent are valid; and

        c.      Apple's iOS devices incorporate features claimed in the '172 Patent.

**A.      EXECUTIVE SUMMARY**

5.      The '172 Patent – and claims – focus on the way a user interacts with a touch screen device, and more particularly, a user's ability to enter text, and have that text automatically corrected, on a portable electronic device.   Samsung and Dr. Kaliski concede that the Samsung Galaxy Nexus

REPLY DECLARATION OF
DR. KARAN SINGH
Case No. 12-cv-00630

Gibson, Dunn &
Crutcher LLP

infringes claims 18, 19 and 27 of the '172 Patent when the claims are viewed from this clear perspective.

6.      Indeed, Samsung and its expert, Dr. Kaliski, offer no challenge at all to my opinion that the Samsung Galaxy Nexus infringes claim 27 of the '172 Patent.  And, for claims 18 and 19, Dr. Kaliski's argument that infringement depends on the way in which bits representing what the user types and sees on the screen are stored in memory finds absolutely no support in the claim language or the specification.   Neither the patent itself – nor the claims – specify the way in memory by which the device causes the current character string to be "kept" on the display.  Rather, as recited in claims 18 and 19, all that is required to demonstrate infringement is for the ***display*** to contain the current character string in the first area after the user gestures (e.g., taps) on the current character string in the second area (e.g., suggestions bar).   Thus, there is no real dispute that the Samsung Galaxy Nexus infringes claims 18 or 19 either.

**B.      OVERVIEW OF THE '172 PATENT**

7.      In the '172 Patent, a user enters a "current character string" displayed in a "first area" such as the body of an electronic mail message or the body of an SMS text message.  As the user presses on different locations on the touch screen keyboard, the characters selected are collated together to form the "current character string" in that first area.

8.      As the '172 Patent describes, instead of "car," the user may have typed "cae" by pressing on the "e" key that neighbors the "r" key on the touch screen keyboard as shown below in Fig. 4D (where the first area is labeled with number 214).

REPLY DECLARATION OF
DR. KARAN SINGH
Case No. 12-cv-00630                              3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



**FIG. 4D**

16      9.      To assist the user in correcting mistakes, while the current character string is being

17  displayed in the first area, the '172 Patent describes presenting to the user one or more "suggested

18  replacement character strings" on the touch screen interface.  In the example of Fig. 4D above, the

19  suggested replacement character string of "car" is shown along with the current character string of

20  "cae" in a suggestions bar between the keyboard and the text input area 214.

21
22      10.     The '172 Patent then describes that the touch screen graphical user interface enables

23  the user to interact with the touch screen to "replace" the "current character string" with the

24  "suggested replacement character string," in one of two ways.  First, the user can "gesture" or tap on

25  the "suggested replacement character string" on the touch screen.  Second, the user can "gesture" or

26  tap on a key on the keyboard associated with a delimiter (such as a space bar or punctuation mark).

27  The word in the first area of the display is then "replaced", such that the suggested replacement

28

character string appears on the display in the place where the "current character string" was previously displayed.  Dr. Kaliski does not contest, much less address, this disclosure in the '172 Patent's specification.

11.     If the user intended to input the current character string that is shown in the first area (for example the "cae" in the first area in Fig. 4D above), then the user gestures on top of the current character string that is shown in the second area – the suggestions bar.  The result of that action is that the current character string of "cae" is kept on the display and not replaced by the suggested character replacement string.  Dr. Kaliski fails to address this aspect of the claimed invention as well.

12.     As this illustrates, the '172 Patent focuses on what is displayed to the user and how the user interacts with the graphical user interface on the touch screen display to choose the words that are shown in the display as the user inputs text.

13.     The claims are consistent with the '172 Patent's specification.  For example, claim 18 references the display seen by the user as well as the user's interaction with that display by performing gestures on the current and suggested character strings:

> 18.  A graphical user interface on a portable electronic device with a keyboard and a touch screen display, comprising:
>
> a *first area of the touch screen display* that *displays* a current character string being input by a user with the keyboard; and
>
> a *second area of the touch screen display* separate from the first area that *displays* the current character string or a portion thereof and a suggested replacement character string for the current character string;
>
> wherein;
>
> the *current character string in the first area* is replaced with the suggested replacement character string if the user activates a key on the keyboard associated with a delimiter;
>
> the *current character string in the first area* is replaced with the suggested replacement character string if the user *performs a gesture on the suggested replacement character string* in the second area;

Gibson, Dunn &
Crutcher LLP

the *current character string in the first area* is kept if the user *performs a gesture in the second area on the current character string or the portion thereof displayed* in the second area.

('172 Patent col. 12:49-13:4 (emphasis added); *see also* '172 Patent col. 13:5-34 (claim 19).)  As the plain language of claim 18 makes clear, "kept" and "replaced" refers to what the user visually sees in the first area of the display – it does not, as Dr. Kaliski asserts, refer to how or where the bits representing what is shown on the screen are stored in memory.  Claim 19 contains similar display-focused language and therefore, it too is focused on what occurs on the display in response to various inputs from a user on the touch screen display.  And, claim 27 focuses on user correction by replacing the current character string with a suggested replacement when the user presses on a punctuation key.

## C.    OVERVIEW OF INFRINGEMENT ANALYSIS

14.    As I explained in my opening declaration, I evaluated what was displayed on the touch screen of the Galaxy Nexus in response to various inputs to determine whether each of the requirements of claims 18, 19 and 27 were satisfied.  Based on my evaluation, it is very clear that the Samsung Galaxy Nexus infringes each of those claims, a position that Dr. Kaliski does not refute.

15.    As I demonstrated in my opening declaration, the Galaxy Nexus satisfies every element of the asserted '172 Patent claims.  (*See* Singh Decl. ¶¶ 56-113 and Ex 6.)  For claim 18, I determined by using the Galaxy Nexus that it provides a touch screen display that 1) displays a current character string input by the user in a first area of the display; 2) displays the same current character string or a portion thereof in a second area of the display; 3) displays a suggested character string or strings to replace the current character string in the same second area of the display; 4) allows the user to replace the current character string with a suggested string by performing a gesture over the suggested string or selecting a delimiter key (*e.g.* spacebar or punctuation mark); and 5) allows the user to keep the current character string by performing a gesture on the current character

string or portion thereof in the second display area.  (*See* Singh Decl. ¶¶ 56-92 and Ex. 6.).  None of that is disputed by Samsung.

16.     For example, as shown below, a user of the Galaxy Nexus has typed in "messaf" as a current character string in a first area (the message area) of an email message.  That character string, "messaf," also appears in a suggestion bar – the second area of the display (the black area that has "messaf," "message" and "messages" displayed).



17.     If the user either taps on "message" or selects the space bar, then the character string "messaf" in the first area (the message area) is replaced with "message."   And, if the user taps on the "messaf" in the suggestions bar of the Galaxy Nexus, then the display still shows "messaf" in the first area of the screen and is ready to accept input of the next character by the user.  Thus, pursuant to claims 18 and 19, the current character string *in the first area* has been kept.

