Highly Confidential - Attorneys' Eyes Only

Page 1

1                UNITED STATES DISTRICT COURT
2               NORTHERN DISTRICT OF CALIFORNIA
3                     SAN JOSE DIVISION
4
5   APPLE INC., a California corporation,
6
                   Plaintiff,
7
    vs.                              CASE NO.  12-cv-00630-LHK
8
    SAMSUNG ELECTRONICS CO.,
9   LTD., a Korean business
    entity; SAMSUNG ELECTRONICS
10  AMERICA,INC., a New York
    corporation; SAMSUNG
11  TELECOMMUNICATIONS AMERICA,
    LLC, a Delaware limited
12  liability company,
13                 Defendants.
    _____/
14
15
16           H I G H L Y   C O N F I D E N T I A L
17            A T T O R N E Y S'   E Y E S   O N L Y
18
19     VIDEOTAPED DEPOSITION OF KARAN SINGH, Ph.D.
20              REDWOOD SHORES, CALIFORNIA
21               WEDNESDAY, APRIL 17, 2012
22
23  BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR
24  CSR LICENSE NO. 9830
25  JOB NO. 47999

Highly Confidential - Attorneys' Eyes Only

Page 2

```
 1      WEDNESDAY, APRIL 18,
 2         9:32 A.M.
 3
 4
 5
 6    VIDEOTAPED DEPOSITION OF KARAN SINGH, Ph.D.,
 7  taken at QUINN EMANUEL URQUHART & SULLIVAN,
 8  LLP, 555 Twin Dolphin Drive, Redwood Shores,
 9  California, pursuant to Notice, before me,
10  ANDREA M. IGNACIO HOWARD, CLR, CCRR, RPR,
11  CSR License No. 9830.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential - Attorneys' Eyes Only

Page 3

```
 1  A P P E A R A N C E S:
 2
 3     FOR APPLE INC.:
 4     GIBSON DUNN
 5     By:  BRIAN M. BUROKER, Esq.
 6          JENNIFER RHO, Esq.
 7     1050 Connecticut Avenue, N.W.
 8     Washington, D.C. 20036
 9
10
11
12
13     FOR SAMSUNG ELECTRONICS CO. LTD:
14     QUINN EMANUEL URQUHART & SULLIVAN
15     By:  SEAN S. PAK, Esq.
16     50 California Street
17     San Francisco, California 94111
18
19
20
21
22     ALSO PRESENT:  Frank Quirarte, Videographer
23            ---oOo---
24
25
```

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential - Attorneys' Eyes Only

Page 4

```
 1      REDWOOD SHORES, CALIFORNIA
 2         WEDNESDAY, APRIL 18, 2012
 3            9:32 A.M.
 4
 5
 6
 7     THE VIDEOGRAPHER:  Good morning, ladies and
 8  gentlemen.
 9     This is the start of disc labeled No. 1 in
10  the videotaped deposition of Dr. Karan Singh.  In the
11  matter of Apple Inc. versus Samsung Electronics LTD,
12  et al.
13     Held in the United States District Court, in
14  the Northern District of California, San Jose
15  Division.  Case No. 11-cv-01846-LHK.
16     This deposition is being held at 555 Twin
17  Dolphin Drive, in Redwood Shores, California, in the
18  offices of Quinn Emanuel on April 18th, 2012, at
19  approximately 9:32 a.m.
20     My name is Frank Quirarte from TSG Reporting,
21  Inc.  I am the legal video specialist today.
22     Our court reporter is Andrea Ignacio, in
23  association with TSG Reporting.
24     Will counsel and all present please identify
25  yourselves and who you represent.
```

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential - Attorneys' Eyes Only

Page 5

```
 1     MR. PAK:  Sean Pak of Quinn Emanuel,
 2  representing Samsung.
 3     MR. BUROKER:  Brian Buroker and Jennifer Rho
 4  of Gibson Dunn for Apple.
 5     THE VIDEOGRAPHER:  Madam Court Reporter,
 6  would you please swear in the witness.
 7
 8        KARAN SINGH, Ph.D.,
 9       having been sworn as a witness
10       by the Certified Shorthand Reporter,
11         testified as follows:
12
13        EXAMINATION BY MR. PAK
14     MR. PAK:  Good morning, Doctor.
15     THE WITNESS:  Good morning.
16     MR. PAK:  Q.  Can you please state and spell
17  your name for the record.
18     A  Karan Singh.  My passport says Karansher
19  Singh.  I will spell it.  K-A-R-A-N-S-H-E-R,
20  S-I-N-G-H.
21     Q  And have you been deposed before?
22     A  Once.
23     Q  In which case?
24     A  I don't remember the exact case number, but
25  it's an ITC case.  Apple versus Samsung.
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 50

1  deposition of Dr. Karan Singh.
2       (Recess taken.)
3       THE VIDEOGRAPHER:  Back on the record.
4  The time is 10:54 a.m.
5       This marks the beginning of Disc No. 2 in the
6  deposition of Dr. Karan Singh.
7       MR. BUROKER:  I just wanted to clarify for
8  the record about the protective order.
9       Dr. Singh is -- signed the protective order
10 in the earlier Northern District of California case,
11 the 1846 case.
12      To the extent that evidence in that case is
13 usable in this case, he has had access to some of that
14 information, and that I'm informed that he has just
15 signed the protective order within the last few days
16 in the 630 case, the undertaking.  Excuse me.
17      MR. PAK:  Q.  Sir, in the last Northern
18 District of California case, the 1846 case that
19 counselor mentioned, were you provided with access to
20 any Samsung confidential information?
21   A  The -- you said the other Northern District
22 of California case, yes.
23   Q  Were you given access to Samsung source code?
24   A  Yes.
25   Q  But I take it, based on the testimony you

