Confidential
Under Protective Order

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                    SAN JOSE DIVISION
 4   APPLE INC., a California         )
     corporation,                     )
 5                                    )
                     Plaintiff,       )
 6                                    )
            vs.                       )  No: 12-CV-00630-LHK
 7                                    )
     SAMSUNG ELECTRONICS CO., LTD,    )
 8   a Korean business entity;        )
     SAMSUNG ELECTRONICS AMERICA,     )
 9   INC., a New York corporation;    )
     SAMSUNG TELECOMMUNICATIONS       )
10   AMERICA, LLC, a Delaware         )
     limited liability company        )
11                                    )
                     Defendants.      )
12   _____)
     AND RELATED CROSS ACTIONS.       )
13   _____)
14
15         CONFIDENTIAL UNDER PROTECTIVE ORDER
16           DEPOSITION OF MARTIN E. KALISKI
17                Palo Alto, California
18               Thursday, May 10, 2012
19
20
21
22
23   Reported By:
24   LINDA VACCAREZZA, RPR, CLR, CRP, CSR. NO. 10201
25   JOB NO. 49125
```

## Page 2

Confidential
Under Protective Order

May 10, 2012
8:47 a.m.

Videotaped deposition of
MARTIN E. KALISKI, held at held at
Gibson Dunn & Crutcher, LLP, 1881
Page Mill Road, Palo Alto,
pursuant to Subpoena before Linda
Vaccarezza, a Certified Shorthand
Reporter of the State of
California.

TSG Reporting - Worldwide    877-702-9580

## Page 3

Confidential
Under Protective Order

APPEARANCES:
 QUINN EMANUEL URQUHART & SULLIVAN
   Attorneys for Defendants
     50 California Street
     San Francisco, California 94111
   BY: SEAN S. PAK, ESQ.
   BY: JOHN T. MCKEE, ESQ.


 GIBSON DUNN & CRUTCHER
   Attorneys for Plaintiff
     1050 Connecticut Avenue, N.W.
     Washington D.C. 20036
   BY: BRIAN M. BUROKER, ESQ.
   BY: JEFFREY G. LAU, ESQ.









 VIDEOGRAPHER: Alexei Dias
TSG Reporting - Worldwide    877-702-9580

## Page 4

Confidential
Under Protective Order

     THE VIDEOGRAPHER:  Good morning.
This is the beginning of Disk Number 1 of
the videotaped deposition of Mr. Martin
Kaliski in the matter Apple versus
Samsung Electronics in the United States
District Court for the Northern District
of California, San Jose Division.  Case
number 12-CV-630 LHK.  This deposition is
being held at 1881 Page Mill Road, Palo
Alto, California, on May 10th, 2012, at
9:41 a.m. (sic.) My name is Alexei Dias
from TSG Reporting, Inc., and our court
reporter is Linda Vaccarezza.
     Counsel, please introduce
yourself.
     MR. BUROKER:  Brian Buroker and
Jeffery Lau for Apple, the plaintiff.
     MR. PAK:  This is Sean Pak of
Quinn Emanuel.  With me is John McKee,
representing Samsung.
     THE VIDEOGRAPHER:  Will the court
reporter please swear the witness.
     And to correct the record, the
time is 8:42 a.m.

TSG Reporting - Worldwide    877-702-9580

## Page 5

Confidential
Under Protective Order

     MARTIN KALISKI,
       Having been duly sworn, by the
    Certified Shorthand Reporter, was
    examined and testified as follows:
          EXAMINATION
BY MR. BUROKER:
     Q.  Good morning, Dr. Kaliski.  Could
you please state and spell your name for the
record, please?
     A.  Martin, M-a-r-t-i-n.  Kaliski,
K-a-l-i-s-k-i.
     Q.  Do you have a current business
address?
     A.  I do.
     Q.  Could you please state your
current business address?
     A.  2831 El Cerrito, C-e-r-r-i-t-o.
Street, San Luis Obispo, California 93401.
     Q.  Is that the address of your --
you're currently a professor emeritus, correct?
     A.  Yes.
     Q.  Is that the same address as you
keep an office at the university, or is that a
different address?
     A.  My office is based in my home.

TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 54

1  to deal with that is it's just ordinary usage.
2  Hitting a key, touching a key, swiping a key.
3      Q.   And that can include hitting,
4  swiping, touching a key on a virtual keyboard?
5      A.   Absolutely. Yes.
6      Q.   And what was your understanding of
7  the term "gesture" as you used it in the last
8  sentence of Paragraph 14 of your declaration?
9      A.   Well, that certainly is a term
10 that appears in Dr. Singh's declaration. And
11 I'm -- what I was trying to say earlier is -- and
12 it's not avoiding answering your question, it's
13 making sure that you understand why I'm answering
14 it the way I am. My job is to rebut Dr. Sings
15 report.
16          In order to do that, I need to
17 understand the basis of his opinions. In order
18 to understand that, I need to understand how he's
19 construing various terms that appear in the
20 claims. Gesture is one of them, for example.
21          Unfortunately, Dr. Singh has not
22 stated what any of his claim constructions are.
23 He has a perplexing definition of what ordinary
24 skill in the art is.
25          He's not articulated what the art
   TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 55

1  itself is, and all I can do is my best to infer
2  how he is viewing what the patent is teaching,
3  which appears to be from a visual perspective
4  what the user sees.
5          And I have attempted to take that
6  view in my analysis and in my rebuttal. And so
7  whatever he means by gesture is what I will view
8  gesture as. Something where the user does
9  something that can be seen, that does something
10 to the screen.
11         I'm really at a tremendous
12 disadvantage here, you understand.
13     Q.   So you did not independent of what
14 Dr. Singh did try to give your own interpretation
15 of any claims of the asserted patent claims; is
16 that correct?
17     A.   Essentially, yes. My job is to
18 rebut what he says and to try to figure out what
19 claim construction he's using.
20         Part of the problem is that in his
21 own testimony he seems to have -- he seems to
22 have himself been ambiguous on his claim
23 constructions, as to whether he was, for example,
24 looking at things visually or algorithmically.
25         I've done my best to respond to
   TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 56

1  his arguments using his view of the world and his
2  view of the claim terms. I'll leave my answer at
3  that.
