Highly Confidential - Attorneys' Eyes Only

Page 1

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                   SAN JOSE DIVISION

4

5    APPLE INC., a California
     corporation,

6

                 Plaintiff,

7

     vs.                        CASE NO.  12-cv-00630-LHK

8

     SAMSUNG ELECTRONICS CO.,

9    LTD., a Korean business
     entity; SAMSUNG ELECTRONICS

10   AMERICA,INC., a New York
     corporation; SAMSUNG

11   TELECOMMUNICATIONS AMERICA,
     LLC, a Delaware limited

12   liability company,

13               Defendants.
     _____/

14

15

16        H I G H L Y   C O N F I D E N T I A L

17        A T T O R N E Y S'  E Y E S   O N L Y

18

19     VIDEOTAPED DEPOSITION OF GREG JOSWIAK

20          REDWOOD SHORES, CALIFORNIA

21          TUESDAY, APRIL 17, 2012

22

23   BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR

24   CSR LICENSE NO. 9830

25   JOB NO. 48577

Highly Confidential - Attorneys' Eyes Only

Page 2

1    TUESDAY, APRIL 17, 2012
2         9:40 A.M.
3
4
5
6    VIDEOTAPED DEPOSITION OF GREG JOSWIAK,
7    taken at QUINN EMANUEL URQUHART & SULLIVAN,
8    LLP, 555 Twin Dolphin Drive, Redwood Shores,
9    California, pursuant to Notice, before me,
10   ANDREA M. IGNACIO HOWARD, CLR, CCRR, RPR,
11   CSR License No. 9830.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1    A P P E A R A N C E S :
2
3    FOR APPLE INC.:
4    GIBSON DUNN
5    By:  JOSH A. KREVITT, Esq.
6       ROD STONE, Esq.
7    200 Park Avenue
8    New York, New York 10166
9
10
11
12
13   FOR SAMSUNG ELECTRONICS CO. LTD:
14   QUINN EMANUEL URQUHART & SULLIVAN
15   By:  DAVID L. ELSBERG, Esq.
16      DANIEL POSNER, Esq.
17   51 Madison Avenue
18   New York, New York 10010
19
20
21
22
       ALSO PRESENT:  Alan Dias, Videographer
23
       Erika Tierney, Apple Inc.
24
       ---oOo---
25

Page 4

1       REDWOOD SHORES, CALIFORNIA
2        TUESDAY, APRIL 17, 2012
3           9:40 A.M.
4
5
6
7       THE VIDEOGRAPHER:  Good morning.  I am Alan
8    Dias from TSG Reporting.
9       This is a matter pending before the United
10   States District Court for the Northern District of
11   California.  Case No. 12-cv-000630.
12      We are located today at 555 Twin Dolphin
13   Drive in the city of Redwood Shores, California.
14   Today is April 17, 2012.
15      Once again, my name is Alan Dias from TSG.
16   Here with me is Andrea Ignacio, the court reporter.
17      Counsel, will you please identify yourselves
18   for the record.
19      MR. ELSBERG:  David Elsberg from Quinn
20   Emanuel for Samsung.  And here with me is my
21   colleague, Dan Posner.
22      MR. KREVITT:  Josh Krevitt and Rod Stone from
23   Gibson Dunn, and Erika Tierney from Apple on behalf of
24   Apple.
25      THE VIDEOGRAPHER:  Will the court reporter

Page 5

1    please swear in the witness.
2
3           GREG JOSWIAK,
4       having been sworn as a witness
5      by the Certified Shorthand Reporter,
6          testified as follows:
7
8       THE VIDEOGRAPHER:  You may proceed.
9
10      (Document marked Joswiak Exhibit 1
11       for identification.)
12
13      EXAMINATION BY MR. ELSBERG
14      MR. ELSBERG:  I'm showing you what we have
15   marked as Exhibit 1.
16      Q   Do you see on the front of the document it's
17   entitled Samsung's First 30(b)(6) Deposition Notice to
18   Apple Inc.?
19      A   I do.
20      Q   And if you would turn to page 4.  Do you see
21   topic No. 2?
22      A   I do.
23      Q   You're testifying today as a 30(b)(6) witness
24   for Apple with respect to Topic No. 2, including
25   subtopics A through H; correct?

Highly Confidential - Attorneys' Eyes Only

Page 18

1    THE WITNESS:  I'm neither the legal expert
2  nor the financial expert.  I can talk to you about
3  topics covered in No. 2.
4    MR. ELSBERG:  Q.  If you have any information
5  at all relating to the question I just asked you,
6  please share it with me now.
7    MR. KREVITT:  Same objections.
8    THE WITNESS:  Again, I -- I'm not the guy who
9  can make the legal conclusion, nor the financial
10  expert, but I'd love to talk to you about topics
11  covered in No. 2.
12    MR. ELSBERG:  Q.  And -- and you agree that
13  one of the topics covered in topic No. 2 is all facts
14  supporting Apple's contention that Apple will suffer
15  irreparable harm without the issuance of a preliminary
16  injunction; correct?
17    A  I can tell you that Apple will suffer harm,
18  and I can talk to you about that.  But I'm not the
19  financial expert nor the legal expert to draw the
20  conclusion.
21    Q  You are the 30(b)(6) witness on topic No. 2;
22  correct?
23    A  That is correct.
24    Q  Okay.  The iPhone has many features on it;
25  correct?

Page 19

1    A  That is correct.
2    Q  How many?
3    A  Many.
4    Q  How many?
5    A  Innumerable.
6    Q  More than a thousand?
7    A  I don't know.
8    Q  Less than a thousand?
9    A  I don't know.  It depends how you --
10    Q  Do you --
11    A  -- it depends how you would count them.
12    Q  How would you count them?
13    A  Lots of different ways.
14    Q  Okay.  So using some way to count it, tell me
15  how many features the iPhone has.
16    MR. KREVITT:  Objection.
17    THE WITNESS:  It is not something I've
18  counted.
19    MR. ELSBERG:  Q.  Other than "innumerable,"
20  can you give me any estimation about how many features
21  it has?
22    MR. KREVITT:  Objection.
23    THE WITNESS:  It's not something I've
24  counted.
25    MR. ELSBERG:  Q.  Is the answer no, you

Page 20

1  can't?
2    A  No.  The answer is it's not something I've
3  counted.
4    Q  I'm not asking if you've counted it.
5    I'm asking:  Can you tell me roughly how many
6  features does the iPhone have?
7    A  How would I -- how would I give you the
8  number if I haven't counted them?
9    Q  Okay.  If -- if you have any ability to tell
10  me, even roughly, how many features the iPhone has,
11  please tell me now.
12    MR. KREVITT:  Objection; calls for
13  speculation; asked and answered.
14    THE WITNESS:  I have not counted them.

REDACTED

Page 21

REDACTED

Highly Confidential - Attorneys' Eyes Only

Page 22

REDACTED

Page 23

REDACTED

```
10        MR. ELSBERG:  Okay.  So you -- you -- I know
11   you said it's an absurd question.  I apologize.  I --
12   it's an important one to me.
13      Q   I want to give you another chance.  If you
14   can list out features of the iPhone that do not
15   contribute to ease of use.
16        MR. KREVITT:  Objection; asked and answered;
17   foundation; outside the scope of his topics and object
18   to the form of the question.
19        THE WITNESS:  I think I've answered that
20   already.
21        MR. ELSBERG:  Okay.
22      Q   You're familiar with the feature slide to
23   unlock?
24      A   Yes, I am.
25      Q   And slide to unlock refers to a feature that
```

Page 24

```
1   allows the user to unlock the device by performing a
2   gesture on an unlock image that moves the image across
3   the screen; correct?
4      A  That generally describes it.
```

REDACTED

```
9        MR. KREVITT:  Object to the form.
10        THE WITNESS:  Can you -- can you repeat the
11   question.
12        MR. ELSBERG:  Sure.
```

REDACTED

```
17        MR. KREVITT:  Object to the form.
```

REDACTED

Page 25

REDACTED

Highly Confidential - Attorneys' Eyes Only

Page 26

REDACTED

Page 27

REDACTED

4    MR. ELSBERG:  Q.  You're familiar with the
5   feature called word recommendation?
6      A   Auto -- are you talking about auto
7   correction?
8      Q   It's a feature that suggests words to the
9   user as the user is typing characters into the touch
10  screen keyboard.  Are you familiar with that?
11     A   I'm familiar with our auto correction
12  feature, if that's what you're describing.
13     Q   Okay.  Let me switch back to slide to unlock
14  for a second.

REDACTED

Page 28

REDACTED

11      MR. ELSBERG:  Okay.
12     Q   Switching back to word recommendation, do you
13  have any data showing that word recommendation
14  specifically contributes to consumers' perception of
15  ease of use for any Apple products?
16      MR. KREVITT:  Are you talking about auto
17  correction?
18      THE WITNESS:  Yeah, I would ask again, if
19  you're describing auto correction, we can talk about
20  that.  We don't call it word recommendation.
21      MR. ELSBERG:  Q.  Have you ever heard of the
22  word recommendation feature?
23     A   We don't use those terms.  We talk about auto
24  correction.
25     Q   Have you ever heard of word recommendation?

Page 29

1      MR. KREVITT:  Asked and answered.
2      THE WITNESS:  I know the word "word" and I
3   know the word "recommendation."  We don't call it
4   that.  We call it auto correction.
5      MR. ELSBERG:  Okay.  Let's call it auto
6   correction.
7      Q   What work has been done -- let me start
8   again.

REDACTED

Highly Confidential - Attorneys' Eyes Only



Page 30

REDACTED

7       That said, when I delivered the -- one of the
8  first iPhones to Walt Mossberg, one of our reviewers,
9  in June, one of the first things that he said to me,
10  and unfortunately said publicly before the review of
11  this product, is that he thought we had made a mistake
12  with the glass keyboard and not doing a chiclet
13  keyboard.
14       And he had a little bit less than two
15  products -- or two weeks to test the product. And in
16  his review and in his experience, he called out the
17  fact that using it, including having auto correction,
18  made it as good or better than any keyboard he had
19  ever used on a small type of device.

REDACTED

23       MR. ELSBERG: Q. Anything else you can point
24  to?
25       MR. KREVITT: Objection.

Page 31

REDACTED

Page 32

1       THE WITNESS: And I think I answered that.

REDACTED

7       MR. ELSBERG: So I just want to make sure
8  it's clear.

REDACTED

14       MR. KREVITT: Objection; form; calls for
15  speculation; foundation and asked and answered.
16       THE WITNESS: Again, I think I've answered.

REDACTED

Page 33

REDACTED

24       MR. ELSBERG: Okay.
25       Q  You're familiar with the feature called links

Highly Confidential - Attorneys' Eyes Only



Page 34

1  for structures?
2      A  I am.
3      Q  And this is a feature -- it's a method for
4  detecting structures like phone numbers, and then
5  performing actions based on the detected structures?
6      A  I'm familiar with the feature.
7      Q  Did I just describe it in a generally
8  accurate way?
9      A  Generally.
10     Q  Okay.

REDACTED

Page 35

REDACTED

Page 36

REDACTED

Page 37

REDACTED

Highly Confidential - Attorneys' Eyes Only

Page 38



REDACTED

12  Q  You're familiar with voice recognition?
13  A  As a concept, sure.
14  Q  Is voice recognition the ability to translate
15  voice into text or text commands?
16  A  It can be.  It can be recognizing what --
17  what you said.  It's the second part to say what you
18  do with it.
19  Q  Okay.  What is voice activation?
20  A  What is voice activation?  Give me a context.
21  Q  For example, does Siri use voice activation?
22  A  We -- it's not a term we use as far as in
23  general use of voice activation.  So give me a broader
24  context and --
25  Q  Does Siri use voice recognition?

