# EXHIBIT 1 TO PENG DECLARATION

# (EXHIBIT 4 TO VELLTURO REPLY DECLARATION)

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               SAN JOSE DIVISION

4    APPLE INC., a California
     corporation,

5
               Plaintiff,              Case No.

6
       vs.                             11-CV-00630-LHK

7

     SAMSUNG ELECTRONICS CO., LTD.,
8    a Korean business entity;
     SAMSUNG ELECTRONICS AMERICA,
9    INC., a New York corporation;
     SAMSUNG TELECOMMUNICATIONS
10   AMERICA, LLC, a Delaware
     limited liability company,

11
               Defendants.

12

13

14        HIGHLY CONFIDENTIAL INFORMATION

15          OUTSIDE ATTORNEYS' EYES ONLY

16        PURSUANT TO THE PROTECTIVE ORDER

17

18

19   VIDEOTAPED DEPOSITION OF MICHAEL J. WAGNER

20            Palo Alto, California

21              May 4, 2012

22

23   REPORTED BY:

24   CYNTHIA MANNING, CSR No. 7645, CLR, CCRR

25   JOB NO. 49122

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 2

```
 1          May 4,
 2          9:31 a.m.
 3
 4
 5       Deposition of MICHAEL J. WAGNER, taken
 6  at 1881 Page Mill Road, Palo Alto, California,
 7  before Cynthia Manning, Certified Shorthand
 8  Reporter No. 7645, Certified LiveNote Reporter,
 9  California Certified Realtime Reporter.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1  APPEARANCES:
 2
 3  FOR APPLE INC.:
 4
        GIBSON, DUNN & CRUTCHER
 5      BY:  MARK REITER, ESQ.
            ROD STONE, ESQ.
 6      2100 McKinney Avenue
        Dallas, Texas 75201
 7
 8
 9  FOR SAMSUNG ELECTRONICS COMPANY, LTD., SAMSUNG
    ELECTRONICS AMERICA, INC., SAMSUNG
10  TELECOMMUNICATIONS AMERICA, LLC:
11      QUINN EMANUEL URQUHART & SULLIVAN
        BY:  WILLIAM C. PRICE, ESQ.
12      865 S. Figueroa Street
        Los Angeles, California 90017
13
14
15
16  ALSO PRESENT:
17      Cameron Kistler, Gibson Dunn
18      Benjamin Gerald, Videographer
19
20
21
22
23
24
25
```

Page 4

```
 1       PALO ALTO, CALIFORNIA;
 2    FRIDAY, MAY 4, 2012: 9:31 A.M.
 3
 4       THE VIDEOGRAPHER:  Good morning.
 5    This marks the beginning of the disk
 6  labeled No. 1 of the videotaped deposition of
 7  Michael Wagner in the matter Apple Incorporated
 8  versus Samsung Electronics Co., Ltd., et al.,
 9  held in the United States District Court for the
10  Northern District of California.  Case number is
11  12-CV-00630-LHK.
12       This deposition is being held at 1881
13  Page Mill Road in the City of Palo Alto,
14  California, taken on May 4th, 2012, at
15  approximately 9:32 a.m.
16       My name is Benjamin Gerald from TSG
17  Reporting, Incorporated, and I am the legal video
18  specialist.
19       The court reporter is Cynthia Manning,
20  in association with TSG Reporting.
21       At this time will counsel please
22  identify themselves for the record?
23       MR. REITER:  Mark Reiter from Gibson,
24  Dunn & Crutcher representing Apple.
25       MR. STONE:  Rod Stone from Gibson, Dunn
```

Page 5

```
 1  representing Apple.
 2       MR. KESSLER:  Cameron Kistler from
 3  Gibson, Dunn, representing Apple.
 4       MR. PRICE:  William Price from Quinn
 5  Emanuel representing Samsung.
 6       THE VIDEOGRAPHER:  Thank you.  Will the
 7  reporter please swear the witness.
 8
 9          MICHAEL J. WAGNER,
10    Having first been duly sworn, testified
11    as follows:
12
13       THE VIDEOGRAPHER:  Thank you.  Please
14  proceed.
15
16          EXAMINATION
17  BY MR. REITER:
18    Q.  Good morning.
19    A.  Good morning.
20    Q.  Can you state your name for the record,
21  please?
22    A.  Michael Joseph Wagner.
23    Q.  And Mr. Wagner, why are you here?
24    A.  I'm retained as an expert for Samsung to
25  respond to Dr. Vellturo's declaration in support
```

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 6

1  of a motion for a preliminary injunction.
2      Q.  And you are working on a number of
3  matters adverse to Apple; is that true?
4      A.  I am.
5      Q.  Okay.  You -- can you tell me briefly
6  what those matters are?
7      A.  Yes.  I'm working on -- well, I've been
8  retained in four matters.  I'm not saying I'm
9  working on four matters, but I'm working on both
10  of the matters in the Northern District of
11  California where Apple is suing Samsung.
12      Q.  That includes -- when you say "both,"
13  that's the matter we're here for today; is that
14  right?
15      A.  Yes, and the matter I'm going to be
16  deposed in next Saturday.
17      Q.  You're a busy man.
18      A.  I have a trial all week in Florida as
19  well, and four reports this week.
20      Q.  Oh, wow.
21      A.  And the other two matters are both for
22  Motorola, and that is the Illinois action and the
23  Florida action, and I have issued a report and
24  been deposed in the Illinois matter.  I've really
25  done no work to speak of in the Florida matter.

Page 7

1      Q.  Okay.  In the Illinois matter, is
2  Motorola -- you're representing Motorola?
3      A.  I'm not representing anybody, but I'm
4  retained by counsel for Motorola.
5      Q.  I understand.
6          You're working on behalf of Motorola?
7      A.  I am.
8      Q.  In that case, does Motorola have patents
9  that it is asserting against Apple?
10      A.  It -- they do.
11      Q.  Okay.  Are you giving an opinion in that
12  case about damages relating to Apple's alleged
13  infringement of the Motorola patents?
14      A.  I am not.  They asked me to do that, but
15  I said I am too busy, I can do one role for you,
16  and I'm only responding to Apple's assertions.
17      Q.  Okay.  In the first Northern District of
18  California case between Samsung and Apple, I
19  believe Samsung is asserting patents against
20  Apple in that case; is that right?
21      A.  They are.
22      Q.  Are you working or providing an opinion
23  for Samsung as to Apple's damages as a result of
24  its alleged infringement?
25      A.  I am not.

Page 8

1      Q.  So you're just responding to, in both of
2  those cases, the damages analysis that Apple's
3  experts have provided?
4      A.  And hopefully to avoid two more sets of
5  questions, that's my role in all four of the
6  cases, only responsive to Apple's patents.
7      Q.  Okay.  Okay.  Now, in this case -- let's
8  go ahead and just mark his -- his declaration.  I
9  think we'll be looking at that a lot.
10          (Deposition Exhibit 1 was marked for
11          identification.)
12      A.  Thank you.
13  BY MR. REITER:
14      Q.  I've had the court reporter mark as
15  Exhibit 1 the declaration that you submitted in
16  support of Samsung's opposition to Apple's motion
17  for preliminary injunction.
18          If you could take a moment and make sure
19  that's your declaration.
20      A.  It appears to be.  It does not include
21  the nine schedules that were attached, but
22  besides that, it appears to be complete.
23      Q.  Okay.  And it doesn't include any of the
24  exhibits that were referenced as well?
25      A.  Correct.

Page 9

1      Q.  Okay.  When did you begin working on
2  this opposition or this declaration, Mr. Wagner?
3      A.  I would say probably in early March.
4      Q.  After you saw Mr. Vellturo's -- or
5  Dr. Vellturo's report or declaration?
6      A.  Yes.
7      Q.  Now, your opinion, in sum and substance,
8  is that Dr. Vellturo has not shown that Apple
9  would be irreparably harmed by the infringement
10  that Apple alleges Samsung is -- is committing
11  through the Galaxy Nexus phone; is that right?
12      A.  Yes.
13      Q.  I'd like to go ahead and start with I
14  think at least what I consider the first
15  substantive section, Roman numeral IV on page 8,
16  criticisms of Dr. Vellturo's declaration.
17          Are you there?
18      A.  I'm there.  Thank you.
19      Q.  And in that section, you begin that
20  Dr. Vellturo has overstated the impact of Samsung
21  sales of the Galaxy Nexus on Apple.
22          Do you see that?
23      A.  I do.
24      Q.  Okay.  Now, you'll agree that the Galaxy
25  Nexus has had some impact on Apple's sales?

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY



Page 10

1    A. I would say that's correct.
2    Q. Okay. You just don't believe that it
3  has had a substantial impact?
4    A. Correct.
5
6
7    Q. Okay.
8
9    A.
10
11
12    Q.
13
14    A. I am.
15    Q. Okay.
16
17    A. Yes.
18    Q. Okay. Do you know what the Galaxy Nexus
19  sales are worldwide?
20    A. I don't.
21    Q. In other places it's called Galaxy
22  Prime, are you familiar with that?
23    A. I am not.
24    Q. Did you, in putting together your
25  declaration, talk to anybody from Samsung about

Page 11

1  worldwide sales of the Galaxy Nexus or Galaxy
2  Prime?
3    A. No.
4    Q. So just to be clear, you do agree that
5  the Galaxy Nexus has had some impact on Apple's
6  sales?
7    A. I don't have the data to prove it, but
8  it's possible that some of the purchasers of the
9  Galaxy Nexus, if that phone is not on the market,
10  may have purchased an Apple.
11    Q. You'll agree that the Galaxy Nexus
12  competes with the Apple iPhones; right?
13    A. I do.
14    Q. Okay. In fact, I think in your
15  declaration, you acknowledge that at least one
16  reporter identified it as one of the most
17  competitive threats to the iPhone; is that right?
18    A. That's true.
19    Q. So in presenting your opinions, at least
20  in this first section that we're focusing on, I
21  believe you identified what Apple's unit sales
22  were up through the last quarter of 2011; is that
23  right?
24    A. I do.
25    Q. Okay. And that's -- that's shown in

Page 12

1  Figure 1 on page 10?
2    A. It is.
3    Q. Okay. And what was that data based on?
4  How did you -- how did you come to compile that
5  figure, Figure 1?
6    A. Well, the source schedule is my schedule
7  3. I'd have to refresh any recollection, but I
8  believe this is Apple data.
9    Q. At one point you talk about -- and I
10  think it's at the top of page 9 --
11    A. Oh, it's IDC data.
12    Q. IDC data?
13    A. Yeah. I'll stand corrected. It's IDC
14  data.
15    Q. Okay. And you find that data to be
16  generally reliable?
17    A. I do. I've used it in many cases.
18    Q. Why did you stop with fourth quarter
19  2011 in your presentation?
20    A. Because that was the last quarter I had
21  information for, a full quarter.
22    Q. Full quarter, okay.
23    You submitted this report on April 23rd?
24    A. Yes.
25    Q. Of this year?

Page 13

1    A. Correct.
2    Q. And that was after the close of the
3  first quarter of 2012?
4    A. Correct, but I don't think IDC has
5  reported this quarter's information yet as of
6  that date. At least I had not seen it.
7    Q. Had you talked to anybody at Samsung
8  about what their sales looked like for the first
9  quarter of 2012?
10    A. Well, only for the Galaxy Nexus, and I
11  think I have some information as to their
12  projected sales through that time period.
13    Q. Yes, right, we'll get to that.
14    Did you talk about their overall U.S.
15  sales, what they projected for -- for that first
16  quarter?
17    A. I'm not recalling talking to anyone at
18  Samsung about that.
19    Q. Now, since you submitted your report,
20  there has been some press about Samsung's results
21  both in 2011 and in 2012, haven't there?
22    A. There has.
23    Q. How did Samsung do?
24    A. They did well.
25    Q. They did very well in 2011, didn't they?

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 14

1     MR. PRICE:  Objection; ambiguous.
2     THE WITNESS:  It's all relative.
3  Compared to Apple, they didn't, but compared to
4  the rest of their competitors, they did.
5  BY MR. REITER:
6     Q.  Well, in 2011, they took over -- they --
7  they surpassed Apple and they're the number one
8  smartphone manufacturer in the world, aren't
9  they?
10    A.  I believe that's correct for -- and that
11 includes all smartphones, not just the high-end
12 smartphones.
13    Q.  Right, fair enough.
14       But for all smartphones, you'll agree
15 that Samsung is the number one smartphone
16 manufacturer in the world now; right?
17    A.  I believe that's correct.
18    Q.  And did Samsung have a successful first
19 quarter 2012?
20    A.  I believe they did.
21    Q.  Let me just go through some of this
22 data.  I got all these documents, I figure we
23 might as well use them.
24       Let's see.  Actually, I don't need to do
25 that.  Let's just do A, yeah.

Page 15

1     (Deposition Exhibit 2 was marked for
2  identification)
3     MR. PRICE:  If you can give me two, that
4  would be great.
5     MR. REITER:  Oh, sure, yeah.
6     MR. PRICE:  Scott is going to show up
7  eventually.
8     MR. REITER:  Do you want another report?
9     MR. PRICE:  No, that's okay.
10    THE WITNESS:  Declaration.
11    MR. REITER:  Declaration.  You know, we
12 keep calling them reports.  I think we did that
13 in Dr. Vellturo's declar- -- or deposition, too.
14 It's just what we're used to.
15 BY MR. REITER:
16    Q.  So I've had marked as Exhibit 2 a
17 DailyTech article that's titled "Samsung More
18 Than Quadruples Smartphone Sales; Outsells Nokia,
19 Apple."
20       If you'll take a moment and look at
21 that, please, Mr. Wagner.
22    A.  (Witness reviewing document.)
23    Q.  Okay.
24    A.  Sure.  Thank you.
25    Q.  So in the first full paragraph, not the

Page 16

1  first sentence, it talks about Samsung and Apple
2  accounting for 90 percent of the sales of
3  high-end handsets.
4       Do you see that?
5     A.  I do.
6     Q.  So would you agree, based on that, that
7  the high-end smartphone market has basically
8  become, for lack of a better metaphor, a
9  two-horse race?
10    A.  It's a good analogy.  I own horses.
11    Q.  Oh, you do?
12    A.  And I have two horses.
13    Q.  Okay.  So you'll agree that Apple and
14 Samsung are the two horses now in the smartphone
15 market?
16    A.  Clearly during this period of time.
17    Q.  And it goes on to say that Samsung
18 posted a record quarter.
19       Do you see that?
20    A.  I do.
21    Q.  And that in the first quarter, Samsung
22 beat out Apple in unit sales; isn't that right?
23    A.  I see it's talking about, you know,
24 total handset sales, but I don't see where it
25 says, you know, high-end smart end [sic].

