# EXHIBIT 2 TO PENG DECLARATION

# (EXHIBIT 5 TO VELLTURO REPLY DECLARATION)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

APPLE INC., a California Corporation,

Plaintiff,

v.

SAMSUNG ELECTRONICS CO., LTD, a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware Limited liability company

Defendants.

Case No: 12-CV-00630-LHK

* H I G H L Y C O N F I D E N T I A L *
* ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER *

VIDEOTAPED DEPOSITION
OF
KEVIN GEKLINSKY
New York, New York
Monday, May 7, 2012

Reported by:
ANNETTE ARLEQUIN, CCR, RPR, CLR
JOB NO. 49410

May 7, 2012
10:00 a.m.

Videotaped deposition of KEVIN GEKLINSKY held at the offices of Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York, pursuant to Notice, before Annette Arlequin, a Certified Court Reporter, a Registered Professional Reporter, a Certified LiveNote Reporter and a Notary Public of the State of New York.

A P P E A R A N C E S:

GIBSON, DUNN & CRUTCHER LLP
Attorneys for Plaintiff
200 Park Avenue
New York, New York 10166
BY: PAUL E. TORCHIA, ESQ.
ptorchia@gibsondunn.com

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Attorneys for Defendants
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
BY: SCOTT L. WATSON ESQ.
scottwatson@quinnemanuel.com

ALSO PRESENT:

SAMSUNG TELECOMMUNICATIONS AMERICA, LLC:
By: CINDI MORELAND, VP, General Counsel

Manuel Garcia, Legal Video Specialist

10:11AM

Highly Confidential - Attorneys' Eyes Only - Protective Order

(Plaintiff's Geklinsky Exhibit 1, Apple Inc.'s Second Notice of Rule 30(b)(6) Deposition to Defendants, marked for identification, as of this date.) 10:11AM

(Plaintiff's Geklinsky Exhibit 2, Declaration of Kevin Geklinsky, marked for identification, as of this date.)

(Plaintiff's Geklinsky Exhibit 3, Supplemental Declaration of Kevin 10:11AM Geklinsky, marked for identification, as of this date.)

THE VIDEOGRAPHER: This is the start of tape labeled No. 1 of the video deposition of Kevin Geklinsky in the matter 10:34AM of Apple Inc. versus Samsung Electronics Company Limited on May 7, 2012, at approximately 10:34. My name is Manuel Garcia from TSG Reporting, Inc., and I am the legal video specialist. 10:34AM

The court reporter is Annette Arlequin in association with TSG Reporting, Inc.

Will counsel please introduce yourself. 10:34AM

Highly Confidential - Attorneys' Eyes Only - Protective Order

MR. TORCHIA: This is Paul Torchia of Gibson Dunn & Crutcher. I represent the plaintiff Apple Inc.

MR. WATSON: Scott Watson with Quinn 10:34AM Emanuel on behalf of defendant Samsung.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

* * *

K E V I N G E K L I N S K Y, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. TORCHIA:

Q. Good morning, Mr. Geklinsky.
A. Good morning.
Q. Could you state your full name and current address for the record, please.
A. Kevin Geklinsky, 520 Red Barn Drive, 10:35AM Easton, Pennsylvania 18040.
Q. And who is your employer, Mr. Geklinsky?
A. Samsung Telecommunications of America. 10:35AM

Highly Confidential - Attorneys' Eyes Only - Protective Order

product that it would promote. They may promote it along with other products, but I wouldn't necessarily phrase it to be promoted over other products. 12:23PM

Q. Well, it's a product that is promoted with particular emphasis, right?

MR. WATSON: Vague and ambiguous.

A. I would say it would be promoted with extra emphasis. 12:23PM

Q. Okay. And that actually happened with the Galaxy Nexus; Verizon promoted the Galaxy Nexus with extra emphasis, right?

A. Not in my professional opinion.

Q. You believe that that didn't happen? 12:24PM

A. I believe that they -- they advertised the product. I wouldn't say that they advertised it with extra emphasis. At least the results did not prove that to be the case. 12:24PM

Q. All right. So is it your -- is it your belief that it was -- Samsung wanted that to happen but it didn't happen, is that what you're saying?

MR. WATSON: Lacks foundation. 12:24PM

Highly Confidential - Attorneys' Eyes Only - Protective Order

A. I can't speak for what was -- what was negotiated or expected via marketing.

Q. All right. Do you know if the Galaxy Nexus was considered a hero phone? 12:24PM

A. I don't know that.

Q. Okay. Do you know if hero phones are -- are intended to create interest, drive interests in other phones? Is that part of the objective of a -- of a hero phone? 12:24PM

MR. WATSON: Vague and ambiguous.

A. I think to my understanding, hero model -- "hero model" is a term used by Verizon Wireless, and I can't speak as to what their intent is in that manner. 12:25PM

Q. Okay.

THE WITNESS: May I get some more water while you look?

MR. WATSON: We're pretty close to lunch. You want to take our break now. 12:26PM

MR. TORCHIA: Yeah, we're at the lunch break now.

THE VIDEOGRAPHER: The time is 12:26. We're going off the record.

(Luncheon recess is taken.) 12:27PM

Highly Confidential - Attorneys' Eyes Only - Protective Order

A F T E R N O O N S E S S I O N

(Time noted: 1:22 p m.)

* * *

THE VIDEOGRAPHER: The time is 1:22. 01:21PM Back on the record.

