JOSH A. KREVITT (CA SBN 208552)
jkrevitt@gibsondunn.com
H. MARK LYON (CA SBN 162061)
mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, California 94304-1211
Telephone: (650) 849-5300
Facsimile: (650) 849-5333

WILLIAM F. LEE (*pro hac vice*)
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

HAROLD J. MCELHINNY (CA SBN 66781)
hmcelhinny@mofo.com
MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

MARK D. SELWYN (SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

*Attorneys for Plaintiff and Counterclaim-Defendant Apple Inc.*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>        Plaintiff,<br><br>   vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>        Defendants. | Civil Action No. 12-CV-00630-LHK<br><br>**JURY TRIAL DEMANDED**<br><br>**COUNTERCLAIM-DEFENDANT APPLE INC.'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN REPLY TO SAMSUNG'S COUNTERCLAIMS** |
| SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>        Counterclaim-Plaintiffs,<br><br>   v.<br><br>APPLE INC., a California corporation,<br><br>        Counterclaim-Defendant. | |

1

2

**INTRODUCTORY STATEMENT**

3      1.      This is Apple Inc.'s ("Apple") responsive pleading under Fed. R. Civ. P. 12, and

4 contains Apple's defenses to the counterclaims asserted by defendants and counterclaim-

5 plaintiffs Samsung Electronics Co., Ltd. ("SEC"), Samsung Electronics America, Inc. ("SEA"),

6 and Samsung Telecommunications America, LLC ("STA," and collectively with SEC and SEA,

7 "Samsung" or "Samsung Counterclaimants"), as well as Apple's Counterclaims In Reply to

8 Samsung's Counterclaims.

9      2.      Apple responds to the allegations contained in the numbered paragraphs of

10 Samsung's Counterclaims below, but first provides this overview of its response.

11

12      3.      With respect to Samsung's counterclaims of patent infringement, Apple denies

13 that it infringes any valid claim of the patents identified in Claims III - X of Samsung's

14 Counterclaims ("Samsung Asserted Patents").

15      4.      At various times, Samsung declared two of the Samsung Asserted Patents to the

16 European Telecommunications Standards Institute ("ETSI"), a leading standard-setting

17 organization ("SSO"), as purportedly essential to practice the Universal Mobile

18 Telecommunications System ("UMTS") standard, the world's most widely adopted

19 telecommunications standard.  (The patents Samsung has declared essential to the UMTS

20 standard are referred to collectively herein as the "Declared-Essential Patents.")  However,

21 Samsung deliberately and deceptively failed to disclose its purported intellectual property rights

22 ("IPR") to the Third Generation Platform Partnership ("3GPP"), the SSO that set the UMTS

23 standard, before its members decided to incorporate into the standard technologies purportedly

24 covered by Samsung's patents, in violation of ETSI's IPR policy.  Furthermore, Samsung issued

25 a written declaration to the SSO, committing to license its Declared-Essential Patents to all

26

27

28

implementers of the UMTS standard on fair, reasonable, and non-discriminatory ("FRAND")

terms, but when 3GPP was considering alternative technologies, deliberately and deceptively

concealed from 3GPP and its constituent SSOs that it in fact would not offer FRAND license

terms.  Accordingly, as to all patents Samsung has declared essential to the UMTS standard,

Apple is entitled to a license on FRAND terms.

## APPLE'S ANSWER TO SAMSUNG'S COUNTERCLAIMS

Apple hereby responds to each numbered paragraph of the Counterclaims as follows:

1.      Apple admits that SEC and STA (collectively, the "Samsung Patent

Counterclaimants") purport to seek declarations and judgments for alleged patent infringement.

Except as expressly admitted, Apple denies the remaining allegations in Paragraph 1 of the

Counterclaims.

2.      Apple admits that the Samsung Counterclaimants purport to seek declarations of

noninfringement and invalidity for each of the Apple patents in suit.  Except as expressly

admitted, Apple denies the remaining allegations in Paragraph 2 of the Counterclaims.

## NATURE OF THE ACTION[1]

3.      Apple admits that the Samsung Patent Counterclaimants' Counterclaims purport

to be an action for patent infringement.  Except as expressly admitted, Apple denies the

remaining allegations in Paragraph 3 of the Counterclaims.

4.      Apple admits that the Samsung Counterclaimants' Counterclaims purport to be an

action for a declaratory judgment of invalidity and non-infringement of the Apple patents in suit.

---

[1] For convenience and clarity, Apple's Answer uses the same headings as set forth in Samsung's
Counterclaims.  In so doing, Apple does not admit any of the allegations contained in Samsung's
headings.

Except as expressly admitted, Apple denies the remaining allegations in Paragraph 4 of the Counterclaims.

## THE PARTIES

5.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 5 of the Counterclaims.

6.     Apple admits the allegations in Paragraph 6 of the Counterclaims.

7.     Apple admits the allegations in Paragraph 7 of the Counterclaims.

8.     Apple admits the allegations in Paragraph 8 of the Counterclaims.

## JURISDICTIONAL STATEMENT

9.     Apple admits that the Samsung Counterclaims purport to be actions for patent infringement under the patent laws of the United States, and actions for declaratory relief under the Declaratory Judgment Act, and the patent laws of the United States.  Except as expressly admitted, Apple denies the remaining allegations in Paragraph 9 of the Counterclaims.

10.     Apple admits the allegations in Paragraph 10 of the Counterclaims.

11.     Apple admits that this Court has personal jurisdiction over Apple for this action.

12.     Apple admits, for purposes of this action only, that venue is proper in this District.

13.     Apple admits the allegations in Paragraph 13 of the Counterclaims.

## FACTUAL BACKGROUND

14.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14 of the Counterclaims, and therefore denies the same.

15.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 of the Counterclaims, and therefore denies the same.

16.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 of the Counterclaims, and therefore denies the same.

17.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17 of the Counterclaims, and therefore denies the same.

18.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 of the Counterclaims, and therefore denies the same.

19.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 of the Counterclaims, and therefore denies the same.

20.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 of the Counterclaims, and therefore denies the same.

21.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 of the Counterclaims, and therefore denies the same.

22.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 of the Counterclaims, and therefore denies the same.

23.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 of the Counterclaims, and therefore denies the same.

24.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 of the Counterclaims, and therefore denies the same.

25.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25 of the Counterclaims, and therefore denies the same.

## SAMSUNG'S INTELLECTUAL PROPERTY RIGHTS

26.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26 of the Counterclaims, and therefore denies the same.

27.     Apple admits the allegations in the first three sentences in Paragraph 27.  Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 27 of the Counterclaims, and therefore denies the same.

28.    Apple admits the allegations in the first three sentences in Paragraph 28.  Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 28 of the Counterclaims, and therefore denies the same.

29.    Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29 of the Counterclaims, and therefore denies the same.

30.    Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30 of the Counterclaims, and therefore denies the same.

31.    Apple admits that the increase in usage of mobile device networks has increased demand for capacity and throughput, particularly in data-demanding applications such as video. Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 31 of the Counterclaims, and therefore denies the same.

32.    Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32 of the Counterclaims, and therefore denies the same.

33.    Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33 of the Counterclaims, and therefore denies the same.

34.    Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34 of the Counterclaims, and therefore denies the same.

35.    Apple denies the allegations in Paragraph 35 of the Counterclaims.

36.    Apple admits that the '087 Patent is entitled "Method and Apparatus for Performing Non-Scheduled Transmission in a Mobile Communication System for Supporting an Enhanced Uplink Data Channel"; that the '087 Patent indicates that it was issued by the United States Patent and Trademark Office ("USPTO") on July 13, 2010; and that an uncertified copy of the '087 Patent is attached to the Complaint as Exhibit 1.  Apple lacks knowledge or information sufficient to form a belief as to whether Samsung is the current owner of all rights, title, and

1  interest in the '087 Patent.  Except as expressly admitted, Apple denies the remaining allegations

2  in Paragraph 36 of the Counterclaims.

3      37.    Apple admits that the '596 Patent is entitled "Method and Apparatus for Signaling

4  Control Information of Uplink Packet Data Service in Mobile Communication System"; that the

5  '596 Patent indicates that it was issued by the United States Patent and Trademark Office

6  ("USPTO") on June 23, 2009; and that an uncertified copy of the '596 Patent is attached to the

7  Complaint as Exhibit 2.  Apple lacks knowledge or information sufficient to form a belief as to

8  whether Samsung is the current owner of all rights, title, and interest in the '596 Patent.  Except

9  as expressly admitted, Apple denies the remaining allegations in Paragraph 37 of the

10 Counterclaims.

11     38.    Apple admits that the '470 Patent is entitled "Audio/Video Device Having a

12 Volume Control Function for an External Audio Reproduction Unit by Using Volume Control

13 Buttons of a Remote Controller and Volume Control Method Therefor"; that the '470 Patent

14 indicates that it was issued by the United States Patent and Trademark Office ("USPTO") on

15 March 2, 2012; and that an uncertified copy of the '470 Patent is attached to the Complaint as

16 Exhibit 3.  Apple lacks knowledge or information sufficient to form a belief as to whether

17 Samsung is the current owner of all rights, title, and interest in the '470 Patent.  Except as

18 expressly admitted, Apple denies the remaining allegations in Paragraph 38 of the

19 Counterclaims.

20     39.    Apple admits that the '757 Patent is entitled "Multimedia Synchronization

21 Method and Device"; that the '757 Patent indicates that it was issued by the United States Patent

22 and Trademark Office ("USPTO") on August 18, 2009; and that an uncertified copy of the '757

23 Patent is attached to the Complaint as Exhibit 4.  Apple lacks knowledge or information

24 sufficient to form a belief as to whether Samsung is the current owner of all rights, title, and

interest in the '757 Patent.  Except as expressly admitted, Apple denies the remaining allegations in Paragraph 39 of the Counterclaims.

40.     Apple admits that the '058 Patent is entitled "Data Displaying Apparatus and Method"; that the '058 Patent indicates that it was issued by the United States Patent and Trademark Office ("USPTO") on June 19, 2007; and that an uncertified copy of the '058 Patent is attached to the Complaint as Exhibit 5.  Apple lacks knowledge or information sufficient to form a belief as to whether Samsung is the current owner of all rights, title, and interest in the '058 Patent.  Except as expressly admitted, Apple denies the remaining allegations in Paragraph 40 of the Counterclaims.

41.     Apple admits that the '179 Patent is entitled "Software Keyboard System Using Trace of Stylus of a Touch Screen and Method for Recognizing Key Code Using the Same"; that the '179 Patent indicates that it was issued by the United States Patent and Trademark Office ("USPTO") on September 18, 2001; and that an uncertified copy of the '179 Patent is attached to the Complaint as Exhibit 6.  Apple lacks knowledge or information sufficient to form a belief as to whether Samsung is the current owner of all rights, title, and interest in the '179 Patent. Except as expressly admitted, Apple denies the remaining allegations in Paragraph 41 of the Counterclaims.

42.     Apple admits that the '449 Patent is entitled "Apparatus for Recording and Reproducing Digital Image and Speech"; that the '449 Patent indicates that it was issued by the United States Patent and Trademark Office ("USPTO") on May 1, 2001; and that an uncertified copy of the '449 Patent is attached to the Complaint as Exhibit 7.  Apple lacks knowledge or information sufficient to form a belief as to whether Samsung is the current owner of all rights, title, and interest in the '449 Patent.  Except as expressly admitted, Apple denies the remaining allegations in Paragraph 42 of the Counterclaims.

43. Apple admits that the '239 Patent is entitled "Remote Video Transmission System"; that the '239 Patent indicates that it was issued by the United States Patent and Trademark Office ("USPTO") on November 26, 1996; and that an uncertified copy of the '239 Patent is attached to the Complaint as Exhibit 8. Apple lacks knowledge or information sufficient to form a belief as to whether Samsung is the current owner of all rights, title, and interest in the '239 Patent. Except as expressly admitted, Apple denies the remaining allegations in Paragraph 43 of the Counterclaims.

## APPLE'S ALLEGED CLAIMS AGAINST SAMSUNG

44. Apple admits the allegations in Paragraph 44 of the Counterclaims.

45. Apple admits the allegations in Paragraph 45 of the Counterclaims.

### FIRST CLAIM FOR RELIEF

### (Declaration of Non-Infringement)

46. Apple admits that the Samsung Counterclaimants restate and incorporate by reference each of the allegations in Paragraphs 1 through 45 of the Counterclaims as though fully set forth herein. Apple repeats and re-alleges all the responses in Paragraphs 1 through 45 above, as if set forth fully herein.

47. Apple admits the allegations in Paragraph 47 of the Counterclaims.

48. Apple admits that it has alleged that certain Samsung products infringe the Patents In Suit. Apple further admits that the Samsung Counterclaimants have denied that their activities infringe the Patents In Suit and that the Samsung Counterclaimants' denials create an actual controversy between the parties. Except as expressly admitted, Apple denies the remaining allegations in Paragraph 48 of the Counterclaims.

49. Apple denies the allegations in Paragraph 49 of the Counterclaims.

### SECOND CLAIM FOR RELIEF

**(Declaration of Invalidity)**

50.     Apple admits that the Samsung Counterclaimants restate and incorporate by reference each of the allegations in Paragraphs 1 through 49 of the Counterclaims as though fully set forth herein.  Apple repeats and re-alleges all the responses in Paragraphs 1 through 49 above, as if set forth fully herein.

51.     Apple admits that it has alleged that certain Samsung products infringe the Patents In Suit and that these patents are valid.  Apple further admits that the Samsung Counterclaimants have denied the validity of the Patents In Suit and that the Samsung Counterclaimants' denials create an actual controversy between the parties.  Except as expressly admitted, Apple denies the remaining allegations in Paragraph 51 of the Counterclaims.

52.     Apple denies the allegations in Paragraph 52 of the Counterclaims.

**THIRD CLAIM FOR RELIEF**

**(Infringement of the '087 Patent)**

53.     Apple admits that the Samsung Counterclaimants restate and incorporate by reference each of the allegations in Paragraphs 1 through 52 of the Counterclaims as though fully set forth herein.  Apple repeats and re-alleges all the responses in Paragraphs 1 through 52 above, as if set forth fully herein.

