# EXHIBIT GG

Highly Confidential

Page 1

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3                        SAN JOSE DIVISION

4       _____

5       APPLE INC., a California            )

6       Corporation,                        )

7                         Plaintiff,        )

8            v.                             ) Case No: 12-CV-00630-LHK

9       SAMSUNG ELECTRONICS CO., LTD., a    )

10      Korean corporation; SAMSUNG         )

11      ELECTRONICS AMERICA, INC., a New    )

12      York corporation; SAMSUNG           )

13      TELECOMMUNICATIONS AMERICA, LLC,    )

14      a Delaware Limited liability        )

15      company                             )

16                         Defendants.      )

17      _____)

18           H I G H L Y   C O N F I D E N T I A L

19

20        VIDEOTAPED DEPOSITION OF DR. KARAN SHER SINGH

21        Hotel Elysee Palace, 59 Promenade des Anglais

22                         Nice, France

23                    Sunday, May 27, 2012

24

25      Job No. 50028

Highly Confidential

1    A P P E A R A N C E S:

2

3        GIBSON DUNN & CRUTCHER

4        Attorneys for Plaintiff

5            1050 Connecticut Avenue, N.W.,

6            Washington, D.C. 20036

7        BY: BRIAN M. BUROKER

8

9

10       QUINN EMANUEL URQUHART & SULLIVAN

11       Attorneys for Defendants

12           51 Madison Avenue

13           New York, New York 10010

14       BY: ANASTASIA M. FERNANDS

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential

1    Q.    Did you review the prior art that was

2    cited by Dr. Kaliski?

3    A.    I reviewed the four key prior art

4    references that were cited by Dr. Kaliski, yes.

5    Q.    Did you review any of the other prior

6    art references other than the four that you

7    referred to as the four key prior art references?

8    A.    No, I did not.

9    Q.    Why not?

10    A.    I did not review them because

11   I reviewed -- what I did review is Dr. Kaliski's

12   summarization of those references and, from what I

13   was able to discern, those were descriptions,

14   generalized descriptions, of work or systems

15   pertaining to the general field of text entry.

16            There was nothing beyond that in

17   Dr. Kaliski's declaration to guide me or any other

18   person of ordinary skill in the art how those

19   references would be relevant.  He did do that very

20   explicitly for what I spoke of as the four key

21   references and so I did go into those in detail.

22    Q.    And what do you mean when you say the

23   "general field of text entry"?

24    A.    I mean the '172 patent -- which is the

25   patent that we are talking about, the declarations

Highly Confidential

1  are about -- essentially deals with facilitating

2  the entry of text in a general sense on mobile

3  devices or devices with small screen real estate

4  and so when I say the general area of text entry,

5  it could deal with the same general area or it

6  could be potentially even more general, just

7  dealing with how humans can provide textual input

8  to a computational device.

9       Q.    And you chose not to review the other

10  patent cited by Dr. Kaliski that you thought,

11  based on his description, related to the general

12  field of text entry?

13       A.    Well, as I said, I read Dr. Kaliski's

14  description summarization of those pieces of prior

15  art and neither in his summarization nor -- so,

16  neither was there anything that I felt required

17  more detailed analysis in his summarization, nor

18  did he provide any guidance in terms of how these

19  pieces of prior art would be relevant beyond this

20  belonging to the same general area.

21       Q.    And is it your opinion that the '172

22  patent pertains to the general field of text

23  entry?

24       A.    It pertains -- yes, it is.  It falls

25  within the general field but it pertains to --

Highly Confidential

1   I mean, it relates to far more specific things

2   that are detailed in the claims, in the claim

3   language of the patent.

4           (Exhibit 1 marked for identification.)

5       Q.    You've just been handed what's been

6   marked as exhibit 1.  It's a document with a title

7   "Reply declaration of Dr. Karan Singh regarding

8   U.S. patent number 8,074,172".  Do you recognize

9   this document?

10      A.    Yes.  Just give me a minute, I will

11  just leaf through it.

12      Q.    And I will note for the record that the

13  exhibits to the document were omitted, that you

14  had attached exhibits to your declaration.  This

15  is the declaration without its the exhibits.

16          Do you recognize the document?

17      A.    Yes.

18      Q.    Okay.  And this is the reply

19  declaration that you referred to earlier?

20      A.    Yes.

21      Q.    Could you turn to what is page 3 of the

22  reply declaration in paragraph 6?

23      A.    Mm-hm.

24      Q.    The next to last sentence of

25  paragraph 6 you state that:

Highly Confidential

Page 11

1  referring counter to the context of the sentence

2  before that says:

3          "... Dr. Kaliski's argument that

4  infringement depends on the way in which bits

5  representing what the user types and sees on the

6  screen are stored in memory ..." is -- that's why

7  the word "displays" is in bold.

8          It's essentially trying to say that the

9  interpretation of the claims of the 172 are

10 a visual interpretation of what is presented to

11 the -- presented to the human, what you see,

12 rather than any underlying structural

13 representation of the strings and the other claim

14 elements that are being discussed over here.

15     Q.   You would agree that at least claim 19,

16 for example, includes the word "instructions" in

17 the claim language, correct?

18     A.   Yes, it -- I will agree that it

19 includes the word "instructions".  However, if

20 I was to read claim 19 -- I mean, without actually

21 looking at claim 19, it essentially refers to the

22 existence of instructions, to perform -- to result

23 in the visual description that has been described.

24         So, yes, the word "instruction" is used

25 but it's in this context.

Page 12

1    Q.    When you say "in this context" in your

2    opinion that the word "instruction" is to be used

3    to refer to a visual description?

4    A.    No, the word "instructions" is used to

5    refer to some program or some computational

6    programmatic entity that -- whose visual

7    manifestation is what is described by the claims.

8    Q.    What is the basis for your opinion that

9    the claims focus on what is ultimately displayed

10   to the user?

11   A.    Sorry, could I have you repeat the

12   question?

13   Q.    As I've understood your last answers

14   correctly, that your -- it's your opinion that the

15   claims themselves that you analyzed focused on

16   what ultimately is displayed to the user; is that

17   correct?

18   A.    That is correct.

19   Q.    Okay.  And why do you believe these

20   claims, in particular the claims that refer to

21   instructions, are focused on what is ultimately

22   displayed to the user?

23   A.    So I believe in my report I go to

24   certain lengths in describing exactly why it is my

25   belief.  I just need to find the appropriate

Highly Confidential

1    Q.    And specifically, are there algorithms

2    in the specification?

