# EXHIBIT 3

1
2                  UNITED STATES DISTRICT COURT
3                 NORTHERN DISTRICT OF CALIFORNIA
4                      SAN JOSE DIVISION
5

    APPLE INC., a California          )
6   Corporation,                      )
                                      )
7                      Plaintiff,     )
                                      )
8              v.                     ) Case No: 12-CV-00630-LHK
                                      )
9   SAMSUNG ELECTRONICS CO., LTD,     )
    a Korean business entity;         )
10  SAMSUNG ELECTRONICS AMERICA,      )
    INC., a New York corporation;     )
11  SAMSUNG TELECOMMUNICATIONS        )
    AMERICA, LLC, a Delaware          )
12  Limited liability company         )
                       Defendants.    )
13  _____)
14        * H I G H L Y   C O N F I D E N T I A L *
15  * ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER *
16                 VIDEOTAPED DEPOSITION
17                        OF
18                  KEVIN GEKLINSKY
19                 New York, New York
20                 Monday, May 7, 2012
21
22
23

    Reported by:
24  ANNETTE ARLEQUIN, CCR, RPR, CLR
    JOB NO. 49410
25

Page 2

```
 1
 2
 3
 4                    May 7, 2012
 5                    10:00 a.m.
 6         Videotaped deposition of KEVIN
 7    GEKLINSKY held at the offices of Gibson,
 8    Dunn & Crutcher LLP, 200 Park Avenue, New
 9    York, New York, pursuant to Notice, before
10    Annette Arlequin, a Certified Court
11    Reporter, a Registered Professional
12    Reporter, a Certified LiveNote Reporter and
13    a Notary Public of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2    A P P E A R A N C E S :
 3
 4       GIBSON, DUNN & CRUTCHER LLP
 5       Attorneys for Plaintiff
 6          200 Park Avenue
 7          New York, New York  10166
 8       BY: PAUL E. TORCHIA, ESQ.
 9          ptorchia@gibsondunn.com
10
11       QUINN EMANUEL URQUHART & SULLIVAN, LLP
12       Attorneys for Defendants
13          865 South Figueroa Street, 10th Floor
14          Los Angeles, California  90017
15       BY: SCOTT L. WATSON  ESQ.
16          scottwatson@quinnemanuel.com
17
18    ALSO PRESENT:
19
20    SAMSUNG TELECOMMUNICATIONS AMERICA, LLC:
21       By: CINDI MORELAND, VP, General Counsel
22
23       Manuel Garcia, Legal Video Specialist
24
25                    10:11AM
```

Page 4

```
 1    Highly Confidential - Attorneys' Eyes Only - Protective Order
 2         (Plaintiff's Geklinsky Exhibit 1,
 3    Apple Inc.'s Second Notice of Rule 30(b)(6)
 4    Deposition to Defendants, marked for
 5    identification, as of this date.)      10:11AM
 6         (Plaintiff's Geklinsky Exhibit 2,
 7    Declaration of Kevin Geklinsky, marked for
 8    identification, as of this date.)
 9         (Plaintiff's Geklinsky Exhibit 3,
10    Supplemental Declaration of Kevin         10:11AM
11    Geklinsky, marked for identification, as of
12    this date.)
13         THE VIDEOGRAPHER:  This is the start
14    of tape labeled No. 1 of the video
15    deposition of Kevin Geklinsky in the matter   10:34AM
16    of Apple Inc. versus Samsung Electronics
17    Company Limited on May 7, 2012, at
18    approximately 10:34.  My name is Manuel
19    Garcia from TSG Reporting, Inc., and I am
20    the legal video specialist.         10:34AM
21         The court reporter is Annette
22    Arlequin in association with TSG Reporting,
23    Inc.
24         Will counsel please introduce
25    yourself.                 10:34AM
```

Page 5

```
 1    Highly Confidential - Attorneys' Eyes Only - Protective Order
 2         MR. TORCHIA:  This is Paul Torchia of
 3    Gibson Dunn & Crutcher.  I represent the
 4    plaintiff Apple Inc.
 5         MR. WATSON:  Scott Watson with Quinn   10:34AM
 6    Emanuel on behalf of defendant Samsung.
 7         THE VIDEOGRAPHER:  Will the court
 8    reporter please swear in the witness.
 9              *     *     *
10    K E V I N   G E K L I N S K Y, called as a
11       witness, having been duly sworn by a
12       Notary Public, was examined and testified
13       as follows:
14    EXAMINATION BY
15    MR. TORCHIA:
16       Q.  Good morning, Mr. Geklinsky.
17       A.  Good morning.
18       Q.  Could you state your full name and
19    current address for the record, please.
20       A.  Kevin Geklinsky, 520 Red Barn Drive,   10:35AM
21    Easton, Pennsylvania 18040.
22       Q.  And who is your employer,
23    Mr. Geklinsky?
24       A.  Samsung Telecommunications of
25    America.                  10:35AM
```

Page 66

Highly Confidential - Attorneys' Eyes Only - Protective Order

1  product that it would promote.  They may promote
2  it along with other products, but I wouldn't
3  necessarily phrase it to be promoted over other
4  products.                                12:23PM
5      Q.  Well, it's a product that is promoted
6  with particular emphasis, right?
7          MR. WATSON:  Vague and ambiguous.
8      A.  I would say it would be promoted with
9  extra emphasis.                          12:23PM
10     Q.  Okay.  And that actually happened
11 with the Galaxy Nexus; Verizon promoted the
12 Galaxy Nexus with extra emphasis, right?
13     A.  Not in my professional opinion.
14     Q.  You believe that that didn't happen?  12:24PM
15     A.  I believe that they -- they
16 advertised the product.  I wouldn't say that
17 they advertised it with extra emphasis.  At
18 least the results did not prove that to be the
19 case.                                    12:24PM
20     Q.  All right.  So is it your -- is it
21 your belief that it was -- Samsung wanted that
22 to happen but it didn't happen, is that what
23 you're saying?
24         MR. WATSON:  Lacks foundation.    12:24PM

Page 67

Highly Confidential - Attorneys' Eyes Only - Protective Order

1      A.  I can't speak for what was -- what
2  was negotiated or expected via marketing.
3      Q.  All right.  Do you know if the Galaxy
4  Nexus was considered a hero phone?        12:24PM
5      A.  I don't know that.
6      Q.  Okay.  Do you know if hero phones are
7  -- are intended to create interest, drive
8  interests in other phones?  Is that part of the
9  objective of a -- of a hero phone?        12:24PM
10         MR. WATSON:  Vague and ambiguous.
11     A.  I think to my understanding, hero
12 model -- "hero model" is a term used by Verizon
13 Wireless, and I can't speak as to what their
14 intent is in that manner.                 12:25PM
15     Q.  Okay.
16         THE WITNESS:  May I get some more
17 water while you look?
18         MR. WATSON:  We're pretty close to
19 lunch.  You want to take our break now.   12:26PM
20         MR. TORCHIA:  Yeah, we're at the
21 lunch break now.
22         THE VIDEOGRAPHER:  The time is 12:26.
23 We're going off the record.
24         (Luncheon recess is taken.)        12:27PM

