# EXHIBIT 20

JOSH A. KREVITT (CA SBN 208552)
jkrevitt@gibsondunn.com
H. MARK LYON (CA SBN 162061)
mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone: (650) 849-5300
Facsimile: (650) 849-5333

MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

MARK D. SELWYN (CA SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

*Attorneys for Plaintiff Apple Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | CASE NO. 12-cv-00630 LHK (PSG)<br><br>**REPLY DECLARATION OF CHRISTOPHER VELLTURO, PH.D.**<br><br>**Hearing:**<br>Date:  June 7, 2012<br>Time:  1:30 PM<br>Place:  Courtroom 8<br>Judge:  Hon. Lucy H. Koh |

Privileged and Highly Confidential
Prepared at the Request of Counsel

I.      OVERVIEW AND SUMMARY ................................................................................. 1

II.     Unique Dynamics of the Smartphone Market ........................................................... 8

        A.      The Smartphone Market Is at a Critical Phase ............................................... 8

        B.      Stickiness/Loyalty, Network Effects and Demand Complementarities Relating
                to Smartphones ............................................................................................. 13

                1.      Samsung Documents Recognize Stickiness and Loyalty in the Android
                        and Apple Platforms ............................................................................ 14

                2.      Samsung Recognizes That Network Effects Expand Platform Stickiness
                        and Loyalty .......................................................................................... 21

                3.      Ice Cream Sandwich Amplifies the Impact of Network Effects,
                        Stickiness, and Platform Loyalty ........................................................ 23

III.    Competition Between Apple's iPhone and Samsung's Galaxy Nexus ................... 24

        A.      Considerations of Historic Smartphone Unit Shipments and Shares ........... 25

                1.      Samsung's Historic Rise to the Top .................................................... 25

                2.      Recent Sales of the iPhone 4S ............................................................ 34

        B.      The Present State of Competition between Apple and Samsung and Samsung's
                Strategic Intent ............................................................................................. 35

        C.      The Role of the Galaxy Nexus in Samsung's Plan to Defeat Apple ........... 37

        D.      Intra- Vs. Interplatform Competition ........................................................... 41

IV.     The Competitive Significance of the Patented Features ......................................... 44

        A.      Slide-to-Unlock ('721 Patent) ..................................................................... 45

        B.      AutoCorrect ('172 Patent) ............................................................................ 48

        C.      Data Structures ('647 Patent) ....................................................................... 51

        D.      Universal Search ('604 Patent) .................................................................... 54

        E.      General Considerations by Mr. Wagner of the Patented Features ............... 59

V.      The Irreparable Harm To Apple From Samsung's Ongoing Infringement ............ 63

        A.      Harm to Apple Will Be Substantial .............................................................. 63

                1.      Samsung Will Cause Apple to Suffer Long Term Loss of Market Share ....... 64

                2.      Samsung Infringing Smartphone Sales Lead to a Wide Range of
                        Additional Lost Product/Service Sales ............................................... 65

REPLY DECLARATION OF CHRISTOPHER VELLTURO,                    Privileged and Highly Confidential
Ph.D.  – CASE NO. 12-cv-00630-LHK (PSG)                       Prepared at the Request of Counsel

ii

B.     Samsung's Claims of Insubstantial Damages Are Unsupported................................ 68

C.     Harm to Apple Cannot Be Reliably Quantified in Important Ways .......................... 70

     1.     Samsung and Mr. Wagner Claim Incorrectly That Any Lost Sales of iPhones and other iOS-based Devices, Products and Services can be Reliably Ascertained ....................................................................... 70

          a)     Surveys/Conjoint Analyses ............................................... 72

          b)     Hedonic Regressions......................................................... 73

          c)     Estimating Damages Emanating from Network Effects ................... 75

     2.     Samsung and Mr. Wagner Dismiss Harms to Apple's Reputation and Goodwill........................................................................ 76

REPLY DECLARATION OF CHRISTOPHER VELLTURO,        Privileged and Highly Confidential
Ph.D.   – CASE NO. 12-cv-00630-LHK (PSG)          Prepared at the Request of Counsel

iii

## I.     OVERVIEW AND SUMMARY[1]

1.     I am the founder and president of Quantitative Economic Solutions, LLC, an economic consulting firm.  I also teach, on occasion, economics and business strategy at the Graduate School of Management at Boston University.  I received a Doctor of Philosophy degree (Ph.D.) in Economics from the Massachusetts Institute of Technology in Cambridge, Massachusetts in 1989.

2.     I submitted a declaration in this action on February 8, 2012 ("Vellturo Declaration" or "my Original Declaration") in which I concluded that Apple would suffer significant and irreparable harm absent the issuance of a preliminary injunction on Samsung's Galaxy Nexus smartphones.[2] Since that time, additional discovery has taken place in this matter and Samsung has issued an Opposition to Apple's Motion for a Preliminary Injunction ("Samsung Opposition"), which included a Declaration from Michael J. Wagner ("Wagner Declaration").  The Samsung Opposition and Wagner Declaration contain assessments of my Original Declaration and affirmative assessments of irreparable harm.  Samsung asserts and Mr. Wagner concludes that Apple will not suffer irreparable harm in the absence of a Preliminary Injunction on the Galaxy Nexus, and, correspondingly, that the conclusions I reached in my Original Declaration are misguided and incorrect.  In particular, Mr. Wagner concludes that any harm suffered by Apple absent a Preliminary Injunction is *de mininis*, and can be adequately remedied through monetary compensation in the form of patent infringement damages assessed at trial.

3.     I have been asked by Counsel for Apple to update the conclusions I reached in my Original Declaration based upon the additional discovery provided in this matter.  Further, I was

---

[1] Attached as Appendix A is an index of all exhibits cited herein.

[2] I also testified via deposition on April 18, 2012 ("Vellturo Deposition") on the issues raised in my Original Declaration and additional evidence produced since February 8, 2012 that related to my opinions.

asked to assess the criticisms put forward by Samsung and Mr. Wagner of my conclusions and assess the reasonableness of the conclusions they affirmatively reach.  In this context, I have reviewed:

- Strategy and business documents produced by Samsung;

- Apple's Opening Brief, Samsung's Opposition Brief, and the Court's previous order denying Apple's motion for a preliminary injunction in Case No. 11-CV-01846;

- *Apple Inc. v. Samsung Electronics Co.*, No. 2012-1105 (Fed. Cir. May 14, 2012);

- Additional publicly available documents;

- Wagner Declaration;

- Deposition transcripts of witnesses for Apple, including Mark Buckley[3], Greg Joswiak[4], Arthur Rangel[5], Steven Sinclair[6], Dr. Nathaniel Polish[7], Dr. Ravin Balakrishnan[8], Dr. Todd C. Mowry[9] and Dr. Karan Singh[10];

- Deposition transcripts of witnesses for Samsung, including Michael J. Wagner[11] and Kevin Geklinsky[12].

---

[3] Deposition of Mark Buckley, April 10, 2012 ("Buckley Deposition").

[4] Deposition of Greg Joswiak, April 17, 2012 ("Joswiak Deposition").

[5] Deposition of Arthur Rangel, April 5, 2012 ("Rangel Deposition").

[6] Deposition of Steven Sinclair, April 4, 2012 ("Sinclair Deposition").

[7] Deposition of Dr. Nathaniel Polish, April 3, 2012 ("Polish Deposition").

[8] Deposition of Dr. Ravin Balakrishnan, April 6, 2012 ("Balakrishnan Deposition").

[9] Deposition of Dr. Todd C. Mowry, April 4, 2012 ("Mowry Deposition").

[10] Deposition of Dr. Karan Singh, April 17, 2012 ("Singh Deposition").

[11] Deposition of Michael J. Wagner, May 4, 2012 ("Wagner Deposition").

4.      Based on this additional work, I have reaffirmed the conclusions I reached in my
original report that the Galaxy Nexus, if not enjoined, will cause Apple to suffer significant and
irreparable harm, in the form of both a permanent loss of market share in the smartphone market and
future lost sales in many other aspects of Apple's business, including, for example, sales of
smartphone applications and accessories, Apple iPods, iPads and related accessories, and Apple
desktop and laptop computers.  Moreover, as I explained, and as Mr. Wagner does not rebut, a large
portion of these losses could never be recaptured by Apple because of the inherent "stickiness" of, or
customer loyalty to, smartphone platforms, as well as network effects.  The full quantum of these
losses could never be fully calculated in this, or a later, patent infringement case.  Further, I have
reaffirmed my conclusion that Samsung's infringement of the patents-in-suit allows Samsung to offer
product features that are central to demand for smartphones and, thus, critical to the success of the
Galaxy Nexus and Samsung's strategy more broadly.  While I find substantial additional evidence
that supports my original conclusions, the internal strategic documents recently produced by
Samsung are paramount in my supplemental findings, as these documents clearly demonstrate the
following:

- ███████████████████████████████████████████████
  ████

- The smartphone marketplace is entering a critical phase wherein large numbers of
  first-time purchasers present a key opportunity to build an installed base of users;

- Platform/smartphone stickiness, product/brand loyalty, and network effects form a
  powerful triumvirate that locks first-time users into their smartphone/platform of

---

*(Cont'd from previous page)*

[12] Deposition of Kevin Geklinsky, May 7, 2012 ("Geklinsky Deposition").

REPLY DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-00630-LHK (PSG)                    Privileged and Highly Confidential
                                                          Prepared at the Request of Counsel
                          3

choice, which leads in turn to myriad other revenue opportunities that strengthen
platform stickiness and further entrench the installed base;

- The Galaxy Nexus represents a key product release in Samsung's battle to unseat
  Apple, due to, among other things, its competitive feature set, the "halo effects"
  associated with the phone, and implementation of the Ice Cream Sandwich operating
  system architecture.

5.      Further, I conclude that Samsung's claim (put forward to a substantial degree in the
Wagner Declaration) that Apple will not suffer substantial or irreparable harm as a result of
Samsung's infringement is unsupported by the evidence.  In addition, Mr. Wagner's conclusion that
any such harm can be readily quantified at a trial held in the future through a damages analysis
suffers from a superficial and simplistic consideration of the complexities associated with a damages
analysis involving differentiated products (such as smartphones) in a highly dynamic marketplace
with strong network effects and demand complementarities between smartphones and other devices,
hardware, software, and digital content.

6.      In summary, Samsung's analyses and Mr. Wagner's findings suffer from the following
infirmities:

- Samsung's claim that its Galaxy Nexus is directed at intra-Android competition and
  not at Apple's iOS ecosystem is wholly at odds with a vast array of Samsung strategic
  documents, which clearly cite Apple as its central competitive target.[13]  This is
  perhaps best emblemized by a central strategy goal found throughout Samsung's
  plans:

---

[13] Additionally, as cited in my Original Declaration, Samsung's many commercials that clearly target
the iPhone are also clear evidence that Samsung has positioned the Galaxy Nexus, and its
smartphones more broadly, to compete with Apple's iPhone and not other Android devices.

**"S>A"**

That is, Samsung's primary goal is to defeat and surpass Apple.[14]

- Samsung claims (largely through Mr. Wagner) that network effects and the inherent tippiness of the relevant products and services in this matter are far weaker than I found, and, thus, any harm sustained by Apple as a result of Samsung's infringing smartphones is largely confined to limited lost sales of Apple's iPhones during the period of infringement. Again, Samsung's business documents repeatedly and directly contradict this claim, as Samsung recognizes the strong network effects under which it plans to parlay its smartphone success to all aspects of a digital media ecosystem, including future smartphone, tablet, digital media, computers, and even Samsung television sales.

- Samsung cites Apple's recent success with the iPhone 4S launch as evidence of the lack of any substantial harm from Samsung's launch of the Galaxy Nexus. However, as I note below, neither Samsung nor Mr. Wagner address the fact that the Galaxy Nexus also enjoyed substantial sales – amounting to ███████████ in revenue – in the first few months after its recent launch. In any event, whether or not Apple continues to successfully sell the iPhone 4S is simply the wrong question – the relevant question is whether Apple's marketplace position will be materially different in the absence of a Preliminary Injunction than if such an injunction is issued.

---

[14] It is noteworthy that in his Declaration, Mr. Wagner's analyses are essentially devoid of supporting material from Samsung's business documents. ██████████████████████████████████████████████████████████████████████████

- Samsung claims that its Galaxy Nexus has garnered limited sales in the U.S. since its mid-December launch (and that it forecasts limited additional sales into 2012), and, thus, they conclude that no substantial harm will accrue to Apple in the absence of a Preliminary Injunction.  As noted extensively in my Original Declaration, the harm generated by Galaxy Nexus infringement radiates and ripples across many dimensions that are not reflected in a simple accounting of unit shipments.  Moreover, Samsung's own financial results and its forecast for the future indicate that its "S>A" strategic goal is coming within reach:

> "Samsung reported January-March operating profit of 5.85 trillion won ($5.15 billion), broadly in line with its earlier estimate of 5.8 trillion won, and nearly double the 2.95 trillion won a year ago.  In the fourth quarter of 2011, the company had an operating profit of 5.3 trillion won.
>
> Its handset division profit nearly tripled to 4.27 trillion won, accounting for 73 percent of total profit.  Operating profit margin of the division also improved to 18.4 percent from 11 percent a year ago and 12 percent in the preceding quarter, helped by strong sales of the high-end Galaxy S and Note.
>
> Samsung and Apple have formed a near duopoly in the high-end smartphone market, as traditional stalwarts struggle to introduce compelling models that can successfully crack into the segment.
>
> The duo controlled 90 percent of the high-end smartphone market last year and their combined stake will remain little changed at 88 percent by 2013, according to Bernstein analysts."[15]

7.     As the above quotation indicates, Samsung has been steadily gaining on Apple in the United States smartphone market.  As discussed below, both IDC data and NDP data show that Mr. Wagner's market share data, based on year-end 2011, are no longer accurate.  Those data, and Dr. Wagner's charts depicting it, showed a transitory spike in Apple's performance due to the release of

---

[15] Exh. 18 (Miyoung Kim, *Samsung Crushes Earnings, Blows Past Nokia to Become World's Biggest Cellphone Maker*, Business Insider, April 26, 2012, available at http://articles.businessinsider.com/2012-04-26/tech/31408867_1_smartphone-samsung-nokia).

Privileged and Highly Confidential
Prepared at the Request of Counsel

the iPhone 4S.  Data from Q1 2012 show that Apple's share is declining from this spike and that Samsung is continuing to close the gap.

8.     Finally, it is my understanding that the Court has already entered an order recognizing many of the dynamics of the smartphone market, including with respect to Samsung and Apple in particular, that I explain below but that Mr. Wagner largely dismisses.  For example, I understand that the Court concluded that Apple and Samsung directly "compete in the same smartphone market, particularly in the market for first-time smartphone buyers, and thus the potential for harm from infringing conduct is strong."[16]  This was true for the Court despite Samsung's (incorrect) claims that its true competition is with other companies making Android-compatible smartphones.[17]  I further understand that the Court recognized that the smartphone market is at a critical stage, as I explain below, because "the evidence suggests that in the next three to five years the market for new smartphone purchasers, who have not established an allegiance to any brand, operating system, or product, is likely to increase significantly."[18]  At the same time, the Court agreed that brand loyalty and stickiness exacerbate the importance of first-time smartphone purchasers' buying decisions, while making the task of calculating potential harm to Apple from Samsung's infringement difficult: "The evidence in the record suggests that Apple's loyalty makes the initial decision regarding which product to purchase even more important because the potential customers that Apple loses to Samsung may have long-term effects that are difficult to calculate and may not be recaptured."[19]  According to the Court, and as I reiterate below, this harm radiates beyond just the smartphone

---

[16] Order Denying Motion for Preliminary Injunction, *Apple, Inc. v. Samsung Electronics Co., Ltd.*, Case No. 11-CV-01846-LHK (N.D. Cal., Dec. 2, 2011), at 31-32 ("1846 Court Order").

[17] *Id.* at 31.

[18] *Id.* at 31.

[19] *Id.* at 32.

REPLY DECLARATION OF CHRISTOPHER VELLTURO,                    Privileged and Highly Confidential
Ph.D.  – CASE NO. 12-cv-00630-LHK (PSG)                            Prepared at the Request of Counsel

market, potentially having "long term implications for downstream purchases" of, for example,

"apps, other Apple devices such as desktops, laptops, and iPods, and future models of Apple

smartphones."[20]   The Court even pointed to testimony Mr. Wagner had given in that prior case in

which he agreed that "the decision to purchase one Apple iPhone may have repercussions that could

lead to future lost customers and future lost sales that cannot be recovered because of network

compatability benefits."[21]   Finally, I understand that the Court found that the evidence showed that

Apple "is likely to lose market share to Samsung in the absence of an injunction."[22]   In this

declaration, I provide additional evidence concerning each of the above conclusions the Court

reached in the prior case, and note how additional factors in this case, such as the competitive

significance of the patented features at issue, further support a finding that a Preliminary Injunction is

necessary to foreclose substantial and incalculable harm to Apple.

