QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Cal. Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Cal. Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Cal. Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

William C. Price (Cal. Bar No. 108542)
williamprice@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>        Plaintiff,<br><br>      vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>      Defendants. | CASE NO. 12-cv-00630-LHK<br><br>**SAMSUNG'S OPENING CLAIM CONSTRUCTION BRIEF**<br><br>**Date:**   **February 21, 2013**<br>**Time:**   **10:30 am**<br>**Place:**  **Courtroom 8, 4th Floor**<br>**Judge:**  **Hon. Lucy H. Koh** |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION...................................................................................................... 1

II.     CLAIM CONSTRUCTION LAW ........................................................................... 2

III.    U.S. PATENT NO. 7,756,087................................................................................. 3

      A.      Introduction to the '087 Patent................................................................. 3

      B.      Non-Scheduled Transmission .................................................................. 6

      C.      N ................................................................................................................ 9

IV.     U.S. PATENT NO. 7,577,757................................................................................. 12

      A.      Introduction to the '757 Patent................................................................. 12

      B.      Zone Specific Storage and Interface Device ........................................... 13

      C.      The Intrinsic Evidence Supports Samsung's Construction ..................... 14

      D.      The Extrinsic Evidence Supports Samsung's Construction .................... 16

V.      U.S. PATENT NO. 5,579,239................................................................................. 16

      A.      Introduction to the '239 Patent................................................................. 16

      B.      Means for Capturing, Digitizing, and Compressing at Least One Composite Signal.......................................................................................................... 18

      C.      Means for Transmitting the Composite Signal ....................................... 22

VI.     CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Page**

## Cases

*ASM America, Inc. v. Genus, Inc.*,
    401 F.3d 1340 (Fed. Cir. 2005) ................................................................................................ 14

*Aristocrat Techs. Austl. Pty Ltd. v. International Game Tech.*,
    521 F.3d 1328 (Fed. Cir. 2008) ........................................................................................ 21, 24

*B. Braun Medical Inc. v. Abbott Laboratories et al.*,
    124 F.3d 1419 (Fed. Cir. 1997) ................................................................................... 3, 17, 25

*Brown v. 3M*,
    265 F.3d 1349 (Fed. Cir. 2001) .................................................................................................. 2

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
    296 F.3d 1106 (Fed. Cir. 2002) .................................................................................................. 2

*Dealertrack v. Huber*,
    674 F.3d 1315 (Fed. Cir. 2012) ................................................................................................ 15

*Digital-Vending Services Intern., LLC v. University of Phoenix, Inc.*,
    672 F.3d 1270 (Fed. Cir. 2012) ................................................................................................ 10

*E-Pass Techs., Inc. v. 3Com Corp.*,
    343 F.3d 1364 (Fed. Cir. 2003) .................................................................................................. 7

*High Point Sarl v. Sprint Nextel Corp.*,
    No. 09-02269-CM, 2012 U.S. Dist. LEXIS 108485 (D. Kan. Aug. 3, 2012) ........................... 19

*InterDigital Communications, LLC v. International Trade Commission*,
    690 F.3d 1318 (Fed. Cir. 2012) ................................................................................................ 23

*Interactive Gift Exp., Inc. v. Compuserve Inc.*,
    256 F.3d 1323 (Fed. Cir. 2001) ................................................................................................ 10

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
    355 F.3d 1361 (Fed. Cir. 2004) .................................................................................................. 2

*Lockheed Martin v. Space Systems/Loral, Inc.*,
    324 F.3d 1308 (Fed. Cir. 2003) .................................................................................................. 2

*MBO Laboratoriess, Inc. v. Becton, Dickinson & Co.*,
    474 F.3d 1323 (Fed. Cir. 2007) ................................................................................................ 12

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ......................................................... 2

*Medtronic, Inc. v. Advanced Cardiovascular System, Inc.*,
    248 F.3d 1303 (Fed. Cir. 2001) .................................................................................................. 3

*Mettler-Toledo, Inc. v. B-Tek Scales, LLC*, 671 F.3d 1291 (Fed. Cir. 2012) ................................... 2

*Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.,*
    194 F.3d 1250 (Fed. Cir. 1999) ...................................................................17, 22, 23

*O2 Micro International Ltd. v. Beyond Innovation Technology Co., Ltd.,*
    521 F.3d 1351 (Fed. Cir. 2008) .................................................................................2

*Omega Engineering, Inc. v. Raytek Corp.,*
    334 F.3d 1314 (Fed. Cir. 2003) ..............................................................................7, 8

*On Demand Machine Corp. v. Ingram Industrial, Inc.,*
    442 F.3d 1331 (Fed Cir. 2006) ...............................................................................19

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) ...........................................................................2, 25

*Retractable Tech., Inc. v. Becton, Dickinson & Co.,*
    653 F.3d 1296 (Fed. Cir. 2011) ...............................................................................20

*SanDisk Corp. v. Memorex Products, Inc.,*
    415 F.3d 1278 (Fed. Cir. 2005) ...............................................................................15

*Southwall Tech., Inc. v. Cardinal IG Co.,*
    54 F.3d 1570 (Fed. Cir. 1995) .................................................................................10

*Stanacard, LLC v. Rebtel Networks, AB,*
    680 F. Supp. 2d 483 (S.D.N.Y. 2010) .....................................................................19

*U.S. Surgical Corp. v. Ethicon, Inc.,*
    103 F.3d 1554 (Fed. Cir. 1997) .......................................................................2, 6, 10

*Visto Corp. v. Good Tech, Inc.,*
    No. 2:06-CV-039, 2008 U.S. Dist. LEXIS 3244 (E.D. Tex. Jan. 16, 2008) ............19

*Visto Corp. v. Research in Motion, Ltd.,*
    623 F. Supp. 2d 756 (E.D. Tex. Apr. 30, 2008) .................................................19, 21

*Vitrionics Corp. v. Conceptronic Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) ...................................................................................2

*Wenger Manufacturing, Inc. v. Coating Machine System, Inc.,*
    239 F.3d 1225 (Fed. Cir. 2001) .......................................................................3, 22, 25

## Statutes

35 U.S.C. § 112, ¶ 6 ......................................................................................................19

## I.      **INTRODUCTION**

Defendants and counterclaimants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively "Samsung") respectfully submit this opening brief on five disputed claim terms from three of the eight Samsung utility patents infringed by Apple Inc. ("Apple").   The five terms at issue are "non-scheduled transmission" and "N" as used in U.S. Patent No. 7,756,087 (the "'087 Patent"); "zone specific storage and interface device" as used in U.S. Patent No. 7,577,757 (the "'757 Patent"); and "means for capturing, digitizing, and compressing at least one composite signal" and "means for transmitting the composite signal" as used in U.S. Patent No. 5,579,239 (the "'239 Patent").

