# Exhibit B

JOSH A.  KREVITT (CA SBN 208552)
jkrevitt@gibsondunn.com
H. MARK LYON (CA SBN 162061)
mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, A  94304-1211
Telephone:  (650) 849-5300
Facsimile:  (650) 849-5333

MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

MARK D. SELWYN (CA SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

Attorneys for Plaintiff and
Counterclaim-Defendant Apple Inc.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

APPLE INC., a California corporation,

        Plaintiffs,

      v.

SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,

        Defendants.

SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA,

Case No. 12-CV-00630-LHK

**PLAINTIFF AND COUNTERCLAIM-DEFENDANT APPLE INC.'S AMENDED INVALIDITY CONTENTIONS**

1    LLC, a Delaware limited liability company,

2                  Counterclaim-Plaintiff,

3         v.

4    APPLE INC., a California corporation,

5                  Counterclaim-Defendant.

6

7

8    **PLAINTIFF AND COUNTERCLAIM-DEFENDANT**
     **APPLE INC.'S AMENDED INVALIDITY CONTENTIONS**

9    **I.      INTRODUCTION**

10            Pursuant to Rule 3-3 of the Local Rules of Practice for Patent Cases Before the United

11   States District Court for the Northern District of California ("Patent L.R.") and the Court's

12   Minute Order and Case Management Order [Dkt. No. 160], Plaintiff and Counterclaim-

13   Defendant Apple Inc. ("Apple") hereby serves Amended Invalidity Contentions with respect to

14   the asserted claims of U.S. Patent Nos. 7,756,087 ("the '087 patent"), 7,551,596 ("the '596

15   patent"), 7,672,470 ("the '470 patent"), 7,577,757 ("the '757 patent"), 7,232,058 ("the '058

16   patent"), 6,292,179 ("the '179 patent"), 6,226,449 ("the '449 patent"), and 5,579,239 ("the '239

17   patent") (collectively, the "Patents-In-Suit") identified by Samsung Electronics Co., Ltd.,

18   Samsung Electronics America, Inc. and Samsung Telecommunications America, LLC

19   (collectively, "Samsung") in Samsung's Disclosure of Asserted Claims and Infringement

20   Contentions served on June 15, 2012.

21            Samsung has asserted the following claims against Apple:

22   •      '087 patent:  claims 1-2, 6-10, 14-16, 34-35, 39-40

23   •      '596 patent:  claims 1, 4, 6, 13, 16, 18

24   •      '470 patent:  claims 7-16

25   •      '757 patent:  claims 1-5, 11, 12, 14, 15

- '058 patent:  claims 1, 4, 9, 12, 17

- '179 patent:  claims 1, 3-8, 10-11

- '449 patent:  claims 25 and 27

- '239 patent:  claims 1-7, 15-17

With respect to each asserted claim and based on its investigation to date, Apple hereby: (a) identifies each item of prior art that anticipates each asserted claim or renders it obvious; (b) specifies whether each such item of prior art anticipates each asserted claim or renders it obvious, and, if it renders it obvious, explains why the prior art renders the asserted claim obvious and identifies any combinations of prior art showing obviousness; (c) submits a chart identifying where specifically in each item of prior art each limitation of each asserted claim is found, including, for each limitation that is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function; (d) identifies the grounds of invalidity based on 35 U.S.C. § 101, indefiniteness under 35 U.S.C. § 112(2) or enablement or written description under 35 U.S.C. § 112(1) of any of the asserted claims.

In addition, pursuant to Patent L.R. 3-4, and based on its investigation to date, Apple has produced documents within its possession, custody, and control required to accompany the Amended Invalidity Contentions.  In addition, at a mutually convenient time, Apple will make available the source code in its possession sufficient to show the operation of the accused functionality.

## II.   RESERVATIONS

Consistent with Patent L.R. 3-6, Apple reserves the right to amend these Amended Invalidity Contentions.

The information and documents that Apple produces are provisional and subject to further revision as follows.  Apple expressly reserves the right to amend these disclosures and the accompanying document production should Samsung provide any information that it failed to provide in its Patent L.R. 3-1 and 3-2 disclosures, or should Samsung amend its Patent L.R. 3-1 or 3-2 disclosures in any way.  Further, because discovery (including discovery from third parties) is not complete, Apple reserves the right to revise, amend, and/or supplement the information provided herein, including identifying and relying on additional references, should Apple's further search and analysis yield additional information or references, consistent with the Patent Local Rules and the Federal Rules of Civil Procedure.  Moreover, Apple reserves the right to revise its ultimate contentions concerning the invalidity of the asserted claims, which may change depending upon the Court's construction of the asserted claims, any findings as to the priority or invention date of the asserted claims, and/or positions that Samsung or its expert witness(es) may take concerning claim construction, infringement, and/or invalidity issues.

Prior art not included in this disclosure, whether known or unknown to Apple, may become relevant.  In particular, Apple is currently unaware of the extent, if any, to which Samsung will contend that limitations of the asserted claims are not disclosed in the prior art identified by Apple, or will contend that any of the identified references do not qualify as prior art under Section 102.  The identification of any patents as prior art shall be deemed to include identification of any foreign counterpart patents.  To the extent that such issues arise, Apple reserves the right to identify additional teachings in the same references or in other references that anticipate or would have made the addition of the allegedly missing limitation to the device or method obvious.  In providing these contentions, Apple has relied on Samsung's compliance with Patent Local Rules 3-1 and 3-2.

Apple's claim charts in Exhibits A-1 through H-9 cite to particular teachings and disclosures of the prior art as applied to features of the asserted claims.  However, persons having ordinary skill in the art may view an item of prior art generally in the context of other publications, literature, products, and understanding.  Accordingly, the cited portions are only examples, and Apple reserves the right to rely on uncited portions of the prior art references and on other publications and expert testimony as aids in understanding and interpreting the cited portions, as providing context thereto, and as additional evidence that a claim limitation is known or disclosed.  Citations to figures are inclusive of all discussion of those figures.  Apple further reserves the right to rely on uncited portions of the prior art references, other publications, documents explicitly or implicitly incorporated by references, and testimony to establish bases for combinations of certain cited references that render the asserted claims obvious.  Further, for any combination, Apple reserves the right to rely additionally on information generally known to those skilled in the art and/or common sense.

The references discussed herein and in the claim charts in Exhibits A-1 through H-9, or elsewhere identified, may disclose the elements of the asserted claims explicitly and/or inherently, and/or they may be relied upon to show the state of the art in the relevant timeframe. The suggested obviousness combinations are provided in the alternative to Apple's anticipation contentions and are not to be construed to suggest that any reference included in the combinations is not itself anticipatory.

Apple further reserves the right to assert that the asserted claims are invalid under 35 U.S.C. § 102(f) in the event that Apple obtains evidence that the named inventors of the Patents-In-Suit did not invent (either alone or in conjunction with others) the subject matter recited in the asserted claims.  Should Apple obtain such evidence, it will provide the name of the person(s)

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)

from whom, and the circumstances under which, the invention or any part of it was derived.

Apple further intends to rely on inventor admissions concerning the scope of the asserted claims

or of the prior art relevant to the asserted claims found in, *inter alia*:  the patent prosecution

history and/or reexamination history for the Patents-In-Suit and related patents and/or patent

applications; any deposition testimony of the named inventors of the Patents-In-Suit; and the

papers filed and any evidence submitted by Samsung in conjunction with this litigation or any

related actions.  To the extent any information is identified under Section 102(f), Apple reserves

the right to contend that the patent is invalid for failure to name the correct inventor, and/or to

contend that Samsung lacks standing to bring this litigation with respect to such patents.

Apple further reserves the right to assert that the patents are unenforceable due to

inequitable conduct at least on the grounds that any of the references identified herein were

material and withheld with an intent to deceive the patent office.

Furthermore, nothing stated herein shall be treated as an admission or suggestion that

Apple agrees with Samsung regarding either the scope of any asserted claim or the claim

constructions Samsung advances in its Infringement Contentions or anywhere else.  To the extent

that Apple's Amended Invalidity Contentions reflect constructions of claim limitations consistent

with or suggested by Samsung's Infringement Contentions, no inference is intended nor should

any be drawn that Apple agrees with Samsung's claim constructions.  Nor shall anything in these

Invalidity Contentions be treated as an admission that Apple's accused technology meets any

limitation of any asserted claim.  Apple denies that it infringes any claim of the Patents-In-Suit.

To the extent that any prior art reference identified by Apple contains a claim element that is the

same as or similar to an element in an accused product, based on a claim construction inferred

from Samsung's Infringement Contentions, inclusion of that reference in Apple's original or

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)

Amended Invalidity Contentions shall not be deemed a waiver by Apple of any claim construction or non-infringement position.  Apple expressly reserves the right to contest any claim construction asserted by Samsung and expressly reserves all noninfringement arguments.

Depending on the Court's construction of the asserted claims of the Patents-In-Suit, and/or positions that Samsung or its expert witness(es) may take concerning claim interpretation, infringement, and/or invalidity issues, different ones of the charted prior art references in Exhibits A-1 through H-9, or otherwise identified herein, may be of greater or lesser relevance and different combinations of these references may be implicated.  Given this uncertainty, the charts may reflect alternative applications of the prior art against the asserted claims.  Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term.  Apple also reserves all of its rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description, and/or not enabled.  Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112.  Apple also reserves its right to challenge the patentability of any of the asserted claims under 35 U.S.C. § 101.

III.     IDENTIFICATION OF PRIOR ART PURSUANT TO PATENT L.R. 3-3(a)

A.     The '087 Patent

1.     Prior Art Patent References

The following prior art patent references, including those patent references listed in Exs. A-1 through A-7, anticipate and/or render obvious the asserted claims of the '087 patent.

|    | Patent No. / Application No. | Country of Origin | Date Issued/Published |
|----|------------------------------|-------------------|-----------------------|
| 1. | 5,638,369 (Ayerst)           | US                | June 10, 1997         |
| 2. | 5,905,720 (Lin)              | US                | May 18, 1999          |
| 3. | 5,940,741 (Briancon)         | US                | August 17, 1999       |
| 4. | 6,721,294 (Bahrenburg)       | US                | April 13, 2004        |
| 5. | 6,973,070 (Larghi)           | US                | December 6, 2005      |

| | Patent No. / Application No. | Country of Origin | Date Issued/Published |
|---|---|---|---|
| 6. | 7,321,780 (Love) | US | January 22, 2008 |
| 7. | 7,123,596 (Fukui) | US | October 17, 2006 |
| 8. | 7,382,747 (Hu) | US | June 3, 2008 |
| 9. | 7,804,850 (Sebire) | US | September 28, 2010 |
| 10. | 2002/0191579 (Terry) | US | December 19, 2002 |
| 11. | 2004/0085934 (Balachandran) | US | May 6, 2004 |
| 12. | 2004/0024883 (Hlasney) | US | February 5, 2004 |

2.      Prior Art Publications

The following prior art publications, including those publications listed in Exs. A-1 through A-7, anticipate and/or render obvious the asserted claims of the '087 patent.

| | Title | Date of Publication | Author or Publisher |
|---|---|---|---|
| 1. | 3GPP TDoc R1-030284 | 2003 | 3GPP |
| 2. | 3GPP TDoc R1-030401 | 2003 | 3GPP |
| 3. | 3GPP TDoc R1-040680 | 2004 | 3GPP |
| 4. | 3GPP TDoc R1-040861 | 2004 | 3GPP |
| 5. | 3GPP TDoc R1-041069 | 2004 | 3GPP |
| 6. | 3GPP TDoc R1-041087 | 2004 | 3GPP |
| 7. | 3GPP TDoc R1-041366 | 2004 | 3GPP |
| 8. | 3GPP TDoc R1-041469 | 2004 | 3GPP |
| 9. | "Channel Allocation Protocols in Frequency-Time Controlled High Speed Networks" | 1988 | Chlamtac, Ganz |
| 10. | 3GPP TS 05.02 V8.2.1 | 2000 | 3GPP |
| 11. | "GSM Phase 2+ General Packet Radio Service GPRS: Architecture, Protocols, and Air Interface" | 1999 | Bettstetter, Vögel, and Eberspächer |
| 12. | "W-CDMA Random Access Channel Transmission over Satellite-UMTS" | 2002 | Kueh, Capellacci, Tafazolli and Evans |
| 13. | 3GPP TS 04.60 V6.3.1 | 2000 | 3GPP |
| 14. | GSM 04.60 V6.1.0 | 1998 | ETSI |

**B.      The '596 Patent**

1.      Prior Art Patent References

The following prior art patent references, including those patent references listed in Exs. B-1 through B-17, anticipate and/or render obvious the asserted claims of the '596 patent.

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)

|  | Patent No. / Application No. | Country of Origin | Date Issued/Published |
|---|---|---|---|
| 1. | 2003/0147371 (Choi) | US | Aug. 7, 2003 |
| 2. | 2002-335285 (Okuda) | JP | Nov. 22, 2002 |
| 3. | 8,259,656 (Chun) | US | Sep. 4, 2012 |

2.  Prior Art Publications

The following prior art publications, including those publications listed in Exs. B-1 through B-17, anticipate and/or render obvious the asserted claims of the '596 patent.

|  | Title | Date of Publication | Author or Publisher |
|---|---|---|---|
| 1. | PROPOSED EIA/TIA INTERIM STANDARD, Wideband Spread Spectrum Digital Cellular System Dual-Mode Mobile Station - Base Station Compatibility Standard | Apr. 21, 1992 | Qualcomm |
| 2. | IS-95B Specification, TIA/EIA-95-B ANSI Publication Version – December 1998 | December 1998 | ANSI |
| 3. | 3GPP2 C.S0003-D, Medium Access Control (MAC) Standard for cdma2000 Spread Spectrum Systems, Release D | Feb. 13, 2004 | 3GPP2 |
| 4. | C30-20030306-063 QC RL Proposal_v1.0 | Mar. 6, 2003 | Qualcomm |
| 5. | 3GPP TS 25.321 v5.0.0 | March 2002 | 3GPP |
| 6. | 3GPP TS 25.321 v5.7.0 | December 2003 | 3GPP |
| 7. | 3GPP TR 25.896 v1.0.0 | September 2003 | 3GPP |
| 8. | 3GPP TR 25.896 v6.0.0 | March 2004 | 3GPP |
| 9. | RP-020677, Approved Report of the 17th 3GPP TSG RAN meeting (Biarritz, France 3rd  -6th September, 2002) | Dec. 3-6, 2002 | 3GPP |
| 10. | Approved Report of the 21th 3GPP TSG RAN meeting (Frankfurt, Germany, 16 - 19 September 2003) | 2003 | 3GPP |
| 11. | Approved Report of the 23th 3GPP TSG RAN meeting (Phoenix, Arizona, USA, 10 - 12 March 2004) | 2004 | 3GPP |
| 12. | R2-041681, Draft (3) Report of the 42nd TSG-RAN WG2 meeting (Montreal, Canada, 10-14 May 2004) | May 26, 2004 | 3GPP |

| | | Title | Date of Publication | Author or Publisher |
|---|---|---|---|---|
| | 13. | Approved Report of the 24th 3GPP TSG RAN meeting  (Seoul, South Korea, 2 - 4 June 2004) | 2004 | 3GPP |
| | 14. | R1-041020, Approved Report of 3GPP TSG RAN WG1 Rel.6 Ad-Hoc Meeting in Cannes (Cannes, France, 21 – 24 June, 2004) | June 21-24, 2004 | 3GPP |
| | 15. | R2-042190, Approved Minutes (draft 4) of the 43rd TSG-RAN WG2 meeting (Prague, Czech Republic, 16-20 August 2004) | Sep. 17, 2004 | 3GPP |
| | 16. | Draft1 Minutes of the 44th TSG-RAN WG2 meeting (Sophia-Antipolis, France, 04-08 October 2004) | Oct. 19, 2004 | 3GPP |
| | 17. | Draft0 Minutes of the 45th TSG-RAN WG2 meeting (Shin-Yokohama, Japan, 15-19 November 2004) | Nov. 22, 2004 | 3GPP |
| | 18. | R2-050233, Draft(1) Minutes of the 45th TSG-RAN WG2 meeting (Shin-Yokohama, Japan, 15-19 November 2004) | Dec. 4, 2004 | 3GPP |
| | 19. | RP-020658 | Sep. 3-6, 2002 | Ericsson, Motorola, Nokia, AT&T Wireless Services |
| | 20. | RP-030399 | Sep. 16-19, 2003 | Nokia |
| | 21. | RP-040021 | Mar. 10-12, 2004 | Nokia |
| | 22. | RP-040081 | Mar. 10-12, 2004 | Ericsson |
| | 23. | RP-040155 | June 2-4, 2004 | 3GPP |
| | 24. | RP-040429 | December 2004 | 3GPP |
| | 25. | RP-040497 | December 2004 | 3GPP |
| | 26. | R1-031202 | Nov. 17-21, 2003 | Fujitsu |
| | 27. | R1-031246 | Nov. 11, 2003 | Qualcomm |
| | 28. | R1-040451 | May 10-14, 2004 | Motorola |
| | 29. | R1-040561 | May 10-14, 2004 | Ericsson |
| | 30. | R1-040675 | June 21-24, 2004 | Motorola |
| | 31. | R1-040683 | June 21-24, 2004 | Ericsson |
| | 32. | R1-040690 | June 21-24, 2004 | Samsung |
| | 33. | R1-040695 | June 21-24, 2004 | Samsung |
| | 34. | R1-040696 | June 21-24, 2004 | Samsung |
| | 35. | R1-040711 | June 21-24, 2004 | Panasonic |
| | 36. | R1-040728 | June 21-24, 2004 | Nokia |
| | 37. | R1-040763 | June 21-24, 2004 | Fujitsu |

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)

|  | Title | Date of Publication | Author or Publisher |
|---|---|---|---|
| 38. | R1-040764 | June 21-24, 2004 | Fujitsu |
| 39. | R1-040765 | June 21-24, 2004 | Fujitsu |
| 40. | R1-040773 | June 21-24, 2004 | NTT DoCoMo |
| 41. | R1-040785 | June 21-24, 2004 | Siemens |
| 42. | R1-040790 | June 21-24, 2004 | Siemens |
| 43. | R1-04-0900 | August 16-20, 2004 | Qualcomm |
| 44. | R1-040910 | August 16-20, 2004 | Motorola |
| 45. | R1-041066 | Sep. 20-25, 2004 | Motorola |
| 46. | R2-040917 | May 10-14, 2004 | Ericsson |
| 47. | R2-040959 | May 10-14, 2004 | Infineon |
| 48. | R2-040964 | May 10-14, 2004 | Nokia |
| 49. | R2-041055 | May 10-14, 2004 | LG |
| 50. | R2-041127 | May 10-14, 2004 | Qualcomm |
| 51. | R2-041276 | June 21-24, 2004 | InterDigital |
| 52. | R2-041288 | June 21-24, 2004 | Infineon |
| 53. | R2-04-1294 | June 21-24, 2004 | NEC |
| 54. | R2-041307 | June 21-24, 2004 | Qualcomm |
| 55. | R2-041313 | June 21-24, 2004 | Ericsson |
| 56. | R2-041337 | June 21-24, 2004 | Samsung |
| 57. | R2-041338 | June 21-24, 2004 | Samsung |
| 58. | R2-041348 | June 21-24, 2004 | LG |
| 59. | R2-041352 | June 21-24, 2004 | Fujitsu |
| 60. | R2-041354 | June 21-24, 2004 | Fujitsu |
| 61. | R2-041358 | June 21-24, 2004 | Nokia |
| 62. | R2-041359 | June 21-24, 2004 | Nokia |
| 63. | R2-041496 | August 16-20, 2004 | Motorola |
| 64. | R2-041545 | August 16-20, 2004 | LG |
| 65. | R2-041546 | August 16-20, 2004 | LG |
| 66. | R2-041549 | August 16-20, 2004 | Lucent |
| 67. | R2-041590 | August 16-20, 2004 | Siemens |
| 68. | R2-041622 | August 16-20, 2004 | Fujitsu |
| 69. | R2-041648 / R1-041648 | August 16-20, 2004 | Qualcomm |
| 70. | R2-041649 | August 16-20, 2004 | Qualcomm |
| 71. | R2-041927 | Oct. 4-8, 2004 | Ericsson |
| 72. | R2-041950 | Oct. 4-8, 2004 | LG |
| 73. | R2-042063 | Oct. 4-8, 2004 | Infineon |
| 74. | R2-042065 | Oct. 4-8, 2004 | Nortel |
| 75. | R2-042133 | Oct. 4-8, 2004 | Qualcomm |
| 76. | R2-042244 | Oct. 4-8, 2004 | Ericsson |
| 77. | R2-042358 | No later than Nov. 15-19, 2004 | Motorola |
| 78. | R2-042360 | No later than Nov. 15-19, 2004 | Motorola, Nortel, Siemens |
| 79. | R2-042382 | No later than | Samsung |

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)

| | | Title | Date of Publication | Author or Publisher |
|---|---|---|---|---|
| | | | Nov. 15-19, 2004 | |
| 80. | | R2-042402 | No later than Nov. 15-19, 2004 | Samsung, Ericsson, Qualcomm |
| 81. | | R2-042441 | No later than Nov. 15-19, 2004 | Ericsson |
| 82. | | R2-042453 | No later than Nov. 15-19, 2004 | Fujitsu |
| 83. | | R2-042462 | No later than Nov. 11, 2004 | LG |
| 84. | | R2-042465 | No later than Nov. 15-19, 2004 | NEC |
| 85. | | R2-042493 | No later than Nov. 15-19, 2004 | Siemens |
| 86. | | R2-042739 | No later than Nov. 15-19, 2004 | 3GPP |
| 87. | | Vayanos email | Nov. 10, 2004 | Vayanos |
| 88. | | Siemens - E-DCH - MAC-e-es header (included in Vayanos email) | No later than Nov. 10, 2004 | Ericsson |
| 89. | | Samsung MACe-es structure (included in Vayanos email) | No later than Nov. 10, 2004 | Samsung |
| 90. | | QC MAC header schemes v2 (included in Vayanos email) | No later than Nov. 10, 2004 | Qualcomm |
| 91. | | Nortel MAC header scheme (included in Vayanos email) | No later than Nov. 10, 2004 | Nortel |
| 92. | | Nokia MAC-e_es headers on template (included in Vayanos email) | No later than Nov. 10, 2004 | Nokia |
| 93. | | Motorola – MACe Header functional split (included in Vayanos email) | No later than Nov. 10, 2004 | Motorola |
| 94. | | Ericsson – MAC header scheme pA1 (included in Vayanos email) | No later than Nov. 10, 2004 | Ericsson |
| 95. | | Lee email | Nov. 11, 2004 | Lee |
| 96. | | R2-042664 | No later than Nov. 15-19, 2004 | 3GPP |
| 97. | | R2-042716 | Nov. 22, 2004 | 3GPP / Godard |
| 98. | | R2-042719 (also designated on its face as "Tdoc R2-04xxxx" and "25.309 CR 1 rev 1") | Nov. 23, 2004 | 3GPP / Godard |
| 99. | | R2-042725 | Nov. 29, 2004 | 3GPP / Godard |
| 100. | | R2-042730 | Nov. 29, 2004 | 3GPP / Godard |
| 101. | | Fauconnier email | Oct. 29, 2004 | Fauconnier |
| 102. | | HSUPA MAC-e and MAC-es PDUs.zip (included in Fauconnier | Oct. 29, 2004 | Nokia |

| | Title | Date of Publication | Author or Publisher |
|---|---|---|---|
| | email) | | |
| 103. | MAC-e-es header proposal.doc (included in Fauconnier email) | Oct. 29, 2004 | Motorola |
| 104. | Header Format Discussion.zip (included in Fauconnier email) | Oct. 29, 2004 | Qualcomm |
| 105. | MAC-e-es PDUs.doc (included in Fauconnier email) | Oct. 29, 2004 | Nortel |
| 106. | Open items-291005-minuted.doc (included in Fauconnier email) | Oct. 29, 2004 | Fauconnier |
| 107. | Vayanos email | Nov. 4, 2004 | Vayanos |
| 108. | QC MAC header schemes.zip (included in Vayanos email) | Nov. 4, 2004 | Qualcomm |

**C.     The '470 Patent**

1.     Prior Art Patent References

The following prior art patent references, including those patent references listed in Exs. C-1 through C-13, anticipate and/or render obvious the asserted claims of the '470 patent.

| | Patent No. / Application No. | Country of Origin | Date Issued/Published |
|---|---|---|---|
| 1 | 6,819,942 (Aotake) | U.S. | Nov. 16, 2004 |
| 2 | JP Pub. No. 2002-10389 (Onoda) | Japan | Jan. 11, 2002 |
| 3 | JP Unexamined Patent Pub. No. H8-330867 (Hasegawa) | Japan | Dec. 13, 1996 |
| 4 | 6,867,820 (Jin) | U.S. | Mar. 15, 2005 |
| 5 | 6,041,225 (Jung) | U.S. | Mar. 21, 2000 |
| 6 | JP 2002-151986A (Takemoto) | JP | May 24, 2002 |
| 7 | PCT/US00/00664 (Chinnaswami) | PCT | July 20, 2000 |

2.     Prior Art Publications

The following prior art publications, including those publications listed in Exs. C-1 through C-13, anticipate and/or render obvious the asserted claims of the '470 patent.

| | Title | Date of Publication | Author or Publisher |
|---|---|---|---|
| 1 | Sony Ericsson T616 Mobile Phone User Guide | May 2003 | Sony Ericsson Mobile Communications AB |

| | Title | Date of Publication | Author or Publisher |
|---|---|---|---|
| 2 | Sony Ericsson T610 Mobile Phone User Guide | March 2003 | Sony Ericsson Mobile Communications AB |
| 3 | Nokia 3590 Mobile Phone User Guide | 2002 | Nokia Corporation |
| 4 | Nokia 6100 Mobile Phone User Guide | 2003 | Nokia Corporation |
| 5 | Nokia 7210 Mobile Phone User Guide | 2003 | Nokia Corporation |
| 6 | Sony Ericsson T68i Mobile Phone User Guide | October 2002 | Sony Ericsson Mobile Communications AB |
| 7 | Sony Ericsson P800 User Guide | September 2002 | Sony Ericsson Mobile Communications AB |
| 8 | Canon GL2 Digital Video Camcorder Instruction Manual | July 2002 | Canon Inc. |
| 9 | iMac User's Guide | 2002 | Apple |
| 10 | Sony Ericsson P800 / P802 White Paper | January 2003 | Sony Ericsson Mobile Communications AB |

3.    Non-Patent/Publication References

Apple also contends that the Patents-In-Suit are invalid in view of public knowledge and uses and/or offers for sale or sales of products and services that are prior art under 35 U.S.C. § 102(a) or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. § 102(g), and that anticipate or render obvious the asserted claims.

The following lists each item of prior art under 35 U.S.C. § 102(a), (b), and/or (g) by the name of the item and, to the extent now known, when the item became publicly known or was used, offered for sale, or sold, the identities of the persons or entities that made the item public, publicly used it, or made the offer for sale, and the identities of the person(s) or entities involved in, and the circumstances surrounding the making of, the invention.  Apple contends that the following descriptions are stated on information and belief, and are supported by the information

1  and documents that will be produced by Apple and/or third parties.  As discovery is not

2  complete, Apple continues to investigate these events.

3          At a mutually convenient time, Apple will make available for inspection any products

4  listed below that it has in its possession.

5                              (a)      Sony Ericsson T616 Mobile Phone and User Guide

6          The Sony Ericsson T616 is a mobile phone offered for sale to the public or placed in

7  public use by Sony Ericsson in March 2003.  The User Guide was published at least as early as

8  May 2003.

9

10                             (b)      Sony Ericsson T610 Mobile Phone and User Guide

11         The Sony Ericsson T610 is a mobile phone offered for sale to the public or placed in

12  public use by Sony Ericsson in March 2003.  The User Guide was published at least as early as

13  March 2003.

14

15                             (c)      Nokia 3590 Mobile Phone and User Guide

16         The Nokia 3590 Mobile Phone is a mobile phone offered for sale to the public or placed

17  in public use by Nokia in April 2002.  The User Guide was published in 2002.

18                             (d)      Nokia 6100 Mobile Phone and User Guide

19         The Nokia 6100 Mobile Phone is mobile phone offered for sale to the public or placed in

20  public use by Nokia in January 2003.  The User Guide was published in 2003.

21

22                             (e)      Nokia 7210 Mobile Phone and User Guide

23         The Nokia 7210 Mobile Phone is a mobile phone offered for sale to the public or placed

24  in public use by Nokia in January 2003.  The User Guide was published in 2003.

25                             (f)      Sony Ericsson T68i Mobile Phone and User Guide

26         The Sony Ericsson T68i Mobile Phone is a mobile phone offered for sale to the public or

27  placed in public use in October 2002.  The User Guide was published in October 2002.

28

          (g)      Sony Ericsson P800 Mobile Phone and User Guide, and Sony Ericsson P800/P802 White Paper

The Sony Ericsson P800 Mobile Phone is a mobile phone offered for sale to the public or placed in public use in September 2002.  The User Manual was published in September 2002. The P800 / P802 White Paper was published in January 2003.

          (h)      Canon GL2 Digital Video Camcorder and Instruction Manual

The Canon GL2 Digital Video Camcorder is a camcorder offered for sale to the public or placed in public use in July 2002.  The Instruction Manual was published in July 2002.

          (i)      iMac G4, OS X 10.2, and iMac User's Guide

The iMac G4 is a desktop computer offered for sale to the public or placed in public use at least as early as July 2002.  The iMac User's Guide was published in 2002.  Mac OS X 10.2 is an operating system for use on the iMac G4 that was offered for sale to the public or placed in public use in August 2002.

**D.**      **The '757 Patent**

        1.      Prior Art Patent References

The following prior art patent references, including those patent references listed in Exs. D-1 through D-10, anticipate and/or render obvious the asserted claims of the '757 patent.

| | Patent No. / Application No. | Country of Origin | Date Issued/Published |
|---|---|---|---|
| 1. | 09/768933 (Lipscomb) | US | Feb. 28, 2002 |
| 2. | 7,587,446 (Onyon) | US | Sep. 8, 2009 |
| 3. | 7,020,704 (Lipscomb) | US | Mar. 28, 2006 |
| 4. | 6,694,336 (Multer) | US | Feb. 17, 2004 |
| 5. | 6,671,757 (Multer) | US | Dec. 30, 2003 |
| 6. | 6,636,873 (Carini) | US | Oct. 21, 2003 |
| 7. | 2000-222268 (Surugadai) | JP | Aug. 11, 2000 |
| 8. | 5,729,735 (Meyring) | US | May. 17, 1998 |
| 9. | PCT/US00/27564 | WO | April 12, 2001 |
| 10. | PCT/US01/02315 | WO | July 26, 2001 |
| 11. | 5,297,231 (Miller) | US | Mar. 22, 1994 |
| 12. | 5,758,177 (Gulick) | US | May 26, 1998 |

| | Patent No. / Application No. | Country of Origin | Date Issued/Published |
|---|---|---|---|
| 13. | 5,550,566 (Hodgson) | US | Aug. 27, 1996 |
| 14. | PCT WO96/21898 (Boothby) | WO | Jul. 18, 1996 |

        2.      Prior Art Publications

The following prior art publications, including those publications listed in Exs. D-1 through D-10, anticipate and/or render obvious the asserted claims of the '757 patent.

| | Title | Date of Publication | Author or Publisher |
|---|---|---|---|
| 1. | "SWAN: A Mobile Multimedia Wireless Network" | April 1996 | Prathima Agrawl, Eoin Hyden, Paul Krzyzanowski, Partho Mishra, Mani B. Srivastava, and John A. Trotter |
| 2. | "Replication of Multimedia Data Using Master-Slave Architecture" | August 1997 | Sohail Sheikh, Raj Gaesan |
| 3. | "Support for Speculative Update Propagation and Mobility in Deno" | April 2001 | Ugur Cetintemel, Peter J. Keleher, Michael J. Franklin |
| 4. | "A Java Framework for Mobile Data Synchronization" | September 2000 | Norman H. Cohen |
| 5. | "EasyStreet: A location management and data synchronization application for mobile computing." | July 2000 | Steven J. Mastrianni |
| 6. | "Rumor: Mobile Data Access Through Optimistic Peer-to-Peer Replication" | 1998 | Richard Guy, Peter Reiher, David Ratner, Michial Gunter, Wilkie Ma, and Gerald Popek |
| 7. | "The Dangers of Replication and a Solution" | May 1996 | Jim Gray, Pat Helland, Patrick O'Neil, Dennis Shasha |
| 8. | "Oracle 8i Concepts Manual" | December 1999 | Oracle Corp. |
| 9. | Unison File Synchronizer Version 2.1 Manual | June 2000 | Benjamin Pierce |
| 10. | HitPlayer Manual | July 2000 | Aztec Radiomedia/Digigram |
| 11. | HitPlayer Brochure | September 2000 | Aztec Radiomedia/Digigram |

3.      Non-Patent/Publication References

Apple also contends that the Patents-In-Suit are invalid in view of public knowledge and uses and/or offers for sale or sales of products and services that are prior art under 35 U.S.C. § 102(a) or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. § 102(g), and that anticipate or render obvious the asserted claims.

