JOSH A. KREVITT (CA SBN 208552)
jkrevitt@gibsondunn.com
H. MARK LYON (CA SBN 162061)
mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone:    (650) 849-5300
Facsimile: (650) 849-5333

WILLIAM F. LEE (pro hac vice)
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

MARK D. SELWYN (CA SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

Attorneys for Plaintiff and Counterclaim-Defendant Apple Inc.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br>Defendants. | CASE NO. 12-cv-00630-LHK (PSG)<br><br>APPLE INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF PURSUANT TO PATENT LOCAL RULE 4-5<br><br>Claim Construction Hearing:<br><br>Date:   February 21, 2013<br>Time:   10:30 a.m.<br>Place:  Courtroom 8, 4th Floor<br>Judge:  Hon. Lucy H. Koh |
| SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br>Counterclaim-Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation,<br>Counterclaim-Defendant. | |

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................1

II.     U.S. PATENT NO. 7,756,087 ("THE '087 PATENT")....................................1

        A.      Technology Background ..............................................................................1

        B.      Disputed Term:  "Non-Scheduled Transmission" (All Claims) ....................3

        C.      Disputed Term:  "N" (All Claims) ..............................................................6

III.    U.S. PATENT NO. 7,577,757 ("THE '757 PATENT")....................................9

        A.      Technology Background ..............................................................................9

        B.      Disputed Term:  "Zone Specific Storage and Interface Device" (All claims)...............9

IV.     U.S. PATENT NO. 5,579,239 ("THE '239 PATENT")....................................12

        A.      Technology Background ..............................................................................13

        B.      Disputed Term:  "Means for Capturing, Digitizing, and Compressing at Least One/Said Composite Signal" (Claims 1, 5, and 6)................................14

                1.      The Required Structure Must Include Software...............................14

                2.      The Required Structure Must Include a Video Card With a Video Capture Module...................................................16

                3.      The Required Structure Must Include an Audio Card. ....................19

        C.      Disputed Term:  "Means for Transmitting Said/the Composite Signal" (Claims 1, 7) ...........................................................21

                1.      The Required Structure Must Include Software...............................21

                2.      The Required Structure Must Include Modems. ..............................23

V.      CONCLUSION ................................................................................................25

# TABLE OF AUTHORITIES

**CASES**

Page(s)

*Am. Calcar v. Am. Honda Motor Co.,*
651 F.3d 1318 (Fed. Cir. 2011).................................................................. 5

*Amgen Inc. v. Hoechst Marion Roussel, Inc.,*
469 F.3d 1039 (Fed. Cir. 2006).................................................................. 24

*Andersen Corp. v. Fiber Composites, LLC,*
474 F.3d 1361 (Fed. Cir. 2007).................................................................. 18

*Apple, Inc. v. Samsung Elecs. Co.,*
876 F. Supp. 2d 1141 (N.D. Cal. June 29, 2012)................................... 5, 12

*Aristocrat Tech. v. Int'l Game Tech.,*
521 F.3d 1328 (Fed. Cir. 2008).................................................................. 16

*Avago Techs. Fiber IP (Singapore) Pte. Ltd. v. IPtronics, Inc.,*
2012 U.S. Dist. LEXIS 125363 (Sept. 4, 2012 N.D. Cal.) ..................... 21

*Bd. of Trustees of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.,*
528 F. Supp. 2d 967 (N.D. Cal 2010) ................................................. 4, 8, 9

*Becton, Dickinson & Co. v. Tyco Healthcare Group, LP,*
616 F.3d 1249 (Fed. Cir. 2010).................................................................. 12

*Blackboard, Inc. v. Desire2Learn Inc.,*
574 F.3d 1371 (Fed. Cir. 2009).................................................................. 24

*Boston Scientific Corp. v. Cordis Corp.,*
2008 US. Dist. LEXIS 4122 (Jan. 18, 2008 N.D. Cal.) ........................... 5

*Business Objects, S.A. v. Microstrategy, Inc.,*
393 F.3d 1366 (Fed. Cir. 2005).............................................................. 15, 23

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,*
296 F.3d 1106 (Fed. Cir. 2002).............................................................. 15, 22

*Cross Med. Prods. V. Medtronic Sofamor Dank, Inc.,*
424 F.3d 1293 (Fed. Cir. 2005).............................................................. 21, 25

*Default Proof Credit Card Sys., Inc. v. Home Depot USA, Inc.,*
412 F.3d 1291 (Fed. Cir. 2005).............................................................. 17, 18

*Engineered Prods. Co. v. Donaldson Co.,*
147 Fed. Appx. 979 (Fed. Cir. 2005)........................................................ 23

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Ergo Licensing, LLC v. Carefusion 303, Inc.*,
    673 F.3d 1361 (Fed. Cir. 2012)................................................................................................. 24

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.*,
    909 F.2d 1464 (Fed. Cir. 1990)................................................................................................. 20

*IMRA Am., Inc. v. IPG Photonics Corp.*,
    2010 U.S. Dist. LEXIS 136394 (Dec. 27, 2010 E.D. Mich.)................................................. 4, 8

*In re Google Litigation*,
    2011 U.S. Dist. LEXIS 98469 (Aug. 31, 2011 N.D. Cal.)................................................. 5, 7, 8

*Noah Sys., Inc. v. Intuit Inc.*,
    675 F.3d 1302 (Fed. Cir. 2012)................................................................................................. 22

*Omega Eng'g Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003)................................................................................................... 6

*Paragon Solutions, LLC v. Timex Corp.*,
    566 F.3d 1075 (Fed. Cir. 2009)................................................................................................. 20

*Retractable Tech., Inc. v. Becton, Dickinson & Co.*,
    653 F.3d 1296 (Fed. Cir. 2011)........................................................................................... 19, 25

*St. Clair Intellectual Prop. Consultants v. Acer, Inc.*,
    2012 U.S. Dist. LEXIS 111021 (Aug. 7, 2012 D. Del.) ....................................................... 4, 8

*Visto Corp. v. Research in Motion Ltd.*,
    623 F. Supp. 2d 756 (E.D. Tex. 2008) ..................................................................................... 16

**STATUTES**

35 U.S.C. § 112 ................................................................................................................... passim

**OTHER AUTHORITIES**

Danny Briere & Pat Hurley, *Home Theater for Dummies* (2003) ................................................ 12

Mark Fleischmann, *Practical Home Theater: A Guide to Video and Audio Systems* (2003 ed.
    2002) ........................................................................................................................................ 12

## I.     INTRODUCTION

The parties' *Markman* positions reflect vastly different approaches to claim construction.  For its part, Apple has faithfully applied the claim construction framework that the Federal Circuit established in *Phillips* and its progeny—by proposing definitions for the five disputed terms that are firmly grounded in the claims, specifications, and prosecution histories of the patents-in-suit.

Samsung has not followed these same principles.  By way of example, for both means-plus-function limitations at issue in the '239 patent, Samsung contends that the required structure does not include hardware and software components that it expressly identified as part of the required structure just a few weeks earlier in the Joint Claim Construction Statement.  For the '087 patent, Samsung contends that no construction of either disputed term is necessary, even though both are technical terms that require examination of a complex specification, and it proposes fallback constructions that rest on flawed readings of the patent and misstatements of the law.  And for the sole term at issue from the '757 patent, Samsung proposes a construction based on "examples" from the specification that simply do not exist and that merely repeats undefined words from the term.

Accordingly, the Court should adopt Apple's proposed constructions for the five disputed claim terms, and reject Samsung's shifting and improper effort to alter the scope of its patents by twisting the meaning of those terms.

## II.    U.S. PATENT NO. 7,756,087 ("THE '087 PATENT")

The parties dispute two claim terms for the '087 patent:  "non-scheduled transmission" and "N."  As detailed below, Apple's proposed constructions are supported by the '087 patent claims and specification, while Samsung's attempt to avoid a construction of both technical terms would improperly force the jury to determine their meaning.

