QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

William C. Price (Bar No. 108542)
williamprice@quinnemanuel.com
Michael L. Fazio (Bar No. 228601)
michaelfazio@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | CASE NO. 12-CV-00630-LHK (PSG)<br><br>**SAMSUNG'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**<br><br>Date:     February 21, 2013<br>Time:     10:30 a.m.<br>Place:    Courtroom 8, 4th Floor<br>Judge:   Hon Lucy H. Koh |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................................... 1

ARGUMENT ................................................................................................................................... 1

I.     U.S. PATENT NO. 5,666,502 ........................................................................................... 1

     A.     Description of the '502 Patent ............................................................................... 1

           1.     Samsung's Proposed Construction Of "History List" Reflects The "Invention" Described In The Specification, File History, And Inventor Testimony; Apple's Construction Seeks To Recapture The Prior Art .............................................................................................................. 4

           2.     Samsung's Proposed Construction For "Field Class" Tracks The Intrinsic Evidence; Apple Again Proposes Only To Confuse The Jury ........................................................................................................................ 8

II.    U.S. PATENT NO. 5,946,647 ......................................................................................... 11

     A.     Description Of The '647 Patent ......................................................................... 11

     B.     Samsung's Proposed Construction For "Action Processor" Adheres To The Intrinsic Evidence; Apple's Arguments Would Read Out The Words "Action Processor" From The Claims ............................................................... 13

III.   U.S. PATENT NO. 7,761,414 ......................................................................................... 15

     A.     Description of the '414 Patent and the Stated Purpose of the Invention ................ 15

     B.     The Intrinsic Evidence and the Stated Purpose of the Invention Require Adoption of Samsung's Proposed Construction ...................................................... 16

     C.     Apple's Proposal, For "Plain and Ordinary Meaning," Would Improperly Shift the Claim Construction Dispute to the Jury .................................................... 18

     D.     Apple's Argument and Proposed Constructions Are Not Based On The '414 Patent Specification or Prosecution History ........................................................... 19

IV.   U.S. PATENT NO. 8,014,760 ......................................................................................... 20

     A.     The PTO Repeatedly Rejected Broader Iterations of the '760 Claim Language In Light of Prior Art Replete with Call Lists and Missed Call Information ........................................................................................................... 21

     B.     Samsung's Construction is Necessary Because the Examiner Added and Defined the "Completely Substituting" Limitation to Specifically Require Complete Substitution of the Call List with Contact Information ........................ 22

     C.     Apple's Proposed Construction is Unsupportable ................................................. 24

D.      Samsung's Construction is Supported by the Specification and Does Not
        Read Limitations from the Specification into the Claims ....................................... 25

V.      CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*,
   132 F. 3d 701 (Fed. Cir. 1997) ................................................................. 8

*Bristol-Myers Squibb Co. v. Teva Pharmaceuticals USA, Inc.*,
   288 F. Supp. 2d 562 (S.D.N.Y. 2003) ...................................................... 8

*Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*,
   334 F.3d 1294 (Fed. Cir. 2003) .............................................................. 20

*Cat Tech LLC v. TubeMaster, Inc.*,
   528 F.3d 871 (Fed. Cir. 2008) ................................................................ 10

*CyberSource Corp. v. Retail Decisions, Inc.*,
   654 F.3d 1366 (Fed. Cir. 2011) .............................................................. 10

*Edwards Lifesciences LLC v. Cook Inc.*,
   582 F.3d 1322 (Fed. Cir. 2009) ................................................................ 5

*Evans Med. Ltd. v. American CynamidCo.*,
   11 F. Supp. 2d 338 (S.D.N.Y. 1998), *aff'd* 215 F.3d 1347 (Fed. Cir. 1999) ...................... 8

*Fujitsu Ltd. v. Belkin Int'l, Inc.*,
   No. 10-cv-3972-LHK, 2012 WL 4497966 (N.D. Cal. Sept. 28, 2012) ............................. 19

*Honeywell Int'l, Inc. v. ITT Indus.*,
   452 F.3d 1312 (Fed. Cir. 2006) ................................................................ 5

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996) ................................................................................ 20

*MBO Laboratories, Inc. v. Becton, Dickinson & Co.*,
   474 F.3d 1323 (Fed. Cir. 2007) .............................................................. 19

*Merck & Co. Inc. v. Teva Pharm. USA, Inc.*,
   395 F.3d 1364 (Fed. Cir. 2005) .............................................................. 14

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co. Ltd.*,
   521 F.3d 1351 (Fed. Cir. 2008) ........................................................ 18, 19

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) .............................................................. 19

*Retractable Techs., Inc. v. Becton, Dickinson and Co.*,
   653 F.3d 1296 (Fed. Cir. 2011) ............................................................ 6, 7

*SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys. Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001) ........................................................................... 7

*Verizon Servs. Corp. v. Vonage Holdings Co*rp.,
    503 F.3d 1295 (Fed. Cir. 2007) ........................................................................... 5

*Warner-Jenkinson Co. Inc. v. Hilton Davis Chemical Co.*,
    520 US 17 (1997) ............................................................................................... 25


**OTHER AUTHORITIES**

MᴄGʀᴀᴡ-Hɪʟʟ Dɪᴄᴛɪᴏɴᴀʀʏ ᴏғ Sᴄɪᴇɴᴛɪғɪᴄ ᴀɴᴅ Tᴇᴄʜɴɪᴄᴀʟ Tᴇʀᴍs 457 (6th Ed. 2003).............. 19

Tʜᴇ Oxғᴏʀᴅ Aᴍᴇʀɪᴄᴀɴ Dɪᴄᴛɪᴏɴᴀʀʏ ᴀɴᴅ Tʜᴇsᴀᴜʀᴜs: ᴡɪᴛʜ Lᴀɴɢᴜᴀɢᴇ Gᴜɪᴅᴇ 291
    (American Ed. 2003 ............................................................................................. 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# INTRODUCTION

Defendants and Counterclaimants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively "Samsung") respectfully submit this responsive brief for the five disputed claim terms from Apple's '502, '647, '414, and '760 patents.  Throughout the claim construction process, Apple maintained that no constructions were necessary for any of the disputed terms – until, for the first time in its opening brief, Apple turned on a dime and offered "alternative" constructions.  Apple's initial position that no constructions were necessary made little sense here, where the intrinsic evidence provides specific guidance for the distinct meaning of the disputed terms, and failing to construe these terms would force the jury to try to parse the patents on their own.  This of course is a job for the Court.  Apple's late-proposed "alternative" constructions fare no better, conflicting with the intrinsic evidence Apple evidently hopes to avoid.  In contrast, Samsung's constructions clarify ambiguities in the disputed terms by following the patents' specifications and prosecution histories.  Accordingly, the Court should adopt Samsung's proposed construction for each disputed term.

