# EXHIBIT J

FILE HISTORY

US 5,579,239

PATENT:         5,579,239

INVENTORS:   Freeman, Mitchael C.

Freeman, Richard C.

Boss, Chad

Freeman, Michael H.

TITLE:           Remote video transmission system

APPLICATION
NO:              US1994198130A

FILED:           16 FEB 1994

ISSUED:         26 NOV 1996

COMPILED:    06 OCT 2011



ISSUE CLASSIFICATION

08/198130

5579239

5579239

| UTILITY SERIAL NUMBER 08/198130 | PATENT DATE NOV 2 6 1996 | PATENT NUMBER |
|---|---|---|

| SERIAL NUMBER 08/198,130 | FILING DATE 02/16/94 | CLASS 178 364 | SUBCLASS 514c | GROUP ART UNIT 2614 | EXAMINER Assouad E. Pipata |
|---|---|---|---|---|---|

**APPLICANTS**
MITCHAEL C. FREEMAN, TULSA, OK; RICHARD C. FREEMAN, TULSA, OK; CHAD BOSS, TULSA, OK; MICHAEL H. FREEMAN, LIBERTY MOUNDS, OK.

**CONTINUING DATA*********************
VERIFIED

**FOREIGN/PCT APPLICATIONS***********
VERIFIED

FOREIGN FILING LICENSE GRANTED 03/11/94          ***** SMALL ENTITY *****

| Foreign priority claimed ☐ yes ☒ no 35 USC 119 conditions met Verified and Acknowledged Examiner's Initials | AS FILED | STATE OR COUNTRY OK | SHEETS DRWGS. | TOTAL CLAIMS 15 | INDEP. CLAIMS 2 | FILING FEE RECEIVED $355.00 | ATTORNEY'S DOCKET NO. 0460.337 |
|---|---|---|---|---|---|---|---|

**ADDRESS**
SCOTT R. ZINGERMAN
CATALANO, ZINGERMAN & MCKAY
810 SOUTH CINCINNATI, STE. 200
TULSA, OK 74119

**TITLE**
REMOTE VIDEO TRANSMISSION SYSTEM

U.S. DEPT. of COMM.-Pat. & TM Office-PTO-436L (rev. 10-78)

| PARTS OF APPLICATION FILED SEPARATELY | | A-888 6-18-96 Applications Examiner |
|---|---|---|

| NOTICE OF ALLOWANCE MAILED 11-11-96 | Patrick J. Assouad Assistant Examiner | CLAIMS ALLOWED | |
|---|---|---|---|
| | | Total Claims 34 | Print Claim 1 |

| ISSUE FEE | | | DRAWING | | |
|---|---|---|---|---|---|
| Amount Due $1235.00 | Date Paid 8-13-96 | ELLIS B. RAMIREZ PRIMARY EXAMINER GROUP 2400 Primary Examiner | Sheets Drwg. 2 | Figs. Drwg. 3 | Print Fig. 1 |

| | ISSUE BATCH NUMBER A88 |
|---|---|

| Label Area | PREPARED FOR ISSUE |
|---|---|

**WARNING:** The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368. Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

Form PTO-436A
Rev. 8/92)

RB

(FACE)

# 5,579,239

## REMOTE VIDEO TRANSMISSION SYSTEM

## Transaction History

| Date | Transaction Description |
|---|---|
| 2/16/1994 | Information Disclosure Statement (IDS) Filed |
| 2/16/1994 | Information Disclosure Statement (IDS) Filed |
| 3/17/1994 | Application Captured on Microfilm |
| 8/2/1994 | Case Docketed to Examiner in GAU |
| 6/20/1995 | Case Docketed to Examiner in GAU |
| 7/3/1995 | Information Disclosure Statement (IDS) Filed |
| 7/3/1995 | Information Disclosure Statement (IDS) Filed |
| 7/24/1995 | Non-Final Rejection |
| 7/25/1995 | Miscellaneous Incoming Letter |
| 8/2/1995 | Mail Non-Final Rejection |
| 8/4/1995 | Information Disclosure Statement (IDS) Filed |
| 8/4/1995 | Information Disclosure Statement (IDS) Filed |
| 2/6/1996 | Response after Non-Final Action |
| 2/6/1996 | Affidavit(s) (Rule 131 or 132) or Exhibit(s) Received |
| 2/6/1996 | Request for Extension of Time - Granted |
| 2/28/1996 | Date Forwarded to Examiner |
| 3/25/1996 | Non-Final Rejection |
| 3/28/1996 | Mail Non-Final Rejection |
| 5/21/1996 | Response after Non-Final Action |
| 6/5/1996 | Date Forwarded to Examiner |
| 6/11/1996 | Mail Notice of Allowance |
| 6/11/1996 | Notice of Allowance Data Verification Completed |
| 8/12/1996 | Mailroom Date of Drawing(s) |
| 8/13/1996 | Issue Fee Payment Verified |
| 8/20/1996 | Drawing(s) Matched to Application |
| 8/20/1996 | Drawing(s) Received at Publications |
| 8/23/1996 | Drawing(s) Processing Completed |
| 10/21/1996 | Issue Notification Mailed |
| 11/26/1996 | Recordation of Patent Grant Mailed |
| 12/29/2004 | Expire Patent |
| 2/27/2006 | Petition to Accept Late Payment of Maintenance Fee Payment Filed |
| 10/2/2006 | Mail-Petition Decision - Accept Late Payment of Maintenance Fees - Granted |

09/198130

PART 1 of 2

APPROVED FOR LICENSE ☐

INITIALS _____

MAR 079431

| Date Entered or Counted | CONTENTS | Date Received or Mailed |
|---|---|---|
| | 1. Application _____ papers. | 2-26-94 |
| | 2. PRIOR ART | |
| 7/27 | 3. Rejection (3mos) | AUG 02 1995 |
| 3/2 | 4. Letter re Filing of Continuation | 7-3-95   07-25-95 |
| | 5. Prior Art | 8-3-95 |
| | 6. Ext. of time   3 mos. | 2-6-96   (Im 2-24) |
| | 7. Affidavit | 2-6-96 |
| | 8. Amdt A | 2-6-96 |
| 3-25-96 | 9. Res 3 mos | 3/28/96 |
| 9/1/ | 10. Amdt B   Further Supplemental | 5-21-96 |
| 10-10-96 | 11. Notice of allow | 6-11-96 |
| 8/20/96 | 12. | 8/2/96 |
| | 13. | |
| | 14. Petition 1.318(c) | 02/27/06 |
| | 15. Fee Granted | 10-02-06 |
| | 16. | |
| | 17. | |
| | 18. | |
| | 19. | |
| | 20. | |
| | 21. | |
| | 22. | |
| | 23. | |
| | 24. | |
| | 25. | |
| | 26. | |
| | 27. | |
| | 28. | |
| | 29. | |
| | 30. | |
| | 31. | |
| | 32. | |

(FRONT)

## SEARCHED

| Class | Sub. | Date | Exmr. |
|---|---|---|---|
| 364 | 514 | 7/17/95 | POA |
| 345 | 2 | | |
| 348 | 1 5 | | |
| | 1 4 | | |
| 358 | 3 1 1 | | |
| | 3 3 5 | | |
| 455 | 3. 1 | | |
| | 33.1 | | |
| 379 | 9 0 | | |
| UPDATED SEARCH | | 5/20/96 | POA |

## SEARCH NOTES

| | Date | Exmr. |
|---|---|---|
| Searched Dialog & APS. | 7/17/95 | POA |
| Re-searched DIALOG & APS extensively. | 5/20/96 | POA |

## INTERFERENCE SEARCHED

| Class | Sub. | Date | Exmr. |
|---|---|---|---|
| 364 | 514 C | 6/4/96 | POA |
| 455 | 3. 1 | | |
| | 73.1 | | |
| 348 | 14 | | |
| 358 | 335 | | |
| 379 | 9 0 | | |

(RIGHT OUTSIDE)

Staple Issue Slip Here

| POSITION | ID NO. | DATE |
|---|---|---|
| CLASSIFIER | 5 | 3-7-94 |
| EXAMINER | 287 | 3/10 |
| TYPIST | 302 | 3/11/94 |
| VERIFIER | 327 | 03-17 |
| CORPS CORR. | | |
| SPEC. HAND | | |
| FILE MAINT. | | |
| DRAFTING | | |

## INDEX OF CLAIMS

| Final | Original | 2/7/94 | 3/2/94 | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Date | | | | | |
| 1 | 1 | ✓ | ✓ | = | | | | |
| 2 | 2 | | ✓ | = | | | | |
| 3 | 3 | | ✓ | = | | | | |
| 4 | 4 | | ✓ | = | | | | |
| 5 | 5 | | ✓ | = | | | | |
| 6 | 6 | | ✓ | = | | | | |
| 7 | 7 | | ✓ | = | | | | |
| | 8 | | | | | | | |
| 8 | 10 | | ✓ | = | | | | |
| | 11 | | | | | | | |
| 9 | 12 | | ✓ | = | | | | |
| 10 | 13 | | ✓ | = | | | | |
| 11 | 14 | ✓ | ✓ | = | | | | |
| | 15 | ✓ | | | | | | |
| 12 | 16 | | ✓ | = | | | | |
| 13 | 17 | | ✓ | = | | | | |
| 14 | 18 | | ✓ | = | | | | |
| 15 | 19 | | ✓ | = | | | | |
| 16 | 20 | | ✓ | = | | | | |
| 17 | 21 | | ✓ | = | | | | |
| 18 | 22 | | | = | | | | |
| 19 | 23 | | | = | | | | |
| 20 | 24 | | | = | | | | |
| 21 | 25 | | | = | | | | |
| 22 | 26 | | | = | | | | |
| 23 | 27 | | | = | | | | |
| 24 | 28 | | | = | | | | |
| 25 | 29 | | | = | | | | |
| 26 | 30 | | | = | | | | |
| 27 | 31 | | | = | | | | |
| 28 | 32 | | | = | | | | |
| 29 | 33 | | | = | | | | |
| 30 | 34 | | | = | | | | |
| 31 | 35 | | | = | | | | |
| 32 | 36 | | | = | | | | |
| 33 | 37 | | | = | | | | |
| 34 | 38 | | . | = | | | | |
| | 39 | | | | | | | |
| | 40 | | | | | | | |
| | 41 | | | | | | | |
| | 42 | | | | | | | |
| | 43 | | | | | | | |
| | 44 | | | | | | | |
| | 45 | | | | | | | |
| | 46 | | | | | | | |
| | 47 | | | | | | | |
| | 48 | | | | | | | |
| | 49 | | | | | | | |
| | 50 | | | | | | | |

### SYMBOLS

```
✓ ... ... ... ... .. Rejected
= ... ... ... ... .. Allowed
. (Through numeral) Canceled
÷ ... ... ... ... .. Restricted
N ... ... ... ... .. Non-elected
I ... ... ... ... .. Interference
A ... ... ... ... .. Appeal
O ... ... ... ... .. Objected
```

| Final | Original | | | Date | | | | |
|---|---|---|---|---|---|---|---|---|
| | 51 | | | | | | | |
| | 52 | | | | | | | |
| | 53 | | | | | | | |
| | 54 | | | | | | | |
| | 55 | | | | | | | |
| | 56 | | | | | | | |
| | 57 | | | | | | | |
| | 58 | | | | | | | |
| | 59 | | | | | | | |
| | 60 | | | | | | | |
| | 61 | | | | | | | |
| | 62 | | | | | | | |
| | 63 | | | | | | | |
| | 64 | | | | | | | |
| | 65 | | | | | | | |
| | 66 | | | | | | | |
| | 67 | | | | | | | |
| | 68 | | | | | | | |
| | 69 | | | | | | | |
| | 70 | | | | | | | |
| | 71 | | | | | | | |
| | 72 | | | | | | | |
| | 73 | | | | | | | |
| | 74 | | | | | | | |
| | 75 | | | | | | | |
| | 76 | | | | | | | |
| | 77 | | | | | | | |
| | 78 | | | | | | | |
| | 79 | | | | | | | |
| | 80 | | | | | | | |
| | 81 | | | | | | | |
| | 82 | | | | | | | |
| | 83 | | | | | | | |
| | 84 | | | | | | | |
| | 85 | | | | | | | |
| | 86 | | | | | | | |
| | 87 | | | | | | | |
| | 88 | | | | | | | |
| | 89 | | | | | | | |
| | 90 | | | | | | | |
| | 91 | | | | | | | |
| | 92 | | | | | | | |
| | 93 | | | | | | | |
| | 94 | | | | | | | |
| | 95 | | | | | | | |
| | 96 | | | | | | | |
| | 97 | | | | | | | |
| | 98 | | | | | | | |
| | 99 | | | | | | | |
| | 100 | | | | | | | |

| PATENT NUMBER | | ORIGINAL CLASSIFICATION | | | | |
|---|---|---|---|---|---|---|
| | | CLASS | | SUBCLASS | | |
| | | 4 | | 14 C | | |
| APPLICATION SERIAL NUMBER | | CROSS REFERENCE(S) | | | | |
| | | CLASS | SUBCLASS (ONE SUBCLASS PER BLOCK) | | | |
| APPLICANT'S NAME (PLEASE PRINT) | | | | | | |
| | | | | | | |
| | | | | | | |
| IF REISSUE, ORIGINAL PATENT NUMBER | | | | | | |
| | | 386 | 46 | 109 | 846 | |
| INTERNATIONAL CLASSIFICATION | | | | | | |
| | L | | | | | |
| | | GROUP ART UNIT | ASSISTANT EXAMINER (PLEASE STAMP OR PRINT FULL NAME) | | | |
| | | | PRIMARY EXAMINER (PLEASE STAMP OR PRINT FULL NAME) | | | |
| | | | Ellis B Ramirez | | | |

PTO 270
(REV. 5-91)

**ISSUE CLASSIFICATION SLIP**

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE

US005579239A

# United States Patent [19]

## Freeman et al.

| | |
|---|---|
| [11] | **Patent Number:** **5,579,239** |
| [45] | **Date of Patent:** **Nov. 26, 1996** |

[54] **REMOTE VIDEO TRANSMISSION SYSTEM**

[76] Inventors: **Mitchael C. Freeman**, 14318 E. 11th St., Tulsa, Okla. 74108; **Richard C. Freeman**, 563 S. 87th East Ave., Tulsa, Okla. 74112; **Chad Boss**, 14131 E. 12th St., Tulsa, Okla. 74108; **Michael H. Freeman**, R.R. 1, Box 315-A, Liberty Mounds, Okla. 74047

[21] Appl. No.: **198,130**

[22] Filed: **Feb. 16, 1994**

[51] Int. Cl.$^6$ ............................................... H04L 5/00

[52] U.S. Cl. .................... 364/514 C; 455/3.1; 455/33.1; 348/14; 379/90; 386/46; 386/109

[58] Field of Search .......................... 364/514; 345/2; 348/15, 14; 358/311, 335; 455/3.1, 33.1; 379/90

[56]                **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| H1175 | 4/1993 | Giorgio | 370/118 |
| 2,095,360 | 10/1937 | Green | 178/5.6 |
| 2,203,758 | 6/1940 | Walker | 178/5.6 |
| 2,302,852 | 11/1942 | Goddard | 250/6 |
| 2,576,115 | 11/1951 | Hill | 178/44 |
| 2,881,427 | 4/1959 | Huber | 343/200 |
| 3,969,040 | 7/1976 | Gharavi | 358/136 |
| 4,311,877 | 1/1982 | Kahn | 179/15.55 R |
| 4,337,483 | 6/1982 | Guillou | 358/114 |
| 4,637,035 | 1/1987 | Betts | 375/8 |
| 4,663,660 | 5/1987 | Fedele et al. | 358/136 |
| 4,734,920 | 3/1988 | Betts | 375/8 |
| 4,811,407 | 3/1989 | Blokker, Jr. et al. | 382/1 |
| 4,825,286 | 4/1989 | Graves | 358/143 |
| 4,862,456 | 8/1989 | Giorgio | 370/118 |
| 4,864,567 | 9/1989 | Giorgio | 370/118 |
| 4,963,995 | 10/1990 | Lang | 358/335 |
| 5,016,100 | 5/1991 | Citta et al. | 358/133 |
| 5,058,133 | 10/1991 | Duncanson et al. | 375/38 |
| 5,062,136 | 10/1991 | Gattis et al. | 380/18 |
| 5,065,396 | 11/1991 | Castellano et al. | 370/84 |
| 5,127,021 | 6/1992 | Schreiber | 375/1 |
| 5,130,792 | 7/1992 | Tindell et al. | 358/85 |
| 5,148,272 | 9/1992 | Acampora et al. | 358/133 |

| | | | |
|---|---|---|---|
| 5,235,680 | 8/1993 | Bijnagte | 395/161 |
| 5,247,347 | 9/1993 | Litteral et al. | 358/85 |
| 5,253,275 | 10/1993 | Yurt et al. | 375/122 |
| 5,262,875 | 11/1993 | Mincer et al. | 358/335 |

(List continued on next page.)

### OTHER PUBLICATIONS

Rosenthal et al., "Planetary Data Distribution System", Dec. 2, 1993.

McConnell, "TV, Phone Home; GTE Mobilnet Service is Delivering Compressed Video over Cellular Channels". May 2, 1994.

Communications Daily, "Odetics Demonstrated Fas-Trans2000 Digital Cellular Transmitter Capable of Sending Compressed Digital Video over Cellular Link". Sep. 13, 1994.

Brochure Microcom® Bridge/Router ™ *Introducing the WANmiser™ Advantage* Sep. 1993.

*Primary Examiner*—Ellis B. Ramirez
*Assistant Examiner*—Patrick J. Assouad
*Attorney, Agent, or Firm*—Catalano, Zingerman & Associates

[57]                **ABSTRACT**

A remote video transmission system for digitizing and compressing an audio/visual signal, transmitting that signal over low band width lines, such as land telephone lines, cellular telephone lines, or radio frequencies, decompressing the digitized data and converting it to an audio/visual signal for broadcast. Components of this system include: A remote unit, a host unit, and a playback unit. The remote unit is capable of digitizing and compressing the audio/visual signal as well as transmitting the compressed, digitized data. Data may be divided and sent to multiple ports for output. Data may also be edited prior to transmission. The host unit is automated to receive data transmitted from the remote unit and reassemble the data if it has been divided. The playback unit stores and automatically catalogs transmitted data files. The player unit also decompresses the digitized data files and converts them to an audio/visual signal which may then be broadcast. The audio/visual signal can either be NTSC, PAL, or Y/C video.

**34 Claims, 2 Drawing Sheets**



**5,579,239**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,272,529 | 12/1993 | Frederiksen | 358/133 |
| 5,293,378 | 3/1994 | Shimizu | 370/94.1 |
| 5,355,167 | 10/1994 | Juri | 348/405 |
| 5,355,450 | 10/1994 | Garmon et al. | 395/162 |
| 5,361,278 | 11/1994 | Vaupel et al. | 375/122 |
| 5,365,272 | 11/1994 | Siracusa | 348/426 |
| 5,375,068 | 12/1994 | Palmer et al. | 364/514 |
| 5,390,239 | 2/1995 | Morris et al. | 379/93 |
| 5,428,671 | 6/1995 | Dykes et al. | 379/93 |
| 5,440,336 | 8/1995 | Buhro et al. | 348/13 |
| 5,482,043 | 1/1996 | Zulauf | 128/660.04 |
| 5,495,284 | 2/1996 | Katz | 348/15 |



*Fig. 1*



*Fig. 2*

*Fig. 3*

5,579,239

1

# REMOTE VIDEO TRANSMISSION SYSTEM

## BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to capturing a video signal at one location and transmitting that signal to another location over telephone lines, cellular, radio and other telemetric frequencies.

Advances in the information highway promotes the United States as a world leader in the computer, video and broadcast industries. This invention adds to that information highway.

Transmission of a real time video signal from a remote location to a base location is conventionally done by one of two methods: Microwave or satellite. Equipment associated with these methods is extremely expensive and has significant limitations. The large amount of equipment necessary for satellite technology for remote transmission requires that the equipment be installed in trucks having an integral satellite dish. The signal is received from the video camera, beamed to the satellite, and then beamed to the base location for broadcast. The enormous amount of equipment and the sophisticated technology required makes satellite transmission extremely expensive and impractical for many applications. Satellite transmission does, however, send real time broadcast quality signals. The costs associated with satellite transmission are justifiable for large events such as sporting events where transmission could be made from a single location over a sustained period of time. It is not practical, however, for coverage such as news coverage where short segments from many different locations are necessary. An example would be in covering a natural disaster. Speed in obtaining and broadcasting video footage is a competitive requirement in news gathering situations.

The required set up time and inaccessibility of the satellite truck are significant additional limitations to satellite type transmission.

Microwave transmission technology overcomes some of the limitations of satellite technology but has several additional limitations of its own. Microwave transmission systems are less expensive and require less equipment. With a microwave system, a video signal is obtained and transmitted from the remote location at microwave frequencies from a vehicle mounted transmitting antenna to a base antenna for broadcast.

Difficulties have been encountered using this technology in aligning the antenna on the vehicle with the base antenna. Obstructions between the transmitting antenna and the base antenna may also prevent passage of the signal. Setup limitations also inhibit the use of microwave transmission systems in obtaining short segments of video at one location, transmission of that signal, moving to another location, transmission, movement, etc. Transmission is also limited to accessibility of the vehicle to the location of the subject matter.

The limitations of satellite and microwave technology have forced video broadcasters to devise alternative means of transmission, which may include: Setting up a remote microwave or satellite transmission post and transporting segments on video tape to it from multiple remote locations. More often, broadcasters capture video segments on tape and then manually transport those tapes back to the station as quickly as possible for broadcast.

With the establishment and advancements in cellular technology, television broadcasters have begun sending

2

teams into remote locations for reports transmitted via cellular telephone. Cellular technology provides the ability to access a location and immediately report information back to the station. This use of cellular telephones transmits voice messages only and excludes video transmission altogether. Cellular technology has also been used to transmit data such as facsimile and computer file transmissions from one location to another. Cellular telephones have been quick to transmit data received from a facsimile machine or computer having a modem to a second fax machine or computer. Cellular combined with computer technology has never been used, however, to transmit a broadcast quality video signal.

A need, therefore, exists in the art for a highly portable, cost-effective method and apparatus for capturing and transmission of broadcast quality video from a remote location to a base location. A need also exists for a capture and transmission apparatus over cellular, land lines, or radio or other frequencies. Additionally, with the current FCC limitations regarding cellular transmissions from airborne craft an additional need is evidenced for video over the radio or other telemetric frequencies.

## SUMMARY OF THE INVENTION

It is the purpose of the present invention to provide a method and means for capturing full-color, full-motion audio/video signals, digitizing and compressing the signals into a digitized data file, and transmitting the signals over telephone lines, cellular, radio and other telemetric frequencies.

A second object includes splitting the digitized, compressed, audio/video signal prior to transmission in order to reduce transmission time.

A further object is to provide an apparatus that will transmit audio/video files for immediate broadcast over radio frequencies, cellular telephone frequencies, or land telephone lines.

An apparatus to accomplish this purpose includes a remote unit, a host unit, and a player or a basic embodiment includes a remote and a combined host/player unit. This apparatus provides the capability of digitizing and compressing a signal which is then transmitted over low band width lines.

The remote unit includes means for digitizing and compressing a video signal, storage of the digitized and compressed data file, and transmission of this data file over telephone lines, cellular, radio and other telemetric frequency. The remote unit may also split the data file prior to transmission for multiple simultaneous transmissions in order to reduce transmission time. The host unit is automated to receive the transmitted data file, recombine it if it has been split, and store the recombined data file to the playback unit. The playback unit stores and automatically catalogs transmitted data files. The playback unit also decompresses the digitized data file and converts it to an audio/visual signal for broadcast.

In one preferred embodiment, an audio/visual signal is input into the remote unit from a video camera at a remote location. The remote unit is a combination portable personal computer having one or more computer interfaces and a corresponding number of cellular telephones. Computer software loaded on a hard disk drive in the remote unit instructs it to capture the input signal to a video capture card within the remote unit. The video capture card takes the audio/visual signal, digitizes it into a computer data file, and

5,579,239

3

compresses that data file. Once digitized and compressed, the data file is captured in the computer's memory by a capture module on the video capture card. A software sequence then instructs the computer central processing unit to store the captured data file on the computer's hard disk drive. After the video file has been captured, it may be edited as desired prior to transmission to the host unit.

Once stored, a computer program sequence removes the digitized data from the hard drive, breaks the data file, and sends it to one or more computer interfaces which transmit the data file, using a corresponding number of cellular telephones, to the host unit. The data file is split and organized so as to reduce the amount of time of transmission of the data file.

A software sequence installed on the remote unit automatically catalogs data files stored in the system hard drive. These files are cataloged visually on a computer monitor for easy visual recognition. A single frame of video from each stored data file is displayed on the monitor in a catalog array to allow the operator the ability to quickly identify the file and select a file for retrieval or transmission to the host unit as required.

In an alternate embodiment, a basic one, the signal is not divided before it is transmitted. In this alternate embodiment, only a single interface and a single cellular phone are necessary.

The host unit is a desktop personal computer with installed communications software and one or more computer interfaces connected to a corresponding number of telephone lines. The interfaces are set to receive transmitted data files from the remote unit.

If the data files have been split for transmission, a software program recombines the split file back to its original single data file. A computer monitor is connected to the host unit for viewing of the stored data files at the host unit. A software program also copies this recombined data file to a network hard disk drive of the playback unit. The host unit and the playback unit are interfaced to allow transfer of data files. The computer to computer interface between the host unit and the playback unit is a computer network in the preferred embodiment, however, any known port to port connection could be substituted.

The playback unit is the interface between captured video and the master control which outputs the signal. Once the recombined data file has been stored on the networked hard disk drive of the playback unit, the data file may then either remain stored for later use or retrieved for broadcast.

Stored data files may be edited at the host location as desired.

For broadcast, a video card located in the playback unit retrieves the stored data file, decompresses the file, and converts the digitized data to VGA. The video card in the playback unit is similar to the video card in the remote unit with the exception that the card in the playback unit does not have a capture module.

Once the data file has been decompressed and converted to digital, a converter card converts the VGA signal to the desired signal for broadcast (NTSC, PAL, Y/C video, etc.) Hardware playback of the signal or output of the signal is to a monitor or VCR for storage on conventional video tape or immediate broadcast.

Other features and advantages of the invention will become apparent in view of the drawings and following detailed description.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 depicts the components and the sequence of the process of the present invention.

4

FIG. 2 is the control screen of the remote unit.

FIG. 3 is the configuration screen of the remote unit.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENT

The drawings represent the present invention wherein FIG. 1 depicts the remote unit 2, wherein the input signal is captured, compressed, digitized, and transmitted to a host unit 3 which receives the transmitted video signal and stores it to playback unit 4 where it can be output to a monitor or edited for playback or broadcast. In the preferred embodiment, the data file is split by the remote unit 2 prior to transmission to the host unit 3. The host unit 3 recombines the split data file and stores it to playback unit 4 via a computer network.

In the preferred embodiment, remote unit 2 is a portable personal computer having a 486DX-2/66 motherboard, 10-inch plasma display, 210 MB notebook hard disk drive, MS DOS Vet. 6.2 operating system, Microsoft® Windows™ Ver. 3.1, Microsoft® Video for Windows, Procom Plus® for Windows, trackball bus mouse, high speed serial ports, 1 MB Windows accelerator video card, video capture card with capture module, audio capture card, SVGA to NTSC converter, SVGA video adapter. The remote unit also has up to four computer interfaces such as modems, each connected to a cellular telephone.

A signal is input into remote unit 2 from any device having the capacity to output a video signal 1, such as a video camera, video cassette recorder/player, laser disc player, etc. The video signal received by the remote unit can be of any generally known format, such as NTSC, PAL, and Y/C video (or S video). The remote unit 2 is designed to be portable so that it can be transported and used in areas which are inaccessible or unsuited for a conventional desktop personal computer. It is understood, however, that remote unit 2 could be a desktop computer or have variations in its internal configuration.

The video signal input into the remote unit is received by a video card having a capture module therein. Such a card is available commercially from Intel/IBM. A computer software program such as "VIDEO FOR WINDOWS" available from MicroSoft® operates with the video card and capture module to capture, digitize, and compress the video signal into a data file. Other software packages are commercially available for use in operating environments other than windows and may be substituted for "VIDEO FOR WINDOWS."

A software sequence, discussed below, instructs "VIDEO FOR WINDOWS" what parameters to capture the file under. A permanent capture file is stored on the hard disk of the remote unit and is called up into the remote unit's RAM where an input video signal is captured. This permanent capture file has a 10 Mb default, however, in the event a larger file is created, the capture file will expand to the requisite size.

The capture card in the remote unit uses BIT-MAP technology to capture and display motion of the video file. BIT-MAP technology is suitable in order to maximize transmission speed.

As it is being captured in the capture file, the input signal is being digitized and compressed. The digitized and compressed data file is then named and captured in the computer's random access memory (RAM) for transmission to the host unit. The "VIDEO FOR WINDOWS" software package allows for editing of a data file once captured. In this way,

5,579,239

| 5 | 6 |

editing can be accomplished at the remote location prior to transmission of the file. The digitized, compressed, and captured file is displayed visually on the monitor.

As stated above, the video file is captured according to system parameters selected on the remote unit for each data file. The capture software sequence A includes the following steps:

## CAPTURE SOFTWARE SEQUENCE A

1. A video palette file is copied to "MICROSOFT® WINDOWS™" clipboard. This video palette file is a created data file stored on the hard disk of the remote. This video palette file is created with "VIDEO FOR WINDOWS" by loading a video clip and extracting the color palette from that clip.

2. The second step is that the control screen is painted on the monitor of the remote without pictures. FIG. 2 depicts this control screen 20 with boxes, collectively 22, shown without pictures therein.

3. Bit map files are obtained and displayed into boxes 22 of screen 20. A different bit map file will be displayed in each box 22 on screen 20. Bit map files are created by "VIDEO FOR WINDOWS" by retrieving the first frame of video from the captured video file, supplying the color from the stored palette file, and displaying this image in one of the boxes 22. These video files are displayed (or catalogued) on control screen 20 to allow quick identification and selection of a file for retrieval or transmission. The remote unit is capable of storing and displaying up to eight (8) bit map files. When the ninth file is captured, the software will automatically overwrite the oldest captured data file and display this new file on control screen 20.

4. The software sequence then reads the configuration files created as a result of user selection of capture and storage parameters. These parameters are input form a set of selection buttons found on control screen 20 of FIG. 2.

5. The user selects whether the video signal will be captured either with or without audio. "SELECTION" button 28 on control screen 20 of FIG. 2 requests the choice of capture and storage of audio. The selection buttons on screen 20 are activated using any conventional means such as the computer keyboard, mouse, or similar pointing device. An audio capture card installed in the remote unit captures the audio of an input signal. Capture with audio makes the data file longer since the audio signal must also be digitized, compressed, and stored in the remote unit's hard disk. It is evident that the longer the data file, the longer the time required for transmission of the entire data file from the remote unit to the host unit. It is often desirable to transmit video files only without audio in situations where a broadcast station wants to provide video footage of a situation quickly. It is desirable for broadcast stations to provide such video coverage as quickly as possible after a newsworthy event has taken place, such as an accident or natural disaster. In these situations, it is desirable to broadcast the video footage of the incident in a remote location. Audio coverage can be made by a reporter on location in another fashion, such as over a cellular telephone.

6. The software sequence reads the configuration files created as a result of user selection of capture and storage parameters. These parameters are input from a "SELECTION" button 30 marked "CONFIGURE" found on screen 20 of FIG. 2. Selection of the "CONFIGURE" selection button 30 calls up a configuration file from the remote hard disk. The configuration file opens a "Window" bringing up a screen showing the capture configuration options. FIG. 3 depicts the configuration screen 36 which appears as a result of selecting the configuration "SELECTION" button 30 of FIG. 2. It is not necessary to input a set of configuration parameters each time a video signal is captured since the system stores the previous set of configuration parameters which were selected for the previous capture sequence. The configuration parameters are discussed below.

7. Once the configuration parameters are selected, the video card in the remote unit captures the input video signal to its memory. Capture includes digitizing the input video signal to form a binary data file and then compressing that file. The file is compressed in order to conserve memory space and reduce transmission time. The remote unit then stores the digitized and compressed video signal as a data file with a .cap extension on the hard disk. The capture sequence is initiated by activation of the "CAPTURE" selection button 32.

8. "EXIT" selection button 34 allows the user to exit the capture software sequence to a DOS prompt. The capture software sequence may be exited prior to powering off the remote unit after a video sequence is captured, transmitted, viewed, or edited.

9. After the video sequence is captured, it may be viewed, edited, or transferred to the host unit. Each bit map file box 22 has a "VIEW" selection button 24 and a "TRANSFER" selection button 26. Upon selection of "VIEW" button 24, a captured video data file may be retrieved from the remote hard disk and the video sequence run. The video sequence is displayed in its respective bit map file box 22.

"VIDEO FOR WINDOWS" provides the system the capability for editing a captured data file on the remote unit before it is transmitted to a host unit. As the file is being viewed, sequences may be deleted or edited together as desired.

Selection of "TRANSFER" button 26 initiates the transfer software sequence B and file splitting software sequence C, discussed below. The captured, digitized and compressed data file is then automatically transmitted to the host unit.

FIG. 3 depicts the configuration screen. Selection of the "CONFIGURE" button 30 of the capture screen 20, FIG. 2, calls up a stored configuration file. This configuration file displays the configuration screen 36 of FIG. 3.

Referring to FIG. 3, the default directory request 38 allows for a choice of host name. Default directory listing 38 is a listing of all the host locations to which a data file may be transmitted. Choosing a host name in default directory 38 accesses the transmission parameters for that host name entered and stored in a transfer file, discussed below.

Phone parameter 40 allows for selection of the number of cellular telephones to be used to transmit the captured data file from the remote unit to the host unit. The greater the number of cellular telephones used to transmit, the lesser the transmission time. It is often desirable to transmit a video file as quickly as possible, especially in broadcast news situations where the goal is to broadcast video clips of developing news features as soon as possible. Although there is no theoretical limit to the number of cellular telephones which may be installed in the remote unit upon combination of additional processors, it has been found that between two and four are sufficient for most applications.

Capture length parameter 42 allows for selection of the length of the video sequence to be captured. Generally, video sequences will be between five (5) and one hundred twenty (120) seconds in length.

The video card is capable of capturing an input video signal at a selected number of frames per second. Frames per

5,579,239

7                                    8

second parameter 46 allows for this selection on configuration screen 36. The number of frames per second in which the video card will capture a video sequence generally ranges between one (1) and thirty (30) frames/second. As the number of frames per second in which the file is captured increases, the resultant captured file will approach full motion when it is viewed upon playback. It follows that the greater number of frames captured per second, the larger the data file will be upon capture, which will require a longer transmission time. It is the option of the user to select the desired number of frames per second, understanding that video quality may be sacrificed for transmission speed. In situations where the video subject is stationary, or moving slowly, this sacrifice in video quality may not be present.

In situations where multiple remote units transmit back to a single host unit, it is desirable to identify the remote unit from which transmission is commenced. This naming convention is advantageous to ensure the stored file on the host unit will not be overwritten by an identically named video file of different content. Remote # parameter 44 allows for selection of a remote unit number between 00 and 99. Upon capture, a data file is created and named with an identification of the remote unit number.

The call letter selection parameter 48 allows for input of the call letters of the host broadcast station to which the captured file will be transmitted. Any four (4) characters may be entered as the station call letters. When the capture file is created, it will be named with the input call letters in addition to the remote number as discussed above. The captured file will have a file extension .cap. Input of the call letters is desirable when a remote unit transmits to several host units located at different broadcast stations having different call letters.

