# EXHIBIT 1

US007761414B2

## (12) United States Patent
### Freedman

(10) Patent No.: **US 7,761,414 B2**
(45) Date of Patent: **Jul. 20, 2010**

(54) **ASYNCHRONOUS DATA SYNCHRONIZATION AMONGST DEVICES**

(75) Inventor: **Gordon J. Freedman**, Palo Alto, CA (US)

(73) Assignee: **Apple Inc.**, Cupertino, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 49 days.

(21) Appl. No.: **11/650,624**

(22) Filed: **Jan. 7, 2007**

(65) **Prior Publication Data**
US 2008/0168291 A1     Jul. 10, 2008

(51) **Int. Cl.**
*G06F 7/00*     (2006.01)
*G06F 17/00*     (2006.01)

(52) **U.S. Cl.** .................................................... **707/610**

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,974,238 A | 10/1999 | Chase, Jr. | |
| 6,023,708 A | 2/2000 | Mendez et al. | |
| 6,034,621 A | 3/2000 | Kaufman | |
| 6,178,403 B1 | 1/2001 | Detlef | |
| 6,269,405 B1 | 7/2001 | Dutcher et al. | |
| 6,295,541 B1 | 9/2001 | Bodnar et al. | |
| 6,393,434 B1 | 5/2002 | Huang et al. | |
| 6,430,576 B1 | 8/2002 | Gates et al. | |
| 6,564,261 B1 * | 5/2003 | Gudjonsson et al. | ........ 709/227 |
| 6,571,245 B2 | 5/2003 | Huang et al. | |
| 6,708,221 B1 | 3/2004 | Mendez et al. | |
| 6,789,258 B1 | 9/2004 | Zak, Jr. et al. | |
| 6,985,912 B2 | 1/2006 | Mullins et al. | |
| 6,990,513 B2 | 1/2006 | Belfiore et al. | |
| 7,096,867 B2 | 8/2006 | Smith et al. | |
| 7,100,039 B2 | 8/2006 | Fisher et al. | |
| 7,188,193 B1 | 3/2007 | Getsin et al. | |

| | | | |
|---|---|---|---|
| 7,200,668 B2 | 4/2007 | Mak et al. | |
| 7,263,551 B2 | 8/2007 | Belfiore et al. | |
| 7,401,104 B2 | 7/2008 | Shah et al. | |
| 7,454,462 B2 | 11/2008 | Belfiore et al. | |

(Continued)

### FOREIGN PATENT DOCUMENTS

WO     WO-03/073292     9/2003

(Continued)

### OTHER PUBLICATIONS

Ori Shalev et al, "Predictive Log-Synchronization" ACM SIGOPS Operating Systems Review, vol. 40, Issue 4, Oct. 2006, pp. 305-315.*

(Continued)

*Primary Examiner*—Uyen T. Le
(74) *Attorney, Agent, or Firm*—Blakely, Sokoloff, Taylor & Zafman LLP

(57) **ABSTRACT**

Systems, methods and computer readable media for synchronization tasks and non-synchronization tasks being executed concurrently. In one exemplary embodiment, a method includes executing at least one user-level non-synchronization processing thread and executing at least one synchronization processing thread concurrently with the executing of the at least one user-level non-synchronization processing thread. The at least one user-level non-synchronization processing thread may include operations to access a first database which is synchronized by the at least one synchronization processing thread during a synchronization operation between the first database on a first processing system and a second database on a second data processing system.

**32 Claims, 28 Drawing Sheets**



# US 7,761,414 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,458,091 | B1 | 11/2008 | Getsin et al. |
| 7,580,946 | B2 | 8/2009 | Mansour et al. |
| 2002/0087632 | A1 | 7/2002 | Keskar |
| 2002/0116405 | A1 * | 8/2002 | Bodnar et al. ............... 707/202 |
| 2002/0123325 | A1 | 9/2002 | Cooper |
| 2002/0124241 | A1 | 9/2002 | Grey et al. |
| 2003/0095096 | A1 | 5/2003 | Robbin et al. |
| 2003/0126301 | A1 | 7/2003 | Mason et al. |
| 2004/0054711 | A1 | 3/2004 | Multer |
| 2004/0054739 | A1 | 3/2004 | Friend et al. |
| 2004/0093342 | A1 | 5/2004 | Arbo et al. |
| 2004/0139178 | A1 | 7/2004 | Mendez et al. |
| 2004/0148375 | A1 | 7/2004 | Levett et al. |
| 2004/0181580 | A1 | 9/2004 | Baranshamaje |
| 2004/0186916 | A1 | 9/2004 | Bjorner |
| 2004/0224638 | A1 | 11/2004 | Fadell et al. |
| 2004/0225731 | A1 | 11/2004 | Piispanen et al. |
| 2004/0225791 | A1 | 11/2004 | Keskar et al. |
| 2005/0125459 | A1 | 6/2005 | Sutinen et al. |
| 2005/0147130 | A1 | 7/2005 | Hurwitz et al. |
| 2005/0268307 | A1 | 12/2005 | Gates et al. |
| 2006/0005191 | A1 * | 1/2006 | Boehm ........................ 718/100 |
| 2006/0015818 | A1 | 1/2006 | Chaudhri et al. |
| 2006/0059207 | A1 | 3/2006 | Hirsch et al. |
| 2006/0101082 | A1 | 5/2006 | Agrawal et al. |
| 2006/0248162 | A1 | 11/2006 | Kawasaki |
| 2006/0264206 | A1 | 11/2006 | Taba et al. |
| 2007/0022155 | A1 * | 1/2007 | Owens et al. ............... 709/202 |
| 2007/0075965 | A1 | 4/2007 | Huppi et al. |
| 2007/0118570 | A1 | 5/2007 | Wang |
| 2007/0271317 | A1 | 11/2007 | Carmel |
| 2007/0271505 | A1 | 11/2007 | Dandekar et al. |
| 2008/0010286 | A1 | 1/2008 | Zhang et al. |
| 2008/0033950 | A1 | 2/2008 | Lemay et al. |
| 2008/0163743 | A1 | 7/2008 | Freedman |
| 2008/0168072 | A1 | 7/2008 | Freedman |
| 2008/0168106 | A1 | 7/2008 | Freedman |
| 2008/0168126 | A1 | 7/2008 | Freedman |
| 2008/0168184 | A1 | 7/2008 | Freedman et al. |
| 2008/0168292 | A1 | 7/2008 | Freedman |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO-03/088613 | 10/2003 |
| WO | WO-2008/085869 | 7/2008 |
| WO | WO-2009/023040 | 2/2009 |

## OTHER PUBLICATIONS

Lev Novik et al., "Peer-to-Peer Replication in WinFS", research. microsoft.com/pub/tr/TR-2006-78, Jun. 2006, 17 pages.*
SyncML, "Building an Industry-Wide Mobile Data Synchronization Protocol", SyncML White Paper, Version 1.0, Jan. 2001, 14 pages.
International Search Report & Written Opinion for PCT Application No. PCT/US2008/000062 mailed Mar. 12, 2009, Whole document.
Office Action for U.S. Appl. No. 11/650,730 mailed Mar. 31, 2009, Whole document.
Office Action for U.S. Appl. No. 11/650,732 mailed Apr. 3, 2009, Whole document.
Office Action for U.S. Appl. No. 11/650,729 mailed Apr. 28, 2009, Whole document.
Jonsson, Andreas , et al., "SyncML—getting the mobile Internet in sync", Ericsson Review, No. 3; XP-002958500, (2001), 110-115.
Lockhart, Robert K., et al., "Specifications for Ir Mobile Communications (IrMC)", Version 1.1; XP-002155443; Jan. 1, 1999, 29-44.
International Search Report & Written Opinion for PCT Application No. PCT/US2008/000087, mailed Jan. 30, 2009.

* cited by examiner



FIG. 1   (Prior Art)

APLNDC630-0000173142



FIG. 2

APLNDC630-0000173143



FIG. 3

APLNDC630-0000173144

U.S. Patent

Jul. 20, 2010

Sheet 4 of 28

US 7,761,414 B2



FIG. 4

APLNDC630-0000173145



175
Device
Time
Host
177
Connection and authentication on (may be 2-way authentication using self-signed certs)
179
181
Ready
Sync data class A (or next data class...)
183
185
OK, sync data class A
Send version number of DCH for data class A
187
189
Send version number of data source for data class A
Send next host anchor and previous device anchor and sync type
191
193
Send next device anchor and previous host anchor and sync type
Get changes if fast sync; get all records if full (slow) sync
195
197
Send changes (or all records)
Acknowledge
199
201
Save next device anchor at device
Save next device anchor at host and commit to changes or all records
203
205
Send "ready to pull" message
Send changes (or all records)
207
209
Acknowledge
211
Send record ID map
Send commit to device
213
215
Save next host anchor and save store
217
Acknowledge
Commit pulled records and save next host anchor
219
Disconnect (e.g., when done with all data classes)

FIG. 5



FIG. 6A

APLNDC630-0000173147



6B-1
Ask device for changes in current data class
277
6B-3
Process records and send acknowledge to device
279
6B-2
Save next device anchor at host
281
Ask sync services to prepare to "pull"
283
287
285
Has fast sync mode been selected?
No
Send all records to device from host
Yes
Send changes to device from host for current data class and receive acknowledge
289
Receive and save record ID map from device
291
293
Can device commit to changes?
No
Cancel and return to next data class
Yes
Device confirms it committed
295
Commit pulled records (ID map) and save next host anchor
297
Go To NEXT data class
299

FIG. 6B



FIG. 7A

APLNDC630-0000173149



FIG. 7B

APLNDC630-0000173150



Begin synchronizing
401
403
405
Next data class?
None Left
End sync and disconnect
Yes
Initialize DCH on host and send DCH version number for current data class to device (alternatively, send data source version number to host)
407
Initialize Data Source (DS) on device and compare DS version number on device to DCH version number on host
409
Decide how/whether to sync and/or alert user to update/upgrade one or more DS and/or DCH on their device and/or host
411
If decided to sync, perform synchronizing for current data class
413
Complete sync (e.g., save anchors) for current data class
415

FIG. 8A



Begin synchronizing
425
427
429
Next data class?
None Left
End sync and disconnect
Yes
Initialize DCH for current data class on host and send DCH version number to device; initialize Data Source (DS) for current data class on device and send DS version number to host
431
DO NOT sync
Higher version number software component decides how/whether to sync for current data class (and/or whether to alert user to update/upgrade a software component on their device and/or host)
433
Perform sync for current data class
435
Complete sync (e.g., save anchor) for current data class
437

FIG. 8B

Contacts Data Class Structured
Data Format

First
Name _____    Last
Name _____

Address _____

City _____

State _____

Country _____

Email _____

Phone _____

Cell Phone _____

Fax _____

Group _____

## FIG. 9A

Calendar Data Class Structured
Data Format

Subject _____

Location _____

Start    Date _____
         Time _____

End      Date _____
         Time _____

Reminder _____

Invite _____

Notes _____

## FIG. 9B



FIG. 10



FIG. 11

APLNDC630-0000173155



525
527
Device
Host
533
Host ID Mapped To:
Device ID Mapped To:
535
529
Device's Private Key For That Host
Host's Private Key For The Device
531
545
Device's Certificate Used For That Host
Device's Certificate For The Host
547
541
Host's Certificate For The Device
Host's Certificate For The Device
543
537
Host's Certificate Authority Certificate For The Device (Used In Self Signed Authentication)
Host's Certificate Authority Certificate For The Device (Used In Self Signed Authentication)
539

FIG. 12



Execute non-synchronization threads/ processes on device and on host
575
Begin execution of synchronization software on device and on host while continuing execution of non-synchronization threads/processes on the device and the host
577
13A-1
Synchronization software component (e.g., Sync Agent 109) attempts to acquire a lock (e.g., through flock) on store for a data class
579
580
No
Lock acquired?
Yes
581
Notify application and wait
Lock acquired
591
Begin synchronizing for currently processed data class
Not acquired
583
Cancel synchronizing of data class and go to next class
593
If user attempts to change store for the data class while synchronizing, present an alert
Go To 13B-1

FIG. 13A



FIG. 13B

APLNDC630-0000173158



FIG. 14A

FIG. 14B

FIG. 14C

FIG. 14D



FIG. 15A

FIG. 15B

FIG. 15D

FIG. 15C

APLNDC630-0000173160

U.S. Patent

Jul. 20, 2010

Sheet 20 of 28

US 7,761,414 B2



FIG. 16A

APLNDC630-0000173161



FIG. 16B



Map first bookmarks in a first format
for a first web browser on a host
into an intermediate format (e.g., a
canonical format)

715

Map second bookmarks in a second format
for a second web browser on the host
into the intermediate format

717

Synchronizing the first bookmarks and the
second bookmarks with third bookmarks on
a device which is coupled to the host
during the synchronizing

719

# FIG. 16C



FIG. 16D

725

Select ONLY one option:

727 ☑ Synchronize device's bookmarks to host's bookmarks and host's bookmarks to device's bookmarks (two way synchronization)

729 ☐ Synchronize from device's bookmarks to host's bookmarks ONLY (one way synchronization)

731 ☐ Synchronize from host's bookmarks to device's bookmarks ONLY

FIG. 16E

735

Select ONLY one option:

737 ☐ Synchronize bookmarks for all web browsers on both device and host

739 ☑ Synchronize bookmarks on device with bookmarks of selected web browsers on host

741 ○ Internet Explorer
742 ◉ Firefox
743 ◉ Safari
744 ○ Other

FIG. 16F

750

Select folders to synchronize

751 ☐ Limit synchronization of bookmarks to selected bookmark folders on host's web browser to be synchronized with bookmarks of device

Case 5:12-cv-00630-LHK   Document 395-4   Filed 03/12/13   Page 27 of 152



Receive set up of email (or other electronic message system) account information on device (for account "A")  —  781

Receive set up of email (or other electronic message system) account information on host (for account "B")  —  783

Establish connection of device to host  —  785

Synchronize email account (account "B") established on host as a new email account on the device (optionally - do not synchronize email account set up on device)  —  787

# FIG. 17

APLNDC630-0000173165

Case 5:12-cv-00630-LHK   Document 395-4   Filed 03/12/13   Page 28 of 152



FIG. 18

APLNDC630-0000173166

Case 5:12-cv-00630-LHK   Document 395-4   Filed 03/12/13   Page 29 of 152



FIG. 19



FIG. 20

APLNDC630-0000173168



FIG. 21

APLNDC630-0000173169

US 7,761,414 B2

1

## ASYNCHRONOUS DATA SYNCHRONIZATION AMONGST DEVICES

### FIELD OF THE INVENTION

The various embodiments described herein relate to systems and methods for synchronizing data between two or more data processing systems such as a desktop computer system and a handheld computer system.

### BACKGROUND OF THE INVENTION

Modern data processing systems, such as a general purpose computer, a handheld computer, a cellular telephone, media players, etc. have been reduced in size to the point that they can often be readily carried around by a user. Furthermore, these devices are powerful enough that they can provide substantial computing power to allow a user to maintain contact information, maintain calendar information, provide email functionality, and even provide web browsing. These devices also may include support for a task or a To Do list or database and other sources of data for a user. An example of a small handheld computer is the Palm Treo, and other examples of handheld computers include those which run a Windows CE operating system.

These handheld computers typically allow a user to synchronize their data between the handheld computer and another computer, such as a user's desktop computer, such that both computers maintain the same set of information, such as the same calendar for the user, thereby allowing the user to view their calendar on either the desktop computer or the handheld computer. The synchronization is typically performed by coupling together the host computer with a handheld computer through a mechanical and electrical connection provided by a dock. FIG. 1 shows an example in the prior art of a handheld computer being coupled mechanically and electrically to a host computer through the dock 26. The system 10 includes the host computer 12 and the handheld computer 14. Synchronization software 16, running on the host, performs the synchronization between the respective databases, such as the contacts database 18 which is synchronized with the handheld contacts database 20. Furthermore, the synchronization software 16 synchronizes the calendar database 22 on the host computer with the handheld's calendar database 24. Synchronization software 16 on the host computer can synchronize each of the databases separately through the use of "conduits." The synchronization software 16 opens and maintains a data connection link through a conduit, and each conduit must implement all the software needed to make and maintain the link in order to synchronize a particular database. The handheld computer merely acts as a storage device by vending its storage memory, such as a hard drive or a flash memory, to the host computer which, through the synchronization software 16, opens each database to perform the synchronization. There is often no active agent on the handheld computer 14 which participates in the synchronization process; in other words, the synchronization software 16 on the host computer 12 performs the synchronization operations for both sets of databases on both devices. When there is a synchronization agent on the handheld computer, it does not have the facilities and architecture described in this disclosure, including, for example, providing a plug-in model on both the handheld and the host for different data classes, and does not allow applications on the handheld computer to run concurrently with the synchronization process, and various other features described herein. There is no use of authentication and encryption using self-signed certifi-

2

cates with private key/public key cryptography. Certain existing systems allow for limited synchronization of emails between a host and a handheld computer, but there is no synchronization of changes in email account setup information. Certain systems also allow for the synchronization of bookmarks for web browsing between a host and a handheld computer. These systems allow for the synchronization of a set of bookmarks having the same format in both the handheld and the host. Certain synchronization systems are described under the name "SyncML" and further information about these systems can be found at www.openmobilealliance.org and at www.openmobilealliance.org/tech/affiliates/syncml/syncmlindex.html.

### SUMMARY OF THE DESCRIPTION

This description relates to systems, methods and computer readable media which allow for synchronization tasks and non-synchronization tasks to be executed concurrently. In one embodiment, a method includes executing at least one non-synchronization processing thread, such as at least one user-level non-synchronization processing thread, and executing at least one synchronization processing thread concurrently with the executing of the at least one non-synchronization processing thread. The execution of at least one non-synchronization processing thread may include operations to access a first database which is synchronized by the, at least one synchronization processing thread during a synchronization operation between the first database on a first data processing system and a second database on a second data processing system.

In at least certain embodiments, a method as described herein allows a user to operate both a host and a device while the two systems are performing synchronization operations. Hence, for example, a user may manipulate or view a calendar while a synchronization operation, which synchronizes structured data from, for example, the calendar or other databases such as a contact database, is being performed.

In at least certain embodiments, the at least one synchronization processing thread may be provided by a synchronization software component which is configured to cause retrieval and storage of structured data from a first store and wherein the at least one user-level non-synchronization processing thread is provided by a user application which provides a user interface to allow a user to access and edit the structured data in the first store. These different threads may be in different address spaces. In at least certain embodiments, the synchronization software component acquires a lock on the first store in order to prevent the user application from affecting the first store while a synchronization process is occurring. In at least certain embodiments, the synchronization software component attempts to acquire the lock, and if it fails to do so, the synchronization software component sends a message to the user application to obtain the lock on the first store. The lock, in certain embodiments, may be the FLOCK Unix command. The synchronization software component may cancel synchronization for at least one data class if the user application fails to release the lock on the first store after a period of time subsequent to sending of the message.

Other systems and methods are also described, and computer readable media, which contain executable instructions to cause a computer to operate as described herein, are also described.

US 7,761,414 B2

3

4

BRIEF DESCRIPTION OF THE DRAWINGS

The present invention is illustrated by way of example and not limitation in the figures of the accompanying drawings in which like references indicate similar elements.

FIG. 1 shows in block diagram form an example of a prior art synchronization system.

FIG. 2 shows an example of a data processing system, such as a host computer.

FIG. 3 shows an example of a data processing system, such as a handheld computer or other type of data processing system.

FIG. 4 shows an example of a software architecture for implementing synchronization between, for example, a device and a host.

FIG. 5 is a flow chart showing events in time between a device and a host according to one example of a synchronization process.

FIGS. 6A and 6B are flow charts which illustrate a synchronization process on, for example, a host.

FIGS. 7A and 7B are flow charts illustrating a synchronization process on, for example, a device.

FIGS. 8A and 8B are flow charts illustrating the use of version identifiers according to at least certain embodiments of the inventions.

FIGS. 9A and 9B illustrate two examples of data formats for two different types of data classes; in particular, FIG. 9A shows a data format for a contacts data class which contains structured data, and FIG. 9B shows a data format for a calendar data class.

FIG. 10 shows an example of a software architecture having multiple layers as described herein.

FIG. 11 is a flow chart illustrating an embodiment of a method which may be performed with the software architecture shown in FIG. 10.

FIG. 12 illustrates the result of a two-way authentication process which may be used in at least certain embodiments described herein.

FIGS. 13A and 13B are flowcharts which illustrate one method in which synchronization and non-synchronization operations may be performed concurrently by one or both of a host and a device during a synchronization process.

FIGS. 14A, 14B, 14C, and 14D illustrate various possible formats for bookmarks for different types of web browsers.

FIGS. 15A, 15B, 15C, and 15D illustrate a modified bookmark structure which occurs after synchronization through, in at least one embodiment, an intermediate or canonical format for a bookmark data structure.

FIG. 16A shows an example of mapping relationships between a web browser on a host and a web browser on a device, wherein this mapping relationship also shows the mapping between the data structure of the bookmarks on the host and the device relative to an intermediate format.

FIG. 16B is a flow chart illustrating a method according to one embodiment described herein.

FIG. 16C is a flow chart illustrating another embodiment relating to the synchronization of bookmarks.

FIGS. 16D, 16E, and 16F provide examples of user interfaces for allowing preference settings with respect to the synchronization of bookmarks between two data processing systems, such as between a device and a host.

FIG. 17 is a flow chart illustrating a method for synchronization of email account or other electronic message account setup information.

FIG. 18 shows a memory of a device and a memory of a host which store email account setup information as shown in the figure.

FIG. 19 is a flow chart which illustrates one method for synchronizing notes which may include embedded To Do's in at least certain embodiments described herein.

FIG. 20 is a flow chart illustrating an embodiment of a method for creating a To Do within a note to create an embedded To Do.

FIG. 21 shows an example of a method for using a filter to decide whether or not a note is to be synchronized.

DETAILED DESCRIPTION

Various embodiments and aspects of the inventions will be described with reference to details discussed below, and the accompanying drawings will illustrate the various embodiments. The following description and drawings are illustrative of the invention and are not to be construed as limiting the invention. Numerous specific details are described to provide a through understanding of various embodiments of the present invention. However, in certain instances, well-known or conventional details are not described in order to provide a concise discussion of embodiments of the present inventions.

The present invention can relate to an apparatus for performing one or more of the operations described herein. This apparatus may be specially constructed for the required purposes, or it may comprise a general purpose computer selectively activated or reconfigured by a computer program stored in the computer. Such a computer program may be stored in a machine (e.g. computer) readable storage medium, such as, but is not limited to, any type of disk including floppy disks, optical disks, CD-ROMs, and magnetic-optical disks, read-only memories (ROMs), random access memories (RAMs), erasable programmable ROMs (EPROMs), electrically erasable programmable ROMs (EEPROMs), magnetic or optical cards, or any type of media suitable for storing electronic instructions, and each coupled to a bus.

A machine-readable medium includes any mechanism for storing or transmitting information in a form readable by a machine (e.g., a computer). For example, a machine-readable medium includes read only memory ("ROM"); random access memory ("RAM"); magnetic disk storage media; optical storage media; flash memory devices; electrical, optical, acoustical or other form of propagated signals (e.g., carrier waves, infrared signals, digital signals, etc.); etc.

Prior to describing the various different embodiments in connection with synchronization architectures, systems, methods and computer readable media, a brief discussion will be provided in connection with the data processing systems which may be part of the synchronization process. The term "host" and the term "device" are intended to refer generally to data processing systems rather than specifically to a particular form factor for the host versus a form factor for the device. FIGS. 2 and 3 show examples of two different data processing systems, where the system shown in FIG. 2 may be referred to as a host while the system shown in FIG. 3 may be referred to as a device, although the system shown in FIG. 2 may be referred to as a device while the system shown in FIG. 3 may be referred to as a host.

FIG. 2 shows one example of a computer system which is a form of a data processing system. Note that while FIG. 2 illustrates various components of a computer system, it is not intended to represent any particular architecture or manner of interconnecting the components as such details are not germane to the present inventions. It will also be appreciated that personal digital assistants (PDAs), cellular telephones, media players (e.g. an iPod), devices which combine aspects or functions of these devices (a media player combined with a PDA and a cellular telephone in one device), network com-

APLNDC630-0000173171

US 7,761,414 B2

5                                                              6

puters, an embedded processing device within another
device, and other data processing systems which have fewer
components or perhaps more components may also be used to
implement one or more embodiments of the present inven-
tions and may be one or more of the data processing systems
described herein. The computer system shown in FIG. 2 may,
for example, be a Macintosh computer from Apple Computer,
Inc. or a computer which runs the Windows operating soft-
ware from Microsoft Corporation.

As shown in FIG. 2, the computer system 45 includes a bus
51 which is coupled to one or more microprocessors which
form a processing system 47. The bus 51 is also coupled to
memory 49 and to a non-volatile memory 50, which may be
a magnetic hard drive in certain embodiments, or flash
memory in other embodiments. The bus is also coupled to a
display controller and display 52 and one or more input/
output (I/O) devices 53. Further, the bus is coupled to an
optional dock 54 and to one or more wireless transceivers 55,
which may be a Bluetooth transceiver or a WiFi transceiver or
an infrared transceiver. It will be appreciated that the wireless
transceivers 55 are optional as shown in FIG. 2. The process-
ing system 47 may optionally be coupled to optional cache
48. The processing system 47 may include one or more micro-
processors, such as a microprocessor from Intel or IBM. The
bus 51 interconnects these various components together in a
manner which is known in the art. Typically, the input/output
devices 53 are coupled to the system through input/output
controllers. The memory 49 may be implemented as dynamic
RAM (DRAM) which provides fast access to data but
requires power continually in order to refresh or maintain the
data in the memory. The non-volatile memory 50 may be a
magnetic hard drive or other non-volatile memory which
retains data even after power is removed from the system.
While FIG. 2 shows that the non-volatile memory 50 is a local
device coupled directly to the rest of the components in the
data processing system, it will be appreciated that other
embodiments may utilize a non-volatile memory which is
remote from a system, such as a network storage device,
which is coupled to the data processing system through a
network interface, such as a modem or an Ethernet interface.
The bus 51, as is well known in the art, may include one or
more buses connected to each other through various bridges,
controllers, and/or adapters as is known in the art. In one
embodiment, the I/O controller 53 may include a USB
adapter for controlling USB peripherals and an IEEE-1394
controller for IEEE-1394 compliant peripherals.

It will be apparent from this description that aspects of the
inventions may be embodied, at least in part, in software. That
is, the techniques may be carried out in a computer system or
other data processing system in response to its processor or
processing system executing sequences of instructions con-
tained in a memory, such as memory 49 or non-volatile
memory 50 or the memory 63 shown in FIG. 3. In various
embodiments, hardwired circuitry may be used in combina-
tion with the software instructions to implement the present
inventions. Thus, the techniques are not limited to any spe-
cific combination of hardware circuitry and software nor to
any particular source for the instructions executed by the data
processing system. In addition, throughout this description,
various functions and operations are described as being per-
formed by or caused by software code to simplify description.
However, those skilled in the art will recognize that what is
meant by such expressions is that the functions result from
execution of the code by a processing system.

The dock 54 and/or the wireless transceivers 55 provide a
physical interface for coupling the data processing system
shown in FIG. 2 to another data processing system, such as

the data processing system shown in FIG. 3, or to another data
processing system which resembles the system shown in FIG.
2. The dock 54 may be similar to a dock in the prior art, such
as the dock 26, such that it provides both a mechanical and
electrical connection between one data processing system
and another data processing system to allow a synchroniza-
tion process to be performed between the two systems. In
other embodiments, the wireless transceivers 55 may provide
an electrical connection between the two systems for the
purpose of a synchronization process without providing a
mechanical connection between the two systems.

FIG. 3 shows an example of another data processing sys-
tem which may synchronize data with other data processing
systems, such as the system shown in FIG. 2 or a system
which is similar to that shown in FIG. 3. The data processing
system 60 shown in FIG. 3 includes a processing system,
which may be one or more microprocessors, or which may be
a system on a chip integrated circuit, and the system also
includes memory 63 for storing data and programs for execu-
tion by the processing system. The system 60 also includes an
audio input/output subsystem 64 which may include a micro-
phone and a speaker for, for example, playing back music or
providing telephone functionality through the speaker and
microphone. A display controller and display device 65 pro-
vide a visual user interface for the user; this digital interface
may include a graphical user interface which is similar to that
shown on a Macintosh computer when running OS X oper-
ating system software. The system 60 also includes one or
more wireless transceivers, such as a WiFi transceiver, an
infrared transceiver, a Bluetooth transceiver, and/or a wireless
cellular telephony transceiver. It will be appreciated that addi-
tional components, not shown, may also be part of the system
60 in certain embodiments, and in certain embodiments fewer
components than shown in FIG. 3 may also be used in a data
processing system. The data processing system 60 also
includes one or more input devices 66 which are provided to
allow a user to provide input to the system. These input
devices may be a keypad or a keyboard or a touch panel or a
multi-touch panel. The data processing system 60 also
includes an optional input/output device 67 which may be a
connector for a dock, such as the dock 54 shown in FIG. 2. It
will be appreciated that one or more buses, not shown, may be
used to interconnect the various components as is well known
in the art. The data processing system shown in FIG. 3 may be
a handheld computer or a personal digital assistant (PDA), or
a cellular telephone with PDA-like functionality, or a hand-
held computer which includes a cellular telephone, or a media
player, such as an ipod, or devices which combine aspects or
functions of these devices, such as a media player combined
with a PDA and a cellular telephone in one device. In other
embodiments, the data processing system 60 may be a net-
work computer or an embedded processing device within
another device, or other types of data processing systems
which have fewer components or perhaps more components
than that shown in FIG. 3.

At least certain embodiments of the inventions may be part
of a digital media player, such as a portable music and/or
video media player, which may include a media processing
system to present the media, a storage device to store the
media and may further include a radio frequency (RF) trans-
ceiver (e.g., an RF transceiver for a cellular telephone)
coupled with an antenna system and the media processing
system. In certain embodiments, media stored on a remote
storage device may be transmitted to the media player
through the RF transceiver. The media may be, for example,
one or more of music or other audio, still pictures, or motion
pictures.

US 7,761,414 B2

7

The portable media player may include a media selection device, such as a click wheel input device on an iPod® or iPod Nano® media player from Apple Computer, Inc. of Cupertino, Calif., a touch screen input device, pushbutton device, movable pointing input device or other input device. The media selection device may be used to select the media stored on the storage device and/or the remote storage device. The portable media player may, in at least certain embodiments, include a display device which is coupled to the media processing system to display titles or other indicators of media being selected through the input device and being presented, either through a speaker or earphone(s), or on the display device, or on both display device and a speaker or earphone(s). Examples of a portable media player are described in published U.S. patent application numbers 2003/0095096 and 2004/0224638, both of which are incorporated herein by reference.

In certain embodiments, the data processing system 60 may be implemented in a small form factor which resembles a handheld computer having a tablet-like input device which may be a multi-touch input panel device which is integrated with a liquid crystal display. Examples of such devices are provided in U.S. patent application Ser. No. 11/586,862, filed Oct. 24, 2006, and entitled "AUTOMATED RESPONSE TO AND SENSING OF USER ACTIVITY IN PORTABLE DEVICES," which is assigned to the same assignee as the instant application. This foregoing application is hereby incorporated herein by reference.

In the following description, various software components which are used for both synchronization and non-synchronization processing operations are described. It will be understood that in at least certain embodiments, these various software components may be stored in the memory 49 and/or memory 50 shown in FIG. 2 for one type of data processing system, and in the case of a system such as that shown in FIG. 3, these various different software components may be stored in the memory 63 which may include volatile memory as well as non-volatile memory, such as flash memory or a magnetic hard drive.

FIG. 4 shows an example of an embodiment of a particular software architecture for a synchronization system between one or more data processing systems, such as a device, which may be a handheld computer, and a host, which may be a desktop or a laptop computer. This software architecture may be used to implement one or more of the various embodiments described herein, such as the methods shown in FIGS. 5, 6A, 6B, 7A, and 7B, and FIGS. 8A and 8B. This synchronization system may be used to synchronize structured data, such as data in a contacts or address database. Different data typically have different structures or formats which specify how the data is organized and formatted. These are referred to as data classes, and FIGS. 9A and 9B provide examples of two different structured data formats for two different data classes. In particular, FIG. 9A shows a data format for a contacts data class, and FIG. 9B shows a format for a calendar data class format. The synchronization system shown in FIG. 4 may be used to synchronize calendar data between two different calendar stores on the two different systems and to also synchronize contact data between the two contact stores on the two systems as will be described further below.

The software architecture shown in FIG. 4 includes a plurality of software components on the device side 101 and a plurality of software components on the host side 103. There is, in addition, device link software 107 which in effect bridges the connection between the two software components which are separated by the line 105 which represents the physical separation between the device and the host. It will be

8

appreciated that the software components on each side are stored in respective memory on each data processing system. The device includes one or more user application programs which are used to access and edit structured data in a particular data class. FIG. 4 shows examples of three such user application programs. In particular, calendar application program 125 is used to access and edit calendar data in the calendar store database 119. Similarly, the contacts application program is used by a user to access and edit contacts or address book information stored in the contacts store database 121. Similarly, the other application programs 129, which may include a notes application program, widget programs for presenting widgets, a web browser having bookmarks, an email program which includes email account setup information, a To Do list program, and possibly other programs which have structured data, are represented by the other application programs 129 which have access to and provide the ability to edit information in other stored databases 123. These user application programs, such as application programs 125 and 127, are separate from the synchronization software components which are responsible for synchronizing structured data in each of the different classes. These software components are shown in FIG. 4 as data sources 113, 115, and 117. In particular, the calendar data source 113 is responsible for causing the retrieval and storage of the structured data from its particular data class, which is the calendar data class, during a synchronization process. Similarly, the contacts data source 115 is responsible for causing the retrieval and storage of structured data in the contacts stored database 121, which may represent the user's address book or other contact information database. Similarly, other data sources, such as other data sources 117, are responsible for causing the retrieval and storage of structured data from other structured data stores. This may include databases for notes, emails, bookmarks, and/or To Do lists and other databases or stores of data. The data sources may also perform other functions, such as formatting the data either for storage on the device or for transmission to the host, transmitting and/or receiving version identifiers with respect to each data source relative to each data class handler for a particular data class, sending device and host anchors as described herein in order to ensure that synchronization operations are performed as atomic transactions to ensure that the synchronization is either completed or not, allowing the system to roll back to a prior state if it is not completed (in order to ensure that synchronization can be performed even if the connection is interrupted). Further, the data sources may also remap unique identification values for records on the device to records on the host so that the device can maintain a unique record regardless of a record ID (identifier) provided by a host. Each data source is coupled through software based messages to a sync agent software component 109 which is responsible for, at least in part, maintaining a data connection between the device and the host through a device link software such 107, an example of which is shown in FIG. 10 and described herein. The sync agent 109 provides services, through software based messages, such as calls or APIs (Application Program Interface), to various data sources. In at least one embodiment, the sync agent 109 may implement or handle or determine the order of synchronization of the various data classes by specifying directly or indirectly the order. For example, the sync agent 109 may determine and specify that the calendar data class is synchronized first and then the contacts data class is synchronized next and then the To Do list data class is synchronized next, etc. The sync agent 109, in another embodiment, may receive the order through one or more commands or messages from the sync client and, in

APLNDC630-0000173173

US 7,761,414 B2

9                                                                         10

turn, may implement that order by sending messages to the data sources in that order. The sync agent 109 also alerts a data source if a link fails when synchronization is occurring, and it will tell the data source to roll back to a prior synchronization state if the link fails before synchronization is completed. Further, the sync agent may ask a data source to commit changes if the synchronization has been successful, which causes the data source to write the data to a particular store for the particular data class.

The software architecture of FIG. 4 provides abstractions that allow plugging in of many different data classes; including "after market" plug-ins by third party suppliers in at least certain embodiments. In effect, this architecture creates a "sync client" which is split into two pieces (one on the host in the form of synch client 111 and one on the device in the form of sync agent 109) and uses a sync server, in the form of sync services 141, which operates with both the synch client 111 and the sync agent 109. The device, in an embodiment in this architecture, does not interact directly with the sync server (e.g. sync services 141) but instead exchanges messages with the sync client 111 which interacts (through software based messages) with the sync server. In one embodiment, the Sync Server manages storing, comparing, (mingling), and differencing data from various clients (applications, other servers, and Sync Client for a device). The Sync Client, in one embodiment, manages the connection (with authentication and cryptography) to the device, transferring and modifying data between the device and the computer, as well as handling sync anchors, control flow to arbitrate between the sync server and the device, checking versioning of data classes, and providing a plug-in model to optimize and organize handling of different data classes (DataClassHandlers). The Sync Client, in one embodiment, also does all the filtering (only syncing contacts in specific groups, or events in specific calendars, events within a date range, a subset of mail accounts, and notes or note attachments with a size threshold). In one embodiment, SyncAgent has a plug-in model for Data Sources, and runs as a separate process from applications on the device which manage/display the data, but can interact with them in parallel (with locking, or concurrent access), and notifies the applications when data changes.

The device link software component 107 includes a plurality of software components, such as the layers of software components shown in FIG. 10, and the device link 107 maintains, in at least one embodiment, an authenticated connection link between the device and the host, thereby allowing the passing of commands and data between the two data processing systems during the synchronization process. In addition, as shown in FIG. 10, the device link software components 107 also provide for, in at least certain embodiments, the connection to be used for additional applications to transfer other information back and forth between the device and the host including, but not limited to, a backup application or a configuration application and diagnostic tools. Further details with respect to the device link 107 are provided below in connection with FIGS. 10, 11, and 12. In at least certain embodiments, at least a portion of the device link software stack may reside on both the device and the host memory. In preferred embodiments, a portion of the device link software stack resides and executes on both the device and the host.

