QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
Kevin A. Smith (Bar No. 250814)
kevinsmith@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

William C. Price (Bar No. 108542)
williamprice@quinnemanuel.com
Michael L. Fazio (Bar No. 228601)
michaelfazio@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

STEPTOE & JOHNSON, LLP
John Caracappa (*pro hac vice*)
jcaracappa@steptoe.com
1330 Connecticut Avenue, NW
Washington, D.C. 20036
Telephone: (202) 429-6267
Facsimile: (202) 429-3902

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | CASE NO. 12-CV-00630-LHK (PSG)<br><br>**SAMSUNG'S OPPOSITION TO APPLE'S MOTION TO COMPEL A RESPONSE TO INTERROGATORY NO. 22 AND PRODUCTION OF DIFF PRINTOUTS**<br><br>Date: April 11, 2013<br>Time: 10:00 a.m.<br>Courtroom: 5, 4th Floor<br>Honorable Paul S. Grewal |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 1

    A.    Samsung Produces Source Code for Software Running on Accused Devices, Providing Apple With All Review Tools It Requested, and Even Gives Apple a Window Into Its Ongoing Development. ......................................... 1

    B.    This Court's Protective Order Governing Confidentiality Protects Samsung's Highly Confidential Source Code Production. ........................................ 3

    C.    After Samsung Objects to Apple's Printing of "Diff" Reports in June 2012, Apple Fails to Respond to Samsung's Letter and Ignores the Issue of "Diff" Reports Until December 2012. ................................................................................... 4

    D.    Apple Serves Multiple Rounds of Infringement Contentions, But None of Apple's Infringement Contentions Provide Any Analysis of Any Source Code Used on Any Samsung Accused Product. ........................................................ 5

    E.    Having Failed to Provide Any Contentions Actually Addressing Samsung's Accused Products, Apple Asks Samsung to Do Its Homework by Analyzing Apple's Conclusory Infringement Allegations and Making Apple's Own Case. .......................................................................................................................... 6

ARGUMENT ...................................................................................................................... 7

I.     APPLE SHOULD NOT BE PERMITTED TO REMOVE DIFF PRINTOUTS FROM THE SECURE SOURCE CODE INSPECTION FACILITY. ................................. 7

    A.    The Protective Order Allows Apple to Print Only Samsung Source Code – Not "Diff" Reports, Which Apple Admits Are "Apple Work Product," Not Samsung Source Code. ................................................................................................. 8

    B.    Apple's Motion Would Eviscerate the Protective Order's Printing Limits. ............. 9

    C.    The Protective Order Explicitly Bars Apple From Making Copies of Samsung's Source Code in Its Experts' Notes – Which is What Apple Admits "Diff" Reports Are. ...................................................................................... 10

    D.    Apple Does Not Need Printouts of "Diff" Reports For Any Proper Purpose. ........ 11

II.    HAVING FAILED TO DILIGENTLY REVIEW SAMSUNG'S SOURCE CODE, APPLE CANNOT FORCE SAMSUNG TO PARSE APPLE'S INFRINGEMENT CONTENTIONS AND ASSERT APPLE'S PATENTS AGAINST ITSELF. ................... 12

    A.    Apple Cannot Conscript Samsung as Its Consulting Expert and Force Samsung to Guess the Infringement Theory (If Any) Behind the Conclusory Statements and Claim Language in Apple's Infringement Contentions. ............... 12

B.   "Differences" Between Third-Party Open Source Code and Code Compiled Onto The Accused Devices Are Irrelevant, Burdensome, and Would Reveal Trade Secrets Without Helping Apple In This Action. ........................................... 17

C.   Apple Claims Confusion About "Duplicate" Files in Samsung's Source Code Production, But Its Confusion Arises Only From Its Failure to Perform Basic Analysis of Samsung's Files. ......................................................... 17

D.   Apple's Own Discovery Responses Demonstrate That Samsung Completely And Properly Responded To Interrogatory No. 22. ................................................. 18

E.   Apple Failed To Fulfill The Lead Counsel Meet and Confer Requirement Regarding "Files That Relate To The Accused Features and Functionality." ........ 19

CONCLUSION ................................................................................................................ 20

# TABLE OF AUTHORITIES

**Page**

## Cases

*Apple Inc. v. Samsung Elecs. Co. Ltd.*,
  Case No. 11-1846-LHK-JSG (N.D. Cal.) ..................................................................16

*Baxter Healthcare Corp. v. Fresenius Med. Care Holding, Inc.*,
  2008 WL 5272186 (N.D. Cal. Dec. 15, 2008) ........................................................15

*Berster Techs., LLC v. Christmas*,
  2011 WL 4710801 (E.D. Cal. Oct. 4, 2011) ...........................................................15

*Big Baboon Corp. v. Dell, Inc.*,
  723 F. Supp. 2d 1224 (C.D. Cal. 2010) ..................................................................15

*Diagnostic Sys. Corp. v. Symantec Corp.*,
  Nos. 06-1211, 07-960, 2009 WL 1607717 (C.D. Cal. Jun. 5, 2009) .......................16

*Digital Reg of Texas, LLC v. Adobe Sys. Inc.*,
  No. 12-01971, 2013 WL  633406 (N.D. Cal. Feb. 20, 2013) ...........................11, 12

*FatPipe Networks India Ltd. v. XRoads Networks, Inc.*,
  No. 2:09-cv-186, 2010 WL 3064369 (D. Utah Aug. 3, 2010) ...............................16

*LaserDynamics, Inc v. Asus Comp. Int'l*,
  No. 2:06-c 2009 U.S. Dist. LEXIS 3878 (E.D. Tex. Jan. 21, 2009) .......................16

*U.S. v. Kellogg Brown & Root Servs., Inc.*,
  284 F.R.D. 22 (D.D.C. 2012) .................................................................................15

*Vasudevan Software, Inc. v. Int'l Bus. Machs. Corp.*,
  No. 09-05897, 2011 WL 940263 (N.D. Cal. Feb. 18, 2011) ...........................15, 16

## Rules

Fed. R. Civ. P. 33 .........................................................................................15, 16, 19

Pat. L.R. 3-1(c) ........................................................................................................16

L.R. 37-2 ....................................................................................................................8

# INTRODUCTION

No good deed goes unpunished – certainly not in litigation.  In this action, in response to Apple's demands, Samsung gave Apple unprecedented access to Samsung's source code – including a window into released *and* unreleased versions of Samsung's highly confidential source code, exactly as Samsung maintains its code on its own servers.  Despite Samsung's extensive production, designed to avoid any possibility of dispute, Apple still wants more, demanding extraordinary and unprecedented relief that Apple did not seek or obtain in its prior case against Samsung.  If the Court grants Apple's Motion, the result would eviscerate the Protective Order by allowing Apple to evade the parties' agreed limits on printing source code and removing trade secret information from the review room.  Moreover, it would force Samsung to serve as Apple's expert witness, requiring Samsung to parse Apple's infringement contentions – all 12,900 pages of them – and then guess about the code *Samsung* thinks *Apple* might allege infringes *Apple's patents*.

