# EXHIBIT 1

WILMERHALE

September 5, 2012

John Pettit

+1 650 858 6056(t)
+1 650 858 6100(f)
john.pettit@wilmerhale.com

**Via E-Mail**

Michael L. Fazio, Esq.
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017

Re:     Apple v. Samsung Elec. Co. et al., Case No 12-cv-0630

Dear Mr. Fazio:

I am writing to reply to your August 23, 2012 letter.

As Apple stated in its Patent Local Rule disclosures served on August 10, 2012, the source code relating to the accused product functionality charted in Samsung's Infringement Contentions is available at WilmerHale's Palo Alto office, located at 950 Page Mill Road, Palo Alto, California. Please let me know when you would like to arrange for an inspection.

The source code includes code related to, for example, the following functionality:

- the display and operation of the magnifying glass,

- the display and operation of the on-screen keyboard,

- compression and decompression of media content,

- the uploading of video content to YouTube,

- the attachment of video content to an email,

- the display and operation of volume controls,

- iCloud and Photo Stream content management, and

- baseband data transmission and formatting.

This letter will also confirm that Apple intends to make available relevant Intel and Qualcomm firmware in Apple's possession. Apple does not possess HDL code for the baseband chip; to the extent you believe such code is relevant, you will need to seek it from Intel and Qualcomm.

WILMERHALE

Michael L. Fazio
September 5, 2012
Page 2

Best regards,

John Pettit

ACTIVEUS 100677955v1

# EXHIBIT 2

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

555 Mission Street
San Francisco, CA 94105-2933
Tel 415.393.8200
www.gibsondunn.com

Emily L. Fedman
Direct: +1 415.393.8269
Fax: +1 415.374.8499
EFedman@gmail.com

Client: 03290-00026

June 8, 2012


VIA ELECTRONIC MAIL

Jeanine Zalduendo
Quinn Emanuel
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

Re:     *Apple v. Samsung Elecs. Co. et al*, Case No. 12-cv-0630
        Samsung Source Code Production

Dear Jeanine:

I write in response to your June 4, 2012 letter.  Apple will respond regarding the pages
Samsung refuses to produce by June 15, 2012.


Sincerely,

Emily L. Fedman

ELF/cjd

# EXHIBIT 3

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
Kevin A. Smith (Bar No. 250814)
kevinsmith@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

William C. Price (Bar No. 108542)
williamprice@quinnemanuel.com
Patrick M. Shields (Bar No. 204739)
patrickshields@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS CO., LTD.,
SAMSUNG ELECTRONICS AMERICA, INC. and
SAMSUNG TELECOMMUNICATIONS AMERICA, LLC

STEPTOE & JOHNSON, LLP
John Caracappa (*pro hac vice*)
jcaracappa@steptoe.com
1330 Connecticut Avenue, NW
Washington, D.C. 20036
Telephone: (202) 429-6267
Facsimile: (202) 429-3902

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>             Plaintiff,<br><br>        vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>             Defendants. | CASE NO. 12-CV-00630-LHK<br><br>**SAMSUNG'S FIRST SET OF INTERROGATORIES TO APPLE** |

1    Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendants Samsung

2 Electronics, Co. Ltd., Samsung Telecommunications America, LLC and Samsung Electronics

3 America, Inc., (collectively "Samsung") request that Plaintiff Apple Inc. ("Apple") produce for

4 inspection and copying the documents and things set forth below at the offices of Quinn Emanuel

5 Urquhart & Sullivan, LLP, 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017,

6 within 30 days.

7    **DEFINITIONS**

8    1.    The terms "APPLE," "PLAINTIFF," "YOU," and "YOUR" shall refer to Apple,

9 Inc., any predecessor or successor of Apple, Inc., and any past or present parent, division,

10 subsidiary, affiliate, joint venture, associated organization, director, officer, agent, employee,

11 consultant, staff member, or other representative of Apple, Inc., including counsel and patent

12 agents, in any country.

13    2.    The term "DEFENDANTS" or "SAMSUNG" means Samsung Electronics Co.,

14 Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC.

15    3.    The terms "DOCUMENT" and "DOCUMENTS" shall have the broadest meaning

16 ascribed to them by Federal Rule of Civil Procedure 34 and Federal Rule of Evidence 1001.    This

17 includes copies which differ from the original in any way, including handwritten notations or other

18 written or printed matter.    It also includes information stored electronically, whether in a

19 computer database or otherwise, regardless of whether such documents are presently also in non-

20 electronic form.

21    4.    "COMMUNICATION," in the plural as well as the singular, means any transmittal

22 and/or receipt of information, whether such was oral or written, and whether such was by chance,

23 prearranged, formal or informal, and specifically includes, but is not limited to, conversations in

24 person, telephone conversations, electronic mail (including instant messages and text messages),

25 voicemail, letters, memoranda, statements, media releases, magazine and newspaper articles, and

26 video and audio transmissions.

27

28

5.     The terms "DATE" and "DATES" mean the exact date(s), if known, or the closest approximation to the exact date(s) as can be specified, including without limitation the year, month, week in a month, or part of a month.

6.     The phrases "THIRD PARTY" and/or "THIRD PARTIES" mean all persons who are not parties to this LITIGATION, as well as their officers, directors, employees, agents and attorneys.

7.     The term "RELATING TO " or "RELATED TO" shall mean regarding, referring to, concerning, mentioning, reflecting, pertaining to, evidencing, identifying, involving, describing, discussing, commenting on, embodying, responding to, supporting, contradicting, containing, or constituting (in whole or in part).

8.     The term "COMPLAINT" refers to APPLE's "Amended Complaint for Patent Infringement" filed August 31, 2012, in the Litigation.

9.     The phrase "ANSWER AND COUNTERCLAIMS IN REPLY" refers to "Apple Inc.'s Answer, Defenses, and Counterclaims in Reply to Samsung's Counterclaims" filed May 31, 2012 in the LITIGATION.

10.     The term "APPLE PATENTS" shall mean U.S. Patent Nos. 5,666,502, 5,946,647, 6,847,959, 7,761,414, 8,014,760, 8,046,721, 8,074,172, 8,086,604, and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents.

11.     The phrase "APPLE COVERED PRODUCT" means any PRODUCT sold or offered for sale at any time by APPLE that APPLE contends practices any of the APPLE PATENTS.

12.     "PRIOR ART" shall mean any reference, publication, patent, physical specimen, use, invention by another, sale, offer for sale, or other activities that are relevant to the validity of the APPLE PATENT including anything that is relevant to the patentability of any patent claim under 35 U.S.C. §§ 102 and 103. Prior Art is not limited to references or other activities cited to the United States Patent and Trademark Office during prosecution of any patent.

13.     "PATENTED FEATURES" shall refer to the alleged inventions claimed by the APPLE PATENTS and their commercial embodiments.

14.     The term "SAMSUNG ACCUSED PRODUCTS" shall refer to the products identified in Apple Inc.'s Disclosure of Asserted Claims & Infringement Contentions and/or Apple's Amended Complaint for Patent Infringement.

15.     The term "'087 PATENT" shall mean U.S. Patent No. 7,756,087 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claim the same subject matter.

16.     The term "'596 PATENT" shall mean U.S. Patent No. 7,551,596 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claim the same subject matter.

17.     The term "'470 PATENT" shall mean U.S. Patent No. 7,672,470 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claim the same subject matter.

18.     The term "'757 PATENT" shall mean U.S. Patent No. 7,577,757 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claim the same subject matter.

19.     The term "'058 PATENT" shall mean U.S. Patent No. 7,232,058 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claim the same subject matter.

20.     The term "'179 PATENT" shall mean U.S. Patent No. 6,292,179 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claim the same subject matter.

21.     The term "'449 PATENT" shall mean U.S. Patent No. 6,226,449 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claim the same subject matter.

22.    The term "'239 PATENT" shall mean U.S. Patent No. 5,579,239 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claim the same subject matter.

23.    The term "SAMSUNG PATENTS" shall mean the '087 PATENT, '596 PATENT, '470 PATENT, '757 PATENT, '058 PATENT, '179 PATENT, '449 PATENT, '239 PATENT, and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claim the same subject matter.

24.    The term "APPLE ACCUSED PRODUCTS" shall mean all iPhones, iPads, iPod Touches, Apple computers, Apple TV, iCloud, iTunes, and any other products identified in any of SAMSUNG's complaints or infringement contentions served in this action as infringing any claim of any SAMSUNG PATENT.

25.    The connectives "and," "or," and "and/or" shall be construed either disjunctively or conjunctively, as necessary, to bring within the scope of these requests for production all responses that might otherwise be construed to be outside of their scope.

26.    The word "each" includes the word "every," and the word "every" includes the word "each," as necessary, to bring within the scope of these requests for production all responses that might otherwise be construed to be outside of their scope.

27.    The word "any" includes the word "all," and the word "all" includes the word "any," as necessary to bring within the scope of these requests for production all responses that might otherwise be construed to be outside of their scope.

28.    The word "all" includes the word "each," and the word "each" includes the word "all," as necessary to bring within the scope of these requests for production all responses that might otherwise be construed to be outside of their scope.

29.    The use of the singular form of any word includes the plural and vice-versa, as necessary to bring within the scope of these requests for production all responses that might otherwise be construed to be outside of their scope.

## INSTRUCTIONS

The following instructions shall apply to each of the Interrogatories herein:

1.      In answering the following Interrogatories, furnish all available information, including information in the possession, custody, or control of any of PLAINTIFF's attorneys, directors, officers, agents, employees, representatives, associates, investigators or division affiliates, partnerships, parents or subsidiaries, and persons under PLAINTIFF's control, who have the best knowledge, not merely information known to PLAINTIFF based on PLAINTIFF's own personal knowledge. If YOU cannot fully respond to the following Interrogatories after exercising due diligence to secure the information requested thereby, so state, and specify the portion of each Interrogatory that cannot be responded to fully and completely. In the latter event, state what efforts were made to obtain the requested information and the facts relied upon that support the contention that the Interrogatory cannot be answered fully and completely; and state what knowledge, information or belief PLAINTIFF has concerning the unanswered portion of any such Interrogatory.

2.      If any information requested is claimed to be privileged or otherwise, provide all information falling within the scope of the Interrogatory which is not privileged, and for each item of information contained in a document to which a claim of privilege is made, identify such document with sufficient particularity for purposes of a motion to compel, such identification to include at least the following:

        a.      the basis on which the privilege is claimed;

        b.      the names and positions of the author of the information and all other persons participating in the preparation of the information;

        c.      the name and position of each individual or other person to whom the information, or a copy thereof, was sent or otherwise disclosed;

        d.      the date of the information;

        e.      a description of any accompanying material transmitted with or attached to such information;

        f.      the number of pages in such document or information;

g.      the particular Interrogatory to which such document is responsive; and whether any business or non-legal matter is contained or discussed in such information.

3.      In the event YOU contend that any of these Interrogatories is objectionable, in whole or in part, YOU shall state with particularity each such objection and the bases therefore, and shall respond to the remainder of the Interrogatory to the extent you are not objecting to it.

4.      For any Interrogatory or portion thereof that YOU determine to be vague, overbroad, or unclear, YOU shall adopt a reasonable meaning for that portion of the Interrogatory, state the adopted meaning in YOUR response to the particular Interrogatory, and produce responsive information accordingly.

5.      The words "and" and "or" shall be construed as either conjunctive or disjunctive in such manner as will broaden as widely as possible the scope of any request for production; the word "including" means "including without limitation."

6.      The use of the singular form of any word includes the plural and vice versa.

7.      PLAINTIFF's obligation to respond to these Interrogatories is continuing and its responses are to be supplemented to include subsequently acquired information in accordance with the requirements of Rule 26(e) of the Federal Rules of Civil Procedure.

## INTERROGATORIES

**INTERROGATORY NO. 1:**

Separately identify and describe in detail each and every instance in which APPLE or anyone else has ever given notice to SAMSUNG of the existence and/or the alleged infringement of the APPLE PATENTS, including without limitation: the date of notice; the manner in which notice was given; the patent(s) and the patent claim(s) at issue; the sum and substance of the notice; and the identity of all documents or oral communications constituting such notice.

**INTERROGATORY NO. 2:**

Separately for each claim of the APPLE PATENTS that APPLE contends SAMSUNG has infringed or is infringing, describe in detail all facts relevant to the conception of that claimed invention, including without limitation: the date of conception, the name of each person who contributed to the conception, the specific contribution made by each such person to the claimed invention, how these persons arrived at their claimed invention, and the identity of all documents (by Bates numbers) relating to such conception.

**INTERROGATORY NO. 3:**

Separately for each claim of the APPLE PATENTS that APPLE contends SAMSUNG has infringed or is infringing, describe in detail all facts relevant to the first reduction to practice of that claimed invention, including without limitation: the date of the first reduction to practice, the name of each person who contributed to the reduction to practice, the nature of each person's contribution, all facts and circumstances relating to any alleged diligence between the asserted conception and reduction to practice dates, the identity of each person with knowledge of such diligence, the nature of each person's participation, involvement, and/or contribution to the diligence in reduction to practice, and the identity of all documents (by Bates numbers) relating to such diligence and reduction to practice.

**INTERROGATORY NO. 4:**

Separately for each of the APPLE PATENTS, identify each APPLE COVERED PRODUCT, which of the APPLE PATENTS are embodied in the APPLE COVERED PRODUCT, the date each APPLE COVERED PRODUCT was first sold in the United States, and whether each APPLE COVERED PRODUCT was marked pursuant to 35 U.S.C. § 287 or otherwise, how each APPLE COVERED PRODUCT was marked including the location and manner of the marking, the individuals or entities that marked each APPLE COVERED PRODUCT, and any interruptions or other changes in the practice of marking the APPLE COVERED PRODUCT since it was first marked. The APPLE COVERED PRODUCTS shall be

identified by commercial name, commercial model number, telecommunications carrier (if applicable), date of product announcement, date of product release, "code name," and any other identifiers used internally and/or externally to identify or refer to the product at any point during its research, design, development, manufacture, marketing, sale, transfer, distribution, testing, qualification, importation, export, or otherwise.

**INTERROGATORY NO. 5:**

Separately for each claim of the APPLE PATENTS, identify each secondary consideration that YOU contend supports the non-obviousness of the invention(s) claimed (e.g., commercial success, long-felt need, commercial acquiescence, expressions of skepticism, copying, teaching away, simultaneous development, failure of others, unexpected results, commercial acquiescence through acceptance of licenses, departure from acceptable principles of prior art, or acclaim by industry), and for each such alleged secondary consideration describe in detail the facts underlying the alleged secondary consideration.

**INTERROGATORY NO. 6:**

Please IDENTIFY EACH PERSON who was involved in the prosecution of the APPLE PATENTS -- including without limitation, ALL engineers, developers, programmers, designers, testers, patent agents, attorneys, AND draftsmen -- AND DESCRIBE the role EACH such PERSON played in the prosecution of the APPLE PATENTS.

**INTERROGATORY NO. 7:**

For each SAMSUNG ACCUSED PRODUCT, describe the circumstances under which APPLE first became aware of each SAMSUNG ACCUSED PRODUCT's alleged infringement, including, but not limited to, the date(s) upon which APPLE first became aware of such SAMSUNG ACCUSED PRODUCT; the date upon which APPLE first became aware that such SAMSUNG ACCUSED PRODUCT allegedly infringed one or more of the APPLE PATENTS; any investigations, reverse engineering, analyses, tests, or studies done on any SAMSUNG

ACCUSED PRODUCT by or on the behalf of APPLE with respect to possible infringement of any claim of one or more of the APPLE PATENTS, including without limitation the date, procedures, and results of such analyses, tests, or studies; and an identification of all persons involved in any such analyses, tests, or studies and any related documents.

**INTERROGATORY NO. 8:**

Describe in detail all communications with THIRD PARTIES relating to actual or potential licenses, sublicenses, settlement agreements, technology sharing agreements, or other agreements regarding the APPLE PATENTS, including by identifying by Bates range all documents relating to any such communications.

**INTERROGATORY NO. 9:**

For EACH of the APPLE PATENTS, please set forth the royalty (expressed as a percentage to be applied to gross revenue in the case of a running royalty, AND expressed as a dollar amount in the case of a lump sum royalty, AND expressed as the royalty base) which APPLE believes is appropriate for a non-exclusive license to use such patent.

**INTERROGATORY NO. 10:**

Separately for each of the APPLE PATENTS, state the complete factual and legal basis for YOUR contentions that APPLE is entitled to injunctive relief against infringement of the APPLE PATENTS, including but not limited to: (a) what irreparable injury APPLE has suffered; (b) why other remedies such as monetary damages are inadequate to compensate for that injury; (c) why the balance of hardships between APPLE and SAMSUNG warrants a permanent injunction; and (d) why the public interest would not be disserved by an injunction.

**INTERROGATORY NO. 11:**

Separately for each claim of the SAMSUNG PATENTS, identify each secondary consideration that YOU contend supports the obviousness of the invention(s) claimed, and for

each such alleged secondary consideration describe in detail the facts underlying the alleged secondary consideration including any related documents and people most knowledgeable of the secondary consideration.

**INTERROGATORY NO. 12:**

If YOU contend or believe that YOU do not infringe any asserted claim of the SAMSUNG PATENTS, state with specificity the complete factual and legal bases for such contention or belief.

**INTERROGATORY NO. 13:**

Separately for all SOFTWARE produced by APPLE including, but not limited to iOS SOURCE CODE, IDENTIFY: (a) each version of SOFTWARE that corresponds to commercially distributed versions of SOFTWARE; (b) which APPLE ACCUSED PRODUCT was commercially distributed with which version of the SOFTWARE produced by APPLE; and (c) all material differences between the commercially distributed versions of SOFTWARE that are relevant to any aspect, element or function of any APPLE ACCUSED PRODUCT that is alleged to infringe any of the SAMSUNG PATENTS.

**INTERROGATORY NO. 14:**

Describe and identify each communication between YOU and any THIRD PARTY concerning any infringement or possible infringement of any of the patents asserted by either party; or concerning any license, request for license, offer to license or possible license, of any of the patents asserted by either party; or concerning notice of any of the patents asserted by either party, the value of the patents asserted by either party; or concerning the validity, invalidity, enforceability, or unenforceability of the patents asserted by either party. For each such communication identified, identify each person involved in the communication, the date and form of the communication, and provide a brief description of the communication.

Case No. 12-CV-00630-LHK
SAMSUNG'S FIRST SET OF INTERROGATORIES TO APPLE

**INTERROGATORY NO. 15:**

Identify the person of ordinary skill in the art for each of the APPLE PATENTS and each of the SAMSUNG PATENTS.

**INTERROGATORY NO. 16:**

Describe in detail the factual and legal basis (including the identity of all documents and persons) upon which you will rely to establish, or that contradict, each of YOUR affirmative defenses.

**INTERROGATORY NO. 17:**

Describe in detail the factual and legal basis (including the identity of all documents and persons) upon which you will rely to establish, or that contradict, each of the denials AND allegations set forth in the ANSWER AND COUNTERCLAIMS IN REPLY.

**INTERROGATORY NO. 18:**

Specifically for each of the SAMSUNG PATENTS, identify and explain in detail each design-around and/or alleged alternative technology or method that can be used as an alternative to the patented technology, including but not limited to: (1) a description of the alleged design-around; (2) a description of when and how the alleged design-around was developed; (3) the identity of individuals involved in developing the alleged design-around, including their titles and departments if they are or were Samsung employees; (4) dates when the alleged design-around was incorporated into APPLE's products; and (5) each product available on the market simultaneously with the APPLE ACCUSED PRODUCTS that would have been an acceptable non-infringing alternative for customers who purchased the APPLE ACCUSED PRODUCTS.

**INTERROGATORY NO. 19:**

With respect to each of the APPLE PATENTS and foreign counterparts to each of the APPLE PATENTS, identify any prior art references YOU found or of which YOU were aware but

that YOU did not cite or otherwise provide to the United States Patent and Trademark Office prior to the issuance of the patent.

**INTERROGATORY NO. 20:**

If YOU contend or believe that any of the asserted claims of the APPLE PATENTS are not practiced by any of the APPLE COVERED PRODUCTS, identify each such asserted claim and explain in detail the reasons why the respective APPLE COVERED PRODUCT does not practice each such claim, including a description of the differences between the respective APPLE COVERED PRODUCT and any APPLE COVERED PRODUCT that YOU do contend or believe practices the same claim of the APPLE PATENTS.

**INTERROGATORY NO. 21:**

Identify the date on which APPLE first became aware of the SAMSUNG PATENTS, the circumstances by which APPLE first became aware of the SAMSUNG PATENTS, and the identity of each PERSON at APPLE who became aware of the SAMSUNG PATENTS at that time.

**INTERROGATORY NO. 22:**

Please set forth APPLE'S DOCUMENT retention policy in its entirety.

**INTERROGATORY NO. 23:**

Please DESCRIBE when APPLE instituted ANY litigation hold RELATING to the LITIGATION; how APPLE implemented ANY litigation hold RELATING to the LITIGATION; who was responsible for monitoring compliance with such litigation hold; AND ANY instances of non-compliance with such litigation hold.

**INTERROGATORY NO. 24:**

Please IDENTIFY AND DESCRIBE EACH AND every litigation, dispute OR proceeding -- prior OR current -- RELATING to the validity, enforceability OR ownership of ANY APPLE PATENTS or foreign counterparts to any APPLE PATENTS, including but not limited to: the parties involved in such litigation OR dispute; the court in which such litigation was/is pending, OR the arbitral body before which such dispute was/is pending, or the administrative body before which such proceeding was/is pending; the current status of such litigation, dispute OR proceeding; AND the non-attorney PERSONS at APPLE who are most knowledgeable about such litigation, dispute OR proceeding.

DATED: September 25, 2012

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By /s/ Patrick M. Shields
    Charles K. Verhoeven
    Kevin P.B. Johnson
    Victoria F. Maroulis
    William C. Price
    Patrick M. Shields

    John Caracappa (*pro hac vice*)
    Steptoe & Johnson, LLP
    1330 Connecticut Avenue, NW
    Washington DC 20036
    TEL:   202-429-6267
    FAX:   202-429-3902

    Attorneys for Defendants
    SAMSUNG ELECTRONICS CO., LTD.,
    SAMSUNG ELECTRONICS AMERICA, INC.,
    and SAMSUNG TELECOMMUNICATIONS
    AMERICA, LLC

# EXHIBIT 4

1
2
3
4
5

JOSH A. KREVITT (CA SBN 208552)
jkrevitt@gibsondunn.com
H. MARK LYON (CA SBN 162061)
mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, California 94304-1211
Telephone: (650) 849-5300
Facsimile: (650) 849-5333

WILLIAM F. LEE (*pro hac vice*)
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

6
7
8
9
10
11

HAROLD J. MCELHINNY (CA SBN 66781)
hmcelhinny@mofo.com
MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

MARK D. SELWYN (SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

12

*Attorneys for Plaintiff and Counterclaim-Defendant Apple Inc.*

13
14

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

15

16
17
18
19
20
21
22

APPLE INC., a California corporation,

      Plaintiff,

      v.

SAMSUNG ELECTRONICS CO., LTD., a
Korean corporation; SAMSUNG
ELECTRONICS AMERICA, INC., a New
York corporation; and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC,
a Delaware limited liability company,

      Defendants.

Civil Action No. 12-CV-00630-LHK (PSG)

**APPLE INC.'S OBJECTIONS AND
RESPONSES TO SAMSUNG'S FIRST
SET OF INTERROGATORIES**

**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**

23
24
25
26
27
28

SAMSUNG ELECTRONICS CO., LTD., a
Korean corporation; SAMSUNG
ELECTRONICS AMERICA, INC., a New
York corporation, and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC,
a Delaware limited liability company,

      Counterclaim-Plaintiffs,

      v.

APPLE INC., a California corporation,

      Counterclaim-Defendant.

**INTERROGATORY NO. 13:**

Separately for all SOFTWARE produced by APPLE including, but not limited to iOS SOURCE CODE, IDENTIFY: (a) each version of SOFTWARE that corresponds to commercially distributed versions of SOFTWARE; (b) which APPLE ACCUSED PRODUCT was commercially distributed with which version of the SOFTWARE produced by APPLE; and (c) all material differences between the commercially distributed versions of SOFTWARE that are relevant to any aspect, element or function of any APPLE ACCUSED PRODUCT that is alleged to infringe any of the SAMSUNG PATENTS.

