```
 1                    UNITED STATES DISTRICT COURT

 2                  NORTHERN DISTRICT OF CALIFORNIA

 3                        SAN JOSE DIVISION

 4

 5

 6   APPLE INC., A CALIFORNIA        )  C-12-00630 LHK
     CORPORATION,                    )
                                     )  SAN JOSE, CALIFORNIA
 7                    PLAINTIFF,     )
                                     )  FEBRUARY 21, 2013
 8              VS.                  )
                                     )  PAGES 1-179
 9   SAMSUNG ELECTRONICS CO., LTD.,  )
     A KOREAN BUSINESS ENTITY;       )
10   SAMSUNG ELECTRONICS AMERICA,    )
     INC., A NEW YORK CORPORATION;   )
11   SAMSUNG TELECOMMUNICATIONS      )
     AMERICA, LLC, A DELAWARE        )
12   LIMITED LIABILITY COMPANY,      )
                                     )
13                    DEFENDANTS.    )
     _____ )
14                                   )
                                     )
15

16                  TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE LUCY H. KOH
17                UNITED STATES DISTRICT JUDGE

18

19

20              APPEARANCES ON NEXT PAGE

21

22

23   OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
24

25          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
               TRANSCRIPT PRODUCED WITH COMPUTER
```

```
 1        A P P E A R A N C E S:

 2    FOR APPLE:              GIBSON, DUNN & CRUTCHER
                              BY:  JOSH A. KREVITT
 3                            200 PARK AVENUE
                              NEW YORK, NEW YORK  10166
 4
                              BY:  H. MARK LYON
 5                            1881 PAGE MILL ROAD
                              PALO ALTO, CALIFORNIA  94304
 6
                              BY:  MARK REITER
 7                            2100 MCKINNEY AVENUE
                              DALLAS, TEXAS  75201
 8
                              WILMER, CUTLER, PICKERING, HALE & DORR
 9                            BY:  MARK D. SELWYN
                              950 PAGE MILL ROAD
10                            PALO ALTO, CALIFORNIA  94304

11

12    FOR SAMSUNG:           QUINN, EMANUEL, URQUHART,
                              OLIVER & HEDGES
13                            BY:  WILLIAM C. PRICE
                              865 SOUTH FIGUEROA STREET
14                            10TH FLOOR
                              LOS ANGELES, CALIFORNIA  90017
15
                              BY:  KEVIN P.B. JOHNSON
16                                 VICTORIA F. MAROULIS
                              555 TWIN DOLPHIN DRIVE, 5TH FLOOR
17                            REDWOOD SHORES, CALIFORNIA  94065

18                            BY:  SEAN SANG-CHUL PAK
                              50 CALIFORNIA STREET, 22ND FLOOR
19                            SAN FRANCISCO, CALIFORNIA  94111

20

21

22

23

24

25
```

```
1     SAN JOSE, CALIFORNIA                    FEBRUARY 21, 2013

2                       P R O C E E D I N G S

3          (COURT CONVENED AND THE FOLLOWING PROCEEDINGS WERE HELD:)

4               THE CLERK:  CALLING CASE NUMBER C-12-00630 LHK,

5     APPLE, INCORPORATED VERSUS SAMSUNG ELECTRONICS COMPANY LIMITED,

6     ET AL.

7          COUNSEL, STATE YOUR APPEARANCES, PLEASE.

8               MR. KREVITT:  GOOD MORNING, YOUR HONOR.  JOSH KREVITT

9     FROM GIBSON, DUNN ON BEHALF OF APPLE.  WITH ME THIS MORNING ARE

10    MARK LYON AND MARK REITER, ALSO FROM GIBSON, DUNN, AND

11    MARK SELWYN FROM THE WILMER, HALE FIRM WILL BE PRESENTING TODAY

12    ON BEHALF OF APPLE.

13              MR. PRICE:  GOOD MORNING, YOUR HONOR.  BILL PRICE OF

14    QUINN, EMANUEL FOR SAMSUNG.  AND WITH ME ARE KEVIN JOHNSON,

15    SEAN PAK, AND VICTORIA MAROULIS.

16              MR. JOHNSON:  GOOD MORNING, YOUR HONOR.

17              THE COURT:  OKAY, GOOD MORNING.

18         ALL RIGHT.  WELL, THANK YOU FOR STIPULATING TO ONE OF THE

19    CLAIM TERMS.

20         DO YOU HAVE ANY UPDATES ON ANY OF THE OTHERS?

21              MR. LYON:  YOUR HONOR, MARK LYON.

22         WE -- ON THE '760 CLAIM TERM, WE DID MEET AND CONFER, BUT

23    WE WERE UNABLE TO REACH AN AGREEMENT, AND WE CAN EXPLAIN WHY.

24              THE COURT:  ALL RIGHT.  WHEN WE GET TO THAT TERM --

25    YOU CAN TELL ME MORE LATER, BUT WERE YOU AT LEAST ABLE TO
```

```
 1      NARROW THE DISPUTE OR IDENTIFY EXACTLY WHAT'S IN CONTENTION?

 2              MR. LYON:  I BELIEVE WE'VE NARROWED THE FOCUS.  WE

 3      UNDERSTAND THE FOCUS OF THE DISPUTE NOW, SO I THINK WE CAN

 4      ADDRESS THAT FAIRLY WELL FOR YOUR HONOR TODAY.

 5              THE COURT:  ALL RIGHT.  THANK YOU.

 6          NOW, IF, DURING TODAY'S HEARING, A PARTY RAISES EXTRINSIC

 7      EVIDENCE THAT WAS NOT PREVIOUSLY DISCLOSED, I'M EXPECTING THE

 8      OTHER PARTY TO JUMP UP AND OBJECT.  OKAY?

 9          AND IF THAT OBJECTION IS MADE, I HAVE ALL OF THE

10      DECLARATIONS AND THE PARTY WHO WAS TRYING TO INTRODUCE THE

11      EXTRINSIC EVIDENCE WILL HAVE TO POINT OUT THE PARAGRAPH NUMBER

12      AND THE DECLARANT WHERE THAT WAS PREVIOUSLY AND TIMELY

13      DISCLOSED.  OKAY?  SO THAT'S GOING TO BE OUR PROCEDURE.

14          I DON'T WANT ANYONE TO NOT OBJECT, OKAY?  IF YOU SEE THAT

15      HAPPENING, LET ME KNOW.

16              OKAY.  MR. JOHNSON, WHAT'S THE DROP DEAD TIME TODAY?

17              MR. JOHNSON:  YOUR HONOR, WE'RE -- IT'S UP TO YOU.  I

18      MEAN, YOU KNOW, I HAVE A PLANE IN THE AFTERNOON, BUT --

19              THE COURT:  WELL, WHAT TIME DO YOU NEED TO LEAVE TO

20      CATCH THAT?  I THINK WE SHOULD BE ABLE TO DO IT SINCE WE'RE

21      STARTING IN THE MORNING, BUT I JUST --

22              MR. JOHNSON:  YOU KNOW, IF I CAN LEAVE AT ABOUT 3:30,

23      SOMETHING LIKE THAT?

24              THE COURT:  OKAY.  I HOPE WE CAN FINISH BEFORE THEN,

25      BUT --
```

```
1              MR. JOHNSON:  RIGHT.

2              THE COURT:  WE'LL TREAT THAT AS OUR -- THAT'LL BE OUR

3     DROP DEAD TIME.  WE CAN STOP MID-SENTENCE AT 3:30.

4         OKAY.  I SAW WHAT YOU ALL FILED AS FAR AS ACCUSED PRODUCTS

5     AND CLAIMS AND IT'S JUST TOO MUCH, SO WE'RE GOING TO HAVE A

6     MORE FOCUSSED AND STREAMLINED CASE IF THIS DOESN'T GET STAYED,

7     AND SO I'M GOING TO REQUIRE THAT YOU ALL LIMIT YOURSELVES TO 25

8     PATENT CLAIMS TOTAL, EACH SIDE, AS WELL AS 25 ACCUSED PRODUCTS,

9     AND WE'LL KEEP NARROWING AND NARROWING.

10        BUT I WANT THIS TO BE DONE -- CAN YOU DO THAT RIGHT NOW OR

11    DO YOU NEED A CLAIM CONSTRUCTION RULING?  I MEAN, YOU'VE

12    ALREADY BEEN LITIGATING THIS THING FOR OVER A YEAR.  YOU'VE

13    ALREADY HAD A MINI TRIAL IN THE FORM OF A PRELIMINARY

14    INJUNCTION.  YOU'VE ALREADY GONE UP ON APPEAL.  YOU MUST KNOW

15    SOMETHING ABOUT WHAT'S YOUR BEST CASE.

16              MR. KREVITT:  YOUR HONOR, IT CERTAINLY WOULD BE

17    HELPFUL TO HAVE A SENSE OF WHAT YOUR CLAIM CONSTRUCTION RULING

18    WILL BE.  WE RECEIVED TENTATIVES LAST WEEK.  WE MAY RECEIVE

19    ADDITIONAL GUIDANCE FROM YOUR HONOR TODAY OR IN THE NEAR

20    FUTURE.

21        WE WILL BE IN A POSITION TO MEET WHATEVER DEADLINE YOUR

22    HONOR SETS, OF COURSE, IN TERMS OF NARROWING THE NUMBER OF

23    CLAIMS, BUT WOULD REQUIRE -- OR AT LEAST WOULD REQUEST SOME

24    TIME WITHIN WHICH TO DO THAT.

25              THE COURT:  AND WHAT IS THAT?  BECAUSE I'M NOT GOING
```

```
 1        TO DO A PROVE-IT-UP SUMMARY JUDGMENT MOTION LIKE I DID LAST

 2     TIME.  THAT IS JUST NOT HAPPENING.

 3        SO I'M GOING TO REQUIRE THAT THERE BE FURTHER NARROWING

 4     NOW, FURTHER NARROWING MAYBE BEFORE EXPERT DISCOVERY, AND

 5     FURTHER NARROWING BEFORE SUMMARY JUDGMENT.

 6        I'M NOT GOING TO HAVE A SUMMARY JUDGMENT THAT IS EVERYTHING

 7     UNDER A CIRCUS TENT.  IT'S NOT GOING TO BE LIKE THAT THIS TIME

 8     AROUND.

 9        SO YOU TELL ME.  HOW IS THIS CASE GOING TO GET MORE

10     FOCUSSED AND MORE STREAMLINED?

11             MR. KREVITT:  YOUR HONOR, IF WE CAN HAVE AN

12     OPPORTUNITY TO CONFER INTERNALLY AND CONFER WITH SAMSUNG, WE

13     MIGHT BE ABLE TO, WITHIN A SHORT PERIOD OF TIME, MAKE A

14     PROPOSAL TO YOUR HONOR BOTH WITH RESPECT TO TIMING AND SEQUENCE

15     CONCERNING THAT NARROWING.

16             THE COURT:  WELL, NO, BECAUSE I KNOW WHAT'S GOING TO

17     HAPPEN.  I'M GOING TO GET, LIKE, THREE FILINGS AND YOU'RE NOT

18     GOING TO REACH AN AGREEMENT.

19        I WANT TO KNOW, IT'S GOING TO BE 25 CLAIM TERMS -- 25

20     CLAIMS PER SIDE AND 25 ACCUSED PRODUCTS NOW IN THE MIDST OF --

21     YOUR FACT DISCOVERY CUT OFF IS IN JULY, SO YOU --

22             MR. JOHNSON:  MAYBE IF WE COULD JUST TAKE, EVEN

23     DURING THE BREAK TODAY, IF MR. KREVITT AND I CAN JUST CONFER

24     AND COME UP WITH A PROPOSED SCHEDULE THAT WE THINK MAKES SENSE,

25     WE CAN REPORT BACK TO YOU IN THE COURSE OF TODAY.
```

1        BUT I THINK IT WOULD BE HELPFUL TO AT LEAST TALK TO THE

2   OTHER SIDE A LITTLE BIT ABOUT WHAT THE PLANS ARE, BECAUSE I

3   COULD SEE, FRANKLY, BOTH SIDES DROPPING CLAIMS IN LIGHT OF SOME

4   OF YOUR HONOR'S -- DEPENDING ON WHAT YOUR HONOR IS GOING TO DO

5   ON CLAIM CONSTRUCTION, AND THAT MAY FURTHER HELP WINNOW IT

6   DOWN.

7        BUT I THINK COMING UP WITH A SCHEDULE BETWEEN THE TWO OF

8   US -- AND WE UNDERSTAND YOUR HONOR'S GUIDANCE.  IT'S NOT GOING

9   TO BE LIKE LAST TIME.  WE HAVE THAT IN MIND.

10       BUT AT LEAST TALKING TO THE OTHER SIDE ABOUT A PROPOSAL

11  EVEN FOR A FEW MINUTES DURING THE BREAK.

12           THE COURT:  WELL, MY ONLY CONCERN IS THAT THERE ARE

13  SO MANY CLAIMS THAT ARE IDENTIFIED IN YOUR FILINGS, AND I

14  UNDERSTAND THERE ARE EVEN MORE PATENTS OUT THERE THAT AREN'T

15  EVEN ON THIS LIST.  IS THAT CORRECT?  OR IS THIS THE ENTIRE

16  UNIVERSE OF THE CASE?

17           MR. LYON:  FOR THIS CASE, YOUR HONOR, THESE ARE THE

18  PATENTS.  WHAT APPLE SUBMITTED WAS THE EIGHT APPLE PATENTS THAT

19  ARE ASSERTED.  WE'RE ONLY DEALING WITH FOUR OF THOSE PATENTS

20  TODAY.

21           THE COURT:  ALL RIGHT.

22           MR. LYON:  BUT THERE ARE OTHER PATENTS.

23       THE OTHER THING, IF I MIGHT POINT OUT, I BELIEVE THERE'S A

24  CASE MANAGEMENT CONFERENCE ON THE COURT'S CALENDAR FOR THIS

25  CASE TOWARDS THE END OF MARCH.  PERHAPS WHAT WE COULD DO -- AND

```
 1        I DON'T KNOW WHAT YOUR HONOR IS GOING TO BE ABLE TO DO AS FAR

 2    AS ISSUING A MARKMAN RULING BEFORE THEN, BUT PERHAPS THAT WOULD

 3    BE A GOOD TIME TO REVISIT THIS AND HAVE SOME DISCUSSION.

 4        THAT WOULD GIVE US TIME TO TALK TO OUR CLIENTS, MAYBE

 5    ASSESS THE CASE AND ASSESS WHATEVER GUIDANCE YOUR HONOR CAN

 6    PROVIDE ON CLAIM CONSTRUCTION.

 7            THE COURT:  WELL, YOU KNOW, ON THIS CASE, AS IT IS

 8    CURRENTLY FRAMED, I'M REFUSING TO GO FORWARD ON THIS CASE.

 9    OKAY?  SO I'M EITHER GOING TO VACATE EVERYTHING AND LET THIS

10    SIMMER FOR ABOUT FIVE YEARS AND YOU CAN COME BACK TO ME AFTER

11    THE APPEAL IS DECIDED, OR YOU'RE GOING TO NARROW THIS AND

12    STREAMLINE THIS, BECAUSE I REFUSE TO DO THIS.  OKAY?

13        SO I'M GOING TO REQUIRE THAT YOU NARROW THE NUMBER OF

14    PATENT CLAIMS PER SIDE TO 25 AFTER THE MARKMAN ORDER, AND THAT

15    YOU NARROW THE NUMBER OF ACCUSED PRODUCTS TO 25.  OKAY?

16        NOW, BEYOND THAT, WHEN WE MEET AGAIN AT OUR NEXT CASE

17    MANAGEMENT CONFERENCE, YOU CAN TELL ME HOW YOU'RE GOING TO

18    NARROW THAT FURTHER BEFORE EXPERT -- LET ME LOOK AT THE CASE

19    SCHEDULE.

20        SO YOU HAVE FACT DISCOVERY CUT OFF JULY 8, EXPERT

21    DISCOVERY IS JULY AND AUGUST, AND THEN YOU FILE DISPOSITIVE

22    MOTIONS IN SEPTEMBER.

23        SO WHAT I'M GOING TO REQUIRE, IF YOU DON'T STAY THE CASE,

24    IS A NARROWING OF THE CASE AFTER THE MARKMAN RULING; A FURTHER

25    NARROWING -- AND IT'S GOING TO BE A NARROWING THAT INCLUDES NOT
```

1    ONLY PATENT CLAIMS AND ACCUSED PRODUCTS, BUT IT'S ALSO GOING TO

2    INCLUDE PRIOR ART, OKAY?  EVERYTHING IS GOING TO BE NARROWED

3    AND FOCUSSED.

4         JUST TAKE YOUR BEST SHOTS.  I DON'T WANT A LOT OF SAUSAGE

5    FILLER.

6         SO YOU'RE GOING TO NARROW IT AGAIN BEFORE EXPERT

7    DISCOVERY, AND YOU'RE GOING TO NARROW IT BEFORE SUMMARY

8    JUDGMENT, AND THEN YOU'RE GOING TO NARROW IT FURTHER AGAIN

9    AFTER DISPOSITIVE MOTIONS.  OKAY?

10        SO I JUST -- I WANT IT TO BE CLEAR THAT THIS IS GOING TO

11   BE A FOCUSSED AND STREAMLINED CASE.

12            MR. JOHNSON:  UNDERSTOOD, YOUR HONOR.  JUST SO

13   THERE'S NO MISINTERPRETATION, FROM OUR SIDE, WE INTEND TO MOVE

14   TO STAY AND WE HAVE -- WE WILL BE DOING THAT, AND YOUR HONOR

15   GAVE US UNTIL MARCH 7TH, I THINK, TO CONFER WITH THE OTHER SIDE

16   AND TALK ABOUT STAYING THE CASE, BUT WE DO THINK THIS CASE

17   OUGHT TO BE STAYED.

18            MR. KREVITT:  YOUR HONOR, WE -- WE'LL ADDRESS THAT AT

19   THE APPROPRIATE TIME, OR WE'RE HAPPY TO ADDRESS IT NOW.

20        IT'S OUR STRONG VIEW, OF COURSE, THAT THIS CASE SHOULD NOT

21   BE STAYED.

22        AS WE IDENTIFIED IN OUR LIST OF PRODUCTS THAT YOUR HONOR

23   REQUESTED, THERE'S NOT A SINGLE PATENT IN COMMON BETWEEN THIS

24   CASE AND THE 1846 CASE.  WITH THE EXCEPTION OF A FEW PRODUCTS,

25   FOUR OUT OF 23, THERE'S NOT A SINGLE PRODUCT IN COMMON.

1      THE CASES HAVE NO OVERLAP OTHER THAN THE FACT THAT IT IS

2   APPLE AND SAMSUNG AS THE PARTIES.  DIFFERENT PATENTS, DIFFERENT

3   PRODUCTS, DIFFERENT ISSUES, AND THERE'S NO REASON THAT THIS

4   CASE SHOULD BE STAYED IN LIGHT OF THE 1846 CASE.

5      THERE'S NO REASON THAT THE 1846 CASE SHOULD HAVE ANY IMPACT

6   ON THIS CASE GIVEN THAT, AS I SAID, IT IS DIFFERENT PATENTS,

7   DIFFERENT PRODUCTS.

8          THE COURT:  ALL RIGHT.  WELL, I WILL LOOK AT THAT

9   WHEN IT'S FILED, AFTER YOU FILE YOUR STATUS REPORT AND THE

10   MOTION IS FILED.

11      IF THE CASE IS NOT STAYED, THOUGH, YOU CAN ASSUME THAT YOU

12   WILL BE DOING THIS NARROWING AND STREAMLINING AFTER THE MARKMAN

13   ORDER, BEFORE EXPERT DISCOVERY, BEFORE SUMMARY JUDGMENT, AND

14   AFTER SUMMARY JUDGMENT.

15      HOW MUCH TIME WILL YOU NEED AFTER THE MARKMAN ORDER TO

16   IDENTIFY THE 25 CLAIMS AND 25 ACCUSED PRODUCTS?

17          MR. JOHNSON:  YOUR HONOR, FROM OUR STANDPOINT, I

18   WOULD SAY ABOUT A WEEK.

19          MR. KREVITT:  WE WERE GOING TO SUGGEST TWO WEEKS,

20   YOUR HONOR.

21          THE COURT:  WE'LL SPLIT THE BABY AND DO TEN DAYS.

22   OKAY?  SO TEN DAYS AFTER THE MARKMAN ORDER, YOU'RE -- BOTH

23   SIDES WILL NARROW THIS CASE TO 25 PATENT CLAIMS PER SIDE, 25

24   ACCUSED PRODUCTS PER SIDE, WITH FURTHER NARROWING AT THREE

25   DIFFERENT SUBSEQUENT INFLECTION POINTS.

1            OKAY.  ALL RIGHT.  LET ME ASK, APPLE, YOU SUBMITTED TWO

2      LISTS OF ACCUSED PRODUCTS.  WAS THERE A DIFFERENCE BETWEEN YOUR

3      TWO LISTS?

4            MR. LYON:  OH, YOUR HONOR, I THINK THERE WAS -- THE

5      PROBLEM WAS MERELY ONE IN FILING.  I THINK PAGE NUMBERS OR

6      SOMETHING WERE CUT OFF IN THE ORIGINAL FILING.  SO IT IS -- IT

7      SHOULD BE AN IDENTICAL LIST.  IT WAS JUST FILED TO CORRECT THAT

8      ONE PROBLEM.

9            THE COURT:  OH, OKAY.  IN THE FUTURE, IF YOU FILE A

10     SUBSEQUENT ONE, CAN YOU JUST PUT IN THE ECF LINE WHAT THE

11     DIFFERENCE WAS, IF IT WAS JUST A FORMATTING ERROR OR SOMETHING?

12           MR. LYON:  WE'LL DO THAT.  I APOLOGIZE FOR ANY

13     CONFUSION.

14           THE COURT:  THAT'S NOT A PROBLEM.

15           MS. MAROULIS:  AND, YOUR HONOR, MAY WE JUST NOTE

16     BRIEFLY THAT WE WROTE TO APPLE.  THERE WAS ONE PRODUCT ON BOTH

17     LISTS THAT WE DID NOT BELIEVE WAS IN THE CASE, AND TO THE

18     EXTENT WE CANNOT RESOLVE IT INFORMALLY, WE WILL BE OBJECTING TO

19     THAT.  IT'S TAB 8.19, ICE CREAM SANDWICH.

20           THE COURT:  WELL, I THINK THAT THAT WOULD GO TO

21     JUDGE GREWAL IF IT DOES END UP REQUIRING MOTION PRACTICE.

22           LET ME ASK, APPLE ALSO FILED AN AMENDED OPENING CLAIM

23     CONSTRUCTION BRIEF.  WHAT WAS THE PURPOSE OF THE AMENDMENT?

24           MR. LYON:  I BELIEVE, AGAIN, THAT WAS ANOTHER ISSUE

25     WITH THE PAGE NUMBERS BEING CUT OFF IN LARGE PART.  THERE

```
 1        WAS -- I THINK THERE WERE A COUPLE TYPOGRAPHICAL ERRORS THAT

 2        WERE CORRECTED AT THE SAME TIME.  BUT, AGAIN, IT'S NOT A

 3        SUBSTANTIVE CHANGE IN ANY WAY.

 4           IN THE FUTURE IF THAT HAPPENS AND WE'RE TRYING TO CORRECT

 5        SOME MINOR ISSUES, WE WILL MAKE SURE TO NOTE THAT.  BUT IT

 6        SHOULD BE IDENTICAL IN SUBSTANCE.

 7               THE COURT:  OKAY.  JUST, AGAIN, THE SAME REQUEST.  IF

 8        YOU DO THAT, PUT JUST A NOTE IN THE ECF NOTATION --

 9               MR. LYON:  ABSOLUTELY.

10               THE COURT:  -- THAT THERE ARE CHANGES.

11               MR. LYON:  WE'LL DO THAT.

12               THE COURT:  OKAY.  SO LET ME -- LET'S GO TO THE '502.

13           I ASSUME WE'RE GOING TO DO THE PATENTS IN THE SAME SEQUENCE

14        THAT WE DID LAST WEEK.

15               MR. LYON:  THAT'S OUR PLAN.

16               THE COURT:  OKAY.  ALL RIGHT.  LET'S GO -- FOR THE

17        '502 -- AND I ASSUME, REGARDLESS OF WHAT TERM IS BEING

18        CONSTRUED TODAY, YOUR IDENTIFICATION OF -- DOES IT DEPEND ON

19        WHICH PRODUCT IS BEING ACCUSED OF WHICH CLAIM?

20               MR. LYON:  NO, YOUR HONOR.  WE HAVE -- THE TERMS THAT

21        WE'RE TALKING ABOUT, I BELIEVE, APPEAR IN -- I BELIEVE THEY

22        APPEAR IN ALL THE INDEPENDENT CLAIMS THAT ARE ASSERTED, BUT

23        CERTAINLY WE DON'T BELIEVE THAT THE MEANING OF THOSE CLAIMS

24        VARIES IN ANY WAY WITH RESPECT TO EITHER THE CLAIMS THAT ARE

25        BEING ASSERTED OR WITH RESPECT TO THE PRODUCTS AGAINST WHICH
```

```
 1        THEY'RE ASSERTED.
 2                THE COURT:  ALL RIGHT.  AND AGAIN, YOU'RE
 3    INCORPORATING BY REFERENCE THE DISPUTED TERM THAT'S IN THE
 4    INDEPENDENT CLAIM AND THE DEPENDENT CLAIMS?
 5                MR. LYON:  CORRECT.
 6                THE COURT:  OKAY.  ALL RIGHT.
 7        LET ME ASK YOU, LAST WEEK MR. PAK MADE A DISTINCTION
 8    BETWEEN -- THEY BELIEVE THERE HAS TO BE SHARING ACROSS FIELDS
 9    THROUGH FIELD CLASSES, AND THEN THEY EXTEND THAT TO THERE HAS
10    TO BE SHARING ACROSS APPLICATIONS.
11        NOW, I UNDERSTAND THAT YOU DISPUTE THE SHARING ACROSS
12    APPLICATIONS.
13                MR. LYON:  CORRECT.
14                THE COURT:  BUT WHAT ABOUT THE INITIAL NOTION THAT
15    MR. PAK RAISED, THAT THERE HAS TO BE SHARING ACROSS FIELDS
16    THROUGH THE CLASSES?
17                MR. LYON:  I THINK IN BOTH CASES THAT'S INCORRECT,
18    YOUR HONOR, AND LET ME EXPLAIN WHY.
19        IF YOU LOOK AT -- IF WE COULD PULL UP SLIDE 5?
20        THAT'S THE CLAIM AND THE CLAIM DOESN'T SAY ANYTHING
21    ABOUT -- IT SAYS YOU HAVE AT LEAST ONE FIELD ASSOCIATED WITH A
22    FIELD CLASS, AND THAT'S THE WAY THE CLAIM LANGUAGE IS WRITTEN.
23        SO IT DOES CONTEMPLATE THE IDEA THAT YOU HAVE A FORM OR
24    APPLICATION THAT HAS ONLY ONE FIELD THAT'S ASSOCIATED WITH IT.
25        NOW, I WOULD SUBMIT THAT THERE ARE DIFFERENT EMBODIMENTS OF
```

1      THIS INVENTION WHERE YOU ARE USING THE SAME APPLICATION AND YOU

2      HAVE MULTIPLE FIELDS.

3          I THINK I SHOWED LAST WEEK DURING THE TUTORIAL WHERE YOU

4      HAVE THE PURCHASE FORM THAT HAD A BILLING ADDRESS AND A

5      SHIPPING ADDRESS AND WE SHARED -- USING THE SAME FIELD CLASS,

6      WE WERE ABLE TO SHARE HISTORY LISTS ACROSS THOSE FIELDS.

7      THAT'S CERTAINLY SOMETHING THAT CAN BE DONE WITH THIS

8      INVENTION.

9          AND ALSO, YOU COULD SHARE THOSE FIELDS AND THE HISTORY

10     LISTS ACROSS APPLICATIONS SHOULD YOU WANT TO.

11         THE POINT OF THIS INVENTION IS FLEXIBILITY, TO ALLOW THE

12     DEVELOPERS TO BE ABLE TO DO WHAT THEY WANT TO DO WITH THESE

13     HISTORY LISTS, AND IT'S CERTAINLY MORE EFFICIENT AND COULD BE

14     BETTER FOR THE USER IF YOU ARE SHARING THEM ACROSS -- WITHIN A

15     FORM IN ONE APPLICATION OR MAYBE SHARING THEM ACROSS

16     APPLICATIONS.

17         BUT THERE'S NO REQUIREMENT THAT YOU HAVE TO DO THAT.

18             THE COURT:  WELL, WHAT'S THE POINT OF HAVING A CLASS

19     IF YOU'RE NOT SHARING ACROSS FIELDS?

20             MR. LYON:  SO IT GIVES YOU THE FLEXIBILITY FOR

21     LATER -- HAVING THAT STRUCTURE AVAILABLE TO THE PROGRAMMERS

22     ALLOWS THEM TO CREATE PERHAPS UPDATES OR DIFFERENT

23     APPLICATIONS.  IT GIVES THE FLEXIBILITY TO THE DEVELOPERS TO DO

24     THIS.  SO THAT'S THE PURPOSE.

25         IT DOESN'T MEAN -- ESSENTIALLY YOU DO HAVE TO HAVE A FIELD

```
 1        CLASS.  THAT PART WE ALL AGREE ON.

 2            AND SO IT WOULD BE CONCEIVABLE, ALTHOUGH MAYBE NOT REALLY

 3        VERY EFFICIENT, TO HAVE A SITUATION WHERE YOU HAVE AN

 4        APPLICATION THAT ONLY HAS ONE FIELD AND HAS A FIELD CLASS BUT

 5        DOESN'T REALLY TAKE ADVANTAGE OF IT.

 6            BUT THE IDEA IS THAT WOULD BE IN THE SYSTEM AND AVAILABLE

 7        TO DEVELOPERS TO USE SHOULD THEY CHOOSE TO DO IT IN OTHER

 8        APPLICATIONS DOWN THE ROAD.

 9                THE COURT:  ALL RIGHT.  LET ME ASK SAMSUNG, I -- I'D

10        LIKE TO KNOW SPECIFICALLY WHERE IN THE PATENT AND THE FILE

11        HISTORY IT SAYS THAT A FIELD CLASS MUST LINK TO FIELDS FROM

12        DIFFERENT FORMS IN DIFFERENT APPLICATIONS.

13                MR. PAK:  THANK YOU, YOUR HONOR.

14            SO FIRST THE DEMONSTRATIVES ON THIS POINT -- I THINK WE

15        HAVE PROBABLY ABOUT FIVE SLIDES THAT I CAN WALK YOU THROUGH

16        THAT WILL LAY OUT THE INTRINSIC RECORD --

17                THE COURT:  NO.  JUST POINT ME TO A COLUMN AND A LINE

18        NUMBER.  IT'S BETTER IF I CAN JUST LOOK IT UP MYSELF.  THANK

19        YOU.

20                MR. PAK:  SURE.  WHEN WE HAVE -- COULD WE START WITH

21        THE FIGURE 4?

22                THE COURT:  OKAY.

23                MR. PAK:  AND I HAVE SOME DEMONSTRATIVES PREPARED ON

24        THAT, AND THAT --

25            IF WE COULD BRING UP SLIDE 17, MR. FISHER?
```

1     YOUR HONOR, SO I'M GOING TO WALK YOU THROUGH FIGURE 4, AND

2     AS WE TALKED ABOUT BEFORE, WE DO BELIEVE THAT THERE'S A

3     MEANINGFUL DIFFERENCE BETWEEN CLASS AND INSTANCE, AND THAT'S

4     REFLECTED NOT ONLY IN THE INTRINSIC RECORD HERE IN THE PATENT

5     SPECIFICATION, BUT ALSO IN THE PROSECUTION HISTORY.

6     IN THIS PARTICULAR FIGURE THAT WE TALKED ABOUT LAST TIME,

7     YOUR HONOR, RECALL THAT THERE IS A DECISION POINT 165.  SO THIS

8     IS THE FLOW CHART.  THIS IS THE ONLY ALGORITHM THAT'S DISCLOSED

9     IN THE PATENT SPECIFICATION FOR HOW YOU DETERMINE WHETHER A

10    PARTICULAR FIELD HAS A HISTORY LIST ASSOCIATED WITH IT.

11    SO YOU DISPLAY A FORM WITH A FIELD, THE FIELD IS POSSIBLE,

12    YOU GET TO DECISION POINT 165.

13    168.  SORRY, YOUR HONOR.

14    168 IS DESCRIBED IN COLUMN 9, LINE 67 THROUGH 10, LINE 3,

15    AS DETERMINING WHETHER THE NAME FIELD REQUESTS A PERSON'S NAME.

16          THE COURT:  WAIT.  WHAT WAS THE LINE NUMBER IN COLUMN

17    9?

18          MR. PAK:  COLUMN 9, LINE 67, TO COLUMN 10, LINE 3.

19          THE COURT:  OKAY.

20          MR. PAK:  AND THERE ARE TWO NOTIONS HERE.  ONE IS,

21    WHAT IS THE FIELD?  THE FIELD IS THE NAME FIELD.

22    BUT THE NAME FIELD IS THEN ASSOCIATED WITH A FIELD CLASS,

23    AND THAT FIELD CLASS IS DESCRIBED HERE AS "WHICH REQUESTS A

24    PERSON'S NAME."

25          SO REGARDLESS OF THE NAME OF THE NAME FIELD -- AND I

```
 1    APOLOGIZE FOR THE CONFUSION -- BUT IT COULD BE A "TO" OR A
 2    "FROM" FIELD, AND THE FIELD CLASS ITSELF WILL TELL YOU THAT
 3    THAT PARTICULAR "TO" FIELD, FOR EXAMPLE, REQUESTS A PERSON'S
 4    NAME.
 5              THE COURT:  WHY CAN'T THERE JUST BE MULTIPLE FIELDS
 6    WITHIN THE SAME FORM?  I THINK THAT'S WHAT THIS IS MORE
 7    REFERRING TO.
 8              MR. PAK:  ABSOLUTELY, YOUR HONOR, AND I THINK THAT'S
 9    EXACTLY WHAT WE'RE GETTING AT.
10    WE HAVE MULTIPLE FORMS -- WE HAVE A FORM WITH MULTIPLE
11    FIELDS, AND WHAT'S HAPPENING IS WHEN YOU HAVE, FOR EXAMPLE, THE
12    PERSON'S NAME BEING REQUESTED, THEN -- AND THERE ARE SOME
13    EXAMPLES OF THAT FURTHER ON IN COLUMN 9, 51 THROUGH 60 OF
14    DIFFERENT TYPES OF FIELDS THAT HAVE A NAME INDICATION.
15    AND WHAT HAPPENS IS EVERY TIME YOU ENCOUNTER A FIELD, THIS
16    FLOW CHART OR ALGORITHM ON THE LEFT-HAND SIDE FROM FIGURE 4
17    WOULD BE EXECUTED, WHICH MEANS THAT WITH THE HISTORY LIST
18    DETERMINATION IN STEP 168, YOU'RE ASKING YOURSELF, IS THIS
19    FIELD BELONGING TO A FIELD CLASS?
20              AND EVERY TIME YOU HAVE A FIELD THAT BELONGS TO THE SAME
21    NAME FIELD CLASS, FOR EXAMPLE, THAT SHARED HISTORY LIST WILL BE
22    PULLED UP.
23              AND SO VISUALLY THIS IS WHAT WE WOULD SEE.
24              AND THIS IS, YOUR HONOR -- IF YOU RECALL FROM MR. LYON'S
25    PRESENTATION LAST WEEK, HE PRESENTED A DEMONSTRATIVE THAT
```

```
 1        INDICATED WHAT THE INVENTION WAS.

 2             AND IN THIS PARTICULAR ILLUSTRATION, WE HAVE A PDA DEVICE

 3        WITH TWO DISTINCT FIELDS, SHIPPING ADDRESS AND BILLING ADDRESS,

 4        TWO FIELDS IN THE SAME FORM RUNNING ON THE SAME APPLICATION.

 5             BUT BECAUSE THEY BOTH BELONG TO THE SAME FIELD CLASS OF

 6        ADDRESS, THEY'RE GOING TO BE ENCOUNTERING THE SAME HISTORY

 7        TABLE IN THIS DECISION BLOCK 168.

 8             SO THE ALGORITHM ITSELF, THE KEY THING TO UNDERSTAND ABOUT

 9        THE ALGORITHM IS THAT IT'S EXECUTED EVERY TIME YOU ENCOUNTER A

10        FIELD IN A FORM, AND BY EXECUTING THIS ALGORITHM IN FIGURE 4,

11        THE ONLY RESULT WILL BE THAT FIELDS THAT SHARE A FIELD CLASS

12        WILL ACCESS THE SAME HISTORY LIST.

13             THAT'S THE ENTIRETY OF THE INVENTION HERE.  WITHOUT THE

14        USE OF A FIELD CLASS, YOU GO BACK TO WHAT THE PRIOR ART TAUGHT,

15        WHICH IS FIELD INSTANCE.  ONE FIELD, ONE HISTORY LIST.

16             THAT'S WHAT THE EXAMINER WAS CONSIDERING IN THE CONTEXT OF

17        THE TURBO C++ PROGRAM, AND THE EXAMINER MADE A VERY CLEAR

18        DISTINCTION BETWEEN A FIELD INSTANCE VERSUS A FIELD CLASS.

19             SO THAT'S A SECOND IMPORTANT PIECE OF EVIDENCE IN THE

20        INTRINSIC RECORD, YOUR HONOR, AND WE HAVE A -- IF I CAN ADDRESS

21        YOUR ATTENTION TO THIS, THIS IS SLIDE 7 IN OUR PRESENTATION,

22        WHICH IS THE NOTICE OF ALLOWANCE FROM THE PROSECUTION HISTORY.

23             FOR THE RECORD, THIS IS APPLE NDC 630, BATES NUMBER 56188.

24             IN ALLOWING THE CLAIMS, THE PATENT EXAMINER LOOKED AT THE

25        DIFFERENCE BETWEEN WHAT'S SHOWN ON THE LEFT-HAND SIDE, THAT'S
```

1     THE TURBO C++ PROGRAM, PRIOR ART, AND -- YOUR HONOR, YOU CAN

2     SEE THAT THERE'S A NAME FIELD HERE, AND THAT NAME FIELD HAS A

3     HISTORY LIST ASSOCIATED WITH THAT ONE FIELD, SO IF YOU TYPE

4     INTO THAT FIELD, YOU WILL BRING UP THE LIST OF PREVIOUSLY

5     INPUTED INFORMATION.

6          AND WHAT THE PATENTEE -- WHAT THE PATENTEE ALSO AGREED TO

7     AND THE PATENT EXAMINER FOUND WAS THAT HISTORY LIST BEING

8     ASSOCIATED WITH A SINGLE FIELD INSTANCE WAS ALREADY TAUGHT IN

9     THE PRIOR ART.

10         AND SPECIFICALLY, THE EXAMINER NOTED THAT BORLAND C++

11    SEEMS TO LIMIT UPDATING TO A SPECIFIC ENTRY FIELD INSTANCE.

12         WHAT THAT MEANS IS THERE'S ONLY ONE PLACE IN THE FORM IN

13    WHICH YOU CAN NOW UPDATE A HISTORY LIST, AND HE SAID THAT WAS

14    IN THE PRIOR ART.

15         BASED ON THIS, HE THEN MODIFIED THE TITLE AS WE TALKED

16    ABOUT TO ADD FIELD CLASS, AND HE FURTHER AMENDED THE CLAIMS AS

17    WE SEE HERE.  CLAIM 11 IS A GOOD EXAMPLE OF THAT.

18         MR. LYON TALKED ABOUT THE FORM HAVING AT LEAST ONE FIELD.

19    THAT WAS ALREADY IN THE EXAMINER -- IN THE CLAIM LANGUAGE.

20    THAT'S JUST TALKING ABOUT THE FORM CONCEPT.  CAN THE FORM HAVE

21    MULTIPLE FIELDS OR NOT?  THAT'S ALREADY IN THE CLAIM LANGUAGE.

22         WHAT WAS ADDED WAS THIS NOTION OF NOW ASSOCIATING THE

23    HISTORY LIST WITH A FIELD CLASS, AND THAT SPECIFICALLY IS ADDED

24    HERE IN TWO PLACES.

25              THE COURT:  BUT THAT HAS NOTHING TO DO WITH HAVING A

1        FIELD SPAN MORE THAN ONE FORM OR MORE THAN ONE APPLICATION.

2            I MEAN, I AGREE WITH YOU THAT FOR THE C++, IT'S MORE THE

3        FACT THAT TWO FIELDS ARE ASSOCIATED WITH THE SAME FIELD

4        CLASS --

5                MR. PAK:  YES.

6                THE COURT:  -- THE ADDRESSES THAT CAN BE IN DIFFERENT

7        FIELDS, SHIPPING OR MAILING ADDRESSES.

8                MR. PAK:  YES.

9                THE COURT:  BUT THAT, TO ME, STILL DOESN'T HAVE

10       ANYTHING TO DO WITH YOUR POINT THAT IT HAS TO BE SHARED ACROSS

11       DIFFERENT FORMS OR MULTIPLE APPLICATIONS.

12               MR. PAK:  I AGREE, YOUR HONOR.  AND I WANT TO BE VERY

13       CLEAR ON THAT POINT.

14               THE COURT:  OKAY.

15               MR. PAK:  AS I DISCUSSED WITH YOU LAST TIME, THERE

16       ARE TWO ISSUES.

17               THE COURT:  OKAY.

18               MR. PAK:  THERE'S THE QUESTION OF, IS SHARING OF SOME

19       TYPE REQUIRED, SHARING WITHIN, FOR EXAMPLE, MULTIPLE FIELDS

20       WITHIN A FORM?

21               THE COURT:  OKAY.

22               MR. PAK:  NOW, THERE'S A FURTHER ISSUE.  IF SHARING

23       IS REQUIRED, DO WE THEN EXTEND THAT CONCEPT TO REQUIRE SHARING

24       OF APPLICATIONS, ACROSS APPLICATIONS?

25           FOR TODAY'S PRESENTATION, I'M JUST GOING TO RELY ON THE

```
 1        LEGAL SUBMISSIONS, THE BRIEFINGS THAT WE HAD WITH RESPECT TO

 2        THE SECOND ISSUE OF WHETHER SHARING ACROSS APPLICATIONS IS

 3        REQUIRED OR NOT.

 4               THE COURT:  OKAY.

 5               MR. PAK:  WE UNDERSTAND YOUR HONOR'S COMMENTS AT THE

 6        LAST HEARING ABOUT SOME OF THE OPTIONAL LANGUAGE THAT YOU FOUND

 7        IN THE SPECIFICATION.

 8               THE COURT:  OKAY.

 9               MR. PAK:  AND THERE'S SOME CASE LAW ON THAT, BUT

10        WE'RE NOT GOING TO ARGUE THAT WITH YOU HERE TODAY.

11               THE COURT:  OKAY.

12               MR. PAK:  YOUR HONOR, ON THE BASIC QUESTION OF

13        SHARING ACROSS FIELDS, WHETHER THAT'S WITHIN A SINGLE FORM OR

14        MULTIPLE FORMS WITHIN A SINGLE APPLICATION, I THINK THE RECORD

15        IS ABSOLUTELY CLEAR THAT WHAT DISTINGUISHED WHAT WE SEE ON THE

16        LEFT-HAND SIDE, WHICH IS PRIOR ART, VERSUS WHAT APPLE IS

17        ALLEGING IS THE INVENTION IS THE DIFFERENCE BETWEEN "INSTANCE"

18        AND "CLASS."

19           "CLASS," YOUR HONOR, MEANS A GROUP OF MEMBERS THAT SHARE

20        THE SAME CHARACTERISTIC.  "CLASS" IS INHERENTLY A PLURAL

21        CONCEPT.

22           AND SPECIFICALLY IN THIS CONTEXT, "FIELD INSTANCE" WAS IN

23        THE PRIOR ART.  THE WORD "CLASS" WAS USED TO DISTINGUISH THE

24        INVENTION ON THE RIGHT-HAND SIDE THAT IT HAD MULTIPLE FIELDS

25        THAT ARE ASSOCIATED WITH THE SAME HISTORY TABLE THROUGH A FIELD
```

1    CLASS.

2      IF --

3            THE COURT:  I'M SORRY TO INTERRUPT YOU.  LET ME STOP

4    YOU ONE SECOND.

5            MR. PAK:  SURE.

6            THE COURT:  SO LAST WEEK THERE WAS AN AGREEMENT THAT

7    THE FIRST HALF OF YOUR CONSTRUCTION, "A LIST OF CHOICES BASED

8    ON HISTORICAL INFORMATION," IS NOT SUBSTANTIVELY ANY DIFFERENT

9    THAN "A LIST OF PREVIOUSLY USED ENTRIES," WHICH IS APPLE'S

10   FALLBACK CONSTRUCTION.

11     SO THE ONLY POINT THAT WAS IN CONTENTION LAST WEEK IS THE

12   LANGUAGE THAT IS SHARED BETWEEN DIFFERENT APPLICATIONS.

13     BUT FROM WHAT I'M HEARING FROM YOU RIGHT NOW, YOU'RE SAYING

14   YOU'RE NO LONGER ADVOCATING THE SHARING BETWEEN DIFFERENT

15   APPLICATIONS, SO WHAT IS THE CONSTRUCTION YOU'RE PROPOSING

16   TODAY?

17           MR. PAK:  YES.

18           THE COURT:  YEAH.

19           MR. PAK:  YOUR HONOR, JUST TO BE CLEAR, WE ARE STILL

20   MAINTAINING THE "SHARING ACROSS APPLICATIONS" FOR APPELLATE

21   PURPOSES.  I'M NOT GOING TO ARGUE THAT HERE TODAY WITH YOU.

22           THE COURT:  OKAY.

23           MR. PAK:  WHAT WE'RE PROPOSING -- BECAUSE OF THE

24   LANGUAGE WE JUST HEARD FROM MR. LYON, WE THINK THE IDEA OF

25   PLURALITY, SHARING ACROSS FIELDS, IS CAPTURED IN THE LANGUAGE

```
 1         CATEGORY THAT YOU PUT INTO YOUR TENTATIVE CONSTRUCTION, WHICH

 2         IS "CATEGORY," AGAIN, IS SIMILAR TO "CLASS."  IT'S TALKING

 3         ABOUT A GROUP OF MEMBERS THAT SHARE THE SAME CHARACTERISTICS.

 4              HOWEVER, BECAUSE OF WHAT WE JUST HEARD FROM MR. LYON, WE --

 5         AND ALSO THIS IS SOMETHING THAT WE HAD PROPOSED TO APPLE JUST

 6         YESTERDAY TO TRY TO REACH CLOSURE ON THIS ISSUE, YOUR HONOR, SO

 7         WE WOULD PROPOSE A SLIGHT REVISION TO CLARIFY THIS POINT, AND

 8         THIS IS ON OUR DEMONSTRATIVE SLIDE 13.

 9              WE HAD TALKED ABOUT, AS YOUR TENTATIVE CONSTRUCTION, "A

10         CATEGORY OF INFORMATION ASSOCIATED WITH A FIELD."

11              IF "CATEGORY" IS NOT CONSTRUED OR UNDERSTOOD TO HAVE SOME

12         NOTION OF SHARING ACROSS FIELDS, THE PROBLEM IS "FIELD CLASS"

13         COLLAPSES TO THE SAME IDEA AS A "FIELD INSTANCE," WHICH, AGAIN,

14         WE KNOW WAS IN THE PRIOR ART AND DIFFERENT THAN THE INVENTION.

15              THE COURT:  OH, OKAY.  I'M SORRY.  SO YOU'RE ON

16         "FIELD CLASS."  I KNOW THAT YOUR "HISTORY LIST" ARGUMENT

17         DEPENDS ON YOUR "FIELD CLASS" ARGUMENT.

18              MR. PAK:  THAT'S RIGHT.

19              THE COURT:  OKAY.  SO ON THE "FIELD CLASS"

20         CONSTRUCTION, THE DISPUTE, I THOUGHT PREVIOUSLY, WAS ON YOUR

21         POSITION THAT "DATA ELEMENT" HAD TO BE INCLUDED, AND THEN LAST

22         WEEK YOU SAID, "NO, WE WOULD BE SATISFIED WITH 'SOFTWARE

23         CODE'" --

24              MR. PAK:  YES.

25              THE COURT:  -- "IN LIEU OF 'DATA ELEMENT.'"
```

```
 1          SO YOU ARE NOT ADVOCATING THAT TODAY.  TODAY YOU'RE TAKING

 2     THE COURT'S TENTATIVE FROM LAST WEEK AND JUST ADDING

 3     "MULTIPLE."

 4          MR. PAK:  YES.  AND THE REASON FOR THAT, YOUR HONOR,

 5     IS I THINK THERE WAS ALL -- THERE WAS CLEAR AGREEMENT LAST

 6     WEEK, INCLUDING MR. LYON'S STATEMENTS ON THE RECORD --

 7     EVERYBODY AGREES, WHATEVER THIS CATEGORY IS, IT IS IN SOFTWARE.

 8          SO WE ALL AGREE THAT THIS IS NOT A MENTAL ABSTRACTION OF

 9     SOME TYPE.  SO I'M NOT, YOUR HONOR, GOING TO INSIST ON SOME

10     ADDITIONAL LANGUAGE TO TRY TO CAPTURE THAT IDEA.

11          BUT WHAT I AM SUGGESTING HERE TODAY IS BECAUSE WE'RE GOING

12     TO BE ENDING UP -- AND THIS IS REALLY AN IMPORTANT ISSUE, YOUR

13     HONOR, BECAUSE AS YOU TALKED ABOUT, WE WANT TO STREAMLINE THE

14     CASE.

15          TO FIGURE OUT WHETHER A PRIOR ART SYSTEM --

16          THE COURT:  LET ME ASK YOU, DID YOU DISCLOSE YOUR NEW

17     CONSTRUCTION TO APPLE?

18          MR. PAK:  YES, WE DID YESTERDAY.

19          MR. LYON:  YOUR HONOR, I'M SORRY TO INTERRUPT -- I'M

20     SORRY TO INTERRUPT MR. PAK -- BUT THAT IS NOT TRUE.

21          THIS IS THE FIRST TIME.

22          MR. PAK:  MR. PRICE ACTUALLY INCLUDED THIS IN HIS

23     E-MAIL.

24          MR. LYON:  I DON'T BELIEVE HE DID.

25          THE COURT:  ALL RIGHT.  LET ME SEE THE E-MAIL.  JUST
```

```
 1      LIKE LAST YEAR.  LET ME SEE THE DOCUMENT.  LET ME SEE THE

 2      DOCUMENT.

 3               MR. PRICE:  YOUR HONOR, THERE WAS A MISCOMMUNICATION.

 4      IT WAS NOT INCLUDED.  I SHOULD HAVE INCLUDED IT.

 5               MR. LYON:  SO THIS IS LITERALLY --

 6               THE COURT:  OKAY.  SO THIS IS A SANDBAG.

 7               MR. PAK:  NO, YOUR HONOR.

 8               THE COURT:  THIS IS A SANDBAG.  I MEAN, YOU HAD ALL

 9      THIS TIME TO BRIEF AND NOW YOU'RE COMING UP WITH A BRAND NEW

10      CONSTRUCTION AT 11:10 FOR A CLAIM CONSTRUCTION THAT STARTED AT

11      10:30 AND NO ONE HAS SEEN THIS BEFORE?

12               MR. PAK:  YOUR HONOR, THIS IS TO -- WITH ALL

13      RECOGNITION OF YOUR HONOR'S CONCERNS HERE, THIS IS TRYING TO

14      CAPTURE THE IMPORTANT IDEA WE TALKED ABOUT LAST WEEK THAT APPLE

15      IS FULLY AWARE OF.

16           I APOLOGIZE FOR THE MISCOMMUNICATION WITH MR. PRICE.  OUR

17      INTENT ABSOLUTELY WAS TO COMMUNICATE THIS TO APPLE.

18               THE COURT:  SO HOW MANY CLAIM CONSTRUCTION ORDERS DO

19      YOU WANT ME TO WRITE?  I ALREADY HAVE A DRAFT ORDER ON WHAT YOU

20      BRIEFED.  NOW YOU WANT ME TO WRITE A WHOLE SEPARATE ONE ON A

21      BRAND NEW CONSTRUCTION THAT YOU'RE PRESENTING TO ME DURING THE

22      CLAIM CONSTRUCTION HEARING?

23               MR. PAK:  YOUR HONOR, REALLY THIS IS -- AGAIN, IF

24      THERE'S AGREEMENT ON THE WORD "CATEGORY," THIS CONSTRUCTION IS

25      INTENDED TO CAPTURE THE IDEA THAT THERE IS A NOTION OF SHARING
```

```
1    ACROSS FIELDS, WHICH IS ABSOLUTELY WHAT WE HAD DISCUSSED LAST

2    WEEK.

3             THE COURT:  ALL RIGHT.  LET ME ASK APPLE, WHAT IS

4    YOUR POSITION ON THIS NEW CONSTRUCTION?

5             MR. LYON:  SO, YOUR HONOR, THANK YOU.

6        I MEAN, HAVING NOT HAD MUCH TIME TO CONSIDER IT, BUT I

7    THINK IT'S THE SAME.  I BELIEVE THAT WHEN YOU LOOK AT THE CLAIM

8    LANGUAGE, IT SAYS "AT LEAST ONE FIELD."  IT DOES NOT SAY

9    "MULTIPLE FIELDS."

10       AND WHILE, YES, YOU CAN USE FIELD CLASSES ACROSS MULTIPLE

11   FIELDS IF YOU WOULD LIKE TO, THERE'S NOTHING IN THE PATENT,

12   NOTHING IN THE CLAIMS, STARTING THERE, THAT REQUIRES YOU TO

13   HAVE A FIELD CLASS THAT GOES ACROSS MULTIPLE FIELDS.

14       THERE ARE OBVIOUSLY BETTER IMPLEMENTATIONS OF THE INVENTION

15   AND OTHERS THAT WOULD TAKE MULTIPLE -- YOU KNOW, THE MOST USE

16   OF THIS INVENTION.

17       BUT THERE IS NOTHING IN THE CLAIM LANGUAGE, STARTING THERE,

18   THAT REQUIRES THIS.

19       SO THIS WOULD BE AN ERROR TO PUT THIS IN BECAUSE "FIELD

20   CLASS" IS JUST THE CATEGORY --

21             THE COURT:  BUT AGAIN I QUESTION, WHY WOULD YOU HAVE

22   A CLASS IF THERE'S ONLY ONE FIELD?

23             MR. LYON:  THE IDEA WOULD BE, AGAIN, FOR FLEXIBILITY

24   FOR FUTURE DEVELOPMENT, AS WELL AS OTHER ASPECTS.

25       THERE'S A LOT OF ASPECTS OF A SYSTEM THAT GETS PUT IN PLACE
```

1    THAT MAY NOT BE USED.  YOU SEE THAT ALL KINDS OF TIMES WITH

2    OPERATING SYSTEMS AND VARIOUS OTHER TYPES OF MANY PROGRAMS.

3        THIS IS -- THE INVENTORS OF THIS SYSTEM ARE VERY CLEAR

4    ABOUT THEIR IDEA.  THEY WANTED TO MAKE THIS A FLEXIBLE TOOL SO

5    THAT PEOPLE COULD DEVELOP APPLICATIONS AS THEY WANT.

6        NOW, THERE ARE INSTANCES WHERE YOU MIGHT NOT WANT TO SHARE

7    INFORMATION ACROSS FIELDS.  FOR EXAMPLE, IF YOU HAVE A MEDICAL

8    APPLICATION THAT HAS PATIENT RECORDS, YOU WOULDN'T WANT TO

9    SHARE THAT, MAYBE NOT EVEN WITHIN THE SAME FORM.  IT DEPENDS.

10   MAYBE THERE ARE CERTAIN ASPECTS THAT ONLY CERTAIN PHYSICIANS

11   COULD SEE, BUT CERTAINLY NOT ACROSS APPLICATIONS.

12       YOU WOULDN'T WANT THAT INFORMATION COMINGLING WITH A

13   CONTACT FILE TO SOME OTHER DOCTORS THAT DON'T HAVE ACCESS TO

14   THE PATIENT APPLICATION.

15       SO IT'S ALL UP TO THE DEVELOPER TO CHOOSE.

16           THE COURT:  LET ME ASK MR. PAK, WHY DON'T YOU GIVE ME

17   COLUMN AND LINE NUMBER THAT STARTS -- THAT SUPPORTS THIS NEW

18   CONSTRUCTION.

19           MR. PAK:  SO, YOUR HONOR, THAT BEGINS --

20           THE COURT:  I DON'T WANT YOUR SLIDES.  I DO NOT WANT

21   YOUR SLIDES.  I WANT COLUMN AND LINE NUMBERS.  THAT'S ALL I

22   WANT.

23           MR. PAK:  WE HAVE COLUMN 9, YOUR HONOR, LINE 67 TO 10

24   THROUGH 3.

25       THAT DISCUSSION IS ALSO FOLLOWED UP IN COLUMN 9, LINE --

```
1              THE COURT:  OKAY.  JUST STOP.

2              MR. PAK:  SURE.

3              THE COURT:  LET ME READ IT.

4              MR. PAK:  SURE.

5              THE COURT:  "AFTER DISPLAYING 166 THE FORM, A

6    DECISION 168 IS MADE BASED ON WHETHER THERE IS A HISTORY LIST

7    AVAILABLE FOR THE PARTICULAR FIELD OF THE FORM.  FOR EXAMPLE,

8    IF THE FIELD WITHIN THE FORM IS A NAME FIELD WHICH REQUESTS A

9    PERSON'S NAME, THEN THE DECISION 168 DETERMINES WHETHER THERE

10   IS A HISTORY LIST AVAILABLE FOR THE NAME FIELD."

11             MR. PAK:  YES.

12             THE COURT:  ALL RIGHT.  I'M NOT PERSUADED BY THAT,

13   BUT GO AHEAD.

14             MR. PAK:  THEN IF YOU FOLLOW COLUMN 9, LINES 51 TO

15   62, YOU WILL SEE THAT THERE ARE -- AND WE TALKED ABOUT THIS

16   LAST TIME -- THAT THERE ARE MULTIPLE --

17             THE COURT:  NOPE, NOPE, NOPE.  I'M GOING TO READ IT.

18   IF YOU'RE GOING TO SAY SOMETHING SAYS SOMETHING, LET ME READ

19   IT.

20        OKAY.  61.  "THE FORM IS DISPLAYED 166 ON A DISPLAY SCREEN

21   OF THE COMPUTER SYSTEM."  ALL RIGHT.

22             MR. PAK:  SO, YOUR HONOR, COLUMN 9, LINES 50 DOWN TO

23   62 WHERE IT TALKS ABOUT MULTIPLE NAME FIELDS ALL RUNNING ON THE

24   SAME FIGURE 4.

25             THE COURT:  "FOR EXAMPLE, IN AN APPLICATION PROGRAM,
```

```
 1       SUCH AS A FAX SENDING PROGRAM RUNNING ON A COMPUTER, WHEN

 2       SENDING A FAX, A FORM WILL BE DISPLAYED TO THE USER REQUESTING

 3       THAT THE USER ENTER THE NAME OF THE PERSON TO WHICH THE FAX IS

 4       TO BE SENT.  ANOTHER EXAMPLE IS AN ELECTRONIC BUSINESS CARD

 5       PROGRAM (E.G., ROLODEX-LIKE PRODUCT) RUNNING ON A COMPUTER,

 6       WHEREIN WHEN ENTERING A NEW BUSINESS ACQUAINTANCE, A FORM WILL

 7       BE DISPLAYED TO THE USER REQUESTING THE NAME, COMPANY, ADDRESS,

 8       PHONE, ET CETERA OF THE PERSON.  THE ABOVE TWO EXAMPLES OF

 9       FORMS ARE TWO OF MANY TYPES OF FORMS THAT CAN BE USED WITH THE

10       INVENTION."

11               MR. PAK:  AND WHAT WE --

12               THE COURT:  I GUESS I DON'T SEE HOW IT SUPPORTS THAT.

13           I ALSO --

14               MR. PAK:  COULD I --

15               THE COURT:  I MEAN, THIS -- ON FIGURE 4 --

16               MR. PAK:  YES.

17               THE COURT:  -- THIS SAYS THAT THE INVENTION MAY WORK

18       WITH A FAX PROGRAM.  IT MAY WORK WITH A ROLODEX.

19           BUT IT DOESN'T TALK AT ALL ABOUT THERE BEING ANY SHARING.

20               MR. PAK:  WELL, WHAT'S KEY, YOUR HONOR, IS THAT BOTH

21       OF THOSE EXAMPLE FORMS HAVE THE SAME NAME FIELD CLASS

22       ASSOCIATED WITH THEM, AND THEY'RE RUNNING THE SAME ALGORITHM,

23       WHICH IS FIGURE 4.

24           SO IF BOTH APPLICATIONS ARE RUNNING AND BOTH FORMS ARE

25       RUNNING THAT SAME FIGURE 4 THAT WE SAW, THAT MEANS THAT THEY
```

1    WILL GO THROUGH THE SAME DECISION BLOCK 168, AND BECAUSE THEY

2    HAVE THE SAME FIELD CLASS NAME, THEY WILL DEFINITELY SHARE THE

3    SAME HISTORY LIST.

4        AND FURTHERMORE, YOUR HONOR, THIS IS COLUMN 10, AND THIS IS

5    VISUALLY ILLUSTRATED IN COLUMN 10 AND DESCRIBED AT THE BOTTOM,

6    64 TO 67, AND I'LL ALLOW YOU TO READ THAT, YOUR HONOR.

7        THE COURT:  SO IT'S COLUMN 10, 64 THROUGH 67.  "THE

8    INPUT FIELDS OF A FORM THEN DESIGNATE THE FIELD CLASS

9    ASSOCIATED THEREWITH.  HERE, THE FIELD CLASS ASSOCIATED WITH

10   THE FIELD 184 WOULD BE 'FULL NAME.'"

11       AND THAT'S IN FIGURE 5A.

12       MR. PAK:  THAT'S RIGHT.

13       THE COURT:  ALL RIGHT.  WHAT ELSE HAVE YOU GOT?

14       MR. PAK:  SO JUST ON THAT POINT, YOUR HONOR, IF YOU

15   LOOK AT THE LANGUAGE, IT'S THE INPUT FIELDS OF A FORM, PLURAL,

16   FIELDS OF A FORM ARE THEN DESIGNATING A SINGLE FIELD CLASS,

17   FIELD CLASS ASSOCIATED THEREWITH.

18       SO THIS NOTION, AGAIN, IS THERE'S A DISTINCTION IN THE

19   RECORD NOW, IN THE PATENT SPECIFICATION, OF THE DIFFERENCE

20   BETWEEN A FIELD INSTANCE VERSUS A FIELD CLASS, AND A FIELD

21   CLASS HAS ASSOCIATED WITH IT MULTIPLE FIELDS.  THAT REALLY IS

22   THE TRUE POINT OF ADDING "FIELD CLASS" TO THIS.

23       AND THEN IN TERMS OF THE DEMONSTRATIVES, YOUR HONOR, THAT

24   ARE SUPPORTIVE, LET'S TAKE A LOOK AT FIGURE 13.

25       THIS IS A VERY CONCRETE EXAMPLE OF THE TYPE OF SHARING THAT

```
1        IS ACROSS -- THAT WOULD OCCUR ACROSS FIELDS.

2            I UNDERSTAND, YOUR HONOR, THAT THIS IS IN THE CONTEXT --

3               THE COURT:  WHY DIDN'T YOU DISCLOSE THIS TO APPLE

4        BEFORE THE CLAIM CONSTRUCTION HEARING?  DIDN'T YOU ALL MEET AND

5        CONFER IN PERSON?  DIDN'T YOU FILE THINGS ON TUESDAY?

6               MR. PAK:  YES.  REALLY, YOUR HONOR, IT WAS -- I AM

7        GENUINELY APOLOGETIC.  WE HAD --

8               THE COURT:  SO WHAT TIME DID YOU COME UP WITH THIS?

9               MR. PAK:  WE HAD COME UP WITH THIS PROBABLY 4:00 P.M.

10       YESTERDAY WHEN LOOKING AT YOUR TRANSCRIPT.

11              THE COURT:  OKAY.  SO YOU'VE BEEN LITIGATING THIS

12       CASE FOR A YEAR.  WHY SHOULD I THINK THIS HAS ANY LEGITIMACY IF

13       YOU HADN'T BEEN ABLE TO THINK THIS UP IN A YEAR AFTER YOU'VE

14       HAD ALL THIS CLAIM CONSTRUCTION DISCOVERY, CLAIM CONSTRUCTION

15       BRIEFING, TUTORIAL?

16              MR. PAK:  WELL, YOUR HONOR, WE THINK IT'S ACTUALLY

17       CAPTURED ALREADY IN WHAT YOU DESCRIBED AS "CATEGORY OF

18       INFORMATION," AND LOOKING AT WHAT YOU SAID AND WHAT MR. LYON

19       SAID IN THE TRANSCRIPT, FROM THE HEARING TRANSCRIPT, WHICH WE

20       RECEIVED LATE YESTERDAY, WHAT BECAME CLEAR TO US WAS THAT THERE

21       MAY BE SOME AMBIGUITY ABOUT WHETHER "CATEGORY OF INFORMATION"

22       INCLUDES THE CONCEPTS OF LINKING TO MULTIPLE FIELDS --

23              THE COURT:  OKAY.  LET ME STOP YOU.  OTHER THAN

24       FIGURES 13A AND 13B, WHICH WE ALREADY DISCUSSED, WHAT ELSE?

25       GIVE ME ANY EVIDENCE YOU HAVE.  SINCE THIS IS NOT BRIEFED, YOU
```

1    NEED TO TELL ME NOW.

2        AND I ASSUME FOR INTRINSIC EVIDENCE YOU WANT TO JUST CITE

3    AGAIN TO THE EXAMINER'S STATEMENT OF REASONS FOR ALLOWANCE

4    REGARDING BORLAND C++.

5            MR. PAK:  THAT'S RIGHT, YOUR HONOR.

6            THE COURT:  OKAY.  ANYTHING ELSE?  GIVE ME ALL YOU'VE

7    GOT.  WHAT ELSE?

8            MR. PAK:  WE ALSO HAVE STATEMENTS --

9            THE COURT:  I DON'T WANT ANY REPRESENTATION OF WHAT

10   IT SAYS.

11           MR. PAK:  SURE.

12           THE COURT:  I WANT A LINE NUMBER AND A CITATION AND

13   I'LL LOOK THAT UP MYSELF.  WHAT IS IT?

14           MR. PAK:  FIGURE -- COLUMN 16.

15           THE COURT:  OKAY.

16           MR. PAK:  LINE 37 DOWN TO 49.

17           THE COURT:  "THE DESTINATION FIELD 318 IS ASSOCIATED

18   WITH THE NAME CLASS.  HENCE, EVEN THOUGH THE PHONE MESSAGING

19   PROGRAM AND THE FAX PROGRAM ARE DIFFERENT PROGRAMS, THE SAME

20   HISTORY TABLE IS USED FOR FIELDS WITHIN FORMS ASSOCIATED WITH

21   THESE PROGRAMS.  THUS, THE HISTORY DEVELOPED FOR A PARTICULAR

22   COMPUTER, PROGRAM, OR USER IS AVAILABLE NOT ONLY FOR LATER USE

23   BY THE SAME APPLICATION, BUT ALSO FOR LATER USE BY DIFFERENT

24   APPLICATIONS.  THIS IS BENEFICIAL BECAUSE THE USER DOES NOT

25   HAVE TO BUILD A HISTORY FOR EACH PARTICULAR APPLICATION.

```
 1        INSTEAD, THE HISTORY IS SHARED ACROSS APPLICATIONS SO THAT THE

 2    EASE OF USE IS IMPROVED.  THE HISTORY THAT IS DEVELOPED IS ALSO

 3    MORE RELIABLE WHEN SHARED ACROSS APPLICATIONS BECAUSE THE

 4    SAMPLE SIZE IS GREATER."

 5        ALL RIGHT.  WHAT ELSE DO YOU HAVE?

 6            MR. PAK:  THE LAST ONE, YOUR HONOR, IS SUMMARY OF THE

 7    INVENTION, COLUMN 2, LINE 30 TO 41.

 8            THE COURT:  LINE -- OKAY.  COLUMN 2, LINE, WHAT, 30

 9    THROUGH 41?

10            MR. PAK:  YES, YOUR HONOR.

11            THE COURT:  OKAY.  IS THAT IT?

12            MR. PAK:  THOSE ARE THE CITES FROM THE INTRINSIC

13    EVIDENCE.

14            THE COURT:  OKAY.  AND ANYTHING ELSE THAT YOU ALL

15    PREVIOUSLY SUBMITTED THAT YOU'RE RELYING ON FOR THIS?  OR IS

16    THIS IT?  I JUST WANT TO KNOW WHAT THE UNIVERSE IS.

17            MR. PAK:  I THINK WE ALSO CITED SOME EVIDENCE IN THE

18    FORM OF INVENTOR TESTIMONY IN OUR BRIEFING AS WELL, AND IF I

19    COULD -- DO YOU HAVE A COPY OF OUR OPPOSITION?

20            THE COURT:  I DO.  AND I WAS GOING TO DISREGARD THE

21    INVENTOR'S TESTIMONY, ACTUALLY.  THAT'S MR. CAPPS?

22            MR. PAK:  YOUR HONOR.  MR. CAPPS' TESTIMONY --

23            THE COURT:  THAT'S ON THE POINT ABOUT THE HISTORY

24    LIST BEING SHARED ACROSS APPLICATIONS?

25            MR. PAK:  ACTUALLY, HE ALSO DISCUSSES SHARING ACROSS
```

1       FIELDS AS WELL WITHIN THAT SYSTEM, I BELIEVE.

2              THE COURT:  ALL RIGHT.  IS IT WHAT YOU'VE ALREADY

3       SUBMITTED?

4              MR. PAK:  YES.

5              THE COURT:  OKAY.  THEN I'LL TAKE A LOOK AT THAT.

6          SO THIS WOULD BE THE DECLARATION OF MR. BRIGGS, EXHIBIT 4

7       TO MS. MAROULIS'S DECLARATION?  IS THAT IT?

8              MR. PAK:  YES.

9              THE COURT:  OKAY.  ALL RIGHT.

10         NOW, LET ME ASK MR. LYON, ANYTHING YOU WANT TO ADD THAT YOU

11      HAVEN'T ALREADY STATED?

12             MR. LYON:  VERY BRIEFLY, YOUR HONOR.

13         THE ONLY THING I WOULD SAY, AND THIS IS ACTUALLY -- YOU'RE

14      GOING TO SEE THIS IN SOME OF THE OTHER PATENTS, TOO -- IS THAT

15      SAMSUNG IS FOCUSSING ON EMBODIMENTS THAT ARE DISCLOSED.

16      THEY'RE TRYING TO READ THOSE EMBODIMENTS INTO THE CLAIM, AND

17      THAT'S WHAT WE SEE.

18         IF YOU LOOK AT -- FOR EXAMPLE, THE BEST ILLUSTRATION OF

19      THIS IS COLUMN 16, THE SECTION MR. PAK JUST REFERRED TO.  HE

20      REFERRED TO LINES, I BELIEVE IT WAS 30 -- AND I DON'T HAVE THEM

21      EXACTLY, BUT I CIRCLED SOMEWHERE AROUND 36 OR 37 DOWN TO ABOUT

22      49.

23         BUT THAT SECTION, IF YOU LOOK AT -- ABOVE THAT TO AROUND

24      LINE 23, IT'S DESCRIBING FIGURES 13 AND 13A AND B, WHICH ARE

25      THE ILLUSTRATIONS THAT ARE ILLUSTRATING THE APPLICATION, THE

```
 1        EMBODIMENT, WHERE YOU ARE SHARING ACROSS APPLICATIONS.

 2            SO IN THAT SITUATION, IT'S NOT A SURPRISE THAT YOU WOULD BE

 3        FINDING A BENEFIT BY SHARING BECAUSE THIS IS THE DISCLOSURE,

 4        THIS IS THE EXAMPLE THAT'S GIVEN IN THE PATENT OF WHY YOU MIGHT

 5        USE A FIELD CLASS TO SHARE ACROSS APPLICATIONS.

 6            THE CLAIM LANGUAGE, THOUGH -- AND I JUST SUBMIT, IF YOU GO

 7        BACK AND LOOK AT THE CLAIM LANGUAGE, IT'S VERY -- IT'S NOT

 8        LIMITED IN ANY WAY, AND MR. PAK HASN'T POINTED YOU TO ANYTHING

 9        IN THE SPECIFICATION, ANYTHING IN THE PROSECUTION HISTORY,

10        THAT'S A DISAVOWAL OR SOME KIND OF LIMIT ON THE SCOPE.

11            THE BORLAND SLIDE, LET ME ADDRESS THAT JUST VERY BRIEFLY --

12        IF I COULD PUT UP SLIDE 12, PLEASE -- IF YOU LOOK AGAIN JUST AT

13        WHAT THE EXAMINER SAID ABOUT BORLAND, HE'S SAYING IT DOESN'T

14        TEACH UPDATING THE HISTORY LIST ASSOCIATED WITH THE FIELD

15        CLASS.

16            IN FACT, THERE'S NO MENTION AT ALL IN BORLAND OF A FIELD

17        CLASS AT ALL.

18            SO THE IDEA THERE IS BORLAND HAS HISTORY LISTS, IT HAS A

19        FIELD, AND YOU'RE UPDATING A FIELD.

20            BUT THERE'S NO CONCEPT OF THE FLEXIBILITY THAT WE'VE BEEN

21        TALKING ABOUT HERE THAT'S PUT IN BY "FIELD CLASS," AND THAT'S

22        WHY BORLAND WAS CONSIDERED NOT TO BE PERTINENT BY THE EXAMINER.

23            I SUBMIT THAT -- YOU KNOW, OBVIOUSLY YOU'VE GOT THE

24        PROSECUTION HISTORY AND YOU CAN DRAW YOUR OWN CONCLUSIONS ON

25        THAT, BUT I SUBMIT THAT'S REALLY WHAT'S GOING ON.
```

```
1          IT'S NOT SAYING THAT SOMEHOW WE ARE SHARING WITHIN FORMS.

2     THERE'S NOTHING ABOUT THAT WITHIN BORLAND.

3          SO THIS IDEA OF A CATEGORY BEING SOMEHOW CARRIED IN A

4     PLURALITY, OR THE NAME CLASS CARRYING A PLURALITY JUST DOESN'T

5     MAKE SENSE WHEN THE CLAIMS SAY "AT LEAST ONE FIELD."

6               THE COURT:  I DON'T KNOW IF YOU ALL SUBMITTED THE --

7     YOU DIDN'T SUBMIT THE FULL FILE HISTORY, AND BASED ON OUR

8     DISCUSSION LAST WEEK, I DON'T THINK YOU SUBMITTED WHATEVER YOU

9     WERE REFERRING TO.

10         SO TELL ME WHERE THERE ARE PAGE AND EXHIBIT NUMBERS THAT

11    SHOW WHAT YOU'VE JUST HIGHLIGHTED.

12              MR. LYON:  SURE.

13              THE COURT:  OKAY.  NOW, THE SECOND ONE IS PAGE 4,

14    STATEMENT OF REASONS FOR ALLOWANCE, WHICH IS EXHIBIT 2, SO THAT

15    I HAVE.

16              MR. LYON:  OKAY.

17              THE COURT:  TELL ME WHERE THE "AS PER INDEPENDENT

18    CLAIM 16, PRIOR ART OF RECORD FAILS TO PROVIDE A HISTORY TABLE

19    FOR EACH OF A PLURALITY OF FIELD CLASSES AND ASSIGNING A DATA

20    VALUE," DO I HAVE THAT?

21              MR. LYON:  I THINK YOU DO, YOUR HONOR.  BUT IF I --

22    AND I'LL TELL YOU WHAT.  I DON'T HAVE IT HANDY.  I THINK YOU

23    DO.  IF YOU DON'T, I'M NOT RELYING ON THAT PARTICULAR ONE.

24         I WANTED TO JUST FOCUS REALLY ON THE BORLAND STATEMENT FOR

25    PURPOSES OF WHAT I'M ARGUING HERE TODAY, AND I'M NOT TRYING TO
```

```
 1        EXPAND THE RECORD.

 2            I DO THINK -- THERE ARE TWO THINGS I GUESS I WOULD SAY

 3        ABOUT THE PROSECUTION HISTORY.  I THINK YOU DO HAVE -- AND I

 4        THINK YOU'RE REFERRING TO THE '760 PATENT APPLICATION FOR

 5        PURPOSES OF THAT.  I DO THINK YOU HAVE ALL THE PERTINENT PAPERS

 6        FOR THAT.

 7            WE'RE HAPPY ON THE OTHER HAND, AND I THINK SAMSUNG WOULD

 8        AGREE, IF IT WOULD BE HELPFUL FOR YOUR HONOR, WE'LL LODGE THE

 9        FULL PROSECUTION HISTORIES WITH THE PATENTS.  WE JUST DIDN'T

10        WANT TO BURDEN THE COURT WITH A LOT OF EXTRA PAPER.  BUT IF

11        IT'S HELPFUL, WE'RE HAPPY TO DO THAT BECAUSE IT IS PUBLIC

12        RECORD.

13                THE COURT:  OKAY.  NOW, I ASSUME YOU DON'T NEED ANY

14        DISCUSSION ON "HISTORY LIST" BECAUSE WE WERE TALKING ABOUT

15        "HISTORY LIST" AND IT JUMPED TO "FIELD CLASS," SO LET'S SKIP

16        THAT BECAUSE I UNDERSTAND THAT SAMSUNG'S "HISTORY LIST"

17        POSITION DEFAULTS TO YOUR "FIELD CLASS" POSITION.  OKAY?

18            YOU DON'T HAVE ANYTHING ELSE ON "FIELD" -- ON "HISTORY

19        LIST," RIGHT?

20                MR. LYON:  NO, I DON'T THINK SO.

21                THE COURT:  OKAY.  I'M PROBABLY GOING TO STICK WITH

22        "A LIST OF PREVIOUSLY USED ENTRIES."

23                MR. LYON:  THANK YOU, YOUR HONOR.

24                THE COURT:  OKAY.

25            ALL RIGHT.  LET'S GO TO -- LET'S GO TO "ACTION PROCESSOR,"
```

```
 1        WHICH IS THE '647, AND I ONLY HAVE ONE QUESTION ON THIS ONE.

 2             MR. REITER:  GOOD MORNING, YOUR HONOR.  MARK REITER

 3        FOR APPLE.

 4          I DON'T KNOW IF YOUR QUESTION WAS FOR ME OR FOR SAMSUNG.

 5             THE COURT:  IT'S FOR SAMSUNG.

 6             MR. REITER:  OKAY.

 7             MR. PRICE:  NO PRESSURE, YOUR HONOR.  HI.

 8             THE COURT:  IS YOUR COLD GONE?

 9             MR. PRICE:  IT'S PRETTY MUCH GONE, YES.  YOU'RE SAFE,

10        APPLE IS SAFE, AND YOUR CLERKS ARE SAFE.

11             THE COURT:  ALL RIGHT, GOOD.

12          OKAY.  SO I WANTED YOU TO HAVE AN OPPORTUNITY TO ADDRESS

13        APPLE'S CLAIM DIFFERENTIATION ARGUMENT THAT THEY MADE LAST WEEK

14        WITH REGARD TO CLAIM 3, AND THEN IT APPEARS THAT IT COULD ALSO

15        APPLY TO CLAIM 16.

16             MR. PRICE:  SURE.

17          WELL, CLAIM DIFFERENTIATION, YOUR HONOR, OBVIOUSLY FLOWS

18        FROM THE DOCTRINE THAT CLAIMS ARE PRESUMED TO BE DIFFERENT IN

19        SCOPE, AND APPLE IS SAYING THAT WITH OUR CONSTRUCTION OF CLAIM

20        1, THAT CLAIM 3 AND CLAIM 10 DON'T DIFFER IN SCOPE FROM CLAIM

21        1.

22          THAT'S JUST SIMPLY NOT TRUE, AND IN FACT, IF WE CAN PUT UP

23        SLIDE 12, THE FEDERAL CIRCUIT HAS BEEN CLEAR THAT THE CLAIM

24        DIFFERENTIATION, THE CLAIMS ARE PRESUMED TO DIFFER IN SCOPE

25        DOESN'T MEAN THAT EVERY LIMITATION MUST BE DISTINGUISHED FROM
```

1    ITS COUNTERPART IN ANOTHER CLAIM, ONLY THAT AT LEAST ONE

2    LIMITATION MUST DIFFER.

3         AND CLAIM 3 AND CLAIM 10 HAVE DIFFERENT LIMITATIONS BECAUSE

4    THEY'RE DEALING WITH DESCRIBING A DIFFERENT INVENTION.

5         AND IN PARTICULAR, IF WE GO TO SLIDE 13, CLAIM 3 IS

6    DISTINCT FROM CLAIM 1 BECAUSE IT CLAIMS -- AND CLAIM 1 DOES

7    NOT -- AN APPLICATION PROGRAMMING INTERFACE AND IT SPECIFIES

8    THE APPLICATION THAT INPUTS DATA HAS TO BE RUNNING

9    CONCURRENTLY.

10        CLAIM 1 DOESN'T DISTINGUISH BETWEEN WHETHER OR NOT THE

11   APPLICATION, WHICH IS PROVIDING THE DATA, AND THE INVENTION IN

12   CLAIM 1 IS RUNNING CONCURRENTLY OR SEPARATELY.

13        UNDER CLAIM 1, YOU COULD CLOSE ONE APPLICATION AND THE

14   APPLICATION IN THE INVENTION COULD THEN BE DOING ITS JOB ON THE

15   SAME DOCUMENT.

16        SO YOU SEE THE LANGUAGE ITSELF FROM CLAIM 3, "A SYSTEM

17   RECITED IN CLAIM 1 WHEREIN THE INPUT DEVICE RECEIVES THE DATA

18   FROM AN APPLICATION RUNNING CONCURRENTLY" -- THAT'S NOT IN

19   CLAIM 1 -- "AND WHEREIN THE PROGRAM ROUTINES STORED IN MEMORY

20   FURTHER COMPRISE AN APPLICATION PROGRAM INTERFACE," AND, AGAIN,

21   THE APPLICATION PROGRAM INTERFACE IS NOT CLAIMED IN CLAIM 1,

22   "FOR COMMUNICATING WITH THE APPLICATION."

23        AND I THINK THE THEORY BEING THAT IF THEY'RE RUNNING

24   CONCURRENTLY, THE APPLICATION AND -- WILL WANT TO BE

25   COMMUNICATING CONCURRENTLY WITH THE PROGRAM, AND WHERE APPLE

```
1        CLAIMED AN APPLICATION PROGRAM INTERFACE WHICH FACILITATES THAT

2    COMMUNICATION.

3        CLAIM 10, YOU HAVE THE SAME THING, EXCEPT IT'S REFERRING

4    TO AN OUTPUT RATHER THAN AN INPUT.

5            THE COURT:  BUT HOW DOES -- HOW IS CONCURRENTLY -- I

6    UNDERSTAND YOU'RE SAYING THAT THESE ARE DIFFERENT

7    LIMITATIONS --

8            MR. PRICE:  YES.

9            THE COURT:  -- THAT DISTINGUISH CLAIM 3 FROM CLAIM 1.

10           MR. PRICE:  RIGHT.

11           THE COURT:  BUT "RUNNING CONCURRENTLY," DOESN'T THAT

12   SORT OF INHERENTLY IMPLY SEPARATENESS?  LIKE "CONCURRENTLY"

13   MEANS IT'S NOT THE SAME THING.  DOESN'T THAT SORT OF IMPLY THAT

14   THEY'RE DIFFERENT IF THEY'RE RUNNING CONCURRENTLY?

15           MR. PRICE:  WELL, I THINK THAT WOULD ACTUALLY -- IF

16   YOU HAD THAT INTERPRETATION, THAT WOULD SUPPORT OUR

17   INTERPRETATION THAT THE APPLICATION IS SEPARATE FROM THE

18   PROGRAM.

19           THE COURT:  OKAY.

20           MR. PRICE:  BUT I THINK WHAT WE'RE TALKING ABOUT WITH

21   "RUNNING CONCURRENTLY" IS -- IT'S LIKE A SPELL CHECKER WHICH,

22   AS YOU'RE WRITING A DOCUMENT, YOU KNOW, GIVES YOU SUGGESTED

23   WORDS IN PLACE OF WHAT YOU'RE WRITING.

24       I THINK "CONCURRENTLY" MEANS THAT BOTH THE PROGRAM WHICH IS

25   ANALYZING THE STRUCTURES AND PROVIDING USER INTERFACE, AND
```

1    THEN, YOU KNOW, EVENTUALLY GIVES YOU PROPOSED ACTIONS IS

2    RUNNING AT THE SAME TIME THAT YOU ARE RUNNING THE APPLICATION

3    TO WHICH YOU'RE APPLYING THE PROGRAM.

4          THE COURT:  WHAT -- SO --

5          MR. PRICE:  AND I THINK YOU SEE THAT, YOUR HONOR, IN

6    THE ABSTRACT WHERE THAT'S BASICALLY WHAT THEY'RE -- THEY'RE

7    SAYING IN THE ABSTRACT THAT YOU CAN DO BOTH BASICALLY AT THE

8    SAME TIME.

9          THE COURT:  SO THE MOST SIGNIFICANT LIMITATIONS THAT

10   YOU THINK CLAIM 3 ADDS ARE THE WHAT?

11         MR. PRICE:  THE FACT THAT THE APPLICATION IS RUNNING

12   CONCURRENTLY, AND CLAIM 1 IS SILENT ON THAT, AND THAT THEY'RE

13   CLAIMING IN CLAIM 3 AND CLAIM 10 THAT APPLICATION PROGRAM

14   INTERFACE.

15      SO, FOR EXAMPLE, YOUR HONOR, IF YOU LOOK AT FIGURE 2, WHICH

16   WE HAVE, I THINK, IN SLIDE 18, YOU'LL SEE THAT WITHIN BOX 165,

17   WHICH THEY REFER TO AS THE PROGRAM WHICH HAS THE ANALYZER

18   SERVER, APPLICATION PROGRAM INTERFACE, USER INTERFACE, ACTION

19   PROCESSOR.  IN CLAIM 1, THEY DON'T CLAIM THE APPLICATION

20   PROGRAM INTERFACE.

21      IN CLAIMS 3 AND 10 THEY DO CLAIM THAT AS PART OF THE

22   PROGRAM, THE PROGRAM ROUTINE.

23         THE COURT:  AND SO FOR CLAIM 16, YOU WOULD SAY THE

24   SAME SIGNIFICANT NEW LIMITATION WOULD BE THE RUNNING

25   CONCURRENTLY?

```
 1              MR. PRICE:  YOU MEAN CLAIM 10, YOUR HONOR?

 2              THE COURT:  I'M LOOKING AT 16, AND 10 AS WELL.

 3              MR. PRICE:  LET'S SEE.  YES, THAT -- CLAIM 16 ALSO

 4    DEALS WITH "RUNNING CONCURRENTLY."

 5              THE COURT:  ALL RIGHT.  LET ME GIVE MR. REITER AN

 6    OPPORTUNITY TO RESPOND.

 7         DO YOU AGREE OR DISAGREE?

 8              MR. REITER:  THANK YOU, YOUR HONOR.

 9         IF WE COULD PUT UP SLIDE 19 FIRST, OR ACTUALLY SLIDE 20.

10    SLIDE 20.

11         MR. PRICE IS FOCUSSED ON, AND THE COURT HAS RECOGNIZED,

12    THAT THEY'RE TRYING TO SAY THAT THE DIFFERENCE BETWEEN CLAIM 1,

13    FOR EXAMPLE, AND CLAIMS 3 AND 10 IS "CONCURRENTLY," AN

14    APPLICATION RUNNING CONCURRENTLY.

15         BUT IF WE GO TO CLAIM 1, WE'LL SEE THAT THERE IS NO

16    APPLICATION IN CLAIM 1.  CLAIM 1 DOESN'T CLAIM AN APPLICATION.

17    CLAIM 1 CLAIMS THE PROGRAM ROUTINES THAT INCLUDE THE ANALYZER

18    SERVER, THE USER INTERFACE, AND THE ACTION PROCESSOR.  ALL OF

19    THAT CAN BE COMBINED WITH THE APPLICATION.

20         WHEN WE GET TO CLAIM 3 AND WHEN WE GET TO CLAIM 10, THEN WE

21    SEE AN APPLICATION.  THEN WE SEE AN APPLICATION PROGRAM

22    INTERFACE, WHICH IS WHAT WE ALSO SEE IN FIGURE 2, WHICH IS

23    REPRESENTATIVE OF BOX 165 IN FIGURE 1.

24         SO THERE IS EXPLICIT DIFFERENTIATION HERE IN THE ADDITION

25    TO THE APPLICATION AND THE APPLICATION PROGRAM INTERFACE
```

1     BETWEEN 1, INDEPENDENT CLAIM 1, AND DEPENDENT CLAIMS 3 AND 10.

2           THE COURT:  ALL RIGHT.  I'M GOING TO GIVE MR. PRICE

3     AN OPPORTUNITY TO RESPOND TO THAT.

4           MR. PRICE:  WELL, I THINK THE RESPONSE IS I BELIEVE

5     THAT HE'S CORRECT IN THAT CLAIM 1 -- YOU READ THE LANGUAGE.  IT

6     DOES NOT CLAIM AN APPLICATION PROGRAM INTERFACE.  IT DOES NOT

7     SAY WHETHER THE PROGRAM IS RUNNING CONCURRENTLY OR SEPARATELY.

8           THE COURT:  OKAY.  I'M GOING TO GIVE MR. REITER AN

9     OPPORTUNITY TO RESPOND TO THAT.

10          MR. REITER:  IT DOESN'T CLAIM AN APPLICATION, YOUR

11    HONOR.  SO, THEREFORE, TO SAY THAT THE ACTION PROCESSOR MUST BE

12    SEPARATE FROM A CLIENT OR SEPARATE FROM AN APPLICATION IS

13    READING SOMETHING INTO THE CLAIM THAT JUST SIMPLY IS NOT IN

14    CLAIM 1.

15       IT DOESN'T CLAIM AN APPLICATION.  THAT COMES LATER.  THAT

16    EMBODIMENT IS LATER DESCRIBED IN CLAIMS 3 AND 10.

17       AND SO THERE IS AN ABSOLUTE DIFFERENCE, USING MR. PRICE'S

18    WORDS, TO LOOK TO SEE IF THERE'S SOMETHING DIFFERENT BETWEEN 3

19    AND 10, AND THE DIFFERENCE IS THE APPLICATION, THE APPLICATION

20    PROGRAM INTERFACE.  THAT'S NOT IN CLAIM 1.  CLAIM 1 DOESN'T

21    MENTION THAT.

22       IT ALLOWS FOR THE APPLICATION AND THE APPLICATION PROGRAM

23    INTERFACE TO BE ALL COMBINED WITH THESE PROGRAM ROUTINES.

24          MR. PRICE:  YOUR HONOR, I THINK I'VE HEARD AN

25    ADMISSION THAT CLAIMS 3 AND 10 DO PROVIDE ADDITIONAL

```
 1       LIMITATIONS, AND AS A MATTER OF LAW, THE CLAIM DIFFERENTIATION

 2       DOCTRINE DOES NOT APPLY WHEN THE OTHER CLAIMS HAVE DIFFERENT

 3       LIMITATIONS.

 4            SO I'M KIND OF WONDERING WHAT WE'RE TALKING ABOUT HERE.

 5            AND SECONDLY, YOUR HONOR, CLAIMS 3 AND 10 DO NOT SAY

 6       WHETHER OR NOT THE APPLICATION IS PART OF THE SUBPROGRAM

 7       ROUTINES.

 8            IF -- YOU KNOW, IF YOU LOOK AT -- FIRST, IF YOU JUST LOOK

 9       AT THE LANGUAGE, YOU KNOW, THE -- IF WE CAN GO TO THE PATENT

10       ITSELF, LET'S SAY 6, SLIDE 6 -- IT LENDS ITSELF AS -- I'M

11       SORRY.  SLIDE 6.

12              THE COURT:  WHAT'S THE LINE AND COLUMN NUMBER,

13       PLEASE?

14              MR. PRICE:  THE CLAIM LANGUAGE ITSELF IN CLAIM 1 --

15              THE COURT:  OH, OKAY.  SORRY.

16              MR. PRICE:  SO IT'S THE CLAIM LANGUAGE ITSELF.

17            YOU KNOW, IT IDENTIFIES THREE SPECIFIC PROGRAM ROUTINES,

18       ANALYZER SERVER, USER INTERFACE, ACTION PROCESSOR.

19            AND AS JUDGE POSNER HAS SAID, SOMEONE WITH ORDINARY SKILL

20       IN THE ART WOULD READ SERVERS AS MEANING SOMETHING THAT SERVES

21       OTHER CLIENTS.

22            AND APPLE IS THE ONE THAT CHOSE THIS LANGUAGE.

23            AND ACTION PROCESSOR WOULD BE READ THE SAME WAY, BECAUSE A

24       PROCESSOR IS USUALLY THOUGHT OF AS SOMETHING, YOU KNOW, LIKE ON

25       YOUR COMPUTER.  YOU HAVE A PROCESSOR THAT SERVES VARIOUS
```

1    CLIENTS AND APPLICATIONS.

2        SO IF YOU JUST LOOK AT THE LANGUAGE, THAT ITSELF SUPPORTS

3    OUR INTERPRETATION.

4        BUT EVEN WITH CLAIMS 3 AND 10, IF YOU LOOK AT THE

5    EMBODIMENT, THE ONLY EMBODIMENT WHICH IS SHOWN IN THE PATENT,

6    THE ONLY EMBODIMENT, AND YOU LOOK AT FIGURES 2 --

7            THE COURT:  DOES YOUR ARGUMENT REQUIRE THE INFERENCE

8    THAT CLAIM 1 HAS AN APPLICATION?

9            MR. PRICE:  NO.  AN APPLICATION IS NOT CLAIMED IN

10   CLAIM 1.

11           THE COURT:  I UNDERSTAND.

12           MR. PRICE:  YEAH.

13           THE COURT:  BUT DO YOU NEED TO INFER THAT SO THAT

14   WHEN YOU'RE LOOKING AT CLAIMS 3 AND 10, YOU'RE SAYING, "WELL,

15   IT'S A SYSTEM IN CLAIM 1 WHEREIN THE APPLICATION THAT IS

16   INFERRED, OR THE APPLICATION THAT'S INFERRED IN CLAIM 1 HAPPENS

17   TO BE RUNNING CONCURRENTLY?"  AND THAT'S THE DISTINGUISHING

18   LIMITATION IS THE "CONCURRENT RUNNING"?

19           MR. PRICE:  WELL, RIGHT.  AS YOU CAN SEE, LOOKING AT

20   CLAIM 1, SOMETHING HAS TO BE PROVIDING DATA TO THE ROUTINES.

21   IT'S SOMETHING WHICH ISN'T CLAIMED, AND THAT WOULD BE THE

22   CLIENT OR AN APPLICATION OF SOME SORT, YES.

23           THE COURT:  OKAY.  SO --

24           MR. PRICE:  BUT THEY'RE JUST NOT CLAIMING THAT.

25           THE COURT:  RIGHT.  BUT YOU'RE SAYING THAT WE HAVE

1     TO --

2              MR. PRICE:  SO FOR CLAIM DIFFERENTIATION, YOU HAVE TO

3     BE CLAIMING SOMETHING DIFFERENT, AND THEY ARE CLAIMING

4     SOMETHING DIFFERENT.

5              THE COURT:  RIGHT.  AND SO YOU'RE SAYING WE HAVE TO

6     ASSUME THAT THERE IS AN APPLICATION IN CLAIM 1 IN ORDER TO SAY

7     THAT THE DIFFERING LIMITATION IS THE "CONCURRENT RUNNING"?

8              MR. PRICE:  WELL, NO.

9              THE COURT:  NO?

10             MR. PRICE:  WE DON'T HAVE TO ASSUME THAT CLAIM 1

11    CLAIMS AN APPLICATION.

12         IN FACT, IT DOES NOT.  IT SPECIFICALLY DOES NOT.

13         FOR IT TO HAVE ANY VALUE, IT HAS TO -- THERE HAS TO BE A

14    SYSTEM.

15         I MEAN, IF YOU LOOK AT CLAIM -- IF YOU LOOK AT THE FIRST

16    FIGURE IN THE PATENT ON PAGE 1, YOU SEE THAT THIS, THIS

17    INVENTION IS TO BE USED IN THE CONTEXT OF A COMPUTER, YOU KNOW,

18    WITH A CPU AND AN OUTPUT DEVICE AND AN INPUT DEVICE, AS YOU CAN

19    SEE FROM THE DIAGRAM THERE AT THE BOTTOM.

20         AND SO THE QUESTION IS, WHAT IS CLAIMED IN THE PATENT?

21         SO, YES, FOR THIS SYSTEM TO HAVE ANY USE, YOU'RE GOING

22    TO -- YOU KNOW, YOU'RE GOING TO HAVE A CPU, YOU'RE GOING TO

23    HAVE, YOU KNOW, A PRINTER IF YOU WANT TO PRINT OUT STUFF.

24         I MEAN, THIS IS THE CONTEXT IN WHICH YOU WOULD USE IT.

25             BUT WHAT DOES THE SYSTEM CLAIM?  YOU KNOW, IT DOES NOT --

1    CLAIM 1 DOES NOT CLAIM AN APPLICATION.

2            THE COURT:  ALL RIGHT.  LET ME HEAR FROM --

3            MR. PRICE:  AND, YOUR HONOR, EVEN IF IT DID CLAIM AN

4    APPLICATION --

5            THE COURT:  UM-HUM.

6            MR. PRICE:  -- THE POINT IS THAT GIVEN THE WAY YOU

7    WOULD INTERPRET "ACTION PROCESSOR," THE SAME WAY YOU'D

8    INTERPRET "ANALYZER SERVER" IN CLAIM 1, YOU WOULD BE TALKING

9    ABOUT AN APPLICATION THAT IS SEPARATE FROM THE SUBPROGRAM

10   ROUTINES AND THAT SEPARATELY PROVIDES INFORMATION.

11       AND IF YOU LOOK AT THE ONLY EMBODIMENT --

12           THE COURT:  LET ME INTERRUPT YOU A SECOND.  I

13   APOLOGIZE FOR DOING SO.

14       I THOUGHT EARLIER YOU SAID THAT THE LIMITING -- THE

15   LIMITATION THAT DIFFERENTIATED 3 AND 10 FROM 1 WERE THAT THE

16   APPLICATIONS WERE RUNNING CONCURRENTLY AND THAT THERE IS AN

17   APPLICATION PROGRAM INTERFACE.

18           MR. PRICE:  YES.

19           THE COURT:  IN ORDER FOR ME NOT TO FIND CLAIM

20   DIFFERENTIATION, DON'T I NEED TO FIND THAT THERE IS AN

21   APPLICATION IN CLAIM 1, EVEN IF NOT CLAIMED, BUT IT'S THERE,

22   AND THE DIFFERING LIMITATION IS JUST THE "CONCURRENT RUNNING"?

23           MR. PRICE:  NO.

24           THE COURT:  NO?

25           MR. PRICE:  NO, YOUR HONOR.

```
 1              THE COURT:  WHY NOT?

 2              MR. PRICE:  BECAUSE ALL YOU NEED TO FIND FOR -- WHAT

 3     YOU NEED TO FIND FOR CLAIM DIFFERENTIATION IS THAT THERE IS A

 4     LIMITATION THAT DIFFERS BETWEEN THE CLAIMS.

 5          CLAIM 1 DOES NOT CLAIM AN APPLICATION.  IT DOES NOT

 6     CLAIM --

 7              THE COURT:  SO THAT'S WHAT THE DIFFERENCE IS FOR

 8     CLAIM 3?  IT IS CLAIMING AN APPLICATION?

 9              MR. PRICE:  NO, NO.  CLAIM 3 IS CLAIMING -- IF I CAN

10     GET TO IT -- A CONCURRENT RUNNING OF AN APPLICATION AND A

11     PROGRAM INTERFACE, THE APPLICATION PROGRAM INTERFACE, WHICH YOU

12     SEE IN FIGURE 2 OF THE PATENT.

13          CLAIM 1 DOESN'T CLAIM THE APPLICATION PROGRAM INTERFACE.

14     IT DOESN'T CLAIM AN APPLICATION RUNNING CONCURRENTLY.

15              THE COURT:  RIGHT.  BUT YOU DIDN'T HIGHLIGHT

16     "APPLICATION" IN 3, WHICH MAKES ME ASSUME THAT YOU THINK 1

17     CONTAINS THE APPLICATION AND THE DIFFERING LIMITATION IS THE

18     "CONCURRENT RUNNING."

19              MR. PRICE:  NO.  THE PROGRAM IN 1 --

20              THE COURT:  UM-HUM.

21              MR. PRICE:  1 CLAIMS THE SYSTEM WITH THE PROGRAM.

22          THE PROGRAM IN 1 HAS NO LIMITATION ON WHETHER IT'S RUNNING

23     WITH AN APPLICATION OR CONCURRENTLY OR AT THE SAME TIME.  IT

24     JUST HAS NO LIMITATION AS TO THAT.

25              THE COURT:  BUT IT ALSO DOESN'T HAVE AN APPLICATION
```

1    AT ALL.

2              MR. PRICE:  YEAH, RIGHT.  IT JUST ASSUMES SOMETHING

3    IS GIVING IT DATA.

4         AND WHATEVER THAT IS, IT CAN BE RUNNING CONCURRENTLY, IT

5    CAN BE RUNNING AT THE SAME TIME IN RESPONSE TO RECEIVING THAT

6    DATA.

7              THE COURT:  ALL RIGHT.  LET ME HEAR FROM MR. REITER.

8              MR. REITER:  WELL, FIRST IF WE LOOK AT CLAIM 1, THE

9    FIRST LIMITATION AFTER THE PREAMBLE IS "INPUT DEVICE FOR

10   RECEIVING DATA."

11        SO THERE DOESN'T HAVE TO BE AN APPLICATION.  THERE CAN BE,

12   AS WE'VE IDENTIFIED IN OUR INFRINGEMENT CONTENTIONS, AN ANTENNA

13   THAT IS THE INPUT DEVICE THAT RECEIVES AN E-MAIL FROM SOMEPLACE

14   ELSE.

15        THE APPLICATION IS NOT CLAIMED.  THE APPLICATION IS NOT

16   CLAIMED IN CLAIM 1, AS THE COURT HAS ACKNOWLEDGED NOW SEVERAL

17   TIMES.

18        SO WE HAVE AN INPUT DEVICE THAT IS CLAIMED, THAT INPUT

19   DEVICE RECEIVES DATA, AND THEN WE HAVE THESE PROGRAM ROUTINES.

20   THESE PROGRAM ROUTINES ARE AN ANALYZER SERVER, A USER

21   INTERFACE, AND AN ACTION PROCESSOR, AND THOSE ALL HAVE SPECIFIC

22   FUNCTIONS AS DEFINED BY THE CLAIMS.

23        THE ANALYZER SERVER DETECTS STRUCTURES AND PROVIDES LINKING

24   ACTIONS; THE USER INTERFACE PROVIDES THE SELECTION OF A

25   DETECTED STRUCTURE IN A LINKED ACTION; AND THE ACTION PROCESSOR

1    GOES ON AND DOES THAT.

2         THERE'S NO SUGGESTION IN THESE CLAIMS, AND FURTHER THERE'S

3    NO SUGGESTION IN THE PATENT, THAT THERE MUST BE SEPARATENESS

4    BETWEEN A CLIENT AND THESE PROGRAM ROUTINES.  THE "CLIENT" TERM

5    IS NOT USED.

6         WITH RESPECT TO APPLICATION, AS WE'VE SAID, CLAIM 1 DOESN'T

7    CLAIM IT.

8         WE SEE THAT IN CLAIM 3.  WE SEE THAT IN CLAIM 10.

9         WE SEE IT IN CLAIMS 3 AND 10, LIKEWISE, THAT THERE MUST BE

10   AN APPLICATION PROGRAM INTERFACE, WHICH IS ONE OF THE

11   SUBROUTINES THAT'S SHOWN IN FIGURE 2 BUT IS, AGAIN, NOT CLAIMED

12   IN CLAIM 1.

13        SO THERE IS NOTHING IN CLAIM 1 THAT REQUIRES, ONE, AN

14   APPLICATION, MUCH LESS AN APPLICATION THAT IS SEPARATE FROM

15   THESE ROUTINES THAT ARE SPECIFICALLY CLAIMED.

16        MR. PRICE MADE A REFERENCE TO THERE'S ONLY ONE EMBODIMENT.

17        WELL, THE FEDERAL CIRCUIT, AND WE CITED THIS TO YOUR HONOR

18   IN OUR BRIEFING, THE LIEBEL-FLARSHEIM CASE SAYS EVEN IF THERE

19   IS ONE EMBODIMENT, UNLESS THERE IS AN EXPRESS DISAVOWAL OR THE

20   PATENTEE IS ACTING EXPLICITLY AS HIS OR HER OWN LEXICOGRAPHER,

21   WE DON'T LIMIT THE CLAIMS TO THAT ONE EMBODIMENT.

22        SAMSUNG HAS POINTED TO NO DISAVOWAL, NOR HAVE THEY POINTED

23   TO ANY TYPE OF REFERENCE WHERE THE PATENTEES HAVE ACTED AS

24   THEIR OWN LEXICOGRAPHERS.

25        SO LOOKING AT LIEBEL-FLARSHEIM, LOOKING AT WHAT THE FEDERAL

1    CIRCUIT HAS SAID, WE CAN'T LIMIT THIS CLAIM TO THE ONE

2    EMBODIMENT THAT'S SHOWN BECAUSE THERE IS NO REFERENCE, NO

3    STATEMENT THAT WE NEED TO OR SHOULD.

4        AND THEN WHEN WE LOOK AT CLAIMS 3 AND 10, WE SEE THAT THERE

5    ARE DIFFERENCES.

6        AND I'LL ACKNOWLEDGE TO MR. PRICE, YES, CLAIMS 3 AND 10

7    HAVE DIFFERENT APPLICATIONS.  THEY'RE NARROWER.  THEY REQUIRE

8    THE APPLICATION.  THEY REQUIRE THE API.  CLAIM 1 DOES NOT.

9        AND THEN TO READ -- AND WE'RE NOT ARGUING ABOUT ANALYZER

10   SERVER HERE TODAY.  I HEARD THAT.  I GOT ASKED A QUESTION LAST

11   WEEK BY YOUR HONOR ABOUT, WELL, AM I READING THE WORD "SERVER"

12   OUT OF THE CLAIM, THE CLAIM TERM?

13       WE'RE TALKING ABOUT ACTION PROCESSOR.  THE WORD "SERVER"

14   DOESN'T APPEAR THERE, SO WE'RE NOT READING ANYTHING OUT BY OUR

15   ALTERNATIVE CONSTRUCTION WHICH FOLLOWS THE CLAIM LANGUAGE.

16           MR. PRICE:  ACTUALLY, THEY'RE READING OUT "ACTION

17   PROCESSOR."

18           MR. REITER:  NO.

19           MR. PRICE:  IF -- I BELIEVE THIS IS APPLE'S

20   CONSTRUCTION.  IF WE LOOK AT SLIDE 11 -- CAN WE SWITCH --

21   APPLE'S CONSTRUCTION IS THAT -- "A PROGRAM ROUTINE THAT

22   PERFORMS THE SELECTED ACTION ON THE DETECTED STRUCTURE."

23       BUT APPLE USED WORDS THAT ARE KNOWN TO THOSE OF ORDINARY

24   SKILL IN THE ART, SUCH AS "SERVER" AND "PROCESSOR," WHICH

25   COMPEL A CONCLUSION THAT WE'RE TALKING ABOUT, YOU KNOW,

1    NUMEROUS -- OR AN APPLICATION, OR MORE THAN ONE APPLICATION,

2    YOU KNOW, SENDING DATA TO WHAT APPLE CLAIMS TO HAVE INVENTED,

3    WHICH IS -- WHICH ARE THESE PROGRAM ROUTINES.

4              MR. REITER:  IF I COULD ADDRESS WHAT MR. PRICE --

5              THE COURT:  OKAY.  WHY DON'T YOU JUST LET HIM FINISH?

6              MR. REITER:  I WAS KIND OF IN THE MIDDLE OF

7    SOMETHING.

8              MR. PRICE:  I'M SORRY.

9              MR. REITER:  AND ACTUALLY, TO MR. PRICE'S POINT, IF

10   WE PUT UP SLIDE 6 OF OUR PRESENTATION, SAMSUNG AND APPLE AGREE

11   ON THE CONSTRUCTION.  IT'S IDENTICAL WITH THE EXCEPTION OF

12   "SEPARATE FROM A CLIENT."

13      SAMSUNG SAYS "PROGRAM ROUTINES SEPARATE FROM A CLIENT" --

14   WE, OF COURSE, DON'T -- "THAT PERFORM THE SELECTED ACTION ON

15   THE DETECTED STRUCTURE."

16      WE'RE PROPOSING "PROGRAM ROUTINES," AND I THINK LAST WEEK

17   WE ADDRESSED WHETHER IT NEEDS TO BE PLURAL OR NOT, WHETHER

18   THERE'S A DIFFERENCE, "THAT PERFORM THE SELECTED ACTION ON THE

19   DETECTED STRUCTURE."

20      WE HAVE AN IDENTICAL CONSTRUCTION WITH THE EXCEPTION OF ONE

21   PHRASE, "SEPARATE FROM A CLIENT," AND THAT "SEPARATE FROM A

22   CLIENT" IS NOT SUPPORTED BY THE SPECIFICATION, IT'S NOT

23   SUPPORTED BY THE OTHER CLAIMS, AND MOST IMPORTANTLY, IT IS NOT

24   SUPPORTED BY THIS CLAIM, CLAIM 1.

25              THE COURT:  ALL RIGHT.  LET ME GIVE, MR. PRICE, YOU

```
 1    CAN HAVE THE LAST WORD AND THEN I'D LIKE TO MOVE ON TO THE NEXT

 2    PATENT, PLEASE.

 3           MR. PRICE:  SURE.  IT ACTUALLY, YOUR HONOR, IS

 4    SUPPORTED BY THE CLAIM.  IT'S SUPPORTED BY USING THE WORD

 5    "PROCESSOR" IN "ACTION PROCESSOR," JUST AS JUDGE POSNER FOUND

 6    WITH "SERVER" AND "ANALYZER SERVER," AND THAT IS EVIDENCED BY

 7    THE FACT THAT IN THE ONLY EMBODIMENT THAT IS DISCUSSED -- AND

 8    THAT IS SLIDE 15 -- IN THE ONLY EMBODIMENT THAT IS DISCUSSED,

 9    THE APPLICATION IS SEPARATE FROM 165, WHICH IS THE PROGRAM, AND

10    THAT PROGRAM, IF YOU GO TO FIGURE 2, AND THAT IS SLIDE -- LET'S

11    GO TO SLIDE 18 -- FIGURE 2, THAT 165 IS WHAT CONTAINS THE

12    ANALYZER SERVER, AND YOU'RE LOOKING FOR THREE, THE APPLICATION

13    PROGRAM INTERFACE, USER INTERFACE, AND ACTION PROCESSOR WHICH

14    SERVE THE CLIENTS, OR "APPLICATION" IS THE SAME AS "CLIENT."

15        THIS WAS ACTUALLY PREPARED, YOUR HONOR, TO ANSWER YOUR

16    QUESTION AS TO WHAT FIGURE 5 WAS, SO IT'S KIND OF A COMBINATION

17    SLIDE.

18        NOW I'M JUST POINTING THE COURT TO FIGURE 2.

19           THE COURT:  ALL RIGHT.  THANK YOU.

20        ALL RIGHT.  LET'S PLEASE GO TO -- LET'S GO TO "CONCURRENTLY

21    WITH" PLEASE.

22           MR. REITER:  AGAIN ME ON THIS ONE, YOUR HONOR.  I

23    DON'T KNOW IF YOU HAVE QUESTIONS FIRST FOR SAMSUNG OR YOU

24    HAVE --

25           THE COURT:  I HAVE QUESTIONS FIRST FOR SAMSUNG ON
```

```
 1        THIS ONE.
 2                    MR. REITER:  OKAY.
 3                    MR. PAK:  YES, YOUR HONOR.
 4                    THE COURT:  ALL RIGHT.  I HAVE A COUPLE QUESTIONS ON
 5        THIS ONE.
 6                    MR. PAK:  SURE.
 7                    THE COURT:  SO LAST WEEK YOU ARGUED THAT THIS
 8        INVENTION WASN'T REALLY ABOUT CELL PHONES, IT WAS MORE ABOUT
 9        THE MACINTOSH AND OTHER DEVICES.
10                    MR. PAK:  YES.
11                    THE COURT:  BUT THERE IS LANGUAGE IN COLUMN 6 THAT
12        THIS SYSTEM MAY BE IMPLEMENTED ON A CELL PHONE, AND THERE IS
13        THAT P.C MAGAZINE ARTICLE FROM DECEMBER OF 2010 ANNOUNCING THE
14        WORLD'S FIRST DUAL CORE PHONE BY LG.
15            SO YOU TELL ME, HOW DOES THIS ALL SQUARE IF THIS PATENT IS
16        2007, FILED JANUARY 2007, AND WE HAVE DECEMBER OF 2010 THE VERY
17        FIRST DUAL CORE PHONE?  DO YOU WANT TO ADDRESS THAT?
18                    MR. PAK:  SURE, YOUR HONOR, AND I'LL ADDRESS IT IN
19        TWO RESPECTS.
20                    THE COURT:  OKAY.
21                    MR. PAK:  FIRST IS WITH RESPECT TO THE LAW.
22            IF YOU LOOK AT THE INTAMIN CASE, AND THIS IS ACTUALLY ONE
23        EXAMPLE AND I THINK YOUR HONOR MAY BE AWARE OF OTHER FEDERAL
24        CIRCUIT CASES AS WELL -- SLIDE 12.
25            YOUR HONOR, THERE IS NO LEGAL REQUIREMENT THAT A SINGLE
```

1      CLAIM MUST BE CONSTRUED TO COVER EVERY SINGLE EMBODIMENT THAT

2      IS DISCLOSED IN THE PATENT SPECIFICATION.

3          IN FACT, IT'S VERY COMMONPLACE TO HAVE A CLAIM THAT COVERS

4      CERTAIN EMBODIMENTS, BUT DO NOT COVER OTHER EMBODIMENTS IN THE

5      SAME PATENT SPECIFICATION.

6          SO JUST AS A LEGAL PROPOSITION, BECAUSE THERE'S A LONG

7      LAUNDRY LIST OF POSSIBLE DATA PROCESSING SYSTEMS DOES NOT MEAN

8      THAT WE SHOULD DEVIATE FROM THE PLAIN AND ORDINARY MEANING OF

9      "CONCURRENTLY WITH."

10     OUR CONSTRUCTION, IF YOU RECALL, YOUR HONOR, COMES DIRECTLY

11    FROM THE PATENT SPECIFICATION THAT SAYS "AT THE SAME TIME."

12     IF YOU APPLY THAT PLAIN AND ORDINARY MEANING, WHATEVER DATA

13    PROCESSING SYSTEMS THAT EXISTED IN 2007 THAT CAN MEET THAT

14    PLAIN AND ORDINARY MEANING TAKEN VERBATIM OUT OF THE PATENT

15    SPECIFICATION, QUALIFIES.

16     OTHERS, IF THEY DIDN'T AS A FACTUAL MATTER, THAT'S FINE AS

17    WELL.  THERE'S NO LEGAL REQUIREMENT, AS APPLE SUGGESTS, THAT WE

18    SHOULD SOMEHOW DEVIATE FROM THE PLAIN AND ORDINARY MEANING AND

19    GO TO DICTIONARY DEFINITIONS IN AN ATTEMPT TO TRY TO CAPTURE

20    EVERY SINGLE POSSIBLE EXAMPLE THAT IS GIVEN IN A PATENT

21    SPECIFICATION, AND THAT -- SO THAT'S ONE LEGAL MATTER THAT I'D

22    LIKE TO BRING TO YOUR ATTENTION.

23       THE COURT:  SO LET ME ASK YOU TWO QUESTIONS FOR

24    FOLLOW-UP.

25       MR. PAK:  YES.

```
 1              THE COURT:  FIRST OF ALL, DO YOU AGREE THAT EITHER AT

 2     THE TIME THAT THIS PATENT WAS FILED OR EVEN AT -- WELL, AT THIS

 3     TIME, PHONES DID NOT HAVE DUAL CORE PROCESSORS.  IS THAT RIGHT,

 4     OR NOT?

 5              MR. PAK:  WE DISAGREE, YOUR HONOR.  AND IF I -- I

 6     UNDERSTOOD YOUR HONOR'S INSTRUCTIONS THIS MORNING VERY CLEARLY

 7     ABOUT EXTRINSIC EVIDENCE THAT WAS NOT CITED.  THAT IS --

 8              THE COURT:  YOU CITED SMT PROCESSORS LAST TIME, BUT

 9     THAT WAS NOT IN WHAT YOU HAD TIMELY DISCLOSED; CORRECT?

10              MR. PAK:  THE POINT IS --

11              THE COURT:  ANSWER MY QUESTION.  YOU HADN'T TIMELY

12     DISCLOSED THAT AND YOU USED THAT LAST WEEK.  THAT WAS NOT FAIR.

13              MR. PAK:  YOUR HONOR, BUT IN REPLY BRIEFING, THAT WAS

14     WHEN APPLE MADE THE ARGUMENT ABOUT P.C MAGAZINE.  WE DIDN'T

15     HAVE AN OPPORTUNITY TO SUBMIT DECLARATIONS OR A SURREPLY TO

16     DEAL WITH FACTUAL ISSUES, AND THAT WAS IN THE CONTEXT OF THE

17     TUTORIAL TO TRY TO ADDRESS SOME OF THE ISSUES ABOUT WHAT WAS

18     AVAILABLE IN THE FIELD.

19         YOUR HONOR, WE DIDN'T HAVE AN OPPORTUNITY TO RESPOND TO THE

20     SPECIFIC P.C MAGAZINE --

21              THE COURT:  PRIOR ART FOR INVALIDITY SHOULD BE NOT BE

22     PART OF THE TUTORIAL, EITHER.

23              MR. PAK:  WE'RE NOT ARGUING INVALIDITY.

24              THE COURT:  SO WHAT --

25              MR. PAK:  IF I MAY, YOUR HONOR --
```

```
1              THE COURT:  WHAT EVIDENCE IS THERE THAT SMT

2    PROCESSORS WERE IN CELL PHONES IN 2007?  ANYTHING?

3              MR. PAK:  AND AGAIN, I WANT TO BE VERY CAUTIOUS,

4    BECAUSE I DON'T -- THE SLIDE THAT I HAD PREPARED REFERENCES AN

5    LG PATENT WHICH IS -- IF YOU RECALL, THE WORLD P.C MAGAZINE

6    2010 ARTICLE WAS ABOUT AN LG PHONE.

7              THE COURT:  UM-HUM.

8              MR. PAK:  THE ONLY THING I WANT TO -- AND AGAIN, I

9    DIDN'T HAVE THE OPPORTUNITY, WE DIDN'T HAVE THE OPPORTUNITY TO

10   DEAL WITH THIS, TO PROVIDE ANY KIND OF FACTUAL DECLARATION OR

11   DEAL WITH THAT FACTUAL POINT BECAUSE WE DIDN'T HAVE A SURREPLY.

12     WITH YOUR HONOR'S PERMISSION, IF I COULD JUST PUT UP THAT

13   ONE PATENT --

14             THE COURT:  OKAY.  WHY ARE YOU SANDBAGGING?  IF YOU

15   WANTED TO RAISE SOMETHING, YOU COULD HAVE REQUESTED LEAVE TO

16   FILE A SURREPLY.

17             MR. PAK:  YES.

18             THE COURT:  YOU COULD HAVE DONE THAT TIMELY.  YOU

19   COULD HAVE GIVEN APPLE TIME TO RESPOND.

20     BUT YOU'RE WAITING TO THROW IN SMT PROCESSOR DURING THE

21   TUTORIAL, WHICH I HAVE NEVER SEEN BEFORE, OKAY?

22     AND NOW YOU'RE COMING IN AND YOU'VE GOT A NEW LG PATENT

23   THAT'S NOT PREVIOUSLY BEEN DISCLOSED AND YOU'RE JUST GOING TO

24   NOW SLAM IT ON ME AT NOON DURING A CLAIM CONSTRUCTION THAT

25   STARTED AT 10:30?  I MEAN, WHAT IS GOING ON HERE?
```

```
1          MR. PAK:  YOUR HONOR, YOU'RE ASKING ME A FACTUAL

2     QUESTION.  YOU'RE ASKING ME FACTUALLY WHETHER LG -- WHETHER

3     THAT P.C MAGAZINE ARTICLE IN 2010 WAS THE FIRST AWARENESS IN

4     THE INDUSTRY OF A CELL PHONE WITH A DUAL CORE PROCESSOR.

5          IF YOU WANT ME TO ANSWER THAT QUESTION, YOUR HONOR, THE

6     ONLY WAY I CAN DO THAT IS BY RELYING ON THINGS THAT ARE OUT

7     THERE IN THE PUBLIC RECORD.

8          I AGREE WITH YOUR HONOR THAT IF I HAD KNOWN THAT THIS WAS

9     GOING TO BE SUCH A MAJOR ISSUE, I SHOULD HAVE SOUGHT LEAVE.

10          BUT I THINK ULTIMATELY, IF YOU STEP BACK --

11          THE COURT:  WAIT, WAIT.  YOU HAD THE SMT PROCESSOR

12     SLIDE PREPARED FOR THE TUTORIAL.

13          MR. PAK:  IN THE TUTORIAL, YES, YOUR HONOR.

14          THE COURT:  SO WHERE IS THE SURPRISE THERE?  OKAY?

15     YOU MUST HAVE KNOWN, BASED ON THE REPLY, THAT YOU NEEDED THAT,

16     SO I'M NOT CLEAR ON WHAT YOU'RE JUST SAYING RIGHT NOW.

17          YOU'RE SAYING "IT WAS SUCH A SURPRISE, I JUST HAPPENED TO

18     HAVE A SLIDE PREPARED SO I JUST USED IT DURING THE TUTORIAL"?

19     THAT MAKES NO SENSE TO ME.

20          MR. PAK:  THAT'S NOT WHAT I'M SAYING.

21          THE COURT:  OKAY.  WHAT ARE YOU SAYING?

22          MR. PAK:  WHAT I'M SAYING IS YOU'RE ASKING ME A

23     FACTUAL QUESTION OF WHETHER CELL PHONES IN 2007 -- WAS IT KNOWN

24     THAT CELL PHONES IN 2007 COULD HAVE USED DUAL CORE PROCESSORS

25     IN THE INDUSTRY OR NOT?
```

```
1         TO ANSWER THAT QUESTION, I COULD EITHER ANSWER WITHOUT

2    CITING TO ANY EVIDENCE THAT I THINK ABSOLUTELY YES, IT WAS

3    KNOWN IN THE ART, STATE OF THE ART, AND WE DON'T HAVE TO GO

4    BEYOND PUBLIC RECORDS TO KNOW THAT CELL PHONES IN 2007

5    ABSOLUTELY COULD HAVE USED MULTICORE PROCESSORS.

6         AND IN FACT, THERE WERE SPECIFIC TEACHINGS IN THE ART TO DO

7    THAT.  I APOLOGIZE FOR NOT HAVING CITED THOSE SPECIFIC PIECES

8    OF EVIDENCE, BUT IT'S COMMON KNOWLEDGE.

9         WHAT APPLE WAS DOING IS SAYING -- AGAIN, BUT YOUR HONOR, I

10   THINK THIS IS --

11         THE COURT:  OTHER THAN THE SMT PROCESSOR THAT YOU

12   USED LAST WEEK, CAN THE ONE PROCESSOR WITH THAT MULTICORE

13   FUNCTIONALITY EXECUTE TWO THREADS AT PRECISELY THE SAME

14   INSTANCE?

15         MR. PAK:  YES.

16         THE COURT:  AND CAN YOU GIVE ME ANY INTRINSIC

17   EVIDENCE ON THAT?

18         MR. PAK:  WELL, INTRINSIC EVIDENCE IN TERMS OF WHAT

19   THE PATENT SPECIFICATION TEACHES?

20         THE COURT:  YES.

21         MR. PAK:  OKAY.  WHAT THE PATENT SPECIFICATION

22   TEACHES IS THE FOLLOWING, YOUR HONOR:  IF YOU LOOK AT COLUMN

23   24 --

24         THE COURT:  OKAY.

25         MR. PAK:  -- LINES 42 TO 64.  IF YOU SEE THERE, THIS
```

1    IS THE -- AND THIS IS SLIDE 5 FROM OUR PRESENTATION -- YOUR

2    HONOR, IF YOU REMEMBER, WE TALKED ABOUT FIGURE 13A, WHICH IS

3    THE ALGORITHM.

4         THE COURT:  UM-HUM, YES.

5         MR. PAK:  THAT'S THE ALGORITHM FOR "CONCURRENT

6    EXECUTION."

7         IN THAT SAME PARAGRAPH, TWICE THE PATENTEE DESCRIBED THAT

8    AS OPERATING EXACTLY AT THE SAME TIME.

9         AND THEN IF YOU LOOK AT FIGURE 13A, THE ACTUAL FIGURE

10   ITSELF, YOUR HONOR, WHICH IS ON SLIDE 4, THE ALGORITHM WORKS

11   THE FOLLOWING WAY:  IN STEP 575, YOU EXECUTE WHAT ARE CALLED

12   NON-SYNCHRONIZATION THREADS.  THOSE ARE THE THREADS THAT ARE

13   RESPONSIBLE FOR THE USER INTERFACE.

14        THEN IN STEP 577, YOU CONTINUE EXECUTION OF THOSE

15   NON-SYNCHRONIZATION THREADS AND THEN YOU BEGIN EXECUTION OF THE

16   SYNCHRONIZATION THREAD.

17        AND THEN REALLY, YOUR HONOR, DO YOU SEE THE LOCK ACQUIRED

18   BOX IN THAT FIGURE, IN FIGURE 13?  THAT LOCKING MECHANISM IS

19   DESIGNED TO ENSURE THAT TWO THREADS THAT ARE RUNNING AT THE

20   SAME TIME DO NOT CONFLICT WITH EACH OTHER, BECAUSE IF I HAVE A

21   THREAD THAT'S TRYING TO ACCESS, LET'S SAY, A VARIABLE IN MEMORY

22   AT THE SAME TIME THAT I'M TRYING TO SYNCHRONIZE THAT VARIABLE

23   WITH A DIFFERENT SYSTEM, I'M GOING TO HAVE ISSUES.

24        SO THIS LOCKING MECHANISM, WHICH COULD HAVE BEEN

25   IMPLEMENTED ON A VARIETY OF DEVICES IN 2007, INCLUDING CELLULAR

1    TELEPHONES, WHICH WAS IDENTIFIED AS ONE OF THE DISCLOSED

2    EMBODIMENTS IN THE PATENT, WOULD HAVE ALLOWED FOR SIMULTANEOUS,

3    AT THE SAME TIME EXECUTION.

4        SO OUR POSITION IS REALLY SIMPLE, YOUR HONOR.  LET'S GIVE

5    "CONCURRENTLY WITH" THE MEANING THAT THE PATENTEE GAVE IT IN

6    WRITING IN THE PATENT SPECIFICATION, AND SPECIFICALLY, "AT THE

7    SAME TIME," WHICH IS LANGUAGE THAT APPEARS HERE IN THE PATENT

8    SPECIFICATION.

9        THERE WAS NO REFERENCE IN THE PATENT SPECIFICATION TO

10   "OVERLAPPING" OR "INTERLEAVING" OR ANY OF THE EXTRINSIC

11   EVIDENCE THAT APPLE HAS CITED TO YOU.

12       THEIR ONLY CONTENTION IS SOMEHOW IN 2007, CELL PHONE

13   PROCESSORS WERE NOT DUAL CORE.

14       AGAIN, WE THINK THAT'S BESIDE THE POINT LEGALLY.

15       BUT FACTUALLY THAT WAS NOT TRUE, AND I DON'T THINK THEY

16   WOULD -- EVEN THOUGH THEY MAY HAVE BEEN THE FIRST COMMERCIAL

17   PRODUCT, THERE'S NO EVIDENCE IN THE RECORD BEFORE YOU, YOUR

18   HONOR, THAT THE STATE OF THE ART DID NOT INCLUDE CELL PHONES

19   RUNNING WITH DUAL CORE PROCESSORS.

20       IN FACT, THERE WERE.  SO --

21           THE COURT:  OKAY.  SO LAST WEEK YOU ARGUED THAT

22   IMPLEMENTATION ON CELL PHONES IS DISCLAIMED IN SOME INSTANCES.

23       CAN YOU CLARIFY THAT AND POINT OUT COLUMN AND LINE NUMBERS

24   WHERE THAT IS THE CASE?

25           MR. PAK:  DISCLAIMED, YOUR HONOR, IN THE SENSE

```
 1         THAT --

 2                 THE COURT:  YES.

 3                 MR. PAK:  I DON'T --

 4                 THE COURT:  I GUESS YOU CITED TO THE BACKGROUND OF

 5    THE INVENTION --

 6                 MR. PAK:  YES, YOUR HONOR.

 7                 THE COURT:  -- LAST TIME.

 8                 MR. PAK:  OH, YES.  WHAT I DESCRIBED TO YOU WAS THERE

 9    ARE -- IN THE BACKGROUND OF THE INVENTION -- THIS WAS GOING

10    BACK TO THE POINT MR. REITER WAS MAKING ABOUT THE ARCHITECTURE

11    AND WHETHER SPECIFIC ARCHITECTURES WERE DESCRIBED.

12        AND IF YOU GO TO THE PATENT, IN THE BACKGROUND OF THAT

13    PATENT, THERE IS DISCLOSURE AT --

14                 THE COURT:  CAN YOU GIVE ME A LINE NUMBER?

15                 MR. PAK:  SURE, ABSOLUTELY, YOUR HONOR.  LET ME JUST

16    BRING THAT UP.

17        THIS IS ON COLUMN 1, AND THIS IS LINES 59 THROUGH 64, AND

18    I'LL GIVE YOUR HONOR A CHANCE TO READ THAT AND THEN IF YOU LIKE

19    I CAN COMMENT ON IT AS WELL.

20                 THE COURT:  OKAY.  "WHEN THERE IS A SYNCHRONIZATION

21    AGENT ON THE HANDHELD COMPUTER, IT DOES NOT HAVE THE FACILITIES

22    AND ARCHITECTURE DESCRIBED IN THIS DISCLOSURE, INCLUDING, FOR

23    EXAMPLE, PROVIDING A PLUG-IN MODEL ON BOTH THE HANDHELD AND THE

24    HOST FOR DIFFERENT DATA CLASSES, AND DOES NOT ALLOW

25    APPLICATIONS ON THE HANDHELD COMPUTER TO RUN CONCURRENTLY WITH
```

```
 1        THE SYNCHRONIZATION PROCESS, AND VARIOUS OTHER FEATURES

 2        DESCRIBED HEREIN."

 3             SO WHAT DOES THAT SAY ABOUT CELL PHONES?

 4             MR. PAK:  SO THIS IS VERY CLEAR, YOUR HONOR.  WHAT

 5        THIS IS SAYING IS THAT IN 2007, THERE WERE HANDHELD COMPUTERS,

 6        OR CELL PHONE, PDA DEVICES, THAT DID NOT HAVE THE ARCHITECTURE

 7        TO IMPLEMENT THE TECHNOLOGY THAT'S DESCRIBED OF EXECUTING

 8        THREADS AT THE SAME TIME.

 9             SO THERE WERE PRIOR ART CELL PHONES OUT THERE IN 2007 THAT

10        DIDN'T HAVE THE ABILITY TO EXECUTE THREADS AT THE SAME TIME,

11        AND THAT'S FINE.  THAT'S THE PRIOR ART.

12             WHAT THEN THE PATENTEE TEACHES IS THAT IF YOU ADOPT, FOR

13        EXAMPLE, THE LOCKING MECHANISM AND YOU HAVE A MULTITHREADING

14        ARCHITECTURE RUNNING ON THESE HANDHELD PHONES, WHICH WERE ALL

15        POSSIBLE TECHNOLOGICALLY AND APPLE HASN'T PROVEN OTHERWISE, IN

16        2007 THE CLAIMED INVENTION COULD RUN ON ALL KINDS OF DATA

17        PROCESSING SYSTEMS, INCLUDING CELL PHONES.

18             THE COURT:  I GUESS I'M UNCLEAR.  I THOUGHT LAST WEEK

19        YOUR WHOLE POINT WAS THIS IS NOT DIRECTED TOWARDS CELL PHONES,

20        AND EVERYWHERE IT REFERS TO COMPUTERS, WE'RE REALLY TALKING

21        ABOUT MACINTOSHES AND COMPUTER COMPUTERS.

22             SO THIS SEEMS TO BE AN INCONSISTENT ARGUMENT OF SAYING,

23        "OH, NO, EVERYWHERE YOU SEE COMPUTER, NOW ASSUME THAT THAT

24        INCLUDES CELL PHONE."

25             MR. PAK:  NO, YOUR HONOR.  MY ARGUMENT -- I APOLOGIZE
```

```
1     IF THERE WAS LACK OF CLARITY LAST TIME.

2         WHAT I'M SAYING, YOUR HONOR, IS THAT THE CLAIMS ARE

3     FOCUSSED ON DATA PROCESSING SYSTEMS.  THE WORD "CELL PHONE"

4     DOES NOT APPEAR IN ANY OF THE CLAIMS.  THERE'S A LONG LIST OF

5     EXAMPLES OF DATA PROCESSING SYSTEMS, INCLUDING MACINTOSH,

6     LAPTOPS, INCLUDING CELL PHONES, PDA'S.

7             THE COURT:  I DON'T SEE MACINTOSH.  I SEE A DATA

8     PROCESSING ASSISTANT MAY BE A HANDHELD COMPUTER OR A PERSONAL

9     DIGITAL, CELLULAR TELEPHONE --

10            MR. PAK:  COLUMN 5, YOUR HONOR.  IF YOU LOOK AT THE

11    TOP OF COLUMN 5, THE EXAMPLE IN THE EMBODIMENT OF FIGURE 2 IS,

12    IN FACT, A MACINTOSH COMPUTER FROM APPLE, OR WINDOWS WHICH

13    RUNS -- OR A COMPUTER WHICH RUNS THE WINDOWS OPERATING SYSTEM

14    FROM MICROSOFT.  THAT'S AT THE TOP OF COLUMN 5, LINES 5 THROUGH

15    9.

16            THE COURT:  ALL RIGHT.  BUT DO YOU SEE MY POINT HERE?

17    LAST WEEK YOU WERE SAYING, "ANY TIME IT'S COMPUTER SYSTEM, IT

18    MEANS COMPUTER.  IT DOESN'T MEAN CELL PHONE."

19        BUT TODAY I'M HEARING, "NO, ANY TIME YOU HEAR COMPUTER, YOU

20    SHOULD ASSUME THAT MEANS A CELL PHONE."

21            MR. PAK:  NO, NO, YOUR HONOR.  THAT'S NOT WHAT I'M

22    SAYING.

23            THE COURT:  OKAY.

24            MR. PAK:  THERE ARE CLEAR DESCRIPTIONS IN THE PATENT

25    OF DATA PROCESSING SYSTEMS THAT COULD INCLUDE P.C.'S, LIKE WHAT
```

```
 1          WE SEE HERE AS MACINTOSH AT THE TOP OF COLUMN 5.

 2             THEY ALSO USE THE WORD "HANDHELD COMPUTER," WHICH IS WHAT

 3          WE SEE IN COLUMN 2, OR COLUMN 1, YOUR HONOR.

 4                    THE COURT:  OKAY.

 5                    MR. PAK:  SO A HANDHELD COMPUTER IS SOMETHING THAT

 6          GOES INTO A PDA DEVICE OR CELL PHONE OR OTHER TYPES OF THINGS.

 7             AND WHAT I'M SAYING TO YOU IS IN 2007 WHEN THE PATENTEE

 8          WROTE THIS PATENT, HE --

 9                    THE COURT:  CAN I TELL YOU WHY I DON'T THINK

10          "HANDHELD COMPUTER" NECESSARILY MEANS "CELL PHONE"?

11                    MR. PAK:  SURE.

12                    THE COURT:  LOOK AT COLUMN 6, LINE 44.  "THE DATA

13          PROCESSING SYSTEM SHOWN IN FIGURE 3 MAY BE A HANDHELD COMPUTER

14          OR A PERSONAL DIGITAL ASSISTANT OR A CELLULAR TELEPHONE WITH

15          PDA-LIKE FUNCTIONALITY."

16                    MR. PAK:  RIGHT.

17                    THE COURT:  I GUESS IT DOES INCLUDE A HANDHELD

18          COMPUTER WHICH INCLUDES A CELLULAR TELEPHONE.

19                    MR. PAK:  ABSOLUTELY.

20                    THE COURT:  BUT THEY SEEM TO ALWAYS DEFINE THEM

21          DISTINCTLY.

22                    MR. PAK:  IF YOU LOOK, YOUR HONOR, AT THE SAME EXACT

23          LOCATION -- I WAS GOING TO GO THERE -- COLUMN 6, LINE 47, IT

24          SAYS "A HANDHELD COMPUTER WHICH INCLUDES A CELLULAR TELEPHONE."

25                    THE COURT:  RIGHT.  BUT IT ALWAYS SEEMS TO DESCRIBE
```

```
 1        THEM SEPARATELY INSTEAD OF JUST ASSUMING THAT A HANDHELD

 2        COMPUTER IS A CELL PHONE.

 3              MR. PAK:  I THINK WHAT -- YOUR HONOR, MY

 4        INTERPRETATION OF THAT LANGUAGE IS THAT THE PATENTEE IS SAYING

 5        THERE'S A CATEGORY, A BROADER CATEGORY OF THINGS CALLED

 6        HANDHELD COMPUTERS THAT COULD INCLUDE, AS ONE EXAMPLE, A

 7        CELLULAR TELEPHONE.  BUT IT COULD BE OTHER TYPES OF HANDHELD

 8        DEVICES, FOR EXAMPLE, PDA'S, TABLETS, AND MANY OTHER DEVICES

 9        THAT ARE DESCRIBED HERE.

10              THE COURT:  YOU'RE PROBABLY RIGHT ON THAT.

11              MR. PAK:  AND SO -- THANK YOU, YOUR HONOR.

12         SO ON THE HANDHELD COMPUTER, JUST GOING BACK TO COLUMN 1,

13        WHAT IS IMPORTANT HERE TO UNDERSTAND IS THAT ARCHITECTURE DOES

14        MATTER.  THE PATENTEE IS TELLING US THAT IN THE PRIOR ART THERE

15        WERE HANDHELD COMPUTERS THAT DIDN'T HAVE THE RIGHT KIND OF

16        ARCHITECTURE TO IMPLEMENT THE INVENTION, NAMELY, THEY DIDN'T

17        HAVE MULTITHREADING.  THEY DIDN'T HAVE THE ABILITY TO EXECUTE

18        MULTITHREADS AT THE SAME TIME.

19         SO THE FACT THAT THERE WERE SOME CELL PHONES OUT THERE THAT

20        DIDN'T PRACTICE THE INVENTION IS FINE, AS LONG AS WE CAN FIND

21        EMBODIMENTS IN THE PATENT, INCLUDING THE APPLE MACINTOSH, AND

22        ALSO PDA DEVICES, AND POSSIBLY CELL PHONES AS WELL, THAT COULD

23        EXECUTE THE THREADS WITH THE LOCKING MECHANISM THAT ARE

24        DESCRIBED, THEN UNDER THE LAW, THAT IS ALL THAT IS REQUIRED.

25              AND REALLY, AT THE END OF THE DAY, YOUR HONOR, WHAT WE'RE
```

```
 1          REALLY ASKING FOR IS NOTHING MORE THAN JUST TO GO TO THE

 2     VERBATIM DEFINITION THAT'S GIVEN IN COLUMN 13 THAT SAYS, "WHEN

 3     WE TALK ABOUT CONCURRENTLY, WE'RE TALKING ABOUT AT THE SAME

 4     TIME.  WE'RE NOT TRYING TO RESTRICT OUR INVENTION, OR THE

 5     INVENTION TO ANY TYPE OF PROCESSOR CORE ARCHITECTURE WHERE IT

 6     INCLUDES OR EXCLUDED CELL PHONES.  ALL WE'RE SAYING IS IF YOU

 7     ARE A DATA PROCESSING SYSTEM AND YOU CAN EXECUTE THREADS

 8     CONCURRENTLY AND AT THE SAME TIME AS DESCRIBED IN COLUMN 13" --

 9               THE COURT:  DO YOU MEAN COLUMN 24?

10               MR. PAK:  SORRY, YOUR HONOR.  IT'S --

11               THE COURT:  COLUMN 24, IT'S TALKING ABOUT FIGURE 13.

12               MR. PAK:  -- FIGURE 13, EXACTLY.

13               THE COURT:  OKAY.

14               MR. PAK:  AT THE BOTTOM OF COLUMN 24, DESCRIBING

15     FIGURE 13, IT SAYS SPECIFICALLY TWICE THAT IN THE CONTEXT OF

16     "CONCURRENTLY" THAT IT'S "AT THE SAME TIME."  THAT'S WHERE THE

17     SAMSUNG CONSTRUCTION COMES FROM.

18         THERE'S NO MENTION, YOUR HONOR, IN THE PATENT SPECIFICATION

19     OF "INTERLEAVING," "OVERLAPPING," "MULTITASKING."  ALL THE

20     THINGS THAT THEY CITED IN THE DICTIONARY DEFINITIONS ARE

21     COMPLETELY EXTRINSIC.

22         AND AS WE KNOW FROM THE PHILLIPS CASE, YOUR HONOR, WHEN YOU

23     HAVE AN INTRINSIC RECORD THAT IS CLEAR ABOUT WHAT THE TERM

24     MEANS, INTRINSIC RECORD TRUMPS EXTRINSIC EVIDENCE.  THAT'S THE

25     LAW.
```

1       SO I THINK IT WOULD BE BOTH PRUDENT TO STICK WITH WHAT WE

2   HAVE IN THE PATENT SPECIFICATION AND LET THE CHIPS FALL IN

3   TERMS OF WHETHER A PRIOR ART SYSTEM OR AN ACCUSED DEVICE CAN

4   ACTUALLY MEET THIS LIMITATION OF "AT THE SAME TIME."  THAT'S

5   ALL WE'RE ASKING FOR, YOUR HONOR.

6       THE COURT:  OKAY.  LET ME TALK TO MR. REITER, BECAUSE

7   I AGREE THAT I THINK COLUMN 24 IS THE STRONGEST EVIDENCE FOR

8   REQUIRING "AT THE SAME TIME."

9       SO WHY DON'T YOU ADDRESS WHERE IT SPECIFICALLY SAYS, "FOR

10  EXAMPLE, IF BOTH THE DEVICE AND THE HOST HAVE THESE

11  CAPABILITIES, THEN A USER ON THE DEVICE MAY BE VIEWING A

12  CALENDAR PROGRAM WHICH DISPLAYS A CALENDAR OF THE USER SHOWING

13  EVENTS AND POSSIBLY NEW ITEMS FOR THE USER WHILE AT THE SAME

14  TIME A SYNCHRONIZATION SERVICE IS SYNCHRONIZING THE CALENDAR

15  DATA ON THE DEVICE WITH CALENDAR DATA ON THE HOST"; AND THEN IT

16  GOES AGAIN A FEW LINES LATER, "SIMILAR, THE USER MAY USE AN

17  APPLICATION PROGRAM ON THE HOST TO ACCESS AND EDIT THE CALENDAR

18  DATA OR OTHER STRUCTURED DATA FOR OTHER APPLICATIONS WHILE AT

19  THE SAME TIME, THE HOST IS PERFORMING SYNCHRONIZATION

20  OPERATIONS ON STRUCTURED DATA IN ONE OR MORE STORES OF

21  STRUCTURED DATA."

22      MR. REITER:  YES, YOUR HONOR.

23    SO LET'S START WITH THE BASICS.

24      THE COURT:  UM-HUM.

25      MR. REITER:  THE BASICS ARE, AND THE FEDERAL CIRCUIT

1    HAS SAID, AND THEY'VE SAID THIS IN PHILLIPS, THAT WE HAVE TO

2    UNDERSTAND THESE TERMS, THESE CLAIM TERMS IN THE CONTEXT OF THE

3    WAY ONE OF SKILL IN THE ART WOULD UNDERSTAND THEM, NOT THE WAY

4    WE WOULD LOOK AT THEM AS LAY PEOPLE, BUT THE WAY ONE OF SKILL

5    IN THE ART WOULD LOOK AT THEM.

6        SO "CONCURRENTLY," AS WE HAVE SAID ONE OF SKILL IN THE ART

7    WOULD UNDERSTAND IN A SINGLE PROCESSOR SYSTEM, AS WE'VE ALL

8    RECOGNIZED IS DISCLOSED IN THE '414 PATENT, WOULD ALLOW FOR

9    INTERLEAVING SUCH THAT A USER PERCEIVES THE EXECUTION TO OCCUR

10   AT THE SAME TIME, OR CONCURRENTLY, AND THAT'S WHAT THE

11   DICTIONARIES THAT WE SHOWED YOUR HONOR LAST WEEK DEMONSTRATE.

12            THE COURT:  BUT WHERE IS INTRINSIC EVIDENCE IN THE

13   SPEC OF "INTERLEAVING"?

14            MR. REITER:  THE INTRINSIC EVIDENCE IN THE SPEC, I

15   BELIEVE, YOUR HONOR, IS GOING BACK TO THE CELL PHONE REFERENCE.

16      YOU TALKED WITH MR. PAK AT SOME LENGTH ABOUT CELL PHONES

17   AND WHETHER CELL PHONES HAD SINGLE CORE, DUAL CORE, OR WHAT

18   TYPE OF CORE, WHAT TYPE OF PROCESSORS.

19            THE COURT:  ALL RIGHT.  BUT THAT'S ALL EXTRINSIC.

20      SO THERE IS NO INTRINSIC EVIDENCE SUPPORTING YOUR

21   CONSTRUCTION.

22            MR. REITER:  RESPECTFULLY, I DISAGREE, YOUR HONOR.

23            THE COURT:  OKAY.  POINT ME TO A COLUMN AND A LINE

24   NUMBER.

25      AND YOU STILL HAVEN'T ANSWERED MY QUESTION.  SO YOU'RE

1    TELLING ME A PERSON OF ORDINARY SKILL IN THE ART WOULD READ "AT

2    THE SAME TIME" AND NOT UNDERSTAND THAT AS AT THE SAME TIME?

3    RIGHT?

4              MR. REITER:  NO.

5              THE COURT:  I MEAN, A PERSON OF ORDINARY SKILL IN THE

6    ART IS GOING TO READ "AT THE SAME TIME," AND YOU'RE SAYING

7    THEY'RE NOT GOING TO UNDERSTAND THAT MEANS AT THE SAME TIME?

8              MR. REITER:  NO.  WHAT I'M SAYING, YOUR HONOR, IS

9    THAT WHEN A PERSON OF ORDINARY SKILL IN THE ART READS THE

10   CLAIMS, READS THE DUAL THREADED CLAIMS AND IT TALKS ABOUT

11   CONCURRENT EXECUTION OF THE TWO THREADS, THAT THAT PERSON OF

12   SKILL IN THE ART, AT THE TIME, IS GOING TO UNDERSTAND THAT THAT

13   ALLOWS FOR INTERLEAVING OF THOSE THREADS.  THAT'S WHAT I'M

14   SAYING.

15      I'M NOT TALKING ABOUT THE SPECIFICATION.

16      AND I APOLOGIZE, YOUR HONOR, IF I HAVEN'T ANSWERED YOUR

17   QUESTION DIRECTLY.

18             THE COURT:  NO, YOU HAVEN'T.

19             MR. REITER:  OKAY.

20             THE COURT:  YOU HAVEN'T.  ANSWER COLUMN 24, LINES 52

21   THROUGH 54.  I'M JUST NOT HEARING ANY ANSWER TO THAT AT ALL.

22             MR. REITER:  WELL, OKAY.

23      SO 52 THROUGH 54, AS YOUR HONOR READ, "FOR EXAMPLE, IF BOTH

24   THE DEVICE AND THE HOST HAVE THESE CAPABILITIES, THEN A USER ON

25   THE DEVICE MAY BE VIEWING A CALENDAR PROGRAM WHICH DISPLAYS A

1    CALENDAR OF THE USER SHOWING EVENTS AND POSSIBLY TO DO ITEMS

2    FOR THE USER WHILE AT THE SAME TIME A SYNCHRONIZATION SERVICE

3    IS SYNCHRONIZING THE CALENDAR DATA ON THE DEVICE."

4        THAT IS FROM THE PERCEPTION OF THE USER.  IT IS TALKING

5    ABOUT WHAT THE USER IS VIEWING AND WHAT IS GOING ON WHILE THE

6    USER IS WORKING ON THE SYSTEM, AND THAT IS WHAT THIS INVENTION

7    IS ABOUT IS THAT IT ALLOWS THE USER TO WORK ON HIS OR HER

8    DEVICE, LISTEN TO MUSIC, ADD A CALENDAR ENTRY, DO A TO DO LIST

9    WHILE CONCURRENTLY, OR AT THE SAME TIME AS IN THE PATENT -- I'M

10   NOT GOING TO WALK AWAY FROM IT -- AS THE SPECIFICATION SAYS, AT

11   THE SAME TIME THE SYSTEM IS SYNCHRONIZING.  THAT IS FROM THE

12   USER'S PERSPECTIVE.

13       AND THE RECORD EVIDENCE THAT WE PUT IN WITH OUR BRIEFING

14   SHOWS THAT THE DICTIONARIES EXPLAIN THAT BECAUSE THESE

15   PROCESSORS WORK SO QUICKLY, FROM THE USER'S PERCEPTION, WHICH

16   IS EXACTLY WHAT IS BEING DESCRIBED HERE, IT APPEARS TO BE AT

17   THE SAME TIME.

18       ONE OF SKILL IN THE ART, THOUGH, WE DID NOT --

19            THE COURT:  OKAY.  I'M SORRY TO INTERRUPT YOU.  WHAT

20   SAYS THAT THIS IS LIMITED TO A USER'S PERSPECTIVE?

21            MR. REITER:  WELL, IT TALKS ABOUT, JUST AS YOU SAID,

22   LINE 52, COLUMN 24, "FOR EXAMPLE, IF BOTH THE DEVICE AND THE

23   HOST HAVE THESE CAPABILITIES, THEN A USER ON THE DEVICE AND THE

24   HOST MAY HAVE THESE CAPABILITIES" --

25            THE COURT:  NO, NO.  FINISH IT.  "A USER ON THE

```
 1     DEVICE MAY BE VIEWING A CALENDAR PROGRAM WHICH DISPLAYS A

 2     CALENDAR OF THE USER SHOWING EVENTS AND POSSIBLY TO DO ITEMS

 3     FOR THE USER, WHILE AT THE SAME TIME A SYNCHRONIZATION SERVICE

 4     IS SYNCHRONIZING THE CALENDAR DATA ON THE DEVICE WITH CALENDAR

 5     DATA ON THE HOST."

 6          THAT, TO ME, IS NOT LIMITING "WHILE AT THE SAME TIME" TO A

 7     USER'S PERSPECTIVE.

 8               MR. REITER:  I THINK -- I RESPECTFULLY DISAGREE, YOUR

 9     HONOR.

10               THE COURT:  OKAY.

11               MR. REITER:  I THINK WHAT THAT IS EXPLAINING IS THE

12     USER IS WORKING ON THE SYSTEM.

13          AGAIN, WE HAVE TO TAKE A STEP BACK.  WHAT IS THIS INVENTION

14     ABOUT?  THIS INVENTION IS ABOUT ALLOWING A USER TO OPERATE HIS

15     OR HER DEVICE WHILE AT THE SAME TIME SYNCHRONIZING THE DEVICE.

16          SO YOU'RE MANIPULATING THE DEVICE, YOU'RE ADDING A CALENDAR

17     ENTRY, YOU'RE LISTENING TO MUSIC, YOU'RE READING E-MAIL, AND AT

18     THE SAME TIME, IN THE BACKGROUND, UNSEEN BY THE USER,

19     SYNCHRONIZATION IS GOING ON.

20          AND THIS IS EXPLAINING EXACTLY WHAT THE USER IS SEEING AND

21     NOT SEEING.  HE OR SHE IS ABLE TO MANIPULATE THE DEVICE WHILE

22     SYNCHRONIZATION IS GOING ON AT THE SAME TIME.

23          THE CLAIMS, HOWEVER, DON'T USE "AT THE SAME TIME."  THEY

24     TALK ABOUT VERY TECHNICAL TERMS.  THEY TALK ABOUT THREADS AND

25     THEY TALK ABOUT CONCURRENT EXECUTION, BECAUSE THOSE ARE TERMS
```

1    THAT ARE UNDERSTOOD BY THOSE OF SKILL IN THE ART, "MULTIPLE

2    THREADS EXECUTING CONCURRENTLY."

3        THEY CHOSE THEIR LANGUAGE VERY CAREFULLY.  AND AS WE'VE

4    TALKED ABOUT, AND AS YOU'VE TALKED ABOUT WITH MR. PAK, CELL

5    PHONES, AT THAT TIME, AT THE TIME OF THE FILING, DID NOT HAVE

6    AND WERE NOT PUBLICLY AVAILABLE WITH DUAL CORES.  THEY ONLY HAD

7    SINGLE CORE PROCESSORS.

8        SO IN ORDER TO HAVE CONCURRENT EXECUTION -- AND THIS PATENT

9    IS VERY MUCH ABOUT LINKING A COMPUTER WITH A CELL PHONE.  I

10   THINK YOU WENT THROUGH THAT WITH MR. PAK.

11           THE COURT:  WHY DON'T YOU ADDRESS THE SMT PROCESSORS?

12           MR. REITER:  WELL, AGAIN, THE SMT PROCESSOR IS NOT

13   SOMETHING THAT'S IN THE RECORD.  THAT'S NOT SOMETHING THAT WAS

14   BRIEFED.

15           THE COURT:  RIGHT.  BUT YOU DON'T WANT ME TO MAKE A

16   DECISION THAT'S JUST WRONG BECAUSE IT WAS INCOMPLETE, I ASSUME,

17   RIGHT?

18           MR. REITER:  NO, I DON'T.

19           THE COURT:  YOU WANT ME TO JUST DO A FACTUALLY WRONG

20   CLAIM CONSTRUCTION?

21           MR. REITER:  NO, OF COURSE NOT, YOUR HONOR.

22           THE COURT:  OKAY.  SO WHY DON'T YOU ADDRESS IT?

23           MR. REITER:  SO THE SMT PROCESSOR IS A TYPE OF

24   PROCESSOR THAT HAD VIRTUAL DUAL CORES.

25       BUT, AGAIN, THE PATENT DOESN'T TALK ABOUT CORES OR DOESN'T

1    TALK ABOUT HOW THE PROCESSOR IS SET UP.  IT TALKS ABOUT ONE

2    PROCESSOR IN A DATA PROCESSING SYSTEM.  THAT'S WHAT THE PATENT

3    TALKS ABOUT.

4        IT DOESN'T GET INTO LIMITATIONS OF HOW THOSE PROCESSORS ARE

5    SET UP, WHETHER THEY'RE DUAL CORE, SINGLE CORE, SMT TYPE

6    PROCESSOR.

7        IT SAYS ONE MICROPROCESSOR.  THAT'S IT.

8            THE COURT:  WELL --

9            MR. REITER:  I'M SORRY, YOUR HONOR.

10           THE COURT:  GO AHEAD.

11           MR. REITER:  THERE'S NO DISAVOWAL IN THIS PATENT,

12   THERE'S NO STATEMENT BY THE INVENTORS THAT SAYS, "IN ORDER TO

13   HAVE CONCURRENT EXECUTION, IN ORDER TO SATISFY THIS CLAIM, WE

14   DISAVOW SINGLE CORE PROCESSORS AND WE'RE ONLY GOING FOR DUAL

15   CORE PROCESSORS OR SMT TYPE CORE PROCESSORS."  THEY'RE SILENT

16   AS TO THAT.

17       AND WHAT PHILLIPS SAYS AND WHAT RENSHAW SAYS, WHAT THE

18   FEDERAL CIRCUIT SAYS IS WHAT WE NEED TO DO IN CLAIM

19   CONSTRUCTION IS UNDERSTAND WHAT THE INVENTORS INVENTED AND THEN

20   CONSTRUE THE CLAIMS IN THAT CONTEXT.

21       THE INVENTORS WERE NOT INVENTING MICROPROCESSORS.  THEY

22   DON'T TALK ABOUT THAT HERE.

23       IN FACT, THEY PUSH AWAY FROM THE ARCHITECTURE OF THE

24   MICROPROCESSORS, AND I KNOW MR. PAK TALKED ABOUT COLUMN 1 AND

25   THAT IS GETTING INTO THE ARCHITECTURE OF THE SOFTWARE AND IT

1    GETS -- I KNOW THAT SEEMS LIKE A LOT OF DOUBLE TALK, AND I

2    DON'T MEAN FOR IT TO BE.

3         BUT WHAT THE PATENT -- WHEN THEY TALK ABOUT THEIR INVENTION

4    IN COLUMN 2, NOT IN THE PRIOR ART, IN COLUMN 2, THEY'RE SAYING

5    "WE DON'T CARE ABOUT THE ARCHITECTURE.  WE'RE NOT INVENTING

6    MICROPROCESSORS.  WE'RE NOT INVENTING HOW THESE BUSES AND

7    COMPONENTS ARE ALL CONNECTED TOGETHER.  WE'RE INVENTING A

8    SOFTWARE SYSTEM, A SYSTEM THAT ENABLES A USER TO WORK ON HIS OR

9    HER DEVICE AT THE SAME TIME THAT IT IS SYNCHRONIZING, AND THAT

10   HAPPENS BECAUSE OF CONCURRENT EXECUTION," AND THAT'S THE WAY

11   THEY CLAIMED IT, "OF DUAL THREADS."

12         THE COURT:  ALL RIGHT.  WELL, LET ME TELL YOU WHAT MY

13   CONCERN IS ABOUT YOUR CONSTRUCTION.

14        YOUR CONSTRUCTION RELIES ON EXTRINSIC EVIDENCE, WHICH

15   FACTUALLY MAY OR MAY NOT BE COMPLETE OR ACCURATE.

16        AND WHAT I HAVE IS INTRINSIC EVIDENCE SAYING "AT THE SAME

17   TIME," WHICH IS WHAT SAMSUNG IS PROPOSING.

18        SO INTRINSIC EVIDENCE IS ALWAYS SUPERIOR TO EXTRINSIC

19   EVIDENCE, SO WHAT AM I SUPPOSED TO DO?

20         MR. REITER:  WELL, IF WE TURN BACK TO PHILLIPS,

21   PHILLIPS SAYS IT'S FINE TO LOOK AT DICTIONARIES, AND PHILLIPS

22   RECOGNIZES, AND I BELIEVE RENSHAW RECOGNIZES, THAT CERTAIN

23   TERMS ARE USED BY THOSE OF SKILL IN THE ART IN PARTICULAR WAYS,

24   AND IT'S OKAY TO LOOK AT THOSE DICTIONARIES, AS LONG AS THE

25   DICTIONARIES ARE NOT INCONSISTENT WITH WHAT IS DESCRIBED IN THE

```
1        PATENT.

2             SAMSUNG HAS NOT, FIRST OF ALL, SAID THAT ANY OF THE

3    DICTIONARY DEFINITIONS THAT WE HAVE CITED ARE WRONG.  THEY'VE

4    COMPLAINED ABOUT THE DATES, AND THE LATEST ONE WE DID WAS IN

5    2004, WHICH WAS JUST TWO YEARS, REALLY, BECAUSE THIS WAS FILED

6    JANUARY OF 2007, TWO YEARS FROM THE TIME OF THE FILING.

7             SO THEY HAVEN'T SAID THAT THESE DICTIONARIES ARE WRONG.

8    THEY HAVEN'T SHOWN INCONSISTENT DICTIONARIES.

9                 THE COURT:  BUT WHY SHOULD I RELY ON A DICTIONARY IF

10   I'VE GOT SPECIFICATION LANGUAGE?

11                MR. REITER:  BECAUSE AGAIN, YOUR HONOR, AND AGAIN

12   WITH ALL DUE RESPECT, THE SPECIFICATION IS NOT TALKING ABOUT

13   CONCURRENT EXECUTION OF DUAL THREADS.

14            IT IS TALKING ABOUT WHAT THE USER SEES AND DOESN'T SEE WHEN

15   HE OR SHE IS WORKING ON THEIR DEVICE, WHEN HE OR SHE IS USING

16   THIS INVENTION.  THAT IS WHAT IS BEING DESCRIBED THERE IN

17   COLUMN 24, NOT CONCURRENT EXECUTION OF DUAL THREADS.

18            THERE'S NOTHING ABOUT THE NON-SYNCHRONIZATION THREAD OR THE

19   SYNCHRONIZATION THREAD DESCRIBED IN THAT PORTION OF COLUMN 24.

20                THE COURT:  DID YOU UNDERSTAND MR. PAK'S LOCK

21   ACQUIRED ARGUMENT?

22                MR. REITER:  I'M SORRY?

23                THE COURT:  THE LOCK ACQUIRED ARGUMENT IN FIGURE

24   13A --

25                MR. REITER:  YEAH.
```

```
 1              THE COURT:  -- DO YOU WANT TO RESPOND TO THAT?

 2              MR. REITER:  WHAT FIGURE 13A IS EXPLAINING IS THE

 3    ALGORITHM, IF YOU WILL, FOR HOW TO ALLOW FOR THE -- OR HOW THE

 4    INVENTION OPERATES WHEN YOU'RE DOING THE CONCURRENT EXECUTION.

 5         AND WHAT IT DOES AND WHAT IT EXPLAINS IS IT LOCKS -- IN

 6    OTHER WORDS, IT LOCKS ACCESS, AS I UNDERSTAND IT, TO A CERTAIN

 7    PART OF THE DATA SO THAT THERE'S NOT OVERWRITING OR

 8    INCONSISTENT DATA THAT'S BEING PUT IN.

 9         SO THE USER IS ABLE TO GO ALONG AND WORK ON HIS OR HER

10    DEVICE, AND THEN THE SYSTEM LOCKS ANOTHER PART OF THE DEVICE

11    WHILE THE SYNCHRONIZATION IS TAKING PLACE SO THAT CAN'T BE

12    OVERRIDDEN AT THE SAME TIME THAT THE USER IS WORKING ON IT, OR

13    THE SYNCHRONIZATION IS TAKING PLACE.

14         DID I EXPLAIN THAT OKAY?

15              THE COURT:  NO, I DIDN'T UNDERSTAND THAT.

16              MR. REITER:  OKAY.  I'M NOT SURE I DID EITHER.

17         SO IN BOX 159 ON FIGURE 13A, THE SYNCHRONIZATION SOFTWARE

18    COMPONENT -- AND THIS IS -- REMEMBER, THERE'S TWO THREADS,

19    NON-SYNCHRONIZATION AND SYNCHRONIZATION.

20              THE COURT:  I DON'T EVEN SEE BOX 159.

21              MR. REITER:  I'M SORRY, 579.

22              THE COURT:  OH, OKAY.

23              MR. REITER:  BOX 579, IT EXPLAINS THE SYNCHRONIZATION

24    SOFTWARE COMPONENT ATTEMPTS TO ACQUIRE A LOCK ON THE STORE FOR

25    A DATA CLASS.
```

1          SO IF WE LOOK AT THE CLAIMS, WE SEE THERE'S A FIRST DATA

2     STORE AND A SECOND DATA STORE, SO WHAT THIS SOFTWARE COMPONENT

3     IS DOING IS IT'S LOCKING PART OF THE DATA THAT IS GOING TO BE

4     SYNCHRONIZED SO THAT AS THE USER IS WORKING ON THE DEVICE, THEY

5     DON'T TRY TO MANIPULATE THE SAME DATA THAT IS BEING

6     SYNCHRONIZED.

7          THEY'RE ABLE TO STILL WORK WITH THE DEVICE, BUT THE SYSTEM

8     DOESN'T WANT THE USER -- FOR EXAMPLE, IF YOU HAVE A CALENDAR

9     ENTRY FOR JULY 5TH AND YOU WANT -- AND IT'S SYNCHRONIZING FROM

10    YOUR COMPUTER TO JULY 5TH, AND THEN YOU TRY TO GO INTO JULY 5TH

11    AGAIN AT THE SAME TIME THAT SYNCHRONIZATION IS TAKING PLACE,

12    IT'S GOING TO LOCK THAT OUT AND PROTECT THAT LITTLE BIT OF

13    DATA, EVEN THOUGH YOU CAN STILL MANIPULATE YOUR CALENDAR ENTRY,

14    AND THAT'S WHAT THE LOCK WAS.

15         AND THEN IT GOES ON TO SAY IS THE LOCK ACQUIRED, AND IF

16    IT'S YES, WE SEE IN 580, WHICH IS THE YES LINE, BEGIN

17    SYNCHRONIZING.

18         AND THEN WE GO TO 593, "IF THE USER ATTEMPTS TO CHANGE,

19    STORE FOR THE DATA CLASS WHILE SYNCHRONIZING, PRESENT AN

20    ALERT."  IN OTHER WORDS, "YOU'RE TRYING TO CHANGE JULY 5TH,

21    WE'RE SYNCHRONIZING RIGHT NOW."

22         AND THEN YOU GO TO 13B, YOU FINISH SYNCHRONIZING, AND THEN

23    YOU'LL RELEASE THE LOCK AND THEN -- AND SO FORTH.  THE USER CAN

24    CONTINUE TO MANIPULATE THE DEVICE.

25              THE COURT:  ALL RIGHT.  WELL, I'D LIKE TO MOVE ON.

1          IS THERE ANYTHING YOU WANT TO ADD?

2               MR. PAK:  JUST TWO QUICK COMMENTS, YOUR HONOR.

3               THE COURT:  OKAY.  GO AHEAD, PLEASE.

4               MR. PAK:  OKAY.  SO I THINK IT'S VERY IMPORTANT TO

5     UNDERSTAND THE CONTEXT OF THE COMMENTS WE'VE BEEN LOOKING AT IN

6     COLUMN 24, "AT THE SAME TIME."

7          YOUR HONOR, THAT'S DESCRIBING FIGURE 13.  FIGURE 13 IS ALL

8     ABOUT THE EXECUTION OF THE THREADS.  THIS IS NOT ABOUT OTHER

9     FIGURES THAT SHOW WHAT'S HAPPENING ON THE SCREEN.

10          AND SPECIFICALLY, AS YOUR HONOR NOTED, "AT THE SAME TIME"

11    IS DESCRIBING WHAT'S HAPPENING WITH THE SYNCHRONIZATION

12    PROCESS.  SO WE THINK THAT'S AN IMPORTANT POINT TO MAKE HERE.

13          THE SECOND IS, YOUR HONOR, AS COUNSEL FOR APPLE I THINK

14    IMPLICITLY ACKNOWLEDGED, THERE IS NO DISCUSSION IN THE

15    INTRINSIC RECORD ABOUT "INTERLEAVING" AT ALL.  THERE'S NO

16    MECHANISM HERE.

17          IN FACT, THE LOCKING MECHANISM THAT WE WERE DISCUSSING IS

18    INTENDED TO WORK WHEN YOU HAVE TWO THREADS RUNNING AT THE SAME

19    TIME BECAUSE YOU HAVE THE ABILITY NOW TO HAVE TWO THREADS THAT

20    ARE TRYING TO ACCESS THE SAME DATA ELEMENT.

21          THAT PROBLEM DOESN'T NECESSARILY ARISE IF YOU'RE

22    INTERLEAVING BECAUSE NOW YOU HAVE INSTRUCTIONS THAT COULD BE

23    SEQUENCED IN DIFFERENT WAYS TO AVOID THIS NEED TO HAVE A

24    LOCKING MECHANISM.

25          BUT THE PATENT IS VERY CLEAR, WE BELIEVE, THAT IT'S ABOUT

```
 1        AT THE SAME TIME EXECUTION, IT SHOWS AN ALGORITHM FOR DOING

 2        THAT, AND IT TALKS ABOUT VARIOUS EMBODIMENTS THAT ARE FULLY

 3        CAPABLE OF DOING THAT IN 2007.

 4            THANK YOU, YOUR HONOR.

 5                THE COURT:  OKAY.

 6                MR. REITER:  YOUR HONOR, ONE LAST POINT, AND THAT IS

 7        I THINK WE HAVE TO GO BACK TO THE CELL PHONE EMBODIMENT.

 8        SINGLE CORES WERE ONLY AVAILABLE ON CELL PHONES, AND ONE OF

 9        SKILL IN THE ART, WHETHER YOU WANT TO TALK ABOUT "AT THE SAME

10        TIME," ONE OF SKILL IN THE ART UNDERSTOOD "CONCURRENT

11        EXECUTION" TO ALLOW FOR THIS PERCEPTION, AS WE SAW IN COLUMN 24

12        FOR THE USER, AND WE CAN'T EXCLUDE -- AND I SAW THE CASE, BUT

13        WE KNOW AND I KNOW THAT YOUR HONOR HAS SEEN THESE CASES FROM

14        PHILLIPS AND RENSHAW AND FROM OTHER FEDERAL CIRCUIT CASES WHERE

15        EXCLUDING ANY PREFERRED EMBODIMENT IS RARELY, IF EVER, CORRECT.

16            AND THEY HAVE IDENTIFIED NOTHING, NOTHING IN THE INTRINSIC

17        RECORD THAT SAYS THAT WE HAVE DISAVOWED THE CELL PHONE WITH THE

18        SINGLE CORE MICROPROCESSOR.

19            WE HAVEN'T DONE THAT, IT'S NOT IN HERE, AND ONE OF SKILL IN

20        THE ART, UNDERSTANDING THE TECHNOLOGY AT THE TIME, WOULD HAVE

21        UNDERSTOOD THAT SINGLE CORE PROCESSORS EXECUTE CONCURRENTLY.

22            THANK YOU, YOUR HONOR.

23                THE COURT:  ALL RIGHT.  I'VE GOT TO GET MR. JOHNSON

24        ON HIS TRIP.  LET'S -- LET ME ASK MS. SHORTRIDGE --

25                (DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE
```

```
 1      REPORTER.)

 2              THE COURT:  HOW LONG SHOULD WE -- NOW WOULD BE A GOOD

 3      TIME TO TAKE A BREAK SINCE MS. SHORTRIDGE HAS BEEN TRANSCRIBING

 4      FOR QUITE SOME TIME.  SHOULD WE GO AHEAD AND TAKE A LUNCH BREAK

 5      NOW?  I WANT US TO FINISH NO LATER THAN 3:30.  I CAN WE CAN DO

 6      THAT.

 7          N IS NO LONGER AN ISSUE.

 8          I THINK WE CAN DO THAT, BUT LET ME HEAR FROM YOU ALL.  HOW

 9      MUCH WOULD YOU LIKE TO TALK OFF?  45 MINUTES?  AN HOUR?  WHAT'S

10      YOUR PREFERENCE?

11              MR. LYON:  YOUR HONOR, I THINK ON OUR SIDE, WE'RE --

12      WE'RE FLEXIBLE ON THAT.  I DON'T THINK WE NEED A LONG LUNCH

13      BREAK.  IF YOU'D LIKE TO TAKE A SHORTER ONE TO KEEP IT CLOSER

14      TO 3:30, THAT'S FINE.

15          THE ONLY COMMENT I WOULD MAKE, MR. REITER HAS A HEARING IN

16      NEW JERSEY TOMORROW AND WOULD NEED TO LEAVE, IF THAT'S ALL

17      RIGHT WITH YOU.  WE RAISED THIS.

18              THE COURT:  I'M SORRY.  I'M HAVING TROUBLE HEARING

19      YOU.

20              MR. LYON:  I'M SORRY.

21          MR. REITER HAS A HEARING IN NEW JERSEY TOMORROW MORNING AND

22      HAS A PLANE TO CATCH, SO WOULD YOU MIND IF HE LEFT DURING OUR

23      BREAK?

24              THE COURT:  OH, NOT AT ALL.

25              MR. LYON:  OKAY.  OTHERWISE I DON'T THINK IT MATTERS
```

```
1      TO US.  HOWEVER LONG YOU TAKE IS FINE.

2              THE COURT:  OKAY.

3              MR. REITER:  UNLESS YOUR HONOR IS GOING TO HAVE MORE

4      QUESTIONS ABOUT THE '414 AND '647, I APPRECIATE THE COURTESY.

5              THE COURT:  NO.  I THINK I WILL JUST MOVE ON TO THE

6      '760 AND THEN THE THREE SAMSUNG PATENTS.

7              MR. REITER:  THANK YOU VERY MUCH, YOUR HONOR.

8              THE COURT:  SO 45 MINUTES?

9              MR. JOHNSON:  YEAH.  WE'RE FLEXIBLE.  SO -- YOU KNOW,

10     IT ALL DEPENDS ON YOUR HONOR'S QUESTIONS, FRANKLY, I THINK WITH

11     RESPECT TO THE REMAINING TERMS.  SO WE'RE PREPARED TO KEEP IT

12     SHORT FOR LUNCH.

13             THE COURT:  I -- YOU KNOW, I MEAN, I CAN GIVE YOU

14     SORT OF A PREVIEW.

15         ON THE '087, I THINK I UNDERSTAND APPLE'S ARGUMENT, BUT I'D

16     LIKE TO HAVE SAMSUNG RESPOND TO WHAT -- I FORGOT THE ATTORNEY'S

17     NAME LAST WEEK -- HE ARGUED ABOUT WHAT INFORMATION IS

18     TRANSMITTED, JUST THE N AND THE K TTI'S.  SO I HAVE SOME

19     QUESTIONS ON THAT.

20         I THINK WE NEED TO TALK A LITTLE BIT ABOUT THE ZONE ISSUE

21     WITH REGARD TO THE '757.

22         LET'S TAKE -- I STILL THINK A 45 MINUTE BREAK WOULD MAKE

23     SENSE, OKAY, SINCE WE HAVE SO MANY PEOPLE.

24             MR. LYON:  THAT'S FINE.

25             THE COURT:  ALL RIGHT.  THANK YOU THEN.  LET'S --
```

1        LET'S COME BACK THEN AT 1:10.  OKAY.  THANK YOU.

2               MR. PRICE:  THANK YOU, YOUR HONOR.

3               MR. LYON:  THANK YOU, YOUR HONOR.

4               THE COURT:  OKAY.  THANK YOU.

5          (LUNCH RECESS FROM 12:27 P.M. TO 1:18 P.M.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **AFTERNOON SESSION**

2              THE COURT:  OKAY.  GOOD AFTERNOON AND WELCOME BACK.

3      PLEASE TAKE A SEAT.

4          ALL RIGHT.  THE ONES THAT I COULD USE YOUR MOST -- THE MOST

5      HELP WITH ARE PROBABLY THE '760 AND THE -- I THINK I'M ACTUALLY

6      OKAY ON THE '229 -- I MEAN, WE'LL GET TO IT -- AND ALSO THE

7      '757.

8          LET'S GO TO THE '760 FIRST AND ASK IF YOU WERE ABLE TO

9      IDENTIFY WHAT THE DISPUTE IS, BECAUSE THERE DID SEEM TO BE SOME

10     CONSENSUS.

11             MR. LYON:  I DO THINK WE'VE NOW HAD A CHANCE TO MEET

12     AND CONFER AND I DO THINK IT'S CRYSTALLIZED AT THIS POINT.

13         SO IF YOU LOOK AT THE OLD -- THIS WAS THE ORIGINAL PROPOSED

14     CONSTRUCTION FOR BOTH PARTIES.

15         APPLE HAD ORIGINALLY SAID "NO CONSTRUCTION NECESSARY"

16     BECAUSE WE DO STILL BELIEVE --

17             THE COURT:  LET'S NOT EVEN GO THERE.

18             MR. LYON:  I UNDERSTAND.

19         SO WHAT WE'VE DONE IS WE'VE PROPOSED AN ALTERNATIVE.

20         SAMSUNG HAD PROPOSED THEIR CONSTRUCTION, WHICH ESSENTIALLY

21     SAID -- HAD THIS NEGATIVE LIMITATION, EFFECTIVELY, THAT YOU

22     DON'T HAVE ANY OF THE MISSED CALL LISTS VISIBLE.

23         AS PART OF THE MEET AND CONFER, WE PROPOSED ANOTHER --

24     TRIED TO MATCH THEIRS A LITTLE BIT, TRIED TO PROPOSE A

25     CONSTRUCTION IN THE WAY SO THAT "DISPLAYING AT LEAST TWO

```
 1      CONTACT OBJECTS IN PLACE OF THE DISPLAY OF THE LIST OF
 2      INTERACTIVE ITEMS," AND I'LL EXPLAIN WHY I THINK THAT MAY WORK
 3      HERE, TOO, BECAUSE WHEN YOU --
 4              THE COURT:  DID YOU DISCLOSE THAT TO SAMSUNG?
 5              MR. LYON:  WE DID.
 6              THE COURT:  WHEN?
 7              MR. LYON:  THIS WAS TUESDAY, I BELIEVE.  WE HAD A
 8      MEET AND CONFER THAT STARTED FRIDAY AND IT CONTINUED MONDAY AND
 9      TUESDAY AND WE BELIEVE WE SENT IT TO THEM IN E-MAIL ON TUESDAY.
10              THE COURT:  OKAY.
11              MR. LYON:  SAMSUNG DID NOT LIKE THAT AND THEN
12      COUNTER-PROPOSED LAST NIGHT, LAST EVENING, ENTIRELY REPLACING
13      THE "DISPLAY OF INTERACTIVE ITEMS FROM A MISSED CALL LIST" WITH
14      "THE CONTACT LIST ENTRY."
15          SO OUR VIEW HAS ALWAYS BEEN THAT THE LIMITATION WE'RE
16      TALKING ABOUT HERE, "COMPLETELY SUBSTITUTING," HAS TO DO WITH
17      HOW YOU'RE VIEWING THE INFORMATION, NOT NECESSARILY WHAT THE
18      INFORMATION IS.
19          SAMSUNG NOW SEEMS TO -- THEY HAVE ALWAYS HAD THIS IDEA THAT
20      IT RELATES TO THE CONTENT OF THE INFORMATION, BUT THEY'VE GONE
21      FROM AN EXCLUSIONARY THING, WHERE YOU CAN'T HAVE ANY
22      INFORMATION FROM THE MISSED CALLS VISIBLE, TO NOW SAYING WE
23      NEED TO ADD IN SOME EXTRA INFORMATION, SOME ADDITIONAL
24      INFORMATION, THAT CONTACT LIST ENTRY THAT WE'LL GET INTO.
25          SO LET ME, IF I CAN, WALK YOU THROUGH -- BEAR WITH ME AND
```

1    I'LL WALK YOU THROUGH THE CLAIMS AND THE PROSECUTION HISTORY A

2    BIT AS TO WHY I THINK APPLE'S CONSTRUCTION IS CORRECT HERE AND

3    POINT OUT A COUPLE OF POINTS WHY I THINK SAMSUNG'S IS

4    INCORRECT.

5            THE COURT:  CAN I ASK, BEFORE YOU DO THAT, I THOUGHT

6    THAT LAST WEEK'S DISPUTE WAS THAT SAMSUNG DID NOT LIKE HAVING A

7    SORT OF BLOW UP OR A ZOOMING IN OF THE MISSED CALL LIST

8    DISPLAY, AND IF THAT WAS THE SOLE SECOND DISPLAY, THAT THAT WAS

9    INSUFFICIENT.

10   DOES THAT SOUND RIGHT, MR. PRICE?  I THOUGHT THAT'S WHAT

11   YOUR --

12           MR. PRICE:  THAT WAS CONCEPTUALLY THE PROBLEM THAT WE

13   HAD.

14   SO I DON'T WANT TO INTERRUPT THE PRESENTATION, BUT WE WERE

15   TRYING TO FIGURE OUT, YOU KNOW, HOW TO DESCRIBE WHAT WE SEE IN

16   12C.

17           THE COURT:  OKAY.

18           MR. PRICE:  A PICTURE IS WORTH A THOUSAND WORDS.

19           THE COURT:  OKAY.

20           MR. PRICE:  AND WE WERE TRYING TO COME UP WITH LESS

21   THAN A THOUSAND WORDS TO DESCRIBE WHAT WE THOUGHT THE PATENT

22   WAS.

23   SO LAST WEEK, YES, WE WERE STRUGGLING WITH THAT ISSUE.

24           THE COURT:  SURE.

25           MR. PRICE:  I THINK -- I DON'T WANT TO GO -- I THINK

1    WE'VE COME UP WITH AN ELEGANT AND SIMPLE SOLUTION THAT RELATES

2    TO THE SPECIFICATION AND WE'LL GET INTO THAT SO THAT WE DON'T

3    HAVE TO USE ALL THOSE WORDS TO DESCRIBE IT, SO IT DOESN'T HAVE

4    TO BE IN THE NEGATIVE ANYMORE.

5            THE COURT:  OKAY.  BUT YOU'RE -- YOU HAVE A GREATER

6    CONCERN THAN JUST THE ZOOMING IN OR THE BLOWING UP OF THE

7    EXCERPT FROM THE MISSED CALL LIST?

8            MR. PRICE:  YEAH.  THE CONCERN IS THAT WE BELIEVE

9    THAT THAT SECOND PAGE --

10           THE COURT:  YES.

11           MR. PRICE:  -- THAT WHAT'S GOING ON THERE, WHEN YOU

12   HIT 12B, IS THAT YOU'RE SHOWING THE CONTACT INFORMATION.

13       IN OTHER WORDS, YOU HAVE AN ADDRESS BOOK.  THAT'S WHAT

14   YOU'RE SHOWING.

15           THE COURT:  OKAY.

16           MR. PRICE:  AND WE THINK THAT'S WHAT THE EXAMINER

17   MEANT.

18       AND THAT WAY WE DON'T HAVE TO SAY IT DOESN'T HAVE THIS AND

19   DOESN'T HAVE THIS.  IT'S THE CONTACT INFORMATION THAT'S IN YOUR

20   PHONE.

21           MR. LYON:  AND OUR DISAGREEMENT WITH THAT, YOUR

22   HONOR, IS TWO-FOLD.

23       I THINK ONE IS THAT THE LIMITATION WAS REALLY ADDED TO DEAL

24   WITH THE BLOWING UP ASPECT OF IT, NOT WHAT CONTENT IS THERE.

25           BUT ALSO, THAT BY GOING WITH SAMSUNG'S PROPOSAL, IT'S

```
1    FOCUSSED SOLELY ON THE PREFERRED EMBODIMENT, AND IT DOESN'T --
2    IT'S NOT EXPANSIVE ENOUGH TO COVER OTHER EMBODIMENTS OF THE
3    CLAIMS, AND I'LL EXPLAIN THAT AND SHOW YOU WHERE IN THE
4    SPECIFICATION THAT COMES AS WE GO IF YOU BEAR WITH ME.
5              THE COURT:  OKAY.  I HAVE TO SAY, THOUGH, I DON'T
6    THINK EITHER CONSTRUCTION MAKES THIS -- THIS TASK OF CONSTRUING
7    THIS TERM EASIER.  I THINK I'M ACTUALLY MORE CONFUSED BY THE
8    TWO PROPOSALS.
9              MR. LYON:  SO PART OF THAT, AND I KNOW YOU --
10             MR. PRICE:  I BET I CAN ADDRESS THAT, YOUR HONOR.
11             THE COURT:  OKAY.
12             MR. LYON:  PART OF THAT, AND I KNOW YOU HAVE A VERY
13   DIS -- YOU DISLIKE THE PLAIN AND ORDINARY MEANING IDEA.
14             THE COURT:  WE'RE NOT GOING TO DO THAT.
15             MR. LYON:  PART OF IT, AND I SUBMIT TO YOU -- NO, I
16   UNDERSTAND -- BUT PART OF THAT IS BECAUSE THE LANGUAGE ITSELF
17   IS FAIRLY DESCRIPTIVE OF WHAT THEY'RE DOING AS YOU WALK THROUGH
18   THE EXAMPLES IN THE PROSECUTION HISTORY.
19        SO LET ME SHIFT TO THE CLAIM IF I MIGHT.
20             THE COURT:  OKAY.
21             MR. LYON:  AND WE'LL START THERE, AND IF YOU HAVE
22   QUESTIONS, PLEASE INTERRUPT ME.
23        SO THE FOCUS AGAIN, JUST NOW, SEEMS TO BE -- IT'S REALLY
24   COME DOWN TO SAMSUNG'S POSITION THAT THERE IS ADDITIONAL
25   INFORMATION THAT HAS TO BE IN THE SECOND DISPLAY, THIS CONTACT
```

1    LIST ENTRY THAT THEY HAVE.

2         OUR VIEW IS THAT THE CLAIMS ACTUALLY SPELL OUT WHAT THIS

3    CONTACT INFORMATION MUST BE, AND THEY DON'T INCLUDE ALL OF THE

4    INFORMATION THAT SAMSUNG IS TRYING TO REQUIRE THE CLAIMS TO

5    HAVE.

6         AND THE PROSECUTION HISTORY ITSELF REALLY ONLY SPEAKS TO

7    THE FORM OF THE DISPLAY, NOT THE CONTENT.

8         SO IF YOU LOOK AT THE CLAIMS, AND WE'LL FOCUS IN ON THE

9    LANGUAGE OF THIS PARTICULAR LIMITATION, YOU SEE THAT WE'RE

10   TALKING ABOUT "COMPLETELY SUBSTITUTING DISPLAY OF THE LIST OF

11   INTERACTIVE ITEMS," WHICH IS THE MISSED CALLS, "WITH THE

12   DISPLAY OF CONTACT INFORMATION.

13        LATER ON IN THE CLAIM, HOWEVER, THE CLAIM STATES THAT THE

14   DISPLAYED CONTACT INFORMATION, WHICH WE'VE NOW DEFINED AS BEING

15   PART OF THE SECOND DISPLAY, THE DISPLAY CONTACT INFORMATION,

16   THE ONLY REQUIREMENTS ARE THAT IT HAS A PLURALITY OF CONTACT

17   OBJECTS, AND THEN A FIRST CONTACT OBJECT THAT HAS A TELEPHONE

18   NUMBER OBJECT, AND A SECOND OBJECT THAT HAS A NON-TELEPHONIC

19   NUMBER OBJECT.

20        THOSE ARE THE ONLY REQUIREMENTS IN THE CLAIMS AS TO WHAT

21   "CONTACT INFORMATION" MUST BE.  EVERYTHING ELSE IS OPTIONAL.

22        AND YOU CAN INCLUDE A FULL CONTACT LIST ENTRY IF YOU WANT

23   TO.  IN FACT, THE SPECIFICATION DISCLOSES EMBODIMENTS WHERE

24   THAT IS THE CASE.

25        BUT IT'S OPTIONAL.  THAT IS NOT REQUIRED BY THE CLAIM

1    LANGUAGE.

2         SO THEN THE QUESTION IS, IS THERE SOMETHING ABOUT THE TERM

3    "CONTACT INFORMATION" THAT IS EITHER EXPRESSLY DEFINED IN THE

4    SPECIFICATION OR DISAVOWED IN THE SCOPE OF THE SPECIFICATION,

5    BECAUSE THOSE ARE THE ONLY REAL REASONS TO LIMIT THAT

6    TERMINOLOGY OTHERWISE BECAUSE IT IS, I THINK, EXPRESSLY DEFINED

7    IN THE CLAIM ITSELF AS TO WHAT IT HAS TO INCLUDE.

8         IF YOU TURN TO THE PROSECUTION HISTORY, WHICH WE HAVE

9    INCLUDED AND WE'VE TRIED TO INCLUDE CITES HERE IN THE -- BUT I

10   DO HAVE THE CITES AND I WON'T REFER TO ANYTHING WE HAVEN'T

11   ARGUED BEFORE -- THERE ARE TWO NOTICES OF ALLOWANCE FOR THIS

12   PATENT, WHICH IS A LITTLE BIT UNUSUAL.

13        THE FIRST NOTICE OF ALLOWANCE CAME ABOUT IN APRIL OF

14   2000 -- EXCUSE ME -- APRIL OF 2011, AND IF YOU NOTICE WHAT I'VE

15   GOT ON THE TOP IS THE STATE OF THE CLAIM AT THE TIME THAT THAT

16   NOTICE OF ALLOWANCE WAS ISSUED.

17        IT INCLUDED THE LANGUAGE "IMMEDIATELY DISPLAYING CONTACT

18   INFORMATION" WHEN YOU SELECTED THE ITEM ON THE LIST.  SO IT

19   DIDN'T HAVE THIS CONCEPT OF REPLACING THE DISPLAY.  IT JUST

20   SAID "WE'RE GOING TO DISPLAY THE CONTACT INFORMATION

21   IMMEDIATELY AFTERWARDS."

22        THERE WAS A REQUEST FOR A CONTINUED EXAMINATION THAT WAS

23   FILED IN THIS CASE BY THE APPLICANT --

24             THE COURT:  OKAY.  I'M SORRY TO STOP YOU.

25             MR. LYON:  SURE.

```
 1              THE COURT:  I JUST NEED TO FIND -- I WANT TO SEE THE
 2    ACTUAL PAGE FOR MYSELF.
 3              MR. LYON:  SURE.
 4              THE COURT:  SO THIS IS EXHIBIT 6 AT PAGE 4 IS THE TOP
 5    ONE?
 6              MR. LYON:  AND EXHIBIT N IS THE BOTTOM ONE.
 7              THE COURT:  ALL RIGHT.  OKAY.
 8              MR. LYON:  OKAY.  SO THERE WAS A REQUEST FOR A
 9    CONTINUED EXAMINATION BECAUSE THERE WAS AN IDS SUBMITTED, SO
10    THE APPLICANTS FILED A REQUEST FOR CONTINUED EXAMINATION.
11         AS PART OF WHAT THAT -- WHAT HAPPENED IS THE PATENT OFFICE
12    DID ANOTHER SEARCH FOR PRIOR ART AND THE CHEW REFERENCE WAS
13    IDENTIFIED AT THAT POINT.
14         AND SO THEN THERE WAS A COMMUNICATION WITH THE EXAMINER AND
15    A SECOND NOTICE OF ALLOWANCE WAS ISSUED IN JUNE OF 2011 THAT
16    ADDED IN SPECIFICALLY THAT CLAIM LANGUAGE.
17              THE COURT:  AND WHAT PAGE IS THAT?
18              MR. PRICE:  THAT WOULD BE PAGE --
19         DO WE HAVE A PAGE FOR THAT?  I MIGHT.
20              THE COURT:  OKAY.  I HAVE IT.
21              MR. LYON:  DO YOU HAVE IT?
22              THE COURT:  YES.
23              MR. LYON:  OKAY.  SO IF WE GO TO -- THESE ARE THE
24    EXAMINER'S REASONS OF ALLOWANCE FOR THE -- REASONS FOR ALLOWING
25    THE CLAIMS IN THE TWO NOTICES OF ALLOWANCE.
```

 1          AND YOU SEE THAT -- THIS IS IN RHO REPLY DECLARATION,

 2     EXHIBIT 5.  IT'S AT PAGE -- WELL, I GUESS IT'S JUST EXHIBIT 5

 3     ON MY LIST HERE, AND THEN EXHIBIT N AGAIN.

 4          WHAT YOU SEE IS THE ONLY DIFFERENCE BETWEEN THE NOTICES OF

 5     ALLOWANCE HERE, THE REASONS BEING ARE THE FACT THAT THE CHEW

 6     REFERENCE WAS CITED, AND THEN THE EXAMINER IN THE SECOND NOTICE

 7     OF ALLOWANCE ADDED IN THE EXAMINER'S AMENDMENT TO PUT THIS

 8     CLAIM LANGUAGE IN.

 9          SO IT'S -- IT'S FAIRLY CLEAR, WE SUBMIT, THAT WHEN YOU LOOK

10     AT THE RECORD HERE, IN THE FIRST NOTICE OF ALLOWANCE, THE KUN,

11     HAITANI AND TWERDAHL REFERENCES ALL HAVE BEEN OVERCOME, AND IT

12     WAS THE INTRODUCTION OF THE CHEW REFERENCE THAT CAUSED THE

13     SECOND AMENDMENT, THIS EXAMINER'S AMENDMENT, THIS SECOND

14     AMENDMENT TO BE ISSUED.

15               THE COURT:  WAIT.  WHERE DO YOU SEE THAT IN EXHIBIT

16     5?  BECAUSE I DON'T.

17               MR. LYON:  EXHIBIT 5 IS THE --

18               THE COURT:  THAT'S THE TOP PORTION.

19               MR. LYON:  IT SHOULD BE THE TOP ONE.

20               THE COURT:  WHERE DOES IT SAY THAT IT'S BECAUSE OF

21     CHEW?

22               MR. LYON:  IT DOESN'T IN EXHIBIT 5.  IT'S IN EXHIBIT

23     6.  I APOLOGIZE.

24          SO EXHIBIT 5 WAS THE APRIL NOTICE OF ALLOWANCE AND CHEW WAS

25     NOT IDENTIFIED AT THAT POINT.

1      THE EXAMINER FOUND CHEW IN MAY AND IN JUNE ISSUED THE

2   SECOND NOTICE OF ALLOWANCE, THIS TIME ADDING IN THE LANGUAGE,

3   THE "COMPLETELY SUBSTITUTING" LANGUAGE, AND SAYING THAT "WE'RE

4   NOW GOING TO OVERCOME CHEW AS PART OF ADDING IN THAT LANGUAGE."

5      SO THE IDEA HERE, IT'S A LITTLE COMPLICATED AND I

6   APOLOGIZE, BUT THAT'S -- THIS RECORD IS JUST KIND OF A LITTLE

7   STRANGE.

8      THEY -- THERE HAD ALREADY BEEN -- ALL OF THESE REFERENCES

9   HAD BEEN OVERCOME IN THE FIRST NOTICE OF ALLOWANCE, AND IT

10   WAS -- BY FINDING THE CHEW REFERENCE, THE EXAMINER DECIDED TO

11   ADD IN THIS "COMPLETELY SUBSTITUTING" LANGUAGE IN ORDER TO

12   OVERCOME THE CHEW REFERENCE AND ALLOW THE CLAIMS.

13      IF WE LOOK TO THE CHEW REFERENCE, WHAT WE SEE IS THE CHEW

14   REFERENCE IS REALLY DIRECTED TO THIS IDEA OF USING SUBMENUS.

15   IT TALKS ABOUT THE PRIOR ART AND IT TALKS ABOUT HAVING THE

16   ABILITY TO PULL UP A FULL SCREEN CONTACT LIST AS PART OF THE

17   PRIOR ART.

18      BUT IT SAYS "OUR IDEA HERE, OUR INVENTIVE CONCEPT BEHIND

19   THIS CHEW PATENT IS THIS IDEA OF SUBMENUS, SO THAT WHEN YOU

20   TOUCH THE ENTRY, YOU GET A SUBMENU OF ALL OF THE CONTACT

21   INFORMATION."

22      THERE WERE NO CONTACT OBJECTS AS PART OF THIS, THIS

23   REFERENCE.  THIS WAS REALLY JUST ALL ABOUT HAVING SUBMENUS AS

24   PART OF THE DISPLAY.

25      SO IT MAKES SENSE, THEN, WHEN YOU LOOK AT THE "COMPLETELY

1    SUBSTITUTING" LANGUAGE, THAT WHAT THE EXAMINER WAS DOING HERE

2    WAS TRYING TO SAY "WE'RE GOING TO AVOID THIS IDEA OF SUBMENUS.

3    WE'RE GOING TO ACTUALLY REPLACE AND CHANGE THE DISPLAY."

4         SO IT'S THE FORM OF THE DISPLAY, NOT THE CONTENT OF WHAT

5    WAS BEING DISPLAYED THAT WAS AT ISSUE AND THAT WAS NEEDING TO

6    BE OVERCOME.

7         THE OTHER THING I WOULD POINT OUT THAT I FOUND SOMEWHAT

8    INTERESTING IS THAT IN THE FEBRUARY AMENDMENT, WHICH WE

9    PROVIDED IN EXHIBIT 6 TO THE RHO REPLY DECLARATION, THERE WERE

10   DEPENDENT CLAIMS THAT HAD BEEN ADDED THAT HAD THE REQUIREMENT

11   OF REPLACING THE DISPLAY OF THE LIST OF INTERACTIVE ITEMS WITH

12   THE DISPLAY OF THE CONTACT INFORMATION.

13        AS PART OF THE JUNE EXAMINER'S AMENDMENT, WHAT HAPPENED WAS

14   THOSE CLAIMS WERE CANCELLED AND FOLDED INTO THIS -- AND

15   EFFECTIVELY FOLDED INTO THE INDEPENDENT CLAIMS THROUGH THIS

16   "COMPLETELY SUBSTITUTING" LANGUAGE.

17        SO ESSENTIALLY WHAT THE EXAMINER DID WAS TAKE SOME CLAIM

18   LANGUAGE THAT HAD BEEN IN ONLY DEPENDENT CLAIMS AND MAKE IT

19   PART OF THE OVERALL CLAIMS.

20        SO IN OTHER WORDS, WE DON'T WANT SUBMENUS, WE DON'T WANT

21   THESE SUBLISTS, WE WANT TO HAVE A COMPLETE NEW WINDOW DISPLAY

22   OF THIS INFORMATION THAT WE'RE GOING TO SHOW.

23        AND THEN WHEN YOU LOOK BACK AT THE CLAIM AGAIN, THE CLAIM

24   DEFINES THAT THAT INFORMATION, AT A MINIMUM, HAS TO INCLUDE THE

25   CONTACT LIST AND THAT'S ALL IT REALLY HAS TO HAVE.

```
1           LET ME SHOW YOU A TIMELINE THAT MAY HELP, TOO.  SO THIS IS

2      SORT OF THE TIMELINE, THE PROGRESSION OF WHAT I JUST RAN

3      THROUGH.

4           ON FEBRUARY 14TH, THE APPLICANT ADDS IN THESE DEPENDENT

5      CLAIMS REQUIRING REPLACING THE DISPLAYS.

6           ON APRIL 15TH, THE EXAMINER ALLOWS THE APPLICATION OVER

7      THE KUN, HAITANI, AND TWERDAHL REFERENCES.

8           IN MAY, THE APPLICANT SENDS IN A REQUEST FOR A CONTINUED

9      EXAMINATION, WHICH THEN HAS THE EXAMINER GO OUT AND FIND THE

10     CHEW REFERENCE.

11          AND THEN FINALLY, IN JUNE, THE EXAMINER ISSUES THE SECOND

12     NOTICE OF ALLOWANCE CITING CHEW AND ADDING IN THE "COMPLETELY

13     SUBSTITUTING" LANGUAGE.

14          THE COURT:  SO I NEED TO GET THE TWO ALTERNATIVE

15     CONSTRUCTIONS IN WRITING SINCE I DON'T HAVE THEM, AND I SEE ON

16     PAGE -- OR I GUESS SLIDE 13 --

17          MR. LYON:  YES.

18          THE COURT:  -- IS YOUR PROPOSED CONSTRUCTION.

19          MR. LYON:  RIGHT.  AND UNFORTUNATELY, I DIDN'T HAVE

20     SAMSUNG'S PROPOSED CONSTRUCTION AT THE TIME WE WERE CREATING

21     THIS SLIDE, SO I DIDN'T HAVE THEM.  I DID JUST QUICKLY HAVE OUR

22     SLIDE PRESENTER ADD IT TO THE VERY FIRST SLIDE.

23          BUT I'M SURE SAMSUNG WOULD BE HAPPY TO SUBMIT IT.

24          THE COURT:  WELL, LET ME GET IT NOW.  SO IT'S EITHER

25     "DISPLAYING AT LEAST TWO CONTACT OBJECTS IN PLACE OF THE
```

```
1          DISPLAY OF THE LIST OF INTERACTIVE ITEMS."

2             ALL RIGHT.  AND THEN SAMSUNG'S IS --

3                MR. LYON:  MR. PRICE CAN CORRECT ME, BUT I BELIEVE

4          IT'S SHOWN ON THIS SLIDE UP HERE.

5                MR. PRICE:  IT IS, YOUR HONOR, AND WE'LL SUBMIT OUR

6          SLIDES THAT HAVE ACTUALLY THE CONTEXT OF THE CLAIM LANGUAGE,

7          TOO.

8                THE COURT:  SO IT'S "ENTIRELY REPLACING THE DISPLAY

9          OF INTERACTIVE ITEMS FROM A MISSED CALL LIST WITH THE CONTACT

10         LIST ENTRY."

11               MR. LYON:  SO --

12               THE COURT:  OKAY.

13               MR. LYON:  I'M SORRY.

14               THE COURT:  LET ME JUST HEAR WHY YOURS -- I GUESS I

15         DON'T REALLY SEE HOW WHAT YOU WENT THROUGH SHOWS THAT THE

16         DISPLAY -- YOU'RE GETTING THE "AT LEAST TWO" FROM CLAIM 1?

17               MR. LYON:  CORRECT.

18               THE COURT:  OKAY.  IN PLACE OF A DISPLAY OF THE --

19         WHERE ARE YOU GETTING THE LIST OF INTERACTIVE ITEMS?

20               MR. LYON:  THAT'S FROM THE CLAIM ITSELF, TOO.  THAT'S

21         ALSO THE CLAIM LANGUAGE BECAUSE IT REFERS TO THE MISSED CALL

22         LIST AS THE LIST OF INTERACTIVE ITEMS IN THE CLAIM LANGUAGE.

23               THE COURT:  OKAY.  LET ME JUST GO BACK AND LOOK.

24            OKAY.  SO YOU'RE GETTING YOURS -- ALL RIGHT.  OKAY.

25            LET ME HEAR WHY YOURS IS BETTER THAN SAMSUNG'S.
```

1          MR. LYON:  SO OURS -- I SUBMIT OURS IS BETTER BECAUSE

2    IT DOES TRACK THE ACTUAL LANGUAGE OF THE CLAIM AND IT DOESN'T

3    LIMIT, OVERLY LIMIT THE CLAIM LANGUAGE BEYOND WHAT'S ALREADY

4    THERE.

5          SINCE THE DISPLAYED CONTACT INFORMATION IS NOW BEING

6    DISPLAYED IN THE SECOND DISPLAY, IT'S ACTUALLY DEFINED, WHAT

7    NEEDS TO BE THERE IS DEFINED IN THE CLAIM.  IT'S THESE

8    PLURALITY OF CONTACT OBJECTS THAT HAVE AT LEAST A FIRST ONE AND

9    AT LEAST A SECOND ONE.

10         THOUGH -- THAT'S REALLY ALL THAT'S REQUIRED HERE.  YOU CAN

11   ADD IN ADDITIONAL INFORMATION IF YOU WANT TO, BUT IT IS NOT

12   ACTUALLY REQUIRED BY THE CLAIM LANGUAGE.

13         AND CLAIM 1 IS EXEMPLARY.

14         THE OTHER CLAIMS ARE ALL VERY SIMILAR TO THIS.  ALL OF THEM

15   TALK ABOUT CONTACT OBJECTS BEING THERE.  NONE OF THEM TALK

16   ABOUT ANY OTHER KIND OF INFORMATION HAVING TO BE IN THE

17   DISPLAY.

18              THE COURT:  OKAY.

19              MR. LYON:  IF I CAN, CAN WE GO TO SLIDE 12.

20              THE COURT:  BUT WHAT'S --

21              MR. LYON:  SO THE REASON WHY I THINK SAMSUNG'S IS

22   INCORRECT IS BECAUSE IT'S ACTUALLY TRYING TO READ AN EMBODIMENT

23   INTO THE CLAIM LANGUAGE, BECAUSE IF YOU LOOK AT THE LANGUAGE --

24   THE ONLY TIME "CONTACT LIST ENTRY" IS ACTUALLY USED, IT COMES

25   UP IN THE SPECIFICATION AT COLUMN 24, LINES 55 THROUGH 59.

```
 1              THE COURT:  OKAY.  CAN YOU GIVE ME JUST ONE MINUTE?

 2              MR. LYON:  ABSOLUTELY.

 3              THE COURT:  24, LINES --

 4              MR. LYON:  LINES 55 THROUGH 59.

 5              THE COURT:  OKAY.  GO AHEAD, PLEASE.

 6              MR. LYON:  AND THAT'S IN REFERENCE TO SOME

 7      EMBODIMENTS.  IN OTHER WORDS, IT'S SAYING, "IN SOME OF THE

 8      EMBODIMENTS, YOU CAN DISPLAY A CONTACT LIST ENTRY WHEN YOU HAVE

 9      THIS INTERACTION WITH THE MISSED CALL LIST," AND WE AGREE THAT

10      THAT'S CERTAINLY POSSIBLE AND THE CLAIMS COVER THAT ASPECT IF

11      YOU WANT TO DO THAT.

12          BUT THERE IS NOTHING IN THE CLAIM LANGUAGE ITSELF THAT

13      REQUIRES YOU TO ACTUALLY DO THE CONTACT LIST ENTRY.  THAT WOULD

14      BE READING IN THIS EMBODIMENT SPECIFICALLY INTO THE CLAIM.

15          AND IN FACT, YOU CAN SEE, WHEN YOU LOOK THROUGH THE

16      SPECIFICATION, THAT ALL OTHER TIMES WHEN "CONTACT INFORMATION"

17      IS DISCUSSED, IT'S ONLY TALKING ABOUT IT INCLUDING A PLURALITY

18      OF CONTACT OBJECTS, AS I'VE QUOTED HERE FROM COLUMN 31, LINES 5

19      THROUGH 14.

20          AND YOU CAN ALSO SEE FROM -- IF WE CAN PUT UP FIGURE 23,

21      AND IF WE CAN ZOOM IN ON THIS PORTION RIGHT THERE.

22          SO THIS -- FIGURES 23 AND 24 AND 25 ARE DESCRIBED BY THE

23      PATENT AS GIVING MORE DETAILS ON HOW YOU HANDLE MISSED CALLS.

24          THIS PATENT APPLICATION, IF YOU LOOK AT IT, IT COVERS A

25      NUMBER OF ASPECTS OF A USER INTERFACE.  THE MISSED CALL
```

1    DISCUSSION IS REALLY FOCUSSED ON FIGURES 23 AND 25, AS WELL AS

2    A COUPLE OF THE OTHER FIGURES, 12 AND 12B AND C AND D.

3         AND WHEN YOU LOOK AT FIGURE 23, ALL IT SAYS IS "WE'RE GOING

4    TO DISPLAY CONTACT INFORMATION THAT INCLUDES A PLURALITY OF

5    CONTACT OBJECTS."  IT DOESN'T SAY ANYTHING ABOUT IT REQUIRING A

6    CONTACT LIST ENTRY.

7         AND THAT FIGURE 12, AS WE'VE BEEN LOOKING AT PREVIOUSLY,

8    SHOWS THAT EMBODIMENT WHERE YOU'RE DOING THE CONTACT LIST

9    ENTRY, BUT IT'S ONLY ONE EMBODIMENT.  IT IS NOT THE SUM TOTAL

10   OF WHAT WE WERE TALKING ABOUT.

11        SO OUR VIEW, YOUR HONOR, IS THAT IF YOU START WITH THE

12   CLAIM LANGUAGE, AS WE'RE SUPPOSED TO DO THROUGH THE FEDERAL

13   CIRCUIT, AND LOOK TO SEE IS THERE ANYTHING IN THE CLAIM

14   LANGUAGE OR IN THE SPECIFICATION THAT DISAVOWS SCOPE BEYOND

15   WHAT IT COULD OTHERWISE COVER, OR SOMEHOW DEFINES IT SO THAT IT

16   HAS TO COVER SOMETHING DIFFERENT, THEN OTHERWISE YOU NEED TO

17   GIVE IT THE BREADTH THAT IT ACTUALLY REQUIRES IN THE CLAIM,

18   WHICH IS JUST LIMITING IT TO THOSE CONTACT LIST ENTRIES.

19             THE COURT:  WHAT IS A CONTACT LIST ENTRY?

20             MR. LYON:  I'M SORRY.  I MISSED YOUR QUESTION.

21             THE COURT:  WHAT IS A CONTACT LIST ENTRY?

22             MR. LYON:  A CONTACT LIST ENTRY, I BELIEVE -- IF WE

23   CAN GO TO FIGURE 12C -- THIS IS AN EXAMPLE, BUT -- AND THIS IS

24   NOT BY ANY MEANS THE ONLY EXAMPLE, BUT IT'S JUST THE IDEA, I

25   BELIEVE, OF YOU HAVE CONTACTS IN YOUR PHONE, YOU HAVE A CONTACT

1    LIST IN YOUR PHONE, YOU HAVE AN ENTRY FOR, IN THIS CASE, SAY

2    BRUCE WALKER, AND THIS IS AN EXAMPLE OF WHAT IT MIGHT LOOK

3    LIKE.

4         AND I BELIEVE THIS IS WHY MR. PRICE IS GOING TO ARGUE THAT

5    THIS IS -- WE NEED TO FOCUS SOLELY ON THIS FIGURE AND READ THIS

6    FIGURE AND THIS EMBODIMENT INTO THE CLAIMS.

7         BUT IT IS AN EXAMPLE OF WHAT THE CLAIMS COVER, NOT A

8    REQUIREMENT.

9         AND WHEN YOU LOOK AT THE PROSECUTION HISTORY THAT ADDRESSES

10   THIS, THERE'S NO DISAVOWAL OF ANYTHING BEYOND THIS.  THERE IS A

11   RECOGNITION THAT CHEW AND THESE OTHER REFERENCES DON'T DISCLOSE

12   THE IDEA OF FULL REPLACEMENT SCREENS AS OPPOSED TO SUBMENUS OR

13   THOSE KINDS OF THINGS, BUT THERE'S NOT THIS KIND OF A

14   DISAVOWAL, AND THERE'S CERTAINLY NOT A CLEAR DISAVOWAL OF ANY

15   KIND OF SCOPE.

16        THE COURT:  AND WHAT DOES THIS COLUMN 24, LINES 55

17   THROUGH 61, WHAT DOES THAT MEAN?  "THE TOUCHSCREEN DISPLAYS THE

18   CORRESPONDING CONTACT LIST ENTRY FOR THE OTHER PARTY IF THE

19   PHONE NUMBER CANNOT BE ASSOCIATED WITH AN ENTRY IN THE USER'S

20   CONTACT LIST."  WHAT DOES THAT MEAN?

21        MR. LYON:  SO THAT IS THE IDEA THAT -- LET'S SAY YOU

22   HAVE A PHONE CALL COMING IN FROM BRUCE WALKER, YOU HAVE

23   BRUCE WALKER'S CONTACT INFORMATION, YOU PULL UP THAT CONTACT

24   LIST ENTRY FOR THIS PARTICULAR ONE.

25        ON THE OTHER HAND, IF IT'S A PHONE CALL FROM SOMEBODY WHO'S

1    NOT ON YOUR CONTACT LIST, YOU PULL UP SORT OF A DEFAULT SCREEN

2    OR DEFAULT IMAGE SO THAT YOU COULD ENTER IN ADDITIONAL CONTACT

3    INFORMATION IF YOU WANTED TO.

4            THE COURT:  BUT IT SEEMS ODD.  YOU'RE DISPLAYING

5    CONTACT LISTS ENTRY ONLY IF THE PHONE NUMBER CAN'T BE

6    ASSOCIATED WITH A CONTACT LIST ENTRY.  THAT'S THE WAY IT SEEMS

7    TO BE WORDED.  THE TOUCHSCREEN DISPLAYS THE CORRESPONDING

8    CONTACT INFORMATION --

9            MR. LYON:  AH, YOU'RE RIGHT.  ACTUALLY, I THINK I WAS

10   MISREADING THAT.  I THINK YOU'RE RIGHT.

11           THE COURT:  IF --

12           MR. LYON:  WHAT THIS IS ACTUALLY -- WHAT THE CONTACT

13   LIST ENTRY IS REFERRING TO HERE IS THE DEFAULT SCREEN.  I DID

14   NOT READ THAT CORRECTLY.

15       SO IT IS ACTUALLY THE DEFAULT SCREEN WHERE YOU ARE GIVEN

16   THE OPTION TO ENTER IN CONTACT INFORMATION.

17       AN EXAMPLE --

18           THE COURT:  AND WHAT IS THE DEFAULT SCREEN?

19           MR. LYON:  SO I DON'T KNOW THAT WE HAVE -- LET ME SEE

20   IF THERE'S A PICTURE.  I DON'T KNOW IF WE HAVE A GOOD PICTURE

21   OF THAT IN THE PATENT.

22       BUT THE IDEA WOULD BE THAT YOU HAVE -- OH, HERE.  MAYBE 12D

23   WOULD BE PERHAPS AN EXAMPLE OF THAT.  LET ME LOOK AND SEE IF

24   THAT'S RIGHT.  YEAH.

25           OH, ACTUALLY -- ALL RIGHT.  SO A LITTLE CLARITY ON THAT

1    LANGUAGE IN COLUMN 24.

2        IT SAYS THE TOUCH -- IT SAYS IF YOU HAVE AN ACTIVATING ICON

3    FOR A PARTICULAR ROW, "THE TOUCHSCREEN DISPLAYS THE

4    CORRESPONDING CONTACT LIST ENTRY FOR THE" --

5            THE COURT:  WHERE ARE YOU READING?

6            MR. LYON:  -- "THE CORRESPONDING CONTACT LIST" --

7            THE COURT:  WHERE ARE YOU READING?

8            MR. LYON:  I'M READING COLUMN 24.

9            THE COURT:  WHAT LINE?

10           MR. LYON:  LINES 55 THROUGH 59, THE SAME PLACE WE

11   WERE JUST LOOKING AT.

12           THE COURT:  THAT'S NOT WHAT I HAVE FOR LINES 55

13   THROUGH 61 ON COLUMN 24.

14           MR. LYON:  YOU SEE "IN SOME EMBODIMENTS"?

15           THE COURT:  YES.  BUT THAT'S NOT WHAT YOU WERE

16   READING BEFORE.

17           MR. LYON:  OKAY.  SO WHAT IT'S REFERRING TO IS IT

18   SAYS IT PULLS UP THE CORRESPONDING CONTACT LIST ENTRY FOR THE

19   OTHER PARTY, FOR EXAMPLE, FIGURE 12C, OR FIGURE 12D, WHICH IS

20   WHAT I JUST REFERRED TO AS I BELIEVE THE DEFAULT SCREEN, "IF

21   THE PHONE NUMBER CANNOT BE ASSOCIATED WITH AN ENTRY IN THE

22   USER'S CONTACT LIST."

23        SO WHAT THAT'S SAYING IS 12C WOULD BE THE ENTRY YOU MIGHT

24   SEE IN THIS PARTICULAR EMBODIMENT IF YOU SEE -- IF YOU HAVE

25   THIS PERSON'S NAME IN YOUR CONTACT LIST.

```
 1        12D IS THE ENTRY YOU WOULD SEE IF YOU DON'T.

 2        SO THAT'S THE IDEA OF THAT PASSAGE AND WHAT THEY'RE

 3   DESCRIBING IN THAT PARTICULAR EMBODIMENT.

 4        AND IT'S -- THE ACTUAL INFORMATION SHOWN IN THE FIGURES

 5   ISN'T SO IMPORTANT.  THE IDEA WOULD BE THAT IN THIS TYPE OF AN

 6   EMBODIMENT, YOU WOULD BE PULLING UP WHATEVER YOUR PHONE MIGHT

 7   BE STORING FOR CONTACT INFORMATION.

 8        BUT THE CLAIM LANGUAGE ITSELF DOESN'T REQUIRE THAT.  IT

 9   ONLY REQUIRES THAT YOU HAVE THE TWO CONTACT LISTS.

10            THE COURT:  OKAY.  THANK YOU.

11            MR. LYON:  THANK YOU.

12            THE COURT:  OKAY.  LET ME HEAR FROM MR. PRICE.

13        WHAT IS -- WELL, FIRST, THE BASIS OF YOUR CONSTRUCTION, IF

14   YOU COULD PLEASE CITE ME TO COLUMN AND LINE NUMBERS OR OTHER

15   EVIDENCE WHY YOURS IS SUPERIOR TO APPLE'S AND WHAT'S DEFECTIVE

16   ABOUT APPLE'S.

17            MR. PRICE:  SURE, YES.

18        AND FIRST, YOUR HONOR, LET ME START WITH WHAT'S DEFECTIVE

19   ABOUT APPLE'S, IF I MAY?

20            THE COURT:  OKAY.

21            MR. PRICE:  AND IF WE CAN GO TO -- I BELIEVE -- IS IT

22   SLIDE 11 WHICH HAS -- YEAH.

23        NOW, WHAT APPLE IS DOING IS ACTUALLY TAKING OUT "CONTACT

24   INFORMATION" ALTOGETHER, BECAUSE IF YOU READ THE LANGUAGE, IT'S

25   "COMPLETELY SUBSTITUTING DISPLAY THE LIST OF INTERACTIVE ITEMS
```

1    WITH DISPLAY OF CONTACT INFORMATION FOR A RESPECTIVE CALLER."

2        NOW, THAT'S WHEN YOU FIRST HAVE THE TERM "CONTACT

3    INFORMATION," AND SOMEONE READING THIS, SOMEONE OF ORDINARY

4    SKILL IN THE ART, YOU WOULD THINK "CONTACT INFORMATION" WOULD

5    BE INFORMATION THAT ALLOWS YOU TO CONTACT SOMEONE, PHONE

6    NUMBERS, E-MAIL ADDRESSES, ET CETERA.

7            THE COURT:  UM-HUM.

8            MR. PRICE:  NOW, WHAT APPLE IS SAYING IS -- BECAUSE

9    IT SAYS "INCLUDING A PLURALITY OF CONTACT OBJECTS," THEY'RE

10   SAYING THAT DEFINES "CONTACT INFORMATION."

11       THERE'S NOTHING THERE AT ALL THAT SUGGESTS THAT.

12       RATHER, THIS IS A SITUATION WHERE YOU MIGHT NOT NORMALLY

13   THINK THAT AN OBJECT AS CONTACT INFORMATION, AND WHAT APPLE'S

14   PATENT DOES -- AND 12C PROBABLY IS AN ILLUSTRATION OF THAT, AND

15   I'LL GET BACK TO WHY IT IS, IN FACT, PART OF THE CLAIM -- IF WE

16   GO TO 12C, IT'S SLIDE 5, IF YOU SEE 12C HERE, THE WAY THIS

17   WORKS IS THAT IF YOU PUSH "WORK," IT'LL MAKE A PHONE CALL.

18   IT'S A CONTACT OBJECT.

19       IF YOU PUSH "HOME," IT'LL MAKE A PHONE CALL.  IT'S A

20   CONTACT OBJECT.

21       IF YOU PUSH "E-MAIL," ET CETERA.

22       AND IN FACT, IF YOU GO BACK TO THE CLAIM LANGUAGE, THAT'S

23   WHAT IT SAYS CONTACT OBJECTS ARE, YOU KNOW, "FIRST CONTACT

24   OBJECT COMPRISING A TELEPHONE NUMBER OBJECT HAVING THE RETURN

25   TELEPHONE NUMBER, AND A SECOND CONTACT OBJECT ASSOCIATED WITH A

1    NON-TELEPHONIC COMMUNICATION MODALITY FOR CONTACTING THE

2    RESPECTIVE CALLER," AND IF WE CAN SHOW THE -- AND ACTUALLY, IF

3    WE CAN JUST SHOW THE FULL CLAIM 1.  I'LL SHOW YOUR HONOR

4    WHAT --

5              THE COURT:  BUT DO YOU THINK THEIR "AT LEAST" IS

6    TRYING TO GET AT THAT THERE MIGHT BE MORE, BUT THERE HAS TO BE

7    AT LEAST THE TWO?

8              MR. PRICE:  NO, NOT AT LEAST.  IT IS THAT YOU HAVE TO

9    HAVE CONTACT INFORMATION, AND THERE'S AN UNDERSTANDING AS TO

10   WHAT THAT MEANS AND I'LL EXPLAIN WHY IN THE PATENT THAT MEANS

11   THE CONTACT LIST.

12      BUT THAT HAS TO INCLUDE SOMETHING YOU MIGHT NOT OTHERWISE

13   THINK IT WOULD INCLUDE, WHICH IS AN OBJECT THAT YOU CAN PUSH

14   WHICH THEN RESULTS IN, UPON PUSHING THAT OBJECT, INITIATING A

15   CALL OR A NON-TELEPHONIC COMMUNICATION MODALITY.

16      AND IF YOU AND I, YOUR HONOR, WERE TALKING ABOUT CONTACT

17   INFORMATION, IT WOULDN'T POP INTO OUR HEAD THAT THAT INCLUDES A

18   BUTTON THAT YOU CAN PUSH AND MAKE A CALL.

19      SO WHAT CLAIM 1 IS SAYING IS THAT BASICALLY YOU NEED TO

20   HAVE CONTACT INFORMATION, BUT YOU ALSO HAVE TO HAVE THESE TWO

21   CONTACT OBJECTS.

22      OTHERWISE -- IF WE CAN GO BACK TO, I THINK IT'S TO SLIDE

23   11 -- OTHERWISE YOU JUST DON'T NEED ANY OF THIS LANGUAGE.  IT

24   WOULD BE COMPLETELY SUBSTITUTING "DISPLAY OF THE LIST OF

25   INTERACTIVE ITEMS" WITH "DISPLAY OF A PLURALITY OF CONTACT

1    OBJECTS, INCLUDING THE FIRST AND THE SECOND."

2      APPLE'S INTERPRETATION OF THIS GIVES "CONTACT

3    INFORMATION" -- MAKES ALL OF THIS MEANINGLESS.

4          THE COURT:  SO THE INTERACTIVE ITEM, IS THAT

5    REFERRING TO, YOU KNOW, IT WOULD RESPOND TO A TAP GESTURE?

6          MR. PRICE:  YEAH, IT RESPONDS TO A TAP.

7          THE COURT:  OKAY.  SO YOU'RE SAYING THAT "CONTACT

8    INFORMATION" NEEDS TO INCLUDE THE INTERACTIVE --

9          MR. PRICE:  THEY THOUGHT OF THAT.  IT HAS TO INCLUDE

10   THAT.  WE'RE NOT DISPUTING THAT.

11     BUT WHAT WE ARE SAYING IS IT'S NOT JUST THAT.  OTHERWISE

12   YOU WOULDN'T EVEN HAVE THE "CONTACT INFORMATION" PHRASE IN THE

13   PATENT.  IT WOULD JUST SAY "COMPLETELY SUBSTITUTING DISPLAY OF

14   THE LIST OF INTERACTIVE ITEMS WITH DISPLAY OF A FIRST CONTACT

15   OBJECT AND A SECOND CONTACT OBJECT."

16         THE COURT:  WHAT ELSE DO YOU THINK NEEDS TO BE

17   INCLUDED IN "CONTACT INFORMATION," OTHER THAN THE MINIMUM OF

18   TWO CONTACT OBJECTS?

19         MR. PRICE:  I THINK WHAT NEEDS TO BE INCLUDED, YOUR

20   HONOR, IS THE CONTACT LIST.  THAT'S WHAT THIS PATENT IS ALL

21   ABOUT.

22     NOW, FIRST LET ME SAY WHY -- WHAT IT'S NOT ABOUT.  IT IS

23   NOT ABOUT JUST FILLING THE SCREEN.  YOU KNOW, YOU SAW THAT,

24   THAT THE PATENT EXAMINER CITED CHEW IN ADDITION TO OTHER

25   CITATIONS, YOU KNOW, AND MADE AMENDMENTS.

```
 1        AND IT IS TRUE THAT FROM THE FIRST TIME OF GRANTING UNTIL

 2   THE SECOND, AFTER RE-EXAMINATION, CHEW WAS THE ONLY NEW PRIOR

 3   ART ADDED, YOU KNOW, TO THAT LIST.

 4        THE COURT:  UM-HUM.

 5        MR. PRICE:  BUT YOU CAN'T CONCLUDE FROM THAT THAT THE

 6   EXAMINER FOCUSSED JUST ON CHEW.  THE EXAMINER RE-EXAMINED THE

 7   PRIOR ART.

 8        APPLE SAID, "OH, IT MUST HAVE BEEN BECAUSE CHEW HAD A

 9   PARTIAL DISPLAY OF A LIST."

10        BUT CHEW ALSO HAD A FULL DISPLAY.

11        IF YOU LOOK AT THE CHEW PATENT, AND PARTICULARLY AT --

12   WE'LL GO TO SLIDE 9 HERE.

13        SEE, THIS IS THE CHEW PATENT, AND WHAT APPLE POINTS TO IS

14   THAT THIS FIGURE 5, AND THAT RESPONDS TO DISPLAYING A SUBLIST

15   WITH PRIMARY INFORMATION CANDIDATES FOR THE FIRST RECORD IF THE

16   FIRST INPUT IS DETERMINED TO BE A TAP ON THIS SECOND PORTION OF

17   THE FIRST ENTRY, MEANING THAT IF YOU TAP OVER HERE, YOU'RE

18   GOING TO GET THE SUBLIST OF INFORMATION ABOUT MR. ABERCROMBIE,

19   RIGHT?

20        BUT WHAT CHEW ALSO TEACHES IS THAT IF YOU HAVE A SINGLE TAP

21   WITH A STYLUS -- THEY HAVE A STYLUS -- ACTIVATING THE CONTACT

22   ENTRY IN MOST OF THE ROW, FOR EXAMPLE, IF YOU TAP ON THE

23   TELEPHONE NUMBER OR THE NAME, SO IF YOU TAPPED ON

24   TERESA ATKINSON OR THE NUMBER AS OPPOSED TO XYZ HERE, THEN

25   YOU'LL OPEN THE ENTIRE DATA RECORD.
```

1    IT DOESN'T GRAPHICALLY SHOW THAT FIRST PART HERE, BUT CHEW

2    TEACHES YOU'VE GOT TWO OPTIONS.  YOU CAN TAP ON THE NAME AND

3    THE PHONE NUMBER AND WHAT YOU GET IS THE ENTIRE RECORD, NOT A

4    SUBLIST; OR, AND THIS IS WHAT APPLE FOCUSES ON, IF YOU TAP

5    INSTEAD ON SOMETHING BESIDES THE NAME AND THE PHONE NUMBER, SAY

6    W OR H, YOU WILL GET A SUBLIST.

7    SO CHEW TEACHES WHAT IT COULD NOT -- THE ADDITION OF THE

8    SUBSTITUTING LANGUAGE COULDN'T BE TO GET AROUND CHEW.

9    IN FACT, TWERDAHL ALSO HAD A DISPLAY OF FULL PAGE.  IF WE

10   GO TO SLIDE 9 -- 10.

11   TWERDAHL -- SORRY -- WHICH IS ALSO MENTIONED BY THE

12   EXAMINER, ALSO SHOWED YOU COULD GO TO A CALL HISTORY LIST, PUSH

13   A NAME, AND YOU GET A FULL SCREEN.

14   IN THIS CASE, IT'S CALL INFORMATION.  IT DOESN'T HAVE THE

15   LITTLE OBJECTS, BUT --

16   SO THE EXAMINER, IF WE'RE TRYING TO SPECULATE AS TO WHAT HE

17   DID, WHICH IS IMPROPER, IT WOULD BE HARD TO SAY THE EXAMINER

18   WAS SAYING, "I'M ADDING THE 'SUBSTITUTING' LANGUAGE BECAUSE

19   WHAT REALLY DISTINGUISHES THIS FROM PRIOR ART IS IT'S A FULL

20   SCREEN."

21   AND IN FACT TWERDAHL ALSO SHOWED, I THINK, A PARTIAL

22   SCREEN, AND THAT'S ON 16, SLIDE 16.

23   I'M SORRY.  IT'S -- TWERDAHL ALSO SHOWED A PARTIAL SCREEN

24   WHEN YOU CLICKED ON A PHONE NUMBER.  SO DID CHEW.

25   AND IN FACT, SO DID KUN.

```
 1              SO THAT SPECULATION DOESN'T MAKE SENSE.  THE BEST THING TO

 2     DO IS TO LOOK TO SEE WHAT THE EXAMINER SAID HE DID.  WHAT'S THE

 3     EXAMINER'S STATEMENT AS TO WHY HE PUT IN THIS LANGUAGE?

 4              AND THE LANGUAGE HE PUT IN -- IF WE CAN GO TO SLIDE 3 --

 5     IS "COMPLETELY SUBSTITUTING DISPLAY OF THE LIST OF INTERACTIVE

 6     ITEMS WITH DISPLAY OF CONTACT INFORMATION."

 7              SO YOU HAVE "OF"'S ON BOTH OF THESE.  IT'S NOT JUST

 8     TALKING ABOUT FORMAT.  IT'S TALKING ABOUT SUBSTITUTING THE LIST

 9     OF INTERACTIVE ITEMS WITH DISPLAY OF CONTACT INFORMATION.

10              SO IT GOES TO CONTENT AS WELL.  YOU'RE NOT JUST SHOWING

11     THE LIST OF MISSED CALLS.  YOU'RE SHOWING CONTACT INFORMATION.

12              NOW, WHAT DOES THAT MEAN?

13              WELL, THE EXAMINER, IN HIS REASONS FOR ALLOWANCE, TOLD US

14     THAT.  IF WE GO TO SLIDE 4, WE SEE THIS.  I'M SORRY -- HERE WE

15     GO.  THANK YOU.

16              THIS IS THE EXAMINER'S STATEMENT OF REASONS FOR ALLOWANCE.

17              NOW, IT'S ALSO GOT THE LANGUAGE, "COMPLETELY SUBSTITUTING

18     DISPLAY OF THE LIST OF INTERACTIVE ITEMS WITH DISPLAY OF

19     CONTACT INFORMATION FOR A RESPECTIVE CALLER CORRESPONDING TO

20     THE RESPECTIVE USER SELECTED ITEM, AS DEFINED IN THE

21     SPECIFICATIONS (FIGURES 12B AND 12C)."

22              SO WHILE IT IS TRUE THAT THERE IS CASE LAW SAYING, YOU

23     KNOW, THAT THE SPECIFICATION DOESN'T CREATE A LIMITATION, THE

24     SPECIFICATION DOES HAVE TO BE READ, THOUGH, IN KIND OF

25     DETERMINING WHAT THE SCOPE OF THE PATENT IS, AND IN THIS CASE,
```

1    IN THIS CASE THE EXAMINER ALLOWED CLAIM 1 OVER THE PRIOR ART

2    AND HE TELLS YOU WHY.

3        HE TALKS ABOUT -- HE'S INCLUDED THE LANGUAGE "COMPLETELY

4    SUBSTITUTING DISPLAY OF THE LIST OF INTERACTIVE ITEMS WITH

5    DISPLAY OF CONTACT INFORMATION FOR A RESPECTIVE CALLER" WITH

6    THIS LANGUAGE HERE, AND HE TELLS YOU WHAT HE MEANS BY THAT, "AS

7    DEFINED IN THE SPECIFICATION (FIGURES 12B AND 12C)."

8        THE EXAMINER IS TELLING YOU WHAT HE THINKS IS NEW AND

9    UNIQUE ABOUT THIS INVENTION IS THAT IT'S GOING FROM A MISSED

10   CALL LIST TO A PAGE -- YOU KNOW, FULLY REPLACING THAT WITH A

11   PAGE WHICH GIVES YOU CONTACT INFORMATION AS DEFINED IN THE

12   SPECIFICATION, 12B AND 12C.

13       SO WE WERE LOOKING AT 12B AND 12C, YOUR HONOR, FOR A LONG

14   TIME -- GO TO SLIDE 5 -- AND THE PROBLEM WAS HOW TO DESCRIBE

15   THIS IN WORDS.  AND THAT'S WHY WE WERE HERE LAST TIME SAYING,

16   "WELL, IT DOESN'T JUST BLOW UP SOME OF THE MISSED CALL LIST."

17   IT DOESN'T -- IT'S NOT A SUBSET.  IT'S -- YOU KNOW, IT'S MORE

18   INFORMATION.

19       AND THEN, YOU KNOW, COMMON SENSE KIND OF KICKED IN, AND

20   THAT IS THAT WHAT THEY'RE DOING HERE IS THEY'RE LOOKING AT THE

21   CONTACT LIST AND SUBSTITUTING THE CONTACT LIST IF THERE IS A

22   CONTACT LIST ASSOCIATED WITH THE MISSED CALL.

23       AND IF YOU LOOK AT THE DEFINITION OF 12C IN THE SPEC, THAT

24   DEFINITION DOESN'T CHANGE.  THE DEFINITION OF 12C -- AND YOU

25   WERE LOOKING AT IT, YOUR HONOR -- IT SAYS "IN SOME EMBODIMENTS,

1    IN RESPONSE TO USER ACTIVATING ICON 2808 FOR A PARTICULAR

2    ROW" --

3         AND ACTUALLY, CAN WE GO BACK SO I CAN SHOW HER HONOR WHAT

4    2808 IS?

5         THAT IS -- LET'S SAY YOU PRESSED THIS 2808, THIS ARROW

6    KEY -- SO IF WE CAN GO BACK, "IN RESPONSE TO A USER ACTIVATING

7    2808 FOR A PARTICULAR ROW, THE TOUCHSCREEN DISPLAYS THE

8    CORRESPONDING CONTACT LIST ENTRY FOR THE OTHER PARTY," AND THEN

9    IT TELLS YOU WHAT IT'S TALKING ABOUT, U/I 2800C, WHICH IS

10   FIGURE 12C.  AND THIS IS WHAT WE WENT THROUGH BEFORE.

11        SO THE WAY THAT THE EXAMINER DEFINED THAT "COMPLETE

12   SUBSTITUTION OF INTERACTIVE CALLS WITH CONTACT INFORMATION,"

13   THE WAY THE EXAMINER DEFINED THAT WAS SAYING 12C DEFINES THAT,

14   AND THIS IS THE DEFINITION OF 12C.

15        IT'S ALSO -- IF YOU LOOK AT 12C, THAT'S WHAT IT IS.

16        AND THE WAY THAT YOU KNOW THAT 12C IS THE CONTACT LIST

17   ENTRY IS BECAUSE OF WHAT GOES ON THE SETTING -- AND THIS IS

18   WHAT YOU ASKED ABOUT EARLIER -- AND THAT WAS THIS "OR"

19   LANGUAGE, YOUR HONOR, WHERE IT SAYS "OR 2800D, FIGURE 12D, IF

20   THE PHONE NUMBER CANNOT BE ASSOCIATED WITH AN ENTRY IN THE

21   USER'S CONTACT LIST."

22        SO ONE OF TWO THINGS HAPPENS, YOU KNOW, WHEN YOU PUSH THAT

23   2808, THAT BUTTON ON 12B.  IT EITHER LOOKS TO SEE WHETHER YOU

24   HAVE A CONTACT ENTRY AND IT BRINGS THAT UP, 12C, AND THE PATENT

25   SPECIFIES, IN ADDITION TO THE LANGUAGE THAT THE EXAMINER ADDED,

1    THE PATENT SPECIFIES YOU MUST HAVE THE CONTACT LIST AND IT MUST

2    HAVE THESE CONTACT OBJECTS THAT ALLOW YOU TO PUSH IT AND

3    INITIATE A CALL OR A PHONE -- OR AN E-MAIL.

4         THE COURT:  HOW DO YOU RESPOND TO WHAT MR. LYON SAID

5    THAT THE SECTION THAT YOU'RE READING FROM, COLUMN 24, SAYS "IN

6    SOME EMBODIMENTS"?

7         MR. PRICE:  TWO RESPONSES.  IT IS THE ONLY EMBODIMENT

8    ASSOCIATED WITH THIS PATENT.

9       BUT SECOND AND MORE IMPORTANTLY, THIS ISN'T A QUESTION OF

10   SAYING A PARTICULAR EMBODIMENT IS THE PATENT CLAIM.

11      THIS IS A QUESTION OF DEFINING WHAT 12C IS.  THE DEFINITION

12   OF 12C -- AFTER THIS INITIAL -- AFTER THIS INITIAL DEFINITION,

13   IT IS REFERRED THROUGHOUT THE PATENT AS "CONTACT INFORMATION"

14   OR "THE CONTACT INFORMATION."  IT'S CLEAR IT IS HEWING TO THIS

15   DEFINITION, THAT IT'S THE CONTACT LIST ENTRY.

16      AND SO WE'RE NOT LOOKING TO THE SPECIFICATION FOR A

17   PARTICULAR EMBODIMENT.  WE'RE LOOKING TO THE SPECIFICATION TO

18   ASK OURSELVES, WHAT DID THE PATENT EXAMINER MEAN WHEN HE SAID

19   "AS DEFINED BY 12C"?

20        AND SO THAT IS -- IN OTHER WORDS, WE ARE LOOKING AT --

21   SLIDE 4 --

22        THE COURT:  I WANTED TO ASK THAT QUESTION OF MR. LYON

23   NOW, IF YOU WOULDN'T MIND JUST WAITING ONE SECOND.

24        MR. PRICE:  SURE, OKAY.

25        THE COURT:  SO HOW DO YOU RESPOND TO THE REASON FOR

1    ALLOWANCE -- THIS IS PAGE 15 OF EXHIBIT N, I BELIEVE, EXHIBIT

2    N.

3              MR. LYON:  RIGHT.

4              THE COURT:  -- EXHIBIT N THAT DOES SAY "COMPLETELY

5    SUBSTITUTING DISPLAY OF THE LIST OF INTERACTIVE ITEMS WITH

6    DISPLAY OF CONTACT INFORMATION FOR A RESPECTIVE CALLER

7    CORRESPONDING TO THE RESPECTIVE SELECTED USER ITEM AS DEFINED

8    IN THE SPECIFICATION (FIGURES 12B AND 12C)."

9              MR. LYON:  I THINK TWO RESPONSES.  ONE IS THAT YOU

10   HAVE TO LOOK AT THE TIMING OF THIS.  AND AGAIN, THE TWERDAHL

11   AND KUN AND HAITANI REFERENCES ALL HAVE BEEN OVERCOME WITH THE

12   PREVIOUS LANGUAGE THAT JUST SAID "DISPLAYING CONTACT

13   INFORMATION."  IT DIDN'T SAY ANYTHING ABOUT HOW.  IT JUST SAID

14   THAT.

15        SO WHEN YOU LOOK AT 12B AND 12C, IT SORT OF BEGS THE

16   QUESTION IN SOME WAYS, BECAUSE IT DOES HAVE A FULL SCREEN

17   REPLACEMENT, SO IT IS OVERCOMING THE CHEW REFERENCE IN THAT

18   SENSE BECAUSE WE SAW THE SUBMENU, AND IT'S THE DIFFERENCE THAT

19   WE'RE TALKING ABOUT.  IT'S HOW YOU'RE DISPLAYING IT.

20        IT DOESN'T REALLY SAY -- HE DOESN'T SIT THERE AND SAY "IT

21   HAS ADDITIONAL CONTACT INFORMATION BEYOND WHAT CHEW DISCLOSED"

22   OR BEYOND WHAT ANYONE ELSE DISCLOSED.  HE'S TALKING ABOUT THIS

23   BEING EXAMPLES OF THE FULL SCREEN REPLACEMENT.

24        SO I THINK IT DOESN'T -- I GUESS THERE'S TWO THINGS YOU CAN

25   THINK ABOUT --

1          THE COURT:  WELL, BUT IN THIS INSTANCE, THE REASON

2     FOR ALLOWANCE, IT DOESN'T SAY THIS WAS JUST AN EXAMPLE.  THIS

3     SAYS "AS DEFINED IN THE SPEC."

4          MR. LYON:  UNDERSTOOD, YOUR HONOR.

5       AND WHAT I'M SAYING IS THAT IF YOU LOOK AT THE SPEC AND

6     WHAT IT'S SAYING IS "WE REPLACED ONE SCREEN WITH ANOTHER," AND

7     THAT'S THE DIFFERENCE BETWEEN WHAT CHEW AND THESE OTHER

8     REFERENCES GAVE WITH THE SUBMENU IDEA.

9          AND AT A MINIMUM, I WOULD SAY IT'S NOT CLEAR THAT THERE'S A

10    DISAVOWAL OF SCOPE HERE, BUT I WOULD SAY THAT IF YOU REALLY

11    LOOK FAIRLY AT THE ORDER OF HOW THIS DEVELOPED, THE FACT THAT

12    TWERDAHL AND ALL OF THESE REFERENCES WERE OVERCOME WITH THE

13    LANGUAGE THAT'S ALREADY IN THERE AND IT'S ONLY THIS "COMPLETELY

14    SUBSTITUTING" LANGUAGE THAT GETS ADDED IN, THAT IT'S REALLY

15    THIS IDEA OF SWAPPING THE DISPLAYS THAT WAS BEING ADDED IN,

16    THAT THE EXAMINER WAS SAYING, "AS YOU SEE IT IN THE SPEC WITH

17    RESPECT TO THOSE FIGURES, THAT'S WHAT WE'RE TALKING ABOUT,"

18    SWAPPING THE DISPLAYS WITHOUT SUBMENUS.

19          THE COURT:  ALL RIGHT.  LET ME LET MR. PRICE FINISH.

20    THANK YOU.

21          MR. LYON:  SURE.

22          MR. PRICE:  AND, YOUR HONOR, TWERDAHL ALSO HAS A

23    SUBSCREEN.  IT HAS EXACTLY THE SAME THING CHEW DOES.

24       IT WOULD MAKE NO SENSE FOR THE EXAMINER TO THINK, ALL OF A

25    SUDDEN, OH, CHEW HAS A SUBSCREEN.  WE'VE GOT TO MAKE NOW --

1    JUST CHANGE THE FORMAT AND THAT WILL MAKE, THAT WILL MAKE

2    APPLE'S PATENT INNOVATIVE IN SOME WAY.

3            THE COURT:  DO I HAVE ANYTHING ON TWERDAHL IN THE

4    RECORD BEFORE ME?

5            MR. PRICE:  YES, AND I CAN FIND THE EXACT CITATIONS.

6            THE COURT:  OKAY.

7            MR. LYON:  16.  IT'S YOUR 16.

8            MR. PRICE:  16.

9            THE COURT:  I'M SORRY.  16 OF WHICH EXHIBIT?

10           MS. MAROULIS:  MAROULIS EXHIBIT 16.

11           MR. PRICE:  YOU HEARD THAT?  YOU'RE YOUNGER THAN ME.

12   AND YOU ARE.

13           THE COURT:  I DON'T HAVE THAT BEFORE ME, BUT THAT'S

14   WHERE WE'LL LOOK FOR IT.

15           MR. PRICE:  IF YOU LOOK AT SLIDE 16, YOU'LL SEE

16   TWERDAHL ALSO HAS, IF YOU TAP AND HOLD A PHONE NUMBER, YOU'LL

17   GET THIS LIST OF NUMBERS WHICH DOESN'T COVER THE WHOLE SCREEN.

18       AND THE PRIMARY PROBLEM WITH APPLE'S ARGUMENT, AND ITS

19   INTERPRETATION, IS -- IF WE CAN GO BACK TO --

20           THE COURT:  BUT THIS DOESN'T HAVE, LIKE -- I THOUGHT

21   THE PROBLEM WITH CHEW WAS IT WAS MORE LIKE KUN WHERE YOU STILL

22   HAVE THE ORIGINAL MISSED CALL LIST IN THE BACKGROUND, AND THEN

23   YOU HAVE A SUBSET SORT OF BLOWN UP AND ZOOMED IN ON TOP OF THAT

24   BACKGROUND.

25           MR. PRICE:  AND -- WELL, I THINK WHAT APPLE IS SAYING

1    IS THAT WHAT YOU NEED IS TO, IS THAT -- YEAH.

2        TWERDAHL, IF YOU TOUCH THIS NUMBER, YOU'RE NOT GOING TO

3    COMPLETELY COVER UP THE INTERACTIVE LIST.

4        AND WHAT I'M SAYING IS THAT APPLE IS SAYING THAT THE

5    EXAMINER DIDN'T REALIZE THAT WAS IN THE PRIOR ART UNTIL CHEW

6    AND THAT THE EXAMINER WAS TRYING TO OVERCOME CHEW, WHICH SHOWS

7    THAT -- THE EXACT SAME THING IN TWERDAHL.

8        IF WE GO TO THE CHEW SLIDE, THIS IS 9, SLIDE 9.

9        SEE, CHEW KIND OF DOES THE SAME THING.  IT'S GOT THIS LIST

10   THAT DOESN'T COVER THE ENTIRE SCREEN.

11       BUT TWERDAHL HAD THAT AS WELL, SO IT WOULDN'T MAKE SENSE

12   FOR THE EXAMINER TO SAY, "OH, I NEED TO AMEND THE LANGUAGE TO

13   OVERCOME CHEW."  HE WOULD HAVE HAD TO HAVE AMENDED THE LANGUAGE

14   TO OVERCOME TWERDAHL AS WELL IF THAT'S WHAT WAS GOING ON IN HIS

15   MIND.

16           THE COURT:  SO I COULDN'T SEE, BUT TWERDAHL HAS THIS

17   SORT OF SAME ZOOMED IN OR BLOWN UP EXCERPT FROM --

18           MR. PRICE:  FROM SOME KIND OF CONTACT INFORMATION.

19   IT'S JUST HERE IN FIGURE 5.

20           THE COURT:  BECAUSE I COULDN'T TELL IF THAT'S -- IF

21   THAT'S --

22           MR. PRICE:  SEE, IT'S COVERING MR. COMBS AND UNNAMED

23   HERE.  YOU ORIGINALLY HAVE -- LIKE FOR MINDY CHAHAL, YOU HAVE A

24   PHONE NUMBER, AND THAT'S AN INTERACTIVE CALL LIST.  IF YOU TAP

25   AND HOLD ON THE PHONE NUMBER, IT BRINGS UP A LIST OF

```
 1      INFORMATION FOR THE CALLER WHICH DOESN'T COVER THE ENTIRE

 2      SCREEN.

 3          SO IT IS RAMPANT SPECULATION TO SAY THE EXAMINER WAS JUST

 4      SAYING, "OH, WE NEED A COMPLETE SCREEN" WHEN HE TELLS US IN

 5      HIS, IN HIS REASON FOR SAYING THIS IS UNIQUE AND INNOVATIVE --

 6      AND THAT'S SLIDE 4 -- THAT COMPLETELY SUBSTITUTING OTHER --

 7      DISPLAYING OTHER INTERACTIVE DEVICES WITH DISPLAY OF CONTACT

 8      INFORMATION, AND THAT IS DEFINED BY 12B AND 12C.

 9              THE COURT:  UM-HUM.

10              MR. PRICE:  AND THAT IS THE WHOLE POINT OF THE

11      INVENTION IS IT IS GOING FROM A LIST OF MISSED CALLS TO A

12      CONTACT LIST AND THEN YOU CAN DO SOMETHING WITH THAT LIST.  YOU

13      CAN -- THAT'S WHY YOU HAVE TO HAVE THE CONTACT OBJECTS.

14          AND YOU -- WHEN I WAS SHOWING YOU THE LANGUAGE IN THE

15      SPECIFICATION ABOUT 12C, YOUR HONOR HAD ALSO ASKED, YOU KNOW,

16      ABOUT WHAT'S THE REST OF THAT LANGUAGE MEAN ABOUT 12D?

17          IF WE CAN GO TO 6.

18          REMEMBER, THERE WAS THAT LANGUAGE AT THE END, AND THIS IS

19      WHAT SHOWS YOU THAT WHAT -- WHEN THE EXAMINER WAS TALKING ABOUT

20      HIS DEFINITION -- THIS IS THE DEFINITION.  THIS IS WHAT SHOWS

21      YOU WE'RE REALLY GOING TO THE CONTACT LIST AND THE ADDRESS BOOK

22      BECAUSE IT SAYS, YOU KNOW, YOU SHOW 12C, THE CONTACT LIST

23      ENTRY, OR YOU SHOW 12D IF THE PHONE NUMBER CAN'T BE ASSOCIATED

24      WITH AN ENTRY IN THE USER'S CONTACT LIST.

25          AND THAT'S WHAT -- IF WE GO TO SLIDE 7 -- THAT'S WHAT 12D
```

1    WAS.  YOU SEE YOU'VE GOT BASICALLY NOTHING IN YOUR CONTACT

2    LIST, AND SO YOU COME UP WITH A PAGE LIKE 12D WHICH HAS THE

3    NUMBER AND THE MISSED CALL LIST AND THEN YOU HAVE THE CONTACTS,

4    ET CETERA.

5         NOW, APPLE'S NOT CLAIMING 12D, YOU KNOW.  THE QUESTION HERE

6    IS, WHAT DOES "CONTACT INFORMATION" MEAN IN CLAIM 1?

7         AND SO THE ELEGANCE OF WHAT WE ARE PROPOSING -- AND IF WE

8    CAN PUT UP OUR PROPOSAL ON SLIDE 8 -- SO HERE'S WHAT WE'RE

9    PROPOSING, YOUR HONOR, THAT IT WOULD READ:  "IMMEDIATELY IN

10   RESPONSE TO DETECTING A FINGER GESTURE ON THE SECOND

11   INTERACTIVE DISPLAYED PORTION OF THE RESPECTIVE USER SELECTED

12   ITEM IN THE LIST," AND THAT'S 2808, "ENTIRELY REPLACING THE

13   DISPLAY OF INTERACTIVE ITEMS FROM A MISSED CALL LIST WITH THE

14   CONTACT LIST ENTRY," AND THEN WE GO BACK TO THE CLAIM LANGUAGE,

15   "FOR A RESPECTIVE CALLER CORRESPONDING TO THE RESPECTIVE USER

16   SELECTED ITEM, THE DISPLAYED CONTACT INFORMATION INCLUDING A

17   PLURALITY OF CONTACT OBJECTS," AND THEN LISTING THE OBJECTS.

18        AND WHAT THIS DOES IS IT -- IT GIVES CREDENCE TO WHAT THE

19   EXAMINER SAID HE WAS DOING IN ORDER TO GRANT THIS PATENT, AND

20   THAT IS, THIS IS NEW AND INNOVATIVE, ACCORDING TO THE EXAMINER,

21   BECAUSE, AS SHOWN IN ITS SINGLE EMBODIMENT, YOU KNOW, IT BRINGS

22   UP A FULL PAGE OF THE CONTACT LIST OF THAT CALLER.

23        AND APPLE'S INTERPRETATION, YOUR HONOR, READS OUT

24   EVERYTHING -- LET'S GO BACK TO CLAIM 1 -- READS OUT --

25   BASICALLY GOES FROM "COMPLETELY SUBSTITUTING THE LIST, DISPLAY

1    OF THE LIST OF INTERACTIVE ITEMS WITH DISPLAY OF," AND THEN

2    JUST READS OUT "CONTACT INFORMATION FOR RESPECTIVE CALLER

3    CORRESPONDING TO A SELECTED USER, SELECTED CONTACT," AND JUST

4    GOES TO "A PLURALITY OF CONTACT OBJECTS."

5              THE COURT:  UM-HUM.  LET ME HAVE MR. LYON RESPOND TO

6    THAT, THAT YOU'RE READING OUT ALL THAT LANGUAGE IN CLAIM 1.

7              MR. LYON:  THANK YOU, YOUR HONOR.

8        NO, I WOULD SUBMIT THAT WE ARE NOT DOING THAT, BECAUSE WHAT

9    WE'RE DOING IS TRYING TO REFLECT WHAT REALLY IS THERE.

10       I THINK WHAT WE'RE TRYING TO DO IS GIVE LIFE TO WHAT IS

11   MEANT BY "COMPLETELY SUBSTITUTING," BECAUSE THAT'S REALLY WHAT

12   THE QUESTION IS.  THE REST OF THE LANGUAGE, "CONTACT

13   INFORMATION," ALL THAT WAS IN THERE BEFORE THE CHEW REFERENCE

14   CAME OUT.

15       AND THE TWERDAHL REFERENCE -- AND YOU HAVE THESE IN YOUR

16   RECORD, IT'S EXHIBIT 16, AS MR. PRICE SAID, TO THE MAROULIS

17   DECLARATION, AND THE CHEW REFERENCE IS EXHIBIT 19 -- IF YOU

18   READ THEM, THE TWERDAHL REFERENCE HAD NO -- IT ONLY HAD

19   TELEPHONIC CONTACT OPTIONS.

20       SO IT DIDN'T MATTER -- BECAUSE IT DIDN'T HAVE

21   NON-TELEPHONIC CONTACT OPTIONS, IT DIDN'T MATTER WHETHER THERE

22   WAS A SUBMENU OR NOT.

23       ON THE OTHER HAND, CHEW DID.  CHEW HAD BOTH TELEPHONIC AND

24   NON-TELEPHONIC CONTACT OBJECTS.

25       AND SO THE QUESTION WAS, WHAT'S THE DIFFERENCE?  IT WAS

1    THIS "COMPLETELY SUBSTITUTING" POINT, NOT SO MUCH WHAT ELSE WAS

2    THERE.  IT WASN'T ENOUGH TO JUST HAVE THE PLURALITY OF CONTACT

3    OBJECTS TO GET AROUND CHEW, AND I THINK IF YOU READ THROUGH

4    THAT AND YOU LOOK AT THE FIGURE -- ESSENTIALLY THE FIGURE THAT

5    WE'VE ALL BEEN LOOKING AT FROM CHEW IS ON THE COVER PAGE, THE

6    FRONT PAGE OF THE CHEW PATENT, SO IT'S REALLY THE SEMINAL

7    FIGURE.  THAT'S WHAT CHEW WAS TRYING TO DO WAS TO COME UP WITH

8    THIS SUBMENU IDEA FOR CONTACT OBJECTS THAT WERE BOTH TELEPHONIC

9    AND NON-TELEPHONIC, AND WHAT APPLE HAS CREATED HERE WAS

10   SOMETHING THAT WAS A LITTLE BIT DIFFERENT AND THAT'S WHAT THE

11   EXAMINER RECOGNIZED.

12       SO IT DOESN'T READ OUT ANYTHING.  IT'S GIVING LIFE TO WHAT

13   THE CLAIM LIMITATION SCOPE REALLY SHOULD BE, AND IT SHOULDN'T

14   BE LIMITED BY THIS CONTACT.

15           THE COURT:  OKAY.  I'LL GIVE YOU ONE LAST QUICK WORD

16   IF YOU WANT TO ADD ANYTHING AND THEN I'D LIKE TO MOVE ON

17   BECAUSE WE'RE RUNNING OUT OF TIME.

18           MR. PRICE:  SURE.  YOUR HONOR, I WOULD SAY, FIRST OF

19   ALL, WHEN THIS WAS FIRST -- WHEN THE PATENT WAS FIRST GRANTED

20   BY THE PATENT EXAMINER, IT ALREADY HAD IN IT THE LANGUAGE ABOUT

21   "CONTACT INFORMATION" AND THEN SAYING "INCLUDING THE PLURALITY

22   OF CONTACT OBJECTS" AND LISTING THE TWO OBJECTS.

23       I MEAN, IT ALREADY HAD THAT IN THERE.  IT HAD THE DIFFERENT

24   CONCEPTS OF "CONTACT INFORMATION," WHICH MEANS SOMETHING, AND

25   THEN ADDING SOMETHING WHICH YOU MIGHT NOT OTHERWISE THINK IS

1    CONTACT INFORMATION, WHICH WOULD BE DOCUMENTS.

2         AND SECOND, I JUST WANT TO GIVE YOU AN ILLUSTRATION, YOUR

3    HONOR, OF WHAT WE'RE REALLY TALKING ABOUT, BECAUSE SOMETIMES

4    YOU KIND OF NEED TO FIGURE OUT WHAT IS APPLE'S INVENTION, WHAT

5    ARE THEY SAYING THAT THIS INVENTION COVERS.

6         SO WE DID A MOCKUP -- AND THIS IS 20 -- OF A SYSTEM OR A

7    PHONE WHICH HAS A MISSED CALL LIST, LIKE FRED CALLED AND JOHN

8    CALLED.

9         AND THEN IF YOU CLICK ON THAT MISSED CALL LIST, YOU KNOW,

10   IN THIS EXAMPLE YOU WOULD GET A SECOND PAGE WHICH WOULD HAVE --

11   WHICH WOULD BE A SUBSET OF THE FIRST PAGE.  IT WOULD SHOW YOU

12   THE TWO MISSED CALLS AND WHAT TIME THEY WERE.

13        AND THEN YOU COULD CALL HIM OR SEND HIM A TEXT MESSAGE.

14        AND UNDER APPLE'S CONSTRUCTION, THEY'RE ARGUING THAT

15   BECAUSE THIS SECOND PAGE HAS WHAT THEY'RE SAYING ARE CONTACT

16   OBJECTS AND HAS CONTACT INFORMATION, WHICH IS NOTHING MORE THAN

17   THE INFORMATION THAT WAS ON THE MISSED CALL LIST, THAT THAT'S

18   COVERED BY THEIR PATENT.

19        THE PATENT EXAMINER MADE VERY CLEAR, NO, THAT'S NOT

20   ANYTHING NEW OR INNOVATIVE.

21        AND THERE'S NOTHING NEW OR INNOVATIVE ABOUT THIS PATENT.

22   WHAT THIS PATENT DOES IS IT ACCESSES THE CONTACT LIST AND GIVES

23   YOU THE CONTACT INFORMATION FROM THE CONTACT LIST, AND THAT'S

24   WHY THE EXAMINER SAID "AS DEFINED BY" -- SUBSTITUTED "AS

25   DEFINED BY FIGURES 12B AND 12C."

```
1              MR. LYON:  YOUR HONOR, MAY I MAKE ONE QUICK POINT?

2              THE COURT:  ONE QUICK ONE.

3              MR. LYON:  VERY QUICK.

4          JUST ON THIS FIGURE, I DO AGREE -- THIS IS APPLE'S POINT --

5      AND BECAUSE WHAT YOU'RE SEEING HERE IS A MOCKUP OF -- YOU HAVE

6      A SAMSUNG PHONE, THAT'S ESSENTIALLY WHAT THEY'RE TRYING TO SAY

7      IS "WE DON'T INFRINGE BECAUSE THIS IS OUR POINT."

8          BUT THAT DOES MEET THE CLAIM LIMITATIONS.  AND THE POINT

9      HERE IS, I AGREE WITH MR. PRICE, THAT THE CONTACT INFORMATION

10     WAS IN THE CLAIM WHEN TWERDAHL WAS THERE.

11         BUT TWERDAHL HAD NO NON-TELEPHONIC CONTACT OBJECTS.

12         IT WAS ONLY WHEN WE GOT TO THE CHEW REFERENCE WHERE IT HAD

13     BOTH AND THEN WE SAW THE SUBMENU THAT THE EXAMINER FELT THAT WE

14     HAD TO HAVE THE ADDITIONAL LANGUAGE OF "COMPLETELY

15     SUBSTITUTING" THE ONE DISPLAY FROM THE OTHER TO RECOGNIZE IT

16     WAS A FULL SCREEN VERSUS A SUBMENU DELIVERY.

17             THE COURT:  AND YOU'RE SAYING THE SECOND CONTACT

18     OBJECT IN THE PHOTO ON THE RIGHT IS THE ENVELOPE FOR MAIL?

19             MR. LYON:  YEAH, THE ENVELOPE WOULD BE AN E-MAIL

20     CONTACT OBJECT.  THE PHONE NUMBER WOULD BE A PHONE NUMBER

21     CONTACT OBJECT THAT HAS A PHONE NUMBER IN IT.  THERE'S FRED,

22     THE INFORMATION FROM HIM.

23         IN SOME INSTANCES YOU'LL SEE PERHAPS, YOU KNOW, LOCATIONS,

24     SUCH AS WASHINGTON D.C. OR SOMETHING LIKE THAT.

25             BUT YOU SEE THAT THERE IS CONTACT INFORMATION THERE.  IT'S
```

1     JUST SOME OF IT IS REPLICATED FROM THE MISSED CALL SCREEN.

2     SOME OF IT IS NEW.  SOME OF IT'S NOT.

3          THE POINT IS ALL THAT'S REQUIRED ARE THE CONTACT OBJECTS

4     BY THE CLAIMS.

5          THANK YOU, YOUR HONOR.

6          MR. PRICE:  ONE SECOND JUST TO CLARIFY, YOUR HONOR.

7          AND IN THIS, THERE IS -- THE SYSTEM DOES NOT LOOK AT ANY

8     INFORMATION STORED IN THE PHONE AT ALL.  THIS IS SIMPLY

9     BRINGING OVER THE PHONE NUMBERS.  IT IS NOT CHECKING TO SEE

10    WHETHER THERE'S ANYTHING STORED IN YOUR PHONE.

11         AND SO WHAT APPLE IS SUGGESTING YOU DO IS GRANT IT A PATENT

12    THAT IS THAT BROAD WHEN IT REFERS TO "CONTACT INFORMATION," AND

13    TO DO THAT BY SPECULATING ABOUT WHAT THE PATENT EXAMINER

14    INTENDED TO DO, AS OPPOSED TO READING WHAT THE PATENT EXAMINER

15    SAID HE DID, WHICH IS COMPLETELY SUBSTITUTING THE MIXED

16    INTERACTIVE -- THE INTERACTIVE CALL LIST WITH CONTACT

17    INFORMATION FOR THE RESPECTIVE CALLER AS DEFINED BY 12B AND

18    12C.

19         THAT IS WHAT THE EXAMINER THOUGHT WAS INNOVATIVE WAS THAT

20    YOU'RE ACTUALLY LOOKING AT THE CONTACT INFORMATION, THAT, IN

21    COMBINATION WITH THE OTHER ELEMENTS OF THE CLAIM, WHICH IS THAT

22    YOU WOULD BE ABLE TO PUSH AND CONTACT.  THAT'S THE OTHER

23    ELEMENT OF CLAIM 1.

24         THE COURT:  UM-HUM.  OKAY.  THANK YOU.

25         LET'S GO QUICKLY TO THE '087, AND I WANTED TO ASK SAMSUNG,

```
 1    SO LAST WEEK -- I WAS LOOKING THROUGH THE TRANSCRIPT OF THE

 2    TUTORIAL, AND LAST WEEK APPLE SAID THE NON-SCHEDULED

 3    TRANSMISSION INFORMATION FOR N AND K TTI IS USED TO CONTROL THE

 4    DATA RATE BY LIMITING THE AMOUNT OF TIME THE UE CAN SEND

 5    INFORMATION.

 6        DO YOU AGREE WITH THAT, OR NOT?

 7            MR. JOHNSON:  I DON'T -- I DON'T AGREE.

 8        THE ISSUE, YOUR HONOR, IS THAT -- YOU KNOW, AND I THINK

 9    APPLE WOULD CONCEDE THIS.  THE DATA RATE, EVEN IN THE

10    SCHEDULING ASSIGNMENT INFORMATION, IS NECESSARY EVEN TO SEND

11    NST'S, AND WE CAN WALK THROUGH AND I CAN POINT YOU TO WHERE IN

12    THE SPEC THAT COMES FROM.

13        BUT, YOU KNOW, IT'S THE ALLOWED DATA RATE THAT'S COMBINED

14    WITH THE K AND THE N'S WHICH THEN GIVE YOU WHAT THE PATENT

15    CALLS THE EFFECTIVE DATA RATE.

16        AND THE ALLOWED DATA RATE COMES FROM THE SAI, THE

17    SCHEDULING ASSIGNMENT INFORMATION.  THAT'S NOT DETERMINED BY K.

18    IT'S NOT DETERMINED BY N.  IT COMES FROM THE SAI.  AND I CAN

19    SHOW YOU A COUPLE OF SLIDES AND WALK YOU THROUGH THAT.

20        AND THE DATE RATE AND K ARE DIFFERENT.

21        ULTIMATELY, THE EFFECTIVE DATA RATE TELLS YOU WHEN YOU CAN

22    SEND -- YOU KNOW, REMEMBER I PUT UP --

23        LET ME JUST GO TO THE TUTORIAL SLIDE 10, PLEASE, RYAN.

24        I PUT UP THIS SLIDE DURING THE TUTORIAL AND WE TALKED ABOUT

25    THE FACT THAT THE SHADED SUBFRAMES HERE TELL THE USER
```

1    EQUIPMENT, TELL THE PHONE, WHEN CAN I SEND INFORMATION?

2        SO BY SAYING WHEN I CAN SEND INFORMATION, THAT'S NOT THE

3    SAME AS SAYING HOW FAST YOU CAN SEND THE INFORMATION.  THAT'S

4    SAYING WHEN YOU CAN SEND IT.  YOU CAN SEND IT IN THESE THREE

5    FRAMES.

6        IT'S NOT TELLING THE USER EQUIPMENT HOW FAST THE

7    INFORMATION IS GOING TO BE SENT.  THE HOW FAST THE INFORMATION

8    IS GOING TO BE SENT IS THE ALLOWED DATA RATE.

9        AND IF YOU LOOK AT --

10       AND GO TO MARKMAN SLIDE 7, PLEASE, RYAN.

11       THE '087 PATENT, IN COLUMN 2, LINES 54 TO 62, IT TALKS

12   ABOUT A DATA RATE AND IT SAYS "THE SCHEDULING ASSIGNMENT

13   INFORMATION COMPRISES INFORMATION ABOUT AN ALLOWED DATA RATE."

14       AND WHEN YOU READ ON INTO THE PATENT, WHEN YOU GET TO

15   COLUMN 6, COLUMN 6 SAYS, AT LINES 39 TO 48, "ACCORDING TO THE

16   NODE B CONTROLLED SCHEDULING, NON-SCHEDULED TRANSMISSION IS

17   POSSIBLE AT A DATA RATE WITHIN A PREDETERMINED LIMIT."

18       SO THE NON-SCHEDULED TRANSMISSION IS USING AN ALLOWED DATA

19   RATE FROM THE SAI.

20       AND YOU SEE THIS WHEN YOU GO INTO THE CLAIMS.  CLAIM 1

21   TALKS ABOUT NON-SCHEDULED TRANSMISSION, AND DEPENDENT CLAIM 6

22   TALKS ABOUT TRANSMITTING THE DATA WITHIN A DATA RATE ALLOWED BY

23   A RADIO NETWORK CONTROLLER.

24       THE DATA RATE THAT'S ALLOWED THAT'S BEING DISCUSSED THERE

25   IS THE ALLOWED DATA RATE THAT COMES FROM THE SAI.

```
1        SO -- AND WHEN YOU -- LET ME ALSO DIRECT YOUR ATTENTION,

2   YOUR HONOR, TO FIGURE 3 BECAUSE THIS IS -- THIS IS REALLY

3   WHAT'S GOING ON AND THERE'S A DISTINCTION HERE BETWEEN ALLOWED

4   DATA RATE AND EFFECTIVE DATA RATE.  THE PATENT TALKS ABOUT

5   BOTH.

6        ALLOWED DATA RATE IS USED TO DETERMINE WHAT THE EFFECTIVE

7   DATA RATE IS THAT THE NST'S RELY UPON.

8        SO WHEN YOU LOOK AT -- AND THIS IS BASICALLY FIGURE 3 HERE

9   IN THE MIDDLE -- THE ALLOWED DATA RATE COMES FROM THE RADIO

10  NETWORK CONTROLLER, AND OUT OF THIS LARGE SET OF TFC'S, THE

11  BASE STATION SAYS HERE IS A SUBSET OF ALLOWED DATA RATES BASED

12  UPON HOW CLOSE THE PHONES ARE TO THE BASE STATION, AND IT'S

13  GOING TO -- AND IT'S SAYING THE USER EQUIPMENT CAN BASICALLY

14  USE ANY ONE OF THESE TFC'S, AND THIS IS WHERE THE USER

15  EQUIPMENT ACTUALLY GETS THE TRANSMISSION DATA RATE.

16       AND, AGAIN, IT'S CHOSEN FROM THE OVERALL ALLOWED DATA

17  RATE.

18       AND WHAT IS REALLY GOING ON HERE IS -- AND THIS IS AT

19  COLUMN 7, LINES 61 TO 65.  THERE'S A FORMULA DOWN HERE THAT

20  SAYS "THE EFFECTIVE DATA RATE IS EQUAL TO THE DATA TRANSMISSION

21  RATE," WHICH WE JUST SAW COMES FROM THE ALLOWED DATA RATE,

22  "TIMES K OVER N."

23       SO WHAT THIS IS SAYING IS THE DATA RATE IS NECESSARY TO

24  SEND TO THE NST'S, AND THE ALLOWED DATA RATE IS USED, ALONG

25  WITH THE K AND N, TO GIVE YOU WHAT IS THE EFFECTIVE DATA RATE,
```

1       AND THAT MAKES SENSE WHEN YOU LOOK AT WHAT IS GOING ON.

2            IF YOU LOOK AT K HERE, K IS EQUAL TO -- YOUR HONOR,

3       REMEMBER WE TALKED ABOUT K BEING EQUAL TO 3 HERE.  THERE ARE

4       THREE SUBFRAMES OUT OF THIS 8 BIT SEQUENCE WHERE YOU CAN SEND A

5       SHORT TEXT.

6            AND N IS EQUAL TO 8 HERE.  THERE ARE 8 SUBBITS, OR THERE'S

7       AN 8 BIT STREAM HERE.  SO K OVER N, BASICALLY 3 OVER 8, 3/8THS.

8            SO IT TAKES THE TRANSMISSION RATE WHICH CAME FROM THE

9       ALLOWED DATA RATE AND CONVERTS THAT TO AN EFFECTIVE DATA RATE.

10           BUT THE TRANSMISSION RATE IS BASED ON THE ALLOWED DATA

11      RATE.

12           AND SO AS YOU MOVE THROUGH THIS, YOU KNOW -- AS THIS

13      NUMBER VARIES, IF K GOES UP, THEN IT COULD HAVE -- IT HAS AN

14      EFFECT ON WHAT THE EFFECTIVE DATA RATE COULD BE.  THE MORE

15      TIMES -- THE MORE INSTANCES WHEN YOU CAN SEND INFORMATION, THAT

16      HAS AN EFFECT ON WHAT THE EFFECTIVE RATE WOULD BE.  IT CAN

17      INCREASE OR DECREASE IT.

18           YET IT'S DEPENDENT UPON WHAT IS THE INITIAL TRANSMISSION

19      RATE THAT HAS COME FROM THE RNC, FROM THE ALLOWED DATE RATE OF

20      THE RNC.

21           AND THAT'S, THAT'S WHAT THE PATENT DESCRIBES.

22           AND, AGAIN, WHEN YOU LOOK AT THE SPECIFICATION --

23               THE COURT:  SO HOW DOES -- I'M SORRY TO INTERRUPT

24      YOU.

25               MR. JOHNSON:  SURE.

1          THE COURT:  HOW DOES THIS -- FROM WHAT I UNDERSTAND

2     FROM WHAT APPLE WAS SAYING LAST WEEK IS THAT THE SCHEDULING

3     ASSIGNMENT INFORMATION, WHICH INCLUDES DATA RATE INFORMATION,

4     IS ONLY RELEVANT TO SCHEDULED TRANSMISSIONS, AND THAT'S HOW HE

5     TRIED TO DISTINGUISH, WHAT WAS THAT, COLUMN 2, LINES 59 THROUGH

6     62 THAT TALK ABOUT THE SCHEDULING ASSIGNMENT INFORMATION

7     COMPRISES INFORMATION ABOUT AN ALLOWED DATA RATE.

8          HE SAID THAT THAT ONLY APPLIES TO SCHEDULED TRANSMISSIONS.

9          MR. JOHNSON:  AND THAT'S JUST NOT CORRECT.  THAT'S --

10    I MEAN, THE -- WHAT HE'S TRYING TO DO IS GO BACK -- I'LL GO

11    BACK TO WHAT THEIR CONSTRUCTION IS.

12         THEIR CONSTRUCTION IS "TRANSMISSION OF UPLINK DATA BY THE

13    UE WITHOUT USING SCHEDULING ASSIGNMENT INFORMATION."

14         THERE'S NOTHING IN THE CLAIMS THAT SUPPORT, OR THE SPEC,

15    THAT SUPPORT A NEGATIVE LIMITATION LIKE THIS THAT SAYS YOU

16    CAN'T USE THE SCHEDULING ASSIGNMENT INFORMATION.

17         AND, IN FACT, IMPORTING THIS NEGATIVE LIMITATION READS OUT

18    AND IGNORES THE PREFERRED EMBODIMENTS, WHICH SPECIFICALLY SAY

19    YOU CAN USE SCHEDULING ASSIGNMENT INFORMATION.  COLUMN 5, LINES

20    15 TO 31, AND 32 TO 47 SAY, "RECEIVING AT LEAST ONE OF

21    SCHEDULING ASSIGNMENT INFORMATION GENERATED BY THE NODE B BASED

22    ON THE SCHEDULING INFORMATION AND NON-SCHEDULED TRANSMISSION

23    INFORMATION."

24         AND IT GOES ON TO THEN SAY, OVER AT LINE 32, "RECEIVER

25    RECEIVING AT LEAST ONE OF SCHEDULING ASSIGNMENT INFORMATION

1    GENERATED BY THE NODE B BASED ON SCHEDULING INFORMATION AND

2    NON-SCHEDULED TRANSMISSION INFORMATION."

3         SO EVEN THE SPECIFICATION SAYS THAT THE PHONES, THE USER

4    EQUIPMENT, CAN RECEIVE BOTH THE SCHEDULING ASSIGNMENT

5    INFORMATION AND THE NON-SCHEDULED TRANSMISSION INFORMATION.

6         AND THE CLAIMS CONFIRM THAT.  THE CLAIMS SAY -- CLAIMS 27

7    AND 34 SAY THAT "THE USER EQUIPMENT," THE PHONES, "CAN RECEIVE

8    BOTH SCHEDULING ASSIGNMENT INFORMATION AND NON-SCHEDULED

9    TRANSMISSION INFORMATION," WE SEE THAT RIGHT IN THE RECEIVING

10   STEPS IN CLAIM 27, "RECEIVING AT LEAST ONE OF SCHEDULING

11   ASSIGNMENT INFORMATION GENERATED BY THE NODE B BASED ON THE

12   SCHEDULING INFORMATION AND NON-SCHEDULED TRANSMISSION

13   INFORMATION."

14        AND A VERY SIMILAR LIMITATION APPEARS IN CLAIM 34.

15             THE COURT:  SO YOUR -- YOUR POSITION IS THAT IT'S NOT

16   POSSIBLE TO HAVE A NON-SCHEDULED TRANSMISSION WITHOUT THE DATA

17   RATE?

18             MR. JOHNSON:  THE DATA -- THAT'S CORRECT.

19             THE COURT:  OKAY.

20             MR. JOHNSON:  I MEAN --

21             THE COURT:  AND THAT THE DATA RATE IS SOMETHING THAT

22   HAS TO BE TRANSMITTED FROM THE RNC TO THE UE?

23             MR. JOHNSON:  THAT'S RIGHT.  AND THAT'S WHAT FIGURE 3

24   SHOWS.

25             THE COURT:  OKAY.  BECAUSE HE WAS TRYING TO SAY, LAST

 1    WEEK, THAT THE RNC COULD GIVE LIMITED INFORMATION AND THEN THE

 2    UE CALCULATES HOW THAT WOULD BE PROJECTED OUT INTO THE FUTURE.

 3         DO YOU REMEMBER HE WAS TALKING ABOUT THAT?

 4              MR. JOHNSON:  I REMEMBER THAT.

 5              THE COURT:  YEAH.

 6              MR. JOHNSON:  BUT WHEN YOU LOOK AT THE SPEC, AND A

 7    PERSON OF ORDINARY SKILL READING THE SPEC WOULD NOT -- WOULD

 8    SEE AND COME TO THE OPPOSITE CONCLUSION THAN APPLE DOES WITH

 9    RESPECT TO TRYING TO READ IN THIS LIMITED NEGATIVE LIMITATION,

10    BECAUSE THE SPECIFICATION IS FILLED WITH EXAMPLES WHERE

11    SCHEDULING ASSIGNMENT INFORMATION IS USED AND IS PART OF

12    ULTIMATELY THE NON-SCHEDULED TRANSMISSION INFORMATION.

13         THEY WANT TO COMPLETELY IGNORE -- I'LL JUST GO BACK TO

14    THEIR CLAIM LANGUAGE, THEIR CONSTRUCTION, BECAUSE IT'S

15    IMPORTANT -- WITHOUT USING SCHEDULING ASSIGNMENT INFORMATION,

16    THERE IS NO CLEAR, UNMISTAKABLE DISAVOWAL.

17         WE HEARD APPLE SAY THIS HOW MANY TIMES WHEN THEY WERE

18    TALKING ABOUT APPLE'S PATENTS?

19         WELL, IN THIS INSTANCE, THERE'S EVEN LESS OF A CLEAR AND

20    UNMISTAKABLE DISAVOWAL HERE.

21         IN FACT, THE SPEC GOES FURTHER AND SAYS YOU CAN USE

22    SCHEDULING ASSIGNMENT INFORMATION, AND A PERSON OF ORDINARY

23    SKILL IN THE ART WOULD UNDERSTAND IT THAT WAY.

24              THE COURT:  OKAY.  WELL, I'M INCLINED TO AGREE WITH

25    YOU AND ADOPT YOUR CONSTRUCTION, SO LET ME JUST GIVE A MINUTE

```
1         OR TWO TO APPLE.

2            THANK YOU.

3               MR. JOHNSON:  THANK YOU.

4            YOUR HONOR, JUST -- I HAVE JUST SOME SLIDES THAT I MAY HAVE

5       REFERENCED.

6               THE COURT:  YES, WE'LL DEFINITELY TAKE THEM AND USE

7       THEM.

8               MR. JOHNSON:  CAN I HAND THEM UP?

9               THE COURT:  YES, THANK YOU.

10              MR. JOHNSON:  THANK YOU.

11              THE COURT:  OKAY.  SO MY QUESTION FOR APPLE, IF YOU

12      WANT TO RESPOND, IS THAT SAMSUNG DISAGREES WITH YOU THAT YOU

13      CAN HAVE NON-SCHEDULED TRANSMISSION WITHOUT HAVING DATA RATE

14      INFORMATION BE RECEIVED BY THE UE.  I GUESS THAT'S NUMBER ONE.

15          AND NUMBER TWO, IF YOU'RE STILL SAYING THAT JUST WITH THE N

16      AND THE K TTI'S, THAT THE UE CAN DETERMINE THE DATA RATE, I

17      WANT SOME COLUMN AND LINE NUMBER CITATIONS.

18              MR. SELWYN:  I'D BE HAPPY TO DO THAT.

19          MR. JOHNSON SAID THAT APPLE HASN'T SHOWN ANY PLACE IN THE

20      SPECIFICATION THAT IDENTIFIED A DISAVOWAL.  I'M GOING TO TAKE

21       YOU TO SEVERAL OF THOSE PLACES.

22          I ALSO WANT TO CLEAR UP SOME CONFUSION I THINK THAT WAS

23      CREATED BY THE PRESENTATION.

24              APPLE AGREES THAT THE UE CAN RECEIVE BOTH SCHEDULING --

25      SCHEDULED INFORMATION AND NON-SCHEDULED INFORMATION, AND IF YOU
```

```
 1        LOOK AT CLAIMS 27 AND 34, WHICH MR. JOHNSON JUST SHOWED YOU,

 2        THAT'S WHAT IT SAYS.  IT HAS A LIMITATION THAT SAYS RECEIVING

 3        BOTH OF THOSE.

 4            OUR POSITION AND OUR CONSTRUCTION IS THAT THOSE -- FOR

 5        NON-SCHEDULED TRANSMISSION, SAI, SCHEDULING ASSIGNMENT

 6        INFORMATION ISN'T USED BY THE UE, AND THAT'S VERY IMPORTANT

 7        BECAUSE WHAT THE PATENT DOES, IT SETS UP A DICHOTOMY BETWEEN,

 8        ON THE ONE HAND, SCHEDULED TRANSMISSION AND NON-SCHEDULED

 9        TRANSMISSION.

10            AND THE PATENT, IN PART, DEFINES NON-SCHEDULED

11        TRANSMISSION BY CONTRAST TO SCHEDULED TRANSMISSION.

12            WHERE DOES IT DO THAT?  LET ME POINT YOU TO SOME PLACES.

13            FIRST, THE ABSTRACT ITSELF AT THE BOTTOM OF IT SAYS --

14            THE COURT:  WELL, LET ME ASK YOU --

15            MR. SELWYN:  SURE.

16            THE COURT:  -- THE PATENT SAYS THAT THE SAI INCLUDES

17        THE DATA RATE, AND IT'S STILL YOUR POSITION THAT YOU CAN HAVE A

18        NON-SCHEDULED TRANSMISSION WITHOUT THE DATA RATE?

19            MR. SELWYN:  YES, BECAUSE WITH THE NON-SCHEDULED

20        TRANSMISSION YOU GET THE N AND THE K.  THAT'S PART OF THE E-DCH

21        SET UP THAT'S RECEIVED BY THE UE.

22        SO IT HAS THE N.  IT HAS THE K.  AND REMEMBER WHAT THOSE

23        ARE.  THE N IS THE PERIOD OF TIME IN WHICH YOU CAN SEND A

24        TRANSMISSION.  K TELLS YOU THE NUMBER OF TIMES THAT YOU CAN DO

25        THAT.
```

1    SO WHAT THE BASE STATION, NODE B, IS ABLE TO DO IS SET AN

2    EFFECTIVE DATA RATE IN THAT E-DCH SET UP WITH THE N AND THE K.

3        SO ABSOLUTELY YOU CAN HAVE A NON-SCHEDULED TRANSMISSION

4    THAT SETS AN EFFECTIVE DATA RATE USING THE N AND K.

5        WHAT YOU CAN'T DO -- AND THIS IS CRITICALLY IMPORTANT --

6    WHAT YOU CAN'T DO WITH THE NON-SCHEDULED TRANSMISSION IS USE

7    SCHEDULING ASSIGNMENT INFORMATION.

8        SCHEDULING ASSIGNMENT INFORMATION IS THAT ENTIRE BACK AND

9    FORTH THAT'S DEMONSTRATED IN FIGURE 2 WITH THE OVERHEAD

10   COMMUNICATIONS THAT ARE GOING BETWEEN THE UE AND THE BASE

11   STATION.

12       THAT'S THE POINT OF THE PATENT.  THAT'S THE POINT OF THE

13   CLAIMED INVENTION IS THAT YOU DON'T NEED TO DO THAT, AND IT

14   DRAWS A DISTINCTION BETWEEN, ON THE ONE HAND, A SCHEDULED

15   TRANSMISSION FOR A LARGE FILE, LIKE A MOVIE FILE WHERE IT'S

16   IMPORTANT TO BE TALKING TO THE BASE STATION AND FIGURING OUT

17   HOW YOU'RE GOING TO SCHEDULE, AND THEN CONTRAST THAT WITH

18   NON-SCHEDULED TRANSMISSION WHERE YOU'RE SENDING VERY SMALL

19   AMOUNTS OF INFORMATION, LIKE A TEXT MESSAGE.

20       IN THAT INSTANCE, WHEN YOU'RE SENDING SOMETHING LIKE A TEXT

21   MESSAGE, YOU DON'T NEED TO DO SCHEDULING ASSIGNMENT INFORMATION

22   BECAUSE THE BASE STATION HAS TOLD YOU THE N AND THE K AS PART

23   OF THE INITIAL SET UP.

24       AND IT ACTUALLY SAYS THAT AT COLUMN 7.  IT SAYS, "THE

25   PARAMETERS N AND K ARE DEFINED ON A UE-BY-UE BASIS WHEN E-DCH

1   IS INITIALLY ESTABLISHED OR REESTABLISHED."  THAT'S AT COLUMN

2   7, LINES 30 AND 31.

3        AND THAT'S EXACTLY WHAT'S HAPPENING.  WHEN THE UE GETS IN

4   CONTACT WITH THE BASE STATION DURING ITS INITIAL SET UP, IT

5   GETS THE N AND K.

6        IF IT WANTS TO DO A NON-SCHEDULED TRANSMISSION, THAT'S ALL

7   IT NEEDS.  IT DOESN'T NEED TO GO THROUGH SCHEDULING ASSIGNMENT

8   INFORMATION.

9        IN CONTRAST, IF IT WANTS TO SEND A MOVIE FILE, A BIG FILE,

10  SOMETHING LIKE THAT, THEN IT GOES THROUGH THE ROUTINE OF

11  EXCHANGING SCHEDULING ASSIGNMENT INFORMATION.

12       AND REPEATEDLY THE PATENT EMPHASIZES THAT.

13       MR. JOHNSON SAID THAT THE PATENT IS FILLED WITH EXAMPLES

14  WHERE SCHEDULING ASSIGNMENT INFORMATION IS USED FOR SCHEDULING

15  TRANSMISSION --

16            THE COURT:  LET ME STOP THIS, OKAY, BECAUSE WE ONLY

17  HAVE AN HOUR LEFT.  GIVE ME YOUR BEST COLUMN AND LINE NUMBERS

18  AND WE'LL LOOK IN THE PATENT.  OKAY?  JUST GIVE ME YOUR BEST.

19            MR. SELWYN:  SURE.  THE ABSTRACT, LAST SENTENCE;

20  COLUMN 3, LINES 23 THROUGH 26.

21            THE COURT:  OKAY.  THE ABSTRACT, OKAY.

22       COLUMN 3, LINES?

23            MR. SELWYN:  23 THROUGH 26.

24            THE COURT:  OKAY.

25            MR. SELWYN:  COLUMN 6, LINES 49 THROUGH 53.

```
1              THE COURT:  OKAY.

2              MR. SELWYN:  CLAIM 1, AND I'D ALSO ASK YOUR HONOR TO

3    LOOK AT THE CONTRAST BETWEEN FIGURE 2, WHICH IS DESCRIBED AS

4    CONVENTIONAL E-DCH, MEANING CONVENTIONAL SCHEDULED

5    TRANSMISSION, AND FIGURE 4, WHICH IS DESCRIBED AS NON-SCHEDULED

6    TRANSMISSION.  IT MAKES NO REFERENCE TO SCHEDULING ASSIGNMENT

7    INFORMATION.

8              THE COURT:  OKAY.  ANYTHING ELSE?

9              MR. SELWYN:  NO.  THOSE ARE THE ITEMS WHERE THE

10   PATENT DEFINES NON-SCHEDULED TRANSMISSION BY REFERENCE TO NOT

11   USING SAI IN THE TRANSMISSION.

12             THE COURT:  IF THE DATA RATE IS MEGABYTES PER SECOND

13   AND THE TTI'S ARE IN SECONDS, HOW ARE YOU USING N AND THE K

14   TTI'S TO CALCULATE MEGABYTES PER SECOND?

15             MR. SELWYN:  N AND K ARE BOTH MEASURED IN TERMS OF

16   TTI'S.

17             THE COURT:  UM-HUM.

18             MR. SELWYN:  THE INITIAL SET UP COULD HAVE ADDITIONAL

19   INFORMATION THAT IS USED FOR A NON-SCHEDULED TRANSMISSION.

20         BUT WHAT CAN'T BE USED FOR A NON-SCHEDULED TRANSMISSION,

21   BECAUSE THE PATENT SAYS SO, IS SAI.

22             THE COURT:  SO WHAT IS THAT?  THAT SOUNDS LIKE A

23   LOOPHOLE YOU'RE TRYING TO BRING IN SAYING, "OH, THERE'S OTHER

24   INFORMATION THAT COULD HAVE BEEN TRANSFERRED BEFORE THAT COULD

25   BE USED."
```

1          MR. SELWYN:  RESPECTFULLY, I DON'T THINK SO, BECAUSE

2   WHAT THE PATENT IS TELLING US IS THE NODE B IS SENDING TWO

3   TYPES OF INFORMATION.  IT'S SENDING SCHEDULED INFORMATION AND

4   NON-SCHEDULED.

5          THE COURT:  IT'S SAYING THE RNC IS SENDING THAT

6   INFORMATION, RIGHT?  NOT THE NODE B.

7          MR. SELWYN:  NODE B, RNC, YES.

8          THE COURT:  WELL, THEY'RE NOT THE SAME.  THEY'RE NOT

9   DEFINED THE SAME IN THIS PATENT SPECIFICATION.  RNC IS

10  DIFFERENT THAN NODE B.

11         MR. SELWYN:  CORRECT.  BUT THE IMPORTANT POINT IS

12  THAT THE UE IS RECEIVING BOTH OF THOSE.  EQUIPPED WITH BOTH OF

13  THOSE, IT CAN GO ONE OF TWO ROUTES.  IT CAN GO NON-SCHEDULED

14  TRANSMISSION USING THE N AND K VALUES, OR IT CAN GO THE ROUTE

15  OF A SCHEDULED TRANSMISSION USING THE SCHEDULING ASSIGNMENT

16  INFORMATION.

17     AND IF IT DECIDES TO GO THE NON-SCHEDULED TRANSMISSION

18  ROUTE, IT DOES NOT HAVE TO GO THROUGH ALL OF THE OVERHEAD

19  COMMUNICATIONS THAT ARE INVOLVED AND DEPICTED IN FIGURE 2 FOR

20  SAI.

21         THE COURT:  ALL RIGHT.  ANYTHING ELSE YOU WANTED TO

22  ADD?

23         MR. SELWYN:  NO, NOT AT THIS TIME.

24         THE COURT:  OKAY.

25     LET'S GO TO THE -- MR. JOHNSON, DO YOU WANT TO HAVE THE

```
 1       LAST WORD SINCE THIS IS YOUR PATENT?

 2              MR. JOHNSON:  JUST VERY BRIEFLY.

 3          WITH RESPECT TO -- AGAIN, ONCE YOU HAVE THE N AND THE K'S,

 4       YOU STILL NEED TO KNOW WHAT THE ALLOWED DATA RATE IS, AND

 5       COLUMN 2, LINES 54 TO 62, TALKS ABOUT THE SCHEDULING ASSIGNMENT

 6       INFORMATION, COMPRISING INFORMATION ABOUT AN ALLOWED DATA RATE.

 7          THE PATENT ONLY SAYS THE ALLOWED DATA RATE IS FROM THE SAI.

 8          AND WHEN YOU LOOK AT COLUMN 3, LINES 23 TO 34, AND THIS IS

 9       THE SECTION WE'VE SEEN APPLE RELY UPON IN THE PAST -- THIS IS

10       SLIDE 16 -- THE PATENT NEVER SAYS THAT NON-SCHEDULED

11       TRANSMISSIONS EXCLUDE THE USE OF SAI, SCHEDULING ASSIGNMENT

12       INFORMATION.

13          THIS -- IT SAYS THE UE ENABLES NST'S FOR TRANSMITTING

14       UPLINK DATA THROUGH THE ENHANCED DATA CHANNEL WITHOUT USING

15       SCHEDULING ASSIGNMENT INFORMATION.  IT CAN DO THAT.

16          BUT ULTIMATELY, IT NEEDS THE ALLOWED DATA RATE, AND THE USE

17       OF THE WORD HERE, THE NON-SCHEDULED TRANSMISSIONS, CAN QUICKLY

18       TRANSMIT.  IT DOESN'T SAY THAT IT -- THAT THE NON-SCHEDULED

19       TRANSMISSIONS EXCLUDE THE USE.  IT'S SAYING IT CAN DO THIS.

20          AND THAT'S THE POINT.

21          BUT ULTIMATELY, YOU KNOW, WE START WITH THE FACT THAT THE

22       DATA RATE IS IN MEGABITS PER SECOND, AS YOU POINTED OUT, YOUR

23       HONOR.  N AND K'S ARE TYPICALLY, YOU KNOW, IN THE PATENT

24       THEY'RE DESCRIBED IN TERMS OF MILLISECONDS, 2 MILLISECONDS.

25          YOU STILL NEED WHAT THE MEGABYTES PER SECOND IS.  YOU NEED
```

1    TO KNOW WHAT THE DATA RATE IS, AND THAT ONLY COMES FROM THE

2    SAI.

3        THANK YOU.

4            MR. SELWYN:  YOUR HONOR, CAN I BRIEFLY RESPOND TO

5    THAT?

6            THE COURT:  GO AHEAD.

7            MR. SELWYN:  I'LL REFER YOU TO THE PART OF THE PATENT

8    THAT WAS REFERRED TO IN YOUR FIRST QUESTION TO MR. JOHNSON,

9    BECAUSE YOU CAN USE AN N AND A K TO DETERMINE EFFECTIVE DATA

10   RATE, AND THAT'S THE LANGUAGE THAT APPEARS AT COLUMN 6, LINES

11   65 THROUGH 67 THAT TELLS US THAT USING THE N AND K'S AND

12   EFFECTIVE DATA RATE CAN BE VARIED.  THAT'S HOW AN EFFECTIVE

13   DATA RATE IS DETERMINED BASED ON THE N AND K.

14       NODE B CAN DECIDE HOW IT WANTS TO SET A DATA RATE FOR

15   NON-SCHEDULED TRANSMISSION BY WHAT IT DETERMINES TO BE THE

16   WINDOW FOR N AND HOW MANY K'S IT WANTS TO ALLOW.

17       WITH THOSE TWO VARIABLES, YOU CAN SET AN EFFECTIVE DATA

18   RATE, AND THAT'S WHAT NODE B DOES.

19           THE COURT:  DO YOU WANT TO RESPOND TO THAT,

20   MR. JOHNSON?

21           MR. JOHNSON:  SURE.

22       WHEN YOU GO ON AND IF YOU LOOK AT THE BOTTOM OF COLUMN 7 IN

23   MY SLIDE 10 -- PLEASE, RYAN -- THE PATENT SPECIFICALLY SAYS THE

24   EFFECTIVE DATA RATE IS EQUAL TO THE DATA TRANSMISSION RATE,

25   WHICH COMES FROM THE ALLOWED DATA RATE, TIMES K AND N.

1          SO EVEN FOR THE EFFECTIVE DATA RATE, IT'S BASED ON THE

2     SCHEDULING ASSIGNMENT INFORMATION'S ALLOWED DATA RATE.  THAT'S

3     HOW A PERSON OF ORDINARY SKILL, READING THE SPEC, PARTICULARLY

4     LINES -- COLUMN 7, LINES 61 TO 65 AND FIGURE 3 OF THE PATENT

5     WOULD UNDERSTAND WHAT THOSE DISCLOSURES MEAN.  IT HAS TO COME

6     FROM THE ALLOWED DATA RATE.

7          THE COURT:  DO YOU WANT TO RESPOND TO WHAT MR. SELWYN

8     SAID, THAT FIGURE 2 DOES SPECIFICALLY HAVE SCHEDULING

9     ASSIGNMENT INFORMATION BEING TRANSMITTED FROM NODE B TO THE UE?

10    HE'S SAYING, WELL, THIS IS A SCHEDULED TRANSMISSION, AND THAT

11    FIGURE 4, WHICH IS THE FLOW CHART FOR THE NON-SCHEDULED, IS NOT

12    MENTIONING THE TRANSFER OF THAT SAI.

13          MR. JOHNSON:  SCHEDULE 2 DOES TALK ABOUT THE

14    SCHEDULING ASSIGNMENT INFORMATION.

15          THE COURT:  UM-HUM.

16          MR. JOHNSON:  BUT AS I SAID, SCHEDULE -- FIGURE 3, IN

17    CONNECTION WITH THE DISCLOSURE IN THE SPEC, TALKS ABOUT HOW

18    THAT ALLOWED RATE IS USED TO DETERMINE THE EFFECTIVE RATE.

19          AND THAT'S WHAT'S DESCRIBED ULTIMATELY IN FIGURE 4,

20    DETERMINING THE EFFECTIVE RATE.  YOU KNOW, IT'S EXACTLY -- THIS

21    GOES AND DOVETAILS NICELY WITH EXACTLY THAT PART OF THE

22    SPECIFICATION AT COLUMN 7, LINES 61 TO 65, WHICH SAYS THE

23    EFFECTIVE RATE IS BASED ON THE SAI'S ALLOWED DATA RATE.  IT'S

24    THE TRANSMISSION RATE TIMES K OVER N.

25          MR. SELWYN:  AND, YOUR HONOR, WE AGREE THAT FIGURE 4

1    DEPICTS THE FLOW CHART FOR NON-SCHEDULED TRANSMISSION.

2        YOU'LL SEE NO REFERENCE IN THERE TO SAI.

3        WHAT YOU WILL SEE IS USE OF K AND N TO VARY AND SET AN

4    EFFECTIVE DATA RATE.

5            MR. JOHNSON:  WELL, THE REFERENCE TO SAI IS RIGHT

6    THERE, "DETERMINE THE EFFECTIVE DATA RATE."  THAT EFFECTIVE

7    DATA RATE COMES FROM THE SAI ALLOWED DATA RATE.  THE ONLY

8    ALLOWED DATA RATE THAT'S DISCLOSED IN THE PATENT IS IN

9    CONNECTION WITH THE SCHEDULING ASSIGNMENT INFORMATION.

10       SO IT'S TELLING YOU, DETERMINE THE EFFECTIVE DATA RATE BY

11   MULTIPLYING K OVER N TIMES THE TRANSMISSION RATE.

12       BUT THAT'S -- THESE FIGURES FOLLOW EACH OTHER BECAUSE

13   THEY'RE ALL RELATED.

14       AND WHEN YOU START WITH FIGURE 2, IT TALKS ABOUT THE

15   SCHEDULING ASSIGNMENT INFORMATION.

16       FIGURE 3 IS TALKING ABOUT HOW WE'RE GOING TO CALCULATE THE

17   EFFECTIVE TRANSMISSION RATE THAT'S USED IN CONNECTION WITH THE

18   NST'S, AND THAT THAT INFORMATION COMES FROM THE ALLOWED DATA

19   RATE AND THE SCHEDULING ASSIGNMENT INFORMATION.

20           THE COURT:  LET ME ASK, HOW DO YOU RESPOND TO THAT,

21   MR. SELWYN, COLUMN 7, LINES 64 AND 65?  IT SAYS YOU NEED TO

22   KNOW THE DATA TRANSMISSION RATE IN ORDER TO CALCULATE THE

23   EFFECTIVE DATA RATE WITH K AND N.

24           MR. SELWYN:  BECAUSE THE -- YOU USE K AND N TO

25   DETERMINE THE EFFECTIVE DATA RATE.

1          THE COURT:  BUT YOU HAVE TO MULTIPLY THAT BY THE DATA

2     TRANSMISSION RATE.

3          MR. SELWYN:  SURE.

4          THE COURT:  YOU DON'T GET THE EFFECTIVE DATA RATE

5     SOLELY FROM K AND N.

6          MR. SELWYN:  THAT'S PART OF THE E-DCH SET UP.

7        BUT IT'S NOT SAI.  SAI IS THE BACK AND FORTH THAT'S GOING

8     BETWEEN THE BASE STATION AND THE UE TO CREATE SCHEDULING.

9          THE COURT:  SO WHERE ARE YOU GETTING THE DATA

10    TRANSMISSION RATE FROM?

11         MR. SELWYN:  THAT CAN BE WITH THE E-DCH, THE INITIAL

12    SET UP.

13         THE COURT:  AND WHERE DOES IT SAY THAT IN THE PATENT?

14         MR. SELWYN:  WELL, IT SAYS AT THE BOTTOM OF COLUMN 3,

15    FOR EXAMPLE, "IN ADDITION TO THE NODE B CONTROLLED SCHEDULING,

16    ADDITIONAL SIGNALLING IS REQUIRED TO CONTROL AN E-DCH DATA RATE

17    AVAILABLE IN THE NON-SCHEDULED TRANSMISSION."

18      SO WHAT THAT IS SAYING IS THAT IN ADDITION TO K AND N

19    TTI'S, YOU COULD BE USING SOMETHING ELSE.

20      I GRANT YOU IT DOESN'T SPECIFY WHAT THAT IS, BUT THERE'S NO

21    DISAVOWAL OF SOMETHING THAT COULD BE.

22         IN CONTRAST, THERE IS A DISAVOWAL IN SCHEDULING THE

23    ASSIGNMENT INFORMATION TO MAKE THAT CALCULATION IN THE

24    NON-SCHEDULED TRANSMISSION CONTEXT.

25         THE COURT:  THE DISAVOWAL IS WHERE?

1        MR. SELWYN:  THE DISAVOWAL IS IN THE PLACES THAT I

2    CITED FOR YOU.

3        THE COURT:  OKAY.  I DON'T AGREE WITH THAT.

4    ALL RIGHT.  LET'S GO TO '757, PLEASE.

5    LET ME HEAR WHETHER YOU ALL HAVE HAD ANY MORE THOUGHTS

6    ABOUT LANGUAGE THAT COULD BE USED.  DOES ANYONE HAVE ANY

7    THOUGHTS ABOUT -- LAST WEEK YOU ALL THOUGHT THERE WAS SOME WAY

8    IN WHICH THAT COULD BE EXPLORED.

9        MR. SELWYN:  I THINK YOUR HONOR HAD SUGGESTED THAT

10   CONSIDERATION BE GIVEN TO "RESIDES" OR "REMAINS" IN PLACE OF

11   "FIXED," AND YOU ASKED US TO GET BACK TO YOU THIS WEEK, AND THE

12   ANSWER TO THAT QUESTION IS IF YOUR HONOR IS INCLINED TO MAKE

13   THAT CHANGE TO APPLE'S PROPOSED CONSTRUCTION, WE DON'T HAVE AN

14   OBJECTION.

15       THE COURT:  LET ME -- WHAT EVIDENCE DO YOU HAVE THAT

16   THIS SPECIFICATION RELATES TO METHODS THAT WERE NEVER ISSUED,

17   WHICH IS WHAT YOU REPRESENTED LAST WEEK?

18       MR. SELWYN:  THE CLAIMS THEMSELVES.  THE CLAIMS ARE

19   ALL SYSTEM CLAIMS.

20       THE COURT:  SO YOU'RE JUST BASING IT ON THE TITLE?

21       MR. SELWYN:  NO, YOUR HONOR.  THE CLAIMS THEMSELVES

22   ARE ALL RECITED AS SYSTEM CLAIMS.

23       THE COURT:  I KNOW.  BUT WHAT MAKES YOU THINK THAT

24   THEY WERE ALL SUPPOSED TO BE METHOD CLAIMS?  THE TITLE OF THE

25   PATENT?

1          MR. SELWYN:  THE TITLE OF THE PATENT AND THE INITIAL

2     CLAIMS THAT WERE APPLIED FOR, INCLUDING METHOD CLAIMS.

3          THE COURT:  ALL RIGHT.  LET ME HEAR FROM MR. JOHNSON.

4          MR. JOHNSON:  SO, YOUR HONOR, THE ISSUE IS, DOES THE

5     ZONE SPECIFIC STORAGE AND INTERFACE DEVICE HAVE TO BE FIXED,

6     AND THE SPECIFICATION, AS WE TALKED ABOUT LAST WEEK, DISCLOSES

7     MOBILE AND PORTABLE EMBODIMENTS, AND WE -- I'LL TALK IN A

8     MINUTE ABOUT YOUR HONOR'S QUESTIONS WITH RESPECT TO "RESIDES"

9     AND "REMAINS," BUT I WANT TO GO BACK TO, YOU KNOW, AGAIN, THE

10    LIMITATION THAT APPLE WANTS TO READ INTO IT THAT IT'S FIXED IN

11    A ROOM OR A SIMILAR BOUNDED LOCATION IS NOT SUPPORTED BY THE

12    PREFERRED EMBODIMENTS.

13         THE SPECIFICATION SAYS THAT IT'S NOT LIMITED TO FIXED

14    DEVICES.

15         YOUR HONOR, FIGURE 1 OF THE PATENT, WHICH IS DIRECTED TO A

16    SYSTEM AND IS COVERED BY THE CLAIMS, AND WHEN YOU LOOK AT THE

17    DETAILED DESCRIPTION OF THE INVENTION, IT TALKS ABOUT IN

18    GENERAL, THE INVENTION IS A SYSTEM AND METHOD COMPRISING

19    DIGITAL MULTIMEDIA PLAYERS CONNECTED TO A NETWORK CAPABLE OF

20    TRANSFERRING, RECEIVING, STORING, DECODING, AND PLAYING

21    SELECTED DATA FILES FROM A PLETHORA OF DEVICES.

22         NOWHERE DOES IT SAY THAT INDIVIDUAL DEVICES HAVE TO ONLY BE

23    FIXED IN A ROOM OR BY A SPECIAL BOUNDARY.

24         AND WHEN YOU LOOK AT OTHER PORTIONS OF THE SPECIFICATION,

25    FOR EXAMPLE, AGAIN FIGURE 1 TALKS ABOUT A PORTABLE MULTIMEDIA

1    PLAYER 108.

2         COLUMN 5, LINES 9 TO 13 TALKS MORE ABOUT THE PORTABLE

3    MULTIMEDIA PLAYER.

4         COLUMN 5, LINES 24 TO 27 TALK ABOUT PORTABLE AND FIXED

5    DIGITAL MULTIMEDIA DEVICES.

6         SO READING IN THE LIMITATION THAT APPLE WANTS TO READ IN,

7    THAT IT'S FIXED AND IT'S IN A ROOM OR SET OFF BY A PARTICULAR

8    BOUNDARY WOULD NOT COVER THESE PORTIONS OF THE SPEC THAT TALK

9    ABOUT PORTABLE MULTIMEDIA DEVICES.

10        AND THERE ARE OTHER PORTIONS OF THE SPEC THAT GO ON TO TALK

11   ABOUT THE FACT THAT THERE ARE ZONES THAT MOVE, AND IT TALKS

12   ABOUT COLUMN 6, LINES 33 TO 38 --

13             THE COURT:  ACTUALLY, CAN I -- LET ME JUST TAKE YOU

14   TO --

15             MR. JOHNSON:  SURE.

16             THE COURT:  I THINK -- WELL, FIRST I WANT TO ASK WHY

17   YOU DROPPED CLAIM 13.

18             MR. JOHNSON:  THAT --

19             THE COURT:  WAS THAT BECAUSE IT READS, "WHEREIN THE

20   ZONE SPECIFIC STORAGE AND INTERFACE DEVICE IS DISPOSED TO BE

21   COUPLED TO A WIRELESS MOBILE DEVICE"?  BECAUSE THAT WOULD SEEM

22   TO UNDERMINE THAT WIRELESS MOBILE DEVICES ARE ZONE SPECIFIC

23   STORAGE INTERFACE DEVICES.

24             MR. JOHNSON:  YOUR HONOR, I'D HAVE TO CONFER WITH MY

25   TEAM TO UNDERSTAND THAT QUICKLY.

```
 1              THE COURT:  OKAY.

 2              MR. JOHNSON:  AND I CAN DO THAT.

 3          DO YOU WANT TO GIVE ME A QUICK MINUTE?  OR I CAN COME BACK

 4      TO IT.

 5              THE COURT:  YEAH, WHY DON'T YOU COME BACK TO THAT

 6      SINCE WE'RE RUNNING OUT OF TIME.

 7          I MOSTLY WANT YOU, THEN, TO TAKE A LOOK AT FIGURE 7, COLUMN

 8      8, LINE 20.  SO IT SPECIFICALLY SAYS THAT 706, 708, AND 710 ARE

 9      THE ZONE SPECIFIC STORAGE INTERFACE DEVICES.

10              MR. JOHNSON:  IT DOES, YOUR HONOR.

11              THE COURT:  AND IT SPECIFICALLY SAYS THE MP3 PLAYER,

12      714, IS NOT A ZONE SPECIFIC STORAGE INTERFACE DEVICE.  A

13      PERSONAL COMPUTER IS NOT.

14          ANYWAY, WHY DON'T YOU ADDRESS THAT?

15              MR. JOHNSON:  WELL, IF YOU GO BACK TO COLUMN 8, LINE

16      17, IT REFERS TO FIGURE 7 AS A PARTICULAR EMBODIMENT, AND THIS

17      IS DESCRIBING WHAT APPLE TALKS ABOUT AS A COMMERCIAL

18      EMBODIMENT, AND IT DEPICTS, YOU KNOW, THE ACTUAL COMMERCIAL

19      EMBODIMENT THAT REQUEST WAS MAKING AT THE TIME, AND IT

20      DESCRIBES IT IN THESE COLUMNS.

21              THE COURT:  UM-HUM.

22          MR. JOHNSON:  IT DOESN'T SAY THAT THESE PARTICULAR

23      DEVICES 708, 710, AND 706 ARE FIXED OR THAT THEY'RE NECESSARILY

24      IN A ROOM OR SET OFF BY A PARTICULAR BOUNDARY.

25          YOU ALSO, I THINK, HAVE TO FOCUS ON WHAT THE LANGUAGE OF
```

```
1        THE CLAIMS SAY, AND THE CLAIM LANGUAGE --

2             THE COURT:  BUT EVEN IF IT'S AN EMBODIMENT, LET'S SAY

3    IT'S AN EMBODIMENT, WOULDN'T THEY AT LEAST GET THE TERMINOLOGY

4    RIGHT?  IF THEY REALLY THOUGHT A PERSONAL COMPUTER WAS A ZONE

5    SPECIFIC STORAGE INTERFACE DEVICE, WOULDN'T THEY JUST SAY THAT?

6        AND EVEN IF IT'S AN EMBODIMENT, THAT DOESN'T CHANGE THE

7    CLAIM TERMS, DOES IT?

8             MR. JOHNSON:  IT DOESN'T CHANGE THE CLAIM TERMS, BUT

9    IT'S NOT A DISAVOWAL OF THAT, BECAUSE YOU'VE GOT TO LOOK AT IT

10   IN THE CONTEXT OF WHAT'S DESCRIBED ELSEWHERE IN THE PATENT,

11   INCLUDING FIGURES 1 TO 5, AND WHAT GETS TO YOU FIGURE 7.

12       AND NOWHERE DOES IT SAY THAT THE DEVICES 706, 708, OR 710

13   ARE FIXED.  THEY'RE IDENTIFIED AS ZONE DEVICES.

14       BUT WHEN YOU LOOK AT THE REST OF COLUMN 8, AS YOU READ

15   THROUGH IT, NOWHERE DOES IT SAY THAT THOSE INDIVIDUAL ITEMS

16   706, 708, AND 710 ARE FIXED.

17       AND WHEN YOU LOOK AT THE REST OF THE PATENT DISCLOSURE, IT

18   TALKS ABOUT IT IN THE CONTEXT OF MOBILE DEVICES, PORTABLE

19   DEVICES, AND IF YOU READ THE CLAIM LANGUAGE, A PERSON OF

20   ORDINARY SKILL, READING ALL THIS TOGETHER, WOULD UNDERSTAND

21   THAT IT COVERS MOBILE, PORTABLE DEVICES.

22       AND, YOU KNOW, THE SPECIFICATION AT COLUMN 10 TALKS ABOUT

23   THESE DEVICES BEING IN CARS AND YACHTS, AND THERE WERE CARS

24   WITH THIS AUDIO REQUEST PRO LOCATED IN THEM AT THE TIME.

25            THE COURT:  BUT IF I GO BACK TO FIGURE 7, IT SAYS AN
```

```
1    AUTOMOBILE 716, AND THAT'S NOT A ZONE SPECIFIC DEVICE.

2        LOOK AT CLAIM 13.  UNDER THE THEORY OF CLAIM

3    DIFFERENTIATION, I MEAN, IT SPECIFICALLY DOES DISTINGUISH -- I

4    GUESS IT'S NOT EVEN CLAIM DIFFERENTIATION NECESSARILY, BUT

5    CLAIM 13 DOES SPECIFICALLY DISTINGUISH BETWEEN ZONE SPECIFIC

6    STORAGE DEVICES AND WIRELESS MOBILE DEVICES.

7            MR. JOHNSON:  IT USES DIFFERENT TERMS, YES.

8            THE COURT:  SO WOULDN'T THAT -- IT'S SAYING IT'S

9    COUPLED TO A WIRELESS MOBILE DEVICE.  WOULDN'T THAT IMPLY THAT

10   THEY'RE NOT THE SAME THING?

11           MR. JOHNSON:  NO.  I THINK IT'S -- WELL, I DON'T

12   THINK IT PRECLUDES THEM BEING, YOU KNOW, COUPLING TO ANOTHER

13   ZONE SPECIFIC STORAGE DEVICE.

14       THIS IS TALKING ABOUT, I THINK, IN THE CONTEXT OF, YOU

15   KNOW, THE NETWORK AND COMMUNICATING OVER THE NETWORK.

16       AND IF YOU LOOK BACK AT FIGURE 1, IT TALKS ABOUT THE

17   NETWORK 102 AND IT TALKS ABOUT THERE BEING WIRELESS CAPABILITY

18   TO SYNCHRONIZE THESE DEVICES.

19       SO I THINK THIS COULD BE, YOU KNOW, A SPECIFIC EXAMPLE OF A

20   ZONE SPECIFIC STORAGE AND INTERFACE DEVICE.  A WIRELESS MOBILE

21   DEVICE COULD BE A SPECIFIC EXAMPLE OF A ZONE SPECIFIC STORAGE

22   AND INTERFACE DEVICE.

23       BUT I DON'T THINK IT'S NECESSARILY SAYING THAT THEY'RE

24   ABSOLUTELY DIFFERENT.  WE CAN THINK OF ONE AS THE GENUS AND ONE

25   AS MORE THE SPECIES IN THAT RESPECT.
```

1        AGAIN, IT REALLY TALKS ABOUT IT IN THE CONTEXT OF DEVICES

2    BECAUSE THEY ARE DEVICES AND THEY ARE -- YOU KNOW, WHEN YOU

3    FOCUS BACK ON COLUMN 10, IT TALKS ABOUT THE FACT THAT THESE ARE

4    MOBILE DEVICES AND PORTABLE DEVICES, AND YOU'RE GOING TO BE

5    ABLE TO CONNECT TO THEM WIRELESSLY AS WELL.

6            THE COURT:  ALL RIGHT.  LET'S GO TO THE '239.

7            MR. JOHNSON:  AND, YOUR HONOR, JUST BEFORE WE GO

8    THERE?

9            THE COURT:  YES.

10            MR. JOHNSON:  VERY BRIEFLY, YOUR HONOR ASKED ABOUT

11    THE "RESIDES."

12        YOU KNOW, THE ISSUE THAT WE HAVE IS THAT "FIXED" IS TOO

13    RIGID, AND "IN A ROOM," "SIMILAR BOUNDED LOCATION" I THINK IS

14    ALSO TOO RIGID.

15            THE COURT:  UM-HUM.

16            MR. JOHNSON:  THERE IS -- THERE ARE REFERENCES IN THE

17    SPEC TO THE WORD "RESIDES."

18            THE COURT:  UM-HUM.

19            MR. JOHNSON:  AND, YOU KNOW, THOSE APPEAR AT COLUMN

20    8, LINES 21 TO 25.

21            THE COURT:  UM-HUM.

22            MR. JOHNSON:  COLUMN 7, LINES 47 TO 49.

23            THE COURT:  SO WHAT WOULD YOU PROPOSE?

24            MR. JOHNSON:  SO I WOULD PROPOSE "A DEVICE THAT

25    RESIDES IN A LISTENING OR VIEWING AREA."

```
1              THE COURT:  SO FOR YOUR OLD CONSTRUCTION, THE SAME

2      LANGUAGE, EXCEPT THAT INSTEAD OF "ASSOCIATED WITH A

3      PARTICULAR," YOU WOULD SAY "THAT RESIDES IN A VIEWING AND/OR

4      LISTENING ZONE OR AREA"?

5              MR. JOHNSON:  AREA, RIGHT.  AND I'M EVEN GOING TO --

6      I'M EVEN GOING TO --

7              THE COURT:  "THAT RESIDES IN A VIEWING AND/OR

8      LISTENING AREA"?

9              MR. JOHNSON:  RIGHT.

10             THE COURT:  OKAY.

11             MR. JOHNSON:  AND JUST, WHILE I WAS THINKING MORE

12     ABOUT THIS DURING THE LUNCH BREAK, YOUR HONOR --

13             THE COURT:  YES.

14             MR. JOHNSON:  -- LOOKING MORE AT APPLE'S

15     CONSTRUCTION -- AS I SAID, THE REAL ISSUE IS "FIXED," "ROOM,"

16     AND "SIMILAR BOUNDED LOCATION."

17         IF WE WANTED TO GET CLOSER TO APPLE'S CONSTRUCTION, WE

18     COULD PROPOSE "A DEVICE THAT RESIDES IN A LOCATION FOR

19     MULTIMEDIA PLAYBACK."

20         IT'S REALLY THE NOTION OF "FIXED" AND "SIMILARLY BOUNDED"

21     AND "ROOM" THAT WE HAVE ISSUES WITH BECAUSE THE SPECIFICATION

22     IS NOT SO LIMITED.

23             THE COURT:  "A DEVICE THAT RESIDES IN A LOCATION FOR

24     MULTIMEDIA PLAYBACK"?

25         WHAT'S THE SIGNIFICANCE OF MULTIMEDIA PLAYBACK?
```

```
1            MR. JOHNSON:  THAT'S REALLY APPLE'S LANGUAGE.

2            THE COURT:  OKAY, YEAH.

3        MR. SELWYN, OR WHOEVER ELSE IS SPEAKING FOR APPLE.

4            MR. SELWYN:  YOUR HONOR, WE COULD REMOVE THE

5    "MULTIMEDIA PLAYBACK" IF YOU'RE INCLINED TO DO SO.

6        A COMMENT ON THE PROPOSED CONSTRUCTION THAT YOU JUST HEARD.

7    THAT PROPOSED CONSTRUCTION WOULD COVER ANY DEVICE, ANY OF THE

8    DEVICES IN THE PATENT.

9        AS WE DISCUSSED LAST WEEK AT THE TUTORIAL, THE PATENT

10   DESCRIBES A LARGE NUMBER OF DEVICES, AND ONE OF THE THINGS THAT

11   WE HAVE TO DO IS DISTINGUISH BETWEEN EACH OF THOSE DEVICES.

12       "A DEVICE THAT RESIDES IN A VIEWING OR LISTENING AREA," ALL

13   DEVICES ARE GOING TO RESIDE IN A VIEWING OR LISTENING AREA, THE

14   MP3 PLAYER, THE DIGITAL MULTIMEDIA PLAYER.

15       THAT DOESN'T DISTINGUISH IT WHATSOEVER FROM A ZONE SPECIFIC

16   STORAGE AND INTERFACE DEVICE.  ALL OF THE DEVICES IN THIS

17   PATENT WOULD BECOME ESSENTIALLY THE SAME THING AS "A DEVICE

18   THAT RESIDES IN A VIEWING OR LISTENING AREA."

19            THE COURT:  SO YOU DON'T CARE ABOUT "FOR MULTIMEDIA

20   PLAYBACK"?

21            MR. SELWYN:  NO.  WE WOULD BE FINE WITH A

22   CONSTRUCTION OF "A DEVICE THAT RESIDES IN A ROOM OR SIMILAR

23   LOCATION," WHICH I THINK IS TRUE TO THE INTRINSIC EVIDENCE AND

24   TRUE TO THE WAY A ZONE SPECIFIC STORAGE AND INTERFACE DEVICE IS

25   DESCRIBED IN THE PATENT.
```

```
 1          THE COURT:  BUT AREN'T WE JUST KICKING THE CAN DOWN

 2    THE ROAD?  AREN'T WE GOING TO FIGHT LATER ABOUT WHAT "SIMILAR

 3    LOCATION" MEANS?

 4          MR. SELWYN:  WELL, THE JURY CAN DECIDE WHAT "SIMILAR

 5    LOCATION" MEANS.  THE PATENT SAYS, "E.G., ROOMS."  SO WE KNOW

 6    ROOMS IS RIGHT.

 7       AND WE ARE WILLING TO EXPAND THAT TO BE A LOCATION SIMILAR

 8    TO A ROOM.

 9          THE COURT:  OKAY.  "OR RESIDES IN A LOCATION LIKE A

10    ROOM"?  I GUESS THAT'S THE SAME THING.

11       OKAY.  LET'S GO TO THE LAST PATENT SINCE WE'RE RUNNING OUT

12    OF TIME HERE.  THANK YOU BOTH.

13       OKAY.  LET'S SORT OF BREAK THESE DOWN.  LET'S HANDLE THE

14    "CAPTURING, DIGITIZING, AND COMPRESSING AT LEAST ONE SAID

15    COMPOSITE SIGNAL FIRST."

16          MR. JOHNSON:  YOUR HONOR, JUST IF I COULD VERY

17    BRIEFLY -- JUST 30 SECONDS ON THE LAST POINT?

18          THE COURT:  OKAY.

19          MR. JOHNSON:  JUST -- WITH RESPECT TO COLUMN -- I'LL

20    DIRECT YOUR ATTENTION TO COLUMN 3, LINES 7 TO 10, BECAUSE THE

21    SPECIFICATION TALKS ABOUT ROOMS -- THIS IS SLIDE 18, RYAN -- IT

22    TALKS ABOUT ROOMS, BUT IT ALSO TALKS ABOUT "FOR OTHER

23    LOCATIONS," FOR EXAMPLE, SUMMER HOME, CAR, YACHT.  IT'S NOT

24    JUST LIMITED TO ROOMS.

25          AND COLUMN 10, LINES 1 TO 10, TALKS ABOUT MULTIPLE ZONES OR
```

1    ROOMS IN A NETWORKED BUILDING OR MULTIPLE LOCATIONS TRAVELLING

2    THROUGH WIDE AREA NETWORKS, SUCH AS THE INTERNET.

3        COLUMN 9, LINES 12 TO 14 SAYS "IN A TYPICAL CUSTOM HOME

4    INSTALLATION, THERE MAY BE UPWARDS OF 20 ZONES, E.G., ROOMS."

5    "FOR EXAMPLE."  IT DOESN'T SAY "I.E."  THESE ARE EXAMPLES.

6        AND AS I JUST POINTED OUT, THERE ARE PLENTY OF OTHER

7    EXAMPLES WHERE THE SPECIFICATION REFERS TO OTHER EXAMPLES

8    BEYOND JUST ROOMS.

9            THE COURT:  OKAY.

10           MR. SELWYN:  YOUR HONOR, MAY I RESPOND TO THAT?

11           THE COURT:  HALF A SECOND.

12           MR. SELWYN:  THE PATENT IS CLEAR THAT THE ZONE

13    SPECIFIC DEVICE HAS TO RESIDE IN A ZONE.  YOU CAN HAVE MULTIPLE

14    ZONE SPECIFIC DEVICES IN A ZONE, BUT A ZONE CLEARLY HAS TO BE

15    SOMETHING THAT HAS SOME BOUNDARY AROUND IT.

16        THERE ARE OTHER DEVICES THAT CAN BE OF A MOBILE NATURE,

17    SUCH AS THE ONES THAT MR. JOHNSON REFERRED YOU TO, THE WIRELESS

18    DEVICE AND SO FORTH, THE INTELLIGENT MP3 PLAYER.

19        BUT THE ZONE SPECIFIC STORAGE INTERFACE DEVICE IS NOT ONE

20    OF THOSE.

21           THE COURT:  ALL RIGHT.  LET'S GO TO '239, PLEASE.

22    LET'S HANDLE THE FIRST TERM.

23           MR. SELWYN:  SO, YOUR HONOR, WITH RESPECT TO THE

24    FIRST TERM, THERE WAS ONE ASPECT OF THE CONSTRUCTION THAT I WAS

25    HOPING TO BE HEARD ON.

```
 1              THE COURT:  WHAT'S THAT?

 2              MR. SELWYN:  THE SOFTWARE PORTION OF IT.

 3         YOUR HONOR'S TENTATIVE CONSTRUCTION AGREED WITH APPLE WITH

 4    RESPECT TO THE VIDEO CARD, WITH VIDEO CAPTURE MODULE, AND THE

 5    AUDIO CAPTURE CARD, BUT DIDN'T INCORPORATE THE ASPECT OF

 6    SOFTWARE, WHICH I WAS HOPING TO ADDRESS.

 7              THE COURT:  OKAY, BRIEFLY.

 8              MR. SELWYN:  SO FIRST THERE WAS A QUESTION LAST WEEK

 9    OF WHETHER SAMSUNG'S JOINT CLAIM CONSTRUCTION STATEMENT

10    INCLUDED SOFTWARE AS STRUCTURE, AND MR. JOHNSON SAID HE DIDN'T

11    THINK SO.

12         IN FACT, IT MOST CERTAINLY DID.

13              MR. JOHNSON:  I SAID I DIDN'T KNOW.

14    SORRY.  PARDON ME.

15              MR. SELWYN:  WELL, WE CAN FIGURE IT OUT RIGHT NOW.

16         IF WE CAN PUT UP SLIDE 13, PLEASE.

17         THIS WAS SAMSUNG'S JOINT CLAIM CONSTRUCTION STATEMENT, AND

18    IN FACT, IT INCLUDED MORE SOFTWARE THAN APPLE DID IN ITS

19    CONSTRUCTION.

20         IF WE CAN GO TO THE NEXT SLIDE?

21          ONE OF THE PORTIONS THAT SAMSUNG SPECIFICALLY REFERRED TO

22    IS THE VIDEO FOR WINDOWS PORTION.

23          BUT LET'S PUT THAT ASIDE AND LET ME JUST DEMONSTRATE WHY

24    THEY WERE CORRECT.

25         IF WE GO TO THE NEXT SLIDE, PLEASE.
```

1           THIS IS COLUMN 4, LINES 17 THROUGH 27 OF THE PATENT WHICH

2      MAKES SPECIFIC REFERENCE TO BOTH HARDWARE AND SOFTWARE.

3           IF WE CAN HIGHLIGHT THAT?

4           AND WHAT'S KEY, IF WE GO TO THE NEXT SLIDE, IS THE WAY THE

5      PATENT --

6           THE COURT:  BUT THE PATENT HAS THE VIDEO CARD

7      CAPTURING INPUT VIDEO SIGNAL TO ITS MEMORY.  "CAPTURING"

8      INCLUDES DIGITIZING AND THEN COMPRESSING, SO WHY IS ANY

9      SOFTWARE NECESSARY?  THE SPECIFICATION DESCRIBES THE VIDEO CARD

10     DOING EVERYTHING.

11          MR. SELWYN:  COLUMN 4, LINES 39 THROUGH 45, AND IN

12     PARTICULAR, THE LANGUAGE THAT SAYS, "A COMPUTER SOFTWARE

13     PROGRAM SUCH AS 'VIDEO FOR WINDOWS' AVAILABLE FROM MICROSOFT

14     OPERATES WITH THE VIDEO CARD AND CAPTURE MODULE TO CAPTURE,

15     DIGITIZE, AND COMPRESS THE VIDEO SIGNAL."

16          SO ANALYTICALLY, IF I WERE TASKED TO DETERMINE STRUCTURE

17     THAT CORRESPONDS TO THE CLAIMED FUNCTION AND TO LOOK FOR

18     EVIDENCE WITHIN THE SPECIFICATION LINKING WHAT WE PROPOSE TO BE

19     THE STRUCTURE WITH THE FUNCTION, IN OUR VIEW, THIS IS ABOUT AS

20     CLEAR A LINKAGE AS THE PATENT CAN PROVIDE, BECAUSE WHAT IT'S

21     TELLING YOU IS THAT THE SOFTWARE PACKAGE OPERATES WITH THE

22     HARDWARE, THE VIDEO CARD, AND THE CAPTURE MODULE, TO DO

23     EXPRESSLY WHAT IS THE CLAIMED FUNCTION.

24          THEN THE PATENT INCLUDES, AS CAPTURE SOFTWARE SEQUENCE A,

25     A LONG RECITATION OF THE SPECIFIC STEPS THAT ARE REQUIRED TO

1    PERFORM THAT FUNCTION.

2              THE COURT:  OKAY.  LET ME STOP YOU HERE.

3         ALL RIGHT.  WHEN WE WERE AT THE TUTORIAL LAST WEEK, YOU

4    SAID FOR THE VIDEO CAPTURE MODULE, YOU HAVE TO LOOK AT THE

5    ORIGINAL SPECIFICATION, NOT THE PROSECUTION HISTORY FOR THE

6    STRUCTURE.

7         DO YOU REMEMBER SAYING THAT?

8              MR. SELWYN:  I DO.

9              THE COURT:  OKAY.  CAN YOU CITE ME A CASE WHICH

10   SUPPORTS THAT?

11             MR. SELWYN:  WHAT I CAN CITE YOU IS THE MPEP, WHICH

12   REFERS TO THE CONTEXT OF WHAT IS THE DESCRIPTION OF THE PATENT,

13   THE ORIGINAL SPECIFICATION.

14             THE COURT:  ALL RIGHT.  GIVE ME THE CITE.

15             MR. SELWYN:  OF THE MPEP?

16             THE COURT:  YEAH.

17             MR. SELWYN:  I DON'T HAVE THAT AT MY FINGERTIPS.

18             THE COURT:  ALL RIGHT.  LET ME GO TO -- YOU WERE

19   GOING TO LOOK INTO WHETHER YOU HAD AN ANSWER AS TO WHY YOU DID

20   AUDIO CARD INSTEAD OF AUDIO CAPTURE CARD.

21             MR. SELWYN:  I DO HAVE AN ANSWER TO THAT.  IT WAS A

22   MISTAKE.

23             THE COURT:  WHAT'S THE ANSWER TO THAT?

24             MR. SELWYN:  IT SHOULD BE AUDIO CAPTURE CARD.  YOUR

25   HONOR IS CORRECT.

```
 1            THE COURT:  OKAY.  LET ME GO TO SAMSUNG, JUST BECAUSE
 2     WE'RE RUNNING OUT OF TIME.
 3            MR. JOHNSON:  YOUR HONOR, IF YOU'RE LEANING MY WAY, I
 4     HAVE NO COMMENT.
 5        IF YOU HAVE QUESTIONS, I'M HAPPY TO STAY.
 6            THE COURT:  WELL, I WAS THINKING OF STILL KEEPING
 7     WHAT I HAD SAID LAST WEEK, "AN AUDIO CARD AND A VIDEO CARD
 8     HAVING A VIDEO CAPTURE MODULE WITHOUT ANY SOFTWARE."
 9        SO IT'S NOT EXACTLY WHAT YOU HAD PROPOSED, BUT ARE YOU
10     SATISFIED WITH THIS?
11            MR. JOHNSON:  WELL, LET'S TALK ABOUT THE SOFTWARE
12     FIRST SINCE THAT'S WHAT MR. SELWYN ADDRESSED, AND THE -- YOUR
13     HONOR, I THINK YOU'RE CORRECT TO LEAVE IT OUT.
14            THE COURT:  UM-HUM.
15            MR. JOHNSON:  AND THE REASON IS EVEN THE PORTION --
16     THE SPECIFICATION TALKS ABOUT SOFTWARE IN THE CONTEXT OF -- AND
17     THE PORTION THAT MR. SELWYN DIRECTED YOU TO AT COLUMN 4, WHEN
18     YOU READ ON IN COLUMN 4 TOWARDS THE BOTTOM AT LINE 63 AND
19     TOWARDS THE ENDS OF THAT AND ALL THE WAY TO THE END OF THAT, IT
20     TALKS ABOUT THE VIDEO -- THE SOFTWARE PACKAGE BEING USED FOR
21     EDITING OF THE DATA FILE ONCE IT'S CAPTURED.
22        SO THE SOFTWARE IS USED AFTER THE FUNCTION OF CAPTURING,
23     DIGITIZING, AND COMPRESSING.
24        IF YOU READ LINE 66, "THE 'VIDEO FOR WINDOWS' SOFTWARE
25     PACKAGE ALLOWS FOR EDITING OF THE DATA FILE ONCE CAPTURED."
```

```
1              AND IF YOU LOOK AT THAT IN THE CONTEXT OF COLUMN 2,

2      CONTINUING ON TO COLUMN 3, IT SAYS -- AND I'M AT ABOUT LINE

3      66 -- "THE VIDEO CAPTURE CARD TAKES THE AUDIO/VISUAL SIGNAL,

4      DIGITIZES IT INTO A COMPUTER DATA FILE, AND COMPRESSES THAT

5      DATA FILE.  ONCE DIGITIZED AND COMPRESSED, THE DATA FILE IS

6      CAPTURED IN THE COMPUTER'S MEMORY BY A CAPTURE MODULE ON THE

7      VIDEO CAPTURE CARD.  A SOFTWARE SEQUENCE THEN INSTRUCTS THE

8      COMPUTER CENTRAL PROCESSING UNIT TO STORE THE CAPTURED DATA

9      FILE ON THE COMPUTER'S HARD DISK DRIVE.  AFTER THE VIDEO FILE

10     HAS BEEN CAPTURED, IT MAY BE EDITED AS DESIRED PRIOR TO

11     TRANSMISSION."

12             SO THE SOFTWARE THAT'S BEING DISCUSSED, AND EVEN THE

13     SOFTWARE PORTION THAT MR. SELWYN DIRECTED YOU TO, IS REALLY NOT

14     BEING PERFORMED AND IS NOT PART OF THE STRUCTURE FOR PERFORMING

15     THE FUNCTION OF MEANS FOR CAPTURING, DIGITIZING, AND

16     COMPRESSING AT LEAST ONE COMPOSITE SIGNAL.

17             THE COURT:  BUT DOESN'T THE VIDEO CARD NEED SOME

18      INSTRUCTIONS IN ORDER TO DO THOSE THINGS?  WHERE WOULD IT GET

19      THAT INSTRUCTION FROM OTHER THAN FROM SOFTWARE?

20             MR. JOHNSON:  BUT, AGAIN, THE TASK THAT WE'RE DEALING

21      WITH RIGHT NOW IS WHAT'S THE STRUCTURE FOR PERFORMING THE

22      FUNCTION?

23             AND THE STRUCTURE IS, WE SUBMIT, THE AUDIO/VIDEO

24      CAPTURING.  IT'S THE MODULE, AND THE MODULE ITSELF IS WHAT IS

25      AT ISSUE.
```

```
1              AND WHEN YOU GO TO --

2              RYAN, IF YOU COULD, SLIDE 7.

3              THE STRUCTURE IS NOT LIMITED TO AN AUDIO OR VIDEO CARD,

4      AND, YOU KNOW, AGAIN, GOING BACK TO CLAIM 9 BECAUSE I THINK

5      IT'S IMPORTANT, IT'S PART OF THE SPECIFICATION, IT TALKS ABOUT

6      A VIDEO CAPTURE MODULE TO CAPTURE, DIGITIZE, AND COMPRESS THE

7      COMPOSITE SIGNAL.

8              AND, AGAIN, A PERSON OF ORDINARY SKILL IN THE ART READING

9      THIS WOULD UNDERSTAND THAT IN THE PROSECUTION HISTORY, THE TERM

10     "VIDEO CARD HAVING A VIDEO CAPTURE MODULE" WAS REMOVED, "VIDEO

11     CAPTURE CARD" WAS REMOVED AND REPLACED WITH "A VIDEO CAPTURE

12     MODULE."

13             AND THAT IS THE STRUCTURE THAT IS USED TO CAPTURE,

14     DIGITIZE, AND COMPRESS.

15             SO THE ISSUE WE HAVE WITH YOUR HONOR'S CONSTRUCTION IS THE

16     REQUIREMENT OF THERE TO BE AN ACTUAL AUDIO CARD OR A VIDEO CARD

17     BECAUSE, AS YOU GO INTO THE SPEC FURTHER, THERE ARE EXAMPLES,

18     AND EVEN IF YOU LOOK AT THE SECTION MR. SELWYN JUST DIRECTED

19     YOU TO --

20             THE COURT:  LET ME ASK YOU, SINCE I WAS GETTING INTO

21     WHAT YOU ARE ADDRESSING NOW, TELL ME WHY THE CAPTURE STRUCTURE

22     FOR A REMOTE COMPUTER THAT'S IN CLAIM 9 IS THE SAME AS FOR A

23     REMOTE UNIT WHICH ISN'T A COMPUTER IN CLAIM 1.  WHY ARE THOSE

24     NECESSARILY THE SAME?  WHY DO THEY HAVE TO BE THE SAME?  THAT

25     IS, I THINK, WHAT YOU'RE ARGUING BASED ON THE PROSECUTION
```

```
 1        HISTORY AND THE CHANGES THAT WERE MADE TO CLAIM 9.

 2             IS THERE ANY SIGNIFICANCE THAT 9 IS TALKING ABOUT A REMOTE

 3        UNIT BEING A COMPUTER, WHEREAS 1 IS TALKING ABOUT A MOBILE

 4        REMOTE UNIT?

 5                  MR. JOHNSON:  NO, THERE'S NO DISTINCTION WITH RESPECT

 6        TO -- WITH RESPECT TO THAT.

 7             A REMOTE LOCATION TO A HOST LOCATION IN THE PREAMBLE FOR 9

 8        AND THE PREAMBLE FOR 1, WE WOULD ARGUE, FIRST OF ALL, IT'S NOT

 9        SO LIMITING.

10             BUT THERE'S NO DISTINCTION WITH RESPECT TO THE IDEA OF

11        CAPTURING, DIGITIZING, AND COMPRESSING, WHICH IS DESCRIBED

12        THROUGHOUT THE SPEC.

13             THE IDEA HERE IS WHEN THE CLAIM INITIALLY READ "VIDEO

14        CARD," IT WAS REPLACED TO SAY "VIDEO CAPTURE MODULE."

15             AND THAT'S, IN FACT, THE STRUCTURE FOR PERFORMING THE

16        FUNCTION HERE.

17             AND AGAIN, YOU KNOW, WE AGREE ON THE FUNCTION.  THE

18        FUNCTION IS TO CAPTURE, DIGITIZE, AND COMPRESS, AND THAT'S

19        EXACTLY THE LANGUAGE THAT WE SEE IN CLAIM 9.

20             AND SO --

21                  THE COURT:  WHAT ABOUT THE FACT THAT THE COMPUTER IN

22        9 IS NOT MOBILE AND WHATEVER THE REMOTE UNIT IS IN CLAIM 1 IS?

23        WHY WOULD THEY NECESSARILY HAVE THE SAME STRUCTURE?

24                  MR. JOHNSON:  WELL, I THINK CLAIM 9 COULD COVER A

25        REMOTE UNIT THAT IS MOBILE, AND SO I DON'T SEE IT NECESSARILY
```

1    BEING SO LIMITED TO THE FACT THAT IT'S -- THAT IT HAS TO BE --

2    THAT THERE HAS TO BE A DISTINCTION BETWEEN THE TWO.

3        CLAIM 1 REFERS SPECIFICALLY TO A MOBILE REMOTE UNIT.

4        BUT CLAIM 9 COULD COVER REMOTE OR -- I MEAN, SORRY --

5    MOBILE OR OTHERWISE.

6            THE COURT:  LET'S GO TO THE FINAL TERM THAT'S IN THE

7    '239.

8            MR. JOHNSON:  AND JUST VERY BRIEFLY, YOUR HONOR,

9    CLAIMS 5 AND 6 ARE IMPORTANT BECAUSE CLAIMS 5 AND 6 TALK ABOUT

10   VIDEO CAPTURED DEVICES.  IT DOESN'T SAY -- IT DOESN'T SAY

11   "CARDS."  THE TERM "DEVICE," THE WORD "DEVICE" THERE IS BROADER

12   THAN "CARDS."

13       AND SO, YOU KNOW, I AGREE THAT -- AND WHEN YOU LOOK BACK AT

14   COLUMN 4, THE LANGUAGE THAT MR. SELWYN POINTED YOU TO AROUND

15   LINE 43, 44, IT TALKS ABOUT "OPERATES WITH THE VIDEO CARD AND

16   CAPTURE MODULE TO CAPTURE, DIGITIZE, AND COMPRESS THE VIDEO

17   SIGNAL INTO A DATA FILE."

18       AND THIS IS THE SPECIFICATION AS IT WAS FILED.  YOU HEARD

19   THAT, DURING THE TUTORIAL, THAT CLAIM 9 DIDN'T EXIST BACK WHEN

20   IT WAS ORIGINALLY FILED.

21       SO -- BUT THE SPECIFICATION ITSELF TALKS ABOUT A CAPTURE

22   MODULE, LINES 44 AND 43, COLUMN 4, TO CAPTURE, DIGITIZE, AND

23   COMPRESS THE VIDEO SIGNAL TO A DATA FILE.

24       AND AT THE VERY LEAST, YOUR HONOR, WE SUBMIT THAT -- AND

25   USING THE MICROCHEMICAL FEDERAL CIRCUIT CASE FROM 1999, WHEN

1    THERE ARE MULTIPLE EMBODIMENTS IN THE SPECIFICATION THAT

2    CORRESPOND TO A CLAIMED FUNCTION, IF IT'S A VIDEO CARD ON THE

3    ONE HAND AND A VIDEO CAPTURE MODULE ON THE OTHER HAND, THEN THE

4    PROPER APPLICATION OF 112(6) DICTATES THAT YOU LOOK AT THOSE

5    ELEMENTS.

6        SO WE'D SUBMIT THAT ONE POSSIBLE CONSTRUCTION IS "A VIDEO

7    CAPTURE MODULE" OR "AN AUDIO AND VIDEO CARD HAVING A VIDEO

8    CAPTURE MODULE."

9            THE COURT:  WELL, THEN YOU'RE BASICALLY MAKING IT

10   "COMPOSITE," WHICH "COMPOSITE" INHERENTLY IS NOT JUST ONE.

11       BUT I HEAR YOU, BUT I'D LIKE TO MOVE ON IF THAT'S ALL

12   RIGHT.

13           MR. JOHNSON:  OKAY.

14           THE COURT:  OKAY.  LET'S GO TO THE FINAL TERM.  YOU

15   WERE GOING TO GET BACK TO ME AS TO WHETHER RADIO TRANSMISSION,

16   CELL PHONE, AND PHONE WERE EXCLUSIVELY ANALOG BACK IN 1994.

17           MR. JOHNSON:  WELL, THE -- THEY WEREN'T EXCLUSIVELY

18   ANALOG BACK THEN.  THERE WERE DIGITAL ONES.  EUROPE WAS A

19   LITTLE BIT AHEAD OF THE UNITED STATES.

20       BUT AT THIS PORTION, IN ORDER TO TRANSMIT AND TO RECEIVE,

21   THOSE TRANSMISSIONS OCCUR -- I MEAN, THEY'RE ANALOG AND SO

22   THEY'RE DIGITAL TO ANALOG CONVERTERS, AND THIS IS ABOUT THE

23   TIME WHEN -- YOU KNOW, DIGITAL ELECTRONICS HAS BEEN AROUND FOR

24   A LONG TIME.  THERE WAS -- THERE WERE DIGITAL PHONES THAT WERE

25   IN EXISTENCE AT THE TIME, AND THEY WERE NEW, BUT THEY WERE

1    RIGHT ON THE CUSP.

2         AND SO WHEN YOU LOOK AT, YOU KNOW, THE AREA OF DISPUTE,

3    AGAIN, WITH RESPECT TO -- AND SLIDE 22, PLEASE, RYAN -- WITH

4    RESPECT TO "THE MEANS FOR TRANSMITTING THE COMPOSITE SIGNAL"

5    IS, YOU KNOW, ARE RADIO TRANSMITTERS PART OF THE CORRESPONDING

6    STRUCTURE?

7         AND, YES, THE SPEC DISCLOSES TELEPHONES, CELLULAR, RADIO

8    FREQUENCY, AND OTHER TELEMETRIC FREQUENCIES, AND WE TALKED A

9    LITTLE BIT ABOUT TELEMETRIC FREQUENCIES LAST TIME.

10        BUT THE SPEC DISCLOSES RADIO TRANSMITTERS, COLUMN 9, LINES

11   38 TO 45, AND ALSO COLUMN 10, LINES 42 TO 49.

12        IT TALKS ABOUT FILES CAN BE TRANSMITTED USING RADIO

13   FREQUENCIES, CELLULAR TELEPHONES IN THE REMOTE ARE REPLACED

14   WITH RADIO TRANSMITTERS.

15        COLUMN 10 --

16             THE COURT:  DO YOU HAVE MORE STRUCTURE FOR ME ON THE

17   TELEMETRIC FREQUENCY?

18             MR. JOHNSON:  WHAT I HAVE WITH RESPECT TO THE

19   TELEMETRIC FREQUENCIES, AND THERE ARE OBVIOUSLY REFERENCES IN

20   THE SPEC --

21             THE COURT:  RIGHT.

22             MR. JOHNSON:  -- IS CLAIM 3 REQUIRES A STRUCTURE TO

23   INCLUDE RADIO FREQUENCIES AND OTHER TELEMETRIC FREQUENCIES.

24        DURING PROSECUTION, THERE WAS A 112 REJECTION, AND THE

25   APPLICANT EXPLAINED WHAT OTHER TELEMETRIC FREQUENCIES WERE AND

1      SAID, AS A MATTER OF PRACTICALITY, TELEMETRIC FREQUENCY COULD

2      BE ANY FREQUENCY ON WHICH DATA MAY BE TRANSMITTED.

3          AND AFTER THIS EXPLANATION WAS PROVIDED, THE 112

4      INDEFINITENESS REJECTION WAS WITHDRAWN.

5              THE COURT:  BUT WHAT'S THE STRUCTURE THAT'S DISCLOSED

6      THERE?

7              MR. JOHNSON:  WELL, IT'S THE -- IT'S ANY FREQUENCY ON

8      WHICH DATA CAN BE TRANSMITTED.

9          SO IT'S THE STRUCTURE OR THE FREQUENCY ON WHICH DATA CAN BE

10     TRANSMITTED.

11             THE COURT:  THAT JUST SEEMS CIRCULAR.  THE STRUCTURE

12     IS THE FREQUENCY --

13             MR. JOHNSON:  RIGHT.

14             THE COURT:  -- ON WHICH DATA MAY BE TRANSMITTED?

15     SO --

16             MR. JOHNSON:  SO THEY'RE TELLING -- JUST -- WE HAVE

17     RADIO TRANSMITTERS, AND THE IDEA HERE, ULTIMATELY -- AND I

18     DON'T WANT TO GET BOGGED DOWN ON THIS BECAUSE I THINK WHAT'S

19     IMPORTANT ARE THE RADIO TRANSMITTERS HERE --

20             THE COURT:  BUT RADIO TRANSMITTERS END.  I'M

21     CONCERNED WITH FREQUENCY TRANSMITTER.  I FEEL AWKWARD SAYING

22     "THE STRUCTURE IS ANY FREQUENCY ON WHICH DATA MAY BE

23     TRANSMITTED."  THAT --

24             MR. JOHNSON:  I UNDERSTAND THE HESITATION.

25             THE COURT:  YEAH.

1          MR. JOHNSON:  A PERSON OF ORDINARY SKILL READING IT

2     WOULD UNDERSTAND THAT TELEMETRIC FREQUENCIES ARE BROADER AND

3     COULD INCLUDE MICROWAVE FREQUENCIES, COULD INCLUDE FREQUENCIES

4     TRANSMITTED VIA SATELLITE, AND THOSE ARE ALL DESCRIBED IN THE

5     SPECIFICATION.

6          SO THEY WOULD BE TRANSMITTERS THAT TRANSMIT DATA AT THOSE

7     FREQUENCIES, ESSENTIALLY.

8          BUT I DO WANT TO ADDRESS, YOUR HONOR, THIS ISSUE OF MODEM,

9     BECAUSE THIS, I THINK, IS -- THIS IS IMPORTANT.

10          AND FROM SAMSUNG'S STANDPOINT, THE SPEC, YOU KNOW,

11     INDICATES THAT THE MODEM PERFORMS STEPS THAT ARE PRIOR TO THE

12     FUNCTION OF TRANSMITTING THE COMPOSITE SIGNAL.  WE TALKED ABOUT

13     THIS LAST TIME A LITTLE BIT.

14          BUT I WANT TO DRAW YOUR ATTENTION, YOUR HONOR, TO CLAIM 11

15     OF THE PATENT BECAUSE CLAIM 11 IS DEPENDENT AND IT TALKS ABOUT

16     "AN APPARATUS ACCORDING TO CLAIM 9 WHEREIN THE REMOTE UNIT

17     INCLUDES A TRANSMITTER CONNECTED TO EACH COMPUTER INTERFACE

18     SUCH THAT EACH TRANSMITTER TRANSMITS."

19          SO CLAIM 11 EXPLAINS THAT A TRANSMITTER IS DIFFERENT THAN A

20     COMPUTER INTERFACE, AND THE TRANSMITTER IS ACTUALLY THE

21     STRUCTURE THAT DOES THE TRANSMITTING.

22          GOING BACK TO COLUMN 4, LINES 25 TO 27, "THE REMOTE UNIT

23     ALSO HAS UP TO FOUR COMPUTER INTERFACES, SUCH AS MODEMS."  IT

24     DOESN'T SAY, YOU KNOW, "ONLY MODEMS."  IT SAYS "SUCH AS

25     MODEMS."

1    AND THE STRUCTURE HERE THAT WE'RE REALLY TALKING ABOUT IS

2    COMPUTER INTERFACES, NOT MODEMS, BECAUSE THERE ARE OTHER

3    INTERFACES THAT WOULD FIT AND ARE DESCRIBED IN A WAY THAT A

4    PERSON OF ORDINARY SKILL IN THE ART WOULD UNDERSTAND, YOU KNOW,

5    MODEMS TO BE NOT PART OF THE TRANSMISSION.

6    AND, IN FACT, WHEN YOU LOOK AT COLUMN 8 AND COLUMN 14, AND

7    THIS IS SLIDE 30 OF OUR DECK, THE SPECIFICATION DESCRIBES THESE

8    PRE-TRANSMISSION FUNCTIONS OF THE MODEM.

9    AND, AGAIN, IT'S THE -- THE MODEM SERVES AS AN INTERFACE.

10    THE COURT:  BUT I GUESS WHAT'S DOING THE -- WHAT IS

11    DOING THE CONVERSION FROM ONE FORMAT, WHETHER IT'S DIGITAL OR

12    ANALOG, TO THE OTHER?  I DON'T REALLY SEE THE COMPUTER

13    INTERFACE DOING THAT.

14    MR. JOHNSON:  WELL, THE COMPUTER INTERFACE DOES THE,

15    DOES THE MODULATION.  IT BASICALLY SETS UP THE -- IT SETS UP

16    THE DATA BEFORE IT'S TRANSMITTED, SO IT'S -- IT CONDITIONS THE

17    DATA, IF YOU WILL.

18    SO IT CAN -- YOU KNOW, THERE CAN BE CIRCUITRY THAT WOULD DO

19    THE CONDITIONING, THAT WOULD DO THE CONVERSION.  AND THAT'S, IN

20    FACT, HOW IT TYPICALLY WORKS.

21    BUT TO HAVE -- TO HAVE -- I DON'T THINK THE STRUCTURE IS SO

22    LIMITED TO ABSOLUTELY REQUIRE A MODEM HERE, BECAUSE THE

23    SPECIFICATION TALKS ABOUT THE FACT THAT THESE ARE COMPUTER

24    INTERFACES, AND COMPUTER INTERFACES ARE BROADER.  THEY CAN

25    BE -- EVEN IF THEY'RE -- EVEN IF YOU DISAGREE WITH ME, YOUR

1    HONOR, THAT THE MODEM IS NOT PART OF THE TRANSMISSION,

2    "COMPUTER INTERFACES" IS A BETTER TERM THAN "MODEM" BECAUSE THE

3    SPEC TALKS ABOUT THE FACT THAT A MODEM IS AN EXAMPLE OF A

4    COMPUTER INTERFACE, AND A COMPUTER INTERFACE ITSELF IS

5    STRUCTURE.  IT'S WHAT INTERFACES THE COMPUTER TO THE

6    TRANSMISSION.

7        AND A PERSON OF ORDINARY SKILL, AGAIN, READING THIS WOULD

8    UNDERSTAND THAT AN INTERFACE IS STRUCTURE IN AND OF ITSELF, AND

9    IT CAN BE A MODEM, IT CAN BE CIRCUITRY, IT CAN BE OTHER THINGS

10   BEYOND JUST A MODEM.

11       SO LIMITING THE STRUCTURE HERE TO A PARTICULAR MODEM WE

12   THINK IS INCORRECT.

13           THE COURT:  YOUR POSITION IS THAT THE MEANS FOR

14   TRANSMITTING IS ONLY THAT FINAL STEP OF ACTUALLY BROADCASTING

15   THE SIGNAL?

16           MR. JOHNSON:  THAT'S RIGHT.

17           THE COURT:  THAT'S YOUR POSITION?

18           MR. JOHNSON:  AND THAT'S WHY -- WHEN YOU LOOK AT THE

19   CLAIM, IT TALKS ABOUT --

20           THE COURT:  AND WHY DO YOU GET THAT, BECAUSE THAT'S

21   JUST THAT VERY LAST STEP?

22           MR. JOHNSON:  RIGHT.  I GET IT FROM THE ACTUAL

23   LANGUAGE, "MEANS FOR TRANSMITTING THE COMPOSITE SIGNAL."

24       I MEAN, IT'S -- YOU KNOW, EVERYTHING THAT HAPPENS BEFORE

25   THEN, THERE ARE STEPS THAT OCCUR TO GET THE -- TO GET THE DATA

1      READY TO BE TRANSMITTED.

2          BUT THIS MEANS FOR TRANSMITTING THE COMPOSITE SIGNAL IS

3      JUST THAT.  IT'S WHEN THE DATA IS ACTUALLY BEING TRANSMITTED.

4          AND THE SPECIFICATION TALKS ABOUT MODEMS IN THE CONTEXT OF

5      THINGS THAT HAPPEN BEFORE THE TRANSMISSION.

6          AND IN FACT, IT TALKS ABOUT IT, AND PARTICULARLY AT COLUMN

7      9, LINES 38 TO 45, AND COLUMN 10, LINES 42 TO 49.

8          THIS IS SLIDE 31.

9          IT TALKS ABOUT THE MODEM IN CONJUNCTION WITH CELLULAR AND

10     LAND LINE EMBODIMENTS, WHICH MAKES SENSE.  AGAIN, YOU'RE

11     TALKING ABOUT --

12              THE COURT:  I'M SORRY.  DID YOU GIVE ME THE -- COLUMN

13     10, LINE 42?

14              MR. JOHNSON:  42 TO 49.

15              THE COURT:  THAT TO ME JUST, JUST IS DISCUSSING

16     MODEMS.  IT'S NOT DISCUSSING ANYTHING ELSE AS IN LIEU OF A

17     MODEM.  THEY'RE SORT OF THE SAME FUNCTION.

18              MR. JOHNSON:  WELL, IF YOU LOOK AT THESE TWO SEGMENTS

19     TOGETHER, YOUR HONOR, CLAIM -- COLUMN 10 --

20              THE COURT:  WHICH?  I'M SORRY.

21              MR. JOHNSON:  LET'S START WITH COLUMN 9, 38 TO 45.

22              THE COURT:  38 TO 45, OKAY.

23              MR. JOHNSON:  THIS IS TALKING ABOUT CELLULAR AND LAND

24     LINE EMBODIMENTS, AND IT'S TALKING ABOUT IT, YOU KNOW, "IN

25     AREAS WHICH ARE INACCESSIBLE TO STANDARD TELEPHONE LINES AND

1    OUTSIDE CELLULAR TELEPHONE SALES.  FILES CAN BE TRANSMITTED

2    USING RADIO FREQUENCIES.  IN ORDER TO ACCOMPLISH THIS, THE

3    CELLULAR TELEPHONES IN REMOTE AREAS ARE REPLACED WITH RADIO

4    TRANSMITTERS.  EACH TRANSMITTER OPERATES USING DIFFERENT

5    FREQUENCIES TO KEEP THEM ALL SEGREGATED."

6         THE INTERFACE THAT'S DESCRIBED IN THE PATENT, IN THE MODEMS

7    ARE DONE IN THE CONTEXT OF CELLULAR AND LAND LINE EMBODIMENTS.

8         WHEN YOU GET TO THE RADIO AND TRANSMISSION EMBODIMENT,

9    WHICH IS IN COLUMN 10, LINES 42 TO 49, IT DOESN'T DESCRIBE AN

10    INTERFACE.  IT DOESN'T DESCRIBE THE MODEM.  IT TALKS ABOUT JUST

11    RADIO TRANSMITTERS.

12         SO MY POINT IS THAT WHEN YOU'RE TALKING ABOUT THE ACTUAL

13    TRANSMISSION AND WHEN YOU'RE LOOKING AT THE CLAIM LANGUAGE, THE

14    TRANSMISSION IS JUST THAT, IT'S PURE TRANSMISSION.  IT'S NOT

15    WHAT HAPPENS BEFORE.

16         AND THE MODEM IS BEFORE THE TRANSMISSION.

17              THE COURT:  OKAY.  ALL RIGHT.

18         LET ME GIVE MR. SELWYN --

19         SO LET ME ASK, BEFORE YOU STEP AWAY FROM THE PODIUM,

20    MR. JOHNSON, YOU WOULD RATHER HAVE "A SET OF ONE OR MORE

21    MODEMS," AS WAS IN MY TENTATIVE, YOU'D RATHER HAVE "ONE OR MORE

22    INTERFACES IN A ROOM"?

23              MR. JOHNSON:  I'D RATHER HAVE "ONE OR MORE COMPUTER

24    INTERFACES," PERIOD.

25         AND IF YOU LOOK AT COLUMN 7, WHICH IS DEPENDENT UPON 3,

```
1    WHICH IS DEPENDENT UPON 1, IT TALKS ABOUT "COMPUTER INTERFACES

2    WHEREIN THE MEANS FOR TRANSMITTING THE COMPOSITE SIGNAL INCLUDE

3    AT LEAST ONE COMPUTER INTERFACE," SORRY, "AT LEAST ONE

4    INTERFACE INSTALLED IN CONJUNCTION WITH THE REMOTE UNIT."

5         IT DOESN'T SAY "MODEM" THERE.

6         AND MY POINT IS THAT I THINK "MODEM" IS OVERLY RESTRICTIVE.

7    THE SPEC, EVEN AT COLUMN 4, TALKS ABOUT "COMPUTER INTERFACE."

8         AND IF YOUR HONOR IS INCLINED TO DISAGREE WITH ME AS TO

9    WHETHER MODEM IS PART OF TRANSMISSION OR NOT, AT THE VERY

10   LEAST, INSTEAD OF "MODEM," IT SHOULD SAY "COMPUTER INTERFACE."

11             THE COURT:  OKAY.  LET ME HEAR FROM MR. SELWYN THEN.

12             MR. SELWYN:  A FEW POINTS, YOUR HONOR.

13        FIRST, A COMPUTER INTERFACE IS TRYING TO CLAIM PURE

14   FUNCTION.  THAT'S A GENERIC STRUCTURE.  IT GIVES NO

15   SPECIFICITY.

16        IF THAT IS WHAT IS STRUCTURE, THEN WE'RE GOING TO HAVE AN

17   INDEFINITENESS PROBLEM WITH THIS CLAIM.

18        I HEARD MR. JOHNSON SAY THAT THE PATENT IS PURE

19   TRANSMISSION AND THE MODEM IS NOT ASSOCIATED WITH THAT.

20        AGAIN, IF THAT'S THE READ, THERE WILL BE AN INDEFINITENESS

21   ISSUE.

22        IN FACT, THE SPECIFICATION MAKES QUITE CLEAR THAT THE MODEM

23   IS PERFORMING THE TRANSMITTING FUNCTION.  IT IS THE ONLY

24   DISCLOSED STRUCTURE TO DO THAT.

25        AND BECAUSE WE'RE TALKING ABOUT 112(6), IT'S NOT IMPORTANT
```

```
 1    WHETHER ONE OF ORDINARY SKILL IN THE ART COULD DEVISE A METHOD

 2    USING A COMPUTER INTERFACE OR TO THINK ABOUT COMPUTER

 3    INTERFACES FOR PERFORMING THE TRANSMISSION FUNCTION.  THAT'S A

 4    QUESTION OF ENABLEMENT.

 5        HERE WE'RE FOCUSSED ON 112(6), AND THE EXAMPLES MATTER.

 6    THE EXAMPLE HERE, AND THE ONLY EXAMPLE, IS "A MODEM FOR

 7    PERFORMING THE TRANSMITTING FUNCTION."  THEREFORE, THE

 8    CORRESPONDING STRUCTURE SHOULD BE CONSTRUED AS "MODEM" BECAUSE

 9    THAT'S THE ONLY THING THAT IS DISCLOSED FOR PERFORMING THAT

10    FUNCTION.

11            THE COURT:  WELL, WHY NOT JUST SAY "INTERFACES SUCH

12    AS MODEMS"?

13            MR. SELWYN:  BECAUSE "INTERFACES" IS GENERIC.  THAT'S

14    CLAIMING ALL MEANS OF TRANSMISSION.

15        YOU SHOULD BE LIMITED TO WHAT IS DISCLOSED FOR PERFORMING

16    THAT FUNCTION.  THE STRUCTURE THAT'S DISCLOSED IS A MODEM.

17        "COMPUTER INTERFACE" IS LIKE CLAIMING COMPUTERS.  IT'S JUST

18    GENERIC.  IT DOESN'T GIVE ANY SPECIFICITY AS TO WHAT THE

19    CORRESPONDING STRUCTURE WOULD BE.

20            THE COURT:  ALL RIGHT.  DO YOU WANT TO ADDRESS THE

21    SPECIFIC CITATIONS TO THE SPECIFICATION AND TO CLAIM 7?  YOU

22    DON'T THINK THOSE ARE DISCLOSING OTHER STRUCTURES THAT ARE

23    MODEMS?

24            MR. SELWYN:  NO.  IT'S NOT DISCLOSING ANY STRUCTURE

25    FOR PERFORMING A TRANSMISSION ANY MORE THAN "TELEMETRIC
```

1    FREQUENCY" DISCLOSES A STRUCTURE.

2         TELEMETRIC FREQUENCIES ARE FREQUENCIES, ALL FREQUENCIES.

3    THAT'S NOT STRUCTURE.  THAT'S THE FUNCTION THAT IS PERFORMED BY

4    THE MODEM FOR TRANSMITTING OVER VARIOUS FREQUENCIES.

5              THE COURT:  LET ME ASK, DO YOU HAVE ANY PROBLEMS WITH

6    THE TENTATIVE NOT LISTING ALL OF THE SOFTWARE SEQUENCES?

7              MR. SELWYN:  RESPECTFULLY, WE DO.  WE DO BELIEVE THAT

8    THE TENTATIVE SHOULD HAVE INCLUDED "ADDITIONAL SOFTWARE

9    SEQUENCES THAT ARE NECESSARY FOR PERFORMING THE RECITED

10   FUNCTION."  I'M HAPPY TO GO THROUGH THAT.

11             THE COURT:  WELL, I REMEMBER WHAT YOU SAID FROM THE

12   HEARING, THAT YOU THOUGHT IT HAS TO HAVE THE CAPABILITY TO DO

13   IT, EVEN IF IT'S NOT ACTUALLY -- IF ALL FIVE SEQUENCES AREN'T

14   ACTUALLY EXERCISED.  IT HAS TO HAVE THE ABILITY TO DO IT.

15             MR. SELWYN:  WELL, YES.  AND THE TENTATIVE DIDN'T

16   INCLUDE SEVERAL OF THE STEPS THAT ARE IDENTIFIED IN THE

17   TRANSFER SOFTWARE SEQUENCE B.

18             THE COURT:  RIGHT.  BUT THEY'RE THE ONES THAT THE

19   PATENT SAYS DON'T HAVE TO BE.

20             MR. SELWYN:  WELL, I DON'T THINK THAT'S QUITE RIGHT.

21        SO THE TENTATIVE OMITTED STEPS 1 THROUGH 3 OF THE SOFTWARE

22   SEQUENCE.  STEPS 1 AND 2 CONTROL THE TRANSFER PROCESS,

23   INCLUDING THE COMMUNICATION PORTS, AND IT DESCRIBES THE PROGRAM

24   THAT CONTROLS THE TRANSFER.

25        STEP 3 IS FOR THE INITIATION OF THE FILE SPLITTING

1    SOFTWARE.

2        THESE ARE, IN FACT, PART OF THE SOFTWARE SEQUENCE THAT

3    SAMSUNG ITSELF INCLUDED IN THE JOINT CLAIM CONSTRUCTION AS

4    CORRESPONDING STRUCTURE.

5            THE COURT:  WELL, YOU ALREADY KNOW THAT I CITED LAST

6    WEEK THE COLUMN AND LINE NUMBERS WHERE THE SPLITTING IS

7    OPTIONAL, AND THE OTHER SEQUENCING STEP THAT I EXCLUDED IS ALSO

8    OPTIONAL PER THE CLAIM LANGUAGE.

9        SO -- ALL RIGHT.

10       WELL, I DON'T HAVE ANYTHING MORE.  THANK YOU ALL VERY MUCH.

11           MR. SELWYN:  THANK YOU, YOUR HONOR.

12           MR. JOHNSON:  YOUR HONOR, JUST BRIEFLY, JUST TO

13   RESPOND TO TWO POINTS QUICKLY?

14           THE COURT:  OKAY, SURE.

15           MR. JOHNSON:  THIS NOTION THAT COMPUTER INTERFACE IS

16   NOT STRUCTURE I THINK IS PROBLEMATIC AND INCORRECT FOR SEVERAL

17   REASONS.

18           THE COURT:  OKAY.

19           MR. JOHNSON:  I MEAN, THIS COMPUTER RIGHT HERE IS

20   OBVIOUSLY A STRUCTURE.  A COMPUTER IS STRUCTURE.  IT'S NOT --

21   IT'S NOT A FUNCTION.  IT'S NOT A FUNCTIONAL IDEA.

22       COMPUTER INTERFACE ITSELF IS FUNCTION, AND A PERSON OF

23   ORDINARY SKILL WOULD UNDERSTAND THAT IT COULD BE SUCH AS A

24   MODEM, OR IT COULD BE CIRCUITRY, OR IT COULD BE OTHER THINGS AS

25   WELL.

1          BUT COMPUTER INTERFACE, IN AND OF ITSELF, IS STRUCTURE.

2          AND JUST TO REWIND THE TAPE A LITTLE BIT, WHEN WE'RE

3     TALKING ABOUT MODEMS, WHEN WE'RE IN THE CELL PHONE WORLD, WHICH

4     THIS PATENT TALKS ABOUT, THERE'S NO NEED FOR A MODEM, WHICH IS

5     WHY THERE'S A DISTINCT SORT OF DESCRIPTION WHEN YOU LOOK AT THE

6     SPECIFICATION.

7          WHEN THEY'RE TALKING ABOUT THE CELL PHONE WORLD, IT TALKS

8     ABOUT RADIO TRANSMITTERS AND THE MODEM IDEA DOESN'T COME UP IN

9     THE CONTEXT OF RADIO TRANSMITTERS.

10         "MODEM," IN THE SPEC, COMES UP IN THE CONTEXT WHEN IT'S

11    TALKING ABOUT LAND LINES, FOR EXAMPLE.

12         SO THERE'S -- THERE IS A DISTINCTION, WHICH IS WHY, FROM

13    SAMSUNG'S STANDPOINT, READING IN A MODEM TO BE REQUIRED AS THE

14    STRUCTURE IS INCONSISTENT WITH THE SPECIFICATION BECAUSE THE

15    SPECIFICATION TALKS ABOUT, SURE, USING MODEMS IN SOME

16    INSTANCES, BUT NOT USING THEM IN OTHER INSTANCES.

17         SO IT'S NOT NECESSARILY STRUCTURE THAT IS REQUIRED TO

18    PERFORM THE FUNCTION HERE, AND THE FUNCTION IS TRANSMITTING THE

19    COMPOSITE SIGNAL.

20              THE COURT:  BUT THE STRUCTURE HAS TO BE DISCLOSED IN

21    THE SPEC, AND IT SEEMS LIKE THE STRUCTURE THAT YOU CLAIM IS

22    DISCLOSED IS IN CLAIM 7 AND NOT IN THE SPEC.

23         I THINK THAT'S A LITTLE TOO OBLIQUE IN THE TWO COLUMN

24    CITATIONS THAT YOU POINTED TO.

25              MR. JOHNSON:  WELL, CLAIM 7 IS PART OF THE

1    SPECIFICATION, I MEAN, AND THERE ARE PLENTY OF CASES THAT TALK

2    ABOUT THAT IN THE CONTEXT.

3        BUT THERE ARE -- THERE ARE EXAMPLES -- I MEAN, I DON'T WANT

4    TO GO THROUGH OUR BRIEF AGAIN, YOUR HONOR, BUT I'LL JUST DIRECT

5    YOUR ATTENTION, IF YOU COULD, TO LOOK AT THE PORTIONS OF THE

6    SPECIFICATION I REFERRED TO BECAUSE THERE IS A DISTINCTION

7    BETWEEN THE CELLULAR WORLD AND THESE OTHER WORLDS, AND MODEMS

8    ARE DESCRIBED IN THE CONTEXT OF USING TRANSMISSIONS ACROSS LAND

9    LINES.

10        IT GOES BACK TO THE TIMEFRAME OF THESE MODEMS, REMEMBER,

11    AND TAKING THE TELEPHONE RECEIVER AND PUTTING IT IN THIS SORT

12    OF BLACK BOX MODEM AND, YOU KNOW, IT THEN TRANSMITS INFORMATION

13    ACROSS TELEPHONE LINES AND LAND LINES LIKE THAT.

14        THAT'S NOT WHAT THIS PATENT IS STRICTLY LIMITED TO, WHICH

15    IS WHY THE NOTION OF A COMPUTER INTERFACE, IF ANYTHING, IS

16    STRUCTURE AND IT'S MORE ACCURATE THAN SIMPLY LIMITING IT TO THE

17    MODEM.

18            MR. SELWYN:  BUT THE APPLICANTS CHOSE TO WRITE THEIR

19    CLAIMS IN 112(6) FORMAT, SO IT'S NOT BEING LIMITED TO THE

20    STRUCTURE THAT IS DISCLOSED.  YOU GET THE STRUCTURE THAT'S

21    DISCLOSED AND EQUIVALENCE.

22        IF THEY WANTED TO SHOW ADDITIONAL STRUCTURE FOR THE OTHER

23    TYPES OF TRANSMISSIONS THAT MR. JOHNSON REFERRED TO, THEY COULD

24    HAVE.  THEY DIDN'T.  THEY REFERRED TO "MODEM."  THAT'S THE

25    CORRESPONDING STRUCTURE.

1     MR. JOHNSON:  BUT SAMSUNG -- I MEAN, THEY DID IT BY

2     REFERRING TO IT AS "COMPUTER INTERFACE."  THAT'S WHY "COMPUTER

3     INTERFACE" IS DESCRIBED IN THE SPEC, BECAUSE IT ISN'T JUST

4     LIMITED TO A MODEM, AND THAT IS -- THINK ABOUT THE INTERFACE.

5     THINK ABOUT THE INTERFACE THAT SITS ON THE BACK OF ANY

6     COMPUTER.  THERE IS STRUCTURE.  THAT IS STRUCTURE.  THAT IS NOT

7     SOME AMORPHOUS CONCEPT OR A FUNCTION.  THAT IS STRUCTURE.

8         AND JUST, YOUR HONOR, JUST BECAUSE YOU TOUCHED ON IT

9     BRIEFLY WITH RESPECT TO THE SOFTWARE ISSUE -- AND THIS IS SLIDE

10    38 IN OUR PRESENTATION -- WITH RESPECT TO THE COURT'S TENTATIVE

11    CONSTRUCTION, THERE ARE TWO FUNCTIONS THAT WE BELIEVE ARE NOT

12    PART OF THE MEANS FOR TRANSMITTING, AND THAT IS "INITIALIZING

13    ONE OR MORE PORTS" AND "OBTAINING THE STORED DATA FILES."

14        WE BELIEVE THAT THOSE ARE PRETRANSMISSION FUNCTIONS THAT

15    ARE DONE SEPARATE AND APART FROM THE -- AGAIN, THE FUNCTION

16    HERE THAT WE'RE TALKING ABOUT IS "MEANS FOR TRANSMITTING THE

17    COMPOSITE SIGNAL," "TRANSMITTING THE SIGNAL."

18        "INITIALIZING ONE OR MORE PORTS" IS NOT PART OF THAT, NOR

19    IS "OBTAINING THE STORED DATA FILES."  THAT DOES NOT RELATE

20    TO --

21        THE COURT:  CAN YOU GIVE ME ANY COLUMN OR LINE NUMBER

22    CITATION FOR THAT?

23        MR. JOHNSON:  THE INITIALIZING ONE OR MORE PORTS,

24    COLUMN 8, LINES 26 TO 27; AND THE STORED FILES -- ONE SECOND.

25        MR. SELWYN:  AND WHILE HE'S LOOKING, YOUR HONOR, I

1    WOULD JUST RESPOND THAT THESE ARE STEPS THAT ARE NECESSARY FOR

2    PERFORMING THE FUNCTION.  YOU CANNOT PERFORM THE TRANSMITTING

3    FUNCTION WITHOUT INITIALIZING THE PORTS AND OBTAINING THE

4    STORED DATA FILES IN WHAT'S DISCLOSED.

5             MR. JOHNSON:  AND, AGAIN, JUST A FINAL POINT.

6        THE TRANSMISSIONS PORTION OF THE SPEC REALLY STARTS AT

7    COLUMN 9, AND THE PORTION THAT I JUST REFERRED TO, THE

8    INITIALIZING PORTS AND STORING THE DATA FILES ARE DISCUSSED

9    BEFORE THAT, NOT IN THE CONTEXT OF TRANSMISSION.

10       AND WHEN YOU THINK ABOUT IT JUST FROM HOW A PERSON OF

11   ORDINARY SKILL IN THE ART WOULD UNDERSTAND IT, THEY WOULD NOT

12   SEE THAT "INITIALIZING THE PORTS" OR "OBTAINING THE STORED DATA

13   FILE" MEETS THE FUNCTION OF "TRANSMITTING THE COMPOSITE

14   SIGNAL."  THOSE ARE THINGS THAT HAPPEN BEFORE THE COMPOSITE

15   SIGNAL IS TRANSMITTED.

16            MR. SELWYN:  IT ALL COMES UNDER THE HEADING OF

17   TRANSFER SOFTWARE SEQUENCE B.  THAT IS WHAT IS DISCLOSED FOR

18   PERFORMING THE SEQUENCE OF TRANSFER IN THE PATENT, ALL OF THOSE

19   STEPS.

20            THE COURT:  ALL RIGHT.  SO FOR YOUR CITATIONS, WHAT,

21   COLUMN 8, MR. JOHNSON?  WHERE DO I FIND THAT IN THE PATENT?

22            MR. JOHNSON:  WELL, "INITIALIZING ONE OR MORE PORTS,"

23   AS YOUR HONOR RECOGNIZES, IS DISCUSSED AT COLUMN 8 --

24            THE COURT:  OKAY.

25            MR. JOHNSON:  -- LINES 26 TO 27.

1          AND MY POINT IS THAT TALKS -- YOU KNOW, THE TRANSMISSION IS

2     REALLY DESCRIBED STARTING AT THE TOP OF COLUMN 9.

3          AND WHEN, AGAIN, YOU'RE LOOKING AT IT FROM A PERSON OF

4     ORDINARY SKILL READING WHAT THIS PATENT DESCRIBES, INITIALIZING

5     THE PORTS AND OBTAINING THE STORED DATA INFORMATION IS NOT PART

6     OF THE ACTUAL TRANSMISSION.

7          AND, OF COURSE, I MEAN, APPLE -- JUST THINK ABOUT IT.

8     APPLE WANTS AS MUCH STRUCTURE AS POSSIBLE TO BE READ INTO THIS

9     LIMITATION BECAUSE THEY'RE GOING TO TURN AROUND AND ARGUE THAT

10    THEY DON'T HAVE THAT STRUCTURE AS PART OF THIS, THAT THEY DON'T

11    DO THAT, AND WHEN YOU LOOK AT THE CONTEXT OF HOW THE PATENT IS

12    WRITTEN AND YOU LOOK AT THE SPECIFIC FUNCTION WHICH IS, WE

13    AGREE, TRANSMITTING THE COMPOSITE SIGNAL, INITIALIZING THE PORT

14    AND STORING THE DATA FILE IS NOT PART OF TRANSMITTING.

15          THE COURT:  WHERE -- SO YOU CITE TO COLUMN 8, LINES

16    26 THROUGH 27 FOR "INITIALIZING ONE OR MORE PORTS."

17          WHAT DO YOU CITE TO FOR "OBTAINING THE STORED DATA FILES"

18    NOT BEING PART OF THE SOFTWARE SEQUENCE?

19          MR. JOHNSON:  THAT'S WHAT I WAS JUST LOOKING FOR.

20          THE COURT:  OKAY.

21          MR. SELWYN:  AND CAN I JUST DIRECT YOUR HONOR TO

22    COLUMN 8, LINES 23 THROUGH 25, WHICH EXPLICITLY TELL ONE OF

23    ORDINARY SKILL IN THE ART THAT IT'S TRANSFER SOFTWARE SEQUENCE

24    B THAT ENABLES THE REMOTE UNIT TO COMMUNICATE WITH THE HOST

25    UNIT, TO TRANSMIT A STORED DATA FILE USING THE SYSTEM HARDWARE.

1      THAT'S LINKING THE SOFTWARE DISCLOSED IN TRANSFER SOFTWARE

2  SEQUENCE B TO THAT FUNCTION.

3      YOU CAN'T PICK AND CHOOSE WHICH STEPS YOU WANT TO INCLUDE.

4  THAT IS CORRESPONDING THE SOFTWARE SEQUENCE IN ITS ENTIRETY TO

5  WHAT WE HAVE AGREED TO AS THE CLAIM FUNCTION.

6          MR. JOHNSON:  WELL, IF WE -- SO IF WE LOOK AT COLUMN

7  8 AND WE START AT LINE 25, IT SAYS "TRANSFER SOFTWARE SEQUENCE

8  B CONTAINS ALL THE INSTRUCTIONS NECESSARY TO INITIALIZE

9  COMMUNICATION PORTS AND REMOTE, OBTAIN A CELLULAR CONNECTION

10  WITH EACH CELLULAR TELEPHONE TO THE HOST UNIT, OBTAIN THE

11  STORED DATA FILE."  THAT'S WHERE "STORED DATA FILE" IS

12  DISCUSSED.

13      BUT CERTAINLY THE "OBTAIN A CELLULAR CONNECTION,"

14  "OBTAINING THE STORED DATA FILE," "INITIATING THE FILE

15  SPLITTING SEQUENCE C," THOSE ARE FUNCTIONS THAT ARE NOT

16  ASSOCIATED WITH TRANSMITTING THE COMPOSITE SIGNAL, AND THAT'S

17  REALLY MY POINT IS THE PATENT TALKS ABOUT THESE ISSUES, BUT

18  WHAT WE'RE SUPPOSED TO DO HERE IS LOOK AT THE FUNCTION OF

19  TRANSMITTING THE COMPOSITE SIGNAL.  WHAT IS THE STRUCTURE FOR

20  DOING THAT?

21      AND THE STRUCTURE THAT'S DESCRIBED IN COLUMN 8,

22  INITIALIZING THE PORTS AND STORING THE DATA FILE, IS NOT PART

23  OF THAT STRUCTURE FOR PERFORMING THE FUNCTION OF TRANSMITTING

24  THE COMPOSITE SIGNAL.

25          MR. SELWYN:  AND THAT JUST OVERLOOKS THE TOPIC

```
1      SENTENCE OF THIS PARAGRAPH.

2              THE COURT:  ALL RIGHT.  WELL, IT'S NOW TIME.

3         THANK YOU ALL --

4              MR. SELWYN:  THANK YOU, YOUR HONOR.

5              THE COURT:  -- VERY MUCH, AND I WILL SEE YOU THEN, I

6      GUESS IN MARCH FOR THE CMC.

7              MR. PRICE:  YOUR HONOR, MAY WE SUBMIT THE SLIDES THAT

8      WE USED?

9         MR. JOHNSON --

10             THE COURT:  YES, PLEASE.  WE DON'T HAVE THOSE?

11     PLEASE, IF WE COULD, PLEASE, WE'LL REVIEW THEM IN CHAMBERS IF

12     WE HAVE ANY OTHER CHANCE TO LOOK AT THEM.

13             MR. JOHNSON:  THANKS FOR YOUR PATIENCE, YOUR HONOR.

14             THE COURT:  OKAY.  THANK YOU.  GO CATCH YOUR FLIGHT.

15             MR. JOHNSON:  THANK YOU.

16             MR. SELWYN:  THANK YOU, YOUR HONOR.

17             THE COURT:  OKAY.  THANK YOU.

18             MR. LYON:  THANK YOU, YOUR HONOR.

19             MR. PRICE:  THANK YOU, YOUR HONOR.

20         (THE PROCEEDINGS IN THIS MATTER WERE CONCLUDED.)

21

22

23

24

25
```

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____

17    LEE-ANNE SHORTRIDGE, CSR, CRR
      CERTIFICATE NUMBER 9595

18    DATED:  MARCH 28, 2013

19

20

21

22

23

24

25