| | |
|---|---|
| JOSH A. KREVITT (CA SBN 208552)<br>jkrevitt@gibsondunn.com<br>H. MARK LYON (CA SBN 162061)<br>mlyon@gibsondunn.com<br>GIBSON, DUNN & CRUTCHER LLP<br>1881 Page Mill Road<br>Palo Alto, CA  94304-1211<br>Telephone: (650) 849-5300<br>Facsimile: (650) 849-5333 | WILLIAM F. LEE (pro hac vice)<br>william.lee@wilmerhale.com<br>WILMER CUTLER PICKERING<br>HALE AND DORR LLP<br>60 State Street<br>Boston, Massachusetts 02109<br>Telephone: (617) 526-6000<br>Facsimile: (617) 526-5000 |
| MICHAEL A. JACOBS (CA SBN 111664)<br>mjacobs@mofo.com<br>RICHARD S.J. HUNG (CA SBN 197425)<br>rhung@mofo.com<br>MORRISON & FOERSTER LLP<br>425 Market Street<br>San Francisco, California 94105-2482<br>Telephone: (415) 268-7000<br>Facsimile: (415) 268-7522 | MARK D. SELWYN (CA SBN 244180)<br>mark.selwyn@wilmerhale.com<br>WILMER CUTLER PICKERING<br>HALE AND DORR LLP<br>950 Page Mill Road<br>Palo Alto, CA 94304<br>Telephone: (650) 858-6000<br>Facsimile: (650) 858-6100 |

*Attorneys for Plaintiff and Counterclaim-Defendant Apple Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>                    Plaintiff,<br><br>          v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>                    Defendants.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>                    Counterclaim-Plaintiff,<br>          v.<br><br>APPLE INC., a California corporation,<br><br>                    Counterclaim-Defendant. | CASE NO. 12-cv-00630-LHK  (PSG)<br><br>**DECLARATION OF GREGORY JOSWIAK IN SUPPORT OF APPLE'S RENEWED SEALING MOTION** |

JOSWIAK DECLARATION IN SUPPORT OF APPLE'S SEALING MOTION
12-CV-00630-LHK (PSG)

I, Gregory Joswiak, declare and state as follows:

1. I am a Vice President in Apple's Product Marketing department. I submit this declaration in support of Apple's motions regarding sealing, filed contemporaneously herewith. I have personal knowledge of the matters set forth below. If called as a witness I could and would competently testify as follows.

2. I understand Apple seeks to seal sensitive categories of market strategy and financial information: (a) portions of recent customer research reports; (b) third party confidential research; and (c) highly sensitive and non-public financial information (cost data, product line details, and detailed product-level and model-level profit margins). If disclosed to the public, these categories of information would expose Apple to serious competitive harm. Such information would also be highly likely to impact Apple's share price and, in turn, its shareholders.

**Apple's Proprietary Customer Research and Analysis**

3. Apple moves to seal the following documents or portions thereof, which contain proprietary, highly confidential Apple marketing research and analysis:

   a. Exhibits 1, 2, 3, 5, and 6 to the Declaration of Arthur Rangel in Support of Apple's Motion for Preliminary Injunction (the "Rangel Declaration");

   b. Exhibits 53, 82, and 112 to the Declaration of Christopher Vellturo in Support of Apple's Motion for Preliminary Injunction (the "Vellturo Declaration");

   c. Exhibits S, GGG, HHH and III to the Declaration of Michael J. Wagner in Support of Samsung's Opposition to Apple's Motion for Preliminary Injunction (the "Wagner Declaration");

   d. Exhibit Y to the Declaration of Daniel Posner in Support of Samsung's Opposition to Apple's Motion for Preliminary Injunction; and

   e. Exhibits 25, 26, 30 and 31 to the Reply Declaration of Christopher Vellturo in Support of Apple's Reply in Support of Apple's Motion for Preliminary Injunction (the "Vellturo Reply Declaration").

4. These documents contain and otherwise comprise Apple's proprietary and confidential market analysis of Apple's specific customer base. Such reports were prepared by Apple's "Market

Research & Analysis" division ("MRA"). This division within Apple is focused on identifying and surveying Apple's particular customer base. Apple, like other consumer-product companies, devotes substantial resources to surveying market factors and consumer opinions in order to develop competitive sales strategies. Indeed, Apple maintains information about its customer base, including customer contact information, as one of its trade secrets. Apple has worked hard for many years to develop its customer database and determine how to select a representative sample from that database that will accurately reflect Apple's complete customer base. Because only Apple has access to its customer base, Apple's MRA division is uniquely positioned to conduct surveys and create detailed reports concerning Apple customer preferences (as opposed to the population at large). This is an invaluable asset to Apple and unavailable to any other company in the smartphone and tablet market.

