# EXHIBIT Q

## To the Declaration of Daniel C. Posner in Support of Samsung's Oppositon to Apple's Motion for Preliminary Injunction

092791

PATENT CROSS LICENSE AGREEMENT
dated as of October 1, 1991,
between INTERNATIONAL BUSINESS
MACHINES CORPORATION, a New York
corporation (hereinafter called
IBM), and APPLE COMPUTER, INC., a
California corporation
(hereinafter called APPLE).

Each of the parties hereto has the right (as GRANTOR herein) to grant licenses to the other party (as GRANTEE herein) under certain patents and desires to acquire a nonexclusive license under certain patents of the other party.

Each of the parties hereto expects to continue research and development which will produce further patents and each party may require a nonexclusive license under such patents of the other party.



CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APPLE and IBM have entered into a Covenant Not to Sue and Audiovisual License Agreement dated October 1, 1991 and certain other agreements as of that date and contemplate other arrangements of mutual benefit to the parties.

In partial consideration of the rights conferred under the Covenant Not to Sue and Audiovisual License Agreement and for other good and valuable consideration, the sufficiency of which is acknowledged, the parties agree as follows:

Section 1.   Definitions

1.1 "Information Handling System" shall mean any instrumentality or aggregate of instrumentalities primarily designed to compute, classify, process, transmit, receive, retrieve, originate, switch, store, display, manifest, measure, detect, record, reproduce, handle, or otherwise utilize any form of information, intelligence, or data for business, scientific, control or other purposes.

1.2 "IHS Product" shall mean an Information Handling System, any Supply or any instrumentality or aggregate of instrumentalities (including, without limitation, any component or subassembly) designed for incorporation in an Information Handling System; provided, however, that a Manufacturing Apparatus shall not be considered to be an IHS Product. Examples of instrumentalities or aggregates which are not IHS Products include, but are not limited to, steel mills, automobiles and elevators.

-2-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010042

1.3  "Manufacturing Apparatus" shall mean, as to each party hereto, any instrumentality or aggregate of instrumentalities primarily designed for use in the fabrication of an IHS Product licensed herein to that party.

1.4  "Supply" shall mean, as to each party hereto, any article or matter designed for use in or by, and designed to be effectively consumed in the course of operation of, another IHS Product licensed herein to that party.

1.5  "Apple Licensed Patents" shall mean all patents throughout the world, including utility models and, subject to Section 13.4, including design patents and registrations for type fonts (but not including any other design patents or registrations), issued or issuing on patent applications entitled to an effective filing date prior to October 1, 1996, under which patents or the applications therefor APPLE or any of its Subsidiaries now has, or hereafter obtains, the right to grant licenses to IBM of or within the scope granted herein without such grant or the exercise of rights thereunder resulting in the payment of royalties or other consideration by APPLE or its Subsidiaries to third parties (except for payments among APPLE and Subsidiaries of APPLE, and payments to third parties for inventions made by said third parties while employed by APPLE or any of its Subsidiaries).  The term "APPLE Licensed Patents" shall also include those of the aforesaid applications which have been

-3-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010043

published and any patent reissuing on any of the aforesaid patents.

1.6  "IBM Licensed Patents" shall mean all patents throughout the world, including utility models and, subject to Section 13.4, including design patents and registrations for type fonts (but not including any other design patents or registrations), issued or issuing on patent applications entitled to an effective filing date prior to October 1, 1996, under which patents or the applications therefor IBM or its Subsidiaries now has, or hereafter obtains, the right to grant licenses to APPLE of or within the scope granted herein without such grant or the exercise of rights thereunder resulting in the payment of royalties or other consideration by IBM or its Subsidiaries to third parties (except for payments among IBM and Subsidiaries of IBM, and payments to third parties for inventions made by said third parties while employed by IBM or any of its Subsidiaries). The term "IBM Licensed Patents" shall also include those of the aforesaid applications which have been published and any patent reissuing on any of the aforesaid patents.

1.7  "Subsidiary" shall mean a corporation, company or other entity:

1.7.1     more than fifty percent (50%) of whose outstanding shares or securities (representing the right to vote for the election of directors or other managing authority) are, now or hereafter, owned or controlled, directly or indirectly,

-4-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

by a party hereto, but such corporation, company or other entity shall be deemed to be a Subsidiary only so long as such ownership or control exists; or

1.7.2     which does not have outstanding shares or securities, as may be the case in a partnership, joint venture or unincorporated association, but more than fifty percent (50%) of whose ownership interest representing the right to make the decisions for such corporation, company or other entity is now or hereafter, owned or controlled, directly or indirectly, by a party hereto, but such corporation, company or other entity shall be deemed to be a Subsidiary only so long as such ownership or control exists.

1.8  "Data Processing Apparatus" shall mean:1.8.1 an Apple Computer;

1.8.2   , an Apple Computer Server;

1.8.3     a Consumer Product;

1.8.4     Printers, Displays, Digitizers, Analog Apparatus, Memory Products and/or Coded Input Apparatus; or

1.8.5     any combinations of Input/Output Equipment (including the apparatus of Section 1.8.4) with any of the instrumentalities or aggregates of Section 1.8.1, 1.8.2 or 1.8.3; and

if provided therewith, such Data Processing Apparatus may include related switching and testing equipment and other auxiliary apparatus locally associated therewith and involved in the performance of the functions thereof.

