# EXHIBIT V

**To the Declaration of Daniel C. Posner in Support of Samsung's Oppositon to Apple's Motion for Preliminary Injunction**

# EXHIBIT V
# FILED UNDER SEAL

111902

PATENT CROSS LICENSE AGREEMENT
(the "Agreement") dated as of
October 25, 2002, between
INTERNATIONAL BUSINESS MACHINES
CORPORATION, a New York
corporation ("IBM"), and APPLE
COMPUTER, INC., a California
corporation ("APPLE")

Each of the parties hereto has the right (as GRANTOR herein)
to grant licenses to the other party (as GRANTEE herein) under
certain patents and desires to acquire a nonexclusive license
under certain patents of the other party.

Each of the parties hereto expects to continue research and
development, which will produce further patents and each party
may require a nonexclusive license under such patents of the
other party.

APPLE and IBM plan to enter into certain other agreements
on or about the date this Agreement is signed and contemplate
other arrangements of mutual benefit to the parties.

For good and valuable consideration, the sufficiency of
which is acknowledged, the parties agree as follows:

Section 1. <u>Definitions</u>

"APPLE Licensed Apparatus" shall mean IHS Products, IHS Programs,
IHS Complexes and any combination of any, some or all of the
foregoing; provided, however, that APPLE Licensed Apparatus
shall not include Main Frame Computers. Any such combination
shall be considered an APPLE Licensed Apparatus even though its



CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

elements are leased, sold or otherwise transferred at different times.

"Apple Licensed Patents" shall mean all patents throughout the world, including utility models and, subject to Section 13.4, including design patents and registrations for type fonts (but not including any other design patents or registrations), issued or issuing on patent applications entitled to an effective filing date prior to October 25, 2012, under which patents or the applications therefor APPLE or any of its Subsidiaries now has, or hereafter obtains, the right to grant licenses to IBM of or within the scope granted herein without such grant or the exercise of right's thereunder resulting in the payment of royalties or other consideration by APPLE or its Subsidiaries to third parties (except for payments among APPLE and Subsidiaries of APPLE, and payments to third parties for inventions made by said third parties while employed by APPLE or any of its Subsidiaries). The term "APPLE Licensed Patents" shall also include those of the aforesaid applications which have been published and any patent reissuing on any of the aforesaid patents.

"Authorized Assembler" shall mean a third party that, pursuant to a written contract with a Grantee, assembles Grantee's Licensed Products, in accordance with written specifications provided by said Grantee, for sale under Grantee's brand name.

"IBM Licensed Apparatus" shall mean IHS Products, IHS Programs, IHS Complexes and any combination of any, some or all of the foregoing. Any such combination shall be considered an IBM Licensed Apparatus even though its elements are leased, sold or otherwise transferred at different times.

"IBM Licensed Patents" shall mean all patents throughout the world, including utility models and, subject to Section 13.4, including design patents and registrations for type fonts (but

2



CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010085

not including any other design patents or registrations), issued or issuing on patent applications entitled to an effective filing date prior to October 25 2012, under which patents or the applications therefor IBM or its Subsidiaries now has, or hereafter obtains, the right to grant licenses to APPLE of or within the scope granted herein without such grant or the exercise of rights thereunder resulting in the payment of royalties or other consideration by IBM or its Subsidiaries to third parties (except for payments among IBM and Subsidiaries of IBM, and payments to third parties for inventions made by said third parties while employed by IBM or any of its Subsidiaries). The term "IBM Licensed, Patents" shall also include those of the aforesaid applications which have been published and any patent reissuing on any of the aforesaid patents.

"IHS Complex" shall mean an aggregate of instrumentalities, which is the combination of one or more IHS Products with other apparatus which is not an IHS Product or a Manufacturing Apparatus.

"IHS Product" shall mean an Information Handling System, any Supply or any instrumentality or aggregate of instrumentalities (including, without limitations, any component or subassembly) designed for incorporation in an Information Handling System; provided, however, that a Manufacturing Apparatus shall not be considered to be an IHS Product.  Examples of instrumentalities or aggregates which are not IHS Products include, but are not limited to, steel mills, automobiles and elevators.

"IHS Program" shall mean a plurality of instructions capable of being compiled, executed or interpreted by an IHS Product or an IHS Complex, whether or not such instructions are in machine readable form.

"Information Handling System" shall mean any instrumentality or aggregate of instrumentalities primarily designed to compute,



CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010086

classify, process, transmit, receive, retrieve, originate, switch, store, display, manifest, measure, defect, record, reproduce, handle, or otherwise utilize any form of information, intelligence, or data for business, scientific, control or other purposes.

"Integrated Circuit" shall mean an integral unit including a plurality of interconnected Semiconductor Circuits and/or Semiconductor Devices for attachment to a substrate and/or passive circuit elements; such unit forming, or contributing to the formation of, a circuit for performing electrical or electronic functions.

"Licensed Patents" shall mean either IBM Licensed Patents or APPLE Licensed Patents, or both, as the context indicates.

"Licensed Products" shall mean either IBM Licensed Products or APPLE Licensed Products, or both, as the context indicates.

"Main Frame Computer" shall mean any IHS Product including one or more general or special purpose processing units primarily designed to utilize a native instruction set based on the IBM S/390 or AS400 architecture, or any upward derivative, upward follow-on, or upward extension of said architectures (but not equivalent to the IBM Power or PowerPC native instruction set, nor any of its successors, used by Apple), and which IHS Product is primarily designed to operate under control of one of the IBM S/390 or AS400 operating systems.

"Manufacturing Apparatus" shall mean any instrumentality or aggregate of instrumentalities primarily designed for use in the fabrication of an IHS Product.

