# EXHIBIT F

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FRANCES J. SMITH,

               Plaintiff,

v.

LIFE INVESTORS INSURANCE
COMPANY OF AMERICA,

               Defendant.

Case No. 2:07-cv-00681

Hon. Terrence McVerry

CIVIL ACTION

## PLAINTIFF'S FIRST MOTION TO COMPEL PRODUCTION OF DOCUMENTS PURSUANT TO FED. R. CIV. P. 37

Plaintiff respectfully requests that the Court compel Defendant Life Investors Insurance Company of America ("Life Investors") to produce documents pursuant to Fed.R.Civ. P. 37.

## I.    STATEMENT OF FACTS

Plaintiff brings the instant class action against Life Investors for breach of contract, declaratory relief, and statutory bad faith as a result of the company's decision, implemented in April 2006, to change its treatment of "actual charges" benefits in its supplemental cancer insurance policies.  As this Court has previously recognized, "The key issue in this case is the meaning of the term 'actual charges' in the supplemental cancer insurance policy provided by Defendant."  (Doc. #23 at 1).  Plaintiff asserts that after 30 years of interpreting "actual charges" to mean the charges set forth in providers' bills and statements, Defendant in bad faith breached its contracts by reinterpreting the meaning of "actual charges" as the discounted amounts ultimately accepted by providers as payment in full, in order to pay lesser benefits to its insureds.

A.  Life Investors Administers Thousands of "Actual Charges" Cancer Policies Nationwide

Life Investors (including its predecessors) has been selling and administering supplemental cancer policies that pay benefits based upon "actual charges" since 1975. See Doc. # 121 at 10. Life Investors presently administers 192 supplemental cancer policies that pay benefits based upon "actual charges" in Pennsylvania on policy forms LPC0100 and BPC0100 (referred to as LPC01PA and BPC01PA). See Doc. 122-2, Declaration of James Byrne, at ¶ 4. The company also administers approximately 90,000 of these supplemental cancer policies nationwide. See Gooch v. Life Investors Ins. Co. of America, 1:07-CV-00016, Doc. # 119, Declaration of Stephen Gwin, at ¶16. At least 10,000 of these "actual charges" policies, including the policy issued to Plaintiff Frances J. Smith in Pennsylvania, were issued without annual maximums on the "actual charges" benefits payable for chemotherapy, radiation therapy, and blood treatments. See Ex. 1, Letter to PA Dept. of Insurance dated Dec. 22, 2008.

B. The Change In The Interpretation Of "Actual Charges" Came Out Of The Financial Department

Life Investors and its sister insurers developed and in 1995 began selling the XPC0100 Cancer Select policy form. See Ex. 2, Cancer Select Marketing Brochure for XPC0100, at 1 - 6; Ex. 3, Life Investors' 8/15/2003 Rate Increase Filing, at 2. While the policies used the term "actual charges," the Cancer Select marketing brochures, including the brochure provided to Mrs. Smith, stated that the policy form paid the "charges" for chemotherapy, radiation and blood benefits. See Ex. 2 at 4; Doc. #47-02, PX1 - Smith Policy, at 3. Carol Rutledge, a long-time cancer claims supervisor at Life Investors, testified that the term "actual charges" referred to provider charges. See Ex. 20, Deposition of Carol Rutledge ("Rutledge Dep.") at 31. The claims procedures required only provider statements of charges. See id. at 32-33. Until 1998, the Cancer Select policy form could be purchased without annual maximums on the benefits paid for chemotherapy, radiation, and blood. See Ex. 8, Deposition of Stephen Gwin ("Gwin Dep.")

at 35-36. The LPC0100 and BPC0100 policies at issue in this litigation are both examples of the Cancer Select policy form.[1]

Shortly after it began selling Cancer Select, Life Investors apparently experienced higher than expected claims. See Doc. # 156-03; PX2 at 27. In order to calculate how much the claims were increasing over time, Life Investors commissioned a cost claims study of its cancer business ("Wakely Report") around 2001, which was available to the company by 2003. Id. at 65-67. Although Life Investors has not provided this report to Plaintiff, references to the Wakely Report in Life Investors' rate increase filings to the Pennsylvania Department of Insurance indicate that the report revealed that those policies with unlimited "actual charges" chemotherapy benefits were "experiencing very high trend rates because of the increasing costs and utilization of chemotherapy." See Ex. 3, at 3 - 5. The Wakely Report projected the amounts of benefits cost increases in future years. See Id.

By 2003, the LPC0100 and BPC0100 policy forms were no longer being sold in Pennsylvania, and likely elsewhere.[2] See Ex 3 at 2 (referring to policies as a "closed block").

