1           UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5

6  APPLE INC., A CALIFORNIA        )  C-12-00630 LHK
   CORPORATION,                    )
                                   )  SAN JOSE, CALIFORNIA
7            PLAINTIFF,            )
                                   )  FEBRUARY 14, 2013
8        VS.                       )
                                   )  PAGES 1-168
9  SAMSUNG ELECTRONICS CO., LTD.,  )
   A KOREAN BUSINESS ENTITY;       )
10 SAMSUNG ELECTRONICS AMERICA,    )
   INC., A NEW YORK CORPORATION;   )
11 SAMSUNG TELECOMMUNICATIONS      )
   AMERICA, LLC, A DELAWARE        )
12 LIMITED LIABILITY COMPANY,      )
                                   )
13           DEFENDANTS.           )
   _____ )
14                                 )
                                   )

15

16          TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE LUCY H. KOH
17          UNITED STATES DISTRICT JUDGE

18

19

20          APPEARANCES ON NEXT PAGE

21

22

23  OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595

24

25      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
           TRANSCRIPT PRODUCED WITH COMPUTER

```
 1     A P P E A R A N C E S:

 2     FOR APPLE:              GIBSON, DUNN & CRUTCHER
                               BY:   JOSH A. KREVITT
 3                             200 PARK AVENUE
                               NEW YORK, NEW YORK  10166
 4
                               BY:  H. MARK LYON
 5                             1881 PAGE MILL ROAD
                               PALO ALTO, CALIFORNIA  94304
 6
                               BY:  MARK REITER
 7                             2100 MCKINNEY AVENUE
                               DALLAS, TEXAS  75201
 8
                               WILMER, CUTLER, PICKERING, HALE & DORR
 9                             BY:  WILLIAM F. LEE
                               60 STATE STREET
10                             BOSTON, MASSACHUSETTS  02109

11                             BY:  MARK D. SELWYN
                               950 PAGE MILL ROAD
12                             PALO ALTO, CALIFORNIA  94304

13                             BY:  CALVIN S. WALDEN
                               7 WORLD TRADE CENTER
14                             250 GREENWICH STREET
                               NEW YORK, NEW YORK  10007
15

16     FOR SAMSUNG:           QUINN, EMANUEL, URQUHART,
                               OLIVER & HEDGES
17                             BY:  WILLIAM C. PRICE
                               865 SOUTH FIGUEROA STREET
18                             10TH FLOOR
                               LOS ANGELES, CALIFORNIA  90017
19
                               BY:  KEVIN P.B. JOHNSON
20                                  VICTORIA F. MAROULIS
                               555 TWIN DOLPHIN DRIVE, 5TH FLOOR
21                             REDWOOD SHORES, CALIFORNIA  94065

22                             BY:  SEAN SANG-CHUL PAK
                               50 CALIFORNIA STREET, 22ND FLOOR
23                             SAN FRANCISCO, CALIFORNIA  94111

24

25
```

```
1      SAN JOSE, CALIFORNIA                    FEBRUARY 14, 2013

2                     P R O C E E D I N G S

3           (COURT CONVENED AND THE FOLLOWING PROCEEDINGS WERE HELD:)

4           THE CLERK:  CALLING CASE NUMBER C-12-00630 LHK, APPLE

5      INCORPORATED VERSUS SAMSUNG ELECTRONICS COMPANY, LIMITED, ET

6      AL.

7           COUNSEL, STATE YOUR APPEARANCES, PLEASE.

8           MR. KREVITT:  GOOD AFTERNOON, YOUR HONOR.

9      JOSH KREVITT FROM GIBSON, DUNN.  GOOD TO SEE YOU.

10          WITH ME TODAY ARE MY COLLEAGUES, MARK LYONS AND

11     MARK REITER, WHO WILL BE PRESENTING THE TUTORIAL TODAY, YOUR

12     HONOR.

13          AND MR. LEE IS HERE ALSO AND WILL BE PRESENTING.

14          MR. LEE:  GOOD MORNING, YOUR HONOR.  BILL LEE FROM

15     WILMER, HALE.  MARK SELWYN, CALVIN WALDEN, MY PARTNERS ARE

16     HERE, AND WE'LL BE PRESENTING PORTIONS OF THE TUTORIAL.

17          THE COURT:  OKAY.

18          MR. PRICE:  GOOD AFTERNOON, YOUR HONOR.  I'M

19     BILL PRICE OF QUINN, EMANUEL FOR SAMSUNG.  AND WITH ME ARE MY

20     COLLEAGUES, KEVIN JOHNSON, SEAN PAK, AND VICTORIA MAROULIS.

21          MR. JOHNSON:  GOOD MORNING.

22          THE COURT:  OKAY.  GOOD AFTERNOON TO EVERYONE.

23          OKAY.  LET ME FIRST ASK, WITH REGARD TO THE OTHER CASE,

24     WHAT IS THE -- WHAT IS ALREADY ON APPEAL?

25          MS. MAROULIS:  YOUR HONOR, THERE ARE TWO APPEALS.
```

1    FIRST OF ALL, THERE'S A CONSOLIDATED APPEAL OF THE SEALING

2    ORDER THAT BOTH PARTIES FILED IN THE CONSOLIDATED CASE; AND

3    THEN JUST RECENTLY APPLE APPEALED THE DENIAL OF THE PERMANENT

4    INJUNCTION AND FILED THEIR OPENING BRIEF ON FEBRUARY 12TH.

5         THE COURT:  OKAY.  AND THE CONSOLIDATED SEALING

6    APPEAL, HAS THAT BEEN SET FOR A HEARING?

7         MS. MAROULIS:  YES, YOUR HONOR.  IT'S BEEN FULLY

8    BRIEFED AND SET FOR A HEARING ON MARCH 26TH.

9         THE COURT:  OKAY.  MARCH 26TH.  AND HAS THE

10   INJUNCTION DENIAL BEEN SET FOR A HEARING?

11        MS. MAROULIS:  NO, YOUR HONOR.  IT WAS ONLY -- THE

12   OPENING BRIEF WAS FILED AND THE RESPONSIVE BRIEF IS DUE

13   MARCH 28TH, I BELIEVE.

14        THE COURT:  OKAY.  HOW -- I KNOW I STILL HAVE ONE

15   MORE ORDER TO ISSUE IN THAT CASE.

16     HOW IS THAT GOING TO WORK?  ARE THEY ALL GOING TO BE

17   CONSOLIDATED -- I MEAN, SEPARATE FROM THE SEALING AND THE

18   INJUNCTION JUNCTION, IS EVERYTHING ELSE GOING TO BE

19   CONSOLIDATED?

20        MR. LEE:  I THINK, YOUR HONOR, GIVEN THE SCHEDULE WE

21   HAVE, THE SEALING ISSUE WILL BE DECIDED AFTER THE HEARING.

22     I THINK IT'LL BE UP TO THE COURT WHETHER TO CONSOLIDATE THE

23   MERITS WITH THE PERMANENT INJUNCTION.  THEY'VE DONE BOTH

24   DEPENDING HOW THEY WANT TO DEAL WITH IT.

25     THEY ALSO CAN HAVE THE SAME PANEL HEAR BOTH, BUT AT

```
 1    DIFFERENT POINTS IN TIME.

 2             THE COURT:  THAT'S WHAT I WAS GOING TO ASK YOU.  ARE

 3    THE SEALING PANEL AND THE INJUNCTION DENIAL PANEL THE SAME?

 4             MR. LEE:  VERY UNLIKELY.

 5             THE COURT:  OKAY.

 6             MR. LEE:  THE SEALING PANEL ACTUALLY HAS BEEN

 7    SPECIALLY SET FOR AN AFTERNOON THE LAST WEEK IN MARCH.

 8        THE INJUNCTION PANEL ACTUALLY WOULDN'T BE SET YET BECAUSE

 9    WE JUST FILED OUR OPENING BRIEF LAST -- A COUPLE DAYS AGO, ON

10    TUESDAY, AND THE PANEL WON'T BE SET UNTIL THEY FILE THEIR

11    BRIEF, WE REPLY, AND THEN THE PANEL WILL BE SET AFTER THAT.

12             THE COURT:  OKAY.  SO WE WON'T KNOW?

13             MR. LEE:  WE WON'T KNOW.

14             THE COURT:  OKAY.  DO YOU HAVE ANY SENSE ON

15    WHETHER -- WAS THE SEALING EXPEDITED?  OR HAS THAT BEEN --

16             MS. MAROULIS:  NO, YOUR HONOR.  A REGULAR -- BECAUSE

17    THE PARTIES DIDN'T OPPOSE EACH OTHER'S SEALING MOTIONS, IT WAS

18    FAIRLY BRIEF.

19             THE COURT:  I SEE.  OKAY.  SO WHAT IS YOUR

20    EXPECTATION ON WHETHER THE REST OF THE ORDERS WILL BE EXPEDITED

21    OR THEY'LL ALSO BE ON A ROUGHLY SEVEN, EIGHT MONTH TIME FRAME?

22             MR. LEE:  I -- I THINK, YOUR HONOR, IF WE SET THE

23    SEALING APPEAL ASIDE, IF SAMSUNG FILED ITS BRIEF AND WE THEN

24    REPLY IN THE NEXT TWO MONTHS, LET'S SAY, TWO AND A HALF MONTHS,

25    THAT PUTS US INTO EARLY MAY; GENERALLY IT TAKES ABOUT 60 DAYS
```

1    TO 90 DAYS BEFORE THEY SET THE PANEL, WHICH PUTS YOU INTO

2    AUGUST OR SEPTEMBER; AND THEN THE INTERNAL GUIDELINE AT THE

3    FEDERAL CIRCUIT IS AFTER A HEARING, 90 DAYS IS THE INTERNAL

4    GUIDELINE THEY TRY TO OPERATE UNTIL THE OPINION IS PUBLISHED,

5    SO THAT WOULD PUT US CLOSE TO THE END OF THE YEAR.

6         MS. MAROULIS:  AND TO ANSWER YOUR HONOR'S QUESTION,

7    WE EXPECT THE BRIEFING TO BE ON A REGULAR SCHEDULE FOR THE

8    SUBSEQUENT APPEALS.

9         THE COURT:  OKAY.  ALL RIGHT.  BECAUSE I WAS GOING TO

10   ASK IF WE CAN STAY THIS CASE WHILE THE APPEAL IS PENDING IN THE

11   OTHER CASE.  DO WE REALLY NEED TO HAVE TWO CASES GOING

12   SIMULTANEOUSLY?

13        MR. LEE:  I THINK YOUR ANSWER -- FROM APPLE'S POINT

14   OF VIEW, THE CASES ARE DIFFERENT.  THEY HAVE DIFFERENT PATENTS.

15   THEY GO TO DIFFERENT ISSUES AND I THINK THAT THEY SHOULD

16   PROCEED IN PARALLEL.

17      I'M NOT SURE THAT STAYING THIS TO LEARN WHAT HAPPENS WOULD

18   REALLY EDUCATE WHAT HAPPENS HERE.

19        MR. KREVITT:  I AGREE, YOUR HONOR.  I WOULD JUST

20   NOTE, IN ADDITION TO WHAT MR. LEE SAID, THAT THIS CASE ALSO

21   INVOLVES DIFFERENT PRODUCTS.

22        MS. MAROULIS:  YOUR HONOR, FROM SAMSUNG'S

23   PERSPECTIVE, THERE'S QUITE A BIT OF OVERLAP OF TECHNOLOGY, BUT

24   THAT'S SOMETHING THAT WE CAN DISCUSS WITH RESPECT TO

25   COMPLIANCE, YOUR HONOR, JUST PUT IT ON THE TABLE.  I THINK BOTH

```
 1        SIDES WOULD NEED TO TALK.
 2              THE COURT:  SURE.  I DON'T MEAN TO PUT YOU ON THE
 3        SPOT.  I JUST DON'T KNOW IF WE REALLY NEED TWO CASES ON THIS.
 4        I ASSUME ANY ULTIMATE RESOLUTION IS GOING TO BE GLOBAL AND IT'S
 5        GOING TO INCLUDE ALL PRODUCTS AND ALL TECHNOLOGY.
 6           SO DO WE REALLY NEED A WHOLE OTHER CASE?
 7              MR. JOHNSON:  AND YOUR HONOR, I THINK WE'RE INCLINED
 8        TO AGREE, RATHER, AND SO WE JUST WANT TO TALK IT OVER WITH OUR
 9        CLIENT AND TALK ABOUT IT, AND ALSO CONFER WITH THE OTHER SIDE
10        ABOUT IT.
11           BUT YOU'RE GOING TO HEAR TODAY, THERE'S A LOT OF TECHNOLOGY
12        HERE THAT IS SIMILAR TO THE TECHNOLOGY THAT WE DEALT WITH IN
13        THE FIRST CASE AND PRODUCTS ARE SIMILAR IN A LOT OF RESPECTS,
14        AND SO WE'RE GOING TO BE -- THERE'S OVERLAP IN OUR OPINION.
15              THE COURT:  SO WHAT I'D LIKE TO DO IS -- AND, YOU
16        KNOW, OBVIOUSLY YOUR CLIENTS WILL DECIDE.  BUT I WOULD LIKE TO
17        SET A TIMELINE FOR YOU ALL TO CONSULT WITH YOUR CLIENTS, AND
18        THEN ALSO HAVE A MEET AND CONFER AND SEE IF THERE'S ANY
19        NARROWING THAT CAN BE DONE, OR -- AND THEN JUST LET ME KNOW.
20           SO YOU TELL ME, WHAT'S THE TIME FRAME?  CAN YOU DO THAT IN
21        A COUPLE WEEKS?
22              MR. KREVITT:  CERTAINLY, YOUR HONOR.
23              MR. LEE:  WE CAN.
24              MR. KREVITT:  WE CAN CONFER WITH OUR CLIENTS AND
25        CONFER WITH SAMSUNG AND REPORT BACK TO THE COURT.
```

```
 1                   THE COURT:  OKAY.  I LIKE DEADLINES AND,

 2      UNFORTUNATELY, I DIDN'T BRING MY CALENDAR.

 3            WHAT ABOUT BY MARCH 7TH?

 4                   MR. JOHNSON:  THAT'S FINE.

 5                   MR. LEE:  THAT'S FINE.

 6                   THE COURT:  OKAY.  SO BY MARCH 7TH OF 2013 -- SHOULD

 7      I DO MY FAVORITE OF HAVING LEAD TRIAL COUNSEL MEET IN PERSON?

 8                   MR. KREVITT:  IT IS ALWAYS A PLEASURE TO MEET WITH

 9      SAMSUNG.

10                   MR. PRICE:  MAYBE --

11                   THE COURT:  ALL RIGHT.

12                   MR. LEE:  WE MAY BE ANOTHER FEW WEEKS BY THEN.

13                   MR. PRICE:  CAN WE MAKE IT IN THE STATE OF

14      CALIFORNIA?

15                   MR. LEE:  THANK YOU.

16                   THE COURT:  LET'S HAVE A MEET AND CONFER IN PERSON,

17      AND THEN BY THE 7TH OF MARCH, PLEASE FILE A STATUS REPORT ON

18      THIS ISSUE, A JOINT STATUS REPORT, PLEASE.

19            OKAY.  GO AHEAD, PLEASE, AND TELL ME WHAT PRODUCTS ARE IN

20      THIS CASE, AND I GUESS WE SHOULD REALLY START BY PATENT, THE

21      ONES THAT WE'RE GOING TO BE DISCUSSING TODAY.

22            WHAT -- IS IT THE '502?

23                   MR. KREVITT:  YOUR HONOR?

24                   THE COURT:  UM-HUM.

25                   MR. KREVITT:  JUST SO THE PARTIES CAN UNDERSTAND WHAT
```

```
 1      YOUR PREFERENCE IS, WE HAD INTENDED TO GO PATENT BY PATENT

 2      WHERE APPLE WOULD PRESENT FIRST ON ITS PATENT, ONE PATENT;

 3      SAMSUNG WOULD HAVE AN OPPORTUNITY TO PRESENT ON THAT PATENT.

 4              THE COURT:  YES, PLEASE.

 5              MR. KREVITT:  THAT'S HOW WE HAD ASSUMED YOUR HONOR

 6      WANTED TO PROCEED.

 7              THE COURT:  YES, YES.

 8              MR. KREVITT:  SO WE'RE GOING TO ADDRESS APPLE'S FOUR

 9      PATENTS -- THERE ARE MORE PATENTS AT ISSUE IN THE CASE, AS YOUR

10      HONOR IS AWARE.

11              THE COURT:  RIGHT.

12              MR. KREVITT:  BUT FOR PURPOSES OF TODAY, WE ARE ONLY

13      ADDRESSING THE PATENTS THAT ARE AT ISSUE IN THE CLAIM

14      CONSTRUCTION PROCESS.

15          THERE ARE FOUR APPLE PATENTS, WE'LL PRESENT ON THOSE; AND

16      THEN THERE ARE THREE SAMSUNG PATENTS WHICH THE PARTIES WILL

17      ADDRESS FOLLOWING THE APPLE PATENTS.

18              THE COURT:  SURE, AND WE'LL DO PING PONG.  I HAVE

19      QUESTIONS ON THEM.

20              MR. KREVITT:  THAT'S OUR INTENTION, YOUR HONOR.

21              THE COURT:  OKAY, THAT'S FINE.

22          SO WITH REGARD TO THE '502, WHAT PRODUCTS ARE AT ISSUE FOR

23      THIS PATENT?  AND IF IT'S A LAUNDRY LIST, YOU CAN JUST SORT OF

24      TELL ME BY GENERAL CATEGORY.

25              MR. LYON:  YOUR HONOR, IT'S MARK LYON.  IT IS A
```

1     LAUNDRY LIST.

2               THE COURT:  OKAY.

3               MR. LYON:  AND IT VARIES BY PATENT A BIT BECAUSE

4     CERTAIN PRODUCTS HAVE SOME OF THE FEATURES AND CERTAIN PRODUCTS

5     DO NOT IN SOME CASES.

6          BUT IT IS GENERALLY THE PRODUCTS THAT SAMSUNG -- THE

7     PHONES, MUSIC PLAYERS, TABLETS THAT GENERALLY WERE NOT PART OF

8     THE FIRST CASE.  THESE ARE ALL FOLLOW-ON PRODUCTS OR DIFFERENT

9     PRODUCTS THAT CAME OUT, SUCH AS THE GALAXY S III IS A GOOD

10    EXAMPLE, AND THERE'S VARIANCE ON THAT.

11         AND UNFORTUNATELY I DIDN'T COME PREPARED TO -- THERE IS A

12    CHART THAT SORT OF MAPS THE PRODUCTS BY PATENT.

13              THE COURT:  OKAY.  CAN I SET A DATE FOR YOU ALL TO

14    FILE THAT CHART --

15              MR. LYON:  ABSOLUTELY.

16              THE COURT:  -- FOR BOTH OF YOUR AFFIRMATIVE CASES,

17    WHAT PRODUCTS HAVE BEEN INFRINGE ACCUSED OF INFRINGING EACH

18    PATENT.

19              MR. LYON:  WE CAN DO THAT.  IF YOU WANT US TO DO THAT

20    ON THE 7TH AS WELL --

21              THE COURT:  WHY DON'T YOU DO THAT SOONER?  CAN YOU DO

22    THAT NEXT WEEK?

23              MR. LYON:  SURE.

24              THE COURT:  OKAY.  SO THEN BY -- WHAT ABOUT THE -- I

25    WOULD LOVE TO GET IT EARLIER IN THE WEEK.  CAN YOU FILE IT BY

```
1      TUESDAY, THE 19TH?

2              MR. LYON:  ABSOLUTELY.  WE CAN DO IT BY MONDAY.

3              THE COURT:  OR TOMORROW?  OR MONDAY, THAT'S FINE.

4              MR. LYON:  OR TOMORROW.

5              THE COURT:  YEAH.  IF YOU HAVE IT AVAILABLE, I WOULD

6      LOVE IT TOMORROW.

7              MR. LYON:  WE DO.  I JUST DIDN'T BRING IT WITH ME.  I

8      APOLOGIZE.

9              THE COURT:  OKAY.  SO WHAT IS THAT?  THAT'S THE 15TH.

10     SO FEBRUARY 15TH, PLEASE FILE A CHART OF ACCUSED PRODUCTS.

11             MS. MAROULIS:  YOUR HONOR, MAY WE CLARIFY?  YOU

12     SIMPLY WANT THE LIST OF PRODUCTS, WHICH PRODUCTS ARE ACCUSED,

13     OR DO YOU NEED ANY OTHER DETAIL?

14             THE COURT:  NO.  I THINK THAT WOULD BE FINE.

15             MR. LYON:  DO YOU WANT --

16             THE COURT:  IF YOU COULD IDENTIFY IT AS EITHER A

17     MUSIC PLAYER OR A TABLET OR A SMARTPHONE, THAT WOULD BE

18     HELPFUL, IN ADDITION TO THE OFFICIAL, YOU KNOW, NAME OF THAT

19     PARTICULAR PRODUCT.

20             MR. LYON:  SURE.  DO YOU WANT THE CLAIMS THAT ARE

21     ASSERTED AS WELL?

22             THE COURT:  ACTUALLY, THAT'S ONE OF THE QUESTIONS I

23     WAS GOING TO ASK YOU.  I WAS A LITTLE BIT UNCLEAR FROM THE

24     JOINT CASE MANAGEMENT STATEMENT.  DID YOU ONLY IDENTIFY THE

25     INDEPENDENT AND THE DEPENDENT CLAIMS THAT YOU WERE ASSERTING
```

```
 1      FOR EACH PATENT?  IS THAT HOW --

 2              MR. LYON:  I BELIEVE THAT'S THE CASE, BUT I DON'T

 3      RECALL EXACTLY WHAT IT SAID IN THE CASE MANAGEMENT STATEMENT.

 4      WE CAN VERIFY THAT.

 5          WHY DON'T I JUST LIST THE CLAIMS AS WELL IN THE CHARTS SO

 6      THAT YOU HAVE THAT INFORMATION?  THIS IS JUST ALL PART OF WHAT

 7      OUR INFRINGEMENT CONTENTIONS HAVE BEEN AND WE CAN GIVE YOU

 8      THAT, THE PRODUCTS, THE PATENT CLAIMS, AND THE TYPE OF PRODUCTS

 9      SO THAT YOU HAVE ALL THAT INFORMATION.

10              THE COURT:  OKAY.  THAT WOULD BE HELPFUL BECAUSE IN

11      CERTAIN INSTANCES, I'M ASSUMING YOU ARE IDENTIFYING DEPENDENT

12      CLAIMS --

13              MR. LYON:  WE ARE.

14              THE COURT:  -- WHICH DEPEND UPON INDEPENDENT CLAIMS

15      THAT HAVE INTERNAL DISPUTE, BUT THEN THERE WERE CERTAINLY OTHER

16      CLAIMS THAT CONTAINED THE DISPUTED TERMS THAT WEREN'T ON YOUR

17      LIST, SO I'M ASSUMING THAT THOSE ARE NOT BEING ASSERTED.

18              MR. LYON:  I THINK THAT'S CORRECT, YES.

19              THE COURT:  OKAY.  IF YOU COULD VERIFY THAT, THAT

20      WOULD BE GREAT.  IF YOU COULD PUT THAT, PLEASE, IN YOUR CHART

21      THAT BOTH SIDES ARE FILING TOMORROW ON THEIR AFFIRMATIVE CASE.

22              MR. LYON:  WE WILL DO THAT.

23              THE COURT:  OKAY.  NOW, WITH SOME OF THESE, I

24      ASSUME -- I CAN GUESS THAT SOME OF THESE ARE REALLY

25      NON-INFRINGEMENT FIGHTS, BUT OTHERS I'M JUST NOT CLEAR ON WHAT
```

1    THE SIGNIFICANCE IS AND WHY THEY'RE BEING ARGUED.

2        AS WE GO THROUGH EACH OF THESE TERMS, IF YOU COULD JUST

3    GIVE ME AN UNDERSTANDING OF THE CONTEXT OF WHY THIS IS

4    IMPORTANT, WHETHER, YOU KNOW, THERE'S PRIOR ART ON THIS OR WHAT

5    THE SIGNIFICANCE IS, THAT WOULD BE HELPFUL.

6        MR. LYON:  OKAY.

7            THE COURT:  OKAY.  NOW, LET ME ASK, I ASSUME YOUR

8    BUSINESS RELATIONSHIP IS ONGOING.  IS THAT RIGHT?  HAS THAT

9    DIMINISHED IN ANY CAPACITY?  OR WHAT'S UP WITH THAT?

10           MR. LEE:  THE RELATIONSHIP BETWEEN APPLE AND SAMSUNG,

11   AS YOU HEARD ABOUT, IT'S ONGOING.

12           THE COURT:  IT'S WHAT?

13           MR. LEE:  ONGOING.

14           THE COURT:  ONGOING.  NO DIMINISHING IN THAT

15   RELATIONSHIP AT ALL?

16           MR. LEE:  I'M NOT SURE IN TERMS OF ABSOLUTE DOLLARS,

17   BUT IT'S AN ONGOING RELATIONSHIP.

18           THE COURT:  ALL RIGHT.  AND I'M WASTING MY BREATH

19   HERE, BUT I ASSUME NO FURTHER SETTLEMENT DISCUSSIONS; CORRECT?

20   OR NOT ANY THAT HAVE GONE ANYWHERE.

21           MR. LEE:  THE ANSWER TO THE LAST QUESTION IS THAT'S

22   CORRECT.

23           THE COURT:  OKAY.  ALL RIGHT.  OKAY.

24       ALL RIGHT.  WHY DON'T WE GO AHEAD WITH THE TUTORIAL, AND

25   THIS IS GOING TO BE SORT OF A FRANKENSTEIN TUTORIAL/MARKMAN, SO

```
 1      I DON'T KNOW HOW MUCH YOU HAVE PREPARED ABOUT THE TECHNOLOGY OR

 2      IF YOU WANT TO ACTUALLY SPECIFICALLY GO INTO -- I HAVE SPECIFIC

 3      QUESTIONS ON EACH TERM.

 4           WHAT WOULD YOU LIKE TO DO?

 5                MR. JOHNSON:  YOUR HONOR, WE WERE THINKING THAT WE

 6      WOULD, AS WE DID WITH THE LAST TUTORIAL, THAT WE WOULD WALK

 7      THROUGH THE TECHNOLOGY.

 8        TO THE EXTENT THAT YOU HAVE QUESTIONS THAT THEN CAN INFORM

 9      US TO SIMPLIFY AND STREAMLINE OUR PRESENTATION NEXT WEEK AND

10      ANSWER QUESTIONS, WE'D BE HAPPY TO TRY AND AT LEAST START TO

11      HEAR WHAT YOUR HONOR'S QUESTIONS ARE IN THAT RESPECT.

12                THE COURT:  OKAY.

13                MR. JOHNSON:  I THINK THAT'LL INFORM OUR

14      PRESENTATIONS FOR NEXT WEEK.

15                THE COURT:  THAT'S FINE.  BUT I WOULD LIKE YOU TO

16      ANSWER MY QUESTIONS TODAY, AND THEN IF YOU NEED TO REVISE IT OR

17      REFLECT FURTHER FOR NEXT WEEK, THAT'S FINE.

18                MR. LYON:  AND, YOUR HONOR, THAT WAS WHAT I WAS GOING

19      TO SAY IS WE'LL DO OUR BEST TO ANSWER ANY QUESTIONS YOU HAVE

20      TODAY.

21         THERE MAY BE SOME THINGS WE NEED TO GO BACK AND LOOK INTO A

22      BIT AND RESPOND NEXT WEEK.

23                THE COURT:  AND IF YOU NEED TO MODIFY YOUR RESPONSE

24      AFTER YOU'VE REFLECTED FURTHER, THAT'S FAIR BECAUSE THIS IS A

25      TUTORIAL, NOT A CLAIM CONSTRUCTION.
```

```
 1              MR. LYON:  THANK YOU VERY MUCH.

 2              THE COURT:  BUT IT WOULD ALSO HELP ME FOR NEXT WEEK

 3    IF I COULD GET ANSWERS TO THESE QUESTIONS.  OKAY?

 4              MR. LYON:  WE'LL DO OUR BEST.

 5              THE COURT:  ALL RIGHT.  LET'S GO AHEAD -- OH, ONE

 6    OTHER THING WE NEED TO DO.  WE'RE CURRENTLY SCHEDULED TO START

 7    NEXT WEEK AT 10:30, AND I'M WONDERING IF WE SHOULD MOVE THAT

 8    PERHAPS -- WELL, MAYBE WE SHOULD SEE HOW LONG TODAY GOES.  BUT

 9    LET'S HAVE ANOTHER DISCUSSION ABOUT WHETHER WE CAN PERHAPS MOVE

10    THAT TO NOON AS WELL.  OKAY?  SO JUST REMIND ME AT THE END AND

11    WE CAN TALK ABOUT THAT.

12         MY ONE LAST HOUSEKEEPING MATTER IS LAST TIME THE PARTIES

13    WERE ABLE TO ACTUALLY STIPULATE TO TWO OUT OF THE TEN TERMS,

14    AND I WANT TO MAKE A REQUEST THAT AFTER TODAY, IF YOU GET SOME

15    SENSE OF HOW I'M THINKING ABOUT IT AND, YOU KNOW, BOTH SIDES

16    HAVE DEVELOPED YOUR OWN POSITIONS FURTHER SINCE THE BRIEFING,

17    IF WE COULD HAVE A MEET AND CONFER BETWEEN LEAD TRIAL COUNSEL

18    IN PERSON, IN CALIFORNIA, TO SEE IF THERE'S ANY NEW AGREEMENT

19    ON ANY OF THE TERMS OR IF IT COULD BE NARROWED IN ANY WAY.

20              MR. KREVITT:  WE'D BE HAPPY TO, YOUR HONOR.

21              THE COURT:  SO GIVE ME A DATE BY WHICH YOU'RE GOING

22    TO DO THAT SO THAT THEN WE CAN HAVE A DATE FOR YOU TO ACTUALLY

23    FILE SOMETHING SO WE WILL HAVE THAT AND INCORPORATE THAT IN OUR

24    PREPARATION.

25              MR. KREVITT:  AND YOU WILL WANT THAT BEFORE THE
```

1      MARKMAN HEARING, YOUR HONOR?

2              THE COURT:  YES, PLEASE.

3              MR. KREVITT:  OKAY.  SO THEN WE ARE SCHEDULED TO MEET

4      AND CONFER ON OTHER ISSUES, LEAD COUNSEL, TOMORROW.  SO WE CAN

5      ADDRESS THAT ISSUE TOMORROW.

6              THE COURT:  OKAY.  SO WHEN WOULD YOU --

7              MR. KREVITT:  AND THEN THE PARTIES MAY WISH TO HUDDLE

8      AND --

9              MR. JOHNSON:  HOW ABOUT TUESDAY?

10             MR. KREVITT:  TUESDAY SHOULD BE FINE.

11             THE COURT:  OKAY, THANK YOU.  I'D APPRECIATE THAT.

12     SO MEET AND CONFER ON FEBRUARY 15TH, AND THEN PLEASE FILE YOUR

13     STATUS REPORT ON YOUR CLAIM CONSTRUCTION FOR THE 19TH.

14         ALL RIGHT.  LET'S GO TO -- I ASSUME YOU WANT TO START WITH

15     HISTORY LIST.  IS THAT RIGHT?

16             MR. LYON:  YES, YOUR HONOR.

17             THE COURT:  OKAY.  NOW, TELL ME WHY -- YOU KNOW, THIS

18     PARTICULAR PATENT GOT A LOT OF REAL ESTATE IN THE BRIEFING, SO

19     I ASSUME THIS IS A BIG MONEY ITEM.  OR WHY IS THIS ONE, NUMBER

20     ONE, FIRST, AND WHY DID YOU DEVOTE SO MUCH OF THE BRIEFING TO

21     THIS?

22             MR. LYON:  SO THIS IS A TERM THAT SAMSUNG ASKED TO

23     PUT INTO PLAY, BECAUSE IT'S OUR POSITION THAT ULTIMATELY --

24     THERE ARE ACTUALLY TWO TERMS HERE.  THERE'S THE "HISTORY LIST"

25     TERM AND THEN THE "FIELD CLASS" TERM THAT ARE PART OF THIS

```
 1        PATENT.
 2              IT'S OUR POSITION THOSE ARE BOTH FAIRLY OBVIOUS AND PLAIN
 3        AND ORDINARY MEANING KIND OF TERMS WHEN WE LOOK AT THE TERMS
 4        AND SEE WHAT THE CLAIMS ARE SAYING.
 5              THEY HAVE A DIFFERENT APPROACH ON THAT AND THEY HAVE
 6        CERTAIN CONSTRUCTIONS THAT THEY'RE PROPOSING.
 7              I DON'T HAVE -- I CAN PRESUME THAT I THINK IT IS PROBABLY
 8        NON-INFRINGEMENT BASED, BUT WE DON'T REALLY KNOW EXACTLY THE
 9        BASIS YET AND THAT'S SOMETHING MAYBE SAMSUNG CAN GIVE MORE
10        INSIGHT TO.
11              BUT I CAN GO THROUGH, WALK THROUGH THE TERMS, AND THEN IF
12        YOU HAVE QUESTIONS AS WE GO THROUGH, I'LL DO MY BEST TO ANSWER
13        AND WE CAN CERTAINLY FOLLOW UP NEXT WEEK WITH ANYTHING THAT'S
14        UNCLEAR.
15                   THE COURT:  OKAY.
16                   MR. LYON:  OH, WE HAVE SOME SLIDES AND DISKS OF THE
17        ANIMATION.  WOULD YOU -- WOULD IT BE OKAY IF I --
18                   THE COURT:  OH, YES, PLEASE.
19                   MR. LYON:  ONE FOR --
20                   THE COURT:  YES, PLEASE.
21                   MR. LYON:  SO THIS IS -- AND I WILL SAY ONE CAVEAT.
22        THIS IS THE AGENDA THAT WE THOUGHT WE WOULD GO THROUGH TODAY.
23        THE CAVEAT IS I'M NOT GOING TO PRESUME -- I JUST LISTED THE
24        SAMSUNG PATENTS HERE.  I'M NOT PRESUMING THIS IS THE ORDER THAT
25        SAMSUNG WOULD LIKE TO TAKE THEM IN.  IT MAY BE, IT MAY NOT BE.
```

```
 1          BUT EFFECTIVELY THERE ARE 16 PATENTS IN THE CASE, EIGHT FOR
 2     APPLE AND EIGHT FAR SAMSUNG.  FOR THE MARKMAN PRESENTATION,
 3     ONLY SEVEN OF THEM ARE ACTUALLY AT ISSUE.  THERE ARE ONLY SEVEN
 4     PATENTS FROM WHICH THE TEN TERMS THAT THE PARTIES SELECTED
 5     APPEAR.
 6          AND IN OUR BASIS FOR THE APPLE PATENTS, THERE ARE THE TWO
 7     TERMS FOR THE '502 AND THEN ONE EACH FOR THE '647, '414, AND
 8     '760.
 9          SO I'LL DISCUSS THE '502 AND THEN TURN IT OVER TO SAMSUNG
10     COUNSEL FOR THEIR PERSPECTIVE.
11          THIS IS WHAT WE CALL THE HISTORY LIST PATENT FOR SHORTHAND,
12     AND I THINK THE TITLE GIVES YOU A PRETTY GOOD FEEL FOR WHAT IT
13     IS.  IT'S GRAPHICAL USER INTERFACE THAT WE'RE TALKING ABOUT
14     HERE THAT USES HISTORY LIST WITH FIELD CLASSES, SO IT'S NOT
15     REALLY SURPRISING THAT THOSE ARE THE TWO TERMS THAT WE'RE
16     FOCUSSED ON HERE TODAY, AND THAT'S REALLY WHAT THE MEAT OF THE
17     PATENT IS.
18          IF YOU THINK ABOUT BACK -- THIS IS BACK IN THE DAY, IN THE
19     MID-'90S WHEN THIS PATENT WAS FILED ORIGINALLY, THE DEVICES AT
20     THE TIME, THEY WERE LAPTOPS AND THEY WERE COMPUTERS THAT PEOPLE
21     WERE USED TO HAVING CALENDARING AND E-MAIL AND VARIOUS OTHER
22     KINDS OF -- AND PURCHASING THINGS ON-LINE, VARIOUS KINDS OF
23     THINGS WHERE YOU'D ENTER IN INFORMATION USING A KEYBOARD, AND A
24     FULL SIZE KEYBOARD WAS FINE.
25          BUT AS YOU GOT TO MORE HANDHELD AND COMPACT DEVICES, IT GOT
```

1    HARDER AND HARDER TO DO THAT.  WHAT YOU WOULD SEE OFTEN IS A

2    DEVICE THAT HAD A VERY SMALL KEYBOARD AND SOME KIND OF EITHER A

3    STYLUS OR FINGER OR FINGERNAIL IN A WAY OF ENTERING AND PECKING

4    OUT THE INFORMATION, WHICH MAKES IT A LITTLE BIT MORE AWKWARD

5    TO ENTER IN LENGTHY AMOUNTS OF INFORMATION, AND PARTICULARLY IF

6    YOU'RE GOING TO BE REPETITIVE ABOUT IT, IF YOU'RE GOING TO HAVE

7    TO ENTER THE SAME KINDS OF THINGS, LIKE NAMES OR ADDRESSES OR

8    THINGS LIKE THAT OVER AND OVER FOR DIFFERENT APPLICATIONS, OR

9    EVEN WITHIN THE SAME APPLICATION.

10       SO ONE APPROACH WAS TO TRY TO JUST COLLECT EVERYTHING THAT

11   HAD BEEN ENTERED IN PREVIOUSLY SO THAT YOU HAD A LISTING

12   EFFECTIVELY OF WHAT HAD ALREADY BEEN ENTERED.

13       BUT WHAT YOU WOULD SEE IN THE DEVICES AT THE TIME WOULD BE

14   THESE WOULD BE LONG LISTS THAT WOULD INCLUDE INFORMATION SUCH

15   AS ADDRESSES AND MAYBE PHONE NUMBERS AND NAMES, ALL KIND OF IN

16   ONE BIG BUNCH.  THEY MIGHT BE ALPHABETICALLY ORDERED OR SOME

17   OTHER WAY.  IT WASN'T PARTICULARLY HELPFUL.

18       SO THE INTERFACE WAS A BIT CLUTTERED, A LITTLE BIT

19   DIFFICULT TO DO, SO WHAT THE '502 PATENT SEEKS TO DO IS TO TRY

20   TO SMOOTH AND STREAMLINE THAT AND MAKE IT A LITTLE BIT MORE

21   INTELLIGENT AS FAR AS THE INTERFACE GOES SO THAT IT'S EASIER

22   FOR A PERSON TO USE A SMALL HANDHELD DEVICE WITH A KEYBOARD OR

23   SOME OTHER ENTRY TYPE OF MECHANISM AND NOT HAVE TO BE ENTIRELY

24   REPETITIVE ABOUT ENTERING INFORMATION.

25       AND IT DOES THIS THROUGH THE USE OF FIELD CLASSES IN

1    PARTICULAR, AND HISTORY LISTS THAT ARE ASSOCIATED WITH THESE

2    FIELD CLASSES.

3        THIS IS FIGURE 8 FROM THE '502 PATENT, AND I'LL TAKE A

4    MOMENT TO EXPLAIN THIS BECAUSE I THINK THIS REALLY IS THE HEART

5    OF WHAT WE'RE TALKING ABOUT WHAT THESE VARIOUS IDEAS ARE.

6        THE PATENT SAYS WE HAVE A FORM, AND IT COULD BE AN ADDRESS

7    BOOK ENTRY WHERE YOU'RE TRYING TO CREATE A CONTACT FOR YOUR

8    PHONE FILES, IT COULD BE A FORM THAT YOU SEE ON THE INTERNET

9    WHERE YOU'RE TRYING TO PURCHASE SOMETHING AND YOU HAVE TO ENTER

10   IN YOUR SHIPPING AND BILLING ADDRESS INFORMATION.

11       AND WITHIN THAT FORM YOU WILL HAVE FIELDS IN WHICH YOU ARE

12   GOING TO ENTER INFORMATION.  IN THIS CASE, IN FIGURE 5A, YOU

13   SEE A NAME FIELD, AN ADDRESS FIELD, A COMPANY FIELD, AND A

14   PHONE FIELD.

15       AND EACH OF THOSE HAVE DIFFERENT KINDS OF INFORMATION THAT

16   YOU'RE GOING TO BE ENTERING IN, BUT THEY ALL HAVE THE

17   INFORMATION -- THEY'RE ALL PLACES WHERE YOU NEED TO FILL OUT

18   THE FORM, EFFECTIVELY ENTER THAT INFORMATION WITH SOME KIND OF

19   DATA VALUE.

20       SO WHAT THE '502 PATENT SAYS IS WE'LL CREATE SOMETHING

21   CALLED A FIELD CLASS AND THE FIELD CLASS WILL BE THE TYPE OF

22   INFORMATION THAT'S GOING INTO THESE FIELDS.

23       SO, FOR EXAMPLE, IN THE NAME FIELD, YOU MIGHT HAVE A FIELD

24   CLASS THAT'S CALLED "FULL NAME" AND ESSENTIALLY THAT'S THE TYPE

25   OF INFORMATION THAT'S GOING TO GO INTO THAT NAME CLASS.

```
 1         AND WE MIGHT HAVE A DIFFERENT FIELD CLASS FOR AN ADDRESS

 2    FIELD BECAUSE THAT'S ADDRESS INFORMATION.

 3         WE MIGHT HAVE A DIFFERENT FIELD CLASS FOR A PHONE FIELD

 4    BECAUSE THAT'S PHONE INFORMATION.

 5         BUT BY HAVING THAT FIELD CLASS TIED TO THE FIELD, WE KNOW

 6    NOW WHAT KIND OF INFORMATION WE'RE TALKING ABOUT FOR THAT

 7    PARTICULAR FIELD.

 8         AND THEN WHAT WE DO WITH THAT IS WE THEN ASSOCIATE A

 9    HISTORY LIST THAT'S TIED TO THAT PARTICULAR KIND OF INFORMATION

10    AND WE TIE THAT TO THE FIELD CLASS THAT WE'RE TALKING ABOUT.

11         SO, FOR EXAMPLE, IF WE'RE LOOKING AT THE NAME FIELD, WE

12    HAVE A FULL NAME FIELD CLASS, AND THEN TIE A HISTORY LIST THAT

13    HAS NAME INFORMATION, FULL NAME INFORMATION THAT'S ASSOCIATED

14    WITH THAT FIELD CLASS.

15         SO ANY TIME I HAVE A FORM OR I HAVE A FIELD AND A FORM AND

16    I WANT TO HAVE FULL NAME INFORMATION, I CAN USE THIS SAME

17    HISTORY LIST TO BE ABLE TO GO BACK AND SEE, WHAT DID I ENTER

18    PREVIOUSLY THAT WOULD HAVE TO DO WITH FULL NAME TYPE INFORMING?

19         AND I MIGHT HAVE A DIFFERENT HISTORY LIST FOR PHONE FIELD

20    BECAUSE I HAVE PHONE NUMBERS AND OTHER KIND OF INFORMATION.

21         SO EFFECTIVELY WHAT YOU GET IS IT'S THE TIE IN OF A FIELD

22    CLASS TO A FIELD, SO THAT EACH FIELD THAT IS ASSOCIATED WITH

23    THE FIELD CLASS, AND EACH FIELD CLASS THEN HAS ASSOCIATED WITH

24    IT THE HISTORY LIST, SO THAT FOR EACH FIELD NOW YOU HAVE A VERY

25    PARTICULARIZED HISTORY LIST THAT GOES TO THAT CATEGORY OF
```

```
1        INFORMATION FOR THAT FIELD.

2            LET ME WALK THROUGH, IF I COULD, AN EXAMPLE OF THIS.

3            THIS IS JUST ONE WE CREATED, BUT IT'S BASED ON THE

4        DISCLOSURES IN THE PATENT AND IT'S NOT IN PARTICULAR IN ANY

5        SPECIFIC CLAIM.  IT'S SORT OF AN EXAMPLE OF WHAT WE SEE HOW THE

6        PATENT DESCRIBING IT.

7            THERE'S A SHOP NOW -- LET'S SAY WE'RE GOING TO BUY

8        SOMETHING FROM THE SHOP NOW WEBSITE AND WE HAVE TO FILL IN A

9        COUPLE OF ADDRESSES, THE SHIPPING ADDRESS AND THE BILLING

10       ADDRESS.

11           PREVIOUSLY WE'VE ENTERED IN A COUPLE OF ADDRESSES TO THE

12       PHONE.  WE HAVE 299 BROADWAY ADDRESS THAT WE ENTERED IN LAST

13       TIME ON FEBRUARY 4TH, AND WE HAVE A 2261 MARKET STREET ADDRESS

14       THAT WAS ENTERED IN BACK IN NOVEMBER.  THAT INFORMATION IS

15       STORED AND RETAINED IN THE HISTORY TABLE THAT EFFECTIVELY IS

16       WHAT YOU DO TO KEEP THE HISTORY LIST INFORMATION.

17           AND THERE ARE DIFFERENT WAYS YOU CAN STORE THAT

18       INFORMATION, BUT ONE OPTION WOULD BE TO KEEP TRACK OF WHEN YOU

19       LAST ENTERED IT, AND ALSO MAYBE KEEP TRACK OF HOW MANY TIMES

20       YOU ENTERED IT SO YOU CAN SEE, YOU KNOW, "I'VE USED THE MARKET

21       STREET ADDRESS AN AWFUL LOT MORE THAN I'VE USED THE BROADWAY

22       STREET ADDRESS."

23           BUT THE PHONE KEEPS THAT HISTORY TABLE FOR A SPECIFIC FIELD

24       CLASS, AND IN THIS CASE WE'RE TALKING ABOUT AN ADDRESS FIELD

25       CLASS.
```

1        AND THE PHONE ALSO ASSOCIATES EACH OF THESE SHIPPING

2    ADDRESS AND BILLING ADDRESS FIELDS WITH THIS PARTICULAR ADDRESS

3    CLASS, SO WE HAVE A HISTORY LIST FOR THAT.

4        AND IF I GO TO ENTER IN AN ADDRESS IN MY SHIPPING ADDRESS,

5    I SEE A HISTORY LIST POP UP THAT HAS THE PREVIOUS ENTRIES FOR

6    ADDRESS INFORMATION THAT I'VE ALREADY PUT INTO THE PHONE.

7        BUT LET'S SAY I DON'T REALLY WANT TO USE EITHER OF THOSE

8    ADDRESSES, I HAVE A DIFFERENT ONE I WANT TO TYPE IN.  SO AT

9    THAT POINT I TYPE IN A PARTICULAR ADDRESS INTO THE PHONE INTO

10   THE SHIPPING ADDRESS FIELD, AND BECAUSE THAT'S INFORMATION THAT

11   GOES TO THE ADDRESS FIELD CLASS, IT'S THEN ADDED TO THE HISTORY

12   TABLE THAT'S ASSOCIATED WITH THAT ADDRESS FIELD CLASS, AND WE

13   SEE THAT IT REFLECTS THE MOST RECENT TIME IT WAS ENTERED AND

14   HOW MANY TIMES IT'S BEEN DONE.

15       NOW, WHEN I GO TO A BILLING ADDRESS FIELD, BECAUSE THAT'S

16   ALSO ADDRESS INFORMATION, THAT BILLING ADDRESS FIELD WILL BE

17   ASSOCIATED WITH THE ADDRESS FIELD CLASS AS WELL.

18       AND SO NOW WHEN I TYPE IN THE BILLING ADDRESS, BECAUSE I'VE

19   ENTERED IN A NEW ADDRESS, I SEE THAT THE HISTORY LIST INCLUDES

20   THAT NEW ADDRESS BECAUSE IT REFERENCES IT FROM THE HISTORY

21   TABLE WHERE I'VE ADDED IT, AND BECAUSE IT'S THE MOST RECENT

22   ENTRY, IT COMES UP ON THE TOP SO IT'S AVAILABLE TO YOU.

23       AND ASSUMING I WANT TO HAVE THE SAME BILLING ADDRESS AS I

24   DO A SHIPPING ADDRESS, I CAN JUST SELECT THAT, AND THEN --

25              THE COURT:  MAY I ASK -- I'M SORRY TO INTERRUPT

1   YOU -- HOW LONG ARE EACH OF YOUR TUTORIAL PRESENTATIONS?

2         MR. LYON:  WE'VE -- WELL, WE HAVE FOUR PATENTS, WE'VE

3   SHOT FOR ROUGHLY 15 MINUTES EACH, BUT I THINK A COUPLE ARE

4   ACTUALLY SHORTER THAN THAT.  MAYBE A COUPLE MIGHT GO A LITTLE

5   BIT LONGER.  SO PROBABLY 15 MINUTES EACH FOR THE APPLE PATENTS,

6   AND THEN THERE'S THREE SAMSUNG PATENTS, SO THERE'S ABOUT 15 TO

7   20 MINUTES FOR EACH OF THOSE AS WELL.

8         THE COURT:  OKAY.  BECAUSE I HAVE QUESTIONS, SO I'M

9   TRYING TO THINK OF HOW WE CAN ALLOT THE TIME.  CAN I ASK YOU TO

10  DO YOUR PRESENTATIONS IN A SHORTER AMOUNT OF TIME?

11        MR. LYON:  SURE, WE'LL TRY THAT.  WE'LL TRY TO SPEED

12  IT UP AS BEST WE CAN, BUT SLOW US DOWN IF IT GETS CONFUSING.

13        THE COURT:  OKAY, THANK YOU.

14        MR. LYON:  SO THEN THIS JUST SHOWS THAT NOW, SINCE

15  I'VE ADDED THE CHESTNUT STREET ADDRESS HERE, IT SHOWS ON THE

16  TABLE.

17      SO I'LL GO THROUGH THIS NEXT SLIDE AND JUST SUMMARIZE IF I

18  CAN.  THE KEY POINT IS IT HAS A FIELD CLASS ASSOCIATED WITH

19  THIS ADDRESS AND A HISTORY LIST THAT IS ASSOCIATED WITH THAT

20  PARTICULAR FIELD CLASS, SO THAT WHENEVER YOU ENTER IT INTO A

21  FIELD, YOU'RE GETTING RELEVANT INFORMATION FROM WHAT YOU'VE

22  ALREADY SEEN.

23      VERY QUICKLY, THIS PATENT CAN BE USED AND IMPLEMENTED IN

24  DIFFERENT WAYS.  IT CAN BE A PEN-BASED SYSTEM, IT CAN BE A

25  GRAPHICAL USER INTERFACE WHERE YOU'RE USING THE FINGERNAIL OR

1    SOME OTHER MEANS.

2          THE MAIN IDEA IS THERE'S SOME METHOD OF POINTING AND

3    ENTERING IN ON A KEYBOARD OR SOMETHING LIKE THAT.  THAT'S THE

4    KIND OF DATA ENTRY WE'RE TALKING ABOUT AND THIS IS A WAY TO

5    SPEED THAT UP.

6          AND THEN VERY, VERY QUICKLY I'LL RUN THROUGH, THIS IS AN

7    METHOD CLAIM, SO YOU CAN SEE HOW IT WORKS.  YOU HAVE A CLAIM,

8    FOR EXAMPLE, THE FIRST ELEMENT IS DISPLAYING A FORM ON THE

9    DISPLAY SCREEN THAT HAS AT LEAST ONE FIELD ASSOCIATED WITH THE

10   FIELD CLASS.  YOU DISPLAY A HISTORY LIST THAT'S ASSOCIATED WITH

11   THAT FIELD CLASS.

12         YOU DETERMINE WHEN -- IN THIS CASE THE USER SELECTS

13   MARY KAY, WHICH IS THE BOTTOM OF THE FIELD, SO THAT THEY'VE

14   SELECTED THAT.

15         YOU THEN ADD THAT DATA VALUE TO THE FIELD AND YOU UPDATE

16   THE HISTORY LIST SO THE NEXT TIME YOU SEE IT, NOW MARY KAY IS

17   CLOSER TO THE TOP BECAUSE MARY KAY IS MORE RECENTLY ENTERED.

18   IN THIS CASE THAT'S THE EXAMPLE OF HOW THAT'S DONE.  BUT YOU DO

19   SOMETHING TO UPDATE THE HISTORY LIST TO TAKE ACCOUNT OF THE

20   FACT THAT YOU'VE USED THIS INFORMATION.

21         THAT'S ALL WE REALLY HAVE FOR THIS PARTICULAR PATENT AS

22   FAR AS THAT.

23         SO IF YOU HAVE ANY SPECIFIC QUESTIONS --

24             THE COURT:  OKAY.  I DO.  I ONLY HAVE ONE FOR YOU ON

25    THIS PATENT.

```
 1          I GUESS WE CAN START WITH FIGURE 4 IS THE SIMPLEST

 2    EMBODIMENT OF THIS PATENT AND IT HAS THE TWO PROGRAMS, THE FAX

 3    OR THE ROLODEX OR ADDRESS BOOK.

 4          MR. LYON:  RIGHT.

 5          THE COURT:  AND THE MAIN DISPUTE WITH THIS TERM FOR

 6    "HISTORY LIST" IS WHETHER IT HAS TO BE SHARED -- WELL, WHETHER

 7    IT HAS TO BE SHARED BETWEEN DIFFERENT APPLICATIONS, SO I WANT

 8    TO ASK YOU IF THERE WAS ANYTHING IN THE SPEC THAT SAID THAT, IN

 9    THIS PARTICULAR EMBODIMENT, THERE WASN'T SHARING OF HISTORY

10    LIST BETWEEN THE FAX AND THE ROLODEX.

11          MR. LYON:  SO THERE ARE SAMPLES THAT ARE GIVEN WHERE

12    IT IS SHARED.

13          THE COURT:  YES.

14          MR. LYON:  AND IT DEFINITELY SAYS THAT, YOU KNOW,

15    THOSE ARE SITUATIONS WHERE YOU'RE SHARING IT.

16          AND I THINK IF YOU LOOK TOWARDS THE BACK, THERE'S FIGURES

17    13A AND 13B, FOR EXAMPLE, WHERE YOU HAVE A PHONE MESSAGE AND A

18    FAX COVER SHEET THAT BOTH HAVE NAME FIELDS.

19          THERE'S A CALLER, BUT THEY BOTH HAVE THE NAME "FIELD

20    CLASS," OR THEY HAVE SIMILAR FIELD CLASSES.  SO THEY'RE SHARING

21    THE LIST ACROSS THOSE APPLICATIONS.

22          BUT THE SPECIFICATION IS ALSO VERY CLEAR WHAT SHARING IS,

23    IS YOU CAN SHARE.  IT'S IMPORTANT THAT THE INFORMATION BE

24    SHAREABLE ACROSS APPLICATIONS, BUT NOT THAT IT HAS TO BE

25    SHARED.
```

```
 1        IN OTHER WORDS, YOU CAN USE -- AS I JUST SHOWED, YOU CAN

 2   HAVE A FORM THAT'S IN THE SAME APPLICATION --

 3        THE COURT:  WHAT'S THE ANSWER TO MY QUESTION?  MY

 4   QUESTION IS, IS THERE ANYTHING IN THE SPEC THAT SAYS THAT THERE

 5   ISN'T SHARING GOING ON IN FIGURE 4?  I THINK THE ANSWER IS NO,

 6   RIGHT?

 7        MR. LYON:  SPECIFIC TO FIGURE 4?

 8        THE COURT:  YEAH.

 9        MR. LYON:  I DON'T THINK IT COMES OUT AND SAYS THERE

10   IS NOT SHARING, BUT I ALSO DON'T THINK IT COMES OUT AND SAYS

11   THAT THERE HAS TO BE SHARING.  I THINK IT'S JUST AN EXAMPLE.

12        THE COURT:  ALL RIGHT.  THANK YOU.

13        MR. LYON:  SURE.

14        THE COURT:  OKAY.  I HAVE MORE QUESTIONS FOR SAMSUNG

15   ON THIS PARTICULAR PATENT.

16        MR. PAK:  GOOD AFTERNOON, YOUR HONOR.  SEAN PAK OF

17   QUINN, EMANUEL.

18      YOUR HONOR, PURSUANT TO YOUR REQUEST, I'LL TRY TO

19   STREAMLINE THE TECHNOLOGY PRESENTATION --

20        THE COURT:  THANK YOU.

21        MR. PAK:  -- TO GIVE YOU SUFFICIENT TIME TO ASK ANY

22   QUESTIONS THAT YOU MAY HAVE.

23        THE COURT:  THANK YOU.

24        MR. PAK:  BUT I DO THINK THERE ARE REALLY IMPORTANT

25   BACKGROUND FACTS HERE, AND YOU ASKED THE QUESTION, WHY IS THIS
```

```
 1        IMPORTANT?  WHY ARE WE TALKING ABOUT HISTORY LIST AND FIELD

 2     CLASSES?

 3             AND I THINK IT'S IMPORTANT FOR TWO REASONS.  ONE IS THERE'S

 4     A FUNDAMENTAL DIFFERENCE FROM SAMSUNG'S PERSPECTIVE BETWEEN HOW

 5     THE ACCUSED LISTS WORK IN THE SAMSUNG PHONES --

 6             THE COURT:  UM-HUM.

 7             MR. PAK:  -- VERSUS WHAT'S BEEN DESCRIBED AS BEING

 8     NEW AND NOVEL IN THE '502 PATENT.

 9             AND I THINK TO UNDERSTAND THAT, WE REALLY HAVE TO LOOK AT

10     WHAT EXISTED IN THE TECHNOLOGY IN 1995, AND WE CAN SEE THAT IN

11     THE INTRINSIC RECORD.

12             SO PART OF MY TECHNOLOGY TUTORIAL PRESENTATION TODAY IS TO

13     GIVE YOU A SNAPSHOT OF THE TECHNOLOGY THAT EXISTED IN 1995 THAT

14     WAS SPECIFICALLY CONSIDERED BY THE PATENT EXAMINER, AND THEN

15     THERE WAS AN EXCHANGE BETWEEN THE EXAMINER AND THE PATENTEE AND

16     THERE WERE A NUMBER OF CHANGES THAT OCCURRED TO THE CLAIM

17     LANGUAGE, AS WELL AS THE PATENT SPECIFICATION ITSELF, TO TRY TO

18     ARTICULATE WHAT IS DIFFERENT BETWEEN WHAT HAPPENED BEFORE,

19     BECAUSE WE ALL AGREE -- AND I THINK WHAT MR. LYON PRESENTED WAS

20     IN SOME WAYS WHAT EXISTED IN THE PRIOR ART TO A LARGE EXTENT,

21     HISTORICAL LISTS, NOTHING NEW -- BUT THE IDEA OF HAVING A LIST

22     OF HISTORY INFORMATION.

23             SO THE KEY QUESTION HERE FOR US TO ANSWER IS, WHAT IS NEW

24     ABOUT THE '502 PATENT AND WHERE IS THAT NOVELTY CAPTURED IN THE

25     CLAIM LANGUAGE?
```

```
 1              THE COURT:  SO FOR YOU IT'S BOTH INVALIDITY AND
 2    NON-INFRINGEMENT?
 3              MR. PAK:  ABSOLUTELY, YOUR HONOR.  BECAUSE FROM OUR
 4    PERSPECTIVE, IF YOU GIVE THE NOVELTY SIGNIFICANCE IN THE CLAIM
 5    LANGUAGE, WE THINK THERE'S A CLEAR NON-INFRINGEMENT POSITION
 6    BECAUSE OF THE FUNDAMENTAL DIFFERENCE IN HOW OUR PRODUCTS WORK
 7    VERSUS WHAT'S IN THE '502 PATENT.
 8         IF NOT, THEN THAT TURNS INTO A PRIOR ART CASE WHERE THERE'S
 9    A LARGE ARRAY OF PRIOR ART DEVICES.
10              THE COURT:  OKAY.
11              MR. PAK:  SO WITH THAT BACKGROUND, LET'S SEE IF I CAN
12    CUT TO THE CHASE HERE.
13         WHY DON'T WE GO TO SLIDE 4, MR. SHIRAZI?
14         SO DURING PROSECUTION, YOUR HONOR, THERE WAS A PARTICULAR
15    PRIOR ART SYSTEM CALLED TURBO C++, AND WHAT YOU SEE HERE ON THE
16    SCREEN IS ACTUALLY JUST A COLORIZED VERSION OF THE SCREEN
17    SNAPSHOTS THAT WERE ACTUALLY CONSIDERED BY THE PATENT EXAMINER
18    DURING PROSECUTION.
19         C++, AS YOUR HONOR MAY KNOW, IS A VERY POPULAR PROGRAMMING
20    LANGUAGE.  TURBO C++ WAS AN EDITOR THAT A SOFTWARE DEVELOPER
21    WOULD USE TO WRITE CODE IN C++.
22         AND WHAT WE'RE SEEING THERE IS A FUNCTION CALLED "OPEN THE
23    FILE," SO THIS WOULD BE ONE OF THE WINDOWS THAT THE SOFTWARE
24    DEVELOPER WOULD SEE, AND IN THIS PARTICULAR INSTANCE, THE
25    DEVELOPER WOULD WANT TO OPEN A PARTICULAR FILE SO THAT HE COULD
```

1    CONTINUE WORKING ON THE SOFTWARE.

2        AND YOU CAN IMAGINE SOFTWARE DEVELOPERS ARE WORKING ON

3    LARGE NUMBER OF FILES OVER DAYS, PERIODS OF MONTHS, SO IT WAS

4    CONVENIENT FOR THE DEVELOPER TO BE ABLE TO ACCESS A LIST, A

5    HISTORICAL LIST OF WHAT FILED HE HAD DEVELOPED OR WORKED ON IN

6    THE PAST.

7        SO IF YOU SEE, WHAT HAPPENS IF IS THE USER CLICKS ON THE

8    DOWN ARROW ICON, IT BRINGS UP A LIST, AND THAT LIST IS NOW

9    ASSOCIATED WITH THIS NAME FIELD AND IT CONTAINS A LIST OF ALL

10   THE PREVIOUS FILES THAT HE HAD USED BEFORE, AND THEN THE USER

11   CAN THEN SELECT WHICH OF THESE FILES HE WANTS TO USE.

12       AND SPECIFICALLY THE EXAMINER FOUND THAT THIS TURBO C++

13   PRIOR ART SYSTEM HAD A LIST OF PREVIOUSLY ENTERED FILE NAMES TO

14   EXPEDITE THE ENTRY OF INFORMATION PREVIOUSLY USED DATA.

15       SO IT WAS CLEAR FROM JUST THE PROSECUTION HISTORY ALONE

16   THAT THE IDEA OF HAVING A HISTORICAL LIST THAT CAN BE REORDERED

17   IN A WAY THAT, FOR EXAMPLE, PUTS UP FREQUENTLY USED FILES

18   FIRST, THAT IDEA ALREADY EXISTED IN THE PRIOR ART.

19       AND THAT'S WHAT THE EXAMINER TOLD THE PATENTEE AT THE TIME.

20   "THIS IS PART OF THE PRIOR ART.  WHY IS YOUR INVENTION

21   DIFFERENT THAN WHAT EXISTED BEFORE?"

22       AND TO UNDERSTAND THAT, WE CAN TAKE A LOOK AT ANOTHER VERY

23   POPULAR OPERATING SYSTEM I THINK WE MAY HAVE ALL USED.  THIS IS

24   FROM WINDOWS 95, YOUR HONOR.

25       WINDOWS 95, IF YOU RECALL, HAD THESE DIFFERENT DIALOGUE

1    BOXES WHERE, AGAIN, WE SEE THE SIMILAR DOWN ARROW WHICH ALLOWS

2    THE USER TO BRING UP PREVIOUSLY ENTERED INFORMATION INTO A

3    PARTICULAR FIELD.

4         SO IF YOU WERE PRINTING UP THE FIND UTILITY IN WINDOWS 95,

5    BY CLICKING ON THIS DOWN ARROW, THERE WOULD BE A DROP DOWN MENU

6    AND THEN THE USER WOULD BE ABLE TO SEE THE LIST OF PREVIOUSLY

7    ENTERED TEXT SEARCHES AND SELECT THE ONE THAT HE WANTS.

8         SAME THING IS TRUE FOR COMMANDS.

9         AND SO IF WE MOVE TO THE SELECT SLIDE, WHAT WE SEE IS THAT

10   WHETHER YOU LOOK AT WINDOWS 95, TURBO C++, OR ANY OF THE

11   COUNTLESS NUMBER OF APPLICATIONS THAT HAD HISTORY LISTS, AND IF

12   YOU LOOK AT WHAT'S SHOWN TO THE USER COMPARED TO WHAT'S IN

13   FIGURE 5B OF THE '502 PATENT, WHICH MR. LYON ILLUSTRATED FOR

14   US, FROM A VISUAL STANDPOINT, YOUR HONOR, THERE'S REALLY NO

15   DIFFERENCE.

16        THE USER SEES A FIELD, BY CLICKING ON AN ICON OR DOING

17   SOME OTHER TYPE OF MANUAL ENTRY, THE USER IS PRESENTED WITH A

18   LIST OF PREVIOUSLY INSERTED INFORMATION, AND THEN THE USER HAS

19   THE ABILITY TO SELECT ONE OF THESE ENTRIES AND THEREBY SAVING

20   TIME.

21        SO TO UNDERSTAND THE NOVELTY OF THE INVENTION, WE HAVE TO

22   GO BEYOND WHAT THE USER SEES ON THE SCREEN AT ANY DIFFERENT

23   POINT IN TIME.

24        THAT GOES TO YOUR QUESTION, YOUR HONOR, ABOUT FIGURE 4,

25   BECAUSE FIGURE 4 --

```
 1              THE COURT:  SO LET ME -- LET ME GO TO MY QUESTIONS.

 2    SO THE TURBO NEVER TALKED ABOUT SHARING THE HISTORY LIST ACROSS

 3    DIFFERENT APPLICATIONS, RIGHT?

 4              MR. PAK:  EXACTLY.

 5              THE COURT:  SO WHY -- IF THAT'S THE WHOLE POINT OF

 6    THE DISPUTE IS WHETHER THE HISTORY LISTS ARE BEING SHARED

 7    ACROSS APPLICATIONS, WHY DOES TURBO C++ HELP YOU?  IT DOESN'T

 8    ADDRESS THAT -- THE EXAMINER NEVER ADDRESSED THAT ONE POINT.

 9              MR. PAK:  NO, HE DID, YOUR HONOR.

10         WHAT HAPPENS IS TURBO C++ WAS CONSIDERED.

11              THE COURT:  YEAH.

12              MR. PAK:  THEN THE EXAMINER COMES BACK AND SAYS, "IF

13    YOU'RE TALKING ABOUT HAVING A DEDICATED HISTORY LIST PER FIELD

14    THAT IS NOT SHARED, THAT IS PRIOR ART.  THAT'S TURBO C++."

15              THE COURT:  ALL RIGHT.  I HAVE EXHIBIT 2 IN FRONT OF

16    ME.  SO SHOW ME WHERE IT SAYS THAT.

17              MR. PAK:  SO IF YOU LOOK AT EXHIBIT 2 TO OUR

18    BRIEFING --

19              THE COURT:  UM-HUM.  IT SEEMS LIKE IT'S REQUIRING

20    MORE THAT THE FIELD CLASSES BE LINKED TO MORE THAN ONE FIELD

21    AND NOT NECESSARILY TALKING ABOUT SHARING ACROSS APPLICATIONS.

22              MR. PAK:  SO WHAT HE SAYS IS THE FIELD CLASS IS A

23    CONCEPT, SO MAYBE THIS GOES BACK TO THE BASIC QUESTION YOU WERE

24    ASKING --

25              THE COURT:  UM-HUM.
```

```
 1            MR. PAK:  -- WHICH IS -- FIRST OF ALL, A KEY CONCEPT

 2   IS SHARING.  IS THERE SOME TYPE OF SHARING GOING ON OR NOT?

 3            THE COURT:  OKAY.

 4            MR. PAK:  FIELD CLASS IS THE MECHANISM THROUGH WHICH

 5   SHARING OCCURS, AND IF YOU LOOK AT WHAT THE EXAMINER SAYS IS

 6   BORLAND C++ DOES NOT TEACH --

 7            THE COURT:  I'M SORRY.  CAN YOU GIVE ME A PAGE?

 8            MR. PAK:  YES.  THIS IS IN THE EXAMINER'S AMENDMENT,

 9   PAGE 4, AND THIS IS THE BATES NUMBER 188, ENDING IN 188.

10            THE COURT:  OKAY.

11            MR. PAK:  AND YOU CAN SEE, YOUR HONOR, THAT WHAT HE

12   DOES BEFORE THAT IS HE ADDS THE LIMITATION, "ONE FIELD

13   ASSOCIATED WITH A FIELD CLASS" TO THE CLAIMS THAT WERE PENDING

14   BEFORE HIM AT THE TIME.

15      HE ALSO ADDS "WITH FIELD CLASSES" TO THE TITLE THAT'S SHOWN

16   A COUPLE PAGES BEFORE.

17      AND THEN THERE'S AN INTERVIEW WITH THE PATENTEE, HE COMES

18   BACK AND SAYS TURBO C++ HAD HISTORY LIST, HAD LISTS OF

19   INFORMATION THAT WAS DEDICATED TO A FIELD, BUT BORLAND C++ DOES

20   NOT TEACH UPDATING THE HISTORY LIST ASSOCIATED WITH THE FIELD

21   CLASS.

22      IN CONTRAST, BORLAND C++ SEEMS TO LIMIT UPDATING TO A

23   SPECIFIC ENTRY FIELD INSTANCE, AND HE CITES PAGES 7 THROUGH 10.

24            THE COURT:  UM-HUM.

25            MR. PAK:  SO THE FIRST BASIC CONCEPT THAT I THINK
```

```
1    THAT SAMSUNG IS ADVOCATED FOR WHICH IS NOT FOUND IN APPLE'S

2    POSITION IS THE IDEA OF SHARING.

3            THE COURT:  BUT I DON'T SEE THE IDEA OF SHARING IN

4    WHAT YOU JUST READ.  I DON'T SEE THAT IN THERE.

5            MR. PAK:  SO BORLAND C++ LIMITS UPDATING TO A

6    SPECIFIC ENTRY FIELD INSTANCE.

7            THE COURT:  UM-HUM.

8            MR. PAK:  SO IN C++, WHAT WE SAW WAS YOU HAVE A

9    DEDICATED HISTORY LIST AND THAT DEDICATED HISTORY LIST ONLY HAS

10   INFORMATION DEDICATED TO A PARTICULAR FIELD INSTANCE.

11     AND SO HE ADDS THE WORD "FIELD CLASS."  "CLASS" IS A

12   GENERAL CATEGORY OF FIELDS.

13           THE COURT:  UM-HUM.

14           MR. PAK:  TYPES OF INFORMATION THAT IS SHARED BY

15   MULTIPLE FIELDS.

16     SO WHAT HE'S INDICATING HERE IS THAT IN ORDER TO

17   DISTINGUISH THE INVENTION FROM WHAT HAD GONE BEFORE IT, WHICH

18   IS TURBO C++, WE NEED TO NOW BUILD IN A CONCEPT OF A MECHANISM

19   FOR SHARING INFORMATION, AND THAT'S THE FIELD CLASS.

20     OTHERWISE, YOUR HONOR, IN TERMS OF WHAT'S HAPPENING ON THE

21   SCREEN, AND ALSO IN TERMS OF THE SOFTWARE, THERE WOULD BE NO

22   DIFFERENCE.  IF YOU HAD DEDICATED HISTORY LISTS, ONE-TO-ONE

23   RELATIONSHIP TO FIELDS, THEN THERE WOULD BE NO DIFFERENCE

24   BETWEEN TURBO C++ AND THE INVENTION.

25           I THINK ONE SLIDE THAT I --
```

```
 1              THE COURT:  CAN I ASK YOU TO ADDRESS WHAT MR. LYON

 2     SAID, THAT IN THE SPEC, AT LEAST IN THE ABSTRACT, AND ALSO IN

 3     COLUMN 4, IT SAYS THAT THE HISTORY LIST CAN BE SHARED, BUT IT

 4     DOESN'T SAY MUST BE SHARED.

 5         SO HOW AM I SUPPOSED TO UNDERSTAND THAT?

 6              MR. PAK:  YES.  I'LL TRY TO ADDRESS THAT QUESTION AS

 7     WELL, YOUR HONOR.

 8              THE COURT:  UM-HUM.

 9              MR. PAK:  AND WE CAN START WITH THE SUMMARY OF THE

10     INVENTION, WHICH REALLY HELPS CLARIFY THIS POINT FOR US, AND

11     THAT'S --

12              THE COURT:  OKAY.

13              MR. PAK:  YOU CAN SEE IN THE SUMMARY OF THE

14     INVENTION, IF YOU TURN TO LINE 30 IN COLUMN 2 -- AND I'LL PUT

15     THAT ON THE SCREEN AS WELL.

16         MR. SHIRAZI, COULD I GET SLIDE 8?  AND AS WE NOTED IN OUR

17     BRIEF IN STATEMENTS ABOUT WHAT THE INVENTION IS AND HOW IT

18     DISTINGUISHES ITSELF FROM THE PRIOR ART ARE IMPORTING

19     STATEMENTS IN TERMS OF CLAIM CONSTRUCTION.

20         WE HAVE THE SUMMARY OF THE INVENTION IN WHICH IT SAYS, "THE

21     INVENTION ALSO FACILITATES THE SHARING OF HISTORICAL INPUT DATA

22     BETWEEN DIFFERENT APPLICATIONS, AND BY SHARING THE DATA BETWEEN

23     THE APPLICATIONS, THE HISTORY LIST BECOMES MORE USEFUL AND

24     VALUABLE TO THE USER AND THEREBY FURTHER IMPROVES THE EASE OF

25     USE OF THE COMPUTER SYSTEM."
```

1          SO WE HAVE A BASIC STATEMENT HERE IN THE SUMMARY OF THE

2     INVENTION WHICH STATES THAT THE REASON WHY THIS INVENTION IS

3     DIFFERENT THAN SYSTEMS LIKE C++ THAT HAVE DEDICATED HISTORY

4     LISTS WAS THE SHARING OF THE HISTORICAL INFORMATION ACROSS

5     DIFFERENT APPLICATIONS.

6          AND THE MECHANISM FOR DOING THAT IS THE FIELD CLASS, AND

7     JUST TO GIVE YOU A SENSE OF --

8               THE COURT:  OKAY.  BUT ANSWER MY QUESTION, PLEASE.

9               MR. PAK:  YES.

10              THE COURT:  YOU SAID IN THE ABSTRACT AT COLUMN 4,

11    LINE 20 THROUGH 22, IT SPECIFICALLY SAYS CAN BE SHARED.

12              MR. PAK:  YES, RIGHT.

13              THE COURT:  AM I SUPPOSED TO IGNORE THAT?

14              MR. PAK:  NO, YOUR HONOR.  YOU SHOULD GIVE MEANING TO

15    THAT IN LIGHT OF THE SUMMARY OF THE INVENTION.

16         WE'RE NOW IN THE CLAIM CONSTRUCTION STAGE.  WE'RE TRYING TO

17    DEFINE THE METES AND BOUNDS OF THE CLAIM.  TO GIVE AN OPTIONAL

18    DESCRIPTION, TO SAY AN INVENTION CAN INCLUDE SOMETHING, BUT

19    DOESN'T HAVE TO INCLUDE THAT FEATURE DOESN'T HELP US IN TERMS

20    OF DEFINING THE SCOPE OF THE CLAIMS.

21         IF IT DOESN'T HAVE TO INCLUDE SOMETHING IN TERMS OF CLAIM

22    SCOPE, IT'S IRRELEVANT TO DETERMINING WHETHER SOME PIECE OF

23    PRIOR ART SYSTEM IS INVALIDATING OR NOT, OR WHETHER

24    INFRINGEMENT IS OCCURRING OR NOT.

25              AND THE KEY POINT WITH THE TURBO C++ PROSECUTION HISTORY IS

```
1      THAT THE IDEA OF SHARING THROUGH FIELD CLASSES WAS THE VERY

2      REASON WHY THE INVENTION WAS ALLOWED OVER THE PIECE OF PRIOR

3      ART THAT WAS CONSIDERED.

4          SO TO SAY -- YOU'RE ABSOLUTELY RIGHT THAT THE SPECIFICATION

5      SAYS "CAN."

6          BUT THE SUMMARY OF THE INVENTION ALSO MAKES IT VERY CLEAR

7      THAT IT'S THE IDEA OF SHARING THAT DISTINGUISHES THE INVENTION

8      FROM THE PRIOR ART SYSTEMS.

9          AND SO I THINK THE FUNDAMENTAL DISAGREEMENT IS NOT WHETHER

10     THE TECHNOLOGY THAT'S DESCRIBED IN THE PATENT SHARES

11     INFORMATION.  THE FUNDAMENTAL DISAGREEMENT IS APPLE SAYS THAT'S

12     JUST AN OPTIONAL FEATURE --

13              THE COURT:  UM-HUM.

14              MR. PAK:  -- SO LET'S IGNORE IT FOR CLAIM

15     CONSTRUCTION PURPOSES.

16          WELL, WHAT WE'RE SAYING TO YOU, YOUR HONOR, IS WE CAN'T

17     IGNORE IT BECAUSE THAT IS THE WHOLE REASON, THAT IS THE WHOLE

18     REASON WHY THIS INVENTION IS DIFFERENT THAN THE PRIOR ART.

19     OTHERWISE, IF YOU DON'T INCLUDE THE CONCEPT OF SHARING IN SOME

20     FORM IN THE CLAIM CONSTRUCTION, THERE'S NO DIFFERENCE,

21     MEANINGFUL DIFFERENCE, BETWEEN WHAT WAS CONSIDERED TURBO C++

22     VERSUS THE INVENTION.

23          AND THE MECHANISM THROUGH WHICH THAT HAPPENS IS THE FIELD

24     CLASS, AND THE WORD "CLASS" EXPLICITLY INCLUDES THE IDEA OF

25     SHARING.
```

```
 1        NOW, YOUR HONOR -- SO I THINK THERE ARE TWO DISPUTES HERE,

 2   AND I JUST WANT TO CLARIFY SOMETHING FOR THE RECORD AS YOU

 3   THINK ABOUT THIS ISSUE, AND I'M SURE WE'LL BE ABLE TO ADDRESS

 4   THIS FURTHER IN THE MARKMAN --

 5            THE COURT:  I DON'T REALLY REMEMBER YOUR FIELD CLASS

 6   ARGUMENT IN YOUR BRIEFING.  IS THIS SOMETHING THAT'S BEEN

 7   REFINED FURTHER, OR WHAT?

 8            MR. PAK:  WHICH ARGUMENT?  ABOUT THE --

 9            THE COURT:  THE ARGUMENT YOU'RE MAKING NOW ABOUT

10   TURBO C++.

11            MR. PAK:  WE ABSOLUTELY DID PUT THAT IN THE

12   OPPOSITION, YOUR HONOR, WHEN WE WALKED THROUGH THE TURBO C++

13   HISTORY.  WE SPECIFICALLY TALKED ABOUT THE FIELD CLASS

14   AMENDMENT AND WHY THE EXAMINER ADDED THAT AS A BASIS FOR THE

15   SHARING OF THE INFORMATION.

16            THE COURT:  LET ME ASK YOU, I UNDERSTAND THAT THERE

17   IS A DIFFERENCE OF OPINION AS TO THE SHARING BETWEEN DIFFERENT

18   APPLICATIONS.

19        BUT WHAT IS YOUR VIEW ABOUT "A LIST OF PREVIOUSLY USED

20   ENTRIES"?

21            MR. PAK:  YES.

22            THE COURT:  DO YOU OBJECT TO THAT?

23            MR. PAK:  THE CONCEPT OF LISTS OF PREVIOUSLY USED

24   ENTRIES?

25            THE COURT:  YES.  LET'S PUT ASIDE THE "SHARED ACROSS
```

```
1        DIFFERENT APPLICATIONS."

2               MR. PAK:  YES.

3               THE COURT:  JUST THAT LANGUAGE.

4               MR. PAK:  THAT LANGUAGE, WE DO NOT HAVE A PROBLEM

5        WITH THAT.

6               THE COURT:  ALL RIGHT.  IS THERE A DIFFERENCE BETWEEN

7        "A LIST OF CHOICES BASED ON HISTORICAL INFORMATION," WHICH IS

8        WHAT YOU ARE PROPOSING, AND "THE LIST OF PREVIOUSLY USED

9        ENTRIES" THAT APPLE GIVES AS AN ALTERNATIVE?

10               MR. PAK:  I DON'T THINK THERE'S A MEANINGFUL

11        DIFFERENCE.

12               THE COURT:  OKAY.

13               MR. PAK:  AND, YOUR HONOR, IF I MAY JUST CLARIFY ONE

14        THING?  ALTHOUGH WE EXPRESSED THIS DISPUTE IN TERMS OF SHARING

15        ACROSS APPLICATIONS, IF YOU THINK ABOUT THE CONCEPT, THERE ARE

16        ACTUALLY TWO SUBPARTS TO IT.  ONE IS WHETHER SHARING IS

17        REQUIRED OR NOT, WHETHER THAT'S SHARING ACROSS FIELDS THROUGH

18        FIELD CLASS, OR -- AND THEN, BY EXTENSION, SHARING ACROSS

19        APPLICATIONS.

20            BUT THE BASIC NOTION OF SHARING, WE THINK, IS AN IMPORTANT

21        CONCEPT AND THAT'S A DISAGREEMENT BETWEEN US AND APPLE'S

22        POSITION, WHETHER SHARING AT ALL HAS TO BE PART OF THE CLAIM

23        CONSTRUCTION FOR THE CONCEPT OF HISTORY LIST AS EMBODIED IN THE

24        '502 PATENT.

25               AND THEN I THINK THERE'S A NEXT QUESTION, WHICH IS DO THE
```

```
1    CLAIMS, IN LIGHT OF WHAT'S STATED IN THE SUMMARY OF THE

2    INVENTION, FURTHER REQUIRE SHARING ACROSS DIFFERENT

3    APPLICATIONS?  WE BELIEVE THEY DO.

4        BUT I THINK THERE ARE TWO NOTIONS HERE:  ONE, IS THERE

5    SHARING REQUIRED TO GIVE PROPER MEANING TO THE WORD "HISTORY

6    LIST" IN THE CONTEXT OF FIELD CLASSES; AND THEN FURTHER THE

7    SECOND QUESTION OF WHETHER THAT SHARING HAS TO ALSO EXTEND TO

8    APPLICATIONS RATHER THAN SIMPLY FIELDS.

9            THE COURT:  SO LET ME ASK YOU THE SAME QUESTION I

10   ASKED MR. LYON, AND I -- AND I AGREE THAT THERE ARE CERTAINLY

11   EXAMPLES IN THE PATENT WHERE THERE IS SHARING ACROSS

12   APPLICATIONS.

13       BUT LET'S GO BACK TO FIGURE 4.

14           MR. PAK:  YES.

15           THE COURT:  HE HAD TO ADMIT THAT THERE'S NOTHING HERE

16   SAYING THAT SHARING ISN'T GOING ON, BUT IS THERE ANYTHING HERE

17   THAT SAYS THAT SHARING IS GOING ON?

18           MR. PAK:  SO TO ANSWER THAT QUESTION, YOUR HONOR,

19   WHAT WE SEE IN FIGURE 4 --

20           THE COURT:  YES.

21           MR. PAK:  -- AND I THINK THERE WAS SOME TALK ABOUT

22   FIGURE 5 IN THE PRESENTATION AS WELL, BUT FIGURE 4 IS THE

23   ALGORITHM, IT'S WHAT'S HAPPENING UNDER THE HOOD, AND THERE'S

24   ONLY ONE EMBODIMENT IN THE ENTIRE PATENT THAT DESCRIBES WHAT'S

25   ACTUALLY HAPPENING INSIDE THE SOFTWARE TO ENABLE THE INVENTION,
```

1    AND THAT STARTS WITH FIGURE 4.

2        SO THERE IS NO ALTERNATIVE EMBODIMENT FOR HOW THE SYSTEM

3    ACTUALLY WORKS.

4        THERE ARE ALTERNATIVE EMBODIMENTS THAT ARE SHOWN IN TERMS

5    OF WHAT THE USER SEES ON THE SCREEN.  FOR EXAMPLE, FIGURE 5

6    ONLY SHOWS ONE APPLICATION RUNNING AT THAT PARTICULAR POINT IN

7    TIME.

8        BUT -- AND FIGURE 13 SHOWS MULTIPLE APPLICATIONS RUNNING AT

9    THE SAME TIME.

10        BUT WHAT'S IMPORTANT TO NOTE IS FIGURE 4 IS THE ONLY

11    EMBODIMENT, THE BASIC EMBODIMENT OF ACTUALLY HOW THE SOFTWARE

12    WORKS.

13        THERE ARE -- AND THIS SINGLE EMBODIMENT OF HOW THE

14    ALGORITHM WORKS IS THEN USED FOR ALL APPLICATIONS.  SO EVERY

15    APPLICATION THAT PRACTICES THE '502 PATENT IS REUTILIZING

16    FIGURE 4, SO THERE'S NO ALTERNATIVE EMBODIMENT IN TERMS OF HOW

17    THE SOFTWARE ACTUALLY WORKS.  THERE'S A SINGLE EMBODIMENT.

18        AND IF YOU LOOK AT THE ALGORITHM, YOUR HONOR, OF FIGURE 4,

19    THERE IS -- THIS ENTIRE ALGORITHM -- AND THEN IF YOU GO

20    THROUGH, THERE ARE SOME RELATED ALGORITHMS, INCLUDING FIGURES 7

21    AND 8 AND 9 AND SO FORTH, THAT DESCRIBE FURTHER STEPS TO THE

22    MAINTENANCE AND GENERATION OF THE HISTORY LIST.

23        BUT FIGURE 4 IS THE SAME ALGORITHM THAT RUNS ON EVERY

24    SINGLE APPLICATION, AND WHEN YOU'RE TALKING ABOUT -- AS

25    MR. LYON SHOWED YOU -- THE IDEA OF FREQUENTLY UPDATED

```
1        INFORMATION BASED ON THE LAST USE --
2              THE COURT:  UM-HUM.  WHY DON'T YOU ANSWER MY
3        QUESTION?
4              MR. PAK:  YES?
5              THE COURT:  WHERE DOES IT SAY THAT THERE IS A SHARING
6        OF HISTORY LISTS BETWEEN THE ROLODEX AND THE FAX.
7              MR. PAK:  I THINK IT'S ACTUALLY PRETTY CLEAR FROM THE
8        DESCRIPTION IN COLUMN 9.  IT SAYS THIS -- "FIGURE 4 IS THE
9        BASIC BUILDING BLOCK, OR A BLOCK DIAGRAM OF LIST PROCESSING
10       ASSOCIATED WITH THE BASIC EMBODIMENT OF THE INVENTION," AND
11       THEN IT GOES ON TO SAY, "THE LIST PROCESSING BEGINS BY
12       DISPLAYING A FORM.  FORM IS AN ELECTRONIC IMAGE."
13          AND THEN IT GOES ON TO TALK ABOUT SPECIFIC TYPES OF
14       APPLICATIONS THAT WERE ALL UTILIZED AS ALGORITHM.
15          SO THIS IS THE SAME ALGORITHM THAT RUNS ON ALL OF THESE
16       APPLICATIONS THAT ARE ON THE COMPUTER SYSTEM.
17             THE COURT:  RIGHT.  AND IT STILL DOESN'T SAY THERE'S
18       ANY SHARING GOING ON OF HISTORY LISTS BETWEEN THE FAX AND THE
19       ROLODEX.
20             MR. PAK:  WELL, THEY ALL HAVE FIELD CLASSES, YOUR
21       HONOR, SO THIS GOES BACK TO THE FIELD CLASS CONCEPT.  ANY
22       EMBODIMENT OF THIS PATENT IS GOING TO BE USING FIELD CLASSES.
23          IF I HAD A ROLODEX, YOUR HONOR, WITH THE "TO" FIELD, THAT
24       FIELD IS NOW GOING TO BE ASSOCIATED WITH THE NAME "FIELD
25       CLASS."
```

```
1          ON THE SAME SYSTEM, IF I HAVE AN EXCEL SPREADSHEET WITH A
2     "NAME" FIELD, THAT'S ALSO GOING TO BE ASSOCIATED WITH THE NAME
3     "FIELD CLASS."
4          SO IF YOU RUN THIS ALGORITHM, THE SAME ALGORITHM WITHOUT
5     ANY MODIFICATION ON THAT SYSTEM, EVERY SINGLE APPLICATION THAT
6     SHARES A FIELD CLASS, BY DEFAULT, WILL BE SHARING INFORMATION.
7          THE COURT:  ALL RIGHT.  LET'S GO TO "FIELD CLASS."
8          THE DISPUTE HERE SEEMS TO BE WHETHER A DATA ELEMENT IS
9     REQUIRED.  YOU CONCEDE THAT DATA ELEMENT IS NOWHERE IN THE SPEC
10    AND IT'S NOT IN THE CLAIMS, BUT YOUR CONCERN IS THAT UNLESS
11    IT'S IN THERE, PEOPLE WILL NOT SORT OF UNDERSTAND WHERE IT IS.
12         BUT IN CLAIM 11 WHERE IT SAYS, "A METHOD FOR INPUTTING DATA
13    INTO A COMPUTER SYSTEM," WOULDN'T THAT SORT OF PROVIDE AN
14    EMBODIMENT IN A COMPUTER, SO IT WOULDN'T BE SO ABSTRACT AND
15    UNCLEAR?
16         MR. PAK:  SO I THINK THE DISPUTE HAS NARROWED, YOUR
17    HONOR.
18         THE COURT:  OKAY.
19         MR. PAK:  AT THE VERY BEGINNING OF THE BRIEFING
20    PROCESS, IT WAS NOT CLEAR WHETHER APPLE WAS TAKING THE POSITION
21    THAT A FIELD CLASS COULD JUST BE AN ABSTRACT ASSOCIATION OF
22    CATEGORY BY THE USER.
23         THE COURT:  OKAY.
24         MR. PAK:  SO WE INTRODUCED THE CONCEPT OF A DATA
25    ELEMENT.  OBVIOUSLY WE CAN FIGHT ABOUT WHAT THE PROPER WORDS
```

1        SHOULD BE.

2                THE COURT:  OKAY.

3                MR. PAK:  BUT THE NOTION -- THE BASE FIGHT WAS WE

4        BELIEVE THERE HAS TO BE SOME ELEMENT OR STRUCTURE AND SOFTWARE

5        THAT CODIFIES OR ENCODES THE CATEGORY INFORMATION THAT BOTH

6        PARTIES AGREE INVOLVES FIELD CLASSES.

7            IN THEIR REPLY BRIEF, YOUR HONOR, THEY CAME BACK AND

8        ACKNOWLEDGED TWO THINGS:  ONE, THEY ACKNOWLEDGED THAT THEY ARE

9        NOT ARGUING FOR SOME KIND OF ABSTRACT NOTION.  THEY AGREE WITH

10       SAMSUNG'S POSITION THAT A FIELD CLASS IS A STRUCTURE IN

11       SOFTWARE, THAT THIS IS AN ELEMENT.  I THINK YOU HEARD THAT IN

12       THE TUTORIAL PRESENTATION EARLIER TODAY.

13           THE SECOND THING THAT THEY DID, YOUR HONOR, IS THEY USED

14       THE WORD "CODE."  IF YOU LOOK AT THEIR REPLY BRIEF, THEY USE

15       THE WORD "CODE" TO TALK ABOUT FIELD CLASSES.  "FIELD CODES" IS

16       A TERM THAT APPEARS IN THEIR REPLY BRIEF THROUGHOUT.

17           IF THE ISSUE REALLY IS, "WE DON'T LIKE THE WORD 'DATA

18       ELEMENT' BECAUSE THAT 'DATA ELEMENT' IS EITHER UNCLEAR OR IT'S

19       NOT STATED IN THE SPECIFICATION," YOUR HONOR, AS A COMPROMISE

20       POSITION, SAMSUNG IS AMENABLE TO SAYING, INSTEAD OF "DATA

21       ELEMENT," LET'S USE "CODE," "SOFTWARE CODE" OR "CODE" THAT

22       IDENTIFIES THE TYPE OF INFORMATION ASSOCIATED WITH THE FIELD.

23           BUT REALLY THE DISPUTE HERE IS REALLY ABOUT -- IN THE

24       BEGINNING IT WAS ABOUT WHETHER THIS IS AN ABSTRACT NOTION OR

25       SOMETHING IN SOFTWARE, AND I THINK "CODE," AS A TERM THAT APPLE

1    USED, IS A SUITABLE TERM FOR US.

2         THE COURT:  OKAY.  SO YOUR ALTERNATIVE CONSTRUCTION

3    IS "SOFTWARE CODE THAT IDENTIFIES A CATEGORY OF INFORMATION"?

4    IS THAT YOUR PROPOSAL?

5         MR. PAK:  YES.  I THINK -- LET ME MAKE SURE I HAVE

6    THE EXACT LANGUAGE.

7         (PAUSE IN PROCEEDINGS.)

8         MR. PAK:  YES.  SO IF WE USE "CODE" TO BE "TYPE OF

9    INFORMATION," "CODE INDICATING THE CATEGORY OF INFORMATION,"

10   "SOFTWARE CODE INDICATING THE TYPE OF INFORMATION INFERRED INTO

11   THE FIELD," I THINK THAT WOULD BE ACCEPTABLE TO US.

12        THE COURT:  WAIT.  "SOFTWARE CODE" -- REPEAT THAT,

13   PLEASE.

14        MR. PAK:  YES.  "SOFTWARE CODE INDICATING," AND IT'S

15   ACTUALLY USED CATEGORIES BECAUSE THAT'S SOMETHING THAT WE PUT

16   IN, "THE CATEGORY OF INFORMATION ENTERED INTO THE FIELD."

17        THE COURT:  "SOFTWARE CODE INDICATING THE CATEGORY OF

18   INFORMATION" --

19        MR. PAK:  -- "ENTERED INTO THE FIELD."

20        THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

21   I'M GOING TO GIVE MR. LYON ONE MINUTE BECAUSE WE'VE GOT TO

22   MOVE ON.

23        MR. PAK:  SURE.

24        THE COURT:  WE'VE GOT SIX MORE PATENTS.

25   WHAT'S YOUR VIEW ON THAT ALTERNATIVE?

1           MR. LYON:  YOUR HONOR, I THINK -- SO FUNDAMENTALLY,

2    NUMBER ONE, I DON'T THINK APPLE BELIEVES THAT WE NEED TO

3    INTERPRET THIS BECAUSE, AS YOU KNOW, THE CLAIM LANGUAGE ITSELF

4    TALKS ABOUT IT BEING A PROGRAM.  I DON'T THINK THERE'S ANY REAL

5    DISPUTE.  THE JURY IS NOT GOING TO LOOK AT THIS AND SAY THIS IS

6    SOME KIND OF ABSTRACT IDEAL.  THEY UNDERSTAND IT'S PART OF THE

7    PROGRAM.

8        THE ISSUE IS, WHAT DOES "CODE" MEAN?  DOES THIS MEAN WE

9    HAVE TO HAVE A LENGTHY METHOD AND STRUCTURE OR SOMETHING LIKE

10   THAT?  OR IS IT SOMETHING SIMPLER?

11       AND THERE'S NOTHING IN THE CLAIMS THAT TALK ABOUT THAT.

12   ALL IT REALLY IS IS IT'S A WAY OF CATEGORIZING INFORMATION SO

13   YOU KNOW WHAT HISTORY LIST TO TIE IT TO.  AND IT CAN BE A CODE,

14   IT CAN BE A VARIABLE, IT CAN BE ALL KINDS OF DIFFERENT THINGS.

15       I DON'T THINK THERE'S ANYTHING -- AND THIS ISN'T A

16   MEANS-PLUS-FUNCTION CLAIM.

17           THE COURT:  OKAY.  LET ME JUST GIVE YOU ANOTHER

18   MINUTE ON THE TURBO C++.  I'M GOING TO GIVE YOU A MINUTE TO

19   RESPOND TO MR. PAK'S ARGUMENT.

20           MR. LYON:  SO IN THAT PARTICULAR INSTANCE THE

21   EXAMINER WAS TALKING ABOUT THAT IT WAS OBVIOUSLY ENTERING

22   INFORMATION INTO THE FIELD.

23       BUT THERE'S NO EVIDENCE AND THERE'S NO INDICATION THAT

24   TURBO C++ WAS USING FIELD CLASSES, IN OTHER WORDS, TYING VERY

25   SPECIFIC TYPES OF CATEGORIES OF INFORMATION TO FIELDS WITHIN

```
 1          THE FORM OR OUTSIDE THE FORM.

 2              AND I THINK PART OF WHAT MR. -- WITH ALL DUE RESPECT TO

 3      MR. PAK, PART OF THE PROBLEM WITH THE PATENT AS HE DESCRIBES IT

 4      IS THERE'S NOTHING IN THERE AT ALL THAT TALKS ABOUT YOU HAVE TO

 5      SHARE ACROSS APPLICATIONS.

 6              AS A MATTER OF FACT, IF YOU LOOK AT COLUMN 2 THAT HE CITES,

 7      IT READS, "IN ADDITION TO PROVIDING A GREATER EASE OF USE TO

 8      USERS, THE INVENTION ALSO FACILITATES THE SHARING OF DATA."  IT

 9      DOESN'T SAY "HAS TO SHARE DATA."

10              THE COURT:  I UNDERSTAND THAT.  HE'S SAYING JUST THE

11      VERY NATURE OF "FIELD CLASS" MEANS INHERENTLY THAT APPLICATIONS

12      ARE SHARING.

13              MR. LYON:  THEY ARE SHARE --

14              THE COURT:  THAT'S WHY YOU HAVE TO CREATE CLASS.

15              MR. LYON:  PARDON ME.  I DIDN'T MEAN TO INTERRUPT

16      YOU.

17              THE COURT:  GO AHEAD.

18              MR. LYON:  THEY ARE SHAREABLE.  I THINK THAT'S THE

19      DIFFERENCE.

20          IT IS SOMETHING WHERE YOU CAN CREATE APPLICATIONS TO SHARE

21      ACROSS, BUT THERE'S NOTHING THAT SAYS I HAVE TO NAME MY "TO"

22      FIELD IN AN E-MAIL PROGRAM A FULL NAME FIELD AND I HAVE TO USE

23      THAT PARTICULAR FIELD CLASS.

24          I COULD HAVE A SEPARATE FIELD CLASS FOR AN ADDRESS PROGRAM.

25      BUT PERHAPS IN AN ADDRESS PROGRAM, I HAVE SEVERAL, LIKE A HOME
```

1    ADDRESS, A WORK ADDRESS.  I MIGHT USE THE SAME FIELD CLASS

2    WITHIN THAT PROGRAM FOR THOSE, BUT NOT NECESSARILY SHARE THEM

3    ACROSS APPLICATIONS.

4        IT'S -- THESE ARE SORT OF OPTIONAL DETAILS THAT THE PATENT

5    ALLOWS AND PERMITS, BUT THEY ARE NOT REQUIRED.  NOTHING IN THE

6    CLAIMS -- I MEAN, IF YOU START WITH THE CLAIMS, WHICH WE SHOULD

7    DO, THERE'S NOTHING IN THE CLAIMS THAT REQUIRES IT.  THERE'S

8    NOTHING IN THE SPECIFICATION THAT REQUIRES IT.

9        AND MR. PAK HASN'T BEEN ABLE TO POINT TO A CLEAR DISAVOWAL

10    ANYWHERE IN THE PROSECUTION HISTORY OF IT, EITHER.

11        SO THE CLAIMS NEED TO BE GIVEN THEIR FULL SCOPE.

12        AND THEN ALL OF MR. PAK'S ARGUMENTS ABOUT WHETHER

13    WINDOWS 95 HAD IT OR TURBO C++, THOSE ARE FOR A DIFFERENT DAY.

14    THAT'S SOMETHING THAT WE CAN TALK ABOUT LATER ON IN THE CASE.

15            THE COURT:  ALL RIGHT.  CAN YOU PLEASE GO TO '647?

16            MR. LYON:  SURE, YES.  MR. REITER WILL ADDRESS THAT.

17            THE COURT:  OKAY.  THANK YOU.

18            MR. REITER:  GOOD AFTERNOON, YOUR HONOR.  MARK REITER

19    FOR APPLE.

20        SO THE COURT IS FAMILIAR WITH THE '647 PATENT, IT'S ONE OF

21    THE PATENTS THAT WAS AT ISSUE IN THE PRELIMINARY INJUNCTION,

22    AND I'LL GO QUICKLY THROUGH THE TUTORIAL TO REFRESH THE COURT'S

23    MEMORY REGARDING THE TECHNOLOGY.

24        BEFORE I START THAT, YOUR HONOR, IF IT WOULD BE HELPFUL TO

25    ADDRESS YOUR QUESTIONS IN ADVANCE, I'M HAPPY TO DO THAT TO --

1     THEN AS I GO THROUGH THE TUTORIAL, MAYBE COVERING THEM --

2     OBVIOUSLY IT'S PURELY UP TO YOU, BUT I WANTED TO TRY AND

3     EXPEDITE IT AND MAKE IT AS FRIENDLY FOR YOU AS POSSIBLE.

4          THE COURT:  OKAY.  THAT WOULD BE GREAT.

5       ALL RIGHT.  SO OTHER THAN FIGURE 5, WHAT, IF ANY, OTHER

6     PART OF THE SPEC HAS THE INTEGRATION?

7          MR. REITER:  OTHER THAN FIGURE 5 -- AND I'M SORRY,

8     YOUR HONOR.  WHAT DO YOU MEAN BY "THE INTEGRATION"?

9          THE COURT:  THE INVENTION BEING INTEGRATED INTO AN

10    APPLICATION.

11         MR. REITER:  OKAY.  SO YOU'RE GOING TO THE POINT THAT

12    SAMSUNG IS RAISING THAT THERE NEEDS TO BE A SEPARATE CLIENT AND

13    SERVER?

14         THE COURT:  MY UNDERSTANDING IS THAT WAS THE --

15    SEPARATE FROM A CLIENT.

16         MR. REITER:  YES.

17         THE COURT:  YOU'RE SAYING SEPARATE FROM A SERVER IS

18    ALSO AN ISSUE?

19         MR. REITER:  NO.  THE ISSUE IS RAISED IN THE CONTEXT

20    OF THAT THEY'RE -- THE WORD "SERVER" IS USED IN THE CLAIMS, AND

21    THEREFORE SAMSUNG READS IN, ALTHOUGH THERE'S NOTHING IN THE

22    APPLICATION, NOTHING IN THE SPECIFICATION, NOTHING IN THE

23    PROSECUTION HISTORY THAT TALKS ABOUT A SERVER-CLIENT

24    RELATIONSHIP, WHICH IS WHERE THIS CLIENT COMES FROM.

25       IT'S BECAUSE THE CLAIM USES THE WORD "SERVER," THEY ARE

 1      ASSUMING THAT THEY CAN READ THE WORD "CLIENT" IN TO CREATE THAT

 2      RELATIONSHIP THAT JUST -- THAT THE PATENT IS NOT ABOUT.

 3          SO THE ISSUE WITH RESPECT TO WHETHER OR NOT -- AND REALLY

 4      OUR CONSTRUCTIONS, THE COURT OBVIOUSLY IS AWARE, ARE ALMOST

 5      IDENTICAL EXCEPT WITH RESPECT TO THE ISSUE OF "SEPARATE FROM A

 6      CLIENT."

 7              THE COURT:  UM-HUM.

 8              MR. REITER:  THERE IS NOTHING IN THE PATENT THAT

 9      REQUIRES, AS I SAID, THE SOFTWARE OR THE ACTION PROCESSOR TO BE

10      SEPARATE FROM A CLIENT.  WE DON'T REALLY KNOW WHAT THE CLIENT

11      IS HERE FROM THE APPLICATION.

12          AND IN FACT, ONE OF THE THINGS THAT SAMSUNG POINTED TO IN

13      ITS OPPOSITION BRIEF WAS FIGURE 2 AND THE TRANSMITTAL AS SHOWN

14      IN FIGURE 2 OF INFORMATION FROM THE APPLICATION PROGRAM

15      INTERFACE TO THE USER INTERFACE TO THE ACTION PROCESSOR, AND WE

16      SEE THAT UP HERE NOW.

17          AND THIS IS ALL 165, AND 165 IS THE PROGRAM.

18          SO EVERYTHING IS ALL TOGETHER, AND WHAT SAMSUNG HAS ARGUED

19      IN THEIR BRIEF IS THAT THIS APPLICATION PROGRAM INTERFACE,

20      BECAUSE IT'S TRYING TO TRANSMIT SOMETHING, MUST THEREFORE

21      INDICATE THAT THERE IS A SEPARATENESS.

22          BUT AS I SAID, IF WE LOOK AT FIGURE 2, WE'LL SEE THAT ALL

23      OF THAT INFORMATION IS TOGETHER, AND IF WE GO BACK TO FIGURE

24      1 --

25              THE COURT:  GIVE ME AN EXAMPLE OF AN APPLICATION

```
 1        PROGRAM INTERFACE.

 2                  MR. REITER:  AN APPLICATION PROGRAM INTERFACE IS, AS

 3        I UNDERSTAND IT, IS AN INTERFACE THAT ALLOWS ONE TO --

 4                  THE COURT:  IS THAT LIKE A MODEM?  OR WHAT IS IT?

 5                  MR. REITER:  NO, I DON'T BELIEVE IT'S LIKE A MODEM.

 6          YOU'RE GETTING A LITTLE BIT BEYOND MY EXPERTISE HERE, BUT

 7        AS I UNDERSTAND IT, IT IS AN INTERFACE THAT ALLOWS AN

 8        APPLICATION, FOR EXAMPLE, LIKE A CONTACT OR AN E-MAIL, TO WORK

 9        WITH OTHER PARTS OF THE SYSTEM.

10          SO, FOR EXAMPLE, WE HAVE WINDOWS OR AN OPERATING SYSTEM AND

11        IT WORKS WITH WORD, IT WORKS WITH E-MAIL, AND THERE ARE

12        INTERFACES IN THERE THAT ALLOW IT ALL TO WORK TOGETHER

13        SEAMLESSLY SO IT SEEMS LIKE IT'S ONE BIG SYSTEM.

14          DID I ANSWER THE COURT'S QUESTION?

15          THE QUESTION WAS, I BELIEVE, OTHER THAN FIGURE 5, IS THERE

16         ANYTHING THAT SHOWS THAT IT'S ALL TOGETHER?

17              AND AS I THINK I TRIED TO POINT OUT, IF WE LOOK AT FIGURE

18        1 AND BOX 165, IT'S PROGRAM.

19              IF WE GO TO FIGURE 2, WE SEE ALL OF THOSE ELEMENTS OF THE

20        PROGRAM, ONE OF WHICH, WHICH SAMSUNG POINTS TO, IS THE

21        APPLICATION PROGRAM INTERFACE, WHICH THEY SAY TRANSMITS

22        SOMETHING, SO THEREFORE, IT MUST BE SEPARATE, ALL OF THAT BEING

23        IN THAT ONE BOX OF THE PROGRAM, SO THEY ARE ALL TOGETHER.

24        THERE ISN'T THE SEPARATENESS.

25              NOW, ARE THERE VARIOUS COMPONENTS IN THE SYSTEM?  YES.
```

```
 1              AND, IN FACT --

 2                   THE COURT:  WHY ISN'T THE ANALYZER SERVER SEPARATE?

 3                   MR. REITER:  I'M SORRY?

 4                   THE COURT:  WHY ISN'T THE ANALYZER SERVER SEPARATE?

 5                   MR. REITER:  WHY IS IT NOT?

 6                   THE COURT:  YES.

 7                   MR. REITER:  AGAIN, FROM FIGURE 2, WE SEE IT IS PART

 8      OF THE PROGRAM, ALL IN THE SAME BOX, THE ANALYZER SERVER, THE

 9      API, THE USER INTERFACE, AND THE ACTION PROCESSOR.

10         THE ACTION PROCESSOR IS THE TERM THAT IS IN DISPUTE.  IT IS

11      ONE OF THE PROGRAM ELEMENTS.

12         AND IF WE GO TO THE CLAIM, CLAIM 1, WE CAN SEE -- I'LL LET

13      YOU BLOW THAT UP SO IT'S EASIER TO SEE -- BUT WE CAN SEE WE

14      HAVE A MEMORY STORING INFORMATION, INCLUDING PROGRAM ROUTINES,

15      AND THOSE PROGRAM ROUTINES ARE THE ROUTINES WE JUST SAW IN BOX

16      165.

17         AND WE HAVE THOSE PROGRAM ROUTINES; WE HAVE AN ANALYZER

18      SERVER THAT DETECTS STRUCTURES AND LINKS ACTIONS TO THE

19      DETECTED STRUCTURES; WE HAVE A USER INTERFACE THAT ENABLES

20      SELECTION OF THE DETECTED STRUCTURE AND THE LINKED ACTION; AND

21      THEN WE ALSO HAVE THE ACTION PROCESSOR FOR PERFORMING THE

22      SELECTED ACTION LINKED TO THE SELECTED STRUCTURE.

23         THERE'S NOTHING IN THIS CLAIM LANGUAGE ABOUT ANYTHING BEING

24      SEPARATE.

25              AND IN FACT, IF ANYTHING, IT'S ALL TALKING ABOUT IT BEING
```

1      TOGETHER IN THIS BOX OF PROGRAMS.

2          WOULD IT BE HELPFUL FOR ME TO TAKE THE COURT THROUGH KIND

3      OF WHAT THE INTENT OF THE PATENT IS, WHAT THE INVENTION IS TO

4      PUT THESE CLAIM ELEMENTS IN CONTEXT?

5              THE COURT:  NO, THANK YOU.

6              MR. REITER:  OKAY.

7              THE COURT:  LET ME GO TO -- SINCE YOU HAVE ANALYZER

8      SERVER IN YOUR FIGURE 2, JUDGE POSNER DID FIND THAT THAT WAS

9      REQUIRING SEPARATENESS.

10         DO YOU WANT TO ADDRESS THAT?

11             MR. REITER:  YES, HE DID.

12             THE COURT:  DO YOU THINK HE JUST GOT IT WRONG, OR

13     WHAT?

14             MR. REITER:  WE DO.  WITH ALL DUE RESPECT TO

15     JUDGE POSNER, WE DO BELIEVE HE GOT IT WRONG.

16         AS I SAID, THERE IS NOTHING IN THIS PATENT ABOUT A

17     CLIENT-SERVER RELATIONSHIP, AND I THINK IF WE GO BACK AND LOOK

18     AT JUDGE POSNER'S OPINION, HE DERIVES FROM THE USE OF THE WORD

19     "SERVER," "ANALYZER SERVER," THAT THERE MUST BE SOME

20     CLIENT-SERVER RELATIONSHIP WHERE YOU HAVE A HOST, IF YOU WILL,

21     AND THEN A CLIENT.

22         AND THAT IS NOT WHAT THIS PATENT IS ABOUT.  THE PATENT IS

23     ABOUT IDENTIFYING STRUCTURES, SUCH AS DATES, ADDRESSES,

24     TELEPHONE NUMBERS, THAT MAY BE WITHIN DATA THAT'S PRESENTED TO

25     THE USER IN AN E-MAIL OR A DOCUMENT OR WHATNOT, IDENTIFYING

1    THOSE STRUCTURES, AND ALLOWING THE USER TO PERFORM SOME ACTION

2    ON THOSE STRUCTURES, WHETHER IT'S DIALING THE PHONE NUMBER OR

3    COPYING THE PHONE NUMBER TO HIS OR HER ADDRESS BOOK OR

4    RESPONDING TO THE PERSON.

5         AND IT'S DOING THAT VERY SIMPLY, BECAUSE WHAT WE ARE

6    DEALING WITH HERE IS, AS WE KNOW, A SMALL DEVICE, AND TRYING TO

7    MANIPULATE THE DEVICE.  IT'S NOT AS IF WE'RE AT OUR DESKTOP AND

8    WE'RE ABLE TO EASILY MOVE THE MOUSE AROUND, CLICK ON SOMETHING,

9    COPY IT, PASTE IT, VERY SIMPLE.

10        BUT ON A SMALL DEVICE, LIKE A HANDHELD PHONE, THAT BECOMES

11   MORE DIFFICULT.  IT'S A LOT OF TAPPING.  IT'S HARD TO

12   PARTICULARLY SELECT THE SMALL TEXT BECAUSE IT IS MUCH SMALLER.

13   MY FINGERS ARE BIG.  I ALWAYS FIND THE WRONG THING.

14        SO THIS INVENTION ALLOWS THE SYSTEM TO AUTOMATICALLY DETECT

15   THOSE STRUCTURES AND PRESENT DIFFERENT ACTIONS TO THE USER

16   AUTOMATICALLY, AND IT DOES THAT USING THESE DIFFERENT ELEMENTS,

17   AS ARE CLAIMED, THAT ARE PROGRAM CODE WITHIN A PROGRAM MODULE.

18             THE COURT:  BUT IT SEEMS LIKE YOU'RE MAKING THE SAME

19   ARGUMENT THAT JUDGE POSNER REJECTED.  YOU'RE TRYING TO SAY THIS

20   WHOLE THING IS JUST ONE PROGRAM, AND HE SAID THAT CAN'T BE THE

21   CASE BECAUSE YOU'RE MAKING SERVER SUPERFLUOUS.

22             MR. REITER:  NO.

23             THE COURT:  YOU'RE SAYING THIS IS ALL JUST ONE

24   PROGRAM ROUTINE AND YOU'RE JUST REALLY DEFINING AN ANALYZER.

25             MR. REITER:  WELL, THE PATENTEE CHOSE TO NAME THE

1    ANALYZER SERVER -- USE THE WORD "ANALYZER SERVER," BUT DID NOT,

2    AS I SAID, USE IT IN THE CONTEXT OF A CLIENT-SERVER

3    RELATIONSHIP.  THAT IS THE NAME THAT THEY PICKED.  THEY COULD

4    HAVE CALLED IT "BOB FOR DETECTING THE STRUCTURE."

5         THE COURT:  WHY DIDN'T THEY CALL IT "ANALYZER" LIKE

6    JUDGE POSNER'S CASE?

7         MR. REITER:  I CAN'T GO INTO THE MIND --

8         THE COURT:  IF SO, THEY DIDN'T REALLY MEAN ANYTHING.

9    WHY DIDN'T THEY SAY "ANALYZER"?  THAT WOULD HAVE BEEN BETTER

10   THAN "BOB."

11        MR. REITER:  WELL, LET -- JUST LOOKING -- GOING BACK

12   TO THE PATENT AND SEEING WHERE "ANALYZER SERVER" IS INTRODUCED,

13   IF WE LOOK AT COLUMN 3 --

14        THE COURT:  OKAY.

15        MR. REITER:  -- LINE 51 TO 52, REFERRING NOW TO

16   FIGURE 2, "A SCHEMATIC BLOCK DIAGRAM PROGRAM 165 IS SHOWN

17   TOGETHER WITH ITS INTERACTION WITH A DOCUMENT 210.  PROGRAM 165

18   CONTAINS PROGRAM SUBROUTINES, INCLUDING AN ANALYZER SERVER, AN

19   APPLICATION PROGRAM INTERFACE, A USER INTERFACE, AND AN ACTION

20   PROCESSOR."

21      AND THEN IT GOES ON TO SAY, "THE ANALYZER SERVER RECEIVES

22   DATA HAVING RECOGNIZABLE PATTERNS FROM A DOCUMENT WHICH MAY BE

23   RETRIEVED FROM A STORAGE MEDIUM."

24      THAT'S WHAT I WAS SAYING A MOMENT AGO, THAT RECOGNIZABLE

25   PATTERN IS A PHONE NUMBER OR AN ADDRESS.

```
 1        AND WHAT THEY HAVE DONE IS THEY HAVE SIMPLY NAMED THE

 2   PROMISE MODULE THAT DOES THAT AN ANALYZER SERVER.  IT ANALYZES

 3   IT AND SERVES UP THE INFORMATION.

 4        BUT IT IS NOT WRITTEN IN THE CONTEXT OF A CLIENT-SERVER

 5   RELATIONSHIP, AND THERE'S NOTHING -- AND I THINK IT'S VERY,

 6   VERY IMPORTANT TO UNDERSTAND THAT THERE IS NOTHING ABOUT THIS

 7   PATENT OR THE USE OF THAT TERM THAT DERIVES A SERVER-CLIENT

 8   RELATIONSHIP JUST BECAUSE THE WORD "SERVER" IS USED.

 9             THE COURT:  LET ME ASK ANOTHER QUESTION.

10        SAMSUNG JUST SAYS, "A PROGRAM ROUTINE," WHEREAS YOU PROVIDE

11   FOR THE PLURAL OF ROUTINES.  IS THAT SIGNIFICANT IN ANY WAY?

12             MR. REITER:  WELL, I THINK IT'S HARD TO SAY.  IN THE

13   WAY THAT TODAY'S PROGRAMS ARE WRITTEN --

14             THE COURT:  UH-HUH.

15             MR. REITER:  -- THERE'S MULTIPLE DIFFERENT PARTS.

16   WHEN I WENT TO SCHOOL, WE HAD A PROGRAM AND IT HAD SUBROUTINES

17   AND OTHER SUBROUTINES THAT MAKE ALL THE OTHER SUBROUTINES.

18             MR. PRICE:  YOUR HONOR, TO MAKE THIS QUICKER, SAMSUNG

19   THINKS THERE'S NO DIFFERENCE.

20             THE COURT:  NO DIFFERENCE BETWEEN THE SINGULAR OR THE

21   PLURAL?

22             MR. PRICE:  YES.

23             THE COURT:  ALL RIGHT.  THANK YOU.

24        ALL RIGHT.  THANK YOU.

25             MR. REITER:  THANK YOU, YOUR HONOR.
```

```
1            THE COURT:  OKAY.

2            MR. PRICE:  YOUR HONOR, I GUESS I'LL ASK YOU THE SAME

3    QUESTION THAT MR. REITER DID.

4       AND EXCUSE ME FOR A MINUTE.  I NEED TO PULL A RUBIO AND GET

5    SOME WATER.

6            THE COURT:  PLEASE, GO AHEAD.

7            MR. PRICE:  I HAVE A BAD COLD AND WILL HAVE TO SIP ON

8    THIS.

9            THE COURT:  SORRY ABOUT THAT.

10           MR. PRICE:  I'LL TRY NOT TO TOUCH THE MIKE.

11           THE COURT:  DON'T BREATHE THIS WAY.

12       (LAUGHTER.)

13           THE COURT:  DON'T BREATHE THAT WAY, EITHER.

14       YOU CAN BREATHE ON APPLE, OKAY?

15       (LAUGHTER.)

16           THE COURT:  I GUESS I'M GOING TO ASK YOU THE SORT OF

17   OPPOSITE QUESTION OF, IS THERE ANYTHING IN THE SPEC THAT

18   WOULDN'T ALLOW THE INTEGRATION?  AND IF I THINK FIGURE 5 DOES

19   HAVE THE INTEGRATION, DOES THAT UNDERMINE YOUR ARGUMENT THAT

20   IT'S GOT TO BE SEPARATE FROM THE CLIENT?

21           MR. PRICE:  WELL, I THINK, YOUR HONOR -- FIRST OF

22   ALL, YES.

23       TWO THINGS.  ONE IS THERE'S THE CLAIM LANGUAGE ITSELF,

24   WHICH USES WORDS WHICH ARE KNOWN TO ONE OF ORDINARY SKILL IN

25   THE ART AS MEANING, YOU KNOW, SOMETHING WHICH SERVES OTHER --
```

1      AND WE'VE SAID "CLIENTS," BUT "APPLICATIONS" IS JUST AS GOOD A

2      WORD.  WE USE "CLIENTS" BECAUSE THAT'S WHAT JUDGE POSNER USED

3      AND WE INTEND TO ASK FOR COLLATERAL ESTOPPEL ON THAT, SO WE

4      JUST WANT TO BE CONSISTENT.

5              THE COURT:  UM-HUM.

6              MR. PRICE:  BUT WHEN YOU LOOK AT THE CLAIM LANGUAGE

7      ITSELF AND THE INTRINSIC -- AT THE FIGURES THAT ARE ACTUALLY IN

8      THE PATENT, AND I WANT TO ADDRESS FIGURE 5 BECAUSE I DON'T

9      THINK IT SUGGESTS ANYTHING ABOUT INTEGRATION --

10             THE COURT:  OKAY.

11             MR. PRICE:  -- AND THEN THE HISTORY, WHICH IS WHERE

12     APPLE SAYS THIS IS A SYSTEM-WIDE SERVICE, AND THAT'S NECESSARY

13     TO SAY TO DISTINGUISH IT FROM WHAT WAS OUT THERE WHERE WHAT WAS

14     OUT THERE WAS YOU COULD USE DETECTION AND DETECTORS TO DETECT

15     E-MAILS, PHONE NUMBERS, ET CETERA, AND YOU COULD LINK THAT TO

16     ACTIONS.

17             THE COURT:  UM-HUM.

18             MR. PRICE:  BUT EACH PROGRAMMER COULD DO THAT

19     DIFFERENTLY.  EACH APPLICATION COULD.

20         YOU KNOW, WHAT THIS METHOD PROVIDES IS A CENTRALIZED

21     SERVICE WHICH GIVES YOU UNIFORMITY, AND APPLE WOULD, I'M SURE,

22     SAY QUALITY AS OPPOSED TO HAVING THE INDIVIDUAL PROGRAMMERS DO

23     IT.

24             THE COURT:  UM-HUM.

25             MR. PRICE:  NOW, IF YOU LOOK AT THE FIGURES AND YOU

```
 1        LOOK -- CAN YOU LOOK FIRST AT THE -- I'M NOT SURE WHICH -- I'M
 2        TAKING THE SLIDES OUT OF ORDER HERE.
 3            IF YOU LOOK AT -- LET'S DO SLIDE 12.
 4                THE COURT:  OKAY.
 5                MR. PRICE:  IF YOU LOOK AT FIGURE 1, NOW, FIGURE 1,
 6        UNLIKE, SAY -- AND CLAIM 1, UNLIKE CLAIM, YOU KNOW, CLAIM 15,
 7        YOU KNOW, CLAIM 15 OF THE PATENT DOESN'T TALK ABOUT ANALYZER
 8        SERVERS OR A USER INTERFACE OR AN ACTION PROCESSOR.
 9            CLAIM 15 DOES WHAT, BASICALLY WHAT MR. REITER WAS SAYING.
10        IT DOESN'T SPECIFY, YOU KNOW, THESE DIFFERENT PROGRAM ROUTINES.
11        IT AVOIDS THEM ALTOGETHER.
12            NOW, OF COURSE, CLAIM 15 HAS BEEN HELD TO BE INVALID,
13        BECAUSE WHAT'S UNIQUE ABOUT PATENT -- ABOUT APPLE'S INVENTION
14        IS THIS, IS THIS SEPARATENESS.
15            THE NAME SERVER, THE PHRASE "SERVER" TO AN ORDINARY PERSON
16        OF SKILL IN THE ART, MEANS SOMETHING WHICH IS SERVING OTHER
17        APPLICATIONS OR CLIENTS.
18            THE SAME NAME "PROCESSOR" IS THE SAME THING.  IT IS KNOWN
19        TO ONE OF ORDINARY SKILL IN THE ART TO MEAN SOMETHING WHICH
20        SERVES OTHER APPLICATIONS OR CLIENTS.
21            AND IF YOU LOOK AT THE FIGURE, YOU SEE 165 IS THE PROGRAM,
22        AND IT'S UNDISPUTED, THIS IS WHAT CONTAINS THE ANALYZER SERVER,
23        THE USER INTERFACE, THE ACTION PROCESSOR.
24            IN FACT, IF WE CAN GO TO, I GUESS IT'S FIGURE -- SLIDE 13.
25                THE COURT:  WHY DIDN'T YOU WANT TO CONSTRUE "ANALYZER
```

```
 1        SERVER"?  BECAUSE THAT REALLY SEEMS TO BE ALMOST MORE KEY THAN

 2        "ACTION PROCESSOR."

 3                 MR. PRICE:  WE BELIEVE THAT IT'S BEEN CONSTRUED AND

 4        IT'S COLLATERAL ESTOPPEL.

 5                 THE COURT:  OKAY.

 6                 MR. PRICE:  SO THIS BOX 165 HAS THE ANALYZER SERVER,

 7        USER INTERFACE, AND THE ACTION PROCESSOR BECAUSE THAT'S WHAT

 8        THE FIGURE, THE FIGURE SHOWS.

 9            AND THEN IF WE GO TO, IF WE CAN, TO KIND OF SEE HOW THIS

10        ALL WORKS, AND I BELIEVE THAT'S -- WHICH FIGURE IS THAT?  WE

11        CAN KIND OF RUN THROUGH THIS.

12            ONE THING LET'S NOTE, AND I THINK MR. REITER POINTED THIS

13        OUT, THAT IN THE DIAGRAM -- THIS IS THE DIAGRAM OF RAM MEMORY.

14        THIS IS JUST A MEMORY DIAGRAM.

15            THE APPLICATION, OR THE CLIENT, IS SEPARATE FROM THE

16        ANALYZER SERVER, THE USER INTERFACE, AND THE ACTION PROCESSOR.

17            NOW, I THINK HE SOMEHOW MISUNDERSTOOD OUR ARGUMENT.

18                 THE COURT:  I'M SORRY.  WHICH DIAGRAM IS THAT?

19        FIGURE 1 STILL?

20                 MR. PRICE:  THAT IS -- THAT'S USING --

21                 THE COURT:  FIGURE 1?

22                 MR. PRICE:  -- FIGURE 1.

23                 THE COURT:  OKAY.

24                 MR. PRICE:  AND THAT'S THE PROGRAM -- THESE ARE THE

25        PROGRAM ROUTINES.
```

1          AND THERE'S NO DISPUTE THAT THAT IS MEANT TO DEPICT THE

2     THREE PROGRAM ROUTINES WHICH ARE SET FORTH IN CLAIM 1, ANALYZER

3     SERVER, USER INTERFACE, AND ACTION PROCESSOR.

4          AND THEN YOU COMBINE THAT WITH THE NAMES AND -- LET'S GO

5     BACK TO THE FRONT HERE -- THE ORDINARY USE OF THOSE WORDS,

6     "SERVER" AND "PROCESS," AND THAT TELLS YOU WHAT APPLE IS SAYING

7     IS WE'VE GOT A SYSTEMWIDE SERVICE HERE THAT APPLICATIONS CAN

8     USE.

9          AND SO WHAT THE INVENTION IS -- AND FIGURE 5 HERE, YOUR

10    HONOR, IS NOT -- IT DOESN'T SUGGEST INTEGRATION.  IT SHOWS YOU

11    HOW IT WORKS.  IT IS AN EXAMPLE OF HOW THIS PROGRAM ROUTINE

12    WORKS.

13         SO WHAT HAPPENS IS -- NOW, HERE IT SAYS "DETECTS

14    STRUCTURES," AND THAT CAN BE WRITTEN INTO THE PROGRAM BY A

15    PROGRAMMER TO AN APPLICATION, BUT NO ONE EVER DOES.  BUT THAT'S

16    THE EXAMPLE IT USES.

17         SO IF "DETECTS STRUCTURES" IS CLICKED, THEN THE APPLICATION

18    WOULD THEN SEND THE DOCUMENT, LET'S SAY THIS E-MAIL, SEND IT TO

19    THE PROGRAMMING ROUTINES.

20         THE ANALYZER SERVER THEN DOES ITS ANALYSIS, AND IT'S NOT

21    REALLY SPECIFIED HOW THAT'S DONE BECAUSE IT DIFFERS DEPENDING

22    ON WHAT YOU WANT TO LOOK IT, IT DOES ITS ANALYSIS AND ANALYZES

23    STRUCTURES, PHONE NUMBERS, ADDRESSES, E-MAILS.

24         IT THEN USES THE USER INTERFACE TO THEN BASICALLY MARK UP

25    THE DOCUMENT, HIGHLIGHTING THE PHONE NUMBER OR AN ADDRESS OR A

```
1        NAME.

2            NOW, AT THIS POINT IF THE USER CLICKS ON ONE OF THOSE DROP

3       DOWNS, THEN THE USER INTERFACE, AGAIN -- DO THE GRAPHICS, DON'T

4       GO THERE YET -- TO DROP DOWN THE GRAPHICS OF WHAT DO YOU WANT

5       TO CLICK ON?  DO YOU WANT THIS -- CAN WE GO BACK A MOMENT?

6            IF YOU WANT TO -- IN THIS PHONE NUMBER, DO YOU WANT TO PUT

7       IT IN A TELEPHONE BOOK OR DO YOU WANT TO CALL OR WHATEVER?

8            AND THEN WHEN THAT'S CLICKED, YOU BRING IN THE ACTUAL

9       PROCESSOR, WHICH THEN PROVIDES INSTRUCTIONS TO WHAT YOU'RE

10      SUPPOSED TO DO, AND IN THIS CASE THE CLICK WAS TO -- THE

11      EXAMPLE IS IT'S PUTTING IT IN THE ADDRESS BOOK.

12           SO FIGURE 5 IS USED IN THE PATENT NOT TO SUGGEST

13      INTEGRATION.  IT'S TO SHOW HOW -- IF WE GO BACK TO FIGURE --

14      THIS IS BASICALLY FIGURE 1 TO SHOW HOW THIS WORKS.

15               THE COURT:  ALL RIGHT.  OKAY.  THANK YOU.

16           CAN WE -- LET ME ASK, DO YOU WANT TO TAKE A BREAK NOW?

17           (DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE COURT

18      REPORTER.)

19               THE COURT:  OKAY.  CAN WE GO TO THE '414, PLEASE?

20      THANK YOU.

21               MR. PRICE:  WE HAVE SOME BEAUTIFUL GRAPHICS, TOO,

22      YOUR HONOR, THAT WE'LL PROVIDE YOU IF YOU WANT.

23               THE COURT:  YES, PLEASE.  I WOULD LIKE TO TAKE IT.

24      AND WE'LL GET INTO MORE QUESTIONS NEXT WEEK, BUT I'LL TAKE YOUR

25      SET OF SLIDES.
```

1          MR. PRICE:  WE'LL GET THEM FOR YOU, YOUR HONOR.

2          THE COURT:  OKAY.  THANK YOU.  AND MAY MS. SHORTRIDGE

3     HAVE A SET, AND THEN WHATEVER EXTRAS YOU HAVE FOR MY CLERKS AND

4     EXTERNS?  GREAT, THANK YOU.

5          (PAUSE IN PROCEEDINGS.)

6          THE COURT:  YOU KNOW, I KIND OF ASSUMED THAT -- I'M

7     GOING TO GIVE YOU HALF A MINUTE -- I WAS KIND OF ASSUMING THAT

8     FIGURE 5 SHOWS INTEGRATION, BUT DOES IT REALLY, OR NOT?

9          MR. REITER:  WELL, FIGURE 5, YOUR HONOR, JUST REALLY

10    SHOWS THE OUTWARD EMBODIMENT OF -- AS WHAT THE USER SEES IN

11    UTILIZING THE INTENTION OF THE '647 PATENT.

12         THE COURT:  SO THE ANSWER IS NO?

13         MR. REITER:  NO, IT DOESN'T SHOW.

14         THE COURT:  OKAY.  SO THEN IS THERE ANYTHING IN THE

15    PATENT THAT SHOWS INTEGRATION, OR ANYTHING IN THE SPEC?

16         MR. REITER:  WELL, LET ME CORRECT MY ANSWER.  I'M NOT

17    SURE I HEARD YOUR QUESTION CORRECTLY.

18       FIGURE 5 SHOWS -- AND I AM ADDRESSING YOUR QUESTION, YOUR

19    HONOR -- FIGURE 5 SHOWS WHAT THE USER SEES.  SO IT DOESN'T SHOW

20    YOU WHAT'S BEHIND THE SCENES, WHETHER IT'S INTEGRATION OR NOT

21    INTEGRATION.

22       SO DOES IT SHOW INTEGRATION?  DOES IT NOT SHOW INTEGRATION?

23    IT DOESN'T SHOW EITHER.  IT'S NOT DESIGNED TO DO THAT.

24       IT'S DESIGNED TO SHOW OR ILLUSTRATE HOW A USER WILL HAVE

25    THESE STRUCTURES, THE PHONE NUMBERS, THE ADDRESS AND SO FORTH,

1    IDENTIFIED TO HIM OR HER AND HOW THE USER WOULD BE ABLE TO

2    MANIPULATE THOSE TO PERFORM ACTIONS.

3        FIGURE 5 DOESN'T GO TO HOW THE PROGRAMMING BEHIND THE

4    SCENES IS SET UP AND WHETHER OR NOT THE PROGRAMS ARE PART OF OR

5    SEPARATE FROM THE APPLICATION ITSELF.

6        AND, IN FACT, I THINK IF WE GO TO CLAIM 3 -- AND THIS IS

7    THE POINT WE MADE IN OUR REPLY BRIEF -- CLAIM 3 IMPLIES THAT

8    THERE MIGHT BE SOME KIND OF SEPARATION BECAUSE IT TALKS ABOUT

9    THE SYSTEM RECITED IN CLAIM 1 WHEREIN THE INPUT DEVICE RECEIVES

10   DATA FROM AN APPLICATION RUNNING CONCURRENTLY, AND WHEREIN THE

11   PROGRAM ROUTINE IS STORED IN MEMORY FURTHER COMPRISE AN

12   APPLICATION PROGRAM INTERFACE FOR COMMUNICATING WITH THE

13   APPLICATION.

14       SO THE APPLICATION PROGRAM INTERFACE, WHICH WE SAW IN

15   FIGURE 2 IN BOX 165, IS NOT A PART OF CLAIM 1.  IT'S NOT

16   REQUIRED TO BE A PART OF CLAIM 1.

17       AND AN APPLICATION PROGRAM INTERFACE WOULD BE INCLUDED WHEN

18   THERE IS AN APPLICATION TO INTERFACE WITH.  IT MIGHT BE

19   SOMETHING SEPARATE.

20       CLAIM 1 DOESN'T INCLUDE THAT.  CLAIM 1 IS NOT SAYING YOU

21   HAVE TO HAVE A SEPARATE APPLICATION AND YOU HAVE TO HAVE, THEN,

22   AN API, AN APPLICATION PROGRAM INTERFACE.

23       SO THAT INTERFACE DOESN'T HAVE TO EXIST, AND THE WAY THAT

24   THEY CHOSE TO CLAIM IT USING DEPENDENCY DEMONSTRATES THAT THE

25   INVENTOR CONTEMPLATED THAT THESE PROGRAMS COULD BE PART OF THE

```
 1        APPLICATION.  IT DOESN'T HAVE TO BE SEPARATE.

 2              THE COURT:  ALL RIGHT.

 3          CAN YOU GO TO THE '414, PLEASE?

 4              MR. REITER:  YES, YOUR HONOR.

 5          SO I HAVE A REALLY NICE PRESENTATION, BUT I SUSPECT THAT

 6      YOU HAVE QUESTIONS YOU'D RATHER TALK ABOUT.

 7              (PAUSE IN PROCEEDINGS.)

 8              THE COURT:  WELL, I GUESS THIS ALL BOILS DOWN TO

 9      WHETHER ONE PROCESSOR CAN BE MULTI-CORE AND WHETHER A

10      MULTI-CORE PROCESSOR IS ONE OR TWO PROCESSORS, WHICH I GUESS IS

11      THE SAME QUESTION.  HOW SHOULD I APPROACH THIS?

12              MR. REITER:  WELL, TO PROVIDE SOME CONTEXT, THE IDEA

13      BEHIND THE PATENT, AS I THINK THE COURT IS AWARE NOW, IS TO

14      ALLOW SYNCHRONIZATION AND OPERATION OF THE DEVICES THAT ARE

15      BEING SYNCHRONIZED TO TAKE PLACE CONCURRENTLY.

16          IF, FOR EXAMPLE, WE GO TO SLIDE -- I'M SORRY, I TOOK MY

17      GLASSES OFF -- 12, I'VE GOT A LITTLE ANIMATION THAT SHOWS

18      WHAT'S SUPPOSED TO HAPPEN.

19          SO AS WE GO THROUGH, WE SEE THAT THERE IS SYNCHRONIZATION

20      GOING ON BETWEEN THE HANDHELD DEVICE AND THE COMPUTER.  THE

21      CONTACTS ARE GOING.

22          WE ALSO SEE NEW CONTACTS ARE BEING TYPED IN AT THE SAME

23      TIME AND THEN THAT IS ABLE TO MOVE OVER TO THE COMPUTER.

24          AND HOW IS THAT DONE?  WHAT THE PATENT TALKS ABOUT, WHAT

25      THE CLAIMS TALK ABOUT, ARE HAVING TWO THREADS, AND THOSE ARE
```

1    SIMPLY -- THREADS ARE SIMPLY -- IF WE CAN GO TO SLIDE 9 -- 9,

2    PLEASE -- A THREAD -- THIS DICTIONARY WAS USED IN OUR

3    BRIEFING -- IS JUST A SERIES OF STEPS.

4        SO WE SEE THAT THE PROGRAM INSTRUCTIONS GO INTO THE CPU AND

5    THE CPU PROCESSES IT.

6        NOW, WHAT THE PATENT TALKS ABOUT IS HAVING TWO DIFFERENT

7    SETS OF THREADS, A SYNCHRONIZATION THREAD AND A

8    NON-SYNCHRONIZATION THREAD THAT WORK CONCURRENTLY.

9        AND WE ALSO SEE IN THE DICTIONARIES THAT TWO THREADS CAN

10   EXECUTE CONCURRENTLY.  SINCE MICROPROCESSORS WORK SO QUICKLY,

11   IT SEEMS SIMULTANEOUSLY, EVEN THOUGH EACH OPERATION IS USUALLY

12   EXECUTED IN SEQUENCE.

13       AND THAT'S WHAT WE SEE HERE.  WE HAVE MULTIPLE THREADS

14   GOING INTO THE CPU AND THEY'RE WORKING VERY, VERY QUICKLY AND

15   CONCURRENTLY.

16       AND SO WHAT THE PATENT, AS I SAID, IS ABOUT IS USING THESE

17   TWO THREADS, BEING ABLE TO SYNCHRONIZE, AND ALSO OPERATE THE

18   DEVICE CONCURRENTLY.

19       AND WE SEE THAT IN THE CLAIM.  WE HAVE EXECUTING AT LEAST

20   ONE USER LEVEL NON-SYNCHRONIZATION PROCESSING THREAD, WHICH IS

21   TYPING A NEW CONTACT IN, IT'S PROVIDED BY A USER APPLICATION,

22   IT PROVIDES AN INTERFACE, ALLOWS ACCESS AND EDITING, AND IT'S

23   ASSOCIATED WITH A FIRST DATABASE.  THAT'S WHERE THE INFORMATION

24   IS STORED.

25       AND THEN WE HAVE THIS SECOND PROCESSING THREAD, ONE

1        SYNCHRONIZATION PROCESSING THREAD, AND THAT WORKS CONCURRENTLY

2        WITH THE NON-SYNCHRONIZATION PROCESSING THREAD THAT GOES INTO

3        THE CPU, AND IT -- AS THE CLAIM SAYS, THEY'RE EXECUTED

4        CONCURRENTLY SO THAT INFORMATION FROM THE FIRST DATABASE CAN GO

5        INTO THE SECOND DATABASE WHILE THE USER IS ABLE TO OPERATE THE

6        DEVICE.

7            THE PATENT IS VERY CLEAR.  IT TALKS ABOUT HAVING ONE

8        MICROPROCESSOR OR MULTIPLE MICROPROCESSORS.  IT TALKS ABOUT

9        HAVING ONE PROCESSING SYSTEM OR MULTIPLE PROCESSING SYSTEMS.

10           BUT THE POINT IS, IT SAYS THAT IT CAN BE ONE PROCESSING

11       SYSTEM WITH ONE MICROPROCESSOR.

12           AND AT THE TIME, FOR CELL PHONES, THERE WERE NO DUAL-CORE

13       PROCESSORS, SO WE CAN'T SAY THAT ONE OF SKILL IN THE ART AT THE

14       TIME WOULD HAVE READ THIS AND UNDERSTOOD THAT THERE HAD TO BE

15       DUAL-CORE PROCESSORS BEING USED, OR MULTIPLE PROCESSORS, FOR

16       THAT MATTER, BEING USED IN THE DEVICE.

17           AND THERE IS NOTHING IN THE PATENT, AS I THINK YOUR HONOR

18       HAS ALREADY PICKED UP, ABOUT WHETHER THERE ARE DUAL-CORE

19       PROCESSORS OR A SINGLE CORE PROCESSOR.  I'M NOT EVEN SURE THE

20       WORD "CORE" APPEARS IN THE PATENT.

21              THE COURT:  BUT WHAT ABOUT THIS IBM DOCUMENT, WHICH

22       IS TWO YEARS, ACTUALLY AT LEAST TWO YEARS BEFORE THIS PATENT

23       APPLICATION WAS FILED, IT'S FROM 2005, SAYING A DUAL-CORE

24       PROCESSOR CHIP.

25           IT MAKES IT SEEM LIKE THERE IS ONE CHIP THAT CAN HAVE

```
1    MULTI-CORE -- ONE PROCESSOR THAT CAN HAVE A MULTI-CORE.
2            MR. REITER:  THERE'S NO QUESTION, YOUR HONOR.  WE'RE
3    NOT DISPUTING THAT AT THE TIME OF THE PATENT THERE WERE
4    DUAL-CORE PROCESSORS.
5            THE COURT:  OKAY.
6            MR. REITER:  THE POINT IS THE PATENT DOESN'T, AND
7    IT'S VERY CLEAR.  IF WE LOOK AT, FOR EXAMPLE, SLIDE --
8            THE COURT:  SO THEN I'M A LITTLE BIT CONFUSED THEN.
9    SO WHAT WERE YOU SAYING DIDN'T EXIST AT THE TIME OF THIS
10   PATENT?
11           MR. REITER:  OH, IN CELL PHONES.  CELL PHONES, WHICH
12   THIS PATENT, AS WE SEE, TALKS ABOUT, DID NOT HAVE DUAL-CORE
13   PROCESSING UNTIL THREE YEARS LATER.  WE PUT THAT IN IN OUR
14   REPLY BRIEF.  IT WAS A P.C. MAGAZINE ARTICLE THAT SAID THE
15   FIRST DUAL-CORE CELL PHONE WAS INTRODUCED THREE YEARS AFTER
16   THIS PATENT WAS FILED.
17      SO THE PATENT IS TALKING ABOUT HAVING THIS FUNCTIONALITY,
18   THE ABILITY TO WORK ON THE DEVICE AND SYNCHRONIZE THE DEVICE
19   CONCURRENTLY AT A TIME WHEN CELL PHONES ONLY WERE MADE WITH
20   SINGLE CORE PROCESSORS.
21      SO GIVEN THAT POINT, ONE OF SKILL IN THE ART, AT THE TIME
22   OF THE FILING, READING THIS AND SEEING THAT THE PATENT IS
23   DIRECTED TO CELL PHONES, WOULD NOT HAVE SAID, "OH, I'M JUST
24   GOING TO USE DUAL-CORE PROCESSORS."
25           AND IN FACT, I THINK VERY IMPORTANTLY, ON SLIDE 7 WE MADE
```

```
 1        THIS POINT IN OUR BRIEF.

 2            THE COURT:  WHY WOULDN'T THAT HAVE BEEN OBVIOUS TO DO

 3        SO IF THE TECHNOLOGY WAS OUT THERE?  WHAT IS SO SPECIAL ABOUT

 4        PUTTING THAT IN A CELL PHONE?

 5            MR. REITER:  I'M NOT A CELL PHONE ENGINEER.  I DON'T

 6        KNOW HOW EASY OR HARD IT WOULD BE TO PUT A DUAL-CORE PROCESSOR

 7        INTO A CELL PHONE.

 8          THE POINT IS THE PATENT'S NOT ABOUT THE PROCESSORS, AND THE

 9        PATENT VERY SPECIFICALLY SAYS THAT THE VARIOUS COMPONENTS OF

10        THE COMPUTER SYSTEM ARE NOT INTENDED TO REPRESENT ANY

11        PARTICULAR ARCHITECTURE OR MANNER OF INTERCONNECTING.

12          THE COMPONENTS, AS SUCH DETAILS, ARE NOT GERMANE THE

13        PRESENT INVENTION.

14          WHETHER WE'RE USING A DUAL-CORE PROCESSER OR SINGLE CORE

15        PROCESSOR OR A QUAD-CORE PROCESSOR, THAT'S NOT WHAT THE PATENT

16        IS ABOUT.

17          THE PATENT EXPLAINS YOU CAN HAVE ONE MICROPROCESSOR AND YOU

18        CAN HAVE THIS INVENTION, YOU CAN MAKE THE INVENTION WORK AND IT

19        EXPLAINS HOW.  AND IT'S DONE THAT -- IT DOES THAT BY USING THE

20        DIFFERENT THREADS AND THE PROCESS IS CONCURRENT.

21            THE COURT:  CAN A SINGLE PROCESSOR THAT'S NOT

22        MULTI-CORE EXECUTE THE TWO THREADS --

23            MR. REITER:  IT EXECUTES --

24            THE COURT:  -- AT THE SAME TIME?

25            MR. REITER:  IT EXECUTES THE TWO THREADS AS I SHOWED
```

1    YOU.  THEY INTERLEAVE THE THREADS INTO THE PROCESSOR AND THE

2    PROCESSOR PROCESSES THEM THAT WAY.  THE MULTIPLE THREADS ARE

3    INTERLEAVED AND IT HAPPENS SO QUICKLY THAT IT SEEMS

4    SIMULTANEOUS TO THE USER.

5            THE COURT:  UM-HUM.  OKAY.

6            MR. REITER:  I THINK WHAT'S REALLY IMPORTANT HERE,

7    YOUR HONOR, IS SAMSUNG IDENTIFIES NOTHING ABOUT THE

8    ARCHITECTURE THAT IS SPECIFIC TO THEIR CONSTRUCTION OF HAVING

9    THESE DUAL CORES.  THERE'S NOTHING ABOUT THAT IN THE PATENT.

10   THERE'S NOTHING ABOUT THAT IN THE PROSECUTION HISTORY, ANYWHERE

11   IN THE INTRINSIC EVIDENCE.

12       THE EXTRINSIC EVIDENCE, AS WE BOTH HAVE POINTED OUT, THEY

13   ARGUED DUAL-CORE PROCESSORS, BUT THEY WEREN'T USED IN CELL

14   PHONES.  THIS PATENT ABSOLUTELY DISCUSSES THE INVENTION

15   EMBODIED IN CELL PHONES.

16       SO ONE OF ORDINARY SKILL IN THE ART, READING THE PATENT AND

17   UNDERSTANDING THAT THE ARCHITECTURE IS NOT GERMANE TO THE

18   INVENTION AND UNDERSTANDING THAT THESE MULTIPLE THREADS, FOR A

19   LONG TIME, HAVE BEEN INTERLEAVED AND OPERATED ON BY THE

20   PROCESSOR VERY, VERY QUICKLY SO THAT IT IS CONCURRENT, WOULD

21   UNDERSTAND THAT AND WOULD NOT SAY THAT YOU HAVE TO HAVE TWO

22   PROCESSORS AS SHOWN BY WHEN HE SAYS IT CAN BE ONE OR MORE

23   PROCESSOR.

24       THIS IS TAKEN ENTIRELY OUT OF LEFT FIELD AND IS ATTORNEY

25   ARGUMENT THAT THE PATENT SAYS YOU HAVE TO HAVE DUAL-CORE

```
1    PROCESSORS.

2            THE COURT:  LET ME ASK, ONE OF THE CRITICISMS THAT

3    SAMSUNG HAS OF YOUR POSITION IS THAT YOU'VE GOT, YOU KNOW, A

4    FILE DATE OF JANUARY 2007, BUT THE DICTIONARIES THAT YOU

5    SUBMITTED ARE FROM '92 AND 2004.  WAS THERE A REASON WHY YOU

6    DID THAT?

7            MR. REITER:  WELL, I THINK THE '92 DEMONSTRATES THAT

8    IT IS WELL-ESTABLISHED, AND HAS BEEN FOR A LONG TIME, WHEN

9    USING A SINGLE CORE PROCESSOR OR USING A MICROPROCESSOR, THAT

10   CONCURRENT EXECUTION CAN HAPPEN.

11           THE COURT:  BUT WHY DIDN'T YOU SUBMIT MORE RECENT

12   EXTRINSIC EVIDENCE THAT IS CLOSER TO THE FILING DATE?

13           MR. REITER:  I'M SURE THAT WE LOOKED FOR WHAT WAS

14   MOST PERTINENT.

15           THE COURT:  I MEAN, '92 IS 15 YEARS BEFORE THE FILING

16   DATE.

17           MR. REITER:  I UNDERSTAND THE CRITICISM AND I

18   UNDERSTAND THE SKEPTICISM.

19      BUT I THINK ONE CAN ALSO LOOK AT IT AND SAY -- AND I THINK

20   THIS IS THE RIGHT PERCEPTION OR PERSPECTIVE -- THAT IT HAS LONG

21   BEEN UNDERSTOOD IN THE ART, PARTICULARLY WHERE THE

22   SPECIFICATION TALKS ABOUT HAVING ONE MICROPROCESSOR, WITHOUT

23   DESCRIBING MULTIPLE CORES OR SINGLE CORES AND SO FORTH, HAVING

24   ONE MICROPROCESSOR AND CONCURRENT EXECUTION.

25           ONE MICROPROCESSOR WITH A SINGLE CORE WAS AROUND IN 1992.
```

```
 1        WE KNOW THAT.  THAT'S WHAT WAS THERE.

 2           AND WE NOW HOW ENGINEERS LOOKED AT THAT AND WE KNOW THAT,

 3        GIVEN THAT THE ARCHITECTURE IS NOT GERMANE, GIVEN THAT THE

 4        PATENT TALKS ABOUT ONE MICROPROCESSOR, GIVEN THAT IT TALKS

 5        ABOUT MULTIPLE THREADS, THAT GOING BACK TO '92 IS ABSOLUTELY

 6        ACCEPTABLE AND RELIABLE IN UNDERSTANDING HOW ONE OF SKILL IN

 7        THE ART WOULD HAVE LOOKED AT THIS INVENTION.

 8              THE COURT:  AND I'M SORRY, I'M STILL A LITTLE

 9        CONFUSED.

10           YOUR POSITION IS THAT A SINGLE PROCESSOR THAT IS SINGLE

11        CORE COULD OR COULD NOT EXECUTE TWO THREADS CONCURRENTLY?

12              MR. REITER:  CAN, YES.

13              THE COURT:  CAN?

14              MR. REITER:  YES.

15              THE COURT:  OKAY.  AND WHICH -- WHICH CONCURRENTLY IS

16        THAT?  IS THAT THE SORT OF ALTERNATING ONE THAT YOU ALL SEEM TO

17        BE PROPOSING OF SWITCHING BACK AND FORTH, BUT HAVING IT SO

18        CLOSE IN TIME THAT IT SEEMS SIMULTANEOUS?  OR IS THAT THE

19        SAMSUNG VERSION OF DOING IT AT THE EXACT SAME INSTANT?

20              MR. REITER:  WELL --

21              THE COURT:  WHICH WAY IS THAT?

22              MR. REITER:  WE HAVE TRIED TO PROVIDE, YOUR HONOR, A

23        DEFINITION -- AND I'M JUST LOOKING FOR IT HERE -- A DEFINITION

24        THAT ALIGNS WITH HOW ONE OF SKILL IN THE ART WOULD HAVE

25        UNDERSTOOD IT.
```

1    SO WHAT WE SAID, OBVIOUSLY, IS LONGER, "THE SYNCHRONIZATION

2    THREAD AND THE NON-SYNCHRONIZATION THREAD ARE BOTH ACTIVE

3    DURING AN OVERLAPPING TIME INTERVAL."  THAT'S WHAT I SHOWED ON

4    THE SCREEN.  THAT IS WHAT WE THINK IS AN APPROPRIATE DEFINITION

5    THAT WE BELIEVE IS AT THE SAME TIME AS ONE OF SKILL IN THE ART,

6    OR CONCURRENTLY AS ONE OF SKILL IN THE ART WOULD HAVE

7    UNDERSTOOD IT.

8        BUT TO THE EXTENT THAT SAMSUNG COMES IN AND SAYS THAT IT'S

9    NOT AT THE SAME TIME BECAUSE YOU HAVE THE INSTRUCTIONS COMING

10   IN ONE AT A TIME, THAT MISAPPLIES HOW ONE OF SKILL IN THE ART

11   WOULD HAVE UNDERSTOOD IT, CONCURRENT EXECUTION, MULTIPLE

12   THREADS.

13       IT WAS A WELL UNDERSTOOD APPLICATION, A WAY OF MAKING THE

14   SYSTEM WORK WHEN THERE WAS ONLY SINGLE CORE, ONE CPU PROCESSING

15   SYSTEM.

16       AND I KNOW I'VE SAID THIS MANY TIMES, BUT I HAVE TO KEEP

17   GOING BACK TO THE POINT, AS I HAVE UP HERE, THAT THE

18   ARCHITECTURE IS NOT GERMANE TO THIS INVENTION.  THE INVENTION

19   IS BEING ABLE TO DO THESE TWO THINGS CONCURRENTLY.

20           THE COURT:  UM-HUM.

21           MR. REITER:  AND THE PATENT IS VERY CLEAR ABOUT

22   HAVING ONE MICROPROCESSOR, ONE PROCESSING SYSTEM BEING ABLE TO

23   DO THAT, THE PATENT TALKS ABOUT CELL PHONES BEING ABLE TO DO

24   THAT, AND WE KNOW AT THE TIME THE PATENT WAS FILED, IT WAS

25   THREE YEARS LATER THAT CELL PHONES HAD MULTI-CORE PROCESSORS.

```
1            THE COURT:  RIGHT.  BUT THE PATENT DOESN'T MENTION

2    WHETHER, EVEN IF IT'S ONE MICROPROCESSOR, WHETHER IT'S

3    MULTI-CORE OR NOT, RIGHT?

4            MR. REITER:  NO, NOT AT ALL.  IT'S NOT GERMANE TO THE

5    INVENTION.

6        IT'S TALKING ABOUT -- BECAUSE PEOPLE, OR ONE OF SKILL IN

7    THE ART WOULD HAVE UNDERSTOOD, JUST AS OUR DEFINITION EXPLAINS,

8    THAT YOU HAVE THE TWO THREADS ACTIVE DURING AN OVERLAPPING

9    INTERVAL.

10       AND JUST AS THE DICTIONARY DEFINITION THAT WE SHOWED FROM

11   2004 SAYS, IT HAPPENS SO QUICKLY, IT'S DEEMED CONCURRENT.

12           THE COURT:  OKAY.  THANK YOU.

13       LET ME FIRST ASK --

14           MR. PAK:  YES.

15           THE COURT:  -- IF YOU AGREE THAT A SINGLE

16   MICROPROCESSOR -- A SINGLE PROCESSOR THAT IS NOT MULTI-CORE CAN

17   EXECUTE THE TWO THREADS AT THE SAME TIME.

18           MR. PAK:  YES, YOUR HONOR, AND I HAVE SOME SLIDES

19   PREPARED FOR YOU ON THAT.

20           THE COURT:  OKAY.

21           MR. PAK:  SO WHY DON'T WE TURN TO SLIDE 27?

22       SO, YOUR HONOR, YOU HEARD ABOUT CORES IN PROCESSORS, AND

23   THERE WAS SOME BRIEFING ABOUT MULTI-CORE PROCESSORS, AND REALLY

24   THAT ARGUMENT COMES ABOUT BECAUSE APPLE IS ARGUING THAT THERE'S

25   NO MENTION OF CORES IN THE SPECIFICATION.
```

1        MULTI-CORE PROCESSORS EXISTED IN 2007 --

2                THE COURT:  UM-HUM.

3                MR. PAK:  -- AS WELL AS SINGLE CORE PROCESSORS.

4                THE COURT:  DID THEY -- DID MULTI-CORE PROCESSOR

5        EXIST IN CELL PHONES IN 2007?  DO YOU AGREE WITH APPLE THAT --

6                MR. PAK:  NO, WE DON'T -- WE ACTUALLY -- FIRST OF

7        ALL, NONE OF THE -- LET ME STEP BACK.

8            NONE OF THE CLAIMS REQUIRE CELL PHONES THAT ARE BEING

9        ASSERTED.

10           THE PATENT SPECIFICATION ITSELF MAKES IT ABSOLUTELY CLEAR,

11       AND THIS STARTS ON COLUMN 4, LINE 57, THAT THE EMBODIMENTS OF

12       THE INVENTION COULD INCLUDE A WIDE VARIETY OF DEVICES,

13       INCLUDING PDA DEVICES, CELLULAR TELEPHONES, COMPUTER SYSTEMS.

14           IN FACT, THE SPECIFIC EMBODIMENT THAT'S IDENTIFIED IN

15       FIGURE 2 AT THE TOP OF COLUMN 5 IS THE MACINTOSH COMPUTER

16       SYSTEM, YOUR HONOR, AND THE MACINTOSH COMPUTER SYSTEM IN 2007

17       FROM APPLE USED NOT ONLY MULTI-CORE PROCESSORS, BUT MULTIPLE

18       PROCESSORS.

19           AND THIS IS IMPORTANT BECAUSE LOOKING AT THE CLAIM

20       LANGUAGE -- THIS IS SLIDE 5 -- ACTUALLY, MOVE TO -- YEAH.  I

21       GOT IT.

22           SO, YOUR HONOR, THIS IS SLIDE 3 IN OUR PRESENTATION WHERE

23       IT'S SELECTING CLAIM 11.  CLAIM 11 IS NOT DIRECTED TO

24       PROCESSORS OR CPU'S.  CLAIM 11 IS DIRECTED TO DATA PROCESSING

25       SYSTEMS.

1          AND THE DATA PROCESSING SYSTEM, AS YOU CAN SEE IN CLAIM

2     13, COULD BE A HOST, WHICH IS A P.C. SYSTEM, IT COULD BE A WORK

3     STATION, OR IT COULD BE A HANDHELD DEVICE.

4          AND FURTHERMORE, AS WE WERE POINTING OUT IN COLUMN 4, YOUR

5     HONOR, IT COULD BE A PDA DEVICE, IPODS, CELLULAR TELEPHONES,

6     MACINTOSH COMPUTER SYSTEMS.

7          SO NONE OF THESE CLAIMS ARE DIRECTED TOWARDS CPU'S.

8          THE QUESTION IS, WERE THERE DATA PROCESSING SYSTEMS

9     AVAILABLE IN 2007 THAT WERE FULLY CAPABLE OF DOING CONCURRENT

10    EXECUTION, WHICH MEANS RUNNING THE THREADS AT THE SAME TIME?

11         AND THAT LANGUAGE, YOUR HONOR, "AT THE SAME TIME," COMES

12    DIRECTLY FROM THE PATENT SPECIFICATION WHEN IT TALKS ABOUT THE

13    EXECUTION OF THE THREADS.

14         SO IF YOU GIVE THE PLAIN MEANING TO THE WORD "CONCURRENT,"

15    AT THE SAME TIME, THE QUESTION IS, ARE THERE EMBODIMENTS

16    DISCLOSED IN THE PATENT THAT ARE CAPABLE OF PERFORMING THAT

17    PLAIN MEANING FUNCTION?  AND THE ANSWER IS ABSOLUTELY YES.

18         AND JUST TO FINISH THE ORIGINAL QUESTION, YOUR HONOR,

19    GOING BACK TO YOUR QUESTION ABOUT WHETHER THERE WERE SINGLE

20    PROCESSORS, SINGLE CORE PROCESSORS, THIS IS GOING BACK TO SLIDE

21    27.

22         SO WE TALKED ABOUT MULTI-CORE PROCESSORS AND THERE'S NO

23    DOUBT, AND I THINK APPLE'S COUNSEL AGREES WITH US, THAT YOU

24    COULD HAVE MULTIPLE THREADS RUNNING ON MULTIPLE CORES AT THE

25    SAME TIME, AND EACH CORE WOULD BE DEDICATED TO A SINGLE THREAD

1    IN THIS EXAMPLE.

2         AND HERE WE'RE NOT TALKING ABOUT INTERLEAVING.  WE'RE

3    TALKING ABOUT HAVING TWO THREADS RUNNING ON TWO SEPARATE CORES.

4         BUT IN 2007, WE HAD WHAT WERE CALLED SMT PROCESSORS, AND

5    SMT PROCESSORS IS A SINGLE CORE PROCESSOR THAT HAD MULTIPLE

6    EXECUTE PATHS.  THAT MEANS THAT INSIDE OF THAT CORE, YOU HAD

7    THE ABILITY TO PROCESS MULTIPLE INSTRUCTIONS AT THE SAME TIME.

8    WITH THIS ARCHITECTURE, YOUR HONOR, YOU COULD EXECUTE TWO

9    THREADS CONCURRENTLY, AT THE SAME TIME, IN A SINGLE CORE.

10        AND THIS WAS PUBLISHED BACK IN 1997 IN A PAPER PUBLISHED

11   BY DECK THAT DESCRIBES SIMULTANEOUS MULTITHREADING ARCHITECTURE

12   WHICH HAS A PROCESSOR THAT CAN ISSUE MULTIPLE INSTRUCTIONS FROM

13   MULTIPLE THREADS EACH CYCLE.

14        AND IN FACT, BY 2007 -- SO THAT WAS 1997.  TEN YEARS LATER

15   WE HAD ALL KINDS OF DATA PROCESSING SYSTEMS, INCLUDING THE

16   APPLE MACINTOSH, WHICH IS DESCRIBED AS AN EXEMPLARY EMBODIMENT

17   THAT HAD MULTIPLE PROCESSOR; WE HAVE MULTI-CORE PROCESSORS THAT

18   WERE IN LAPTOPS FROM APPLE; AND WE HAD SINGLE CORE PROCESSORS,

19   INCLUDING INTEL'S PENTIUM 4, WHICH WAS ONE OF THE MOST WIDELY

20   USED PROCESSORS AT THE TIME THAT HAD A SINGLE CORE, USED THE

21   SMT ARCHITECTURE TO BE ABLE TO EXECUTE MULTIPLE THREADS AT THE

22   SAME TIME, CONCURRENTLY.

23        SO THIS WHOLE ISSUE ABOUT WHETHER CELL PHONES HAD THE

24   ABILITY TO DO THE CLAIMED FUNCTION OR NOT THROUGH DUAL-CORE

25   CELL PHONES, PROCESSORS, IS A RED HERRING.  NONE OF THE CLAIMS

```
 1      REQUIRE CELL PHONES.

 2           THE CLAIMS ARE BROAD.  THEY TALK ABOUT DATA PROCESSING

 3      SYSTEMS.  THE EMBODIMENTS THAT ARE DISCLOSED IN THE PATENT

 4      COVER A WIDE RANGE.  SO WE DON'T THINK THE RIGHT FOCUS HERE IS

 5      FOCUSSING ON CELL PHONES.

 6           SO LET US STEP BACK.  THE WORD "CONCURRENTLY," IF YOU LOOK

 7      AT THE PATENT SPECIFICATION, IS GIVEN PLAIN MEANING IN

 8      COLUMN 25, AND THIS IS WHAT WE INCLUDED IN THE BRIEFING, AND I

 9      THINK YOUR HONOR PICKED THIS UP AS WELL.

10           COLUMN 25 TALKS ABOUT HOW THE THREADS ARE ACTUALLY

11      EXECUTED AND SCHEDULED, AND IT USES THE WORDS "AT THE SAME

12      TIME."

13           SORRY, COLUMN 24, AND THIS APPEARS AT LINE 52, LINE --

14      COLUMN 24 FROM COLUMN, OR LINE 42 TO 64, AND WE SEE THE USE OF

15      "CONCURRENTLY" AND "AT THE SAME TIME" SYNONYMOUSLY.  THAT'S THE

16      PLAIN MEANING OF THE WORD "CONCURRENTLY."

17           COUNSEL FOR APPLE SAID THE ARCHITECTURE DOESN'T MATTER.

18           WELL, ABSOLUTELY THE ARCHITECTURE MATTERS.

19           IN FACT, IF WE LOOK AT COLUMN 1 OF THE PATENT -- AND

20      MR. SHIRAZI, IF WE COULD BLOW UP THE BOTTOM OF COLUMN 1 -- IT

21      SAYS, "WHEN THERE IS A SYNCHRONIZATION AGENT ON A HANDHELD

22      COMPUTER" -- THIS IS DESCRIBING THE PRIOR ART, YOUR HONOR, IN

23      COLUMN 1, "IT DOES NOT HAVE THE FACILITIES AND ARCHITECTURE

24      DESCRIBED IN THIS DISCLOSURE."

25           SO HOW -- WHETHER IT'S SOFTWARE ARCHITECTURE OR HARDWARE
```

1    ARCHITECTURE, IT ABSOLUTELY MATTERS WHETHER THE DEVICE IS

2    CAPABLE OF PERFORMING THE CLAIMED FUNCTION OR NOT.

3         IT CRITICIZES THE PRIOR ART BECAUSE IT DOESN'T HAVE THE

4    HARDWARE AND SOFTWARE ARCHITECTURE FOR DOING CONCURRENT, AT THE

5    SAME TIME EXECUTION OF MULTIPLE THREADS.

6         AND THE RESPONSE FROM APPLE IS TO SAY, WELL, LET'S LOOK AT

7    SOME EXTRINSIC EVIDENCE, SOME DICTIONARY DEFINITIONS GOING BACK

8    TO THE 1990S.

9         BUT WHATEVER THAT MAY HAVE BEEN IN 1990S, BY 2007 IT WAS

10   CLEAR THAT THERE WAS A WIDE ARRAY OF DEVICES, DATA PROCESSING

11   SYSTEMS THAT COULD EXECUTE, AT THE SAME TIME, MULTIPLE THREADS,

12   INCLUDING DEVICES THAT ARE SPECIFICALLY CITED AS EXEMPLARY

13   EMBODIMENTS IN THE PATENT.

14        SO WE DON'T NOTE TO GO BEYOND THE INTRINSIC EVIDENCE.  WE

15   LOOK AT WHAT'S DESCRIBED HERE, THE ARCHITECTURE AND PRIOR ART

16   THAT WAS CRITICIZED.

17        WE GO TO THE DESCRIPTIONS OF "CONCURRENT EXECUTION" THAT

18   ARE FOUND IN THE PATENT AT 25.  IT APPLIES THE PLAIN AND

19   ORDINARY MEANING OF "CONCURRENT" AS "AT THE SAME TIME."

20        THERE'S SPECIFIC EMBODIMENTS THAT ARE GIVEN, INCLUDING THE

21   MACINTOSH COMPUTER, AS A DATA PROCESSING SYSTEM IN FIGURE 2.

22   NO QUESTION THAT THE MACINTOSH COMPUTER HAD MULTIPLE PROCESSORS

23   EXECUTING THREADS SIMULTANEOUSLY AT THE SAME TIME.

24        SO I THINK A LOT OF WHAT YOU HEARD TODAY WAS TRYING TO

25   REDEFINE THE PATENT AND CONFINE IT TO THE CELL PHONE WORLD AND

1    ARGUING THAT CELL PHONES, IN 2007, DIDN'T HAVE SPECIFIC TYPES

2    OF CORES OR SPECIFIC TYPES OF PROCESSORS.

3         BUT WE REALLY THINK THAT'S NOT THE ISSUE.  THE ISSUE IS

4    DATA PROCESSING SYSTEMS.  LOOK AT THE INTRINSIC EVIDENCE, LOOK

5    AT THE SPECIFIC SYSTEMS THAT WERE OUT THERE IN 2007, INCLUDING

6    SINGLE PROCESSORS THAT WERE FULLY CAPABLE OF PERFORMING THE

7    RECITED FUNCTION, AND THAT'S REALLY THE ISSUE FROM OUR

8    PERSPECTIVE, YOUR HONOR.

9              THE COURT:  OKAY.

10        (PAUSE IN PROCEEDINGS.)

11             THE COURT:  OKAY.  WE'LL DO ONE MORE.  LET'S GO AHEAD

12   AND TO THE '760.

13             MR. REITER:  YOUR HONOR, MAY I RESPOND BRIEFLY TO

14   WHAT MR. PAK SAID ABOUT THE '414?

15             THE COURT:  YES, BRIEFLY.

16             MR. REITER:  VERY BRIEFLY.  TWO POINTS.

17        ONE IS I MAY HAVE MISSPOKE WHEN I ANSWERED YOUR QUESTION AT

18   THE END OF MY DISCUSSION.

19        FIRST, THE PATENT DOES VERY CLEARLY SAY ONE OR MORE

20   PROCESSORS.  IF WE LOOK AT COLUMN 5 --

21             THE COURT:  YEAH, I KNOW THAT.

22             MR. REITER:  OKAY.  NUMBER TWO, THE PATENT DOES TALK

23   ABOUT MACINTOSH COMPUTERS, BUT IT ALSO TALKS ABOUT PDA'S AND

24   CELL PHONES.  IF YOU LOOK AT COLUMN 6, LINE 44, "THE DATA

25   PROCESSING SYSTEM SHOWN IN FIGURE 3 MAY BE A HANDHELD COMPUTER

1    OR A PERSONAL DIGITAL PDA OR A CELLULAR TELEPHONE WITH A

2    PDA-LIKE FUNCTIONALITY."

3         THE POINT IS THAT THE PATENT TALKS ABOUT DIFFERENT

4    EMBODIMENTS, IT DOESN'T TALK ABOUT ANY SPECIFIC TYPE OF

5    EMBODIMENT, SO THE PATENT NEEDS TO BE, THE CLAIMS NEED TO BE

6    READ TO COVER THE EMBODIMENTS DISCLOSED.  IT CAN'T EXCLUDE AN

7    EMBODIMENT.

8         SO BY REQUIRING THE MULTIPLE CORE PROCESSOR -- WHICH BY THE

9    WAY, THIS IS A NON-INFRINGEMENT ARGUMENT THAT THEY ARE MAKING

10   OUT OF WHOLE CLOTH, I THINK THAT'S PRETTY CLEAR -- BUT DOES THE

11   PATENT SAY THE ONLY POSSIBLE WAY TO DO THIS INVENTION, THE ONLY

12   POSSIBLE WAY IS TO HAVE A MULTI-CORE PROCESSOR WHEN I HAVE A

13   SINGLE PROCESSOR SYSTEM?  NO, IT DOESN'T ADDRESS THAT.  IT

14   DOESN'T SAY THAT.

15        IN FACT, IT SAYS THE OPPOSITE WHEN IT TALKS ABOUT THE CELL

16   PHONES, AND IT SAYS THE CELL PHONE IS AN APPROPRIATE

17   EMBODIMENT, THE CLAIMS NEED TO BE READ TO COVER THE CELL PHONE,

18   AND THE CELL PHONES ONLY HAD SINGLE CORE, SINGLE PROCESSORS.

19        THANK YOU, YOUR HONOR.

20             THE COURT:  OKAY.  ALL RIGHT.  LET'S GO TO '760,

21   PLEASE.

22             MR. LYON:  ALL RIGHT.  THANK YOU, YOUR HONOR.

23        I'LL BE REALLY BRIEF ON THIS ONE.  I THINK THIS IS REALLY

24   NOW BOILED DOWN TO JUST ONE TERM THAT WE'RE REALLY DISPUTING,

25   AND IT'S PART OF THAT ONE TERM IN THE CLAIM CONSTRUCTION.  IT'S

1    THIS "COMPLETELY SUBSTITUTING DISPLAY OF THE LIST," AND I THINK

2    THE PARTIES, AS I READ THE OPPOSITION AND REPLIES, I THINK

3    WE'RE CONVERGED THAT THERE'S AN ISSUE POTENTIALLY ABOUT WHETHER

4    "CONTACT INFORMATION" WAS LIMITED IN SOME WAY.

5        I DON'T THINK THAT'S THERE.  I THINK NOW WE'RE JUST TALKING

6    ABOUT -- WHEN WE SAY, "COMPLETELY SUBSTITUTING DISPLAY OF THE

7    LIST OF INTERACTIVE ITEMS WITH DISPLAY OF CONTACT INFORMATION,"

8    DOES THAT MEAN WE HAVE TO ELIMINATE SO THAT NONE OF THE LIST OF

9    MISSED CALLED IS VISIBLE, WHICH IS WHAT SAMSUNG SAYS, SO THAT

10   WE'RE SAYING WE'RE SUBSTITUTING THE CONTENT OF THOSE DISPLAYS,

11   OR ARE WE JUST REPLACING THE DISPLAYS?

12       AND IF WE COULD LOOK TO SLIDE 12?

13       AT THIS POINT IT SEEMS LIKE THE PARTIES HAVE CONVERGED WHAT

14   WE'RE REALLY TALKING ABOUT WITH THIS TERM IS FIGURE 12B AND

15   12C, AND IF YOU LOOK AT THAT, YOU CAN SEE FIGURE 12B SHOWS THE

16   LIST OF MISSED CALLS, AND THE IDEA IS WHEN YOU TOUCH THIS

17   PARTICULAR INTERACTIVE PORTION, THE FIRST PART WHEN YOU TOUCH

18   ESSENTIALLY THE NAME IN THIS FIGURE, YOU WOULD PULL UP A LIST

19   OF CONTACT INFORMATION.

20       EXCUSE ME.  IT WAS THE ARROW, NOT THE NAME.  I APOLOGIZE.

21       BUT YOU PUSH ONE PART OF THE DISPLAY AND YOU PULL UP THE

22   CONTACT INFORMATION.

23       IF YOU'LL NOTICE, THOUGH, THE FIGURES VERY DEFINITELY SHOW

24   THAT THE CONTENT OF THE INFORMATION OVERLAPS TO SOME DEGREE.

25   THERE'S NAME INFORMATION STILL OVERLAPPING, THERE'S ACTUALLY --

```
 1        BOTH FIGURES SHOW THE DATE AND TIME OF THE MISSED CALL SHOWING
 2     IN THE FIGURES.
 3          SO IT'S NOT A SITUATION WHERE THE PATENT IS DESCRIBING AN
 4     IDEA THAT WE'RE GOING TO HIDE ALL OF THE INFORMATION CONTENT
 5     FROM THE FIRST DISPLAY.
 6          WHAT IT'S SAYING IS, AND IT'S PRETTY CLEAR WHEN YOU LOOK AT
 7     COLUMN 24, LINES 31 THROUGH I THINK IT'S 25:41 WHERE IT
 8     DESCRIBES THESE FIGURES, THAT WE'RE SAYING WE'RE GOING TO
 9     CHANGE DISPLAYING THIS LIST OF MISSED CALLS WITH ANOTHER
10     DISPLAY, WE'RE GOING TO REPLACE IT WITH ANOTHER DISPLAY THAT
11     HAS THE CONTACT INFORMATION.
12          BUT IT DOESN'T SAY THAT WE'RE GOING TO MAKE SURE THAT NONE
13     OF THE INFORMATION IS LISTED, AND THAT'S, I THINK
14     FUNDAMENTALLY, THE DISPUTE HERE.
15             THE COURT:  THIS IS ONE WHERE I WAS HOPING THAT YOU
16     ALL COULD REACH AGREEMENT BECAUSE IT LOOKS LIKE YOU'RE SAYING
17     ESSENTIALLY THE SAME THING WITH DIFFERENT WORDS.
18          WHO IS HANDLING THIS FOR SAMSUNG?  CAN WE COME TO SOME
19     AGREEMENT ON THIS ONE?
20          YOU'RE NOT, MR. LYON, SAYING THAT THE LIST OF MISSED CALLS
21     THAT'S FIGURE 12B HAS TO BE IN FIGURE 12C, RIGHT?
22          YOU'RE JUST SAYING THE MISSED CALLER WHOM YOU'VE SELECTED,
23     THAT PERSON'S NAME, ADDRESS, PHONE NUMBER, WHATEVER CONTACT
24     INFORMATION AND DATE AND TIME OF THE MISSED CALL WILL APPEAR ON
25     THE SECOND DISPLAY SCREEN?
```

```
 1           MR. LYON:  WHAT I -- WHAT WE'RE SAYING I THINK, YOUR
 2    HONOR -- IF I COULD HAVE FIGURE 6, I CAN SHOW YOU EXACTLY WHAT
 3    I THINK WE'RE SAYING -- THAT THE DIFFERENCE -- WHEN THE
 4    EXAMINER HAD IT IN COMPLETELY SUBSTITUTING, IT WAS IN REFERENCE
 5    TO THE CHEW REFERENCE, THERE WAS A REJECTION BASED ON THAT.
 6        IT SHOULD BE FIGURE 6.  EXCUSE ME, NOT FIGURE 6.  SLIDE 6.
 7    I APOLOGIZE.
 8        AND THE CHEW REFERENCE, THIS IS AN EXAMPLE, THE CHEW
 9    REFERENCE WHEN YOU LOOK AT -- I THINK THERE'S A FIGURE IN OUR
10    BRIEFING ON THIS -- IT EFFECTIVELY HAD SORT OF A SUBMENU THAT
11    POPPED UP WITH THE INFORMATION FOR THE CONTACT INFORMATION, AND
12    IT OVERLAPPED THE EXISTING DISPLAY OF MISSED CALLS.
13        AND THE POINT THERE WAS IT GOT CLUTTERED AND IT DIDN'T LOOK
14    GOOD.  SO WHAT THIS INVENTION IS DOING, IT'S NOT OVERLAPPING
15    LIKE THAT.  WHEN IT SAYS COMPLETELY SUBSTITUTING, WHAT THE
16    EXAMINER WAS DOING WITH THIS AMENDMENT WAS SAYING WE'RE GOING
17    TO SWAP OUT THE DISPLAYS COMPLETELY.
18           THE COURT:  THE PROSECUTION HISTORY DOESN'T CITE TO
19    CHEW.  IT DOESN'T IDENTIFY WHY THIS PATENT WAS ALLOWED OVER
20    CHEW.  IT JUST KIND OF PUTS IT WITH TWO OTHER PATENTS.
21           MR. LYON:  I WOULD SUBMIT, YOUR HONOR, IF YOU TRACK
22    AND FOLLOW THROUGH THE PROSECUTION HISTORY ON THAT --
23           THE COURT:  WELL, YOU ALL DIDN'T SUBMIT THAT.  YOU
24    ONLY SUBMITTED PIECES, AND WHAT YOU DID SUBMIT DOESN'T ACTUALLY
25    TALK ABOUT CHEW.  IT JUST LISTS IT WITH TWO OTHER PATENTS.
```

```
 1        SO CAN WE COME TO SOME AGREEMENT HERE?  DO YOU HAVE,

 2   MR. LYON, ANY OBJECTION TO -- WELL, MAYBE I SHOULD START WITH

 3   MR. PRICE.

 4            MR. PRICE:  YOUR HONOR, I BELIEVE THE REASON WE MAY

 5   NOT BE ABLE TO COME TO AGREEMENT --

 6            THE COURT:  YES.

 7            MR. PRICE:  -- IS THAT WE BELIEVE THAT THE EXAMINER,

 8   WHEN HE SAID THERE HAD TO BE COMPLETE SUBSTITUTION, WASN'T

 9   TALKING ABOUT JUST FILLING UP THE PAGE.

10            THE COURT:  UH-HUH.

11            MR. PRICE:  HE DEFINED IT BY LOOKING AT FIGURES 12B

12   AND 12C, AND IF YOU LOOK AT THOSE FIGURES -- AND THIS IS SLIDE

13   14 -- YOU CAN SEE THAT, YOU KNOW, THE FORMATTING AND CONTENT IS

14   DIFFERENT.

15            THE COURT:  BUT IT STILL HAS BRUCE WALKER, IT STILL

16   HAS THE DATE OF THE CALL, IT STILL HAS THE DATE AND TIME OF THE

17   MISSED CALL.

18            MR. PRICE:  EXACTLY.  BUT WHAT IT DOESN'T HAVE --

19   WHAT IT DOES NOT DO IS SIMPLY BLOW UP THE PART OF THIS LIST AND

20   IMPORT IT OVER.  IT'S NOT JUST -- IT'S NOT TAKING THAT LIST OR

21   A SUBSET OF THAT LIST AND DISPLAYING THE LIST OR SUBSET.

22        SO, FOR EXAMPLE, A CONCRETE EXAMPLE, SOME MISSED CALL LISTS

23   LIST MR. WALKER, INSTEAD OF HAVING THE 3 UP THERE, IT WOULD

24   ACTUALLY HAVE WALKER, WALKER, WALKER, CALLED THREE TIMES.

25            AND LET'S SAY A PROGRAM THAT -- ALL THAT WAS DONE WAS
```

```
1    TAKING THIS SUBPORTION OF THAT LIST AND DISPLAYING IT ON THE

2    NEXT PAGE.

3        IN OTHER WORDS, YOU'RE NOT REALLY TRYING TO GET CONTACT

4    INFORMATION.  YOU'RE TRYING TO SEE WHO'S -- SOME WOULD CALL IT

5    A STALKER APP.

6        BUT YOU'RE JUST TAKING A SUBSET OF THIS AND IMPORTING IT

7    OVER WITH NO OTHER CHANGES.

8        SEE, WE'RE SAYING THAT'S NOT A COMPLETE SUBSTITUTION.

9            THE COURT:  SO YOU'RE SAYING IF YOU TAP ON

10   BRUCE WALKER AND YOU JUST GET, WHAT, THE NUMBER OF TIMES THAT

11   BRUCE WALKER HAS CALLED YOU?  THAT'S YOUR CONCERN?

12           MR. PRICE:  LET'S SAY IF YOU -- THIS IS UNUSUAL

13   BECAUSE IT DOESN'T GIVE ANY CONTACT INFORMATION HERE AT ALL.

14           THE COURT:  RIGHT.

15           MR. PRICE:  BUT LET'S SAY INSTEAD OF HAVING THE NAME

16   BRUCE WALKER, IT SAID 408, ALL RIGHT?  SO YOU TAP ON THAT, AND

17   ALL YOU GET IS -- LET'S SAY THAT 408 ALSO CALLED LATER -- IS IT

18   IMPORTS A SUBLIST OF THIS PAGE.  IT JUST ADDS UP THE 408S THAT

19   WERE CALLED FROM THAT NUMBER AND GIVES YOU A LIST FROM THAT,

20   WHICH IS A SUBLIST OF THE PAGE.

21           THE COURT:  I'M JUST CONFUSED.

22       SO YOU DO ALLOW -- IF, LET'S SAY, BRUCE WALKER'S PHONE

23   NUMBER WAS ALSO SHOWING UP ON FIGURE 12B, SO YOU WOULD BE FINE

24   WITH BRUCE WALKER, THE PHONE NUMBER, DATE AND TIME OF THE CALL

25   SHOWING UP ON FIGURE 12C?  THAT WOULD BE A COMPLETE REPLACEMENT
```

```
1      IN THE SECOND DISPLAY TO YOU?  OR NOT?

2              MR. PRICE:  IF THAT'S HIS CONTACT INFORMATION, YES.

3              THE COURT:  THAT WOULD SUFFICE?

4              MR. PRICE:  THAT'S CONTACT INFORMATION.

5              THE COURT:  WELL, BUT I'M SAYING WHAT IF THE CONTACT

6      INFORMATION WAS MORE VISIBLE ON 12B?  LIKE YOU SAID 12B DOESN'T

7      HAVE A PHONE NUMBER, IT DOESN'T HAVE AN ADDRESS, IT DOESN'T

8      HAVE AN E-MAIL ADDRESS.

9        LET'S SAY 12B HAD THAT CONTACT INFORMATION FOR

10     BRUCE WALKER, AND THEN YOU HAD A TAP GESTURE ON BRUCE WALKER

11     AND THEN THAT INFORMATION SHOWED UP ON FIGURE 12C,

12     BRUCE WALKER'S NAME, HIS E-MAIL ADDRESS AND HIS PHONE NUMBERS,

13     WOULD THAT --

14             MR. PRICE:  THAT'S COMPLETELY SUBSTITUTING THE PAGE.

15             THE COURT:  THAT IS SUBSTITUTING THE PAGE?

16             MR. PRICE:  YES.

17             THE COURT:  I GUESS I'M STILL CONFUSED ABOUT WHAT IS

18     THE DISAGREEMENT HERE, BECAUSE IT SEEMS LIKE THERE IS AGREEMENT

19     ON THE INFORMATION THAT'S BEING REPEATED IN 12C AFTER THE TAP

20     GESTURE ON 12B.

21             MR. PRICE:  THE HYPOTHETICAL YOU GAVE, YOUR HONOR, IS

22     NOT THE SAME AS JUST TRANSPORTING OVER THAT EXACT SAME LINE.

23     IT IS A COMPLETE SUBSTITUTION.  IT IS NOT JUST TAKING ONE THING

24     ON THAT LIST.

25        SO THE EXAMPLE I GAVE, IMAGINE THIS 408, THIS SAME NUMBER,
```

```
 1        SHOWS UP THREE TIMES IN A ROW.

 2             THE COURT:  OKAY.

 3             MR. PRICE:  THIS PERSON CALLED YOU THREE TIMES AND

 4   THE PROGRAM SAID -- INSTEAD OF LUMPING THEM ALL TOGETHER, IT

 5   LISTS THEM SEPARATELY.

 6             THE COURT:  OKAY.

 7             MR. PRICE:  IF YOU PUT ONE OF THOSE AND ALL YOU GOT

 8   WAS JUST A SUBSET, NOTHING ELSE, THAT'S NOT A COMPLETE

 9   SUBSTITUTION.  IT'S JUST -- IT'S JUST BASICALLY --

10             THE COURT:  YOU MEAN IF IT WERE JUST TO SHOW YOU THE

11   408 NUMBER THREE TIMES WITH NO ADDITIONAL INFORMATION?

12             MR. PRICE:  YES.

13             THE COURT:  OKAY.  BUT WHAT IF IT HAD DIFFERENT

14   ADDITIONAL INFORMATION?  IT HAD THE E-MAIL ADDRESS, IT HAD THE

15   NAME, IT HAD OTHER CONTACT INFORMATION FOR THE PERSON

16   ASSOCIATED WITH THAT 408 NUMBER?

17             MR. PRICE:  SO THEN, LIKE IF IT WAS ON TOP, I THINK

18   OUR POSITION IS THAT IF THIS CONTAINS A SUBSET OF THIS EXACTLY

19   AS IT'S SHOWN, THEN THAT WOULD NOT BE A COMPLETE SUBSTITUTION.

20        BUT CERTAINLY IF IT CONTAINED ONLY, YOU KNOW, A SUBSET OF

21   THAT LIST, IT CERTAINLY WOULD NOT BE A COMPLETE SUBSTITUTION.

22             THE COURT:  WELL, DO YOU CONSIDER BRUCE WALKER,

23   JANUARY 26, 10:53 A.M. APPEARING IN BOTH FIGURES 12B AND 12C --

24             MR. PRICE:  YES.

25             THE COURT:  -- WHEN YOU SAID THAT IT WOULD BE
```

```
1        PROBLEMATIC FOR THAT PORTION OF THE MISSED CALLER LIST TO BE

2        APPEARING ON THE RESULTING SCREEN OR DISPLAY AFTER THE TAP

3        GESTURE, IS THAT PROBLEMATIC TO YOU, OR THAT'S OKAY?

4                MR. PRICE:  NO, NO.  IT'S --

5                THE COURT:  THAT'S OKAY?

6                MR. PRICE:  IF ALL YOU GOT WAS THE SAME LINE, WE

7        MIGHT HAVE THAT DISAGREEMENT.

8            BUT YOU'RE OBVIOUSLY IN WHAT IS DEFINED AS COMPLETELY

9        SUBSTITUTING THE INFORMATION.  YOU ACTUALLY GET THE FORMATTING

10       OF CONTACT INFORMATION ABOUT BRUCE WALKER.

11           NOW, IF YOU DIDN'T GET THE WORK NUMBER -- I MEAN, THIS

12       REALLY IS NOT ANY CONTACT INFORMATION.  BRUCE WALKER IS

13       BRUCE WALKER.  I THINK CONTACT INFORMATION HAS TO INCLUDE PHONE

14       NUMBER, E-MAIL, OR SOMETHING OF THAT SORT.

15           SO MAYBE I MISHEARD THE COURT'S QUESTION, YOUR HONOR, BUT I

16       THINK THE COURT'S QUESTION SORT OF ELIMINATED ANY CONTACT

17       INFORMATION IN THE HYPOTHETICAL.

18               MR. LYON:  YOUR HONOR --

19               MR. PRICE:  IF YOU COME OVER AND YOU HAVE ANY CONTACT

20       INFORMATION, YES, IT'S COMPLETELY SUBSTITUTED.

21               MR. LYON:  YOUR HONOR, MAY I ADDRESS A COUPLE OF

22       POINTS MR. PRICE MADE?

23               THE COURT:  GO AHEAD.

24               MR. LYON:  SO I THINK PART OF THE PROBLEM IS IF WE GO

25       ALONG THE WAY SAMSUNG IS APPROACHING IT, IT'S VERY DIFFICULT TO
```

1      KNOW WHERE YOU DRAW THE LINE.

2          WE HAVE A SITUATION WHERE WE HAVE MISSED CALL INFORMATION

3      THAT IS CLEARLY SHOWN HERE.  WE HAVE THE BRUCE WALKER AND THE

4      DATE AND TIME OF THE MISSED CALL.  THAT IS MISSED CALL

5      INFORMATION.  THAT IS NOT CONTACT INFORMATION.  THAT'S MISSED

6      CALL INFORMATION.

7          SO IF IT'S OKAY TO DO THAT FOR HERE, BUT THEN WE -- WHERE

8      IS THE SUBSET?

9          AND WHAT THE PROBLEM IS WITH THIS IS WHAT WE'RE TALKING

10     ABOUT WHEN YOU LOOK AT THE CLAIMS IS IT'S THE DISPLAY OF

11     CONTACT INFORMATION THAT'S BEING SUBSTITUTED.

12         IT DOESN'T SAY THAT THE CONTACT HAS TO BE COMPLETELY

13     ISOLATED.  THERE HAS TO BE CONTACT INFORMATION.  I THINK THAT'S

14     PRETTY CLEAR FROM THE CLAIMS.  THE CONTACT INFORMATION HAS TO

15     BE SUBSTITUTED FOR THE DISPLAY MISSED CALLS.

16         BUT THAT DOESN'T MEAN WE HAVE TO ISOLATE OUT ALL THE

17     INFORMATION, BECAUSE THE PATENT VERY CLEARLY SHOWS YOU DON'T.

18         SO THE PROBLEM WITH SAMSUNG'S DEFINITION, "ADDING IN NONE

19     OF THE LIST OF" -- OR "NONE OF THE LIST OF MISSED CALLS

20     VISIBLE," IS WE NOW HAVE AN ARBITRARY LINE WE'RE DRAWING

21     BECAUSE WE'RE SAYING IT'S OKAY TO DO IT IN SOME CASES, BUT NOT

22     IN OTHERS.

23         THAT'S NOT WHAT THE CLAIMS SAY, AND WHEN YOU START WITH

24     THE CLAIMS AND GO BACK -- AND THAT'S NOT WHAT THE EXAMINER SAID

25     WHEN HE WAS TALKING ABOUT DISPLAYS THAT ARE DIFFERENT IN

```
1      FORMAT, BUT THAT ARE NOT NECESSARILY DIFFERENT COMPLETELY

2      ANYWAY.

3              THE COURT:  BUT WHAT'S YOUR POSITION?  IF IT JUST

4      SHOWS A SUBSET OF THE LIST OF MISSED CALLS, WHY IS THAT A

5      COMPLETE SUBSTITUTION?

6              MR. LYON:  IF IT'S JUST SHOWING A LIST OF THE SUBSET

7      OF MISSED CALLS, THEN IT'S GOT TO HAVE SOME KIND OF CONTACT

8      INFORMATION, PHONE NUMBER OR E-MAIL OR SOMETHING.  I THINK

9      THAT'S PRETTY CLEAR.

10         WHEN YOU'RE SAYING WE'RE SUBSTITUTING IN CONTACT

11     INFORMATION, THAT IS MORE THAN JUST A LIST OF MISSED CALLS.

12         BUT IF IT HAS PHONE NUMBERS AND VARIOUS OTHER THINGS IN

13     THERE, THAT'S PART OF WHAT WE'RE TALKING ABOUT.

14             THE COURT:  BUT YOUR ALTERNATIVE CONSTRUCTION COULD

15     POTENTIALLY INCLUDE JUST A SUBSET OF MISSED CALL LIST AS IT'S

16     CURRENTLY WORDED.

17             MR. LYON:  I DON'T THINK --

18             THE COURT:  "LISTS OF INTERACTIVE ITEMS WITH THE

19     DISPLAY OF INFORMATION FOR A SELECTED CONTACT, INFORMATION FOR

20     A SELECTED CONTACT" COULD CERTAINLY INCLUDE THE NUMBER OF TIMES

21     BRUCE WALKER HAS CALLED YOU.

22             MR. LYON:  TRUE.  I SEE YOUR POINT.  THAT'S NOT, I

23     DON'T THINK, WHAT WE'RE REALLY INTENDING HERE.

24             THE COURT:  YEAH.

25             MR. LYON:  IT'S NOT JUST THAT INFORMATION.  IT'S NOT
```

1     JUST REPEATING THE INFORMATION IN A DIFFERENT FORM NECESSARILY.

2        BUT IT IS INCLUDING INFORMATION FOR THE CONTACT, BECAUSE

3     THE IDEA HERE, AGAIN, IS THAT YOU CAN THEN PRESS ON THAT

4     INFORMATION AND INITIATE A RESPONSE, EITHER ANOTHER PHONE CALL

5     OR AN E-MAIL OR SOMETHING ELSE.

6           THE COURT:  MR. PRICE, YOU'RE SURE THAT THERE IS NOT

7     SOME MEETING OF THE MIND HERE?  IT SOUNDS LIKE MR. LYON AGREES

8     WITH YOU THAT IF IT WAS SIMPLY REPEATING A SUBSET OF THE MISSED

9     CALL LIST, THAT THAT WOULD NOT BE A COMPLETE SUBSTITUTION.

10          MR. PRICE:  FOR THAT PART OF THE ELEMENT.

11       I MEAN, THERE IS ALSO CONTACT ICONS OR THINGS YOU CAN PUSH.

12       BUT WE MAY BE ABLE TO TALK AND AGREE ON SOMETHING BY NEXT

13    THURSDAY.

14          THE COURT:  I WOULD APPRECIATE THAT, TO AT LEAST

15    EXPLORE IF THERE IS SOME MIDDLE GROUND.

16       I MEAN, YOU'RE OKAY IF A PART OF IT HAPPENS TO BE SIMILAR

17    TO WHAT'S IN THE MISSED CALL LIST, BUT IF THERE IS FURTHER

18    CONTACT INFORMATION FOR THE INDIVIDUAL TO WHOM THERE'S BEEN A

19    SNAP GESTURE, YOU WOULD BE OKAY WITH THAT?

20          MR. PRICE:  I THINK, IF I'M ENVISIONING CORRECTLY, IF

21    THAT'S E-MAIL ADDRESS AND OTHER CONTACT INFORMATION?

22          THE COURT:  YOU TAP ON BRUCE WALKER AND THEN ALL OF A

23    SUDDEN E-MAIL ADDRESSES POP UP, WORK NUMBERS POP UP.

24       BUT, AS WE SAID BEFORE, PART OF THAT INFORMATION IS THE

25    SAME.

```
 1              MR. PRICE:  OH, YEAH.  IF PART OF THE INFORMATION IS

 2    THE SAME, THAT'S NOT A PROBLEM, BECAUSE OBVIOUSLY YOU MAY HAVE

 3    CONTACT INFORMATION ON THE MISSED CALLS.

 4              THE COURT:  SURE.  SO WHAT -- I GUESS I'M NOT CLEAR

 5    ON WHAT THE DISPUTE IS ABOUT HERE, BECAUSE --

 6              MR. PRICE:  WE CAN FIGURE IT OUT.

 7              MR. LYON:  I WAS GOING TO SAY, MAYBE WE SHOULD TALK,

 8    BECAUSE I DON'T THINK WE'RE QUITE THERE YET.  I DON'T THINK WE

 9    ARE.  BUT LET US CONFER AND MAYBE WE'LL FIGURE IT OUT.

10        I DO THINK THERE'S AN ISSUE OF JUST REFORMATTING IT WITH

11    CONTACT INFORMATION.  THAT'S NOT WHAT -- WE'RE TRYING TO AVOID

12    THE CLAIM LIMITATION.  THAT'S NOT WHAT WE'RE TRYING TO GET TO

13    HERE.

14        SO LET US TALK AND MAYBE WE CAN ISOLATE WHAT THE SPECIFIC

15    DISPUTE STILL IS AND THEN, IF WE NEED TO, WE CAN TALK ABOUT

16    THAT NEXT WEEK WITH YOUR HONOR AND KIND OF GO THROUGH THAT AT

17    THAT POINT.

18              THE COURT:  OKAY.  AND PLEASE SUBMIT THAT ON THE

19    SCHEDULE THAT WE TALKED ABOUT EARLIER.

20              MR. LYON:  YEAH, I THINK IT'S TUESDAY.

21              THE COURT:  ON TUESDAY, IF YOU COME UP WITH A NEW, OR

22    AT LEAST A MORE NARROWED DISPUTE, BECAUSE I HAVE TO SAY,

23    READING THE TWO, I WAS REALLY NOT CLEAR ON --

24              MR. PRICE:  MAYBE WE CAN USE EXAMPLES.

25              THE COURT:  -- EXACTLY WHAT THE DISAGREEMENT WAS.
```

```
1            MR. PRICE:  RIGHT, AND USING EXAMPLES WOULD PROBABLY

2    HELP.

3         AND YOUR HONOR, IF YOU DON'T MIND, THIS IS THE LAST PATENT

4    THAT I WAS GOING TO DISCUSS.  WITH YOUR PERMISSION IF I CAN

5    LEAVE THE COURTROOM?

6            THE COURT:  WHY DON'T WE TAKE OUR BREAK NOW BECAUSE

7    WE'VE BEEN GOING OVER TWO HOURS.

8            MR. PRICE:  I HAVE TO DRIVE BACK TO L.A. BECAUSE I

9    CAN'T FLY.  SO I'M NOT INVOLVED IN ANY OF THE OTHER PATENTS --

10           THE COURT:  OKAY.  ALL RIGHT.  WELL, THANK YOU AND I

11   HOPE YOU RECOVER FROM YOUR COLD.

12           MR. PRICE:  OKAY.  THANK YOU.

13           THE COURT:  OKAY.  LET'S GO AHEAD AND TAKE A -- LET'S

14   TAKE A 20 MINUTE BREAK.  THANK YOU.

15           (RECESS FROM 2:11 P.M. UNTIL 2:34 P.M.)

16           THE COURT:  THANK YOU.  PLEASE TAKE A SEAT.  WELCOME

17   BACK.

18        LET'S DO THE LAST THREE, THE SAMSUNG PATENTS.

19           MR. JOHNSON:  THANK YOU, YOUR HONOR.

20        UNLESS YOUR HONOR HAS A PARTICULAR PREFERENCE IN TERMS OF

21   THE ORDER, WE WERE GOING TO FOLLOW THE BRIEF AND DO THE '087

22   PATENT, THE '757, AND THE '239.

23           THE COURT:  THAT'S FINE.  AND I THINK FOR THE '087,

24   WE WOULD LIKE TO END -- ESPECIALLY FOR THE '239, I WOULD LIKE

25   TO SEE YOUR PRESENTATION.  HOPEFULLY IT'S --
```

1              MR. JOHNSON:  IT IS SHORT.

2              THE COURT:  OKAY.

3              MR. JOHNSON:  MAY I HAND THE BINDERS UP?

4              THE COURT:  PLEASE, PLEASE.

5          THANK YOU.

6              MR. JOHNSON:  YOUR HONOR, WE'LL START WITH THE '087

7    PATENT, AND THE '087 PATENT IS A STANDARDS PATENT.  IT HAS TO

8    DO WITH NON-SCHEDULED TRANSMISSIONS IN A 3GPP SYSTEM.

9          THE PRIORITY DATE IS JULY 2004.  WE'VE LISTED THE ASSERTED

10   CLAIMS HERE AT THE BOTTOM THAT ARE AT ISSUE, AND THE INVENTION

11   EVENTUALLY BECAME PART OF THE 3GPP STANDARD, AND I'LL WALK

12   BRIEFLY THROUGH THE TECHNOLOGY THAT'S INVOLVED.

13         THIS IS FIGURE 1 FROM THE PATENT.  IT DESCRIBES RELATED

14   ART, AND AS YOU CAN SEE, THERE ARE MULTIPLE PHONES ON THE

15   RIGHT-HAND SIDE HERE, 104, 102, 101, AND 103, THE PATENT REFERS

16   TO THESE AS UE.  THERE ARE A LOT OF ACRONYMS IN THIS PATENT

17   THAT CAN GET CONFUSING.

18         BUT ON THE LEFT-HAND SIDE IS THE BASE STATION, WHICH IS

19   NODE B, AND WE SEE THE CHANNELS, 114, 112, AND 111, WHICH ARE

20   THE CHANNELS WHERE THE INFORMATION IS TRANSFERRED BACK AND

21   FORTH BETWEEN THE PHONE AND THE BASE STATION.

22         AND THIS PATENT HAS TO DO WITH SOMETHING CALLED ENHANCED

23   DATA CHANNEL, AND WHAT WE SEE IS THAT THE PHONES ON THE

24   RIGHT-HAND SIDE ULTIMATELY ARE TRYING TO COMMUNICATE WITH THE

25   BASE STATION, AND A PROBLEM ARISES WHEN A LARGE NUMBER OF

 1       PHONES THAT HAVE CONTENT ON THEM, VIDEOS OR PHOTOGRAPHS, FOR

 2       EXAMPLE, START SENDING THE DATA AT THE SAME TIME TO THE BASE

 3       STATION.

 4           AND ULTIMATELY, IF THEY ALL START ARRIVING -- AND THE

 5       PHONES, THIS IS OBVIOUSLY ILLUSTRATIVE -- IT CAUSES

 6       INTERFERENCE, WHICH CAN CAUSE DELAYS AND ERRORS.

 7           SO WHEN THE E-DCH, THE ENHANCED DATA CHANNEL, WAS ADDED TO

 8       THE 3G STANDARD, THE PHONES REDUCED INTERFERENCE BY SCHEDULING

 9       THESE TRANSMISSIONS.  THEY TRIED TO FIGURE OUT, WHEN AM I GOING

10       TO SEND THE VIDEO OF MY KID AS OPPOSED TO SOMEBODY ELSE SENDING

11       A PHOTO OF THEIR GRANDMOTHER, FOR EXAMPLE.

12           AND FIGURE 2 OF THE PATENT SHOWS THIS SCHEDULING PROCESS,

13       AND THIS IS FROM FIGURE 2.  THIS IS ON THE RIGHT-HAND SIDE.

14           AND IF WE BREAK DOWN WHAT FIGURE 2 IS REALLY DESCRIBING,

15       I'LL GO THROUGH IT IN A LITTLE BIT MORE DETAIL.

16           SO LET'S TALK ABOUT WHAT THE PROBLEM IS THAT THE '087 WAS

17       TRYING TO SOLVE.

18           IF THE UE, THE FIRST PHONE ON THE UPPER RIGHT-HAND SIDE,

19       SENDS SCHEDULING INFORMATION TO THE BASE STATION, SO WHAT IT'S

20       DOING IS IT'S BASICALLY -- THE FIRST THING IT'S GOING TO DO IS

21       IT'S GOING TO SEND INFORMATION TO THE BASE STATION TO -- I TELL

22       THE BASE STATION, I GIVE THE BASE STATION INFORMATION ABOUT THE

23       PHONE THAT INCLUDES, FOR EXAMPLE, INFORMATION ABOUT WHAT TYPE

24       OF DATA THE PHONE WANTS TO SEND, HERE, FOR EXAMPLE, A VIDEO OF

25       A CHILD RIDING A BIKE.

1          NEXT THING THAT HAPPENS IS THE BASE STATION WILL SEND BACK

2     SCHEDULING ASSIGNMENT INFORMATION, AND THIS IS ABBREVIATED SAI

3     IN THE BRIEFS, AND THIS IS THE SCHEDULING INFORMATION FROM THE

4     BASE STATION THAT BASICALLY INCLUDES INFORMATION ABOUT THIS IS

5     THE ALLOWED DATE RATE THAT WE'RE GOING TO ALLOW THE PHONE TO

6     SEND DATA AT, AND IT ALSO INCLUDES INFORMATION ABOUT TIMING,

7     WHEN CAN THE PHONE ACTUALLY SEND THE VIDEO, FOR EXAMPLE.

8          THE COURT:  AND IS THE TIMING INFORMATION INCLUDED

9     WHETHER IT'S A SCHEDULED TRANSMISSION OR A NON-SCHEDULED

10    TRANSMISSION?  DOES IT STILL HAVE THE TIMING INFORMATION?

11         MR. JOHNSON:  YES, IT STILL HAS THE TIMING

12    INFORMATION.

13         THE COURT:  OKAY.  OTHER THAN THE DATA RATE AND THE

14    TIMING INFORMATION, IS THERE ANYTHING ELSE THAT'S IN SAI?

15         MR. JOHNSON:  THERE IS ADDITIONAL INFORMATION.  IT

16    TELLS INFORMATION ABOUT THE PHONE AND OTHER THINGS LIKE THAT.

17         THE COURT:  OKAY.

18         MR. JOHNSON:  BUT FOR PURPOSES OF WHAT'S AT ISSUE

19    WITH RESPECT TO THE TERM HERE, THE TIMING INFORMATION IS REALLY

20    WHAT THE SOLUTION OF THE '087 IS DIRECTED TO, BECAUSE IT'S

21    GOING TO TELL ULTIMATELY WHEN YOU -- INSTEAD OF SENDING VIDEOS,

22    WHEN YOU WANT TO SEND A NON-SCHEDULED TRANSMISSION, THE TIMING

23    INFORMATION IS GOING TO TELL THE PHONE WHEN IT CAN SEND THAT.

24         THE COURT:  OKAY.

25         MR. JOHNSON:  SO IF WE GO THROUGH THIS, AFTER THE

1    PHONE RECEIVES THE SAI INFORMATION BACK FROM THE BASE STATION,

2    THE PHONE CAN THEN GO AHEAD AND SEND THE VIDEO.

3        NOW, WHAT HAPPENS, AND ONE OF THE PROBLEMS WITH THESE

4    SCHEDULED TRANSMISSIONS, IS THAT THE SCHEDULING PROCESS TAKES

5    TOO LONG AND IT BECOMES INEFFICIENT, BECAUSE AS EACH OF THESE

6    PHONES IS ASKING FOR SAI, SCHEDULING ASSIGNMENT INFORMATION,

7    AND TRYING TO SEND VIDEOS, YOU SEE THAT IT'S GENERALLY AN

8    INEFFICIENT PROCESS FOR THOSE PARTICULAR MESSAGES THAT MAY BE

9    SHORT AND TIME SENSITIVE DATA.

10       SO IF YOU'RE TRYING TO SEND VIDEO OR A LARGE JPEG, THAT'S

11   ONE THING.

12       BUT IF YOU WANT TO SEND A QUICK ACKNOWLEDGMENT OF A TEXT OR

13   E-MAIL OF SOME SORT THAT YOU RECEIVED DATA, SOMETHING THAT GOES

14   BACK THAT DOES NOT HAVE A LOT OF DATA, GOING THROUGH THIS

15   SCHEDULING PROCESS CAN BE INEFFICIENT.

16       SO WHAT THE PATENT DESCRIBES IN ORDER TO SOLVE THIS PROBLEM

17   IS SOMETHING CALLED NON-SCHEDULED TRANSMISSIONS, AND THIS NEW

18   TYPE OF TRANSMISSION WAS ADDED TO THE 3G STANDARD.

19       NOW, THE PHONE STILL USES SCHEDULED TRANSMISSION OF

20   INFORMATION FOR LARGE DATA LIKE VIDEOS AND PHOTOGRAPHS.

21       BUT NOW THE PHONE USES SOMETHING CALLED NON-SCHEDULED

22   TRANSMISSIONS TO SEND SHORT, TIME SENSITIVE DATA.

23       SO WHAT WE SEE ON THE LEFT-HAND SIDE HERE IS SOMETHING

24   CALLED AN RNC, A RADIO NETWORK CONTROLLER, AND IT DOES WHAT THE

25   NAME DESCRIBES IT AS, CONTROLS THE NETWORK, AND IT'S BASICALLY

 1    SENDING INFORMATION TO THE PHONE ABOUT WHEN -- AND TELLING THE

 2    PHONE WHEN IT CAN SEND THESE SHORT TEXTS, THESE SMALL DATA

 3    FILES.  SO IT'S RESPONSIBLE ULTIMATELY FOR CONTROLLING THE

 4    NETWORK.

 5         AND IN ADDITION TO SENDING THE NON-SCHEDULED TRANSMISSION

 6    INFORMATION, THE PHONE, IF IT WANTS TO SEND A VIDEO, IT STILL

 7    CAN SEND SCHEDULING INFORMATION TO THE BASE STATION AND IT

 8    RECEIVES BACK SCHEDULING ASSIGNMENT INFORMATION THAT TELLS YOU,

 9    IF I'VE GOT A VIDEO, I CAN SEND IT ALONG A SCHEDULED

10    TRANSMISSION, AND THIS IS A BIG FAT GREEN ARROW THAT SHOWS THIS

11    IS A LARGER FILE.

12         YET, BECAUSE THE RNC HAS ALSO SENT NON-SCHEDULED

13    TRANSMISSION INFORMATION, IT'S TELLING THE PHONE, IF YOU WANT

14    TO SEND SMALL DATA FILES, YOU CAN DO IT IN A PARTICULAR

15    SEQUENCE.

16         AND I'M GOING TO GO THROUGH WHAT THAT SEQUENCE IS AND

17    EXPLAIN HOW THAT MAKES THE WHOLE PROCESS BASICALLY MORE

18    EFFICIENT.

19              THE COURT:  MAY I ASK, DOES THE RNC ALSO SEND THE

20    SCHEDULING ASSIGNMENT INFORMATION?  OR IS THAT COMING FROM THE

21    BASE STATION?

22              MR. JOHNSON:  IT'S COMING FROM THE BASE STATION.

23              THE COURT:  OKAY.  THE RNC, IS THAT PART OF THE BASE

24    STATION?  IS IT A COMPONENT OF THE BASE STATION?  OR IS IT A

25    TOTALLY SEPARATE ENTITY?

```
1            MR. JOHNSON:  I MEAN, IT'S A SEPARATE ENTITY THAT

2      WORKS IN CONNECTION WITH THE BASE STATION, BUT IT IS A SEPARATE

3      ENTITY.

4            THE COURT:  SEPARATE, OKAY.

5          SO THE SCHEDULING ASSIGNMENT INFORMATION THAT WOULD BE

6      TRANSFERRED FROM THE BASE STATION TO THE PHONES HERE WOULD BE

7      THE DATA RATE AND THE TIMING INFORMATION?

8            MR. JOHNSON:  RIGHT.

9            THE COURT:  OKAY.

10            MR. JOHNSON:  RIGHT.

11            THE COURT:  OKAY.

12            MR. JOHNSON:  AND LIKE WE SAW BEFORE, THE PHONE, AS I

13      SAID, CAN STILL SEND SCHEDULED TRANSMISSIONS.

14          BUT BECAUSE THE PHONE IS SENDING BOTH SCHEDULED AND

15      NON-SCHEDULED TRANSMISSIONS --

16            THE COURT:  UM-HUM.

17            MR. JOHNSON:  -- THE PHONE CAN LOOK AT WHAT THE

18      SCHEDULING ASSIGNMENT INFORMATION IS AND FIGURE OUT, IF IT'S

19      GOT A VIDEO TO SEND, IT CAN FIGURE OUT WHEN TO SEND THE VIDEO.

20          IF IT'S GOT THE SMALL DATA FILES IT WANTS TO SEND, IT CAN

21      FIGURE OUT WHEN TO SEND THOSE, AS OPPOSED TO JUST WAITING IN

22      LINE.

23            THE COURT:  OKAY.

24            MR. JOHNSON:  SO IF WE LOOK AT FIGURE 9, FIGURE 9 IS

25      THE FIRST -- IT'S COMPLICATED IF YOU LOOK AT IT BY ITSELF, BUT
```

1    FIGURE 9 ILLUSTRATES HOW THE NON-SCHEDULED TRANSMISSIONS WORK.

2         IF WE LOOK AT THE LEFT-HAND SIDE, WHAT WE SEE ARE

3    REFERENCES TO THREE PHONES, UE, 0 -- USER EQUIPMENT 0, 1, AND

4    2.

5         THEN WE SEE, ALONG THE RIGHT-HAND SIDE, WE BASICALLY SEE

6    THE LAYOUT OF WHAT THE BIT MAPS ARE GOING TO LOOK LIKE TELLING

7    THE PHONE WHEN IT CAN SEND THESE NON-SCHEDULED TRANSMISSIONS,

8    WHEN IT CAN SEND THE SHORT DATA FILES, THESE TEXTS BASICALLY.

9         AND THE NON-SCHEDULED TRANSMISSIONS ALLOW THE PHONE REALLY

10   TO QUICKLY TRANSMIT SHORT DATA WITHOUT HAVING TO GO THROUGH

11   THAT COMPLICATED SCHEDULING PROCESS THAT WE SAW WITH THE LARGER

12   FILES, LIKE VIDEO AND LARGE PHOTOS.

13            THE COURT:  UM-HUM.

14         MR. JOHNSON:  SO LET'S JUST DO A LEVEL OF ABSTRACTION

15   HERE AND LOOK A LITTLE BIT CLOSER AT WHAT WE'RE SEEING.

16         EACH USER EQUIPMENT, EACH PHONE BASICALLY HAS A DIFFERENT

17   PATTERN THAT'S USED TO TRANSMIT DATA.

18            THE COURT:  UM-HUM.

19         MR. JOHNSON:  THE FIRST PATTERN IS HIGHLIGHTED IN

20   GREEN, AND WHAT WE SEE HERE ARE EIGHT SUBFRAMES THAT TELL --

21   SOME HAVE SHADING AND SOME DON'T.

22         THE ONES WITH SHADING BASICALLY IDENTIFY A 2 MILLISECOND

23   SUBFRAME IN WHICH THE PHONE CAN SEND A SHORT TEXT FILE OR DATA

24   FILE OR A SMALL FILE.

25         THE SUBFRAMES THAT DON'T HAVE ANY SHADING ARE THOSE

```
 1        SUBFRAMES WHERE THE PHONE IS NOT ALLOWED TO SEND THE SMALL

 2        FILE.

 3             AND SO IF YOU -- IF YOU LOOK AT HOW THESE INTERACT TOGETHER

 4        ACROSS THESE THREE PHONES, YOU START TO SEE THAT WHAT WE'RE

 5        SEEING IS THERE ARE NON-SCHEDULED TRANSMISSION INFORMATION FROM

 6        THE RNC THAT IS TELLING THESE THREE DIFFERENT PHONES WHEN IT

 7        CAN SEND THESE SMALL DATA FILES.

 8             SO IN THIS INSTANCE -- AND WE'RE GOING TO TALK ABOUT N NEXT

 9        WEEK, BUT HERE N IS EQUAL TO 8 BECAUSE THERE ARE EIGHT BITS AND

10        EIGHT SUBFRAMES, ONE, TWO, THREE, FOUR, FIVE, SIX, SEVEN,

11        EIGHT, AND THE K THAT'S REFERENCED HERE REFERS TO FOR EACH OF

12        THESE LINES, WHERE IS THE FRAME?  HOW MANY FRAMES ARE THERE

13        WHERE I CAN SEND THE SMALL DATA FILES?

14             AND FOR EACH OF THESE, THERE ARE THREE.  SO IF WE SEE HERE

15        THERE'S A SUBFRAME THAT'S GOT SHADING IN THE FIRST BIT, IN THE

16        FOURTH BIT, AND THEN IN THE SEVENTH BIT.  SO THERE ARE THREE OF

17        THOSE IN EACH ONE OF THESE BIT MAPS.

18                  THE COURT:  UM-HUM.

19                  MR. JOHNSON:  AND IF WE GO A LITTLE BIT FURTHER, WE

20        SEE THAT ULTIMATELY THE RNC IS SENDING THESE BIT MAPS TO EACH

21        OF THESE PHONES, AND THAT IS THE NON-SCHEDULED TRANSMISSION

22        INFORMATION.

23             WHEN YOU LOOK AT THE BIT MAPS ON THE RIGHT-HAND SIDE, THEY

24        ARE BASICALLY A SCHEDULE FOR EACH OF THESE PHONES ON WHEN IT

25        CAN IDENTIFY -- WHEN IT CAN SEND THESE SMALL DATA FILES.
```

1       IF WE STEP THROUGH IT WE CAN SEE, FOR EXAMPLE, THE FIRST

2   BIT, THE PHONES LOOK AT THIS FIRST BIT, WHICH IS BIT 0, AND THE

3   FIRST PHONE AT THE TOP HERE, UE 0, SEES A 1, SO IT KNOWS, "HEY,

4   I CAN SEND SOME DATA IN THIS FIRST TRANSMISSION TIME INTERVAL

5   0."

6            THE COURT:  UM-HUM.

7            MR. JOHNSON:  AND THE SECOND PHONE, WHICH IS -- THESE

8   ARE ALL OFF BY 1 -- UE 1 SEES A 0 AND IT SAYS, "I CAN'T SEND

9   ANY TRANSMISSION INFORMATION THERE."

10      THE THIRD PHONE AT THE BOTTOM SEES A 1 AND IT CAN GO AHEAD

11  AND SEND A TRANSMISSION TIME INTERVAL, SOME DATA IN THAT FIRST

12  PACKET.

13      SO AS WE STEP THROUGH THIS AND AS THE PHONES LOOK AT THE

14  SUBSEQUENT BITS, WE SEE, BASICALLY, THERE ARE PATTERNS OVER

15  WHICH THESE PHONES ARE BEING TOLD THAT THEY CAN SEND THESE

16  SMALL DATA FILES THAT ARE NOT SCHEDULED.

17      AND IF WE LINE THESE UP, BASICALLY WHAT WE SAW, EACH OF

18  THESE HERE -- K IS EQUAL TO 3 FOR EACH OF THOSE PHONES -- THERE

19  ARE EIGHT BITS ON THE RIGHT-HAND SIDE THAT THE PHONE HAS LOOKED

20  AT, AND WHILE THERE MAY BE SOME OVERLAP, FOR EXAMPLE, THERE ARE

21  TWO SMALL DATA PACKS IN TTI 0 FOR THIS FIRST PHONE AND THE LAST

22  PHONE, BUT MOST OF THESE OTHERS, ALL OF THESE OTHERS ARE NOT

23  OVERLAPPING.

24      AND SO YOU CAN SEE THAT ULTIMATELY WHAT THE RNC IS DOING IS

25  IT'S SCHEDULING THESE PHONES IN A WAY SO THAT THEY CAN SEND

```
1      SMALL DATA FILES THAT DON'T REQUIRE A LOT OF BANDWIDTH IN THESE

2      TTI'S WHICH, IN THE PATENT SPECIFICATION, REFERS TO ABOUT 2

3      MILLISECONDS.

4          AND THIS RESULTS, OVERALL, IN LESS INTERFERENCE.

5              THE COURT:  SO IS THE RNC SORT OF LIKE THE BRAINS OF

6      SETTING THE SCHEDULE AND --

7              MR. JOHNSON:  THE RNC IS THE KEEPER OF THE SCHEDULE.

8      I MEAN, IT GENERATES THE SCHEDULE.  IT GENERATES THE BIT

9      MAPS --

10             THE COURT:  OKAY.

11             MR. JOHNSON:  -- FOR THE PHONES AND THE PHONES

12     RECEIVE THAT INFORMATION IN THE FORM OF NON-SCHEDULED

13     TRANSMISSION INFORMATION AND THEY ARE THEN -- THEY CAN THEN

14     FIGURE OUT WHEN THEY'RE ALLOWED TO SEND THESE SMALL TEXTS, FOR

15     EXAMPLE.

16             THE COURT:  UM-HUM.  SO IF THE RNC TRANSMITS

17     SOMETHING, WILL IT BE CONSIDERED THAT THE BASE STATION IS

18     TRANSMITTING THAT?

19             MR. JOHNSON:  THAT -- THAT PROBABLY -- I PROBABLY

20     NEED TO GO BACK AND LOOK AT THE SPEC FOR NEXT WEEK ON THAT.

21             THE COURT:  OKAY, THAT'S FINE.  THAT'S FINE.

22             MR. JOHNSON:  THAT IS THE PRESENTATION AND TUTORIAL

23     FOR THE '087 PATENT, AND I'M HAPPY TO ADDRESS ANY QUESTIONS YOU

24     HAVE.

25             THE COURT:  DO YOU THINK THAT IN YOUR CONSTRUCTION --
```

```
1     NOT THE NO CONSTRUCTION, BUT YOUR ALTERNATIVE ONE, THAT WE NEED

2     TO PUT ANYTHING IN THERE ABOUT MAKING IT CLEAR THAT THE

3     NON-SCHEDULED TRANSMISSION HAS TO HAPPEN DURING ONE OF THOSE

4     TIME INTERVAL, ONE OF THOSE TTI'S, OR NOT?

5               MR. JOHNSON:  NO.  I THINK -- AND THE REASON WE SAY

6     THAT NO CONSTRUCTION IS NECESSARY IS WHEN YOU LOOK AT THE --

7     WHEN YOU LOOK AT THE CLAIM LIMITATION AND YOU LOOK AT THE REST

8     OF THE LANGUAGE THAT APPEARS AFTERWARDS --

9               THE COURT:  YEAH.

10              MR. JOHNSON:  -- I THINK IT'S PRETTY CLEAR AND TELLS

11    A PERSON OF ORDINARY SKILL IN THE ART REALLY WHAT IT IS THAT

12    WE'RE TALKING ABOUT AND WHAT NON-SCHEDULED TRANSMISSION

13    INFORMATION REALLY IS.

14       IT GOES ON TO SAY -- I DON'T KNOW IF YOU CAN PUT UP CLAIM 1

15    FROM THE '087 PATENT, PLEASE.

16       IT SAYS "RECEIVES NON-SCHEDULED TRANSMISSION INFORMATION

17    INDICATING K TRANSMISSION TIME INTERVALS, TTI'S, FOR

18    TRANSMITTING NON-SCHEDULED DATA VIA THE ENHANCED DATA CHANNEL

19    WHERE NON-SCHEDULED TRANSMISSIONS CAN BE PERFORMED DURING THE K

20    TTI'S WITHIN A PERIOD HAVING N TTI'S."

21              THE COURT:  YOU KNOW, ANY TIME I'VE DONE CLAIMS WITH

22    ORDINARY MEANING, IT'S BEEN FOUGHT OUT LATER IN SUMMARY

23    JUDGMENT, AT TRIAL, IT'S BEEN A TOTAL PAIN BECAUSE EVERYONE

24    SAYS, "OH, YEAH, PLAIN AND ORDINARY MEANING," AND THEN IT'S

25    GOING TO BE MONTHS AND MONTHS OF HEADACHES BECAUSE THEN YOU ALL
```

```
1      WILL BE LITIGATING WHAT THAT PLAIN AND ORDINARY MEANING IS.

2      SO --

3                MR. JOHNSON:  YOUR HONOR, THE ISSUE HERE -- AND THIS

4      IS TRUE IN ALL THE SAMSUNG PATENTS, I BELIEVE -- ALL OF THESE

5      LIMITATIONS THAT APPLE IS ADVOCATING ARE REALLY DIRECTED AT

6      NON-INFRINGEMENT ARGUMENTS AND THE NEGATIVE LIMITATION THAT

7      THEY WANT TO INTERJECT, QUOTE, "WITHOUT USING THE SCHEDULING

8      AND TIMING INFORMATION SENT BY THE BASE STATION."

9                THE COURT:  YEAH.

10               MR. JOHNSON:  THAT -- WE CAN TALK ABOUT THE REASONS

11     WHY THAT'S WRONG NEXT WEEK, BUT GENERALLY SPEAKING, THAT'S --

12     WHEN WE LOOK AT THE CLAIM LANGUAGE, I'M JUST NOT -- THIS MAY BE

13     ONE OF THOSE RARE INSTANCES WHERE THE LANGUAGE ITSELF IN THE

14     CLAIM DEFINES WHAT THE NON-SCHEDULED TRANSMISSION INFORMATION

15     IS --

16               THE COURT:  YEAH.

17               MR. JOHNSON:  -- BY PROVIDING THAT ADDITIONAL

18     LANGUAGE AFTERWARDS WHERE IT STARTS -- WHERE IT SAYS

19     "INDICATING" AND WHAT FOLLOWS AFTER THAT, THAT'S REALLY -- THAT

20     REALLY TELLS A PERSON OF ORDINARY SKILL IN THE ART WHAT

21     NON-SCHEDULED TRANSMISSION INFORMATION IS.

22        IT HAS THE NOTION IN THERE OF THE TIMING.  IT REFERS TO THE

23     TTI SPECIFICALLY.

24               THE COURT:  UM-HUM.  DO YOU THINK THAT YOU CAN EVEN

25     HAVE A TRANSMISSION FROM THE PHONE WITHOUT THE BASE STATION, OR
```

```
1     I GUESS THE RNC, GIVING THE DATA RATE TO THE PHONE?

2          MR. JOHNSON:  I DON'T THINK THE DATA RATE IS

3     COMPLETE -- IS REQUIRED UNDER THE -- I HAVE TO THINK ABOUT

4     THIS.  I DON'T THINK IT'S REQUIRED UNDER THE CLAIM.  IT'S NOT

5     SPELLED OUT SPECIFICALLY IN THE CLAIMS.

6        WHAT'S SPELLED OUT ARE THE NUMBER -- YOU KNOW, THE END

7     TTI'S, THE NUMBER OF BITS, AND IT CAN VARY.

8          THE COURT:  UM-HUM.

9          MR. JOHNSON:  AND IT'S ALSO K, WHICH IS ANOTHER

10    VARIABLE.

11       I MEAN, AGAIN -- YOU KNOW, THE NEGATIVE CONSTRUCTION THAT

12    APPLE WANTS TO IMPOSE, EVEN IN THE LETTER N, I MEAN, THAT'S --

13    THAT'S -- MY SON IS IN FIFTH GRADE AND I HELP HIM WITH HIS

14    HOMEWORK AND HE TALKS A LOT ABOUT N'S.

15          THE COURT:  I'M NOT EVEN GOING TO ASK YOU A QUESTION

16    ABOUT THAT.

17          MR. JOHNSON:  RIGHT.  SO IT'S THE SAME IDEA HERE.

18    IT'S THE LANGUAGE THAT APPEARS AFTER THAT THAT I THINK --

19          THE COURT:  I WAS TRYING TO THROW YOU A SOFTBALL

20    HERE.  THEY WANT TO SAY "WITHOUT USING SCHEDULING ASSIGNMENT

21    INFORMATION," AND I'M WONDERING IF THAT'S EVEN POSSIBLE.

22       HOW CAN YOU NOT CONVEY THE DATA RATE AND THE TIMING

23    INFORMATION TO THE PHONE?  I MEAN, CAN YOU EVEN DO THAT?

24          MR. JOHNSON:  THAT WOULD -- I THINK, WITH ALL DUE

25    RESPECT, THAT WOULD RENDER THE CLAIM, I MEAN, YOU KNOW, I DON'T
```

1    WANT TO SAY INOPERABLE, BUT IT JUST -- DOING IT THE WAY THEY

2    WANT TO DO IT BASICALLY READS OUT WHAT I THINK THE

3    SPECIFICATION, THE PREFERRED EMBODIMENT DISCLOSES.

4           THE COURT:  OKAY.  THANK YOU.

5           MR. WALDEN:  GOOD AFTERNOON.

6           THE COURT:  GOOD AFTERNOON.

7           MR. WALDEN:  MY NAME IS CALVIN WALDEN.  I'M HERE FOR

8    APPLE TO TALK ABOUT THE '087 PATENT.

9         UNLESS YOU HAVE ANY QUESTIONS TO START, I'D MAYBE START BY

10   ANSWERING A COUPLE OF THE QUESTIONS THAT YOU HAD ASKED COUNSEL

11   FOR SAMSUNG.

12          THE COURT:  UM-HUM.

13          MR. WALDEN:  THE RNC, JUST IN CASE THERE'S ANY

14   CONFUSION, THE RADIO NETWORK CONTROLLER IN THEIR TUTORIAL, THEY

15   SHOWED IT AS A -- IT LOOKS LIKE A COMPUTER.  THAT'S REALLY WHAT

16   IT IS.  IT'S A COMPUTER.

17        AND A COMPUTER -- AND WE DIDN'T MEAN TO BUY AN ARGUMENT OR

18   A DISPUTE HERE BETWEEN RNC AND BASE STATION.

19          THE COURT:  UM-HUM.

20          MR. WALDEN:  BUT A CELL TOWER THAT TRANSMITS TO AND

21   FROM A UE IS ESSENTIALLY AN ANTENNA.

22        SO THEN THE QUESTION IS, WHERE'S THE COMPUTER THAT'S DOING

23   ALL THE CALCULATIONS?

24          THE COURT:  UM-HUM.

25          MR. WALDEN:  AND IN THIS TYPE OF SYSTEM, THAT'S

1    CALLED THE RNC.  SO THE RNC CAN BE SITUATED AT THE CELL TOWER,

2    OR THERE CAN BE AN RNC THAT CAN SERVICE MORE THAN ONE CELL

3    TOWER.  SO YOU CAN ESSENTIALLY HAVE A HUB AND SPOKES WHERE YOU

4    HAVE MULTIPLE CELL TOWERS AND ONE RNC THAT SERVICES THAT CELL

5    TOWER.

6        BUT IF THE PATENT DESCRIBES SENDING INFORMATION TO THE UE

7    FROM THE RNC, THE RNC DOES NOT SEPARATELY SEND THAT

8    INFORMATION.  THAT'S ALWAYS GOING TO BE SENT THROUGH THE CELL

9    TOWER, ESSENTIALLY THROUGH THE NODE B.

10   SO WHEN WE -- WHEN WE TALK ABOUT HOW THE --

11          THE COURT:  WAIT.  SO YOU'RE SAYING THE RNC NEVER

12   SEPARATELY SENDS THE TIMING INFORMATION TO THE CELL PHONE?  IT

13   ALWAYS GOES TO THE BASE STATION?

14          MR. WALDEN:  THAT'S CORRECT.  THE BASE STATION IS, IS

15   THE DEVICE, ESSENTIALLY, IN THE SYSTEM THAT COMMUNICATES WITH

16   THE UE, WITH THE CELL PHONE.

17       SO WHEN YOU HAVE A CELL PHONE, YOU'RE IN CONTACT WITH A

18   CELL TOWER, WHICH WE REFER TO AS THE BASE STATION.

19          THE COURT:  UM-HUM.

20          MR. WALDEN:  AND THAT BASE STATION MAY OR MAY NOT

21   HAVE THAT COMPUTER, THAT RNC SITTING THERE AT THAT TOWER.

22          THE COURT:  UM-HUM.

23          MR. WALDEN:  OR IS MAY -- THERE MAY BE MULTIPLE

24   TOWERS, ESSENTIALLY, THAT IS SERVICED BY ONE RNC.

25          THE COURT:  SO WHAT INFORMATION DO YOU BELIEVE THE

1    BASE STATION HAS TO SEND TO THE CELL PHONE IN ORDER TO HAVE A

2    NON-SCHEDULED TRANSMISSION?

3                MR. WALDEN:  WELL, IN -- THAT'S A GOOD QUESTION, AND

4    THERE'S TWO ANSWERS TO THE QUESTION.

5                THE COURT:  OKAY.

6                MR. WALDEN:  THE FIRST ANSWER IS IN GENERAL, WHAT

7    INFORMATION IS NEEDED TO BE SENT?

8                THE COURT:  YEAH.

9                MR. WALDEN:  BECAUSE I THINK ONE THING NEEDS TO BE

10   CLEAR.

11       FROM THE PATENT -- THE BACKGROUND OF THE PATENT IS VERY

12   CLEAR THAT BOTH SCHEDULED TRANSMISSIONS AND NON-SCHEDULED

13   TRANSMISSIONS EXISTED PRIOR TO THE PATENT.

14       SO PRIOR TO THE PATENT, IT WAS OFTEN CALLED AUTONOMOUS

15   TRANSMISSIONS, NOT NON-SCHEDULED TRANSMISSIONS.

16                THE COURT:  UM-HUM.

17                MR. WALDEN:  BUT THE TERM EXISTED AND THE CONCEPT

18   EXISTED.

19       THE IDEA OF A NON-SCHEDULED TRANSMISSION IS SIMPLY A

20   TRANSMISSION THAT'S NOT SCHEDULED, AND THAT IDEA HAD EXISTED

21   PREVIOUSLY IN SYSTEMS.

22       AND SO THE ANSWER TO THE QUESTION OF WHAT NEEDS TO BE SENT

23   TO THE UE, IN PAST SYSTEMS, SOMETIMES IT HAD BEEN NOTHING, AND

24   SIMPLY THE UE, AFTER IT HAD AN INITIAL SET UP IN COMMUNICATION

25   WITH THE BASE STATION TO LET IT KNOW, OR THE CELL TOWER TO LET

1      IT KNOW IT WAS IN PROXIMITY, THE UE COULD THEN SIMPLY SEND DATA

2      WHEN IT NEEDED TO SEND IT AND THAT WOULD BE CALLED A

3      NON-SCHEDULED OR AN AUTONOMOUS TRANSMISSION.

4          AS DESCRIBED IN THE PATENT, THOUGH, THERE CAN BE WAYS THAT

5      THE BASE STATION, OR THE NODE B, CAN CONTROL THESE

6      NON-SCHEDULED TRANSMISSIONS.  SO IN THE PRIOR ART, AND IN

7      DESCRIBING THE BACKGROUND OF THE INVENTION SECTION OF THE

8      PATENT, IT DESCRIBES THAT ADDITIONAL SIGNALLING COULD BE SENT

9      TO THE UE TO CONTROL THE DATA RATE OF THE UE.

10         SO THAT IS -- THAT HAD BEEN -- THAT HAD EXISTED IN THE

11     PRIOR ART AND IS DESCRIBED IN THE BACKGROUND OF THE INVENTION

12     SECTION.

13         AND SO OFTEN IT HAD BEEN THAT THE DATA RATE OF THE UE HAD

14     BEEN LIMITED IN NON-SCHEDULED TRANSMISSIONS, AND THE REASON --

15     AND THE WAY THEY DID THAT WOULD BE TO SEND THAT NON-SCHEDULED

16     TRANSMISSION INFORMATION AT THE BEGINNING, NOT SCHEDULING --

17             THE COURT:  THE BASE STATION SENDING IT TO THE UE?

18             MR. WALDEN:  CORRECT.

19             THE COURT:  OKAY.

20             MR. WALDEN:  CORRECT.  NOW, THAT INFORMATION MAY HAVE

21     BEEN CALCULATED AT THE RNC, BUT IT'S GOING TO BE THE BASE

22     STATION THAT SENDS IT TO THE UE.

23             THE COURT:  UM-HUM.

24             MR. WALDEN:  THE PATENT, THE REAL -- THE POINT OR THE

25     PURPOSE OF THE PATENT --

```
1              THE COURT:  SO WHAT -- SO I THOUGHT THE PATENT

2     DESCRIBES THE DATA RATE AS THE SCHEDULING ASSIGNMENT

3     INFORMATION, BUT YOU JUST CALLED IT THE SCHEDULING TRANSMISSION

4     INFORMATION.

5          SO WHAT'S THE DIFFERENCE BETWEEN THE TWO?

6              MR. WALDEN:  WELL, THE DIFFERENCE BETWEEN THE TWO IS

7     THE DIFFERENCE BETWEEN A SCHEDULED TRANSMISSION AND A

8     NON-SCHEDULED TRANSMISSION.

9              THE COURT:  OKAY.  I SHOULD SAY NON-SCHEDULED

10    TRANSMISSION INFORMATION.

11             MR. WALDEN:  RIGHT.  SO THE PATENT DESCRIBES SENDING

12    A PARTICULAR TYPE OF NON-SCHEDULED TRANSMISSION INFORMATION

13    THAT IS THESE LIMITS ON THE, ON WHEN YOU CAN SEND THAT DATA,

14    LIMITS ON THE TTI'S IN WHICH YOU CAN SEND THAT DATA.

15             THE COURT:  UM-HUM.

16             MR. WALDEN:  SO THE PATENT DESCRIBES -- AND I SHOULD

17    CALL UP FIGURE -- I'M SORRY -- COLUMN 3 OF THE PATENT AT THE

18    BOTTOM AT LINE 62.

19         IT SAYS AT THE BOTTOM THERE, "IN ADDITION TO THE NODE B

20    CONTROLLED SCHEDULING" -- I'M SORRY.  I'LL LET YOU GET THERE.

21         THE BOTTOM, AND AGAIN, WE'RE IN THE BACKGROUND OF THE

22    INVENTION SECTION OF THE PATENT.

23         IT SAYS, "IN ADDITION TO THE NODE B CONTROLLED SCHEDULING,

24    ADDITIONAL SIGNALLING IS REQUIRED TO CONTROL AN E-DCH DATA RATE

25    AVAILABLE IN THE NON-SCHEDULED TRANSMISSION."
```

1          SO PREVIOUSLY THERE'S A DESCRIPTION OF THE SENDING OF

2     SCHEDULING ASSIGNMENT INFORMATION FOR A SCHEDULED TRANSMISSION,

3     AND IN THAT SCHEDULING ASSIGNMENT INFORMATION, THERE WILL BE

4     INFORMATION ABOUT TIMING AND DATA RATE FOR SCHEDULED

5     TRANSMISSIONS.

6          THE PATENT SAYS, THOUGH, YOU NEED ADDITIONAL SIGNALLING IF

7     YOU WANT TO CONTROL THE DATA RATE FOR NON-SCHEDULED

8     TRANSMISSIONS.

9          AND AS DESCRIBED IN THE PATENT, THAT'S WHAT COMES OVER IN

10    THE NON-SCHEDULED TRANSMISSION INFORMATION TO BEGIN WITH.

11          THE COURT:  WELL, TELL ME WHERE IT SAYS THAT.

12    BECAUSE COLUMN 2, LINES 59 THROUGH 61, SAY "THE SCHEDULING

13    ASSIGNMENT INFORMATION COMPRISES INFORMATION ABOUT AN ALLOWED

14    DATA RATE AND ALLOWED TRANSMISSION TIMING" AND SO ON.

15          SO I WAS CURIOUS AS TO WHY YOUR CONSTRUCTION SAYS "WE WANT

16    TO EXCLUDE THE SCHEDULING ASSIGNMENT INFORMATION," WHICH MEANS

17    THAT YOU WANT TO EXCLUDE THE DATA RATE INFORMATION AND THE

18    TRANSMISSION TIMING INFORMATION.

19          MR. WALDEN:  I -- I -- I THINK IT -- I THINK IT CAN

20    BE CLARIFIED BY UNDERSTANDING THAT THE CONTEXT OF THE DATA RATE

21    THAT'S DESCRIBED IN COLUMN 2 IS DESCRIBED IN CONNECTION WITH

22    FIGURE 2.

23          THE COURT:  UM-HUM.

24          MR. WALDEN:  AND FIGURE 2, THE SCHEDULING ASSIGNMENT

25    INFORMATION OF FIGURE 2, WHICH IS SHOWN ON LINE 208 OF FIGURE

1   2, THIS ENTIRE FIGURE IS DESCRIBING A SCHEDULED TRANSMISSION,

2   NOT A NON-SCHEDULED TRANSMISSION.

3       SO, AGAIN, IT'S IMPORTANT, I THINK, TO KEEP IN MIND THE

4   DIFFERENCE BETWEEN A SCHEDULED TRANSMISSION AND A NON-SCHEDULED

5   TRANSMISSION.

6       FIGURE 2, WHICH IS SHOWN UP HERE ON THE SCREEN, SHOWS THE

7   STEPS THAT ARE NECESSARY FOR A SCHEDULED TRANSMISSION, AND THE

8   STEPS INCLUDE THIS INITIAL E-DCH SET UP; THERE'S THE SENDING OF

9   SCHEDULING INFORMATION FROM THE UE, THAT'S STEP 204; THE 206,

10  THERE'S A DETERMINATION OF THE SCHEDULING ASSIGNMENT.

11          THE COURT:  OKAY.  THEN SHOW ME WHERE IN THE SPEC THE

12  INFORMATION THAT YOU BELIEVE NEEDS TO BE INCLUDED FROM THE BASE

13  STATION TO THE UE, WHERE IS THAT?

14          MR. WALDEN:  WELL, IN THE SPEC, THE --

15          THE COURT:  UH-HUH.

16          MR. WALDEN:  -- DESCRIPTION OF WHAT IS INCLUDED IN

17  THE NON-SCHEDULED -- IS THAT WHAT YOU'RE ASKING, WHAT'S THE

18  INFORMATION THAT'S INCLUDED IN THE NON-SCHEDULED TRANSMISSION

19  INFORMATION?

20          THE COURT:  YES, UM-HUM.

21          MR. WALDEN:  SO THAT IS THE -- IT'S ESSENTIALLY THE

22  ENTIRE SPEC STARTING WITH THE DETAILED DESCRIPTION.

23      BUT YOU CAN SEE, STARTING AT LINE 49 ON COLUMN 6, IT TALKS

24  ABOUT A NON-SCHEDULED TRANSMISSION, STARTING AT LINE 49, CAN

25  QUICKLY TRANSMIT E-DCH DATA BY OMITTING A SERIES OF PROCESSING

1    FOR SENDING SCHEDULING INFORMATION FROM THE UE TO THE NODE B

2    AND RECEIVING SCHEDULING ASSIGNMENT INFORMATION FROM THE NODE

3    B.

4         NOW, THE REST OF THAT PARAGRAPH DESCRIBES HOW YOU NEED TO

5    KNOW THE CONTROLLED DATA RATE.

6         THE NEXT PARAGRAPH EXPLAINS, FROM THE PATENT, HOW DO YOU

7    THAT, AND WHAT THEY SAY IS THERE'S A NON-SCHEDULED TRANSMISSION

8    PERIOD DENOTED BY N, AND A NON-SCHEDULED TRANSMISSION CAN BE

9    PERFORMED DURING THE DETERMINED NUMBER OF TIMES K WITHIN A

10   NON-SCHEDULED TRANSMISSION PERIOD N.  THE PARAMETERS N AND K

11   ARE EXPRESSED IN UNITS OF TTI'S SERVING AS UNITS OF E-DCH DATA

12   TRANSMISSION.

13        SO BY CALCULATING A NUMBER FOR N AND A NUMBER FOR K AND

14   ESSENTIALLY ALLOWING -- MAKING K LESS THAN N, THERE'S A CONTROL

15   OF THE UE THAT ONLY ALLOWS THE UE TO SEND DATA DURING CERTAIN

16   TTI'S, BUT NOT OTHERS, AND ULTIMATELY BY LIMITING THE AMOUNT OF

17   DATA THAT THE UE CAN SEND, THE DATA RATE IS LIMITED FROM THE

18   UE.

19             THE COURT:  SO WHAT IS THE E-DCH DATA?  WHAT'S

20   INCLUDED IN THAT?

21             MR. WALDEN:  DATA -- IF WE CAN GO BACK TO THE

22   TUTORIAL?

23        ESSENTIALLY E-DCH DATA, I'LL SHOW YOU HERE, THERE'S A

24   DOWNLINK CHANNEL AND AN UPLINK CHANNEL BETWEEN A UE AND THE

25   NODE B BASE STATION.

1       AND THERE ARE TWO CHANNELS WHICH ARE ENHANCED CHANNELS,

2   THEY'RE CALLED E-DPDCH AND E-DPCCH, AND THOSE ARE THE TWO

3   ENHANCED DEDICATED CHANNELS FOR SENDING UPLINK DATA

4   INFORMATION.

5       THOSE CHANNELS CAN BE USED TO SEND SCHEDULED TRANSMISSIONS

6   AND THEY CAN BE USED TO SEND NON-SCHEDULED TRANSMISSIONS AS

7   WELL.

8       THE SCHEDULED TRANSMISSIONS, THE TYPE OF DATA THAT YOU SEND

9   WITH SCHEDULED TRANSMISSIONS IS USUALLY LARGE, LARGE TYPES OF

10  DATA, LIKE A VIDEO TRANSMISSION IF YOU WANTED TO SEND A VIDEO,

11  OR IF YOU'RE USING YOUR CELL PHONE, IF YOU'RE TALKING ON YOUR

12  CELL PHONE AND THERE'S A LOT OF VOICE DATA TO BE TRANSMITTED.

13      THE NON-SCHEDULED TRANSMISSIONS ARE USED USUALLY FOR

14  SMALLER TYPES OF DATA TRANSMISSIONS, SO USUALLY IT WOULD BE

15  LIKE TEXTS OR SMS MESSAGES WHERE YOU'RE NOT SENDING A LOT OF

16  DATA, BUT YOU'RE OFTEN SENDING IT AND SO, THEREFORE, YOU CAN

17  USE THIS NON-SCHEDULED TRANSMISSION TECHNIQUE THAT AVOIDS A LOT

18  OF THE HAND SHAKING THAT'S NECESSARY FOR SEVERAL TRANSMISSIONS.

19          THE COURT:  SO IN YOUR CONSTRUCTION, WHAT ARE YOU

20  EXCLUDING BY SAYING "THE TRANSMISSION WITHOUT USING SCHEDULING

21  ASSIGNMENT INFORMATION"?  WHAT ARE YOU EXCLUDING BY THAT

22  PHRASE?

23          MR. WALDEN:  ESSENTIALLY WHEN YOU LOOK AT FIGURE 2,

24  AGAIN, FIGURE 2 BEING THE FIGURE THAT SHOWS SCHEDULING, WHAT'S

25  NECESSARY FOR A SCHEDULED TRANSMISSION, WHAT WE'RE EXCLUDING IS

1    THE INFORMATION THAT COMES ACROSS ON STEP 208, THE SCHEDULING

2    ASSIGNMENT INFORMATION, THIS BEING THE TYPE OF SCHEDULING

3    INFORMATION THAT IS USED FOR A SCHEDULED TRANSMISSION.

4        ONE THING --

5            THE COURT:  OKAY.  SO THAT IS THE DATA RATE AND THE

6    TIMING INFORMATION?

7            MR. WALDEN:  FOR A SCHEDULED TRANSMISSION.

8            THE COURT:  OKAY.

9            MR. WALDEN:  THAT'S JUST -- THAT'S IMPORTANT TO KEEP

10   IN MIND, BECAUSE EVERY SINGLE TIME YOU HAVE A SCHEDULED

11   TRANSMISSION, YOU ARE GOING TO HAVE THIS -- YOU'RE GOING TO

12   HAVE THIS HAND SHAKE, EVERY SINGLE TIME.

13       AFTER E-DCH SET UP, IF YOU'RE GOING TO HAVE A SCHEDULED

14   TRANSMISSION, YOU'RE GOING TO HAVE TO SEND SCHEDULING

15   INFORMATION.  YOU'RE GOING TO HAVE TO PERFORM SCHEDULING

16   INFORMATION --

17           THE COURT:  I'M MORE CONFUSED AND I'M GETTING

18   FRUSTRATED.

19           MR. WALDEN:  I'M SORRY.

20           THE COURT:  SO WHAT IS THE INFORMATION THAT YOU

21   BELIEVE IS NECESSARY FOR YOUR NON-SCHEDULED TRANSMISSION

22   CONSTRUCTION?  ANYTHING?

23           MR. WALDEN:  IN THE CLAIMS, THE INFORMATION THAT'S

24   NECESSARY IS THE NON-SCHEDULED INFORMATION ABOUT THE K AND THE

25   N TTI'S.

1       THERE'S NO DISPUTE THAT THAT INFORMATION IS NOT SCHEDULING

2    ASSIGNMENT INFORMATION.

3           THE COURT:  OKAY.  SO THAT'S ALL THE INFORMATION YOU

4    NEED IS, WHAT, THE VALUES OF N AND K FOR THE TIME INTERVALS?

5    OR WHAT?

6           MR. WALDEN:  CORRECT.  TO BE COVERED BY THE CLAIMS,

7    THE INFORMATION THAT NEEDS TO BE TRANSMITTED IS THE

8    NON-SCHEDULED TRANSMISSION INFORMATION FOR THE N AND K TTI'S.

9           THE COURT:  OKAY.

10          MR. WALDEN:  THAT INFORMATION IS USED TO CONTROL THE

11   DATA RATE ESSENTIALLY BY LIMITING THE AMOUNT OF TIME THAT THE

12   UE CAN SEND THE INFORMATION.

13          THE COURT:  OKAY.  ALL RIGHT.  YOU DON'T NEED DATA

14   RATE INFORMATION AND YOU DON'T NEED THE TIMING INTERVAL BECAUSE

15   THIS IS NOT A SCHEDULED TRANSMISSION?

16          MR. WALDEN:  THAT'S CORRECT.

17          THE COURT:  OKAY.

18          MR. WALDEN:  THAT'S CORRECT.

19      AND SO WHAT I'LL DO IS I'LL -- THE LAST THING I'LL DO IS

20   I'LL JUST TRY TO -- WE HAVE A LITTLE BIT OF BETTER INFORMATION

21   THAN I'VE GIVEN YET FOR WHAT IS THE N AND THE K TTI'S, WHAT

22   THOSE ARE.

23      A TTI, I DON'T BELIEVE THERE'S ANY DISPUTE, IS CALLED A

24   TRANSMISSION TIME INTERVAL IN THE PATENT AND IS ESSENTIALLY THE

25   SMALLEST PERIOD OF TIME THAT THE UE CAN USE FOR TRANSMITTING

1       INFORMATION.

2           AND TTI'S ARE DESCRIBED IN THE PATENT THROUGHOUT THE PATENT

3       IN TERMS OF MILLISECONDS.

4           SO THEY TALK ABOUT TTI'S OF 10 MILLISECONDS OR TTI'S OF 2

5       MILLISECONDS, AND IN OUR TUTORIAL HERE, WE SHOW TTI'S OF 2

6       MILLISECONDS.

7           THE PATENT DESCRIBES THAT YOU CAN TAKE A SET OF THESE

8       EIGHT -- YOU CAN TAKE A SET OF TTI'S -- FOR EXAMPLE, IN THE

9       PATENT THEY DESCRIBE EIGHT AND WE USE THAT IN OUR EXAMPLE --

10      AND BY ALLOWING TRANSMISSIONS DURING SOME OF THOSE, CERTAIN OF

11      THOSE TTI'S BUT NOT OTHERS, YOU CAN LIMIT THE TIMES IN WHICH A

12      UE CAN SEND NON-SCHEDULED TRANSMISSION INFORMATION.

13          THAT INFORMATION CAN BE THEN SENT TO THE UE, AND THEN THE

14      UE CAN ESSENTIALLY REPEAT THAT INFORMATION OUT INTO THE FUTURE

15      TO UNDERSTAND WHEN IT CAN SEND NON-SCHEDULED TRANSMISSIONS AND

16      WHEN IT CANNOT SEND.

17          SO IN THIS EXAMPLE, THE SHADED TTI'S ARE THOSE TTI'S IN

18      WHICH THE UE CAN SEND THE TRANSMISSION INFORMATION, THE

19      NON-SCHEDULED TRANSMISSIONS, BUT THE WHITE TTI'S ARE THE ONES

20      WHERE IT CANNOT SEND THE NON-SCHEDULED TRANSMISSIONS.

21              THE COURT:  LET ME ASK, IN COLUMN 8, LINES 30 THROUGH

22      34 WHERE IT SAYS "THE RNC CAN GIVE NOTIFICATION OF INFORMATION

23      TO BE USED TO DETERMINE THE POSSIBLE NON-SCHEDULED TRANSMISSION

24      TIME INTERVALS," IS THAT ENVISIONING THE BASE STATION MAKING

25      THAT DETERMINATION, OR THE PHONE?

```
 1                MR. WALDEN:  THE PHONE.

 2                THE COURT:  OKAY.  SO IF THE PHONE CAN MAKE THAT

 3     DETERMINATION, THEN WOULDN'T THAT BE IN TENSION WITH YOUR

 4     CONSTRUCTION SAYING THAT IT'S THE BASE STATION THAT HAS TO MAKE

 5     THE DETERMINATION AND THEN TRANSFER IT TO THE PHONE?

 6                MR. WALDEN:  WELL, HERE'S THE ONE STATEMENT I'LL MAKE

 7     ABOUT THAT IN WHICH I'LL AGREE WITH YOU THAT PERHAPS OUR

 8     CONSTRUCTION USING THE TERM "THE BASE STATION MAKES THE

 9     DETERMINATION" IS NOT --

10                THE COURT:  UM-HUM.

11                MR. WALDEN:  -- WE CAN TALK ABOUT THAT, BECAUSE AS

12     DESCRIBED IN THE PATENT, IT'S THE RNC THAT MAKES THAT INITIAL

13     DETERMINATION, WHAT ARE THE VALUES FOR N AND K?

14          AS DESCRIBED IN THE PATENT, THIS DETERMINATION IS MADE BY

15     THE RNC AND THEN SENT TO THIS PHONE WHICH WILL THEN USE THAT

16     INFORMATION TO CALCULATE PRECISELY WHEN IT CAN SEND

17     NON-SCHEDULED TRANSMISSIONS.

18          SO WHEN WE SAY "DETERMINED AT THE BASE STATION" FOR OUR

19     CONSTRUCTION, IT MAY BE BETTER -- IT MAY BE A BETTER USE OF THE

20     LANGUAGE TO SAY IT WAS DETERMINED AT THE RNC.  IN OUR VIEW, THE

21     RNC IS PART OF THE BASE STATION, BUT WE DON'T REALLY THINK THAT

22     NEEDS TO BE A FIGHT.

23                THE COURT:  OKAY.  BUT YOU JUST SAID THE RNC DOESN'T

24     HAVE TO BE PART OF THE BASE STATION, IT CAN BE SEPARATE FROM

25     THE BASE STATION.
```

```
 1            MR. WALDEN:  WELL, THAT'S FAIR.  IN THE PATENT IT
 2     APPEARS THAT THE RNC IS USED INTERCHANGEABLY WITH THE BASE
 3     STATION.
 4            THE COURT:  WHERE?
 5            MR. WALDEN:  WELL, IN GENERAL.  LIKE, FOR EXAMPLE,
 6     HERE IN COLUMNS 7 AND 8 WHEN IT'S TALKING ABOUT THE RNC MAKES
 7     THESE DETERMINATIONS AND THEN THE RNC TRANSMITS THIS DATA TO
 8     THE CELL PHONES.
 9        THE RNC, AGAIN, IS THE COMPUTER.  SO IN OUR VIEW, THAT IS
10     ESSENTIALLY TALKING ABOUT THE BASE STATION, WHICH IS THE
11     TOWER --
12            THE COURT:  BUT YOU JUST SAID THE BASE STATION IS THE
13     CELL TOWER.  I DON'T SEE HOW THAT'S INHERENTLY THE SAME THING
14     AS A COMPUTER.
15            MR. WALDEN:  WELL, I -- I WANT TO BE -- I'LL TRY TO
16     MAKE THIS CLEAR.
17            THE COURT:  UM-HUM.
18            MR. WALDEN:  THERE IS A CELL TOWER.
19            THE COURT:  UM-HUM.
20            MR. WALDEN:  THERE'S -- WHICH IS ALSO CALLED THE NODE
21     B IN THE PATENT.
22            THE COURT:  UM-HUM.
23            MR. WALDEN:  THERE IS A TERM CALLED BASE STATION
24     WHICH IS PERHAPS LOOSELY USED, BUT A BASE STATION IS USUALLY
25     THE CELL TOWER PLUS THE COMPUTER THAT'S ASSOCIATED WITH THAT
```

1      CELL TOWER WHICH DOES THE CALCULATIONS.

2          THAT COMPUTER IS THE RNC.

3          SO IN OUR VIEW, A BASE STATION USUALLY INCLUDES AN RNC.

4          BUT SAMSUNG MAKES A POINT, SOMETIMES RNC'S, THERE CAN BE

5      ONE RNC FOR MORE THAN ONE CELL TOWER --

6              THE COURT:  UM-HUM.

7              MR. WALDEN:  -- IN WHICH CASE YOU MAY NOT WANT TO

8      CALL THE RNC THE BASE STATION.

9          SO WHEN WE SAY IN OUR PROPOSED CONSTRUCTION THAT N IS A

10     PARAMETER THAT'S DETERMINED AT THE BASE STATION --

11             THE COURT:  UM-HUM.

12             MR. WALDEN:  -- MAYBE IT'S BETTER TO SAY IT'S

13     DETERMINED AT THE RNC, BECAUSE THAT IS STRAIGHT FROM THE

14     SPECIFICATION AND THE PATENT AND, THEREFORE, IT WOULD BE MORE

15     CLEAR.

16             THE COURT:  YEAH.  BUT THIS IS STILL SAYING THE RNC

17     CAN GIVE NOTIFICATION OF INFORMATION TO BE USED TO DETERMINE

18     THE POSSIBLE NON-SCHEDULED TRANSMISSION TIME INTERVALS.

19         SO IT'S THE PHONE THAT'S GOING TO USE THE INFORMATION FROM

20     THE RNC TO MAKE THOSE TIME INTERVAL DETERMINATIONS.

21             MR. WALDEN:  WELL --

22             THE COURT:  SO --

23             MR. WALDEN:  THIS IS -- AGAIN, SO THE RNC, JUST

24     LOOKING AT THE, ON THE TUTORIAL HERE, THE RNC IS THE PORTION OF

25     THE SYSTEM THAT CALCULATES THIS INITIAL SET OF TTI'S,

1    CALCULATES THAT THERE'S GOING TO BE EIGHT TTI'S IN THIS SET,

2    FOR EXAMPLE, AND THAT THERE'S GOING TO BE THREE SHADED TTI'S IN

3    THIS POSITION.

4         THAT INFORMATION WOULD THEN BE SENT TO THE CELL PHONE.

5         THE CELL PHONE WILL THEN USE THAT INFORMATION TO CALCULATE

6    TTI'S GOING OUT INTO THE FUTURE, ESSENTIALLY BY REPEATING THAT

7    SAME SET OF EIGHT TTI'S THAT IT RECEIVED FROM THE BASE STATION.

8         SO WHEN THE PATENT TALKS ABOUT THERE BEING A CALCULATION

9    BOTH AT THE RNC AND AT THE CELL PHONE, THEY ARE BOTH DOING

10   CALCULATIONS.  THE RNC IS DOING THE INITIAL CALCULATION OF THE

11   TTI SET, BUT THE CELL PHONE THEN TAKES THAT INFORMATION AND

12   CALCULATES OUT INTO THE FUTURE WHEN IT CAN PRECISELY SEND

13   INFORMATION.

14        THE COURT:  OKAY.  THANK YOU.

15   LET'S GO TO '757, PLEASE.

16        MR. JOHNSON:  YOUR HONOR, I'M HAPPY TO ADDRESS '757.

17   CAN I JUST SAY TWO QUICK THINGS?

18        THE COURT:  YES, GO AHEAD, PLEASE.

19        MR. JOHNSON:  YOUR HONOR, JUST TO GO BACK FOR A

20   SECOND.  CLAIM 1 -- THE CLAIMS DON'T TALK ABOUT THE BASE

21   STATION.  IMPORTING A LIMITATION THAT TALKS ABOUT THE BASE

22   STATION MAKES IT MORE CONFUSING AND READS IN A NEGATIVE

23   LIMITATION AND THERE'S NO CLEAR WAIVER OR DISCLAIMER HERE.

24        BUT PERHAPS ONE OF THE BIGGEST ISSUES IS THAT, YOU KNOW, BY

25   USING THIS LANGUAGE WITHOUT -- APPLE'S LANGUAGE WITHOUT USING

1        THE SCHEDULING INFORMATION, YOU'RE EXCLUDING THE PREFERRED

2    EMBODIMENT.

3        AND IF WE LOOK BACK AT COLUMN 8, YOUR HONOR, JUST ABOVE

4    WHERE YOU WERE REFERRING TO, THIS LANGUAGE HERE, STARTING AT

5    LINE 26, SAYS "THE RNC SENDS NON-SCHEDULED TRANSMISSION

6    PARAMETERS INDICATING THE DETERMINED N AND K VALUES AND THE

7    POSSIBLE NON-SCHEDULED TIME INTERVALS SET ON THE BASIS OF THE N

8    AND K VALUES TO THE NODE B AND THE UE'S."

9        IT SAYS THAT IT CAN SEND IT EITHER TO THE NODE B OR TO THE

10   UE'S.

11       IF YOU GO AND READ THE NEXT SENTENCE, WHICH YOUR HONOR

12   REFERRED TO, IT'S BASICALLY SAYING AND IT REFERS TO GIVING

13   DIRECT -- DIRECTLY GIVE NOTIFICATION.

14       IT'S REFERRING TO THE FACT THAT YOU CAN -- THE RNC CAN

15   EITHER GO TO THE BASE STATION OR IT CAN ALSO GO DIRECTLY TO THE

16   UE, AND THE LANGUAGE IN THE CLAIM IS NOT SO LIMITED.

17       AND IF WE LOOK BACK UPON THE PREFERRED EMBODIMENT, YOUR

18   HONOR, JUST FOR PURPOSES OF NEXT WEEK, I'LL GIVE YOU JUST A

19   COUPLE OF COLUMN AND LINE NUMBERS TO LOOK AT.

20       COLUMN 2, LINES 54 THROUGH 62, THROUGH 62 REFERS TO THE

21   FACT THAT SCHEDULING ASSIGNMENT INFORMATION COMPRISES

22   INFORMATION ABOUT AN ALLOWED DATA RATE.

23       BUT THEN WHEN YOU LOOK AT COLUMN 6, LINES 39 TO 48, IT

24   SAYS, "ACCORDING TO THE NODE B CONTROLLED SCHEDULING,

25   NON-SCHEDULED TRANSMISSION IS POSSIBLE AT A DATA RATE WITHIN A

1    PREDETERMINED LIMIT."

2        DATA RATE IS NOT SPECIFIED IN THE CLAIMS AND THE SPEC

3    SPECIFICALLY SAYS THAT THE NON-SCHEDULED TRANSMISSION USES AN

4    ALLOWED DATA RATE FROM THE SAI, AND THAT MAKES SENSE,

5    PARTICULARLY WHEN -- I'LL GIVE YOU TWO OTHER COLUMN CITES.

6        COLUMN 5, LINE 15, ULTIMATELY THROUGH 47.  THERE THE

7    SPECIFICATION STATES THAT THE UE, THE PHONE BASICALLY, CAN

8    RECEIVE BOTH THE SCHEDULING ASSIGNMENT INFORMATION AND THE

9    NON-SCHEDULED TRANSMISSION INFORMATION.  IT REFERS TO RECEIVING

10   BOTH.

11       AND SO BY IMPORTING THE NEGATIVE LIMITATION THAT APPLE

12   WANTS, IT'S GOING TO READ OUT THIS PORTION OF THE SPEC WHICH

13   BASICALLY SAYS THAT YOU CAN HAVE BOTH, AND THAT MAKES PERFECT

14   SENSE AND THAT'S THE WAY THE SYSTEM ULTIMATELY WORKS.

15            THE COURT:  OKAY.

16            MR. JOHNSON:  OKAY.  THANKS.

17       THE '757 PATENT, YOUR HONOR.

18       SO THIS PATENT IS TITLED "MULTIMEDIA SYNCHRONIZATION METHOD

19   AND DEVICE," AND THE PRIORITY DATE HERE IS JUNE OF 2001.  IT

20   BASICALLY DEALS WITH ALLOWING A USER TO SYNCHRONIZE AND ACCESS

21   MULTIMEDIA CONTENT ON MULTIPLE DEVICES.

22       WE TALKED EARLIER ABOUT AN APPLE PATENT THAT TALKS A LITTLE

23   BIT ABOUT SYNCHRONIZATION THIS MORNING, OR EARLIER, NOT THIS

24   MORNING.

25       THIS PATENT IS SIX YEARS EARLIER THAN APPLE'S PATENT, AND

1    IT BASICALLY ALLOWS, IF YOU LOOK AT FIGURE 1, A USER TO ACCESS

2    THEIR MULTIMEDIA LIBRARY FROM MULTIPLE DEVICES BY SYNCHRONIZING

3    AT LEAST A PORTION OF THE MULTIMEDIA LIBRARY BETWEEN CENTRAL

4    AND REMOTE DEVICES.

5        SO IF WE LOOK AT FIGURE 1, WE SEE 102 IS THE NETWORK AND

6    THE MASTER DIGITAL MULTIMEDIA DEVICE IS 112.  IT ALSO REFERS TO

7    HAVING PORTABLE MULTIMEDIA PLAYER 108 AND DIGITAL MULTIMEDIA

8    DEVICE 104.

9        IF WE DO A LEVEL OF ABSTRACTION, WHAT WE'RE TALKING ABOUT

10   ARE, YOU KNOW, BASICALLY A SERVER DOWN ON THE LEFT-HAND SIDE,

11   MAYBE A LAPTOP ON THE RIGHT-HAND SIDE, BOTTOM RIGHT, A PHONE,

12   AND A TABLET COMPUTER.

13       AND HERE WE SEE DIFFERENT CONTENT ON THE DIFFERENT DEVICES,

14   A VIDEO UP ON THE TABLET COMPUTER, MUSIC DOWN ON THE LAPTOP,

15   AND PHOTOS OVER ON THE, OVER ON THE PHONE.

16       ULTIMATELY THE IDEA IS TO BE ABLE TO SYNCHRONIZE THIS

17   CONTENT ACROSS ALL OF THE DEVICES.

18       AND THE PROBLEM THAT WAS ADDRESSED BY THE '757 THAT'S

19   DESCRIBED IN COLUMN 2, IT SAYS "THE PRIOR ART DOES NOT TEACH

20   USER SPECIFIC INFORMATION, INCLUDING SUBSTANTIALLY IDENTICAL

21   AUDIO, VIDEO, AND PHOTOGRAPHIC INFORMATION AT EACH ZONE."

22   WE'LL TALK ABOUT ZONE A LITTLE BIT TODAY, BUT MORE NEXT WEEK

23   AND WHAT THAT MEANS.

24       THE SOLUTION REALLY WAS TO TEACH A SYSTEM TO SYNCHRONIZE

25   ALL THIS CONTENT ACROSS THESE DEVICES, AND WHAT WE SEE HERE IS

```
1    BASICALLY THE PHOTOS GOING TO THE DEVICES THAT DON'T HAVE

2    PHOTOS, AND THE VIDEOS GOING TO THE DEVICES THAT DON'T HAVE

3    VIDEOS, AND THE MUSIC GOING TO THE DEVICES THAT DON'T HAVE

4    MUSIC SO THAT ULTIMATELY YOU HAVE THE CONTENT ACROSS ALL OF

5    THESE DEVICES AND THEY'RE SYNCHRONIZED.

6         THE COURT:  CAN I POINT YOU TO TWO PARTS OF THE

7    SPECIFICATION?  COLUMN 8, LINES 17 THROUGH 31 TALKS ABOUT ZONE

8    SPECIFIC STORAGE AND INTERFACE DEVICES, BUT MAKES IT CLEAR THAT

9    AN MP3 PLAYER IS ANOTHER DEVICE, WHICH IS NOT ONE OF THOSE ZONE

10   SPECIFIC STORAGE INTERFACE DEVICES, AND THE CAR IS NOT ONE OF

11   THOSE ZONE DEVICES, OR EVEN A, IT LOOKS LIKE A PERSONAL

12   COMPUTER.

13        MR. JOHNSON:  I'M SORRY.  YOU SAID LINE 17 -- COLUMN

14   8, LINE --

15        THE COURT:  YEAH.  "A LOCAL AREA NETWORK COUPLES

16   CENTRAL STORAGE AND INTERFACE DEVICE TO ZONE SPECIFIC STORAGE

17   AND INTERFACE DEVICE, EACH OF WHICH RESIDES IN A SPECIFIC

18   ZONE."

19        MR. JOHNSON:  IT SAYS EACH OF WHICH RESIDES IN A

20   SPECIFIC ZONE.

21        THE COURT:  UM-HUM.

22        MR. JOHNSON:  AND --

23        THE COURT:  BUT THEN IT MAKES IT SEEM LIKE THE MP3

24   PLAYER IS NOT ONE OF THOSE DEVICES AND THAT AN AUTOMOBILE IS

25   NOT ONE OF THOSE DEVICES.
```

```
1              MR. JOHNSON:  AND THAT'S -- I DON'T SEE THAT SAME

2     CONNECTION.  A PERSONAL COMPUTER IS COUPLED TO OTHER DEVICES

3     SUCH AS AN INTELLIGENT MP3.  I THINK IT'S IDENTIFYING THE

4     PARTICULAR DEVICES.

5              THE COURT:  SO YOU'RE SAYING THAT IS SAYING -- IT IS

6     SAYING AN MP3 PLAYER IS A ZONE SPECIFIC STORAGE INTERFACE

7     DEVICE?

8              MR. JOHNSON:  YES.  AND IF YOU LOOK --

9              THE COURT:  AND THAT AUTOMOBILE IS A ZONE SPECIFIC

10    STORAGE DEVICE?

11             MR. JOHNSON:  IT TALKS ABOUT -- IF YOU GO BACK TO

12    FIGURE 1, FIGURE 1 TALKS ABOUT THE PORTABLE MEDIA, PORTABLE

13    MULTIMEDIA PLAYER.

14        AND, IN FACT, THE SPEC TALKS ABOUT MOBILE MULTIMEDIA

15    PLAYERS OR PORTABLE MULTIMEDIA PLAYERS, AND AS WE MOVE -- JUST

16    TO FAST FORWARD -- THERE'S A PORTION OF THE SPEC THAT TALKS

17    ABOUT, IN COLUMN 4, LINES 32 TO 35 --

18             THE COURT:  BUT HOW DO YOU DEAL WITH ALL THE LANGUAGE

19    THAT SAYS IT HAS TO BE IN A ROOM?

20             MR. JOHNSON:  WELL, I MEAN, THE ISSUE IS -- WHAT

21    APPLE WOULD LIKE IT TO BE IS THAT IT'S A DEVICE THAT'S FIXED IN

22    A ROOM OR HAS SOME SPECIFIC BOUNDARIES ON IT.

23        AND WHEN YOU LOOK AT HOW DEVICES OPERATE, IT -- FIRST OF

24    ALL, I MEAN, PHONES DON'T NEED TO BE IN A PARTICULAR ROOM.

25    MOBILE DEVICES DON'T NEED TO BE IN A PARTICULAR ROOM.
```

1      THE SPEC TALKS ABOUT A CAR, A DEVICE BEING IN A CAR.  IT

2  TALKS ABOUT EVEN A DEVICE BEING ON A YACHT, WHICH SOUNDS PRETTY

3  GOOD TO ME.  BUT ULTIMATELY THESE ARE DEVICES WHERE THERE ARE

4  BASICALLY LISTENING ZONES.

5      AND IF YOU LOOK AT COLUMN 4, LINES 32 TO 35, IT SAYS, "AT

6  LEAST ONE USER CAN BE SITUATED AT ANY ONE OF THE ZONES AND

7  ACCESS SUBSTANTIALLY IDENTICAL AUDIO, VIDEO, AND PHOTOGRAPHIC

8  INFORMATION RELATED TO THE AT LEAST ONE USER."

9      THAT'S SAYING I CAN SIT AT A LAPTOP AND I CAN LISTEN TO ONE

10  BEATLES SONG, I CAN BE IN FRONT OF A TABLET WHICH IS SOMEWHERE

11  ELSE LOCATED AND LISTEN TO A DIFFERENT BEATLES SONG AND LISTEN

12  TO SOME U2 SONG.

13      IT'S NOT FIXED TO A PARTICULAR ROOM.  THAT'S THE WHOLE

14  IDEA BEHIND THE -- THE SPECIFICATION TALKS ABOUT THESE DEVICES

15  BEING MOBILE AND PORTABLE.

16      AND WHEN YOU LOOK AT THE REST OF THE LANGUAGE, IT GOES ON

17  TO SAY, AGAIN, THESE MAY INCLUDE DEVICES SUCH AS PERSONAL

18  COMPUTERS LOCATED IN OTHER ROOMS OR OTHER LOCATIONS, SOME ARE

19  HOMES, CARS, YACHTS OR AN ON-LINE SERVER, WEBSITE DATABASE.

20      SO THE IDEA IS ULTIMATELY THESE HAVE -- THESE HAVE

21  LISTENING ZONES TO THEM, IF YOU WILL, THAT ARE NOT FIXED IN A

22  PARTICULAR ROOM OR SIMPLY BOUNDED BY A LOCATION.

23      THE SPEC GOES ON AND TALKS ABOUT PORTABLE AND MOBILE

24  DEVICES, AND THERE IS, IF ANYTHING -- AND I THINK WE'LL GO

25  THROUGH IN MORE DETAIL NEXT WEEK -- THERE'S NO CLEAR OR

1    UNMISTAKABLE DISCLAIMER OF MOBILE AND PORTABLE DEVICES HERE OR

2    THAT IT'S SIMPLY GOT TO BE FIXED IN A ROOM.  THAT LANGUAGE JUST

3    DOESN'T APPEAR IN THE CLAIMS.

4            THE COURT:  IT DOES SAY IN A ROOM, BUT YOU'RE SAYING

5    IT'S JUST NOT FIXED?

6            MR. JOHNSON:  RIGHT.  I'M SAYING THAT THE ADDITIONAL

7    LIMITATION, THAT IT REQUIRES THAT IT BE FIXED IN A ROOM OR IN A

8    BOUNDED LOCATION, THAT LANGUAGE DOESN'T APPEAR.

9            THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

10           MR. SELWYN:  GOOD AFTERNOON, YOUR HONOR.  MARK SELWYN

11   FOR APPLE.

12      YOUR HONOR, TO BE CANDID, THIS IS A CONFUSING PATENT AND

13   THERE ARE THREE REASONS WHY IT IS CONFUSING.

14      FIRST, IT'S BECAUSE ALTHOUGH THE TITLE OF THIS PATENT IS

15   METHOD AND DEVICE, IN FACT, THERE AREN'T ANY METHOD CLAIMS IN

16   THE PATENT.

17      WHY IS THAT?  BECAUSE WHEN THE APPLICATION WAS INITIALLY

18   APPLIED FOR, THERE WERE METHOD CLAIMS AND THERE WERE SYSTEM

19   CLAIMS.  MUCH OF THIS SPECIFICATION RELATES TO THESE METHOD

20   CLAIMS THAT WERE NEVER ISSUED.

21      SO WHEN WE TRY TO RELATE SOME OF THE THINGS THAT

22   MR. JOHNSON JUST DESCRIBED TO THE CLAIMS, THERE'S A DISCONNECT

23   BECAUSE PORTIONS OF THE SPECIFICATION ARE RELATED TO METHODS

24   THAT NEVER ISSUED AS CLAIMS.

25           THE SECOND REASON IT'S CONFUSING IS BECAUSE ZONE SPECIFIC

1    STORAGE AND INTERFACE DEVICE, THAT'S NOT A TERM OF ART.

2    NEITHER APPLE NOR SAMSUNG HAS SUGGESTED TO YOU THAT THIS IS A

3    TERM OF ART.  WE HAVEN'T GIVEN YOU DICTIONARY DEFINITIONS FOR

4    THIS TERM.  WE HAVEN'T GIVEN YOU PERIODICALS EXPLAINING WHAT

5    THIS TERM IS, NOTHING.

6         AND WHAT THAT MEANS IS WE HAVE TO LOOK TO THE INTRINSIC

7    EVIDENCE FOR CLUES TO PIECE THIS TOGETHER, WHAT THIS MEANS.

8         AND THE THIRD REASON THIS IS A VERY CONFUSING PATENT IS

9    THIS:  THESE ARE ALL THE DIFFERENT TERMS THAT THIS PATENT USES

10   FOR VARIOUS TYPES OF DEVICES, IT'S A VERY LENGTHY LIST, AND WE

11   HAVE TO FIGURE OUT HOW ALL OF THESE DIFFERENT DEVICES RELATE IN

12   THE CLAIMED SYSTEM.

13        AND, TO BE CANDID, IT'S NOT TERRIBLY CLEAR AND WE HAVE TO

14   FIGURE IT OUT FROM VARIOUS CLUES, AND I THINK YOUR HONOR WAS ON

15   TO WHAT SOME OF THOSE CLUES ARE.

16        IF WE START WITH FIGURE 7 OF THE PATENT, THIS IS THE,

17   PROBABLY THE BEST FIGURE IN THE PATENT DESCRIBING WHAT THE

18   SYSTEM IS AND WHAT IT DOES.

19        AND IT ILLUSTRATES HOW THE VARIOUS TYPES OF DEVICES

20   INTERACT WITH ONE ANOTHER.  IT TEACHES CONNECTING THE CENTRAL

21   STORAGE AND INTERFACE DEVICES TO VARIOUS OTHER TYPES OF DEVICES

22   OVER TWO DIFFERENT TYPES OF NETWORKS, THE LOCAL AREA NETWORK

23   AND A WIDE AREA NETWORK.

24        IT TELLS US THAT 702 AND 722 ARE CENTRAL STORAGE AND

25   INTERFACE DEVICES, AND IT IDENTIFIES 704 AND 724 AS LAN'S AND

1      718 AS THE WIDE AREA NETWORK.

2          THEN IT TELLS US SOMETHING ABOUT THE ZONE SPECIFIC STORAGE

3      AND INTERFACE DEVICES.  706, 708, 710, 726 ARE LABELED AS ZONE

4      SPECIFIC STORAGE AND INTERFACE DEVICES, AND THE PATENT TELLS US

5      THOSE ARE WHAT SYNCHRONIZES WITH THE CENTRAL STORAGE AND

6      INTERFACE DEVICE.

7          THE SPECIFICATION GIVES US ANOTHER CLUE TO HELP INTERPRET

8      THIS TERM.  IT GIVES US WHAT IT DESCRIBES AS A PRACTICAL

9      EXAMPLE OF A ZONE SPECIFIC STORAGE AND INTERFACE DEVICE.  IT'S

10     THE AUDIO REQUEST MULTIZONE.  THIS IS THE COMMERCIAL EMBODIMENT

11     THAT THE ORIGINAL OWNERS OF THE PATENT WERE SELLING.  THAT'S ON

12     TOP.

13         THE CENTRAL STORAGE DEVICE, THE AUDIO REQUEST PRO, IS ON

14     THE BOTTOM.

15         THOSE CLEARLY LOOK LIKE SOMETHING THAT WOULD BE FIXED TO A

16     PARTICULAR ZONE, AS OPPOSED TO SOME OF THE OTHER DEVICES THAT

17     ARE DESCRIBED IN THE SYSTEM, SUCH AS THE INTELLIGENT MP3 PLAYER

18     AND AN AUTOMOBILE THAT HAS AUDIO REQUEST CAPABILITIES.

19         NOW, I DO WANT TO FOCUS ALSO ON THE LANGUAGE IN THE PATENT

20     THAT DESCRIBES THE INTELLIGENT MP3 PLAYER, BECAUSE YOUR HONOR

21     WILL SEARCH IN VAIN FOR ANY INDICATION THAT THAT GETS

22     SYNCHRONIZED OR HOW THAT GETS SYNCHRONIZED.

23         IF YOU LOOK AT THE LANGUAGE IN THE SPECIFICATION, WHAT IT

24     ACTUALLY SAYS ABOUT THAT IS THAT IT'S COUPLED, AND SAMSUNG'S

25     REPLY MARKMAN BRIEF MAKES VERY CLEAR THAT "COUPLED" IS NOT THE

1    SAME THING AS "SYNCHRONIZED."

2        SO WE ARE LEFT TO WONDER EXACTLY HOW THAT INTELLIGENT MP3

3    PLAYER WORKS WITH THE REST OF THE SYSTEM.  ALL WE KNOW, BECAUSE

4    IT'S ALL THAT'S DESCRIBED, IS THE ZONE SPECIFIC STORAGE AND

5    INTERFACE DEVICE SYNCHRONIZES WITH THE CENTRAL STORAGE AND

6    INTERFACE DEVICE.

7        NONE OF THESE PORTABLE DEVICES, THE INTELLIGENT MP3 PLAYER,

8    THE AUTOMOBILE, ARE EVER DESCRIBED AS ZONE SPECIFIC STORAGE AND

9    INTERFACE DEVICES.

10        AND WE WOULD SUGGEST THAT THE BEST WAY TO MAKE SENSE OF

11    THIS -- AND IT'S NOT EASY BECAUSE THIS IS NOT A VERY CLEAR

12    PATENT -- IS THAT DEVICES THAT ARE -- THERE'S A DIFFERENCE

13    BETWEEN DEVICES THAT ARE FIXED IN A SINGLE ZONE ON THE ONE HAND

14    AND DEVICES THAT CAN MOVE ACROSS MULTIPLE ZONES, AND THE PATENT

15    CONSISTENTLY CALLS DEVICES THAT CAN MOVE ACROSS ZONES MOBILE

16    DEVICES, WIRELESS DEVICES, WHEREAS DEVICES THAT ARE FIXED IN A

17    SINGLE ZONE ARE DESCRIBED AS THE ZONE SPECIFIC STORAGE AND

18    INTERFACE DEVICES.

19        THAT MAKES CONTEXT -- THAT MAKES SENSE IN THE CONTEXT OF

20    WHAT "ZONE SPECIFIC" MEANS.

21        AND IF WE LOOK FOR OTHER CLUES, WE SEE THAT THE PATENT

22    DESCRIBES ZONE SPECIFIC STORAGE DEVICE -- INTERFACE DEVICES

23    RESIDING, COEXISTING.  THESE ARE TERMS THAT HAVE CONNOTATIONS

24    OF BEING FIXED TO A PARTICULAR ZONE.

25        AGAIN, NOT A LOT OF CLUES IN THIS PATENT, BUT EVERYBODY

```
1       AGREES THAT THESE ARE NOT TERMS THAT ARE TERMS OF ART.

2       EVERYBODY AGREES WE HAVE TO LOOK TO THE INTRINSIC EVIDENCE TO

3       FIGURE IT OUT, AND THE INTRINSIC EVIDENCE CLEARLY SUPPORTS THAT

4       DESCRIPTION AS OPPOSED TO ONE THAT WOULD ALLOW THESE DEVICES TO

5       MOVE ANY WHICH WAY AND BE DEFINED BY, BE DEFINED BY THE

6       LOCATION OF THE MUSIC.

7           SAMSUNG'S CONSTRUCTION ESSENTIALLY WOULD READ "ZONE

8       SPECIFIC" OUT ENTIRELY OF THE CLAIM LANGUAGE.

9               THE COURT:  IS THERE ANOTHER VERB THAT WOULD BE

10      ACCEPTABLE THAT'S NOT AS RIGID AS "FIXED" OR "BOUNDED"?

11      BECAUSE I DO THINK THAT "FIXED" AND "BOUNDED" ARE TOO STRONG

12      FOR WHAT'S ENVISIONED IN THE PATENT.

13              MR. SELWYN:  YOUR HONOR, WE CAN THINK --

14              THE COURT:  MAYBE "RESIDES" SINCE THAT WAS LANGUAGE

15      THAT'S IN THE PATENT.

16              MR. SELWYN:  WE CAN THINK ABOUT "RESIDES" AND PERHAPS

17      I CAN REPORT NEXT WEEK ON THAT.  I THINK "RESIDED" IS

18      CONSISTENT WITH WHAT IS DESCRIBED AS "A ZONE SPECIFIC STORAGE

19      AND INTERFACE DEVICE."  WE WOULD SAY "RESIDED" HAS THAT

20      CONNOTATION OF BEING FIXED.

21          SO I DON'T WANT TO GET INTO AN ISSUE.

22              THE COURT:  "REMAINS"?

23              MR. SELWYN:  SORRY?

24              THE COURT:  "REMAINS"?

25              MR. SELWYN:  I THINK THAT'S A LOT CLOSER TO --
```

```
1            THE COURT:  I THINK "FIXED" AND "BOUNDED" IS TOO

2    RESTRICTIVE.

3            MR. SELWYN:  WELL, I WOULD SAY THIS.

4            THE COURT:  UM-HUM.

5            MR. SELWYN:  UNDER OUR UNDERSTANDING OF THE PATENT,

6    THE "ZONE SPECIFIC STORAGE AND INTERFACE DEVICE" IS SOMETHING

7    THAT REMAINS, THAT RESIDES, THAT IS FIXED TO THE ZONE.  IT'S

8    NOT SOMETHING THAT CAN BE MOVING ACROSS MULTIPLE ZONES.

9         SO PERHAPS SOME OF THE LANGUAGE THAT YOUR HONOR WAS

10   PROPOSING GETS TO THE SAME IMPORT THAT WE'RE SUGGESTING THIS

11   TERM CONVEYS.

12           THE COURT:  WHAT DO YOU MAKE OF COLUMN 10, LINES 4

13   AND 5?

14        (PAUSE IN PROCEEDINGS.)

15           MR. SELWYN:  THAT IS CONSISTENT WITH THE WAY WE ARE

16   CONSTRUING THE TERM.

17        UNDER OUR UNDERSTANDING OF THE PATENT, YOU CAN HAVE -- A

18   ZONE CAN HAVE MORE THAN ONE ZONE SPECIFIC STORAGE AND INTERFACE

19   DEVICE.  A HOUSE CAN HAVE MULTIPLE ZONES WITHIN IT.

20        YOU CAN HAVE A CENTRAL STORAGE DEVICE THAT IS SYNCHRONIZED

21   TO A ZONE SPECIFIC STORAGE DEVICE LOCATED IN MULTIPLE DIFFERENT

22   ZONES WITHIN A HOUSE.

23           THE COURT:  OKAY.

24           MR. SELWYN:  IN THIS TEXT, IT'S SUGGESTING A CENTRAL

25   STORAGE DEVICE THAT IS SYNCHRONIZED TO THE ZONE SPECIFIC.  ZONE
```

```
 1      SPECIFIC CAN BE IN MULTIPLE LOCATIONS OR ZONES.

 2            THE COURT:  WELL, WHAT ABOUT THE MULTIPLE LOCATIONS

 3      TRAVELLING THROUGH A WIDE AREA NETWORK, SUCH AS THE INTERNET?

 4            MR. SELWYN:  WELL, YOU COULD HAVE AN OUTPUT DEVICE

 5      WHICH IS DISTINCT IN THIS PATENT FROM A ZONE SPECIFIC STORAGE

 6      AND INTERFACE DEVICE THAT IS MOVING THROUGH MULTIPLE ZONES.

 7            THE COURT:  UM-HUM.

 8            MR. SELWYN:  THE INTELLIGENT MP3 PLAYER CAN BE

 9      SOMETHING THAT MOVES THROUGH MULTIPLE ZONES.

10            THE COURT:  OKAY.  THANK YOU.

11            MR. SELWYN:  THANK YOU, YOUR HONOR.

12            THE COURT:  OKAY.  LET'S GO TO THE '239, THE LAST

13      PATENT, PLEASE.

14            MR. JOHNSON:  YOUR HONOR, JUST SINCE YOU WERE IN

15      COLUMN 10, I WOULD SAY, IF WE READ A LITTLE BIT FURTHER DOWN IN

16      COLUMN 10, IF WE KEEP GOING WHERE IT TALKS ABOUT THE INSTANT

17      INVENTION AND THEN IT GOES ON TO FURTHER TALK ABOUT "IN A

18      PLAYBACK OR PLAYER FEATURE INTERFACED WITH A MOBILE OR FIXED

19      RADIO RECEIVER."

20       SO I THINK THE SPEC TALKS ABOUT IT BEING EITHER MOBILE OR

21      FIXED.  THE CLAIM LANGUAGE DOESN'T HAVE THOSE RESTRICTIONS IN

22      IT.

23       AND SO THAT'S WHY, WHEN YOU SAY YOU WANT TO LIMIT IT TO ONE

24      AS BEING FIXED, IT'S GOING TO READ OUT A PORTION OF THE SPEC

25      WHICH TALKS ABOUT IT BEING MOBILE.
```

```
1          AND THAT'S WHY THE REFERENCES TO THE CAR AND THE YACHT EVEN

2     REFER TO ARQ REQUESTS, THAT THERE ARE DATA THAT'S BEING

3     TRANSFERRED, SYNCHRONIZATION DATA, AND THOSE DEVICES ARE

4     MOVING.

5          SO WITH, THAT I'LL MOVE TO THE '239.

6              THE COURT:  OKAY.

7              MR. JOHNSON:  ALL RIGHT.  THIS PATENT WAS FILED IN

8     1994 AND IS TITLED "REMOTE VIDEO TRANSMISSION SYSTEM."

9          THE PROBLEM THAT IT ADDRESSED, FRANKLY, WAS BASICALLY

10    TRYING TO FIGURE OUT -- AND THIS IS WHERE WE HAVE TO CAST

11    OURSELVES BACK TO 1994 -- THAT AT THE TIME IT WAS VERY

12    DIFFICULT TO TRANSMIT VIDEO AND AUDIO FROM REMOTE LOCATIONS TO

13    ANOTHER LOCATION, AND THAT WAS DONE, AND WHAT THE PATENT

14    SPECIFICATION TALKS ABOUT IS THE USE OF BASICALLY SATELLITE

15    TRANSMISSION.  YOU KNOW, YOU HAVE SATELLITE TRUCKS, NEWS

16    TRUCKS -- THERE WERE A FEW OF THOSE HERE IN AUGUST OF LAST

17    YEAR -- TRANSMITTING INFORMATION UP TO A SATELLITE AND THEN

18    BEAMING IT DOWN TO SOME OTHER LOCATION.  THERE'S A LOT OF

19    EQUIPMENT INVOLVED THERE.  THERE'S A LOT OF EXPENSE INVOLVED

20    THERE.

21         WHAT THE INVENTORS CAME UP WITH WAS A NOVEL APPROACH TO

22    BASICALLY TRANSMIT VIDEO AND AUDIO FROM A REMOTE LOCATION BY

23    CAPTURING, DIGITIZING, AND COMPRESSING THE VIDEO AND AUDIO

24    INFORMATION AND THEN TRANSMITTING IT OVER DIFFERENT TYPES OF

25    MEDIA.
```

1      AND THIS REALLY REDUCED THE COSTS AND REDUCED THE AMOUNT OF

2      EQUIPMENT THAT'S INVOLVED.

3      AND THE SPECIFICATIONS AND THE PATENT TALK ABOUT, AS I

4      MENTIONED, THESE -- THE PRIOR SYSTEMS OUT THERE BEING MICROWAVE

5      OR SATELLITE TRANSMISSION POSTS, AND EVEN TALKS -- GOES ON AND

6      TALKS ABOUT -- THIS IS COLUMN 1, LINES 58 TO 65 -- THAT

7      BROADCASTERS WOULD CAPTURE VIDEO SEGMENTS ON TAPE AND THEN

8      MANUALLY TRANSPORT THAT TAPE BACK TO THE STATION AS QUICKLY AS

9      POSSIBLE.

10     THE SOLUTION, AS I MENTIONED -- AND IT WAS CLEARLY LAID OUT

11     IN THE ABSTRACT, IN THE SUMMARY OF THE INVENTION -- IS TO

12     DEVELOP A SYSTEM THAT DIGITIZES AND COMPRESSES THE AUDIO/VISUAL

13     SIGNAL AND THEN TRANSMITS THAT SIGNAL OVER LOW BANDWIDTH LINES,

14     SUCH AS LAND TELEPHONE LINES OR CELLULAR LINES OR RADIO

15     FREQUENCIES, AND THEN DECOMPRESSING THE DIGITAL DATA AND

16     CONVERTING IT TO A SIGNAL THAT CAN BE USED FOR BROADCAST.

17     SO IF WE THINK OF IT IN THE MOST SORT OF COMMON SENSE,

18     SOMEBODY IS OUT WITH A DEVICE AND THEY WANT TO RECORD A SCENE

19     THAT THEY HAPPEN TO COME ABOUT, A KID'S SOCCER GAME.  YOU CAN

20     PRESS THE DEVICE TO RECORD, AND THEN THE DEVICE THEN

21     TRANSMITS -- ULTIMATELY CAPTURES THE INFORMATION, IT DIGITIZES

22     IT, AND SENDS IT.

23     NOW, ONE OF THE PROBLEMS IS THAT BECAUSE YOU'RE

24     TRANSMITTING VIDEO OR OTHER TYPES OF INFORMATION, YOU'RE GOING

25     TO RUN INTO THE FACT THAT LARGE FILES CAN CREATE BANDWIDTH

1    ISSUES, AND THAT'S WHY HERE WE SEE SOMEBODY SITTING AT A

2    DESKTOP WAITING FOR THE VIDEO BASICALLY TO DOWNLOAD, AND LOTS

3    OF TIMES WE RUN INTO THE.  WHEN YOU'RE LOOKING AT A VIDEO, YOU

4    SEE THE LITTLE TIME WHEEL PASSING ALONG AND YOU ALSO SEE THE

5    FACT THAT THERE IS -- THAT YOU REQUIRE SOME BUFFERING FOR THE

6    TRANSMISSION BASICALLY TO CATCH UP.

7        SO THE INVENTORS CAME UP WITH THIS IDEA OF USING A VIDEO

8    CAPTURE MODULE TO CAPTURE THE VIDEO AND AUDIO, DIGITIZE IT TO

9    1'S AND 0'S, AND THEN COMPRESS IT IN A WAY TO BASICALLY MAKE

10   THE FILE USE LESS BANDWIDTH.

11       AND ONCE IT'S COMPRESSED, THE HOST UNIT, IN THIS INSTANCE

12   SOMEBODY SITTING AND WATCHING THE VIDEO ON A LAPTOP, WAS

13   AUTOMATED TO RECEIVE THE TRANSMITTED FILE, AND BECAUSE OF THE

14   COMPRESSION, THE TOP RIGHT-HAND CORNER, WE SEE THAT THERE

15   AREN'T ISSUES WITH RESPECT TO TRANSMITTING VIDEO.  I MEAN,

16   WE'VE GOT THE FILES ARE NOW SMALLER.

17       AND THE SPECIFICATION TALKS ABOUT THE FACT THAT THERE ARE

18   DIFFERENT TRANSMISSION METHODS.  COLUMN 4, LINES 25 TO 27,

19   "FILES MAY BE TRANSMITTED USING TELEPHONE LINES, CELLULAR,

20   RADIO, AND OTHER TELEMETRIC FREQUENCIES."

21       "OTHER TELEMETRIC FREQUENCIES" TELLS A PERSON OF ORDINARY

22   SKILL IN THE ART, THAT MEANS WI-LAN, OR WI-FI LIKE WE HAVE IN

23   THE COURTROOM.  THAT'S WHAT THAT'S REFERRING TO.

24       THE REMOTE UNIT IS -- WE CAN THINK OF IT IN THE CONTEXT OF

25   THE DEVICE, PHONE, TABLET, OR ANOTHER DEVICE THAT CAPTURES,

1    DIGITIZES, AND COMPRESSES THE FILES, AND ULTIMATELY TRANSMITS

2    THE FILES.

3        BUT BEFORE THEY'RE TRANSMITTED, AND WHAT WE SEE HERE IN THE

4    BLUE BOX, THERE ARE OTHER FUNCTIONS THAT ARE DONE THAT ARE

5    SEPARATE AND APART FROM THE TRANSMISSION.

6        SO, FOR EXAMPLE, THE SPECIFICATION AT COLUMN 3 AND COLUMN 7

7    TALKS ABOUT SPLITTING AND ORGANIZING THE SIGNAL.

8        AT COLUMN 6, LINES 36 TO 61, IT TALKS ABOUT SELECTING THE

9    NUMBER OF CELLULAR TELEPHONES, YOU KNOW, THAT ARE GOING TO BE

10   USED IN ONE EMBODIMENT VERSUS ANOTHER.

11       COLUMN 7, LINES 24 TO 33 TALKS ABOUT ALLOWING THE INPUT OF

12   CALL LETTERS FOR A TELEVISION STATION TRANSMISSION, FOR

13   EXAMPLE.

14       SO THE SPECIFICATION TALKS ABOUT THESE THINGS THAT ARE

15   HAPPENING IN CONTEXT THAT ARE SEPARATE AND APART FROM

16   TRANSMITTING.

17       NOW, THAT IS ESSENTIALLY THE TUTORIAL WITH RESPECT TO THE

18   TECHNOLOGY, AND I'M HAPPY TO TRY AND ANSWER ANY QUESTIONS WITH

19   RESPECT TO THE CLAIMS, THE TERMS THAT ARE AT ISSUE.

20            THE COURT:  OKAY, SURE.

21       LET'S -- OKAY.  LET'S GO TO "THE FIRST MEANS FOR CAPTURING

22   AND DIGITIZING AND COMPRESSING AT LEAST ONE COMPOSITE SIGNAL."

23            MR. JOHNSON:  RIGHT.  SO THE ISSUE FOR BOTH OF THESE

24   TERMS, AS I MENTIONED BEFORE, IS ONE OF NON-INFRINGEMENT.

25            AND APPLE IS TRYING TO READ IN LIMITATIONS AND STRUCTURE

1    INTO, BASICALLY INTO THE CONSTRUCTIONS HERE THAT, I BELIEVE,

2    SET UP WHAT THEY PERCEIVE TO BE NON-INFRINGEMENT ARGUMENTS.

3         THE ISSUE IS THAT THEY WANT TO LIMIT THE MEANS FOR

4    CAPTURING BASICALLY TO AN AUDIO CARD, A VIDEO CARD, YOU KNOW,

5    TO BASICALLY THE VIDEO FOR WINDOWS THAT USES PARTICULAR

6    ALGORITHMS THAT ARE IDENTIFIED IN THE SPEC.

7         AND THE -- THE SPECIFICATION SAYS THAT VIDEO AND AUDIO

8    CAPTURE MODULE IS USED TO CAPTURE, DIGITIZE, AND COMPRESS THE

9    COMPOSITE SIGNAL.  THAT'S IN CLAIM 9.

10        THE COURT:  UM-HUM.

11        MR. JOHNSON:  AND WE KNOW FROM THE PROSECUTION

12   HISTORY THAT THE TERM "VIDEO CARD" WAS REMOVED FROM, ULTIMATELY

13   FROM WHAT BECAME CLAIM 9, AND THE TERM "VIDEO CAPTURE MODULE"

14   WAS USED INSTEAD, AND THAT IS THE STRUCTURE FOR PERFORMING THE

15   CLAIMED FUNCTION OF THE MEANS FOR CAPTURING, DIGITIZING, AND

16   COMPRESSING.

17        YOU KNOW, THE PROBLEM WITH APPLE'S CONSTRUCTIONS -- WITH

18   APPLE'S CONSTRUCTION IS THAT IT REQUIRES BOTH VIDEO AND AUDIO

19   CARDS AND THE SPECIFICATION MAKES IT PRETTY CLEAR THAT IT CAN

20   BE AND/OR.  IT DOESN'T NEED TO BE BOTH.

21        THE SPECIFICATION ALSO TALKS ABOUT THE FACT THAT YOU CAN

22   HAVE THE USER TRANSMIT WITHOUT AUDIO.  THAT'S AT COLUMN,

23   LINES -- COLUMN LINES 39 TO 60.

24        THE COURT:  CAN I ASK YOU, I HAVE TWO QUESTIONS ON

25   THE FIRST ONE, AND THEN YOU CAN DO THE SECOND ONE, THE FINAL

1    TERM.

2              MR. JOHNSON:  SURE.

3              THE COURT:  AND I AGREE IT'S NOT CRYSTAL CLEAR, BUT

4    IN THE FILE HISTORY, IF YOU LOOK AT EXHIBIT 4, EXHIBIT 4, PAGE

5    2, AND IT'S NOT COMPLETELY CLEAR, BUT IT LOOKS LIKE THE

6    EXAMINER REJECTED "AUDIO AND/OR VIDEO" BECAUSE OF

7    INDEFINITENESS.

8         AND THEN IF YOU LOOK AT EXHIBIT, I GUESS IT'S I, PAGE 6

9    WHERE IT SAYS "THE REMOTE UNIT MAY BE INSTRUCTED TO CAPTURE THE

10   VIDEO PORTIONS OF THE COMPOSITE SIGNAL ONLY," AND EVEN JUST

11   CHANGING "AUDIO AND/OR VIDEO" TO "COMPOSITE SIGNAL" MAKES IT

12   SEEM LIKE IT HAS TO HAVE THE CAPABILITY TO DO BOTH.

13        WHAT'S YOUR --

14             MR. JOHNSON:  YOUR HONOR, I DON'T -- UNFORTUNATELY, I

15   DON'T HAVE THOSE PARTICULAR EXHIBITS IN FRONT OF ME.

16             THE COURT:  OH, OKAY.

17             MR. JOHNSON:  AND I CAN -- I CAN GET THEM AND TRY AND

18   ANSWER THE QUESTION OR I CAN BE PREPARED TO ANSWER THEM ON

19   WEDNESDAY, BUT I JUST DON'T HAVE IT RIGHT HERE IN FRONT OF ME

20   NOW.

21             THE COURT:  OKAY.  ALL RIGHT.  WELL, NEXT WEEK I WILL

22   WANT TO KNOW IF IT --

23             MR. JOHNSON:  RIGHT, I UNDERSTAND.

24             THE COURT:  IT LOOKS LIKE, JUST FROM CHANGING THE

25   WORDS FROM "AUDIO AND/OR VIDEO" TO "COMPOSITE" --

```
 1            MR. JOHNSON:  RIGHT.

 2            THE COURT:  "COMPOSITE," BY ITS NATURE, SEEMS LIKE

 3     IT'S MORE THAN ONE.

 4        SO WHY WOULDN'T IT BE HAVING THE CAPABILITY TO DO BOTH?

 5            MR. JOHNSON:  WELL, I MEAN, IF YOU GO BACK AND YOU

 6     LOOK -- AND I'LL LOOK AT THOSE SECTIONS -- BUT IF YOU GO BACK

 7     AND YOU LOOK AT THE CLAIMS THAT ARE IN THE PATENT NOW --

 8            THE COURT:  YEAH.

 9            MR. JOHNSON:  -- YOU HAVE CLAIM 4 THAT TALKS -- THAT

10     SAYS IT CAN BE AND/OR.

11        CLAIM 5, WHICH IS DEPENDENT, SAYS VIDEO ONLY.

12            THE COURT:  UM-HUM.

13            MR. JOHNSON:  CLAIM 6 SAYS AUDIO ONLY.

14        THERE'S JUST -- THERE'S -- THE PROBLEM IS THAT APPLE'S

15     CONSTRUCTION IS REQUIRING BOTH, YET THE SPECIFICATION -- A

16     PERSON OF ORDINARY SKILL, READING THE SPECIFICATION, WOULD

17     UNDERSTAND THAT IT CAN BE BOTH, BUT IT CAN BE AUDIO OR VIDEO AS

18     WELL.  IT DOESN'T NEED TO BE BOTH.

19        AND THAT'S -- THE CLAIMS ARE PART OF THE SPECIFICATION AND

20     THE CLAIMS TALK ABOUT THE FACT THAT IT CAN BE ONE OR THE OTHER

21     OR BOTH.

22            THE COURT:  YEAH.

23            MR. JOHNSON:  AND THE OTHER --

24            THE COURT:  I MEAN, I HEAR YOU ABOUT CLAIM 5 AND 6.

25        BUT I THINK THERE ARE OTHER -- I MEAN, JUST SAYING THAT IT
```

1    INCLUDES ONE, IT'S -- I DON'T THINK THAT INHERENTLY MEANS THAT

2    ONE COMPOSITE SIGNAL CAN'T HAVE BOTH.

3          MR. JOHNSON:  BUT IF THEY THEN -- IF WE HAVE CLAIM 6

4    OR WE HAVE CLAIM 5 THAT SAYS IT'S ONLY ONE, AND YET APPLE'S

5    CONSTRUCTION REQUIRES BOTH, IT RENDERS CLAIM 5 AND 6 BASICALLY

6    MEANINGLESS WITH RESPECT TO THOSE TERMS.

7          THE COURT:  IT'S NOT RESTRICTED TO ONE.  IT SAYS IT

8    INCLUDES ONE, AND THEN IT INCLUDES OTHER THINGS, LIKE IN

9    REALTIME, INSTALLED IN SAID REMOTE UNIT.  IT DOES ADD OTHER

10   ELEMENTS.

11      LET ME ASK ON THE SOFTWARE ISSUE.

12      YOUR JOINT CLAIM CONSTRUCTION STATEMENT DID HAVE A

13   COMPUTER -- I'M SORRY.  I GUESS THAT'S REALLY MORE FOR THE

14   SECOND ONE.  LET ME GO --

15         MR. JOHNSON:  I THINK IT'S THIS ONE, TOO, IN THE

16   SENSE THAT THE ALGORITHM, I THINK, EVEN THE ALGORITHM THAT THEY

17   CITE INCLUDES A LOT OF UNCLAIMED FUNCTIONALITY.

18         THE COURT:  UM-HUM.

19         MR. JOHNSON:  IT TALKS ABOUT USING BIT MAP TECH TO

20   MAXIMIZE THE TRANSMISSION SPEED.  IT TALKS ABOUT LOADING VIDEO

21   PALLET FILES.

22      NONE OF THOSE ARE REALLY -- NONE OF THOSE LIMITATIONS ARE

23   CLAIMED, AND SO IT WOULD BE IMPROPER TO USE THAT PART OF THE

24   ALGORITHM, AND THERE ARE OTHERS THAT WE OUTLINE IN OUR BRIEF

25   THAT ARE UNCLAIMED FUNCTIONS THAT ARE INCLUDED WITHIN THE

1    STRUCTURE THAT APPLE IS IDENTIFYING FOR PERFORMING THIS

2    FUNCTION.

3              THE COURT:  WELL, I GUESS I'M -- I'M CURIOUS AS TO

4    WHY YOU DON'T THINK THAT.

5              MR. JOHNSON:  WHY I DON'T THINK?  I'M SORRY.

6              THE COURT:  THAT THE SOFTWARE IS NECESSARY, BUT AT

7    LEAST IN YOUR JOINT CLAIM CONSTRUCTION STATEMENT, YOU DID HAVE

8    SOFTWARE BE PART OF THE STRUCTURE, AT LEAST FOR "A MEANS FOR

9    TRANSMITTING SAID COMPOSITE SIGNAL."

10             MR. JOHNSON:  RIGHT.  FOR THE NEXT ONE, RIGHT.

11             THE COURT:  YEAH.

12             MR. JOHNSON:  I MEAN, IT CAN BE.

13        BUT IT'S NOT FOR -- IT'S NOT APPROPRIATE FOR THIS -- FOR

14   THE MEANS FOR CAPTURING.

15             THE COURT:  WELL, ACTUALLY, YOU HAD IT FOR THIS ONE

16   AS WELL, FOR CAPTURING, DIGITIZING, AND COMPRESSING.

17             MR. JOHNSON:  YEAH, I DON'T THINK -- I'D HAVE TO GO

18   BACK AND LOOK AT IT, BUT I DON'T THINK IT WAS THE SAME RANGE OF

19   SOFTWARE AND THE SPECIFIC ALGORITHM THAT APPLE IS IDENTIFYING

20   NOW IN CONNECTION WITH THEIRS.

21             THE COURT:  SO YOU WOULD BE OKAY IF SOFTWARE IS

22   INCLUDED, AS LONG AS IT'S NOT AS SPECIFIC AS WHAT APPLE WANTS?

23             MR. JOHNSON:  WELL, LET'S GO BACK.

24             THE COURT:  OKAY.

25             MR. JOHNSON:  THE REAL ISSUE IS AUDIO AND VIDEO

```
 1        CARDS, AND THIS -- THE STRUCTURE FOR PERFORMING THIS FUNCTION

 2        IS NOT LIMITED TO AUDIO AND VIDEO CARDS.

 3             THE SPECIFICATION TALKS ABOUT A VIDEO CAPTURE MODULE, AND

 4        IT TALKS ABOUT IT IN THE CONTEXT OF CLAIM 9, AND IT SAYS THAT

 5        IT CAN CAPTURE, DIGITIZE, AND COMPRESS, AND THAT'S EXACTLY WHAT

 6        THE FUNCTION OF THIS MEANS-PLUS-FUNCTION ELEMENT IS, CAPTURING,

 7        DIGITIZING, AND COMPRESSING.

 8             AND A MODULE IS STRUCTURE, WHICH WE KNOW FROM THE FEDERAL

 9        CIRCUIT DECISIONS.

10             AND SO WE DON'T THINK WE NEED TO GET TO THE ALGORITHM OR

11        SOFTWARE.  WE THINK THAT THE APPROPRIATE STRUCTURE IS THE VIDEO

12        AND/OR AUDIO CAPTURE MODULE AND THE EQUIVALENTS.

13             GOING -- LIMITING IT TO THE VIDEO CARDS AND THE AUDIO CARDS

14        AND THE SOFTWARE IS OVERLY RESTRICTIVE BECAUSE THAT'S NOT THE

15        STRUCTURE THAT'S -- FOR PERFORMING THE CLAIMED FUNCTION.

16             AND THE CLAIMED FUNCTION, AGAIN, IS -- AND IT'S

17        IMPORTANT -- IS CAPTURING, DIGITIZING, AND COMPRESSING.  THAT'S

18        AGREED TO BY THE PARTIES.

19             THE STRUCTURE -- THE SOFTWARE THAT APPLE IS RELYING ON --

20                  THE COURT:  UM-HUM.

21                  MR. JOHNSON:  -- DOESN'T MEET THAT LIMITATION.  IT

22        GOES -- IT HAS A LOT OF NON-CLAIMED FUNCTIONALITY, AS I

23        ARTICULATED AND AS WE LAID OUT IN OUR BRIEF, AND THAT'S ONE

24        REASON WHY THEIR SOFTWARE LIMITATION IS NOT CORRECT.

25             AND THE OTHER REASON IS I THINK WHEN YOU LOOK AT -- IF WE
```

```
 1        GO BACK TO CLAIMS 4, 5, AND 6 AND THIS AUDIO, VIDEO, AND/OR

 2        ISSUE --

 3                THE COURT:  UM-HUM.

 4                MR. JOHNSON:  -- I WOULD JUST POINT YOUR HONOR TO, TO

 5        WHAT I BELIEVE IS JUST ABOVE WHERE YOU WERE READING IN THE

 6        PROSECUTION HISTORY.  SOMEBODY HANDED ME ONE PAGE.

 7                THE COURT:  OKAY.

 8                MR. JOHNSON:  AND IT'S PAGE 103 OF 187, AND THIS IS

 9        DOCUMENT -- IT WAS FILED 363-2.

10                THE COURT:  OKAY.

11                MR. JOHNSON:  AND IT SAYS, "THE TERM 'COMPOSITE

12        SIGNAL' IS GENERALLY KNOWN TO MEAN A SIGNAL WHICH INCLUDES

13        COMPONENTS SUCH AS AUDIO AND/OR VIDEO."

14           AND THAT'S THE --

15                THE COURT:  I'M SORRY.  WHAT PAGE?  I HAVE THAT

16        DOCUMENT.

17                MR. JOHNSON:  I THINK IT'S PAGE 6.

18                THE COURT:  OKAY.  WHICH CLAIM ARE YOU REFERRING TO?

19                MR. JOHNSON:  I'M READING FROM A PORTION OF WHAT

20        LOOKS LIKE -- IT'S A PORTION OF THE PROSECUTION HISTORY THAT IS

21        IN THE MIDDLE OF THE PAGE, AND I'M HAPPY TO HAND THIS -- THIS

22        IS MY ONLY COPY.  I'M HAPPY TO HAND IT UP.  BUT IT'S TALKING

23        ABOUT CLAIM 12, WHICH ULTIMATELY BECAME CLAIM 9.

24           IT'S FOR PURPOSES OF GOING BACK TO -- YOUR HONOR RAISED

25        COMPOSITE SIGNAL.
```

```
1                THE COURT:  OKAY.

2                MR. JOHNSON:  AND HERE THE APPLICANT IS SAYING

3     COMPOSITE SIGNAL CAN BE AUDIO AND/OR VIDEO.

4                THE COURT:  LET ME JUST SEE WHAT YOUR PAGE IS,

5     BECAUSE THAT DOESN'T MATCH WHAT MY PAGE IS.  MY MIDDLE OF THE

6     PAGE HAS AN APPARATUS ACCORDING TO CLAIM 9.

7                MR. JOHNSON:  I'LL FIND IT AND I'LL GIVE YOU THE

8     CITE.

9                THE COURT:  OKAY.  I PROBABLY HAVE IT IN HERE.  I

10    JUST NEED TO FIND THE RIGHT PAGE.

11         (PAUSE IN PROCEEDINGS.)

12                THE COURT:  I HAVE IT.  I HAVE IT.  THANK YOU.

13                MR. JOHNSON:  OKAY.

14                THE COURT:  YEAH, I MEAN, I AGREE THIS IS REALLY,

15    REALLY UNCLEAR.

16         BUT THAT SAME SECTION SAYS, "CAPTURE THE VIDEO PORTIONS OF

17    THE COMPOSITE SIGNAL ONLY," WHICH MAKES IT SEEM LIKE THERE MUST

18    BE OTHER PORTIONS OTHER THAN VIDEO.

19                MR. JOHNSON:  BUT, AGAIN, I THINK WE GO BACK TO HOW A

20    PERSON OF ORDINARY SKILL IN THE ART WOULD UNDERSTAND IT, AND

21    LOOKING AT THE CLAIMS WITH RESPECT TO THE SPEC -- I MEAN,

22    IT'S -- THE -- THERE'S SIMPLY NO REQUIREMENT, I THINK, IN THE

23    CLAIM THAT SAYS IT'S GOT TO BE BOTH.

24         AND COMPOSITE SIGNAL IS UNDERSTOOD TO BE AUDIO AND/OR

25    VIDEO.
```

1        THE CLAIMS 4, 5, AND 6 TALK ABOUT AUDIO OR VIDEO.  IT

2    JUST -- IT DOESN'T HAVE TO BE BOTH.

3        IF WE FOLLOW APPLE'S CONSTRUCTION REQUIRING IT TO BE BOTH,

4    THEN IT IGNORES PART OF THE PROSECUTION -- PART OF THE SPEC AND

5    THE PREFERRED EMBODIMENT.

6            THE COURT:  CAN I ASK YOU QUESTIONS ABOUT THE LAST

7    TERM?

8            MR. JOHNSON:  SURE.

9            THE COURT:  OKAY.  WELL, SO THIS HAS TO DO WITH --

10   WE'VE GOT THE MODEM ISSUE, THE SOFTWARE ISSUE, AND THE RADIO

11   FREQUENCY AND OTHER TELEMETRIC MEANS ISSUE.  LET'S GO TO THE

12   MODEM.

13       DO WE NEED TO HAVE A MODEM TO TRANSFORM DIGITAL SIGNALS

14   INTO ANALOG SIGNALS?

15           MR. JOHNSON:  ARE YOU ASKING ME GENERALLY?  I

16   THINK -- FIRST OF ALL, I -- HAVING A MODEM AS PART OF THE

17   CONSTRUCTION I THINK IS TOO LIMITING AND WOULD BE A MISTAKE.

18       THERE ARE LOTS OF THINGS THAT CAN CONVERT.  A DIGITAL TO

19   ANALOG CONVERTER, FOR EXAMPLE, CAN CONVERT DIGITAL SIGNALS INTO

20   ANALOG.  A MODEM IS NOT REQUIRED TO DO THAT.

21       AND IN THE CONTEXT OF THE PATENT, A MODEM IS REALLY AN

22   INTERFACE, AND COLUMN 2 SAYS, "THE REMOTE UNIT ALSO HAS FOUR

23   COMPUTER INTERFACES SUCH AS MODEMS."

24           THE COURT:  I'M SORRY.  WHAT'S YOUR LINE NUMBER?

25           MR. JOHNSON:  I'M SORRY.  IT'S COLUMN 4, LINES 25 TO

1   27.  I MISSPOKE.

2          THE COURT:  YOU SAID 24 TO 27?

3          MR. JOHNSON:  25 TO 27.  COLUMN 4, LINES 25 TO 27.

4          THE COURT:  THE REMOTE UNIT ALSO HAS FOUR INTERFACES

5   SUCH AS MODEMS.

6          MR. JOHNSON:  THAT'S REALLY WHAT MODEMS ARE.  THEY'RE

7   INTERFACES THAT BASICALLY ALLOW -- THEY DON'T DO THE

8   TRANSMISSION.  THEY ARE -- THEY MODULATE.  THEY BASICALLY

9   INTERPRET THE INFORMATION TO BE ABLE TO SEND IT ALONG.  THEY

10  DON'T DO THE TRANSMISSION THEMSELVES.

11         THE COURT:  YEAH.

12         MR. JOHNSON:  THEY BASICALLY -- THAT'S WHERE THE TERM

13  "MODEM" COMES FROM, MODULATION, AND THAT'S ESSENTIALLY WHAT IT

14  DOES IS IT TAKES A SIGNAL AND IT MODULATES IT OR DEMODULATES IT

15  SO THAT IT CAN THEN SEND IT ALONG SO THE COMPUTER CAN

16  UNDERSTAND IT.

17         THE COURT:  BUT DIDN'T YOUR JOINT CLAIM CONSTRUCTION

18  STATEMENT HAVE A TELEMETRY FREQUENCY INTERFACE?  WOULDN'T THAT

19  BE A MODEM IN YOUR STRUCTURE?

20     I'M LOOKING AT PAGE 26.

21         MR. JOHNSON:  PAGE 26 OF THE --

22         THE COURT:  26 OF THE JOINT CLAIM CONSTRUCTION

23  STATEMENT, "A COMPUTER, TELEPHONE, CELLULAR, RADIO FREQUENCY,

24  AND/OR TELEMETRIC FREQUENCY INTERFACE WITH ASSOCIATED SOFTWARE,

25  AND EQUIVALENTS."  WOULD THAT MEAN THAT THEN MODEM SHOULD BE IN

```
 1           YOUR STRUCTURE?

 2                MR. JOHNSON:  I'D HAVE TO GO BACK AND LOOK.  I DON'T

 3      THINK SO.  I THINK WHAT WE'RE SAYING IS THAT -- AT MOST IT'S AN

 4      INTERFACE THAT WE'RE TALKING ABOUT.

 5                THE COURT:  YEAH.

 6                MR. JOHNSON:  AND THE SPECIFICATION SAYS THAT IT HAS

 7      TO BE -- YOU KNOW, IT'S A COMPUTER INTERFACE, AND IT SAYS "SUCH

 8      AS MODEMS."  THERE ARE OTHER WAYS TO DO THIS AND THERE ARE

 9      OTHER TYPES OF DEVICES.

10         APPLE DEFINITELY WANTS TO LIMIT THIS TO A MODEM.

11                THE COURT:  UM-HUM.

12                MR. JOHNSON:  AGAIN, GOING BACK IN TIME, THIS IS

13      1994, AND WE'RE TALKING ABOUT IN THE CONTEXT BACK THEN, YOU

14      KNOW, MODEMS THAT WERE USED -- I MEAN, I REMEMBER THE FIRST

15      MODEMS WHERE YOU TAKE THE PHONE AND YOU SORT OF PLUG THAT PHONE

16      DOWN INTO THIS BOX AND THAT WAS THE MODEM.  IT WOULD TAKE THE

17      SIGNAL AND IT WOULD MODULATE IT.  IT WAS AN INTERFACE.  IT

18      WASN'T RESPONSIBLE FOR THE TRANSMISSION.

19                THE COURT:  UM-HUM.

20                MR. JOHNSON:  SO WHEN WE TALK ABOUT MEANS FOR

21      TRANSMITTING, THIS IS NOT PART OF THAT.

22                THE COURT:  UM-HUM.

23                MR. JOHNSON:  THIS IS AN INTERFACE THAT DOESN'T DO

24      THE MEANS FOR TRANSMITTING.

25                THE COURT:  BACK IN '94, WERE THE PHONES, THE CELL
```

1      PHONES AND RADIO TRANSMISSIONS, ALL ANALOG?

2              MR. JOHNSON:  I DON'T THINK THEY WERE ALL ANALOG, BUT

3      I'D HAVE TO CHECK BETWEEN NOW AND THURSDAY.

4              THE COURT:  OKAY.

5              MR. JOHNSON:  AND THAT'S THE OTHER ISSUE IS APPLE'S

6      CONSTRUCTION REALLY EXCLUDES RADIO OR OTHER TELEMETRIC

7      FREQUENCIES.  I MEAN, IT BASICALLY RENDERS CLAIM 3 INOPERABLE.

8              THE COURT:  WHAT ARE -- FOR TELEMETRIC FREQUENCIES,

9      THERE'S CERTAINLY A LOT OF LANGUAGE IN THE SPEC THAT INCLUDES

10     THAT, BUT THERE'S NOT REALLY ANYTHING THAT DEFINES WHAT THE

11     STRUCTURE OF THAT IS.

12         SO WHERE SHOULD WE LOOK FOR THAT?

13             MR. JOHNSON:  I THINK TELEMETRIC FREQUENCY, IT'S

14     STRUCTURE IN THE SENSE THAT IT'S TELLING YOU WHERE IN THE BAND

15     OF FREQUENCIES IT IS -- IT'S A SIGNAL BAND THAT IS REFERRED

16     TO AS -- WE CAN GO BACK TO -- IT CAN INCLUDE WI-FI, IT CAN

17     INCLUDE WI-LAN.

18         WE CAN MAYBE ALSO LOOK A LITTLE BIT MORE CLOSELY AT TRYING

19     TO ADDRESS WHAT, IF THERE ARE ANY OTHER SPECIFIC EXAMPLES OF

20     TELEMETRIC FREQUENCIES.

21             THE COURT:  IF YOU COULD, NEXT THURSDAY -- I MEAN,

22     I -- YOU KNOW, I WOULD BE INCLINED TO INCLUDE IT IF THE

23     STRUCTURE WAS DISCLOSED, AND I JUST DON'T SEE A DISCLOSURE OF

24     THE STRUCTURE.

25         SO IF YOU CAN BRING THAT NEXT WEEK OF WHERE -- I MEAN, I

1      AGREE, THE LANGUAGE IS CERTAINLY IN THERE MORE THAN ONCE.

2             MR. JOHNSON:  YEAH.

3             THE COURT:  TELEMETRIC FREQUENCIES.  BUT IS THE

4      STRUCTURE DISCLOSED?

5             MR. JOHNSON:  YEAH, WELL, I THINK -- I THINK IF YOU

6      LOOK AT THE LANGUAGE, IT'S TELEPHONE LINES, CELL, RADIO

7      FREQUENCIES, AND OTHER TELEMETRIC FREQUENCIES.  WE'RE TALKING

8      ABOUT A FREQUENCY BAND OVER WHERE THIS INFORMATION IS

9      TRANSMITTED.

10        IN THE PAST, THE INFORMATION WAS TRANSMITTED, AS I SAID, TO

11     SATELLITES, AND THE PATENT SPEC TALKS ABOUT MICROWAVE

12     FREQUENCIES.

13        ALL OF THESE ARE STRUCTURE, YOU KNOW, THAT -- AS AMORPHOUS

14     AS IT SOUNDS, YOU THINK ABOUT THE FREQUENCY BAND.  OTHER

15     TELEMETRIC FREQUENCIES WOULD INCLUDE WI-LAN, WI-FI.

16        SO WE'LL LOOK A LITTLE BIT MORE CLOSELY AT IT AND BE

17     PREPARED TO ADDRESS IT ON THURSDAY.

18            THE COURT:  OKAY.  LET'S GO TO PAGE 8 -- I'M SORRY --

19     COLUMN 8.  FOR THIS LAST SECTION, STARTING AT LINE 61 DOWN TO

20     67 WHERE IT'S TALKING ABOUT THE MODEM INTERFACING EACH

21     COMMUNICATION PORT, OBTAINING A CONNECTION WITH THE PHONE LINE

22     OR HOST UNIT, ISN'T THE OBTAINING A SECTION PART OF THE

23     TRANSMISSION?

24            MR. JOHNSON:  NO.  THIS IS TALKING ABOUT IN THE

25     CONTEXT OF THE TRANSFER.  THE TRANSMISSION AND THE TRANSFER IS,

```
1        IS SEPARATE AND THE MODEM IS NOT USED FOR TRANSMITTING.

2            AGAIN, IT'S, IT'S REALLY AN INTERFACE.

3            AND IF YOU GO AND LOOK AT --

4                THE COURT:  WHAT'S THE DIFFERENCE BETWEEN TRANSFER

5        AND TRANSMISSION?

6                MR. JOHNSON:  WELL, THE TRANSMISSION REFERS TO AFTER

7        THE SIGNAL HAS BEEN MODULATED OR DEMODULATED, IT'S SENT OUT.

8                THE COURT:  UM-HUM.

9                MR. JOHNSON:  I MEAN, SO THE MODEM BASICALLY CAN BE

10       SEEN AS AN INTERFACE, AND THAT'S THE WAY IT'S DESCRIBED HERE.

11           BUT IT'S NOT PART OF THE ACTUAL TRANSMISSION.  IT'S NOT

12       PART OF THE MEANS FOR TRANSMISSION.  IT STEPS UP TO AND

13       BASICALLY INTERFACES, BUT DOESN'T ACTUALLY DO THE TRANSMISSION.

14           TRANSFERRING REFERS TO -- I MEAN, IT REFERS --

15               THE COURT:  BUT YOU DON'T THINK ACTUALLY MAKING THE

16       CONNECTION THAT ALLOWS THE TRANSMISSION IS PART OF THE

17       TRANSMISSION?

18               MR. JOHNSON:  YEAH, I DON'T, BECAUSE I THINK WHEN IT

19       TALKS ABOUT THE -- THE CLAIMS TALK ABOUT -- ONE SECOND.

20           IT TALKS ABOUT THE MEANS FOR TRANSMITTING THE COMPOSITE

21       SIGNAL.

22           IT'S -- IT'S TALKING ABOUT IN A SEPARATE -- I MEAN, IT'S

23       SEPARATE AND APART FROM THE TRANSFERRING PART.  IT'S SEPARATE

24       FROM THE MODEM.  I AGREE THAT IT STEPS UP TO AND MODULATES, BUT

25       IT DOESN'T ACTUALLY -- IT'S NOT RESPONSIBLE FOR TRANSMITTING
```

1      IT.

2          IT'S LIKE AN INTERPRETATION DEVICE THAT SITS BEFORE IT THAT

3      CONDITIONS THE SIGNAL OR MODULATES THE SIGNAL BEFORE IT'S SENT.

4              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

5          LET ME --

6              MR. JOHNSON:  THANK YOU.

7              THE COURT:  LET ME ASK APPLE SOME QUESTIONS.

8          OKAY.  LET'S DO THE -- WE'RE IN THE HOME STRETCH HERE.

9          LET'S DO THE CAPTURING, DIGITIZING, COMPRESSING FIRST.

10         CAN YOU PLEASE -- I THINK ON THE ISSUE OF VIDEO CAPTURE

11     MODULE, LIKE MR. JOHNSON SAID, THE DIFFICULTY THAT YOU ALL HAVE

12     IS WITH CLAIM 9, AND I AM LOOKING AT -- IT'S THE SAME ECF,

13     363-2 -- I GUESS IT'S DIFFERENT EXCERPTS FROM THE FILE HISTORY,

14     EXHIBIT I -- WHERE THEY TOOK OUT, YOU KNOW, THE CHANGE BEING

15     MADE SPECIFICALLY TO SECTION A WHERE IT WAS "A VIDEO CARD

16     HAVING A VIDEO CAPTURE MODULE."

17         DO YOU WANT TO GO AHEAD AND ADDRESS THAT?

18             MR. SELWYN:  I WOULD.

19         YOUR HONOR, I THINK THAT THE ANALYTICAL TASK IS FOR US TO

20     LOOK AT THE ORIGINAL DISCLOSURE, AND THAT AMENDMENT WAS NOT IN

21     THE ORIGINAL DISCLOSURE, AND ASK OURSELVES, WHAT IS THE

22     STRUCTURE THAT IS LINKED AND ACTUALLY PERFORMING THE CLAIMED

23     FUNCTION?

24         AND ON THIS ISSUE, THE SPECIFICATION REPEATEDLY MAKES

25     CLEAR THAT IT'S NOT ONLY A VIDEO CAPTURE CARD, BUT IT'S A VIDEO

1     CAPTURE CARD WITH THE CAPTURE MODULE.

2          I CAN CITE FIVE OR SIX PLACES IN THE SPECIFICATION THAT

3     TALK ABOUT BOTH THE VIDEO CAPTURE CARD AND THE CAPTURE MODULE

4     AS BEING NECESSARY TO PERFORM THE CLAIMED FUNCTION.

5          THAT'S THE END OF THE STORY.  THAT IS WHAT IT DISCLOSED AS

6     STRUCTURE FOR PERFORMING THAT FUNCTION.

7               THE COURT:  SO I'M SUPPOSED TO DISREGARD THIS PART OF

8      THE FILE HISTORY?

9               MR. SELWYN:  YOU ARE SUPPOSED TO LOOK AT WHAT IS IN

10     THE ORIGINAL SPECIFICATION FOR STRUCTURE.

11              THE COURT:  UM-HUM.

12              MR. SELWYN:  AND YOU CAN'T LOOK AT AN AMENDMENT TO IT

13      FOR PROVIDING A STRUCTURE.

14          AND IN THIS CASE THEY'RE SUGGESTING THAT THIS AMENDMENT IS

15     TAKING AWAY STRUCTURE THAT WAS DISCLOSED IN THE SPECIFICATION.

16          WE WOULD SUGGEST, RESPECTFULLY, THAT'S INCORRECT

17     ANALYTICALLY AND THAT THE TASK HERE IS TO BE LOOKING AT THE

18     SPECIFICATION, AT THE ORIGINAL DISCLOSURE, AND TRYING TO

19     IDENTIFY WHAT IT IS THAT IT'S DESCRIBED AS PERFORMING THAT

20     CLAIMED FUNCTION.

21          THAT IS THE QUID PRO QUO FOR BEING ABLE TO CLAIM IN THE

22     MANNER THAT THEY HAVE.  YOU HAVE TO LOOK AT WHAT IS DISCLOSED

23     AS PERFORMING THE FUNCTION.

24              THE COURT:  WHAT'S THE DIFFERENCE, IN YOUR MIND,

25      BETWEEN AN AUDIO CARD AND AN AUDIO CAPTURE CARD LIKE IS IN THE

1    SPEC?  IS THERE A REASON --

2          MR. SELWYN:  SO WHAT'S -- ON THE VIDEO SIDE, THE

3    REMOTE UNIT HAS THE VIDEO CAPTURE CARD WITH THE CAPTURE MODULE.

4          THE COURT:  UM-HUM.

5          MR. SELWYN:  THE AUDIO PORTION OF IT HAS AN AUDIO

6    CAPTURE CARD, AND THERE'S NOT A SEPARATE AUDIO MODULE THAT I

7    RECALL.

8       MAYBE I'M MISUNDERSTANDING YOUR QUESTION.

9          THE COURT:  WELL, I'M WONDERING WHY YOU'RE PROPOSING

10   "AUDIO CARD" INSTEAD OF "AUDIO CAPTURE CARD."  I'M LOOKING AT

11   MULTIPLE -- YOU KNOW, COLUMN 4, LINE 24, COLUMN 5, LINE 45.

12   IT'S ALWAYS SAYING "AUDIO CAPTURE CARD."  IT'S NOT SAYING

13   "AUDIO CARD."  WHY DID YOU TAKE THAT OUT, "CAPTURE"?

14         MR. SELWYN:  I MAY HAVE TO RETURN TO THAT NEXT WEEK.

15         THE COURT:  THAT'S FINE.

16         MR. SELWYN:  I'M NOT SURE THAT WE'RE DRAWING A

17   DISTINCTION BETWEEN THE TWO OF IMPORT.

18         THE COURT:  THAT'S FINE.

19         MR. SELWYN:  BUT I CAN ADDRESS THE QUESTION THAT YOU

20   WERE ASKING MR. JOHNSON, IF YOU LIKE, ABOUT WHETHER IT SHOULD

21   BE INTERPRETED AS AUDIO AND/OR VIDEO, AND HERE I THINK THE FILE

22   HISTORY, AS WELL AS THE CLAIM LANGUAGE, IS VERY IMPORTANT.

23      BECAUSE AS YOUR HONOR WILL RECALL, THAT LANGUAGE, AUDIO

24   AND/OR VIDEO SIGNAL, WAS IN THE LANGUAGE -- IN THE CLAIM

25   ORIGINALLY AND THE EXAMINER RESPONDED WITH AN INDEFINITENESS

1    REJECTION.

2         THE COURT:  UH-HUH.

3         MR. SELWYN:  AND IT WAS CHANGED TO BE "COMPOSITE

4    SIGNAL" IN RESPONSE.

5         AND I THINK WHAT IS SAID IN THE PROSECUTION HISTORY AROUND

6    THIS IS VERY IMPORTANT, AND I WOULD POINT YOUR HONOR TO THE

7    LANGUAGE THAT'S ON THE SAME PAGE THAT SAYS, "WITH REGARD TO THE

8    PRESENT INVENTION, THE COMPOSITE SIGNAL WHICH IS CAPTURED BY

9    THE REMOTE UNIT MAY HAVE BOTH AUDIO AND VIDEO COMPONENTS AND IS

10   COMMONLY KNOWN TO BE 'A COMPOSITE SIGNAL.'"

11        THE COURT:  THIS SAYS "MAY."  IT SAYS "MAY HAVE

12   BOTH."

13        MR. SELWYN:  RIGHT.  BUT IT'S AN APPARATUS CLAIM AND

14   A CORRESPONDING STRUCTURE FOR PERFORMING AUDIO AND VIDEO.  IT'S

15   THE AUDIO CARD AND THE VIDEO CAPTURE MODULE -- VIDEO CAPTURE

16   CARD WITH THE CAPTURE MODULE.

17        THE COURT:  LET'S GO TO YOUR SOFTWARE POINT.

18        MR. SELWYN:  YES.

19        THE COURT:  IF YOU GO TO PAGE 6, LINE 9 THROUGH 14,

20   THIS HAS THE VIDEO CARD DOING EVERYTHING, CAPTURING THE SIGNAL

21   TO ITS MEMORY, DIGITIZING IT, COMPRESSING IT.

22        WHY WOULD YOU NEED SOFTWARE IF THE VIDEO CARD IS ABLE TO DO

23   EVERYTHING, CAPTURING, DIGITIZING, COMPRESSING?

24        MR. SELWYN:  WELL, BECAUSE IT DOESN'T WORK WITHOUT

25   CAPTURE SOFTWARE SEQUENCE A.

1       SO WHAT'S HAPPENING HERE IS YOU HAVE A COLLECTION OF

2   HARDWARE, INCLUDING THE VIDEO CAPTURE CARD, THAT IS RUNNING A

3   SOFTWARE PACKAGE AND DOING CAPTURE SOFTWARE SEQUENCE A.

4       I MEAN, APPLE AND SAMSUNG HAVE A FUNDAMENTALLY DIFFERENT

5   PHILOSOPHY HERE ABOUT HOW TO APPROACH THE SOFTWARE SEQUENCES.

6       IF YOU LOOK AT THE SPECIFICATION, MOST OF IT IS ACTUALLY A

7   RECITATION OF SIX SEPARATE SOFTWARE SEQUENCES, AND THOSE

8   ALGORITHMS ARE WHAT IS NECESSARY TO PERFORM THE CLAIMED

9   FUNCTIONS.

10      IN THIS CASE, A VIDEO CAPTURE CARD, BY ITSELF, IS NOT GOING

11  TO PERFORM THE CLAIMED FUNCTION.  YOU NEED THE SOFTWARE, AND IN

12  PARTICULAR, THE SOFTWARE SEQUENCE THAT'S DESCRIBED HERE, IN

13  ORDER TO DO THAT.

14      THE HARDWARE ITSELF, THAT'S NOT GOING TO DO IT.

15          THE COURT:  LET'S GO TO THE LAST TERM.

16          MR. SELWYN:  SO IF I COULD ADDRESS, AND YOUR HONOR

17  MAY HAVE ISSUES AND QUESTIONS, BUT JUST BRIEFLY THE POINT ABOUT

18  MODEM AND THE DEBATE THAT OCCURS THERE?

19          THE COURT:  UM-HUM.

20          MR. SELWYN:  YOU CAN'T DO TRANSMISSION WITHOUT AN

21  INTERFACE.  THE PARTIES AGREE ON THAT.

22      A MODEM IS THE ONLY THING THAT IS DESCRIBED AS THAT

23  INTERFACE, AND THE PARTIES AGREE ON THAT AS WELL.

24          THE COURT:  BUT IT SAYS "SUCH AS."  IT DOESN'T SAY

25  "EXCLUSIVELY," RIGHT?

```
 1              MR. SELWYN:  WELL, REMEMBER THE TASK THAT WE ARE

 2      DOING HERE.  WE'RE TRYING TO FIND WHATEVER STRUCTURE IS

 3      DISCLOSED TO PERFORM THE CLAIMED FUNCTION.  YOU DON'T GET TO

 4      INFER STRUCTURE AND HAVE THAT BE -- HAVE THAT BE STRUCTURE.

 5      THE STRUCTURE HAS TO BE DISCLOSED IN THE SPECIFICATION.

 6          ALL THAT IS DISCLOSED AS THE INTERFACE IS A MODEM.  SO YOU

 7      DON'T GET THINGS OTHER THAN -- YOU DON'T GET SOMETHING BROADER

 8      THAN THAT.  YOU GET THE MODEM AND ITS EQUIVALENTS.

 9              THE COURT:  YOU KNOW, THE RADIO FREQUENCY IS, AND THE

10      TELEMETRIC FREQUENCY IS EXPLICITLY CALLED OUT IN MULTIPLE

11      PORTIONS OF THE SPECIFICATION.

12          WHY SHOULD THAT BE READ OUT AND EXCLUDED?

13              MR. SELWYN:  WELL, BUT REMEMBER WHAT THEY ARE ASKING

14      FOR, BECAUSE THE SPECIFICATION DOESN'T MENTION CELLULAR

15      TELEPHONE TRANSMITTER, IT DOESN'T MENTION TELEMETRIC FREQUENCY

16      TRANSMITTER, IT DOESN'T MENTION TRANSMITTER.

17          IT HAS THIS LANGUAGE ABOUT TELEMETRIC FREQUENCIES, WHICH

18      THE EXAMINER ITSELF ASKED THE APPLICANTS, WHAT DOES THIS MEAN?

19          IF THEY ARE SAYING THAT THIS IS STRUCTURE, THEN THEY'RE

20      ESSENTIALLY CLAIMING ANYTHING THAT CAN PERFORM THE FUNCTION.

21          THAT IS FAR TOO GENERIC TO CONSTITUTE STRUCTURE,

22      ESPECIALLY IN LIGHT OF ALL THE MORE SPECIFIC STRUCTURE THAT IS

23      DISCLOSED IN THE SPECIFICATION.  YOU CAN'T IGNORE THAT

24      DISCLOSED STRUCTURE IN PLACE OF THIS GENERIC LANGUAGE WHICH

25      ITSELF IMPOSES NO STRUCTURE.
```

1          THE COURT:  ALL RIGHT.  LET'S GO TO YOUR SOFTWARE

2     REQUIREMENT.

3          IT LOOKS LIKE IN THE SPEC THERE ARE A COUPLE OF PLACES

4     WHERE THEY DON'T SAY ALL THE STEPS ARE REQUIRED, SO WOULD YOU

5     AGREE THAT AT LEAST SOME OF THE SOFTWARE ELEMENTS AREN'T

6     NECESSARY TO PERFORM TRANSMISSION?

7          MR. SELWYN:  SO IF WE'RE FOCUSSING NOW ON -- CAPTURE

8     SOFTWARE SEQUENCE A IS THE SOFTWARE SEQUENCE THAT YOUR HONOR

9     HAS IN MIND?

10          THE COURT:  I AM LOOKING AT "MEANS FOR TRANSMITTING

11    SAID COMPOSITE SIGNAL," AND FOR THIS ONE I HAVE THE THREE, YOU

12    KNOW, SOFTWARE, MODEM ISSUE, AND THEN THE RADIO FREQUENCY AND

13    TELEMETRIC MEANS AS BEING THE THREE DISPUTES ON THIS ONE.

14         SO IT'S ON THE SOFTWARE ISSUE.  I GUESS IF YOU WANT TO GO

15    TO A COLUMN, LET'S GO TO COLUMN 9.

16          MR. SELWYN:  SO THE ANSWER TO THE QUESTION IS WE DO

17    SAY THAT THE SPECIFIC ALGORITHM THAT'S EXPRESSED HERE IN TERMS

18    OF A SOFTWARE SEQUENCE IS WHAT IS REQUIRED AS THE STRUCTURE,

19    AND THAT'S THE WAY IT SHOULD BE CONSTRUED.

20         THERE WAS, IN FACT, YOUR HONOR, A CASE THAT THE FEDERAL

21    CIRCUIT ISSUED YESTERDAY CALLED FUNCTION MEDIA VERSUS GOOGLE

22    WHICH FOCUSSED ON SIMILAR CLAIM TERM, "MEANS FOR TRANSMITTING,"

23    AND IN THAT PARTICULAR CASE, THE COURT FOUND THAT THERE WASN'T

24    AN ALGORITHM DISCLOSED AND THE CLAIM WAS INDEFINITE.

25          BUT THAT -- THE CASE MAKES CLEAR THAT YOU HAVE TO INCLUDE,

1       AS STRUCTURE, WHATEVER IS THE DISCLOSED ALGORITHM.

2            HERE, TO BE SURE, A NUMBER OF THE ALGORITHMS ARE LENGTHY.

3       THEY HAVE A NUMBER OF DIFFERENT STEPS.  BUT THAT'S WHAT IS

4       DISCLOSED AS PERFORMING THE CLAIMED FUNCTION, SO THAT SHOULD BE

5       CAPTURED IN THE CONSTRUCTION.

6            THE COURT:  LET'S GO TO SPECIFIC ONES THEN.  SINCE

7       WE'RE ALREADY AT COLUMN 9 -- WELL, NO.  GO TO COLUMN 3.  I

8       THINK THAT'S BETTER.  COLUMN 3, LINES 22 THROUGH 24, IT SAYS,

9       "IN AN ALTERNATE EMBODIMENT, A BASIC ONE, THE SIGNAL IS NOT

10      DIVIDED BEFORE IT IS TRANSMITTED."

11           SO IF ONE OF THE SOFTWARE STEPS IS SPLIT AND THIS ONE, AT

12      LEAST THIS ALTERNATE EMBODIMENT IS SAYING SPLITTING IS NOT

13      REQUIRED, THEN WHY DO WE HAVE TO HAVE ALL OF THESE SOFTWARE

14      STEPS?

15           MR. SELWYN:  BECAUSE THE -- WE'RE TALKING ABOUT AN

16      APPARATUS CLAIM THAT HAS TO BE ABLE TO PERFORM CERTAIN

17      FUNCTIONS, THAT BEING ONE OF THE FUNCTIONS, AND THEREFORE, YOU

18      DO HAVE TO INCLUDE IT WITHIN THE SOFTWARE SEQUENCE THAT'S

19      DESCRIBED.  YOU HAVE TO HAVE THE MEANS TO BE ABLE TO DO THAT.

20           THE COURT:  WOULD IT BE HELPFUL IF -- WOULD IT BE

21      HELPFUL IF, NEXT WEEK, I JUST SORT OF FILED TENTATIVE

22      CONSTRUCTIONS AND THEN YOU COULD ADDRESS THAT?  WHAT WOULD

23      BE --

24           MR. SELWYN:  SURE.

25           THE COURT:  WHAT WOULD BE MORE HELPFUL?  I WANT TO

1    SEE WHAT YOU AGREE TO FIRST.  I'M HOPING THAT YOU -- I'M HOPING

2    THAT, AT LEAST ON THE COMPLETE SUBSTITUTION OF THE DISPLAY,

3    THAT YOU COME TO AN AGREEMENT ON THAT.  I MEAN, YOU GUYS SHOULD

4    GIVE ME THAT ONE.  I THINK THAT'S '760.

5        WELL, LET ME -- LET ME THINK ABOUT THAT.  MAYBE I'LL DO

6    THAT SO THAT YOU CAN AT LEAST --

7            MR. JOHNSON:  I WAS JUST GOING TO SAY, I THINK WE

8    UNDERSTAND YOUR HONOR'S -- GIVEN YOUR HONOR'S QUESTIONS, I

9    THINK WE'RE AT LEAST PREPARED TO GO BACK AND FINE TUNE OUR

10   PRESENTATION FOR NEXT WEEK, AND ALSO MEET AND CONFER WITH APPLE

11   AND SEE IF WE CAN BRIDGE ANY GAPS ON THE '760, AND MAYBE ON N,

12   FOR EXAMPLE, AND SOME OF THE OTHER TERMS AND SEE WHAT WE CAN DO

13   AND THEN REPORT BACK.

14           THE COURT:  YOU SHOULD REALLY AGREE ON N.  I MEAN,

15   THAT WAS -- THAT ONE IS ALMOST EMBARRASSING.  COME ON.

16       OKAY.  I MEAN, I CAN -- IF IT'S HELPFUL, I CAN SORT OF TELL

17   YOU WHAT THE TENTATIVES ARE NOW.  IS THAT USEFUL?

18       OKAY.  ON "HISTORY LIST," AT THIS POINT I'M INCLINED TO GO

19   WITH APPLE'S CONSTRUCTION OF "A LIST OF PREVIOUSLY USED

20   ENTRIES."

21       MR. PRICE REPRESENTED THAT THERE WAS NO DIFFERENCE FROM

22   SAMSUNG'S PERSPECTIVE BETWEEN "A LIST OF CHOICES BASED ON

23   HISTORICAL INFORMATION."

24       WITH REGARD TO WHETHER IT'S SHARED BETWEEN DIFFERENT

25   APPLICATIONS, I THINK THAT THE SPECIFICATION IS TOO CLEAR THAT

1    THAT CAN HAPPEN, BUT IT'S NOT REQUIRED.  IT'S A "CAN," NOT A

2    "MUST."  SO THAT'S MY TENTATIVE ON THAT ONE.

3        ON "FIELD CLASS," I STILL AM NOT CONVINCED THAT WHETHER

4    IT'S SOFTWARE CODE OR A DATA ELEMENT, THOSE ARE NOT IN THE

5    CLAIMS.  THEY'RE NOT IN THE SPEC.

6        IT WAS AN INTERESTING PERSPECTIVE ON "FIELD CLASS"

7    REQUIRING SHARING AMONGST, OR "FIELD CLASS" REQUIRING SOME TYPE

8    OF CODE, BUT I'M NOT PERSUADED BY THAT, SO I WAS INCLINED

9    TENTATIVELY TO GO WITH "THE CATEGORY OF INFORMATION ASSOCIATED

10   WITH A FIELD."

11       NOW, "ACTION PROCESSOR," I MEAN, WE'LL LOOK AT THAT AGAIN.

12   THE FIGURE, I GUESS IT WAS FIGURE 3 SHOWING THAT FORM -- I

13   THINK WE'RE GOING TO HAVE TO GO BACK AND LOOK AT THAT ARGUMENT.

14   SO ON THAT ONE I'M -- I NEED TO GO BACK AND LOOK AT THAT, BUT

15   I'M, AT THIS POINT, NOT PERSUADED THAT IT HAS TO BE SEPARATE

16   FROM A CLIENT.  OKAY?

17       AT THIS POINT ON "CONCURRENTLY WITH," THE TENTATIVE WOULD

18   BE THAT IT JUST HAS TO BE "DURING AN OVERLAPPING TIME INTERVAL"

19   AND NOT "AT THE SAME TIME."

20       ON THE '760, I HOPE YOU REACH AN AGREEMENT.

21       ON "NON-SCHEDULED TRANSMISSION," I'M GOING TO ADOPT

22   SAMSUNG'S CONSTRUCTION.

23       ON "INTEGER," I THINK IT'S "A POSITIVE INTEGER."  THAT'S

24   WHAT N IS.

25       SO I WOULD HOPE THAT YOU WOULD REACH AN AGREEMENT.  THE

1    CLAIMS ARE PRETTY EXPLICIT THAT THAT'S WHAT THAT IS, SO THAT'S

2    WHAT I'M INCLINED TO DO.

3         ON THE '757, I THINK I COULD REALLY USE YOUR HELP BECAUSE

4    I DON'T AGREE WITH APPLE THAT IT'S FIXED AND BOUNDED.

5         SO I COULD REALLY USE YOUR HELP AND COMBINED THINKING ON

6    SOME WAY TO CONVEY THAT IT'S NOT FIXED AND BOUNDED, BUT IT

7    SOMEHOW REMAINS IN A ROOM OR HAS SOME -- BUT IT CAN BE ALSO AN

8    OUTDOOR AREA.

9         I REALLY COULD USE YOUR HELP ON THAT ONE, BECAUSE I'M NOT

10   SATISFIED WITH EITHER PARTY'S LANGUAGE.  I DON'T THINK IT QUITE

11   CAPTURES IT.

12        BUT I'LL ALSO GO BACK AND LOOK AT SOME OF THE ARGUMENTS

13   THAT WERE RAISED TODAY.

14        OKAY.  I DON'T THINK THAT SOFTWARE IS REQUIRED FOR "MEANS

15   FOR CAPTURING, DIGITIZING, AND COMPRESSING AT LEAST ONE SAID

16   COMPOSITE SIGNAL."  I'M INCLINED AT THIS POINT TO GO WITH "AN

17   AUDIO CARD AND A VIDEO CARD HAVING A VIDEO CAPTURE MODULE."

18        I THINK THAT'S JUST THE MOST, I THINK, SUPPORTED BY THE

19   PROSECUTION HISTORY AND THE CLAIM LANGUAGE AND THE

20   SPECIFICATION, WHICH I WILL AGREE THE CLAIMS AND SPEC ARE

21   SOMEWHAT AMBIGUOUS ON THAT POINT.  OKAY?

22        WITH REGARD TO "MEANS FOR TRANSMITTING SAID COMPOSITE

23   SIGNAL," THIS ONE IS SORT OF A FRANKENSTEIN OF BOTH, AND IT

24   WOULD BE "ONE OR MORE MODEMS CONNECTED TO ONE OR MORE CELLULAR

25   TELEPHONES, TELEPHONE LINES, AND/OR RADIO TRANSMITTERS AND

1    SOFTWARE PERFORMING A SOFTWARE SEQUENCE OF INITIALIZING ONE OR

2    MORE COMMUNICATION PORTS ON THE REMOTE UNIT, OBTAINING THE

3    STORED DATA FILE, AND TRANSMITTING THE STORED DATA FILE."

4         BUT I -- YOU KNOW, IT COULD BE "INTERFACES" INSTEAD OF

5    "MODEMS."  YOU KNOW, I'M NOT CLEAR ON WHETHER THE STRUCTURE FOR

6    TELEMETRIC FREQUENCIES WAS ADEQUATELY DISCLOSED.  MR. JOHNSON

7    IS GOING TO ADDRESS THAT NEXT WEEK.

8         I MEAN, ALL OF THESE ARE OPEN QUESTIONS, BUT THAT'S JUST

9    SORT OF THE CURRENT THINKING.

10         AND I WOULD APPRECIATE, NEXT WEEK, IF YOU CAN TELL ME WHY

11    THESE ARE WRONG, WHAT SHOULD BE BETTER, AND HOPEFULLY YOU CAN

12    COME TO AGREEMENT ON AT LEAST '760 AND ON N.  OKAY?

13         ALL RIGHT.  LET'S FIGURE OUT -- THIS WAS A LONG HEARING.

14    I THINK NEXT WEEK WILL PROBABLY BE SHORTER BECAUSE YOU WON'T BE

15    DOING THE TECHNOLOGY TUTORIAL AND WE'VE REALLY DISCUSSED A LOT

16    TODAY WITH CLAIM CONSTRUCTION.

17         SO WHAT TIME DO YOU THINK WE SHOULD START?  I DON'T THINK

18    WE SHOULD START AT 10:30.  I THINK THAT'S TOO EARLY.  SO WHAT'S

19    YOUR PROPOSAL?

20              MR. JOHNSON:  YOUR HONOR, THE ONLY THING I WAS GOING

21    TO ASK IS IF -- I WAS GOING TO TRY AND -- APPLE, I THINK, WOULD

22    AGREE.

23         I WAS GOING TO -- I HAVE A PERSONAL ISSUE WITH STARTING AT

24    10:30 JUST BECAUSE I'M SUPPOSED TO FLY OUT WITH MY KIDS LATER

25    ON THAT AFTERNOON, AND WITH MY WIFE TO DO SOMETHING.

```
1          AND SO I WAS WONDERING IF THERE'S ANY WAY -- AND I

2    UNDERSTAND YOUR HONOR WANTS TO KEEP IT SHORT, AND I HAVE A

3    FLIGHT AT 5:00, WHICH --

4               THE COURT:  OH, KEEP THAT TIME?

5               MR. JOHNSON:  SO THAT'S MY ONLY -- THAT'S MY ONLY

6    ISSUE.

7               THE COURT:  THAT'S FINE.

8               MR. LEE:  THAT'S FINE WITH US.

9               MR. KREVITT:  YES, THAT'S FINE.  WE'RE HAPPY TO

10   ACCOMMODATE MR. JOHNSON'S VACATION SCHEDULE.

11        (LAUGHER.)

12              MR. JOHNSON:  PLEASE LEAVE THAT OUT OF THE PAPERS.

13        (LAUGHTER.)

14              THE COURT:  IT'S VALENTINE'S DAY, SO I KNOW THERE'S A

15   LOT OF LOVE IN THE ROOM RIGHT NOW.

16     OKAY.  SO WE'LL KEEP THAT AT 10:30, BUT HOPEFULLY IT'LL BE

17   MUCH, MUCH SHORTER.

18     I THINK YOU KNOW, YOU KNOW, WHAT INFORMATION WOULD BE

19   HELPFUL AND WE'LL GO BACK AND LOOK AT ALL THE ARGUMENTS THAT

20   YOU'VE RAISED TODAY BECAUSE MAYBE IT'LL CHANGE OUR MINDS ON

21   SOME OF THESE.

22     OKAY?  ALL RIGHT.  WHAT ELSE DO WE HAVE TO DO?  ANYTHING

23   ELSE?

24              MR. KREVITT:  NOTHING FROM APPLE, YOUR HONOR.

25              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.
```

1           MR. JOHNSON:  THANK YOU, YOUR HONOR.

2           MR. KREVITT:  THANK YOU, YOUR HONOR.

3        (THE PROCEEDINGS IN THIS MATTER WERE CONCLUDED.)

1

2

3                          CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____

17    LEE-ANNE SHORTRIDGE, CSR, CRR
      CERTIFICATE NUMBER 9595

18         DATED:  FEBRUARY 20, 2013

19

20

21

22

23

24

25