REPLY DECLARATION OF
DR. KARAN SINGH
Case No. 12-cv-00630                                      7

18.     Again, none of that is disputed by Samsung either.  Put simply, Samsung does not dispute that the Galaxy Nexus includes the functionality I relied on to show infringement.  ████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████  Indeed, no such support exists for such an argumen  ████████

█████████████████████████████████████████████████████

█████████████████████████████████████████  Again, all that is relevant to answer the infringement question is what is shown on the device's display after the device responds to the user's interaction on the touch screen.  And even Dr. Kaliski admitted that when viewing the device, the current character string that was in the first area of the display is still at the same place on the display, thus meaning that it was "kept" in that display.  (Kaliski Dep. 73:20-75:17 (Relevant portions of Dr. Kaliski's Deposition are attached as Exhibit 4).)

19.     Infringement of claim 27 is similarly clear.  Unlike claims 18 and 19, claim 27 does not require a first area or a second area.  Rather, claim 27 requires a portable electronic device that 1) displays a current character string input by the user and a suggested replacement character string; 2) while both the current character string and the suggested replacement are displayed, allowing the user to select a punctuation mark; 3) after the selection of the punctuation mark, replacing the current character string with the suggested replacement and appending the selected punctuation mark immediately after the suggested replacement.  ('172 Patent col. 14:35-55.)  The Galaxy Nexus satisfies all of these requirements.  (*See* Singh Decl. ¶¶ 93-113.)

20.     Dr. Kaliski does not offer an affirmative reason for why the Galaxy Nexus does not infringe claim 27.  Instead, he simply states that, because I did not examine the Galaxy Nexus source code, I cannot tell whether the Galaxy Nexus actually includes the "instructions" to perform the functionality claimed in claim 27 and thus cannot demonstrate that the Galaxy Nexus infringes. (Kaliski Decl. ¶ 95.)  I do not, however, need to look at the code to determine whether the Galaxy Nexus includes instructions to perform the functionality.  As explained above and in my original declaration, by using the device, I verified that the Galaxy Nexus performs the exact functionality required by claim 27.  Such functionality does not occur magically; rather, instructions implement the functionality.  Ultimately, Dr. Kaliski fails to allege that the Galaxy Nexus lacks any element of claim 27 or that the source code proves otherwise.  Because the Galaxy Nexus includes the claimed functionality, there also can be no dispute that it contains instructions for implementing that functionality.  Accordingly, the Galaxy Nexus infringes claim 27 of the '172 Patent.

### D.     OVERVIEW OF VALIDITY ANALYSIS

21.     I also disagree with Dr. Kaliski's assertion that the asserted '172 Patent claims are invalid due to anticipation or obviousness.  His invalidity arguments are based primarily on four prior art references: US Patent Pub. No. 2006/0274051 ("Longe"); US Patent No. 6,801,190 ("Robinson"); the *TextPlus for the Palm OS Users Guide* ("TextPlus User Guide"); and US Patent No. 5,953,549 ("King").  Specifically, he argues that Longe and Robinson anticipate all of the asserted '172 claims, that the TextPlus Users Guide anticipates claim 27 of the '172 Patent, and that all four of the references, standing alone or in combination with one another, render the asserted '172 Patent claims obvious. (Kaliski Decl. ¶ 135.)  I disagree.  In my opinion, none of these references anticipates or renders the asserted '172 Patent claims obvious.  In fact, the PTO explicitly found all of the '172

Patent claims valid over Longe and, by implication, Robinson.[1]  Oct. 24, 2011 Notice of Allowability, Reasons for Allowance ¶ 6.

22.     As explained above, claims 18 and 19 require the current character string input by the user to be displayed in two places on the screen.  Longe, Robinson, The TextPlus User Guide, and King all fail to anticipate these claims because none displays the current character string input by the user in two areas on the touch screen.  For example, Figure 1B from Longe shows a first area (the main text area in the background) and a second area (the popup word suggestion list) of the display.  The current character string "rwzt" is only displayed in the second area of the display.



**FIG. 1B**

23.     In addition, neither Longe nor Robinson anticipate claim 27 of the '172 Patent because neither discloses *replacing* the current character string with a suggested replacement string.  Instead, Longe and Robinson both describe a situation where words are placed, for the first time, in what Dr. Kaliski calls the "first area" after the user selects either the current character string or a suggested replacement string in the "second area".  Thus, there is never a word in the first area to "replace."

---

[1]  The portions of Robinson relevant to Dr. Kaliski's opinions are nearly identical to the portions of Longe relied upon by Dr. Kaliski.  Thus, Robinson's content was also deemed insufficient to invalidate any of the asserted '172 claims.

24.     In addition, The TextPlus User Guide fails to anticipate claim 27 because it does not disclose appending a selected punctuation mark to a suggested replacement string after the user selects a punctuation mark.

25.     Finally, it is my opinion that none of the prior art referenced by Dr. Kaliski, standing alone or in combination with other references, renders the asserted '172 claims obvious.  All of the references were designed to be complete, stand alone solutions to specific issues related to text input on small, portable devices.  Dr. Kaliski does not provide any reason for why a person of ordinary skill in the art would modify or combine any of these stand alone solutions to satisfy the elements of the asserted '172 Patent claims.

## INFRINGEMENT

### A.     The Galaxy Nexus Infringes The Asserted '172 Patent Claims

26.     In my February declaration, I opined that the Galaxy Nexus satisfies all of the claim limitations found in claims 18 and 19 of the '172 Patent.  (*See* Singh Decl. ¶¶ 56-92 & Ex. 6.)  My opinion remains unchanged.

27.     In fact, as Dr. Kaliski made clear during his deposition, he does not dispute that, from a visual perspective, the Galaxy Nexus infringes the asserted '172 Patent claims:

```
17          Q.   So you're saying if you apply a
18   visual approach to the claims that there is
19   infringement?
20          A.   I have no opinion on infringement
21   with a visual approach.  I'm simply saying I
22   don't even have to look at infringement.  I'm
23   just looking -- I found prior art that
24   invalidates it.
```

(Kaliski Dep. 99:17-24.)

REPLY DECLARATION OF
DR. KARAN SINGH
Case No. 12-cv-00630                    11

Gibson, Dunn &
Crutcher LLP

28.     The only reason Dr. Kaliski proffers for why the Galaxy Nexus does not infringe claims 18 and 19 of the '172 Patent is that, in his opinion, ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████  Dr. Kaliski does not provide an affirmative reason for why the Galaxy Nexus does not infringe claim 27 of the '172 Patent.  In fact, during his deposition, it appears that Dr. Kaliski admitted that he has no opinion whatsoever as to whether the Galaxy Nexus infringes claim 27.[2]

29.     However, even if Dr. Kaliski's understanding of the Galaxy Nexus source code is correct, his noninfringement argument is irrelevant because, as I discussed in the overview section of my declaration, the claim language and patent specification clearly demonstrate that the asserted '172 Patent claims relate to what the user ultimately sees on the display, not the steps the source code takes to generate the display.  Claims 18, 19, and 27 all refer to performing gestures on the current character string or suggested replacement string.  (*See* '172 Patent cl. 18, 19, 27)  As I stated above, it would be nonsensical to speak of gesturing on a character string if character string is construed to refer to source code or a memory location.  In addition, claims 18 and 19 both refer to keeping or replacing the user-input character string *in the "first area" of the display* depending on the gesture

---

[2]  Paragraph 92 in Dr. Kaliski's declaration is the only place where he alleges that the Galaxy Nexus does not infringe claim 27 of the '172 Patent.  (Kaliski Decl. ¶ 92 ("It is my opinion that the Samsung Galaxy Nexus does not infringe any of the '172 Asserted Claims.").)  However, during his deposition, Dr. Kaliski stated that paragraph 92 was a "typographical error" and that his discussion is only about claims 18 and 19.  (Kaliski Dep. 93:23-94:3 ("You had asked me at the beginning of the deposition if there was anything I wanted to correct in the report.  Paragraph 92, I'm saying it doesn't infringe any of the asserted claims.  My discussion is about claims 18 and 19.  That's a typographical error.")