TSG Reporting - Worldwide     877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 51

1  gave today, you did not analyze any of the Samsung
2  source code in connection with your declaration for
3  this investigation?
4    A  That is correct.
5    Q  Did you rely on any other confidential
6  information besides the source code from the earlier
7  1846 case, in connection with your declaration in this
8  case?
9    A  No, there's no -- no overlap.
10   Q  Okay.  Doctor, did you discuss the substance
11 of your testimony during the break?
12   A  No.
13   Q  It was my -- my fault in one of the
14 questions.  I want to re-ask the question just to make
15 sure we can have a clear record.
16   A  Okay.
17   Q  Okay.  Would you agree with me that a person
18 of ordinary skill in the art in 2007 would require
19 experimentation to develop an algorithm and a set of
20 instructions for taking an input character string and
21 appending a punctuation mark to that string?
22      MR. BUROKER:  Objection; vague.
23      THE WITNESS:  It would depend.  It would
24 really depend on -- on -- on the system.  But the
25 answer is, yeah, it may or may not.

TSG Reporting - Worldwide     877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 52

1       MR. PAK:  Q.  And when you say it depends on
2  system, are you talking about some of these that we
3  mentioned earlier this morning?
4       MR. BUROKER:  Objection; vague.
5       THE WITNESS:  Yeah, possibly.
6       MR. PAK:  Q.  What are some of the other
7  factors that you have in mind?
8    A  Other factors could be related to how
9  characters were displayed.
10   Q  Any other factors?
11   A  Well, at least these two.
12   Q  What's the difference between replacing a
13 character string and retaining a character string?
14      MR. BUROKER:  Objection; vague.
15      THE WITNESS:  As I said, you sort have to
16 qualify the question -- sorry -- yes, the question was
17 when you talk about retaining or replacing something,
18 usually that's something -- it needs to exist at a
19 particular location or at a particular -- it has to be
20 somewhere.
21      And so I would -- I would say that retaining
22 that entity means it stays where it is, and replacing
23 that entity would be replacing that entity in its said
24 location with something else.
25      MR. PAK:  Q.  And let me see if I can make it

TSG Reporting - Worldwide     877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 53

1  a little bit more precise for you.
2    A  Right.
3    Q  So if we have an example of a character
4  string being stored as a variable in a Java
5  application --
6    A  Right.
7    Q  -- okay?
8       You know how to do that?
9    A  Yes.
10   Q  Okay.  How would you do that?
11   A  How would you?
12   Q  How would you store a character string as a
13 variable in Java?
14   A  You would assign a variable to the given
15 character string.
16   Q  Is there a type of variable that you would
17 declare?
18   A  Declare a string a variable.
19   Q  So let's assume that a character string has
20 been stored as a string variable in Java.
21      What is the difference between replacing that
22 variable and retaining that variable?  Let me be --
23      Let's assume that a character string has been
24 stored as a string variable in Java.
25      What is the difference between replacing that

TSG Reporting - Worldwide     877-702-9580

14 (Pages 50 to 53)

Highly Confidential - Attorneys' Eyes Only

Page 54

1 character string and retaining that character string
2 in that particular example?
3     MR. BUROKER: Objection; vague; foundation;
4 incomplete hypothetical.
5     THE WITNESS: It would also -- it would
6 somewhat depend on -- on whether that set of
7 characters that form the character string that you
8 mentioned were the only characters that were being
9 stored by that variable or whether it was potentially
10 part of perhaps another variable. Perhaps another --
11 a larger, larger string.
12     MR. PAK: Q. Well, let's take the first
13 scenario --
14   A  Okay.
15   Q  -- And see if you can explain it for us.
16   A  Okay. What is -- what is the first scenario?
17   Q  It is where the -- as you mentioned -- the
18 only characters that are being stored are the vari- --
19 are the characters that are being replaced. It's now
20 part of a larger character string.
21   A  Right.
22     In that scenario, you would, in general,
23 reassign the variable to another string.
24   Q  In which context?
25   A  In -- in -- in the context of replacing.
    TSG Reporting - Worldwide    877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 55

1   Q  On the other hand, if you were to simply
2 retain the character string in that variable, how
3 would you perform that function?
4   A  You would leave it as is.
5   Q  And in the second scenario you mentioned
6 where the character string that's stored in the string
7 variable is part of a larger string, what is the
8 difference between replacement of that string versus
9 retaining that string?
10     MR. BUROKER: Same objections.
11     THE WITNESS: Well, you would -- you would
12 need to change a portion of -- of that, of the string.
13     MR. PAK: Q. And how would one do that?
14   A  Well, the -- there are a number of ways that
15 you could actually accomplish that. In code, in
16 general, you could create a completely new variable
17 where you -- where you take a portion, you take
18 another portion.
19     But in -- specifically, actually, if you
20 wanted to replace it in that, in -- in -- in a given
21 variable, then you would have to truncate the previous
22 string and -- and append or concatenate it with the --
23 with the second string.
24   Q  Do you know if that's possible in Java?
25   A  Yeah, there are -- there are mechanisms to
    TSG Reporting - Worldwide    877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 56