4      Q.   And you did that in your analysis
5  of the infringement issues and the validity
6  issues in this case?
7      A.   Both.
8      Q.   Because you understand that you're
9  supposed to use the same claim interpretations
10 for infringement and validity; is that correct?
11     A.   I certainly do.
12         MR. BUROKER: Counsel, shall we
13 take a break.
14         MR. PAK: Sure.
15         THE VIDEOGRAPHER: This is the end
16 of Disk Number 1. The time is 9:54 a.m.
17 and we are now going off the record.
18         (Off the record at 9:54 a.m. until
19 10:02 a.m.)
20         THE VIDEOGRAPHER: This is the
21 beginning of Disk Number 2. The time is
22 10:02 a.m. And we are now going back on
23 the record.
24 BY MR. BUROKER:
25     Q.   Dr. Kaliski, one other question I
   TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 57

1  meant to ask earlier. You did not rely on any
2  expert declarations from any of Samsung's other
3  experts in this case, correct?
4      A.   No.
5      Q.   And you certainly considered and
6  relied on Dr. Singh's declaration, but you didn't
7  rely on any other Apple declarations in
8  conjunction with your analysis, correct?
9      A.   No.
10     Q.   And you identified having read the
11 transcripts of Apple employees Ken Kocienda and
12 Greg Christie; is that correct?
13     A.   Uhh --
14     Q.   That would be --
15     A.   Oh, B. That's A.
16         Yes.
17     Q.   And Mr. Christie is not an
18 inventor on the 172 patent; is that correct?
19     A.   Nope.
20     Q.   What was the reason for reviewing
21 the deposition transcript of Mr. Christie in
22 conjunction with your analysis of the 172 patent?
23     A.   It comes into play towards the end
24 of my declaration. I'll point to you
25 specifically where. Paragraph 177.
   TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 70

1  display that displays a current character string
2  being input by a user with a keyboard," correct?
3      A.   That's what that says.
4      Q.   So the first place the phrase
5  "current character string" is in that first full
6  paragraph in claim 18?
7      A.   Yes.
8      Q.   And that is describing what is
9  displayed in the first area of the touch screen
10 display, correct?
11     A.   It is among things that might be
12 displayed in the first area.
13     Q.   And so would you agree that the
14 word "current character string" is referring to
15 what is shown on the display?
16     A.   Not necessarily.  The display
17 displays a current character string.  The string
18 of course is a pattern of zeros and ones in some
19 coded alphabet.  What's displayed is a
20 visualization of the string.
21          One of ordinary skill in the art,
22 even with just a Bachelor's degree, would realize
23 that you're not displaying the string.  What
24 you're displaying is a representation of the
25 string.  You're tweaking the pixels so that it

TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 71

1  reflects the characters that make up the string
2  so it looks like the string.
3      Q.   This does not -- claim 18 does not
4  say displaying a representation of a string, does
5  it?
6      A.   Doesn't have to.  Everybody knows
7  when you're looking at a display you're
8  displaying a representation of the data, you're
9  not actually displaying the data.
10     Q.   Is there any place that you're
11 aware of in the 172 that says when it uses the
12 word "current character string" it is actually
13 talking about a representation of what's in
14 memory?
15     A.   Somebody of ordinary skill in the
16 art reading this patent would know that just as,
17 for example, 172 is totally silent about the
18 portable electronic device having a battery.  I
19 don't think this -- or having a case or having --
20 or made out of plastic or whatever.  There is
21 not -- a patent doesn't necessarily have to state
22 every single thing that one of ordinary skill in
23 the art would know is there.
24          All I'm simply saying is you
25 can't -- the current character string is an

TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 72

1  encoded version of the data that's sitting
2  somewhere in the computer.
3      Q.   Or it's possible that it's the
4  characters that I see when I look at the screen;
5  isn't it?
6      A.   We are getting now to a claim
7  construction issue.  I haven't seen an explicit
8  proffering of that definition of current
9  character string by your expert.  It's what you
10 see.  Your mind says, hey, that's the current
11 character string, but you realize there's a --
12 just so we are on the same page here.  When I hit
13 a key on my laptop or on that Smartphone, I hit
14 the letter A and the A appears on the screen.
15 That key is not what appears on the screen.
16 There's a lot that goes behind the scene.
17          A keyboard encoder figures out
18 what key you pressed and it moves it from a
19 keyboard buffer into some area of a display
20 memory and the display memory reads it.  But it
21 happens so instantaneously that the only time you
22 notice that it's not the case is when you're on a
23 very slow system and you hit the key and it takes
24 forever to appear.
25          So we have to be a little bit

TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 73

1  careful with language.  I agree that what you're
2  seeing here is what you typed.  It's the current
3  character string.  But at a software level behind
4  the scenes it's not necessarily what the current
5  character string is in view of where it's
6  stored.
7           And it just reinforces what I've
8  said all along, that Dr. Singh has taken a visual
9  view of this patent.
10     Q.   And visually if in the Samsung
11 Galaxy Nexus device the person performs a gesture
12 on the current character string, the same letters
13 that were on the screen before are on the screen
14 after, correct?
15          MR. PAK:  Objection.  Incomplete
16 hypothetical.
17          THE WITNESS:  If the gesture is to
18 maintain it, to keep it and not replace
19 it, the same letters will be there, yes.
20     Q.   Let's use the Wakasa declaration,
21 because I don't think there's any screen shot
22 examples in your declaration.
23          If you look at the Wakasa
24 declaration, which is Exhibit 5 on Page 2 there's
25 a screen shot.  Do you see that?

TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 74

```
 1      A.   I do.
 2      Q.   And you reviewed this as part of
 3  your declaration, correct?
 4      A.   I did say that, yes.
 5      Q.   So in his example the letters TES
 6  have been input and are showing in the area with
 7  the long blue underline.  Do you see that?
 8      A.   Yes.
 9      Q.   And in the black area between that
10  and where the keys are shown there are three
11  different entries.  There's TES on the left-hand
12  side; YES in the middle; and TEA on the right,
13  correct?
14      A.   Yes.
15      Q.   What's your understanding of what
16  the TES in the black portion of this screen is?
17      A.   That's a copy of the current
18  character string.
19      Q.   And what's the YES in the center?
20      A.   That's a suggested replacement.
21      Q.   And what's the TEA?
22      A.   That's another suggested
23  replacement.