Page 39

1  A  Part of what Siri does is voice recognition.
2  Q  Okay.  Are you familiar with a feature in the
3  iPhone called unified search?
4  A  Yeah.  Again, not a term we typically use for
5  customers, but yes, I'm familiar with the concept.
6  Q  And what is the unified search feature of the
7  iPhone?
8  A  Again, not a -- not a feature name, which is
9  what you're implying, that we would typically use for
10  customers.  So I'm not sure if the way you've asked it
11  is a way that I can properly answer.
12  Q  Have you -- are you familiar with the idea
13  that the unified search feature allows a user to
14  perform a search request that can search multiple
15  sources of information, both on the device, like the
16  user's contacts, and off the device, such as the web,
17  all with a single interface?
18  A  Correct.  As a -- as a general description
19  of, for example, what Siri can do with a -- something
20  you've asked it to -- to -- information to find, for
21  example.
22  Q  Now, there are products that have voice
23  recognition but do not have the unified search
24  feature; correct?
25  MR. KREVITT:  Objection.

Page 40

1  THE WITNESS:  Again, voice recognition is a
2  component in the chain of what Siri does.  So there
3  have been lots of products that do voice recognition
4  and do other things that don't do what Siri does.
5  MR. ELSBERG:  Okay.
6  Q  And there are products that have a unified
7  search feature but not a voice recognition feature;
8  correct?
9  MR. KREVITT:  Objection.
10  Are you talking about Apple products?  Any
11  products?
12  MR. ELSBERG:  Any products.
13  MR. KREVITT:  Calls for speculation;
14  foundation; outside the scope of the topics for which
15  the witness has been designated to testify.
16  THE WITNESS:  Yeah.  Again, I can talk to you
17  about what Siri does and what Siri --
18  MR. ELSBERG:  No, I didn't ask about Siri.
19  Q  I'm asking:  Are you aware of whether there
20  are any products that have a unified search feature
21  but not a voice recognition feature?
22  MR. KREVITT:  Same objections; foundation;
23  calls for speculation and outside the scope of this
24  deposition.
25  THE WITNESS:  Again, I'm not the expert on

Page 41

1  all the products that might do that.  I can describe
2  to you what Siri does.
3  MR. ELSBERG:  I'm not asking about Siri.
4  Q  The Samsung Galaxy Nexus does not have a
5  voice recognition feature like Siri; correct?
6  A  I don't think any product has a system -- a
7  system like Siri.  Voice recognition, again, is just a
8  component.
9  Q  Okay.  You -- you can't ask the Galaxy Nexus
10  questions and have it speak back to you; correct?
11  MR. KREVITT:  Objection.
12  THE WITNESS:  I'm not -- I'm not fully aware
13  of what you're asking.  If you want to repeat the
14  question.
15  MR. ELSBERG:  Q.  Can you ask the Galaxy
16  Nexus questions and have it speak back to you?
17  MR. KREVITT:  Objection.
18  THE WITNESS:  I'm not sure if it speaks back
19  or not.  I know you can ask it questions.
20  MR. ELSBERG:  Q.  Do you know whether you can
21  ask it questions orally?
22  THE WITNESS:  Again, with the Google system,
23  generally you have to ask within a specific syntax.
24  You have to ask in a certain way how to ask a
25  question.

Highly Confidential - Attorneys' Eyes Only

Page 42

1        MR. ELSBERG:  Q.  The Samsung Galaxy Nexus,
2    do you know whether you can ask it questions orally
3    and have it give you a response?
4        MR. KREVITT:  Objection; foundation; calls
5    for speculation; asked and answered.
6        THE WITNESS:  Yeah, I've described what I
7    know.  I'm not the expert on how their full system
8    works.
9        MR. ELSBERG:  Q.  Tell me everything you know
10   about -- about the ability of a user to ask the Galaxy
11   Nexus a question orally and get any type of response.
12       MR. KREVITT:  Objection; asked and answered;
13   calls for speculation; foundation and outside the
14   scope of the topics for which the witness has been
15   designated to testify.
16       THE WITNESS:  I think I just answered it.
17       MR. ELSBERG:  Q.  Nothing you can add?
18       MR. KREVITT:  Same objections.
19       THE WITNESS:  I think I've answered it.
20       MR. ELSBERG:  Q.  If there's anything you can
21   add, please do.
22     A  I understand your question.  I think I
23   answered it.





Page 46

REDACTED

Page 47

REDACTED

Page 48

REDACTED

Page 49

REDACTED

13    Q   Okay.  If Samsung removed the four allegedly
14  infringing features from the Galaxy Nexus and sold the
15  Galaxy Nexus without those features, would it have any
16  impact on the sales or market share of the Galaxy
17  Nexus?
18        MR. KREVITT:  Objection.
19        THE WITNESS:  I -- I -- that would be
20  something I'd have to speculate on, and I don't know
21  how to quite speculate on that.
22        MR. ELSBERG:  Okay.
23    Q   If Samsung removed the four allegedly
24  infringing features from the Galaxy Nexus and sold the
25  Galaxy Nexus without those features, would it have any

Highly Confidential - Attorneys' Eyes Only

Page 50

1   impact on sales or market share of the iPhone?
2       MR. KREVITT:  Objection; calls for
3   speculation; foundation and outside the scope.
4       THE WITNESS:  Same answer.  That would be
5   something you'd have to guess at or speculate, and I
6   don't know how I would do that.
7       MR. ELSBERG:  Q.  Same answer for other Apple
8   products?
9    A  Same answer.
10   Q  Okay.  If Samsung removed the four allegedly
11  infringing features from the Galaxy Nexus and sold the
12  Galaxy Nexus without those four features, would this
13  have any impact on the revenues or profits generated
14  by the Galaxy Nexus?
15      MR. KREVITT:  Objection; calls for
16  speculation; foundation; hypothetical; outside the
17  scope of the topics for which he's been designated to
18  testify.
19      THE WITNESS:  It is a really difficult
20  question to answer because you don't know what they
21  would do in place of those.  It's something, again, I
22  would choose not to speculate on.
23      MR. ELSBERG:  Q.  And to answer, you would
24  have to speculate?
25   A  It's a future question you've asked.  I don't

Page 51

1   know how --
2       MR. KREVITT:  It's a hypothetical question.
3       THE WITNESS:  Hypothetical future question.
4   I don't know how you would do anything but speculate
5   to a hypothetical future question.
6       MR. ELSBERG:  Q.  And -- and your answer
7   would be the same if I asked you about the iPhone or
8   other Apple products?
9       MR. KREVITT:  Objection; I don't know what
10  the question is.
11      THE WITNESS:  If it's the same hypothetical
12  future question, then again, I --
13      MR. ELSBERG:  I'll ask it again just to make
14  sure we're on the same page.
15   Q  If Samsung removed the four allegedly
16  infringing features from the Galaxy Nexus and sold the
17  Galaxy Nexus without those four features, would this
18  have any impact on the revenues or profits generated
19  by the iPhone or other Apple products?
20      MR. KREVITT:  Objection; object to the form
21  of the question; calls for speculation; foundation;
22  hypothetical; it's outside the scope of his deposition
23  topics.
24      THE WITNESS:  It is -- it is a hypothetical
25  future question.  Again, you would have no choice but

Page 52

1   to speculate, and I would choose not to.
2       MR. ELSBERG:  Okay.
3    Q  The Galaxy Nexus has hundreds of individual
4   functions and design elements; correct?
5       MR. KREVITT:  Objection; foundation.
6       THE WITNESS:  Feature count, you're asking?
7   Will you repeat the question.
8       MR. ELSBERG:  I'm sorry.  I switched to a --
9       THE WITNESS:  Yeah.
10      MR. ELSBERG:  -- slightly different topic
11  now.
12      THE WITNESS:  Yeah.
13      MR. ELSBERG:  The Galaxy Nexus --
14      THE WITNESS:  Uh-huh.
15      MR. ELSBERG:  Let's just start over.  Put
16  aside the last question.
17      THE WITNESS:  Okay.
18      MR. ELSBERG:  This is a different question.
19   Q  The -- the Galaxy Nexus has many individual
20  functions and design elements; correct?
21      MR. KREVITT:  Objection.
22      THE WITNESS:  Again, it depends how you count
23  things; but sure, it has many features --
24      MR. ELSBERG:  Okay.
25      THE WITNESS:  -- and design elements.

Page 53

1       MR. ELSBERG:  Q.  And the four allegedly
2   infringing features are just a small part of the
3   overall phone; correct?
4       MR. KREVITT:  Objection.
5       THE WITNESS:  I wouldn't say they're
6   necessarily a small part because, again, ingredients
7   can be core parts of things, even though they're --
8   and a statistical count may seem small.
9       MR. ELSBERG:  Q.  What portion of the price
10  of the Galaxy Nexus is attributable to any one of the
11  four features?
12      MR. KREVITT:  Objection; foundation; outside
13  the scope; calls for speculation.
14      THE WITNESS:  I don't know how to guess and
15  how you would calculate that.
16      MR. KREVITT:  David, when -- we'd like to
17  take a break when you have a moment.
18      MR. ELSBERG:  Okay.  Let me just do a couple
19  more questions.
20      MR. KREVITT:  Okay.

REDACTED

Highly Confidential - Attorneys' Eyes Only



Page 54

REDACTED

23    MR. ELSBERG:  Okay.  We can take a break
24  here.
25    MR. KREVITT:  Okay.  Good.

Page 55

1    THE VIDEOGRAPHER:  This is the end of Disc
2  No. 1, Volume I.
3    We are off the record at 10:33 a.m.
4    (Recess taken.)
5    THE VIDEOGRAPHER:  This is the beginning of
6  Disc No. 2, Volume I.
7    We are back on the record at 10:49 a.m.
8    You may proceed.
9    MR. ELSBERG:  Q.  The Galaxy Nexus has a
10  larger screen size than the iPhone; correct?
11    A  That's correct.
12    Q  And the Galaxy Nexus has a higher resolution
13  display than the iPhone?
14    A  We have the highest density of resolution
15  with the iPhone.
16    Q  Are you unfamiliar -- or do you disagree with
17  the statement that the Galaxy Nexus has a higher
18  resolution display?
19    A  And I'm saying that we have the highest
20  density resolution, which is what I generally refer to
21  as high resolution.  We have --
22    Q  Okay.
23    A  -- a higher pixel density.
24    Q  Does the Galaxy Nexus have a higher clock
25  speed processor?

Page 56

1    A  We don't generally talk about our processor
2  speeds publicly.  I know that they do. REDACTED
5    Q  Does the Galaxy Nexus have a higher clock
6  speed processor?
7    MR. KREVITT:  Objection; asked and answered.
8    THE WITNESS:  They talk about a clock speed,
9  and we don't.
10    MR. ELSBERG:  I'm not asking what you talk
11  about.
12    Q  I'm asking:  Does the Galaxy Nexus have a
13  higher clock speed processor or not?
14    A  They do.
15    Q  And does the Galaxy Nexus have more memory
16  than the iPhone?
17    A  I believe it does.  Again, not something that
18  we market as far as a component of our products.
19    Q  Does the Galaxy Nexus have a faster camera
20  shutter than the iPhone?
21    MR. KREVITT:  Objection; these are all
22  outside the scope.
23    And to the extent you know, you should
24  answer, but please don't speculate.
25    THE WITNESS:  Yeah, I don't know their

Page 57

1  shutter speed.
2    MR. ELSBERG:  I'm not asking whether you know
3  the Galaxy Nexus' precise shutter speed.
4    Q  I'm asking a comparative question, which is:
5  Does the Galaxy Nexus have a faster camera shutter
6  than the iPhone?
7    A  Without knowing their shutter speed, I
8  couldn't make that assessment.
9    Q  Are you saying you don't know?
10    MR. KREVITT:  Objection; asked and answered.
11    THE WITNESS:  I think I've answered that.  I
12  don't know what their shutter speed is.
13    MR. ELSBERG:  Okay.  I'm not asking what
14  their shutter speed is.  I could look at two cars, and
15  I may not know exactly how fast one and the other one
16  is going, but I may know comparatively one is faster.
17    Q  So putting aside whether you know precisely
18  the shutter speed for each one, I'm asking you:  Do
19  you know whether the Galaxy Nexus has a faster camera
20  shutter than the iPhone?
21    A  And I don't know their shutter speed, and I
22  don't know if they're faster.
23    Q  Okay.  How many consumers have purchased the
24  Galaxy Nexus because it has a larger screen than the
25  iPhone?