Page 17

1     Q.  For the last sentence of the first page:
2     "In Q1 Samsung was on top of the
3     smartphone industry, beating out Apple
4     in unit sales."
5     Do you see that?
6     A.  Where are you reading, again?  I'm
7  sorry.
8     Q.  The very last sentence of the first
9  page.
10    A.  I'm sorry, the first page.
11       I assume that's worldwide, but yes.
12    Q.  Okay.  Apple doesn't sell anything but
13 smartphones, right, as far as in the phone
14 market?
15    A.  Correct.
16    Q.  Okay.  Now, in the second paragraph of
17 the second page, right above the picture of the
18 building with the Samsung name on it, it says:
19    "The numbers are particularly
20    impressive, given that a year ago Apple
21    was estimated to outsell Samsung nearly
22    two to one.  The Samsung triumph came to
23    incredible growth.  While Apple managed
24    to double its smartphone sales on a
25    year-to-year basis, Samsung more than

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 18

1    quadrupled its sales - a superhuman
2    feat."
3        Do you see that?
4        A. I do.
5        Q. Now, part of your opinion about the lack
6    of alleged irreparable harm is that Sam- -- is
7    that Apple is continuing to do well; isn't that
8    right?
9        A. That's one of the reasons, yes.
10       Q. Okay. And just because Apple is -- is
11   continuing to do well doesn't mean that it
12   couldn't do better; isn't that right?
13       A. Oh, I agree with that as well.
14       Q. And in -- in this article, it's talking
15   about Apple doing well, increasing its sales two
16   to one; right?
17       A. They do.
18       Q. But Samsung doubled that and increased
19   its sales four to one; isn't that right?
20       A. Yeah, but not with the Nexus. It was
21   due to other things.
22       Q. Well, the Nexus is certainly a part of
23   Samsung's offering, isn't it?
24       A. ████████████████████
25   ████████████████

Page 19

1        Q. Now, I know that you take issue, and you
2    just raised that point, with how much of a -- a
3    factor the Galaxy Nexus is in Samsung's growth.
4    Let me show you Exhibit M to your declaration.
5        (Deposition Exhibit 3 was marked for
6        identification)
7    BY MR. REITER:
8        Q. Do you recognize this, Mr. Wagner?
9        A. I do.
10       Q. And I'd like to have you focus at the
11   chart on the bottom of the page. You'll see that
12   there is a row for Verizon.
13       Do you see that?
14       A. Yes.
15       Q. Okay. And in December and January, what
16   is identified as the largest selling or most
17   popular Android phone sold at Verizon?
18       A. Samsung Galaxy Nexus.
19       Q. Okay. And in February and March, where
20   does the Galaxy Nexus fit in Verizon's tier of
21   popular phones?
22       A. It's -- it's the third most popular
23   phone, but behind the iPhone and the Motorola
24   RAZR.
25       Q. And the Motorola RAZR is an Android

Page 20

1    phone?
2        A. It is.
3        Q. So it's the second most popular Android
4    phone sold by Verizon?
5        A. According to this chart, yes.
6        Q. Okay. So the Galaxy Nexus is doing
7    pretty well at Verizon?
8        MR. PRICE: Objection; vague.
9        THE WITNESS: I -- I -- well, in -- if
10   this is correct, it's in the top three, but
11   relatively to the other phones, I can't tell you
12   without seeing the data.
13   BY MR. REITER:
14       Q. Okay. Well, this is a -- an exhibit
15   that you submitted with your declaration; right?
16       A. Oh, it is, yes.
17       Q. Okay. So you found it at least somewhat
18   reliable, otherwise you wouldn't have submitted
19   it; right?
20       A. I -- I can't tell you it's reliable. I
21   think it's from a -- a reliable source, but the
22   actual data itself, I don't know how it was
23   compiled or if it's accurate.
24       Q. Well, then why would you submit it with
25   your declaration?

Page 21

1        A. Well, the main reason to just show
2    that the iPhone 4S is still the number one seller
3    in this time period, which is the first full
4    quarter of the release of the Galaxy Nexus,
5    and -- and I don't know if this is the article,
6    but it may be, is the one that says and -- that
7    the iPhone 4S outsold all Android phones in total
8    at these carriers.
9        Q. Okay. But nonetheless, at Verizon,
10   which is the only carrier that offers the -- the
11   Galaxy Nexus right now, it is the number one or
12   number two selling Android phone, based on the
13   exhibit that you submitted?
14       A. Yes.
15       (Deposition Exhibit 4 was marked for
16       identification)
17       MR. REITER: Is anybody else warm in
18   here?
19       THE WITNESS: I'm good.
20       MR. REITER: Must just be me.
21       MR. PRICE: If you're not on camera, you
22   can take off your jacket.
23       THE WITNESS: You don't have to have it
24   on for me.
25       MR. REITER: You know, everybody -- you

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 22

1   guys are wearing ties.  It made me embarrassed.
2        Okay.  This is Exhibit 4?
3        THE REPORTER:  Yes.
4        MR. PRICE:  I'll set a trend then.
5        MR. REITER:  Okay.
6        MR. PRICE:  I'll take off my jacket.
7        MR. REITER:  Then I'll follow along.
8        MR. PRICE:  This is going to be Exhibit
9   3?
10       MR. REITER:  4.
11       MR. PRICE:  4.
12       THE WITNESS:  (Witness reviewing
13  document.)
14  BY MR. REITER:
15       Q.  Have you had a chance to take a look
16  through it?
17       A.  I did.
18       Q.  Now, Exhibit 4 is an article that --
19  entitled "Samsung Predicts Record Proffer --
20  Profit for Q1 2012"; is that correct?
21       A.  Yes.
22       Q.  Okay.  And it appears to be dated April
23  6, 2012?
24       A.  It does.
25       Q.  So this was available before you

Page 23

1   submitted your report?
2        A.  It was.
3        Q.  Did you look at any data or any of this
4   type of data in -- in compiling your -- your
5   declaration?
6        A.  I think I looked at data like this.  I'm
7   not recalling looking at this particular article.
8        Q.  Okay.  But you were familiar with the
9   fact that Samsung was predicting a record quarter
10  at the time that you submitted your declaration
11  on April 23rd?
12       A.  I believe that I was.
13       Q.  You didn't mention anything about that
14  in your declaration?
15       A.  No.
16       Q.  And if you look at the paragraph
17  underneath the picture of a Samsung phone that
18  starts "It's been a good quarter for the Korean
19  company," do you see that?
20       A.  I do.
21       Q.  It goes on to say, "reaching the" --
22  well, my eyes are not good -- "5 million Galaxy
23  Note sales point and seeing strong demand for its
24  Galaxy Nexus Googlephone," do you see that?
25       A.  I do.

Page 24

1        Q.  So the -- the Galaxy Nexus has been
2   reported as contributing to Samsung's growth;
3   isn't that right?
4        A.  It does in this article, yes.
5        Q.  Okay.  Now, we talked a moment ago about
6   IDC numbers, and I acknowledged that the IDC
7   numbers weren't available when you did your
8   report.
9        Have you taken an opportunity to look at
10  any IDC data since you submitted your report on
11  the U.S. smartphone market?
12       A.  No, not any new data.
13       (Deposition Exhibit 5 was marked for
14       identification.)
15  BY MR. REITER:
16       Q.  So I've had marked as Exhibit 5,
17  "Worldwide Smartphone Market Continues to Soar,
18  Carrying Samsung to Top Position."  And it's an
19  IDC press release.
20       Do you see that?
21       A.  I do.
22       Q.  Okay.  Take a moment to look through it,
23  Mr. Wagner, and let me know when you're ready to
24  talk about it for a minute.
25       A.  (Witness reviewing document.)

Page 25

1        Okay, I've looked at it.
2        Q.  Okay.  This report, in the third
3   paragraph, acknowledges also that Samsung
4   overtook Apple for the smartphone leadership
5   position.
6        Do you see that?
7        A.  Worldwide, yes.
8        Q.  Yes.  And it explains in the next
9   paragraph that the race between Apple and Samsung
10  remained tight in the quarter, as both companies
11  posted growth; is that right?
12       A.  Yes.
13       Q.  And it identifies or attributes some of
14  that growth, for Samsung at least, to its Galaxy
15  brand of smartphones.
16       Do you see that?
17       A.  It does.
18       Q.  And the Galaxy Nexus would be included
19  within that brand?
20       A.  It does, but the only model they mention
21  is the Galaxy Note.
22       Q.  Right.  And then it says, "and other
23  Galaxy smartphones"?
24       A.  It does.
25       Q.  The paragraph -- or the first paragraph,

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 26

1  "Samsung" -- underneath "Samsung "-- or
2  "Smartphone Vendor Highlights," do you see that?
3      A.  I do.
4      Q.  It attributes Samsung as having --
5  setting a new market record for the number of
6  smartphones shipped in a single quarter; is that
7  right?
8      A.  It does.
9      Q.  You don't have any reason to doubt that?
10     A.  I do not.
11     Q.  And again, it also talks about expansion
12 of its Galaxy portfolio in nearly all directions?
13     A.  It does.
14     Q.  And the Galaxy Nexus is part of that
15 portfolio?
16     A.  It is in that portfolio.
17     Q.  And it notes that Apple slipped to
18 second?
19     A.  Worldwide, yes.
20     Q.  Yes.
21         And last thing I -- I just wanted to
22 kind of talk about is if you flip to the next
23 page, it's got a chart, and -- and I acknowledge
24 that this is worldwide sales, but what was
25 Samsung's year-over-year change worldwide?

Page 27

1      A.  According to this, 267 percent.
2      Q.  Is that, in your opinion as a financial
3  expert, a substantial growth?
4      A.  I think that's a fair characterization.
5      Q.  Now, in paragraph 24 of your report,
6  going back to that, you -- in the first sentence,
7  you talk about "with each new device following
8  the original release."
9          I assume the original release of the
10 iPhone?
11     A.  I do.
12     Q.  The iPhone sales were reinvigorated.
13 What did you mean by that?
14     A.  That the normal pattern with the release
15 of an Apple phone or a new generation is that
16 they show fairly large growth in that quarter or
17 possibly the next quarter, with then a decline in
18 sales until the next release, which then will
19 again show an increase of sales.  In fact, each
20 time they reach a new high every time, but then
21 there's also the typical pattern of a decline in
22 sales and then another reinvigoration.
23         And then there's never been a -- much of
24 a reinvigoration as the -- the last time when
25 they released the 4S, but that's partially due to

Page 28

1  the fact that they are now in more carriers than
2  they were historically.
3      Q.  If I understood that correctly, Apple
4  sales increase when they introduce a new, and
5  then they tend to drop off as that phone
6  becomes --
7      A.  Dated.
8      Q.  -- dated?
9      A.  Yes.
10     Q.  And Apple's data supports that; right?
11         Let's -- I want to look at one of the
12 exhibits that you attached, Exhibit UU.
13         (Deposition Exhibit 6 was marked for
14         identification.)
15 BY MR. REITER:
16     Q.  So I've had marked as Exhibit 6 a
17 document that was attached as Exhibit UU to your
18 declaration.
19         Does this document look familiar to you,
20 Mr. Wagner?
21     A.  It does.
22     Q.  And I'd like you to turn to Bates No.
23 APLNDC630-0000135170.
24         I'm going to be looking at, actually,
25 170 and 171.

Page 29

1          Have you looked at those, or did you
2  notice those charts when you were preparing your
3  declaration, Mr. Wagner?
4      A.  I did.

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 30



22   Q. Now, turning back to your report, Figure
23 2. What does Figure 2 show, Mr. Wagner?
24   A. Unlike units, which is Figure 1, I think
25 this is market share. And it's really just

Page 31

1 showing the same patterns using market share as
2 the vertical axis rather than units.
3   Q. It shows the market share of Samsung and
4 Apple; is that right?
5   A. Yes.
6   Q. Samsung is the dotted line and Apple is
7 the solid line?
8   A. Yes.
9   Q. And your data stops at the end of
10 calendar year 2011?
11   A. It does.
12   Q. And I may have already asked you this.
13 I know we talked about what you did subsequent to
14 2011. But if I did, I apologize.
15     You didn't look to see how Apple and
16 Samsung's U.S. market shares trended in the
17 following quarter, first quarter of 2012?
18   A. Correct. I did not have that data when
19 I prepared this report.
20   Q. And you haven't gone back to look at
21 that data in preparation for your deposition?
22   A. Well, you know, I think I've seen some
23 information on that subject. I think both Apple
24 and Samsung have increased their market share in
25 the U.S. in the first quarter.

Page 32

1   Q. Are you --
2   A. But I don't have a number for you.
3   Q. Well, let's -- I was able to find
4 something. So instead of talking around it,
5 let's do this.
6     (Deposition Exhibit 7 was marked for
7     identification)
8     THE WITNESS: (Witness reviewing
9 document.)
10     I'm ready. I think I know where you're
11 going to go.
12 BY MR. REITER:
13   Q. I hate to be so predictable. My
14 daughter says I am.
15   A. Good for your daughter.
16   Q. So it says here that Apple -- this is in
17 the U.S., is this right, this data?
18   A. This is U.S. data as reported by NPD.
19   Q. Are you familiar with NPD?
20   A. I am.
21   Q. Is that a reliable source of data?
22   A. It is.
23   Q. It says that Apple leads all other
24 manufacturers and has a 29 percent -- or has 29
25 percent of the U.S. Smartphone market; is that

Page 33

1 right?
2   A. It does.
3   Q. And it says that Samsung, at the end of
4 the first quarter of 2012, has a 24 percent share
5 of the U.S. market, Smartphone market; is that
6 right?
7   A. It does.
8   Q. And what does it say that Samsung's
9 growth was year over year?
10   A. 140 percent.
11   Q. And what about Apple's?
12   A. I don't know -- I think it's year over
13 year -- first quarter year over year.
14   Q. Correct. Right. So from first quarter
15 of 2011 to -- compared to first quarter of 2012.
16 Is that the way you understand it?
17   A. That's how I understand it. And I
18 understand this is the entire Smartphone market,
19 not just the high-end Smartphone market.
20   Q. So Samsung had a 140 percent increase,
21 or growth?
22   A. They did.
23   Q. And what was Apple's?
24   A. 7 percent. But you have to understand,
25 when you start from a huge base, a 7 percent

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 34

1  growth actually could be as many, if not more,
2  units than 140 percent growth.  It depends on
3  where you start from.
4      Q.  Now, you mentioned a moment ago that
5  this was the entire Smartphone market, not just
6  high-end; is that right?
7      A.  That's correct.
8      Q.  Okay.  Do you consider Apple to be a
9  participant in the entire Smartphone market?
10     A.  Pardon me?
11     Q.  In the entire Smartphone market.
12     A.  Not historically, no.  They would be
13  considered only at the high end because of their
14  price points.
15     Q.  You said "not historically."  What about
16  today?
17     A.  Well, now I would say that -- 3GS, I
18  would not consider to be a high-end phone,
19  although in its day it was the leader; but it is
20  pretty stale as a product, and subsequent product
21  generations have really increased functionality
22  over that product.
23         So I would say today, to the extent that
24  Apple offers a 3GS, it's not in the high end.
25     Q.  Is it low end or...