* * *

K E V I N G E K L I N S K Y, resumed and testified as follows:

EXAMINATION BY (Cont'd.) 01:22PM
MR. TORCHIA:

Q. All right. Mr. Geklinsky, I'm sorry but I would like to go back to Exhibit No. 4 to ask some more questions.

Exhibit No. 4 is the spreadsheet with 01:22PM your hand markings on it.

Now, just to sum up, I think we covered actual sell-in numbers and the total number of Galaxy Nexus sold -- strike that.

The total number of Galaxy Nexus 01:23PM units sold to carriers or Google as of May 4th [redacted]

A. Correct.

Q. And that's -- that's an actual, right? 01:23PM

Highly Confidential - Attorneys' Eyes Only - Protective Order

A. Yes.

Q. Okay. And the total actual sell-through to end-users as of May 4th that you calculated was [redacted], right? 01:23PM

A. Yes.

Q. And the projected sell-through to end-users up to the end of Q2, 2012 was [redacted] but not including an estimate for Google, correct? 01:24PM

A. Correct.

Q. And those are all U.S. numbers, correct?

A. Yes.

Q. Okay. Now, I don't think what we got 01:24PM yet is a sell-in number projected to the end of the second quarter of 2012. I think I forgot to ask for that, so I'd like to ask --

A. Okay.

Q. -- for that now. 01:24PM

MR. WATSON: And this is just for the second quarter?

BY MR. TORCHIA:

Q. The sell-in number of the Galaxy Nexus through second quarter. Do you understand 01:24PM

Page 70

Highly Confidential - Attorneys' Eyes Only - Protective Order
what I'm asking for?
A. Um-hmm. So my estimate, current forecast from beginning of sales through Q2 of 2012 would be [REDACTED] 01:25PM
Q. And have you noted that on the document, sir?
A. Um-hmm.
(Witness complies.)
MR. TORCHIA: And the next break 01:26PM we'll make yet another copy.
A. If I may pause a second. I'm just thinking on the Verizon -- let me think here.
It would be less than that. I know -- I know what the remaining quantity that 01:26PM we have on plan for Verizon, but it's not all -- it's not all in Q2. So I would have to readjust that, to the best of my knowledge.
Q. All right. And what would you readjust it to? 01:26PM
A. Bear with me one second.
(Witness calculating.)
A. [REDACTED]
Q. All right. And you noted that on the document, sir? 01:27PM

Page 71

Highly Confidential - Attorneys' Eyes Only - Protective Order
A. Yes.
Q. Okay.
MR. WATSON: Is now a good time to -- I just want to raise one thing. I don't 01:27PM mind leaving the exhibit number the same, but it occurs to me that we have copies that are now incomplete versions of what will ultimately be Exhibit 4.
Is that -- is that scanned in your 01:27PM system or anything yet?
MR. TORCHIA: (Nodding.)
MR. WATSON: So maybe what we should do is destroy these right now so that we make sure that there is not an Exhibit 4 01:27PM floating around that is not the final version, if that's agreeable to you.
MR. TORCHIA: I'm fine taking five and doing that. Let's go off the record and I'll make another copy and fix the 01:28PM record.
MR. WATSON: Okay.
THE VIDEOGRAPHER: The time is 1:28. We're going off the record.
(Recess is taken.) 01:29PM

Page 72

Highly Confidential - Attorneys' Eyes Only - Protective Order
THE VIDEOGRAPHER: The time is 1:30. We're back on the record.
BY MR. TORCHIA:
Q. So let me just help us for the 01:31PM record. On my copy, the very bottom number that you write is cut off because of just the copying, so maybe you can write it to the right and a little above.
Would that be okay, Mr. Geklinsky? 01:31PM
A. To the right here and above?
Q. Yeah.
(Witness complies.)
A. Do you need to make additional copies? 01:31PM
MR. WATSON: I think we're okay.
MR. TORCHIA: Yeah. We can make another copy at the end.
MR. WATSON: And just so the record is clear, that's Exhibit 4. The 01:31PM handwritten portions are the witness's and the type portions are counsel's.
MR. TORCHIA: Okay.
MR. WATSON: Typed portions are counsel's. 01:31PM

Page 73

Highly Confidential - Attorneys' Eyes Only - Protective Order
BY MR. TORCHIA:
Q. And did you see any inaccuracies in the numbers in the top portion when you compared them to declaration and to the chart, 01:32PM Mr. Geklinsky?
A. I didn't -- I didn't compare all of the numbers.
MR. WATSON: Do you want him to do that or... 01:32PM
Q. Do you remember seeing -- you can, if you'd like. I --
A. I haven't seen any errors, but I haven't checked every number here.
Q. Do the numbers seem right in the 01:32PM tables that you have seen given your knowledge of what the sales numbers are?
A. They seem correct.
Q. Okay. So let's move on.
Now, you've given us unit numbers in 01:32PM your testimony and in your declaration, correct?
A. Yes.
Q. Do you know what -- the revenues that Samsung has made for the sales of the Galaxy Nexus as of May 4th in the United States? 01:33PM

Highly Confidential - Attorneys' Eyes Only - Protective Order

A. I would have to have time to be able to calculate that, but I don't have that on the top of my head.

Q. Do you have an approximate idea? 01:33PM

We have approximately [redacted] nits as of May 4th, correct?

A. Correct.

Q. So what is the approximate revenue Samsung would have made for the sales of those 01:33PM units?

A. I'm not sure of the -- I am not aware of the pricing to Google or Sprint, so I wouldn't want to speak for their revenue. But -- 01:33PM

Q. So are you -- go ahead.

A. Given time, I can determine that.

Q. All right. Well, let me ask you this: Are you aware of the pricing for Verizon?

A. Yes. 01:33PM

Q. Do you know what the average price for Verizon for [redacted] would be?

MR. WATSON: Vague and ambiguous as to time.