54.     Apple denies the allegations in Paragraph 54 of the Counterclaims.

55.     Apple denies the allegations in Paragraph 55 of the Counterclaims.

56.     Apple denies the allegations in Paragraph 56 of the Counterclaims.

57.     Apple denies the allegations in Paragraph 57 of the Counterclaims.

58.     Apple denies the allegations in Paragraph 58 of the Counterclaims.

59.     Apple denies the allegations in Paragraph 59 of the Counterclaims.

60.     Apple denies the allegations in Paragraph 60 of the Counterclaims.

**FOURTH CLAIM FOR RELIEF**

**(Infringement of the '596 Patent)**

61.    Apple admits that the Samsung Counterclaimants restate and incorporate by reference each of the allegations in Paragraphs 1 through 60 of the Counterclaims as though fully set forth herein.  Apple repeats and re-alleges all the responses in Paragraphs 1 through 60 above, as if set forth fully herein.

62.    Apple denies the allegations in Paragraph 62 of the Counterclaims.

63.    Apple denies the allegations in Paragraph 63 of the Counterclaims.

64.    Apple denies the allegations in Paragraph 64 of the Counterclaims.

65.    Apple denies the allegations in Paragraph 65 of the Counterclaims.

66.    Apple denies the allegations in Paragraph 66 of the Counterclaims.

67.    Apple denies the allegations in Paragraph 67 of the Counterclaims.

68.    Apple denies the allegations in Paragraph 68 of the Counterclaims.

**FIFTH CLAIM FOR RELIEF**

**(Infringement of the '470 Patent)**

69.    Apple admits that the Samsung Counterclaimants restate and incorporate by reference each of the allegations in Paragraphs 1 through 68 of the Counterclaims as though fully set forth herein.  Apple repeats and re-alleges all the responses in Paragraphs 1 through 68 above, as if set forth fully herein.

70.    Apple denies the allegations in Paragraph 70 of the Counterclaims.

71.    Apple denies the allegations in Paragraph 71 of the Counterclaims.

72.    Apple denies the allegations in Paragraph 72 of the Counterclaims.

73.    Apple denies the allegations in Paragraph 73 of the Counterclaims.

74.    Apple denies the allegations in Paragraph 74 of the Counterclaims.

75.     Apple denies the allegations in Paragraph 75 of the Counterclaims.

76.     Apple denies the allegations in Paragraph 76 of the Counterclaims.

## SIXTH CLAIM FOR RELIEF

### (Infringement of the '757 Patent)

77.     Apple admits that the Samsung Counterclaimants restate and incorporate by reference each of the allegations in Paragraphs 1 through 76 of the Counterclaims as though fully set forth herein.  Apple repeats and re-alleges all the responses in Paragraphs 1 through 76 above, as if set forth fully herein.

78.     Apple denies the allegations in Paragraph 78 of the Counterclaims.

79.     Apple denies the allegations in Paragraph 79 of the Counterclaims.

80.     Apple denies the allegations in Paragraph 80 of the Counterclaims.

81.     Apple denies the allegations in Paragraph 81 of the Counterclaims.

82.     Apple denies the allegations in Paragraph 82 of the Counterclaims.

83.     Apple denies the allegations in Paragraph 83 of the Counterclaims.

84.     Apple denies the allegations in Paragraph 84 of the Counterclaims.

## SEVENTH CLAIM FOR RELIEF

### (Infringement of the '058 Patent)

85.     Apple admits that the Samsung Counterclaimants restate and incorporate by reference each of the allegations in Paragraphs 1 through 84 of the Counterclaims as though fully set forth herein.  Apple repeats and re-alleges all the responses in Paragraphs 1 through 84 above, as if set forth fully herein.

86.     Apple denies the allegations in Paragraph 86 of the Counterclaims.

87.     Apple denies the allegations in Paragraph 87 of the Counterclaims.

88.     Apple denies the allegations in Paragraph 88 of the Counterclaims.

89.     Apple denies the allegations in Paragraph 89 of the Counterclaims.

90.     Apple denies the allegations in Paragraph 90 of the Counterclaims.

91.     Apple denies the allegations in Paragraph 91 of the Counterclaims.

92.     Apple denies the allegations in Paragraph 92 of the Counterclaims.

**EIGHTH CLAIM FOR RELIEF**

**(Infringement of the '179 Patent)**

93.     Apple admits that the Samsung Counterclaimants restate and incorporate by reference each of the allegations in Paragraphs 1 through 92 of the Counterclaims as though fully set forth herein.  Apple repeats and re-alleges all the responses in Paragraphs 1 through 92 above, as if set forth fully herein.

94.     Apple denies the allegations in Paragraph 94 of the Counterclaims.

95.     Apple denies the allegations in Paragraph 95 of the Counterclaims.

96.     Apple denies the allegations in Paragraph 96 of the Counterclaims.

97.     Apple denies the allegations in Paragraph 97 of the Counterclaims.

98.     Apple denies the allegations in Paragraph 98 of the Counterclaims.

99.     Apple denies the allegations in Paragraph 99 of the Counterclaims.

100.    Apple denies the allegations in Paragraph 100 of the Counterclaims.

**NINTH CLAIM FOR RELIEF**

**(Infringement of the '449 Patent)**

101.    Apple admits that the Samsung Counterclaimants restate and incorporate by reference each of the allegations in Paragraphs 1 through 100 of the Counterclaims as though fully set forth herein.  Apple repeats and re-alleges all the responses in Paragraphs 1 through 100 above, as if set forth fully herein.

102.    Apple denies the allegations in Paragraph 102 of the Counterclaims.

103.    Apple denies the allegations in Paragraph 103 of the Counterclaims.

104.    Apple denies the allegations in Paragraph 104 of the Counterclaims.

105.    Apple denies the allegations in Paragraph 105 of the Counterclaims.

106.    Apple denies the allegations in Paragraph 106 of the Counterclaims.

107.    Apple denies the allegations in Paragraph 107 of the Counterclaims.

108.    Apple denies the allegations in Paragraph 108 of the Counterclaims.

### TENTH CLAIM FOR RELIEF

### (Infringement of the '239 Patent)

109.    Apple admits that the Samsung Counterclaimants restate and incorporate by reference each of the allegations in Paragraphs 1 through 108 of the Counterclaims as though fully set forth herein.  Apple repeats and re-alleges all the responses in Paragraphs 1 through 108 above, as if set forth fully herein.

110.    Apple denies the allegations in Paragraph 110 of the Counterclaims.

111.    Apple denies the allegations in Paragraph 111 of the Counterclaims.

112.    Apple denies the allegations in Paragraph 112 of the Counterclaims.

113.     Apple denies the allegations in Paragraph 113 of the Counterclaims.

114.    Apple denies the allegations in Paragraph 114 of the Counterclaims.

### PRAYER FOR RELIEF FOR SAMSUNG COUNTERCLAIMANTS

Apple denies that the Samsung Counterclaimants are entitled to any relief sought by the Samsung Counterclaimants in their Prayer for Relief.

### PRAYER FOR RELIEF FOR SAMSUNG PATENT COUNTERCLAIMANTS

Apple denies that the Samsung Patent Counterclaimants are entitled to any relief sought by the Samsung Patent Counterclaimants in their Prayer for Relief.

### APPLE'S DEFENSES TO SAMSUNG'S COUNTERCLAIMS

Apple asserts the following defenses to Samsung's Counterclaims:

**FIRST DEFENSE**
**(Non-Infringement)**

Samsung is not entitled to any relief against Apple because Apple has not directly or indirectly infringed any valid claim of the Samsung Asserted Patents.

**SECOND DEFENSE**
**(Invalidity)**

One or more of the claims of the Samsung Asserted Patents are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and 112.

**THIRD DEFENSE**
**(Limitation of Damages)**

Samsung's right to seek damages is limited, including without limitation by 35 U.S.C. §§ 286 and 287.

**FOURTH DEFENSE**

**(Authority to Practice and/or Unenforceability)**

One or more of the Samsung Asserted Patents are unenforceable against Apple because of estoppel, laches, waiver, unclean hands, patent exhaustion, license/covenants not to assert, implied license/covenants not to assert, and/or other contractual or equitable doctrines.  With respect to patent exhaustion, Samsung has contractually authorized chipset suppliers, specifically including but not limited to Intel and Qualcomm as set out in the Counterclaims below, to sell chipsets that practice Samsung's patents.  To the extent any of the Samsung Asserted Patents are substantially embodied in chipsets from such authorized suppliers, these suppliers have made "authorized sales" of those chipsets to Apple that exhaust those patents, and Samsung is not

1    entitled to enforce those patents against Apple.  Moreover, to the extent that Samsung has

2    contractually authorized (whether by license, covenant not to assert, or other grant of authority)

3    the customers of chipset suppliers to use chipsets under the Samsung products, such customers

4    (like Apple) are contractually entitled to do so.  With respect to implied license/covenant not to

5    assert, for over three years before it ever asserted the Samsung Asserted Patents, Samsung well

6    knew that Apple was selling end products containing wireless telecommunications chipsets that

7    Samsung claims practice the Declared-Essential Patents.  Indeed, Samsung annually has supplied

8    billions of dollars of components for those Apple products and derived great economic benefit

9    from doing so.  Based on Samsung's conduct, Apple reasonably inferred that Samsung consented

10   to its sales of end products containing chipsets that Samsung belatedly claims infringe the

11   Declared-Essential Patents, and Apple relied on Samsung's failure to assert those patents in

12   developing and selling end products that incorporate those chipsets.  Finally, with respect to its

13   Declared-Essential Patents, Samsung has engaged in standard-setting misconduct, including

14   without limitation Samsung's breach of its commitments to offer FRAND license terms for the

15   Declared-Essential Patents and Samsung's breach of its patent disclosure requirements or based

16   on other circumstances.

17

18                                     **FIFTH DEFENSE**

19                                     **(FRAND License)**

20          To the extent that the Declared-Essential Patents are essential to any ETSI standard and

21   to the extent any of the alleged inventions described in and allegedly covered by the Declared-

22   Essential Patents are used, manufactured, or sold by or for Apple, its suppliers, and/or its

23   customers, Apple has the irrevocable right to be licensed on FRAND terms under those patents.

**SIXTH DEFENSE**

**(No Injunctive Relief)**

To the extent that Samsung seeks injunctive relief for alleged infringement, the relief it seeks is unavailable because (i) Apple is entitled to sell products that incorporate chipsets from Samsung licensed suppliers and (ii) seeking injunctive relief is contrary to Samsung's commitment to SSOs to license the Declared-Essential Patents on FRAND terms and Apple's irrevocable right to obtain a license by virtue of Samsung's FRAND commitments. In addition, the alleged injury to Samsung is not immediate or irreparable; and Samsung has an adequate remedy at law for any alleged injury.

**APPLE INC.'S COUNTERCLAIMS IN REPLY**

Plaintiff Apple, on personal knowledge as to its own acts, and on information and belief as to all others based on its own and its attorneys' investigation, alleges Counterclaims In Reply against Samsung Electronics Co., Ltd., Samsung Telecommunications America, LLC, and Samsung Electronics America, Inc. (collectively, "Samsung") as follows:

**NATURE OF THE ACTION**

1. Having failed to compete successfully with Apple's products (including its iPhone and iPad) by innovating and designing products that customers desire, Samsung has instead launched product after product that unlawfully misappropriate the distinctive designs and patented features that are hallmarks of Apple's success. These Counterclaims In Reply arise from Samsung's illegal and abusive assertions of its patents in retaliation for Apple seeking to

stop Samsung from imitating Apple's iPhone and iPad and to try to coerce Apple into tolerating Samsung's imitation.

2.      In late summer 2010, Apple and Samsung began discussions related to Samsung's copying and infringement of Apple's intellectual property relating to its highly successful iPhone and iPad products.  Specifically, the parties discussed Samsung's infringement of Apple's designs and of certain Apple patents that are not essential to practice any standard.  During these discussions, Samsung for the first time claimed that Apple was required to make royalty payments for implementation of Samsung's Declared-Essential Patents in Apple's products that comply with the UMTS wireless telecommunications standard.  Samsung did this notwithstanding that it had well known for over three years that Apple's iPhone and later iPad incorporated chipsets enabling cellular communications capability from independent suppliers, yet had never claimed Apple was infringing Samsung's patents.

3.      After Samsung refused Apple's requests for Samsung to stop its copying, Apple sued Samsung in this Court, bringing claims that include patent, trade dress, and trademark infringement.  *Apple Inc. v. Samsung Electronics Co., Ltd., et al.*, Case No. 5:11-cv-01846-LHK. That case is set for trial before the Honorable Lucy H. Koh on July 30, 2012.  In retaliation, Samsung counterclaimed against Apple for infringement of, *inter alia*, patents it has declared essential to the UMTS standard and committed to license on FRAND terms.  Samsung asserted these counterclaims against Apple in the *Apple Inc. v. Samsung Electronics, Co., Ltd., et al.*, Case No.  5:11-cv-01846-LHK (hereinafter, the "Earlier Case") before it had offered any specific licensing terms for its declared essential patents.  In that action, Apple has challenged Samsung's actions by asserting claims against it for, *inter alia*, breach of contract, violation of Section 2 of the Sherman Act, violation of the California Unfair Competition Law, and equitable doctrines.

1        4.      After the Earlier Case was filed, Samsung continued to release products that

2    infringe not only many of the same design patents, utility patents, trademarks, and trade dress

3    rights asserted in the Earlier Case, but also the additional utility patents asserted here.  When

4    Apple brought this action to protect its intellectual property rights, Samsung again asserted

5    counterclaims for infringement of Declared-Essential Patents and seeks to enjoin Apple's

6    practice of the UMTS standard notwithstanding that (i) Samsung is not entitled to enforce the

7    Declared-Essential Patents against Apple's sales of end products by virtue of Samsung's license

8    agreements with chipset suppliers, including Intel and Qualcomm and (ii) to the extent any of

9    Samsung's alleged inventions described in and allegedly covered by the Declared-Essential

10   Patents are used, manufactured, or sold by or for Apple, its suppliers, and/or its customers, Apple

11   has the right to a FRAND license to practice Samsung's Declared-Essential Patents.  Despite

12   Samsung's commitment to grant Apple a license on FRAND terms, Samsung has only offered

13   terms that are manifestly in violation of that obligation, as a court in the Netherlands has held.