3    A.    There are -- there's disclosure there.

4    There's -- there's -- yes, you could consider that

5    kind of -- the sort of descriptions that are there

6    to be algorithms, yes.

7           (Exhibit 2 marked for identification.)

8    Q.    You've just been handed what we've

9    marked as exhibit 2 so that you have it in front

10   of you and it is the patent number 8,074,172.

11   A.    Mm-hm.

12   Q.    If I refer to this as the "'172 patent"

13   you'll understand what I'm referring to?

14   A.    Yes.

15   Q.    Okay.  I just wanted to make sure you

16   have that in front of you.

17   A.    Yes.

18   Q.    First, though, in your declaration in

19   paragraph 80 --

20   A.    Yes.

21   Q.    -- are there any portions of the

22   specification that you refer to as constituting an

23   algorithm?

24   A.    Well, for starters, figure 3 is

25   certainly described in a manner that constitutes

Highly Confidential

Page 20

1    a flow of logic which could be termed as an

2    algorithm.

3        Q.    Other than figure 3, are there any

4    portions of the specification that you refer to in

5    paragraph 80 of your declaration that constitute

6    an algorithm?

7        A.    Paragraph 79, I think.

8        Q.    No, in paragraph 80 of your

9    declaration.

10       A.    Actually, I haven't read paragraph 80.

11   Could I just take a quick look?

12            (Document review.)

13            I guess there's a section column 13,

14   lines 5 to 34 that I seem to refer to.

15       Q.    And if you turn to that, column 13,

16   line 5 to 34 is claim 19, correct?

17       A.    Yes, that is right.

18       Q.    Other than figure 3 and claim 19

19   itself, is there anything else in the '172 patent

20   that you believe constitutes an algorithm

21   describing the steps necessary to perform claim

22   19?

23       A.    There are illustrations that to me and

24   any person that's a person of ordinary skill in

25   the art could easily be -- could easily be sort of

Highly Confidential

1    equivalent to having an algorithm that is kind of

2    written down in a flow of logic the way figure 3

3    shows.

4              If you look at, for example, the

5    sequence of figures from starting from figure 4A

6    all the way through 4H -- well, all the way

7    through 4I as well as -- as well as probably the

8    sequence of figures 5A/5B, they essentially

9    describe a flow of steps.  They give you shots of

10   before and after in terms of what happens and

11   then, if you go to their textual description in

12   the specification of the patent, which I believe

13   would be -- right, so starting around -- well,

14   starting around the beginning of column 9, if we

15   look at, "Attention is now directed to figures 4A

16   to 4I ...", the overall structure is being

17   illustrated.

18             It describes how input is -- it

19   describes here, it describes an embodiment of how

20   input is displayed, how the text -- what it can

21   typically include if you look at that and then it

22   goes to 4B.

23             It says:

24             "The character string may be a complete

25   or incomplete word.  The device may display one or

Highly Confidential

Page 22

1    more suggested replacements ..."

2            So it's showing examples of those

3    replacements.

4            If you come down, further down --

5    essentially, I mean, I could read the entire

6    column for you but my reading, and one of a person

7    of ordinary skill in the art, is it's essentially

8    providing a visual description, a visual

9    contextual description, that a person of ordinary

10   skill in the art would be able to translate into

11   a computer executable output.

12       Q.    And would you consider that visual

13   contextual description to be an algorithm?

14       A.    It could as long as there was -- you

15   know, as long as there was sufficient disclosure

16   there.

17       Q.    As it is used here, do you consider it

18   to be an algorithm?

19       A.    I certainly see it to contribute to the

20   overall enablement of the patent claims.

21       Q.    Does the fact that it contributes to

22   the overall enablement of the patent claims make

23   it an algorithm?

24       A.    I believe that the overall patent

25   claims have a few different -- I mean, there are

Page 30

1    forms.  I've pointed at two more traditional

2    algorithmic forms: one in the claim language

3    itself that describes the textual flow, and one in

4    a figure that is defined as a flow chart.

5              In addition to that, there are examples

6    and description in -- that certainly contribute to

7    the understanding of these claims and the

8    understanding and their enablement.  Personally,

9    when I work with students, quite often, you know,

10   we discuss things in a manner that is not

11   necessarily -- that may or may not be written down

12   in a pseudo code or in some very traditional or

13   formal fashion that is still something that the

14   student is absolutely able to unequivocally

15   understand.

16        Q.    The question I asked was much more

17   specific than that.

18        A.    Okay, right.

19        Q.    Here in paragraph 80 of your

20   declaration --

21        A.    Yes.

22        Q.    -- other than claim 19 itself and

23   figure 3 --

24        A.    Yes.

25        Q.    -- you don't identify anything else in

Highly Confidential

Page 31

1   the specification that is an algorithm related to

2   the instructions of claim 19?

3        A.    Right, in terms of -- I mean, basically

4   if you're asking me what the text over here in the

5   declaration actually says, yes, the text in the

6   declaration specifically recites the claim and it

7   refers to a figure, yes.

8             However, I believe that if you want to

9   talk about the overall notion of enablement, you

10  should be -- you know, you should maybe look at

11  the fact that there's all this other information

12  that contributes to your understanding as well.

13       Q.    You didn't identify any of that other

14  information as part of the algorithm related to

15  claim 19 here in your declaration, did you?

16       A.    Not in this paragraph but given that

17  this patent is 40 I don't know how many pages

18  long, you know, if you wanted to just describe

19  that overall loose, you know, that overall

20  description, you're looking at -- I mean, as far

21  as this is concerned, I was trying to define sort

22  of a crisp declaration that would be -- yes, that

23  would be sufficient and I believe that what I've

24  described is sufficient in that sense.

25       Q.    In your earlier answer you referred to

1    input sequence that would be -- that would bear

2    the same relationship to the word "invention" or

3    "generally" or "CAZ" that you may have typed in

4    the past.

5         Q.    I don't think that was quite my

6    question but --

7         A.    Okay, I apologize.  Right.

8         Q.    So we've entered CAZ and it's appeared

9    in 104?

10        A.    Yes.

11        Q.    After the point which CAZ has appeared

12   in 104, the user can attach additional characters

13   to CAZ, right?

14        A.    The user can enter new input character

15   sequence that would appear in the word choice list

16   as such and can -- and similar to the way CAZ was

17   committed to region 104, can do the same as well.

18   But what I'm saying is that semantically there is

19   no connection between that new current input

20   sequence and the CAZ that was typed in the past.