Page 68

Highly Confidential - Attorneys' Eyes Only - Protective Order

1      A F T E R N O O N   S E S S I O N
2          (Time noted:  1:22 p.m.)
3              *     *     *
4          THE VIDEOGRAPHER:  The time is 1:22.   01:21PM
5  Back on the record.
6              *     *     *
7  K E V I N   G E K L I N S K Y,  resumed and
8          testified as follows:
9  EXAMINATION BY (Cont'd.)                  01:22PM
10 MR. TORCHIA:
11     Q.  All right.  Mr. Geklinsky, I'm sorry
12 but I would like to go back to Exhibit No. 4 to
13 ask some more questions.
14     Exhibit No. 4 is the spreadsheet with   01:22PM
15 your hand markings on it.
16     Now, just to sum up, I think we
17 covered actual sell-in numbers and the total
18 number of Galaxy Nexus sold -- strike that.
19     The total number of Galaxy Nexus       01:23PM
20 units sold to carriers or Google as of May 4th
21 was 600,000, right?
22     A.  Correct.
23     Q.  And that's -- that's an actual,
24 right?                                    01:23PM

Page 69

Highly Confidential - Attorneys' Eyes Only - Protective Order

1      A.  Yes.
2      Q.  Okay.  And the total actual
3  sell-through to end-users as of May 4th that you
4  calculated was 385,600 units, right?       01:23PM
5      A.  Yes.
6      Q.  And the projected sell-through to
7  end-users up to the end of Q2, 2012 was
8  598,000 -- 598,000, but not including an
9  estimate for Google, correct?             01:24PM
10     A.  Correct.
11     Q.  And those are all U.S. numbers,
12 correct?
13     A.  Yes.
14     Q.  Okay.  Now, I don't think what we got   01:24PM
15 yet is a sell-in number projected to the end of
16 the second quarter of 2012.  I think I forgot to
17 ask for that, so I'd like to ask --
18     A.  Okay.
19     Q.  -- for that now.                  01:24PM
20         MR. WATSON:  And this is just for the
21 second quarter?
22 BY MR. TORCHIA:
23     Q.  The sell-in number of the Galaxy
24 Nexus through second quarter.  Do you understand   01:24PM

Page 70

1  Highly Confidential - Attorneys' Eyes Only - Protective Order
2  what I'm asking for?
3      A.  Um-hmm.  So my estimate, current
4  forecast from beginning of sales through Q2 of
5  2012 would be 798,000 units.          01:25PM
6      Q.  And have you noted that on the
7  document, sir?
8      A.  Um-hmm.
9      (Witness complies.)
10     MR. TORCHIA:  And the next break    01:26PM
11  we'll make yet another copy.
12     A.  If I may pause a second.  I'm just
13  thinking on the Verizon -- let me think here.
14     It would be less than that.  I
15  know -- I know what the remaining quantity that  01:26PM
16  we have on plan for Verizon, but it's not all --
17  it's not all in Q2.  So I would have to readjust
18  that, to the best of my knowledge.
19     Q.  All right.  And what would you
20  readjust it to?                01:26PM
21     A.  Bear with me one second.
22     (Witness calculating.)
23     A.  708,000, approximately.
24     Q.  All right.  And you noted that on the
25  document, sir?                 01:27PM

Page 71

1  Highly Confidential - Attorneys' Eyes Only - Protective Order
2      A.  Yes.
3      Q.  Okay.
4      MR. WATSON:  Is now a good time to --
5  I just want to raise one thing.  I don't   01:27PM
6  mind leaving the exhibit number the same,
7  but it occurs to me that we have copies
8  that are now incomplete versions of what
9  will ultimately be Exhibit 4.
10     Is that -- is that scanned in your   01:27PM
11  system or anything yet?
12     MR. TORCHIA:  (Nodding.)
13     MR. WATSON:  So maybe what we should
14  do is destroy these right now so that we
15  make sure that there is not an Exhibit 4  01:27PM
16  floating around that is not the final
17  version, if that's agreeable to you.
18     MR. TORCHIA:  I'm fine taking five
19  and doing that.  Let's go off the record
20  and I'll make another copy and fix the   01:28PM
21  record.
22     MR. WATSON:  Okay.
23     THE VIDEOGRAPHER:  The time is 1:28.
24  We're going off the record.
25     (Recess is taken.)            01:29PM

Page 72

1  Highly Confidential - Attorneys' Eyes Only - Protective Order
2      THE VIDEOGRAPHER:  The time is 1:30.
3  We're back on the record.
4  BY MR. TORCHIA:
5      Q.  So let me just help us for the   01:31PM
6  record.  On my copy, the very bottom number that
7  you write is cut off because of just the
8  copying, so maybe you can write it to the right
9  and a little above.
10     Would that be okay, Mr. Geklinsky?   01:31PM
11     A.  To the right here and above?
12     Q.  Yeah.
13     (Witness complies.)
14     A.  Do you need to make additional
15  copies?                    01:31PM
16     MR. WATSON:  I think we're okay.
17     MR. TORCHIA:  Yeah.  We can make
18  another copy at the end.
19     MR. WATSON:  And just so the record
20  is clear, that's Exhibit 4.  The       01:31PM
21  handwritten portions are the witness's and
22  the type portions are counsel's.
23     MR. TORCHIA:  Okay.
24     MR. WATSON:  Typed portions are
25  counsel's.                   01:31PM

Page 73

1  Highly Confidential - Attorneys' Eyes Only - Protective Order
2  BY MR. TORCHIA:
3      Q.  And did you see any inaccuracies in
4  the numbers in the top portion when you compared
5  them to declaration and to the chart,      01:32PM
6  Mr. Geklinsky?
7      A.  I didn't -- I didn't compare all of
8  the numbers.
9      MR. WATSON:  Do you want him to do
10  that or...                   01:32PM
11     Q.  Do you remember seeing -- you can, if
12  you'd like.  I --
13     A.  I haven't seen any errors, but I
14  haven't checked every number here.
15     Q.  Do the numbers seem right in the    01:32PM
16  tables that you have seen given your knowledge
17  of what the sales numbers are?
18     A.  They seem correct.
19     Q.  Okay.  So let's move on.
20     Now, you've given us unit numbers in   01:32PM
21  your testimony and in your declaration, correct?
22     A.  Yes.
23     Q.  Do you know what -- the revenues that
24  Samsung has made for the sales of the Galaxy
25  Nexus as of May 4th in the United States?  01:33PM

## Page 74

1 Highly Confidential - Attorneys' Eyes Only - Protective Order
2     A.   I would have to have time to be able
3 to calculate that, but I don't have that on the
4 top of my head.
5     Q.   Do you have an approximate idea?     01:33PM
6        We have approximately 600,000 units
7 as of May 4th, correct?
8     A.   Correct.
9     Q.   So what is the approximate revenue
10 Samsung would have made for the sales of those     01:33PM
11 units?
12     A.   I'm not sure of the -- I am not aware
13 of the pricing to Google or Sprint, so I
14 wouldn't want to speak for their revenue.  But
15 --     01:33PM
16     Q.   So are you -- go ahead.
17     A.   Given time, I can determine that.
18     Q.   All right.  Well, let me ask you
19 this:  Are you aware of the pricing for Verizon?
20     A.   Yes.     01:33PM
21     Q.   Do you know what the average price
22 for Verizon for the 600,000 would be?
23       MR. WATSON:  Vague and ambiguous as
24 to time.
25     Q.   Let me restate that.     01:34PM