9.      The remainder of this Declaration identifies the additional evidence I have identified

that: 1) reinforces my original conclusions, and 2) refutes Samsung's claims.

## II.      UNIQUE DYNAMICS OF THE SMARTPHONE MARKET

### A. The Smartphone Market Is at a Critical Phase

10.      As I demonstrated in my Original Declaration, the smartphone market is in the midst of

a critical phase in which large numbers of consumers will acquire their first smartphone.  These users

represent a key battlefield between Apple with its iPhone/iOS offering and Samsung's

Galaxy/Android offering; once they have chosen a phone/platform, users are likely to remain with

that platform and become further entrenched through the acquisition of additional products and

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

Privileged and Highly Confidential
Prepared at the Request of Counsel

services unique to their smartphone/platform.  My conclusions were based on statistical analyses of

smartphone adoption, as well as reviews of industry-related analysis and forecasts.

11.     As part of recent discovery in this matter, I have reviewed a significant set of Samsung

strategic documents pertaining to the current and future state of the smartphone marketplace.  These

documents fully support my original finding – Samsung, too, sees the next 12-18 months as a critical

time in which to acquire first-time smartphone purchasers and build its installed base.  In particular,

Samsung's strategic documents recognize that capturing first-time smartphone purchasers in the next

12-18 months is "critical" to its plan to build an ecosystem to rival and overtake that of Apple iOS.

Samsung estimates that "60M U.S. Consumers . . . will buy their first smartphone in 2012"[23] and that

"100+ million consumers will become 1st time smartphone users in the next two years."[24]  Samsung

recognizes the magnitude of this opportunity and its importance to the future of the smartphone

industry and other industries.  According to a presentation designed for Samsung's Chief Operating

Officer and a ████████████████████████████████████████████████████

████████████████ █ ████████████████[25] because "[c]apturing first time smartphone buyers is

critical to success," as "[c]onsumers are loyal to an ecosystem once they enter."[26]

12.     In its Opposition Motion and supporting materials, Samsung does not challenge the fact

that the smartphone market is in the midst of a critical phase as a result of high numbers of first-time

adopters.  Indeed, as noted above, it is my understanding that this Court has already found this to be

---

[23] Exh. 35 ("GS Choi Visit to STA, 9/20/2011," SAMNDCA00258674) at -681.  Mr. Wagner agreed
       that Samsung's own prediction was that 60 million people in 2012 would be buying their first
       smartphone.  Wagner Deposition, 61:17-21.

[24] Exh. 40 ("COO Visit to STA, Sep. 2011," SAMNDCA00276935) at -987.

[25] Exh. 40 ("COO Visit to STA, Sep. 2011," SAMNDCA00276935) at -7000.

[26] Exh. 37 ("2012 Strategy Planning, Aug. 2011," SAMNDCA00268352) at -372.

the case when ruling on Apple's prior motion for a Preliminary Injunction.[27]  Rather, Samsung and

Mr. Wagner downplay the relevance of these adopters (and the role that the iPhone and Galaxy

Nexus play in their acquisition and retention) by characterizing these new users as "the late majority

and laggards" who are not likely to purchase high-end smartphones such as the iPhone 4S and the

Galaxy Nexus.[28]

13.    This assessment fails to recognize the interdependency (e.g., halo effects) of demand

for smartphones on a platform across price segments – a reality that is expressly recognized in the

strategic plans at Samsung.  Indeed, Samsung recognizes that high-end full-feature "hero" devices are

important drivers of demand for its entire line of smartphones and that the Galaxy Nexus is a

centerpiece of this competitive dynamic.[29]  As a general matter, Samsung recognizes that its Galaxy

brand creates a "[h]alo affect for mid/lower tiered product offering[s]."[30]  Attractive high-end devices

spur initial customer interest and lead to purchases of lower-priced devices, with the potential for the

customer to trade up to the higher-priced phone, in addition to buying into the Android/Samsung

ecosystem.[31]  Indeed, Mr. Wagner agreed "that Samsung is trying to use or has tried to use the

_____

[27] 1846 Court Order, at 31 ("the evidence suggests that in the next three to five years the market for
new smartphone purchasers, who have not established an allegiance to any brand, operating
system, or product, is likely to increase significantly.").

[28] Wagner Declaration, ¶¶ 104-106.

[29] I discuss the role Galaxy Nexus specifically plays as a "hero" device in Section III.C.

[30] Exh. 40 ("COO Visit to STA, Sep. 2011," SAMNDCA00276935) at -992.

[31] This concept is a common strategy among consumer goods, as can be seen in the promotion of
high-end luxury automobiles to generate interest in the brand and initial purchase of a lower-end
"entry level" luxury car with the prospect of generating a loyal customer.  See, for example, Ex.
14 (Julie Halpert, *Car Industry's New Target: Wealthy, Tree-Hugging Drivers*,
thefiscaltimes.com, Jan. 16, 2012, http://www.thefiscaltimes.com/Articles/2012/01/16/Industrys-
New-Target-Wealthy-Tree-Hugging-Drivers.aspx#page1) ("Michelle Krebs, a senior analyst at
Edmunds.com, says the high-end car consumer is important to car companies because, as the
economy emerges from the recession, the luxury segment will grow. They are one of the first

*(Cont'd on next page)*

Galaxy Nexus to create a halo effect for its lower-priced products."[32]  In this context, it is noteworthy that Samsung's advertising and promotional campaigns are increasingly directed at its high-end Galaxy line of products, where Samsung is ███████████████████████████████

███████████[33]  Of course, the introduction of the Ice Cream Sandwich operating system with the Galaxy Nexus is an important contributor to this product tiering, as Ice Cream Sandwich assures customers that their content will be transferrable to higher-end devices should entry-level purchasers opt to trade up at a future date.

14.     Mr. Wagner's assertion that the iPhone 4S and the Galaxy Nexus do not compete significantly and directly, and for first time customers, is in any event, incorrect.  Samsung's own data on price sensitivities among first-time buyers shows that a significant cadre of them (12-20%) expects to pay either $150-$199, or $200 or more for their first smartphone.[34]  Indeed, Mr. Wagner admitted that 2.5 million first-time smartphone owners bought the iPhone 4S in the first three months after its release.[35]  Also, Samsung's own documents estimate that Apple's iPhone-intended

---

*(Cont'd from previous page)*

demographics to start spending again. The luxury market is also important for image; it has a halo effect over the rest of the automaker's range, she says.").

[32] Exh. 4 (Wagner Deposition) at 86:21-25.

[33] Exh. 53 ("2012 Strategy Discussion: STA Presentation to GBM Leadership," S-ITC-500047393) at -401.  *See also* Exh. 55 ("FY '12 STA Marketing: Driving to an Honorable #1," S-ITC-500054991) at -993 ██████████████
████████████████████████
(emphasis in original).   Samsung has even begun releasing "teaser trailers", typically released by movie studios, touting its new Galaxy offerings (and in turn likening Apple customers to sheep). Exh. 17 (Chris Richardson, webpronews.com, Apr. 23, 2012, http://www.webpronews.com/samsung-galaxy-s3-compares-iphone-users-to-sheep-2012-04).

[34] Exh. 37 ("2012 Strategy Planning, Aug. 2011," SAMNDCA00268352), at -372.

[35] Exh. 4 (Wagner Deposition) at 73:10-23.

purchasers will in the future "draw equally from Apple's current user base and new-to-smartphone users."[36]

15.    Mr. Wagner also failed to recognize that the Samsung/Android and iPhone/iOS infrastructure is likely to have an additional and significant influx of "new" users who actually skew significantly to higher-end devices – current RIM/Blackberry users.  Samsung notes that RIM users represent "low hanging fruit"[37]  and "are jumping to Android and Apple."[38]  Although silent on this phenomenon in his Declaration, Mr. Wagner substantially agreed with my assessment at his deposition:

> "Q. Do you agree that this segment of the market, the former RIM users or RIM converts, as – as I've been calling them, is a significant opportunity for both Samsung and Apple?
> A. I think it's a signi- – significant opportunity in the marketplace, assuming RIM is not going to be successful in their next product and operating system."[39]

As to Mr. Wagner's hesitation concerning RIM's future success, Samsung's own market analyses indicate that it expects RIM's decline to accelerate – Samsung projects it as "unlikely that RIM's current 2H11 Product lineup will make a dent to reverse their current losses."[40]

---

[36] Exh. 44 ("BEAT APPLE: Apple vs Samsung Consumer Insights," SAMNDCA10389445) at -451.

[37] Exh. 56 ("STA 2012 Winning Strategy, Aug. 2011," S-ITC-500056374) at -402.

[38] Exh. 50 ("Defeating Apple at Verizon," SAMNDCA630-00095422) at -425.

[39] Exh. 4 (Wagner Deposition) 81:10-17.  Mr. Wagner also expects that former RIM customers will generally be more interested in purchasing higher-end phones, a category that includes the Galaxy Nexus: "Q. And do you have an understanding of whether these RIM users would be interested in the premium products, such as the Galaxy Nexus?  A. I don't know that, but my expectation would be that they would be more interested in the -- more at the higher end of the spectrum of smartphones than the lower end, but at the actual top, I don't know."  Exh. 4 (Wagner Deposition) 81:22 – 82:4.

[40] Exh. 51 ("STA Factbook, Aug. 2011," S-ITC-003353288) at -301.

Privileged and Highly Confidential
Prepared at the Request of Counsel

### B. Stickiness/Loyalty, Network Effects and Demand Complementarities Relating to Smartphones

16.     In my Original Declaration, I provide an extensive discussion of the strong consumer loyalty, or "stickiness", that sets in once a consumer has chosen a smartphone.  These dynamics make it highly likely that end users will remain with their selected platform for future smartphone purchases, as well as for purchases of other devices that operate within the same platform (e.g. tablets).[41]  These dynamics in turn are also amplified through network effects, wherein a greater installed base of users on a platform generates stronger incentives for additional users to switch to that platform.  Given these characteristics, the substantial majority of smartphone customers will "lock-in" to their platform of choice in the coming few years; therefore, the relative success that smartphone competitors have during this phase of competition (during which first-time adoption is at its zenith) will shape their future businesses for many years to come.  Again, I understand as well that the Court has already reached these same conclusions with respect to the smartphone market, finding that Apple's brand loyalty "makes the initial decision regarding which product to purchase even more important because the potential customers that Apple loses to Samsung may have long-term effects that are difficult to calculate and may not be recaptured."[42]

17.     Once again, in its business documents, Samsung recognizes the importance of these stickiness/network effects, and the key role the next few years will play in establishing user loyalties. Samsung's documents are consistent and unequivocal in this regard – Samsung views the ultimate

---

[41] Mr. Wagner has an understanding of "stickiness" that is similar to my own:  "Q. What do you understand stickiness to mean?  A. I think it would be the propensity for a purchaser or user to stay with the same manufacturer and platform that they had in their last-generation product." Exh. 4 (Wagner Deposition) at 45:15-20.  Further, Mr. Wagner agrees that as one's installed base increases, one's opportunity to have repeat customers also increases.  Exh. 4 (Wagner Deposition) at 46:2-5 ("Q. So the greater your install base, the greater your opportunity to have repeat customers. A. That's true." ).

[42] 1846 Court Order, at 32.

battle with Apple as one of competing ecosystems, where myriad devices and content provided by Apple have interdependent demand characteristics under which demand for one product on the iOS platform expands demand for other iOS devices, which feeds back on the loyalty and stickiness of all the devices and content in the Apple ecosystem.  As I summarize below, ███████████████████████ a████████████████████████████████████████████████

18.     These documents and data stand in sharp contrast to the conclusions reached by Samsung and Mr. Wagner.  Mr. Wagner concludes that I "overstate[] potential harm derived by network effects,"[43] the "stickiness that one could expect among Galaxy Nexus purchasers,"[44] and the "impact of platform loyalty on sales of other Apple products."[45]  I disagree.  Samsung documents clearly support my original findings.

### 1.  Samsung Documents Recognize Stickiness and Loyalty in the Android and Apple Platforms

19.     Samsung's documents recognize that the Apple iOS and Android platforms are indeed "sticky."  Samsung specifically uses this descriptor in evaluating the smartphone marketplace.  For example, in a 2012 strategy document, Samsung states that the "Android & Apple ecosystems are 'sticky' (high repeat purchases)" and notes that Apple retention is 78% while Android retention is 80%.[46]

20.     Samsung strategy documents also correctly identify several of the characteristics of smartphones and their platforms that generate stickiness.  Namely, as "[u]sers gain comfort with UI / services and build[] [a] library of applications and content," they face "[h]igh [s]witching [c]osts"

---

[43] Wagner Declaration, § IV.E.

[44] Wagner Declaration, ¶ 97.

[45] Wagner Declaration,§ IV.G.

[46] Exh. 37 ("2012 Strategy Planning, Aug. 2011," SAMNDCA00268352), at -358.

REPLY DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.   – CASE NO. 12-cv-00630-LHK (PSG)                                Privileged and Highly Confidential
                                                                        Prepared at the Request of Counsel
14

because they "have the expectation to be able to use those apps on their next device, increasing stickiness within that ecosystem."[47]  Samsung even correctly notes that accessories compatible with a particular operating system can help drive stickiness.[48]

     21.    Samsung further recognizes that "[p]latforms/OEMs," including Apple and OEMs that employ the Android operating system, are "developing comprehensive experiences to increase customer stickiness within [their] ecosystem."[49]  In particular, Samsung believes that both the Apple and Android platforms are significantly sticky.  With respect to Apple, Samsung highlights the "insanely great experience" Apple offers users, which helps create a "[c]ustomer lock-in loop."[50]  According to Samsung, "[o]nce a consumer buys [an] Apple product they are likely to use their services, and subsequently become locked into Apple's offering."[51]  This dynamic can be seen in the below chart, prepared by Samsung[52]:

_____

[47] Exh. 56 ("STA 2012 Winning Strategy, Aug. 2011," S-ITC-500056374) at -410.

[48] Exh. 40 ("COO Visit to STA, Sep. 2011," SAMNDCA00276935) at -7034.

[49] Exh. 51 ("STA Factbook, Aug. 2011," S-ITC-003353288) at -310.

[50] Exh. 51 ("STA Factbook, Aug. 2011," S-ITC-003353288) at -324.

[51] Exh. 51 ("STA Factbook, Aug. 2011," S-ITC-003353288) at -324.

[52] Exh. 51 ("STA Factbook, Aug. 2011," S-ITC-003353288) at -324.



22.    This escalating lock-in value chart can be understood by beginning at the top left.  An end user enters the cycle with an initial purchase of an Apple iPhone.  Having invested his/her experience and integrated his/her digital content and other data into the device and platform, user stickiness develops.  Combined with positive experiences in accessory/digital content availability and quality, the overall experience and end-user stickiness makes the customer more inclined to purchase other smartphones from the same supplier/platform and to replace its existing phone with an upgrade when the time comes.  Further, this purchase intent expands to other devices, which then actually leads to multiple, interlocking cycles.  The resulting dynamic implies that the initial purchase of a smartphone (either by a new smartphone buyer or a platform switcher) is expected to generate large opportunities for additional sales of myriad devices and services into the future.

23.    Separately, Samsung has noted that Apple has "[v]ery sticky/loyal" customers[53] and that Apple is "Best In Class" at "Engaging" and "Keeping the Customer".[54] ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

24.    For Samsung too, "[o]nce a consumer buys a Samsung product, they are more likely to use Samsung services, increasing stickiness with Samsung ecosystem,"[56] as Samsung's chart below shows[57]:

---

[53] Exh. 48 ("STA Competitive Situation Paradigm Shift: HQ CFO," SAMNDCA11545927) at -944.

[54] Exh. 40 ("COO Visit to STA, Sep. 2011," SAMNDCA00276935) at -7022.

[55] Exh. 37 ("2012 Strategy Planning, Aug. 2011," SAMNDCA00268352) at -373.

[56] Exh. 35 ("GS Choi Visit to STA, 9/20/2011," SAMNDCA00258674) at -752.