The '087 Patent is essential to the 3rd Generation Partnership Project ("3GPP") standard, which defines the protocols for transmitting information wirelessly and ensures that mobile devices made by different manufacturers can operate together within a wireless network. Samsung has played a critical role in developing the 3GPP standard, and the '087 Patent illustrates the efforts and investments Samsung has made in developing this standard.

The '239 and '757 feature patents cover aspects that are critical to the use and enjoyment of Apple's products.   These Samsung patents provide the user with the ability to synchronize their multimedia content across multiple devices, and to transmit videos from one device to another over cellular and other telemetric frequencies.   The inventions disclosed in these feature patents have become integral parts of the user experience and are demanded by consumers.

For all five terms, Samsung's proposed constructions are consistent with the claims, specification, and prosecution history, as well as the ordinary meaning of the term.  By contrast, Apple's definitions are litigation-inspired attempts to avoid infringement.  The Court should reject Apple's efforts to artificially narrow the claims and construe the terms in accordance with the established principle that claims should be given their full breadth unless there is a "clear and unmistakable disclaimer."

1   **II.    CLAIM CONSTRUCTION LAW**

2   Claim construction is a matter of law to be determined by the Court.  *Markman v.*

3   *Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370

4   (1996).  "It is well-settled that, in interpreting an asserted claim, the court should look first to the

5   intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in

6   evidence, the prosecution history.  Such intrinsic evidence is the most significant source of the

7   legally operative meaning of disputed claim language."  *Liquid Dynamics Corp. v. Vaughan Co.,*

8   *Inc.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004) (quoting *Vitrionics Corp. v. Conceptronic Inc.*, 90 F.3d

9   1576, 1582 (Fed. Cir. 1996)).  In addition to intrinsic evidence, a court may rely on extrinsic

10  evidence, such as dictionaries and treatises, to shed light on the claimed technology.  *Phillips v.*

11  *AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005).  However, extrinsic evidence is considered

12  "less significant than the intrinsic record" and "less reliable than the patent and its prosecution

13  history in determining how to read claim terms."  *Id.* at 1317-18.

14  Not every claim limitation requires construction.  *U.S. Surgical Corp. v. Ethicon, Inc.*, 103

15  F.3d 1554, 1568 (Fed. Cir. 1997).  Claim terms that are not technical terms of art may not require

16  construction.  *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001).  Though a limitation may

17  require construction to resolve a genuine, material dispute, courts are not required to construe

18  *every* limitation.  *O2 Micro Int'l Ltd. v. Beyond Innovation Technology Co., Ltd.*, 521 F.3d 1351,

19  1360 (Fed. Cir. 2008).

20  Construction of means-plus-function limitations consists of two steps.  First, the court

21  identifies and construes the function.  *Lockheed Martin v. Space Systems/Loral, Inc.*, 324 F.3d

22  1308, 1319 (Fed. Cir. 2003).  Once that function is identified, it is legal error to narrow or

23  broaden its scope further.  *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113

24  (Fed. Cir. 2002).  Second, the Court "must look to the specification to determine the structures

25  that correspond to the claimed function."  *Mettler-Toledo, Inc. v. B-Tek Scales, LLC*, 671 F.3d

26  1291, 1296 (Fed. Cir. 2012) ("Our case law is clear that a means-plus-function claim limitation is

27  limited to the structures disclosed in the specification and equivalents.") (citation omitted);

28

*Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311-12 (Fed. Cir. 2001). "A court may not import functional limitations that are not recited in the claim, or structural limitations from the written description that are unnecessary to perform the claimed function." *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001). Structure disclosed in the specification is "corresponding" structure only if "the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *B. Braun Medical Inc. v. Abbott Labs et al.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997).

### III.   U.S. PATENT NO. 7,756,087

#### A.   Introduction to the '087 Patent

The '087 Patent relates to sending data on a transport channel, such as the enhanced data channel (E-DCH) portion of the 3GPP standard. Ex. A, '087 Patent at 1:54-58.[1] In a 3GPP system, a mobile device (*i.e.* user equipment) uses the E-DCH (*i.e.*, channel) to transmit data to a base station (*i.e.* Node B). *Id.* at 6:39-41. When the E-DCH was first added to the 3GPP standard, user equipment (UE) had to reserve space on the E-DCH using a complicated scheduling process to transmit data. *Id.* at 2:42-47, Figure 2. The UE sent scheduling information, such as the UE's transmission power and the amount of data to be transmitted, to the base station. *Id.* at 2:47-48. In response, the base station sent scheduling assignment information (SAI), such as the allowed data rate and transmission timing, back to the UE. *Id.* at 2:56-59. The problem with this approach was that sending and receiving such detailed channel access information was time consuming and inefficient for certain types of data, such as time-sensitive data. *Id.* at 6:49-59, 9:7-19.

To solve this problem, the '087 Patent discloses using two transmission modes: a scheduled mode and a non-scheduled mode. *See id.* at 6:49-59, claim 34. By using both modes together, the UE can use scheduled mode to send longer data, such as movies or pictures, and non-scheduled mode to send short, time sensitive data. *See id.* at 5:32-48, 12:19-36, claim 34.

---

[1]   Citations to "Ex. ___" refer to the Declaration of Todd M. Briggs in Support of Samsung's Opening Claim Construction Brief and the exhibits thereto.

1        To perform non-scheduled transmissions, the UE receives the same SAI that it did for

2   scheduled transmissions. *Id.* However, in non-scheduled transmission mode, the UE no longer

3   needs to receive the SAI for *each* transmission to dictate the allowed transmission time slots. *Id.*

4   at 6:39-59. Instead, the UE receives "non-scheduled transmission information," in the form of

5   parameters or a bit map, when the E-DCH is established or reestablished. *Id.* at 7:30-34, 13:6-8.

6   This non-scheduled transmission information identifies a periodically recurring set of time slots

7   that the UE is allowed to use to send delay sensitive data. *Id.* at 13:8-13. If the UE needs to

8   quickly send data, the UE can send the data during the recurring time slots with reduced

9   scheduling delay by eliminating the need to receive the SAI prior to each transmission. *Id.* at

10   6:49-53. If the UE does not need to send data, the UE does not have to use the available time

11   slots. *Id.* at 6:60-63, 9:12-19.

12        Figure 2, annotated below, illustrates the scheduling process for scheduled transmissions:

22   '087 Patent at Figure 2 (annotated). The UE sends scheduling information (shown as the red

23   arrow 204) to the Node B. Next, the Node B sends SAI (shown as the red arrow 208) to the UE.

24   Not shown in original Figure 2 is the non-scheduled transmission information. When using both

25   modes, the Node B transmits both the SAI and non-scheduled transmission information (shown as

26   the blue arrow). *Id.* at 13:6-19. The non-scheduled transmission information, in the form of

27   parameters or a bit map, is used during non-scheduled transmissions. *Id.* The non-scheduled

28

**SAMSUNG'S OPENING CLAIM CONSTRUCTION BRIEF**

transmission information streamlines the scheduling process so that the UE does not have to use and receive the SAI *every* time it sends delay-sensitive data. *Id.* at 6:49-59.