The following lists each item of prior art under 35 U.S.C. § 102(a), (b), and/or (g) by the name of the item and, to the extent now known, when the item became publicly known or was used, offered for sale, or sold, the identities of the persons or entities that made the item public, publicly used it, or made the offer for sale, and the identities of the person(s) or entities involved in, and the circumstances surrounding the making of, the invention.  Apple contends that the following descriptions are stated on information and belief, and are supported by the information and documents that will be produced by Apple and/or third parties.  As discovery is not complete, Apple continues to investigate these events.

At a mutually convenient time, Apple will make available for inspection any products listed below that it has in its possession.

(a)      Oracle 8i System/Software and Oracle 8i Concepts Manual ("Oracle 8i System")

The Oracle 8i System is a database management system offered for sale to the public or placed in public use by Oracle beginning in 1999.

(b)      Unison File Synchronizer Version 2.1 and Manual ("Unison")

Unison is a file-synchronization tool for Unix and Windows that was known or in use no later than June 8, 2000.

(c)      Aztec Radiomedia/Digigram HitPlayer, Manual, and Brochure ("HitPlayer")

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)

The HitPlayer is a device for providing and controlling audio at remote locations.  The Aztec Radiomedia/Digigram HitPlayer was known or in use at least prior to April of 2000.  The HitPlayer Manual was publically available no later than July of 2000.  The HitPlayer Brochure was publicly available no later than September of 2000.

**E.**      **The '058 Patent**

1.      Prior Art Patent References

The following prior art patent references, including those patent references listed in Exs. E-1 through E-13, anticipate and/or render obvious the asserted claims of the '058 patent.

|  | Patent No. / Application No. | Country of Origin | Date Issued/Published |
|---|---|---|---|
| 1. | 5,347,295 (Agulnick et al.) | US | September 13, 1994 |
| 2. | 5,615,384 (Allard et al.) | US | March 25, 1997 |
| 3. | 7,450,114 (Anwar) | US | November 11, 2008 |
| 4. | 7,075,512 (Fabre et al.) | US | July 11, 2006 |
| 5. | 5,341,466 (Perlin) | US | August 23, 1994 |
| 6. | 4,751,507 (Hama et al.) | US | June 14, 1988 |
| 7. | 6,073,036 (Heikkinen et al.) | US | June 6, 2000 |
| 8. | 6,211,856 (Choi et al.) | US | April 3, 2001 |
| 9. | 4,712,870 (Robinson et al.) | US | December 15, 1987 |

2.      Prior Art Publications

The following prior art publications, including those publications listed in Exs. E-1 through E-13, anticipate and/or render obvious the asserted claims of the '058 patent.

|  | Title | Date of Publication | Author or Publisher |
|---|---|---|---|
| 1. | "A Multi-Scale, Multi-Layer, Translucent Virtual Space" | August 1997 | Lieberman |
| 2. | "Toolglass and Magic Lenses:  The See-Through Interface" and related video presentation | 1993 | Bier, et al. |
| 3. | Macintosh User's Manual | 1984 | Apple Computer, Inc. |
| 4. | "The Embedded Zooming Applications for Personal Digital Assistants" | July 2003 | Lee and Grice |
| 5. | "PhotoMesa:  A Zoomable Image Browser Using Quantum Treemaps and Bubblemaps" | 2001 | Bederson |
| 6. | PhotoMesa Internet site, including | 2001 | University of |

| | Title | Date of Publication | Author or Publisher |
|---|---|---|---|
| | http://www.cs.umd.edu/hcil/photomesa/help.html, http://www.cs.umd.edu/hcil/photomesa/, and http://www.cs.umd.edu/hcil/photomesa/download/ | | Maryland |

3.      Non-Patent/Publication References

Apple also contends that the '058 patent is invalid in view of public knowledge and uses and/or offers for sale or sales of products and services that are prior art under 35 U.S.C. § 102(a) or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. § 102(g), and that anticipate or render obvious the asserted claims.

The following lists each item of prior art under 35 U.S.C. § 102(a), (b), and/or (g) by the name of the item and, to the extent now known, when the item became publicly known or was used, offered for sale, or sold, the identities of the persons or entities that made the item public, publicly used it, or made the offer for sale, and the identities of the person(s) or entities involved in, and the circumstances surrounding the making of, the invention.  Apple contends that the following descriptions are stated on information and belief, and are supported by the information and documents that will be produced by Apple and/or third parties.  As discovery is not complete, Apple continues to investigate these events.

At a mutually convenient time, Apple will make available for inspection any products listed below that it has in its possession.

(a)      Deluxe Paint IV and Manual

Deluxe Paint IV is a bitmap graphics editor offered for sale to the public or placed in public use by Electronic Arts beginning in 1989.

(b)      MacPaint 2.0 and Guide

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)

MacPaint 2.0 is a bitmap graphics paint program for use with Apple computers offered for sale to the public or placed in public use by Claris beginning in 1988.

(c)     Photoshop 5.0 and User Guide

Photoshop 5.0 is a photograph and image editor offered for sale to the public or placed in public use by Adobe beginning in 1998.

(d)     IBM Simon and Users Guide

The IBM Simon is a smartphone offered for sale to the public or placed in public use by IBM beginning in 1994.

(e)     Apple LC 630 and User Guides

The Apple LC 630 is a computer offered for sale to the public or place in public use by Apple Computer, Inc. in 1994.

(f)     PhotoMesa 1.3, PhotoMesa Internet Documentation, and PhotoMesa References[1]

PhotoMesa 1.3 is software offered for sale to the public or placed in public use by the University of Maryland (Bederson) no later than December 3, 2001.

**F.     The '179 Patent**

1.     Prior Art Patent References

The following prior art patent references, including those patent references listed in Exs. F-1 through F-5, anticipate and/or render obvious the asserted claims of the '179 patent.

|     | Patent No. / Application No. | Country of Origin | Date Filed / Issued / Published |
|-----|------------------------------|-------------------|--------------------------------|
| 1.  | 6,104,317 (Panagrossi)       | US                | Aug. 15, 2000 (Issued) Feb. 27, 1998 (Filed) |
| 2.  | 6,094,197 (Buxton et al.)    | US                | July 25, 2000 (Issued) |

---

[1] References herein to PhotoMesa or PhotoMesa 1.3 incorporate the PhotoMesa System, PhotoMesa Internet Documentation, and PhotoMesa Reference, as defined and set forth in Ex. E-13.  Apple contends that the PhotoMesa System, PhotoMesa Internet Documentation, and PhotoMesa Reference each individually and collectively (and/or in combination with any of the other references set forth herein), anticipate and/or render obvious the asserted claims of the '058 patent.   (Ex. E-13.)

| | Patent No. / Application No. | Country of Origin | Date Filed / Issued / Published |
|---|---|---|---|
| | | | May 24, 1994 (Filed) |
| 3. | H8-272787 (Ishihara) | JP | Oct. 18, 1996 (Published) |
| 4. | 6,008,799 (Van Kleeck) | US | Dec. 28, 1999 (Issued) May 24, 1994 (Filed) |
| 5. | World Intellectual Property Organization Int'l Patent App. WO 97/30386 (Kato et al.) | WO | Aug. 21, 1997 (Published) |
| 6 | 5,778,404 (Capps) | US | July 7, 1998 (Issued) Aug. 7, 1995 (Filed) |
| 7. | H6-102985 (Sugano) | JP | Apr. 15, 1994 (Published) |
| 8. | 4,725,694 (Auer) | US | Feb. 16, 1988 (Issued) May 13, 1986 (Filed) |
| 9. | 6,073,036 (Heikkinen) | US | June 6, 2000 (Issued) April 28, 1997 (Filed) |
| 10. | H8-249122 (Hata) | JP | Sept. 27, 1996 (Published) |
| 11. | 202,923 (Brooks) | US | April 30, 1878 (Issued) Dec. 30, 1875 (Filed) |
| 12. | 2,532,228 (Hesh) | US | Nov. 28, 1950 (Issued) July 26, 1946 (Filed) |
| 13. | 3,633,724 (Samuel) | US | Jan. 11, 1972 (Issued) Jan. 22, 1970 (Filed) |
| 14. | 3,965,315 (Wuenn) | US | June 22, 1976 (Issued) Jan. 8, 1975 (Filed) |
| 15. | 4,029,915 (Ojima) | US | June 14, 1977 (Issued) Dec. 3, 1975 (Filed) |
| 16. | 4,449,839 (Bleuer) | US | May 22, 1984 (Issued) Sept. 22, 1982 (Filed) |
| 17. | 4,761,522 (Allen) | US | Aug. 2, 1988 (Issued) Oct. 6, 1986 (Filed) |
| 18. | 5,514,866 (Retter) | US | May 7, 1996 (Filed) Oct. 4, 1993 (Issued) |
| 19. | 4,333,097 (Buric) | US | June 1, 1982 (Filed) Sept. 12, 1980 (Issued) |
| 20. | 5,258,748 (Jones) | US | Nov. 2, 1993 (Filed) Aug. 28, 1991 (Issued) |
| 21. | 5,612,719 (Beernink) | US | March 18, 1997 (Filed) April 15, 1994 (Issued) |
| 22. | 5,805,167 (van Cruyningen) | US | Sept. 8, 1998 (Filed) Oct. 30, 1996 (Issued) |
| 23. | 5,959,629 (Masui) | US | Sept. 28, 1999 (Issued) Nov. 12, 1997 (Filed) |
| 24. | 6,107,994 (Harada et. al.) | US | Aug. 22, 2000 (Issued) Sept. 26, 1997 (Filed) |

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)

2.     Prior Art Publications

The following prior art publications, including those publications listed in Exs. F-1

through F-5, anticipate and/or render obvious the asserted claims of the '179 patent.

| | Title | Date of Publication | Author or Publisher |
|---|---|---|---|
| 1. | "An empirical evaluation of some articulatory and cognitive aspects of marking menus" | 1993 | Gordon Kurtenbach, et al., Human Computer Interaction |
| 2. | "T-Cube: A Fast, Self Disclosing Pen-Based Alphabet, Human Factors in Computing Systems" | April 24-28, 1994 | Dan Venolia & Forrest Neiberg |
| 3. | "The Design and Evaluation of Marking Menus" (Ph.D. Dissertation) | 1993 | Gordon P. Kurtenbach, Dept. of Computer Science, Univ. of Toronto |
| 4. | "An Empirical Comparison of Pie vs. Linear Menus" | 1988 | Jack Callahan, et. al., CHI '88. |
| 5. | "The Design and Implementation of Pie Menus" | 1991 | Don Hopkins |
| 6. | "User Learning and Performance with Marking Menus" | 1994 | Gordon P. Kurtenbach & William Buxton, Proceedings of CHI '94 |
| 7. | "The Limits of Expert Performance Using Hierarchic Marking Menus" | 1993 | Gordon P. Kurtenbach & William Buxton, Proceedings of InterCHI '93 |
| 8. | "Issues in Combining Marking and Direct Manipulation Techniques" | Nov. 11-13, 1991 | Gordon P. Kurtenbach & William Buxton, User Interface Software and Technology (UIST) |
| 9. | "The Gestures in Human-Computer Communication" (appearing in The Art of Human-Computer Interface Design) | 1994 | Gordon P. Kurtenbach & Eric A. Hulteen |
| 10. | "The paper-like interface" (in Designing and Using Human Computer Interface and Knowledge-Based Systems) | Sept. 18-22, 1989 | C. G. Wolf et. al. |
| 11. | "Dialogue Management for Gestural Interfaces" | 1987 | Jim Rhyne, ACM Computer Graphics |
| 12. | "Quikwriting:  Continuous Stylus-based Text Entry" | Nov. 1998 | Ken Perlin, Proceedings of the 11th Annual ACT Symposium on User Interface and Technology (UIST). |
| 13. | "Cirrin: A word-level unistroke keyboard for pen input," | Nov. 1998. | Jennifer Mankoff & Gregory D. Abowd, ACM Symposium on User Interface and Technology |

|  | Title | Date of Publication | Author or Publisher |
|---|---|---|---|
|  |  |  | (1998) |
| 14. | "PenPut – Beyond character Recognition" | 1992 & 1993 | Organek Technology |

3.      Non-Patent/Publication References

Apple also contends that the Patents-In-Suit are invalid in view of public knowledge and uses and/or offers for sale or sales of products and services that are prior art under 35 U.S.C. § 102(a) or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. § 102(g), and that anticipate or render obvious the asserted claims.

The following lists each item of prior art under 35 U.S.C. § 102(a), (b), and/or (g) by the name of the item and, to the extent now known, when the item became publicly known or was used, offered for sale, or sold, the identities of the persons or entities that made the item public, publicly used it, or made the offer for sale, and the identities of the person(s) or entities involved in, and the circumstances surrounding the making of, the invention.  Apple contends that the following descriptions are stated on information and belief, and are supported by the information and documents that will be produced by Apple and/or third parties.  As discovery is not complete, Apple continues to investigate these events.

At a mutually convenient time, Apple will make available for inspection any products listed below that it has in its possession.

(a)      Apple's Newton MessagePad 2000 and User Guide

Apple's Newton MessagePad 2000 is a hand-held computing device offered for sale to the public or placed in public use by Apple Computer Inc. ("Apple") at least as early as 1996. (*See e.g.*, APL7940016416935- APL7940016416937; APL7940016417922-

APL7940016417923.)  The User Guide was published in 1997.  (APL7940016418419 -

APL7940016418709; *see also* APL7940016416940 - APL7940016416984;

APL7940016418364-APL7940016418365; APL7940016418366-

APL7940016418367;  APL7940016418368-APL7940016418369; APL7940016418370-

APL7940016418373; APL7940016418374-APL7940016418376; APL7940016418377-

APL7940016418418; APL7940016418718-APL7940016418759; APL7940016418760-

APL7940016419050; APL7940016419059-APL7940016419072; APL7940016419073-

APL7940016419083.)

## G.      The '449 Patent

### 1.      Prior Art Patent References

The following prior art patent references, including those patent references listed in Exs. G-1 through G-5, anticipate and/or render obvious the asserted claims of the '449 patent.

|  | Patent No. / Application No. | Country of Origin | Date Issued/Published |
|---|---|---|---|
| 1 | 6,104,430 (Fukuoka) | U.S. | August 15, 2000 |
| 2 | 5,796,428 (Matsumoto) | U.S. | August 18, 1998 |
| 3 | 5,613,032 (Cruz) | U.S. | March 18, 1997 |
| 4 | 5,706,457 (Dwyer) | U.S. | January 6, 1998 |
| 5 | 5,444,483 (Maeda) | U.S. | August 22, 1995 |
| 6 | JP Unexamined Patent Pub. No. H7-7647 (Hashimoto) | JP | January 10, 1995 |
| 7 | JP Unexamined Patent Publ No. H05-344460 (Yamada) | JP | December 24, 1993 |
| 8 | JP-H2-292974 (Takarada) | JP | December 4, 1990 |

### 2.      Prior Art Publications

The following prior art publications, including those publications listed in Exs. G-1 through G-5, anticipate and/or render obvious the asserted claims of the '449 patent.

| | Title | Date of Publication | Author or Publisher |
|---|---|---|---|
| 1 | Apple's PhotoFlash for Macintosh | 1995 | Apple |

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)

| | Title | Date of Publication | Author or Publisher |
|---|---|---|---|
| | User Guide | | |
| 2 | Introducing Microsoft Windows 95 | 1995 | Microsoft |
| 3 | Ricoh RDC-1 Digital Camera Instruction Manual | 1995 | Ricoh |
| 4 | Ricoh DC-1 Service Manual | 1995 | Ricoh |

3.   Non-Patent/Publication References

Apple also contends that the Patents-In-Suit are invalid in view of public knowledge and uses and/or offers for sale or sales of products and services that are prior art under 35 U.S.C. § 102(a) or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. § 102(g), and that anticipate or render obvious the asserted claims.

The following lists each item of prior art under 35 U.S.C. § 102(a), (b), and/or (g) by the name of the item and, to the extent now known, when the item became publicly known or was used, offered for sale, or sold, the identities of the persons or entities that made the item public, publicly used it, or made the offer for sale, and the identities of the person(s) or entities involved in, and the circumstances surrounding the making of, the invention.  Apple contends that the following descriptions are stated on information and belief, and are supported by the information and documents that will be produced by Apple and/or third parties.  As discovery is not complete, Apple continues to investigate these events.

At a mutually convenient time, Apple will make available for inspection any products listed below that it has in its possession.

(a)   Apple's PhotoFlash for Macintosh and User Guide

Apple's PhotoFlash for Macintosh is software for organizing digital photos offered for sale to the public or placed in public use by Apple at least as early as 1995.  The User Guide was published in 1995.

           (b)      Windows 95 and Introducing Windows 95 Manual

Windows 95 is an operating system offered for sale to the public or placed in public use by Microsoft in 1995.  The Manual was published in 1995.

           (c)      Ricoh RDC-1 Digital Camera, Ricoh RDC-1 Digital Camera Instruction Manual, and Ricoh DC-1 Service Manual

The Ricoh RDC-1 is a digital camera offered for sale to the public or placed in public use by Ricoh in 1995.  The Instruction Manual and Service Manual were published at least as early as 1995.

**H.**      **The '239 Patent**

        1.      Prior Art Patent References

The following prior art patent references, including those patent references listed in Exs. H-1 through H-9, anticipate and/or render obvious the asserted claims of the '239 patent.

| | Patent No. / Application No. | Country of Origin | Date Issued/Published |
|---|---|---|---|
| 1. | 7,831,663 (Ludwig) | US | Nov. 9, 2010 |
| 2. | 7,822,813 (Ludwig) | US | Oct. 26, 2010 |
| 3. | 7,433,921 (Ludwig) | US | Oct. 7, 2008 |
| 4. | 6,175,717 (Rebec) | US | Jan. 16, 2001 |
| 5. | 5,946,445 (Peters) | US | Aug. 31, 1999 |
| 6. | 5,821,987 (Larson) | US | Oct. 13, 1998 |
| 7. | 5,712,679 (Coles) | US | Jan. 27, 1998 |
| 8. | 5,689,641 (Ludwig) | US | Nov. 18, 1997 |
| 9. | 5,633,891 (Rebec) | US | May 27, 1997 |
| 10. | 5,506,954 (Arshi) | US | Apr. 9, 1996 |
| 11. | 5,379,351 (Fandrianto) | US | Jan. 3, 1995 |
| 12. | 5,262,875 (Mincer) | US | Nov. 16, 1993 |
| 13. | 5,253,275 (Yurt) | US | Oct. 12, 1993 |
| 14. | 5,170,427 (Guichard) | US | Dec. 8, 1992 |
| 15. | 5,164,980 (Bush) | US | Nov. 17, 1992 |
| 16. | 4,972,457 (O'Sullivan) | US | Nov. 20, 1990 |

| | Patent No. / Application No. | Country of Origin | Date Issued/Published |
|---|---|---|---|
| 17. | 4,963,995 (Lang) | US | Oct. 16, 1990 |
| 18. | 4,825,457 (Lebowitz) | US | Apr. 25, 1989 |
| 19. | 4,772,956 (Roche) | US | Sep. 20, 1988 |
| 20. | 5-236188 | JP | Sept. 10, 1993 |
| 21. | 05-167965 | JP | July 2, 1993 |
| 22. | 5,170,427 (Guichard) | US | December 8, 1992 |

2.       Prior Art Publications

The following prior art publications, including those publications listed in Exs. H-1 through H-9, anticipate and/or render obvious the asserted claims of the '239 patent.

| | Title | Date of Publication | Author or Publisher |
|---|---|---|---|
| 1. | "Kodak SV9600 Still Video Transceiver" | 1989 | Keith A. Hadley |
| 2. | ActionMedia / Indeo Product Brief | 1992 | Intel Corp. and IBM Corp. |
| 3. | "DVI Technology: The digital Future of Multimedia" | 1992 | Intel Corp. and IBM Corp. |

3.       Non-Patent/Publication References

Apple also contends that the Patents-In-Suit are invalid in view of public knowledge and uses and/or offers for sale or sales of products and services that are prior art under 35 U.S.C. § 102(a) or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. § 102(g), and that anticipate or render obvious the asserted claims.

The following lists each item of prior art under 35 U.S.C. § 102(a), (b), and/or (g) by the name of the item and, to the extent now known, when the item became publicly known or was used, offered for sale, or sold, the identities of the persons or entities that made the item public, publicly used it, or made the offer for sale, and the identities of the person(s) or entities involved in, and the circumstances surrounding the making of, the invention.  Apple contends that the following descriptions are stated on information and belief, and are supported by the information

1    and documents that will be produced by Apple and/or third parties.  As discovery is not

2    complete, Apple continues to investigate these events.

3          At a mutually convenient time, Apple will make available for inspection any products

4    listed below that it has in its possession.

5

6

7                    (a)      The '239 inventors' offer for sale of a device embodying the
                               invention prior to the critical date.

8

9          Apple also contends that the '239 patent is invalid in view of the inventors' offer for sale,

10   and/or public use of the subject matter of the '239 patent more than one year before the date they

11   filed the '239 patent application.

12                   (b)      Kodak SV9600 Still Video Transceiver

13         The Kodak SV9600 Still Video Transceiver is a device developed for transmitting and

14   receiving video images that was offered for sale to the public or placed in public use by Eastman

15   Kodak Company at least as early as 1989.

16

17                   (c)      Intel/IBM's ActionMedia II System

18         Intel and IBM's ActionMedia II system is software and hardware for processing video

19   offered for sale to the public or placed in public use by Intel and IBM at least as early as 1992.

20   The product documentation was published in 1992.

21   **IV.    CLAIM CHARTS PURSUANT TO PATENT L.R. 3-3 (C)**

22         Individual claim charts that identify where each element of each asserted claim can be

23   found in each item of prior art are attached hereto.  A listing of these claim charts is provided

24   below:

25         Exhibit A-1 through A-7:  Claim charts for the '087 patent

26

27         Exhibit B-1 through B-17:  Claim charts for the '596 patent

28

1    Exhibit C-1 through C-13:  Claim charts for the '470 patent

2    Exhibit D-1 through D-10:  Claim charts for the '757 patent

3    Exhibit E-1 through E-13:  Claim charts for the '058 patent

4    Exhibit F-1 through F-5:  Claim charts for the '179 patent

5    Exhibit G-1 through G-5:  Claim charts for the '449 patent

6    Exhibit H-1 through H-9:  Claim charts for the '239 patent

7

8    **V.   DISCLOSURE OF INVALIDITY DUE TO ANTICIPATION PURSUANT TO PATENT L.R. 3-3(B) AND (C)**

9

10       Subject to the reservation of rights above and based on Apple's present understanding of

11   the asserted claims of the Patents-In-Suit, and the apparent constructions Samsung is asserting

12   based on Samsung's Infringement Contentions, the prior art references charted in Exhibits A-1

13   through H-9 identify items of prior art that anticipate the asserted claims.  The charts identify

14   where each element of each asserted claim can be found in each item of prior art.  In particular:

15       **A.   The '087 Patent**

16
17       1.   U.S. Patent No. 7,321,780 anticipates claims 1, 2, 6-10, 14-16, 34, 35, 39

18            and 40 of the '087 patent (Chart A-1).

19       2.   3GPP Tdoc R1-030284, "Scheduled and Autonomous Mode Operation for

20            the Enhanced Uplink," 3GPP TSG RAN WG1#31, Tokyo, Japan, Feb. 17-

21            20th 2003, anticipates claims 1 and 9 of the '087 patent (Chart A-2).

22       3.   3GPP Tdoc R1-040680, "Consideration to Autonomous Transmission on

23            E-DCH," 3GPP TSG RAN WG1, CANNES, France, 21–24 June, 2004,

24            anticipates claims 1 and 9 of the '087 patent (Chart A-5).

25

26       **B.   The '596 Patent**

27

28

1.    Qualcomm Inc.'s "Proposed EIA/TIA Interim Standard Wideband Spread Spectrum Digital Cellular System Dual-Mode Mobile Station - Base Station Compatibility Standard," dated April 21, 1992 ("Qualcomm 1992 Proposal"), anticipates claims 1, 4, 6, 13, 16, and 18 of the '596 patent (Exhibit B-1).

2.    The IS-95B Specification, TIA/EIA-95-B ANSI Publication Version – December 1998 ("IS-95B Specification"), anticipates claims 1, 4, 6, 13, 16, and 18 of the '596 patent (Exhibit B-2).

3.    cdma2000 1XRTT, as described in 3GPP2 C.S0003-D, Version 1.0, dated February 13, 2004 ("cdma2000 1XRTT"), anticipates claims 1, 4, 6, 13, 16, and 18 of the '596 patent (Exhibit B-3).

4.    3GPP Tdoc R2-042462, "Control Information Transfer In MAC Layer," 3GPP TSG-RAN WG2 Meeting #45, Yokohama, Japan, 15 – 19 November 2004, anticipates claims 1, 4, 6, 13, 16, and 18 of the '596 patent (Exhibit B-7).

5.    U.S. Patent No. 8,259,656 anticipates claims 1, 4, 6, 13, 16, and 18 of the '596 patent (Exhibit B-16).

C.    **The '470 Patent**

1.    The Sony Ericsson T616 Mobile Phone, as described in the Sony Ericsson T616 User Guide, anticipates claims 7-16 of the '470 patent (Chart C-1).

2.    U.S. Patent No. 6,819,942 anticipates claims 7-16 of the '470 patent (Chart C-2).

3.   JP 2002-10389, published January 11, 2002, anticipates claims 7-16 of the '470 patent (Chart C-3).

4.   The Nokia 3590 Mobile Phone, as described in the Nokia 3590 Mobile Phone User Guide, anticipates claims 7-16 of the '470 patent (Chart C-4).

5.   Japanese Publication No. H8-330867 anticipates claims 7-16 of the '470 patent (Chart C-5).

6.    The Nokia 6100 Mobile Phone, as described in the Nokia 6100 Mobile Phone User Guide, anticipates claims 7-16 of the '470 patent (Chart C-6).

7.   The Nokia 7210 Mobile Phone, as described in the Nokia 7210 Mobile Phone User Guide, anticipates claims 7-16 of the '470 patent (Chart C-7).

8.   The Sony Ericsson T68i Mobile Phone, as described in the Sony Ericsson T68i User Guide, anticipates claims 7-16 of the '470 patent (Chart C-8).

9.   The Sony Ericsson P800 Mobile Phone, as described in the Sony Ericsson P800 User Manual and the P800 / P802 White Paper, anticipates claims 7-16 of the '470 patent (Chart C-9).

10.   The Sony Ericsson T610 Mobile Phone, as described in the Sony Ericsson T610 User Guide, anticipates claims 7-16 of the '470 patent (Chart C-10).

11.   PCT/US00/00664 anticipates claims 7-16 of the '470 patent (Chart C-11).

12.   The Canon GL2 Digital Video Camcorder, as described in the GL2 Instruction Manual, anticipates claims 7-16 of the '470 patent (Chart C-12).

13.   The iMac G4 (OS X 10.2 installed) anticipates claims 7-16 of the '470 patent (Chart C-13).

**D.**    <u>**The '757 Patent**</u>

1.    U.S. Patent No. 7,587,446 to Onyon et al. anticipates claims 1-5, 11, 12, 14, and 15  of the '757 patent (Chart D-1).

2.    U.S. Patent Application No. 2002/0026442 A1 anticipates claims 1-5, 11, 12, 14, and 15  of the '757 patent (Chart D-2).

3.    U.S. Patent No. 7,020,704 to Lipscomb anticipates claims 1-5, 11, 12, 14, and 15 of the '757 patent (Chart D-3).

4.    U.S. Patent No. 6,636,873 to Carini et al. anticipates claims 1-5, 11, 12, 14, and 15 of the '757 patent (Chart D-4).

5.    The Oracle 8i System, as described in the Oracle 8i Concepts Manual, anticipates claims 1-5, 11, 12, 14, and 15 of the '757 patent (Chart D-5).

6.    U.S. Patent No, 5,729,735 to Meyering anticipates claims 1-5, 11, 12, 14, and 15 of the '757 patent (Chart D-6).

7.    U.S. Patent No, 6,000,000 to Hawkins et al. anticipates claims 1-5, 11, 12, 14, and 15 of the '757 patent (Chart D-7).

8.    PCT International Application WO96/21898 to Boothby anticipates claims 1-5, 11, 12, 14, and 15 of the '757 patent (Chart D-8).

9.    Unison File Synchronizer Version 2.1 and Manual anticipate claims 1-5, 11, 12, 14, and 15 of the '757 patent (Chart D-9).

10.    Aztec RadioMedia/Digigram HitPlayer, the HitPlayer Manual, and the HitPlayer Brochure anticipate claims 1-5, 11, 12, 14, and 15 of the '757 patent (Chart D-10).

**E.**    <u>**The '058 Patent**</u>

1.   U.S. Patent No. 5,347,295 to Agulnick et al. ("Agulnick"), granted September 13, 1994 anticipates claims 1, 4, 9, 12, and 17 of the '058 patent (Chart E-1).

2.   U.S. Patent No. 5,615,384 to Allard et al. ("Allard"), granted March 25, 1997 anticipates claims 1, 4, 9, 12, and 17 of the '058 patent (Chart E-2).

3.   U.S. Patent No. 7,450,114 to Anwar ("Anwar"), granted November 11, 2008 anticipates claims 1, 4, 9, 12, and 17 of the '058 patent (Chart E-3).

4.   Electronic Arts, Deluxe Paint IV ("Deluxe Paint"), 1989, anticipates claims 1, 4, 9, 12, and 17 of the '058 patent (Chart E-4).

5.   U.S. Patent No. 7,075,512 to Fabre et al. ("Fabre"), granted on July 11, 2006 anticipates claims 1, 4, 9, 12, and 17 of the '058 patent (Chart E-5).

6.   Lieberman, A Multi-Scale, Multi-Layer, Translucent Virtual Space ("Lieberman"), Media Laboratory, Massachusetts Institute of Technology, August 1997, pp. 1-8 anticipates claims 1, 4, 9, 12, and 17 of the '058 patent (Chart E-6).

7.   Claris, MacPaint 2.0 ("MacPaint"), 1988, anticipates claims 1, 4, 9, 12, and 17 of the '058 patent (Chart E-7).

8.   U.S. Patent No. 5,341,466 to Perlin ("Perlin"), granted August 23, 1994 anticipates claims 1, 4, 9, 12, and 17 of the '058 patent (Chart E-8).

9.   Adobe, Photoshop 5.0 ("Photoshop"), 1998 anticipates claims 1, 4, 9, 12, and 17 of the '058 patent (Chart E-9).

10. Bier et al., Toolglass and Magic Lenses:  The See-Through Interface ("Bier"), Xerox PARC, 1993, pp. 73-80 anticipates claims 1, 9, and 17 of the '058 patent (Chart E-10).

11. IBM, Simon and Users Guide, 1993 anticipates claims 1, 4, 9, 12, and 17 of the '058 patent (Chart E-11).

12. Lee and Grice, "The Embedded Zooming Applications for Personal Digital Assistants," July 2003, anticipates claims 1, 4, 9, 12, and 17 of the '058 patent (Chart E-12).

13. PhotoMesa 1.3 (developed at and licensed by the University of Maryland (Bederson)), 2001, anticipates claims 1, 4, 9, 12, and 17 of the '058 patent (Chart E-13).

**F.** **The '179 Patent**

1. U.S. Patent No. 6,104,317 to Panagrossi ("Panagrossi"), granted August 15, 2000 anticipates claims 1, 4, 5, 6, 7, 8, 10, and 11 of the '179 patent (Chart F-1).

2. U.S. Patent No. 6,094,197 to Buxton, et al. ("Buxton"), granted July 25, 2000 anticipates claims 1, 3, 4, 5, 6, 7, 8, 10, and 11 of the '179 patent (Chart F-2).

3. JP App. No. H8-272787 by Ishihara ("Ishihara), published October 18, 1996 anticipates claims 1, 3, 4, 5, 6, 7, 8, 10, and 11 of the '179 patent (Chart F-3).

4.      U.S. Patent No. 6,008,799 to Van Kleeck ("Van Kleeck"), granted December 28, 1999 anticipates claims 1, 3, 4, 5, 6, 7, 8, 10, and 11 of the '179 patent (Chart F-4).

5.      WO 97/30386 by Kato ("Kato"), published August 21, 1997 anticipates claims 1, 5, 6, 7, 8, 10, and 11 of the '179 patent (Chart F-5).

G.      **The '239 Patent**

1.      U.S. Patent No, 4,963,995 to Lang anticipates claims 1-3, and 5 of the '239 patent (Chart H-1).

2.      Keith A. Hadley, Kodak SV9600 Still Video Transceiver, SPIE Optical Sensors and Electronic Photography, 1989, pp. 238-245 anticipates claims 1-3, and 7 of the '239 patent (Chart H-2).