### A.     Technology Background

The '087 patent concerns the transmission of data (e.g., voice or video) from user equipment or "UE" (e.g., a cell phone) to a "Node B" (i.e., a base station) in a mobile communications system, such as Universal Mobile Telecommunications System ("UMTS").  ('087 patent, Abstract, 1:35-41.) UMTS communications from a UE to a Node B may occur on an enhanced uplink dedicated channel ("E-DCH"), which is a type of channel that allows for improved data transmissions.  (*Id.,* 1:54-57.)

1   Data transmissions from the UE to Node B on the E-DCH can occur in one of two modes:  (i) a

2   scheduled transmission mode; or (ii) a non-scheduled transmission mode.

3       Figure 2 depicts the steps involved in a scheduled transmission mode.  (*Id.*, 2:41-42.)  During

4   that process, after an E-DCH is "set up" between the UE and Node B (step 202), the UE sends certain

5   "scheduling information" to the Node B (step 204).  (*Id.*, 2:44-53.)  Using that scheduling

6   information, as well as scheduling information received from other UEs, the Node B determines and

7   sends to the UE "scheduling assignment information" ("SAI") (including "information about an

8   allowed data rate and allowed transmission timing, and so on") that governs subsequent scheduled

9   transmissions from the UE (steps 206, 208).  (*Id.*, 2:54-60.)  To send a data transmission to the Node

10  B, the UE determines the format for the data packet and sends that information to the Node B (steps

11  210, 212), and then transmits the actual data to the Node B (step 214).  (*Id.*, 2:62-67.)  The Node B

12  determines whether it successfully received the data (step 216), and sends an "ACK"

13  (acknowledgment) or "NACK" (non-acknowledgment) message to the UE (step 218).  (*Id.*, 3:7-15.)

14      A UMTS system uses a less complex process for non-scheduled data transmissions.  For those

15  transmissions, a UE can send data to the Node B without prior notice or the lengthy message

16  exchange depicted in Figure 2.[1]  By skipping those steps, non-scheduled transmissions allow data to

17  be transmitted more quickly, but if too many UEs simultaneously transmit data to the Node B (at high

18  data rates), excessive interference can negatively affect system performance.  (*Id.*, 3:53-62, 4:8-10.)

19      The '087 patent purports to address this interference issue by imposing certain limits on when

20  a UE can send non-scheduled transmissions to the Node B.  To do so, when the E-DCH is first

21  established or reestablished, the Node B sends the UE "non-scheduled transmission information,"

22  which identifies a limited number of time slots (within a recurring set of time slots) when the UE may

23  send non-scheduled transmissions to the Node B (in the '087 patent, these time slots are called

24  transmission time intervals or TTIs).  Because the UE is allowed to send data during some TTIs, but

25  not others, the amount of non-scheduled transmission data sent from the UE (and resulting

26  

27  [1]   In its brief, Samsung suggests that its edited version of Figure 2 shows both scheduled ***and*** non-scheduled transmissions, but later admits that the original figure only depicts ***scheduled***

28  transmissions.  (Samsung *Markman* Brief ("SMBr.") (Dkt. 335)) at 4 ("Not shown in original Figure 2 is non-scheduled transmission information.").)

1  interference) is limited.  (*Id.*, 7:30-34, 13:6-8.)

2       **B.       Disputed Term: "Non-Scheduled Transmission" (All Claims)**

3

| Apple's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| Transmission of uplink data by the UE without using scheduling assignment information sent by the base station | None |

6       The intrinsic evidence confirms that, as used in the '087 patent, the term "non-scheduled

7  transmission" refers to the "transmission of uplink data by the UE without using scheduling

8  assignment information sent by the base station."  Samsung appears to agree that a "non-scheduled

9  transmission" involves the transmission of uplink data by a UE to the Node B, but argues that non-

10  scheduled transmissions can include scheduling assignment information as well.  Samsung is wrong.

11       Apple's proposed construction is supported by the plain language of the claim term itself—a

12  "***non-scheduled*** transmission"—which confirms that the transmission is ***not*** scheduled, and thus,

13  does ***not*** include the type of scheduling assignment information that a base station must send in a

14  ***scheduled*** transmission mode.  ('087 patent, Fig. 2; *id.*, claims 27, 34 (uplink data is transmitted

15  "according to the ***scheduling assignment information*** in a Node B controlled ***scheduling mode***").)[2]

16       Apple's proposed construction is also confirmed by the '087 specification, which explicitly

17  states that the very purpose of a non-scheduled transmission is to transmit uplink data "***without*** using

18  scheduling assignment information": "The UE enables non-scheduled transmission (referred to as

19  non-scheduled transmission) for transmitting uplink data through the E-DCH ***without using***

20  ***scheduling assignment information***."  (*Id.*, 3:23-26; *id.*, Abstract ("The UE transmits the uplink data

21  ***without the Node B's scheduling*** at the possible ***non-scheduled*** transmission time intervals.").)

22  Indeed, the '087 inventors claimed that their use of non-scheduled transmissions was beneficial

23  precisely because those transmissions avoided delay by ***eliminating*** scheduling communications

24  between the UE and Node B, including the transmission of scheduling assignment information.  (*Id.*,

25  3:26-30, 6:49-53 ("The non-scheduled transmission can quickly transmit E-DCH data by ***omitting*** a

26  series of processes for sending scheduling information from the UE to the Node B and receiving

27

28  _____
   [2]   All bold and italic emphases throughout this brief are added (*i.e.*, not in original).

1    scheduling assignment information from the Node B.").)

2           In its opening brief, Samsung contends that Apple's construction should be rejected for three

3    reasons, none of which has merit.

4           **First**, Samsung contends that no construction of "non-scheduled transmission" is necessary

5    because the term supposedly has a "clear meaning."  (SMBr. at 6.)  But the meaning of "non-

6    scheduled transmission" is not clear from the claim as a whole, is not straightforward, and relates to

7    complex technology.  Requiring the jury to attempt to determine the meaning of a technical term used

8    in a patent involving intricate wireless technologies would be unfair and improper.  *See St. Clair*

9    *Intellectual Prop. Consultants v. Acer, Inc.*, No. 10-282-LPS, 2012 U.S. Dist. LEXIS 111021, at

10   **41-42 (D. Del. Aug. 7, 2012) (construction required for "a technical term and, in light of the

11   complex technology involved"); *IMRA Am., Inc. v. IPG Photonics Corp.*, No. 06-15137, 2010 U.S.

12   Dist. LEXIS 136394, at **14-15 (E.D. Mich. Dec. 27, 2010) ("[C]onstruction of technical terms is

13   'clearly appropriate.'"); *see also Bd. of Trustees of the Leland Stanford Junior Univ. v. Roche*

14   *Molecular Sys., Inc.*, 528 F. Supp. 2d 967, 982 (N.D. Cal. 2010) ("The purpose of claim construction

15   is to resolve disputed meanings and technical scope in order to aid the fact-finder.").

16          **Second**, Samsung alternatively contends that, if construed, the term should be interpreted to

17   mean "the transmission of data using non-scheduled transmission information indicating possible

18   TTIs," and that non-scheduled transmission information **can** include scheduling assignment

19   information—which, according to Samsung, is how the term is "consistently" used "throughout the

20   patent."  (SMBr. at 6.)  To make that argument, however, Samsung ignores the word "**_non_**-

21   scheduled" and the many specification passages cited above in which the inventors made clear that a

22   "non-scheduled transmission" **eliminates** the need for—and therefore does **not** use—scheduling

23   assignment information.  And despite its claim of "consistent" use, Samsung cites to just four lines

24   from the specification, and those lines merely identify (like Samsung's proposed construction) **when**

25   a non-scheduled transmission can be made—not **what it is**.  (SMBr. at 6 (citing '087 patent, 6:60-64

26   ("An [sic] non-scheduled transmission period is denoted by N, and non-scheduled transmission can

27   be performed the predetermined number of times k within the non-scheduled transmission period

28   N.")).)

Samsung's proposed construction also should be rejected because it defines the phrase "non-scheduled transmission" by using the same disputed phrase:  "the transmission of data using **non-scheduled transmission** information indicating possible TTIs."  That type of circular and incomplete construction cannot be correct, and would not be helpful to the jury.  *See*, *e.g.*, *Apple, Inc. v. Samsung Elecs. Co.*, 876 F. Supp. 2d 1141, 1146-47 (N.D. Cal. June 29, 2012) (rejecting Samsung's construction that repeated claim term as "awkward and circular").