# ARGUMENT

## I.     U.S. PATENT NO. 5,666,502

### A.     Description of the '502 Patent

The '502 patent, entitled "Graphical User Interface Using Historical Lists With Field Classes," was filed in August 1995.  It claims an improved use of "history lists" in software, to make it easier for users to input text into various "fields," such as a field for the recipient of a message.  ('502 Fig. 5A; 10:45-55.)  Using the patent's architecture, each field has a "field class" based on the category of information entered into that field.  (*Id.* 2:61-66.)  For example, a field for a person's name could have a field class of "name," regardless of whether the field was called "Incoming Caller" and held names of incoming callers, or was called "Fax Recipient" and held names of fax recipients.  (*Id.* 16:29-38, 16:54-59, 16:63-17:7.)  The patent teaches that multiple fields ("Incoming Caller," "Fax Recipient") should each be designated with a single field class ("name") where they hold the same type of information, and further teaches using separate field

classes ("name," "address") for different types of information.  (*Id.* 10:45-55, 16:29-38, 16:54-59, 16:63-17:7.)  As disclosed in the patent, when a user inputs data into a field, the system stored the input in a "history list" containing "the most recently and/or frequently used data values" for that "field class" of data.  (*Id.* Abstract; 11:3-7.)  Critically, each "field class" had only one "history list" to track inputs received by all fields in that class; that list was then "shared between different applications that execute on the computer system."  (*Id.* Abstract.)  Thus, once a user entered "John Smith" as an "Incoming Caller," he or she could select "John Smith" as a possible "Fax Recipient," because both "Incoming Caller" and "Fax Recipient" are fields of field class "name," and therefore share the same history list:



FIG. 13A          FIG. 13B

(*Id.* Figs. 4, 13A-B; 16:26-41.)

        According to the patent, this approach to classifying and sharing data offered advantages over the prior art.  Once shared across fields, "the historical list becomes more useful and valuable to the user and thereby further improves the ease of use of the computer system."  (*Id.* 4:22-25.)  For example, if a user receives many phone messages from "John Smith," it is likely that the same user will send faxes to "John Smith," and thus it will be useful if "John Smith" appears in the Fax Cover Sheet's history list as well as the Phone Message's history list – even though Fax Cover Sheet and Phone Message are separate applications.  (*Id.* Fig. 13A-B; 16:38-41.)  To provide these alleged benefits, "the invention . . . facilitates the sharing of the historical input data between different applications," so that newly installed applications can access history lists generated by other applications.  (*Id.* 16:41-44 ("the history developed for a particular computer, program or user is available not only for later use by the same application, but also for *later use [by] different applications*") (emphasis added).)  And by pooling information between applications, the history list becomes more useful: "[t]he history that is developed is also more reliable when shared across

1   applications because the sample size is greater."  (*Id.* 16:47-49.)

2        During prosecution, the Examiner confirmed that the alleged novelty of the invention was

3   its ability to share history information for each "field class" across multiple applications.  (Ex. 2,

4   at APLNDC630-0000056188.)[1]  The Examiner initially rejected the asserted claims based on

5   screenshots of the Borland Turbo C++ software and its "Open File" field – which, the Examiner

6   noted, "teaches a history list maintained for a data entry field for quick selection of previous

7   inputted information."  (*Id.* at APLNDC630-0000056181.)  The Examiner allowed the claims only

8   after amendment at Apple's urging, following an interview with the Examiner, to require a "field

9   class."  (*Id.* at APLNDC630-0000056186.)  For example, claim 11 as amended required

10  "displaying a form on the display screen of the computer system, the form having at least one field

11  **<u>associated with a field class and</u>** requiring data entry by a user; displaying a history list

12  associated with the field **<u>class</u>** on the display screen."  (*Id.* at APLNDC630-0000056187 (emphasis

13  added).)  The Examiner characterized the prior art as maintaining a *separate* "history list" for each

14  individual field, such as "Fax Recipient," instead of a *shared* "history list" for a single field class,

15  such as "name."  The Examiner noted that "Borland C++ does not teach updating the history list

16  associated with the field class.  In contrast, Borland C++ seems to limit updating to a specific

17  entry field instance."  (*Id.* at APLNDC630-0000056188.)  The Examiner thus based allowance on

18  sharing history lists among fields in various applications of a particular "field class."

19       Testimony from Stephen Capps, the sole inventor, confirmed that the patent's claimed

20  novelty was association of a *field* with a field *class* that identified the *type* of information entered

21  into the field, so that different fields in the same field class would share "history list" information

22  automatically.  In his deposition, Mr. Capps was asked to use prior art software that tracked a

23  history of the user's inputs in a single search field:

24

25

26

---

27     [1]  Citations to "Ex." refer to exhibits attached to the Declaration of Victoria Maroulis in
    Support of Samsung's Responsive Claim Construction Brief, which has been filed concurrently
28  with this brief.



(Ex. 3 at 161:7-166:17; Ex. 4.)  Mr. Capps admitted that this prior art disclosed "a history of what's been typed in that field."  (Ex. 3 at 164:15-17.)  Asked how the prior art was "different from what you considered to be your invention in the '502 patent," Mr. Capps pointed to two points of novelty – classifying information and sharing that information between applications:

> Q.   So how is this functionality we just looked at different from what you considered to be your invention in the '502 patent?
>
> A.   There is ***no indication here that if I went into a different program, that I would get the same list***.  There's ***no indication that I've classified this as anything***.  And I would say ***those are the big differences***.

(Ex. 3 at 165:24-166:11 (emphasis added and objection omitted).)

### 1. Samsung's Proposed Construction Of "History List" Reflects The "Invention" Described In The Specification, File History, And Inventor Testimony; Apple's Construction Seeks To Recapture The Prior Art

As its specification and prosecution history confirm, the alleged novelty of the '502 patent was sharing history lists based on field classes: all fields of the same class, in all applications, shared the same history list.  Apple's proposed construction is designed to improperly capture *any* list of user histories – including history lists in the prior art that were *not* shared between applications.  Samsung's construction ("a list of choices based on historical information that is shared between different applications") faithfully reflects what was allegedly inventive, and for that reason the Court should adopt it.

The '502 patent repeatedly and consistently describes "the invention" – not an exemplary embodiment, but "the invention" – as an architecture for sharing history lists between all fields of the same field class, including fields in different applications.  For example, the patent states that "the invention . . . facilitates the sharing of the historical input data between different applications."  ('502 2:35-38.)  It even describes specific "usage of the invention" to share history information "across different programming applications":  sharing a history list for the "name"

field class between fields in two different applications, the "caller" field of a phone message application and the "to" field of a fax application. (*Id.* 16:23-38; Figs. 13A-B.) The patent also describes "the invention" as sharing company names between fields designated for company name information in two separate applications – an accounting program and a greeting card program. (*Id.* 16:50-17:7.) This "invention" is the patent's allegedly key improvement over the prior art: "the history developed for a particular computer, program or user is available not only for later use by the same application, but also for *later use by different applications*," so that "the user does not have to build a history list for each particular application." (*Id.* 16:41-49 (emphasis added).) The patent also claimed that the "history that is developed is also more reliable when shared across applications because the sample size is greater." (*Id.* 16:41-49.) Finally and critically, according to the Examiner the patent became novel only when it claimed the ability to update history lists for *multiple* fields in *multiple* applications. (Ex. 2, at APLNDC630-0000056188 (allowing claims over Borland Turbo C++ functionality shown in screenshots, as that functionality tracked historical inputs for "a specific entry field instance" rather than multiple fields sharing the same "field class").)