Audio capture parameter 50 identified whether capture of audio has been selected on capture software sequence A, FIGURE 2. Audio capture parameter 50 will either display "AUDIO IS ON" or "AUDIO IS OFF," depending upon the previous selection.

Selection buttons 52, 54, and 56 of capture configuration screen 36 are selection buttons commonly found using the "MICROSOFT®WINDOWS™" environment. "CANCEL" selection button 52 instructs the remote unit to disregard any changes made on the configuration screen 36 and abort back to the control screen 20, FIG. 2. When "CANCEL" button 52 is selected, the remote unit will default back to the previously stored parameters.

If changes are made to the capture configuration screen 36, those changes can be stored as a configuration file on the disk drive. Selection button 54, marked "OK" instructs the remote unit to write over the previously saved configuration file. This new set of parameters will then become the default parameters until further changes are made using configuration screen 36.

The "CHANGE DIR" selection button 56 allows changes to be made to the dialing directories in the transfer software sequence B discussed below. Selection of the "CHANGE DIR" button 56 calls up the stored dialing directory file which allows changes to be made to the dialing directory used with the transfer software sequence C.

Upon selection, a program file is retrieved from the transfer software sequence B stored on the hard disk drive. This program file paints a dialing directory screen on the monitor of the remote unit to allow changes to be made to the dialing directory. If no changes are necessary, the transfer software sequence will use the previously stored information. The dialing directory screen is similar to dialing directory screens used with communications software pack-

ages commercially available with the exception that this dialing directory includes dialing information for each transmission line in the remote unit. In the preferred embodiment, there are four modems and four cellular telephones installed. Hence, there will be dialing directory information for each cellular telephone.

The dialing directory information stored in transfer software sequence B, used in the dialing directory screen, lists the first and last name and telephone number of the receiving host unit. When the correct dialing directory information is input, it may be saved into the transfer file and the dialing directory screen exited.

Once the dialing directory information is stored and the dialing directory screen exited, capture screen 20 of FIG. 2 is again displayed on the monitor. The remote unit is now ready to transmit the newly captured video sequence to the host unit. Transmission of a data file is accomplished by selecting the "TRANSFER" button 26 in the bit map file box 22 containing the first frame of video of the file to be transmitted. Selection of "TRANSFER" button 26 initiates the transfer software sequence B and the file splitting software sequence C.

Transfer software sequence B enables the remote unit to communicate with the host unit to transmit a stored data file using the system hardware. Transfer software sequence B contains all of the instructions necessary to initialize the communications ports on the remote, obtain a cellular connection with each cellular telephone to the host unit, obtain the stored data file, initiate file splitting sequence C, and transmit the split data file. The remote unit uses the run time module of a communications software package, such as Procom Plus® for WINDOWS™ which is loaded onto the remote. Communications software packages such as Procom Plus® for WINDOWS™ are available commercially.

Upon selection of the transfer button 26 of FIG. 2, the configuration file is read containing the configuration parameters selected above. This includes the dialing directory information. Transfer software sequence B is then called for each communications port to which the data file will be transmitted. Each modem interfaces through a different communications port. In the preferred embodiment, transfer software sequence B will be called four times.

TRANSFER SOFTWARE SEQUENCE B

1. The first program called for a communications port (COM1) controls the transfer process. COM1 also controls the monitor display notifying the operator of the throughput, size of the file, and the percentage complete.

2. Each of the other communications ports communicates with COM1 in the Windows™ environment, using dynamic data exchange (DDE). DDE is known in the industry and allows multiple applications to share information.

3. COM1 calls file splitting software sequence C, discussed below, and initiates the splitting of the data file. The data file is split into 10K pieces, or files. Each 10K file is created with a DOS archive bit set affixed to the file. As each 10K file of the data file is created, it is stored having a sequential file name extension from 001–999.

4. The modems interfacing each communication port execute the dialing directory file discussed above and obtain a connection with the telephone line on the host unit. The program automatically sends the cellular strings from each communications port to initialize the modems on the host unit. All other settings such as baud rate, protocol, and miscellaneous AT commands, are preset in the remote and

5,579,239

9

10

host unit. The transmission system operates using a Z modem-based protocol.

5. Each communications port executes a dialing directory (DIR) command to locate a file containing an archived bit set. Once a file is located, it is retrieved, the archived bit set removed, and the 10K file transmitted from that line. It is not necessary for the stored files to be transmitted in sequential order since the host unit will recombine the file using the numbering system discussed above. If an error occurs during transmission, the program puts the archived bit set back on the file so that the 10K file can be transmitted from another line. Once transmission of a 10K file is complete, the file is saved on the hard disc, and another having an archived bit set is received and transmitted.

6. The 10K file files containing archived bit sets are retrieved, transmitted, and stored until all have been sent. When a communications port finds no more files having archived bit sets, it hangs up automatically.

7. If a cellular line loses communications with the host unit or if interference prohibits accurate transmission of a file, the line will drop out, and the remaining files will be transmitted from the remaining ports.

8. All of the transmitted, restored, 10K files are recombined into a complete data file.

Files may be transmitted using telephone lines, cellular, radio and other telemetric frequencies. In the preferred embodiment, cellular telephones are integrated with the remote unit to allow transmission of files from areas which are inaccessible to standard telephone lines. It may be desirable, in certain specialized applications, to transmit from a single remote location or locations where standard telephone lines are accessible. The remote unit may still be portable as long as a telephone jack is available for transmission. In that event, the cellular telephones are omitted from the remote, and the modems connected to standard telephone jacks, using standard telephone connectors and wiring.

In areas which are inaccessible to standard telephone lines and outside cellular telephone "cell," files can be transmitted using radio frequencies. In order to accomplish this, the cellular telephones in the remote are replaced with radio transmitters. Corresponding radio receivers are then installed in the host unit to receive the signal transmitted from the remote. Each transmitter operates using a different frequency so as to keep each signal segregated.

Transmission of the data file is accomplished automatically by the remote unit once transfer button 26 of FIG. 2 is selected. This allows the operator freedom to pursue other video clips for subsequent transfer and submission during the transmission process. In this manner, the invention provides rapid access and broadcasts the video segments from locations generally inaccessible and cost prohibitive much faster than conventional methods.

In situations where news teams are sent out in a vehicle to obtain video segments, an inverter could be installed in the vehicle to convert DC from its battery to AC to be used by the remote unit. In addition, five DB gain antennas could be mounted on the vehicle to improve transmission quality of the cellular signal. An antenna would be mounted on the vehicle for each cellular telephone in the remote unit. A video signal could then be captured at one remote location, transfer button 26 selected, and the remote unit transported in the vehicle to a different location while it is transmitting the file.

In order to decrease transmission time of the data file, it may be split into 10K files and transmitted over multiple land telephone lines, cellular telephones, or radio frequencies.

FILE SPLITTING SOFTWARE C

1. After transfer button 26 of FIG. 2 is selected, COM1 opens the main data file and begins splitting that file into 10K files.

2. A DOS archive bit set is fixed to each 10K file. This archive bit set allows the transfer software sequence B to determine whether a file on the directory is a file to be transmitted. It also enables it to determine whether a file has already been transmitted. As each file is retrieved, the DOS archive bit set is removed prior to transmission. Transmission is complete when there are no files left on the directory containing a DOS archive bit set. Each cellular line on the remote will hang up automatically.

3. After all of the 10K file files have been transmitted and each phone line has hung up, COM1 begins piecing the 10K files back together. This is accomplished by sequential read-write operation. A master data file is opened, and then the files are counted between 001-999 (or until all files are used) and pieced together in their sequential order. Twenty K (20K) pieces are read, the file is created, and then written until the entire data file has been combined.

The host unit 3 of FIG. 1 is automated to receive a data file transmitted from remote unit 2. Host unit 3 is a personal computer having a 486DX-2/66 motherboard, 210 Mb hard disk drive, monitor, high speed serial ports, 1 MB Windows accelerator video card, MS DOS Ver. 6.2 operating system, trackball bus mouse, Microsoft® Windows™ Ver. 3.1, Novell® Netware Lite™, 16 Bit Ethernet card, and a 1.44 MB floppy drive. Host unit 3 also has up to four (4) modems connected to up to four (4) separate telephone lines to receive a signal transmitted from each cellular telephone of the remote. It is not necessary to install cellular telephones in host unit 3 unless it will be transported from location to location. In the general application, however, host unit 3 will be installed at a single location and wired to one to four telephone lines.

The number of modems in host unit 3 corresponds to the number of modems used in the remote unit 2. If radio transmitters are used in remote unit 2 instead of telephones, radio receivers would be installed in host unit 3 so that there is a corresponding radio receiver for each radio transmitter. Each radio receiver in host unit 3 is set to the same frequency as the radio transmitter in remote unit 2 from which it will receive transmitted data files.

The four modems in host unit 3 receive the data file transmitted by the four cellular telephones in remote unit 2 in 10K files. Host unit 3 recombines the split data file and copies it to a network hard disk drive for access by playback unit 4. The hard disk drive on host unit 3 stores only software necessary to run the functions of host unit 3. Data files received from remote unit 2 are stored on hard disk drive of playback unit 4. Host unit 3 and playback unit 4 are networked together. A pier-to-pier network, such as "Novell Lite™" by Novell® is particularly suitable for this purpose. When host unit 3 is turned on, it automatically runs host boot software sequence D.

HOST BOOT SOFTWARE SEQUENCE D

1. Host unit 3 looks for the server device on the network. Playback unit 4 is addressed as the network server.

2. Host unit 3 logs onto the network as host.

5,579,239

**11**

3. Drive letter E: is mapped as "play here." Drive E: is a RAM drive in which data files are stored for immediate playback and viewed on an NTSC monitor or output to the master control.

4. Drive letter F: is mapped as "save here." This is the subdirectory on the hard disk drive of playback unit 4 to which host unit 3 stores data files received from remote unit 2.

5. Host unit 3 loads Windows™ or another suitable operating environment.

6. File reception software sequence E is initiated. File reception software sequence E allows host unit 3 to wait for and receive incoming data files automatically.

One host unit can support as many as thirty (30) remote units. The host unit can only receive a transmitted data file from one remote unit at any given time, however.

File reception software sequence E is essentially the same as transfer software sequence B. File reception software sequence S automates each telephone line end modem of host unit 3 to obtain communication with each cellular telephone of remote unit 2 and receive the transmitted data file in 10K files and recombine the data file for storage on the hard disk drive of playback unit 4.

FILE RECEPTION SOFTWARE SEQUENCE E

1. The first program called by host boot software sequence D for a communications port "COM1" controls the file reception process on host unit 3. "COM1" also controls the monitor display notifying the operator of the throughput, size of the file, and percentage complete.

2. Each of the other communications ports communicates with "COM1" in the WINDOWS™ environment, using dynamic data exchange (DDE). DDE is known in the industry and allows multiple applications to share information.

3. The modem's interfacing with each communications port are all ready to receive the cellular string transmitted by each cellular telephone in remote unit 2. Upon receipt of the cellular strings, the modem is ready to receive transmitted data. All other settings such as baud rate, protocol, and miscellaneous AT commands are preset in the host unit in order to automate the file receiving process.

4. As each COM port on remote unit 2 completes transfer of the data file in 10K files, the line will immediately drop out until all four lines have hung up.

5. Host unit 3 then recombines the 10K files into a complete data file using a sequential read/write operation. A master data file is opened in the E: subdirectory on the hard disk drive of the playback unit. The 10K files are then assembled according to their file extension created by remote unit 2 when the data file was split. The 10K files are assembled sequentially between 001 and 999. Twenty kilobyte (20K) pieces are read and then written until the entire data file has been recombined and stored on the network hard drive of playback unit 4.

6. Host unit 3 then executes line 1 of this file reception software sequence E and COM1 awaits connection with remote unit 2 to receive another transmitted data file.

Playback unit 4 of FIG. 1 is the interface between captured video and the station master control which outputs the signal. In the preferred embodiment, playback unit 4 is a personal computer with a 486DX-2/66 motherboard, 210 Mb hard disk drive, 1.44MB floppy drive, high speed serial ports, 1 MB Windows accelerator video card, MS DOS Ver.

**12**

6.2 operating system, Microsoft® Windows™, Microsoft® Video for Windows, Novell® Netware Lite™, trackball bus mouse, video decompression card, audio decompression card, VGA video to NTSC scan converter, and 16 bit ethernet card. Playback unit 4 is automated so that upon boot, it logs into the network, accesses its multi-tasking environment such as Windows™, and is ready to retrieve and play stored data files.

PLAYBACK BOOT SOFTWARE SEQUENCE F

1. Playback unit 4 initializes network, with playback unit 4 being the server.

2. Playback unit 4 logs into the network as player.

3. Drive letter E: is mapped as "Play Here." Drive E: is a RAM drive in which data files are stored for immediate playback, viewed on an NTSC monitor at the station's master control.

4. Driver letter F: is mapped as "Save Here." This is the subdirectory on the hard disk drive of playback unit 4 wherein which host unit 3 stores data files received from remote unit 2.

5. Playback unit 4 executes WINDOWS™ or similar suitable multi-tasking environment such as OS/2 from IBM, UNIX, or Novell®.

6. WINDOWS™ is automated to bring up the file manager. Once the recombined data file has been stored on a network hard disk drive of playback unit 4, the data file may either remain stored for later use, edited, or retrieved for output to the master control. It may be advantageous to have numerous host units networked with a single playback unit so that numerous data files can be received from numerous remote units simultaneously. Alternatively, in a basic embodiment, host unit 3 and playback unit 4 could be integrated into a single host/playback unit.

Playback unit 4 has a video card installed in an expansion slot. This video card is similar as the video card installed in remote unit 2 with the exception that the capture module is not necessary. When a data file is retrieved by playback unit 4 for output to the master control, the video card decompresses the file and converts the digitized data to VGA.

If a data file received by host unit 3 is for immediate playback, it is "stored" in the E: drive. The E: drive is a drive for temporary storage of the data file for immediate playback or output to the master control.

If the data file received by host unit 3 is for later playback or output, it is saved in the F: drive for later retrieval. The F: drive is a subdirectory of the hard disk drive of playback unit 4 for storage of data files.

Once decompressed and converted to VGA, a scan converter card installed in playback unit 4 converts the VGA signal to the desired broadcast signal. Although "NTSC" is the most common broadcast signal, the signal could also be converted to "PAL," "Y/C video," or other broadcast signal as required. This "NTSC" signal output from the scan converter card can be viewed on an "NTSC" monitor for immediate playback for broadcast, or stored on video tape or other conventional means for later use.

While the invention has been described with a certain degree of particularity, it is manifest that many changes may be made in the details of construction without departing from the spirit and scope of this disclosure. It is understood that the invention is not limited to the embodiment set forth herein for purposes of exemplification, but is to be limited only by the scope of the attached claim or claims, including

5,579,239

13

the full range of equivalency to which each element thereof is entitled.

What is claimed is:

1. An apparatus for transmission of data, comprising:
  a mobile remote unit including:
    a.) means for capturing, digitizing, and compressing at least one composite signal;
    b.) means for storing said composite signal;
    c.) means for transmitting said composite signal;
  a host unit including:
    a.) means for receiving at least one composite signal transmitted by the remote unit;
  a playback unit including:
    a.) means for exchanging data with said host unit;
    b.) means for storing the composite signal received by the host unit;
    c.) means for decompressing said composite signal.

2. An apparatus according to claim 1 wherein the host unit and the playback unit are combined in a single computer.

3. An apparatus according to claim 1 wherein the composite signal is transmitted over telephone lines, cellular, radio or other telemetric frequencies.

4. An apparatus according to claim 3 further including means for splitting and organizing the digitized, compressed audio and/or video signal prior to transmission.

5. An apparatus according to claim 1 wherein the means for capturing, digitizing, and compressing said composite signal includes a video capture device installed in said remote unit to capture said composite signal in real time.

6. An apparatus according to claim 5 wherein the means for capturing, compressing and digitizing said Composite signal includes an audio capture device installed in said remote unit.

7. An apparatus according to claim 3 wherein the means for transmitting the composite signal includes: at least one interface installed in conjunction with said remote unit; a cellular telephone connected to each said interface.

8. An apparatus according to claim 1 wherein said means for decompressing said video signal includes a decompression board in said playback unit.

9. An apparatus for transmission of data from a remote location to a host location, comprising:
  a remote unit capable of receiving a composite signal;
  said remote unit being a computer, including:
    a.) a video capture module to capture, digitize and, compress said composite signal into a data file;
    b.) at least two computer interfaces;
    c.) means for splitting said data file into pieces;
    d.) means for tagging said pieces in sequential order;
    e.) means for storing said data file;
    f.) means for transmitting said sequentially tagged pieces through said interfaces;
  a host unit;
  said host unit being a computer, including:
    a.) at least two computer interfaces for receiving said sequentially tagged pieces transmitted from said remote unit wherein said interfaces being connected correspondingly with said interfaces in said remote unit;
    b.) means for recombining the sequentially tagged pieces into their original order to form a second data file;
  a playback unit;
  said playback unit being a personal computer, including:
    a.) means for exchanging data with said host unit;
    b.) means for storing the second data file received by the host unit;

14

    c.) means for decompressing said second data file;
    d.) means for converting said second data file to a broadcast signal.

10. An apparatus according to claim 9 wherein the remote unit includes a cellular telephone connected to each computer interface.

11. An apparatus according to claim 9 wherein the remote unit includes a transmitter connected to each computer interface such that each transmitter transmits at a different frequency.

12. An apparatus according to claim 1 including means for converting said composite signal to a VGA signal.

13. An apparatus according to claim 12 further including means for converting said VGA signal to a broadcast signal.

14. An apparatus according to claim 13 wherein said means for converting said VGA signal to a broadcast signal includes a scan converter card.

15. An apparatus for transmission of data, comprising:
  a computer including a video capture module to capture and compress video in real time;
  means for transmission of said captured video over a cellular frequency.

16. The apparatus of claim 15 wherein the means for transmission of said captured video over a cellular frequency includes;
  at least two interfaces operating in conjunction with said computer;
  a cellular telephone connected to each said interface.

17. The apparatus of claim 16 further including means for splitting the captured video into pieces for transmission through said interfaces.

18. An apparatus according to claim 1 including means for converting said composite signal to a broadcast signal.

19. The apparatus of claim 9 wherein said remote unit is mobile.

20. The apparatus of claim 9 wherein said video capture module on said video card captures, digitizes and compresses said composite signal in real time.

21. An apparatus according to claim 9 wherein the remote unit includes a telephone line connected to each computer interface.

22. An apparatus according to claim 9 wherein said interfaces are capable of simultaneous transmission.

23. An apparatus according to claim 9 including means for converting said composite signal to a VGA signal.

24. An apparatus according to claim 23 further including means for converting said VGA signal to a broadcast signal.

25. An apparatus according to claim 9 including means for converting said composite signal to a broadcast signal.

26. An apparatus for transmission of data from a remote location to a host location, comprising:
  a remote unit, including:
    a.) a video capture device to capture and digitize said composite signal into a data file;
    b.) at least two computer interfaces;
    c.) means for splitting said data file into pieces;
    d.) means for tagging said pieces in sequential order;
    f.) means for transmitting said tagged pieces through said interfaces wherein said interfaces are capable of simultaneous transmission;
  a host unit, including:
    a.) at least two computer interfaces for receiving said tagged pieces transmitted from said remote unit wherein said interfaces are capable of simultaneous data reception;
    b.) means for recombining the tagged pieces into their original sequential order.

5,579,239

15

27. The apparatus of claim 26 wherein the composite signal is transmitted over telephone lines, cellular, radio or other telemetric frequencies.

28. The apparatus of claim 26 wherein the data file is compressed prior to transmission by the remote unit.

29. An apparatus according to claim 26 including means for converting said composite signal to a VGA signal.

30. An apparatus according to claim 29 further including means for converting said VGA signal to a broadcast signal.

31. An apparatus according to claim 26 including means for converting said composite signal to a broadcast signal.

16

32. An apparatus according to claim 26 wherein the tagged pieces are transmitted from said remote unit to said host unit over telephone lines, cellular, radio or other telemetric frequencies.

33. An apparatus according to claim 26 wherein said remote unit is mobile.

34. An apparatus according to claim 26 wherein said remote unit captures and digitizes the composite signal in real time.

* * * * *

PATENT APPLICATION SERIAL NO. __09/198130__

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

PTO-1556
(5/87)

BAR CODE LABEL

| | |
|---|---|
| ‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖ | # U.S. PATENT APPLICATION |

| SERIAL NUMBER | FILING DATE | CLASS | GROUP ART UNIT |
|---|---|---|---|
| 08/198,130 | 02/16/94 | 178 | 2614 |

**APPLICANT**

MITCHAEL C. FREEMAN, TULSA, OK; RICHARD C. FREEMAN, TULSA, OK; CHAD BOSS, TULSA, OK; MICHAEL H. FREEMAN, LIBERTY MOUNDS, OK.


**CONTINUING DATA********************
VERIFIED

_____


**FOREIGN/PCT APPLICATIONS***********
VERIFIED

_____


FOREIGN FILING LICENSE GRANTED 03/11/94       ***** SMALL ENTITY *****

| STATE OR COUNTRY | SHEETS DRAWING | TOTAL CLAIMS | INDEPENDENT CLAIMS | FILING FEE RECEIVED | ATTORNEY DOCKET NO. |
|---|---|---|---|---|---|
| OK | 2 | 15 | 2 | $355.00 | 0460.93Z |

**ADDRESS**

SCOTT R. ZINGERMAN
CATALANO, ZINGERMAN & MCKAY
810 SOUTH CINCINATI, STE. 200
TULSA, OK  74119

**TITLE**

REMOTE VIDEO TRANSMISSION SYSTEM

This is to certify that annexed hereto is a true copy from the records of the United States Patent and Trademark Office of the application which is identified above.

By authority of the
COMMISSIONER OF PATENTS AND TRADEMARKS

Date _____                Certifying Officer

08/198130

UNITED STATES PATENT APPLICATION

FOR

REMOTE VIDEO TRANSMISSION SYSTEM

*08/198130*

## ABSTRACT OF THE ~~INVENTION~~ *Disclosure*

A remote video transmission system for digitizing and compressing an audio/visual signal, transmitting that signal over low band width lines, such as land telephone lines, cellular telephone lines, or radio frequencies, decompressing the digitized data and converting it to an audio/visual signal for broadcast. Components of this system include:  A remote unit, a host unit, and a playback unit. The remote unit is capable of digitizing and compressing the audio/visual signal as well as transmitting the compressed, digitized data.  Data may be divided and sent to multiple ports for output.  Data may also be edited prior to transmission.  The host unit is automated to receive data transmitted from the remote unit and reassemble the data if it has been divided.  The playback unit stores and automatically catalogs transmitted data files.  The player unit also decompresses the digitized data files and converts them to an audio/visual signal which may then be broadcast.  The audio/visual signal can either be NTSC, PAL, or Y/C video.



08/198130

## BACKGROUND OF THE INVENTION
### Field of the Invention

5        This invention relates to capturing a video signal at one
location and transmitting that signal to another location over
telephone lines, cellular, radio and other telemetric
frequencies.

         Advances in the information highway promotes the United
10       States as a world leader in the computer, video and broadcast
industries. This invention adds to that information highway.

         Transmission of a real time video signal from a remote
location to a base location is conventionally done by one of
two methods: Microwave or satellite. Equipment associated
15       with these methods is extremely expensive and has significant
limitations. The large amount of equipment necessary for
satellite technology for remote transmission requires that the
equipment be installed in trucks having an integral satellite
dish. The signal is received from the video camera, beamed to
20       the satellite, and then beamed to the base location for
broadcast. The enormous amount of equipment and the
sophisticated technology required makes satellite transmission
extremely expensive and impractical for many applications.
Satellite transmission does, however, send real time broadcast
25       quality signals. The costs associated with satellite
transmission are justifiable for large events such as sporting
events where transmission could be made from a single location
over a sustained period of time. It is not practical,
however, for coverage such as news coverage where short
30       segments from many different locations are necessary. An
example would be in covering a natural disaster. Speed in
obtaining and broadcasting video footage is a competitive
requirement in news gathering situations.

         The required set up time and inaccessibility of the
35       satellite truck are significant additional limitations to
satellite type transmission.

3

Microwave transmission technology overcomes some of the limitations of satellite technology but has several additional limitations of its own.  Microwave transmission systems are less expensive and require less equipment.  With a microwave system, a video signal is obtained and transmitted from the remote location at microwave frequencies from a vehicle mounted transmitting antenna to a base antenna for broadcast.

Difficulties have been encountered using this technology in aligning the antenna on the vehicle with the base antenna. Obstructions between the transmitting antenna and the base antenna may also prevent passage of the signal.  Setup limitations also inhibit the use of microwave transmission systems in obtaining short segments of video at one location, transmission of that signal, moving to another location, transmission, movement, etc.  Transmission is also limited to accessibility of the vehicle to the location of the subject matter.

The limitations of satellite and microwave technology have forced video broadcasters to devise alternative means of transmission, which may include:  Setting up a remote microwave or satellite transmission post and transporting segments on video tape to it from multiple remote locations. More often, broadcasters capture video segments on tape and then manually transport those tapes back to the station as quickly as possible for broadcast.

With the establishment and advancements in cellular technology, television broadcasters have begun sending teams into remote locations for reports transmitted via cellular telephone. Cellular technology provides the ability to access a location and immediately report information back to the station.  This use of cellular telephones transmits voice messages only and excludes video transmission altogether. Cellular technology has also been used to transmit data such

4

as facsimile and computer file transmissions from one location
to another.  Cellular telephones have been quick to transmit
data received from a facsimile machine or computer having a
modem to a second fax machine or computer.  Cellular combined
5    with computer technology has never been used, however, to
transmit a broadcast quality video signal.

      A need, therefore, exists in the art for a highly
portable, cost-effective method and apparatus for capturing
and transmission of broadcast quality video from a remote
10   location to a base location.  A need also exists for a capture
and transmission apparatus over cellular, land lines, or radio
or other frequencies.  Additionally, with the current FCC
limitations regarding cellular transmissions from airborne
craft an additional need is evidenced for video over the radio
15   or other telemetric frequencies.

5

## SUMMARY OF THE INVENTION

It is the purpose of the present invention to provide a method and means for capturing full-color, full-motion audio/video signals, digitizing and compressing the signals into a digitized data file, and transmitting the signals over telephone lines, cellular, radio and other telemetric frequencies.

A second object includes splitting the digitized, compressed, audio/video signal prior to transmission in order to reduce transmission time.

A further object is to provide an apparatus that will transmit audio/video files for immediate broadcast over radio frequencies, cellular telephone frequencies, or land telephone lines.

An apparatus to accomplish this purpose includes a remote unit, a host unit, and a player or a basic embodiment includes a remote and a combined host/player unit. This apparatus provides the capability of digitizing and compressing a signal which is then transmitted over low band width lines.

The remote unit includes means for digitizing and compressing a video signal, storage of the digitized and compressed data file, and transmission of this data file over telephone lines, cellular, radio and other telemetric frequency. The remote unit may also split the data file prior to transmission for multiple simultaneous transmissions in order to reduce transmission time. The host unit is automated to receive the transmitted data file, recombine it if it has been split, and store the recombined data file to the playback unit. The playback unit stores and automatically catalogs transmitted data files. The playback unit also decompresses the digitized data file and converts it to an audio/visual signal for broadcast.

In one preferred embodiment, an audio/visual signal is

6

input into the remote unit from a video camera at a remote location. The remote unit is a combination portable personal computer having one or more computer interfaces and a corresponding number of cellular telephones. Computer software loaded on a hard disk drive in the remote unit instructs it to capture the input signal to a video capture card within the remote unit. The video capture card takes the audio/visual signal, digitizes it into a computer data file, and compresses that data file. Once digitized and compressed, the data file is captured in the computer's memory by a capture module on the video capture card. A software sequence then instructs the computer central processing unit to store the captured data file on the computer's hard disk drive. After the video file has been captured, it may be edited as desired prior to transmission to the host unit.

Once stored, a computer program sequence removes the digitized data from the hard drive, breaks the data file, and sends it to one or more computer interfaces which transmit the data file, using a corresponding number of cellular telephones, to the host unit. The data file is split and organized so as to reduce the amount of time of transmission of the data file.

A software sequence installed on the remote unit automatically catalogs data files stored in the system hard drive. These files are cataloged visually on a computer monitor for easy visual recognition. A single frame of video from each stored data file is displayed on the monitor in a catalog array to allow the operator the ability to quickly identify the file and select a file for retrieval or transmission to the host unit as required.

In an alternate embodiment, a basic one, the signal is not divided before it is transmitted. In this alternate embodiment, only a single interface and a single cellular



7

phone are necessary.

The host unit is a desktop personal computer with installed communications software and one or more computer interfaces connected to a corresponding number of telephone
5    lines. The interfaces are set to receive transmitted data files from the remote unit.

If the data files have been split for transmission, a software program recombines the split file back to its original single data file. A computer monitor is connected to
10   the host unit for viewing of the stored data files at the host unit. A software program also copies this recombined data file to a network hard disk drive of the playback unit. The host unit and the playback unit are interfaced to allow transfer of data files. The computer to computer interface
15   between the host unit and the playback unit is a computer network in the preferred embodiment, however, any known port to port connection could be substituted.

The playback unit is the interface between captured video and the master control which outputs the signal. Once the
20   recombined data file has been stored on the networked hard disk drive of the playback unit, the data file may then either remain stored for later use or retrieved for broadcast.

Stored data files may be edited at the host location as desired.
25   For broadcast, a video card located in the playback unit retrieves the stored data file, decompresses the file, and converts the digitized data to VGA. The video card in the playback unit is similar to the video card in the remote unit with the exception that the card in the playback unit does not
30   have a capture module.

Once the data file has been decompressed and converted to digital, a converter card converts the VGA signal to the desired signal for broadcast (NTSC, PAL, Y/C video, etc.)

8

Hardware playback of the signal or output of the signal is to
a monitor or VCR for storage on conventional video tape or
immediate broadcast.

5      Other features and advantages of the invention will
become apparent in view of the drawings and following detailed
description.



9

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGURE 1 depicts the components and the sequence of the process of the present invention.

FIGURE 2 is the control screen of the remote unit.

5         FIGURE 3 is the configuration screen of the remote unit.

10

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The drawings represent the present invention wherein
FIGURE 1 depicts the remote unit **2**, wherein the input signal
is captured, compressed, digitized, and transmitted to a host
5    unit **3** which receives the transmitted video signal and stores
it to playback unit **4** where it can be output to a monitor or
edited for playback or broadcast.   In the preferred
embodiment, the data file is split by the remote unit **2** prior
to transmission to the host unit **3**.   The host unit **3**
10    recombines the split data file and stores it to playback unit
**4** via a computer network.

In the preferred embodiment, remote unit **2** is a portable
personal computer having a 486DX-2/66 motherboard, 10-inch
plasma display, 210 MB notebook hard disk drive, MS DOS Ver.
15    6.2 operating system, Microsoft® Windows™ Ver. 3.1, Microsoft®
Video for Windows,  Procom Plus® for Windows, trackball bus
mouse, high speed serial ports, 1MB Windows accelerator video
card, video capture card with capture module, audio capture
card, SVGA to NTSC converter, SVGA video adapter.  The remote
20    unit also has up to four computer interfaces such as modems,
each connected to a cellular telephone.

A signal is input into remote unit **2** from any device
having the capacity to output a video signal **1**, such as a
video camera, video cassette recorder/player, laser disc
25    player, etc.  The video signal received by the remote unit can
be of any generally known format, such as NTSC, PAL, and Y/C
video (or S video).  The remote unit **2** is designed to be
portable so that it can be transported and used in areas which
are inaccessible or unsuited for a conventional desktop
30    personal computer.  It is understood, however, that remote
unit **2** could be a desktop computer or have variations in its
internal configuration.

The video signal input into the remote unit is received



11

by a video card having a capture module therein. Such a card
is available commercially from Intel/IBM. A computer software
program such as "VIDEO FOR WINDOWS" available from MicroSoft®
operates with the video card and capture module to capture,
5      digitize, and compress the video signal into a data file.
Other software packages are commercially available for use in
operating environments other than windows and may be
substituted for "VIDEO FOR WINDOWS."

       A software sequence, discussed below, instructs "VIDEO
10     FOR WINDOWS" what parameters to capture the file under. A
permanent capture file is stored on the hard disk of the
remote unit and is called up into the remote unit's RAM where
an input video signal is captured. This permanent capture
file has a 10 Mb default, however, in the event a larger file
15     is created, the capture file will expand to the requisite
size.

       The capture card in the remote unit uses BIT-MAP
technology to capture and display motion of the video file.
BIT-MAP technology is suitable in order to maximize
20     transmission speed.

       As it is being captured in the capture file, the input .
signal is being digitized and compressed. The digitized and
compressed data file is then named and captured in the
computer's random access memory (RAM) for transmission to the
25     host unit.    The "VIDEO FOR WINDOWS" software package allows
for editing of a data file once captured. In this way,
editing can be accomplished at the remote location prior to
transmission of the file.    The digitized, compressed, and
captured file is displayed visually on the monitor.

30        As stated above, the video file is captured according to
system parameters selected on the remote unit for each data
file. The capture software sequence **A** includes the following
steps:

_/ /_

12

## CAPTURE SOFTWARE SEQUENCE A

1.      A video palette file is copied to "MICROSOFT®
WINDOWS™" clipboard.  This video palette file is a
created data file stored on the hard disk of the
remote.  This video palette file is created with
"VIDEO FOR WINDOWS" by loading a video clip and
extracting the color palette from that clip.

2.      The second step is that the control screen is
painted on the monitor of the remote without
pictures.  Figure 2 depicts this control screen **20**
with boxes, collectively **22**, shown without pictures
therein.

3.      Bit map files are obtained and displayed into
boxes **22** of screen **20**.  A different bit map file
will be displayed in each box **22** on screen **20**.  Bit
map files are created by "VIDEO FOR WINDOWS" by
retrieving the first frame of video from the
captured video file, supplying the color from the
stored palette file, and displaying this image in
one of the boxes **22**.  These video files are
displayed (or catalogued) on control screen **20** to
allow quick identification and selection of a file
for retrieval or transmission.  The remote unit is
capable of storing and displaying up to eight (8)
bit map files.  When the ninth file is captured,
the software will automatically overwrite the
oldest captured data file and display this new file
on control screen **20**.

4.      The software sequence then reads the
configuration files created as a result of user
selection of capture and storage parameters.  These
parameters are input form a set of selection
buttons found on control screen **20** of FIGURE 2.

13

5.      The user selects whether the video signal will
be captured either with or without audio.
"SELECTION" button **28** on control screen **20** of
FIGURE 2 requests the choice of capture and storage
of audio.  The selection buttons on screen **20** are
activated using any conventional means such as the
computer keyboard, mouse, or similar pointing
device.  An audio capture card installed in the
remote unit captures the audio of an input signal.
Capture with audio makes the data file longer since
the audio signal must also be digitized,
compressed, and stored in the remote unit's hard
disk.  It is evident that the longer the data file,
the longer the time required for transmission of
the entire data file from the remote unit to the
host unit.  It is often desirable to transmit video
files only without audio in situations where a
broadcast station wants to provide video footage of
a situation quickly.  It is desirable for broadcast
stations to provide such video coverage as quickly
as possible after a newsworthy event has taken
place, such as an accident or natural disaster.  In
these situations, it is desirable to broadcast the
video footage of the incident in a remote location.
Audio coverage can be made by a reporter on
location in another fashion, such as over a
cellular telephone.