The device link software component 107 provides for a communication link between the sync agent 109 executing on the device 101 and the sync client 111 executing on the host 103. The device link 107 passes software based messages, such as calls and responses to calls, between software components as well as the structured data prepared in a format for synchronization in at least certain embodiments. The sync client 111 operates, at least in part, to maintain an authenticated connection between the host and device in at least certain embodiments. Moreover, the sync client, in one embodiment, may send device and host anchors as described herein, and may cause the saving of next device and next host anchors in response to a successful synchronization for a particular data class as described further herein. In one embodiment, the sync client will determine the synchronization mode as described further below and will also invoke the correct data class handler for a particular data class to manage the handling of data during the synchronization session for that data class, such as determining the entity types which are to be synchronized for that data class, transforming records to and from the device, determining the order to pull changes from the sync server (sync services) based on entity type, and to perform filtering on records pulled from the sync server (sync services). The sync client 111 is coupled to a data class handler for each data class which is supported by the host. In the example shown in FIG. 4, there is a data class handler for the calendar data class 135, and a data class handler for a contacts data class 137, as well as data class handlers for one or more other data classes 139. Each of these data class handlers is dedicated to providing synchronization services during a synchronization process for a particular data class. For example, when synchronizing calendar data, the data class handler will format calendar data obtained from a calendar data store 143A so that such data may be transmitted to the device for storage on the calendar store 119. Similarly, the data class handler may format data received from the device so that it may be stored in a database on the host. For example, the data class handler may perform, in at least certain embodiments, reformatting operations on data received from the device 101. In at least certain embodiments, the data class handlers for each data class may perform one or more functions for that particular data class. For example, the data class handler may cause the retrieval and storage of structured data from the store for that data class. Furthermore, the data class handler may format data for the device, and may filter structured data when synchronizing data. This filtering may be based upon a group, such as a personal group or business group for a contacts data store or may be based on size, such as for a notes data store as described further below. Moreover, a data class handler may send its version identifier to its corresponding data source for a particular data type on the device and may receive an identifier of the version of the data source for that particular data class. Moreover, a data class handler may create a new filter based on new records sent to the device or received from the device or perform operations with respect to modifying filters, such as a filter based on group or size or other parameters, as a result of the synchronization process, and SyncClient will save the modified filters. Moreover, SyncClient may cause the saving of remapped identifiers obtained from the device for records on the device as described herein. It will be understood that a data class handler for a particular class will typically be executing at the same time as a data source of the same class on the device. These two software components, together with a sync agent on the device and the sync client on the host, form active agents on both data processing systems which are active in executing software components as part of the synchronization process. In one embodiment, the data class handlers may not directly cause the storage and retrieval of structured data from data stores on the host. They transmit messages to the sync client 111 which in turn requests the sync services 141 which may in turn directly or indirectly cause retrieval and storage from the calendar stored database 143A or the contacts stored database 145A or other stored databases 147A. In another

US 7,761,414 B2

11

embodiment, Sync Client drives the saving and retrieval process, and gets data from sync services, and calls out to functions in the Data Class handler. The Sync Client asks the data class handler what entity types to synchronize with sync services. When it gets records it asks the data class handler to transform them for the device (note that the data class handler might return the same record untransformed in many cases). The Sync Client wires the Data Class Handler directly to the Sync Server (sync services) for purposes of filtering, so that the sync server directly asks the DataClassHandler whether or not to filter a record, and then the Sync Client asks the Data Class Handler (both after it has finished pushing records from the device and after it has pulled records from sync services for the device). The Data Class Handler is "responsive;" it responds to requests from the Sync Client (and in the case of filtering, the Sync Server), and it is the Sync Client that is the active agency responsible for controlling the sync operation on the host side.

The host may also include user application programs, such as a calendar application program 143, a contacts application program 145, and other application programs 147 which are used by a user to access and edit corresponding data classes having structured data stored in a corresponding stored database, such as a calendar stored database 143A. The architecture shown in FIG. 4 shows the data stores on the host side as being coupled directly to the application program; it will be appreciated that there is typically a file management system on a host data processing system which manages each database and which receives calls or other requests from software components such as the application programs 143 or 145 or other components, such as data class handlers or the sync services 141 in order to affect reading and writing of data to a particular stored database.

The following tables set out the functions of each of the following software components shown in FIG. 4: (1) a data source component; (2) sync agent component; (3) sync client component; and (4) data class handler component.

TABLE A

Data Source

Open data source (database or files used to house data)
Provide version, determine if can sync if Sync Client (Data Class handler) version is smaller
Manage Computer (host) and Device Sync Anchors on device side, determine if can fast or slow sync
Coordinate with applications using data from data source
Clear all data if being reset
Send changed/new/deleted records to Sync Client
Coordinate with application(s) for its data class to keep track of which records have changed since last synchronization (Change History)
Process and Commit data from Sync Client side
Remap record identifiers for new records from Sync Client side

TABLE B

Sync Agent

Manage connection from the device to the Sync Client on computer side
Manage control flow/state machine for synchronization operation on device side
Interface to DeviceLink for connection layer on device (which also does the authentication and cryptography)
Set up the correct Data Source for a given Data Class
Provide process infrastructure for synchronization

12

TABLE B-continued

Sync Agent

Launch on demand so Sync Client can connect to device to synchronize
Cleanly handle connection loss or cancel request from Computer (host) side
Handle cancel notification on device side (i.e. from a user interface on the device) to stop synchronizing at user request

TABLE C

Sync Client

Manage connection to Sync Server (sync services) on computer (host), and Sync Agent on device
Manage control flow/state machine for synchronization operation on computer (host) side
Manage Computer and Device Sync Anchors on computer (host) side
Interface to DeviceLink for connection layer on computer (host) (which also does the authentication and cryptography)
Set up the correct Data Class Handler and load filtering information for a given Data Class
Interface to Sync Server (sync services) - manage sync type (fast, slow, reset) and synchronization operation with Sync Server (sync services)
Get changes from Sync Server (sync services) to send to Device
Tell Sync Server about remapped record identifiers from Sync Client (Data Source)
Cleanly handle connection loss or cancel request from device side
Handle cancel notification on computer (host) side (i.e. from a user interface on the computer (host)) to stop synchronizing at user request

TABLE D

Data Class Handler

Provide version, determine if can synchronize if Sync Agent (Data Source) version is smaller (older)
Specify which data types to synchronize
Provide Filtering on all records
Specify which order to pull different record types from Sync Server (sync services) (to make device side processing of added/changed records more efficient)
Transform records (e.g. from one format to another format) pulled from Sync Services on computer (Sync Server) to be sent to the device (to optimize transfer and work for device)
Transform records (e.g. from one format to another format) from device (Sync Agent/Data Source) to be pushed into SyncServices (to optimize transfer and work for device)

FIG. 5 shows a flow chart indicating various actions and operations which occur on the host and the device over time during a typical synchronization process according to at least one embodiment. The vertical line down the center separates the host operations and actions from the device's operations and actions and also represents the progress of time during a synchronization operation. The host 177 may begin the synchronization by connecting to the device and authenticating with the device in operation 179. This may be a two-way authentication using self-signed certificates and a self-assigned certificate authority from the host. An example of a collection of certificates which may be used in connection with a two-way authentication is shown in FIG. 12. This authentication may be encrypted with public key/private key cryptography so that the security level is relatively high. This will allow a mobile handheld device to be securely authenticated through a WiFi wireless connection or a Bluetooth wireless connection without risk of the device being exposed to other hosts, thereby revealing potentially private and/or confidential data on the device or its host. In response to the connection operation 179, the device 175 responds with a

US 7,761,414 B2

13

ready signal **181**. Then in operation **183**, the host indicates that it wants to begin a synchronization operation for data class A (or the next data class) as shown in operation **183**. Typically, synchronization is performed for one data class at a time by one data source and one data class handler on the device and the host, respectively, at least in those embodiments which use the software architecture of FIG. 4. In response to the signal in operation **183**, the device responds with an acknowledgement in operation **185** indicating that it is capable of performing a synchronization operation on data class A because it has the necessary software components, such as a data source for the data class A. If the device does not have the necessary software components to perform the synchronization, it will indicate that synchronization cannot proceed. In this manner, at least in certain embodiments, the device and the host perform automatic checking, without user intervention, for the support to synchronize one or more data classes. This automatic checking of support for each data class may be performed separately for all data classes or selected data classes on both the device and the host. In at least certain embodiments, the device and/or host may decide, based on dynamic conditions and states, not to synchronize a data class at a particular time. For example, if an application which uses a database having data in the data class is actively using the database, then the device and/or host may not synchronize that data class in the current synchronization process. In response to the acknowledgement from operation **185** of the device, the host in operation **187**, sends its version number for the particular data class handler for data class A. In response, the device, in operation **189**, sends its version number for its data source for data class A. In this way, each of the device and the host receive both version numbers and can perform a comparison to determine which software component to use to decide whether and how to synchronize the structured data in data class A. Typically, the higher version number indicates the later version of the software component. Typically, it is preferred to use the later software component to decide whether and how to synchronize for a particular data class. In alternative embodiments, it may be possible to use the earlier software component. The advantage of using the later software component is that it has knowledge of prior formats, generally, and hence will understand how to deal with prior formats as well as supporting newer formats. In at least one embodiment, if the data source is a later version than the data class handler, then the device will decide how to handle the synchronization if it can be performed. On the other hand, in at least certain embodiments, if the data class handler on the host is the later version of the software component in this comparison, then the host may decide how to perform the synchronization for the particular data class. Further information in connection with this comparison of version numbers is provided in conjunction with a discussion of FIGS. 8A and 8B below.

After operation **189**, the host, in operation **191**, sends a next host anchor and the previous device anchor to the device. The device, in operation **193**, sends its next device anchor and the previous host anchor. These anchors are used, as is known in the art, to attempt to make the synchronization operations essentially atomic transactions such that a synchronization is either completed or not and each of the host and the device can recognize that a prior synchronization is incomplete and hence the data was rolled back to its prior state without making changes which would have occurred if a particular synchronization session had been completed. In each of operations **191** and **193**, the host and the device respectively may also transmit to the other system a synchronization type, which indicates a particular type of synchronization which

14

the sending system thinks it needs to perform in the current synchronization operation. There are typically at least three different types of synchronization operations: (1) a complete synchronization, which typically occurs the first time that a host and a device are synchronized; (2) a changes synchronization, which merely synchronizes the changes that occurred since the last synchronization; and (3) a reset operation in which data on one or more system is reset to a default or factory setting, which typically means all user data is erased or removed from the system which has been reset. The type of synchronization requested by each device is considered in a synchronization type negotiation. Typically, both systems will send the same synchronization type (e.g. a changes type), but in some instances, one system may request a complete or slow synchronization while another will request a changes (fast) synchronization, and in such instance, in at least one embodiment, the two systems will negotiate to select the "worst" synchronization operation in the sense of time. Since the complete synchronization takes longer than a changes synchronization, in most cases, the complete synchronization (a "slow" synchronization) will be selected over a fast synchronization (a "changes" synchronization). The negotiation of the type of synchronization is performed with knowledge of the status of the anchors. As is known in the art, a comparison of the anchors will reveal whether the prior synchronization was completed or not. If it was interrupted, then the previous host anchor from the device will not match the host's version of its previous host anchor. Similarly, if the prior synchronization was interrupted or otherwise incomplete, the previous device anchor from the host will not match the previous device anchor at the device when the comparison is performed at the device. The fact that there is a mismatch reveals a problem with the prior synchronization which will cause either the host or the device to request a complete (slow) synchronization type. An anchor may be a value which is used by one or both systems in a synchronization process to determine the state of synchronization of the systems. Typically, the fact that anchors match indicates that the last synchronization was successfully completed.

After the synchronization type has been negotiated, then in operation **195** a synchronization begins by the host requesting either the changes if it is a fast sync or all records if it is a full or complete sync. Then in operation **197**, the device sends the changes, or all records depending on the type of synchronization, to the host. The host acknowledges in **199** the transmission transactions resulting from operation **197**. These acknowledgements may be performed at one or more levels, including at a packet level or a record level, etc. A final acknowledgement from the host will cause the device, in operation **201**, to save its next device anchor at the device. As is known in the art, at the end of a successful synchronization, all "next" anchors, such as a next device anchor which has been saved, will become a previous device anchor for use in a future synchronization. In at least one embodiment, the sync agent maintains for each class the previous host anchor as well as the previous device anchor and will create the next device anchor for a particular data class during a synchronization operation. Similarly, in at least one embodiment, the sync client will maintain for each class a previous host anchor and a previous device anchor and may create the next host anchor for use in the processes shown in FIGS. **5**, **6A**, **6B**, **7A**, and **7B**. The device may acknowledge after operation **201** that it has saved its next device anchor in operation **201** which will cause the host in operation **203** to save the next device anchor at the host and to commit to a data store the changes or all records for the particular data class. This may occur by having the data class handler for a particular class request sync ser-

US 7,761,414 B2

15

vices **141**, or in other embodiments, a file system software component, to make changes to the database or store for the structured data of the particular data class being synchronized. Then in operation **205**, the device indicates that it is ready to pull. This indicates to the host that the device is ready to accept either changes or all records depending on the synchronization type which was negotiated. In response, the host in operation **207** sends changes or all records, depending on the synchronization type, and the device acknowledges (operation **211**) these data transmissions from operation **207** at one or more levels of granularity as indicated above. Then, in one embodiment, in operation **211**, the device sends a map which indicates the relationship between identifiers (ID) for each record maintained at the host relative to a corresponding ID maintained at the device for the same record; in an alternative embodiment, the device may indicate the map information when it acknowledges the records received from the host computer rather than as a separate message in the protocol. It will be appreciated that in alternative implementations, the same identifier may be used, but at least in certain embodiments, it may be desirable to have a distinct and separate ID maintained by the device for each record which may be different than an ID maintained for that same record on the host. Hence, a map or a relationship between the corresponding IDs may be maintained. In this case, the map is created by the device and transmitted to the host. In response to receiving the record ID map, the host provisionally stores the map indicating the relationships between a device ID for a record and the host ID for the same record. After all records have been sent to the device, and acknowledged from the device (and the record mappings have been provisionally stored on the host), the host transmits a commit request to the device in operation **213** which will cause the device to save either the changes or all records, depending on the synchronization type, from the current synchronization session to its data store for the current data class. Also, in operation **215**, the device will save the next host anchor. Then in operation **217**, the device responds with an acknowledgement signal which will cause the host in operation **219** to commit the pulled records and to save the next host anchor. The committing of pulled records also commits the provisionally stored map indicating the relationship between a device ID for a record and the host ID for the same record.

The method shown in FIG. **5** is repeated for each data class which is to be synchronized. When all data classes have been synchronized, then the host and the device can disconnect.

It will be appreciated that the method shown in FIG. **5** may be implemented differently in alternative embodiments; for example, certain operations may be omitted and the order of those operations may be different. For example, the transmission of the version numbers may be omitted or the transmission of the ID map may be omitted. Furthermore, in an alternative embodiment, the order of operations may be altered such that the device pulls changes or all records from the host first before sending its changes or all records to the host. Furthermore, the connection may be initiated by the device rather than the host and the device may perform certain operations that the host performs in the method shown in FIG. **5**.

FIGS. **6A** and **6B** show a flow chart which illustrates one embodiment of the operations performed by software components on a host, such as the sync client software component as well as a data class handler for a particular data class being synchronized in a synchronization session. The discussion of FIGS. **6A**, **6B**, **7A**, and **7B** will assume that the software architecture shown in FIG. **4** is used in the particular embodiment being described for these methods. It will be appreciated that alternative software architectures may also be used with

16

these methods. Operation **251** of FIG. **6A** involves determining whether or not the device and the host have been connected by the device link set of software components, such as the device link **107**. This connection determination may be performed by the sync client **111**. Then in operation **253**, it is determined whether there are any further data classes that still require synchronization for a current synchronization session. If none are left, then the device and the host may be disconnected. Then in operation **255**, it is determined whether the device can synchronize the particular data class. This is similar to the automatic checking of support for a particular data class that was described in connection with operation **185** of FIG. **5**. If the device cannot synchronize a particular data class, then synchronization for that data class is canceled, reverting back to operation **253**. Synchronization for a data class may not be supported if the device does not include a particular data source to support synchronization of the data class. Also, synchronization for the data class might be refused by the device if the data source cannot obtain resources that it needs to synchronize that data class (e.g. as described herein, the application using the data in the data class may refuse to yield to requests to synchronize the data class). If it is supported, then in operation **257**, the sync client obtains the version number of the data source for the current data class being synchronized. This version number is compared to the version number of the data class handler on the host to determine whether they match or are otherwise compatible. This version checking has been described elsewhere and is further illustrated in FIGS. **8A** and **8B**. If the versions do not match and are not otherwise compatible, then a user interface in operation **261** may be presented to the user to indicate the need or desirability to update or upgrade one or more software components in order to allow synchronization to be performed. If the versions match or are otherwise compatible, then in operation **263**, the anchors and synchronization type are obtained from the device. This in at least one embodiment results in operation **193** shown in FIG. **5**. Then in operation **265**, the synchronization operation is started, and in operation **267**, the synchronization mode (e.g. one of complete, or changes only, or reset) is negotiated. If reset mode is negotiated in operation **267**, then this is detected in operation **269** which causes processing to branch to operation **273** which tells the device to clear all records. If reset mode has not been selected, then the processing selects between either fast synchronization mode as determined in operation **271** or full/complete synchronization mode, resulting in operation **275**.

In operation **277**, the host asks the device for changes in the current data set if the synchronization is a fast synchronization. The records are processed in operation **279** at the host and one or more acknowledgement may be sent to the device. The processing of the records in operation **279** may be performed by the data class handler for the current data class, and this processing may include "mutation" of records and other changes to put the structured data into the proper format for storage in the data store for the current data class. Then, in one embodiment in operation **281**, the host saves the next device anchor, and in operation **283** it asks sync services, such as the sync services component **141**, to prepare to pull, which involves transmitting changes or all records to the device as the second part of synchronization from the host's side. The form of synchronization is determined in operation **285**. If it is a fast synchronization, then operation **289** follows. In one embodiment, if it is a slow (complete) synchronization (e.g. a reset synchronization), then operation **287** follows. One or more acknowledgments are received from the device; the host may also receive with these acknowledgments from the

APLNDC630-0000173177

US 7,761,414 B2

17

device a record ID map which shows the relationship between
the device ID for a record and the corresponding host ID for
that record. This ID map is saved at the host by the data class
handler for the current data class. Then in operation 293, the
host sends a message to the device asking whether it can
commit to the changes. If not, then synchronization is can-
celed, leaving the device anchors as they were previously,
which indicates an incomplete synchronization when the next
synchronization process begins. If the device can confirm
commitment, it will do so in operation 295, which includes
receiving a message from the device that it can commit to the
changes or all records. At this point, in operation 297, the host
commits the pulled records by saving the ID map it received
from the device and saving the next host anchor. In one
embodiment, saving of the ID map (recording remapping) is
performed only if the commit succeeds and the host commits
the pulled records and saves the next host anchor. Then the
host proceeds to the next data class by reverting back to
operation 253 in FIG. 6A. It will be appreciated that in alter-
native embodiments, some of the operations may be omitted
or additional operations may be performed and the sequence
of operations may be changed relative to that shown in FIGS.
6A and 6B.

FIGS. 7A and 7B illustrate a method which may be per-
formed by a device in at least certain embodiments to perform
synchronization at the device. This synchronization may
employ the software architecture shown in FIG. 4 and may
also follow the method shown in FIG. 5 for the device portion
of FIG. 5. In operation 301, the device waits for a connection
which may be a wired connection or a wireless connection.
Once it is connected in operation 303, it tells the host that the
device is ready for synchronization. This operation 303 may
be performed by the sync agent software component of FIG.
4. Then in operation 305, the device waits for a request to
synchronize data in a particular data class or disconnect. If in
operation 307 it is found that it does not have a data source for
a particular data class, then synchronization for that data class
will not be performed and operation 307 reverts back to
operation 305 for the next data class. Operation 307 repre-
sents one way in which the device supports automatic check-
ing of support for a particular data class as described else-
where in this disclosure. If a data source for the data class is
found, then a negotiation of version occurs in operation 309.
This negotiation of the version may occur between the data
source on the device and the data class handler on the host as
described elsewhere and as shown in FIGS. 8A and 8B. After
the version has been negotiated in operation 309, the device
obtains anchors from the host and based on those anchors, as
described herein, determines the synchronization mode (e.g.
full/slow, fast/changes only, or reset). The operations after
operation 311 select one of the modes and process the data
accordingly. If reset mode has been selected, then in operation
315 all records are marked as cleared. It will be understood
that in at least certain embodiments, the data is not cleared
immediately or deleted immediately but rather is marked to
be cleared. If fast synchronization is determined to have been
selected in operation 317, then processing proceeds to opera-
tion 321 in which changes are sent for the current data class
from the device to the host. If slow synchronization has been
selected, then processing proceeds from operation 317 to
operation 319 in which all records are sent from the device.
After sending all records or sending changes only from the
device or marking the records to be cleared, operation 323
saves the next device anchor at the device and clears history at
the device. Clear history refers to the change history man-
aged, in at least one embodiment, by the application on the
device and the Data Source. As changes are made by the user

18

in an application (e.g. Contacts or Calendar application), the
application notes these changes in a Change History which
can be consulted by the Sync Agent's Data Source if it can do
a "fast sync". The Data Source gets the change history (list of
changes since last synchronization) so it knows what records
were changed (and can only send over the changed records
instead of all records—in a "fast sync"), and after the syn-
chronization (or when doing a reset or slow sync) it clears the
change history (the list of changes), so the application can
then start building a new list of changes for the next synchro-
nization. Note that there may be a history cursor used to
coordinate between the application and the data source, so the
data source will only clear history up to the point it used
during the synchronization, and the application can add new
entries to the history after that, but those history entries after
the point used during synchronization will not erroneously be
cleared by the Data Source after synchronization. Change
History may be maintained by Contacts, Calendars, and
Notes applications in at least one embodiment. Processing
proceeds from operation 323 to operation 325 in which the
device sends a message that it is ready to pull data from the
host. The synchronization mode is determined in operation
327. If a slow/full synchronization is to be performed, then all
records in operation 329 are received from the host. On the
other hand, if a fast synchronization is to be performed, then
changes from the host are received for the current data class
and the device sends back one or more acknowledgments to
the host confirming receipt of the data. One or more acknowl-
edgements may also be transmitted from the device to the host
for the records received in operation 329. Then in operation
333, the device creates a remapping for added records and
sends device identifiers for those records to the host. This
remapping is typically performed by the data source for the
current data class and is transmitted to the data class handler
on the host for the current data class, which causes the saving
of the mapping between host IDs for a particular record and
device IDs for the same record. Then in operation 335, the
sync client on the host asks the sync agent on the device
whether the device can commit to the changes. If not, the data
source causes a rollback to the prior version of the structured
data by not saving the changes from the current synchroniza-
tion session and, after operation 337, processing proceeds to
the next data class, which in one embodiment may mean that
processing returns back to operation 305. If the device can
commit to the changes, then operation 339 is performed in
which the device saves the next host anchor and commits the
transaction by saving the changes or all records into its store for
the current data class and sends a message to the host that the
device has committed.

FIGS. 8A and 8B will now be referred to in connection with
embodiments which utilize version identifiers for the data
source and the data host handler in determining whether and
how to synchronize for a particular data class the structured
data on both the host and the device. After a sync agent on a
device and a sync client on a host have begun synchronizing,
as in operation 401, the method of FIG. 8A determines
whether there is another data class that needs to be synchro-
nized and identifies that data class. As noted elsewhere, either
the sync agent or the sync client may be responsible for
selecting the order of synchronization among the various data
classes. If there are no data classes left to synchronize, then
the synchronization session is ended and the device and host
are disconnected for purposes of synchronization in operation
405. If there are additional data classes to be synchronized,
then processing proceeds to operation 407 in which the next
data class begins synchronization by initializing the data class
handler on the host for the selected data class and sends that

US 7,761,414 B2

19

data class handler version number for the current data class to the device. Alternatively, the data source on the device may send its version number to the host. In operation 409, the data source initializes itself on the device and compares its version number on the device to the data class handler version number on the host. Then in operation 411, based on the comparison of the version numbers, it is decided how and whether to synchronize and whether or not an alert needs to be presented to the user to update or upgrade one or more data source software components or data class handler components on the user's device and/or host. In the method of FIG. 8A, it is assumed that one system or the other system makes a decision in operation 411 based upon the set of version identifiers which is either on the device or the host but not both. FIG. 8B represents an alternative implementation in which both systems have both version numbers and can perform the comparison and arrive at the same decision. If a decision was made to synchronize in operation 411, then in operation 413 the synchronizing is performed for the current data class, and FIGS. 5, 6A, 6B, 7A, and 7B provide examples of how synchronization can be performed for a current data class. After synchronization is completed, other operations are performed, such as saving anchors for the current data class in operation 415, and the process of FIG. 8A reverts back to operation 403 which has been described previously. It will be appreciated that alternative embodiments of FIG. 8A may involve fewer operations or more operations and may alter the sequence of those operations in a manner which is different than that shown in FIG. 8A.

FIG. 8B shows an embodiment which utilizes version identifiers for each data source software component on a device and for each data class handler software component on the host. In this embodiment, both the host and the device will receive both version numbers and perform the comparison and then decide how and whether to synchronize for the current data class. After the sync agent on the device and the sync client on the host have begun synchronizing in operation 425, it is determined in operation 427 whether there are any data classes that need to be synchronized and to select the next data class for synchronization. One or both of the sync agent and the sync client may perform this function in operation 427. If there are no further data classes to synchronize, then, in operation 429, synchronization is ended and the device and host may be disconnected under software control. If there is a next data class to synchronize, then, in operation 431, the data class handler for the current data class on the host is initialized and it causes its version number to be sent to the device. A data source software component for the same current data class on the device is also initialized and its version number is sent to the host. The host and the device each compare the two version numbers and decide, based upon the higher version number, how and whether to synchronize for the current data class. If it is decided to not synchronize for the current data class, one or both systems may display or otherwise present an alert to the user suggesting the user to update and/or upgrade a software component or several software components on at least one of their device and the host. In this case, synchronization for the current data class will not occur and processing reverts back to operation 427. If, on the other hand, the higher version number software component decides that it is compatible with a lower version number software component on the other system, then synchronization can be performed. Also, if the version numbers match, then synchronization can also be performed. In operation 435, synchronization is performed and then in operation 437 synchronization is completed by, for example, saving anchors and processing other data for the current data class and then

20

processing reverts back to operation 427. In some embodiments, the system (host or device) with the higher version may use the version information from the other system in order to take any action necessary to synchronize data to and from the system with the old version. For example, the "old system" might use a different name for some properties, and the system with the higher version can know this and translate the name back and forth. The older system might represent some properties differently, and if they can be translated back and forth the system with the higher version can do that translation coming and going.

Another aspect of at least certain embodiments described herein relates to a manner in which a software layer for creating and maintaining a data connection for one or more services may be used for each of those services and may provide an interface to one or more stream handlers which implement transport protocols to send structured data, files and other data through a physical interface, such as a wired USB interface or a Bluetooth wireless interface or other wireless interfaces, such as a WiFi interface or a wireless cellular telephone interface. The same layer may also provide for encrypted authentication, and this authentication may be a two-way authentication which establishes an authenticated connection throughout the transmission back and forth between a device and a host through the device link connection layer. The software architecture shown in FIG. 4 shows a device link 107 which may be implemented in the manner shown in FIG. 10 which illustrates a software architecture in which layers of software interface with each other through messages or calls at the interface between the software layers. The software architecture 450 is shown as having four layers which include a device link connection layer 457, a stream handler layer 459, and stream libraries layer 465 as well as an upper layer for one or more applications or services, such as a backup application or service or a configuration application or service or synchronization services provided by the sync client software component and the sync agent software component described herein. The sync client and sync agent software components 454 provide the synchronization functions and operations described with respect to FIGS. 4-8B. The application software component 452 may be a backup application which backs up data, including data which has not been synchronized, or alternatively a configuration application or one or more other types of applications which need to make a connection in a secure and authenticated manner through the device link connection layer 457. The stream handler layer 459 includes one or more stream handlers. In the particular embodiment shown in FIG. 10, there is a USB stream handler 461 and a Bluetooth stream handler 462 and a TCP stream handler 463. These different stream handlers implement the communication protocols and handle the stream over the different interface represented by USB or Bluetooth or TCP (which may be a WiFi or other wireless interface which utilizes TCP/IP). The stream library layer 465 is called upon by the stream handler to transmit and receive data through the particular protocol represented by the stream handler. For example, the USB stream handler may make calls to a particular group of stream libraries in order to transmit data over a USB interface. Similarly, the Bluetooth stream handler 462 may make calls to one or more libraries in the libraries layer 465 in order to transmit and receive data through a wireless Bluetooth interface. The device link connection layer 457 provides a unified interface to all the stream handlers in the stream handlers layer 459 by making calls to the appropriate stream handler based upon the currently used physical interface to connect the device to the host. The device link connection layer 457 includes both connection functionality and

US 7,761,414 B2

21

authentication and/or encryption functionality represented by the sublayers 456 and 458, respectively. The sublayer 456 is responsible for selecting the particular physical interface and establishing a connection through the interface by authenticating, as described below, the host to the device and the device to the host, and at the same time by invoking a particular stream handler for the selected interface which in turn invokes the appropriate stream libraries to create packets or other data structures for transmission over the physical interface. The device link connection layer 457 may be responsive to either a user input to synchronize or back up or configure a device, or may be responsive to an automatic discovery of the device through a technology such as Bonjour from Apple Computer, Inc. For example, docking a device in a dock which is coupled to the host may cause Bonjour to recognize that a device has been docked to a host and that the user may desire to synchronize the device. This may cause a display of a user interface asking the user if the device should be synchronized, or alternatively, the device may be automatically synchronized as a result of placing it in the dock. This will then cause the sync agent and sync client to begin a synchronization process as described herein and to also make calls to the device link connection layer in order to transmit data between the host and the device. Calls made by the sync client or the sync agent in the process of synchronization (or calls made by an application such as a backup application 452) result in the device link connection layer 457 making software based calls or sending other types of messages to the stream handlers layer 459, which in turn call particular libraries in the stream libraries layer 465. With an architecture such as that shown in FIG. 10, the synchronization software components, such as the sync client and the sync agent components, are isolated from the stream handlers. Thus, a sync agent software component and a sync client software component do not need to implement such handlers. Further, the device connection layer provides a uniform interface which authenticates the device to the host across three different physical interfaces and many different stream handlers; this isolates the synchronization software components as well as the other application components from the authentication software. Hence, a developer of a synchronization client or a synchronization agent or a data source for a data class or a data class handler for a data class do not need to recreate code (e.g. software program) to implement stream handlers or to implement authentication or encryption or to implement software to create the connection between a device and a host. Furthermore, by integrating the authentication and the encryption layer with the device connection layer, all services which use the device connection layer, such as the synchronization services or the application services 452 (e.g. backup applications, configure applications, diagnostic applications, etc.), obtain the benefit of automatic, two-way authentication, in at least certain embodiments, as a result of making calls to the device link connection layer 457 which in turn causes authentication and/or encryption to any one of the possible physical interfaces and their corresponding stream handlers. The use of the authentication and encryption layer 458 at a layer of abstraction between the transport and the protocol (stream handler) layers makes the architecture useable by more than just synchronization.

In one embodiment, the architecture shown in FIG. 10 provides a number of useful features. DeviceLink 457 may handle all authentication and encryption automatically for the application (the application may merely have to indicate where to find the certificates used by the security code). Further, the DeviceLink connection authenticates both the device and the host. DeviceLink 457 may provide asynchro-

22

nous behavior for all stream handlers (transports) doing I/O between the device and host, so the transport just has to read/write synchronously, and DeviceLink 457 manages the thread control to make it appear as asynchronous to the application, so the application never blocks reading and writing—the application (such as Sync Client on the host or Sync Agent on the device) is notified of incoming data (and other related things, such as connection/disconnection) via callbacks. DeviceLink 457 does all the authorization at the top of the stream (transport) layer, so all transport types which may be plugged in get authentication and encryption without needing to implement anything special. In one embodiment, Device Link 457 may have file transfer facilities built directly into DeviceLink's protocol. This may be used for backup, and other tools (and can be used in future applications based on device link 457). The protocol of DeviceLink 457 may include a function to do efficient transfer of a file in pieces, so that a file does not have to be read completely in memory at one time. Further, DeviceLink 457 may provide Unix style "stat" information (by itself, or with the file), such as the size of the file and the last modified date, so the applications can keep track of the file's state to tell if it needs to copy it or not (this may be useful for incremental backups). Once connected via DeviceLink 457, an application can use the protocol to request information about a file, and to request the file itself. The file is sent in chunks to avoid reading a huge file into memory all at once (on both sides). DeviceLink 457 may provide some default behavior when the file is requested to just get the file and send it (so the application doesn't need to respond to the callback for the request and take explicit action), although the application can respond if it wants to do custom handling (and use its own code if it wants). Similarly, when receiving pieces of a file, a default callback handles simply writing the file to disk, but that may be overridden in some embodiments. DeviceLink 457 may provide a "white list" of which files (or directories) can be requested, and which files or directories can be written into, so the two sides can control access. Other file copying solutions on the device may also exist independently of DeviceLink 457; for example, a media player (e.g. iTunes) may provide file copying facilities; however, DeviceLink 457 provides considerable infrastructure (authentication, asynchronous interface, part of the existing DeviceLink protocol for ease of use by an application), and has more functionality then a simple file copy API (it has the white lists, and default handling which can be overridden, and chunks the files).

An example of a sequence of operations which involve the use of device link connection layer 457 will now be provided. In one embodiment, a synchronization initiator (for example, either Sync Agent 109 on the device or Sync Client 111 on the host) will be launched (e.g. by the user or by the system, such as by a Bonjour discovery process). The initiator will then try to connect to the other side. The initiator, through DeviceLink connection layer 457, will establish a basic (unauthenticated) connection, which causes the launching of the other application (e.g. if Sync Client 111 initiates the process then basic connection may cause the launching of Sync Agent 109 on the device; conversely, if Sync Agent 109 initiates the process then basic connection may cause the launching of Sync Client 109 on the host). At this point, the DeviceLink connection layer 457 attempts to perform a two-way authentication process, described further herein; if that process succeeds, then an authenticated connection between the host and the device has been created and the synchronization initiator gets a callback from the DeviceLink connection layer 457 that the connection was made and the connectee application (that was launched by the basic connection) gets a notification that an

US 7,761,414 B2

23

incoming connection was made; for example, if authentication is successful and if Sync Client 111 was the initiator, then Sync Client 111 will receive the callback and Sync Agent 109 is the connectee application. If authentication fails, the initiator receives a connection failed callback and there is no connection, and the connectee will normally exit after some time interval.

FIG. 11 illustrates an alternative example of the operations of a device link connection layer 457. In operation 501, a connection is established. This may be performed by discovering the device. For example, Bonjour may be used to discover the device, either when connected through a wireless connection or a wired connection to the host. The device link connection layer may then decide which interface to use, and there may be a priority associated with each of those interfaces based upon speed, security, and convenience. For example, USB may be the highest priority connection interface followed by WiFi and finally Bluetooth, in at least certain embodiments. After an interface has been selected, then in operation 503 the device link connection layer performs authentication between the host and the device. In at least certain embodiments, this authentication is two-way, meaning that each of the device and the host perform authentication operations with certificates created upon initialization. FIG. 12 shows an example of the collection of certificates that the device and host may have after initialization of both in a manner described herein. In certain embodiments, authentication may be optional. After authentication is performed, then in operation 505 the device connection layer or other software may cause the launching of a sync client and sync agent in order to begin synchronization. While synchronization is occurring, the device link connection layer maintains the connection, which may be maintained as an authenticated connection, during the synchronization process of structured data in operation 507. In alternative embodiments, the method of FIG. 11 may be used with non-synchronization services, such as the backup application or configure application 452. In this case, the connection may be maintained, and it may be an authenticated connection during those services. After synchronization or other services are complete, the device link connection layer may disconnect the device from the host in software, even though the device may still be in the dock of the host. In other words, the software connection is torn down as a result of ending the synchronization process or other process which invoked the device link connection layer 457.

FIG. 12 shows an example of data structures maintained at both a device and a host after performing an initialization of an authentication system which provides two-way authentication between the device and the host. The authentication is encrypted with public key/private key cryptography, thereby providing a high level of security to allow a device to be synchronized to a host through a wireless interface while maintaining sufficient security so that the user can be assured that other hosts will not be able to obtain access to data on either the device being synchronized or the host. Moreover, this two-way authentication may be used for file transfers between the device and the host and for other services (e.g. diagnostic services) which utilize the authenticated connection. In order to provide adequate security, the device may be required to be connected by a wired interface initially and the user may be asked, by the display of the device, to enter a value, such as a large number or other character string, into the host. Alternatively, the value may be displayed on the display of the host and the user may be required to enter that value or character string into the device. Following this operation, the device may create a private and public key pair and

24

save its private key. The host may perform a similar operation to create a private key of the host and a corresponding public key of the host. The host may also create a certificate for a self-created certificate authority and may further create a public key/private key pair for the certificate authority. Each of the device and the host may include an identifier which may be a unique identifier for each system, and each of these identifiers may be transmitted to the other side (device ID transmitted to host and host ID transmitted to device) and this identifier is mapped to the saved private key of a particular system. In the example shown in FIG. 12, the saved private key of the device 529 for its host is mapped to the host's ID which is provided by the host. Similarly, the device's ID 535 for that device is mapped to the private key of the host 531. The host may create a certificate and sign it with a certificate authority using the host's public key, optionally with additional information. The host may also create a device certificate and sign it with the certificate authority certificate and then may transmit these certificates (537, 541, and 545) to the device. These certificates can be used in known techniques, such as a secure socket layer handshake, to provide transport layer security and to provide a two-way authentication between the device and the host. This authentication may be maintained during the entire connection, which may include a synchronization operation and other operations utilizing this authenticated connection. In one embodiment, as shown in FIG. 12, the device has a mapping between a host identifier and the following: Device private key used for that host, device certificate used for that host, host certificate, host certificate authority certificate (used in the self-signed authentication). Similarly, the host has a mapping from a device ID to the following: Host private key used for the device, host certificate used for that device, device certificate, host certificate authority certificate used with that device. The device has a separate device private key for any host it communicates with (the private key maps to the device certificate used with that host, and the device has one device certificate per host), and there is a similar arrangement on the host side, as there is a separate private key host certificate pair per device.