The parties negotiated and the Court entered a comprehensive protective order, which Apple cannot rewrite at its whim.  Moreover, Samsung cannot predict which code corresponds to conclusory allegations in Apple's infringement contentions – particularly when Samsung does not agree that Apple's allegations are correct.  Apple does not want to do its own homework by reviewing Samsung's source code production, which has been available for many months.  Apple instead seeks to shortcut its own work by shifting its burden of proof to Samsung.  Samsung has more than met its obligations regarding source code production.  The Court should deny Apple's motion outright.

# BACKGROUND

### A.    Samsung Produces Source Code for Software Running on Accused Devices, Providing Apple With All Review Tools It Requested, and Even Gives Apple a Window Into Its Ongoing Development.

Samsung's source code production in this action is unprecedented in its scope and breadth.  On June 2, 2012, in connection with Apple's motion for a preliminary injunction accusing only a single device, the Samsung Galaxy Nexus (Docket No. 10), Samsung produced for inspection all source code it had in its possession for the Galaxy Nexus.  (Declaration of Michael L. Fazio in

SAMSUNG'S OPPOSITION TO APPLE'S MOTION TO COMPEL RE ROG 22 AND DIFF PRINTOUTS

1   Support of Samsung's Opposition ("Fazio Decl.") ¶ 2.)  Apple has never complained about the

2   sufficiency of this production.

3       Rule 26 discovery commenced on May 16, 2012, and on June 15 Apple provided

4   infringement contentions identifying accused Samsung products.  (Docket No. 160; Declaration of

5   James D. Judah in Support of Samsung's Opposition ("Judah Decl.") Ex. 174.)  On November 7,

6   2012, Samsung produced for inspection voluminous source code for these accused devices.  (Fazio

7   Decl. ¶ 3.)  Samsung made this source code available at Samsung's secure review facility in San

8   Jose, California.  (Fazio Decl. ¶ 4.)  To avoid any disputes, Samsung provided unprecedented

9   access to source code "as kept in the ordinary course of business" – specifically, letting Apple's

10  attorneys and consulting experts view Samsung's actual source code development efforts as they

11  occur, exactly as maintained by Samsung on servers in Korea.  (Fazio Decl. ¶ 4.)  When

12  Samsung's engineers update Samsung's codebase, those changes are immediately available to

13  Apple's reviewers.  (Fazio Decl. ¶ 4.)  Thus, Samsung provided Apple not only the source code

14  for released versions of its source code, but also a window into its ongoing development

15  process.  (Fazio Decl. ¶ 4.)[1]

16      In addition to giving Apple source code for all of the accused devices, Samsung also gave

17  Apple the source code review tools it requested.  Apple asked Samsung to install two powerful

18  source code review tools, Visual Slick Edit and Cygwin, for its reviewers to use on Samsung's

19  source code.  (Fazio Decl. ¶ 5.)  Samsung installed both tools; Apple has used them without

20

21      [1]  Apple complains that Samsung gave Apple *too much transparency*:  it complained that

22  access to Samsung's development servers in Korea was at times too slow (Fazio Decl. Ex. 8) and
    that a window into Samsung's ongoing development process was sometimes confusing, as new

23  files would appear during software development.  (Fazio Decl. Exs. 8, 10.)  In response to these
    complaints, Samsung again accommodated Apple, agreeing to supplement its existing live

24  production by also downloading and providing local copies of all publicly released versions of
    source code for all accused devices.  (Fazio Decl. Ex. 12.)  In contrast, Apple refused to produce

25  all versions of its source code for the accused devices, instead providing only self-selected
    "representative" versions of code – and only portions of those versions.  (Valek Decl.

26  Ex. 4.)  Samsung repeatedly asked Apple to align its own production with Apple's demands of
    Samsung, but Apple has repeatedly refused.  (Fazio Decl. Exs. 9, 11, 12 and Valek Decl.

27  Ex. 4.)  Unless Apple changes its unreasonable position regarding its own production of code,

28  Samsung will unfortunately be required to seek assistance on this issue from the Court.

1   restriction.  (*Id.*)  As of this filing, Apple has printed over 12,500 pages of Samsung's highly

2   confidential source code.  (Fazio Decl. ¶ 6.)

3        Finally, although it has no relevance to Apple's infringement claims because it is not

4   installed on any accused devices, at Apple's request, Samsung also provided copies of code from

5   the Android Open Source Project, which Samsung downloaded from the publicly available source

6   code repository at source.android.com.  Apple's reviewers could therefore compare the open-

7   source code against Samsung's proprietary and highly confidential source code using the review

8   computer in Samsung's secure review facility.  (Fazio Decl. Ex. 9.)  Apple thus had full access to

9   Samsung's crown jewels:  not only Samsung's highly confidential source code, but also tools that

10  would allow Apple's reviewers to discover precisely where Samsung made its trade-secret

11  changes and additions to the underlying open-source project.

12        **B.    This Court's Protective Order Governing Confidentiality Protects Samsung's**
            **Highly Confidential Source Code Production.**
13

14        Samsung could provide Apple access to its crown jewels precisely because the Court,

15  through its Protective Order governing confidentiality in this action, entered robust protections

16  governing source code production.  On May 9, 2012, the parties filed the Stipulation Regarding

17  Electronic Discovery, Protective Order, Privilege Logs, and Expert Discovery (Docket No. 171

18  ("Stipulation")), attaching as Exhibit 1 an "Agreed Upon Protective Order Regarding Disclosure

19  and Use of Discovery Materials" ("Protective Order").  (*Id.* at 7.)  Paragraph 11 of the Protective

20  Order governs the disclosure and review of source code.  (Docket No. 171-1 at 11-18.)  Its very

21  specific terms maintain the security of highly confidential source code by strictly regulating all

22  conduct regarding that code.