**RESPONSE TO INTERROGATORY NO. 13**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY      Case No. 12-CV-00630-LHK (PSG)

APPLE'S RESPONSES TO SAMSUNG'S FIRST SET OF INTERROGATORIES

Apple objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.  Apple also objects to this Interrogatory on the grounds that it that the phrases "material differences" and "relevant to any aspect, element or function of any APPLE ACCUSED PRODUCT that is alleged to infringe any of the SAMSUNG PATENTS-IN-SUIT" are vague and ambiguous.  Apple bases its response on its current understanding of the Samsung's infringement contentions as set forth in Samsung's Patent Local Rule 3-1 disclosures.  Apple also objects to this Interrogatory to the extent responsive information is found within the iOS software produced by Apple on the source code computer, and is therefore equally available to Samsung.  Apple also objects to this Interrogatory because it contains multiple subparts that each should count as a separate interrogatory.

Subject to and without waiving the foregoing General and Specific Objections, Apple responds as follows:

The iOS software produced by Apple on the source code computer is representative of commercially distributed versions of software as indicated below with respect to the features of the Apple Accused Products currently accused in Samsung's Patent Local Rule 3-1 disclosures:

| SOFTWARE produced by APPLE | Commercially distributed versions of SOFTWARE |
|---|---|
| Additional_Samsung630_Def_20120810/148_iOS5.0.1_MP3_10830613 | iOS 5.0.1 |
| Additional_Samsung630_Def_20120810/598-AppleHDA | OS X 10.3 |
| Additional_Samsung630_Def_20120810/600-Samsung630 | OS X 10.3 |
| Additional_Samsung630_Def_20120810/601-photostreams | Windows |

-54-

| | |
|---|---|
| Additional_Samsung630_Def_20120810/602<br>-MessageWriter | iOS 5.1.1 |
| Additional_Samsung630_Def_20120810/606<br>-Sources_12027921_Notes/4.0 | iOS 4.3.5 |
| Additional_Samsung630_Def_20120810/606<br>-Sources_12027921_Notes/5.0 | iOS 5.0 |
| Additional_Samsung630_Def_20120810/607<br>-Sources_12027921_Keyboard/4.0 | iOS 4.3.5 |
| Additional_Samsung630_Def_20120810/607<br>-Sources_12027921_Keyboard/5.0 | iOS 5.0.1 |
| Additional_Samsung630_Def_20120810/608<br>-YouTube_Upload_12027983/4.0 | iOS 4.3.5 |
| Additional_Samsung630_Def_20120810/608<br>-YouTube_Upload_12027983/5.0 | iOS 5.0 |
| Additional_Samsung630_Def_20120810/609<br>-Mail_Display_12030752/4.0 | iOS 4.3.5 |
| Additional_Samsung630_Def_20120810/609<br>-Mail_Display_12030752/5.0 | iOS 5.0 |
| Additional_Samsung630_Def_20120810/610<br>-Audio_Internal_Speakers_12029267/4.0 | iOS 4.3.5 |
| Additional_Samsung630_Def_20120810/610<br>-Audio_Internal_Speakers_12029267/5.0 | iOS 5.0 |
| Additional_Samsung630_Def_20120810/611<br>-Audio_External_Device_12028021/4.0 | iOS 4.3.5 |
| Additional_Samsung630_Def_20120810/611<br>-Audio_External_Device_12028021/5.0 | iOS 5.0 |
| Additional_Samsung630_Def_20120810/612<br>-ubiquity-234.2 | OS X 10.3 |
| Additional_Samsung630_Def_20120810/623<br>-Sources_12060633_Samsung/4.0 | iOS 4.3.5 |
| Additional_Samsung630_Def_20120810/623<br>-Sources_12060633_Samsung/5.0 | iOS 5.0 |

-55-

| | |
|---|---|
| Additional_Samsung630_Def_20120810/624 -Samsung630Audio | OS X 10.3 |
| Additional_Samsung630_Def_20120810/625 -Sources_12027810_VolumeControl/4.0 | iOS 4.3.5 |
| Additional_Samsung630_Def_20120810/625 -Sources_12027810_VolumeControl/5.0 | iOS 5.0 |
| Additional_Samsung630_Def_20120810/626 -HomeSharing | OS X 10.3 |
| Additional_Samsung630_Def_20120810/627 -DAAPSource | iOS 4.3.5 <br><br> iOS 5.1.1 |
| Additional_Samsung630_Def_20120928/666 -Samsung_630_Photostream_12233938 | iOS 5.1.1 |
| Additional_Samsung630_Def_20120928/667 -Samsung_630_Calendar_12237405/4.0 | iOS 4.3.5 |
| Additional_Samsung630_Def_20120928/667 -Samsung_630_Calendar_12237405/5.0 | iOS 5.1.1 |
| Additional_Samsung630_Def_20120928/671 -QT771GM_OSX | OS X 10.3 |
| Additional_Samsung630_Def_20120928/675 -SamsungiTunes 2012-09-24 | iTunes 7.3, 7.4, 7.5, 7.6, 7.7, 8.0, 8.`, 8.2, 9.0, 9.1, 9.2, 10.0, 10.1, 10.2, 10.3, 10.4, 10.5, 10.6, 10.6.3, 10.7 |
| Additional_Samsung630_Def_20120928/677 -SourceDrop_12280919_Samsung/5.0 | iOS 5.0 |
| Additional_Samsung630_Def_20120928/678 -Samsung_630_Keyboards_12333733/4.3.5 | iOS 4.3.5 |
| Additional_Samsung630_Def_20120928/678 -Samsung_630_Keyboards_12333733/5.1.1 | iOS 5.1.1 |
| Additional_Samsung630_Def_20121010/698 -Samsung630_atv_source | iOS 5.1.1 |
| Additional_Samsung630_Def_20121010/706 -Samsung_630_Photo_12447650/4.3.5 | iOS 4.3.5 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY          Case No. 12-CV-00630-LHK (PSG)

APPLE'S RESPONSES TO SAMSUNG'S FIRST SET OF INTERROGATORIES

| Additional_Samsung630_Def_20121010/706 -Samsung_630_Photo_12447650/5.1.1 | iOS 5.1.1 |
|---|---|

Apple further responds that the iOS software produced by Apple on the source code computer corresponds to the Apple Accused Products as indicated below:

| SOFTWARE produced by APPLE | APPLE ACCUSED PRODUCT commercially distributed therewith |
|---|---|
| iOS 4.x | iPhone 3G, iPhone 3GS, iPhone 4, iPod touch (2nd generation), iPad, iPad 2 |
| iOS 5.x | iPhone 3GS, iPhone 4, iPhone 4S, iPod touch (3rd generation), iPod touch (4th generation), iPad, iPad 2, the new iPad |

Discovery is still in its early stages and Apple is continuing to investigate.  Apple reserves the right to supplement and/or amend its response as appropriate.

**INTERROGATORY NO. 14:**

-57-

1

2

3   Dated:  November 8, 2012

By:   /s/ H. Mark Lyon

4

5   JOSH A. KREVITT (CA SBN 208552)
jkrevitt@gibsondunn.com
H. MARK LYON (CA SBN 162061)
mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, California 94304-1211
Telephone: (650) 849-5300
Facsimile: (650) 849-5333

6

7

8

9   HAROLD J. MCELHINNY (CA SBN 66781)
hmcelhinny@mofo.com
MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

10

11

12

13

14

15   MARK D. SELWYN (SBN 244180)
(mark.selwyn@wilmerhale.com)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100

16

17

18

19

20   WILLIAM F. LEE (admitted *pro hac vice*)
(william.lee@wilmerhale.com)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone:  (617) 526-6000
Facsimile:  (617) 526-5000

21

22

23

24

25   ***Attorneys for Plaintiff and Counterclaim-Defendant Apple Inc.***

26

27

28

-92-

# EXHIBIT 5

1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
    Charles K. Verhoeven (Bar No. 170151)
2   charlesverhoeven@quinnemanuel.com
    50 California Street, 22nd Floor
3   San Francisco, California 94111
    Telephone: (415) 875-6600
4   Facsimile: (415) 875-6700

5   Kevin P.B. Johnson (Bar No. 177129)
    kevinjohnson@quinnemanuel.com
6   Victoria F. Maroulis (Bar No. 202603)
    victoriamaroulis@quinnemanuel.com
7   555 Twin Dolphin Drive, 5th Floor
    Redwood Shores, California  94065-2139
8   Telephone: (650) 801-5000
    Facsimile: (650) 801-5100

9
    William C. Price (Bar No. 108542)
10  williamprice@quinnemanuel.com
    865 S. Figueroa St., 10th Floor
11  Los Angeles, California 90017
    Telephone: (213) 443-3000
12  Facsimile: (213) 443-3100

13  Attorneys for Defendants
    SAMSUNG ELECTRONICS CO., LTD.,
14  SAMSUNG ELECTRONICS AMERICA, INC.
    and SAMSUNG TELECOMMUNICATIONS
15  AMERICA, LLC

16                    UNITED STATES DISTRICT COURT

17          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

18

19  APPLE INC., a California corporation,         CASE NO. 12-cv-00630-LHK

20                  Plaintiff,                    **SAMSUNG'S FOURTH SET OF
                                                  INTERROGATORIES TO APPLE**
21          vs.                                   **(NOS. 27 - 37)**

22  SAMSUNG ELECTRONICS CO., LTD., a
    Korean business entity; SAMSUNG
23  ELECTRONICS AMERICA, INC., a New
    York corporation; SAMSUNG
24  TELECOMMUNICATIONS AMERICA,
    LLC, a Delaware limited liability company,
25
                    Defendants.
26

27

28

Pursuant to Rules 26 and 33 of the <u>Federal Rules of Civil Procedure</u>, Defendants and Counterclaimants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (together, "Samsung") request that Apple Inc. answer the following interrogatories ("Interrogatories"), in writing and under oath, within 30 days from the date of service hereof.

To the extent that any of these Interrogatories may at any time be supplemented, changed, or otherwise affected by information acquired by Apple subsequent to the service of its answers, Samsung directs Apple to promptly serve supplemental answers reflecting such changes pursuant to Rule 26(e) of the <u>Federal Rules of Civil Procedure</u>.

## **DEFINITIONS**

The terms and phrases used in the Interrogatories have the meanings ascribed to them under the <u>Federal Rules of Civil Procedure</u> and the Local Rules of the United States District Court for the Northern District of California. In addition, the following terms and phrases shall have the meanings set forth below whenever used in any Interrogatory:

1.      The terms "SAMSUNG" and/or "DEFENDANTS" mean Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC and all predecessors, successors, predecessors-in-interest, successors-in-interest, subsidiaries, divisions, parents, and/or affiliates, past or present, any companies that have a controlling interest in any of them, and any current or former employee, officer, director, principal, agent, consultant, representative, or attorney thereof, or anyone acting on their behalf.

2.      The terms "APPLE," "YOU," "YOUR" and/or "PLAINTIFF" mean Apple Inc., and all predecessors, successors, predecessors-in-interest, successors-in-interest, subsidiaries, divisions, parents, and/or affiliates, past or present, any companies that have a controlling interest in any of them, and any current or former employee, officer, director, principal, agent, consultant, representative, or attorney thereof, or anyone acting on its behalf.

3.      The term "'087 PATENT" shall mean U.S. Patent No. 7,756,087 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claims the same subject matter.

4.      The term "'596 PATENT" shall mean U.S. Patent No. 7,551,596 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claims the same subject matter.

5.      The term "'470 PATENT" shall mean U.S. Patent No. 7,672,470 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claims the same subject matter.

6.      The term "'757 PATENT" shall mean U.S. Patent No. 7,577,757 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claims the same subject matter.

7.      The term "'058 PATENT" shall mean U.S. Patent No. 7,232,058 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claims the same subject matter.

8.      The term "'179 PATENT" shall mean U.S. Patent No. 6,292,179 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claims the same subject matter.

9.      The term "'449 PATENT" shall mean U.S. Patent No. 6,226,449 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claims the same subject matter.

10.     The term "'239 PATENT" shall mean U.S. Patent No. 5,579,239 and all parents, progeny, continuations, applications, divisional applications, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claims the same subject matter.

11.     The phrase "SAMSUNG PATENTS-IN-SUIT" means the '087 PATENT, the '596 PATENT, the '470 PATENT, the '757 PATENT, the '058 PATENT, the '179 PATENT, the '449 PATENT, the '239 PATENT.

12.     The phrase "APPLE PATENTS-IN-SUIT" means United States Patent Nos. 5,946,647; 6,847,959; 8,046,721; 8,074,172; 8,014,760; 5,666,502; 7,761,414; 8,086,604, and each of them.

13.     The phrase "APPLE ACCUSED PRODUCT" shall mean electronic devices that allow for communications and data transfer over networking including establishing data connections, execution of user operations and audio play back of digital data that are manufactured, distributed, and/or sold by You or Your parent, subsidiary, or affiliate companies or on Your behalf, or on behalf of Your parent, subsidiary, or affiliate companies anywhere in the world, at any time between September 14, 2012 through the pendency of the LITIGATION, including each and every Apple product that Samsung has identified as infringing in any of its complaints or infringement contentions served in this action.  The term shall include, without limitation, the following devices: all versions of the Apple iPhone 4, the Apple iPhone 4S, the iPhone 5, the iPad 2, the iPad 3, the iPad 4, the iPad Mini; the iPod Touch; Macs; iMacs; Macbooks, and PCs running iTunes.  To the extent any additional products are added to the case, either by order or stipulation, those products are also subject to this definition.

14.     The term "LITIGATION" means the above-referenced action, 12-cv-00630 (LHK) in the United States District Court for the Northern District of California.

15.     The term "COMPLAINT" refers to APPLE's "Complaint for Patent Infringement" filed February 8, 2012, in the Litigation.

16.     The phrase "ANSWER AND COUNTERCLAIMS" refers to SAMSUNG's "Answer, Defenses, and Counterclaims to Apple's Amended Complaint" filed May 31, 2012, in the LITIGATION.

17.     The phrase "ANSWER AND COUNTERCLAIMS IN REPLY" refers to "Apple Inc.'s Answer, Defenses, and Counterclaims in Reply to Samsung's Counterclaims" filed September 14, 2012, in the LITIGATION.

18.     The term "3GPP" shall mean the organization known as the 3rd Generation Partnership Project which specifies, develops, and promulgates technical specifications for wireless networks.

19.     The term "HSDPA" shall mean High-Speed Downlink Packet Access, the mobile telecommunications protocol.

20.     The term "HSUPA" shall mean High-Speed Uplink Packet Access, the mobile telecommunications protocol.

21.     The term "HSPA+" shall mean Evolved High-Speed Packet Access, the mobile telecommunications protocol.

22.     The term "Software" shall include source code, hardware code, machine code, assembly code, or code written in any programming language, and code that can be compiled or acted upon by a processor, any listings or printouts thereof, and any release notes describing the features or modifications of such code.

23.     The term "Executable Software" shall mean computer files containing encoded instructions capable of being executed by a processing unit (e.g., central processing unit, micro-controller), and any release notes describing the features or modifications of such files.  The term shall include, without limitation, firmware and executable binary files.

24.     The term "Hardware" includes all constituted parts of a device including, but not limited to, assemblies, subassemblies, modules, individual integrated circuits, chipset, chipsets, software, hardware-based capabilities, and/or application specific integrated circuits.

25.     The term "Baseband Processor" shall mean a processor in a mobile telecommunications device that is mainly used to process communication functions.

26.     The term "PERSON(S)" means natural persons as well as business entities and associations of all sorts, including partnerships, companies, proprietorships, joint ventures, corporations, government agencies, and unincorporated associations.

27.     The term "DOCUMENT(S)" has the broadest possible meaning permitted by Federal Rules of Civil Procedure Rules 26 and 34 and the relevant case law, and the broadest meaning consistent with the terms "writings" or "recordings" as set forth in Rule 1001 of the Federal Rules of Evidence, and specifically and without limitation include tangible things and electronically stored information, including e-mail and information stored on computer disk or other electronic, magnetic, or optical data storage medium. "DOCUMENT(S)" also includes all drafts or non-final versions, alterations, modifications, and amendments to any of the foregoing.

28.     The term "COMMUNICATION(S)" means the transmittal of information in the form of facts, ideas, inquiries, and any exchange or transfer of information whether written, oral, electronic, or in any form.

29.     The phrase "TANGIBLE THING(S)" has the broadest possible meaning permitted by Federal Rules of Civil Procedure 26 and 34 and the relevant case law.

30.     The term "DATE(S)" means the exact date(s), if known, or the closest approximation to the exact date(s) as can be specified, including without limitation the year, month, week in a month, or part of a month.

31.     The terms "ENTITY" and/or "ENTITIES" mean, including without limitation, corporation, company, firm, partnership, joint venture, association, governmental body or agency, or PERSONS other than a natural PERSON.

32.     The phrases "THIRD PARTY" and/or "THIRD PARTIES" mean all persons who are not parties to this LITIGATION, as well as their officers, directors, employees, agents and attorneys.

33.     The terms "RELATING," "RELATED," and "RELATES" mean regarding, referring to, concerning, mentioning, reflecting, pertaining to, analyzing, evidencing, stating, involving, identifying, describing, discussing, documenting, commenting on, dealing with, embodying, responding to, supporting, contradicting, comprising, containing, or constituting (in whole or in part), as the context makes appropriate.

34.     The use of a verb in any tense shall be construed as the use of the verb in all other tenses.

35.     The use of the singular form of any word includes the plural and vice versa.

36.     The singular is to be construed as including the plural and vice versa. "AND" as well as "OR" are to be construed either disjunctively or conjunctively to acquire the broadest meaning possible, so as to bring within the scope of the Interrogatory all information that might otherwise be construed to be outside its scope. The term "ALL" is to be construed to mean "ANY" and "EACH" and vice versa.

37.     "INCLUDING" shall be construed to mean "including, without limitation" or "including, but not limited to."

38.     The term "IDENTIFY" means (1) when referring to a PERSON, the PERSON'S full name, present OR last known address AND telephone number, AND the last known title AND place of employment; (2) when referring to non-patent DOCUMENTS, the production number OR type of DOCUMENT, its general nature AND subject matter, DATE of creation, AND ALL author(s), addresses(s), and recipient(s); AND (3) when referring to patent DOCUMENTS, the country, patent AND/OR application number, dates of filing, publications, AND grant, AND the names of patentees OR applicants.

39.     The term "DESCRIBE," when used in relation to an act, event, instance, occasion, transaction, conversation, OR COMMUNICATION, means (a) to state the DATE AND place thereof; (b) to identify the individual participants; (c) to summarize separately for EACH individual participant what he said OR did; AND (d) to IDENTIFY each DOCUMENT used OR prepared in connection therewith OR making ANY reference thereto.

## INSTRUCTIONS

1.     If APPLE contends that ANY Interrogatory is objectionable in whole OR in part, please state with particularity each objection, the basis for it, AND the categories of information to which the objection applies, AND respond to the Interrogatory insofar as it is not deemed objectionable.

2.     If APPLE finds the meaning of ANY term OR phrase in these Interrogatories unclear, please assume a reasonable meaning, state what the assumed meaning is, AND respond to the Interrogatory according to the assumed meaning.

3.     If APPLE is withholding OR intends to withhold ANY information requested by an Interrogatory by reason of the attorney-client privilege, work-product doctrine, OR other privilege, doctrine, OR immunity, please provide a privilege log identifying: (i) the information, DOCUMENT, OR COMMUNICATION alleged to be so protected by author, subject matter, DATE, number of pages, attachments, AND appendices; (ii) the names AND job titles of ALL recipients of the information, DOCUMENT, OR COMMUNICATION, including blind copy

1   recipients AND ANY individual to whom the information, DOCUMENT, OR

2   COMMUNICATION was distributed, shown, OR explained; (iii) the information, DOCUMENT,

3   OR COMMUNICATION'S current custodian; AND (iv) ALL bases, factual AND legal, on which

4   such protection from discovery rests. Please provide this log at the time YOU serve YOUR

5   responses to these Interrogatories.

6       4.      The following Interrogatory shall be deemed continuing so as to require

7   supplementation in the event that APPLE obtains additional knowledge OR information

8   responsive to the Interrogatories.

9

10                          **INTERROGATORIES**

11  **INTERROGATORY NO. 27**

12       Identify by Bates Number all DOCUMENTS or things on which APPLE intends to rely at

13  trial in this LITIGATION, including but not limited to all DOCUMENTS APPLE will use to

14  support its claims of infringement on the APPLE PATENTS-IN-SUIT, its claims that the APPLE

15  PATENTS-IN-SUIT are valid and enforceable, its damages and injunctive relief claims for the

16  APPLE PATENTS-IN-SUIT, its claims that it does not infringe the SAMSUNG PATENTS-IN-

17  SUIT, its claims that the SAMSUNG PATENTS-IN-SUIT are invalid or unenforceable, its claims

18  RELATING to Samsung's claims for damages and injunctive relief on the SAMSUNG

19  PATENTS-IN-SUIT, and any other claims, affirmative defense, or counterclaim APPLE has or

20  will assert in this LITIGATION.

21

22  **INTERROGATORY NO. 28**

23       Separately for each APPLE ACCUSED PRODUCT, IDENTIFY: (1) the Baseband

24  Processor used (listed by name, model number, serial number, part number, and internal code

25  name); (2) the Executable Software incorporated or installed in the Baseband Processor (listed by

26  file name, Build ID, and Software release version); (3) the 3GPP Release(s) supported (including

27  which versions and subversions of the 3GPP specification are supported within each Release); (4)

28

1  the version(s) of HSUPA supported; (5) the version(s) of HSDPA supported, and (6) the version(s)

2  of HSPA+ supported, and IDENTIFY any documents which reflect these categories of documents.

3

4  **INTERROGATORY NO. 29**

5       Separately for each APPLE ACCUSED PRODUCT and each Baseband Processor,

6  IDENTIFY the Software or portions of Software, including corresponding Software Build IDs,

7  Software release versions, file name, and line numbers, for (1) performing non-scheduled

8  transmissions, and (2) forming and transmitting control information for an uplink packet data

9  service, including forming and transmitting a MAC-e PDU, or state which of these functions are

10  not performed by the APPLE ACCUSED PRODUCT or Baseband Processor.

11

12  **INTERROGATORY NO. 30**

13       For each APPLE ACCUSED PRODUCT, IDENTIFY whether APPLE contends that

14  product complies with the 3GPP Standard, including compliance with 3GPP Technical

15  Specification 25.331 v.6.0.0 or later, 25.321 v.6.0.0 or later, and 25.309 v.6.0.0 or later.  If APPLE

16  contends that an APPLE ACCUSED PRODUCT does not comply with the 3GPP Standard or

17  Technical Specification, APPLE should so state.

18

19  **INTERROGATORY NO. 31**

20       Describe any testing performed on each APPLE ACCUSED PRODUCT, including by or

21  with any third party, for certification of compliance with 3GPP standards and/or for compliance

22  with a 3GPP carrier's network.

23

24  **INTERROGATORY NO. 32**

25       For each APPLE ACCUSED PRODUCT, IDENTIFY by Bates Number the final

26  submitted and completed version (completed by Apple and submitted to AT&T) of the following

27  documents:

28       (1) AT&T Device Requirements Document (AT&T Document # 13340);

(2) Handset Specification Compliance Spreadsheet (AT&T Document # 13289); and

(3) Lab and Field Test Requirements for Terminal Unit Acceptance (AT&T Document # 10776)

**INTERROGATORY NO. 33**

Separately for each APPLE ACCUSED PRODUCT, IDENTIFY: (1) each and every still and video camera used (listed by manufacturer, name, model number, serial number, part number, and internal code name); (2) each and every camera module and/or camera processor used (listed by manufacturer, name, model number, serial number, part number, and internal code name); (3) each and every image and/or image signal processor used (listed by manufacturer, name, model number, serial number, part number, and internal code name); (4) each and every RF communication module used (identified by manufacturer, name, model number, serial number, part number, and internal code name); (5) each and every applications processor used (identified by manufacturer, name, model number, serial number, part number, and internal code name; (6) each and every physical or electrical connection between each of these components, each other, and each baseband processor; (7) the Executable Software incorporated or installed in each of these components (listed by file name, Build ID, and Software release version); (8) to the extent any of the software complies with any camera or image related standard, IDENTIFY the standards and portions of the standards the software complies with, and IDENTIFY any documents which reflect these categories of documents.