5. For example, the MRA division creates periodic "iPhone Buyer Surveys," which present market data and analysis based on iPhone customer preferences in countries around the world, including how Apple's customers value certain product features and whether they consider products offered by Apple's competitors. This data is not limited to that gathered in the United States, but also includes data gathered worldwide. The unique market research that Apple conducts – as well as the conclusions that Apple draws from that data – cannot be replicated by anyone other than Apple. Indeed, similar data is not available to Apple's competitors because Apple's competitors lack access to Apple's current customer base and therefore cannot replicate the analysis contained in the surveys and survey data. Were Apple's competitors to attempt to replicate this research, they would have to hire an outside vendor to prepare a panel of Apple customers to survey. There is no way for our competitors to know if the selected panel is actually representative of Apple's customers in both opinion and demographics. Publicly releasing these reports would allow Apple's competitors access to data that Apple has painstakingly prepared using data and methods only available to Apple.

6. Apple also strictly maintains the confidentiality of this information within the company. This extremely sensitive product research information is subject to very tight distribution control. Only a select group of individuals within a small number of departments are allowed to receive our market research information. I must personally approve any and all requests to distribute any of our iPhone-related surveys. When I do allow this data to circulate outside of the tiny group of

pre-approved individuals, which I rarely do, I almost always only provide individual survey questions on a need to know basis.

7. Apple's market research data, and the related conclusions, are intertwined with Apple's past, present, and future product development and marketing strategies. Apple's market research thus details the results of surveys conducted by Apple in order to gain insight into customer purchasing decisions and preferences, and respond accordingly. Thus, Apple relies upon its internal competitive analyses of the market, which may integrate certain confidential third party data, in considering and developing its business and product positioning strategy. Apple's market research reports thus can foreshadow Apple's specific intentions for positioning its products, as well as those features upon which it focuses development efforts.

8. Just as important as the survey data are the conclusions Apple has drawn from the data. Knowing about Apple's customer base preferences is extremely useful to a competitor, but knowing about what Apple thinks about its customer base preferences is even more valuable. If Apple had access to this kind of in-depth analysis of our competitors, we could infer what product features our competitors are likely to offer next, when, and in what markets. Our probability of success in predicting our competitors' next move next would improve dramatically. Having that level of insight and confidence in our competitors' next moves would allow us to target our efforts to prepare products and marketing counterstrategies in the short term, and target our long-term product plans to stay far ahead of the competition. Given unfettered access to Apple's recent internal market research, I have no doubt that Apple's competitors would use it as described above, resulting in serious competitive harm to Apple.

9. Public disclosure of the internal marketing reports and competitive positioning analyses would critically damage Apple. Because these reports disclose Apple's strategic product-placement and marketing plans, Apple's competitors could predict Apple's future business strategies and product development, as well as focus their own development, production, and marketing efforts to compete against Apple's product releases based on Apple's own research. Moreover, disclosure of these analyses would grant Apple's competitors invaluable insight into the preferences and interests of Apple's customers. This in turn would enable Apple's competitors to strategically position their

own products based on to the features and services that are most desirable to Apple's consumer base. This knowledge would grant Apple's competitors a significant, and unfair, advantage in the marketplace.

10. As an illustrative example, among the documents whose sealing is at issue are the quarterly and yearly buyer surveys that Apple conducts for many of its products as well as surveys focused on Apple's customers' use of specific features, *e.g.* Siri. Exhibit HHH to the Wagner Declaration, for example, is a recent survey of iPhone buyers which contains highly sensitive intelligence on Apple customers and customer preferences worldwide. For the reasons detailed above, disclosure of these documents would irreparably harm Apple's business. The surveys reveal, country-by-country, what is driving our customers to buy our products versus other products such as the Android products that Samsung sells. No competitor has access to our customer base to conduct such in-depth analysis. Getting access to this analysis would be of enormous benefit to our competitors. Today, a competitor who is trying to take away Apple market share can only speculate how Apple's customers weigh the relative value of, for instance, the experience they had using a different Apple product, Siri's searching capability, or the compact size of the product. They have to guess as to what demographics – age, gender, occupation – are most satisfied with Apple's products. Certainly, they do not know how the preferences of customers in, for example, Japan differ from those in Australia, Korea, France or the United States. Perhaps most importantly, they are unable to observe trends over time. All of that information is set out in exacting detail in the proposed exhibits. No other entity could replicate this research because no other entity has access to Apple's specific and exact customer base. And based on Exhibit HHH, or other of these documents, Apple's competitors could predict the features and demographics that Apple would target in its new products, and whether such targeting would be country-specific.