-5-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010045

1.9  "Input/Output Equipment" shall mean any instrumentality or aggregate of instrumentalities (i) primarily designed to deliver data to, and/or receive data from, an instrumentality or aggregate of instrumentalities as described in Section 1.8, either directly or through intervening transmission facilities, and (ii) which is accessible in response to input/output programming instruction control.

1.10 "Coded Input Apparatus" shall mean any instrumentality or aggregate of instrumentalities primarily designed to select one or more of a plurality of coded signals for input, with or without preliminary storage, to an instrumentality or aggregate of instrumentalities described in Section 1.8. in response to operator manipulation.

1.11 "Printer" shall mean any instrumentality or aggregate of instrumentalities primarily designed for printing human perceivable representations on a medium.  Printer shall also mean any instrumentality or aggregate of instrumentalities primarily designed for incorporation therein.

1.12 "Display" shall mean any instrumentality or aggregate of instrumentalities primarily designed for manifesting human perceivable representations of information, intelligence and/or data in alphanumeric and/or graphic form on manifesting means, which instrumentality or aggregate of instrumentalities may include means, which may be operator interactive, for generating,

-6-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

storing, controlling and/or presenting such information, intelligence or data.  Display shall also mean any instrumentality or aggregate of instrumentalities primarily designed for incorporation therein.

1.13 "Semiconductor Material" shall mean any material, which does not exhibit superconductivity at a temperature in excess of twenty degrees Kelvin ($20^{\circ}$K), whose conductivity is intermediate to that of metals and insulators at room temperature and whose conductivity, over some temperature range, increases with increases in temperature.  Such materials shall include but not be limited to refined products, reaction products, reduced products, mixtures and compounds.

1.14 "Semiconductor Device" shall mean an electrical and/or electronic component and any material therefor, comprising a body of one or more Semiconductor Materials and one or more electrodes associated therewith, and, if provided therewith, housing and/or supporting means therefor.

1.15 "Semiconductor Circuit" shall mean a circuit in which one or more Semiconductor Devices are interconnected in one or more paths (including passive circuit elements, if any) for performing electrical or electronic functions and if provided therewith, housing and/or supporting means therefor, but such Semiconductor Circuit shall not comprise a printed circuit board.

-7-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

1.16 "Integrated Circuit" shall mean an integral unit including a plurality of interconnected Semiconductor Circuits and/or Semiconductor Devices for attachment to a substrate and/or passive circuit elements; such unit forming, or contributing to the formation of, a circuit for performing electrical or electronic functions.

1.17 "Semiconductor Memory" shall mean an Integrated Circuit, which is designed for storing and retrieving digital information, intelligence or data.

1.18 "Semiconductor Apparatus" shall mean any Semiconductor Material, Semiconductor Device, Semiconductor Circuit, Integrated Circuit and/or Semiconductor Memory.

1.19 "Communication Apparatus" shall mean any IHS Product primarily designed for the transmission, reception and/or transfer of information, intelligence or data by propagating electric, electro-optic and/or electromagnetic energy over a medium.

1.20 "Memory Product" shall mean an IHS Product (which may include, for example, an IHS Product formed from at least one prefabricated Semiconductor Memory) primarily designed for use with an instrumentality or aggregate of instrumentalities as described in Section 1.8, to store and/or retrieve information, and any instrumentality or aggregate of instrumentalities designed for incorporation in such an IHS Product; provided,

-8-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

however, that a Semiconductor Memory shall not be considered to be a Memory Product.

1.21 "Analog Apparatus" shall mean any instrumentality or aggregate of instrumentalities for use with an instrumentality or aggregate of instrumentalities as described in Section 1.8, that receives a digital or analog input signal and provides an analog output signal; such instrumentality or aggregate including: sound reproduction systems and multimedia devices.

1.23 "DP Product" shall mean a Data Processing Apparatus, any Supply or any instrumentality or aggregate of instrumentalities (including without limitation, any component or subassembly) designed for incorporation in a Data Processing Apparatus; provided, however, that a Manufacturing Apparatus shall not be considered to be a DP Product.

1.23 "IHS Complex" shall mean an aggregate of instrumentalities, which is the combination of one or more IHS Products with other apparatus which is not an IHS Product or a Manufacturing Apparatus.

1.24 "DP Complex" shall mean an aggregate of instrumentalities which is the combination of one or more Data Processing Apparatus with other apparatus which is not an IHS Product or a Manufacturing Apparatus.

-9-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010049

1.25 "Digitizer" shall mean any instrumentality or aggregate of instrumentalities primarily designed to detect any analog information (including representations indicative of digital information) and convert it to digital information for use with an instrumentality or aggregate of instrumentalities as described in Section 1.8; such instrumentality or aggregate including, but not limited to: mouse, joy stick, scanner, camera, security device, tablet, trackball, microphone, pen/stylus based device, and touch sensitive device.

1.26 "IHS Program" shall mean a plurality of instructions capable of being compiled, executed or interpreted by an IHS Product or an IHS Complex, whether or not such instructions are in machine-readable form.

1.27 "DP Program" shall mean a plurality of instructions capable of being compiled, executed or interpreted by a DP Product or a DP Complex, whether or not such instructions are in a machine-readable form.

1.28 "IBM Licensed Apparatus" shall mean IHS Products, IHS Programs, IHS Complexes and any combination of any, some or all of the foregoing. Any such combination shall be considered an IBM Licensed Apparatus even though its elements are leased, sold or otherwise transferred at different times.