"Redundant Array of Inexpensive Disks" or "RAID" shall mean any IHS Product including a redundant array of Rotating Memory Products primarily designed for storing information and

4

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010087

redundant information in said array and for providing such stored information notwithstanding the failure of one of such Rotating Memory Products.

"Rotating Memory Product" shall mean any IHS Product primarily designed for recording and/or reproducing information in digital form, during relative motion between a recording medium (including, without limitation, a cylinder or disk) having a readable and/or writeable layer (including, without limitation, a magnetic, optical or magneto-optical layer) and one or more transducers, each transducer operative to read and/or write information from or on such medium.  Rotating Memory Product shall also include any instrumentality or aggregate of instrumentalities (including, without limitation, any component or subassembly) designed for incorporation in such an IHS Product.  An aggregation or combination of two or more Rotating Memory Products (such as a Redundant Array of Inexpensive Disks (RAID)) or an aggregation or combination of one or more Rotating Memory Products with another IHS Product (such as a computer which includes a Rotating Memory Product) shall not be deemed to be a Rotating Memory Product notwithstanding that Rotating Memory Products are included within it.

"Semiconductor Apparatus" shall mean any Semiconductor Material, Semiconductor Device, Semiconductor Circuit, Integrated Circuit and/or Semiconductor Memory.

"Semiconductor Circuit" shall mean a circuit in which one or more Semiconductor Devices are interconnected in one or more paths (including passive circuit elements, if any) for performing electrical or electronic functions and if provided therewith, housing and/or supporting means therefor, but such Semiconductor Circuit shall not comprise a printed circuit board.

"Semiconductor Device" shall mean an electrical and/or electronic component and any material therefor, comprising a

5

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010088

body of one or more Semiconductor Materials and one or more electrodes associated therewith, and, if provided therewith, housing and/or supporting means therefor.

"Semiconductor Material" shall mean any material, which does not exhibit superconductivity at a temperature in excess of twenty (20) degrees Kelvin, whose conductivity is intermediate to that of metals and insulators at room temperature and whose conductivity, over some temperature range, increases with increases in temperature. Such materials shall include but not be limited to refined products, reaction products, reduced products, mixtures and compounds.

"Semiconductor Memory" shall mean an Integrated Circuit, which is designed for storing and retrieving digital information, intelligence or data.

"Subsidiary" shall mean a corporation, company or other entity:
(a)   more than fifty percent (50%) of whose outstanding shares or securities (representing the right to vote for the election of directors or other managing authority) are, now or hereafter, owned or controlled, directly or indirectly, by a party hereto, but such corporation, company or other entity shall be deemed to be a Subsidiary only so long as such ownership or control exists; or
(b)   which does not have outstanding shares or securities,  as may be the case in a partnership, joint venture or unincorporated association, but more than fifty percent (50%) of whose ownership interest representing the right to make the decisions for such corporation, company or other  entity is now or hereafter, owned or controlled, directly or  indirectly, by a party hereto, but such corporation, company or other entity shall be deemed to be a Subsidiary only so long as such ownership or control exists.



CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER                    APL-ITC796-0000010089

"Supply" shall mean, as to each party hereto, any article or matter designed for use in or by, and designed to be effectively consumed in the course of operation of, another IHS Product licensed herein to that party.

"Systems Management Service Program" shall mean a customizable, integrated Program to support the management and control of multi-vendor, multi-establishment networks of IHS Products.

Section 2. <u>Licenses and Warrants</u>

███████████████████████████████████████████

2.1.1 to make, use, import, lease, sell and/or otherwise transfer IBM Licensed Apparatus and to practice any process involved in the manufacture or use thereof and to provide any service; and

2.1.2 to make, have made, use and have used Manufacturing Apparatus and to practice and have practiced any method involved in the manufacture or use thereof; provided, however, that the rights granted in this Section 2.1.2 shall not serve to enlarge the scope of the rights granted in Sections 2.1.3 and 2.1.4; and

2.1.3 in addition to the license granted in subsection 2.1.4, to have made Semiconductor Apparatus for use, lease, sale or other transfer by or for IBM as part of or for use in another IBM Licensed Apparatus or as repair and replacement parts therefor; provided, however, that the license granted in this subsection 2.1.3 shall not be under any claims covering a method or process of manufacturing Semiconductor Apparatus; and

2.1.4 to have made IBM Licensed Apparatus (including Semiconductor Apparatus) by another manufacturer for the use, lease, sale or transfer by IBM, only when all the following conditions are met:

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER                                    APL-ITC796-0000010090

2.1.4.1 the designs and specifications (or in the case of
Semiconductor Apparatus, the net list, circuit or logic diagram,
or other specification or information specifying the unique
circuit design) for the manufacture of said IBM Licensed
Apparatus are furnished by, and originate with, IBM (or with
IBM's contractor, whether or not said contractor is also said
other manufacturer, provided that any patents and patent
applications, based upon inventions made in the course of the
contract, which cover any IBM Licensed Apparatus or any portion
thereof which is the subject of the contract, are licensable by
IBM to APPLE hereunder); and
2.1.4.2 said designs and specifications (or in the case of
Semiconductor Apparatus, the net list, circuit or logic diagram,
or other specification or information specifying the unique
circuit design) are in sufficient detail that no additional
designing is required by the manufacturer other than to adapt
the product to the production processes and standards normally
used by the manufacturer; provided, however, said license to
have made under Section 2.1.4 shall be only under APPLE Licensed
Patents which would, in the absence of this Agreement, be caused
to be infringed by compliance with such designs and
specifications, and the infringement so caused could not
reasonably be avoided while retaining such compliance; and
provided, further, that the license to have made shall not apply
to any IBM Licensed Apparatus in the form manufactured or
marketed by said other manufacturer prior to IBM's furnishing of
said designs and specifications.