C. Life Investors Determined To Reinterpret "Actual Charges" In Order To Obtain The Discounts On Charges Negotiated And Received By Primary Insurers

In early 2004, Gwin met with his boss Kelly Adams, who was Life Investors' Director of Finance, and informed him that some of the "actual charges" cancer policies issued by Life Investors and its affiliated companies were losing money. See Doc. # 156-03, PX 2 at 94.

---

[1] The Cancer Select XPC0100 policy form was called LPC0100 when sold by Life Investors and BPC0100 when sold by sister-insurer Bankers United Life Assurance Company ("Bankers"). When sold by other operating companies with the Aegon Group, the forms were similarly named (e.g., Monumental Life Insurance Company sold policies under form MPC0100 and PFL Life Insurance Company sold policies under form PPC0100).

[2] Due to the merger of Bankers into Life Investors in 2001, the BPC0100 policy form was also effectively discontinued by 2003.

Shortly thereafter, in late April 2004, Adams convened the "Discontinued Supplemental Insurance Taskforce" (hereinafter "Taskforce") to consider ways to better "manage" the companies' increasingly unprofitable cancer policies.  Id. at 86.

Adams testified that at the group's first meeting in April 2004 the Taskforce made a finding that "we were paying claims based on list amounts on statements…and not following the language in our policies."  See Doc. # 156-04, PX 4 at 73.  Adams later relayed the Taskforce's finding that Life Investors and Transamerica might be "paying claims wrong" to Connie Whitlock.  Ex. 5, Deposition of Connie Whitlock ("Whitlock Dep.") at 159-160.   Ms. Whitlock was at that time Senior Vice President of both Life Investors and Transamerica Life Insurance Company, (Whitlock Dep. at 6, 8) and the individual responsible for operations of Life Investors' claims departments in Louisville, Kentucky and Little Rock, Arkansas (id. at 9).

Ms. Whitlock then claims to have undertaken a "review" of Life Investors and Transamerica's practice of paying "actual charges."  Id. at 71-73.  Notably, her investigation either failed to identify or deliberately disregarded evidence that "actual charges" had been previously defined to mean the amounts paid prior to any insurance discount in several of the Cancer Select policies that had been issued since 1995, including the BPC0100 policy issued in Oklahoma.[3]  See id. at 77-79, 200-202.  Ms. Whitlock also denied being aware of the impact of the decision on the companies' benefit costs when she made her decision, (id. at 64) even though it is clear that Life Investors' actuary Gwin performed analysis in later 2004 or early 2005 that estimated that Life Investors' payments to insureds would be reduced by 23.2 percent as a result

---

[3] Although documents pertaining to Life Investors' and Bankers' discussions with the Oklahoma Department of Insurance about the meaning of "actual charges" constitute relevant evidence of the companies' historic interpretation of the term, Life Investors has refused to provide Plaintiff with these documents.  Plaintiff seeks copies of these policies and related correspondence.  See Ex. 6 at 1; discussion *infra* at Section III(D).

of the proposed change in treatment of "actual charges" benefits, and shared this information

with Adams.  See Doc. # 128-3, Letter from Stephen Gwin; Ex. 4, Excerpts of Deposition of

KellyAdams ("Adams Dep.") at 114.

Ms. Whitlock sought approval to change the treatment of "actual charges" benefits from

her boss, Brenda Clancy, who was at that time Executive Vice President of Life Investors and

Transamerica, and a member of Life Investors' Board of Directors.  See Whitlock Dep. at 59.

Approvals were also obtained from Chief Financial Officer of the AEGON Financial Partners

Division, Chris Garrett; and General Counsel of the AEGON Financial Partners Division, David

Goldstein.  Id. at 92, 102.  Approval may have been obtained from Life Investors' or its parent

companies' Boards of Directors; however, defense counsel have indicated that all such

documents are being withheld on grounds of relevance.  See Ex. 6, Email to Solares dated

4/15/09 at 1.

D.  The 2006 Change Was A High Level Change Affecting Three Companies and Thousands of Policies Nationally

Whitlock internally announced her decision to authorize the change in treatment of actual

charges benefits in Life Investors' and Transamerica's supplemental insurance policies by

memorandum dated July 22, 2005.  See Ex. 7, July 22, 2005 Memorandum.  Thereafter, in

January and February 2006, Life Investors sent letters to "tens of thousands" of insureds across

the country announcing its decision to change the benefits it would pay under the "actual

charges" provisions in its insurance policies.  See Doc. #68-3, PX1 at 114.