Gibson, Dunn &
Crutcher LLP

the user performs. (*See* '172 Patent cl. 18, 19.)  Similarly, the specification repeatedly discusses keeping or replacing of the current character string in the "display tray" of the device, a reference to the actual display the user sees.  *See, e.g.*, '172 Patent col. 9:30-38 ("If the user taps on the duplicate of the current character string . . . , the current character string is left as is in the display tray.  If the user taps on the suggested replacement . . . , the current character string is replaced in the display tray."); '172 Patent col. 9:55-63 (describing how the "current character string in the display tray is replaced by the suggested replacement" if the user selects a delimiter); '172 Patent col. 7:40-43 & figs. 2, 4, 5 (showing that the "display tray" refers to the display seen by the user).

30.     Because the asserted '172 claims refer to what the user sees on the display and not the steps the source code takes to generate that display, there is *no dispute* that the Galaxy Nexus infringes the asserted '172 claims.  As I noted above, Dr. Kaliski provides no opinion on whether the Galaxy Nexus infringes from a visual perspective.  (Kaliski Dep. 99:17-24.)

**B.    Dr. Kaliski's Noninfringement Position Is Based On Incorrect Interpretations Of My Testimony**

31.     Dr. Kaliski's noninfringement argument incorrectly assumes that the asserted '172 claims refer to how the source code of the Galaxy Nexus operates, not what the user actually sees on the display.  However, Dr. Kaliski provides no support for this reading of the claims.  In fact, Dr. Kaliski did not even attempt to construe any of the terms in the asserted claims himself:

```
13          Q.    So you did not independent of what
14     Dr. Singh did try to give your own interpretation
15     of any claims of the asserted patent claims; is
16     that correct?
17          A.    Essentially, yes.  My job is to
18     rebut what he says and to try to figure out what
19     claim construction he's using.
```

(Kaliski Dep. 55:13-19.)  Instead, Dr. Kaliski claims that he attempted to use *my* interpretation of the asserted claims in doing his infringement analysis.  (*Id.* at 55:25-56:2.)  However, I have *never* interpreted the asserted '172 claims as describing anything other than what the user sees on the display.  Thus, because Dr. Kaliski's noninfringement opinion is based on an incorrect understanding of my interpretation of the claim terms, the entire premise of his noninfringement argument is flawed, and his opinion is meritless.

32.     Nor do any of Dr. Kaliski's citations to my deposition testimony support his contention that I suggested the '172 claim terms could be interpreted to refer to how the source code operates.  Indeed, in none of the instances of my testimony Dr. Kaliski cites was I responding to a question regarding my construction of the terms in the asserted '172 claims.  For example, Dr. Kaliski cites to page 63 of my deposition transcript to support the proposition that I "was unable to identify the understanding of one of ordinary skill in the art of 'replace a character string.'"  (Kaliski Decl. ¶ 84.)  However, as the deposition transcript shows, my statement was in response to a question regarding "string manipulation to replace a character string", not my understanding of what a person of ordinary skill in the art would understand the *claim term* "replace" to mean by itself.  (Singh Dep. at 63:16-19 (Relevant portions of my deposition are attached as Exhibit 3).)

33.     Similarly, in paragraph 86 of his declaration, Dr. Kaliski misleadingly quotes testimony from page 245 of my deposition to argue that I "admitted 'replacing' and 'appending' can refer to both 'a visual – the visual result' as well as to 'one particular way – of doing things' at an algorithmic level."  (Kaliski Decl. ¶ 86.)  Again, as the deposition transcript shows, my statements were in response to a question asking me whether I "also believe that [claim 27] *signifies something* in terms of the algorithm to one of ordinary skill in the art."  (Singh Dep. at 245:15-17.)  In response to this question *about algorithms*, I provided possible methods that one of ordinary skill could utilize to implement the user interface claimed in claim 27.  (*Id.* at 245:15-246:5.)  Thus, contrary to Dr.

REPLY DECLARATION OF
DR. KARAN SINGH
Case No. 12-cv-00630                                            14

Kaliski's characterization of my testimony, I was *not* stating that the "replacing" and "appending" elements in claim 27 could refer to the source code a portable electronic device employs to generate the display seen by the user.

34.     Dr. Kaliski's mischaracterization of my deposition testimony continues in paragraph 103 of his declaration, where he states that my definition of "keeping" as used in the claims of the '172 Patent means "'you would leave [a string variable] as is.'"  (Kaliski Decl. ¶ 103.)  This was not, and has never been, my position.  This quote came in the context of a series of questions from counsel for Samsung that specifically asked about the types of algorithms and source code a system might use to implement the functionality claimed in the asserted '172 claims.  (*See* Singh Dep. 51:17-56:5.)  Because the questions were directed at algorithms and source code, my answer related to algorithms and source code.  In summary, none of my deposition testimony Dr. Kaliski cites support his incorrect conclusion that I left open the possibility that the asserted '172 claims could relate to source code.  In fact, if I thought that determining whether the Galaxy Nexus infringes the asserted claims required source code analysis, I would have at least reviewed the publicly available Android source code as part of my analysis.

35.     To the extent that Dr. Kaliski himself interprets the '172 Patent claim terms to refer to how the source code operates, I disagree for the reasons I stated above regarding why the '172 claim terms refer to what the user visually sees on a display.

36.     Because the asserted '172 claims refer to what the user sees on a display, and because Dr. Kaliski has admitted that he has no opinion as to whether the Galaxy Nexus infringes under a "visual" reading of the asserted claims, there is no dispute that the Galaxy Nexus infringes claims 18, 19, and 27 of the '172 Patent.

Gibson, Dunn &
Crutcher LLP

**APPLE'S USE OF THE PATENTED TECHNOLOGY**

37.     Dr. Kaliski contends that my opinion that Apple practices the '172 Patent was limited to a short paragraph.  He then says that Apple does not use a bar in the middle of the screen that shows the current character string a second time.  As I testified at my deposition, that portion of my February 8, 2012 Declaration was inaccurate due to typographical errors.  The Apple iOS products incorporate functionality to enable replacement of a suggested replacement character string for a current character string through the use of delimiters like the space bar and punctuation marks.  If the user selects a punctuation mark, the system replaces the current character string with the suggested replacement character string appended with the punctuation mark selected, as described and claimed in at least claim 27 of the '172 Patent.

38.     In addition, Dr. Kaliski uses confusing terminology when he discussed the "English-language version of the iPhone."  In point of fact, all current models of the iPhone 4S sold in the United States come with keyboards for multiple languages.  For example, as can be seen from the screenshot below, the iPhone 4S that was purchased in the United States for my analysis includes over 50 different keyboards, many of which display the current character string and the suggested replacement string in a bar between the text input area and the keyboard.