1 support it.
2   Q  And in that second scenario we've been
3 discussing, what would the user do to perform the
4 function of simply retaining the character string?
5   A  Nothing.
6     MR. BUROKER: Objection; vague; lacks
7 foundation.
8     MR. PAK: Q. Sir, if you could take out
9 Exhibit No. 1.
10  A  Yes.
11  Q  I take it that you've analyzed the figures
12 and specification of this patent?
13  A  Yes.
14  Q  When was the last time you saw this patent?
15  A  Let's see. I saw it yesterday.
16  Q  Did you meet with counsel to prepare for your
17 deposition?
18  A  Yes.
19  Q  And I take it that you reviewed this patent
20 in connection with that session?
21  A  Yes.
22  Q  Why don't you take a quick look at the
23 figures and the specification of the '172 patent, and
24 let me know if you see any code instructions that are
25 included as part of the '172 patent specification.
    TSG Reporting - Worldwide    877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 57

1     MR. BUROKER: Objection; vague; lacks
2 foundation.
3     THE WITNESS: There are algorithmic
4 flowcharts.
5     MR. PAK: Q. Where is that?
6   A  Figure 3.
7   Q  Okay. Besides Figure 3, do you see any other
8 inclusion of code instructions?
9   A  In figures -- nope.
10  Q  Okay. And let's look at Figure 3.
11    If you compare Figure 3 to Claim 19 of
12 the '172 patent --
13  A  Okay.
14  Q  -- do you see that the functions that are
15 identified for the instructions in Claim 19 are
16 reproduced in Figure 3?
17    MR. BUROKER: Objection; foundation; form.
18    THE WITNESS: Can you repeat the question.
19    MR. PAK: Sure.
20  Q  Do you see that the functions that are
21 identified for the instructions in Claim 19 are
22 reproduced in figure -- Figure 3 of the same patent?
23    MR. BUROKER: Objection.
24    THE WITNESS: The functionality is -- is
25 reproduced, yes.
    TSG Reporting - Worldwide    877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 62

1  and answered that.  You're, anyway, trying to --
2  anyway twist the word "particular."
3      THE WITNESS:  Well, yes.  To the extent I can
4  see, there's -- there's no description at -- at the
5  level of code that has been provided to perform that
6  replacement.
7      MR. PAK:  Okay.
8  Q  So based on -- well, first of all -- let me
9  step back.
10     You believe you are at least one of ordinary
11 skill in the art with respect to the '172 patent?
12 A  That's right.
13 Q  You looked at the patent?
14 A  Yes.
15 Q  You looked at the prosecution history?
16 A  Yes.
17 Q  So based on what you read, please tell me the
18 algorithm that you have in mind for performing a
19 replacement of a current character string with another
20 character string.
21     MR. BUROKER:  Objection; foundation; form;
22 incomplete hypothetical.
23     THE WITNESS:  Well -- sorry.  Yeah.
24     Depending on -- depending on the system I was
25 working with, one algorithm that a person of ordinary

TSG Reporting - Worldwide    877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 63

1  skill in the art might use is to take the string that
2  one wished to replace and use that string to -- to
3  change the string that was being currently displayed,
4  wherever it was currently being displayed.
5      However, the -- however, the -- the display
6  of the current character string in -- in the first
7  area, as -- as the claim language says, it would
8  essentially take that string and -- and replace it.
9  That's the algorithm.
10     You would use essentially string manipulation
11 instructions to do that.
12     MR. PAK:  Q.  And the techniques that you
13 just described would be something that would be well
14 known to one of ordinary skill in the art in 2007?
15 A  To perform string manipulation?  Yes.
16 Q  And specifically, to perform string
17 manipulation to replace a character string, do you
18 believe that that was something well known to one of
19 ordinary skill in the -- skill in the art in 2007?
20     MR. BUROKER:  Objection; form and foundation.
21     THE WITNESS:  To -- when you -- when you ask
22 a question like that, I think you -- it -- it -- in my
23 mind, it sort of is a bit vague, because you can talk
24 about replacing a string at a visual level on -- on a
25 screen, as well as you can talk about taking a string

TSG Reporting - Worldwide    877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 64

1  variable and -- and replacing that string variable.
2      Performing a string manipulation to change
3  one variable's contents, yes, would -- would have been
4  known to a person of ordinary skill in the art.
5      MR. PAK:  Q.  You said it's a bit vague
6  because you can talk about replacing a string at a
7  visual level versus taking a string variable and
8  replacing that string variable?
9  A  Right.
10 Q  What did you mean by that?
11 A  Well, the -- the -- the visual display of
12 a -- of a string sort of requires that -- that the
13 string variable that -- that is -- is sort of
14 capturing the particular string is also displayed
15 using some display mechanism.
16 Q  Do you believe that it would have been well
17 known to one of ordinary skill in the art in 2007, the
18 function of -- and the function in the algorithms of
19 taking a replacement character string and displaying
20 it on a screen?
21     MR. BUROKER:  Objection; vague; incomplete
22 hypothetical.
23     THE WITNESS:  Potentially, depending on the
24 system, yes.
25     MR. PAK:  Q.  What type of system did you