24      Q.   And so it's your understanding if
25  a person using their finger makes a gesture on
```
TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 75

```
 1  the TES that's in the black part of the screen,
 2  what happens?
 3      A.   On the TES?
 4      Q.   Correct.
 5      A.   Well, as Mr. Wakasa states in his
 6  declaration, what happens is it's replaced with a
 7  copy of itself.  He says right on line eight of
 8  Page 3, "The uncommitted TES will be discarded
 9  and replaced by the newly committed TES."
10      Q.   Does the same three letters, TES,
11  that were on the screen before -- strike that.
12           The same three letters, TES, that
13  are in the white area with the long blue
14  underline will still be on -- displayed on the
15  screen after I tap on the TES that's in the black
16  section?
17      A.   That's true.
18      Q.   And if the person taps on the YES
19  with their finger, performs a gesture of that
20  sort, then the TES in the white section with the
21  long blue underline gets replaced with the
22  letters YES, correct?
23      A.   That's correct.
24      Q.   And if the person doesn't do one
25  of those two things but taps on the space bar,
```
TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 76

```
 1  it's your understanding that the YES will replace
 2  the TES in the white space with the long blue
 3  underline?
 4      A.   I don't recall what the default is
 5  when you tap on the spacebar.  It may take the
 6  default one that's underlined and that will be
 7  the one that it picks.
 8      Q.   Looking at Paragraph 98 of your
 9  declaration, its says, "Based on my understanding
10  of the Android source code that is implemented in
11  the Galaxy Nexus."
12           First of all, that's based on
13  solely on the declaration of Ken Wakasa not your
14  own independent knowledge, correct?
15      A.   That is correct.
16           As I say, "as described in the
17  declaration of Ken Wakasa."
18      Q.   And then you say, "And assuming
19  that kept means you would leave a string variable
20  as is as described by Dr. Singh.  It is my
21  understanding that in the Galaxy Nexus the
22  currently character string is always replaced and
23  that it is never kept."
24           Then you say, "Instead of keeping
25  the string, the string is replaced with a
```
TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 77

```
 1  suggestion, which in this case is a copy of the
 2  same set of characters from a different location
 3  in memory."
 4           Do you see that?
 5      A.   I do.
 6      Q.   What is your basis for saying it
 7  comes from a different location in memory?
 8      A.   My understanding from what I've
 9  read from Dr. Wakasa is that the suggestions are
10  stored somewhere in memory and whatever the
11  suggestion is, even if it's the same string, is
12  read out by one of the routines he's cited and
13  overwrites what's in the display memory and
14  that's what's displayed at that spot.
15      Q.   You have the Wakasa declaration?
16      A.   I do.  I do.
17      Q.   Can you find for me where he
18  mentions at all memory?
19      A.   Well, the word "memory" doesn't
20  appear here.  But he's talking about like in
21  Paragraph 5 the text view can hold text.  That
22  text is held in a memory.
23           These methods that he cites here,
24  these variety Java methods that he's talking
25  about use variables which are stored -- which
```
TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 90

1  Q. You said "take the CAE." That is
2  not the endmost sequence of nonwhite spaced
3  characters.
4  A. Oh, I'm sorry. I'm sorry. CAE,
5  my mistake.
6  Q. So CAE is the --
7  A. My apologies. Okay, sorry.
8  Q. And CAE is also displayed in the
9  word selection area 216 where there's a circle
10 around it and also there's a numeric reference to
11 2A, correct?
12 A. For unrelated reasons it's
13 displayed there.
14 Q. And then in this example, CAR is a
15 suggested character -- strike that.
16       CAR is a suggested replacement
17 string, correct?
18 A. Yes.
19 Q. And it's your understanding from
20 reading the 172 patent that if a person makes a
21 gesture on CAE, which is what that circle
22 represents, the screen that the user would be
23 presented with is what is shown in Figure 4C?
24 A. Yes.
25 Q. So the cursor would move over one
   TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 91

1  space and the characters CAE would still be shown
2  in the display tray 214?
3  A. That is true.
4  Q. And if instead the user -- I guess
5  this is shown in 4D and 4E. If the user makes a
6  gesture on CAR in Figure 4D, then what the user
7  would see is what is in Figure 4E, correct?
8  A. Right. Now, appreciate that as
9  the patent points out in column nine, and I'll
10 give you the cite in a moment, when the user
11 makes the gesture on CAE, CAE is not replaced or
12 overwritten with a copy of itself. It's just
13 left alone.
14       Column nine, line 30 starting
15 about line 30, "If the user taps on the duplicate
16 226 of the current character string 222 in the
17 word selection area" --
18 Q. I'm sorry, but where did you
19 start?
20 A. Line 30 of column nine.
21 Q. Okay.
22 A. "If the user taps on the duplicate
23 226 of the current character string 222 in the
24 word selection area 216 with a finger 212, as
25 indicated by the finger contact 228 in Figure 4B,
   TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 92

1  the current character string 222 is left as is in
2  the display tray 214."
3        "Left as is" is very clear
4  language. It's not touched. Doesn't say it's
5  overwritten with a copy of itself; it's left as
6  is.
7  Q. And are you finished?
8  A. Yes.
9  Q. And that is saying left as is in
10 the display tray 214 referring to what you see on
11 the screen, correct?
12 A. That's what it's talking about,
13 214.
14 Q. And going back to Figure B, what
15 is shown in 216 is CIA, which is the current
16 character string, correct?
17 A. It's the same characters. The
18 current character string is what's in 214. One
19 of the suggestions is to keep the current
20 character string and it's duplicated in region
21 216.
22 Q. Yeah. It's referred to as
23 duplicate 226 of the current character string
24 222, correct?
25 A. Right. The string can't be in two
   TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 93

1  places at once. It's clearly -- yeah, it's being
2  displayed in two different places.
3  Q. But what you're tapping on is the
4  letters CA that are showing up on the touch
5  screen device, correct?
6  A. You're tapping on a portion of the
7  screen that contains a visual representation of
8  the letters that comprise the current character
9  string.
10 Q. In your section on noninfringement
11 report that goes from Section 92 to 105, you
12 don't mention claim -- strike that. The only
13 mention of claim 27 is in Paragraph 95; is that
14 correct?