Highly Confidential - Attorneys' Eyes Only



Page 58

1      MR. KREVITT:  Objection; outside the scope;
2 foundation.

REDACTED

Page 59

REDACTED

Page 60

REDACTED

Page 61

REDACTED

Highly Confidential - Attorneys' Eyes Only



Highly Confidential - Attorneys' Eyes Only

Page 66

1 would have an impact, what data can you point to
2 showing that any one of the four features will have
3 any impact on purchasers of the Samsung Galaxy Nexus
4 in the future?
5      A  Well, again, knowing that ease of use is of
6 great importance to our customers, if something were
7 to diminish the ease of use of a product, one would
8 speculate that it would have an -- an impact on
9 customers perceiving that product as not being as easy
10 to use.
11          For example, on the iPhone, if we didn't have
12 auto correction, if you just typed on the keyboard and
13 had to correct every mistake you made every time, you
14 would probably not be very happy with your purchase.
15 You would probably not be very happy in recommending
16 the product to your friends.
17          And certainly, that would have some impact.
18 I can't tell you the precise impact for that, either
19 for us or for our competitors.  But I just know that
20 that would, by common sense, have an impact.
21      Q  Okay.  Other than what you just told me, is
22 there any other data you can point to showing that any
23 purchasers of the Samsung Galaxy Nexus in the future
24 will be influenced by any one of the four features?
25          MR. KREVITT:  Objection; form; foundation;

Page 67

1 asked and answered.
2          THE WITNESS:  I think I've answered.
3 Again --
4          MR. ELSBERG:  Okay.
5          THE WITNESS:  -- I think it would impact ease
6 of use, and we know that's important.



Page 68

Page 69

1 me that would indicate that any of Apple's products
2 have lost any market share as a result of Samsung
3 selling the Galaxy Nexus?
4          MR. KREVITT:  Objection.
5          THE WITNESS:  I think I just answered it.  So
6 again --
7          MR. ELSBERG:  Okay.
8          THE WITNESS:  -- if somebody bought a Galaxy
9 Nexus, they didn't buy an iPhone.  Hence, whatever
10 small part of market share for that one device -- and
11 certainly, it's more than one device.  I just can't
12 give you a precise quantity.

24      Q  Okay.  I -- I don't want to beat it to death,
25 but I want to make sure we're complete.

25          MR. ELSBERG:  Q. Any other data you can give

Highly Confidential - Attorneys' Eyes Only

Page 70

1    Is there -- is there anything else that --
2  that you could point to indicating whether any of
3  Apple's products have lost any market share as a
4  result of Samsung selling the Galaxy Nexus?
5    MR. KREVITT:  Objection; beating to death.
6    THE WITNESS:  Again, maybe -- maybe to give
7  you another context which is similar, again, we're
8  competing for the same customer; right?  We're in the
9  same markets.  We're competing for the same customer.
10   So again, by definition, if somebody bought
11  one of their products and didn't buy ours, you know,
12  that is some loss of customer; hence, some loss of
13  market share.  I can't give you a precise number to
14  tell you that.
15   I just know that our -- our potential
16  customers of each of us are considering each other's
17  devices.  One would surmise some percentage would have
18  bought us as they considered us had that product not
19  exist.  I just can't give you a precise number.
20    MR. ELSBERG:  Okay.
21   Q  Anything else to add?  I just want to make
22  sure I'm exhausting you on this.
23    MR. KREVITT:  Objection.
24    THE WITNESS:  You've exhausted me.
25    MR. ELSBERG:  Okay.

Page 71

1    Q  Does Apple have any information concerning
2  whether the availability of the Galaxy Nexus in the
3  marketplace has impacted one version of the iPhone
4  more than others?
5    A  If it's affected -- can you repeat the
6  question.
7    Q  Sure.
8    Does Apple have any information concerning
9  whether the availability of the Galaxy Nexus in the
10  marketplace has impacted one version of the iPhone
11  more than others?
12   A  So I think it would be a similar answer that
13  I just gave, which is, again, we don't know the
14  precision of the impact.  Just that our customers of
15  all of our products that are in our line have
16  considered Samsung products and considered iPhone
17  products to a fairly decent percentage.
18   Some are choosing us; some are choosing
19  Samsung products.  The ones that chose the Galaxy
20  Nexus are customers we didn't get for the iPhone.
21   Q  And again, when you say the
22  one -- "the ones that chose the Galaxy Nexus are
23  customers we didn't get for the iPhone," it's possible
24  that all of those customers are ones that wouldn't
25  have bought the iPhone even if the Galaxy Nexus were

Page 72

1  unavailable; correct?
2    MR. KREVITT:  Objection.
3    THE WITNESS:  Again, our data would suggest
4  some percentage of them may have purchased us.  Some
5  percentage may have purchased something else.  But
6  there is a percentage, certainly, since they were
7  considering us, that one would surmise would have
8  purchased us had the Galaxy Nexus not existed.

REDACTED

Page 73

REDACTED

4    Q  Okay.  Has Apple made any efforts to
5  determine whether it will lose smartphone market share
6  as a result of the Galaxy Nexus in the future?
7    MR. KREVITT:  Objection; form.
8

21    MR. ELSBERG:  Q.  Has Apple made any efforts
22  to estimate the size of any market share it might lose
23  in the future as a result of the availability of the
24  Galaxy Nexus in the marketplace?
25    MR. KREVITT:  Objection.

Highly Confidential - Attorneys' Eyes Only

Page 74

1      THE WITNESS:  Again, it's the same answer.
2    It's a -- it's something you can surmise that there is
3    an impact because people tend to be loyal, "sticking,"
4    if you will, to the brand that they purchased.  You
5    know, a precise number in the future, I'm not aware of
6    a study to that effect.
7      MR. ELSBERG:  Okay.
8      Q  Putting aside a precise number, I asked if
9    Apple had made any efforts to estimate the size of any
10   market share it might lose in the future as a result
11   of the availability of the Galaxy Nexus in the
12   marketplace.
13     Have you now given me your complete answer?
14     MR. KREVITT:  Objection.
15     THE WITNESS:  Again, we know that we're
16   competing for the same customers.  Those customers are
17   going to consider -- lots of them are going to
18   consider Samsung and Apple devices.  It's very likely
19   that -- that the person who purchases will repurchase
20   that brand in the future.  I think that's logical and
21   common sense.  I think that speaks for itself.
22     MR. ELSBERG:  Okay.
23     Q  Other than that, if any efforts have been
24   made to estimate the size of any market share that
25   Apple might lose in the future as a result of the

Page 75

1    availability of the Galaxy Nexus in the marketplace,
2    please identify each of those efforts for me now.
3      MR. KREVITT:  Objection; asked and answered;
4    object to the form of the question.
5      MR. ELSBERG:  If it's -- if it's been
6    answered --
7      THE WITNESS:  I think I -- I think I've
8    answered it.
9      MR. ELSBERG:  Okay.  If there's nothing to
10   add, there's nothing to add.  I just want to make sure
11   I've exhausted you.
12     THE WITNESS:  I think I -- I think I've
13   answered it.
14     MR. ELSBERG:  Okay.
15     Q  So I -- I take it that Apple has no estimate
16   at all of how much market share it might lose in the
17   future as a -- as a result of the availability of the
18   Galaxy Nexus in the marketplace?
19     MR. KREVITT:  Objection; form; foundation;
20   asked and answered half a dozen times.

REDACTED

Page 76

REDACTED

Highly Confidential - Attorneys' Eyes Only



Page 78

REDACTED

Page 79

REDACTED

Page 81

MR. ELSBERG:  But -- but I'm asking about
estimates of future lost market share.
  Q   So is that the same as an estimate of future
lost market share or not?
  A   I was talking specifically about stickiness,
retention within a brand platform, which I think I
have over the last several answers.
  Q   Okay.  So I'm focusing specifically on
estimates or efforts to estimate future lost market
share.
    Can you tell me whether any efforts have been
made specifically to estimate the future loss of
market share that Apple will suffer as a result of the
Galaxy Nexus?
    MR. KREVITT:  Objection; form; foundation;
and asked and answered, I would estimate, a dozen
times.
    MR. ELSBERG:  Let's hear it.
    MR. KREVITT:  You may not like the answer;
you may like the answer.
    MR. ELSBERG:  I do -- I do like the answer.
    MR. KREVITT:  Then move on --
    MR. ELSBERG:  I just want to make sure it's
complete.

1    MR. KREVITT:  -- because we're -- we're
2  not -- I'm not going to allow the witness to be
3  subjected to harassment all day with the same question
4  over and over and over again.
5    MR. ELSBERG:  So I'll -- I'll repeat the
6  question because you didn't answer it while your --
7  your lawyer was talking.

REDACTED

24    MR. ELSBERG:  Okay.
25  Q   But other than -- other than surmising in the

Highly Confidential - Attorneys' Eyes Only

Page 82



REDACTED

1   way that you just described, is there -- has there
2   been any effort to actually generate a -- an estimate
3   of future potential lost market share to Apple as a
4   result of the Samsung Galaxy Nexus?
5        MR. KREVITT:  Same objections and
6   mischaracterizes the testimony.
7        THE WITNESS:  Again, I think I -- I've
8   answered it in what we look at.
9        MR. ELSBERG:  Okay.  Thank you.
10       (Document marked Joswiak Exhibit 3
11        for identification.)
12       MR. ELSBERG:  I'm showing you what's been
13  marked as Exhibit 3.  These are exhibits to
14  Mr. Rangel's declaration in this lawsuit.  And if you
15  would turn to tab 1.
16       THE WITNESS:  Okay.

Highly Confidential - Attorneys' Eyes Only



Page 86

REDACTED

Highly Confidential - Attorneys' Eyes Only



Page 90

REDACTED

Highly Confidential - Attorneys' Eyes Only

Page 94



Highly Confidential - Attorneys' Eyes Only



Page 98

REDACTED

Highly Confidential - Attorneys' Eyes Only



Page 102

REDACTED

REDACTED

6      MR. ELSBERG:  Okay.  Let's turn to 9.
7      THE WITNESS:  Tab 9?  Back to the other one?
8      MR. ELSBERG:  No, no, no.  Sorry.
9      THE WITNESS:  Oh, okay.
10     MR. ELSBERG:  That was for my colleague, Dan.
11     THE WITNESS:  Okay.
12     MR. ELSBERG:  Thank you, Dan.
13     Okay.  So this is what we are marking as
14 Exhibit No. 5.
15     (Document marked Joswiak Exhibit 5
16     for identification.)
17     MR. ELSBERG:  Q.  Do you see this is an
18 article entitled "Apple's iPhone Hooks Users"?  Do you
19 see that?
20     A   Yeah.  Let me familiarize myself.
21     Q   Sure.  Take your time if you'd like to read
22 it.
23     A   Okay.
24     Q   Okay.  I will represent to you that the date
25 of this article is September 26, 2011.  For some

Page 104

20     Q   Okay.  And you see it says that:
21     "Users are reluctant to shift to a rival
22 platform, such as Android, BlackBerry or Microsoft's
23 Windows phone."
24     My question is:  Do you agree that from
25 November 2011 through the present, roughly 90 percent

Highly Confidential - Attorneys' Eyes Only



Page 106

REDACTED

Page 107

1   If you look at the paragraph that starts
2   "when we look at all consumers who are considering
3   changing handsets," all of a sudden they change the
4   base --
5       Q   Okay.  Well, let me ask you --
6       A   -- from all handsets to those who are
7   considering.  It's really not a super-well-written
8   article.
9           I'd love to see the survey, if you have it.
10  We might be able to talk better about the data because
11  they've kind of mucked up the writing, it looks like.
12          MR. ELSBERG:  Okay.  Move to strike.
13          That wasn't my question.
14          THE WITNESS:  Okay.
15          MR. ELSBERG:  Q.  Right now, I was just
16  asking, do you see that sentence that:
17          "Crucially, UBS found that some 31 percent of
18  Android users are likely to move to Apple for the next
19  handset."
20      A   I see it says that.
21      Q   Okay.  So we can just put aside the -- the
22  article for a second, and let me ask you a question
23  that's not based --
24      A   Okay.
25      Q   -- on the -- the article.