Page 35

1      A.  I would -- you know, that's debatable.
2  You know, if -- if it's given away for free by a
3  carrier, it would probably be considered
4  competing with low-end phones as well.
5      Q.  Apple offers the 4 as well, the iPhone
6  4; right?
7      A.  They do.
8      Q.  Where do you consider that to be in the
9  market?
10     A.  You know, I haven't studied enough to
11  know.  But I would call that more mid-tier now,
12  probably.
13     Q.  And do you base that on price?
14     A.  Principally on price.
15     Q.  Do you include the feature set that's
16  available at all?
17     A.  Well, the feature set in relationship to
18  the feature set on other phones, yes.
19     Q.  So going back to Exhibit 7 and comparing
20  it to your Figure 2 in your declaration, the way
21  in which you ended your chart at the end of
22  calendar year 2011 is not accurate today; is that
23  right?
24         MR. PRICE:  Objection; vague.
25         THE WITNESS:  It doesn't record today.

Page 36

1  So, yes, it's not accurate as of today.
2  BY MR. REITER:
3      Q.  Okay.  You have Apple in your chart at
4  Figure 2 at around 45 percent of the market; is
5  that right?
6      A.  I do.  But that's, again, based on IP --
7  IDC data, which would be different than NPD data.
8      Q.  Okay.
9      A.  So, yes.  But I do.
10     Q.  Okay.  And you have Samsung at just
11  under 20 percent in your chart, Figure 2?
12     A.  I do.
13     Q.  Okay.  And at least based on the NPD
14  data that we're looking at, Samsung is at 24
15  percent today and Apple is at 29 percent?
16     A.  Yes, based on the retail market shares
17  as published by NPD Group.
18     Q.  And do you know -- in Figure 2, is that
19  retail market share or is it something different?
20     A.  I would think that's more shipments to
21  carriers.
22     Q.  How does that differ?
23     A.  That's kind of like a wholesale market
24  and a retail market.  I would call the carrier
25  market the wholesale market, and the actual

Page 37

1  transactions at a store would be the retail
2  market.
3      Q.  The retail market reflects what devices
4  are actually in the hands of customers; is that
5  right?
6      A.  End-users, yes.
7      Q.  By the way, do you still use your
8  iPhone?
9      A.  I still have my iPhone 4.
10     Q.  Okay.  Haven't upgraded to 4S?
11     A.  No.  Only -- a couple of my children
12  have, but I have not, because I'm more careful
13  with my phone.  The upgrades are due to
14  mechanical problems.
15     Q.  I have children, too, and I understand
16  what you're saying.  "Dad, I dropped my phone."
17         By the way, Mr. Wagner, do you want
18  anything to drink?
19     A.  I'm fine, but thank you for offering.
20         MR. REITER:  I'd like to go to another
21  one of your exhibits.
22         (Deposition Exhibit 8 was marked for
23         identification)
24  BY MR. REITER:
25     Q.  I've had marked as Exhibit 8 a document

Page 38

```
 1   that you attached to your declaration as Exhibit
 2   QQ.  It bears Bates Nos. SAMNDCA00258674 through
 3   258827.
 4       A.  Correct.
 5       Q.  Are you familiar with that document?
 6       A.  I have seen this document before.
 7       Q.  Did you speak to anybody at Samsung
 8   about this document or -- let me stop there.
 9       A.  I did not.
10       Q.  Okay.  Did you speak to anybody at
11   Samsung at all in preparation of your report,
12   your declaration?
13       A.  I have some vague recollection that I
14   did, but I'd need my memory refreshed.
15           But I clearly did not, dealing with this
16   document.
17       Q.  Did you speak to somebody in Korea,
18   somebody that had to be translated?
19       A.  Yes.
20       Q.  Did you speak to anybody in the
21   United States?
22       A.  Not that I'm aware of.
23       Q.  Do you remember the position of the
24   person that you spoke with?
25       A.  You know, I have to say that I think
```

Page 39

```
 1   it's more probable it was dealing with the other
 2   Samsung case that I had this conversation, if I
 3   had to hazard a guess right now, without having
 4   more refreshment of my recollection of the
 5   conversation.
 6       Q.  What did y'all talk about?
 7       A.  I know I talked to Samsung about
 8   financial information.  And I may also have
 9   talked -- and this is what is more clear to me --
10   to Samsung in Korea about technical information
11   about patents.  And I don't think that would have
12   been in this case.
13       Q.  Did you read the four preliminary
14   injunction patents in this case?
15       A.  I have.
16       Q.  You read them or you just looked at
17   them?
18       A.  Well, yeah, I guess it's a good
19   definition.  I would say what I did is I scanned
20   them.
21       Q.  Okay.  The reason why I asked is I
22   looked at your deposition from the other
23   preliminary injunction matter, and you said you
24   just looked at the cover of the patents.  And I
25   was wondering if you did a more detailed analysis
```

Page 40

```
 1   of these patents.
 2       A.  No.  I'm not recalling that I focused on
 3   the claims of this patent, so I'm not recalling
 4   reading the claims.
 5           I'm recalling reading the abstract and,
 6   basically, the basic information on the front
 7   page of these patents as well.
 8       Q.  So it was more just the front page?
 9       A.  Now I have in one of the patents looked
10   more closely at it; but that was more in
11   connection with work in the other case, rather
12   than preparing this preliminary injunction
13   declaration.
14       Q.  That would be the '647 patent?
15       A.  It would be.
16       Q.  Okay.  And given that that's also
17   asserted against Motorola?
18       A.  Yes.
19       Q.  Did you work on the HTC matter at all?
20       A.  No.
21       Q.  If you'll turn to Bates No. --
22       A.  Just use the last two digits and I'll
23   find it.
24       Q.  Okay.  84.  We're probably going to have
25   to use the last three digits.
```

Page 41

```
 1       A.  Yeah.
 2       Q.  684.
 3       A.  Yeah.  I just realized that.  Thank you.
 4   Yes.
 5       Q.  Now, I apologize.  But just looking at
 6   the cover of this very quickly, this is dated
 7   September 20th, 2011?
 8       A.  It is.
 9       Q.  And that's before the Galaxy Nexus was
10   released; right?
11       A.  It is.
12       Q.  So back to page 684. ████████████
13   ████████████████████████████████████
14   ████████████████████████████████████
15   ███████████████████████████████
16           Do you see that?
17       A.  It does.
18       Q. ████████████████████████████████
19   ██████████████████████████████████
20       A. ████████████████████████████████████
21   █████████.
22       Q. ██████████████████████████████
23
24       A.  That's my reading as well.
25       Q.  And it shows that, at least as of
```



Page 42

1  September of 2011, Samsung ████████████████
2  ████████████████████████████████
3  ████████████████████████
4      A. ███
5      Q. That didn't quite come to fruition at
6  the end of 2011, did it?
7      A. Well, again, I believe this is probably
8  worldwide, and maybe it did. I don't think this
9  is U.S. It did not in the U.S.; I agree with
10  you.
11      Q. Why do you think this was worldwide?
12      A. I don't. It doesn't tell me.
13      Q. Okay. Well, do you know who STA is?
14      A. I do. And the "A" stands for America.
15      Q. Right. So does that give you any
16  additional information as to whether this was
17  worldwide or the U.S.?
18      A. You know, that would probably lean more
19  that it's the U.S., or at least the Americas.
20      Q. So Samsung shows that it is at least
21  ████████████████████████████████
22  ████████████████████████
23      A. I agree with that.
24      Q. ████████████████████████
25  ████████████████████████

Page 43

1  ████████████████████████████
2      A. First quarter of 2011?
3      Q. Of 2012. I'm sorry.
4      A. Yes.
5      Q. Up 140 percent from 2011.
6      A. Correct.
7      Q. Now, in your report -- back to your
8  report for just a moment. After Figure 2 you
9  have Figures 3 and 4 that talk about revenue and
10  profit.
11      A. I do.
12      Q. Why did you include that?
13      A. Because they're really more relevant
14  metrics. People don't care about units from a
15  financial standpoint. From a financial
16  standpoint what matters is revenues and profits.
17      Q. When one is trying to grow an install
18  base, though, then one cares about units; isn't
19  that right?
20      A. If they aren't interested in the
21  demographics of the characteristics of those
22  units, yes. Clearly, units -- they're a relevant
23  metric, absolutely. I agree with that.
24      Q. And in -- well, strike that.
25      Let's go to -- flip to page 1 -- or two

Page 44

1  pages, to 686.
2      A. (Witness complies.)
3      Q. And the title of this page is
4  ████████████████████████████████
5  ████████████████████████████████
6  ████████████████████████████████
7      Did I read that correctly?
8      A. You did.
9      Q. And do you see on the -- again on the
10  right-hand side -- ████████████████████
11      A. I see the formula.
12      Q. Do you have any understanding of what
13  that means?
14      A. I don't.
15      Q. You don't know that it means ████████
16  ████████████████████████
17      A. I think that's possible, yes.
18      Q. And in the first kind of bubble there at
19  the top of the page on the right-hand side it
20  says, ████████████████████████████████
21  ████████████████
22      Do you see that?
23      A. I do for the S III, not for The Nexus.
24      Q. The Nexus isn't on this page, is it?
25      A. It's not on here anywhere.

Page 45

1      Q. But this is clear, ████████████████
2  ████████████████████
3      A. Oh, no dispute about that.
4      Q. Okay.
5      A. I agree with that.
6      Q. ████████████████████████████████
7      A. ████████████████████████████████
8  ████████████████████████████████
9  ████████████████
10      Q. Well, it -- that's true, of course. But
11  it also is particularly important in this
12  industry, where there are things such as --
13  you've heard the term "stickiness"; right?
14      A. I've heard the term, yes.
15      Q. What do you understand "stickiness" to
16  mean?
17      A. I think it would be the propensity for a
18  purchaser or user to stay with the same
19  manufacturer and platform that they had in their
20  last-generation product.
21      Q. So the more people that you have having
22  bought into a platform, the more people that will
23  buy it again in the future; right?
24      A. Well, that's the hope. It's not always
25  true, but that's -- that's the intent, or the

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 46

1  goal.
2      Q.  So the greater your install base, the
3  greater your opportunity to have repeat
4  customers.
5      A.  That's true.
6      Q.  And that would be another reason why
7  it's important to increase the install base as
8  opposed to focusing on revenues, at least in a
9  short instance?
10     A.  I think you focus on both.  I don't
11 think you ever forget about revenues.  But yes, I
12 agree that you're going to also focus on units.
13     Q.  Now, let's turn to page 690.  On the
14 left-hand side you see the bullet that says:
15 ████████████████████████████████████████
16 ████████████████████████████████████████
17
18     A.  I see that.
19     Q.  I've got a number of examples that I'm
20 sure you're familiar with, given that this was
21 attached to your report, of Samsung ████████
22 ████████████████  And you're not going to
23 take any issue with the fact that that is
24 Samsung's objective, at least in this market?
25     A.  Oh, no.  I -- I clearly think that is.

Page 47

1  And I would say that based on what I've seen,
2  that I believe that is their goal. ███████████
3  ████████████████████████████████████████
4      Q.  Do you consider Samsung, in view of the
5  data that's come out in the first quarter of
6  2012, to be a number two still?
7      A.  Clearly, in the high-end Smartphone
8  market, I do.
9      Q.  Okay.
10     A.  Overall, they seem to be neck-in-neck
11 with Apple at this point.
12     Q.  Do you believe that Apple and Samsung
13 are competitors in the premium space?
14     A.  I do.
15     Q.  And Samsung is working to close the gap
16 on the premium devices; right?
17     A.  I believe they are.
18     Q.  Galaxy Nexus you would consider to be a
19 premium device?
20     A.  I agree with that as well.
21     Q.  And that is one of the tools that
22 Samsung is using to try and close that premium
23 gap with Apple?
24     A.  Well, that was their intent.  They
25 haven't seemed to be successful in their

Page 48

1  strategy.  But, yes.
2      Q.  Well, their share has grown in the
3  United States?
4      A.  Not due to The Nexus, but that is true.
5      Q.  Let's go to page 782 of the document,
6  and it's titled ████████████████████████
7      Do you see that?
8      A.  I do.
9      Q.  And it identifies the Galaxy Nexus
10 ████████████████████████████████████████
11     A.  It does.
12     Q.  Okay.  It says "The first Ice Cream
13 Sandwich device."
14     Do you see that?
15     A.  I do.
16     Q.  What does that mean to you?
17     A.  What that means is this is the first
18 Smartphone that is released that is based on
19 Android's latest and newest operating system, Ice
20 Cream Sandwich.  And that's why it has the name
21 Nexus.
22     Q.  That's why the Galaxy has the name
23 Nexus?
24     A.  Yes.
25     Q.  Because of Ice Cream Sandwich?