Q. Let me restate that. 01:34PM

Highly Confidential - Attorneys' Eyes Only - Protective Order

Do you know what the average price of the Verizon constituent of the [redacted] would be?

A. Yes. 01:34PM

Q. What would that be?

A. [redacted]

Q. And what portion of [redacted] is Verizon -- [redacted] is Verizon?

A. [redacted] 01:34PM

Q. Okay. Would it be cruel to ask you to [redacted] -- you don't have to do it on that paper. I can give you a different one.

MR. WATSON: Let's have him write on something separate. 01:35PM

(Witness calculating.)

MR. WATSON: Somewhere his fifth grade math teacher would be very proud right now.

(Witness calculating.) 01:36PM

A. For the [redacted] if my math is correct, [redacted]

Q. Okay. So that's a revenue number, correct?

A. Correct. 01:36PM

Highly Confidential - Attorneys' Eyes Only - Protective Order

Q. So for the [redacted] Samsung made approximately [redacted] of revenue; is that right?

A. Correct. 01:36PM

Q. All right. And you would expect that there would be some more revenue associated with the Sprint and Google sales, but you're not sure what that is?

A. Correct. 01:37PM

Q. Okay. How would you determine that information, Mr. Geklinsky?

A. Further discussion with Brian Charity and Curt Matson.

Q. Now, do you know what portion of that 01:37PM revenue that we just discussed would be profit?

A. I do not. I don't have visibility to that.

Q. All right. Do you know, with respect to Verizon, whether any other Android phone 01:37PM outperformed the Galaxy Nexus in the fourth quarter of 2011?

MR. WATSON: Vague and ambiguous.

Q. Do you understand that question?

Sold more units. Is that more clear than 01:38PM

Highly Confidential - Attorneys' Eyes Only - Protective Order

"outperformed"?

A. I'm -- I'm just trying to think.

MR. WATSON: May lack foundation.

Q. How about we restate the whole 01:38PM question for the record. I'll do that for you.

Are you aware of any Android phone that sold more units than the Galaxy Nexus in the United States in the fourth quarter of 2011 on Verizon? 01:38PM

A. Without having the data in front of me, I would believe that there were quite a few in Q4 and possibly -- possibly our Droid Charge. Again, without having the data in front of me, I can't -- I can't answer for sure. 01:38PM

Q. So you're not sure?

A. Not sure.

Q. All right. Do you know how the Galaxy Nexus has performed on Sprint relative to other Android phones? 01:39PM

A. I do not.

Q. Did you do anything to determine that in preparation for your deposition today?

A. I did not ask how -- how the sell-through compared to other Android phones on 01:39PM

Page 78

Highly Confidential - Attorneys' Eyes Only - Protective Order

Sprint's network.
MR. TORCHIA: I'd like to mark as Exhibit 6, a document with control No. S-ITC-600027846 to 600027905. It's a 01:40PM document entitled, "Verizon Weekly GM Report," dated January 9th, 2012.
(Plaintiff's Geklinsky Exhibit 6, "Verizon Weekly GM Report," Bates stamped S-ITC-600027846 to 600027905, marked for 01:40PM identification, as of this date.)
BY MR. TORCHIA:
Q. Do you recognize the document I've marked as Exhibit 6, Mr. Geklinsky?
(Document review.) 01:41PM
A. Yes.
Q. What is this document?
A. Weekly report of account activity and related information.
Q. Who would have prepared this 01:42PM document?
A. Um, generally the document is compiled by me from data from various sources and submissions by other account team members.
Q. All right. Let's turn to page '848. 01:43PM

Page 79

Highly Confidential - Attorneys' Eyes Only - Protective Order

MR. WATSON: Do you have one more copy of that?
MR. TORCHIA: I think I might.
(Handing.) 01:43PM
MR. WATSON: Thank you.
BY MR. TORCHIA:
Q. Do you see page '848, Mr. Geklinsky?
A. Yes.
Q. See where it says, "VZW sales focus 01:43PM first quarter, 2012" at the top?
A. Yes.
Q. Now, tell me just generally what the slide refers to. What is the information on this slide? 01:43PM
A. Generally the target column is a representation of quarterly targets for the account team.
AP1 is an indication of the cust -- combined customers forecast for purchase. AP2 01:44PM would be would be the account team's demand plan. And then, of course, the gap between those.
Q. All right. So there's no actual sales numbers here? 01:44PM

Page 80

Highly Confidential - Attorneys' Eyes Only - Protective Order

A. No. These are all forecast and for the quarter.
Q. All right. And, um, these forecasts that you prepared -- did you prepare these 01:44PM forecasts, Mr. Geklinsky?
A. I can't say I prepared the forecast. The AP1 is the customer's forecast. AP2 is the account team consensus forecast.
Q. I see. 01:45PM
Um, and now, the Galaxy Nexus is listed at the top, correct?
A. Correct.
Q. Are these phones -- are these -- these other phones here below, are they all 01:45PM Samsung phones?
A. Yes.
Q. All right. Now, so -- and let me ask you, are these all Droid phones? Or are some of them phones with other platforms? 01:45PM
A. There are others as well.
Q. Okay. Um, are there any phones -- are there any Samsung phones that are not listed on this table that were being carried at Verizon at the time? 01:45PM