14   The reasons why Samsung's offer violates its promise of FRAND terms are discussed at

15   Paragraphs 55 and 85 below.

16       5.      Samsung's efforts to coerce Apple into tolerating Samsung's imitation have not

17   been limited to the actions in this Court.  Samsung has launched an aggressive, worldwide

18   campaign to enjoin Apple from allegedly practicing Samsung's patents.  Samsung has sued

19   Apple for infringement and injunctions in no fewer than eight countries outside the United

20   States.  Indeed, Samsung's litigation campaign and other conduct related to its declared-essential

21   patents is so egregious that the European Commission recently has opened an investigation to

22   determine whether Samsung's behavior violates EU competition laws.  Apple brings these

23   Counterclaims In Reply to halt Samsung's abuse and protect consumers, the wireless

24   telecommunications industry, and Apple from further injury.

**APPLE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN REPLY
TO SAMSUNG'S COUNTERCLAIMS**
Case No. 12-cv-00630-LHK                    19

6.      With respect to Apple's Counterclaims In Reply 1 through 16, Apple seeks declaratory judgment of non-infringement and invalidity to resolve the legal and factual questions raised by Samsung's accusation of infringement of the Samsung Asserted Patents and to afford relief from the uncertainty and controversy that Samsung's accusations have precipitated.

7.      With respect to Apple's Counterclaims in Reply 17 to 19, Apple seeks to remedy Samsung's breaches of its ETSI IPR disclosure obligations and FRAND commitments, unlawful monopolization, and violation of the California Unfair Competition law.  Samsung abused standard-setting processes that are crucial to bringing pro-competitive benefits to innovators, telecommunications equipment and network suppliers, and end consumers alike by (i) deliberately and deceptively failing to disclose purportedly essential IPR during the standards setting process and (ii) intentionally concealing from the SSOs and designers and sellers of products implementing the UMTS standard that it would not in fact offer FRAND license terms for its Declared-Essential Patents to all UMTS implementers.  Samsung then exploited the unlawfully-obtained monopoly positions that UMTS conferred on its claimed standards-essential technologies and breached its contractual FRAND commitments by (i) asserting patents that it knows, and a reasonable person would know, Samsung is precluded from asserting; and (ii) Samsung's untimely disclosures of its claimed essential IPR, failure to disclose that it did not intend to meet its FRAND commitments to ETSI, and subsequent refusal to meet its FRAND obligations regarding patents that it claims to be essential to the UMTS standard.  Samsung's refusal to meet its FRAND obligations, motivated by Samsung's desire to infringe with impunity the designs and the non-essential patents on the functions that have differentiated Apple's products and made them so successful in the marketplace, is unfair, unreasonable, and discriminatory and violates Samsung's FRAND commitment.

1

2

## PARTIES

3

8.     Apple is a corporation organized under the laws of the State of California, and its

4

principal place of business is in Cupertino, California.

5

9.     Apple designs and markets a broad range of innovative products including

6

7

portable digital music players (the iPod), mobile communications devices (the iPhone), and

8

tablet computers (the iPad).  One or more Apple entities is and has been a member of ETSI since

9

2001.

10

10.     According to Samsung's Answer and Counterclaims, Samsung Electronics Co.,

11

Ltd. (referred to individually herein as "SEC") is a corporation organized and existing under the

12

laws of the country of Korea having its corporate headquarters at 416 Maetan-3dong,

13

Yeongtong-gu, Suwon-City, Gyeonggi-do, Korea 443-742.

14

11.     Samsung Electronics America, Inc. (referred to individually herein as "SEA") is a

15

16

New York corporation with its principal place of business at 85 Challenger Road, Ridgefield

17

Park, New Jersey 07660.  On information and belief, SEA was formed in 1977 as a subsidiary of

18

SEC and markets, sells, or offers for sale a variety of consumer electronics, including mobile

19

communication devices and tablet computers.  On information and belief, SEA also manages the

20

North American operations of STA, Samsung Electronics Canada, and Samsung Electronics

21

Mexico.

22

23

12.     Samsung Telecommunications America, LLC (referred to individually herein as

24

"STA") is a limited liability corporation organized under the laws of Delaware, with its principal

25

place of business at 1301 East Lookout Drive, Richardson, Texas 75082.

26

27

28

**APPLE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN REPLY**
**TO SAMSUNG'S COUNTERCLAIMS**
Case No. 12-cv-00630-LHK                              21

13.     Samsung claims to own many patents that it asserts have been incorporated into various standards for wireless technologies, including the following Declared-Essential Patents: '087 Patent and '596 Patent.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over the counterclaims pursuant to the Federal Patent Act, 28 U.S.C. §§ 1338(a), 2201, and 2202, and pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337.

15.     The Court also has supplemental jurisdiction over the state law claims asserted in these counterclaims under 28 U.S.C. § 1367 because the state and federal claims arise from a common nucleus of operative facts.

16.     Samsung has subjected itself to personal jurisdiction by counterclaiming against Apple in this District, and, in any event, Samsung is subject to personal jurisdiction because it places wireless communication devices in the stream of commerce knowing that such products will be sold in the state of California.

17.     Venue is proper in this District under 28 U.S.C. § 1391 and § 1400(b).  SEC, SEA, and STA transact business within this District and offer for sale in this District products that infringe Apple's patents.  In addition, SEC, SEA, and STA have counterclaimed against Apple in this District.  Moreover, a substantial part of the events giving rise to the claim occurred in this District.

## APPLE UMTS CHIPSET SUPPLIERS

18.     Apple first introduced its iPhone 3G in early 2008 and its iPad in spring 2010. Both products and subsequent versions incorporate UMTS baseband chipsets from third parties.

1    It is only through the incorporation of those chipsets that the iPhone and iPad allegedly practice

2    the Declared-Essential Patents.

3        19.    Apple purchased all of its UMTS baseband chipsets for the iPhone and iPad from

4    Infineon Technologies ("Infineon") until January 2011, when Intel Corporation ("Intel")

5    completed its acquisition of Infineon's Wireless Solutions business (the part of Infineon that

6    supplied chipsets).  Today, the Apple iPhone and iPad products use baseband chipsets from

7    (depending on the model of Apple product) Intel or Qualcomm Inc.  ("Qualcomm").

8        20.    Samsung has well known since the introduction of the iPhone that the iPhone (and

9    later the iPad) incorporates chipsets from independent chipset suppliers and that enable cellular

10   communications functionality.  Indeed, beginning with the introduction of the original iPhone,

11   Samsung has supplied Apple with billions of dollars a year in components for the iPhone and

12   iPad.  But it was not until late summer 2010 that Samsung claimed for the first time that Apple

13   was infringing any of Samsung's patents by selling the iPhone or iPad.

14       21.    Samsung's assertion of infringement arose in the course of discussions between

15   Apple and Samsung related to Samsung's continuing pattern of copying Apple's products and

16   infringing of Apple's trade dress and trademarks as well as certain Apple patents that are not

17   essential to practice any standard.  The infringed Apple patents, asserted in the Earlier Case and

18   here, include those covering the distinctive designs and proprietary features that have been the

19   hallmarks of Apple's highly successful products (including the iPhone and iPad).

20       22.    Samsung has brought these claims accusing Apple of infringing the Declared-

21   Essential Patents in utter disregard of the fact that, as described below, Samsung is precluded

22   from enforcing those patents with respect to Apple end products that incorporate chipsets from

23   Samsung licensed suppliers, such as Intel and Qualcomm, by virtue of Samsung's license

24   agreements with those chipset suppliers.

25       23.    Samsung entered into a patent cross license agreement and amendments thereto

26   with Intel (the "Samsung-Intel Agreement").

27

28

24.     To the extent any of the Samsung Asserted Patents are substantially embodied in chipsets supplied by Intel, Intel has made "authorized sales" of those chipsets to Apple that exhaust those patents.  Accordingly, Samsung is not entitled to enforce those Samsung Asserted Patents against Apple.

25.     Samsung entered into a patent cross license agreement and amendments thereto with Qualcomm (the "Samsung-Qualcomm Agreement").

26.     To the extent any of the Samsung Asserted Patents are substantially embodied in chipsets supplied by Qualcomm, Qualcomm has made "authorized sales" of those chipsets to Apple that exhaust those patents.  Accordingly, Samsung is not entitled to enforce those Samsung Asserted Patents against Apple.

27.     The Samsung-Qualcomm Agreement further contains covenants from Samsung that run directly to Qualcomm's chipset customers based on the customer's use of Qualcomm chipsets.  Apple is a third party beneficiary of that promise to Qualcomm, and is entitled to enforce it.

28.     To the extent that any of the Samsung Asserted Patents are implemented by a Qualcomm chipset, Samsung has covenanted not to assert those patents against Qualcomm customers such as Apple.  Accordingly, Samsung is not entitled to enforce those Samsung Asserted Patents against Apple.

## STANDARDS IN THE WIRELESS COMMUNICATIONS INDUSTRY

29.     Mobile wireless carriers offer the consumer access to their "networks" to enable the consumer to, among other things, place and receive calls and access e-mail, the Internet, and a variety of services.  The handsets sold by Apple and Samsung include a computer chipset that enables the handset to communicate with the carriers' networks.  Most handset designers— including Apple and Samsung—use chipsets from third-party manufacturers.

30.     To facilitate interoperability among the cellular networks and various cellular mobile devices, carriers, handset manufacturers, and chipset manufacturers, among others,

1  participate in the development of industry technical standards that establish precise specifications

2  for the essential components of the technology.  Once these standards are established, competing

3  manufacturers and competing carriers can offer their own products and services that are

4  compliant with the standards.

5          31.     Technical standards play a critical role in the development of wireless data and

6  telecommunications technologies.  In general, technical standards—such as those for mobile

7  wireless technology—have the potential to encourage innovation and promote competition

8  among telecommunications equipment suppliers and network providers in the wireless

9  telecommunications industry.  The technical specifications for most standards are published and

10 broadly available.  Product designers and manufacturers are thus more willing to invest heavily

11 in the development of handsets or component parts because, so long as their products are

12 compliant with the published technical standard, those products will operate effectively within

13 the carrier networks and be compatible with other products from third parties.

14         32.     Standards development also reduces costs for both suppliers and purchasers.  For

15 suppliers, standardization reduces the need in many instances to develop products to a particular

16 purchaser's specifications.  Accordingly, because a single product or product line may be sold to

17 multiple purchasers and distributed more widely, manufacturing volumes increase and per unit

18 costs decrease.  Purchasers benefit from increased price competition among suppliers.  Because

19 many suppliers make standards-compliant products, switching suppliers typically does not

20 require a substantial redesign of one's products or a substantial technical transfer to enable the

21 new supplier to produce compatible products.  The lower "switching cost" intensifies

22 competition among suppliers, leading to lower prices.

23         33.     On the other hand, technical standardization also creates a "lock-in" effect and the

24 risk of "patent hold-up."  Although standards are the products of coordination and compromise

25 among competitors, certain aspects of standards may be—and often are—claimed by patents.

26 Before standardization, the royalty a patentee can earn from a patent license for its technology is

27 constrained in part by the availability of alternative technical approaches to perform that

28

1    function.  If a standard requires a designer to employ that patented technology, however, those

2    other technological approaches are no longer available substitutes and no longer constrain the

3    patentee's ability to demand royalties far in excess of what is warranted by the intrinsic value of

4    the technology.  Moreover, that some end consumers might be able to choose among handsets

5    that practice different telecommunications standards does nothing to mitigate the fact that a

6    device manufacturer is locked into the standard that its device practices.  As Samsung has

7    explained in other litigation: "The payoff for owners of patents that are incorporated into the

8    standard is substantial because the entire industry will need a license to the patents essential to

9    the standard . . . ."  First Amended Complaint at 5, *Samsung Elec. Co. v. InterDigital Commc'ns

10   Corp.*, No. 07-0167 (D. Del. Sept. 14, 2007).

11          34.    This phenomenon is compounded because designers, such as Apple, invest great

12   resources developing innovative, new products that also comply with the technical standard.

13   Even if there were an alternative standard, the costs and disruption associated with switching is

14   typically prohibitively expensive.  The designer that implements a standard thus becomes

15   "locked-in."  Left unconstrained, owners of patents that purportedly cover certain features within

16   the standard can take advantage of lock-in and demand exorbitant royalties and other terms from

17   the designers, knowing that it would be less costly for the designer to pay the excessive royalty

18   or capitulate to unreasonable terms rather than incur the cost of switching or face a risk of

19   injunction.  This dynamic is often called "patent hold-up."

20          35.    As Samsung has recognized, "the whole point of a standard setting body is to

21   create a standard that everyone can follow without fear of lawsuits that are going to stop the

22   standard."  Hearing Transcript at 87, *Certain 3G Wideband Code Division Multiple Access

23   (WCDMA) Mobile Handsets and Components Thereof*, Inv. No. 337-TA-601 (ITC July 8, 2008).

24   Accordingly, most SSOs have adopted IPR policies to address the problem of patent hold-up.

25   These policies set forth requirements concerning, among other things: (a) disclosure of IPR that

26   may claim any portion of the specifications of the standard in development; and (b) whether and

27

28

1   to what extent parties holding purported essential IPR must commit to licensing these IPR on

2   FRAND terms and conditions.

3        36.    Timely disclosure of purportedly essential IPR is critical to ensuring that those

4   participating in standards development can evaluate technical proposals with knowledge of the

5   potential licensing costs that designers may incur when developing standards-compliant

6   products.

7        37.    Additionally, as set forth in greater detail below, the IPR policies at issue here

8   require participants claiming to own essential IPR to commit to license those IPR on FRAND

9   terms to any implementer of the standard.  Those commitments grant implementers the right to

10  practice claimed essential patents and preclude parties making FRAND commitments from

11  seeking to enjoin parties from practicing the relevant standard.  Participants in standards

12  development rely on these contractual undertakings to ensure that the widespread adoption of the

13  standard will not be hindered by IPR holders seeking to extract unreasonable royalties and terms

14  from those implementing the standard.