21        Q.    What do you mean that semantically

22   there was no connection between the --

23        A.    Semantic -- sorry.

24        Q.    Between the new character sequence and

25   the CAZ that was typed in the past if letters are

Page 73

1   added to the CAZ?

2          MR. BUROKER:  Object to form:

3      incomplete and lack of foundation.

4      A.    In the context of the Longe patent, the

5   characters CAZ once committed to region 104 are

6   part of committed text.  Their relationship to

7   a new character input sequence that you might type

8   in the context of the Longe reference is the same

9   relationship that those new characters that you

10  might type may have to just about any piece of

11  text that might be in that window in the sense

12  that they are independent.  There is no connection

13  between them.

14     Q.    You're saying if a user inputs --

15  strike that.

16          You're saying that if a user selects

17  a character string CAZ and then decides to use an

18  edit function, either adding or deleting from CAZ,

19  there's no connection between the original CAZ and

20  the subsequent word created from the CAZ?

21     A.    That's not what I said.

22          MR. BUROKER:  Object to form.

23          THE WITNESS:  Sorry.

24          MR. BUROKER:  Go ahead.

25     A.    That's not what I said.  What I said

Highly Confidential

Page 74

1   was you said the user enters CAZ, selects CAZ.

2   CAZ is now committed as part of the region 104.

3          Now the user commences to create a new

4   character input sequence, starts to type in RWZ,

5   for example.  RWZ will appear as it does in this

6   word choice list.  CAZ will be in 104 and then at

7   some point, yes, if you choose to select RWZ, it

8   would end up appearing as CAZRWZ but they are

9   independent character input sequences in the

10  context of Longe.

11      Q.   But you have changed the character

12  input sequence entirely into RWZ; whereas, in my

13  example, you're using the cursor that appears in

14  104 to then take the CAZ you've put in 104 and to

15  either add or subtract from CAZ.

16      A.   Well, in the scenario that you're

17  referring to where you pull into the word choice

18  list, you're constructing a new -- you're

19  constructing a new character sequence and CAZ is

20  not -- does not exist anymore in 104.  You're --

21  it's like starting the process from scratch,

22  starting a new process from scratch.

23      Q.   So if the CAZ is pulled back into the

24  word selection area --

25      A.   Yes.

1      Q.      -- and then you're saying the process

2   started from scratch, even if ultimately I end up

3   with CAZ again?

4      A.      Yes.

5      Q.      Let's go back to CAZ has been put into

6   104.  At that point, what happens if a user

7   presses the edit word key in the Longe reference?

8      A.       In my understanding and the

9   understanding of a person with ordinary skill in

10  the art, the word that is either part of or

11  immediately to the left of the cursor -- so it

12  could be CAZ or it could be some other word like

13  "generally" or "keyboard" or "invention", if we

14  just quote a few words from 1B -- would get pulled

15  into the word choice list and create a new

16  character input sequence.

17     Q.      So the word that is pulled into the

18  word choice list comes from the 104 area in that

19  example --

20     A.      It comes --

21          MR. BUROKER:  Wait until she finishes.

22          THE WITNESS:  I apologize.

23  BY MS. FERNANDS:

24     Q.      -- when edit word key is selected?

25     A.      It comes from the 104 area and it

Highly Confidential

1  are considering.  Are claims 18, 19 and 27 of the

2  '172 patent limited to providing suggestions for

3  misspelled words, in your opinion?

4          MR. BUROKER:  Object to form calls for

5      legal conclusion.

6      A.    No.

7      Q.    And, in fact, suggestions for word

8  completion, whether or not there was

9  a misspelling, could be a character string,

10  correct?

11          MR. BUROKER:  Same objection.

12      A.    That is true.  However, I'd probably

13  add that the difference that might exist between

14  a system that is designed strictly for word

15  completion and a system that is designed generally

16  for suggested word or alternatives, that

17  difference may have an impact on the design

18  choices that the system makes because of the

19  differences between, in one case, words being

20  completions of an existing character string and in

21  the other case words being connected -- related

22  but potentially is a different character string

23  altogether.

24      Q.    But in your opinion the claims you

25  analyzed, 18, 19 and 20, would apply whether it

Highly Confidential

1    was word completion or suggested word

2    alternatives?

3            MR. BUROKER:  Same objection.

4        A.    18, 19 and 27.

5        Q.    18, 19 and 27, correct.

6        A.    Yes, insofar as ... yes, it's not

7    limited to word completion.

8        Q.    Now in front of you as exhibit I is

9    another document concerning the TextPlus.

10       A.    Yes.

11       Q.    And do you see that at the top it says

12   under "DeepWave, "On the Internet since 1993"; do

13   you see that?

14       A.    Yes.

15       Q.    Do you have any reason to doubt that

16   this was on the Internet since 1993?

17           MR. BUROKER:  Object to form:

18       mischaracterizes the document.

19       A.    No.  Again, I took this document on its

20   face value as submitted by -- as accompanying

21   Dr. Kaliski's declaration.

22       Q.    Actually, your counsel is absolute

23   right.  I was looking at the wrong date.  Let me

24   try that again.  It looks like DeepWave was on the

25   Internet since 1993.  Let's try another question?

Highly Confidential

Page 136

1      Q.     The question was whether -- well, do

2  you recall how one selects the text in King, if

3  you want to select one of the suggestions or

4  the --

5      A.     Well, I believe I -- one embodiment in

6  which King selects words is by pressing this key

7  called the "Select" key, labeled number 60, and

8  you dress that multiple times and it kind of

9  scrolls through its list of suggestions and

10  whatever you're currently at, that is your -- that

11  is the selection.  So ...

12      Q.     If you hit the "Select" key it is your

13  understanding it selects what is in the text area?

14      A.     Well, my understanding from what

15  I recall from King -- and if you want me to answer

16  that conclusively I will happily read and go

17  through the patent but my general understanding

18  from what I recall is that when you press that

19  "Select" button, every time you press the "Select"

20  button, this little box which currently is over

21  "age", it kind of moves across to "aid" to "bid"

22  and then kind of cycles through those inputs and

23  you can keep cycling through them if you want by

24  continuing to press that "Select" button.

25      Q.     You can also select a word by tapping

Highly Confidential

Page 137

1    it in King, correct?

2        A.    I --

3        Q.    And if you want to look at King --

4        A.    Yes, maybe.

5        Q.    I think perhaps if you look at column

6    11, around line 20?

7        A.    Column 11, line 20?

8        Q.    Yes.

9        A.    "Alternatively ... select the desired

10   word ..."