## Page 75

1 Highly Confidential - Attorneys' Eyes Only - Protective Order
2       Do you know what the average price of
3 the Verizon constituent of the 600,000 units
4 would be?
5     A.   Yes.     01:34PM
6     Q.   What would that be?
7 
8     Q.   And what portion of the 600,000 is
9 Verizon -- 600,000 units is Verizon?
10     A.   450,000.     01:34PM
11     Q.   Okay.  Would it be cruel to ask you
12 to multiply ▮ -- you don't have to do it on
13 that paper.  I can give you a different one.
14       MR. WATSON:  Let's have him write on
15 something separate.     01:35PM
16       (Witness calculating.)
17       MR. WATSON:  Somewhere his fifth
18 grade math teacher would be very proud
19 right now.
20       (Witness calculating.)     01:36PM
21     A.   For the 450,000 Verizon units, if my
22 math is correct, ▮
23     Q.   Okay.  So that's a revenue number,
24 correct?
25     A.   Correct.     01:36PM

## Page 76

1 Highly Confidential - Attorneys' Eyes Only - Protective Order
2     Q.   So for the 450,000 Verizon units,
3 Samsung made approximately ▮ of
4 revenue; is that right?
5     A.   Correct.     01:36PM
6     Q.   All right.  And you would expect that
7 there would be some more revenue associated with
8 the Sprint and Google sales, but you're not sure
9 what that is?
10     A.   Correct.     01:37PM
11     Q.   Okay.  How would you determine that
12 information, Mr. Geklinsky?
13     A.   Further discussion with Brian Charity
14 and Curt Matson.
15     Q.   Now, do you know what portion of that     01:37PM
16 revenue that we just discussed would be profit?
17     A.   I do not.  I don't have visibility to
18 that.
19     Q.   All right.  Do you know, with respect
20 to Verizon, whether any other Android phone     01:37PM
21 outperformed the Galaxy Nexus in the fourth
22 quarter of 2011?
23       MR. WATSON:  Vague and ambiguous.
24     Q.   Do you understand that question?
25 Sold more units.  Is that more clear than     01:38PM

## Page 77

1 Highly Confidential - Attorneys' Eyes Only - Protective Order
2 "outperformed"?
3     A.   I'm -- I'm just trying to think.
4       MR. WATSON:  May lack foundation.
5     Q.   How about we restate the whole     01:38PM
6 question for the record.  I'll do that for you.
7       Are you aware of any Android phone
8 that sold more units than the Galaxy Nexus in
9 the United States in the fourth quarter of 2011
10 on Verizon?     01:38PM
11     A.   Without having the data in front of
12 me, I would believe that there were quite a few
13 in Q4 and possibly -- possibly our Droid Charge.
14 Again, without having the data in front of me, I
15 can't -- I can't answer for sure.     01:38PM
16     Q.   So you're not sure?
17     A.   Not sure.
18     Q.   All right.  Do you know how the
19 Galaxy Nexus has performed on Sprint relative to
20 other Android phones?     01:39PM
21     A.   I do not.
22     Q.   Did you do anything to determine that
23 in preparation for your deposition today?
24     A.   I did not ask how -- how the
25 sell-through compared to other Android phones on     01:39PM

1  Highly Confidential - Attorneys' Eyes Only - Protective Order
2      Sprint's network.
3          MR. TORCHIA:  I'd like to mark as
4      Exhibit 6, a document with control No.
5      S-ITC-600027846 to 600027905.        01:40PM
6      document entitled, "Verizon Weekly GM
7      Report," dated January 9th, 2012.
8          (Plaintiff's Geklinsky Exhibit 6,
9      "Verizon Weekly GM Report," Bates stamped
10     S-ITC-600027846 to 600027905, marked for    01:40PM
11     identification, as of this date.)
12 BY MR. TORCHIA:
13     Q.  Do you recognize the document I've
14 marked as Exhibit 6, Mr. Geklinsky?
15         (Document review.)        01:41PM
16     A.  Yes.
17     Q.  What is this document?
18     A.  Weekly report of account activity and
19 related information.
20     Q.  Who would have prepared this        01:42PM
21 document?
22     A.  Um, generally the document is
23 compiled by me from data from various sources
24 and submissions by other account team members.
25     Q.  All right.  Let's turn to page '848.    01:43PM

1  Highly Confidential - Attorneys' Eyes Only - Protective Order
2          MR. WATSON:  Do you have one more
3      copy of that?
4          MR. TORCHIA:  I think I might.
5          (Handing.)        01:43PM
6          MR. WATSON:  Thank you.
7  BY MR. TORCHIA:
8      Q.  Do you see page '848, Mr. Geklinsky?
9      A.  Yes.
10     Q.  See where it says, "VZW sales focus    01:43PM
11 first quarter, 2012" at the top?
12     A.  Yes.
13     Q.  Now, tell me just generally what the
14 slide refers to.  What is the information on
15 this slide?        01:43PM
16     A.  Generally the target column is a
17 representation of quarterly targets for the
18 account team.
19         AP1 is an indication of the cust --
20 combined customers forecast for purchase.  AP2    01:44PM
21 would be would be the account team's demand
22 plan.  And then, of course, the gap between
23 those.
24     Q.  All right.  So there's no actual
25 sales numbers here?        01:44PM

1  Highly Confidential - Attorneys' Eyes Only - Protective Order
2      A.  No.  These are all forecast and for
3  the quarter.
4      Q.  All right.  And, um, these forecasts
5  that you prepared -- did you prepare these    01:44PM
6  forecasts, Mr. Geklinsky?
7      A.  I can't say I prepared the forecast.
8  The AP1 is the customer's forecast.  AP2 is the
9  account team consensus forecast.
10     Q.  I see.        01:45PM
11         Um, and now, the Galaxy Nexus is
12 listed at the top, correct?
13     A.  Correct.
14     Q.  Are these phones -- are these --
15 these other phones here below, are they all    01:45PM
16 Samsung phones?
17     A.  Yes.
18     Q.  All right.  Now, so -- and let me ask
19 you, are these all Droid phones?  Or are some of
20 them phones with other platforms?        01:45PM
21     A.  There are others as well.
22     Q.  Okay.  Um, are there any phones --
23 are there any Samsung phones that are not listed
24 on this table that were being carried at Verizon
25 at the time?        01:45PM

1  Highly Confidential - Attorneys' Eyes Only - Protective Order
2      A.  Yes.
3      Q.  Okay.  So what are those?
4      A.  Those would be, for example, could be
5  basic feature phones that have no gap between    01:46PM
6  forecasts.  For example, U360 Gusto is one
7  that's a fairly consistent volume product that
8  wasn't reflected here because there was no
9  action needed to close the forecast gap.
10     Q.  I see.        01:46PM
11         Are all of Samsung's smartphones
12 listed on this table, deployed at Verizon, that
13 is?
14         MR. WATSON:  Vague as to time, but...
15     A.  I'm just trying to think.  I -- I    01:46PM
16 would have to say yes, it does appear that
17 they're all listed.
18     Q.  Okay.  And the Galaxy Nexus is listed
19 as the top in terms of what Samsung was
20 targeting, correct, at 650,000 units for the    01:47PM
21 first quarter?
22         MR. WATSON:  Misstates the document.
23     Q.  Why don't you tell me why the Galaxy
24 Nexus was listed at the top.
25     A.  This was -- it was not listed for any    01:47PM