[57] Exh. 35 ("GS Choi Visit to STA, 9/20/2011," SAMNDCA00258674) at -752.  I note that the presentation containing this chart was apparently made for Samsung's own CEO in order to explain the dynamics of the U.S. market and Samsung's strategy therein.



25.    Indeed, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮  In fact, Dr.

Wagner acknowledged at his deposition that Samsung sought to emulate Apple's ecosystem.[62]

---

[58] Exh. 51 ("STA Factbook, Aug. 2011," S-ITC-003353288) at -436.

[59] Exh. 38 ("STA Mid-Term Plan 2011-2015," SAMNDCA00268763) at -783.

[60] Exh. 35 ("GS Choi Visit to STA, 9/20/2011," SAMNDCA00258674) at -750.

[61] Exh. 51 ("STA Factbook, Aug. 2011," S-ITC-003353288) at -434 to -436 (emphases removed).

[62] Exh. 4 (Wagner Deposition) at 118:14 – 122:1, 139:5-13.

26.     Both Samsung and Apple recognize that the effect of this stickiness and associated loyalty extends demand for products within the ecosystem beyond smartphones to the ecosystem's applications ("apps"), accessories and, moreover, to other devices that operate within the ecosystem. These purchases further cement customers' relationships within the ecosystem and provide a feedback effect that stimulates additional stickiness, loyalty and purchase intent.  As Apple reports, "[a] positive experience with the iPhone is increasingly cited as a reason for purchase" of an Apple Mac computer,[63] and almost 7 out of 10 iPhone users that bought a Mac were influenced to do so because of their iPhone.[64]  Samsung's own documentation shows that iPhone buyers tend to buy iPads and other iOS devices as well as content and apps[65] and points to the common positive user experience at Apple as helping to encourage the purchase of other Apple products.[66]  In fact, according to Samsung, "[e]ach iOS user spends over $100 on content & apps" with an "av[erage] of 83 app downloads per user in 2011."[67]  Moreover, I understand that this Court has recognized these same purchasing dynamics, concluding that Apple's brand loyalty means that "Apple could lose sales of tag-along products like apps, other Apple devices such as desktops, laptops, and iPods, and future models of Apple smartphones."[68]

27.     Regarding its own ecosystem, Samsung expects this stickiness to apply not only at the platform (e.g., Android) level, but at the Samsung product level as well.  Specifically, in

_____

[63] Exh. 25 ("Mac Buyer Tracking Study: FY 2011 Year End Report,"APLNDC630-0000062843) at -973.

[64] Exh. 26 ("Mac Buyer Tracking Study: Q1 2012 Report,"APLNDC630-0000056522) at -805.

[65] Exh. 35 ("GS Choi Visit to STA, 9/20/2011," SAMNDCA00258674) at -792.

[66] Exh. 38 ("STA Mid-Term Plan 2011-15," SAMNDCA00268763, at -780.

[67] Exh. 48 ("STA Competitive Situation Paradigm Shift: HQ CFO," SAMNDCA11545927) at -939.

[68] 1846 Court Order, at 32.

presentations prepared for its own chief executives, Samsung recognizes that selling products to its base "is more efficient" because "[c]onsumers who own our smartphones are pre-disposed to purchase our products."[69]

28.



29.     Based on all of these dynamics, it is unsurprising that Samsung's overarching strategies for the next one to three years include the following:

---

[69] Exh. 35 ("GS Choi Visit to STA, 9/20/2011," SAMNDCA00258674) at -795; Exh. 40 ("COO Visit to STA, Sep. 2011," SAMNDCA00276935) at -7035.

[70] Exh. 35 ("GS Choi Visit to STA, 9/20/2011," SAMNDCA00258674) at -752; Exh. 40 ("COO Visit to STA, Sep. 2011," SAMNDCA00276935) at -7012.

[71] Exh. 35 ("GS Choi Visit to STA, 9/20/2011," SAMNDCA00258674) at -797.

Privileged and Highly Confidential
Prepared at the Request of Counsel

- ████████████████████████████
- █████████████████████████
- ████████████████████████████████

30.     All of the above documents and evidence reinforce my findings, as well as the Court's

conclusions set forth in its prior Order, as to the critical nature of stickiness in the dynamics

surrounding competition between Apple and Samsung and the wide-ranging harm that Apple will

sustain as a result of Samsung's infringement across multiple product lines.  Indeed, as a result of

stickiness and its effects on sales of complementary products that form the ecosystem, Apple's loss of

an iPhone sale to the Galaxy Nexus results in the loss of additional sales of different products as well

as the loss of share in the markets in which those complementary products (e.g., iPad) compete.

### 2. Samsung Recognizes That Network Effects Expand Platform Stickiness and Loyalty

31.     As I noted in my Original Declaration, network effects – both direct and indirect – are

present in significant forms in the iPhone/iOS and Samsung/Android platforms.  As with consumer

stickiness and loyalty, Mr. Wagner concludes that I overstate the importance of these effects.  Again,

documents from Samsung are inconsistent with Mr. Wagner's claim, and reinforce my conclusion as

to their importance.

32.     At a general level, Samsung recognizes the presence of network-type effects, as the

"[c]ustomer buying process favors larger, more established ecosystems."[73]  More specifically,

Samsung identifies the role network effects play in the Apple iOS ecosystem: there are "high levels

of co-ownership within iOS because of network effects where Apple's "products work better together

_____

[72] Exh. 38 ("STA Mid-Term Plan 2011-2015," SAMNDCA00268763) at -779 to -781.

[73] Exh. 56 ("STA 2012 Winning Strategy, Aug. 2011," S-ITC-500056374) at -410.

than separate."[74]  Samsung notes that these effects apply across all smartphone platforms: "all

[smartphones] have network effects" that "= more demand for smartphones."[75]

33.     In his Declaration, Mr. Wagner disagreed with my conclusion that harm from network

effects extends to other related Apple products and services, such as apps and related hardware

businesses (e.g., iPad and Mac), by citing one Apple presentation slide (reproduced below), which

stated that "[a]lready owning an iOS product (touch or iPad) is not always helping sell an iPhone."[76]

However, at his deposition, Mr. Wagner acknowledged that he was simply focusing on this one

slide's "not always" language, and conceded that "owning an iOS product does at some times help

sell other iOS products."[77]



---

[74] Exh. 35 ("GS Choi Visit to STA, 9/20/2011," SAMNDCA00258674) at -793.

[75] Exh. 52 ("Market Insights from the UX Workshop," S-ITC-010632298) at -301.

[76] Wagner Declaration, ¶ 98.

[77] Exh. 4 (Wagner Deposition) at 124:19 – 125:14.  Mr. Wagner further agreed with the statement
   "that Apple products within its iOS ecosystem do help to sell other Apple products within the iOS
   ecosystem."  Exh. 4 (Wagner Deposition) at 126:3-6.

Mr. Wagner also agreed at his deposition "that smartphone demand for a particular brand or – or platform will drive additional demand for that platform."[78]  Mr. Wagner further agreed that data produced by Apple demonstrated that the iPhone absolutely drives sales of the Mac computers.[79]

34.    In his Declaration, Mr. Wagner also specifically disagreed with my statement that harms to Apple's network effects would lead to diminished incentives for software developers to create apps for the smaller base of Apple smartphones.[80]  For support, he cited reports that app developers were generally more interested in developing for iOS than for Android.[81]  However, at his deposition, Mr. Wagner was shown one of Samsung's own documents – indeed one that he relied on for other statements in his Declaration – that reports that 35 percent of app developers in 2011 intended to use the Android platform, compared to only 27 percent who planned to use iOS.[82]  In response, Mr. Wagner had no explanation for the discrepancy between his assumptions regarding app-development incentives as set forth in his Declaration and Samsung's own figures.[83]

### 3.  Ice Cream Sandwich Amplifies the Impact of Network Effects, Stickiness, and Platform Loyalty

35.    The inclusion of the Ice Cream Sandwich operating system in the Galaxy Nexus is directed at expanding network effects, product/platform stickiness, and product loyalty.  The cross-device compatibility of Ice Cream Sandwich enhances demand for Android devices (and Android content and services) by providing users with a seamless ability to access content across various

---

[78] Exh. 4 (Wagner Deposition) at 140:22 – 141:1.

[79] Exh. 4 (Wagner Deposition) at 129:5-16.

[80] Wagner Declaration, ¶ 75.

[81] Wagner Declaration, ¶ 76.

[82] Exh. 35 ("GS Choi Visit to STA, 9/20/2011," SAMNDCA00258674), at -755.

[83] Exh. 4 (Wagner Deposition) at 145:21 – 147:3.

Privileged and Highly Confidential
Prepared at the Request of Counsel

devices.  By assuring that future Ice Cream Sandwich releases will be available for smartphones with

legacy versions, the Android platform becomes more sticky in that end users recognize that longer-

term investments in devices and content can be made with greater assurances of continued

compatibility and support under the Android platform.[84]

36.     As Mr. Wagner recognized at his deposition, the fact that different products, including

tablets and phones, will be able to work better together as a result of Ice Cream Sandwich

interoperability will ultimately help sell more Samsung devices.[85]

## III.    COMPETITION BETWEEN APPLE'S IPHONE AND SAMSUNG'S GALAXY NEXUS

37.     As I stated in my Original Declaration, competition in the smartphone marketplace is

intense, with Samsung having made substantial inroads in the past two years at the expense – to a

significant degree – of Apple.  Despite a two-year lag between Apple's introduction of the iPhone

and Samsung's introduction of its Galaxy smartphone line, Samsung has overtaken Apple and all

other suppliers as the largest seller of smartphones in the world, and now sells significantly more

Android-based phones that any other supplier.  Indeed, as I understand, the Court in its prior order

expressly recognized that Apple and Samsung compete directly in the same smartphone market,

particularly for critical first-time-buyer purchase.[86]

38.     Samsung's documents confirm that its success has come significantly at the expense of

Apple (a point also noticed within Apple).  Samsung's documents also clearly demonstrate that, at

present, Samsung has its competitive sights set squarely on displacing Apple and Apple's iOS

---

[84] Exh. 35 ("GS Choi Visit to STA, 9/20/2011," SAMNDCA00258674) at -796.

[85] Exh. 4 (Wagner Deposition) 142:20-24.

[86] 1846 Court Order, at 31.

ecosystem.  Further, these documents explicitly identify the Galaxy Nexus as a key contributor to this offensive.

39.     In its Opposition Papers and related declarations, Samsung claims that its recent share gains have not come at Apple's expense to any significant degree, but rather represent a successful campaign for established Android users.  I do not agree with this characterization.  What is noteworthy in this regard is that Samsung is silent in its brief about its competitive intentions at present and in the near future.  As Samsung's documents show however, there is no doubt that Apple is perceived to be Samsung's main competitive focus at present, and will be for the foreseeable future.

## A.  Considerations of Historic Smartphone Unit Shipments and Shares

### 1.  Samsung's Historic Rise to the Top

40.     As I noted in my Original Declaration, Samsung's share of smartphones has risen substantially in the past 18 months, while shares at Apple (allowing for spikes associated with new product launches) have dropped.[87]

41.     One of the documents included in Samsung's Opposition papers (Wagner Exhibit UU) reflects Apple's view that it continues to lose share to Android and Samsung.  This Apple presentation provides a clear depiction of the Android platform's ability to capture the lion's share of first-time buyers and that the gap between iOS and Android continues to widen.  As the document states: "iOS spikes at each iPhone launch, but momentum is lost . . . Android is able to take advantage of frequent new product introductions to maintain its lead."[88]

---

[87] Vellturo Declaration, ¶¶ 22-23.

[88] Exh. 29 ("US First Time Smartphone Buyer Analysis" APLNDC630-0000135164) at -170.  In this context, Mr. Wagner's claim that my data analysis fails to evaluate the complete picture is

*(Cont'd on next page)*

42.     Even if one accepts the view that Apple's share of smartphone sales is stable, this does not then establish that Samsung is not competing away sales from the iPhone.  As the sales of smartphones on flagging platforms (e.g., RIM/Blackberry) fade, prior users of Blackberry smartphones, for example, may opt for a Samsung/Android device over an iPhone/iOS option (or vice versa).  This is direct competition.

43.     While, historically, Android-based smartphones have been provided by suppliers in addition to Samsung (e.g., HTC and LG, primarily), trends in 2011 and into 2012 clearly demonstrate that Samsung has become the significant front-runner among Android device makers.  In this context, it is noteworthy that Samsung provides NO chart in its Opposition papers or supporting declarations that shows its own share of overall smartphone sales.  In Figure 1, I add Samsung's reported share of smartphone sales to Figure 11 from Mr. Wagner's Declaration, which shows smartphone shipment shares for other Android providers (HTC, LG, and Huawei), and update the chart to include data from Q1 2012.

---

*(Cont'd from previous page)*

peculiar.  As this Apple document clearly recognizes, Apple's shares are "spikier" than that of Android (a point I specifically noted and took into account), given the frequent launch of new Android models compared to the annual launch of Apple iPhone models.  Rather than focusing on the general trend in shares between the two platforms, it is Mr. Wagner who selectively discusses share information from the two quarters immediately following the launch of the iPhone 4S to establish a lack of competition between Apple and Samsung and a lack of harm to Apple.



**Figure 1**
**Share of U.S. Smartphone Units - HTC, Hwawei, LG, and Samsung**
**1Q 2008 - 1Q 2012**

**Sources**: Wagner Declaration, Schedule 2
IDC WW Mobile Phone Tracker_PrelimHistoricalTop10_2012Q1_Apple.xls

These data show that Samsung has overtaken, by a substantial margin, all other Android phone manufacturers.  Also noteworthy is that, while there are sharp drops in the observed shares of HTC, LG and Huawei that correspond to sharp increases in Apple's 4S sales in late 2011 and early 2012 (as depicted in Figure 2 in paragraph 47), Samsung's share shows no such sharp reversal.  These dynamics are once again testament to Samsung's emergence and establishment as the dominant provider of Android-based smartphones.  Thus, the evidence of sharp competition between Android- and iOS-based smartphones is, at present, largely coincident with sharp competition between Samsung and Apple smartphones.  As one industry observer stated on April 28, 2012:

> "Samsung and Apple have formed a near duopoly in the high-end smartphone market, as traditional stalwarts struggle to introduce

compelling models that can successfully crack into the segment."[89]

44.    Mr. Wagner asserts that "although Samsung's market share has increased in recent years, the sales data do not provide evidence that Samsung has taken substantial market share from Apple."[90]  For evidence, Mr. Wagner presents a series of charts on unit shipments and shares of smartphones indicating that Apple's smartphone share has remained relatively stable, with intermittent spikes associated with new iPhone launches.  That Apple's share has remained relatively steady in the face of sharp share increases by Samsung, Mr. Wagner argues, is testament to a lack of competition between Samsung smartphones and Apple's iPhones.  This logic, and correspondingly Samsung's position, do not hold up in the face of the contradictory documents and a proper consideration of share dynamics, as provided above.

45.    The problems with Mr. Wagner's claims are thrown into stark relief when one considers data regarding U.S. smartphone market share from the first quarter of 2012, which Mr. Wagner did not consider in preparing his Declaration.[91]  According to the NPD Group, which Mr. Wagner acknowledges is a reliable source of data,[92]  "Samsung's share of the smartphone market grew 140 percent in the first quarter of 2012, over the prior year, to reach 24 percent."[93]  By contrast,

---

[89] Exh. 18 (Miyoung Kim, *Samsung Crushes Earnings, Blows Past Nokia to Become World's Biggest Cellphone Maker*, Business Insider, April 26, 2012, available at http://articles.businessinsider.com/2012-04-26/tech/31408867_1_smartphone-samsung-nokia)..

[90] Wagner Declaration, ¶ 22.

[91] Exh. 4 (Wagner Deposition) at 31:15-19 ("Q. You didn't look to see how Apple and Samsung's U.S. market shares trended in the following quarter, first quarter of 2012?  A. Correct.  I did not have that data when I prepared this report.").

[92] Exh. 4 (Wagner Deposition) at 32:16-22.

[93] Exh. 20 (NPD Group, *Samsung Now Sells One in Four U.S. Smartphones, Bolstered By Growing Pre-Paid Sales*, May 2, 2012, http://npdgroup.com/wps/portal/npd/us/news/pressreleases/pr_120502).