The '087 Patent repeatedly states that the UE will receive both SAI and non-scheduled transmission information when an E-DCH is established or reestablished. *Id.* at 2:54-61, 5:32-48, 11:44-65, 12:19-36, claims 6, 14, 34. The SAI can provide the UE with important information, such as the data rate, which is utilized to transmit data in non-scheduled mode. *Id.* at 2:54-61, 11:66-12:36, claims 6, 14. The UE can then transmit data in non-scheduled mode, at the established data rate, during the allowed time intervals indicated by the non-scheduled transmission information. *Id.* at 6:49-59. While the UE does not *have* to use the SAI, the UE *may* use some portion of the SAI for non-scheduled transmissions. *Id.*

Figure 9 illustrates the type of non-scheduled transmission information that three UEs—UE 0, UE 1, UE 2—can use to send non-scheduled data:



'087 Patent at Figure 9 (annotated). Each UE is permitted to transmit non-scheduled data in k of N transmission time intervals (TTIs). *Id.* In Figure 9, there are 8 possible TTIs, so N equals 8. *Id.* at 12:45-49. Each UE is allowed to transmit in 3 of the 8 TTIs, as indicated by the shaded TTIs, so k equals 3. *Id.*

To indicate the TTIs in which a UE can transmit, the Node B can send the UE a bit map that has length N bits. '087 Patent at 13:6-19. A "1" bit indicates a TTI where the UE can

transmit non-scheduled data; a "0" bit indicates a TTI where the UE cannot transmit non-scheduled data.  *Id.*   Because k equals 3 in Figure 9, there are 3 "1" bits in the transmitted bit map.  *Id.*   Using UE 0 as an example, the bit map 10010010 tells UE 0 that it can transmit non-scheduled data in the first, fourth, and seventh TTIs (*i.e.,* the shaded TTIs).  *Id.* at 12:52-59.  Similarly, UE 1 can transmit in the second, fifth, and eighth TTIs, and UE 2 can transmit in the first, third, and sixth TTIs.  *Id.*

## B. Non-Scheduled Transmission

| Samsung's Proposed Construction | Apple's Proposed Construction |
| --- | --- |
| No construction necessary. | Transmission of uplink data by the UE without using scheduling assignment information sent by the base station. |

The term "non-scheduled transmission" appears in all of the asserted claims of the '087 Patent.   Exemplary claim 1 is reproduced below.

> 1.    A method for performing **non-scheduled transmission** in a user equipment (UE) of a mobile communication system for supporting an enhanced uplink dedicated channel (E-DCH), comprising the steps of:
>
> receiving non-scheduled transmission information indicating k transmission time intervals (TTIs) for transmitting non-scheduled data via the E-DCH, wherein **non-scheduled transmissions** can be performed during the k TTIs within a period having N TTIs; and
>
> transmitting data on at least one TTI of the k TTIs within the period;
>
> wherein the parameter k is an integer greater than 0 and less than or equal to a positive integer N.

Ex. A, '087 Patent at claim 1 (emphasis added).   The term "non-scheduled transmission" does not need to be construed.   It is used throughout the patent with a clear meaning, consistently referring to the transmission of data using non-scheduled transmission information indicating possible TTIs.  *See e.g., id.* at 6:60-64, claim 1.   Because this definition is already part of the claim, no construction is necessary.  *U.S. Surgical*, 103 F.3d at 1568 (claim construction is only necessary if the claims themselves do not define a term because claim construction "is not an obligatory exercise in redundancy").

1

### 1.     Apple's Construction Improperly Adds a Negative Limitation

Apple's proposed construction contains the negative limitation: "without using scheduling assignment information sent by the base station."   This negative limitation is inconsistent with the specification and the claims, and the prosecution history is silent on this issue.   There is no justification for limiting the claims in this manner.

Courts should "interpret claims 'in view of the specification' without unnecessarily importing limitations from the specification into the claims."   *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1369 (Fed. Cir. 2003).   This admonition against importing limitations should apply even more so when a party attempts to import a negative limitation as Apple seeks to do here.   Indeed, as delineated by the Federal Circuit, the bar for imposing a negative limitation is high and discouraged unless there is a "clear and unmistakable disclaimer."   *See Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1322-23 (Fed. Cir. 2003).

No such disclaimer exists in this case.   Apple's relies on the first sentence of the following passage for its construction:

> The UE **enables** non-scheduled transmission (referred to as non-scheduled transmission) for transmitting uplink data through the E-DCH **without using scheduling assignment information**.   The non-scheduled transmission can quickly transmit E-DCH data by **omitting a series of processes** for sending scheduling information from the UE to the Node B and receiving scheduling assignment information from the Node B.   The system limits a data rate possible for the non-scheduled transmission to within a relative low level, thereby maintaining a system performance enhancement through the Node B controlled scheduling and **reducing a delay time due to scheduling**.

Ex. A, '087 Patent at 3:23-34 (emphasis added).   This sentence, however, does not provide any basis for importing Apple's negative limitation into the claim.   This sentence does not characterize the invention as forbidding the use of SAI, or distinguish the prior art on the basis that the invention never uses the SAI.   Instead, this sentence makes the point that the non-scheduled transmissions "enable" or allow the UE to omit a series of processes so that it does not have to use the SAI every time it sends data.   *Id.*

The patent never says the UE *cannot* use the SAI, or any part thereof, for non-scheduled transmissions.   *Id.* at 6:49-59.   In fact, the patent says the opposite.   The

specification and claims state the UE may use the SAI, such as the data rate information, to perform non-scheduled transmissions.   *See id.* at 2:54-61, 11:44-65, claims 6, 14. According to multiple dependent claims, the UE is required to transmit data during a non-scheduled transmission within the "data rate allowed."   *See id.* at claims 6 and 14; *see also id.* at 11:44-65 (explaining that the UE uses more than just the non-scheduled transmission information, such as data rate information, to perform non-scheduled transmissions).   As described above, the SAI contains, among other things, information about the "allowed data rate."   *Id.* at 2:54-61.   Therefore, the UE may use at least part of the SAI to send non-scheduled transmissions.   *Id.*   Apple's construction is incorrect as it defines non-scheduled information as precluding any use of the SAI.

Apple's proposed construction attempts to espouse what a non-scheduled transmission is *not*.   Instead, the proper construction should explain what a non-scheduled transmission *is*.   *Omega*, 334 F.3d at 1322.   The patent and claims make it clear that a non-scheduled transmission is a transmission that uses non-scheduled transmission information indicating possible TTIs (*i.e.,* the possible transmissions according to, for example, a bitmap).   *E.g.*, Ex. A, '087 Patent at 6:60-64, claim 1.   While the invention alleviates the need for SAI, the invention does not *require* the elimination of the SAI altogether.   *Id.* at 6:49-59.   In fact, the '087 Patent teaches the opposite: the SAI comprises data rate information used during non-scheduled mode.   *Id.* at 2:54-61, 11:44-65, claims 6, 14.   Accordingly, Apple's negative limitation should be rejected.