3.      U.S. Patent No. 5,633,891 to Rebec et al. anticipates claims 1 and 3-6 of the '239 patent (Chart H-3).

4.      U.S. Patent No. 7,433,921 to Ludwig et al. anticipates claims 1-7, and 15-17 of the '239 patent (Chart H-4).

5.      U.S. Patent No. 5,506,954 to Arshi et al. anticipates claims 1-7, and 15-17 of the '239 patent (Chart H-5).

6.      U.S. Patent No. 4,825,457 to Lebowitz et al. anticipates claims 1 and 3 of the '239 patent (Chart H-6).

7.      Japanese Patent Appl. 05-167965 to Heisei anticipates claims 1-7, and 15-17 of the '239 patent (Chart H-7).

8.      U.S. Patent No. 5,170,427 to Guichard et al. anticipates claims 1-3, 5, and 6 of the '239 patent (Exhibit H-8).

9.      The ActionMedia II System anticipates claims 1-3, 5, and 6 of the '239

patent (Exhibit H-9).

## VI.      DISCLOSURE OF INVALIDITY DUE TO OBVIOUSNESS PURSUANT TO PATENT L.R. 3-3(b) AND (c)

Subject to the reservation of rights above and based on Apple's present understanding of

the asserted claims of the Patents-In-Suit, and the apparent constructions Samsung is asserting

based on its Infringement Contentions, the prior art references identified above in Sections III

and V, and charted in Exhibits A-1 through H-9, each anticipate the asserted claims.

To the extent a finder of fact finds that a limitation of a given claim was not disclosed by

one of the references identified above pursuant to Patent L.R. 3-3(a), those claims are

nevertheless unpatentable as obvious because the asserted claims contain nothing that goes

beyond ordinary innovation.  To the extent not anticipated, no asserted claim goes beyond

combining known elements to achieve predictable results or does more than choose between

clear alternatives known to those of skill in the art.

Moreover, to the extent the foregoing references are found not to anticipate the asserted

claims, the foregoing references render the asserted claims obvious either alone or in

combination with one or more of the other references identified above pursuant to Patent L.R. 3-

3(a).  As explained herein and/or in the accompanying charts, it would have been obvious to a

person of skill in the art at the time of the alleged invention of the asserted claims of the Patents-

In-Suit to combine the various references cited herein so as to practice the asserted claims of the

Patents-In-Suit.  In addition to the specific combinations of prior art and the specific

combinations of groups of prior art disclosed, Apple reserves the right to rely on any other

combination of any prior art references disclosed herein.  Apple further reserves the right to rely

upon combinations disclosed within the prosecution history of the references cited herein.  These

obviousness combinations reflect Apple's present understanding of the potential scope of the claims that Samsung appears to be advocating and should not be construed as Apple's acquiescence to Samsung's interpretation of the patent claims.

A.     **The '087 Patent**

In accordance with Patent L.R. 3-3(b), prior art references rendering the asserted claims of the '087 patent obvious, alone or in combination with other references, are discussed below and included in Exhibits A-1 through A-7.  Exhibits A-1 through A-7 include exemplary claim charts for the '087 patent showing specific combinations of references, including citations to where in the references the teachings, suggestions, and motivations to combine the references are disclosed.  Further reasons to combine the references identified in Exhibits A-1 through A-7 include the nature of the problem being solved, the express, implied and inherent teachings of the prior art, the knowledge of persons of ordinary skill in the art, that such combinations would have yielded predictable results, and that such combinations would have represented known alternatives to a person of ordinary skill in the art.

In particular, Apple contends that the asserted claims of the '087 patent would have been obvious in view of the prior art references identified above.  For example, Exhibits A-1 through A-7 include exemplary claim charts that describe how the asserted claims of the '087 patent would have been obvious in view of the following references alone or in combination.  The primary references cited in Apple's exemplary claim charts, Exhibits A-1 through A-7 are U.S. Patent No. 7,321,780; 3GPP Tdoc R1-030284; and 3GPP Tdoc R1-040680.  Each of the primary references teaches all or, at a minimum, the vast majority of the limitations of the '087 patent asserted claims.  To the extent any claim elements are found to missing from the primary references, secondary references are designated for combination with the primary references,

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)

including the following:  US 5638369, US 5905720, US 5940741, US 6721294, US 6973070, US 7123596, US 7321780, US 7382747, US 7804850, US 2002/0191579, TDoc R1-03-0284, TDoc R1-03-0401, TDoc R1-04-0680, TDoc R1-04-0861, TDoc R1-04-1069, TDoc R1-04-1087, TDoc R1-04-1366, TDoc R1-04-1469, Chlamtac and Ganz reference, 3GPP TS 05.02 (V8.2.1), Bettstetter reference, Kueh reference, US 2004/0085934, 3GPP TS 04.60 (V6.3.1), and GSM 04.60 (V6.1.0).

Taken alone or together in the combinations set forth below, the prior art references include all limitations of the '087 patent asserted claims:

1.      If not anticipated, then claims 1-2, 6-10, 14-16, 34-35, 39-40 would have been obvious over US 7321780, alone or in view of any one of US 5638369, US 5905720, US 5940741, US 6721294, US 6973070, US 7123596, US 7382747, US 7804850, US 2002/0191579, TDoc R1-03-0284, TDoc R1-03-0401, TDoc R1-04-0680, TDoc R1-04-0861, TDoc R1-04-1069, TDoc R1-04-1087, TDoc R1-04-1366, TDoc R1-04-1469, Chlamtac and Ganz reference, 3GPP TS 05.02 (V8.2.1), Bettstetter reference, Kueh reference, US 2004/0085934, 3GPP TS 04.60 (V6.3.1), and GSM 04.60 (V6.1.0).

2.      If not anticipated, then claims 1-2, 6-10, 14-16, 34-35, 39-40 would have been obvious over 3GPP Tdoc R1-030284, alone or in view of any of US 5638369, US 5905720, US 5940741, US 6721294, US 6973070, US 7123596, US 7321780, US 7382747, US 7804850, US 2002/0191579, TDoc R1-030401, TDoc R1-040680, TDoc R1-040861, TDoc R1-041069, TDoc R1-041087, TDoc R1-041366, TDoc R1-041469, Chlamtac and

Ganz reference, 3GPP TS 05.02 (V8.2.1), Bettstetter reference, Kueh reference, US 2004/0085934, 3GPP TS 04.60 (V6.3.1), and GSM 04.60 (V6.1.0).

3.    If not anticipated, then claims 1-2, 6-10, 14-16, 34-35, 39-40 would have been obvious over 3GPP Tdoc R1-040680, alone or in view of any of US 5638369, US 5905720, US 5940741, US 6721294, US 6973070, US 7123596, US 7321780, US 7382747, US 7804850, US 2002/0191579, TDoc R1-030284, TDoc R1-030401, TDoc R1-040861, TDoc R1-041069, TDoc R1-041087, TDoc R1-041366, TDoc R1-041469, Chlamtac and Ganz reference, 3GPP TS 05.02 (V8.2.1), Bettstetter reference, Kueh reference, US 2004/0085934, 3GPP TS 04.60 (V6.3.1), and GSM 04.60 (V6.1.0).

**B.    The '596 Patent**

In accordance with Patent L.R. 3-3(b), prior art references rendering the asserted claims of the '596 patent obvious, alone or in combination with other references, are discussed below and included in Exhibits B-1 through B-17. Exhibits B-1 through B-17 include exemplary claim charts for the '596 patent showing specific combinations of references, including citations to where in the references the teachings, suggestions, and motivations to combine the references are disclosed. Further reasons to combine the references identified in Exhibits B-1 through B-17 include the nature of the problem being solved, the express, implied and inherent teachings of the prior art, the knowledge of persons of ordinary skill in the art, that such combinations would have yielded predictable results, and that such combinations would have represented known alternatives to a person of ordinary skill in the art.

In particular, Apple contends that the asserted claims of the '596 patent would have been obvious in view of the prior art references identified above.  For example, Exhibits B-1 through B-17 include exemplary claim charts that describe how the asserted claims of the '596 patent would have been obvious in view of the following references alone or in combination.  The primary references cited in Apple's exemplary claim charts, Exhibits B-1 through B-17, are:

1.　　　Exhibit B-1: Qualcomm Inc.'s "Proposed EIA/TIA Interim Standard Wideband Spread Spectrum Digital Cellular System Dual-Mode Mobile Station - Base Station Compatibility Standard," dated April 21, 1992;

2.　　　Exhibit B-2: IS-95B Specification;

3.　　　Exhibit B-3: cdma2000 1XRTT, as described in 3GPP2 C.S0003-D, Version 1.0, dated February 13, 2004;

4.　　　Exhibit B-4: US 2003/0147371 ("Choi '371 application");

5.　　　Exhibit B-5: R2-042739;

6.　　　Exhibit B-6: R2-042382 (Samsung);

7.　　　Exhibit B-7: R2-042462 (LG);

8.　　　Exhibit B-8: R2-042360 (Motorola, Nortel, Siemens);

9.　　　Exhibit B-9: "Siemens - E-DCH - MAC-e-es header" (hereinafter "Siemens MAC-e PDU Proposal");

10.　　　Exhibit B-10 ("MAC-e PDU DDI Proposals"): "QC MAC header schemes v2"; "Ericsson – MAC header scheme pA1"; R2-042402 (Samsung, Ericsson, Qualcomm);

11.　　　Exhibit B-11 ("Ericsson MAC-e PDU Proposals"): R2-041313 (Ericsson); R2-041927 (Ericsson); R2-042244 (Ericsson);

12.     Exhibit B-12 ("MAC-e PDU Proposals"): R1-041648 (Qualcomm); R2-040964 (Nokia); R2-041055 (LG); R2-041307 (Qualcomm); R2-041338 (Samsung); R2-041348 (LG); R2-041358 (Nokia); R2-041546 (LG); R2-041950 (LG); R2-042133 (Qualcomm); "Nortel MAC header scheme" (Nortel); "Nokia MAC-e_es headers on template" (Nokia); and "Motorola – MACe Header functionnal split" (Motorola);

13.     Exhibit B-14 ("25.309 Drafts"): R2-042664; R2-042716; R2-042719 (also designated on its face as "Tdoc R2-04xxxx" and "25.309 CR 1 rev 1"); R2-042725; and R2-042730;

14.     Exhibit B-15 ("10/29/04 Submissions" and "Open Items list" attached to Fauconnier 10/29/04 email): HSUPA MAC-e and MAC-es PDUs.zip; MAC-e-es header proposal.doc; Header Format Discussion.zip; MAC-e-es PDUs.doc; and Open items-291004-minutd.doc;

15.     Exhibit B-16: U.S. Patent No. 8,259,656; and

16.     Exhibit B-17 ("Qualcomm 11/4/04 Proposal" attached to Vayanos 11/4/04 email): QC MAC header schemes.zip.

Each of the primary references teaches all or, at a minimum, the vast majority of the limitations of the '596 patent asserted claims.  To the extent any claim elements are found to missing from the primary references, secondary references are designated for combination with the primary references, including the following:

1.     JP 2002-335285

2.     3GPP TR 25.896 v6.0.0;

3.     3GPP TS 25.321 v5.0.0;

4.      3GPP TS 25.321 v5.7.0;

5.      Draft0 Minutes of the 45th TSG-RAN WG2 meeting (Shin-Yokohama, Japan, 15-19 November 2004) (hereinafter "WG2 45 Minutes");

6.      R1-031246 (Qualcomm);

7.      R1-040451 (Motorola);

8.      R1-041649 (Qualcomm);

9.      R2-041352 (Fujitsu);

10.     R2-041545 (LG);

11.     R2-042065 (Nortel);

12.     R2-042493 (Siemens); and

13.     C30-20030306-063 QC RL Proposal_v1.0 (Qualcomm).

Taken alone or together in the combinations set forth below, the primary prior art references include all limitations of the '596 patent asserted claims:

1.      Claims 1, 4, 6, 13, 16, and 18 would have been obvious over Qualcomm 1992 Proposal (Ex. B-1), alone or in view of any one or more of

(a)     C30-20030306-063, entitled "QC Reverse Link Proposal" and dated May 2003;

(b)     US 2003/0147371 (Ex. B-4);

(c)     R2-042739 (Ex. B-5);

(d)     R2-042382 (Samsung) (Ex. B-6);

(e)     R2-042462 (LG) (Ex. B-7);

(f)     "QC MAC header schemes v2" (Qualcomm), "Ericsson – MAC header scheme pA1" (Ericsson), R2-042402 (Samsung, Ericsson, Qualcomm) (Ex. B-10);

(g)     R2-041313 (Ericsson), R2-041927 (Ericsson), R2-042244 (Ericsson) (Ex. B-11);

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)

(h)     R2-042664, R2-042716, R2-042719, R2-042725, and R2-042730 (Ex. B-14);

(i)     HSUPA MAC-e and MAC-es PDUs.zip, MAC-e-es header proposal.doc, Header Format Discussion.zip, MAC-e-es PDUs.doc ("10/29/04 Submissions") (Ex. B-15);

(j)     U.S. Patent No. 8,259,656 (Ex. B-16).

2.      Claims 1, 4, 6, 13, 16, and 18 would have been obvious over the  IS-95B

Specification (Ex. B-2), alone or in view of any one or more of

(a)     C30-20030306-063, entitled "QC Reverse Link Proposal" and dated May 2003;

(b)     US 2003/0147371 (Ex. B-4);

(c)     R2-042739 (Ex. B-5);

(d)     R2-042382 (Samsung) (Ex. B-6);

(e)     R2-042462 (LG) (Ex. B-7);

(f)     "QC MAC header schemes v2" (Qualcomm), "Ericsson – MAC header scheme pA1" (Ericsson), R2-042402 (Samsung, Ericsson, Qualcomm) (Ex. B-10);

(g)     R2-041313 (Ericsson), R2-041927 (Ericsson), R2-042244 (Ericsson) (Ex. B-11);

(h)     R2-042664, R2-042716, R2-042719, R2-042725, and R2-042730 (Ex. B-14);

(i)     HSUPA MAC-e and MAC-es PDUs.zip, MAC-e-es header proposal.doc, Header Format Discussion.zip, MAC-e-es PDUs.doc ("10/29/04 Submissions") (Ex. B-15);

(j)     U.S. Patent No. 8,259,656 (Ex. B-16).

3.      Claims 1, 4, 6, 13, 16, and 18 would have been obvious over cdma2000

1XRTT (Ex. B-3), alone or in view of any one or more of

(a)     C30-20030306-063, entitled "QC Reverse Link Proposal" and dated May 2003;

(b)     US 2003/0147371 (Ex. B-4);

(c)    R2-042739 (Ex. B-5);

(d)    R2-042382 (Samsung) (Ex. B-6);

(e)    R2-042462 (LG) (Ex. B-7);

(f)    "QC MAC header schemes v2" (Qualcomm), "Ericsson – MAC header scheme pA1" (Ericsson), R2-042402 (Samsung, Ericsson, Qualcomm) (Ex. B-10);

(g)    R2-041313 (Ericsson), R2-041927 (Ericsson), R2-042244 (Ericsson) (Ex. B-11);

(h)    R2-042664, R2-042716, R2-042719, R2-042725, and R2-042730 (Ex. B-14);

(i)    HSUPA MAC-e and MAC-es PDUs.zip, MAC-e-es header proposal.doc, Header Format Discussion.zip, MAC-e-es PDUs.doc ("10/29/04 Submissions") (Ex. B-15);

(j)    U.S. Patent No. 8,259,656 (Ex. B-16).

4.    Claims 1, 4, 6, 13, 16, and 18 would have been obvious over US 2003/0147371 (Ex. B-4), alone or in view of any one or more of

(a)    3GPP TS 25.321 v5.0.0;

(b)    R2-041545 (LG);

(c)    R2-042739 (Ex. B-5);

(d)    R2-042382 (Samsung) (Ex. B-6);

(e)    R2-042462 (LG) (Ex. B-7);

(f)    R2-042360 (Motorola, Nortel, Siemens) (Ex. B-8);

(g)    Siemens MAC-e PDU Proposal (Ex. B-9);

(h)    MAC-e PDU DDI Proposals (Ex. B-10);

(i)    Ericsson MAC-e PDU Proposals (Ex. B-11);

(j)    WG2 45 Minutes, TR 25.896 v6.0.0, R1-031246 (Qualcomm), R1-040451 (Motorola), R2-041352 (Fujitsu), R2-042065 (Nortel), R2-042493 (Siemens) (Ex. B-13);

(k)     R2-042664, R2-042716, R2-042719, R2-042725, and R2-042730 (Ex. B-14);

(l)     HSUPA MAC-e and MAC-es PDUs.zip, MAC-e-es header proposal.doc, Header Format Discussion.zip, MAC-e-es PDUs.doc ("10/29/04 Submissions") (Ex. B-15);

(m)     U.S. Patent No. 8,259,656 (Ex. B-16).

5.     Claims 1, 4, 6, 13, 16, and 18 would have been obvious over  R2-042739 (Ex. B-5) standing alone or in view of one or more of

(a)     US 2003/0147371 (Ex. B-4);

(b)     R2-042382 (Samsung) (Ex. B-6);

(c)     R2-042462 (LG) (Ex. B-7);

(d)     R2-042360 (Motorola, Nortel, Siemens) (Ex. B-8);

(e)     Siemens MAC-e PDU Proposal (Ex. B-9);

(f)     WG2 45 Minutes, TR 25.896 v6.0.0, R1-031246 (Qualcomm), R1-040451 (Motorola), R2-041352 (Fujitsu), R2-042065 (Nortel), R2-042493 (Siemens), JP 2002-335285 (Ex. B-13);

(g)     R2-042664, R2-042716, R2-042719, R2-042725, and R2-042730 (Ex. B-14);

(h)     U.S. Patent No. 8,259,656 (Ex. B-16).

6.     Claims 1, 4, 6, 13, 16, and 18 would have been obvious over R2-042382 (Samsung) (Ex. B-6), alone or in view of any one or more of

(a)     R1-041649 (Qualcomm);

(b)     R2-042739 (Ex. B-5);

(c)     R2-042462 (LG) (Ex. B-7);

(d)     MAC-e PDU DDI Proposals (Ex. B-10);

(e)     Ericsson MAC-e PDU Proposals (Ex. B-11);

(f)     WG2 45 Minutes, TR 25.896 v6.0.0, R1-031246 (Qualcomm), R1-040451 (Motorola), R2-041352 (Fujitsu), R2-042065 (Nortel), R2-042493 (Siemens) (Ex. B-13);

(g)     R2-042664, R2-042716, R2-042719, R2-042725, and R2-042730 (Ex. B-14);

(h)     HSUPA MAC-e and MAC-es PDUs.zip, MAC-e-es header proposal.doc, Header Format Discussion.zip, MAC-e-es PDUs.doc ("10/29/04 Submissions") (Ex. B-15);

(i)     U.S. Patent No. 8,259,656 (Ex. B-16).

7.     Claims 1, 4, 6, 13, 16, and 18 would have been obvious over R2-042462 (LG) (Ex. B-7), alone or in view of one or more of

(a)     US 2003/0147371 (Ex. B-4);

(b)     R2-042739 (Ex. B-5);

(c)     R2-042382 (Samsung) (Ex. B-6);

(d)     MAC-e PDU DDI Proposals (Ex. B-10);

(e)     Ericsson MAC-e PDU Proposals (Ex. B-11);

(f)     TR 25.896 v6.0.0, R1-031246 (Qualcomm), R1-040451 (Motorola), R2-041352 (Fujitsu), R2-042065 (Nortel), R2-042493 (Siemens), JP 2002-335285 (Ex. B-13);

(g)     R2-042664, R2-042716, R2-042719, R2-042725, and R2-042730 (Ex. B-14);

(h)     HSUPA MAC-e and MAC-es PDUs.zip, MAC-e-es header proposal.doc, Header Format Discussion.zip, MAC-e-es PDUs.doc ("10/29/04 Submissions") (Ex. B-15);

(i)     U.S. Patent No. 8,259,656 (Ex. B-16).

8.     Claims 1, 4, 6, 13, 16, and 18 would have been obvious over R2-042360 (Motorola, Nortel, Siemens) (Ex. B-8), alone or in view of one or more of

(a)     US 2003/0147371 (Ex. B-4);

(b)     R2-042739 (Ex. B-5);

  (c)  R2-042382 (Samsung) (Ex. B-6);

  (d)  R2-042462 (LG) (Ex. B-7);

  (e)  MAC-e PDU DDI Proposals (Ex. B-10);

  (f)  Ericsson MAC-e PDU Proposals (Ex. B-11);

  (g)  WG2 45 Minutes, TR 25.896 v6.0.0, R1-031246 (Qualcomm), R1-040451 (Motorola), R2-041352 (Fujitsu), R2-042065 (Nortel), R2-042493 (Siemens) (Ex. B-13);

  (h)  R2-042664, R2-042716, R2-042719, R2-042725, and R2-042730 (Ex. B-14);

  (i)  HSUPA MAC-e and MAC-es PDUs.zip, MAC-e-es header proposal.doc, Header Format Discussion.zip, MAC-e-es PDUs.doc ("10/29/04 Submissions") (Ex. B-15);

  (j)  U.S. Patent No. 8,259,656 (Ex. B-16).

9.  Claims 1, 4, 6, 13, 16, and 18 would have been obvious over the Siemens MAC-e PDU Proposal (Ex. B-9), alone or in view of one or more of

  (a)  US 2003/0147371 (Ex. B-4);

  (b)  R2-042739 (Ex. B-5);

  (c)  R2-042382 (Samsung) (Ex. B-6);

  (d)  R2-042462 (LG) (Ex. B-7);

  (e)  MAC-e PDU DDI Proposals (Ex. B-10);

  (f)  Ericsson MAC-e PDU Proposals (Ex. B-11);

  (g)  WG2 45 Minutes, TR 25.896 v6.0.0, R1-031246 (Qualcomm), R1-040451 (Motorola), R2-041352 (Fujitsu), R2-042065 (Nortel), R2-042493 (Siemens), JP 2002-335285 (Ex. B-13);

  (h)  R2-042664, R2-042716, R2-042719, R2-042725, and R2-042730 (Ex. B-14);

  (i)  HSUPA MAC-e and MAC-es PDUs.zip, MAC-e-es header proposal.doc, Header Format Discussion.zip, MAC-e-es PDUs.doc ("10/29/04 Submissions") (Ex. B-15);

  (j)  U.S. Patent No. 8,259,656 (Ex. B-16).

10.     Claims 1, 4, 6, 13, 16, and 18 would have been obvious over  any one of

the MAC-e PDU DDI Proposals (Ex. B-10), standing alone or in view of

one or more of

(a)     US 2003/0147371 (Ex. B-4);

(b)     R2-042739 (Ex. B-5);

(c)     R2-042382 (Samsung) (Ex. B-6);

(d)     R2-042462 (LG) (Ex. B-7);

(e)     R2-042360 (Motorola, Nortel, Siemens) (Ex. B-8);

(f)     Siemens MAC-e PDU Proposal (Ex. B-9);

(g)     Ericsson MAC-e PDU Proposals (Ex. B-11);

(h)     WG2 45 Minutes, TR 25.896 v6.0.0, R1-031246 (Qualcomm), R1-040451 (Motorola), R2-041352 (Fujitsu), R2-042065 (Nortel), R2-042493 (Siemens), JP 2002-335285 (Ex. B-13);

(i)     R2-042664, R2-042716, R2-042719, R2-042725, and R2-042730 (Ex. B-14);

(j)     HSUPA MAC-e and MAC-es PDUs.zip, MAC-e-es header proposal.doc, Header Format Discussion.zip, MAC-e-es PDUs.doc ("10/29/04 Submissions") (Ex. B-15);

(k)     U.S. Patent No. 8,259,656 (Ex. B-16).

11.     Claims 1, 4, 6, 13, 16, and 18 would have been obvious over  any one of

the Ericsson MAC-e PDU Proposals (Ex. B-11), standing alone or in view

of one or more of

(a)     US 2003/0147371 (Ex. B-4);

(b)     R2-042739 (Ex. B-5);

(c)     R2-042382 (Samsung) (Ex. B-6);

(d)     R2-042462 (LG) (Ex. B-7);

(e)     R2-042360 (Motorola, Nortel, Siemens) (Ex. B-8);

(f)     Siemens MAC-e PDU Proposal (Ex. B-9);

(g)     MAC-e PDU DDI Proposals (Ex. B-10);

(h)     WG2 45 Minutes, TR 25.896 v6.0.0, R1-031246 (Qualcomm), R1-040451 (Motorola), R2-041352 (Fujitsu), R2-042065 (Nortel), R2-042493 (Siemens), JP 2002-335285 (Ex. B-13);

(i)     R2-042664, R2-042716, R2-042719, R2-042725, and R2-042730 (Ex. B-14);

(j)     HSUPA MAC-e and MAC-es PDUs.zip, MAC-e-es header proposal.doc, Header Format Discussion.zip, MAC-e-es PDUs.doc ("10/29/04 Submissions") (Ex. B-15);

(k)     U.S. Patent No. 8,259,656 (Ex. B-16).

12.     Claims 1, 4, 6, 13, 16, and 18 would have been obvious over  any one of the MAC-e PDU Proposals (Ex. B-12), standing alone or in view of one or more of

(a)     US 2003/0147371 (Ex. B-4);

(b)     R2-042739 (Ex. B-5);

(c)     R2-042382 (Samsung) (Ex. B-6);

(d)     R2-042462 (LG) (Ex. B-7);

(e)     R2-042360 (Motorola, Nortel, Siemens) (Ex. B-8);

(f)     Siemens MAC-e PDU Proposal (Ex. B-9);

(g)     MAC-e PDU DDI Proposals (Ex. B-10);

(h)     Ericsson MAC-e PDU Proposals (Ex. B-11);

(i)     WG2 45 Minutes, TR 25.896 v6.0.0, R1-031246 (Qualcomm), R1-040451 (Motorola), R2-041352 (Fujitsu), R2-042065 (Nortel), R2-042493 (Siemens), JP 2002-335285 (Ex. B-13);

(j)     R2-042664, R2-042716, R2-042719, R2-042725, and R2-042730 (Ex. B-14);

(k)    HSUPA MAC-e and MAC-es PDUs.zip, MAC-e-es header proposal.doc, Header Format Discussion.zip, MAC-e-es PDUs.doc ("10/29/04 Submissions") (Ex. B-15);

(l)    U.S. Patent No. 8,259,656 (Ex. B-16).

13.    Claims 1, 4, 6, 13, 16, and 18 would have been obvious over  any one of the 25.309 Drafts (Ex. B-14), standing alone or in view of one or more of

(a)    US 2003/0147371 (Ex. B-4);

(b)    R2-042739 (Ex. B-5);

(c)    R2-042382 (Samsung) (Ex. B-6);

(d)    R2-042462 (LG) (Ex. B-7);

(e)    R2-042360 (Motorola, Nortel, Siemens) (Ex. B-8);

(f)    Siemens MAC-e PDU Proposal (Ex. B-9);

(g)    Ericsson MAC-e PDU Proposals (Ex. B-11);

(h)    WG2 45 Minutes, TR 25.896 v6.0.0, R1-031246 (Qualcomm), R1-040451 (Motorola), R2-041352 (Fujitsu), R2-042065 (Nortel), R2-042493 (Siemens), JP 2002-335285 (Ex. B-13);

(i)    U.S. Patent No. 8,259,656 (Ex. B-16).

14.    Claims 1, 4, 6, 13, 16, and 18 would have been obvious over  any one of the 10/29/04 Submissions (Ex. B-15), standing alone or in view of one or more of

(a)    US 2003/0147371 (Ex. B-4);

(b)    R2-042739 (Ex. B-5);

(c)    R2-042382 (Samsung) (Ex. B-6);

(d)    R2-042462 (LG) (Ex. B-7);

(e)    R2-042360 (Motorola, Nortel, Siemens) (Ex. B-8);

(f)    Siemens MAC-e PDU Proposal (Ex. B-9);

(g)    MAC-e PDU DDI Proposals (Ex. B-10);

(h)     Ericsson MAC-e PDU Proposals (Ex. B-11);

(i)     WG2 45 Minutes, TR 25.896 v6.0.0, R1-031246 (Qualcomm), R1-040451 (Motorola), R2-041352 (Fujitsu), R2-042065 (Nortel), R2-042493 (Siemens), JP 2002-335285 (Ex. B-13);

(j)     R2-042664, R2-042716, R2-042719, R2-042725, and R2-042730 (Ex. B-14);

(k)     U.S. Patent No. 8,259,656 (Ex. B-16).

15.     Claims 1, 4, 6, 13, 16, and 18 would have been obvious over  U.S. Patent No. 8,259,656 to Chun (Ex. B-16), standing alone or in view of one or more of

(a)     US 2003/0147371 (Ex. B-4);

(b)     R2-042739 (Ex. B-5);

(c)     R2-042382 (Samsung) (Ex. B-6);

(d)     MAC-e PDU DDI Proposals (Ex. B-10);

(e)     Ericsson MAC-e PDU Proposals (Ex. B-11);

(f)     WG2 45 Minutes, TR 25.896 v6.0.0, R1-031246 (Qualcomm), R1-040451 (Motorola), R2-041352 (Fujitsu), R2-042065 (Nortel), R2-042493 (Siemens), JP 2002-335285 (Ex. B-13);

(g)     R2-042664, R2-042716, R2-042719, R2-042725, and R2-042730 (Ex. B-14);

(h)     HSUPA MAC-e and MAC-es PDUs.zip, MAC-e-es header proposal.doc, Header Format Discussion.zip, MAC-e-es PDUs.doc ("10/29/04 Submissions") (Ex. B-15).

16.     Claims 1, 4, 6, 13, 16, and 18 would have been obvious over  the Qualcomm 11/4/04 Proposal (Ex. B-17), standing alone or in view of one or more of

(a)     US 2003/0147371 (Ex. B-4);

(b)     R2-042739 (Ex. B-5);

(c)     R2-042382 (Samsung) (Ex. B-6);

(d)     R2-042462 (LG) (Ex. B-7);

(e)     R2-042360 (Motorola, Nortel, Siemens) (Ex. B-8);

(f)     Siemens MAC-e PDU Proposal (Ex. B-9);

(g)     MAC-e PDU DDI Proposals (Ex. B-10);

(h)     Ericsson MAC-e PDU Proposals (Ex. B-11);

(i)     WG2 45 Minutes, TR 25.896 v6.0.0, R1-031246 (Qualcomm), R1-040451 (Motorola), R2-041352 (Fujitsu), R2-042065 (Nortel), R2-042493 (Siemens), JP 2002-335285 (Ex. B-13);

(j)     R2-042664, R2-042716, R2-042719, R2-042725, and R2-042730 (Ex. B-14);

(k)     HSUPA MAC-e and MAC-es PDUs.zip, MAC-e-es header proposal.doc, Header Format Discussion.zip, MAC-e-es PDUs.doc ("10/29/04 Submissions") (Ex. B-15);

(l)     U.S. Patent No. 8,259,656 (Ex. B-16).

## C.     The '470 Patent

In accordance with Patent L.R. 3-3(b), prior art references rendering the asserted claims of the '470 patent obvious, alone or in combination with other references, are discussed below and included in Exhibits C-1 through C-13.  Exhibits C-1 through C-13 include exemplary claim charts for the '470 patent showing specific combinations of references, including citations to where in the references the teachings, suggestions, and motivations to combine the references are disclosed.  Further reasons to combine the references identified in Exhibits C-1 through C-13 include the nature of the problem being solved, the express, implied and inherent teachings of the prior art, the knowledge of persons of ordinary skill in the art, that such combinations would have yielded predictable results, and that such combinations would have represented known alternatives to a person of ordinary skill in the art.

In particular, Apple contends that the asserted claims of the '470 patent would have been obvious in view of the prior art references identified above.  For example, Exhibits C-1 through C-13 include exemplary claim charts that describe how the asserted claims of the '470 patent would have been obvious in view of the following references alone or in combination.  The primary references cited in Apple's exemplary claim charts, Exhibits C-1 through C-13, are (1) the Sony Ericsson T616 Mobile Phone, as described in the Sony Ericsson T616 User Guide; (2) U.S. Patent No. 6,819,942; (3) JP 2002-10389; (4) the Nokia 3590 Mobile Phone, as described in the Nokia 3590 Mobile Phone User Guide; (5) Japanese Publication No. H8-330867; (6) Nokia 6100 Mobile Phone, as described in the Nokia 6100 Mobile Phone User Guide; (7) the Nokia 7210 Mobile Phone, as described in the Nokia 7210 Mobile Phone User Guide; (8) the Sony Ericsson T68i Mobile Phone, as described in the Sony Ericsson T68i User Guide; (9) the Sony Ericsson P800 Mobile Phone, as described in the Sony Ericsson P800 User Manual and the P800 / P802 White Paper; (10) the Sony Ericsson T610 Mobile Phone, as described in the Sony Ericsson T610 User Guide; (11) International Application Number PCT/US00/00664; (12) the Canon GL2 Digital Video Camcorder, as described in the GL2 Instruction Manual; and (13) the iMac G4 (OS X 10.2 installed).  Each of the primary references teaches all or, at a minimum, the vast majority of the limitations of the '470 patent asserted claims.  To the extent any claim elements are found to missing from the primary references, secondary references are designated for combination with the primary references, including the following:  (1) U.S. Patent No. 6,867,820; (2) U.S. 6,041,225; and (3) JP 2002-151986A.