**Finally**, Samsung contends that Apple's proposed construction should be rejected because it includes a "negative limitation," which according to Samsung, must be avoided "unless there is a 'clear and unmistakable disclaimer.'"  (SMBr. at 7.)  That is not the law.  The Federal Circuit and other courts have repeatedly approved constructions that impose negative limitations when supported by the intrinsic record.  *See*, *e.g.*, *Am. Calcar v. Am. Honda Motor Co.*, 651 F.3d 1318, 1329, 1339-40 (Fed. Cir. 2011) (approving negative limitations "without any intervening action by the user" and "not in response to any action on the part of the user"); *Boston Scientific Corp. v. Cordis Corp.*, No. C 02-01474 JW, 2008 US. Dist. LEXIS 4122, at **37-38, 44-45 (N.D. Cal. Jan 18, 2008) (adding negative limitation when "clear that the inventors intended to impose [one]" by their use of the term in the patent).

That same result applies here.  The term "non-scheduled transmission" itself includes a negative restriction (i.e., "non") that necessarily indicates what the transmission does **not** include (i.e., scheduling information)—therefore, it makes complete sense to define this negative term with a negative limitation.  *See In re Google Litigation*, No. C-08-03172 RMW, 2011 U.S. Dist. LEXIS 98469, at *20 (N.D. Cal. Aug. 31, 2011) (defining "non-semantic method" as "a method of analysis that is based on direct relationships between textual objects and *that otherwise does not account for phrases and words in a textual object*").  As detailed above, the specification further reinforces that negative limitation by explaining that "[t]he UE enables non-scheduled transmission (referred to as non-scheduled transmission) for transmitting uplink data through the E-DCH *without using scheduling assignment information*."  ('087 patent, 3:23-26.)  Apple's proposed construction

1    captures that aspect of the term by quoting this negative phrasing verbatim from the specification.[3]

2    Unable to overcome this intrinsic evidence, Samsung creates its own by alleging the '087

3    patent states that, "[t]o perform non-scheduled transmission, the UE receives the same SAI that it did

4    for scheduled transmissions."  (SMBr. at 4.)  But the cited passages merely state that the UE receives

5    "non-scheduled transmission information" ('087 patent, 5:32-48, 12:19-36, claims 27, 34)—they say

6    **nothing** about receiving **scheduling assignment information**, which even Samsung admits elsewhere

7    in its brief is different from "non-scheduled transmission information."  (SMBr. at 4 ("[T]he Node B

8    transmits **both** the SAI **and** non-scheduled transmission information.").)  Samsung further contends

9    that the specification and claims 6 and 14 demonstrate that a UE may use data rate information from

10   scheduling assignment information to perform non-scheduled transmissions.  (SMBr. at 7-8.)  But

11   again, Samsung's cited provisions say no such thing.  By contrast, other provisions (that Samsung

12   does not cite) explain that "additional signaling"—not scheduling assignment information—is what

13   controls the data rate for non-scheduled transmissions.  ('087 patent, 3:63-65 ("[A]dditional signaling

14   is required to control an E-DCH data rate available in the non-scheduled transmission.").)

15   **C.    Disputed Term:  "N" (All Claims)**

16   
| Apple's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| A non-scheduled transmission parameter, expressed in units of TTIs and denoting the total number of TTIs in a non-scheduled transmission period, that is determined at the base station and transferred to the User Equipment UE | None |

20   As used in the '087 patent, the term "N" refers to a non-scheduled transmission parameter,

21   expressed in units of TTIs and denoting the total number of TTIs in a non-scheduled transmission

22   period, that is determined at the base station and transferred to the User Equipment (UE).

23   That construction is confirmed by the plain language of the claims, which uses the term "N"

24   to refer to a parameter included in the non-scheduled transmission information that sets the total

25   number of TTIs or time slots in the non-scheduled transmission period.  ('087 patent, claim 1

26   

27   _____

[3]   Samsung cites *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1322 (Fed. Cir. 2003), but that
28   case involved a means-plus-function limitation for which the "corresponding structure" needed to be
     based on what was actually disclosed in the specification.  Those facts are not present here.

1   ("receiving non-scheduled transmission information indicating k transmission time intervals (TTIs)

2   for transmitting non-scheduled data via the E-DCH, wherein non-scheduled transmissions can be

3   performed during the k TTIs within ***a period having N TTIs*** . . . wherein the parameter k is an integer

4   greater than 0 and less than or equal to a positive integer ***N***").)  The claim language also confirms that

5   the UE "receive[s]" the non-scheduled transmission information that contains the N parameter—i.e.,

6   the network determines the value of "N," and then transmits it to the UE, just as Apple has proposed.

7        Apple's construction is also supported by the '087 specification, which repeatedly refers to

8   "N" as one of several non-scheduled transmission parameters:  "[T]he non-scheduled transmission

9   parameter determiner 702 determines the non-scheduled transmission ***parameters*** such as an [sic]

10   non-scheduled transmission period ***N***."  (*Id.*, 11:26-31; *see id.*, 12:4-8 ("non-scheduled transmission

11   parameters received from the receiver 806 such as the possible non-scheduled transmission time

12   interval, the transmission period N"); *id.*, 6:63, 7:30, 8:2-3, 8:11-12, 11:4 (referring to "N" as a

13   "parameter").)  Likewise, the '087 specification explicitly states that "N" is a parameter that denotes

14   a total number of TTIs in a non-scheduled transmission period, and that N is expressed in units of

15   TTIs:  "The parameters N and k are expressed in units of TTIs serving as units of E-DCH data

16   transmission."  (*Id.*, 6:63-64; *see id.*, 6:60 ("non-scheduled transmission period is denoted by N"); *id.*,

17   Abstract, 6:62-63, 7:36-37, 7:61-67, 8:12-14, 8:62-63, 10:64-66, 12:45-49.)

18        The '087 specification also confirms that the UMTS network is what determines the value of

19   "N," and that the Node B transmits that already-determined parameter to the UE.  For example, in

20   connection with Figure 7, the '087 patent repeatedly explains that the UMTS network (preferably the

21   network controller or "RNC") uses the "non-scheduled transmission parameter determiner" to

22   calculate the value of N, and then sends that calculated N parameter to the Node B, which transmits it

23   to the UE.  (*Id.*, 11:3-4 "[T]he RNC notifies the Node B and each UE of the parameters N and k");

24   *id.*, 11:44-48 ("[The UE receives, from the RNC, non-scheduled transmission parameters such as an

25   [sic] nonscheduled transmission period N"); *id.*, 11:34-36 ("A transmitter sends the determined

26   nonscheduled transmission parameters 703 to the Node B and each UE through signaling."); *id.*, 6:9-

27   11, 11:14-17, 11:26-34 (describing non-scheduled transmission parameter determiner as an

28   "apparatus . . . in the UMTS system, preferably in the RNC," that determines non-scheduled

1   transmission parameters such as "N").)

2       In its opening *Markman* brief, Samsung contends that the Court should reject Apple's

3   proposed construction of "N" for two reasons.  Both arguments fail.

4       **First**, Samsung contends that there is no need for the Court to construe the term "N" because

5   it is a basic "issue of algebra."  (SMBr. at 10.)  But the parties' dispute is not directed to whether "N"

6   in isolation is an algebraic value.  Rather, the parties dispute what **the '087 patent says** can determine

7   the value of N, and what **the '087 patent says** that specific value must identify—inquiries that cannot

8   be resolved by reference to the generic treatises that Samsung cites.  Therefore, accepting Samsung's

9   invitation not to construe "N" would improperly leave resolution of that technical inquiry to the jury.

10  *See St. Clair*, 2012 U.S. Dist. LEXIS 111021, at **41-42; *IMRA Am.,* 2010 U.S. Dist. LEXIS

11  136394, at **14-15; *Roche,* 528 F. Supp. 2d at 982.