Thus, the intrinsic record makes clear that sharing historical information between different applications is not a "possible embodiment," as Apple suggests (Opening Br. at 9), but rather the invention itself. The law is straight-forward on this issue: when a patentee consistently describes one embodiment as "the present invention," the "public is entitled to take the patentee at his word." *Honeywell Int'l, Inc. v. ITT Indus.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006); *see also, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention."); *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1330 (Fed. Cir. 2009) ("[W]hen the preferred embodiment is described in the specification as the invention itself, the claims are not necessarily entitled to a scope broader than that embodiment. Here, the specification frequently describes an 'intraluminal graft' as 'the present invention' or 'this invention,' indicating an intent to limit the invention to intraluminal devices." (citations omitted).) Apple improperly seeks to broaden the scope of the alleged invention through claim construction.

1    (*See, e.g.*, Opening Br. at 9.)

2         Recent Federal Circuit decisions illustrate that Samsung's proposed construction is correct,

3    and that Apple's effort to erase the "invention" from the claims is untenable.  In *Retractable*

4    *Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296 (Fed. Cir. 2011), the patent specification

5    described the "invention" as including a one-piece body for a syringe; only one-piece bodies were

6    disclosed for use with the "invention," and prior art multi-part bodies for syringes were criticized.

7    *Id*. at 1304-05.  The asserted claims recited a syringe comprising a "body," but did not expressly

8    require the body to be one piece.  *Id*. at 1299.  The district court refused to limit "body" to single-

9    piece bodies.  *Id*. at 1302.  The Court of Appeals reversed, limiting the term "body" to "one-piece

10   bod[ies]," because the specification "expressly recite[d] that 'the invention' has a body

11   constructed as a single structure expressly distinguish[ed] the invention from the prior art based on

12   this feature and only disclose[d] embodiments that are expressly limited to having a body that is a

13   single piece."  *Id*. at 1305.  The Federal Circuit noted its construction was compelled by the nature

14   of the invention:  "In reviewing the intrinsic record to construe the claims, we strive to capture the

15   scope of the actual invention, rather than . . . allow the claim language to become divorced from

16   what the specification conveys is the invention."  *Id.*; *see also id*. at 1311 (Plager, J., concurring)

17   ("However much desired by the claim drafters, who want claims that serve as business weapons

18   and litigation threats, the claims cannot go beyond the actual invention.").

19        *Retractable Technologies* controls here.  The '502 patent states that "*the invention* …

20   facilitates the sharing of the historical input data between different applications." ('502 2:35-38

21   (emphasis added).)  Moreover, the '502 patent expressly distinguishes the alleged invention from

22   the prior art based on sharing history lists between different applications, and the specification

23   repeatedly describes the patent's architecture for sharing history lists between applications as an

24   improvement over the single-application history lists known in the prior art:

25   •    "By sharing the data between applications, the historical list becomes more useful and
          valuable to the user and thereby further improves the ease of use of the computer system."
26        ('502 2:38-41.)

27   •    "Thus, the history developed for a particular computer, program or user is available not
          only for later use by the same application, but also for later use by different applications.
28        This is beneficial because the user does not have to build a history for each particular

application. Instead, the history is shared across applications so that the ease of use is improved."  (*Id.* 16:41-47.)

• "The history that is developed is also more reliable when shared across applications because the sample size is greater."  (*Id.* 16:47-49.)

Here as in *Retractable Technologies*, the patentee's efforts to distinguish over the prior art must limit the claims.[2]  Just as in *Retractable Technologies*, the '502 patent also discloses only one embodiment – an architecture to share history lists between all fields of the same "field class," *including* fields in different applications.  *Retractable Techs.*, 653 F.3d at 1305.  For example, Fig. 4, a "basic block diagram of list processing 164 associated with a basic embodiment of the invention" ('502 9:41-42), depicts form-filling functionality used by *two different applications*: a "fax sending program" and an "electronic business card program."  (*Id.* 9:49-60.)  Each application includes a form with a field designated to enter names.  (*Id.* 9:67-10:3.)  Using the algorithm of Figure 4, those two fields of the "name" field class point to the same history list. (*Id.* Fig. 4 block 168; 10:9-11.)  The two fields in two different applications both point to a single, shared history list associated with the "name" field class.  (*Id.* Fig. 4 blocks 168 & 170; 16:30-41.)

Apple's brief mischaracterizes the patent's disclosures on this issue.  Apple emphatically claims that Fig. 4 is a separate embodiment that "describes only a *single* application" (Opening Br. at 9 (emphasis added)) and that Samsung's construction would somehow exclude Fig. 4.  This is incorrect.  Fig. 4 is not a separate embodiment; it is the algorithm used by the patent's *only* embodiment, and it is explicitly described as being used by *multiple* applications.  ('502 9:49-60.) Apple claims that there is "no mention of multiple applications" in "'502 Patent, 9:40-10:32," describing Figure 4 – but the '502 patent *explicitly discusses two applications* within those lines of the specification: a "fax sending program" and an "electronic business card program."  (*Compare* Opening Br. at 9-10, *with* '502 9:49-60.)  Both of these applications include a field for name information ('502 9:51-60); following Fig. 4, these two fields share the history list for the "name"

_____

[2] *See also SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys. Inc.*, 242 F.3d 1337, 1342-1343 (Fed. Cir. 2001) ("[T]he SciMed patents distinguish the prior art on the basis of the use of dual lumens and point out the advantages of the coaxial lumens used in the catheters that are the subjects of the SciMed patents.  That discussion in the written description supports the district court's conclusion that the claims should not be read so broadly as to encompass the distinguished prior art.").

1   field class.  (*Id.* 9:65-10:3 ("decision 168" uses field class to determine the appropriate history list;

2   "if the field within the form *is a name field which requests a person's name*, then the decision 168

3   determines whether there is a history list available for the name field") (emphasis added).)

4   Apple's mischaracterization of the patent's disclosures on this issue is part and parcel of its effort

5   to broaden the scope of the '502 patent's claimed "invention."

6        Apple's arguments are also inconsistent with testimony from the inventor, Mr. Capps.[3]

7   Samsung agrees with Mr. Capps that the '502 patent "invention" is described as sharing history

8   information between different software programs, where the user's historical input is organized by

9   the *class* of data entered into the *input fields* (*i.e.* "field class").  (*See supra* at I.A.)  Apple cannot

10  undo what the patent, the file history, and the inventor all describe as the purported "invention,"

11  nor can it construe the claims to cover a broader scope than that supported by the intrinsic record.