6.      The software sequence reads the configuration
files created as a result of user selection of
capture and storage parameters.  These parameters
are input from a "SELECTION" button **30** marked
"CONFIGURE" found on screen **20** of Figure 2.
Selection of the "CONFIGURE" selection button **30**

14

calls up a configuration file from the remote hard disk:  The configuration file opens a "Window" bringing up a screen showing the capture configuration options.  Figure 3 depicts the configuration screen **36** which appears as a result of selecting the configuration "SELECTION" button **30** of Figure 2.  It is not necessary to input a set of configuration parameters each time a video signal is captured since the system stores the previous set of configuration parameters which were selected for the previous capture sequence.
The configuration parameters are discussed below.

7.    Once the configuration parameters are selected, the video card in the remote unit captures the input video signal to its memory. Capture includes digitizing the input video signal to form a binary data file and then compressing that file.  The file is compressed in order to conserve memory space and reduce transmission time. The remote unit then stores the digitized and compressed video signal as a data file with a .cap extension on the hard disk.  The capture sequence is initiated by activation of the "CAPTURE" selection button **32**.

8.    "EXIT" selection button **34** allows the user to exit the capture software sequence to a DOS prompt. The capture software sequence may be exited prior to powering off the remote unit after a video sequence is captured, transmitted, viewed, or edited.

9.    After the video sequence is captured, it may be viewed, edited, or transferred to the host unit. Each bit map file box **22** has a "VIEW" selection

15

button **24** and a "TRANSFER" selection button **26**. Upon selection of "VIEW" button **24**, a captured video data file may be retrieved from the remote hard disk and the video sequence run.  The video sequence is displayed in its respective bit map file box **22**.

"VIDEO FOR WINDOWS" provides the system the capability for editing a captured data file on the remote unit before it is transmitted to a host unit.  As the file is being viewed, sequences may be deleted or edited together as desired.

Selection of "TRANSFER" button **26** initiates the transfer software sequence B and file splitting software sequence C, discussed below.  The captured, digitized and compressed data file is then automatically transmitted to the host unit.

FIGURE 3 depicts the configuration screen.  Selection of the "CONFIGURE" button **30** of the capture screen **20**, Figure 2, calls up a stored configuration file.  This configuration file displays the configuration screen **36** of FIGURE 3.

Referring to FIGURE 3, the default directory request **38** allows for a choice of host name.  Default directory listing **38** is a listing of all the host locations to which a data file may be transmitted.  Choosing a host name in default directory **38** accesses the transmission parameters for that host name entered and stored in a transfer file, discussed below.

Phone parameter **40** allows for selection of the number of cellular telephones to be used to transmit the captured data file from the remote unit to the host unit.  The greater the number of cellular telephones used to transmit, the lesser the transmission time.  It is often desirable to transmit a video file as quickly as possible, especially in broadcast news situations where the goal is to broadcast video clips of



16

developing news features as soon as possible.  Although there is no theoretical limit to the number of cellular telephones which may be installed in the remote unit upon combination of additional processors, it has been found that between two and

5      four are sufficient for most applications.

Capture length parameter **42** allows for selection of the length of the video sequence to be captured.  Generally, video sequences will be between five (5) and one hundred twenty (120) seconds in length.

10     The video card is capable of capturing an input video signal at a selected number of frames per second.  Frames per second parameter **46** allows for this selection on configuration screen **36**.  The number of frames per second in which the video card will capture a video sequence generally ranges between

15     one (1) and thirty (30) frames/second.  As the number of frames per second in which the file is captured increases, the resultant captured file will approach full motion when it is viewed upon playback.  It follows that the greater number of frames captured per second, the larger the data file will be

20     upon capture, which will require a longer transmission time. It is the option of the user to select the desired number of frames per second, understanding that video quality may be sacrificed for transmission speed.  In situations where the video subject is stationary, or moving slowly, this sacrifice

25     in video quality may not be present.

In situations where multiple remote units transmit back to a single host unit, it is desirable to identify the remote unit from which transmission is commenced.  This naming convention is advantageous to ensure the stored file on the

30     host unit will not be overwritten by an identically named video file of different content.  Remote # parameter **44** allows for selection of a remote unit number between 00 and 99.  Upon capture, a data file is created and named with an

17

identification of the remote unit number.

The call letter selection parameter **48** allows for input of the call letters of the host broadcast station to which the captured file will be transmitted.  Any four (4) characters may be entered as the station call letters.  When the capture file is created, it will be named with the input call letters in addition to the remote number as discussed above.  The captured file will have a file extension .cap.  Input of the call letters is desirable when a remote unit transmits to several host units located at different broadcast stations having different call letters.

Audio capture parameter **50** identified whether capture of audio has been selected on capture software sequence **A**, FIGURE 2.  Audio capture parameter **50** will either display "AUDIO IS ON" or "AUDIO IS OFF," depending upon the previous selection.

Selection buttons **52**, **54**, and **56** of capture configuration screen **36** are selection buttons commonly found using the "MICROSOFT® WINDOWS™" environment.  "CANCEL" selection button **52** instructs the remote unit to disregard any changes made on the configuration screen **36** and abort back to the control screen **20**, FIGURE 2.  When "CANCEL" button **52** is selected, the remote unit will default back to the previously stored parameters.

If changes are made to the capture configuration screen **36**, those changes can be stored as a configuration file on the disk drive.  Selection button **54**, marked "OK" instructs the remote unit to write over the previously saved configuration file.  This new set of parameters will then become the default parameters until further changes are made using configuration screen **36**.

The "CHANGE DIR" selection button **56** allows changes to be made to the dialing directories in the transfer software sequence B discussed below.  Selection of the "CHANGE DIR"

/7

18

button **56** calls up the stored dialing directory file which allows changes to be made to the dialing directory used with the transfer software sequence **C**.

Upon selection, a program file is retrieved from the
5    transfer software sequence **B** stored on the hard disk drive. This program file paints a dialog directory screen on the monitor of the remote unit to allow changes to be made to the dialing directory.  If no changes are necessary, the transfer software sequence will use the previously stored information.
10   The dialing directory screen is similar to dialing directory screens  used  with  communications  software  packages commercially available with the exception that this dialing directory includes dialing information for each transmission line in the remote unit.  In the preferred embodiment, there
15   are  four  modems  and  four  cellular  telephones  installed. Hence, there will be dialing directory information for each cellular telephone.

The dialing directory information stored in transfer software sequence **B**, and displayed in the dialing directory
20   screen, lists the first and last name and telephone number of the receiving host unit.  When the correct dialing directory information is input, it may be saved into the transfer file and the dialing directory screen exited.

Once the dialing directory information is stored and the
25   dialing directory screen exited, capture screen **20** of FIGURE 2 is again displayed on the monitor.  The remote unit is now ready to transmit the newly captured video sequence to the host unit.  Transmission of a data file is accomplished by selecting the "TRANSFER" button **26** in the bit map file box **22**
30   containing  the  first  frame  of  video  of  the  file  to  be transmitted.  Selection of "TRANSFER" button **26** initiates the transfer software sequence **B** and the file splitting software sequence **C**.

19

Transfer software sequence **B** enables the remote unit to communicate with the host unit to transmit a stored data file using the system hardware.   Transfer software sequence **B** contains all of the instructions necessary to initialize the communications ports on the remote, obtain a cellular connection with each cellular telephone to the host unit, obtain the stored data file, initiate file splitting sequence C, and transmit the split data file.  The remote unit uses the run time module of a communications software package, such as Procom Plus® for WINDOWS™ which is loaded onto the remote. Communications software packages such as Procom Plus® for WINDOWS™ are available commercially.

Upon selection of the transfer button **26** of FIGURE 2, the configuration file is read containing the configuration parameters selected above.   This includes the dialing directory information.  Transfer software sequence **B** is then called for each communications port to which the data file will be transmitted.   Each modem interfaces through a different communications port.  In the preferred embodiment, transfer software sequence **B** will be called four times.

TRANSFER SOFTWARE SEQUENCE **B**

1.   The first program called for a communications port (COM1) controls the transfer process.  COM1 also controls the monitor display notifying the operator of the throughput, size of the file, and the percentage complete.

2.   Each of the other communications ports communicates with COM1 in the Windows™ environment, using dynamic data exchange (DDE).  DDE is known in the industry and allows multiple applications to share information.

3.   COM1 calls file splitting software sequence C, discussed below, and initiates the splitting of the

20

data file.  The data file is split into 10K pieces,
or files.   Each 10K file is created with a DOS
archive bit set affixed to the file.  As each 10K
file of the data file is created, it is stored
5           having a sequential file name extension from 001-
999.

4.   The  modems  interfacing  each  communication  port
execute the dialing directory file discussed above
and obtain a connection with the telephone line on
10          the host unit.  The program automatically sends the
cellular strings from each communications port to
initialize the modems on the host unit.  All other
settings   such   as   baud   rate,   protocol,   and
miscellaneous AT commands, are preset in the remote
15          and host unit.   The transmission system operates
using a Z modem-based protocol.

5.   Each   communications   port   executes   a   dialing
directory (DIR) command to locate a file containing
an archived bit set.  Once a file is located, it is
20          retrieved, the archived bit set removed, and the
10K file transmitted from that line.   It is not
necessary for the stored files to be transmitted in
sequential order since the host unit will recombine
the file using the numbering system discussed
25          above.  If an error occurs during transmission, the
program puts the archived bit set back on the file
so that the 10K file can be transmitted from
another line.   Once transmission of a 10K file is
complete, the file is saved on the hard disc, and
30          another having an archived bit set is received and
transmitted.

6.   The 10K file files containing archived bit sets are
retrieved, transmitted, and stored until all have

21

been sent.   When a communications port finds no
more files having archived bit sets, it hangs up
automatically.

7.   If a cellular line loses communications with the
host unit or if interference prohibits accurate
transmission of a file, the line will drop out, and
the remaining files will be transmitted from the
remaining ports.

8.   All of the transmitted, restored, 10K files are
recombined into a complete data file.

Files may be transmitted using telephone lines, cellular,
radio and other telemetric frequencies.   In the preferred
embodiment, cellular telephones are integrated with the remote
unit to allow transmission of files from areas which are
inaccessible to standard telephone lines.   It may be
desirable, in certain specialized applications, to transmit
from a single remote location or locations where standard
telephone lines are accessible.   The remote unit may still be
portable as long as a telephone jack is available for
transmission.   In that event, the cellular telephones are
omitted from the remote, and the modems connected to standard
telephone jacks, using standard telephone connectors and
wiring.

In areas which are inaccessible to standard telephone
lines and outside cellular telephone "cell," files can be
transmitted using radio frequencies.   In order to accomplish
this, the cellular telephones in the remote are replaced with
radio transmitters.   Corresponding radio receivers are then
installed in the host unit to receive the signal transmitted
from the remote.   Each transmitter operates using a different
frequency so as to keep each signal segregated.

Transmission   of   the   data   file   is   accomplished
automatically by the remote unit once transfer button **26** of

22

FIGURE 2 is selected.  This allows the operator freedom to pursue other video clips for subsequent transfer and submission during the transmission process.  In this manner, the invention provides rapid access and broadcasts the video

5       segments from locations generally inaccessible and cost prohibitive much faster than conventional methods.

In situations where news teams are sent out in a vehicle to obtain video segments, an inverter could be installed in the vehicle to convert DC from its battery to AC to be used by

10      the remote unit.  In addition, five DB gain antennas could be mounted on the vehicle to improve transmission quality of the cellular signal.  An antenna would be mounted on the vehicle for each cellular telephone in the remote unit.  A video signal could then be captured at one remote location, transfer

15      button **26** selected, and the remote unit transported in the vehicle to a different location while it is transmitting the file.

In order to decrease transmission time of the data file, it may be split into 10K files and transmitted over multiple

20      land telephone lines, cellular telephones, or radio frequencies.

### FILE SPLITTING SOFTWARE C

1.   After transfer button **26** of FIGURE 2 is selected, COM1 opens the main data file and begins splitting

25      that file into 10K files .

2.   A DOS archive bit set is fixed to each 10K file. This archive bit set allows the transfer software sequence **B** to determine whether a file on the directory is a file to be transmitted.  It also

30      enables it to determine whether a file has already been transmitted.  As each file is retrieved, the DOS archive bit set is removed prior to transmission.  Transmission is complete when there

23

are no files left on the directory containing a DOS
archive bit set.  Each cellular line on the remote
will hang up automatically.

3.   After  all  of  the  10K  file  files  have  been
5         transmitted and each phone line has hung up, COM1
begins piecing the 10K files back together.  This
is accomplished by sequential read-write operation.
A master data file is opened, and then the files
are counted between 001-999 (or until all files are
10        used)  and  pieced  together  in  their  sequential
order.  Twenty K (20K) pieces are read, the file is
created,  and  then  written  until  the  entire  data
file has been combined.

The host unit **3** of FIGURE 1 is automated to receive a
15   data file transmitted from remote unit **2**.  Host unit **3** is a
personal computer having a 486DX-2/66 motherboard, 210 Mb hard
disk drive, monitor, high speed serial ports, 1MB Windows
accelerator video card, MS DOS Ver. 6.2 operating system,
trackball bus mouse, Microsoft® Windows™ Ver. 3.1, Novell®
20   Netware Lite™, 16 Bit Ethernet card, and a 1.44MB floppy
drive.  Host unit **3** also has up to four (4)  modems connected
to up to four (4) separate telephone lines to receive a signal
transmitted from each cellular telephone of the remote.  It is
not necessary to install cellular telephones in host unit **3**
25   unless it will be transported from location to location.   In
the  general  application,  however,  host  unit  **3**  will  be
installed  at  a  single  location  and  wired  to  one  to  four
telephone lines.

The number of modems in host unit **3** corresponds to the
30   number  of  modems  used  in  the  remote  unit  **2**.    If  radio
transmitters are used in remote unit **2** instead of telephones,
radio receivers would be installed in host unit **3** so that
there  is  a  corresponding  radio  receiver  for  each  radio

24

transmitter. Each radio receiver in host unit **3** is set to the same frequency as the radio transmitter in remote unit **2** from which it will receive transmitted data files.

5      The four modems in host unit **3** receive the data file transmitted by the four cellular telephones in remote unit 2 in 10K files. Host unit **3** recombines the split data file and copies it to a network hard disk drive for access by playback unit **4**. The hard disk drive on host unit **3** stores only software necessary to run the functions of host unit **3**. Data

10     files received from remote unit **2** are stored on hard disk drive of playback unit **4**. Host unit **3** and playback unit **4** are networked together. A pier-to-pier network, such as "Novell Lite™" by Novell® is particularly suitable for this purpose.

       When host unit **3** is turned on, it automatically runs host

15     boot software sequence **D**.

### HOST BOOT SOFTWARE SEQUENCE D

1.     Host unit **3** looks for the server device on the network. Playback unit **4** is addressed as the network server.

20     2.     Host unit **3** logs onto the network as host.

3.     Drive letter E: is mapped as "play here." Drive E: is a RAM drive in which data files are stored for immediate playback and viewed on an NTSC monitor or output to the master control.

25     4.     Drive letter F: is mapped as "save here." This is the subdirectory on the hard disk drive of playback unit **4** to which host unit **3** stores data files received from remote unit **2**.

5.     Host unit **3** loads Windows™ or another suitable

30     operating environment.

6.     File reception software sequence **E** is initiated. File reception software sequence **E** allows host unit **3** to wait for and receive incoming data files

25

automatically.

One host unit can support as many as thirty (30) remote units. The host unit can only receive a transmitted data file from one remote unit at any given time, however.

File reception software sequence **E** is essentially the same as transfer software sequence **B**. File reception software sequence **E** automates each telephone line end modem of host unit **3** to obtain communication with each cellular telephone of remote unit **2** and receive the transmitted data file in 10K files and recombine the data file for storage on the hard disk drive of playback unit **4**.

## FILE RECEPTION SOFTWARE SEQUENCE **E**

1.  The first program called by host boot software sequence **D** for a communications port "COM1" controls the file reception process on host unit **3**. "COM1" also controls the monitor display notifying the operator of the throughput, size of the file, and percentage complete.

2.  Each of the other communications ports communicates with "COM1" in the WINDOWS™ environment, using dynamic data exchange (DDE). DDE is known in the industry and allows multiple applications to share information.

3.  The modem's interfacing with each communications port are all ready to receive the cellular string transmitted by each cellular telephone in remote unit **2**. Upon receipt of the cellular strings, the modem is ready to receive transmitted data. All other settings such as baud rate, protocol, and miscellaneous AT commands are preset in the host unit in order to automate the file receiving process.

4.  As each COM port on remote unit **2** completes

26

transfer of the data file in 10K files, the line
will immediately drop out until all four lines have
hung up.

5.   Host unit **3** then recombines the 10K files into a
complete data file using a sequential read/write
operation.  A master data file is opened in the E:
subdirectory on the hard disk drive of the playback
unit.  The 10K files are then assembled according
to their file extension created by remote unit **2**
when the data file was split.  The 10K files are
assembled sequentially between 001 and 999.  Twenty
kilobyte (20K) pieces are read and then written
until the entire data file has been recombined and
stored on the network hard drive of playback unit
4.

6.   Host unit **3** then executes line 1 of this file
reception software sequence **E** and COM1 awaits
connection with remote unit **2** to receive another
transmitted data file.

Playback unit **4** of FIGURE 1 is the interface between
captured video and the station master control which outputs
the signal.  In the preferred embodiment, playback unit **4** is
a personal computer with a 486DX-2/66 motherboard, 210Mb hard
disk drive, 1.44MB floppy drive, high speed serial ports, 1MB
Windows accelerator video card, MS DOS Ver. 6.2 operating
system, Microsoft® Windows™, Microsoft® Video for Windows,
Novell®  Netware  Lite™,  trackball  bus  mouse,  video
decompression card, audio decompression card, VGA video to
NTSC scan converter, and 16 bit ethernet card.  Playback unit
**4** is automated so that upon boot, it logs into the network,
accesses its multi-tasking environment such as Windows™, and
is ready to retrieve and play stored data files.

PLAYBACK BOOT SOFTWARE SEQUENCE **F**

27

1.   Playback unit **4** initializes network, with playback
     unit 4 being the server.

2.   Playback unit **4** logs into the network as player.

3.   Drive letter E: is mapped as "Play Here."  Drive E:
     is a RAM drive in which data files are stored for
     immediate playback, viewed on an NTSC monitor, or
     output to the station's master control.

4.   Driver letter F: is mapped as "Save Here."  This is
     the subdirectory on the hard disk drive of playback
     unit **4** wherein which host unit **3** stores data files
     received from remote unit **2**.

5.   Playback unit **4** executes WINDOWS™ or similar
     suitable multi-tasking environment such as OS/2
     from IBM, UNIX, or Novell®.

6.   WINDOWS™is automated to bring up the file manager.

     Once the recombined data file has been stored on a
network hard disk drive of playback unit **4**, the data file may
either remain stored for later use, edited, or retrieved for
output to the master control.  It may be advantageous to have
numerous host units networked with a single playback unit so
that numerous data files can be received from numerous remote
units simultaneously.  Alternatively, in a basic embodiment,
host unit **3** and playback unit **4** could be integrated into a
single host/playback unit.

     Playback unit **4** has a video card installed in an
expansion slot.  This video card is similar as the video card
installed in remote unit **2** with the exception that the capture
module is not necessary.  When a data file is retrieved by
playback unit **4** for output to the master control, the video
card decompresses the file and converts the digitized data to
VGA.

     If a data file received by host unit **3** is for immediate
playback, it is "stored" in the E: drive.  The E: drive is a

28

drive for temporary storage of the data file for immediate playback or output to the master control.

If the data file received by host unit **3** is for later playback or output, it is saved in the F: drive for later retrieval. The F: drive is a subdirectory of the hard disk drive of playback unit **4** for storage of data files.

Once decompressed and converted to VGA, a scan converter card installed in playback unit **4** converts the VGA signal to the desired broadcast signal. Although "NTSC" is the most common broadcast signal, the signal could also be converted to "PAL," "Y/C video," or other broadcast signal as required. This "NTSC" signal output from the scan converter card can be viewed on an "NTSC" monitor for immediate playback for broadcast, or stored on video tape or other conventional means for later use.

While the invention has been described with a certain degree of particularity, it is manifest that many changes may be made in the details of construction without departing from the spirit and scope of this disclosure. It is understood that the invention is not limited to the embodiment set forth herein for purposes of exemplification, but is to be limited only by the scope of the attached claim or claims, including the full range of equivalency to which each element thereof is entitled.

29

**CLAIMS**

**What is claimed is:**

*sub a 7*  1.   An apparatus for transmission of data, comprising:

2        a remote unit including means for capturing, compressing,
3    digitizing, storing, and transmitting at least one audio
4    and/or video signal;

5        a host unit including:

6            a.)  means for receiving at least one audio and/or
7            video signal transmitted by the remote unit;

8
9        a playback unit including:

10           a.)  means for exchanging data with said host unit;
11           b.)  means for storing the video signal received by
12           the host unit;
13           c.)  means for decompressing said video signal;
14           d.)  means for converting said digitized video
15           signal to a broadcast signal;

*sub b2 7* 2.   An apparatus according to claim 1 wherein the host unit
2    and the playback unit are combined in a single personal
3    computer.

*sub a2 7* 3.   An apparatus according to claim 1 wherein the video signal
2    is transmitted over telephone lines, cellular, radio and other
3    telemetric frequencies.

29

30

1    4.  An apparatus according to claim 3 further including means
2    for splitting and organizing the digitized, compressed audio
3    and/or video signal prior to transmission.

*SUB B4*    5.  An apparatus according to claim 1 wherein the means for
2    capturing, compressing and digitizing said audio and/video
3    signal includes a video card with a capture module installed
4    in said remote unit.

5    6.  An apparatus according to claim 5 wherein the means for
6    capturing, compressing and digitizing said audio and/or video
7    signal includes an audio card installed in said remote unit.

1    7.  An apparatus according to claim 3 wherein the means for
2    transmitting the video signal includes:

3        at least one interface installed in conjunction with said
4        remote unit;

5        a cellular telephone connected to said interface.

1    8.  An apparatus according to claim 1 wherein the means for
2    receiving the video signal transmitted from the remote unit
3    includes at least one interface installed in said host unit.

1    9.  An apparatus according to claim 1 wherein data is
2    exchanged between said host unit and said playback unit
3    through a computer to computer interface.

1    10.  An apparatus according to claim 1 wherein said means for
2    decompressing said video signal includes a decompression board
3    in said playback unit.

31

4     11.  An apparatus according to claim 1 wherein said means for
5     converting said digitized video signal to a broadcast signal
6     includes a scan converter card.

*sub93*

1     12.  An apparatus for transmission of data from a remote
2     location to a host location, comprising:

3         a remote unit capable of receiving an input and audio
4     and/or video signal;

5         said remote unit being a personal computer, including:

6             a.)  a video card having a video capture module to
7             capture, compress, and digitize said video signal
8             into a data file;
9             b.)  at least one computer inteface;
10           c.)  means for transmitting said data file;
11           d.)  means for splitting and organizing said data
12           file prior to transmission;
13           e.)  means for storing said data file;

14     a host unit;

15     said host unit being a personal computer, including:

16           a.)  at least one computer interface;
17           b.)  means for recombining the split data file;

18     a playback unit;

19     said playback unit being a personal computer, including:

20           a.)  means for exchanging data with said host unit;

32

21        b.)   means for storing the video signal received by
22        the host unit;
23        c.)   a decompression card for decompressing said
24        data file;
25        d.)   a scan converter card for converting said data
26        file to a broadcast signal;

1   13.   An apparatus according to claim 12 wherein the remote
2   unit includes a cellular telephone connected to each computer
3   interface.

1   14.   An apparatus according to claim 12 wherein the remote
2   unit includes a transmitter connected to each computer
3   interface such that each transmitter transmits at a different
4   frequency.

1   15.  An apparatus according to claim 12 wherein the means for
2   exchanging data between the playback unit and the host unit is
3   a computer to computer interface.

ADD A47

ADD B77

31

Express Mail Label No. TB5558787114US
Attorney Docket
Z0460.93

## DECLARATION AND POWER OF ATTORNEY

As a below named inventor, I hereby declare that:

My residence, post office address and citizenship are as stated below next to my name.

I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled:

### REMOTE VIDEO TRANSMISSION SYSTEM

the specification of which (check one)

[X] is attached hereto.

[ ] was filed on _____ as Application Serial No. _____
    and was amended on _____ (if applicable).

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, Section 1.56 (a).

I hereby claim foreign priority benefits under Title 35, United States Code, Section 119 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application to which priority is claimed:

#### PRIOR FOREIGN APPLICATION(S)

Priority Claimed
**NONE**

| (Number) | (Country) | (Day/month/year filed) | Yes [ ] | No [ ] |
|----------|-----------|------------------------|---------|--------|
| (Number) | (Country) | (Day/month/year filed) | Yes [ ] | No [ ] |
| (Number) | (Country) | (Day/month/year filed) | Yes [ ] | No [ ] |

[Page 1 of 3]

I hereby claim the benefit under Title 35, United States Code, Section 20 of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, Section 112, I acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, Section 1.56 (a) which occurred between the filing date of the prior application and the national or PCT international filing date of this application:

**NONE**

(Appl. Serial No.) (Filing date) (Status) (patented, pending, abandoned)

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

POWER OF ATTORNEY: As named inventor, or named inventors, I (We) hereby appoint the following attorney(s) and/or agent(s) to prosecute this application and transact all business in the Patent and Trademark Office connected therewith.

Frank Catalano, Registration No. 25,836
Scott R. Zingerman, Registration No. 35,422
Molly D. McKay, Registration No. 35,609

of Catalano, Zingerman & McKay, Avanti Building, 810 South Cincinnati, Suite 200, Tulsa, OK 74119, Telephone Number (918) 584-8787, members of the Bar of the State of Oklahoma, to prosecute this application to register, to transact all business in the Patent and Trademark Office in connection therewith, and to receive the Letters Patent Document, if issued.

SEND CORRESPONDENCE TO:                     DIRECT TELEPHONE CALLS TO:
Scott R. Zingerman                          Scott R. Zingerman
Catalano, Zingerman & McKay                 (918) 584-8787
810 South Cincinati, Suite 200
Tulsa, Oklahoma 74119

Full name of first inventor:     MITCHAEL C. FREEMAN

Inventor's signature: _____     2-16-94 .
                                                   DATE
Residence:             14318 East 11th Street, Tulsa, OK  74108
Citizenship:           United States of America
Post Office Address:   SAME AS ABOVE

[Page 2 of 3]

**Full name of Second Inventor:** RICHARD C. FREEMAN

Inventor's signature: _____   2-16- 94
                                                    DATE

Residence:              563 S. 87th East Avenue, Tulsa, OK  74112
Citizenship:            United States of America          OK
Post Office Address:    SAME AS ABOVE

**Full name of Third Inventor:** CHAD BOSS

Inventor's signature: _____   2- 16 -94
                                                    DATE

Residence:              14131 East 12th Street, Tulsa, OK  74108
Citizenship:            United States of America          OK
Post Office Address:    SAME AS ABOVE

**Full name of Fourth Inventor:** MICHAEL H. FREEMAN

Inventor's signature: _____   2/16/94
                                                    DATE

Residence:              R.R. 1, Box 315-A, Liberty Mounds, OK  74047
Citizenship:            United States of America          OK
Post Office Address:    SAME AS ABOVE

[Page 3 of 3]

Express Mail Label No. TB555878114US

Applicant:   Mitchael C. Freeman et al                    Attorneys Docket: Z0460.93
For:         Remote Video Transmission System

being filed simultaneously herewith.


## VERIFIED STATEMENT (DECLARATION) CLAIMING SMALL ENTITY
## STATUS (37 CFR 1.9(f) and 1.27(b) - INDEPENDENT INVENTOR

As a below named inventor, I hereby declare that I qualify as an independent inventor as defined in 37 CFR 1.9(c) for purposes of paying reduced fees under section 41(a) and (b) of Title 35, United States Code, to the Patent and Trademark Office with regard to the invention entitled:

REMOTE VIDEO TRANSMISSION SYSTEM

described in

    <u>X</u>   the specification filed herewith
    __   application serial no. _____, filed _____
    __   patent no. _____, issued _____

I have not assigned, granted, conveyed or licensed and am under no obligation under contract or law to assign, grant, convey or license, any rights in the invention to any person who could not be classified as an independent inventor under 37 CFR 1.9(c) if that person had made the invention, or to any concern which would not qualify as a small business concern under 37 CFR 1.9(d) or a nonprofit organization under 37 CFR 1.9(e).

Each person, concern or organization to which I have assigned, granted, conveyed, or licensed or am under an obligation under contract or law to assign, grant, convey, or license any rights in the invention is listed below:

    ___   no such person, concern, or organization
    <u>XX</u>   persons, concerns or organizations listed below*
    *Note:  Separate verified statements are required from each named person, concern or organization having rights to the invention averring to their status as small entities. (37 CFR 1.27)

FULL NAME:  Fonet, Inc.
ADDRESS:    2504 N. Hemlock Circle, Broken Arrow, OK  74012
[ ] INDIVIDUAL     [ X] SMALL BUSINESS      [ ]NONPROFIT ORGANIZATION

FULL NAME:  Computerized Automation Technologies, Inc., d/b/a PC Designs
ADDRESS:    2504 N. Hemlock Circle, Broken Arrow, OK  74012
[ ]     INDIVIDUAL  [X ] SMALL BUSINESS     [ ] NONPROFIT ORGANIZATION

1

I acknowledge the duty to file, in this application or patent, notification of any change in status resulting in loss of entitlement to small entity status prior to paying, or at the time of paying, the earliest of the issue fee or any maintenance fee due after the date on which status as a small entity is no longer appropriate. (37 CFR 1.28(b))

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application, any patent issuing thereon, or any patent to which this verified statement is directed.


Full Name of the Inventor:    MITCHAEL C. FREEMAN

Inventor's signature:

Date:    2-16-94


Full Name of the Inventor:    RICHARD D. FREEMAN
Inventor's signature.

Date:    2-16-94


Full Name of the Inventor:    CHAD BOSS

Inventor's signature:

Date:    2-16-94


Full Name of the Inventor:    MICHAEL H. FREEMAN

Inventor's signature:    Michael H. Freeman

Date:    2-16-94


2

Express Mail Label No. TB5558787114US

Applicant:     **MITCHAEL C. FREEMAN et al**          Attorneys Docket: Z0460.93
Serial No:
Filed or Issued:
For:           REMOTE VIDEO TRANSMISSION SYSTEM

### VERIFIED STATEMENT (DECLARATION) CLAIMING SMALL ENTITY STATUS (37 CFR 1.9(f) and 1.27(c) - SMALL BUSINESS CONCERN

I HEREBY DECLARE that I am

[ ]     the owner of the small business concern identified below:

[xx]    an official of the small business concern empowered to act on behalf of the concern identified below:

NAME OF CONCERN:      Fonet, Inc.
Address:              2504 N. Hemlock Circle
                      Broken Arrow, OK  74012

I hereby declare that the above identified small business concern qualifies as a small business concern as defined in 37 CFR 1.9(d) for purposes of paying reduced fees under section 41(a) and (b) of Title 35, United States Code, in that the number of employees of the concern, including those of its affiliates, does not exceed 500 persons. For purposes of this statement, (1) the number of employees of the business concern is the average over the previous fiscal year of the concern of the persons employed on a full-time, part-time or temporary basis during each of the pay periods of the fiscal year, and (2) concerns are affiliates of each other when either, directly or indirectly, one concern controls or has the power to control the other, or a third-party or parties controls or has the power to control both.

I hereby declare that rights under contract or law have been conveyed to, and remain with, the small business concern identified above with regard to the invention entitled:

### REMOTE VIDEO TRANSMISSION SYSTEM

by inventor(s): Mitchael C. Freeman, Richard C. Freeman, Chad Boss, and Michael H. Freeman

described in

[X ]    the specification filed herewith
[  ]    application S.N. 0 /_____, filed_____.
[ ]     Patent No._____, issued_____.

If the rights held by the above identified small business concern are not exclusive, each individual, concern or organization having rights in the invention is listed below, and no rights to the invention are held by any person, other than the inventor, who would not qualify as an independent inventor under 37 CFR 1.9(c) if that person made the invention, or by any concern which would not qualify as a small business concern under 37 CFR 1.9(d) or a nonprofit organization under 37 CFR 1 9(e).

NAME:      Fonet, Inc.
ADDRESS:   2504 N. Hemlock Circle
           Broken Arrow, OK  74012

[  ] Individual  [ X ] Small Business Concern
[  ] Nonprofit Organization

I acknowledge the duty to file, in this application or patent, notification of any change in status resulting in loss of entitlement to small entity status prior to paying, or at the time of paying, the earliest of the issue fee or any maintenance fee due after the date on which status as a small entity is no longer appropriate.  (37 CFR 1.28(b))

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application, any patent issuing thereon, or any patent to which this verified statement is directed.

Name of Person Signing _____

Title of Person Other than Owner: _VICE  PRESIDENT_____

Address of Person Signing _14131  E.  12  L_____
                          Tulsa   OK   74108

Date:_ 2-16-94 _____

Express Mail Label No. TB5558787114US

Applicant:     **MITCHAEL C. FREEMAN et al**                    Attorneys Docket: Z0460.93
Serial No:
Filed or Issued:
For:          REMOTE VIDEO TRANSMISSION SYSTEM

## VERIFIED STATEMENT (DECLARATION) CLAIMING SMALL ENTITY
## STATUS (37 CFR 1.9(f) and 1.27(c) - SMALL BUSINESS CONCERN

I HEREBY DECLARE that I am

[ ]      the owner of the small business concern identified below:

[xx]     an official of the small business concern empowered to act on behalf of the
         concern identified below:

NAME OF CONCERN:       Computerized Automation Technologies, Inc.
ADDRESS OF CONCERN:  2504 N  Hemlock Circle
                     Broken Arrow, OK  74012

I hereby declare that the above identified small business concern qualifies as a small
business concern as defined in 37 CFR 1.9(d) for purposes of paying reduced fees under section
41(a) and (b) of Title 35, United States Code, in that the number of employees of the concern,
including those of its affiliates, does not exceed 500 persons. For purposes of this statement, (1)
the number of employees of the business concern is the average over the previous fiscal year
of the concern of the persons employed on a full-time, part-time or temporary basis during each
of the pay periods of the fiscal year, and (2) concerns are affiliates of each other when either,
directly or indirectly, one concern controls or has the power to control the other, or a third-party
or parties controls or has the power to control both.

I hereby declare that rights under contract or law have been conveyed to, and remain with,
the small business concern identified above with regard to the invention entitled:

### REMOTE VIDEO TRANSMISSION SYSTEM

by inventor(s): Mitchael C. Freeman, Richard C. Freeman, Chad Boss, and Michael H. Freeman

described in

        [X ]     the specification filed herewith
        [  ]     application S.N. 0 /_____, filed_____.
        [ ]      Patent No._____, issued_____.

If the rights held by the above identified small business concern are not exclusive, each
individual, concern or organization having rights in the invention is listed below, and no rights to
the invention are held by any person, other than the inventor, who would not qualify as an
independent inventor under 37 CFR 1.9(c) if that person made the invention, or by any concern
which would not qualify as a small business concern under 37 CFR 1.9(d) or a nonprofit
organization under 37 CFR 1.9(e).

NAME:         Computerized Automation Technologies, Inc.
ADDRESS:      2504 N. Hemlock Circle
              Broken Arrow, OK  74012Fonet, Inc.

[ ] Individual  [ X ] Small Business Concern
[ ] Nonprofit Organization

I acknowledge the duty to file, in this application or patent, notification of any change in status resulting in loss of entitlement to small entity status prior to paying, or at the time of paying, the earliest of the issue fee or any maintenance fee due after the date on which status as a small entity is no longer appropriate.  (37 CFR 1.28(b))

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application, any patent issuing thereon, or any patent to which this verified statement is directed.