FIGS. 13A and 13B relate to an aspect of at least certain embodiments described herein. This aspect involves the ability for one or both of the device and the host to have both non-synchronization processes and synchronization processes occurring concurrently in that they are both being executed by one or more processing systems. Both sets of processes or threads may be in different address spaces. This allows a user of a device to operate the device while it is being synchronized, and similarly allows a user of the host to operate the host while the host is synchronizing with the device. For example, if both the device and the host have these capabilities, then a user on the device may be viewing a calendar program which displays a calendar of the user showing events and possibly To Do items for the user while at the same time a synchronization service is synchronizing the calendar data on the device with calendar data on the host. This synchronization may be implemented using the software architecture shown in FIG. 4 and may further use the methods shown in FIGS. 5-7B. Similarly, the user may use an application program on the host to access and edit the calendar data or other structured data for other applications while at the same time the host is performing synchronization operations on structured data in one or more stores of structured data. The synchronization process may be implemented on the host using the architecture shown in FIG. 4 and using the methods shown in FIGS. 5-7B, which have been described above.

US 7,761,414 B2

25                                                        26

The non-synchronization threads or processes may be user-level or non-user-level threads or processes which are not synchronization tasks. The synchronization threads or processes are synchronization tasks performed by one or more synchronization software components such as Sync Agent **109** or Sync Client **111** or other synchronization software components. The concurrent execution of the non-synchronization threads or processes and the synchronization threads or processes may occur on one or both of the device and the host. Operation **575** in FIG. **13A** shows that non-synchronization threads or processes may be performed on both the device and the host. In operation **577**, execution of synchronization software begins on, in this embodiment, both the device and the host while execution of non-synchronization threads or processes continues on both the device and the host. In operation **579**, a synchronization software component, such as the Sync Agent **109**, attempts to acquire a lock on a store for a data class which is to be synchronized. Sync Agent **109** in one embodiment may do this by invoking the Unix FLOCK call to lock the file containing, for example, the bookmarks to be synchronized. Also in one embodiment, if a synchronization software component accesses an SQlite database, if may not need to acquire a lock as the database may handle this function itself. In one embodiment, Contacts, Calendars and Notes may be stored in databases which handle their own locking at a lower level. Also in one embodiment, Sync Client may not attempt to acquire any locks. If the lock is acquired, as determined in operation **580**, then synchronizing is begun in operation **591**. On the other hand, if the lock is not acquired then the synchronization component, in operation **581**, may notify the application using the data class that the synchronization component requests the lock and the synchronization component waits for a response. The application may receive a response indicating the lock is acquired, in which case processing proceeds to operation **591**; otherwise, if the lock is not acquired after the notification, the processing proceeds to operation **583** in which synchronizing of the current data class is canceled and operation **579** follows if further data classes need to be synchronized (otherwise the process ends). If, while synchronizing is being performed, the user attempts to change the store for the data class being synchronized, the system (e.g. either the device or the host) may present, in operation **593**, an alert to the user that the system cannot accept changes until synchronizing is completed. After synchronization for the current data class is completed, in operation **595**, the lock is released and processing proceeds to the next data class, if one still remains to be synchronized, or synchronization is finished.

It will be appreciated that in alternative embodiments, only one of the host and the device may support concurrent operation of non-synchronization processes and synchronization processes.

Another aspect of at least certain embodiments described herein relate to methods and systems for synchronizing bookmarks or favorites on one or both of the device and the host when synchronizing structured data. The bookmarks of various web browsers on each of the device and the host may be collected together and stored in an intermediate or canonical topology which is used to synchronize the bookmarks and collections of bookmarks on at least two web browsers, one being on the device and one being on the host. In certain embodiments, there may be multiple web browsers operating or used by a user on the host and one web browser used on the device. The intermediate topology collects the various bookmarks from the different web browsers, aggregates those into the canonical topology, and then uses that topology to synchronize the bookmark structures for each of the web brows-

ers on such a system. In addition, the synchronizing may also include converting between one format (e.g. a URL data type to another format (e.g. a string representing the URL) for each of the one or more bookmarks in each web browser.

The synchronization of bookmarks on different browsers may require a mechanism to convert or otherwise deal with the difference in the format of the hierarchy of bookmarks. For example, different web browsers have different data structures for maintaining a hierarchy of a collection of bookmarks. Each of these data structures may be considered a topology. FIGS. **14A**, **14B**, **14C**, and **14D** provide examples of those different topologies. The example shown in FIG. **14A** may be the topology of the web browser known as Safari from Apple Computer, Inc. of Cupertino, while the topology shown in FIG. **14B** may be the topology of Internet Explorer from Microsoft Corporation, and the topology shown in FIG. **14C** may be the topology of Firefox, and the topology shown in FIG. **14D** may be the topology of a web browser on a device, such as a handheld computer with wireless cellular telephone capabilities or other wireless interfaces, such as WiFi, which may be used to access the Internet and browse the Internet. The topologies shown in FIGS. **14A**, **14B**, **14C**, and **14D** represent the topology prior to synchronization among the web browsers. The topology **625** includes a bookmarks menu **627** and a bookmarks bar **629** as well as one or more folders **631** which may be arranged in a hierarchy including folders **632** and **633**. The topology **637** in FIG. **14B** does not include a bookmarks menu but does include a bookmarks bar **638**. Another difference between the topology **637** and the topology **625** is the existence of bookmarks at a top level in the topology, such as the bookmarks **639** and **640**. In the topology **625**, there is no support for bookmarks at the top level; in other words, the bookmarks must be within a folder or in the bookmarks menu or in the bookmarks bar. In contrast, the topology of **637** supports bookmarks at the top level, such as the bookmarks **639** and **640**. The topology **637** also includes a collection of one or more folders which may be arranged in a hierarchy, such as folders **641** and folders **642** and **643**. The topology **651** is similar to the topology **625** except that bookmarks at the top level, such as bookmarks **639** and **654**, may be included in the topology **651** but they are not included or allowed in the topology **625**. The topology **651** includes a bookmarks menu **652**, a bookmarks bar **653**, bookmarks at the top level, such as bookmarks **639** and **654**, and a collection of folders containing bookmarks, such as folders **656** and **657** and **658**.

FIGS. **15A**, **15B**, **15C**, and **15D** show how the bookmark topologies appear after a synchronization between the collections of bookmarks for the different web browsers. The designation "A" as been added to each reference numeral to indicate that it is the same element except after synchronization. For example, the bookmarks menu **627**A is the same as the bookmarks menu **627** except that it may include additional bookmarks as a result of the synchronization operation. It can be seen that synchronization has caused the addition of a top level folder **675** which may contain top level bookmarks from other topologies, such as the bookmarks **639** and **640** and **654**. Hence, the synchronization process has added another folder to the structure **625**A to accommodate bookmarks for top level bookmarks in other web browsers. Similarly, the topology **637**A has now included, after synchronization, a bookmarks menu **676** which incorporates the bookmarks found in the bookmarks menu **627** and **652** from the other two web browsers. The bookmarks data structure shown in FIG. **15D** has been modified to include a top level folder **677** in order to accommodate bookmarks at the top level from other web browsers. Hence, in the example shown

APLNDC630-0000173182

US 7,761,414 B2

27

in FIGS. 15A, 15B, 15C, and 15D, a synchronization process among multiple web browsers has resulted in the addition of bookmarks and folders and other data structures to the different topologies in order to synchronize the bookmarks among the different web browsers. This synchronization was able to occur even though the topologies for the bookmark structures of the different web browsers are different. The synchronizing which occurred is a form of synchronization which does not delete a bookmark in one web browser if it is not present in another. This synchronization may be implemented through an intermediate topology, such as a canonical topology. An example of such a topology is shown in FIG. 16A along with a topology for a host's web browser bookmark structure and a device's web browser bookmark structure. A mapping relationship is also shown between the canonical topology and each of the other two topologies 637A and 665A. A mapping relationship is shown by a line with an arrow at each end. For example, bookmarks in the bookmark bar 638A are mapped to bookmarks in the bookmark bar 692 in the canonical topology. Similarly, top level bookmarks 639 and 640 are mapped to the top level folder 693 in the canonical topology. Similarly, folders and bookmarks within those folders 641A are mapped to folders 694 in the canonical topology 690. Bookmarks in the bookmark menu 691 of the canonical topology are mapped to other bookmarks 669A. This mapping relationship allows conversion during synchronization from one set of bookmarks on a device or a host to another set of bookmarks in another web browser on the device or the host.

FIGS. 16B and 16C illustrate two methods for synchronizing bookmarks. Operation 701 of FIG. 16B maps at least one bookmark from at least one web browser on a host to at least one of an intermediate topology or a device topology for bookmarks. For example, the top level bookmarks 639 and 640 may be mapped to the intermediate topology 690 or directly mapped to the device topology 665A. In operation 703, at least one bookmark from at least one web browser on the device is mapped to at least one of an intermediate topology or the host's topology for bookmarks. An example of this mapping may be the mapping which occurs in bookmarks added to the top level folder in the topology 665A, which in turn are mapped to the top level bookmarks in the topology 637A. The mapping, in operation 701 and 703, may be implemented by a table or other data structure which shows the association between the different topologies such that synchronization may be performed in operation 705. In that operation, bookmarks are synchronized on a device with bookmarks on the host. As noted in operation 705, the device's bookmark topology may be different from the host's topology, and different than the intermediate topology as is shown in FIG. 16A.

The method of FIG. 16C assumes that an intermediate topology is used and that there is a mapping between each of the web browsers and the intermediate topology. It will be understood that at least in certain embodiments, the host or the device may maintain a complete data structure of all bookmarks in the intermediate topology which can then be used to update the bookmark structure of each web browser. In operation 715, first bookmarks in a first topology for a first web browser on a host are mapped to an intermediate topology which may be maintained on the host or the device. In operation 717, second bookmarks in a second topology for a second web browser on the host are also mapped into the intermediate topology. Then in operation 719, the first bookmarks and the second bookmarks on the host are synchronized with third bookmarks on a device which is coupled to the host during the synchronizing period. In this particular

28

method, two different web browsers having two different topologies on the host are synchronized with a web browser on the device. In at least certain embodiments, the device's topology for its web browser may be different than the first topology and different than the second topology and the intermediate topology.

In an embodiment, the system may perform this synchronization automatically without user interaction and without requesting any input from a user. While this may reduce the complexity required to configure such a system, it may be desirable to present one or more user interfaces which allow a user to set preference settings or other settings which indicate how the synchronization of bookmarks is to be performed among two or more web browsers. The user interface 725 shown in FIG. 16D allows a user to select one option from three possible options by selecting one of the three check boxes 727, 729, and 731. The check mark shown in the check box 727 indicates that a user has selected the first option which synchronizes the device's bookmarks to the host's bookmarks and the host's bookmarks to the device's bookmarks; this is considered a two-way synchronization. The other two options are one-way only synchronizations. In particular, if the user had selected check box 729, then synchronization would be performed only to synchronize from the device's bookmarks to the host's bookmarks. If the user had selected check box 731, then synchronization would be performed from the host's bookmarks to the device's bookmarks only.

FIG. 16E illustrates another user interface which allows a user to select all web browsers for synchronization or only selected ones of the web browsers. If the user selects the check box 737, then synchronization is performed for all web browsers on both the device and the host. The interface 735 shows that the user has selected the second option by selecting the check box 739. In this case, the system will synchronize bookmarks with bookmarks of selected web browsers on the host, and the user has selected buttons 742 and 743 but has not selected buttons 741 and 744. Hence, bookmarks maintained by Firefox and bookmarks maintained by Safari on the host will be synchronized with bookmarks on the device as a result of these selections in the user interface 735. The selection of the button 744 will cause an application browser window to appear to display applications on the host to allow the user to pick selected applications from the list to include in the set of web browsers to be synchronized on the host.

The user interface 750 shown in FIG. 16F allows the user to limit synchronization to selected folders. This option has not been selected as can be seen by the absence of a check mark in the check box 751. If the user does select check box 751, then one or more browser windows may be caused to appear to allow a user to browse through windows containing lists of various bookmarks and bookmark folders, and bookmark bars on a system. It will be appreciated that each of these user interfaces may be used individually or in combination to allow a user to control how bookmarks are synchronized in at least certain embodiments described herein.

FIG. 17 relates to another aspect of at least certain embodiments described herein. This aspect relates to the synchronization of setup information for one or more electronic message system accounts, such as an email account or an instant messaging account. This synchronization may be performed in a one-way direction from the host to the device rather than in both directions. Moreover, in at least certain embodiments, modifications made to an account setup information on the host may not be reflected on a previously set up account which has been established and is existing on the device.

US 7,761,414 B2

29

The flow chart of FIG. 17 provides one example of how account information may be synchronized. FIG. 18 shows a memory structure of the device and a memory structure of the host with respect to email account setup information. The method of FIG. 17 may begin in operation **781** in which a data processing system receives setup information for an email account (or for other types of electronic message systems). This information is received on the device and may be for an account "A." The setup information **791** may be an example, in FIG. **18**, of such setup information. In operation **783**, the host may receive information to set up an email account which may be account "B" and is shown as setup information **795** in FIG. **18**. Synchronization may occur after establishing a connection between the device and the host as in operation **785**. During the synchronization operation **787**, account B, which was established on the host, may be synchronized as a new account on the device. The synchronization may be a one-way synchronization in at least one embodiment; this is represented by the arrow **790** shown in FIG. **18**. In this case, the email account which was set up on the device is not synchronized back to the host. In this embodiment, the device ends up having a superset of the email accounts. This may be desirable in cases where the user prefers greater privacy on the device than the host, for example.

It will be appreciated that in alternative embodiments, the direction of synchronization may be reversed such that it is from the device to the host and not from the host to the device. In this case, any account set up on the device will be synchronized and established on the host, but not vice versa.

FIGS. 19, 20, and 21 relate to another aspect of at least certain embodiments described herein. This aspect relates to how notes may be synchronized. In at least certain embodiments, a note, which is typically a text freeform document, may contain other information, such as image data, audio data, movie data, and even To Do items. The To Do items may be embedded within the note and may be created as part of creating the note. When the note is synchronized, the To Do item is also synchronized in a separate To Do database in at least certain embodiments. Further information in connection with notes having embedded To Do items may be found in co-pending U.S. patent application Ser. No. 11/499,009, filed on Aug. 4, 2006, and entitled "Methods and Systems for Managing To Do Items or Notes or Electronic Messages;" this application is hereby incorporated herein by reference.

FIG. 19 shows one exemplary method for synchronizing a note which contains one or more embedded To Do's on either a host or a device. The note itself may be treated as one data class, while the To Do item will be treated as, in at least certain embodiments, another data class. If the architecture of FIG. 4 is utilized, then a portion of the note is synchronized for the data source and the data class handler for the note store while another portion of the note is synchronized with another data store and another data class handler for the To Do data class. In an alternative embodiment, the note with an embedded To Do may be synchronized to merely one database or store rather than two through the use of only one pair of a data store and a data class handler. In operation **811**, the note with an embedded To Do is stored on a host or a device. This will cause the updating of a To Do database on the host (or the device) in operation **813**. When synchronization occurs in operation **815**, the note database on the device is synchronized and the To Do database on the device is also synchronized. If the note was stored on the device in operation **811**, then the note database on the host is synchronized and the To Do database on the host is synchronized in operation **815**. In this manner, different parts of the note are synchronized to two different data stores.

30

FIG. **20** provides an example of how an embedded note may be created. In operation **825**, a system, such as a device or a host, receives content of the note. This content may be a freeform text document but may also include image data, such as a picture or other graphics. Then in operation **827**, the system receives a selection of a command to create a To Do item from at least a portion of the content of the note. This selection may occur, in certain embodiments, before receiving the content. Then in operation **829**, a To Do item is added to a To Do database. This new To Do item may optionally be presented to the user in a To Do window or other user interface item.

FIG. **21** shows an example of how a note or other type of structured data may be synchronized or not depending on a filter. In the case of a note, the filter may be the size of the note to prevent the systems from attempting to synchronize a very large note which contains either a lot of text or image data. In operation **841**, a connection is established to synchronize notes on a device to notes on a host. In operation **843**, it is determined if a synchronization filter for notes has been set, either by the system, such as a default, or by the user. As synchronization is performed, operation **845** is also performed for each note which is to be synchronized between the host and the device. This operation involves determining whether or not the note satisfies the filter. In one embodiment, the filter may be a maximum size of the note. If the note exceeds the maximum size, then it will not be synchronized or only text portions will be synchronized. This is shown in operation **849**. If the note does satisfy the filter, then it is synchronized as shown in operation **847**. This is repeated for each note which is to be synchronized. In another embodiment, rather than not synchronizing larger notes at all, a method may synchronize text and/or other small portions of such larger notes and include an indicator or marker in the synchronized copy (which has been reduced in size by the removal of the image or other data) that a portion of the original note (e.g. the image data portion) has not been included in the synchronized copy. In this way, synchronization of at least a portion of larger notes can still be performed while filtering out, in the synchronization process itself, the larger parts of the note.

Another aspect of at least certain embodiments relate to transformations of data as part of the synchronization process between the host and the device. Examples of these transformations include: converting data types such as a URL to a text string (e.g., in synchronizing bookmarks) or converting date formats for calendar events or converting contact images, etc. In each case, the device and the host may use a different format; for example, the device may use a first date format for calendar events and the host may use a second date format for calendar events. In one embodiment, the Data Class Handler for a data class on the host may perform the transformations for that data class for both the host and the device as noted in Table D. In other embodiments, the Data Source on the device for a data class and the Data Class Handler on the host for that data class may share the tasks of transforming between formats for that data class.

Further information will now be provided with respect to transformation of image formats. For example, the device may support contact images (e.g. for a contacts or address book application on the device) having a richer (e.g. more varied) format than contact images (for contacts or address book application on the host) on the host. Further, the device may store previously clipped versions of an image and previously scaled versions of images for a contact so it can display them quickly.

APLNDC630-0000173184

US 7,761,414 B2

31

On the host, there may be just one small image for a contact's picture. This image can be fairly large if set via API (Application Program Interface) from another application, but if created in a contacts or address application on a host, it may be small, and if it is created from an original image that is larger, that original image is lost. In contrast, on the device, in one embodiment, the original image which was used to create a contact image may be maintained in its entirety. For example, a user can pick images from a photo or camera application and apply them as a contact's image—these can be any size, so the user may choose the visible area of the image to use, and that visible area is, if necessary, scaled (e.g. scaled down) so it fits on the screen. The device may store a clip rectangle which the user chooses (though some user interface) to choose the portion of that image to be displayed. The device may also store clipped and scaled images for a rectangular-sized and square-sized image. The rectangular image may be the size of the screen, and may be shown on an incoming call. The square image may be shown scaled down even smaller as part of the contact, and used in situations where there is only some of the screen (a square area) which is available to display the image. In one embodiment, when the user chooses the clip rectangle, the user interface shows how the rectangular and square images will look. If the user wants to regenerate what the device displays, the user will, in this embodiment, still have the original image, so the user can go back to the original image and choose another clip rectangle, and regenerate the saved images in rectangular and square sizes and shapes.

Synchronization of contacts/address book, at least in one embodiment, includes synchronizing the images in the contacts/address book and this includes synchronizing the clip rectangle as well as the original image. The synchronizing process may also have to regenerate the optimized images in certain cases, such as if the user changes the image in their Address Book on the host, or if the user gets an image from a device and synchronizes it to another device (e.g., the user gets an image from a device with one sized screen and wants to synchronize it to a device with a differently sized screen). The Data Class Handler may, in one embodiment, clip/scale new/changed images when synchronizing them onto the device because that may be faster than having the device do it (and the device may also be memory constrained. Because there might be more than one device synchronizing the same contact images, and those devices could have different sized displays, in one embodiment, separate clip rectangles are saved for each unique device display size, so an image can be clipped differently on one device with a different size than another device. The Data Class Handler in one embodiment manages keeping track of the different rectangles (since each device will only know about the one rectangle that matches its screen size). For example, if a device has 320×480 screen, and a contact image is originally 1024×800, the synchronization process stores optimized images for the entire screen (320×480) and a square 320×320 representation as well. The user can pick the clip rectangle out of the original image which is then scaled down to 320×480 (and the device cuts out a 320×320 part), and this is synchronized to the host. If the image changes on the host, the synchronization process (through the Data Class Handler, for example) recomputes the 320×480 and 320×320 images for the device. If a new image is synchronized to a device with a different size, if the original image is still large enough to cover the screen, the synchronization process, in one embodiment, will find the center of the image in the clip area for one of the existing clip rectangles (for the other size device screen), and expand/contract the clip rectangle accordingly to fit the different size

32

(e.g. larger size) screen. If the new device has a smaller screen, the synchronizing process may merely scale the image down to that size.

Another aspect of at least certain embodiments relate to frameworks and architecture for synchronizing widgets. Generally, widgets are user interface elements that include information and one or more tools that let the user perform tasks and/or provide access to information. Widgets can perform a variety of tasks, including, for example, communicating with a remote server or other source of data to provide information to a user (e.g., weather report; stock prices; sunrise/sunset times; current phase of the moon; current exchange rates; etc.), providing commonly needed functionality (e.g., a calculator; a calendar; a clock; etc.), or acting as an information repository (e.g., a notebook). Widgets can be displayed and accessed through an environment referred to as a "unified interest layer," "dashboard layer," "dashboard environment," or "dashboard." Widgets and dashboards are described in co-pending U.S. patent application Ser. No. 10/877,968, entitled "Unified Interest Layer for User Interface," filed on Jun. 25, 2004, which patent application is incorporated herein by reference in its entirety.

Widgets on a device may be synchronized, using any one of the embodiments described herein, with widgets on a host or another device. The synchronization may be one-way (from device to host or another device only or from host or another device to device only) or two-way. In the case of two-way synchronizations, both systems will normally end up with a common set of widgets, assuming both systems can support the full, common set of widgets.

Widgets may be treated, at least in certain embodiments, as another data class and may be synchronized using the architecture shown in FIG. 4 and described throughout this disclosure. In one embodiment, a Data Source for widgets may exist on a device and a Data Class Handler for widgets may exist on a host. The executable software which implements the widget may not be synchronized but the configuration settings for the widget may be synchronized between a device and a host or between a device and another device. Each widget on a system may have configuration settings and these settings may be stored as one file for a particular type of widget. For example, a weather widget may have settings which specify three cities (e.g. San Francisco, Los Angeles, and Washington, D.C.) and those settings are stored as one file or record for purposes of synchronization.

In the foregoing specification, the invention has been described with reference to specific exemplary embodiments thereof. It will be evident that various modifications may be made thereto without departing from the broader spirit and scope of the invention as set forth in the following claims. The specification and drawings are, accordingly, to be regarded in an illustrative sense rather than a restrictive sense.

What is claimed is:

1. A machine implemented method comprising:

executing at least one user-level non-synchronization processing thread, wherein the at least one user-level non-synchronization processing thread is provided by a user application which provides a user interface to allow a user to access and edit structured data in a first store associated with a first database; and

executing at least one synchronization processing thread concurrently with the executing of the at least one user-level non-synchronization processing thread, wherein the at least one synchronization processing thread is provided by a synchronization software component

APLNDC630-0000173185

US 7,761,414 B2

33

34

which is configured to synchronize the structured data from the first database with the structured data from a second database.

2. The method as in claim 1, wherein the first database is in on a first data processing system, and wherein the at least one user-level non-synchronization processing thread includes operations to access the first database which is synchronized by the at least one synchronization processing thread with the second database on a second data processing system.

3. The method as in claim 2 wherein the first data processing system is a host and the second data processing system is a handheld device.

4. The method as in claim 1 wherein the synchronization software component acquires a lock on the first store.

5. The method as in claim 4 wherein the lock is a FLOCK Unix command.

6. The method as in claim 4 wherein the synchronization software component releases the lock after synchronization for a first data class is completed.

7. The method as in claim 6 wherein the first and the second data processing systems are synchronized in a peer-to-peer manner.

8. The method as in claim 1 wherein the synchronization software component attempts to acquire a lock on the first store, and if it fails, the synchronization software component sends a message to the user application to obtain the lock on the first store.

9. The method as in claim 8 wherein the synchronization software component cancels synchronization for at least one data class if the user application fails to release the lock on the first store.

10. The method as in claim 1 wherein the synchronization software component is configured to synchronize structured data of a first data class and other synchronization software components are configured to synchronize structured data of other corresponding data classes.

11. A computer readable storage medium containing executable program instructions which when executed cause a data processing system to perform a method comprising:

executing at least one user-level non-synchronization processing thread, wherein the at least one user-level non-synchronization processing thread is provided by a user application which provides a user interface to allow a user to access and edit structured data in a first store associated with a first database; and

executing at least one synchronization processing thread concurrently with the executing of the at least one user-level non-synchronization processing thread, wherein the at least one synchronization processing thread is provided by a synchronization software component which is configured to synchronize the structured data from the first database with the structured data from a second database.

12. The storage medium as in claim 11 wherein the first database is in on a first data processing system, and wherein the at least one user-level non-synchronization processing thread includes operations to access the first database which is synchronized by the at least one synchronization processing thread with the second database on a second data processing system.

13. The storage medium as in claim 12 wherein the first data processing system is a host and the second data processing system is a handheld device.

14. The storage medium as in claim 11 wherein the synchronization software component acquires a lock on the first store.

15. The storage medium as in claim 14 wherein the lock is a FLOCK Unix command.

16. The storage medium as in claim 14 wherein the synchronization software component releases the lock after synchronization for a first data class is completed.

17. The storage medium as in claim 16 wherein the first and the second data processing systems are synchronized in a peer-to-peer manner.

18. The storage medium as in claim 11 wherein the synchronization software component attempts to acquire a lock on the first store, and if it fails, the synchronization software component sends a message to the user application to obtain the lock on the first store.

19. The storage medium as in claim 18 wherein the synchronization software component cancels synchronization for at least one data class if the user application fails to release the lock on the first store.

20. The storage medium as in claim 11 wherein the synchronization software component is configured to synchronize structured data of a first data class and other synchronization software components are configured to synchronize structured data of other corresponding data classes.

21. A data processing system comprising:

means for executing at least one user-level non-synchronization processing thread that includes means for accessing structured data in a first store associated with a first database; and

means for executing at least one synchronization processing thread concurrently with the executing of the at least one user-level non-synchronization processing thread that includes means for synchronizing the structured data from the first database with the structured data from a second database.

22. The system as in claim 21 wherein the first database is in on a first data processing system, and wherein at least one user-level non-synchronization processing thread includes operations to access the first database which is synchronized by the at least one synchronization processing thread with the second database on a second data processing system.

23. A machine implemented method comprising:

executing at least one non-synchronization processing thread, wherein the at least one non-synchronization processing thread is provided by a user application which provides a user interface to allow a user to access and edit structured data in a first store associated with a first database; and

executing at least one synchronization processing thread concurrently with the executing of the at least one non-synchronization processing thread, wherein the at least one synchronization processing thread is provided by a synchronization software component which is configured synchronize the structured data from the first database with the structured data from a second database.

24. The method as in claim 23 wherein the first database is in on a first data processing system, and wherein the at least one non-synchronization processing thread includes operations to access the first database which is synchronized by the at least one synchronization processing thread with the second database on a second data processing system.

25. The method as in claim 24 wherein the first data processing system is a host and the second data processing system is a handheld device.

26. The method as in claim 23 wherein the synchronization software component acquires a lock on the first store.

27. A computer readable storage medium containing executable program instructions which when executed cause a data processing system to perform a method comprising:

US 7,761,414 B2

35

executing at least one non-synchronization processing thread, wherein the at least one non-synchronization processing thread is provided by a user application which provides a user interface to allow a user to access and edit structured data in a first store associated with a first database; and

executing at least one synchronization processing thread concurrently with the executing of the at least one user-level non-synchronization processing thread, wherein the at least one synchronization processing thread is provided by a synchronization software component which is configured synchronize the structured data the first database with the structured data from a second database.

**28**. The storage medium as in claim **27** wherein the first database is in on a first data processing system, and wherein the at least one non-synchronization processing thread includes operations to access the first database which is synchronized by the at least one synchronization processing thread with the second database on a second data processing system.

**29**. The storage medium as in claim **28** wherein the first data processing system is a host and the second data processing system is a handheld device.

36

**30**. The storage medium as in claim **27** wherein the synchronization software component acquires a lock on the first store.

**31**. A data processing system comprising:

means for executing at least one non-synchronization processing thread that includes

means for accessing structured data in a first store associated with a first database; and

means for executing at least one synchronization processing thread concurrently with the executing of the at least one non-synchronization processing thread that includes means for synchronizing the structured data from the first database with the structured data from a second database.

**32**. The system as in claim **31** wherein the first database is in on a first data processing system, and wherein at least one non-synchronization processing thread includes operations to access the first database which is synchronized by the at least one synchronization processing thread with the second database on a second data processing system.

\*   \*   \*   \*   \*

# EXHIBIT 2

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
Kevin A. Smith (Bar No. 250814)
kevinsmith@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129 (CA);
2542082 (NY))
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

William C. Price (Bar No. 108542)
williamprice@quinnemanuel.com
Patrick M. Shields (Bar No. 204739)
patrickshields@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS CO.,
LTD., SAMSUNG ELECTRONICS AMERICA,
INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

STEPTOE & JOHNSON, LLP
John Caracappa (*pro hac vice*)
jcaracappa@steptoe.com
1330 Connecticut Avenue, NW
Washington, D.C. 20036
Telephone: (202) 429-6267
Facsimile: (202) 429-3902

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>             Plaintiff,<br><br>       vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>             Defendants. | CASE NO. 12-CV-00630-LHK<br><br>**SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES** |

Pursuant to the Court's Minute Order and Case Management Order, and Patent Local Rules 3-3 and 3-4, Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, "Samsung") submit invalidity contentions and document productions for U.S. Patent Numbers 5,666,502 ("the '502 Patent"); 5,946,647 ("the '647 patent"); 6,847,959 ("the '959 patent"); 7,761,414 ("the '414 patent); 8,014,760 ("the '760 patent); 8,046,721 ("the '721 patent"); 8,074,172 ("the '172 patent"); and 8,086,604 ("the '604 patent") (collectively, "Apple Asserted Patents").  Apple Inc. is referred to herein as "Apple" or "Plaintiff."

## PATENT LOCAL RULE 3-3 DISCLOSURES

1.      This disclosure is directed to preliminary invalidity and unenforceability issues only and does not address claim construction or non-infringement.  Samsung reserves all rights with respect to such issues, including but not limited to its position that claims of the Apple Asserted Patents are to be construed in a particular manner and are not infringed.

2.      These invalidity contentions are preliminary and are based on Samsung's current knowledge, understanding, and belief as to the facts and information available as of the date of these contentions.  Samsung has not yet completed its investigation, discovery, or analysis of information related to this action, and additional discovery may require Samsung to supplement or amend its invalidity contentions.  While Samsung has made a good-faith effort to provide a comprehensive list of prior art relevant to this case, Samsung reserves the right to modify or supplement its prior art list and invalidity contentions at a later time with or based upon pertinent information that may be subsequently discovered from Apple or third-parties.  Moreover, discovery is ongoing and Samsung reserves the right to pursue all other defenses that may be available to it, including but not limited to defenses that the Apple Asserted Patents are unenforceable based on laches, estoppel, waiver acquiescence, inequitable conduct, patent misuse, patent exhaustion, express or implied license, or any other grounds.

3.      Any invalidity analysis depends, ultimately, upon claim construction, which is a question of law reserved for the Court.  The asserted claims have not yet been construed by the Court in this case and, thus, Samsung has not yet had the opportunity to compare the asserted

1   claims of the Apple Asserted Patents (as construed by the Court) with the prior art.  Samsung

2   reserves the right to amend, supplement, or materially modify its invalidity contentions after the

3   claims have been construed by the Court.  Samsung also reserves the right to amend, supplement,

4   or materially modify its invalidity contentions based on any claim construction positions that

5   Apple may take in this case.  Samsung also reserves the right to assert that a claim is indefinite,

6   not enabled, or fails to meet the written description requirement based on any claim construction

7   position Plaintiff may take in this case or based on any claim construction the Court may adopt in

8   this case.

9          4.      Samsung's invalidity contentions are directed to the claims asserted by Plaintiff that

10  are identified in Plaintiff's June 15, 2012 Disclosure of Asserted Claims and Infringement

11  Contentions.  In its Infringement Contentions, however, Plaintiff states that it "reserves the right to

12  supplement or amend these disclosures as further facts are revealed during the course of this

13  litigation."  Samsung therefore reserves the right to modify, amend, supplement or otherwise alter

14  its invalidity contentions in the event that Plaintiff supplements or amends its infringement

15  contentions or takes a claim construction position that is different than or in addition to those set

16  forth in its infringement contentions, or for any other reason constituting good cause to modify,

17  amend, supplement or otherwise alter these invalidity contentions.

18         5.      Samsung further contends that Plaintiff appears to be pursuing overly broad

19  constructions of the asserted claims of the Apple Asserted Patents in an effort to piece together an

20  infringement claim where none exists and to accuse products that do not practice the claims as

21  properly construed.  At the same time, Plaintiff's infringement contentions are in many places too

22  general and vague to discern exactly how Plaintiff contends each accused product practices each

23  element of the asserted claims.  These invalidity contentions are not intended to be, and are not, an

24  admission that the asserted claims are infringed by any of Samsung's products or technology, that

25  any particular feature or aspect of any of the accused products practices any elements of the

26  asserted claims, or that any of Plaintiff's apparent constructions are supportable or proper.  To the

27  extent that any of the prior art discloses the same functionality or feature of any of the accused

28  products, Samsung reserves the right to argue that said feature or functionality does not practice

1    any element of any of the asserted claims, and to argue, in the alternative, that if said feature or

2    functionality is found to practice any element of any of the asserted claims of the Apple Asserted

3    Patents, then the prior art reference demonstrates that that element is not novel to the invention

4    and that the claim is not patentable.

5          6.       Attached hereto as Exhibits A through H are representative claim charts that

6    demonstrate how the asserted claims of the Apple Asserted Patents are invalid in view of certain

7    prior art.  The references cited in Exhibits A through H may disclose the limitations of the asserted

8    claims of the Apple Asserted Patents either expressly and/or inherently.  Moreover, the suggested

9    obviousness combinations are in the alternative to Samsung's anticipation contentions.  The

10   obviousness combinations set forth in these contentions should not be construed to suggest that

11   any reference included in any combination is not anticipatory in its own right.

12         7.       In this action, Plaintiff asserts that Samsung infringes certain claims of the Apple

13   Asserted Patents.  Although Plaintiff asserts that these claims are either literally infringed or

14   infringed under the doctrine of equivalents, Plaintiff has failed to provide any analysis or

15   explanation regarding alleged infringement of the asserted claims of the patents-in-suit under the

16   doctrine of equivalents.  Samsung reserves its rights to modify, amend, supplement or otherwise

17   alter its preliminary infringement contentions in the event Plaintiff is permitted to modify, amend,

18   supplement, or clarify their infringement contentions with respect to direct infringement (literal

19   and under the doctrine of equivalents).

20         8.       Samsung is providing invalidity contentions only for the claims asserted by

21   Plaintiff, but hereby reserves the right to seek invalidation of all claims in each of the Apple

22   Asserted Patents.

23         9.       Samsung reserves the right to modify, amend, or supplement these disclosures as

24   additional information becomes available, and as its discovery and investigation proceed.

25

26

27

28

# I.     THE '502 PATENT

## A.     Local Patent Rule 3-3(a):  Identification of Prior Art[1]

At this time, Samsung contends that at least the following prior art references anticipate or render obvious, either alone or in combination, the asserted claims of the '502 Patent:

### 1.     Patent References[2]

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 4,330,845 | May 18, 1982 | Dec. 31, 1979 |
| US | 4,559,598 | Dec. 17, 1985 | Feb. 22, 1983 |
| US | 4,737,980 | Apr. 12, 1988 | July 19, 1985 |
| US | 4,862,498 | Aug. 29, 1989 | Nov. 28, 1986 |
| US | 4,896,291 | Jan. 23, 1990 | May 20, 1988 |
| US | 5,007,019 | Apr. 9, 1991 | Jan. 5, 1989 |
| US | 5,041,967 | Aug. 20, 1991 | Oct. 13, 1987 |
| US | 5,103,498 | Apr. 7, 1992 | Aug. 2, 1990 |
| US | 5,265,014 | Nov. 23, 1993 | Apr. 10, 1990 |
| US | 5,317,646 | May 31, 1994 | Mar. 24, 1992 |
| US | 5,357,431 | Oct. 18, 1994 | Jan. 25, 1993 |
| US | 5,386,298 | Jan. 31, 1995 | Apr. 26, 1993 |
| US | 5,396,419 | Mar. 7, 1995 | Sep. 8, 1992 |
| US | 5,455,901 | Oct. 3, 1995 | Sep. 12, 1994 |
| US | 5,459,488 | Oct. 17, 1995 | Jan. 19, 1993 |
| US | 5,479,536 | Dec. 26, 1995 | Nov. 27, 1991 |
| US | 5,495,565 | Feb. 27, 1996 | June 21, 1994 |
| US | 5,513,308 | Apr. 30, 1996 | Sep. 1, 1993 |
| US | 5,537,618 | July 16, 1996 | Dec. 23, 1993 |
| US | 5,555,496 | Sep. 10, 1996 | May 6, 1994 |
| US | 5,557,515 | Sep. 17, 1996 | Aug. 11, 1989 |
| US | 5,574,482 | Nov. 12, 1996 | May 17, 1994 |
| US | 5,608,898 | Mar. 4, 1997 | Nov. 12, 1992 |
| US | 5,619,708 | Apr. 8, 1997 | Oct. 25, 1994 |
| US | 5,623,681 | Apr. 22, 1997 | Nov. 19, 1993 |
| US | 5,632,022 | May 20, 1997 | Nov. 13, 1991 |
| US | 5,644,735 | July 1, 1997 | May 27, 1992 |
| US | 5,675,362 | Oct. 7, 1997 | Nov. 14, 1988 |
| US | 5,682,510 | Oct. 28, 1997 | Mar. 30, 1995 |
| US | 5,682,538 | Oct. 28, 1997 | Aug. 12, 1994 |
| US | 5,704,029 | Dec. 30, 1997 | May 23, 1994 |
| US | 5,724,449 | Mar. 3, 1998 | Nov. 27, 1991 |
| US | 5,748,512 | May 5, 1998 | Feb. 28, 1995 |

---

[1]   To the extent one or more prior art patents, publications, or systems are identified in the claim charts attached as Exhibits A-H to this document, but are not included in the tables and lists below for each patent, those prior art patents, publications, or systems should also be considered as prior art to the asserted patents.