23        The first line of defense is the Protective Order's strict limits on printing highly

24  confidential source code.  The Order provides that the "Receiving Party," here Apple, "may print

25  limited portions of the Source Code only when reasonably necessary to facilitate the Receiving

26  Party's preparation of court filings, expert reports, and trial exhibits, and shall print only such

27  portions as are relevant to the claims and defenses in the case and are reasonably necessary for

28  such purpose."  (Docket No. 171-1 at 14 (¶ 11(i)).)  The Order also allows the "Producing Party,"

here Samsung, to object if "the printed portions are excessive and/or not done for a permitted purpose."  (*Id.*)  Finally, the Order states that printouts exceeding "50 continuous pages or 10% or more of a specific software release shall be presumed excessive and not done for a permitted purpose."  (*Id.*)  Protected by these provisions, Samsung could and did produce the *complete source code* for its devices, forestalling any dispute over whether Samsung had provided sufficiently relevant source code.  Should Apple seek to print source code that was not "relevant to the claims and defenses in the case and are reasonably necessary for such purpose," Samsung could object under the Protective Order.  (*Id.*)  (Except for Apple's printing of "diff" reports, Samsung has so far not made any such objections.)

Just as Paragraph 11(i) of the Protective Order regulated Apple's ability to print Samsung's source code, Paragraph 11(n) prohibited Apple's reviewers from copying Samsung's highly confidential source code into their notes:

> The Receiving Party shall be entitled to take notes relating to the Source Code but may not copy the Source Code into the notes and may not take such notes electronically on the Confidential Source Code Computer itself or any other computer.  No copies of all or any portion of the Source Code may leave the room in which the Source Code is inspected except as otherwise provided herein.  Further, no other written or electronic record of the Source Code is permitted except as otherwise provided herein.

(*Id.*, at 16 (¶ 11(n)).)  Paragraph 11(n) thus closed a potential loophole under which a reviewing party could evade the limits in Paragraph 11(i) by laundering highly confidential source code into reviewer "notes."  Thus the Protective Order struck a carefully negotiated balance:  Samsung could produce complete versions of its source code and avoid all-too-likely disputes over what source code is relevant to Apple's allegations – disputes unfortunately occurring about *Apple's* source code production, which unlike Samsung's is far from complete – while relying on the Protective Order's strong protections against abuse of its highly confidential source code.

**C.     After Samsung Objects to Apple's Printing of "Diff" Reports in June 2012, Apple Fails to Respond to Samsung's Letter and Ignores the Issue of "Diff" Reports Until December 2012.**

On June 2, 2012, Apple conducted its first inspection of Samsung's source code.  (Fazio Decl. ¶ 7; Furman Decl. Ex. E.)  During that review, Apple's code reviewer used the source code review tools Samsung installed on the computer to create "difference reports," often called "diffs"

or "diff" reports.  A "diff" report compares the contents of two files; it is similar to a "blackline" comparison between two Microsoft Word documents, with one important difference:  unlike a "blackline" comparison, a "diff" report excerpts and repeats *only the differences* between two files, making it a potentially compact mechanism to export a tremendous amount of information.

During that June 2, 2012 inspection, Apple's source code reviewer printed several hundred pages of "diff" reports that had been generated on Samsung's highly confidential source code computer.  (Furman Decl. Exs. E, F.)  Some of the "diff" reports that Apple printed are extremely long and appear to be wholesale comparisons of entire source code versions.  In one case, a single "diff" report printed by Apple exceeded *500 pages*.  (Fazio Decl. ¶ 8; Furman Decl. Ex. E.)

Samsung objected to Apple's printing of "diff" reports for removal from Samsung's source code review facility, explaining that this was not allowed under the Protective Order.  (Furman Decl. Ex. F.)  In response, Apple told Samsung that it would "respond regarding the pages Samsung refuses to produce by June 15, 2012."  (Fazio Decl. Ex. 2.)  Apple then abandoned this issue for nearly six months, however, giving Samsung no response until December 5, 2012. (Furman Decl. Ex. I.)  Following further discussions, on February 15-16, 2013, the parties held a lead counsel meet and confer on various discovery matters including the "diff" printouts.  (Fazio Decl. Ex. 6.)  Notwithstanding the dispute, Apple was (and is) permitted to continue creating "diff" reports for use in Samsung's secure review room.

> **D.**    **Apple Serves Multiple Rounds of Infringement Contentions, But None of Apple's Infringement Contentions Provide Any Analysis of Any Source Code Used on Any Samsung Accused Product.**

Samsung produced its source code for the Galaxy Nexus on June 2, 2012.  (*See supra* at 1-2.)  On June 15, 2012, Apple served its first infringement contentions under Patent Local Rule 3-1 and 3-2.  (Judah Decl. Ex  174.)  Although Apple could have directed at least the Galaxy Nexus contentions against the source code on the device itself, its contentions even against the Galaxy Nexus confirmed that "[t]he source code for the Android operating system and the applications available with Android can be found at http://source.android.com/source/downloading.html.  All references to source code are to files available from that site."  (Judah Decl. Ex. 98, at 6.)

1   Since Samsung produced source code for each accused device, Apple has amended its

2   infringement contentions by order of the Court on November 15, 2012 (Docket No. 302) and by

3   the parties' stipulation entered by the Court on January 16, 2013. (Docket No. 348.) Although

4   Apple made many changes to its infringement contentions, one thing stayed constant: nowhere in

5   these contentions did Apple analyze *any* Samsung proprietary source code actually running on *any*

6   accused device, even though Samsung made source code for some accused devices available for

7   inspection in June 2012, and made code for *all* devices available by November 2012.

8   As a result, as of today Apple has served three rounds of infringement contentions, totaling

9   at least 21,243 pages, but *none* of these infringement contentions reflect *any* analysis of source

10  code Samsung made available, on *any* accused product. There is no dispute on this point. Even in

11  its motion to compel, Apple admits its infringement contentions reference no Samsung source

12  code; they instead only reference "specific files in the public Android source code," not the actual

13  source code used in any accused product. (Motion at 1.)