**INTERROGATORY NO. 34**

Separately for each APPLE ACCUSED PRODUCT and each component identified in Interrogatory No. 28, IDENTIFY (1) the Software or portions of Software, including corresponding Software Build IDs, Software release versions, file name, module names, and line numbers, (2) the location of that software (e.g., the applications processor), and (3) the author and/or authors of that software, for: capturing image signals and/or data; digitizing image signals and/or data; compressing image signals and/or data; storing image signals and/or data;

1  transmitting image signals and/or data; receiving image signals and/or data; exchanging signals

2  and/or data with another device; storing image signals and/or data received from another device;

3  decompressing image signals and/or data; splitting image data and/or signals; organizing image

4  data and/or signals; or state which of these functions are not performed by any component in an

5  APPLE ACCUSED PRODUCT.

6

7  **INTERROGATORY NO. 35**

8      For each feature identified in Samsung's infringement contentions for each SAMSUNG

9  PATENT, describe each way Apple markets, promotes, teaches, instructs, demonstrates,

10  advertises, or otherwise shows customers and/or end users each identified feature for each APPLE

11  ACCUSED PRODUCT, and identify any documents which reflect the same.

12

13  **INTERROGATORY NO. 36**

14      Separately for each APPLE ACCUSED PRODUCT, IDENTIFY (including, where

15  applicable, by manufacturer, name, model number, serial number, part number, internal code

16  name, circuit, and circuit schematic and/or portion thereof); (1) each and every component that

17  converts an optical image into an analog signal, including without limitation each CMOS image

18  sensor; (2) each and every component that converts an optical analog signal to a digital signal,

19  including without limitation each analog-to-digital converter; (3) each and every component that

20  compresses image and/or video signals, including, for example and without limitation, the image

21  and/or video encoder module(s) or logic block(s) of an A4, A5 or A6 processor; (4) each and

22  every component which stores compressed image and/or video signals into memory, including, for

23  example and without limitation, the interface circuit to NAND flash memory; (5) each and every

24  component which decompresses image and/or video signals, including, for example and without

25  limitation, the image and/or video decoder module(s) or logic block(s) of an A4, A5 or A6

26  processor; (6) each and every component which reproduces and displays a decompressed image

27  and/or video signal, including, for example and without limitation, the graphics module(s) or

28  GPU(s) of an A4, A5 or A6 processor; (7) each and every component which reproduces a sound

1  signal associated with a video signal; (8) each and every compression method used to store or

2  record images captured with the APPLE ACCUSED PRODUCT's camera(s), including, for

3  example and without limitation, JPEG; (9) each and every compression method supported for

4  display and/or playback of stored or recorded images, including, for example and without

5  limitation, JPEG; (10) each and every compression method used to store or record videos captured

6  with the APPLE ACCUSED PRODUCT's camera, including, for example and without limitation,

7  MPEG4 and H.264; (11) each and every compression method supported for display and/or

8  playback of stored or recorded videos, including, for example and without limitation, MPEG4 and

9  H.264.

10

11  **INTERROGATORY NO. 37**

12         Separately for each APPLE ACCUSED PRODUCT, IDENTIFY (including, where

13  applicable, by manufacturer, name, model number, serial number, part number, internal code

14  name, circuit, and circuit schematic and/or portion thereof); (1) each and every speaker; (2) each

15  and every stereo headphone jack; (3) each and every audio processing component, including, for

16  example and without limitation, each audio codec chip; (4) each and every display; (5) each and

17  every processor; (6) each and every touchscreen control and/or sensor circuit, including, for

18  example and without limitation, each touchscreen or trackpad controller chip.

19

20

21

22

23

24

25

26

27

28

1    DATED:  January 11, 2013              Respectfully submitted,

2                                          QUINN EMANUEL URQUHART &
                                           SULLIVAN, LLP
3

4

5                                          By    /s/ Amar L. Thakur
                                              Charles K. Verhoeven
6                                             Kevin P.B. Johnson
                                              Victoria F. Maroulis
7                                             William C. Price
                                              Attorneys for Defendants
8                                             SAMSUNG ELECTRONICS CO., LTD.,
                                              SAMSUNG ELECTRONICS AMERICA, INC.
9                                             and SAMSUNG TELECOMMUNICATIONS
                                              AMERICA, LLC
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**<u>CERTIFICATE OF SERVICE</u>**

2

  I am employed in the County of San Francisco, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is 50 California St., 22nd Floor, San Francisco, CA 94111.

3

4

  On January 11, 2012, I served true copies of the following documents, described as:

5

  **SAMSUNG'S THIRD SET OF INTERROGATORIES TO APPLE**

6

  on the interested parties in this action addressed as follows:

7

| **<u>ATTORNEYS FOR APPLE INC</u>.** | **<u>ATTORNEYS FOR APPLE INC</u>.** |
|---|---|
| MICHAEL A. JACOBS<br>mjacobs@mofo.com<br>RICHARD S. J. HUNG<br>rhung@mofo.com<br>MORRISON & FOERSTER LLP<br>425 Market Street<br>San Francisco, CA    94105-2482<br>Telephone (415) 268-7000<br>Facsimile (415) 268-7522 | JOSH A. KREVITT<br>jkrevitt@gibsondunn.com<br>H. MARK LYON<br>mlyon@gibsondunn.com<br>MARK REITER<br>mreiter@gibsondunn.com<br>GIBSON, DUNN & CRUTCHER LLP<br>1881 Page Mill Road<br>Palo Alto, CA   94302-1211<br>Telephone: (650) 849-5300<br>Facsimile: (650) 849-5333<br>Apple/Samsung@gibsondunn.com |
| **<u>ATTORNEYS FOR APPLE INC.</u>**<br><br>MARK D. SELWYN<br>mark.selwyn@wilmerhale.com<br>WILMER CUTLER PICKERING<br>HALE AND DORR LLP<br>950 Page Mill Road<br>Palo Alto, CA   94304<br>Telephone: (650) 858-6000<br>Facsimile: (650) 858-6100 | |

8

9

10

11

12

13

14

15

16

17

18

19

20

**BY ELECTRONIC MAIL TRANSMISSION** from alexbinder@quinnemanuel.com, by transmitting PDF format copies of such documents to each such person identified above, at the e-mail address listed in their address(es). The documents were transmitted by electronic transmission and such transmission was reported as complete and without error.

21

22

23

  I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

24

25

  Executed on January 11, 2012, at San Francisco, California.

26

27

        */s/ Alex Binder*

28

# EXHIBIT 6

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

2100 McKinney Avenue
Dallas, TX 75201-6912
Tel 214.698.3100
www.gibsondunn.com

Michael A. Valek
Direct: +1 214.698.3369
Fax: +1 214.571.2916
MValek@gibsondunn.com

February 14, 2013

VIA ELECTRONIC MAIL

Michael L. Fazio, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543

Re:     *Apple Inc. v. Samsung Electronics Co. et al.*, No. 12-cv-0630

Dear Counsel:

In advance of tomorrow's lead trial counsel meet and confer, we write to inform you of the
specific issues that Apple intends to discuss.  This letter should not be deemed an exhaustive
list of all issues that remain between the parties regarding the discovery listed below and
Apple incorporates by reference its prior correspondence on these issues.  Moreover,
Samsung should not interpret the absence of any previously-identified issue from the list
below to mean that the issue has been satisfactorily resolved, as such issues may be raised in
future discussions between the parties.

**Samsung's Refusal to Produce Financial Information and Documents re Profitability of
Accused Products**

As detailed in Apple's letters dated January 14, 2013, November 21, 2012, November 5,
2012 (re Rog. Nos. 30 & 31) and October 29, 2012 (re RFP Nos. 314-316), Samsung has
refused:  a) to produce gross financial information (revenues, profits, etc.) for each of its
accused productions and for the different Samsung entities in this case and to provide
summary information of the same scope and detail as that provided in the 1846 action;[1] and
b) refused to produce relevant financial documents concerning the profitability, market share
and other financial information relating to its accused products.  Accordingly, Apple seeks
production of the documents and information as identified in its Nov. 21st letter from M.

---

[1]  In its most recent correspondence, Samsung erroneously contends that information regarding the profitability
of its accused products is irrelevant outside of a profits disgorgement context.  But, as Apple explained in the
1846 action, the profitability of the accused products is one of the *Georgia Pacific* factors and therefore relevant
to the reasonable royalty analysis. *See* Apple Inc.'s Mot. to Compel Production of Documents and Things, Case
No. 11-cv-1846-LHK (N.D. Cal. Jan. 11, 2012), at 19-20.  The Court did not disagree on this point and, as
detailed in Apple's November 21st letter, previously ordered Samsung to produce such financial information.

**GIBSON DUNN**

Michael L. Fazio, Esq.
February 14, 2013
Page 2


Valek to M. Fazio, including the documents listed in item 1 of its January 14th letter from M. Valek to M. Fazio.  To the extent Samsung has recently agreed to withdraw any of its objections to producing any of this information, Apple seeks clarification of the same.

**Samsung's Objections and Responses to Apple's Second Set of RFPs**

As detailed in Apple's letters dated January 10, 2013, November 16, 2012, Nov. 6, 2012, Sept. 27, 2012 and August 27, 2012, Apple seeks production of documents in response to its Requests concerning the Bada Platform.  Samsung has objected that its Bada Platform is irrelevant because it is not available on any products Samsung sales in the United States, but has not represented that it will not rely on the Bada platform as a basis for any argument in this case.  Accordingly, the requested documents are relevant and discoverable and Apple seeks Samsung's agreement to produce documents responsive to the full scope of these Requests.

| RFP No. | Issues |
|---|---|
| 103, 107 and 111 | Samsung's relevance and breadth objections and its refusal to either produce documents concerning the Bada platform or stipulate that it will not rely on the Bada platform as a basis for any argument in this case. |
| 129 | Samsung's speculative objection and limitation to only those documents it intends to rely on, rather than "all documents," as requested. |

**Samsung's Objections and Responses to Apple's Third Set of RFPs[2]**

| RFP No. | Issues |
|---|---|
| 168 | Samsung's overbroad and vagueness objections and refusal to produce documents other than documents related to the accused products |
| 171 | Samsung's refusal to produce documents relating to inventorship other than documents sufficient to show conception and reduction to practice |
| 172 | Samsung's vagueness objection and refusal to produce documents other than documents sufficient to show the identity of the inventors |
| 204 | Samsung's vagueness objections and refusal to produce documents |
| 220 | Confirmation that Apple's clarifications and agreement to limit this request to the patents-in-suit or patents covering comparable technology (as requested by Samsung), as set forth in our November 21 letter, resolves Samsung's objections |
| 230 | Samsung's overbroad and "expert discovery" objections and refusal to produce documents |

---

[2]  These issues are described in greater detail in Apple's letters regarding Samsung's objections and responses to Apple's Third Set of RFPs, dated Oct. 10 and Nov. 21, 2012.

**GIBSON DUNN**

Michael L. Fazio, Esq.
February 14, 2013
Page 3

| 232 | Samsung's relevance and vagueness objections and refusal to produce documents |
| 233 | Samsung's relevance and vagueness objections and refusal to produce documents |

### Samsung's Objections and Responses to Apple's Fourth Set of RFPs[3]

| RFP No. | Issues |
| --- | --- |
| 236 | Clarification of Samsung's agreement to produce documents as explained in the Nov. 23 Letter from M. Valek to M. Fazio |
| 265 | Samsung's vagueness objection and its refusal to produce documents |
| 268, 269 and 273 | Samsung's overbroad objection and its refusal to produce documents |
| 275 | Samsung's overbroad and vagueness objections and its refusal to produce documents |
| 276 | Samsung's vagueness objection and its refusal to produce documents |
| 287-288 | Samsung's relevance and breadth objections and its refusal to produce documents |
| 307-308 | Samsung's overbroad and vagueness objections and its refusal to produce documents |

### Samsung's Objections and Responses to Apple's Seventh Set of RFPs[4]

| RFP No. | Issues |
| --- | --- |
| 416 | Samsung's relevance objections and its refusal to produce documents relating to standards-setting organization and specification in which Samsung participated relating to an On-screen Display |

### Samsung's Refusal to Answer Apple Interrogatory No. 22

As detailed in Apple's letters dated December 12, 2012 and November 5, 2012, Interrogatory No. 22 asks Samsung to identify the differences, if any, between the different versions of Android source code relating to the accused functionality in Samsung's Accused Products

---

[3] These issues are described in greater detail in Apple's letters regarding Samsung's objections and responses to Apple's Fourth Set of RFPs, dated Nov. 21 and Oct. 29, 2012.
[4] This issue is described in greater detail in Apple's letters regarding Samsung's objections and responses to Apple's Sevenths Set of RFPs, dated January 7 and February 13, 2013.

# GIBSON DUNN

Michael L. Fazio, Esq.
February 14, 2013
Page 4

and the publicly-available versions of the same.  As explained before, if Samsung is aware of any such differences relating to the accused functionality, particularly any Samsung contends are material to the issue of infringement, it must identify them by supplementing its response to this interrogatory.

**Samsung's Refusal to Produce Diff Printouts**

As detailed in Apple's letters dated January 11, 2013 and December 5, 2012, Samsung has refused to produce copies of the printouts made by Apple's expert, Abdul Sowayan, on November 7 and 8, 2012 (herein referred to as "diffs") and has refused to produce any diffs Apple's expert may prepare in future source code inspections.  Samsung has no basis either under the Protective Order or any other applicable discovery rule to refuse to produce these highly relevant materials.  Apple seeks the immediate production of these printouts as well as Samsung's representation that it will not withhold any future diff printouts Apple may prepare comparing Samsung's source code to the public versions of Android.

**Supplementation of Interrogatory Responses**

Apple has identified a number of Samsung interrogatory responses that are incomplete and otherwise deficient.[5]  Samsung has served similarly worded interrogatories that it has served on Apple.  As both parties have suggested in their correspondence, we intend to meet and confer on the appropriate scope and schedule for supplementation of the interrogatories below.

| Apple Rog. No. | Samsung Rog. No. | Issue |
| --- | --- | --- |
| 11 | 1 | Notice of existence and alleged infringement of patents |
| 12, 13 | 2, 3 | Facts relating to conception and reduction to practice |
| 15 | 11 | Secondary consideration contentions for Samsung's patents |
| 17 | 8 | Communications with third parties relating to actual or potential licenses |
| 18 | 6 | Identification of persons involved in prosecution |
| 19 | 10 | Injunctive relief contentions |
| 20 | 5 | Secondary consideration contentions for Apple's patents |
| 23 | 31 | First awareness of patents-in-suit |
| 24 | 12 | Non-infringement contentions |
| 26 | 14 | Communications with third parties re infringement or possible infringement |

---

[5]  *See, e.g.*, P. Kolovos Letter to A. Thakur dated Jan. 16, 2013; P. Kolovos letter to M. Fazio dated Jan. 14, 2013; P. Kolovos Letter to A. Thakur dated Dec. 20, 2012; M. Valek letter to M. Fazio dated Nov. 5, 2012.

**GIBSON DUNN**

Michael L. Fazio, Esq.
February 14, 2013
Page 5

| 28 | 16 | Identification of persons/documents with knowledge of affirmative defenses |
| 29 | 18 | Identification of design-arounds and alleged alternatives to patented technology |
| 37, 38 | 26 | Validity contentions |

**Resumed Depositions of Young-Bum Kim and Ju-Ho Lee/Samsung's Inventor Productions**

As noted in our letters of November 29, 2012 and January 15, 2013, Samsung's conduct during the depositions of Young-Bum Kim and Ju-Ho Lee, as well as its production of a massive volume of custodial documents for these witnesses just prior to these depositions, necessitates a second day of deposition for both.  Apple seeks Samsung's agreement to bring these two inventors to the United States for an additional day of deposition (at any time convenient for the witnesses).  In addition, Apple seeks confirmation that future Samsung inventor productions will be made in a more readily accessible format, as described in our November 21 letter.  If Samsung is unwilling to do so, we should revisit the timing of productions in advance of depositions.

**Samsung's Objections to Topics 7 and 14 of Apple's Third 30(b)(6) Notice**

As detailed in Apple's letter dated February 8, 2013, Samsung has objected to and refused to provide a witness for topic 7 (best mode) and topic 14 (novelty).  Samsung has no basis to refuse to provide a witness on these topics, which seek information about how the alleged inventions described in the Samsung Patents-in-Suit differ from the prior art and techniques for carrying out those inventions.  Apple has agreed, in its letter dated February 8, to limit these topics in scope to the asserted claims of the Samsung Patent-in-Suit.  We seek Samsung's confirmation that it will provide a corporate witnesses to testify on these topics as modified.

**Conception and Reduction to Practice Documents**

As discussed in multiple letters, including most recently in letters of January 9 and February 13, 2013, Samsung's production of documents related to the conception and reduction to practice of the '058, '179, and '470 patents is incomplete.  These documents should have been produced in June 2012 pursuant to Local Rule 3-2(b), and Samsung has refused to promptly remedy this deficiency.

# GIBSON DUNN

Michael L. Fazio, Esq.
February 14, 2013
Page 6

**Samsung's Former Employee Inventor Documents**

As detailed in multiple letters, including most recently in letters of January 9 and February 13, Samsung has refused to promptly produce responsive documents from the files of Samsung's four former employee inventors – Jae-hoon Lee, Kwang-Bok Lee, Jin-Chul Lee, and Youn-Hyoung Heo – or, if those documents are no longer available, to provide information on when and how those former employees' documents were destroyed.

Regards,

*/s/ Michael A. Valek*

MAV/klc

# EXHIBIT 7

1   JOSH A. KREVITT (CA SBN 208552)
    jkrevitt@gibsondunn.com
2   H. MARK LYON (CA SBN 162061)
    mlyon@gibsondunn.com
3   GIBSON, DUNN & CRUTCHER LLP
    1881 Page Mill Road
4   Palo Alto, California  94304-1211
    Telephone:  (650) 849-5300
5   Facsimile:  (650) 849-5333

6   MICHAEL A. JACOBS (CA SBN 111664)
    mjacobs@mofo.com
7   RICHARD S.J. HUNG (CA SBN 197425)
    rhung@mofo.com
8   MORRISON & FOERSTER LLP
    425 Market Street
9   San Francisco, California  94105-2482
    Telephone:  (415) 268-7000
10  Facsimile:  (415) 268-7522

WILLIAM F. LEE (*pro hac vice*)
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, Massachusetts  02109
Telephone:  (617) 526-6000
Facsimile:  (617) 526-5000

MARK D. SELWYN (CA SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California  94304
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100

*Attorneys for Plaintiff and
Counterclaim-Defendant Apple Inc.*

11

12

13                  **UNITED STATES DISTRICT COURT**

14                **NORTHERN DISTRICT OF CALIFORNIA**

                         **SAN JOSE DIVISION**
15

16   APPLE INC., a California corporation,

                                              Civil Action No. 12-CV-00630-LHK
17              Plaintiff,

18        vs.                                 **APPLE INC.'S OBJECTIONS AND
                                              RESPONSES TO SAMSUNG'S FOURTH
19   SAMSUNG ELECTRONICS CO., LTD., a         SET OF INTERROGATORIES (NOS. 27-
     Korean business entity; SAMSUNG          37)**
20   ELECTRONICS AMERICA, INC., a New
     York corporation; SAMSUNG                **APPLE'S RESPONSE TO
21   TELECOMMUNICATIONS AMERICA,              INTERROGATORY NO. 28 IS
     LLC, a Delaware limited liability company, DESIGNATED HIGHLY
22                                            CONFIDENTIAL – ATTORNEYS' EYES
                Defendants.                   ONLY**
23

24

25

26

27

28

1     Apple MacBook Pro related documents: APL630DEF-WH0000021022 -

2  APL630DEF-WH0000025379, APL630DEF-WH0000035506 - APL630DEF-

3  WH0000037615.

4     Apple MacBook Air related documents: APL630DEF-WH0000020068 -

5  APL630DEF-WH0000021021, APL630DEF-WH0000034008 - APL630DEF-

6  WH0000034539.

7     Discovery is still in its early stages and Apple is continuing to investigate.  Apple

8  reserves the right to supplement and/or amend its response as appropriate.

9  **INTERROGATORY NO. 34:**

10     Separately for each APPLE ACCUSED PRODUCT and each component identified in

11  Interrogatory No. 28, IDENTIFY (1) the Software or portions of Software, including

12  corresponding Software Build IDs, Software release versions, file name, module names, and

13  line numbers, (2) the location of that software (e.g., the applications processor), and (3) the

14  author and/or authors of that software, for:  capturing image signals and/or data; digitizing

15  image signals and/or data; compressing image signals and/or data; storing image signals

16  and/or data; transmitting image signals and/or data; receiving image signals and/or data;

17  exchanging signals and/or data with another device; storing image signals and/or data

18  received from another device; decompressing image signals and/or data; splitting image data

19  and/or signals; organizing image data and/or signals; or state which of these functions are not

20  performed by any component in an APPLE ACCUSED PRODUCT.

21  **RESPONSE TO INTERROGATORY NO. 34**

22     Apple objects to this Interrogatory on the grounds that it is overbroad, unduly

23  burdensome, and not reasonably calculated to lead to the discovery of admissible evidence,

24  especially to the extent it seeks information about the accused Apple products beyond the

25  components, functionalities, or technologies of those products that may be relevant to

26  Samsung's patents-in-suit, and/or that Samsung has placed at issue in this case in its Patent

27  Rule 3-1 Disclosures.  Accordingly, in responding to this interrogatory, Apple is only

28

APPLE'S RESPONSES TO SAMSUNG'S FOURTH SET OF INTERROGATORIES

providing information for those Apple products that Samsung has accused of infringing the '449 and '239 patents.  Apple also objects to this Interrogatory as vague, overbroad and not relevant to the claims and defenses of the parties to the extent it seeks information about "each component identified in Interrogatory No. 28."  Apple further objects to this Interrogatory as it contains subparts, each of which should count as a separate Interrogatory.

Apple also objects to this Interrogatory to the extent it seeks information that is subject to a confidentiality or non-disclosure agreement or governed by a protective order preventing its production, or otherwise seeks confidential, proprietary, or trade secret information of third parties. Apple further objects to this Interrogatory to the extent it requires information outside Apple's possession, custody, and control, including, for example, information concerning components that Apple has purchased from third parties.

Subject to and without waiving the foregoing General and Specific Objections, Apple responds that in accordance with Federal Rule of Civil Procedure 33(d), Apple has produced and/or will produce documents responsive to this Interrogatory, and that the burden of ascertaining the answer to this Interrogatory from the produced business records is substantially the same for Apple as for Samsung.

Discovery is still in its early stages and Apple is continuing to investigate.  Apple reserves the right to supplement and/or amend its response as appropriate.

**INTERROGATORY NO. 35:**

For each feature identified in Samsung's infringement contentions for each SAMSUNG PATENT, describe each way Apple markets, promotes, teaches, instructs, demonstrates, advertises, or otherwise shows customers and/or end users each identified feature for each APPLE ACCUSED PRODUCT, and identify any documents which reflect the same.

**RESPONSE TO INTERROGATORY NO. 35**

Apple objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence,

Dated:  February 14, 2013

*/s/ Mark D. Selwyn*
Mark D. Selwyn (CA SBN 244180)
(mark.selwyn@wilmerhale.com)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California  94304
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100

William F. Lee (admitted *pro hac vice*)
(william.lee@wilmerhale.com)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, Massachusetts  02109
Telephone:  (617) 526-6000
Facsimile:  (617) 526-5000

JOSH A. KREVITT (CA SBN 208552)
jkrevitt@gibsondunn.com
H. MARK LYON (CA SBN 162061)
mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, California  94304-1211
Telephone:  (650) 849-5300
Facsimile:  (650) 849-5333

MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

*Attorneys for Plaintiff and*
*Counterclaim-Defendant Apple Inc.*

ActiveUS 104823405v.5

# EXHIBIT 8

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Joshua Furman
Direct: +1 212.351.2461
Fax: +1 212.351.5261
JFurman@gibsondunn.com

February 27, 2013

VIA E-MAIL (michaelfazio@quinnemanuel.com)

Michael Fazio
Quinn Emanuel Urquhart & Sullivan, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017

Re:     *Apple v. Samsung*, 12-cv-630

Dear Michael:

I write regarding the setup of the source code computers at Samsung's offices in San Jose. Currently, the setup of the computers is materially interfering with Apple's efforts to review Samsung's source code and needs to be rectified immediately.