11. I wish to add that Apple is not seeking to seal all of its market research data submitted in connection with the briefing on Apple's motion for preliminary injunction. I understand that, in seeking a preliminary injunction in this action, Apple relied upon specific data from these analyses of Apple customer reactions to the patented features at issue. This data was used to demonstrate how Samsung's infringement with respect to those features has a causal nexus with the irreparable harm

that Apple will suffer absent a preliminary injunction. While those discrete data points directly relate to Apple's claims, the complete documents from which they were taken contain a substantial amount of additional data that bear little or no relevance to this action.

12. Apple has not sought to seal the data points that are specifically used in the parties' briefing and declarations and which therefore bear relevance to the litigation. Still further, Apple has made the difficult decision to not seek sealing of older iPhone purchaser studies, even though Apple has expended significant effort and expense gathering the information in these different reports and surveys, and internally treats them on a strictly confidential basis as well. However, I understand that the Court wants the parties to restrict their requests to seal to only their most sensitive confidential information. We view the market research analyses of Apple's customer base and otherwise provide a guide to Apple's future product strategy as the crown jewels of the marketing research group. Thus, Apple seeks to seal only the full reports themselves, and only to the extent those reports were generated in 2011 and 2012, and only the data that has not already been publicly disclosed in the briefing or during the earlier case between Apple and Samsung.

**Third Party Confidential Information**

13. Apple also moves to seal the following documents or portions of documents, which constitute or otherwise extensively draw from market analysis reports provided to Apple by third-party market research companies under contractual agreements restricting the public disclosure of such information:

    a. Exhibits 22 and 28 and Attachments B-L to the Vellturo Declaration;

    b. Exhibits B, R, PP, and UU to the Wagner Declaration;

    c. Exhibit CC to the Posner Declaration; and

    d. Exhibits 22, 27, and 29 to the Vellturo Reply Declaration.

14. I understand that the Court has previously ruled that such third party confidential information may be sealed. In particular, the recent market data and analysis purchased from third-party research companies because that data and analysis has considerable commercial value for those vendors. In my capacity as an Apple employee, I am aware of Apple's interaction with third-party research companies such as IDC. Accordingly, I am familiar with the general business of those third-

party companies, the reasons for Apple's purchases of such data, the terms under which such purchases are typically made, as well the demands that those third-party companies make on Apple when Apple must produce information from those companies to the extent those subjects are described in additional detail below.

15. It is my understanding that if information of the third-party research companies were to be made publicly available, it would effectively eliminate all meaningful opportunities for the vendors to sell such information. For these companies, and particularly a company like the International Data Corporation ("IDC"), which is a leading research and analysis firm focusing on the smartphone market, such data and analysis constitutes the backbone of their businesses. These companies spend significant resources to compile, analyze, and make available their data, and in turn require considerable payment in order to recoup those investments. It thus costs Apple a substantial amount to obtain this data; each individual report purchased from these companies typically costs many thousands of dollars. Public disclosure of the entirety, or even a substantial portion, of this third-party data would thus completely supplant the market for these reports. Indeed, many of these vendors provide their research to customers like Apple via a subscription service—a service that would be critically impaired if the research became available via public download from the court's website. Essentially, public disclosure of all or a substantial part of one of these reports would effectively destroy the marketability of that report forever and render it worthless to Apple's secondary vendors.

16. I am aware of the foregoing because each of these third-party market research companies puts into place extensive protective measures specifically designed to avoid public disclosure of their reports and to preserve the reports' confidentiality. For example, in order to produce and otherwise use these reports during the present litigation, Apple was specifically required to provide notice of such disclosure and a copy of the Protective Order entered in this action, as well as agree to ensure that the third-party research would be produced only under the highest confidentiality designation available, *i.e.*, "Highly Confidential – Outside Attorneys' Eyes Only." As another example, one of the third party companies, IDC, specifically required Apple to enter into a litigation-specific Content Use Agreement containing strict protections and stipulations concerning

1  IDC's proprietary and otherwise confidential information.  That Content Use Agreement specifically

2  conditions consent to use IDC content upon that content being afforded the protections of the

3  Protective Order.

4      17.    Apple has extensively negotiated with IDC and has reached out to other third parties

5  to discuss what marketing information may be disclosed without additional repercussions to Apple

6  beyond this litigation. However, Apple has been unable to resolve these issues except with respect to

7  IDC, which gave permission to publicly disclose only passing references to its Apple- and Samsung-

8  focused data in the parties' briefs and supporting declarations.  IDC further reaffirmed that Apple is

9  contractually obligated to otherwise maintain the confidentiality of all large portions of its data,

10  including any full reports, at issue.