-10-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER                                APL-ITC796-0000010050

1.29 "APPLE Licensed Apparatus" shall mean DP Products, Communication Apparatus, DP Complexes and DP Programs, and any combination of any, some or all of the foregoing. Any such combination shall be considered an APPLE Licensed Apparatus even though its elements are leased, sold or otherwise transferred at different times.

1.30 "Apple Computer" shall mean an IHS Product consuming no more than one and one-half (1.5) KVA of electrical power, in one enclosure, and having no external dedicated cooling physically connected thereto, and which is primarily designed for operation interactively by an individual, having one or more general or special purpose processing units; said IHS Product further including some input/output capability and a memory and occupying no more than sixteen (16) square feet or sixty-four (64) cubic feet of space; said IHS Product primarily designed to include not more than twenty (20) peripheral adapters that handle transfers of data with local peripheral equipment; but shall not include an IHS Product having one or more general or special purpose processing units primarily designed to utilize a native instruction set based on System/360, System/370, AS/400, or the Supercomputer Systems, Inc. SSI operating systems, or any upward derivative, upward follow-on, or upward extension of said operating systems, and which IHS Product is primarily designed to operate under control of one of said operating systems.

-11-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

1.31 "Apple Computer Server" shall mean an IHS Product consuming no more than one and one-half (1.5) KVA of electrical power, in one enclosure, and having no external dedicated cooling physically connected thereto, and which, by means of interconnection through Communications Apparatus, is primarily designed to provide services of storage, retrieval, processing, communications or inputting and/or outputting information at the request of one or more Apple Computers, to augment or enhance the capability of said Apple Computer, or to provide communications capability among a plurality of Apple Computers, said IHS Product primarily designed to include not more than twenty (20) peripheral adapters (exclusive of Memory Products) that handle transfers of data with local peripheral equipment; but shall not include an IHS Product having one or more general or special purpose processing units primarily designed to utilize a native instruction set based on System/360, System/370, AS/400, or the Supercomputer Systems, Inc. SSI operating systems, or any upward derivative, upward follow-on, or upward extension of said operating systems, and which IHS Product is primarily designed to operate under control of one of said operating systems.

1.32 "Consumer Product" shall mean an IHS Product primarily designed for personal non-commercial use for entertainment and/or education purposes.

-12-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010052

Section 2.    Licenses and Warrants

[REDACTED]

2.1.1    to make, use, import, lease, sell and/or otherwise transfer IBM Licensed Apparatus and to practice any process involved in the manufacture or use thereof; and

2.1.2    to make, have made, use and have used Manufacturing Apparatus and to practice and have practiced any method involved in the manufacture or use thereof; provided, however, that the rights granted in this Section 2.1.2 shall not serve to enlarge the scope of the rights granted in Sections 2.1.3 and 2.1.4; and

2.1.3    to have made Semiconductor Apparatus; and

2.1.4    to have made IBM Licensed Apparatus (other than Semiconductor Apparatus) by another manufacturer for the use, lease, sale or transfer by IBM, only when all the following conditions are met:

2.1.4.1    the designs, specifications and working drawings for the manufacture of said IBM Licensed Apparatus (other than Semiconductor Apparatus) are furnished by, and originate with, IBM (or with IBM's contractor, whether or not said contractor is also said other manufacturer, provided that any patents and patent applications, based upon inventions made in the course of the contract, which cover any IBM Licensed Apparatus (other than Semiconductor Apparatus) or any portion thereof

-13-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER                                    APL-ITC796-0000010053

which is the subject of the contract, are licensable by IBM to APPLE hereunder); and

2.1.4.2   said designs, specifications and working drawings are in sufficient detail that no additional designing is required by the manufacturer other than to adapt the product to the production processes and standards normally used by the manufacturer;

provided, however, said license to have made under Section 2.1.4 shall be only under APPLE Licensed Patents which would, in the absence of this Agreement, be caused to be infringed by compliance with such designs, specifications and working drawings, and the infringement so caused could not reasonably be avoided while retaining such compliance; and provided, further, that the license to have made shall not apply to any IBM Licensed Apparatus in the form manufactured or marketed by said other manufacturer prior to IBM's furnishing of said designs, specifications and working drawings.

In the absence of a written agreement to the contrary between IBM and another manufacturer IBM shall be deemed to have authorized said other manufacturer (i) to make Manufacturing Apparatus or Semiconductor Apparatus under the license granted to IBM in Section 2.1.2 or 2.1.3 when IBM has ordered said Manufacturing Apparatus or Semiconductor Apparatus from said other manufacturer, whether or not said Manufacturing Apparatus or Semiconductor Apparatus is in existence at the time of said order and (ii) to make said IBM Licensed Apparatus (other than

-14-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010054

Semiconductor Apparatus) under the license granted to IBM in Section 2.1.4 when both conditions specified in Section 2.1.4.1 and 2.1.4.2 are fulfilled.  Upon written request, IBM shall inform APPLE whether, and if so to what extent, any manufacturer identified by APPLE is operating under the license granted to IBM in Section 2.1.2, 2.1.3 or 2.1.4.

In the event that neither APPLE nor any of its Subsidiaries has the right to grant a license under any particular APPLE Licensed Patent of the scope set forth above in this Section 2.1, then the license granted herein under said APPLE Licensed Patent shall be of the broadest scope which APPLE or any of its Subsidiaries has the right to grant within the scope set forth above.