In the absence of a written agreement to the contrary between
IBM and another manufacturer IBM shall be deemed to have
authorized said other manufacturer (i) to make Manufacturing
Apparatus or Semiconductor Apparatus under the license granted
to IBM in Section 2.1.2 or 2.1.3 when IBM has ordered said
Manufacturing Apparatus or Semiconductor Apparatus from said
other manufacturer, whether or not said Manufacturing Apparatus
or Semiconductor Apparatus is in existence at the time of said

8

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010091

order and (ii) to make said IBM Licensed Apparatus (including
Semiconductor Apparatus) under the license granted to IBM in
Section 2.1.4 when both conditions specified in Section 2.1.4.1
and 2.1.4.2 are fulfilled. Upon written request, IBM shall
inform APPLE whether, and if so to what extent, any manufacturer
identified by APPLE is operating under the license granted to
IBM in Section 2.1.2, 2.1.3 or 2.1.4.

Subject to section 13.10, a particular IBM Licensed
Apparatus shall be licensed under only those APPLE Licensed
Patents which, but for the license granted herein, would have
been infringed (including contributory infringement) if IBM had
made, used, imported, offered for sale, leased, sold and/or
otherwise transferred such IBM Licensed Apparatus in the country
where such APPLE Licensed Patents exist.

In the event that neither APPLE nor any of its Subsidiaries
has the right to grant a license under any particular APPLE
Licensed Patent of the scope set forth above in this Section 2.1,
then the license granted herein under said APPLE Licensed Patent
shall be of the broadest scope which APPLE or any of its
Subsidiaries has the right to grant within the scope set forth
above.

2.2.1 to make, use, import, lease, sell and/or otherwise
transfer APPLE Licensed Apparatus and to practice any process
involved in the manufacture or use thereof and to provide any
service; and

2.2.2 to make, have made, use and have used Manufacturing
Apparatus and to practice and to have practiced any method
involved in the manufacture or use thereof; provided, however,
that the rights granted in this Section 2.2.2 shall not serve to
enlarge the scope of the rights granted in Section 2.2.4 and
2.2.5; and



CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010092

2.2.3 to make Semiconductor Apparatus for the use, lease, sale or other transfer by APPLE as part of APPLE Licensed Apparatus or as repair and replacement parts thereof in the following instances:

2.2.3.1 to interconnect prefabricated Integrated Circuits (including connection to passive and/or prefabricated active circuits) and attach such interconnected Integrated Circuits to substrates and/or packages, and/or to attach prefabricated substrates including Integrated Circuits to packages;

2.2.3.2 to modify physical characteristics of prefabricated Semiconductor Apparatus to change the electrical or electronic function(s) of such Semiconductor Apparatus;

2.2.3.3 to complete the final circuit forming layers of a Semiconductor Circuit and/or Integrated Circuit through Utilization of a commercially available device designed for forming such layers on a prefabricated base device; and/or

2.2.3.4 to interconnect one or more prefabricated Semiconductor Memory (including connection to passive and/or prefabricated active circuits) and attach such Semiconductor Memory to substrates and/or packages, and/or attach prefabricated substrates including Semiconductor Memory to packages;

2.2.4 to have made APPLE Licensed Apparatus, and to have made Semiconductor Apparatus other than Semiconductor Memories, by another manufacturer for the use, lease, sale or transfer by APPLE, only when all the following conditions are met:

2.2.4.1 the designs and specifications (or in the case of Semiconductor Apparatus, the net list, circuit or logic diagram, or other specification or information specifying the unique circuit design) for the manufacture of said APPLE Licensed Apparatus are furnished by, and originate with, APPLE (or with APPLE's contractor, whether or not said contractor is also said other manufacturer, provided that any patents and patent applications, based upon inventions made in the course of the contract, which cover any APPLE Licensed Apparatus or any portion thereof which is the subject of the contract, are licensable by APPLE to IBM hereunder); and



CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010093

2.2.4.2 said designs and specifications (or in the case of Semiconductor Apparatus, the net list, circuit or logic diagram, or other specification or information specifying the unique circuit design) are in sufficient detail that no additional designing is required by the manufacturer other than to adapt the product to the production processes and standards normally used by the manufacturer; provided, however, said license to have made under Section 2.2.4 shall be only under IBM Licensed Patents which would, in the absence of this Agreement, be caused to be infringed by compliance with such designs and specifications, and the infringement so caused could not reasonably be avoided while retaining such compliance, and provided, further, that the license to have made shall not apply to any APPLE Licensed Apparatus in the form manufactured or marketed by said other manufacturer prior to APPLE's furnishing of said designs and specifications. In the absence of a written agreement to the contrary between APPLE and another manufacturer, APPLE shall be deemed to have authorized said other manufacturer (i) to make Manufacturing Apparatus or Semiconductor Apparatus under the license granted to APPLE in Section 2.2.2 or 2.2.5 when APPLE has ordered said Manufacturing Apparatus or Semiconductor Apparatus from said other manufacturer, whether or not said Manufacturing Apparatus or Semiconductor Apparatus is in existence at the time of said order, and
(ii) to make said APPLE Licensed Apparatus (including Semiconductor Apparatus) under the license granted to APPLE in Section 2.2.4 when both conditions specified in Sections 2.2.4.1 and 2.2.4.2 are fulfilled; and
2.2.5    in addition to the license granted in subsection 2.2.4, to have made Semiconductor Apparatus for use, lease, sale or other transfer by or for APPLE as part of or for use in another APPLE Licensed Apparatus or as repair and replacement parts therefor; provided, however, that the license granted in this subsection 2.2.5 shall not be under any claims covering a method or process of manufacturing Semiconductor Apparatus.