The change in treatment of benefits applied to all "actual charges" policies administered

by Life Investors, Transamerica and Monumental Life Insurance Company ("Monumental"),

including not only supplemental cancer policies, but other policies (e.g., heart, accident and

specified disease) as well.  See Ex. 9, Training Presentation Slides, at 1-6.  The change became

effective in April, 2006 for the LPC0100 and BPC0100 policies issued in Pennsylvania.

    E.  Substantive Discovery Disputes

This action was subsequently filed in April 2007.  See Doc. # 1, at 1.  Plaintiff served her

First Request for Production of Documents to Defendant ("First Requests") on May 9, 2008.

Defendant served its Objections And Responses To Plaintiffs' First Request For Production of

Documents (hereinafter, "First Responses") on September 12, 2008.[4]  See Ex. 10, Excerpts from

Defendant's Objections and Responses to Plaintiffs' First Request for Production of Documents.

Although defense counsel informed Plaintiff's counsel in March 2009 that its production

in response to Plaintiff's First Requests was substantially complete, Life Investors has continued

to produce small batches of documents intermittently, including most recently on May 1, 2009.

See Ex. 11, Letter enclosing discovery dated May 1, 2009.  Defense counsel has not yet fully

completed its privilege log.   See id. at 1-2.

Given that Defendant is still in the process of producing a privilege log and that the

parties are still conferring regarding those logs, Plaintiff does not now seek to compel documents

being withheld on grounds of privilege that have been identified on Life Investors' partial

privilege log.  However, Life Investors is withholding documents on grounds other than

privilege, including (1) meeting minutes and related documents reviewed by Life Investors'

Board of Directors in connection with the change in treatment of actual charges benefits; (2)

---

[4] LR 37.2 provides that "Any discovery motion filed pursuant to Fed.R.Civ.P. 26 through 37 shall include, in the motion itself or in an attached memorandum, a verbatim recitation of each interrogatory, request, answer, response, and objection which is the subject of the motion or a copy of the actual discovery document which is the subject of the motion."  In compliance with LR 37.2, Plaintiff has attached Excerpts of Defendant's Objections and Responses to Plaintiffs' First Request for Production of Documents at Exhibit 10 and Excerpts of Plaintiff's First Requests at Exhibit 22.

Gwin's letters regarding estimates of the savings to the company associated with the change in treatment of "actual charges" benefits; (3) the Wakely report and other unprivileged actuarial documents; (4) documents exchanged between Life Investors and third parties (state insurance regulators, trade associations, and lobbyists) relating to the meaning of "actual charges"; and (5) the list of search terms used by Life Investors in identifying documents responsive to Plaintiff's First Requests.

As the parties have reached impasse on these issues, resolution by the Court is requested.

## II.   APPLICABLE LAW

"Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party."  F.R.C.P. 26(b)(1).  Relevance for discovery purposes is broadly and liberally construed. Hickman v. Taylor, 329 U.S. 495, 501, 507, 67 S.Ct. 385, 388-89, 391-92, 91 L.Ed. 451 (1947). Thus parties are entitled to discovery on "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978) (citing Hickman, 329 U.S. at 501, 67 S.Ct. at 388); Pearson v. Miller, 211 F.3d 57, 65 (3d Cir. 2000) (all relevant material is discoverable absent assertion of an evidentiary privilege); see also Preyer v. United States Lines, 64 F.R.D. 430, 431 (E.D.Pa. 1973), aff'd, 546 F.2d 418 (3d Cir. 1976) (noting information can be relevant and thus discoverable as long as the information is reasonably calculated to lead to the discovery of admissible evidence).

The Court may limit discovery if the burden or expense of the proposed discovery outweighs its likely benefit. See Fed.R.Civ.P. 26(b)(2)(C)(iii).  However, "where relevance is in doubt, the court should be permissive in allowing discovery."  Yang v. Reno, 157 F.R.D. 625, 631 (M.D. Pa. 1994).

## III.    ARGUMENT

### A.    __Request 14 – Board Meeting Minutes__

As part of her First Requests, Plaintiff asked that Defendant produce all documents that relate to discussions or meetings by Life Investors' or its parent companies' Boards of Directors regarding the change in the companies' interpretation or application of the "actual charges" benefit language.[5]  See Ex. 10, at 13.  In response, Life Investors objected that the request as stated was overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  Id.   Nonetheless, Life Investors agreed that subject to its objections, the company would "produce non-privileged documents responsive to this request, if any."  Id.

After approximately ten months without receiving any documents responsive to Request 14, Plaintiff's counsel inquired whether Life Investors would be producing any responsive documents.  See Ex. 6, at 1.  At that time, Plaintiff's counsel were informed by defense counsel Irma Reboso Solares that Defendant was producing some documents relating to the Taskforce's meetings.  Id.  However, Defendant would not produce documents relating to the consideration of the "actual charges" decision by Life Investors' Board of Directors as these documents were allegedly not relevant.  Id.