39.     My February 8, 2012 Declaration provided my opinion that the iOS products practice the '172 Patent technology, which means that it utilizes at least one claim of the '172 Patent.  Dr. Kaliski does not dispute that the iOS products practice claim 27 of the '172 Patent.

## VALIDITY

40.     It is my opinion that claims 18, 19 and 27 of the '172 Patent are valid over the alleged prior art discussed by Dr. Kaliski.

41.     Dr. Kaliski leads his invalidity arguments with two references whose content was already reviewed by the PTO and found to be insufficient to render any of the claims of the '172 anticipated or obvious.  He apparently chose to lead with these references because his arguments relying on the TextPlus User Guide and King are even weaker.  All of these systems have significant design differences that will prevent a finding of invalidity.

1

**A.     Longe And Robinson Do Not Anticipate Or Render Claims 18, 19, Or 27 Obvious**

2      42.     As I previously noted, the PTO explicitly found all of the '172 Patent claims valid

3  over Longe.  Oct. 24, 2011 Notice of Allowability, Reasons for Allowance ¶ 6.   In addition, the

4

5  portions of Robinson relevant to Dr. Kaliski's opinions are nearly identical to the portions of Longe

6  relied upon by Dr. Kaliski, meaning that Robinson's content, like Longe, was already deemed

7  insufficient to invalidate any claim of the '172 Patent.  Neither reference discloses displaying the

8  current character string input by the user in two locations: a "first area" of the display and a "second

9  area" of the display that is separate from the first area which also displays suggested replacement

10  character strings.  '172 Patent cols. 12:53-59; 13:13-20.

11      43.     According to Dr. Kaliski, region 104 of Longe is the "first area" as used in claims 18

12  and 19 of the '172 Patent, and region 150 is the "second area." (Kaliski Decl. ¶ 115 ("Figure 1B

13

14  [from Longe] illustrates a virtual keyboard, Exact Type word 154 (current character string), Default

15  word 160 (replacement string), output text region 104 (first area), and a word choice list region 150

16  (second area).".)  Figures 1A and 1B of Longe are shown below for reference.

17

18

19

20

21

22

23

24

25

26

27

28



FIG. 1A                                          FIG. 1B

Gibson, Dunn &
Crutcher LLP

44.     As can be seen from Figures 1A and 1B, instead of displaying the current character string in two locations, Longe and Robinson only show the current character string in one area of the screen: "word choice list region 150". (Kaliski Decl. ¶ 115.) The current character string, which in Fig. 1B is "rwzt", is *not* shown in the "output text region 104 (first area)." (*Id.*) Only after the user selects either the current character string or a suggested replacement does the final word appear in what Dr. Kaliski considers to be the "first area" of Longe or Robinson. This is illustrated clearly in Figures 5A through 5E of Longe and the accompanying text that explains the figures. (*See* Longe at ¶¶ [0241]-[0246].) There, the figures and the accompanying text describe how the invention disclosed in Longe "generate[s] text *to be output* to text display region 104." (Longe at ¶ [0241].) Specifically, as each letter is input by the user, the word choice list is updated. (*See* Longe at ¶¶ [0241]-[0246].) Only after the user selects a character string in the word choice list is the word added to the output text display region 104. (*See* Longe at ¶¶ [0241]-[0246]; Fig. 5E.) Thus, instead of *replacing* the current character string that already exists in the first area with a suggested word selected from the second area—as required by claims 18 and 19—Longe and Robinson commit the selected word into the "first area" for the first time.

45.     Dr. Kaliski argues that paragraphs 169, 172, 178, 181, and 232 in Longe disclose displaying the current character string in two separate areas.[3] (*See* Kaliski Decl. ¶¶ 116-17.) However, for the reasons set forth in the following paragraphs, he is incorrect.

46.     Rather than disclosing displaying the current character string in two separate areas, paragraphs 169 and 181 of Longe confirm my opinion that Longe only displays the current character string in one area. Paragraph 169 states, in pertinent part:

> Two overlapping regions are defined on the display each of which display information to the user. An upper output text region 104 **displays the text entered**

---

[3]   Although Dr. Kaliski cites to paragraph 178 of Longe, the quotation he uses preceding that citation actually comes from paragraph 169. I address both paragraphs in this section.

REPLY DECLARATION OF
DR. KARAN SINGH
Case No. 12-cv-00630                                              19

> **by the user and serves as a buffer for text input and editing**.  A word choice list region 150, which in a preferred embodiment shown in FIG. 1B is super-imposed on top of the text region 104 provides a list of words and other interpretations corresponding to the keystroke sequence entered by a user.

(Longe at ¶ [0169] (with the portion of text quoted by Dr. Kaliski highlighted in bold).)  As an initial matter, the portion of the paragraph cited by Dr. Kaliski states nothing about displaying the current character string in two areas.  Furthermore, the paragraph continues by referencing Fig. 1B.  As I discussed above, Fig. 1B shows the current character string in only *one* area – the "word choice list region 150" – not two.  (Kaliski Decl. ¶ 115.)

47.     Paragraph 181 also describes the current character string being displayed in one location at any given time.  Dr. Kaliski excerpts the following from Paragraph 181 of Longe:

> When no current input sequence exists, an interaction on the Edit Word key 114 causes the system to establish a current input sequence consisting of the coordinate locations associated with the letters of the word that contains the insertion point cursor 107 or is immediately to the left of this cursor in the output text region 104.  The result is that this word is ***pulled in*** to the system creating a word choice list in which the word appears both as the Default word 160 and the Exact Type word 154.

(Kaliski Decl. ¶ 116 (emphasis added); Longe at ¶ [0181].)  In other words, if the user selects the Edit Word key when the cursor is in the middle of or directly to the right of a word that already exists in the text area (the first area), that word is pulled *from* the text area *to* the word choice list, where the user can select another suggested word.  Thus, like paragraph 169, paragraph 181 also describes displaying the current character string in ***only one location***.

48.     Dr. Kaliski's reliance on paragraphs 172 and 232 of Longe is also misplaced.  Paragraph 172 says nothing about displaying the user input string in a second area.  (*Id.* at ¶ [0172]).)  Instead, it merely describes a situation where the word choice list 150 displays a list of suggestions for the user based on frequency of use information, even when the user input string constitutes an actual word.  (*Id.* at ¶ [0172].)

Gibson, Dunn &
Crutcher LLP

49.     Likewise, paragraph 232 describes an embodiment that contains an initial word choice list and another "pop-up" word choice list that is generated from one of the words in the initial word choice list.  Dr. Kaliski excerpts the following from paragraph 232 of Longe:

> In another embodiment, the word-choice list is horizontal with words placed side-by-side in one or more lines, displayed in a convenient area such as along the bottom of the application text area or projected along the top of the virtual keyboard.  In another embodiment, an indication near each word or word stem in the list may cue the user that completions based on that word stem may be displayed and selected by means of a designated selection input applied to the list entry.  The subsequent pop-up word choice list shows only words incorporating the word stem and may, in turn, indicate further completions.  A word may be selected or extended via any of the methods described herein, adjusting appropriately for the horizontal versus vertical orientation.