TSG Reporting - Worldwide    877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 65

1  have in mind?
2  A  Could be -- well, could be any -- any system,
3  really.  But it would -- it would depend on the -- on
4  the intricacies of the system, the parameters of the
5  system.
6  Q  Setting those system differences aside, would
7  you agree with me that the function and the algorithms
8  of taking a replacement character string and
9  displaying it on a screen would have been well known
10 to one of ordinary skill in the art in 2007?
11     MR. BUROKER:  Objection; form; foundation.
12     THE WITNESS:  If there was an appropriate
13 motivation to do so in -- in -- in a certain context,
14 perhaps.
15     MR. PAK:  Q.  When you say "perhaps," does
16 that mean that you don't know, or are you saying --
17 A  I would -- meaning that I would -- I would
18 need to know what the -- what the precise scenario in
19 which one would want to perform such an operation
20 would be to be able to provide a conclusive --
21 conclusive answer.
22 Q  Let me be more precise.
23 A  Okay.
24 Q  Setting aside those system differences, and
25 in the context of providing input on a keyboard, would

TSG Reporting - Worldwide    877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 66

1  you agree with me that one of ordinary skill in the
2  art in 2007 would have known how to take a replacement
3  character string and display it on a screen?
4     A  One of ordinary skill in the art would know
5  how to take a character string -- any given character
6  string and display it on a screen, yes.
7     Q  You would agree with me that prior to 2007,
8  there were systems that would take input character
9  strings and replace them with -- with another
10 character string; correct?
11        MR. BUROKER:  Objection; vague.
12        THE WITNESS:  Potentially.
13        MR. PAK:  Yes.
14    Q  What do you mean "potentially"?
15    A  Well, meaning that it's plausible.  But I
16 don't -- you know, I don't have access to any specific
17 system prior to 2007 on which I could literally test
18 this out and -- and answer that question the way
19 you've phrased it.
20    Q  You have not investigated that issue?
21    A  I have not taken specific systems that I know
22 to predate 2007 and -- and -- and looked into the
23 aspect of -- of string -- looked into whether it was
24 precisely replacing a string on -- on the screen.  But
25 I can -- it is plausible that -- that such systems did

TSG Reporting - Worldwide     877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 67

1  exist.
2     Q  You would agree with me, at least, that the
3  concept of taking an input character string and
4  replacing it with another character string was
5  known --
6     A  The concept, yes.
7     Q  -- prior to 2007?
8     A  Yes.
9     Q  Okay.  You would also agree with me that the
10 algorithms for taking an input character string and
11 replacing it with another character string was -- were
12 also known in the 2007 time period?
13    A  Assuming that -- that you were given a
14 particular design and the -- a reason or motivation or
15 context to -- to do -- to perform such an action,
16 the -- the concept of doing it, yes.
17    Q  So I take it the -- in your expert opinion,
18 the point of novelty of the '172 patent is not the
19 general concept of taking a -- an input character
20 string and replacing it with another character string?
21        MR. BUROKER:  Objection; vague; incomplete
22 hypothetical.
23        THE WITNESS:  I believe the point of novelty
24 in the '172 is -- are -- are the collection of claims
25 of the '172.  And the claims -- the way they are

TSG Reporting - Worldwide     877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 68

1  formulated capture an innovative design to facilitate
2  text entry on a portable electronic device.
3        MR. PAK:  And I want to get into that.
4        THE WITNESS:  Okay.
5        MR. PAK:  I'll definitely get into that.
6        THE WITNESS:  Sure.
7        MR. PAK:  I'm just trying to establish a
8  baseline.
9        THE WITNESS:  Yeah.
10       MR. PAK:  Q.  The specific concept of simply
11 replacing an input character string with another
12 character string is not something that was new as of
13 2007 --
14       MR. BUROKER:  Objection; form.
15       MR. PAK:  Q.  -- right?
16    A  Well, the concept of replacing of a character
17 string, of one string being replaced by another
18 string, typically, yes, the concept would -- may well
19 have existed.
20       But bereft of -- bereft of a context to
21 surround it, the -- just the notion of replacing a
22 string with another string is -- it needs to be looked
23 at in -- in a larger context to be able to make --
24 to -- to be able to say things about its novelty.
25    Q  Fair.  I just want to get --

TSG Reporting - Worldwide     877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 69

1     A  Right.
2     Q  -- the record straight.
3     A  Yes.
4     Q  And we'll get to the specific combinations
5  later.
6        Now, the concept of taking a replacement
7  character string and displaying it on a screen, you
8  would also agree that that concept generally was also
9  known prior to 2007?
10       MR. BUROKER:  Objection; vague; asked and
11 answered.
12       THE WITNESS:  Yeah, the concept of putting a
13 character string -- a character string up on a -- up
14 on a screen, yes, just by itself.
15       MR. PAK:  Q.  And the concept of checking for
16 misspellings as the user types a word was also well
17 known prior to 2007; correct?
18       MR. BUROKER:  Objection; form.
19       THE WITNESS:  Yes, perhaps.  But I -- from
20 what I -- what I believe you're reciting, though,
21 are -- are sort of individual elements or individual
22 concepts which are -- essentially by themselves may be
23 known, yes.
24       MR. PAK:  That's what I'm trying to get at.
25       THE WITNESS:  Right.  Okay.