15       Let me restate, because I cleared
16 out my -- in your noninfringement section, which
17 is Paragraphs 92 to 100, the only mention of
18 claim 27 is in Paragraph 95; is that correct?
19 A. If you say so. I would have to
20 double check. It looks like that's true.
21       Give me a moment here. I wanted
22 to just check something else.
23       Right. You had asked me at the
24 beginning of the deposition if there was anything
25 I wanted to correct in the report. Paragraph 92,
   TSG Reporting - Worldwide    877-702-9580

24 (Pages 90 to 93)

Confidential
Under Protective Order

Page 94

1  I'm saying it doesn't infringe any of the
2  asserted claims. My discussion is about claims
3  18 and 19. That's a typographical error.
4      Q.   Okay. You're familiar with the
5  Longe patent publication?
6      A.   Are we switching to prior art?
7      Q.   Yes.
8           Do you want to take a break?
9      A.   No. I was going to say if we are
10 talking about Longe, I would like a copy of the
11 claim chart that's attached to the report before
12 we talk about it and a copy of Longe itself.
13     Q.   I would just ask quickly, you're
14 familiar with the Longe patent publication,
15 correct?
16     A.   I am.
17     Q.   And it's one of the references
18 that you relied on in rendering an opinion
19 relating to validity?
20     A.   Yes.
21          (Exhibits 9 and 10 were marked for
22 identification.)
23     Q.   What was marked as Exhibit 9 is a
24 document that was Exhibit F to your declaration
25 and is the copy of U.S. patent application

TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 95

1  publication 2006/0274051 to Longe, et al. And
2  what was marked as Exhibit 10 is a document that
3  was entitled U.S. patent number -- sorry, it was
4  Exhibit K to your declaration, U.S. Patent Number
5  8074172 as anticipated by/obvious in view of U.S.
6  P App Pub 2006/02740512, Longe, et al.
7           Are you familiar with those two
8  documents?
9      A.   Yes.
10     Q.   And that's the Longe publication
11 in the claim chart you were referring to earlier?
12     A.   Yes.
13     Q.   Looking at the claim chart, is it
14 your opinion that all of claims, 18, 19 and 27,
15 are anticipated by Longe?
16     A.   Yes.
17     Q.   I'm trying to understand what was
18 the purppose in saying in the heading that it's
19 anticipated by/obvious.
20     A.   That's easy. My standard practice
21 in putting things together, even when I feel
22 there's anticipation, is to say and/or rendered
23 obvious just in case somebody finds some little
24 tweak in the argument. But certainly my position
25 is that it anticipates.

TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 96

1      Q.   And you're aware that the Patent
2  and Trademark Office disagreed with that
3  assessment, correct?
4      A.   I agree they considered Longe. We
5  would have to look at the back and forth that
6  went on. And I'm going to want to have copies of
7  that if we are going to be talking about it. But
8  the Patent Office considered it. It issued the
9  patent having considered it.
10          But my position as outlined in my
11 discussion in this report is that the Patent
12 Office overlooked some things and was addressing
13 some things and overlooked some other things.
14     Q.   So you're disagreeing with the
15 Patent Office's decision to allow the patent over
16 the Longe reference, correct?
17     A.   I'm saying that the Patent Office
18 may have done a diligent job, but they overlooked
19 some aspects of Longe in addressing certain
20 things. They didn't -- they didn't necessarily
21 look at other things.
22          The inventors themselves, the
23 applicants themselves, in their rebuttal
24 acknowledged certain things that Longe
25 disclosed. And when a fresh look is taken at it

TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 97

1  my view is that Longe anticipates.
2      Q.   Do you believe you're in a better
3  position to assess patentability than the patent
4  examiner in this particular case?
5      A.   Give me a break here. We know
6  that it is perfectly all right to look at art
7  that the Patent Office has already considered in
8  doing an invalidity analysis that indeed may be a
9  little bit harder to do than if they hadn't
10 considered it, but the law doesn't preclude it,
11 to my understanding.
12     Q.   And it's an even higher burden of
13 proof on behalf of the party trying to assert the
14 patent invalid, do you understand that?
15          MR. PAK: Objection.
16 Mischaracterizes the law.
17          THE WITNESS: I understand that as
18 a nonattorney that there are various
19 burden of proof. That's not something I
20 have expertise in.
21     Q.   Is there any source code attached
22 to the Longe patent publication?
23     A.   I haven't seen any source code.
24     Q.   So you were able to give an
25 opinion as to whether the claims were anticipated

TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 98

1  **without seeing any source code from Longe,**
2  **correct?**
3      A.   And I'll tell you why.  The reason
4  why is that it is my opinion that Dr. Singh's
5  entire infringement analysis is based on a visual
6  towards approach to the 172 patent in the accused
7  products.
8          Using that same visual approach,
9  it is my view that every one of those claim
10 elements is clearly and unambiguously present in
11 Longe.
12         I don't need to look at code; I'm
13 looking at it visually.
14     Q.   **But in your noninfringement**
15 **analysis you didn't just use a visual approach,**
16 **correct?**
17     A.   But you're missing the point on
18 this, and I hope it's not intentionally.  You
19 have to have the same approach for both
20 infringement and validity.  Okay?
21         And maybe this could have been
22 stated differently, but I think I did an
23 appropriate job in stating it, but I will state
24 it again.
25         If the overarching claim

Confidential
Under Protective Order

Page 99

1  construction that's being used is a visual one,
2  which is what appears to be the case in
3  Dr. Singh's declaration, then we don't even worry
4  about noninfringement.  This cut and dry, Longe
5  anticipates all the claims, as well as some of
6  the other prior art I've cited.
7          If on the other hand you go behind
8  the scenes and look at what's going on with the
9  code and so forth, and it's a nonvisual approach,
10 then of course I would have to see code to see
11 how Longe is really doing it.
12         But then my argument is we don't
13 infringe under the -- what appears to be the way
14 the patent itself is using the term "keep" to
15 mean left.  So there's no inconsistency in what
16 I've said.
17     Q.   **So you're saying if you apply a**
18 **visual approach to the claims that there is**
19 **infringement?**
20     A.   I have no opinion on infringement
21 with a visual approach.  I'm simply saying I
22 don't even have to look at infringement.  I'm
23 just looking -- I found prior art that
24 invalidates it.