Page 108

REDACTED

Page 109

REDACTED

15      Q   Okay.
16          THE WITNESS:  Can we take a bathroom break?
17          MR. ELSBERG:  Yeah, of course.
18          THE WITNESS:  Sorry.  Too much coffee.
19          MR. ELSBERG:  Off the record.
20          THE VIDEOGRAPHER:  This is the end of Disc
21  No. 2, Volume I.
22          We are off the record at 11:56 a.m.
23          (Recess taken.)
24          THE VIDEOGRAPHER:  This is the beginning of
25  Disc No. 3, Volume I.

Highly Confidential - Attorneys' Eyes Only



Page 110

1        We are back on the record at 12:16 p.m.
2        You may proceed.

REDACTED

Page 111

REDACTED

Page 112

REDACTED

Page 113

REDACTED

Highly Confidential - Attorneys' Eyes Only

Page 114



Highly Confidential - Attorneys' Eyes Only



Highly Confidential - Attorneys' Eyes Only

Page 122



21      MR. ELSBERG: Okay.  Now would actually be a
22 good time for a break.
23      THE WITNESS: A lunch or a short break?
24      MR. ELSBURG:  Sure, if that works for you.
25      You guys okay with that?

Highly Confidential - Attorneys' Eyes Only

Page 126

1    THE WITNESS: Sure.
2    THE VIDEOGRAPHER: We're off the record at
3  12:35 p.m.
4    (Lunch break taken at 12:35 p.m.)
5    ---oOo---
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 127

1    A F T E R N O O N   S E S S I O N
2    1:13 P.M.
3
4
5
6    THE VIDEOGRAPHER: We are back on the record
7  at 1:13 p.m.
8    You may proceed.
9    (Document marked Joswiak Exhibit 6
10    for identification.)
11    MR. ELSBERG: Showing you what's been marked
12  as Exhibit No. 6.
13   Q  Have you seen this before?
14    MR. KREVITT: Thank you.
15    THE WITNESS: Give me a moment, if you don't
16  mind, just to reread it.
17    I have.
18    MR. ELSBERG: Q. What is this?
19   A  Every quarter, Apple reports its quarterly
20  results.  This is the results from the first fiscal
21  quarter of 2012, so the quarter that ends in
22  December 2011, and this is a release that summarizes
23  those results.  There's data that's provided and an
24  analyst call that goes along with it.
25   Q  And as far as you know, everything in this is

Page 128

1  accurate?
2    MR. KREVITT: Objection; foundation.
3    THE WITNESS: I have no reason to not believe
4  that; but I don't do the release.
5    MR. ELSBERG: I understand you don't do the
6  release.
7    THE WITNESS: Yeah.
8    MR. ELSBERG: Q. After Samsung started
9  selling the Galaxy Nexus on December 15, 2011, Apple
10  posted all-time record high quarterly revenue figures;
11  correct?
12   A  For the quarter that actually ended
13  December 31st, two weeks later, that's -- that's
14  correct.
15   Q  And after Samsung started selling the Galaxy
16  Nexus on December 15, 2011, Apple posted all-time
17  record high quarterly net profit figures; correct?
18   A  For the quarter that ended two weeks later,
19  that's correct.
20   Q  And after Samsung started selling the Galaxy
21  Nexus on December 15, 2011, Apple posted all-time
22  record high sales of iPhones, iPads and Macs; correct?
23   A  For the quarter that ended -- ended two weeks
24  later, that's correct.
25    Are you done with this one, David?

Page 129

1   Q  Yes.  You can put it aside.
2    (Document marked Joswiak Exhibit 7
3    for identification.)
4    MR. ELSBERG: I'm showing you what's been
5  marked as Exhibit No. 7.
6   Q  Do you see this is an article dated April 2,
7  2012, entitled "iPhone 4S remains best-selling U.S.
8  smartphone in March, Samsung gains share"?  Do you see
9  that on top?
10   A  I do see that -- that title.
11   Q  Okay.  And again, you see the date is from
12  just a couple of weeks ago, April 2, 2012?
13   A  I see that date.
14   Q  Okay.  And do you see in the first two
15  sentences, it reports on an analysis done by Canaccord
16  Genuity analyst Mike Walkley?
17   A  I see that.  That's not an analyst I'm
18  familiar with.
19   Q  Well, you don't deny that Apple has used work
20  done by Canaccord Genuity; do you?
21   A  I don't know.  I'm not familiar with that
22  name.
23   Q  Okay.  Do you see that it says in the second
24  sentence that:
25    "Checks performed by Canaccord Genuity

Highly Confidential - Attorneys' Eyes Only

Page 130

1   analyst Mike Walkley and his team found that Apple's
2   latest iPhone was the best-selling smartphone at
3   Verizon Wireless, AT&T and Sprint in March, continuing
4   a trend that began when the device was first launched
5   last October."
6        MR. KREVITT:  Are you just asking if that's
7   what the words say?
8        MR. ELSBERG:  I asked him, does he see that.
9        MR. KREVITT:  Okay.
10       THE WITNESS:  I see -- I see where it says
11   that.
12       MR. ELSBERG:  Okay.
13   Q   Do you have any basis to dispute the
14   statement that:
15       "Apple's latest iPhone was the best selling
16   smartphone at Verizon Wireless, AT&T and Sprint in
17   March of 2012."
18   A   I hope that's correct.  I don't know if that
19   is or not.
20   Q   Any basis to dispute it?
21   A   I --
22       MR. KREVITT:  Objection.
23       THE WITNESS:  -- I don't know either way.  I
24   don't know.  I don't have concrete data.  They don't
25   report to us how much they've sold of our competitors'

Page 131

1   phones.
2        MR. ELSBERG:  I understand.
3   Q   If there is anything, though, that you can
4   point to that you're aware of that suggests that it's
5   incorrect that Apple's latest iPhone was the
6   best-selling smartphone at Verizon Wireless, AT&T and
7   Sprint in March 2012, please identify it for me now.
8        MR. KREVITT:  Objection; asked and answered;
9   lacks foundation.
10       THE WITNESS:  And I'm just saying I don't
11   know concretely.  They don't report those yet.  So at
12   some point they'll probably report their quarterly
13   sales and we'll have a better understanding.  And at
14   some point, obviously, we'll report ours, and
15   everybody starts to report their numbers.
16       MR. ELSBERG:  Q.  Nothing that you can point
17   to right now?
18   A   Not either way.
19   Q   Okay.  All right.
20       Let's turn to the next exhibit.  15.
21       (Document marked Joswiak Exhibit 8
22        for identification.)
23       MR. ELSBERG:  I'm showing you what has been
24   marked as Exhibit 8.
25   Q   Do you see that this is an article entitled:

Page 132

1        "iPhone 4S outselling all Android phones
2   combined at Sprint and AT&T:  analyst."
3   A   What's the date -- date of this article,
4   David?
5   Q   Well, first, please answer my question.  Do
6   you --
7   A   Okay.  Sorry.
8   Q   -- do you see the -- do you see that this is
9   an article -- I'll start again.
10       Do you see that this is an article entitled:
11       "iPhone 4S outselling all Android phones
12   combined at Sprint and AT&T:  analyst."
13   A   I do see that it says that.
14   Q   And do you see -- I'll represent to you that
15   this is an article that was printed -- or that bears
16   the date April 3, 2012.
17   A   So it appears to be a different article on
18   the same report of Exhibit 7.
19   Q   And do you see toward the end of the first
20   paragraph, in the second sentence of the first
21   paragraph, do you see it says that:
22       "A report by Canaccord Genuity analyst Mark
23   Walkley indicates that the iPhone is the top-selling
24   smartphone on all three of the Big Four U.S. carriers
25   that carry it."

Page 133

1        Do you see that?
2   A   It's kind of funny wording to say "all three
3   of the Big Four," but I do see that it says that.
4   Q   And --
5   A   I count four differently than they did, but
6   that's just me.
7   Q   Putting aside what you find funny about the
8   sentence, let me ask you a serious question.
9        Do you have any basis to dispute that as of
10   April 3 of 2012, the iPhone was the top-selling
11   smartphone on three of the Big Four U.S. carriers that
12   carry it?
13       MR. KREVITT:  Objection; foundation; asked
14   and answered with respect to the same report.
15       THE WITNESS:  Yeah, again, these are just
16   different articles covering the same Canaccord
17   Genuity, who, as I said, I'm not familiar with,
18   report.
19       It's the same answer as I provided on
20   Exhibit 7.  I don't have the concrete answers yet.
21   I'm not sure anybody has the concrete answers yet.
22   This looks to be done based on just some channel
23   sampling.  I'm not sure if it's correct or not.  I
24   hope it's correct, by the way.
25       MR. ELSBERG:  Q.  And then you see further

Highly Confidential - Attorneys' Eyes Only

Page 134

1  down in the article, in the third paragraph towards
2  the end, it says:
3      "The iPhone is outselling all Android phones
4  on Sprint and AT&T combined."
5      Sir, do you have any basis to dispute that as
6  of April 3rd, 2012, the iPhone was outselling all
7  Android phones on Sprint and AT&T combined?
8      MR. KREVITT:  Object to the form and lacks
9  foundation.
10      THE WITNESS:  It's peculiar wording for me
11  because I don't know what they mean that the iPhone is
12  outselling.  The iPhone -- all iPhones?  All iPhones
13  in the U.S. are selling -- outselling all Android
14  phones that were sold on Sprint in the -- it's
15  peculiar wording, so I don't know how to make a
16  concrete assessment one way or the other.  It's very
17  peculiar wording.
18      MR. ELSBERG:  Q.  So let me -- putting aside
19  what -- putting aside the wording of the articles, do
20  you have any information about whether the iPhone, all
21  models of it, is outselling all Android phones on
22  Sprint and AT&T combined, meaning larger numbers of
23  sales?
24      MR. KREVITT:  Same objections.
25      THE WITNESS:  All right.

Page 135

1      To help you out, are you asking if I know if
2  all iPhones sold by Sprint and AT&T outsell all
3  Android phones sold at Sprint and AT&T?
4      MR. ELSBERG:  Q.  If you -- if you compare
5  the number of iPhones that are being sold in the U.S.
6  to the number of Android phones on Sprint and AT&T, do
7  you know which number is higher as of April 3rd, 2012?
8      MR. KREVITT:  Same objections.
9      THE WITNESS:  I don't.
10      But it's weird because we would be also
11  selling iPhones on Verizon.  So it's a -- it would be
12  an odd comparison.  It would be basically saying
13  iPhone sold on three carriers is outselling Androids
14  as they're sold on only two, and excluding the biggest
15  carrier of all, being Verizon.  So again, it's
16  peculiar.
17      I don't -- I don't have the concrete numbers
18  one way or the other.  They haven't reported.  AT&T
19  hasn't reported theirs.  Sprint hasn't reported
20  theirs.  Verizon -- they don't give us weekly reports
21  to say, Here's how they're doing versus the
22  competition.  I think, you know, they have some reason
23  not to.
24      MR. ELSBERG:  All right.  Move to strike
25  everything after the first two words "I don't."