Page 49

1      A.  It's because it's the first phone
2  released on that particular operating -- that
3  particular operating system.
4      Q.  You saw that Samsung announced the S III
5  in London earlier this week?
6      A.  I actually read an article about it
7  today in the San Jose Mercury News.
8      Q.  And that's running on Ice Cream
9  Sandwich, too; right?
10     A.  It is.  And it doesn't have the same
11 nexus, because it's not the first one.
12     Q.  It's not the first one.
13     Is there anything -- well, strike that.
14     You understand that the Ice Cream
15 Sandwich platform is the first Android platform
16 that allows interoperability between the devices?
17     A.  I'm aware of that fact.
18     Q.  Do you find that significant at all?
19     A.  I think there's some significance to
20 that.
21     Q.  The Apple devices all have
22 interoperability running on the iOS platform; is
23 that right?
24     A.  That's correct.
25     Q.  And up until Ice Cream Sandwich, none of

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 50

1  the Android devices -- or the Android devices
2  didn't have that level of interoperability?
3      A. That is correct, with other devices.
4      Q. Flip the page to 784, at the top of the
5  page you see █████████████████
6      A. I do.
7      Q. And at the premium level, ██████████
8  ███████████████████
9      A. That's correct.
10     Q. And the Samsung products that are
11 identified for the first half of 2012 at
12 Verizon --██████████████████████████
13 █████       isn't that right?
14     A. That's correct.
15     Q. And at Sprint, ████████████████
16 ████
17     A. Correct.
18     Q. So those are the only products, at least
19 as of the time this deck was prepared, that
20 Samsung was going to use to compete at that
21 premium level.
22     A. On those two carriers, yes.
23     Q. Now, you mentioned several times about
24 ████████████████████████████████
25 ████████████████████████████

Page 51

1  ████████████████████████
2      Q. I understand. I understand.
3      Did you look at any projections of what
4  Samsung expected the Galaxy Nexus to sell in
5  comparison to what it actually sold?
6      A. No.
7      Q. So it may have been that the Galaxy
8  Nexus is actually a huge success at Samsung,
9  selling exactly what they wanted it to sell; you
10 just don't know?
11     A. Anything is possible.  But, again, if --
12 if --███████████████████████████████
13 ██████████
14     Q. Well, this page doesn't show anything
15 about forecasted sales, does it?
16     A. It does not say anything about volumes
17 or forecasts.
18     Q. And you didn't investigate what the
19 forecasts were prior to the release of the Galaxy
20 Nexus?
21     A. That is correct.
22     Q. So you have no idea of how the sales
23 measure against the forecast, the actual sales?
24     A. I do not.
25     MR. REITER:  Let's to go Tab 5.

Page 52

1      (Deposition Exhibit 9 was marked for
2      identification)
3      MR. REITER:  This is exhibit --
4      THE REPORTER:  9.
5      MR. REITER:  So we've had marked as
6  Exhibit 9 a Declaration of Kevin Geklinsky,
7  G-E-K-L-I-N-S-K-Y.
8      Q. Have you seen that declaration before,
9  Mr. Wagner?
10     A. I'm not recalling seeing it right now,
11 no.
12     Q. Okay.  Now, you identify some sales
13 numbers in your declaration of the Galaxy Nexus.
14     A. I do.  And I do note, in preparing for
15 this deposition, that there is one error in my
16 use of numbers.  But, yes, I do have some
17 numbers.
18     Q. Where did you get those numbers from?
19     A. From a document that was given to us, a
20 spreadsheet of both sales and forecast, sales in
21 units for the Galaxy Nexus since introduction.
22     Q. That was given to you by the lawyers?
23     A. Well, my staff got it.  I assume it came
24 through lawyers.  That's the normal way I get
25 information.

Page 53

1      Q. Okay.  You just mentioned a moment ago
2  that there was an error in numbers.
3      A. Yes.
4      Q. What was that?
5      A. I think it's --
6      Q. Or what is that error?
7      A. It's --█████████████████████
8  ████████  And it's on paragraph 73, on page
9  37.
10     Where I say the number is ████████  the
11 number should be ███████  And actually, the
12 numbers are right on page 64 in the declaration
13 in the Figure 9; but this number wasn't updated.
14 It was missed.
15     Q. Okay.  So where did you get that number,
16 the ████████  Your staff got it from...
17     A. I actually think it was from
18 Mr. Geklinsky.  Because I remember that's -- and
19 either -- I may have had a conversation with him,
20 or my staff did.  But I think that was the source
21 of the information that we used.  But he gave it
22 to us not in a conversation, but in a
23 spreadsheet.
24     Q. A spreadsheet.
25     Now in paragraph 1, Mr. Geklinsky is

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 54

1  director of business planning for Verizon.
2      Do you see that?
3      A. No. No.
4      Q. You don't see that in paragraph 1?
5      A. Oh. I thought you were saying at
6  Verizon. For Verizon at -- for Samsung
7  Telecommunications America, yes. I'm sorry.
8      Q. For the Verizon account.
9      A. Yes. I'm sorry, yes.
10     Q. Do you know if his projections in
11 paragraph 5 include Sprint?
12     A. I don't believe that it does.
13     Q. So these are just the Verizon sales
14 numbers and projections?
15     A. Yes.
16     Q. And up through, essentially now, the
17 Galaxy Nexus was only available on Verizon; is
18 that right?
19     A. That's correct.
20     Q. Did you talk to anybody or do any
21 investigation about how well the Galaxy Nexus is
22 going to do at Sprint?
23     A. No.
24     MR. REITER: Tab 4.
25     (Deposition Exhibit 10 was marked for

Page 55

1      identification)
2  BY MR. REITER:
3      Q. So Exhibit 10 is a BGR publication. It
4  says "Galaxy Nexus Pre-orders Sell Out At
5  Sprint."
6      I'll give you a moment to take a look at
7  that.
8      A. (Witness reviewing document.)
9      Yeah. I've seen this document before.
10     Q. Okay. So then you're aware that in four
11 days the Galaxy Nexus preorders sold out at
12 Sprint.
13     A. Yes.
14     Q. Now, it does note that -- at least the
15 reporter didn't know how much -- or how many
16 units Sprint had been allocated; but it did say
17 that presales supply was healthy.
18     Do you see that?
19     A. I do.
20     Q. So based on this, does this still --
21 does this inform your opinion at all that Galaxy
22 Nexus is a failure?
23     A. I didn't say it was a failure. I just
24 said, in my opinion, it has not had the level of
25 success that impacted Apple sales. I don't think

Page 56

1  it's a total failure, and I'd need more
2  information to know.
3      I've also seen other information where
4  industry observers are not expecting large sales
5  of this product because it is stale by now on
6  Sprint, but I have no information about
7  quantities.
8      Q. You didn't look into that?
9      A. No.
10     Q. And Apple sells on Sprint; right?
11     A. They do.
12     MR. REITER: Why don't we go ahead and
13 take a break. We've been going about an hour.
14     THE VIDEOGRAPHER: The time is 10:34
15 a.m., and we're off the record.
16     (Recess taken)
17     THE VIDEOGRAPHER: The time is 10:50
18 a.m., and we are back on the record.
19 BY MR. REITER:
20     Q. Mr. Wagner, I'd like to switch topics
21 just a little bit and talk about what is -- at
22 least what I call the critical juncture.
23     Do you have an understanding of what
24 that means in -- in the smartphone market?
25     A. Are you talking about what your expert

Page 57

1  calls "the tipping point"?
2      Q. No, not that.
3      Let's -- I think you say -- or call it
4  at paragraph 104 "an inflection point in the
5  market."
6      A. Okay. Now I know what you're talking
7  about, yes.
8      Q. What do you -- just to make sure we're
9  on the same page, what do you understand that to
10 be?
11     A. That we are at the stage in the product
12 life cycle of the smartphone market where we have
13 passed clearly the innovators, the early
14 adopters, and the early majority purchasers of
15 these products. Now 50 percent of the people
16 that are going to buy this product have bought
17 it, and so now we are at a place where it's going
18 to be the -- the late majority and the laggards
19 are going to be the people buying for the first
20 time into this marketplace. That's what I mean.
21     Q. Okay. Okay.
22     Now, wrapped up into what you just said
23 is kind of a -- at least in my mind, a more
24 simplistic way of looking at it, is that the
25 mobile phone market is shifting from feature

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 58

1    phones to smartphones?
2        A.  Well, it's been -- no, I couldn't
3    characterize it that way.  It's been shifting
4    since the smartphone came out, but now there are
5    more smartphone owners than feature phone owners.
6    If that's what you mean by your statement, then I
7    agree with you.
8        Q.  Okay.  That's what I meant, is that now
9    the -- the majority of the people -- we're at a
10   point where I think we've just reached the
11   majority of the people, mobile phone users are
12   actually using smartphones rather than feature
13   phones.
14       A.  I think that point was reached sometime
15   in the fourth quarter of 2011.
16       Q.  Right.  I think that's right.
17           And your opinion talks about, in this
18   second half of the adopters, those are the late
19   adopters, I think you called them?
20       A.  Yeah, late majority or laggards.
21       Q.  Laggards seems so pejorative.
22       A.  It is pejorative, but you talk to a
23   laggard, and they don't consider it to be
24   pejorative.  They're -- they're honored by that
25   because they don't care about technology.  It's

Page 59

1    not -- it doesn't run their lives like it does
2    for innovators, like you and me.
3        Q.  Was the iPhone your first smartphone?
4        A.  No.
5        Q.  What was your first one?
6        A.  BlackBerry.
7        Q.  You consider that to be a smartphone?
8        A.  Yes.  It was at the time.  It was
9    clearly -- it was practically -- probably the
10   leader for business users of this technology.
11       Q.  Do you have a definition of
12   "smartphone"?
13       A.  I have a layperson's definition.
14       Q.  What is that?
15       A.  Well, it's a -- it's really a -- a
16   computer in a phone that offers more than just
17   voice services.  It allows you to search the
18   Internet.  It allows you to do e-mail.  It --
19   it -- then probably the next most important
20   functionality is it makes your device become a
21   camera and a -- and a camcorder.  I think
22   traditionally those are like the main features
23   that make this smart, versus just being a device
24   that you can make a telephone call with and talk
25   to someone using voice.

Page 60

1        Q.  Before you got your iPhone, were you
2    still using the BlackBerry?
3        A.  I had three or four generations of Black
4    phones and then the last phone purchase was my
5    first foray onto the iOS platform.
6        Q.  So you are a RIM convert, as I call it?
7        A.  You could -- that would be a fair
8    characterization.
9        Q.  Just to make sure, Dr. Vellturo in his
10   report has a number of pages on this inflection
11   point, the -- the shift from feature phones to
12   smartphones?
13       A.  He does.
14       Q.  Okay.  And you don't take issue with the
15   fact that that -- that that has happened and is
16   continuing to take place?
17       A.  No, I have no disagreement with him.  I
18   think that he did not pursue that issue deep
19   enough to understand the characteristics of how
20   that market is changing from what has happened in
21   the past to what is going to happen in the
22   future.
23       Q.  Because in your opinion, the late
24   adopters have different priorities with respect
25   to their purchases than the early adopters; is

Page 61

1    that right?
2        A.  Yes, that is correct.
3        Q.  Now, there are still a substantial
4    number of people in the U.S. market at least that
5    have yet to buy their first smartphone; right?
6        A.  I'd agree with that.
7        Q.  And just to kind of quantify that, if we
8    could go back to Exhibit 8, which is your Exhibit
9    QQ.
10       A.  Yes.
11       Q.  And if we take a look at page 681.
12           You see that it says at the top,
13   ████████████████████████████████████████████
14   ████████████████████████████████████████
15   ███████████████████████████████
16       A.  I do.
17       Q.  So at least according to Samsung in
18   September of 2011, 2012 showed ████████████
19           ████████████ first-time smartphone
20   adopters?
21       A.  Yes.  But, again, to be clear, these are
22   the -- the late adopters.
23       Q.  Understood.  But there are ████████
24   ██████████████ that are buying their first
25   smartphone?

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 62

1    A.  That's the prediction.
2    Q.  Do you believe that Apple and Samsung
3  compete for these first-time buyers now?
4    A.  I think there's probably some
5  competition, but I don't think there's very much.
6    Q.  You don't think that it's important to
7  Apple for it to get these first-time purchasers?
8    A.  Oh, I think it is important.  I've seen
9  them studying this market, yes.
10    Q.  And why don't you think there's much
11  competition?
12    A.  Because of Apple's strategy of wanting
13  to be known as the premium brand and having the
14  highest-priced phones in the market.  I mean,
15  even in the high-end market, they're 50 percent
16  higher than Samsung's prices, and that type of
17  strategy is not going to be attractive to this
18  segment of the population.
19    Q.  And you -- you believe that ███
20  ███████ just using that number based on
21  the Samsung document, are going to be not
22  interested in purchasing an Apple phone because
23  it's too expensive?
24    A.  I can't be that strong.  I think there
25  probably are some, but it -- it's a small

Page 63

1  minority.
2    Q.  Well, if we -- if we just look at that
3  page, 681, at the bottom of the page it talks
4  about expected retail price for next phone
5  smartphone intenders.
6      Do you see that?
7    A.  I do.
8    Q.  And what's your understanding of what it
9  means by "smartphone intenders"?
10    A.  Those would be the first-time buyers.
11    Q.  And it breaks it down by price.
12      Do you see that?
13    A.  I do.
14    Q.  And at the far right side of the chart,
15  it has ██████ up.
16      Do you see that?
17    A.  There are two bars for that, yes.
18    Q.  Yeah.  And on average, ██████████████
19  ████████████████████████████████████████
20  ████████████████████████████████████████
21  ██████████████████████████████; is that right?
22    A.  Correct.
23    Q.  And if you take ██████████████████
24  ███████ and you're the accountant, that's about
25  ██████████ right?

Page 64

1    A.  I couldn't take it as ██████████
2  ██████ I'd take it as ██████████████
3    Q.  ███████████████████████████
4    A.  Right.  Yeah, yes, I would.
5    Q.  That's still a large number of users
6  to -- buy one's phone, isn't it?
7    A.  I agree with that.
8    Q.  And, in fact, Samsung, in the right --
9  at the right side of the -- page, says that
10  it has good coverage of the premium tier, ████
11  ████████
12    A.  They do.
13    Q.  Okay.  So clearly, there is a segment of
14  the first-time smartphone buyer still remaining
15  that is interested in the so-called premium
16  smartphone; isn't that right?
17    A.  I believe there are -- there are some,
18  right.
19    Q.  Okay.  According to at least this
20  information, ████████████████████████
21  ████████████████████
22    A.  That would be true, if you believe these
23  numbers.
24    Q.  Now, in characterizing the late adopters
25  as "laggards," you're relying on one of the

Page 65

1  exhibits that you attached to your declaration?
2    A.  First off, let me be clear.  Not all
3  late adopters are laggards; only the last 16
4  percent of the market.  There -- the biggest
5  segment would be called "late majority."
6    Q.  Okay.  There's a figure 24 on page 56 of
7  your declaration, which I think you're looking at
8  right now.
9    A.  Yes.
10    Q.  Okay.  And you took that from Exhibit SS
11  of your -- or Exhibit SS is -- that's where that
12  figure comes from; is that right?
13    A.  It does.
14      MR. REITER:  What?  Oh.
15      (Deposition Exhibit 11 was marked for
16      identification)
17      MR. REITER:  What are we on?
18      THE REPORTER:  11.
19  BY MR. REITER:
20    Q.  I've had marked as Exhibit 11 a document
21  that you attached as Exhibit SS to your
22  declaration.
23      Are you familiar with that document,
24  Mr. Wagner?
25    A.  I am.