Page 81

Highly Confidential - Attorneys' Eyes Only - Protective Order

A. Yes.
Q. Okay. So what are those?
A. Those would be, for example, could be basic feature phones that have no gap between 01:46PM forecasts. [redacted]
Q. I see. 01:46PM
Are all of Samsung's smartphones listed on this table, deployed at Verizon, that is?
MR. WATSON: Vague as to time, but...
A. I'm just trying to think. I -- I 01:46PM would have to say yes, it does appear that they're all listed.
Q. Okay. And the Galaxy Nexus is listed as the top in terms of what Samsung was targeting, correct, at [redacted] for the 01:47PM first quarter?
MR. WATSON: Misstates the document.
Q. Why don't you tell me why the Galaxy Nexus was listed at the top.
A. This was -- it was not listed for any 01:47PM

21

TSG Reporting - Worldwide 877-702-9580

Page 82

Highly Confidential - Attorneys' Eyes Only - Protective Order

particular reason at the top. They're not sorted in any particular manner. In the following week, it could have been listed in a different order. 01:47PM

Q. All right. You had a target of [REDACTED] right? Is that what -- is that what states, the document?

A. For account team targets, yes.

Q. All right. And AP 1, that is -- is that the carrier estimate or is that Samsung's estimate? 01:47PM

A. That's the carrier. And again, stating carrier meaning they're distributor partners as well. 01:48PM

Q. I see.

[REDACTED] is that Samsung's estimate?

A. That represents the -- that represents the current demand plan schedule for -- schedule for demand in production. 01:48PM

Q. [REDACTED]

A. [REDACTED] 01:48PM

Page 83

Highly Confidential - Attorneys' Eyes Only - Protective Order

[REDACTED]

Q. All right. Is it fair to say that as of this time, the Galaxy Nexus was one of -- or was Samsung's leading smartphone on Verizon? 01:49PM

MR. WATSON: Vague.

Q. Is that a fair statement?

A. I would have to recall, which I can't -- I can't off the top of my head, the launch date [REDACTED] 01:49PM

Q. But as of this time -- but so you -- is the answer you don't know or -- 01:49PM

A. Well, I'd -- I'd have to determine -- and, again, I don't know if I can determine if [REDACTED]

Q. Why would you need that information to know whether the Galaxy Nexus as of this time was Samsung's leading phone at Verizon? 01:50PM

A. [REDACTED] 01:50PM

Page 84

Highly Confidential - Attorneys' Eyes Only - Protective Order

[REDACTED]

Q. All right. So let's flip to page 855. 01:50PM

(Document review.)

Q. Now, you see how page 855 has a slide that's entitled, "VZW Product Dashboard"?

A. Yes.

Q. All right. Did you prepare this slide? 01:50PM

A. No, I did not.

Q. Do you know who prepared this slide?

A. That would be the director of product management. 01:50PM

Q. I want to make sure we're looking at the same one. Are you on page 27855?

A. Yes.

Q. Does it say, "VZW Product Dashboard" at the top? 01:51PM

A. It does.

Q. Okay. Now, on the row i515, it says -- the first row it says, "i515 Galaxy Nexus." Do you see that?

A. Um-hmm. 01:51PM

Page 85

Highly Confidential - Attorneys' Eyes Only - Protective Order

Q. What does i515 signify?

A. That's just the model number, the SKU of the product.

Q. Okay. So if we see i515 elsewhere, that means Galaxy Nexus? 01:51PM

A. Yes.

MR. WATSON: Lacks foundation.

Q. [REDACTED] 01:51PM

Do you see that?

A. I see what it says.

Q. All right. [REDACTED]

A. I see that. 01:51PM

Q. Um, you reviewed this document before -- before it was completed, correct?

A. I had -- I had compiled the individual reports, this being one of those individual reports. 01:52PM

Q. Do you ever recall correcting the information on page 855?

A. I don't recall correcting the information.

Q. Okay. What does -- [REDACTED] is 01:52PM

Page 106

Highly Confidential - Attorneys' Eyes Only - Protective Order

customer buying decisions, we -- we respond to what the customers are saying they're buying the product for.

Q. Okay. So would you believe it's -- 02:30PM it's fair to say that survey -- customer surveys focus on newer features?

MR. WATSON: Lacks foundation.

A. I don't have visibility as -- as to that. 02:30PM

Q. All right. How about advertisement, when you see phones trying to differentiate themselves from their competitors, do they point to baseline functionality that everybody has, or do they point to features that make them 02:31PM different from their competitors? What's your experience?

A. Unfortunately most of my visibility is to Verizon's advertising that doesn't point to much, so -- except for maybe a price point. 02:31PM But, you know, again I think advertising has been done in many ways.

Q. So would it -- would it surprise you to see that advertising doesn't focus on features that are baseline features that are the 02:31PM

Page 107

Highly Confidential - Attorneys' Eyes Only - Protective Order

same across most smartphones out there? That wouldn't surprise you, right?

A. I don't think that would surprise me.

Q. 02:31PM

02:32PM

: Asked and answered.

A. I think it's dependent on the customer's intended use of the product.

Q. 02:32PM

A. I -- I wouldn't say it's important or unimportant. 02:32PM

02:32PM

Page 108

Highly Confidential - Attorneys' Eyes Only - Protective Order

Q. Not to every user. Let's put it this way: 02:33PM

A. I would say we would be at a disadvantage.

Q. And if er compared to competitive phones, you would be at a disadvantage, right? 02:33PM

A. In theory, if we had a reputation for having a poor performance, I would have to assume.

Q. Okay. 02:33PM

A. Again, if we had a bad rep -- a bad review for not having I would assume that we would be at a disadvantage. 02:34PM

Q. All right. And if you had a bad review for having that would put you at a disadvantage against your competitors, too, right?