15       38.    Samsung itself has acknowledged, in other litigation, the crucial role that FRAND

16  commitments play in ensuring that standards setting does not become a mechanism for abusive

17  practices and in protecting industry participants against exploitation by patentees that gain

18  monopolies through the standard-setting process.  First:

19             Without certain rules . . . [SSOs] would be illegal trusts because

20             [SSOs] are a forum in which competitors . . . determine which
           products they will and will not make. . . . To prevent patent owners

21             from imposing monopolistic royalties and to mitigate the threat of
           a single patent owner holding up the industry, [SSOs] condition the

22             standardization of proprietary technology upon the patent owner's
           promise to make the technology available to the public royalty-free

23             or on [FRAND] terms.

24  First Amended Complaint at 5, *Samsung Elec. Co. v. InterDigital Commc'ns Corp.*, No. 07-0167

25  (D. Del. Sept. 14, 2007). Second:

26

27             [I]n exchange for having its technology included in the standard,
           for having the [SSO] promote the standards worldwide, and for
           having the industry directed to use its patented technology, each

28

**APPLE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN REPLY
TO SAMSUNG'S COUNTERCLAIMS**

1
2
3

> [SSO] member trades away the right to refuse to license its
> intellectual property to anyone willing to pay FRAND terms.  In
> short, the promise of FRAND licenses is the quid pro quo of the
> bargain struck between the [SSO] and the intellectual property
> owner.

4

*Id.* at 6.

5
6
7
8
9

39.     Breaching FRAND commitments, as Samsung has done here, undermines the

safeguards that SSOs put in place to guard against abuse.  By seeking to unfairly exploit a

patent's actual or purported incorporation into a standard, the patentee violates the very

commitment that led to incorporation of that technology in the first place.

10

**The Evolution of Mobile Wireless Telecommunications Standards**

11
12
13
14
15
16

40.     Mass marketing of cell phones began in the 1980s with phones that operated on

analog networks.  The two principal disadvantages of analog signals—compared to the digital

signals on which later generations of cell phone networking were based—are that analog

transmissions have "noise," creating signal loss and distortion, and analog networks are ill-

equipped to handle high volumes of voice traffic or data transmissions.

17
18
19
20
21

41.     The second generation of mobile wireless technology, commonly referred to as

"2G," began the transition to digital technology.  The rollout of 2G networks—which used

available bandwidth for voice traffic more efficiently than did analog and provided support for

the data transmission necessary for paging and text messaging—coincided with the proliferation

of consumer mobile wireless sales.

22
23
24
25
26
27

42.     2G networks and advanced 2G networks, sometimes referred to as 2.5G networks,

also began supporting more data-intensive applications, such as email, web browsing, and

sending and receiving pictures by phone.  The third generation ("3G") technologies were

developed to support even more data-intensive operations commonly associated with

smartphones like the iPhone, such as multimedia, more sophisticated web browsing, music and

video downloading, and global positioning systems.

28

1    43.    Nearly all mobile wireless carriers now support 2G technology, and in the United

2    States 3G networks.  As this is happening, fourth generation ("4G"), known as Long Term

3    Evolution ("LTE") for Global System for Mobile Communications ("GSM")-based networks,

4    has been standardized, and some carriers are beginning to introduce those networks.

5    44.    The most widely implemented digital telecommunications standards worldwide

6    are based on the GSM technology, a 2G standard.  Development of GSM began in Europe with

7    the formation of the Groupe Special Mobile within the European Conference of Postal and

8    Telecommunications Administrations ("CEPT").

9    45.    In 1988, at the urging of the European Commission, European national posts and

10   telecommunications ministries formed the ETSI.  ETSI, a non-profit SSO, is headquartered in

11   France.  In 1989, development of GSM was transferred to the auspices of ETSI, where

12   standardization of GSM was completed.

13   46.    Subsequent generations of the GSM standard have featured technical

14   enhancements that permit greater data rates and increased voice capacity.  Many GSM carriers

15   have adopted a technology known as GSM Packet Radio Service ("GPRS"), 2.5G technology.

16   In addition, a technology known as Enhanced Data Rates for GSM Evolution ("EDGE") is

17   employed by most carriers as an add-on to GPRS to achieve higher data rates.

18   47.    The third generation of the GSM family of standards is UMTS, which employs

19   wide-band CDMA ("WCDMA") technology.  The UMTS standard was designed to efficiently

20   support significantly increased speeds and capacity over limited spectrum bandwidth, thereby

21   enabling new and enhanced services and applications such as mobile e-commerce, broadcast

22   television, position location, and mobile multimedia web browsing, including music and video

23   downloads.

24   48.    UMTS – the third generation of GSM, the world's most-widely adopted

25   telecommunications standard family—has been standardized by 3GPP and is the most widely

26   adopted 3G telecommunication standard worldwide.  3GPP is a collaboration of six SSOs from

27   around the world, including ETSI, the Telecommunications Technology Association ("TTA"),

28

the Association of Radio Industries and Businesses ("ARIB"), the Alliance for Telecommunications Industry Solutions ("ATIS"), the China Communications Standards Association ("CCSA"), and the Telecommunication Technology Committee ("TTC"). 3GPP promotes global convergence in the design of mobile phone systems based on GSM by producing globally-applicable specifications for those systems that SSOs can incorporate into their standards. Ultimately, each member organization formally adopts the 3GPP technical specifications as standards. 3GPP's initial mission was to develop a 3G system specification, but having met that goal it now develops successor specifications, including LTE.

49. Cellular technology has continued to develop. Driven by demand for an increasing number of wireless applications and improved quality of existing applications, carriers wish to offer newer technologies that provide ever-increasing bandwidth supporting more advanced applications such as video and multimedia applications.

**SAMSUNG'S DELIBERATE NON-DISCLOSURE
OF AND FALSE COMMITMENTS CONCERNING ITS
PURPORTED ESSENTIAL INTELLECTUAL PROPERTY**

50. Because SSOs—including 3GPP and its organizational partners—purportedly incorporated Samsung's patented technology into the UMTS standard, unless constrained, Samsung has the ability to demand and potentially extract exorbitant royalties and unreasonable terms for patents it asserts are essential to those standards. To encourage its technologies to be incorporated into the standard and to avoid the SSO's consideration of the cost of standardizing purportedly patented technology, Samsung deliberately and deceptively failed to disclose during the standard-setting process IPR that it now claims to be essential to UMTS. In fact, one or more named inventors on the application for the concealed patents or other Samsung personnel frequently participated in the relevant Working Group, and submitted proposals covering technology for which Samsung was pursuing a patent. Moreover, consistent with its objective to cause 3GPP to standardize the relevant technology through concealment and then take advantage of locked-in standard implementers to obtain exorbitant royalties and other license terms,

Samsung did not intend to meet its FRAND commitments, but never told that to 3GPP or its organizational partners that.  In fact, Samsung represented just the opposite as described below. Samsung disclosed certain of its IPR only after the relevant standard or standard specification was finalized.

51.    For standards developed under the 3GPP umbrella, participants, such as Samsung, were required to follow the IPR Policy of the organizations in which it held membership.  Third Generation Partnership Project (3GPP) Partnership Project Description 2 - 4 (December 1998), at 46.  As a member of ETSI, therefore, Samsung was bound to follow the ETSI IPR Policy in connection with all of its relevant activities.

52.    Samsung deliberately and deceptively concealed certain of its IPR during the standards-setting process at the same time that it was proposing that 3GPP standardize technologies that it later claimed were covered by its Declared-Essential Patents.

53.    Samsung's abuse of the standards-setting process went far beyond untimely disclosure of its IPR.  Samsung had first committed to license its Declared-Essential Patents on FRAND terms on December 14, 1998 by submitting to ETSI a blanket FRAND commitment. (*See* Paragraph 65, *infra*.)  Samsung's subsequent concealment of its IPR was accompanied by its intentional failure to disclose to the 3GPP that it would not offer to all UMTS implementers FRAND license terms for each respective Declared-Essential Patent.  That is, Samsung intended not to abide by is prior explicit written commitment to license only on terms that would preclude it from exploiting  the "hold-up" power it now abusively seeks to wield.

54.    Samsung's deliberate and deceptive failures to disclose its Declared-Essential Patents and its unwillingness to offer FRAND terms, despite its previous written representation that it would do so, were intended to and did cause 3GPP to incorporate into the UMTS standard technology that Samsung now claims is covered by its Declared-Essential Patents.  Had Samsung timely disclosed that it had relevant IPR, that it would not offer FRAND license terms to all those implementing the standard, and that it would take the position that parties implementing the standard were not entitled to practice its Declared-Essential Patents, 3GPP would have

decided to standardize an alternative technology to perform the relevant function.  Alternatively,

3GPP would have continued to leave the relevant function out of the standard, in which case

implementers would have been free to choose various alternative technologies to perform that

function and 3GPP would have been free to continue to evaluate competing alternative

technologies for potential standardization in future iterations of the standard.

55.     Samsung has in fact violated its FRAND commitments by counterclaiming

against Apple for infringement and seeking to enjoin Apple from selling its standards-compliant

products without offering Apple a FRAND license, notwithstanding that, to the extent any of the

alleged inventions described in and allegedly covered by the Declared-Essential Patents are used,

manufactured, or sold by or for Apple, its suppliers, and/or its customers, Apple is entitled to a

FRAND license to Samsung's Declared-Essential Patents.  Indeed, on October 14, 2011, The

Hague District Court in the Netherlands found Samsung's attempt to enjoin sales of Apple

products based on declared essential patents entirely improper where Samsung has failed to

engage in *bona fide* negotiations over FRAND license terms and has offered only terms that are

manifestly not FRAND.

56.     To facilitate its standard-setting activity, ETSI promulgated an IPR policy, set

forth in Annex 6 of its Rules of Procedure.

57.     Clause 4 of the policy requires, among other things, that members timely disclose

to the organization any IPR they own that may be essential to standards that have been developed

or are being developed.  Participants in ETSI standard development understand that this

provision requires disclosure of all IPR that they believe might be essential to standards under

consideration.  Clause 4 requires in particular that a participant submitting a technical

specification to ETSI, as Samsung did, make ETSI aware of any IPR that might be essential if

that proposal is adopted.  Clause 4.1 states:

> [E]ach MEMBER shall use its reasonable endeavors, in particular
> during the development of a STANDARD or TECHNICAL
> SPECIFICATION where it participates, to inform ETSI of
> ESSENTIAL IPRs in a timely fashion.  In particular, a MEMBER
> submitting a technical proposal for a STANDARD or
> TECHNICAL SPECIFICATION shall, on a bona fide basis, draw

the attention of ETSI to any of that MEMBER's IPR which might
be ESSENTIAL if that proposal is adopted.

Under ETSI's IPR policies, the term "IPR" is defined to include patent applications as well as

issued patents:

"IPR" shall mean any intellectual property right conferred by
statute law including applications therefore other than trademarks.

58.     Clause 6 of ETSI's IPR policy governs the availability of licenses to essential

IPR.  In relevant part, Clause 6.1 states:

When an ESSENTIAL IPR relating to a particular STANDARD or
TECHNICAL SPECIFICATION is brought to the attention of
ETSI, the Director-General of ETSI shall immediately request the
owner to give within three months an irrevocable undertaking in
writing that it is prepared to grant irrevocable licenses on fair,
reasonable and non-discriminatory [FRAND] terms and conditions
under such IPR to at least the following extent:

• MANUFACTURE, including the right to make or have made
customized components and sub-systems to the licensee's own
design for use in MANUFACTURE;

• sell, lease, or otherwise dispose of EQUIPMENT so
MANUFACTURED;

• repair, use, or operate EQUIPMENT; and

• use METHODS.

The above undertaking may be made subject to the condition that
those who seek licenses agree to reciprocate.

59.     If an owner of an essential IPR refuses to undertake a FRAND commitment with

respect to that IPR, then, as provided in Section 8 of the ETSI IPR Policy, ETSI may suspend

work on relevant parts of the standard or redesign the standard to render the IPR non-essential.

60.     ETSI's IPR Policy was designed to benefit all ETSI members, as well as all other

parties that implement an ETSI standard.  In particular, the stated objective of the policy,

described in Clause 3.1, is to "reduce the risk" to those implementing the standards or other

technical specifications "that investment in the preparation, adoption and application of the

STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable." The IPR Policy specifies that it "shall be governed by the laws of France." Clause 12.

61. During all times relevant to these allegations, Samsung has been a member of ETSI. Samsung actively participated in 3GPP's development of the UMTS standard. As a result of its membership in ETSI and participation in 3GPP's standard-setting process for UMTS, Samsung was and is bound by the ETSI Rules of Procedure, including the ETSI IPR Policy. As was required by the ETSI IPR policy, Samsung submitted declarations to ETSI promising to license its Declared-Essential Patents on FRAND terms. *See infra* ¶¶ 65 and 69.

62. Samsung has represented to Apple, and has alleged in its Counterclaims here, that it owns patents that are essential to the UMTS standard.

### 1. Samsung's Deliberate Non-Disclosure of IPR During the Standard-Setting Process

63. Samsung deliberately and deceptively failed to disclose the existence of its claimed IPR during the standard-setting process despite proposing for adoption into the standard technologies that it believed were covered by its Declared-Essential Patents, all the time intentionally concealing that fact from 3GPP and its members. Samsung personnel (including named inventors on applications for the concealed patents) frequently participated in the relevant Working Groups. The reason for Samsung's intentional failures to disclose its IPR is clear: it knew that by doing so and by simultaneously and intentionally failing to disclose that it would not offer FRAND license terms for each respective Declared-Essential Patent to all implementers of the standard, it would induce 3GPP to adopt the technologies that it claims are covered by its Declared-Essential Patents asserted here. For each of the Declared-Essential Patents, Samsung intentionally failed to disclose its IPR:

> (a) Samsung asserts that the '087 patent, which purports to claim a "method and apparatus for performing non-scheduled transmission in a mobile communication system for supporting an enhanced uplink data channel," is essential to specification 25.309 of UMTS, yet Samsung concealed the existence of its IPR

during the standards-setting process.  In particular, the claimed priority date for the '087 patent, based on the filing of a related Korean patent application, is July 16, 2004.  A second related Korean patent application was filed on August 11, 2004.  A few days later, on August 16, 2004, Samsung submitted a proposal to a 3GPP working group that incorporated the technology for which Samsung was pursuing a patent.  Inventors Juho Lee, Young-Jun Kwak, and Youn-Hyoung Heo attended the meeting at which the proposal was submitted.  On November 15, 2004, Samsung submitted to the same 3GPP working group an additional proposal incorporating the technology for which Samsung was pursuing a patent.  Inventors Young-Bum Kim, Juho Lee, Youn-Hyoung Heo, and Joon-Young Choo attended the meeting at which the proposal was submitted.  Samsung's disclosure to ETSI states that the '087 technology was included in the version of the standard adopted in December 2004 (3GPP TS 25.309 v.6.2.0).  Inventors Sung-Ho Choi and Juho Lee attended that December 2004 meeting.  However, Samsung did not disclose to ETSI the existence of its purportedly essential IPR until more than a year later, on May 16, 2006.