11            Yes, it does say that.

12       Q.    So you can use the "Select" button or

13   tap a word to select them?

14       A.    Yes.

15       Q.    Then in King, column 22 at line 30 --

16       A.    Yes.

17       Q.    -- my question is doesn't King column

18   22 around -- at 30 and in that paragraph discloses

19   choosing -- accepting the current provisionally

20   accepted term by using a character from the

21   symbols mode, correct?

22       A.    (Document review.)

23            Yes, it seems possible.  I would

24   probably need to review it again in detail if you

25   wanted me to answer that conclusively but it seems

Highly Confidential

1  possible.

2      Q.     In that paragraph of the King patent at

3  what begins at line 36, do you see where it says:

4         "This is allows the user to easily

5  generate a word and immediately follow it with

6  a character such as a comma, period, or hyphen."

7      A.     Mm-hm.  Yes, I see that.

8      Q.     So King is disclosing an easy way to

9  generate a word and immediately add a punctuation

10  character, correct?

11         MR. BUROKER:  Object to form.

12      A.     King is disclosing some form of

13  selection related to punctuation.  That is

14  correct, but as to how it relates to the rest of

15  the design of King, that's something that I would

16  probably need to go into in detail to provide

17  a conclusive answer.

18      Q.     When you say King is disclosing a form

19  of selection that relates to punctuation, what do

20  you mean, that the selection relates to

21  punctuation?

22      A.     Well, it seems like there's a mechanism

23  by which -- it seems like there's a mechanism by

24  which punctuation could be used as a means to

25  select a word, potentially.  Yes, potentially that

Highly Confidential

1    does.

2        Q.    So moving on in your declaration,

3    heading D on page 31 at line 24 states your

4    opinion that claims 18, 19 and 27 are not obvious

5    combinations of known elements, correct?

6        A.    Yes.

7        Q.    Correct?

8        A.    Yes.

9        Q.    And one of the facts to which you cite

10   here is the PTO considered over 60 different prior

11   art references; is that correct?

12       A.    Yes.

13       Q.    What's the relevance of the fact that

14   the PTO considered over 60 prior art references to

15   your analysis?

16       A.    Well, the fact that the PTO -- yes, the

17   PTO looked at a number of different prior art

18   references that were -- that could have been

19   considered either alone or in combination and

20   didn't find them -- didn't find that they made

21   these claims obvious to me is an indication of --

22   is evidence of the novelty of these claims in the

23   design of these kind of text systems or text entry

24   systems.

25             There are subtle differences in both

Highly Confidential

Page 144

1    Q.    I need to ask you a different question.

2    A.    Okay.

3    Q.    So you don't know whether the

4  additional references cited by Dr. Kaliski are

5  different in any way from the references that were

6  before the Patent Office?

7    A.    No, I did not cross-reference them in

8  the sense that it's possible that some of the

9  additional references that Dr. Kaliski cited were

10  already taken into account by the Patent Office

11  but it's possible that they were not as well.

12    Q.    In your opinion was there a particular

13  problem that the inventors of the '172 patent were

14  seeking to solve?

15    A.    Yes.  I guess that it's sort of a, kind

16  of, an ongoing problem where people continue to

17  find look for new and novel designs which is the

18  problem relating to facilitating text entry on

19  a small screen display.

20          There are many, many designs that have

21  been proposed in the past and there continue to be

22  designs that are proposed.  The '172 at the time

23  I believe the patent was filed proposed a design

24  with novel claim elements and in that respect did

25  provide a solution to this problem.

Highly Confidential

Page 145

1      Q.    You referred to facilitating text entry

2  on small screen devices.  Is facilitating text

3  entry on small screen devices the field that you

4  believe is relevant to the '172 patent?

5      A.    Well, there are many aspects that

6  contribute to the '172 patent.  There is the

7  issue --

8      Q.    Sorry, I'm smiling, Dr. Singh, because

9  of the rain and the noise in here.

10      A.    I know.

11          MR. BUROKER:  For the record, it's

12      pouring and we're in a room that is loud,

13      so ...

14          THE WITNESS:  I'll try and speak

15      a little louder.

16          MS. FERNANDS:  Yes, I think that will

17      help the Court Reporter to speak a little

18      louder and for all of us now.

19  BY MS. FERNANDS:

20      Q.    I'm sorry, would you like me to repeat

21  the question?

22      A.    Yes, please repeat the question.

23      Q.    Okay.  You referred to facilitating

24  text entry on small screen devices.  Is that

25  facilitating text entry on small screen devices

Page 146

1    the field you believe is relevant to the '172

2    patent?

3          A.    I think that is a field that is

4    relevant.  There are various aspects of -- there

5    are various aspects that come together on the

6    '172.

7               The '172 largely focuses on the

8    management and the display and the presentation

9    and the selection process of alternative

10   suggestions that could be associated with text

11   that is entered on, typically, devices that have

12   a small amount of real estate available.

13         Q.    So that management display and

14   presentation process of alternative suggestions

15   that could be associated in text, would that

16   include text completion?

17         A.    Text completion would be one part of it

18   but not limited to.

19         Q.    Would it also include text suggestions?

20         A.    Well --

21         Q.    In addition to completion, perhaps

22   suggestions, suggestions that were not purely

23   completion but, for instance, if some of the

24   examples we have seen misspelling words suggested

25   as a properly spelt word?

Highly Confidential

1        A.      Yes.

2        Q.      Or we've seen nonsensical words

3   suggested as a word.  It would include that as

4   well?

5        A.      It deals with -- yes, it deals with

6   those kinds of words, yes.

7        Q.      Would it also include spell checking?

8   And we are just --

9        A.      In a -- we are talking in a general

10   sense.  Yes, in a general sense, the words would

11   attempt to spell check the input as well, yes.

12        Q.      In your opinion, would the person of

13   ordinary skill in the art look to display on small

14   screen devices for all of these types of text

15   issues that we've just discussed, considering the

16   problems addressed by the inventors of the '172

17   patent?

18        A.      Can you rephrase the question?

19        Q.      That was a badly worded question,

20   absolutely.

21              So we've just walked through a variety

22   of things, correct?

23        A.      Yes.

24        Q.      You had referred to text entry on small

25   screen displays, correct?

Highly Confidential

Page 148

1      A.     Yes.

2      Q.     And then we discussed text entry on

3  small screen displays can encompass a number of

4  different technologies, correct?

5      A.     Can encompass a number of different

6  issues that can arise out of text entry, yes.