Page 82

Highly Confidential - Attorneys' Eyes Only - Protective Order

1  particular reason at the top. They're not
2  sorted in any particular manner. In the
3  following week, it could have been listed in a
4  different order.                                01:47PM
5     Q.  All right. You had a target of
6  650,000 units, right? Is that what -- is that
7  what states, the document?
8     A.  For account team targets, yes.
9     Q.  All right. And AP 1, that is -- is     01:47PM
10 that the carrier estimate or is that Samsung's
11 estimate?
12    A.  That's the carrier. And again,
13 stating carrier meaning they're distributor
14 partners as well.                              01:48PM
15    Q.  I see.
16       And 464, is that Samsung's estimate?
17    A.  That represents the -- that
18 represents the current demand plan schedule
19 for -- schedule for demand in production.      01:48PM
20    Q.  Okay. So the Galaxy Nexus is leading
21 all of these other phones in the -- in the terms
22 of both what Samsung targeted and the current
23 demand plan; is that right?
24    A.  The quantity is higher for the         01:48PM

Page 83

Highly Confidential - Attorneys' Eyes Only - Protective Order

1  target. And at this time, in this week, the
2  quantity was higher than the other smartphones
3  in that demand plan.
4     Q.  All right. Is it fair to say that as  01:49PM
5  of this time, the Galaxy Nexus was one of -- or
6  was Samsung's leading smartphone on Verizon?
7        MR. WATSON: Vague.
8     Q.  Is that a fair statement?
9     A.  I would have to recall, which I        01:49PM
10 can't -- I can't off the top of my head, the
11 launch date for the Stratosphere model, which
12 has achieved volumes greater than Galaxy Nexus.
13    Q.  But as of this time -- but so you --
14 is the answer you don't know or --             01:49PM
15    A.  Well, I'd -- I'd have to determine --
16 and, again, I don't know if I can determine if
17 we're looking at this document -- the launch
18 date of Stratosphere.
19    Q.  Why would you need that information     01:50PM
20 to know whether the Galaxy Nexus as of this time
21 was Samsung's leading phone at Verizon?
22    A.  Because at -- at this time, from my
23 recollection, sales were not very good of Galaxy
24 Nexus at Verizon Wireless. And if Stratosphere  01:50PM

Page 84

Highly Confidential - Attorneys' Eyes Only - Protective Order

1  had launched, Stratosphere would have already
2  been exceeding Galaxy Nexus.
3     Q.  All right. So let's flip to page
4  855.                                           01:50PM
5        (Document review.)
6     Q.  Now, you see how page 855 has a slide
7  that's entitled, "VZW Product Dashboard"?
8     A.  Yes.
9     Q.  All right. Did you prepare this        01:50PM
10 slide?
11    A.  No, I did not.
12    Q.  Do you know who prepared this slide?
13    A.  That would be the director of product
14 management.                                    01:50PM
15    Q.  I want to make sure we're looking at
16 the same one. Are you on page 27855?
17    A.  Yes.
18    Q.  Does it say, "VZW Product Dashboard"
19 at the top?                                    01:51PM
20    A.  It does.
21    Q.  Okay. Now, on the row i515, it says
22 -- the first row it says, "i515 Galaxy Nexus."
23 Do you see that?
24    A.  Um-hmm.                                 01:51PM

Page 85

Highly Confidential - Attorneys' Eyes Only - Protective Order

1     Q.  What does i515 signify?
2     A.  That's just the model number, the SKU
3  of the product.
4     Q.  Okay. So if we see i515 elsewhere,     01:51PM
5  that means Galaxy Nexus?
6     A.  Yes.
7        MR. WATSON: Lacks foundation.
8     Q.  Here it says, "Comments: Sales
9  remain robust."                                01:51PM
10       Do you see that?
11    A.  I see what it says.
12    Q.  All right. And you also see, "VOC
13 feedback is quite positive," right?
14    A.  I see that.                             01:51PM
15    Q.  Um, you reviewed this document
16 before -- before it was completed, correct?
17    A.  I had -- I had compiled the
18 individual reports, this being one of those
19 individual reports.                            01:52PM
20    Q.  Do you ever recall correcting the
21 information on page 855?
22    A.  I don't recall correcting the
23 information.
24    Q.  Okay. What does "VOC feedback is       01:52PM

Page 106

Highly Confidential - Attorneys' Eyes Only - Protective Order
2  customer buying decisions, we -- we respond to
3  what the customers are saying they're buying the
4  product for.
5      Q.   Okay.  So would you believe it's --    02:30PM
6  it's fair to say that survey -- customer surveys
7  focus on newer features?
8          MR. WATSON:  Lacks foundation.
9      A.   I don't have visibility as -- as to
10 that.                                           02:30PM
11     Q.   All right.  How about advertisement,
12 when you see phones trying to differentiate
13 themselves from their competitors, do they point
14 to baseline functionality that everybody has, or
15 do they point to features that make them      02:31PM
16 different from their competitors?  What's your
17 experience?
18     A.   Unfortunately most of my visibility
19 is to Verizon's advertising that doesn't point
20 to much, so -- except for maybe a price point.    02:31PM
21 But, you know, again I think advertising has
22 been done in many ways.
23     Q.   So would it -- would it surprise you
24 to see that advertising doesn't focus on
25 features that are baseline features that are the   02:31PM

Page 107

Highly Confidential - Attorneys' Eyes Only - Protective Order
2  same across most smartphones out there?  That
3  wouldn't surprise you, right?
4      A.   I don't think that would surprise me.
5      Q.   Okay.  Now, we talked about three      02:31PM
6  applications.  We talked about text, we talked
7  about email, and we talked about I think
8  browsers, right?
9      A.   Correct.
10     Q.   Those are all important, right?        02:32PM
11     A.   Again --
12         MR. WATSON:  Asked and answered.
13     A.   I think it's dependent on the
14 customer's intended use of the product.
15     Q.   You're not going to say that having a   02:32PM
16 browser or having email or having text messages
17 is unimportant, right?  You wouldn't say that?
18     A.   I -- I wouldn't say it's important or
19 unimportant.  I mean, I have known customers
20 that have used smartphones without -- without    02:32PM
21 text application.  I've known customers that are
22 -- you know, users that have the desire to watch
23 movies when they're on the airplane.  I can't
24 say that in general those applications are --
25 are important to every user.                    02:32PM

Page 108

Highly Confidential - Attorneys' Eyes Only - Protective Order
2      Q.   Not to every user.  Let's put it this
3  way:  If Samsung didn't have a browser on its
4  phone, it would not have a competitive phone,
5  right?                                          02:33PM
6      A.   I would say we would be at a
7  disadvantage.
8      Q.   And if Samsung had a poor browser
9  experience compared to competitive phones, you
10 would be at a disadvantage, right?             02:33PM
11     A.   In theory, if we had a reputation for
12 having a poor performance, I would have to
13 assume.
14     Q.   Okay.  Now, for text messaging, if
15 Samsung didn't have text messaging capability on   02:33PM
16 its phones, it would be at a competitive
17 disadvantage, right?
18     A.   Again, if we had a bad rep -- a bad
19 review for not having text messaging, I would
20 assume that we would be at a disadvantage.      02:34PM
21     Q.   All right.  And if you had a bad
22 review for having poor email capability, that
23 would put you at a disadvantage against your
24 competitors, too, right?
25     A.   Again, I think it -- it depends on    02:34PM