REPLY DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-00630-LHK (PSG)                Privileged and Highly Confidential
                                                      Prepared at the Request of Counsel
28

Apple's share of the smartphone market grew only 7 percent in the first quarter of 2012, again, over the prior year, to capture 29 percent of the market.[94]  These numbers tell a much different story than those in Figure 2 of Mr. Wagner's Declaration, which showed Apple as having around 45 percent of the smartphone market and Samsung as having just under 20 percent.[95]

      46.     Indeed, as Mr. Wagner admitted in his deposition, his Figure 2 is not an accurate depiction of the U.S. smartphone market today.[96]  Furthermore, the numbers in Mr. Wagner's Figure 2, which are based on International Data Corporation (IDC) data reflecting smartphone manufacturer shipments to their distributors, are not as relevant to the questions at issue in this case as the NPD data discussed above.  The NPD data are based on sales of Apple and Samsung smartphones to end users, and those data are more relevant to questions of stickiness, network effects, and platform loyalty, than data concerning shipments to distributors.  Samsung apparently agrees with this point, as it focused entirely on sales to end users and ignored shipments to carriers when reporting the purportedly low sales of the Galaxy Nexus in its Opposition Brief.[97]  Had Samsung instead focused on shipment data, as Dr. Wagner does in Figure 2, the Galaxy Nexus sales numbers that it reported would have been much higher.[98]  Samsung's effort to focus on end-user data to minimize the

---

[94] Exh. 20 (NPD Group, *Samsung Now Sells One in Four U.S. Smartphones, Bolstered By Growing Pre-Paid Sales*, May 2, 2012, http://npdgroup.com/wps/portal/npd/us/news/pressreleases/pr_120502).

[95] Wagner Declaration, Fig. 2, ¶ 25.

[96] Exh. 4 (Wagner Deposition) at 35:19 – 36:1.  ("Q.  So going back to Exhibit 7 and comparing it to your Figure 2 in your declaration, the way in which you ended your chart at the end of calendar year 2011 is not accurate today; is that right?  . . . THE WITNESS:  It doesn't record today.  So, yes, it's not accurate as of today.").

[97] Opposition Brief at 23 (referring only to sales through to end-users as reported in Samsung's Geklinski Declaration, and ignoring sales to carriers).  *See also* Exh. 5 (Geklinski Deposition) at 68:15 – 69:6 (reporting 600,000 sales to carriers, as opposed to the 385,000 sales to end users).

[98] Exh. 5 (Geklinski Deposition) at 69:15 – 71:2.

Privileged and Highly Confidential
Prepared at the Request of Counsel

apparent impact of the Galaxy Nexus, while at the same time focusing on shipment data to overstate the market presence of the iPhone, is inconsistent.

47.     Leaving aside this inconsistency, the updated IDC data support my previous conclusions. Figures for the first quarter of 2012 published by IDC corroborate Samsung's rise to the top of the smartphone market. According to IDC, Samsung has now become the world's top mobile phone maker as well as the world's top smartphone maker, beating out Nokia and Apple respectively in Q1 2012.[99] IDC also reports that Samsung "established a new market record for the number of smartphones shipped in a single quarter" propelled by the company's "continued expansion of its Galaxy portfolio in nearly all directions."[100] In fact, according to IDC's smartphone shipment figures, Samsung's rise in worldwide smartphone market share nearly tripled from 2011 to 2012.[101] Mr. Wagner admitted at his deposition that Samsung's growth has been substantial.[102] Figure 2 shows how quickly Samsung has caught up to and surpassed Apple in terms of worldwide shipments of smartphones:

---

[99] Exh. 19 (IDC, *Worldwide Smartphone Market Continues to Soar, Carrying Samsung Into the Top Position in Total Mobile Phone and Smartphone Shipments, According to IDC*, May 1, 2012, http://www.idc.com/getdoc.jsp?containerId=prUS23455612. *See also* Exh. 22 ("IDC WW Mobile Phone Tracker 2012Q1 Top 10," Tab="Worldwide.").

[100] Exh. 19 (IDC, *Worldwide Smartphone Market Continues to Soar, Carrying Samsung Into the Top Position in Total Mobile Phone and Smartphone Shipments, According to IDC*, May 1, 2012, http://www.idc.com/getdoc.jsp?containerId=prUS23455612).

[101] Exh. 19 (IDC, *Worldwide Smartphone Market Continues to Soar, Carrying Samsung Into the Top Position in Total Mobile Phone and Smartphone Shipments, According to IDC*, May 1, 2012, http://www.idc.com/getdoc.jsp?containerId=prUS23455612).

[102] Exh. 4 (Wagner Deposition) 26:21 – 27:4. I acknowledge, as Mr. Wagner does, that IDC's figures represent worldwide smartphone sales and market share. However, the trends identified by IDC are illustrative of Samsung's ascension in the smartphone market generally, including in the United States.



**Figure 2**
**Share of Worldwide Smartphone Units - Apple and Samsung**
**1Q 2004 - 1Q 2012**

**Sources**: IDC WW Mobile Phone Tracker_PrelimHistoricalTop10_2012Q1_Apple.xls
IDC WW Mobile Phone Tracker_Prelim Historical Top 10_2011Q3_Apple.xlsx
IDC WW Mobile Phone Tracker_FinalData_2011Q1_Apple.xls

48.     Moreover, as depicted in Figure 3, Samsung has also been gaining steadily in

smartphone share in the U.S.  These data confirm that while Apple's share increased greatly in Q4

2011 in response to the mid-October launch of the iPhone 4S, Apple's share decreased and

Samsung's share increased in Q1 2012 shortly after the mid-December launch of Samsung's Galaxy

Nexus.



**Figure 3**
**Share of U.S. Smartphone Units - Apple and Samsung**
**Q1 2004 - Q1 2012**

Sources:  IDC WW Mobile Phone Tracker_PrelimHistoricalTop10_2012Q1_Apple.xls
IDC Worldwide Quarterly Mobil Phone Tracker: Q1 2011 Forecast Data.xls
IDC WW Mobile Phone Tracker 2011Q3 Top 10.xls

49.    In his Declaration, Mr. Wagner puts forward additional studies of smartphone

performance in the form of shares of revenues and shares of profits commanded by each supplier.

Mr. Wagner prefaces this discussion with the "maxim" that such studies are highly relevant since

revenue and profit are what "manufacturers value the most."[103]  This statement is a broad

generalization that is not applicable in the current smartphone environment.  As noted extensively

throughout my report, the battle being waged at present between Samsung/Android and iPhone/iOS

---

[103] Wagner Declaration, ¶ 26.

Privileged and Highly Confidential
Prepared at the Request of Counsel

is, to a major degree, directed at capturing the largest installed base of users possible in order to drive

network stickiness and loyalty.[104]

50.     Samsung's internal strategic documents on this point consistently focus almost entirely

on <u>unit</u> shipments and <u>unit</u> installed base, not on dollar revenue or short-run smartphone profit.  In

this context, ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████   In this sense, Mr.

Wagner's attention to revenues and profits on smartphones is entirely misplaced and provides no

relevant guidance on the nature of competition currently being waged between Apple and

Samsung.[106]

51.     Further, citing an Apple presentation, Mr. Wagner points out that 1) the fact that T-

Mobile does not carry the iPhone and 2) the importance of Samsung's widespread carrier availability

provides evidence that my analysis of historical sales is incorrect.  To the contrary, these data are in

fact demonstrative of the competition between Apple and Samsung and support my original analysis.

Mr. Wagner writes:

> "Apple's presentation concludes that Samsung's similarity of customer
> profile to that of T-Mobile, as well as Apple's lack of a T-Mobile product
> offering, 'provid[e] Samsung and Android an opportunity to add to their
> market growth with no challenges from other platforms.'  This exemplifies

---

[104] Mr. Wagner's own testimony belies the importance he places on revenue and profits in identifying
   smartphone performance.  Tellingly, Mr. Wagner admitted at his deposition that he was familiar
   with the fact that Samsung was predicting a record quarter of profits at the time he submitted his
   declaration on April 23rd, yet he did not mention anything about that prediction in his declaration.
   Exh. 4 (Wagner Deposition, 23:8-12).

[105] Exh. 38 ("STA Mid-Term Plan 2011-15," SAMNDCA00268763) at -778.

[106] Moreover, it is unclear what these revenue and profit data represent, given the complexity of
   smartphone subsidization, and the proprietary nature of product-level profit information.  I see no
   evaluation by Mr. Wagner of the validity or accuracy of the numbers upon which he relies.

Privileged and Highly Confidential
Prepared at the Request of Counsel

the type of effects that Dr. Velturo's historical sales analysis overlooks, resulting in his conclusions being incorrect."[107]

However, this presentation highlights Apple's concern that Samsung can add share at T-Mobile, where the Apple iPhone is not available, and, thus, enhance the overall strength of Android, thereby demonstrating the competition between Apple and Samsung.

### 2. Recent Sales of the iPhone 4S

52.     While the iPhone 4S has generated substantial demand in the two quarters since its launch in October 2011, it is important to understand the context of the 4S launch relative to launches of new Samsung models.  As noted above, the immediate uptake in new iPhone models is due in significant part to the latent demand that accumulates over the full year between Apple introductions.[108]  In contrast, Android-based smartphones (including those of Samsung) are launched far more frequently (with at times several launched each month) so that a highly successful Android product line will naturally show more modest initial uptakes for any new model.[109]  Simply focusing on the initial success of the iPhone 4S ignores the economics of latent demand and product introduction cycles, and correspondingly leads to erroneous findings as to the true degree of competitive interaction between various smartphone platforms and devices.  Indeed, as Figure 2 above demonstrates, Apple's share decreased in Q1 2012.

53.     Moreover, that Apple has followed up on its historic success of its iOS devices with another well-received product does not address the question of harm or its irreparability.  The relevant question in addressing harm is not "have Apple's smartphones continued to sell well in

---

[107] Wagner Declaration, ¶ 32.

[108] As noted by Mr. Wagner, Apple launched new iPhone models in 2008, 2009, 2010 and 2011. (See, e.g., Wagner Declaration, Figure 1).

[109] Exh. 12 (Kent German, *A Brief History of Android Phones*, cnet.com, Aug. 2, 2011, http://reviews.cnet.com/8301-19736_7-20016542-251/a-brief-history-of-android-phones/).

competition with Samsung," but rather, "what impact has Samsung's expansion (and subsequent infringement) had on Apple's business and what impact will it have in the future absent a preliminary injunction?"  The fact that Apple products continue to sell well in a growing marketplace actually complicates the ability to assess the harm Apple will sustain as a result of Samsung's infringement, since Apple's growth trajectories differ between the world with and without a preliminary injunction. Thus, a full assessment of lost iPhone sales needs to conduct reliably a comparative analysis of growth trajectories, not just a simple accounting of lost sales on an account-by-account basis.

**B.  The Present State of Competition between Apple and Samsung and Samsung's Strategic Intent**

54.     While the parties may differ in their assessment as to how Samsung got to its position as the world's largest provider of smartphones, there can be no doubt about where Samsung plans in the immediate future to win additional business – and that is from Apple.  Samsung's documents are clear: "(the) "US market [is] becoming a two horse race between Apple and Samsung"[110] that spans across "Smartphones, Tablets, [and] Accessories."[111]

55.     Samsung's strategic plans for 2012 and 2013 leave no question that Samsung intends to utilize its current leadership position among Android-based smartphones to "pass and sustain the lead over Apple" in the smartphone space.[112]  Indeed, as Samsung recognizes in a document outlining its

---

[110] Exh. 48 ("STA Competitive Situation Paradigm Shift: HQ CFO," SAMNDCA11545927) at -934.

[111] Exh. 40 ("COO Visit to STA, Sep. 2011," SAMNDCA00276935) at -7018.  At his deposition, Mr. Wagner conceded that "Apple and Samsung are the two horses now in the smartphone market." Wagner Deposition, 16:13-16.

[112] *See, e.g.*, Exh. 35 ("GS Choi Visit to STA, 9/20/2011," SAMNDCA00258674) at -686.

Privileged and Highly Confidential
Prepared at the Request of Counsel

2012 "winning strategy," "[i]n order to achieve and sustain #1 in the smartphone and tablet markets,

STA [Samsung Telecommunications America] must: . . . **BEAT APPLE**."[113]

56.    Samsung documents further conclude that these goals can come only at Apple's

expense, i.e., that Samsung's "future success is dependent on blunting Apple."[114]  Put another way,

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████

57.    On the product development side, Samsung officials recognized last year that "[i]f our

goal is to start taking share from Apple [in 2012], we should have an understanding of what it will

take.  We need to communicate to R&D ASAP so we can get features/functionality on roadmap."[116]

In the cellular subscriber space, this means that Samsung must "slow the rapidly growing Apple

install base at VZW [i.e., Verizon] and reduce the sizable Apple base at ATT."[117]

58.    At his deposition, Mr. Wagner took no issue with the notion that Samsung's current

goal is to blunt Apple's progress:

> "Q. I've got a number of examples that I'm sure you're familiar with, given that
> this was attached to your report, of Samsung seeking to blunt or beat Apple.  And

---

[113]  Exh. 56 ("STA 2012 Winning Strategy, Aug. 2011," S-ITC-500056374) at -376 (emphasis in original). ████████████████████████████████████████████████████████ Exh. 46 ("STA Meeting with HQ Leadership Team," SAMNDCA10853181) at -197.

[114]  Exh. 35 ("GS Choi Visit to STA, 9/20/2011," SAMNDCA00258674) at -690; Exh. 57 ("STA Strategy Update, Nov. 11, 2011," S-ITC-500057690) at -696.

[115]  Exh. 44 ("BEAT APPLE: Apple vs Samsung Consumer Insights," SAMNDCA10389445)  at -446, -448.

[116]  Exh. 54 (Email from Corey Kerstetter to Todd Pendleton et al, re: "What Would it Take for iPhone/iPad user to Switch to Samsung Smartphone/Tablet,"S-ITC-500049452) at -452

[117]  Exh. 51 ("STA Factbook, Aug. 2011," S-ITC-003353288) at -334.

---

you're not going to take any issue with the fact that that is Samsung's objective, at least in this market?

A. Oh, no. I -- I clearly think that is.  And I would say that based on what I've seen, that I believe that is their goal.  Most number twos in market's goal is to replace number one."[118]

59. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████"[119]  In

short, Samsung believes that in order to "overcome the influence of iPhone," it "must urgently drive

awareness, preference and purchases of Galaxy-branded smartphones to combat Apple."[120]

### C.  The Role of the Galaxy Nexus in Samsung's Plan to Defeat Apple

60.     As I determined in my Original Declaration, Samsung views the Galaxy Nexus as an

important tool in the battle to overtake Apple.  Documents from Samsung that I have recently

received bear this out.  The Galaxy Nexus is presently Samsung's lead smartphone at two of the four

major U.S. wireless providers: Verizon and Sprint (where pre-orders of the Nexus sold out in just

four days).[121]  Samsung views the Galaxy Nexus (also called the "Nexus Prime" in Samsung

materials) as a "Best-in-Class Product[]" that is part of its "winning formula" to "Beat Apple" at

---

[118] Exh. 4 (Wagner Deposition) at 46:19 – 47:3.

[119] Exh. 56 ("STA 2012 Winning Strategy, Aug. 2011," S-ITC-500056374) at -402.

[120] Exh. 57 ("STA Strategy Update, Nov. 11, 2011," S-ITC-500057690) at -724.

[121] Exh. 16 (Zach Epstein, *Galaxy Nexus Pre-Orders Sell Out at Sprint*, Apr. 20, 2012, http://www.bgr.com/2012/04/20/galaxy-nexus-pre-orders-sell-out-at-sprint/).  Notably, Mr. Wagner did not communicate with anyone at Samsung when preparing his declaration regarding how well the Galaxy Nexus was predicted to do at Sprint.  Wagner Deposition, 54:20-23.

Privileged and Highly Confidential
Prepared at the Request of Counsel

Verizon.[122]  In fact, multiple Samsungs strategic presentations I have reviewed identify and highlight the Galaxy Nexus as an "Action[] to Beat Apple."[123]

61.    Similarly, Samsung's strategy documents identify the iPhone as a "key competitor" of the Galaxy Nexus,[124] and internal documents at Apple identify the Galaxy Nexus as a top competitive alternative for the iPhone.[125]  Each clearly perceives the other as a strategic threat.

62.    Further, as Samsung's own documents indicate, the Galaxy Nexus serves as a "hero" device that is heavily promoted and touted in an effort not only to sell the Nexus, but also to create general interest in the Samsung line of smartphones and the Android platform. Samsung documents specifically refer to the Galaxy Nexus as a "hero" device to be used to build and sustain the Galaxy brand.[126]  Samsung's intent was clear: to "leverage the buzz to come out of the Galaxy Nexus announcement to show superior innovation  . . . coming out of Samsung"[127] and to use the Galaxy Nexus as a vehicle to "celebrate our superior product innovation[] stor[y]."[128] ██████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

---

[122] Exh. 50 ("Defeating Apple at Verizon," SAMNDCA630-00095422) at -432.