### 2.   "Non-Scheduled Transmission" Does Not Need Construction

As explained above, "non-scheduled transmission" does not need construction, because the claims themselves define this term as a transmission using non-scheduled transmission information indicating possible TTIs.   Examining representative claim 1 below, the claim already specifies that a non-scheduled transmission is performed using non-scheduled transmission information (see blue highlighting) and that the non-scheduled transmission information indicates possible TTIs (see green highlighting).   The claim

continues to specify that a non-scheduled transmission can be performed during the possible TTIs (see additional green highlighting).   This is all that is required for this term, and it does not require construction.

> receiving **non-scheduled transmission information** indicating **k transmission time intervals (TTIs)** for transmitting non-scheduled data via the E-DCH, wherein non-scheduled transmissions **can be performed during the k TTIs within a period having N TTIs**; …

Ex. A, '087 Patent at claim 1.   As noted above, if the Court decides otherwise, it should define "non-scheduled transmission" to mean the transmission of data using non-scheduled transmission information to indicate possible TTIs—the same meaning this phrase is given in the claims themselves.

**C.    N**

| Samsung's Proposed Construction | Apple's Proposed Construction |
|---|---|
| No construction necessary. | A non-scheduled transmission parameter, expressed in units of TTIs and denoting the total number of TTIs in a non-scheduled transmission period, that is determined at the base station and transferred to the User Equipment UE [sic] |

The term "N" appears in most of the asserted claims of the '087 Patent.   Exemplary claims 1 and 2 are reproduced below.

> 1.    A method for performing non-scheduled transmission in a user equipment (UE) of a mobile communication system for supporting an enhanced uplink dedicated channel (E-DCH), comprising the steps of:
>
> receiving non-scheduled transmission information indicating k transmission time intervals (TTIs) for transmitting non-scheduled data via the E-DCH, wherein non-scheduled transmissions can be performed during the k TTIs within a period having **N TTIs**; and
>
> transmitting data on at least one TTI of the k TTIs within the period;
>
> wherein the parameter k is an integer greater than 0 and less than or equal to a **positive integer N**.

2.    The method of claim 1, wherein the non-scheduled transmission information is configured by a bit map of **N bits** indicating the k TTIs using specific bit values.

Ex. A, '087 Patent at claims 1 and 2.   The term "N" does not need to be construed.   This is an issue of algebra—not claim construction.   The term is not a technical term of art, and it is readily understood to be a positive integer.   This is how the drafters themselves defined "N" during prosecution.   *Id.* at 15:45-46.   Because this definition is already part of the claim, no construction is necessary.   *U.S. Surgical*, 103 F.3d at 1568.

### 1.    "N" Should Not Be Construed to Mean a Parameter That Is "Expressed in Units of TTIs"

When a term, such as N, is clearly defined by the claim language, a construction that deviates from that claim language would be improper.   *See Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves.").

*First*, starting with exemplary claim 1, the claim itself defines N to be a positive integer. This is the only definition that is consistent with the remainder of claim 1 and the dependent claims, such as claim 2.   *See Digital-Vending Services Intern., LLC v. University of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) (a claim term "is presumed to have the same meaning throughout all of the claims in the absence of any reason to believe otherwise"); *see also Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995).   Apple argues that N has to be "expressed in units of TTIs," however, this construction cannot be correct when claim 1 recites "N TTIs" and claim 2 recites "N bits."   If N has to be "expressed in units of TTIs," it would be redundant to refer to "N TTIs" in claim 1.   Substituting Apple's construction for the term "N" in claim 1 would result in "<u>TTIs</u> TTIs."   Moreover, it would be nonsensical to refer to "N bits" in claim 2 as units of TTIs.   Substituting Apple's construction for the term "N" in claim 2 would be the same as saying "<u>TTIs</u> bits."   The only definition for N that is consistent with "N TTIs" in claim 1 and "N bits" in claim 2 is "a positive integer," as defined in claim 1.

***Second***, ignoring the unambiguous claim language, Apple relies entirely on the first part of the following passage from the specification.

> An non-scheduled transmission period is denoted by N, and non-scheduled transmission can be performed the predetermined number of times k within the non-scheduled transmission period N.   **The parameters N and k are expressed in units of TTIs serving as units of E-DCH data transmission**.   That is, the non-scheduled transmission can be performed during k TTIs and **N TTIs** and an effective data rate can be varied, such that the system performance is optimized.

'087 Patent at 6:60-67 (emphasis added).   This passage does not support Apple's construction. This passage explains that N can be used to describe the period and indicate the number of TTIs in the period.   In the very next sentence, N is used to refer to "N TTIs."   When this passage is read in its entirety, it is proof that N can refer to the number of TTIs, but the letter N does not necessarily mean TTIs.   *Id.*   Otherwise, it would be redundant to say "N TTIs."   This point is reinforced later in the specification when N is used to indicate the number of bits in the bit map. *Id.* at 13:13-14.   If the term N has to be expressed in TTIs, it would not be used to describe the bits in the bit map.   Therefore, there is no reason to construe "N" to mean "a parameter expressed in TTIs" when such a construction would be at odds with the specification and the claims.

***Third***, requiring N to be a parameter in all embodiments would leave many of the preferred embodiments inoperable.   Apple relies steps 401 and 403 in Figure 4, which read:

> [401] Determine effective Data Rate, Autonomous Transmission Period N, and Number of Autonomous Transmissions k … [403] Transmit Autonomous Transmission Parameters

Apple's construction ignores the following passage, which describes a preferred embodiment where the base station transfers a bit map of N bits to the User Equipment:

> In step 403, the RNC sends non-scheduled transmission parameters indicating the determined N and k values and the possible non-scheduled transmission time intervals set on the basis of the N and k values to the Node B and the UEs through signaling.   **The RNC can give notification of information to be used to determine the possible non-scheduled transmission time intervals or can directly give notification of the set possible non-scheduled transmission time intervals using a bit map**.

Ex. A, '087 Patent at 8:26-34 (emphasis added); *see also id.* at 13:6-19 (setting the number of bits in a bit map to "N").   While the '087 Patent allows N to be a transmission parameter in some embodiments, *id.* at 6:63-64, it is not a parameter in the preferred embodiment that uses a bit map,

*id.* at 8:26-34.   Additionally, the '087 Patent specifies that the "non-scheduled transmission parameters" can be different from N—they can merely "indicat[e]" or indirectly disclose N.   *Id.*

**Fourth**, Apple's construction improperly requires that the base station transfer N to the UE.   Such a construction is unsupported by the '087 Patent.   In direct contradiction to Apple's construction, the '087 Patent teaches that a bit map, not N, is sent to the UE.   *Id.* at 8:26-34. Apple's construction eliminates this preferred embodiment.   It is well established that "a claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct."   *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007).