Taken alone or together in the combinations set forth below, the primary prior art references include all limitations of the '470 patent asserted claims:

1.     To the extent not anticipated, claims 7 and 12 would have been obvious over U.S. Patent No. 6,819,942 alone or in combination with any one of (1) the Sony Ericsson T616 Mobile Phone; (2) the Nokia 3590 Mobile Phone; (3) the Nokia 6100 Mobile Phone; (4) the Nokia 7210 Mobile Phone; (5) the Sony Ericsson T68i Mobile Phone; (6) the Sony Ericsson P800 Mobile Phone; (7) the Sony Ericsson T610 Mobile Phone; and (8) the Canon GL2 Digital Video Camcorder.

2.     To the extent not anticipated, claims 7 and 12 would have been obvious over JP 2002-10389 alone or in combination with any one of (1) the Sony Ericsson T616 Mobile Phone; (2) the Nokia 3590 Mobile Phone; (3) the Nokia 6100 Mobile Phone; (4) the Nokia 7210 Mobile Phone; (5) the Sony Ericsson T68i Mobile Phone; (6) the Sony Ericsson P800 Mobile Phone; (7) the Sony Ericsson T610 Mobile Phone; and (8) the Canon GL2 Digital Video Camcorder.

3.     To the extent not anticipated, claims 7 and 12 would have been obvious over JP H5-330867 alone or in combination with any one of (1) the Sony Ericsson T616 Mobile Phone; (2) the Nokia 3590 Mobile Phone; (3) the Nokia 6100 Mobile Phone; (4) the Nokia 7210 Mobile Phone; (5) the Sony Ericsson T68i Mobile Phone; (6) the Sony Ericsson P800 Mobile Phone; (7) the Sony Ericsson T610 Mobile Phone; and (8) the Canon GL2 Digital Video Camcorder.

4.     To the extent not anticipated, claims 11 and 16 would have been obvious over U.S. Patent No. 6,819,942 alone or in combination with any one of

(1) U.S. Patent No. 6,867,820; (2) U.S. 6,041,225; and (3) JP 2002-151986A.

5.      To the extent not anticipated, claims 11 and 16 would have been obvious over JP 2002-10389 alone or in combination with any one of (1) U.S. Patent No. 6,867,820; (2) U.S. 6,041,225; and (3) JP 2002-151986A.

6.      To the extent not anticipated, claims 11 and 16 would have been obvious over the iMac G4 alone or in combination with any one of (1) U.S. Patent No. 6,867,820; (2) U.S. 6,041,225; and (3) JP 2002-151986A.

7.      To the extent not anticipated, claims 7, 11, 12, and 16  would have been obvious over any one of (1) the Sony Ericsson T616 Mobile Phone; (2) the Nokia 3590 Mobile Phone; (3) the Nokia 6100 Mobile Phone; (4) the Nokia 7210 Mobile Phone; (5) the Sony Ericsson P800 Mobile Phone; (6) the Sony Ericsson T610 Mobile Phone; (7) the Sony Ericsson T68i Mobile Phone; and (8) the Canon GL2 Digital Video Camcorder alone or in combination with any one of (1) the Sony Ericsson T616 Mobile Phone; (2) the Nokia 3590 Mobile Phone; (3) the Nokia 6100 Mobile Phone; (4) the Nokia 7210 Mobile Phone; (5) the Sony Ericsson P800 Mobile Phone; (6) the Sony Ericsson T610 Mobile Phone; (7) the Sony Ericsson T68i Mobile Phone; and (8) the Canon GL2 Digital Video Camcorder.

8.      To the extent not anticipated, claims 7, 8, 11, and 12 would have been obvious over any one of (1) the Sony Ericsson T616 Mobile Phone; (2) the Nokia 3590 Mobile Phone; (3) the Nokia 6100 Mobile Phone; (4) the Nokia 7210 Mobile Phone; (5) the Sony Ericsson T68i Mobile Phone; (6)

the Sony Ericsson P800 Mobile Phone; (7) the Sony Ericsson T610

Mobile Phone; (8) the Canon GL2 Digital Video Camcorder; and (9)

PCT/US00/00664 alone or in combination with any one of U.S. Patent No.

6,819,942, JP 2002-10389, and JP H8-330867.

9.      To the extent not anticipated, claims 7 and 8 would have been obvious

over U.S. Patent No. 6,819,942 alone or in combination with either JP

2002-10389 or JP H8-330867.

**D.      <u>The '757 Patent</u>**

In accordance with Patent L.R. 3-3(b), prior art references rendering the asserted claims

of the '757 patent obvious, alone or in combination with other references, are discussed below

and included in Exhibits D-1 through D-10.  Exhibits D-1 through D-10 include exemplary claim

charts for the '757 patent showing specific combinations of references, including citations to

where in the references the teachings, suggestions, and motivations to combine the references are

disclosed.  Further reasons to combine the references identified in Exhibits D-1 through D-10

include the nature of the problem being solved, the express, implied and inherent teachings of the

prior art, the knowledge of persons of ordinary skill in the art, that such combinations would

have yielded predictable results, and that such combinations would have represented known

alternatives to a person of ordinary skill in the art.

In particular, Apple contends that the asserted claims of the '757 patent would have been

obvious in view of the prior art references identified above.  For example, Exhibits D-1 through

D-10 include exemplary claim charts that describe how the asserted claims of the '757 patent

would have been obvious in view of the following references alone or in combination.  The

primary references cited in Apple's exemplary claim charts, Exhibits D-1 through D-10 are U.S.

Patent No. 7,587,446 to Onyon et al. ("the '446 Patent"), U.S. Patent Application No.

2002/0026442 A1 ("the '442 Pub."), U.S. Patent No. 7,020,704 to Lipscomb ("the '704 Patent"),

U.S. Patent No. 6,636,873 to Carini et al. ("the '873 Patent"), the Oracle 8i System as described

in the Oracle 8i concepts manual ("the Oracle 8i System"), U.S. Patent No, 5,729,735 to

Meyering ("the '735 Patent"), U.S. Patent No, 6,000,000 to Hawkins et al. ("the '000 Patent),

PCT International Application WO96/21898 to Boothby ("Boothby"), the Unison File

Synchronizer Version 2.1 and Manual ("Unison"), and the Aztec RadioMedia/Digigram

HitPlayer, the HitPlayer Manual, and the HitPlayer Brochure ("the HitPlayer").  Each of the

primary references teaches all or, at a minimum, the vast majority of the limitations of the '757

patent asserted claims.  To the extent any claim elements are found to missing from the primary

references, secondary references are designated for combination with the primary references,

including the following: U.S. Patent No. 5,297,231, U.S. Patent No. 5,550,566, and U.S. Patent

No. 5,758,177.

     Taken alone or together in the combinations set forth below, the primary prior art

references include all limitations of the '757 patent asserted claims:

    1.    Claim 1 would have been obvious over the '446 Patent alone or in view of

        any one of the '442 Pub. (Exhibit D-2), the '704 Patent (Exhibit D-3), the

        '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), Boothby

        (Exhibit D-8), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

    2.    Claims 3 and 15  would have been obvious over the '446 Patent alone or

        in view of any one of the '442 Pub. (Exhibit D-2), the '704 Patent (Exhibit

        D-3), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5),

        Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

3.      Claims 2 and 14 would have been obvious over the '446 Patent alone or in view of any one of the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

4.      Claims 4 and 5 would have been obvious over the '446 Patent alone or in view of any one of the '442 Pub. (Exhibit D-2), the '704 Patent (Exhibit D-3), the '735 Patent (Exhibit D-6), Boothby (Exhibit D-8), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

5.      Claim 11 would have been obvious over the '446 Patent alone or in view of any one of the HitPlayer (Exhibit D-10), U.S. Patent No. 5,297,231, U.S. Patent No. 5,550,566, U.S. Patent No. 5,758,177.

6.      Claim 12 would have been obvious over the '446 Patent alone or in view of any one of the '704 Patent (Exhibit D-3), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), the '735 Patent (Exhibit D-6), the '000 Patent (Exhibit D-7), Boothby (Exhibit D-8), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

7.      Claim 1 would have been obvious over the '442 pub. alone or in view of any one of the '446 Patent (Exhibit D-1), the '704 Patent (Exhibit D-3), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), Boothby (Exhibit D-8), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

8.      Claims 3 and 15  would have been obvious over the '442 pub. alone or in view of any one of the '446 Patent (Exhibit D-1), the '704 Patent (Exhibit

D-3), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

9.     Claims 2 and 14 would have been obvious over the '442 pub. alone or in view of any one of the '446 Patent (Exhibit D-1), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

10.    Claims 4 and 5 would have been obvious over the '442 pub. alone or in view of any one of the '446 Patent (Exhibit D-1), the '704 Patent (Exhibit D-3), the '735 Patent (Exhibit D-6), Boothby (Exhibit D-8), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

11.    Claim 11 would have been obvious over the '442 pub. alone or in view of any one of the '446 Patent (Exhibit D-1), the HitPlayer (Exhibit D-10), U.S. Patent No. 5,297,231, U.S. Patent No. 5,550,566, U.S. Patent No. 5,758,177.

12.    Claim 12 would have been obvious over the '442 pub. alone or in view of any one of the '446 Patent (Exhibit D-1), the '704 Patent (Exhibit D-3), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), the '735 Patent (Exhibit D-6), the '000 Patent (Exhibit D-7), Boothby (Exhibit D-8), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

13.    Claim 1 would have been obvious over the '704 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), Boothby (Exhibit D-8), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

14. Claims 3 and 15  would have been obvious over the '704 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

15. Claims 2 and 14 would have been obvious over the '704 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

16. Claims 4 and 5 would have been obvious over the '704 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the '735 Patent (Exhibit D-6), Boothby (Exhibit D-8), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

17. Claim 11 would have been obvious over the '704 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the HitPlayer (Exhibit D-10), U.S. Patent No. 5,297,231, U.S. Patent No. 5,550,566, U.S. Patent No. 5,758,177.

18. Claim 12 would have been obvious over the '704 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), the '735 Patent (Exhibit D-6), the '000 Patent (Exhibit D-7), Boothby (Exhibit D-8), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

19. Claim 1 would have been obvious over the '873 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the

'704 Patent (Exhibit D-3), the Oracle 8i System (Exhibit D-5), Boothby (Exhibit D-8), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

20.      Claims 3 and 15  would have been obvious over the '873 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the '704 Patent (Exhibit D-3), the Oracle 8i System (Exhibit D-5), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

21.      Claims 2 and 14 would have been obvious over the '873 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the Oracle 8i System (Exhibit D-5), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

22.      Claims 4 and 5 would have been obvious over the '873 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the '704 Patent (Exhibit D-3), the '735 Patent (Exhibit D-6), Boothby (Exhibit D-8), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

23.      Claim 11 would have been obvious over the '873 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the HitPlayer (Exhibit D-10), U.S. Patent No. 5,297,231, U.S. Patent No. 5,550,566, U.S. Patent No. 5,758,177.

24.      Claim 12 would have been obvious over the '873 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the '704 Patent (Exhibit D-3), the Oracle 8i System (Exhibit D-5), the '735 Patent (Exhibit D-6), the '000 Patent (Exhibit D-7), Boothby (Exhibit D-8), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

25.    Claim 1 would have been obvious over the Oracle 8i System alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the '704 Patent (Exhibit D-3), the '873 Patent (Exhibit D-4), Boothby (Exhibit D-8), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

26.    Claims 3 and 15  would have been obvious over the Oracle 8i System alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the '704 Patent (Exhibit D-3), the '873 Patent (Exhibit D-4), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

27.    Claims 2 and 14 would have been obvious over the Oracle 8i System alone or in view of any one of the '446 Patent (Exhibit D-1), the '873 Patent (Exhibit D-4), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

28.    Claims 4 and 5 would have been obvious over the Oracle 8i System alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the '704 Patent (Exhibit D-3), the '735 Patent (Exhibit D-6), Boothby (Exhibit D-8), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

29.    Claim 11 would have been obvious over the Oracle 8i System alone or in view of any one of the '446 Patent (Exhibit D-1), the HitPlayer (Exhibit D-10), U.S. Patent No. 5,297,231, U.S. Patent No. 5,550,566, U.S. Patent No. 5,758,177.

30.     Claim 12 would have been obvious over the Oracle 8i System alone or in view of any one of the '446 Patent (Exhibit D-1), the '704 Patent (Exhibit D-3), the '873 Patent (Exhibit D-4), the '735 Patent (Exhibit D-6), the '000 Patent (Exhibit D-7), Boothby (Exhibit D-8), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

31.     Claim 1 would have been obvious over the '735 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the '704 Patent (Exhibit D-3), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), Boothby (Exhibit D-8), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

32.     Claims 3 and 15  would have been obvious over the '735 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the '704 Patent (Exhibit D-3), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

33.     Claims 2 and 14 would have been obvious over the '735 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

34.     Claims 4 and 5 would have been obvious over the '735 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the '704 Patent (Exhibit D-3), Boothby (Exhibit D-8), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

35.  Claim 11 would have been obvious over the '735 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the HitPlayer (Exhibit D-10), U.S. Patent No. 5,297,231, U.S. Patent No. 5,550,566, U.S. Patent No. 5,758,177.

36.  Claim 12 would have been obvious over the '735 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the '704 Patent (Exhibit D-3), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), the '000 Patent (Exhibit D-7), Boothby (Exhibit D-8), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

37.  Claim 1 would have been obvious over the '000 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the '704 Patent (Exhibit D-3), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), Boothby (Exhibit D-8), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

38.  Claims 3 and 15  would have been obvious over the '000 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the '704 Patent (Exhibit D-3), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

39.  Claims 2 and 14 would have been obvious over the '000 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

40.     Claims 4 and 5 would have been obvious over the '000 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the '704 Patent (Exhibit D-3), the '735 Patent (Exhibit D-6), Boothby (Exhibit D-8), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

41.     Claim 11 would have been obvious over the '000 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the HitPlayer (Exhibit D-10), U.S. Patent No. 5,297,231, U.S. Patent No. 5,550,566, U.S. Patent No. 5,758,177.

42.     Claim 12 would have been obvious over the '000 Patent alone or in view of any one of the '446 Patent (Exhibit D-1), the '704 Patent (Exhibit D-3), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), the '735 Patent (Exhibit D-6), Boothby (Exhibit D-8), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

43.     Claims 1, 3, and 15 would have been obvious over Boothby alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the '704 Patent (Exhibit D-3), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

44.     Claims 2 and 14 would have been obvious over Boothby alone or in view of any one of the '446 Patent (Exhibit D-1), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

45.     Claims 4 and 5 would have been obvious over Boothby alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the '704 Patent (Exhibit D-3), the '735 Patent (Exhibit D-6), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

46.     Claim 11 would have been obvious over Boothby alone or in view of any one of the '446 Patent (Exhibit D-1), the HitPlayer (Exhibit D-10), U.S. Patent No. 5,297,231, U.S. Patent No. 5,550,566, U.S. Patent No. 5,758,177.

47.     Claim 12 would have been obvious over Boothby alone or in view of any one of the '446 Patent (Exhibit D-1), the '704 Patent (Exhibit D-3), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), the '735 Patent (Exhibit D-6), the '000 Patent (Exhibit D-7), Unison (Exhibit D-9), and the HitPlayer (Exhibit D-10).

48.     Claim 1 would have been obvious over Unison alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the '704 Patent (Exhibit D-3), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), Boothby (Exhibit D-8), and the HitPlayer (Exhibit D-10).

49.     Claims 3 and 15  would have been obvious over Unison alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the '704 Patent (Exhibit D-3), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), and the HitPlayer (Exhibit D-10).

50.     Claims 2 and 14 would have been obvious over Unison alone or in view of any one of the '446 Patent (Exhibit D-1), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), and the HitPlayer (Exhibit D-10).

51.     Claims 4 and 5 would have been obvious over Unison alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the '704 Patent (Exhibit D-3), the '735 Patent (Exhibit D-6), Boothby (Exhibit D-8), and the HitPlayer (Exhibit D-10).

52.     Claim 11 would have been obvious over Unison alone or in view of any one of the '446 Patent (Exhibit D-1), the HitPlayer (Exhibit D-10), U.S. Patent No. 5,297,231, U.S. Patent No. 5,550,566, U.S. Patent No. 5,758,177.

53.     Claim 12 would have been obvious over Unison alone or in view of any one of the '446 Patent (Exhibit D-1), the '704 Patent (Exhibit D-3), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), the '735 Patent (Exhibit D-6), the '000 Patent (Exhibit D-7), Boothby (Exhibit D-8), and the HitPlayer (Exhibit D-10).

54.     Claim 1 would have been obvious over the HitPlayer alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the '704 Patent (Exhibit D-3), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), Boothby (Exhibit D-8), and Unison (Exhibit D-9).

55.     Claims 3 and 15 would have been obvious over the HitPlayer alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit

D-2), the '704 Patent (Exhibit D-3), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), and Unison (Exhibit D-9).

56.     Claims 2 and 14 would have been obvious over the HitPlayer alone or in view of any one of the '446 Patent (Exhibit D-1), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), and Unison (Exhibit D-9).

57.     Claims 4 and 5 would have been obvious over the HitPlayer alone or in view of any one of the '446 Patent (Exhibit D-1), the '442 Pub. (Exhibit D-2), the '704 Patent (Exhibit D-3), the '735 Patent (Exhibit D-6), Boothby (Exhibit D-8), and Unison (Exhibit D-9).

58.     Claim 11 would have been obvious over the HitPlayer alone or in view of any one of the '446 Patent (Exhibit D-1), U.S. Patent No. 5,297,231, U.S. Patent No. 5,550,566, U.S. Patent No. 5,758,177.

59.     Claim 12 would have been obvious over the HitPlayer alone or in view of any one of the '446 Patent (Exhibit D-1), the '704 Patent (Exhibit D-3), the '873 Patent (Exhibit D-4), the Oracle 8i System (Exhibit D-5), the '735 Patent (Exhibit D-6), the '000 Patent (Exhibit D-7), Boothby (Exhibit D-8), and Unison (Exhibit D-9).

E.     <u>The '058 Patent</u>

In accordance with Patent L.R. 3-3(b), prior art references rendering the asserted claims of the '058 patent obvious, alone or in combination with other references, are discussed below and included in Exhibits E-1 through E-13.  Further reasons to combine these references include the nature of the problem being solved, the express, implied, and inherent teachings of the prior art, the knowledge of persons of ordinary skill in the art, that such combinations would have

yielded predictable results, and that such combinations would have represented known alternatives to a person of ordinary skill in the art.

In addition to the charted '058 Obviousness References, Apple may also rely upon other background prior art to demonstrate the state of the prior art, which is relevant to obviousness of the asserted claims.  For example, the problem of limited space on the display of computing devices, and the use of "layers" to address that problem, was well-known in the art long before the '058 patent.  Indeed, Apple was a pioneer in the field of managing limited screen space with layers.

One way Apple accomplished this was with "pop-up menus."  For example, below is a screen shot from the first Macintosh computer user manual, released in 1984, showing the desktop running Macintosh "System" software:



(Macintosh User Manual at 25.)  By clicking the "File" option at the top of the interface, the user caused a list of menu options to appear as a layer on top of the pre-existing display.  Pop-up menus such as these provided users with additional command options, without having to change the display to a different screen, or to overcrowd the primary display with these menu options.  These types of drop-down menus were well-known in the art decades before the priority date of the '058 patent.

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)

The early Macintosh OS employed layers in other ways as well, as illustrated by the following screen shot from the first Macintosh user manual:



This display includes two layers of information – one showing icons on the desktop corresponding to a list of file folder names (*i.e.*, "System Disk" and "Trash") that, when clicked, reveal a second, overlapping layer listing file names and related details from the selected folder (*i.e.*, the contents of the "System Disk" and "Trash" folders selected from the first layer). (Macintosh User Manual at 22.)

Similar overlapping layers are shown in the following screen shot from the first Macintosh user manual:



In this example, the user clicked the "System Disk" icon/file folder, which caused the "System Disk" folder to appear in a first layer including two files, one of which is "System Folder."  The user then clicked the "System Folder" folder to display the contents of that folder (five files) in a second layer.  (Macintosh User Manual at 57.)

Accordingly, these and many other prior art references and products at the time (including many Apple references and products, such as MacPaint 2.0 running on an Apple LC 630, *see* Exhibit E-7) disclosed the concept of using layers to manage the problem of limited screen space.  As such, this concept was well-known in the art long before the priority date of the '058 patent.

In addition, the concept of enlarging portions of a display to make them more easily visible was similarly well-known in the art long before the priority date of the '058 patent.   As an initial matter, the general concept of a magnification lens has been known for hundreds, perhaps even thousands of years, and the use of a physical magnification lens to enlarge a display screen has been known in the art for many decades.  For example, early television sets employed add-on magnification lenses to increase the size of the picture, such as the 1950 advertisement shown below:

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)



Similarly, the use of magnification lenses to enlarge computer screens has been around for decades.  For example, U.S. Patent No. 4,712,870 to Robinson (filed in 1986) shows a magnifying lens used with a computer display, and notes that "[a]djustable lens holders for use with computer visual displays are shown in a number of patents":



(U.S. Patent No. 4,712,870 at Fig. 1, 1:7-34.)

The idea of magnifying the display of a computing device using virtual means has also been known for decades – including enlarging information displayed in layers.  For example, as

shown in Exhibit E-7, Apple's MacPaint 2.0, released in the late 1980s, allowed an image displayed in one layer to be magnified in a second layer:



Similarly, as shown in Exhibit E-9, Photoshop 5.0, released in 1998, also allowed the user to magnify the contents of an image (here, a tree) shown in a layer:



Accordingly, the aforementioned art, all of which was well-known before the earliest possible priority date of the '058 patent, demonstrates that the concepts disclosed in the '058 patent were all known in the prior art, and were just one of a finite number of options by which data could be displayed efficiently on a display.  Furthermore, these long-known concepts form the basis of additional references that, taken alone or in combination, render the asserted claims of the '058 patent obvious, as set forth in Exhibits E-1 through E-13.

In particular, Apple contends that the asserted claims of the '058 patent would have been obvious in view of the prior art references identified above.  For example, Exhibits E-1 through

E-13 include exemplary claim charts that describe how the asserted claims of the '058 patent would have been obvious in view of the following references alone or in combination.  The primary references cited in Apple's exemplary claim charts, Exhibits E-1 through E-13, are Fabre, Lieberman, MacPaint, Bier, Photoshop, Agulnik, Allard, Deluxe Paint, Anwar, Simon, Perlin, Lee, and PhotoMesa 1.3.  Each of the primary references teaches all or, at a minimum, the vast majority of the limitations of the '058 patent asserted claims.  To the extent any claim elements are found to be missing from the primary references, secondary references are designated for combination with the primary references, including the following:  Hama, Heikkinen, and Choi.

Taken alone or together in the combinations set forth below, the primary prior art references include all limitations of the '058 patent asserted claims:

1. Claims 1, 4, 9, 12, and 17 would have been obvious over any one of Fabre (Ex. E-5), Lieberman (Ex. E-6), MacPaint (Ex. E-7), Bier (Ex. E-10), Photoshop (Ex. E-9), Agulnik (Ex. E-1), Allard (Ex. E-2), Deluxe Paint (Ex. E-4), Anwar (Ex. E-3), Simon (Ex. E-11), Lee (Ex. E-12), PhotoMesa (Ex. E-13), and Perlin (Ex. E-8).

2. Claims 1, 4, 9, 12, and 17 would have been obvious over Fabre, alone or in view of one or more of Lieberman (Ex. E-6), MacPaint (Ex. E-7), Bier (Ex. E-10), Photoshop (Ex. E-9), Agulnik (Ex. E-1), Allard (Ex. E-2), Deluxe Paint (Ex. E-4), Anwar (Ex. E-3), Simon (Ex. E-11), Perlin (Ex. E-8), Lee (Ex. E-12), PhotoMesa (Ex. E-13), Hama, Heikkinen, and Choi.

3. Claims 1, 4, 9, 12, and 17 would have been obvious over Lieberman, alone or in view of one or more of Fabre (Ex. E-5), MacPaint (Ex. E-7), Bier

(Ex. E-10), Photoshop (Ex. E-9), Agulnik (Ex. E-1), Allard (Ex. E-2), Deluxe Paint (Ex. E-4), Anwar (Ex. E-3), Simon (Ex. E-11), Perlin (Ex. E-8), Lee (Ex. E-12), PhotoMesa (Ex. E-13), Hama, Heikkinen, and Choi.

4.   Claims 1, 4, 9, 12, and 17 would have been obvious over MacPaint, alone or in view of one or more of Fabre (Ex. E-5), Lieberman (Ex. E-6), Bier (Ex. E-10), Photoshop (Ex. E-9), Agulnik (Ex. E-1), Allard (Ex. E-2), Deluxe Paint (Ex. E-4), Anwar (Ex. E-3), Simon (Ex. E-11), Perlin (Ex. E-8), Lee (Ex. E-12), PhotoMesa (Ex. E-13), Hama, Heikkinen, and Choi.

5.   Claims 1, 4, 9, 12, and 17 would have been obvious over Bier, alone or in view of one or more of Fabre (Ex. E-5), Lieberman (Ex. E-6), MacPaint (Ex. E-7), Photoshop (Ex. E-9), Agulnik (Ex. E-1), Allard (Ex. E-2), Deluxe Paint (Ex. E-4), Anwar (Ex. E-3), Simon (Ex. E-11), Perlin (Ex. E-8), Lee (Ex. E-12), PhotoMesa (Ex. E-13), Hama, Heikkinen, and Choi.

6.   Claims 1, 4, 9, 12, and 17 would have been obvious over Photoshop, alone or in view of one or more of Fabre (Ex. E-5), Lieberman (Ex. E-6), MacPaint (Ex. E-7), Bier (Ex. E-10), Agulnik (Ex. E-1), Allard (Ex. E-2), Deluxe Paint (Ex. E-4), Anwar (Ex. E-3), Simon (Ex. E-11), Perlin (Ex. E-8), Lee (Ex. E-12), PhotoMesa (Ex. E-13), Hama, Heikkinen, and Choi.

7.   Claims 1, 4, 9, 12, and 17 would have been obvious over Agulnik, alone or in view of one or more of Fabre (Ex. E-5), Lieberman (Ex. E-6), MacPaint (Ex. E-7), Bier (Ex. E-10), Photoshop (Ex. E-9), Allard (Ex. E-2), Deluxe Paint (Ex. E-4), Anwar (Ex. E-3), Simon (Ex. E-11), Perlin

(Ex. E-8), Lee (Ex. E-12), PhotoMesa (Ex. E-13), Hama, Heikkinen, and Choi.

8. Claims 1, 4, 9, 12, and 17 would have been obvious over Allard, alone or in view of one or more of Fabre (Ex. E-5), Lieberman (Ex. E-6), MacPaint (Ex. E-7), Bier (Ex. E-10), Photoshop (Ex. E-9), Agulnik (Ex. E-1), Deluxe Paint (Ex. E-4), Anwar (Ex. E-3), Simon (Ex. E-11), Perlin (Ex. E-8), Lee (Ex. E-12), PhotoMesa (Ex. E-13), Hama, Heikkinen, and Choi.

9. Claims 1, 4, 9, 12, and 17 would have been obvious over Deluxe Paint, alone or in view of one or more of Fabre (Ex. E-5), Lieberman (Ex. E-6), MacPaint (Ex. E-7), Bier (Ex. E-10), Photoshop (Ex. E-9), Agulnik (Ex. E-1), Allard (Ex. E-2), Anwar (Ex. E-3), Simon (Ex. E-11), Perlin (Ex. E-8), Lee (Ex. E-12), PhotoMesa (Ex. E-13), Hama, Heikkinen, and Choi.

10. Claims 1, 4, 9, 12, and 17 would have been obvious over Anwar, alone or in view of one or more of Fabre (Ex. E-5), Lieberman (Ex. E-6), MacPaint (Ex. E-7), Bier (Ex. E-10), Photoshop (Ex. E-9), Agulnik (Ex. E-1), Allard (Ex. E-2), Deluxe Paint (Ex. E-4), Simon (Ex. E-11), Perlin (Ex. E-8), Lee (Ex. E-12), PhotoMesa (Ex. E-13), Hama, Heikkinen, and Choi.

11. Claims 1, 4, 9, 12, and 17 would have been obvious over Perlin, alone or in view of one or more of Fabre (Ex. E-5), Lieberman (Ex. E-6), MacPaint (Ex. E-7), Bier (Ex. E-10), Photoshop (Ex. E-9), Agulnik (Ex. E-1), Allard (Ex. E-2), Deluxe Paint (Ex. E-4), Simon (Ex. E-11), Anwar (Ex. E-3), Lee (Ex. E-12), PhotoMesa (Ex. E-13), Hama, Heikkinen, and Choi.

12. Claims 1, 4, 9, 12, and 17 would have been obvious over Simon, alone or in view of one or more of Fabre (Ex. E-5), Lieberman (Ex. E-6), MacPaint (Ex. E-7), Bier (Ex. E-10), Photoshop (Ex. E-9), Agulnik (Ex. E-1), Allard (Ex. E-2), Deluxe Paint (Ex. E-4), Perlin (Ex. E-8), Anwar (Ex. E-3), Lee (Ex. E-12), PhotoMesa (Ex. E-13), Hama, Heikkinen, and Choi.

13. Claims 1, 4, 9, 12, and 17 would have been obvious over Lee, alone or in view of one or more of Fabre (Ex. E-5), Lieberman (Ex. E-6), MacPaint (Ex. E-7), Bier (Ex. E-10), Photoshop (Ex. E-9), Agulnik (Ex. E-1), Allard (Ex. E-2), Deluxe Paint (Ex. E-4), Anwar (Ex. E-3), Simon (Ex. E-11), Perlin (Ex. E-8), PhotoMesa (Ex. E-13), Hama, Heikkinen, and Choi.

14. Claims 1, 4, 9, 12, and 17 would have been obvious over PhotoMesa, alone or in view of one or more of Fabre (Ex. E-5), Lieberman (Ex. E-6), MacPaint (Ex. E-7), Bier (Ex. E-10), Photoshop (Ex. E-9), Agulnik (Ex. E-1), Allard (Ex. E-2), Deluxe Paint (Ex. E-4), Anwar (Ex. E-3), Simon (Ex. E-11), Perlin (Ex. E-8), Lee (Ex. E-12), Hama, Heikkinen, and Choi.

## F.   The '179 Patent

In accordance with Patent L.R. 3-3(b), prior art references rendering the asserted claims of the '179 patent obvious, alone or in combination with other references, are discussed below and included in Exhibits F-1 through F-5.  Further reasons to combine these references include the nature of the problem allegedly being solved (i.e., the desire to include a useful virtual keyboard on computing devices with limited screen size), the express, implied, and inherent teachings of the prior art (which teach numerous ways to use virtual keyboards on devices with limited screen size, including via the use of function keys, rearranged keyboards, and keyboards

the combine multiple characters on a single key), the knowledge of persons of ordinary skill in the art (who were well aware of this art, and other relevant art in the typewriter and traditional keyboard context invoking similar space-saving concepts), that such combinations would have yielded predictable results (i.e., it was well known what would occur if multiple characters are combined on a single keyboard key), and that such combinations would have represented known and a finite number of alternatives to a person of ordinary skill in the art (i.e., keyboard size could be reduced by using fewer characters, by using fewer or smaller keys, or by using a larger display).

In addition to the references charted in Exhibits F-1 through F-5, Apple may also rely upon other background prior art to demonstrate the state of the prior art, which is relevant to obviousness of the asserted claims.  Indeed, the basic concept of applying multiple character values to a single key of a keyboard was disclosed more than a century ago with the advent of a shifting "platen" to allow one typewriter key to represent multiple characters.  For example, U.S. Patent No. 202,923 to Brooks ("Brooks"), which was filed in 1878, teaches a typewriter with a "vibrating platen," "a machine which, without having duplicate keys and type-bars, will print both capital and small letters, so that the depression of each key will cause the printing of an upper or lower case letter, as may be desired."  (*Id.* at 1.)  Over the next half century, the use of "Shift" keys on typewriters to reduce the number of keys on a keyboard became widespread.  *See* U.S. Patent No. 2,532,228 to Hesh ("Hesh") at 4:2-5 (in 1946, characterizing an electrically operated typewriter including "shift keys" as a "standard construction, [for which] a detailed explanation thereof is not required").)