12      **Second**, Samsung admits that the '087 patent defines "N" as a transmission parameter for

13  TTIs in some embodiments, but contends that Apple's construction would improperly exclude other

14  embodiments that use "N" when referring to a bitmap.  (SMBr. at 11-12.)  But in each of those

15  bitmap examples, the value of "N" is still a parameter denoting the number of TTIs within a period—

16  the bitmap is merely **the form** by which the UE is informed of the "N" parameter.  For example,

17  claims 1 and 9 refer to "a period having N TTIs," but do not specify **how** the "N" parameter is

18  communicated to the UE.  By contrast, claims 2 and 10 make clear that "N" is communicated to the

19  UE in the form of a "bitmap" in which the total number of bits equals the number "N."  (*E.g.*, '087

20  patent, claim 2 ("The method of claim 1, wherein the non-scheduled transmission information is

21  configured by a bit map of N bits indicating the k TTIs using specific bit values.").)[4]  In all four

22  claims, "N" is a non-scheduled transmission parameter received by the UE denoting a number of

23  TTIs, just as Apple has proposed.

24      Similarly, in connection with Figure 9, the '087 specification explains that the UE receives a

25  bitmap of 8 bits, meaning that "N" equals 8 and there are 8 TTIs in the period defined for non-

26

27  ─────────────
    [4]   For example, assuming "N" is 5 (i.e., there are 5 TTIs in the period "N TTIs"), claims 1 and 9 do
28  not specify how that parameter is transmitted to the UE, while claims 2 and 10 require transmitting
    the same parameter by sending a 5-bit signal to the UE.

1    scheduled transmission.  (*Id.*, 12:45-59.)  Apple's proposed construction properly covers this bitmap

2    embodiment as well in which the total number of bits (signifying "N") equals the total units of TTIs.

## III.   U.S. PATENT NO. 7,577,757 ("THE '757 PATENT")

4         The parties' sole dispute for the '757 patent centers around whether a "zone specific storage

5    and interface device" is a device that resides in a fixed location, as Apple contends, or whether it can

6    be a portable device that moves freely across multiple zones, as Samsung contends.  As detailed

7    below, the intrinsic record confirms Apple's proposed construction.

### A.   Technology Background

9         The '757 patent is directed to a system for synchronizing a user's multimedia collection (e.g.,

10   movies, music) across "a multiplicity of devices in a multimedia environment" so users can access

11   their collection in different locations.  ('757 patent, 4:17-19.)  As shown in Figure 7, users store their

12   multimedia collection in central storage and interface device 702.  (*Id.*, 4:19-23, 8:41-50.)  Using a

13   network connection (e.g., local area network 704 or wide area network 718), the system keeps the

14   centrally-stored multimedia files synchronized across the user's multimedia devices.  Some of these

15   devices may move across multiple zones—devices that the patent refers to as "mobile" or "portable"

16   devices.  (*E.g., id.*, 3:50, 8:57-58, claims 13-15.)  Conversely, "zone specific storage and interface

17   devices" are devices that "reside" in (i.e., they are "specific" to) a single zone.  (*Id.*, 8:21-25, 9:12-14,

18   9:47-51.)

### B.   Disputed Term: "Zone Specific Storage and Interface Device" (All claims)

| Apple's Proposed Construction | Samsung's Proposed Construction |
| --- | --- |
| a device fixed in a room, or similar bounded location, for multimedia playback | a storage and interface device associated with a particular viewing and/or listening zone |

22        The intrinsic and relevant extrinsic evidence confirms that a "zone specific storage and

23   interface device" is "a device fixed in a room, or similar bounded location, for multimedia playback."

24   That construction is supported by the term itself, which makes clear that the "storage and interface

25   device" must be "zone specific"—i.e., the device must be dedicated to and fixed in a zone, and not

26   move across multiple zones.  It is also confirmed by claim 13, which distinguishes "a zone specific

27   storage and interface device" from "a wireless mobile device."  (*Id.*, claim 13 ("The system of claim

28   1, wherein the zone specific storage and interface device is disposed to be coupled to a wireless

1   mobile device.").)

2   　　　　The '757 specification also supports Apple's construction by distinguishing between devices

3   based on whether they are fixed in a single zone or can move across multiple zones.  The patent

4   consistently refers to devices that can move across multiple zones as "mobile" or "portable" devices.

5   (*E.g.*, *id.*, 3:50, 8:57-58, claims 13-15.)  By contrast, the patent explains that "zone specific storage

6   and interface devices" are devices that "reside" in a single zone.  (*Id.*, 7:65-67 (referring to "devices

7   residing in different zones"); *id.*, 8:21-25 (explaining that zone specific storage and interface devices

8   706, 708, and 710 each "resides in a specific zone").)  Thus, while multiple zone specific storage and

9   interface devices can "co-exist in a zone" (*id.*, 9:44-47), each must be fixed in that same single zone.

10  For that reason, there is ***no example*** in the '757 specification of a zone specific storage and interface

11  device that serves multiple zones simultaneously or that can move between different zones.  And the

12  only real-world example of a zone specific storage and interface device identified in the '757 patent

13  is the "AudioReQuest Multizone" (*id.*, 8:41-44)—a large, heavy device that was fixed in a specific

14  zone, unlike the "mobile" and "portable" devices described elsewhere in the patent.  (Ex. 1 (ARQ

15  Zone User Manual) at CARTERNDCA630-00000008 (showing image of the device).)[5]

16  　　　　The '757 specification also confirms that a "zone" refers to a "fixed" location.[6]  The patent

17  does not provide an explicit definition of a "zone," but explains that the very purpose of dividing

18  locations into different zones "is to give a user substantially ***exclusive*** or reclusive enjoyment of

19  information shared by zone specific storage and interface devices." (*Id.*, 9:47-51.)  In other words,

20  each zone is "exclusive" from all other zones.  The specification also provides a single example of a

21  zone, explaining that a house with 20 different rooms would have 20 different zones:  "In a typical

22  custom home installation, there may be upwards of ***20 zones (e.g., rooms)*** with independent control

23  and output." (*Id.*, 9:12-14; *see id.*, 4:32-35 ("user can be ***situated*** at anyone [sic] of the zones").)

24  This too confirms that a "zone" refers to a bounded and fixed location, such as a room.  Indeed, if a

25

26  [5] As used herein, "Ex." refers to the exhibits attached to the Declaration of Peter J. Kolovos in
     Support of Apple Inc.'s Responsive Claim Construction Brief Pursuant to Patent Local Rule 4-5.
27  [6]  　The patent similarly distinguishes between "output devices" that are "fixed" and "mobile."  (*E.g.*,
     '757 patent, 3:50 ("fixed radio receiver"), *id.*, 5:26-27 ("fixed digital multimedia devices"), *id.*, 3:50
28  ("mobile . . . radio receiver").)

1    zone was something other than a location with set boundaries, it would make no sense for a zone

2    specific storage and interface devices to "reside" or "exist" within it.

3         In its *Markman* brief, Samsung raises a host of arguments attacking Apple's proposed

4    construction, but those arguments fail for several reasons.

5         **First,** Samsung contends that Apple's proposed construction would improperly exclude

6    disclosed embodiments because the '757 specification is supposedly "replete with examples of

7    portable or mobile multimedia devices that may serve as a 'zone specific storage and interface

8    device.'" (SMBr. at 14.)  But that is simply untrue.  **None** of Samsung's cited specification excerpts

9    refers to a "mobile" or "portable" device as a zone specific storage and interface device, or otherwise

10   describes a zone specific storage and interface device as moving across multiple zones—because

11   there is no such disclosure in the '757 patent.  Rather, as noted above, the claims and specification of

12   the '757 patent maintain a consistent **distinction** between "mobile"/"portable" devices that can move

13   across multiple zones, and "zone specific storage and interface devices" that "reside" in and are

14   limited to a single zone.