12
13  **2.   Samsung's Proposed Construction For "Field Class" Tracks The Intrinsic Evidence; Apple Again Proposes Only To Confuse The Jury**

14       Samsung's construction of "field class" reflects the invention actually claimed by the

15  patent, while Apple's proposal would serve only to confuse the jury.  The alleged novelty of

16  the '502 patent was organizing *fields* into *classes*, based on the category of information held by the

17  field.  Samsung's proposed construction tracks the patent's descriptions of "field classes": the

18  patent repeatedly describes a "field class" as data in software that connects a "history list" to fields

19  having the same "field class," and that identifies the field's category of information.  Input fields

20  and history lists are each organized into "classes" of content, based on the content of their inputs;

21  so if a field "requires a person's name," then the field class will identify the category of content

22

23       [3]   While the Federal Circuit has cautioned against relying on self-serving, after-the-fact
24  inventor testimony for claim construction, *Bell & Howell Document Mgmt. Prods. Co. v. Altek
    Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997), inventor "[t]estimony ***against*** a patentee's own interest"
25  is "perhaps the most persuasive extrinsic evidence" a court can consider.  *Bristol-Myers Squibb
    Co. v. Teva Pharm. USA, Inc.*, 288 F. Supp. 2d 562, 586 (S.D.N.Y. 2003) (court should disregard
26  self-serving inventor testimony, but admissions against inventor's interest are highly relevant);
    *Evans Med. Ltd. v. American CynamidCo.*, 11 F. Supp. 2d 338, 350 (S.D.N.Y. 1998), *aff'd* 215
27  F.3d 1347 (Fed. Cir. 1999) (inventor made a "clear" and "positive" statement "that the position
    advanced by defendants as to the meaning of . . . the claims of his patents is absolutely correct,
28  and that the construction for which plaintiffs contend is plainly wrong.")

for that field as "names." ('502 Fig. 5A; 9:65-10:7, 10:64-66, 11:19-20.)  Figures 13A and 13B illustrate this content-based classification: a "Caller" field in a phone message program receives information about caller's names, and so "[t]he caller field 314 is associated with a *name class* for which a history table is maintained." (*Id.* 16:30-32 (emphasis added).)  Likewise, the "To" field of a fax program also requires a person's name, and so this separate field is also identified with the same "name" *field class*. (*Id.* 16:37-41.)  Using this setup, the "field class" determines the category of information for a given field, and is then used to select the "history list" of the corresponding "field class" type. (*Id.* 11:19-20 (history lists and tables are also "associated with a field class").).[4]  This approach means that fields of the "name" field class will share the same history list. (*Id.* Fig. 4; 16:23-17:7; *see also id.* Fig. 13A-B; 6:38-41 (fields of class "name" share one history list).)

The parties largely agree about the role played by the "field class."  Apple admits the field class must indicate "the type of information entered into the field," *i.e.*, identify a category of content. (Opening Br. at 6.)  Apple also agrees that "the specification and claims state that a field is associated with a field class, which, in turn, is associated with a history list" – *i.e.*, the field class links a field to a history list. (Opening Br. at 11.)  Samsung's proposed construction captures both of these ideas.  Apple's proposed construction adds a layer of redundancy that will only confuse the jury.  Specifically, replacing the claim term "field class" with Apple's proposed construction creates a circular claim limitation: ". . . the form having at least *one field associated with* a [category of information *associated with a field*] . . ." ('502 claim 11.)

Samsung's proposed construction, in contrast, would retain the alleged novelty of the patent.  The patent described a specific mechanism that would be used in the software to match fields with history lists. ('502 10:63-66.)  This "field class" was described by the Examiner as a new and specific aspect of the claimed software, specifically noted in his Reasons for Allowance (Ex. 2, at APLNDC630-0000056188) and in fact added to the *title* of the patent before allowance

---

[4]   Figure 4 explains this decision-making process; "a decision 168 [is made] based on whether there is a history list available for the particular field of the form," such that "if the field within the form is a *name field* which requests a person's name, then the decision 168 determines whether there is a history list *available for the name field*." (*Id.* Fig. 4; 9:65-10:3.)

1   (*Id.* at APLNDC630-0000056186.).  The file history confirms the "field class" must exist in

2   software, and not simply as a user's mental impression.[5]  For example, the Borland Turbo C++

3   screenshots considered by the Examiner show a history list comprised entirely of file names, but

4   the examiner did not find there was a "field class" in the software simply because the visible list of

5   history could be mentally classified by a user as "file" information.  (*Id.* at APLNDC630-

6   0000056181.)  If the "field class" in the '502 patent was nothing more than an *abstract* association

7   between a field and a category of information, and not a tangible data element in the software, the

8   claims would be unpatentable, and thus would not have been allowed.  (*See id.*)

9       Apple resists admitting that the field class must be concrete data in a software program,

10   because it cannot identify any concrete "field class" in the actual accused software.  Instead, it

11   proposes no construction at all, or a generalized construction of "a category of information

12   associated with a field" (Opening Br. at 10), in order to accuse *any association* – including even a

13   *mental* association in a user's mind.  Apple's construction is improper for multiple reasons.  It

14   would fail to cite patent-eligible subject matter.  *See, e.g.*, *CyberSource Corp. v. Retail Decisions,*

15   *Inc.*, 654 F.3d 1366, 1371 (Fed. Cir. 2011) (holding a claim not patent-eligible because "it is

16   drawn to an unpatentable mental process – a subcategory of unpatentable abstract ideas").  It

17   would collapse the distinction between the claim and the prior art.  And it would render the

18   limitation essentially meaningless.  *See Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 885

19   (Fed. Cir. 2008) (declining to adopt a construction that would "render[] an important claim

20   limitation . . . functionally meaningless").  Apple's complaints that "data element" is unsupported

21   and confusing are meritless; the term has a plain meaning, in the patent and in the field, and Apple

22   – not Samsung – would confuse the jury by wiping this term clean of any substantive meaning.[6]

---

23   [5]   The claims likewise confirm this; the "invention" is described as software for "computer

24   systems" ('502 1:5-7), and the claims explicitly recite software for a "computer system" (claim 1),
     a "graphical user interface" (claim 8), a "method for inputting data into a computer system"

25   (claims 11 and 16), and a "computer readable medium containing program instructions" (claim

26   26).

     [6]   Apple labels the "data element" aspect of Samsung's proposed construction as a

27   "completely new and undefined technical term . . . found nowhere in the intrinsic record."
     (Opening Br. at 7.)  But the patent repeatedly points to data elements (*see, e.g.*, '502 10:66-67,

28   11:3-5, 16:59-63, 16:67-17:7), and in particular "strings" (computer science parlance for words),

II.      **U.S. PATENT NO. 5,946,647**

The parties dispute the construction of the term "action processor."  Samsung proposes that "action processor" means "a program routine separate from a client that performs the selected action on the detected structure."  Apple alleges that no construction is necessary, or in the alternative, proposes that the Court should adopt Samsung's construction, absent the phrase "separate from a client."  The Court should adopt Samsung's construction.

As an initial matter, Apple's request for no construction – based on the allegedly "clear" context of the claims – ignores the fact that a jury confronted with the phrase "action processor" will likely either not understand the term or assume it refers to hardware, when in fact it covers software.  For this reason alone, the term requires construction.  Samsung's proposal addresses this point and adheres to the intrinsic evidence.  Apple's alternative construction merely restates language already present in claim 1 and renders the words "action processor" meaningless.

A.       **Description Of The '647 Patent**

The '647 patent describes the core of the invention as a software "program to identify structures in a document and perform selected computer-based actions on the identified structures."  ('647 2:21-25.)  The three program routines within that software program – an "analyzer server," "user interface," and "action processor" – serve client applications by "detecting structures in the data," "linking actions to the detected structures," "enabling the selection of a detected structure and a linked action," and "performing the selected action linked to the selected structure."  (*Id.* claim 1, 2:28-53.)