Name of Person Signing _____

Title of Person Other than Owner: _CEO_____

Address of Person Signing _5 6 3  S.  8 7  E  Ave_____

_Tulsa  OK  74112_____

Date: _2-16-94_____

PRINT OF DRAW ~GS
AS ORIGINAL.    LED

08/198130



FIG 1

PRINT OF DRAWINGS
AS ORIGINALLY FILED



FIG 2

CAPTURE    CONFIG

AUDIO ON/OFF    EXIT

VIEW   TRANSFER

FIG 3

DEFAULT DIRECTORY
XXXXX XXXXXX

NUMBER OF PHONES  X

CAPTURE LENGTH  XX

REMOTE #  XX

FRAMES/SEC  XX

CALL LETTERS  XXXX

AUDIO IS OFF

CHANGE DIR    OK    CANCEL

08/**198130**



Express Mail Label No. TB5558787114US
**PATENT**
Attorney Docket No. 0460.93Z

---

"EXPRESS MAIL" MAILING LABEL NUMBER
N o .   T B 5 5 5 8 7 8 7 1 1 4 U S

DATE OF DEPOSIT:  _February 16, 1994_
I HEREBY CERTIFY THAT THIS PAPER OR FEE IS BEING
DEPOSITED WITH THE UNITED STATES POSTAL SERVICE
"EXPRESS MAIL POST OFFICE TO ADDRESSEE" SERVICE
UNDER 37 cfr 1.10 ON THE DATE INDICATED ABOVE AND IS
ADDRESSED TO THE COMMISSIONER OF PATENTS AND
TRADEMARKS, WASHINGTON, D.C. 20231.

**Box Patent Application
Commissioner of Patents
and Trademarks
Washington, D.C. 20231**

_Scott R. Zingerman_
TYPED OR PRINTED NAME OF PERSON MAILING

_Scott R. Zingerman_
SIGNATURE OF PERSON MAILING PAPER OR FEE

---

## NEW APPLICATION TRANSMITTAL

Dear Sir:

Transmitted herewith for filing is the patent application of:

MITCHAEL C. FREEMAN et al

for:

REMOTE VIDEO TRANSMISSION SYSTEM

This application is an original and is in the English language.

Enclosed are the following papers:

28  Pages of specification
4   Pages of claims
1   Page Abstract
2   Sheets Drawings (informal)

Additional papers are enclosed as follows:

Declaration executed by the inventors.

**Information Disclosure Statement:**

An Invention Disclosure Statement with Form PTO-1449 is also enclosed.

**Fee Calculation:**

CLAIMS AS FILED

| Number Filed | Number Extra | Rate | Basic Fee $710.00 |
|---|---|---|---|
| Total Claims: 15 - 20 = | -0- | x $ 22.00 | -0- |
| Independent Claims:  2 - 3 = | -0- | x $ 74.00 | -0- |
| Multiple Dependent Claims | | $230.00 | -0- |

**Filing Fee Calculation    $ 710.00**

A Verified Statement Claiming Small Entity is enclosed.

**Filing Fee Calculation (50%) of above  $ 355.00**

The Commissioner is hereby authorized to debit the $355.00 filing fee to the deposit account of the undersigned, No. 03-1127.  In addition, the Commissioner is hereby authorized to credit any overpayment or debit any additional fees which might become due during the pendency of this application to the deposit account of the undersigned, No. 03-1127.

Respectfully submitted,

CATALANO, ZINGERMAN & McKAY

By_____
Scott R. Zingerman, Reg. No. 35,422
810 South Cincinnati, Suite 200
Tulsa, Oklahoma  74119
(918) 584-8787
Fax (938) 599-9889

2



08/198130

Express Mail Label No. TB5558787114US
Attorney Docket No.
Z0460.93

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

Patent application
of:        **MITCHAEL C. FREEMAN et al**

for:       **REMOTE VIDEO TRANSMISSION SYSTEM**

the specification of which is being transmitted herewith.


**Commissioner of Patents and Trademarks**
Washington, D.C.  20231


# INFORMATION DISCLOSURE STATEMENT

<u>**INFORMATION DISCLOSURE STATEMENT**</u>

  Submitted herewith are copies of patents, publications or other information of which we are aware, which we believe may be material to the examination of this application and in respect of which there may be a duty to disclose.

  The filing of this information disclosure statement shall not be construed as a representation that a search has been made (37 CFR 1.97(g)), an admission that the information cited is, or is considered to be, material to the patentability or that no other material information exists.

  The filing of this invention disclosure statement shall not be construed as an admission against interest in any manner. (Notice of January 9, 1992, 1135 O.G. 13-25, at 25.)

  Legible copies of all items listed in the attached Form PTO-1449 accompany this information statement.

The person making this statement is the attorney who signs below on the basis of the information in the attorney's file.

_Scott R. Zingerman_

Scott R. Zingerman, Reg. No. 35,422
CATALANO, ZINGERMAN & McKay
810 South Cincinnati, Suite 200
Tulsa, Oklahoma  74119
(918) 584-8787
Attorneys for Applicant

2

FORM PTO-1449

Sheet 1 of 1  *08/198138*

## INFORMATION DISCLOSURE STATEMENT BY APPLICANT

APPLICANT:  MITCHAEL C  FREEMAN et al        TITLE:   REMOTE VIDEO TRANSMISSION SYSTEM
Filed:                                        Atty. Docket No  Z0460.93

### U.S. PATENT DOCUMENTS

| Examiner Initial | | Document Number | Date | Name | Class | Subclass | Filing Date, if appropriate |
|---|---|---|---|---|---|---|---|
| PGA | | 2,095,360 | 10/12/37 | Green | 178 | 5 6 | |
| PGA | | 2,203,758 | 06/11/40 | Walker | 178 | 5 6 | |
| PGA | | 2,302,852 | 11/24/42 | Goddard | 250 | 6 | |
| PGA | | 2,576,115 | 11/27/51 | Hill | 178 | 44 | |
| PGA | | 2,881,427 | 04/07/59 | Huber | 343 | 200 | |
| PGA | | 4,311,877 | 01/19/82 | Kahn | 179 | 15.55R | |
| PGA | | 5,127,021 | 06/30/92 | Schreiber | 375 | 1 | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

### FOREIGN PATENT DOCUMENTS

| | | Document Number | Date | Country | Class | Subclass | Translation YES/NO |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

### OTHER ART (INCLUDING AUTHOR, TITLE, DATE, PAGES, ETC.)

| Type | Title | Date |
|---|---|---|
| Brochure | Microcom® Bridge/Router ™ *Introducing the WANmiser™ Advantage* | 9/93 |
| | | |
| | | |

PGA

Examiner___Patrick Assouad_____    Date:___6/27/95_____



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 08/198,130 | 02/16/94 | FREEMAN | M  0460.93Z |

|  | EXAMINER |
|---|---|
|  | ASSOUAD,P |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2414 | 3 |

24M1/0802

SCOTT R. ZINGERMAN
CATALANO, ZINGERMAN & MCKAY
810 SOUTH CINCINATI, STE. 200
TULSA, OK  74119

DATE MAILED:
08/02/95

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☒ This application has been examined   ☐ Responsive to communication filed on _____   ☐ This action is made final.

A shortened statutory period for response to this action is set to expire __3__ month(s), __0__ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I   THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☒ Notice of References Cited by Examiner, PTO-892.       2. ☒ Notice of Draftsman's Patent Drawing Review, PTO-948.
3. ☒ Notice of Art Cited by Applicant, PTO-1449.             4. ☐ Notice of Informal Patent Application, PTO-152.
5. ☐ Information on How to Effect Drawing Changes, PTO-1474..   6. ☐ _____

**Part II   SUMMARY OF ACTION**

1. ☒ Claims _____ 1-15 _____ are pending in the application.

   Of the above, claims _____ are withdrawn from consideration.

2. ☐ Claims _____ have been cancelled.

3. ☐ Claims _____ are allowed.

4. ☒ Claims _____ 1-15 _____ are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ Claims _____ are subject to restriction or election requirement.

7. ☒ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.

8. ☐ Formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____. Under 37 C.F.R. 1.84 these drawings
   are ☐ acceptable; ☐ not acceptable (see explanation or Notice of Draftsman's Patent Drawing Review, PTO-948).

10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on _____. has (have) been ☐ approved by the
    examiner; ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed _____, has been ☐ approved; ☐ disapproved (see explanation).

12. ☐ Acknowledgement is made of the claim for priority under 35 U.S.C. 119. The certified copy has ☐ been received ☐ not been received
    ☐ been filed in parent application, serial no. _____; filed on _____.

13. ☐ Since this application apppears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in
    accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

**EXAMINER'S ACTION**

Serial Number: 08/198,130                                          -2-

Art Unit: 2414


**Part III   DETAILED ACTION**

### *Drawings*

1.   This application has been filed with informal drawings which
are acceptable for examination purposes only.  Formal drawings
will be required when the application is allowed.   Also note the
enclosed PTO Form 948 from the Draftsperson.


### *Claim Rejections - 35 USC § 112*

2.   Claims 1-15 are rejected under 35 U.S.C. § 112, second
paragraph, as being indefinite for failing to particularly point
out and distinctly claim the subject matter which applicant
regards as the invention.  Specifically,


A claim should be a single sentence followed by a period.  Claim
1, line 15, and claim 12, line 26, ends with a semicolon.  See
MPEP 608.01(m).


In claim 1, line 4, and claim 12, line 4, and throughout, we have
"audio and/or video".  The mere use of an alternative expression
in a claim does not automatically render such claim vague and
indefinite. See <u>Ex parte Head</u>, 214 USPQ 551, 553 (P.O. Bd. App.
1982).  However, alternative expressions may render a claim
indefinite if the limitation covers *two different elements*.  In
claims 1 and 12, video and audio are definitely two different

Serial Number: 08/198,130                                          -3-

Art Unit: 2414


elements.  Therefore, claims 1 and 12 are vague and indefinite.
We do not see a clear definition of the instant invention.

In claim 1, lines 11, 13, 14, claim 3, line 1, "the video
signal", "said video signal", "said digitized video signal" lack
direct antecedent basis.  We see in claim 1, "audio and/or video
signal", and taking the "audio signal" yields this problem.
Similar problems are seen in independent claim 12.

In claim 1, line 15, and claim 12, line 26, what is the
definition of a "broadcast signal".  This is exceedingly vague
and indefinite.  Any signal sent to any other device or unit is a
possible "broadcast signal".  What is the specific nature of this
broadcast signal?

In claim 3, what are "telemetric frequencies"?  A "telephone
line", a "cellular [line]", etc. are not perceived by the
examiner to be so-called "frequencies" in and of themselves.
They do however operate under certain (frequency) bandwidth
limitations.  Furthermore, "and other telemetric frequencies" is
not a specific limitation.  What specific "other telemetric
frequencies" are being claimed here?

Serial Number: 08/198,130                                        -4-

Art Unit: 2414


In claim 3, line 2, we see "telephone lines, cellular, radio, **and**
(emphasis added) telemetric frequencies". The instant invention
as disclosed and best understood by the examiner, is not capable
of transmitting data over all these mediums *at the same time* as
is inferred from the claim as written.  This is a vague and
indefinite claim limitation.


In claim 4, "splitting and organizing" a signal is exceedingly
vague and indefinite.


Claims 8, 9, and 15 do not further limit claim 1 (or claim 12).
*All* computer-based units which communicate with one another will
include one or more communications interfaces by the very nature
of computer communications.  This is already present in claim 1.
It should also be noted that claim 1 inherently recites a
computer-based apparatus by the very nature of the "digital"
operations cited which include "storing" and other processing.


Claim 12, line 9, "inteface" should be --interface--.
Claim 12, line 3, "receiving an input" an exceedingly vague and
indefinite.


Claims not specifically cited above are rejected because they are
dependent upon a rejected base claim.

Serial Number. 08/198,130                                              -5-

Art Unit: 2414


### Claim Rejections - 35 USC § 102

3.   The following is a quotation of the appropriate paragraphs
of 35 U.S.C. § 102 that form the basis for the rejections under
this section made in this Office action:

> A person shall be entitled to a patent unless --
> (a) the invention was known or used by others in this
> country, or patented or described in a printed publication
> in this or a foreign country, before the invention thereof
> by the applicant for a patent.

Claims 1-15 are rejected under 35 U.S.C. § 102(a) as being
anticipated by **Rosenthal et al.** ("Planetary Data Distribution
System", **12/2/1993**).

**Rosenthal et al.** discloses a system that distributes
digitized video, text, and other data to desktop personal
computers via existing transmission facilities which may include
(but are not limited to): conventional tv relay satellites,
distributed cable systems, or other bandwidth-capable networks.
The most easily discernible correspondence between the instant
claimed invention and Fig. 1 of the disclosure is shown by the
diagram of the "PDDS" of **Rosenthal et al.** Note again that the
transmission mediums are not limited by this diagram and may
possibly include "other telemetric frequencies" such as telephone
lines, cellular, radio, etc. as stipulated by dependent claim 3
of the instant application.  Also note that the "capturing,
compressing digitizing, storing, and transmitting of at least one
audio and/or video signal" is clearly anticipated by **Rosenthal et
al.**

Serial Number: 08/198,130                                                          -6-

Art Unit: 2414

The applicant should also be made aware that the U.S.

Patent to **Gattis et al.** (5,062,136) has at least one common

inventor/author with this publication by **Rosenthal et al.**

## *Claim Rejections - 35 USC § 103*

4.   The following is a quotation of 35 U.S.C. § 103 which forms
the basis for all obviousness rejections set forth in this Office
action:

> A patent may not be obtained though the invention is not
> identically disclosed or described as set forth in section
> 102 of this title, if the differences between the subject
> matter sought to be patented and the prior art are such that
> the subject matter as a whole would have been obvious at the
> time the invention was made to a person having ordinary
> skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which
> the invention was made.

> Subject matter developed by another person, which qualifies
> as prior art only under subsection (f) or (g) of section 102
> of this title, shall not preclude patentability under this
> section where the subject matter and the claimed invention
> were, at the time the invention was made, owned by the same
> person or subject to an obligation of assignment to the same
> person.

Claims 1-15 are rejected under 35 U.S.C. § 103 as being

unpatentable over **Gattis et al.** ('136) in view of **Dykes et al.**

('671) and **Guillou** ('483).

The correspondence between the instant claimed invention

and that of **Gattis et al.** is as follows:  a) the remote unit is

#1 or #2 desktop computer 26A or 26B in combination with the

Serial Number: 08/198,130                                                    -7-

Art Unit: 2414


video camera 22A or 22B, the frame grabber, the CODECs, the
modem, and the encryptor/decryptor;  and b) the host unit is #1
or #2 desktop computer 26A or 26B in combination with the video
camera 22A or 22B, the frame grabber, the CODECs, the modem, and
the encryptor/decryptor;  and c) the playback unit is the video
camera 22A or 22B, the frame grabber, the CODECs, the modem, and
the encryptor/decryptor.

 Attention is directed specifically to col. 4, lines 66-68.
"The output signal from the sender requires no return; therefore,
the system can be used in the "broadcast" or one-way mode."
Attention should also be directed to the fact that the apparatus
of **Gattis et al.** further comprises means for interleaving non-
video information with selected picture lines (see at least claim
7) and that the modulator/demodulator, the CODEC devices, the
encryptor/decryptor devices, the frame grabber, and even the
digital display, all require some memory or storage capability to
obviously process digital information.

 The difference between the instant claimed invention and
that of **Gattis et al.** lies in the specific citation of
transmission via "cellular, radio and other telemetric
frequencies".  (Note above 35 USC 112 second paragraph
deficiencies regarding this also.)

 **Dykes et al.** teach a modem which includes connections for
both land lines and a cellular phone.  Cellular file transfer

Serial Number: 08/198,130                                      -8-

Art Unit: 2414


operations between remote and local host computers are clearly

aimed at "the coupling of functions between the computer and the

cellular telephone" (col. 1, lines 10-12).

Guillou clearly teach in at least Fig. 7 that the

transmission and reception of text and video signals through

radio broadcast means is not new in the art.

It would have been obvious to one of ordinary skill in the

art at the time the invention was made to incorporate cellular

telephone and radio broadcast transmission as taught by Dykes et

al. and Guillou, into the telecommunications system of Gattis,

because inter-computer communication, either by direct hardwire

connection, modem interfacing with a standard or cellular

telephone, or through the air via radiated radio waves, has been

known to efficiently link computer systems for the purpose of

transmitting both analog and digital-based text, graphics, audio,

video, etc.


### Conclusion

5.   The prior art made of record and not relied upon is

considered pertinent to applicant's disclosure.  See the enclosed

PTO Form 892.


6.   Any inquiry concerning this communication or earlier

communications from the examiner should be directed to Patrick

Serial Number: 08/198,130                                          -9-

Art Unit: 2414


Assouad whose telephone number is (703) 305-3811.  The examiner

can normally be reached Monday-Thursday from 6:45 AM to 5:15 PM.

Non-confidential electronic communications of a general nature

may also be forwarded to *"passouad@uspto.gov"*, via the Internet.

    If attempts to reach the examiner by telephone are

unsuccessful, the examiner's supervisor, Mr. Todd Voeltz, can be

reached at (703) 305-9714.  The fax number for this Group is

(703) 305-95[64,65].  NOTE: Unofficial communications or proposed

amendments MUST be marked DRAFT at the top of each  page to

prevent inadvertent entry into the permanent record.

    Any inquiry of a general nature or relating to the status of

this application should be directed to the Group receptionist

whose telephone number is (703) 305-3800.


Patrick J. Assouad

P♂A

7/17/95


EMANUEL T. VOELTZ
SUPERVISORY PATENT EXAMINER
GROUP 2400

TO SEPARATE, H·  TOP AND BOTTOM EDGES, SNAP—APART AND DISCARD CARBON

| FORM PTO-892 (REV. 2-92) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | SERIAL NO. 08/198,130 | GROUP ART UNIT 2414 | ATTACHMENT TO PAPER NUMBER 3 |
|---|---|---|---|---|
| NOTICE OF REFERENCES CITED | APPLICANT(S) Freeman et al. | | | |

**U.S. PATENT DOCUMENTS**

| | | DOCUMENT NO. | DATE | NAME | CLASS | SUB-CLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | A | 5 4 2 8 6 7 1 | 6/27/95 | Dykes et al. | 379 | 93 | 11/9/92 |
| | B | 5 2 3 5 6 8 0 | 8/10/93 | Bijnagte | 395 | 161 | |
| | C | 4 8 1 1 4 0 7 | 3/7/89 | Blokker Jr. et al. | 382 | 1 | |
| | D | 4 3 3 7 4 8 3 | 6/29/82 | Guillou | 358 | 114 | |
| | E | 5 0 6 2 1 3 6 | 10/29/91 | Gattis et al. | 380 | 18 | |
| | F | 5 2 6 2 8 7 5 | 11/16/93 | Mincer et al. | 358 | 335 | |
| | G | 5 1 3 0 7 9 2 | 7/14/92 | Tindell et al. | 358 | 85 | |
| | H | 5 3 7 5 0 6 8 | 12/20/94 | Palmer et al. | 364 | 514 | |
| | I | | | | | | |
| | J | | | | | | |
| | K | | | | | | |

**FOREIGN PATENT DOCUMENTS**

| | | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUB-CLASS | PERTINENT SHTS. DWG | PP. SPEC. |
|---|---|---|---|---|---|---|---|---|---|
| | L | | | | | | | | |
| | M | | | | | | | | |
| | N | | | | | | | | |
| | O | | | | | | | | |
| | P | | | | | | | | |
| | Q | | | | | | | | |

**OTHER REFERENCES (Including Author, Title, Date, Pertinent Pages, Etc.)**

| | |
|---|---|
| R | Rosenthal et al. "Planetary Data Distribution System", 12/2/1993, |
| S | |
| T | |
| U | |

| EXAMINER Patrick Assouad | DATE 7/17/95 | |
|---|---|---|

***** A copy of this reference is not being furnished with this office action. (See Manual of Patent Examining Procedure, section 707.05 (a).)**

Form PTO 948 (Rev. 10 94)          U.S DEPARTMENT OF COMMERCE - Patent and Trademark Office     Application No. *08/198,130*

# NOTICE OF DRAFTSPERSON'S PATENT DRAWING REVIEW

PTO Draftspersons review all originally filed drawings regardless of whether they are designated as formal or informal. Additionally, patent Examiners will review the drawings for compliance with the regulations. Direct telephone inquiries concerning this review to the Drawing Review Branch, 703-305-8404.

The drawings filed (insert date) **?**

A. ____ not objected to by the Draftsperson under 37 CFR 1.84 or 1.152

B. ____ objected to by the Draftsperson under 37 CFR 1.84 or 1.152 as indicated below. The Examiner will require submission of new, corrected drawings when necessary. Corrected drawings must be submitted according to the instructions on the back of this Notice.

1. DRAWINGS. 37 CFR 1.84(a). Acceptable categories of drawings:
Black ink. Color
___ Not black solid lines. Fig(s)_____
___ Color drawings are not acceptable until petition is granted.
Fig(s)_____

2. PHOTOGRAPHS. 37 CFR 1.84(b)
___ Photographs are not acceptable until petition is granted.
Fig(s)_____
___ Photographs not properly mounted (must use brystol board or photographic double-weight paper) Fig(s)_____
___ Poor quality (half-tone). Fig(s)_____

3. GRAPHIC FORMS. 37 CFR 1.84 (d)
___ Chemical or mathematical formula not labeled as separate figure Fig(s)_____
___ Group of waveforms not presented as a single figure using common vertical axis with time extending along horizontal axis.
Fig(s)_____
___ Individuals waveform not identified with a separate letter designation adjacent to the vertical axis. Fig(s)_____

4. TYPE OF PAPER. 37 CFR 1.84(e)
___ Paper not flexible, strong, white, smooth, nonshiny, and durable
✓ Sheet(s)_____
___ Erasures, alterations, overwritings, interlineations, cracks, creases, and folds copy machine marks not accepted Fig(s) *ALL*
___ Mylar, velum paper is not acceptable (too thin) Fig(s)____ ___

5. SIZE OF PAPER. 37 CFR 1.84(f): Acceptable sizes
21.6 cm. by 35.6 cm (8 1/2 by 14 inches)
21.6 cm. by 33.1 cm (8 1/2 by 13 inches)
21.6 cm. by 27.9 cm (8 1/2 by 11 inches)
21.0 cm by 29.7 cm (DIN size A4)
___ All drawing sheets not the same size. Sheet(s)_____
___ Drawing sheet not an acceptable size Sheet(s)_____

6. MARGINS. 37 CFR 1.84(g): Acceptable margins:

Paper size

| 21.6 cm. X 35.6 cm | 21.6 cm X 33.1 cm. | 21.6 cm X 27.9 cm | 21.0 cm X 29.7 cm |
|---|---|---|---|
| (8 1/2 X 14 inches) | (8 1/2 X 13 inches) | (8 1/2 X 11 inches) | (DIN size A4) |
| T 5.1 cm (2") | 2.5 cm (1") | 2.5 cm (1") | 2.5cm |
| L .64 cm. (1/4") | 64 cm (1/4") | .64 cm. (1/4") | 2.5 cm |
| R .64 cm. (1/4") | .64 cm (1/4") | .64 cm (1/4") | 1.5 cm |
| B .64 cm. (1/4") | .64 cm (1/4") | 64 cm. (1/4") | 1.0 cm |

Margins do not conform to chart above.
Sheet(s) **1 + 2**
✓ Top (T) ___ Left (L) ___ Right (R) ___ Bottom (B)

7. VIEWS. 37 CFR 1.84(h)
REMINDER: Specification may require revision to correspond to drawing changes.
___ All views not grouped together. Fig(s)_____
___ Views connected by projection lines or lead lines.
Fig(s)_____
___ Partial views. 37 CFR 1.84(h) 2

___ View and enlarged view not labeled separately or properly
Fig(s)_____
___ Sectional views. 37 CFR 1.84 (h) 3
___ Hatching not indicated for sectional portions of an object.
Fig(s)_____
___ Cross section not drawn same as view with parts in cross section with regularly spaced parallel oblique strokes. Fig(s)_____

8. ARRANGEMENT OF VIEWS. 37 CFR 1.84(i)
___ Words do not appear on a horizontal, left-to-right fashion when page is either upright or turned so that the top becomes the right side, except for graphs. Fig(s)_____

9. SCALE. 37 CFR 1.84(k)
___ Scale not large enough to show mechanism with crowding when drawing is reduced in size to two-thirds in reproduction.
Fig(s)_____
___ Indication such as "actual size" or scale 1/2" not permitted.
Fig(s)_____

10. CHARACTER OF LINES, NUMBERS, & LETTERS. 37 CFR 1.84(l)
✓ Lines, numbers & letters not uniformly thick and well defined, clean, durable, and black (except for color drawings).
Fig(s) *ALL*

11. SHADING 37 CFR 1.84(m)
✓ Solid black shading areas not permitted.
Fig(s) **1**
___ Shade lines, pale, rough and blurred. Fig(s)_____

12. NUMBERS, LETTERS, & REFERENCE CHARACTERS. 37 CFR 1.84(p)
✓ Numbers, letters, and reference characters not plain and legible. 37 CFR 1.84(p)(1) Fig(s) *ALL*
___ Numbers and reference characters not oriented in same direction as the view. 37 CFR 1.84(p)(1) Fig(s)_____
___ English alphabet not used. 37 CFR 1.84(p)(2)
Fig(s)_____
___ Numbers, letters, and reference characters do not measure at least .32 cm. (1/8 inch) in height. 37 CFR(p)(3)
Fig(s)_____

13. LEAD LINES. 37 CFR 1.84(q)
___ Lead lines cross each other. Fig(s)_____
___ Lead lines missing. Fig(s)_____

14. NUMBERING OF SHEETS OF DRAWINGS. 37 CFR 1.84(t)
___ Sheets not numbered consecutively, and in Arabic numerals, beginning with number 1. Sheet(s)_____

15. NUMBER OF VIEWS. 37 CFR 1.84(u)
___ Views not numbered consecutively, and in Arabic numerals, beginning with number 1. Fig(s)_____
___ View numbers not preceded by the abbreviation Fig.
Fig(s)_____

16. CORRECTIONS. 37 CFR 1.84(w)
___ Corrections not made from prior PTO-948.
Fig(s)_____

17. DESIGN DRAWING. 37 CFR 1.152
___ Surface shading shown not appropriate. Fig(s)_____
___ Solid black shading not used for color contrast.
Fig(s)_____

COMMENTS:

ATTACHMENT TO PAPER NO._____     REVIEWER   *LAM*     DATE *06/2*





GP2414

#-3½

Atty. Dkt. No. Z0460.93

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:   MITCHAEL C. FREEMAN et al

REMOTE VIDEO TRANSMISSION SYSTEM

Serial No:   08/198,130

Filed:   02/16/94

Group:   2314

Examiner:   Edward Pipala

Commissioner of Patents and Trademarks
Washington, D.C.  20231

"EXPRESS MAIL" MAILING LABEL NUMBER
_TB636 16959 X US_
DATE OF DEPOSIT: _7/3/95_
I HEREBY CERTIFY THAT THIS PAPER OR FEE IS BEING
DEPOSITED WITH THE UNITED STATES POSTAL SERVICE
"EXPRESS MAIL POST OFFICE TO ADDRESSEE" SERVICE
UNDER 37 cfr 1.10 ON THE DATE INDICATED ABOVE AND
IS ADDRESSED TO THE COMMISSIONER OF PATENTS
AND TRADEMARKS, WASHINGTON, D.C. 20231.

_Ruth A. Griffith_
TYPED OR PRINTED NAME OF PERSON MAILING

_Ruth A. Griffith_
SIGNATURE OF PERSON MAILING PAPER OR FEE

## TRANSMITTAL OF SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT BEFORE MAILING OF FIRST OFFICE ACTION

Dear Sir:

This Supplemental Information Disclosure Statement is being filed before the

mailing date of a first Office Action on the merits.  No certification or fee is believed

necessary.  However, the Commissioner is hereby authorized to debit any fees which may

be necessary to the deposit account of the undersigned, No. 03-1127.

Submitted herewith are copies of patents, publications or other information which

recently have been brought to our attention subsequent to the filing of the Information

Disclosure Statement which we believe may be material to the examination of this

application and in respect of which there may be a duty to disclose.

The filing of this information disclosure statement shall not be construed as a

representation that a search has been made (37 CFR 1.97(g)), an admission that the information cited is, or is considered to be, material to the patentability or that no other material information exists.

The filing of this invention disclosure statement shall not be construed as an admission against interest in any manner. (Notice of January 9, 1992, 1135 O.G. 13-25, at 25.)

Legible copies of all items listed in the attached Form PTO-1449 [Modified] accompany this information statement.

The person making this statement is the attorney who signs below on the basis of the information in the attorney's file.

Respectfully submitted,

By: _Scott R. Zingerman_
Scott R. Zingerman, Reg. No. 35,422
CATALANO, ZINGERMAN & ASSOCIATES
810 South Cincinnati, Suite 200
Tulsa, Oklahoma  74119
(918) 584-8787
Attorneys for Applicant

FORM PTO-1449 [MODIFIED]                                                    Sheet 1 of 1

## INFOR....TION DISCLOSURE STATEMENT BY AF..ICANT

APPLICANT:   MITCHEAL C. FREEMAN et al      TITLE:   REMOTE VIDEO TRANSMISSION SYSTEM
S.N.:        08/198,130                      Filed:   02/15/94              Atty. Dkt. No.  Z0460.93

### U.S. PATENT DOCUMENTS

| Examiner Initial | Document Number | Date | Name | Class | Subclass | Filing Date, if appropriate |
|---|---|---|---|---|---|---|
| | 5,390,239 | 2/95 | Morris et al | 379 | 93 | |
| | 5,365,272 | 11/94 | Siracusa | 348 | 426 | |
| | 5,361,278 | 11/94 | Vaupel et al | 375 | 122 | |
| | 5,355,450 | 10/94 | Garmon et al | 395 | 162 | |
| | 5,355,167 | 10/94 | Juri | 348 | 409 | |
| | 5,272,529 | 12/93 | Frederiksen | 358 | 133 | |
| | 5,148,272 | 9/92 | Acampora et al | 358 | 133 | |
| | 5,016,100 | 5/91 | Citta et al | 358 | 133 | |
| | 4,963,995 | 10/90 | Lang | 358 | 335 | |
| | 4,825,286 | 4/89 | Graves | 358 | 143 | |
| | 4,663,660 | 5/87 | Fedele et al | 358 | 136 | |
| | 3,969,040 | 11/90 | Gharavi | 358 | 136 | |

### FOREIGN PATENT DOCUMENTS

| | | Document Number | Date | Country | Class | Subclass | Translation YES/NO |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

### OTHER ART (INCLUDING AUTHOR, TITLE, DATE, PAGES, ETC.)

| Type | Title | Date |
|---|---|---|
| | | |
| | | |
| | | |

Examiner _____          Date: _____3/21/56_____

*GP234*
*#4*
**PATENT** *08-17-95*
*MJC*

In re Application of:

MITCHAEL C. FREEMAN

| | |
|---|---|
| Serial No: | 08/198,130 |
| Filed: | February 16, 1994 |
| For: | REMOTE VIDEO TRANSMISSION SYSTEM |
| Group No: | 2314 |
| Examiner: | Edward Pipala |

I HEREBY CERTIFY THAT THIS CORRESPONDENCE IS BEING DEPOSITED WITH THE UNITED STATES POSTAL SERVICE AS FIRST CLASS MAIL IN AN ENVELOPE ADDRESSED TO:  COMMISSIONER OF PATENTS AND TRADEMARKS, WASHINGTON, D.C. 20231, ON THE DATE SHOWN:

Date: _July 21, 1995_

_Scott R. Zingerman_
Scott R. Zingerman

## NOTIFICATION OF FILING OF
## CONTINUATION APPLICATION

Commissioner of Patents
and Trademarks

Washington, D.C.  20231

Dear Sir:

Notification is hereby being made of the filing of a continuation application for this case concurrently herewith.

Respectfully submitted,

CATALANO, ZINGERMAN & ASSOCIATES

By _Scott R. Zingerman_
Scott R. Zingerman, Reg. No. 35,422
810 S. Cincinnati, Suite 200
Tulsa, Oklahoma  74119
(918) 584-8787

Attorneys for Applicant



23/4

# 5

Atty. Dkt. No. Z0460.93

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:    MITCHAEL C. FREEMAN et al

REMOTE VIDEO TRANSMISSION SYSTEM

Serial No:    08/198,130

Filed:        02/16/94

Group:        2314

Examiner:     Edward Pipala

Commissioner of Patents and Trademarks
Washington, D.C.  20231

"EXPRESS MAIL" MAILING LABEL NUMBER
TB 838 826 538 U.S.
DATE OF DEPOSIT:
I HEREBY CERTIFY THAT THIS PAPER OR FEE IS BEING
DEPOSITED WITH THE UNITED STATES POSTAL SERVICE
"EXPRESS MAIL POST OFFICE TO ADDRESSEE" SERVICE
UNDER 37 cfr 1.10 ON THE DATE INDICATED ABOVE AND
IS ADDRESSED TO THE COMMISSIONER OF PATENTS
AND TRADEMARKS, WASHINGTON, D.C. 20231.

Janet Sanchez
TYPED OR PRINTED NAME OF PERSON MAILING

Janet Sanchez
SIGNATURE OF PERSON MAILING PAPER OR FEE

## TRANSMITTAL OF SECOND SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT BEFORE MAILING OF FIRST OFFICE ACTION

Dear Sir:

This Second Supplemental Information Disclosure Statement is being filed before the mailing date of a first Office Action on the merits.  No certification or fee is believed necessary.  However, the Commissioner is hereby authorized to debit any fees which may be necessary to the deposit account of the undersigned, No. 03-1127.

Submitted herewith are copies of patents, publications or other information which recently have been brought to our attention subsequent to the filing of the Information Disclosure Statement which we believe may be material to the examination of this application and in respect of which there may be a duty to disclose.

The filing of this information disclosure statement shall not be construed as a

representation that a search has been made (37 CFR 1.97(g)), an admission that the information cited is, or is considered to be, material to the patentability or that no other material information exists.

The filing of this invention disclosure statement shall not be construed as an admission against interest in any manner. (Notice of January 9, 1992, 1135 O.G. 13-25, at 25.)

Legible copies of all items listed in the attached Form PTO-1449 [Modified] accompany this information statement.

The person making this statement is the attorney who signs below on the basis of the information in the attorney's file.