[2]   Samsung incorporates by reference all prior art references cited in the patents listed herein and/or their file histories.

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 5,752,054 | May 12, 1998 | June 6, 1995 |
| US | 5,799,107 | Aug. 25, 1998 | Oct. 15, 1997 |
| US | 5,805,676 | Sep. 8, 1998 | May 19, 1995 |
| US | 5,818,437 | Oct. 6, 1998 | July 26, 1995 |
| US | 5,835,635 | Nov. 10, 1998 | June 27, 1995 |
| US | 6,008,799 | Dec. 28, 1999 | May 24, 1994 |
| US | 6,018,342 | Jan. 25, 2000 | July 3, 1995 |
| US | 7,136,710 | Nov. 14, 2006 | Dec. 23, 1991 |

2.    **Publications**[3]

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| A Modular and Flexible Architecture for an Integrated Corpus Query System | July 1994 | Oliver Christ | Cornell University |
| A Pen-Based Database Interface for Mobile Computers | 1994 | Rafael Alonso and V.S. Mani | Institute of Electrical and Electronics Engineers |
| Adaptive and Predictive Techniques in a Communication Prosthesis | 1987 | Andrew L. Swiffin, John L. Arnott, J. Adrian Pickering, and Alan F. Newell | Informa Healthcare |
| Adaptive predictive text generation and the reactive keyboard | 1989 | John Darragh, John Joseph | University of Calgary |
| A Stylus-Based User Interface for Text: Entry and Editing | June 1991 | Aaron Goodisman | Massachusetts Institute of Technology |
| Adaptive predictive text generation and the reactive keyboard | 1991 | John J. Darragh and Ian H. Witten | Elsevier |
| Context and Orientation in Hypermedia Networks | 1989 | Kenneth Utting and Nicole Yankelovich | Association for Computing Machinery |
| Designing the User Interface | 1992 | Ben Schneiderman | Addison-Wesley |
| Enhancing the Usability of an Office Information System Through Direct Manipulation | Dec. 1983 | Alison Lee and F.H. Lochovsky | Association for Computing Machinery |
| Facilitating the Development of Representations in Hypertext with IDE | Nov. 1989 | Daniel S. Jordan, Daniel M. Russell, Anne-Marie S. | Association for Computing Machinery |

---

[3]   Samsung incorporates by reference all prior art references identified in the publications listed herein.

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| | | Jensen, and Russell A. Rogers | |
| IBM Simon User's Manual | 1994 | | IBM |
| Investigations into History Tools for User Support | Apr. 1992 | Alison Lee | University of Toronto |
| Marquise: Creating Complete User Interfaces by Demonstration | Apr. 1993 | Brad A. Myers, Richard G. McDaniel, and David S. Kosbie | Association for Computing Machinery |
| Microsoft Foundation Class Primer | 1993 | Jim Conger | Waite Group Press |
| Pen Computing: A Technology Overview and a Vision | July 1995 | Andre Meyer | Association for Computing Machinery |
| Predictive interfaces: What will they think of next? | Nov. 1991 | Saul Greenberg, John Darragh, David Maulsby, and Ian H. Witten | University of Calgary |
| Predictive interfaces: What will they think of next? | 1995 | Saul Greenberg, John Darragh, David Maulsby, and Ian H. Witten | Association for Computing Machinery |
| Reducing Keystroke Counts with a Predictive Computer Interface | 1982 | Ian H. Witten, John G. Cleary, John J. Darragh, and David R. Hill | Institute of Electrical and Electronics Engineers |
| Software Interface for the Touch-Sensitive Menu of the Technician's Assister System | Dec. 20, 1990 | Joseph A. Molnar and Sonia Faletti | Defense Technical Information Center |
| Split Menus: Effectively Using Selection Frequency to Organize Menus | Mar. 1994 | Andrew Sears and Ben Schneiderman | Association for Computing Machinery |
| Supporting command reuse: empirical foundations and principles | Feb. 1993 | Saul Greenberg and Ian H. Witten | Academic Press |
| Supporting Command Reuse: Mechanisms for Reuse | Feb. 1993 | Saul Greenberg and Ian H. Witten | Academic Press |
| The Computer User as Toolsmith: The Use, Reuse, and Organization of Computer-based Tools | 1993 | Saul Greenberg | Cambridge University Press |
| The Design of a Graphical Browsing Interface for a Hypertext System | Feb. 25, 1994 | Joslyn A.A. Smith | University of New Brunswick |
| The Human Factors of Graphic Interaction: Tasks | Dec. 1980 | James D. Foley and Peggy Chan | Defense Technical |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| and Techniques | | | Information Center |
| The Information Grid: A Framework for Information Retrieval and Retrieval-Centered Applications | Nov. 1992 | Ramana Rao, Stuart K. Card, Herbert D. Jellinek, Jock D. Mackinlay, and George G. Robertson | Association for Computing Machinery |
| The XKWIC User Manual | Aug. 2, 1995 | Oliver Christ | Institut für maschinelle Sprachverarbeitung, Universität Stuttgart |
| Tools for Supporting the Collaborative Process | Nov. 1992 | James R. Rhyne and Catherine G. Wolf | Association for Computing Machinery |
| Touch-sensitive screens: the technologies and their application | 1986 | J.A. Pickering | Elsevier |
| User modeling in interactive computer systems | 1984 | Saul Greenberg and Ian H. Witten | University of Calgary |
| Using a touchscreen for simple tasks | 1990 | John D. Gould, Sharon L. Greene, Stephen J. Boies, Antonia Meluson and Manvan Rasamny | IBM T.J. Watson Research Center |
| Using Graphic History in Browsing the World Wide Web | May 1995 | Eric Z. Ayers and John T. Stasko | Georgia Institute of Technology |

3.      **Systems**

All versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '502 Patent, including documents and source code describing the same:

- Windows 95 Preview Program Builds

Samsung reserves the right to amend these invalidity contentions to assert these references depending on the claim construction and infringement positions Apple may take as the case proceeds.  Moreover, Samsung reserves the right to use these references in combination with other

references to render the claims of the '502 Patent obvious in the event Apple takes the position that certain claim limitations are missing from the references charted in Exhibit A.

**B.      Local Patent Rule 3-3(b):  Whether Each Item Anticipates or Renders Obvious the Asserted Claims**

Plaintiff asserts claims 1-2, 4-5, 8, 11, 13-17, 20, 22-24 and 26 of the '502 Patent against Samsung in this lawsuit.  All of those claims are invalid because the '502 Patent fails to meet one or more of the requirements for patentability.  The individual bases for invalidity are provided below and in the claim charts attached as Exhibit A.  Each of the foregoing listed prior art documents, the underlying work, and/or the underlying apparatus or method qualifies as prior art under one or more sections of 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

Although Samsung has identified at least one citation per limitation for each reference, each and every disclosure of the same limitation in the same reference is not necessarily identified.  Rather, in an effort to focus the issues, Samsung has generally cited representative portions of identified references, even where a reference may contain additional support for a particular claim element.  In addition, persons of ordinary skill in the art generally read a prior art reference as a whole and in the context of other publications and literature.  Thus, to understand and interpret any specific statement or disclosure within a prior art reference, such persons would rely on other information within the reference, along with other publications and their general scientific knowledge.  Samsung may rely upon uncited portions of the prior art references and on other publications and expert testimony to provide context, and as aids to understanding and interpreting the portions that are cited.  Samsung may also rely on uncited portions of the prior art references, other disclosed publications, and the testimony of experts to establish that a person of ordinary skill in the art would have been motivated to modify or combine certain of the cited references so as to render the claims obvious.

1.      **Anticipation**

Some or all of the asserted claims of the '502 Patent are invalid as anticipated under 35 U.S.C. § 102 in view of each of the prior art references identified above and in the claim charts included in Exhibit A, which identify specific examples of where each limitation of the asserted

1   claims is found in the prior art references.  As explained above, the cited portions of prior art

2   references identified in the attached claim charts are exemplary only and representative of the

3   content and teaching of the prior art references, and should be understood in the context of the

4   reference as a whole and as they would be understood by a person of ordinary skill in the art.

5                  2.   **Obviousness**

6         To the extent any limitation is deemed not to be exactly met by an item of prior art listed

7   above and in Exhibit A, then any purported differences are such that the claimed subject matter as

8   a whole would have been obvious to one skilled in the art at the time of the alleged invention, in

9   view of the state of the art and knowledge of those skilled in the art.  The item of prior art would,

10  therefore, render the relevant claims invalid for obviousness under 35 U.S.C. § 103(a).

11        In addition, the references identified above render one or more asserted claims of the '502

12  Patent obvious when the references are read in combination with each other, and/or when read in

13  view of the state of the art and knowledge of those skilled in the art.  Each and every reference

14  identified is also relevant to the state of the art at the time of the alleged invention.  Any of the

15  references disclosed above may be combined to render obvious (and therefore invalid) each of

16  Plaintiff's asserted claims.  Samsung may rely upon a subset of the above identified references or

17  all of the references identified above, including all references in Exhibit A, for purposes of

18  obviousness depending on the Court's claim construction, positions taken by Apple during this

19  litigation, and further investigation and discovery.

20        Moreover, to the extent the foregoing references are found not to anticipate the asserted

21  claims, the foregoing references render the asserted claims obvious either alone or in combination

22  with one or more of the other references identified above pursuant to P.R. 3-3(a).  As explained

23  herein and/or in the accompanying charts, it would have been obvious to a person of skill in the art

24  at the time of the alleged invention of the asserted claims of the '502 Patent to combine the various

25  references cited herein so as to practice the asserted claims of the '502 Patent.

26        Motivations to combine the above items of prior art are present in the references

27  themselves, the common knowledge of one of ordinary skill in the art, the prior art as a whole, or

28  the nature of the problems allegedly addressed by the '502 Patent.  Combining the references

disclosed in Exhibit A would have been obvious, as the references identify and address the same technical issues and suggest very similar solutions to those issues. Samsung reserves the right to amend or supplement these invalidity contentions to identify additional reasons that combining the references would be obvious to one of ordinary skill in the art.

In accordance with P.R. 3-3(b), prior art references rendering the asserted claims obvious, alone or in combination with other references, including identification of combinations showing obviousness, are identified in Exhibits A-1 to A-6, which includes exemplary claim charts for the asserted claims of the '502 Patent showing specifically where in each reference or combinations of references each asserted claim is found, and an explanation of why the prior art renders the asserted claim obvious.

In addition to the specific combinations of prior art and the specific combinations of groups of prior art disclosed, Samsung reserves the right to rely on any other combination of any prior art references disclosed herein. Samsung further reserves the right to rely upon combinations disclosed within the prosecution history of the references cited herein.

The obviousness combinations set forth in these contentions reflect Samsung's present understanding of the potential scope of the claims that Plaintiff appears to be advocating and should not be seen as Samsung's acquiescence to Plaintiff's interpretation of the patent claims. Samsung reserves the right to amend or supplement these contentions regarding anticipation or obviousness of the asserted claims, in view of further information from Plaintiff, information discovered during discovery, or a claim construction ruling by the Court. Plaintiff has not identified what elements or combinations it alleges were not known to one of ordinary skill in the art at the time. Therefore, for any claim limitation that Plaintiff alleges is not disclosed in a particular prior art reference, Samsung reserves the right to assert that any such limitation is either inherent in the disclosed reference or obvious to one of ordinary skill in the art at the time in light of the same, or that the limitation is disclosed in another of the references disclosed above and in combination would have rendered the asserted claim obvious.

### C.  Local Patent Rule 3-3(c):  Charts Identifying where Specifically in each Alleged item of Prior Art each Asserted Claim is Found

Pursuant to Local Patent Rule 3-3(c), charts identifying where specifically in each alleged item of prior art each limitation of each asserted claim is found, including for each limitation that Samsung contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function is attached in Exhibits A-1 to A-6.

### D.  Local Patent Rule 3-3(d):  Other Grounds for Invalidity

Samsung identifies the following grounds for invalidity of the asserted claims of the '502 Patent based on 35 U.S.C. §§ 101 and/or 112 ¶¶ 1 and 2.  Samsung reserves the right to supplement these disclosures based on further investigation and discovery.

#### 1.  Invalidity Based on 35 U.S.C. § 101

The asserted claims of the '502 Patent are invalid under 35 U.S.C. § 101 because they only claim abstract ideas.  Many limitations in the asserted claims are common abstractions in computer systems and programming languages.  For example, "a list of choices is produced", "stores historical information", "the select choice is input into said computer system and displayed", "determining whether the user has selected an item", "assigning a data value", "determining whether the data value already exists", "adding the data value", "data values within the history table correspond directly or indirectly or input values", "updating the usage information" each refer only to programming abstractions or the manipulation of information; these are concepts, not physical objects or tangible matter.

#### 2.  Invalidity Based on Enablement or Written Description Under 35 U.S.C. § 112(1) and/or Invalidity Based on Indefiniteness Under 35 U.S.C. § 112(2)

Samsung asserts that each asserted claim of the '502 Patent is invalid in that the '502 specification fails to particularly point out and distinctly claim the alleged invention of the '502 Patent.  Samsung further asserts that each asserted claim of the '502 Patent is invalid as not containing a written description of the invention, and of the manner and process of making and

using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the alleged invention.

Based on Samsung's present understanding of Plaintiff's infringement contentions, Samsung asserts that claims 1, 2, 5, 8, 11, 15-17, 20, 23-24, 26 of the '502 Patent are invalid for reciting the following claim terms/phrases:

- "input tablet"

- "field of a form" / "field of the form" / "a form having at least one field" / "a form"

- "a list of choices is produced from said history table"

- "historical information concerning usage of data values" / "usage information"

- "history table for the field class corresponding to the field is updated" / "updating the history list" / "updating the history table" / "updating the usage information corresponding to the data value to reflect its recent usage"

- "requiring data input" / "requiring data entry"

- "field class corresponding to the field" / "the field being associated with one of the field classes"

- "selecting the history list for the field based on the field class associated with the field"

- "a history list associated with the field class"

- "determining whether the user has selected an item from the displayed history list" / "assigning a data value for the field to that of a data value associated with the selected item"

- "identifying the history table for the field class associated with the field"

- "for the field class"

These claim terms/phrases as apparently construed by Apple violate the written description, enablement, and/or definiteness requirements of 35 U.S.C. § 112.

Based on Samsung's present understanding of Plaintiff's infringement contentions, at least one or more of these claim terms/phrases are indefinite because they are inconsistent with and broader than the alleged invention disclosed in the specification and given Plaintiff's apparent constructions of the claims, any person of ordinary skill in the art at the time of the invention

would not understand what is claimed, even when the claims are read in light of the specification. Moreover, based on Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted claims in which these claim terms/phrases appear lack written description because the specification of the '502 Patent demonstrates that the patentee neither conceived of nor demonstrated possession of all that Apple now contends the claims cover.

Samsung further asserts that claim 26 is invalid for reciting at least the following claim terms/phrases:

- "computer readable code devices for displaying . . ."
- "computer readable code devices for determining . . ."
- "computer readable code devices for assigning . . ."
- "computer readable code devices for updating . . ."

Each of these claims is governed by 35 U.S.C. § 112, paragraph 6.  The '502 patent specification, however, fails to set forth the structure, material or acts for accomplishing the claimed computer readable code devices.  Each of these claims is therefore invalid as indefinite under 35 U.S.C. § 112(2).

In addition, based on Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted claims in which these claim terms/phrases appear are invalid because the specification fails to provide sufficient disclosure to enable any person of ordinary skill in the art to which it pertains, or with which it is most nearly connected, to implement the invention without undue experimentation.

For at least the reasons set forth above, the claims fail to satisfy the requirements of § 112 ¶¶ 1 and 2.

## II.      THE '647 PATENT

### A.      Local Patent Rule 3-3(a):  Identification of Prior Art

At this time, Samsung contends that at least the following prior art references anticipate or render obvious, either alone or in combination, the asserted claims of the '647 Patent:

1.    **Patent References**[4]

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| JP | H6-342426 | Dec. 13, 1994 | May 31, 1993 |
| JP | H2-184155 | July 18, 1990 | Jan. 11, 1989 |
| JP | H2-158875 | June 19, 1990 | Dec. 13, 1988 |
| KP | 1995-0007892B1 | Sep. 15, 1994 | Feb 1, 1993 |
| EP | 0 458 563 | May 20, 1991 | May 21, 1990 |
| EP | 369013A1 | Feb. 15, 1995 | Jul. 31, 1987 |
| EP | 458563A2 | Nov. 27, 1991 | May 21, 1990 |
| EP | 635808A2 | Jan. 25, 1995 | Jul., 21, 1993 |
| USA | 4,227,245 | Oct. 7, 1980 | Jun. 1, 1972 |
| USA | 4,818,131 | Apr. 4, 1989 | Dec. 29, 1985 |
| JP | 5027962A | Feb. 5, 1993 | July 22, 1991 |
| USA | 5,101,424 | Mar. 31, 1193 | Sep. 8, 1990 |
| USA | 5,212,792 | May 18, 1993 | June 1, 1989 |
| USA | 5,261,042 | Nov. 9, 1993 | Nov. 20, 1989 |
| USA | 5,301,350 | Apr. 5, 1994 | Oct. 10, 1989 |
| USA | 5,359,317 | Oct. 25, 1994 | Oct. 9, 1992 |
| USA | 5,369,778 | Nov. 29, 1994 | Aug. 21, 1987 |
| USA | 5,375,200 | Dec. 20, 1994 | Nov. 13, 1992 |
| USA | 5,375,201 | Dec. 20, 1994 | Dec. 18, 1992 |
| USA | 5,398,336 | Mar. 14, 1995 | Oct. 16, 1990 |
| USA | 5,418,717 | May 23, 1995 | Aug. 27, 1990 |
| USA | 5,437,036 | Jul. 25, 1995 | Sep. 3, 1992 |
| USA | 5,463,772 | Oct. 31, 1995 | Apr. 23, 1993 |
| USA | 5,483,352 | Jan. 9, 1996 | Aug. 27, 1992 |
| USA | 5,572,643 | Nov. 5, 1996 | Oct. 19, 1995 |
| USA | 5,604,897 | Feb. 18, 1997 | May 18, 1990 |
| USA | 5,606,712 | Feb. 25, 1997 | July 19, 1993 |
| USA | 5,634,124 | May 27, 1997 | Aug. 21, 1987 |
| USA | 5,649,222 | Jul. 15, 1997 | May 8, 1995 |
| USA | 5,671,427 | Sep. 23, 1997 | Oct. 12, 1994 |
| USA | 5,737,734 | Apr. 7, 1998 | Sep. 15, 1995 |
| USA | 5,774,729 | June 30, 1998 | Dec. 19, 1991 |
| USA | 5,787,432 | Jul. 28, 1998 | Dec. 6, 1990 |
| USA | 5,790,793 | Aug. 4, 1998 | Apr. 4, 1995 |
| USA | 5,799,268 | Aug. 25, 1998 | Sep. 28, 1994 |
| USA | 5,859,636 | Jan. 12, 1995 | Dec. 27, 1995 |
| USA | 5,905,890 | May 18,1999 | Oct. 27, 1993 |
| USA | 5,995,106 | Nov. 30, 1999 | May 24, 1993 |
| USA | 6,115,710 | Sep. 5, 2000 | Sep. 28, 1989 |
| USA | 6,259,446 | July 10, 2001 | Dec. 23, 1992 |
| USA | 6,678,706 | Jan. 13, 2004 | Apr. 18, 1991 |
| USA | 7,006,881 | Feb. 28, 2006 | Dec. 23, 1991 |

---

[4]   Samsung incorporates by reference all prior art references cited in the patents listed herein and/or their file histories.

2.    **Publications**[5]

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| A Fast Algorithm for Multi-Pattern Searching | May 1994 | Sun Wu | N/A |
| A Methodology for the Automatic Construction of a Hypertext for Information Retrieval. | 1993 | Maristella Agosti; Fabio Crestani | N/A |
| A Relaxation Method for Understanding Speech Utterances. | 1992 | Stephanie Seneff | N/A |
| A System For Discovering Relationships by Feature Extraction from Text Databases | Aug 1994 | Jack G. Conrad and Mary Hunter Utt | N/A |
| A Taxonomy of See-Through Tools. | Apr. 24-28, 1994 | Eric A. Bier; Maureen C. Stone; Ken Fishkin; William Buxton; Thomas Baudel | N/A |
| A Template Matcher for Robust NL Interpretation. | 1991 | Eric Jackson; Douglas Appelt; John Bear; Robert Moore; Ann Podlozny | N/A |
| Actions (scripts) - Actions are AppleScript scripts which perform tasks using the detected text. | 1997 | Apple Computer | N/A |
| Actions (scripts) - Tips and Tricks | 1997 | Apple Computer | N/A |
| Actions (scripts) - Writing AppleScript Actions for Detectors | 1997 | Apple Computer | N/A |
| Actions (scripts) - Writing AppleScript Actions for Detectors (extracting the detected text) | 1997 | Apple Computer | N/A |
| Actions (scripts) - Writing AppleScript Actions for Detectors (Running the Script) | 1997 | Apple Computer | N/A |
| Actions (scripts) - Writing AppleScript Actions for Detectors (Script Body) | 1997 | Apple Computer | N/A |
| Actions (scripts) - Writing AppleScript Actions for Detectors (USCityState Detector) | 1997 | Apple Computer | N/A |
| Agents of Alienation. | Jul. 1995 | Jaron Lanier | N/A |

[5]    Samsung incorporates by reference all prior art references identified in the publications listed herein.

| Title | Date of Publication | Author | Publisher |
|-------|---------------------|--------|-----------|
| Agents that Reduce work and Information Overload. | Jul. 1994 | Patti Maes | N/A |
| An Efficient Context-Free Parsing Algorithm. | Apr. 1969 | Jay Earley | N/A |
| An Open Agent Architecture. | 1994 | Philip R. Cohen; Adam Cheyer; Michelle Wang; Soon Cheol Baeg | N/A |
| Anaphora in a Wider Context: Tracking Discourse Referents. | 1996 | Christopher Kennedy; Branimir Boguraev | N/A |
| Apple Developer CD Series | Including but not limited to Nov. 1992, Dec. 1993, Mar. 1994, Jun. 1994, Sep. 1994, Dec. 1994, Jun. 1995, Aug. 1995, Sep. 1995, Nov. 1995, Dec. 1995, Feb. 1996, Mar. 1996, Jun. 1996, Aug. 1996, and Nov. 1996 | Apple Developer Group | N/A |
| Apple Human Interface Guidelines | 1992 | | N/A |
| Apple Newton – Backing up pre-installed software packages using a storage card | 1995 | N/A | N/A |
| Apple Newton – Features of the Newton 2.0 Operating System | Undated | N/A | N/A |
| Apple Newton – Flow Charts | Undated | N/A | N/A |
| Apple Newton – Hardware Guide | Undated | Joe Tate | N/A |
| Apple Newton – Internal Serial Slot Designer's Guide | Undated | N/A | N/A |
| Apple Newton – Message Pad Accessories | Undated | N/A | N/A |
| Apple Newton – Message Pad Handbook | 1995 | N/A | N/A |
| Apple Newton – Message Pad Specifications | Undated | N/A | N/A |
| Apple Newton – Programmer's Guide | Undated | Don Mills | N/A |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Apple Newton – Programmer's Reference | Undated | N/A | N/A |
| Apple Newton – ROM Board Designer's Guide | Undated | N/A | N/A |
| Apple Newton – Solutions Guide vol. 1 & 2 | 1995 | David Nagel | N/A |
| Apple Newton – System Update 1.3 | 1995 | N/A | N/A |
| Applescript – The Easy Way is the Right Way | 1998 | Apple Computer, Inc. | N/A |
| At Macworld, Apple failed to regain believers among the once faithful | Jan. 13, 1997 | Denise Caruso | N/A |
| Automatic Authoring and Construction of Hypermedia for Information Retrieval. | Feb. 1995 | Maristella Agosti; Massimo Melucci; Fabio Crestani | N/A |
| Automatic Hypertext Construction. | Jan. 1995 | James Allan | N/A |
| Automatic Structuring and Retrieval of Large Text Files | Feb. 1994 | Gerard Salton, James Allan, and Chris Buckley | Association for Computing Machinery |
| Automatic Text Processing: The Transformation, Analysis, and Retrieval of Information by Computer | 1989 | Gerard Salton | N/A |
| Automatic Text Structuring and Retrieval – Experiments in Automatic Encyclopedia Searching. | 1991 | Gerard Salton; Chris Buckley | N/A |
| Byte cover story entitled "The Point of the Pen" | Feb. 1991 | Robert Carr | McGraw-Hill |
| Cambridge Journals, "National Language Engineering" | Mar. 1995 | N/A | N/A |
| Collaborative Programmable Intelligent Agents. | 1998 | Bonnie A. Nardi; James R. Miller; David J. Wright | N/A |
| Complete Guide to the NextStep User Environment. | 1993 | Michael B. Shebanek | N/A |
| Connecting – With Your EO Cellular Module | 1992 | Ann Cullen | EO Publications |
| Converting a Textbook to Hypertext | July 1992 | Roy Rada | Association for Computing Machinery |
| Creating Highly-Interactive and Graphical User Interfaces by Demonstration. | Aug. 1986 | Brad A. Myers; William Buxton | N/A |
| Creating User Interfaces Using Programming by Example, | Apr. 1990 | Brad A. Myers | N/A |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Visual Programming, and Constraints. | | | |
| Currency Detectors | 1997 | Apple Computer | N/A |
| CyberDesk: A Framework for Providing Self-Integrating Context-Aware Services. | 1998 | Anind K. Dey; Gregory D. Abowd Andrew Wood | N/A |
| Data Detectors – summary | 1997 | Apple Computer | N/A |
| Demonstrational Techniques for Instructible Interface Agents. | Mar. 1994 | Henry Lieberman | N/A |
| Detectors - definition | 1997 | Apple Computer | N/A |
| Developing Adaptive Systems To Fit Individual Aptitudes. | 1992 | David Benyon; Dianne Murray | N/A |
| Developing for the User | May 19, 1988 | Robert Carr | M&T Publishing |
| "Dexter With Open Eyes," | February 1994 | John L. Leggett and John L. Schnase | Communications of the Association for Computing Machinery, |
| Documents as User Interfaces. | 1991 | Eric A. Bier; Ken Pier | N/A |
| Downloading the Apple Data Detectors SDK for developers. | 1997 | Apple Computer | N/A |
| Dr. Dobb's Journal Article entitled, "A Conversation with Robert Carr Part II" | Dec. 1991 | Michael Swaine | M&T Publishing |
| Dr. Dobb's Journal of Software Tools for the Professional Programmer – Avoiding Software Pitfalls | May 19, 1988 | N/A | M&T Publishing |
| Dr. Dobb's Journal of Software Tools for the Professional Programmer –  Operating System Platforms | Nov. 1991 | N/A | M&T Publishing |
| Drop Zones: An Extension to LiveDoc. | Apr. 1998 | Thomas Bonura; James R. Miller | N/A |
| Eager Demonstration Video | 1991 | Allen Cypher | N/A |
| Eager: Programming Repetitive Tasks By Example. | Apr 28-May 2, 1991 | Allen Cypher | N/A |
| Effective Video Screen Displays: Cognitive Style and Cuing Effectiveness | Jan. 1994 | Kenneth A. Cory | SIGCHI Bulletin |
| Embedded Menus:  Selecting Items in Context | 1986 | Larry Koved; Ben Shneiderman | N/A |
| Embedded Menus: Selecting Items In Context | Apr. 1986 | Larry Koved and Ben Schneiderman | Association for Computing Machinery |
| Embedded Menus: Selecting Items in Context, ACM Vol. 29 No. 4 | Apr. 1986 | Larry Koved; Ben Schneiderman | N/A |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| EmbeddedButtons: Documents as User Interfaces | Nov. 1991 | Eric A. Bier | Association for Computing Machinery |
| Entering the World-Wide Web: A Guide to Cyberspace. | Mar. 1994 | Kevin Hughes | N/A |
| Experiments with Oval: A Radically Tailorable Tool for Cooperative Work. | Apr. 1995 | Thomas W. Malone; Kum-Yew Lai; Christopher Fry | N/A |
| Exploring EXPECT: A Tcl-based Toolkit for Automating Interactive Programs. | Dec. 1, 1994 | Don Libes | N/A |
| Finding and Reminding File Organization from the Desktop. | Jul. 1995 | Deborah Barreau; Bonnie A. Nardi | N/A |
| Formal Languages and Their Relation to Automata | 1969 | John Hopcroft and Jeffrey Ullman | Addison-Wesley |
| Fortune article entitled "Hot New PCs That Read Your Writing" | Feb. 11, 1991 | Brenton R. Schlender | The Time Inc Magazine Company |
| From documents to objects: An overview of LiveDoc. | Apr. 1998 | Jim Miller; Thomas Bonura | N/A |
| FYI, revised draft URL document | Aug. 5, 1994 | Tim Berners-Lee, Larry Masinter, Mark McCahill | N/A |
| Getting Results with Microsoft Office. | 1995 | Microsoft | N/A |
| Getting Started – With Your EO Personal Communicator | 1992 | Ann Cullen | EO Publications |
| Getting Started with PenPoint [Version 1.0] | 1992 | N/A | N/A |
| GNU Emacs:  UNIX Text Editing and Programming. | 1992 | Michael A. Schoonover; John S. Bowie; William R. Arnold | N/A |
| GNU Emacs: goto-addr.el extension | Aug. 15, 1995 | Eric Ding | N/A |
| GO Corporation – At Last, Technology Harnesses One of The Most Powerful Forces Known to Man | 1991 | N/A | N/A |
| Go Corporation Business Plan | June 23, 1988 | N/A | N/A |
| GO Corporation Current Status & Future Goals | Undated | N/A | N/A |
| Graphical Search and Replace. | Aug. 1988 | David Kurlander | N/A |
| Handwritten Notes –  Dr. Dobbs - "Designing Apps" | Undated | N/A | N/A |
| Handwritten Notes –  Software Development "Tips" | Undated | N/A | N/A |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Handwritten Notes – "Key Philosophies of FW" | Undated | N/A | N/A |
| HieNet: A User-Centered Approach for Automatic Link Generation. | Nov. 1993 | Daniel T. Chang | N/A |
| http://graphcomp.com/info/specs/nets/ddeapi.html, April 1995 ("DDE") | Apr. 1995 | N/A | N/A |
| Hypertext: Concepts, Systems and Applications. | Nov. 1990 | N. Streitz; A. Rizk; J. Andre | N/A |
| Incorporating String Search in a Hypertext System: User Interface and Signature File Design Issues | 1990 | Faloutsos, Raymond Lee, Catherine Plaisant and Ben Shneiderman | HyperMedia |
| Incremental maintenance of semantic links in dynamically changing hypertext systems | 1990 | Simon M. Kaplan and Yoelle S. Maarek | Butterworth–Heinemann |
| Information For Developers" sheet | Undated | N/A | N/A |
| Intelligent Agents: What We Learned At The Library. | 1996 | Bonnie A. Nardi; Vicki O'Day | N/A |
| Interactive Constraint-Based Search And Replace. | May 3-7, 1992 | David Kurlander; Steven Feiner | N/A |
| Internet Address Detectors | 1997 | Apple Computer | N/A |
| Learning Perl | 1993 | Randall L. Schwartz | O'Reilly & Associates |
| Letter, The Indsiders Guide to The Personal Computer Industry, article entitled "Operating Systems GO's Got The Most Modern OS Around" | Jan. 28, 1991 | N/A | Industry Publishing Company |
| Looking for the Bright Side of User Interface Agents. | Jan. 1995 | Ben Schneiderman | N/A |
| Lookup Guide to the EO Personal Communicator | 1993 | Ann Cullen | EO Publications |
| Lotus Notes Application Development Handbook. | May 1995 | Erica Kerwien | N/A |
| The Lynx_users_guide.html file ("Lynx User Guide") entitled "Lynx User Guide Version 2.3" | May, 20, 1994 | N/A | N/A |
| Mac OS Discussion Forum – Apple Script | 1998 | Apple Computer | N/A |
| Managing Internet Information Services | 1994 | Cricket Liu | O'Reilly & Associates |
| Microsoft Foundation Class Primer | 1993 | Jim Conger | Waite Group Press |
| Multi-media RISSC Informatics Receiving Information with | 1986 | Daniela Rus; Devika | N/A |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Structural Structural Components. | | Subramanian | |
| N2 Newton – Overview | Jul. 22, 1996 | N/A | N/A |
| N2 Newton – Power Adaptor Designer's Guide | Undated | N/A | N/A |
| N2 Newton – Power System Architecture | Undated | N/A | N/A |
| Newton Programmers Guide | 1994 | | Addison-Wesley |
| Parsing Techniques – a Practical Guide | 1990 | Dick Grune and Ceriel Jacobs | Ellis Horwood, Chichester |
| PC Magazine article entitled "First Looks, Hands-on Reviews of the Latest Products" | June 30, 1992 | Bruce Brown | N/A |
| PC Magazine article entitled "Power Programming, An Introduction to Pen-Based Computing" | Jan. 14, 1992 | Ray Duncan | N/A |
| PC Week article entitled "PenPoint Makes Its Debut with Support from 40 ISVs" | Apr. 20, 1992 | Erica Schroeder | N/A |
| PenApps Developer's Release – Software Development Kit | Undated | N/A | N/A |
| PenPoint - A Catalog of Products and Services | 1992 | N/A | N/A |
| PenPoint 1.01 SDK Installation and Release Notes | Sep. 27, 1992 | N/A | N/A |
| PenPoint API Reference Volume I | 1990 | N/A | Addison-Wesley |
| PenPoint Architectural Reference Volume I | 1991 | N/A | Addison-Wesley |
| PenPoint Architectural Reference Volume II | 1991 | N/A | Addison-Wesley |
| PenPoint Development Tools | 1991 | N/A | Addison-Wesley |
| PenPoint Getting Started | 1991 | N/A | N/A |
| PenPoint Introduction letter re Software Development Kit | Undated | N/A | N/A |
| PenPoint News Release "GO Announces PenPoint Operating System For Mobile Pen-based Computing" | Jan. 22, 1991 | N/A | N/A |
| PenPoint Notebook User Interface | 1991 | N/A | N/A |
| Penpoint Programming | 1992 | Andy Novobilski | Addison-Wesley |
| PenPoint User Interface Design Reference | 1991 | N/A | Addison-Wesley |
| Perspective Handbook | Nov. 1992 | N/A | |
| Pocket Guides – Eleven Basic PenPoint Gestures | 1991 | N/A | |
| POSIX Programmer's Guide | 1994 | Donald Lewine | O'Reilly & |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Writing Portable UNIX Programs | | | Associates |
| Programming Perl | 1991 | Larry Wall and Randall L. Schwartz | O'Reilly & Associates |
| Programming Windows: the Microsoft guide to writing applications for Windows 3 | 1990 | Charles Petzold | Microsoft Press |
| Release 1.0 – A Monthly Report | Jan. 22, 1991 | Esther Dyson | |
| Remote Interfaces and File System, Text and Handwriting Classes, Application Classes, Installation Classes, Miscellaneous Classes, and Windows & UI Toolkit Control Classes | Undated | N/A | N/A |
| Searching for the Missing Link: Discovering Implicit Structure in Spatial Hypertext | Nov. 1993 | Catherine C. Marshall and Frank M. Shipman III | Association for Computing Machinery |
| sed & awk | 1991 | Dale Dougherty | O'Reilly & Associates |
| Sidekick – The Desktop Organizer Just a Keystroke Away | 1985 | N/A | Borland International |
| Sidekick – The Desktop Organizer Just a Keystroke Away (Special Edition for AST Research Inc.) | Mar. 1985 | N/A | Borland International |
| Sidekick 2.0 Getting Started | 1991 | N/A | Borland International |
| Sidekick 2.0 User's Guide | 1991 | N/A | Borland International |
| Sidekick software and screenshots, version 1.52A | 1985 | N/A | N/A |
| Sidekick Version 1.5 Owner's Handbook | Mar. 1995 | N/A | Borland International Inc. |
| The Simon User Manual1 | 1994 | N/A | IBM |
| The AT&T EO Travel Guide | 1993 | Ken Maki | John Wiley & Sons, Inc. |
| The Computing Strategy Report | Mar. 1991 | William M. Bluestein and John C. McCarthy | Forrester Research Inc |
| The file mhonarc (the mail MHonArc Perl script) from the top level of the MHonArc distribution | Oct. 1, 1994 | N/A | N/A |
| The file mhonarc.txt from the doc directory of the MHonArc distribution | Oct. 1, 1994 | N/A | N/A |

| Title | Date of Publication | Author | Publisher |
|-------|---------------------|--------|-----------|
| The Mosaic Handbook for Microsoft Windows | 1994 | Dale Dougherty and Richard Koman | O'Reilly & Associates |
| The UNIX Programming Environment | 1984 | Brian W. Kernighan and Rob Pike | Prentice-Hall Inc. |
| The Windows Interface Guidelines — A Guide for Designing Software | Feb. 13, 1995 | N/A | N/A |
| The World of Messaging – An Introduction to Personal Communications | 1992 | Randy Stock | EO Publications |
| UNIX Applications Programming Mastering the Shell | 1990 | Ray Swartz | SAMS |
| UNIX in a Nutshell | 1994 | Daniel Gilly and the staff of O'Reilly & Associates, Inc. | O'Reilly & Associates |
| UNIX System V/386 Programmer's Reference Manual | 1988 | N/A | Prentice Hall |
| User interface design for the Hyperties electronic encyclopedia | Nov. 1987 | Ben Schneiderman | N/A |
| Using PenPoint [Version 1.0] | 1992 | N/A | N/A |
| Using Sidekick: The Desktop Organizer | 1988 | Phillp R. Robinson | McGraw-Hill |
| Visual Basic 4 Unleashed | 1995 | Conrad Scott et al. | Sams Publishing |

3.    **Systems**

All versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '647 Patent, including documents and source code describing the same:

- Apple Message Pad

- Apple Newton

- AppleScript and/or Open Scripting Architecture

- Eager

- EO Personal Communicator 448 and 880

1
- Eudora

2
- GNU Emacs

3
- GriD Systems

4
- Homer

5
- Hypertext

6
- IBM ThinkPad 700T

7
- Internet Explorer

8
- Lotus Notes

9
- Lynx System

10
- mIRC

11
- Mosaic

12
- NCR 3125 and 3130

13
- NCSA Mosaic for X Window System Version 2.4

14
- Netscape Navigator

15
- Newton Operating System

16
- NeXTSTEP, NeXTStep, and/or OpenSTEP, including NXSpellChecker and NXSpellServer

17
- PenPoint Operating System

18
- Perspective

19
- Selection Recognition Agent

20
- Sidekick

21
- Simon

22
- SNOBAL

23
- Third-party software for Newton Operating System

24
- Third-party software for PenPoint Operating System, including but not limited to all editions of PenSoft Perspective

25
- Visual Basic

1

•     Visual CE

2

•     Windows 95 Beta

3

•     WordPerfect

4

•     X Window System

5

6

7

8

9

Samsung reserves the right to amend these invalidity contentions to assert these references depending on the claim construction and infringement positions Apple may take as the case proceeds.  Moreover, Samsung reserves the right to use these references in combination with other references identified above to render the claims of the '647 Patent obvious in the event Apple takes the position that certain claim limitations are missing from the references charted in Exhibit B.