14          **E.      Having Failed to Provide Any Contentions Actually Addressing Samsung's
                      Accused Products, Apple Asks Samsung to Do Its Homework by Analyzing**
15          **Apple's Conclusory Infringement Allegations and Making Apple's Own Case.**

16  Apple's Third Set of Interrogatories included Interrogatory No. 22, which asked Samsung

17  to identify from its source code production "all files that relate to the Accused Features and

18  functionality of the Accused Samsung Products" as well as "any differences between that file and

19  the publicly available version of the source code." (Furman Decl. Ex. C.) Samsung objected, as it

20  had already agreed to produce the source code that Apple sought. (Furman Decl. Ex. D.)

21  No portion of the February 15-16, 2013 meet and confer, nor any meet and confer

22  preceding it, was dedicated to Interrogatory No. 22's request that Samsung "[i]dentify from the

23  Source Code produced in response to Request Nos. 96 and 97 in Apple's Second Set of Requests

24  for Production all files that relate to the Accused Features and functionality of the Accused

25  Samsung Products." (Fazio Decl. Ex. 6; Valek Decl. Ex. 3; Furman Decl. Ex. C.) However, on

26  February 19, after the meet-and-confer discussions between lead counsel, Apple suggested for the

27  first time that Samsung should supplement "its response to Apple's Interrogatory No. 22 to

28  identify any differences between each version of Android source code in its accused products and

1   the comparable public version of Android source code that Samsung contends are material to the

2   alleged non-infringement of Apple's asserted patent claims in the event the public version were

3   found to infringe." (Valek Decl. Ex. 3 at 3.)  In response, on March 1, Samsung explained that

4   Apple was improperly seeking to shift onto Samsung the burden of making its infringement case:

> Apple's request is improper.  Apple has not provided a detailed identification of the portions of Samsung's source code that Apple accuses of infringement, in *any* version of the accused software – much less for *all* accused versions.  Apple instead leaves Samsung to guess as to the accused source code, and then to further guess as to what code may be relevant to Apple's not-yet-articulated infringement theories, or how those theories might translate between different versions of Samsung's software.  Apple may not shift the burden of developing and articulating its infringement theories to Samsung.

9   (Valek Decl. Ex. 4.)  Apple refused Samsung's proposal.  (Valek Decl. Ex. 5.)  Samsung reiterated

10  this offer on March 14, again seeking a compromise that would avoid motion practice:

> Apple has full access to the Samsung source code it requested.  The information Apple seeks is found in this source code.  Apple is in the best position to obtain the information it seeks (i.e., an infringement theory) from this source code.  And Samsung remains willing to identify Samsung code that Samsung will rely on for non-infringement, if Apple will first identify the Samsung code that Apple will rely on for infringement.  But we are simply unable to put the cart before the horse and provide a granular rebuttal to infringement allegations that have not been provided at the same level of granularity.

15  (Valek Decl. Ex. 6 at 3.)  Apple did not respond to Samsung's renewed proposal.

## ARGUMENT

**I.**    **APPLE SHOULD NOT BE PERMITTED TO REMOVE DIFF PRINTOUTS FROM THE SECURE SOURCE CODE INSPECTION FACILITY.**

The parties' dispute over "diff" reports is a very narrow one regarding whether Apple should be permitted to remove "diff" reports from the secure review facility.  Samsung already made the requested code available in a secure review facility.  Samsung installed all the analysis tools Apple requested on computers in Samsung's secure facility.  Samsung already permits Apple to run "diff" reports using the provided analysis tools.  Samsung allows Apple to access "diff" reports, in both electronic and paper form, in Samsung's secure review facility.  The *only* thing Apple cannot do is remove printed "diff" reports from Samsung's secure facility.  The Protective Order prohibits this practice – and for good reason.  Apple's Motion is a transparent attempt to circumvent the terms of the Protective Order, and Apple has not provided any showing of such a need.  Thus, the motion should be denied.

**A.      The Protective Order Allows Apple to Print Only Samsung Source Code – Not "Diff" Reports, Which Apple Admits Are "Apple Work Product," Not Samsung Source Code.**

The Protective Order itself permits Apple to print "Source Code" – and *only "Source Code"* – as defined by that Order.  Specifically, paragraph 11(i) states that "[t]he Confidential Source Code Computer shall be equipped with a printer with commercially reasonable printing speeds *to print copies of the Source Code* on watermarked pre-Bates numbered paper, which shall be provided by the Producing Party."  (Docket No. 171-1 at 14 (¶ 11(i)) (emphasis added).)  "Apple agrees with Samsung that the diff printouts are not source code (see Protective Order, ¶ 2(h))."  (Motion at 14.)  Apple also admits that "diff" printouts copy excerpts of source code into a file.  (*Id*. at 15.)  As the Protective Order explains, "[n]o copies of all *or any portion* of the Source Code may leave the room in which the Source Code is inspected *except as otherwise provided herein*."  (Docket No. 171-1 at 16 (¶ 11(n)) (emphases added).)  Apple's admission that "diff" reports "are not source code" under the Protective Order, combined with the fact that *only* "source code" may be printed under the Protective Order, shows that Apple simply wants to rewrite the Protective Order to authorize exactly what that Order prohibits.

Furthermore, Apple's admission that "diff" reports are not source code also exposes a fatal procedural flaw in its motion.  Apple asked this Court to compel production of documents it has *not even asked Samsung to produce*.  As required by Local Rule 37-2, Apple's motion identified two requests it alleges support its request for "diff" reports:

> **REQUEST FOR PRODUCTION NO. 96:**  Source code and any other instructions utilized by or implemented on the Accused Devices, including, but not limited to, source code for each version of the Android operating system and applications utilized by each of the Accused Devices.

> **REQUEST FOR PRODUCTION NO. 97:**  Source code and any other instructions utilized by or implemented on the Accused Devices, including, but not limited to, source code for the features and functionality used by the Accused Devices that Apple has alleged infringe the Patents-in-Suit.

(Notice of Motion at 2-3.)  These requests explicitly seek only "[s]ource code and any other instructions utilized by or implemented on the Accused Devices."  Printed "diff" reports are, by Apple's own admission, "Apple work product" generated by Apple's source code reviewers.  (Motion at 12.)  They are not "utilized by or implemented on" any Samsung product, accused or

1  otherwise; nor could they be, as "diff" reports are not executable.  Thus, "diff" reports are not

2  responsive to the two requests Apple identifies, and its motion must fail for this reason as well.