Source Code Not Locally Available

Apple's reviewers report that the source code is not located on the source code computers; rather, the computers are configured to download desired source code files from a remote server over the Internet.  Moreover, our reviewers report unusually slow data transfers.  It is our understanding that code for a particular Samsung device is available on a workspace from a remote source code repository system.  In order to review that code, our reviewers must download the remote workspace to the Source Code Computer; a time consuming process. For example, it takes two to three hours to download one workspace, which represents a single device/carrier/Android version combination.  Because of the complicated nature of Android code and Samsung's inclusion of code that does not actually run on the device, it is necessary to download the entire workspace to analyze the code properly.  Given that there are at least forty device/carrier/Android versions that should be available on Samsung's source code computers, it would take at least an estimated 120 hours (or ten full days of source code review time) to download the source code.  This is plainly unacceptable and materially disadvantages Apple's source code review.

In addition to interfering with Apple's ability to analyze the source code, this setup is in violation of the protective order.  Paragraph 11(b) states in relevant part:

> All Source Code shall be made available by the Producing Party to the Receiving
> Party in a secure room, on at least two secured, **stand-alone computers** (running

**GIBSON DUNN**

Michael Fazio
February 27, 2013
Page 2

> a reasonably current operating system) per software platform produced, **without Internet access or network access to other computers**, as necessary and appropriate to prevent and protect against any unauthorized copying, transmission, removal, or other transfer of any Source Code outside or away from the computer on which the Source Code is provided for inspection (hereinafter "Confidential Source Code Computer"). . . .

> Protective Order ¶ 11(b) (emphasis added).

Samsung's current source code computers are not "stand-alone" because they have network access to other computers.  Similarly, paragraph 11(d) states that "[t]he Producing Party shall make the Source Code available electronically and in **text searchable form**."  (emphasis added).  The source code as provided is not text searchable, because running a text search requires first downloading the code from the server, which can take several hours.

Lastly, our reviewers informed us that on February 26 the server hosting the workspaces for all Jelly Bean devices became unavailable for some period of time.  Such outages are an corollary to the improper way the Source Code has been made available and unnecessarily hinder the review and download of the Source Code.

Please confirm that Samsung will produce source code *on* the source code computers in a format that complies with the protective order and makes analysis possible.  In other words, please provide a local copy of the source code on the source code computers.

<u>Up-to-date Open Source Android Code Not Available</u>

Apple's reviewers also report that the open source copy of Android that has been provided on the Source Code Computers does not include Android versions 4.1.x or versions 4.2.x, where X represents all relevant subversions.  Moreover, the open source copy of Android code was provided on a single external drive.  Apple believes that a second external hard drive has now been provided, but the second external hard drive also lacks the open source copy of Android versions 4.1.x and 4.2.x.  Please confirm that Samsung will immediately augment both hard drives with the open source copy of Android with the most up to date versions, including 4.1.x and 4.2.x.

# GIBSON DUNN

Michael Fazio
February 27, 2013
Page 3


Sincerely,


*/s/ Joshua Furman*

# EXHIBIT 9

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California  90017-2543 | TEL: (213) 443-3000  FAX: (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3227**

WRITER'S INTERNET ADDRESS
**michaelfazio@quinnemanuel.com**

March 4, 2013

<u>VIA E-MAIL</u>

Joshua Furman, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY  10166-0193

Re:   Apple v. Samsung Elecs. Co. et al, Case No 12-cv-0630

Dear Counsel:

I write to respond to Apple's letter dated February 27, 2013 regarding Apple's inspection of source code at Samsung's offices in San Jose.  Apple contends that the source code review "setup is in violation of the protective order."  According to Apple, the Protective Order requires "a local copy of the source code on the source code computers."  There is no such provision in the Protective Order.  Rather, paragraph 11(b) of the Protective Order requires that the source code be "available" on the review machines, which Samsung's source code indisputably is.  The Protective Order does not require that a copy physically reside on the machines, as Apple seems to contend.

Samsung trusts that Apple understands the volume of source code that Apple has requested – which, as Apple acknowledges, encompasses source code for "at least forty device/carrier/Android versions" – constitutes terabytes of data, which cannot fit on a local hard drive.  Accordingly, the source code must be on high capacity servers, readily accessed by the review machines.  This is the arrangement the parties agreed to months ago.  Apple's counsel personally visited the inspection site in early November 2012 and reviewed Samsung's configuration.  As I am sure you recall, Apple's expert, Mr. Sowayan, made two trips in early November, and you accompanied him on one of his visits.  Apple made no objection during

**quinn emanuel urquhart & sullivan, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York  10010-1601  | TEL (212) 849-7000  FAX (212) 849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California  94111-4788 | TEL (415) 875-6600  FAX (415) 875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California  94065-2139 | TEL (650) 801-5000  FAX (650) 801-5100
CHICAGO | 500 W. Madison Street, Suite 2450, Chicago, Illinois  60661-2510 | TEL (312) 705-7400  FAX (312) 705-7401
WASHINGTON, DC | 1299 Pennsylvania Avenue NW, Suite 825, Washington, District of Columbia  20004-2400 | TEL (202) 538-8000  FAX (202) 538-8100
LONDON | 16 Old Bailey, London EC4M 7EG, United Kingdom | TEL +44 20 7653 2000  FAX +44 20 7653 2100
TOKYO | NBF Hibiya Building, 25F, 1-1-7, Uchisaiwai-cho, Chiyoda-ku, Tokyo 100-0011, Japan | TEL +81 3 5510 1711  FAX +81 3 5510 1712
MANNHEIM | Mollstraße 42, 68165 Mannheim, Germany | TEL +49 621 43298 6000  FAX +49 621 43298 6100
MOSCOW | Paveletskaya Plaza, Paveletskaya Square, 2/3, 115054 Moscow, Russia | TEL +7 499 277 1000  FAX +7 499 277 1001
HAMBURG | An der Alster 3, 20099 Hamburg, Germany | TEL +49 40 89728 7000  FAX +49 40 89728 7100

either of those visits to the source code "setup," nor at any time over the following months until Apple's letter of February 27th.

Apple points out that it can take hours to download one "workspace."  It remains unclear, however, how this download time (assuming the time asserted by Apple is accurate) handicaps Apple's source code reviewers.  Presumably, the reviewers would download data in the background, while concurrently reviewing other, previously downloaded source code.  Stated differently, despite Apple's assertions of long download times for large files, Apple notably does not say its reviewers are sitting idle while source code is downloading.  Logically, they would first download some smaller files and review those while larger files are downloading.  Indeed, Apple's reviewers have printed approximately 7,500 pages of source code to date, further showing that their review has not been hindered.

Further, Apple asserts that Samsung's source code computers "are not 'stand-alone' because they have network access to other computers."  Apple asserts this violates the Protective Order.  Preliminarily, the computers do not allow for the unauthorized access to the Internet.  Rather, and consistent with the Protective Order, each laptop has only a secured, port-to-port connection directly to Samsung servers that contain exclusively source code.  If Apple is now contending that its source code reviewers have attempted to obtain Internet or some other network access during their inspections, then please promptly inform us of this fact.

Importantly, Apple seems to misunderstand the provision restricting Internet and network access.  The provision is for the protection of the Producing Party.  As expressly stated in paragraph 11(b) of the Protective Order, the restrictions on Internet and network access are to prevent unauthorized copying, and are limited to those:

> necessary and appropriate to prevent and protect against any unauthorized copying, transmission, removal or other transfer of any Source code outside or away from the computer on which the Source Code is provided for inspection.

Apple also contends that Samsung's source code is "not text searchable."  Samsung has confirmed that the source code made available for inspection on both laptops is, in fact, text searchable.  To the extent that Apple continues to contend to the contrary, then please explain why this issue is only being raised now after months of access.  Is Apple contending it never conducted a text search before February 27, 2013?

Apple's letter also complains of an outage.  There has only been one outage and this lone event lasted fifty minutes.  Apple's letter omits the fact that Mr. Rezvani immediately contacted you on February 26th and informed you of the outage.  *See* Email from Rezvani to Furman dated February 26, 2012.  Apple was also informed that the reviewers could make up for the approximately fifty minute outage by staying past 7:00 p.m.  Notwithstanding Samsung's offer, the reviewers chose to leave for the day before 7:00 p.m.  In any event, Samsung apologizes for this rare event.  Servers do, on isolated occasions, go down.  Samsung remains agreeable to permitting Apple's reviewers to come early or stay late on any day of Apple's choosing to make up for this fifty minutes.

Additionally, Apple requests that Samsung "immediately augment both hard drives with the open source copy of Android with the most up to date versions, including 4.1.x and 4.2.x."  As Apple is undoubtedly aware, the Android open source code is publicly available on the Internet. Nothing in the Protective Order requires Samsung to make that source code available to Apple's reviewers during their inspection of Samsung's code; and the provision of such code at the review site thus far has been a courtesy.  Samsung will further extend this courtesy and endeavor to make the requested Android open source code available at the inspection site.  Samsung notes that it is amenable to continuing to extend to Apple professional courtesies of this sort, but Samsung believes that Apple's latest request that Samsung reconfigure its entire source code laptop configuration, which Apple has been using for four months, is simply unreasonable.

Lastly, by separate letter dated March 1, 2013, Samsung raised several issues with Apple's source code, including that Apple has not produced a full code base for all versions of iOS, Mac OS X, and any other relevant software, in a manner consistent with Samsung's production of its own source code.  Given the diligence that Samsung has exercised in addressing Apple's purported issues with Samsung's source code, Samsung trusts that Apple will be equally diligent in addressing this critical issue regarding Apple's missing source code, and we look forward to Apple's prompt response.

Very truly yours,

Michael L. Fazio

# EXHIBIT 10

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Joshua Furman
Direct: +1 212.351.2461
Fax: +1 212.351.5261
JFurman@gibsondunn.com

March 6, 2013

VIA E-MAIL

Michael Fazio
Quinn Emanuel Urquhart & Sullivan, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017

Re:     *Apple v. Samsung*, 12-cv-630

Dear Michael:

I write in response to your letter of March 4, 2013 regarding the setup of the source code computers at Samsung's office in San Jose.

<u>Samsung's Source Code Is Not Locally Available As Required by the Protective Order</u>

As explained in my previous correspondence, Samsung's current source code setup does not comply with the Protective Order.  Samsung is simply wrong to allege that the current arrangement is one that the "parties agreed to months ago."  There was no such agreement.  Further, Samsung's non-compliance is prejudicing Apple's ability to efficiently and accurately review Samsung's source code.

Specifically, Samsung must provide computers that have all versions of the relevant source code ***on*** the source code computer.  Source code that is available for download is not "on" the computer.  It is clearly "off" of the computer.

The use of the word "available" in section 11(b) does not support your argument to the contrary.  The entire sentence from section 11(b) of the Protective Order reads:

> All Source Code shall be made <u>available</u> by the Producing Party to the Receiving Party in a secure room, ***on at least two secured***, stand-alone computers (running a reasonably current operating system) per software platform produced, without Internet access or network access to other computers, as necessary and appropriate to prevent and protect against any unauthorized copying, transmission, removal, or other transfer of any Source Code outside or away from the computer on which the Source Code is provided for inspection (hereinafter "Confidential Source Code Computer").

Protective Order ¶ 11(b) (emphasis added).

**GIBSON DUNN**

Michael Fazio
March 6, 2013
Page 2

As you can see from the full quote, the word "available" is used generally to describe *where* the computers will be made available – in a secure room.  The next sentence describes where the code shall reside in relation to the computer – "*on* at least two."  The Order does not say "available from," or "accessible by" the source code computer or anything that is open to the interpretation that Samsung now gives.  Rather it says "on."

While we appreciate you offering various solutions to overcome the admittedly unacceptable download times and network outages Apple's reviewers have experienced in attempting to work with Samsung's non-compliant setup, that suggestion entirely misses the point.  The Protective Order requires installation of all code on the review computer.  If Samsung were in compliance, there would be no need for any work-around solutions.  And, the solutions you are proposing are not acceptable.  The large volume of code and the duplicative and apparently vestigial pieces of code within the production, looking at single files is not sufficient.  Apple has a right to review all code for a particular device in order to perform an analysis.  Moreover, your explanation for Samsung's non-compliant setup is irrelevant as well. The Protective Order requires a device that stores all requested source code on that machine.  If the volume of source code is high, as you suggest, then Samsung should provide a computer with the appropriate amount of storage space instead of the ones it chose.  We note that your claims that the "volume of source code that Apple has requested – which, as Apple acknowledges, encompasses source code for at least forty device/carrier/Android versions – constitutes terabytes of data, which cannot fit on a local hard drive."  In fact, each of the approximately 50 workspaces constitutes about 15 GB of data; totaling approximately 750 GB of data.  While this volume apparently exceeds the capacity of the hard disks currently installed on the source code computers Samsung chose to use, it is well within the range of hard disks that readily available.  Indeed Samsung itself sells at least seven laptop computers with a hard drive capacity of at least 1 terabyte, a full 25% more than is required to host the produced source code.  Samsung can thus fully comply with its obligations under the Protective Order by supplying appropriate hardware so that all requested code is stored **on** those computers as the Protective Order plainly requires.

Please correct Samsung's non-compliance immediately.

<u>Modification of the Source Code on the Source Code Computer and Failure to Notify Apple of Changes to the Source Code Computer</u>

On February 6, 2013 Samsung agreed "that both parties will provide notice whenever new source code is installed on any inspection computer."  *See* Feb 6 letter from Mr. Thakur.  On February 27 Apple requested that Samsung confirm this agreement as certain changes were made to the source code computer without notice to Apple.  Mr. Rezvani responded on

**GIBSON DUNN**

Michael Fazio
March 6, 2013
Page 3


March 1 by confirming that changes were made and saying that "[i]n the future, we will be more precise in notifying Apple of additions to Samsung's source code."

Nevertheless, it appears that since February 27 not only has more source code been added to Samsung's source code production without notice to Apple, but Samsung has also changed and moved the existing source code.

For example, the client-side path for the workspace  SGH-T999_Galaxy S3 at port 1713 was moved from /ICS_PROD/MIDAS/SGH-T999_USA_TMO_MR to /. In addition, four workspaces (1) SCH-I535_Galaxy S3 at port 1714  (2) SCH-R530_Galaxy S3 at port 1714 (3) SCH-R950_Galaxy Note2 at port 1714  (4) SPH-L710_Galaxy S3 at port 1714  had their mappings to a directory changed and their source code moved to a new directory structure. Moreover, it appears the new directories containing new source code have been added to those workspaces.

Samsung's modification of the source code structure for a number of devices substantially hinders Apple's ability to review the source code.  Source code files are identified by directory and file name.  A change in either makes it almost impossible to find a file that has been previously analyzed.  For example, source code printouts from the source code computer list a file and directory name.  When the file moves from one directory the identification in the printout is no longer valid and the does not correctly identify the analyzed file.  The file could also become lost requiring reviewers to search for the file in its new location and repeat the analysis to confirm that they are looking at the same one previously analyzed.  In some instances this is almost impossible given the vast number of duplicate file names which exist in Samsung's source code production.  Moreover, this problem is exacerbated by the fact that the code is hosted on a remote server.  A change in the remote configuration may entail a change in how the code is downloaded and could result in two local copies in different directories that have the same exact contents or two inconsistent locations for the same workspace were only a partial workspace or particular files downloaded before and after a change (as you suggest doing as a workaround to the slow download speed).

Samsung must provide, in writing, a complete listing of all modifications to the source code produced by Samsung including any changes to directories where the code is found. Samsung must also provide, in writing, a comprehensive mapping of the old directories to the new locations for each modification such that the files from any source code printout can be found in the new location. Samsung must further confirm in writing that no modifications will be made to the already produced code going forward and that Samsung will provide ample notice of any additions to the source code computer.  Last, Samsung must confirm in

**GIBSON DUNN**

Michael Fazio
March 6, 2013
Page 4

writing that no modifications were made to contents of any of the source code files themselves.

<u>Failure to Produce Source Code Printouts</u>

In addition, Samsung has further failed to produce a single page of any of the printouts made by Apple's source code reviewers since February 19th.  The last correspondence Apple has received from Samsung regarding printouts from the source code computer was on February 25th, where Samsung improperly refused to produce certain diff printouts (but failed to address any of the other printouts made by Apple reviewers).  Apple has received no correspondence on this issue since Feb. 25.

Once again, Samsung is not complying with its obligations under the Protective Order.  Section 11(j) plainly requires Samsung to delivery printed source code copies within 48 hours.   The operative language is as follows:  "copies shall be made for outside counsel for the Receiving Party on watermarked paper within 48 hours.  It is the responsibility of the Producing Party to **ensure delivery of the printed documents to outside counsel for the Receiving Party within 48 hours**." Protective Order ¶ 11(j) (emphasis added).

We understand that Samsung may be taking the view that it has 48 hours after the completion of an inspection to provide copies, rather than within 48 hours of when the documents are printed.  Such a position is unsupported by the Protective Order and contrary to the parties practice to date.

Please produce all documents printed by Apple's source code reviewers immediately, given that Samsung did not timely object to any of the material Apple printed.  *See* Protective Order ¶ 11(i).

***

To the extent that Samsung is not willing to address and rectify these issues immediately Apple's lead trial counsel is available to meet and confer on March 15th at the meet and confer currently scheduled at Quinn Emanuel's offices in Redwood Shores.  If Samsung's lead trial counsel is not available on that date Apple's lead trail counsel is also available to meet and confer on March 14th in Palo Alto or San Francisco.

# GIBSON DUNN

Michael Fazio
March 6, 2013
Page 5


Sincerely,


*/s/ Joshua Furman*

# EXHIBIT 11

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California  90017-2543 | TEL: (213) 443-3000  FAX: (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3227**

WRITER'S INTERNET ADDRESS
**michaelfazio@quinnemanuel.com**

March 12, 2013

<u>VIA E-MAIL</u>

Brian Buroker
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306

Re:     Apple v. Samsung Elecs. Co. et al, Case No 12-cv-0630

Dear Counsel:

I write to respond to Apple's letter dated March 6, 2013.  In order to understand why Apple's purported complaints are disingenuous, it is necessary to recount some background.

As Apple is well aware, Apple has refused to produce full source code base for all versions of iOS.  *See* Letter from Fazio to Valek dated March 1, 2013.  Rather, Apple has only produced selected portions of one version of iOS 4 (iOS 4.3.5); a mixed collection of iOS 5 (iOS 5.0, iOS 5.01; and iOS 5.1.1); a mixed collection of iOS 6 (iOS 6.0 and 6.0.1); and one version of Mac OS X (OS X 10.3), with the claim that these selectively produced versions are "representative of other iOS versions."  *See id.*  Apple does not dispute the incompleteness of its source code production.  Samsung raised the deficiencies with Apple's source code production again as part of Samsung's March 4th letter, to which Apple's March 6th letter responds.  Apple, however, completely ignores this portion of Samsung's letter and instead focuses on the *manner* of Samsung's source code production.  Needless to say, Apple's complaints about the configuration of Samsung's source code production – which is production of a full code base – ring hollow *given that Apple refuses to produce a full code base in the first place.*

Indeed, Apple does not dispute that Samsung has provided full versions of its source code – not

**quinn emanuel urquhart & sullivan, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York  10010-1601 | TEL (212) 849-7000  FAX (212) 849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California  94111-4788 | TEL (415) 875-6600  FAX (415) 875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California  94065-2139 | TEL (650) 801-5000  FAX (650) 801-5100
CHICAGO | 500 W. Madison Street, Suite 2450, Chicago, Illinois  60661-2510 | TEL (312) 705-7400  FAX (312) 705-7401
WASHINGTON, DC | 1299 Pennsylvania Avenue NW, Suite 825, Washington, District of Columbia  20004-2400 | TEL (202) 538-8000  FAX (202) 538-8100
LONDON | 16 Old Bailey, London EC4M 7EG, United Kingdom | TEL +44 20 7653 2000  FAX +44 20 7653 2100
TOKYO | NBF Hibiya Building, 25F, 1-1-7, Uchisaiwai-cho, Chiyoda-ku, Tokyo 100-0011, Japan | TEL +81 3 5510 1711  FAX +81 3 5510 1712
MANNHEIM | Mollstraße 42, 68165 Mannheim, Germany | TEL +49 621 43298 6000  FAX +49 621 43298 6100
MOSCOW | Paveletskaya Plaza, Paveletskaya Square, 2/3, 115054 Moscow, Russia | TEL +7 499 277 1000  FAX +7 499 277 1001
HAMBURG | An der Alster 3, 20099 Hamburg, Germany | TEL +49 40 89728 7000  FAX +49 40 89728 7100

just selective snippets or "representative" samples as Apple has.  Nor does Apple dispute that it conducted numerous source code inspections this past November using the existing source code set-up and did not object to that configuration then or at any time during the subsequent four months.  Instead Apple plays semantics with what it means for source code to be "available."  As Samsung has already explained, the source code is "available" "on" the review machines: Apple's reviewers have been looking at the code by using the review machines and not by any other means.  The code is thus "available" in the ordinary sense of that term – *i.e.*, "capable of being made use of, at one's disposal."  *See* Oxford English Dictionaries Online at http://oxforddictionaries.com/definition/english/available?q=available.  Also, as Apple has noted on more than one occasion, when the reviewers download a workspace they are, in fact, looking at a copy of code that resides "on" the machine.  And Apple concedes by its silence that the Protective Order does not that state that the source code must "reside" on the review machines.

Apple's letter also states that Samsung "offer[ed] various solutions to overcome the admittedly unacceptable download times and network outages."  It remains unclear what Apple's statement references.  To be sure, in its letter of March 4th, Samsung offered a common sense way for Apple's source code reviewers to review code.  *See* Letter from Fazio to Furman dated March 4, 2013 ("Presumably, the reviewers would download data in the background, while concurrently reviewing other, previously downloaded source code.  Stated differently, despite Apple's assertions of long download times for large files, Apple notably does not say its reviewers are sitting idle while source code is downloading").  The remainder of Apple's statements regarding "solutions that [Samsung] is proposing" appears to be based upon Apple's misreading of Samsung's March 4th letter.  To be clear, because the configuration of Samsung's source code review machines complies with the Protective Order, there is no need for Samsung to propose a "solution."

Wordplay notwithstanding, in an effort to reach an accommodation on Apple's purported issue, Samsung proposes the following: Given that Apple raised its issue regarding the configuration of Samsung's source code review machines only recently, the source code for the devices that was made available since the initial inspection will remain accessible through the Perforce servers.  As for the source code for the newly accused devices – *i.e.*, Galaxy Note 10.1, Galaxy Nexus (Jelly Bean), Galaxy S III (Jelly Bean), Galaxy Note II, Galaxy Tab 8.9 (Ice Cream Sandwich), Galaxy Tab 2 10.1, and Rugby Pro – Samsung will make the source code for these recently added devices available on a physical drive residing in the inspection room.  Please let us know if this compromise proposal is agreeable.

Apple also asserts that "the client-side path for the workspace SGH-T999_Galaxy S3 at port 1713 was moved from /ICS_PROD/MIDAS/SGH-T999_USA_TMO_MR to /."  That path was not moved.  In any event, it remains unclear why the location of a given workspace on the Perforce servers matters once the reviewers have downloaded it.  Please explain why Apple seems to contend that file locations on the Perforce servers are germane after the reviewers have downloaded those files.  Further, Samsung notes that merely moving the location of a workspace for a given device does not change the contents of a workspace for a given device.  Stated differently, changing the directory in which the workspace for a given device resides does not change: the contents of the folders within the workspace; the names of the folders in the workspace; the contents of the subfolders within those folders; the names of the subfolders within those folders; or the lines of code in within those folders or subfolders.

Moreover, Samsung is not in a position to comment on how Apple's reviewers should keep track of what they have reviewed and what they have not reviewed.  Samsung's obligation is to allow Apple to review the files and workspaces in the manner they are kept in the ordinary course of Samsung's business, which Samsung has done.  Samsung also notes that it has verbally informed Apple's reviewers of the addition of source code for several devices, and separately followed up with written notification on March 1, 2013.

In any event, Samsung confirms that the four workspaces identified in your letter – to wit,  SCH-I535_Galaxy S3 at port 1714, SCH-R530_Galaxy S3 at port 1714, SCH-R950_Galaxy Note2 at port 1714, and SPH-L710_Galaxy S3 at port 1714 – had additional source code added on or about March 5, 2013.  That additional source code concerns the modification of one or more functionalities not at issue in this litigation. Apple's reviewers are free to examine this source code and to use the comparison software at Apple's disposal to ascertain the precise additions.