11      18.    Moreover, Apple strictly maintains the confidentiality of this information even within

12  Apple; Apple limits the recipients of such complete research data reports and competitive analyses to

13  select groups of individuals requiring such information in order to perform their normal job

14  responsibilities, or who otherwise require such information in light of their decision-making

15  authority.  As an example of the protections provided to this material, we are required to obtain

16  multiple levels of approval before any of these documents may be produced in a litigation, even when

17  being produced under a Protective Order with a "Highly Confidential – Outside Attorneys' Eyes

18  Only" confidentiality designation.

19  **Financial Information**

20      19.    I also understand that Apple is moving to seal the financial information contained in:

21      a.    Figure 13 in paragraph 72 of the Declaration of Michael J. Wagner in support of

22      Samsung's Opposition to Apple's Motion for Preliminary Injunction ("Wagner

23      Declaration");

24      b.    Exhibits B, L, XX, YY, ZZ, AAA, BBB, and III to the Wagner Declaration; and

25      c.    Exhibit 4 to the Declaration of Chris Vellturo in support of Apple's Reply in

26      support of Apple's Motion for Preliminary Injunction.

27      20.    I understand that these documents reveal Apple's cost, product line details, and

28  detailed product-level and model-level profit margins. Disclosure of this data would severely harm

Apple. As part of my responsibilities as Vice President in the Product Marketing department of Apple, I consider competitive decisions about what products to offer, with what features, when, and at what price points.

21. When we make those decisions, two of the critical components of our decision making process are (1) what our customers value, and (2) what are our competitors are offering or are likely to be offering in the future. Apple (like other companies) makes an extensive effort and invests heavily in getting the best possible information about those factors. If I and others in my department had access to my competitors' precise cost and profit data, that would give us a significant competitive advantage. We would know exactly what price points to aim for in what markets. It would reveal our competitors' weaknesses because we would know what products have thin or negative profit margins. We could then target those markets for competition on feature sets knowing that our competitors are unable to withstand additional competitive pressure. It would also reveal the soft spots in the market where our competitors are commanding unusually high profit margins. We could target those markets for competition too. If competitors gain access to similar information regarding Apple's cost and profit structure, I am confident they will use the information to gain unfair advantage over Apple in the marketplace.

22. As discussed above, I have reviewed certain Apple documents that the Parties have attached as exhibits to their filings in this case. I note that they contain detailed cost and profit information, units and revenues broken down by market, model, and submodel. This information is extremely sensitive. For example, only Apple knows how many 16 GB iPhone 5 devices Apple sold last quarter in the United States as compared to 64 GB iPhone 5 devices or 8 GB iPhone 5 devices, and what Apple's profit margins on each of those products was. Such information is contained, for example, Exhibit L to Michael J. Wagner's Declaration filed in Support of Samsung's Opposition to Apple's Motion for a Preliminary Injunction. If the information contained in the documents I reviewed were distributed, however, competitors would know that and would be able to target their product offerings at Apple's most successful and profitable products. It is a treasure trove of competitive intelligence.

* * *

23.     None of the highly confidential and proprietary information identified and discussed above is disclosed publicly by Apple or any competitor of whom I am aware.  As a result, if Apple's information were disclosed, it would not simply be harmed—it would have no defense, as it has no access to similar data from the competitors that would use the information against Apple.  This is not a matter of Apple wanting to keep secret information that most of the world shares—this type of information is generally understood in the industry to be critically important to keep under lock and key.

I declare under the penalty of perjury under the laws of the United States of America that the forgoing is true and correct to the best of my knowledge.

Dated: April 4, 2013                By: _____
                                         Gregory Joswiak

**ATTESTATION**

I, H. Mark Lyon, am the ECF User whose ID and password are being used to file this Stipulation. In compliance with General Order 45, X.B., I hereby attest that Gregory Joswiak has concurred in this filing.

Dated: April 8, 2013

                                                    /s/ *H. Mark Lyon*
                                                     H. Mark Lyon