2.2  Subject to the provisions of Sections 2.7 and 2.8, IBM, on behalf of itself and its Subsidiaries, grants to APPLE a worldwide, nonexclusive, nontransferable license under the IBM Licensed Patents:

2.2.1     to make, use, import, lease, sell and/or otherwise transfer APPLE Licensed Apparatus and to practice any process involved in the manufacture or use thereof; and

2.2.2     to make, have made, use and have used Manufacturing Apparatus and to practice and to have practiced any method involved in the manufacture or use thereof; <u>provided</u>, <u>however</u>, that the rights granted in this Section 2.2.2 shall not serve to enlarge the scope of the rights granted in Section 2.2.4; and

-15-



CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER



2.2.3      to make Semiconductor Apparatus for the use, lease, sale or other transfer by APPLE as part of APPLE Licensed Apparatus or as repair and replacement parts thereof in the following instances:

2.2.3.1    to interconnect prefabricated Integrated Circuits (including connection to passive and/or prefabricated active circuits) and attach such interconnected Integrated Circuits to substrates and/or packages, and/or to attach prefabricated substrates including Integrated Circuits to packages;

2.2.3.2    to modify physical characteristics of prefabricated Semiconductor Apparatus to change the electrical or electronic function(s) of such Semiconductor Apparatus;

2.2.3.3    to complete the final circuit forming layers of a Semiconductor Circuit and/or Integrated Circuit through utilization of a commercially available device designed for forming such layers on a prefabricated base device; and/or

2.2.3.4    to interconnect one or more prefabricated Semiconductor Memory (including connection to passive and/or prefabricated active circuits) and attach such Semiconductor Memory to substrates and/or packages, and/or attach prefabricated substrates including Semiconductor Memory to packages.

2.2.4      to have made APPLE Licensed Apparatus, and to have made Semiconductor Apparatus other than Semiconductor Memories,

-16-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010056



by another manufacturer for the use, lease, sale or transfer
by APPLE, only when all the following conditions are met:

2.2.4.1    the designs, specifications and working drawings for
the manufacture of said APPLE Licensed Apparatus are
furnished by, and originate with, APPLE (or with
APPLE's contractor, whether or not said contractor is
also said other manufacturer, provided that any patents
and patent applications, based upon inventions made in
the course of the contract, which cover any APPLE
Licensed Apparatus or any portion thereof which is the
subject of the contract, are licensable by APPLE to IBM
hereunder); and

2.2.4.2    said designs, specifications and working drawings are
in sufficient detail that no additional designing is
required by the manufacturer other than to adapt the
product to the production processes and standards
normally used by the manufacturer;

provided, however, said license to have made under Section
2.2.3 shall be only under IBM Licensed Patents which would,
in the absence of this Agreement, be caused to be infringed
by compliance with such designs, specifications and working
drawings, and the infringement so caused could not
reasonably be avoided while retaining such compliance, and
provided, further, that the license to have made shall not
apply to any APPLE Licensed Apparatus in the form
manufactured or marketed by said other manufacturer prior to

-17-



CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APPLE's furnishing of said designs, specifications and working drawings.

In the absence of a written agreement to the contrary between APPLE and another manufacturer, APPLE shall be deemed to have authorized said other manufacturer (i) to make Manufacturing Apparatus under the license granted to APPLE in Section 2.2.2 when APPLE has ordered said Manufacturing Apparatus from said other manufacturer, whether or not said Manufacturing Apparatus is in existence at the time of said order, and (ii) to make said APPLE Licensed Apparatus under the license granted to APPLE in Section 2.2.4 when both conditions specified in Sections 2.2.4.1 and 2.2.4.2 are fulfilled.  Upon written request, APPLE shall inform IBM whether, and if so to what extent, any manufacturer identified by IBM is operating under the license granted to APPLE in Section 2.2.2 or 2.2.4.

In the event that neither IBM nor any of its Subsidiaries has the right to grant a license under any particular IBM Licensed Patent of the scope set forth above in this Section 2.2, then the license granted herein under said IBM Licensed Patent shall be of the broadest scope which IBM or any of its Subsidiaries has the right to grant within the scope set forth above.

2.3  Subject to the provisions of Sections 2.7 and 2.8, IBM, to the extent it has the right to do so, on behalf of itself and its Subsidiaries, hereby warrants to APPLE that the users of DP Products, Communication Apparatus, and DP Complexes manufactured,

-18-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

used, leased, sold or otherwise transferred by APPLE or its sublicensed Subsidiaries, within the scope of the licenses granted to APPLE under this Agreement, shall not be subject to suit under the IBM Licensed Patents:

2.3.1     for the use of such DP Products, Communication Apparatus, and DP Complexes;

2.3.2     for the formation and use of any DP Complex which includes any such DP Product, whether or not such formed DP Complex includes other apparatus which is not an IHS Product and is not furnished by APPLE or any of its sublicensed Subsidiaries, on the condition that APPLE or its sublicensed Subsidiary proposed or otherwise participated in such formation and/or use; provided, however, that such warrant shall not be construed to cover any apparatus per se which forms a part of such DP Complex, which is either not otherwise licensed to APPLE herein or not furnished by APPLE or its sublicensed Subsidiary; and

2.3.3     for the modification and use of such DP Products and DP Complexes and the DP Complexes of Section 2.3.2 above in accordance or in combination with DP Programs and/or Supplies whether or not such DP Programs and/or Supplies are furnished by APPLE or its sublicensed Subsidiary; provided, however, that such warrant shall not extend to the manufacture, lease, sale or other transfer of such Programs or Supplies which are not furnished by APPLE or its sublicensed Subsidiary;

-19-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010059

provided, however that such warrant shall not pertain to any IBM Licensed Patent which covers a formation and use or modification and use referred to above with respect to which a third party (other than said user) is an infringer (including contributory infringer).