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010094

Upon written request, APPLE shall inform IBM whether, and if so to what extent, any manufacturer identified by IBM is operating under the license granted to APPLE in Section 2.2.2, 2.2.4, or 2.2.5.

Subject to section 13.10, a particular APPLE Licensed Apparatus shall be licensed under only those IBM Licensed Patents which, but for the license granted herein, would have been infringed (including contributory infringement) if APPLE had made, used, imported, offered for sale, leased, sold and/or otherwise transferred such APPLE Licensed Apparatus in the country where such IBM Licensed Patents exist.

In the event that neither IBM nor any of its Subsidiaries has the right to grant a license under any particular IBM Licensed Patent of the scope set forth above in this Section 2.2, then the license granted herein under said IBM Licensed Patent shall be of the broadest scope which IBM or any of its Subsidiaries has the right to grant within the scope set forth above.

2.3 Subject to the provisions of Sections 2.7 and 2.8, IBM, to the extent it has the right to do so, on behalf of itself and its Subsidiaries, hereby covenants to Apple that it will not sue the users of APPLE Licensed Apparatus manufactured, used, leased, sold or otherwise transferred by APPLE or its sublicensed Subsidiaries within the scope of the licenses granted to APPLE under this Agreement, for infringement of any of the IBM Licensed Patents:

2.3.1 for the use of such APPLE Licensed Apparatus;

2.3.2 for the formation and use of any combination which includes any such APPLE Licensed Apparatus, whether or not such formed combination includes other apparatus which is not furnished by APPLE or any of its sublicensed Subsidiaries, on the condition that APPLE or its sublicensed Subsidiary proposed or otherwise participated in such formation and/or use; provided, however, that such covenant shall not be construed to cover any apparatus per se which forms a part of such combination, which



CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010095

is either not otherwise licensed to APPLE herein or not
furnished by APPLE or its sublicensed Subsidiary; and
2.3.3 for the modification and use of such APPLE Licensed
Apparatus and/or the combination of Section 2.3.2 above in
accordance or in combination with IHS Programs and/or Supplies
whether or not such IHS Programs and/or Supplies are furnished
by APPLE or its sublicensed Subsidiary; provided, however, that
such covenant shall not extend to the manufacture, lease, sale
or other transfer of such Programs or Supplies which are not
furnished by APPLE or its sublicensed Subsidiary; and provided,
further that such covenant shall not pertain to any IBM Licensed
Patent which covers a use or formation and use or modification
and use referred to above with respect to which a third party
(other than said user) is an infringer (including contributory
infringer).

2.4 Subject to the provisions of Section 2.7, APPLE on behalf of
itself and its Subsidiaries, hereby covenants to IBM that it
will not sue the users of IBM Licensed Apparatus manufactured,
leased, sold or otherwise transferred by IBM or its sublicensed
Subsidiaries within the scope of the licenses granted to IBM
under this Agreement, for infringement of any of the APPLE
Licensed Patents,
2.4.1 for the use of such IHS Products and IHS Complexes;
2.4.2 for the formation and use of any combination which
includes any such IHS Product, whether or not such formed
combination includes other apparatus which is not furnished by
IBM or any of its sublicensed Subsidiaries, on the condition
that IBM or its sublicensed Subsidiary proposed or otherwise
participated in such formation and/or use, provided, however,
that such covenant shall not be construed to cover any apparatus
per se which forms a part of such combination, which is either
not otherwise licensed to IBM herein or not furnished by IBM or
its sublicensed Subsidiary; and
2.4.3 for the modification and use of such IHS Products and/or
combination of Section 2.4.2 above in accordance or in

13



CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010096

combination with IHS Programs and/or Supplies, whether or not
such IHS Programs and/or Supplies are furnished by IBM or its
sublicensed Subsidiary; provided, however, that such covenant
shall not extend to the manufacture, lease, sale or other
transfer of such IHS Programs or Supplies which are not
furnished by IBM or its sublicensed Subsidiary; and provided,
further, that such covenant shall not pertain to any APPLE
Licensed Patent which covers a use or formation and use or
modification and use referred to above with respect to which a
third party (other than said user) is an infringer (including
contributory infringer).

2.5 With respect to IHS Programs and/or Supplies leased, sold
and/or otherwise transferred by APPLE or its sublicensed
Subsidiary, IBM, to the extent it has the right to do so, on
behalf of itself and its Subsidiaries, hereby covenants to Apple
that it will not sue users of such IHS Programs and/or Supplies,
for infringement of any of the IBM Licensed Patents, for use of
IHS Products and IHS Complexes in accordance or in combination
with such IHS Programs and/or Supplies, whether or not such IHS
Products and IHS Complexes are furnished by APPLE or its
sublicensed Subsidiary; provided, however, that such covenant
shall not include or be construed to cover any such IHS Product
or IHS Complex or any portion or portions thereof, which is not
furnished by APPLE or its sublicensed Subsidiary and which would,
without the use of such IHS Program or Supply, be covered by an
IBM Licensed Patent.

2.6 With respect to IHS Programs and/or Supplies leased, sold
and/or otherwise transferred by IBM or its sublicensed
Subsidiary, APPLE, to the extent it has the right to do so, on
behalf of itself and its Subsidiaries, hereby covenants to IBM
that it will not sue users of such IHS Programs and/or Supplies,
for infringement of any of the APPLE Licensed Patents, for use
of IHS Products and IHS Complexes in accordance or in
combination with such IHS Programs and/or Supplies, whether or

14



CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

not such IHS Products and IHS Complexes are furnished by IBM or its sublicensed Subsidiary; provided, however, that such covenant shall not include or be construed to cover any such IHS Product or IHS Complex or any portion or portions thereof, which is not furnished by IBM or its sublicensed Subsidiary and which would, without the use of such IHS Program or Supply, be covered by an APPLE Licensed Patent.