---

[5] Request 14 states: "Produce each document, including each corporate minute that relates to, evidences, summarizes, describes, records or was distributed in preparation for any conversations, discussions, meetings, votes, debates or resolutions occurring during each meeting of, with, including or between any of your shareholders, directors, officers, executives, representatives, employees, or agents either during or prior to the Relevant Time Period that related to any actual or proposed change or modification to your process of handling or paying any Actual Charges Claim, including any actual or proposed changes to your interpretation, construction, definition or application of the term "actual charges" contained in any Actual Charges Policy."  See Ex. 10, at 13.

Life Investors' objection that documents relating to any consideration by the Board of the actual charges decision are not relevant borders on frivolous. The decision to change the treatment of "actual charges" benefits was a decision made by high-level corporate executives that affected tens of thousands of insurance policies and likely has resulted in considerable savings for Life Investors and its sister-insurers. If the Board authorized or was informed of the reversal of the company's longstanding practice of paying "actual charges" benefits without affording consideration to the interests of its insureds, or recklessly proceeded based solely on information about how much the company would save, such facts would be evidence of bad faith. See Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 751-752 (3d Cir. 1994) (holding reckless disregard for interests of insured could support finding of bad faith; remanding for trial court to determine whether insurer afforded "the interest of the insured the same faithful consideration it gives its own interest").

Plaintiff's request is clearly calculated to elicit information relevant to her bad faith claim. Moreover, the burden is upon the party resisting discovery to establish that the requested documents are not relevant or that production would be unduly burdensome. Josephs v. Harris Corp., 677 F.2d 985, 992 (3d Cir.1982) (party resisting discovery "must show specifically" how the information requested "is not relevant or how each question is overly broad, burdensome or oppressive") (citations omitted).

Life Investors has not, and cannot, establish that the requested information is irrelevant or unduly burdensome. Therefore, Defendant should be compelled to provide all relevant documents reflecting or relating to Life Investors' or its parent companies' Boards of Directors' consideration of the decision to change its historic treatment "actual charges" benefits.

## B. Requests 17 – Estimates of the Costs of Paying Actual Charges Claims

Prior to Whitlock's July 22, 2005 decision to change the treatment of "actual charges" benefits, Life Investors' actuary, Gwin, performed several analyses of the costs of paying "actual charges" claims based upon providers' charges as opposed to paying based upon the lesser amounts ultimately accepted by providers as payment. See Doc. # 159-02, PX 1 at 154-156. Gwin later sent letters discussing these analyses to the Tennessee Department of Commerce and Insurance and the Kentucky Department of Insurance, (Id. at 157-158) and may have provided information about these analyses to other third parties. See id. at 161 (counsel refusing to let Gwin answer who else he had informed). Gwin testified that his analyses reflected the estimated impact on the company of changing its treatment of "actual charges" benefits for all of Life Investors' supplemental cancer policies. Id. at 155.

In response to Plaintiff's request for documents related to the estimation of the costs of paying actual charge claims,[6] Life Investors has asserted attorney-client and work product privilege over all or nearly all of the actuarial work performed by Gwin in advance of Life Investors' decision to change the treatment of "actual charges" benefits.[7] See Ex. 12, Letter to Solares dated 1/6/09, at 1. Life Investors has also refused to produce Gwin's communications with state insurance departments summarizing his actuarial analyses even though these documents are not privileged, are not listed on Life Investors' privilege log, and at least one of

---

[6] In Request 17, Plaintiff requested that Life Investors "Produce each document that relates to the estimation, evaluation, or assessment, either prior or during the Relevant Time Period, of the costs of paying Actual Charges Claims on the basis of the amounts contained in healthcare providers' bills rather than on some other basis." See Ex. 10, at 15.

[7] Plaintiff has already filed one motion regarding Gwin's actuarial work over which Life Investors has asserted privilege, (See Doc. # 128) and is in the process of conferring with Life Investors regarding additional actuarial work that Life Investors has identified as privileged on its privilege logs.

these communications has been produced in another parallel case in the Middle District of Tennessee.[8]  Life Investors has objected that the letters "are not at issue in this case" and are irrelevant because they do not specifically concern Life Investors' Pennsylvania policies.  See Ex. 10, at 15; Ex. 21, Excerpt from Letter to Doyle dated 1/20/09, at 1-2.