(Longe at ¶ [0232].)  According to Dr. Kaliski, the "word stems constitute a current character string in a first area, which are also displayed in a second area described as the 'subsequent pop-up word choice list.'"  (Kaliski ¶ 117.)  This is incorrect.  Paragraph 232 explicitly states that the pop-up word choice list "shows *only* words *incorporating* the word stem," not the word stem itself.  (Longe at ¶ [0232].)

50.     Neither does paragraph 178 of Longe disclose displaying the current character string in two locations.  During his deposition, Dr. Kaliski quoted a portion of paragraph 178 of Longe to support his contention that Longe discloses displaying the current character string in two locations.  (Kaliski Dep. at 137:8-138:2.)  The portion of the paragraph he cites has nothing to do with displaying the current character string twice.  Instead, what Dr. Kaliski considers the "key thing" in paragraph 178 only discloses that if the user decides to accept the current character string as entered by the user, and the string is not in the lexicon, Longe will add the word to the lexicon.  (Kaliski Dep. at 137:7; Longe at ¶ [0178].)  Thus, if the user attempts to type the same word sometime later, but does not hit the exact letters required to formulate the word, the word *will appear in the word suggestion list* for the user to choose.  (Longe at ¶ [0178].)  The paragraph says nothing about displaying the current character string in a second location.  In summary, none of the paragraphs Dr.

Gibson, Dunn &
Crutcher LLP

Kaliski cites changes my opinion that Longe does not disclose displaying the current character string in two locations.

51.     In addition, Longe and Robinson does not disclose replacing the current character string in the first area with a suggestion selected from the second area, as required by claims 18 and 19 of the '172 Patent. '172 Patent cols. 12:60-67; 13:21-29.  Dr. Kaliski argues that paragraphs 231 and Figure 4J of Longe disclose this requirement.  (Kaliski Decl. Ex. 9 at 5.)  He is wrong. Paragraphs 231 and Figure 4J describe generating a new word choice list based on selecting a suggested string in the word choice list.  After the user types the current character string, paragraphs 231 and Figure 4J disclose that the user can perform a gesture on an area of the touch screen that will cause the suggested string to replace the current character string *in the word choice list* and generate a new word choice list based on the selected suggested string.  Thus, paragraphs 231 and Figure 4J describe replacing the current character string in the *second* area with another character string in the same *second* area.  At no point is the current character string displayed in the first area.  Therefore, no current character string in the first area ever exists to be replaced.

52.     Because Longe and Robinson fail to disclose the elements of claims 18 and 19 described above, they cannot anticipate these claims.

53.     Claim 27 is also not anticipated by Longe or Robinson because they fail to disclose *replacing* the current character string with a suggested character string when the user selects a punctuation mark.  In Longe and Robinson, the default word is placed, for the first time, in the "First Area" of the display when a user selects a punctuation mark.  The user-input current character string is never replaced by the suggested string.  Thus, Longe and Robinson do not anticipate claim 27.

54.     To support his incorrect conclusion that Longe and Robinson anticipate claim 27, Dr. Kaliski mischaracterizes my deposition testimony at page 183, lines 4-14 to argue that I "agreed that

step 41032 of Figure 4J of Longe discloses replacing an input sequence" during my deposition.

(Kaliski Decl. ¶ 111.)  However, I agreed to no such thing:

> Q [by Mr. Pak]: So you would agree with me that part of the Figure 4J algorithm in the specific paragraphs that we've been reading into the record does involve, quote, "replacing an input sequence with sequence of X/Y locations of characters in the selected word, choosing from a word list"?
>
> x                    x                    x
>
> THE WITNESS: It uses the word "replace," but it's – it doesn't – it doesn't clarify what and how is being replaced where.  I don't – I don't see that just by looking at – at that box.
>
> MR. PAK: Fair.

(Singh Dep. at 183:4-15.)

55.     As the above excerpt shows, I only agreed that Figure 4J uses the word "replace," not that "step 41032 of Figure 4J . . . discloses replacing an input sequence," as alleged by Dr. Kaliski. (Kaliski Decl. ¶ 111.)  Nor does Figure 4J actually disclose replacing an input sequence in the manner claimed in claim 27 of the '172 Patent.  Claim 27 of the '172 Patent describes a situation where, with both the current character string and a suggested replacement string displayed, if the user selects a punctuation mark, the portable electronic device replaces the current character string with the suggested character string and appends the punctuation mark immediately after the suggested character string.  '172 Patent col. 14:35-55.  The situation described in Figure 4J of Longe is completely different.  As I discussed in paragraph 51 above, the "replacing" of step 41032 of Figure 4J refers to replacing the current character string with a suggested character string *in the word choice list* to *generate a new list of suggestions*.  Only after the word choice list is generated can the user select a punctuation mark to accept the suggested word.  This process fails to anticipate claim 27 for at least two reasons: 1) "replacing" the current character string is triggered by selecting a specific portion of the screen corresponding to suggested word, not by selecting a punctuation mark; and 2) under the process disclosed in Figure 4J, by the time the user can select a punctuation mark, the user

input current character string has *already been replaced* by the suggested word in the word choice list.  Thus, the user cannot select a punctuation mark while *both* the user-input current character string and the suggested string are on the display, as required by claim 27.

56.      Nor does Longe or Robinson render the claims of the '172 Patent obvious.  Although Dr. Kaliski states his opinion that Longe or Robinson, "standing alone," render the asserted '172 Patent claims obvious, he offers no reasons or analysis for his opinion.  (Kaliski Decl. ¶ 135.)  Thus, for the reasons I provided in my opening declaration, it continues to be my opinion that Longe and Robinson do not render any of the asserted '172 claims obvious.  (*See* Singh Decl. ¶¶ 120-126.)

57.      Paragraph 123 of my February Declaration included a typographical mistake that suggests that, like claims 18 and 19 of the '172 Patent, claim 27 also required that both the first and second area display the current character string or a portion thereof.  I understood then, as I do now, that only claims 18 and 19 have that requirement.  As I stated in my February Declaration, Longe does not anticipate or render obvious claims 18, 19 or 27, for the reasons I have discussed in detail above.

**B.      TextPlus Does Not Anticipate Or Render Claims 18, 19, Or 27 Obvious**

58.      In his declaration, Dr. Kaliski asserted that the *TextPlus for the Palm OS Version 5.5 Users Guide* ("TextPlus User Guide") anticipates claim 27 of the '172 Patent.  (Kaliski Decl. ¶ 135, 149-53.)  I disagree.  The TextPlus User Guide does not anticipate claim 27 for failure to disclose all of the claim 27 elements.  As Dr. Kaliski admitted during his deposition, nowhere does the TextPlus User Guide disclose appending a punctuation mark after the word selected by the user, as required by claim 27.  (Kaliski Dep. 176:18-177:1.)

59.      Nor does the TextPlus User Guide render the claims of the '172 Patent obvious.  As an initial matter, the TextPlus User Guide does not attempt to solve the same problem the inventors of the '172 Patent sought to solve: namely, the decrease in efficiency of typing on a small keyboard due

to typing errors.  (’172 Patent col. 1:20-37.)  By contrast, the TextPlus User Guide does not disclose a program that provides suggestions for misspelled words.  Instead, the program disclosed in the TextPlus User Guide simply offers word or phrase *completions* based on the letters the user has already typed.  (*See* Kaliski Decl. Ex. H at 4, 6, 9.)