TSG Reporting - Worldwide     877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 70

1   MR. PAK: And we'll later get to why you
2   think specific combinations may be novel or not.
3   THE WITNESS: Fine.
4   MR. PAK: Q. I want to just establish on the
5   record that you would agree with me that the specific
6   individual limitations that we've been discussing are
7   well known -- were well known in the 2007 time period?
8   MR. BUROKER: Objection; vague and compound.
9   THE WITNESS: Perhaps.
10   MR. PAK: Q. You don't dispute that
11   technically, sitting here today?
12   MR. BUROKER: Same objections.
13   THE WITNESS: Taken out of context, I -- I
14   cannot -- I cannot dispute it; but I cannot re -- I
15   cannot corroborate it, either, because I -- I believe
16   you would want to look at the -- a person of ordinary
17   skill in the art would -- would want to look at --
18   at -- to define, you know, a concept by itself, I
19   think -- I think you -- the -- the limitations as you
20   are mentioning them, I would imagine that they -- they
21   would need to be embedded in a broader context for
22   them to -- for them to have some substantive meaning.
23   MR. PAK: Q. Do you understand as an expert
24   that you could have patent claims where one of the
25   limitations is a novel limitation on its own?

TSG Reporting - Worldwide    877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 71

1   MR. BUROKER: Objection; lacks foundation;
2   calls for a legal conclusion.
3   He's not a lawyer.
4   THE WITNESS: Yeah, I can't -- I can't
5   legally opine on -- on that.
6   MR. PAK: Not my question.
7   THE WITNESS: Right. Okay.
8   MR. PAK: I'm not asking you to opine
9   legally.
10   THE WITNESS: Yes.
11   MR. PAK: Q. I'm asking you what your legal
12   understanding is --
13   A   Yes.
14   Q   -- so you can apply that legal understanding
15   as part of your expert analysis.
16   A   Right.
17   Q   Have you been instructed on the question of
18   whether a patent claim can have a novel element as one
19   of its limitations?
20   MR. BUROKER: Objection; it's not the law; it
21   lacks foundation.
22   THE WITNESS: Not specifically, but I would
23   imagine that it could.
24   MR. PAK: Q. And have you also been
25   instructed on whether a patent claim can claim novelty

TSG Reporting - Worldwide    877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 72

1   in combining known elements?
2   A   Yes.
3   Q   Earlier today you talked about system
4   differences in terms of how input character strings
5   are received and processed --
6   A   Yes.
7   Q   -- do you recall that?
8   A   Yes.
9   Q   Can you look through the '172 patent again
10   and tell me whether you see any specific descriptions
11   on the way in which the '172 system would receive and
12   process input characters.
13   MR. BUROKER: Objection; vague.
14   THE WITNESS: Yeah, I believe there's --
15   there -- there are -- there are descriptions in --
16   around Column 7, if you look around Line 20, where it
17   talks about looking at taps and swipes and ways of
18   receiving input.
19   MR. PAK: My question was more specific. It
20   was talking about character strings.
21   THE WITNESS: Oh, okay.
22   MR. PAK: So --
23   THE WITNESS: What was the question, again,
24   then?
25   MR. PAK: Q. Can you look through the patent

TSG Reporting - Worldwide    877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 73

1   again --
2   A   Yes.
3   Q   -- and tell me whether you see any specific
4   descriptions of the way in which the '172 system would
5   receive and process input characters, character
6   strings.
7   MR. BUROKER: Objection; vague.
8   THE WITNESS: Yeah, I think it -- Column 8
9   talks about the operation of a soft keyboard, right,
10   and receiving -- receiving characters from -- from
11   this keyboard, plurality of input, delimiters and so
12   on. So there are a couple of paragraphs there that
13   generally talk about character strings.
14   MR. PAK: Okay. Let me ask you a more
15   specific question.
16   THE WITNESS: Yeah.
17   MR. PAK: Q. Can you tell me, based on what
18   you've read in the '172 patent, whether the
19   '172 patent system uses a string variable to hold an
20   input character string?
21   A   I believe it would have some form of -- of --
22   that -- that there would be -- a person of ordinary
23   skill in the art would -- would imagine that there
24   would be some form of variable that was -- that was
25   holding the -- the -- the different character strings

TSG Reporting - Worldwide    877-702-9580

19 (Pages 70 to 73)

Highly Confidential - Attorneys' Eyes Only

Page 94

1    A   The area where the replacement was -- was
2   entered.
3    Q   So comparing the iPhone design --
4    A   Yeah.
5    Q   -- to the designs that are depicted in the
6   figures of the '172 patent --
7    A   Yes.
8    Q   -- do you think there's anything
9   unpredictable or surprising about a design in which
10  the current character string is displayed twice, such
11  as the figures shown in the '172 patent, versus a
12  design in which the current character string is
13  displayed only once on the screen, such as the iPhone?
14       MR. BUROKER:  Objection; vague; incomplete
15  hypothetical.
16       THE WITNESS:  I find it difficult to answer
17  the question specifically with regards to the words
18  "unpredictable" or "surprising."
19       We're talking about two different designs
20  that -- that address a certain problem.  In
21  themselves, they are -- they are complete solutions.
22  But the differences between them, subtle as they may
23  seem, can have a strong impact on -- on the usability.
24       MR. PAK:  That's my point.
25    Q   My point is, I want an understanding from

TSG Reporting - Worldwide    877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 95