25     Q.   **Okay.  So what's easier for you to**

Confidential
Under Protective Order

Page 100

1  **look at for going through your opinion on Longe,**
2  **is it the text of the declaration or the chart?**
3      A.   The chart is probably a good place
4  to start.  I may go back to the text.
5      Q.   **Text of the declaration?**
6      A.   The text of my declaration.
7      Q.   **Of course the text of Longe?**
8      A.   And the text of Longe.
9      Q.   **So applying a visual**
10 **interpretation of the claims as you have in**
11 **Exhibit 10, you say that Longe discloses a first**
12 **area of the touch screen display that displays a**
13 **current character string being input by user with**
14 **the keyboard.**
15         **Where is the first area that**
16 **you're referring to?**
17     A.   Sure.  Let's go back to the Longe
18 publication itself, that first area, if you look
19 at Figure 1A is area 104.
20     Q.   **I'm sorry.  Where did you refer me**
21 **back to?**
22     A.   Figure 1A of Longe.
23     Q.   **Okay.**
24     A.   Area 104 is the first area.
25     Q.   **And where does it show in**

Confidential
Under Protective Order

Page 101

1  **Figure 1A the current character string being**
2  **input by a user with a keyboard?**
3      A.   Everything that's shown as typed
4  text in Figure 1A has been entered by the user
5  from the keyboard.  It says right there, in fact,
6  in the second sentence, partway down, "This is an
7  example of where text might appear in the text
8  output region of the system."
9          Goes on to say, "As the user
10 enters a sequence of key strokes in the auto
11 correcting keyboard region lists of words," blah,
12 blah, blah.  This is where the first character
13 string appears.  It's clear.
14     Q.   **That's not clear from Figure 1,**
15 **correct?**
16     A.   Well, we are looking at Figure
17 1A.  And Figure 1B is basically the same as
18 Figure 1A, but all that's happened is that for
19 reasons outside of where we are focusing here
20 something triggered the pop-up word suggestion
21 list to appear.  And when it appeared it's
22 covering over part of it.  That's the second
23 region.
24     Q.   **But the letters that were typed in**
25 **Figure 1B are RWZT, correct?**

Confidential
Under Protective Order

Page 134

1  of Disk 2, Volume 2.  Time is 11:48 a.m.
2  and we are now going off the record.
3       (Lunch recess was taken from
4  11:48 p.m. To 12:35 p.m.)
5       THE VIDEOGRAPHER:  This is the
6  beginning of Disk Number 3.  The time is
7  12:35 p.m. and we are now going back on
8  the record.
9       MR. BUROKER:  I'll mark two
10 additional exhibits.
11      (Exhibits 12 and 13 were marked
12 for identification.)
13 BY MR. BUROKER:
14      Q.  So what was marked as Exhibit 12
15 was also Exhibit J to Dr. Kaliski's deposition.
16 Declaration which is U.S. Patent Number 5953541,
17 King.
18          And then 13 is Exhibit L to the
19 declaration, which is a document entitled U.S.
20 Patent Number 8,074,172, is anticipated
21 by/obvious in view of U.S.P.
22          That's the wrong chart.  It was
23 Exhibit N to the declaration, excuse me.  So
24 Exhibit 13 is Exhibit N, and it's U.S. Patent
25 Number 8,074,172 is obvious in view of U.S.P.
   TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 135

1  595-3541.  Is that what you have?  Dr. Kaliski.
2  It's Exhibit N?
3       A.  That's Robinson, and J is
4  Robinson.  Okay, yeah.  I mean, King, King.
5       Q.  Correct.  So what you have in
6  front of you is the King reference that's
7  described in your declaration as well as the
8  claim chart you prepared, correct?
9       A.  Correct.  Before we get to King,
10 can I just tweak something I said on Longe?
11      Q.  If it's necessary to correct your
12 testimony, yes.
13      A.  It's necessary to clarify it, and
14 it would be very brief.  One thing which we can
15 dispense with very quickly is you had asked about
16 whether Longe disclosed non-overlapping windows
17 or overlapping windows.  I believe that that came
18 up in this discussion.  And all of this stuff is
19 here, but in the heat of the moment, I just
20 overlooked it when talking to you.
21          But if you were to look, for
22 example, on Page 2 of the claim chart, which is
23 Exhibit 10, in Paragraph 232, first sentence.
24 "In another embodiment, the word choice list is
25 horizontal with words placed side-by-side in one
   TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 136

1  or more lines displayed in a convenient area such
2  as along the bottom of the application text area
3  or projected along the top of the virtual
4  keyboard."  So that discloses an embodiment where
5  they are not overlapping, akin to the 172
6  patent.
7           The second thing which I just
8  wanted to point out, when we were talking about
9  whether or not what the user was typing in
10 appeared in region 104, our whole long discussion
11 about that, it was on my mind all along, but I
12 just didn't get into my answer.  Paragraph 178 of
13 Longe, and I will just read it.  A few sentences
14 into the record.
15          "In accordance with another aspect
16 of the invention" -- this is at the beginning of
17 178, "for each input sequence of interaction
18 points, a word is constructed by identifying the
19 character nearest each interaction point and
20 composing a word consisting of the sequence of
21 identified characters.  This exact type," in
22 quotes, 'word' is then presented as a word choice
23 in the word selection list."
24          This is what we were talking about
25 in Figure 5 that you were going through with me.
   TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 137

1       "This word may then be selected in
2  the usual manner by, for example, touching it in
3  the word selection list.  Exact type entries can
4  be edited by, for example, pressing a backspace
5  key to delete one character at a time from the
6  end of the word."
7           Now, this is the key thing.
8       "Once the user selects the exact
9  type word, it is automatically accepted for
10 output and is added to the information being
11 composed.  When so selected, the exact type
12 string may be added as a candidate for inclusion
13 into the lexicon of words so that in the future,
14 it can be typed using the auto correcting
15 keyboard without needing to precisely
16 interaction," it says, but interact "each letter
17 of the word as it necessary in first entering an
18 exact type entry."
19          So what this is saying basically
20 is yes, 5 A may show that it's not in area 104
21 the first time you're typing it, but once you've
22 accepted it and it's in the lexicon, that future
23 such interaction is precluded.  And it's, I
24 believe that was what I was trying to say to
25 support my comment that things, indeed, that are
   TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 138

1  in the dictionary that are known appear in 104 as
2  you're typing them.