Page 136

1      THE WITNESS:  You had me at hello.
2      MR. ELSBERG:  All right.  Let's put this
3  document aside.
4    Q  Has any effort been made to measure the
5  extent to which products other than -- sorry.  Let me
6  start over.
7      Has any effort been made to measure the
8  extent to which sales or market share of products
9  other than the iPhone have decreased because of the
10  Galaxy Nexus?
11      MR. KREVITT:  Object to the form; foundation.
12      MR. ELSBERG:  And I'm referring to Apple
13  products.
14      THE WITNESS:  Yeah, repeat the question.  I
15  want to make sure I --
16      MR. ELSBERG:  Sure.

REDACTED

Page 137

REDACTED

Highly Confidential - Attorneys' Eyes Only

Page 138

1       MR. ELSBERG: Q. Who summarized it to you?
2       A I believe it would be John Brown, who is in
3   Art Rangel's organization, but --
4       Q When? Sorry. Go ahead.
5       A -- some of the results are somewhat familiar.
6   That's why I -- and I shouldn't guess at that because
7   it's possible I -- some press people covered it, too.
8   I've seen some of these results.
9       Q And --
10      A I don't recall seeing this precise report,
11  this exact report.
12      Q Okay. And you said John Brown. When do you
13  believe John Brown summarized it to you?
14      A As I just said, maybe he did. You know,
15  there's some vague recollection I have of this study.
16  John handles secondary, so if anybody would have, it
17  would have been John. But I don't have a concrete
18  recollection.
19      Q I asked you when. What --
20      A I don't have a concrete recollection. I
21  would have a hard time giving you when.
22      Q No, that's not necessarily true at all. So
23  I'm asking you a question. I'm asking --
24      MR. KREVITT: He's answered the question.
25      MR. ELSBERG: No, no.

Page 139

1       Q I'm asking you the question: Can you put a
2   time frame on this?
3       A So the report is in February.
4       Q Right.
5       A Okay. That's all I can show you. The report
6   says February. I don't have the concrete
7   recollection. Like I said, this is vaguely familiar.
8   That's all I can give you.
9       Q If you would turn to the page ending in '707
10  on the bottom right-hand corner.
11      By the way, Apple businesspeople use work
12  that's done by comScore from time to time; correct?
13      A I believe we have. That's -- it is an
14  organization I'm familiar with, unlike the one we
15  talked about in the last series of questions.
16      Q Okay. And you have no reason to believe that
17  comScore is an unreliable source of information?
18      A I don't --
19      MR. KREVITT: Objection; foundation.
20      THE WITNESS: -- I don't know either way.
21  I'm not the research expert in our group. Art Rangel
22  is, who I believe you guys have talked to. He would
23  be a better person to answer that.
24      MR. ELSBERG: Okay.

Page 140



REDACTED

Highly Confidential - Attorneys' Eyes Only

Page 142

Page 143



REDACTED

14    MR. ELSBERG:  Actually, now, I'm just
15  learning.
16    THE WITNESS:  Okay.
17    MR. ELSBERG:  So you said that there's this
18  bell curve.  So just tell me about that bell curve
19  that you just mentioned.
20    THE WITNESS:  Traditional marketing 101, you
21  know, is that people come to technologies at different
22  rates:  Early adopters, mainstream and late adopters.
23    MR. ELSBERG:  Okay.
24  Q  And tell me:  What's the difference between
25  early, mainstream and late adopters as you understand

Highly Confidential - Attorneys' Eyes Only

Page 146

1 that?
2       MR. KREVITT:  Objection; vague.
3       THE WITNESS:  Again, we could probably talk
4 for two days on it, if you have the time.
5       Early adopters are the first to get excited
6 about a new technology and buy it.  Mainstream are
7 when lots of people are buying things.  And late
8 adopters love referential buying.  They love to know
9 that lots of other people have bought something before
10 they buy something.
11       MR. ELSBERG:  Q.  Are there typically any
12 other distinguishing characteristics for each of these
13 categories?
14       MR. KREVITT:  Objection; vague; foundation
15 and outside the scope of the topics.
16       THE WITNESS:  I think that's a fairly good
17 general description.  I think that's -- it hopefully
18 provides the framework, maybe, for you.
19       MR. ELSBERG:  I just -- you know, for
20 example, early -- early adopters are the ones to
21 get -- I think you said generally the first to get
22 excited.
23    Q  Are early adopters generally more fluent with
24 or comfortable with new technology, whereas the -- the
25 mainstream or the late adopters are generally less

Page 147

1 comfortable with new technology?
2       MR. KREVITT:  Objection; vague; foundation
3 and outside the scope of the topics the witness has
4 been designated to testify.
5       And now you're not talking about
6 smartphone --
7       MR. ELSBERG:  Stop making a speech.  Stop
8 making a speech.
9       MR. KREVITT:  You're way -- I am --
10       MR. ELSBERG:  Stop making a speech.  You're
11 trying to coach the witness.  You're trying to make
12 speeches.  This would go a lot more quickly if you
13 would let the witness answer and stick to appropriate
14 objections.
15       MR. KREVITT:  Are you asking about general --
16       MR. ELSBERG:  I asked my question.
17       MR. KREVITT:  I instruct the witness not to
18 answer the question.
19       MR. ELSBERG:  All right.
20       We're going to make a motion.
21       MR. KREVITT:  Fine.  If you're not going to
22 let me --
23       MR. ELSBERG:  We're going to make a -- we're
24 going to make a motion on this.
25       MR. KREVITT:  Make your motion.

Page 148

1       MR. ELSBERG:  You have a chance to withdraw
2 that instruction.
3       MR. KREVITT:  I -- I have a chance to --
4       MR. ELSBERG:  You can withdraw your
5 instruction or we're going to make a motion, and we're
6 going to call this witness back.  You have no basis to
7 instruct the witness not to answer, and you know that.
8       MR. KREVITT:  If you're not going to allow me
9 to state my objections, I instruct the witness not to
10 answer it.
11       MR. ELSBERG:  Okay.
12       MR. KREVITT:  If I'm allowed to make my
13 objections, I will not instruct the witness not to
14 answer.
15       MR. ELSBERG:  Stop making a speech.
16       MR. KREVITT:  You are not going to cut me off
17 and expect me to allow you to continue the questioning
18 of the witness, period.  That's not going to happen.
19       MR. ELSBERG:  Stop.  We are going to end up
20 calling this witness back because you're intent on
21 making speeches and improper instructions.
22       MR. KREVITT:  Do whatever you want to do.
23 I'm telling you you are not going to cut off my
24 objections and expect me to allow you to continue
25 questioning the witness.  That is not going to happen.

Page 149

1       You are asking questions that are well beyond
2 the scope of the topics for which the witness has been
3 designated to testify.  The questions are vague.  The
4 questions -- there is no foundation for the questions,
5 and they're inappropriate.  I'm allowed to make those
6 objections --
7       MR. ELSBERG:  Are you done?
8       MR. KREVITT:  -- and I'm going to.
9       MR. ELSBERG:  Are you done?
10       MR. KREVITT:  I am done now.
11       MR. ELSBERG:  Are you withdrawing your
12 instruction not to answer now?
13       MR. KREVITT:  Yes --
14       MR. ELSBERG:  Okay.
15       MR. KREVITT:  -- in light of those
16 objections.
17       MR. ELSBERG:  I'll ask the question again.
18    Q  Subject to those objections, so we don't need
19 to repeat them, I'd like to know what other
20 characteristics generally are associated with these
21 different categories in the bell curve.
22       So, for example, generally, are early
23 adopters more comfortable with new technology, whereas
24 mainstream and late adopters are less comfortable?
25 Let's start with that.

Highly Confidential - Attorneys' Eyes Only

Page 150

1      MR. KREVITT:  Same objections.
2      THE WITNESS:  So again, early adopters
3  generally are willing to take more of a risk on a new
4  product or get excited by a new product.
5      MR. ELSBERG:  Q.  What else are features that
6  generally characterize early adopters?
7      MR. KREVITT:  Objection; vague; foundation;
8  outside the scope of the topics for which the witness
9  has been designated to testify.
10     THE WITNESS:  Again, I think that's a pretty
11 good general description of what they are.  I mean,
12 it's a -- it's -- it's -- it's a very loose framework;
13 right?  It is truly a -- a marketing 101 concept,
14 right, that just says some people come to technology
15 or products.  It doesn't even have to be technology.
16 Sometimes it's like that with cars; right?  They come
17 to it faster.  They get excited more easily about
18 something that's new.  They don't need as much
19 reference.
20     Mainstream buyers need some reference.  They
21 need to know people are buying it.  There's a network
22 effect that comes into play with the mainstream
23 buyers.
24     And with the late adopters -- some people
25 might call them laggards -- they need more of that.

Page 151

1  They need more of the safety, the referential buying.
2  The network effect is even more important for them.
3      MR. ELSBERG:  Q.  And the -- the laggards,
4  they tend to be people that are generally less
5  comfortable with new products and technologies?
6      MR. KREVITT:  Objection.
7      THE WITNESS:  I'm not sure you can always say
8  that.  Again, to me, at least in the way I've always
9  understood it, it has more to do with safety, you
10 know, and referential, you know, knowing that you're
11 buying something that was safe to buy.  If a lot of
12 other people have bought it, it's safe.
13     Some of them are not as technical savvy.
14 Some are, you know.  They're just -- before they put
15 their hard-earned money on it, they want to know
16 they're making a safe purchase.
17     MR. ELSBERG:  Some -- I understand some are;
18 some aren't.
19   Q  But, generally speaking, according to this
20 bell curve model, are laggards understood to be the
21 group that overall are less comfortable with new
22 technologies?
23     MR. KREVITT:  Objection; vague; foundation;
24 outside the scope of the topics for which the witness
25 has been designated to testify.

Page 152

1      THE WITNESS:  Again, in the way that I've
2  learned it, it was more about referential, more about
3  knowing there's a safety in the purchase.  I think
4  you'd have to probably look at it on a
5  technology-by-technology basis to make, you know --
6  and less in a general.
7      Again, I said it could apply to cars.  I
8  don't think you could say people who are late in
9  buying a model car couldn't drive as well, you know.
10 They're just -- they just need the safety to know that
11 everybody else has a Taurus --
12     MR. ELSBERG:  Okay.
13     THE WITNESS:  -- before they get the Taurus.
14     MR. ELSBERG:  Q.  And what -- what is the
15 name -- does this -- does this bell curve that -- that
16 you referred to, does it have a -- is it known by a
17 name in marketing -- you said marketing 101, so
18 marketing classes or --
19   A  Just an adoption curve.

REDACTED

Page 153

REDACTED

6      MR. ELSBERG:  Q.  But there are -- it is true
7  that people within Apple's marketing department have
8  actually applied that curve to smartphones; correct?
9    A  I don't know.
10     MR. KREVITT:  Objection; foundation.
11     MR. ELSBERG:  Q.  You don't -- you don't deny
12 it; do you?
13   A  I don't know.
14     MR. KREVITT:  Hang on.  Time out.
15     MR. ELSBERG:  Okay.
16     MR. KREVITT:  Let me get my objections in,
17 please.  Objection; foundation; calls for speculation
18 and outside the scope of the topics.
19     MR. ELSBERG:  Q.  My question is:  Do you
20 deny it?
21   A  I don't --
22     MR. KREVITT:  Deny what?
23     MR. ELSBERG:  Q.  Do you deny that people
24 within Apple's marketing department have applied this
25 bell curve that you're talking about to iPhones?