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 66

1    Q.  Now, this document is not about the
2  smartphone industry, is it?
3    A.  No.
4    Q.  It's just a general analysis of how to
5  target late adopters in any market; is that
6  right?
7    A.  Well, no, it's not any market.  I would
8  call it any technology market.
9    Q.  Okay.  Now, just turn your attention to
10 the conclusion, very first sentence.  It says:
11       "Late adoption populations offer
12       tremendous potential for growth, but
13       they remain untapped for a reason."
14       Do you see that?
15    A.  I do.
16    Q.  Okay.  So there's tremendous opportunity
17 for growth?
18    A.  I agree with that.
19    Q.  Okay.  And what is the -- the reason --
20 what is your understanding of the reason that
21 they remain untapped?
22    A.  Because they voted with their actions.
23 In that -- any particular technology that's been
24 out for a while, over half of its product life
25 cycle, they've shown no interest in acquiring

Page 67

1  that technology.
2    Q.  You said in half of the product life
3  cycle.  That's -- a product life cycle is not
4  necessarily equivalent to a technology life
5  cycle, is it?
6    A.  Yeah, and if I used the term "product,"
7  I should have used the term "technology life
8  cycle."
9    Q.  Okay.  You think that the smartphone
10 technology life cycle is halfway through its --
11 its life?
12    A.  It's halfway through its adoption curve.
13    Q.  Okay.  That doesn't mean that it's only
14 going to be around for another 5 years, given
15 that it probably started around 2007, is when
16 it --
17    A.  Correct, although that's possible.  I'm
18 not a predictor of where technology is leading
19 us, but it may be that there's going to be some
20 brand-new technology that is just now surfacing
21 that is going to replace this whole industry.
22 It's possible.  I don't believe that.
23       I don't know that, but all I'm saying is
24 that after the ten years, there will be no more
25 first adopters, except for people who are just

Page 68

1  reaching the age they can buy something.
2  There'll always be those first adopters.
3    Q.  Of course.  Of course.
4       But these first adopters -- or these
5  late adopters, I'm sorry, at least according to
6  your article, still provide tremendous
7  opportunity for the manufacturers of these
8  technologies; right?
9    A.  I agree with that.
10       MR. PRICE:  And I object to the
11 characterization of this being his article,
12 unless you mean he looked at it.
13       MR. REITER:  Fair characterization.
14 BY MR. REITER:
15    Q.  When I mean your article, what was
16 attached -- this article that was attached to
17 your declaration.
18    A.  That was my understanding.
19    Q.  I don't mean to attribute you as the
20 author.
21       I asked a moment ago about whether you
22 thought Apple was trying to attract first-time
23 adopters to the smartphone industry.
24    A.  You did ask me that.
25    Q.  Okay.  And I wasn't really sure I

Page 69

1  understood your answer.  You think Apple is or is
2  not?
3    A.  Oh, I think they are.
4    Q.  Do you think Apple has been successful
5  in that?
6    A.  I have no information to tell me that.
7       MR. REITER:  Let's go to tab 7.
8       (Deposition Exhibit 12 was marked for
9       identification)
10       MR. REITER:  Are you flying back today,
11 Bill?
12       MR. PRICE:  I hope to.  How about you?
13       MR. REITER:  No.  I just want to make
14 sure you have plenty to take back.
15       MR. PRICE:  I see.
16 BY MR. REITER:
17    Q.  I've had marked as Exhibit 12 a document
18 that you attach to your declaration as Exhibit
19 HHH.
20       Are you familiar with this document?
21    A.  I am.

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY



Page 70

Page 71

22    MR. REITER: Let's look at tab A.
23    (Deposition Exhibit 13 was marked for
24    identification)
25    //

Page 72

1   BY MR. REITER:
2       Q.  I've had marked as Exhibit 12 a document
3   that was previously marked as Buckley Exhibit 1
4   in Mr. Buckley's deposition.
5       Did you read or look at Mr. Buckley's
6   deposition?
7       Oh, 13, I'm sorry, Exhibit 13.
8       A.  To answer your compound question, no.
9       Q.  I'm sorry, I got distracted by the
10  numbers.
11      So you -- let me break that down again
12  because I lost track of it.
13      You did not look at Mr. Buckley's
14  deposition?
15      A.  I did not.
16      Q.  And you haven't seen this document
17  before?
18      A.  This document looks familiar, but maybe
19  I've just seen documents like this.
20      Q.  Actually, you may have seen it in the
21  context of the other Samsung Apple case, because
22  I know it was produced in that.
23      A.  Yeah, I can't tell you where I've seen
24  it before, but it looks familiar to me.
25

Page 73

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY



Page 74

Page 75

Page 76

1

6    Q.  Okay.  And do you have any data to -- to
7  demonstrate that sitting here today in, I guess,
8  the second quarter of calendar year '12, that the
9  population would not be interested in spending
10 premium dollars on their first smartphone?
11    A.  I have no information to quantify that.
12    Q.  And all you rely on is what we looked at
13 before, Exhibit SS to your declaration?

14

19

23    Q.  Now, are you aware that at Verizon,
24 Samsung lowered the price of the Galaxy Nexus to
25 $49?

Page 77

1    A.  Yes.
2    Q.  And are you also aware that Sprint is
3  offering the Galaxy Nexus at $149?
4    A.  I'm not aware of the pricing at Sprint,
5  no.
6        (Deposition Exhibit 14 was marked for
7        identification)
8  BY MR. REITER:
9    Q.  So I've had marked as Exhibit 14 a
10 printout from AmazonWireless that shows the price
11 or -- or shows the Galaxy Nexus available on
12 Sprint.
13       Do you see that?
14    A.  I do.
15    Q.  Okay.  And the price is $149?
16    A.  That's where it's -- it's from that
17 price; so it's that price or more, I guess,
18 depending on the plan.
19    Q.  The plan or how much memory the phone
20 has?
21    A.  Correct.
22    Q.  Do you know what the original price was
23 of the Galaxy Nexus when it was first released
24 with Verizon, assuming there's a plan?
25    A.  Assuming there's a plan?

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 78

1     Q.  Yeah.
2     A.  199 is my recollection, but I may be
3  wrong.
4     Q.  Is it your understanding that the price
5  of the phone has started to come down?
6     A.  Oh, clearly as it gets stale, clearly
7  the price has to come down to be competitive.
8     Q.  And that's what's happening with the
9  Galaxy Nexus?
10     A.  Clearly.
11     Q.  And so it's going to be more attractive
12  to those first-time buyers; is that right?
13     A.  It would be.
14     Q.  A few moments ago we were talking about
15  you switching from RIM to the iPhone.
16        Do you remember that?
17     A.  I do.
18     Q.  By the way, I did the same thing.  Had a
19  BlackBerry for quite some time and my first --
20     A.  We're brothers.
21     Q.  Yeah, exactly.  Parents both from New
22  York; right?
23     A.  Must be related.
24     Q.  Actually, on a break, I'll tell you a
25  funny story about that.

Page 79

1        Now, customers switching from RIM to
2  either an Android device, or an iOS device, do
3  you put them in the same category as these late
4  majority or laggards?
5     A.  I do not.
6     Q.  Are those -- I think I called them RIM
7  converts before.
8     A.  You used that term before and I think
9  that's a fair characterization.
10     Q.  All right.  Is that segment of the
11  population price sensitive, in your
12  understanding?
13     A.  Some may be, but most I would not put in
14  that category.
15        MR. REITER:  Now, let's go to tab 12.
16        (Deposition Exhibit 15 was marked for
17        identification)
18  BY MR. REITER:
19     Q.  I've had marked as Exhibit 15 a document
20  that was attached to your declaration as Exhibit
21  TT.
22        Are you familiar with this document,
23  Mr. Wagner?
24     A.  I am.
25     Q.  And what is this document?

Page 80

1

13

Page 81

1



HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY



Page 82

5      Q.  Well, just using yourself as an example,
6  you were interested in the -- the higher-end
7  device when you switched from your BlackBerry to
8  a different type of smartphone; is that right?
9      A.  When I bought my iPhone, it was the
10  premium product that Apple offered at Verizon.
11      Q.  And I -- I did the same thing at -- at
12  AT&T.
13         So the -- would you also agree that
14  the -- the demographics of the RIM converts is
15  going to be different than the demographics of
16  the late majority or laggards, as is described in
17  Exhibit SS to your declaration?
18      A.  Yes.
19

Page 84

Page 83

Page 84

12         (Deposition Exhibit 16 was marked for
13         identification)
14  BY MR. REITER:
15      Q.  I've marked as Exhibit 16 a document
16  that was produced by Samsung,
17  dated September 2011.  It bears Bates No.
18  SAMNDCA00276935 to 277043.
19         Have you seen this document before,
20  Mr. Wagner?
21      A.  You know, I don't think that I have.
22  It's possible, because there's so much redundancy
23  in the charts in these presentations.  I've
24  certainly seen some of this information before.
25  I'm not personally recalling seeing this

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY



Page 86

1  particular document.
2      Q.  Okay.  I'd like to draw your attention
3  to Bates No. page 992, and at the top it says,
4  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5           Are we in the same place?
6      A.  We are.
7      Q.  Are you familiar with the term ▮▮▮▮
8  ▮▮▮▮
9      A.  I am.
10     Q.  What does that mean to you?
11     A.  That means that ▮▮▮▮▮▮▮▮▮▮
12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮
17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18  ▮▮▮▮▮▮▮▮▮▮
19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23  ▮▮▮▮▮▮▮▮▮▮▮▮▮d
24  ▮▮▮▮
25     A.  Yes.

Page 87

1          MR. REITER:  Now, let's look at another
2  document, Tab 15.
3          (Deposition Exhibit 17 was marked for
4          identification)
5  BY MR. REITER:
6      Q.  So as Exhibit 17, I've had marked a
7  document titled ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8  ▮▮▮▮▮▮▮▮▮▮▮  Bates Nos.
9  S-ITC-500054991 to 54998.
10         Have you seen this document before,
11  Mr. Wagner?
12     A.  You know, again, I'm not recalling
13  seeing this document.  Some of the PowerPoint
14  slides look familiar to me, so it's possible I
15  have; but I'm not recalling it sitting here right
16  now.
17     Q.  Let's look at page 993, and I apologize
18  for how small this is.  Took me a while to read
19  it.
20         But it says at the top, ▮▮▮▮▮▮▮▮▮
21         Do you see that?
22     A.  I do.
23     Q.  And it says, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Right?

Page 88

1      A.  Year over year.
2      Q.  Right.  And it goes on to say, in bold,
3  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4          Do you see that?
5      A.  I do.
6      Q.  And that would mean ▮▮▮▮▮▮▮▮
7  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8  ▮▮▮▮▮▮▮▮▮▮
9      A.  That would be my understanding of this
10  document.
11     Q.  Okay.  And ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13     A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14  ▮▮▮▮▮▮▮▮▮
15     Q.  Okay.  And it looks like, based on this
16  document, that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19          Do you see that?
20     A.  I do.
21     Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22  ▮▮▮▮▮▮
23     A.  Yes.
24     Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25

Page 89

1          Do you see that?
2      A.  I do.
3      Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5      A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8  ▮▮▮▮▮▮▮▮▮▮▮▮▮
9      Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11  ▮▮▮▮▮▮
12     A.  I agree with that.
13     Q.  All right.  You can put that away.
14         Let's turn back to your report, and
15  specifically page 18, the section that begins --
16  or is titled "Dr. Vellturo's analysis understates
17  the importance of platform competition."
18         With me?
19     A.  I am.
20     Q.  Okay.  Why is it that platform
21  competition is important?
22     A.  Well, it's important because it affects
23  both current purchase decisions and future
24  purchase considerations.
25     Q.  How so?

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 90

1    A.  That -- we talked about this before.
2  There's a certain amount of stickiness,
3  particularly at the platform level, of whose
4  operating system you're going to have operating
5  your Smartphone.
6        And Apple has a phenomenal stickiness to
7  people who are loyal to Apple.
8         There is a smaller group that are
9  significantly hostile to Apple and wouldn't by an
10  Apple product no matter how good it was, or
11  better than what they could possibly buy from the
12  alternative.
13        And then there's a lot of people that
14  are in between.
15    Q.  "In between" being that they might
16  switch from one platform to another?
17    A.  Correct.
18    Q.  Okay.  Now, you state here that
19  Dr. Velluturo understates the importance of
20  platform competition.
21        I didn't quite understand, reading
22  through the document, how he understated the
23  importance.  Maybe you could explain that to me.
24    A.  Yeah.  And that may be a poor choice of
25  words or a phrase.

Page 91

1        What I think that Dr. Vellturo does is
2  he equates the Galaxy Nexus with the Android
3  Platform.  And this case is not -- and the
4  preliminary injunction -- is not about the
5  Android Platform and iOS or the Apple 4S.
6        And I think that is where I'm critical
7  of him, that there are a whole bunch of people
8  who, if they did not consider or would not have
9  the Samsung Galaxy Nexus with the four infringing
10  features in it, if that product wasn't on the
11  market, but one that had everything else that did
12  but did not have those four features, the
13  question is:  What would happen to those
14  customers?
15        Would they go to Apple and buy a 4S or
16  would they buy another product on Android?
17        And I think he's not appreciating the
18  fact that probably many of those would just go to
19  another Android phone.
20    Q.  Many of those would probably go to
21  another Android phone you just said; right?
22    A.  Right.  It's just not -- by definition,
23  if they didn't buy Nexus, they would buy an Apple
24  4S.
25    Q.  You don't have any data or evidence that

Page 92

1  suggests that they would probably go to another
2  Android phone; that's just your supposition?
3    A.  Right.  And by the time we get to
4  damages in this case, I expect that that
5  answer -- I'll have an answer to that question
6  through some type of statistical information,
7  either from -- that you guys are providing me or
8  Samsung is going to provide me.  That's the way
9  to measure that.
10        And it should have been done here, in my
11  opinion, if it's true.
12        MR. REITER:  I was just told that we
13  have a few minutes left on the tape, and we're
14  just starting a new section, so why don't we go
15  ahead and take a break.
16        THE VIDEOGRAPHER:  This marks the end of
17  Disk No. 1 in the deposition of Michael Wagner.
18        The time is 11:33 a.m., and we are off
19  the record.
20        (Recess taken)
21        THE VIDEOGRAPHER:  This marks the
22  beginning of Disk No. 2 in the deposition of
23  Michael Wagner.
24        The time is 11:46 a.m., and we are back
25  on the record.