A. Again, I think it -- it depends on 02:34PM

Page 109

Highly Confidential - Attorneys' Eyes Only - Protective Order

the overall product. I think in some ways that there may be other benefits of the product that may outweigh.

Q. Well, you certainly agree that it's 02:34PM not good to have bad reviews out there of the -- of basic core functionality of your products? I think you said that. That's not a good thing to have. That will hurt you in the marketplace, right? 02:34PM

MR. WATSON: Mischaracterizes prior testimony.

A. I -- I think it would be -- it would be common sense to say that a bad review would not -- would not be favorable. 02:34PM

Q. Okay. Now, the Galaxy Nexus -- the Galaxy Nexus has 02:35PM

A. Yes.

Q. Okay. And with respect to the Galaxy Nexus, the Galaxy Nexus doesn't have a classic keyboard on it, right?

A. That's correct. 02:35PM

Highly Confidential - Attorneys' Eyes Only - Protective Order

Q. How do you enter text into a Galaxy Nexus?

A. By touching the screen to type.

Q. There's a keyboard on the touchscreen 02:35PM of the Galaxy Nexus that's displayed to you, right?

A. Correct.

Q. And you have to type on that touchscreen keyboard, right? 02:35PM

A. Correct.

Q. Now, have you ever heard -- were you -- strike that.

Now, you're aware that not too long ago, most people who were typing on smartphones 02:35PM were typing for the most part on tactile keyboards, right?

A. Meaning a separate keyboard for the product?

Q. Yeah, a hardware plastic keyboard? 02:36PM

A. I can't -- I wouldn't say most people.

Q. Five years ago?

A. I -- I would assume.

Q. Five years ago, most people who were 02:36PM

Highly Confidential - Attorneys' Eyes Only - Protective Order

doing email on a smartphone were typing on a real tactile keyboard; is that right?

A. I would assume.

Q. And you would also agree that when 02:36PM there was a move from tactile keyboards to people typing on soft keyboards or glass, there is a lot of skepticism where people thought that, gee, I'm not going to be able to move from typing to a tactile keyboard to a glass 02:36PM keyboard; that's true, right?

MR. WATSON: Lacks foundation.

A. I personally didn't experience that. We've had touchscreen keyboards for a number of years in our product, in our product offerings 02:36PM at Verizon.

Q. You aware of that being a sentiment generally; that there was a lot of -- that there was resistance to a fair number of people in moving from tactile keyboards to touchscreen 02:37PM keyboards?

A. No, I am not aware of that.

Q. You've never heard -- have you ever heard of anyone describing a resistance from moving from a tactile keyboard to a touchscreen 02:37PM

Highly Confidential - Attorneys' Eyes Only - Protective Order

keyboard?

A. Not personally, no, I have not.

Q. All right. Let's talk about the typing experience on the Galaxy Nexus. 02:37PM

You would agree that it's important to offer customers of the Galaxy Nexus a good typing experience, right?

MR. WATSON: Vague and ambiguous.

A. I would agree it's beneficial to have 02:37PM a good typing experience.

Q. All right. And you would further agree that if in the reviews of the Galaxy Nexus, it's review as having a bad typing experience, if that happened, that would be 02:38PM something that would be a disadvantage, correct?

A. I wouldn't agree entirely. I think that if -- if the keyboard was -- was reviewed poorly but other features were -- were positive, then it -- then it could still be a positive 02:38PM device, positive experience.

Q. The device as a whole could be a positive experience. But focusing on that one feature, you don't want a bad review about your typing experience; isn't that right? 02:38PM

Highly Confidential - Attorneys' Eyes Only - Protective Order

A. It would be preferred not to have a bad review.

Q. And in fact, typing is integral to a number of applications that are offered on the 02:38PM Galaxy Nexus; isn't that true? Email, text messaging, browser support; isn't that true?

A. I would say it's a necessity.

Q. Okay. Now, you're aware that Samsung offers a feature that corrects mistakes while a 02:39PM user is typing on a Galaxy Nexus, right?

A. I am aware that it's available. I'm not -- I'm not aware if it's Samsung or if it's provided by Google.

Q. But you are aware on the Galaxy Nexus 02:39PM there is functionality that allows for the automatic correction of text while a user is typing, right?

A. I am aware of the functionality.

Q. And that is -- that functionality is 02:39PM designed to improve the typing experience, correct?

A. I would -- I would assume that to be the intent. I'm not -- I'm not aware of the -- the development stage, so I would have to make 02:40PM

Page 114

Highly Confidential - Attorneys' Eyes Only - Protective Order
that assumption.
Q. Okay. Let's take a look at a couple of documents.
MR. TORCHIA: Let's take a five-minute break to get some water first. 02:40PM
THE VIDEOGRAPHER: The time is 2:40. We are going off the record.
(Recess is taken.)
THE VIDEOGRAPHER: The time is 2:41. We're back on the record. 02:41PM
MR. TORCHIA: I'd like to mark as Exhibit 8, a document with control No. SAMNDCA630-00055959 to 55980, document entitled, "Media Lab Analysis Galaxy Nexus." 02:42PM
(Plaintiff's Geklinsky Exhibit 8, Document entitled, "Media Lab Analysis Galaxy Nexus," Bates stamped SAMNDCA630-00055959 to 55980, marked for identification, as of this date.) 02:42PM
BY MR. TORCHIA:
Q. Do you recognize this document, Mr. Geklinsky?
A. No, I do not. 02:43PM