(b)  Samsung asserts that the '596 patent, which purports to claim a "method and apparatus for signaling control information of uplink packet data service in mobile communication system," is essential to the UMTS standard, yet Samsung concealed the existence of its IPR during the standard-setting process.  In particular, the claimed priority date for the '596 patent, based on the filing of a related Korean patent application, is November 9, 2004.  Less than a week later, on November 15, 2004, Samsung submitted a proposal to a 3GPP working group that incorporated the technology for which Samsung was pursuing a patent.  Both of the named inventors, Soeng-Hun Kim and Gert Jan Van Lieshout, attended the meeting at which this proposal was submitted.  On September 21, 2005, a change request drafted by Panasonic that incorporated the technology for which Samsung was pursuing a patent was approved at RAN Plenary meeting #29, September 21-23, 2005.  Inventor Gert Jan Van Lieshout attended the meeting at which the change request was approved.  However, Samsung did not disclose to ETSI its purportedly essential IPR until many years later on May 6, 2010.

64.  Samsung's non-disclosure excluded viable alternative technologies from the relevant Input Technologies Markets (defined below).  Had Samsung properly disclosed the existence of its IPR and its unwillingness to abide by FRAND obligations with respect to such IPR, 3GPP would have decided to standardize an alternative technology to perform the relevant function.  Alternatively, 3GPP would have continued to leave the relevant function out of the standard, in which case implementers would have been free to choose various alternative technologies to perform that function and 3GPP would have been free to continue to evaluate competing alternative technologies for potential standardization in future iterations of the standard.  In either case, but for Samsung's non-disclosures, alternative viable technologies would not have been excluded from the relevant Input Technologies Market (defined below).

For each of the Declared-Essential Patents asserted here, 3GPP had multiple viable alternatives

to standardizing the technology Samsung now claims is covered by its patents:

> (a)  The '087 patent relates to a way that non-scheduled data transmissions (or "autonomous" transmissions) may be guided and handled so as to reduce the cumulative interference from multiple user equipment ("UE") devices in non-scheduled transmission mode.  The '087 patent proposes to limit autonomous transmission interference by specifying a subset of transmission time intervals ("TTIs") that a UE can use within a frame time.  The approach identified in the '087 patent was not the only way available to the Working Group for reducing interference that may be caused by non-scheduled UE transmissions.  For example, in a Liaison Statement sent from TSG RAN WG 1 to TSG RAN WG 2, three alternatives to Samsung's approach were identified in submissions by Motorola and Lucent.  (*See* R1-041246, explaining that R1-041211 and R1-041069 proposed alternatives to Samsung's proposal in R1-041087.)  Accordingly, there were viable alternatives that the Working Group could have adopted.

> (b)  The '596 patent relates to the way scheduling (or control) information is included in the uplink communications.  Added information is distributed between the packet header and the payload of a MAC-e PDU.  An indicator that is placed into the header informs the receiver that control information is present in the payload.  However, there are other ways to send control information in the uplink that the Working Group could have adopted.  For example, LG Electronics Inc.  submitted a proposal (R1-042462) titled "Control Information Transfer in MAC Layer" to the 3GPP TSG RAN WG1 Meeting #45, November 15-19, 2004.  That proposal noted that there were alternative ways of delivering MAC control information, multiple ways of identifying control information in the MAC-e PDU, and multiple ways to implement those approaches.  For example, one bit at the start of a MAC-e PDU could be used to identify that control information was present.  The control information could be present in either the header or the payload portions of the MAC-e PDU.  Various combinations of those approaches (indicator symbols and placement) would have been viable alternatives to Samsung's '596 technology.  Accordingly, there were viable alternatives the Working Group could have adopted.

## 2.  Samsung's FRAND Deceit

65.     Samsung has submitted declarations to ETSI committing to irrevocably license

the Declared-Essential Patents on FRAND terms pursuant to Clause 6.1 of ETSI's IPR policy.

By letter dated December 14, 1998, signed by Young Ky Kim on behalf of Samsung Electronics

Corporation, addressed to ETSI SMG2, Samsung made a general FRAND Commitment, "with

regard to the W-CDMA technology being elaborated by ETSI as a standard for the UMTS

Terrestrial Radio Access (UTRA) FDD Mode," that it was "prepared to grant licenses to its

essential IPRs on a fair, reasonable, and non-discriminatory basis in accordance with the terms

1    and conditions set forth in Clause 6.1 of the ETSI IPR Policy." That declaration did not include

2    references to any particular IPR. Instead, by its submission Samsung promised to license on

3    FRAND terms all Samsung IPR essential to the specified standard, which encompasses the

4    technologies that Samsung claims to be covered by the Declared-Essential Patents that Samsung

5    asserts in this action, i.e., the '087 patent and the '596 patent.

6          66.    Samsung's failure to inform 3GPP that, contrary to this 1998 blanket undertaking,

7    it in fact would not meet its commitments under its 1998 FRAND declaration was intentional

8    and made with deceptive intent in order to induce 3GPP to include in the UMTS standard

9    technologies that Samsung claims are covered by Samsung's Declared-Essential Patents.

10   Samsung's objective during 3GPP's consideration of the relevant input technologies was first to

11   cause those technologies to be standardized through its advocacy for their adoption and

12   simultaneous deceit as described above, and then to take advantage of the lock-in effect by

13   demanding exorbitant royalties or other license terms that were unfair, unreasonable, and/or

14   discriminatory, which objective was flatly inconsistent with its prior explicit FRAND

15   undertaking to the ETSI.

16         67.    Combined with its deliberate concealment of IPR for each of the Declared-

17   Essential Patents during the standardization process, Samsung's concealment of its true intention

18   not to offer FRAND terms to all those implementing the standard—despite its prior written

19   commitment to the contrary—induced 3GPP to standardize each of the technologies that

20   Samsung claims is covered by the Declared-Essential Patents. Had Samsung disclosed its IPR

21   and its true intention not to offer FRAND license terms for each Declared-Essential Patent,

22   3GPP would not have standardized the input technologies that Samsung now claims to be

23   covered by each Declared-Essential Patent. Rather, 3GPP would have decided either to

24   standardize an alternative technology to perform the relevant function or continued to leave the

25   relevant function out of the standard, in which case implementers would have been free to

26   choose various alternative technologies to perform that function and 3GPP would have been free

27

28

1   to continue to evaluate competing alternative technologies for potential standardization in future

2   iterations of the standard.

3        68.    Because, during the standardization process relevant to each of the input

4   technologies that Samsung now claims to be covered by a Declared-Essential Patent, Samsung

5   intentionally concealed that it would not abide by its 1998 written FRAND declaration and in

6   fact intended not to offer FRAND terms, 3GPP and its members relied on that 1998 declaration

7   and Samsung's continuing obligations there under in entertaining Samsung's technology

8   proposals (*supra* ¶ 63) and ultimately in agreeing to standardize the technologies that Samsung

9   claims are covered by its patents.

10       69.    Years later, after standardization of the relevant technologies, Samsung submitted

11  false IPR Declarations including references to specific patents and patent applications, including

12  the Declared-Essential Patents Samsung asserts in this action.  In particular:

13

14           (a)  On behalf of Samsung Electronics Corporation, Seung Gun,
             Park, Vice President signed an IPR Information and Licensing
15           Declaration on May 16, 2006 that Samsung submitted to ETSI.
             Annex 2 to that Declaration includes the Korean patent application
16           to which the '087 patent claims priority (page 8 of 17).

17           (b)  On behalf of Samsung Electronics Corporation, Heungmo Lee,
             Vice President signed an IPR Information and Licensing
18           Declaration on May 6, 2010 that Samsung submitted to ETSI.  The
             annex to that Declaration includes the '596 Patent (page 3-4 of 6).

19  In both of the declarations above, Samsung reconfirmed its 1998 written undertaking using
20  equivalent language.  In the 2006 Declaration for the '087 Patent, Samsung wrote:

21           The SIGNATORY and/or its AFFILIATES hereby declare that
             they are prepared to grant irrevocable licenses under the IPRs on
22           terms and conditions which are in accordance with clause 6.1 of
             the ETSI IPR Policy, in respect of the STANDARD, to the extent
23           that the IPRs remain ESSENTIAL.

24  In the 2010 Declaration for the '596 Patent, Samsung correspondingly wrote:

25           To the extent that the IPR(s) disclosed in the attached IPR
             Information Statement Annex are or become, and remain
26           ESSENTIAL in respect of the ETSI Work Item, STANDARD
             and/or TECHNICAL SPECIFICATION identified in the attached
27           IPR Information Statement Annex, the Declarant and/or its
             AFFILIATES are prepared to grant irrevocable licenses under

28

**APPLE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN REPLY
TO SAMSUNG'S COUNTERCLAIMS**
Case No. 12-cv-00630-LHK            38

1          this/these IPR(s) on terms and conditions which are in accordance
           with Clause 6.1 of the ETSI IPR Policy.

2

3          70.     Both of these declarations were deliberately contrary to Samsung's undisclosed

4    true intention not to offer FRAND terms for the Declared-Essential Patents.  Each written

5    undertaking nevertheless constitutes a promise that all interested parties are entitled to license the

6    specified claimed standards-essential patents on FRAND terms, foreclosing the patentee from

7    claiming infringement of its patents or seeking to obtain an injunction to prohibit an implementer

8    from practicing the standard.

9          71.     Samsung's FRAND declarations falsely represented that Samsung would license

10   its claimed essential patents on FRAND terms.  None of Samsung's FRAND declarations

11   covering any of the Samsung Asserted Patents disclosed that Samsung would take the position

12   that parties practicing the relevant standard were not entitled to a FRAND license to its claimed

13   essential patents, refuse to offer FRAND license terms to certain parties, or attempt to prevent

14   parties from practicing the relevant standard.

15         72.     On information and belief, Samsung has declared essential many patents that are

16   in fact not essential to practicing the UMTS standard.

17         73.     Once the 3GPP participants selected technologies that Samsung claims are

18   covered by its patents, they effectively lost the option to instead include or use alternative

19   technologies capable of performing those functions, thereby excluding such technologies from

20   the relevant Input Technologies Markets (defined below), or to continue to leave the relevant

21   function out of the standard, in which case implementers would have been free to choose various

22   alternative technologies to perform that function and continue to evaluate competing alternative

23   technologies for potential standardization in future iterations of the standard.  Accordingly, to the

24   extent that Samsung's Declared-Essential Patents are essential to any standard, it was Samsung's

25   untimely disclosure of its IPR and/or its false FRAND declarations—not the inherent attributes

26   of its purportedly essential technologies or the uncorrupted operation of the standard-setting

27

28

1  process—that conferred monopoly power on Samsung with respect to the technologies that

2  perform the functions included in the standard.

3       74.    Samsung's FRAND declarations are binding contractual commitments made to

4  ETSI, its members, and designers and sellers of products implementing ETSI standards

5  (including Apple), for the benefit of ETSI, its members, and any entity that implements UMTS

6  (or any other ETSI standard for which Samsung declared essential IPR and undertook a FRAND

7  commitment).  Samsung therefore, in accordance with Clause 6.1 of ETSI's IPR policy, bound

8  itself to license on FRAND terms to Apple, a seller of products that implement the UMTS

9  standard and a member of ETSI.  Indeed, Samsung has admitted as much in other litigation

10  where it has acknowledged that its membership in ETSI created an "actual or implied contract to

11  comply with ETSI's governing documents, including, but not limited to, ETSI's Intellectual

12  Property Rights Policy."  First Amended Complaint at 8, *Samsung Elec. Co. v. InterDigital

13  *Commc'ns Corp.*, No. 07-0167 (D. Del. Sept. 14, 2007).  Samsung has also admitted that by

14  making a FRAND declaration to ETSI, the declarant "expressly promised the wireless telecom

15  SDOs . . . all members [of those SDOs] and any potential licensee of technology allegedly

16  essential for compliance with the respective 3G wireless telecommunications standard, that [the

17  declarant] would be prepared to grant irrevocable licenses to its 3G IPR on FRAND terms."  *Id.*

18  at 22-23.

19       75.    Apple, other members of ETSI, and other companies implementing the UMTS

20  standard have reasonably relied on Samsung's FRAND commitments to: (a) grant licenses to

21  those patents and patent applications that Samsung claims are essential on fair, reasonable, and

22  non-discriminatory terms; and (b) not to seek to impose unfair, unreasonable, or discriminatory

23  conditions on licensing, such as cross-licenses of patents covering proprietary technology that is

24  not essential to any standard.  In particular, Apple and others have relied on Samsung's

25  commitments that preclude Samsung from seeking to enjoin them from practicing the UMTS

26  standard, and that require Samsung to provide fair, reasonable, and non-discriminatory royalties

27  and other license terms that would permit efficient competitors such as Apple profitably to offer

28

standards-compliant products in competition with Samsung and other owners of purportedly

essential patents.