7      Q.     And so, in your opinion, would

8  the person of ordinary skill in the art, looking

9  to solve the problem that the '172 patent

10  inventors addressed, as you described it, have

11  looked to all of those different issues within

12  text entry?

13      A.     Well, it depends.  It depends on -- it

14  depends on the design that you are looking at.

15  So, for instance, if you're looking at the ability

16  to deal with spell checking and certain kinds of

17  replacements, that potentially is a different or

18  can be a different problem, if it's strictly that,

19  from looking at the problem of word completion.

20  If you look at word completion by itself and only

21  that then you may be able to make some assumptions

22  that will impact your design.

23          So the answer is that a person of

24  ordinary skill in the art would look at the

25  specific problem domain that they were seeking to

Highly Confidential

1   find a solution for and then, based on analysis of

2   that, come up with, you know, what aspects or

3   areas of the design space they should explore.

4       Q.    Other than text entry on small screen

5   displays is there a particular problem domain that

6   you think the '172 patent addresses?

7       A.    Well, let's look at the '172 patent and

8   see what they say.  It is usually in the summary

9   of invention.  Yes, essentially, I mean it's like

10  I've said that they are looking to address the

11  issue on portable electronic devices.

12          However, it's, you know, the actual

13  portability of the electronic device I think is

14  less the issue here than the size of the screen in

15  some sense, so to speak, but -- so you can

16  imagine, you know, it trying to be applicable on

17  some other kinds of -- I mean, it's what it says

18  it's just -- you know, it's applicable, they are

19  trying to address the issue of portable electronic

20  devices and the issues that result with text entry

21  on it.  That's what it says and that's what

22  I believe it is.

23      Q.    With respect to the issue of display,

24  the issue of how to display text to facilitate

25  text entry would not differ based on whether the

Highly Confidential

Page 152

1    Q.    And then with respect to that aspect as

2  to how best to display text entry on a small

3  screen device, is there any difference in your

4  opinion between the ambiguous keyboard and

5  unambiguous keyboard for purposes of text display?

6    A.    Yes, it could have -- it's possible

7  that things could have an impact in terms of what

8  you chose to display, where you chose to display

9  it, how you chose to display it, depending on what

10  information you had with regards to what your

11  input was likely to be.

12         If you knew that certain aspects of

13  your input were going to be very reliable then you

14  may choose to display things one way.  If you

15  expected that certain parts are likely to be quite

16  erroneous because of whatever intricacies of the

17  device that was providing the input then you may

18  choose to show things in various different ways.

19         So it could have an impact and in

20  certain scenarios it might not.  You would

21  actually really have to kind of compare systems

22  and, yes, look into that at that issue.

23    Q.    Do you think the person of ordinary

24  skill in the art looking to find a better way to

25  display text on a small screen would have looked

Page 153

1    to the ambiguous keyboard technology that was

2    prior art?

3              MR. BUROKER:  Objection to form.

4        A.    Probably not or I mean they could have

5    if they wanted to but in general the ambiguous

6    keyboard provides a whole different design space

7    in many ways and so if I think a person of

8    ordinary skill in the art really wanted to design

9    a solution for a particular style of keyboard or

10   a particular design space that's the space that

11   they would look at and think in coming up with

12   their solutions.

13        Q.    The '172 patent does not claim a style

14   of keyboard, does it?

15        A.    Well, as I mentioned the '172

16   implicitly assumes an unambiguous keyboard because

17   it talks about the notion of a precise character

18   string that is being received as input.

19        Q.    When you say a "precise character

20   string" you are basing that opinion on the fact

21   that it says in the claims, for instance, in claim

22   18 a current character string?

23        A.    Well, I'm basing it on that.  I'm

24   basing it on the fact that the images in the '172

25   keyboard show what was typically relate to be an

Page 157

1    through line 18, do you see the sentence that

2    states:

3                "It would not be obvious to one of

4    ordinary skill in the art to combine references

5    that provide solutions specifically tailored for

6    different types of input devices (ambiguous vs.

7    nonambiguous keyboards)."

8                Do you see that?

9        A.    Yes.

10       Q.    Why in your opinion would the person of

11   ordinary skill in the art not combine the display

12   feature from ambiguous and nonambiguous keyboards?

13       A.    I suggested one example or one possible

14   point which is that if, for instance, you knew

15   that certain aspects of your input were reliable,

16   then maybe you would like to display them in a way

17   where it was very clear to the user that this is

18   likely to be the correct -- this is likely to be

19   the desired or intended input.

20                On the other hand, if you knew ahead of

21   time that because of the nature of the keyboard or

22   the nature of the input that it was going to be

23   inherently noisy or erroneous, then you may choose

24   to promote another form of display.  You may

25   choose to promote what you algorithmically thought

Highly Confidential

Page 158

1   was more likely.

2           So the way that you would display,

3   maybe using any number of possible forms of

4   design, maybe you might want to show things in a

5   different font or a different color or in a

6   general manner of speaking the input device,

7   particularly the example where you know the

8   difference in the form of the quality of the input

9   that you're getting can have an impact on your

10  choice of design.

11          That's really all I'm trying to say

12  over there is that if you have designed a solution

13  that's complete, it's well-defined and it's

14  created with a particular set of design space

15  assumptions that usually trying to mix and match

16  them in almost all the cases that I've talked is

17  generally considered a really bad design

18  principle.

19          If you want to design something that is

20  good for a particular set of design assumptions

21  you start with those assumptions and you work from

22  there.

23      Q.    In the cases that you teach do you

24  teach that predecessor technology should be

25  considered in determining what are good and bad

Highly Confidential

Page 159

1   design choices?

2       A.    In as much as they seem relevant to

3   the -- in as much as they seem relevant to the

4   task at hand, yes.

5       Q.    In paragraph 73 of your declaration at

6   line 17, toward the end of the line, you state:

7           "I have been informed and understand

8   that Dr. Kaliski and Samsung bear a heavy burden

9   of demonstrating invalidity and their vague

10  reference to a long list of references does not

11  provide enough detail to understand what alleged

12  combination they believe would render claims 18,

13  19 and 27 obvious."

14          Do you see that?

15      A.    Yes.

16      Q.    And what is your understanding of the

17  heavy burden of demonstrating invalidity that you

18  say must be borne by Dr. Kaliski and Samsung?