Page 109

Highly Confidential - Attorneys' Eyes Only - Protective Order
2  the overall product.  I think in some ways that
3  there may be other benefits of the product that
4  may outweigh.
5      Q.   Well, you certainly agree that it's     02:34PM
6  not good to have bad reviews out there of the --
7  of basic core functionality of your products?  I
8  think you said that.  That's not a good thing to
9  have.  That will hurt you in the marketplace,
10 right?                                           02:34PM
11         MR. WATSON:  Mischaracterizes prior
12 testimony.
13     A.   I -- I think it would be -- it would
14 be common sense to say that a bad review would
15 not -- would not be favorable.                  02:34PM
16     Q.   Okay.  Now, the Galaxy Nexus -- the
17 Galaxy Nexus has all three of these things we've
18 been talking about.  It has email support, it
19 has support for text messaging, and it has
20 browser support, right?                         02:35PM
21     A.   Yes.
22     Q.   Okay.  And with respect to the Galaxy
23 Nexus, the Galaxy Nexus doesn't have a classic
24 keyboard on it, right?
25     A.   That's correct.                        02:35PM

Page 110

Highly Confidential - Attorneys' Eyes Only - Protective Order

1    Highly Confidential - Attorneys' Eyes Only - Protective Order
2        Q.   How do you enter text into a Galaxy
3    Nexus?
4        A.   By touching the screen to type.
5        Q.   There's a keyboard on the touchscreen    02:35PM
6    of the Galaxy Nexus that's displayed to you,
7    right?
8        A.   Correct.
9        Q.   And you have to type on that
10   touchscreen keyboard, right?                    02:35PM
11       A.   Correct.
12       Q.   Now, have you ever heard -- were
13   you -- strike that.
14           Now, you're aware that not too long
15   ago, most people who were typing on smartphones    02:35PM
16   were typing for the most part on tactile
17   keyboards, right?
18       A.   Meaning a separate keyboard for the
19   product?
20       Q.   Yeah, a hardware plastic keyboard?    02:36PM
21       A.   I can't -- I wouldn't say most
22   people.
23       Q.   Five years ago?
24       A.   I -- I would assume.
25       Q.   Five years ago, most people who were    02:36PM

Page 111

1    Highly Confidential - Attorneys' Eyes Only - Protective Order
2    doing email on a smartphone were typing on a
3    real tactile keyboard; is that right?
4        A.   I would assume.
5        Q.   And you would also agree that when    02:36PM
6    there was a move from tactile keyboards to
7    people typing on soft keyboards or glass, there
8    is a lot of skepticism where people thought
9    that, gee, I'm not going to be able to move from
10   typing to a tactile keyboard to a glass    02:36PM
11   keyboard; that's true, right?
12           MR. WATSON:  Lacks foundation.
13       A.   I personally didn't experience that.
14   We've had touchscreen keyboards for a number of
15   years in our product, in our product offerings    02:36PM
16   at Verizon.
17       Q.   You aware of that being a sentiment
18   generally; that there was a lot of -- that there
19   was resistance to a fair number of people in
20   moving from tactile keyboards to touchscreen    02:37PM
21   keyboards?
22       A.   No, I am not aware of that.
23       Q.   You've never heard -- have you ever
24   heard of anyone describing a resistance from
25   moving from a tactile keyboard to a touchscreen    02:37PM

Page 112

1    Highly Confidential - Attorneys' Eyes Only - Protective Order
2    keyboard?
3        A.   Not personally, no, I have not.
4        Q.   All right.  Let's talk about the
5    typing experience on the Galaxy Nexus.    02:37PM
6           You would agree that it's important
7    to offer customers of the Galaxy Nexus a good
8    typing experience, right?
9           MR. WATSON:  Vague and ambiguous.
10       A.   I would agree it's beneficial to have    02:37PM
11   a good typing experience.
12       Q.   All right.  And you would further
13   agree that if in the reviews of the Galaxy
14   Nexus, it's review as having a bad typing
15   experience, if that happened, that would be    02:38PM
16   something that would be a disadvantage, correct?
17       A.   I wouldn't agree entirely.  I think
18   that if -- if the keyboard was -- was reviewed
19   poorly but other features were -- were positive,
20   then it -- then it could still be a positive    02:38PM
21   device, positive experience.
22       Q.   The device as a whole could be a
23   positive experience.  But focusing on that one
24   feature, you don't want a bad review about your
25   typing experience; isn't that right?    02:38PM

Page 113

1    Highly Confidential - Attorneys' Eyes Only - Protective Order
2        A.   It would be preferred not to have a
3    bad review.
4        Q.   And in fact, typing is integral to a
5    number of applications that are offered on the    02:38PM
6    Galaxy Nexus; isn't that true?  Email, text
7    messaging, browser support; isn't that true?
8        A.   I would say it's a necessity.
9        Q.   Okay.  Now, you're aware that Samsung
10   offers a feature that corrects mistakes while a    02:39PM
11   user is typing on a Galaxy Nexus, right?
12       A.   I am aware that it's available.  I'm
13   not -- I'm not aware of if it's Samsung or if it's
14   provided by Google.
15       Q.   But you are aware on the Galaxy Nexus    02:39PM
16   there is functionality that allows for the
17   automatic correction of text while a user is
18   typing, right?
19       A.   I am aware of the functionality.
20       Q.   And that is -- that functionality is    02:39PM
21   designed to improve the typing experience,
22   correct?
23       A.   I would -- I would assume that to be
24   the intent.  I'm not -- I'm not aware of the --
25   the development stage, so I would have to make    02:40PM

## Page 114

Highly Confidential - Attorneys' Eyes Only - Protective Order

1  that assumption.
2
3      Q.  Okay.  Let's take a look at a couple
4  of documents.
5          MR. TORCHIA:  Let's take a          02:40PM
6  five-minute break to get some water first.
7          THE VIDEOGRAPHER:  The time is 2:40.
8  We are going off the record.
9          (Recess is taken.)
10         THE VIDEOGRAPHER:  The time is 2:41.    02:41PM
11 We're back on the record.
12         MR. TORCHIA:  I'd like to mark as
13 Exhibit 8, a document with control No.
14 SAMNDCA630-00055959 to 55980, document
15 entitled, "Media Lab Analysis Galaxy          02:42PM
16 Nexus."
17         (Plaintiff's Geklinsky Exhibit 8,
18 Document entitled, "Media Lab Analysis
19 Galaxy Nexus," Bates stamped
20 SAMNDCA630-00055959 to 55980, marked for       02:42PM
21 identification, as of this date.)
22 BY MR. TORCHIA:
23     Q.  Do you recognize this document,
24 Mr. Geklinsky?
25     A.  No, I do not.          02:43PM

## Page 115

Highly Confidential - Attorneys' Eyes Only - Protective Order

1
2      Q.  Okay.  Um, do you have -- apart from
3  this specific document, do you know what a media
4  lab analysis is?
5      A.  This is not something that I have      02:44PM
6  received in the past for any product.
7      Q.  Okay.  And it's not something you
8  looked at obviously in preparation for your
9  deposition today?
10     A.  Correct.          02:44PM
11     Q.  Do you know who the media QA lab is?
12     A.  I do not.
13     Q.  Do you know -- so you don't know what
14 the division of Samsung that -- that lab would
15 be, right?          02:44PM
16     A.  I do not.
17     Q.  Okay.  Let's -- let's turn to page
18 55971 where it says "Messaging," and then in
19 parens it says, "Consumer Reports."
20         MR. WATSON:  '71?          02:45PM
21         MR. TORCHIA:  Yes, '971.
22         (Document review.)
23     Q.  Let's actually go to the first page
24 first where they give us some basic
25 understanding, which is '960.  It's the second   02:45PM