[123] Exh. 35 ("GS Choi Visit to STA, 9/20/2011," SAMNDCA00258674) at -798; Exh. 40 ("COO Visit to STA, Sep. 2011," SAMNDCA00276935), at -7029.

[124] Exh. 35 ("GS Choi Visit to STA, 9/20/2011," SAMNDCA00258674) at -786.

[125] See, e.g., Exh. 27 ("iPhone Competitive Tracker, Week of 12/26/11," APLNDC630-000128163) at -163, -165.

[126] Exh. 57 ("STA Strategy Update, Nov. 11, 2011," S-ITC-500057690) at -725.

[127] Exh. 36 ("STA Briefing Document for JK Shin," SAMNDCA00261725) at -825.

[128] Exh. 57 ("STA Strategy Update, Nov. 11, 2011," S-ITC-500057690) at -741.

[129] Exh. 40 ("COO Visit to STA, Sep. 2011," SAMNDCA00276935) at -991.

REPLY DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-00630-LHK (PSG)                            Privileged and Highly Confidential
                                                                  Prepared at the Request of Counsel
38

63.     Samsung's beliefs in this regard are based upon survey results indicating that knowledge of the Galaxy brand increases Samsung purchase intent and that this value extends beyond Android-based products and services and into Samsung computers and televisions.[130] Moreover, ████████████████████████████████████████████████████████ ████████████████████████████████████████[1]

64.     A central aspect of the Galaxy Nexus launch is the phone's role as the torchbearer for Android's new "Ice Cream Sandwich" operating system.  Under Ice Cream Sandwich, Samsung/Android products, such as Samsung's Note tablets and its Galaxy Nexus smartphones, provide a seamless user experience wherein applications will run on all Ice Cream Sandwich devices.[132]  These capabilities place Samsung/Android in closer competition with Apple's ecosystem, as prior comparative advantages for Apple in cross-device compatibility are mitigated.

65.     Mr. Wagner attempted to downplay the competitive significance of the Galaxy Nexus in his Declaration by arguing that "the Galaxy Nexus has not generated the kind of sales that Dr. Vellturo hypothesizes and is unlikely to do so."[133]  For support, Mr. Wagner claimed that "Samsung forecasts that it will sell about 532,000 Galaxy Nexus phones over its first 36 weeks of sales."[134] However, Kevin Geklinsky, a Samsung director of business planning, testified that in fact Samsung had already sold 600,000 Galaxy Nexus phones to carriers or Google as of May 4, 2012 (only 20

---

[130] Exh. 41 ("Samsung Q4 '11 Deep Dive," SAMNDCA00380801) at -827.

[131] Exh. 35 ("GS Choi Visit to STA, 9/20/2011," SAMNDCA00258674) at -729.

[132] Exh. 45 (Email from Nicholas Dicarlo to Corey Kersetter, re: "RE: Nexus Prime:  Should it be VZ Exclusive," SAMNDCA10441301) at -301.  *See also* Exh. 4 (Wagner Deposition), 49:14-17 ("You understand that the Ice Cream Sandwich platform is the first Android platform that allows interoperability between the devices?  A.  I'm aware of that fact.").

[133] Wagner Declaration, ¶ 74.

[134] Wagner Declaration, ¶ 73.

weeks after the Galaxy Nexus was launched in the United States), of which 385,600 had been sold

through to end users.[135]   In terms of its sales of the Galaxy Nexus to Verizon alone in this period, Mr.

Geklinsky reported that Samsung has already ████████████████████████████████████████

in just a few months.[136]   Further, Mr. Geklinsky noted that Samsung projected to sell roughly 708,000

Galaxy Nexus phones to carriers by the end of the second quarter of 2012, with roughly 598,000 of

those phones selling through to end users (excluding phones sold to end users by Google).[137]   Given

the difference between these figures and those Mr. Wagner relies upon in his report, it is perhaps not

surprising that Mr. Wagner did not look at *any* comparisons between what Samsung expected the

Galaxy Nexus to sell and what it actually sold, and thus could not state at his deposition whether or

not the Galaxy Nexus has been a success.[138]

66.   Moreover, it appears Samsung is heading in a more aggressive direction with the

Galaxy Nexus that will expand its sales.[139]  Mr. Wagner recognized this dynamic at his deposition[140]:

> "Q. Is it your understanding that the price of the phone has started to come
> down?
> A. Oh, clearly as it gets stale, clearly the price has to come down to be
> competitive.
> Q. And that's what's happening with the Galaxy Nexus?

---

[135] Exh. 5 (Geklinsky Deposition) at 68:20 – 69:6.

[136] Exh. 5 (Geklinsky Deposition) 76:2-5.  Mr. Geklinsky could not provide revenue estimates for
sales of the Galaxy Nexus phone to Sprint or Google, which accounts for roughly 150,000 of the
total 600,000 units sold, because he did not know the average price for those units.  Exh. 5
(Geklinsky Deposition) 76:6 – 78:2.

[137] Exh. 5 (Geklinsky Deposition) at 69:15 – 70:23.

[138] Exh. 4 (Wagner Deposition) at 51:3-24.

[139] Exh. 36 ("STA Briefing Document for JK Shin," SAMNDCA00261725) at -746; Exh. 21
(Amazon Wireless: Samsung Galaxy Nexus 4G Android Phone (Sprint),
http://wireless.amazon.com/Samsung-Galaxy-Nexus-Android-Sprint/dp/B007UO9HW6
(retrieved 5/3/2012))

[140] Exh. 4 (Wagner Deposition) at 78:4-13.

REPLY DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.   – CASE NO. 12-cv-00630-LHK (PSG)                                    Privileged and Highly Confidential
                                                                           Prepared at the Request of Counsel
40

> A. Clearly.
> Q. And so it's going to be more attractive to those first time buyers; is that right?
> A. It would be."

Further, Mr. Wagner recognized at his deposition that Apple at present does compete with iPhone offerings at lower price points and will continue to do so in the future.[141]

### D. Intra- Vs. Interplatform Competition

67.     Samsung and Mr. Wagner claim that Samsung has historically primarily competed within the Android platform for sales (though Mr. Wagner does not assert this dynamic will remain in place in the future).  Mr. Wagner concludes that "a smartphone's operating system is a top purchase consideration, indicating that Samsung is competing against other Android manufacturers more than with Apple."[142]  I agree that platform competition is intense between iOS and Android, indicating its importance in the minds of consumers.  However, Mr. Wagner's second statement does not logically follow from the first.  To the contrary, the value placed by consumers on various platforms is an important driver of which platform a customer may initially choose, which is indicative of intense competition between Samsung/Android and Apple/iOS – NOT within various Android devices.  Moreover, once a platform is chosen, the stickiness of the platform that leads to more significant competition between Android smartphones at this stage in the consumer ownership process is precisely the dynamic that I identified in my Original Declaration that leads to losses of end users on the iOS platform to Samsung/Android and generates wide-ranging and long-lasting harm to Apple.

---

[141] Exh. 4 (Wagner Deposition) at 35:5-18.

[142] Wagner Declaration, ¶ 39.

The intense competition for first-time[143] smartphone business between iPhone/iOS and Samsung/Android is in a critical phase at present, and once end users choose, they lock in to their platform of choice.  These are exactly the conclusions I reached that point to the substantial and irreparable nature of harm that Apple that will face absent a Preliminary Injunction.  I understand as well that the Court reached these same conclusions in its prior Order, noting that even if Samsung were correct that sales of its smartphones detract from sales of other Android-compatible phones, this does not alter the reality that "both Apple and Samsung compete in the same smartphone market, particularly in the market for first-time smartphone buyers, and thus the potential for harm from infringing conduct is strong."[144]

68.    Mr. Wagner's use of Android and Apple end-user surveys reinforces the degree of stickiness in the smartphone market and, thus, confirms the critical nature of the current competition to capture first-time smartphone buyers.  On the Android side, Mr. Wagner notes that among Android smartphone owners, 55 percent responded that nothing could make them buy an iPhone instead.[145] According to Mr. Wagner, this implies that a large segment of currently uncommitted users would have a similar view and, thus, competition for these customers would be among providers of Android phones.  Mr. Wagner is incorrect.  This is a classic mistake in survey interpretation known as adverse selection.  The survey obtains attitudes about a population that has *already chosen not to purchase from Apple*, and have instead already adopted the Android platform at the time of the survey.  This raises two problems.

---

[143] In this context, it is important to recognize that significant "first-time" buyers of iPhone/iOS or Samsung/Android include users shifting from fading platforms (e.g., Blackberry/RIM).

[144] 1846 Court Order at 31-32.

[145] Wagner Declaration, ¶ 47.

Privileged and Highly Confidential
Prepared at the Request of Counsel

69. First, the respondents are being asked about giving up their existing platform for the iPhone, not their considerations of platforms *at the time they initially chose a platform*. Of course, with the network effects, platform stickiness and loyalty aspects associated with a smartphone platform, as I discussed in my Original Declaration and noted above, it is unsurprising that a significant portion of the Android platform installed base is reluctant to consider Apple and iOS.

70. Second, existing Android owners all share an important characteristic that they do not share with *anyone* in the remainder of the actual and potential smartphone end user population – they have already chosen Android. From an economic and statistical standpoint, this is a key bias in the sample since, at some point in their selection of Android, they (at least implicitly) rejected Apple and iOS. In the set of first-time smartphone purchasers, which is a large and strategically critical set of end users who will enter the smartphone marketplace for the first time in the next 18 months, *none* have chosen Android over Apple, or vice versa, yet. Applying any unwillingness to consider iOS and Android as potential competitors observed among customers that have already chosen Android to the non-intersecting set of first time smartphone customers is profoundly incorrect. When presented with these surveys at his deposition, Mr. Wagner agreed that these surveys provide no insight into the buying preferences of first time smart phone buyers.[146]

71. Rather, Mr. Wagner's survey evidence with respect to Android users clearly demonstrates that many of them are sticky to the platform and are unwilling to consider a switch to iOS once they have secured an Android platform. Similarly, Mr. Wagner's discussion of the iPhone 4S survey results (indicating that many people purchased the iPhone 4S because they are a "fan of Apple products") is further testament to the stickiness of customers to their smartphone platform.

---

[146] Exh. 4 (Wagner Deposition) at 94:5-17, 95:11 – 98:15.

Privileged and Highly Confidential
Prepared at the Request of Counsel

This further expands the harm that Samsung will generate at Apple beyond the mere displacement of iPhone sales, and renders the overall task of fully identifying Apple's losses that much more difficult.

## IV.     THE COMPETITIVE SIGNIFICANCE OF THE PATENTED FEATURES

72.     As I explained in my Original Declaration, Apple's iPhone prompted a significant wave of consumer smartphone adoption by combining and enhancing key capabilities of feature phones, smartphones, and other portable devices in a manner that was "accessible and exciting to normal people for the first time."[147]  An important catalyst for this adoption has been the distinctive user interface and user experience Apple pioneered in the iPhone, which is in turn driven by the inclusion of the smartphone features described in the Asserted Patents.   Samsung recognized the value of the iPhone intuitive user experience soon after the iPhone was released and very quickly set the iPhone "as the benchmark/goal for improvement in any of our products."[148]  Indeed, Samsung's own documents show that it evaluated the iPhone user interface extensively, criticized its own phones as inferior in comparison, and did everything it could to emulate the iPhone experience.[149]

73.     Mr. Wagner finds that my assessment of the importance of the patented features is "unconvincing."[150]  However, additional information that I have reviewed thus far in discovery confirms the importance of each of the patented inventions in demand for smartphones and, most

---

[147]  Vellturo Declaration, ¶ 40; *see also* Exh. 11 (Dan Frommer, *History Lesson: How the iPhone Changed Smart phones Forever,* Bus. Insider, June 6, 2011, http://www.businessinsider.com/iphone-android-smartphones-2011-6).

[148]  Exh. 43 (Email from Sang Hung to YK Yongki et al., "Competitive Touch UX consumer usability study – iphone, Palm Pre Motorola Droid & Cliq, HTC Hero, LG Versa," SAMNDCA10175266) at -266.

[149]  See Exh. 32 ("S1, iPhone Comparative Evaluation Results," SAMNDCA00203880) at -3882 to -4010.

[150]  Wagner Declaration, ¶ 56.

notably, identifies significant attention paid to these very features by Samsung with respect to its development and commercialization of competitive smartphone offerings, as I detail below.

### A. Slide-to-Unlock ('721 Patent)

74.     As I explained in my Original Declaration, the "slide-to-unlock" feature that I understand is described in the '721 patent has been widely regarded as a direct contributor to the unique user experience associated with the iPhone and other iOS devices.  Mr. Wagner claims that my support for this feature's importance consists merely of a speech given by Steve Jobs at the unveiling of the first iPhone and the presence of the feature in the "ads for the first iPod (sic)."[151]  In reality, as Apple's head of iPhone product marketing, Greg Joswiak, stated in his deposition, "[a]ll of [Apple's] commercials for quite a period of time for the iPhone started with a finger sliding to unlock it at the beginning of each commercial as we demonstrated that feature."[152]  Slide-to-unlock thus became "somebody's introduction, both in ad and in reality[,] in using the iPhone" and a "core part" of the iPhone experience.[153]

75.     Arthur Rangel, director of product marketing research and analysis at Apple, reiterated the fundamental contributions slide-to-unlock made to the iPhone's success, believing it to be "part of iPhone-ness, if you will," and a factor that "goes with ease of use and just what people assume an iPhone does."[154]

76.     Apple and third-party materials also indicate that the slide-to-unlock feature was integral in enabling functional use of an all-touchscreen smartphone such as the iPhone.  As I noted

---

[151] Wagner Declaration, ¶ 57.

[152] Exh. 3 (Joswiak Deposition) at 26:22-25.

[153] Exh. 3 (Joswiak Deposition) at 27:1-3.

[154] Posner Declaration (D.I. 115-2), Exh. J (Rangel Deposition) at 147:15-19.

Privileged and Highly Confidential
Prepared at the Request of Counsel

in my initial report, prior to the iPhone's launch, Apple was concerned with "how to prevent the device from playing music or making a call accidentally when it was jangling in your pocket" – a problem exacerbated by the iPhone's full touchscreen interface.[155]  Smartphone market observers in turn connected the need for a reliable method of unlocking a phone with overall usability.  As one analyst report explained before the iPhone was first introduced:  "The primary threat to existing vendors [presented by an Apple phone] is in the user interface.  If Apple builds a phone that is easy and genuinely pleasurable to use, the company will have a winner no matter how it is priced or sold.  Why hasn't anyone designed a bar phone with a slide lock/unlock switch found on every iPod (other than the shuffle) since its launch?  It's not that Apple has a lock – forgive the pun – on good ideas . . . ."[156]  The iPhone's elegant slide-to-unlock solution has since become an iconic component of the iPhone user experience and a contributing factor to the phone's success.

77.     Mr. Wagner claims that there is no indication that the slide-to-unlock feature has influenced the demand for the iPhone or the Galaxy Nexus.[157]  But Samsung's own documents reveal that Samsung has paid considerable attention to the feature and identified it as a key component if Samsung phones are to match the iPhone's ease of use.

78.     For example, a Samsung user survey I reviewed focused on the usability and design of the lock screen on Samsung phones as compared to iPhones.  The study concluded that the Samsung Galaxy S's lock screen, which employed a slide-to-unlock feature similar to the Galaxy Nexus,

---

[155] Velluro Declaration, Exh. 48 (Walter Isaacson, *Steve Jobs* (2011)).

[156] Exh. 23 (Email from Arthur Rangel to Bill Evans, re: "Re: Apple Phone: Who Cares? (And Why?) | Spotlight," APLNDC0001324274) at -275 (quoting Avi Greengart, from Current Analysis).

[157] Wagner Declaration, ¶ 57.