### 2.    "N" Does Not Need Construction

When, as here, the term is a straightforward term with a readily understood meaning, the term does not need construction.   The term "N" is routinely used in numerous contexts to mean a positive integer.   *See, e.g.*, Ex. B, STAN GIBILSCO, THE ILLUSTRATED DICTIONARY OF ELECTRONICS 457 (7th ed. 1997) (defining "N" to mean a "symbol for Number" and "Symbol for natural set of counting numbers (0, 1, 2, 3, …); Ex. C, BRYAN PFAFFENBERGER, WEBSTER'S NEW WORLD DICTIONARY OF COMPUTER TERMS 248 (10th ed. 2003) (defining "N" to mean a "common mathematical variable for expressing an indeterminate number of items").   Consistent with this ordinary usage, the claims expressly define "N" to mean a "positive integer."   The term "N" needs no construction, and if the Court concludes otherwise, any construction should simply reflect the definition the claims already give to this term.

## IV.   U.S. PATENT NO. 7,577,757

### A.    Introduction to the '757 Patent

The '757 Patent is directed to systems for synchronizing audio, video, and photographic content among multiple devices in a multimedia environment.   *See* Ex. D, '757 Patent, Abstract. As a result of the claimed systems that were invented more than 10 years ago, it is now commonplace to have the content of its multimedia collection "available in multiple locations or zones that the consumer may go." *Id.* at 3:2-7.

The '757 Patent describes "synchronizing a multiplicity of devices in a multimedia environment." *Id.* at 4:17-19.  This inventive system is comprised of "at least one central storage and interface device" and "at least one zone." *Id.* at claim 1.  The '757 Patent states that the purpose of the "zones" is to allow consumers to enjoy their audio, video, or photographic content anywhere because "the output can be played in multiple zones or rooms in a networked building or in multiple locations traveling through a wide area network such as the Internet." *Id.* at 10:3-5.

### B.     Zone Specific Storage and Interface Device

| Samsung's Proposed Construction | Apple's Proposed Construction |
|---|---|
| a storage and interface device associated with a particular viewing and/or listening zone | a device fixed in a room, or similar bounded location, for multimedia playback |

The term "zone specific storage and interface device" appears in independent claim 1:

1.   A system for synchronizing devices in a multimedia environmental, the system comprising:

at least one central storage and interface device, wherein audio, video, or photographic data, including content information and content management information, relating to at least one user, are stored in digital form; and

at least one zone, each zone having at least one **zone specific storage and interface device** capable of storing or interfacing with information stored in the central storage and interface device, wherein audio, video, or photographic information, relating to at least one user, contained within the zone specific storage and interface device and the central storage and interface device, are updated in relation to the zone specific storage and interface devices and the central storage and interface device, whereby the at least one user can be situated in any one of the zones and access the audio, video, or photographic information related to the at least one user.

Ex. D, '757 patent at claim 1 (emphasis added).  The dispute over this term boils down to one primary point of contention: whether or not the meaning of "zone specific storage and interface device" should be limited, as Apple contends, to a device that is "fixed" within a "room, or similar bounded location."   As explained below, Apple's proposal improperly narrows this claim's scope in contravention of the basic tenets of claim construction and should be rejected.  The Court should adopt Samsung's construction, which is supported by both the intrinsic and extrinsic evidence.

C.      **The Intrinsic Evidence Supports Samsung's Construction**

The specification broadly describes a "zone" as an area where a consumer may have "substantially exclusive or reclusive enjoyment" of its multimedia content wherever "the consumer may go." *Id.* at 3:6-7 and 9:49.   Accordingly, "zone specific storage and interface devices" allow the consumer to "be situated at anyone [sic] of the zones and access substantially identical audio, video, and photographic information."   *Id.* at 4:32-34.   Each "zone specific storage and interface device", therefore, provides a viewing or listening zone for the consumer to access and enjoy the stored multimedia content.   *See, e.g., ASM America, Inc. v. Genus, Inc.,* 401 F.3d 1340, 1343 (Fed. Cir. 2005) (relying on the purpose of the invention to construe term).

The specification is replete with examples of portable or mobile multimedia devices that may serve as a "zone specific storage and interface device".   Figure 1 depicts a preferred embodiment of the claimed systems:



FIG. 1

The specification describes that this embodiment allows for the delivery of multimedia content from a central storage and interface device to a portable multimedia player 108:

> With reference to FIG. 1, a digital multimedia device 104 is connected to network 102 along with a multimedia database 106. In addition, a *portable multimedia player 108*, a personal computer 110, and "master" digital multimedia player are connected to network 102…The network 102 is capable of delivering data files between the network devices, such as multimedia database 106, personal computer 110, *portable and fixed digital multimedia devices* 104, 112.

Ex. D, '757 Patent at 5:9-13, 5:24-27 (emphasis added).

Similarly, the specification provides further embodiments that distribute multimedia content to a portable or mobile device :

- "The content source database is further capable of communication with other network devices to deliver the data stored in the database to a digital player device, personal computer or microprocessor, or *portable personal digital player*" (*Id.* at 5:55-59 (emphasis added));

- Describing that a commercial embodiment of a central storage and interface device, the Audi ReQuest Pro, can transfer music to other devices "such as *digital portable players*" (*Id.* at 8:45-61 (emphasis added));

- "[C]ar and *other mobile devices* can also synchronize over wired or wireless connections" (*Id.* at 9:36-38 (emphasis added)); and

- "[A]n online file server which exists either through a proprietary system or a public service, can be used to synchronize their music collections from their Pro, so that music can be streamed to their web browser, *wireless cell phone*, or other devices, anywhere on the Internet.   (*Id.* at 9:38-43 (emphasis added)).

Moreover, each sentence of the specification that uses the term "fixed" also includes either the terms "mobile" or "portable", which confirms that both types of devices are covered by the claimed inventions.   *See id.* at 3:50 ("mobile or fixed"); 5:26 ("portable and fixed"); 10:16 (mobile or fixed").   Apple's construction, however, would limit this term to a device that is at a fixed location even though the specification clearly states that it also can be mobile.   A construction, such as Apple's, "that excludes a preferred embodiment is rarely, if ever, correct." *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005).

It is also improper to limit the scope of a term in the absence of a clear and unmistakable waiver.   *See Dealertrack v. Huber*, 674 F.3d 1315, 1322 (Fed. Cir. 2012) ("To specifically exclude the Internet would thus require a waiver of claim scope that is both so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer.").   Here, there was no disavowal of claim scope in the specification or the prosecution history.   Therefore, the Court should reject Apple's proposal, and adopt Samsung's construction that is both consistent with the intrinsic evidence and the law.