Hesh further confirms that, by the mid-1940s, it was also known how to have a single key correspond to several different characters, even without the use of a shift key.  For example, as

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)

shown below, Hess explains that a single key could correspond to "five or more operations" based on the direction that the user moved the key (*i.e.*, center, forward, backward, right, or left), thereby "greatly reducing the number of keys required to operate the machine":



(*See id.* at Fig. 1, 1:34-43, 2:16-33, 6:33-35.)

In the decades that followed, the field of art was replete with disclosures of physical keyboard keys that could each produce multiple character values without the use of a separate "Shift" key – based on the direction of the user's input.   For example, as shown below, U.S. Patent No. 3,633,724 to Samuel ("Samuel"), filed in 1970, taught an electric typewriter with "polygonal-shaped key members," each "movable both axially and pivotally on the arcuate edges of a respective four-sided key support member to selectively depress one of five upstanding, symmetrically arranged key lever actuating posts positioned at the center and corner of each key member" so as to produce the selected one of five possible character values based on the direction of the user's pressing of the selected key:

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)



(*Id.* at Abstract, 1:49-2:12, Figs. 1-2, 6-8 (the user depressed and pivoted the key in a certain

direction to select the desired character).)  In this manner, the Samuel design "eliminate[ed] the

undesirable need for a plurality of key members."  (*Id.*, 1:69-71.)

Similarly, as shown below, U.S. Patent No. 3,965,315 to Wuenn ("Wuenn"), filed in

1975, discloses a "pivoted key actuator and associated switch assembly," including a small

pocket calculator with "key elements" that are "pivotal members," each having multiple "contact

elements" that can be engaged based on the direction of the user's pivot when depressing the

"key element":



FIG.6

(*See id.*, Abstract, 4:60-62, Figs. 6, 9-11.)  Wuenn further explained that "[k]eyboards which are used on desktop calculators or computers may advantageously employ a switch of this nature and one or more of the switch elements may be employed to replace all of the usual key button actuators which are employed in the known types of calculators."  (*Id.*, 2:22-27.)

As shown below, U.S. Patent No. 4,029,915 to Ojima ("Ojima"), also filed in 1975, similarly discloses a portable electronic calculator with pivot keys, each of which can correspond to four different characters (each of which is printed on the key) depending on the direction of the user's pivot when depressing the key:



FIG. 9A

FIG. 9B

(*See, e.g.*, *id.*, Abstract, 1:29-2:62, 5:24-6:41, Figs. 7, 9A, 9B.)

Likewise, U.S. Patent 4,449,839 to Bleuer ("Bleuer"), filed in 1982, teaches a "keyboard for a typewriter or the like including a series of elongate keys" that can each produce one of three possible character values (each printed on the key) depending on whether the user depresses the "center," "upper edge," or "lower edge" of the key:



(*Id.*, Abstract, Fig. 1.)  Bleuer also discloses a "shift key" in conjunction with the "elongate keys" "to cause the printing of [a] numeral instead of the letter" for which the upper edge of the key is primarily designated.  (*Id.*; *see also* Fig. 1, 3:52 – 5:6.)

Likewise, U.S. Patent No. 4,761,522 to Allen ("Allen"), filed in 1986, teaches a keyboard with a "plurality of keys thereon, each of which is capable of three switching actions for entry of data or commands into a word processor, typewriter, computer or the like":



Fig. 5

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)

(*Id.*, Abstract ("Each key includes a first inclined surface for generating a first switching action responsive to finger contraction, a second inclined surface for generating a second switching action responsive to finger extension, and a horizontal surface for actuating a third switching action responsive to finger depression."); *id.*, 1:6-2:28, Figs. 1, 3-5; *see also* U.S. Patent No. 5,514,866 to Retter ("Retter") at Abstract, 1:6-3:30, 4:3-39, Fig. 1 (disclosing a hard keyboard on which each key is connected to multiple switches to allow the user to indicate for any key—via an up, down, left, or right flicking of a "switch"—which particular key value the user desires).)

　　　　With the advent of the digital age, system designers applied these same decades-old mechanical typewriter concepts to computer keyboards.  For example, U.S. Patent No. 4,333,097 to Buric ("Buric"), filed in 1980, discloses a keyboard with ten keys and a cathode tube display, with each key capable of producing any of a "plurality of symbols" via the display:





(*Id.*, Abstract, 2:40-56, 3:22-7:43, Figs. 1, 3-6.)  The user could use the ten hard keys to manipulate a series of on-screen menus that provided numerous character values as input options for each hard key.  (*Id.*)  Similarly, U.S. Patent No. 5,258,748 to Jones ("Jones"), filed in 1991, addressed the increasing space challenges presented by smaller computing devices by disclosing a "calculating device" with a "keyboard includ[ing] menu keys corresponding to menu labels displayable on the display and a multi-function key having a primary function and a secondary function."  (*Id.*, Abstract, 1:6-48.).)  The device executed the primary function if the key was depressed for a short time, and a "set of menu labels" associated with the key if pressed for a longer period of time.  (*Id.*, Abstract, 1:50-2:23, Fig. 2.)

Prior art computing devices also applied the concepts of assigning multiple character values to a single key on a touch screen keyboard, particularly for devices with smaller displays. For example, U.S. Patent No. 4,725,694 to Auer et al. ("Auer"), filed in 1986, disclosed a computer with a touch-sensitive flat-screen display, including a virtual keyboard that used a "touch shift" key to assign multiple values to a single key on the touch screen keyboard ("e.g., capital letter rather than lower case letters"):

1
2
3
4
5
6
7
8
9
10
11



12   (*Id.* at Abstract, 4:63-5:7, Fig. 4.)  Similarly, Apple's Newton MessagePad 2000 ("Newton")

13   (first offered for sale to the public or placed in public use as early as 1996) included a virtual

14   touch screen keyboard with a shift key:

15
16
17
18
19
20
21
22



23
24
25   (1997 MessagePad 2000 User's Manual at 14; *id.* at 15 (explaining that the "option" key

26   assigned special characters to each key).)  Using a stylus, the user selected a desired key by

27
28

pressing it on the display (the key would remain highlighted for a short period time after it was pressed).  (*See* Newton screen shot below.)



The MessagePad also presented a pop-up menu of punctuation symbols when the user pressed the carat symbol on the screen and highlighted the selected punctuation mark to indicate selection.  (1997 MessagePad 2000 User's Manual at 25; US 5,778,404 to Capps ("Capps").)

Much like the typewriter examples set forth above, other virtual keyboards attempted to save space by displaying multiple characters on a single key, and using location and directional information associated with the user's input to determine which displayed character the user intended to select.  For example, as described in Exhibit F-1, U.S. Patent No. 6,104,317 to Panagrossi ("Panagrossi") discloses a computing device such as a cell phone that displays multiple characters on a telephone-like keypad, and uses the location and direction of the user's input to determine which displayed character the user intended to select:



*FIG. 4B*

(Panagrossi Abstract, Figure 4B.)  In another example of prior art, as described in Exhibit F-2, U.S. Patent No. to Buxton et. al. 6,094,197 ("Buxton"), each key of the virtual keyboard is associated with multiple functions or special characters that the user inputs using the location and direction of a pen:



Likewise, prior art in the context of Japanese and Chinese keyboards assigned multiple characters to a single key based on location and direction information, so as to avoid displaying, for instance, all of the Roman letters necessary for inputting Japanese text.  (*See*, *e.g.*, JP H8-272787 to Ishihara ("Ishihara") as described in Exhibit F-3; JP H6-102985 to Sugano ("Sugano"). )  For instance, to select the character "ka" from the virtual keyboard on an input screen, as taught by Ishihara and displayed below, a pen stroke may be made by a user on the pentagonal shaped key:

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)

FIG. 1



FIG. 3

(Ishihara, ¶ 15 and Figures 1 and 3.)  Sugano also teaches selection of multiple keycodes from keys displayed on a virtual keyboard to type Chinese and Japanese characters accomplished by the user with certain defined pen strokes:

|   | ①· | ②→ | ③↓ | ④← | ⑤↑ |
|---|---|---|---|---|---|
| a | あ | い | う | え | お |
| K | か | き | く | け | こ |
| S | さ | し | す | せ | そ |
| T | た | ち | つ | て | と |
| N | な | に | ぬ | ね | の |
| H | は | ひ | ふ | へ | ほ |
| M | ま | み | む | め | も |
| V | や |  | ゆ |  | よ |
| R | ら | り | る | れ | ろ |
| W | わ |  |  |  | ゑ |
| 濁 | ゜ | ゜ | 拗音 |  | ん |
| 変 | 変換 | 無変換 | 拡張変換 | 漢字辞書 |  |

FIG. 2

EXAMPLE OF INPUT METHOD ON VIRTUAL KEYBOARD OF THE PRESENT INVENTION

| Input | Actual keyboard | Virtual keyboard |
|---|---|---|
| d | No-shift keying of d key | d · |
| d i | Simultaneous keying of d key and left shift key | ←d |
| d u | Simultaneous keying of d key and right shift key | d→ |

(Sugano, Figure 3(b).)                    (Sugano, Figure 2.)

Still other prior art addressed the issue of limited screen size by using pen or stylus movement or "gesturing" to indicate information such as location, duration of press, and directional information in connection with a variety of menu types, including "pie menus" and "marking menus."  For example, in 1988, Callahan et al. published "An Empirical Comparison of Pie vs. Linear Menus" ("Callahan"), which describes pie menus as circular menus that present

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)

their options radially from a central point (*e.g.*, the cursor on a keyboard).  Callahan states that "[p]ie menus enjoy a two fold advantage because of their unique design:  items are placed at equal radial distances from the center of the menu and the user need only move the cursor by a small amount in some direction for the system to recognize the intended selection."  (*Id.* at 96.) Callahan discusses actuating a pie menu on a computer screen interface by pushing and holding the mouse button to invoke a pop-up pie menu; holding the mouse button in a depressed position while moving the cursor into the desired region of the pie menu; and once in the desired region releasing the mouse button to make the desired selection.  (*Id.* at 97-98.)  In 1991, Dan Hopkins, a co-author of the Callahan paper, further described the use of pie menus in stylus or pen-based systems, in "The Design and Implementation of Pie Menus" ("Hopkins").

For instance, one early implementation of using pie menus to make selections on a touch screen widely described in the pie and marking menu literature was the Momenta pen based computer system, (which used a system-wide pie menu named the "Command Compass"), as shown below in Figure 1 from Hopkins:



(Hopkins, Figure 1; *see also* Hopkins at 5 (Editors Note); Gordon P. Kurtenbach & William Buxton, "The Limits of Expert Performance Using Hierarchic Marking Menus, Proceedings of

InterCHI '93, 482-87 (1993) ("Limits of Expert Performance") at 4; Gordon P. Kurtenbach, "The Design and Evaluation of Marking Menus," Ph. D. dissertation, Dept. of Computer Science, Univ. of Toronto (1993) ("Kurtenbach Thesis) (incorporated by reference by Buxton described in Exhibit F-2) 114, Figure 5.1.)  The Command Compass operates by allowing the user to manipulate text or graphical objects often with a single stroke.  (Hopkins at 5.)  This is accomplished by arranging options such as "move," "copy," "cut," "paste," etc. in a pie menu from which a user can make a selection by popping up the menu over the object or text that needs to be edited, and then dragging the pen or stylus in the direction of the text to be moved or pasted.  (Hopkins at 5; Figure 1.)

Around this same time, William Buxton and Gordon Kurtenbach were studying and publishing extensively on marking menus, a variation of pie/radial menus for touch-based computers that provide a means of bypassing pop-up menus.  (*See, e.g.*, Gordon P. Kurtenbach & William Buxton, "User Learning and Performance with Marking Menus," Proceedings of CHI '94, 258-264 (1994) ("User Learning"); Kurtenbach Thesis (as set forth herein and in attached Exhibits F-2); Gordon P. Kurtenbach et. al., "An empirical evaluation of some articulatory and cognitive aspects of marking menus," Human Computer Interaction 8:1-23 (1993) ("An empirical evaluation"); Kurtenbach & Buxton, Limits of Expert Performance; Gordon P. Kurtenbach & William Buxton, "Issues in Combining Marking and Direct Manipulation Techniques," User Interface Software and Technology (UIST), Hilton Head, SC 137-144 (Nov. 11-13, 1991) ("Issues in Combining").)

As illustrated in figure (a) below, pie menus involve the user pressing and holding a mouse button or a stylus against the screen to produce a circular pop-up menu from which the user can make the desired selection by radially tracing the cursor or stylus in the direction of the

desired itm; by contrast, as illustrated in Figure (b) below, marking menus allow the user to make

selections from the menu quickly using direction (without the pop-up pie menu feature) once the

user has memorized the pop-up menu layout.  (Kurtenbach & Buxton, "User Learning," 1-2.)



(*Id*. at 2, Figure 1.)  That is, marking menus rely on the user to recall the location of the item in

the menu and draw a mark by pressing down on the screen and then moving in the direction of

the desired menu item, without that menu actually appearing on the screen.  (*Id*. at 2.)  As

described above in Buxton, Figures 9 and 15, and in the attached Exhibit F-2, Buxton and

Kurtenbach also applied these concepts specifically to touch screen keyboards wherein a single

key could represent multiple functions and special character values via pen-based events.

Visual feedback for item selection also permeated the prior art discussed above.  Both the

pie and marking menu paradigms teach visual feedback after selection is made, which allows the

user to visually confirm the item selected.  In the context of simple pie or radial menus, the

selected item may be highlighted in the menu as feedback to the user.  (Callahan at 96.)

However, even when the menu does not pop up, as in the marking menu alternative, visual

feedback may occur by previewing the selection or displaying the selection on an overlay near

the cursor.  (Hopkins at 5.)  In one of their experimental designs, Kurtenbach and Buxton

describe that after selection is confirmed, a grayed-out menu appears displaying the menu with

the slice selected for a period of one second, both when selection is made from a pop-up menu

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)

and a hidden menu indicating which response has been made.  (Kurtenbach Thesis at 68; *see also* Kurtenbach, et. al., An empirical evaluation, at 6.)

Along with pie and marking menus, the general concept of touch screen "gesturing" was known in the art by the mid-1990's as well.  For example, as early as 1990, Kurtenbach and Apple's Eric A. Hulteen described the advantages of gesture-based computer input, such as gestures drawn with a stylus on a tablet, and provided multiple examples of gestures used in systems such as Virtual Studio.  (*See* "The Gestures in Human-Computer Communication" (appearing in The Art of Human-Computer Interface Design, a book conceived of by S. Joy Mountford, Manager of the Human Interface Group at Apple Computer, Inc.); *see also* C. G. Wolf et. al., "The paper-like interface" in Designing and Using Human Computer Interface and Knowledge-Based Systems, 494-501 (B. V. North Holland:  Elsevier Science 1989); Jim Rhyne, "Dialogue Management for Gestural Interfaces," ACM Computer Graphics, 21(2), 137-142 (1987).).)

Similarly, U.S. Patent No. 5,612,719 to Beernink et al. ("Beernink")—an Apple patent filed in 1994—taught a "gesture sensitive button for graphical user interfaces" including a digital computer and touch screen activated by a pointing mechanism to conserve space on the display screen.  (*Id.*, Abstract.)  Specifically, Beernink taught that a check mark gesture on a "Recognize" key would generate a pop-up menu from which the user could choose from several additional values for that particular key.  (*Id.*, 6:7-17, Figs. 4a, 4b.)  Similarly, U.S. Patent No. 5,805,167 to van Cruyningen ("van Cruyningen"), filed in 1996, taught a "method and apparatus for using directional gestures in popup menus to enter data into and control a computer system."  (*Id.*, Abstract.)  Van Cruyningen discusses pie menus and the user's evolution to using them essentially as marking menus, *i.e.*, "as operators gain experience with a particular pie menu

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)

layout, they begin to choose items through directional gestures without even looking at the individual items." (*Id.*, 2:10-30.)  However, because of problems associated with purely radial pie menus, van Cruyningen teaches employing pie menus on a "rectangular grid." (*Id.*, 3:24 – 5:32.)  Specifically, much like the accused functionality of the accused Apple devices, van Cruyningen describes using "directional gesturing" (up, down, left, right) in conjunction with Japanese language keyboards such that a gesture with respect to a single key can produce a pop-up menu with additional options for that key (including additional pop-up menus).  (*Id.*, 10:46 – 11:53.)  Figures 8A and 8B of van Cruyningen below exemplify this functionality:



FIG. 8A



FIG. 8B

Other prior art created new types of keyboards that used key location and/or directional information input by the user to differentiate between multiple key values displayed on a pie or radial menu.  For instance, the T-Cube, developed by Apple's Dan Venolia and Forrest Neiberg, taught a technique for entering text in a pen-based computer where each letter was arranged in a pie or radial menu and could be selected by a "flick gesture" of a pen or stylus in a particular direction of the menu:

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)



(Dan Venolia & Forrest Neiberg, "T-Cube: A Fast, Self Disclosing Pen-Based Alphabet, Human

Factors in Computing Systems 265-270 (April 24-28, 1994) ("Venolia") at 265 Figure 1.)  The

T-Cube pie menu displays multiple possible options arranged in eight directions.  (Venolia at

265.)  When a user drags the pen in one of eight directions in the menu, one of the characters is

highlighted, thus showing visual confirmation of the selected character.  (*Id*. at 265, Fig. 1.)

When the pen is lifted, the selected character is typed.  (*Id*.)  The starting cell and direction of the

pen determine which character is to be selected in the T-Cube.  (*Id*. at 266.)  T-Cube also teaches

visual feedback of the selection by momentarily displaying the selected character:



(*Id*. at 268, Fig. 5.)   A number of additional similar implementations organizing characters in a

menu from which selection could be made were developed in the mid-1990s, including

Quikwriting, Cirrin, and Organek Standards and Smart Case for PenPut.  (*See, e.g.*, Ken Perlin,

"Quikwriting:  Continuous Stylus-based Text Entry," Proceedings of the 11th Annual ACT

Symposium on User Interface and Technology (UIST), 215-216 (New York, NY 1998); Jennifer

Mankoff & Gregory D. Abowd, "Cirrin: A word-level unistroke keyboard for pen input," ACM

Symposium on User Interface and Technology (1998); "PenPut – Beyond character

Recognition," Organek Technology (1992 & 1993).)  The layout of characters and symbols used by these systems in lieu of a traditional Qwerty keyboard is illustrated below:




Figure 1: The word "finished" written on a circular, word-level soft keyboard.

(Quikwriting, Figure 1)          (Organek, Chart 1)          (Cirrin, Figure 1)

By the mid-1990s, visual feedback was also well known in prior art describing Qwerty keyboards displayed on a touch screen to help the user distinguish between the key selected and the rest of the keys, particularly on smaller keyboards made necessary by small displays.  For instance, the Apple Newton highlighted the key selected by a user.  (*See* 1997 MessagePad 2000 User's Manual at 15; Newton screen shot *supra*.)  In another early example, Japanese Patent Application No. H8-249122 to Hata ("Hata") teaches enlarging the selected key on a software keyboard to distinguish it from other keys, and then returning the key to its original size after a prescribed time has elapsed:



(Hata Abstract, Figure 3.)  Similarly, U.S. Patent 6,073,036 to Heikkinen, et. al. ("Heikkinen")

teaches a cell phone with a touch screen where selected numbers are magnified.  (Heikkinen,

Abstract.)

Accordingly, the aforementioned art, all of which was well-known before the earliest

possible priority date of the '179 patent, demonstrates that the concepts disclosed in the '179

patent were all known in the prior art (including the types of features that Samsung has accused

in its infringement contentions), and just one of a finite number of options by which a user could

select a character displayed on a touch screen keyboard.  Furthermore, these long-known

concepts form the basis of additional references that, taken alone or in combination, render the

asserted claims of the '179 patent obvious, as set forth in Exhibits F-1 through F-5.

In particular, Apple contends that the asserted claims of the '179 patent would have been

obvious in view of the prior art references identified above.  Furthermore, Exhibits F-1 through

F-5 include exemplary claim charts that describe how the asserted claims of the '179 patent

would have been anticipated and/or obvious in view of the following references alone or in

combination.  The primary references cited in Apple's exemplary claim charts, Exhibits F-1

through F-5 teach all or, at a minimum, the vast majority of the limitations of the '179 patent

asserted claims.  To the extent any claim elements are found to missing from the primary references, secondary references are designated for combination with the primary references, including the following combinations

1. Claims 1, 3, 4, 5, 6, 7, 8, 10, and 11 would have been obvious over any one of Panagrossi, Buxton, Ishihara, Van Kleeck, and Kato.  (Exs. F-1 to F-5.)

2. Claims 1, 3, 4, 5, 6, 7, 8, 10, and 11 would have been obvious over Panagrossi, alone or in view of one or more of Buxton, Ishihara, Van Kleeck, Kato, Hata, Auer, Sugano, Capps, Harada, Masui, Heikkinen, Kurtenbach et. al. "An empirical evaluation", Kurtenbach's Thesis, Venolia's T-Cube, Hopkins, Callahan, or the Apple Newton Message Pad 2000 as disclosed by the User's Manual.  (Ex. F-1.)

3. Claims 1, 3, 4, 5, 6, 7, 8, 10, and 11 would have been obvious over Buxton, alone or in view of one or more of Panagrossi, Ishihara, Van Kleeck, Kato, Hata, Auer, Sugano, Capps, Harada, Masui, Heikkinen, Kurtenbach et. al. "An empirical evaluation", Kurtenbach's Thesis, Venolia's T-Cube, Hopkins, Callahan, or the Apple Newton Message Pad 2000 as disclosed by the User's Manual.  (Ex. F-2.)

4. Claims 1, 3, 4, 5, 6, 7, 8, 10, and 11 would have been obvious over Ishihara, alone or in view of one or more of Panagrossi, Buxton, Van Kleeck, Kato, Hata, Auer, Sugano, Capps, Harada, Masui, Heikkinen, Kurtenbach et. al. "An empirical evaluation", Kurtenbach's Thesis,

Venolia's T-Cube, Hopkins, Callahan, or the Apple Newton Message Pad
2000 as disclosed by the User's Manual.  (Ex. F3.)

5.      Claims 1, 3, 4, 5, 6, 7, 8, 10, and 11 would have been obvious over Van
Kleeck, alone or in view of one or more of Panagrossi, Buxton, Ishihara,
Kato, Hata, Auer, Sugano, Capps, Harada, Masui, Heikkinen, Kurtenbach
et. al. "An empirical evaluation", Kurtenbach's Thesis, Venolia's T-Cube,
Hopkins, Callahan, or the Apple Newton Message Pad 2000 as disclosed
by the User's Manual.  (Exs. F-4.)

6.      Claims 1, 3, 4, 5, 6, 7, 8, 10, and 11 would have been obvious over Kato,
alone or in view of one or more of Panagrossi, Buxton, Ishihara, Van
Kleeck, Hata, Auer, Sugano, Capps, Harada, Masui, Heikkinen,
Kurtenbach et. al. "An empirical evaluation", Kurtenbach's Thesis,
Venolia's T-Cube, Hopkins, Callahan, or the Apple Newton Message Pad
2000 as disclosed by the User's Manual.  (Exs. F-5.)

G.      **The '449 Patent**

In accordance with Patent L.R. 3-3(b), prior art references rendering the asserted claims
of the '449 patent obvious, alone or in combination with other references, are discussed below
and included in Exhibits G-1 through G-5, as amended.  Exhibits G-1 through G-5 include
exemplary claim charts for the '449 patent showing specific combinations of references,
including citations to where in the references the teachings, suggestions, and motivations to
combine the references are disclosed.  Further reasons to combine the references identified in
Exhibits G-1 through G-5 include the nature of the problem being solved, the express, implied
and inherent teachings of the prior art, the knowledge of persons of ordinary skill in the art, that

such combinations would have yielded predictable results, and that such combinations would have represented known alternatives to a person of ordinary skill in the art.

In particular, Apple contends that the asserted claims of the '449 patent would have been obvious in view of the prior art references identified above.  For example, Exhibits G-1 through G-5 include exemplary claim charts that describe how the asserted claims of the '449 patent would have been obvious in view of the following references, alone or in combination.  The primary references cited in Apple's exemplary claim charts, Exhibits G-1 through G-5, are (1) U.S. Patent No. 6,104,430; (2) U.S. Patent No. 5,444,483; (3) Unexamined Japanese Patent Application H7-7647; and (4) the Ricoh RDC-1 Digital Camera, as described in the Instruction Manual and the Service Manual.  Each of the primary references teaches all or, at a minimum, the vast majority of the limitations of the '449 patent asserted claims.  To the extent any claim elements are found to missing from the primary references, secondary references are designated for combination with the primary references, including the following:  (1) U.S. Patent No. 5,796,428; (2) U.S. Patent No. 5,613,032; (3) Apple's PhotoFlash for Macintosh, as described in the User Guide; (4) Windows 95, as described in Introducing Windows 95; and (5) Japanese Patent Application JP-H2-292974.

Taken alone or together in the combinations set forth below, the primary prior art references include all limitations of the '449 patent asserted claims:

    1.    Claims 25 and 27 would have been obvious over U.S. Patent No. 6,104,430 alone or in combination with (a) U.S. Patent No. 5,796,428 and (b) Apple PhotoFlash, Windows 95, and/or Japanese Patent Application JP-H2-292974.

2.     Claims 25 and 27 would have been obvious over the Ricoh RDC-1 Digital Camera alone or in combination with (a) U.S. Patent No. 5,796,428 and (b) Apple PhotoFlash, Windows 95, and/or Japanese Patent Application JP-H2-292974.

3.     Claims 25 and 27 would have been obvious over Unexamined Japanese Patent Application H7-7647 alone or in combination with (a) U.S. Patent No. 5,613,032, (b) U.S. Patent No. 5,796,428, and (c) Apple PhotoFlash, Windows 95, and/or Japanese Patent Application JP-H2-292974.

4.     Claims 25 and 27 would have been obvious over U.S. Patent No. 5,444,483 alone or in combination with (a) U.S. Patent No. 6,104,430, (b) U.S. Patent No. 5,796,428, and (c) Apple PhotoFlash, Windows 95, and/or Japanese Patent Application JP-H2-292974.

5.     Claims 25 and 27 would have been obvious over Unexamined Japanese Patent Application H5-344460A alone or in combination with (a) U.S. Patent No. 6,104,430, (b) U.S. Patent No. 5,796,428, and (c) Apple PhotoFlash, Windows 95, and/or Japanese Patent Application JP-H2-292974.

**H.**     <u>**The '239 Patent**</u>

In accordance with Patent L.R. 3-3(b), prior art references rendering the asserted claims of the '239 patent obvious, alone or in combination with other references, are discussed below and included in Exhibits H-1 through H-9. Exhibits H-1 through H-9 include exemplary claim charts for the '239 patent showing specific combinations of references, including citations to where in the references the teachings, suggestions, and motivations to combine the references are

disclosed.  Further reasons to combine the references identified in Exhibits H-1 through H-9 include the nature of the problem being solved, the express, implied and inherent teachings of the prior art, the knowledge of persons of ordinary skill in the art, that such combinations would have yielded predictable results, and that such combinations would have represented known alternatives to a person of ordinary skill in the art.

In particular, Apple contends that the asserted claims of the '239 patent would have been obvious in view of the prior art references identified above.  For example, Exhibits H-1 through H-9 include exemplary claim charts that describe how the asserted claims of the '239 patent would have been obvious in view of the following references alone or in combination.  The primary references cited in Apple's exemplary claim charts, Exhibits H-1 through H-7, are U.S. Patent No, 4,963,995 (Chart H-1); Keith A. Hadley, Kodak SV9600 Still Video Transceiver (Chart H-2); U.S. Patent No. 5,633,891 (Chart H-3); U.S. Patent No. 7,433,921 (Chart H-4); U.S. Patent No. 5,506,954 (Chart H-5); U.S. Patent No. 4,825,457 (Chart H-6); Japanese Patent Appl. 05-167965 (Chart H-7); U.S. Patent No. 5,170,427 (Exhibit H-8); and Action Media II System (Exhibit H-9).

Taken alone or together in the combinations set forth below, the primary prior art references include all limitations of the '239 patent asserted claims:

      1.      Claims 1, 3, 17 would have been obvious over U.S. Patent No, 4,963,995 (Exhibit H-1) alone or in view of any one of the following: the SV9600 (Exhibit H-2), U.S. Patent No. 5,633,891 (Exhibit H-3), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), U.S. Patent No. 4,825,457 (Exhibit H-6), Japanese Patent Appl. 05-167965

(Exhibit H-7), U.S. Patent No. 5,170,427 (Exhibit H-8), or Action Media II System (Exhibit H-9).

2.      Claim 2 would have been obvious over U.S. Patent No, 4,963,995 (Exhibit H-1) alone or in view of any one of the following: the SV9600 (Exhibit H-2), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5) , U.S. Patent No. 5,170,427 (Exhibit H-8), or Action Media II System (ExhibitH-9).

3.      Claim 4 would have been obvious over U.S. Patent No, 4,963,995 (Exhibit H-1) alone or in view of any one of the following: the SV9600 (Exhibit H-2), or U.S. Patent No. 5,633,891 (Exhibit H-3).

4.      Claims 5 and 6 would have been obvious over U.S. Patent No, 4,963,995 (Exhibit H-1) alone or in view of any one of the following: U.S. Patent No. 5,633,891 (Exhibit H-3), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), Japanese Patent Appl. 05-167965 (Exhibit H-7), U.S. Patent No. 5,170,427 (Exhibit H-8), or Action Media II System (Exhibit H-9).

5.      Claim 7 would have been obvious over U.S. Patent No, 4,963,995 (Exhibit H-1) alone or in view of any one of the following: the SV9600 (Exhibit H-2), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 4,825,457 (Exhibit H-6), or Japanese Patent Appl. 05-167965 (Exhibit H-7).

6.      Claim 15 would have been obvious over U.S. Patent No, 4,963,995 (Exhibit H-1) alone or in view of any one of the following: the SV9600 (Exhibit H-2), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No.

5,506,954 (Exhibit H-5), U.S. Patent No. 4,825,457 (Exhibit H-6), or Japanese Patent Appl. 05-167965 (Exhibit H-7).

7.     Claim 16 would have been obvious over U.S. Patent No, 4,963,995 (Exhibit H-1) alone or in view of U.S. Patent No. 7,433,921 (Exhibit H-4).

8.     Claims 1, 3, 17 would have been obvious over the SV9600 (exhibit H-2) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), U.S. Patent No. 5,633,891 (Exhibit H-3), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), U.S. Patent No. 4,825,457 (Exhibit H-6), Japanese Patent Appl. 05-167965 (Exhibit H-7), U.S. Patent No. 5,170,427 (Exhibit H-8), or Action Media II System (Exhibit H-9).

9.     Claim 2 would have been obvious over the SV9600 (exhibit H-2) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), U.S. Patent No. 5,170,427 (Exhibit H-8), or Action Media II System (Exhibit H-9).

10.     Claim 4 would have been obvious over the SV9600 (exhibit H-2) alone or in view of U.S. Patent No. 5,633,891 (Exhibit H-3).

11.     Claims 5 and 6 would have been obvious over the SV9600 (exhibit H-2) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), U.S. Patent No. 5,633,891 (Exhibit H-3), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5),

Japanese Patent Appl. 05-167965 (Exhibit H-7), U.S. Patent No. 5,170,427 (Exhibit H-8), or Action Media II System (Exhibit H-9).

12.     Claim 7 would have been obvious over the SV9600 (exhibit H-2) alone or in view of any one of the following: U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 4,825,457 (Exhibit H-6), or Japanese Patent Appl. 05-167965 (Exhibit H-7).

13.     Claim 15 would have been obvious over the SV9600 (exhibit H-2) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), U.S. Patent No. 4,825,457 (Exhibit H-6), or Japanese Patent Appl. 05-167965 (Exhibit H-7).

14.     Claim 16 would have been obvious over the SV9600 (exhibit H-2) alone or in view of U.S. Patent No. 7,433,921 (Exhibit H-4).

15.     Claims 1, 3, 17 would have been obvious over U.S. Patent No. 5,633,891 (Exhibit H-3) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), the SV9600 (Exhibit H-2), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), U.S. Patent No. 4,825,457 (Exhibit H-6), Japanese Patent Appl. 05-167965 (Exhibit H-7), U.S. Patent No. 5,170,427 (Exhibit H-8), or Action Media II System (Exhibit H-9).

16.     Claim 2 would have been obvious over U.S. Patent No. 5,633,891 (Exhibit H-3) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), the SV9600 (Exhibit H-2), U.S. Patent No.

1   7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), U.S.

2   Patent No. 5,170,427 (Exhibit H-8), or Action Media II System (Exhibit

3   H-9).

17.   Claim 4 would have been obvious over U.S. Patent No. 5,633,891 (Exhibit

H-3) alone or in view of the SV9600 (Exhibit H-2).