15        That same distinction also appears in Figure 7, despite Samsung's claim to the contrary.

16   Although Samsung correctly notes that item 714 can be a "digital portable player" (SMBr. at 15), the

17   patent never describes that device as a zone specific storage and interface device (*id.*, 8:56-61).

18   Rather, in Figure 7, the specification only identifies items 706, 708, 710, and 726 as "zone specific

19   storage and interface devices," and explains that each "***resides in*** a specific zone (not shown)."  (*Id.*,

20   8:21-25, 8:35-36. Fig. 7.)  By contrast, it describes item 714 as a type of "other device" (*id.*, 8:26-27),

21   further reinforcing that a digital portable player is not a zone specific storage and interface device.

22        **Second**, Samsung suggests that Apple's proposed construction is improper because it

23   supposedly would fail to cover both "fixed" and "mobile"/"portable" devices.  (SMBr. at 15.)  As an

24   initial matter, there is no requirement for the claims to cover every embodiment disclosed in the

25   patent.  But even so, the claims of the '757 patent indisputably cover both types of devices under

26   Apple's construction.  For example, claim 13 can be met by a zone specific storage and interface

27   device (i.e., a "fixed" device) that is "coupled to a wireless mobile device" (i.e., a "mobile" or

28   "portable" device).

1    **Third**, Samsung alleges that Apple's proposed construction is inconsistent with the relevant

2    extrinsic evidence.  But that evidence (including references cited by Samsung) confirms that "zone"

3    is a term of art in the home audio field that refers to a bounded area, such as a room.  *See, e.g.*, Ex. 2

4    (Mark Fleischmann, *Practical Home Theater:  A Guide to Video and Audio Systems*, p. 167 (2003 ed.

5    2002) ("**Multi-room**: Audio system serving more than one room**. Also called multi-zone**."); *id.* at 77

6    ("Higher-end receivers and pre-pros may have **multi-room (or multi-zone)** outputs-basically a second

7    set of stereo speaker-level outputs to feed a system in another room"); Ex. 3 (Danny Briere & Pat

8    Hurley, *Home Theater for Dummies*, p. 127 (2003) ("The simplest **multizone** receivers have a pair of

9    stereo audio outputs (not speaker connectors or amplifier channels, just outputs).  These outputs

10   enable you to run an audio cable to **another room** and connect to a separate amplifier and speakers in

11   that **room**.").)

12   **Fourth,** Samsung argues that "zone specific storage and interface device" should be construed

13   to mean "a storage and interface device associated with a particular viewing and/or listening zone."

14   But that proposed construction conflicts with the many disclosures of the '757 patent cited above, and

15   would also improperly read "zone specific" out of the claim—because under Samsung's construction,

16   a zone specific storage and interface device can be "associated with" an unlimited number of zones,

17   and therefore need not be "specific" to any zone.  *See Becton, Dickinson & Co. v. Tyco Healthcare*

18   *Group, LP*, 616 F.3d 1249, 1257 (Fed. Cir. 2010) (holding that a construction rendering a "limitation

19   functionally meaningless" should be rejected).  Samsung's construction also fails to attribute any

20   meaning to the word "zone," which it simply repeats in the body of its construction.  That circular

21   and unhelpful construction should be rejected.  *See*, *e.g., Apple, Inc.*, 876 F. Supp. 2d at 1146-47

22   (rejecting Samsung's construction that repeated claim term as "awkward and circular").

23   **IV.    U.S. PATENT NO. 5,579,239 ("THE '239 PATENT")**

24   Two claim terms are at issue for the '239 patent:  "means for capturing, digitizing, and

25   compressing at least one composite signal" and "means for transmitting said composite signal."  The

26   parties agree that both terms are means-plus-function limitations, and also agree which claimed

27   functions the limitations require.  But the parties disagree about the specific structures required to

28   perform those claimed functions.  As discussed below, Apple's positions are firmly grounded in the

structural disclosures of the '239 patent, while Samsung's incorrect and shifting positions are not.

### A.      Technology Background

The '239 patent purports to address a need for "television broadcasters" to capture and transmit "broadcast quality video" (e.g., "news coverage," such as "a natural disaster") from a "remote location" to a network "host" station for immediate "real time" broadcast. ('239 patent, 1:14-2:22.)  The patent admits that this was already possible in the prior art, but claims (incorrectly) that it only could occur by using:  (i) expensive satellite systems (involving trucks and satellite dishes); or (ii) microwave systems that required "a vehicle mounted transmitting antenna for broadcast." (*Id.*, 1:14-65.)  The '239 inventors claimed to be the first to recognize that already-existing devices could also transmit broadcast-quality video over already-existing "telephone lines, cellular, radio, and other telemetric frequencies." (*Id.*, 2:11-13, 2:26-31 ("Cellular combined with computer technology has never been used, however to transmit a broadcast quality video signal.").)

The '239 inventors depicted "the components . . . of the present invention" in Figure 1, which shows a remote unit 2 (a desktop or laptop computer) that receives video signal 1 "from any device having the capacity to output a video signal . . . such as a video camera, video cassette recorder/player, laser disk player, etc." (*Id.*, 3:66-67, 4:7-38, Fig. 1.)  Remote unit 2 contains "a video capture card having a capture module therein" that receives video signal 1, and "a computer software program . . . [that] operates with the video card and capture module to capture, digitize, and compress the video signal into a data file." (*Id.*, 4:28-59.)[7]  In a section labeled "Capture Software Sequence A," the '239 specification details the eight steps of the "capture, digitize, and compress" process, including step 5, which allows the user to "select[] whether the video signal will be captured either with or without audio" (and if audio is desired, the device uses the "audio capture card installed in the remote unit"). (*Id.*, 5:4-6:23.)

After video is captured (from another device), digitized, and compressed, remote unit 2 splits the video into multiple files, and transmits the split files to host unit 3 by using multiple modems,

---

[7]   As used in the '239 patent, the term "capture" refers to transferring an existing video from a device to remote unit 2—not the process of recording the video. (*Id.*, 4:28-59; *see* Ex. 6 [2/2/96 Aff.] ¶ 3 & Ex. A at 6-7.)  In fact, the patent does not discuss any video camera components, or explain how to record, digitize, or compress a video.

1  each of which "interfaces through a different communications port." (*Id.*, 8:40-41.)  To do so, remote

2  unit 2 uses "the run time module of a communications software package, such as Procom Plus for

3  WINDOWS which is loaded onto the remote," as described in the "Transfer Software Sequence B"

4  section of the specification.  (*Id.*, 6:36-39, 8:17-33, 8:35-10:2.)  This communications software

5  package is "called for each communications port to which the data file will be transmitted."  (*Id.*,

6  8:38-41.)  Upon receipt, "host unit 3 recombines the split data file and stores it to playback unit 4,"

7  which can prepare the video for "immediate playback for broadcast, or stor[age] on video tape or

8  other conventional means for later use." (*Id.*, 4:12-16, 12:12-60.)  Samsung purchased the '239

9  patent in 2011, and claims in this case that the patent (directed to supposed problems facing

10 "television broadcasters") covers features of Apple's iPhone, iPad, iPod touch, and Mac products.

11 **B.** **Disputed Term:  "Means for Capturing, Digitizing, and Compressing at Least One/Said Composite Signal" (Claims 1, 5, and 6)**

12

| Apple's Proposed Construction | Samsung's New Proposed Construction |
|---|---|
| <u>Function</u>: capturing, digitizing, and compressing at least one/said composite signal | <u>Function</u>: capturing, digitizing, and compressing at least one composite signal |
| <u>Structure</u>: an audio card, a video card having a video capture module, and a video capture software package, such as Video for Windows software, using the software sequence set forth at 2:63-3:3, 4:39-63, 5:4-6:23, and 6:62-7:14. | <u>Structure</u>: a video and/or audio capture module, and equivalents |

18      The parties agree that this limitation is governed by § 112, ¶ 6, and that the claimed function

19 is "capturing, digitizing, and compressing at least one composite signal," but disagree about whether

20 the structures required to perform the claimed functions includes:  (i) ***both*** hardware ***and*** software, as

21 Apple ***and Samsung*** represented in their Joint Claim Construction Statement, or just hardware ***alone***,

22 as Samsung argued for the first time in its opening *Markman* brief; (2) a video card that contains a

23 video capture module (as Apple contends), or either no video capture components at all or just the

24 video capture module itself (as Samsung contends); and (3) an audio card (as Apple contends), or

25 either no required audio components at all or an "audio capture module" (as Samsung contends).  As

26 detailed below, the intrinsic evidence confirms Apple's positions.