Accordingly, the '647 specification teaches that the "analyzer server," "user interface," and "action processor" program routines comprise a program separate from other email or word processing applications.  For instance, Fig. 1 of the '647 patent illustrates this program (165) as

that identify the category of information – such as "name" or "company."  (*Id.* 16:67-17:7.)  Moreover, Apple's *own patents* filed contemporaneously with the '502 patent repeatedly use "data element" in the same manner Samsung proposes: concrete data in a software program.  (*See, e.g.,* Ex. 5 (U.S. Patent No. 5,671,446 (filed Mar. 16, 1995)) (using "data element" more than one hundred times with this meaning)).)  Apple's own patents thus confirm that Apple's newfound objection is baseless: one of skill would have no trouble understanding the meaning of "data element" in the computer software context.

1  separate from an application (167):



"The program 165 of the present invention . . . identif[ies] structures in the data presented by application 167, . . . enable[s] the user to select a structure and an action, and [] automatically perform[s] the selected action on the identified structure." (*Id.* 3:38-45.)

Figure 2 of the '647 patent, reproduced below, also illustrates the separation between an application (labeled as document 210) and the program (165), which includes the analyzer server (220), user interface (240), and action processor (250):



In describing Figure 2, the '647 patent further spells out the action processor's separation, specifying that the detected structure and selected action are "transmitted" to the action processor after selection: "[u]pon selection of a candidate action, user interface **240** transmits the selected structure and the selected action to action processor **250**." (*Id.* 4:52-54; *see also id.* 5:44-50.)

The '647 specification thus describes a separate program (165) comprising an "analyzer server," "user interface," and "action processor" serving client applications. During prosecution, the '647 inventors emphasized this aspect, explaining that in contrast to the prior art, their invention was a "system-wide service" accessible to a variety of client applications. (*See* Ex. 7, at APLNDC630-0000039851 ("In addition, Applicants' invention is a system-wide service that can be used to enable cooperating systems to detect recognizable structures in their data").)

Accordingly, in addressing the term "analyzer server" in Apple's case against Motorola involving the '647 patent, the Honorable Judge Richard Posner construed the term to mean "a server routine *separate from a client* that receives data having structures from the client." (Ex. 8,

1   at 10 (emphasis added).)  Judge Posner relied in part on the word "server" in reaching this

2   construction, noting that the '647 specification supports the understanding that "server" means "a

3   client-server relationship between the analyzer server and the applications that request structure

4   detection and linking."  (*Id*. at 9.)  Samsung's construction of "action processor" similarly

5   addresses this separation of the program (165) from a client application.  Both Judge Posner's

6   construction and Samsung's proposed construction recognize that the invention of the '647 patent

7   is a "system-wide service" that relies on a client-server model, wherein the analyzer server and

8   action processor are separate from the various client applications they serve.

9   **B.      Samsung's Proposed Construction For "Action Processor" Adheres To The**
           **Intrinsic Evidence; Apple's Arguments Would Read Out The Words "Action**
10          **Processor" From The Claims**

11          Samsung's construction is consistent with the well-known understanding of a "processor"

12  in computing contexts – a part of the system capable of carrying out basic computation on behalf

13  of a variety of applications.  It is also consistent with the '647 patent's specification, which teaches

14  that the claimed "analyzer server," "user interface," and "action processor" program routines are

15  part of a program separate from other applications.  (*See, e.g.*, '647 3:34-42; Figs. 1 & 2 (above).)

16  As is described by the '647 patent and reinforced by its prosecution history, the claimed program

17  routines operate on data that come from a variety of applications, providing those client

18  applications with a system-wide service.

19          Apple essentially ignores this evidence.  Instead, Apple argues that Samsung's

20  construction is inappropriate because it uses the word "client" instead of the word "application."

21  As an initial matter, Samsung has no objection to the Court replacing the word "client" in

22  Samsung's construction with "application."  Samsung proposed using "client" because that term is

23  consistent with the construction of "analyzer server" adopted by Judge Posner.  (Ex. 8.)  In a

24  client-server model as claimed by the '647 patent, a person of ordinary skill in the art at the time

25  of the invention would have understood that any time a server is present, a client is assumed –

26  particularly in light of the disclosures in the intrinsic evidence.  (*See, e.g.*, '647 2:42-49; 3:36-41;

27  Figures 1, 2.)

28          Moreover, Samsung's use of the term "client" and the requirement that the action

processor be "separate" from client applications are both consistent with the fact that the '647 inventors considered their invention to be a "system-wide service" accessible to a variety of client applications – one of the bases on which the inventors distinguished their invention during prosecution.  (Ex. 7, at APLNDC630-0000039851.)  Using a term consistent with both the intrinsic evidence and the construction adopted by Judge Posner will help the jury understand how one of ordinary skill in the art would have understood the "analyzer server" and "action processor" software routines, and will give the jury a plain standard to apply to core infringement disputes.[7]

By proposing that "action processor" needs no construction, or alternatively construing it without the "separate from a client" phrase in Samsung's construction, Apple reads out "action processor" from the claims, replacing it with a generic "program routine."  In fact, Apple's entire proposed construction merely restates functionality that is already in the explicit claim language, striking "action processor" from claim 1:  "program routines ~~including…. an action processor~~ for performing the selected action linked to the selected structure."  ('647 claim 1.)

If the '647 inventors did not want to limit claim 1 to a system with an "action processor," they could have drafted the claim to recite a "program routine" that executed the linked actions, without further limitation.  For example, claim 15 recites "executing the selected action linked to the selected structure," without the requirement that this step be taken by an "action processor."  It is black letter law that each word of a claim should be given meaning.  *See, e.g.*, *Merck & Co. Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").  In claim 1, the '647 inventors chose to separately claim the program routines and assign them names with specific meaning.  To one of skill in the art, the word "server" implies a client-server relationship.  Similarly, the word "processor" in action processor implies a separate software component that executes basic actions on behalf of client applications – just as a traditional hardware processor does in a computer.

---

[7] The Court should ignore Apple's reference to the preliminary injunction phase of the case, and in particular, Apple's mention of non-infringement positions for the "analyzer server term." (*See* Opening Br. at 18.)  Those arguments have no bearing on the construction of the term "action processor."

1    Thus, Samsung's construction should be adopted.  Apple's argument – and its proposed

2  construction – attempts to read out the words "action processor" from the asserted claims.

3  Samsung's construction captures the understanding of one of ordinary skill in the art, the

4  disclosures in the specification, and the inventor's arguments during prosecution.

5  **III.    U.S. PATENT NO. 7,761,414**

6    In U.S. Patent No. 7,761,414 (the "'414 patent"), the parties dispute the construction of a

7  single phrase, "concurrently with."  Samsung's simple construction, reading "concurrently with"

8  to mean "at the same time," follows the intrinsic and extrinsic evidence, the state of the industry at

9  the time of filing, and the basic purpose of the alleged invention as explained by the '414 patent

10  itself.  In response, Apple levies two contradictory arguments:  it first alleges that no construction

11  is necessary because the meaning of the term is plain, but then argues (based solely on out-of-date

12  dictionary definitions) for a highly technical construction that appears nowhere in the intrinsic

13  record:  "the synchronization thread and the nonsynchronization thread are both active during an

14  overlapping time interval."  (Opening Br. at 20.)  Apple's only remaining argument is that

15  Samsung's construction allegedly excludes one of the wide variety of embodiments disclosed in

16  the patent.  But the entirety of Apple's argument on this point is attorney say-so regarding

17  extrinsic evidence.  And worse, it is not true.  The Court should therefore dismiss both of Apple's

18  contradictory arguments and follow the intrinsic evidence by adopting Samsung's construction of

19  "concurrently with" to mean "at the same time."