Respectfully submitted,

By: _____
Scott R. Zingerman, Reg. No. 35,422
CATALANO, ZINGERMAN & ASSOCIATES
810 South Cincinnati, Suite 200
Tulsa, Oklahoma  74119
(918) 584-8787
Attorneys for Applicant

FORM PTO-1449 [MODIFIED]                                      Sheet 1 of 1

## INFORMATION DISCLOSURE STATEMENT BY APPLICANT

APPLICANT:   MITCHAEL C. FREEMAN et al         TITLE:  REMOTE VIDEO TRANSMISSION SYSTEM
S.N.:        08/198,130                         Filed:  02/15/94         Atty. Dkt. No.  Z0460.93

### U.S.PATENT DOCUMENTS

| Examiner Initial | | Document Number | Date | Name | Class | Subclass | Filing Date, if appropriate |
|---|---|---|---|---|---|---|---|
| PGM | | H1175 | 4/1993 | Giorgio | 370 | 118 | |
| PGM | | 4,637,035 | 1/1987 | Betts | 375 | 8 | |
| PGM | | 4,734,920 | 3/1988 | Betts | 375 | 8 | |
| PGM | | 4,862,456 | 8/1989 | Giorgio | 370 | 118 | |
| PGM | | 4,864,567 | 9/1989 | Giorgio | 370 | 118 | |
| PGM | | 5,058,133 | 10/1991 | Duncanson et al | 375 | 38 | |
| PGM | | 5,065,396 | 11/1991 | Castellano et al | 370 | 84 | |
| PGM | | 5,293,378 | 3/1994 | Shimizu | 370 | 94.1 | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

### FOREIGN PATENT DOCUMENTS

| | | Document Number | Date | Country | Class | Subclass | Translation YES/NO |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

### OTHER ART (INCLUDING AUTHOR, TITLE, DATE, PAGES, ETC.)

| Type | Title | Date |
|---|---|---|
| | | |
| | | |

Examiner _____   Date: 3/21/96



450-217

2414
#6/Ext.B
m.E
2-28-96

PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:

MITCHAEL C. FREEMAN ET AL

Serial No:    08/198,130

Filed:    02/16/94

For:   REMOTE VIDEO
       TRANSMISSION SYSTEM

Group No:   2414

Examiner:    P. Assouad

I HEREBY CERTIFY THAT THIS CORRESPONDENCE IS
BEING DEPOSITED WITH THE UNITED STATES POSTAL
SERVICE AS FIRST CLASS MAIL IN AN ENVELOPE ADDRESSED
TO:   COMMISSIONER OF PATENTS AND TRADEMARKS,
WASHINGTON, D.C. 20231, ON
THE DATE SHOWN:

Date: *Feb. 2, 1996*

*Ruth A. Griffith*
    Ruth A. Griffith

Commissioner of Patents and Trademarks
Washington, D.C.  20231

Dear Sir:

### PETITION AND FEE FOR EXTENSION OF TIME
### UNDER 37 CFR 1.136(a)

Commissioner of Patents and Trademarks
Washington, D.C.  20231

Dear Sir:

This is a Petition for an Extension of Time for a total of three months to February

2, 1996.

An Amendment in Response to the Office Action dated August 2, 1995 is filed

herewith for which this extension is requested.

Applicant is a small entity.  The Verified Statement has previously been filed.

Our Check in the amount of $450.00 is enclosed to cover a three-month extension fee for a small entity.

The Commissioner is hereby authorized to debit any additional fees or credit any overpayment in connection with this application to the deposit account of the undersigned, No. 03-1127.

Based on the extension requested in this petition, the extended period for response will expire February 2, 1996.

If an additional extension of time is required, please consider this a petition therefor.

Respectfully submitted,

CATALANO, ZINGERMAN & ASSOCIATES

By

Frank J. Catalano, Reg. No. 25,836
Scott R. Zingerman, Reg. No. 35,422
810 S. Cincinnati, Suite 200
Tulsa, Oklahoma 74119
(918) 584-8787

Attorneys for Applicant

02-02-1996 02:33PM   FRC   CATALAND,ZINGERMAN&ASSOC.   TO      2517057   P.02

#7
M.E
2-28-96

PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:

MITCHAEL C. FREEMAN ET AL

Serial No:   08/198,130

Filed:       02/16/94

For:   REMOTE VIDEO
       TRANSMISSION SYSTEM

Group No:   2414

Examiner:   P. Assouad

I HEREBY CERTIFY THAT THIS CORRESPONDENCE IS
BEING DEPOSITED WITH THE UNITED STATES POSTAL
SERVICE AS FIRST CLASS MAIL IN AN ENVELOPE
ADDRESSED TO: COMMISSIONER OF PATENTS AND
TRADEMARKS, WASHINGTON, D.C. 20231, ON
THE DATE SHOWN.

Date: FEB 2, 1996

Ruth O. Duffield

Rum A Griffith

Commissioner of Patents and Trademarks
Washington, D.C. 20231

Dear Sir:

## AFFIDAVIT UNDER 37 CFR §1.131

State of Oklahoma    )
                     ) ss.
County of Tulsa      )

We, Mitchael C. Freeman, Richard C. Freeman, Chad Boss, and Michael H. Freeman, being duly sworn, depose and state.

1    We are the co-inventors of claims 1-15 of the patent application identified above.

2    Prior to April 8, 1993, we conceived the idea of an apparatus that, among other things, captures, digitizes, and compresses a high resolution, full motion composite signal; splitting the resultant data file; and transmitting it via telemetric frequencies to a host location for subsequent use.

3.   An illustrated description of our invention (copy attached hereto as Exhibit "A") was provided to KFOR-TV in Oklahoma City, Oklahoma prior to April 8, 1993.

4.    A live demonstration of the invention described in Exhibit "A" was made to KFOR-TV in Oklahoma City, Oklahoma prior to April 8, 1993.

5.    Two units which embodied our invention were purchased by KFOR-TV from our licensee Fonet, Inc. and shipped prior to April 8, 1993 as evidenced by KFOR-TV purchase order dated April 5, 1993 (attached hereto as Exhibit "B").

6.    An August 16, 1993 article from Electronic Media (Exhibit "C") reports Melissa Klinzing of KFOR-TV as stating, "I took over in March (1993) and at that point Mike said it was perfected and we needed to buy it. . . we cut a deal and that was that. It's been phenomenal."

7.    Also, an article from the May 3, 1994 edition of the Tulsa World (Exhibit "D") describes our invention and its usage by KFOR-TV since April 1993. ("FirstLook Video is being used by television stations across the nation and Canada. KFOR-TV in Oklahoma City has been using the system since last April" [1993].

FURTHER AFFIANTS SAY NOT.

Mitchell Z. Freeman

Richard C. Freeman

Chad Boss

Michael H. Freeman

SUBSCRIBED AND SWORN TO BEFORE ME THIS 2nd DAY OF February, 1996.

Notary Public

Comm Expires: 12/28/97

## GENERAL DESCRIPTION OF CELLULAR VIDEO TRANSMISSION SYSTEM



Accepts any NTSC signal, ie. camera, VCR, laser disk, et cetera.

PVII Remote unit digitizes and compresses video/audio NTSC signal. Data may be divided and sent to multiple ports for output over cellular or continuous telephone systems. Data may be edited prior to transmission.

PVII Remote Unit

Audio/video files are split and transmitted via integrated cellular phones and antennas, or continuous telephone systems, to the Host Unit. The Host Unit is automated to wait for incoming video/audio data. When data is received, it is reassembeld in its original order and is ready for use. Data files are automatically catalogued visually by the system for easy installation.

PVII Host Unit

Playback Unit can access Host receiving unit for playback of video/audio as NTSC signal.

PVII Playback Unit

Playback via hardwire signal to NTSC monitor.

The PVII Host/Playback Video unit with NTSC output consists of:

- (i)    two FONET Host  units (PCs) with software
- (ii)   one monitor
- (iii)  two or more modems
- (iv)   two or more dedicated telephone lines

The Remote Video Compression unit consists of:

- (i)    two or more cellular transceivers with interface
- (ii)   two or more cellular antennas
- (iii)  one 9" SVGA monitor
- (iv)   one 1000 watt DC to AC converter
- (v)    one camera interface
- (vi)   one FONET Video System with software

Exhibit "A"

02-22-1996 02:35PM  FROM  CATALAND,ZINGERMAN&ASSOC.  TO  2517057  P.05

KFC   Oklahoma City  TEL-No.4054786205   ;    APr. 8,93  7:31 P.01



**STRONG
KFOR·TV**
800 E. Britton Rd.
P.O. Box 14069
Oklahoma City, OK 73113

PURCHASE ORDER  № 012594

| | | |
|---|---|---|
| Vendor FONET, Idc., | Ship to KFOR - TV | |
| Address 2504 N. Hemlock | Address 444 E. Britton Rd | |
| City Broken Arrow, OK 74102 | City O.C. | Zip Code OK 73113 |

| Date 4/7/93 | Delivery | Deliver Via Best Way | FOB/Carrier No / Description | Freight Collect | Prepaid | Date Required | Tax | |
|---|---|---|---|---|---|---|---|---|

| | Quantity | Item / Catalog No / Description | Account No | Cost Per Unit | Cost Extended |
|---|---|---|---|---|---|
| 1 | 2 | Fonet units (initially) | | | |
| 2 | | [2 units later] to include | | | |
| 3 | | software, computers, | | | |
| 4 | | monitors, cell phones, | | | |
| 5 | | modems, inverters, uninterrupted | | | |
| 6 | | power source, and on-site | | | |
| 7 | | training | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | 2 | units later (@ new ) | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |

☐ Confirming Phone Order to  Dick Freeman  Date 4/5/93

Received By _____

Approved By _____

Exhibit "B"

ELECTRONIC MEDIA *August 16, 1993*

16

**TECHNOLOGY**

# First Video allows risky close-ups of twisters

BY DANA BLANKENHORN
Special to ELECTRONIC MEDIA

There may be no tougher shot for a TV news operation than live, or near-live, footage of a tornado on the march.

But while covering a tornado can be risky, in markets such as Oklahoma City, getting a shot of a fast-moving tornado may mean the difference between winning or losing in the ratings.

NBC affiliate KFOR-TV in Oklahoma City has seen the cost of failure, according to news director Melissa Klinzing.

"May is our biggest month for weather, and we traditionally lose the May book," Ms. Klinzing says.

But not this year. By using digital compression, cellular modems, a satellite that can fix the position of a truck within 30 feet, and some brave photographers, KFOR had its strongest May book in years, thanks to its new First Video system.

The First Video system takes teamwork, Ms. Klinzing says. The camera operator has to work closely with the storm chaser to get within a half-mile of the storm and shoot a tape out the window.

The tape is digitized and compressed while the truck is moving.

Then, using two cellular phones with modems, the files are transmitted to the station.

"The computer sits in the front seat. It's about the same size as an airline carry-on, but with a TV monitor," Ms. Klinzing says. "Just plug the camera into the unit, and you can edit the tape frame-by-frame with a mouse. Then transmit it with the cellular system."

After the tape is reassembled from the files and rushed to broadcast, the field team can use the phones to offer live commentary on the storm and where it's heading.

PC Designs of Broken Arrow, Okla., sold KFOR the First Video system, which was designed by its FoNet unit.

According to PC Designs President Dick Freeman, "Each file is different," and phone line conditions can vary, too.

"Using the twin cellular modems, we've sent files as fast as 25,000 bits per second, as slow as 1,200 bits per second," Mr. Freeman says.

The average 15-second file takes two to three minutes to transmit, he says.

Mr. Freeman, whose company's biggest contract to date has been selling computers to California's prison system, is now showing First Video to cellular operators around the country for use in insurance, police work, medicine and other fields.

The files themselves are not typical TV fare, either. They may be as slow as 12 frames per second in black and white.

*(Continued on Page 24)*



# First Video allows tornado close-ups

*(Continued from Page 16)*

But their impact can be dramatic, when combined with a live voice from the truck and a system called NewsTracker 4.

NewsTracker 4 is a satellite-based global positioning system, Ms. Klinzing says.

Geographic data is matched with a road map that can pinpoint the truck's location within 30 feet.

"We can say a tornado was on the ground four minutes ago, and say our guys are driving down the road. [Camera operator] Chuck Musgrove can then report live from the truck as the tape plays," using the same cellular phone used to send the tape, Ms. Klinzing says.

But the system is good for more than just chasing tornadoes, she adds.

"We've got it in St. Louis now," she says, "Everyone's fighting for satellite time, so I sent First Video to St.

Louis. For two shows it gave us a real good view of the flood, without waiting for satellite time."

Another time, the First Video crew came upon a 15-car accident while it was chasing a storm.

"A farmer had been burning a field and the wind shifted, causing the accident," she says. "We beat the competition by at least two hours on that story."

Ms. Klinzing is quick to disclaim credit for the technology.

Meteorologist Mike Morgan, a technology expert, gets credit for knowing what was possible, while former news director Mark Toney, now at WBBM-TV in Chicago, told Mr. Morgan to look into it.

"I took over in March, and at that point Mike said it was perfected and we needed to buy it," Ms. Klinzing says. "We cut a deal and that was it. It's been phenomenal." #



Presents



Contents of this packet, excluding excerpts from *Electronic Media*, the *Tulsa World*, the *Hawaii Star-Bulletin*, *Broadcasting* and *Cable TV/Fax*, and *Communicator* are © 1993, 1994, 1995 FoNet, Inc.

EXHIBIT "C"

# KOTV Buys Portable Video Systen

Martin Mitchell
orld Staff Writer

KOTV Channel 6 has acquired innovative system capable of nding complete motion video d audio images via cellular one lines.

FirstLook Video, marketed by C Designs in Broken Arrow, is a volutionary system that allows otographers in the field to instantly send news footage back to e station without the use of microwave technology.

"We are very excited about this because we can now do what no her system in the Tulsa market in do right now," said KOTV ews Director David Duitch. "We 'e excited because we feel Jim iles has one more way to alert ewers about the dangerous orms that are approaching."

While KOTV will rely heavily n the system to chase storms, uitch said station personnel will be limited by their imaginaon" in regards to utilizing the nit.

Duitch said the station should ave the system on-line this week.

The portable unit — weighing ess than 30 pounds and about the ize of an airline carry-on case — igitizes and compresses the tape efore transmitting the images to ne station through two or more ellular phone lines.

The data then is reassembled nd footage is ready to air in a natter of minutes.

"We found television stations in competitive markets were looking for a way to get audio and voice images back to the station quickly," said PC Design Chairman and CEO Richard Freeman. 'A majority of our sales have come within the past 60 days."

FirstLook Video is being used by television stations across the nation and Canada. KFOR-TV in Oklahoma City has been using the system since last April.

FirstLook Video allows photographers to capture and send high-resolution, full-motion video that normally would require use of a microwave-satellite truck.

In those fast-breaking situations where a microwave truck isn't in the area, such as automobile accidents, fires or natural disasters, the FirstLook Video system proves an invaluable tool in today's competitive electronic media market," Freeman said.

"It can be used anywhere there is a power source, like a cigarette lighter or boat generator," Freeman said.

Photographers can also edit



World file p

The FirstLook Video unit transmits images to a television station via cellular phone.

footage while in the field. The system is capable of storing eight different clips of varying lengths in its database, all of which can be quickly retrieved and edited.

The unit's user friendly menu saves files by using the still image from the first frame of each file. This, Freeman said, allows the user to quickly find the correct footage to edit and transmit to the host unit at the station.

While obvious uses would include disasters and violent weather, Chad Boss, PC Design vice president, said one station in Wisconsin utilized FirstLook to provide updates on high school football games in the area.

"We traveled to three different football games, transmitting the signal from each game on the way to the next," Boss said. "The station would then provide updates between programs."

Freeman believes PC Designs' innovative system is not limited to broadcast media.

The company is working with hospitals in Texas on installing the FirstLook system in emergency vehicles.

Field personnel could film the injured individual and transmit images to the hospital. This would allow medical personnel to better understand the severity of injuries before patients arrive, Freeman said.

The insurance and automobile industry have also shown interest in the system, Freeman added.

Tuesday, May 3, 1994

**TULSA WORLD**

# BUSINESS

EXHIBIT "D"





PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:

MITCHAEL C. FREEMAN ET AL

Serial No:    08/198,130

Filed:    02/16/94

For:   REMOTE VIDEO
        TRANSMISSION SYSTEM

Group No:    2414

Examiner:    P. Assouad

I HEREBY CERTIFY THAT THIS CORRESPONDENCE IS
BEING DEPOSITED WITH THE UNITED STATES POSTAL
SERVICE AS FIRST CLASS MAIL IN AN ENVELOPE
ADDRESSED TO  COMMISSIONER OF PATENTS AND
TRADEMARKS, WASHINGTON, D.C. 20231, ON
THE DATE SHOWN:

Date:  *FEB. 2, 1996*

*Ruth A. Griffith*
*Ruth A. Griffith*

## AMENDMENT AND RESPONSE TO THE OFFICE ACTION DATED AUGUST 2, 1995

Commissioner of Patents and Trademarks

Washington, D.C.  20231

Dear Sir:

This is an Amendment responsive to the Office Action of August 2, 1995.

Please amend the above-identified application in the following manner:

IN THE CLAIMS:

Please cancel claims 8, 9, 11, and 15.

Please amend the following claims:

*SUB B17*

1. (Amended)         An apparatus for transmission of data, comprising:

a remote unit including means for capturing, compressing, digitizing, storing, and transmitting at least one [audio and/or video] composite signal;

a host unit including:

a.)      means for receiving at least one [audio and/or video] composite signal transmitted by the remote unit;

a playback unit including:

a.)      means for exchanging data with said host unit;

b.)      means for storing the [video] composite signal received by the host unit;

c.)      means for decompressing said [video] composite signal[;].

[d.)     means for converting said digitized video signal to a broadcast signal;]

*SUB B37*

3. (Amended)         An apparatus according to claim 1 wherein the [video] composite signal is transmitted over [telephone lines, cellular, radio [and] or other telemetric frequencies.

*SUB B5*

12. (Amended)        An apparatus for transmission of data from a remote location to a host location, comprising:

a remote unit capable of receiving [an input and audio and/or video] a composite signal;

2

said remote unit being a personal computer, including:

    a.)    a video card having a video capture module to capture, compress, and digitize said [video] <u>composite</u> signal into a data file;

    b.)    at least one computer [inteface] <u>interface;</u>

    c.)    means for transmitting said data file;

    d.)    means for splitting and organizing said data file prior to transmission;

    e.)    means for storing said data file



a host unit;

said host unit being a personal computer, including:

    a.)    at least one computer interface;

    b.)    means for recombining the split data file;

a playback unit;

said playback unit being a personal computer, including:

    a.)    means for exchanging data with said host unit;

    b.)    means for storing the [video signal] <u>data file</u> received by the host unit;

    c.)    a decompression card for decompressing said data file;

    d.)    a scan converter card for converting said data file to a broadcast signal[;] .

Please add the following new claims:

16.   An apparatus according to claim 1 including means for converting said composite signal to a VGA signal.

17.   An apparatus according to claim 16 further including means for converting said VGA signal to a broadcast signal.

18.   An apparatus according to claim 17 wherein said means for converting said VGA signal to a broadcast signal includes a scan converter card.

19.   An apparatus for transmission of data, comprising:

a personal computer including a video card having a video capture module to capture video;

means for transmission of said captured video over a cellular frequency.

20.   The apparatus of claim 19 wherein the means for transmission of said captured video over a cellular frequency includes;

at least one interface operating in conjunction with said computer;

a cellular telephone or land telephone line connected to each said interface.

37



21.   The apparatus of claim 2Ø wherein the captured video is split prior to transmission.--

## R E M A R K S

The Office Action dated August 2, 1995 rejects claims 1-15 under 35 U.S.C. §112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which Applicant regards as the invention.  Claims 1-15 are rejected under 35 U.S.C. §102(a) as being anticipated by Rosenthal et al (Planetary Data Distribution System) dated December 2, 1993.  Further, claims 1-15 are rejected under 35 U.S.C. §103 as being unpatentable over Gattis et al (U.S. P.N. 5,062,136) in view of Dykes et al (U.S. P.N. 5,428,671) and Guillou (U.S. P.N. 4,337,483).  For convenience and clarity in this Amendment and Response, Applicant hereby responds to the Office Action with numbered paragraphs corresponding to the numbered paragraphs contained in Part III of the Office Action.

1.   Applicant understands that this application has been filed with informal drawings which are acceptable for examination purposes only.   Applicant further understands that formal drawings will be required when the application is allowed.

2.   Claims 1-15 are rejected in the Office Action under 35 U.S.C. §112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the

5

subject matter which Applicant regards as the invention.   Pursuant to the above amendment to the claims and the following remarks, Applicant hereby responds to each specific rejection under 35 U.S.C. §112, second paragraph.   Applicant respectfully requests reconsideration and allowance of claims 1-15 upon the sufficient grounds and explanation herein presented.

Claims 1 and 12 are rejected because they end with a semi-colon.  Claims 1 and 12 have been amended above to end with a period.  This rejection is believed overcome.

In claim 1, line 4, and claim 12, line 4, and throughout, the alternative expression "audio and/or video" has been objected to as covering two different elements and thereby vague and indefinite.  As can be seen above regarding amended claims 1, 3, and 12, "audio and/or video" signal has been replaced with "composite" signal.   The term "composite signal" is generally known to mean a signal which includes components such as audio and/or video.  With regard to the present invention, the composite signal which is captured by the remote unit may have both audio and video components as is commonly known to be a "composite signal."  However, a "composite signal" having both audio and video information is necessarily a larger quantity of information and correspondingly has larger digitized file sizes.  In instances where rapid transmission of a video segment is desired in order to reduce the size of the resultant digitized and compressed data file to be transmitted to the host unit, the remote unit may be instructed to capture the video portions of the composite signal only.  Thus, this smaller data file can be transmitted faster than a larger one.  It is believed by Applicant that the amendments to claims 1, 3, and 12 wherein "composite" signal has been substituted for "audio and/or video" signal,

6

overcomes the indefiniteness rejection in the Office Action.

In claim 1, lines 11,13, 14 and claim 3, line 1, "the video signal", "said video signal", "said digitized video signal" have been rejected for lacking antecedent basis. The amendments to claims 1, 3, and 12, wherein "audio and/or video" signal has been substituted with "composite" signal also provides the antecedent basis to overcome this rejection.

The term "broadcast signal" in claim 1, line 15 and claim 12, line 26, is rejected in the Office Action as being vague and indefinite. Claim 1 is amended above to delete the term "broadcast signal". However, new claim 17 has been added which includes the term "broadcast signal".

In the specification, page 7, lines 31-33 and page 28, lines 7-15, the term "broadcast" is defined as being NTSC, PAL, Y/C video (or S Video) or other such broadcast signal. Although of different video waveforms, all formats are broadcast signals commonly known in the industry as recited in claims 12, 17, and 18.

The term "telemetric frequencies" has been objected to in claim 3. Telemetric frequencies, as used in the present application, includes any frequency over which a composite signal can be transmitted. As a matter of practicality, "telemetric frequency" could be any frequency on which data may be transmitted.

With further regard to claim 3, the Office Action has rejected the term "telephone lines, cellular, radio **and** telemetric frequencies" (emphasis added). Claim 3 has been amended to recite, "telephone lines, cellular, radio, **or** other telemetric. Applicant asserts, however, that it is possible to transmit over a plurality of these mediums at the same time.

7

Once the captured, digitized, and compressed composite signal is split pursuant to File Splitting Software C (pp. 22-24), it is transferred pursuant to Transfer Software Sequence B (pp. 19-22). It is conceivable that portions of a split file can be transmitted via cellular, land lines, and radio frequencies simultaneously. The mode of transmission of a block of a split file is irrelevant as long as it is received intact by the host unit. The host unit then reassembles the files, pursuant to File Reception Software Sequence E (pp. 25-26). The availability of multiple modes of transmission may be practical in situations or environments where the reliability of any particular mode changes. Further, transmission over two or more of the same transmission mediums provides   (a)   enhanced (faster) completed transmissions; and (b) redundancy for reliability. It is thus contemplated that if one or more transmission interface connections, the remaining interface connections can transmit all split files for complete transmission. In this fashion speed and reliability are achieved. The remote and host units can be configured with several different transmission modes.

The terms "splitting and organizing" in claim 4 has been objected to as being vague and indefinite. The term "splitting" is defined on page 22, line 18 - page 24, line 13, of the specification and includes the method in which files are split. The term "organizing" in claim 4 includes the affixation of a DOS archive bit set to each packetized portion of the split file, thereby identifying files on the directory of the remote unit which are to be transmitted. In the preferred embodiment 10k "packets" (sub-files) are employed. The organizing function is defined as described on page 22, line 26 - page 23, line 3 of the present application which recombines the packets (sub-files) into their proper sequence.

8

Claims 8, 9, and 15 have been rejected for failing to further limit claim 1.  Claims 8, 9, and 15 have been deleted herein.

Claim 12, line 9, has been corrected to read "interface" rather than "inteface".  The term "receiving on input" has been deleted from claim 12 pursuant to the above amendments to claim 12.

Pursuant to the amendments to the claims and the remarks herein, the rejections in the Office Action under 35 U.S.C. §112, second paragraph, are overcome.  Allowance of claims 1-7, 10, and 12-14 is respectfully requested.


3.      Claims 1-15 have been rejected in the Office Action under 35 U.S.C. §102(a) as being anticipated by Rosenthal et al.  ("Planetary Data Distribution System", 12/2/1993).  Reconsideration of claims 1-15 as amended herein is respectfully requested.

As pointed out, with gratitude, in the Office Action, the date of the Rosenthal et al reference is December 2, 1993.  Attention is directed to Applicants' Affidavit Under 37 CFR §1.131, which is incorporated herein by reference.  Pursuant to Applicants' Affidavit Under 37 CFR §1.131, Applicants conceived and reduced to practice their Remote Video Transmission System of the present invention including the subject matter of Applicants' claims 1-15 prior to April 8, 1993.  New claims 16-21 have been added herein.  The subject matter of new claims 16-21 was embodied in the device conceived and reduced to practice prior to April 8, 1993 and thus substantially earlier in time than Rosenthal et al.

Further, the "Remote Video Transmission System" invention of claims 1-15 was not described in the Rosenthal et al publication, and the date of the Rosenthal et al publication

9

is after the invention of the "Remote Video Transmission System" by Applicants.

The Rosenthal et al "Planetary Data Distribution System" publication is not prior art and cannot anticipate Applicants' claims under 35 U.S.C. §102(a). The rejection in the Office Action under 35 U.S.C. §102(a) is overcome. Allowance of claims 1-15 is respectfully requested.

4.     Claims 1-15 have been rejected in the Office Action under 35 U.S.C. §103 as being unpatentable over Gattis et al ('136) in view of Dykes et al ('671) and Guillou ('483). Claims 1, 3, and 12 have been amended, and claims 8, 9, 11, and 15 have been canceled in this Amendment and Response. Reconsideration and allowance of claims 1-7, 10, and 12-14 is hereby respectfully requested.

The Gattis et al ('136) patent lacks a significant element contained within Applicants' independent claims 1 and 12 which is not supplied by Dykes et al or Guillou. Specifically, amended claim 1 requires "means for capturing, compressing, digitizing, storing, and transmitting at least one composite signal" (emphasis added). Claim 12 recites "a remote unit being a personal computer, including:  a.) a video card having a video capture module to capture, compress, and digitize said signal into a data file."

Significantly, Gattis et al as referenced on page 7 of the Office Action, and in column 3, line 67 - column 4, line 3, of Gattis, discloses the usage of a frame grabber 24A. This device only contemplates an uninterrupted, continuous stream of information digitized on a line by line of resolution basis that ultimately represent a sequence of "pictures." Gattis does not contemplate the creation of full-motion composite signal video information

10

into digitized files which can be stored, transmitted, played or replayed. This is a very significant difference. Under Gattis the video quality is depicted by the available connection speed, and the lower the speed the lower the quality of the frames grabbed. Moreover, the system disclosed in Gattis even fails if the connection is not a continuous link sufficiently fast to provide "an acceptable picture." Gattis, column 8, line 66. Thus, Gattis does not disclose the creation of a data file as required by Applicants' claims. Also, Gattis does not contemplate the ability to provide a high quality full-motion picture with lower band width connections and cannot take into account the actual variables encountered in video data transmissions (whether analog or digital) including: variable baud rates; interference; line loss and the like. However, in Applicants' invention, full-motion composite signal is captured into digitized files and transmitted over narrow (slow) and/or intermittent band widths while and still maintaining the original captured quality of the video.

Neither Dykes et al, nor Guillou supply this important deficiency of Gattis et al. Claims 1-7, 10, and 12-14 must be allowed at least for this reason and is respectfully requested. Claims 2-7 and 10 depend upon claim 1 and Claims 13-14 depend upon claim 12 and are all allowable at least for the reasons set forth above with regard to claims 1 and 12.

Further, claims 5, 12, 13, and 14 all require "means for splitting and organizing the digitized, compressed, composite signal prior to transmission." As discussed above with regard to the rejections under 35 U.S.C. §112, the means for splitting and organizing the digitized, compressed composite signal prior to transmission includes splitting the

11

captured, organized, and compressed composite signal according to the present application (p. 22, line 18 - p. 24, line 14). Gattis does not disclose splitting the file prior to transmission. In fact, Gattis recognizes the problem of transmission speed. In column 4, lines 9-13, Gattis states, "Efficient transmission of such signals without overloading the transmission channel requires the use of a compressed code. A compressed code also reduces the amount of memory required to store each frame." Although the present invention employs compression technology, transmission speed is increased by splitting and then simultaneously transmitting the portions of the split file. Gattis, column 4, lines 21-22, states:

> "The video signal fed into the encoder/compressor 30A should be a standard black and white signal."

Capture of full motion color video with audio produces a much larger digitized data file. Transmission of that large file in real time necessitates the splitting function described by Applicants.

Applicants have added new claims 16-21. New claims 16-21 do not include new subject matter. The arguments contained herein in response to the rejections under 35 U.S.C. §112, 102(a) and 103 apply to new claims 16-20. Allowance is respectfully requested.

12

The application as originally filed had 15 claims, including two independent claims. In this Amendment four dependent claims have been canceled. One independent claim and five dependent claims have been added. This totals 3 independent claims, and 14 dependent claims. Therefore, it is not believed any additional filing fee is necessary. However, the Commissioner is hereby authorized to credit any overpayment or debit any additional fees which may be due in connection with this Amendment to the deposit account of the undersigned, No. 03-1127.

In view of the above comments and amendments to the claims which clearly distinguish the claims for the prior art, it is respectfully requested that the Office Action be reconsidered and that the application be allowed.

Respectfully submitted,

CATALANO, ZINGERMAN & ASSOCIATES

By

Frank J. Catalano, Reg. No. 25,836
Scott R. Zingerman, Reg. No. 35,422
810 S. Cincinnati, Suite 200
Tulsa, Oklahoma 74119
(918) 584-8787
Attorneys for Applicant

13



**UNITED STATES . .PARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address:   COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | . | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 08/198,130 | 02/16/94 | FREEMAN | M | 0460.93Z |

24M1/0328

SCOTT R. ZINGERMAN
CATALANO, ZINGERMAN & MCKAY
810 SOUTH CINCINATI, STE. 200
TULSA, OK  74119

ASSOUAD EXAMINER

| ART UNIT | PAPER NUMBER |
|---|---|
| 2414 | 9 |

DATE MAILED:

03/28/96

**Please find below and/or attached an Office communication concerning this application or proceeding.**

Commissioner of Patents and Trademarks

| | Application No. | Applicant(s) |
| --- | --- | --- |
| ***Office Action Summary*** | 08/284,061 | **Freeman et al.** |
| | Examiner | Group Art Unit |
| | **Patrick Assouad** | **2414** |

X Responsive to communication(s) filed on _Feb 6, 1996_ _____ .

☐ This action is **FINAL**.

☐ Since this application is in condition for allowance except for formal matters, **prosecution as to the merits is closed** in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11; 453 O.G. 213.

A shortened statutory period for response to this action is set to expire ____*3*____ month(s), or thirty days, whichever is longer, from the mailing date of this communication. Failure to respond within the period for response will cause the application to become abandoned. (35 U.S.C. § 133). Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

Disposition of Claims

  X Claim(s) _1-7, 10, 12-14, and 16-21_ _____ is/are pending in the application.

    Of the above, claim(s) _____ is/are withdrawn from consideration.

  ☐ Claim(s) _____ is/are allowed.

  X Claim(s) _1-7, 10, 12-14, and 16-21_ _____ is/are rejected.

  ☐ Claim(s) _____ is/are objected to.

  ☐ Claims _____ are subject to restriction or election requirement.

**Application Papers**

  ☐ See the attached Notice of Draftsperson's Patent Drawing Review, PTO-948.

  ☐ The drawing(s) filed on _____ is/are objected to by the Examiner.

  ☐ The proposed drawing correction, filed on _____ is  ☐ approved  ☐ disapproved.

  ☐ The specification is objected to by the Examiner.

  ☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. § 119**

  ☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d).

    ☐ All  ☐ Some*  ☐ None   of the CERTIFIED copies of the priority documents have been

      ☐ received.

      ☐ received in Application No. (Series Code/Serial Number) _____ .

      ☐ received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    *Certified copies not received: _____

  ☐ Acknowledgement is made of a claim for domestic priority under 35 U.S.C. § 119(e).

**Attachment(s)**

  X Notice of References Cited, PTO-892

  X Information Disclosure Statement(s), PTO-1449, Paper No(s). ___*5*___

  ☐ Interview Summary, PTO-413

  ☐ Notice of Draftsperson's Patent Drawing Review, PTO-948

  ☐ Notice of Informal Patent Application, PTO-152

--- *SEE OFFICE ACTION ON THE FOLLOWING PAGES* ---

Serial Number: 08/284,061                                    -2-

Art Unit: 2414


**Part III    DETAILED ACTION**

### Response to Amendment

1.  This action is responsive to the amendment filed 2/6/1996.

Claims 1-7, 10, 12-14, and 16-21 are pending.  Claims 8-9, 11,

and 15 have been cancelled by the amendment.  Claims 16-21 have

been added by the amendment.


2.  Claims 1-15 have been amended properly and therefore the 35

USC 112, second paragraph rejection of claims 1-15 is withdrawn.


3.   Applicant's arguments with respect to claims 1-15 have been

considered but are deemed to be moot in view of the new grounds

of rejection.


### Claim Rejections - 35 USC § 103

4.   The following is a quotation of 35 U.S.C. § 103 which forms
the basis for all obviousness rejections set forth in this Office
action:

> A patent may not be obtained though the invention is not
> identically disclosed or described as set forth in section
> 102 of this title, if the differences between the subject
> matter sought to be patented and the prior art are such that
> the subject matter as a whole would have been obvious at the
> time the invention was made to a person having ordinary
> skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which
> the invention was made.

> Subject matter developed by another person, which qualifies
> as prior art only under subsection (f) or (g) of section 102
> of this title, shall not preclude patentability under this
> section where the subject matter and the claimed invention

Serial Number: 08/284,061                                    -3-

Art Unit: 2414

      were, at the time the invention was made, owned by the same
      person or subject to an obligation of assignment to the same
      person.

5. Claims 1-7, 10, 12-14, and 16-21 are rejected under 35 U.S.C.

§ 103 as being unpatentable over **Yurt et al.** (**'275)** which has

priority to **1/7/1991** in view of **Gattis et al.** (**'136)** which has

priority to **9/12/1990** or **Palmer et al.** (**'068)** which has priority

to **6/3/1992**.

      **Yurt et al**. disclose an audio and video transmission and

receiving system.  "The compressed and encoded audio and/or video

information is sent over standard telephone, cable or satellite

broadcast channels to a receiver..." {Abstract}.

      As per independent claims 1, 12: the "remote unit" is the

library and transmission means of **Yurt et al.**; the "host unit"

and the "playback unit" are the reception or the requesting means

and the playback means of **Yurt et al**.

      As per independent claim 19 and dependent claims 3, 7, 13,

14, 20:  **Yurt et al**. do not limit themselves to any particular

transmission "frequency" or "telemetric frequency". See col. 4,

lines 54-65, col. 16, lines 9-20, and col. 17, lines 1-5 of **Yurt**

**et al**.  We see that the communication channels may include:

common telephone service, ISDN and B-ISDN, DBS, cable television,

microwave, VHF, UHF, satellite broadcasting, and MAN.  Note that

MANs {Metropolitan Area Networks} are common carrier or private

Serial Number: 08/284,061                                    -4-
Art Unit: 2414

communication channels designed to link sites in a region.  From
the above, **Yurt et al**. is certainly not limited to, but clearly
may include, a particular (telemetric) frequency band, namely
cellular, in the case of the instant claimed invention.

The difference between the instant claimed invention and
that of **Yurt et al**. lies in the notion of the "computer-based"
means of the system; video/audio is displayed/played on a
personal computer (versus a standard television monitor) which of
course requires the appropriate hardware to do so.

Both **Palmer et al**. and **Gattis et al**. teach the conversion of
various standard video formats into a format suitable for
processing and display by a personal computer or workstation.