10

11

**B.     Local Patent Rule 3-3(b):  Whether Each Item Anticipates or Renders Obvious the Asserted Claims**

12

13

14

15

16

17

Plaintiff asserts claims 1-2, 4, 6 and 8-9 of the '647 Patent against Samsung in this lawsuit. All of those claims are invalid because the '647 Patent fails to meet one or more of the requirements for patentability.  The individual bases for invalidity are provided below and in the claim charts attached as Exhibit B.  Each of the foregoing listed prior art documents, the underlying work, and/or the underlying apparatus or method qualifies as prior art under one or more sections of 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

18

19

20

21

22

23

24

25

26

27

28

Although Samsung has identified at least one citation per limitation for each reference, each and every disclosure of the same limitation in the same reference is not necessarily identified. Rather, in an effort to focus the issues, Samsung has generally cited representative portions of identified references, even where a reference may contain additional support for a particular claim element.  In addition, persons of ordinary skill in the art generally read a prior art reference as a whole and in the context of other publications and literature.  Thus, to understand and interpret any specific statement or disclosure within a prior art reference, such persons would rely on other information within the reference, along with other publications and their general scientific knowledge.  Samsung may rely upon uncited portions of the prior art references and on other publications and expert testimony to provide context, and as aids to understanding and interpreting the portions that are cited.  Samsung may also rely on uncited portions of the prior art references,

1   other disclosed publications, and the testimony of experts to establish that a person of ordinary

2   skill in the art would have been motivated to modify or combine certain of the cited references so

3   as to render the claims obvious.

4                   1.     **Anticipation**

5        Some or all of the asserted claims of the '647 Patent are invalid as anticipated under 35

6   U.S.C. § 102 in view of each of the prior art references identified above and in the claim charts

7   included in Exhibit B, which identify specific examples of where each limitation of the asserted

8   claims is found in the prior art references.  As explained above, the cited portions of prior art

9   references identified in the attached claim charts are exemplary only and representative of the

10   content and teaching of the prior art references, and should be understood in the context of the

11   reference as a whole and as they would be understood by a person of ordinary skill in the art.

12                   2.     **Obviousness**

13        To the extent any limitation is deemed not to be exactly met by an item of prior art listed

14   above and in Exhibit B, then any purported differences are such that the claimed subject matter as

15   a whole would have been obvious to one skilled in the art at the time of the alleged invention, in

16   view of the state of the art and knowledge of those skilled in the art.  The item of prior art would,

17   therefore, render the relevant claims invalid for obviousness under 35 U.S.C. § 103(a).

18        In addition, the references identified above render one or more asserted claims of the '647

19   Patent obvious when the references are read in combination with each other, and/or when read in

20   view of the state of the art and knowledge of those skilled in the art.  Each and every reference

21   identified is also relevant to the state of the art at the time of the alleged invention.  In general, the

22   references disclosed above may be combined to render obvious (and therefore invalid) each of

23   Plaintiff's asserted claims.  Samsung may rely upon a subset of the above identified references or

24   all of the references identified above, including all references in Exhibit B, for purposes of

25   obviousness depending on the Court's claim construction, positions taken by Apple during this

26   litigation, and further investigation and discovery.

27        Moreover, to the extent the foregoing references are found not to anticipate the asserted

28   claims, the foregoing references render the asserted claims obvious either alone or in combination

with one or more of the other references identified above pursuant to P.R. 3-3(a).  As explained herein and/or in the accompanying charts, it would have been obvious to a person of skill in the art at the time of the alleged invention of the asserted claims of the '647 Patent to combine the various references cited herein so as to practice the asserted claims of the '647 Patent.

Motivations to combine the above items of prior art are present in the references themselves, the common knowledge of one of ordinary skill in the art, the prior art as a whole, or the nature of the problems allegedly addressed by the '647 Patent.  Combining the references disclosed in Exhibit B would have been obvious, as the references identify and address the same technical issues and suggest very similar solutions to those issues.  Samsung reserves the right to amend or supplement these invalidity contentions to identify additional reasons that combining the references would be obvious to one of ordinary skill in the art.

In accordance with P.R. 3-3(b), prior art references rendering the asserted claims obvious, alone or in combination with other references, including identification of combinations showing obviousness, are identified in Exhibits B-1 through B-14, which includes exemplary claim charts for the asserted claims of the '647 Patent showing specifically where in each reference or combinations of references each asserted claim is found, and an explanation of why the prior art renders the asserted claim obvious.

In particular, Samsung contends that the asserted claims of the '647 Patent would have been obvious in view of the prior art references identified above.  For example, Exhibit B includes exemplary claim charts that describe how the asserted claims of the '647 Patent would have been obvious in view of all references identified in Exhibit B, which, if found not to anticipate the claims of the '647 Patent, render the claims of the '647 Patent obvious alone.

In addition to the specific combinations of prior art and the specific combinations of groups of prior art disclosed, Samsung reserves the right to rely on any other combination of any

prior art references disclosed herein.  Samsung further reserves the right to rely upon combinations disclosed within the prosecution history of the references cited herein.

The obviousness combinations set forth in these contentions reflect Samsung's present understanding of the potential scope of the claims that Plaintiff appears to be advocating and should not be seen as Samsung's acquiescence to Plaintiff's interpretation of the patent claims.

Samsung reserves the right to amend or supplement these contentions regarding anticipation or obviousness of the asserted claims, in view of further information from Plaintiff, information discovered during discovery, or a claim construction ruling by the Court.  Plaintiff has not identified what elements or combinations it alleges were not known to one of ordinary skill in the art at the time.  Therefore, for any claim limitation that Plaintiff alleges is not disclosed in a particular prior art reference, Samsung reserves the right to assert that any such limitation is either inherent in the disclosed reference or obvious to one of ordinary skill in the art at the time in light of the same, or that the limitation is disclosed in another of the references disclosed above and in combination would have rendered the asserted claim obvious.

**C.**     **Local Patent Rule 3-3(c):  Charts Identifying where Specifically in each Alleged item of Prior Art each Asserted Claim is Found**

Pursuant to Local Patent Rule 3-3(c), charts identifying where specifically in each alleged item of prior art each limitation of each asserted claim is found, including for each limitation that Samsung contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function is attached in Exhibits B-1 through B-14.

**D.**     **Local Patent Rule 3-3(d):  Other Grounds for Invalidity**

Samsung identifies the following grounds for invalidity of the asserted claims of the '647 Patent based on 35 U.S.C. §§ 101 and/or 112 ¶¶ 1 and 2.  Samsung reserves the right to supplement these disclosures based on further investigation and discovery.

1.     **Invalidity Based on 35 U.S.C. § 101**

The asserted claims of the '647 Patent are also invalid under 35 U.S.C. § 101 because they only claim abstract ideas.  Many limitations in the asserted claims are common abstractions in

computer systems and programming languages.  For example, "detecting structures in data and performing actions on detected structures," "an analyzer server for detecting structures in the data, and for linking actions to the detected structures," "a user interface enabling the selection of a detected structure and a linked action," "an action processor for performing the selected action linked to the detected structure," "grammars and a parser for detecting structures in the data," "a string library and a fast string search function for detecting string structures in the data," each refer only to programming abstractions or the manipulation of information; these are concepts, not physical objects or tangible matter.

          2.    **Invalidity Based on Enablement or Written Description Under 35 U.S.C. § 112(1) and/or Invalidity Based on Indefiniteness Under 35 U.S.C. § 112(2)**

Samsung asserts that each asserted claim of the '647 Patent is invalid in that the '647 specification fails to particularly point out and distinctly claim the alleged invention of the '647 Patent.  Samsung further asserts that each asserted claim of the '647 Patent is invalid as not containing a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the alleged invention.

Based on Samsung's present understanding of Apple's infringement contentions, Samsung asserts that claims 1, 2, 4, 6, 8, and 9 of the '647 Patent are invalid for reciting at least the following claim terms/phrases:

- "input device"

- "output device"

- "program routines"

- "detecting structures in the data"

- "analyzer server"

- "linking actions to the detected structures"

- "user interface enabling the selection of a detected structure and a linked action;"

1

- "action processor"

2

- "a fast string search function for detecting string structures in the data"

3

- "highlights"

4

- "the user interface enables selection of an action by causing the output device to

5

display a pop-up menu of the linked actions."

6

7  These claim terms/phrases as apparently construed by Apple violate the written description,

8  enablement, and/or definiteness requirements of 35 U.S.C. § 112.  For instance, the term "fast

9  string search" either fails to quantify how "fast" a string search must be in order to infringe claim

10  6, or refers to a particular algorithm that is not disclosed anywhere in the claims or specification.

11          Based on Samsung's present understanding of Apple's infringement contentions, at least

12  one or more of these claim terms/phrases are indefinite because they are inconsistent with and

13  broader than the alleged invention disclosed in the specification and given Apple's apparent

14  constructions of the claims, any person of ordinary skill in the art at the time of the invention

15  would not understand what is claimed, even when the claims are read in light of the specification.

16  Moreover, based on Samsung's present understanding of Apple's infringement contentions, each of

17  the asserted claims in which these claim terms/phrases appear lack written description because the

18  specification of the '647 Patent demonstrates that the patentee neither conceived of nor

19  demonstrated possession of all that Apple now contends the claims cover.  In addition, based on

20  Samsung's present understanding of Apple's infringement contentions, each of the asserted claims

21  in which these claim terms/phrases appear are invalid because the specification fails to provide

22  sufficient disclosure to enable any person of ordinary skill in the art to which it pertains, or with

23  which it is most nearly connected, to implement the invention without undue experimentation.

24          For at least the reasons set forth above, the claims fail to satisfy the requirements of § 112

25  ¶¶ 1 and 2.

26

27

28

1

**III.     THE '959 PATENT**

2

    **A.     Local Patent Rule 3-3(a):  Identification of Prior Art**

3

    At this time, Samsung contends that at least the following prior art references anticipate or

4

render obvious, either alone or in combination, the asserted claims of the '959 Patent:

5

        1.     **Patent References[6]**

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 3,496,299 | Feb. 17, 1970 | Nov. 14, 1966 |
| US | 4,260,854 | Apr. 7, 1981 | May 20, 1975 |
| US | 5,577,241 | Nov. 19, 1996 | Dec. 7,1994 |
| US | 5,634,053 | May 27, 1997 | Aug. 29, 1995 |
| US | 5,659,732 | Aug. 19, 1997 | May 17, 1995 |
| US | 5,671,426 | Sep. 23, 1997 | June 22, 1993 |
| US | 5,742,816 | Apr. 21, 1998 | Sep. 15, 1995 |
| US | 5,748,512 | May 5, 1998 | Feb. 28, 1995 |
| US | 5,845,278 | Dec. 1, 1998 | Sep. 12, 1997 |
| US | 5,855,015 | Dec. 29, 1998 | May 12, 1995 |
| US | 5,913,205 | June 15, 1999 | Mar. 28, 1996 |
| US | 5,913,215 | June 15, 1999 | Feb. 19, 1997 |
| US | 5,937,406 | Aug. 10, 1999 | Jan. 31, 1997 |
| US | 5,987,446 | Nov. 16, 1999 | Nov. 12, 1996 |
| US | 6,000,020 | Dec. 7, 1999 | Apr. 1, 1997 |
| US | 6,005,565 | Dec. 21, 1999 | Mar. 25, 1997 |
| US | 6,008,799 | Dec. 28, 1999 | May 24, 1994 |
| US | 6,018,342 | Jan. 25, 2000 | July 3, 1995 |
| US | 6,026,429 | Feb. 15, 2000 | Nov. 10, 1997 |
| US | 6,065,003 | May 16, 2000 | Aug. 19, 1997 |
| US | 6,070,158 | May 30, 2000 | Aug. 14, 1996 |
| US | 6,078,914 | June 20, 2000 | Dec. 9, 1996 |
| US | 6,098,065 | Aug. 1, 2000 | Feb. 13, 1997 |
| US | 6,266,094 | July 24, 2001 | June 14, 1999 |
| US | 6,311,182 | Oct. 30, 2001 | Nov. 17, 1997 |
| US | 6,324,534 | Nov. 27, 2001 | Sep. 10, 1999 |
| US | 6,345,269 | Feb. 2, 2002 | Mar. 26, 1999 |
| US | 6,366,915 | Apr. 2, 2002 | Nov. 4, 1998 |
| US | 6,370,543 | Apr. 9, 2002 | May 24, 1996 |
| US | 6,415,285 | July 2, 2002 | Dec. 8, 1999 |
| US | 6,424,968 | July 23, 2002 | Oct. 15, 1998 |
| US | 6,445,834 | Sep. 3, 2002 | Oct. 19, 1998 |
| US | 6,574,632 | June 3, 2003 | Nov. 18, 1998 |
| US | 6,578,048 | June 10, 2003 | June 5, 1995 |
| US | 6,615,172 | Sep. 2, 2003 | Nov. 12, 1999 |
| US | 6,665,640 | Dec. 16, 2003 | Nov. 12, 1999 |
| US | 6,697,835 | Feb. 24, 2004 | Oct. 28, 1999 |
| US | 6,842,758 | Jan. 11, 2005 | July 30, 1999 |

    [6]   Samsung incorporates by reference all prior art references cited in the patents listed herein and/or their file histories.

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 6,845,370 | Jan. 18, 2005 | Nov. 19, 1998 |
| US | 6,862,713 | Mar. 1, 2005 | Aug. 31, 1999 |
| US | 6,901,366 | May 31, 2005 | Aug. 26, 1999 |
| US | 7,653,614 | Jan. 26, 2010 | July 15, 1999 |
| US | 7,873,995 | Jan. 18, 2011 | Sep. 29,2003 |
|  |  |  |  |
| EP | 0706139 | Published Apr. 10, 1996 | Sep. 9, 1994 |
| WO | 98/32289 | Published July 23, 1998 | Jan. 17, 1997 |

2.      **Publications**[7]

| An Information System Based on Distributed Objects | 1987 | Michael Caplinger | Computing Machinery |
|---|---|---|---|
| An Information System for Corporate Users: Wide Area Information Servers | Sep. 1991 | Brewster Kahle and Art Medler | Online |
| Annotating the World Wide Web using Natural Language | 1997 | Boris Katz |  |
| ARIADNE: A System for Constructing Mediators for Internet Sources | 1998 | Jose Luis Ambite, Naveen Ashish, Greg Barish, Craig A. Knoblock, Steven Minton, Pragnesh J. Modi, Ion Muslea, Andrew Philpot and Sheila Tejada | SIGMOD |
| Browsing Local and Global Information | 1995 | Masum Hasan, Gene Golovchinsky, Emanuel Noik, Nipon Charoenkitkarn, Mark Chignell, Alberto Mendelzon and David Modjeska | Proceedings of the 1995 conference of the Centre for Advanced Studies on Collaborative Research |
| Building the infrastructure of resource sharing: union catalogs, distributed search, and | Jan. 1, 1997 | Lynch, Clifford | Library Trends |

---

[7]   Samsung incorporates by reference all prior art references identified in the publications listed herein.

| | | | |
|---|---|---|---|
| cross-database linkage | | | |
| The Computer User as Toolsmith | 1993 | Saul Greenberg | |
| CyberDesk: A Framework for Providing Self-Integrating Ubiquitous Software Services | 1997 | Anind K. Dey, Gregory Abowd, Mike Pinkerton and Andrew Wood | |
| Dataware Technologies Introduces Dataware II Knowledge Query Server | Sep. 21, 1998 | | PR Newswire |
| Discover: A Resource Discovery System based on Content Routing | | Mark A. Sheldon, Andrzej Duda, Ron Weiss, David K. Gifford | |
| The Distributed Information Search Component (Disco) and the World Wide Web | 1997 | Anthony Tomasic, Remy Amouroux, Philippe Bonnet, Olga Kapitskaia, Hubert Naacke, Louiqa Raschid | SIGMOD |
| Doctor Linux – 5th Edition | 1997 | John Purcell, ed. | Linux Systems |
| Dragon Systems® Demonstrates First PDA Speech Recognition Technology on the Digital StrongARM Processor in Apple Newton MessagePad 2000 | March 25, 1997 | | Dragon Systems |
| The Effectiveness of GlOSS for the Text Database Discovery Problem | | Luis Gravano, Hector Garcia-Molina and Anthony Tomasic | |
| Experience the Internet's most powerful search tool | | | The WebTools Company |
| Exploring Computer Science with Scheme | 1998 | | Spinger-Verlag New York, Inc. |
| FreeWAIS-sf: A Wide Area Information Server for Structured Documents and Retrieval Functionality | | | |
| FreeWAIS-sf | Mar. 30, 1995 | Ulrich Pfeifer Tung Huynh | University of Dortmund |
| freeWAIS-sf – UNIDO Edition | Oct. 1995 | Ulrich Pfeifer | University of |

| | | | |
|---|---|---|---|
| 0.5 | | | Dortmund |
| Hemlock – An Internet Search Tool for the Newton | 1999 | Sean Luke | |
| Hemlock An Internet Search Tool for the Newton | | | |
| Heuristics – Intelligent Search Strategies for Computer Problem Solving | 1984 | Judea Pearl | Addison-Wesley |
| How to Create a WAIS Query | | | |
| Implementation of the SMART Information Retrieval System | May 1985 | Chris Bucley | |
| The Info Agent: An Interface for Supporting Users in Intelligent Retrieval | 1995 | Daniela D' Aloisi and Vittorio Giannini | |
| Infoharness: Managing Distributed, Heterogeneous Information | 1999 | Kshitij Shah and Amit Sheth | IEEE Internet Computing |
| Information Retrieval Algorithms and Heuristics | 1998 | David A. Grossman and Ophir Frieder | Kluwer Academic |
| Information Retrieval (Z39.50): Application Service Definition and Protocol Specification | 1995 | | NISO Press |
| Information Retrieval on the World Wide Web | 1997 | Venkat N. Gudivada, Vijay V. Raghavan, William I. Grosky and Rajesh Kasanagottu | IEEE Internet Computing |
| INQUERY System Overview | Undated | John Broglio, James P. Callan and W. Bruce Croft | |
| Internet Fish | May 1996 | Brian A. LaMacchia | |
| An Introduction to Multisensor Data Fusion | 1997 | David L. Hall and James Llinas | IEEE |
| Macworld Mac OS 8.5 Bible | 1999 | Lon Poole | IDG Books Worldwide |
| Mac OS 8.5 – Black Book | 1999 | Mark R. Bell and Debrah D. Suggs | The Coriolis Group, |
| Mac OS 8.5: GO FOR IT! Part I | Oct. 29 1998 | Michael Lambert | The Mac Observer |
| Mac OS 8.5: GO FOR IT! Part II | Oct. 29 1998 | Michael Lambert | The Mac Observer |
| Mac OS 8.5 Special Report | 1998 | | MacInTouch |
| MAC OS 9: The Missing Manual – Finding Files and Web Sites with Sherlock 2 | | | |

| | | | |
|---|---|---|---|
| MacWAIS Software Version 1.28 | Feb. 23, 1994 | | EINet |
| The MetaCrawler Architecture for Resource Aggregation on the Web | Nov. 8, 1996 | Erik Selberg and Oren Etzioni | |
| Microsoft Universal Data Access Platform | 1998 | Jose A. Blakeley, Michael J. Pizzo | SIGMOD |
| Microsoft Windows 98 Companion | 1998 | Martin Matthews | Microsoft Press |
| Modern Heuristic Search Methods | 1996 | V.J. Rayward-Smith, I.H. Osman, C.R. Reeves and G.D. Smith | John Wiley and Sons |
| Multiobjective Heuristic Search | 1999 | Pallab Dasgupta, P.P. Chakrabarti and S.C. Desarkar | Vieweg |
| NetHopper Version 3.0 – User's Manual | 1997 | | AllPen |
| Newton Apple MessagePad Handbook | 1995 | | Apple |
| Newton Solutions Guide | | | Apple |
| Newton Programmer's Guide | 1996 | | Addison-Wesley |
| Northern Light: New Search Engine for the Web and Full-Text Articles | Feb. 1998 | Greg Notess | Online |
| Overview of Wide Area Information Servers | Apr. 1991 | Brewster Kahle | |
| Pen Pals | Oct. 12, 1993 | Christopher Barr and Michael Neubarth | PC Magazine |
| Peter Rand's Review of Hemlock | 1999 | Peter Rand | |
| Rama: An Architecture for Internet Information Filtering | May 1, 1991 | Jim Binkley and Leslie Young | Kluwer |
| Search Algorithms Under Different Kinds of Heuristics – A Comparative Study | 1983 | A. Bagchi and A. Mahanti | Indian Institute of Management Calcutta |
| Sigerson, A Sherlock Power Booster | Dec. 2, 1998 | James Sentman | the Mac Observer |
| Sherlock Holmes am Newton | Dec. 1999 | | |
| Softscape's QuickFind Search and Retrieval Software | Nov. 1997 | Robert J. Boeri | EMedia Professional |
| Software Quality Engineering – A Total Technical and | 1988 | Michael S. Deutsch and | Prentice-Hall |

| | | | |
|---|---|---|---|
| Management Approach | | Ronald R. Willis | |
| Surviving the Storm: Using Metasearch Engines Effectively | May 1999 | Randal D. Carlson and Judi Repman | Computers in Libraries |
| Toward more comprehensive Web searching: single searching versus megasearching | 1998 | Greg R. Notess | Online |
| Unix for the Impatient | 1996 | Paul W. Abrahams and Bruce A. Larson | Addison-Wesley |
| User's Guide to the Macintosh version of the WAIS interface | 1991 | | Thinking Machines |
| WAIS, A Sketch Of An Overview | Sep. 23, 1991 | Jeff Kellem | |
| WAIS Search Help | | | |
| What is freeWAIS-sf? | | | |
| Wide Area Information Servers (WAIS) | June 1994 | M. St. Pierre, J. Fullton, K. Gamiel, J. Goldman, B. Kahle, J. Kunze, H. Morris and F. Schiettecatte | |
| Windows 98 Annoyances | Oct. 1998 | David A. Karp | O'Reilly |
| Windows 98 for Dummies | 1999 | Andy Rathbone | Wiley |
| WordPerfect for Windows V 5.2 | 1992 | | WordPerfect |
| Xerox Delivers Global Competitive Advantage to Manufacturing Customers Through Solutions Portfolio | Apr. 27, 1999 | | Business Wire |
| Xerox Introduces Two Products to Expand Knowledge Sharing Software Portfolio | Nov. 9, 1999 | | Business Wire |
| Xerox unveils "askOnce", which brings a new search dimension to end-users by giving universal access to multiple information sources through one simple query | 1999 | | Xerox |
| The Z39.50 Information Retrieval Standard – Part I: A Strategic View of Its Past, Present and Future | Apr. 1997 | Clifford A. Lynch | D-Lib Magazine |

3.      **Systems**

All versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '959 Patent, including documents and source code describing the same:

- Dragon Systems Speech Recognition
- Hemlock
- Linux
- Mac OS 8.5
- Newton 2.0
- NetHopper
- Sherlock Utility
- Unix
- WAIS protocol and WAIStation client
- Windows 98

Samsung reserves the right to amend these invalidity contentions to assert these references depending on the claim construction and infringement positions Apple may take as the case proceeds.  Moreover, Samsung reserves the right to use these references in combination with other references to render the claims of the '959 Patent obvious in the event Apple takes the position that certain claim limitations are missing from the references charted in Exhibit C.

**B.      Local Patent Rule 3-3(b):  Whether Each Item Anticipates or Renders Obvious the Asserted Claims**

Plaintiff asserts claims 1-5, 9-12, 14-17, 19-20, 22-25, 27-30 and 32-33 of the '959 Patent against Samsung in this lawsuit.  All of those claims are invalid because the '959 Patent fails to meet one or more of the requirements for patentability.  The individual bases for invalidity are provided below and in the claim charts attached as Exhibit C.  Each of the foregoing listed prior art documents, the underlying work, and/or the underlying apparatus or method qualifies as prior art under one or more sections of 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

1    Although Samsung has identified at least one citation per limitation for each reference,

2    each and every disclosure of the same limitation in the same reference is not necessarily identified.

3    Rather, in an effort to focus the issues, Samsung has generally cited representative portions of

4    identified references, even where a reference may contain additional support for a particular claim

5    element.  In addition, persons of ordinary skill in the art generally read a prior art reference as a

6    whole and in the context of other publications and literature.  Thus, to understand and interpret any

7    specific statement or disclosure within a prior art reference, such persons would rely on other

8    information within the reference, along with other publications and their general scientific

9    knowledge.  Samsung may rely upon uncited portions of the prior art references and on other

10   publications and expert testimony to provide context, and as aids to understanding and interpreting

11   the portions that are cited.  Samsung may also rely on uncited portions of the prior art references,

12   other disclosed publications, and the testimony of experts to establish that a person of ordinary

13   skill in the art would have been motivated to modify or combine certain of the cited references so

14   as to render the claims obvious.

15              1.    **Anticipation**

16   Some or all of the asserted claims of the '959 Patent are invalid as anticipated under 35

17   U.S.C. § 102 in view of each of the prior art references identified above and in the claim charts

18   included in Exhibit C, which identify specific examples of where each limitation of the asserted

19   claims is found in the prior art references.  As explained above, the cited portions of prior art

20   references identified in the attached claim charts are exemplary only and representative of the

21   content and teaching of the prior art references, and should be understood in the context of the

22   reference as a whole and as they would be understood by a person of ordinary skill in the art.

23              2.    **Obviousness**

24   To the extent any limitation is deemed not to be exactly met by an item of prior art listed

25   above and in Exhibit C, then any purported differences are such that the claimed subject matter as

26   a whole would have been obvious to one skilled in the art at the time of the alleged invention, in

27   view of the state of the art and knowledge of those skilled in the art.  The item of prior art would,

28   therefore, render the relevant claims invalid for obviousness under 35 U.S.C. § 103(a).

In addition, the references identified above and in Exhibit C render one or more asserted claims of the '959 Patent obvious when the references are read in combination with each other, and/or when read in view of the state of the art and knowledge of those skilled in the art.  Each and every reference identified is also relevant to the state of the art at the time of the alleged invention. Any of the references disclosed above may be combined to render obvious (and therefore invalid) each of Plaintiff's asserted claims.  Samsung may rely upon a subset of the above identified references or all of the references identified above, including all references in Exhibit C, for purposes of obviousness depending on the Court's claim construction, positions taken by Apple during this litigation, and further investigation and discovery.

Moreover, to the extent the foregoing references are found not to anticipate the asserted claims, the foregoing references render the asserted claims obvious either alone or in combination with one or more of the other references identified above pursuant to P.R. 3-3(a).  It would have been obvious to a person of skill in the art at the time of the alleged invention of the asserted claims of the '959 Patent to combine the various references cited herein so as to practice the asserted claims of the '959 Patent.

Motivations to combine the above items of prior art are present in the references themselves, the common knowledge of one of ordinary skill in the art, the prior art as a whole, or the nature of the problems allegedly addressed by the '959 Patent.  Combining the references disclosed in Exhibit C would have been obvious, as the references identify and address the same technical issues and suggest very similar solutions to those issues.  Samsung reserves the right to amend or supplement these invalidity contentions to identify additional reasons that combining the references would be obvious to one of ordinary skill in the art.

In accordance with P.R. 3-3(b), prior art references rendering the asserted claims obvious, alone or in combination with other references, including identification of combinations showing obviousness, are identified in Exhibits C-1 to C-9, which includes exemplary claim charts for the

asserted claims of the '959 Patent showing specifically where in each reference or combinations of references each asserted claim is found, and an explanation of why the prior art renders the asserted claim obvious.

In particular, Samsung contends that the asserted claims of the '959 Patent would have been obvious in view of the prior art references identified above and in Exhibit C.  For example, Exhibit C includes claim charts that describe how the asserted claims of the '959 Patent would have been obvious in view of all references identified in Exhibit C, which, if found not to anticipate the claims of the '959 Patent, render the claims of the '959 Patent obvious alone.

In addition to the specific combinations of prior art and the specific combinations of groups of prior art disclosed, Samsung reserves the right to rely on any other combination of any prior art references disclosed herein.  Samsung further reserves the right to rely upon combinations disclosed within the prosecution history of the references cited herein.

The obviousness combinations set forth in these contentions reflect Samsung's present understanding of the potential scope of the claims that Plaintiff appears to be advocating and should not be seen as Samsung's acquiescence to Plaintiff's interpretation of the patent claims.

Samsung reserves the right to amend or supplement these contentions regarding anticipation or obviousness of the asserted claims, in view of further information from Plaintiff, information discovered during discovery, or a claim construction ruling by the Court.  Plaintiff has not identified what elements or combinations it alleges were not known to one of ordinary skill in the art at the time.  Therefore, for any claim limitation that Plaintiff alleges is not disclosed in a particular prior art reference, Samsung reserves the right to assert that any such limitation is either inherent in the disclosed reference or obvious to one of ordinary skill in the art at the time in light of the same, or that the limitation is disclosed in another of the references disclosed above and in combination would have rendered the asserted claim obvious.

C.      **Local Patent Rule 3-3(c):  Charts Identifying where Specifically in each Alleged item of Prior Art each Asserted Claim is Found**

Pursuant to Local Patent Rule 3-3(c), charts identifying where specifically in each alleged item of prior art each limitation of each asserted claim is found, including for each limitation that Samsung contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function are attached in Exhibits C-1 through C-9.

D.      **Local Patent Rule 3-3(d):  Other Grounds for Invalidity**

Samsung identifies the following grounds for invalidity of the asserted claims of the '959 Patent based on 35 U.S.C. §§ 101 and/or 112 ¶¶ 1 and 2.  Samsung reserves the right to supplement these disclosures based on further investigation and discovery.

1.      **Invalidity Based on 35 U.S.C. § 101**

The asserted claims of the '959 Patent are invalid under 35 U.S.C. § 101 because they claim only abstract ideas.  For example, "using a different heuristic to locate information," "heuristic(s) locates items of information," "providing said information identifier to a plurality of heuristics to locate information in a plurality of locations," and "determining at least one candidate item of information,"  each refer only to programming abstractions or the manipulation of information; these are concepts, not physical objects or tangible matter.

2.      **Invalidity Based on Enablement or Written Description Under 35 U.S.C. § 112(1) and/or Invalidity Based on Indefiniteness Under 35 U.S.C. § 112(2)**

Samsung asserts that each asserted claim of the '959 Patent is invalid in that the '959 specification fails to particularly point out and distinctly claim the alleged invention of the '959 Patent.  Samsung further asserts that each asserted claim of the '959 Patent is invalid as not containing a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the alleged invention.

Based on Samsung's present understanding of Plaintiff's infringement contentions, Samsung asserts that claims 1-5, 9-12, 14-17, 19-20, 22-25, 27-30 and 32-33 of the '959 Patent are

invalid for reciting at least the claim terms "heuristic" and/or "heuristics."  Based on Samsung's present understanding of Plaintiff's infringement contentions, Samsung further asserts that claims 9-12, 14-16, 22, 23, 27, 28, 32 and 33 are invalid for reciting at least the claim term/phrase "heuristics locates" and one or more of the following phrases:

- "one of said heuristics locates information on the basis of names of files"
- "another of said heuristics locates items of information on the basis contents of files"
- "another of said heuristics locates items of information on the basis of most recently accessed items"
- "one of said heuristics locates items of information that are stored locally on a computer system"
- "another of said heuristics locates items of information that are stored on remote computer systems"
- "said other heuristic locates Internet web pages"
- "said other heuristic locates items of information that are stored on a wide-area network"

Also based on Samsung's present understanding of Plaintiff's infringement contentions, Samsung further asserts that claims 20, 25, and 30 are invalid for reciting at least the claim term/phrase "the information identifier is applied separately to each heuristic."  Samsung also asserts that claim 24 is invalid for reciting "program instructions."  Claims 24, 25, 27-30, 32 and 33 are invalid for reciting "determin[ing] at least one candidate item of information based upon the plurality of heuristics."  These claim terms/phrases as apparently construed by Apple violate the written description, enablement and/or definiteness requirements of 35 U.S.C. § 112.

Based on Samsung's present understanding of Plaintiff's infringement contentions, at least one or more of these claim terms/phrases are indefinite because they are inconsistent with and broader than the alleged invention disclosed in the specification and given Plaintiff's apparent constructions of the claims, any person of ordinary skill in the art at the time of the invention would not understand what is claimed, even when the claims are read in light of the specification.

1   Moreover, based on Samsung's present understanding of Plaintiff's infringement contentions, each

2   of the asserted claims in which these claim terms/phrases appear lack written description because

3   the specification of the '959 Patent demonstrates that the patentee neither conceived of nor

4   demonstrated possession of all that Plaintiff now contends the claims cover.

5        Samsung further asserts that claims 29, 20, 32 and 33 are invalid for reciting at least the

6   following claim terms/phrases:

7        • "means for inputting an information identifier"

8        • "means for providing said information identifier to a plurality of heuristics . . ."

9        • "means for determining at least one candidate item of information based upon the

10          plurality of heuristics,"

11       • "means for displaying a representation of said candidate item of information."

12   Each of these claim limitations is governed by 35 U.S.C. § 112, paragraph 6.  The '959 patent

13   specification, however, fails to set forth the structure, material or acts for accomplishing the

14   recited function.  Each of these claims is therefore invalid as indefinite under 35 U.S.C. § 112(2).

15       In addition, based on Samsung's present understanding of Plaintiff's infringement

16   contentions, each of the asserted claims in which the terms identified above appear are invalid

17   because the specification fails to provide sufficient disclosure to enable any person of ordinary

18   skill in the art to which it pertains, or with which it is most nearly connected, to implement the

19   invention without undue experimentation.  The '959 patent specification fails to describe the

20   manner and process of making and using the claimed invention in such full, clear concise and

21   exact terms as to enable a person of ordinary skill in the art to which it pertains to make and use

22   the claimed invention.

23       For at least the reasons set forth above, the claims fail to satisfy the requirements of § 112

24   ¶¶ 1 and 2.