3    **B.**    **Apple's Motion Would Eviscerate the Protective Order's Printing Limits.**

4    In addition to evading the Protective Order's limitation of printing to source code itself,

5  Apple's motion would also evade the Order's strict limits on printing.  The Order states that

6  printouts exceeding "50 continuous pages or 10% or more of a specific software release shall be

7  presumed excessive and not done for a permitted purpose."  (Docket No. 171-1 at 14, 16 (¶¶ 11(i),

8  (n)); *see supra* at 4.)  "Diff" reports allow easy evasion of this limit, however, because a "diff"

9  report contains substantially *more* information than its page count would indicate.  Because "diff"

10  reports include only the differences between two files, a "diff" report necessarily includes more

11  information than its page count; it reveals that all the other, unprinted pages are identical across

12  two files.  (*See supra* at 4-5.)

13    For example, if Apple ran a "diff" report comparing Samsung's proprietary version of a

14  particular file to the corresponding version of the open-source file, the resulting printout would

15  reveal *all of the changes* Samsung made to the open-source version, whether or not accused of

16  infringement.  These "diff" reports would, by their nature, *reveal Samsung's crown jewels*:  its

17  add-ons to the open-source Android operating system, which are a closely guarded trade secret.

18  Apple has already printed such "diff" reports; as Apple admits, its reviewers' analysis "included

19  use of the diff program to compare Samsung's source code with the public Android source code

20  and printing the results."  (Motion at 3.)  Removing "diff" reports from the secure review room

21  would eviscerate the Protective Order's strict printing limits and put tremendous amounts of

22  proprietary information at risk of inadvertent disclosure in a manner that the parties did not

23  contemplate when they agreed to a printing regime.

24    Apple admits as much, arguing that "the page and percentage limits of paragraph 11(i) do

25  not make sense in the context of diff printouts."  (Motion at 15.)  This admission dooms Apple's

26  motion.  If Apple wished to negotiate a Protective Order in which printing of "diff" reports "made

27  sense," it could have done so.  Having decided to endorse the existing Protective Order, Apple

28  cannot now seek to rewrite it on a whim, after Samsung relied on that Order in producing sensitive

1   materials.  These types of "diff" reports can disclose a tremendous amount of commercially

2   sensitive information in a small package, and Samsung would not have agreed to removing them

3   from the review room in the manner Apple proposes.  (Fazio Decl. ¶ 8.)

4       **C.      The Protective Order Explicitly Bars Apple From Making Copies of
            Samsung's Source Code in Its Experts' Notes – Which is What Apple Admits**

5       **"Diff" Reports Are.**

6           In admitting that "diff" reports are not "Source Code" under the Protective Order, Apple

7   states instead that "diff" reports are its code reviewers' "work product."  (Motion at 12.)

8   Consequently, pursuant to Paragraph 11(n) of the Protective Order such expert "work product" is

9   explicitly barred from creation:

10          The Receiving Party shall be entitled to take notes relating to the Source Code but
            *may not copy the Source Code into the notes and may not take such notes*

11          *electronically on the Confidential Source Code Computer itself or any other*
            *computer.*  No copies of all or any portion of the Source Code may leave the room

12          in which the Source Code is inspected except as otherwise provided herein.
            Further, no other written or electronic record of the Source Code is permitted

13          except as otherwise provided herein.

14  (Docket No. 171-1 at 16 (¶ 11(n)) (emphasis added).)  Given Apple's admission that these reports

15  are excerpts of code that "memorialize the inspection" and "analysis of source code," (Motion at

16  15), Apple is prohibited from removing these types of notes from the source code review facility,

17  just as Apple is prohibited from bringing cameras or laptops into the review facility in order to

18  type up or photograph excerpts of source code.  (Docket No. 171-1 at 16-17 (¶ 11(o)).)  Notably,

19  Apple may remove the handwritten notes its reviewers prepare, as provided by Paragraph 11(n),

20  and it may print limited portions of individual Samsung source code files in the manner authorized

21  and regulated by Paragraph 11(i).  But Apple cannot excerpt thousands of lines of source code into

22  "diff" reports and remove those selective excerpts of source code from the review facility; doing

23  so would "copy the Source Code into [Apple's] notes" and impermissibly remove a "written or

24  electronic record of the Source Code" from the secure facility.

25          Additionally, Apple admits that "diffs" are "analysis of source code."  (Motion at 15.)  The

26  terms of the Protective Order make clear that Apple's analysis of source code must occur within

27  the security of Samsung's source code review room, stating:

28

[T]he parties acknowledge and agree that the purpose of the protections herein would be frustrated by printing portions of code *for review and analysis elsewhere.*

(Docket at 171-1 at 14 (¶ 11(i)) (emphasis added).)  Therefore, this language provides a further prohibition on Apple removing "diffs" from the secure facility.

Apple remains free to prepare "diff" reports in the secure review facility, and to analyze those reports as it conducts its investigation.  Samsung will continue to make all "diff" reports available for review in this secure facility.  But Apple cannot jeopardize the security of Samsung's code by removing printed "diff" reports, or other notes that excerpt source code, from Samsung's secure facility.  Paragraph 11 of the Protective Order explicitly bars this.  On that basis alone, Apple's motion should be denied.[2]

### D.      Apple Does Not Need Printouts of "Diff" Reports For Any Proper Purpose.

Apple claims that "[w]ithout the diff printouts the only way Apple's expert would be able to support his opinion of infringement would be to do a line-by-line comparison on hundreds of printed pages of source code, basically replicating the diff program by hand."  (Motion at 12.)  Requiring a plaintiff to perform an infringement analysis on every accused device is not an undue burden.  Apple is the party who chose to accuse 26 products of infringing its patents; to proceed with claims against 26 products, it must analyze those 26 products.  It cannot now protest that having to review source code for those products is unduly burdensome.  Indeed, Apple prepared its expert reports and infringement arguments in two recent actions against Samsung – both the 1846 action and ITC Investigation 337-TA-796 – *without* printouts of "diff" reports. Apple cannot now remove printed "diff" reports from the secure facility simply because Apple believes this would somehow accelerate its analysis, any more than Apple can bring a laptop or camera into the secure facility to expedite its analysis.  (Docket No. 171-1 at 16 (¶ 11(n)).)

Apple cites no authority to argue that a party cannot effectively use software to analyze differences in source code unless it is allowed to remove printouts of "diff" reports from a secure inspection facility.  The *Digital Reg of Texas, LLC v. Adobe Sys. Inc.*, No. 12-01971, 2013 WL

---

[2]   Even if the Court were to find Apple's request permissible under the Protective Order (it is not), the risk and burden to Samsung of disclosure of proprietary source code is not outweighed by Apple's desire to shortcut its infringement analysis.