Apple also complains that it has not received copies of the source code that Apple's reviewers printed during this most recent inspection.  Notably, during the two inspections in November 2012, Apple was provided with source code printouts at the close of each inspection.  Apple did not object to the timing of these prior source code productions.  Apple's past consent to this practice evidences Apple's understanding that Paragraph 11(j) contemplates printouts will be produced within 48 hours from the end of an inspection, and not within 48 hours from the end of each day during an inspection.  The fact that Paragraph 11(j) does not include language that the printed copies be delivered or produced to outside counsel within 48 *after printing* also supports Samsung's reading.

More to the point, the delivery of printouts is now an issue only because Apple chose to schedule a four-week long inspection (which it apparently seeks to extend by an additional two weeks), but does not want to wait until the inspection concludes.  Nonetheless, and as an accommodation to Apple, Samsung will commence preparing copies of the source code printed by Apple during its recent inspection for production starting this week, to the extent that such printouts comply with the Protective Order.  Samsung also notes that Apple's reviewers have resorted to using the smallest legible font size when printing in an attempt to circumvent the 50 page limit of Paragraph 11(i), thus violating the spirit of the Protective Order.  Please confirm that Apple will not further manipulate font size in its printouts to attempt to circumvent the 50 page limit on source code printouts.

Additionally, Apple demands a lead trial counsel meet and confer this week.  As Apple's counsel is well aware, the parties agreed at the February 15-16 lead trial counsel meet and confer to attempt to streamline the meet and confer process by meeting in a non-lead trial counsel setting in order to resolve as many issues as possible.  The parties' agreement in this regard was designed to avoid the precise scenario that Apple now contemplates – a proposed lead trial counsel meet and confer with inadequate notice.  In any event, Samsung's lead trial counsel is unavailable on the dates requested by Apple and the parties have since agreed to meet in-person in a non-lead trial counsel setting on March 21, 2013 in Los Angeles.

Lastly, Samsung is in receipt of Apple's letter of today regarding purported re-mapping of certain source code directories.  Notably, Apple has had nearly five months to review Samsung's source code and now Apple seems to demand a response to its recent purported issue regarding

directory locations within five days.  Nonetheless, we are reviewing Apple's letter and investigating the issues raised therein, and anticipate responding as soon as reasonably possible.

Very truly yours,

Michael L. Fazio

# EXHIBIT 12

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California  90017-2543 | TEL: (213) 443-3000  FAX: (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3227**

WRITER'S INTERNET ADDRESS
**michaelfazio@quinnemanuel.com**

March 26, 2013

<u>VIA E-MAIL</u>

Michael A. Valek
Gibson Dunn & Crutcher LLP
2100 McKinney Avenue
Dallas, TX 75201-6912

Re:     <u>Apple Inc. v. Samsung Electronics Co. et al., Case No. 12-cv-00630-LHK</u>

Dear Counsel:

I write to follow-up on Samsung's letters of March 4, 2013 and March 12, 2013 regarding source code production.

As we explained in those letters, Samsung gave Apple access to all released and unreleased versions of Samsung's source code for all the accused devices.  For the reasons we have already explained, we do not believe that Apple's request that Samsung download source code onto a local hard drive is appropriate or required by the Protective Order.  Nonetheless, in the spirit of compromise, Samsung will supplement its existing production by downloading and making locally available on external hard drives all released versions of source code for all the accused devices.  Samsung will continue to make all released and unreleased versions of the code available live through Perforce until those drives are ready.  Once those hard drives are up and running, Samsung proposes that it continue to make released and unreleased versions of the source code for all the accused devices available through Perforce upon Apple providing one week's notice.

Although we will proceed as quickly as possible, downloading this volume of source is not an immediate process.  Accordingly, if there are specific devices for which Apple would like to prioritize inspection of source code, please identify them promptly so that Samsung may

**quinn emanuel urquhart & sullivan, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York  10010-1601  | TEL (212) 849-7000  FAX (212) 849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California  94111-4788 | TEL (415) 875-6600  FAX (415) 875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California  94065-2139 | TEL (650) 801-5000  FAX (650) 801-5100
CHICAGO | 500 W. Madison Street, Suite 2450, Chicago, Illinois  60661-2510 | TEL (312) 705-7400  FAX (312) 705-7401
WASHINGTON, DC | 1299 Pennsylvania Avenue NW, Suite 825, Washington, District of Columbia  20004-2400 | TEL (202) 538-8000  FAX (202) 538-8100
LONDON | 16 Old Bailey, London EC4M 7EG, United Kingdom | TEL +44 20 7653 2000  FAX +44 20 7653 2100
TOKYO | NBF Hibiya Building, 25F, 1-1-7, Uchisaiwai-cho, Chiyoda-ku, Tokyo 100-0011, Japan | TEL +81 3 5510 1711  FAX +81 3 5510 1712
MANNHEIM | Mollstraße 42, 68165 Mannheim, Germany | TEL +49 621 43298 6000  FAX +49 621 43298 6100
MOSCOW | Paveletskaya Plaza, Paveletskaya Square, 2/3, 115054 Moscow, Russia | TEL +7 499 277 1000  FAX +7 499 277 1001
HAMBURG | An der Alster 3, 20099 Hamburg, Germany | TEL +49 40 89728 7000  FAX +49 40 89728 7100

download source code for those devices first.

Additionally, as you know, Apple's production of source code remains woefully incomplete.  As Samsung has repeatedly stated, Apple has only produced selected portions of one version of iOS 4 (iOS 4.3.5); a mixed collection of iOS 5 (iOS 5.0, iOS 5.01 and iOS 5.1.1); a mixed collection of iOS 6 (iOS 6.0 and 6.0.1); and one version of Mac OS X (OS X 10.3), with the claim that these selectively produced versions are "representative of other iOS versions."  Just as Apple has asked for all versions of Samsung's source code, and for the same reasons, Samsung is entitled to all versions of Apple's source code.  And these productions must be complete:  Apple has produced only limited portions of source code that Apple unilaterally deems relevant to the accused functionalities.  As Samsung has pointed out on numerous occasions, these excerpts of code make Samsung's review unworkable as Samsung continues to request additional code that Apple has omitted, wait for Apple to agree to produce it, and then further wait for Apple to produce that code.  Please confirm by March 29 that Apple will produce a full code base for all versions of iOS and Mac OS X for each accused device.

Very truly yours,

Michael L. Fazio

# EXHIBIT 13

US005666502A

# United States Patent [19]

## Capps

| [11] | Patent Number: | **5,666,502** |
|------|----------------|---------------|
| [45] | Date of Patent: | **Sep. 9, 1997** |

[54] **GRAPHICAL USER INTERFACE USING HISTORICAL LISTS WITH FIELD CLASSES**

[75] Inventor: **Stephen P. Capps**, San Carlos, Calif.

[73] Assignee: **Apple Computer, Inc.**, Cupertino, Calif.

[21] Appl. No.: **511,904**

[22] Filed: **Aug. 7, 1995**

[51] Int. Cl.⁶ ............................... **G06F 3/00**; G06F 15/00
[52] U.S. Cl. ............................................. **345/352**; 395/768
[58] Field of Search ..................... 395/149, 766, 395/768–769, 155–161, 68, 76, 12, 767, 326–358, 620, 146; 345/146, 902, 173–183

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,235,679 | 8/1993 | Yoshizawa et al. ................... | 395/156 |
| 5,261,042 | 11/1993 | Brandt ................................. | 395/156 |
| 5,367,619 | 11/1994 | Dipaolo et al. ..................... | 395/149 |
| 5,367,626 | 11/1994 | Morioka et al. .................... | 395/159 |
| 5,396,264 | 3/1995 | Falcone et al. ..................... | 345/146 |
| 5,398,310 | 3/1995 | Tchao et al. ................... | 395/358 X |
| 5,420,975 | 5/1995 | Blades et al. ...................... | 395/156 |
| 5,491,495 | 2/1996 | Ward et al. ........................ | 395/173 |
| 5,497,455 | 3/1996 | Suga et al. ........................ | 395/159 |
| 5,497,484 | 3/1996 | Potter et al. ................. | 395/156 X |
| 5,552,806 | 9/1996 | Lenchik ....................... | 345/146 X |
| 5,588,105 | 12/1996 | Foster et al. ...................... | 395/326 |

### OTHER PUBLICATIONS

Turbo C ++ v3.0, Borland International, 1992, screen pp. 1–10. 1992.
"Timeslips® III for the Mac", 1992 Timeslips Corporation, Essex, MA, 1992 pp. 7–11 through 7–13 and 8–12 through 8–18.

*Primary Examiner*—John E. Breene
*Attorney, Agent, or Firm*—Hickman Beyer & Weaver

[57] **ABSTRACT**

A data input technique for a computer that provides the user with a historical list of potential choices for the data input is described. A historical list is displayed to the user so that the user can input data by selecting an item from the historical list being displayed. The historical list contains the most recently and/or frequently used data values for the data field that the user is inputting data. Preferably, the historical list is displayed over a form also being displayed that requires the data input into its one or more of its fields. By using the historical lists a user is able to enter data with a greater ease of use than previously obtainable. The historical can also be shared between different applications that execute on the computer system concurrently or at different times. By sharing the data between applications, the historical list becomes more useful and valuable to the user and thereby further improves the ease of use of the computer system. The data input technique can be implemented numerous ways, including as a system, an apparatus, a graphical user interface, or a method, or as a computer readable medium.

**26 Claims, 13 Drawing Sheets**



Case 5:12-cv-00630-LHK   Document 424-2   Filed 04/01/13   Page 80 of 119



*Figure 1*



*Figure 2*

**U.S. Patent**      Sep. 9, 1997      Sheet 3 of 13      **5,666,502**



*Figure 3*



FIG. 4



FIG. 5A



FIG. 5B

204        206        208        202

| STRING / PTR | TIME | # USES |
|---|---|---|
| Diane Penn | 8/8/95  12:01 | 25 |
| Joe M. State | 8/5/95  18:01 | 3 |
| <ptr to Mary Kay> | 3/3/95  20:19 | 6 |
| Steve Smith | 8/7/95  10:43 | 32 |
| Bill D. Thomas | 7/29/95   7:51 | 1 |

## FIG. 6A

212        214        216        210

| STRING / PTR | TIME | # USES |
|---|---|---|
| TSI, Inc. | 5/2/95 | 18 |
| SAM Systems | 6/21/95 | 33 |
| <ptr to Apple Computer> | 8/7/95 | 59 |
| First National Bank | 7/8/95 | 9 |
| Hickman & Beyer | 4/9/95 | 2 |

## FIG. 6B



FIG. 7



FIG. 8



FIG. 9



FIG. 10



FIG. 11



FIG. 12

PHONE MESSAGE

Caller : _<name>_____

Phone :_____ 314

Message :_____

_____

_____

312

FIG. 13A

FAX COVER SHEET

To :__<name>_____

From :_____ 318

Notes :_____

_____

_____

316

FIG. 13B

320

SALES INVOICE

Buyer :          <company>
                       322

Product :

Price :

Quantity :

FIG. 14A

324

REMINDER BILL

To :             <company>
                       326

Amount :

Address :

FIG. 14B

328

GREETING

To :             <name>
                       332

Company :        <company>
                       330

Address :

Greeting Type :        ☐ Birthday   ☐ Get Well

FIG. 14C

5,666,502

1

# GRAPHICAL USER INTERFACE USING HISTORICAL LISTS WITH FIELD CLASSES

## BACKGROUND OF THE INVENTION

The present invention relates generally to computer systems, and more particularly to data input techniques for computer systems.

Computers are becoming increasingly powerful, lightweight, and portable. The computing power of computers that once filled entire rooms is now residing on a desktop. Laptop, notebook, and sub-notebook computers are virtually as powerful as their desktop counterparts. Even smaller hand-held computers are now capable of computing tasks that required much larger machines a few short years ago.

As a part of this trend, computerized personal organizers are becoming increasingly popular with a large segment of the population. Computerized personal organizers tend to be small, lightweight, and relatively inexpensive, and can perform such functions as keeping a calendar, an address book, a to-do list, etc. While many of these functions can also be provided in conventional computer systems, personal organizers are very well suited to the personal organization task due to their small size and portability. Personal organizers are available from many companies including Sharp and Casio of Japan.

A relatively new form of computer, the pen-based computer system, holds forth the promise of a marriage of the power of a general purpose computer with the functionality and small size of a personal organizer. An example of a pen-based computer system is the Newton® 120 pen-based computer made and marketed by Apple Computer, Inc. of Cupertino, Calif.

A pen-based computer system is typically a small, hand-held computer where the primary method for inputting data includes a "pen" or stylus. A pen-based computer system is commonly housed in a generally rectangular enclosure, and is provided with a dual-function display assembly that can serve as both an input device and an output device. When operating as an input device or "tablet", the display assembly senses the position of the tip of a stylus on the viewing screen and provides this positional information to the computer's central processing unit (CPU). Some display assemblies can also sense the pressure of the stylus on the screen to provide further information to the CPU. When operating as an output device, the display assembly presents computer-generated images on the screen.

The dual-function display assemblies of pen-based computer systems permit users to operate the computer as a computerized notepad, among other functions. For example, graphical images can be input into the pen-based computer by merely moving the stylus on the surface of the screen. As the CPU senses the position and movement of the stylus, it generates a corresponding image on the screen to create the illusion that the stylus is drawing the image directly upon the screen, i.e. that the stylus is "inking" an image on the screen. By "ink" it is meant that pixels on the screen are activated in such a manner that it appears that the stylus is leaving a trail of ink on the display assembly. With suitable recognition software, the "ink" can be recognized to input text, numerics, graphics, and other recognized information into the pen-based system.

Computer systems require user input for one reason or another. The typical input sources are a keyboard, a mouse and a track ball, and in the case of pen-based computers, a stylus. One conventional way of reducing the burden on the user to individually enter or "ink" each character is to

2

provide a list to the user whereby the user need only select one of the list items to thereby cause the data to be entered. These lists are generally arranged in a alphabetical order. Although such lists alleviate the user from having to type in or otherwise enter the data, the data entry process is still burdensome on the user. Namely, if there is a list available, which in many cases there is not, the list is generally too long and requires a substantial amount of time for the user to identify the item to be selected. Also, if the user has waded through the list and not found the desired data, the user becomes frustrated due to the wasted time and effort. Therefore, there is a need for an improved user interface that allows a user to enter data with a greater ease of use.

## SUMMARY OF THE INVENTION

Broadly speaking, the present invention is a data input technique for a computer that provides the user with a historical list of potential choices for the data input.

According to the data input technique of the invention, a historical list is displayed to the user so that the user can input data by selecting an item from the historical list being displayed. Preferably, the historical list is displayed over a form also being displayed. The form is an electronic image, typically of some sort of document, to which data needs to be entered into its one or more fields. The user inputs data for a field of the form by selecting an item from the displayed historical list which corresponds to the particular field.

The invention overcomes the problems associated with the prior art by providing the historical list of the most recently and/or frequently used data values for the data field that the user is entering data. The historical list is kept relatively small and the items therein have a reasonable probability of being the data the user desires. In addition to providing a greater ease of use to users, the invention also facilitates the sharing of the historical input data between different applications. By sharing the data between applications, the historical list becomes more useful and valuable to the user and thereby further improves the ease of use of the computer system. The invention can be implemented numerous ways, including as a system, an apparatus, a graphical user interface, or a method, or as a computer readable medium.

As a pen-based computer system, the invention includes an I/O display system including at least an input tablet and a display screen, a memory system for storing program code and data, a CPU for processing the program code in accordance with the data, and a plurality of history tables maintained within the memory system, each of the history tables corresponding to a different field class. When inputting data via the input tablet into a field of a form being displayed on the display screen, a list of choices is produced from the history table for the field class corresponding to the field and displayed on the display screen. Each of the history tables stores historical information concerning usage of data values with respect to a different one of the field classes. Preferably, the list of choices produced from the history table is a menu list of most recently and frequently used data values for the field class.

As a graphical user interface, the invention includes a history list for each of a plurality of field classes, a form having at least one field requiring data input, the field being associated with one of the field classes, and a history list selector for selecting the history list for the field based on the field class associated with the field. Preferably, the history list for each of the field classes is a menu list of most recently

5,666,502

3

and frequently used data values for the field classes. The graphical user interface is useful for any computer system, but is particularly useful for a pen-based computer system because data entry via a stylus is generally more time consuming and burdensome to the user.

As a method for inputting data into a computer system having a display screen associated therewith, the invention includes the operations of: displaying a form on the display screen of the computer system, the form having at least one field requiring data entry by a user; displaying a history list associated with the field on the display screen of the computer system; determining whether the user has selected an item from the displayed history list; assigning a data value for the field to that of a data value associated with the selected item when it is determined that the user has selected an item; and updating the history list in accordance with the selected item when it is determined that the user has selected an item.

As a computer readable medium containing program instructions for inputting data into a computer system having a display screen associated therewith, the invention includes: computer readable code devices for displaying a form on the display screen of the computer system; the form having at least one field requiring data entry by a user; computer readable code devices for displaying a history list associated with the field on the display screen of the computer system; computer readable code devices for determining whether the user has selected an item from the displayed history list; computer readable code devices for assigning a data value for the field to that of a data value associated with the selected item when it is determined that the user has selected an item; and computer readable code devices for updating the history list in accordance with the selected item when it is determined that the user has selected an item.

These and other advantages of the present invention will become apparent upon reading the following detailed descriptions and studying the various figures of the drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of the electronics of a pen-based computer system in accordance with the present invention;

FIG. 2 is a perspective view of a complete pen-based computer system including a housing, display assembly, and stylus, where the electronics of FIG. 1 are enclosed within the housing;

FIG. 3 is a top plan view of the housing and display assembly of pen-based computer system of FIG. 2;

FIG. 4 is a basic block diagram of list processing associated with a basic embodiment of the invention;

FIGS. 5A and 5B are illustrations of features of the invention which are displayed on a display screen of a computer system;

FIGS. 6A and 6B are exemplary history tables from which history lists can be produced;

FIG. 7 is a flow chart illustrating history list processing associated with a detailed embodiment of the invention;

FIG. 8 is a flow chart illustrating history list generation processing;

FIG. 9 is a flow chart illustrating data retrieval processing;

FIG. 10 is a flow chart illustrating history table management processing,

FIG. 11 is a flow chart illustrating processing associated with adding a string to a history table;

4

FIG. 12 is a flow chart illustrating processing associated with adding a data record pointer to a history table;

FIGS. 13A and 13B are illustrations of usage of the invention across different programming applications; and

FIGS. 14A, 14B and 14C are illustrations of another example of the usage of the invention across different applications.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention is a data input technique for a computer that provides the user with a historical list of potential choices for the data input. A historical list is displayed to the user so that the user can input data by selecting an item from the historical list being displayed. The historical list contains the most recently and/or frequently used data values for the data field that the user is inputting data. By using the historical lists a user is able to enter data with a greater ease of use than previously obtainable. The historical list can also be shared between different applications that execute on the computer system concurrently or at different times. By sharing the data between applications, the historical list becomes more useful and valuable to the user and thereby further improves the ease of use of the computer system.

The processing associated with the data input technique according to the invention is discussed in detail below. However, before describing the details of the processing, a computer system for carrying out the processing is described.

The present invention is well suited for pointer based computer systems such as the pen-based, pen-aware, mouse, track ball, and track pad controlled systems that are currently popular. For the purposes of illustration, the invention will be described in connection with a pen-based system; however, the invention is equally applicable to other computer systems.

As shown in FIG. 1, a block diagram 10 of the electronics of a pen-based computer in accordance with the present invention includes a central processing unit (CPU) 12, a memory system 14, an input/output (I/O) dual function display system 16, a clock system 18, a power system 20, a sound system 22, a PCMCIA connector 24, and a serial I/O system 26. The various, components and systems of the computer 10 are coupled together by an I/O controller 28 which serves as an interface between the CPU 12 and other components of the computer 10. More specifically, the I/O controller 28 is an application-specific integrated circuit (ASIC) designed to handle memory, peripherals, and I/O tasks, as well as housekeeping functions such as providing system clocks, controlling power usage, etc. The design, manufacture, and use of ASICs is well known to those skilled in the art. The pen-based computer 10 as illustrated is currently being manufactured and sold by Apple Computer, Inc. of Cupertino, Calif. as a Newton® 120 Personal Digital Assistant (PDA).

CPU 12 is preferably a commercially available, single chip microprocessor. While CPU 12 can be a complex instruction set computer (CISC) chip, it is preferable that CPU 12 be one of the commercially available, reduced instruction set computer (RISC) chips which are known to be of generally higher performance than CISC chips. In the present embodiment, the CPU 12 is preferably an ARM® 610 RISC chip operating at 20 megahertz and is available from a variety of sources including VLSI Technology, Inc. of San Jose, Calif. and Plessey Semiconductor of England.

5,666,502

The present CPU 12 includes a 32 bit data (D) bus 30, a 32 bit address (A) bus 32, and an 8 bit control (C) bus 34.

The memory system 14 includes static random access memory (SRAM) 36, non-volatile read/write "flash" memory 38, and read-only memory (ROM) 40. The SRAM 36 serves as volatile "scratch pad" memory for the computer system 10 and, in the current system, includes 512 kilobytes of memory. The flash memory 38 is where user data is stored, preferably includes about 2 megabytes of memory, and is available as a standard product from Intel Corporation of Santa Clara, Calif. The ROM 40 stores the operating system and embedded application programs, and currently comprises approximately 8 megabytes of memory. Of course, there are many equivalents for the SRAM 36, flash memory 38, and ROM 40. For example, dynamic random access memory (DRAM) can be substituted for SRAM 36, battery-backed random accessed memory (RAM) can be substituted for flash memory 38, and a programmable read-only memory (PROM) can be substituted for the ROM 40.

The memory system 14 is coupled directly to the data (D) bus 30 and the address (A) bus 32. The memory system 14 is also coupled to a memory control bus 42 of controller 28. The CPU 12 and controller 28 cooperate to read and write data to the memory system 14 via the busses 30, 32, and 42.

The display system 16 serves as both an input device and an output device. More particularly, a tablet 44, multiplexer (MUX) 46, and analog-to-digital (A/D) converter 48 convert the contact of a stylus (see FIG. 2) with the tablet 44 and its subsequent movement over the tablet into digital data that is input to the controller 28. The tablet 44 is preferably a four-wire resistive membrane tablet and provides positional information on a bus 50 which is input into the MUX 46. The MUX 46 determines which of the four sides of the tablet is to be read. Such tablets are widely available from a variety of sources including Nissha of Japan. An output from the MUX 46 is input to A/D converter 48 on a bus 52. An output from the A/D converter 48 is input into the controller 28. The display system 16 further includes an ASIC 56, a dedicated SRAM 58, and an LCD screen 60. The ASIC 56 is an LCD controller coupled to the data (D) bus 30, the address (A) bus 32, and the memory control bus 42. The purpose of the ASIC 56 is to allow the CPU 12 to write to the screen as if it were a RAM sitting on the memory bus 42. The SRAM 58 is coupled to the ASIC 56 by a dedicated bus 62, and the screen 60 is coupled to the ASIC 56 by a dedicated bus 64. The ASIC 56 serves as a controller for the screen 60, and uses the SRAM 58 as a frame buffer to store images to be displayed on the screen 60. The LCD screen 60 is preferably a standard super-twist LCD matrix screen available from a number of sources including Seiko-Epson of Japan. The LCD screen preferably comprises a rectangular array of picture elements or "pixels", as is well known to those skilled in the art.

The clock system 18 includes a main system clock 66 and a real-time clock (RTC) crystal 68. The main system clock is a four-terminal oscillator and is used to provide the master clock for the computer 10. In the present embodiment, the main system clock 66 operates at 40 megahertz. Oscillator clocks such as clock 66 can be commercially obtained from many sources including Seiko-Epson of Japan. This master clock may be divided down by the controller 28 for various timing purposes in the system, and is coupled to the controller 28 by a line 70.

The RTC crystal 68 is tuned to 32.768 kilohertz, which is evenly divisible by a power of 2. The RTC crystal 68 forms the basis of a crystal based oscillator that can provide a continuous, precise, uninterrupted signal at 1 hertz by divid-

ing down the 32.768 kilohertz crystal signal with a 10 bit divider. The circuitry for performing this type of task is well-known, and form a part of controller 28 in this embodiment. The one hertz RTC signal increments a RTC counter (also a part of the controller 28) to count of the total number of seconds that has elapsed since midnight, Jan. 1, 1904 (an arbitrary start time). The value in the RTC counter can be converted into time of day and date information by relatively straight-forward calculations well known to those skilled in the art. Since the RTC crystal 68 is coupled to the controller 28 by a dedicated two-line bus 72 to provide the 32.768 kilohertz signal to the controller 28.