2.4  Subject to the provisions of Section 2.7, APPLE on behalf of itself and its Subsidiaries, hereby warrants to IBM that the users of IHS Products and IHS Complexes manufactured, leased, sold or otherwise transferred by IBM or its sublicensed Subsidiaries within the scope of the licenses granted to IBM under this Agreement, shall not be subject to suit under the APPLE Licensed Patents:

2.4.1     for the use of such IHS Products and IHS Complexes;

2.4.2     for the formation and use of any IHS Complex which includes any such IHS Product, whether or not such formed IHS Complex includes other apparatus which is not an IHS Product and is not furnished by IBM or any of its sublicensed Subsidiaries, on the condition that IBM or its sublicensed Subsidiary proposed or otherwise participated in such formation and/or use, provided, however, that such immunity shall not be construed to cover any apparatus per se which forms a part of such IHS Complex, which is either not otherwise licensed to IBM herein or not furnished by IBM or its sublicensed Subsidiary; and

2.4.3     for the modification and use of such IHS Products and IHS Complexes and the IHS Complexes of Section 2.4.2 above

-20-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

in accordance or in combination with IHS Programs and/or
Supplies, whether or not such IHS Programs and/or Supplies
are furnished by IBM or its sublicensed Subsidiary;
provided, however, that such warrant shall not extend to the
manufacture, lease, sale or other transfer of such IHS
Programs or Supplies which are not furnished by IBM or its
sublicensed Subsidiary;

provided, however that such warrant shall not pertain to any
APPLE Licensed Patent which covers a formation and use or
modification and use referred to above with respect to which a
third party (other than said user) is an infringer (including
contributory infringer).

2.5  With respect to DP Programs and/or Supplies leased, sold
and/or otherwise transferred by APPLE or its sublicensed
Subsidiary, IBM, to the extent it has the right to do so, on
behalf of itself and its Subsidiaries, hereby warrants to APPLE
that the users of such DP Programs and/or Supplies, shall not be
subject to suit under the IBM Licensed Patents, for use of DP
Products and DP Complexes in accordance or in combination with
such DP Programs and/or Supplies, whether or not such DP Products
and DP Complexes are furnished by APPLE or its sublicensed
Subsidiary; provided, however, that such warrant shall not
include or be construed to cover any such DP Product or DP
Complex or any portion or portions thereof, which is not
furnished by APPLE or its sublicensed Subsidiary and which would,

-21-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010061

without the use of such DP Program or Supply, be covered by an
IBM Licensed Patent.

2.6  With respect to IHS Programs and/or Supplies leased, sold
and/or otherwise transferred by IBM or its sublicensed
Subsidiary, APPLE, to the extent it has the right to do so, on
behalf of itself and its Subsidiaries, hereby warrants to IBM
that the users of such IHS Programs and/or Supplies, shall not be
subject to suit under the APPLE Licensed Patents, for use of IHS
Products and IHS Complexes in accordance or in combination with
such IHS Programs and/or Supplies, whether or not such IHS
Products and IHS Complexes are furnished by IBM or its
sublicensed Subsidiary; provided, however, that such warrant
shall not include or be construed to cover any such IHS Product
or IHS Complex or any portion or portions thereof, which is not
furnished by IBM or its sublicensed Subsidiary and which would,
without the use of such IHS Program or Supply, be covered by an
APPLE Licensed Patent.

2.7  No license or warrant is granted or made by either party
hereto with respect to:

2.7.1    any apparatus per se which forms part of an IHS Complex
         or a DP Complex, as the case may be, and which is not
         otherwise licensed herein; and

2.7.2    any third parties acquiring items from either party for
         the combination of items licensed hereunder with other items
         except as provided in Sections 2.3, 2.4, 2.5 and 2.6.

-22-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER                                    APL-ITC796-0000010062

2.8   No license or warrant is granted or made by IBM to APPLE, either directly or by implication, estoppel or otherwise, under any IBM Licensed Patent claim:

2.8.1   for the manufacture of any Input/Output Equipment other than Printers, Displays, Digitizers, Analog Apparatus, Memory Products and/or Coded Input Apparatus, or for the use, lease, sale or other transfer thereof other than as part of a combination as defined in Section 1.8.3; or

2.8.2   to make Semiconductor Apparatus other than as stated in Section 2.2.3 (although APPLE may have made any Semiconductor Apparatus in accordance with Section 2.2.4); and

2.8.3   for the use, lease, sale, and/or other transfer of Semiconductor Apparatus other than Semiconductor Apparatus which is included as part of apparatus otherwise licensed herein or as repair and replacement parts thereof.

2.9   Either one of the parties shall, upon request of the other party, grant to any manufacturer a license under Licensed Patents to make for said other party, and to practice any method or process involved in such making, any Licensed Products identified by said other party. Such license shall be granted in a separate agreement between said one party and said manufacturer on reasonable terms and conditions, at least as favorable (including with respect to payment) as those offered to any third party at the time of the request. Upon written request, said one party

-23-

6 59

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010063

shall inform said other party of the terms and conditions of any agreement entered into pursuant to this Section 2.9.