2.7 No license or warrant or immunity or covenant not to sue is granted or made by either party hereto with respect to:
2.7.1 any apparatus per se which forms part of an IHS Complex or combination and which is not otherwise licensed herein; and
2.7.2 any third parties acquiring items from either party for the combination of items licensed hereunder with other items except as provided in Sections 2.3, 2.4, 2.5 and 2.6.

2.8 No license or warrant or immunity or covenant not to sue is granted or made by IBM to APPLE, either directly or by implication, estoppel or otherwise, under any IBM Licensed Patent claim:
2.8.1 to make Semiconductor Apparatus other than as stated in Section 2.2.3 (although APPLE may have made any Semiconductor Apparatus in accordance with Section 2.2.4 or 2.2.5); and
2.8.2 for the use, lease, sale, and/or other transfer of Semiconductor Apparatus other than Semiconductor Apparatus which is included as part of or for use in apparatus otherwise licensed herein or as repair and replacement parts therefor.

2.9 Either one of the parties shall, upon request of the other party, grant to any manufacturer a license under Licensed Patents to make for said other party, and to practice any method or process involved in such making, any Licensed Products identified by said other party.  Such license shall be granted in a separate agreement between said one party and said manufacturer on reasonable terms and conditions, at least as favorable (including with respect to payment) as those generally

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER                                        APL-ITC796-0000010098

offered to third parties at the time of the request. Upon written request, said one party shall inform said other party of the terms and conditions of any agreement entered into pursuant to this Section 2.9.

2.10 IBM shall, upon request of APPLE, grant to APPLE a license under IBM Licensed Patents for all or part of the remaining fields of Information Handling System not licensed to APPLE herein on reasonable terms and conditions at least as favorable (including with respect to payment) as those generally offered to third parties at the time of the request.

2.11 IBM shall, upon request of APPLE, grant to any manufacturer a license under IBM Licensed Patents to make for APPLE, and to practice any method or process involved in such making, any apparatus licensed to APPLE under an agreement entered into pursuant to Section 2.10. Such license shall be granted in a separate agreement between IBM and said manufacturer on reasonable terms and conditions at least as favorable (including with respect to payment) as those generally offered to third parties at the time of the request. Upon written request by APPLE, IBM shall inform APPLE of the terms and conditions of any agreement entered into pursuant to this Section 2.11.

2.12 A product which, if assembled by or for Grantee, would be licensed to Grantee hereunder shall also be licensed hereunder if assembled by an Authorized Assembler, provided:
(a)  the purchase price paid to Grantee and Grantee's designees for items included in the product exceeds sixty percent (60%) of the total cost of manufacturing and/or purchasing all of the items included in the product; and
(b)  the product is sold under Grantee's brand name.

2.13 The parties understand and acknowledge that Licensed Products include IHS Programs, and that IHS Programs are often distributed to end users by providing a master copy of such IHS

16

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010099

Program to a distributor, replicator, original equipment manufacturer, value-added-reseller or other third party and authorizing such third party to reproduce such IHS Program in identical form.  The IHS Programs reproduced by such authorized third parties are used or further distributed as products of Grantee.  Accordingly, the parties agree that the licenses and other rights granted in this Section 2 shall apply to the reproduction and subsequent distribution by authorized third parties of copies of such IHS Programs, which copies are in substantially identical form as provided by the Grantee or its sublicensed Subsidiaries and which copies are used or distributed by such authorized third party as products of Grantee or its sublicensed Subsidiaries, including products co-branded with a third party trademark or tradename, and products included in another product branded with a third party trademark or tradename (but not including such other product).  For purposes of this subsection 2.13, an IHS Program shall be deemed substantially identical to its original form even if it has been translated for use in a specific geography, or adapted for use in or with a particular hardware or software product.

2.14 If, by October 25, 2012, APPLE is not and has never been in the business (as defined below) for Systems Management Service Programs, then APPLE Licensed Apparatus shall be deemed to exclude Systems Management Service Programs, effective October 25, 2012.  For purposes of this Section 2.14, APPLE shall be deemed to be "in the business" if, anywhere in the world, APPLE or its sublicensed Subsidiary has:

(i)  commenced to manufacture at least one product which meets the definition of Systems Management Service Programs;

(ii) committed significant funds to the imminent commencement of such manufacture;

(iii) sold or offered to sell at least one such product to third parties; or



CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010100

(iv) entered into contractual arrangements with a third party
for such third party to provide design, manufacturing or
marketing services for at least one such product.

2.15 If, by October 25, 2012, APPLE is not and has never been in
the business of manufacturing (as defined below) Rotating Memory
Products, then irrespective of whether Apple is licensed to use,
import and/or sell Rotating Memory Products, the license granted
to APPLE in Section 2 of this Agreement shall be deemed to
exclude manufacture of such products, effective October 25, 2012.
For purposes of this Section 2.15, APPLE shall be deemed to be
"in the business of manufacturing" if, anywhere in the world,
APPLE or its sublicensed Subsidiary has:
(i)  commenced to manufacture at least one product which meets
the definition of Rotating Memory Products; or
(ii) committed significant funds to the imminent commencement of
such manufacture.

2.16 If, after the effective date of this Agreement, a party or
any of its Subsidiaries ("Acquiring Party") acquires an entity,
and said entity is, immediately prior to the date of acquisition,
licensed by the other party ("Licensor") under one or more
Licensed Patents through an existing agreement pursuant to which
fixed payments are made by said entity to Licensor, then the
license and other rights granted herein to the Acquiring Party
with respect to said Licensed Patents shall apply to products
manufactured by said entity, provided that such fixed payments
shall continue to be made by the Acquiring Party or said entity
to the Licensor with respect to such products notwithstanding
that the Acquiring Party may have been licensed for the same
Licensed Products before the acquisition.  If the Acquiring
Party or said entity does continue to make such fixed payments,
then said entity shall continue to enjoy all rights conferred on
it under its existing agreement (in addition to whatever rights
may be sublicensed to it pursuant to the present Agreement).