Contrary to Life Investors' objection, Gwin's letters are clearly relevant and contain information that is applicable to the policies at issue in this action.  Gwin testified that the analysis discussed in these letters pertains to all of Life Investors' supplemental cancer policies. See Doc. # 159-02, PX1 at 155.  This would include the supplemental cancer policies at issue in this litigation.  Moreover, Life Investors' consideration of the financial benefits that would accrue to the company from the change is clearly relevant to Plaintiff's bad faith claims.  See Jurinko v. Medical Protective Co., 305 Fed. Appx. 13, *21, 2008 WL 5378011, **6 (3d Cir. 2008) (noting "'[T]he motive of self-interest or ill will' of the insurer, while not a third element, 'is probative of the second element....'" of the test for bad faith).

The burden associated with producing this limited discovery will also be light. Moreover, any privilege over the letters has been waived.  See Westinghouse Electric Corporation v. Republic of Philippines, 951 F.2d 1414, 1427-1429 (3d Cir. 1991) (under traditional waiver doctrine, a voluntary disclosure to a third party regulator waives privilege even if the third party agrees not to disclose the communications to anyone else.)

For all of these reasons, Life Investors should be compelled to produce Gwin's letters and any other documents not listed on its privilege log that relate to the estimation of the costs of

---

[8] Life Investors has objected that Plaintiff's Request 17 is "overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence because it seeks documents that are not at issue in this case and information for time periods outside the scope of the action."  Ex. 10, at 15.  Life Investors also objected to Request 17 on grounds of attorney-client privilege, work-product doctrine, or other applicable privilege.  Id.

paying "actual charges" benefits based upon providers' charges versus payments on some other basis. This production should be made in manipulable electronic format, which is the format in which it is kept in the usual course of business.[9] See Fed.R.Civ. P. 34(b)(2)(E).

## C. Request 18: the Wakely Report and Unprivileged Actuarial Work

In Request 18, Plaintiff sought to obtain computations, cost analyses, and other actuarial documents pertaining to Defendant's "actual charges" policies beginning in 1995 (past 13 years), which was the year that Life Investors began selling the LPC0100 policy form.[10] Defendant has objected to Request 18 as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence because it sought documents not limited to the issues relevant to this action, and outside the geographic scope of this action and relevant time period. See Ex. 10, at 15-16. When the parties conferred, Defendant indicated that it was willing to produce non-privileged responsive documents if Plaintiff would agree to limit this request to the past four years. See Ex. 19, Letter dated 11/11/08, at 4. Given that Plaintiff was aware of both the Wakely Report created prior to 2003 and Gwin's actuarial work completed during 2004, Plaintiff could not agree to those terms. See Ex. 14, Letter dated 11/18/08, at 3.

---

[9] See Ayers v. SGS Control Servs., 2006 WL 1519609, *2 (S.D.N.Y. Apr. 3, 2006) (court ordered production of payroll and timekeeping records in "electronic, manipulable form" since process of recreating the data in electronic form would be "burdensome, time consuming, and expensive"); Lombardo v. Broadway Stores, Inc., 2002 WL 86810, *8 (Cal. Ct. App. Jan. 22, 2002) (recognizing that "computerized records had evidentiary unique value distinct from the hard copy records: They made the information accessible.")

[10] Request 18 states: "Produce each document relating to every actuarial memoranda, methodologies, risk outlines, assumptions, cost analyses, formulas, illustrative examples or computations that relate to the "actual charges" provisions of any Actual Charges Policy, including any Pennsylvania Actual Charges Policy."

Note: the cost calculations discussed *supra* at Section III(B) are also captured by this request, and Plaintiff moves to compel their production under both Request 17 and Request 18.

The documents sought by Plaintiff during this entire time period (1995 - present) are relevant. Life Investors developed the LPC0100 policy form around 1994 and began selling the policy form in 1995. Life Investors' actuary testified at his deposition that Life Investors incurred high loss rates on its some of its "actual charges" cancer policies by the late 1990s, and that the Wakely Report was commissioned to examine the rising costs of Life Investors' cancer claims. See Doc. # 156-03, PX2 at 27; Gwin Dep. at 65-66. The Wakely Report projected future increases in benefits, and therefore may reflect how the company understood "actual charges" to be paid in 2001. Moreover, any actuarial analyses, by the company related to its payments under the policies, as well as the underlying electronic databases used to generate those analyses, are relevant to Plaintiff's bad faith claim and may also contain references to how Defendant understood those policies to pay "actual charges" benefits or information from which Plaintiff could determine how much the company could expect to save.

Defendant has objected to this request on grounds of undue burden. However, Life Investors has not made any showing of burden. Josephs, 677 F.2d at 992 (party resisting discovery "must show specifically" how the information requested "is not relevant or how each question is overly broad, burdensome or oppressive") (citations omitted). Gwin also testified that a copy of the Wakely report is contained in a binder in his office, and thus should be easy to find and produce. Gwin Dep. at 66.