60.     Furthermore, the TextPlus User Guide actually teaches away from appending the punctuation mark after the word selected by the user.  In the context of the disclosure upon which Dr. Kaliski relies, the TextPlus User Guide similarly utilizes punctuation marks and space bars purely as selection mechanisms.  Choosing a punctuation mark or the space bar operates to select a chosen replacement word, but will not cause anything – whether it be a punctuation mark or a space – to be entered after that word automatically.  This is made clear because the space bar – used in the same manner as punctuation marks in this scenario – will not cause a space to be entered after the word.  Rather, in order to ensure that spaces are automatically inserted after words are entered, the user must explicitly enable an “Auto Insert Space” feature in the menu screen below.

**TextPlus Anywhere Options**
- ☑ Enable  ☑ All Applications
- List at  ☑ Bottom    ☐ Right
- ☐ Passive Keyboard Mode
- ☑ Enable Double Tap Popup
- ☑ Auto Insert Space
- Number of Words to Show: ▼ 3
- Number of Phrases to Show: ▼ 2
- Show List after ▼ 1  Characters
- ☐ Enable Sound   ☐ Separator

[ OK ]   [Cancel]

The TextPlus User Guide explains, “If the Auto Insert Space option is selected, a space is automatically inserted every time a word is entered.  One space is also automatically inserted after a

Gibson, Dunn &
Crutcher LLP

punctuation mark is entered."  *See* Ex. H. to Kaliski Declaration, TextPlus User Guide at 9.  Notably, this explanation precedes the statement relied upon by Dr. Kaliski to allege that the TextPlus User Guide anticipates claim 27, and particularly the statement "[i]f the word is the one you want to enter, enter a space or any punctuation marks and the word is automatically entered."  *Id.*  Because the TextPlus User Guide teaches away from appending a punctuation mark after the word selected by the user, and because it cannot offer word suggestions for misspelled words, it is also my opinion that the TextPlus User Guide, standing on its own, does not render claim 27 of the '172 Patent obvious.

61.     Dr. Kaliski's assertion that the TextPlus software renders claims 18 and 19 obvious is similarly without merit.  (Kaliski Decl. ¶¶ 135, 262.)  Nowhere does the TextPlus User Guide disclose displaying the current character string in two locations.  TextPlus instead describes a product that displays the current character string in only *one* area of the display:



In the above screenshot, taken from Exhibit M of Dr. Kaliski's Declaration, the current character string – "M" – is only displayed once.  Dr. Kaliski argues that the following excerpt from the TextPlus Users Guide discloses displaying the current character string in two locations:

> Since only two phrases can be displayed at the same time, it is possible that none of the two phrases displayed in the Phrase List is the desired phrase, but one or both of them has the same starting word as the desired phrase.  Instead of entering all the letters for the starting word, you should tap on the arrow (Move to the next word) icon at the right hand side of the Phrase List and the starting word is automatically inserted at the current cursor location.  Now you can keep on entering the letters of the next word in the phrase until the desired phrase shows up in the Phrase List.

(Kaliski Ex. H at 10.)  Specifically, Dr. Kaliski argues that "if a typed string is recognized as a word that is part of a phrase, it is displayed as a first word of a phrase.  The phrases list thus displays the current character string or a portion thereof."  (Kaliski Ex. M at 3.)  In other words, if the user types "More," the second area will display phrases incorporating "More", such as "More Than" or "More likely."  Dr. Kaliski asserts that this satisfies the claim elements requiring displaying the current character string in the second area.  I disagree.  Claims 18 and 19 of the '172 Patent both require that the second area of the display *always* show the current character string, *even if it is not a recognized word*.  For example, if the user were to enter the string "rwxt" in the first area, "rwxt" must also be displayed in the second area.  The TextPlus User Guide does not disclose this functionality.

62.     Furthermore, even if the phrase list satisfies the elements requiring displaying the current character string in a second area, the TextPlus User Guide fails to disclose keeping the current character string by gesturing on the current character string or a portion thereof in the second area, as required by claims 18 and 19.  As the TextPlus User's Guide discloses, to keep the first word of a phrase in the phrase list, the user must select "on the ***arrow (Move to the next word) icon*** at the right hand side of the Phrase List", *not* the current character string itself.  (Kaliski Ex. M at 10.)

63.     Dr. Kaliski also argues that, even if the TextPlus User Guide does not disclose displaying the current character string in two areas, one of ordinary skill would have been motivated

Gibson, Dunn &
Crutcher LLP

to implement this feature.  (Kaliski Decl. Ex. M at 3-4.)  However, this argument is belied by Dr.

Kaliski's own allegation that a previous version of TextPlus, as disclosed in the following screenshot

found in the *Comparative Review of Text Completion Software* article ("Comparison Article"),

displayed the current character string in two areas.  (Kaliski Decl. ¶ 128; Ex. M at 4; Ex. I.)



64.     Assuming that Dr. Kaliski's interpretation of the Comparison Article is correct—that

it discloses a version of TextPlus displaying the current character string in two areas—his

interpretation would also mean that the developers of TextPlus *abandoned* this user interface in favor

of one that only displays it in one area.  (*Compare* Kaliski Decl. Ex. H at 4 *with* Kaliski Decl. Ex. I at

2.)  Instead of rendering claims 18 and 19 of the '172 Patent obvious, the Comparison Article, as

interpreted by Dr. Kaliski, would show that the TextPlus software actually *teaches away* from the

claimed features.

65.     Nor do I agree with Dr. Kaliski's interpretation of the screenshot.  Although the

current character string happens to be displayed twice in the screenshot he cites, he cannot show

whether the suggestions list would include the current character string if the current character string

was not a complete word.  For example, in the screenshot above, Dr. Kaliski has no way of knowing

whether the word suggestion list would show "Wh" if the user had only typed "Wh" as opposed to

the complete word "What."  Indeed, because TextPlus focuses on word *completions*, it is likely that

the second area would display complete words only, not words-in-progress, as required by claims 18 and 19 of the '172 Patent.  Thus, the TextPlus program does not render claims 18 or 19 of the '172 Patent obvious.

### C.    King Does Not Render Claims 18, 19, Or 27 Obvious

66.    US Patent 5,953,541 ("King") also fails to render claims 18, 19, and 27 of the '172 Patent obvious.  King addresses the issue of discerning ambiguous keyboard strokes input on a portable device containing a reduced keyboard—*i.e.* a keyboard where one key represents multiple characters.  (*See, e.g.*, '541 Patent col. 3:19-30.)  The keyboard keys may be touch sensitive.  ('541 Patent col. 12:5-26.)  That is, if the user taps on the left side of a key representing the letters A, B, and C that is programmed to understand a tap on the left side as A, a tap in the center as B, and a tap on the right side a as C, King will recognize the user input as "A".  (*Id.*)  However, because keys on a portable device are necessarily small, accurate typing would be difficult.  King addresses this problem with a user interface that shows the user the word or words King deduces the user to mean in the main text area of the display, as opposed to what the user actually input.  Figure 1A of King illustrates this:

REPLY DECLARATION OF
DR. KARAN SINGH
Case No. 12-cv-00630

Gibson, Dunn &
Crutcher LLP

29



*Fig. 1A*

The above figure shows the display of the preferred embodiment of King after the user has selected the center part of the "ABC", "GHI", and "DEF" keys, in that order.  The user-input character string is "bhe" and labeled as area 72 in Figure 1 A.  ('541 Patent col. 12:20-26.).  As can be seen in Figure 1A, King automatically inserts a suggested word—here, "age"—in the main text area 66 of the display.  This suggestion also appears in the word suggestion list 76.  Instead of "age", the user can also select any of the other word suggestions listed in the word suggestion list, including the actual user-input character string "bhe".