1   your --
2    A   Yes.
3    Q   -- perspective, having analyzed the iPhone --
4    A   Yeah.
5    Q   -- and analyzed the figures of the
6   '172 patent --
7    A   Yeah.
8    Q   -- do you believe that there is something
9   surprising or better about the '172 figures compared
10  to the iPhone design?
11       MR. BUROKER:  Same objections.
12       THE WITNESS:  As far as I see, both patents
13  actually -- both -- both phones actually practice the
14  '172 patent.  So I -- that's -- that's a question
15  that's difficult to answer.
16       MR. PAK:  Not my question.
17       THE WITNESS:  Okay.
18       MR. PAK:  My question is focused on the
19  display of the current character string.
20       THE WITNESS:  I see.  Okay.  Right.
21       MR. PAK:  Q.  On that question --
22    A   Right.
23    Q   -- do you have a view -- if you don't have
24  one, that's fine.
25    A   Okay.

TSG Reporting - Worldwide    877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 96

1    Q   But do you have an expert opinion, sitting
2   here today --
3    A   Yes.
4    Q   -- on whether the display twice
5   implementation as shown in the figures on the
6   '172 patent is better than the display once system
7   used in the iPhone?
8        MR. BUROKER:  Objection; vague; incomplete.
9        THE WITNESS:  Inasmuch as I have looked at
10  both designs, I think to answer a question like
11  "better," you would need to perform a formal sort of
12  usability analysis.  But I find that they -- they do
13  both work.
14       MR. PAK:  Q.  You find both of them to be
15  acceptable; correct?
16    A   Acceptable, yes.
17    Q   And I take it that you have not done a
18  usability study comparing the iPhone design versus the
19  figures shown in the '172 patent?
20    A   No.
21       MR. PAK:  Okay.  I'm going to hand you my
22  next exhibit.
23       THE WITNESS:  Okay.
24       MR. PAK:  This is your declaration, sir.
25       THE WITNESS:  Okay.

TSG Reporting - Worldwide    877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 97

1        (Document marked Singh Exhibit 2
2         for identification.)
3        MR. PAK:  And I will mark as Exhibit No. 2
4   the declaration of Dr. Singh regarding the
5   '172 patent.
6        MR. BUROKER:  I'll just note for the record,
7   it does not include the exhibits; correct?
8        MR. PAK:  I believe it does not -- it does
9   not include the exhibits.
10       MR. BUROKER:  This exhibit to the deposition
11  doesn't include the exhibits that we're going to
12  attach?
13       MR. PAK:  Correct.
14    Q   Okay.  Do you recognize this document?
15    A   Yes.
16    Q   Okay.  This is your declaration in the
17  context of the preliminary injunction motion in this
18  case?
19    A   Uh-huh.
20    Q   Are you -- are you aware of any
21  misrepresentations or inaccuracies in your
22  declaration, sitting here today?
23    A   I did come across a few -- yeah, certainly
24  there -- there are a few typos and -- and -- and a few
25  mistakes in there.

TSG Reporting - Worldwide    877-702-9580

25 (Pages 94 to 97)

Highly Confidential - Attorneys' Eyes Only

Page 182

1    MR. PAK: Q. But here, I just want to
2 establish that in 228 paragraph of the Longe
3 reference, it does talk about replacing a current
4 input string or sequence --
5    MR. BUROKER: Same objections.
6    MR. PAK: Q. -- true?
7  A  It talks about a current input sequence of
8 actual interaction points when a sequence of
9 interaction points corresponding to the coordinate
10 locations of the letters comprising a word in the
11 selected row.
12    It doesn't quite -- it's not clear what the
13 meaning to me is, just reading this, or, I would
14 imagine, me or a person of ordinary skill in the art
15 just reading this, this paragraph.
16  Q  We'll get to that.
17  A  Yeah.
18  Q  It uses the word "replace," sir; right?
19  A  I see the word replace there, yes.
20  Q  Okay. And if we look at the algorithm 4J, do
21 you see box 41032?
22  A  41032, yes.
23  Q  Can you please read that into the record.
24  A  "Replace input sequence with sequence of X/Y
25 locations of characters in selected word."

Highly Confidential - Attorneys' Eyes Only

Page 183

1  Q  That's part of the algorithm for Figure 4J;
2 right?
3  A  That is correct.
4  Q  So you would agree with me that part of the
5 Figure 4J algorithm in the specific paragraphs that
6 we've been reading into the record does involve,
7 quote, "replacing an input sequence with sequence of
8 X/Y locations of characters in the selected word,
9 choosing from a word list"?
10    MR. BUROKER: Objection; vague; compound.
11    THE WITNESS: It uses the word "replace," but
12 it's -- it doesn't -- it doesn't clarify what and how
13 is being replaced where. I don't -- I don't see that
14 just by looking at -- at that box.
15    MR. PAK: Fair.
16  Q  Now, we saw that in the '172 patent there was
17 no specific description of the replacement algorithm
18 in that patent --
19    MR. BUROKER: Object to form; foundation.
20    MR. PAK: Q. -- correct?
21  A  There was -- there was a clear indication
22 of -- of the procedure, the process of -- of
23 replacement.
24  Q  I'm talking about specific algorithms for the
25 replacement function itself.