3         And when you've digested that, I
4  have one last thing I just wanted -- a minor
5  thing I just wanted to mention.
6      Q.  You're relying on the last
7  sentence of what you just read to say that you
8  don't -- that the word then automatically goes
9  into Section 104?
10     A.  Yes, because --
11     Q.  It doesn't say that, though.
12     A.  It doesn't say it in those words,
13 but it says once it's accepted and in the
14 lexicon, in the future, it can be typed using the
15 keyboard without needing to precisely interaction
16 each letter of the word as is necessary in first
17 entering an exact -- the way I read that is in
18 the future, you don't have to basically go
19 through the pop-up window because is a known
20 word.
21     Q.  But then in that future, it
22 doesn't describe that in the future, it would
23 have a pop-up window at all?
24     A.  That's right.  And that's why as
25 you're --

TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 139

1      Q.  So there would be no second area
2  in that example that you've just given?
3         There would be no suggested words,
4  if that's true, even if what you say is true,
5  there would be no suggested words presented?
6      A.  Not necessarily.  Because another
7  embodiment -- there are multiple embodiment to
8  this patent.  Another embodiment is this word
9  stem business.  So let's say I was typing the
10 word, and when I first did it, I said 5 A.  Those
11 figures popped up.
12        Now I accept the word.  It's in
13 the dictionary.  I start typing it again.  No
14 pop-up yet, but now when I -- if it becomes -- if
15 it suddenly recognizes a stem of a word, like
16 you're typing "PEA" and it's the stem of "pear."
17 Maybe at that point, the pop-up window appears.
18 So now it's in the area where I was typing 104
19 and it's also in the pop-up window.
20        Finally, I just wanted to a
21 comment about the claims of the 172 patent, which
22 I could kick myself, frankly, for not making,
23 because it was really important.  Which is these
24 claims talk about a first area and a second area
25 of Claims 18 and 19, and how the character string

TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 140

1  appears in the first area and second area with
2  suggested replacements.  It never says, ever,
3  that it has to appear in those areas at the same
4  time.
5         And what ticked me off on that was
6  when we were talking about the editing example
7  and you said, well, maybe it disappears from the
8  first area.  How do I know it doesn't?  But it
9  was in the first area.  And now you've edited it,
10 and now it's in the pop-up list.  It's in the
11 second area.  There's nothing in these claims
12 that says concurrent.
13     Q.  Where is that in your declaration
14 that you submitted to the court?  Where is that
15 argument that you just gave me in that
16 declaration?
17        It's not in there, is it, sir?
18     A.  That one?  That one is not.
19 Doesn't change the fact that it's true.
20     Q.  We'll strike it from the record.
21        MR. PAK:  What's the basis for
22 striking?
23        MR. BUROKER:  It wasn't submitted
24 timely.  His declaration has already been
25 submitted to the court.  It's not -- I

TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 141

1  didn't ask him a question to ask him to
2  supplement his opinion.  So I'd strike it
3  because it's non-responsive to any
4  question that I asked.
5         MR PAK:  I think he was clarifying
6  on the record what he had discussed
7  before in response to your line of
8  question on the edit select feature, but
9  I understand your move, so...
10 BY MR. BUROKER:
11     Q.  So right before that, you gave an
12 example of maybe this, maybe that.  You
13 understand that there's the disclosure to
14 anticipate has to connect different portions of
15 the disclosure, don't you, sir?
16     A.  Of course I do.
17     Q.  So you're picking something out of
18 column or Paragraph 178, and saying you combine
19 that with something out of 240, and maybe the two
20 used together would result in an embodiment in
21 which there's a word stem that -- that's your
22 testimony?
23     A.  I'm looking at the disclosure as a
24 whole.  All I have to show is that everything in
25 each one of those claims is anticipated as

TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 146

1  the keys had multiple interpretation, because A,
2  B and C is on the same key press.
3       And so the King talks about, I
4  believe, different ways that it can make that
5  unambiguous. One way, for example, is to hit it
6  once, twice or three times, and another is for
7  the system to figure out where on the key you
8  were most likely touching it.
9       But A, G and E comes there because
10 the system has interpreted that as what you
11 pressed by some algorithm. And so that is what
12 it views the current character string as. And
13 conceptually, that's no different than any other
14 keyboard where the keyboard figures out that you
15 pressed a key. And so yes, AGE is the current
16 character string.
17     Q.   You refer to Column 27, Column
18 27? Lines 11, 12.
19     A.   Yes.
20     Q.   Okay. So what that text says is
21 the user has -- I think there's something
22 missing. It says "In Figure 5 B, the user has
23 subsequently -- the GH -- GFH key followed by the
24 DEF key, touching both keys approximately in the
25 center."

TSG Reporting - Worldwide   877-702-9580

Confidential
Under Protective Order

Page 147

1       A.   You're reading in the wrong
2  place. 11 and 12 is the word vocabulary module
3  as interpreted the ABC, GHI, DEF keystroke
4  sequence has the words AGE. That's what I'm
5  citing.
6       Q.   But the previous sentence which
7  leads into that says that the user has pressed in
8  the center of those keys, correct?
9       A.   Yes.
10      Q.   So how do you know that they
11 wanted -- that they were inputting AGE, and not
12 BEH or any other combination of those three
13 letters?
14      A.   That's implicit in all of this
15 stuff. Even on a single key, single letter
16 keyboard, how do you know, you know, when I'm
17 going to hit the Q, that my finger doesn't graze
18 the W. That's the whole point. The current
19 character string is based upon what the system
20 interprets you having hit. In this case, it
21 interprets it as being A, G and E.
22      Q.   Then where does it disclose
23 replacing the current character string if the
24 user hits a delimiter in King?
25      A.   Well, it doesn't explicitly do

TSG Reporting - Worldwide   877-702-9580

Confidential
Under Protective Order

Page 148

1  it. That is why I'm arguing King is a 103
2  reference. It does talk about how you can hit
3  select and replace it. And we get down to the
4  question, well, is the select key a delimiter.
5  Get down to the construction of what delimiter
6  means.
7       But failing that, if you can -- it
8  would be obviously to modify King to certainly
9  have it accepted, not just by hitting select, but
10 by hitting a delimiter.