Highly Confidential - Attorneys' Eyes Only



Page 154

1       MR. KREVITT:  Objection; foundation; outside
2   the scope; calls for speculation and asked and
3   answered.
4       THE WITNESS:  If you want to show me a
5   document, we can talk about it.
6       MR. ELSBERG:  We'll get to a document.
7   Q  I'm asking:  Do you deny it?
8       MR. KREVITT:  Same objections.
9       THE WITNESS:  I previously said I don't know.
10  So as a result, I don't know to either deny or
11  confirm.
12      MR. ELSBERG:  Okay.  Thank you.

REDACTED

Page 155

REDACTED

25      MR. ELSBERG:  Okay.

Page 156

1       Q  Is the smartphone market now in a critical
2   juncture in which most consumers will switch to
3   smartphones and make their initial smartphone
4   purchases during this litigation?
5       MR. KREVITT:  Objection; foundation.
6       THE WITNESS:  I think we have definitely been
7   in a period of time where people are in great numbers
8   buying their first smartphone.  And whether they
9   realize it or not, they're buying into a brand that
10  will end up making a -- both a brand and platform
11  choice for them.  I think that is a -- that makes this
12  a very critical time that I think will continue for
13  some time.
14      MR. ELSBERG:  Q.  And continue for how long?
15      A  I don't know.  I couldn't tell you with
16  certainty.
17      Q  Tell me generally.
18      MR. KREVITT:  Objection.
19      THE WITNESS:  Again, lots of people are
20  buying their first smartphones right now.  Eventually,
21  everybody, or at least a very large part of the
22  population, will have purchased their first
23  smartphone, and you will be out of first-time buyers.
24      MR. ELSBERG:  Can you --
25      THE WITNESS:  People will have segregated

Page 157

1   themselves into a -- a camp, if you will.
2       MR. ELSBERG:  Q.  And if -- and -- and Apple
3   refers to this time period you're describing as a,
4   quote, critical juncture; correct?
5       A  I think it just is.  I don't know if there's
6   an official Apple title to it.  It just is, because
7   once somebody buys a smartphone, that brand is really
8   going to align themselves to a platform and to -- so
9   obviously, biggest are Android and iOS.  Once you've
10  bought into that platform, you start to buy apps for
11  it.
12      You buy, you know, various things that attach
13  to both that OS and the device.  You start to invest
14  in an infrastructure and ecosystem around the choice
15  that you made, which makes it then, in addition to the
16  brand we've already talked about, makes it even less
17  likely that you will switch platforms in the future.
18      Q  I'm going to show you on the Livenote
19  computer the answer that you just gave and ask you:
20  Where you said "that brand is really going to align
21  themselves," did you mean to say "that brand is really
22  going to" --
23      A  The brand that they choose is going to
24  align -- the brand that the person chooses is going to
25  align that person to a -- to a camp.

Highly Confidential - Attorneys' Eyes Only

Page 158

1    For example, if they bought an iPhone, they
2  aligned themselves to iOS.  They might not have come
3  in saying, "I want iOS."  They decided they wanted an
4  iPhone.
5    They might have chosen to buy a Samsung
6  Galaxy Nexus, and that got them onto the Android
7  platform.  They may or may not have been wanting to go
8  Android as much as they wanted that handset.
9    And that's what I'm saying.  With first-time
10 buyers, they will end up aligning themselves into a
11 platform, depending on the brand that they purchased.
12   Does that make -- does that make sense?
13 Q  Yes.  And what you're -- what you're
14 describing is applicable to consumers who would
15 purchase the Samsung Galaxy Nexus during the next 18
16 to 24 months; correct?
17 A  Well, it would -- it would apply to any
18 customer, right, who is buying a smartphone.  They
19 will buy a brand of a smartphone, and it has an OS
20 platform attached to it.
21   So you end up with the stickiness of the
22 platform because of lots of reasons, including, as I
23 said, the infrastructure you start to invest around
24 it.  That exists for iPhone customers.  That exists
25 for Samsung customers.  That exists for HTC customers,

Page 159

1  et cetera.
2  Q  So what you said would apply to consumers who
3  would purchase the Galaxy Nexus in the next 18 to
4  24 months; correct?
5  A  Of course, yes.  That would apply to all
6  smartphone customers.
7  Q  Okay.  So if Samsung were not permitted to
8  sell smartphones during the next 18 to 24 months, what
9  impact would it have on Samsung's market share after
10 that 24 months?
11   MR. KREVITT:  Objection; calls for
12 speculation; form; foundation and outside the scope of
13 the topics for which the witness has been designated
14 to testify.
15   THE WITNESS:  I -- I would be speculating on
16 the precise impact, but I would imagine that would
17 have a considerable impact.
18   MR. ELSBERG:  Q.  What would -- what would be
19 the considerable impact?
20   MR. KREVITT:  Same objections; foundation;
21 outside the scope of the topics and calls for
22 speculation.
23   THE WITNESS:  Again, it's -- it would be a
24 guess.  Again, they'd lose the brand allegiance.  They
25 wouldn't necessarily lose the OS allegiance because

Page 160

1  they would still be able to retain, one would assume,
2  Android customers from other brands later in the game.
3  But again, speculating on how that would play out.
4    MR. ELSBERG:  Q.  And what do you mean when
5  you say Samsung would lose brand allegiance?
6  A  Well, if they weren't selling products during
7  that time frame, then during that time you don't have
8  repeat buyers, by definition, that would -- would
9  obviously repeat their purchase based on the numbers
10 we talked about earlier, to the tune of the ████████
11 or so.
12 Q  And -- and do you believe that Samsung would
13 lose market share as -- if they were unable to sell
14 the Galaxy Nexus during the next 18 to 24 months, and
15 then were able to sell only after that period?
16   MR. KREVITT:  Objection; object to the form;
17 there's no foundation, and it calls for speculation.
18 It's also outside the scope of the topics for which
19 the witness has been designated to testify and
20 mischaracterizes his prior testimony.
21   THE WITNESS:  So your question changed a bit
22 from question to question.  I don't know if you
23 intended it.  So you may want to look back at your --
24 you talked --
25   MR. ELSBERG:  I'll ask you --

Page 161

1    THE WITNESS:  -- prior about all --
2    MR. ELSBERG:  -- I'll ask --
3    THE WITNESS:  -- Samsung smartphones.
4    MR. ELSBERG:  -- I'll ask a new question.
5    MR. KREVITT:  Hang on.  Hang on.
6    THE WITNESS:  This was -- you just asked
7  about the Galaxy Nexus, so I just want to make sure
8  you meant that to be different.
9    MR. ELSBERG:  I will -- I will ask --
10   THE WITNESS:  Okay.
11   MR. ELSBERG:  -- a brand-new question.
12   THE WITNESS:  Okay.
13   MR. ELSBERG:  Q.  Do you believe that if
14 Samsung were not allowed to sell the Galaxy Nexus
15 during the next 18 to 24 months and were only allowed
16 to sell it after the end of that period, do you
17 believe that Samsung would suffer permanent loss of
18 market share as a result of not being able to sell
19 during the 18 to 24 months?
20   MR. KREVITT:  Objection; this is outside the
21 scope of the topics for which the witness has been
22 designated to testify.  The witness has established --
23 has established he has no foundation on which to
24 testify --
25   MR. ELSBERG:  You're making a speech again.

Highly Confidential - Attorneys' Eyes Only



Page 162

1        MR. KREVITT:  So I object on the basis of
2    foundation; and it explicitly, in light of his prior
3    testimony, calls for speculation.  It's an improper
4    question.
5        THE WITNESS:  What I would say, David, is
6    it's different than I could answer the other one,
7    which is not selling any smartphones.
8        I don't know what they would do in response
9    to just not selling a particular model.  Without
10    knowing what they would do in response to just not
11    selling a particular model, I don't even have any way
12    of speculating what would happen to the market share.
13    Just -- I just don't know.

REDACTED

Page 163

REDACTED

21        MR. ELSBERG:  Okay.
22        MR. KREVITT:  We've been going for a little
23    over an hour.  Is now a good time for a break?
24        MR. ELSBERG:  Sure.
25        MR. KREVITT:  Yeah.

Page 164

1        THE VIDEOGRAPHER:  This is the end of Disc
2    No. 3, Volume I.
3        We are off the record at 1:54 p.m.
4        (Recess taken.)
5        THE VIDEOGRAPHER:  This is the beginning of
6    Disc No. 4, Volume I.
7        We are back on the record at 2:08 p.m.
8        You may proceed.
9        (Document marked Joswiak Exhibit 10
10         for identification.)
11        MR. ELSBERG:  Showing you what's been marked
12    as Exhibit 10.
13    Q  Have you seen this before?
14    A  Give me a minute.
15        I haven't seen this particular article, no.
16    Q  Have you seen similar reports that convey the
17    same information in it?
18        MR. KREVITT:  Objection.
19        THE WITNESS:  I recall seeing something about
20    this survey that's being referenced, but only probably
21    another type of article, not the survey itself.

REDACTED

Page 165

REDACTED

Highly Confidential - Attorneys' Eyes Only



Page 166

REDACTED

18    Do you see that?
19    A  I see that those words are there.
20    Q  During the time period that Samsung has been
21 selling the Galaxy Nexus, Apple has maintained its
22 stature as the most popular mobile platform among
23 application developers; correct?
24    MR. KREVITT:  Objection; foundation.
25    THE WITNESS:  I don't know their developer

Page 167

1 count.  I don't know the concrete answer to that.
2    MR. ELSBERG:  Q.  Do you have a general
3 answer to that?
4    A  I believe it's true what you had said, but I
5 don't want to state it as a matter of fact.
6    Q  You have to reason to deny it?
7    MR. KREVITT:  Objection.
8    THE WITNESS:  I don't have specific
9 information that would contradict that.
10    MR. ELSBERG:  Okay.
11    Q  And Apple -- sorry.  Let me start over.
12    Application developers have not decreased the
13 number or quality of the applications that they have
14 been developing for Apple as a result of the Galaxy
15 Nexus; correct?
16    MR. KREVITT:  Objection; form; foundation;
17 outside the scope.
18    THE WITNESS:  Yeah, I'm not quite sure how to
19 answer that.  You know, I don't know if there's
20 perhaps one developer who would change his mind.  I
21 don't know.  If there's one, maybe there's two.  If
22 there's two, maybe there's more.  I don't know.  I
23 don't have a conversation with every developer and
24 understand what their motivation is for their
25 development decisions.

Page 168

REDACTED

Page 169

REDACTED

Highly Confidential - Attorneys' Eyes Only



Highly Confidential - Attorneys' Eyes Only



Page 174

REDACTED

Highly Confidential - Attorneys' Eyes Only



Page 178

REDACTED

REDACTED

18    Q  Any other forms of harm that occurred to the
19  Apple ecosystem as a result of the Galaxy Nexus?
20    A  There may be.  Those are the ones that I
21  think are pretty good ones that come to mind.
22    Q  Nothing else you can think of right now?
23    MR. KREVITT:  Objection.
24    THE WITNESS:  I didn't come with notes, so I
25  have to -- unfortunately have to go off the top of my

Page 180

Highly Confidential - Attorneys' Eyes Only



Highly Confidential - Attorneys' Eyes Only

Page 186



REDACTED

13      MR. ELSBERG: Okay.

14      THE WITNESS: But there is an impact.

15      MR. ELSBERG: Okay. Okay. Thank you.

16   Q   Are there specific characteristics or

17 features of the Galaxy Nexus that create network

18 effects?