Page 93

1  BY MR. REITER:
2    Q.  Mr. Wagner, this section that we were
3  talking about before the break on page 18,
4  Dr. Vellturo's analysis understates the
5  importance of platform competition, would you
6  agree that there is a difference -- that the
7  importance of platform competition is different
8  depending upon whether one is a first-time
9  Smartphone purchaser or somebody that has already
10  adopted or purchased a Smartphone?
11    A.  I'd need more information to know.
12    Q.  What type of information would you need
13  to know?
14    A.  I'd like to have a survey of those types
15  of customers to find out, you know, with just
16  that subset of the population, how important is
17  the operating system to your purchase decision?
18        I don't think I've seen a survey that --
19  or a study that segregates that segment of this
20  population, and I'd want to see that.
21    Q.  Okay.  Now, in your declaration, pages
22  19, 20, 21, you talk about a Business Insider
23  article.
24        Tab 16.
25    A.  I do.

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 94

1    Q.  I'd like to go over that with you.
2        (Deposition Exhibit 18 was marked for
3        identification)
4    BY MR. REITER:
5    Q.  I've had marked as Exhibit 18 the
6    Business Insider article that was marked as
7    Exhibit Q to your declaration.
8        Do you recognize it as the same?
9    A.  It is.
10   Q.  And that article really focuses on
11   existing Smartphone users, is that right, the
12   pool -- or the population that was surveyed to
13   generate the results?
14   A.  I believe that's correct.
15   Q.  In fact, it says almost all of the
16   survey participants already use a Smartphone.
17   A.  Correct.
18   Q.  And then it also says, a few bullets
19   down on the first page of Exhibit 18, that "most
20   survey participants are not" -- all caps "not" --
21   "planning to switch platforms when they upgrade."
22       Do you see that?
23   A.  I do.
24   Q.  And it goes on to say that features and
25   platform are the most important factors when

Page 95

1    choosing a Smartphone; is that right?
2    A.  That is.  And that would be my
3    understanding as well.
4    Q.  Now this exhibit, if you flip a page to
5    the first chart -- I guess it's the third page of
6    the exhibit -- says, "The truth about
7    Smartphones: Our Exclusive Survey on iPhone
8    versus Android."
9        Do you see that?
10   A.  I do.
11   Q.  And this is the -- this is where you got
12   your data that some people said they would never
13   buy an Apple product.  They hate Apple.
14   A.  Well, I didn't need this to tell me
15   that.  But this does put a percentage on that
16   number.
17   Q.  Now, this population that was pooled on
18   that issue are Android users?
19   A.  The majority of them are Android.
20   Q.  Well, it says on this page 3 that "Among
21   Android users, most say they will never buy an
22   iPhone..."
23   A.  Oh, that's true for this question, yes.
24   Q.  Okay.  So the people that are
25   identifying -- or at least the 55.7 percent in

Page 96

1    this survey that said they hate Apple, are people
2    that have already select Android?
3    A.  Yeah.  I don't think people that have
4    owned Apple hate Apple.  There may be a few, but
5    that would be a minority.
6    Q.  But these Android users, at least in
7    this survey, at least 50- -- close to 56 percent
8    of them -- they are going to stick with Android;
9    right?
10   A.  Regardless of what.
11   Q.  So looking back at paragraph 47 through
12   49 of your declaration, and particularly
13   paragraph 49, you say, "As demonstrated by these
14   surveys" -- and it's more than just the exhibit
15   we're talking about -- "a substantial portion of
16   consumers have strong preferences either for or
17   against Apple, meaning that many of the customers
18   that select an Android phone, such as a Galaxy
19   Nexus, would not consider an iPhone as an
20   alternative."
21       Do you see that?
22   A.  Yes.
23   Q.  "This is another factor that
24   Dr. Velluro's analysis does not take into
25   account."

Page 97

1        Are you saying there that people that
2    purchased a Galaxy Nexus, or at least a portion
3    of those, will, after that choice, just stick
4    with Android?
5    A.  At least a portion of them, yes.
6    Q.  So they would never switch over to the
7    iOS system?
8    A.  Correct.  Even if The Nexus was not
9    available, that those types of customers would
10   find another similar phone that runs on Android
11   rather than switching to Apple.
12   Q.  But focusing on that portion that
13   purchased the Galaxy Nexus, they will become
14   locked into the Android system; is that right?
15   A.  Many of them probably already were.
16   Q.  Now, why do you say this is another
17   factor that Dr. Velluro's analysis does not take
18   into account?
19   A.  Because I didn't see him addressing
20   this, this issue.
21   Q.  And what is "this" specifically?
22   A.  That a fairly significant portion of the
23   population of Smartphone purchasers are either a
24   hundred percent in the Apple camp or a hundred
25   percent in the Android camp.  And what we're

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 98

1    dealing with here is a single phone, the Galaxy
2    Nexus.
3        Q.  And you're basing that assumption, or
4    assertion that they are either in the Apple camp
5    or Android camp, based on this Business Insider
6    data?
7        A.  Well, this is confirmatory of my
8    understanding from other -- my studying this
9    market before.
10       Q.  Okay.  And this business -- as we said,
11   this Business Insider data is based on people
12   that have already purchased Smartphones; they are
13   already Smartphone users?
14       A.  I agree.  I don't think this has much to
15   say about first-time buyers.
16       Q.  So let's look at a -- I'm not sure I've
17   got the right -- Tab 17.
18           (Deposition Exhibit 19 was marked for
19           identification)
20   BY MR. REITER:



HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY



Page 102

Page 103

Page 104

Page 105

7      Q. You understand -- and I understand
8   you're a lawyer; right?
9      A. Licensed in the State of California.
10     Q. Okay.  So when I ask you legal
11   questions, I guess you feel comfortable
12   answering?
13     A. No.  And I'm not giving you a legal
14   opinion.
15     Q. Okay.
16     A. I'm talking about just causation, as a
17   damage expert.  I mean if you had hired me,
18   that's what I would have done in a declaration
19   for you.
20     Q. Okay.
21     A. I would have attempted -- I would have
22   gotten surveys done.  I would have done conjoin
23   analysis.  I would have found out how important
24   these features are, and do they drive the demand
25   for The Nexus.

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 106

1    And if that conclusion was reached, then
2  I'd go to the next step of what -- and it's only
3  the next step that Dr. Velluro goes to. And he
4  never addresses, in my opinion -- I'm sure he'll
5  disagree with me -- that he addressed this first
6  causation issue.
7    Q.  Okay. And the causation issue you are
8  focusing on is whether or not the specific
9  patented features actually drive consumer demand;
10 is that right?
11   A.  Correct. Did they -- were they a major
12 factor in the purchase decision of the customers
13 who bought a Samsung Nexus phone during this
14 period of time.
15   Q.  Okay. Do you think it's relevant as to
16 whether or not those features are core
17 functionality to the phones?
18     MR. PRICE: Objection; vague.
19     THE WITNESS: I think there's a relation
20 there, yes.
21 BY MR. REITER:
22   Q.  Is it that they -- they have to -- they
23 can only drive demand, that that is the critical
24 feature, or the critical analysis?
25   A.  Well, again, now you're asking for a

Page 107

1  legal conclusion. I'm not giving you one.
2    But as a damage expert, I think if it's
3  a -- if it's a -- if it's one of the major
4  reasons, like it would make the top four, that
5  that, in my mind, satisfies the element of
6  causation and demand.
7    Q.  Okay.
8    A.  But the -- the case law is not real
9  consistent on this, but that's my position as a
10 damage expert.
11   Q.  Okay. And just so I'm clear, the
12 consumer demand issue, is that distinct from
13 whether or not the feature or the technology is a
14 core part of the product?
15     MR. PRICE: Same objection. Ambiguous.
16     THE WITNESS: Yeah. I'd need more
17 information to know. But to me, the standard for
18 causation on damages is that the existence of
19 these four features would make or break the
20 purchase decision; that there would be a
21 different purchase decision if these features
22 were not in the product, and then be able to
23 quantify how many would have changed their
24 decision.
25 //

Page 108

1  BY MR. REITER:
2    Q.  So when you say "make or break," so it's
3  a binary decision. But for the presence of this
4  feature nobody would have bought the phone?
5    A.  Correct. I think that's what's relevant
6  right now.
7    Q.  Going back to the stickiness issue,
8  putting aside the features -- and I understand
9  that you feel strongly about that, so I'm not
10 dismissing that.
11     But do you take issue with
12 Dr. Velluro's -- the numbers that he provides on
13 how sticky the Android Platform is?
14     And -- and --
15   A.  I'm not recalling taking issue with
16 any -- he would not make the numbers up. He
17 would use sources like I have used. And I
18 wouldn't necessarily dispute those figures, I
19 don't think.
20   Q.  Well, why don't we just look at your
21 report, because I wasn't clear as to whether you
22 took issue with his numbers or didn't take issue
23 with his numbers.
24     So we can start at -- around paragraph
25 88, I think, is where we actually get into the

Page 109

1  numbers.
2    And there in paragraph 88 you attribute
3  to Dr. Velluro that he cites to documents that
4  show some 70 to 78 percent of Android users and
5  some 80 to 88 percent of iPhone users would stick
6  with that platform for their next purchase.
7    Do you see that?
8    A.  I do.
9    Q.  And you don't take issue with the source
10 of the data or his recitation of that data, do
11 you?
12   A.  I do not.
13   Q.  In the next sentence Dr. Velluro
14 identifies an article that says 6 out of 10 users
15 would be -- would stick with Android.
16     Do you see that?
17   A.  Correct.
18   Q.  Okay. And you don't take issue with
19 that?
20   A.  I do not.
21   Q.  You cite to a Piper Jaffray analyst
22 publication from October 2011 that says only 47
23 percent of Android users would expect to buy
24 another Android device.
25     Do you see that in paragraph 89?

28

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY



Page 110

1    A. I do.
2    Q. So you'll agree that, at least based on
3  some of the data, between 50 and 80 percent of
4  existing Android users will buy another Android
5  device; is that right?
6    A. Rounding to tens, yes.
7    Q. Have you seen any data from Samsung on
8  what they attribute the stickiness of the Android
9  Platform is?
10   A. I think I've seen some information from
11 Samsung on that topic.
12   Q. Do you recall what that is?
13   A. It would be one of these types of
14 documents we have already looked at that is a
15 bunch of PowerPoints.
16   Q. Oh, I'm sorry. I meant do you recall
17 the quantification.
18   A. Again, there may be some. They would be
19 probably collecting that from the same types of
20 sources that have already been cited.
21   MR. PRICE: I'm sorry. Do you mean
22 quantification of the stickiness or the reasons
23 for stickiness?
24   MR. REITER: Quantification for the
25 stickiness -- or quantification of the

Page 111

1  stickiness, the percentage.
2    THE WITNESS: Right. And I think -- you
3  know, I've seen that information. I have an
4  unrefreshed recollection I've seen that
5  information in Samsung documents. I don't think
6  it was internally generated by Samsung. I think
7  it would have been from some study that they
8  commissioned or bought.
9    MR. REITER: Let's see if we can refresh
10 your recollection. Let's go to Tab 18.
11   (Deposition Exhibit 20 was marked for
12   identification)
13 BY MR. REITER:
14   Q. Exhibit 20 is a document titled ███████
15 ████████████████████████████████████ with
16 Bates No. SAMNDCA00268352 through 268384.
17   Have you seen this --
18   MR. PRICE: I think you misspoke. It's
19 from ██████
20   MR. REITER: Oh. I don't know what I
21 said, but that's right.
22   THE WITNESS: I have seen this document
23 before.
24 BY MR. REITER:
25   Q. Okay. Did you see the document in the

Page 112

1  context of preparing this declaration or some of
2  your other work?
3    A. I think it was this declaration.
4    Q. I didn't see it as an exhibit. You
5  didn't attach it? You don't recall attaching it?
6    A. I'm not recalling attaching it.
7    Q. Okay. Let's look at page 58, Bates No.
8  58. At the top it says:
9  ████████████████████████████████
10 █████████████████████████████
11 █████████████████████████████
12 █████████████████████████
13   Do you see that?
14   A. I do.
15   Q. What is your understanding of what it
16 means by ██████████████████████
17   A. ████████████████████████████
18 ████████████████████████████████████
19 ████████████████
20   Q. ████
21 ████████████████████████████████████
22   A. ████
23 ████████████████████████████████████
24   Q. ████
25 ████████████████████████████████████

Page 113

1  ██████████████████████████
2    A. They do. But I think it -- and it may
3  be in this document or another document. ██████
4  ████████████████████████████████████
5  ████████████████████████████████████
6  █████████████████████████████
7    Q. Right. And I'm just focusing on Android
8  right now.
9    A. I understand.
10   Q. And the Android side, on the left side
11 of the document, █████████████████████
12 ████████████████████████████
13 ████████████████████████
14 ████████████████████████
15   A. Based on first-quarter 2011 data from
16 Nielsen.
17   Q. Right. And then I'll agree with you, on
18 ████████████████████████████████████
19 ████████████████████████
20 ██████████████
21   A. Right. Correct.
22   Q. Since first quarter of 2011, do you know
23 ████████████████████████████████████
24 ████████████
25   A. For Smartphones in the U.S., I think

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY



Page 114

1  it's lower.
2      Q. ▮▮▮▮▮▮▮
3      A. Yes.
4      Q. So you'll agree that ▮▮▮▮
5  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8  ▮▮▮▮▮▮
9          MR. PRICE: Object to lack of
10  foundation, and it's vague.
11          THE WITNESS: ▮▮▮▮▮▮▮
12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13  ▮▮▮▮▮
14  BY MR. REITER:
15      Q. You don't think that they market to
16  that?
17          MR. PRICE: Object; vague.
18          MR. REITER: Let me restate the
19  question.
20  BY MR. REITER:
21      Q. You don't think that they plan their
22  business taking into account the stickiness?
23      A. No, I think that they do. I think that
24  they -- that they do marketing. They do a
25  substantial amount of marketing.