Page 115

Highly Confidential - Attorneys' Eyes Only - Protective Order
Q. Okay. Um, do you have -- apart from this specific document, do you know what a media lab analysis is?
A. This is not something that I have received in the past for any product. 02:44PM
Q. Okay. And it's not something you looked at obviously in preparation for your deposition today?
A. Correct. 02:44PM
Q. Do you know who the media QA lab is?
A. I do not.
Q. Do you know -- so you don't know what the division of Samsung that -- that lab would be, right? 02:44PM
A. I do not.
Q. Okay. [REDACTED]
MR. WATSON: '71? 02:45PM
MR. TORCHIA: Yes, '971.
(Document review.)
Q. Let's actually go to the first page first where they give us some basic understanding, which is '960. It's the second 02:45PM

Page 116

Highly Confidential - Attorneys' Eyes Only - Protective Order
page actually. All right.
See here -- see here how it says -- the top of the -- of the page says, "Complete CR score predictions"? 02:46PM
A. Yes.
Q. And then it lists a number of, I guess, categories [REDACTED] 02:46PM
Do you see that?
A. Yes, I see that.
Q. And you see how it's got scores next to each one of those?
A. Yes. 02:46PM
Q. Okay. And those scores rate from poor to excellent, right?
A. Yes.
Q. And they're -- you can see what they are based on how filled in the circle is, right? 02:46PM
A. That's correct.
Q. Okay. Now, one of those is -- is messaging. Do you see that?
A. Yes.
Q. [REDACTED] 02:46PM

Page 117

Highly Confidential - Attorneys' Eyes Only - Protective Order
MR. WATSON: Lacks foundation.
Q. [REDACTED] 02:47PM
A. [REDACTED]
Q. I'll take you -- I'll take you to page '971 where it actually talks about messaging. 02:47PM
(Document review.)
Q. [REDACTED] 02:47PM
MR. WATSON: Lack of foundation.
A. What it appears on this page.
Q. Okay. See how it says, [REDACTED] 02:48PM
A. I see that on the page.
Q. Now, that is something that the Galaxy Nexus -- is that something that Samsung 02:48PM

Page 118

Highly Confidential - Attorneys' Eyes Only - Protective Order
touted as an improvement to the Galaxy Nexus?
MR. WATSON: Vague and ambiguous.
Lacks foundation.
A. I don't recall any reference to it 02:48PM
being touted in the Galaxy Nexus.
Q. Would you agree [REDACTED] o
[REDACTED]
[REDACTED]
MR. WATSON: Asked and answered. 02:48PM
Vague and ambiguous.
A. Again, as I read this, I have no
indication as to whether it's improved over
pre -- earlier version of Galaxy Nexus or other
products in the marketplace, so I can't really 02:49PM
provide an answer on that.
Q. All right. Let's flip to the next
page, which is 973.
All right. Before we do that, I just
want to ask you one more question. 02:49PM
MR. WATSON: So we're back on 971?
MR. TORCHIA: Yeah, back on 971.
Q. [REDACTED]
[REDACTED]
[REDACTED] 02:50PM

Page 119

Highly Confidential - Attorneys' Eyes Only - Protective Order
A. I see that referenced.
Q. Do you have any reason to believe
that -- do you have any reason to believe that
this document is incorrect in the way that it's 02:50PM
evaluating [REDACTED] of the
Galaxy Nexus?
MR. WATSON: Lacks foundation.
A. I don't -- I don't know what criteria
they used to form that conclusion. 02:50PM
Q. And do you have any reason to believe
that the [REDACTED]
[REDACTED]
[REDACTED]
[REDACTED] 02:51PM
MR. WATSON: Lacks foundation. Vague
and ambiguous.
A. I have no indication as to what the
rating was or what the criteria used to
determine the rating. 02:51PM
Q. All right. Let's go to 973.
Do you see the words, [REDACTED]
under the last bullet? It says "comparative
features" on the top. Do you see that?
A. Yes, I see that here. 02:51PM

Page 120

Highly Confidential - Attorneys' Eyes Only - Protective Order
Q. You see how it says [REDACTED] at
the last bullet?
A. I see that.
Q. All right. Do you know what [REDACTED] 02:51PM
[REDACTED] is?
A. I'm -- I'm familiar with the
function.
Q. Is [REDACTED] a feature on the
Galaxy Nexus? 02:51PM
A. Yes.
Q. Is it an important feature on the
Galaxy Nexus?
A. [REDACTED]
[REDACTED] 02:52PM
[REDACTED]
Q. Okay. Would you say it is less
important than the four features you looked at
in connection with preparing for your deposition
today? 02:52PM
MR. WATSON: Compound. Vague and
ambiguous. Lacks foundation.
Q. Or more important?
A. [REDACTED]
[REDACTED] 02:52PM

Page 121

Highly Confidential - Attorneys' Eyes Only - Protective Order
[REDACTED]
[REDACTED]
[REDACTED]
[REDACTED] 02:52PM
[REDACTED]
[REDACTED]
[REDACTED]
[REDACTED]
Q. Okay. When you say "identified," 02:53PM
what are you referring to? Identified by who?
Customer surveys?
A. By customer surveys as to features
and reasons that influence their buying
decisions. 02:53PM
MR. TORCHIA: Let's move to
Exhibit 7.
MR. WATSON: Move back to Exhibit 7?
MR. TORCHIA: Oh, what are we on now?
MR. WATSON: This is 8. 02:54PM
MR. TORCHIA: So we're on 9. I'm
sorry.
I'd like to mark as Exhibit 9 a
document control No. SAMNDCA630149504 to
149512. 02:55PM

Highly Confidential - Attorneys' Eyes Only - Protective Order

(Plaintiff's Geklinsky Exhibit 9, Document entitled "Verizon Post UT, Bates stamped SAMNDCA630149504 to 149512" marked for identification, as of this date.) 02:54PM

BY MR. TORCHIA:

Q. I'll give you a moment to read that document, Mr. Geklinsky.

(Document review.)