76.     As Samsung has admitted in other litigation, "[c]onsistent with the purposes of

standardization," an ETSI member "knew or reasonably should have expected" that its promise

to license on FRAND terms "would induce potential licensees . . . to take or refrain from taking

certain actions."  First Amended Complaint at 23, *Samsung Elec. Co. v. InterDigital Commc'ns*

*Corp.*, No. 07-0167 (D. Del. Sept. 14, 2007).  In a different litigation, Samsung articulated the

issues in more detail:

> By its declarations of essentiality to ETSI, the Claimant made a clear and unequivocal
> representation to ETSI Members and to all other third-party undertakings that sought to
> manufacture and supply mobile telephone handsets incorporating the relevant technology,
> including the Defendants, that it was prepared to grant them irrevocable licenses under its
> portfolio of essential patents (including the Patents) on FRAND terms and conditions.
>
> In view of the purpose of making such declarations (see Clause 3 of the ETSI IPR Policy)
> and in view of the statements of the Claimant … the said representation was intended to
> affect legal relations between the Claimant and *inter alia* the Defendants, and to be acted
> upon by the latter accordingly.  Alternatively, for the said reasons, it was of such a nature
> that a reasonable person would have understood it to be so.

Re-Amended Defence and Counterclaim at ¶¶ 88-89, *Telefonaktiebolaget LM Ericsson v*

*Samsung Electronics UK Ltd.*, HC06 C00618 (Mar. 15, 2007).

Apple has invested substantial resources in developing and marketing its iPhone and iPad

products in reliance on Samsung's FRAND commitments and is locked in to the UMTS

standard.  Samsung reasonably should have expected that Apple would do so.

### SAMSUNG'S BREACH OF ITS FRAND OBLIGATIONS REGARDING ITS PURPORTED ESSENTIAL PATENTS

77.     Consistent with its true intention throughout the relevant standardization period

that it would not offer FRAND license terms to all implementers of the Declared-Essential

Patents, Samsung has in fact failed to offer such terms to Apple and has breached its FRAND

obligation regarding its Declared-Essential Patents.

78.     Apple introduced its innovative and highly successful iPhone in early 2007.  From that time forward, Apple has had a continuing substantial business relationship with Samsung.  But it was not until late summer 2010, that Samsung claimed for the first time that Apple was infringing any of its Declared-Essential Patents by selling the iPhone.

79.     Samsung's assertion arose in the course of discussions between Apple and Samsung related to Samsung's continuing pattern of copying and infringement of certain Apple patents that are not essential to practice any standard, including patents that cover the distinctive designs and proprietary features that have been the hallmarks of Apple's highly successful products (including the iPhone and iPad).

80.     After the parties were unable to resolve their dispute over Samsung's copying of Apple's products, Apple sued Samsung for infringing Apple's trade dress, trademarks, and non-essential patents in the Earlier Case.

81.     In retaliation, Samsung counterclaimed against Apple seeking to enjoin Apple from selling products compliant with the UMTS standard.  It did so notwithstanding that, as a matter of law, to the extent any of the alleged inventions described in and allegedly covered by the declared-essential patents in the Earlier Case are used, manufactured, or sold by or for Apple, its suppliers, and/or its customers, Apple has the right to a FRAND license to those patents by virtue of Samsung's FRAND commitments.

82.     When, even in the face of the Earlier Case, Samsung continued to introduce new products that infringe Apple's patents, Apple brought the instant suit against Samsung to prevent Samsung's continued infringement of Apple's patents.  Once again, Samsung retaliated by seeking to enjoin Apple's practice of the UMTS standard by alleging that Apple infringes the Declared-Essential Patents, notwithstanding that, as a matter of law, to the extent any of the alleged inventions described in and allegedly covered by the Declared-Essential Patents are used, manufactured, or sold by or for Apple, its suppliers, and/or its customers, Apple has the right to a FRAND license to those patents by virtue of Samsung's FRAND commitments.

### 1. Samsung's Refusal to Offer FRAND License Terms for Its Declared-Essential Patents

83.    Apple has repeatedly asked Samsung to quote FRAND license terms for its declared-essential patents.  It has also repeatedly asked Samsung to provide basic information necessary for Apple to determine whether any rate that Samsung quotes is in fact fair, reasonable, and non-discriminatory, including (a) the royalty base to which Samsung contends the FRAND royalty rate would apply (e.g., the full price of the end-user product or only the component of the end-user product that allegedly practices the Declared-Essential Patents), (b) confirmation that other companies are also paying any royalty rate that Samsung would seek from Apple, and (c) copies or summaries of license agreements with manufacturers of UMTS-compliant chipsets.

84.    After months of repeated Apple requests for a FRAND offer, Samsung finally offered Apple a license to its Declared-Essential Patents on July 25, 2011.  That offer however, was manifestly not FRAND.  Among other things:  (i) Samsung demanded a royalty rate for its portfolio of declared-essential patents that is substantially higher than that indicated by the royalty calculation that Samsung has publicly stated should apply to determine a royalty rate for patents that are declared essential to the UMTS standard; and (ii) Samsung refused to provide Apple personnel any information about any license agreements for declared-essential UMTS patents with other device manufacturers, which would allow Apple personnel to determine whether any future Samsung offers are in fact FRAND (no such information is necessary to determine that Samsung's only offer thus far is not FRAND).  (Apple cannot disclose herein all of the reasons why the offer is not FRAND because Samsung has insisted that the offer be kept confidential.)

85.    On October 14, 2011, The Hague District Court in the Netherlands held that Samsung's only offer to Apple for a license to its Declared-Essential Patents was plainly not on FRAND terms.  On March 14, 2012, that same court held that Samsung's efforts to enjoin Apple's use, if any, of Samsung's Declared-Essential Patents was inconsistent with the obligation to grant a FRAND license.

**2. Samsung's Discrimination Against Apple**

86.     Samsung has not sought to enjoin any other implementer of the UMTS standard from infringing any of its Declared-Essential Patents, even though many such implementers do not have a license from Samsung to practice its declared-essential patents.  Samsung is singling out Apple for abusive assertion of Declared-Essential Patents because Apple owns non-standards-essential patents that Samsung wishes to infringe with impunity and Apple has not permitted it to do so.

87.     As described in Paragraphs 19-28, Samsung not only has discriminatorily singled out Apple, from among all other UMTS implementers, for the infringement claims asserted in this action, but in so doing has asserted against Apple patents that it is precluded from enforcing based on Samsung's license agreements with Apple's chipset suppliers, including Intel and Qualcomm, and further has asserted patents as to which Apple has an implied license by virtue of its longstanding knowledge and participation in the production of the Apple products which it now claims infringe its patents.

88.     In addition, Samsung is a party to a cross-license agreement with Qualcomm, pursuant to which Samsung has granted covenants not to assert patents it owns or controls against customers of Qualcomm with respect to wireless devices that practice such patents by incorporating wireless telecommunications chipsets purchased from Qualcomm, including the Declared-Essential Patents.

89.     By letters dated April 21, 2011 and February 2, 2012, Samsung attempted to exercise its purported right to exclude Qualcomm's sales of chipsets to Apple from the coverage of covenants in the Samsung-Qualcomm Agreement.  Samsung has also purported to exclude Qualcomm's sales of chipsets to Apple from the coverage of covenants in the license agreement(s) that provide that Samsung will not assert its claimed essential IPR against Qualcomm's chipset customers.  Samsung has said that it was doing so because Apple had sued Samsung on several non-essential patents in the Earlier Case, and because Apple had raised an exhaustion claim with respect to Samsung's patents.

90.     Samsung's actions constitute yet another instance of Samsung seeking to leverage its Declared-Essential Patents to coerce Apple into tolerating Samsung's copying of its distinctive product designs and functions.  By treating Apple differently from other UMTS implementers because Apple holds non-essential patents that Samsung wishes to infringe with impunity, Samsung is engaging in unfair, unreasonable, and discriminatory conduct that constitutes a clear violation of its FRAND commitments.

91.     Samsung asserts these counterclaims against Apple for infringement of the Declared-Essential Patents to retaliate for and provide settlement leverage in this action and the Earlier Case, which Apple has brought against Samsung for infringement of its non-standards-essential patents.  Indeed, Samsung claimed that Apple was infringing its Declared-Essential Patents only after Apple sought to halt Samsung's copying of Apple's iPhone and iPad.  It then repeatedly refused to offer FRAND terms for its Declared-Essential Patents standing alone or provide Apple personnel any of the information necessary to evaluate whether a supposedly FRAND offer was actually fair, reasonable, and non-discriminatory.  And finally, on information and belief, Samsung has neither demanded royalties from nor sued for infringement other implementers of the UMTS standard that, unlike Apple, do not own non-essential patents that Samsung wishes to practice.

92.     Thus, Samsung is seeking, unlawfully and in breach of its FRAND commitments, to assert the monopoly power it wrongly obtained in the Input Technologies Markets (defined below) in a discriminatory manner to try to coerce Apple into tolerating Samsung's pattern of repeatedly infringing Apple's designs, trade dress, trademarks, and non-standards-essential patents or licensing to Samsung its proprietary technology (to which Samsung is not entitled).  Left unaddressed, this conduct will chill innovation, quality, and price competition for end products that comply with the UMTS standard by allowing Samsung to free ride on Apple's massive investments in innovation and product development rather than invest in its own distinctive products that consumers desire.

93.     Indeed, a fundamental reason for ETSI's IPR policy is to permit innovators to invest in and bring to market new products that comply with the UMTS standard with confidence that holders of declared-essential patents will not seek to enjoin those products or otherwise abuse the monopoly positions that have been conveyed on them through the standardization process.

94.     Samsung itself objected to precisely this sort of violation of FRAND obligations in another litigation.  After observing that ETSI rules permit a holder of claimed-essential patents to ask for a "reciprocal license" to a potential licensees' patents that are essential to the relevant standard, Samsung drew a sharp distinction between that and an attempt to leverage claimed-essential patents by demanding that the licensee agree not to assert non-standards-essential patents as a condition to the license, which Samsung recognized is a clear breach of ETSI rules:

> What [the patent holder] demanded was not [a reciprocal license to essential patents] but much, much more.  They demanded a nonassert by Samsung, i.e., an agreement by Samsung that it would not assert any of its patents against *any* of [the patent holder's] potential products, well beyond what ETSI rules permitted and, therefore, clearly not FRAND.

Hearing Transcript at 92, *Certain 3G Wideband Code Division Multiple Access (WCDMA) Mobile Handsets and Components Thereof*, Inv. No. 337-TA-601 (ITC July 8, 2008) (emphasis added).

At another point in the same hearing, Samsung explained in somewhat different terms how similar behavior violates FRAND rules:

> [The patent holder] condition [sic] our taking a license under the standard of ETSI . . . on our taking another license that's not covered by that standard.  So, in other words, they are not just going to offer us a license on what they are obligated to license us. They say if you take that, you have also got to take another license. So they are tying the two.  ETSI rules don't permit that.  And that obviously increases dramatically the cost of the license to Samsung.  That is not consonant with their FRAND obligation.

*Id.* at 89.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SAMSUNG HAS ENGAGED IN ANTICOMPETITIVE AND UNFAIR
CONDUCT THAT HAS INJURED AND WILL CONTINUE TO INJURE
COMPETITION AND APPLE IN THE INPUT TECHNOLOGIES MARKETS**

95.     Samsung's unlawful conduct has had, and will continue to have, a substantial

anticompetitive effect on the Input Technologies Markets defined below.

96.     In developing UMTS, ETSI participants sought to select the most appropriate

technology to provide each individual function within the standards.  ETSI participants evaluated

whether to incorporate particular proposed functionalities and whether to include viable

alternative competing technologies into the standards.  They made these decisions based on

technical and commercial merit and intellectual property considerations, including whether the

proposed technology was covered by disclosed IPR and, if so, whether the party claiming to hold

patents covering that technology had committed to make it available on FRAND terms.

97.     UMTS consists of many different technologies performing a variety of functions.

The technologies that perform each of these functions are essential inputs into the manufacture of

products and services that comply with the standards.

98.     Because UMTS specifies a set of distinct technologies to perform the various

functions within the standard, once the standard was adopted, for those functions included in the

standard, there were (by definition) no substitutes for the standardized technologies that perform

each function.

99.     Once ETSI participants selected a single technology to perform a particular

function needed to practice the standard, any alternative technologies that had been capable of

performing that function were no longer viable alternatives for Apple and other parties seeking to

implement UMTS.  Thus, the selection of a particular technology during the standard-setting

process reduced to a single option the technology to perform each function that ETSI determined

to include in the standard.  Parties implementing the standard such as Apple are thus "locked-in"

to the technology.

100.    If a technology selected for inclusion in the standard is protected by patents, the patent owner controls the supply of that particular technological input for the standard.  This is true for each function comprising the standard for which patented technology was selected.

101.    As Samsung explained in a litigation in the United Kingdom:

> The Claimant holds a dominant position in each of the relevant technology markets.  Any undertaking that wishes to carry on business in the economic market for the supply of mobile telephone handsets for use in the European Union has no choice but to seek and obtain a license under the Claimant's portfolio of essential patents (including the Patents).  If the Claimant were to choose to exploit any such undertaking by, for example, charging excessive and/or discriminatory prices, that undertaking could not respond by switching its purchases of the relevant technology to an alternative supplier, or by using some alternative technology.  The Claimant is therefore an unavoidable trading partner for any undertaking wishing to compete in the mobile handset market in the European Union.  It faces no competitors in the supply of the relevant technology, and it has the power to behave to an appreciable extent independently of its customers and, ultimately, consumers.

Re-Amended Defence and Counterclaim at ¶70, *Telefonaktiebolaget LM Ericsson v Samsung Electronics UK Ltd.*, HC06 C00618 (Mar. 15, 2007).

102.    Here, Samsung has claimed that each of its Declared-Essential Patents is essential to practicing technologies that are used for certain functions of UMTS, the world's most widely adopted telecommunications standard.

103.    The technology that Samsung has identified with respect to each of these Declared-Essential Patents concerns a specific aspect of radio signal transmission in a UMTS network.  For UMTS, the '087 patent identifies an Autonomous Transmission Technology and the '596 patent identifies a Scheduling Information Transmission Technology.

104.    The relevant markets in which to assess the anticompetitive effects of Samsung's conduct, therefore, are the various markets for technologies that—before the standard was implemented—were competing to perform each of the various functions covered by each of Samsung's purported essential patents for UMTS (collectively, the relevant "Input Technologies Markets").  The functionality for UMTS provided by each Input Technology, therefore, comprises its own relevant market for antitrust purposes.  In particular, for UMTS the technology

1    identified in the '087 patent and its reasonable substitutes comprise the Autonomous

2    Transmission Technology Market.  The technology identified in the '596 Patent and its

3    reasonable substitutes comprise the Scheduling Information Transmission Technology Market.