19      A.    I mean, my understanding and, you know,

20  that's where the word "I have been informed" comes

21  from, this is an understanding that I've gathered

22  from counsel that generally patents are -- that

23  are granted by the PTO are presumed valid unless

24  shown conclusively otherwise and that the burden

25  of proof for that lies on the other -- on the

Page 169

1    mean by that paragraph is I was -- I reviewed the

2    declaration of Christopher Vellturo.  It's

3    a declaration that spans, I believe, four patents.

4    I did not review the entire declaration.  I simply

5    read the passages that pertain specifically to the

6    '172 patent and the impression that I got from

7    reading those passages was that the two products

8    over here, both the Samsung and the iPhone, were

9    commercially successful and that success was in

10   part due to their ability to enter, to be

11   successful in facilitating text entry and

12   that's -- and that aspect is what pertains to the

13   claims for the '172 patent.

14        Q.    My question was much more specific.

15   What do mean by "word recommendation technology",

16   as you use it in this sense?

17        A.    Well, word recommendation technology

18   just simply relating to, essentially, what I'm

19   referring to is the ability to provide suggested

20   alternatives and the presentation, their

21   selection, the things that are claimed -- that are

22   part of the claims of the '172 patent.

23        Q.    The claims of the '172 patent do not

24   disclose a mechanism for choosing what words to

25   recommend, do they?

Highly Confidential

1       A.     No.  I'm sorry, do not ...?

2       Q.     They do not disclose the -- strike

3   that.

4              The '172 patent doesn't claim a means

5   of choosing the words to recommend, does it?

6              MR. BUROKER:  Object to form.

7       A.     Can you maybe rephrase that?  I just

8   want to make sure I understand.

9       Q.     Let me step back again.  We've been

10  talking all day about display, right?

11      A.     Yes.

12      Q.     And we've been talking about how the

13  '172 patent is focused on the display of the word

14  being entered and the recommended words; is that

15  accurate?

16      A.     Mm-hm.

17      Q.     And the '172 patent does not claim, at

18  least in claims that we have been discussing, the

19  underlying functionality for how to determine

20  which words I want?

21      A.     I see.  Yes, I get your point and

22  perhaps we could -- yes, maybe instead of using

23  the word -- the phrase "word recommendation

24  technology" you could refer to what I was trying

25  to say over there as being the selection mechanism

Highly Confidential

Page 171

1    or the overall system of word -- of text entry

2    a part of which is certainly, a portion of which

3    is certainly the display and the actual selection

4    mechanisms and, yes, the '172 does not talk about

5    how or which words are actually suggested, yes.

6              MS. FERNANDS:  Shall we take a break?

7              THE VIDEOGRAPHER:  Going off the record

8         at 4:20.

9    (4:20 p.m.)

10                        (Recess taken.)

11   (4:29 p.m.)

12             THE VIDEOGRAPHER:  Back on the record

13        at 4:29.

14   BY MS. FERNANDS:

15        Q.    So going back to your declaration, in

16   paragraph 78 --

17        A.    Yes.

18        Q.    -- your title there on F is:

19              "Claims 18 and 27 Describe How The

20   System Responds To User Actions."

21              Do you see that?

22        A.    Yes.

23        Q.    What do you mean by that?

24        A.    What I mean is it's a paragraph in

25   response to a point made by Dr. Kaliski that there

Highly Confidential

Page 174

1    Q.    Now, the claim requires that the first

2  character string -- the character string in the

3  first area be replaced with a suggested character

4  string if the user activates a key on the

5  keyboard, correct?

6    A.    Which claim element are you reading?

7    Q.    For example, after the "wherein" clause

8  in claim 18.

9    A.    Yes.

10   Q.    "The current character string in the

11  first area is replaced with the suggested

12  replacement character string if the user activates

13  a key on the keyboard", correct?

14   A.    That is correct, yes.

15   Q.    So a current character string is never

16  replaced with a suggested replacement if the user

17  never activates anything; is that correct?

18   A.    That's sounded a little complicated.

19  Can you slow that down and maybe repeat it for me.

20   Q.    I'm sorry.  The current character

21  string in the first area is never replaced with

22  a suggested character string if the user never

23  activates the key or never performs the gesture?

24   A.    That is correct but the functionality

25  is there.  It talks -- the beginning of the claim

Highly Confidential

Page 175

1    talks about a graphical user interface on

2    a portable device which has this capability with

3    a keyboard touch screen display and it embodies

4    the functionality to perform, to behave in this

5    fashion.

6        Q.    Where does it say that this is -- that

7    it is a graphical user interface on a portable

8    electronic keyboard with this capability?

9        A.    Well --

10           MR. BUROKER:  Objection: calls for

11       a legal conclusion.  Go ahead.

12       A.    So I'm not a lawyer in this regard but

13   I believe the way the claim has been written with

14   the term comprising -- I believe it says that, at

15   least my reading of the claim is that and I

16   believe a person of ordinary skill in the art is

17   that this piece of functionality is what is

18   there -- you know, if it's there on a graphical

19   user interface with a portable electronic device

20   with a keyboard and touch screen display that that

21   is what the claim captures.

22       Q.    So even if no-one ever replaces

23   a current character string by activating the key

24   or making a gesture, if the functionality exists,

25   in your opinion, there's an infringement?

Highly Confidential

Page 176

1      A.      In my opinion, yes, for claims 18 and

2      27.

3      Q.      For claims 18 and 27?

4      A.      Yes, as described, yes.

5      Q.      So infringement occurs, in your

6      opinion, upon the selling of a device that could

7      do these things?

8              MR. BUROKER:  Objection:

9              mischaracterizes, calls for a legal

10             conclusion.

11     A.      I suppose I -- yes, I mean, I'm not

12     a -- I'm expressing technical opinions with

13     regards to the patent and its claims.

14     Q.      And it's your opinion that neither

15     claim 18 or 27 requires the user to take any

16     action; is that correct?

17     A.      Yes, I believe so.

18             (Exhibit 8 marked for identification.)

19     Q.      You have just been handed what we have

20     marked as exhibit number 8.  It is a document

21     bearing the title:

22             "Declaration of ... Martin E. Kaliski

23     regarding U.S. Patent No. 8,074,172", and do you

24     recognize this?

25     A.      Yes, it appears to be what we have been

Highly Confidential

Page 181

1    anything that I would say on this would be

2    somewhat speculative, just it would be completely

3    speculative so I ...

4        Q.    And you chose not to review this patent

5    publication even though Dr. Kaliski described it

6    in his declaration, correct?

7        A.    Yes.  As I said there, Dr. Kaliski

8    didn't provide any clear guidance as to how this

9    patent was relevant in some sort of a -- in sort

10   of an obviousness analysis.  There was no clear,

11   yes, guidance that led me to review it in detail.