## Page 116

Highly Confidential - Attorneys' Eyes Only - Protective Order

1  page actually.  All right.
2      See here -- see here how it says --
3  the top of the -- of the page says, "Complete CR
4  score predictions"?          02:46PM
5      A.  Yes.
6      Q.  And then it lists a number of, I
7  guess, categories.  It says, "Display, phoning,
8  camera, ease of use, messaging, battery --
9  battery life, voice quality and web browsing."   02:46PM
10 Do you see that?
11     A.  Yes, I see that.
12     Q.  And you see how it's got scores next
13 to each one of those?
14     A.  Yes.          02:46PM
15     Q.  Okay.  And those scores rate from
16 poor to excellent, right?
17     A.  Yes.
18     Q.  And they're -- you can see what they
19 are based on how filled in the circle is, right?  02:46PM
20     A.  That's correct.
21     Q.  Okay.  Now, one of those is -- is
22 messaging.  Do you see that?
23     A.  Yes.
24     Q.  What does messaging mean to you?      02:46PM

## Page 117

Highly Confidential - Attorneys' Eyes Only - Protective Order

1
2          MR. WATSON:  Lacks foundation.
3      Q.  Does messaging mean anything to you?
4  When you see these -- these list of features,
5  what does the word "messaging" mean?          02:47PM
6      A.  I'm not sure of their definition of
7  "messaging" as -- as it pertains to this
8  document or this test unless --
9      Q.  I'll take you -- I'll take you to
10 page '971 where it actually talks about          02:47PM
11 messaging.
12         (Document review.)
13     Q.  I see messaging relates here to both
14 what looks like MMS messaging and also mail.  I
15 guess broadly would you agree that if you read   02:47PM
16 this description that messaging refers to a
17 combination of mail and text messaging?
18         MR. WATSON:  Lack of foundation.
19     A.  What it appears on this page.
20     Q.  Okay.  See how it says, "Keyboard      02:48PM
21 seems improved both in terms of design and auto
22 correction accuracy" at the bottom?
23     A.  I see that on the page.
24     Q.  Now, that is something that the
25 Galaxy Nexus -- is that something that Samsung   02:48PM

Page 118

1   Highly Confidential - Attorneys' Eyes Only - Protective Order
2   touted as an improvement to the Galaxy Nexus?
3       MR. WATSON:  Vague and ambiguous.
4   Lacks foundation.
5       A.  I don't recall any reference to it        02:48PM
6   being touted in the Galaxy Nexus.
7       Q.  Would you agree it's important to
8   have a keyboard that seems improved both in
9   terms of design and auto correction accuracy?
10      MR. WATSON:  Asked and answered.        02:48PM
11  Vague and ambiguous.
12      A.  Again, as I read this, I have no
13  indication as to whether it's improved over
14  pre -- earlier version of Galaxy Nexus or other
15  products in the marketplace, so I can't really        02:49PM
16  provide an answer on that.
17      Q.  All right.  Let's flip to the next
18  page, which is 973.
19      All right.  Before we do that, I just
20  want to ask you one more question.        02:49PM
21      MR. WATSON:  So we're back on 971?
22      MR. TORCHIA:  Yeah, back on 971.
23      Q.  You see how the score that messaging
24  got, if you go to 960, was very good?  So you
25  have a score that messaging was very good?        02:50PM

Page 119

1   Highly Confidential - Attorneys' Eyes Only - Protective Order
2       A.  I see that referenced.
3       Q.  Do you have any reason to believe
4   that -- do you have any reason to believe that
5   this document is incorrect in the way that it's        02:50PM
6   evaluating the messaging capability of the
7   Galaxy Nexus?
8       MR. WATSON:  Lacks foundation.
9       A.  I don't -- I don't know what criteria
10  they used to form that conclusion.        02:50PM
11      Q.  And do you have any reason to believe
12  that the improvements in the keyboard and auto
13  correction accuracy did not have a role in
14  obtaining that good score for the Galaxy Nexus
15  on messaging?        02:51PM
16      MR. WATSON:  Lacks foundation.  Vague
17  and ambiguous.
18      A.  I have no indication as to what the
19  rating was or what the criteria used to
20  determine the rating.        02:51PM
21      Q.  All right.  Let's go to 973.
22      Do you see the words, "Face Unlock"
23  under the last bullet?  It says "comparative
24  features" on the top.  Do you see that?
25      A.  Yes, I see that here.        02:51PM

Page 120

1   Highly Confidential - Attorneys' Eyes Only - Protective Order
2       Q.  You see how it says "Face Unlock" at
3   the last bullet?
4       A.  I see that.
5       Q.  All right.  Do you know what Face        02:51PM
6   Unlock is?
7       A.  I'm -- I'm familiar with the
8   function.
9       Q.  Is Face Unlock a feature on the
10  Galaxy Nexus?        02:51PM
11      A.  Yes.
12      Q.  Is it an important feature on the
13  Galaxy Nexus?
14      A.  I wouldn't say so.  It's not a
15  feature that's been identified as a decision in        02:52PM
16  buying the product.
17      Q.  Okay.  Would you say it is less
18  important than the four features you looked at
19  in connection with preparing for your deposition
20  today?        02:52PM
21      MR. WATSON:  Compound.  Vague and
22  ambiguous.  Lacks foundation.
23      Q.  Or more important?
24      A.  I wouldn't be able to say it's less
25  or more important.  What I do know is the data        02:52PM

Page 121

1   Highly Confidential - Attorneys' Eyes Only - Protective Order
2   that none of these -- none of the features,
3   including Face Unlock, to my knowledge was
4   identified as a reason why a customer was
5   purchasing the product.  I'm not aware that Face        02:52PM
6   Unlock was identified as a feature that was
7   influencing customers' buying decision for the
8   product, nor as I understand were the other four
9   features in discussion.
10      Q.  Okay.  When you say "identified,"        02:53PM
11  what are you referring to?  Identified by who?
12  Customer surveys?
13      A.  By customer surveys as to features
14  and reasons that influence their buying
15  decisions.        02:53PM
16      MR. TORCHIA:  Let's move to
17  Exhibit 7.
18      MR. WATSON:  Move back to Exhibit 7?
19      MR. TORCHIA:  Oh, what are we on now?
20      MR. WATSON:  This is 8.        02:54PM
21      MR. TORCHIA:  So we're on 9.  I'm
22  sorry.
23      I'd like to mark as Exhibit 9 a
24  document control No. SAMNDCA630149504 to
25  149512.        02:55PM

1  Highly Confidential - Attorneys' Eyes Only - Protective Order
2       (Plaintiff's Geklinsky Exhibit 9,
3       Document entitled "Verizon Post UT, Bates
4       stamped SAMNDCA630149504 to 149512" marked
5       for identification, as of this date.)     02:54PM
6  BY MR. TORCHIA:
7       Q.   I'll give you a moment to read that
8  document, Mr. Geklinsky.
9       (Document review.)
10      MR. WATSON:  I assume you don't have     02:56PM
11  a translation?
12      MR. TORCHIA:  No.
13      Q.   Do you recognize this document,
14  Mr. Geklinsky?
15      A.   No, I do not.              02:56PM
16      Q.   Do you know what "NJ Post UT" means?
17      A.   From the content of the report, I
18  would have to believe that it may be user trial
19  team, but that would be a guess.
20      Q.   Okay.  All right.  You can put it to     02:57PM
21  the side.
22      (Witness complies.)
23      Q.   Are you familiar with a feature on
24  the Galaxy Nexus called the Google quick search
25  box?                          02:58PM