REPLY DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-00630-LHK (PSG)                    Privileged and Highly Confidential
                                                          Prepared at the Request of Counsel
46

"fared well against iPhone's lock screen" and that "[u]sers of iPhones rated the lock screen as similar to their current phones."[158]

79.    Another Samsung user survey found that an alternative method for unlocking Samsung phones ("long-pressing" on an unlock button) was "[a]n unfavorable aspect of the user experience" and an "important" target for fixing.[159]  Specifically, users lamented that it was difficult to know if the long-press unlock method was working, unlike with the iPhone where "you know it's sliding."[160] Yet another Samsung survey indicates that when Samsung implemented a shorter time period for pressing the unlock button, users reported greater ease of unlocking, but echoed Apple's initial worries that such a phone "may unintentionally unlock in their pocket or purse . . . ."[161]  Accordingly, Samsung's analysts recommended "an on-screen, gesture-based unlock" for Samsung phones.[162]

80.    I understand that Samsung has also included a "face unlock" feature in its Galaxy Nexus phone that allows the phone to be unlocked if the phone's camera recognizes a user's face. Indeed, Mr. Wagner places particular emphasis on "face unlock" as a supposedly differentiating feature of the Galaxy Nexus, believing it to be "noteworthy that there are specific advertisements for the Galaxy Nexus promoting" it.[163]  However, Samsung's own analysis of the Galaxy Nexus'

---

[158] Exh. 34 ("Galaxy S—Expert Analysis and User Research Draft Report," SAMNDCA00249929) at -959.

[159] Exh. 33 ("Critical Findings Brief – i920 Usability Test & iPhone Benchmarking, 06.25.09," SAMNDCA00231459) at -472.

[160] Exh. 33 ("Critical Findings Brief – i920 Usability Test & iPhone Benchmarking, 06.25.09," SAMNDCA00231459) at -484.

[161] Exh. 42 ("Final Report: i920 Usability Tests—Pre-User Trial and Post-User Trial, 09.25.2009," SAMNDCA10029586) at -603.

[162] Exh. 42 ("Final Report: i920 Usability Tests—Pre-User Trial and Post-User Trial, 09.25.2009," SAMNDCA10029586) at -603.

[163] Wagner Declaration, ¶ 64.

REPLY DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-00630-LHK (PSG)                Privileged and Highly Confidential
Prepared at the Request of Counsel
47

"[c]omparative [f]eatures" reveals that this addition is simply a "poor gimmick" that is "not an improvement over existing unlock methods" (such as slide-to-unlock) and, therefore, "hurts the phone more than it helps."[164]  In other words, even Samsung disagrees with Mr. Wagner's assessment of the important significance of the technology at issue in this case.

81.    It is clear that the slide-to-unlock feature that I understand to be taught by the '721 patent was not only an important component of the overall usability of iPhones, but also a key area of interest for Samsung in its development of the Galaxy line of smartphones, which includes the Galaxy Nexus.

82.    Notably, Mr. Geklinsky, who I understand was tasked by Samsung in part to be their official representative concerning the importance of the accused functionalities in their smartphones, claimed that he did not have a solid basis on which to deny (or conclude) that slide-to-unlock was a "core feature" of Samsung's phones.[165]

### B.  AutoCorrect ('172 Patent)

83.    It is my understanding that the '172 patent "makes it easier and faster for a user to enter words and other text using the touchscreen keyboard," as I explained in my Original Declaration.[166] Dr. Wagner contends that this "does not prove the value or extent of use of this feature by users of the iPhone 4s or Galaxy Nexus."[167]  But documents I have reviewed indicate that the ease and speed enabled by the autocorrect feature described in the '172 patent contribute directly to the success of the iPhone 4s and Galaxy Nexus.  In fact, these materials indicate that without an autocorrect feature,

---

[164] Exh. 49 ("Media Lab Analysis | Galaxy Nexus," SAMNDCA630-00055959) at -973.

[165] Exh. 5 (Geklinsky Deposition) at 132:2-11.

[166] Vellturo Declaration, ¶ 45.

[167] Wagner Declaration, ¶ 58.

Privileged and Highly Confidential
Prepared at the Request of Counsel

widespread adoption of the iPhone's touchscreen and virtual keyboard may never have occurred – a consideration that Mr. Wagner has overlooked.

84.     The materials I have reviewed reveal that Apple viewed the '172 patent's autocorrect feature as critical in overcoming a key sticking point in the iPhone's widespread adoption: the transition for most users from a conventional push-button text-entry system to one based on a virtual keyboard.  According to Steven Sinclair, an iPhone product marketing manager at Apple, when Apple first launched the iPhone, "there was a very concerted effort by the company to overcome this belief that a – a phone that didn't have a keypad, a physical hard keyboard, was really usable.  So we spent a lot of effort to educate consumers about the fact that you could use a touch screen and still be very accurate, and the ability to correct and suggest words is a very important element of that capability."[168]

85.     An Apple iPhone Reviewer's Guide from 2007 confronts this user skepticism directly, touting the iPhone's virtual keyboard with autocorrect functionality by claiming that in "less than a week you'll likely be typing faster on iPhone than on any other small keyboard – especially if you trust the intelligence of the keyboard".[169]

86.     In addition, third-party reviewers of the initial iPhone specifically credited the phone's autocorrect feature with enabling use of its virtual keyboard.  As one reviewer noted,

> "[t]apping the skinny little virtual keys on the screen is frustrating, especially at first.  Two things make the job tolerable.  First, some very smart software offers to complete words for you, and, when you tap the

---

[168] Exh. 1 (Sinclair Deposition) at 65:7-16.

[169] Exh. 28 ("iPhone Reviewers Guide: June 2007,"APLNDC630-0000128231) at -238.

wrong letter, figures out what word you intended. In both cases, tapping the Space bar accepts its suggestion."[170]

87.     Similarly, as Greg Joswiak explained during his deposition:

"I can point you back, for example, to the original iPhone where we made a January introduction in 2007.  Obviously, understanding the keyboard was something we would have to get people to understand and made a big deal out of auto correction.

That said, when I delivered the -- one of the first iPhones to Walt Mossberg, one of our reviewers, in June, one of the first things that he said to me, and unfortunately said publicly before the review of this product, is that he thought we had made a mistake with the glass keyboard and not doing a chiclet keyboard.

And he had a little bit less than . . . two weeks to test the product.  And in his review and in his experience, he called out the fact that using it, including having auto correction, made it as good or better than any keyboard he had ever used on a small type of device.

So I would say that's very important data to the fact that we had done something very well with auto correction in our keyboards."[171]

88.     Although at his deposition, Mr. Geklinsky could not say whether auto correction has contributed to high scores the Galaxy Nexus has received for its messaging capabilities (i.e., text messaging and emailing),[172] he agreed that typing was a "necessity" for messaging and web browsing

---

[170] Vellturo Declaration, Exh. 9 (David Pogue, *The iPhone Matches Most of Its Hype,* N.Y. Times, June 27, 2007, http://www.nytimes.com/2007/06/27/technology/circuits/27pogue.html?pagewanted=all).

[171] Exh. 3 (Joswiak Deposition, 30:2-22).  In the subsequent review prepared by Mr. Mossberg's team, they stated that "[t]he iPhone's most controversial feature, the omission of a physical keyboard in favor of a virtual keyboard on the screen, turned out in our tests to be a nonissue, despite our deep initial skepticism. After five days of use, Walt — who did most of the testing for this review — was able to type on it as quickly and accurately as he could on the Palm Treo he has used for years. This was partly because of smart software that corrects typing errors on the fly."  Exh.  8 (All Things D, *The iPhone Is a Breakthrough Handheld Computer*, June 26, 2007, http://allthingsd.com/20070626/the-iphone-is-breakthrough-handheld-computer).

[172] Exh. 5 (Geklinsky Deposition) at 118:23 – 119:20.

REPLY DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.  – CASE NO. 12-cv-00630-LHK (PSG)                                      Privileged and Highly Confidential
Prepared at the Request of Counsel
50

on the phone[173] and that Samsung would not want poor reviews of its typing functionality,[174] and he assumed that Samsung's intent in including autocorrect on its phones was to improve the typing experience.[175]

89.     In short, contrary to Mr. Wagner's belief that there is no proof of "the value or extent of use of this feature by users of the iPhone 4s or the Galaxy Nexus," documents indicate that Apple's introduction of the autocorrect feature laid the foundation for widespread user adoption of virtual keyboards, and thus directly contributed to the success of iPhones as well as Samsung's smartphones offering the same functionality, including the Galaxy Nexus.

### C.  Data Structures ('647 Patent)

90.     In my Original Declaration, I explained my understanding that the invention described in the '647 patent increases the ease of use and overall customer experience with the iPhone because it "enhances customer access to capabilities of the smartphone relevant to a given piece of data such as an email address, phone number and postal address, and the ease with which they can store or use that data in the appropriate application."[176]  Mr. Wagner discounts the contributions that this feature makes to a smartphone's usability saying simply that there may be many components of the concept of "ease of use".[177]  I respectfully disagree with Mr. Wagner's conclusion, which I find ignores the fundamental benefits of effectively accessing various capabilities relevant to different pieces of data on a smartphone.

---

[173] Exh. 5 (Geklinsky Deposition) at  113:4-8.

[174] Exh. 5 (Geklinsky Deposition) at 112:4-113:3.

[175] Exh. 5 (Geklinsky Deposition) at 113:20-114:2.

[176] Vellturo Declaration, ¶ 45 (citing Mowry Decl., ¶¶ 22-24, 87).

[177] Wagner Declaration, ¶ 56.

91.     The functionality described in the '647 Patent was a primary theme of Apple's original marketing efforts for the iPhone.  For example, Apple's 2007 iPhone Reviewer's Guide begins by noting that the "iPhone introduces an entirely new user interface – the first in 20 years" – through which "[m]aking a call is as simple as tapping a name."[178]  It continues by noting that "any phone number that appears in an email, SMS text message, or web page can be called instantly by tapping on it."[179]

92.     I believe that Mr. Wagner overlooks the importance of this functionality in driving demand for iPhones, and in turn for the Galaxy Nexus, in large part because the function is so intimately tied to the basic capabilities of a smartphone.  In many ways, smartphone users may now take much of the intelligence of their phones for granted.  As I explain below, in Section IV.E, users may not cite a particular function as being important in a smartphone because that function has become so ubiquitous in smartphone offerings.  Yet, the very fact that these features, such as the ability to link to different data structures to perform different activities, are found in all competitive smartphones means that they are an important driver of consumer demand.

93.     Indeed, smartphone buyers may have difficulty identifying the importance of a particular function on their phone even if they would readily identify a phone's shortcomings if that function were removed.  As iPhone user discussion groups have revealed, "ease of use" is "[o]ne of iPhone's hallmarks," yet is also "a broad concept that is tough for customers to verbalize.  It includes the phone being easy to pick up and use immediately without having to dig through the instructional materials; intuitive, flat navigation . . . and feature integration (e.g., calling phone numbers from

_____

[178] Exh. 28 ("iPhone Reviewers Guide: June 2007,"APLNDC630-0000128231) at -233.

[179] Exh. 28 ("iPhone Reviewers Guide: June 2007,"APLNDC630-0000128231) at -240.

emails).”[180]  Despite these facts, “ease of use” has been measured by Apple as being “very important”

to customers, and according to Greg Joswiak, Apple’s head of iPhone marketing, focus group data

has shown that Apple customers specifically call out the functionality of linking to data structures as

contributing to the iPhone’s ease of use.[181]  Arthur Rangel, Apple’s director of product marketing

research and analysis, similarly conveyed how important linking to data structures was for iPhone

users:

> “In conversations where we’ve done, like, Android versus iPhone, we
> have Android owners and we have iPhone owners in a discussion group.
> The iPhone owners will talk about those kinds of things, how smooth it is
> and how it’s easy to, you know, ask for something, and things show up in
> different places.   So you do, you know, a search for a restaurant or
> whatever, and it shows up, or you can – you know, when the results come
> up, you can press on it and call, and those kind of things.

> But have we broken that out to ask specifically about those things? No.
> We would if ease of use were lower. We’d probably go back and go,
> What’s going on there; right?  But we typically get very high scores on
> ease of use.”[182]

94.    Samsung’s own documents indicate that it is important for smartphones to provide

direct linking to data structures, as implemented by the iPhone.  For example, a 2010 Samsung study

appears to compare various functional aspects of the iPhone to Samsung’s Galaxy S1 phone – a

precursor to the Samsung Galaxy Nexus.  One section focuses on the iPhone’s ability to place phone

calls or begin writing emails when a user presses on phone numbers or email addresses shown in a

---

[180] Exh. 24 (Memorandum from Theo Downs-Le Guin and Erin Leedy to James Imahiro and Art
      Rangel re: “Key findings from iPhone owners qualitative sessions,” APLNDC0002420480) at
      -480.

[181] Exh. 3 (Joswiak Deposition) at 34:10 – 36:3.

[182] Posner Declaration (D.I. 115-2), Exh. J (Rangel Deposition) at 123:19 – 124:8.

memo stored on the device.[183]  The presentation then shows screenshots of the iPhone performing this functionality side-by-side with a screenshot from the Galaxy S1 where no such functionality is shown.  Further, although the original document is largely in Korean, I have reviewed a certified translation, and it is my understanding that the text beneath these screenshots states that the "Improvement Directions" are to "improve usability by providing Links for Web, Call, E-mail for memo contents that can be linked,"  just as in the iPhone.

95.    In sum, Mr. Wagner oversimplifies the impact that linking to different data structures has on the usability of the iPhone and Samsung Galaxy Nexus.  In particular, he fails to acknowledge that while users may not cite the inclusion of a common feature as influencing their decision to purchase a particular product, the feature's widespread adoption and use is a strong indicator of its importance in demand for that product.

### D.  Universal Search ('604 Patent)

96.    The universal search capability claimed in the '604 patent appeared  in conjunction with the offering of the Siri personal assistant on the iPhone 4S, which was introduced in October 2011.  As I noted in my Original Declaration, Siri features centrally in advertisements for the iPhone 4S and is cited as the most-liked feature of the 4S by end users.  Mr. Wagner dismisses the value of the '604 invention, claiming the interactive-voice aspect of Siri is what drives demand, not the universal search capabilities that Siri provides.[184]

97.    Mr. Wagner fails to recognize that an interactive voice-based personal assistant (as well as the non-voice based infringing search capabilities on the Galaxy Nexus) is of no value if it cannot

---

[183] Exh. 32 ("S1, iPhone Comparative Evaluation Results," SAMNDCA00203880) at -915.  As noted, in reviewing this document, I relied upon a certified translation, which can be found at Exhibit 32.

[184] Wagner Declaration, ¶ 59-60.

find the information the user seeks.  By broadening the scope of the search for materials sought by the user, the '604 patent lies at the heart of this feature's functionality.  In other words, the voice-based interaction merely provides user-friendly access to the capability end users really seek: information derived from multiple potential data sources.

98.     To illustrate this point, think of a human personal assistant, as opposed to a "virtual personal assistant," as Mr. Wagner describes Siri.  If I asked a human assistant to find my friend's phone number, and the assistant used only the internet and not my personal contacts list to perform that search, I would always have to check the accuracy of the information my assistant retrieved.  Similarly, if I asked my assistant to find the number for a particular airline, and my assistant searched only my personal contacts list, I may not have the information needed to change a flight reservation to accommodate a last-minute scheduling change.  The ability to intelligently search multiple data sources for the most pertinent information is crucial for the success of any assistant – human or virtual.

99.     In his deposition, Dr. Nathaniel Polish, an expert in speech-recognition systems who submitted a declaration on behalf of Apple in this case, corroborated the critical importance of Siri's universal search capabilities.  As he put it, when designing speech interfaces, "needing to be comprehensive is extremely important;" "having speech interfaces that just do one little narrow thing really [has not] gotten much consumer acceptance."[185]  Instead, it is "what's in the '604 [patent that] allows Siri to operate on lots of different kinds of data which makes it more broadly useful."[186]  Put another way, while "there may well be other aspects of Siri such as its ability to do speaker independent speech recognition . . . or handle noisy microphones" that are important, "Siri's value

---

[185] Exh. 2 (Polish Deposition) at 156:7-11.

[186] Exh. 2 (Polish Deposition) at 156:11-13.

Privileged and Highly Confidential
Prepared at the Request of Counsel

comes from its comprehensiveness and . . . the claimed features of the '604 are important to achieving that comprehensiveness."[187]

100.    According to Greg Joswiak, Apple customers share Dr. Polish's beliefs.  As Mr. Joswiak explained, "[f]inding information is very important to [Apple's] customers", but "[p]art of the magic,…. if you will, of Siri and our products in general is not explaining to the customer the entire way something works.  The magic is they just ask Siri a question, and Siri comes back with the appropriate response.  They didn't . . . have to understand that there's unified search going on….  They just asked a question.  The answer came back.  We know finding information is very important to them."[188]

101.    Indeed, a recent iPhone 4S user study (produced subsequent to my Original Declaration) identifies the search capabilities accessed through Siri as an important contributor to end-user satisfaction with the feature.  In particular, 61% of iPhone users cited "finding information" as a common way they use Siri, which overall met or exceeded the expectations of over 75% of iPhone 4S buyers.[189]  Putting this in context, using Siri to place a call ranked only three percentage points higher than using it for searching.  In other words, searching is, in essence, as important as speaking on the phone.