1    **D.      The Extrinsic Evidence Supports Samsung's Construction**

2        Samsung's construction of ""zone specific storage and interface device" is also consistent

3    with the use of the term "zone" in the audio/video industry.   Those of ordinary skill in the art at

4    the time of the inventions understood that a "zone" is an area where multimedia content from a

5    particular source may be viewed or heard.   *See* Ex. E, John Sciacca, *Sound All Around*, Sound &

6    Vision, July/August 2001 at 95.   Bose Corporation, a company that specializes in audio

7    equipment, expressly described a "zone" as a listening area that may include open spaces (such as

8    patios, convertibles or boat decks) that are not bounded locations.   *See* Ex. F, Bose Corporation,

9    *The Bose Lifestyle 11 Music System Overview,* (Rev. 1, 1994) at 5 ("Each listening area, whether a

10   room or a group of rooms (including outdoor areas) is referred to as a zone.").

11       Even the extrinsic evidence identified by Apple demonstrates that its proposal to equate a

12   "zone specific storage and interface device" with a "device fixed in a room" is flawed.   This

13   evidence supports the notion that a "zone specific" device is the source of audio or visual output to

14   a particular area.   For example, it teaches that a multizone system requires a different audio

15   source (*i.e.*, zone specific storage and interface device) for each zone.   *See* Ex. G, DANNY BRIERE

16   AND PAT HURLEY, HOME THEATER FOR DUMMIES (2003) at 126-27 ("the key feature" of a

17   multizone system is not merely being able to play music in a different room, but that a "different

18   audio source" can be heard in each zone); *see also id.* at 28 ("A multizone system allows you to

19   access different sources and send them to independent outputs independently.").   Apple's

20   proposed construction of "zone specific" device that focuses solely on the location of the physical

21   device rather than the area of its output is contrary to the understanding of one skilled in the art

22   and should be rejected.

23   **V.      U.S. PATENT NO. 5,579,239**

24       **A.      Introduction to the '239 Patent**

25       The '239 patent describes an invention that saw the great potential for wireless

26   communications.   In 1994, when the '239 patent was filed, wireless communication was new.

27   The Internet itself was in its earliest stages, unknown to many, and very few individuals had

28

**SAMSUNG'S OPENING CLAIM CONSTRUCTION BRIEF**

mobile phones.   The '239 inventors were involved in video broadcasts, and recognized the potential in marrying video with the emerging wireless and mobile technologies.   The invention provides both a remote and host unit.   The remote unit can be brought to a location away from the host unit, and is used to capture video.   After the video is converted into digital format and compressed, it is transmitted to the host unit.   The host unit receives the signal, and prepares the signal for playback by storing and decompressing the video.   Claim 1 of the '239 patent captures this novel technology.

The two terms at issue for the '239 patent are means plus function terms.   The first term is "means for capturing, digitizing, and compressing at least one composite signal."   The second term at issue is "means for transmitting the composite signal."   These terms are found in claim 1, reproduced below:

> An apparatus for transmission of data, comprising:
> a mobile remote unit including:
>> a.) **means for capturing, digitizing, and compressing at least one composite signal**;
>> b.) means for storing said composite signal;
>> c.) **means for transmitting said composite signal**;
> a host unit including:
>> a.) means for receiving at least one composite signal transmitted by the remote unit;
> a playback unit including:
>> a.) means for exchanging data with said host unit;
>> b.) means for storing the composite signal received by the host unit;
>> c.) means for decompressing said composite signal.

Ex. H, '757 Patent at claim 1.   It is axiomatic that the structure for a means plus function claim limitation must be "clearly linked" to the claimed function. *B. Braun Med.., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997).   Apple and Samsung agree on the functions for both terms. But in both cases, Samsung's proposed construction captures the full and accurate structure disclosed in the '239 specification.   Apple, however, attempts to improperly limit both constructions by importing structures that exceed those minimally necessary to actually perform the claimed function. *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1257-58 (Fed. Cir. 1999) (holding that a district court erred by incorporating "structure from the written

description beyond that necessary to perform the claimed function").

**B.** **Means for Capturing, Digitizing, and Compressing at Least One Composite Signal**

| Samsung's Proposed Construction[2] | Apple's Proposed Construction |
|---|---|
| Agreed function: capturing, digitizing, and compressing at least one composite signal. Corresponding structure: A video and/or audio capture module, and equivalents. | Agreed function: capturing, digitizing, and compressing at least one composite signal. Corresponding structure: An audio card, a video card having a video capture module, and a video capture software package, such as Video for Windows software, using the software sequence set forth at 2:63-3:3, 4:39-63, 5:4-6:23, and 6:62-7:14. |

This term appears in independent claim 1, and dependent claims 5 and 6. The parties agree that the function should be "capturing, digitizing and compressing at least one composite signal." The parties disagree on the corresponding structure.

**1.     The Specification Supports Samsung's Structure**

Samsung's proposed structure is "a video and/or audio capture module, and equivalents." This structure is disclosed in conjunction with the preferred embodiment in column 4. '239 Patent at 4:40-48 ("The video signal input into the remote unit is received by a video card having a *capture module* therein. . . . A computer software program . . . operates with the video card and *capture module* to capture, digitize, and compress the video signal into a data file."); *See also* 2:66-3:1.

The claims further support Samsung's construction. Dependent claims 5 and 6 depend from claim 1 and indicate that the structure of the means plus function limitation is a "video capture" or "audio capture **device**." Because claims 5 and 6 depend from claim 1, the structure for "means for capturing digitizing, and compressing the composite signal" must encompass a video and/or audio capture device. Additionally, independent claim 9, which does not include

---

[2]     Samsung has simplified the construction proposed in the parties Joint Claim Construction Statement consistent with the language used in the '239 patent specification.

means plus function language, includes the following limitation: "a video capture module to capture, digitize and, compress said composite signal into a data file." *See also* claims 15 and 20.