18.   Claims 5 and 6 would have been obvious over U.S. Patent No. 5,633,891

(Exhibit H-3) alone or in view of any one of the following: U.S. Patent

No, 4,963,995 (Exhibit H-1), U.S. Patent No. 7,433,921 (Exhibit H-4),

U.S. Patent No. 5,506,954 (Exhibit H-5), Japanese Patent Appl. 05-

167965 (Exhibit H-7), U.S. Patent No. 5,170,427 (Exhibit H-8), or Action

Media II System (Exhibit H-9).

19.   Claim 7 would have been obvious over U.S. Patent No. 5,633,891 (Exhibit

H-3) alone or in view of any one of the following: the SV9600 (Exhibit H-

2), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 4,825,457

(Exhibit H-6), or Japanese Patent Appl. 05-167965 (Exhibit H-7).

20.   Claim 15 would have been obvious over U.S. Patent No. 5,633,891

(Exhibit H-3) alone or in view of any one of the following: U.S. Patent

No, 4,963,995 (Exhibit H-1), the SV9600 (Exhibit H-2), U.S. Patent No.

7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), U.S.

Patent No. 4,825,457 (Exhibit H-6), Japanese Patent Appl. 05-167965

(Exhibit H-7), U.S. Patent No. 5,170,427 (Exhibit H-8), or Action Media

II System (Exhibit H-9).

21.     Claim 16 would have been obvious over U.S. Patent No. 5,633,891 (Exhibit H-3) alone or in view of U.S. Patent No. 7,433,921 (Exhibit H-4).

22.     Claims 1, 3, 17 would have been obvious over U.S. Patent No. 7,433,921 (Exhibit H-4) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), the SV9600 (Exhibit H-2), U.S. Patent No. 5,633,891 (Exhibit H-3), U.S. Patent No. 5,506,954 (Exhibit H-5), U.S. Patent No. 4,825,457 (Exhibit H-6), Japanese Patent Appl. 05-167965 (Exhibit H-7), U.S. Patent No. 5,170,427 (Exhibit H-8), or Action Media II System (Exhibit H-9).

23.     Claim 2 would have been obvious over U.S. Patent No. 7,433,921 (Exhibit H-4) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), the SV9600 (Exhibit H-2), U.S. Patent No. 5,506,954 (Exhibit H-5) , U.S. Patent No. 5,170,427 (Exhibit H-8), or Action Media II System (Exhibit H-9).

24.     Claim 4 would have been obvious over U.S. Patent No. 7,433,921 (Exhibit H-4) alone or in view of any one of the following: the SV9600 (Exhibit H-2), or U.S. Patent No. 5,633,891 (Exhibit H-3).

25.     Claims 5 and 6 would have been obvious over U.S. Patent No. 7,433,921 (Exhibit H-4) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), U.S. Patent No. 5,633,891 (Exhibit H-3), U.S. Patent No. 5,506,954 (Exhibit H-5), Japanese Patent Appl. 05-167965 (Exhibit H-7), U.S. Patent No. 5,170,427 (Exhibit H-8), or Action Media II System (Exhibit H-9).

26.      Claim 7 would have been obvious over U.S. Patent No. 7,433,921 (Exhibit H-4) alone or in view of any one of the following: the SV9600 (Exhibit H-2), U.S. Patent No. 4,825,457 (Exhibit H-6), or Japanese Patent Appl. 05-167965 (Exhibit H-7).

27.      Claim 15 would have been obvious over U.S. Patent No. 7,433,921 (Exhibit H-4) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), the SV9600 (Exhibit H-2), U.S. Patent No. 5,506,954 (Exhibit H-5), U.S. Patent No. 4,825,457 (Exhibit H-6), or Japanese Patent Appl. 05-167965 (Exhibit H-7).

28.      Claims 1, 3, 17 would have been obvious over U.S. Patent No. 5,506,954 (Exhibit H-5) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), the SV9600 (Exhibit H-2), U.S. Patent No. 5,633,891 (Exhibit H-3), U.S. Patent No. 7,433,921 (Exhibit H-4),  U.S. Patent No. 4,825,457 (Exhibit H-6), Japanese Patent Appl. 05-167965 (Exhibit H-7), U.S. Patent No. 5,170,427 (Exhibit H-8), or Action Media II System (Exhibit H-9).

29.      Claim 2 would have been obvious over U.S. Patent No. 5,506,954 (Exhibit H-5) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), the SV9600 (Exhibit H-2), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,170,427 (Exhibit H-8), or Action Media II System (Exhibit H-9).

30.      Claim 4 would have been obvious over U.S. Patent No. 5,506,954 (Exhibit H-5) alone or in view of any one of the following: the SV9600 (Exhibit H-2), or U.S. Patent No. 5,633,891 (Exhibit H-3).

31.      Claims 5 and 6 would have been obvious over U.S. Patent No. 5,506,954 (Exhibit H-5) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), U.S. Patent No. 5,633,891 (Exhibit H-3), U.S. Patent No. 7,433,921 (Exhibit H-4), Japanese Patent Appl. 05-167965 (Exhibit H-7), U.S. Patent No. 5,170,427 (Exhibit H-8), or Action Media II System (Exhibit H-9).

32.      Claim 7 would have been obvious over U.S. Patent No. 5,506,954 (Exhibit H-5) alone or in view of any one of the following: the SV9600 (Exhibit H-2), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 4,825,457 (Exhibit H-6), or Japanese Patent Appl. 05-167965 (Exhibit H-7).

33.      Claim 15 would have been obvious over U.S. Patent No. 5,506,954 (Exhibit H-5) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), the SV9600 (Exhibit H-2), U.S. Patent No. 7,433,921 (Exhibit H-4),  U.S. Patent No. 4,825,457 (Exhibit H-6), or Japanese Patent Appl. 05-167965 (Exhibit H-7).

34.      Claim 16 would have been obvious over U.S. Patent No. 5,506,954 (Exhibit H-5) alone or in view of U.S. Patent No. 7,433,921 (Exhibit H-4).

35.      Claims 1, 3, 17 would have been obvious over U.S. Patent No. 4,825,457 (Exhibit H-6) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), the SV9600 (Exhibit H-2), U.S. Patent No.

5,633,891 (Exhibit H-3), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), Japanese Patent Appl. 05-167965 (Exhibit H-7), U.S. Patent No. 5,170,427 (Exhibit H-8), or Action Media II System (Exhibit H-9).

36.    Claim 2 would have been obvious over U.S. Patent No. 4,825,457 (Exhibit H-6) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), the SV9600 (Exhibit H-2), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), U.S. Patent No. 5,170,427 (Exhibit H-8), or Action Media II System (Exhibit H-9).

37.    Claim 4 would have been obvious over U.S. Patent No. 4,825,457 (Exhibit H-6) alone or in view of any one of the following: the SV9600 (Exhibit H-2), or U.S. Patent No. 5,633,891 (Exhibit H-3).

38.    Claims 5 and 6 would have been obvious over U.S. Patent No. 4,825,457 (Exhibit H-6) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), U.S. Patent No. 5,633,891 (Exhibit H-3), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), Japanese Patent Appl. 05-167965 (Exhibit H-7), U.S. Patent No. 5,170,427 (Exhibit H-8), or Action Media II System (Exhibit H-9).

39.    Claim 7 would have been obvious over U.S. Patent No. 4,825,457 (Exhibit H-6) alone or in view of any one of the following: the SV9600 (Exhibit H-2), U.S. Patent No. 7,433,921 (Exhibit H-4), or Japanese Patent Appl. 05-167965 (Exhibit H-7).

40.     Claim 15 would have been obvious over U.S. Patent No. 4,825,457 (Exhibit H-6) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), the SV9600 (Exhibit H-2), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), or Japanese Patent Appl. 05-167965 (Exhibit H-7).

41.     Claim 16 would have been obvious over U.S. Patent No. 4,825,457 (Exhibit H-6) alone or in view of U.S. Patent No. 7,433,921 (Exhibit H-4).

42.     Claims 1, 3, 17 would have been obvious over Japanese Patent Appl. 05-167965 (Exhibit H-7) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), the SV9600 (Exhibit H-2), U.S. Patent No. 5,633,891 (Exhibit H-3), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), U.S. Patent No. 4,825,457 (Exhibit H-6), U.S. Patent No. 5,170,427 (Exhibit H-8), or Action Media II System (Exhibit H-9).

43.     Claim 2 would have been obvious over Japanese Patent Appl. 05-167965 (Exhibit H-7) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), the SV9600 (Exhibit H-2), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), U.S. Patent No. 5,170,427 (Exhibit H-8), or Action Media II System (Exhibit H-9).

44.     Claim 4 would have been obvious over Japanese Patent Appl. 05-167965 (Exhibit H-7) alone or in view of any one of the following: the SV9600 (Exhibit H-2), or U.S. Patent No. 5,633,891 (Exhibit H-3).

45.  Claims 5 and 6 would have been obvious over Japanese Patent Appl. 05-167965 (Exhibit H-7) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), U.S. Patent No. 5,633,891 (Exhibit H-3), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), U.S. Patent No. 5,170,427 (Exhibit H-8), or Action Media II System (Exhibit H-9).

46.  Claim 7 would have been obvious over Japanese Patent Appl. 05-167965 (Exhibit H-7) alone or in view of any one of the following: the SV9600 (Exhibit H-2), U.S. Patent No. 7,433,921 (Exhibit H-4), or U.S. Patent No. 4,825,457 (Exhibit H-6).

47.  Claim 15 would have been obvious over Japanese Patent Appl. 05-167965 (Exhibit H-7) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), the SV9600 (Exhibit H-2), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), or U.S. Patent No. 4,825,457 (Exhibit H-6).

48.  Claim 16 would have been obvious over Japanese Patent Appl. 05-167965 (Exhibit H-7) alone or in view of U.S. Patent No. 7,433,921 (Exhibit H-4).

49.  Claims 1, 3, 17 would have been obvious over U.S. Patent No. 5,170,427 (Exhibit H-8) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), the SV9600 (Exhibit H-2), U.S. Patent No. 5,633,891 (Exhibit H-3), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), U.S. Patent No. 4,825,457 (Exhibit H-

1    6), Japanese Patent Appl. 05-167965 (Exhibit H-7), or Action Media II

2    System (Exhibit H-9).

3    50.    Claim 2 would have been obvious over U.S. Patent No. 5,170,427 (Exhibit

4    H-8) alone or in view of any one of the following: U.S. Patent No,

5    4,963,995 (Exhibit H-1), the SV9600 (Exhibit H-2), U.S. Patent No.

6    7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5),

7    Japanese Patent Appl. 05-167965 (Exhibit H-7), or Action Media II

8    System (Exhibit H-9).

9    51.    Claim 4 would have been obvious over U.S. Patent No. 5,170,427 (Exhibit

10   H-8) alone or in view of any one of the following: the SV9600 (Exhibit H-

11   2), or U.S. Patent No. 5,633,891 (Exhibit H-3).

12   52.    Claims 5 and 6 would have been obvious over U.S. Patent No. 5,170,427

13   (Exhibit H-8) alone or in view of any one of the following: U.S. Patent

14   No, 4,963,995 (Exhibit H-1), U.S. Patent No. 5,633,891 (Exhibit H-3),

15   U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954

16   (Exhibit H-5), Japanese Patent Appl. 05-167965 (Exhibit H-7), or Action

17   Media II System (Exhibit H-9).

18   53.    Claim 7 would have been obvious over U.S. Patent No. 5,170,427 (Exhibit

19   H-8) alone or in view of any one of the following: the SV9600 (Exhibit H-

20   2), U.S. Patent No. 7,433,921 (Exhibit H-4), Japanese Patent Appl. 05-

21   167965 (Exhibit H-7), or U.S. Patent No. 4,825,457 (Exhibit H-6).

22   54.    Claim 15 would have been obvious over U.S. Patent No. 5,170,427

23   (Exhibit H-8) alone or in view of any one of the following: U.S. Patent

No, 4,963,995 (Exhibit H-1), the SV9600 (Exhibit H-2), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), U.S. Patent No. 4,825,457 (Exhibit H-6), or Japanese Patent Appl. 05-167965 (Exhibit H-7).

55. Claim 16 would have been obvious over U.S. Patent No. 5,170,427 (Exhibit H-8) alone or in view of U.S. Patent No. 7,433,921 (Exhibit H-4).

56. Claims 1, 3, 17 would have been obvious over the Action Media II System (Exhibit H-9) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), the SV9600 (Exhibit H-2), U.S. Patent No. 5,633,891 (Exhibit H-3), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), U.S. Patent No. 4,825,457 (Exhibit H-6), Japanese Patent Appl. 05-167965 (Exhibit H-7), or U.S. Patent No. 5,170,427 (Exhibit H-8).

57. Claim 2 would have been obvious over the Action Media II System (Exhibit H-9) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), the SV9600 (Exhibit H-2), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), U.S. Patent No. 5,170,427 (Exhibit H-8), or Japanese Patent Appl. 05-167965 (Exhibit H-7).

58. Claim 4 would have been obvious over the Action Media II System (Exhibit H-9) alone or in view of any one of the following: the SV9600 (Exhibit H-2), or U.S. Patent No. 5,633,891 (Exhibit H-3).

59.     Claims 5 and 6 would have been obvious over the Action Media II System (Exhibit H-9) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), U.S. Patent No. 5,633,891 (Exhibit H-3), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), U.S. Patent No. 5,170,427 (Exhibit H-8), or Japanese Patent Appl. 05-167965 (Exhibit H-7).

60.     Claim 7 would have been obvious over the Action Media II System (Exhibit H-9) alone or in view of any one of the following: the SV9600 (Exhibit H-2), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 4,825,457 (Exhibit H-6), or Japanese Patent Appl. 05-167965 (Exhibit H-7).

61.     Claim 15 would have been obvious over the Action Media II System (Exhibit H-9) alone or in view of any one of the following: U.S. Patent No, 4,963,995 (Exhibit H-1), the SV9600 (Exhibit H-2), U.S. Patent No. 7,433,921 (Exhibit H-4), U.S. Patent No. 5,506,954 (Exhibit H-5), U.S. Patent No. 4,825,457 (Exhibit H-6), or Japanese Patent Appl. 05-167965 (Exhibit H-7).

62.     Claim 16 would have been obvious over the Action Media II System (Exhibit H-9) alone or in view of U.S. Patent No. 7,433,921 (Exhibit H-4).

**Motivations to Combine**

Apple believes that no showing of a specific motivation to combine prior art is required to combine the references disclosed above and in the attached charts.  As reflected above, in the attached exhibits, and in the references themselves, there was a reason to make each combination

1   – each combination of art would have produced no unexpected results, and each combination at

2   most would simply represent a known alternative to one of ordinary sill in the art.  *See KSR Int'l*

3   *Co. v. Teleflex, Inc.*, 550 U.S. 398, 414-18 (2007) (rejecting the Federal Circuit's "rigid"

4   application of the teaching, suggestion, or motivation-to-combine test, instead espousing an

5   "expansive and flexible" approach).  "The combination of familiar elements according to known

6   methods is likely to be obvious when it does no more than yield predictable results."  *Id.* at 416.

7   Similarly, "[w]hen a work is available in one field of endeavor, design incentives and other

8   market forces can prompt variations of it, either in the same field or a different one," *id.* at 417,

9   and thus "if a technique has been used to improve one device, and a person of ordinary skill in

10  the art would recognize that it would improve similar devices in the same way, using the

11  technique is obvious unless its actual application is beyond his or her skill."  *Id.*  Indeed, the

12  Supreme Court has held that a person of ordinary skill is "a person of creativity, not an

13  automaton" and "in many cases a person of ordinary skill in the art will be able to fit the

14  teachings of multiple patents together like pieces of a puzzle."  *Id.* at 420-21.

15          Nevertheless, in accordance with the Patent Local Rules, and in addition to the

16  information contained elsewhere in these contentions, Apple hereby identifies below additional

17  motivations and reasons to combine the cited art.

18          To determine whether there is a reason to combine the known elements in the manner

19  claimed by a patent, a court can "look to interrelated teachings of multiple patents; the effects of

20  demands known to the design community or present in the marketplace; and the background

21  knowledge possessed by a person having ordinary skill in the art."  *Id.* at 418.  For example,

22  obviousness can be demonstrated by showing "there existed at the time of invention a known

23  problem for which there was an obvious solution encompassed by the patent's claims."  *Id.* at

420.  "[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.*  Common sense also teaches that "familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle."  *Id.*

Applying these principles, it would have been obvious to a person of ordinary skill in the art at the time the application that issued as each of the Patents-In-Suit was filed to combine, modify, or use the teachings of the prior art to make the purported inventions of those patents, including by making each of the combinations identified above.  The motivation to combine the teachings of the prior art references disclosed herein can be found in each of (1) the references themselves, (2) the nature of the problem being solved, (3) the express, implied and inherent teachings of the prior art, (4) the knowledge of persons of ordinary skill in the art, (5) the fact that the prior art is generally directed towards the subject matter of each respective asserted patent, and (6) the predictable results obtained in combining the elements of the prior art.

## I.        '087 Patent

Any reference or combination of references that anticipates or makes obvious an asserted independent claim also makes obvious any asserted claim dependent on that independent claim because every element of each dependent claim was known by a person of ordinary skill at the time of the alleged invention, and it would have been obvious to combine those known elements with the independent claims at least as a matter of common sense and routine innovation.

Numerous prior art references, including those identified above pursuant to Patent L.R. 3-3(a) and in the Exhibits, reflect common knowledge and the state of the prior art before the priority date of the '087 patent.  Because it would be unduly burdensome to create detailed claim

charts for the many invalidating combinations, Apple has provided illustrative examples of such invalidating combinations below and in Exhibits A-1 through A-7.  For at least the reasons described above and below in the examples provided, as well as in the attached claim charts, it would have been obvious to one of ordinary skill in the art to combine any of a number of prior art references, including any combination of those identified in Exhibits A-1 through A-7, to meet the limitations of the asserted claims.  As such, Apple's identification of exemplary combinations is without limitation to Apple's identifying other invalidating combinations as appropriate.

As stated above, the '780 patent, the '284 reference, and the '680 reference anticipate several of the asserted claims.  To the extent these references are found to not anticipate any one of the asserted claims, they render the claims obvious, whether standing alone, or when combined with knowledge of the ordinary artisan and/or the nature of the problem to be solved.  To the extent the '780 patent, the '284 reference, and/or the '680 reference is found to lack particular elements of the asserted claims, those elements would have represented mere obvious modifications.

To the extent the '780 patent, the '284 reference, or the '680 reference are found to lack an explicit teaching of the limitation of "a controller selecting a Node B controlled scheduling mode or an non-scheduled transmission mode to transmit data" of claim 34, it would have been obvious to the ordinary artisan to have a controller in the UE select whether to transmit data autonomously or not according to a scheduling assignment from the base station (Node B).  Transmitting data from a UE to the base station in an autonomous transmission mode was known before the earliest priority date for the '087 patent.  *See, e.g.*, US 5638369, US 5905720, US 5940741, US 6973070, US 7321780, US 7382747, US 7804850, US 2002/0191579, TDoc R1-

03-0284, TDoc R1-03-0401, TDoc R1-04-0680, TDoc R1-04-0861, TDoc R1-04-1087, TDoc R1-04-1366, Chlamtac and Ganz reference, and US 2004/0085934.  Similarly, transmitting data from a UE to the base station in a scheduled transmission mode, such as according to a scheduling grant, was known before the earliest priority date for the '087 patent.  *See, e.g.*, US 5940741, US 6721294, US 6973070, US 7321780, US 7382747, TDoc R1-03-0284, and TDoc R1-03-0401.

To the extent the '780 patent, the '284 reference, or the '680 reference are found to lack an explicit teaching of the limitation of "a receiver receiving non-scheduled transmission information indicating k transmission time intervals (TTIs) for transmitting non-scheduled data via the E-DCH" of claims 1 and 9, it would have been obvious to the ordinary artisan for a receiver in the UE to receive from the base station particular information concerning the allowance for autonomous transmission in subsequent uplink communications.  *See, e.g.*, US 7321780, US 7804850, TDoc R1-03-0284, TDoc R1-04-0861, TDoc R1-04-1087, TDoc R1-04-1366, and Chlamtac and Ganz reference.  An enhanced uplink dedicated channel was known before the earliest priority date of the '087 patent.  *See, e.g.*, US 7321780, US 7382747, US 7804850, TDoc R1-03-0284, TDoc R1-03-0401, TDoc R1-04-0680, TDoc R1-04-0861, TDoc R1-04-1087, TDoc R1-04-1366, and US 2004/0085934.  For example, it would have been obvious to the ordinary artisan to indicate to the UE which or how many (k) transmission time intervals (TTIs) the UE would be permitted to use to transmit autonomously in the uplink.

To the extent the '780 patent, the '284 reference, or the '680 reference are found to lack an explicit teaching of the limitation of "a receiver receiving at least one of scheduling assignment information generated by the Node B based on scheduling information and non-scheduled transmission information indicating k transmission time intervals (TTIs)" of claim 34,

it would have been obvious to the ordinary artisan to have the base station generate information concerning a scheduling assignment.  For instance, prior to the alleged invention of the '087 patent, the 3GPP standards required the base station to generate information concerning scheduling assignments.  The UE would then receive from the base station that information concerning the allowance for scheduled and/or non-scheduled transmission information including indicating which or how many (k) transmission time intervals (TTIs) the UE should use.

To the extent the '780 patent, the '284 reference, or the '680 reference are found to lack an explicit teaching of the limitation of "non-scheduled transmissions . . . performed during the k TTIs within a period having N TTIs" of claims 1 and 9, it would have been obvious to the ordinary artisan to have the permitted autonomous transmissions performed during some number (k) of transmission time intervals (TTIs) within the period having the maximum number (N) of transmission time intervals (TTIs) of the frame.  In fact, because transmitting data autonomously via the E-DCH was known before the earliest priority date of the '087 patent, the transmission necessarily was performed during some k TTIs within a period having N TTIs.  *See, e.g.*, 3GPP TS 05.02 (V8.2.1) and 3GPP TS 04.60 (V6.3.1).  Several prior art references explicitly teach that data is transmitted autonomously in the uplink – from the UE to the base station – which must occur on one or more transmission time intervals (TTIs).  *See, e.g.*, US 5638369, US 5905720, US 5940741, US 6973070, US 7321780, US 7382747, US 7804850, US 2002/0191579, TDoc R1-03-0284, TDoc R1-03-0401, TDoc R1-04-0680, TDoc R1-04-0861, TDoc R1-04-1087, TDoc R1-04-1366, Chlamtac and Ganz reference, and US 2004/0085934.

To the extent the '780 patent, the '284 reference, or the '680 reference are found to lack an explicit teaching of the limitation of "a transmitter transmitting data on at least one TTI of the

k TTIs within the period" of claims 1 and 9, it would have been obvious to the ordinary artisan to have the transmitter of the UE transmit autonomously on at least one transmission time intervals (TTIs) of the permissible number (k) of transmission time intervals (TTIs) within the period having the maximum number (N) of transmission time intervals (TTIs) of the frame.  In fact, because autonomously transmitting data via the E-DCH was known before the earliest priority date of the '087 patent, transmission necessarily occurred on at least one transmission time interval (TTI) of the permissible number (k) of transmission time intervals (TTIs) within a period of N TTIs.  *See, e.g.*, US 5638369, US 5905720, US 5940741, US 6973070, US 7321780, US 7382747, US 7804850, US 2002/0191579, TDoc R1-03-0284, TDoc R1-03-0401, TDoc R1-04-0680, TDoc R1-04-0861, TDoc R1-04-1087, TDoc R1-04-1366, Chlamtac and Ganz reference, and US 2004/0085934.

  To the extent the '780 patent, the '284 reference, or the '680 reference are found to lack an explicit teaching of the limitation of the transmitter "transmitting uplink data according to the scheduling assignment information in the Node B controlled scheduling mode, and transmitting uplink data on at least one TTI of the k TTIs within the period in the non-scheduled transmission mode" of Claim 34, it would have been obvious to the ordinary artisan to have the transmitter of the UE transmit autonomously on at least one transmission time interval (TTI) of the permissible number (k) of transmission time intervals (TTIs) within the period having the maximum number (N) of transmission time intervals (TTIs) of the frame.  In fact, because autonomously transmitting data via the E-DCH was known before the earliest priority date of the '087 patent, transmission necessarily occurred on at least one transmission time interval (TTI) of the permissible number (k) of transmission time intervals (TTIs) within a period having N TTIs. *See, e.g.*, US 5638369, US 5905720, US 5940741, US 6973070, US 7321780, US 7382747, US

7804850, US 2002/0191579, TDoc R1-03-0284, TDoc R1-03-0401, TDoc R1-04-0680, TDoc R1-04-0861, TDoc R1-04-1087, TDoc R1-04-1366, Chlamtac and Ganz reference, and US 2004/0085934.  Transmitting data in the uplink in a scheduling mode, such as according to a scheduling grant, was known before the earliest priority date for the '087 patent.

To the extent the '780 patent, the '284 reference, or the '680 reference are found to lack an explicit teaching of the limitation of "wherein the parameter k is an integer greater than 0 and less than or equal to a positive integer N" of claims 1 and 9, it would have been obvious to the ordinary artisan that the value of "k" could not be less than or equal to zero, which would result in having no transmission time interval (TTI) used for the uplink transmission.  It also would have been obvious to the ordinary artisan that it would be impossible for the value of "k" to be greater than the maximum number (N) of transmission time intervals (TTIs) of the frame.  It also would have been obvious to the ordinary artisan that it would be impossible for the value of "k" to be a non-integer.  Accordingly, it would have been obvious to the ordinary artisan that the value of "k" must be an integer greater than 0 and less than or equal to the maximum number (N) of transmission time intervals (TTIs) of the frame.

To the extent the '780 patent, the '284 reference, or the '680 reference are found to lack an explicit teaching of the limitation of "wherein the non-scheduled transmission information is configured by a bit map of N bits indicating the k TTIs using specific bit values" of claims 2, 10 and 35, it would have been obvious to the ordinary artisan to use a bit map to indicate which or how many transmission time intervals (TTIs) are allowed for autonomous transmission among the maximum number (N) of transmission time intervals (TTIs) of the frame.  For example, before the earliest priority date of the '087 patent, a bit map was used to indicate which or how many transmission time intervals (TTIs) are allowed for autonomous transmission among the

maximum number (N) of transmission time intervals (TTIs) of the frame.  *See, e.g.,* US 6721294, US 7321780, and US 2002/0191579.  In fact, in the GSM standard (from which the UMTS standard evolved), the GPRS standard used a bit map to assign transmission time intervals (TTIs) for transmitting data in the uplink.  *See, e.g.*, GSM 04.60 version 6.1.0 § 12.4 (1998).

To the extent the '780 patent, the '284 reference, or the '680 reference are found to lack an explicit teaching of the limitation of "transmitting the data within a data rate allowed by a radio network controller (RNC) on at least one TTI of the k TTIs" of claims 6 and 14, it would have been obvious to the ordinary artisan for the UE to transmit autonomously on at least one of the transmission time intervals (TTIs) of the permissible number (k) of transmission time intervals (TTIs) within the period having the maximum number (N) of transmission time intervals (TTIs) of the frame.  Because autonomous transmission in the uplink was known before the earliest priority date of the '087 patent, transmission necessarily occurred on at least one transmission time interval (TTI) of the permissible number (k) of transmission time intervals (TTIs).  Moreover, it would have been obvious to the ordinary artisan that the transmission of the data in the uplink used a data rate that was allowed by a radio network controller.  The designation of allowable data rates for the UE, assigned by a radio network controller, was known before the earliest priority date of the '087 patent.  *See, e.g.*, US 7321780; R1-030284; R1-040680.

To the extent the '780 patent, the '284 reference, or the '680 reference are found to lack an explicit teaching of the limitation of a transmitter computing "a non-scheduled transmission determination value according to a connection frame number (CFN) for generating a frame to be used in communication with a Node B accessed by the UE and a subframe number" of claims 7, 15 and 39, it would have been obvious to the ordinary artisan that for autonomous transmission,

a frame must be used for the UE to communicate via an uplink communication with a Node B.  It also would have been obvious to the ordinary artisan that the transmitter computes a control value relating to a connection frame number (CFN) and a subframe number for controlling autonomous transmission in the uplink.  *See, e.g.*, US 7321780.

To the extent the '780 patent, the '284 reference, or the '680 reference are found to lack an explicit teaching of the limitation of "transmitting the data in TTIs in which non-scheduled transmission determination values correspond to values of the k TTIs" of claims 7, 15 and 39, it would have been obvious to the ordinary artisan that for autonomous transmission, the data must be transmitted on at least one transmission time interval (TTI).  Further, it would have been obvious to the ordinary artisan that the value computed by the transmitter, which must indicate, for autonomous transmission, the activated TTIs, that are indexed by a connection frame number (CFN) and a subframe number, would correspond to the values of the permissible number (k) of transmission time intervals (TTIs).  *See, e.g.*, US 7321780.

To the extent the '780 patent, the '284 reference, or the '680 reference are found to lack an explicit teaching of the limitation of "wherein the non-scheduled transmission determination value is computed by (CFN*n+Subframe Number)mod N, where a TTI size of the E-DCH is 1/n of a frame length" of claims 8, 16 and 40, it would have been obvious to the ordinary artisan that the permissible number (k) of transmission time intervals (TTIs) could be computed in this manner.  It was known before the earliest priority date of the '087 patent to select a channel based an equation of the form (A*B+C)modN, where A is a first frame number, B is a constant, C is a second frame number and N is a constant.  *See, e.g.*, US 7321780 and EP 1489773.

To the extent any cited reference is found to lack an explicit teaching of information that is transmitted in the uplink from a UE to a Node B, as may be required by one or more of the

asserted claims, the ordinary artisan would have understood this information to be inherent in the disclosures of the references, or obvious in view of the references, because they all relate to information that can be transmitted in the uplink.

Finally, all of the references identified in charts A-1 to A-7 are in the same field of telecommunication systems, and in particular, mobile telecommunications. Further, all of these references relate to the same problem of efficiently transmitting of data on an uplink in a telecommunications system. Moreover, the combinations of all of these references would simply be a matter of combining known elements in a known manner to achieve predictable results. To the extent that any limitation is determined not to be disclosed in any of these references, it would have been obvious to combine any of these references to provide the allegedly missing limitation.

### J.     ‘596 Patent

Any reference or combination of references that anticipates or makes obvious an asserted independent claim also makes obvious any asserted claim dependent on that independent claim because every element of each dependent claim was known by a person of ordinary skill at the time of the alleged invention, and it would have been obvious to combine those known elements with the independent claims at least as a matter of common sense and routine innovation.

Numerous prior art references, including those identified above pursuant to Patent L.R. 3-3(a) and in the Exhibits, reflect common knowledge and the state of the prior art before the priority date of the ’596 patent. Because it would be unduly burdensome to create detailed claim charts for the thousands of invalidating combinations, Apple has provided illustrative examples of such invalidating combinations below and in Exhibits B-1 through B-17. For at least the reasons described above and below in the examples provided, as well as in the attached claim

charts, it would have been obvious to one of ordinary skill in the art to combine any of a number of prior art references, including any combination of those identified in Exhibits B-1 through B-17, to meet the limitations of the asserted claims.  As such, Apple's identification of exemplary combinations is without limitation to Apple's identifying other invalidating combinations as appropriate.

As stated above, claims 1, 4, 6, 13, 16, and 18 of the '596 patent are anticipated by (1) Qualcomm 1992 Proposal, (2) IS-95B Specification, (3) cdma2000 1XRTT, (4) 3GPP Tdoc R2-042462 (LG), and (5) U.S. Patent No. 8,259,656.  To the extent these references are found to not anticipate any one of the asserted claims, they render the claims obvious, whether standing alone, or when combined with the knowledge of the person of ordinary skill and/or the nature of the problem to be solved.  To the extent these references are found to lack particular elements of the asserted claims, those elements would have represented mere obvious modifications.

To the extent the Choi '371 application is found to lack an explicit teaching of transmitting information in the uplink from a User Equipment (UE) to a Node B, as may be required by one or more of the asserted claims, it would have been obvious for a person of ordinary skill to apply its disclosures to the uplink.  The Choi '371 application relates to the transmission of control information in the downlink in UMTS, and it would have been obvious to apply its disclosures where it was desirable or necessary for control information to be transmitted in the uplink in UMTS.  Accordingly, such an adaptation of the Choi '371 application would provide no unexpected results and would have required nothing more than ordinary skill.

To the extent any of the other primary references is found to lack an explicit teaching of transmitting information in the uplink from a UE to a Node B, as may be required by one or more of the asserted claims, the person of ordinary skill would have understood this to be

1   inherent in or obvious from those references because they all relate to information, such as that

2   would be contained in a MAC-e PDU, that would or could be transmitted in the uplink.

3           To the extent any of the primary references is found to lack an explicit teaching of the

4   limitation of claims 1 and 13 of "forming a control service data unit (SDU) including control

5   information for an uplink packet data service," or the limitation of 4 and 16 that "the control

6   information includes at least one of transmission power information of a UE to transmit the

7   uplink packet data service and buffer status information thereof," these limitations would have

8   been obvious to the person of ordinary skill.  The person of ordinary skill would have been aware

9   of the necessity and/or benefits for the UE to transmit information, such as information relating

10  to its transmission power or buffer status, to the Node B in UMTS for use in Node B scheduling.