27      **1.      The Required Structure Must Include Software.**

28      The specification makes clear that software is part of the structure required to perform the

claimed capturing, digitizing, and compressing functions.  For example, the only specific example of remote unit 2 in the patent is described as using Microsoft's Video for Windows software program "to capture, digitize, and compress."  ('239 patent, 4:17-21; *id.*, 4:41-48 ("A ***computer software program*** such as 'VIDEO FOR WINDOWS' available from Microsoft ***operates with*** the video card and capture module ***to capture, digitize, and compress*** the video signal into a data file.").)  This disclosure alone makes clear that software is part of the structure required to perform the claimed capturing, digitizing, and compressing functions—just as Apple has proposed in its construction.  *See Business Objects, S.A. v. Microstrategy, Inc.*, 393 F.3d 1366, 1373 (Fed. Cir. 2005) (construing "query engine means" to require the specific algorithm described over several columns of the patent).

Consistent with that disclosure, Apple's construction also permits the structural software requirements to be met by programs other than Video for Windows, but only if they perform the steps that the specification requires of the software.  ('239 patent, 2:63-3:3, 4:39-63, 5:4-6:23, 6:62-7:14.) That is, because the '239 inventors chose to draft this limitation in means-plus-function format, and because they described the software sequence as part of the structure that performs the claimed function, that structure is required by the claims.  *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1119 (Fed. Cir. 2002)  ("[C]orresponding structure must include ***all structure*** that actually performs the recited function.").

In its opening *Markman* brief, Samsung contends that software is not part of the structure required to perform the claimed capturing, digitizing, and compressing functions.  (SMBr. at 20-21.) But that argument fails for several reasons.

***First***, just two months ago, Samsung expressly ***agreed*** in the Joint Claim Construction Statement that "associated software" ***is*** part of the structure required to perform the claimed capturing, digitizing, and compressing functions:  "*Structure*:  a video and/or audio capture module ***with associated software***, and equivalents."  (Dkt. No. 300 [JCCS] at 9.)  Samsung attempts to justify its complete reversal on that issue by casting its new no-software position as a mere effort to "simplify" the parties' claim construction disputes.  (SMBr. at 18 n.2.)  But it is difficult to understand how a change that ***expands*** the number of issues in dispute could simplify anything. Samsung changed positions because it now realizes that it cannot prove infringement under a proper

1    construction of the claims—not as an effort to compromise.

2            *Second*, Samsung suggests that software can only be part of the structure required for a

3    means-plus-function limitation if the limitation is directed to a "general purpose processor."  (SMBr.

4    at 21.)  But that is not the law.  The *Aristocrat* case that Samsung cites merely held that claims

5    requiring a general purpose computer were invalid for indefiniteness because the patentee had not

6    sufficiently disclosed an algorithm.  *Aristocrat Tech. v. Int'l Game Tech.*, 521 F.3d 1328, 1337 (Fed.

7    Cir. 2008).[8]  Here, by contrast, Apple does not contend that the patent discloses insufficient structure

8    to perform the claimed function.  Rather, Apple contends that software is required structure because

9    the '239 specification *expressly describes* it as part of the structure performing that function.

10           *Finally*, Samsung complains that, even if software is part of the required structure, Apple's

11   proposed construction improperly relies on specification excerpts about software that is irrelevant to

12   the claimed functions.  Again, however, that argument conflicts with positions that Samsung itself

13   took in the Joint Claim Construction Statement—in which Samsung identified *the same* excerpts as

14   disclosing structure required by the "means for capturing, digitizing, and compressing." (Dkt. No.

15   300 [JCCS] at 9 ("Intrinsic:  The specification of the '239 patent, including Fig. 1, Col. 2:40-45,

16   2:46-48; 2:59-3:6; 4:7-9; 4:17-25; 4:28-57; 4:62-63; 5:10-8:42; 12:61-13:2; and 13:25-32.").)[9]  As

17   shown above, these excerpts are clearly linked to the claimed function.

18                  **2.      The Required Structure Must Include a Video Card With a Video**
19                  **Capture Module.**

20           The '239 specification repeatedly identifies a video card with a capture module as performing

21   the claimed capturing, digitizing, and compressing functions.  ('239 patent, 2:63-3:3 ("Summary of

22   the Invention":  "Computer software loaded on a hard disk drive in the remote unit instructs it to

23   *capture* the input signal to a *video capture card* within the remote unit.  The *video capture card* takes

24   ─────────────────

25   [8]    Samsung also cites *Visto Corp. v. Research in Motion Ltd.*, 623 F. Supp. 2d 756 (E.D. Tex. 2008), without explanation or citation to a specific page.  (SMBr. at 21.)  That case does not discuss the algorithm requirements for a general purpose computer or specialized processor.

26   [9]    Samsung criticizes Apple for including specification references to "BITMAP technology," but the
27   patent explains that the "capture card" and software use those bitmaps "to capture . . . the video file" (i.e., for the claimed capturing function).  ('239 patent, 4:58-61.)  Samsung also casts other
28   specification excerpts as directed to "different unclaimed criteria" (SMBr. 22), but those portions are directed to the claimed capturing function when using the audio capture card.  (*Id.*, 5:39-46.)

the audio/visual signal, *digitizes* it into a computer data file, and *compresses* that data file.  Once

digitized and compressed, the data file is *captured* in the computer's memory by *a capture module

on the video capture card*."); *id.*, 4:39-46 ("The video signal input into the remote unit is received by

*a video card having a capture module* therein. . . . A computer software program . . . *operates with

the video card and capture module to capture, digitize, and compress* the video signal into a data

file."); *id.*, 4:58-59 ("The *capture card* in the remote unit uses BIT-MAP technology to *capture* and

display motion of the video file."); *id.*, 6:9-13 ("[T]he *video card* in the remote unit *captures* the

input video signal to its memory.  *Capture* includes *digitizing* the input video signal to form a binary

data file and then *compressing* that file."); *id.*, 6:66-67 ("The *video card* is capable of *capturing* an

input video signal at a selected number of frames per second."); *id.*, 7:2-4 ("The number of frames

per second in which *the video card* will *capture* a video sequence generally ranges between one (1)

and thirty (30) frames/second.").)

As such, consistent with Apple's proposed construction, a video capture card with a capture

module is part of the structure required to perform the claimed capturing, digitizing, and compressing

functions.  *See Default Proof Credit Card Sys., Inc. v. Home Depot USA, Inc.*, 412 F.3d 1291, 1298

(Fed. Cir. 2005) ("While corresponding structure need not include all things necessary to enable the

claimed invention to work, it must include *all structure* that actually performs the recited

function.").)

In its *Markman* brief, Samsung contends that the required structure does not need to include

*any* video components (i.e., "a video and/*or* audio capture module"), or if it does, it should be limited

to the video capture module *alone* (and not the video card on which the module resides).  That

argument fails for the following reasons.