20    **A.    Description of the '414 Patent and the Stated Purpose of the Invention**

21    The '414 patent addresses synchronizing a device with a host by executing a

22  synchronization thread and a non-synchronization thread *at the same time*.  For instance, the '414

23  patent specification explained that prior art software did "not allow applications on the handheld

24  computer to run concurrently with the synchronization process" that was syncing their data.  ('414

25  1:64-66.)  The alleged point of novelty in the '414 patent was thus the ability to let applications

26  run "concurrently with the synchronization process."  (*Id.*)  The '414 prosecution history confirms

27  this point; during prosecution, after the claims were initially rejected, Apple distinguished the

28  invalidating prior art by emphasizing *concurrent* rather than *sequential* execution of the user

1   interface and synchronization threads:

2       As set forth above, Owens discloses manipulating the objects once they have been
        synchronized. In contrast, amended claim 1 refers to **concurrently** accessing and
3       editing structured data in a first database associated with a first database and
        synchronizing the structured data from the first database with the structured data
4       from a second database.

5   (Ex. 10, APLNDC630-0000050517 (emphasis in original); *see also* APLNDC630-0000049980

6   ("In contrast, claim 1 recites a non-synchronization thread that allows a user to access **and edit**

7   data in a first store and a synchronization thread that executes **concurrently** and allows for

8   retrieval **and storage** of data in the first store.") (emphasis in original).)

9       In its brief, Apple argues that the '414 patent is directed to avoiding data corruption,

10  without citing the patent's actual disclosures. (Opening Br. at 19.)  But "data corruption" never

11  appears in the patent, as a phrase or as a concept.  Apple's fabricated "problem" and allegedly

12  patented solution are nothing more than unsupported attorney argument.  What the '414 patent

13  does address is synchronizing a device with a host by executing a synchronization thread and a

14  non-synchronization thread *at the same time*.

15      **B.**     **The Intrinsic Evidence and the Stated Purpose of the Invention Require
                Adoption of Samsung's Proposed Construction**
16

17      Samsung's construction – "at the same time" – arises directly from the specification and

18  follows the stated purpose of the invention.  The patent describes an allegedly novel "ability . . .

19  to have both non-synchronization processes and synchronization processes occurring concurrently

20  in that they are both being executed by one or more processing systems," and specifically

21  describes those processes as executing "at the same time":

22      For example . . . a user on the device may be viewing a calendar program which
        displays a calendar of the user showing events and possibly To Do items for the user
23      while *at the same time* a synchronization service is synchronizing the calendar data
        on the device with calendar data on the host. . . .  Similarly, the user may use an
24      application program on the host to access and edit the calendar data or other
        structured data for other applications while *at the same time* the host is performing
25      synchronization operations on structured data in one or more stores of structured data.

26  ('414 1:64-66, 24:52-67 (emphasis added).)  Similarly, the specification uses "concurrently" to

27  mean "at the same time" when describing various implementations.  For example, the

28  specification notes that Figs. 13A and 13B show the "concurrent execution of the non-

synchronization threads or processes and the synchronization threads or processes . . . .  In operation **577**, *execution* of synchronization software *begins* on, in this embodiment, both the device and the host *while execution* of non-synchronization threads or processes *continues* on both the device and the host."  (*Id.* 25:7-12 (emphases added); *see also* Fig. 13A ("Begin execution of synchronization software on device and on host while continuing execution of non-synchronization threads/processes on the device and the host.").)  This evidence all supports Samsung's straightforward construction: "concurrently with" means "at the same time."

Apple ignores the entirety of this intrinsic evidence.  Instead, Apple claims that Samsung's construction would exclude the "preferred embodiment" of the '414 patent, because – according to Apple's extrinsic evidence and attorney argument – a single microprocessor is incapable of executing two threads "at the same time."  There is a reason Apple submits no actual evidence to support this argument:  it is not true.  There is no preferred embodiment that exclusively describes a single processor; the '414 patent describes the invention as being practiced by "one *or more* processing systems" or "one *or more* data processing systems," which "may include one *or more* microprocessors."  (*Id.* 5:23-24, 6:15-20, 7:40-41, 24:48-51 (emphases added).)  There is no dispute that *two* processing systems, each having one or more microprocessors, could be configured to execute two sets of instructions "at the same time."  Similarly, there is no dispute that a *single* processing system with multiple processors would also be capable of executing two sets of instructions at the same time.  Apple labels one permutation "preferred," without explanation, and claims Samsung's construction would exclude processing systems with only *one* microprocessor, because a single microprocessor is supposedly incapable of executing two threads "at the same time."  (Opening Br. at 21:15-27; 22:17-23:4.)  This is attorney argument, unsupported by any intrinsic evidence, and for that reason alone is insufficient.  Worse, it is factually incorrect.  At the time the patent was filed, single processors *could* be configured to execute multiple threads at the same time.[8]  Thus, even if the "preferred" embodiment is limited to

---

[8]   As one example, some multi-core processors have the capability to be specially configured to execute multiple threads at the same time.  (*See e.g.,* Athlon 64 X2, *available at* http://en.wikipedia.org/wiki/Athlon_64_X2 (last accessed Jan. 9, 2013) (attached as Ex. 11) ("The

1    a single-processor system (it is not), Samsung's proposed construction would not exclude that

2    embodiment.  Apple cites no *intrinsic* evidence contrary to Samsung's construction because there

3    is none, and its arguments fueled by *extrinsic* evidence rest on a faulty premise.

4      **C. Apple's Proposal, For "Plain and Ordinary Meaning," Would Improperly

5        Shift the Claim Construction Dispute to the Jury**

6       Apple presents multiple, conflicting claim construction theories for the phrase

7    "concurrently with."  First, Apple argues that the phrase requires no construction.  Then, lacking

8    intrinsic evidence, Apple repeatedly alleges that "concurrently" means "rapidly alternating in

9    between [*sic*] the instructions in each thread (the common understanding of concurrency in the

10   art)."  (Opening Br. at 21.)  More confusingly, Apple then offers a contradictory alternative

11   construction:  "the synchronization thread and the nonsynchronization thread are both active

12   during an overlapping time interval."  (*Id*. at 20.)

13      As an initial matter, Apple's multiple proposed constructions as well as its disagreement

14   with Samsung's proposed construction proves that the phrase "concurrently with" does, in fact,

15   require construction.  Apple offers no explanation for why it proposes two opposing constructions,

16   one which contradicts what Apple repeatedly claims is "the common understanding of

17   concurrency in the art."  Should the Court construe "concurrently with" to have its "plain and

18   ordinary meaning," the only result would be a jury dispute over the meaning of "plain and

19   ordinary meaning," which the law does not allow.  *See O2 Micro Int'l Ltd. v. Beyond Innovation

20   Tech. Co. Ltd.*, 521 F.3d 1351, 1360-61 (Fed. Cir. 2008) (reversing claim construction order

21   finding "plain and ordinary meaning" where "the 'ordinary' meaning of a term does not resolve

22   the parties' dispute, and claim construction requires the court to determine what claim scope is

23   appropriate in the context of the patents-in-suit."); *Fujitsu Ltd. v. Belkin Int'l, Inc.*, No. 10-cv-

24   benefit of dual-core processors like the X2 are their ability to process more software threads at the
     same time"; noting production began in 2005).)  Apple surely knows this; as of January 7, 2007,

25   when Apple filed the '414 patent, it sold multiple computers with dual-core processors (Ex. 20,
     Butler Affidavit ¶ 6 & Ex. A at 20-5 through 12 (iMac), 20-13 through 20-18 (Mac Mini), 20-19

26   through 20-25 (MacBook), 20-26 through 20-33 (MacBook Pro).)  These processors were in

27   widespread use by 2007; in addition to Apple products, they were offered in Windows-based
     computers sold by companies such as IBM, Lenovo, and Dell. (*Id*. at 20-34 through 20-39.).