Therefore, it would have been obvious to one of ordinary
skill at the time the invention was made to incorporate the
reception and transmission of standard video/audio from a
standard personal computer/workstation as taught by **Palmer et al**.
or **Gattis et al**. into the audio and video transmission and
reception system of **Yurt et al**. because "desktop" video
communications were clearly anticipated by the above inventors
and this can only be accomplished via the appropriate video/audio
conversion hardware as disclosed and taught.

See at least col. 6, lines 8-44 of **Palmer et al**. or col. 4,
lines 1-24 of **Gattis et al**.

Serial Number: 08/284,061                                    -5-
Art Unit: 2414

Note that the "scan converter card" of the instant invention
is simply the frame grabber in combination with the
encoding/decoding hardware as shown in Fig. 2 of **Palmer et al**. or
Fig. 1 of **Gattis et al**.

As per dependent claim 2, the notion of a "computer-based"
system is addressed above.

As per dependent claims 5 and 6, the "video card" is again
the above-mentioned "frame grabber" in combination with the
encoding decoding hardware of **Palmer et al**. or **Gattis et al**.   The
"audio card" is seen in at least the "audio subsystem" (element
32) of Fig. 2 of **Palmer et al**.

As per dependent claim 10, the "decompression board" is
clearly seen in Fig. 1 of **Gattis et al**. or Fig. 2 of **Palmer et
al**.

As per dependent claims 16-18, note that "VGA" is simply one
standard computer display resolution/format and its conversion
to/from a "broadcast signal" is clearly taught (as mentioned
above) by both **Gattis et al**. and **Palmer et al**.

As per dependent claim 21, (while broadly interpreting this
claim) all three of the above cited references "split" the video
data prior to transmission.  This is of course necessary for
conversion and transmission purposes.

Serial Number: 08/284,061                                          -6-

Art Unit: 2414

### *Conclusion*

6.    Any inquiry concerning this communication or earlier

communications from the examiner should be directed to Patrick

Assouad whose telephone number is (703) 305-3811.  The examiner

can normally be reached Monday-Thursday from 6:45 AM to 5:15 PM.

If attempts to reach the examiner by telephone are

unsuccessful, the examiner's supervisor, Mr. Todd Voeltz, can be

reached at (703) 305-9714.  The fax number for this Group is

(703) 305-9731.

     (Note that the Examiner can also be reached for informal

communication via the Internet at: *passouad@uspto.gov*)

     Any inquiry of a general nature or relating to the status of

this application should be directed to the Group receptionist

whose telephone number is (703) 305-3800.


Patrick J. Assouad

*PDA*
*3/25/96*


**EMANUEL T. VOELTZ**
**SUPERVISORY PATENT EXAMINER**
**GROUP 2400**

3-25-96

| *Notice of References Cited* | Application No. 08/198,130 | Applicant(s) Freeman et al. | | | |
|---|---|---|---|---|---|
| | Examiner **Patrick Assouad** | Group Art Unit 2414 | | Page 1 of 1 | |

### U.S. PATENT DOCUMENTS

| | DOCUMENT NO. | DATE | NAME | CLASS | SUBCLASS |
|---|---|---|---|---|---|
| A | 5,253,275 | 10/12/93 | Yurt et al. | 375 | 122 |
| B | 5,482,043 | 1/9/96 | Zulauf | 128 | 660.04 |
| C | 5,495,284 | 2/27/96 | Katz | 348 | 15 |
| D | 5,247,347 | 9/21/93 | Litteral et al. | 358 | 85 |
| E | 5,440,336 | 8/8/95 | Buhro et al. | 348 | 13 |
| F | | | | | |
| G | | | | | |
| H | | | | | |
| I | | | | | |
| J | | | | | |
| K | | | | | |
| L | | | | | |
| M | | | | | |

### FOREIGN PATENT DOCUMENTS

| | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUBCLASS |
|---|---|---|---|---|---|---|
| N | | | | | | |
| O | | | | | | |
| P | | | | | | |
| Q | | | | | | |
| R | | | | | | |
| S | | | | | | |
| T | | | | | | |

### NON-PATENT DOCUMENTS

| | DOCUMENT (Including Author, Title, Source, and Pertinent Pages) | DATE |
|---|---|---|
| U | McConnell, "TV, Phone Home; GTE Mobilnet Service is Delivering Compressed Video over Cellular Channels". | 5/2/1994 |
| V | Communications Daily, "Odetics Demonstrated FasTrans2000 Digital Cellular Transmitter Capable of Sending Compressed Digital Video over Cellular Link". | 9/13/1994 |
| W | | |
| X | | |

| *Interview Summary* | Application No. 08/198,130 | Applicant(s) Freeman et al. | |
|---|---|---|---|
| | Examiner Patrick Assouad | Group Art Unit 2414 | |

All participants (applicant, applicant's representative, PTO personnel):

(1) *Patrick Assouad, Todd Voeltz*          (3) *Mitchael Freeman, Richard Freeman* _____

(2) *Scott Zingerman* _____ (4) ~~*Chad Bose*~~, *Michael Freeman* _____
                                                    *PGM*

Date of Interview _____ *May 21, 1996* _____

Type: ☐ Telephonic   ☒ Personal (copy is given to   ☐ applicant   ☒ applicant's representative).

Exhibit shown or demonstration conducted:   ☒ Yes   ☒ No.   If yes, brief description:    *PGM*

___Unit as a whole was demonstrated._____

Agreement ☐ was reached.   ☒ was not reached.

Claim(s) discussed: *1, 2, 5-7, 12, and 19-38* _____

Identification of prior art discussed:
*Prior art of record; most specifically, Yurt et al. ('275) & Gattis et al. ('136).*
_____

Description of the general nature of what was agreed to if an agreement was reached, or any other comments:
*The draft or proposed amendment faxed on 5/20/1996 (enclosed in application, but not entered) was discussed. This proposed amendment will be considered in view of the comments/arguments made in the interview and upon a further review of the art of record. An official response to the rejection mailed 3/28/96 should nevertheless be filed by Applicant within the prescribed time limit.* Also, claim 19 will include amendments to clarify the limitations on "compression" upon filing of formal amendment.
_____
_____
_____
_____

(A fuller description, if necessary, and a copy of the amendments, if available, which the examiner agreed would render the claims allowable must be attached. Also, where no copy of the amendents which would render the claims allowable is available, a summary thereof must be attached.)

1. ☒   It is not necessary for applicant to provide a separate record of the substance of the interview.

Unless the paragraph above has been checked to indicate to the contrary, A FORMAL WRITTEN RESPONSE TO THE LAST OFFICE ACTION IS NOT WAIVED AND MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW. (See MPEP Section 713.04). If a response to the last Office action has already been filed, APPLICANT IS GIVEN ONE MONTH FROM THIS INTERVIEW DATE TO FILE A STATEMENT OF THE SUBSTANCE OF THE INTERVIEW.

2. ☐   Since the Examiner's interview summary above (including any attachments) reflects a complete response to each of the objections, rejections and requirements that may be present in the last Office action, and since the claims are now allowable, this completed form is considered to fulfill the response requirements of the last Office action. Applicant is not relieved from providing a separate record of the interview unless box 1 above is also checked.

*Patrick Assouad*    5/21/96

Examiner Note: You must sign and stamp this form unless it is an attachment to a signed Office action.

# BEST COPY

05-20-1996 12:22PM   FROM  CATALANO,ZINGERMAN&ASSOC.   TO        17033059731   P.02

PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:

MITCHEAL C. FREEMAN ET AL

Serial No:    08/198,130

Filed:        02/16/94

For:   REMOTE VIDEO
       TRANSMISSION SYSTEM

Group No:   2414

Examiner:   P. Assouad

## AMENDMENT AND RESPONSE TO THE OFFICE ACTION DATED MARCH , 1996

Commissioner of Patents and Trademarks

Washington, D.C.  20231

Dear Sir:

This is an Amendment responsive to the Office Action of March , 1996.

Please amend the above-identified application in the following manner:

IN THE CLAIMS:

Please amend the following claims:

1     1.    (Twice Amended)   An apparatus for transmission of data, comprising:

1

2          a mobile remote unit including:

3                  a.)      means for capturing, digitizing, and compressing[, digitizing, storing,

4                  and transmitting] at least one composite signal;

5                  b.)      means for storing said composite signal;

6                  c.)      means for transmitting said composite signal;

7          a host unit including:

8                  a.)      means for receiving at least one composite signal transmitted by the

9                  remote unit;

10         a playback unit including:

11                 a.)      means for exchanging data with said host unit;

12                 b.)      means for storing the composite signal received by the host unit;

13                 c.)      means for decompressing said composite signal.


1          2.      (Amended)  An apparatus according to claim 1 wherein the host unit and

2          the playback unit are combined in a single [personal] computer.


1          5.      (Amended)  An apparatus according to claim 1 wherein the means for

2          capturing, digitizing, and compressing [and digitizing] said [audio and video]

3          composite signal includes a video [card with a] capture [module] device installed in

4          said remote unit to capture said composite signal in real time.


1          6.      (Amended)  An apparatus according to claim 5 wherein the means for

2

2    capturing, compressing and digitizing said [audio and/or video] <u>composite</u> signal

3    includes an audio [card] <u>capture device</u> installed in said remote unit.


1    7.    (Amended)   An apparatus according to claim 3 wherein the means for

2    transmitting the [video] <u>composite</u> signal includes:

3    at least one interface installed in conjunction with said remote unit

4    a cellular telephone connected to <u>each</u> said interface.


1    12.    (Twice Amended)   An apparatus for transmission of data from a remote

2    location to a host location, comprising:

3    a remote unit capable of receiving a composite source

4    said remote unit being a [personal] computer, including:

5        a.)    a video card having a video capture module to capture, <u>digitize and</u>

6        <u>compress</u>[, and digitize] said composite signal into a data file;

7        b.)    at least [one] <u>two</u> computer [interface] <u>interfaces</u>;

8        [c.)   means for transmitting said data file;]

9        <u>c.)</u>    <u>means for splitting said data file into pieces;</u>

10       [d.]    means for splitting and organizing said data file prior to transmission;]

11       <u>d.)</u>    <u>means for tagging said pieces in sequential order;</u>

12       e.)    means for storing said data file;

13


3

14    f.)    means for transmitting said sequentially tagged pieces through said

15    interfaces;

16    a host unit;

17    said host unit being a [personal] computer, including:

18         a.)    at least [one] two computer [interface] interfaces for receiving said

19         sequentially tagged pieces transmitted from said remote unit wherein said

20         interfaces being connected correspondingly with said interfaces in said

21         remote unit;

22         b.)    means for recombining the [split] sequentially tagged pieces into their

23         original order to form a second data file;

24    a playback unit;

25    said playback unit being a personal computer, including:

26         a.)    means for exchanging data with said host unit;

27         b.)    means for storing the second data file received by the host unit;

28         c.)    [a decompression card] means for decompressing said second data

29         file;

30         d.)    [a convert converter card] means for converting said second data file to

31         a broadcast signal.

1    19.   (Amended)   An apparatus for transmission of data, comprising:

2    a [personal] computer including a video card having a video capture module to

3    capture video in real time;

4

4      means for transmission of said captured video over a cellular frequency.

1      20.   (Amended)   The apparatus of claim 19 wherein the means for transmission

2      of said captured video over a cellular frequency includes

3      at least [one] two interfaces [interface] operating in conjunction with said computer,

4      a cellular telephone [or land telephone line] connected to each said interface.

1      21.   (Amended)   The apparatus of claim 20 [wherein the captured video is split]

2      further including means for splitting the captured video into pieces for [prior to]

3      transmission through said interfaces.

Please add the following new claims 22-38 as follow:

1      --22.  An apparatus according to claim 1 including means for converting said

2      composite signal to a broadcast signal.

1      23.   The apparatus of claim 12 wherein said remote unit is mobile.

1      24.   The apparatus of claim 12 wherein said video capture module on said video

2      card captures, digitizes and compresses said composite signal in real time.

1  25.   An apparatus according to claim 12 wherein the remote unit includes a

2       telephone line connected to each computer interface.


1  26.   An apparatus according to claim 12 wherein said interfaces are capable of

2       simultaneous transmission.


1  27.   An apparatus according to claim 12 including means for converting said

2       composite signal to a VGA signal.


1  28.   An apparatus according to claim 27 further including means for converting

2       said VGA signal to a broadcast signal.


1  29.   An apparatus according to claim 12 including means for converting said

2       composite signal to a broadcast signal.


1  30.   An apparatus for transmission of data from a remote location to a host

2       location, comprising:

3       a remote unit, including:

4            a.)   a video capture device to capture and digitize said composite signal

5                  into a data file;

6.            b.)   at least two computer interfaces;

7            c.)   means for splitting said data file into pieces;

6

8        d.)     means for tagging said pieces in sequential order;

9                f.)     means for transmitting said   tagged pieces through said

10               interfaces wherein said interfaces are capable of simultaneous

11               transmission;

12   a host unit, including:

13       a.)     at least  two computer interfaces for receiving said tagged pieces

14               transmitted from said remote unit wherein said interfaces are capable of

15               simultaneous data reception;

16       b.)     means for recombining the tagged pieces in their original sequential

17               order.

1    31.     The apparatus of claim 30 wherein the composite signal is transmitted over

2    telephone lines, cellular radio or other telemetric frequencies.

1    32.     The apparatus of claim 30 wherein the data file is compressed prior to

2    transmission by the remote unit.

1    33.     An apparatus according to claim 30 including means for converting said

2    composite signal to a VGA signal.

1    34.     An apparatus according to claim 33 further including means for converting

2    said VGA signal to a broadcast signal.

7

1    35.   An apparatus according to claim 30 including means for converting said

2    composite signal to a broadcast signal.

1    36.   An apparatus according to claim 30 wherein the tagged pieces are

2    transmitted from said remote unit to said host unit over telephone lines, cellular,

3    radio or other telemetric frequencies.

1    37.   An apparatus according to claim 30 wherein said remote unit is mobile.

1    38.   An apparatus according to claim 30 wherein said remote unit captures and

2    digitizes the composite signal in real time.—

## REMARKS

It is believed by applicant that a brief description of the present invention is helpful.

The present invention includes an apparatus capable of capturing a full-color, full-motion composite signal in real time; digitizing that composite signal into a data file; compressing the data file and transmitting it through a computer interface via telephone lines, cellular, radio, and other telemetric frequencies from a remote unit to a host unit. Additionally, the data file may be split into pieces and tagged for simultaneous transmission through a plurality computer interfaces. Once received by the host unit, the

8

tagged pieces are recombined into their original order for storage, playback, or broadcast.

The remote unit may be a mobile device capable of receiving a composite signal at a remote location away from electrical utilities wherein the composite signal is captured, digitized, and compressed in real-time (while a video camera is recording) for immediate transmission to the host unit. The host unit is generally located at a central location, such as a television broadcast station wherein the data file is immediately broadcast, viewed, or stored for later use.

In the Office Action, claims 1-7, 10, 12-14, and 16-21 are rejected under 35 U.S.C. §103 as being unpatentable over Yurt et al ('273) in view of Curtis et al ('136) or Palmer et al ('068).

In view of the above amendments, reconsideration of claims 1-7, 10, 12-14, and 16-21 is respectfully requested.

Independent claim 1 has been amended to describe the remote unit as being mobile. As used herein, the term "mobile" is defined to include an apparatus that may be used without regard to location using an external power supply of internal power sources without regard to the type of current supplied by the available power source. As described above, Applicants' claim 1 includes a mobile remote unit which could be used in a remote location regardless of the power source available. For example, if available, the remote unit could be operated in a location where it is plugged into a conventional alternating current power source provided by an electrical utilities provider or in the event such "power sources" is unavailable, the remote unit could operate by battery or by a power source supplied by a vehicle (direct current). In this way, the remote unit of the present invention

9

could be operated from a stationary location or while being transported such as by a motor vehicle so as to capture, digitize, and compress a composite signal of a live-action event.

A mobile device is not disclosed by Yurt et al, Gattis et al, or Palmer et al. The library and transmission means described in Yurt is a very large data storage facility from which archived data is transmitted from this central storage location to a remote subscriber. The mobile remote unit of Applicants' claim 1 contemplates the opposite philosophy—transmission of video data files from a potentially isolated remote location to a host location for further processing and/or broadcast. There is nothing in Yurt which would suggest or contemplate modifying the library and transmission means so as to be mobile. The rejection in the Office Action with regard to claim 1 under 35 U.S.C. §103 is, therefore, believed overcome. Reconsideration and allowance of claim 1, as amended, is respectfully requested.

Claims 2-7, 10, and new claim 22 are dependent claims which depend upon independent claim 1 and are allowable at least for the reasons set forth above. Reconsideration and allowance of claims 2-7, 10, and new claim 22 is respectfully requested.

Claim 12 has been amended to recite at least two computer interfaces installed in each remote and host unit as well as splitting the data file into pieces and tagging the pieces in sequential order in the remote unit prior to transmission. Transmission of the tagged pieces of the data file is done through the multiple interfaces.

Yurt does not disclose such a device. Yurt discloses only a single communications channel from its transmission system to its reception system. Yurt does not disclose

breaking the data file into pieces and transmitting the pieces over a _plurality_ of communications channels.  This is significant.  Transmission of the pieces according to Applicants' claim 12 decreases transmission time.  Neither Gattis nor Palmer supply this deficiency in Yurt.  Accordingly, claim 12, as amended above, must be allowed. Reconsideration and allowance of claim 12 is respectfully requested.

Claims 13, 14, 16, 17, 18, and new claims 23-29 depend upon claim 12 and are thereby allowable at least for the reasons set forth above.  Reconsideration and allowance of claims 13, 14, 16,17, 18, and 23-29 are respectfully requested.

Claim 19 as amended describes an apparatus for transmission of data comprising a computer including a video card having a video capture module to capture video in real time.  As used herein, the term "real time" includes the capture of visual information in an apparent simultaneous fashion.  This would include capture of a composite signal previously stored as well as capture of a composite signal occurring as the event is taking place.

Real time capture is significantly different than the method described by Yurt.  Yurt contemplates a system which takes a video sequence such as a motion picture of known length characteristics and then subjecting that signal to a complex mathematical algorithm which captures, digitizes, and compresses that signal.  This method disclosed by Yurt is very time consuming and requires complex and expensive hardware to accomplish.  As stated above, the Yurt disclosure contemplates a storage library of known files.  This library is precompressed (col. 7, line 47—col. 8, line 26).  In the Yurt disclosure, it is desirable to perform this substantive precompression so as obtain a data file which is as

11

small as possible so as to reduce transmission time. Yurt does not disclose the use of a video card including a video capture module in order to accomplish its capture. The frame grabber technology of Gattis and Palmer is likewise significantly different from a video card having a video capture module as recited in claim 19. The differences between a video card and frame grabber were discussed in Applicant's Amendment and Response to the Office Action dated August 2, 1995, incorporated herein by reference. In light of the fact that a video capture card having a video capture module is not contemplated by Yurt nor Gattis or Palmer, the rejection of claim 19 under 35 U.S.C. §103 is believed overcome. Allowance of claim 19 is respectfully requested.

Claims 20 and 21 depend upon claim 19 and are deemed allowable at least for the reasons set forth above. Reconsideration and allowance of claims 20 and 21 is respectfully requested.

New claims 22-38 have been added. New claims 22-38 do not include any new matter which would require an additional search. Consideration and allowance of claims 22-30 is respectfully requested.

This application as originally filed had 15 claims, including two independent claims. In the prior Amendment, four dependent claims were canceled, one independent claim and five dependent claims were added, totaling 3 independent claims, and 14 dependent claims.

One independent claim and 16 dependent claims have been added by this Amendment. The additional filing fee is $78.00 for one independent claim in excess of three and $110.00 for ten additional dependent claims in excess of 20. The Commissioner

12

is hereby authorized to credit any overpayment or debit any additional fees which may be due in connection with this Amendment to the deposit account of the undersigned, No. 03-1127.

In view of the above comments and amendments to the claims which clearly distinguish the claims for the prior art, it is respectfully requested that the Office Action be reconsidered and that the application be allowed.

Respectfully submitted,

CATALANO, ZINGERMAN & ASSOCIATES

By_____

Scott R. Zingerman, Reg. No. 35,422
810 S. Cincinnati, Suite 200
Tulsa, Oklahoma 74119
(918) 584-8787
Attorneys for Applicant

13

05-20-1996 12:22PM   FROM CATALANO,ZINGERMAN&ASSOC.   TO      17033059731   P.01

# CATALANO, ZINGERMAN & ASSOCIATES, P.C.
### Patent, Trademark & Copyright Attorneys
### The Avanti Building ■ 810 South Cincinnati ■ Suite 200
### Tulsa, Oklahoma 74119-1612

**Frank J. Catalano***
**Scott R. Zingerman**
 *also admitted in Michigan

**W. Rex McPhail**

**Telephone (918) 584-8787**
**Facsimile (918) 599-9889**

**Of Counsel: John D. Gassett**

# Fax Transmission

**To:**        Examiner P. Assouad        **From:** Scott Zingerman
**Company:**   PTO Group 2414             **Date:** May 20, 1996
**Fax #:**     (703) 305-9731

You should receive 14 page(s) including this one.
If you do not receive all pages, please call

**Message:**        **Re:**   Freeman et al, S.N. 08/198,130

Enclosed is a draft of an Amendment for your consideration.  We are looking forward to meeting with you at 9:00 A.M. tomorrow.

THE INFORMATION CONTAINED IN THIS FACSIMILE TRANSMISSION IS CONFIDENTIAL INFORMATION WHICH MAY CONTAIN INFORMATION THAT IS LEGALLY PRIVILEGED AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. THE INFORMATION IS INTENDED SOLELY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE, COPYING, DISTRIBUTION OR TAKING OF ANY ACTION IN RELIANCE ON THE CONTENTS OF THIS FACSIMILE TRANSMISSION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS FACSIMILE TRANSMISSION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TO US VIA THE U.S. MAIL.

#10/B

PATENT

1996 MAY 21  PM 1:07

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:

MITCHEL C. FREEMAN ET AL

Serial No:     08/198,130

Filed:         02/16/94

For:   REMOTE VIDEO
       TRANSMISSION SYSTEM

Group No:   2414

Examiner:   P. Assouad



### AMENDMENT AND RESPONSE TO THE OFFICE
### ACTION DATED MARCH 28, 1996

Commissioner of Patents and Trademarks

Washington, D.C.  20231

Dear Sir:

This is an Amendment responsive to the Office Action of March 28, 1996.

Please amend the above-identified application in the following manner:

IN THE CLAIMS:

Please amend the following claims:

1.     (Twice Amended)   An apparatus for transmission of data, comprising:

2      a <u>mobile</u> remote unit including<u>:</u>

3          <u>a.)</u>    means for capturing, <u>digitizing, and</u> compressing[, digitizing, storing,

4          and transmitting] at least one composite signal;

5          <u>b.)</u>    <u>means for storing said composite signal;</u>

6          <u>c.)</u>    <u>means for transmitting said composite signal;</u>

7      a host unit including:

8          a.)    means for receiving at least one composite signal transmitted by the

9          remote unit;

10     a playback unit including:

11         a.)    means for exchanging data with said host unit;

12         b.)    means for storing the composite signal received by the host unit;

13         c.)    means for decompressing said composite signal.

---

1      2.    (Amended)   An apparatus according to claim 1 wherein the host unit and the

2      playback unit are combined in a single [personal] computer.

---

1      3. (Twice Amended)      An  apparatus  according  to  claim  1  wherein  the

2      composite signal is transmitted over [[]telephone lines, cellular, radio or other

3      telemetric frequencies.

---

4      5.    (Amended)   An apparatus according to claim 1 wherein the means for

5      capturing, <u>digitizing, and</u> compressing [and digitizing] said [audio and video]

6    <u>composite</u> signal includes a video [card with a] capture [module] <u>device</u> installed in

7    said remote unit <u>to capture said composite signal in real time</u>.


1    6.    (Amended)   An apparatus according to claim 5 wherein the means for

2    capturing, compressing and digitizing said [audio and/or video] <u>composite</u> signal

3    includes an audio [card] <u>capture device</u> installed in said remote unit.


1    7.    (Amended)   An apparatus according to claim 3 wherein the means for

2    transmitting the [video] <u>composite</u> signal includes:

3    at least one interface installed in conjunction with said remote unit;

4    a cellular telephone connected to <u>each</u> said interface.


1    12.   (Twice Amended)   An apparatus for transmission of data from a remote

2    location to a host location, comprising:

3    a remote unit capable of receiving a composite signal;

4    said remote unit being a [personal] computer, including:

5        a.)    a video [card having a video] capture module to capture, <u>digitize and</u>

6        compress[, and digitize] said composite signal into a data file;

7        b.)    at least [one] <u>two</u> computer [interface] <u>interfaces</u>;

8        [c.)    means for transmitting said data file;]

9        <u>c.)</u>    <u>means for splitting said data file into pieces;</u>

10        [d.)    means for splitting and organizing said data file prior to transmission;]

3



11        <u>d.)</u>     <u>means for tagging said pieces in sequential order;</u>

12        e.)     means for storing said data file;

13        <u>f.)</u>     <u>means for transmitting said sequentially tagged pieces through said</u>

14        <u>interfaces;</u>

15   a host unit;

16   said host unit being a [personal] computer, including:

17        a.)     at least [one] <u>two</u> computer [interface] <u>interfaces for receiving said</u>

18        <u>sequentially tagged pieces transmitted from said remote unit wherein said</u>

19        <u>interfaces being connected correspondingly with said interfaces in said</u>

20        <u>remote unit;</u>



21        b.)     means for recombining the [split] <u>sequentially tagged pieces into their</u>

22        <u>original order to form a second</u> data file;

23   a playback unit;

24   said playback unit being a personal computer, including:

25        a.)     means for exchanging data with said host unit;

26        b.)     means for storing the <u>second</u> data file received by the host unit;

27        c.)     [a decompression card] <u>means</u> for decompressing said <u>second</u> data

28        file;

29        d.)     [a scan converter card] <u>means</u> for converting said <u>second</u> data file to

30        a broadcast signal.



1   19.   (Amended)   An apparatus for transmission of data, comprising:

2   a [personal] computer including a [video card having a] video capture module to

3   capture and compress video in real time;

4   means for transmission of said captured video over a cellular frequency.


1   20.   (Amended)   The apparatus of claim 19 wherein the means for transmission

2   of said captured video over a cellular frequency includes;

3   at least [one] two interfaces [interface] operating in conjunction with said computer;

4   a cellular telephone [or land telephone line] connected to each said interface.


1   21.   (Amended)   The apparatus of claim 20 [wherein the captured video is split]

2   further including means for splitting the captured video into pieces for [prior to]

3   transmission through said interfaces.


Please add the following new claims 22-38 as follow:


1   22.   An apparatus according to claim 1 including means for converting said

2   composite signal to a broadcast signal.


1   23.   The apparatus of claim 12 wherein said remote unit is mobile.


5

1    24.    The apparatus of claim 12 wherein said video capture module on said video

2    card captures, digitizes and compresses said composite signal in real time.

1    25.    An apparatus according to claim 12 wherein the remote unit includes a

2    telephone line connected to each computer interface.

1    26.    An apparatus according to claim 12 wherein said interfaces are capable of

2    simultaneous transmission.

1    27.    An apparatus according to claim 12 including means for converting said

2    composite signal to a VGA signal.

1    28.    An apparatus according to claim 27 further including means for converting

2    said VGA signal to a broadcast signal.

1    29.    An apparatus according to claim 12 including means for converting said

2    composite signal to a broadcast signal.

1    30.    An apparatus for transmission of data from a remote location to a host

2    location, comprising:

3    a remote unit, including:

4  a.) a video capture device to capture and digitize said composite signal

5  into a data file;

6  b.) at least two computer interfaces;

7  c.) means for splitting said data file into pieces;

8  d.) means for tagging said pieces in sequential order;

9   f.) means for transmitting said  tagged pieces through said

10   interfaces wherein said interfaces are capable of simultaneous

11   transmission;

12 a host unit, including:



13  a.) at least  two computer interfaces for receiving said tagged pieces

14  transmitted from said remote unit wherein said interfaces are capable of

15  simultaneous data reception;

16  b.) means for recombining the tagged pieces into their original sequential

17  order.

1 31. The apparatus of claim 30 wherein the composite signal is transmitted over

2 telephone lines, cellular, radio or other telemetric frequencies.

1 32. The apparatus of claim 30 wherein the data file is compressed prior to

2 transmission by the remote unit.

1   33.   An apparatus according to claim 30 including means for converting said

2   composite signal to a VGA signal.

1   34.   An apparatus according to claim 33 further including means for converting

2   said VGA signal to a broadcast signal.

1   35.   An apparatus according to claim 30 including means for converting said

2   composite signal to a broadcast signal.

1   36.   An apparatus according to claim 30 wherein the tagged pieces are

2   transmitted from said remote unit to said host unit over telephone lines, cellular,

3   radio or other telemetric frequencies.

1   37.   An apparatus according to claim 30 wherein said remote unit is mobile.

1   38.   An apparatus according to claim 30 wherein said remote unit captures and

2   digitizes the composite signal in real time.--

## REMARKS

It is believed by applicants that a brief description of the present invention is helpful.

8

The present invention includes an apparatus capable of capturing a full-color, full-motion composite signal in real time; digitizing that composite signal into a data file; compressing the data file and transmitting it through a computer interface via telephone lines, cellular, radio, and other telemetric frequencies from a remote unit to a host unit. Additionally, the data file may be split into pieces and tagged for simultaneous transmission through a plurality computer interfaces. Once received by the host unit, the tagged pieces are recombined into their original order for storage, playback, or broadcast.

The remote unit may be a mobile device capable of receiving a composite signal at a remote location away from electrical utilities wherein the composite signal is captured, digitized, and compressed in real-time (while a video camera is recording) for immediate transmission to the host unit. The host unit is generally located at a central location, such as a television broadcast station wherein the data file is immediately broadcast, viewed, or stored for later use.

In the Office Action, claims 1-7, 10, 12-14, and 16-21 are rejected under 35 U.S.C. §103 as being unpatentable over Yurt et al ('273) in view of Gattis et al ('136) or Palmer et al ('068).

In view of the above amendments, reconsideration of claims 1-7, 10, 12-14, and 16-21 is respectfully requested.

Independent claim 1 has been amended to describe the remote unit as being mobile. As used herein, the term "mobile" is defined to include an apparatus that may be stationary or not used without regard to location using an external power supply or internal power source without regard to the type of current supplied by the available power source.



As described above, Applicants' claim 1 includes a mobile remote unit which could be used in a remote location regardless of the power source available. For example, if available, the remote unit could be operated in a location where it is plugged into a conventional alternating current power source provided by an electrical utilities provider or in the event such "power sources" are unavailable, the remote unit could operate by battery or by a power source supplied by a vehicle (direct current). In this way, the remote unit of the present invention could be operated from a stationary location or while being transported such as by a motor vehicle so as to capture, digitize, and compress a composite signal of a live-action event.

A mobile device is not disclosed by Yurt et al, Gattis et al, or Palmer et al. The library and transmission means described in Yurt is a very large data storage facility from which archived data is transmitted from this central storage location to a remote subscriber. The mobile remote unit of Applicants' claim 1 contemplates the opposite philosophy-- transmission of video data files from a potentially isolated remote location to a host location for further processing and/or broadcast. There is nothing in Yurt which would suggest or contemplate modifying the library and transmission means so as to be mobile. The rejection in the Office Action with regard to claim 1 under 35 U.S.C. §103 is, therefore, believed overcome. Reconsideration and allowance of claim 1, as amended, is respectfully requested.

Claims 2-7, 10, and new claim 22 are dependent claims which depend upon independent claim 1 and are allowable at least for the reasons set forth above. Reconsideration and allowance of claims 2-7, 10, and new claim 22 is respectfully

10

requested.

Claim 12 has been amended to recite at least two computer interfaces installed in each remote and host unit as well as splitting the data file into pieces and tagging the pieces in sequential order in the remote unit prior to transmission. Transmission of the tagged pieces of the data file is done through the multiple interfaces.

Yurt does not disclose such a device. Yurt discloses only a single communications channel from its transmission system to its reception system. Yurt does not disclose breaking the data file into pieces and transmitting the pieces over a plurality of communications channels. This is significant. Transmission of the pieces according to Applicants' claim 12 decreases transmission time. Neither Gattis nor Palmer supply this deficiency in Yurt. Accordingly, claim 12, as amended above, must be allowed. Reconsideration and allowance of claim 12 is respectfully requested.

Claims 13, 14, 16, 17, 18, and new claims 23-29 depend upon claim 12 and are thereby allowable at least for the reasons set forth above. Reconsideration and allowance of claims 13, 14, 16,17, 18, and 23-29 are respectfully requested.

Claim 19 as amended describes an apparatus for transmission of data comprising a computer including a video capture module to capture video in real time. As used herein, the term "real time" includes the capture of information in an apparent simultaneous fashion including the continuiuous updating of the captured information. This would include synchronous capture of a composite signal previously stored as well as capture of a composite signal occurring as the event is taking place (live action).

11

Real time capture is significantly different than the method described by Yurt.  Yurt contemplates a system which takes a video sequence such as a motion picture of known length characteristics and then subjecting that signal to a complex mathematical algorithm which captures, digitizes, and compresses that signal.  This method disclosed by Yurt is very time consuming and requires complex and expensive hardware to accomplish.  As stated above, the Yurt disclosure contemplates a storage library of known files.  This library is precompressed (col. 7, line 47--col. 8, line 26).  In the Yurt disclosure, it is desirable to perform this substantive precompression so as obtain a data file which is as small as possible so as to reduce transmission time.  Yurt does not disclose the use of a video card including a video capture module in order to accomplish its capture.  The frame grabber technology of Gattis and Palmer is likewise significantly different from a video card having a video capture module as recited in claim 19.  The differences between a video card and frame grabber were discussed in Applicant's Amendment and Response to the Office Action dated August 2, 1995, incorporated herein by reference.  In light of the fact that a video capture card having a video capture module is not contemplated by Yurt nor Gattis or Palmer, the rejection of claim 19 under 35 U.S.C. §103 is believed overcome.  Allowance of claim 19 is respectfully requested.

Claims 20 and 21 depend upon claim 19 and are deemed allowable at least for the reasons set forth above.  Reconsideration and allowance of claims 20 and 21 is respectfully requested.

New claims 22-38 have been added.  New claims 22-38 do not include any new matter which would require an additional search.  Consideration and allowance of claims

12

22-30 is respectfully requested.

Amendments in Response to Interview with Examiner on May 21, 1996

As a result of the Interview with the Examiner on May 21, 1996, claim 3 has been amended to correct a typographical error in Applicants' Amendment and Response to the Office Action Dated August 2, 1995.  Specifically, a misplaced bracket was deleted in line 2 before "telephone".

Further, as discussed, claim 19 has been amended to clarify that the captured video is compressed in real time.  Additionally, line 2 has been amended to delete reference to a video capture card leaving reference to a video capture module.  Likewise, claim 12 has been amended in the same fashion in order to delete reference to a "video capture card".

This application as originally filed had 15 claims, including two independent claims. In the prior Amendment four dependent claims were canceled, one independent claim and five dependent claims were added, totaling 3 independent claims, and 14 dependent claims.

One independent claim and 16 dependent claims have been added by this Amendment.  The additional filing fee is $78.00 for one independent claim in excess of three and $110.00 for ten additional dependent claims in excess of 20.  The Commissioner is hereby authorized to credit any overpayment or debit any additional fees which may be due in connection with this Amendment to the deposit account of the undersigned, No. 03-1127.

In view of the above comments and amendments to the claims which clearly

13

distinguish the claims for the prior art, it is respectfully requested that the Office Action be reconsidered and that the application be allowed.