25   **IV.    THE '414 PATENT**

26       **A.    Local Patent Rule 3-3(a):  Identification of Prior Art**

27       At this time, Samsung contends that at least the following prior art references anticipate or

28   render obvious, either alone or in combination, the asserted claims of the '414 Patent:

1.    **Patent References**[8]

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 5,255,388 | Oct. 19, 1993 | Sep. 26, 1990 |
| US | 5,473,776 | Dec. 5, 1995 | Feb. 16, 1993 |
| US | 5,515,502 | May 7, 1996 | Sep. 30, 1993 |
| US | 5,729,710 | Mar. 17, 1998 | June 22, 1994 |
| US | 5,734,910 | Mar. 31, 1998 | Dec. 22, 1995 |
| US | 5,937,414 | Aug. 10, 1999 | Feb. 28, 1997 |
| US | 6,012,081 | Jan. 4, 2000 | July 3, 1996 |
| US | 6,014,681 | Jan. 11, 2000 | July 15, 1997 |
| US | 6,021,414 | Feb. 1, 2000 | Sep. 11, 1995 |
| US | 6,260,075 | July 10, 2001 | June 19, 1995 |
| US | 6,643,669 | Nov. 4, 2003 | Mar. 14, 2000 |
| US | 6,662,212 | Dec. 9, 2003 | Aug. 31, 1999 |
| US | 6,662,212 | Dec. 9, 2003 | Aug. 31, 1999 |
| US | 6,671,700 | Dec. 30, 2003 | May 23, 2000 |
| US | 6,983,247 | Jan. 3, 2006 | June 26, 2002 |
| US | 7,024,491 | Apr. 4, 2006 | May 23, 2001 |
| US | 7,024,491 | Apr. 4, 2006 | May 23, 2001 |
| US | 7,158,998 | Jan. 2, 2007 | July 31, 2002 |
| US | 7,158,998 | Jan. 2, 2007 | July 31, 2002 |
| US | 7,290,034 | Oct. 30, 2007 | May 7, 2004 |
| US | 7,290,034 | Oct. 30, 2007 | May 7, 2004 |
| US | 7,366,743 | Apr. 29, 2008 | Mar. 6, 2002 |
| US | 7,370,025 | May 6, 2008 | Dec. 17, 2002 |
| US | 7,403,958 | July 22, 2008 | Jan. 19, 2005 |
| US | 7,412,460 | Aug. 12, 2008 | June 19, 2003 |
| US | 7,430,426 | Sep. 30, 2008 | Jan. 24, 2005 |
| US | 7,457,846 | Nov. 25, 2008 | Oct. 5, 2001 |
| US | 7,477,890 | Jan. 13, 2009 | June 30, 2000 |
| US | 7,503,052 | Mar. 10, 2009 | Apr. 14, 2004 |
| US | 7,506,006 | Mar. 17, 2009 | Sep. 3, 2004 |
| US | 7,506,006 | Mar. 17, 2009 | Sep. 3, 2004 |
| US | 7,506,006 | Mar. 17, 2009 | Apr. 13, 2006 |
| US | 7,523,344 | Apr. 21, 2009 | June 19, 2006 |
| US | 7,546,364 | June 9, 2009 | May 16, 2002 |
| US | 7,752,166 | July 6, 2010 | Nov. 15, 2001 |
| US | 7,752,166 | July 6, 2010 | Nov. 15, 2001 |
| US | 7,788,225 | Aug. 31, 2010 | Mar. 18, 2005 |
| US | 7,849,140 | Dec. 7, 2010 | Aug. 29, 2002 |
| US | 7,877,797 | Jan. 25, 2011 | Feb. 23, 2006 |
| US | 7,877,797 | Jan. 25, 2011 | Feb. 23, 2006 |
| US | 8,005,889 | Aug. 23, 2011 | Nov. 16, 2005 |
| US | 8,005,889 | Aug. 23, 2011 | Nov. 16, 2005 |
| US | 8,121,978 | Feb. 21, 2012 | Sep. 11, 2003 |
| US | 2006/0026198 | Feb. 2, 2006 | July 30, 2004 |
| US | 2002/0059299 | May 16, 2002 | Jan. 23, 2001 |
| US | 2003/0149762 | August 7, 2003 | Oct. 5, 2001 |

---

[8]   Samsung incorporates by reference all prior art references cited in the patents listed herein and/or their file histories.

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 2005/0278458 | Dec. 15, 2005 | June 9, 2004 |
| US | 2007/0180447 | Aug. 2, 2007 | Nov. 14, 2006 |
| US | 2008/0066148 | Mar. 13, 2008 | Oct. 30, 2007 |
| US | 2008/0256547 | Feb. 23, 2005 | Oct. 16, 2008 |

2.    **Publications**[9]

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| A New Service from Notify Technology The NotifyLink Hosted Edition | Dec. 31, 2005 | | Notify Technology |
| Advanced Windows The Developer's Guide to the Win32® API for Windows NT™ 3.5 and Windows 95 | 1995 | Jeffrey Richter | Microsoft |
| Bayou: Replicated Database Services for World-wide Applications | 1996 | Karin Petersen, Mike Spreitzer, Douglas Terry, Marvin Theimer | Association for Computing Machinery |
| BlackBerry Application Developer Guide Volume 1: Fundamentals | Oct. 13, 2005 | | RIM |
| BlackBerry Application Developer Guide Volume 2: Advanced Topics | Oct. 13, 2005 | | RIM |
| BlackBerry Enterprise Server for Microsoft Exchange Version 4.0 Feature and Technical Overview | Nov. 10, 2004 | | RIM |
| BlackBerry Enterprise Software v4.0 for Microsoft Exchange: Feature Enhancement Overview | 2004 | | RIM |
| BlackBerry Wireless Handheld Version 4.1 User Guide: BlackBerry 7520 | Sep. 7, 2005 | | RIM |
| DataViz - RoadSync Series 80 Manual | | | DataViz |
| Developing Multithreaded Applications for the .NET Compact Framework | June 2005 | Maarten Struys | Microsoft |
| EasyStreet: A location management and data synchronization application for mobile computing | July 19, 2000 | Steven J. Mastrianni | |
| Eliminating duplication and ensuring file integrity in | Dec. 2005 | Muaz Niazi, Umar Manzoor, | IEEE |

[9]    Samsung incorporates by reference all prior art references identified in the publications listed herein.

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Multisync: A multiagent system for ubiquitous file synchronization | | Kiran Ijaz, Summiya and Hina Saleem | |
| Effective Java | 2001 | Joshua Bloch | Addison-Wesley |
| Exchange ActiveSync and Exchange 2003 | July 6, 2005 | | Microsoft |
| Exchange Information Store Service Architecture | May 23, 2005 | | Microsoft |
| Flexible and safe resolution of file conflicts | 1994 | Puneet Kumar and M. Satyanarayanan | DTIC |
| Flexible Update Propagation for Weakly Consistent Replication | 1997 | Karin Petersen, M.J. Spreitzer, D.B. Terry, M.M. Theimer, A.J. Demers | Association for Computing Machinery |
| Getting Started Guide: BlackBerry 8700c Wireless Handheld™ from Cingular | 2005 | | RIM |
| IETF RFC 2251: Lightweight Directory Access Protocol v3 | Dec. 1997 | M. Wahl, T. Howes and S. Kille | IETF |
| IETF RFC 3377: Lightweight Directory Access Protocol v3: Technical Specification | Sep. 2002 | J. Hodges and R. Morgan | IETF |
| IETF RFC 3501:  Internet Message Access Protocol – Version 4rev1 | March 2003 | M. Crispin | IETF |
| Introduction to Microsoft Exchange Server 2003 | July 2004 | | Microsoft |
| Introduction to Multi-Threaded Programming | May 1, 1999 | Brian Masney | Linux Journal |
| iPod nano Features Guide | Sep. 7, 2005 | | Apple |
| Jabber Based Protocol for Collaborative Mobile Work | Sep. 16, 2006 | Martin Klima and Pavel Slavik | Springer-Verlag Berlin Heidelberg |
| Java in a Nutshell 2nd Edition | May 1997 | David Flanagan | O'Reilly |
| Mail Anywhere Studio | 2002 | | iAnywhere Solutions |
| Towards the Ubiquitous Office Vision With focus on Mobile Data Synchronization | Mar. 2002 | Fredrik Hacklin | |
| Managing Update Conflicts in Bayou, a Weakly Connected Replicated Storage System | 1995 | D.B. Terry, M.M. Theimer, Karin Petersen, A.J. Demers, M.J. Spreitzer, C.H. Hauser | Association for Computing Machinery |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Microsoft Exchange Server 2003 ActiveSync Architecture | Jan. 5, 2003 | Steven D. Bramson and Marc Gallucci | Microsoft |
| Microsoft Improves Access to Customer Data with New Smart Client Solution | Dec. 2005 | | Microsoft |
| Microsoft Smart Client Architecture and Design Guide | Sept. 4, 2004 | David Hill, Brenton Webster, Edward A. Jezierski, Srinath Vasireddy, Mo Al-Sabt, Blaine Wastell, Jonathan Rasmusson, Paul Gale and Paul Slater | Microsoft |
| Modern Operating Systems Second Edition | 2001 | Andrew Tanenbaum | Prentice Hall |
| NotifyLink Hosted Edition White Paper | Nov. 13, 2006 | | Notify Technology |
| Novell Evolution 2.4 User Guide | Sep. 7, 2005 | | Novell |
| Object Based Concurrency for Data Parallel Applications: Programmability and Effectiveness | 2002 | Roxana Diaconescu | Norwegian University of Science and Technology |
| OneBridge Mobile Groupware Product Datasheet | 2006 | | iAnywhere Solutions |
| Palm Pilot The Ultimate Guide | 1999 | David Pogue | O'Reilly |
| Primarily Disconnected Operation: Experiences with Ficus | Nov. 1992 | J. S. Heidemann, T. W. Page, R. G. Guy and G. J. Popek | IEEE |
| Pylon Anywhere Client User's Guide | 2003 | | iAnywhere Solutions |
| RCal: An Autonomous Agent for Intelligent Distributed Meeting Scheduling | Nov. 2003 | Rahul Singh | Carnegie Mellon University |
| Resolving file conflicts in the Ficus file system | 1994 | Peter Reiher, John Heidemann, David Ratner, Greg Skinner, and Gerald | Association for Computing Machinery |

SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

| Title | Date of Publication | Author | Publisher |
|-------|--------------------|--------|-----------|
| | | Popek | |
| SemanticLIFE - Outlook Datafeed Module Software Architecture Document Version 2.0 | Apr. 20, 2005 | Hoang Huu Hanh | |
| SunOS Multi-thread architecture | 1991 | M. L. Powell , S. R. Kleiman , S. Barton , D. Shah , D. Stein , M. Weeks | |
| The Bayou Architecture: Support for Data Sharing among Mobile Users | 1994 | K. Petersen, M. Spreitzer, D. Ferry, M. Theimer, B. Welch | IEEE |
| The Case for Non-transparent Replication: Examples from Bayou | 1998 | Douglas B. Terry, Karin Petersen, Mike J. Spreitzer, Marvin M. Theimer | IEEE |
| The Open Group Base Specifications Issue 6 | 2004 | | IEEE |
| Unix Applications Programming Mastering the Shell | 1990 | Ray Swartz | Sams Publishing |
| Using Your Palm® Treo™ 700w Smartphone | 2006 | | Palm |
| Visto Mobile™ Personal Edition for Professionals | 2005 | | Visto |
| Windows CE handheld systems for the corporate mobile work force | Mar. 30, 2005 | Steven J. Mastrianni | |
| SCH-i830 Series Global Pocket PC Phone User Manual | 2005 | | Samsung |
| Windows Mobile Software for Pocket PC: Pocket Outlook | July 1, 2005 | | Microsoft |
| Windows Mobile Software for Pocket PC Phone Edition | Sep. 19, 2003 | | Microsoft |

3.    **Systems**

All versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '414 Patent, including documents and source code describing the same:

- Novell Evolution (at least 2.4)

- Ficus

- Coda

- Bayou

- Mozilla Thunderbird

- SyncKolab

- Mozilla Lightning Project

- Coldsync

- iTunes (at least version 6.0.1), and, for example, Apple Macintosh OS X 10.3.9 / iPod nano / Mac Address Book

- iSync (at least version 1.4), and, for example, Apple Macintosh OS X 10.3.9 / iPod nano / Mac Address Book

- Microsoft Exchange ActiveSync / SCH-i830 Series Global Pocket PC Phone / Palm® Treo™ 700w Smartphone / Pocket Outlook

- Blackberry / BlackBerry Wireless Handheld Version 4.1

- NotifyLink Hosted Edition

Samsung reserves the right to amend these invalidity contentions to assert these references depending on the claim construction and infringement positions Apple may take as the case proceeds.  Moreover, Samsung reserves the right to use these references in combination with other references to render the claims of the '414 Patent obvious in the event Apple takes the position that certain claim limitations are missing from the references charted in Exhibit D.

**B.      Local Patent Rule 3-3(b):  Whether Each Item Anticipates or Renders Obvious the Asserted Claims**

Plaintiff asserts claims 1-2, 4, 6-7, 10-12, 14, 16-17, 20-24, 26-28 and 30-32 of the '414 Patent against Samsung in this lawsuit.  All of those claims are invalid because the '414 Patent fails to meet one or more of the requirements for patentability.  The individual bases for invalidity are provided below and in the claim charts attached as Exhibit D.  Each of the foregoing listed prior art documents, the underlying work, and/or the underlying apparatus or method qualifies as prior art under one or more sections of 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

1    Although Samsung has identified at least one citation per limitation for each reference,

2  each and every disclosure of the same limitation in the same reference is not necessarily identified.

3  Rather, in an effort to focus the issues, Samsung has generally cited representative portions of

4  identified references, even where a reference may contain additional support for a particular claim

5  element.  In addition, persons of ordinary skill in the art generally read a prior art reference as a

6  whole and in the context of other publications and literature.  Thus, to understand and interpret any

7  specific statement or disclosure within a prior art reference, such persons would rely on other

8  information within the reference, along with other publications and their general scientific

9  knowledge.  Samsung may rely upon uncited portions of the prior art references and on other

10 publications and expert testimony to provide context, and as aids to understanding and interpreting

11 the portions that are cited.  Samsung may also rely on uncited portions of the prior art references,

12 other disclosed publications, and the testimony of experts to establish that a person of ordinary

13 skill in the art would have been motivated to modify or combine certain of the cited references so

14 as to render the claims obvious.

15                    1.    **Anticipation**

16    Some or all of the asserted claims of the '414 Patent are invalid as anticipated under 35

17 U.S.C. § 102 in view of each of the prior art references identified above and in the claim charts

18 included in Exhibit D, which identify specific examples of where each limitation of the asserted

19 claims is found in the prior art references.  As explained above, the cited portions of prior art

20 references identified in the attached claim charts are exemplary only and representative of the

21 content and teaching of the prior art references, and should be understood in the context of the

22 reference as a whole and as they would be understood by a person of ordinary skill in the art.

23                    2.    **Obviousness**

24    To the extent any limitation is deemed not to be exactly met by an item of prior art listed

25 above and in Exhibit D, then any purported differences are such that the claimed subject matter as

26 a whole would have been obvious to one skilled in the art at the time of the alleged invention, in

27 view of the state of the art and knowledge of those skilled in the art.  The item of prior art would,

28 therefore, render the relevant claims invalid for obviousness under 35 U.S.C. § 103(a).

In addition, the references identified above render one or more asserted claims of the '414 Patent obvious when the references are read in combination with each other, and/or when read in view of the state of the art and knowledge of those skilled in the art.  Each and every reference identified is also relevant to the state of the art at the time of the alleged invention.  Any of the references disclosed above may be combined to render obvious (and therefore invalid) each of Plaintiff's asserted claims.  Samsung may rely upon a subset of the above identified references or all of the references identified above, including all references in Exhibit D, for purposes of obviousness depending on the Court's claim construction, positions taken by Apple during this litigation, and further investigation and discovery.

Moreover, to the extent the foregoing references are found not to anticipate the asserted claims, the foregoing references render the asserted claims obvious either alone or in combination with one or more of the other references identified above pursuant to P.R. 3-3(a).  As explained herein and/or in the accompanying charts, it would have been obvious to a person of skill in the art at the time of the alleged invention of the asserted claims of the '414 Patent to combine the various references cited herein so as to practice the asserted claims of the '414 Patent.

Motivations to combine the above items of prior art are present in the references themselves, the common knowledge of one of ordinary skill in the art, the prior art as a whole, or the nature of the problems allegedly addressed by the '414 Patent.  Combining the references disclosed in Exhibit D would have been obvious, as the references identify and address the same technical issues and suggest very similar solutions to those issues.  Samsung reserves the right to amend or supplement these invalidity contentions to identify additional reasons that combining the references would be obvious to one of ordinary skill in the art.

In accordance with P.R. 3-3(b), prior art references rendering the asserted claims obvious, alone or in combination with other references, including identification of combinations showing obviousness, are identified in Exhibits D 1-14, which includes exemplary claim charts for the

asserted claims of the '414 Patent showing specifically where in each reference or combinations of references each asserted claim is found, and an explanation of why the prior art renders the asserted claim obvious.

In particular, Samsung contends that the asserted claims of the '414 Patent would have been obvious in view of the prior art references identified above.  For example, Exhibit D includes exemplary claim charts that describe how the asserted claims of the '414 Patent would have been obvious in view of all references identified in Exhibit D, which, if found not to anticipate the claims of the '414 Patent, render the claims of the '414 Patent obvious alone.

In addition to the specific combinations of prior art and the specific combinations of groups of prior art disclosed, Samsung reserves the right to rely on any other combination of any prior art references disclosed herein.  Samsung further reserves the right to rely upon combinations disclosed within the prosecution history of the references cited herein.

The obviousness combinations set forth in these contentions reflect Samsung's present understanding of the potential scope of the claims that Plaintiff appears to be advocating and should not be seen as Samsung's acquiescence to Plaintiff's interpretation of the patent claims.

Samsung reserves the right to amend or supplement these contentions regarding anticipation or obviousness of the asserted claims, in view of further information from Plaintiff, information discovered during discovery, or a claim construction ruling by the Court.  Plaintiff has not identified what elements or combinations it alleges were not known to one of ordinary skill in the art at the time.  Therefore, for any claim limitation that Plaintiff alleges is not disclosed in a particular prior art reference, Samsung reserves the right to assert that any such limitation is either inherent in the disclosed reference or obvious to one of ordinary skill in the art at the time in light of the same, or that the limitation is disclosed in another of the references disclosed above and in combination would have rendered the asserted claim obvious.

C.      **Local Patent Rule 3-3(c):  Charts Identifying where Specifically in each Alleged item of Prior Art each Asserted Claim is Found**

Pursuant to Local Patent Rule 3-3(c), charts identifying where specifically in each alleged item of prior art each limitation of each asserted claim is found, including for each limitation that Samsung contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function is attached in Exhibits D-1 through D-14.

D.      **Local Patent Rule 3-3(d):  Other Grounds for Invalidity**

Samsung identifies the following grounds for invalidity of the asserted claims of the '414 Patent based on 35 U.S.C. §§ 101 and/or 112 ¶¶ 1 and 2.  Samsung reserves the right to supplement these disclosures based on further investigation and discovery.

1.      **Invalidity Based on 35 U.S.C. § 101**

The asserted claims of the '414 Patent are invalid under 35 U.S.C. § 101 because they only claim abstract ideas.  Many limitations in the asserted claims are common abstractions in computer systems and programming languages.  For example, the limitations "one user-level non-synchronization processing thread," "one synchronization processing thread," "a lock on the first store," "releases the lock after synchronization for a first data class is completed," and "synchronized in a peer-to-peer manner," each refer only to programming abstractions or the manipulation of information; these are concepts, not physical objects or tangible matter.

2.      **Invalidity Based on Enablement or Written Description Under 35 U.S.C. § 112(1) and/or Invalidity Based on Indefiniteness Under 35 U.S.C. § 112(2)**

Samsung asserts that each asserted claim of the '414 Patent is invalid in that the '414 specification fails to particularly point out and distinctly claim the alleged invention of the '414 Patent.  Samsung further asserts that each asserted claim of the '414 Patent is invalid as not containing a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the alleged invention.

1   Based on Samsung's present understanding of Plaintiff's infringement contentions,

2   Samsung asserts that the asserted claims of the '414 Patent are invalid under 35 U.S.C. § 112 ¶ 1 at

3   least because they include the following claim terms/phrases:

4   • "one user-level non-synchronization processing thread,"

5   • "one user-level non-synchronization processing thread,"

6   • "concurrently,"

7   • "user interface to allow a user to access and edit structured data in a first store
8     associated with a first database,"

9   • "one synchronization processing thread,"

10  • "synchronization software component which is configured to synchronize the
      structured data from the first database with the structured data from a second
11    database,"

12  • "a lock on the first store,"

13  • "releases the lock after synchronization for a first data class is completed,"

14  • "synchronized in a peer-to-peer manner," and

15  • "synchronize structured data of a first data class and other synchronization software
16    components are configured to synchronize structured data of other corresponding
      data classes."

17

18  These claim terms/phrases as apparently construed by Apple violate the written description and/or

19  enablement requirements of 35 U.S.C. § 112 ¶ 1.  For instance, the term "peer-to-peer" is broader

20  than and inconsistent with the alleged invention disclosed in the specification, and given Apple's

21  infringement contentions, one of ordinary skill in the art would not understand what Apple has

22  claimed.  Additionally, claims 7 and 17  of the '414 patent are invalid because they lack a proper

23  antecedent basis for at least the term "first and second data processing systems."

24      Based on Samsung's present understanding of Plaintiff's infringement contentions, at least

25  one or more of these claim terms/phrases are indefinite because they are inconsistent with and

26  broader than the alleged invention disclosed in the specification and given Plaintiff's apparent

27  constructions of the claims, any person of ordinary skill in the art at the time of the invention

28  would not understand what is claimed, even when the claims are read in light of the specification.

Moreover, based on Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted claims in which these claim terms/phrases appear lack written description because the specification of the '414 Patent demonstrates that the patentee neither conceived of nor demonstrated possession of all that Apple now contends the claims cover.  In addition, based on Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted claims in which these claim terms/phrases appear are invalid because the specification fails to provide sufficient disclosure to enable any person of ordinary skill in the art to which it pertains, or with which it is most nearly connected, to implement the invention without undue experimentation.  Therefore, the claims fail to satisfy the requirements of § 112 ¶¶ 1 and 2.

Samsung further asserts that claims 21, 22, 31, and 32 are invalid for reciting at least the following claim limitations:

- "means for executing at least one user-level non-synchronization processing thread that includes means for accessing structured data in a first store associated with a first database;"

- "means for executing at least one synchronization processing thread concurrently with the executing of the at least one user-level non-synchronization processing thread that includes means for synchronizing the structured data from the first database with the structured data from a second database;"

- "means for executing at least one non-synchronization processing thread;"

- "means for accessing structured data in a first store associated with a first database;"

- "means for executing at least one synchronization processing thread concurrently with the executing of the at least one non-synchronization processing thread that includes means for synchronizing the structured data from the first database with the structured data from a second database."

1    Each of those claim limitations is governed by 35 U.S.C. section 112, paragraph 6.  The

2  '414 patent specification, however, fails to set forth the structure, material or acts for

3  accomplishing the recited function.  Each of these claims is therefore invalid as indefinite under 35

4  U.S.C. § 112(2).

5  **V.    THE '760 PATENT**

6  **A.    Local Patent Rule 3-3(a):  Identification of Prior Art**

7    At this time, Samsung contends that at least the following prior art references anticipate or

8  render obvious, either alone or in combination, the asserted claims of the '760 Patent:

9    1.    **Patent References**[10]

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 6,430,405 | Aug. 6, 2002 | Dec. 7, 1998 |
| US | 6,448,988 | Sep. 10, 2002 | Jan. 29, 1997 |
| US | 6,526,274 | Feb. 25, 2003 | Oct. 25, 1999 |
| US | 6,542,591 | Apr. 1, 2003 | July 27, 2000 |
| US | 6,549,612 | Apr. 15, 2003 | May 6, 1998 |
| US | 6,738,461 | May 18, 2004 | Nov. 1, 2001 |
| US | 6,772,188 | Aug. 3, 2004 | July 14, 2000 |
| US | 6,792,082 | Sep. 14, 2004 | Sep. 11, 1998 |
| US | 6,879,691 | Apr. 12, 2005 | May 12, 2000 |
| US | 6,961,420 | Nov. 1, 2005 | Nov. 13, 2001 |
| US | 7,007,239 | Feb. 28, 2006 | Sep. 21, 2000 |
| US | 7,117,445 | Oct. 3, 2006 | June 30, 2003 |
| US | 7,212,808 | May 1, 2007 | Oct. 15, 2002 |
| US | 7,221,748 | May 22, 2007 | Nov. 12, 2002 |
| US | 7,225,409 | May 29, 2007 | Aug. 25, 1999 |
| US | 7,231,229 | June 12, 2007 | Mar. 16, 2003 |
| US | 7,280,652 | Oct. 9, 2007 | Sep. 13, 2004 |
| US | 7,280,850 | Oct. 9, 2007 | Sep. 27, 2001 |
| US | 7,289,614 | Oct. 30, 2007 | Sep. 29, 2000 |
| US | 7,403,767 | July 22, 2008 | Apr. 29, 2005 |
| US | 7,409,050 | Aug. 5, 2008 | Apr. 21, 2005 |
| US | 7,493,567 | Feb. 17, 2009 | Jan. 28, 2004 |
| US | 7,502,633 | Mar. 10, 2009 | Oct. 15, 2002 |
| US | 7,526,306 | Apr. 28, 2009 | Dec. 8, 2003 |
| US | 7,606,598 | Oct. 20, 2009 | Mar. 31, 2006 |
| US | 7,680,513 | Mar. 16, 2010 | Aug. 8, 2005 |
| US | 7,623,643 | Nov. 24, 2009 | July 26, 2005 |
| US | 7,680,513 | Mar. 16, 2010 | Aug. 8, 2005 |
| US | 7,685,530 | Mar. 23, 2010 | June 10, 2005 |
| US | 7,715,535 | May 11, 2010 | Sep. 27, 2005 |

[10]  Samsung incorporates by reference all prior art references cited in the patents listed herein and/or their file histories.

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 7,724,887 | May 25, 2010 | July 21, 2005 |
| US | 7,778,399 | Aug. 17, 2010 | July 2, 2004 |
| US | 7,778,671 | Aug. 17, 2010 | Oct. 8, 2004 |
| US | 7,779,630 | Sep. 14, 2010 | June 24, 2004 |
| US | 7,783,283 | Aug. 24, 2010 | Sep. 8, 2004 |
| US | 7,839,987 | Nov. 23, 2010 | Nov. 1, 2001 |
| US | 7,894,597 | Feb. 22, 2011 | Oct. 12, 2005 |
| US | 7,920,886 | Apr. 5, 2011 | Jan. 24, 2006 |
| US | 7,991,432 | Aug. 2, 2011 | Apr. 2, 2004 |
| US | 8,001,120 | Aug. 16, 2011 | Feb. 12, 2004 |
| US | 8,019,388 | Sep. 13, 2011 | Feb. 6, 2003 |
| US | 8,064,886 | Nov. 22, 2011 | Feb. 14, 2006 |
| US | 8,095,879 | Jan. 10, 2012 | Dec. 10, 2002 |
| US | 8,175,656 | May 8, 2012 | Feb. 24, 2006 |
| US | 2002/0076015 | June 20, 2002 | Dec. 15, 2000 |
| US | 2002/0111991 | Aug. 15, 2002 | Nov. 1, 1999 |
| US | 2002/0116464 | Aug. 22, 2002 | Feb. 20, 2001 |
| US | 2004/0137955 | July 15, 2004 | Oct. 15, 2002 |
| US | 2004/0235520 | Nov. 25, 2004 | May 20, 2003 |
| US | 2005/0047562 | Mar. 3, 2005 | Aug. 28, 2003 |
| US | 2005/0250483 | Nov. 10, 2005 | May 7, 2004 |
| US | 2004/0267887 | Dec. 30, 2004 | June 30, 2003 |
| US | 2003/0032527 | Feb. 10, 2005 | Aug. 8, 2003 |
| US | 2005/0074109 | Apr. 7, 2005 | Sep. 24, 2004 |
| US | 2005/0141686 | June 30, 2005 | June 7, 2004 |
| US | 2006/0010395 | Jan. 12, 2006 | July 9, 2004 |
| US | 2006/0140189 | June 29, 2006 | Dec. 23, 2004 |
| US | 2006/0281449 | Dec. 14, 2006 | June 14, 2005 |
| US | 2007/0071186 | Mar. 29, 2007 | Sep. 21, 2005 |
| US | 2007/0083600 | Apr. 12,2007 | Oct. 6, 2005 |
| US | 2007/0092072 | Apr. 26, 2007 | Sep. 30, 2005 |
| US | 2007/0133771 | June 14, 2007 | Dec. 12, 2005 |
| US | 2007/0243858 | Oct. 18, 2007 | Apr. 18, 2006 |
| US | 2007/0280457 | Dec. 6, 2007 | June 2, 2006 |
| US | 2008/0295017 | Nov. 27, 2008 | Sep. 5, 2006 |
| EP | 1 069 791 | Jan. 17, 2001 | July 13, 1999 |
| EP | 1 365 564 | Nov. 26, 2003 | Apr. 30, 2003 |

2.    Publications[11]

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Exploring PC-Telephone Convergence with the Enhanced Telephony Prototype | Apr. 2004 | JJ Cadiz, Attila Narin, Gavin Jancke, Anoop Gupta, and Michael Boyle | Association for Computing Machinery |
| Finger Instead of Mouse: | 2003 | Andreas | Springer-Verlag |

[11]   Samsung incorporates by reference all prior art references identified in the publications listed herein.

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Touch Screens as a Means of Enhancing Universal Success | | Holzinger | |
| Ming User Manual | 2006 | | Motorola |
| Model 8690 Inter-Tel Protocol Mode User Guide | Mar. 2006 | | Inter-Tel |
| Motorola A1000 User Guide | 2002 | | Motorola |
| Nokia 9000i User's Manual | 1997 | | Nokia |
| Nokia 9110 User's Manual | 1998 | | |
| P900/P908 White Paper | Dec. 2003 | | Motorola |
| pdQ™ Applications Handbook | 1999 | | Sony Ericsson |
| TAKEphONE User Manual | June 15, 2006 | | Iambic |
| TealPhone User's Manual | Jan. 24, 2006 | | TealPoint Software |
| The Kyocera 7135 Smartphone: Reference Guide | 2002 | | Kyocera |
| User's Guide Agendus for Symbian OS UIQ Edition | Apr. 1, 2004 | | Iambic |
| Using Your Palm® Treo™ 700w Smartphone | 2006 | | Palm |
| using your Treo™ 650 smartphone | 2004 | | Palm |
| XPlore M98 User Manual | July 14, 2005 | | Group Sense PDA |

3.    **Systems**

All versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '760 Patent, including documents and source code describing the same:

- Agenda Fusion

- Agendus Professional

- Motorola A1200

- TealPhone

- Windows Mobile 5

Samsung reserves the right to amend these invalidity contentions to assert these references depending on the claim construction and infringement positions Apple may take as the case proceeds.  Moreover, Samsung reserves the right to use these references in combination with other

references to render the claims of the '760 Patent obvious in the event Apple takes the position that certain claim limitations are missing from the references charted in Exhibit E.

**B.     Local Patent Rule 3-3(b):  Whether Each Item Anticipates or Renders Obvious the Asserted Claims**

Plaintiff asserts claims 1-5 and 7-22 of the '760 Patent against Samsung in this lawsuit.  All of those claims are invalid because the '760 Patent fails to meet one or more of the requirements for patentability.  The individual bases for invalidity are provided below and in the claim charts attached as Exhibit E.  Each of the foregoing listed prior art documents, the underlying work, and/or the underlying apparatus or method qualifies as prior art under one or more sections of 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

Although Samsung has identified at least one citation per limitation for each reference, each and every disclosure of the same limitation in the same reference is not necessarily identified.  Rather, in an effort to focus the issues, Samsung has generally cited representative portions of identified references, even where a reference may contain additional support for a particular claim element.  In addition, persons of ordinary skill in the art generally read a prior art reference as a whole and in the context of other publications and literature.  Thus, to understand and interpret any specific statement or disclosure within a prior art reference, such persons would rely on other information within the reference, along with other publications and their general scientific knowledge.  Samsung may rely upon uncited portions of the prior art references and on other publications and expert testimony to provide context, and as aids to understanding and interpreting the portions that are cited.  Samsung may also rely on uncited portions of the prior art references, other disclosed publications, and the testimony of experts to establish that a person of ordinary skill in the art would have been motivated to modify or combine certain of the cited references so as to render the claims obvious.

**1.     Anticipation**

Some or all of the asserted claims of the '760 Patent are invalid as anticipated under 35 U.S.C. § 102 in view of each of the prior art references identified above and in the claim charts included in Exhibit E, which identify specific examples of where each limitation of the asserted

claims is found in the prior art references.  As explained above, the cited portions of prior art references identified in the attached claim charts are exemplary only and representative of the content and teaching of the prior art references, and should be understood in the context of the reference as a whole and as they would be understood by a person of ordinary skill in the art.

### 2.   Obviousness

To the extent any limitation is deemed not to be exactly met by an item of prior art listed above and in Exhibit E, then any purported differences are such that the claimed subject matter as a whole would have been obvious to one skilled in the art at the time of the alleged invention, in view of the state of the art and knowledge of those skilled in the art.  The item of prior art would, therefore, render the relevant claims invalid for obviousness under 35 U.S.C. § 103(a).

In addition, the references identified above render one or more asserted claims of the '760 Patent obvious when the references are read in combination with each other, and/or when read in view of the state of the art and knowledge of those skilled in the art.  Each and every reference identified is also relevant to the state of the art at the time of the alleged invention.  Any of the references disclosed above may be combined to render obvious (and therefore invalid) each of Plaintiff's asserted claims.  Samsung may rely upon a subset of the above identified references or all of the references identified above, including all references in Exhibit E, for purposes of obviousness depending on the Court's claim construction, positions taken by Apple during this litigation, and further investigation and discovery.

Moreover, to the extent the foregoing references are found not to anticipate the asserted claims, the foregoing references render the asserted claims obvious either alone or in combination with one or more of the other references identified above pursuant to P.R. 3-3(a).  As explained herein and/or in the accompanying charts, it would have been obvious to a person of skill in the art at the time of the alleged invention of the asserted claims of the '760 Patent to combine the various references cited herein so as to practice the asserted claims of the '760 Patent.

Motivations to combine the above items of prior art are present in the references themselves, the common knowledge of one of ordinary skill in the art, the prior art as a whole, or

the nature of the problems allegedly addressed by the '760 Patent.  Combining the references disclosed in Exhibit E would have been obvious, as the references identify and address the same technical issues and suggest very similar solutions to those issues.  Samsung reserves the right to amend or supplement these invalidity contentions to identify additional reasons that combining the references would be obvious to one of ordinary skill in the art.

In accordance with P.R. 3-3(b), prior art references rendering the asserted claims obvious, alone or in combination with other references, including identification of combinations showing obviousness, are identified in Exhibits E-1 to E-8, which includes exemplary claim charts for the asserted claims of the '760 Patent showing specifically where in each reference or combinations of references each asserted claim is found, and an explanation of why the prior art renders the asserted claim obvious.

In particular, Samsung contends that the asserted claims of the '760 Patent would have been obvious in view of the prior art references identified above.  For example, Exhibit E includes exemplary claim charts that describe how the asserted claims of the '760 Patent would have been obvious in view of all references identified in Exhibit E, which, if found not to anticipate the claims of the '760 Patent, render the claims of the '760 Patent obvious alone.

In addition to the specific combinations of prior art and the specific combinations of groups of prior art disclosed, Samsung reserves the right to rely on any other combination of any prior art references disclosed herein.  Samsung further reserves the right to rely upon combinations disclosed within the prosecution history of the references cited herein.

The obviousness combinations set forth in these contentions reflect Samsung's present understanding of the potential scope of the claims that Plaintiff appears to be advocating and should not be seen as Samsung's acquiescence to Plaintiff's interpretation of the patent claims.

Samsung reserves the right to amend or supplement these contentions regarding anticipation or obviousness of the asserted claims, in view of further information from Plaintiff,

information discovered during discovery, or a claim construction ruling by the Court.  Plaintiff has not identified what elements or combinations it alleges were not known to one of ordinary skill in the art at the time.  Therefore, for any claim limitation that Plaintiff alleges is not disclosed in a particular prior art reference, Samsung reserves the right to assert that any such limitation is either inherent in the disclosed reference or obvious to one of ordinary skill in the art at the time in light of the same, or that the limitation is disclosed in another of the references disclosed above and in combination would have rendered the asserted claim obvious.

**C.      Local Patent Rule 3-3(c):  Charts Identifying where Specifically in each Alleged item of Prior Art each Asserted Claim is Found**

Pursuant to Local Patent Rule 3-3(c), charts identifying where specifically in each alleged item of prior art each limitation of each asserted claim is found, including for each limitation that Samsung contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function is attached in Exhibits E-1 to E-8.

**D.      Local Patent Rule 3-3(d):  Other Grounds for Invalidity**

Samsung identifies the following grounds for invalidity of the asserted claims of the '760 Patent based on 35 U.S.C. §§ 101 and/or 112 ¶¶ 1 and 2.  Samsung reserves the right to supplement these disclosures based on further investigation and discovery.

**1.      Invalidity Based on Enablement or Written Description Under 35 U.S.C. § 112(1) and/or Invalidity Based on Indefiniteness Under 35 U.S.C. § 112(2)**

Samsung asserts that each asserted claim of the '760 Patent is invalid in that the '760 specification fails to particularly point out and distinctly claim the alleged invention of the '760 Patent.  Samsung further asserts that each asserted claim of the '760 Patent is invalid as not containing a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the alleged invention.