633406, at *5-6 (N.D. Cal. Feb. 20, 2013) case, cited by Apple, demonstrates just this point.  The court in *Digital Reg of Texas* held that the installation of "source code analyzer tools" – *i.e.*, the analysis software Apple requested, and that Samsung installed – was *sufficient* to permit the plaintiff to inspect the functionality of the accused source code, and *denied* the plaintiff's requests for additional delivery of printouts beyond those specifically permitted by the protective order, since doing so would "*controvert the stipulated protective order*."  *Id.* at *7 (emphasis added).[3]

## II.   HAVING FAILED TO DILIGENTLY REVIEW SAMSUNG'S SOURCE CODE, APPLE CANNOT FORCE SAMSUNG TO PARSE APPLE'S INFRINGEMENT CONTENTIONS AND ASSERT APPLE'S PATENTS AGAINST ITSELF.

### A.   Apple Cannot Conscript Samsung as Its Consulting Expert and Force Samsung to Guess the Infringement Theory (If Any) Behind the Conclusory Statements and Claim Language in Apple's Infringement Contentions.

Apple asks the Court to compel a further response to Interrogatory No. 22, which asks Samsung to "[i]dentify . . . all files that relate to the Accused Features and functionality of the Accused Samsung Products," including "the specific Accused Feature to which the identified file relates, and any differences between that file and the publicly available version of the source code for the Jelly Bean, Ice Cream Sandwich, Honey Comb, Gingerbread and FroYo versions of the Android operating system."  (Motion at 1.)  Apple's interrogatories define "Accused Features" to mean "any aspect, element or function of any Accused Samsung Product that is alleged to infringe any of the Apple Patents-in-Suit, including each function identified in Apple's Disclosure of Asserted Claims and Infringement Contentions and amendments and corrections thereto."  (Furman Decl. Ex. C at 2-3 (emphasis added).)  Thus Apple seeks a narrative description of *any* code that might implement *any* of the vague allegations in Apple's 12,900 pages of infringement contentions, encompassing 173 separate infringement charts for eight asserted patents against 26

---

[3]   Apple implies that Samsung's refusal to deliver printouts of "diff" reports violates the Court's Order Granting-In-Part Apple's Motion to Compel Third Party Google, Inc.  (Docket No. 164).  But that Order – which did not compel Samsung to do anything – did not authorize or in any way suggest Apple could remove printouts of "diff" reports from the secure source code room; it merely required that the Cygwin source code analysis program be loaded onto the inspection computer, along with "software with the ability to *compare* the relevant source code versions."  (Docket No. 164 at 8 (emphasis added).)  That Cygwin program, and others Apple requested, are already installed on Samsung's review computers, and Apple is already actively using them to compare versions of source code.

devices.  (Judah Decl. Exs. 1 through 173.)  Apple says this narrative should be simple for Samsung to prepare, because "Apple's infringement contentions identify the accused features in Samsung's accused products in prose and by reference to specific files in the public Android source code."  (Motion at 1.)  This is simply not true.  Apple's infringement contentions often rely on conclusory allegations or simply restate claim language – providing no insight as to what code (if any) actually underlies Apple's infringement theories.

Consider, for example, Apple's infringement contentions for U.S. Patent No. 5,666,502 ("the '502 Patent") against the Samsung Galaxy S III.  (*See* Judah Decl. Ex. 62.)  Like all of Apple's infringement charts under the '502 Patent, this chart does not analyze or even name a *single source code file*.  (*See* Judah Decl. Exs. 44 through 69.)  Instead it offers the conclusory assertion that the accused functionality uses key claim terms, like "field class":

The Samsung Galaxy S III provides history tables maintained within its memory for each of a plurality of field classes.  A separate history table is provided for the Search YouTube field class, the Search Maps field class, and the Play Store field class, among others.  As shown below, the Samsung Galaxy S III displays a history list for the Search YouTube field class, the Search Maps field class, and the Play Store field class, which are associated with the Search YouTube history table, the Search Maps history table, and the Play Store history table, respectively.

  

(Judah Decl. Ex. 62, at 5.)  Each asserted claim of the '502 patent requires a "field class."  (Fazio Decl., Ex. 13.)  During claim construction, Apple admitted that the '502 patent requires a "field class" to be "part of the program" – that is, some structure under the hood, not simply an abstract

1  idea.  (Fazio Decl. Ex. 14 at 46:2-7.)  Thus, to prove infringement Apple must identify where the

2  software in Samsung's accused products use a "field class."  Instead, through this motion, Apple

3  says Samsung must identify the accused "field class" – which Samsung can hardly do, as Samsung

4  does not believe its products contain any "field classes" in their source code in the first place.

5      Apple's infringement contentions for U.S. Patent Nos. 6,847,959 ("the '959 Patent") suffer

6  from the same problem.  The asserted claims require a "heuristic to locate information" (Fazio

7  Decl. Ex. 15), but Apple again offers nothing beyond restatements of the claim language:

8



The Samsung Galaxy S III running Android Jelly Bean performs the step of each using a different heuristic to locate information which matches said identifier.

For example, as shown above, the Quick Search Box provides the Google, Browser, and Contacts plug-in modules. These plug-in modules each use a different heuristic to locate information which matches the inputted identifier.

22  (Judah Decl. Ex. 98.)  Apple provides no guidance beyond the claim language, thus forcing

23  Samsung – should the Court grant Apple's motion – to guess as to what Apple might call a

24  "heuristic to locate information" on its accused products.