The power system 20 provides power to the computer 10 and is coupled to the controller 28 by a dedicated bi-directional bus 74. The bus 74 allows for the handling of fault detection signals (e.g. low power), switching on and off power to the PCMCIA connector, etc. The power system 20 preferably controls the power system 20 to conserve power at times of low usage of the pen-based computer system.

The sound system 22 includes a small (18 mm diameter) loudspeaker 76 and a D/A converter 78. The D/A converter 78 is coupled to the controller 28 by a line 80, and to the loudspeaker 76 by a line 82. In the present embodiment, the D/A converter 78 is a simple operational amplifier (OP AMP) which acts as an integrator to integrate pulse width modulation (PWM) signals developed on line 80 to provide an analog signal on line 82 to drive loudspeaker 76. Of course, more complex D/A converters can also be used to provide higher quality sound output from loudspeaker 76, as will be apparent to those skilled in the art. Suitable OP AMPS to be used as a D/A converter 78 are readily available on the commercial market, and the miniature loudspeaker is also readily available, such as from Hosiden of Osaka, Japan.

The PCMCIA connector 24 is coupled to the controller 28 by a dedicated data (D') bus 84, a dedicated address (A') bus 86, and a dedicated control (C') bus 88. The PCMCIA specifications for signals on the dedicated data, address, and control busses are industry standard and highly available as the "PC Card" or "PCMCIA" standard. A variety of devices can fit in the PCMCIA slot 24, including memory expansion cards, miniature hard disk drive cards, modem cards, and pager cards, to name a few.

The serial I/O system 26 includes a Serial Communications Controller (SCC) 90, an infrared (IR) transceiver 92, a serial port 94, and a line driver (LD) 96. The SCC 90 is coupled to the data bus (D) 30 by a bus 98 and to the controller 28 by a bus 100. A suitable SCC 90 can be purchased from Zilog Corporation of San Jose, Calif. as part number Z85C30. The Zilog Z85C30 has been available since at least the early 1980's and supports a number of serial protocols. The IR transceiver 92 is coupled to the SCC 90 by a line 102 for received IR signals, and to the controller 28 for IR signals to be transmitted. The IR transceiver includes an IR transmitter (coupled to line 104) and an IR receiver (coupled to line 102), and is available under license from Sharp Corporation of Japan. The IR receiver includes a PIN-type IR-sensitive diode having an output coupled to an analog demodulator and an amplifier to create a signal on line 102, an IR LED coupled to line 104 to be directly driven by a high-power switch of controller 28. The serial port 94 is a standard DIN 8 (8 pin) connector, and is coupled to the line driver LD 96 by an eight bit bus 106. The LD 96 is coupled to the SCC 90 by a bus 107.

Referring now to FIG. 2, a pen based computer system 106 in accordance with the present invention includes the

5,666,502

7

computer 108 and a pen or stylus 110. The computer 108 is enclosed within a generally flat, rectangular case 112 having a front end 114, a back end 116, a left side 118, a right side 120, a top 122, and a bottom 124. The LCD 60 is positioned along the top 122 of the case 112, and the clear membrane tablet 44 is positioned over the LCD 60. Also positioned beneath the tablet 44 along a lower edge 126 thereof, is a printed strip of material 128 including a number of indicia 130. When the tip 132 of the stylus 110 is engaged with the membrane 44 over one of the indicia 130, the computer 108 can respond to the contact as if the indicia were a "button." Therefore, as used herein, a "button" can be an image seen through the tablet 44 (either from the screen 60 or from printed material 128 or the like) that can serve the function of an electro-mechanical button or the like when the tablet 44 is activated over a button image.

A lid 134 is connected to the back end 116 of case 112 by hinge 136. When open as shown or folded back to contact the bottom 124 of case 112, the tablet 44 and screen 60 are available for use. When the cover 134 is folded over the top 122 of case 112, it fully covers the tablet 44 to protect the delicate membrane material. The lid 134 is provided with a latch member 138 which engages a latch member 140 when it is overlying the top 122 of the computer. The latch member 138 is disengaged from the latch member 140 by a mechanical latch release 142.

Also seen in FIG. 2 is an "on" switch 144, a contrast adjustment 146, and a grille 148 for the speaker 76. The stylus 110 is of a collapsible design and can fit into an opening 150 along the right side 120 of case 112. Not seen in this figure along the right side 120 of the case 112 is an opening for a PCMCIA card which can engage PCMCIA connector 24, the DIN 8 port 94, and a power input jack. Not seen along the bottom 124 of the case 112 is a battery access cover and a mechanical ejection button for a PCMCIA card engaged with the PCMCIA connector 24. The IR port 92 is provided along back 116 of the case 112 and is exposed for use when the cover 134 is folded against the bottom 124 of the case 112. The remaining components and systems of the computer block diagram 10 of FIG. 1 are enclosed within the case 112 of the computer system 108.

It should be noted that the preceding discussion is of a preferred embodiment of the present invention, and that there are many alternatives for the stylus 110. For example, a fingernail or other pointed object could be used with the tablet 44 of the present invention. Also, there are other types of tablets available that utilize other types of styluses.

Other types of pointing devices can also be used in conjunction with the present invention. While the method of the present invention is described in the context of a pen-based system, other pointing devices such as a computer mouse, a track ball, a track pad, a tablet, etc. can be used to manipulate a pointer on a screen of a general purpose computer. Therefore, as used herein, the terms "pointer", "pointing device", "pointing apparatus", "pointing means", and the like will refer to any mechanism, device, or system for designating to a particular location on a screen of a computer display.

With additional reference to FIG. 3, information is input into the pen-based computer system by "writing" on the tablet 44 with stylus 110 or the like. Information concerning the location of the tip 132 of stylus 110 on the tablet 44 of the display system 16 is input into the CPU 12 via the controller 28. Typically, this information comprises the Cartesian (i.e. x & y) coordinates of a pixel of the screen 60 over which the tip 132 of the stylus 110 is positioned. The

8

CPU 12 then processes the data under control of an operating system (stored in ROM 40) and possibly an application program stored in the memory system 14 or elsewhere (such as on a PCMCIA card engaged with PCMCIA connector 24). The CPU 12 next produces data which is transferred to the screen 60 via ASIC 56 to produce appropriate images on the screen.

Upon power-up, pen based computer system 106 displays on screen 60 an initial "note" area 151 including a header bar 152 and a number of guidelines 154. The header bar 152 preferably includes the date of creation of the note area 151 and a number of icons and "soft" buttons, not particularly germane to the discussion of the present invention. The guidelines 154 aid a user in entering text, graphics, and data into the pen-based computer system 106. A text object T of the text "Text Object" and a graphic object G of a triangle are shown as being entered within note area 151.

Additional note areas, such as a second note area 156, can be formed by the user by drawing a substantially horizontal line across the tablet 44 with the stylus 110. The substantially horizontal line is recognized by the computer system 106 and is converted into a second header bar 158. Additional text, graphical, and other data can then be entered into this second note area 156.

The screen illustrated in FIG. 3 is referred to as the "notepad", and is preferably an application program running under the operating system of the pen based computer system 10. In this preferred embodiment, the notepad is a special or "base" application which is usually or normally available beneath higher level applications. The notepad application, like other applications, run within a window, which in this instance comprises the entire screen 60. Therefore, as used herein, a "window" is the entire screen or any portion of an entire screen which is dedicated to a particular application program. A description of the operation and use of the notepad can be found in U.S. Pat. No. 5,398,310, assigned to the assignee of the present invention, and incorporated herein by reference. The pen based computer system 10 can also run or execute other application programs in a similar fashion.

A status bar 160 is provided at the bottom of the notepad application. The status bar 160 is provided with a number of active areas and a number of display areas, which again are not particularly germane to the present invention and will therefore not be discussed in detail herein.

The term "object" will be used extensively in the following discussions. As is well known to software developers, an "object" is a logical software unit comprising data and processes which give it capabilities and attributes. For example, an object can be queried as to its type and can return such data as the number of words that it contains, what its bounding box (BBOX) is, etc. Objects can contain other objects of the same or of a different type. Objects can also be used to project images on a screen according to their object type. Example of object types used in the following description include paragraph, line, and word objects. There are many well known texts which describe object oriented programming. See, for example, *Object Oriented Programming for the Macintosh*, by Kurt J. Schmucher, Hayden Book Company, 1986.

In the present invention, objects may be implemented as part of a frame system that comprises frame objects related by a semantic network. A description of semantic networks can be found in "A Fundamental Tradeoff in Knowledge Representation and Reasoning", *Readings in Knowledge Representation*, by Brachman and Leveseque, Morgan Kaufman, San Mateo, 1985.

5,666,502

9 10

It will be noted there is a liberal use of graphic elements in the present invention. For example, the header bars **152** and **158** include lines and other graphical elements. Processes for drawing lines on a computer screen are well known to those skilled in the art. For example, graphics software such as QUICKDRAW from Apple Computer, Inc. of Cupertino, Calif. can be used to draw lines, simple geometrical shapes, etc. A description of the QUICKDRAW graphics software is found in the book *Inside Macintosh, Volumes I, II, and III*, by C. Rose et at., Addison-Wesley Publishing Company, Inc., July 1988. With such graphics software, a line can be drawn by simply specifying the coordinates of the beginning and the end of the line, and by specifying the width of the line.

Another preferred tool for implementing the system of the present invention is a view system. Various types of view systems are well known to those skilled in the art. In the present system, the notepad application on the screen **60** can form a first or "root" layer, with the status bar **160**, for example, positioned in a second layer "over" the root layer. The various buttons **162** of the status bar **160** are positioned in a third layer "over" the second and root layers. The view system automatically handles "taps" and other gestures of the stylus **110** on the screen **60** by returning information concerning the tap or gesture and any object to which it may be related U.S. patent application Ser. No. 07/976,970 filed Nov. 16, 1992, U.S. Pat. No. 5,588,105, on behalf of Foster et. al, entitled "Status Bar for Application Windows" and assigned to the assignee of the present invention describes a preferred view system and how to make and use the status bar, and is incorporated herein by reference.

The object oriented programming and view system software makes the implementation of the processes of the present invention less cumbersome than traditional programming techniques. However, the processes of the present invention can also be implemented in alternative fashions, as will be well appreciated by those skilled in the art. In any case, the processes of the present invention are discussed in detail below with reference to FIGS. 4–14C.

FIG. 4 is a basic block diagram of list processing **164** associated with a basic embodiment of the invention. The list processing **164** is carded out by the a computer system. Preferably, the computer system is the pen-based computer system shown in FIGS. 1–3. However, most computer systems can be programmed to perform the list processing **164**.

The list processing **164** begins by displaying **166** a form having at least one field. A form is an electronic image, typically of some sort of document, to which data needs to be entered into its fields. For example, in an application program such as a fax sending program running on a computer, when sending a fax, a form will be displayed to the user requesting that the user enter the name of the person to which the fax is to be sent. Another example is a electronic business card program (e.g., ROLODEX® like product) running on a computer, wherein when entering a new business acquaintance, a form will be displayed to the user requesting the name, company, address, phone, etc. of the person. The above two examples of forms are two of many types of forms that can be used with the invention. The form is displayed **166** on a display screen of the computer system. In the preferred embodiment, the display screen is the LCD screen **60** shown in FIG. 2.

After displaying **166** the form, a decision **168** is made based on whether there is a history list available for the particular field of the form. For example, if the field within the form is a name field which requests a person's name, then the decision **168** determines whether there is a history list available for the name field. The history list is a list of data values most recently and/or most frequently used for the associated field. For example, if the field is the name field, then the history list for the name field would contain the most recently and/or most frequently used names. The composition of the items within the history list is discussed in greater detail below. When decision **168** determines that there is a history list available for the particular field, then the history list is displayed **170** for the user. Preferably, the history list is displayed as a menu list to the user on the display screen in a location proximate to where the field is displayed.

Next, a decision **172** is made based on whether the user has selected an item within the history list. If the user has not selected an item within the history list, then conventional data input techniques are utilized **174** to enter the necessary data. For example, one conventional data input technique is to provide the user with an alphabetical list of numerous possible names. Here, the list is usually better than no list, but remains cumbersome because of the large size of the list and because the user has to wade through the large amount of unimportant data contained within the list. On the other hand, if the decision **172** determines that an item has been selected from the history list, then the data value for the field is assigned **176** to the data value associated with the selected item of the history list. The history list is also updated **178** to reflect the fact that the selected item was most recently selected. By updating **178** the history list, the historical information maintained in the history list for the particular field is maintained. Additional details pertaining to the updating of the history lists are described below.

FIGS. 5A and 5B are diagrams illustrating features of the invention that are displayed on a display screen of the computer system. Again, in the preferred embodiment, the display screen is the LCD screen **60** shown in FIG. 2. The application program associated with FIGS. 5A and 5B is an address book application program that is executed by the computer system and able to store and display name, address, company and phone information much the same way as a traditional paper version of an address book would. The particular application program is not important so long as the application program requires a user to complete at least one field in a form.

In FIG. 5A, a form **180** is illustrated having a name label **182** for a name field **184**, as well as history list indicators **186** and **187**. Additionally, the form **180** includes an address label **188**, an address field **190**, a company label **192**, a company field **194**, a phone label **196** and a phone field **198**. The user can then, in accordance with the address book application program, input data into the name field **184**, the address field **190**, the company field **194**, and the phone field **198**. The history list indicator **186** is associated with the history list for the name field, and the history list indicator **187** is associated with the history list for the company field.

Consider the case in which the user has opened the form **180** in the address book application program and is now required to enter data into the fields **184**, **190**, **194** and **198**. Of course, the user can skip some of the fields, however, this diminishes the value of the entry in the address book. In any case, when the user seeks to enter data into the name field **184**, the user can click, tap or otherwise select the history list indicator **186** to obtain the history list for names. Preferably, each history list is associated with a field class. The input fields of a form then designate the field class associated therewith. Here, the field class associated with the field **184** would be "full name".

5,666,502

11

In FIG. 5B, a history list **200** is produced after the user has selected the history list indicator **186** associated with the name label **182** or name field **184** is illustrated. Here, the history list **200** is the history list associated with the field class "full name" and includes five (5) names of persons that were most recently and/or frequently used on the computer system. Moreover, an "other" region **201** can be optionally provided within the history list **200** to allow the user to select an input from a larger conventional styled list of choices when the items within the history list do not include the value needed by the user. For example, the other list could be an alphabetic list of all names known to the computer system, typically through a ROLODEX® type application program.

FIGS. **6A** and **6B** are history tables from which the history lists are produced. Although history tables have not been previously mentioned, the history lists that have been previously discussed are preferably produced from history tables. Each history list is associated with a history table, and each history table is associated with a field class.

In FIG. **6A**, the history table **202** produces the history list **200** shown in FIG. **5B**. The history table **202** includes a string/pointer section **204**, a time section **206** and a number of uses section **208**. The string/pointer section **204** contains either a full name or a pointer to a data record including the appropriate full name. The time section **206** includes the time that the full name was last used by the computer system. Time here refers to either calendar date, daily time, or both. The number of uses section **208** maintains a count of the number of times that the full name has been used by the computer system.

You will note that the history list **200** displayed as shown in FIG. 5B is ordered differently than the ordering of the items within the history table **202** shown in FIG. 6A. Preferably, the items within the history list **200** are ordered in a manner in which time information as well as frequency of use information are together considered in determining the ordering of the choices within the history list **200**. Because the name "Diane Penn" was used last in time and is used frequently, it appears first in the history list **200**. It is followed by the name "Steve Smith" because this name appears next in time and also with a substantial frequency of use. Also note that the differences between time of last use and frequency of use for the names "Diane Penn" and Steve Smith" are weighted such that the most recently used name is preferably displayed first in the history list **200**. Here, in this example, the name "Diane Penn" was displayed before the name "Steve Smith" because it was the most recently used item within the table **202** and the relative difference in the frequencies of usage were not substantial enough to list them in the opposite order. Next, the name "Joe M. State" appears because it occurs next in time and its frequency of use is not so much different from the remaining items in the history list **202** to cause it to be displayed later in the history list **200**. The name "Bill D. Thomas" is then displayed because it is next in time, and again not bumped down due to any other items with substantially greater frequency of uses. Lastly, the name "Mary Kay" is placed in the history list **200** because within the history table **202**, the name "Mary Kay" was last in time and its frequency is not substantially greater than other entries.

FIG. **6B** is a diagram illustrating a history table **210** for the company field **194** of the form **180**. Although a history list produced from the history table **210** is not illustrated, it would be similar to the history list **200** shown in FIG. 5B. The history table **210** includes a string/pointer section **212**, a time section **214** and a number of uses section **216**. Here,

12

unlike the time section **206**, the time section **214** is illustrated as containing only a date. This is done to illustrate that the data only option is available, although it is preferable to store both time and date of last use. The ordering of the history list produced from the history table **210** depends on how the system designer prefers to display the history list for the company field **194**. For example, the choice of "First National Bank" may be listed after listing the choice for "SAM Systems" even though it was later in time because the frequency of use of "SAM Systems" is substantially greater than the frequency of use of the "First National Bank." In either case, the first choice in the historical list for this example is likely to be the choice of "Apple Computer" because it is both the most recently and most frequently used item in the history table **210**.

In general, the order determining for the history lists discussed above with reference to FIGS. **6A** and **6B** use a most recently used (MRU) approach so that the items within the list are the most probable choices that the user will desire. MRU approaches are well known to computer programming professionals. Preferably, the MRU approach utilized for order determining uses a combination of time of last use and frequency of use.

FIG. **7** is a flow chart illustrating history list processing **218** associated with a detailed embodiment of the invention. The history list processing **218** is preferably implemented by a programmed computer system. Preferably, the computer system is the pen-based computer system shown in FIGS. **1–3**.

The history list processing **218** displays **220** a form having fields on a display screen of the computer system. Preferably, the display screen is the LCD screen **60** shown in FIG. **2** and the form is displayed using the graphical techniques discussed above with reference to FIG. **3**. A decision **222** then determines whether the form has been dismissed. A form can be dismissed for numerous masons, including closing the application producing the form or completing the process associated with the form. If the decision **222** determines that the form has been dismissed, then the appropriate history tables are updated **224**. The updating **224** of the history tables is described in detail below with respect to FIGS. **10–12**.

On the other hand, when the decision **222** determines that the form has not been dismissed, then the history list processing **218** performs decision **226** based on whether or not user input has been received. As long as user input has not yet been received, the history list processing **218** awaits the user input. Once user input is received, a decision **228** determines whether the user has selected a history list indicator (e.g., history list indicator **186** or **187**). For example, in a pen-based implementation, the selection can be made by tapping the field label or the history list indicator associated therewith. If the user has not selected a history list indicator, then the user has input some kind of request other than for history list processing; therefore, the list processing **218** processes **230** the other user input using conventional approaches and then returns to decision block **222** to repeat the processing for the next user action. Since these other processes **230** are conventional, they are not further discussed.

Alternatively, when the user has selected a history list indicator (e.g., by tapping on the associated field label or history list indicator), a decision **232** is then made based on whether there is a history list available for the field. If there is no history list available for the field, the list processing **218** returns to decision block **222** to repeat the previously

5,666,502

13

described processing because the user's request for a history list is unavailable for this field. On the other hand, if there is a history list available for the field, then the history list is offered 234 to the user as input choices. The history list processing 218 then awaits the user's input at decision 236. When the decision 236 determines that the user has input some sort of data, a decision 238 is made based on whether the user has selected an item from the history list. If the user has not selected an item from the history list, then a decision 240 is made based on whether the user has dismissed the history list. The user dismisses the history list when the user inputs data other than by selecting an item from the history list. If the user has not dismissed the history list, then the history list processing 218 returns to decision block 236 to await additional data input by the user (and may prior thereto perform other conventional processing associated with the data input). If the decision 240 determines that the user has dismissed the history list, then the history list processing 218 returns to decision block 222.

On the other hand, when the decision block 238 determines that the user has selected an item from the history list, then a data value for the field is set 242 to the data value in the history list corresponding thereto. The setting 242 of the data value for the field is explained in greater detail below with respect to FIG. 9. Additionally, additional data values may also be set for other fields within the form that have data values indirectly indicated by the history list. Thereafter, the history list processing 218 returns to decision block 222 to repeat the processing.

FIG. 8 is a flow chart illustrating history list generation processing 244. This history list generation processing 244 is associated with the processing carded out by block 234 of FIG. 7.

The history list generation processing 244 retrieves 246 choices from the history table associated with the field. In the example shown in FIG. 6A, the choices (names) are obtained from the history table 202 associated with the name field. Additionally, the history list generation processing 244 can reorder the names for the history list using a weighted average of the time of last use and frequency of use information retained in the history table 202. This order determining for the history list was described above with respect to FIGS. 6A and 6B.

Next, a loop 248 is invoked to step through each of the choices within the history table. For each choice (item) within the history list, a decision 250 is first made based on whether the choice is a string. Preferably, the choice is one of a string or a data record pointer. As shown in FIGS. 6A and 6B, the regions 204, 212 contain either the data string itself or a data record pointer to the data string. The data record pointer points to a data record (i.e., location) within the computer system where information (including the needed data string) is kept. In any case, if the decision 250 determines that the choice is a string, then no additional processing is needed and processing returns to the beginning of the loop 248 to process the next item in the history table. On the other hand, if the decision block 250 determines that the choice is not a string, then a string is extracted from the appropriate data record for the choice and then substituted 252 therefor. In this case, the choice is a data record pointer to a data record and the history list generation processing 244 replaces the pointer with the data extracted from the data record pointed to by the data record pointer. For the example shown in FIG. 6A, the extracted data from the data record would be the name. Thereafter, the loop 248 again repeats for the next item within the history table. Once all the items have been considered, the history list is displayed 254 to the

14

user. Again, the ordering of the items in the history list largely depends on implementation, though the most recently and/or most frequently use item would preferably by provided first in the history list. Also, the maximum number of elements within the history list is also preferably limited to only those choices having a reasonably good probability of being reused.

FIG. 9 is a flow chart of data retrieval processing 256. The data retrieval processing 256 is the processing performed by block 242 in FIG. 7.

The data retrieval processing 256 begins with a decision block 258 which determines whether the selected item is a string. If the selected item is a string, then the data value for the field is set 260 to the value of the selected item. Following block 260, the data retrieval processing 256 is complete and returns because, in this case, the item selected was a string.

On the other hand, when the decision block 258 determines that the selected item is not a string, then a loop 262 is invoked. The loop 262 scans through each field of the form and determines whether the data record can be used to extract the information needed by the field of the form. Specifically, a decision 264 is made based on whether the field of the form is within the data record. If the field is not within the data record, then the data retrieval processing 256 returns to the beginning of the loop 262 to process the next field in the form. On the other hand, if the field is within the data record, then the data value for the field is set 266 to the pertinent data value extracted from the data record. Following block 266, the data retrieval processing 256 returns to the beginning of the loop 262 to process the remaining fields in the form. Once all of the fields within the form have been considered by the loop 262, the loop 262 is complete and the data retrieval processing 256 returns.

FIG. 10 is a flow chart of history table management processing 268. The history table management processing 268 is the processing performed by block 224 in FIG. 7.

The history table management processing 268 begins with a loop 270. The loop 270 scans through each of the fields in the form. The loop 270 begins with a decision 272 based on whether the field has a history table associated therewith. If the field does not have a history table associated with it, then the history table management processing 268 returns to the beginning of the loop 270 to process the next field within the form. In this case, there is no associated history table to update. On the other hand, if the decision 272 determines that the field does have a history table associated with it, then additional processing is carded out. Namely, a decision 274 determines whether the form contains data in the field currently being evaluated. If the form does not contain data in the field, then there is no updating to be performed so the history table management processing 268 returns to the beginning of the loop 270 to consider the next field within the form.

On the other hand, if the form does contain data in the field, then a decision 276 is made based on whether the data in the field is from a data record. If the data in the field is from a data record, then a data record pointer to the data record is included 278 within the history table. On the other hand, when the data in the field is not from a data record but from a string, the string is included 280 within the history table. Following either of blocks 278 or 280, the history table management processing 268 is complete for the particular field of the form being considered and processing returns to the beginning the loop 270 for consideration of the next field in the form. Once all of the fields within the form

5,666,502

15

have been considered, the loop 270 ends and the history table management processing 268 is complete and returns.

FIG. 11 is a flow chart of processing 282 associated with including or adding a string to the history table. This processing 282 is associated with block 280 in FIG. 10.