2.10 IBM shall, upon request of APPLE, grant to APPLE a license under Licensed Patents for all or part of the remaining fields of Information Handling System not licensed to APPLE herein on reasonable terms and conditions at least as favorable (including with respect to payment) as those offered to any third party at the time of the request.

2.11 IBM shall, upon request of APPLE, grant to any manufacturer a license under Licensed Patents to make for APPLE, and to practice any method or process involved in such making, any apparatus licensed to APPLE under an agreement entered into pursuant to Section 2.10. Such license shall be granted in a separate agreement between IBM and said manufacturer on reasonable terms and conditions at least as favorable (including with respect to payment) as those offered to any third party at the time of the request. Upon written request by APPLE, IBM shall inform APPLE of the terms and conditions of any agreement entered into pursuant to this Section 2.11.

Section 3.    Extension of License to Subsidiaries

3.1 The licenses granted herein shall include the right of the parties hereto to sublicense their respective Subsidiaries and the right of such sublicensed Subsidiaries to sublicense other Subsidiaries. Each sublicensed Subsidiary shall be bound by the

-24-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER                                        APL-ITC796-0000010064

terms and conditions of this Agreement (except for the provisions relating to payment as set forth in Section 5 hereof), as if it were named herein in the place of the party with whom the sublicense originated.  If a Subsidiary ceases to be a Subsidiary and holds any patents or patent applications under which a party hereto is licensed, such licenses will continue for the life of such patents or patent applications.  Any sublicense granted to a Subsidiary shall terminate on the date such Subsidiary ceases to be a Subsidiary.

3.2  In the event a Subsidiary of one party hereto is an Operating Subsidiary (as hereinafter defined) at the time it ceases to be a Subsidiary, and, with the written approval of said one party, requests in writing, within two hundred and seventy (270) days after ceasing to be a Subsidiary, a license agreement with the other party hereto upon terms and conditions substantially identical with the terms and conditions of this Agreement (except as hereinafter provided) the other party hereto agrees that it will enter into such license agreement forthwith. An Operating Subsidiary shall be any Subsidiary of one party hereto which at the time it ceases to be a Subsidiary has all of the following:

3.2.1     a line of marketable products;

3.2.2     patents or other intellectual property relating to the line of marketable products, and

3.2.3     tangible assets equivalent in value to the lesser of ten million U.S. dollars ($10,000,000) or twenty percent

-25-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010065

(20%) of the total assets of the party of which it was
formerly a Subsidiary.

Any such agreement with an Operating Subsidiary shall differ from
this Agreement in the following respects:

3.2.4     this Section 3.2, Section 4 and Section 5, and all
          references to the foregoing Sections, shall be omitted;

3.2.5     the name of the Operating Subsidiary shall be
          substituted for the name of the party hereto of which it was
          formerly a Subsidiary, and

3.2.6     in the event that such Operating Subsidiary is or
          becomes organized under the laws of a country different from
          that of the party hereto of which it was formerly a
          Subsidiary, such license agreement shall contain such
          additional terms and conditions (other than royalty
          provisions) as may exist in patent license agreements
          between the other party hereto and other corporations
          organized under the laws of the same country.

Section 4.    Release

4.1 Each party, on behalf of itself and its Subsidiaries which
are Subsidiaries as of the date of this Agreement, hereby
irrevocably releases the other party, its Subsidiaries which are
Subsidiaries as of the date of this Agreement, and its and their
respective customers, mediate and immediate, from any and all
claims of infringement of any of its Licensed Patents, which
claims have been made or which might be made at any time, with
respect to any apparatus manufactured, used, leased, sold or

-26-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER                                        APL-ITC796-0000010066

otherwise transferred by or for the other party or its
Subsidiaries before the date of this Agreement, and with respect
to any method practiced in the manufacture or use of such
apparatus, to the extent that such apparatus or method would have
been licensed or the subject of any warrant hereunder had it been
manufactured, used, leased, sold or otherwise transferred or
practiced after the date of this Agreement.

Section 5.        <u>Payment</u>



CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010067



## Section 6.   Other License Rights

6.1  It is recognized that the parties hereto or their respective
Subsidiaries, may now have or hereafter obtain, the right to
grant licenses under one or more patents of any country,
including utility models and, subject to Section 13.4, including
design patents and registrations for type fonts (but not
including any other design patents or registrations), issuing on

-28-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010068

patent applications entitled to an effective filing date prior to
October 1, 1996 but that such grant or the exercise of rights
thereunder will result in payment of royalties or other
consideration by GRANTOR or its Subsidiaries to third parties.
Each party (as GRANTOR herein) agrees that, upon written request,
it will grant to the other party (as GRANTEE herein) to the
extent and subject to the terms and conditions under which it
then has the right to do so, a license of the broadest scope
which GRANTOR has the right to grant at any time but of no
greater scope than the scope of the licenses granted herein with
respect to any such patent.  Such license shall be granted under
a separate agreement, upon payment of the same royalty or other
consideration as that which GRANTOR or any of its Subsidiaries is
obligated to pay to a third party because of the grant of such
license or the exercise of rights thereunder.