18



CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

Section 3. <u>Extension of License to Subsidiaries</u>

3.1 The licenses granted herein shall include the right of the parties hereto to sublicense their respective Subsidiaries and the right of such sublicensed Subsidiaries to sublicense other Subsidiaries. Each sublicensed Subsidiary shall be bound by the terms and conditions of this Agreement as if it were named herein in the place of the party with whom the sublicense originated. If a Subsidiary ceases to be a Subsidiary and holds any patents or patent applications under which a party hereto is licensed, such licenses will continue for the life of such patents or patent applications.  Any sublicense granted to a Subsidiary shall terminate on the date such Subsidiary ceases to be a Subsidiary.

3.2 In the event a Subsidiary of one party hereto is an Operating Subsidiary (as hereinafter defined) at the time it ceases to be a Subsidiary, and, with the written approval of said one party, requests in writing, within two hundred and seventy (270) days after ceasing to be a Subsidiary, a license agreement with the other party hereto upon terms and conditions substantially identical with the terms and conditions of this Agreement (except as hereinafter provided) the other party hereto agrees that it will enter into such license agreement forthwith.  An Operating Subsidiary shall be any Subsidiary of one party which at the time it ceases to be a Subsidiary has all of the following:
3.2.1 a line or marketable products;
3.2.2 patents or other intellectual property relating to the line of marketable products; and
3.2.3 tangible assets equivalent in value to the lesser of ten million U.S. dollars ($10,000,000) or twenty percent (20%) of the total assets of the party of which it was formerly a subsidiary.
    Any such agreement with an Operating Subsidiary shall differ from this Agreement in the following respects:

19

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

3.2.4 this Section 3.2 and Section 4, and all references to the foregoing Sections, shall be omitted;

3.2.5 the name of the Operating Subsidiary shall be substituted for the name of the party hereto of which it was formerly a subsidiary;

3.2.6 in the event that such Operating Subsidiary is or becomes organized under the laws of a country different from the United States of America, such license agreement shall contain such additional terms and conditions (other than royalty provisions) as may exist in patent license agreements between the other party hereto and other corporations organized under the laws of the same country;

3.2.7 the licenses granted by the other party to such Operating Subsidiary shall be limited to a field of use appropriate to cover the particular product line being transferred or spun off, including extensions thereto based on the same technology; and

3.2.8 in place of Section 7.2 of this Agreement, the agreement between the other party and such Operating Subsidiary shall contain the following Sections 7.2 and 7.3:

[[7.2 In the event that more than fifty percent (50%) of the outstanding shares or securities (representing the right to vote for the election of directors or other managing authority) of one party hereto (the "Acquired Party") hereafter becomes owned or controlled directly or indirectly by a third party:

7.2.1    the Acquired Party shall promptly give notice of such acquisition to the other party; and

   7.2.2    the license granted to the Acquired Party and all sublicenses (if any) granted to the Acquired Party's remaining Subsidiaries shall automatically become limited to only products identical ("identical" products do not include improvements, enhancements, substitutions, extensions, new releases, new versions, or follow-ons) with those manufactured and marketed by said Acquired Party (or, in the case of a Subsidiary, by such Subsidiary) within the

20



CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

licenses granted in this Agreement (or in such sublicense) prior to such acquisition.

7.3  If one party (the "Acquired Party") is acquired by a third party such that it is no longer a separate legal entity, the license granted to the Acquired Party shall terminate as of the date of acquisition.]]

Section 4. <u>Release</u>

4.1 Each party, on behalf of itself and its Subsidiaries which are Subsidiaries as of the date of this Agreement, hereby irrevocably releases the other party, its Subsidiaries which are Subsidiaries as of the date of this Agreement, and its and their respective customers, mediate and immediate, from any and all claims of infringement of any of its Licensed Patents, which claims have been made or which might be made at any time, with respect to any apparatus manufactured, used, leased, sold or otherwise transferred by or for the other party or its Subsidiaries before the date of this Agreement, and with respect to any method practiced in the manufacture or use of such apparatus.  Insofar as the releases of this Section 4 apply to customers of the parties, such customer releases shall not extend to claims of infringement with respect to which a party hereto would not also be liable as an infringer (either directly or indirectly) but for the existence of a release or license between the parties.

Section 5.   DELIBERATELY LEFT BLANK

Section 6. <u>Other License Rights</u>

6.1 It is recognized that the parties hereto or their respective Subsidiaries, may now have or hereafter obtain, the right to grant licenses under one or more patents of any country, including utility models and, subject to Section 13.4, including

21



CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER                                    APL-ITC796-0000010104

design patents and registrations for type fonts (but not including any other design patents or registrations), issuing on patent applications entitled to an effective filing date prior to October 25, 2012 but that such grant or the exercise of rights thereunder will result in payment of royalties or other consideration by GRANTOR or its Subsidiaries to third parties. Each party (as GRANTOR herein) agrees that, upon written request, it will grant to the other party (as GRANTEE herein) to the extent and subject to the terms and conditions under which it then has the right to do so, a license of the broadest scope which GRANTOR has the right to grant at any time but of no greater scope than the scope of the licenses granted herein with respect to any such patent. Such license shall be granted under a separate agreement, upon payment of the same royalty or other consideration as that which GRANTOR or any of its Subsidiaries is obligated to pay to a third party because of the grant of such license or the exercise of rights thereunder.