These requests are reasonably calculated to lead to the discovery of relevant evidence, and Life Investors should be compelled to produce all responsive documents and databases, including the Wakely Report, preferably in manipulable electronic format. See Fed.R.Civ. P. 34(b)(2)(E).

**D.** **Requests 19: Documents Disclosed To, Or Received From, Third Parties Relating To The Definition or Meaning of "Actual Charges"**

Plaintiff has also requested that Defendant produce documents relating to the meaning of

"actual charges", which were received from or provided to third parties. See Ex. 10, at 16.

Specifically, Plaintiff has requested that Defendant produce:

> each document, including every communication, either prior or during the
> Relevant Time Period, between you and any person, including any government
> department, regulatory, insurance association, or other trade association that
> relates to the interpretation, construction, definition, or application of the term
> "actual charges" or the process of handling or paying claims under any policy
> provisions that promise benefits in whole or in part based upon "actual charge

Id.

Defendant has objected to Plaintiff's Request 19 because it claims that the request is

overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of

admissible evidence because it seeks information regarding insurance policies and time periods

outside the scope of this action, as well as on grounds of privilege. Id. Defendant indicated

that it would only "produce non-privileged documents relating to the phrase "actual charges,"

used in the relevant Pennsylvania cancer only policies." Id.

As this Court has consistently recognized, the meaning of "actual charges" is central to

the claims in this litigation. See Doc. #102 (noting Plaintiff is "seeking a narrow determination

which primarily involves contractual interpretation of the term 'actual charges.'")  Evidence of

Life Investors' prior interpretation of this term, as well as its past payment practices, are relevant

and admissible in the context of Plaintiff's breach of contract claim.  See Tindall v. Friedman, __

A.2d __, 2009 WL 763387, *5 (Pa. Super. March 24, 2009) (prior understanding, including

course of performance, are an aid to interpretation and given great weight); see also Eggleston v.

Dudley, 257 F.2d 398, 400-401 (3d Cir. 1958) (same).

Life Investors' and Bankers' prior statements relating to the meaning of "actual charges" are also relevant to Plaintiff's bad faith claim.  See Klinger v. State Farm Mutual Automobile Ins. Co., 895 F. Supp. 709, aff'd 115 F.3d 230, 233-234 (3d Cir. 1997) (bad faith may be shown be demonstrating that an insurer lacked a reasonable basis for its decision and knew or recklessly disregarded its lack of reasonable basis); Brown v. Progressive Insurance Co., 860 A.2d 493, 500-501 (Pa.Super. 2004) (same).

Life Investors insists that it has not changed its interpretation of the meaning of "actual charges," and that its revised claims procedures implemented in 2006 were necessary to correct a mistake in its claims processing.  See Whitlock Dep. at 65-66.   This is the primary theory of its defense in this litigation, and to protect this defense, Life Investors now seeks to prevent Plaintiff from accessing highly relevant documents and correspondence between Life Investors and third-parties, such as the Oklahoma Department of Insurance, that would establish that Life Investors in fact previously interpreted "actual charges" to mean the amounts charged prior to any insurance discount.

Life Investors argues that the documents Plaintiff seeks are irrelevant and that her request is overbroad because she seeks documents that pertain to "actual charges" policies other than the policies issued in Pennsylvania.  However, Life Investors did not consider geographic or temporal differences in deciding to change its treatment of "actual charges" benefits for more than 90,000 "actual charges" supplemental cancer policies administered by Life Investors, the supplemental cancer policies of two other companies, and an unknown number of other "actual charges" policies nationwide.  See Ex. 9, at 1-6, indicating that the change was to be applied to all actual charges policies administered by the three sister insurers.  As evidenced by its conduct, Life Investors asserted that the term "actual charges" meant the same thing in each and every

policy it administers, regardless of whether it was issued in the 1970s or the 1990s, and

regardless of whether it was issued by Life Investors or a predecessor such as Equity National

Life Insurance Company.  Since Life Investors did not consider geographic or temporal

differences in making its 2006 change, it should not be allowed to hide behind geographic

differences or temporal differences to avoid liability for that decision now.  See Saldi v. Paul

Revere Life Ins. Co., 224 F.R.D. 169, 178 (E.D.Pa. 2004) (granting discovery on defendant

insurer's out of state business practices where nexus existed between out-of-state conduct and in-

state litigation).