67.     In my opinion, King does not render any of the asserted '172 Patent claims obvious.  As an initial matter, King fails to disclose a number of the elements in the asserted '172 claims.  According to Dr. Kaliski, region 66 of King Fig. 1A represents the "first area" of the display, and "selection list 76" represents the "second area."  (Kaliski Decl. ¶ 130.)  Using Dr. Kaliski's own interpretations of the first and second areas, King does not disclose displaying the user-entered current character string in two locations, as required by claims 18 and 19 of the '172 Patent.  Instead,

King discloses the exact opposite: it displays the *suggested* character string in both the first and the second areas; the user-input current character string is only displayed once in the second area. (King Fig. 1A.) Dr. Kaliski is thus wrong when he asserts that King displays the current character string in two locations. (*See* Kaliski Decl. Ex. N at 2-3.) And, because the user-input current character string is never in the "first area," it cannot be *replaced* by a suggestion from the second, as required by claims 18, 19, and 27 of the '172 Patent. Instead, King reverses the asserted claims of the '172 Patent by allowing the user to replace the *suggested* character string with the *user-input* character string. Furthermore, as Dr. Kaliski admitted during his deposition, King also fails to disclose replacing the current character string if the user selects a delimiter. (Kaliski Dep. at 147:22-148:1.)

68.     Nor would it have been obvious for one of ordinary skill in the art to modify King to satisfy the claim elements of the '172 Patent. The solution disclosed in the '172 Patent assumes an unambiguous keyboard which allows for accurate character input. King, by contrast, is specifically tailored to overcome the ambiguity problems associated with character input using reduced keyboards. King displays the *suggested* word in the first area because it *assumes* that the user-input character string will usually not reflect the character string the user actually intended to type. Modifying King to display the user-input character string in the first area would result in the undesirable result of displaying in the first area (the main text area) character strings that usually do not reflect the user's intended words. Thus, one of ordinary skill in the art would not be motivated or have a reason to modify King to disclose the elements of the asserted claims of the '172 Patent. Accordingly, King does not render claims 18, 19, or 27 of the '172 Patent obvious.

**D.     Claims 18, 19, And 27 Are Not Obvious Combinations Of Known Elements**

69.     In addition, Dr. Kaliski argues without any support that some unspecified combination or modification of the four references would render the claims obvious. His contention is belied by the fact that the PTO considered over 60 different prior art references, including the subject matter of

Longe and Robinson, yet found the combination claims novel and non-obvious.  Dr. Kaliski fails to demonstrate how any of these alleged combinations is any better than the prior art the PTO already considered and dismissed.

70.    None of the combinations Dr. Kaliski discusses in paragraphs 163 to 167 of his declaration render the asserted '172 claims obvious.  The four references Dr. Kaliski uses to make combinations – Longe, Robinson, the TextPlus User Guide, and King – were all intended to be complete, stand-alone solutions to the problems they were designed to solve.  In my opinion, one of ordinary skill would not be motivated or have a reason to combine any of these disclosures together.

71.    Dr. Kaliski simply asserts, without providing any support, that one of ordinary skill in the art would be motivated to combine these references because they all "relate to the problem of text input for small devices with limited space." (Kaliski Decl. ¶¶ 163, 164, 165, 166, 167.)  As an initial matter, I disagree with Dr. Kaliski's assumption that one of ordinary skill would combine all references that relate to the problem of text input for small devices.  There are many different issues associated with text input for small devices.  For example, whereas King addresses the problem of text entry on a *reduced, ambiguous* keyboard, Longe, Robinson, and TextPlus all provide solutions to text entry on *unambiguous* keyboards.  It would not be obvious to one of ordinary skill in the art to combine references that provide solutions specifically tailored for different types of input devices (ambiguous vs. nonambiguous keyboards).  Thus, Dr. Kaliski's unsupported assertion that one of ordinary skill in the art would combine all references that "relate to the problem of text input for small devices with limited space" is incorrect.  (Kaliski Decl. ¶¶ 163, 164, 165, 166, 167.) Furthermore, even if one were to accept Dr. Kaliski's assertion, the mere fact that certain references arguably address the same problem does not mean that it would be obvious to combine them.

72.    Nor does Dr. Kaliski provide any reasons as to why the combinations he proposes would overcome any of the shortcomings each reference has on its own.  For example, none of '172

claim elements missing from King or Longe would be satisfied by combining the references.  As discussed above, neither King nor Longe disclose showing the user-input current character string in two places, replacing the user-input current character string in a first area with a suggested character string in another, or keeping the user-input current character string in the first area.  Thus, because the combination of King with Longe would not add any elements that would teach toward the asserted '172 claims, such combination does not render the '172 claims obvious.

73.     Dr. Kaliski also lists a number of additional references to makes an unsubstantiated argument that the asserted '172 claims would have been obvious in view of those references.  He fails to perform any element-by-element analysis using any of those references or specify what, if anything, those references provide beyond the Longe, Robinson, TextPlus and King references he does discuss.  Moreover, he fails to identify what, if anything, those references disclose that was not already included in the 60-plus references that were considered by the US PTO when it determined that none of the issued claims of the '172 Patent were obvious, including its determination that the '172 Patent claims were not obvious in view of Longe (and thus the common disclosure he discussed from Robinson) in combination with any of those 59-plus other references.  I have been informed and understand that Dr. Kaliski and Samsung bear a heavy burden of demonstrating invalidity and their vague reference to a long list of references does not provide enough detail to understand what alleged combination they believe would render claims 18, 19, and 27 obvious.

74.     Dr. Kaliski's opinions regarding nonobviousness are not bolstered by any of the testimony he cites from my deposition or Mr. Kocienda's deposition.  Indeed, I believe his citations are misleading.  In one section of his declaration, Dr. Kaliski attempts to characterize testimony from Mr. Kocienda and me to show that the elements of the '172 Patent were "well-known" in the prior art.  (Kaliski Decl. ¶¶ 175, 179.)  In paragraph 176 of his declaration, Dr. Kaliski cites Mr. Kocienda's deposition testimony to assert that "when asked whether he was the first to invent the

individual elements of the asserted claims, [he was] repeatedly unable to answer in the affirmative."
(Kaliski Decl. ¶ 176.)  However, that Mr. Kocienda does not personally know whether he was the
first to invent the individual elements does not mean that he was in fact not the first to invent such
elements.  Dr. Kaliski also cites a portion of Mr. Kocienda's testimony about spell checking
functionality on Macintosh computers to attempt to support the same proposition.  However, the spell
checking functionality on a Macintosh – or indeed any computer – does not disclose the elements of
the '172 Patent for the simple reason that they were not implemented on a touch screen device, as
required by the '172 claims.