Highly Confidential - Attorneys' Eyes Only

Page 184

1    You and I agreed earlier today that there was
2 no particular algorithm that was described for
3 replacing the current character string in the
4 '172 patent; correct?
5    MR. BUROKER: Objection; misstates
6 character -- misstates testimony.
7    THE WITNESS: I think we agreed that there
8 was no specific indication on how exactly string
9 manipulation might be performed to -- to indicate a
10 replacement. That's what we agreed on, yeah.
11    MR. PAK: Q. We also agreed that one of
12 ordinary skill in the art in the 2007 time period --
13  A  Yes.
14  Q  -- would have known how to use string
15 manipulation to replace current character strings --
16    MR. BUROKER: Same objections.
17    MR. PAK: Q. -- correct?
18  A  In the context of -- given the appropriate
19 motivation and design, yeah, a person of ordinary
20 skill in the art should be able to implement a method
21 that would replace a string, yes.
22  Q  Sir, let's be candid here. You haven't
23 really analyzed Figure 4J and the algorithm that's
24 described in Figure 4J until today; right?
25    MR. BUROKER: Object to form and

Highly Confidential - Attorneys' Eyes Only

Page 185

1 argumentative.
2    MR. PAK: Q. You're analyzing this real
3 time; right?
4    MR. BUROKER: Same objections.
5    THE WITNESS: I've looked at 4J. I haven't
6 analyzed it in detail.
7    MR. PAK: Q. And you didn't do that analysis
8 before you submitted your declaration; right?
9    MR. BUROKER: Same objections.
10    THE WITNESS: Yes, perhaps.
11    MR. PAK: Okay.
12  Q  Now, let's go back to the hypothetical
13 scenario that we were discussing earlier.
14  A  Okay.
15  Q  And this time I'm going to go back to
16 Figures 1A and 1B again.
17    The user types the sequence C-A-Z, and then
18 the letters C-A-Z are displayed in the output text
19 region 104; do you have that scenario in mind?
20    MR. BUROKER: Object to form.
21    THE WITNESS: As far as I understand, when
22 the user types the letters C-A-Z, they would appear in
23 the area 154.
24    MR. PAK: Q. But 154 doesn't appear until
25 the user pushes the edit word?

## Page 242

Highly Confidential - Attorneys' Eyes Only

1  A  From a visual standpoint.
2  Q  Okay.  Let me make sure I --
3  A  I think I -- I...
4  Q  Let me ask my question again.
5  A  Yes.
6  Q  Do you believe that keeping the current
7  character string --
8  A  Yes.
9  Q  -- in the first area is different than
10 replacing the current character string in the first
11 area?
12 A  Replacing it with what?
13 Q  With another input string.
14 A  Yes, of course, yes.
15 Q  Do you think that's a trivial difference?
16    MR. BUROKER:  Objection; form.
17    THE WITNESS:  No, I don't think it's a
18 trivial difference.  In -- as I've said before, in
19 this -- in the area of interface design, small
20 changes, small differences can -- can have a
21 substantial impact.
22    MR. PAK:  Q.  Can you think of differences at
23 the algorithmic level between these two different
24 functions that may have an impact on the system?
25    MR. BUROKER:  Object to form.

TSG Reporting - Worldwide    877-702-9580

## Page 243

Highly Confidential - Attorneys' Eyes Only

1     THE WITNESS:  Depending on the parameters of
2  the system, they -- the way you might design it
3  algorithmically may or may not be -- may or not -- may
4  or may not be different significantly.
5     MR. PAK:  Q.  Can you think of one potential
6  difference at the algorithmic level?
7  A  An algorithmic between --
8  Q  Keeping --
9  A  -- keeping --
10 Q  -- versus replacing.
11 A  -- versus replacing?
12    Sure.  In replace -- in -- to perform a
13 replacement, you need -- the algorithm needs to
14 actually perform -- perform an action that will --
15 that will cause -- cause that string to be replaced.
16 Q  And how is that different than an algorithm
17 that keeps the current character string?
18 A  Well, an algorithm that keeps the current
19 character string potentially doesn't -- doesn't need
20 to replace that string.
21 Q  And would this difference in the algorithm --
22 algorithmic level have any impact on system level
23 performance or design?
24    MR. BUROKER:  Objection; form; incomplete
25 hypothetical.

TSG Reporting - Worldwide    877-702-9580

## Page 244

Highly Confidential - Attorneys' Eyes Only

1     THE WITNESS:  It may or may not, depending on
2  the parameters of the -- of the system.
3     MR. PAK:  Q.  And in what way could it have
4  an impact?
5  A  Potentially, if the -- if the algorithmic
6  difference required resources that -- that were
7  considered significant or impact-worthy.
8  Q  What are these resources that you had in
9  mind?  What do you mean by those resources?
10 A  Well, you mentioned system performance.  That
11 could be one example.
12 Q  How about memory?
13 A  Perhaps.
14 Q  Power consumption?
15 A  Unlikely, but maybe.
16 Q  If I go back to Claim 27 --
17 A  Yes.
18 Q  -- of the '172 patent, it talks about
19 appending a punctuation mark, and that follows
20 replacing the current character string; do you see
21 that?
22 A  Yes.
23 Q  What is your understanding, as one of
24 ordinary skill in the art, when it says that you
25 replace the current character string, and then you