11      Q.   And does it disclose that if you
12 touch on one of the choices in are 70 there, that
13 it can  replace what's in 88?
14      A.   I believe in King, if you
15 basically choose a character by, I think -- I
16 forget how you move along in King. I'd have to
17 go check. You may touch on it. You touch on the
18 one you want to replace, or maybe you move hit,
19 select. I forget exactly how that works.
20      Q.   If you could review your chart,
21 and it's important that we clarify that point.
22      A.   I know it's in here. I just have
23 to find it. Yeah, you just hit the select key
24 multiple times. This is detailed in Column 27.
25 So it talks about in Figure 5 C, you press the

TSG Reporting - Worldwide   877-702-9580

Confidential
Under Protective Order

Page 149

1  select key once, and that basically selects for
2  each time -- every time you press the select key,
3  what happens is you move along the list, and
4  that's the one that replaces your current
5  character string and appends a space to it.
6       Q.   So what's the gesture on suggested
7  replacement string, element 18 D, which says "the
8  current character string in the first area is
9  replaced with the suggested replacement character
10 sting if the user performs a gesture on the
11 suggested replacement character sting in the
12 second area."
13      A.   Column 11, lines 20 to 23 I've
14 cited.
15      Q.   Uh-huh.
16      A.   Which says, "Alternatively,
17 following entry of the keystroke sequence
18 corresponding to the desired word, the user may
19 select the desired word from the selection list
20 by simply touching it. When a word is selected
21 in this fashion prior to any activation of a
22 select key, the selected word is immediately
23 outputted at the insertion point without adding a
24 space." And this is shown if Figure 5 K as well.
25      Q.   And your -- for element 18 E, in

TSG Reporting - Worldwide   877-702-9580

Confidential
Under Protective Order

Page 174

1    A.   I'm not looking to develop a
2  commercial product here; I'm looking to find
3  combinations and prior art that one would be
4  reasonably motivated to look at or that would
5  suggest for themselves for all of the various
6  reasons why one would put together an
7  obviousliness argument.
8    Q.   Without hindsight, right?
9    A.   Of course without hindsight.
10   Q.   And so you're saying it would be
11 obvious to a person of skill in the art to go
12 back in time -- to pull a feature from the 3.0
13 version and put it back into Version 5.5 without
14 hind-site?
15   A.   Assuming it's not there.  And
16 you're just talking in the abstract.  In this
17 situation, given these write-ups, that's a
18 reasonable conclusion to come to.
19   Q.   You just said assuming it's not
20 there.  There is not an example in the user
21 guide, text plus user guide, where the current
22 character string is shown in a first area and a
23 second area, is there?
24   A.   I'm not sure.  As I said to you
25 earlier, this MORE with a highlighted ORE could

TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 175

1  be the first character string.  It could be you
2  typed an M.  The system automatically made it
3  MORE.  And now displayed in the box below all of
4  the options in case you really didn't want MORE,
5  in which case it's in the first area and it's
6  also in the second area.
7    Q.   But claim 18 requires that the
8  current character string is that which was being
9  input by a user with the keyboard.
10      In your example of a typed M and
11 it gives me ORE, I haven't typed ORE with the
12 keyboard, correct?
13   A.   That's why I'm using textPlus --
14 let me just check one thing.
15      I'm only, by the way, arguing
16 textPlus as anticipating 27, where the first
17 area, second area of business is not the critical
18 thing.  Because in 27 it doesn't -- there's no
19 disclosure of a first area.
20      Do keep that in mind.
21   Q.   And for claim 27 you cite for
22 element G the punctuation, you cite to Page 9 of
23 the user guide?
24   A.   Yes.
25   Q.   It says, "If the word is a word

TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 176

1  you want to enter interspace or any punctuation
2  marks then the word is automatically entered"?
3    A.   Yes.
4    Q.   It doesn't show on the -- it does
5  not show on the -- it does not show in any of the
6  figures of the user guide that it accepts the
7  word the person chose and appends the punctuation
8  mark, right?
9    A.   But it says it in the text.
10   Q.   It doesn't say that it appends the
11 punctuation mark in that sentence.
12   A.   One of the options that's
13 disclosed is if an auto insert space option is
14 selected a space is automatically inserted every
15 time a word is entered, so and it does show
16 setting of various options in textPlus.
17   Q.   But this is a choice where you've
18 added a punctuation mark, not a space.  And
19 there's no auto insert punctuation mark in
20 textPlus, right?
21   A.   Since you're hitting a punctuation
22 mark I would think the punctuation mark would be
23 added.
24   Q.   But it doesn't say that expressly,
25 right?

TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 177

1    A.   It doesn't say it, no.
2       MR. BUROKER:  I don't have any
3  further questions.
4       MR. PAK:  Okay.
5       I have a few follow-up questions.
6          EXAMINATION BY MR. PAK
7  BY MR. PAK:
8    Q.   Dr. Kaliski, I want you to bring
9  out your declaration, which I believe is Exhibit
10 Number 4.  Can you also bring out your chart for
11 the Longe reference.
12   A.   I can't find either, so let me --
13   Q.   Take your time.
14      MR. PAK:  It's 10.
15      THE WITNESS:  I think the
16 declaration is Exhibit 4.
17      MR. PAK:  Yes, Exhibit 4.
18      THE WITNESS:  And 10.  I've got
19 both out.  Thank you.
20   Q.   Earlier today you were asked some
21 questions about the Longe reference with respect
22 to your chart.
23   A.   Yes.
24   Q.   Why don't you take a look at your
25 declaration to see if there's a description of

TSG Reporting - Worldwide    877-702-9580

45 (Pages 174 to 177)

Confidential
Under Protective Order

Page 178

1    the Longe reference in narrative form in your
2    declaration as well?
3         If you could identify the page
4    number where such discussion exists.
5         A.   Sure.  It begins on Page 26,
6    Paragraph 114.  There's a discussion of Longe
7    that goes through Paragraph 119.
8         Q.   And similarly, if we look at your
9    declaration, the text of your declaration, do we
10   see a discussion of the Robinson reference in
11   narrative form?
12        A.   We do.  From 120 to 124.
13        Q.   And how about for 125 to 132, what
14   is that discussing.  Or let me step back.