19      MR. KREVITT: Objection.

20      THE WITNESS: I -- you know, as a -- as I

21 stated earlier, when a product is sold, when a -- when

22 a -- when you add to a user base and you add to a

23 platform base, certainly there's a network effect that

24 goes with that.

25      Specific features of the Galaxy Nexus --

Page 187

1 Samsung does some of their own stores and technologies

2 on the device.  They bundle some reader -- reader hub.

3 They do their own store, as well as the -- as well as

4 the Google Play or the Android marketplace.  So

5 certainly, they have things like that, that as you add

6 users to that, they see a network benefit.

7   Q   Other than the specific items that you just

8 identified, are there any other characteristics or

9 features of the Galaxy Nexus that you can itemize that

10 create network effects?

11      MR. KREVITT: Objection; form; foundation;

12 outside the scope; vague.

13      THE WITNESS: Yeah, I'm sure there are

14 others.  That was, I think, generally outside of my

15 topic, too, so I don't have an exhaustive list in my

16 head.  I gave you some, I think, reasonable examples,

17 and I think that hopefully gives you a flavor for it.

18      MR. ELSBERG: Q. Can you think of any other

19 examples?

20      MR. KREVITT: Same objections.

21      THE WITNESS: Again, I think those are pretty

22 good examples.

23      MR. ELSBERG: I understand you think they're

24 good.

25   Q   I'm asking: Can you think of any others?

Page 188

1      MR. KREVITT: Same objections and asked and

2 answered.

3      THE WITNESS: I'll stick with what I have.

4      MR. ELSBERG: Q. If you can think of any

5 others, tell me now.

6      MR. KREVITT: Same objections; asked and

7 answered.

8      MR. ELSBERG: Q. Anything you want to add?

9   A  I think I gave you some pretty good examples.

10   Q  Okay. Does Samsung have goodwill in the

11 marketplace?

12      MR. KREVITT: Objection; foundation; outside

13 the scope of the topics for which this witness has

14 been designated to testify.

15      THE WITNESS: Yeah, I haven't seen any

16 research on Samsung's goodwill.

17      MR. ELSBERG: Q. Regardless of whether

18 you've seen any research, do you have any

19 understanding about whether Samsung has any goodwill

20 in the marketplace?

21      MR. KREVITT: Objection; foundation; form;

22 and it's outside the scope.

23      You believe these questions are within the

24 scope, David?

25      MR. ELSBERG: You can answer.

Page 189

1      MR. KREVITT: You're not willing to say

2 whether you think the questions are within the scope

3 or not?

4      MR. ELSBERG: I'm not here to have a

5 conversation with you.

6      You can answer the question.

7      MR. KREVITT: They're outside the scope.

8 It's confirmed by your unwillingness to say otherwise.

9      THE WITNESS: Again, I -- this is not an area

10 of my expertise to understand Samsung's goodwill in

11 the marketplace.

12      MR. ELSBERG: Q. If you have any

13 understanding about whether Samsung has any goodwill

14 in the marketplace, please tell me your understanding

15 now.

16      MR. KREVITT: Objection.

17      THE WITNESS: I appreciate the opportunity,

18 but again, it's outside of my expertise to understand

19 what Samsung's goodwill is in the marketplace.

20      MR. ELSBERG: Q. Does Apple have goodwill in

21 the marketplace?

22   A  Absolutely.

23   Q  What does goodwill mean?

24   A  Goodwill is an equity that your brand and

25 your products create in the marketplace, a -- a

Highly Confidential - Attorneys' Eyes Only

Page 190

1  following, a -- a -- a promise that's understood by
2  your customers in the marketplace for what you are.
3      For us, you know, Apple products are easy to
4  use and distinctive and innovative and, you know, that
5  goodwill is demonstrated by people, you know, lining
6  up to buy our -- our products when they come out for
7  sale, sometimes sleeping in the streets for two days
8  to get our products because of the goodwill we've
9  created, and their understanding that we will deliver
10 them a great product and a great product experience.
11     Q  Has Apple measured its goodwill?
12        MR. KREVITT:  Objection.
13        THE WITNESS:  I'm not sure how you exactly
14 measure that.  You know whether you're -- you're --
15 whether you've got it or not.  I'm not sure exactly
16 how you'd measure it.
17        MR. ELSBERG:  Q.  So I take it the answer is
18 that Apple has not measured its goodwill?
19        MR. KREVITT:  Objection.
20        THE WITNESS:  Again, I'm not sure it's
21 exactly measurable.
22        MR. ELSBERG:  Okay.  I understand that you
23 aren't sure it's exactly measurable.
24     Q  I'm asking:  Has Apple measured its goodwill?
25        MR. KREVITT:  Objection; asked and answered.

Page 191

1        THE WITNESS:  It's kind of like asking, have
2  you measured your good looks?  You know, I don't know
3  how you measure that.  I guess some people try to, but
4  that's not something we try to measure.
5        MR. ELSBERG:  Thank you.
6     Q  So I take it that you don't know, since you
7  haven't tried to do any measurements, whether during
8  the time Samsung has been selling the Galaxy Nexus,
9  whether Apple's goodwill has been increasing or
10 decreasing?
11        MR. KREVITT:  Objection; vague; foundation.
12        THE WITNESS:  Well, again, I do know that
13 part of what drives our goodwill is our
14 distinctiveness of our products, the innovation of our
15 products, the -- as more products go to market that
16 are similar to that, similar to us, then that
17 distinctiveness is diminished.
18        Can I provide a precise number to that?  No.
19 But as there are more mimics and products that will
20 eventually erode that distinctiveness, then as a
21 marketing person, I would be concerned about that
22 having a long-term effect on goodwill.
23        MR. ELSBERG:  Q.  How do you know what drives
24 Apple's goodwill --
25     A  So --

Page 192

1     Q  -- and what doesn't?
2     A  So as the -- as the senior marketing person
3  at Apple, that's something that I have a feel for, a
4  knowing of, understanding and talking to our
5  customers, to our journalists that cover us, industry
6  analysts -- you develop a good flavor.
7        Obviously, looking at the lines of people
8  waiting for our products when we're releasing them.
9  You -- you have lots of things to judge.  How many
10 people come into our retail stores, you know, lots of
11 things that help us have a general sense as to what
12 our goodwill is.



REDACTED

24        MR. ELSBERG:  Q.  And have any consumers
25 believed that the Galaxy Nexus is an Apple product?

Page 193

1        MR. KREVITT:  Objection; foundation; calls
2  for speculation; outside the scope of the topics.
3        THE WITNESS:  I don't know.  I haven't talked
4  to every Google -- sorry -- Galaxy Nexus customer.
5        MR. ELSBERG:  Q.  Has Samsung engaged in any
6  advertising that has tarnished Apple or mucked its
7  consumers?
8        MR. KREVITT:  Hang on one second.
9        THE WITNESS:  I understand the question.
10 Yes.
11        MR. ELSBERG:  Q.  Identify each instance in
12 which that's occurred.
13     A  I don't know about each instance, especially
14 since they've run the commercials many times.  But I
15 talked about the goodwill that we have that is -- one
16 of the ways in which it's demonstrated is people who
17 will wait outside our stores prior to the introduction
18 of a new product in order to be one of the first to
19 purchase it.  Samsung, in pinpointing us, obviously,
20 as a -- as a -- as a chief competitor, has mocked
21 those people waiting in lines for -- for the new
22 products.
23     Q  Give me each instance in which Samsung has
24 mocked people waiting in lines.
25        MR. KREVITT:  Objection; asked and answered.

Highly Confidential - Attorneys' Eyes Only

Page 194

1       THE WITNESS:  They run multiple ads.  And I
2   can't tell you how many times they've run those ads,
3   but they ran them a lot.  They were in pretty heavy
4   rotation.
5       MR. ELSBERG:  Okay.
6       Q  Identify for me each ad.  I understand each
7   ad may have been run multiple times.  But putting
8   aside the multiple times, I'd like you to identify for
9   me each ad.
10      MR. KREVITT:  Objection; asked and answered;
11  foundation.
12      THE WITNESS:  Again, there were multiple ads.
13  I don't know how to -- I don't know what the titles
14  were of those ads, if that's what you're asking for.
15  They had multiple, as, you know, making fun of people
16  waiting in line, and having some person standing
17  outside the line with their Samsung phone that was,
18  again, making fun of people who were in line.
19      MR. ELSBERG:  Okay.
20      Q  Other than ads that you describe as making
21  fun of people waiting in line, identify each other
22  type of advertisement that you believe has tarnished
23  Apple or mocked its customers.
24      MR. KREVITT:  Objection; form.
25      THE WITNESS:  Well, again, as far as

Page 195

1   tarnishing and reducing goodwill, as I've stated, as
2   we lose distinctiveness of our products, that
3   diminishes our goodwill.
4       And maybe the classic example of that is what
5   happened to Apple in the '80s and early '90s, which is
6   when we had innovated around and experience around a
7   graphical user interface with the Mac and had -- and
8   initially created lots of goodwill about that
9   distinctiveness and innovation.
10      Once Windows came to market looking much like
11  that, our distinctiveness was greatly diminished, to
12  the point where people didn't know which came first,
13  largely, the Mac or -- or Windows.  And our
14  distinctiveness was eroded, our goodwill was
15  diminished, and the company experienced difficulties
16  that -- that that was related -- that that helped
17  contribute to.
18      Did that happen overnight?  No, these things
19  don't.  They happen over time.  And that's why -- one
20  of the reasons it's very important for us to make sure
21  that our products are very distinctive in the
22  marketplace, and our innovation is known, and our ease
23  of use is known, because those things are very
24  important to how your company is viewed in the long
25  term and how your brand is viewed in the long term.

Page 196

1       MR. ELSBERG:  Q.  So in that answer you just
2   gave, were you referring to anything that Samsung did?
3       A  I was giving an example of how that brands
4   can be tarnished.  So as --
5       Q  No, no.  I'm saying --
6       A  -- Samsung --
7       MR. KREVITT:  Let him --
8       THE WITNESS:  -- so as Samsung runs ads
9   that -- and they promote their products in ways that
10  look like the iPhone, that reduces our distinctiveness
11  and diminishes it and, hence, tarnishes us.
12      MR. ELSBERG:  Okay.
13      Q  I'm focusing on ads only by Samsung, and what
14  I'm trying to do is get a complete list from you of
15  every type of ad you believe Samsung has run that has
16  tarnished Apple or mocked its customers.
17      So one type that you've told me about is
18  making fun of people standing in lines.
19      What else would you add to the list of such
20  advertisements?
21      MR. KREVITT:  Objection; outside the scope;
22  asked and answered; form.
23      THE WITNESS:  Again, I've given you some
24  examples, which are the mocking the lines.  But what I
25  was also suggesting is when they run ads of -- showing

Page 197

1   similarities between their product and the iPhone,
2   then that diminishes our distinctiveness, which,
3   hence, tarnishes the brand.
4       MR. ELSBERG:  Q.  Other than ads showing --
5   other than ads making fun of people standing in line
6   and ads showing similarities between Samsung and the
7   iPhone, are there any other types of ads that you
8   believe Samsung has run that has tarnished Apple or
9   mocked its customers?
10      MR. KREVITT:  Same objections.
11      THE WITNESS:  There may be.  These are the
12  ones coming to mind.
13      MR. ELSBERG:  Q.  If you can think of any
14  others, please tell me now.
15      A  I appreciate that.  Those are the ones coming
16  to mind.
17      Q  Okay.  What impact have the ads that you
18  identified by Samsung had, if any, on Apple's market
19  share or sales?
20      MR. KREVITT:  Objection; form; foundation;
21  outside the scope.
22      THE WITNESS:  I don't know.  Those things are
23  difficult to measure.
24      MR. ELSBERG:  Q.  Any -- any sense at all?
25      MR. KREVITT:  Same objections.