Page 115

1          And, clearly, that marketing would not
2  only be to first-time purchasers, but to their
3  install base, to try to influence their next
4  purchase decision.
5      Q. And do you think that, based on the
6  information you've seen from Samsung, that
7  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
9  ▮▮▮▮▮▮▮▮▮▮▮▮ om
10  ▮▮▮▮▮▮▮
11          MR. PRICE: Objection; vague and
12  ambiguous, calls for speculation.
13          THE WITNESS: No, I don't think I have
14  seen that information. ▮▮▮▮▮▮▮
15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17  ▮▮▮▮▮▮
18          But clearly, everyone knows in marketing
19  it's easier to market to an existing customer
20  than to a new customer, if you are keeping
21  everybody happy with your products. I think they
22  take that into consideration, to be responsive to
23  your question.
24          MR. REITER: Okay. Thank you.
25          Let's go to Tab 20.

Page 116

1          (Deposition Exhibit 21 was marked for
2          identification)
3  BY MR. REITER:
4      Q. Exhibit 21, Mr. Wagner, is another
5  document titled ▮▮▮▮▮▮▮▮▮ from
6  August 2011, Bates Nos. S-ITC-500056374 through
7  56457.
8          Have you seen this document before?
9      A. I have.
10      Q. Was that in the context of preparing
11  your declaration here?
12      A. Yes.
13      Q. And this was not a document that you had
14  attached to your declaration?
15      A. I don't believe that it was.
16      Q. And I'd like to turn your attention to
17  the Bates Nos. that end in 412. And just to make
18  sure we're on the right slide it says:
19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21  ▮▮▮▮▮▮▮▮▮▮▮▮
22  ▮▮▮▮▮
23      A. You're right. It's got a lot of the
24  same information we had from that last page we
25  looked at.

Page 117

1      Q. Yeah. I agree.
2          But what I wanted to focus you on is on
3  the right side below the title. It says:
4  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7  ▮▮▮▮▮▮▮
8      A. I do.
9      Q. Okay. So does that help you in
10  answering the question that I asked before?
11  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13  ▮▮▮▮▮▮▮▮▮
14      A. Oh, clearly. As I said, just anyone
15  would do that. ▮▮▮▮▮▮▮
16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18  ▮▮▮▮
19      Q. At least as of the date of this
20  document, August 2011?
21      A. Correct.
22      Q. And we -- as we talked about at the
23  beginning of the deposition, some of the data has
24  changed in the last six, nine months?
25          MR. PRICE: Objection; ambiguous as to

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY



Page 118

1    "some of the data."
2         THE WITNESS:  It has.
3    BY MR. REITER:
4         Q.  So -- and this would apply to Apple,
5    too.  And I think you -- you mentioned this, is
6    that once they have a loyal customer, that --
7    that customer's value is not measured by just the
8    purchase of that first iPhone.
9         A.  I agree with that.  There is an
10   expectation at Apple to retain that customer, not
11   only for the next generation of the product they
12   purchase, but also possibly selling them other
13   products in their ecosystem.
14        Q.  Let's go back to Exhibit 8, which is the
15   [redacted]
16        A.  I've got it.
17        Q.  And page 752.
18        Have you seen that page before?
19        A.  I have.  It's a very busy page.
20        Q.  [redacted]
21   [redacted]
22        A.  I'd agree with that.
23        Q.  Okay.  [redacted]
24   [redacted]
25        A.  [redacted]

Page 119

1    [redacted]
2-13 [redacted]
14        A.  Yes.
15-20 [redacted]
21        A.  That's what I would take from this
22   document.
23        Q.  Okay.  Now, in the center underneath
24   the -- the circle, it says,
25   [redacted]

Page 120

1    [redacted]
2    [redacted]
3         Do you see that?
4         A.  I do.
5         Q.  Okay.  Do you have an understanding of
6    [redacted]
7         A.  I do.
8         Q.  What is that?
9         A.  [redacted]
10-25 [redacted]

Page 121

1-8  [redacted]
9         A.  Yes.
10-22 [redacted]
23   BY MR. REITER:
24        Q.  Has Apple done it?
25        A.  Apple has done a much better job of

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 122

1    doing it.
2        Q.  So in paragraph 119 of your report, you
3    say, "There is little evidence that consumers are
4    locked into Samsung or Android products."
5            It's there and I think it's the third
6    sentence.  Do you see that?
7        A.  Yes.
8        Q.  Okay.  Focusing on the Android part of
9    it, do you still think that there is little
10   evidence that customers or consumers are locked
11   into Android products when you see that even
12   Samsung recognizes that 80 percent of Android
13   purchasers will buy another Android device?
14       A.  I think that sentence is too strong for
15   that part of it.
16       Q.  And then with respect to Samsung, we saw
17   that the numbers were less, that at least as of
18   August, September of 2011, 50 percent of people
19   were repeat purchasers of Samsung devices; is
20   that right?
21       A.  Correct.
22       Q.  So I've got another topic to go into.
23   We can break for lunch or go into the other
24   topic.  It's up to you.
25           THE WITNESS:  Cynthia?

Page 123

1            THE REPORTER:  It's up to you.
2            THE WITNESS:  It's 12:20.  Let's eat.
3            MR. REITER:  Okay.
4            THE VIDEOGRAPHER:  The time is 12:20
5    p.m., and we're off the record.
6            (Lunch recess taken)
7    //
8    //

Page 124

1            AFTERNOON SESSION
2
3            THE VIDEOGRAPHER:  The time is 1:08
4    p.m., and we are back on the record.
5    BY MR. REITER:
6        Q.  Mr. Wagner, I want to switch topics.  We
7    were talking about, I think, stickiness before.
8    We have talked about first-time buyers.  We
9    talked about market share.  Now I want to talk a
10   little bit more about ecosystems.
11

Page 125



HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY



Page 126

23    Q.  Let's see.  I just want to make sure we
24  get it right.
25        MR. REITER:  Good news is --

Page 127

1        MR. PRICE:  The flight.  I'll ask what
2  kind of mail services you guys have.
3        MR. STONE:  You're going to be over the
4  weight limit.
5        MR. REITER:  We can ship that back for
6  you if you want.
7        (Deposition Exhibit 22 was marked for
8        identification)
9        MR. PRICE:  This is?
10        THE REPORTER:  22.
11        MR. PRICE:  22.
12        THE REPORTER:  Yes.
13  BY MR. REITER:

Page 128

Page 129

20        (Deposition Exhibit 23 was marked for
21        identification)
22  BY MR. REITER:
23    Q.  So I've had marked as Exhibit 23
24                        Bates Nos. S-ITC-003353288
25  to 3353507.

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY



Page 130

1      Have you seen this document before,
2  Mr. Wagner?
3      A.  You know, I'm not recalling that I've
4  seen it.  Again, just looking at a couple of
5  pages, I've seen some of these statistics and
6  charts before, but I don't think I've seen them
7  in this document.
8      Q.  So if you go to Bates No. 325 -- 324,
9  I'm sorry.  Have you seen that before?
10     A.  I certainly have.
11     Q.  Okay.  So this is another version of the
12  ▮▮▮▮▮▮▮▮▮▮  we talked about before the lunch
13  break?
14     A.  It has a little bit less information,
15  maybe -- and maybe some different information,
16  but it's basically the same concept.
17
18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19  ▮▮▮▮▮▮▮▮
20     A.  Yes.
21     Q.  Okay.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24
25     A.  It does.

Page 131

1      Q.  Okay.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6  ▮▮▮▮▮▮▮▮▮
7      A.  That could be one of the products would
8  be considered, yes.
9      Q.  What -- what might other products be?
10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11     Q.  Okay.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮r
12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13 ▮▮▮▮▮▮▮▮▮▮
14     A.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17
18     Q.  Yes.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22
23     Do you see that?
24     A.  Yes.
25     Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 132

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2      A.  Yes.
3  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7  ▮▮▮▮▮▮▮▮▮▮▮▮▮
8
9      A.  Yes.
10     MR. PRICE:  I want to object to vague.
11  You mean the quantity or the concept?
12     MR. REITER:  The concept.
13  BY MR. REITER:
14     Q.  Did you understand the question?
15     A.  Yeah.  I mean, that's what I thought you
16  were talking about, and if you --
17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
19     Q.  In what sense would the answer be
20  different?
21     A.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 133

1  ▮▮▮▮▮▮▮▮▮▮▮
2      Q.  I understand what you're saying.
3  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7  ▮▮▮▮▮▮▮▮▮▮
8      A.  I do not.
9      Q.  And I think what you were just
10  referencing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15     A.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17
18     Q.  And in paragraph 109 of your -- your
19  report, you reference Dr. Velturo's discussion
20  of switching costs.  And you go on to say it's --
21  "it is not uncommon for late adopters to feel
22  suspicious of new technology or think that most
23  new technology is unnecessary," and you cite to
24  Exhibit SS again.
25     A.  I do.

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY



Page 134

1    Q.  And then you go on to say that at the
2  conclusion of that paragraph, "switching costs
3  will not be an issue for these late adopters to
4  the smartphone."
5        Are you suggesting that these late
6  adopters do not become loyal to their -- their
7  purchase?
8    A.  No, that's not exactly what I'm saying.
9    Q.  Okay.  What is it that you're saying?
10    A.  What I'm saying is that although history
11  has shown that through the -- the innovators and
12  the early adopters and the early majority, they
13  have some average amount of applications that
14  they put onto their smartphone, that for these
15  late entrants, there will be not the same
16  quantity of applications put on their
17  smartphones.  And so for those first-time buyers,
18  the switching costs will not be as high.
19    Q.  You don't have any data that suggests or
20  demonstrates that these late adopters, or let's
21  just say more recent adopters, focusing on
22  perhaps the last quarter of -- first quarter of
23  2012, that these late adopters are buying less
24  apps than adopters two or three-quarters earlier?
25    A.  I don't.

Page 135

1    Q.  Turning to the next page of this
2  presentation, page 325, it says:
3
4
5
6    A.  Yes.
7    Q.  Do you have an understanding of what
8  that means?
9    A.  I have some understanding, yes.
10    Q.  What is that?
11
12
13
14
15
16
17
18        MR. PRICE:  Objection; misstates the
19  evidence.
20        THE WITNESS:
21
22
23
24
25  //

Page 136

1  BY MR. REITER:
2    Q.
3
4
5    A.
6
7
8
9    Q.        But that -- that wasn't my
10
11
12
13
14    A.
15
16
17    Q.
18    A.
19
20    Q.
21    A.
22
23
24    Q.
25    A.

Page 137

1
2
3
4
5
6    A.  That's our favorite one.
7    Q.  I know.  As my colleague said, it's the
8  exhibit that keeps on giving.
9        And let's turn to page 795.  This --
10  make sure we're at the top of the right page.
11  It's titled
12
13        Do you see that?
14    A.  I do.
15    Q.  And do you have an understanding of
16
17    A.  I do.
18    Q.  What is that?
19
20    Q.  Okay.
21    A.
22
23        Do you see that?
24    A.  I do.
25    Q.  Okay.

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY



Page 138

1
2
3       MR. PRICE:  Objection; vague.
4       THE WITNESS:  I do.  I believe it's more
5   of a hope and a plan than a reality, like it is
6   with Apple.
7   BY MR. REITER:
8       Q.  So it says in the middle of the slide
9   above the bar chart,
10
11
12      Do you see that?
13      A.  I do, but it didn't happen.  But yes, I
14  see that's what they said before introduction of
15  the Nexus.
16      Q.  If you'll turn to page 797.
17
18
19
20      A.  It is.
21      Q.  And it says
22
23      A.  That's the title.
24      Q.  And it appears that

Page 139

1
2
3       Do you agree with that?
4       A.  I do.
5       Q.
6
7
8
9       A.
10
11
12
13      Q.  Now, in your declaration, I think you
14  discussed that the Samsung tablets have not been
15  that successful; is that right?
16      A.  That's correct.
17      Q.  Okay.  Have you seen any data from
18  Samsung or --
19
20      A.
21
22      Q.

Page 140

1
2
3       A.  No, but that -- and that would not
4   surprise me.
5       Q.  Believe it or not, it's the one document
6   I didn't throw in here.
7       Switching for a moment to network
8   effects.  Are you familiar with that term?
9       A.  I am.
10      Q.  What do you understand that to mean?
11      A.  I think -- I have a couple
12  understandings, but I think the one that's
13  relevant to this matter and this issue is that
14  a -- the greater number of purchases of product
15  has an influence on future sales of that product.
16      Q.  Do you agree with that?
17      A.  I do, to a certain extent.
18      Q.  To a certain extent in this market or to
19  a certain extent generally?
20      A.  Both.
21      Q.  Do you disagree with Dr. Vellturo that
22  smartphone demand for a particular brand or -- or
23  platform will drive additional demand for that
24  platform?

Page 141

1       A.  I do not disagree.
2       Q.  And do you agree that with respect to
3   network effects, that products work together
4   better than separately?
5       MR. PRICE:  Objection; vague.
6       THE WITNESS:  Yeah, I'd need more
7   information to know, but generally as a concept,
8   I would agree with that.
9   BY MR. REITER:
10      Q.  Well, we still have, I think, the
11  Exhibit 8 open.
12      A.  No, you've assumed a fact not in
13  evidence.  I don't have it open.
14      Q.  Oh, I'm sorry.  After what we said, I
15  thought we'd just keep it out.
16      A.  You know, I did keep it so I could go
17  right to it, because I had a feeling it wasn't
18  the last time.
19      Q.  I'm looking at page 793.
20      A.  And so am I.
21      Q.  Okay.  And the top of the page talks
22  about
23
24
25      Do you see that?