MR. WATSON: I assume you don't have 02:56PM a translation?

MR. TORCHIA: No.

Q. Do you recognize this document, Mr. Geklinsky?

A. No, I do not. 02:56PM

Q. Do you know what "NJ Post UT" means?

A. From the content of the report, I would have to believe that it may be user trial team, but that would be a guess.

Q. Okay. All right. You can put it to 02:57PM the side.

(Witness complies.)

Q. Are you familiar with a feature on the Galaxy Nexus called the Google quick search box? 02:58PM

Highly Confidential - Attorneys' Eyes Only - Protective Order

A. I'm aware of the Google search box that's on the display.

Q. What is the Google search box that's on the display? 02:58PM

A. It --

Q. What's your understanding of what that feature does?

A. It's a search feature.

Q. What's your understanding of how it 02:58PM works at the highest level. I just want to make sure I understand what your understanding is.

A. That you would enter a search criteria and it would search.

Q. Okay. And do you know where is that 02:58PM search box on the Galaxy Nexus? When somebody powers up the Galaxy Nexus, where is that search box?

A. To the best of my knowledge, it's on the top of the display. 02:58PM

Q. Is -- is it on the top of the display on the home screen?

A. It is on mine.

Q. Okay. You own a Galaxy Nexus?

A. Yes. 02:59PM

Highly Confidential - Attorneys' Eyes Only - Protective Order

Q. All right. Do you know if that is a -- if that is on by default so that the quick search box appears at the top of the display on the home screen by default? 02:59PM

A. It's my understanding that it was when the product was launched. I'm not sure if that is still the case in subsequent software upgrades, for example.

Q. Do you know if there is a setting 02:59PM that you can activate that will take it off of the -- off of the home page or make it so it's not there when you start up?

A. I haven't tried it, so I'm not sure that you can or cannot. 02:59PM

Q. Do you know why that search box is on the home screen as opposed to some other place on the device?

A. I do not know why.

Q. So um -- did you talk to anyone in 03:00PM preparation for your deposition about why the search bar was included in the Galaxy Nexus?

A. No, I did not.

Q. Is it your knowledge that Samsung puts a little -- Samsung puts a little-used 03:00PM

Highly Confidential - Attorneys' Eyes Only - Protective Order

features on the home screen versus under other menus or under other places on the -- on the devices?

MR. WATSON: Lacks foundation. 03:01PM Vague. Argumentative.

A. It's -- it's my understanding this was a design by Google, so I would say that your question would pertain to the Galaxy Nexus.

Q. Okay. So are you saying that it was 03:01PM not Samsung's decision to put the -- the search bar on the home screen of the device?

MR. WATSON: Lacks foundation.

A. I don't have knowledge as to whether it was or was not. 03:01PM

Q. Do you have knowledge as -- as to whether that was put their so users could have access to that immediately when they turn on the device?

MR. WATSON: Lacks foundation. 03:01PM

A. I don't -- I'm not aware of this theory in where or why it was placed.

Q. Okay. So as far as you know, [redacted]

[redacted] Couldn't 03:02PM

Page 126

Highly Confidential - Attorneys' Eyes Only - Protective Order
that be a reason it was put there?
A. Again, I don't have the knowledge as to why the decision was made to place it where -- where it is. 03:02PM
Q. Do you know how long the [redacted] has been supported on Samsung's phones?
A. I do not.
Q. Now, I believe you said that the 03:03PM [redacted]
A. From information that was shared with me [redacted] 03:03PM
Q. Do you know if those surveys asked 03:03PM questions about the Google search box?
A. I -- I do not know that. [redacted] 03:03PM

Page 127

Highly Confidential - Attorneys' Eyes Only - Protective Order
[redacted]
Q. Do you know if the survey was designed to understand [redacted] 03:04PM
A. I don't have visibility to that.
Q. Okay. Now, [redacted] 03:04PM
A. Again, I have no visibility to that information. 03:04PM
Q. So as far as you know, [redacted]
MR. WATSON: Lack of foundation.
A. Again, I have no visibility to that. 03:04PM
Q. As Samsung's 30(b)(6) witness on this topic today, you're not prepared [redacted] 03:05PM

Page 128

Highly Confidential - Attorneys' Eyes Only - Protective Order
MR. WATSON: Vague and ambiguous.
A. [redacted] ature [redacted]. 03:05PM
Q. [redacted] You just don't have the information to do that?
MR. WATSON: Vague and ambiguous. Lacks foundation. 03:05PM
A. I can neither confirm nor deny.
Q. Okay.
MR. TORCHIA: Let's go off the record for about five minutes.
MR. WATSON: Sure. 03:05PM
THE VIDEOGRAPHER: The time is 3:05. We're going off the record.
(Recess is taken.)
THE VIDEOGRAPHER: The time is 3:09. We're back on the record. 03:09PM
BY MR. TORCHIA:
Q. All right. So let's talk about word correction. [redacted] 03:09PM

Page 129

Highly Confidential - Attorneys' Eyes Only - Protective Order
[redacted]
MR. WATSON: Excuse me one second. I lost the -- 03:10PM
(Discussion off the record.)
A. Would you mind repeating the question? I'm sorry.
Q. Sitting here today, you don't have the information to deny that [redacted] 03:10PM
A. I'm -- I'm confident we have the information and what influences customers' buying decisions, [redacted] 03:10PM
Q. Okay. So let me ask you, apart from 03:11PM what the actual surveys are showing about what consumers have reported in surveys, can you tell [redacted] whether Samsung considers that a core feature in its product? 03:11PM

Page 130

Highly Confidential - Attorneys' Eyes Only - Protective Order

MR. WATSON: Lacks foundation.