4    Before standardization, the sellers in these Input Technologies Markets were the companies

5    supplying technologies capable of performing the relevant function incorporated in the standard.

6    After standardization, however, the holder of patents covering the technology that performs a

7    given function holds a monopoly in the relevant Input Technologies Market.  That is because,

8    post-standardization, formerly viable alternative technologies are no longer viable because of the

9    lock-in effect discussed at Paragraphs 33 and 34.

10          105.   UMTS is employed throughout the world and alternative technologies competing

11   to be incorporated into the UMTS standard were offered by suppliers from around the world.

12   Accordingly, the geographic scope of each of the relevant Input Technologies Markets described

13   above is worldwide.

14          106.   If Samsung in fact has patents covering technologies that have been incorporated

15   into the relevant standard, it has the power to raise prices and exclude competition with respect

16   to each of the technologies covered by its patents and incorporated in the relevant standard.  And

17   it acquired that power as a result of its misconduct in connection with the standard-setting

18   process, including untimely disclosure of its IPR and/or false FRAND commitments.  Barriers to

19   entry into these markets are high because, among other reasons, the post-standardization lock-in

20   effect means that other technologies are no longer viable substitutes for the technologies the

21   standard specifies to perform functions included in the standard.

22          107.   As described in Paragraphs 98 to 106, Samsung holds monopoly power in the

23   Input Technologies Markets assuming that the Declared-Essential Patents that Samsung has

24   asserted are – as Samsung claims – essential to the UMTS standard, valid, and enforceable.  In

25   the alternative, even if one or more of the Declared-Essential Patents that Samsung has asserted

26   in this case were ultimately determined not to be essential to the UMTS standard (or were

27   determined to be invalid or unenforceable), Samsung would still hold a monopoly position in the

28

1   Input Technologies Market associated with each such patent until such a determination were

2   established conclusively.  Merely by asserting a Declared-Essential Patent, Samsung is able to

3   extract royalties or other licensing terms for that patent greatly exceeding what it could have

4   obtained before 3GPP standardized the technology it claims is covered by its patent.  Samsung

5   enjoys that hold-up power because, absent a license, a UMTS implementer must risk an improper

6   injunction claim against the sale of products implementing the UMTS standard and/or potential

7   treble damages in an infringement action, and/or prosecute a lengthy and expensive legal

8   challenge to the validity, enforceability, or essentiality of the Declared-Essential Patent.

9   Moreover, that hold-up power is enhanced where Samsung holds and has asserted multiple

10  declared-essential patents, as it did in this instance by seeking to extract exorbitant royalties for

11  its entire portfolio of declared-essential patents.  By the assertion of multiple patents in this case

12  and the Earlier Case, the likelihood that some or even many may prove actually not to be

13  essential (or to be invalid or unenforceable), does not prevent Samsung from extracting

14  monopoly royalties or other improper license terms.

15
16      **SAMSUNG HAS ENGAGED IN UNFAIR AND
        ANTICOMPETITIVE CONDUCT THAT THREATENS TO
17      INJURE APPLE AND COMPETITION IN THE DOWNSTREAM
        MARKETS FOR MOBILE CELLULAR COMMUNICATIONS DEVICES**

18      108.    Samsung deliberately and deceptively failed to timely disclose IPR that it now

19  claims are essential to the relevant industry standard and made false FRAND commitments.

20  This course of misconduct enabled Samsung to obtain monopoly power in the Input

21  Technologies Markets that it could assert against licensees to obtain excessive royalties.

22  Samsung wrongfully asserted this power when it demanded unreasonable and discriminatory

23  license terms from Apple, a more successful competitor in the downstream markets for mobile

24  cellular communications devices in which Apple and Samsung compete.

25      109.    By (a) wrongfully seeking to enjoin Apple from selling end products that contain

26  chipsets, notwithstanding that Apple is entitled to sell end products containing such chipsets by

27  reason of (i) Samsung's license agreements with Intel and Qualcomm and (ii) the FRAND

28

commitments that Samsung made to ETSI; (b) wrongfully obtaining monopoly power in the Input Technologies Markets through non-disclosure of its IPR during the standard-setting process and false commitments to offer FRAND license terms to implementers of the UMTS standard; and (c) attempting to coerce Apple to accept unfair, unreasonable, discriminatory licensing terms by abusively accusing Apple of infringement and seeking an injunction, Samsung seeks to exclude from the manufacture and sale of downstream wireless devices and raise the costs of its rival, Apple.  Moreover, Samsung's conduct more broadly has threatened and continues to threaten unlawfully to exclude rivals from and increase royalties and other costs associated with the manufacture and sale of downstream cellular communications devices that implement the UMTS standard and chill competition to develop and sell innovative new UMTS-compliant products, resulting in increased prices and decreased quality and innovation in downstream product markets and complementary innovation markets.

## ANTICOMPETITIVE EFFECTS OF SAMSUNG'S CONDUCT

110.   The foregoing conduct by Samsung has caused and threatens to cause harm to competition.  These anticompetitive effects include each of the following:

(a) By deliberately failing to disclose purportedly essential IPR during the standard-setting process and by making false FRAND commitments to ETSI, Samsung has improperly foreclosed competition in each of the relevant Input Technologies Markets. Before standardization, each functionality that is purportedly covered by one of Samsung's claimed-essential patents and included in the standard and all available technical alternatives competed in a relevant product market; following standardization, alternative technologies to perform functions necessary to practice the standard are no longer viable.

(b) Samsung's unlawful conduct has increased prices and decreased quality and innovation for technologies in Input Technologies Markets.  Apple and other consumers of input technologies have been harmed by Samsung's conduct by being forced to pay (or face demands for, on threat of injunction and marketplace disparagement) higher prices for and having access to lower quality and less innovative input technologies as a result of Samsung's illegal conduct.

(c) Samsung's conduct has and, unless enjoined, will continue to substantially increase costs associated with the manufacture and sale of downstream mobile cellular communications devices that are compliant with the UMTS standard, potentially exclude rivals from the manufacture and sales of such devices, and chill innovation and quality competition for products that comply with the UMTS standard.

(d) Samsung's conduct also threatens to chill innovation and quality competition for products that comply with the UMTS standard.  If Samsung's conduct is left unchecked, innovators will no longer be able to invest in and bring to market products that comply with the UMTS standard with confidence that holders of declared-essential patents will not be able unreasonably to exploit their position by demanding cross-licenses to *non-essential* patents or exorbitant royalties or other licensing terms.

Such harm will continue unless and until the Court issues appropriate relief as requested below.

## APPLE'S COUNTERCLAIMS IN REPLY

### FIRST COUNTERCLAIM
### (Declaratory Judgment of Non-Infringement of the '087 Patent)

111.   Apple incorporates and realleges Paragraphs 1 through 110 of this Counterclaim.

112.   Apple has not directly or indirectly infringed and is not directly or indirectly infringing any valid claim of the '087 Patent.

113.   To resolve the legal and factual questions raised by Samsung and to afford relief from the uncertainty and controversy that Samsung's accusations have precipitated, Apple is entitled to a declaratory judgment that it has not infringed and is not infringing any valid, enforceable claim of the '087 Patent.

### SECOND COUNTERCLAIM
### (Declaratory Judgment of Invalidity of the '087 Patent)

114.   Apple incorporates and realleges Paragraphs 1 through 113 of this Counterclaim.

115.   One or more of the claims of the '087 Patent are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and/or 112.

116.   To resolve the legal and factual questions raised by Samsung and to afford relief from the uncertainty and controversy that Samsung's accusations have precipitated, Apple is entitled to a declaratory judgment that the '087 Patent is invalid.

## THIRD COUNTERCLAIM
### (Declaratory Judgment of Non-Infringement of the '596 Patent)

117. Apple incorporates and realleges Paragraphs 1 through 116 of this Counterclaim.

118. Apple has not directly or indirectly infringed and is not directly or indirectly infringing any valid claim of the '596 Patent.

119. To resolve the legal and factual questions raised by Samsung and to afford relief from the uncertainty and controversy that Samsung's accusations have precipitated, Apple is entitled to a declaratory judgment that it has not infringed and is not infringing any valid, enforceable claim of the '596 Patent.

## FOURTH COUNTERCLAIM
### (Declaratory Judgment of Invalidity of the '596 Patent)

120. Apple incorporates and realleges Paragraphs 1 through 119 of this Counterclaim.

121. One or more of the claims of the '596 Patent are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and/or 112.

122. To resolve the legal and factual questions raised by Samsung and to afford relief from the uncertainty and controversy that Samsung's accusations have precipitated, Apple is entitled to a declaratory judgment that the '596 Patent is invalid.

## FIFTH COUNTERCLAIM
### (Declaratory Judgment of Non-Infringement of the '470 Patent)

123. Apple incorporates and realleges Paragraphs 1 through 122 of this Counterclaim.

124. Apple has not directly or indirectly infringed and is not directly or indirectly infringing any valid claim of the '470 Patent.

125.     To resolve the legal and factual questions raised by Samsung and to afford relief from the uncertainty and controversy that Samsung's accusations have precipitated, Apple is entitled to a declaratory judgment that it has not infringed and is not infringing any valid, enforceable claim of the '470 Patent.

## SIXTH COUNTERCLAIM
### (Declaratory Judgment of Invalidity of the '470 Patent)

126.     Apple incorporates and realleges Paragraphs 1 through 125 of this Counterclaim.

127.     One or more of the claims of the '470 Patent are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and/or 112.

128.     To resolve the legal and factual questions raised by Samsung and to afford relief from the uncertainty and controversy that Samsung's accusations have precipitated, Apple is entitled to a declaratory judgment that the '470 Patent is invalid.

## SEVENTH COUNTERCLAIM
### (Declaratory Judgment of Non-Infringement of the '757 Patent)

129.     Apple incorporates and realleges Paragraphs 1 through 128 of this Counterclaim.

130.     Apple has not directly or indirectly infringed and is not directly or indirectly infringing any valid claim of the '757 Patent.

131.     To resolve the legal and factual questions raised by Samsung and to afford relief from the uncertainty and controversy that Samsung's accusations have precipitated, Apple is entitled to a declaratory judgment that it has not infringed and is not infringing any valid, enforceable claim of the '757 Patent.

## EIGHTH COUNTERCLAIM
### (Declaratory Judgment of Invalidity of the '757 Patent)

132.     Apple incorporates and realleges Paragraphs 1 through 131 of this Counterclaim.

133.     One or more of the claims of the '757 Patent are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and/or 112.

134.     To resolve the legal and factual questions raised by Samsung and to afford relief from the uncertainty and controversy that Samsung's accusations have precipitated, Apple is entitled to a declaratory judgment that the '757 Patent is invalid.

## NINTH COUNTERCLAIM
### (Declaratory Judgment of Non-Infringement of the '058 Patent)

135.     Apple incorporates and realleges Paragraphs 1 through 134 of this Counterclaim.

136.     Apple has not directly or indirectly infringed and is not directly or indirectly infringing any valid claim of the '058 Patent.

137.     To resolve the legal and factual questions raised by Samsung and to afford relief from the uncertainty and controversy that Samsung's accusations have precipitated, Apple is entitled to a declaratory judgment that it has not infringed and is not infringing any valid, enforceable claim of the '058 Patent.

## TENTH COUNTERCLAIM
### (Declaratory Judgment of Invalidity of the '058 Patent)

138.     Apple incorporates and realleges Paragraphs 1 through 137 of this Counterclaim.

139.     One or more of the claims of the '058 Patent are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and/or 112.

140.     To resolve the legal and factual questions raised by Samsung and to afford relief from the uncertainty and controversy that Samsung's accusations have precipitated, Apple is entitled to a declaratory judgment that the '058 Patent is invalid.

## ELEVENTH COUNTERCLAIM
### (Declaratory Judgment of Non-Infringement of the '179 Patent)

141.     Apple incorporates and realleges Paragraphs 1 through 140 of this Counterclaim.

142.     Apple has not directly or indirectly infringed and is not directly or indirectly infringing any valid claim of the '179 Patent.

143.     To resolve the legal and factual questions raised by Samsung and to afford relief from the uncertainty and controversy that Samsung's accusations have precipitated, Apple is entitled to a declaratory judgment that it has not infringed and is not infringing any valid, enforceable claim of the '179 Patent.

## TWELFTH COUNTERCLAIM
### (Declaratory Judgment of Invalidity of the '179 Patent)

144.     Apple incorporates and realleges Paragraphs 1 through 143 of this Counterclaim.

145.     One or more of the claims of the '179 Patent are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and/or 112.

146.     To resolve the legal and factual questions raised by Samsung and to afford relief from the uncertainty and controversy that Samsung's accusations have precipitated, Apple is entitled to a declaratory judgment that the '179 Patent is invalid.

## THIRTEENTH COUNTERCLAIM
### (Declaratory Judgment of Non-Infringement of the '449 Patent)

147.     Apple incorporates and realleges Paragraphs 1 through 146 of this Counterclaim.

148.     Apple has not directly or indirectly infringed and is not directly or indirectly infringing any valid claim of the '449 Patent.

149.     To resolve the legal and factual questions raised by Samsung and to afford relief from the uncertainty and controversy that Samsung's accusations have precipitated, Apple is entitled to a declaratory judgment that it has not infringed and is not infringing any valid, enforceable claim of the '449 Patent.

## FOURTEENTH COUNTERCLAIM
### (Declaratory Judgment of Invalidity of the '449 Patent)

150.     Apple incorporates and realleges Paragraphs 1 through 149 of this Counterclaim.

151.     One or more of the claims of the '449 Patent are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and/or 112.

152.     To resolve the legal and factual questions raised by Samsung and to afford relief from the uncertainty and controversy that Samsung's accusations have precipitated, Apple is entitled to a declaratory judgment that the '449 Patent is invalid.