12       Q.    Is it your position that prior art

13   references that disclose a first area for user

14   input and a second area with suggested -- strike

15   that, I can't speak anymore.

16           Is it your position that prior art that

17   discloses a first area that shows user input and

18   a second area separate from the first area showing

19   replacement works is not relevant prior art?

20           MR. BUROKER:  Objection: lacks

21       foundation; argumentative.

22       A.    Well, it's my -- my point is simply

23   that Dr. Kaliski provided certain clear analyses

24   of his interpretation, both anticipatory and

25   obvious, by providing some claim charts for the

Highly Confidential

1    particular set of four references.  Those were

2    articulated in a manner that was logical to

3    analyze and I did analyze and respond to those.

4              The other references are references

5    that may or may not have any direct relationship

6    but, beyond that, they do not -- there is no

7    indication on how they are relevant and how and

8    with what they should be combined.

9              My understanding is for issues of

10   obviousness it's not sufficient to put out a bag

11   of prior art but rather to take specific elements

12   of prior art and describe and enunciate quite

13   clearly how they are either to be combined or

14   modify a piece of prior art with regards to

15   a specific claim.

16        Q.    Although you're not a patent lawyer, as

17   you've pointed out several times today, right?

18        A.    Absolutely, I'm not.

19        Q.    Now if you look at paragraph 172 of

20   Dr. Kaliski's declaration?

21        A.    Yes.

22        Q.    Do see paragraph 172 starting at about

23   line 20 at the end, Dr. Kaliski states:

24              "As illustrated in Figure 3, the

25   currently typed word [I think that should be is

Page 183

1    displayed] in displayed along with suggested

2    replacements for that word (these replacements may

3    apostrophes and Commas)."

4            Do you see that?

5        A.    Okay, I see that sentence, yes.

6        Q.    This is in Dr. Kaliski's discussion of

7    what we've now marked as exhibit 9 to this

8    deposition, correct?

9        A.    Yes.

10       Q.    And as you sit here you have no basis

11   to refute Dr. Kaliski's description of figure 3

12   because you have not considered it; is that

13   correct?

14       A.    That is correct.

15       Q.    And Dr. Kaliski continues:

16           "Paragraphs [0029] and [0032] describe

17   how the user can select either the currently typed

18   word or a suggested replacement [word] by moving

19   a scroll wheel to the desired word and pressing

20   or, or by pressing the return key."

21           Do you see that?

22       A.    Yes.

23       Q.    And again you have no to refute

24   Dr.Kaliski's description of what is exhibit 9, the

25   patent application to Scott because you haven't

Highly Confidential

1   considered that before today, correct?

2       A.    No, I haven't cross-referenced the

3   actual patent against the sentences claimed here.

4           (Exhibit 10 marked for identification.)

5       Q.    Now we're giving you what we've marked

6   as 10 which is in fact U.S. patent application

7   publication number 2005/0283358 to Stephanick et

8   al.

9           You haven't reviewed this one before

10  today either, correct?

11      A.    That's correct.

12      Q.    In Dr. Kaliski's declaration can you

13  look at paragraph 171 and you see that in

14  paragraph 171 starting at about line 10

15  Dr. Kaliski's states:

16          "Through various embodiments shown in

17  its many figures, it discloses the originally

18  entered character string and various suggestions

19  for aiding the user in displaying what the

20  intended word really is."

21          Do you see that?

22      A.    Yes.

23      Q.    Here he is referring to what we have

24  marked as exhibit 10, the Stephanick application,

25  correct?

Highly Confidential

1      A.     Yes.

2      Q.     And you haven't formed an opinion as to

3  whether or not that is the correct interpretation

4  of Stephanick as you sit here today?

5      A.     As I sit here today, no, I have not.

6      Q.     So you have no basis to refute

7  Dr. Kaliski's interpretation of Stephanick?

8      A.     At this point, no.

9      Q.     And Dr. Kaliski goes on in around

10  line 12:

11           "It described in paragraph [0040] how

12  the user can interact directly with the device and

13  select the desired character for each set of

14  ambiguous characters.  Such selection may involve

15  having the user 'tap on the desired letter.'"

16           Do you see that?

17      A.     Yes, I do.

18      Q.     And again you have no basis to refute

19  Dr. Kaliski's opinions concerning Stephanick,

20  correct?

21      A.     Correct.

22      Q.     And then Dr. Kaliski continues with

23  respect to Stephanick:

24           "Further discussion discloses the use

25  of gestures (paragraph [0055])."

Highly Confidential

Page 186

1          Correct?

2    A.     Correct.

3    Q.     And you don't have any reason to

4  dispute Dr. Kaliski's interpretation that further

5  discussion in Stephanick discloses the use of

6  gestures, correct?

7    A.     No, I have not reviewed that patent to

8  cross-check.

9          (Exhibit 11 marked for identification.)

10   Q.     You've just been handed what's been

11  marked as exhibit 11.  It is U.S. patent

12  publication number 2006/0206815 and if you look at

13  Dr. Kaliski's declaration this is discussed at

14  paragraph 173.

15         Do you see that?

16   A.     Mm-hm.

17   Q.     On page 44 of Dr. Kaliski's declaration

18  starting at about line 3 he states of this

19  exhibit 11, publication:

20         "A list of suggested 'intended' words

21  is displayed and the user has the opportunity to

22  either keep the word they entered (as originally

23  interpreted by the device) or to select by thumb

24  wheel one of displayed suggested alternatives."

25         Do you see that?

Highly Confidential

Page 187

1      A.    Yes, I see that in Dr. Kaliski's

2  declaration.

3      Q.    In Dr. Kaliski's declaration.  This is

4  Dr. Kaliski's description of what we have now

5  marked as exhibit 11 to this deposition, correct?

6      A.    Yes, it would appear so.

7      Q.    And you read Dr. Kaliski's description

8  prior to today, correct?

9      A.    Yes.

10     Q.    But you did not read exhibit 11 prior

11 to today?

12     A.    No.

13     Q.    And you haven't informed any opinions

14 as to exhibit 11?

15     A.    I have formed -- I have opinions based

16 on Dr. Kaliski's description of these patents but

17 these opinions are based, firstly, on the

18 assumption that what Dr. Kaliski says is true.  So

19 I have not actually cross-checked the veracity of

20 his statements but based on those statements yes,

21 I do have some opinions as to whether they are

22 relevant or not relevant, in as much as

23 Dr. Kaliski has described them.  There may be

24 parts that Dr. Kaliski has not referred to that

25 may or may not be relevant but I -- yes.