1  Highly Confidential - Attorneys' Eyes Only - Protective Order
2       A.   I'm aware of the Google search box
3  that's on the display.
4       Q.   What is the Google search box that's
5  on the display?                   02:58PM
6       A.   It --
7       Q.   What's your understanding of what
8  that feature does?
9       A.   It's a search feature.
10      Q.   What's your understanding of how it     02:58PM
11  works at the highest level.  I just want to make
12  sure I understand what your understanding is.
13      A.   That you would enter a search
14  criteria and it would search.
15      Q.   Okay.  And do you know where is that     02:58PM
16  search box on the Galaxy Nexus?  When somebody
17  powers up the Galaxy Nexus, where is that search
18  box?
19      A.   To the best of my knowledge, it's on
20  the top of the display.              02:58PM
21      Q.   Is -- is it on the top of the display
22  on the home screen?
23      A.   It is on mine.
24      Q.   Okay.  You own a Galaxy Nexus?
25      A.   Yes.                     02:59PM

1  Highly Confidential - Attorneys' Eyes Only - Protective Order
2       Q.   All right.  Do you know if that is
3  a -- if that is on by default so that the quick
4  search box appears at the top of the display on
5  the home screen by default?          02:59PM
6       A.   It's my understanding that it was
7  when the product was launched.  I'm not sure if
8  that is still the case in subsequent software
9  upgrades, for example.
10      Q.   Do you know if there is a setting     02:59PM
11  that you can activate that will take it off of
12  the -- off of the home page or make it so it's
13  not there when you start up?
14      A.   I haven't tried it, so I'm not sure
15  that you can or cannot.              02:59PM
16      Q.   Do you know why that search box is on
17  the home screen as opposed to some other place
18  on the device?
19      A.   I do not know why.
20      Q.   So um -- did you talk to anyone in     03:00PM
21  preparation for your deposition about why the
22  search bar was included in the Galaxy Nexus?
23      A.   No, I did not.
24      Q.   Is it your knowledge that Samsung
25  puts a little -- Samsung puts a little-used     03:00PM

1  Highly Confidential - Attorneys' Eyes Only - Protective Order
2  features on the home screen versus under other
3  menus or under other places on the -- on the
4  devices?
5       MR. WATSON:  Lacks foundation.     03:01PM
6  Vague.  Argumentative.
7       A.   It's -- it's my understanding this
8  was a design by Google, so I would say that your
9  question would pertain to the Galaxy Nexus.
10      Q.   Okay.  So are you saying that it was     03:01PM
11  not Samsung's decision to put the -- the search
12  bar on the home screen of the device?
13      MR. WATSON:  Lacks foundation.
14      A.   I don't have knowledge as to whether
15  it was or was not.              03:01PM
16      Q.   Do you have knowledge as -- as to
17  whether that was put their so users could have
18  access to that immediately when they turn on the
19  device?
20      MR. WATSON:  Lacks foundation.     03:01PM
21      A.   I don't -- I'm not aware of this
22  theory in where or why it was placed.
23      Q.   Okay.  So as far as you know, the
24  reason it was place there is because it was
25  considered a very important feature?  Couldn't     03:02PM

Page 126

1  Highly Confidential - Attorneys' Eyes Only - Protective Order
2  that be a reason it was put there?
3     A.   Again, I don't have the knowledge as
4  to why the decision was made to place it where
5  -- where it is.                                03:02PM
6     Q.   Do you know how long the Google
7  search bar has been supported on Samsung's
8  phones?
9     A.   I do not.
10     Q.   Now, I believe you said that the       03:03PM
11  Google search box wasn't reported in consumer
12  surveys as being a driver of a purchaser's
13  decision?  Did you say that?
14     A.   From information that was shared with
15  me on consumer buying decisions, that was not    03:03PM
16  one of -- not -- not one of the features that I
17  am aware that was.  And I'm not sure if it ever
18  arose as a feature that would be a buying
19  decision.
20     Q.   Do you know if those surveys asked    03:03PM
21  questions about the Google search box?
22     A.   I -- I do not know that.  I think
23  from my understanding the survey was as to what
24  -- what influenced the decision of the customer,
25  such as operating system, speed, size and form    03:03PM

Page 127

1  Highly Confidential - Attorneys' Eyes Only - Protective Order
2  fit.  The size -- display size bore a factor.
3     Q.   Do you know if the survey was
4  designed to understand whether or not those
5  customers valued the quick search box?  Did it    03:04PM
6  -- did it ask that question specifically?
7     A.   I don't have visibility to that.
8     Q.   Okay.  Now, apart from whether
9  customers were thinking about it in the survey
10  context, did you do anything to determine        03:04PM
11  whether the Google quick search bar was
12  considered by Samsung as a core feature from an
13  engineering standpoint?
14     A.   Again, I have no visibility to that
15  information.                                     03:04PM
16     Q.   So as far as you know, the Google
17  quick search bar could in fact be a core feature
18  from an engineering standpoint, couldn't it?
19     MR. WATSON:  Lack of foundation.
20     A.   Again, I have no visibility to that.    03:04PM
21     Q.   As Samsung's 30(b)(6) witness on this
22  topic today, you're not prepared to say that the
23  Google quick search box is not a core feature
24  from an engineering standpoint; isn't that
25  right?                                           03:05PM

Page 128

1  Highly Confidential - Attorneys' Eyes Only - Protective Order
2     MR. WATSON:  Vague and ambiguous.
3     A.   I -- I just haven't heard reference
4  to -- to the search bar as being a core feature
5  or not a core feature.                           03:05PM
6     Q.   You can't deny, sitting here today,
7  that it is a core feature, right?  You just
8  don't have the information to do that?
9     MR. WATSON:  Vague and ambiguous.
10  Lacks foundation.                               03:05PM
11     A.   I can neither confirm nor deny.
12     Q.   Okay.
13     MR. TORCHIA:  Let's go off the record
14  for about five minutes.
15     MR. WATSON:  Sure.                03:05PM
16     THE VIDEOGRAPHER:  The time is 3:05.
17  We're going off the record.
18     (Recess is taken.)
19     THE VIDEOGRAPHER:  The time is 3:09.
20  We're back on the record.              03:09PM
21  BY MR. TORCHIA:
22     Q.   All right.  So let's talk about word
23  correction.  From an engineering standpoint,
24  sitting here today, you don't have the
25  information to deny that word correction is a    03:09PM

Page 129

1  Highly Confidential - Attorneys' Eyes Only - Protective Order
2  core feature from an engineering standpoint,
3  correct?
4     MR. WATSON:  Excuse me one second.  I
5  lost the --                                      03:10PM
6     (Discussion off the record.)
7     A.   Would you mind repeating the
8  question?  I'm sorry.
9     Q.   Sitting here today, you don't have
10  the information to deny that word correction is    03:10PM
11  a core feature from an engineering standpoint,
12  correct?
13     A.   I'm -- I'm confident we have the
14  information and what influences customers'
15  buying decisions, and I'm also confident it's    03:10PM
16  not these features.  So I can't speak from an
17  engineering perspective; but, again, I -- I can
18  speak for what our studies show are influencing
19  customers' buying decisions.
20     Q.   Okay.  So let me ask you, apart from    03:11PM
21  what the actual surveys are showing about what
22  consumers have reported in surveys, can you tell
23  me from an engineering standpoint whether word
24  correction is a core feature, whether Samsung
25  considers that a core feature in its product?    03:11PM