102.    It is also evident that Siri has been a material driver of user demand for the iPhone 4S.  As I noted in my Original Declaration, Siri has been cited as the best-liked feature of the iPhone 4S

---

[187] Exh. 2 (Polish Deposition) at 158:11-21.

[188] Exh. 3 (Joswiak Deposition) 43:25 – 44:11.

[189] Exh. 30 ("US iPhone 4S Siri Data from the Apple Customer Pulse," APLNDC630-0000149086) at -92, -94.

by 49% of iPhone 4S owners.[190]  Similarly, in a more recent Apple survey, 71% of U.S. iPhone 4S

buyers cited Siri as an important feature in their purchasing decision.[191]  In addition, of the 27% of

buyers who purchased an iPhone 4S primarily for a specific feature or capability, nearly 80% cited

Siri as an important feature driving their purchasing decision, and 36% cited Siri as the most

important feature.[192]

103.    Industry observers have highlighted Siri's ability to effectively search multiple sources

of information as a prominent threat to Google and, by extension, Samsung phones that utilize the

infringing search capabilities found in Android.  One observer, writing in *Forbes* magazine, found

that while "many consider [Siri] the best voice recognition application in history," "its potential really

lies in its ability to revolutionize the way we search the Internet, answer questions and consume

information."[193]  The writer then cites another *Forbes* contributor as concluding that Siri "may even

be a 'Google killer'."[194]

104.    Moreover, Google paid considerable attention to universal search capabilities in

developing the accused Google Quick Search Box functionality implemented in the Samsung Galaxy

---

[190] Vellturo Declaration, ¶ 44; *see also* Exh. 13 (John Cox, *Survey: iPhone* 4S *Owners Are Very Satisjfied with the Device,* Network World, Dec. 1, 2011, http://www.macworld.com/articleIl63965120 111l2/survey iphone 4s_owners_are very_satisfied with_the_device.html#lsrc.rss_main) ("Apple's bet on Siri has paid off: ... it is the best-liked feature of the new phone. Siri was ranked as the best-liked feature by 49 percent of these owners.")

[191] Exh. 31 ("iPhone Buyer Survey (FY12 -Q1)," APLNDC630-0000149470) at -490.

[192] Exh. 31 ("iPhone Buyer Survey (FY12 -Q1)," APLNDC630-0000149470) at -481, -483 to -484.

[193] Exh. 15 (Geoffrey Manne, *Google Isn't 'Leveraging Its Dominance,' It's Fighting to Avoid Obsolescence*, Forbes.com, Mar. 12, 2012, http://www.forbes.com/sites/beltway/2012/03/12/google-isnt-leveraging-its-dominance-its-fighting-to-avoid-obsolescence/) (APLNDC630-0000149197) at -197.

[194] Exh. 15 (Geoffrey Manne, *Google Isn't 'Leveraging Its Dominance,' It's Fighting to Avoid Obsolescence*, Forbes.com, Mar. 12, 2012, http://www.forbes.com/sites/beltway/2012/03/12/google-isnt-leveraging-its-dominance-its-fighting-to-avoid-obsolescence/) (APLNDC630-0000149197) at -197.

---

Privileged and Highly Confidential
Prepared at the Request of Counsel

Nexus.  For example, Android developer documents focus on the inclusion in Android phones of "a

redesigned search framework that provides a quick, effective, and consistent way for users to search

across multiple sources – such as browser bookmarks & history, contacts, and the web – directly

from the home screen."[195]  Other Android developer documents describe search as "a *core user*

*feature on Android*" through which "[u]sers should be able to search *any data that is available to*

*them*, whether the content is located on the device or the Internet."[196]  Finally, third party

commentators have noted that the quick search box feature could help drive Android sales device *at*

*Apple's expense*: "this update may seem small, but its implications are huge. It adds a whole new

layer of functionality to Android that completely obliterates the iPhone's functionality. And with

Android launching on more carriers, this type of addition could help it *win new customers, even ones*

*with iPhones*."[197]

　　105.   Samsung similarly focused on universal search capabilities in developing its

smartphones.[198]  One December 2011 Samsung document that I reviewed focused specifically on

comparing users' experiences with Google Voice Actions as implemented in the Samsung Galaxy

Nexus against their experiences with Siri on the iPhone 4S. The study found, among other things, that

consumers could complete more voice-enabled searching tasks (with intended results), such as

---

[195] Exh. 7 (*Android 1.6 Platform Highlights*, Android Developers,
http://developer.android.com/sdk/android-1.6-highlights.html) (APLNDC630-0000149209) at   -
209.

[196] Exh. 6 (*Search*, Android Developers,
http://developer.android.com/guide/topics/search/index.html) (emphases added).

[197] *See* Exh. 10 (Ben Parr, *Google Android Search Just Became Awesome*,
http://mashable.com/2009/10/09/android-quick-search-box/) (emphasis added).

[198] As noted above with respect to other functionalities, Mr. Geklinsky, Samsung's representative
concerning the importance of the accused features, could not say one way or the other whether the
Google universal search functionality (which I understand is embodied in the "Google Quick
Search Box") was a "core feature" of Samsung's phones.  Exh. 5 (Geklinsky Deposition) 127:21-
128:11.

obtaining a weather forecast and finding figures for the U.S. population, with Siri than with Google Voice Action.[199]

106.   As the above documents convey, universal search functionality has been an important element of both Apple and Samsung smartphone development.  In addition, although Mr. Wagner discounts the functionality of the '604 patent as a primary driver of iPhone 4S demand by focusing exclusively on Siri's conversational interface, logic dictates a different conclusion.  Users are drawn to the Siri-based functionality of the iPhone 4S because it can obtain relevant information quickly, from a variety of sources.  If Apple's Siri feature could not reliably obtain relevant information from different sources, its utility as a voice-based "personal assistant" and its importance as a driver of consumer demand would be critically diminished.

### E.  General Considerations by Mr. Wagner of the Patented Features

107.   At a general level, Mr. Wagner concludes from his analysis of the available information that "it is features other than the accused functionalities that are the reasons customers are selecting the Galaxy Nexus."[200]  Relatedly, Mr. Wagner identifies both (a) the absence of survey evidence at Apple as to the importance of the patented features as reasons Apple customers selected the iPhone and (b) the lack of attention paid by Apple to the patented features in its marketing messages to customers as determinative of their lack of importance in driving smartphone customer demand.[201]

---

[199] Exh. 47 ("Samsung Product Experience Research—Competative Automatic Speech Recognition" SAMNDCA11066185) at -214.

[200] Wagner Declaration, ¶ 62.

[201] The one exception is that Mr. Wagner recognizes that there are surveys that identify Siri as a key component of iPhone 4S demand, but he concludes the "universal search" capability of Siri did

*(Cont'd on next page)*

108.   Mr. Wagner's approach represents a serious misunderstanding of product differentiation and customer preferences.  In purchasing a device (or any good for that matter), the end user is selecting the collection of features and the price inherent in that device that the consumer prefers to the collection of features and price points that he/she can get from competitive offerings, or by simply staying with whatever device he/she presently uses.  From a feature standpoint, capabilities that are shared across all (or essentially all) devices are irrelevant to the selection process, because in the world as it exists, these features do not represent a distinguishing characteristic upon which a choice must be made by the consumer (since every product has the feature).  Thus, a feature receives attention by the supplier to the extent it is new or is not available on other devices; likewise, these features form the basis of the consumer decision.

109.   A classic example of this concept in product differentiation and consumer choice is found in automobile air conditioners.  During the 1960s and early 1970s, air conditioning was a new feature available only on certain select vehicle lines.  As such, those suppliers who offered air conditioning made it an important part of their marketing efforts to differentiate their autos from rivals who did not offer air conditioning.  Not surprisingly, customers that elected to buy autos with air conditioning cited its availability as an important consideration in their purchase decision.

110.   Now fast forward to today.  Essentially all automobiles sold in the U.S. come with air conditioning as a standard feature.  Unsurprisingly, automobile companies no longer market air conditioning when trying to entice customers; instead, they promote capabilities they now have (e.g. hybrid fuel capabilities) that not all automobiles have.  Since air conditioning is no longer a distinguishing characteristic among cars, little attention is paid to it, and customers take it as a

---

*(Cont'd from previous page)*

not materially contribute to demand.  As I noted earlier in this section, the universal search capability is an important aspect of customer demand (see Section IV.D).

Privileged and Highly Confidential
Prepared at the Request of Counsel

"given" that every car they consider will have air conditioning.  Thus, consumers will not identify air conditioning as a reason for purchase, and unsurprisingly, car companies will not ask about air conditioning in consumer surveys when trying to understand consumer preferences for various automobile options.

111.    Does the lack of questions about air conditioning in consumer surveys and the lack of identification by consumers of air conditioning as a reason for purchase mean that air conditioning is not important to end user demand?  Not at all, and, in fact, quite the contrary.  The fact that every major supplier of automobiles deems it necessary to offer air conditioning in its automobiles is testament to the essential nature of this feature as a "must have" to participate effectively in the marketplace at all.  From an obverse standpoint, it similarly follows that a car today that did not offer air conditioning would be a non-starter (figuratively and literally).

112.    And so it is with smartphones and the patented features that Mr. Wagner identifies as insignificant drivers of demand.  Their specific absence in both consumer surveys and lists of reasons for which consumers purchased the smartphones they chose is because all of the patented features (except the universal search capability incorporated into Siri and the Galaxy Nexus) are incorporated in all iPhones and many competitive smartphones and have been for some time.  The fact that these features are found in so many competitive smartphones is testimony to their "must have" nature, which establishes their *importance* in demand, not their unimportance.

113.    In this essential way, Mr. Wagner's conclusions that the patented inventions do not drive demand because (1) studies of consumers' reported reasons behind their purchases fail to cite the patented inventions (other than universal search related to Siri) and cite features not related to the patented inventions instead, (2) Apple failed to provide specific questions as to the importance of these features in their end user studies (thereby acknowledging their unimportance), and (3) the lack

of discussion by reviewers of the patented features in their evaluation of the Galaxy Nexus, are entirely misguided.

114.   Finally, Mr. Wagner notes that under the hypothesis that the inventions of the patents-in-suit drive consumer demand, their removal from Samsung smartphones at the conclusion of a full trial on the merits upon an issuance of a permanent injunction should cease all harm to Apple going forward.  He claims that I do not explain how these features can be important to demand today, yet their removal from Samsung smartphones will not cause a cessation to Apple's harm going forward.[202]

115.   I do explain these dynamics clearly in my Original Declaration.[203]  First, an injunction will not remove the infringing Samsung smartphones from end users' hands.  To the extent these end users continue to purchase Android-based products and services after an injunction, a likely occurrence given the network effects and platform stickiness associated with smartphones as discussed extensively in my Original Declaration and above, Apple will continue to be harmed.

116.   The harm is not limited to continued possessors of infringing Samsung smartphones, however.  By utilizing the infringing phones, Samsung will build and expand its ecosystem and that of the Android platform, thereby placing Samsung/Android at a relative competitive advantage at the time of a permanent injunction that it would not have had in the presence of a preliminary injunction. With this advantage in place, the attractiveness of lower-end Android-based smartphones, Android-based tablets, and even the Samsung phones stripped of their infringing capabilities will be enhanced as a result of infringement, and will thus be more able to compete with Apple's iOS-based products

---

[202] Wagner Declaration, ¶¶ 70-71.

[203] Vellturo Declaration, ¶¶ 79-82.

and services.  This enhanced ability of Samsung/Android to compete going forward will result if no preliminary injunction is issued, and the harm to Apple will thus continue into the future.

## V.      THE IRREPARABLE HARM TO APPLE FROM SAMSUNG'S ONGOING INFRINGEMENT

117.    In my Original Declaration, I identified several key factors that establish that Apple will sustain substantial and irreparable harm in the event the Galaxy Nexus is permitted to remain on the market during the pendency of this lawsuit.  In fact, I understand that the factors I have identified are precisely the same as those  that prompted the Court to conclude in its prior Order that "the potential for harm from infringing conduct" in the smartphone market space is "strong".[204]

118.    Samsung and its expert, Mr. Wagner, do not provide a reasonable basis upon which to conclude Apple will not be significantly harmed, or that, should there be such harm, all of it can be readily and reliably quantified at the time of trial.

### A.  Harm to Apple Will Be Substantial

119.    As discussed above in Sections III.B and III.C, Samsung's documents produced in this action clearly demonstrate its plans to significantly erode Apple's business in the immediate future, and that the Galaxy Nexus plays an important role in this displacement.  Importantly, the Samsung documents confirm what I recognized in my Original Declaration – the erosion of Apple's business will take place along multiple dimensions other than merely smartphones, including: digital content, accessories, tablets, and potentially much more.  Moreover, Samsung's documents confirm that network effects and platform stickiness will extend such harm well beyond the date of trial, as users locked in to the Android platform through the purchase of infringing phones are more likely to

---

[204] 1846 Court Order, at 31-32.

remain with the platform, purchase additional products/services, and become more entrenched at Android and, correspondingly, more unlikely to shift to Apple in the long term.

### 1.  Samsung Will Cause Apple to Suffer Long Term Loss of Market Share

120.   As discussed above in Section III.B, Samsung's documents reveal that Samsung sees the smartphone arena going forward as a two-horse race between itself and Apple[205], and Samsung's future success in growing its business "is dependent on blunting Apple."[206]  In Samsung's own words, "[i]n order to achieve and sustain #1 in the smartphone and tablet markets, [Samsung] must: . . . **BEAT APPLE**."[207]

121.   As the world's largest seller of smartphones, Samsung is poised to inflict substantial harm on Apple.  As noted above, the installed base of Android smartphones exceeds the installed base of iOS-based smartphones at present.  Thus, Samsung is armed with a dominant-supplier position within the largest smartphone platform.  This large installed base provides Samsung with substantial leverage over cellular carriers, which will further enhance Samsung's footprint across all tiers of the smartphone industry.

122.   If allowed to remain on the market, the Galaxy Nexus will contribute materially to the harm Samsung will inflict upon Apple.  As the flagship product of Android Ice Cream Sandwich architecture, the Nexus is directed at blunting two key prior comparative advantages of the Apple iOS: 1) cross device (e.g., smartphone/tablet) compatibility, and 2) assurances of forward compatibility of the smartphone with future platform versions.  Further, as a "hero" phone, the

---

[205] Exh. 48 ("STA Competitive Situation Paradigm Shift: HQ CFO," SAMNDCA11545927) at -934.

[206] Exh. 35 ("GS Choi Visit to STA, 9/20/2011," SAMNDCA00258674) at -690.

[207] Exh. 56 ("STA 2012 Winning Strategy, Aug. 2011," S-ITC-500056374) at -376 (emphasis in original).

Galaxy Nexus is used to directly target the Apple experience as a whole (as its televisions commercials starkly demonstrate) and drive end users to all tiers of Samsung smartphones in lieu of the Apple experience.  For all the reasons I have already explained, that loss of market share would extend well into the future and might never be recaptured.

### 2.  Samsung Infringing Smartphone Sales Lead to a Wide Range of Additional Lost Product/Service Sales

123.    As I explained in my Original Declaration, and as, in my understanding, the Court concluded in its prior Order,[208] given the unique characteristics of the smartphone marketplace and its current phase, extensive adoption of a smart phone by first time purchasers means that the "static" harm of lost smartphone sales that Apple will incur as a result of Samsung's infringement radiates out in many ways – both over time, and across products.  As I identified in my Original Declaration, these losses include:

- Direct displacement of iPhones by infringing Samsung Galaxy Nexus phones during the period the Galaxy Nexus remains on the market;

- Additional displacement of iPhones by increased sales of other Android smartphones as the infringing phones expand the network value of the Android platform (and reduce the network value of Apple's iOS);

- Lost collateral sales of iOS devices to lost iPhone purchasers;

- Lost sales to other members of the lost iPhone purchasers' social networks;

- Lost sales of other (non-iOS) Apple products (e.g., Mac computers); and

- Lost (potentially) lifetime sales of digital content.

---

[208] 1846 Court Order at 32.