The Federal Circuit and district courts have repeatedly found the term "module" to be sufficient corresponding structure for means-plus-function limitations.  *See, e.g.*, *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340-41 (Fed Cir. 2006) (affirming claim construction that found "computer module" to be the corresponding structure for "means for a customer to visually review said sales information"); *see also Visto Corp. v. Good Tech, Inc.,* No. 2:06-CV-039, 2008 U.S. Dist. LEXIS 3244, at *32-34, 37 (E.D. Tex. Jan. 16, 2008) (finding "general synchronization module" recites sufficient structure for "first[/second] means for generating first[/second] examination results from first[/second] version information" and "means for generating;" "synchronization start module" recites sufficient structure for "means for initiating;" and "communications module" recites sufficient structure for "means for downloading data"), *constructions adopted by Visto Corp. v. Research in Motion, Ltd.*, 623 F. Supp. 2d 756 (E.D. Tex. Apr. 30, 2008).   Additionally, courts have found that the term "module" in a claim limitation denotes sufficient structure to avoid implicating 35 U.S.C. § 112, ¶ 6.  *See, e.g.*, *High Point Sarl v. Sprint Nextel Corp.*, No. 09-02269-CM, 2012 U.S. Dist. LEXIS 108485, at *14 (D. Kan. Aug. 3, 2012) (holding that "module" has a "well-known meaning to those of skill in the art" and recites sufficient structure to avoid construction as a means-plus-function limitation); *see also Stanacard, LLC v. Rebtel Networks, AB*, 680 F. Supp. 2d 483, 498-99 (S.D.N.Y. 2010) (holding that "originating telephone number module," "telephone number detection module," and "call connection module" recite sufficient structure to avoid construction as means-plus-function limitations).   Samsung's proposed corresponding structure, "a video and/or audio capture module," likewise provides sufficient structure.

### 2.    Apple's Construction Improperly Limits the Structure to include *Both* Video and Audio *Cards*

Apple's construction is wrong because it requires a video *and* audio component and requires both of these components to be in a particular form factor, video and audio *cards*.   Both of Apple's proposed restrictions are contradicted by the intrinsic evidence.

First, the specification makes clear that the structure for "capturing, digitizing, and compressing" covers video *and/or* audio as opposed to requiring *both* video and audio.  For example, the specification describes the situation where a user may choose to transmit without audio in situations where there is not a lot of bandwidth. Ex. H, '239 patent at 5:39-60 ("The user selects whether the video signal will be captured either with or without audio.").

Dependent claims 4 and 5 also confirm that the corresponding structure does not require both video and audio components.   Dependent claim 4 makes it clear that the signal can be video and/or audio. '239 Patent at 13:23-25 ("An apparatus according to claim 3, further including means for splitting and organizing the digitized, compressed *audio and/or video signal* prior to transmission.") (emphasis added).   Moreover, Dependent claim 5 claims only a video component, where dependent claim 6 (dependent on claim 5) claims both a video and audio component. *Id.* at 13:25-32.   To require both to be read into claim 1 would render claims 5 and 6 superfluous. *Retractable Tech., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1312 (Fed. Cir. 2011).

Apple's construction also improperly limits the structure to video and audio "cards."   The specification makes clear that it is the *capture module* that performs the claimed functions of capturing, compressing, and digitizing. *See id.* at 4:40-48.   The video card is the preferred form factor for incorporating the capture module, and may perform other, unclaimed functions.

Apple's construction also contradicts the doctrine of claim differentiation. *Retractable Tech., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1312 (Fed. Cir. 2011).   Claims 5 and 6, both of which depend on claim 1, include examples of the structure that are *broader* than Apple's construction:

> 5.   An apparatus according to claim 1, wherein the means for capturing, digitizing, and compressing said composite signal includes a ***video capture device*** installed in said remote unit to capture said composite signal in real time.

> 6.   An apparatus according to claim 5 wherein the means for capturing, compressing and digitizing said Composite signal includes an ***audio capture device*** installed in said remote unit.

Ex. H, '239 Patent at 13:25-32.  The doctrine of claim differentiation requires that the structure identified for the "means for capturing, digitizing, and compressing" must be necessarily broader

than the structure identified in these claims.   Apple's "card" structure is a subset of a "video capture" and "audio capture" *device*, and cannot be correct.

### 3.   Apple Improperly Incorporates A Specific Software Algorithm

Apple's construction improperly assumes that the corresponding structure is a general purpose processor limited to a specific software algorithm disclosed in the specification.   But the structure for "means for capturing, digitizing, and compressing" is not a general purpose processor. Rather it is a structure that includes a specialized processor element referred to as the "capture module."   This capture module is a part of the "portable personal computer."   Therefore, it is not a general purpose processor and should not be limited to the software algorithm cited by Apple in its construction.   *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) (requiring an algorithm when the disclosed structure was a general purpose processor).   Unlike a general purpose processor, a specialized processor such as the capture module already has a known and specific structure.   *cf. Visto Corp. v. Research in Motion, Ltd.*, 623 F. Supp. 2d 756 (E.D. Tex. Apr. 30, 2008).   Indeed, whether the Court adopts Samsung's or Apple's proposed structure, it should be clear that both Samsung's "video and/or audio capture module" and Apple's "audio card, a video card having a video capture module" include specialized processor elements for performing the recited function.   Accordingly, there is no basis to limit such specialized processor elements to the specific algorithm disclosed in the specification.

### 4.   Apple Incorporates Software that Performs Unclaimed Functions

Even if this term was limited to specific software algorithms, which it is not, Apple identifies algorithms that perform unclaimed functions.   It is legal error to incorporate unclaimed functional limitations from the specification into the claims.   *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001); *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1257-58 (Fed. Cir. 1999).   Apple's proposed algorithmic structure includes the following unclaimed functions: using BIT-MAP technology to maximize transmission speed ('239 Patent at 4:58-61); selecting specific unclaimed parameters and configuration options (*Id*. at 5:4-7, 34-38, 6:62-7:14.); loading a "video palette file" and extracting a color palette (*Id*. at 5:10-

16.); painting images on a monitor (*Id*. at 5:17-20.); storing a displaying files (*Id*. at 5:21-33.); user selection of different unclaimed criteria (*Id*. at 5:39-6:8.); and exiting the software (*Id*. at 6:19-23).

Moreover, Apple's construction is overbroad because it captures function that is claimed in a different part of the claim.   For example, Apple's proposed structure includes examples of ways to store the captured file. Ex. H, '239 Patent 4:50-57, 6:14-18.   The function of storing is part of the element "means for storing said composite signal," a claim limitation that is not at issue here.

### C.   Means for Transmitting the Composite Signal

| Samsung's Proposed Construction[3] | Apple's Proposed Construction |
|---|---|
| Agreed function: transmitting the composite signal. | Agreed function: transmitting the composite signal. |
| Corresponding structure: One or more cellular telephone transmitters, radio frequency transmitters, telemetric frequency transmitters and/or standard telephone line transmitters, and equivalents. | Corresponding structure: One or more modems connected to a corresponding number of cellular telephones or telephone lines and the run-time module of a communications software package, such as ProComm Plus for Windows software, using the software sequence set forth at 3:8-14, 6:36-61, 7:24-33, 7:60-10:2. |

This term appears as element (c) in independent claim 1 reproduced above and dependent claim 7.   As with the first disputed '239 means plus function claim term, the parties agree that the function for this term is "transmitting the composite signal."   But just like the previous term, Apple's proposed construction again attempts to import structures that exceed those minimally necessary to actually perform the claimed function. *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1257-58 (Fed. Cir. 1999).