11  The person of ordinary skill also would have known that a control SDU including control

12  information could be used for this purpose.  The transmission of control information to in the

13  uplink was described in the initial concept document for enhanced uplink produced by 3GPP.

14  See, e.g., 3GPP TR 25.896 v6.0.0 § 7.1.  This concept was also already known at least because it

15  had been proposed for inclusion in another telecommunications standard.  See, e.g., C30-

16  20030306-063 QC RL Proposal_v1.0 (Qualcomm); cdma2000 1XRTT.  During the development

17  of the standard for enhanced uplink in 3GPP, the participants submitted numerous proposals

18  relating to the transmission of control information for Node B scheduling, including transmitting

19  such information in the MAC layer or by using a control SDU or PDU.  See, e.g., R1-031246

20  (Qualcomm); R1-040451 (Motorola); R1-040561 (Ericsson); R1-040675 (Motorola); R1-040683

21  (Ericsson); R1-040690 (Samsung); R1-040696 (Samsung); R1-040728 (Qualcomm); R1-040763

22  (Fujitsu); R1-040765 (Fujitsu); R1-040785 (Siemens); R1-040790 (Siemens); R1-040900

23  (Qualcomm); R1-040910 (Motorola); R1-041066 (Motorola); R2-041276 (InterDigital); R2-

041288 (Infineon); R2-041337 (Samsung); R2-041352 (Fujitsu); R2-041354 (Fujitsu); R2-041496 (Motorola); R2-041549 (Lucent); R2-041590 (Siemens); R2-041622 (Fujitsu); R2-042065 (Nortel); R2-042360 (Motorola); R2-042441 (Ericsson); R2-042453 (Fujitsu);R2-042465 (NEC); R2-042493 (Siemens).  The inclusion of such information within a MAC-e PDU along with other data was also disclosed in numerous references, including R2-042462 (LG) and U.S. Patent No. 8,259,656.

To the extent any of the primary references is found to lack an explicit teaching of the limitation "forming at least one first header part corresponding to the first PDU by using a data description indicator (DDI) field representing the first PDU and an N field representing the number of uplink packet data included in the first PDU" of claims 1 and 13, it would have been obvious to use these fields at least because they were explicitly defined in a number of proposals made by 3GPP participants relating to the MAC-e PDU.  See, e.g., QC MAC header schemes v2 (Qualcomm); Ericsson – MAC header scheme pA1 (Ericsson); R2-042402 (Samsung, Ericsson, Qualcomm).  The DDI and N fields also would have been obvious over a number of other 3GPP proposals and earlier references disclosing the use of similar fields in a MAC-e PDU or other types of PDUs.  See, e.g., R2-041313 (Ericsson); R2-041927 (Ericsson); R2-042244 (Ericsson); R2-042382 (Samsung); see also R1-041648 (Qualcomm); R2-040964 (Nokia); R2-041055 (LG); R2-041307 (Qualcomm); R2-041338 (Samsung); R2-041348 (LG); R2-041358 (Nokia); R2-041546 (LG); R2-041950 (LG); R2-042133 (Qualcomm); Nortel MAC header scheme; Nokia MAC-e_es headers on template; Motorola – MACe Header functionnal split; Qualcomm 11/4/04 Proposal (Ex. B-17); 10/29/04 Submissions (Ex. B-14).  The 3GPP working group agreed to include the DDI and N fields in the definition of the MAC-e PDU in 3GPP TS 25.309 before the priority date of the '596 patent.  See, e.g., 25.309 Drafts (Ex. B-14).  The use of such fields, or

the use of information represented by those fields, also would have been obvious in view of the knowledge of a person of ordinary skill, including because they would have involved a mere obvious matter of design choice.

To the extent any of the primary references is found to lack an explicit teaching of the limitation "forming a second header part corresponding to the control SDU by using a DDI field set as a predetermined specific value representing that the control SDU is transmitted" of claims 1 and 13, the limitation would have been obvious because the person of ordinary skill would have had the general knowledge that a field can be used to indicate or represent information.  At the very least, the use of a DDI field for such purpose would have been obvious because it was disclosed in R2-042462 (LG),WG2 45 Minutes, and U.S. Patent No. 8,259,656.  This limitation also would have been obvious over references disclosing the use of a specific predetermined value for a header field—including both a dedicated header field and the use of an existing header field—to represent the fact that control information was being sent in a PDU.  See, e.g., R2-042360 (Motorola, Nortel, Siemens); Siemens - E-DCH - MAC-e-es header.  The precise makeup of such a field would have involved an obvious matter of design choice.  For example, it would have been well within any ordinarily skilled person's ability to choose from and implement a number of options for a header field to represent the presence of information, such as using a dedicated flag or using a field that already existed in the header.

To the extent any of the primary references is found to lack an explicit teaching of the limitations of claims 1 and 13 relating to forming a second data packet unit (PDU) by concatenating a header and a payload, wherein the header includes the header parts, and the payload includes the first PDU and the control SDU, the limitations would have been obvious because the ordinary artisan would have understood that a PDU could be formed by

concatenating multiple header and payload parts.  At the time that enhanced uplink was being developed by 3GPP, the 3GPP TS 25.321 standard already included a definition of a MAC-hs PDU having a payload including multiple MAC-d PDUs and a padding region, and a header that included fields corresponding to the parts in the payload.  Numerous proposals were made to 3GPP disclosing formats for the MAC-e PDU having concatenated payload and header parts.  A person of ordinary skill thus would have well understood that multiple packet data, including packet data including control information, that need to be transmitted could be concatenated within a single PDU for transmission.  This concept was made explicit in the Choi '371 application, which disclosed concatenating a control message to the payload of a MAC-hs PDU and separately concatenating to the header a field indicating the presence of the control message.  It would have been trivial for a person of ordinary skill to apply this disclosure to a MAC-e PDU.  It was also known that useful information, such as control information, could be included in the padding region of a data packet in order to make more efficient use of transmission resources.  For example, the Choi '371 application disclosed including the control message in an area of the MAC-hs PDU that a person of ordinary skill would have understood otherwise could consist of a padding region.  A person of ordinary skill would have known that the inclusion of useful information, such as control information, in a padding area of a data packet would be beneficial because it would allow for the more efficient use of communication resources.  Such a person also would have known that transmitting such information in the MAC-e PDU would have a number of other benefits, such as the use of HARQ in UMTS.  Moreover, a number of references specifically disclosed forming a MAC-e PDU that includes both MAC-d/MAC-es PDUs and control information for Node B scheduling.  See, e.g., R2-042382 (Samsung); R2-042462 (LG); R2-042493 (Siemens).  To the extent that the MAC-e PDUs disclosed in these

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)

references is found to differ from the subject matter of the asserted claims, the differences would be trivial.  For example, the precise arrangement of fields within the definition of a PDU would have involved mere obvious matters of design choice.

To the extent any of the primary references is found to lack an explicit teaching of the limitation of claims 6 and 18 of "the DDI field inserted into the first header part represents a media access control-data (MAC-d) flow and a logical channel relating to uplink packet data included in the first PDU, and a size of the uplink packet data," such limitation would have been obvious at least because a number of prior art references expressly defined the DDI in this way.  See, e.g., QC MAC header schemes v2; Ericsson – MAC header scheme pA1; R2-042402 (Samsung, Ericsson, Qualcomm).  Such limitation would also have been obvious over the numerous submissions to 3GPP disclosing fields similar to the DDI field or discussing the need for a MAC-e PDU to convey information regarding the MAC-d flow, logical channel, and size of packet data included within its payload, or other similar information.  See, e.g., R2-041313 (Ericsson); R2-041927 (Ericsson); R2-042244 (Ericsson); R2-042382 (Samsung); see also R1-041648 (Qualcomm); R2-040964 (Nokia); R2-041055 (LG); R2-041307 (Qualcomm); R2-041338 (Samsung); R2-041348 (LG); R2-041358 (Nokia); R2-041546 (LG); R2-041950 (LG); R2-042133 (Qualcomm); Nortel MAC header scheme; Nokia MAC-e_es headers on template; Motorola – MACe Header functionnal split; Qualcomm 11/4/04 Proposal (Ex. B-17); 10/29/04 Submissions (Ex. B-14).  Additionally, the DDI fields was defined to represent this information the MAC-e PDU that the 3GPP working group agreed to include in 3GPP TS 25.309 before the priority date of the '596 patent.  See, e.g., 25.309 Drafts (Ex. B-14).

To that extent that any of the references is found to lack an explicit teaching of any of the "block," "control unit," or  "multiplexing and transmission sequence number (TSN) setting unit"

limitations of claim 13, the person of ordinary skill would have understood the disclosure of such structural elements to be inherent in or obvious from the prior art references.

Finally, all of the references identified in charts B-1 to B-17 are in the same field of communication systems.  To the extent that any limitation is missing in any of these references, it would have been obvious to combine any of these references together to provide the allegedly missing limitation.

### K.       '470 Patent

Any reference or combination of references that anticipates or makes obvious an asserted independent claim also makes obvious any asserted claim dependent on that independent claim because every element of each dependent claim was known by a person of ordinary skill at the time of the alleged invention, and it would have been obvious to combine those known elements with the independent claims at least as a matter of common sense and routine innovation.

Numerous prior art references, including those identified above pursuant to Patent L.R. 3-3(a) and in the Exhibits, reflect common knowledge and the state of the prior art before the priority date of the '470 patent.  Because it would be unduly burdensome to create detailed claim charts for the many invalidating combinations, Apple has provided illustrative examples of such invalidating combinations below and in Exhibits C-1 through C-13.  For at least the reasons described above and below in the examples provided, as well as in the attached claim charts, it would have been obvious to one of ordinary skill in the art to combine any of a number of prior art references, including any combination of those identified in Exhibits C-1 through C-13, to meet the limitations of the asserted claims.  As such, Apple's identification of exemplary combinations is without limitation to Apple's identifying other invalidating combinations as appropriate.

As stated above, numerous prior art mobile phones and other devices anticipate the asserted claims of the '470 patent.  Still other devices such as music audio playback devices, camcorders, and computers are described in publications that anticipate the asserted claims of the '470 patent.  Long before the purported invention described in the '470 patent, audio visual devices contained the same basic features:  internal audio components such as speakers, external audio components such as headphones or an external speaker, a display, the ability to determine whether the external audio output device is connected to the A/V device, and the ability to direct the audio signal to the internal speaker or the external audio output device depending on the connection status of that device.  It was also known at the time to use the display to indicate volume level of the playback on the A/V device for both the internal and external audio components.

To the extent that U.S. Patent No. 6,819,942 or JP 2002-10389 is found to lack an explicit teaching of the ability to display an indicator that an external audio device is attached to the claimed device and to provide that indication when the external device is plugged in, it would have been obvious to combine either of these references with any of the mobile phone and/or camcorder devices that had these features (particularly given the finite number of options available for system to decide whether to output sound to an external or internal source).  These prior art mobile phone and camcorder devices include (1) the Sony Ericsson T616 Mobile Phone; (2) the Nokia 3590 Mobile Phone; (3) the Nokia 6100 Mobile Phone; (4) the Nokia 7210 Mobile Phone; (5) the Sony Ericsson T68i Mobile Phone; (6) the Sony Ericsson P800 Mobile Phone; (7) the Sony Ericsson T610 Mobile Phone; and (8) the Canon GL2 Digital Video Camcorder.  A person of ordinary skill in the art, who wanted to improve upon the type of information on screen of the mobile phone described U.S. Patent No. 6,819,942 or on screen of the audio playback

device of JP 2002-10389 and solve the volume control problem described in the '470 patent, would have looked to other devices in the same field, such as the prior art devices and other references, because all of references share all of the relevant components.

To the extent that any limitation is missing in any of these references, it would have been obvious to combine any of these references together to provide the allegedly missing limitation.

For example, to the extent that any one of the prior art mobile phone devices or the camcorder listed above are found to lack a specific disclosure of the "control unit" (or microprocessor) or "audio signal processing unit" limitations of claims 7 and 8, it would have been well within the knowledge of the person of ordinary skill in the art, who would have known to use these common components in the devices listed above.  The use of such components is expressly described in Aotake, Onoda, and Hasegawa.  (*See, e.g.*, Aotake at 3:41-45, 5:28-51, Fig. 2; Onoda at ¶ 53, Fig. 1; Hasegawa at ¶¶ 19-20, 25, 27.)  A person of ordinary skill in the art would therefore have been motivated to combine the microprocessors and audio signal processing teachings of Aotake, Onoda, and Hasegawa, along with their teachings regarding using the microprocessor to control the display of the screen on the device and to determine the path of the audio signal, knowing that these well-known elements would achieve their purposes in combination.

As another example, to the extent that any of the prior art references listed above is found to lack OSD windows indicating stored volumes and the connection status of an external audio reproduction device, it would have been obvious to a person of ordinary skill in the art to look to any one of the numerous existing devices for these features.  The mobile phones listed above were manufactured by two manufacturers who were well known to persons of ordinary skill in the art at the time of the purported of the invention, Nokia and Sony Ericsson.  Such a person

would have been motivated to turn to devices produced by those companies to look for features. As one example, it would have been obvious for a person of ordinary skill in the art to modify a Nokia mobile phone, by looking to the teachings of another phone sold by that same company or its competitor (Sony Ericsson).

## L.      '757 Patent

Any reference or combination of references that anticipates or makes obvious an asserted independent claim also makes obvious any asserted claim dependent on that independent claim because every element of each dependent claim was known by a person of ordinary skill at the time of the alleged invention, and it would have been obvious to combine those known elements with the independent claims at least as a matter of common sense and routine innovation.

Numerous prior art references, including those identified above pursuant to Patent L.R. 3-3(a) and in the Exhibits, reflect common knowledge and the state of the prior art before the priority date of the '757 patent.  Because it would be unduly burdensome to create detailed claim charts for the thousands of invalidating combinations, Apple has provided illustrative examples of such invalidating combinations below and in Exhibits D-1 through D-10.  For at least the reasons described above and below in the examples provided, as well as in the attached claim charts, it would have been obvious to one of ordinary skill in the art to combine any of a number of prior art references, including any combination of those identified in Exhibits D-1 through D-10, to meet the limitations of the asserted claims.  As such, Apple's identification of exemplary combinations is without limitation to Apple's identifying other invalidating combinations as appropriate.

The notion of synchronizing data has been known in the art for decades.  Database systems, such as those provided by Oracle Corp., have been required to handle keeping data

consistent across multiple databases, even where data is being added, changed, or deleted on any of the databases. (Oracle 8i Concepts Manual, at p. 31-3 – 31-7.)  This process is the same regardless of the type of data stored in the database – it is irrelevant whether the databases contain text data such as customer telephone numbers or addresses, audio tracks representing a collection of music albums, or a set of videos or pictures.

The synchronization issue became more mainstream with the advent of PDAs and other mobile computing devices.  Users of these devices take their data with them and make changes wherever they happen to be.  Since the mobile devices are not always connected to a network, support is required for handling changes made on the local device with the data being synchronized when reattached to a master server.

With this widespread use of synchronization across all types of data, it is no surprise that U.S. Patent No. 7,587,446 to Onyon et al. ("the '446 Patent"), U.S. Patent Application No. 2002/0026442 A1 ("the '442 Pub."), U.S. Patent No. 7,020,704 to Lipscomb ("the '704 Patent"), U.S. Patent No. 6,636,873 to Carini et al. ("the '873 Patent"), the Oracle 8i System as described in the Oracle 8i concepts manual ("the Oracle 8i System"), U.S. Patent No, 5,729,735 to Meyering ("the '735 Patent"), U.S. Patent No, 6,000,000 to Hawkins et al. ("the '000 Patent), PCT International Application WO96/21898 to Boothby ("Boothby"), the Unison File Synchronizer Version 2.1 and Manual ("Unison"), and the Aztec RadioMedia/Digigram HitPlayer, the HitPlayer Manual, and the HitPlayer Brochure ("the HitPlayer") each teach each and every limitation of each asserted claim of the '757 patent.  To the extent any of these references is found to lack particular claim elements, such elements would have represented mere obvious modifications.

To the extent any of the '446 Patent, the '442 Pub., the '704 Patent, the '873 Patent, the Oracle 8i System, the '735 Patent, the '000 Patent, Boothby, Unison, and the HitPlayer is found to lack an explicit teaching of "content management information," a person of ordinary skill in the art would recognize that feature to be inherent in the references since stored media content cannot be accessed or manipulated without having information describing the content. Also, it would have been obvious to a person of ordinary skill in the art to include content management information so as to display information describing or grouping the multimedia content collection; selection menus, which inherently require content management information to display the items in the menus, are admitted prior art in the '757 specification. ('757 patent, Col. 1: 54-64; Col. 2:60-67.)  Storing content management information along with the associated content requires only the application of common sense and known methods that would yield predictable results.  For example, the '704 patent discloses the storage of content management data for, among other reasons, cataloging the content.

To the extent any of the '446 Patent, the '442 Pub., the '704 Patent, the '873 Patent, the Oracle 8i System, the '735 Patent, the '000 Patent, Boothby, Unison, and the HitPlayer is found to lack an explicit teaching of synchronizing "audio, video, or photographic data," as opposed to other types of data, a person of ordinary skill in the art would recognize that the synchronization systems described in the '446 Patent, the '442 Pub., the '704 Patent, the '873 Patent, the Oracle 8i System, the '735 Patent, the '000 Patent, Boothby, Unison, and the HitPlayer are agnostic as to the type of data being stored, and it would be obvious to synchronize audio, video, or photographic data in a system that can synchronize any other type of data.  For example, the Oracle 8i reference synchronizes text and binary data, without regard to whether the binary data represents a picture, an audio file, or a computer software executable file.

To the extent any of the '446 Patent, the '442 Pub., the '704 Patent, the '873 Patent, the Oracle 8i System, the '735 Patent, the '000 Patent, Boothby, Unison, and the HitPlayer is found to lack an explicit teaching of  associating content with "at least one user," that teaching would have been obvious to a person of ordinary skill in the art.  In fact, associating multimedia content with a user is admitted prior art to the '757 patent, described in the context of U.S. Patent No. 6,161,142, which is characterized as containing dossiers of a plurality of the subscribers used for matching musical content to a subscriber. ('757 patent, col. 2:10-18).  In other words, music content is associated with at least one of the subscribers.  Additional admitted prior art, U.S. patent no. 6,055,566, is characterized as sorting information according to subscriber preferences, which again is associating the content with a particular subscriber.  Further, the concept of associating data with particular users has been an aspect of database systems since their inception[2].

To the extent any of the '446 Patent, the '442 Pub., the '704 Patent, the '873 Patent, the Oracle 8i System, the '735 Patent, the '000 Patent, Boothby, Unison, and the HitPlayer is found to lack an explicit teaching of  particular network configurations such as a "LAN" (local area network) or "WAN" (wide area network), a person or ordinary skill in the art would recognize that those network types are mere known variations on a theme, and a system that works in one network configuration will work in another.  For that reason, references often list different network configurations like LAN and WAN within a litany of supported network types; for example, the '446 patent states "as used herein, the term "network" includes any network, including a LAN, WAN or open source global network, public or private, or any combination

---

[2] Data, stored in tables, are associated with users.  *See, e.g.*, the Oracle 8i Concepts manual at 10-2, "Associated with each database user is a schema. A schema is a collection of schema objects. Schema objects include tables, views, sequences, synonyms, indexes, clusters, database links, snapshots, procedures, functions, and packages."; "Tables are the basic unit of data storage in an Oracle database" at 10-3).

thereof…" ('446 patent, col. 4:56-59).  As such, a person of ordinary skill in the art would be motivated to use a known network variation appropriate for the circumstances, and such a choice requires only the application of common sense and known methods that would yield predictable results.

To the extent any of the '446 Patent, the '442 Pub., the '704 Patent, the '873 Patent, the Oracle 8i System, the '735 Patent, the '000 Patent, Boothby, Unison, and the HitPlayer is found to lack an explicit teaching of  a coupled "output device," the inclusion of such a device would have been obvious to a person of ordinary skill in the art.  In particular, there is no reason to store multimedia content in the absence of a method to view the content.  And, unless the viewer was coupled to the source of the content, there would be no ability to output the content.  Further, content output devices, such as televisions or stereos, were ubiquitous long before the filing of the '757 patent.  *See, e.g.,* the '704 patent at Figs. 1-2 (showing televisions and other media players for outputting content); the '446 patent at Figs. 3-4 (showing stereos).

To the extent any of the '446 Patent, the '442 Pub., the '704 Patent, the '873 Patent, the Oracle 8i System, the '735 Patent, the '000 Patent, Boothby, Unison, and the HitPlayer is found to lack an explicit teaching of  "converting analog information into digital form," the inclusion of such a feature would have been obvious to a person of ordinary skill in the art.  Many processes in a computer relate to converting analog to digital information (and vice-versa), such as the use of a modem, or playing music through a built-in speaker or headset.  Further, a user converting their music collection, such as their albums, tapes, or compact discs into a pure digital representation for storage on a computer was also well known (see, e.g., the '446 Patent, Col 3:21-30).  It would be reasonable for the conversion to occur at the location where the digital content is to be stored to avoid any unnecessary transportation of the digital files.  Regardless, to

the extent that it is found that "converting analog information into digital form" is still not obvious in light of the references above, such a disclosure could be found in any of U.S. Patent No. 5,550,566 ("the '566 patent"), U.S. Patent No. 5,297,231 ("the '231 patent"), or U.S. Patent No. 5,578,177 ("the '177 patent") (collectively, the "conversion references").  A person of skill in the art would be motivated to combine the conversion references with any of the '446 Patent, the '442 Pub., the '704 Patent, the '873 Patent, the Oracle 8i System, the '735 Patent, the '000 Patent, Boothby, Unison, or the HitPlayer given that each is directed to a central storage and interface computer device and each recognize the need to convert analog information to digital format.  *See* '566 patent, abstract, figure 3, claim 1, claim 7, claim 9, 1:66-2:10, 2:12-48; '231 patent, abstract, figure 2, claims 12-14, 2:54-68, 3:54-4:7, 5:16-50; '177 patent, abstract, figure 1, figure 4, figure 5, figure 8, claim 1, claim 11, claim 12, claim 15, claims 23-25, 2:60-3:10, 5:11-25, 7:60-8:58; 9:23-36, 11:22-33.

Further, to the extent that any of the elements of the asserted claims are found to be lacking in any of the '446 Patent, the '442 Pub., the '704 Patent, the '873 Patent, the Oracle 8i System, the '735 Patent, the '000 Patent, Boothby, Unison, and the HitPlayer, a person of ordinary skill in the art would have been motivated to combine the references, as detailed above, as all of those references are in the same technical area of data synchronization systems.

**M.    '058 Patent**

Any reference or combination of references that anticipates or makes obvious an asserted independent claim also makes obvious any asserted claim dependent on that independent claim because every element of each dependent claim was known by a person of ordinary skill at the time of the alleged invention, and it would have been obvious to combine those known elements with the independent claims at least as a matter of common sense and routine innovation.

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)

Numerous prior art references, including those identified above pursuant to Patent L.R. 3-3(a) and in Exhibits E-1 through E-13, reflect common knowledge and the state of the prior art before the priority date of the '058 patent.  Because it would be unduly burdensome to create detailed claim charts for the many invalidating combinations, Apple has provided illustrative examples of such invalidating combinations below and in Exhibits E-1 through E-13.  For at least the reasons described above and below in the examples provided, as well as in the attached claim charts, it would have been obvious to one of ordinary skill in the art to combine any of a number of prior art references, including any combination of those identified in Exhibits E-1 through E-13, to meet the limitations of the asserted claims.  As such, Apple's identification of exemplary combinations is without limitation to Apple's identifying other invalidating combinations as appropriate.

As stated above, each of Fabre, Lieberman, MacPaint, Bier, Photoshop, Agulnik, Allard, Simon, Deluxe Paint, Anwar, Perlin, Lee, and PhotoMesa anticipate the asserted claims.  To the extent any of these references are found not to anticipate any asserted claim, they render the claims obvious standing alone or when combined with knowledge of the ordinary artisan and/or the nature of the problem to be solved (*i.e.*, saving space on a display by using layers, including layers that can made more visible by magnifying the contents).  To the extent any of these references are found to lack particular claim elements, such elements would have represented mere obvious modifications.

To the extent any of Fabre, Lieberman, MacPaint, Bier, Photoshop, Agulnik, Allard, Simon, Deluxe Paint, Anwar, Perlin, Lee, or PhotoMesa are found to lack any of the elements of claims 1, 4, 9, 12, or 17 of the '058 patent, a person of ordinary skill in the art would have been motivated to combine any of these references with each other (based on the disclosures of the

references set forth for that element in the attached claim charts), or with any one of Hama, Choi, or Heikkinen (also based on the disclosures of these references set forth for that element in the attached claim charts), because all of the references are directed to a computing device (*e.g.*, a personal or portable computer, PDA, etc.) with memory, a display, and a controller.  All also address the same problem (*i.e.*, efficient use of limited screen space) using the same basic technology—*i.e.*, software/circuitry that can store and process a collection of information (*e,g.*, icons, folders, files, images, etc.) and display details corresponding to that information in layers, including portions of layers that are enlarged.  These elements are described in detail in the state of the art section above.

One of ordinary skill also would have been motivated to combine any of the above references together to yield predictable results (given that the use of layers and virtual magnification, including of data displayed in layers, were very well known, as also discussed above), as combining the references would simply entail combining known elements (*e.g.*, a user input unit, memory, a display unit, and software/circuitry to control the display) by known methods in the art.  In addition, any such combination would involve the simple substitution of one known, equivalent element for another.  Moreover, given the many prior art references teaching the use, display, and enlargement of information contained in layers, any such combination would have had a reasonable expectation of success and would have been nothing more than the combination of known elements to achieve their known purposes in the combination.  Further, such combinations would have been obvious to try because there were only a finite number of predictable solutions (*i.e.*, increase screen size, reduce amount of displayed information, or virtually enlarge the displayed information) and/or because known work prompted the variations of predictable design incentives and/or market forces (including,

for example, a trend toward reduced-size displays on hand-held electronic devices, including computers, PDAs, smart phones, and cell phones).

To take just one specific example, a person of ordinary skill in the art would have been motivated to combine Lieberman and Fabre.  Lieberman teaches a "macroscope," *i.e.*, computer software that allows the user to access details in layers (including file folders and maps) and enlarge those details in successive layers; and Fabre teaches "a digital device (e.g., portable computer, personal computer, a cellular telephone, a digital watch, etc.)" that allows a user to access details from icons/files/folders in layers and then "magnify" or "zoom" these details. Both references address the problem of providing visual access to large amounts of information when confronted with limited display size.  A person of ordinary skill in the art would therefore have been motivated to combine the user input unit, memory unit, display unit, and controlling software/circuitry teachings of Lieberman and Fabre, along with their teachings regarding accessing icons/files/folders, presenting detailed data via layers, and enlarging selected data via layers, knowing that these well-known elements would achieve their purposes in combination.

### N.     ‘179 Patent

Any reference or combination of references that anticipates or makes obvious an asserted independent claim also makes obvious any asserted claim dependent on that independent claim because every element of each dependent claim was known by a person of ordinary skill at the time of the alleged invention, and it would have been obvious to combine those known elements with the independent claims at least as a matter of common sense and routine innovation.

Numerous prior art references, including those identified above pursuant to Patent L.R. 3-3(a) and in Exhibits F-1 through F-5 and in the state of the art section above, reflect common

knowledge and the state of the prior art before the priority date of the '179 patent. Because it would be unduly burdensome to create detailed claim charts for the many invalidating combinations, Apple has provided illustrative examples of such invalidating combinations below and in Exhibits F-1 through F-5. For at least the reasons described above and below in the examples provided, as well as in the attached claim charts, it would have been obvious to one of ordinary skill in the art to combine any of a number of prior art references, including any combination of those identified in Exhibits F-1 through F-5, to meet the limitations of the asserted claims. As such, Apple's identification of exemplary combinations is without limitation to Apple's identifying other invalidating combinations as appropriate.

As stated above, Buxton, Ishihara and Van Kleeck anticipate each of the asserted claims. Panagrossi and Kato also anticipate claims 1, 4, 5, 6, 7, 8, 10, and 11. To the extent any of these references are found not to anticipate any asserted claim, they render the claims obvious standing alone or when combined with knowledge of the ordinary artisan and/or the nature of the problem to be solved (*i.e.*, saving space on a virtual keyboard display by assigning multiple character values to a key). To the extent any of these references are found to lack particular claim elements, such elements would have represented mere obvious modifications.

To the extent any of Panagrossi, Buxton, Ishihara, Van Kleeck, and Kato are found to lack any of the elements of claims 1, 3, 4, 5, 6, 7, 8, 10, or 11 of the '179 patent, a person of ordinary skill in the art would have been motivated to combine any of these references with each other (based on the disclosures of the references set forth for that element in the attached claim charts), or with any one of Hata, Auer, Sugano, Capps, Harada, Masui, Heikkinen, Kurtenbach et. al. "An empirical evaluation", Kurtenbach's Thesis, Venolia's T-Cube, Hopkins, Callahan, or the Apple Newton Message Pad 2000 as disclosed by the User's Manual (also based on the

disclosures of these references set forth for that element in the attached claim charts), because all of the references are directed to computing devices with touch screen input methods such as a virtual keyboard (*e.g.*, a personal or portable computer, PDA, cellular phone, etc.) with memory, a touch screen, a converter, and a controller.  All also address the same problem (*i.e.*, efficient use of limited screen space) using the same basic technology (*i.e.*, software/circuitry that can remember and assign multiple character values to a menu or virtual key, detect and process the trace of a stylus on a touch screen, and display a particular character value in response to the trace of the stylus).

One of ordinary skill would have been able to combine any of the above references together to yield predictable results (given that assigning multiple character values to a menu or virtual key, choosing a particular character value in response to the trace of a stylus, and displaying the chosen character value on the screen were very well known, as discussed in the state of the art section above), as combining the references would simply entail combining known elements (*e.g.*, a touch screen, a memory storing the names of keys or items selected, multiple key codes or item codes, and direction/range information for each key or menu, a converter, and software/circuitry controlling the display) by known methods in the art.

In addition, any such combination would yield predictable results using known techniques and would involve the simple substitution of one known, equivalent element for another.  Moreover, given the many prior art references teaching assigning multiple character values to a virtual key and using tracing/gesturing technology to select particular key values on a virtual keyboard, any such combination would have had a reasonable expectation of success and would have been nothing more than the combination of known elements to achieve their known purposes in the combination.  Further, such combinations would have been obvious to try

because there were only a finite number of predictable solutions (*i.e.*, increase screen size, reduce the number of available key character values, or assign multiple character values to a given key) and/or because known work prompted the variations of predictable design incentives and/or market forces (including, for example, a trend toward reduced-size displays on hand-held electronic devices, including computers, PDAs, smart phones, and cell phones).

**O.       ‘449 Patent**

Any reference or combination of references that anticipates or makes obvious an asserted independent claim also makes obvious any asserted claim dependent on that independent claim because every element of each dependent claim was known by a person of ordinary skill at the time of the alleged invention, and it would have been obvious to combine those known elements with the independent claims at least as a matter of common sense and routine innovation.

Numerous prior art references, including those identified above pursuant to Patent L.R. 3-3(a) and in the Exhibits, reflect common knowledge and the state of the prior art before the priority date of the ‘449 patent.  Because it would be unduly burdensome to create detailed claim charts for the many invalidating combinations, Apple has provided illustrative examples of such invalidating combinations below and in Exhibits G-1 through G-5.  For at least the reasons described above and below in the examples provided, as well as in the attached claim charts, it would have been obvious to one of ordinary skill in the art to combine any of a number of prior art references, including any combination of those identified in Exhibits G-1 through G-5, to meet the limitations of the asserted claims.  As such, Apple's identification of exemplary combinations is without limitation to Apple's identifying other invalidating combinations as appropriate.

By the mid-1990s, portable digital cameras were mainstream.  Recording mediums such as semiconductor memories were rapidly becoming lower in cost, smaller in size, and greater in capacity.  ('449 patent col. 1:9-18). When combined with the advance in compression technology, including the public release of the MPEG and JPEG standards in the early 1990s, digital cameras were able to record a large number of moving and still images.

These advances in digital camera technology are evident in each of U.S. Patent No. 6,104,430 ('430 patent); U.S. Patent No. 5,444,483 ('483 patent); Unexamined Japanese Patent Application H7-7647 (JPA 647); the Ricoh RDC-1 Digital Camera, as described in the Instruction Manual and the Service Manual (Ricoh RDC-1); and Unexamined Japanese Patent Application Publication No. H05-344460 ("Yamada").  Each of these references teaches, at a minimum, the vast majority of the limitations of the '449 patent asserted claims.