*First*, Samsung ignores the many specification passages cited above in which the inventors

explicitly explained that the capturing, digitizing, and compressing functions are performed by *both*

the video capture module and the video card on which that module resides.  ('239 patent, 2:63-3:3

(explaining the "video capture card" digitizes and compresses, and "capture module on the video

capture card" captures); *id.*, 4:39-46 (using "the video card *and* capture module to capture, digitize,

and compress").)  In fact, several excerpts refer to the video card alone, without any reference to the

video capture module.  (*Id.*, 4:58-60 (capture function performed by "[t]he **capture card** in the remote

unit"); *id.*, 6:9-13 (explaining "the video card in the remote unit" performs the capturing, digitizing,

and compressing functions).)  Therefore, because the video card itself is described as "actually

perform[ing] the recited function," it would be error to exclude that card from the scope of required

structure.  *Default Proof Credit*, 412 F.3d at 1298.[10]

*Second*, Samsung cites to a handful of cases discussing whether the word "module" provided

sufficient corresponding structure for various means-plus-function limitations.  (SMBr. at 19.)  But

those cases—involving different patents and different claim terms that actually included the word

"module"—are irrelevant to the inquiry here:  i.e., identifying the specific structure that *the '239*

*patent* discloses as performing the claimed capturing, digitizing, and compressing functions.  None of

the cited cases has any relevance to that determination.  Samsung also cites cases holding "that the

term 'module' in a claim limitation denotes sufficient structure to avoid implicating 35 U.S.C. § 112,

¶ 6."  (SMBr. at 19.)  But that argument is puzzling given that the term at issue in the '239 patent

does not use the word "module," and as Samsung admits elsewhere in its brief, the parties agree that

the term at issue here **is** a means-plus-function limitation.  (SMBr. at 17.)

*Finally*, Samsung relies on the doctrine of claim differentiation for dependent claims 5 and 6.

(SMBr. at 20-21.)  But that doctrine is inapplicable because both claims add the requirement for

"capture" of "said composite signal" to occur "**in real time**"—a limitation absent from claim 1.  *See*

*Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1370 (Fed. Cir. 2007) (refusing to apply

claim differentiation where multiple limitations distinguished the claims).  And in any event,

Samsung cannot rely on claim differentiation to read out structure that §112, ¶ 6 requires including in

the claims.  *See Retractable Tech., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir.

2011) ("[A]ny presumption created by the doctrine of claim differentiation will be overcome by a

contrary construction dictated by the written description or prosecution history.").[11]

---

[10]   Samsung provides no support for its assertion that a "card" is a subset of a "video capture device"
or an "audio capture device."  (SMBr. at 21.)  Neither of those terms is found in the specification.

[11]   Samsung also cites *Retractable Tech.*, but inexplicably relies on the dissent (without stating so).
(SMBr. at 20.)

### 3.      The Required Structure Must Include an Audio Card.

The '239 specification makes clear that the capturing, digitizing and compressing functions include both video *and* audio elements, and that the hardware responsible for performing those audio-based functions is an audio card.  ('239 patent, Abstract, 2:26-29, 2:59-61 (referring to capture, digitalization, and compression of "an *audio*/visual signal"); *id.*, 4:24 (preferred embodiment includes "audio capture card"); *id.*, 5:44-46 ("An audio capture card installed in the remote unit captures the audio of an input signal."); *id.*, 5:46-48 (explaining captured audio "must also be digitized, compressed, and stored").)  Accordingly, just as Apple has proposed, a proper construction requires including an audio card as part of the structure that performs the claimed capturing, digitizing, and compressing functions.

In its brief, Samsung argues that the claimed function does not need to include any audio components at all because the limitation at issue supposedly "covers video *and/or* audio as opposed to requiring *both* video and audio."  (SMBr. at 20.)  In other words, according to Samsung, the limitation can be met by a "video module" alone, without any audio components at all (and vice versa as discussed above).  This argument fails for multiple reasons.

*First*, the specification never refers to the capture, digitization, and compression of an audio signal alone (with no video component).  That makes sense given the stated purpose of the claimed invention, which was to transmit broadcast-quality video feeds from remote locations.  If only audio was needed (as Samsung's "video and/or audio" construction would permit), a reporter could simply make a traditional phone call.

*Second*, although the specification describes an optional embodiment in which the user can choose to transmit just video with no audio (to save bandwidth), that feature is irrelevant to a proper construction of the claims.  ('239 patent, 5:39-46.)  The means limitation at issue is found in an *apparatus* claim, and as detailed above, the specification describes that apparatus as requiring hardware and software capable of capturing, digitizing, and compressing *both* video and audio signals.  The mere fact that the claimed device may be *used* to transmit video alone in some situations is irrelevant.  *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990) ("[A]pparatus claims cover what a device *is*, not what a device *does*."); *Paragon Solutions, LLC v.*

*Timex Corp.*, 566 F.3d 1075, 1091 (Fed. Cir. 2009) (same).  None of the dependent claims that Samsung cites refers to the capture, digitization, or compression of an audio signal alone.

**Third**, Samsung argues that dependent claim 4 "makes it clear that the signal can be video and/or audio" because refers to an "audio and/or video signal."  (SMBr. at 20.)  But the doctrine of claim differentiation cannot apply to claim 4, which adds requirements directed to a "means for splitting and organizing" limitation—not the "means for capturing, digitizing, and compressing" at issue here.  In addition, during prosecution, the examiner objected to claims (including claim 1) that used the term "audio and/or video signal" as indefinite.  In response, the patentee amended the claims to replace "audio and/or video signal" with "composite signal," explaining that "[w]ith regard to **the present invention**, the composite signal which is captured by the remote unit may have **both audio and video components as is commonly known to be a 'composite signal.'"** (Ex. 4 [8/2/05 Office Action] at 2-3; Ex. 5 [2/2/96 Amend.] at 6.)  Samsung cannot justify its video-only construction simply because, by error, that same change was not made for claim 4.  Indeed, because claim 4 depends on claim 1 (for which the change **was** made), there is no antecedent basis for "the audio and/ or video signal" limitation in claim 1.

**Finally**, Samsung contends that, to the extent the claimed structure includes hardware directed to audio, it should include an "audio capture module," and not an audio card.  (SMBr. at 20.)  But the specification only uses the term "audio capture card," and never uses the term "audio module" or "audio capture module."  It would be error to introduce that new and unidentified term into the claims.  *See Cross Med. Prods. V. Medtronic Sofamor Dank, Inc.*, 424 F.3d 1293, 1304 (Fed. Cir. 2005) (refusing to include structures not disclosed in the specification); *Avago Techs. Fiber IP (Singapore) Pte. Ltd. v. IPtronics, Inc.*, No. 5:10-cv-02863 EJD, 2012 U.S. Dist. LEXIS 125363, at *15 (N.D. Cal. Sept. 4, 2012) (construction preferred that did not introduce new term into the claim).

**C.      Disputed Term: "Means for Transmitting Said/the Composite Signal" (Claims 1, 7)**

| Apple's Construction | Samsung's Current Construction |
|---|---|
| **Function**: transmitting the/said composite signal | **Function**: transmitting the composite signal |
| **Structure**: one or more modems connected to a corresponding number of cellular telephones or telephone lines and the run-time module of a communications software package, such as ProComm Plus for Windows software, using the software sequence set forth at 3:8-14, 6:36-61, 7:24-33, 7:60-10:2 | **Structure**: One or more cellular telephone transmitters, radio frequency transmitters, telemetric frequency transmitters, and/or standard telephone line transmitters, and equivalents |

The parties agree that this limitation is governed under § 112, ¶ 6, and that the claimed function is "transmitting the composite signal," but disagree about the structure required to perform the claimed function.  This was not always the case—just a few weeks before filing its brief, Samsung represented in the Joint Claim Construction Statement that the required structure included both software and "interfaces."  Reversing course, Samsung now argues for a completely different structure, including dropping software and interfaces in favor of "transmitters."  As shown below, Apple's proposed construction includes structures that the '239 specification identifies as performing the claimed function, while Samsung's shifting construction is nothing more than a litigation-driven effort to ensnare Apple's very different accused products.

**1.      The Required Structure Must Include Software.**

The '239 patent specification repeatedly describes the structure for performing the "means for transmitting" as including the run-time module of a communications software package using the software sequence set forth at 3:8-14, 6:36-61, 7:24-33, and 7:60-10:2.  For example, in the "Transfer Software Sequence B" section (explaining the steps involved in the "transfer" process), the specification explains that to transmit data, "[t]he remote unit uses ***the run time module of a communications software package***, such as Procom Plus® for WINDOWS, which is loaded onto the remote."  ('239 patent, 8:30-34.)  That section further explains that this software is what enables the transmission of video files from the remote unit to the host unit: "Transfer software sequence B enables the remote unit to communicate with the host unit to transmit a stored data file using the system hardware.  Transfer software sequence B contains all of the instructions necessary to initialize the communications ports on the remote, obtain a cellular connection with each cellular telephone to

1   the host unit, obtain the stored data file, initiate file splitting sequence C, and transmit the split data

2   file."  (*Id.*, 8:23-30; *id.*, 8:63-9:2 ("The program automatically sends the cellular strings from each

3   communications port to initialize the modems on the host unit. . . . The transmission system operates

4   using a Z modem-based protocol."); *id.*, 6:36-38 ("Selection of 'TRANSFER' button 26 initiates the

5   transfer software sequence B . . . ."); *id.*, 8:35-10:2 (describing software transfer sequence).)