28

1   3972-LHK, 2012 WL 4497966 (N.D. Cal. Sept. 28, 2012) (order granting in part and denying in

2   part motions for summary judgment).  Samsung and Apple plainly disagree regarding the meaning

3   of "concurrently with," and Apple has shown its willingness to chose a definition that suits it for a

4   given argument; the Court must "adjudicate the parties' dispute regarding the proper scope."  *O2*

5   *Micro*, 521 F.3d at 1362.

          **D.**     **Apple's Argument and Proposed Constructions Are Not Based On The '414**
                  **Patent Specification or Prosecution History**

8        Neither of Apple's proposed constructions are supported by the intrinsic record.  Apple's

9   alternative construction ("the synchronization thread and the nonsynchronization thread are both

10   active during an overlapping time interval") would render the claims nonsensical.  For example,

11   using Apple's construction for the phrase "concurrently with" in claim 1 would result in the

12   following claim language: "executing at least one synchronization processing thread [the

13   synchronization thread and the nonsynchronization thread are both active during an overlapping

14   time interval] the executing of the at least one user-level non-synchronization processing thread."

15   The Court should dismiss Apple's alternative construction for this reason alone.

16        Furthermore, Apple's argument for its constructions relies on a handful of out-of-date

17   dictionary definitions, ignoring the intrinsic record entirely.  This ignores black-letter law: courts

18   must use intrinsic evidence as the primary source for claim construction, and disregard conflicting

19   extrinsic evidence.[9]  Apple compounds that error by relying excessively on dictionaries, which are

20   disfavored because they can be selectively chosen to advocate for just about any position, as Apple

21   has done here.[10]  *See Phillips*, 415 F.3d at 1321-22 ("Dictionaries, by their nature, provide an

---

23       [9]   *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) ("We have viewed extrinsic

24   evidence in general as less reliable than the patent and its prosecution history in determining how
    to read claim terms."); *MBO Laboratories, Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1329

25   (Fed. Cir. 2007).

26       [10]  In any event, the dictionaries Apple cites actually ***support Samsung's construction***,
    defining "concurrently" to mean "at the same time" or "simultaneous," including those cited by

27   Apple.  (*See*, *e.g.*, Ex. 12, McGraw-Hill Dictionary of Scientific and Technical Terms 457
    (6th Ed. 2003) ("Referring to two or more tasks of a computer system which are in progress at the

28   same time."); Ex. 13, The Oxford American Dictionary and Thesaurus: with Language
    Guide 291 (American Ed. 2003) ("existing or in operation at the same time").)

expansive array of definitions.").  Making a bad approach worse, Apple cites definitions that *are not even contemporaneous* with the filing of the patent, and therefore have no relevance to the claims.  (*See* Apple Br., Exs. I, J, and K (definitions from 1992, 1996, and 2004).)  *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1299 (Fed. Cir. 2003) ("[The definitions] are not contemporaneous with the patent, do not reflect the meanings that would have been attributed to the words in dispute by persons of ordinary skill in the art as of the grant of the [] patent, and for those reasons are not considered in our de novo claim construction analysis.").[11]  The Court should reject Apple's proposals, which lack intrinsic support and are based on conflicting, out-of-date dictionary definitions, and adopt Samsung's simple and well-supported construction.

## IV.    U.S. PATENT NO. 8,014,760

The '760 patent, titled "Missed Telephone Call Management for a Portable Multifunction Device," describes methods and devices for displaying an interactive list of missed telephone calls on a portable device.  The parties dispute the construction of the phrase "completely substitute[e/ing] display of the list [of interactive items] with display of contact information."  Samsung's proposed construction ("display[ing] numbers, addresses, and/or instant messaging usernames for contacting a caller such that none of the list of missed calls is visible") is compelled by the prosecution history, where the examiner not only added the limitation, but also defined it in light of the prior art.  Deferring to "plain meaning" is improper here, because, to give the term its proper scope, the jury would be forced to construe the term by examining and applying both the prosecution history and specification.  *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996) (court, not jury, must give claim its proper scope).

Because portable electronic devices with interactive missed call lists were widely used when Apple entered the cell phone market in 2007, the patent contains narrow claims directed at a very specific missed call list with certain features.  Claim 1, for example, claims a method of

---

[11]    Notably, the 2004 dictionary Apple cites gives the definition "[t]he simultaneous execution of multiple computer operations by the CPU" for the term "concurrent execution," and also defines "concurrent" as "[o]ccuring or functioning at the same time, or in a parallel manner" and "concurrent program execution" as "the simultaneous running of multiple computer programs." (*See* Opening Br. Ex. I.)

1  displaying a list of missed calls with two distinct interactive displayed portions.  When a user

2  performs a finger gesture on the first portion, the missed call is returned.  When the second

3  interactive portion is selected, the call list is completely substituted "with display of contact

4  information for a respective caller."  The displayed contact information includes a plurality of

5  contact objects, including a first contact object having the return telephone number and a second

6  contact object associated with a non-telephonic communication mode, such as instant messaging.

7
      **A.**      **The PTO Repeatedly Rejected Broader Iterations of the '760 Claim Language
8               In Light of Prior Art Replete with Call Lists and Missed Call Information**

9        During prosecution, the proposed claims were rejected over several prior art references,

10  including U.S. Patent No. 7,289,614 to Twerdahl.  Twerdahl was derived from work for the Palm

11  OS and disclosed interactive call history lists that allowed a user to select a displayed name to see

12  details concerning a missed call.  The user could tap a telephone number to return a telephone call,

13  or tap and hold a telephone number to view contact information like the caller's address details.

14  (*See* Ex. 16, Twerdahl 6:58 to 7:34.)  A user could also tap a name in the call history list to display

15  additional details about the call.  (*Id.* 6:18-57.)  For example, Figure 3 of Twerdahl shows a call

16  history list and Figure 4 shows a full screen of call details displayed upon selection of a name.

17

18

19

20    

21

22

23  (Ex. 16, Twerdahl Figs. 3-4.  *See also* 6:18-35.)

24        The claims were also rejected in light of a combination of U.S. Patent App. No.

25  2006/0281449 to Kun and U.S. Patent No. 7,680,513 to Haitani.  Figure 5 of Kun, like Twerdahl,

26  disclosed call lists, whereas Haitani disclosed a touch screen:

27

28

(Ex. 17, Kun Fig. 5; *see also* Ex. 18.)