Respectfully submitted,

CATALANO, ZINGERMAN & ASSOCIATES

By _____
Scott R. Zingerman (Reg. No. 35,422
810 S. Cincinnati, Suite 200
Tulsa, Oklahoma  74119
(918) 584-8787
Attorneys for Applicant

14



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address:   COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 08/198,130 | 02/16/94 | FREEMAN | M | 0460.93Z |

24M1/0611

ASSOCIATE EXAMINER

SCOTT R. ZINGERMAN
CATALANO, ZINGERMAN & MCKAY
810 SOUTH CINCINATI, STE. 200
TULSA, OK  74119

| ART UNIT | PAPER NUMBER |
|---|---|
| 2414 | 11 |

DATE MAILED:   06/11/96

**Please find below and/or attached an Office communication concerning this application or proceeding.**

Commissioner of Patents and Trademarks



ELLIS B. RAMIREZ
PRIMARY EXAMINER
GROUP 2400

PTO-90C (REV 2/95)

1 - File Copy

| *Notice of Allowability* | Application No. 08/198,130 | Applicant(s) Freeman et al. |
|---|---|---|
| | Examiner Patrick Assoud | Group Art Unit 2414 |

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance and Issue Fee Due or other appropriate communication will be mailed in due course.

☒ This communication is responsive to *Amend. filed 5/21/1996*

☒ The allowed claim(s) is/are *1-7, 10, 12-14, and 16-38*

☐ The drawings filed on _____ are acceptable.

☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d).

    ☐ All ☐ Some* ☐ None   of the CERTIFIED copies of the priority documents have been

        ☐ received.

        ☐ received in Application No. (Series Code/Serial Number) _____ .

        ☐ received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    *Certified copies not received: _____ .

☐ Acknowledgement is made of a claim for domestic priority under 35 U.S.C. § 119(e).

A SHORTENED STATUTORY PERIOD FOR RESPONSE to comply with the requirements noted below is set to EXPIRE **THREE MONTHS FROM THE "DATE MAILED"** of this Office action. Failure to timely comply will result in ABANDONMENT of this application. Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

☐ Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL APPLICATION, PTO-152, which discloses that the oath or declaration is deficient. A SUBSTITUTE OATH OR DECLARATION IS REQUIRED.

☒ Applicant MUST submit NEW FORMAL DRAWINGS

    ☐ because the originally filed drawings were declared by applicant to be informal.

    ☒ including changes required by the Notice of Draftsperson's Patent Drawing Review, PTO-948, attached hereto or to Paper No. *3* .

    ☐ including changes required by the proposed drawing correction filed on _____ , which has been approved by the examiner.

    ☐ including changes required by the attached Examiner's Amendment/Comment.

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the reverse side of the drawings. The drawings should be filed as a separate paper with a transmittal lettter addressed to the Official Draftsperson.**

☐ Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

Any response to this letter should include, in the upper right hand corner, the APPLICATION NUMBER (SERIES CODE/SERIAL NUMBER). If applicant has received a Notice of Allowance and Issue Fee Due, the ISSUE BATCH NUMBER and DATE of the NOTICE OF ALLOWANCE should also be included.

**Attachment(s)**

    ☐ Notice of References Cited, PTO-892

    ☐ Information Disclosure Statement(s), PTO-1449, Paper No(s). _____

    ☐ Notice of Draftsperson's Patent Drawing Review, PTO-948

    ☐ Notice of Informal Patent Application, PTO-152

    ☐ Interview Summary, PTO-413

    ☐ Examiner's Amendment/Comment

    ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

    ☐ Examiner's Statement of Reasons for Allowance



UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office

Address: Box ISSUE FEE
COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

SCOTT R. ZINGERMAN
FELLERS, SNIDER, ZINGERMAN & BILEY
817 SOUTH CINCINNATI, STE. 200
TULSA, OK 74119

**NOTICE OF ALLOWANCE
AND ISSUE FEE DUE**

☐ Note attached communication from the Examiner

☑ This notice is issued in view of applicant's communication filed _____

| SERIES CODE/SERIAL NO. | FILING DATE | TOTAL CLAIMS | EXAMINER AND GROUP ART UNIT | DATE MAILED |
|---|---|---|---|---|
| 08/190,130 | 02/16/94 | 034 | ASSOUAD, F. | 2414 | 06/11/96 |

First Named Applicant  FREEMAN,  MICHAEL C.

TITLE OF INVENTION  REMOTE VIDEO TRANSMISSION SYSTEM

| ATTY'S DOCKET NO. | CLASS-SUBCLASS | BATCH NO. | APPLN. TYPE | SMALL ENTITY | FEE DUE | DATE DUE |
|---|---|---|---|---|---|---|
| 14640.937 | 364-514.000 | A55 | UTILITY | YES | $625.00 | 09/11/96 |

**THE APPLICATION IDENTIFIES ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT.
_PROSECUTION ON THE MERITS IS CLOSED._**

**THE ISSUE FEE MUST BE PAID WITHIN _THREE MONTHS_ FROM THE MAILING DATE OF THIS NOTICE OR THIS
APPLICATION SHALL BE REGARDED AS ABANDONED.  THIS STATUTORY PERIOD CANNOT BE EXTENDED.**

## HOW TO RESPOND TO THIS NOTICE:

I. Review the SMALL ENTITY Status shown above.
  If the SMALL ENTITY is shown as YES, verify your
  current SMALL ENTITY status:

  A. If the status is changed, pay twice the amount of the
  FEE DUE shown above and notify the Patent and
  Trademark Office of the change in status, or
  B. If the Status is the same, pay the FEE DUE shown
  above.

If the SMALL ENTITY is shown as NO:
A. Pay FEE DUE shown above, or
B. File verified statement of Small Entity Status before, or with,
  pay of 1/2 the FEE DUE shown above.

II. Part B of this notice should be completed and returned to the Patent and Trademark Office (PTO) with your ISSUE FEE.
  Even if the ISSUE FEE has already been paid by charge to deposit account, Part B should be completed and returned.
  If you are charging the ISSUE FEE to your deposit account, Part C of this notice should also be completed and returned.

III. All communications regarding this application must give series code (or filing date), serial number and batch number.
  Please direct all communication prior to issuance to Box ISSUE FEE unless advised to contrary.

**IMPORTANT REMINDER: Patents issuing on applications filed on or after Dec. 12, 1980 may require payment of
maintenance fees.  It is patentee's responsibility to ensure timely payment of maintenance
fees when due.**

PTOL-85 (REV. 12-93) (0651-0033)          4. PATENT AND TRADEMARK OFFICE COPY

## PART B—ISSUE FEE TRANSMITTAL

262-625
561-30

**MAILING INSTRUCTIONS:** This form should be used for transmitting the ISSUE FEE. Blocks 2 through 6 should be completed where appropriate. All further correspondence including the Issue Fee Receipt, the Patent, advance orders and notification of maintenance fees will be mailed to addressee entered in Block 1 unless you direct otherwise, by: (a) specifying a new correspondence address in Block 3 below; or (b) providing the PTO with a separate "FEE ADDRESS" for maintenance fee notifications with the payment of Issue Fee or thereafter. **See reverse for Certificate of Mailing.**

| 1 CORRESPONDENCE ADDRESS | 2. INVENTOR(S) ADDRESS CHANGE (Complete only if there is a change) |
|---|---|

24M1/0611

SCOTT R. ZINGERMAN
CATALANO, ZINGERMAN & MCKAY
810 SOUTH CINCINATI, STE. 200
ULSA, OK  74119

INVENTOR'S NAME

Street Address

City, State and ZIP Code

CO-INVENTOR'S NAME

Street Address

City, State and ZIP Code

RECEIVED
Publishing Division
AUG 13 1996
GP

☐ Check if additional changes are on reverse side

| SERIES CODE/SERIAL NO. | FILING DATE | TOTAL CLAIMS | EXAMINER AND GROUP ART UNIT | DATE MAILED |
|---|---|---|---|---|
| 08/198,130 | 02/16/94 | 034 | ASSOUAD, P.    2414 | 06/11/96 |

First Named Applicant  FREEMAN,        MITCHAEL C.

TITLE OF INVENTION  REMOTE VIDEO TRANSMISSION SYSTEM

| | ATTY'S DOCKET NO. | CLASS-SUBCLASS | BATCH NO. | APPLN. TYPE | SMALL ENTITY | FEE DUE | DATE DUE |
|---|---|---|---|---|---|---|---|
| 2 | 0460.937 | 364-514.00 | A88 | UTILITY | YES | $625.00 | 09/11/96 |

| 3. Correspondence address change (Complete only if there is a change) | 4. For printing on the patent front page, list the names of not more than 3 registered patent attorneys or agents OR, alternatively, the name of a firm having as a member a registered attorney or agent. If no name is listed, no name will be printed. |
|---|---|
| Scott R. Zingerman<br>Catalano, Zingerman & Associates<br>810 S. Cincinnati, Ste. 200<br>Tulsa, OK  74119 | Catalano, Zingerman & Associates<br>1.<br>2.<br>3. |

DO NOT USE THIS SPACE

810 BL 08/21/96 08198130
1 242      625.00 CK
1 561       30.00 CK

| 5. ASSIGNMENT DATA TO BE PRINTED ON THE PATENT (print or type) | |
|---|---|
| (1) NAME OF ASSIGNEE: | 6a. The following fees are enclosed:<br>☒ Issue Fee  ☐ Advance Order # of Copies  10 |
| (2) ADDRESS: (CITY & STATE OR COUNTRY) | 6b. The following fees should be charged to:<br>DEPOSIT ACCOUNT NUMBER  03-1127<br>(ENCLOSE PART C)<br>☐ Issue Fee  ☐ Advance Order - # of Copies<br>☒ Any Deficiencies in Enclosed Fees |

A. ☒ This application is NOT assigned.

☐ Assignment previously submitted to the Patent and Trademark Office.

☐ Assignment is being submitted under separate cover. Assignments should be directed to Box ASSIGNMENTS.

PLEASE NOTE: Unless an assignee is identified in Block 5, no assignee data will appear on the patent. Inclusion of assignee data is only appropriate when an assignment has been previously submitted to the PTO or is being submitted under separate cover. Completion of this form is NOT a substitute for filing an assignment.

The COMMISSIONER OF PATENTS AND TRADEMARKS is requested to apply the Issue Fee to the application identified above.

(Authorized Signature) _____

Frank J. Catalano          (Date) 8/9/96

NOTE: The Issue Fee will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the Patent and Trademark Office.

**1. TRANSMIT THIS FORM WITH FEE-CERTIFICATE OF MAILING ON REVERSE**

PTOL-85B (REV.12-93)(0651-0033)

## Certificate of Mailing

I hereby certify that this correspondence is being deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to:

> **Box ISSUE FEE**
> Commissioner of Patents and Trademarks
> Washington, D.C. 20231

on ____August 9, 1996_____

(Date)

FRANK J. CATALANO

(Name of person making deposit)

(Signature)

8/9/96

(Date)

Note:  If this certificate of mailing is used, it can only be used to transmit the Issue Fee.
This certificate cannot be used for any other accompanying papers.  Each additional
paper, such as an assignment or formal drawing,  must have its own certificate of mailing.

Burden Hour Statement: This form is estimated to take .2 hours to complete.  Time will vary depending upon the needs of the individual case.  Any comments on the amount of time you are required to complete this form should be sent to the Office of Information Systems, Patent and Trademark Office, Washington, D.C. 20231, and to the Office of Information and Regulatory Affairs, Office of Management and Budget, (Project 0651-0033), Washington, D.C. 20503.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS.  SEND TO: Commissioner of Patents and Trademarks, Box Issue Fee, Washington, DC 20231.

REVERSE PTOL-85B (REV. 12-93)(0651-0033)

PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:

MITCHAEL C. FREEMAN ET AL

Serial No:      08/198,130

Filed:          02/16/94

For:   REMOTE VIDEO
       TRANSMISSION SYSTEM

Group No:       2414

Examiner:       P. Assouad

Batch No:       A88

I HEREBY CERTIFY THAT THIS CORRESPONDENCE IS
BEING DEPOSITED WITH THE UNITED STATES POSTAL
SERVICE AS FIRST CLASS MAIL IN AN ENVELOPE
ADDRESSED TO: COMMISSIONER OF PATENTS AND
TRADEMARKS, WASHINGTON, D.C. 20231, ON
THE DATE SHOWN.

Date: 8/8/96

Frank J. Catalano

## TRANSMITTAL OF NEW DRAWINGS TO CORRECT INFORMALITIES WITHIN THREE MONTH PERIOD SET IN NOTICE OF ALLOWABILITY

BOX ISSUE FEE
Commissioner of Patents and Trademarks
Washington, D.C.  20231

Dear Sir:

In response to the Draftsman's objections on PTO-948, Applicant submits

herewith two sheets formal drawings.

The three month period of response set in the Notice of Allowability expires on

September 11, 1996, and this submission is on or before this due date.

Respectfully submitted,
CATALANO, ZINGERMAN & ASSOCIATES

By
   Scott R. Zingerman, Reg. No. 35,422

(918) 584-8787          810 S. Cincinnati, Suite 200
Attorney for Applicants   Tulsa, Oklahoma  74119
Fax (918) 599-9889        Frank J. Catalano, Reg. No. 25,836

5579239



Fig. 1



Fig. 2

Fig. 3





PTO UTILITY GRANT

Paper Number _____

### The Commissioner of Patents and Trademarks

*Has received an application for a patent for a new and useful invention. The title and description of the invention are enclosed. The requirements of law have been complied with, and it has been determined that a patent on the invention shall be granted under the law.*

*Therefore, this*

### United States Patent

*Grants to the person(s) having title to this patent the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States of America or importing the invention into the United States of America for the term set forth below, subject to the payment of maintenance fees as provided by law.*

*If this application was filed prior to June 8, 1995, the term of this patent is the longer of seventeen years from the date of grant of this patent or twenty years from the earliest effective U.S. filing date of the application, subject to any statutory extension.*

*If this application was filed on or after June 8, 1995, the term of this patent is twenty years from the earliest effective U.S. filing date of the application, subject to any statutory extension.*

The
United
States
of
America

*Commissioner of Patents and Trademarks*

*Attest*

Form PTO-1584 (Rev 5/96)

(RIGHT INSIDE)

FPI-LOM

Feb-27-06   03:49pm   From-FSBB&T                    9185839659          T-432   P 001/005   F-786

# FACSIMILE COVER SHEET

RECEIVED
CENTRAL FAX CENTER

FEB 27 2006

Date:   February 27, 2006

NUMBER OF PAGES INCLUDING THIS COVER SHEET:        5

| TO | COMPANY NAME | FAX NUMBER |
|---|---|---|
| Mail Stop Petition Commissioner for Patents | United States Patent and Trademark Office | 571.273.8300 |

£/4

FROM:      Scott R. Zingerman, Esq.            *Attorney Docket No. 20020/98-444*

          Re:    In re application of: FREEMAN, et al.
                 Patent No.:    5,579,239
                 Issue Date:    11/26/1996
                 Title:  Remote Video Transmission System

RECD.

MAR 0 6 2006

OFFICE OF PETITIONS

                 FELLERS, SNIDER, BLANKENSHIP,
                  BAILEY & TIPPENS, P.C.
                    The Kennedy Building
                 321 South Boston Ave., Suite 800
                   Tulsa, Oklahoma 74103-3318
                   TELEPHONE: (918) 599-0621
                   TELECOPIER: (918) 583-9659

                    AUTO QUOTE:  20020

IF YOU DO NOT RECEIVE ALL OF THE PAGES OR IF ANY ARE ILLEGIBLE, PLEASE CONTACT US AT
(918) 599-0621 AS SOON AS POSSIBLE.

MESSAGE:      See attached Petition to Accept Unintentionally Delayed Payment of
Maintenance Fee in an Expired Patent (37 CFR §1.378(c)) for the patent identified above.  Should
you have any questions, please do not hesitate to contact me.

                       Thank you.

**********************************************************
CONFIDENTIALITY NOTICE

This facsimile is intended only for the use of the individual or entity to which it is addressed and may contain information that is
privileged and confidential.  If the reader of this facsimile is not the intended recipient, you are hereby notified that any disclosure,
distribution, or copying of this information is strictly prohibited.  If you have received this facsimile in error, please notify us
immediately by telephone, and return it to us at the above address via the United States Postal Service.

Feb-27-06   03:50pm   From-FSBB&T                           9185839659           T-432   P 002/005   F-766

RECEIVED
CENTRAL FAX CENTER

FEB 27 2006

PTO/SB/66 (10-05)
Approved for use through 05/31/2006. OMB 0651-0016
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PETITION TO ACCEPT UNINTENTIONALLY DELAYED PAYMENT OF MAINTENANCE FEE IN AN EXPIRED PATENT (37 CFR 1.378(c)) | Docket Number (Optional) 20020/98-444 |

Mail to: Mail Stop Petition
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450
Fax. (571) 273-8300

NOTE: If information or assistance is needed in completing this form, please contact Petitions Information
at (571) 272-3282.

Patent No. _____5,579,239_____     Application Number _____08/198,130_____

Issue Date _____11/26/1996_____     Filing Date _____02/16/1994_____

CAUTION:    Maintenance fee (and surcharge, if any) payment must correctly identify: (1) the patent
number (or reissue patent number, if a reissue) and (2) the application number of the
actual U.S. application (or reissue application) leading to issuance of that patent to
ensure the fee(s) is/are associated with the correct patent. 37 CFR 1.366(c) and (d).

Also complete the following information, if applicable

The above - identified patent:

☐    is a reissue of original Patent No. _____, original issue date_____ ;
     original application number _____ ,
     original filing date _____

☐    resulted from the entry into the U.S. under 35 U.S.C. 371 of international
     application _____ filed on _____ .

---

CERTIFICATE OF MAILING (37 CFR 1.8(a))

I hereby certify that this paper (along with any paper referred to as being attached or enclosed) is being deposited with
the United States Postal Service on the date shown below with sufficient postage as first class mail in an envelope
addressed to Mail Stop Petition, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450, or facsimile
transmitted to the U.S. Patent and Trademark Office on the date shown below.

2/27/06

_Scott R. Zingerman_
Signature

Scott R. Zingerman
Typed or printed name of person signing Certificate

03/03/2006 DALLEN   00000006 5579239

01 FC:2552                        1150.00 DP
02 FC:1552                        1640.00 DP

---

[Page 1 of 3]

This collection of information is required by 37 CFR 1.378(c). The information is required to obtain or retain a benefit by the public which is to file (and by the
USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 hour to complete,
including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on
the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and
Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS
ADDRESS. SEND TO: Mail Stop Petition, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

PTO/SB/66 (10-05)
Approved for use through 05/31/2006. OMB 0651-0016
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

1.  SMALL ENTITY

    [X] Patentee claims, or has previously claimed, small entity status. See 37 CFR 1.27.

2.  LOSS OF ENTITLEMENT TO SMALL ENTITY STATUS

    [ ] Patentee is no longer entitled to small entity status. See 37 CFR 1.27(g).

3.  MAINTENANCE FEE (37 CFR 1.20(e)-(g))

    The appropriate maintenance fee must be submitted with this petition, unless it was paid earlier.

| NOT Small Entity | | | Small Entity | | |
|---|---|---|---|---|---|
| Amount | Fee | (Code) | Amount | Fee | (Code) |
| [ ] $_____ | 3 1/2 yr fee | (1551) | [ ] $_____ | 3 1/2 yr fee | (2551) |
| [ ] $_____ | 7 1/2 yr fee | (1552) | [X] $ 1,150.00 | 7 1/2 yr fee | (2552) |
| [ ] $_____ | 11 1/2 yr fee | (1553) | [ ] $_____ | 11 1/2 yr fee | (2553) |

MAINTENANCE FEE BEING SUBMITTED $ 1,150.00

4.  SURCHARGE

    The surcharge required by 37 CFR 1.20(i)(2) of $ 1,640.00 _____ (Fee Code 1558) must be paid as a condition
    of accepting unintentionally delayed payment of the maintenance fee.

    SURCHARGE BEING SUBMITTED $ 1,640.00

5.  MANNER OF PAYMENT

    [ ] Enclosed is a check for the sum of $_____.

    [ ] Please charge Deposit Account No._____ the sum of $_____. A duplicate
        copy of this authorization is attached.

    [X] Payment by credit card. Form PTO-2038 is attached.

6   AUTHORIZATION TO CHARGE ANY FEE DEFICIENCY

    [X] The Director is hereby authorized to charge any maintenance fee, surcharge or petition
        deficiency to Deposit Account No.___ 06-0540 ___. A duplicate copy of this authorization is attached.

[Page 2 of 3]

PTO/SB/66 (10-05)
Approved for use through 05/31/2006  OMB 0651-0016
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

### 7. OVERPAYMENT

As to any overpayment made please

OR

[X]  Credit to Deposit Account No. ___06-0540___ .

[ ]  Send refund check.

### WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft.  Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application.  If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO.  Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent.  Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14).  Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

### 8. STATEMENT

The delay in payment of the maintenance fee to this patent was unintentional.

### 9. PETITIONER(S) REQUEST THAT THE DELAYED PAYMENT OF THE MAINTENANCE FEE BE ACCEPTED AND THE PATENT REINSTATED.

| | |
|---|---|
| Signature(s) of Petitioner(s) | 2/27/06 — Date |
| Scott R. Zingerman — Typed or printed name(s) | 35,422 — Registration Number, if applicable |
| (918) 599-0621 — Telephone Number | |

321 South Boston, Suite 800
Address

Tulsa, OK  74103-3318
Address

37 CFR 1.378(d) states: "Any petition under this section must be signed by an attorney or agent registered to practice before the Patent and Trademark Office, or by the patentee, the assignee, or other party in interest."

### ENCLOSURES:

[X]  Maintenance Fee payment

[X]  Surcharge under 37 CFR 1.20(l)(2) (fee for filing the maintenance fee petition)

[ ]

[Page 3 of 3]

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P. O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

Paper No. 15

SCOTT R. ZINGERMAN
FELLERS SNIDER BLANKENSHIP
BAILEY & TIPPENS
THE KENNEDY BUILDING
321 SOUTH BOSTON SUITE 800
TULSA, OK 74103-3318

**COPY MAILED**

OCT 0 2 2006

**OFFICE OF PETITIONS**

In re Patent No. 5,579,239          :
Issue Date: November 26, 1996       :
Application No. 08/198,130          :          ON PETITION
Filed: February 16, 1994            :
Patentee: Mitchael C. Freeman, et al. :

This is a decision on the petition, filed February 27, 2006, under 37 CFR 1.378(c) to accept the unintentionally delayed payment of a maintenance fee for the above-identified patent.

The petition is **GRANTED**.

The 7 ½ year maintenance fee in this case is hereby accepted and the above-identified patent is reinstated as of the mail date of this decision.

This file is being forwarded to Files Repository.

Telephone inquiries concerning this matter may be directed to the undersigned at (571) 272-3204.

Sherry D. Brinkley
Petitions Examiner
Office of Petitions

FORM PTO-447A

Staple to Front of Application

U.S. DEPARTMENT OF
PATENT & TRADE

# APPLICATION  TRANSFER  REQUEST

**Section I.** APPLICATION TRANSFER REQUEST   Date _6/23/94_   S.N. _08/158,170_

TO:        Receiving A.U. _2602_       Class/sub _348_        Examiner _____

FROM:    Originating A.U. _2614_      Class/sub _178_        Examiner _Coates_

REASON:

_Video Signal transmission claimed_

_No telegraph or telenety_

---

**Section II.** DISPOSITION BY RECEIVING A.U.   Date _6-27-94_   Ex'r _Y Frome_

☐ Accepted (keep in receiving A.U.)

Not Accepted ☐ Forward to _Elect_ _____ Classification Group

☐ Return to Originating A.U. _____ Nonclassification issue only:

REASON:                                                                      ☐ Restriction

_Computer generated video display_ — ☐ Other

_try cl. 395/118_

---

**Section III.** DISPOSITION BY _C/E_ Classification Group.   Date _7-6-94_

☑ Transfer Approved–Forward to A.U. _2314_  Class/sub _364/514_   Classifier _S Cranson_

☐ Transfer Disapproved–Forward to Originating A.U. _____   Concurring _____

                    _accepted by the_                                          Classifier _____

REASON:   _OK  examiner_   Nonclassification issue raised: ☐ Restriction

_364/514_                                        ☐ Other

_6/30_

_364/514_

**PATENT APPLICATION FEE DETERMINATION RECORD**
Effective October 1, 1992

Application or Docket Number
*198130*

### CLAIMS AS FILED - PART I

| | (Column 1) | (Column 2) | | | | | |
|---|---|---|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | SMALL ENTITY RATE | FEE | OR | OTHER THAN SMALL ENTITY RATE | FEE |
| BASIC FEE | | | | $355.00 | OR | | $710.00 |
| TOTAL CLAIMS | *15* minus 20 = | * | x$11= | | OR | x$22= | |
| INDEPENDENT CLAIMS | *2* minus 3 = | * | x 37= | | OR | x 74= | |
| MULTIPLE DEPENDENT CLAIM PRESENT | | | +115= | | OR | +230= | |
| * If the difference in column 1 is less then zero, enter "0" in column 2 | | | TOTAL | *355* | OR | TOTAL | |

### CLAIMS AS AMENDED - PART II

**SMALL ENTITY   OR   OTHER THAN SMALL ENTITY**

#### AMENDMENT A

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | RATE | ADDI-TIONAL FEE | | RATE | ADDI-TIONAL FEE |
|---|---|---|---|---|---|---|---|---|
| Total | * *19* | Minus | ** *20* = | x$11= | | OR | x$22= | |
| Independent | * *3* | Minus | *** *3* = | x 37= | | OR | x 74= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | + 115= | | OR | +230= | |
| | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

#### AMENDMENT B

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | RATE | ADDI-TIONAL FEE | | RATE | ADDI-TIONAL FEE |
|---|---|---|---|---|---|---|---|---|
| Total | * *38* | Minus | ** *20* = *18* | x$11= | | OR | x$22= | *304* |
| Independent | * *4* | Minus | *** *3* = *1* | x 37= | | OR | x 74= | *78* |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | + 115= | | OR | + 230= | |
| | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | *386* |

#### AMENDMENT C

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | RATE | ADDI-TIONAL FEE | | RATE | ADDI-TIONAL FEE |
|---|---|---|---|---|---|---|---|---|
| Total | * | Minus | ** = | x$11= | | OR | x$22= | |
| Independent | * | Minus | *** = | x 37= | | OR | x 74= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | +115= | | OR | +230= | |
| | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

FORM PTO-875
(Rev.10-92)

Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE



( Applicant's
Copy )

U

3/9/70      (Item 13 from file: 148)
DIALOG(R)File 148:IAC Trade & Industry Database
(c) 1996 Info Access Co. All rts. reserv.

07258481      SUPPLIER NUMBER: 15373877     (THIS IS THE FULL TEXT)
TV, phone home; GTE Mobilnet service is delivering compressed video over
   cellular channels.
McConnell, Chris
Broadcasting & Cable, v124, n18, p50(1)
May 2, 1994
ISSN: 1068-6827      LANGUAGE: ENGLISH      RECORD TYPE: FULLTEXT; ABSTRACT
WORD COUNT:   842   LINE COUNT:  00064

ABSTRACT:  GTE Mobilnet Inc plans to offer video cellular telephone
services that send compressed video signals over cellular channels. GTE
will use FoNet's cellular phones with video transmitting capabilities. The
cellular video service will be especially useful to new crews by allowing
them to transmit compressed video to their stations through the cellular
telephone. GTE plans to market the service first to top new broadcasting
stations.

TEXT:
        GTE Mobilnet service is delivering compressed video over cellular
channels
        GTE Mobilnet this summer will be looking to fill some of its cellular
channels with broadcast video.
        In the next few weeks, the company will be bringing FoNet Inc.'s
video-transmitting cellular phone to broadcasters in six markets. The
cellular phone, developed by Tulsa, Okla.-based FoNet using technology from
Intel Corp., allows news crews to dial their home station and send back·
compressed video over cellular channels.
        "A lot of times you can beat people with remote trucks," says
WTHR(TV) Indianapolis news photographer John Kofodimos, whose station has
been using the cellular phone for six months.
        To expand the client list past the 10 stations now using the phones,
FoNet is working with GTE to pitch the units to broadcasters in Houston;
San Francisco; Austin, Tex.; Raleigh, N.C.; Tampa, Fla., and Portland, Ore.
        The promotion plan calls for GTE to pitch the offer to affiliates in
those markets along with an exclusive deal to the first broadcaster to buy
one, says Chad Boss, FoNet's vice president of marketing. GTE Mobilnet's
Paul Fasi says the company will go first to the top news departments in
each market with an offer to use the system exclusively for one year. As
part of the deal, broadcasters will have to display a Mobilnet logo on the
screen whenever broadcasting the phone-delivered footage.
        GTE, which has one system up and running in Honolulu, plans to launch
its sales effort in the continental U.S. within the next two weeks,

-

beginning with Austin. Boss says FoNet hopes to line up a few dozen broadcast users by summer's end.

The phones use a compression unit to take video from a field VTR, digitize and compress it, and pass it to the phone for transmission to the station. The compression modules use Intel Corp. compression technology, which allows users to reduce the size of digital files by storing the video at less than 30 frames per second.

The compression units, which can digitize the video while the camera is recording, hold roughly 20 minutes of video. Sending the material back to base takes varying amounts of time depending on the frame rate broadcasters wish to use. While sending a 15-second clip with audio at 24 frames per second might take about 16 minutes, reducing the frame rate to seven frames per second could allow a crew to send the video in five minutes.

The 3-watt phones can transmit the video files over more than one cellular or land line, allowing users to boost video quality or send files faster. At the television station, a host/player unit receives the video for storage and playback.

FoNet offers the compression modules and phones for $16,900 and the host/player unit for $22,995. GTE Mobilnet, though, will offer the equipment free to broadcasters for the first year, with an option to buy thereafter.

Current users say the units offer the chance to get pictures on the air ahead of competing news trucks, but with a loss in picture quality. "We don't try to bluff anyone," says WTHR's Kofodimos, noting his station's news crews usually transmit the video at nine frames per second.

Jim Prather, vice president of news at WTMJ-TV Milwaukee, says his station usually identifies the source of the video when running the cellular-delivered material. Both Prather and Kofodimos cite traffic accidents as a frequent application for the phones, although Kofodimos says users often have to fight with emergency crews to get a cellular line.

"If you have an older [cellular] system, it will affect the speed at which you can transmit pictures," Kofodimos says. Boss says FoNet is working with cellular technology company PowerTek Industries Inc. to improve the speed and picture quality of transmissions. FoNet says it now can deliver VHS-quality pictures, with slightly better pictures if broadcasters show the pictures at less than full-screen size.

"We think the viewers understand," says Bob Brooks, director of programing and operations at Oklahoma City's KFOR-TV, which uses the phones to deliver early pictures of weather-related news such as tornadoes.

But engineers and news directors in the first six markets slated for the GTE Mobilnet campaign are not so sure viewers will appreciate the FoNet video. "Sometimes it's broken VHS quality," says Art Biggs, chief engineer at KPRC-TV Houston.

While Biggs anticipates taking a good look at the phone, J.L. Hamilton at Houston's KTRK-TV doubts his station could find enough uses for the phone to justify the price tag.

"Before we spend $30,000, they've got to improve the picture quality," says Al Dunbar, chief engineer at WRAL-TV in Raleigh, N.C. The station's news director, Doug Ballin, says the phone eventually will prove useful but is not yet ready for prime time.
COPYRIGHT 1994 Reed Publishing USA

COMPANY NAMES:  GTE Mobilnet Inc.--Services; FoNet Inc.--Products
INDUSTRY CODES/NAMES:  ARTS   Arts and Entertainment
DESCRIPTORS:  Cellular telephone services industry--Services; Cellular
  telephone equipment industry--Products
PRODUCT/INDUSTRY NAMES:  4811801 (Cellular Mobile Radio Services); 3661236
  (Videophones)
SIC CODES:  4812  Radiotelephone communications; 3661  Telephone and
  telegraph apparatus
FILE SEGMENT:  TI File 148



1/9/2      (Item 1 from file: 148)
DIALOG(R)File 148:IAC Trade & Industry Database
(c) 1996 Info Access Co. All rts. reserv.

07529388     SUPPLIER NUMBER: 15821666    (THIS IS THE FULL TEXT)
Odetics demonstrated FasTrans2000 digital cellular transmitter capable of
  sending compressed digital video over cellular link, officials said.
  (Telco/Cable)
Communications Daily, v14, n177, p4(1)
Sept 13, 1994
ISSN: 0277-0679      LANGUAGE: ENGLISH      RECORD TYPE: FULLTEXT
WORD COUNT:   87   LINE COUNT:  00007

TEXT:
        Odetics demonstrated FasTrans2000 digital cellular transmitter
capable of sending compressed digital video over cellular link, officials
said. Demonstration was part of disaster drill conducted by city of San
Gabriel, Cal. Officials said system would allow fire and police departments
to monitor disaster visually from remote location via cellular telephone.
Instead of 24 frames per sec., video is sent at 1-3 frames per sec. for
high-motion, relatively low clarity video, up to one high-resolution frame
of video every 20-30 sec.
        COPYRIGHT 1994 Warren Publishing Inc.

 COMPANY NAMES:  Odetics Inc.--Product introduction
 INDUSTRY CODES/NAMES:  TELC    Telecommunications
 DESCRIPTORS:  Cellular telephone equipment industry--Product introduction
 PRODUCT/INDUSTRY NAMES:  3662166 (Cellular Mobile Tel Equip)
 SIC CODES:  3663  Radio & TV communications equipment
 FILE SEGMENT:  TI File 148

*( Applicants )*
*( Copy )*
*( U )*

3/9/70      (Item 13 from file: 148)
DIALOG(R)File 148:IAC Trade & Industry Database
(c) 1996 Info Access Co. All rts. reserv.

072!8481      SUPPLIER NUMBER: 15373877      (THIS IS THE FULL TEXT)
TV, phone home; GTE Mobilnet service is delivering compressed video over
   cellular channels.
McConnell, Chris
Broadcasting & Cable, v124, n18, p50(1)
May 2, 1994
ISSN: 1068-6827      LANGUAGE: ENGLISH      RECORD TYPE: FULLTEXT; ABSTRACT
WORD COUNT:   842      LINE COUNT:   00064

ABSTRACT:  GTE Mobilnet Inc plans to offer video cellular telephone
services that send compressed video signals over cellular channels. GTE
will use FoNet's cellular phones with video transmitting capabilities. The
cellular video service will be especially useful to new crews by allowing
them to transmit compressed video to their stations through the cellular
telephone. GTE plans to market the service first to top new broadcasting
stations.