Based on Samsung's present understanding of Apple's infringement contentions, Samsung asserts that claims 8, 10, 14, 18, 19, 21 of the '760 Patent are invalid as indefinite because they

combine method and apparatus limitations.  Samsung further asserts that claims 1, 3, 7, 8, 10, 12-22 of the '760 Patent are invalid as indefinite for reciting at least the following claim terms/phrases:

- "interactive displayed portion"

- "immediately in response to detecting" / "detecting a user tap input . . . and immediately in response to that input"

- "initiating a return telephone call"

- "finger gesture" / "finger tap input" / "user tap input"

- "detecting user selection"

- "completely substituting display of the list of interactive items with display of contact information"

- "a first contact object comprising a telephone number object having the return telephone number" / "a first contact object comprising a telephone number associated with the caller"

- "non-telephonic communication modality"

- "a second contact object associated with a non-telephonic communication modality"

- "initiating a communication "

- "instant messaging" / "instant message"

- "the second interactive displayed portion of the respective user selected item is identified by an icon displayed within the respective user selected item"

- "associated with a missed call" / "associated with contact information"

- "associated with sending an email" / "associated with sending an instant message"

- "that input"

- "the finger tap input"

- "that interactive displayed item"

- "the selected interactive displayed item"

1   These claim terms/phrases as apparently construed by Apple violate the written description,

2   enablement and/or definiteness requirements of 35 U.S.C. § 112.

3        Based on Samsung's present understanding of Plaintiff's infringement contentions, at least

4   one or more of these claim terms/phrases are indefinite because they are inconsistent with and

5   broader than the alleged invention disclosed in the specification and given Plaintiff's apparent

6   constructions of the claims, any person of ordinary skill in the art at the time of the invention

7   would not understand what is claimed, even when the claims are read in light of the specification.

8   Moreover, based on Samsung's present understanding of Plaintiff's infringement contentions, each

9   of the asserted claims in which these claim terms/phrases appear lack written description because

10  the specification of the '760 Patent demonstrates that the patentee neither conceived of nor

11  demonstrated possession of all that Apple now contends the claims cover.

12       Samsung further asserts that claims 8-11, 14, 18-19, 21 are invalid for reciting at least the

13  following claim terms/phrases:

14
15      • "instructions, which . . . cause the device to: display . . ." / "instructions for . . .
          displaying . . ." / "instructions to display . . ."

16
17      • "instructions, which . . . cause the device to: . . . completely substituting display
          . . ." / "instructions for . . . completely substituting display . . ." / "instructions to . . .
          completely substituting display . . ."

18
19      • "instructions, which . . . cause the device to: . . . initiate a return telephone call . . ."
          / "instructions for . . . initiating a telephone call . . ." / "instructions to . . . initiate a
          telephone call . . ."

20
21      • "instructions, which . . . cause the device to: . . . initiate a communication . . ." /
          "instructions for . . . initiating a communication . . ." / "instructions to . . . initiate a
22        communication . . ."

23      • "instructions to receive a finger tap input . . ." / "the portable electronic device is
          configured to: receive a finger tap input . . ." / "instructions, which . . . receive a
24        finger tap input . . ."

25      • "instructions to detect a finger tap input . . ." / "instructions for . . . detecting . . ." /
          "instructions that . . . cause the device to . . . detect . . ."

26
27  Each of these claim limitations is governed by 35 U.S.C. § 112, paragraph 6.  The '760 patent

28  specification, however, fails to set forth the structure, material or acts for accomplishing the

1    claimed instructions.  Each of these claims is therefore invalid as indefinite under 35 U.S.C. §

2    112(2).

3        In addition, based on Samsung's present understanding of Plaintiff's infringement

4    contentions, each of the asserted claims in which these claim terms/phrases appear are invalid

5    because the specification fails to provide sufficient disclosure to enable any person of ordinary

6    skill in the art to which it pertains, or with which it is most nearly connected, to implement the

7    invention without undue experimentation.

8        For at least the reasons set forth above, the claims fail to satisfy the requirements of § 112

9    ¶¶ 1 and 2.

10   **VI.    THE '721 PATENT**

11       **A.    Local Patent Rule 3-3(a):  Identification of Prior Art**

12       At this time, Samsung contends that at least the following prior art references anticipate or

13   render obvious, either alone or in combination, the asserted claims of the '721 Patent:

14       1.    **Patent References**[12]

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 6,421,453 | July 16, 2002 | May 15, 1998 |
| US | 6,545,669 | Apr. 8, 2003 | Mar. 26, 1999 |
| US | 7,084,859 | Aug. 1, 2006 | Sep. 18, 1992 |
| US | 7,113,177 | Sep. 26, 2006 | Apr. 4, 2002 |
| US | 7,216,116 | May 8, 2007 | May 2, 1997 |
| US | 7,365,736 | Apr. 29, 2008 | Mar. 23, 2004 |
| US | 7,425,944 | Sep. 16, 2008 | July 1, 2005 |
| US | 7,546,548 | June 9, 2009 | June 28, 2002 |
| US | 7,653,818 | Jan. 26, 2010 | July 21, 2005 |
| US | 7,800,587 | Sep. 21, 2010 | Aug. 11, 2005 |
| US | 8,117,701 | Feb. 21, 2012 | July 7, 2006 |
| US | 8,127,141 | Feb. 28, 2012 | Oct. 29, 2002 |
| US | 2002/0029341 | Mar. 7, 2002 | Feb. 10, 2000 |
| US | 2002/0104005 | Aug. 1, 2002 | Jan. 31, 2001 |
| US | 2006/0012577 | Jan. 19, 2006 | July 16, 2004 |
| US | 2006/0064004 | Mar. 23, 2006 | Sep. 15, 2005 |
| US | 2006/0075250 | Apr. 6, 2006 | Sep. 24, 2004 |
| US | 2006/0092177 | May 4, 2006 | Oct. 30, 2004 |
| US | 2006/0209014 | Sep. 21, 2006 | Mar. 16, 2005 |
| US | 2007/0135091 | June 14, 2007 | Dec. 8, 2005 |

---

[12]  Samsung incorporates by reference all prior art references cited in the patents listed herein and/or their file histories.

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 8,095,87 | Jan. 10, 2012 | Dec. 10, 2002 |
| WO | 01/77792 | Oct. 18, 2001 | Apr. 7, 2000 |
| WO | 03/038569 | May 8, 2003 | Oct. 30, 2001 |
| EP | 1 964 022 | Mar. 10, 2010 | Dec. 23, 2005 |
| US | 5,293,908 | Mar. 15, 1994 | Feb. 24, 1993 |
| US | 5,465,084 | Nov. 7, 1995 | Mar. 27, 1990 |
| US | 5,559,961 | Sep. 24, 1996 | Aug. 30, 1995 |
| US | 5,677,710 | Oct. 14, 1997 | May 10, 1993 |
| US | 5,821,933 | Oct. 13, 1998 | Sep. 14, 1995 |
| US | 5,907,327 | May 25, 1999 | Aug. 15, 1997 |
| US | 5,923,908 | July 13, 1999 | Oct. 30, 1997 |
| US | 6,151,208 | Nov. 21, 2000 | June 24, 1998 |
| US | 6,160,555 | Dec. 12, 2000 | Nov. 17, 1997 |
| US | 6,192,478 | Feb. 20, 2001 | Mar. 2,1998 |
| US | 6,249,606 | June 19, 2001 | Feb. 19, 1998 |
| US | 6,323,846 | Nov. 27, 2001 | Jan. 25, 1999 |
| US | 6,347,290 | Feb. 12, 2002 | June 24, 1998 |
| US | 6,421,453 | July 16, 2002 | May 15, 1998 |
| US | 6,570,557 | May 27, 2003 | Feb. 10, 2001 |
| US | 6,573,883 | June 3, 2003 | June 24, 1998 |
| US | 6,633,310 | Oct. 14, 2003 | May 31, 2000 |
| US | 6,677,932 | Jan. 13, 2004 | Jan. 28, 2001 |
| US | 6,720,860 | Apr. 13, 2004 | June 30, 2000 |
| US | 6,735,695 | May 11, 2004 | Dec. 20, 1999 |
| US | 7,124,433 | Oct. 17, 2006 | Dec. 10, 2002 |
| US | 7,151,843 | Dec. 19, 2006 | Jan. 25, 2005 |
| US | 7,174,462 | Feb. 6, 2007 | Nov. 12, 2002 |
| US | 7,245,293 | July 17, 2007 | July 28, 2005 |
| US | 7,263,670 | Aug. 28, 2007 | June 10, 2004 |
| US | 7,302,642 | Nov. 27, 2007 | June 3, 2003 |
| US | 8,095,879 | Jan. 10,2012 | Dec. 10, 2002 |
| US | 2001/0011308 | Aug. 2, 2001 | May 20, 1997 |
| US | 2001/0012022 | Aug. 9, 2001 | Dec. 10, 1998 |
| US | 2002/0015024 | Feb. 7, 2002 | Jan. 25, 1999 |
| US | 2002/0191029 | Dec. 19, 2002 | May 16, 2001 |
| US | 2002/0196274 | Dec. 26, 2002 | June 8, 2001 |
| US | 2003/0142138 | July 31, 2003 | Jan. 28, 2002 |
| US | 2004/0030934 | Feb. 12, 2004 | Oct. 19, 2000 |
| US | 2004/0034801 | Feb. 19, 2004 | Aug. 5, 2003 |
| US | 2004/0085351 | May 6, 2004 | Sep. 19, 2003 |
| US | 2004/0088568 | May 6, 2004 | Sep. 29, 2003 |
| US | 2004/0230843 | Nov. 18, 2004 | July 8, 2004 |
| US | 2004/0250138 | Dec. 9, 2004 | Apr. 18, 2003 |
| US | 2004/0260955 | Dec. 23, 2004 | June 18,2004 |
| US | 2004/0268267 | Dec. 30, 2004 | June 25, 2003 |
| US | 2005/0050477 | Mar. 3, 2005 | July 19, 2000 |
| US | 2005/0060554 | Mar. 17, 2005 | Aug. 30, 2004 |
| US | 2005/0079896 | Apr. 14, 2005 | Oct. 14, 2003 |
| US | 2005/0134578 | June 23, 2005 | July 13, 2001 |
| US | 2005/0212760 | Sep. 29, 2005 | Mar. 23, 2004 |
| US | 2005/0216862 | Sep. 29, 2005 | Mar. 18, 2005 |

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 2005/0248542 | Nov. 10, 2005 | Apr. 29, 2005 |
| US | 2005/0253817 | Nov. 17, 2005 | June 16,2 003 |
| US | 2005/0264833 | Dec. 1, 2005 | Mar. 7, 2005 |
| US | 2005/0289476 | Dec. 29, 2005 | June 28, 2004 |
| US | 2006/0174339 | Aug. 3, 2006 | Oct. 5, 2005 |
| US | 2006/0267955 | Nov. 30, 2006 | Mar. 6, 2006 |
| US | 2008/0034292 | Feb. 7, 2008 | Aug. 4, 2006 |
| US | 2008/0072172 | Mar. 20, 2008 | Mar. 18, 2005 |
| US | 5,923,908 | July 13, 1999 | Oct. 30, 1997 |
| US | 5,943,052 | Aug. 24, 1999 | Aug. 12, 1997 |
| US | 6,298,146 | Oct. 2, 2001 | June 19, 1997 |
| US | 6,313,853 | Nov. 6, 2001 | Apr. 16, 1998 |
| US | 6,351,634 | Feb. 26, 2002 | June 1, 1999 |
| US | 6,639,584 | Oct. 28, 2003 | July 6, 1999 |
| US | 6,985,137 | Jan. 10, 2006 | Aug. 13, 2001 |
| US | 7,031,756 | Apr. 18, 2006 | Mar. 20, 2000 |
| US | 7,453,443 | Nov. 18, 2008 | June 16, 2003 |
| US | 2004/0010722 | Jan. 15, 2004 | Dec. 23, 2002 |
| US | 2005/0134578 | June 23, 2005 | Nov. 6, 2002 |
| US | 2006/0103633 | May 18, 2006 | Feb. 14, 2005 |
| US | 5,821,933 | Oct. 13, 1998 | Sep. 14, 1995 |
| US | 2002/0191029 | Dec. 19, 2002 | May 16, 2001 |
| US | 2002/0104005 | Aug. 1, 2002 | Jan. 31, 2001 |
| US | 2005/0253817 | Nov. 17, 2005 | June 16, 2003 |
| WO | 2004/001560 | Dec. 31, 2003 | June 19, 2002 |
| WO | 2004/111816 | Dec. 23, 2004 | June 13, 2003 |

2.      **Publications**[13]

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| IBM Research Report – A Wristwatch-Computer Based Password-Vault | Mar. 10, 2005 | Gabor Blasko | IBM |
| Passdoodles; a Lightweight Authentication Method | July 27, 2004 | Christopher Varenhorst | |
| Neonode announces WLAN Mobile Phone | Apr. 12, 2005 | Luigi Lugmayr | 14U News |
| Neonode N1 sells for $620 | Nov. 1, 2004 | Luigi Lugmayr | 14U News |
| Neonode N1 Sells now Europe-Wide | Nov. 16, 2004 | Luigi Lugmayr | 14U News |
| Neonode N1 Smartphone starts selling | Oct. 29, 2004 | Luigi Lugmayr | 14U News |
| Neonode Smartphone goes Skateboarding | Sep. 3, 2004 | Luigi Lugmayr | 14U News |
| New Neonode N1m | Apr. 7, 2005 | Luigi Lugmayr | 14U News |
| New Ultra-Mobile Smartphone Neonode N1 | Dec. 21, 2002 | Luigi Lugmayr | 14U News |

---

[13]   Samsung incorporates by reference all prior art references identified in the publications listed herein.

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Sharp will manufacture the new Danger HipTop | July 25, 2004 | Luigi Lugmayr | 14U News |
| The Neonode N1 Smart Phone is Shipping, kinda | June 25, 2004 | Luigi Lugmayr | 14U News |
| Top 10 Future Technology Stories On I4U | Mar. 19, 2003 | Luigi Lugmayr | 14U News |
| Neonode launches the N1 in Sweden | Oct. 10, 2004 | | Neonode |
| Neonode Newsletter #3 | Undated | The Crew | Neonode |
| Neonode N1 Handset Development Description | Feb. 19, 2003 | | Neonode |
| Neonode Existence – N1 Factsheet V1.1 | 2003 | | Neonode |
| RedNeo Forum | Feb. 3, 2005 | | RedNeo |
| Neonode launches The N1 In Sweden | Oct. 29, 2004 | | Neonode |
| Neonode User Guide | Undated | | Neonode |
| N1 Quick Start Guide V 0.5 | Undated | | Neonode |
| NeoNode N1 - Can a unique interface put this compelling smart phone on the map? | Undated | Conrad H. Blickenstorfer | Pen Computing Magazine |
| RedNeo Forum | Jan. 22, 2005 | | RedNeo |
| RedNeo Forum | Sep. 23, 2004 | | RedNeo |
| The Lemur Owner's Manual | Aug. 1, 2005 | | JazzMutant |
| Lemur Owner's Manual Version 1.2 | 2005 | | JazzMutant |
| Soft Machines: A Philosophy of User-Computer Interface Design | Dec. 1983 | Lloyd H. Nakatani and John A. Rohrlich | |
| Touchscreen Toggle Switches: Push or Slide? Design issues and usability study | Nov. 1990 | Catherine Plaisant & Daniel Wallace | University of Maryland |
| TOUCHSCREEN TOGGLE DESIGN | May 1992 | Catherine Plaisant & Daniel Wallace | |
| Specification of Interface Interaction Objects | Sep. 1993 | David A. Carr | University of Maryland |
| Kenwood - KVT-911DVD Instruction Manual | 2000 | | Kenwood |
| Kenwood's High-End Triumph | July 22, 2002 | Amy Gilroy | TWICE |
| VAIO pocket for Windows | Undated | | Sony |
| Sony Plans HOD Music Portables In U.S. | May 17, 2004 | Joseph Palenchar | TWICE |
| Apple-Samsung Dutch Decision | Aug. 24, 2011 | | |
| Digital Photo Browsing with Souvenirs | 2003 | Elise van den Hoven & Berry | IOS Press |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| | | Eggen | |
| IBM - Access/Control Icons (Icon Keys) | Apr. 4, 1995 | J. McLean, C. A. Pickover and D. Winarski | IBM |
| The design and Analysis of Graphical Passwords | Aug. 1999 | Ian Jermyn, Alain Mayer, Fabian Monrose, Michael K. Reiter, and Aviel D. Rubin | USENIX |
| Motion Gestures | 2005 | | Apple |
| Motion Getting Started Manual | 2004 | | Apple |
| Contact Area Interaction with Sliding Widgets | Undated | Tomer Moscovich | |
| Scheduling home control devices: design issues and usability evaluation of four touchscreen interfaces | 1992 | Catherine Plaisant and Ben Shneiderman | University of Maryland |
| SMART Board Software Version 8.1.3 Introduces Touch Gestures | Aug. 10, 2004 | | Smart Technologies |
| Touch-Sensing Input Devices | 1999 | Ken Hinckley and Mike Sinclair | |
| Layered Touch Panel: The Input Device with Two Touch Panel Layers | Apr. 2002 | | |

   3.    **Systems**

   All versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '721 Patent, including documents and source code describing the same:

- Plaisant

- Gridlock

- Neonode.

   Samsung reserves the right to amend these invalidity contentions to assert these references depending on the claim construction and infringement positions Apple may take as the case proceeds.  Moreover, Samsung reserves the right to use these references in combination with other

references to render the claims of the '721 Patent obvious in the event Apple takes the position that certain claim limitations are missing from the references charted in Exhibit F.

### B.  Local Patent Rule 3-3(b):  Whether Each Item Anticipates or Renders Obvious the Asserted Claims

Plaintiff asserts claims 1-15 of the '721 Patent against Samsung in this lawsuit.  All of those claims are invalid because the '721 Patent fails to meet one or more of the requirements for patentability.  The individual bases for invalidity are provided below and in the claim charts attached as Exhibit F.  Each of the foregoing listed prior art documents, the underlying work, and/or the underlying apparatus or method qualifies as prior art under one or more sections of 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

Although Samsung has identified at least one citation per limitation for each reference, each and every disclosure of the same limitation in the same reference is not necessarily identified.  Rather, in an effort to focus the issues, Samsung has generally cited representative portions of identified references, even where a reference may contain additional support for a particular claim element.  In addition, persons of ordinary skill in the art generally read a prior art reference as a whole and in the context of other publications and literature.  Thus, to understand and interpret any specific statement or disclosure within a prior art reference, such persons would rely on other information within the reference, along with other publications and their general scientific knowledge.  Samsung may rely upon uncited portions of the prior art references and on other publications and expert testimony to provide context, and as aids to understanding and interpreting the portions that are cited.  Samsung may also rely on uncited portions of the prior art references, other disclosed publications, and the testimony of experts to establish that a person of ordinary skill in the art would have been motivated to modify or combine certain of the cited references so as to render the claims obvious.

### 1.  Anticipation

Some or all of the asserted claims of the '721 Patent are invalid as anticipated under 35 U.S.C. § 102 in view of each of the prior art references identified above and in the claim charts included in Exhibit F, which identify specific examples of where each limitation of the asserted

claims is found in the prior art references.  As explained above, the cited portions of prior art references identified in the attached claim charts are exemplary only and representative of the content and teaching of the prior art references, and should be understood in the context of the reference as a whole and as they would be understood by a person of ordinary skill in the art.

### 2. Obviousness

To the extent any limitation is deemed not to be exactly met by an item of prior art listed above and in Exhibit F, then any purported differences are such that the claimed subject matter as a whole would have been obvious to one skilled in the art at the time of the alleged invention, in view of the state of the art and knowledge of those skilled in the art.  The item of prior art would, therefore, render the relevant claims invalid for obviousness under 35 U.S.C. § 103(a).

In addition, the references identified above render one or more asserted claims of the '721 Patent obvious when the references are read in combination with each other, and/or when read in view of the state of the art and knowledge of those skilled in the art.  Each and every reference identified is also relevant to the state of the art at the time of the alleged invention.  Any of the references disclosed above may be combined to render obvious (and therefore invalid) each of Plaintiff's asserted claims.  Samsung may rely upon a subset of the above identified references or all of the references identified above, including all references in Exhibit F, for purposes of obviousness depending on the Court's claim construction, positions taken by Apple during this litigation, and further investigation and discovery.

Moreover, to the extent the foregoing references are found not to anticipate the asserted claims, the foregoing references render the asserted claims obvious either alone or in combination with one or more of the other references identified above pursuant to P.R. 3-3(a).  As explained herein and/or in the accompanying charts, it would have been obvious to a person of skill in the art at the time of the alleged invention of the asserted claims of the '721 Patent to combine the various references cited herein so as to practice the asserted claims of the '721 Patent.

Motivations to combine the above items of prior art are present in the references themselves, the common knowledge of one of ordinary skill in the art, the prior art as a whole, or

the nature of the problems allegedly addressed by the '721 Patent.  Combining the references disclosed in Exhibit F would have been obvious, as the references identify and address the same technical issues and suggest very similar solutions to those issues.  Samsung reserves the right to amend or supplement these invalidity contentions to identify additional reasons that combining the references would be obvious to one of ordinary skill in the art.

In accordance with P.R. 3-3(b), prior art references rendering the asserted claims obvious, alone or in combination with other references, including identification of combinations showing obviousness, are identified in Exhibits F 1-6, which includes exemplary claim charts for the asserted claims of the '721 Patent showing specifically where in each reference or combinations of references each asserted claim is found, and an explanation of why the prior art renders the asserted claim obvious.

In particular, Samsung contends that the asserted claims of the '721 Patent would have been obvious in view of the prior art references identified above.  For example, Exhibit F includes exemplary claim charts that describe how the asserted claims of the '721 Patent would have been obvious in view of all references identified in Exhibit F, which, if found not to anticipate the claims of the '721 Patent, render the claims of the '721 Patent obvious alone.

In addition to the specific combinations of prior art and the specific combinations of groups of prior art disclosed, Samsung reserves the right to rely on any other combination of any prior art references disclosed herein.  Samsung further reserves the right to rely upon combinations disclosed within the prosecution history of the references cited herein.

The obviousness combinations set forth in these contentions reflect Samsung's present understanding of the potential scope of the claims that Plaintiff appears to be advocating and should not be seen as Samsung's acquiescence to Plaintiff's interpretation of the patent claims.

Samsung reserves the right to amend or supplement these contentions regarding anticipation or obviousness of the asserted claims, in view of further information from Plaintiff,

information discovered during discovery, or a claim construction ruling by the Court.  Plaintiff has not identified what elements or combinations it alleges were not known to one of ordinary skill in the art at the time.  Therefore, for any claim limitation that Plaintiff alleges is not disclosed in a particular prior art reference, Samsung reserves the right to assert that any such limitation is either inherent in the disclosed reference or obvious to one of ordinary skill in the art at the time in light of the same, or that the limitation is disclosed in another of the references disclosed above and in combination would have rendered the asserted claim obvious.

### C.    Local Patent Rule 3-3(c):  Charts Identifying where Specifically in each Alleged item of Prior Art each Asserted Claim is Found

Pursuant to Local Patent Rule 3-3(c), charts identifying where specifically in each alleged item of prior art each limitation of each asserted claim is found, including for each limitation that Samsung contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function is attached in Exhibits F 1-6.

### D.    Local Patent Rule 3-3(d):  Other Grounds for Invalidity

Samsung identifies the following grounds for invalidity of the asserted claims of the '721 Patent based on 35 U.S.C. §§ 101 and/or 112 ¶¶ 1 and 2.  Samsung reserves the right to supplement these disclosures based on further investigation and discovery.

#### 1.    Invalidity Based on 35 U.S.C. § 101

The asserted claims of the '721 Patent are invalid under 35 U.S.C. § 101 because they only claim abstract ideas.  Many limitations in the asserted claims are common abstractions in computer systems and programming languages.  For example, "detecting a contact with the touch-sensitive display at a first predefined location corresponding to an unlock image," "continuously moving the unlock image on the touch-sensitive display in accordance with movement of the contact while continuous contact with the touch screen is maintained," "unlocking the hand-held electronic device if the moving the unlock image on the touch-sensitive display results in movement of the unlock image from the first predefined location to a predefined unlock region on the touch-sensitive display," "moving comprises movement along any desired path," "moving

comprises movement along any desired path," "displaying visual cues to communicate a direction of movement of the unlock image required to unlock the device," "an arrow indicating a general direction of movement," each refer only to programming abstractions, the manipulation of information, or abstract ideas regarding user interaction; these are concepts, not physical objects or tangible matter.

    2. **Invalidity Based on Enablement or Written Description Under 35 U.S.C. § 112(1) and/or Invalidity Based on Indefiniteness Under 35 U.S.C. § 112(2)**

  Samsung asserts that each asserted claim of the '721 Patent is invalid in that the '721 specification fails to particularly point out and distinctly claim the alleged invention of the '721 Patent.  Samsung further asserts that each asserted claim of the '721 Patent is invalid as not containing a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the alleged invention.

  Based on Samsung's present understanding of Plaintiff's infringement contentions, Samsung asserts that claim 1-15 of the '721 Patent are invalid under 35 U.S.C. § 112 ¶ 1 at least because they include the following claim terms/phrases:

- "A method for unlocking a handheld device,"

- "continuously moving the unlock image on the touch-sensitive display in accordance with movement of the contact while continuous contact with the touch screen is maintained, wherein the unlock image is a graphical, interactive user-interface object with which a user interacts in order to unlock the device,"

- "unlocking the hand-held electronic device if the moving the unlock image on the touch-sensitive display results in movement of the unlock image from the first predefined location to a predefined unlock region on the touch-sensitive display,"

- "moving comprises movement along any desired path,"

- "moving comprises movement along any desired path,"

- "displaying visual cues to communicate a direction of movement of the unlock image required to unlock the device,"

- "an arrow indicating a general direction of movement."

These claim terms/phrases as apparently construed by Apple violate the written description and/or enablement requirements of 35 U.S.C. § 112 ¶ 1.

Based on Samsung's present understanding of Plaintiff's infringement contentions, at least one or more of these claim terms/phrases are indefinite because they are inconsistent with and broader than the alleged invention disclosed in the specification and given Plaintiff's apparent constructions of the claims, any person of ordinary skill in the art at the time of the invention would not understand what is claimed, even when the claims are read in light of the specification. Moreover, based on Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted claims in which these claim terms/phrases appear lack written description because the specification of the '721 Patent demonstrates that the patentee neither conceived of nor demonstrated possession of all that Apple now contends the claims cover.  In addition, based on Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted claims in which these claim terms/phrases appear are invalid because the specification fails to provide sufficient disclosure to enable any person of ordinary skill in the art to which it pertains, or with which it is most nearly connected, to implement the invention without undue experimentation.  Therefore, the claims fail to satisfy the requirements of § 112 ¶¶ 1 and 2.

Samsung further asserts that claims 11, 7, 8, 9, 10, 12, 14, 15 of the '721 Patent are invalid for reciting at least the following claim limitations:

- "means for displaying an unlock image at a first predefined location on the touch-sensitive display while the device is in a user-interface lock state";

- "means for continuously moving the unlock image on the touch-sensitive display in response to detecting the contact in accordance with movement of the contact while continuous contact with the touch screen is maintained, wherein the unlock image

is a graphical, interactive user-interface object with which a user interacts in order to unlock the device";

- "means for transitioning the device to a user-interface unlock state if the moving the unlock image on the touch-sensitive display results in movement of the unlock image from the first predefined location to a predefined unlock region on the touch-sensitive display";

- "including instructions… to detect a contact with the touch-sensitive display at a first predefined location corresponding to an unlock image";

- "including instructions…. to continuously move the unlock image on the touch-sensitive display in accordance with movement of the detected contact while continuous contact with the touch-sensitive display is maintained, wherein the unlock image is a graphical, interactive user-interface object with which a user interacts in order to unlock the device"; and

- "including instructions… to unlock the hand-held electronic device if the unlock image is moved from the first predefined location on the touch screen to a predefined unlock region on the touch-sensitive display";

- "A computer readable storage medium storing one or more programs, the one or more programs comprising instructions…. comprising… detecting… continuously moving…. and unlocking."

Each of those claim limitations is or may be governed by 35 U.S.C. section 112, paragraph 6.  The '721 patent specification, however, fails to set forth the structure, material or acts for accomplishing the recited function.  Each of these claims is therefore invalid as indefinite under 35 U.S.C. § 112(2).

## VII.    THE '172 PATENT

### A.        Local Patent Rule 3-3(a):  Identification of Prior Art

At this time, Samsung contends that at least the following prior art references anticipate or render obvious, either alone or in combination, the asserted claims of the '172 Patent:

#### 1.        Patent References[14]

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 5,367,453 | Nov. 22, 1994 | Aug. 2, 1993 |
| US | 5,437,036 | July 25, 1995 | Sep. 3, 1992 |
| US | 5,487,616 | Jan. 30, 1996 | June 1, 1995 |
| US | 5,594,640 | July 25, 1995 | Aug. 2, 1993 |
| US | 5,623,406 | Apr. 22, 1997 | Mar. 6, 1995 |
| US | 5,682,439 | Oct. 28, 1997 | Aug. 7, 1995 |
| US | 5,818,437 | Oct. 6, 1998 | July 26, 1995 |
| US | 5,953,541 | Sep. 14, 1999 | Jan. 24, 1997 |
| US | 6,002,390 | Dec. 14, 1999 | Nov. 21, 1997 |
| US | 6,085,206 | July 4, 2000 | June 20, 1996 |
| US | 6,204,848 | Mar. 20, 2001 | Apr. 14, 1999 |
| US | 6,307,548 | Oct. 23, 2001 | Sep. 25, 1997 |
| US | 6,377,965 | Apr. 23, 2002 | Nov. 7, 1997 |
| US | 6,405,060 | June 11, 2002 | Dec. 19, 1997 |
| US | 6,556,841 | Apr. 29, 2003 | May 3, 1999 |
| US | 6,583,798 | June 24, 2003 | July 21, 2000 |
| US | 6,724,370 | Apr. 20, 2004 | Apr. 12, 2001 |
| US | 6,801,190 | Oct. 5, 2004 | May 27, 1999 |
| US | 6,801,659 | Oct. 5, 2004 | Jan. 4, 1999 |
| US | 6,822,585 | Nov. 23, 2004 | Sep. 15, 2000 |
| US | 6,836,759 | Dec. 28, 2004 | Aug. 22, 2000 |
| US | 6,920,452 | July 19, 2005 | Apr. 26, 2001 |
| US | 7,030,863 | Apr. 18, 2006 | July 16, 2003 |
| US | 7,088,345 | Aug. 8, 2006 | May 27, 1999 |
| US | 7,091,885 | Aug. 15, 2006 | June 2, 2004 |
| US | 7,098,896 | Aug. 29, 2006 | Jan. 16, 2003 |
| US | 7,119,794 | Oct. 10, 2006 | Apr. 30, 2003 |
| US | 7,130,798 | Oct. 31, 2006 | Aug. 22, 2000 |
| US | 7,202,853 | Apr. 10, 2007 | Mar. 4, 2003 |
| US | 7,277,088 | Oct. 2, 2007 | Feb. 4, 2004 |
| US | 7,293,231 | Nov. 6, 2007 | Mar. 18, 1999 |
| US | 7,296,019 | Nov. 13, 2007 | Oct. 23, 2001 |
| US | 7,403,888 | July 22, 2008 | June 28, 2000 |
| US | 7,443,316 | Oct. 28, 2008 | Sep. 1, 2005 |
| US | 7,486,277 | Feb. 3, 2009 | Apr. 30, 2003 |
| US | 7,581,180 | Aug. 25, 2009 | May 10, 2001 |
| US | 7,584,093 | Sep. 1, 2009 | Apr. 25, 2005 |
| US | 7,584,426 | Sep. 1, 2009 | Mar. 31, 2004 |

---

[14]    Samsung incorporates by reference all prior art references cited in the patents listed herein and/or their file histories.

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 7,599,828 | Oct. 6, 2009 | Mar. 1, 2005 |
| US | 7,636,083 | Dec. 22, 2009 | Feb. 20, 2004 |
| US | 7,698,123 | Apr. 13, 2010 | Aug. 31, 2004 |
| US | 7,716,579 | May 11, 2010 | May 19, 2005 |
| US | 7,725,419 | May 25, 2010 | Sep. 3, 2003 |
| US | 7,880,730 | Feb. 1, 2011 | Feb. 9, 2004 |
| US | 7,886,233 | Feb. 8, 2011 | May 23, 2005 |
| US | 7,920,132 | Apr. 5, 2011 | May 27, 1999 |
| US | 7,996,589 | Aug. 9, 2011 | Apr. 22, 2005 |
| US | 8,036,878 | Oct. 11, 2011 | May 18, 2005 |
| US | 8,136,050 | Mar. 13, 2012 | Nov. 21, 2003 |
| US | 8,185,841 | May 22, 2012 | May 23, 2005 |
| US | 2003/0033288 | Feb. 13, 2003 | Aug. 13, 2001 |
| US | 2004/0021691 | Feb. 5, 2004 | May 21, 2001 |
| US | 2004/0140956 | July 22, 2004 | Jan. 16, 2003 |
| US | 2004/0183833 | Sep. 23, 2004 | Mar. 19, 2003 |
| US | 2005/0188330 | Aug. 25, 2005 | Feb. 20, 2004 |
| US | 2005/0192802 | Sep. 1, 2005 | Feb. 11, 2004 |
| US | 2005/0283358 | Dec. 22, 2005 | Aug. 26, 2005 |
| US | 2006/0063558 | Mar. 23, 2006 | Sep. 21, 2004 |
| US | 2006/0142997 | June 29, 2006 | Dec. 27, 2002 |
| US | 2006/0149551 | July 6, 2006 | Dec. 22, 2004 |
| US | 2006/0167676 | July 27, 2006 | Jan. 26, 2005 |
| US | 2006/0176283 | Aug. 10, 2006 | Aug. 6, 2004 |
| US | 2006/0190447 | Aug. 24, 2006 | Feb. 22, 2005 |
| US | 2006/0206815 | Sep. 14, 2006 | Mar. 8, 2005 |
| US | 2006/0206816 | Sep. 14, 2006 | Mar. 11, 2005 |
| US | 2006/0274051 | Dec. 7, 2006 | Jan. 12, 2004 |
| US | 2006/0269138 | Nov. 30, 2006 | Aug. 22, 2000 |
| US | 2007/0016862 | Jan. 18, 2007 | July 15, 2005 |
| US | 2007/0061753 | Mar. 15, 2007 | June 30, 2004 |
| US | 2007/0074131 | Mar. 29, 2007 | May 18, 2005 |
| US | 2008/0266263 | Oct. 30, 2008 | Mar. 23, 2006 |
| US | 2009/0019395 | Jan. 15, 2009 | Nov. 22, 2004 |
| US | 2011/0010655 | Jan. 13, 2011 | May 21, 2001 |
| JP | 2001-325062 | Nov. 22, 2001 | May 17, 2000 |

2.     **Publications**[15]

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| A Minimal Device-Independent Text Input Method | Nov. 10, 1999 | Poika Isokoski | University of Tampere |
| A Stylus-Based User Interface for Text: Entry and Editing | June 1991 | Aaron Goodisman | Massachusetts Institute of Technology |
| Adaptive Forms: An | 1998 | Martin Frank | Association for |

---

[15]   Samsung incorporates by reference all prior art references identified in the publications listed herein.

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Interaction Paradigm for Entering Structured Data | | and Pedro Szekely | Computing Machinery |
| An Efficient Text Input Method for Pen-based Computers | Apr. 1998 | Toshiyuki Masui | Association for Computing Machinery |
| Embedded Menus: Selecting Items In Context | Apr. 1986 | Larry Koved and Ben Schneiderman | Association for Computing Machinery |
| Empirically-based Re-design of a Hypertext Encyclopedia | Apr. 1993 | Keith Instone, Barbee Mynatt Teasley, and Laura Leventhal | Association for Computing Machinery |
| FitalyStamp User's Manual | Aug. 12, 2004 | | TextWare Solutions |
| FitalyVirtual User's Manual | Jan. 4, 2005 | | TextWare Solutions |
| From Letters to Words: Efficient Stroke-based Word Completion for Trackball Text Entry | Oct. 2006 | Jacob Wobbrock and Brad Myers | Association for Computing Machinery |
| Handbook for Palm<sup>TM</sup> Tungsten<sup>TM</sup> T Handhelds | 2002 | | Palm |
| Instant Text Mobile User's Manual | May 13, 2005 | | TextWare Solutions |
| Instant Text Mobile Options and Advanced Features | Aug. 16, 2005 | | TextWare Solutions |
| Integrating Pen Operations for Composition by Example | 1998 | Toshiyuki Masui | Association for Computing Machinery |
| Mobile Text Entry | Nov. 8, 2002 | Amal Sirisena | University of Canterbury |
| Model-based and Empirical Evaluation of Multimodal Interactive Error Correction | 1999 | Bernhard Suhm, Brad Myers, and Alex Waibel | Association for Computing Machinery |
| Motorola V3 GSM User Guide | 2005 | | Motorola |
| Natural Language Interfaces: Specifying and Using Conceptual Constraints | 1993 | Elisabeth Godbert, Robert Pasero, and Paul Sabatier | Elsevier |
| POBox: An Efficient Text Input Method for Handheld and Ubiquitous Computers | 1999 | Toshiyuki Masui | Springer-Verlag |
| Read This First – Welcome to Instant Text Mobile | Apr. 9, 2005 | | TextWare Solutions |
| Read This First – Welcome to FitalyStamp | Aug. 5, 2004 | | TextWare Solutions |
| Read This First – Welcome to FitalyVirtual | July 29, 2005 | | TextWare Solutions |
| Syntax PAL: A System to Improve the Written Syntax of Language-Impaired Users | 1992 | Corinne Morris, Alan Newell, Lynda Booth, | Rehabilitation Engineering and Assistive |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
|  |  | Ian Ricketts and John Arnott | Technology Society |
| Text Entry for Mobile Computing: Models and Methods, Theory and Practice | 2002 | I. Scott MacKenzie and R. William Soukoreff | Lawrence Erlbaum Associates |
| Text prediction systems: a survey | 2006 | Nestor Garay-Vitoria and Julio Abascal | Springer-Verlag |
| Toshiba Pocket PC e570 Instruction Manual | Sep. 2001 |  | Toshiba |
| TextPlus$^{TM}$ for the Palm OS Version 5.5 Users Guide | Aug. 31, 2004 |  | TextWare Solutions |
| The Fitaly Keyboard for the Palm Organizer: Reference Manual | Jan. 20, 2000 |  | TextWare Solutions |
| Treo$^{TM}$ 90 Handheld User Guide | 2002 |  | Handspring |
| WiViK On-screen Keyboard | 2003 |  | Prentke Romich Company |

3.      **Systems**

All versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '172 Patent, including documents and source code describing the same:

- eZiTap, eZiText, and eZiType

- Fitaly 3 for the Pocket PC

- FitalyStamp 3

- FitalyVirtual 3

- Interkey Professional

- Instant Text Mobile for the Palm OS5

- LookDA 3.5

- Mac OS X Autocomplete

- Spell Catcher X

- T-Mobile Dash

- TenGO 2.0

- TenGO Palm 1.0

- TenGO Thumb 1.04

- TextPlus 3.0

- TextPlus for the Palm OS Version 5.5

- The Fitaly Keyboard for the Palm Organizer 2.0

- WiViK 3 On-Screen Keyboard

- WordComplete 2.0

Samsung reserves the right to amend these invalidity contentions to assert these references depending on the claim construction and infringement positions Apple may take as the case proceeds.  Moreover, Samsung reserves the right to use these references in combination with other references to render the claims of the '172 Patent obvious in the event Apple takes the position that certain claim limitations are missing from the references charted in Exhibit G.