25      In a telling example of the impossibility of this task, Exhibit P to Apple's motion names

26  MmsSmsProvider.java as "relevant source code" (Motion at 10) because it allegedly "specifies

27  how results from queries related to the content of a device's text messages should be sorted based

28  on *heuristics*" (Furman Decl. Ex. P. at 6) – but Apple's infringement contentions for this device

*never mention text messages*, much less reference any search algorithm for locating text messages. For these limitations – and many others – Apple's conclusory allegations leave Samsung to guess about what code (if any) Apple would accuse if Apple reviewed Samsung's code.  Rule 33 is not designed for this type of burden shifting analysis.  Apple – not Samsung – is the party that must decide how it contends Samsung's software might infringe the asserted claims.[4]

        For precisely this reason, courts have recognized that business records are an appropriate alternative to a narrative response where an interrogatory seeks information that is contained in those records, and is equally available to both parties by examining those records.[5]  Here, the burden of comparing source code to the claim limitations, including the conclusory restatements of claim language in Apple's infringement contentions, properly rests with Apple.  Contrary to Apple's assertions in its motion – but consistent with Apple's own responses to Samsung's interrogatories – courts consistently hold that plaintiffs, not defendants, must analyze source code and explain how it relates to the asserted claims or to existing infringement contentions.  *See, e.g.*, *Vasudevan Software, Inc. v. Int'l Bus. Machs. Corp.*, No. 09-05897, 2011 WL 940263, at *6-8 (N.D. Cal. Feb. 18, 2011) (ordering the plaintiff to provide "pinpoint citations" in supplemental infringement contentions after source code was provided); *Big Baboon Corp. v. Dell, Inc.*, 723 F. Supp. 2d 1224, 1228 (C.D. Cal. 2010) ("Once source code has been provided to the plaintiffs,

---

[4]   This is true not only because it is unduly burdensome to guess Apple's theories and draft Apple's infringement charts, but also because *Samsung does not have all the accused source code*.  Apple accuses many third-party applications, such as Google's YouTube, Google Maps, and Play Store applications – for which only third parties have source code.  (*See, e.g.*, Judah Decl. Ex. 50, at 5-6.)  Samsung obviously cannot give a narrative response about source code that Samsung does not possess.  Yet Apple demands that Samsung review third-party code outside Samsung's possession  to guess about the implementation details Apple might accuse if Apple reviewed that code.

[5]   *See, e.g.*, *Baxter Healthcare Corp. v. Fresenius Med. Care Holding, Inc.*, 2008 WL 5272186, at *2-3 (N.D. Cal. Dec. 15, 2008) (denying patentee's motion to compel a narrative response where "the burden of ascertaining the information responsive to [the interrogatory] would be substantially the same for either party"); *Berster Techs., LLC v. Christmas*, 2011 WL 4710801, at *3 (E.D. Cal. Oct. 4, 2011) (upholding use of business records option where "files are in electronic format and, as proven by plaintiff's own conduct, relatively easily searchable and, thus, not unduly burdensome"); *U.S. v. Kellogg Brown & Root Servs., Inc.*, 284 F.R.D. 22, 30-31 (D.D.C. 2012) (holding that"[t]he relevant files are completely open to KBR's review" and therefore "the burden for ascertaining the answer is substantially the same for either party").

however, courts have required plaintiffs to supplement their infringement charges with pinpoint citations."); *Diagnostic Sys. Corp. v. Symantec Corp.*, Nos. 06-1211, 07-960, 2009 WL 1607717, at *6 (C.D. Cal. Jun. 5, 2009) (compelling plaintiffs to provide amended contentions and discovery responses "expressly identifying and describing what, if any, source code for [defendant's] accused software products infringe" the asserted patents).[6]

Indeed, this is the norm in patent litigation: the defendant produces source code to the plaintiff, and the plaintiff then provides infringement contentions reflecting its analysis of the defendant's source code. *See* Pat. L.R. 3-1(c); *Vasudevan Software, Inc. v. Int'l Bus. Machs. Corp.*, No. 09-05897, 2011 WL 940263, at *6-8 (N.D. Cal. Feb. 18, 2011) (ordering plaintiff to provide "pinpoint citations" in supplemental infringement contentions after defendant's source code was provided). Plaintiffs prosecute their allegations of patent infringement in this fashion every day. Apple itself did so in its prior litigation against Samsung. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co. Ltd.*, Case No. 11-1846-LHK-JSG (N.D. Cal.). In this case, however, Apple simply refuses to do the required work: it wants to review only third-party public code, and not proprietary code on Samsung's actual devices. As Apple freely admits, its infringement contentions reference only "specific files in the public Android source code," and contain *no* analysis of Samsung source code on *any* accused product. (*See supra* at 6.) Instead of actually analyzing code for Samsung's accused products, Apple asks Samsung to serve as its captive expert witness, shifting the burden of identifying accused features through its request for a narrative of the "source code files that correspond to Apple's infringement contentions." (Motion at 1.) This approach is not permitted, or contemplated, by Rule 33. The Court should deny Apple's effort to

---

[6]   Apple cites two cases *FatPipe Networks India Ltd. v. XRoads Networks, Inc.*, No. 2:09-cv-186, 2010 WL 3064369 (D. Utah Aug. 3, 2010) and *LaserDynamics, Inc v. Asus Comp. Int'l*, No. 2:06-cv-348, 2009 U.S. Dist. LEXIS 3878 (E.D. Tex. Jan. 21, 2009), but neither supports its argument. In *FatPipe*, plaintiff and patentee FatPipe was ordered to identify the portions of source code in its *own* device it alleged practiced its *own* asserted patent. *FatPipe*, 2010 WL 3064369, at *4-5. Thus the *FatPipe* Court required FatPipe to parse and understand its *own* legal contentions, not its opponent's allegations as Apple seeks here. Similarly, in *LaserDynamics* the court ordered a narrative explanation of "how certain aspects of the defendants' accused disc drives function" – not a comparison of the accused products to the patent claims or to an infringement chart. *LaserDynamics*, 2009 U.S. Dist. LEXIS 3878, at *7-8. Neither decision supports the extraordinary relief Apple seeks.

1    conscript Samsung as its litigation consultant.

2    **B.    "Differences" Between Third-Party Open Source Code and Code Compiled Onto The Accused Devices Are Irrelevant, Burdensome, and Would Reveal Trade Secrets Without Helping Apple In This Action.**

3

4    Samsung agreed to produce and has produced source code compiled into the accused

5    devices.  But Apple goes further, demanding that Samsung "identify any differences between each

6    version of Android source code in its accused products and the comparable public version of

7    Android source code that Samsung contends are material to the alleged non-infringement of

8    Apple's asserted patent claims in the event the public version were found to infringe." (*See* Valek

9    Decl. Ex. 3.)  This request for a narrative comparison of Samsung's code to third-party code has

10   no relevance to the present case.[7]

11   Apple accuses Samsung of infringement; the only software that is relevant to Apple's

12   claims is software used by Samsung on the accused devices.  The contents of third-party open-

13   source code, and comparisons of that third-party code to Samsung's code, are irrelevant.  Apple

14   can and should analyze Samsung's source code, and not third-party code.  Apple's request to

15   compare third-party code to Samsung code would give attorneys for Apple – a clear competitor of

16   Samsung – access to *every single difference* between the open-source code and the proprietary

17   trade secret code produced by Samsung.  Apple has not provided any basis for relevance for this

18   information.  Notwithstanding this, both the third-party open-source code and the Samsung code

19   have been and continue to be available for inspection on Samsung's computers at the secure

20   review facility.  If Apple chooses to compare this code, it is free to do so in the secure area

21   pursuant to the terms of the Protective Order entered in this case.