The processing 282 begins with a loop 284. The loop 284 processes each item within the history table. First, the least-recently-used (LRU) item within the history table is determined 286. The determination 286 of the LRU item is done using conventional techniques known to computer programming professionals. The techniques are also known in the computer memory arena in relation to cache memory. Also, as discussed above, the LRU determination could utilize a combination of not only least recently used but also frequency of use.

Next, a decision 288 is made based on whether the item within the history table being considered is a string. If the item is not a string, then the item is no longer processed because it is processed by block 278 of FIG. 10. On the other hand, if the item is a string, then decision 290 determines whether the item is equal to the string which is sought to be added to the history table. If the string is not equal to the item, then no further action is taken and the processing returns to block 284 to consider the next item in the history table. On the other hand, if the item is equal to the string to be added to the history table, then the last used time within the history table is set 292 to the current time and the number of uses within the history table for the item is incremented 294. Following block 294, the processing 282 is complete and returns because the history table has been updated in blocks 292 and 294.

However, in a case in which none of the items within the history table match the string to be added to the history table, the loop 284 will complete and following its completion, a decision 296 determines whether the history list is already at its maximum size. If the history list is already at its maximum size, then the LRU item is removed 298 from the history list. Following block 298 or following decision block 296 when the history list is not yet at its maximum size, the string is added 300 to the history list as a new item. Thereafter, blocks 292 and 294 are performed to set 292 the last used time and to increment 294 the number of uses. Here, the updating preferably sets the last used time to the current time and sets the number of uses to one. Again, following block 294, the processing 282 is complete and returns.

FIG. 12 is a flow chart of processing 296 associated with adding a data record pointer to the history table. The processing 296 is associated with block 278 in FIG. 10.

The processing 296 begins with a loop 300 which scans through each item within the history table to determine whether the item within the table is the same as the item sought to be added to the history table. The loop 300 begins by determining 302 the LRU item within the history table. As discussed above, LRU determinations are well-known to those skilled in the art. A decision 304 is then made based on whether the item is a data record pointer. If the item is not a data record pointer, then the processing 296 returns to the beginning of the loop 300 to process the next item in the history table because it is processed by block 280 in FIG. 10. On the other hand, if the item is a data record pointer, then a decision 306 determines whether the item is equal to the data record pointer sought to be added to the history table. If the item does not match the data record pointer to be added to the history table, then the processing 296 returns to the beginning of the loop 300 to consider the

16

next item in the history table. On the other hand, if the item is equal to the data record pointer to be added to the history table, then the item does not need to be physically added to the history table, but the item is itself updated to indicate the current history of its usage. Namely, the last used time is set 308 to the current time, and the number of uses is incremented 310. Following block 310, the processing 296 is complete and returns.

If the loop 300 has proceeded through each of the items in the history table and not found an item which is a data record that matches the data record to be added to the history table, then a decision 312 is performed based on whether the history list is at its maximum size. If the history list is at its maximum size, then the LRU item is removed 314 from the list. Following block 314 or following decision block 312 when the history list is not yet at its maximum size, the data record pointer is added 316 to the history list as a new item. Following block 316, the last used time is set 308 and the number of uses is incremented 310. Here, the updating preferably sets the last used time to the current time and sets the number of uses to one. Again, following block 310, the processing 296 is complete and returns.

FIGS. 13A and 13B are illustrations illustrating usage of the invention across different programming applications. FIG. 13A illustrates a phone messaging program and FIG. 13B illustrates a fax program. The phone messaging program displays a form 312 to the user requiring the user to enter information concerning the caller, the caller's phone number, and the message. In this case, the caller information is entered in a caller field 314. The caller field 314 is associated with a name class for which a history table is maintained. With the fax program, a form 316 is displayed to the user requiring the user to input information concerning to whom a fax is to be sent, from whom the fax is being sent, and any notes for the cover sheet thereof. Here, the destination for the fax is also entered in a destination field 318. The destination field 3 18 is associated with the name class. Hence, even though the phone messaging program and the fax program are different programs, the same history table is used for fields within forms associated with these programs. Thus, the history developed for a particular computer, program or user is available not only for later use by the same application, but also for later use different applications. This is beneficial because the user does not have to build a history for each particular application. Instead, the history is shared across applications so that the ease of use is improved. The history that is developed is also more reliable when shared across applications because the sample size is greater.

FIGS. 14A, 14B and 14C are illustrations of another example of the usage of the invention across different applications. In particular, FIGS. 14A and 14B are associated with an accounting software package which produces a sales invoice form 320 and a reminder bill form 324. In both forms 320 and 324, company information is needed to complete the form. In the sales invoice form 320, it is the buyer field 322 which requests the company information, and in the reminder bill form 324, it is "to" field 326 which requests the company information. Hence, within the different modules of the accounting software package, a history table developed for company names (i.e., field class= "company") can be shared amongst the different modules within the accounting software package. Also, as shown in FIG. 14C, a greeting program which sends greetings such as birthday or get well greetings to persons electronically requires input from the user to a "to" field 322 and a company field 330. Here, the company field 330 is associ-

5,666,502

17

ated with the filed class of "company," and therefore, shares the same history table as was used for the company information required in FIGS. 14A and 14B. The name field 332 is associated with the field class "name" which makes use of a different history table that maintains the history of usage of names such as was used with forms 312, 316 illustrated in FIGS. 13A and 13B.

While this invention has been described in terms of several preferred embodiments, there are alterations, permutations, and equivalents which fall within the scope of this invention. It should also be noted that there are may alternative ways of implementing the processes of the present invention. It is therefore intended that the following appended claims be interpreted as including all such alterations, permutations, and equivalents as fall within the true spirit and scope of the present invention.

What is claimed is:

1. A pen-based computer system, comprising:
   an I/O display system including at least an input tablet and a display screen;
   a memory system for storing program code and data;
   a CPU for processing the program code in accordance with the data; and
   a plurality of history tables maintained within said memory system, each of said history tables corresponding to a different field class,
   wherein when inputting data via the input tablet into a field of a form being displayed on said display screen, a list of choices is produced from said history table for the field class corresponding to the field and displayed on said display screen.

2. A pen-based computer system as recited in claim 1, wherein each of said history tables stores historical information concerning usage of data values with respect a different one of the field classes.

3. A pen-based computer system as recited in claim 2, wherein the list of choices produced from said history table is a menu list of most recently and frequently used data values for the field class.

4. A pen-based computer system as recited in claim 2, wherein when a user selects one of the choices from the list of choices, the selected choice is input into said computer system and displayed in said display screen in the field of the form.

5. A pen-based computer system as recited in claim 2, wherein said history table for the field class corresponding to the field is updated in accordance with a selected item.

6. A pen-based computer system as recited in claim 5, wherein said history tables comprise a plurality of entries, each entry including at least a data value, a time of last use, and a frequency of use.

7. A pen-based computer system as recited in claim 5, wherein the updating of said history tables causes at least one of (i) a data value to be placed in said history table and (ii) causes the time of last use and the frequency of use of one of the data values associated with the selected item to be updated.

8. A graphical user interface, comprising:
   a history list for each of a plurality of field classes;
   a form having at least one field requiring data input, the field being associated with one of the field classes; and
   a history list selector for selecting the history list for the field based on the field class associated with the field.

9. A graphical user interface as recited in claim 8, wherein said history list for each of the field classes is a menu list of most recently and frequently used data values for the field classes.

18

10. A graphical user interface as recited in claim 9, wherein said graphical user interface is for a pen-based computer system, and
   wherein said history list produced for each of the field classes stores historical information concerning usage of data values with respect the associated field class.

11. A method for inputting data into a computer system having a display screen associated therewith, said method comprising:
   (a) displaying a form on the display screen of the computer system, the form having at least one field associated with a field class and requiring data entry by a user;
   (b) displaying a history list associated with the field class on the display screen on the computer system;
   (c) determining whether the user has selected an item from the displayed history list;
   (d) assigning a data value for the field to that of a data value associated with the selected item when said determining (c) determines that the user has selected an item; and
   (e) updating the history list in accordance with the selected item when said determining (c) determines that the user has selected an item.

12. A method as recited in claim 11, wherein the computer system is a pointer-based computer system.

13. A method as recited in claim 11, wherein the computer system is a pen-based computer system.

14. A method as recited in claim 11, wherein the history list is a list of most recently used data values for the field class.

15. A method as recited in claim 11,
   wherein said method further comprises (f) inputting the data by some other means when said determining (c) determines that the user has not selected an item, and
   wherein said updating (e) comprises:
   (e1) determining whether the data value already exists in the history list; and
   (e2) adding the data value to the history list if the data value is determined not to exist in the history list.

16. A method for inputting data into a computer system having a display screen associated therewith, said method comprising:
   (a) providing a history table for each of a plurality of field classes;
   (b) displaying a form on the display screen of the computer system, the form having at least one field requiring data entry by a user;
   (c) producing a history list for the field on the display screen of the computer system based on the history table for the field class associated with the field;
   (d) displaying the history list produced on the display screen of the computer system;
   (e) determining whether the user has selected an item from the displayed history list;
   (f) assigning a data value for the field to that of a data value associated with the selected item from the displayed history list when said determining (e) determines that the user has selected an item from the displayed history list; and
   (g) updating the history table in accordance with the selected item when said determining (e) determines that the user has selected an item from the displayed history list.

5,666,502

19

**17.** A method as recited in claim **16,** wherein the history table corresponding to each of the field classes includes a plurality of entries, each entry comprises a data value and usage information, and

wherein said producing (c) comprises:
   (c1) identifying the history table for the field class associated with the field; and
   (c2) generating the items of the history list from the data values in the history table identified.

**18.** A method as recited in claim **17,** wherein said generating (c2) generates the items for the history list from the data values in the history table identified, and thereafter orders the items based on the usage information associated with the data values.

**19.** A method as recited in claim **18,** wherein the usage information comprises a time of last use and a frequency of use for each data value in the history table.

**20.** A method as recited in claim **17,** wherein the data values within the history table correspond directly or indirectly to input values for the field.

**21.** A method as recited in claim **17,** wherein the data values comprise one of a data string and a data pointer, and wherein the data pointer points a data record containing pertinent information.

**22.** A method as recited in claim **16,** wherein the history table contains the most recently used data values for the field class.

**23.** A method as recited in claim **16,**

wherein said method further comprises (h) inputting the data value by some other means when said determining (c) determines that the user has not selected an item, and

wherein said updating (g) comprises:
   (g1) determining whether the data value already exists in the history list; and
   (g2) adding the data value to the history table if the data value is determined not to exist in the history list.

20

**24.** A method as recited in claim **23,** wherein said updating (g) further comprises:
   (g3) updating the usage information corresponding to the data value to reflect its recent usage.

**25.** A method as recited in claim **24,** wherein the usage information comprises a time of last use and a frequency of use for each data value in the history table, and

wherein said updating (g3) updates the time of last use and the frequency of use corresponding to the data value.

**26.** A computer readable medium containing program instructions for inputting data into a computer system having a display screen associated therewith, said computer readable medium comprising:

computer readable code devices for displaying a form on the display screen of the computer system, the form having at least one field associated with a field class and requiring data entry by a user;

computer readable code devices for displaying a history list associated with the field class on the display screen on the computer system;

computer readable code devices for determining whether the user has selected an item from the displayed history list;

computer readable code devices for assigning a data value for the field to that of a data value associated with the selected item when said determining determines that the user has selected an item; and

computer readable code devices for updating the history list in accordance with the selected item when said determining determines that the user has selected an item.

*     *     *     *     *

# EXHIBIT 14

1           UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               SAN JOSE DIVISION

4

5

6   APPLE INC., A CALIFORNIA        )  C-12-00630 LHK
    CORPORATION,                    )
                                    )  SAN JOSE, CALIFORNIA
7               PLAINTIFF,          )
                                    )  FEBRUARY 14, 2013
8           VS.                     )
                                    )  PAGES 1-168
9   SAMSUNG ELECTRONICS CO., LTD.,  )
    A KOREAN BUSINESS ENTITY;       )
10  SAMSUNG ELECTRONICS AMERICA,    )
    INC., A NEW YORK CORPORATION;   )
11  SAMSUNG TELECOMMUNICATIONS      )
    AMERICA, LLC, A DELAWARE        )
12  LIMITED LIABILITY COMPANY,      )
                                    )
13              DEFENDANTS.         )
    _____ )
14                                  )
                                    )
15

16          TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE LUCY H. KOH
17          UNITED STATES DISTRICT JUDGE

18

19

20          APPEARANCES ON NEXT PAGE

21

22

23  OFFICIAL COURT REPORTER:     LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
24

25      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
            TRANSCRIPT PRODUCED WITH COMPUTER

```
 1      A P P E A R A N C E S:

 2      FOR APPLE:              GIBSON, DUNN & CRUTCHER
                                BY:  JOSH A. KREVITT
 3                              200 PARK AVENUE
                                NEW YORK, NEW YORK  10166
 4
                                BY:  H. MARK LYON
 5                              1881 PAGE MILL ROAD
                                PALO ALTO, CALIFORNIA  94304
 6
                                BY:  MARK REITER
 7                              2100 MCKINNEY AVENUE
                                DALLAS, TEXAS  75201
 8
                                WILMER, CUTLER, PICKERING, HALE & DORR
 9                              BY:  WILLIAM F. LEE
                                60 STATE STREET
10                              BOSTON, MASSACHUSETTS  02109

11                              BY:  MARK D. SELWYN
                                950 PAGE MILL ROAD
12                              PALO ALTO, CALIFORNIA  94304

13                              BY:  CALVIN S. WALDEN
                                7 WORLD TRADE CENTER
14                              250 GREENWICH STREET
                                NEW YORK, NEW YORK  10007
15

16      FOR SAMSUNG:           QUINN, EMANUEL, URQUHART,
                                OLIVER & HEDGES
17                              BY:  WILLIAM C. PRICE
                                865 SOUTH FIGUEROA STREET
18                              10TH FLOOR
                                LOS ANGELES, CALIFORNIA  90017
19
                                BY:  KEVIN P.B. JOHNSON
20                                   VICTORIA F. MAROULIS
                                555 TWIN DOLPHIN DRIVE, 5TH FLOOR
21                              REDWOOD SHORES, CALIFORNIA  94065

22                              BY:  SEAN SANG-CHUL PAK
                                50 CALIFORNIA STREET, 22ND FLOOR
23                              SAN FRANCISCO, CALIFORNIA  94111

24

25
```

```
 1      SAN JOSE, CALIFORNIA                    FEBRUARY 14, 2013

 2                    P R O C E E D I N G S

 3          (COURT CONVENED AND THE FOLLOWING PROCEEDINGS WERE HELD:)

 4          THE CLERK:  CALLING CASE NUMBER C-12-00630 LHK, APPLE

 5   INCORPORATED VERSUS SAMSUNG ELECTRONICS COMPANY, LIMITED, ET

 6   AL.

 7          COUNSEL, STATE YOUR APPEARANCES, PLEASE.

 8          MR. KREVITT:  GOOD AFTERNOON, YOUR HONOR.

 9   JOSH KREVITT FROM GIBSON, DUNN.  GOOD TO SEE YOU.

10          WITH ME TODAY ARE MY COLLEAGUES, MARK LYONS AND

11   MARK REITER, WHO WILL BE PRESENTING THE TUTORIAL TODAY, YOUR

12   HONOR.

13          AND MR. LEE IS HERE ALSO AND WILL BE PRESENTING.

14          MR. LEE:  GOOD MORNING, YOUR HONOR.  BILL LEE FROM

15   WILMER, HALE.  MARK SELWYN, CALVIN WALDEN, MY PARTNERS ARE

16   HERE, AND WE'LL BE PRESENTING PORTIONS OF THE TUTORIAL.

17          THE COURT:  OKAY.

18          MR. PRICE:  GOOD AFTERNOON, YOUR HONOR.  I'M

19   BILL PRICE OF QUINN, EMANUEL FOR SAMSUNG.  AND WITH ME ARE MY

20   COLLEAGUES, KEVIN JOHNSON, SEAN PAK, AND VICTORIA MAROULIS.

21          MR. JOHNSON:  GOOD MORNING.

22          THE COURT:  OKAY.  GOOD AFTERNOON TO EVERYONE.

23      OKAY.  LET ME FIRST ASK, WITH REGARD TO THE OTHER CASE,

24   WHAT IS THE -- WHAT IS ALREADY ON APPEAL?

25          MS. MAROULIS:  YOUR HONOR, THERE ARE TWO APPEALS.
```

1        USED, IS A SUITABLE TERM FOR US.

2                THE COURT:  OKAY.  SO YOUR ALTERNATIVE CONSTRUCTION

3        IS "SOFTWARE CODE THAT IDENTIFIES A CATEGORY OF INFORMATION"?

4        IS THAT YOUR PROPOSAL?

5                MR. PAK:  YES.  I THINK -- LET ME MAKE SURE I HAVE

6        THE EXACT LANGUAGE.

7            (PAUSE IN PROCEEDINGS.)

8                MR. PAK:  YES.  SO IF WE USE "CODE" TO BE "TYPE OF

9        INFORMATION," "CODE INDICATING THE CATEGORY OF INFORMATION,"

10       "SOFTWARE CODE INDICATING THE TYPE OF INFORMATION INFERRED INTO

11       THE FIELD," I THINK THAT WOULD BE ACCEPTABLE TO US.

12               THE COURT:  WAIT.  "SOFTWARE CODE" -- REPEAT THAT,

13       PLEASE.

14               MR. PAK:  YES.  "SOFTWARE CODE INDICATING," AND IT'S

15       ACTUALLY USED CATEGORIES BECAUSE THAT'S SOMETHING THAT WE PUT

16       IN, "THE CATEGORY OF INFORMATION ENTERED INTO THE FIELD."

17               THE COURT:  "SOFTWARE CODE INDICATING THE CATEGORY OF

18       INFORMATION" --

19               MR. PAK:  -- "ENTERED INTO THE FIELD."

20               THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

21           I'M GOING TO GIVE MR. LYON ONE MINUTE BECAUSE WE'VE GOT TO

22       MOVE ON.

23               MR. PAK:  SURE.

24               THE COURT:  WE'VE GOT SIX MORE PATENTS.

25           WHAT'S YOUR VIEW ON THAT ALTERNATIVE?

```
 1            MR. LYON:  YOUR HONOR, I THINK -- SO FUNDAMENTALLY,

 2    NUMBER ONE, I DON'T THINK APPLE BELIEVES THAT WE NEED TO

 3    INTERPRET THIS BECAUSE, AS YOU KNOW, THE CLAIM LANGUAGE ITSELF

 4    TALKS ABOUT IT BEING A PROGRAM.  I DON'T THINK THERE'S ANY REAL

 5    DISPUTE.  THE JURY IS NOT GOING TO LOOK AT THIS AND SAY THIS IS

 6    SOME KIND OF ABSTRACT IDEAL.  THEY UNDERSTAND IT'S PART OF THE

 7    PROGRAM.

 8        THE ISSUE IS, WHAT DOES "CODE" MEAN?  DOES THIS MEAN WE

 9    HAVE TO HAVE A LENGTHY METHOD AND STRUCTURE OR SOMETHING LIKE

10    THAT?  OR IS IT SOMETHING SIMPLER?

11        AND THERE'S NOTHING IN THE CLAIMS THAT TALK ABOUT THAT.

12    ALL IT REALLY IS IS IT'S A WAY OF CATEGORIZING INFORMATION SO

13    YOU KNOW WHAT HISTORY LIST TO TIE IT TO.  AND IT CAN BE A CODE,

14    IT CAN BE A VARIABLE, IT CAN BE ALL KINDS OF DIFFERENT THINGS.

15        I DON'T THINK THERE'S ANYTHING -- AND THIS ISN'T A

16    MEANS-PLUS-FUNCTION CLAIM.

17            THE COURT:  OKAY.  LET ME JUST GIVE YOU ANOTHER

18    MINUTE ON THE TURBO C++.  I'M GOING TO GIVE YOU A MINUTE TO

19    RESPOND TO MR. PAK'S ARGUMENT.

20            MR. LYON:  SO IN THAT PARTICULAR INSTANCE THE

21    EXAMINER WAS TALKING ABOUT THAT IT WAS OBVIOUSLY ENTERING

22    INFORMATION INTO THE FIELD.

23        BUT THERE'S NO EVIDENCE AND THERE'S NO INDICATION THAT

24    TURBO C++ WAS USING FIELD CLASSES, IN OTHER WORDS, TYING VERY

25    SPECIFIC TYPES OF CATEGORIES OF INFORMATION TO FIELDS WITHIN
```

# EXHIBIT 15

US006847959B1

(12) **United States Patent** (10) Patent No.: **US 6,847,959 B1**
Arrouye et al. (45) Date of Patent: **Jan. 25, 2005**

(54) **UNIVERSAL INTERFACE FOR RETRIEVAL OF INFORMATION IN A COMPUTER SYSTEM**

(75) Inventors: **Yan Arrouye**, Cupertino, CA (US);
**Keith Mortensen**, Sunnyvale, CA (US)

(73) Assignee: **Apple Computer, Inc.**, Cupertino, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/478,009**

(22) Filed: **Jan. 5, 2000**

(51) Int. Cl.$^7$ ......................... **G06F 17/30**; G06F 17/00
(52) U.S. Cl. ........................................... **707/2**; 3/104.1
(58) Field of Search ........................ 707/4, 3, 10, 104.1, 707/1–5; 709/201, 217; 712/215, 22, 24; 706/10–15, 46, 45; 719/316

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,404,295 | A | * 4/1995 | Katz et al. | ..................... 707/2 |
| 5,727,129 | A | 3/1998 | Barrett et al. | |
| 5,729,741 | A | * 3/1998 | Liaguno et al. | ............. 707/104 |
| 5,764,906 | A | 6/1998 | Edelstein et al. | |
| 5,870,755 | A | * 2/1999 | Stevens et al. | ............. 707/104 |
| 5,893,107 | A | 4/1999 | Chan et al. | |
| 5,913,205 | A | * 6/1999 | Jain et al. | ..................... 707/2 |
| 5,987,446 | A | * 11/1999 | Corey et al. | ............. 707/3 |
| 6,009,422 | A | * 12/1999 | Ciccarelli | ..................... 707/4 |
| 6,285,785 | B1 | * 9/2001 | Bellegarda et al. | ......... 382/187 |
| 6,311,178 | B1 | * 10/2001 | Bi et al. | ..................... 707/3 |
| 6,628,305 | B1 | * 9/2003 | Hong et al. | ............. 345/734 |
| 6,732,088 | B1 | * 5/2004 | Glance | ......................... 707/3 |
| 2002/0107872 | A1 | * 8/2002 | Hudis et al. | ............. 707/104.1 |

OTHER PUBLICATIONS

Chaudhuri et al "Optimizing queries over multimedia repositories", ACM 1996 pp. 91–102.*
Katayama et al "A universal query interface for heterogeneous distributed digital libraries", IEEE 1996, pp. 332–339.*

Menczer et al, "Adaptive information agents in distributed textual environments" Autonomous Agents 1998, Minneapolis MN, USA, pp. 157–164.*
Das et al, "Experiments in using agent–based retrieval from distributed and heterogeneous databases", IEEE 1997, pp. 27–35.*
Domenig et al, "An overview and classification of mediated query systems", ACM SIGMOD Record, vol. 28, No. 3, Sep. 1999, pp. 63–72.*
Pastor et al, "An architecture for intelligent resource agents", IEEE 1997, pp. 151–159.*
Jim Gray "Parallel database systems 101", ACM 1995, p. 436.*
Gary Perlman, "The FirstSearch user interface architecture: universal access for any user, in many languages, on any platform", ACM 2000, pp. 1–8.*
Dadoun et al, "Parallel processing for efficient subdivision search", ACM 1987, pp. 205–254.*
Wei Hong, "Exploiting inter–operation parallelism in XPRS", ACM 1992, pp. 19–28.*
Ganguly et al, "Efficient and accurate cost models for parallel query optimization", ACM 1996, pp. 172–181.*
Blumenfeld et al, "A uniform interface to networked library services", ACM 1992, pp. 608–613.*
Agosti et al, "Desing of OPAC database to permit different subject searching accesses in a multi–disciplines universities library catalogue database", ACM 1992, pp. 245–255.*

* cited by examiner

Primary Examiner—Uyen Le
(74) Attorney, Agent, or Firm—Burns, Doane, Swecker & Mathis, L.L.P.