6.2  Upon request, each party will inform the other of those
patents then coming within the scope of Section 6.1.

Section 7.      <u>Term of Agreement</u>

7.1  The term of this Agreement shall be from the date hereof
until the expiration of the enforceability of the last to expire
of the Licensed Patents.

7.2  In the event that more than fifty percent (50%) of the
outstanding shares or securities (representing the right to vote
for the election of directors or other managing authority) of one

-29-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

party hereto (the "acquired party") is now, or hereafter becomes, owned or controlled directly or indirectly by a third party, said acquired party shall promptly give notice of such acquisition to the other party.  If such acquisition takes place prior to October 1, 1996, said other party agrees that it will enter into a new agreement with said third party substantially identical to this Agreement (except as provided hereinafter), provided said third party requests such agreement in writing to said other party, and enters into such agreement within two hundred and seventy (270) days after the date of such acquisition.  Any such new agreement with said third party shall differ from this Agreement in the following respects:

7.2.1    said third party's name shall be substituted herein in the place of said acquired party's name and such agreement shall be dated and effective as of the date of such request;

7.2.2    , in the event that a prior patent license agreement exists between said third party and said other party, which prior agreement grants licenses under any of the patents under which licenses are granted by this Agreement, then such new agreement shall grant licenses under such patents only to the extent such patents were not licensed under such prior agreement, and shall in no way affect or alter the terms and conditions of such prior agreement;

7.2.3    in the event said third party is organized under the laws of a country different from that of said acquired party, such agreement shall contain such additional terms and conditions (other than royalty provisions) as may exist

-30-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010070

in patent license agreements between said other party and other corporations organized under the laws of the same country, and

7.2.4     Sections 4 and 5 and any references thereto shall be omitted.

This Agreement shall terminate upon the signing of such new agreement, except that any patent which is a Licensed Patent under this Agreement but which cannot be licensed under such new agreement to the extent it is licensed under this Agreement shall continue to be licensed under the terms and conditions of this Agreement.

If such acquisition takes place prior to October 1, 1996 and said third party does not enter into an agreement, as hereinabove provided,

7.2.5     all licenses and warrants granted and made herein to said other party under any patents issued or issuing on patent applications having an effective filing date subsequent to two hundred and seventy (270) days after the date of such acquisition shall terminate; and

7.2.6     this agreement shall be deemed to have been automatically amended so that the license granted herein to said acquired party becomes a license under said other party's Licensed Patents (including the right to sublicense its Subsidiaries) to make, use, import, lease, sell and/or otherwise transfer only products identical with (i) those manufactured and marketed by said acquired party within the licenses granted in this Agreement prior to such acquisition

-31-

ξ 59

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010071

and (ii) those which were planned for marketing (including
enhancements and improvements to existing products) at the
time of such acquisition and which were actually leased,
sold or otherwise transferred within two hundred and seventy
(270) days after the date of such acquisition.

If such acquisition takes place on or after October 1, 1996, this
Agreement shall terminate if and when said acquired party ceases
to exist as the same legal entity it was prior to such
acquisition.  If said acquired party holds any patents or patent
applications under which the other party is licensed, such
licenses will continue for the life of such patents or patent
applications.

Section 8.      Warranty
8.1  Each party represents and warrants that it has the full
right and power to grant the licenses, warrants, option and
release set forth in Sections 2 and 4 and that there are no
outstanding agreements, assignments or encumbrances inconsistent
with the provisions of said Sections or with any other provision
of this Agreement.  Each party, (as a GRANTOR) further represents
and warrants that prior to the execution of this Agreement it has
informed in writing the other party of any patent originating
from inventions made by employees of GRANTOR or its Subsidiaries,
which patent is now owned by GRANTOR or its Subsidiaries and
which patent, owing to prior arrangements with third parties,
does not, or will not, qualify as a Licensed Patent, under which
licenses are granted of the full scope set forth in Sections 2.1

—32—

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

and 2.2. Neither party makes any other representations or warranties, express or implied, nor does either party assume any liability in respect of any infringement of patents or other rights of third parties due to the other party's operation under the license herein granted.

Section 9.   Communications

9.1 Any payment, notice or other communication required or permitted to be made or given to either party hereto pursuant to this Agreement shall be sent to such party by registered or certified mail, postage prepaid, addressed to it at its address set forth below, or to such other address as it shall designate by written notice given to the other party, and shall be deemed to have been made or given on the date of mailing.  The addresses are as follows:

9.1.1  ,  For IBM,

        IBM Director of Commercial Relations
        International Business Machines Corporation
        2000 Purchase Street
        Purchase, New York 10577

9.1.2  _  For APPLE,  :

        Vice President and General Counsel
        Apple Computer, Inc.
        20525 Mariani Avenue
        Cupertino, California  95014

Section 10.   Assignments

10.1 Neither party shall assign any of its patents, or the applications therefor, which qualify as Licensed Patents as defined herein, or any of its patents or rights which are subject to the other party's rights pursuant to Section 6, unless such

-33-

$959

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

assignment is made subject to the terms and conditions of this Agreement.  Subject to the provisions of Section 3, neither party shall assign any of its rights or privileges hereunder without the prior written consent of the other party.  Any attempted assignment in derogation of the foregoing shall be void.

Section 11.    Know-How and.Trade Secrets

11.1 The parties understand and agree that no license or other right is granted herein to either party, directly or by implication, estoppel or otherwise, with respect to any trade secrets or know-how, and that no such license or other right shall arise from the consummation of this Agreement or from any acts, statements or dealings leading to such consummation. Except as specifically provided herein, neither party is required hereunder to furnish or disclose to the other any technical or other information.