6.2 Upon request, each party will inform the other of those patents then coming within the scope of Section 6.1.

Section 7. <u>Term of Agreement</u>

7.1 The term of this Agreement shall be from the date on which this Agreement is signed by both parties until the expiration of the enforceability of the last to expire of the Licensed Patents.

7.2 In the event that more than fifty percent (50%) of the outstanding shares or securities (representing the right to vote for the election of directors or other managing authority) of one party hereto (the "Acquired Party") hereafter becomes owned or controlled directly or indirectly by a third party, said Acquired Party shall promptly give notice of such acquisition to the other party.

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010105

7.2.1     If such acquisition takes place prior to October 25, 2012, said other party agrees that it will enter into a new agreement with said third party substantially identical to this Agreement (except as provided hereinafter), provided said third party requests such agreement in writing to said other party, and enters into such agreement within two hundred and seventy (270) days after the date of such acquisition.  Any such new agreement with said third party shall differ from this Agreement in the following respects:

7.2.1.1   said third party's name shall be substituted herein in the place of said Acquired Party's name and such agreement shall be dated and effective as of the date of such request;

7.2.1.2   in the event that a prior patent license agreement exists between said third party and said other party, which prior agreement grants licenses under any of the patents under which licenses are granted by this Agreement, then such new agreement shall grant licenses under such patents only to the extent such patents were not licensed under such prior agreement, and shall in no way affect or alter the terms and conditions of such prior agreement;

7.2.1.3   in the event said third party is organized under the laws of a country different from that of said Acquired Party, such agreement shall contain such additional terms and conditions (other than royalty provisions) as may exist in patent license agreements between said other party and other corporations organized under the laws of the same country; and

7.2.1.4   Sections 4 and 5 of this Agreement and any references thereto shall be omitted from such new agreement.

This Agreement shall terminate upon the signing of such new agreement, except that any patent which is a Licensed Patent under this Agreement but which cannot be licensed under such new agreement to the extent it is licensed under this Agreement shall continue to be licensed under the terms and conditions of this Agreement.

23

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER                                          APL-ITC796-0000010106

7.2.2     If such acquisition takes place prior to October 25, 2012 and said third party does not enter into an agreement, as hereinabove provided,

7.2.2.1   all licenses and warrants granted and made herein to said other party under any patents issued or issuing on patent applications having an effective filing date subsequent to two hundred and seventy (270) days after the date of such acquisition shall terminate; and

7.2.2.2   this Agreement shall be deemed to have been automatically amended so that the license granted herein to said Acquired Party becomes a license under said other party's Licensed Patents (including the right to sublicense its Subsidiaries) to make, use, import, lease, sell and/or otherwise transfer only (a) products and services identical with (i) those manufactured and marketed by said acquired party within the licenses granted in this Agreement prior to such acquisition and (ii) those which were planned for marketing (including enhancements and improvements to existing products) at the time of such acquisition and which were actually leased, sold or otherwise transferred within two hundred and seventy (270) days after the date of such acquisition, and (b) future versions, updates and upgrades to such products and services.

7.2.3     If such acquisition takes place on or after October 25, 2012, this Agreement shall terminate if and when said Acquired Party ceases to exist as the same legal entity it was prior to such acquisition.  If said Acquired Party holds any patents or patent applications under which the other party is licensed, such licenses will continue for the life of such patents and patent applications.

Section 8. <u>Representation and Warranty</u>

8.1 Each party represents and warrants that it has the full right and power to grant the licenses, warrants, immunities, option and release set forth in Sections 2 and 4 and that there are no outstanding agreements, assignments or encumbrances

24

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

inconsistent with the provisions of said Sections or with any other provision of this Agreement. Each party, (as a GRANTOR) further represents and warrants that prior to the execution of this Agreement it has informed in writing the other party of any patent originating from inventions made by employees of GRANTOR or its Subsidiaries, which patent is now owned by GRANTOR or its Subsidiaries and which patent, owing to prior arrangements with third parties, does not, or will not, qualify as a Licensed Patent, under which licenses are granted of the full scope set forth in Sections 2.1 and 2.2.  A listing of such patents owned by IBM is attached as Attachment A.  Neither party makes any other representations or warranties, express or implied, nor does either party assume any liability in respect of any infringement of patents or other rights of third parties due to the other party's operation under the license herein granted.

Section 9.  <u>Communications</u>

9.1 Any payment, notice or other communication required or permitted to be made or given to either party hereto pursuant to this Agreement shall be sent to such party by registered or certified mail, postage prepaid, addressed to it at its address set forth below, or to such other address as it shall designate by written notice given to the other party, and shall be deemed to have been made or given on the date of mailing. The addresses are as follows:

9.1.1       For IBM,
            Director of Licensing
            IBM Corporation
            North Castle Drive, MD-NC119
            Armonk, NY  10504-1785
            United States of America
            Facsimile: (914) 765-4380


9.1.2       For APPLE,
            Vice President and General Counsel

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010108

Apple Computer, Inc.
1 Infinite Loop, MS 301-4GC
Cupertino, California 95014

Section 10. <u>Assignments</u>

10.1 Neither party shall assign any of its patents, or the applications therefor, which qualify as Licensed Patents as defined herein, or any of its patents or rights which are subject to the other party's rights pursuant to Section 6, unless such assignment is made subject to the terms and conditions of this Agreement. Subject to the provisions of Sections 3 and 7, neither party shall assign any of its rights or privileges hereunder without the prior written consent of the other party.  Any attempted assignment in derogation of the foregoing shall be void.

Section 11. <u>Know-How and Trade Secrets</u>

11.1 The parties understand and agree that no license or other right is granted herein to either party, directly or by implication, estoppel or otherwise, with respect to any trade secrets or know-how, and that no such license or other right shall arise from the consummation of this Agreement or from any acts, statements or dealings leading to such consummation. Except as specifically provided herein, neither party is required hereunder to furnish or disclose to the other any technical or other information.