     Defendant has also objected that Plaintiff's request presents an undue burden. With

respect to this objection, Plaintiff notes that Life Investors has not provided any evidence to

substantiate its claim of burden.  See Josephs, 677 F.2d at 992 (burden is on party resisting

discovery). Moreover, as Life Investors has only produced approximately 15,000 pages, (see Ex.

11 at 1) since Plaintiff served her discovery a year ago - less than six boxes of documents - it

does not appear that requiring Defendant to produce any relevant evidence in these areas would

be unduly burdensome.

     Finally, Defendant has objected on grounds of privilege.  See Ex. 10, at 16.  However,

Life Investors has not identified any such documents on its privilege log to date and Plaintiff

submits that any privilege over documents exchanged with third-parties would be waived.  See

Westinghouse Electric Corp., 951 F.2d at 1427-1429 (party may waive attorney client and work-

product privileges by voluntary disclosure to a third party)

     In sum, Plaintiff's Request 19 is reasonably calculated to lead to relevant evidence, and

Defendant should be compelled to produce all responsive documents.

### E. **Request 23: Petitions to State Legislatures and Other Lobbying Activities**

Plaintiff has also sought information regarding Defendant's lobbying activities surrounding the meaning of the term "actual charges" in its supplemental insurance policies.[11] See Ex. 10 at 18.   However, Defendant has refused to provide responsive documents pertaining to its lobbying efforts unless those documents pertain specifically to its Pennsylvania policies.[12] As a result, it has not produced any documents pertaining to its lobbying activities in this litigation.

As discussed in connection with Request 19, *supra*, Life Investors has, by its conduct, asserted that "actual charges" means the same thing in all of its "actual charges" policies.  Thus Life Investors' lobbying activities regarding the meaning of "actual charges" in the states that have passed such laws (including Oklahoma, Georgia, South Carolina, and Texas) are relevant to Plaintiff's bad faith claim.  Furthermore, Life Investors has made reference in this litigation to the fact that other state legislatures have passed laws defining "actual charges" consistent with Defendant's current interpretation of that term. See Doc. # 60 at 7. Given Defendant's reliance, and likely future reliance, upon other states' legislatures' interpretation of the "actual charges"

---

[11]  Request 23 states "Produce each document, including each communication relating to any proposed, pending or passed state or federal legislation and/or administrative rule making proceeding that concerns the interpretation, construction, definition, application and/or permissive use of the term or phrase "actual charges" within any supplemental, limited benefit or specified disease insurance policy."  Ex. 10 at 18.

[12] Defendant raised the following objections to Request 23: "Life Investors objects to this request as vague and difficult to understand. Life Investors objects to this request as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence because it seeks documents that are not at issue in this case and information for time periods outside the scope of this action. Life Investors objects to this request to the extent that it seeks information that is subject to the attorney-client privilege, the work-product doctrine, or any other applicable privilege. Subject to the foregoing general and specific objections, including General Objection No. 11, Life Investors will produce non-privileged documents related to proposed, pending, or past legislation regarding the phrase "actual charges," as it relates to the relevant Pennsylvania cancer only policies."  Ex. 10 at 18.

language, documents relating to Defendant's lobbying activities directed towards those states legislatures are clearly relevant evidence that Plaintiff is entitled to discover.  See Metzer v. American Fidelity Assurance Co., 5:05-cv-01387 (Doc. # 285) at 5-6 (indicating that lobbying activities were relevant to bad faith claim and could be used by plaintiff if insurer sought to introduce evidence of state legislation defining "actual charges").

Plaintiff's Request 23 is reasonably calculated to lead to the discovery of relevant evidence, and Defendant should be compelled to produce all responsive, unprivileged documents and to list all privileged documents on its privilege log.

## F. Search Terms

When Plaintiff first served discovery in May 2008, she sought to confer with Defendant regarding the terms of the search that would be used to identify responsive documents.  See Ex. 15, Letter dated May 9, 2008, at 1.  However, Defendant was not inclined to confer and went ahead with its electronic search without obtaining input as to the scope of the search or the terms to be used.  See Ex. 16, Letter dated Sept. 4, 2008, at 3; Ex. 17, Letter dated Sept. 26, 2008, at 4, point 11.  When Plaintiff began asking that the terms of the search be disclosed, Life Investors refused to provide more than a "sample."[13]  See Ex. 13, Letter dated 11/11/08, at 2; Ex. 18, Letter dated 10/20/08, at 1.

Life Investors had a duty to confer with Plaintiff about discovery issues, which it breached when it refused to confer with Plaintiff about search terms in May 2008.