75.     Dr. Kaliski's citations to my deposition testimony similarly fail to support his opinion
as well.  Dr. Kaliski cites to a portion of my testimony to state that I was "unable to identify what was
new about individual claim elements."  (Kaliski Decl. ¶ 178.)  My answer did not indicate this.
Rather, as the deposition transcript shows, I was disagreeing with the premise of the question.  (Singh
Dep. at 70:4-22.)  In my opinion, and as I stated in my deposition, the novelty of an element cannot
be judged in a vacuum; instead, it must be judged in the broader context of the invention claimed.
(*Id.* at 70:13-22.)

76.     Dr. Kaliski also mischaracterizes Mr. Kocienda and my testimony to support his
opinion that the asserted '172 Patent claims were predictable combinations of elements *known in the
prior art*.  (Kaliski Decl. ¶¶180-82.)  Neither the portion of Mr. Kocienda's deposition testimony nor
its surrounding context discusses combining prior art references in any way.  (Kaliski Decl. ¶ 182;
Kocienda Dep. at 112:18-113:12. (Relevant portions of the Kocienda Deposition are attached as
Exhibit 2.)  Similarly, the portion of testimony Dr. Kaliski cites from my deposition has nothing to do
with predictability or combining prior art elements.  (*See* Kaliski Decl. ¶ 182; Singh Dep. 96:1-20.)
Rather, I was discussing my opinion that, while ways of implementing autocorrect technology are
"acceptable," determining whether one is "better" than another cannot be done absent formal

usability studies.  (Singh Dep. 96:1-20.)  Thus, none of the testimony from either Mr. Kocienda or

my deposition support or bolster Dr. Kaliski's nonobviousness opinions in any way.

**E.      The Technology Claimed In The '172 Patent Has Led To The Commercial Success Of The Devices At Issue.**

77.      I also understand, based on my review of the Declaration of Christopher Vellturo, that

the word recommendation technology claimed in the '172 Patent has led to the commercial success of

the Samsung Galaxy Nexus and the iPhone 4S.  As I mentioned in my opening declaration, I

understand that the commercial success of a product due to the merits of the claimed invention –

here, the technology disclosed in the '172 Patent – is a secondary consideration that weighs against a

finding of obviousness.  (Singh Decl. ¶ 37.)  Thus, this further bolsters my conclusion that the

asserted '172 Patent claims are nonobvious.

**F.      Claims 18 And 27 Describe How The System Responds To User Actions**

78.      I have read Dr. Kaliski's argument that claims 18 and 27 of the '172 Patent are

indefinite because they are allegedly apparatus claims that include method steps.  (Kaliski Decl. ¶¶

195-201.) I disagree.  In my opinion, claims 18 and 27 of the '172 Patent are apparatus claims because

they do not require the user to take any action.  Rather, the claims are written in a manner that

describes what the system does in response to user inputs.

**G.      Claims 19 And 27 Contain Algorithms That Enable A Person Of Ordinary Skill In The Art To Practice The Instructions Described In The Claims.**

79.      I have also read Dr. Kaliski's argument that claims 19 and 27 of the '172 Patent are

indefinite because they allegedly fail to provide a corresponding algorithm to the "instructions"

limitations.  (Kaliski Decl. ¶¶ 202-07.)  Again, I disagree.  As I stated earlier in my declaration, the

asserted claims relate only to what the user sees on the display of a touch screen device and requires

that the device include instructions to cause the device to behave in the specified manner.  The '172

Patent discloses algorithms that those instructions would then "instruct" the device to perform.  I understand that for such computer readable medium claims, disclosure of one or more steps that the computer performs is adequate.  That is what the '172 Patent provides.

80.     Here, claims 19 and 27 define the algorithms to be used in the claimed portable electronic devices.  Claim 19 discloses the following algorithm: 1) displaying in a first area of the display a current character string input by the user; 2) displaying in the second area of the display the same current character string or a portion thereof and a suggested replacement for the current character string; 3) if the user activates a key associated with a delimiter or performs a gesture on the suggested replacement in the second area, replacing the current character string in the first area of the display with the suggested replacement; and 4) if the user performs a gesture on the current character string or portion thereof in the second area, keeping the current character string in the first area.  (*See* '172 Patent 13:5-34.)  Figure 3 of the '172 Patent graphically illustrates the algorithm described by claim 19.  ('172 Patent Fig. 3.)  Claim 27 discloses the following algorithm: 1) displaying a current character string input by the user; 2) simultaneously displaying a suggested replacement character string for the current character string; and 3) if the user selects a punctuation mark key, replacing the current character string with the suggested replacement string, and appending the punctuation mark immediately after the suggested replacement string.

81.     Furthermore, in my opinion, persons of ordinary skill in the art would be able to implement the above algorithms by writing source code in a programming language compatible with the device on which the above algorithms would be executed.  The precise choice and sequence of instructions used in such an implementation is meaningful only in so far as they logically implement the functionality described in the claims of the '172 Patent.  Thus, claims 19 and 27 clearly define the structure of the apparatuses claimed.

Gibson, Dunn &
Crutcher LLP

### LEVEL OF ORDINARY SKILL IN THE ART

82.     Dr. Kaliski suggests that I did not know when the '172 Patent was filed.  As I explained in my deposition, I understand that it was filed in 2007 (not 1997 – a typo in my February Declaration) and that the person of ordinary skill in the art that I applied in that February Declaration was someone as described in January of 2007.

83.     Dr. Kaliski's proposed definition of a person of ordinary skill in the art of the '172 Patent does not differ substantially from that I applied, but I prefer my proposed definition. However, my conclusions in this and my original declaration are not affected regardless of which definition is used.

### QUALIFICATIONS AND EXPERIENCE

84.     My qualifications and experience are set forth in my February Declaration and are hereby incorporated by reference.

85.     Since my February 8, 2012 Declaration, in addition to offering testimony by deposition in this case and in *In re Certain Electronic Digital Media Devices and Components Thereof*, Investigation No. 337-TA-796, I have also offered testimony by deposition in *Apple v. Samsung,* Civ. Act. No. 2:10-cv-01846.

### COMPENSATION

86.     Since my February 8, 2012 Declaration, I have formed a consulting company called Cyclic Logic Inc.  Cyclic Logic is charging my current standard rate of $450 per hour for my work on this matter and also being reimbursed for any out-of-pocket expenses.  No part of my compensation is dependent upon the outcome of this litigation or the nature of the opinions that I express.

### MATERIALS CONSIDERED FOR THIS DECLARATION

87.     In addition to the materials considered in the February 8, 2012 Declaration, I have also considered the Kaliski Declaration and all of the alleged prior art specifically discussed in that declaration in forming the opinions set forth in this report.  I have also considered and relied upon my

education, knowledge of the relevant fields, and experience, as well as the additional materials set forth in Exhibit 1 to this Declaration.

## LEGAL STANDARDS APPLIED

88.     In my February 8, 2012 Declaration, I provided an explanation of the legal standards I applied.  I apply that same understanding in this declaration unless specifically referenced elsewhere. I am not a legal expert and offer no legal opinions.  However, I have been informed by counsel of the various legal standards that apply to the pertinent technical issues, and I have applied those standards in arriving at my conclusions expressed in this report.

## CONCLUSION

89.     In sum, it is my opinion that claims 18, 19 and 27 of the '172 Patent are infringed by the Galaxy Nexus; that the Apple iOS devices use the claimed features of the '172 Patent; and that claims 18, 19 and 27 of the '172 Patent are valid.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 14 May, 2012 _____

Karan Singh