TSG Reporting - Worldwide    877-702-9580

## Page 245

Highly Confidential - Attorneys' Eyes Only

1  append the punctuation mark at the end of that string?
2  A  Exactly what you just said, a person of
3  ordinary skill in the art.
4  Q  What -- I'm not trying to be --
5  A  Right.
6  Q  -- trivial here.
7  A  Okay.
8  Q  What I'm trying to understand is:  Is that a
9  visual limitation?  Are we talking about the visual
10 effect of what the user sees, or are we talking about
11 the actual steps that one would follow at the code
12 level to one of ordinary skill in the art?
13 A  Well, it at least refers to a visual -- the
14 visual result.
15 Q  Do you also believe that it signifies
16 something in terms of the algorithm to one of ordinary
17 skill in the art?
18    MR. BUROKER:  Object to form.
19    THE WITNESS:  It suggests one -- one
20 particular way of -- of doing things.
21    MR. PAK:  Okay.
22 Q  What is that?
23 A  Sorry?
24 Q  What is that?
25 A  One way might be to a string manipulation,

TSG Reporting - Worldwide    877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 246

1  where you replace the string and then append to that
2  string a punctuation.
3       But another potential embodiment might be to
4  append a punctuation mark to the replacement string
5  and then perform a string replacement.
6     Q  Do you believe that these are trivial
7  differences or significant differences between these
8  two types of algorithms?
9       MR. BUROKER:  Object to form; foundation.
10      THE WITNESS:  The two examples I gave you at
11 the algorithmic level seem -- seem like they could be
12 alternative.
13      MR. PAK:  Q.  So you would consider the
14 differences to be trivial to one of ordinary skill in
15 the art?
16    A  Which differences to be trivial?
17    Q  The trivial -- I'm sorry.
18      Do you believe that the difference between
19 the first approach, where you replace a string and
20 then append, versus you append the string and then
21 replace, do you believe that difference to be trivial
22 to one of ordinary skill in the art?
23    A  In terms of code instructions that perform
24 string manipulation, it would be simple enough.
25    Q  How about in terms of system performance?

TSG Reporting - Worldwide    877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 247

1     A  It depends on how the strings were being
2  represented.
3     Q  Before today, had you formed any expert
4  opinions in this regard as to whether these
5  alternative ways of replacing and appending are
6  equivalent or not equivalent?
7     A  No, not particularly.
8     Q  Before today, had you formed any expert
9  opinion with respect to whether keeping a current
10 character string versus replacing a current character
11 string are equivalent or not equivalent?
12    A  Yes.  Visually, yes.
13    Q  How about at the algorithmic level?
14    A  I considered it.
15    Q  And was that consideration part of the basis
16 for your declaration that you submitted?
17    A  My declaration was largely based on -- on
18 the -- the visual aspect of replacement.
19    Q  Fair to say that you don't really understand
20 how the -- how the iPhone actually performs the
21 function of placing a suggested word that's been
22 selected onto the screen; correct?
23      MR. BUROKER:  Objection; foundation.
24      THE WITNESS:  As one of ordinary skill in the
25 art, I would have an idea of how that might be done.

TSG Reporting - Worldwide    877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 248

1  However, I have not looked at the Apple source code.
2       MR. PAK:  Q.  There's a range of
3  possibilities; right?
4     A  There is some leeway.
5     Q  And you haven't investigated how the iPhone
6  actually performs that function; correct?
7     A  At the code level, no.
8     Q  And similarly, at the code level, you really
9  don't understand how the accused Samsung Nexus phone
10 actually performs the function of placing a suggested
11 word onto the screen; correct?
12      MR. BUROKER:  Objection.
13      THE WITNESS:  Well, I have not been privy to
14 Samsung code specifically for this functionality for
15 this device, so it's not an analysis as of today that
16 I actually could have performed.
17      MR. PAK:  Q.  Well, even at the level of the
18 Android platform, you don't know today how the Android
19 platform actually performs the function of placing a
20 suggested word onto the screen; right?
21    A  I did not deem it necessary for the purposes
22 of my declaration, but it is certainly something that
23 could be done.
24    Q  You just haven't done it yet?
25    A  No.

TSG Reporting - Worldwide    877-702-9580

Highly Confidential - Attorneys' Eyes Only

Page 249

1     Q  And you didn't do it or rely upon that kind
2  of analysis by someone else as part of your
3  declaration; right?
4     A  No, not as part of my declaration.
5       MR. PAK:  Okay.  Let's take our next break.
6       THE VIDEOGRAPHER:  Going off the record.
7  The time is 5:33 p.m.
8       (Recess taken.)
9       THE VIDEOGRAPHER:  We're back on the record.
10 The time is 5:41 p.m.
11      MR. PAK:  Okay.
12    Q  Sir, having looked at the prosecution history
13 and looked at the Longe reference, do you have
14 anything to add to your testimony on what you believe
15 is the point of novelty for Claim 27 of the '172
16 patent?
17      MR. BUROKER:  Objection; vague.
18      THE WITNESS:  Well, as I mentioned, the
19 claims in themselves, in total, describe a particular
20 design, a design paradigm for text entry.  And in that
21 sense, I find Claim 27 on -- on the '172 to be -- to
22 be different from the design of -- as described by
23 Longe.
24      MR. PAK:  Q.  Do you want to add anything
25 else?  Is that sufficient for you now?

TSG Reporting - Worldwide    877-702-9580

63 (Pages 246 to 249)