15        With respect to the textPlus
16   reference is there a discussion of the textPlus
17   reference in your declaration?
18        A.   125 to 128.
19        Q.   Is there a discussion of the King
20   reference in narrative form in your declaration?
21        A.   129 to 142.
22        Q.   If we turn back, Dr. Kaliski, I
23   noticed that as some of the questions were
24   directed specifically to your charts, I wanted to
25   give you the opportunity to consider also the

TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 179

1    paragraphs that are found in your declaration.
2         So looking at the Longe
3    discussion, particularly on Paragraph 116, I
4    would like to have you read that section into the
5    record.  And then I have a few follow-up
6    questions.  That's paragraph 1 16 of your
7    declaration?
8         A.   "Longe also discloses that the
9    current character string is shown in both the
10   first area and the second area.  Longe discloses
11   that the output text regime 104 displays text
12   entered by the user and serves as a buffer for
13   text input and editing."  It's in quotes from
14   displays to editing.
15        And then I cite to Longe 178,
16   which we looked another earlier.
17        "In addition to this disclosure
18   Longe describes an edit word key 114," which we
19   talked about, "which creates a word choice list
20   on the selected word which already is in the
21   first area."
22        Do you want me to read what --
23        Q.   Actually, you can skip.  We'll
24   just note on record that there's a Paragraph 181
25   cited from your declaration.

TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 180

1         A.   Okay.  "Furthermore, Longe
2    explains that in certain situations it would be
3    preferable that key strokes in the auto
4    correcting keyboard are not matched to characters
5    in isolation but rather entire sequences of key
6    strokes corresponding to completed words are
7    matched against a lexicon of candidate words that
8    includes frequency of use information."
9         And that's a cite to Paragraph
10   172.
11        It's in quotes from key strokes to
12   information.
13        "These disclosures make it clear
14   to one of ordinary skill in the art that Longe
15   teaches disclosing the current character string
16   twice in both the first area and second area as
17   claimed in certain claims of the 172 patent."
18        Q.   Doctor, are those your opinions?
19        A.   I'm not sure who else's they would
20   be.  Yes, they are my opinions.
21        Q.   And you still stand by those
22   opinions?
23        A.   Yes.
24        Q.   If you turn to the next page, can
25   you read into the record your Paragraph 118 of

TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 181

1    your declaration.
2         A.   "Longe also discloses that the
3    words in the word choice list region can be
4    selected 'in the usual manner by for example
5    touching it in the word selection list'
6    (performing a gesture as claimed in certain 172
7    patent claims)."
8         That's a cite to 178 of Longe.
9         "Longe further discloses, 'if a
10   word choice list was displayed prior to
11   contacting the space key 110 or the return key
12   118, the default word 160 is flush to the output
13   text region prior to generating a single space or
14   carriage return character respectively.'
15   (replacing a current character string by
16   activating a key on the keyboard associated with
17   a delimiter as claimed in certain 172 patent
18   claims).
19        And that cites 180 in Longe.
20        Q.   And, again, are those your
21   opinions in this case?
22        A.   Yes.
23        Q.   And do you stand by those
24   opinions?
25        A.   Yes.

TSG Reporting - Worldwide    877-702-9580

Confidential
Under Protective Order

Page 182

1  Q. Just read one more section,
2  Paragraph 119 from your declaration.
3  A. "Longe also discloses an alternate
4  keyboard of punctuation and symbols. 'If a word
5  choice list was displayed prior to displaying
6  such an alternative keyboard, the selection of
7  any character from the displayed alternative
8  keyboard causes the default word of the
9  previously displayed word choice list to be
10 output to the output text region 104 prior to
11 outputting the selected character from the
12 alternative keyboard.'"
13 Q. Again, are those your opinions?
14 A. Yes.
15 Q. And do you stand by those
16 opinions?
17 A. Yes.
18 Q. If you turn back, taking into
19 account some of these paragraphs and looking
20 specifically at Paragraph 116, earlier today
21 counsel asked you questions about whether you had
22 opinions regarding the edit word key feature.
23     Do you recall that?
24 A. Yes.
25 Q. You didn't mention this particular

Confidential
Under Protective Order

Page 183

1  section of your declaration in your response.
2  A. No. We were looking at the claim
3  chart and that seemed to be just as sufficient.
4  Q. By looking at 116, does it refresh
5  your recollection about whether you had formed
6  opinions regarding the edit word key prior to
7  your deposition today?
8  A. Well, yes, I did, just as looking
9  at the claim chart would do that.
10 Q. And looking at the paragraph
11 that's cited from the patent that's in Paragraph
12 181 from the Longe reference, does this
13 disclosure relate to the conversations that you
14 were having with counsel about the edit word key
15 and the replacement functionality?
16 A. Could you repeat that question,
17 please.
18 Q. Sure. Looking at the paragraph
19 that's cited in your declaration in Paragraph
20 116, which is a citation of Paragraph 181 from
21 the Longe reference, does this particular
22 disclosure relate to the conversations that you
23 were having with counsel about the edit word key
24 and the replacement functionality?
25 A. Well, it does. I mean, those

Confidential
Under Protective Order

Page 184

1  conversations basically were serving to remind me
2  that I had these opinions, that I expressed them.
3  Q. And again, when I'm talking about
4  conversations, I'm talking about conversations
5  that you had with Apple's counsel about the edit
6  word key feature.
7      Same question with respect to
8  conversations that you were having with Apple's
9  counsel regarding the discussion of
10 Paragraph 178.
11     Having seen these paragraphs in
12 your declaration, does it refresh your
13 recollection as to whether you had considered
14 Paragraph 178 prior to preparing your declaration
15 in this case?
16 A. Absolutely.
17 Q. That's all the questions I have.
18     MR. BUROKER: Nothing further for
19 me either.
20     THE VIDEOGRAPHER: This concludes
21 today's deposition. The time is
22 ///
23 ///
24 ///
25

Confidential
Under Protective Order

Page 185

1  1:41 p.m. and we are now going off the
2  record.
3   (Time noted: 1:41 p.m.)
4
5      _____
6      MARTIN E. KALISKI
7
8
9  Subscribed and sworn to before me
10 This      day of        , 2012.
11 _____
12
13
14
15
16
17
18
19
20
21
22
23
24
25