Highly Confidential - Attorneys' Eyes Only

Page 198



1       MR. ELSBERG:  All right.  Withdrawn.

Highly Confidential - Attorneys' Eyes Only

Page 202

REDACTED



Page 206



Highly Confidential - Attorneys' Eyes Only



Page 210

REDACTED

Page 211

REDACTED

13    THE WITNESS: And at some point, could we do
14  a potty break?
15    MR. KREVITT: Yeah, sure.
16    MR. ELSBERG: Go ahead.
17    THE VIDEOGRAPHER: This is the end of Disc
18  No. 4, Volume I.
19    We are off the record at 3:09 p.m.
20    (Recess taken.)
21
22
23
24
25

Page 213

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16    THE VIDEOGRAPHER: This is the beginning of
17  Disc No. 5, Volume I.
18    We are back on the record at 3:29 p.m.
19    You may proceed.
20    MR. ELSBERG: Q. Was the iPhone originally
21  available only on the AT&T?
22    A   Yeah. When we introduced the first iteration
23  of the iPhone and started shipping it in June of 2007,
24  it was available on one carrier in the world and that
25  was initially AT&T.

Highly Confidential - Attorneys' Eyes Only

Page 214



1    Q   And did AT&T remain the exclusive carrier for
2  iPhones until last year?
3    A   Well, we started selling it with other
4  carriers in other countries as early as November 2007.
5  I think, maybe to the point of your question, we
6  remained exclusive in the United States until a little
7  bit more than a year ago.
8        In the first calendar quarter of 2011, we
9  came out of Verizon in the U.S., and then in the
10  fourth calendar quarter we came out of Sprint in the
11  U.S.
12    Q   Which -- which versions of the iPhone are
13  still available on AT&T?
14    A   IPhone 3GS, iPhone 4, and iPhone 4S are all
15  available at AT&T.
16    Q   And which ones are available on Verizon?
17    A   The iPhone 4 and the iPhone 4S.
18    Q   And which ones are available on Sprint?
19    A   The iPhone 4 and iPhone 4S.

REDACTED

Highly Confidential - Attorneys' Eyes Only

Page 218

REDACTED

14 Does that make sense?
15 Q Yes, it does make sense.
16 But you don't know the names of any of those
17 vendors?
18 A No, no, no.  Again, it's something that Art
19 brands I wouldn't need to know.  I don't need to know
20 their credibility, because they're being directed by
21 Art.

Page 219

REDACTED

25 MR. ELSBERG:  All right.

Page 220

1 Q If you can identify any additional obstacles,
2 please do it now.
3 MR. KREVITT:  Come on.
4 THE WITNESS:  I appreciate that.
5 MR. KREVITT:  Objection; asked and answered;
6 calls for speculation; lacks foundation.
7 THE WITNESS:  Again, I gave you a big one.
8 I'm not the research expert.  There's probably others.
9 I'm not the guy.
10 MR. ELSBERG:  Okay.

REDACTED

Page 221

1 MR. ELSBERG:  Stop.  Hey, don't interrupt.
2 Don't interrupt.
3 MR. KREVITT:  Can I instruct the witness not
4 to --
5 MR. ELSBERG:  No, you cannot interrupt.
6 MR. KREVITT:  Instruct the witness not to
7 answer beyond "yes" or "no" as to documents.
8 MR. ELSBERG:  Q.  Did you look at any
9 documents that you used as a basis to answer questions
10 today?
11 A What do you mean by "the basis to answer
12 questions"?
13 Q Well, I'm trying to get at what you did to
14 accurately prepare as a 30(b)(6).
15 So I'm asking:  Did you look at any documents
16 that you used today as a basis for giving answers
17 today?
18 MR. KREVITT:  I'm going to instruct the
19 witness not to answer other than to the extent
20 documents may have been used to refresh the witness's
21 recollection.
22 MR. ELSBERG:  I think that's an inappropriate
23 instruction.
24 MR. KREVITT:  In what respect is it
25 inappropriate?



Highly Confidential - Attorneys' Eyes Only

Page 222

1    MR. ELSBERG: I'm not here -- I'm not here to
2  debate you.
3    Q  I'm asking you to answer the question.
4    A  We looked at lots of documents in
5  preparation.  That's what happens in normal
6  preparation.  I don't think anything outside of the
7  usual --
8    Q  What -- identify for me the documents that
9  you looked at that you used as the basis for giving
10  answers in your deposition today?
11    MR. KREVITT:  Objection; that's not what he
12  said.
13    MR. ELSBERG:  It's a new question.
14    MR. KREVITT:  Then --
15    MR. ELSBERG:  Stop interrupting.
16    MR. KREVITT:  Okay.  Objection; it
17  mischaracterizes his testimony.
18    MR. ELSBERG:  I'm not characterizing
19  testimony.
20    MR. KREVITT:  I think you did.
21    MR. ELSBERG:  All right.
22    I'm going ask the question again; okay.
23    MR. KREVITT:  You should try to establish a
24  foundation.
25    MR. ELSBERG:  Q.  Identify for me the

Page 223

1  documents that you looked at that you used as the
2  basis for giving answers in your deposition today.
3    MR. KREVITT:  Objection; lack of foundation
4  and calls for the disclosure of privileged
5  information.
6    If you want to try to establish a foundation,
7  I'll allow the witness to answer.
8    The witness can answer if -- I'm not going to
9  allow the witness to answer.  I don't think you're
10  entitled.  If you disagree, I'd be interested as to
11  why, as to what documents the witness may have looked
12  at in preparation for his deposition, other than
13  insofar as those documents may have been used to
14  refresh the witness's recollection.  If you have a
15  different view, I'd be happy to hear it.
16    MR. ELSBERG:  Are you instructing the witness
17  not to answer?
18    MR. KREVITT:  I'm asking you a question.
19    MR. ELSBERG:  I'm not here to have a debate
20  with you.
21    MR. KREVITT:  Okay.  Then I'm instructing the
22  witness not to answer.
23    MR. ELSBERG:  Okay.
24    MR. KREVITT:  Because I'm asking you to tell
25  me if you have a contrary view.

Page 224

1    MR. ELSBERG:  I do.  I do have a contrary
2  view.
3    MR. KREVITT:  Okay.  So what is your contrary
4  view?
5    MR. ELSBERG:  I'm not -- I'm not here to have
6  a debate with you.
7    MR. KREVITT:  All right.
8    MR. ELSBERG:  If you want to instruct the
9  witness --
10    MR. KREVITT:  I will allow the witness to
11  answer as to the documents that may have been used to
12  refresh the witness's recollection.
13    I don't believe you're entitled to know all
14  of the documents the witness may have looked at in
15  preparation of his testimony.

REDACTED

Page 225

REDACTED

11    MR. KREVITT:  Objection.
12    He just -- objection; that mischaracterizes
13  his testimony.
14    MR. ELSBERG:  I'm not characterizing his
15  testimony.
16    MR. KREVITT:  There is a premise in your
17  question, David.  You either know it and are doing it
18  deliberately or you don't know it, in which case you
19  ought to look at your question.  There's a premise
20  it's improper.
21    MR. ELSBERG:  All right.  You've objected.

REDACTED

Highly Confidential - Attorneys' Eyes Only



Page 226

REDACTED

Page 227

REDACTED

14      MR. ELSBERG:  Okay.
15      Q   How long did you spend preparing for this
16  deposition?
17      A   Four hours perhaps.
18      Q   And did you prepare all in one session, or
19  did you have more than one session?
20      A   One session.  We had a lunch break, other
21  than that.
22      Q   You had a lunch break in between --
23      A   Yeah.
24      Q   -- two parts?
25      A   Yeah.  We came back and kept working through

Highly Confidential - Attorneys' Eyes Only

Page 230

1 lunch.
2 Q  And where was it?
3 A  Where was -- where did we meet?
4 Q  Uh-huh.
5 A  City Center 2 in Cupertino.
6 Q  Who participated?
7 A  Josh --
8   MR. KREVITT:  We did.
9   THE WITNESS:  -- and Rod and Erica.
10   MR. ELSBERG:  Q.  Anybody else?
11 A  Mark Lion.
12 Q  I'm sorry.  Who?
13   MR. KREVITT:  Mark Lion.
14   MR. ELSBERG:  Okay.
15 Q  Anybody else?
16 A  No, no, nope.
17 Q  You sure?
18 A  I'm pretty sure.  I was there --
19 Q  Okay.
20 A  -- yesterday.
21 Q  You seem tentative about it.
22 A  I gave you the list of names.  You keep
23 asking for more.
24 Q  And you said it was a total of about four
25 hours?

Page 231

1 A  That's correct.
2 Q  Okay.  And roughly how many documents did you
3 look at?
4 A  I don't know, David.  I didn't count them.
5 Next time if that's a prerequisite, I will keep track
6 of that.  I don't know.
7 Q  Well --
8 A  I don't know how many you showed to me today.
9 So put away this stack, I couldn't ask -- I couldn't
10 tell you how many.
11 Q  Was it more or less than 20?
12   MR. KREVITT:  Objection; asked and answered.
13   THE WITNESS:  I don't know.
14   MR. ELSBERG:  Q.  Could it have been a
15 thousand?
16 A  I doubt it was a thousand.
17 Q  Do you doubt that it was 500?  Could it have
18 been 500?
19   MR. KREVITT:  Objection.  You're just
20 badgering the witness.
21   MR. ELSBERG:  If he wants -- if he wants
22 to -- to --
23   THE WITNESS:  I don't know.
24   MR. ELSBERG:  -- to spar over this rather
25 than giving me his best belief, I'll have to try to

Page 232

1 narrow it down.
2   MR. KREVITT:  But you're --
3   MR. ELSBERG:  This can go a lot more quicker.
4 I'm asking a simple question.
5   MR. KREVITT:  You're in the position to
6 control the deposition in whether there's sparring,
7 David.  Not the witness.
8   THE WITNESS:  I don't know the exact number.
9   MR. ELSBERG:  Q.  Roughly, a range.
10   MR. KREVITT:  Same objection; asked and
11 answered; calls for speculation.
12   THE WITNESS:  I don't know the exact number.
13   MR. ELSBERG:  Q.  And you can't even estimate
14 a range; correct?
15 A  I don't want to guess.
16 Q  I am not asking you to guess.
17 A  Yeah, you are.
18 Q  I'm asking you for your best belief about
19 roughly how many documents?
20 A  Isn't that called a guess?
21 Q  No.
22 A  To me that's a guess.
23 Q  What's your best --
24 A  If I don't the number --
25 Q  -- what's your best --

Page 233

1 A  -- it has to be a guess.
2   THE REPORTER:  Okay.
3   MR. ELSBERG:  Q.  50 documents?
4 A  I don't know.
5 Q  You can't rule it out?
6 A  I choose not to guess.
7 Q  Okay.  Okay.
8   We are concluded for now.  I'd ask you to
9 produce the documents that the witness identified
10 earlier that were requested be provided to us during a
11 break, which we did not receive during a break.
12   MR. KREVITT:  I don't have documents with me,
13 number one.  And, number two, I think all the
14 documents to which the witness has referred have been
15 produced in discovery.
16   MR. ELSBERG:  I'd ask that you identify them
17 by Bates number.
18   MR. KREVITT:  We will consider that.
19   MR. ELSBERG:  Okay.  Thank you.
20   THE VIDEOGRAPHER:  This is the end of today's
21 deposition.  We are off the record at 3:48 p.m.
22   The master disc will be held by TSG
23 reporting.
24   (WHEREUPON, the deposition ended
25    at 3:48 p.m.)