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY



Page 142

1    A. I do.
2    Q. Okay.  And in the middle it says,
3    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
4    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
5         Do you see that?
6    A. I do, and I assume that's referring to
7    Apple.
8    Q. I understand.
9         Do you have -- putting aside that it's
10   referring to Apple, ▇▇▇▇▇▇▇▇▇▇▇▇▇
11   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
12   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
13   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
14   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
15   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
16   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
17   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
18   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
19   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
20   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
21   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
22   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
23   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
24   A. I think it would.
25   Q. It says in the next row, ▇▇▇▇▇▇

Page 143

1    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
2    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
3    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
4    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
5    Q. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
6    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
7    A. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
8    Q. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
9    A. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
10   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
11   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
12   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
13   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
14   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
15   A. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
16   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
17   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
18   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
19   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
20   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
21   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
22   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
23   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
24
25   Q. Now, in paragraph 78 of your report --

Page 144

1    don't put that away yet.
2    A. Thank you.
3    Q. Paragraph 78 and -- and several other
4    paragraphs, you take one and through today,
5    discussion of network effects as it relates to
6    the development of apps; is that right?
7    A. I do.
8    Q. And in sum and substance, as I read
9    through this paragraph, I got the understanding
10   that what you were saying is, is that app
11   developers really are more likely to develop for
12   the iOS platform than for Android; is that right?
13   A. From day one and through today, yes.
14   Q. Okay.  And have you seen any information
15   that -- or are you aware of any information that
16   indicates that app developers may be more
17   interested in developing for Android?
18   A. No.
19   Q. Android Platform as a whole is bigger
20   than iOS; you'll agree; right?
21   A. It is, but it's more disjointed.  And
22   again, the app developers know that they make a
23   fraction of the money they make on an Android app
24   than they do on an Apple app.
25   Q. You said a moment ago that it's more

Page 145

1    disjointed.  What do you mean by that?
2    A. Well, it's -- it's not as integrated as
3    Apple.  I mean, you buy an Apple product and it's
4    all around Apple iOS.  In Android, there's a
5    whole bunch of different manufacturers you can
6    choose and there's some ability to go in and
7    tweak the Android operating system by each
8    operator, if they so choose.
9    Q. And Ice Cream Sandwich is an attempt by
10   at least Google to correct that disjointed
11   phenomenon we see in the Android ecosystem?
12        MR. PRICE:  Objection, lack of
13   foundation.
14        THE WITNESS:  Yeah, I don't know.  I
15   could see they have some tendency to that, but I
16   don't know if that was their intent.
17   BY MR. REITER:
18   Q. You -- you don't know?
19   A. I don't know.
20   Q. See if I'm in the right place.
21        If you could turn to page 754 of Exhibit
22   8. And it says, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
23        Do you see that?
24   A. I do.
25   Q. It says in the middle:

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY



Page 146

8    Do you read that differently?
9    A. No.
10   Q. Okay.

Page 147

3    A. Correct.
4    Q. You can put that aside now.
5    We talked this morning about the four
6    patents briefly or generally about the patents,
7    and you strongly explained that Dr. Vellturo had
8    not presented evidence of causation, I believe;
9    is that right?
10   A. In my professional judgment, yes.
11   Q. Okay. Now, I'm going to flip the
12   question on you just a little bit. You don't
13   have any evidence -- and there's a couple double
14   negatives here. You don't have any evidence that
15   those features do not drive sales, do you?
16   A. I have --
17   MR. PRICE: Object, lack -- lack of
18   foundation, beyond his assignment.
19   THE WITNESS: I would say that's not
20   correct. I don't have any direct evidence. I
21   certainly have circumstantial evidence.
22   BY MR. REITER:
23   Q. And what is that?
24   A. That I have seen a plethora of marketing
25   documents from both Apple and Samsung during this

Page 148

1    relevant period and I've not seen any -- either
2    of those two companies directly promoting the
3    four features that are enabled by these patents
4    in trying to sell their products.

22   Q. You also, I assume, read the
23   declarations, beyond at least Dr. Vellturo's,
24   that Apple submitted with its preliminary
25   injunction papers about the advertisement that

Page 149

1    were done of the -- the Apple products? I think
2    it was Mr. Sinclair's declaration?
3    A. I personally did not look at them, but
4    I'm aware of them.
5    Q. So you -- you didn't look at his
6    declaration?
7    A. I'm not recalling looking at his
8    declaration.
9    Q. So then you didn't look at the
10   advertisements that he cited in his declaration?
11   A. No. My staff looked at them. I did not
12   look at them.
13   Q. As I read your report, towards the end
14   of your report, I understood you to say that to
15   the extent there is infringement, any harm that
16   Apple suffers would be compensable through
17   damages; is that right?
18   A. I said that, yes.
19   Q. You're smiling.
20   A. That's what I do for a living. If I
21   couldn't do that, I don't know what I'm doing for
22   a living.
23   Q. Okay. You found in every case that
24   you've -- you've worked on that you've been able
25   to calculate damages so that a hundred percent

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 150

1  compensates the -- the infringed party for the
2  damage suffered?
3      A.  I don't think I could be that strong,
4  but I think I have to the extent that it was not
5  speculative damages, yes.
6      Q.  I don't think I under -- I don't think I
7  understood your question.  When you say --
8      A.  You mean the answer?
9      Q.  Your answer; right.
10     It was, to the extent it was not
11  speculative, yes.  What do you mean by that?
12     A.  What I mean by that is that I often have
13  clients that think they have some much broader
14  set of damages than I think they have, and
15  they -- they can't give me any metrics to -- to
16  quantify those and so I don't calculate them.
17  And I've told them I can't calculate those unless
18  you give me information to do so.
19     Q.  That doesn't mean they haven't been
20  harmed, you just can't quantify them?
21     A.  Well, it's possible they're not harmed.
22  But you know, I've worked in hundreds and
23  hundreds of cases on the damages issue and I
24  don't think the law allows you to get every
25  possible damage that may have happened to you.

Page 151

1  You're entitled to get compensation for the
2  damages that are reasonably certain and
3  reasonably calculable, and I've always been able
4  to do that.
5      And I could do it in this case, too.  I
6  can calculate damages to the Apple ecosystem
7  if -- if causation is proved, that you can
8  actually go that far in a damage calculation.  I
9  have a personal belief at this stage we'll never
10  get there, but if you do, I can calculate that.
11  Your client collects that information in spades,
12  even though what's really relevant is not the
13  past, but what's happening right now, and we can
14  get that information through surveys.
15     Q.  Part of that would include convoyed
16  sales, I think you mentioned in your -- your
17  report?
18     A.  Yes.
19     Q.  Okay.  What's your understanding of
20  convoyed sales?
21     A.  Well, that is a term-of-art in our
22  profession and actually, I don't think there are
23  any convoyed sales here.  In order -- in order
24  for there to be a convoyed sale, we'd have to
25  prove that the patented features on the

Page 152

1  infringing 13 products are what drove the
2  purchase decision.  If you can't do that, then
3  convoyed sales are not relevant.  But let's
4  assume that you could meet that burden.  Then it
5  would be things like Mac computers or iCloud
6  service or apps or things like that.
7      Q.  So -- and I understand that this is a
8  big assumption for you to swallow, but just for
9  the purposes of this question, assuming that
10  Apple was able to show that people purchased the
11  Galaxy Nexus as a result of one or more of the
12  four infringing or alleged infringing features,
13  would you say then that Apple's loss of iPad
14  sales, for example, would be a legitimate
15  convoyed sale?
16     A.  Well, it's an incomplete hypothetical
17  because there's one more step that was necessary
18  between what you gave me and what you asked me to
19  conclude, and that is that the customer would not
20  have bought the Samsung Galaxy Nexus but for the
21  infringing features.  That's, of course, the most
22  basic concept that we have to establish.  Then we
23  have to establish, okay, how many of those
24  customers would have bought an Apple product
25  instead, the 4S probably.

Page 153

1      Q.  Uh-huh.
2      A.  And once we prove that number, then I
3  think there would be a certain percentage of
4  those customers that would have bought a Mac as
5  well.  And I think that could be quantified.
6      Q.  And the same is true for the apps?
7      A.  Yes, clearly.
8      Q.  And for iPads?
9      A.  Yes.
10     Q.  And then what about for the next
11  generation Apple phone?
12     A.  Again, we have statistics on their
13  stickiness.  We can calculate that.
14     Q.  So under your assessment, if one can
15  show -- or if Apple can show that but for the
16  infringing features a Galaxy Nexus customer would
17  have purchased an Apple phone?
18     Did I say that right?
19     A.  Yes.
20     Q.  Then the iPad, the Mac, the apps are
21  all -- or potentially all convoyed sales?
22     A.  They're potentially -- if everything you
23  said so far in your hypothetical is true, those
24  are potentially convoyed sales that could be
25  quantified.

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 154

1    Q.  And the same is true for the next
2  generation of the iPhone?
3    A.  Yes.
4    Q.  And how far out into the future does one
5  -- is one able to calculate that?
6    A.  Well, that's a good question.  Again,
7  that's a judgment call from the damage expert,
8  because if you start going out too far it starts
9  getting pretty speculative.  But you can adjust
10 for that with a discount rate.
11     MR. REITER:  Let's take a break.  We
12 might be close to being finished.
13     THE WITNESS:  Thank you.
14     THE VIDEOGRAPHER:  The time is 1:45
15 p.m., and we're off the record.
16     (Recess taken)
17     THE VIDEOGRAPHER:  The time is 1:59
18 p.m., and we are back on the record.
19     MR. REITER:  I have no further
20 questions.
21     THE WITNESS:  Thank you.
22 //
23 //
24 //
25 //

Page 155

1          EXAMINATION
2
3  BY MR. PRICE:
4    Q.  I actually have a couple, but I think
5  only a couple.
6    A.  I'm counting.
7    Q.  Okay.  A lawyer's couple.
8      Mr. Wagner, you were looking -- you were
9  shown -- I think it's Exhibit 6.
10     No, wait.  I'm sorry.  Exhibit 8.  I've
11 got to keep on track here.
12     A.  I certainly saw that exhibit.
13     Q.  Back to 8.
14     And I think it's 784.  See if I'm on the
15 right page there.  I think I didn't take good
16 enough notes.  Hold on a sec.  I'll have a huge
17 stack of documents when I'm done.
18     Do you have an Exhibit 6 in front of
19 you?  I might have miswritten this.
20     And if you'd look at, let's see, 17- --
21 I think it was 170.  Here we go.
22
23



Page 156

Page 157

24     Q.  And early on, at the beginning of the
25  deposition, you were shown figures concerning the

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY



Page 158

1   increase in Samsung's market share worldwide.
2       Do you recall that?
3       A. I do.
4       Q. And you made a distinction saying that's
5   worldwide, not U.S. Do you recall that?
6       A. I believe I did.
7       Q. And why would that distinction be of any
8   significance?
9       A. The only thing that's relevant to this
10  preliminary injunction is what's happening in the
11  United States.
12      Q. And you were also asked about -- in
13  connection with the Samsung increased market
14  share, the documents you've looked at, is a
15  portion of that due to Samsung's growth in the
16  low-end, or what you could say middle-level
17  products?
18      MR. REITER: Objection; leading.
19      THE WITNESS: It's -- clearly, that
20  contributes to their success, yes. That at least
21  the product at issue in this preliminary
22  injunction has not been successful. They have
23  other high-end phones that have been relatively
24  successful, and also mid-tier and lower-tier
25  phones as well.

Page 159

1   BY MR. PRICE:
2       Q. And what has Apple's competitive
3   position historically been with respect to
4   Samsung's low end and mid-level phones?
5       A. They were not really competing in the
6   same market space, or segment, of that Smartphone
7   market.
8       Q. If you look at Exhibit 20, page 358,
9   that's the last three Bates Nos. on Exhibit 20.
10  358.
11      I'm just wondering if you can interpret
12  it for me.
13      If we look at the right side of that, it
14  talks about repeat purchasers.
15
16
17
18
19
20
21  a coin.
22      MR. PRICE: Nothing else.
23  //
24  //
25  //

Page 160

1           FURTHER EXAMINATION
2
3   BY MR. REITER:
4       Q. I have a couple, lawyer's couple,
5   follow-up questions.
6       Mr. Price just asked you some questions
7   about
8       Do you recall that?
9       A. He did.
10      Q. And I believe you said that
11
12
13
14      A. I think I used another adjective. I
15  said "strong effect."
16      Q. So you've seen some evidence?
17      A. I have seen some, like you pointed out
18  to me, some today.
19      Q.
20
21
22      A. Correct.
23      Q. And --
24      A. Or other products.
25      Q. Or other products.

Page 161

1       And Samsung we've talked about, both in
2   the U.S. and worldwide, has enjoyed significant
3   growth in its low-end Smartphone products, hasn't
4   it?
5       A. They have.
6       Q. Mr. Price also asked you about whether
7   Apple and Samsung compete at the low-end market.
8       Do you recall that?
9       A. I do.
10      Q. And you said historically they did not.
11      Do you recall that?
12      A. I did say that.
13      Q. Today they do, though?
14      A. I think with a two-generation-old
15  product they do.
16      Q. And we talked about that at the
17  beginning of your deposition.
18      Do you recall that?
19      A. We did.
20      Q. The 3GS competes with the lower-end
21  products from Samsung?
22      A. Yes.
23      Q. And the 4S with the mid-tier product --
24  or the 4, I'm sorry, with the mid-tier products?
25      A. Yes.

HIGHLY CONFIDENTIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY

Page 162

1    MR. REITER:  I have no additional
2  questions.
3    MR. PRICE:  Me neither.
4    THE VIDEOGRAPHER:  This marks the end of
5  Disk No. 2 of 2 and concludes today's deposition
6  of Michael Wagner.
7    The time is 2:08 p.m., and we're off the
8  record.
9    (Time noted:  2:08 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 163

1    DECLARATION UNDER PENALTY OF PERJURY
2
3    I, MICHAEL J. WAGNER, do hereby certify
4  under penalty of perjury that I have read the
5  foregoing transcript of my deposition taken on
6  May 4, 2012; that I have made such corrections as
7  appear noted herein in ink, initialed by me; that
8  my testimony as contained herein, as corrected,
9  is true and correct.
10
11    DATED this          day of
12  2012, at                  , California.
13
14
15
16
17                  MICHAEL J. WAGNER
18
19
20
21
22
23
24
25

Page 164

1  IN THE MATTER OF:  Apple v Samsung Electronics
2
3  DATE:  May 4, 2012
4  WITNESS:  MICHAEL J. WAGNER
5  Reason codes:
6      1.  To clarify the record.
        2.  To conform to the facts.
7      3.  To correct transcription errors.
8
   Page      Line      Reason
9
10  From           to
11
   Page      Line      Reason
12
13  From           to
14
   Page      Line      Reason
15
16  From           to
17
   Page      Line      Reason
18
19  From           to
20
21
22                MICHAEL J. WAGNER
23
24
25

Page 165

1  STATE OF CALIFORNIA  )
2        :ss
3  COUNTY OF SAN MATEO  )
4    I, CYNTHIA MANNING, a Certified Shorthand
5  Reporter of the State of California, do hereby
6  certify:
7    That the foregoing proceedings were taken
8  before me at the time and place herein set forth;
9  that any witnesses in the foregoing proceedings,
10  prior to testifying, were placed under oath; that
11  a verbatim record of the proceedings was made by
12  me using machine shorthand which was thereafter
13  transcribed under my direction; further, that the
14  foregoing is an accurate transcription thereof.
15    I further certify that I am neither
16  financially interested in the action, nor a
17  relative or employee of any attorney of any of
18  the parties.
19
20    IN WITNESS WHEREOF, I have subscribed my
21  name this 4th day of May 2012.
22
23
24    CYNTHIA MANNING, CSR No. 7645, CCRR, CLR
25