A. I don't have the expertise to be able to provide that answer.

Q. Okay. Now, let's talk about -- let's 03:11PM ask the same question with respect to [redacted] You don't have the information today to [redacted]

MR. WATSON: Hang on. Lacks 03:11PM foundation.

A. The -- the information and understanding I have, again, is [redacted] 03:12PM

Q. Okay. So what about [redacted] 03:12PM

A. [redacted]

Q. Okay. But you don't have any 03:13PM

Page 131

Highly Confidential - Attorneys' Eyes Only - Protective Order

information to deny [redacted]

MR. WATSON: Vague and ambiguous. 03:13PM Lacks foundation.

A. [redacted] 03:13PM

Q. All right. I'd like to ask from an engineering perspective, apart from whatever results you're seeing in customer surveys, I'd like to ask you if you have a basis to deny that Samsung considers this a core feature with 03:13PM respect to the engineering of its products apart from what customers know or do not know.

Do you understand that question?

MR. WATSON: Vague and ambiguous. Lacks foundation. 03:14PM

Q. From an engineering perspective, did you look into whether this is a core feature from an engineering perspective?

A. I didn't review that particular question in preparing for this deposition. 03:14PM

Page 132

Highly Confidential - Attorneys' Eyes Only - Protective Order

Q. Okay. So right now [redacted] 03:14PM

MR. WATSON: Objection. Lacks foundation. Vague and ambiguous.

A. Again, I can't -- I'm not -- I don't know that I have the expertise as to whether -- whether something is a core feature or the 03:15PM definition of core feature.

Q. All right. So the [redacted] 03:16PM

A. Yes.

Q. Does that feature have a name in the Galaxy Nexus? 03:16PM

A. If it does, I'm not aware of it.

Q. But you are familiar -- that is one of the features you looked into in preparation for your deposition today?

A. It's one of the features that -- that 03:16PM

Page 133

Highly Confidential - Attorneys' Eyes Only - Protective Order

was reviewed.

Q. Okay. Now, you don't have any basis [redacted] 03:16PM

MR. WATSON: Lacks foundation. Vague and ambiguous.

Q. Is that right?

[redacted] 03:17PM

MR. TORCHIA: All right. I have no further questions. 03:18PM

MR. WATSON: All right. I don't know what the stipulation is we're using for this round, but I assume it's the same stipulation we were using when we were taking depos. So let's stipulate to the 03:18PM usual stipulations.

MR. TORCHIA: What does that mean?

MR. WATSON: I don't know. I never actually heard the heard the whole thing.

MR. TORCHIA: Whatever happened 03:18PM

Highly Confidential - Attorneys' Eyes Only - Protective Order

before is --

MR. WATSON: It will be fine.

Exactly.

THE VIDEOGRAPHER: The time is 3:18. 03:18PM

This is end of the deposition May 7, 2012.

__________________________

KEVIN GEKLINKSY

Subscribed and sworn to before me

this day of 2012.

________________________________

C E R T I F I C A T E

STATE OF NEW YORK )

: ss.

COUNTY OF WESTCHESTER )

I, ANNETTE ARLEQUIN, a Notary Public within and for the State of New York, do hereby certify:

That KEVIN GEKLINKSY, whose deposition is hereinbefore set forth, was duly sworn by me, and that the transcript of such depositions is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 7th day of May, 2012.

___________________________________

ANNETTE ARLEQUIN, CCR, RPR, CLR

I N D E X

| Witness | Page |
|---|---|
| KEVIN GEKLINSKY | |
| MR. TORCHIA | 5 |

------------- INFORMATION REQUESTS --------------

DIRECTIONS NOT TO ANSWER:

| Page | Line |
|---|---|
| 27 | 10 |
| 28 | 8 |
| 29 | 5 |
| 31 | 19 |
| 45 | 2 |

I N D E X O F E X H I B I T S

| Description | Page |
|---|---|
| Plaintiff's Geklinsky Exhibit 1, Apple Inc.'s Second Notice of Rule 30(b)(6) Deposition to Defendants | 4 |
| Plaintiff's Geklinsky Exhibit 2, Declaration of Kevin Geklinsky | 4 |

I N D E X O F E X H I B I T S(Cont'd )

| Description | Page |
|---|---|
| Plaintiff's Geklinsky Exhibit 3, Supplemental Declaration of Kevin Geklinsky | 4 |
| Plaintiff's Geklinksy Exhibit 4, Excel Spreadsheet | 50 |
| Plaintiff's Geklinsky Exhibit 5, "Defeating Apple At Verizon," Bates stamped SAMDCA 630-95422 through 95437 | 63 |
| Plaintiff's Geklinsky Exhibit 6, "Verizon Weekly GM Report," Bates stamped S-ITC-600027846 to 600027905 | 78 |
| Plaintiff's Geklinsky Exhibit 7, Document entitled "Verizon Weekly GM Report," dated January 30th, 2012, Bates stamped S-ITC-600028078 to 600028141 | 91 |
| Plaintiff's Geklinsky Exhibit 8, Document entitled, "Media Lab Analysis Galaxy Nexus," Bates stamped SAMNDCA630-00055959 to 55980 | 114 |
| Plaintiff's Geklinsky Exhibit 9, Document entitled "Verizon Post UT, Bates stamped SAMNDCA630149504 to 149512" marked for identification, | 122 |