## FIFTEENTH COUNTERCLAIM
### (Declaratory Judgment of Non-Infringement of the '239 Patent)

153.     Apple incorporates and realleges Paragraphs 1 through 152 of this Counterclaim.

154.     Apple has not directly or indirectly infringed and is not directly or indirectly infringing any valid claim of the '239 Patent.

155.     To resolve the legal and factual questions raised by Samsung and to afford relief from the uncertainty and controversy that Samsung's accusations have precipitated, Apple is entitled to a declaratory judgment that it has not infringed and is not infringing any valid, enforceable claim of the '239 Patent.

## SIXTEENTH COUNTERCLAIM
### (Declaratory Judgment of Invalidity of the '239 Patent)

156.     Apple incorporates and realleges Paragraphs 1 through 155 of this Counterclaim.

157.     One or more of the claims of the '239 Patent are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and/or 112.

158.     To resolve the legal and factual questions raised by Samsung and to afford relief from the uncertainty and controversy that Samsung's accusations have precipitated, Apple is entitled to a declaratory judgment that the '239 Patent is invalid.

## SEVENTEENTH COUNTERCLAIM
### (Breach of Contract – FRAND and Other Standard-Related Misconduct)

159.     Apple incorporates and realleges Paragraphs 1 through 158 of this Counterclaim.

160.     As set forth above, by committing to license the Declared-Essential Patents to adopters of the UMTS standard on FRAND terms, Samsung entered into contractual commitments with ETSI, ETSI's members, and designers and sellers of products that implement the Relevant Standards.

161.     Each party implementing the UMTS standard – including Apple – is an intended third party beneficiary and obtains the benefits of Samsung's contractual commitments.  It was material, indeed critical, to Samsung's contractual commitments that Samsung agree to convey FRAND licenses to all adopters of the UMTS standard – including Apple.

162.     Samsung breached these contracts by claiming infringement and seeking to enjoin Apple from practicing the UMTS standard, notwithstanding that, to the extent any of the alleged inventions described in and allegedly covered by the Declared-Essential Patents are used, manufactured, or sold by or for Apple, its suppliers, and/or its customers, Apple has the right to a FRAND license to the Declared-Essential Patents by virtue of Samsung's FRAND

commitments; and by acting unreasonably and unfairly towards and discriminating against Apple because Apple holds designs, trade dress, trademarks, and non-standards-essential patents that Samsung wishes to infringe with impunity.

163. Additionally, as an independent breach of its contractual obligations to ETSI, and to Apple, Samsung failed to timely disclose its allegedly essential patents in accordance with the requirements of the ETSI IPR Policy.

164. As another independent breach of its contractual obligations to ETSI, Samsung has refused to offer FRAND royalty terms to Apple, instead offering excessive terms that violate FRAND, e.g., with respect to both royalty rate and royalty base.

165. As a result of these multiple contractual breaches, Apple has been injured, including in its business or property. Apple has been forced to expend resources resolving this licensing dispute, including defending counterclaims against it for patent infringement and efforts to enjoin its products, and has suffered or faces the threat of, in particular, increased costs, lower quality or innovation for Input Technologies, loss of profits, loss of customers and potential customers, loss of goodwill and product image, uncertainty in business planning, and uncertainty among customers and potential customers.

## EIGHTEENTH COUNTERCLAIM
### (Declaratory Judgment that Apple is Entitled to a License to Samsung's Declared-Essential Patents)

166. Apple incorporates and realleges Paragraphs 1 through 164 of this Counterclaim.

167. There is a dispute between the parties concerning whether, to the extent any of the alleged inventions described in and allegedly covered by the Declared-Essential Patents are used, manufactured, or sold by or for Apple, its suppliers, and/or its customers, Apple has an irrevocable right to a FRAND license to Samsung's Declared-Essential Patents by virtue of Samsung's FRAND commitments.

168. The dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

169.   Apple is entitled to a declaratory judgment that, to the extent any of the alleged inventions described in and allegedly covered by the Declared-Essential Patents are used, manufactured, or sold by or for Apple, its suppliers, and/or its customers and covered by valid Declared-Essential Patents, Apple has the irrevocable right to be licensed on FRAND terms under those patents.

170.   Because Apple and Samsung have been unable to agree on FRAND terms for Samsung's Declared-Essential Patents, Apple is further entitled to a declaratory judgment setting forth the FRAND terms and conditions for a license to the Declared-Essential Patents, including the applicable royalty rate and base.

## NINETEENTH COUNTERCLAIM
### (Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

171.   Apple incorporates and realleges Paragraphs 1 through 170 of this Counterclaim.

172.   Samsung has unlawfully monopolized each of the relevant Input Technologies Markets by deliberately and deceptively failing to timely disclose – before standardization – IPR that Samsung claims covers essential elements of the standard and making false commitments to license IPR on FRAND terms, and by reneging on its FRAND commitments.  Samsung has undertaken this cumulative course of misconduct with the intent to monopolize the relevant Input Technologies Markets.

173.   Had Samsung properly disclosed its IPR in a timely manner and had Samsung disclosed its true intent to assert that parties implementing the standard should be enjoined from selling UMTS compliant products or required to pay exorbitant license fees and accept other non-FRAND terms, 3GPP would have decided to standardize an alternative technology to perform the relevant function.  Alternatively, 3GPP would have continued to leave the relevant function out of the standard, in which case implementers would have been free to choose various alternative technologies to perform that function and 3GPP would have been free to continue to evaluate competing alternative technologies for potential standardization in future iterations of

the standard.  Samsung thus would not have obtained a monopoly in the relevant Input

Technologies Markets.

174.     Samsung's non-disclosure and false FRAND commitments proximately resulted

in incorporation into the standard of technology over which Samsung claims patent rights.

Samsung has therefore unlawfully excluded competing technologies from each of the relevant

Input Technologies Markets and unlawfully acquired monopoly power in those markets.

175.     As a direct and proximate result of Samsung's monopolization, Apple has

suffered injury to its business and property and is threatened by the imminent loss of profits, loss

of customers and potential customers, and loss of goodwill and product image.  Apple suffers

anticompetitive injury as a purchaser in the Input Technologies Markets because reasonable

substitutes have been excluded.  Because Samsung has abused its wrongfully-obtained monopoly

power, Apple has been forced to expend significant resources.  Moreover, Apple also incurred

substantial costs in defending against Samsung's baseless patent infringement counterclaims.

### TWENTIETH COUNTERCLAIM
### (Unfair Competition Under Cal. Bus. & Prof. Code § 17200)

176.     Apple incorporates and realleges Paragraphs 1 through 175 of this Counterclaim.

177.     By the acts alleged, Samsung has engaged in unfair competition within the

meaning of Cal. Bus. & Prof. Code § 17200, et seq., both through conduct that also violates the

antitrust laws and conduct that violates § 17200 for other reasons.

178.     Samsung's conduct, as set forth in these counterclaims, constitutes:  (a) unlawful

business acts or practices in violation of the federal antitrust laws, (b) fraudulent conduct, and (c)

unfair business acts or practices, including but not limited to unfair business practices threatening

an incipient violation of an antitrust law, violating the policy or spirit of the antitrust laws, and

otherwise significantly threatening and harming competition in California and elsewhere.

179.     Samsung committed unlawful business acts or practices by violating Section 2 of

the Sherman Act and Section 5 of the Federal Trade Commission Act.

180.     Samsung engaged in fraudulent conduct by engaging in fraudulent non-disclosures with respect to its claimed essential IPR and FRAND commitments.

181.     Samsung committed unfair business acts or practices by (i) failing to timely disclose its claimed essential IPR; (ii) failing to disclose that it did not intend to meet its FRAND commitments; (iii) suing and then asserting counterclaims against Apple for patent infringement and an injunction, notwithstanding that – as both Samsung knew and a reasonable person would know that – (a) Samsung is precluded from asserting Samsung Asserted Patents against Apple to the extent such patents are substantially embodied in chipsets that Apple buys from licensed suppliers authorized by Samsung to sell such chipsets for incorporation into Apple's products; (b) Apple is impliedly licensed to sell products, as to which Samsung was involved and acquiesced for many years in their production without claiming infringement; and (c) Apple has the right to a FRAND license to Samsung's Declared-Essential Patents by virtue of Samsung's FRAND commitments; (iv) acting unfairly and unreasonably towards and discriminating against Apple in its licensing practices because Apple owns designs, trade dress, trademarks, and non-standards-essential patents that Samsung wishes to infringe with impunity.

182.     As a direct, proximate, and foreseeable result of Samsung's wrongful conduct, as alleged above, competition has been injured in the Input Technologies Markets, for the reasons described in Paragraph 106.  Samsung's wrongful conduct also brings a significant threat of injury for downstream price, quality, and innovation competition for mobile cellular communication devices (including smartphones and table computers), thereby causing injury to consumers in California and elsewhere.  These threatened injuries include the inevitable passing on to consumers of improper royalties demanded by Samsung and decreases in innovation and quality competition for end products that comply with the UMTS standard.  Among other things, Samsung's abusive conduct threatens to dampen innovation for products that comply with the UMTS standard by eliminating manufacturers' ability to invest in and bring to market innovative products with confidence that holders of claimed-essential patents will not seek to enjoin their products or demand exorbitant, non-FRAND licensing terms.

183.     As a direct, proximate, and foreseeable result of Samsung's wrongful conduct, as alleged above, Apple has suffered harm in California and elsewhere, both as a customer in the Input Technologies Markets and as a supplier of downstream products.  This harm includes, among other things:  Samsung's suing and seeking injunctions against Apple end products notwithstanding that Apple is entitled to sell end products containing chipsets Apple purchases from Intel and Qualcomm by virtue of Samsung's license agreements with Intel and Qualcomm, Apple's chipset suppliers; the unavailability of a FRAND license despite Samsung's assurance that it would offer such FRAND licenses; being forced to expend resources to defend counterclaims for patent infringement; and the threat of, in particular, increased costs, lower quality or innovation for Input Technologies, loss of profits, loss of customers and potential customers, loss of goodwill and product image, uncertainty in business planning, and uncertainty among customers and potential customers.

## PRAYER FOR RELIEF

WHEREFORE, Apple requests that the Court:

a.     Dismiss Samsung's Counterclaims in their entirety, with prejudice;

b.     Enter judgment in favor of Apple and against Samsung;

c.     Adjudge and decree that Samsung is liable for breach of contract, violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and/or violation of Cal. Bus. & Prof. Code § 17200;

d.     On Apple's Seventeenth and Nineteenth claims for relief, enter judgment against Samsung for the amount of damages Apple proves at trial and, as an equitable remedy, enter judgment declaring that Samsung's purported essential patents, including the Declared-Essential Patents, are unenforceable by virtue of standards-related misconduct including (i) Samsung's breach of its FRAND commitments and/or (ii) Samsung's breach of its disclosure obligations at ETSI;

e.  On Apple's Eighteenth claim for relief, enter judgment declaring (i) that to the extent any of the alleged inventions described in and allegedly covered by the Declared-Essential Patents are used, manufactured, or sold by or for Apple, its suppliers, and/or its customers, Apple has the irrevocable right to be licensed on FRAND terms under Samsung's Declared-Essential Patents, and (ii) setting forth the FRAND terms and conditions for a license to the Declared-Essential Patents, including the applicable royalty rate and base;

f.  On Apple's Nineteenth claim for relief, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; enter judgment against Samsung for treble the amount of Apple's damages, enjoin Samsung from demanding from Apple non-FRAND terms for Samsung's purportedly essential patents, and award Apple all reasonable attorneys' fees and costs;

g.  On Apple's Twentieth claim for relief, enter judgment that Samsung has violated the California Unfair Competition Law; enjoin Samsung from further violations of that Law; and award all reasonable attorneys' fees and costs;

h.  Declare that Apple has not infringed, and is not infringing, each of the Samsung Asserted Patents;

i.  Declare that one or more of the claims of each of the Samsung Asserted Patents are invalid, void and/or unenforceable against Apple; and

j.  Grant such further relief as the Court deems just and proper.


## DEMAND FOR JURY TRIAL

Apple hereby demands trial by jury on all issues so triable raised by the Amended Complaint or by this Counterclaim in Reply.

Dated:  May 31, 2012                                    _____*/s/ H. Mark Lyon*_____
                                                         Josh A. Krevitt (SBN 208552)
                                                         *jkrevitt@gibsondunn.com*
                                                         H. Mark Lyon (SBN 162061)
                                                         *mlyon@gibsondunn.com*
                                                         GIBSON, DUNN & CRUTCHER LLP
                                                         1881 Page Mill Road
                                                         Palo Alto, CA 94304-1211
                                                         Telephone: (650) 849-5300
                                                         Facsimile: (650) 849-5333

                                                         Michael A. Jacobs (SBN 111664)
                                                         *MJacobs@mofo.com*
                                                         Richard S.J. Hung (SBN 197425)
                                                         *RHung@mofo.com*
                                                         MORRISON & FOERSTER LLP
                                                         425 Market Street
                                                         San Francisco, California 94105
                                                         Telephone: ( 415) 268-7000
                                                         Facsimile:  (415) 268-7522

                                                         Mark D. Selwyn (SBN 244180)
                                                         (*mark.selwyn@wilmerhale.com*)
                                                         WILMER CUTLER PICKERING
                                                         HALE AND DORR LLP
                                                         950 Page Mill Road
                                                         Palo Alto, California 94304
                                                         Telephone: (650) 858-6000
                                                         Facsimile:   (650) 858-6100

                                                         William F. Lee (admitted *pro hac vice*)
                                                         *william.lee@wilmerhale.com*
                                                         WILMER CUTLER PICKERING
                                                         HALE AND DORR LLP
                                                         60 State Street
                                                         Boston, Massachusetts 02109
                                                         Telephone: (617) 526-6000
                                                         Facsimile: (617) 526-5000

                                                         *Attorneys for Plaintiff and*
                                                         *Counterclaim-Defendant Apple Inc.*

1

## CERTIFICATE OF SERVICE

2

3       The undersigned hereby certifies that a true and correct copy of the above and foregoing

4   document has been served on May 31, 2012, to all counsel of record who are deemed to have

5   consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.  Any

6   other counsel of record will be served by electronic mail, facsimile and/or overnight delivery.

7
                                    _____
8                                        */s/ H. Mark Lyon*
                                        H. Mark Lyon
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28