Highly Confidential

Page 188

1      Q.     So did you -- you said you have

2  opinions as to whether these are relevant in as

3  much as Dr. Kaliski described them.

4           What is your opinion as to whether

5  these are relevant?

6      A.     Well, as I mentioned earlier when you

7  asked me a question regarding these references,

8  the descriptions that Dr. Kaliski has are very

9  general descriptions that, by and large, they, you

10 know, in of themselves out of context they may or

11 may not have some relevance to certain claim

12 elements but there's absolutely no clarity, not

13 even a hint of clarity in how any of the remarks

14 related to any of these patents can be combined or

15 used in conjunction with each other or any of the

16 art that -- the art that is -- the other four

17 pieces of art that we've been discussing for

18 anybody or a person of ordinary skill in the art

19 to make any meaningful use of them.  That's ...

20     Q.     Leaving aside whether in your opinion

21 Dr. Kaliski has adequately set forth an

22 obviousness analysis, do you think that a piece of

23 prior art that discloses two areas, one in which

24 text is being input and one with suggested

25 alternatives for the text is relevant to the '172

1    patent?

2              MR. BUROKER:  Objection: vague.

3         A.    It may or may not be relevant.  It

4    really needs to be -- I believe that a clearer

5    disclosure needs to be provided in terms of what

6    relevance it has.

7         Q.    Going back to paragraph 74 of your

8    declaration which is exhibit 1.

9         A.    Yes.

10        Q.    We talked earlier about the last

11   sentence there where you say the spell checking

12   functionality on the mac or any computer does not

13   disclose the elements of the '172 patent because

14   they were not implemented on a touch screen

15   device?

16        A.    At least.

17        Q.    At least because they are not ... but

18   that's the only thing that you point out here in

19   this paragraph specifically as the fact that they

20   were not implemented on a touch screen device,

21   correct?

22        A.    Yes.

23        Q.    Okay.  And it is the case, is it not,

24   that there were touch screen computers?

25             MR. BUROKER:  Objection: calls for

Highly Confidential

Page 190

1        speculation, indefinite.  Calls for

2        speculation and indefinite.

3        A.      When, yesterday?  Like what do you mean

4    when you say that there were touch screens?

5        Q.      Well, let us first start with prior to

6    2007 there were computers that had touch screens?

7        A.      Yes.

8        Q.      And when you say that the spell

9    checking functionality on a Macintosh or in any

10   computer does not disclose the elements of the

11   '172 patent for the simple reason that they were

12   not implemented on a touch screen device, did you

13   take into account the existence of touch screen

14   computers?

15       A.      Yes, in as much as that, you know,

16   Macintosh spell checking, typically Macintosh's

17   were not touch screen computers.  I believe that

18   the portion or the aspects of Mr. Kocienda's

19   testimony that Dr. Kaliski is referring to deals

20   with functionality on a computer that was not

21   a touch screen computer.  There may have been many

22   other differences but at least this was one clear

23   difference.

24       Q.      Did you consider whether there were any

25   other differences?

Highly Confidential

1        A.    No, I didn't feel it necessary.  To me

2   this was a large enough difference to begin with.

3        Q.    Is it your position that the claims in

4   the '172 patent would not have been obvious if all

5   of elements except for the existence of a touch

6   screen were present in a prior art device?

7        A.    It would --

8             MR. BUROKER:  Objection: completely

9        hypothetical.

10        A.    It's somewhat of a hypothetical

11   question.  I've answered many times the fact that

12   if you are looking at a particular design space or

13   a design scenario that had -- that was different,

14   for instance, in this case something that was not

15   a touch screen device, it's design principles as

16   such would be different from the design principles

17   for the '172.

18        Q.    We have also spent some time today

19   talking about ambiguous versus unambiguous

20   keyboards.

21             Is it your position that a person of

22   ordinary skill in the art would not that combined

23   art concerning ambiguous keyboards with art

24   concerning unambiguous keyboards?

25             MR. BUROKER:  Objection: asked and

Highly Confidential

Page 192

1    answered.

2        A.    Sort of asked and answered that

3    question that yes, they are different.  They are

4    generally different forms of input and design

5    spaces while -- yes, and people would generally

6    design for the design space that they were

7    providing a solution for.

8                MS. FERNANDS:  Why don't we take

9        a break.

10               THE VIDEOGRAPHER:  Going of the record

11       at 5.03.

12   (5:03 p.m.)

13                       (Recess taken.)

14   (5:10 p.m.)

15               THE VIDEOGRAPHER:  Back on the record

16       at 5:10.

17               MS. FERNANDS:  I have no further

18   questions today.  Thank you for your time,

19   Dr. Singh.

20               THE WITNESS:  Thank you, counsel.

21               Are we done?

22               MR. BUROKER:  Yes, I have no further

23   questions.

24               THE VIDEOGRAPHER:  This is the end of

25   tape 3 in volume 1 of the deposition of

Highly Confidential

Page 194

```
 1                    CERTIFICATE OF DEPONENT

 2

 3    I, KARAN SINGH, hereby certify that I have read the

 4    foregoing pages, numbered 1 through 193, of my deposition of

 5    testimony taken in these proceedings on Sunday, 27 May 2012,

 6    and, with the exception of the changes listed on the next

 7    page and/or corrections, if any, find them to be a true and

 8    accurate transcription thereof.

 9

10

11

12

13    Signed:  ........................

14    Name:    KARAN SINGH

15    Date:    ........................

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential

Page 195

1                  CERTIFICATE OF COURT REPORTER

2

3      I, GEORGINA FORD, an Accredited LiveNote Reporter, hereby

4      certify that the testimony of the witness KARAN SINGH in the

5      foregoing transcript, numbered pages 1 through 193, taken on

6      Sunday, 27 May 2012 was recorded by me in machine shorthand

7      and was thereafter transcribed by me; and that the foregoing

8      transcript is a true and accurate verbatim record of the

9      said testimony.

10

11     I further certify that I am not a relative, employee,

12     counsel or financially involved with any of the parties to

13     the within cause, nor am I an employee or relative of any

14     counsel for the parties, nor am I in any way interested in

15     the outcome of the within cause.

16

17

18

19

20     Signed:   ...............................

21     GEORGINA FORD, ACR, MAVSTTR, MBIVR

22     Dated:     May 28, 2012

23

24

25