1  Highly Confidential - Attorneys' Eyes Only - Protective Order
2       MR. WATSON:  Lacks foundation.
3       A.   I don't have the expertise to be able
4  to provide that answer.
5       Q.   Okay.  Now, let's talk about -- let's   03:11PM
6  ask the same question with respect to Image
7  Unlock.  You don't have the information today to
8  deny that Image Unlock is a core feature in
9  Samsung's products, correct?
10      MR. WATSON:  Hang on.  Lacks          03:11PM
11      foundation.
12      A.   The -- the information and
13  understanding I have, again, is regarding what
14  we believe are the -- are the primary reasons
15  from customer surveys as to why they're buying   03:12PM
16  the product.  I can't, again, say that Face
17  Unlock by definition is a core feature.  I...
18      Q.   Okay.  So what about the method for
19  unlocking a phone where you drag an image from
20  left to right, you don't have any basis to deny   03:12PM
21  that Image Unlock is a core feature in Samsung's
22  products, correct?
23      A.   It is has not been identified as --
24  as a reason customers are buying the product.
25      Q.   Okay.  But you don't have any       03:13PM

1  Highly Confidential - Attorneys' Eyes Only - Protective Order
2  information to deny whether, from an engineering
3  perspective, Image Unlock is a core feature in
4  Samsung's products, right?
5       MR. WATSON:  Vague and ambiguous.        03:13PM
6  Lacks foundation.
7       A.   Again, it's not one of the features
8  that has been identified as one of the -- the
9  main reasons customers -- the main features that
10  are influencing customers' buying decisions.     03:13PM
11      Q.   All right.  I'd like to ask from an
12  engineering perspective, apart from whatever
13  results you're seeing in customer surveys, I'd
14  like to ask you if you have a basis to deny that
15  Samsung considers this a core feature with       03:13PM
16  respect to the engineering of its products apart
17  from what customers know or do not know.
18      Do you understand that question?
19      MR. WATSON:  Vague and ambiguous.
20  Lacks foundation.                               03:14PM
21      Q.   From an engineering perspective, did
22  you look into whether this is a core feature
23  from an engineering perspective?
24      A.   I didn't review that particular
25  question in preparing for this deposition.        03:14PM

1  Highly Confidential - Attorneys' Eyes Only - Protective Order
2       Q.   Okay.  So right now you can't say
3  that Image Unlock is not a core feature to
4  Samsung products from an engineering
5  perspective; isn't that right?                   03:14PM
6       MR. WATSON:  Objection.  Lacks
7       foundation.  Vague and ambiguous.
8       A.   Again, I can't -- I'm not -- I don't
9  know that I have the expertise as to whether --
10  whether something is a core feature or the       03:15PM
11  definition of core feature.
12      Q.   All right.  So the last feature at
13  issue is this feature where you press on a, for
14  example, a phone number that's in an email or an
15  MMS message and you get the option to either     03:16PM
16  save that into your contacts or call it.  Are
17  you familiar with that feature?
18      A.   Yes.
19      Q.   Does that feature have a name in the
20  Galaxy Nexus?                                    03:16PM
21      A.   If it does, I'm not aware of it.
22      Q.   But you are familiar -- that is one
23  of the features you looked into in preparation
24  for your deposition today?
25      A.   It's one of the features that -- that   03:16PM

1  Highly Confidential - Attorneys' Eyes Only - Protective Order
2  was reviewed.
3       Q.   Okay.  Now, you don't have any basis
4  to deny that that functionality is a core
5  feature from an engineering perspective?          03:16PM
6       MR. WATSON:  Lacks foundation.  Vague
7  and ambiguous.
8       Q.   Is that right?
9       A.   I have a professional opinion that
10  it's not a core feature.  And, again, it's not   03:17PM
11  been -- it's not been a feature that's been
12  identified as affecting customers' buying
13  decisions.
14      MR. TORCHIA:  All right.  I have no
15  further questions.                              03:18PM
16      MR. WATSON:  All right.  I don't know
17  what the stipulation is we're using for
18  this round, but I assume it's the same
19  stipulation we were using when we were
20  taking depos.  So let's stipulate to the         03:18PM
21  usual stipulations.
22      MR. TORCHIA:  What does that mean?
23      MR. WATSON:  I don't know.  I never
24  actually heard the heard the whole thing.
25      MR. TORCHIA:  Whatever happened          03:18PM

Page 134

```
1    Highly Confidential - Attorneys' Eyes Only - Protective Order
2         before is --
3            MR. WATSON:  It will be fine.
4         Exactly.
5            THE VIDEOGRAPHER:  The time is 3:18.     03:18PM
6         This is end of the deposition May 7, 2012.
7
8            _____
9                    KEVIN GEKLINKSY
10
11
12       Subscribed and sworn to before me
13       this    day of        2012.
14
15           _____
16
17
18
19
20
21
22
23
24
25
```

Page 135

```
1
2                    C E R T I F I C A T E
3    STATE OF NEW YORK        )
4                 : ss.
5    COUNTY OF WESTCHESTER   )
6
7            I, ANNETTE ARLEQUIN, a Notary Public
8    within and for the State of New York, do
9    hereby certify:
10           That KEVIN GEKLINKSY, whose deposition
11   is hereinbefore set forth, was duly sworn
12   by me, and that the transcript of such
13   depositions is a true record of the
14   testimony given by such witness.
15       I further certify that I am not related
16   to any of the parties to this action by
17   blood or marriage; and that I am in no way
18   interested in the outcome of this matter.
19       IN WITNESS WHEREOF, I have hereunto set
20   my hand this 7th day of May, 2012.
21
22
23           _____
23              ANNETTE ARLEQUIN, CCR, RPR, CLR
24
25
```

Page 136

```
1
2                    I N D E X
3
4    Witness                       Page
5
6    KEVIN GEKLINSKY
7
8       MR. TORCHIA             5
9
10   ------------ INFORMATION REQUESTS -------------
11   DIRECTIONS NOT TO ANSWER:
12           Page        Line
13           27          10
14           28           8
15           29           5
16           31          19
17           45           2
18
19       I N D E X   O F   E X H I B I T S
20   Description                  Page
21
     Plaintiff's Geklinsky Exhibit 1,        4
22   Apple Inc.'s Second Notice of Rule
     30(b)(6) Deposition to Defendants
23
24   Plaintiff's Geklinsky Exhibit 2,        4
     Declaration of Kevin Geklinsky
25
```

Page 137

```
1
2               I N D E X   O F   E X H I B I T S (Cont'd.)
3
4    Description                  Page
5    Plaintiff's Geklinsky Exhibit 3,        4
     Supplemental Declaration of Kevin
     Geklinsky
6
7    Plaintiff's Geklinsy Exhibit 4,        50
     Excel Spreadsheet
8
9    Plaintiff's Geklinsky Exhibit 5,        63
     "Defeating Apple At Verizon," Bates
10   stamped SAMDCA 630-95422 through
     95437
11
12   Plaintiff's Geklinsky Exhibit 6,        78
     "Verizon Weekly GM Report," Bates
13   stamped S-ITC-600027846 to 600027905
14
15   Plaintiff's Geklinsky Exhibit 7,        91
     Document entitled "Verizon Weekly GM
16   Report," dated January 30th, 2012,
     Bates stamped S-ITC-600028078 to
     600028141
17
18   Plaintiff's Geklinsky Exhibit 8,       114
     Document entitled, "Media Lab
19   Analysis Galaxy Nexus," Bates stamped
     SAMNDCA630-00055980
20
21   Plaintiff's Geklinsky Exhibit 9,       122
     Document entitled "Verizon Post UT,
22   Bates stamped SAMNDCA630149504 to
     149512" marked for identification,
23
24
25
```