124.    These losses are substantial in magnitude and quite likely.  As Samsung recognizes: "(c)onsumers who own our smartphones are pre-disposed to purchase our products."[209]  The gravity of these purchase dynamics are particularly acute in the current marketplace environment, since additional purchases under a given platform create greater stickiness, which drives greater purchase intent, which drives more stickiness, etc.  This "radiating effects" cycle is well-recognized at Samsung, and



_____

[209] Exh. 35 ("GS Choi Visit to STA, 9/20/2011," SAMNDCA00258674) at -795.

[210] Exh. 35 ("GS Choi Visit to STA, 9/20/2011," SAMNDCA00258674) at -752.

Privileged and Highly Confidential
Prepared at the Request of Counsel

125.   And what is Samsung's blueprint for this model?  Apple iOS.  Indeed, as I noted

earlier, Samsung specifically maps out the radiating cycle of Apple iOS as the business model it is

seeking to develop[211]:



126.   To do so, as it repeatedly indicates, Samsung must strip Apple users out of the cycle,

and, more importantly, prevent initial adopters from ever entering Apple's value cycle and have them

enter Samsung's instead.  What this model captures is the full essence of the radiating harm inflicted

in Apple as a result of Samsung's infringement.  An infringing smartphone sale does not simply take

away that sale from Apple, it takes away that user's entry point into the Apple iOS ecosystem, and,

with significant likelihood, takes from Apple the lifetime value of that user as a customer with respect

to additional smartphones, applications, digital content, tablets, Macs, Apple TV, and potentially

other Apple products and services.

---

[211] Exh. 51 ("STA Factbook, Aug. 2011," S-ITC-003353288) at -324.

127.   Moreover, the loss of that end user leads to losses of additional end users as a result of the strong network effects inherent in the smartphone industry.  The higher installed base and more widespread user experience that infringement provides to Samsung and Android increase the value of those networks to other actual and potential users, further expanding demand for these products/platforms at the expense of Apple.

### B.   Samsung's Claims of Insubstantial Damages Are Unsupported

128.   Samsung and its experts believe there are no such lost sales/profits damages, and Mr. Wagner opines that such lost profits damages are unwarranted: "it is my opinion that it (sic) Apple would not suffer any lost sales by the continued sale into the marketplace of Samsung's Galaxy Nexus related to any infringement of the patented functionalities."[212]  As noted above, Mr. Wagner's assessment of the importance of the patented features is fundamentally flawed.  Mr. Wagner evaluates the current focus of end-user purchasing decisions and cites the absence of reference to the accused features in these studies as demonstrative of their unimportance.  As I indicated earlier, this logic fails, especially with respect to features that are in essentially every phone.  Features that do not provide a source of differentiation upon which the customer selects his or her phone (since every phone has the features) should not be expected to be reported prominently in such surveys, even though they are very important.

129.   Instead, the correct question from the standpoint of assessing lost profits is what would demand for the Galaxy Nexus (or, more generally any smart phone) be if the smartphone did not offer the patented features?  Indeed, at his deposition, Mr. Wagner identified the answer to this

---

[212] Wagner Declaration, ¶ 114.

REPLY DECLARATION OF CHRISTOPHER VELLTURO,
Ph.D.   – CASE NO. 12-cv-00630-LHK (PSG)                    Privileged and Highly Confidential
                                                           Prepared at the Request of Counsel
68

question (not the question he answered in his Declaration) as the standard he understand applies in

assessing lost profits stemming from patent infringement:

> "the standard for causation on damages is that the existence of these four features would make or break the purchase decision; that there would be a different purchase decision if these features were <u>not in the product</u>…"[213]

130.    From this standpoint, Mr. Wagner's observations in his Declaration actually

<u>demonstrate</u> the importance of the patented features, since competitive smartphones considered by

end users have these features as basic entry requirements.  Samsung's claim that "but for"

infringement, Samsung would have seen no reduction in demand for its Galaxy Nexus phones and

therefore Apple would not have sustained lost sales is clearly erroneous in this context.

131.    Samsung also concludes that losses in collateral sales are immaterial even in the event

that there were lost Apple iPhone sales due to infringement.  In this context, Mr. Wagner states:

> "[T]here is little evidence that consumers are locked into Samsung or Android products."[214]

This statement is contradicted repeatedly in Apple and Samsung business documents and is at odds

with what is recognized as a key characteristic of demand for smartphones and their platforms

throughout the industry (see, e.g., Section II.B).[215]  In fact, Mr. Wagner himself now believes this

statement to be incorrect, at least concerning lock-in with respect to Android products:

> "Q. Okay.  Focusing on the Android part of it, do you still think that there is little evidence that customers or consumers are locked into Android

---

[213] Exh. 4 (Wagner Deposition) at 107:17-22 (emphasis added).

[214] Wagner Declaration, ¶ 119.

[215] In this context, Mr. Wagner even contradicts himself: "This level of advertising for the [Android] platform… helps to create a branded platform that can compete with Apple's platform.  The resulting preference for the Android platform means many of the customers that select an Android phone (such as the Galaxy Nexus) would not consider a smartphone with a different operating system (such as the iPhone)." Wagner Declaration, ¶46.

   Privileged and Highly Confidential
Prepared at the Request of Counsel

products when you see that even Samsung recognizes that 80 percent of Android purchasers will buy another Android device?

**A. I think that sentence is too strong for that part of it."**[216]

132.     In sum, Mr. Wagner improperly ignores the impact that the patented features have on sales, and in turn drastically underestimates the harm that Apple will experience in the absence of a preliminary injunction.

### C.  Harm to Apple Cannot Be Reliably Quantified in Important Ways

133.     In my Original Declaration, I identified the irreparable nature of a large portion of the identified harms Apple will sustain as a result of Samsung's infringement.  While certain aspects of harm – for example, direct lost iPhone sales and associated digital content - may be partly quantified reliably through a damages assessment at trial, most of these harms do not lend themselves to reliable quantification.  Further, as these harms will radiate forward into the future, they would need to be not only reliably quantified as to their historic effect prior to the date of trial, but also reliably forecast well into the future in a highly dynamic and uncertain marketplace.  In my extensive experience in patent damages assessment, such future damages are virtually never subjected to reliable assessment and thus the patentee virtually never obtains any compensation for these harms.

### 1.  Samsung and Mr. Wagner Claim Incorrectly That Any Lost Sales of iPhones and other iOS-based Devices, Products and Services can be Reliably Ascertained

134.     Samsung, along with Mr. Wagner, opines that any damages from lost sales that Apple sustains as a result of Samsung's infringement can be reasonably calculated at the time of trial.  This conclusion applies not only to lost sales of Apple smartphones, but also to other products offered as

---

[216] Exh. 4 (Wagner Deposition) at 122:8-15.

Privileged and Highly Confidential
Prepared at the Request of Counsel

part of the Apple ecosystem.[217]   According to Mr. Wagner, these losses can be reliably estimated

using various statistical tools, including surveys, conjoint analyses, and/or hedonic regressions.[218]

Losses on convoyed sales, Mr. Wagner posits, can be derived from available end user "churn" studies

and end user data at Apple, perhaps supplemented by survey evidence.[219]

135.   Samsung's documents belie this claim.  As noted above, ████████████████

████████████████████████████████████████████████████████████████

███████ and the blueprint that Apple's success provides for this strategic approach.  The radiating

cycle map recognizes that initial purchase of a smartphone leads initially to customer investment in

the device and its platform, including revenues from accessories and digital content, but then – as a

result of platform/phone stickiness and network effects – goes on to generate additional sales of

phones in the future, as well as other devices (e.g. tablets, computers, televisions).  These additional

sales generate even greater stickiness, and the value cycle thus grows stronger and expands.

136.   Despite the critical nature of this dynamic in Samsung's strategy, it is noteworthy that

the various stages and elements of the cycle are not valued.  If survey evidence were available (or

could be reasonably obtained) that captured the value generated at various stages of this value cycle, I

would expect to see Samsung make use of it.  Instead, Samsung cites very general studies about tablet

purchase trends, and data on digital content purchasing propensities at Apple.

137.   Indeed, Mr. Wagner provides no particularity as to what the statistical analyses he

identifies would encompass; rather, he simply lists a series of tools that have been used in patent

---

[217] Wagner Declaration, ¶¶ 117, 121.

[218] Wagner Declaration, ¶ 116.  It is interesting that Mr. Wagner identifies numerous tools that can be
used to reliably assess the existence of lost profits damages and their amounts, yet he is able to
arrive at the conclusion that lost profits are not warranted without conducting any of these.

[219] Wagner Declaration, ¶¶ 121-122.

Privileged and Highly Confidential
Prepared at the Request of Counsel

damages assessments in the past.  When considered in the context of the specific questions that need

to be answered with respect to damages in this action, these tools are likely to be of limited use – that

is, to the extent they can identify and quantify damages sustained by Apple, they will tend to

understate such damages by a substantial degree.

### a)  Surveys/Conjoint Analyses[220]

138.   At its most general level, a lost profits analysis must assess the additional profits the

patentee (here, Apple) would have earned in a world "but for" the defendant's (here, Samsung)

infringement.  Thus, one must evaluate how many more of Apple's various products (smartphones,

tablets, digital content, and potentially others) Apple would have sold at various points in time, and

the additional profits Apple would have earned on these units.

139.   At the time of trial, the trier of fact would need evidence to assess several elements of

damages:

- The likelihood that purchasers of infringing Samsung products would have selected an Apple iPhone in a "but for" world (and which iPhone model they would have purchased);

- The likelihood that these end users in the "but for" world would purchase next-generation Apple iPhones; and

- The likelihood that these end users would purchase additional Apple products, including iPads, Macs, digital content, etc.

While a carefully designed and executed survey may capture some elements of these tendencies,

there are elements of these questions that are unlikely to be addressed reliably.[221]  Importantly, the

---

[220] A conjoint analysis is a form of survey in which participants are shown various products with varying characteristics at varying price points.

[221] I do not mean to imply that a conjoint, hedonistic regression or some other statistical analysis is necessary to seek lost profits.  Rather these are just tools that may be used to support a lost profits case.  Here, they would be insufficient to provide Apple with full recovery for the reasons discussed below.

respondents who actually purchased an infringing Samsung phone will likely be invested in the

Android platform at the time of survey, and this will bias their response in favor of selecting another

Android device.[222]  Moreover, assessing the likelihood of additional purchase will depend on the

conditions of the state of the world provided to the respondent that will be in place at the time of a

future purchase.

     140.   Leaving aside these methodological and bias issues, there are much broader issues

associated with Samsung's infringement and the damages sustained by Apple that surveys will not be

able to capture, including for example:

- the impact of the greater installed base of Android phones generated as a result of Samsung's infringement on the purchase of additional Android phones (both Samsungs and others) due to network effects;

- The impact of the greater installed base of Android phones generated as a result of Samsung's infringement on the purchase of additional tablets and other devices that operate under the Android platform due to network effects;

These concepts do not lend themselves to survey-based analysis because they relate to the feedback

effects associated with platform adoption.  It is unrealistic to expect survey respondents to factor in

such complexities in their responses in a reasonable and reliable manner.  Indeed, I am unaware of

any survey evidence that has captured these effects reliably, in a patent damages context (or any other

context).

### b)  Hedonic Regressions

     141.   Hedonic regression analysis uses statistical techniques to estimate the portion of the

selling price of a product that can be attributed to a specific feature.  For example, one might seek to

assess the value of having internet access through one's high-definition television.  As there are

---

[222] In my experience, taking consumers "back in time" to their selection of the infringing smartphone and asking them to reconsider their choice based on the information and preferences they had *at that time* is a fruitless exercise.  Yet, such a hypothetical would be essential to avoiding the result bias I identify here.

televisions currently available on the market that do and do not possess internet capabilities, one can collect data on the selling prices of various models, along with other variables (screen size, pixel array) that may also affect the selling price. Through a statistical procedure known as multivariate analysis, a hedonic model of pricing may be estimated that will estimate – controlling for other factors – the incremental price realized through the offering of internet capabilities on a television.

142.   In a patent damages context, such Hedonics are used in addressing damages under a reasonable royalty approach. Hedonic regressions can help identify the incremental value associated with a patented feature, which can serve as a basis for a royalty payment. A reasonable royalty damages assessment typically applies in lieu of a lost profits-based damages award.[223]

143.   Under a reasonable royalty analysis, the patentee and the infringer are posited to sit down at the time of initial infringement and negotiate a license under which the patentee grants rights to the infringer to use the patented inventions. This hypothetical negotiation requires the parties to strike an agreement – there is no option (as there is in the real world) for the parties to fail to come to terms. Having determined the "reasonable royalty" under this construct, the royalty is then applied to the infringing conduct to determine the amount owed in reasonable royalty damages.

144.   Thus, under a reasonable royalty damages assessment, Apple would receive damages in the form of a royalty it is required to accept as part of the hypothetical negotiation. In the actual world, I understand that Apple has steadfastly maintained it has *no intention* or desire to grant a license to Samsung to these patents. The reparations Apple would receive under a reasonable royalty damages award are thus defined by a license whose terms it was (and is) unwilling to accept. A reasonable royalty award, therefore, is, by definition inadequate to fully compensate Apple for its

---

[223] Damages for infringement of a utility patent may also include a "mix" of lost profits and a reasonable royalty – the analysis I provide here is in applicable in the mixed scenario as well.

harms.  That means, under a reasonable royalty award, there are harms Apple sustained for which it will not be compensated at trial.  In other words, a reasonable royalty-based award (such as would be the basis under which a hedonic approach would apply) necessarily implies irreparable harm to Apple.  The only scenario in which a hedonic analysis might apply is one in which irreparable harm exists, and therefore, it cannot be used to mitigate the potential for irreparable harm (as Mr. Wagner implies).

### c)  Estimating Damages Emanating from Network Effects

145.   Despite largely dismissing their relevance in his Declaration, Mr. Wagner expressly recognized at his deposition that network effects matter in this market.[224]  That is, the accumulation of an installed base of users under a smartphone/platform such as Android/Samsung expands demand for additional users to join the network, both through direct network effects (e.g., the ability to interact with more people through certain functions/features, such as a Game Center) and indirect network effects (e.g., the increased incentives for developers to write apps for Android expand as the user base grows; and the greater availability of more apps expands the user  base, thus creating a network "feedback loop").

146.   Mr. Wagner's claim with respect to the potential usefulness of survey evidence in assessing harm to Apple does not provide any reliable means to assess network effects.  Network effects capture a dynamic development of shifts in demand for consumers as the network grows, and of shifts in demand through indirect effects wherein developers extend the value of the system as it grows.  Surveying consumers about their selection mechanisms of smartphones and other devices can capture none of this in a cardinal (quantifiable) fashion – that is, end users will be unable to identify how this effect will change as the installed base of users of applications change.  At best, a survey can

---

[224] Exh. 4 (Wagner Deposition) at 140:8-21.

Privileged and Highly Confidential
Prepared at the Request of Counsel

capture whether the size of the network or the number of applications matters (an ordinal measure) to customers.  Ironically, surveys that capture this ordinal effect would establish the presence of harm to Apple, but the surveys would be powerless to quantify that harm.  Thus, Mr. Wagner's claimed methods to quantify harm to Apple as a result of Samsung's infringement are incapable of quantifying the network effects he believe "matter" in the smartphone market.

### 2.   Samsung and Mr. Wagner Dismiss Harms to Apple's Reputation and Goodwill

147.   Samsung and Mr. Wagner summarily dismiss any claims associated with harm to Apple's brand, reputation, and consumer goodwill as "speculative."  At his deposition, Mr. Wagner recalled that he has virtually always been able to quantify harms sustained by a patentee as a result of infringement fully and reliably, except for elements of harm where insufficient data can be brought forward with which to make such a quantification:

> "I often have clients that think they have some much broader set of damages than I think they have . . . . And I've told them I can't calculate those unless you give me information to do so"[225]

With this logic Mr. Wagner defines a patentee's "harm" to be limited to those adverse effects for which the patentee can generate adequate documentation and data so that they can be quantified to a reliable degree by a damages expert.  Thus, anything that cannot be quantified is not harm, and therefore, all harm can be quantified.  The logic here is perfectly circular and leads to the conclusion that there can never be irreparable harm.  Taken in this context, Mr. Wagner's conclusions that harms to reputation and goodwill sustained by Apple as result of Samsung's infringement are not cognizable harms due to their inability to be reliably quantified says <u>nothing</u> about these harms' existence or significance.

---

[225]  Exh. 4 (Wagner Deposition) at 150:12-18.

Dated:  May 14, 2012

Christopher Vellturo

Privileged and Highly Confidential
Prepared at the Request of Counsel

77