### 1.   The Specification Supports Samsung's Proposed Structure

Samsung's proposed structure is "one or more cellular telephone transmitters, radio frequency transmitters, telemetric frequency transmitters and/or standard telephone line

---

[3]   Samsung has simplified the construction proposed in the parties Joint Claim Construction Statement consistent with the language used in the '239 patent specification.

transmitters, and equivalents."   The specification discloses each of these different transmitters as the "means for transmitting":

> Files may be *transmitted using telephone lines, cellular, radio and other telemetric frequencies.*   In the preferred embodiment, cellular telephones are integrated with the remote unit to allow transmission of files from areas which are inaccessible to standard telephone lines.
>
> . . . In order to accomplish this, the cellular telephones in the remote are replaced with *radio transmitters.*   Corresponding radio receivers are then installed in the host unit to receive the signal transmitted from the remote.   Each *transmitter* operates using a different frequency so as to keep each signal segregated.

Ex. H, '239 Patent at 9:25-45 (emphasis added.)   As explained in this passage, it is the various communication *transmitters* that transmit the composite signal.   The file history also explains that this is the proper construction.   In response to an office action, the Applicant explained that "telemetric frequencies," as well as "cellular," "radio," and "telephone" lines are included in the invention.   Ex. I, Feb. 2, 1996 OA response at 7.   This structure is further confirmed by the claims.   Dependent claim 3 reads:

> An apparatus according to claim 1 wherein the composite signal is transmitted over telephone lines, cellular, *radio, or other telemetric frequencies.*

Ex. H, '239 Patent at 13:20-22 (*emphasis added*).

In contrast, because Apple's proposed structure excludes the radio or other telemetric frequencies from the independent claim, Apple's structure renders a part of claim 3 inoperable because independent claim 1 *cannot* be radio or other telemetric frequencies under Apple's construction.   *See InterDigital Communications, LLC v. Int'l Trade Comm'n*, 690 F.3d 1318, 1324-25 (Fed. Cir. 2012) (finding that the presumption of claim differentiation was "especially strong" where a party was urging that the limitation in a dependent claim should be read into an independent claim) (citing *SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed.Cir.2003)).

### 2.     The "Modem" in Apple's Construction is Not Part of the Structure for "Transmitting the Composite Signal"

Apple's construction is also overly narrow because it incorporates a "modem," which is not part of the structure for "transmitting the composite signal."   The modem is not for transmitting the composite signal, but rather to "interfac[e] each communication port." Ex. H, '239

Patent at 8:4-5.   The modem performs such unclaimed functions as "execut[ing] the dialing directory file."   *Id.*   But it is the cellular telephone transmitter, telephone line transmitter, radio transmitter, or transmitters that transmit telemetric frequencies that are clearly linked to the function "transmitting the composite signal."   *Id.* at 9:25-45.

Moreover, the doctrine of claim differentiation requires that the structure be broader than a modem.   Claim 7 states that the means for transmitting include "at least one interface…." Ex. H, '239 Patent at 13:32-36.   An interface is necessarily broader than a modem as a modem is but one example of an interface, as indicated by the specification.   *See id.* at 4:25-27 ("The remote unit also has up to four computer interfaces *such as* modems…" (emphasis added)).

### 3.  The "Means for Transmitting" is not a General Purpose Processor that Requires an Algorithm

The "means for transmitting a composite signal" is not a general purpose processor and therefore is not limited to a specific algorithm in the specification.   *Aristocrat Techs.*, 521 F.3d at 1333.   The specification makes clear that it is the transmitter that transmits the composite structure, and it does not even include any processor element.   Ex. H, '239 Patent at 9:25-45. Accordingly, there is no basis to incorporate an algorithm as part of the corresponding structure.

### 4.  Apple's Proposed Algorithm Contains Significant Unclaimed Functions

Even if the structure were limited to an algorighm, the algorithms Apple incorporates into its construction are not involved with "transmitting the composite signal," and cannot be correct. For example, the software package Apple identifies is for a different, unclaimed function: "transferring." *See id.* at 6:36-39; 8:45 ("Transfer Software Sequence B.")   As explained below, the process of "transferring" includes many different functions that are not claimed, and certainly not necessary to the "transmitting" function.   Apple's attempt to incorporate these limitations into the structure for "means for transmitting the composite signal" is contrary to established Federal Circuit law. *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001).

Apple cites approximately three columns of software algorithm disclosure that is completely unrelated to the function of "transmitting the composite signal."   As it does with the previous term, Apple incorporates portions of algorithms that are either (1) not related to the

claimed function; or (2) identified in another claim limitation.   Among that algorithm is: removing digitized data from a hard drive (Ex. H, '239 Patent at 3:8-14); breaking, splitting, and organizing the data file (*id*.; 8:13-60; 9:66-10:2); sending it to a computer interface (*id*. at 3:9-10); user interactions unnecessary to the act of "transmitting," such as choosing file names, and selecting the number of phones to use (*id*. at 6:36-61); configuring a file (*id*. at 6:40-43); choosing a name for a file and storing the file (*id*. at 6:44-49, 7:60-61) ("storing" is a function identified in "means for storing said composite signal"); selecting call letters for broadcast over a television station (*id*. at 7:24-33); painting dialog directory screens (*id*. at 7:60-8:22); and executing a dialing directory and selecting unclaimed parameters (*id*. at 8:61-9:13).

In addition to not being part of the claims, many of these functions are clearly and definitively *separate* from the means for transmitting the composite signal based on the doctrine of claim differentiation.   *Phillips*, 415 F.3d at 1315 ("the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.")   For example, dependent claim 4 reads: "[a]n apparatus according to claim 3, *further including means for splitting and organizing the digitized, compressed audio and/or video signal prior to transmission*." '239 Patent at 13:22-24.   This dependent claim makes clear that (1) the means for splitting and organizing is *not part of* the means for transmitting; and (2) the means for splitting and organizing occurs *before* the transmitting occurs.   To incorporate structure tied to this dependent claim into the independent claim is clear error.   *B.Braun Med.*, 124 F.3d at 1424.   Apple's attempts to improperly narrow the construction to cover a specific embodiment should be rejected.

## VI.   CONCLUSION

For the foregoing reasons, Samsung respectfully requests that the Court adopt its proposed constructions.

**SAMSUNG'S OPENING CLAIM CONSTRUCTION BRIEF**

1    DATED: December 21, 2012          QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP
2

3
                                        By */s/ Victoria F. Maroulis*
4                                          Charles K. Verhoeven
                                           Kevin P.B. Johnson
5                                          Victoria F. Maroulis
                                           William C. Price
6                                          Attorneys for SAMSUNG ELECTRONICS
                                           CO., LTD., SAMSUNG ELECTRONICS
7                                          AMERICA, INC., and SAMSUNG
                                           TELECOMMUNICATIONS AMERICA, LLC
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28