To the extent that the '483 patent,  JPA 647, or Yamada are found to lack an explicit teaching of a "compressor which compresses said digital signal outputted from said A/D converter, and generates compressed data by using a different compressing method for moving image signals and for still image signals" or a "decompressor which decompresses said compressed data by using a different decompressing method according to whether said recorded compressed data is a moving image signal or a still image signal" those teachings would have been obvious to a person of ordinary skill in the art.  In fact, JPEG and MPEG signal compression technology is admitted prior art to the '449 patent. ('449 patent at 1:18-21.)  A person of ordinary skill in the art at the time of the invention would have been motivated to combine any of the foregoing references, to the extent it is found necessary, in order to realize the benefits admitted as prior art by the '449 patent.  (*See*, *e.g.*, *id. (*conceding that JPEG and MPEG allow storage of a greater number of still and moving images.))

To the extent the '430 patent, the '483 patent, JPA 647, or the Ricoh RDC-1 is found to lack an explicit teaching of "wherein said recording circuit records each one of said plurality of image signals with classification data," a person of ordinary skill in the art would have been motivated to combine any of these references with U.S. Patent No. 5,796,428 and/or the disclosure of these elements in Yamada, because all of these references are directed to a digital camera that uses known components (*e.g.*, a lens, a CCD, an A/D converter, compression circuits).  Further, each reference discloses techniques for recording moving or still images and/or associated data.  (*See, e.g.*, '430 patent at 1:19-21; '483 patent at 1:8-13; JPA 647 at Abstract and 4, ¶ 0007; Ricoh RDC-1 at Ricoh Service Manual pp. 41, 78; '428 patent at 3:16-22; Yamada at Abstract, ¶¶ 3-4.)  A person of ordinary skill in the art would have been motivated to use the techniques for recording images and/or associated data interchangeably within the various digital cameras disclosed, depending on the needs of the user.  Moreover, because each reference taught digital cameras using the disclosed techniques for recording, a person of ordinary skill in the art would have had a reasonable expectation of success in using the technique used in one digital camera in a different digital camera.

To the extent the '430 patent, the '483 patent, JPA 647, the Ricoh RDC-1, or Yamada is found to be missing claims elements such as "a display which displays said moving image signals and still image signals outputted from said reproducing circuit, and a list of said moving image signal and still image signal as a search mode, and a list of classifications as a classification mode," "said display lists a plurality of classifications and a number of images belonging to each classification," or "wherein said classification is able to change by a direction of a user," a person of ordinary skill would have been motivated to combine these references with the '428 patent, Apple's PhotoFlash for Macintosh as described in the User Guide,

Windows 95 as described in Introducing Windows 95, or Japanese Patent Application JP-H2-292974 ("Takarada").  First, all of the references use the same basic technology—software/circuitry that can store multimedia information (*e.g.*, moving images, still images, and audio).  Second, a person of ordinary still in the art would have been motivated to combine digital camera hardware with software programs that organize multimedia images in order to solve the problem of retrieving, grouping, and deleting image data recorded in a digital camera, as described in the '449 patent. ('449 patent, 1:9-44.  Third, a person of ordinary skill in the art would have been motivated to combine a digital camera with software programs that organize multimedia images in response to predictable design incentives and/or market forces (including, for example, a trend toward integrating displays into digital cameras, and a trend toward storing greater volumes of images on digital cameras).

By way of example, each of the references discloses digital cameras having various interfaces for organizing and/or displaying images.  (*See, e.g.*, '430 patent at 5:36-38; '483 patent at 3:54-66; JPA 647 at 7, ¶ 29; Ricoh RDC-1 at Ricoh RDC-1 Instruction Manual pp. 62, 79; Yamada at ¶¶ 8-9; '428 patent at Abstract, 1:42-47, 3:20-28, Figs. 5, 6, 8; Apple's PhotoFlash for Macintosh at PhotoFlash User's Guide pp. 1, 10, 16, 20-22; Windows 95 at Windows 95 User's Guide pp. 8, 21-22; Takarada at p. 35, Fig. 48.)  A person of ordinary skill in the art would have been motivated to use the techniques of organizing and displaying disclosed in the various prior art digital cameras interchangeably.  Moreover, because each reference taught digital cameras using the disclosed techniques for organizing and displaying images, a person of ordinary skill in the art would have had a reasonable expectation of success in using the technique used in one digital camera in a different digital camera.

**P.**     **'239 Patent**

Any reference or combination of references that anticipates or makes obvious an asserted independent claim also makes obvious any asserted claim dependent on that independent claim because every element of each dependent claim was known by a person of ordinary skill at the time of the alleged invention, and it would have been obvious to combine those known elements with the independent claims at least as a matter of common sense and routine innovation.

Numerous prior art references, including those identified above pursuant to Patent L.R. 3-3(a) and in the Exhibits, reflect common knowledge and the state of the prior art before the priority date of the '239 patent.  Because it would be unduly burdensome to create detailed claim charts for the many invalidating combinations, Apple has provided illustrative examples of such invalidating combinations below and in Exhibits H-1 through H-9.  For at least the reasons described above and below in the examples provided, as well as in the attached claim charts, it would have been obvious to one of ordinary skill in the art to combine any of a number of prior art references, including any combination of those identified in Exhibits H-1 through H-9, to meet the limitations of the asserted claims.  As such, Apple's identification of exemplary combinations is without limitation to Apple's identifying other invalidating combinations as appropriate.

As stated above, each of U.S. Patent No, 4,963,995 to Lang ("the '995 patent"), the Kodak SV9600 Still Video Transceiver ("the SV9600"), U.S. Patent No. 5,633,891 to Rebec et al. ("the '891 patent"), U.S. Patent No. 7,433,921 to Ludwig et al. ("the '921 patent"), U.S. Patent No. 5,506,954 to Arshi et al. ("the '954 patent"), U.S. Patent No. 4,825,457 to Lebowitz et al. ("the '457 patent"), Japanese Patent Appl. 05-167965 to Heisei ("Heisei"), U.S. Patent No. 5,170,427 (Exhibit H-8), and Action Media II System (Exhibit H-9) (collectively, "the '239 prior art references") anticipate the asserted claims.  To the extent the '239 prior art references are

found to not anticipate any asserted claim, they render the claims obvious standing alone or when combined with knowledge of the ordinary artisan and/or the nature of the problem to be solved. To the extent any of the '239 prior art references are found to lack particular claim elements, such elements would have represented mere obvious modifications.

To the extent any of the '239 prior art references are found to lack an explicit teaching for a means for capturing, digitizing, and compressing a composite signal, use of such means would have been obvious in view of the state of the art at the time of the invention. At the time of the '239 patent, hardware and software related to audio/video capture, digitization, and compression were well-known and sold in off-shelf-products for personal computers. It would be simple for one of ordinary skill to implement those techniques and structures into an apparatus. The prior art references disclosed by Apple expressly teach audio/video capture, digitization, and compression. For instance, the '995 patent discloses a video control unit as a video capture device that digitizes and compresses incoming video from a video camera. Additionally, the '921 patent discloses the use of a video camera and microphone, in a collaborative multimedia workstation, to capture, digitize, and compress audio and video into a single file. Further, the Action Media System teaches the use of a set of computer boards that could be installed into any compatible personal computer to provide the ability to capture, digitize, and compress an incoming video signal. These examples, show that such means were readily available to a person of ordinary skill in the art prior to the filing date of the '239 patent.

To the extent any of the '239 prior art references are found to lack a composite signal, combining audio and video into a single digital format would have been obvious. The '239 patent itself reveals that persons of ordinary skill in the art were well-versed in utilizing composite signals in a digital format. One particular example is the '995 patent, which discloses

the use of an NTSC composite signal.  Another example is the ActionMedia II System, which also processes NTSC composite signals.  Any of the other '239 prior art references would have easily been modified by a person of ordinary skill in the art to operate with such a composite signal.

To the extent any of the '239 prior art references are found to lack an explicit teaching for a means for storing a composite signal, use of such means had been known to those of ordinary skill in the art long before the filing date of the '239 patent and would have been obvious.  Prior art references, such as the '921 patent and the '995 patent teach such means.  The '921 patent discloses several storage options including computer-controlled VCRs, and rewritable magnetic or optical disks.  The '995 patent discloses, in addition to those storage means, CD-ROMs and RAM.  Persons of ordinary skill in the art would have been familiar with the variety of digital storage means available at the time the '239 patent was filed, and would have been motivated to combine those storage means with other aspects of the system described in the '239 patent.

To the extent any of the '239 prior art references are found to lack an explicit teaching for a means for transmitting a composite signal, the prior art indicates that combining such means with the previously discussed capture and storage means would have been obvious.  A person of ordinary skill would have been motivated to combine preexisting means for transmitting, such as telephonic or cellular transmission means with a video capture means.  Examples of this combination are disclosed in prior art references such as the SV9600, Heisei, and the '921 patent. Those references disclose the use of cellular transmission means and other telephonic transmission means for a variety of applications including composite signal transmission.  A person of ordinary skill would have found no unexpected results from combining such means together.

To the extent any of the '239 prior art references are found to lack an explicit teaching for the receiving, storage, and playback means limitations in the host unit or playback units, the necessity of receiving and playing back transmissions would have provided a person of ordinary skill in the art motivation to combine prior art means to interface with the remote unit.  Indeed, it makes little sense to transmit a signal, without being able to receive it.  The '921 patent provides a good example such a receiving system.  The '921 patent discloses both a remote collaborative media workstation, and workstations to receive the transmitted signals.  Sending a compressed signal makes it necessary to have a device to receive, decompress, and play that signal.

To the extent any of the '239 prior art references are found to lack an explicit teaching for combining a host unit and playback unit, doing so would have been obvious due to the desire to play video where one receives it.  Again, the '921 patent discloses an example of such a motivation to combine through its collaborative multimedia workstation.  Similarly, the '427 patent discloses a video telephone system, where each video telephone unit receives and plays back video sent from a remote video telephone.

To the extent any of the '239 prior art references are found to lack real-time capture functionality, incorporating such functionality would have been obvious.  Real-time capture devices existed in the prior art, as evidenced by the '921 patent, the ActionMedia II System, and Heisei.  Both the '921 patent and Heisei disclose transmitting live video over cellular connections.  Such live video requires real-time capture. The ActionMedia II System, as another example, specifically supports a "RTV (Real Time Video) " algorithm.

To the extent any of the '239 prior art references are found to lack an explicit teaching for splitting digitized compressed audio or video, doing so would have been obvious.  A person of ordinary skill in the art would have been aware of such off-the-shelf methods for achieving that

function, as they were disclosed in the '239 patent.  Additionally, '239 prior art references disclose such functionally.  For instance, the '921 patent discloses the division of composite signals between two cellular interfaces.  Due to bandwidth limitations at that time, persons of ordinary skill in the art would have been motivated to apply such splitting means.

Finally, all of the references identified in charts H-1 to H-9 are in the same field of transmission systems and use components known to those of ordinary skill in the art at the time the '239 patent was filed in a known way to accomplish that function. To the extent any limitation is missing in any of the references, it would have been obvious to combine any of these references together to provide the allegedly missing limitation.

## VII.   CONTENTIONS UNDER 35 U.S.C. § 112 PURSUANT TO PATENT L.R. 3-3(d)

In accordance with Patent L.R. 3-3(d), Apple includes below the grounds on which Apple contends the asserted claims of the Patents-In-Suit are invalid for failure to meet the requirements of the first two paragraphs of 35 U.S.C. § 112.

As noted above, Samsung has not yet provided a claim construction for many of the terms and phrases that Apple anticipates will be in dispute.  Apple, therefore, cannot provide a complete list of its § 112 defenses because Apple does not know whether Samsung will proffer a construction for certain terms and phrases that is broader than, or inconsistent with, the construction that would be supportable by the disclosure set forth in the specification.

To the extent the following contentions reflect constructions of claim limitations consistent with or implicit in Samsung's Infringement Contentions, no inference is intended nor should any be drawn that Apple agrees with Samsung's claim constructions, and Apple expressly reserves the right to contest such claim constructions.  Apple offers these contentions in response

PLAINTIFF AND COUNTERCLAIM DEFENDANT
APPLE INC.'S AMENDED INVALIDITY
CONTENTIONS
Case No. 12-cv-00630 (LHK)

to Samsung's Infringement Contentions and without prejudice to any position it may ultimately take as to any claim construction issues.

Accordingly, Apple reserves the right to supplement, amend, and/or modify these § 112 invalidity contentions as discovery progresses.

## A.    **'087 Patent**

Apple contends that the asserted claims are invalid as indefinite pursuant to *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005), where the Federal Circuit held that a claim covering both a device and a method using the device is invalid as indefinite under 35 U.S.C. §112 ¶ 2.  In *IPXL*, the claim at issue recited both an apparatus and a method for using the apparatus.  As the Court explained, the combination of structural and method limitations made it unclear whether infringement occurs "when one creates a system that allows the user to change the predicted transaction information or accept the displayed transaction, or whether infringement occurs when the user uses the input means to accept a displayed transaction."  *Id.*, at 1384.  Because claims 9 to 16, 22 to 26, and 34 to 40 of the '087 patent similarly combine structural and method limitations, it is unclear whether infringement of these claims occurs when one creates the apparatus (e.g., an apparatus for performing non-scheduled transmission in a user equipment of a mobile communication system for supporting an enhanced uplink dedicated channel), or for example, when one uses:

- the apparatus' receiver to receive non-scheduled transmission information indicating k transmission time intervals for transmitting non-scheduled data via the enhanced uplink dedicated channel;

- the apparatus' transmitter to transmit to the UE non-scheduled transmission information indicating the k TTIs for transmitting non-scheduled data via the enhanced uplink dedicated channel within a period having N TTIs;

- the apparatus' transmitter to transmit the data within a data rate allowed by a radio network controller on at least one TTI of the k TTIs;

- the apparatus' transmitter to compute a non-scheduled transmission determination value according to a connection frame number (CFN) for generating a frame to be used in communication with a Node B accessed by the UE and a subframe number;

- the apparatus' receiver to receive at least one of scheduling assignment information generated by the Node B based on a scheduling information and non-scheduled transmission information indicating k transmission time intervals (TTIs) for transmitting non-scheduled data via the E-DCH within a period having N TTIs;

- the apparatus' controller to select a Node B controlled scheduling mode or an non-scheduled transmission mode to transmit data;

- the apparatus' transmitter to transmit uplink data according to the scheduling assignment information in the Node B controlled scheduling mode;

- the apparatus' transmitter to transmit uplink data on at least one TTI of the k TTIs within the period in the non-scheduled transmission mode

- the apparatus' controller to set k transmission time intervals; and

- the apparatus' transmitter to to transmit the data in TTIs in which non-scheduled transmission determination values correspond to values of the k TTIs.

Thus, as in *IPXL*, these claims do not apprise a person of ordinary skill in the art of their scope, and they are invalid for indefiniteness under 35 U.S.C. § 112, ¶ 2.

**B.      ‘596 Patent**

The asserted claims of the '596 patent lack written description support in one or more of the Korean patent applications to which it claims priority.  In particular, Korea Patent Application No. 10-2004-0091093 ("KR '093 application") fails to provide written description support for at least the claim limitations "forming at least one first header part corresponding to the first PDU by using a data description indicator (DDI) field representing the first PDU" and "the DDI field inserted into the first header part represents a media access control-data (MAC-d) flow and a logical channel relating to uplink packet data included in the first PDU, and a size of the uplink packet data."

The KR '093 application contains no disclosure of a "data description indicator (DDI) field"—the term does not appear at all in the application.

Thus, the asserted claims of the '596 patent are not entitled to claim priority to the filing date of one or more of the Korean patent applications.

Apple further contends that claims 13, 16, and 18 of the '596 patent are invalid as indefinite under § 35 U.S.C. §112 ¶ 2.  *See IPXL*, 430 F.3d at 1377.  Because these claims combine structural and method limitations, it is unclear whether infringement of these claims occurs when one creates the apparatus (e.g., an apparatus for transmitting control information for an uplink packet data service in a mobile communication system), or for example, when one uses:

- the apparatus's block to form a first protocol data unit (PDU) including uplink packet data;

- the apparatus's control unit to form a control service data unit (SDU) including control information for an uplink packet data service;

- the apparatus's multiplexing and transmission sequence number (TSN) setting unit to form at least one first header part corresponding to the first PDU by using a data description indicator (DDI) field representing the first PDU and an N field representing the number of uplink packet data included in the first PDU;

- the apparatus's multiplexing and transmission sequence number (TSN) setting unit to form a second header part corresponding to the control SDU by using a DDI field set as a predetermined specific value representing that the control SDU is transmitted; or

- the apparatus's multiplexing and transmission sequence number (TSN) setting unit to form a second data packet unit (PDU) by concatenating a header and a payload, the header including the header parts, the payload including the first PDU and the control SDU, wherein the second PDU is transmitted to a Node B;

- the apparatus's control unit to form a control service data unit (SDU) including control information for an uplink packet data service, wherein the control information includes at least one of transmission power information of the UE to transmit the uplink packet data service and buffer status information thereof;

- the apparatus's multiplexing and transmission sequence number (TSN) setting unit to form at least one first header part corresponding to the first PDU by using a data

description indicator (DDI) field representing the first PDU, wherein the DDI field inserted into the first header part represents a media access control-data (MAC-d) flow and a logical channel relating to uplink packet data included in the first PDU, and a size of the uplink packet data.

Thus, as in *IPXL*, these claims do not apprise a person of ordinary skill in the art of their scope, and they are invalid for indefiniteness under 35 U.S.C. § 112, ¶ 2.

Apple further contends that claims 1, 4, 6, 13, 16, and 18 of the '596 patent are invalid as indefinite under § 35 U.S.C. §112 ¶ 2.  The claims require "forming a second data packet unit" without antecedent basis for a first "data packet unit."  In addition, neither the specification nor claims define (or re-define) a "data packet unit" and thus the patent fails to put a person of ordinary skill in the art on notice of what the applicant intended by the phrase.  The claims therefore do not particularly point out and distinctly claim the subject matter which the applicant regards as his invention, and are invalid.

**C.    '757 Patent**

Claims 1-5, 11, 12, 14, and 15 of the '757 patent are invalid under 35 U.S.C. § 112, second paragraph, because they fail to particularly point out and distinctly claim the subject matter which the applicant regards as his invention.  In particular, the term "zone" is indefinite because a person of ordinary skill in the art would be unable to determine the bounds of the claim limitations.  For example, claim 1 claims "at least one zone, each zone having at least one zone specific storage and interface device."  However, the intrinsic evidence provides no definition of the term "zone," and the term is not defined to a person of ordinary skill in the art.

Apple contends that claim term is indefinite under *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008), where the Federal Circuit noted that a claim term is indefinite when a person of ordinary skill in the art is unable to determine the boundaries of the claim.  Here, even Samsung has been unable to utilize the claim term "zone" in its

infringement contentions, which is evident through its failure to indicate what it believes meets the "zone" limitation in the Apple accused devices.  That is because "zone" has no meaning to a person of ordinary skill in the art, and therefore leaves the public unable to determine the bounds of the claims of the '757 patent and unable to avoid infringement.  Thus, the claims terms are indefinite and under 35 U.S.C. § 112, ¶ 2.

**D.    '058 Patent**

At least asserted claims 1, 4, 9, 12, and 17 of the '058 patent are invalid under 35 U.S.C. §112, ¶ 1 because there is no support in the '058 specification for the requirement displaying "specific identification information of the first layer," and are invalid under 35 U.S.C. § 112, ¶ 2 because the claims inconsistently purport to require displaying "***data corresponding to*** specific identification information" for certain limitations and displaying "specific identification information of the first layer" for other limitations.

Furthermore, at least asserted claims 1, 4, and 17 are invalid as indefinite pursuant to *IPXL Holdings*, where the Federal Circuit held that a claim covering both a device and a method using the device is invalid as indefinite under 35 U.S.C. §112, ¶ 2.  In *IPXL*, the claim at issue recited both an apparatus and a method for using the apparatus.  As the Court explained, the combination of structural and method limitations made it unclear whether infringement occurs "when one creates a system that allows the user to change the predicted transaction information or accept the displayed transaction, or whether infringement occurs when the user uses the input means to accept a displayed transaction."  *Id*. at 1384.

'058 claims 1 and 4 are all apparatus claims that require:

- A "user input unit" that outputs a data-display request signal "***if there is a data-display request from a user***"; and

- A "controller" that controls the display unit to display "the plurality of identification information *if said data display request signal is inputted by the user*, display data corresponding to specific identification information via a first layer *if the specific identification information is selected* from among the plurality of identification information, and display a specific area of the specific information in an enlarged form via a second layer *if the specific area is selected* from the specific identification information of the first layer"

(Emphases added.)

Similarly, '058 claim 17 is an apparatus claim that requires:

- A "user input unit" that outputs a data-display request signal "*if there is a data-display request from a user*"; and

- A "controller" that controls the display unit "*in response to the data-display request by the user* to display the plurality of identification information, said display unit further displaying data corresponding to specific identification information via a first layer *if the specific identification information is selected* from among the plurality of identification information, and displaying a specific area of the specific information in an enlarged form via a second layer *if the specific area is selected* from the specific identification information of the first layer"

(Emphases added.)  As in *IPXL*, it is unclear whether infringement of '058 claims 1, 4, and 17 occurs when one creates the apparatus that allows the identified user inputs, or when one uses the apparatus in the manner described (*i.e.*, actually *inputting* the "data display request signal," *selecting* the "specific identification information," and *selecting* the "specific area").  Thus, as in *IPXL*, these claims do not apprise a person of ordinary skill in the art of their scope; they are therefore invalid for indefiniteness under 35 U.S.C. § 112, ¶ 2.  *See also In re Katz Interactive Processing Patent Litigation*, 639 F.3d 1303, 1318 (Fed. Cir. 2011).

**E.**   **'179 Patent**

At least asserted claims 1, 3, 4, 5, and 6 of the '179 patent are invalid under 35 U.S.C. § 112, ¶ 2 because the term "said generated key code" lacks an antecedent basis and is therefore nonsensical.

At least asserted claims 7, 8, 10, and 11 of the '179 patent are invalid under 35 U.S.C. § 112, ¶ 1 because there is no support in the specification for the term "key code information."

At least asserted claims 1, 3, 4, 5, and 6 of the '179 patent are invalid under 35 U.S.C. § 112, ¶ 1 because there is no support in the specification for the term "corresponding screen … information."

At least asserted claims 7, 8, and 10 of the '179 patent are invalid under 35 U.S.C. § 112, ¶ 2 because a person of ordinary skill in the art would find the term "restoring the image to its original state" to be insolubly ambiguous because that phrase follows the language "displaying on *the image* of the keyboard *an image* of the key code generated by step(e)" (i.e., the claim does not explain which of the two images must be restored to its original state).

**F.       '449 Patent**

Claims 25 and 27 of the '449 patent are invalid under 35 U.S.C. §112, second paragraph, because they fail to particularly point out and distinctly claim the subject matter which the applicant regards as his invention.  In particular, the term "recording circuit" is indefinite because it is inconsistent with any corresponding structure as defined in the patent.  For example, claim 25 clearly recites functionality performed by the "recording circuit" which is consistently attributed to other structural elements in the specification.  The "recording circuit" of claim 25 is "a recording circuit which records compressed data, said compressed data including a moving image signal, and a still image signal." '449 at 18:17-19.  The term "recording circuit" is not defined in the '449 patent, nor is it a term known to a person of ordinary skill in the art.  The closest corresponding structural element, an "image recording apparatus" includes functionality such as analog to digital conversion and compression, which is attributed to separate elements in claim 25.  *See* '449 at 13:24-32; *cf.* '449 at 18:17-19.  Claim 25 does not clarify the relationship

1    between the "compressor" and the "recording circuit."  *See* '449 at 18:13-19.  It is not clear

2    whether the compressor and the recording circuit are separate elements as listed in the claim or

3    are combined as described with respect to the "image recording apparatus" of the specification.

4    *See* '449 at 13:24-32; *cf.* '449 at 18:13-19.  The "image recording apparatus" of the specification

5    also includes further elements not mentioned in the claims.  *See* '449 at 13:24-32; *cf.* '449 at

6

7    18:17-19.  A person of ordinary skill in the art is unable to determine the structure and

8    functionalities of the recording circuit of claim 25.  Apple contends that the claim term is

9    indefinite under *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir.

10   2008), where the Federal Circuit noted that a claim term is indefinite when a person of ordinary

11   skill in the art is unable to determine the boundaries of the claim.

12

13          Additionally, claim 25, recites a "reproducing circuit" which clearly recites functionality

14   consistently attributed to other structural elements in the specification.  The "reproducing circuit"

15   of claim 25 is "a reproducing circuit which reproduces a moving image signal, a sound signal in

16   synchronous to said moving image signal, and a still image signal."  '449 at 18:24-26.  The term

17   "reproducing circuit" is not defined in the '449 patent, nor is it a term known to a person of

18   ordinary skill in the art.  The closest corresponding structural element, an "image reproducing

19   apparatus" includes functionality such as decompression, which is attributed to separate elements

20

21   in claim 25.  *See* '449 at 13:48-61; *cf.* '449 at 18:24-26.  It is not clear whether the "reproducing

22   circuit" and the "decompressor" of claim 25 are separate elements as listed in the claim or are

23   combined as described with respect to the "image reproducing apparatus" of the specification.

24   *See* '449 at 13:48-61; *cf.* '449 at 18:24-26.  A person of ordinary skill in the art is unable to

25   determine the structure and functionalities of the reproducing circuit of claim 25.  Apple

26   contends that the claim term is indefinite under *Halliburton Energy Services, Inc. v. M-I LLC*,

27

28

514 F.3d 1244, 1249 (Fed. Cir. 2008), where the Federal Circuit noted that a claim term is indefinite when a person of ordinary skill in the art is unable to determine the boundaries of the claim.

Additionally, claim 25, recites a "search mode" which is not defined in the '449 patent or known to a person of ordinary skill in the art.  Specifically, claim 25 recites "a display which displays said moving image signals and still image signals outputted from said reproducing circuit, a list of said moving image signals and still image signals in a search mode, and a list of classifications in a classification mode."  From the context of claim 25 itself it is not clear if the term "search mode" refers to an undefined search functionality, a list, or another undefined element.  The specification which does not even use the term "search" fails to provide clarification.  The other claims use the term "search" inconsistently.  For example, claim 1, uses the term "search mode."  Claims 19, 30, and 31 use the term "search display."  Claim 2 uses both terms.  A person of ordinary skill in the art is unable to determine the structure or functionalities of a "search mode" as recited in claim 25.  In view of the foregoing, it is not clear whether the term "search mode" provides searching functionality, comprises a list, or what functionality or structure the term is intended to encompass.  Apple contends that the claim term is indefinite under *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008), where the Federal Circuit noted that a claim term is indefinite when a person of ordinary skill in the art is unable to determine the boundaries of the claim.

Claim 27 depends upon and incorporates the limitations of claim 25 and is therefore indefinite at least by virtue of its dependency.

For at least the foregoing reasons, claim 25 is indefinite under 35 U.S.C. §112, second paragraph.

Claims 25 and 27 of the '449 patent is invalid under 35 U.S.C. §112, first paragraph, because the specification of the '449 patent does not contain an adequate written description of the subject matter of these claims, and would not enable one of skill in the relevant art to make and use the same.  In particular, these claims require a "search mode."  However, the specification contains no disclosure or suggestion of searching.  In addition, the term search mode was added by amendment after the filing of the application for the '449 patent.  Thus, the specification and the original claims as filed fail to convey with reasonable clarity to those skilled in the art that, as of the filing date, the applicant was in possession of the invention as now claimed.  *See*, *e.g.*, *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64, 19 USPQ2d 1111, 1117 (Fed. Cir. 1991).  For at least the foregoing reasons, Apple contends that claim 25 fails to comply with the requirement of 35 U.S.C. §112, first paragraph.

Claim 27 depends upon and incorporates the limitations of claim 25 and therefore fails to comply with the requirements of 35 U.S.C. §112, first paragraph at least by virtue of its dependency.

Thus, claims 25 and 27 fail to meet the written description and enablement requirements of 35 U.S.C. §112, first paragraph.

**G.     '239 Patent**

Claims 1, 4, 15, and 17 the '239 patent are invalid under 35 U.S.C. § 112, ¶ 6, because the specification of the '239 patent fails to adequately describe the structure that performs the functions claimed.  The '239 patent specification fails to disclose adequate structure for at least the following: (a) means for capturing, digitizing, and compressing at least one composite signal; (b) means for storing said composite signal; (c) means for transmitting said composite signal; (d) means for receiving at least one composite signal transmitted by the remote unit;  (e) means for

exchanging data with said host unit; (f) means for storing the composite signal received by the host unit; (g) means for decompressing said composite signal; (h) means for splitting and organizing the digitized, compressed audio, and/or video signal prior to transmission; and (i) means for transmission of said captured real time video over a cellular frequency; and (j) means for splitting the captured video into pieces for transmission through said interfaces.

In particular, the '239 patent specification fails to identify the specific algorithms required to make the general purpose computer operate as claimed, as required under *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999) and its progeny.  Claims 1, 4, 15, and 17 include means-plus-function claim elements that claim means programmed to achieve specified functions.  In *WMS Gaming*, the Federal Circuit held that such claim elements require, within the specification, disclosure of particular algorithms recognizable to a person of ordinary skill in the art that achieve those functions.  Because the '239 Patent specification fails to disclose such algorithms for the means-plus-function claim elements, the claims fail to fulfill the 35 U.S.C. § 112, ¶ 6, requirement of disclosing particular structure to achieved the claimed function and are therefore invalid.

## VIII.   DOCUMENTS RELATED TO PRIOR ART PURSUANT TO PATENT L.R. 3-4(a) AND (b)

Pursuant to Patent L.R. 3-4, and based on its investigation to date, Apple has produced documents within its possession, custody and control required to accompany the Invalidity Contentions.

Documents relating to L.R. 3-4(a) bear the following Bates numbers:

- APL630DEF-WH0000018006 - APL630DEF-WH0000027150;

- APL630DEF-WH0000027882 - APL630DEF-WH0000097088;

- APL630DEF-WH-A0000003961 - APL630DEF-WH-A0000004112;

- APLNDC-WH0000021212 - APLNDC-WH0000021454;

- APLNDC-WH-A 0000000001 - APLNDC-WH-A 0000000326.

Documents relating to L.R. 3-4(b) bear the following Bates numbers:

- APL630DEF-WH0000000001 - APL630DEF-WH0000018005;

- APL630DEF-WH0000027151 - APL630DEF-WH0000027881;

- APL630DEF-WH0000097089 - APL630DEF-WH0000097101;

- APL630DEF-WH-A0000000001 - APL630DEF-WH-A0000003938;

- APL630DEF-WH-A0000004113 - APL630DEF-WH-A0000004170;

- APL630DEF-WH0000037616;

- APL630DEF-WH-B0000001 - APL630DEF-WH-B0000003;

- APL630DEF-WH-A0000008984 – APL630DEF-WH-A0000009008;

- RICOH00001 – RICOH00668;

- APL630DEF-WH-A0000003939 - APL630DEF-WH-A0000003960;

- APL7940016416935- APL7940016416937;

- APL7940016417922-APL7940016417923;

- APL7940016418419 -APL7940016418709;

- APL7940016416940 - APL7940016416984;

- APL7940016418364-APL7940016418365;

- APL7940016418366-APL7940016418367;

- APL7940016418368-APL7940016418369;

- APL7940016418370-APL7940016418373;

- APL7940016418374-APL7940016418376;

- APL7940016418377-APL7940016418418;

- APL7940016418718-APL7940016418759;

- APL7940016418760-APL7940016419050;

- APL7940016419059-APL7940016419072;

- APL7940016419073-APL7940016419083;

- APL630DEF-WH-A0000010343-APL630DEF-WH-A0000013289;

- Canon_USA_00001 – Canon_USA_00620;

- 630NK00000001 – 630NK00000848;

- XEROX_630DEF-000000001 – XEROX_630DEF-000001394.

At a mutually convenient time, Apple will make available the source code in its possession sufficient to show the operation of the accused functionality.

Dated:  December ___, 2012

/s/ Mark D. Selwyn
Mark D. Selwyn (SBN 244180)
(mark.selwyn@wilmerhale.com)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California  94304
Telephone:  (650) 858-6000
Facsimile:   (650) 858-6100

JOSH A.  KREVITT (CA SBN 208552)
jkrevitt@gibsondunn.com
H. MARK LYON (CA SBN 162061)
mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, A  94304-1211
Telephone:  (650) 849-5300
Facsimile:  (650) 849-5333

MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
MORRISON & FOERSTER LLP
425 Market Street

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

San Francisco, CA  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522


Attorneys for Plaintiff and
Counterclaim-Defendant Apple Inc.

1

**<u>CERTIFICATE OF SERVICE</u>**

2

3          The undersigned hereby certifies that a true and correct copy of the above and foregoing

document has been served on December ___, 2012 by electronic mail upon the following:

4

5

6                                              /s/ Mark. D Selwyn

7                                             Mark D. Selwyn

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28