6        Because these disclosures clearly link the disclosed software to the claimed transmitting

7   function, the run-time software is required structure for the "means for transmitting" limitation.  *See*

8   *Cardiac Pacemakers*, 296 F.3d at 1119; *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir.

9   2012) ("A structure disclosed in the specification qualifies as a 'corresponding structure' if the

10  specification or the prosecution history clearly links or associates that structure to the function recited

11  in the claim.").

12       In response, Samsung largely makes the same flawed arguments discussed above in

13  connection with the "means for capturing, digitizing, and compressing limitation."

14       ***First***, Samsung contends that no software is required (SMBr. at 22), but that argument

15  conflicts with its admission in the Joint Claim Construction Statement that "associated software" ***is***

16  ***required*** structure for the "means for transmitting" limitation:  "*Structure*:  a computer, telephone,

17  cellular, radio frequency, and/or telemetric frequency interface ***with associated software***, and

18  equivalents."  (Dkt. No. 300 [JCCS] at 26.)

19       ***Second***, just as it did with the "means for capturing, digitizing, and compressing" limitation,

20  Samsung argues that software is not required structure because the "means for transmitting"

21  limitation is not directed to a "general purpose processor."  (SMBr. at 24.)  But that argument fails for

22  the same reasons discussed above—i.e., contrary to Samsung's suggestion, the law does not provide

23  that software can only be required structure for means-plus-function limitations directed to a general

24  purpose processor.  Rather, software must be included as required structure when clearly linked to the

25

26

27

28

1   claimed function, just like here.[12]  *See Business Objects*, 393 F.3d at 1373.

2          ***Third***, nor can Samsung exclude the disclosed software sequence from the required structure

3   simply because the software can perform other "unclaimed" functions as well.  (SMBr. at 24-25.)

4   That is true for many structures properly required for performing a claimed function.  *See Engineered*

5   *Prods. Co. v. Donaldson Co.*, 147 Fed. Appx. 979, 985, 2005 U.S. App. LEXIS 18828, at *13 (Fed.

6   Cir. 2005) ("[C]orresponding structure will almost always perform some additional function in the

7   course of executing the claimed function.").[13]

8                **2.      The Required Structure Must Include Modems.**

9          The '239 specification further confirms that the required structure for performing the "means

10  for transmitting" also includes one or more modems connected to a corresponding number of cellular

11  telephones or telephone lines.  For example, the patent explains that:  (i) the remote unit has "up to

12  four computer interfaces such as modems, each connected to a cellular telephone" ('239 patent, 4:25-

13  27); (ii) "[e]ach modem interfaces through a different communications port" (*id.*, 8:38-41); (iii) "[t]he

14  modems interfacing each communication port . . . obtain a connection with the telephone line on the

15  host unit" (*id.*, 8:61-9:2); and (iv) "[f]iles may be transmitted using telephone lines, cellular, radio

16  and other telemetric frequencies.  In the preferred embodiment, cellular telephones are integrated

17  with the remote unit to allow transmissions of files from areas which are inaccessible to standard

18  telephone lines" (*id.*, 9:25-29; *see id.*, 9:30-37 (explaining that, if telephone lines are used, "the

19  cellular telephones are omitted from the remote, and the modems connected to the standard telephone

20  jacks, using standard telephone connectors and wiring").)

21         In its opening brief, Samsung contends that the required hardware only includes different

22  types of "transmitters."  (SMBr. at 22-24.)  But Samsung did not even mention "transmitters" (of any

23

24  ─────────────────────

25  [12]   Samsung states "[t]he specification makes clear that it is the transmitter that transmits the
    composite structure, and it does not even include any processor element."  (SMBr. at 24.)  But the

26  '239 specification does not even mention a "cellular telephone transmitter," "standard telephone line
    transmitter," or "telemetric frequency transmitter," and therefore, says nothing about whether any of
    those things (whatever they are) can include processors (of any kind).

27  [13]   For example, if a claim includes a "means for signaling" limitation, and the specification discloses
    a blinker shaft as a signaling mechanism, the blinker shaft would not be excluded from the required

28  structure simply because it could be used to turn the car's high beams on and off as well.

kind) in the Joint Claim Construction Statement; instead, it identified the required hardware structure as "a computer, telephone, cellular, radio frequency, and/or telemetric frequency *interface*." Samsung's belated decision to jettison its old construction only underscores the lack of merit underlying its new positions.  In any event, its new "transmitter" arguments fail on the merits for several reasons.

*First*, the specification does not even mention a "cellular telephone transmitter," "telemetric frequency transmitter," or "standard telephone line transmitters," or otherwise explain what those things are, how they work, or how they might be involved in transmitting (and it only contains a passing mention of "radio transmitters," with no explanation of what they are or how they are connected to the "remote unit").  Therefore, Samsung's construction should be rejected because it would render the claims indefinite.  *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1382 (Fed. Cir. 2009) (failure to provide adequate disclosure of structure renders claim indefinite); *see Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 469 F.3d 1039, 1042 (Fed. Cir. 2006) ("When claims are amenable to more than one construction, they should when reasonably possible be interpreted so as to preserve their validity").[14]

*Second*, the specification contains no structural details concerning the phrase "other telemetric frequencies," and during prosecution the applicants admitted that phrase means "*any frequency on which data may be transmitted*."  (Ex. 5 [2/2/96 Amend.] at 7 (emphasis added).) Samsung cannot contend that it is entitled to cover every possible frequency based on this generic disclosure.  *Ergo Licensing, LLC v. Carefusion 303, Inc.*, 673 F.3d 1361, 1364 (Fed. Cir. 2012) (explaining that, under § 112, ¶ 6, "a patentee is only entitled to 'corresponding structure . . . *described in the specification* and equivalents thereof").

*Finally*, Samsung is wrong to the extent it contends that a modem is not part of the required structure.  (SMBr. at 23-24.)  In the Joint Claim Construction Statement, Samsung *agreed* that the structure required for the "means for transmitting" limitation included "interfaces," and cited multiple portions of the specification identifying the interfaces as modems.  (Dkt. No. 300 [JCCS] at 26.)

---

[14]   Samsung cites to portions of paragraphs in the '239 patent that contain the word "transmitter" (SMBr. at 23), but those are only "radio transmitters" (*id.*, 9:25-45).

Indeed, the **only** "interface" that the '239 patent discloses is a ***modem***—a component that is essential to the claimed "transmitting" function given that the remote unit would be unable to transmit anything to the host unit without one.  ('239 patent, 4:25-27, 8:38-41, 8:61-9:2.)[15]

**V.    CONCLUSION**

For the foregoing reasons, Apple requests that the Court adopt its proposed constructions.

WILMER CUTLER PICKERING
HALE AND DORR LLP

Dated:  January 25, 2013            By:    /s/ *Mark D. Selwyn*
                                                    Mark D. Selwyn

*Attorneys for Plaintiff and*
*Counterclaim-Defendant Apple Inc.*

---

[15]  Because no other type of "interface" is disclosed, the doctrine of claim differentiation is inapplicable.  As discussed above, the structure is limited to the disclosures in the specification, and Samsung cannot overcome that rule based on claim differentiation.  *See Cross Med.*, 424 F.3d at 1304; *Retractable Tech.*, 653 F.3d at 1305.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has been served on January 25, 2013 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.

Dated:  January 25, 2013

*/s/ Mark D. Selwyn*
Mark D. Selwyn