**B.     Samsung's Construction is Necessary Because the Examiner Added and Defined the "Completely Substituting" Limitation to Specifically Require Complete Substitution of the Call List with Contact Information**

The term "completely substituted" was first added by the patent examiner, not Apple. Specifically, the PTO replaced the term "immediately displaying" with "completely substituting display of the list of interactive items with display of contact information…":

> immediately in response to detecting a finger gesture on the second interactive displayed portion of the respective user selected item in the list, ~~immediately displaying~~ completely substituting display of the list of interactive items with display of contact information for a respective caller corresponding to the respective user selected item, the displayed contact information including a plurality of contact objects; the plurality of contact objects including:

(Ex. 15, at APLNDC630-0000046352.)

The Examiner then explicitly defined the term by the specification to preserve the distinction between call information, on the one hand, and stored contact information, on the other:  "completely substituting display of the list of interactive items with display of contact information for a respective caller corresponding to the respective user selected item, **as defined in the specification (Figs 12B-12C).**"  (Ex. 15, at APLNDC630-0000046364 (emphasis added).)



Figure 12B shows the missed call list.  ('760 30:45-47.)  Figure 12C then shows what the Examiner meant by "completely substituting" the information relating to missed calls:  a new screen in which the call information has been completely replaced with the display of stored contact information for the caller, such as all of the caller's telephone numbers (including home and work, regardless of where the call was made from), the various addresses associated with the caller, and his/her usernames.  (*See also id.* 31:5-8.)  Samsung's construction precisely tracks the prosecution history and specification, as required by the Examiner's definition of the term.

The specification, like Samsung's construction, consistently describes and preserves this distinction between missed call information and stored contact information for the caller.  The specification particularly uses the term "list of missed calls" narrowly to mean just that, and not other types of information.  (*See, e.g.*, '760 30:44-47 ("A list comprising missed telephone calls is displayed (5002).  For example, UI 2800B (Fig. 12B) displays a list of missed calls."); *id.* 31:63-65 ("A list of items comprising missed telephone calls is displayed (5002), as described above with regard to process 5000 (Fig 23).");  *id.* 24:36-64.)  The specification contrasts missed call list/information with "contact information."  (*See, e.g., id.* 31:5-8; 32:36-40.)  The specification's discussion of contact information even refers back to Figure 12C, which shows information that a user could use to contact the caller, such as the caller's various phone numbers and e-mail addresses.  (*See id.* 31:4-23; 32:24-43.)  The specification never portrays or defines contact information as merely a reiteration of the missed call list or missed call information.  Accordingly, when the claim states that missed call information is completely substituted with contact information, those terms have specific meanings.

1    **C.    Apple's Proposed Construction is Unsupportable**

2        Apple argues that "completely substituting" was intended to require that the contact

3    information cover the entire screen, and was not added to define or limit the content of the display.

4    (Opening Br. at 27.)  Apple's construction is belied by the plain language of the claims

5    themselves, as well as the prosecution history and prior art.

6        Apple's proposed construction, "display of information for a selected contact," reads out

7    the "contact information" requirement of the claims in two separate ways.  First, it would allow

8    any type of information about the caller, such as missed call information, to satisfy the limitation.

9    And second, by ignoring the claims' focus on the *content* of the display and rewriting the claims to

10   be directed to visually substituting screens, Apple's construction renders the "contact information"

11   limitation meaningless.  The claims do not require "completely substituting a first display with a

12   second display," but rather plainly require "completely substituting display *of the list of*

13   *interactive items* with display *of contact information*."  (*See, e.g.*, '760 claim 1.)  Apple's

14   proposed construction cannot be reconciled with the plain language of the claim, which is

15   unambiguously directed to the display of particular content.

16       The prosecution history also flatly contradicts Apple's assertion that the Examiner's

17   amendments were added solely to distinguish between partial screen replacement and full screen

18   replacement.  Apple's argument that the Examiner's amendment was tied to a single figure in the

19   Chew reference is at best an attempt to reconstruct a possible version of what the PTO could have

20   been thinking, but has no bearing on what the PTO actually stated in replacing Apple's proposed

21   terms with "completely substituting."  (Opening Br. at 26.)  The Examiner's Reasons for

22   Allowance do not attribute the amendment solely to the Chew reference, let alone to the one figure

23   of the Chew patent identified by Apple:[12]

24           [B]ecause the closest prior art Chew et al [], Kun et al. [] and
             Haitani [], Twerdahl et al. [], either alone or in combination, fail to
25           anticipate or render obvious, a method, non-transitory computer-
             readable storage medium, portable electronic device comprising
26           immediately in response to detecting a finger gesture (tap input) on
             the second interactive displayed portion of the respective user

27   _____

28       [12]  Notably, the Examiner interview summary concerning the proposed amendments states
     "n/a" for "Prior art documents discussed."

selected item in the list, ***completely substituting display of the list of interactive items with display of contact information for a respective caller*** corresponding to the respective user selected item, as defined in the specification (Figs 12B-12C), <u>in combination</u> with all the other limitations in the claim(s) as defined by applicant.

(Ex. 15, at APLNDC630-0000046364 (emphasis added).)  Instead, the Examiner expressly and unambiguously required complete substitution of display of the list with display *of contact information*.  Apple's improper and theoretical reconstruction obviates the public notice factor that patents serve and cannot supplant the actual statements of the Examiner.  *See, e.g., Warner-Jenkinson Co. Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 24 (1997).

And last, Apple's claim that the Examiner simply meant that the missed call screen is visually replaced with a full screen cannot be reconciled with the prior art.  Twerdahl, for example, discloses replacing a call list with a full screen containing call details.  (*See* Ex. 16, Twerdahl 6:18-35 and Figs. 3-4.)  Even Chew, in a part of the patent not cited by Apple, describes tapping on a portion of a contact list to open a record of contact information.  (*See* Ex. 19, Chew 6:10-15 and Fig. 10.)  It would make no sense to interpret "completely substituting" as being merely a replacement with a full screen when that feature was in the prior art.

### D.    Samsung's Construction is Supported by the Specification and Does Not Read Limitations from the Specification into the Claims

Apple's argument that Samsung is improperly attempting to limit "contact information" to mere examples from the specification is also mistaken.  (*See* Opening Br. at 28.)  In fact, Samsung uses the word "or" in its proposed construction to allow for various types of contact information about the caller, as shown in Figure 12C.  To the extent that the Court believes that "numbers, addresses, and/or instant messaging usernames" is unduly restrictive, an equally appropriate construction could be "numbers, addresses, instant messaging user names and/or other information that would permit a user to contact the caller."

### V.    CONCLUSION

For the foregoing reasons, Samsung respectfully requests that the Court adopt its proposed claim constructions set forth above.

1   DATED: January 25, 2012

2

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

3

4

By /s/ Victoria F. Maroulis

5   Charles K. Verhoeven
    Kevin P.B. Johnson
6   Victoria F. Maroulis
    Michael T. Zeller
7   Attorneys for SAMSUNG ELECTRONICS CO.,
    LTD., SAMSUNG ELECTRONICS AMERICA,
8   INC., and SAMSUNG
    TELECOMMUNICATIONS AMERICA, LLC
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-26-                    Case No. 12-CV-00630-LHK (PSG)
SAMSUNG'S RESPONSIVE CLAIM CONSTRUCTION BRIEF