TEXT:
      GTE Mobilnet service is delivering compressed video over cellular
channels
      GTE Mobilnet this summer will be looking to fill some of its cellular
channels with broadcast video.
      In the next few weeks, the company will be bringing FoNet Inc.'s
video-transmitting cellular phone to broadcasters in six markets. The
cellular phone, developed by Tulsa, Okla.-based FoNet using technology from
Intel Corp., allows news crews to dial their home station and send back
compressed video over cellular channels.
      "A lot of times you can beat people with remote trucks," says
WTHR(TV) Indianapolis news photographer John Kofodimos, whose station has
been using the cellular phone for six months.
      To expand the client list past the 10 stations now using the phones,
FoNet is working with GTE to pitch the units to broadcasters in Houston;
San Francisco; Austin, Tex.; Raleigh, N.C.; Tampa, Fla., and Portland, Ore.
      The promotion plan calls for GTE to pitch the offer to affiliates in
those markets along with an exclusive deal to the first broadcaster to buy
one, says Chad Boss, FoNet's vice president of marketing. GTE Mobilnet's
Paul Fasi says the company will go first to the top news departments in
each market with an offer to use the system exclusively for one year. As
part of the deal, broadcasters will have to display a Mobilnet logo on the
screen whenever broadcasting the phone-delivered footage.
      GTE, which has one system up and running in Honolulu, plans to launch
its sales effort in the continental U.S. within the next two weeks,

beginning with Austin. Boss says FoNet hopes to line up a few dozen
broadcast users by summer's end.
      The phones use a compression unit to take video from a field VTR,
digitize and compress it, and pass it to the phone for transmission to the
station. The compression modules use Intel Corp. compression technology,
which allows users to reduce the size of digital files by storing the video
at less than 30 frames per second.
      The compression units, which can digitize the video while the camera
is recording, hold roughly 20 minutes of video. Sending the material back
to base takes varying amounts of time depending on the frame rate
broadcasters wish to use. While sending a 15-second clip with audio at 24
frames per second might take about 16 minutes, reducing the frame rate to
seven frames per second could allow a crew to send the video in five
minutes.
      The 3-watt phones can transmit the video files over more than one
cellular or land line, allowing users to boost video quality or send files
faster. At the television station, a host/player unit receives the video
for storage and playback.
      FoNet offers the compression modules and phones for $16,900 and the
host/player unit for $22,995. GTE Mobilnet, though, will offer the
equipment free to broadcasters for the first year, with an option to buy
thereafter.
      Current users say the units offer the chance to get pictures on the
air ahead of competing news trucks, but with a loss in picture quality. "We
don't try to bluff anyone," says WTHR's Kofodimos, noting his station's
news crews usually transmit the video at nine frames per second.
      Jim Prather, vice president of news at WTMJ-TV Milwaukee, says his
station usually identifies the source of the video when running the
cellular-delivered material. Both Prather and Kofodimos cite traffic
accidents as a frequent application for the phones, although Kofodimos says
users often have to fight with emergency crews to get a cellular line.
      "If you have an older [cellular] system, it will affect the speed at
which you can transmit pictures," Kofodimos says. Boss says FoNet is
working with cellular technology company PowerTek Industries Inc. to
improve the speed and picture quality of transmissions. FoNet says it now
can deliver VHS-quality pictures, with slightly better pictures if
broadcasters show the pictures at less than full-screen size.
      "We think the viewers understand," says Bob Brooks, director of
programing and operations at Oklahoma City's KFOR-TV, which uses the phones
to deliver early pictures of weather-related news such as tornadoes.
      But engineers and news directors in the first six markets slated for
the GTE Mobilnet campaign are not so sure viewers will appreciate the FoNet
video. "Sometimes it's broken VHS quality," says Art Biggs, chief engineer
at KPRC-TV Houston.
      While Biggs anticipates taking a good look at the phone, J.L.
Hamilton at Houston's KTRK-TV doubts his station could find enough uses for
the phone to justify the price tag.

"Before we spend $30,000, they've got to improve the picture quality," says Al Dunbar, chief engineer at WRAL-TV in Raleigh, N.C. The station's news director, Doug Ballin, says the phone eventually will prove useful but is not yet ready for prime time.
          COPYRIGHT 1994 Reed Publishing USA

COMPANY NAMES:  GTE Mobilnet Inc.--Services; FoNet Inc.--Products
INDUSTRY CODES/NAMES:  ARTS   Arts and Entertainment
DESCRIPTORS:  Cellular telephone services industry--Services; Cellular
 telephone equipment industry--Products
PRODUCT/INDUSTRY NAMES:  4811801 (Cellular Mobile Radio Services); 3661236
 (Videophones)
SIC CODES:  4812  Radiotelephone communications; 3661  Telephone and
 telegraph apparatus
FILE SEGMENT:  TI File 148



1/9/2     (Item 1 from file: 148)
DIALOG(R)File 148:IAC Trade & Industry Database
(c) 1996 Info Access Co. All rts. reserv.

07529388     SUPPLIER NUMBER: 15821666     (THIS IS THE FULL TEXT)
Odetics demonstrated FasTrans2000 digital cellular transmitter capable of
  sending compressed digital video over cellular link, officials said.
  (Telco/Cable)
Communications Daily, v14, n177, p4(1)
Sept 13, 1994
ISSN: 0277-0679     LANGUAGE: ENGLISH     RECORD TYPE: FULLTEXT
WORD COUNT:   87   LINE COUNT:  00007

TEXT:
      Odetics demonstrated FasTrans2000 digital cellular transmitter
capable of sending compressed digital video over cellular link, officials
said. Demonstration was part of disaster drill conducted by city of San
Gabriel, Cal. Officials said system would allow fire and police departments
to monitor disaster visually from remote location via cellular telephone.
Instead of 24 frames per sec., video is sent at 1-3 frames per sec. for
high-motion, relatively low clarity video, up to one high-resolution frame
of video every 20-30 sec.
      COPYRIGHT 1994 Warren Publishing Inc.

COMPANY NAMES:  Odetics Inc.--Product introduction
INDUSTRY CODES/NAMES:  TELC   Telecommunications
DESCRIPTORS:  Cellular telephone equipment industry--Product introduction
PRODUCT/INDUSTRY NAMES:  3662166 (Cellular Mobile Tel Equip)
SIC CODES:  3663  Radio & TV communications equipment
FILE SEGMENT:  TI File 148

3/9/70     (Item 13 from file: 148)
DIALOG(R)File 148:IAC Trade & Industry Database
(c) 1996 Info Access Co. All rts. reserv.

07258481     SUPPLIER NUMBER: 15373877     (THIS IS THE FULL TEXT)
TV, phone home; GTE Mobilnet service is delivering compressed video over
  cellular channels.
McConnell, Chris
Broadcasting & Cable, v124, n18, p50(1)
May 2, 1994
ISSN: 1068-6827     LANGUAGE: ENGLISH     RECORD TYPE: FULLTEXT; ABSTRACT
WORD COUNT:   842   LINE COUNT:  00064

ABSTRACT:  GTE Mobilnet Inc plans to offer video cellular telephone
services that send compressed video signals over cellular channels. GTE
will use FoNet's cellular phones with video transmitting capabilities. The
cellular video service will be especially useful to new crews by allowing
them to transmit compressed video to their stations through the cellular
telephone. GTE plans to market the service first to top new broadcasting
stations.

TEXT:
     GTE Mobilnet service is delivering compressed video over cellular
channels
     GTE Mobilnet this summer will be looking to fill some of its cellular
channels with broadcast video.
     In the next few weeks, the company will be bringing FoNet Inc.'s
video-transmitting cellular phone to broadcasters in six markets. The
cellular phone, developed by Tulsa, Okla.-based FoNet using technology from
Intel Corp., allows news crews to dial their home station and send back
compressed video over cellular channels.
     "A lot of times you can beat people with remote trucks," says
WTHR(TV) Indianapolis news photographer John Kofodimos, whose station has
been using the cellular phone for six months.
     To expand the client list past the 10 stations now using the phones,
FoNet is working with GTE to pitch the units to broadcasters in Houston;
San Francisco; Austin, Tex.; Raleigh, N.C.; Tampa, Fla., and Portland, Ore.
     The promotion plan calls for GTE to pitch the offer to affiliates in
those markets along with an exclusive deal to the first broadcaster to buy
one, says Chad Boss, FoNet's vice president of marketing. GTE Mobilnet's
Paul Fasi says the company will go first to the top news departments in
each market with an offer to use the system exclusively for one year. As
part of the deal, broadcasters will have to display a Mobilnet logo on the
screen whenever broadcasting the phone-delivered footage.
     GTE, which has one system up and running in Honolulu, plans to launch
its sales effort in the continental U.S. within the next two weeks,

beginning with Austin. Boss says FoNet hopes to line up a few dozen broadcast users by summer's end.

The phones use a compression unit to take video from a field VTR, digitize and compress it, and pass it to the phone for transmission to the station. The compression modules use Intel Corp. compression technology, which allows users to reduce the size of digital files by storing the video at less than 30 frames per second.

The compression units, which can digitize the video while the camera is recording, hold roughly 20 minutes of video. Sending the material back to base takes varying amounts of time depending on the frame rate broadcasters wish to use. While sending a 15-second clip with audio at 24 frames per second might take about 16 minutes, reducing the frame rate to seven frames per second could allow a crew to send the video in five minutes.

The 3-watt phones can transmit the video files over more than one cellular or land line, allowing users to boost video quality or send files faster. At the television station, a host/player unit receives the video for storage and playback.

FoNet offers the compression modules and phones for $16,900 and the host/player unit for $22,995. GTE Mobilnet, though, will offer the equipment free to broadcasters for the first year, with an option to buy thereafter.

Current users say the units offer the chance to get pictures on the air ahead of competing news trucks, but with a loss in picture quality. "We don't try to bluff anyone," says WTHR's Kofodimos, noting his station's news crews usually transmit the video at nine frames per second.

Jim Prather, vice president of news at WTMJ-TV Milwaukee, says his station usually identifies the source of the video when running the cellular-delivered material. Both Prather and Kofodimos cite traffic accidents as a frequent application for the phones, although Kofodimos says users often have to fight with emergency crews to get a cellular line.

"If you have an older [cellular] system, it will affect the speed at which you can transmit pictures," Kofodimos says. Boss says FoNet is working with cellular technology company PowerTek Industries Inc. to improve the speed and picture quality of transmissions. FoNet says it now can deliver VHS-quality pictures, with slightly better pictures if broadcasters show the pictures at less than full-screen size.

"We think the viewers understand," says Bob Brooks, director of programing and operations at Oklahoma City's KFOR-TV, which uses the phones to deliver early pictures of weather-related news such as tornadoes.

But engineers and news directors in the first six markets slated for the GTE Mobilnet campaign are not so sure viewers will appreciate the FoNet video. "Sometimes it's broken VHS quality," says Art Biggs, chief engineer at KPRC-TV Houston.

While Biggs anticipates taking a good look at the phone, J.L. Hamilton at Houston's KTRK-TV doubts his station could find enough uses for the phone to justify the price tag.

"Before we spend $30,000, they've got to improve the picture quality," says Al Dunbar, chief engineer at WRAL-TV in Raleigh, N.C. The station's news director, Doug Ballin, says the phone eventually will prove useful but is not yet ready for prime time.
        COPYRIGHT 1994 Reed Publishing USA

COMPANY NAMES:  GTE Mobilnet Inc.--Services; FoNet Inc.--Products
INDUSTRY CODES/NAMES:  ARTS    Arts and Entertainment
DESCRIPTORS:  Cellular telephone services industry--Services; Cellular
  telephone equipment industry--Products
PRODUCT/INDUSTRY NAMES:  4811801 (Cellular Mobile Radio Services); 3661236
  (Videophones)
SIC CODES:  4812  Radiotelephone communications; 3661  Telephone and
  telegraph apparatus
FILE SEGMENT:  TI File 148

1/9/2     (Item 1 from file: 148)
DIALOG(R)File 148:IAC Trade & Industry Database
(c) 1996 Info Access Co. All rts. reserv.

07529388     SUPPLIER NUMBER: 15821666     (THIS IS THE FULL TEXT)
Odetics demonstrated FasTrans2000 digital cellular transmitter capable of
  sending compressed digital video over cellular link, officials said.
  (Telco/Cable)
Communications Daily, v14, n177, p4(1)
Sept 13, 1994
ISSN: 0277-0679      LANGUAGE: ENGLISH      RECORD TYPE: FULLTEXT
WORD COUNT:   87   LINE COUNT:  00007

TEXT:
      Odetics demonstrated FasTrans2000 digital cellular transmitter
capable of sending compressed digital video over cellular link, officials
said. Demonstration was part of disaster drill conducted by city of San
Gabriel, Cal. Officials said system would allow fire and police departments
to monitor disaster visually from remote location via cellular telephone.
Instead of 24 frames per sec., video is sent at 1-3 frames per sec. for
high-motion, relatively low clarity video, up to one high-resolution frame
of video every 20-30 sec.
      COPYRIGHT 1994 Warren Publishing Inc.

COMPANY NAMES:  Odetics Inc.--Product introduction
INDUSTRY CODES/NAMES:  TELC   Telecommunications
DESCRIPTORS:  Cellular telephone equipment industry--Product introduction
PRODUCT/INDUSTRY NAMES:  3662166 (Cellular Mobile Tel Equip)
SIC CODES:  3663  Radio & TV communications equipment
FILE SEGMENT:  TI File 148

# PLANETARY DATA DISTRIBUTION SYSTEM

David A. Rosenthal and James L. Rieger
Naval Air Warfare Center, Weapons Division
2 December 1993

## ABSTRACT:

A system is described that distributes digitized video, text data, and alarm notifications reflecting constantly changing conditions in the planetary environment as well as high-priority information affecting large populations. Data are delivered in near-real time to users worldwide via existing transmission facilities. The system is intended to warn of conditions such as earthquakes, tsunamis, severe weather, and solar disturbances, providing substantially more information than current methods while also continuously relaying large amounts of scientific and other data. Inputs to the system originate from a network of sensors plus Government and other automated information sources. Data handling speed is significantly enhanced by a DoD-developed data/image compression scheme combining digitized video with text and adapted to the transmission media.

Information on the system is directly accessible almost anywhere in the world via desktop-type computers equipped with special low-cost data converters, decoding hardware, and associated software. Transmission is via conventional television relay satellites and distributed by cable systems, individual satellite receivers, or other bandwidth-capable networks. The system can be configured to distribute information to some users and not others and can accommodate a wide variety of data types.

## INTRODUCTION

Despite rapidly broadening commercial and Government efforts to increase information flow to the public via interactive television and related systems, significantly less interest has focused on using emerging distribution technologies for wide area dissemination of emergency and other quickly changing data. Terrestrial phenomena such as earthquakes, severe weather, and tsunamis as well as events affecting the near-earth space environment such as solar flares and geomagnetic storms have significant impacts on human activities but existing warning delivery systems tend to be diverse and provide limited coverage.

The system described below uses a Department of Defense-developed data handling system in conjunction with conventional transmission facilities to deliver time-critical information virtually instantaneously to desktop-type computers in any part of the developed world. Information to be broadcast is assembled at a central location, formatted into data streams, and relayed to satellites for distribution.

The data streams are received via conventional TeleVision Receive Only (TVRO) facilities and then decoded by low-cost ($200-400/user) equipment installed in a desktop-type computer. The system runs in the background on the user's machine, allowing the host computer to perform other tasks while incoming data are automatically retrieved and stored.

Distinct from interactive systems or data bases requiring individual user access, this approach represents a continuous flow of constantly updated emergency, scientific, and educational data while simultaneously providing information useful to the general public.

## The PLANETARY DATA DISTRIBUTION SYSTEM (PDDS)

The primary equipment for the current system is located at two sites (see Figure 1): A central data collection and encoding facility at the U. S. Information Agency's (USIA) Network Control Center in Washington, D. C. and a dedicated data acquisition/interface device located at the National Oceanic and Atmospheric Administration (NOAA) Space Environment Laboratory (SEL) in Boulder, Colorado. Other equipment for relaying the data products via satellite is modular and can be installed at any conventional television uplink site.

Necessary equipment to receive the data consists of a satellite dish and receiver capable of recovering the relayed television signal, a signal converter, and a special circuit board for a desktop-type computer. Individual user equipment is described in greater detail below. Significant in this application is the capability for mass distribution of the entire data product via cable TV

Approved for public release; distribution is unlimited

systems, bandwidth-capable computer networks, and other existing and emerging information distribution systems.

The current system provides two data products:  a high data-rate feed (1.544 Mbits/second) intended for the U. S. (all 50 states), Canada, Mexico, and the Caribbean Region plus a slower feed (64 kbits/second) with global coverage.

The domestic 1.544 Mbit/second product accompanies commercial television signals being relayed via conventional TV satellites.  Simultaneously, the global 64 kbit/second stream is inserted in the Vertical Blanking Interval (VBI) of the video signal of the USIA WORLDNET Television service.  Containing a somewhat smaller data set, the VBI-based transmission product is intended for the worldwide environmental, scientific, technical, and educational communities; it will also be receivable throughout North America.

All data are encoded and prioritized using HORACE[1], a DoD-developed data-transmission protocol, which allows mixing of video and text data.  Data flow is configured such that low priority information can be interrupted to send higher priority data and then lower priority flow resumed.  HORACE also embodies a video data compression scheme allowing eight-bit video pixels to be compressed to from 1.5 to 2 bits; for most storage and viewing purposes, recovered image quality exceeds the display device capabilities.

This highly flexible, real-time approach to information distribution is not limited to any particular type of data and can, in fact, be used in a wide variety of applications such as information services, advertising, and messaging.

## PDDS Inputs and Transmitted Data

Input data for the system come from a worldwide network of sensors, spacecraft, observatories, and Government agencies, whose information is continuously assembled at a central facility in Washington, D. C.  Of particular importance is the data from the NOAA Space Environment Laboratory (SEL).  That organization tracks conditions in the near-earth space environment and serves as a worldwide warning center for disturbances having significant impacts on spacecraft operations, communications, and navigation; PDDS gives the SEL an unprecedented ability to provide virtually instantaneous global warning.

Current plans include the following products to be carried via both domestic and global feeds:

Near-real-time earthquake data from the National Earthquake Information Center
Tsunami warnings from the NOAA Tsunami Warning Center.
Warnings of disturbances in the near-earth space environment which pose hazards to human activities (e. g., manned spacecraft, satellites, navigation systems, communications).
The latest available satellite weather imagery from GOES, METEOSAT 4, and GMS.
The latest solar images (in hydrogen-alpha and other wavelengths) from solar observatories around the world.
Continuously updated data on the sun and solar-terrestrial environment from the NOAA Space Environment Laboratory.

In addition to the above products, the domestic feed is projected to also include:

Detailed earthquake data and maps.
Severe weather warnings and graphics with affected areas depicted.
SIGMET, AIRMET, and other high-priority data from the National Weather Service and the Federal Aviation Administration.
Disaster-related data and graphics from the Federal Emergency Management Agency (FEMA).

## Subcarrier-based Distribution

The domestic, subcarrier-based data streams consist of two components:  a 1.544 Mbit/second (T-1 rate) product which includes an encrypted component.  The combined streams are sent via

---

[1] U. S. Patent No. 5,062,136, "Telecommunication System and Method."

Approved for public release; distribution is unlimited

2

systems, bandwidth-capable computer networks, and other existing and emerging information distribution systems.

The current system provides two data products: a high data-rate feed (1.544 Mbits/second) intended for the U. S. (all 50 states), Canada, Mexico, and the Caribbean Region plus a slower feed (64 kbits/second) with global coverage.

The domestic 1.544 Mbit/second product accompanies commercial television signals being relayed via conventional TV satellites. Simultaneously, the global 64 kbit/second stream is inserted in the Vertical Blanking Interval (VBI) of the video signal of the USIA WORLDNET Television service. Containing a somewhat smaller data set, the VBI-based transmission product is intended for the worldwide environmental, scientific, technical, and educational communities; it will also be receivable throughout North America.

All data are encoded and prioritized using HORACE[1], a DoD-developed data-transmission protocol, which allows mixing of video and text data. Data flow is configured such that low priority information can be interrupted to send higher priority data and then lower priority flow resumed. HORACE also embodies a video data compression scheme allowing eight-bit video pixels to be compressed to from 1.5 to 2 bits; for most storage and viewing purposes, recovered image quality exceeds the display device capabilities.

This highly flexible, real-time approach to information distribution is not limited to any particular type of data and can, in fact, be used in a wide variety of applications such as information services, advertising, and messaging.

## PDDS Inputs and Transmitted Data

Input data for the system come from a worldwide network of sensors, spacecraft, observatories, and Government agencies, whose information is continuously assembled at a central facility in Washington, D. C.   Of particular importance is the data from the NOAA Space Environment Laboratory (SEL).  That organization tracks conditions in the near-earth space environment and serves as a worldwide warning center for disturbances having significant impacts on spacecraft operations, communications, and navigation; PDDS gives the SEL an unprecedented ability to provide virtually instantaneous global warning.

Current plans include the following products to be carried via both domestic and global feeds:

Near-real-time earthquake data from the National Earthquake Information Center
Tsunami warnings from the NOAA Tsunami Warning Center.
Warnings of disturbances in the near-earth space environment which pose hazards to human activities (e. g., manned spacecraft, satellites, navigation systems, communications).
The latest available satellite weather imagery from GOES, METEOSAT 4, and GMS.
The latest solar images (in hydrogen-alpha and other wavelengths) from solar observatories around the world.
Continuously updated data on the sun and solar-terrestrial environment from the NOAA Space Environment Laboratory.

In addition to the above products, the domestic feed is projected to also include:

Detailed earthquake data and maps.
Severe weather warnings and graphics with affected areas depicted.
SIGMET, AIRMET, and other high-priority data from the National Weather Service and the Federal Aviation Administration.
Disaster-related data and graphics from the Federal Emergency Management Agency (FEMA).

## Subcarrier-based Distribution

The domestic, subcarrier-based data streams consist of two components: a 1.544 Mbit/second (T-1 rate) product which includes an encrypted component. The combined streams are sent via

---

[1] U. S. Patent No. 5,062,136, "Telecommunication System and Method."

Approved for public release; distribution is unlimited

leased telephone data line to a satellite uplink facility where more data may be added before being put on a subcarrier for transmission.

In the satellite's reception footprint, conventional equipment at a TVRO station (e. g., cable TV companies or individual home receiving dishes) takes the subcarrier from the television signal. One local distribution approach is for a cable TV company to use commercial equipment to convert the subcarrier signal to a radio frequency and make it available in the FM portion of its cable spectrum. Individual TVRO users can access the subcarrier directly from where it appears at the "wideband output" of their satellite receiver.

A special low-cost circuit board in a desktop-type computer separates the data from the distribution signal, decodes it, and makes it available for use. The circuit board contains its own microprocessor, memory, and instructions so the entire reception, decoding, and data handling operations can take place independent of the computer's main processor.

All arriving data are examined by all user machines but only selected information is accepted. Selections of data to be extracted are made during software initialization and may be changed by the user at any time.

## Vertical Blanking Interval (VBI[2])-based Distribution

Using the VBI of a television signal broadcast worldwide to distribute a data/image product appears to represent a cost-effective application of that capability since the technology involved is well established and accessible throughout the world. Emphasis in this global feed is placed on environmental and scientific information and, despite the slower 64 kbit/second data rate, large amounts of information are still transferred.

Devices similar to "closed-caption" encoders pack outgoing data into the VBI of both NTSC and PAL video waveforms which are then uplinked to various satellites for relay throughout the world. Users in the satellites' footprints employ low-cost VBI-based decoders to extract the data and make it available to desktop-type computers. Though data-recovery hardware differs from the subcarrier-based scheme, data handling and software is essentially the same.

An important capability of the global feed is not only providing essentially instantaneous worldwide warning of hazardous events in the solar-terrestrial environment (current warning times range into the tens of minutes--unacceptably long for many emerging high-tech systems), but also serving as a high-speed conduit for important scientific data which would normally take from weeks to months to distribute. The PDDS worldwide service also provides continuously updated weather satellite imagery, solar data, and communications advisories.

## Data Format

Because the system continuously broadcasts over a wide area and users anywhere can begin monitoring the system at any time, the delivery method is totally asynchronous and capable of transmitting an entire data package relatively quickly.

To accomplish this, the overall scheme employs a repeating data "frame" containing the most current information and digitized video images. Inside the frame, each piece of data has its own unique and unchanging numerical identity, called a "tag," with a maximum of 65,536 tags possible in this particular application. Once identified by its unique number, user software immediately begins organizing incoming tags according to user-set preferences. Information inside each tag can change at any time with software designed to detect the new data and update accordingly.

The number of tags and the number of data bytes in each tag can vary (e. g., the tag with the current "solar flux" value contains just a few bytes while the tag containing the latest GOES satellite image has many more) with software controlling the process. The design objective was to

---

[2] In a television set, this is the time the electron gun is turned off while its beam is repositioned back to the top left corner of the screen. This interval is equivalent to the time necessary to sweep out 21 horizontal picture lines and can be seen as a black bar between frames if a television's "vertical hold" control is adjusted to allow the picture to roll. Line 21 is used in the United States to insert "closed captions" for hearing-impaired viewers; PDDS uses lines 10 through 18.

Approved for public release; distribution is unlimited

3

achieve an approach that allows a user to obtain all current information within a short time after beginning to receive data.

Information is transferred sequentially from the host computer with higher priority data interrupting and replacing the flow of lower priority data. After the higher priority information is sent, the lower priority stream resumes; all data tags are uniquely specified in the stream so user equipment will handle them accordingly.

In the current system configuration, there are four levels of data prioritization with others possible:

1. ASCII character-based alarm data
2. ASCII character-based text that changes rapidly
3. Digitized image and/or line-drawing files
4. ASCII character-based text that changes slowly

## Secure Data Capabilities

Encryption technology allows wide flexibility in offering secure data services as part of the domestic product while providing a method to recover system operating costs via subscription fees. A portion of the data frame as well as separate segments of the data stream have been reserved for this purpose.

In addition to each user's unique "address," any number of different tags can possess different encryption/decryption keys such that only authorized user(s) can receive and access their assigned data. Further, these services are based on state-of-the-art techniques allowing continuous changes to encryption keys and secure tag assignments, ensuring a high degree of data security. All text and image transfer capabilities in the unsecured data product are also available in the secure service.

## Circuit Board and Software

Recovered data are presented to a circuit board installed in the individual user's desktop computer. The data stream is decoded by software and information routed to destinations determined by the user. Under software control, data can be displayed, stored in files, or both. Boards will possess sufficient RAM capacity to store incoming data such that incoming new information is not displayed until completely received. Unless incoming data in a given tag have been designated for storage in files, new data replace the old as they arrive.

Via software, data priorities originally assigned by the system can be manually overridden and displays selected or deselected at the user's option. Software design allows for archived data files to be compatible with and accessible by data base applications. Depending on the host computer's operating system and machine architecture, the entire PDDS application is also designed to allow itself to run in the "background" so the computer can be used for other purposes simultaneously.

Other software options include the capability to store specified image files and retrieve them sequentially, thus producing "movies" (e. g., automatically storing a series of GOES weather images as they arrive and later playing them back to observe air mass movement patterns). Another option is to enable the computer to enter the PDDS program automatically after a set interval, go to a predetermined data page, and display it; in this application, the latest GOES full-disk earth image could be displayed as a "screen saver."

Initial circuit board design requirements call for compatibility with IBM PC-type desktop computers but additional configurations including a totally external unit for laptops and a Macintosh-based circuit board are planned.

For an individual user, unit cost, including Signal Converter, Circuit Board, Software, and Software Documentation is projected to be approximately US$200-400 which is expected to drop substantially as manufacturing volume increases. Moreover, hardware versions are planned that allow the Signal Converter to reside on the circuit board itself, depending upon the method of distributing data (e. g., subcarriers, RF signals via cable TV, Local Area Networks, etc.).

## FUTURE EXPANSION

An important priority in developing PDDS is making the data stream available to the many emerging information services that offer large numbers of television channels. Not only is the present configuration immediately marketable, but additional products are possible which contain

Approved for public release; distribution is unlimited

4

specialized data and images. Also ongoing is an effort to include PDDS as part of the National Information Infrastructure (NII) being developed by the U. S. Government.

Both hardware and software capabilities are expected to further expand and develop after the system becomes operational. Specialized software intended to handle certain categories of data is easily designed (e. g., extracting user-specified tags, archiving, processing, analyzing, and displaying the data) as is specific hardware (outside-world interfaces that act on incoming data).

A notable future enhancement to the PDDS will be serving as a primary real-time worldwide relay for data from the Advanced Composition Explorer (ACE) satellite. This spacecraft will orbit a point of gravitational equilibrium near the sun, monitoring solar magnetic fields and particle emissions. As part of the PDDS product, ACE will provide an approximately 30-minute advance warning of high-energy sub-atomic particles and other solar outbursts that have significant impacts on earth-orbiting satellite systems and other terrestrial activities.

## CONCLUSION

The potential user community for a system such as PDDS appears substantial. Because the system uses existing resources and reception equipment available at low cost, it appears to represent an excellent opportunity to establish a domestic and international real-time information network. Moreover, a primary design objective of PDDS was to produce a data product inherently distributable via mass broadcast media; this seems to make it marketable not only as a stand-alone system, but also as a potential offering for the quickly emerging family of information delivery systems.

At this writing, several U. S. Government agencies are actively involved in evaluating the capabilities PDDS would provide while several more have already expressed interest in participating. The NOAA Space Environment Laboratory intends to use PDDS as a primary data distribution network while officials in all branches of the U. S. military have plans for the system's capabilities. Also an enthusiastic participant is the solar research community and their worldwide system of observatories, with several major research laboratories currently gathering input from their scientists on ways to use the data PDDS would provide.

But seemingly the most important users would be the world's schools, colleges, and universities as well as the public at large as more and more data becomes available via systems like PDDS. Putting a global and instantaneous source of data literally at the fingertips of anyone with a home computer appears a natural direction for information technology.

Approved for public release; distribution is unlimited

5



PLANETARY DATA DISTRIBUTION SYSTEM (PDDS) DIAGRAM

# MPI Family Report (Family Bibliographic and Legal Status)

In the MPI Family report, all publication stages are collapsed into a single record, based on identical application data. The bibliographic information displayed in the collapsed record is taken from the latest publication.

**Report Created Date:** 2011-10-06

**Name of Report:**

**Number of Families:** 1

**Comments:**

## Table of Contents

1. **US5579239A**   19961126   FREEMAN; MITCHAEL C.     US
   Remote video transmission system ........................................................................................................... 1



## Family1

### 2 records in the family.

### US5579239A   19961126

[ no drawing available]

**(ENG) Remote video transmission system**

**Assignee:**  FREEMAN; MITCHAEL C.     US

**Inventor(s):**  FREEMAN MITCHAEL C US ; FREEMAN
RICHARD C US ; BOSS CHAD US ; FREEMAN
MICHAEL H US

**Application No:**  US   19813094   A

**Filing Date:**  19940216

**Issue/Publication Date:**  19961126

**Abstract:**  (ENG) A remote video transmission system for digitizing and compressing an audio/visual signal,
transmitting that signal over low band width lines, such as land telephone lines, cellular telephone lines,
or radio frequencies, decompressing the digitized data and converting it to an audio/visual signal for
broadcast. Components of this system include: A remote unit, a host unit, and a playback unit. The
remote unit is capable of digitizing and compressing the audio/visual signal as well as transmitting the
compressed, digitized data. Data may be divided and sent to multiple ports for output. Data may also be
edited prior to transmission. The host unit is automated to receive data transmitted from the remote unit
and reassemble the data if it has been divided. The playback unit stores and automatically catalogs
transmitted data files. The player unit also decompresses the digitized data files and converts them to an
audio/visual signal which may then be broadcast. The audio/visual signal can either be NTSC, PAL, or
Y/C video.

**Priority Data:**  US 19813094 19940216 A I;

**IPC (International Class):**   H04N00726; H04N00712; H04N00964

**ECLA (European Class):**   H04N00726; H04N00726

**US Class:**  34801401; 34801402; 348E09039; 375E07026; 37909001; 386046; 386109; 725062

**Publication Language:**  ENG

**Filing Language:**  ENG

**Agent(s):**   Catalano, Zingerman & Associates

**Examiner Primary:**  Ramirez, Ellis B.

**Examiner Assistant:**  Assouad, Patrick J.

**US Post Issuance:**
--US Expiration Date: 20041126   20050125   DUE TO FAILURE TO PAY MAINTENANCE FEES
--US Delayed Payment of Maintenance Fees: 20061002   20061031   due to acceptance of delayed payment
of maintenance fee

**Legal Status:**

| Date | +/- | Code | Description |
|---|---|---|---|
| 20050125 | (-) | FP | EXPIRED DUE TO FAILURE TO PAY MAINTENANCE FEE Effective date: 20041126; |
| 20061002 | (+) | PRDP | PATENT REINSTATED DUE TO THE ACCEPTANCE OF A LATE MAINTENANCE FEE Effective date: 20061002; |



## US5684716A 19971104



**(ENG) Remote video transmission system**

**Assignee:**  FREEMAN; MITCHAEL C.    US

**Inventor(s):**  FREEMAN MITCHAEL C   US

**Application No:**  US  50545495  A

**Filing Date:**  19950721

**Issue/Publication Date:**  19971104

**Abstract:**  (ENG) A remote video transmission system for digitizing and compressing an audio/visual signal, transmitting that signal over low band width lines, such as land telephone lines, cellular telephone lines, or radio frequencies, decompressing the digitized data and converting it to an audio/visual signal for broadcast. Components of this system include: A remote unit, a host unit, and a playback unit. The remote unit is capable of digitizing and compressing the audio/visual signal as well as transmitting the compressed, digitized data. Data may be divided and sent to multiple ports for output. Data may also be edited prior to transmission. The host unit is automated to receive data transmitted from the remote unit and reassemble the data if it has been divided. The playback unit stores and automatically catalogs transmitted data files. The player unit also decompresses the digitized data files and converts them to an audio/visual signal which may then be broadcast. The audio/visual signal can either be NTSC, PAL, or Y/C video.

**Priority Data:**  US 19813094 19940216 A R; US 50545495 19950721 A I;

**Related Application(s):**    01    01

**IPC (International Class):**    H04N00726; H04N00712; H04N00964

**ECLA (European Class):**    H04N00712; H04N00712; H04N00726; S09G21202; T04N00726; T04N00964

**US Class:**  715723; 34801401; 34801402; 348E07045; 348E09039; 382232; 386046; 386109; 709236

**Publication Language:**  ENG

**Filing Language:**  ENG

**Agent(s):**    Zingerman, Scott R.; Catalano, Frank J.

**Examiner Primary:**  Voeltz, Emanuel T.

**Examiner Assistant:**  Assouad, Patrick

**US Post Issuance:**
--US Expiration Date: 20051104   20060103   DUE TO FAILURE TO PAY MAINTENANCE FEES
--US Delayed Payment of Maintenance Fees: 20061117   20061212   due to acceptance of delayed payment of maintenance fee

**Legal Status:**

| Date | +/- | Code | Description |
|------|-----|------|-------------|
| 20060103 | (-) | FP | EXPIRED DUE TO FAILURE TO PAY MAINTENANCE FEE Effective date: 20051104; |
| 20061113 | (+) | PRDP | PATENT REINSTATED DUE TO THE ACCEPTANCE OF A LATE MAINTENANCE FEE Effective date: 20061117; |



# USPTO Maintenance Report

| Patent Bibliographic Data | | 10/06/2011 10:35 AM | |
|---|---|---|---|
| Patent Number: | 5579239 | Application Number: | 08198130 |
| Issue Date: | 11/26/1996 | Filing Date: | 02/16/1994 |
| Title: | REMOTE VIDEO TRANSMISSION SYSTEM | | |
| Status: | 4th, 8th and 12th year fees paid | Entity: | Small |
| Window Opens: | N/A | Surcharge Date: | N/A | Expiration: | N/A |
| Fee Amt Due: | Window not open | Surchg Amt Due: | Window not open | Total Amt Due: | Window not open |
| Fee Code: | | | |
| Surcharge Fee Code: | | | |
| Most recent events (up to 7): | 05/27/2008<br>10/02/2006<br>02/27/2006<br>02/27/2006<br>02/27/2006<br>11/26/2004<br>06/16/2004 | Payment of Maintenance Fee, 12th Yr, Small Entity.<br>Petition Related to Maintenance Fees Granted.<br>Surcharge, Petition to Accept Pymt After Exp, Unintentional.<br>Payment of Maintenance Fee, 8th Yr, Small Entity.<br>Petition Related to Maintenance Fees Filed.<br>Patent Reinstated After Maintenance Fee Payment Confirmed.<br>Maintenance Fee Reminder Mailed.<br>--- End of Maintenance History --- | | |
| Address for fee purposes: | FELLERS SNIDER BLANKENSHIP<br>BAILEY & TIPPENS<br>THE KENNEDY BUILDING<br>321 SOUTH BOSTON SUITE 800<br>TULSA OK 74103-3318 | | |