**B.      Local Patent Rule 3-3(b):  Whether Each Item Anticipates or Renders Obvious the Asserted Claims**

Plaintiff asserts claims 2-6, 9-12, 17-21, 23-25 and 27-37 of the '172 Patent against Samsung in this lawsuit.  All of those claims are invalid because the '172 Patent fails to meet one or more of the requirements for patentability.  The individual bases for invalidity are provided below and in the claim charts attached as Exhibit G.  Each of the foregoing listed prior art documents, the underlying work, and/or the underlying apparatus or method qualifies as prior art under one or more sections of 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

Although Samsung has identified at least one citation per limitation for each reference, each and every disclosure of the same limitation in the same reference is not necessarily identified.  Rather, in an effort to focus the issues, Samsung has generally cited representative portions of identified references, even where a reference may contain additional support for a particular claim element.  In addition, persons of ordinary skill in the art generally read a prior art reference as a whole and in the context of other publications and literature.  Thus, to understand and interpret any specific statement or disclosure within a prior art reference, such persons would rely on other information within the reference, along with other publications and their general scientific knowledge.  Samsung may rely upon uncited portions of the prior art references and on other

publications and expert testimony to provide context, and as aids to understanding and interpreting the portions that are cited.  Samsung may also rely on uncited portions of the prior art references, other disclosed publications, and the testimony of experts to establish that a person of ordinary skill in the art would have been motivated to modify or combine certain of the cited references so as to render the claims obvious.

### 1.    **Anticipation**

Some or all of the asserted claims of the '172 Patent are invalid as anticipated under 35 U.S.C. § 102 in view of each of the prior art references identified above and in the claim charts included in Exhibit G, which identify specific examples of where each limitation of the asserted claims is found in the prior art references.  As explained above, the cited portions of prior art references identified in the attached claim charts are exemplary only and representative of the content and teaching of the prior art references, and should be understood in the context of the reference as a whole and as they would be understood by a person of ordinary skill in the art.

### 2.    **Obviousness**

To the extent any limitation is deemed not to be exactly met by an item of prior art listed above and in Exhibit G, then any purported differences are such that the claimed subject matter as a whole would have been obvious to one skilled in the art at the time of the alleged invention, in view of the state of the art and knowledge of those skilled in the art.  The item of prior art would, therefore, render the relevant claims invalid for obviousness under 35 U.S.C. § 103(a).

In addition, the references identified above render one or more asserted claims of the '172 Patent obvious when the references are read in combination with each other, and/or when read in view of the state of the art and knowledge of those skilled in the art.  Each and every reference identified is also relevant to the state of the art at the time of the alleged invention.  Any of the references disclosed above may be combined to render obvious (and therefore invalid) each of Plaintiff's asserted claims.  Samsung may rely upon a subset of the above identified references or all of the references identified above, including all references in Exhibit G, for purposes of obviousness depending on the Court's claim construction, positions taken by Apple during this litigation, and further investigation and discovery.

Moreover, to the extent the foregoing references are found not to anticipate the asserted claims, the foregoing references render the asserted claims obvious either alone or in combination with one or more of the other references identified above pursuant to P.R. 3-3(a).  As explained herein and/or in the accompanying charts, it would have been obvious to a person of skill in the art at the time of the alleged invention of the asserted claims of the '172 Patent to combine the various references cited herein so as to practice the asserted claims of the '172 Patent.

Motivations to combine the above items of prior art are present in the references themselves, the common knowledge of one of ordinary skill in the art, the prior art as a whole, or the nature of the problems allegedly addressed by the '172 Patent.  Combining the references disclosed in Exhibit G would have been obvious, as the references identify and address the same technical issues and suggest very similar solutions to those issues.  Samsung reserves the right to amend or supplement these invalidity contentions to identify additional reasons that combining the references would be obvious to one of ordinary skill in the art.

In accordance with P.R. 3-3(b), prior art references rendering the asserted claims obvious, alone or in combination with other references, including identification of combinations showing obviousness, are identified in Exhibits G-1 to G-11, which includes exemplary claim charts for the asserted claims of the '172 Patent showing specifically where in each reference or combinations of references each asserted claim is found, and an explanation of why the prior art renders the asserted claim obvious.

In particular, Samsung contends that the asserted claims of the '172 Patent would have been obvious in view of the prior art references identified above.  For example, Exhibit G includes exemplary claim charts that describe how the asserted claims of the '172 Patent would have been obvious in view of all references identified in Exhibit G, which, if found not to anticipate the claims of the '172 Patent, render the claims of the '172 Patent obvious alone.

1    In addition to the specific combinations of prior art and the specific combinations of

2 groups of prior art disclosed, Samsung reserves the right to rely on any other combination of any

3 prior art references disclosed herein.  Samsung further reserves the right to rely upon combinations

4 disclosed within the prosecution history of the references cited herein.

5    The obviousness combinations set forth in these contentions reflect Samsung's present

6 understanding of the potential scope of the claims that Plaintiff appears to be advocating and

7 should not be seen as Samsung's acquiescence to Plaintiff's interpretation of the patent claims.

8    Samsung reserves the right to amend or supplement these contentions regarding

9 anticipation or obviousness of the asserted claims, in view of further information from Plaintiff,

10 information discovered during discovery, or a claim construction ruling by the Court.  Plaintiff has

11 not identified what elements or combinations it alleges were not known to one of ordinary skill in

12 the art at the time.  Therefore, for any claim limitation that Plaintiff alleges is not disclosed in a

13 particular prior art reference, Samsung reserves the right to assert that any such limitation is either

14 inherent in the disclosed reference or obvious to one of ordinary skill in the art at the time in light

15 of the same, or that the limitation is disclosed in another of the references disclosed above and in

16 combination would have rendered the asserted claim obvious.

17    **C.    Local Patent Rule 3-3(c):  Charts Identifying where Specifically in each
        Alleged item of Prior Art each Asserted Claim is Found**

18

19    Pursuant to Local Patent Rule 3-3(c), charts identifying where specifically in each alleged

20 item of prior art each limitation of each asserted claim is found, including for each limitation that

21 Samsung contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or

22 material(s) in each item of prior art that performs the claimed function is attached in Exhibits G-1

23 to G-11.

24    **D.    Local Patent Rule 3-3(d):  Other Grounds for Invalidity**

25    Samsung identifies the following grounds for invalidity of the asserted claims of the '172

26 Patent based on 35 U.S.C. §§ 101 and/or 112 ¶¶ 1 and 2.  Samsung reserves the right to

27 supplement these disclosures based on further investigation and discovery.

28

1.      **Invalidity Based on 35 U.S.C. § 101**

The asserted claims of the '172 Patent are invalid under 35 U.S.C. § 101 because they only claim abstract ideas.  Many limitations in the asserted claims are common abstractions in computer systems and programming languages.  For example, "displaying a current character string", "displaying the current character string or a portion thereof and a suggested replacement character string", "displaying a suggested replacement character string", "displaying an alternative suggested replacement character string", "replacing the current character string", "replacing the current character set", "keeping the current character string", "the current character string in the first area is replaced", "the current character string in the first area is kept", "appending a punctuation mark", "the suggested replacement character string in combination with a punctuation a first punctuation mark", "the suggested replacement character string in combination with a second punctuation mark", "adding at the end of said character set a punctuation mark" each refer only to programming abstractions or the manipulation of information; these are concepts, not physical objects or tangible matter.

2.      **Invalidity Based on Enablement or Written Description Under 35 U.S.C. § 112(1) and/or Invalidity Based on Indefiniteness Under 35 U.S.C. § 112(2)**

Samsung asserts that each asserted claim of the '172 Patent is invalid in that the '172 specification fails to particularly point out and distinctly claim the alleged invention of the '172 Patent.  Samsung further asserts that each asserted claim of the '172 Patent is invalid as not containing a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the alleged invention.

Based on Samsung's present understanding of Apple's infringement contentions, Samsung asserts that claims 18, 19, 20, 27, 28, 32, 33 of the '172 Patent are invalid as indefinite because they combine method and apparatus limitations.  Samsung further asserts that claims 2-3, 6, 9, 18-21, 23-25 and 27-37 of the '172 Patent are invalid as indefinite for reciting at least the following claim terms/phrases:

- "current character string" / "current character set"

Case No. 12-cv-00630-LHK
SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

- "being input by a user with a keyboard"

- "replacing the current character string" / "the current character string in the first area is replaced"

- "key on the keyboard associated with a delimiter"

- "keeping the current character string" / "the current character string in the first area is kept"

- "performs a first gesture on the suggested replacement character string"

- "performs a second gesture in the second area on the current character string or the portion thereof"

- "soft keyboard" / "virtual keyboard" / "virtual key" / "virtual . . . key"

- "performs a predefined gesture on the alternative suggested replacement character string in the second area"

- "performs a gesture on the suggested replacement character string"

- "performs a gesture in the second area on the current character string or the portion thereof"

- "user input of a single touch" / "single touch input" / "single touch user selection input"

- "single user input at a first location / single user input at a second location / single user input at a third location"

- "in response to . . . user input" / "in response to the single touch user selection input"

- "accepting the current character string"

These claim terms/phrases as apparently construed by Apple violate the written description, enablement, and/or definiteness requirements of 35 U.S.C. § 112.

Based on Samsung's present understanding of Plaintiff's infringement contentions, at least one or more of these claim terms/phrases are indefinite because they are inconsistent with and broader than the alleged invention disclosed in the specification and given Plaintiff's apparent constructions of the claims, any person of ordinary skill in the art at the time of the invention would not understand what is claimed, even when the claims are read in light of the specification. Moreover, based on Samsung's present understanding of Plaintiff's infringement contentions, each

of the asserted claims in which these claim terms/phrases appear lack written description because the specification of the '172 Patent demonstrates that the patentee neither conceived of nor demonstrated possession of all that Apple now contends the claims cover.

Samsung further asserts that claims 2, 19-21, 27-28, 32-33 are invalid for reciting at least the following claim terms/phrases:

- "displaying a current character string . . ."

- "replacing the current character string . . ."

- "keeping the current character string . . ."

- "instructions for displaying . . ." / "instructions, which . . . display . . ." / "instructions, which . . . perform . . . displaying . . ." / "instructions that . . . perform . . . displaying . . ."

- "instructions for replacing" / "instructions, which . . . replace . . ." / "instructions, which . . . perform . . . replacing . . ." / "instructions that . . . perform . . . replacing . . ."

- "instructions for keeping . . ." / "instructions, which . . . keep . . ."

- "instructions that . . . perform . . . appending . . ."

- "instructions that . . . perform . . . accepting . . ."

Each of these claims is governed by 35 U.S.C. § 112, paragraph 6.  The '172 patent specification, however, fails to set forth the structure, material or acts for accomplishing the claimed steps and instructions.  Each of these claims is therefore invalid as indefinite under 35 U.S.C. § 112(2).

In addition, based on Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted claims in which these claim terms/phrases appear are invalid because the specification fails to provide sufficient disclosure to enable any person of ordinary skill in the art to which it pertains, or with which it is most nearly connected, to implement the invention without undue experimentation.

For at least the reasons set forth above, the claims fail to satisfy the requirements of § 112 ¶¶ 1 and 2.

## VIII.   THE '604 PATENT

### A.        Local Patent Rule 3-3(a):  Identification of Prior Art

At this time, Samsung contends that at least the following prior art references anticipate or render obvious, either alone or in combination, the asserted claims of the '604 Patent:

1.        Patent References[16]

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 3,496,299 | Feb. 17, 1970 | Nov. 14, 1966 |
| US | 4,260,854 | Apr. 7, 1981 | May 20, 1975 |
| US | 5,019,806 | May 28, 1991 | Apr. 30, 1984 |
| US | 5,337,347 | Aug. 9, 1994 | June 25, 1992 |
| US | 5,577,241 | Nov. 19, 1996 | Dec. 7,1994 |
| US | 5,634,053 | May 27, 1997 | Aug. 29, 1995 |
| US | 5,659,732 | Aug. 19, 1997 | May 17, 1995 |
| US | 5,671,426 | Sep. 23, 1997 | June 22, 1993 |
| US | 5,742,816 | Apr. 21, 1998 | Sep. 15, 1995 |
| US | 5,845,278 | Dec. 1, 1998 | Sep. 12, 1997 |
| US | 5,855,015 | Dec. 29, 1998 | May 12, 1995 |
| US | 5,913,205 | June 15, 1999 | Mar. 28, 1996 |
| US | 5,913,215 | June 15, 1999 | Feb. 19, 1997 |
| US | 5,937,406 | Aug. 10, 1999 | Jan. 31, 1997 |
| US | 5,987,446 | Nov. 16, 1999 | Nov. 12, 1996 |
| US | 6,000,020 | Dec. 7, 1999 | Apr. 1, 1997 |
| US | 6,005,565 | Dec. 21, 1999 | Mar. 25, 1997 |
| US | 6,026,429 | Feb. 15, 2000 | Nov. 10, 1997 |
| US | 6,049,796 | Apr. 11, 2000 | Feb. 24, 1997 |
| US | 6,065,003 | May 16, 2000 | Aug. 19, 1997 |
| US | 6,070,158 | May 30, 2000 | Aug. 14, 1996 |
| US | 6,078,914 | June 20, 2000 | Dec. 9, 1996 |
| US | 6,098,065 | Aug. 1, 2000 | Feb. 13, 1997 |
| US | 6,266,094 | July 24, 2001 | June 14, 1999 |
| US | 6,311,182 | Oct. 30, 2001 | Nov. 17, 1997 |
| US | 6,324,534 | Nov. 27, 2001 | Sep. 10, 1999 |
| US | 6,345,269 | Feb. 2, 2002 | Mar. 26, 1999 |
| US | 6,366,915 | Apr. 2, 2002 | Nov. 4, 1998 |
| US | 6,370,543 | Apr. 9, 2002 | May 24, 1996 |
| US | 6,415,285 | July 2, 2002 | Dec. 8, 1999 |
| US | 6,424,968 | July 23, 2002 | Oct. 15, 1998 |
| US | 6,445,834 | Sep. 3, 2002 | Oct. 19, 1998 |
| US | 6,574,632 | June 3, 2003 | Nov. 18, 1998 |
| US | 6,578,048 | June 10, 2003 | June 5, 1995 |
| US | 6,615,172 | Sep. 2, 2003 | Nov. 12, 1999 |
| US | 6,665,640 | Dec. 16, 2003 | Nov. 12, 1999 |
| US | 6,697,835 | Feb. 24, 2004 | Oct. 28, 1999 |
| US | 6,842,758 | Jan. 11, 2005 | July 30, 1999 |

[16]   Samsung incorporates by reference all prior art references cited in the patents listed herein and/or their file histories.

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 6,845,370 | Jan. 18, 2005 | Nov. 19, 1998 |
| US | 6,862,713 | Mar. 1, 2005 | Aug. 31, 1999 |
| US | 6,901,366 | May 31, 2005 | Aug. 26, 1999 |
| US | 7,653,614 | Jan. 26, 2010 | July 15, 1999 |
| US | 7,873,995 | Jan. 18, 2011 | Sep. 29,2 003 |
| | | | |
| EP | 0706139 | Published Apr. 10, 1996 | Sep. 9, 1994 |
| WO | 98/32289 | Published July 23, 1998 | Jan. 17, 1997 |

2.    **Publications**[17]

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| An Information System Based on Distributed Objects | 1987 | Michael Caplinger | Computing Machinery |
| An Information System for Corporate Users: Wide Area Information Servers | Sep. 1991 | Brewster Kahle and Art Medler | Online |
| Annotating the World Wide Web using Natural Language | 1997 | Boris Katz | |
| ARIADNE: A System for Constructing Mediators for Internet Sources | 1998 | Jose Luis Ambite, Naveen Ashish, Greg Barish, Craig A. Knoblock, Steven Minton, Pragnesh J. Modi, Ion Muslea, Andrew Philpot and Sheila Tejada | SIGMOD |
| Browsing Local and Global Information | 1995 | Masum Hasan, Gene Golovchinsky, Emanuel Noik, Nipon Charoenkitkarn, Mark Chignell, Alberto Mendelzon and David Modjeska | Proceedings of the 1995 conference of the Centre for Advanced Studies on Collaborative Research |
| Building the infrastructure of | Jan. 1, 1997 | Lynch, | Library Trends |

---

[17]    Samsung incorporates by reference all prior art references identified in the publications listed herein.

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| resource sharing: union catalogs, distributed search, and cross-database linkage | | Clifford | |
| The Computer User as Toolsmith | 1993 | Saul Greenberg | |
| CyberDesk: A Framework for Providing Self-Integrating Ubiquitous Software Services | 1997 | Anind K. Dey, Gregory Abowd, Mike Pinkerton and Andrew Wood | |
| Dataware Technologies Introduces Dataware II Knowledge Query Server | Sep. 21, 1998 | | PR Newswire |
| Discover: A Resource Discovery System based on Content Routing | | Mark A. Sheldon, Andrzej Duda, Ron Weiss, David K. Gifford | |
| The Distributed Information Search Component (Disco) and the World Wide Web | 1997 | Anthony Tomasic, Remy Amouroux, Philippe Bonnet, Olga Kapitskaia, Hubert Naacke, Louiqa Raschid | SIGMOD |
| Doctor Linux – 5th Edition | 1997 | John Purcell, ed. | Linux Systems |
| The Effectiveness of GlOSS for the Text Database Discovery Problem | | Luis Gravano, Hector Garcia-Molina and Anthony Tomasic | |
| Emacs tutorial | 1985 | | Free Software Foundation |
| Experience the Internet's most powerful search tool | | | The WebTools Company |
| Exploring Computer Science with Scheme | 1998 | | Spinger-Verlag New York, Inc. |
| FreeWAIS-sf: A Wide Area Information Server for Structured Documents and Retrieval Functionality | | | |
| FreeWAIS-sf | Mar. 30, 1995 | Ulrich Pfeifer Tung Huynh | University of Dortmund |
| freeWAIS-sf – UNIDO Edition | Oct. 1995 | Ulrich Pfeifer | University of |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| 0.5 | | | Dortmund |
| GNU Emacs Manual – Searching and Replacement | Undated | | |
| GNU Readline Library | 1988 | | Free Software Foundation |
| Hemlock – An Internet Search Tool for the Newton | 1999 | Sean Luke | |
| Hemlock An Internet Search Tool for the Newton | Undated | | |
| Heuristics – Intelligent Search Strategies for Computer Problem Solving | 1984 | Judea Pearl | Addison-Wesley |
| How to Create a WAIS Query | | | |
| Implementation of the SMART Information Retrieval System | May 1985 | Chris Bucley | |
| Incremental Searching in FoxPro | Oct. 1993 | | PC Magazine |
| The Info Agent: An Interface for Supporting Users in Intelligent Retrieval | 1995 | Daniela D' Aloisi and Vittorio Giannini | |
| Infoharness: Managing Distributed, Heterogeneous Information | 1999 | Kshitij Shah and Amit Sheth | IEEE Internet Computing |
| Information Retrieval Algorithms and Heuristics | 1998 | David A. Grossman and Ophir Frieder | Kluwer Academic |
| Information Retrieval (Z39.50): Application Service Definition and Protocol Specification | 1995 | | NISO Press |
| Information Retrieval on the World Wide Web | 1997 | Venkat N. Gudivada, Vijay V. Raghavan, William I. Grosky and Rajesh Kasanagottu | IEEE Internet Computing |
| INQUERY System Overview | Undated | John Broglio, James P. Callan and W. Bruce Croft | |
| Internet Fish | May 1996 | Brian A. LaMacchia | |
| An Introduction to the EMACS Editor | Jan. 1978 | Eugene Ciccarelli | MIT |
| An Introduction to Multisensor Data Fusion | 1997 | David L. Hall and James Llinas | IEEE |
| Macworld Mac OS 8.5 Bible | 1999 | Lon Poole | IDG Books Worldwide |
| Mac OS 8.5 – Black Book | 1999 | Mark R. Bell | The Coriolis |

Case No. 12-cv-00630-LHK
SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| | | and Debrah D. Suggs | Group, |
| Mac OS 8.5: GO FOR IT! Part I | Oct. 29 1998 | Michael Lambert | The Mac Observer |
| Mac OS 8.5: GO FOR IT! Part II | Oct. 29 1998 | Michael Lambert | The Mac Observer |
| Mac OS 8.5 Special Report | 1998 | | MacInTouch |
| MAC OS 9: The Missing Manual – Finding Files and Web Sites with Sherlock 2 | | | |
| MacWAIS Software Version 1.28 | Feb. 23, 1994 | | EINet |
| The MetaCrawler Architecture for Resource Aggregation on the Web | Nov. 8, 1996 | Erik Selberg and Oren Etzioni | |
| Microsoft Universal Data Access Platform | 1998 | Jose A. Blakeley, Michael J. Pizzo | SIGMOD |
| Microsoft Windows 98 Companion | 1998 | Martin Matthews | Microsoft Press |
| Modern Heuristic Search Methods | 1996 | V.J. Rayward-Smith, I.H. Osman, C.R. Reeves and G.D. Smith | John Wiley and Sons |
| Multiobjective Heuristic Search | 1999 | Pallab Dasgupta, P.P. Chakrabarti and S.C. Desarkar | Vieweg |
| NetHopper Version 3.0 – User's Manual | 1997 | | AllPen |
| Newton Apple MessagePad Handbook | 1995 | | Apple |
| Newton Solutions Guide | | | Apple |
| Newton Programmer's Guide | 1996 | | Addison-Wesley |
| Northern Light: New Search Engine for the Web and Full-Text Articles | Feb. 1998 | Greg Notess | Online |
| Overview of Wide Area Information Servers | Apr. 1991 | Brewster Kahle | |
| Pen Pals | Oct. 12, 1993 | Christopher Barr and Michael Neubarth | PC Magazine |
| Peter Rand's Review of Hemlock | 1999 | Peter Rand | |
| Rama: An Architecture for | May 1, 1991 | Jim Binkley | Kluwer |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Internet Information Filtering | | and Leslie Young | |
| Search Algorithms Under Different Kinds of Heuristics – A Comparative Study | 1983 | A. Bagchi and A. Mahanti | Indian Institute of Management Calcutta |
| Sigerson, A Sherlock Power Booster | Dec. 2, 1998 | James Sentman | the Mac Observer |
| Sherlock Holmes am Newton | Dec. 1999 | | |
| Softscape's QuickFind Search and Retrieval Software | Nov. 1997 | Robert J. Boeri | EMedia Professional |
| Software Quality Engineering – A Total Technical and Management Approach | 1988 | Michael S. Deutsch and Ronald R. Willis | Prentice-Hall |
| Special Edition – Using Visual C++6 | 1998 | Kate Gregory | Que |
| Surviving the Storm: Using Metasearch Engines Effectively | May 1999 | Randal D. Carlson and Judi Repman | Computers in Libraries |
| Toward more comprehensive Web searching: single searching versus megasearching | 1998 | Greg R. Notess | Online |
| Unix for the Impatient | 1996 | Paul W. Abrahams and Bruce A. Larson | Addison-Wesley |
| User's Guide to the Macintosh version of the WAIS interface | 1991 | | Thinking Machines |
| WAIS, A Sketch Of An Overview | Sep. 23, 1991 | Jeff Kellem | |
| WAIS Search Help | | | |
| What is freeWAIS-sf? | | | |
| Wide Area Information Servers (WAIS) | June 1994 | M. St. Pierre, J. Fullton, K. Gamiel, J. Goldman, B. Kahle, J. Kunze, H. Morris and F. Schiettecatte | |
| Windows 98 Annoyances | Oct. 1998 | David A. Karp | O'Reilly |
| Windows 98 for Dummies | 1999 | Andy Rathbone | Wiley |
| WordPerfect for Windows V 5.2 | 1992 | | WordPerfect |
| Xerox Delivers Global Competitive Advantage to Manufacturing Customers Through Solutions Portfolio | Apr. 27, 1999 | | Business Wire |
| Xerox Introduces Two Products | Nov. 9, 1999 | | Business Wire |

Case No. 12-cv-00630-LHK
SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| to Expand Knowledge Sharing Software Portfolio | | | |
| Xerox unveils "askOnce", which brings a new search dimension to end-users by giving universal access to multiple information sources through one simple query | 1999 | | Xerox |
| The Z39.50 Information Retrieval Standard – Part I: A Strategic View of Its Past, Present and Future | Apr. 1997 | Clifford A. Lynch | D-Lib Magazine |

3.    **Systems**

All versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '604 Patent, including documents and source code describing the same:

- Emacs

- GNU

- Hemlock

- Linux

- Mac OS 8.5

- Newton 2.0

- NetHopper

- Sherlock Utility

- WAIS protocol and WAIStation client

- Windows 98

Samsung reserves the right to amend these invalidity contentions to assert these references depending on the claim construction and infringement positions Apple may take as the case proceeds.  Moreover, Samsung reserves the right to use these references in combination with other references to render the claims of the '604 Patent obvious in the event Apple takes the position that certain claim limitations are missing from the references charted in Exhibit H.

**B.      Local Patent Rule 3-3(b):  Whether Each Item Anticipates or Renders Obvious the Asserted Claims**

Plaintiff asserts claims 1, 6, 11 and 16-21 of the '604 Patent against Samsung in this lawsuit.  All of those claims are invalid because the '604 Patent fails to meet one or more of the requirements for patentability.  The individual bases for invalidity are provided below and in the claim charts attached as Exhibit H-1 through H-9.  Each of the foregoing listed prior art documents, the underlying work, and/or the underlying apparatus or method qualifies as prior art under one or more sections of 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

Although Samsung has identified at least one citation per limitation for each reference, each and every disclosure of the same limitation in the same reference is not necessarily identified. Rather, in an effort to focus the issues, Samsung has generally cited representative portions of identified references, even where a reference may contain additional support for a particular claim element.  In addition, persons of ordinary skill in the art generally read a prior art reference as a whole and in the context of other publications and literature.  Thus, to understand and interpret any specific statement or disclosure within a prior art reference, such persons would rely on other information within the reference, along with other publications and their general scientific knowledge.  Samsung may rely upon uncited portions of the prior art references and on other publications and expert testimony to provide context, and as aids to understanding and interpreting the portions that are cited.  Samsung may also rely on uncited portions of the prior art references, other disclosed publications, and the testimony of experts to establish that a person of ordinary skill in the art would have been motivated to modify or combine certain of the cited references so as to render the claims obvious.

1.      **Anticipation**

Some or all of the asserted claims of the '604 Patent are invalid as anticipated under 35 U.S.C. § 102 in view of each of the prior art references identified above and in the claim charts included in Exhibit H, which identify specific examples of where each limitation of the asserted claims is found in the prior art references.  As explained above, the cited portions of prior art references identified in the attached claim charts are exemplary only and representative of the

1   content and teaching of the prior art references, and should be understood in the context of the

2   reference as a whole and as they would be understood by a person of ordinary skill in the art.

3               2.   **Obviousness**

4          To the extent any limitation is deemed not to be exactly met by an item of prior art listed

5   above and in Exhibit H, then any purported differences are such that the claimed subject matter as

6   a whole would have been obvious to one skilled in the art at the time of the alleged invention, in

7   view of the state of the art and knowledge of those skilled in the art.  The item of prior art would,

8   therefore, render the relevant claims invalid for obviousness under 35 U.S.C. § 103(a).

9          In addition, the references identified above render one or more asserted claims of the '604

10  Patent obvious when the references are read in combination with each other, and/or when read in

11  view of the state of the art and knowledge of those skilled in the art.  Each and every reference

12  identified is also relevant to the state of the art at the time of the alleged invention.  Any of the

13  references disclosed above may be combined to render obvious (and therefore invalid) each of

14  Plaintiff's asserted claims.  Samsung may rely upon a subset of the above identified references or

15  all of the references identified above, including all references in Exhibit H, for purposes of

16  obviousness depending on the Court's claim construction, positions taken by Apple during this

17  litigation, and further investigation and discovery.

18         Moreover, to the extent the foregoing references are found not to anticipate the asserted

19  claims, the foregoing references render the asserted claims obvious either alone or in combination

20  with one or more of the other references identified above pursuant to P.R. 3-3(a).  As explained

21  herein and/or in the accompanying charts, it would have been obvious to a person of skill in the art

22  at the time of the alleged invention of the asserted claims of the '604 Patent to combine the various

23  references cited herein so as to practice the asserted claims of the '604 Patent.

24

25         Motivations to combine the above items of prior art are present in the references

26  themselves, the common knowledge of one of ordinary skill in the art, the prior art as a whole, or

27  the nature of the problems allegedly addressed by the '604 Patent.  Combining the references

28

disclosed in Exhibit G would have been obvious, as the references identify and address the same technical issues and suggest very similar solutions to those issues.  Samsung reserves the right to amend or supplement these invalidity contentions to identify additional reasons that combining the references would be obvious to one of ordinary skill in the art.

In accordance with P.R. 3-3(b), prior art references rendering the asserted claims obvious, alone or in combination with other references, including identification of combinations showing obviousness, are identified in Exhibits H-1 through H-9, which includes exemplary claim charts for the asserted claims of the '604 Patent showing specifically where in each reference or combinations of references each asserted claim is found, and an explanation of why the prior art renders the asserted claim obvious.

In particular, Samsung contends that the asserted claims of the '604 Patent would have been obvious in view of the prior art references identified above.  For example, Exhibit H includes exemplary claim charts that describe how the asserted claims of the '604 Patent would have been obvious in view of all references identified in Exhibit H, which, if found not to anticipate the claims of the '604 Patent, render the claims of the '604 Patent obvious alone.

In addition to the specific combinations of prior art and the specific combinations of groups of prior art disclosed, Samsung reserves the right to rely on any other combination of any prior art references disclosed herein.  Samsung further reserves the right to rely upon combinations disclosed within the prosecution history of the references cited herein.

The obviousness combinations set forth in these contentions reflect Samsung's present understanding of the potential scope of the claims that Plaintiff appears to be advocating and should not be seen as Samsung's acquiescence to Plaintiff's interpretation of the patent claims.

Samsung also reserves the right to amend or supplement these contentions regarding anticipation or obviousness of the asserted claims, in view of further information from Plaintiff, information discovered during discovery, or a claim construction ruling by the Court.  Plaintiff has

not identified what elements or combinations it alleges were not known to one of ordinary skill in the art at the time.  Therefore, for any claim limitation that Plaintiff alleges is not disclosed in a particular prior art reference, Samsung reserves the right to assert that any such limitation is either inherent in the disclosed reference or obvious to one of ordinary skill in the art at the time in light of the same, or that the limitation is disclosed in another of the references disclosed above and in combination would have rendered the asserted claim obvious.

### C.     Local Patent Rule 3-3(c):  Charts Identifying where Specifically in each Alleged item of Prior Art each Asserted Claim is Found

Pursuant to Local Patent Rule 3-3(c), charts identifying where specifically in each alleged item of prior art each limitation of each asserted claim is found, including for each limitation that Samsung contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function are attached in Exhibits H-1 through H-9.

### D.     Local Patent Rule 3-3(d):  Other Grounds for Invalidity

Samsung identifies the following grounds for invalidity of the asserted claims of the '604 Patent based on 35 U.S.C. §§ 101 and/or 112  ¶¶ 1 and 2.  Samsung reserves the right to supplement these disclosures based on further investigation and discovery.

#### 1.     Invalidity Based on 35 U.S.C. § 101

The asserted claims of the '604 Patent are invalid under 35 U.S.C. § 101 because they claim only abstract ideas.  For example, "providing said information received from the user-input device to a plurality of heuristic modules," and "determining at least one candidate item of information," "searching by the heuristic modules," and "providing at least one candidate item of information" each refer only to programming abstractions or the manipulation of information; these are concepts, not physical objects or tangible matter.

#### 2.     Invalidity Based on Enablement or Written Description Under 35 U.S.C. § 112(1) and/or Invalidity Based on Indefiniteness Under 35 U.S.C. § 112(2)

Samsung asserts that each asserted claim of the '604 Patent is invalid in that the '604 specification fails to particularly point out and distinctly claim the alleged invention of the '604

1  Patent.  Samsung further asserts that each asserted claim of the '604 Patent is invalid as not

2  containing a written description of the invention and of the manner and process of making and

3  using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to

4  which it pertains, or with which it is most nearly connected, to make and use the alleged invention.

5         Based on Samsung's present understanding of Plaintiff's infringement contentions,

6  Samsung asserts that claims 1, 6, 11 and 16-21 of the '604 Patent are invalid for reciting at least

7  the claim terms "heuristic," "heuristic module," "heuristic algorithm" "respective area of search,"

8  and/or "configured to search."  Claims 16, 18 and 20 of the '604 patent are invalid for reciting at

9  least the claim term "particularized to its associated relevant area of search."  Claims 17, 19 and 21

10  of the '604 patent are invalid for reciting at least "receiving portions of the information descriptor

11  as the portions are being inputted," "providing the portions of the information descriptor to the

12  plurality of heuristic modules as the portions are being received," and "received portion of the

13  information descriptor."  These claim terms/phrases as apparently construed by Apple violate the

14  written description, enablement and/or definiteness requirements of 35 U.S.C. § 112.

15         Based on Samsung's present understanding of Plaintiff's infringement contentions, at least

16  one or more of these claim terms/phrases are indefinite because they are inconsistent with and

17  broader than the alleged invention disclosed in the specification and given Plaintiff's apparent

18  constructions of the claims, any person of ordinary skill in the art at the time of the invention

19  would not understand what is claimed, even when the claims are read in light of the specification.

20  Moreover, based on Samsung's present understanding of Plaintiff's infringement contentions, each

21  of the asserted claims in which these claim terms/phrases appear lack written description because

22  the specification of the '604 Patent demonstrates that the patentee neither conceived of nor

23  demonstrated possession of all that Plaintiff now contends the claims cover.  In addition, based on

24  Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted

25  claims in which these claim terms/phrases appear are invalid because the specification fails to

26  provide sufficient disclosure to enable any person of ordinary skill in the art to which it pertains,

27  or with which it is most nearly connected, to implement the invention without undue

28  experimentation.   The '604 patent specification fails to describe the manner and process of

1  making and using the claimed invention in such full, clear concise and exact terms as to enable a

2  person of ordinary skill in the art to which it pertains to make and use the claimed invention.

3        For at least the reasons set forth above, the claims fail to satisfy the requirements of § 112

4  ¶¶ 1 and 2.

5                    **PATENT LOCAL RULE 3-4 DISCLOSURES**

6        Pursuant to Patent Rule 3-4(a), Defendants will produce, make available for inspection, or

7  identify publicly available information sufficient to show the operation of any specifically

8  identified aspects or elements of an Accused Instrumentality identified by Plaintiff in its Patent

9  L.R. 3-1(c) chart to the extent such information is in Defendants' possession, custody or control.

10  If such information comprises source code, Defendants will make such source code available for

11  inspection pursuant to the protective order in this action.  Documents produced pursuant to Patent

12  Local Rule 3-4(a) include the following:  SAMNDCA630-00920054 - SAMNDCA630-00926298.

13        Pursuant to Patent Rule 3-4(b), Defendants are producing or making available for

14  inspection copies of each item of prior art identified pursuant to Patent Rule 3-3(a) which does not

15  appear in the file history of the Asserted Patent to the extent such prior art is in Samsung's

16  possession, custody or control.  Documents produced pursuant to Patent Local Rule 3-4(a) include

17  the following: SAMNDCA630-00000616 - SAMNDCA630-00003856; SAMNDCA630-

18  00093416 - SAMNDCA630-00095124; SAMNDCA630-00805769 - SAMNDCA630-00809748;

19  SAMNDCA630-00817832 - SAMNDCA630-00826455; and SAMNDCA630-00926299 -

20  SAMNDCA630-00946068.  In addition, devices, systems and /or software are available for

21  inspection upon reasonable notice.

22        Defendants reserve the right to identify and produce additional documents pursuant to the

23  Patent Rules and the orders of the Court.

24

25

26

27

28

1   DATED:  August 10, 2012                QUINN EMANUEL URQUHART & SULLIVAN LLP

2

3                                     By  /s/  Patrick M. Shields
                                          Patrick M. Shields
4                                         Attorneys for Defendants
                                          SAMSUNG ELECTRONICS CO., LTD.,
5                                         SAMSUNG ELECTRONICS AMERICA, INC. and
                                          SAMSUNG TELECOMMUNICATIONS
6                                         AMERICA, LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28