22   **C.    Apple Claims Confusion About "Duplicate" Files in Samsung's Source Code Production, But Its Confusion Arises Only From Its Failure to Perform Basic Analysis of Samsung's Files.**

23

24   Apple also claims it is too difficult for it to analyze Samsung's code, because the code

25   "includes numerous duplicate files that make it impossible for Apple to determine the files [that]

26   _____

27   [7]   Apple contends that a narrative response is "necessary" (Motion at 4) but provides no explanation of how third-party open source code that is not implemented on any of the accused

28   products, and any differences between that unimplemented third-party open source code and the proprietary source code actually installed on the accused devices, are relevant in this case.

1   are actually used in the accused products."  (Motion at 9-10.)  This is simply incorrect:  by

2   reviewing the "make" files in Samsung's source code production, Apple's reviewers could easily

3   determine which files are built in which accused devices.  "Make" files are not exclusive to

4   Samsung or even particularly advanced; they are widely used to build software projects in many

5   languages, and are typically taught in sophomore-level computer science classes.  Samsung

6   provided its source code production to Apple precisely as maintained on its own servers –

7   including the "make" files actually used to build source code into executable software on Samsung

8   devices.  These "make" files provide a roadmap identifying the particular files used to build each

9   device.  Thus, Apple's "confusion" results only from its failure to review the "make" files and

10  understand their contents – again, Apple's failure to do its homework, rather than Samsung's

11  failure to provide the right information.

> **D.      Apple's Own Discovery Responses Demonstrate That Samsung Completely And Properly Responded To Interrogatory No. 22.**

Apple's Motion seeks a level of narrative response that Apple itself considers improper

when Apple is on the receiving end of discovery.  Samsung's Interrogatory No. 13 requested:

> **INTERROGATORY NO. 13:**  Separately for all SOFTWARE produced by APPLE including, but not limited to iOS SOURCE CODE, IDENTIFY: (a) each version of SOFTWARE that corresponds to commercially distributed versions of SOFTWARE; (b) which APPLE ACCUSED PRODUCT was commercially distributed with which version of the SOFTWARE produced by APPLE; and (c) all material differences between the commercially distributed versions of SOFTWARE that are relevant to any aspect, element or function of any APPLE ACCUSED PRODUCT that is alleged to infringe any of the SAMSUNG PATENTS.

(Fazio Decl. Ex. 3 at 10.)  This interrogatory, like Apple's Interrogatory No. 22, asks for

differences between versions of software.  Apple refused to provide a narrative response and

instead responded with document production – not a narrative: "to the extent responsive

information is found within the iOS software produced by Apple on the source code computer, [it]

is therefore equally available to Samsung."  (Fazio Decl. Ex. 4 at 54) (emphasis added).)  Apple

similarly refused to provide a narrative response to an interrogatory asking Apple to identify the

Apple code implementing its accused functionality:

> **INTERROGATORY NO. 34:**  Separately for each APPLE ACCUSED PRODUCT and each component identified in Interrogatory No. 28, IDENTIFY

1

(1) the Software or portions of Software, including corresponding Software Build IDs, Software release versions, file name, module names, and line numbers, (2) the location of that software (e.g., the applications processor), and (3) the author and/or authors of that software, for: capturing image signals and/or data; digitizing image signals and/or data; compressing image signals and/or data; storing image signals and/or data; transmitting image signals and/or data; receiving image signals and/or data; exchanging signals and/or data with another device; storing image signals and/or data received from another device; decompressing image signals and/or data; splitting image data and/or signals; organizing image data and/or signals; or state which of these functions are not performed by any component in an APPLE ACCUSED PRODUCT.

(Fazio Decl. Ex. 5 at 9-10.)  Again, Apple objected and refused to provide a narrative response, because "in accordance with  Federal Rule of Civil Procedure 33(d), Apple has produced and/or will produce documents responsive to this Interrogatory, and that the burden of ascertaining the answer to this Interrogatory from the produced business records is substantially the same for Apple as for Samsung."  (Fazio Decl. Ex. 7 at 18-19.)

These Samsung interrogatories are nearly identical to Apple's own Interrogatory No. 22. Samsung responded exactly as Apple did on near-identical interrogatories.  Apple cannot apply a double standard to source code discovery.

**E.      Apple Failed To Fulfill The Lead Counsel Meet and Confer Requirement Regarding "Files That Relate To The Accused Features and Functionality."**

In any event, the Court does not need to decide Apple's motion as to Interrogatory No. 22 because Apple failed to fulfill the lead trial counsel meet and confer requirement.  ***Not one word*** of the parties' lead trial counsel meet and confer meetings addressed Apple's request that Samsung "[i]dentify … all files that relate to the Accused Features and functionality of the Accused Samsung Products."  (Fazio Decl. Ex. 6; Valek Decl. Ex. 3.)  Apple's meet and confer agenda never mentioned this request.  (Fazio Decl. Ex. 6.)  The Court should not reward Apple for creeping new issues into motions to compel; it should deny the motion as to at least this portion of Interrogatory No. 22 to discourage future violations of the Court's order.

1

## <u>CONCLUSION</u>

2        For the foregoing reasons, the Court should deny Apple's Motion in its entirety.

3

4    DATED: April 1, 2013              QUINN EMANUEL URQUHART &
                                       SULLIVAN, LLP
5

6                                      By /s/ Michael Fazio
7                                         Charles K. Verhoeven
                                          Kevin P.B. Johnson
8                                         Victoria F. Maroulis
                                          Michael T. Zeller
9                                         Attorneys for SAMSUNG ELECTRONICS CO.,
                                          LTD., SAMSUNG ELECTRONICS AMERICA,
10                                        INC., and SAMSUNG
                                          TELECOMMUNICATIONS AMERICA, LLC
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28