(57) **ABSTRACT**

The present invention provides convenient access to items of information that are related to various descriptors input by a user, by means of a unitary interface which is capable of accessing information in a variety of locations, through a number of different techniques. Using a plurality of heuristic algorithms to operate upon information descriptors input by the user, the present invention locates and displays candidate items of information for selection and/or retrieval. Thus, the advantages of a search engine can be exploited, while listing only relevant object candidate items of information.

**49 Claims, 3 Drawing Sheets**





FIG. 1

FIG. 2



*FIG. 3A*



*FIG. 3B*



*FIG. 4*



FIG. 5

US 6,847,959 B1

1

## UNIVERSAL INTERFACE FOR RETRIEVAL OF INFORMATION IN A COMPUTER SYSTEM

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention is directed to a computer-human interface for quickly and easily retrieving desired information in a computer system. More specifically, the present invention is directed to a universal interface which uses a plurality of heuristic algorithms to identify an item of information (e.g., document, application or Internet web page) in response to at least one information descriptor.

2. Description of the Related Art

One of the basic needs of a computer user, especially with the recent growth in the amount of data and information available via networks and the Internet, is to be able to quickly search through the available information to identify useful items, and to thereafter easily locate those items. To satisfy this need, many computer operating systems contain routines that provide a simple way to locate objects. For example, the Finder of the Macintosh® Operating System implemented by Apple Computer, Inc. includes a Find File utility which permits a user to locate various files located in the system directories (e.g., folders) using keywords that occur in the desired file's name. The Find File utility includes the ability to search on local disks and mounted servers. The Windows® operating system, implemented by Microsoft Corporation, also employs a Find mechanism that allows a user to locate files stored in the computer system. The application uses inputted search criteria to generate and display a list of possible files that satisfy the search criteria. At times however, the list can become long and cumbersome, thereby requiring the user to sift through the list and identify useful information. Accordingly, this technique may fail to significantly reduce the time and effort a user expends to identify and retrieve useful information.

As another feature for quickly retrieving items of interest, some computer systems store a list of previously used documents or applications from which they can be easily invoked. However, this feature requires the user to access a different interface element to retrieve the item, and does not provide for the use of keywords to identify the specific document or program that the user desires.

Also, with the advent of the Internet, various specialized find routines have been developed that can be loaded into a computer's memory and launched in order to facilitate user requests for particular information on servers located throughout the world. Additionally, web browser applications enable a user to access worldwide websites and interact with search engines provided by the website.

Like the Find File utility discussed above, finding information on the Internet can prove frustrating because search criteria are often too broad. For example, when a keyword is entered, thousands of different web pages containing these keywords can be displayed in a list for a user to choose from. Accordingly, additional search criteria are needed to more effectively filter information available, for example, on the world wide web. However, there is little technology currently available which allows the computer to help the user determine such additional criteria or to automatically provide additional criteria, so that search results have a higher percentage of items that are of interest to the user.

Additionally, web-browser applications are not designed to search for non-web-based documents or applications

2

located on the computer or an associated computer network and, conversely, File Find-type utility programs are not capable of searching the Internet for web-based documents or applications. There has been no combination of desktop find routines that presents a single interface and Internet browsing routines to allow a computer user to find a needed or desired item of information from among all different types of information storage systems. Additionally, there is no program which is able to process the user's input and then determine, using many different factors, including use of the Internet, the intent of the user as to the file to be retreived. Accordingly, in order to present a more informative and personalized user interface, a unitary manner of finding a user's desired item of information is needed.

### SUMMARY OF THE INVENTION

The present invention provides convenient access to items of information that are related to various descriptors input by a user, by means of a unitary interface which is capable of accessing information in a variety of locations, through a number of different techniques. Using a plurality of heuristic algorithms to operate upon information descriptors input by the user, the present invention locates and displays candidate items of information for selection and/or retrieval. Thus, the advantages of a search engine can be exploited, while listing only relevant object candidate items of information.

In accordance with an exemplary embodiment of the present invention, methods and apparatuses for locating information in a computer system are described which receive an information identifier, locate at least one item of information based upon the information identifier by means of a plurality of heuristic algorithms each having a separate location scheme, provide at least one candidate information item, and display a representation of the information item.

In accordance with another exemplary embodiment of the present invention, methods and apparatuses for locating information in a computer system are described which input an information identifier, providing the information identifier to locate information in the plurality of locations which comprise the Internet and local storage media, wherein the information located matches the information identifier when applied to a plurality of heuristics, determining at least one candidate item of information based upon the plurality of heuristics, and displaying a representation of the candidate item of information.

In yet another exemplary embodiment of the present invention, methods and apparatuses for displaying information in a computer system is described which includes inputting an information identifier, providing the information identifier to a plurality of heuristics in accordance with a global heuristic, wherein each information identifier is matched to information based upon the plurality of heuristics, receiving at least one candidate item of information based upon the information provided to the heuristics in accordance with the global heuristic, and displaying a representation of the candidate items of information.

### BRIEF DESCRIPTION OF THE DRAWINGS

Other objects and advantages of the present invention will become more apparent from the following detailed description of the invention when read in conjunction with the accompanying drawings wherein like elements are designated by like numerals and wherein:

FIG. 1 illustrates the hardware components of a networked computer system of a type in which exemplary embodiments of the present invention can be implemented;

3

FIG. 2 illustrates the software architecture in accordance with exemplary embodiments of the present invention;

FIG. 3A illustrates a partial view of a desktop including a GO-TO menu option, in accordance with an exemplary embodiment of the present invention;

FIG. 3B illustrates a partial view of a desktop including a GO-TO menu option containing a text input window, in accordance with an exemplary embodiment of the present invention;

FIG. 4 illustrates an active window that is displayed when the GO-TO menu option described with respect to FIG. 3 is launched; and

FIG. 5 illustrates a flow diagram describing the GO-TO application in accordance with an exemplary embodiment of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention will now be described with reference to the accompanying drawings describing a universal interface in which user inputs are received and provided to a plurality of separate heuristic algorithms to locate at least one item of information. It will be appreciated that the invention is not limited to only the embodiments set forth within this disclosure. Rather, the particular heuristic algorithms described herein are meant to be exemplary of many different heuristics that can be employed, for the purpose of retrieving information through a simplified user interface.

Referring to FIG. 1, a general computer system 2, in which the present invention can be implemented, is illustrated. Computer system 2 comprises a display device 4 and various input devices such as a keyboard 5, microphone 7 and mouse 3 in operable connection with a memory 6, data processor 9 and local storage media 12 which can include one or more magnetic and/or optical disk drives, for example. Additionally, the computer system 2 can be connected via an Input/Output device 10 (e.g., a modem or cable connection) to a Local Area Network (LAN) server 14. The LAN server 14 can also be connected to a LAN storage volume 8 which stores files for use on the network served by the LAN. The LAN server 14 can also include a Wide Area Network (WAN) router 13 and an Internet router 11. The WAN router and the Internet router can be connected to other servers (not shown) which access additional storage media containing files, application programs, web pages, etc. While other elements and components are normally attached to the computer system 2, only these elements are shown so as not to obscure the invention.

In general, the present invention provides a universal interface that enables the user to readily retrieve an item of desired information located on any of the various storage media that are accessible to the user's computer system, with minimal effort. The desired information could be an application that is stored on the local storage media 12, a file stored on the LAN storage volume 8, or a web page available through the Internet router 11. Rather than require a separate search mechanism to locate each of these different types of information, the present invention facilitates the user's ability to easily retrieve the information by means of a single universal interface which is capable of accessing files on all of these various storage resources.

The components which provide this functionality are illustrated in the architectural block diagram of FIG. 2. In operation, the user provides input which describes the information in which the user is interested. This input could be text data that is entered in a dialog box 15 or spoken words

4

provided to a speech processing program 16. This input is received by an information retrieval manager 18. In the case of spoken words, the speech processing program 16 first converts the speech to text, which is then presented to the information retrieval manager 18.

In response, the information retrieval manager 18 dispatches the input to a plurality of plug-in modules $22_1$–$22_N$. Each plug-in module has an associated heuristic which it employs to locate information that corresponds to the user input. For instance, one module $22_1$ may search the names of files stored on the local storage media 12 and the LAN storage volumes 8, to find those which match the user input. A second module $22_2$ may index and search the contents of files on the local and/or network storage volumes. A third module 223 can maintain a list of the files, applications and web sites which were most recently accessed, and search this list for a match. Yet another module might employ a search engine to locate Internet web pages which match the user input.

Each plug-in module $22_1$–$22_N$ attempts to locate information in a relevant area of search, using its associated heuristic. The results obtained by the modules are sent back to the retrieval manager 18. The information retrieval manager may employ additional heuristics to determine which results are most relevant, and present one or more choices to the user on the display device 4.

In accordance with an embodiment of the present invention, the universal interface can be implemented so as to operate constantly and in tandem with the computer's operating system. The functionality of the information retrieval interface can be accessed in several different ways. FIG. 3A illustrates a desktop display 20 that includes a graphical representation of a button 19 (entitled "GO-TO") within a menu bar 17. Also, located within the menu bar 17 are various conventional menu items such as File, Edit, View, Label, and Special. When the button 19 located in the menu bar 17 is selected by the user, the information retrieval function of the present invention is accessed and the dialog box 15 is displayed. It should be noted that while the access to the information retrieval feature is depicted as being by way of a button located in the menu bar in FIG. 3, there are many other ways in which the interface can be accessed. For example, the interface could be represented by an icon graphically located in a desktop display, and be launched each time the user and clicks on the icon representation via the mouse 3.

In another alternative embodiment illustrated in FIG. 3B, the menu bar 17 might contain a text input window itself, and the information retrieval function is accessed when the user begins to type characters in this window. More generally, the information retrieval system can operate in conjunction with any type of interface via which a user might enter a request for an item of information, by monitoring dialog boxes and other such input mechanisms, including those in individual applications. For example, if a user enters text in a browser window, the information retrieval system can provide this text to the modules to locate relevant items of information.

When the GO-TO button 19 (illustrated in FIG. 3A) is selected by a user, the dialog box, represented by active window 25 illustrated in FIG. 4, is displayed on the desktop of display device 4. The active window 25 provides a text box 27 for the user to enter an information descriptor which comprises a letter, a series of letters, a word, a plurality of words, a phrase or sentences to be used by the retrieval manager 18, in locating information. FIG. 5 illustrates the

5

operations that are performed in response to the user input. In step **310**, the user inputs an information descriptor, either by voice input to the microphone **7** or by manual input to the keyboard **5**, which is displayed in the text box **27**. In step **320**, once the information descriptor is provided, the information retrieval manager **18** provides the information descriptor to one or more of the plug-in modules $22_1 \ldots 22_N$, in accordance with a global heuristic, described in detail below.

In step **330**, the selected plug-in modules $22_1 \ldots 22_N$ receive the information descriptor and determine whether any information matches the criteria of respective locator heuristics associated with the plug-in modules $22_1 \ldots 22_N$. The heuristic of each plug-in module is different. For example, as described previously, one heuristic can operate to match the user descriptor with the names of information located within various storage media in the computer, on servers and the Internet. Another heuristic can identify matches between the information descriptor and the content of files located on the computer, on servers and the Internet.

Additionally, heuristic algorithms can also be provided that store and review the history of information that has been recently accessed to determine which might match the descriptor. Other heuristics can employ a look-up-table to review mappings on a private network accessed either locally or remotely. Another heuristic module might review the favorite locations accessed by a browser application located on computer system **2**. The URLs stored by the browser application can be searched to determine if they match the input of the user. Each plug-in module $22_1 \ldots 22_N$ might identify one item of information, a plurality of possible items of information, or no information that matches the user input, according to the module's heuristic approach.

In step **340**, once a plug-in module $22_1 \ldots 22_N$ has determined that at least one item of information matches its heuristic, the information retrieval manager is notified and sent the information that matches the user input, according to that module's associated heuristic. In accordance with one embodiment of the invention, a "first to respond" approach can be employed to select an item of information to be displayed to the user. In this embodiment, the first plug-in module to notify the information retrieval manager **18** that matching information has been identified is chosen, and its matching information is displayed to the user or, if desired, automatically launched. Alternatively, the information retrieval manager **18** could rank the outputs from the plug-in modules $22_1 \ldots 22_N$ in the order their notifications are received. This would allow for more than one choice to be displayed for a user. Due to differences in communication speeds, this approach will tend to give greater priority to locally stored files than those which are located at more remote sites, such as those on an wide-area network or the Internet.

In other embodiments of the invention, different global heuristics can be employed by the information retrieval manager to determine the results that are to be provided to the user. These global heuristics can be classified into two general categories. In one category, the user input is selectively provided to the plug-in modules, and only the results from those modules are displayed to the user. For instance, all of the modules can be given a priority ranking. When user input is received, it is first provided to the module with the highest ranking. If that module responds within a certain period of time with one or more matches, those matches are

6

displayed. However, if the module responds that it cannot find a match, or does not respond within the allotted period of time, the user input is provided to the next-highest ranking module. The procedure continues in this manner, until a module presents a match, which is then displayed to the user. As an alternative to sequentially accessing individual modules, two or more modules can be grouped at a given priority level, and be accessed in parallel when their priority level is selected.

In a further enhancement of the prioritized approach, the priority ranking of the modules can be context sensitive. For instance, if the user accesses the information retrieval system through an icon on the desktop or a system menu bar, the plug-in modules which perform searches on local storage media can be given higher priority than those which search remote sites. However, if the user enters text via a window in a browser application, it is more likely that the user desires to view a web page, and therefore the plug-in modules whose heuristics are oriented towards Internet sites are given higher priority.

In the second general category of global heuristics, the user input can be provided to most or all of the plug-in modules in parallel, and the results that are returned from each one are then processed in accordance with a given heuristic. For example, as described previously, one heuristic might function to select the first result that is returned. In another heuristic, a frequency of occurrence approach can be employed, wherein an item of information which is identified by a plurality of modules is selected in favor of one which is identified by only one module. In yet another embodiment, the results from the various modules can be weighted in accordance with various criteria, such as their relationship to the context in which the user input was received.

The global heuristic which is employed by the information retrieval manager **18** might also determine the amount of information to be presented to the user. Ideally, the various plug-in modules, through the use of confidence factors calculated for each item of information, would identify a single item of information that best fits the user's input, and only that item is presented to the user. In this case, the item can be automatically opened or launched as well. Various characteristics can be utilized in determining the confidence factors. For example, if a user input multiple words as an information descriptor, and an exact match to the input was found by a plug-in module, the confidence level could be indicated as being 100 percent. On the other hand, if only half of the words were found in an item of information, the confidence level would be less, thereby indicating that this might not be the item of information sought.

In practice, however, it is not likely that only one candidate will provide a good match, particularly if the user inputs a broad term. Accordingly, the calculation of a confidence factor associated with each item of information allows the information retrieval manager to select a relatively limited number of choices to the user, e.g. the top five candidates according to a predetermined minimum confidence level. If these choices do not include the particular item of interest, the user can further refine the input information.

Further in this regard, the information retrieval system can obtain results and display them to the user in real time as the input is being entered. In this embodiment, each

**7**

keystroke or converted speech phoneme is provided to the appropriate plug-in modules as it is received by the manager **18**. For instance, if the user desires to look at prior tax return information, each of the letters "T", "A" and "X" are provided to the modules as they are typed. As soon as the letter "T" is entered, sets of matching items of information are returned by the modules, and the top five candidates are displayed. Entry of the letter "A" causes the list to be updated according to the candidates which match the sequence of letters "TA". After the letter "X" is typed, the displayed list might contain the five most recent tax returns that were filed by the user. If the desired return is not in the list, the user can continue by entering the year of the desired return, or other identifying information, until such time as the item of interest is displayed.

It will be appreciated that this embodiment, in which the displayed items are dynamically updated in real time, is best suited for the retrieval of locally stored information, where communication rates are relatively fast. For access to remotely stored information, it may be more appropriate to wait until the user presses a space key or an "Enter" key before supplying the input to the modules **22**, so that the retrieval is carried out on the basis of whole words or complete phrases.

Accordingly, the present invention provides swift access to information or a list of information that is related to various descriptors input by a user. Using the heuristic analysis combined with user input, the present invention is able to present to a user a manageable amount of information candidates for selection. Thus, the advantages of a search engine can be exploited, and information candidates can be retrieved in a reasonable amount of time.

A particular advantage to the use of plug-in modules to implement the various retrieval heuristics is the fact that it readily lends itself to expansion and adaptability to the user's environment. For instance, the computer's operating system may contain a few plug-in modules that operate according to the most popular heuristics. Other plug-in modules may be developed by various entities to operate according to types of information which they supply. Thus, if a search engine is designed for use on the Internet to locate particular types of web pages, a plug-in module can also be designed to access that search engine and return results to the information retrieval manager. As other techniques are developed for locating information, they can also be embodied in appropriate plug-in modules, to thereby enhance the user's ability to obtain relevant items of interest.

It will be appreciated by those of ordinary skill in the art that the present invention can be embodied in other specific forms without departing from the spirit or essential characteristics thereof. The presently disclosed embodiments are therefore considered in all respects to be illustrative and not restrictive. The scope of the invention is indicated by the appended claims rather than the foregoing description, and all changes that come within the meaning and range of equivalence thereof are intended to be embraced therein.

What is claimed is:

**1**. A method for locating information in a computer system, comprising the steps of:

    inputting an information identifier;

    providing said information identifier to a plurality of plug-in modules each using a different heuristic to locate information which matches said identifier;

**8**

    providing at least one candidate item of information from said modules; and

    displaying a representation of said candidate item of information.

**2**. The method of claim **1** wherein said information identifier is input via an application program having a text input window.

**3**. The method of claim **1** wherein said information identifier is input in by means of a dialog box displayed on a user interface.

**4**. The method of claim **1** wherein said information identifier is vocally entered by a user.

**5**. The method of claim **1** wherein said information identifier is one of a letter, a word, or a phrase.

**6**. The method of claim **1** wherein said information identifier is sequentially provided to said modules until one of said modules provides a candidate item of information.

**7**. The method of claim **6** wherein said modules are ranked in an order of priority, and said information identifier is sequentially provided to said modules in accordance with said ranking.

**8**. The method of claim **7** further including the steps of determining a context for the input of the information identifier, and varying said ranking in accordance with the determined context.

**9**. The method of claim **1** wherein one of said heuristics locates items of information on the basis of names of files.

**10**. The method of claim **9** wherein another of said heuristics locates items of information on the basis of contents of files.

**11**. The method of claim **9** wherein another of said heuristics locates items of information on the basis of most recently accessed items.

**12**. The method of claim **1** wherein one of said heuristics locates items of information that are stored locally on the computer system.

**13**. The method of claim **12** wherein said one heuristic also locates items of information that are stored on a local-area network to which the computer system is connected.

**14**. The method of claim **12** wherein another of said heuristics locates items of information that are stored on remote computer systems.

**15**. The method of claim **14** wherein said other heuristic locates Internet web pages.

**16**. The method of claim **14** wherein said other heuristic locates items of information that are stored on a wide-area network.

**17**. The method of claim **1** wherein said information identifier is provided in parallel to said modules, and further including the step of selecting candidate items of information provided by said modules for display in accordance with a global heuristic.

**18**. The method of claim **1** wherein each candidate item of information has an associated confidence level.

**19**. A method for locating information from a plurality of locations in a computer system, comprising the steps of:

    inputting an information identifier;

    providing said information identifier to a plurality of heuristics to locate information in a plurality of locations which include the Internet and local storage media;

    determining at least one candidate item of information based upon the plurality of heuristics; and

US 6,847,959 B1

9      10

displaying a representation of said candidate item of information.

**20**. The method of claim **19**, wherein the information identifier is applied separately to each heuristic.

**21**. The method of claim **19** wherein the plurality of heuristics are ranked in an order of priority and wherein the information identifier is sequentially provided in accordance with the ranking.

**22**. The method of claim **19** wherein one of the plurality of heuristics locates items of information on the basis of names of files.

**23**. The method of claim **22** wherein another of the heuristics locates items of information on the basis of contents of files.

**24**. A computer readable medium for locating information from a plurality of locations containing program instructions to:

receive an information identifier;

provide said information identifier to a plurality of heuristics to locate information in the plurality of locations which include the Internet and local storage media;

determine at least one candidate item of information based upon the plurality of heuristics; and

display a representation of said candidate item of information.

**25**. The computer readable medium of claim **24**, wherein the information identifier is applied separately to each heuristic.

**26**. The computer readable medium of claim **24** wherein the plurality of heuristics are ranked in an order of priority and wherein the information identifier is sequentially provided in accordance with the ranking.

**27**. The computer readable medium of claim **24** wherein one of the plurality of heuristics locates items of information on the basis of names of files.

**28**. The computer readable medium of claim **24** wherein another of the heuristics locates items of information on the basis of contents of files.

**29**. An apparatus that locates information from a plurality of locations within a computer system, comprising:

means for inputting an information identifier;

means for providing said information identifier to a plurality of heuristics to locate information in the plurality of locations which comprise the Internet and local storage media;

means for determining at least one candidate item of information based upon the plurality of heuristics; and

means for displaying a representation of said candidate item of information.

**30**. The apparatus of claim **29**, wherein the information identifier is applied separately to each heuristic.

**31**. The apparatus of claim **29** wherein the plurality of heuristics are ranked in an order of priority and wherein the information identifier is sequentially provided in accordance with the ranking.

**32**. The apparatus of claim **29** wherein one of the plurality of heuristics locates items of information on the basis of names of files.

**33**. The apparatus of claim **29** wherein another of the heuristics locates items of information on the basis of contents of files.

**34**. A method for displaying information in a computer system, comprising the steps of:

inputting an information identifier;

selectively providing the information identifier to a plurality of heuristics in accordance with a global heuristic, wherein the information identifier is matched to information based upon the plurality of heuristics;

receiving at least one candidate item of information based upon the information provided to the heuristics in accordance with the global heuristic; and

displaying a representation of the candidate items of information.

**35**. The method of claim **34** wherein the global heuristic determines an order in which the information identifier is provided to the heuristics.

**36**. The method of claim **35** wherein the order is a ranking of the plurality of heuristics according to a context in which the information was input.

**37**. The method of claim **34** wherein the information is located over a plurality of locations which comprise at least two of the following: local storage media, a LAN storage volume, a wide area network and an Internet network.

**38**. An apparatus for displaying information in a computer system, comprising:

means for inputting an information identifier;

means for selectively providing the information identifier to a plurality of heuristics in accordance with a global heuristic, wherein the information identifier is matched to information based upon the plurality of heuristics;

means for receiving at least one candidate item of information based upon the information provided to the heuristics in accordance with the global heuristic; and

means for displaying a representation of the candidate items of information.

**39**. The apparatus of claim **38** wherein the global heuristic determines an order in which the information identifier is provided to the heuristics.

**40**. The apparatus of claim **39** wherein the order is a ranking of the plurality of heuristics according to a context in which the information was input.

**41**. The apparatus of claim **38** wherein the information is located over a plurality of locations which comprise at least two of the following: local storage media, a LAN storage volume, a wide area network and an Internet network.

**42**. A method for displaying information in a computer system, comprising the steps of:

inputting an information identifier;

providing the information identifier to a plurality of plug-in modules in accordance with a global heuristic, wherein the information identifier is matched to information by the plug-in modules based upon the plurality of heuristics;

receiving at least one candidate item of information based upon the information provided to the heuristics in accordance with the global heuristic; and

displaying a representation of the candidate items of information.

**43**. The method of claim **42** wherein the global heuristic determines an order in which the information identifier is provided to the heuristics.

**44**. The method of claim **43** wherein the order is a ranking of the plurality of heuristics according to a context in which the information was input.

**45**. The method of claim **42** wherein the information is located over a plurality of locations which comprise at least

US 6,847,959 B1

**11**

two of the following: local storage media, a LAN storage volume, a wide area network and an Internet network.

**46**. An apparatus for displaying information in a computer system, comprising:

    means for inputting an information identifier;

    means for providing the information identifier to a plurality of plug-in modules in accordance with a global heuristic, wherein the information identifier is matched to information by the plug-in modules based upon a plurality of heuristics;

    means for receiving at least one candidate item of information based upon the information provided to the heuristics in accordance with the global heuristic; and

**12**

    means for displaying a representation of the candidate items of information.

**47**. The method of claim **46** wherein the global heuristic determines an order in which the information identifier is provided to the heuristics.

**48**. The method of claim **47** wherein the order is a ranking of the plurality of heuristics according to a context in which the information was input.

**49**. The method of claim **46** wherein the information is located over a plurality of locations which comprise at least two of the following: local storage media, a LAN storage volume, a wide area network and an Internet network.

\*   \*   \*   \*   \*