Section 12.    Applicable Law

12.1 This Agreement shall be construed, and the legal relations between the parties hereto shall be determined, in accordance with the law of the State of New York, United States of America.

Section 13.    Miscellaneous

13.1 Nothing contained in this Agreement shall be construed as a warranty or representation by either party as to the validity or scope of any of its Licensed Patents and either party is free to contest in any proceeding said validity or scope.

-34-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

13.2 Nothing contained in this Agreement shall be construed as conferring any right to use in advertising, publicity, or other promotional activities any name, trade name, trademark, or other designation of either party hereto (including any contraction, abbreviation or simulation or any of the foregoing); and each party hereto agrees not to use or refer to this Agreement or any provision thereof in any advertising or publicity without the express written approval of the other party.

13.3 Nothing contained in this Agreement shall be construed as conferring on either party any license or other right to copy the exterior design of the products of the other party.

13.4 Nothing contained in this Agreement shall be construed as conferring any rights by implication, estoppel or otherwise: to or under copyrights; or with respect to any Programs under any present system of statutory protection or one hereafter enacted, in any country or countries, wherein the copying of a Program is a requisite of infringement under such system.

13.5 Nothing contained in this Agreement shall be construed as limiting the rights which the parties have outside the scope of the licenses granted hereunder, or restricting the right of either party or any of its Subsidiaries to make, have made, use, lease, sell or otherwise dispose of any particular product or products not herein licensed.

-35-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

13.6 Each party shall, upon request from the other party sufficiently identifying any patent, inform the other party as to the extent to which said patent is subject to the licenses and rights granted hereunder. If such licenses or rights under said patent are restricted in scope, copies of all pertinent provisions of any contract or other arrangement creating such restrictions shall, upon request, be furnished to the party making such request, unless such disclosure is prevented by such contract, and in that event a statement of the nature of such restriction will be provided.

13.7 Neither of the parties hereto, nor any of their respective Subsidiaries shall be required hereunder to file any patent application, or to secure any patent or patent rights, or to maintain any patent in force, or to provide copies of patent applications to the other party or its Subsidiaries, or to disclose any inventions described or claimed in such patent applications.

13.8 Neither party shall have any obligation hereunder to institute any action or suit against third parties for infringement of any of its Licensed Patents or to defend any action or suit brought by a third party which challenges or concerns the validity of any of its Licensed Patents. In addition, neither party shall have any right to institute any action or suit against third parties for infringement of any of the other party's Licensed Patents.

-36-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

13.9 It is recognized that one party hereto may have granted to a third party licensing rights with respect to a patent which would otherwise qualify as a Licensed Patent under this Agreement, such rights being subject to payment to the granting party of royalties or other consideration in respect of licenses extended by such third party to another. In any such event, the one party shall promptly repay or cause to be repaid to the other party hereto any royalties or other monetary consideration which the granting party receives or is entitled to receive from such third party as a result of such third party's extension to the other party of a license under the affected patent of or within the scope of the licenses granted under Section 2 of this Agreement.

13.10 The parties agree that Licensed Apparatus leased, sold or otherwise transferred by a party hereto or its sublicensed Subsidiary shall be considered to be licensed under any Licensed Patent which at any time covers such Licensed Apparatus, whether or not the lease, sale or other transfer occurs prior to the issuance of such Licensed Patent and regardless of the country in which it occurs, and notwithstanding that the Licensed Apparatus has been re-leased, re-sold or re-transferred by any entity in the same or another country.

13.11 Because the breach, by either party hereto, of the warrant provisions of Sections 2.3, 2.4, 2.5 or 2.6, would cause irreparable harm and significant injury which would be difficult to ascertain and which would not be compensable by damages alone,

-37-

€ 59

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

both parties agree that one party will have the right to enforce
this Agreement and said warranty provisions by injunction,
specific performance or other equitable relief without prejudice
to any other rights and remedies that the one party may have for
the other party's breach of this Agreement.

13.12 This Agreement will not be binding upon the parties until
it has been signed hereinbelow by or on behalf of each party, in
which event it shall be effective as of the date first above
written.  No amendment or modification hereof shall be valid or
binding upon the parties unless made in writing and signed as
aforesaid.  This Agreement sets forth the entire agreement and
understanding between the parties with respect to the subject
matter hereof and merges all prior discussions between them, and
neither of the parties shall be bound by any conditions,
definitions, warranties, understandings, or representations with
respect to the subject matter hereof other than as expressly
provided herein.  This Agreement supersedes the patent license
agreement between the parties dated as of January 1, 1985 which
latter agreement is hereby terminated; provided, however, that
any patent which was licensed under said latter agreement but is
not an IBM Licensed Patent or APPLE Licensed Patent (as those
terms are defined in this Agreement) shall continue to be
licensed under the terms and conditions of said latter agreement.

13.13 If any provision or provisions of this Agreement shall be
held to be illegal, invalid or unenforceable, that provision of

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010078

the Agreement will be enforced to the maximum extent permissible so as to effect the intent of the parties, and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

13.14 The headings of the several sections are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly signed as of the date first above written.

INTERNATIONAL BUSINESS
MACHINES CORPORATION

Witness:

By

APPLE COMPUTER INC.

Witness:

By

-39-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010079