Section 12. <u>Applicable Law</u>

12.1 This Agreement shall be construed, and the legal relations between the parties hereto shall be determined, in accordance

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010109

with the law of the State of New York, USA, as such law applies to contracts signed and fully performed in New York.

Section 13. <u>Miscellaneous</u>

13.1 Nothing contained in this Agreement shall be construed as a warranty or representation by either party as to the validity or scope of any of its Licensed Patents and either party is free to contest in any proceeding said validity or scope.

13.2 Nothing contained in this Agreement shall be construed as conferring any right to use in advertising, publicity, or other promotional activities any name, trade name, trademark, or other designation of either party hereto (including any contraction, abbreviation or simulation or any of the foregoing); and each party hereto agrees not to use or refer to this Agreement or any provision thereof in any advertising or publicity without the express written approval of the other party.

13.3 Nothing contained in this Agreement shall be construed as conferring on either party any license or other right to copy the exterior design of the products of the other party.

13.4 Nothing contained in this Agreement shall be construed as conferring any rights by implication, estoppel or otherwise: to or under copyrights; or with respect to any Programs under any present system of statutory protection or one hereafter enacted, in any country or countries, wherein the copying of a program is a requisite of infringement under such system.

13.5 Nothing contained in this Agreement shall be construed as limiting the rights which the parties have outside the scope of the licenses granted hereunder, or restricting the right of either party or any of its Subsidiaries to make, have made, use, lease, sell or otherwise dispose of any particular product or products not herein licensed.

27

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

13.6 Each party shall, upon request from the other party sufficiently identifying any patent, inform the other party as to the extent to which said patent is subject to the licenses and rights granted hereunder. If such licenses or rights under said patent are restricted in scope, copies of all pertinent provisions of any contract or other arrangement creating such restrictions shall, upon request, be furnished to the party making such request, unless such disclosure is prevented by such contract, and in that event a statement of the nature of such restriction will be provided.

13.7 Neither of the parties hereto, nor any of their respective Subsidiaries shall be required hereunder to file any patent application, or to secure any patent or patent rights, or to maintain any patent in force, or to provide copies of patent applications to the other party or its Subsidiaries, or to disclose any inventions described or claimed in such patent applications.

13.8 Neither party shall have any obligation hereunder to institute any action or suit against third parties for infringement of any of its Licensed Patents or to defend any action or suit brought by a third party which challenges or concerns the validity of any of its Licensed Patents. In addition, neither party shall have any right to institute any action or suit against third parties for infringement of any of the other party's Licensed Patents.

13.9 It is recognized that one party hereto may have granted to a third party licensing rights with respect to a patent which would otherwise qualify as a Licensed Patent under this Agreement, such rights being subject to payment to the granting party of royalties or other consideration in respect of licenses extended by such third party to another. In any such event, upon request by the other party hereto, the one party shall



CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER                                          APL-ITC796-0000010111

promptly repay or cause to be repaid to the other party hereto
any royalties or other monetary consideration which the granting
party receives or is entitled to receive from such third party
as a direct and specific result of such third party's extension
to the other party of a license under the affected patent of or
within the scope of the licenses granted under Section 2 of this
Agreement.

13.10 Notwithstanding any other provision of this Agreement, the
parties agree that Licensed Apparatus leased, sold or otherwise
transferred by a party hereto or its sublicensed Subsidiary
shall be considered to be licensed under any Licensed Patent
which at any time covers such Licensed Apparatus, whether or not
the lease, sale or other transfer occurs prior to the issuance
of such Licensed Patent and regardless of the country in which
it occurs, and notwithstanding that the Licensed Apparatus has
been released, resold or re-transferred by any entity in the
same or another country.

13.11 Because the breach, by either party hereto, of the warrant
provisions of Sections 2.3, 2.4, 2.5 or 2.6, could cause
irreparable harm and significant injury which would be difficult
to ascertain and which would not be compensable by damages alone,
both parties agree that one party will have the right to enforce
this Agreement and said warranty provisions by injunction,
specific performance or other equitable relief without prejudice
to any other rights and remedies that the one party may have for
the other party's breach of this Agreement.  Notwithstanding the
foregoing, the parties agree that a breach of any of Sections
2.3, 2.4, 2.5 or 2.6 shall not be deemed to be a material breach
of this Agreement.

13.12 This Agreement will not be binding upon the parties until
it has been signed hereinbelow by or on behalf of each party.
No amendment or modification hereof shall be valid or binding
upon the parties unless made in writing and signed as aforesaid.

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER                                    APL-ITC796-0000010112

This Agreement sets forth the entire agreement and understanding between the parties with respect to the subject matter hereof and merges all prior discussions between them, and neither of the parties shall be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein. This Agreement supersedes the patent license agreement between the parties dated as of October 1, 1991 which latter agreement is hereby terminated; provided however, that any patent which was licensed under said latter agreement but is not an IBM Licensed Patent or Apple Licensed Patent (as those terms are defined in this Agreement) shall continue to be licensed under the terms and conditions of said latter agreement.

13.13 If any provision or provisions of this Agreement shall be held to be illegal, invalid or unenforceable, that provision of the Agreement will be enforced to the maximum extent permissible so as to effect the intent of the parties, and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.



30

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010113

13.14 The headings of the several sections are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly signed as of the date first above written.


INTERNATIONAL BUSINESS MACHINES
CORPORATION

Dated:

December 4, 2002

By _____
Gerald Rosenthal
Vice President


APPLE COMPUTER

Dated:

12-18-02

By _____
Jon Rubinstein
Senior Vice President,
Hardware Engineering


31

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010114