---

[13] Defendant ultimately offered to run a supplemental search if Plaintiff would provide suggested terms; however, by the time this offer was made, it was months after Plaintiff had served her discovery.  Moreover, although Plaintiff suggested additional terms in her October 20, 2008 correspondence, (Ex. 18, at 3) it is appears that Life Investors paid no attention to those suggestions.  Ex.13 at 3.  At this point, Plaintiff submits that she is entitled to evaluate the search terms utilized by Defendant.

> Particularly in complex litigation, there is a heightened need for the parties to
> confer about the format of the electronic discovery being produced. Pursuant to
> Federal Rule of Civil Procedure 26, the parties are expected to confer, not only on
> the nature and basis of their claims and defenses, but also to discuss "any issues
> relating to disclosure or discovery or electronically stored information, including
> the form or forms in which it should be produced."

In re Seroquel Products Liability Litig., 244 F.R.D. 650, 655 (M.D. Fl. 2007); see also Gross

Construction Assoc. v. American Manufacturers Mutual Ins. Co., 2009 WL 724954, *3 (S.D.NY

March 19, 2009) ("Electronic discovery requires cooperation between opposing counsel and

transparency in all aspects of preservation and production of ESI.")  If Life Investors did not

want to disclose its search terms or the contours of its search, it should have permitted Plaintiff to

provide input at the outset of the discovery process.  See e.g. In re CV Therapeutics, Inc.

Securities Litigation, 2006 WL 2458720, *2 (N.D. Cal. Aug. 22, 2006) (stating court "gave

Plaintiff an avenue to test or assess the scope of the search terms by ordering Defendants to

produce to Plaintiff the search terms Defendants used.")

Life Investors asserts that its search terms are work product.   See Ex. 13 at 3.   However,

the work-product doctrine only "shelters the mental processes of the attorney, providing a

privileged area within which he can analyze and prepare his client's case." United States v.

Nobles, 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975). The discovery search,

by contrast, is intended to provide materials for *both* parties.  Moreover, electronic discovery is

complicated and there is a need for accountability, both to the other party and to the court.  See

Victor Stanley v. Creative Pipe, 250 F.R.D. 251, 259-62 (D.Md. 2008) (discussing keyword

searches and stating "implementation of the methodology selected should be tested for quality

assurance; and the party selecting the methodology must be prepared to explain the rationale for

the method chosen to the court, demonstrate that it is appropriate for the task, and show that it

was properly implemented.") See e.g. Siemens Aktiengesellschaft v. Jutai 661 Equipamentos

Electronicos, Ltda., 2009 WL 800143, *3 (S.D. Fla 2009) (parties ordered to confer on search

term protocol). Even if the search terms were found by the Court to constitute work product,

they still would not constitute "mental impressions, conclusions, opinions, or legal theories" that

are absolutely protected from disclosure. Fed.R.Civ.P. 26(b)(3). Where, as here, there is no

other means of assessing the terms of the search, disclosure is warranted.

For all of these reasons, defendant should be compelled to disclose the search terms it

used in collecting materials.

## IV.  DISCOVERY DISPUTE CERTIFICATE

Plaintiff's counsel have made a reasonable effort to reach agreement with opposing

counsel on the matters set forth in this motion. The parties have discussed these objections on

numerous occasions. See discovery correspondence attached at Exhibits 6, 11-19, 21. However,

the parties have not been able to reach agreement.

## V.  CONCLUSION

WHEREFORE Plaintiff respectfully requests the Court to enter an Order compelling Life

Investors to produce documents in response to Plaintiff's First Request For Production of

Documents as set forth in the attached proposed Order.

Dated:  May  19, 2009            Respectfully submitted,

/s/ Ellen M. Doyle
Ellen M. Doyle, Esquire
PA I.D. No.
Joel Hurt, Esquire
PA I.D. No.
Maureen Davidson-Welling, Esquire
PA I.D. No. 206751
**STEMBER FEINSTEIN DOYLE &
PAYNE, LLC**
Allegheny Building, 17th floor
429 Forbes Avenue
Pittsburgh, PA  15219
Tel:  (412) 281-8400

*Attorneys for Plaintiff*

21

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing PLAINTIFF'S FIRST

MOTION TO COMPEL PRODUCTION OF DOCUMENTS PURSUANT TO FED. R.CIV. P.

37 was electronically filed on May 19, 2009, with the Clerk of Court using the CM/ECF system,

which will send electronic notification of such filing to all counsel of record registered to receive

it.  I also certify that on May 19, 2009, I served a true and correct copy of the foregoing by First-

Class Mail with postage fully prepaid on the following:

Jack L. Bergstein
PA ID No. 05356
BERGSTEIN & GALPER, P.C.
409 Schoonmaker Avenue
P.O. Box A
Monessen, PA  15062-0551


/s/ Ellen M. Doyle
Ellen M. Doyle