# EXHIBIT 13

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
Kevin A. Smith (Bar No. 250814)
kevinsmith@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

William C. Price (Bar No. 108542)
williamprice@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

STEPTOE & JOHNSON, LLP
John Caracappa (*pro hac vice*)
jcaracappa@steptoe.com
1330 Connecticut Avenue, NW
Washington, D.C. 20036
Telephone: (202) 429-6267
Facsimile: (202) 429-3902

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>       Plaintiff,<br><br>    vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>       Defendants. | CASE NO. 12-CV-00630-LHK<br><br>**SAMSUNG'S SECOND AMENDED PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES** |

Pursuant to the Court's Minute Order and Case Management Order, and Patent Local Rules 3-3 and 3-4, Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, "Samsung") submit amended invalidity contentions and document productions for U.S. Patent Numbers 5,666,502 ("the '502 Patent"); 5,946,647 ("the '647 patent"); 6,847,959 ("the '959 patent"); 7,761,414 ("the '414 patent); 8,014,760 ("the '760 patent); 8,046,721 ("the '721 patent"); 8,074,172 ("the '172 patent"); and 8,086,604 ("the '604 patent") (collectively, "Apple Asserted Patents").  Apple Inc. is referred to herein as "Apple" or "Plaintiff."

## PATENT LOCAL RULE 3-3 DISCLOSURES

1.      This disclosure is directed to preliminary invalidity and unenforceability issues only and does not address claim construction or non-infringement.  Samsung reserves all rights with respect to such issues, including but not limited to its position that claims of the Apple Asserted Patents are to be construed in a particular manner and are not infringed.

2.      These invalidity contentions are preliminary and are based on Samsung's current knowledge, understanding, and belief as to the facts and information available as of the date of these contentions.  Samsung has not yet completed its investigation, discovery, or analysis of information related to this action, and additional discovery may require Samsung to supplement or amend its invalidity contentions.  While Samsung has made a good-faith effort to provide a comprehensive list of prior art relevant to this case, Samsung reserves the right to modify or supplement its prior art list and invalidity contentions at a later time with or based upon pertinent information that may be subsequently discovered from Apple or third-parties.  Moreover, discovery is ongoing and Samsung reserves the right to pursue all other defenses that may be available to it, including but not limited to defenses that the Apple Asserted Patents are unenforceable based on laches, estoppel, waiver acquiescence, inequitable conduct, patent misuse, patent exhaustion, express or implied license, or any other grounds.

3.      Any invalidity analysis depends, ultimately, upon claim construction, which is a question of law reserved for the Court.  The asserted claims have not yet been construed by the Court in this case and, thus, Samsung has not yet had the opportunity to compare the asserted

claims of the Apple Asserted Patents (as construed by the Court) with the prior art.  Samsung reserves the right to amend, supplement, or materially modify its invalidity contentions after the claims have been construed by the Court.  Samsung also reserves the right to amend, supplement, or materially modify its invalidity contentions based on any claim construction positions that Apple may take in this case.  Samsung also reserves the right to assert that a claim is indefinite, not enabled, or fails to meet the written description requirement based on any claim construction position Plaintiff may take in this case or based on any claim construction the Court may adopt in this case.

4.  Samsung's invalidity contentions are directed to the claims asserted by Plaintiff that are identified in Plaintiff's June 15, 2012 Disclosure of Asserted Claims and Infringement Contentions.  In its Infringement Contentions, however, Plaintiff states that it "reserves the right to supplement or amend these disclosures as further facts are revealed during the course of this litigation."  Samsung therefore reserves the right to modify, amend, supplement or otherwise alter its invalidity contentions in the event that Plaintiff supplements or amends its infringement contentions or takes a claim construction position that is different than or in addition to those set forth in its infringement contentions, or for any other reason constituting good cause to modify, amend, supplement or otherwise alter these invalidity contentions.

5.  Samsung further contends that Plaintiff appears to be pursuing overly broad constructions of the asserted claims of the Apple Asserted Patents in an effort to piece together an infringement claim where none exists and to accuse products that do not practice the claims as properly construed.  At the same time, Plaintiff's infringement contentions are in many places too general and vague to discern exactly how Plaintiff contends each accused product practices each element of the asserted claims.  These invalidity contentions are not intended to be, and are not, an admission that the asserted claims are infringed by any of Samsung's products or technology, that any particular feature or aspect of any of the accused products practices any elements of the asserted claims, or that any of Plaintiff's apparent constructions are supportable or proper.  To the extent that any of the prior art discloses the same functionality or feature of any of the accused products, Samsung reserves the right to argue that said feature or functionality does not practice

1   any element of any of the asserted claims, and to argue, in the alternative, that if said feature or

2   functionality is found to practice any element of any of the asserted claims of the Apple Asserted

3   Patents, then the prior art reference demonstrates that that element is not novel to the invention

4   and that the claim is not patentable.

5       6.      Attached hereto as Exhibits A through H are representative claim charts that

6   demonstrate how the asserted claims of the Apple Asserted Patents are invalid in view of certain

7   prior art.  The references cited in Exhibits A through H may disclose the limitations of the asserted

8   claims of the Apple Asserted Patents either expressly and/or inherently.  Moreover, the suggested

9   obviousness combinations are in the alternative to Samsung's anticipation contentions.  The

10  obviousness combinations set forth in these contentions should not be construed to suggest that

11  any reference included in any combination is not anticipatory in its own right.

12      7.      In this action, Plaintiff asserts that Samsung infringes certain claims of the Apple

13  Asserted Patents.  Although Plaintiff asserts that these claims are either literally infringed or

14  infringed under the doctrine of equivalents, Plaintiff has failed to provide any analysis or

15  explanation regarding alleged infringement of the asserted claims of the patents-in-suit under the

16  doctrine of equivalents.  Samsung reserves its rights to modify, amend, supplement or otherwise

17  alter its preliminary infringement contentions in the event Plaintiff is permitted to modify, amend,

18  supplement, or clarify their infringement contentions with respect to direct infringement (literal

19  and under the doctrine of equivalents).

20      8.      Prior art not included in this disclosure, whether known or not known to Samsung,

21  may become relevant. In particular, Samsung is currently unaware of the extent to which Apple

22  will contend that limitations of the asserted claims are not disclosed in the prior art identified

23  herein. To the extent that such an issue arises, Samsung reserves the right to identify additional

24  teachings in the same references or in other references that anticipate or would have made the

25  addition of the allegedly missing limitation obvious. Moreover, Samsung has subpoenaed a

26  number of third parties believed to have information relevant to this disclosure. Samsung

27  expressly reserves the right to amend, supplement, or modify this disclosure as additional

28  information is obtained from third parties.

9.      Samsung further reserves the right to rely on uncited portions of the prior art references and in other publications and testimony as aids in understanding and interpreting the cited portions, as providing context thereto, and as additional evidence that a claim limitation is known or disclosed. Samsung further reserves the right to rely on uncited portions of the prior art references, other publications, and testimony to establish bases for combinations of certain cited references that render the asserted claims obvious.

10.      The references discussed in the claim charts identified above or elsewhere may disclose the elements of the asserted claims explicitly and/or inherently, and/or they may be relied upon to show the state of the art in the relevant time frame. Samsung further reserves the right to rely on additional publications, materials, and testimony that are not yet currently identified for purposes other than as prior art, including but not limited to background, state of the art in the relevant time frame, level of ordinary skill in the art, and motivation to combine.  The suggested obviousness combinations are provided in the alternative to Samsung's anticipation contentions and are not to be construed to suggest that any reference included in the combinations is not by itself anticipatory.

11.      Samsung is providing invalidity contentions only for the claims asserted by Plaintiff, but hereby reserves the right to seek invalidation of all claims in each of the Apple Asserted Patents.

12.      Samsung reserves the right to modify, amend, or supplement these disclosures as additional information becomes available, and as its discovery and investigation proceed.

# I.    THE '502 PATENT

## A.    Local Patent Rule 3-3(a):  Identification of Prior Art[1]

At this time, Samsung contends that at least the following prior art references anticipate under 35 U.S.C. § 102(a), (b), (e), (f) and/or (g) or render obvious under 35 U.S.C. § 103, either alone or in combination, the asserted claims of the '502 Patent:

### 1.    Patent References[2]

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 4,330,845 | May 18, 1982 | Dec. 31, 1979 |
| US | 4,559,598 | Dec. 17, 1985 | Feb. 22, 1983 |
| US | 4,737,980 | Apr. 12, 1988 | July 19, 1985 |
| US | 4,862,498 | Aug. 29, 1989 | Nov. 28, 1986 |
| US | 4,896,291 | Jan. 23, 1990 | May 20, 1988 |
| US | 5,007,019 | Apr. 9, 1991 | Jan. 5, 1989 |
| US | 5,041,967 | Aug. 20, 1991 | Oct. 13, 1987 |
| US | 5,103,498 | Apr. 7, 1992 | Aug. 2, 1990 |
| US | 5,265,014 | Nov. 23, 1993 | Apr. 10, 1990 |
| US | 5,317,646 | May 31, 1994 | Mar. 24, 1992 |
| US | 5,357,431 | Oct. 18, 1994 | Jan. 25, 1993 |
| US | 5,386,298 | Jan. 31, 1995 | Apr. 26, 1993 |
| US | 5,396,419 | Mar. 7, 1995 | Sep. 8, 1992 |
| US | 5,455,901 | Oct. 3, 1995 | Sep. 12, 1994 |
| US | 5,459,488 | Oct. 17, 1995 | Jan. 19, 1993 |
| US | 5,479,536 | Dec. 26, 1995 | Nov. 27, 1991 |
| US | 5,495,565 | Feb. 27, 1996 | June 21, 1994 |
| US | 5,513,308 | Apr. 30, 1996 | Sep. 1, 1993 |
| US | 5,537,618 | July 16, 1996 | Dec. 23, 1993 |
| US | 5,555,496 | Sep. 10, 1996 | May 6, 1994 |
| US | 5,557,515 | Sep. 17, 1996 | Aug. 11, 1989 |
| US | 5,574,482 | Nov. 12, 1996 | May 17, 1994 |
| US | 5,608,898 | Mar. 4, 1997 | Nov. 12, 1992 |
| US | 5,619,708 | Apr. 8, 1997 | Oct. 25, 1994 |
| US | 5,623,681 | Apr. 22, 1997 | Nov. 19, 1993 |
| US | 5,632,022 | May 20, 1997 | Nov. 13, 1991 |
| US | 5,644,735 | July 1, 1997 | May 27, 1992 |
| US | 5,675,362 | Oct. 7, 1997 | Nov. 14, 1988 |
| US | 5,682,510 | Oct. 28, 1997 | Mar. 30, 1995 |
| US | 5,682,538 | Oct. 28, 1997 | Aug. 12, 1994 |
| US | 5,704,029 | Dec. 30, 1997 | May 23, 1994 |

---

[1]    To the extent one or more prior art patents, publications, or systems are identified in the claim charts attached as Exhibits A-H to this document, but are not included in the tables and lists below for each patent, those prior art patents, publications, or systems should also be considered as prior art to the asserted patents.

[2]    Samsung incorporates by reference all prior art references cited in the patents listed herein and/or their file histories.

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 5,724,449 | Mar. 3, 1998 | Nov. 27, 1991 |
| US | 5,748,512 | May 5, 1998 | Feb. 28, 1995 |
| US | 5,752,054 | May 12, 1998 | June 6, 1995 |
| US | 5,799,107 | Aug. 25, 1998 | Oct. 15, 1997 |
| US | 5,805,676 | Sep. 8, 1998 | May 19, 1995 |
| US | 5,818,437 | Oct. 6, 1998 | July 26, 1995 |
| US | 5,835,635 | Nov. 10, 1998 | June 27, 1995 |
| US | 6,008,799 | Dec. 28, 1999 | May 24, 1994 |
| US | 6,018,342 | Jan. 25, 2000 | July 3, 1995 |
| US | 7,136,710 | Nov. 14, 2006 | Dec. 23, 1991 |
| US | 5,561,446 | Oct. 1, 1996 | Jan. 28, 1994 |
| US | 4,763,356 | Aug. 9, 1988 | Dec. 11, 1986 |
| US | 5,133,076 | July 21, 1992 | June 12, 1989 |
| US | 5,903,667 | May 11, 1999 | Aug. 24, 1990 |
| US | 5,477,447 | Dec. 19, 1995 | May 27, 1992 |

2.   **Publications[3]**

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| A Modular and Flexible Architecture for an Integrated Corpus Query System | July 1994 | Oliver Christ | Cornell University |
| A Pen-Based Database Interface for Mobile Computers | 1994 | Rafael Alonso and V.S. Mani | Institute of Electrical and Electronics Engineers |
| Adaptive and Predictive Techniques in a Communication Prosthesis | 1987 | Andrew L. Swiffin, John L. Arnott, J. Adrian Pickering, and Alan F. Newell | Informa Healthcare |
| Adaptive predictive text generation and the reactive keyboard | 1989 | John Darragh, John Joseph | University of Calgary |
| A Stylus-Based User Interface for Text: Entry and Editing | June 1991 | Aaron Goodisman | Massachusetts Institute of Technology |
| Adaptive predictive text generation and the reactive keyboard | 1991 | John J. Darragh and Ian H. Witten | Elsevier |
| Context and Orientation in Hypermedia Networks | 1989 | Kenneth Utting and Nicole Yankelovich | Association for Computing Machinery |
| Designing the User Interface | 1992 | Ben Schneiderman | Addison-Wesley |

---

[3]   Samsung incorporates by reference all prior art references identified in the publications listed herein.

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Enhancing the Usability of an Office Information System Through Direct Manipulation | Dec. 1983 | Alison Lee and F.H. Lochovsky | Association for Computing Machinery |
| Facilitating the Development of Representations in Hypertext with IDE | Nov. 1989 | Daniel S. Jordan, Daniel M. Russell, Anne-Marie S. Jensen, and Russell A. Rogers | Association for Computing Machinery |
| IBM Simon User's Manual | 1994 | | IBM |
| Investigations into History Tools for User Support | Apr. 1992 | Alison Lee | University of Toronto |
| Marquise: Creating Complete User Interfaces by Demonstration | Apr. 1993 | Brad A. Myers, Richard G. McDaniel, and David S. Kosbie | Association for Computing Machinery |
| Microsoft Foundation Class Primer | 1993 | Jim Conger | Waite Group Press |
| Pen Computing: A Technology Overview and a Vision | July 1995 | Andre Meyer | Association for Computing Machinery |
| Predictive interfaces: What will they think of next? | Nov. 1991 | Saul Greenberg, John Darragh, David Maulsby, and Ian H. Witten | University of Calgary |
| Predictive interfaces: What will they think of next? | 1995 | Saul Greenberg, John Darragh, David Maulsby, and Ian H. Witten | Association for Computing Machinery |
| Reducing Keystroke Counts with a Predictive Computer Interface | 1982 | Ian H. Witten, John G. Cleary, John J. Darragh, and David R. Hill | Institute of Electrical and Electronics Engineers |
| Software Interface for the Touch-Sensitive Menu of the Technician's Assister System | Dec. 20, 1990 | Joseph A. Molnar and Sonia Faletti | Defense Technical Information Center |
| Split Menus: Effectively Using Selection Frequency to Organize Menus | Mar. 1994 | Andrew Sears and Ben Schneiderman | Association for Computing Machinery |
| Supporting command reuse: empirical foundations and principles | Feb. 1993 | Saul Greenberg and Ian H. Witten | Academic Press |
| Supporting Command Reuse: Mechanisms for Reuse | Feb. 1993 | Saul Greenberg and Ian H. Witten | Academic Press |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| The Computer User as Toolsmith: The Use, Reuse, and Organization of Computer-based Tools | 1993 | Saul Greenberg | Cambridge University Press |
| The Design of a Graphical Browsing Interface for a Hypertext System | Feb. 25, 1994 | Joslyn A.A. Smith | University of New Brunswick |
| The Human Factors of Graphic Interaction: Tasks and Techniques | Dec. 1980 | James D. Foley and Peggy Chan | Defense Technical Information Center |
| The Information Grid: A Framework for Information Retrieval and Retrieval-Centered Applications | Nov. 1992 | Ramana Rao, Stuart K. Card, Herbert D. Jellinek, Jock D. Mackinlay, and George G. Robertson | Association for Computing Machinery |
| The XKWIC User Manual | Aug. 2, 1995 | Oliver Christ | Institut für maschinelle Sprachverarbeitung, Universität Stuttgart |
| Tools for Supporting the Collaborative Process | Nov. 1992 | James R. Rhyne and Catherine G. Wolf | Association for Computing Machinery |
| Touch-sensitive screens: the technologies and their application | 1986 | J.A. Pickering | Elsevier |
| User modeling in interactive computer systems | 1984 | Saul Greenberg and Ian H. Witten | University of Calgary |
| Using a touchscreen for simple tasks | 1990 | John D. Gould, Sharon L. Greene, Stephen J. Boies, Antonia Meluson and Manvan Rasamny | IBM T.J. Watson Research Center |
| Using Graphic History in Browsing the World Wide Web | May 1995 | Eric Z. Ayers and John T. Stasko | Georgia Institute of Technology |
| Pointing is Primal | Jan. 2, 1984 | Archie W. Mills | InfoWorld |
| Move over, keyboard, Now it's pens, pads, mice … and more | May 1985 | Gordon McComb | Popular Science |
| Using Windows on a Laptop is no Longer a Drag | May 20, 1991 | Nico Krohn | InfoWorld |
| Human-Computer Interaction: a design guide | 1989 | Mark K. Jones | Educational Technology Publications |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Mac Users Rely on Myriad of Input Devices | Apr. 9, 1990 | Yvonne Lee | InfoWorld |
| A Morphological Analysis of the Design Space of Input Devices | Apr. 1991 | Stuart K. Card, Jock D. Mackinlay, George G. Robertson | ACM |
| Issues and Techniques in Touch Sensitive Tablet Input | July 1995 | William Buxton, Ralph Hill, Peter Rowley | ACM |
| Codewright for Windows Programmer's Reference Manual | July 1994 | Premia Corp. | Premia Corporation |
| Codewright for Windows User's Manual | Aug. 1994 | Premia Corp. | Premia Corporation |
| Slate PenApps™ Application Builder Developer's Guide | 1992 | Slate Corporation | Slate Corporation |
| Slate PenApps™ Application Builder Quick Reference | 1992 | Slate Corporation | Slate Corporation |
| Slate PenApps™ Application Builder Reference Manual | 1992 | Slate Corporation | Slate Corporation |
| PenApps™ Developer's Release Software Development Kit | 1991 | Slate Corporation | Slate Corporation |
| Codewright User's Guide | 1992 | Premia Corp. | Premia Corp. |
| Borland C++ Reviewer's Guide | 1991 | Borland Int'l | Borland Int'l |
| Borland Turbo C++ Reviewer's Guide | 1991 | Borland Int'l | Borland Int'l |

### 3. Systems

Samsung also contends that the asserted claims of the '502 patent are invalid in view of public knowledge and uses and/or offers for sale or sales of products and services that are prior art under 35 U.S.C. Sec. 102(a) and/or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. Sec. 102(g), and that anticipate or render obvious the asserted claims.

The following lists prior art products or services that invalidate under 35 U.S.C. Sec. 102(a), (b), and/or (g) by the name of the item, and Samsung may rely on all versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '502 Patent, including documents and source code describing the same:

- Windows 95 Preview Program Builds
- Windows for Pen Computing / Microsoft Office
- Borland Turbo C++ / Borland C++
- Codewright
- XKWIC
- Slate PenApps
- Microsoft Visual C++
- Microsoft Office

Additional details on these invalidating references are included in Exhibit A, including to the extent now known when the item became publicly known or was used, offered for sale, or sold; the identities of the persons or entities that made the item public, publicly used it, or made the offer for sale, and the identities of the person(s) or entities involved in, and the circumstances surrounding the making of, the invention.  Samsung's positions with respect to these references are stated on information and belief, and are supported by the information and documents that will be produced by Samsung and/or third parties.  As discovery is not complete, Samsung continues to investigate these events.  Samsung may use physical samples, executable software, or source code as evidence of the relevant functionality of these prior art products or services, as described in Exhibit A.  At a mutually convenient time, Samsung will make available for inspection any physical samples of products, systems, or software listed above, and/or any source code therefor, that it has in its possession or that becomes available to Samsung in the future during discovery.

Samsung reserves the right to amend these invalidity contentions to assert these references depending on the claim construction and infringement positions Apple may take as the case proceeds.  Moreover, Samsung reserves the right to use these references in combination with other references to render the claims of the '502 Patent obvious in the event Apple takes the position that certain claim limitations are missing from the references charted in Exhibit A.

SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

**B.     Local Patent Rule 3-3(b):  Whether Each Item Anticipates or Renders Obvious the Asserted Claims**

Plaintiff asserts claims 1-2, 4-5, 8, 11, 13-17, 20, 22-24 and 26 of the '502 Patent against Samsung in this lawsuit.  All of those claims are invalid because the '502 Patent fails to meet one or more of the requirements for patentability.  The individual bases for invalidity are provided below and in the claim charts attached as Exhibit A.  Each of the foregoing listed prior art documents, the underlying work, and/or the underlying apparatus or method qualifies as prior art under one or more sections of 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

Although Samsung has identified at least one citation per limitation for each reference, each and every disclosure of the same limitation in the same reference is not necessarily identified.  Rather, in an effort to focus the issues, Samsung has generally cited representative portions of identified references, even where a reference may contain additional support for a particular claim element.  In addition, persons of ordinary skill in the art generally read a prior art reference as a whole and in the context of other publications and literature.  Thus, to understand and interpret any specific statement or disclosure within a prior art reference, such persons would rely on other information within the reference, along with other publications and their general scientific knowledge.  Samsung may rely upon uncited portions of the prior art references and on other publications and expert testimony to provide context, and as aids to understanding and interpreting the portions that are cited.  Samsung may also rely on the prior art of record for any permissible purpose, including prior art discussed in the '502 patent specification itself, including to show that the '502 patent is anticipated or obvious, show the state of the art, show motivation to combine a reference with one or more other references, and to show the proper scope of the claims.  Samsung may also rely on uncited portions of the prior art references, other disclosed publications, and the testimony of experts to establish that a person of ordinary skill in the art would have been motivated to modify or combine certain of the cited references so as to render the claims obvious.

1.     **Anticipation**

Some or all of the asserted claims of the '502 Patent are invalid as anticipated under 35 U.S.C. § 102 in view of each of the prior art references identified above and in the claim charts

included in Exhibit A, which identify specific examples of where each limitation of the asserted

claims is found in the prior art references. As explained above, the cited portions of prior art

references identified in the attached claim charts are exemplary only and representative of the

content and teaching of the prior art references, and should be understood in the context of the

reference as a whole and as they would be understood by a person of ordinary skill in the art.

### 2. **Obviousness**

To the extent any limitation is deemed not to be exactly met by an item of prior art listed

above and in Exhibit A, then any purported differences are such that the claimed subject matter as

a whole would have been obvious to one skilled in the art at the time of the alleged invention, in

view of the state of the art and knowledge of those skilled in the art. The item of prior art would,

therefore, render the relevant claims invalid for obviousness under 35 U.S.C. § 103(a).

In addition, the references identified above render one or more asserted claims of the '502

Patent obvious when the references are read in combination with each other, and/or when read in

view of the state of the art and knowledge of those skilled in the art. Each and every reference

identified is also relevant to the state of the art at the time of the alleged invention. Any of the

references disclosed above may be combined to render obvious (and therefore invalid) each of

Plaintiff's asserted claims. Samsung may rely upon a subset of the above identified references or

all of the references identified above, including all references in Exhibit A, for purposes of

obviousness depending on the Court's claim construction, positions taken by Apple during this

litigation, and further investigation and discovery. Samsung may rely on combinations with any

reference in Exhibit A and any of the other references disclosed herein with respect to the '502

patent, including combinations with any of the patents, publications or systems identified herein as

prior art to the '502 patent.

Moreover, to the extent the foregoing references are found not to anticipate the asserted

claims, the foregoing references render the asserted claims obvious either alone or in combination

with one or more of the other references identified above pursuant to P.R. 3-3(a). As explained

herein and/or in the accompanying charts, it would have been obvious to a person of skill in the art

1    at the time of the alleged invention of the asserted claims of the '502 Patent to combine the various

2    references cited herein so as to practice the asserted claims of the '502 Patent.

3         Motivations to combine the above items of prior art are present in the references

4    themselves, the common knowledge of one of ordinary skill in the art, the prior art as a whole, or

5    the nature of the problems allegedly addressed by the '502 Patent. Combining the references

6    disclosed in Exhibit A would have been obvious, as the references identify and address the same

7    technical issues and suggest very similar solutions to those issues. Samsung reserves the right to

8    amend or supplement these invalidity contentions to identify additional reasons that combining the

9    references would be obvious to one of ordinary skill in the art.

10        In addition to the specific combinations of prior art and the specific combinations of

11   groups of prior art disclosed, Samsung reserves the right to rely on any other combination of any

12   prior art references disclosed herein. Samsung further reserves the right to rely upon combinations

13   disclosed within the prosecution history of the references cited herein.

14        The obviousness combinations set forth in these contentions reflect Samsung's present

15   understanding of the potential scope of the claims that Plaintiff appears to be advocating and

16   should not be seen as Samsung's acquiescence to Plaintiff's interpretation of the patent claims.

17   Samsung reserves the right to amend or supplement these contentions regarding anticipation or

18   obviousness of the asserted claims, in view of further information from Plaintiff, information

19   discovered during discovery, or a claim construction ruling by the Court. Plaintiff has not

20   identified what elements or combinations it alleges were not known to one of ordinary skill in the

21   art at the time. Therefore, for any claim limitation that Plaintiff alleges is not disclosed in a

22   particular prior art reference, Samsung reserves the right to assert that any such limitation is either

23   inherent in the disclosed reference or obvious to one of ordinary skill in the art at the time in light

24   of the same, or that the limitation is disclosed in another of the references disclosed above and in

25   combination would have rendered the asserted claim obvious.

26        In accordance with Patent L.R. 3-3(b), prior art references rendering the asserted claims of

27   the '502 patent obvious, alone or in combination with other references, are discussed above and

28   include in Exhibits A-1 to A-11. Exhibits A-1 to A-11 include exemplary claim charts for the

‘502 patent showing specific combinations of references, including citations to relevant disclosures in those references.

In particular, Samsung contends that the asserted claims of the ‘502 patent would have been obvious in view of the prior art references identified herein. For example, Exhibits A-1 to A-11 include exemplary claim charts that describe how the asserted claims of the ‘502 patent would have been obvious. The primary references cited in Samsung's exemplary claim charts, Exhibits A-1 to A-11, are the Comerford patent, the Vargas patent, the Bristor patent, the *Toolsmith* publication, XKWIC, Microsoft Windows 95, Codewright, Microsoft Windows for Pen Computing, Turbo C++, Microsoft Visual C++, and Microsoft Office.

Each of these primary references teaches all of the limitations of the ‘502 patent's asserted claims. To the extent any claim limitations are found to be missing from the primary references, in addition to the references designated for combination with the primary references, described in each exhibit, it would have been obvious to one of ordinary skill to add the missing limitation based on the corresponding disclosure of that limitation in Exhibits A-1 to A-11. For example, to the extent the primary reference in Exhibit A-1 is found to be missing limitation 1[B], it would have been obvious to combine that primary reference with the disclosure of limitation 1[B] in any one of the many references explicitly disclosing that element, including the disclosures of that element set out in Exhibits A-2 to A-11.

Each of these combinations was obvious to try for a person of ordinary skill in the art. In the field of the ‘502 patent, there was a design need or market pressure to solve a problem and there were a finite number of identified, predictable solutions. A person of ordinary skill had good reason to pursue the known options within his or her technical grasp including combinations of the disclosures in Exhibits A-1 to A-11. Each of these combinations is also the combination of familiar elements according to known methods and yields predictable results. In the field of the ‘502 patent, a great deal of prior research and commercial software was available and design incentives and other market forces would prompt variations of it. Further reasons to combine the references identified in Exhibits A-1 to A-11 include the nature of the problem being solved, the express, implied, and inherent teachings of the prior art, and the knowledge of persons of ordinary

skill in the art that such combinations would have yielded predictable results, and that such combinations would have represented known alternatives to a person of ordinary skill in the art.  For each combination, there is a teaching, suggestion, and motivation to combine both in the references to be combined themselves, as well as in the art generally that was known to a person of ordinary skill in the art.   In any event, each limitation of the '502 patent is, and would have been at the time of the alleged invention, a simple design choice representing a predictable variation within the skill of a person of ordinary skill in the art.  Moreover, each limitation of the '502 patent was well known in the art, including well-known to persons of ordinary skill.

Additional prior art references rendering the asserted claims obvious, alone or in combination with other references, including identification of combinations showing obviousness, are identified in Exhibits A-1 to A-11, which includes exemplary claim charts for the asserted claims of the '502 Patent showing specifically where in each reference or combinations of references each asserted claim is found, and an explanation of why the prior art renders the asserted claim obvious.

In addition to the charted '502 obviousness references and other prior art references disclosed herein, Samsung may also rely on background materials to demonstrate the state of the art, which is relevant to obviousness of the asserted claims.  The concepts claimed in the '502 patent were prevalent in the field of human-computer interaction, and well-known to ordinary artisans long before the earliest alleged conception date of the '502 patent.  While there are too many examples of background materials to list (and the local rules impose no obligation to disclose materials used purely for background or state of the art), representative examples include the following: Alonso & Mani, *A Pen-Based Database Interface for Mobile Computers* (1994); Swiffin et al., *Adaptive and Predictive Techniques in a Communication Prosthesis* (1987); Darragh, Joseph, *Adaptive predictive text generation and the reactive keyboard* (1989); Darragh & Witten, *Adaptive predictive text generation and the reactive keyboard* (1991); Goodisman, *A Stylus-Based User Interface for Text: Entry and Editing* (1991); Schneiderman, *Designing the User Interface* (1992); Lee, *Investigations into History Tools for User Support* (1992); *Pen Computing: A Technology Overview and a Vision* (1995); Sears & Schneiderman, *Split Menus:*

SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

*Effectively Using Selection Frequency to Organize Menus* (1994); Smith, *The Design of a Graphical Browsing Interface for a Hypertext System* (1994); Pickering, *Touch-sensitive screens: the technologies and their application* (1986); Gould et al., *Using a touchscreen for simple tasks* (1990); Ayers & Stasko, *Using Graphic History in Browsing the World Wide Web* (1995); Jones, *Human-Computer Interaction: a design guide* (1989); Buxton et al., *Issues and Techniques in Touch Sensitive Tablet Input* (1995); *Codewright for Windows Programmer's Reference Manual* (1994); *Slate PenApps Developer's Release Software Development Kit* (1991); *Slate PenApps Application Builder Reference Manual* (1992); *Slate PenApps Application Builder Developer's Guide* (1992). The long-known concepts recited in these and similar background materials describe the background knowledge of one of skill in the art, which taken alone or in combination with prior art references described herein, render the asserted claims of the '502 patent obvious.

**C.    Local Patent Rule 3-3(c):  Charts Identifying where Specifically in each Alleged item of Prior Art each Asserted Claim is Found**

Pursuant to Local Patent Rule 3-3(c), charts identifying where specifically in each alleged item of prior art each limitation of each asserted claim is found, including for each limitation that Samsung contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function is attached in Exhibits A-1 to A-11.

**D.    Local Patent Rule 3-3(d):  Other Grounds for Invalidity**

Samsung identifies the following grounds for invalidity of the asserted claims of the '502 Patent based on 35 U.S.C. §§ 101 and/or 112 ¶¶ 1 and 2. Samsung reserves the right to supplement these disclosures based on further investigation and discovery.

1.    **Invalidity Based on 35 U.S.C. § 101**

The asserted claims of the '502 Patent are invalid under 35 U.S.C. § 101 because they only claim abstract ideas. Many limitations in the asserted claims are common abstractions in computer systems and programming languages. For example, "a list of choices is produced", "stores historical information", "the select choice is input into said computer system and displayed", "determining whether the user has selected an item", "assigning a data value",

"determining whether the data value already exists", "adding the data value", "data values within the history table correspond directly or indirectly or input values", "updating the usage information" each refer only to programming abstractions or the manipulation of information; these are concepts, not physical objects or tangible matter.

        2.      **Invalidity Based on Enablement or Written Description Under 35 U.S.C. § 112(1) and/or Invalidity Based on Indefiniteness Under 35 U.S.C. § 112(2)**

Samsung asserts that each asserted claim of the '502 Patent is invalid in that the '502 specification fails to particularly point out and distinctly claim the alleged invention of the '502 Patent. Samsung further asserts that each asserted claim of the '502 Patent is invalid as not containing a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the alleged invention.

Based on Samsung's present understanding of Plaintiff's infringement contentions, Samsung asserts that claims 1, 2, 5, 8, 11, 15-17, 20, 23-24, 26 of the '502 Patent are invalid for reciting the following claim terms/phrases:

- "input tablet"
- "field of a form" / "field of the form" / "a form having at least one field" / "a form"
- "a list of choices is produced from said history table"
- "historical information concerning usage of data values" / "usage information"
- "history table for the field class corresponding to the field is updated" / "updating the history list" / "updating the history table" / "updating the usage information corresponding to the data value to reflect its recent usage"
- "requiring data input" / "requiring data entry"
- "field class corresponding to the field" / "the field being associated with one of the field classes"
- "selecting the history list for the field based on the field class associated with the field"
- "a history list associated with the field class"

- "determining whether the user has selected an item from the displayed history list" / "assigning a data value for the field to that of a data value associated with the selected item"

- "identifying the history table for the field class associated with the field"

- "for the field class"

- computer readable code devices

These claim terms/phrases as apparently construed by Apple violate the written description, enablement, and/or definiteness requirements of 35 U.S.C. § 112.

Based on Samsung's present understanding of Plaintiff's infringement contentions, at least one or more of these claim terms/phrases are indefinite because they are inconsistent with and broader than the alleged invention disclosed in the specification and given Plaintiff's apparent constructions of the claims, any person of ordinary skill in the art at the time of the invention would not understand what is claimed, even when the claims are read in light of the specification. Moreover, based on Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted claims in which these claim terms/phrases appear lack written description because the specification of the '502 Patent demonstrates that the patentee neither conceived of nor demonstrated possession of all that Apple now contends the claims cover.

Samsung further asserts that claim 26 is invalid for reciting at least the following claim terms/phrases:

- "computer readable code devices for displaying . . ."

- "computer readable code devices for determining . . ."

- "computer readable code devices for assigning . . ."

- "computer readable code devices for updating . . ."

Each of these claims is governed by 35 U.S.C. § 112, paragraph 6. The '502 patent specification, however, fails to set forth the structure, material or acts for accomplishing the claimed computer readable code devices. Each of these claims is therefore invalid as indefinite under 35 U.S.C. § 112(2).

In addition, based on Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted claims in which these claim terms/phrases appear are invalid because the specification fails to provide sufficient disclosure to enable any person of ordinary skill in the art to which it pertains, or with which it is most nearly connected, to implement the invention without undue experimentation.

For at least the reasons set forth above, the claims fail to satisfy the requirements of § 112 ¶¶ 1 and 2.

## II.      THE '647 PATENT

### A.      Local Patent Rule 3-3(a):  Identification of Prior Art

At this time, Samsung contends that at least the following prior art references anticipate under 35 U.S.C. § 102(a), (b), (e), (f) and/or (g) or render obvious under 35 U.S.C. § 103, either alone or in combination, the asserted claims of the '647 Patent.  Samsung further hereby incorporates by reference, as if fully set out herein, all invalidity contentions, identification of prior art references and individuals identified as knowledgeable of those prior art references for the '647 patent contained within Samsung's opposition to Apple's Motion for a Preliminary Injunction (Dkt. No. 115), including all exhibits thereto, Dr. Cohen's declarations in support thereof and all exhibits thereto, and all expert depositions regarding such declarations and all exhibits thereto.

#### 1.      Patent References[4]

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| JP | H6-342426 | Dec. 13, 1994 | May 31, 1993 |
| JP | H2-184155 | July 18, 1990 | Jan. 11, 1989 |
| JP | H2-158875 | June 19, 1990 | Dec. 13, 1988 |
| KP | 1995-0007892B1 | Sep. 15, 1994 | Feb 1, 1993 |
| EP | 0 458 563 | May 20, 1991 | May 21, 1990 |
| EP | 369013A1 | Feb. 15, 1995 | Jul. 31, 1987 |
| EP | 458563A2 | Nov. 27, 1991 | May 21, 1990 |
| EP | 635808A2 | Jan. 25, 1995 | Jul., 21, 1993 |
| USA | 4,227,245 | Oct. 7, 1980 | Jun. 1, 1972 |
| USA | 4,818,131 | Apr. 4, 1989 | Dec. 29, 1985 |
| JP | 5027962A | Feb. 5, 1993 | July 22, 1991 |

---

[4]   Samsung incorporates by reference all prior art references cited in the patents listed herein and/or their file histories.

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| USA | 5,101,424 | Mar. 31, 1193 | Sep. 8, 1990 |
| USA | 5,212,792 | May 18, 1993 | June 1, 1989 |
| USA | 5,261,042 | Nov. 9, 1993 | Nov. 20, 1989 |
| USA | 5,301,350 | Apr. 5, 1994 | Oct. 10, 1989 |
| USA | 5,359,317 | Oct. 25, 1994 | Oct. 9, 1992 |
| USA | 5,369,778 | Nov. 29, 1994 | Aug. 21, 1987 |
| USA | 5,375,200 | Dec. 20, 1994 | Nov. 13, 1992 |
| USA | 5,375,201 | Dec. 20, 1994 | Dec. 18, 1992 |
| USA | 5,398,336 | Mar. 14, 1995 | Oct. 16, 1990 |
| USA | 5,418,717 | May 23, 1995 | Aug. 27, 1990 |
| USA | 5,437,036 | Jul. 25, 1995 | Sep. 3, 1992 |
| USA | 5,463,772 | Oct. 31, 1995 | Apr. 23, 1993 |
| USA | 5,483,352 | Jan. 9, 1996 | Aug. 27, 1992 |
| USA | 5,572,643 | Nov. 5, 1996 | Oct. 19, 1995 |
| USA | 5,604,897 | Feb. 18, 1997 | May 18, 1990 |
| USA | 5,606,712 | Feb. 25, 1997 | July 19, 1993 |
| USA | 5,634,124 | May 27, 1997 | Aug. 21, 1987 |
| USA | 5,649,222 | Jul. 15, 1997 | May 8, 1995 |
| USA | 5,671,427 | Sep. 23, 1997 | Oct. 12, 1994 |
| USA | 5,737,734 | Apr. 7, 1998 | Sep. 15, 1995 |
| USA | 5,774,729 | June 30, 1998 | Dec. 19, 1991 |
| USA | 5,787,432 | Jul. 28, 1998 | Dec. 6, 1990 |
| USA | 5,790,793 | Aug. 4, 1998 | Apr. 4, 1995 |
| USA | 5,799,268 | Aug. 25, 1998 | Sep. 28, 1994 |
| USA | 5,859,636 | Jan. 12, 1995 | Dec. 27, 1995 |
| USA | 5,905,890 | May 18,1999 | Oct. 27, 1993 |
| USA | 5,995,106 | Nov. 30, 1999 | May 24, 1993 |
| USA | 6,115,710 | Sep. 5, 2000 | Sep. 28, 1989 |
| USA | 6,259,446 | July 10, 2001 | Dec. 23, 1992 |
| USA | 6,678,706 | Jan. 13, 2004 | Apr. 18, 1991 |
| USA | 7,006,881 | Feb. 28, 2006 | Dec. 23, 1991 |

2.    **Publications**[5]

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| A Fast Algorithm for Multi-Pattern Searching | May 1994 | Sun Wu | N/A |
| A Methodology for the Automatic Construction of a Hypertext for Information Retrieval. | 1993 | Maristella Agosti; Fabio Crestani | N/A |
| A Relaxation Method for Understanding Speech Utterances. | 1992 | Stephanie Seneff | N/A |
| A System For Discovering Relationships by Feature Extraction from Text Databases | Aug 1994 | Jack G. Conrad and Mary Hunter Utt | N/A |

[5]    Samsung incorporates by reference all prior art references identified in the publications listed herein.

| Title | Date of Publication | Author | Publisher |
|-------|---------------------|--------|-----------|
| A Taxonomy of See-Through Tools. | Apr. 24-28, 1994 | Eric A. Bier; Maureen C. Stone; Ken Fishkin; William Buxton; Thomas Baudel | N/A |
| A Template Matcher for Robust NL Interpretation. | 1991 | Eric Jackson; Douglas Appelt; John Bear; Robert Moore; Ann Podlozny | N/A |
| Actions (scripts) - Actions are AppleScript scripts which perform tasks using the detected text. | 1997 | Apple Computer | N/A |
| Actions (scripts) - Tips and Tricks | 1997 | Apple Computer | N/A |
| Actions (scripts) - Writing AppleScript Actions for Detectors | 1997 | Apple Computer | N/A |
| Actions (scripts) - Writing AppleScript Actions for Detectors (extracting the detected text) | 1997 | Apple Computer | N/A |
| Actions (scripts) - Writing AppleScript Actions for Detectors (Running the Script) | 1997 | Apple Computer | N/A |
| Actions (scripts) - Writing AppleScript Actions for Detectors (Script Body) | 1997 | Apple Computer | N/A |
| Actions (scripts) - Writing AppleScript Actions for Detectors (USCityState Detector) | 1997 | Apple Computer | N/A |
| Agents of Alienation. | Jul. 1995 | Jaron Lanier | N/A |
| Agents that Reduce work and Information Overload. | Jul. 1994 | Patti Maes | N/A |
| An Efficient Context-Free Parsing Algorithm. | Apr. 1969 | Jay Earley | N/A |
| An Open Agent Architecture. | 1994 | Philip R. Cohen; Adam Cheyer; Michelle Wang; Soon Cheol Baeg | N/A |
| Anaphora in a Wider Context: Tracking Discourse Referents. | 1996 | Christopher Kennedy; Branimir Boguraev | N/A |

| Title | Date of Publication | Author | Publisher |
|-------|---------------------|--------|-----------|
| Apple Developer CD Series | Including but not limited to Nov. 1992, Dec. 1993, Mar. 1994, Jun. 1994, Sep. 1994, Dec. 1994, Jun. 1995, Aug. 1995, Sep. 1995, Nov. 1995, Dec. 1995, Feb. 1996, Mar. 1996, Jun. 1996, Aug. 1996, and Nov. 1996 | Apple Developer Group | N/A |
| Apple Human Interface Guidelines | 1992 | | N/A |
| Apple Newton – Backing up pre-installed software packages using a storage card | 1995 | N/A | N/A |
| Apple Newton – Features of the Newton 2.0 Operating System | Undated | N/A | N/A |
| Apple Newton – Flow Charts | Undated | N/A | N/A |
| Apple Newton – Hardware Guide | Undated | Joe Tate | N/A |
| Apple Newton – Internal Serial Slot Designer's Guide | Undated | N/A | N/A |
| Apple Newton – Message Pad Accessories | Undated | N/A | N/A |
| Apple Newton – Message Pad Handbook | 1995 | N/A | N/A |
| Apple Newton – Message Pad Specifications | Undated | N/A | N/A |
| Apple Newton – Programmer's Guide | Undated | Don Mills | N/A |
| Apple Newton – Programmer's Reference | Undated | N/A | N/A |
| Apple Newton – ROM Board Designer's Guide | Undated | N/A | N/A |
| Apple Newton – Solutions Guide vol. 1 & 2 | 1995 | David Nagel | N/A |
| Apple Newton – System Update 1.3 | 1995 | N/A | N/A |
| Applescript – The Easy Way is the Right Way | 1998 | Apple Computer, Inc. | N/A |
| At Macworld, Apple failed to regain believers among the once faithful | Jan. 13, 1997 | Denise Caruso | N/A |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Automatic Authoring and Construction of Hypermedia for Information Retrieval. | Feb. 1995 | Maristella Agosti; Massimo Melucci; Fabio Crestani | N/A |
| Automatic Hypertext Construction. | Jan. 1995 | James Allan | N/A |
| Automatic Structuring and Retrieval of Large Text Files | Feb. 1994 | Gerard Salton, James Allan, and Chris Buckley | Association for Computing Machinery |
| Automatic Text Processing: The Transformation, Analysis, and Retrieval of Information by Computer | 1989 | Gerard Salton | N/A |
| Automatic Text Structuring and Retrieval – Experiments in Automatic Encyclopedia Searching. | 1991 | Gerard Salton; Chris Buckley | N/A |
| Byte cover story entitled "The Point of the Pen" | Feb. 1991 | Robert Carr | McGraw-Hill |
| Cambridge Journals, "National Language Engineering" | Mar. 1995 | N/A | N/A |
| Collaborative Programmable Intelligent Agents. | 1998 | Bonnie A. Nardi; James R. Miller; David J. Wright | N/A |
| Complete Guide to the NextStep User Environment. | 1993 | Michael B. Shebanek | N/A |
| Connecting – With Your EO Cellular Module | 1992 | Ann Cullen | EO Publications |
| Converting a Textbook to Hypertext | July 1992 | Roy Rada | Association for Computing Machinery |
| Creating Highly-Interactive and Graphical User Interfaces by Demonstration. | Aug. 1986 | Brad A. Myers; William Buxton | N/A |
| Creating User Interfaces Using Programming by Example, Visual Programming, and Constraints. | Apr. 1990 | Brad A. Myers | N/A |
| Currency Detectors | 1997 | Apple Computer | N/A |
| CyberDesk: A Framework for Providing Self-Integrating Context-Aware Services. | 1998 | Anind K. Dey; Gregory D. Abowd Andrew Wood | N/A |
| Data Detectors – summary | 1997 | Apple Computer | N/A |
| Demonstrational Techniques for Instructible Interface Agents. | Mar. 1994 | Henry Lieberman | N/A |
| Detectors - definition | 1997 | Apple Computer | N/A |
| Developing Adaptive Systems To Fit Individual Aptitudes. | 1992 | David Benyon; Dianne Murray | N/A |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Developing for the User | May 19, 1988 | Robert Carr | M&T Publishing |
| "Dexter With Open Eyes," | February 1994 | John L. Leggett and John L. Schnase | Communications of the Association for Computing Machinery, |
| Documents as User Interfaces. | 1991 | Eric A. Bier; Ken Pier | N/A |
| Downloading the Apple Data Detectors SDK for developers. | 1997 | Apple Computer | N/A |
| Dr. Dobb's Journal Article entitled, "A Conversation with Robert Carr Part II" | Dec. 1991 | Michael Swaine | M&T Publishing |
| Dr. Dobb's Journal of Software Tools for the Professional Programmer – Avoiding Software Pitfalls | May 19, 1988 | N/A | M&T Publishing |
| Dr. Dobb's Journal of Software Tools for the Professional Programmer – Operating System Platforms | Nov. 1991 | N/A | M&T Publishing |
| Drop Zones: An Extension to LiveDoc. | Apr. 1998 | Thomas Bonura; James R. Miller | N/A |
| Eager Demonstration Video | 1991 | Allen Cypher | N/A |
| Eager: Programming Repetitive Tasks By Example. | Apr 28-May 2, 1991 | Allen Cypher | N/A |
| Effective Video Screen Displays: Cognitive Style and Cuing Effectiveness | Jan. 1994 | Kenneth A. Cory | SIGCHI Bulletin |
| Embedded Menus: Selecting Items in Context | 1986 | Larry Koved; Ben Shneiderman | N/A |
| Embedded Menus: Selecting Items In Context | Apr. 1986 | Larry Koved and Ben Schneiderman | Association for Computing Machinery |
| Embedded Menus: Selecting Items in Context, ACM Vol. 29 No. 4 | Apr. 1986 | Larry Koved; Ben Schneiderman | N/A |
| EmbeddedButtons: Documents as User Interfaces | Nov. 1991 | Eric A. Bier | Association for Computing Machinery |
| Entering the World-Wide Web: A Guide to Cyberspace. | Mar. 1994 | Kevin Hughes | N/A |
| Experiments with Oval: A Radically Tailorable Tool for Cooperative Work. | Apr. 1995 | Thomas W. Malone; Kum-Yew Lai; Christopher Fry | N/A |
| Exploring EXPECT: A Tcl-based Toolkit for Automating Interactive Programs. | Dec. 1, 1994 | Don Libes | N/A |

| Title | Date of Publication | Author | Publisher |
|-------|---------------------|--------|-----------|
| Finding and Reminding File Organization from the Desktop. | Jul. 1995 | Deborah Barreau; Bonnie A. Nardi | N/A |
| Formal Languages and Their Relation to Automata | 1969 | John Hopcroft and Jeffrey Ullman | Addison-Wesley |
| Fortune article entitled "Hot New PCs That Read Your Writing" | Feb. 11, 1991 | Brenton R. Schlender | The Time Inc Magazine Company |
| From documents to objects: An overview of LiveDoc. | Apr. 1998 | Jim Miller; Thomas Bonura | N/A |
| FYI, revised draft URL document | Aug. 5, 1994 | Tim Berners-Lee, Larry Masinter, Mark McCahill | N/A |
| Getting Results with Microsoft Office. | 1995 | Microsoft | N/A |
| Getting Started – With Your EO Personal Communicator | 1992 | Ann Cullen | EO Publications |
| Getting Started with PenPoint [Version 1.0] | 1992 | N/A | N/A |
| GNU Emacs:  UNIX Text Editing and Programming. | 1992 | Michael A. Schoonover; John S. Bowie; William R. Arnold | N/A |
| GNU Emacs: goto-addr.el extension | Aug. 15, 1995 | Eric Ding | N/A |
| GO Corporation – At Last, Technology Harnesses One of The Most Powerful Forces Known to Man | 1991 | N/A | N/A |
| Go Corporation Business Plan | June 23, 1988 | N/A | N/A |
| GO Corporation Current Status & Future Goals | Undated | N/A | N/A |
| Graphical Search and Replace. | Aug. 1988 | David Kurlander | N/A |
| Handwritten Notes –  Dr. Dobbs - "Designing Apps" | Undated | N/A | N/A |
| Handwritten Notes –  Software Development "Tips" | Undated | N/A | N/A |
| Handwritten Notes – "Key Philosophies of FW" | Undated | N/A | N/A |
| HieNet: A User-Centered Approach for Automatic Link Generation. | Nov. 1993 | Daniel T. Chang | N/A |
| http://graphcomp.com/info/specs/nets/ddeapi.html, April 1995 ("DDE") | Apr. 1995 | N/A | N/A |
| Hypertext: Concepts, Systems and Applications. | Nov. 1990 | N. Streitz; A. Rizk; J. Andre | N/A |

SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Incorporating String Search in a Hypertext System: User Interface and Signature File Design Issues | 1990 | Faloutsos, Raymond Lee, Catherine Plaisant and Ben Shneiderman | HyperMedia |
| Incremental maintenance of semantic links in dynamically changing hypertext systems | 1990 | Simon M. Kaplan and Yoelle S. Maarek | Butterworth–Heinemann |
| Information For Developers" sheet | Undated | N/A | N/A |
| Intelligent Agents: What We Learned At The Library. | 1996 | Bonnie A. Nardi; Vicki O'Day | N/A |
| Interactive Constraint-Based Search And Replace. | May 3-7, 1992 | David Kurlander; Steven Feiner | N/A |
| Internet Address Detectors | 1997 | Apple Computer | N/A |
| Learning Perl | 1993 | Randall L. Schwartz | O'Reilly & Associates |
| Letter, The Indsiders Guide to The Personal Computer Industry, article entitled "Operating Systems GO's Got The Most Modern OS Around" | Jan. 28, 1991 | N/A | Industry Publishing Company |
| Looking for the Bright Side of User Interface Agents. | Jan. 1995 | Ben Schneiderman | N/A |
| Lookup Guide to the EO Personal Communicator | 1993 | Ann Cullen | EO Publications |
| Lotus Notes Application Development Handbook. | May 1995 | Erica Kerwien | N/A |
| The Lynx_users_guide.html file ("Lynx User Guide") entitled "Lynx User Guide Version 2.3" | May, 20, 1994 | N/A | N/A |
| Mac OS Discussion Forum – Apple Script | 1998 | Apple Computer | N/A |
| Managing Internet Information Services | 1994 | Cricket Liu | O'Reilly & Associates |
| Microsoft Foundation Class Primer | 1993 | Jim Conger | Waite Group Press |
| Multi-media RISSC Informatics Receiving Information with Structural Structural Components. | 1986 | Daniela Rus; Devika Subramanian | N/A |
| N2 Newton – Overview | Jul. 22, 1996 | N/A | N/A |
| N2 Newton – Power Adaptor Designer's Guide | Undated | N/A | N/A |
| N2 Newton – Power System Architecture | Undated | N/A | N/A |
| Newton Programmers Guide | 1994 | | Addison-Wesley |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Parsing Techniques – a Practical Guide | 1990 | Dick Grune and Ceriel Jacobs | Ellis Horwood, Chichester |
| PC Magazine article entitled "First Looks, Hands-on Reviews of the Latest Products" | June 30, 1992 | Bruce Brown | N/A |
| PC Magazine article entitled "Power Programming, An Introduction to Pen-Based Computing" | Jan. 14, 1992 | Ray Duncan | N/A |
| PC Week article entitled "PenPoint Makes Its Debut with Support from 40 ISVs" | Apr. 20, 1992 | Erica Schroeder | N/A |
| PenApps Developer's Release – Software Development Kit | Undated | N/A | N/A |
| PenPoint - A Catalog of Products and Services | 1992 | N/A | N/A |
| PenPoint 1.01 SDK Installation and Release Notes | Sep. 27, 1992 | N/A | N/A |
| PenPoint API Reference Volume I | 1990 | N/A | Addison-Wesley |
| PenPoint Architectural Reference Volume I | 1991 | N/A | Addison-Wesley |
| PenPoint Architectural Reference Volume II | 1991 | N/A | Addison-Wesley |
| PenPoint Development Tools | 1991 | N/A | Addison-Wesley |
| PenPoint Getting Started | 1991 | N/A | N/A |
| PenPoint Introduction letter re Software Development Kit | Undated | N/A | N/A |
| PenPoint News Release "GO Announces PenPoint Operating System For Mobile Pen-based Computing" | Jan. 22, 1991 | N/A | N/A |
| PenPoint Notebook User Interface | 1991 | N/A | N/A |
| Penpoint Programming | 1992 | Andy Novobilski | Addison-Wesley |
| PenPoint User Interface Design Reference | 1991 | N/A | Addison-Wesley |
| Perspective Handbook | Nov. 1992 | N/A | |
| Pocket Guides – Eleven Basic PenPoint Gestures | 1991 | N/A | |
| POSIX Programmer's Guide Writing Portable UNIX Programs | 1994 | Donald Lewine | O'Reilly & Associates |
| Programming Perl | 1991 | Larry Wall and Randall L. Schwartz | O'Reilly & Associates |
| Programming Windows: the Microsoft guide to writing applications for Windows 3 | 1990 | Charles Petzold | Microsoft Press |
| Release 1.0 – A Monthly Report | Jan. 22, 1991 | Esther Dyson | |

| Title | Date of Publication | Author | Publisher |
|-------|--------------------|--------|-----------|
| Remote Interfaces and File System, Text and Handwriting Classes, Application Classes, Installation Classes, Miscellaneous Classes, and Windows & UI Toolkit Control Classes | Undated | N/A | N/A |
| Searching for the Missing Link: Discovering Implicit Structure in Spatial Hypertext | Nov. 1993 | Catherine C. Marshall and Frank M. Shipman III | Association for Computing Machinery |
| sed & awk | 1991 | Dale Dougherty | O'Reilly & Associates |
| Sidekick – The Desktop Organizer Just a Keystroke Away | 1985 | N/A | Borland International |
| Sidekick – The Desktop Organizer Just a Keystroke Away (Special Edition for AST Research Inc.) | Mar. 1985 | N/A | Borland International |
| Sidekick 2.0 Getting Started | 1991 | N/A | Borland International |
| Sidekick 2.0 User's Guide | 1991 | N/A | Borland International |
| Sidekick software and screenshots, version 1.52A | 1985 | N/A | N/A |
| Sidekick Version 1.5 Owner's Handbook | Mar. 1995 | N/A | Borland International Inc. |
| The Simon User Manual1 | 1994 | N/A | IBM |
| The AT&T EO Travel Guide | 1993 | Ken Maki | John Wiley & Sons, Inc. |
| The Computing Strategy Report | Mar. 1991 | William M. Bluestein and John C. McCarthy | Forrester Research Inc |
| The file mhonarc (the mail MHonArc Perl script) from the top level of the MHonArc distribution | Oct. 1, 1994 | N/A | N/A |
| The file mhonarc.txt from the doc directory of the MHonArc distribution | Oct. 1, 1994 | N/A | N/A |
| The Mosaic Handbook for Microsoft Windows | 1994 | Dale Dougherty and Richard Koman | O'Reilly & Associates |
| The UNIX Programming Environment | 1984 | Brian W. Kernighan and Rob Pike | Prentice-Hall Inc. |
| The Windows Interface Guidelines — A Guide for Designing Software | Feb. 13, 1995 | N/A | N/A |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| The World of Messaging – An Introduction to Personal Communications | 1992 | Randy Stock | EO Publications |
| UNIX Applications Programming Mastering the Shell | 1990 | Ray Swartz | SAMS |
| UNIX in a Nutshell | 1994 | Daniel Gilly and the staff of O'Reilly & Associates, Inc. | O'Reilly & Associates |
| UNIX System V/386 Programmer's Reference Manual | 1988 | N/A | Prentice Hall |
| User interface design for the Hyperties electronic encyclopedia | Nov. 1987 | Ben Schneiderman | N/A |
| Using PenPoint [Version 1.0] | 1992 | N/A | N/A |
| Using Sidekick: The Desktop Organizer | 1988 | Phillp R. Robinson | McGraw-Hill |
| Visual Basic 4 Unleashed | 1995 | Conrad Scott et al. | Sams Publishing |
| Documents as User Interfaces | 1991 | Eric A. Bier, Ken Pier | ACM |
| EmbeddedButtons: Supporting Buttons in Documents | Oct. 1992 | Eric A. Bier | ACM |

### 3. Systems

Samsung also contends that the asserted claims of the '647 patent are invalid in view of public knowledge and uses and/or offers for sale or sales of products and services that are prior art under 35 U.S.C. Sec. 102(a) and/or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. Sec. 102(g), and that anticipate or render obvious the asserted claims.

The following lists prior art products or services that invalidate under 35 U.S.C. Sec. 102(a), (b), and/or (g) by the name of the item, and Samsung may rely on all versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '647 Patent, including documents and source code describing the same:

- Apple Message Pad

- Apple Newton

- AppleScript and/or Open Scripting Architecture

Case 5:12-cv-00630-LHK Document 473-5 Filed 04/28/13 Page 32 of 227

1    • Eager

2    • EO Personal Communicator 448 and 880

3    • Eudora

4    • GNU Emacs

5    • GriD Systems

6    • Homer

7    • Hypertext

8    • IBM ThinkPad 700T

9    • Internet Explorer

10   • Lotus Notes

11   • Lynx System

12   • mIRC

13   • Mosaic

14   • NCR 3125 and 3130

15   • NCSA Mosaic for X Window System Version 2.4

16   • Netscape Navigator

17   • Newton Operating System

18   • NeXTSTEP, NeXTStep, and/or OpenSTEP, including NXSpellChecker and
19      NXSpellServer

20   • PenPoint Operating System

21   • Perspective

22   • Selection Recognition Agent

23   • Sidekick

24   • Simon

25   • SNOBAL

26   • Third-party software for Newton Operating System

27   • Third-party software for PenPoint Operating System, including but not limited to
28      all editions of PenSoft Perspective

- • Visual Basic
- • Visual CE
- • Windows 95 Beta
- • WordPerfect
- • X Window System
- • Embedded Buttons

Additional details on these invalidating references are included in Exhibit B, including to the extent now known when the item became publicly known or was used, offered for sale, or sold; the identities of the persons or entities that made the item public, publicly used it, or made the offer for sale, and the identities of the person(s) or entities involved in, and the circumstances surrounding the making of, the invention. Samsung's positions with respect to these references are stated on information and belief, and are supported by the information and documents that will be produced by Samsung and/or third parties. As discovery is not complete, Samsung continues to investigate these events. Samsung may use physical samples, executable software, or source code as evidence of the relevant functionality of these prior art products or services, as described in Exhibit B. At a mutually convenient time, Samsung will make available for inspection any physical samples of products, systems, or software listed above, and/or any source code therefor, that it has in its possession or that becomes available to Samsung in the future during discovery.

Samsung reserves the right to amend these invalidity contentions to assert these references depending on the claim construction and infringement positions Apple may take as the case proceeds. Moreover, Samsung reserves the right to use these references in combination with other references identified above to render the claims of the '647 Patent obvious in the event Apple takes the position that certain claim limitations are missing from the references charted in Exhibit B.

**B.      Local Patent Rule 3-3(b):  Whether Each Item Anticipates or Renders Obvious the Asserted Claims**

Plaintiff asserts claims 1-2, 4, 6 and 8-9 of the '647 Patent against Samsung in this lawsuit. All of those claims are invalid because the '647 Patent fails to meet one or more of the

requirements for patentability.  The individual bases for invalidity are provided below and in the

claim charts attached as Exhibit B.  Each of the foregoing listed prior art documents, the

underlying work, and/or the underlying apparatus or method qualifies as prior art under one or

more sections of 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

Although Samsung has identified at least one citation per limitation for each reference,

each and every disclosure of the same limitation in the same reference is not necessarily identified.

Rather, in an effort to focus the issues, Samsung has generally cited representative portions of

identified references, even where a reference may contain additional support for a particular claim

element.  In addition, persons of ordinary skill in the art generally read a prior art reference as a

whole and in the context of other publications and literature.  Thus, to understand and interpret any

specific statement or disclosure within a prior art reference, such persons would rely on other

information within the reference, along with other publications and their general scientific

knowledge.  Samsung may rely upon uncited portions of the prior art references and on other

publications and expert testimony to provide context, and as aids to understanding and interpreting

the portions that are cited.  Samsung may also rely on the prior art of record for any permissible

purpose, including prior art discussed in the '647 patent specification itself, including to show that

the '647 patent is anticipated or obvious, show the state of the art, show motivation to combine a

reference with one or more other references, and to show the proper scope of the claims. Samsung

may also rely on uncited portions of the prior art references, other disclosed publications, and the

testimony of experts to establish that a person of ordinary skill in the art would have been

motivated to modify or combine certain of the cited references so as to render the claims obvious.

### 1.    **Anticipation**

Some or all of the asserted claims of the '647 Patent are invalid as anticipated under 35

U.S.C. § 102 in view of each of the prior art references identified above and in the claim charts

included in Exhibit B, which identify specific examples of where each limitation of the asserted

claims is found in the prior art references.  As explained above, the cited portions of prior art

references identified in the attached claim charts are exemplary only and representative of the

content and teaching of the prior art references, and should be understood in the context of the reference as a whole and as they would be understood by a person of ordinary skill in the art.

## 2. **Obviousness**

To the extent any limitation is deemed not to be exactly met by an item of prior art listed above and in Exhibit B, then any purported differences are such that the claimed subject matter as a whole would have been obvious to one skilled in the art at the time of the alleged invention, in view of the state of the art and knowledge of those skilled in the art. The item of prior art would, therefore, render the relevant claims invalid for obviousness under 35 U.S.C. § 103(a).

In addition, the references identified above render one or more asserted claims of the '647 Patent obvious when the references are read in combination with each other, and/or when read in view of the state of the art and knowledge of those skilled in the art. Each and every reference identified is also relevant to the state of the art at the time of the alleged invention. In general, the references disclosed above may be combined to render obvious (and therefore invalid) each of Plaintiff's asserted claims. Samsung may rely upon a subset of the above identified references or all of the references identified above, including all references in Exhibit B, for purposes of obviousness depending on the Court's claim construction, positions taken by Apple during this litigation, and further investigation and discovery. Samsung may rely on combinations with any reference in Exhibit B and any of the other references disclosed herein with respect to the '647 patent, including combinations with any of the patents, publications or systems identified herein as prior art to the '647 patent.

Moreover, to the extent the foregoing references are found not to anticipate the asserted claims, the foregoing references render the asserted claims obvious either alone or in combination with one or more of the other references identified above pursuant to P.R. 3-3(a). As explained herein and/or in the accompanying charts, it would have been obvious to a person of skill in the art at the time of the alleged invention of the asserted claims of the '647 Patent to combine the various references cited herein so as to practice the asserted claims of the '647 Patent.

Motivations to combine the above items of prior art are present in the references themselves, the common knowledge of one of ordinary skill in the art, the prior art as a whole, or

the nature of the problems allegedly addressed by the '647 Patent. Combining the references disclosed in Exhibit B would have been obvious, as the references identify and address the same technical issues and suggest very similar solutions to those issues. Samsung reserves the right to amend or supplement these invalidity contentions to identify additional reasons that combining the references would be obvious to one of ordinary skill in the art.

In addition to the specific combinations of prior art and the specific combinations of groups of prior art disclosed, Samsung reserves the right to rely on any other combination of any prior art references disclosed herein. Samsung further reserves the right to rely upon combinations disclosed within the prosecution history of the references cited herein.

The obviousness combinations set forth in these contentions reflect Samsung's present understanding of the potential scope of the claims that Plaintiff appears to be advocating and should not be seen as Samsung's acquiescence to Plaintiff's interpretation of the patent claims. Samsung reserves the right to amend or supplement these contentions regarding anticipation or obviousness of the asserted claims, in view of further information from Plaintiff, information discovered during discovery, or a claim construction ruling by the Court. Plaintiff has not identified what elements or combinations it alleges were not known to one of ordinary skill in the art at the time. Therefore, for any claim limitation that Plaintiff alleges is not disclosed in a particular prior art reference, Samsung reserves the right to assert that any such limitation is either inherent in the disclosed reference or obvious to one of ordinary skill in the art at the time in light of the same, or that the limitation is disclosed in another of the references disclosed above and in combination would have rendered the asserted claim obvious.

In accordance with Patent L.R. 3-3(b), prior art references rendering the asserted claims of the '647 patent obvious, alone or in combination with other references, are discussed above and include in Exhibits B-1 to B-15. Exhibits B-1 to B-15 include exemplary claim charts for the '647 patent showing specific combinations of references, including citations to relevant disclosures in those references.

In particular, Samsung contends that the asserted claims of the '647 patent would have been obvious in view of the prior art references identified herein. For example, Exhibits B-1 to B-

15 include exemplary claim charts that describe how the asserted claims of the '647 patent would

have been obvious. The primary references cited in Samsung's exemplary claim charts, Exhibits

B-1 to B-15, are the Mosaic system, the Lynx system, the Sidekick system, the Perspective system

/ EO Personal Communicator, the Newton Programmer's Guide, the IBM Simon system, the

Stamps patent, the Clayton patent, the mIRC 2.1 system, the Davoust patent, the Gomez and

Nokia patents, the Pandit patent, the Homer system, Hypertext, and the Embedded Buttons

System.

Each of these primary references teaches all of the limitations of the '647 patent's asserted

claims. To the extent any claim limitations are found to be missing from the primary references,

in addition to the references designated for combination with the primary references, described in

each exhibit, it would have been obvious to one of ordinary skill to add the missing limitation

based on the corresponding disclosure of that limitation in Exhibits B-1 to B-15. For example, to

the extent the primary reference in Exhibit B-1 is found to be missing limitation 1[B], it would

have been obvious to combine that primary reference with the disclosure of limitation 1[B] in any

one of the many references explicitly disclosing that element, including the disclosures of that

element set out in Exhibits B-2 to B-15.

Each of these combinations was obvious to try for a person of ordinary skill in the art. In

the field of the '647 patent, there was a design need or market pressure to solve a problem and

there were a finite number of identified, predictable solutions. A person of ordinary skill had

good reason to pursue the known options within his or her technical grasp including combinations

of the disclosures in Exhibits B-1 to B-15. Each of these combinations is also the combination of

familiar elements according to known methods and yields predictable results. In the field of the

'647 patent, a great deal of prior research and commercial software was available and design

incentives and other market forces would prompt variations of it. Further reasons to combine the

references identified in Exhibits B-1 to B-15 include the nature of the problem being solved, the

express, implied, and inherent teachings of the prior art, and the knowledge of persons of ordinary

skill in the art that such combinations would have yielded predictable results, and that such

combinations would have represented known alternatives to a person of ordinary skill in the

1   art.  For each combination, there is a teaching, suggestion, and motivation to combine both in the

2   references to be combined themselves, as well as in the art generally that was known to a person

3   of ordinary skill in the art.   In any event, each limitation of the '647 patent is, and would have

4   been at the time of the alleged invention, a simple design choice representing a predictable

5   variation within the skill of a person of ordinary skill in the art.  Moreover, each limitation of the

6   '647 patent was well known in the art, including well-known to persons of ordinary skill.

7           Additional prior art references rendering the asserted claims obvious, alone or in

8   combination with other references, including identification of combinations showing obviousness,

9   are identified in Exhibits B-1 to B-15, which includes exemplary claim charts for the asserted

10  claims of the '647 Patent showing specifically where in each reference or combinations of

11  references each asserted claim is found, and an explanation of why the prior art renders the

12  asserted claim obvious.  In addition to the charted '647 obviousness references and other prior art

13  references disclosed herein, Samsung may also rely on background materials to demonstrate the

14  state of the art, which is relevant to obviousness of the asserted claims.  The concepts claimed in

15  the '647 patent were prevalent in the field of human-computer interaction, and well-known to

16  ordinary artisans long before the earliest alleged conception date of the '647  patent.  While there

17  are too many examples of background materials to list (and the local rules impose no obligation to

18  disclose materials used purely for background or state of the art), representative examples include

19  the following:  *A Fast Algorithm for Multi-Pattern Searching*, Sun Wu (1994); *Agents that Reduce*

20  *Work and Information Overload*, Patti Maes (1994); *An Open Agent Architecture*, Philip R. Cohen

21  et. al. (1994); *Automatic Hypertext Construction*, James Allen (1995); *Collaborative*

22  *Programmable Intelligent Agents*, Bonnie Nardi et al. (1998); *Creating User Interfaces Using*

23  *Programming by Example*, Brad A. Myers (1990); the *Apple Knowledge Navigator* (1987) and

24  *Future Shock* videos (1988) (available at http://www.digibarn.com/collections/movies/knowledge-

25  navigator.html; http://www.mprove.de/script/88/apple/futureshock.html); *Demonstrational*

26  *Techniques for Instructible Interface Agents*, Henry Lieberman (1994); *Looking for the Bright*

27  *Side of User Interface Agents*, Ben Schneiderman (1995); *sed & awk*, Dale Dougherty (1991);

28  UNIX Applications Programming: Mastering the Shell, Ray Swartz (1990).  The long-known

concepts recited in these and similar background materials describe the background knowledge of one of skill in the art, which taken alone or in combination with prior art references described herein, render the asserted claims of the '647 patent obvious.

**C.**      **Local Patent Rule 3-3(c):  Charts Identifying where Specifically in each Alleged item of Prior Art each Asserted Claim is Found**

Pursuant to Local Patent Rule 3-3(c), charts identifying where specifically in each alleged item of prior art each limitation of each asserted claim is found, including for each limitation that Samsung contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function is attached in Exhibits B-1 through B-15.

**D.**      **Local Patent Rule 3-3(d):  Other Grounds for Invalidity**

Samsung identifies the following grounds for invalidity of the asserted claims of the '647 Patent based on 35 U.S.C. §§ 101 and/or 112 ¶¶ 1 and 2.  Samsung reserves the right to supplement these disclosures based on further investigation and discovery.

**1.**      **Invalidity Based on 35 U.S.C. § 101**

The asserted claims of the '647 Patent are also invalid under 35 U.S.C. § 101 because they only claim abstract ideas.  Many limitations in the asserted claims are common abstractions in computer systems and programming languages.  For example, "detecting structures in data and performing actions on detected structures," "an analyzer server for detecting structures in the data, and for linking actions to the detected structures," "a user interface enabling the selection of a detected structure and a linked action," "an action processor for performing the selected action linked to the detected structure," "grammars and a parser for detecting structures in the data," "a string library and a fast string search function for detecting string structures in the data," each refer only to programming abstractions or the manipulation of information; these are concepts, not physical objects or tangible matter.

2.   **Invalidity Based on Enablement or Written Description Under 35 U.S.C. § 112(1) and/or Invalidity Based on Indefiniteness Under 35 U.S.C. § 112(2)**

Samsung asserts that each asserted claim of the '647 Patent is invalid in that the '647 specification fails to particularly point out and distinctly claim the alleged invention of the '647 Patent.  Samsung further asserts that each asserted claim of the '647 Patent is invalid as not containing a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the alleged invention.

Based on Samsung's present understanding of Apple's infringement contentions, Samsung asserts that claims 1, 2, 4, 6, 8, and 9 of the '647 Patent are invalid for reciting at least the following claim terms/phrases:

- "input device"

- "output device"

- "program routines"

- "detecting structures in the data"

- "analyzer server"

- "linking actions to the detected structures"

- "user interface enabling the selection of a detected structure and a linked action;"

- "action processor"

- "a fast string search function for detecting string structures in the data"

- "highlights"

- "the user interface enables selection of an action by causing the output device to display a pop-up menu of the linked actions."

These claim terms/phrases as apparently construed by Apple violate the written description, enablement, and/or definiteness requirements of 35 U.S.C. § 112.  For instance, the term "fast

string search" either fails to quantify how "fast" a string search must be in order to infringe claim 6, or refers to a particular algorithm that is not disclosed anywhere in the claims or specification.

Based on Samsung's present understanding of Apple's infringement contentions, at least one or more of these claim terms/phrases are indefinite because they are inconsistent with and broader than the alleged invention disclosed in the specification and given Apple's apparent constructions of the claims, any person of ordinary skill in the art at the time of the invention would not understand what is claimed, even when the claims are read in light of the specification. Moreover, based on Samsung's present understanding of Apple's infringement contentions, each of the asserted claims in which these claim terms/phrases appear lack written description because the specification of the '647 Patent demonstrates that the patentee neither conceived of nor demonstrated possession of all that Apple now contends the claims cover. In addition, based on Samsung's present understanding of Apple's infringement contentions, each of the asserted claims in which these claim terms/phrases appear are invalid because the specification fails to provide sufficient disclosure to enable any person of ordinary skill in the art to which it pertains, or with which it is most nearly connected, to implement the invention without undue experimentation.

For at least the reasons set forth above, the claims fail to satisfy the requirements of § 112 ¶¶ 1 and 2.

## III. THE '959 PATENT

### A. Local Patent Rule 3-3(a): Identification of Prior Art

At this time, Samsung contends that at least the following prior art references anticipate under 35 U.S.C. § 102(a), (b), (e), (f) and/or (g) or render obvious under 35 U.S.C. § 103, either alone or in combination, the asserted claims of the '959 Patent. Samsung further hereby incorporates by reference, as if fully set out herein, all invalidity contentions, identification of prior art references and individuals identified as knowledgeable of those prior art references for the '949 patent contained within Samsung's opposition to Apple's Motion for a Preliminary Injunction (Dkt. No. 115), including all exhibits thereto, Dr. Carbonell's declarations in support thereof and all exhibits thereto, and all expert depositions regarding such declarations and all exhibits thereto.

1.    **Patent References**[6]

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 3,496,299 | Feb. 17, 1970 | Nov. 14, 1966 |
| US | 4,260,854 | Apr. 7, 1981 | May 20, 1975 |
| US | 5,477,447 | December 19, 1995 | July 30, 1993 |
| US | 5,577,241 | Nov. 19, 1996 | Dec. 7,1994 |
| US | 5,634,053 | May 27, 1997 | Aug. 29, 1995 |
| US | 5,659,732 | Aug. 19, 1997 | May 17, 1995 |
| US | 5,671,426 | Sep. 23, 1997 | June 22, 1993 |
| US | 5,742,816 | Apr. 21, 1998 | Sep. 15, 1995 |
| US | 5,748,512 | May 5, 1998 | Feb. 28, 1995 |
| US | 5,845,278 | Dec. 1, 1998 | Sep. 12, 1997 |
| US | 5,855,015 | Dec. 29, 1998 | May 12, 1995 |
| US | 5,913,205 | June 15, 1999 | Mar. 28, 1996 |
| US | 5,913,215 | June 15, 1999 | Feb. 19, 1997 |
| US | 5,937,406 | Aug. 10, 1999 | Jan. 31, 1997 |
| US | 5,987,446 | Nov. 16, 1999 | Nov. 12, 1996 |
| US | 6,000,020 | Dec. 7, 1999 | Apr. 1, 1997 |
| US | 6,005,565 | Dec. 21, 1999 | Mar. 25, 1997 |
| US | 6,008,799 | Dec. 28, 1999 | May 24, 1994 |
| US | 6,018,342 | Jan. 25, 2000 | July 3, 1995 |
| US | 6,026,429 | Feb. 15, 2000 | Nov. 10, 1997 |
| US | 6,065,003 | May 16, 2000 | Aug. 19, 1997 |
| US | 6,070,158 | May 30, 2000 | Aug. 14, 1996 |
| US | 6,078,914 | June 20, 2000 | Dec. 9, 1996 |
| US | 6,098,065 | Aug. 1, 2000 | Feb. 13, 1997 |
| US | 6,266,094 | July 24, 2001 | June 14, 1999 |
| US | 6,311,182 | Oct. 30, 2001 | Nov. 17, 1997 |
| US | 6,324,534 | Nov. 27, 2001 | Sep. 10, 1999 |
| US | 6,345,269 | Feb. 2, 2002 | Mar. 26, 1999 |
| US | 6,366,915 | Apr. 2, 2002 | Nov. 4, 1998 |
| US | 6,370,543 | Apr. 9, 2002 | May 24, 1996 |
| US | 6,415,285 | July 2, 2002 | Dec. 8, 1999 |
| US | 6,424,968 | July 23, 2002 | Oct. 15, 1998 |
| US | 6,445,834 | Sep. 3, 2002 | Oct. 19, 1998 |
| US | 6,574,632 | June 3, 2003 | Nov. 18, 1998 |
| US | 6,578,048 | June 10, 2003 | June 5, 1995 |
| US | 6,615,172 | Sep. 2, 2003 | Nov. 12, 1999 |
| US | 6,665,640 | Dec. 16, 2003 | Nov. 12, 1999 |
| US | 6,697,835 | Feb. 24, 2004 | Oct. 28, 1999 |
| US | 6,842,758 | Jan. 11, 2005 | July 30, 1999 |
| US | 6,845,370 | Jan. 18, 2005 | Nov. 19, 1998 |
| US | 6,862,713 | Mar. 1, 2005 | Aug. 31, 1999 |
| US | 6,901,366 | May 31, 2005 | Aug. 26, 1999 |
| US | 7,653,614 | Jan. 26, 2010 | July 15, 1999 |
| US | 7,873,995 | Jan. 18, 2011 | Sep. 29,2003 |
| EP | 0706139 | Published | Sep. 9, 1994 |

---

[6]   Samsung incorporates by reference all prior art references cited in the patents listed herein and/or their file histories.

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| | | Apr. 10, 1996 | |
| WO | 98/32289 | Published July 23, 1998 | Jan. 17, 1997 |
| US | 7,113,939 | Sep 26, 2006 | Sep 21, 1999 |
| US | 6,834,276 | Dec. 21, 2004 | Feb. 25, 1999 |
| US | 6,055,531 | Apr. 25, 2000 | Jun. 23, 1997 |
| US | 5,926,808 | Jul 20, 1999 | Jul 25, 1997 |
| US | 6,131,044 | Oct. 10, 2000 | Apr. 22, 1998 |
| US | 6,014,616 | Jan. 11, 2000 | Nov. 13, 1997 |
| WO | 1999/005839 | Published Apr. 2, 1999 | July 21, 1998 |
| US | 6,006,227 | Dec 21, 1999 | Jun 28, 1996 |
| US | 6,638,313 | Oct 28, 2003 | Jun 28, 1996 |
| US | 6,725,427 | Apr 20, 2004 | Jun 28, 1996 |
| US | 6,691,151 | Feb. 10, 2004 | Jan. 5, 1999 |
| US | 5,404,295 | Apr. 4, 1995 | Aug. 16, 1990 |
| US | 5,727,129 | Mar. 10, 1998 | Jun. 4, 1996 |
| US | 5,729,741 | Mar. 17, 1998 | Apr. 10, 1995 |
| US | 5,764,906 | Jun. 9, 1998 | Nov. 7, 1995 |
| US | 5,870,755 | Feb. 9, 1999 | Feb. 26, 1997 |
| US | 5,893,107 | Apr. 6, 1999 | Jul. 1, 1996 |
| US | 6,009,422 | Dec. 28, 1999 | Nov. 26, 1997 |
| US | 6,285,785 | Sept. 4, 2001 | Mar. 28, 1991 |
| US | 6,311,178 | Oct. 30, 2001 | Sept. 29, 1997 |
| US | 6,628,305 | Nov. 9, 1998 | Sept. 30, 2003 |
| US | 6,732,088 | May 4, 2004 | Dec. 14, 1999 |
| US | 2002/0107872 | Aug. 8, 2002 | Feb. 6, 1998 |
| US | 6,021,405 | Feb. 1, 2000 | Aug. 23, 1996 |
| US | 6,304,870 | Oct. 16, 2001 | Dec. 2, 1997 |
| US | 6,636,853 | Oct. 21, 2003 | Aug. 30, 1999 |
| US | 7,020,670 | Mar. 28, 2006 | Apr. 23, 1998 |
| US | 7,165,064 | Jan. 16, 2007 | Jul. 7, 1999 |
| US | 2002/0138492 | Sept. 26, 2002 | Mar. 7, 2001 |
| US | 2005/0149511 | Jul. 7, 2005 | Jun. 31, 2000 |
| US | 6,185,567 | Feb. 6, 2001 | May 29, 1998 |

2.   **Publications[7]**

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| An Information System Based on Distributed Objects | 1987 | Michael Caplinger | Computing Machinery |
| An Information System for Corporate Users: Wide Area Information Servers | Sep. 1991 | Brewster Kahle and Art Medler | Online |
| Annotating the World Wide Web using Natural Language | 1997 | Boris Katz | |

---

[7]   Samsung incorporates by reference all prior art references identified in the publications listed herein.

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| ARIADNE: A System for Constructing Mediators for Internet Sources | 1998 | Jose Luis Ambite, Naveen Ashish, Greg Barish, Craig A. Knoblock, Steven Minton, Pragnesh J. Modi, Ion Muslea, Andrew Philpot and Sheila Tejada | SIGMOD |
| Browsing Local and Global Information | 1995 | Masum Hasan, Gene Golovchinsky, Emanuel Noik, Nipon Charoenkitkarn, Mark Chignell, Alberto Mendelzon and David Modjeska | Proceedings of the 1995 conference of the Centre for Advanced Studies on Collaborative Research |
| Building the infrastructure of resource sharing: union catalogs, distributed search, and cross-database linkage | Jan. 1, 1997 | Lynch, Clifford | Library Trends |
| The Computer User as Toolsmith | 1993 | Saul Greenberg | |
| CyberDesk: A Framework for Providing Self-Integrating Ubiquitous Software Services | 1997 | Anind K. Dey, Gregory Abowd, Mike Pinkerton and Andrew Wood | |
| Dataware Technologies Introduces Dataware II Knowledge Query Server | Sep. 21, 1998 | | PR Newswire |
| Discover: A Resource Discovery System based on Content Routing | | Mark A. Sheldon, Andrzej Duda, Ron Weiss, David K. Gifford | |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| The Distributed Information Search Component (Disco) and the World Wide Web | 1997 | Anthony Tomasic, Remy Amouroux, Philippe Bonnet, Olga Kapitskaia, Hubert Naacke, Louiqa Raschid | SIGMOD |
| Doctor Linux – 5th Edition | 1997 | John Purcell, ed. | Linux Systems |
| Dragon Systems® Demonstrates First PDA Speech Recognition Technology on the Digital StrongARM Processor in Apple Newton MessagePad 2000 | March 25, 1997 | | Dragon Systems |
| The Effectiveness of GlOSS for the Text Database Discovery Problem | | Luis Gravano, Hector Garcia-Molina and Anthony Tomasic | |
| Experience the Internet's most powerful search tool | | | The WebTools Company |
| Exploring Computer Science with Scheme | 1998 | | Spinger-Verlag New York, Inc. |
| An Extensible Constructor Tool for the Rapid, Interactive Design of Query Synthesizers | 1998 | Michelle Baldonado et al. | ACM conference on Digital libraries, Pittsburgh, PA |
| Erweiterung des FreeWAIS-Servers, translated as Expansion of the FreeWAIS Server | 1994 | Huynh Quoc Thanh Tung | Diploma thesis, University of Dortmund |
| FreeWAIS-sf: A Wide Area Information Server for Structured Documents and Retrieval Functionality | | | |
| FreeWAIS-sf* | Mar. 30, 1995 | Ulrich Pfeifer Tung Huynh | University of Dortmund |
| freeWAIS-sf – UNIDO Edition 0.5 | Oct. 1995 | Ulrich Pfeifer | University of Dortmund |
| freeWAIS-sf FAQ, available at http://iubio.bio.indiana.edu/soft/util/wais/freewais-sf.faq | May 1, 1995 | | |
| FreeWAIS-sf open source software | 1999 and earlier | | Open Source |
| Internet Tools: Where There's a Will, There's a WAIS | 1994 | Glyn Moody | The Guardian |

SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| A Homegrown Competitive Tool at Apple Computer's Corporate Library Becomes the Newest Librarian's Assistant | 1994 | Janet Vratny | IFLA Journal |
| Interfaces for Distributed Systems of Information Servers | September 26, 1993 | Brewster Kahle | |
| Client-Server Standards For Text: Foundation For Innovation | 1991 | Esther Dyson | |
| Emerald Article: Wide Area Information Servers: An Executive Information System for Unstructured Files | 1992 | Brewster Kahle | |
| Wide Area Information Server Concepts | 1989 | Brewster Kahle | |
| Information Retrieval in vernetzten heterogenen Datenbanken," Norbert Govert (1996), translated as "Information Retrieval in Networked Heterogenous Databases" | 1996 | Norbert Govery | University of Dortmund |
| The Internet Strategy Handbook: Lessons from the New Frontier of Business | 1996 | Mary Cronin | Harvard Business School Press |
| WAIS CLIENT SOFTWARE FOR UNIX -- SWAIS & XWAIS, available at http://www.uwo.ca/its/doc/news letters/Focus/Volume 8 (1993)/81-16.txt | March 4, 1993 | Peter Marshall | University of Western Ontario |
| Structural Components of the Isite Information System | 1995 | Kevin Gamiel | |
| Video: WAIS video demonstration | 1991 | | |
| Video: Special Interest Group on Wide Area Information Servers: conference held March 19, 1993 at U.S.G.S. | March 19, 1993 | | U.S.G.S. |
| Video: Wide Area Information Servers (WAIS) launch lecture at Xerox PARC, available at http://archive.org/details/wais_s upercomputer_parc | 1991 | | Xerox PARC |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Proceedings for Wide Area Information Server Workshop, February 3-4, 1992, MCNC Research Triangle Park, NC USA | 1992 | | Microelectronics Center of North Carolina. Center for Communications, National Science Foundation (U.S.), Institute for Academic Technology |
| A GUI-based version of the SenseMaker interface for information exploration | 1997 | M. Baldonado and T. Winograd | Stanford |
| Hemlock – An Internet Search Tool for the Newton | 1999 | Sean Luke | |
| Hemlock An Internet Search Tool for the Newton | | | |
| Heuristics – Intelligent Search Strategies for Computer Problem Solving | 1984 | Judea Pearl | Addison-Wesley |
| How to Create a WAIS Query | | | |
| Implementation of the SMART Information Retrieval System | May 1985 | Chris Bucley | |
| The Info Agent: An Interface for Supporting Users in Intelligent Retrieval | 1995 | Daniela D' Aloisi and Vittorio Giannini | |
| Infoharness: Managing Distributed, Heterogeneous Information | 1999 | Kshitij Shah and Amit Sheth | IEEE Internet Computing |
| Information Retrieval Algorithms and Heuristics | 1998 | David A. Grossman and Ophir Frieder | Kluwer Academic |
| Information Retrieval (Z39.50): Application Service Definition and Protocol Specification | 1995 | | NISO Press |
| Information Retrieval Application Service Definition and Protocol Specification for Open Systems Interconnection, ANSI/NISO Z39.50-1992 | 1992 | | NISO Press |
| Information Retrieval on the World Wide Web | 1997 | Venkat N. Gudivada, Vijay V. Raghavan, William I. Grosky and Rajesh Kasanagottu | IEEE Internet Computing |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| INQUERY System Overview | Undated | John Broglio, James P. Callan and W. Bruce Croft | |
| Internet Fish | May 1996 | Brian A. LaMacchia | |
| An Introduction to Multisensor Data Fusion | 1997 | David L. Hall and James Llinas | IEEE |
| Macworld Mac OS 8.5 Bible | 1999 | Lon Poole | IDG Books Worldwide |
| Mac OS 8.5 – Black Book | 1999 | Mark R. Bell and Debrah D. Suggs | The Coriolis Group, |
| Mac OS 8.5: GO FOR IT! Part I | Oct. 29 1998 | Michael Lambert | The Mac Observer |
| Mac OS 8.5: GO FOR IT! Part II | Oct. 29 1998 | Michael Lambert | The Mac Observer |
| Mac OS 8.5 Special Report | 1998 | | MacInTouch |
| MAC OS 9: The Missing Manual – Finding Files and Web Sites with Sherlock 2 | | | |
| Mac OS 9 for Dummies | 1999 | Bob LeVitus | John Wiley & Son, Inc. |
| MacWAIS Software Version 1.28 | Feb. 23, 1994 | | EINet |
| MacWAIS User Manual Version 1.29 | 1994 | | Microelectronics and Computer Technology Corporation |
| The MetaCrawler Architecture for Resource Aggregation on the Web | Nov. 8, 1996 | Erik Selberg and Oren Etzioni | |
| Metadata for Digital Libraries: Architecture and Design Rationale | 1997 | Michelle Baldonado et al. | Stanford University |
| Microsoft Universal Data Access Platform | 1998 | Jose A. Blakeley, Michael J. Pizzo | SIGMOD |
| Microsoft Windows 98 Companion | 1998 | Martin Matthews | Microsoft Press |
| Modern Heuristic Search Methods | 1996 | V.J. Rayward-Smith, I.H. Osman, C.R. Reeves and G.D. Smith | John Wiley and Sons |

| Title | Date of Publication | Author | Publisher |
|-------|---------------------|--------|-----------|
| Multiobjective Heuristic Search | 1999 | Pallab Dasgupta, P.P. Chakrabarti and S.C. Desarkar | Vieweg |
| NetHopper Version 3.0 – User's Manual | 1997 | | AllPen |
| Newton Apple MessagePad Handbook | 1995 | | Apple |
| Newton Solutions Guide | | | Apple |
| Newton Programmer's Guide | 1996 | | Addison-Wesley |
| Northern Light: New Search Engine for the Web and Full-Text Articles | Feb. 1998 | Greg Notess | Online |
| Overview of Wide Area Information Servers | Apr. 1991 | Brewster Kahle | |
| Pen Pals | Oct. 12, 1993 | Christopher Barr and Michael Neubarth | PC Magazine |
| Peter Rand's Review of Hemlock | 1999 | Peter Rand | |
| Privacy Interfaces for Information Management | | Tessa Lau at al. | ACM October 1999 Vol. 42, No. 10 |
| Rama: An Architecture for Internet Information Filtering | May 1, 1991 | Jim Binkley and Leslie Young | Kluwer |
| Search Algorithms Under Different Kinds of Heuristics – A Comparative Study | 1983 | A. Bagchi and A. Mahanti | Indian Institute of Management Calcutta |
| Searching Structured Documents with the Enhanced Retrieval Functionality of Free Wais-sf and SFgate | 1995 | Ulrich Pfeifer et al. | Computer Networks and ISDN Systems vol. 27, pp. 1027-1036. |
| The Search Engine Report | Sept. 1, 1998 | Danny Sullivan | Search Engine Watch |
| Sigerson, A Sherlock Power Booster | Dec. 2, 1998 | James Sentman | the Mac Observer |
| SFgate open source software | 1998 and earlier | | Open Source |
| SFgate: The WWW Gateway for freeWAIS-sf, Edition 1.108, for SFgate 5.1 | Jan. 1997 | Norbert Gövert and Ulrich Pfeifer | University of Dortmund, Germany |
| Sherlock Holmes am Newton | Dec. 1999 | | |
| Softscape's QuickFind Search and Retrieval Software | Nov. 1997 | Robert J. Boeri | EMedia Professional |

| Title | Date of Publication | Author | Publisher |
|-------|---------------------|--------|-----------|
| Software Quality Engineering – A Total Technical and Management Approach | 1988 | Michael S. Deutsch and Ronald R. Willis | Prentice-Hall |
| Surviving the Storm: Using Metasearch Engines Effectively | May 1999 | Randal D. Carlson and Judi Repman | Computers in Libraries |
| Toward more comprehensive Web searching: single searching versus megasearching | 1998 | Greg R. Notess | Online |
| Unix for the Impatient | 1996 | Paul W. Abrahams and Bruce A. Larson | Addison-Wesley |
| User's Guide to the Macintosh version of the WAIS interface | 1991 | | Thinking Machines Corporation |
| WAIStation User's Guide, available from ftp://ftp.jcu.edu.au/doc/wais/wai station_users_guide.txt | 1991 | Brewster Kahle | Thinking Machines Corporation |
| WAIS, A Sketch Of An Overview | Sep. 23, 1991 | Jeff Kellem | |
| WAIS Search Help | | | |
| WAIS: The Wide Area Information Server or Anonymous What??? | June 18, 1992 | Peter Marshall | The University of Western Ontario |
| What is freeWAIS-sf? | | | |
| Wide Area Information Servers (WAIS) | June 1994 | M. St. Pierre, J. Fullton, K. Gamiel, J. Goldman, B. Kahle, J. Kunze, H. Morris and F. Schiettecatte | |
| Windows 98 Annoyances | Oct. 1998 | David A. Karp | O'Reilly |
| Windows 98 for Dummies | 1999 | Andy Rathbone | Wiley |
| WordPerfect for Windows V 5.2 | 1992 | | WordPerfect |
| Xerox Delivers Global Competitive Advantage to Manufacturing Customers Through Solutions Portfolio | Apr. 27, 1999 | | Business Wire |
| Xerox Introduces Two Products to Expand Knowledge Sharing Software Portfolio | Nov. 9, 1999 | | Business Wire |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Xerox unveils "askOnce", which brings a new search dimension to end-users by giving universal access to multiple information sources through one simple query | 1999 | | Xerox |
| The Z39.50 Information Retrieval Standard – Part I: A Strategic View of Its Past, Present and Future | Apr. 1997 | Clifford A. Lynch | D-Lib Magazine |
| SenseMaker: an information-exploration interface supporting the contextual evolution of a user's interests. | 1997 | Baldonado, Michelle Q Wang; Winograd, Terry. | CHI '97 Proceedings of the ACM SIGCHI Conference on Human factors in computing systems Pages 11-18 ACM New York, NY, USA ©1997 |
| An Interactive, Structure-Mediated Approach To Exploring Information In A Heterogeneous, Distributed Environment. | Dec. 1997 | Baldonado, Michelle Q Wang | Ph.D. Dissertation at Stanford University. December 1997. |
| Techniques and Tools for Making Sense out of Heterogeneous Search Service Results. | 1996 | Baldonado, Michelle Q Wang; Winograd, Terry | Stanford Technical Report. Submitted to Digial Libraries '96. |
| An Interactive, Structure-Mediated Approach to Exploring Information in a Heterogeneous, Distributed Environment. Dissertation Slides. | 1997 | Baldonado, Michelle Q Wang | Ph.D. Dissertation at Stanford University. December 1997. Dissertatoin Slides |
| Toward Comprehensive Web Search (doctoral dissertation) | 1999 | Erik Warren Selberg | University of Washington |
| The anatomy of a large-scale hypertextual Web search engine | Apr. 14-18, 1998 | Sergey Brin and Lawrence Page | ACM |
| Object-Oriented Software Construction | 1997 | Bertrand Mever | Prentice Hall PTR |
| Concepts and Paradigms of Object Oriented Programming | 1990 | Peter Wegner | OOPS Messenger, vol. 1 |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Using Speech Recognition:  A Guide for Application Developers | 1995 | Judith A. Markowitz | Prentice Hall |
| Trends in Speech Recognition | 1980 | Wayne A. (Ed. ) Lea | Speech Science Publications |
| Voice Communication With Computers: Conversational Systems | 1993 | Christopher Schmandt | Van Nostrand Reinhold Computer |
| Voice Recognition | 1997 | Richard L. Klevans, Robert D. Rodman | Artech House |
| AppleSearch | 1993 | Apple Computer, Inc. | Apple Computer, Inc. |
| WAIS and GOPHER SERVERS: A Guide for Internet End-Users | 1994 | Eric L. Morgan | Meckler Publishing/Meckler Corporation |
| Archived - AppleSearch 1.5: Quick Reference | | Apple Computer, Inc. | Apple Computer, Inc. |
| Archived - AppleSearch Bundle For Internet: Internet Essentials | | Apple Computer, Inc. | Apple Computer, Inc. |
| Archived - MacTCP: Information on Version 2.0.6 (8/94) | | Apple Computer, Inc. | Apple Computer, Inc. |
| Archived - AppleSearch WAIS Gateway: Description | | Apple Computer, Inc. | Apple Computer, Inc. |
| Archived - AppleSearch WAIS Gateway: Connecting to the Internet | | Apple Computer, Inc. | Apple Computer, Inc. |
| AppleSearch Windows Client Statement of Work (Document #117) | 1993 | Apple Computer, Inc. | Apple Computer, Inc. |
| Apple IP Gateway Administrator's Guide | 1994 | Apple Computer, Inc. | Apple Computer, Inc. |
| Archived - AppleSearch: WAIS Directory Servers | | Apple Computer, Inc. | Apple Computer, Inc. |
| Archived - AppleSearch 1.5: Work with Network Firewalls | | Apple Computer, Inc. | Apple Computer, Inc. |
| Archived - Accessing the Internet with ClarisWorks (CM) | | Apple Computer, Inc. | Apple Computer, Inc. |
| Archived - AppleSearch Bundle For Internet: Installation Checklist | | Apple Computer, Inc. | Apple Computer, Inc. |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Archived - AppleSearch 1.5 Administrator Guide: Troubleshooting | | Apple Computer, Inc. | Apple Computer, Inc. |
| Archived - Apple's Internet Products (4/97) | | Apple Computer, Inc. | Apple Computer, Inc. |
| Archived - AppleSearch Server 1.5.1 Patch: Read Me, | | Apple Computer, Inc. | Apple Computer, Inc. |
| Sprint PCS User Guide: Samsung Model SCH-3500 | 1999 | Sprint PCS | Sprint PCS |
| SAMSUNG Electronics Develops Watch Phone | March 31, 1999 | | Social Responsibility News |
| AppleSearch Client Future Direction | August 25, 1993 | Kazu Yanagihara | Apple Computer, Inc. |
| AppleSearch Client 1.1 | August 20, 1993 | Kazu Yanagihara | Apple Computer, Inc. |
| Gilligan's Island Design | | Apple Computer, Inc. | Apple Computer, Inc. |
| WAIS 2.0: Technical Description. Table of Contents | 1995 | WAIS Inc | WAIS Inc |
| WAIS Protocol Users Manual | March 30, 1990 | Harry Morris | Thinking Machines Corporation |
| The Z39.50 Protocol in Plain English | | Clifford A. Lynch | |
| Willow: A Uniform Search Interface | 1996 | Debra S. Ketchell et al. | Journal of the American Medical Informatics Association 3(1) pp. 27-27, Jan./Feb. 1996 |
| Massively Parallel Information Retrieval for Wide Area Information Servers | 1991 | Craig Stanfill | Conference Proceedings of 1991 IEEE International Conference on Systems, Man, and Cybernetics, 1991. Decision Aiding for Complex Systems.  Vol. 1, pp. 679-682. |

Case No. 12-cv-00630-LHK
SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

Case 5:12-cv-00630-LHK Document 547-15 Filed 05/28/13 Page 54 of 227

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Use of the ISite Z39.50 software to search and retrieve spatially-referenced data | 1995 | Douglas D. Nebert; James Fulton | Proceedings of Digital Libraries '95, Austin, Texas 1995 (http://csdl.tamu.edu/DL95/), pp. 107-114. |
| Information Fusion with ProFusion | 1996 | Susan Gauch; Guijun Wang | Proceedings of WebNet '96: The First World Conference of the Web Society |
| An Adaptive Multi-Agent Architecture for the ProFusion* Meta Search System | 1997 | Yizhong Fan; Susan Gauch | Proceedings of WebNet '97 |
| Newton MessagePad 2000 Tech Article | 1997 | Worldwide Apple Assist, Apple Computer, Inc. | Apple Computer, Inc. |
| Speech Recognition for the MessagePad 2000 | 1997 | Stephen Breit et al. | Newton Technology Journal 3(2) |
| Adaptive Agents for Information Gathering from Multiple, Distributed Information Sources | 1999 | Yizhong Fan; Susan Gauch | Proceedings of 1999 AAAI Symposium on Agents in Cyberspace, Stanford University, March 1999 |
| On Combining the Knowledge of Heterogeneous Information Repositories | 1996 | Uwe M. Borghoff; Johann H. Schlichter | Journal of Universal Computer Science 2(7) |
| Experiments In using agent-based retrieval from distributed and heterogeneous databases | 1997 | B. Das | Proceedings of 1997 Knowledge and Data Engineering Exchange Workshop |
| GLIMPSE: A Tool to Search Through Entire File Systems | Oct. 1993 | Udi Manber Sun Wu | University of Arizona |
| ProFusion*: Intelligent Fusion from Multiple, Distributed Search Engines | 1996 | Susan Gauch Guijun Wang Mario Gomez | Journal of Universal Computer Science 2(9) |

SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| The ProFusion Website - Search Page available at http://web.archive.org/web/19981206030048/http://profusion.com/ProFusion1.html | Dec. 6, 1998 | | |
| The ProFusion Website – Help Page available at http://web.archive.org/web/19981202000627/http://www.profusion.com/help.html | Dec. 2, 1998 | | |
| The CBKB Website – Info Page available at http://web.archive.org/web/19980210080531/http://www.xerox.fr/ats/xtrim/ | Feb. 10, 1998 | | |
| The CBKB Website – How To Page available at http://web.archive.org/web/19980210090039/http://www.xerox.fr/ats/xtrim/query.html | Feb. 10, 1998 | | |
| The CBKB Website – Sources Page available at http://web.archive.org/web/19980210090024/http://www.xerox.fr/ats/xtrim/sources.html | Feb. 10, 1998 | | |
| The CBKB Website – Home Page available at http://web.archive.org/web/19981205120702/http://www.xrce.xerox.com/research/ct/prototypes/cbkb/home.html | Dec. 5, 1998 | | |
| The CBKB Website – Showroom Page available at http://web.archive.org/web/19980210075604/http://www.xerox.fr/showroom/techno/cbkb.html | Feb. 10, 1998 | | |
| The CBKB Website – Fact Sheet Page available at http://web.archive.org/web/19980210085331/http://www.xerox.fr/showroom/fs/cbkb.html | Feb. 10, 1998 | | |
| The CBKB Website – Intro Page available at http://web.archive.org/web/19990117063438/http://www.rxrc.xerox.com/research/ct/prototypes/cbkb/HELP/introduction.html | Jan. 17, 1999 | | |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| The CBKB Website – Session Manager Page available at http://web.archive.org/web/19990302050035/http://www.rxrc.xerox.com/research/ct/prototypes/cbkb/HELP/sessionManager.html | Mar. 02, 1999 | | |
| The CBKB Website – Query Panel Page available at http://web.archive.org/web/19990302025841/http://www.rxrc.xerox.com/research/ct/prototypes/cbkb/HELP/queryPanel.html | Mar. 02, 1999 | | |
| The CBKB Website – Complex Query Formation Page available at http://web.archive.org/web/19990503032027/http://www.rxrc.xerox.com/research/ct/prototypes/cbkb/HELP/complexQueryFormulation.html | May. 03, 1999 | | |
| The CBKB Website – Result Panel Page available at http://web.archive.org/web/19990302035848/http://www.rxrc.xerox.com/research/ct/prototypes/cbkb/HELP/resultPanel.html | Mar. 02, 1999 | | |
| The CBKB Website – Network Activity Page available at http://web.archive.org/web/19990506074804/http://www.rxrc.xerox.com/research/ct/prototypes/cbkb/HELP/networkActivity.html | May. 06, 1999 | | |
| The CBKB Website – Demo Requirements Page available at http://web.archive.org/web/19990302061054/http://www.rxrc.xerox.com/research/ct/prototypes/cbkb/distrib.html#requirements | Mar. 02, 1999 | | |
| The CBKB Website – Demo Page available at http://web.archive.org/web/19990203055751/http://www.xrce.xerox.com/cbkb-cgi/main | Feb. 03, 1999 | | |
| An Open Agent Architecture. | 1994 | Philip R. Cohen; Adam Cheyer; Michelle Wang; Soon Cheol Baeg | N/A |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| "The Open Agent Architecture:A Framework for Building Distributed Software Systems," | 1999 | D.L. Martin, A.J. Cheyer, and D.B. Moran, | Applied Artificial Intelligence, vol. 13, nos. 1–2, Jan.–Mar. 1999, pp. 91–128. |
| "Development Tools for the Open Agent Architecture", | 1996 | Martin, David et al., | The Practical Application of Intelligent Agents and Multi-Agent Technology (PAAM96), London, Apr. 1996. |
| InfoWiz: An Animated Voice Interactive Information System | May 1999 | Adam Cheyer and Luc Julia | Agents'99 (WS Communicative Agents) : Seattle (USA), May 1999. |
| Multimodal Maps: An Agent-based Approach. | 1998 | Adam Cheyer and Luc Julia | Multimodal Human-Computer Communication Lecture Notes in Artificial Intelligence #1374, Bunt/Beun/Borghuis (Eds.), Springer, pp 111-121. |
| Multimodal User Interfaces in the Open Agent Architecture. | 1998 | Moran D., Cheyer A., Julia L., Martin D. & Park S. | Journal of Knowledge-Based SYSTEMS, #10, pp 295-303. |
| Facilitating Navigation and Information Access with CANOES: Collaborative Agents and Natural Operations in Enhanced Spaces. | 1999 | Julia L. & Cheyer A. | Inter-agency Workshop on "Smart Environment": Atlanta (USA), Submitted. |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Optimizing queries over multimedia repositories | 1996 | S. Chaudhuri and L. Gravano | SIGMOD '96 Proceedings of the 1996 ACM SIGMOD International Conference on Management of Data, ACM, pp. 91-102 |
| A universal query interface for heterogeneous distributed libraries | 1996 | N. Katayama et al. | Proceedings of Seventh International Workshop on Database and Expert Systems Applications, IEEE, pp. 332-339 |
| Adaptive information agents in distributed textual environments | 1998 | F. Menczer & R. K. Belew | AGENTS '98, Proceedings of the Second International Conference on Autonomous Agents, pp. 157-164 |
| An overview and classification of mediated query systems | 1999 | R. Domenig & K.R. Dittrich | ACM SIGMOD Record 28(3), Sept. 1999, pp. 63-72 |
| An architecture for intelligent resource agents | 1997 | J. Pastor et al. | COOPIS '97, Proceedings of the Second IFCIS International Conference on Cooperative Information Systems, IEEE, pp. 151-159 |
| Parallel database systems 101 | 1995 | J. Gray | SIGMOD '95, ACM, May 1995, p. 436 |
| The FirstSearch user interface architecture:  universal access for any user, in many languages, on any platform | 2000 | G. Perlman | CUU '00, Proceedings on the 2000 conference on Universal Usability, ACM, pp. 1-8 |

| Title | Date of Publication | Author | Publisher |
|-------|---------------------|--------|-----------|
| Parallel processing for efficient subdivision search | 1987 | N. Dadoun & D.G. Kirkpatrick | SCG '87 Proceedings of the third annual symposium on Computational geometry, ACM, pp. 205-214 |
| Exploiting inter-operation parallelism in XPRS | 1992 | Wei Hong | SIGMOD '92, Proceedings of the 1992 ACM SIGMOD International Conference on Management of Data Archive, pp. 19-28 |
| Efficient and accurate cost models for parallel query optimization | 1996 | S. Ganguly et al. | PODS '96, Proceedings of the fifteenth ACM SIGACT-SIGMOD-SIGART Symposium on Principles of Database Systems, pp. 172 - 181 |
| A uniform interface to networked library services | 1992 | M. Blumenfeld & R. Droms | SAC '92, Proceedings of the 1992 ACM/SIGAPP Symposium on Applied Computing: Technological Challenges of the 1990's, pp. 608-613 |
| Design of OPAC database to permit different subject searching accesses in a multi-disciplines universities library catalog database | 1992 | M. Agosti & M. Masotti | SIGIR '92, Proceedings of the 15th Annual International ACM SIGIR Conference on Research and Development in Information Retrieval, pp. 245-255 |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| A competence knowledge base system as part of the organizational memory | 2000 | M. Liao et al. | German Research Center for Artificial Intelligence (DFKI) GmbH: F. Puppe (ed.) XPS-99, LNIA 1570, pp. 125-137, Springer-Verlag Heidelberg |

### 3. Systems

Samsung also contends that the asserted claims of the '959 patent are invalid in view of public knowledge and uses and/or offers for sale or sales of products and services that are prior art under 35 U.S.C. Sec. 102(a) and/or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. Sec. 102(g), and that anticipate or render obvious the asserted claims.

The following lists prior art products or services that invalidate under 35 U.S.C. Sec. 102(a), (b), and/or (g) by the name of the item, and Samsung may rely on all versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '959 Patent, including documents and source code describing the same:

- Dragon Systems Speech Recognition

- Hemlock

- Linux

- Mac OS

- Newton

- NetHopper

- Sherlock Utility

- Unix

- WAIS

- Windows 98

- MetaCrawler

- BugsEye / Neal System
- SenseMaker
- AppleSearch
- Rosebud
- Isite
- ProFusion
- CBKB System
- Samsung SCH-2000 cell phone system
- Samsung SCH-3500 cell phone system
- Samsung SPH-WP10 wrist watch phone system
- Open Agent Architecture

Additional details on these invalidating references are included in Exhibit C, including to the extent now known when the item became publicly known or was used, offered for sale, or sold; the identities of the persons or entities that made the item public, publicly used it, or made the offer for sale, and the identities of the person(s) or entities involved in, and the circumstances surrounding the making of, the invention. Samsung's positions with respect to these references are stated on information and belief, and are supported by the information and documents that will be produced by Samsung and/or third parties. As discovery is not complete, Samsung continues to investigate these events. Samsung may use physical samples, executable software, or source code as evidence of the relevant functionality of these prior art products or services, as described in Exhibit C. At a mutually convenient time, Samsung will make available for inspection any physical samples of products, systems, or software listed above, and/or any source code therefor, that it has in its possession or that becomes available to Samsung in the future during discovery.

Samsung reserves the right to amend these invalidity contentions to assert these references depending on the claim construction and infringement positions Apple may take as the case proceeds. Moreover, Samsung reserves the right to use these references in combination with other references to render the claims of the '959 Patent obvious in the event Apple takes the position that certain claim limitations are missing from the references charted in Exhibit C.

**B.** **Local Patent Rule 3-3(b): Whether Each Item Anticipates or Renders Obvious the Asserted Claims**

Plaintiff asserts claims 1-5, 9-12, 14-17, 19-20, 22-25, 27-30 and 32-33 of the '959 Patent against Samsung in this lawsuit. All of those claims are invalid because the '959 Patent fails to meet one or more of the requirements for patentability. The individual bases for invalidity are provided below and in the claim charts attached as Exhibit C. Each of the foregoing listed prior art documents, the underlying work, and/or the underlying apparatus or method qualifies as prior art under one or more sections of 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

Although Samsung has identified at least one citation per limitation for each reference, each and every disclosure of the same limitation in the same reference is not necessarily identified. Rather, in an effort to focus the issues, Samsung has generally cited representative portions of identified references, even where a reference may contain additional support for a particular claim element. In addition, persons of ordinary skill in the art generally read a prior art reference as a whole and in the context of other publications and literature. Thus, to understand and interpret any specific statement or disclosure within a prior art reference, such persons would rely on other information within the reference, along with other publications and their general scientific knowledge. Samsung may rely upon uncited portions of the prior art references and on other publications and expert testimony to provide context, and as aids to understanding and interpreting the portions that are cited. Samsung may also rely on the prior art of record for any permissible purpose, including prior art discussed in the '959 patent specification itself, including to show that the '959 patent is anticipated or obvious, show the state of the art, show motivation to combine a reference with one or more other references, and to show the proper scope of the claims. Samsung may also rely on uncited portions of the prior art references, other disclosed publications, and the testimony of experts to establish that a person of ordinary skill in the art would have been motivated to modify or combine certain of the cited references so as to render the claims obvious.

1. **Anticipation**

Some or all of the asserted claims of the '959 Patent are invalid as anticipated under 35 U.S.C. § 102 in view of each of the prior art references identified above and in the claim charts

included in Exhibit C, which identify specific examples of where each limitation of the asserted

claims is found in the prior art references.  As explained above, the cited portions of prior art

references identified in the attached claim charts are exemplary only and representative of the

content and teaching of the prior art references, and should be understood in the context of the

reference as a whole and as they would be understood by a person of ordinary skill in the art.

### 2.    **Obviousness**

To the extent any limitation is deemed not to be exactly met by an item of prior art listed

above and in Exhibit C, then any purported differences are such that the claimed subject matter as

a whole would have been obvious to one skilled in the art at the time of the alleged invention, in

view of the state of the art and knowledge of those skilled in the art.  The item of prior art would,

therefore, render the relevant claims invalid for obviousness under 35 U.S.C. § 103(a).

In addition, the references identified above and in Exhibit C render one or more asserted

claims of the '959 Patent obvious when the references are read in combination with each other,

and/or when read in view of the state of the art and knowledge of those skilled in the art.  Each and

every reference identified is also relevant to the state of the art at the time of the alleged invention.

Any of the references disclosed above may be combined to render obvious (and therefore invalid)

each of Plaintiff's asserted claims.  Samsung may rely upon a subset of the above identified

references or all of the references identified above, including all references in Exhibit C, for

purposes of obviousness depending on the Court's claim construction, positions taken by Apple

during this litigation, and further investigation and discovery.  Samsung may rely on combinations

with any reference in Exhibit C and any of the other references disclosed herein with respect to the

'959 patent, including combinations with any of the patents, publications or systems identified

herein as prior art to the '959 patent.

Moreover, to the extent the foregoing references are found not to anticipate the asserted

claims, the foregoing references render the asserted claims obvious either alone or in combination

with one or more of the other references identified above pursuant to P.R. 3-3(a).  It would have

been obvious to a person of skill in the art at the time of the alleged invention of the asserted

claims of the '959 Patent to combine the various references cited herein so as to practice the asserted claims of the '959 Patent.

Motivations to combine the above items of prior art are present in the references themselves, the common knowledge of one of ordinary skill in the art, the prior art as a whole, or the nature of the problems allegedly addressed by the '959 Patent.  Combining the references disclosed in Exhibit C would have been obvious, as the references identify and address the same technical issues and suggest very similar solutions to those issues.  Samsung reserves the right to amend or supplement these invalidity contentions to identify additional reasons that combining the references would be obvious to one of ordinary skill in the art.

In addition to the specific combinations of prior art and the specific combinations of groups of prior art disclosed, Samsung reserves the right to rely on any other combination of any prior art references disclosed herein.  Samsung further reserves the right to rely upon combinations disclosed within the prosecution history of the references cited herein.

The obviousness combinations set forth in these contentions reflect Samsung's present understanding of the potential scope of the claims that Plaintiff appears to be advocating and should not be seen as Samsung's acquiescence to Plaintiff's interpretation of the patent claims. Samsung reserves the right to amend or supplement these contentions regarding anticipation or obviousness of the asserted claims, in view of further information from Plaintiff, information discovered during discovery, or a claim construction ruling by the Court.  Plaintiff has not identified what elements or combinations it alleges were not known to one of ordinary skill in the art at the time.  Therefore, for any claim limitation that Plaintiff alleges is not disclosed in a particular prior art reference, Samsung reserves the right to assert that any such limitation is either inherent in the disclosed reference or obvious to one of ordinary skill in the art at the time in light of the same, or that the limitation is disclosed in another of the references disclosed above and in combination would have rendered the asserted claim obvious.

In accordance with Patent L.R. 3-3(b), prior art references rendering the asserted claims of the '959 patent obvious, alone or in combination with other references, are discussed above and include in Exhibits C-1 to C-20.  Exhibits C-1 to C-20 include exemplary claim charts for the '959 patent showing specific combinations of references, including citations to relevant disclosures in those references.

In particular, Samsung contends that the asserted claims of the '959 patent would have been obvious in view of the prior art references identified herein.  For example, Exhibits C-1 to C-20 include exemplary claim charts that describe how the asserted claims of the '959 patent would have been obvious.  The primary references cited in Samsung's exemplary claim charts, Exhibits C-1 to C-20, are the Corey patent, the Legall patent, the MetaCrawler system, MultiSurf, the Neal patent, Newton , the Rubinstein patent, Sherlock, WAIS, the Bennett patent, the Evans patent, the Jensen patent, the SenseMaker system, the Smith patent, the Tung thesis, the Neal / BugsEye system, the Isite system, the ProFusion system, the CBKB system, and the Kirsch patent.

Each of these primary references teaches all of the limitations of the '959 patent's asserted claims.  To the extent any claim limitations are found to be missing from the primary references, in addition to the references designated for combination with the primary references, described in each exhibit, it would have been obvious to one of ordinary skill to add the missing limitation based on the corresponding disclosure of that limitation in Exhibits C-1 to C-20.  For example, to the extent the primary reference in Exhibit C-1 is found to be missing limitation 1[B], it would have been obvious to combine that primary reference with the disclosure of limitation 1[B] in any one of the many references explicitly disclosing that element, including the disclosures of that element set out in Exhibits C-2 to C-20.

Each of these combinations was obvious to try for a person of ordinary skill in the art.  In the field of the '959 patent, there was a design need or market pressure to solve a problem and there were a finite number of identified, predictable solutions.   A person of ordinary skill had good reason to pursue the known options within his or her technical grasp including combinations of the disclosures in Exhibits C-1 to C-20.  Each of these combinations is also the combination of familiar elements according to known methods and yields predictable results.  In the field of the

'959 patent, a great deal of prior research and commercial software was available and design incentives and other market forces would prompt variations of it. Further reasons to combine the references identified in Exhibits C-1 to C-20 include the nature of the problem being solved, the express, implied, and inherent teachings of the prior art, and the knowledge of persons of ordinary skill in the art that such combinations would have yielded predictable results, and that such combinations would have represented known alternatives to a person of ordinary skill in the art. For each combination, there is a teaching, suggestion, and motivation to combine both in the references to be combined themselves, as well as in the art generally that was known to a person of ordinary skill in the art. In any event, each limitation of the '959 patent is, and would have been at the time of the alleged invention, a simple design choice representing a predictable variation within the skill of a person of ordinary skill in the art. Moreover, each limitation of the '959 patent was well known in the art, including well-known to persons of ordinary skill.

Additional prior art references rendering the asserted claims obvious, alone or in combination with other references, including identification of combinations showing obviousness, are identified in Exhibits C-1 to C-20, which includes exemplary claim charts for the asserted claims of the '959 Patent showing specifically where in each reference or combinations of references each asserted claim is found, and an explanation of why the prior art renders the asserted claim obvious.In addition to the charted '959 obviousness references and other prior art references disclosed herein, Samsung may also rely on background materials to demonstrate the state of the art, which is relevant to obviousness of the asserted claims. The concepts claimed in the '959 patent were prevalent in the field of information retrieval in computer systems, and well-known to ordinary artisans long before the earliest alleged conception date of the '959 patent. While there are too many examples of background materials to list (and the local rules impose no obligation to disclose materials used purely for background or state of the art), representative examples include the following: Grossman, "Information Retrieval Algorithms and Heuristics," 1998; Rayward-Smith, "Modern Heuristic Search Methods," 1996; Bagchi, "Search Algorithms Under Different Kinds of Heuristics – A Comparative Study," 1983; Pearl, "Heuristics – Intelligent Search Strategies for Computer Problem Solving," 1984; Dasgupta, "Multiobjective

Heuristic Search – An Introduction to Intelligent Search Methods for Multicriteria Optimization," 1999; Meyer, "Object-Oriented Software Construction," 1997; Wegner, "Concepts and Paradigms of Object-Oriented Programming," 1990; Brin and Page, "The anatomy of a large-scale hypertextual Web search engine," 1998; Gudivada, "Information Retrieval on the World Wide Web," 1997; Das, "Experiments In using agent-based retrieval from distributed and heterogeneous databases," 1997; Markowitz, "Using Speech Recognition: A Guide for Application Developers," 1995; Lea, "Trends in Speech Recognition," 1980; Schmandt, "Voice Communication with Computers: Conversational Systems," 1994; Klevans, "Voice Recognition," 1997; U.S. Patent No. 7,653,614; U.S. Patent No. 5,477,447. The long-known concepts recited in these and similar background materials describe the background knowledge of one of skill in the art, which taken alone or in combination with prior art references described herein, render the asserted claims of the '959 patent obvious.

**C.      Local Patent Rule 3-3(c):  Charts Identifying where Specifically in each Alleged item of Prior Art each Asserted Claim is Found**

Pursuant to Local Patent Rule 3-3(c), charts identifying where specifically in each alleged item of prior art each limitation of each asserted claim is found, including for each limitation that Samsung contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function are attached in Exhibits C-1 through C-20.

**D.      Local Patent Rule 3-3(d):  Other Grounds for Invalidity**

Samsung identifies the following grounds for invalidity of the asserted claims of the '959 Patent based on 35 U.S.C. §§ 101 and/or 112 ¶¶ 1 and 2.  Samsung reserves the right to supplement these disclosures based on further investigation and discovery.

**1.      Invalidity Based on 35 U.S.C. § 101**

The asserted claims of the '959 Patent are invalid under 35 U.S.C. § 101 because they claim only abstract ideas.  For example, "using a different heuristic to locate information," "heuristic(s) locates items of information," "providing said information identifier to a plurality of heuristics to locate information in a plurality of locations," and "determining at least one candidate

1    item of information," each refer only to programming abstractions or the manipulation of

2    information; these are concepts, not physical objects or tangible matter.

3                 **2.    Invalidity Based on Enablement or Written Description Under 35**

                       **U.S.C. § 112(1) and/or Invalidity Based on Indefiniteness Under 35**

4                        **U.S.C. § 112(2)**

5         Samsung asserts that each asserted claim of the '959 Patent is invalid in that the '959

6    specification fails to particularly point out and distinctly claim the alleged invention of the '959

7    Patent. Samsung further asserts that each asserted claim of the '959 Patent is invalid as not

8    containing a written description of the invention, and of the manner and process of making and

9    using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to

10   which it pertains, or with which it is most nearly connected, to make and use the alleged invention.

11         Based on Samsung's present understanding of Plaintiff's infringement contentions,

12   Samsung asserts that claims 1-5, 9-12, 14-17, 19-20, 22-25, 27-30 and 32-33 of the '959 Patent are

13   invalid for reciting at least the claim terms "heuristic" and/or "heuristics." Based on Samsung's

14   present understanding of Plaintiff's infringement contentions, Samsung further asserts that claims

15   9-12, 14-16, 22, 23, 27, 28, 32 and 33 are invalid for reciting at least the claim term/phrase

16   "heuristics locates" and one or more of the following phrases:

17           •   "one of said heuristics locates information on the basis of names of files"

18           •   "another of said heuristics locates items of information on the basis contents of

19                files"

20           •   "another of said heuristics locates items of information on the basis of most

21                recently accessed items"

22           •   "one of said heuristics locates items of information that are stored locally on a

23                computer system"

24           •   "another of said heuristics locates items of information that are stored on remote

25                computer systems"

26           •   "said other heuristic locates Internet web pages"

27           •   "said other heuristic locates items of information that are stored on a wide-area

28                network"

Also based on Samsung's present understanding of Plaintiff's infringement contentions, Samsung further asserts that claim 4 is invalid for reciting at least the claim phrase "said information identifier is vocally entered by a user."  Samsung also asserts that claims 20, 25, and 30 are invalid for reciting at least the claim term/phrase "the information identifier is applied separately to each heuristic."  Samsung also asserts that claim 24 is invalid for reciting "program instructions."  Claims 24, 25, 27-30, 32 and 33 are invalid for reciting "determin[ing] at least one candidate item of information based upon the plurality of heuristics."  These claim terms/phrases as apparently construed by Apple violate the written description, enablement and/or definiteness requirements of 35 U.S.C. § 112.

Based on Samsung's present understanding of Plaintiff's infringement contentions, at least one or more of these claim terms/phrases are indefinite because they are inconsistent with and broader than the alleged invention disclosed in the specification and given Plaintiff's apparent constructions of the claims, any person of ordinary skill in the art at the time of the invention would not understand what is claimed, even when the claims are read in light of the specification. Further, the asserted claims are not sufficiently precise to permit one of skill to determine the boundaries of the claims and ascertain whether or not a given party or product falls within the scope of the claims.

Moreover, based on Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted claims in which these claim terms/phrases appear lack written description because the specification of the '959 Patent demonstrates that the patentee neither conceived of nor demonstrated possession of all that Plaintiff now contends the claims cover.

Samsung further asserts that claims 29, 30, 32 and 33 are invalid for reciting at least the following claim terms/phrases:

- "means for inputting an information identifier"
- "means for providing said information identifier to a plurality of heuristics . . ."
- "means for determining at least one candidate item of information based upon the plurality of heuristics,"
- "means for displaying a representation of said candidate item of information."

Each of these claim limitations is governed by 35 U.S.C. § 112, paragraph 6. The '959 patent specification, however, fails to set forth the structure, material or acts for accomplishing the recited function. Each of these claims is therefore invalid as indefinite under 35 U.S.C. § 112(2).

In addition, based on Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted claims in which the terms identified above appear are invalid because the specification fails to provide sufficient disclosure to enable any person of ordinary skill in the art to which it pertains, or with which it is most nearly connected, to implement the invention without undue experimentation. The '959 patent specification fails to describe the manner and process of making and using the claimed invention in such full, clear concise and exact terms as to enable a person of ordinary skill in the art to which it pertains to make and use the claimed invention.

For at least the reasons set forth above, the claims fail to satisfy the requirements of § 112 ¶¶ 1 and 2.

## IV. THE '414 PATENT

### A. Local Patent Rule 3-3(a): Identification of Prior Art

At this time, Samsung contends that at least the following prior art references anticipate under 35 U.S.C. § 102(a), (b), (e), (f) and/or (g) or render obvious under 35 U.S.C. § 103, either alone or in combination, the asserted claims of the '414 Patent:

### 1. Patent References[8]

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 5,255,388 | Oct. 19, 1993 | Sep. 26, 1990 |
| US | 5,473,776 | Dec. 5, 1995 | Feb. 16, 1993 |
| US | 5,515,502 | May 7, 1996 | Sep. 30, 1993 |
| US | 5,729,710 | Mar. 17, 1998 | June 22, 1994 |
| US | 5,734,910 | Mar. 31, 1998 | Dec. 22, 1995 |
| US | 5,937,414 | Aug. 10, 1999 | Feb. 28, 1997 |
| US | 6,000,000 | Dec. 7, 1999 | May 4, 1998 |
| US | 6,012,081 | Jan. 4, 2000 | July 3, 1996 |
| US | 6,014,681 | Jan. 11, 2000 | July 15, 1997 |
| US | 6,021,414 | Feb. 1, 2000 | Sep. 11, 1995 |
| US | 6,260,075 | July 10, 2001 | June 19, 1995 |

---

[8] Samsung incorporates by reference all prior art references cited in the patents listed herein and/or their file histories.

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 6,446,092 | Sep. 3, 2002 | Mar. 15, 1999 |
| US | 6,643,669 | Nov. 4, 2003 | Mar. 14, 2000 |
| US | 6,662,212 | Dec. 9, 2003 | Aug. 31, 1999 |
| US | 6,662,212 | Dec. 9, 2003 | Aug. 31, 1999 |
| US | 6,671,700 | Dec. 30, 2003 | May 23, 2000 |
| US | 6,983,247 | Jan. 3, 2006 | June 26, 2002 |
| US | 7,024,491 | Apr. 4, 2006 | May 23, 2001 |
| US | 7,024,491 | Apr. 4, 2006 | May 23, 2001 |
| US | 7,032,003 | Apr. 18, 2006 | Aug. 13, 2001 |
| US | 7,158,998 | Jan. 2, 2007 | July 31, 2002 |
| US | 7,290,034 | Oct. 30, 2007 | May 7, 2004 |
| US | 7,290,034 | Oct. 30, 2007 | May 7, 2004 |
| US | 7,318,071 | Jan. 8, 2008 | May 27, 2003 |
| US | 7,366,743 | Apr. 29, 2008 | Mar. 6, 2002 |
| US | 7,370,025 | May 6, 2008 | Dec. 17, 2002 |
| US | 7,403,958 | July 22, 2008 | Jan. 19, 2005 |
| US | 7,412,460 | Aug. 12, 2008 | June 19, 2003 |
| US | 7,430,426 | Sep. 30, 2008 | Jan. 24, 2005 |
| US | 7,457,846 | Nov. 25, 2008 | Oct. 5, 2001 |
| US | 7,477,890 | Jan. 13, 2009 | June 30, 2000 |
| US | 7,503,052 | Mar. 10, 2009 | Apr. 14, 2004 |
| US | 7,506,006 | Mar. 17,2009 | Sep. 3, 2004 |
| US | 7,523,344 | Apr. 21, 2009 | June 19, 2006 |
| US | 7,546,364 | June 9, 2009 | May 16, 2002 |
| US | 7,752,166 | July 6, 2010 | Nov. 15, 2001 |
| US | 7,788,225 | Aug. 31, 2010 | Mar. 18, 2005 |
| US | 7,849,140 | Dec. 7, 2010 | Aug. 29, 2002 |
| US | 7,877,797 | Jan. 25, 2011 | Feb. 23, 2006 |
| US | 8,005,889 | Aug. 23, 2011 | Nov. 16, 2005 |
| US | 8,121,978 | Feb. 21, 2012 | Sep. 11, 2003 |
| US | 2006/0026198 | Feb. 2, 2006 | July 30, 2004 |
| US | 2002/0059299 | May 16, 2002 | Jan. 23, 2001 |
| US | 2003/0149762 | August 7, 2003 | Oct. 5, 2001 |
| US | 2004/0139235 | July 15, 2004 | Oct. 31, 2003 |
| US | 2005/0278458 | Dec. 15, 2005 | June 9, 2004 |
| US | 2006/0238652 | Oct. 26, 2006 | Apr. 22, 2005 |
| US | 2006/0242609 | Oct. 26,2006 | Apr. 22, 2005 |
| US | 2007/0180447 | Aug. 2, 2007 | Nov. 14, 2006 |
| US | 2008/0066148 | Mar. 13, 2008 | Oct. 30, 2007 |
| US | 2008/0256547 | Feb. 23, 2005 | Oct. 16, 2008 |
| EP | 1130513 | Sep. 5, 2001 | Jan. 25, 2000 |

2. **Publications**[9]

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| A Java Framework for Mobile Data Synchronization | 2000 | Norman Cohen | IBM |
| A New Service from Notify Technology The NotifyLink Hosted Edition | Dec. 31, 2005 | | Notify Technology |
| Advanced Windows The Developer's Guide to the Win32® API for Windows NT™ 3.5 and Windows 95 | 1995 | Jeffrey Richter | Microsoft |
| Bayou: Replicated Database Services for World-wide Applications | 1996 | Karin Petersen, Mike Spreitzer, Douglas Terry, Marvin Theimer | Association for Computing Machinery |
| BlackBerry Application Developer Guide Volume 1: Fundamentals | Oct. 13, 2005 | | RIM |
| BlackBerry Application Developer Guide Volume 2: Advanced Topics | Oct. 13, 2005 | | RIM |
| BlackBerry Enterprise Server for Microsoft Exchange Version 4.0 Feature and Technical Overview | Nov. 10, 2004 | | RIM |
| BlackBerry Enterprise Software v4.0 for Microsoft Exchange: Feature Enhancement Overview | 2004 | | RIM |
| BlackBerry Wireless Handheld Version 4.1 User Guide: BlackBerry 7520 | Sep. 7, 2005 | | RIM |
| Broadbeam's Mobile Development Environment – a Technical Perspective | 2003 | | Broadbeam Corporation |
| Calendaring Extensions to WebDAV (CalDAV) | July 2005 | C. Daboo, B. Desruisseaux, L. Dusseault | The Internet Society |
| Coda File System User and System Administrators Manual | 2000 | Mahadev Satyanarayanan, Maria R. Ebling, Joshua Raiff, Peter J. Braam, Jan Harkes | |
| Concurrent Programming in Java: Design Principles and Patterns | 1999 | Doug Lea | Addison Welsely |

---

[9]   Samsung incorporates by reference all prior art references identified in the publications listed herein.

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Connecting Evolution to a GroupWise 7.0 Server | 2005 | Joe Harmon | Novell Cool Solutions |
| DataViz - RoadSync Series 80 Manual | 2006 | | DataViz |
| Description of Outlook 2003 with Cached Exchange Mode in an Exchange Server 2003 Environment | Aug. 2004 | | Microsoft |
| Developing Multithreaded Applications for the .NET Compact Framework | June 2005 | Maarten Struys | Microsoft |
| Dual Core Linux Performance: Two Penguins are Better than One | July 1, 2005 | Kristopher Kubicki | AnandTech |
| EasyStreet: A location management and data synchronization application for mobile computing | July 19, 2000 | Steven J. Mastrianni | |
| Eliminating duplication and ensuring file integrity in Multisync: A multiagent system for ubiquitous file synchronization | Dec. 2005 | Muaz Niazi, Umar Manzoor, Kiran Ijaz, Summiya and Hina Saleem | IEEE |
| Effective Java | 2001 | Joshua Bloch | Addison-Wesley |
| Exchange ActiveSync and Exchange 2003 | July 6, 2005 | | Microsoft |
| Exchange Information Store Service Architecture | May 23, 2005 | | Microsoft |
| Flexible and safe resolution of file conflicts | 1994 | Puneet Kumar and M. Satyanarayanan | DTIC |
| A Flexible Object Merging Framework | 1994 | Jonathan Munson and Prasun Dewan | Association for Computing Machinery |
| Flexible Update Propagation for Weakly Consistent Replication | 1997 | Karin Petersen, M.J. Spreitzer, D.B. Terry, M.M. Theimer, A.J. Demers | Association for Computing Machinery |
| Getting Started Guide: BlackBerry 8700c Wireless Handheld[TM] from Cingular | 2005 | | RIM |
| Guide to Sync | 1998 | Prasun Dewan | |
| Guide to Sync | 1998 | Jonathan Munson | |
| How to Get Started with iSync and .Mac | 2005 | | Apple |

| Title | Date of Publication | Author | Publisher |
|-------|---------------------|--------|-----------|
| IBM Lotus Notes and Domino 7 Reviewer's Guide | 2005 | | IBM |
| IBM Power5 Chip: A Dual-Core Multithreaded Processor | 2004 | Ron Kalla, Balaram Sinharoy, Joel Tendler | IEEE |
| IETF RFC 2251: Lightweight Directory Access Protocol v3 | Dec. 1997 | M. Wahl, T. Howes and S. Kille | IETF |
| IETF RFC 3377: Lightweight Directory Access Protocol v3: Technical Specification | Sep. 2002 | J. Hodges and R. Morgan | IETF |
| IETF RFC 3501: Internet Message Access Protocol – Version 4rev1 | March 2003 | M. Crispin | IETF |
| Inside the Linux 2.6 Scheduler | 2006 | M. Time Jones | IBM |
| Intel Pentium D Processor: Delivering Power and Performance for Advanced Users | 2005 | | Intel |
| Intel Core 2 Duo Desktop Processor Fact Sheet | 2006 | | Intel |
| Intel Core 2 Duo Desktop Processor Product Brief | 2006 | | Intel |
| Intellisync Mobile Suite Client User's Guide | 2004 | | Intellisync |
| Introducing Microsoft Windows Vista | 2006 | William Stanek | Microsoft Press |
| Introduction to Microsoft Exchange Server 2003 | July 2004 | | Microsoft |
| Introduction to Multi-Threaded Programming | May 1, 1999 | Brian Masney | Linux Journal |
| iPod nano Features Guide | Sep. 7, 2005 | | Apple |
| iPod nano Features Guide, 2nd Generation | 2006 | | Apple |
| iPod User's Guide | 2005 | | Apple |
| iTunes Overview – The Best Jukebox and #1 Music Download Store. Now With Video. | 2006 | | Apple |
| iTunes Sync – In Sync With Everything | 2006 | | Apple |
| iSync and .Mac, Anywhere Access to Vital Information | 2005 | | Apple |
| iSync Support | 2005 | | Apple |
| Jabber Based Protocol for Collaborative Mobile Work | Sep. 16, 2006 | Martin Klima and Pavel Slavik | Springer-Verlag Berlin Heidelberg |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Java in a Nutshell 2nd Edition | May 1997 | David Flanagan | O'Reilly |
| Kernel Enhancements for Windows Vista and Windows Server 2008, versions 0.5 and 0.9 | 2005-2006 | | Microsoft |
| Linux Desktop Pocket Guide | 2005 | David Brickner | O'Reilly |
| Lesson 15: iSync and .Mac Sync | 2005 | | Apple |
| Lesson 2: Address Book | 2005 | | Apple |
| .Mac + iCal Sync, Sync and Share Your Calendar | 2005 | | Apple |
| Mail Anywhere Studio | 2002 | | iAnywhere Solutions |
| Towards the Ubiquitous Office Vision With focus on Mobile Data Synchronization | Mar. 2002 | Fredrik Hacklin | |
| Managing NFS and NIS | Jul. 2001 | Mike Eisler Ricardo Labiaga Hal Stern | O'Reilly Media |
| Managing Update Conflicts in Bayou, a Weakly Connected Replicated Storage System | 1995 | D.B. Terry, M.M. Theimer, Karin Petersen, A.J. Demers, M.J. Spreitzer, C.H. Hauser | Association for Computing Machinery |
| Maximizing Desktop Application Performance on Dual-Core PC Platforms | 2005 | Richard Brunner | Windows Hardware Engineering Conference |
| Microsoft Exchange Server 2003 ActiveSync Architecture | Jan. 5, 2003 | Steven D. Bramson and Marc Gallucci | Microsoft |
| Microsoft Exchange Server ActiveSync, Protocol Version 2.5 Reference | Jun. 1, 2005 | | Apple |
| Microsoft Improves Access to Customer Data with New Smart Client Solution | Dec. 2005 | | Microsoft |
| Microsoft Outlook 2003 Product Guide | Dec. 2004 | | Microsoft |
| Microsoft Releases Windows Mobile 5.0 | May 2005 | | Microsoft News Center |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Microsoft Smart Client Architecture and Design Guide | Sept. 4, 2004 | David Hill, Brenton Webster, Edward A. Jezierski, Srinath Vasireddy, Mo Al-Sabt, Blaine Wastell, Jonathan Rasmusson, Paul Gale and Paul Slater | Microsoft |
| Microsoft Windows Vista Unveiled | 2006 | Paul McFedries | Sams Publishing |
| Mobile Information Access | 1996 | Mahadev Satyanarayanan | IEEE |
| Modern Operating Systems Second Edition | 2001 | Andrew Tanenbaum | Prentice Hall |
| Mozilla's Lightning to Strike Outlook? | Dec. 2004 | Paul Festa | CNET News |
| MSS ExpressQ White Paper, Field-Proven Software for Mission-Critical Mobile Applications | Dec. 2004 | | Broadbeam Corporation |
| NotifyLink Hosted Edition White Paper | Nov. 13, 2006 | | Notify Technology |
| Evolution 2.4 User Guide | Sep. 7, 2005 | | Novell |
| Object Based Concurrency for Data Parallel Applications: Programmability and Effectiveness | 2002 | Roxana Diaconescu | Norwegian University of Science and Technology |
| Offline Files in Windows Vista | 2006 | Navjok Virk | Microsoft |
| OneBridge Mobile Groupware Product Datasheet | 2006 | | iAnywhere Solutions |
| Open Sync: A Synchronization Framework White Paper | 2005 | Armin Bauer | |
| Operation-Based Update Propagation in a Mobile File System | 1999 | Yui-Wah Lee | The Chinese University of Hong Kong |
| Oracle Product Information Management Hub, An Oracle White Paper | 2006 | | Oracle |
| PalmPilot Handbook | 1997 | | 3Com |
| PalmPilot The Ultimate Guide | 1999 | David Pogue | O'Reilly |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Persona. Systems Reference Lenovo ThinkCentre Desktops 2005 to present – withdrawn | 2013 | | Lenovo |
| PowerPC G5 White Paper | 2005 | | Apple |
| Power Mac G5 User's Guide | 2005 | | Apple |
| Power Mac G5 Developer Note | 2005 | | Apple |
| Power Mac G5 Technology Overview | 2005 | | Apple |
| Practical Multithreading for Client Apps | 2004 | Jason Clark | MSDN Magazine |
| Primarily Disconnected Operation: Experiences with Ficus | Nov. 1992 | J. S. Heidemann, T. W. Page, R. G. Guy and G. J. Popek | IEEE |
| Pylon Anywhere Client User's Guide | 2003 | | iAnywhere Solutions |
| RCal: An Autonomous Agent for Intelligent Distributed Meeting Scheduling | Nov. 2003 | Rahul Singh | Carnegie Mellon University |
| Resolving file conflicts in the Ficus file system | 1994 | Peter Reiher, John Heidemann, David Ratner, Greg Skinner, and Gerald Popek | Association for Computing Machinery |
| Running Mac OS X Panther | 2003 | Davidson | O'Reilly |
| Saleslogix Data Synchronization Technology for Disconnected Sale Automation Users | 2002 | | Saleslogix |
| SCH-i830 Series Global Pocket PC Phone User Manual | 2005 | | Samsung |
| SemanticLIFE - Outlook Datafeed Module Software Architecture Document Version 2.0 | Apr. 20, 2005 | Hoang Huu Hanh | |
| SunOS Multi-thread architecture | 1991 | M. L. Powell , S. R. Kleiman , S. Barton , D. Shah , D. Stein , M. Weeks | |
| SUSE 9.3 User Guide | 2005 | | Novell |

Case No. 12-cv-00630-LHK
SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

| Title | Date of Publication | Author | Publisher |
|-------|---------------------|--------|-----------|
| Sync: A Java Framework for Mobile Collaborative Applications | 1997 | Jonathan Munson and Prasun Dewan | IEEE |
| Synchronizing a Local Data Store with Microsoft Outlook | Jan. 2006 | | Microsoft |
| Sync Services: Syncing Your Data With Sync Services | 2004 | Gordon Freedman and Nancy Craighill | Apple |
| Sync Services: Fundamentals of Data Synchronization | 2004 | Toby Paterson | Apple |
| The Bayou Architecture: Support for Data Sharing among Mobile Users | 1994 | K. Petersen, M. Spreitzer, D. Ferry, M. Theimer, B. Welch | IEEE |
| The Benefits of Dual-Core Processors in High Performance Computing | 2005 | Mark Chapman | IBM |
| The Case for Non-transparent Replication: Examples from Bayou | 1998 | Douglas B. Terry, Karin Petersen, Mike J. Spreitzer, Marvin M. Theimer | IEEE |
| The Coda Distributed File System | 1998 | Braam | Linux Journal |
| The Coda HOWTO | 2000 | Peter Braam, Robert Baron, Jan Harkes, Marc Schnieder | |
| The Evolution of Coda | 2002 | Mahadev Satyanarayanan | ACM |
| The Facts About 64-Bit Architecture and Mobile Computing | 2005 | | Intel |
| The Next Leap in Microprocessor Architecture: Intel Core Duo Processor | Jan. 2006 | | Intel |
| The Open Group Base Specifications Issue 6 | 2004 | | IEEE |
| Threads | 2003 | | jguru.com |
| Thunderbird 1.5 Release Notes | 2005 | | Mozilla |
| Understanding the Linux 2.6.8.1 CPU Scheduler | Feb. 2005 | Joshua Aas | Silicon Graphics Inc. |
| Understanding the Linux Kernel, 3rd. Edition | Nov. 2005 | Daniel Bovet and Marco Cesati | O'Reilly |

Case No. 12-cv-00630-LHK
SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Unix Applications Programming Mastering the Shell | 1990 | Ray Swartz | Sams Publishing |
| Using FastMail.FM with Mozilla Thunderbird | Jan. 2006 | Terrence Kearns, Bob Peers | |
| Using Your Palm® Treo™ 700w Smartphone | 2006 | | Palm |
| Visto Mobile™ Personal Edition for Professionals | 2005 | | Visto |
| Welcome to Panther – Find out what you can do with Mac OS X and Mac OS X applications | 2004 | | Apple |
| Welcome to Tiger – Find out what you can do with Mac OS X v10.4 | 2005 | | Apple |
| Windows CE handheld systems for the corporate mobile work force | Mar. 30, 2005 | Steven J. Mastrianni | |
| What are the iTunes Library Files? | 2005 | | Apple |
| Windows Mobile Software for Pocket PC: Pocket Outlook | July 1, 2005 | | Microsoft |
| Windows Mobile Software for Pocket PC Phone Edition | Sep. 19, 2003 | | Microsoft |
| Windows Vista: Centralizing Data Synchronization With The New Sync Center, Microsoft 2005 Professional Developers Conference Presentation, including all audio and video recordings and transcripts of the same | 2005 | David Potter | Microsoft |
| Windows Vista User Experience Walkthrough Guide | 2006 | | Microsoft |

3.  **Systems**

Samsung also contends that the asserted claims of the '414 patent are invalid in view of public knowledge and uses and/or offers for sale or sales of products and services that are prior art under 35 U.S.C. Sec.  102(a) and/or (b), and/or prior inventions made in the United States by other

SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

1  inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. Sec. 102(g),

2  and that anticipate or render obvious the asserted claims.

3       The following lists prior art products or services that invalidate under 35 U.S.C. Sec.

4  102(a), (b), and/or (g) by the name of the item, and Samsung may rely on all versions of the

5  following prior art systems commercially sold, publicly known or used before the priority date of

6  the '414 Patent, including documents and source code describing the same:

7       • Evolution (all versions before the '414 priority date, including version 2.4)

8       • Ficus

9       • Coda

10      • Bayou

11      • Mozilla Thunderbird (all versions before the '414 priority date, including version

12        1.5rc2.)

13      • SyncKolab

14      • Mozilla Lightning Project

15      • Coldsync

16      • iTunes (all versions before the '414 priority date, including version 6.0.1)

17      • iSync (all versions before the '414 priority date, including version 1.4)

18      • Sync Services (all versions before the '414 priority date)

19      • Windows Mobile / Microsoft Exchange ActiveSync / Pocket Outlook

20      • Blackberry (all versions before the '414 priority date, including version 4.1)

21      • NotifyLink Hosted Edition

22      • Microsoft Windows Vista (all versions before the '414 priority date)

23      • Sync

24      • Broadbeam Mobile Development Environment / Mobile Solutions System/

25        ExpressSync

26      • Microsoft Outlook

27       Additional details on these invalidating references are included in Exhibit D, including to

28  the extent now known when the item became publicly known or was used, offered for sale, or

1  sold; the identities of the persons or entities that made the item public, publicly used it, or made

2  the offer for sale, and the identities of the person(s) or entities involved in, and the circumstances

3  surrounding the making of, the invention. Samsung's positions with respect to these references

4  are stated on information and belief, and are supported by the information and documents that will

5  be produced by Samsung and/or Apple and/or third parties. As discovery is not complete,

6  Samsung continues to investigate these events. Samsung may use physical samples, executable

7  software, or source code as evidence of the relevant functionality of these prior art products or

8  services, as described in Exhibit D. At a mutually convenient time, Samsung will make available

9  for inspection any physical samples of products, systems, or software listed above, and/or any

10  source code therefor, that it has in its possession or that becomes available to Samsung in the

11  future during discovery.

12       Samsung reserves the right to amend these invalidity contentions to assert these references

13  depending on the claim construction and infringement positions Apple may take as the case

14  proceeds. Moreover, Samsung reserves the right to use these references in combination with other

15  references to render the claims of the '414 Patent obvious in the event Apple takes the position

16  that certain claim limitations are missing from the references charted in Exhibit D.

17      **B.**      **Local Patent Rule 3-3(b): Whether Each Item Anticipates or Renders**
              **Obvious the Asserted Claims**

18

19       Plaintiff asserts claims 1-2, 4, 6-7, 10-12, 14, 16-17, 20-24, 26-28 and 30-32 of the '414

20  Patent against Samsung in this lawsuit. All of those claims are invalid because the '414 Patent

21  fails to meet one or more of the requirements for patentability. The individual bases for invalidity

22  are provided below and in the claim charts attached as Exhibit D. Each of the foregoing listed

23  prior art documents, the underlying work, and/or the underlying apparatus or method qualifies as

24  prior art under one or more sections of 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

25       Although Samsung has identified at least one citation per limitation for each reference,

26  each and every disclosure of the same limitation in the same reference is not necessarily identified.

27  Rather, in an effort to focus the issues, Samsung has generally cited representative portions of

28  identified references, even where a reference may contain additional support for a particular claim

1  element.  In addition, persons of ordinary skill in the art generally read a prior art reference as a

2  whole and in the context of other publications and literature.  Thus, to understand and interpret any

3  specific statement or disclosure within a prior art reference, such persons would rely on other

4  information within the reference, along with other publications and their general scientific

5  knowledge.  Samsung may rely upon uncited portions of the prior art references and on other

6  publications and expert testimony to provide context, and as aids to understanding and interpreting

7  the portions that are cited.  Samsung may also rely on the prior art of record for any permissible

8  purpose, including prior art discussed in the '414 patent specification itself, including to show that

9  the '414 patent is anticipated or obvious, show the state of the art, show motivation to combine a

10  reference with one or more other references, and to show the proper scope of the claims.  Samsung

11  may also rely on uncited portions of the prior art references, other disclosed publications, and the

12  testimony of experts to establish that a person of ordinary skill in the art would have been

13  motivated to modify or combine certain of the cited references so as to render the claims obvious.

14          1.      **Anticipation**

15          Some or all of the asserted claims of the '414 Patent are invalid as anticipated under 35

16  U.S.C. § 102 in view of each of the prior art references identified above and in the claim charts

17  included in Exhibit D, which identify specific examples of where each limitation of the asserted

18  claims is found in the prior art references.  As explained above, the cited portions of prior art

19  references identified in the attached claim charts are exemplary only and representative of the

20  content and teaching of the prior art references, and should be understood in the context of the

21  reference as a whole and as they would be understood by a person of ordinary skill in the art.

22          2.      **Obviousness**

23          To the extent any limitation is deemed not to be exactly met by an item of prior art listed

24  above and in Exhibit D, then any purported differences are such that the claimed subject matter as

25  a whole would have been obvious to one skilled in the art at the time of the alleged invention, in

26  view of the state of the art and knowledge of those skilled in the art.  The item of prior art would,

27  therefore, render the relevant claims invalid for obviousness under 35 U.S.C. § 103(a).

28

In addition, the references identified above render one or more asserted claims of the '414 Patent obvious when the references are read in combination with each other, and/or when read in view of the state of the art and knowledge of those skilled in the art. Each and every reference identified is also relevant to the state of the art at the time of the alleged invention. Any of the references disclosed above may be combined to render obvious (and therefore invalid) each of Plaintiff's asserted claims. Samsung may rely upon a subset of the above identified references or all of the references identified above, including all references in Exhibit D, for purposes of obviousness depending on the Court's claim construction, positions taken by Apple during this litigation, and further investigation and discovery. Samsung may rely on combinations with any reference in Exhibit D and any of the other references disclosed herein with respect to the '414 patent, including combinations with any of the patents, publications or systems identified herein as prior art to the '414 patent.

Moreover, to the extent the foregoing references are found not to anticipate the asserted claims, the foregoing references render the asserted claims obvious either alone or in combination with one or more of the other references identified above pursuant to P.R. 3-3(a). As explained herein and/or in the accompanying charts, it would have been obvious to a person of skill in the art at the time of the alleged invention of the asserted claims of the '414 Patent to combine the various references cited herein so as to practice the asserted claims of the '414 Patent.

Motivations to combine the above items of prior art are present in the references themselves, the common knowledge of one of ordinary skill in the art, the prior art as a whole, or the nature of the problems allegedly addressed by the '414 Patent. Combining the references disclosed in Exhibit D would have been obvious, as the references identify and address the same technical issues and suggest very similar solutions to those issues. Samsung reserves the right to amend or supplement these invalidity contentions to identify additional reasons that combining the references would be obvious to one of ordinary skill in the art.

In addition to the specific combinations of prior art and the specific combinations of groups of prior art disclosed, Samsung reserves the right to rely on any other combination of any

1    prior art references disclosed herein.  Samsung further reserves the right to rely upon combinations

2    disclosed within the prosecution history of the references cited herein.

3            The obviousness combinations set forth in these contentions reflect Samsung's present

4    understanding of the potential scope of the claims that Plaintiff appears to be advocating and

5    should not be seen as Samsung's acquiescence to Plaintiff's interpretation of the patent claims.

6    Samsung reserves the right to amend or supplement these contentions regarding anticipation or

7    obviousness of the asserted claims, in view of further information from Plaintiff, information

8    discovered during discovery, or a claim construction ruling by the Court.  Plaintiff has not

9    identified what elements or combinations it alleges were not known to one of ordinary skill in the

10   art at the time.  Therefore, for any claim limitation that Plaintiff alleges is not disclosed in a

11   particular prior art reference, Samsung reserves the right to assert that any such limitation is either

12   inherent in the disclosed reference or obvious to one of ordinary skill in the art at the time in light

13   of the same, or that the limitation is disclosed in another of the references disclosed above and in

14   combination would have rendered the asserted claim obvious.

15           In accordance with Patent L.R. 3-3(b), prior art references rendering the asserted claims of

16   the '414 patent obvious, alone or in combination with other references, are discussed above and

17   include in Exhibits D-1 to D-20.  Exhibits D-1 to D-20 include exemplary claim charts for the

18   '414 patent showing specific combinations of references, including citations to relevant

19   disclosures in those references.

20           In particular, Samsung contends that the asserted claims of the '414 patent would have

21   been obvious in view of the prior art references identified herein.  For example, Exhibits D-1 to D-

22   20 include exemplary claim charts that describe how the asserted claims of the '414 patent would

23   have been obvious.  The primary references cited in Samsung's exemplary claim charts, Exhibits

24   D-1 to D-20, are Evolution, the Reiher publication, the Kumar publication, Bayou, Mozilla

25   Thunderbird, the ColdSync system, Customer Explorer and the Vadlamani patent, the Terry

26   publication, iTunes, iSync, Exchange ActiveSync, BlackBerry, the Souder patent, NotifyLink,

27   Coda, Microsoft Windows Vista, Sync, the Rashid publication, the Kast patent, and Microsoft

28   Outlook.

Each of these primary references teaches all of the limitations of the '414 patent's asserted claims.  To the extent any claim limitations are found to be missing from the primary references, in addition to the references designated for combination with the primary references, described in each exhibit, it would have been obvious to one of ordinary skill to add the missing limitation based on the corresponding disclosure of that limitation in Exhibits D-1 to D-20.  For example, to the extent the primary reference in Exhibit D-1 is found to be missing limitation 1[B], it would have been obvious to combine that primary reference with the disclosure of limitation 1[B] in any one of the many references explicitly disclosing that element, including the disclosures of that element set out in Exhibits D-1 to D-20.

Each of these combinations was obvious to try for a person of ordinary skill in the art.  In the field of the '414 patent, there was a design need or market pressure to solve a problem and there were a finite number of identified, predictable solutions.   A person of ordinary skill had good reason to pursue the known options within his or her technical grasp including combinations of the disclosures in Exhibits D-1 to D-20.  Each of these combinations is also the combination of familiar elements according to known methods and yields predictable results.  In the field of the '414 patent, a great deal of prior research and commercial software was available and design incentives and other market forces would prompt variations of it.  Further reasons to combine the references identified in Exhibits D-1 to D-20 include the nature of the problem being solved, the express, implied, and inherent teachings of the prior art, and the knowledge of persons of ordinary skill in the art that such combinations would have yielded predictable results, and that such combinations would have represented known alternatives to a person of ordinary skill in the art.  For each combination, there is a teaching, suggestion, and motivation to combine both in the references to be combined themselves, as well as in the art generally that was known to a person of ordinary skill in the art.   In any event, each limitation of the '414 patent is, and would have been at the time of the alleged invention, a simple design choice representing a predictable variation within the skill of a person of ordinary skill in the art.  Moreover, each limitation of the '414 patent was well known in the art, including well-known to persons of ordinary skill.

1    Additional prior art references rendering the asserted claims obvious, alone or in

2  combination with other references, including identification of combinations showing obviousness,

3  are identified in Exhibits D-1 to D-20, which includes exemplary claim charts for the asserted

4  claims of the '414 Patent showing specifically where in each reference or combinations of

5  references each asserted claim is found, and an explanation of why the prior art renders the

6  asserted claim obvious.

7    In addition to the charted '414 obviousness references and other prior art references

8  disclosed herein, Samsung may also rely on background materials to demonstrate the state of the

9  art, which is relevant to obviousness of the asserted claims.  The concepts claimed in the '414

10  patent were prevalent in the field of data storage and synchronization, and well-known to ordinary

11  artisans long before the earliest alleged conception date of the '414 patent.  While there are too

12  many examples of background materials to list (and the local rules impose no obligation to

13  disclose materials used purely for background or state of the art), representative examples include

14  the following:  Armin Bauer, *Open Sync: A Synchronization Framework White Paper* (2005);

15  Norman H. Cohen, *A Java Framework for Mobile Data Synchronization*, IBM (2000);  *IBM Lotus*

16  *Notes and Domino 7 Reviewer's Guide* (2005);  *Oracle Product Information Management Data*

17  *Hub, An Oracle White Paper* (2006); *Intellisync Mobile Suite Client User's Guide* (2004); Doug

18  Lea, *Concurrent Programming in Java: Design Principles and Patterns* (1999); *PalmPilot*

19  *Handbook* (1997); U.S. Patent No. 6,446,092;  U.S. Patent No. 7,032,003; U.S. Patent Application

20  Publication No. 2006/0242609; U.S. Patent Application Publication No. 2008/0256547; U.S.

21  Patent No. 7,849,140; U.S. Patent No. 7,366,743; U.S. Patent No. 6,000,000; EP Patent No.

22  1130513; Struys, *Developing Multithreaded Applications for the .NET Compact Framework*

23  (2005); Joshua Bloch, *Effective Java* (2001); Masney, *Introduction to Multi-Threaded*

24  *Programming* (1999); Swartz, *Unix Applications Programming Mastering the Shell* (1990); *The*

25  *Open Group Base Specifications*, Issue 6 IEEE Std 1003.1 (2004); Andrew Tanenbaum, *Modern*

26  *Operating Systems Second Edition* (2001); Daniel P. Bovet & Marco Cesati, *Understanding the*

27  *Linux Kernel*, (2005); Josh Aas, *Understanding the Linux 2.6.8.1 CPU Scheduler* (2005); David

28  Brickner, *Linux Desktop Pocket Guide*, 1st Ed. (2005); Jason Clark, *Practical Multithreading for*

*Client Apps* (2004); James Davidson, *Running Mac OS X Panther*, O'Reilly (2003); *The Next Leap in Microprocessor Architecture: Intel Core Duo Processor*, Intel White Paper (2006); *The Facts About 64-Bit Architecture and Mobile Computing*, Intel (2005); *Intel Pentium D Processor: Delivery Power and Performance for Advanced Users*, Intel (2005); *Power Mac G5 Technology Overview*, Apple (2005); Mark Chapman, *The Benefits of Dual-Core Processors in High Performance Computing*, IBM (2005); Kalla et al., IBM POWER5 Chip: A Dual-Core Multithreaded Processor (2004); Richard Brunner, *Maximizing Desktop Application Performance on Dual-Core PC Platforms* (2005); Eisler, et al*., Managing NFS and NIS*, 2nd Ed. (2001).  The long-known concepts recited in these and similar background materials describe the background knowledge of one of skill in the art, which taken alone or in combination with prior art references described herein, render the asserted claims of the '414 patent obvious.

**C.      Local Patent Rule 3-3(c):  Charts Identifying where Specifically in each Alleged item of Prior Art each Asserted Claim is Found**

Pursuant to Local Patent Rule 3-3(c), charts identifying where specifically in each alleged item of prior art each limitation of each asserted claim is found, including for each limitation that Samsung contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function is attached in Exhibits D-1 through D-20.

**D.      Local Patent Rule 3-3(d):  Other Grounds for Invalidity**

Samsung identifies the following grounds for invalidity of the asserted claims of the '414 Patent based on 35 U.S.C. §§ 101 and/or 112 ¶¶ 1 and 2.  Samsung reserves the right to supplement these disclosures based on further investigation and discovery.

1.      **Invalidity Based on 35 U.S.C. § 101**

The asserted claims of the '414 Patent are invalid under 35 U.S.C. § 101 because they only claim abstract ideas.  Many limitations in the asserted claims are common abstractions in computer systems and programming languages.  For example, the limitations "one user-level non-synchronization processing thread," "one synchronization processing thread," "a lock on the first store," "releases the lock after synchronization for a first data class is completed," and

1   "synchronized in a peer-to-peer manner," each refer only to programming abstractions or the

2   manipulation of information; these are concepts, not physical objects or tangible matter.

3               2.      **Invalidity Based on Enablement or Written Description Under 35**
                        **U.S.C. § 112(1) and/or Invalidity Based on Indefiniteness Under 35**
4                       **U.S.C. § 112(2)**

5           Samsung asserts that each asserted claim of the '414 Patent is invalid in that the '414

6   specification fails to particularly point out and distinctly claim the alleged invention of the '414

7   Patent. Samsung further asserts that each asserted claim of the '414 Patent is invalid as not

8   containing a written description of the invention, and of the manner and process of making and

9   using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to

10  which it pertains, or with which it is most nearly connected, to make and use the alleged invention.

11          Based on Samsung's present understanding of Plaintiff's infringement contentions,

12  Samsung asserts that the asserted claims of the '414 Patent are invalid under 35 U.S.C. § 112 ¶¶ 1

13  and 2 at least because they include the following claim terms/phrases:

14          • "user-level,"

15          • "at least one user-level non-synchronization processing thread,"

16          • "at least one non-synchronization processing thread,"

17          • "the at least one user-level non-synchronization processing thread,"

18
            • "concurrently with,"
19
            • "first store associated with a first database,"
20
            • "user interface to allow a user to access and edit structured data in a first store
21              associated with a first database,"

22          • "one synchronization processing thread,"
23
            • "synchronization software component which is configured to synchronize the
24              structured data from the first database with the structured data from a second
                database,"
25

26          • "a lock on the first store,"

27          • "releases the lock after synchronization for a first data class is completed,"

28          • "synchronized in a peer-to-peer manner," and

- "synchronize structured data of a first data class and other synchronization software components are configured to synchronize structured data of other corresponding data classes."

These claim terms/phrases as apparently construed by Apple violate the written description, enablement, and/or definiteness requirements of 35 U.S.C. § 112 ¶¶ 1 and 2. For instance, the term "peer-to-peer" is broader than and inconsistent with the alleged invention disclosed in the specification, and given Apple's infringement contentions, one of ordinary skill in the art would not understand what Apple has claimed. Additionally, claims 7 and 17 of the '414 patent are invalid because they lack a proper antecedent basis for at least the term "first and second data processing systems." As another example, the '414 patent contains no written description, disclosure, or teaching of execution "wherein the at least one user-level non-synchronization processing thread is provided by a user application which provides a user interface to allow a user to access and edit structured data in a first store associated with a first database," or of "executing at least one synchronization processing thread concurrently with the executing of the at least one user-level non-synchronization processing thread" as claimed in the '414 patent, including as claimed in claims 1, 4 and 6. Likewise, the '414 patent contains no written description, disclosure, or teaching of executing a non-synchronization processing thread "concurrently with" a synchronization processing thread, under Apple's construction and interpretation of that term, which requires that the non-synchronization processing thread and the synchronization processing thread are both active during an overlapping time interval.

Based on Samsung's present understanding of Plaintiff's infringement contentions, at least one or more of these claim terms/phrases are indefinite because they are inconsistent with and broader than the alleged invention disclosed in the specification and given Plaintiff's apparent constructions of the claims, any person of ordinary skill in the art at the time of the invention would not understand what is claimed, even when the claims are read in light of the specification. As one example, claim 27 is indefinite because it uses the term "the at least one user-level non-synchronization processing thread" without antecedent basis. In light of this language, a person of ordinary skill in the art would not be able to ascertain the metes and bounds of claim 27. For

1    example, a person of ordinary skill in the art would be confused about whether the limitation is

2    intended to qualify the "at least one non-synchronization processing thread" previously recited in

3    claim 27, or to introduce an entirely new limitation into the scope of the claim.  Moreover, based

4    on Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted

5    claims in which these claim terms/phrases appear lack written description because the

6    specification of the '414 Patent demonstrates that the patentee neither conceived of nor

7    demonstrated possession of all that Apple now contends the claims cover.  In addition, based on

8    Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted

9    claims in which these claim terms/phrases appear are invalid because the specification fails to

10   provide sufficient disclosure to enable any person of ordinary skill in the art to which it pertains,

11   or with which it is most nearly connected, to implement the invention without undue

12   experimentation.  Therefore, the claims fail to satisfy the requirements of § 112 ¶¶ 1 and 2.

13           Samsung further asserts that claims 21, 22, 31, and 32 are invalid for reciting at least the

14   following claim limitations:

15   • "means for executing at least one user-level non-synchronization processing thread
16     that includes means for accessing structured data in a first store associated with a
       first database;"

17   • "means for executing at least one synchronization processing thread concurrently
18     with the executing of the at least one user-level non-synchronization processing
       thread that includes means for synchronizing the structured data from the first
19     database with the structured data from a second database;"

20   • "means for executing at least one non-synchronization processing thread;"

21   • "means for accessing structured data in a first store associated with a first
22     database;"

23   • "means for executing at least one synchronization processing thread concurrently
       with the executing of the at least one non-synchronization processing thread that
24     includes means for synchronizing the structured data from the first database with
       the structured data from a second database."

25

26           Each of those claim limitations is governed by 35 U.S.C. section 112, paragraph 6.  The

27   '414 patent specification, however, fails to set forth the structure, material or acts for

28

accomplishing the recited function.  Each of these claims is therefore invalid as indefinite under 35 U.S.C. § 112(2).

## V.     THE '760 PATENT

### A.     Local Patent Rule 3-3(a):  Identification of Prior Art

At this time, Samsung contends that at least the following prior art references anticipate under 35 U.S.C. § 102(a), (b), (e), (f) and/or (g) or render obvious under 35 U.S.C. § 103, either alone or in combination, the asserted claims of the '760 Patent:

1.     **Patent References**[10]

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 6,430,405 | Aug. 6, 2002 | Dec. 7, 1998 |
| US | 6,448,988 | Sep. 10, 2002 | Jan. 29, 1997 |
| US | 6,526,274 | Feb. 25, 2003 | Oct. 25, 1999 |
| US | 6,542,591 | Apr. 1, 2003 | July 27, 2000 |
| US | 6,549,612 | Apr. 15, 2003 | May 6, 1998 |
| US | 6,738,461 | May 18, 2004 | Nov. 1, 2001 |
| US | 6,772,188 | Aug. 3, 2004 | July 14, 2000 |
| US | 6,792,082 | Sep. 14, 2004 | Sep. 11, 1998 |
| US | 6,879,691 | Apr. 12, 2005 | May 12, 2000 |
| US | 6,961,420 | Nov. 1, 2005 | Nov. 13, 2001 |
| US | 7,007,239 | Feb. 28, 2006 | Sep. 21, 2000 |
| US | 7,117,445 | Oct. 3, 2006 | June 30, 2003 |
| US | 7,212,808 | May 1, 2007 | Oct. 15, 2002 |
| US | 7,221,748 | May 22, 2007 | Nov. 12, 2002 |
| US | 7,225,409 | May 29, 2007 | Aug. 25, 1999 |
| US | 7,231,229 | June 12, 2007 | Mar. 16, 2003 |
| US | 7,251,479 | July 31, 2007 | Mar. 13, 2006 |
| US | 7,280,652 | Oct. 9, 2007 | Sep. 13, 2004 |
| US | 7,280,850 | Oct. 9, 2007 | Sep. 27, 2001 |
| US | 7,289,614 | Oct. 30, 2007 | Sep. 29, 2000 |
| US | 7,403,767 | July 22, 2008 | Apr. 29, 2005 |
| US | 7,409,050 | Aug. 5, 2008 | Apr. 21, 2005 |
| US | 7,493,567 | Feb. 17, 2009 | Jan. 28, 2004 |
| US | 7,502,633 | Mar. 10, 2009 | Oct. 15, 2002 |
| US | 7,526,306 | Apr. 28, 2009 | Dec. 8, 2003 |
| US | 7,606,598 | Oct. 20, 2009 | Mar. 31, 2006 |
| US | 7,680,513 | Mar. 16, 2010 | Aug. 8, 2005 |
| US | 7,623,643 | Nov. 24, 2009 | July 26, 2005 |
| US | 7,680,513 | Mar. 16, 2010 | Aug. 8, 2005 |
| US | 7,685,530 | Mar. 23, 2010 | June 10, 2005 |
| US | 7,715,535 | May 11, 2010 | Sep. 27, 2005 |
| US | 7,724,887 | May 25, 2010 | July 21, 2005 |

---

[10]    Samsung incorporates by reference all prior art references cited in the patents listed herein and/or their file histories.

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 7,778,399 | Aug. 17, 2010 | July 2, 2004 |
| US | 7,778,671 | Aug. 17, 2010 | Oct. 8, 2004 |
| US | 7,779,630 | Sep. 14, 2010 | June 24, 2004 |
| US | 7,783,283 | Aug. 24, 2010 | Sep. 8, 2004 |
| US | 7,839,987 | Nov. 23, 2010 | Nov. 1, 2001 |
| US | 7,894,597 | Feb. 22, 2011 | Oct. 12, 2005 |
| US | 7,920,886 | Apr. 5, 2011 | Jan. 24, 2006 |
| US | 7,991,432 | Aug. 2, 2011 | Apr. 2, 2004 |
| US | 8,001,120 | Aug. 16, 2011 | Feb. 12, 2004 |
| US | 8,019,388 | Sep. 13, 2011 | Feb. 6, 2003 |
| US | 8,064,886 | Nov. 22, 2011 | Feb. 14, 2006 |
| US | 8,095,879 | Jan. 10, 2012 | Dec. 10, 2002 |
| US | 8,175,656 | May 8, 2012 | Feb. 24, 2006 |
| US | 2002/0076015 | June 20, 2002 | Dec. 15, 2000 |
| US | 2002/0111991 | Aug. 15, 2002 | Nov. 1, 1999 |
| US | 2002/0116464 | Aug. 22, 2002 | Feb. 20, 2001 |
| US | 2004/0137955 | July 15, 2004 | Oct. 15, 2002 |
| US | 2004/0235520 | Nov. 25, 2004 | May 20, 2003 |
| US | 2005/0047562 | Mar. 3, 2005 | Aug. 28, 2003 |
| US | 2005/0250483 | Nov. 10, 2005 | May 7, 2004 |
| US | 2004/0267887 | Dec. 30, 2004 | June 30, 2003 |
| US | 2005/0032527 | Feb. 10, 2005 | Aug. 8, 2003 |
| US | 2005/0074109 | Apr. 7, 2005 | Sep. 24, 2004 |
| US | 2005/0141686 | June 30, 2005 | June 7, 2004 |
| US | 2006/0010395 | Jan. 12, 2006 | July 9, 2004 |
| US | 2006/0135197 | June 22, 2006 | Nov. 9, 2005 |
| US | 2006/0140189 | June 29, 2006 | Dec. 23, 2004 |
| US | 2006/0281449 | Dec. 14, 2006 | June 14, 2005 |
| US | 2007/0071186 | Mar. 29, 2007 | Sep. 21, 2005 |
| US | 2007/0083600 | Apr. 12,2007 | Oct. 6, 2005 |
| US | 2007/0092072 | Apr. 26, 2007 | Sep. 30, 2005 |
| US | 2007/0133771 | June 14, 2007 | Dec. 12, 2005 |
| US | 2007/0243858 | Oct. 18, 2007 | Apr. 18, 2006 |
| US | 2007/0280457 | Dec. 6, 2007 | June 2, 2006 |
| US | 2008/0295017 | Nov. 27, 2008 | Sep. 5, 2006 |
| EP | 1 069 791 | Jan. 17, 2001 | July 13, 1999 |
| EP | 1 365 564 | Nov. 26, 2003 | Apr. 30, 2003 |

2.    **Publications**[11]

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Exploring PC-Telephone Convergence with the Enhanced Telephony Prototype | Apr. 2004 | JJ Cadiz, Attila Narin, Gavin Jancke, Anoop Gupta, and Michael Boyle | Association for Computing Machinery |

---

[11]    Samsung incorporates by reference all prior art references identified in the publications listed herein.

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Finger Instead of Mouse: Touch Screens as a Means of Enhancing Universal Success | 2003 | Andreas Holzinger | Springer-Verlag |
| Ming User Manual | 2006 | | Motorola |
| Model 8690 Inter-Tel Protocol Mode User Guide | Mar. 2006 | | Inter-Tel |
| Motorola A1000 User Guide | 2002 | | Motorola |
| Nokia 9000i User's Manual | 1997 | | Nokia |
| Nokia 9110 User's Manual | 1998 | | Nokia |
| P900/P908 White Paper | Dec. 2003 | | Sony Ericsson |
| pdQ™ Applications Handbook | 1999 | | Qualcomm |
| TAKEphONE User Manual | June 15, 2006 | | ShSh |
| TAKEphONE User Manual | Feb. 21, 2005 | | ShSh |
| TealPhone User's Manual | Jan. 24, 2006 | | TealPoint Software |
| The Kyocera 7135 Smartphone: Reference Guide | 2002 | | Kyocera |
| User's Guide Agendus for Symbian OS UIQ Edition | Apr. 1, 2004 | | Iambic |
| Using Your Palm® Treo™ 700w Smartphone | 2006 | | Palm |
| using your Treo™ 650 smartphone | 2004 | | Palm |
| XPlore M98 User Manual | July 14, 2005 | | Group Sense PDA |

3.    **Systems**

Samsung also contends that the asserted claims of the '760 patent are invalid in view of public knowledge and uses and/or offers for sale or sales of products and services that are prior art under 35 U.S.C. Sec. 102(a) and/or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. Sec. 102(g), and that anticipate or render obvious the asserted claims.

The following lists prior art products or services that invalidate under 35 U.S.C. Sec. 102(a), (b), and/or (g) by the name of the item, and Samsung may rely on all versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '760 Patent, including documents and source code describing the same:

- Agenda Fusion

- Agendus Professional

- Motorola A1200
- Palm Treo 650
- Palm Treo 700w
- TAKEphONE
- TealPhone
- Windows Mobile 5

Additional details on these invalidating references are included in Exhibit E, including to the extent now known when the item became publicly known or was used, offered for sale, or sold; the identities of the persons or entities that made the item public, publicly used it, or made the offer for sale, and the identities of the person(s) or entities involved in, and the circumstances surrounding the making of, the invention. Samsung's positions with respect to these references are stated on information and belief, and are supported by the information and documents that will be produced by Samsung and/or third parties. As discovery is not complete, Samsung continues to investigate these events. Samsung may use physical samples, executable software, or source code as evidence of the relevant functionality of these prior art products or services, as described in Exhibit E. At a mutually convenient time, Samsung will make available for inspection any physical samples of products, systems, or software listed above, and/or any source code therefor, that it has in its possession or that becomes available to Samsung in the future during discovery.

Samsung reserves the right to amend these invalidity contentions to assert these references depending on the claim construction and infringement positions Apple may take as the case proceeds. Moreover, Samsung reserves the right to use these references in combination with other references to render the claims of the '760 Patent obvious in the event Apple takes the position that certain claim limitations are missing from the references charted in Exhibit E.

**B.** **Local Patent Rule 3-3(b): Whether Each Item Anticipates or Renders Obvious the Asserted Claims**

Plaintiff asserts claims 1-5 and 7-22 of the '760 Patent against Samsung in this lawsuit. All of those claims are invalid because the '760 Patent fails to meet one or more of the requirements for patentability. The individual bases for invalidity are provided below and in the

1   claim charts attached as Exhibit E.  Each of the foregoing listed prior art documents, the

2   underlying work, and/or the underlying apparatus or method qualifies as prior art under one or

3   more sections of 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

4          Although Samsung has identified at least one citation per limitation for each reference,

5   each and every disclosure of the same limitation in the same reference is not necessarily identified.

6   Rather, in an effort to focus the issues, Samsung has generally cited representative portions of

7   identified references, even where a reference may contain additional support for a particular claim

8   element.  In addition, persons of ordinary skill in the art generally read a prior art reference as a

9   whole and in the context of other publications and literature.  Thus, to understand and interpret any

10  specific statement or disclosure within a prior art reference, such persons would rely on other

11  information within the reference, along with other publications and their general scientific

12  knowledge.  Samsung may rely upon uncited portions of the prior art references and on other

13  publications and expert testimony to provide context, and as aids to understanding and interpreting

14  the portions that are cited.  Samsung may also rely on the prior art of record for any permissible

15  purpose, including prior art discussed in the '760 patent specification itself, including to show that

16  the '760 patent is anticipated or obvious, show the state of the art, show motivation to combine a

17  reference with one or more other references, and to show the proper scope of the claims.  Samsung

18  may also rely on uncited portions of the prior art references, other disclosed publications, and the

19  testimony of experts to establish that a person of ordinary skill in the art would have been

20  motivated to modify or combine certain of the cited references so as to render the claims obvious.

21          1.    **Anticipation**

22          Some or all of the asserted claims of the '760 Patent are invalid as anticipated under 35

23  U.S.C. § 102 in view of each of the prior art references identified above and in the claim charts

24  included in Exhibit E, which identify specific examples of where each limitation of the asserted

25  claims is found in the prior art references.  As explained above, the cited portions of prior art

26  references identified in the attached claim charts are exemplary only and representative of the

27  content and teaching of the prior art references, and should be understood in the context of the

28  reference as a whole and as they would be understood by a person of ordinary skill in the art.

### 2. **Obviousness**

To the extent any limitation is deemed not to be exactly met by an item of prior art listed above and in Exhibit E, then any purported differences are such that the claimed subject matter as a whole would have been obvious to one skilled in the art at the time of the alleged invention, in view of the state of the art and knowledge of those skilled in the art. The item of prior art would, therefore, render the relevant claims invalid for obviousness under 35 U.S.C. § 103(a).

In addition, the references identified above render one or more asserted claims of the '760 Patent obvious when the references are read in combination with each other, and/or when read in view of the state of the art and knowledge of those skilled in the art. Each and every reference identified is also relevant to the state of the art at the time of the alleged invention. Any of the references disclosed above may be combined to render obvious (and therefore invalid) each of Plaintiff's asserted claims. Samsung may rely upon a subset of the above identified references or all of the references identified above, including all references in Exhibit E, for purposes of obviousness depending on the Court's claim construction, positions taken by Apple during this litigation, and further investigation and discovery. Samsung may rely on combinations with any reference in Exhibit E and any of the other references disclosed herein with respect to the '760 patent, including combinations with any of the patents, publications or systems identified herein as prior art to the '760 patent.

Moreover, to the extent the foregoing references are found not to anticipate the asserted claims, the foregoing references render the asserted claims obvious either alone or in combination with one or more of the other references identified above pursuant to P.R. 3-3(a). As explained herein and/or in the accompanying charts, it would have been obvious to a person of skill in the art at the time of the alleged invention of the asserted claims of the '760 Patent to combine the various references cited herein so as to practice the asserted claims of the '760 Patent.

Motivations to combine the above items of prior art are present in the references themselves, the common knowledge of one of ordinary skill in the art, the prior art as a whole, or the nature of the problems allegedly addressed by the '760 Patent. Combining the references disclosed in Exhibit E would have been obvious, as the references identify and address the same

technical issues and suggest very similar solutions to those issues.  Samsung reserves the right to amend or supplement these invalidity contentions to identify additional reasons that combining the references would be obvious to one of ordinary skill in the art.

In addition to the specific combinations of prior art and the specific combinations of groups of prior art disclosed, Samsung reserves the right to rely on any other combination of any prior art references disclosed herein.  Samsung further reserves the right to rely upon combinations disclosed within the prosecution history of the references cited herein.

The obviousness combinations set forth in these contentions reflect Samsung's present understanding of the potential scope of the claims that Plaintiff appears to be advocating and should not be seen as Samsung's acquiescence to Plaintiff's interpretation of the patent claims. Samsung reserves the right to amend or supplement these contentions regarding anticipation or obviousness of the asserted claims, in view of further information from Plaintiff, information discovered during discovery, or a claim construction ruling by the Court.  Plaintiff has not identified what elements or combinations it alleges were not known to one of ordinary skill in the art at the time.  Therefore, for any claim limitation that Plaintiff alleges is not disclosed in a particular prior art reference, Samsung reserves the right to assert that any such limitation is either inherent in the disclosed reference or obvious to one of ordinary skill in the art at the time in light of the same, or that the limitation is disclosed in another of the references disclosed above and in combination would have rendered the asserted claim obvious.

In accordance with Patent L.R. 3-3(b), prior art references rendering the asserted claims of the '760 patent obvious, alone or in combination with other references, are discussed above and include in Exhibits E-1 to E-9.  Exhibits E-1 to E-9 include exemplary claim charts for the '760 patent showing specific combinations of references, including citations to relevant disclosures in those references.

In particular, Samsung contends that the asserted claims of the '760 patent would have been obvious in view of the prior art references identified herein.  For example, Exhibits E-1 to E-9 include exemplary claim charts that describe how the asserted claims of the '760 patent would have been obvious.  The primary references cited in Samsung's exemplary claim charts, Exhibits

1   E-1 to E-9, are the Hawkins patent, the Twerdahl patent, the Ambrose patent, the Kun patent

2   application publication, the Tseng patent application publication, the *TAKEphONE* publication or

3   software, the Motorola A1200, the Windows Mobile 5.0 operating system, and the Jin patent

4   application publication.

5           Each of these primary references teaches all of the limitations of the '760 patent's asserted

6   claims.  To the extent any claim limitations are found to be missing from the primary references,

7   in addition to the references designated for combination with the primary references, described in

8   each exhibit, it would have been obvious to one of ordinary skill to add the missing limitation

9   based on the corresponding disclosure of that limitation in Exhibits E-1 to E-9.  For example, to

10  the extent the primary reference in Exhibit E-1 is found to be missing limitation 1[B], it would

11  have been obvious to combine that primary reference with the disclosure of limitation 1[B] in any

12  one of the many references explicitly disclosing that element, including the disclosures of that

13  element set out in Exhibits E-2 to E-9.

14          Each of these combinations was obvious to try for a person of ordinary skill in the art.  In

15  the field of the '760 patent, there was a design need or market pressure to solve a problem and

16  there were a finite number of identified, predictable solutions.   A person of ordinary skill had

17  good reason to pursue the known options within his or her technical grasp including combinations

18  of the disclosures in Exhibits E-1 to E-9.  Each of these combinations is also the combination of

19  familiar elements according to known methods and yields predictable results.  In the field of the

20  '760 patent, a great deal of prior research and commercial software was available and design

21  incentives and other market forces would prompt variations of it.  Further reasons to combine the

22  references identified in Exhibits E-1 to E-9 include the nature of the problem being solved, the

23  express, implied, and inherent teachings of the prior art, and the knowledge of persons of ordinary

24  skill in the art that such combinations would have yielded predictable results, and that such

25  combinations would have represented known alternatives to a person of ordinary skill in the

26  art.  For each combination, there is a teaching, suggestion, and motivation to combine both in the

27  references to be combined themselves, as well as in the art generally that was known to a person

28  of ordinary skill in the art.   In any event, each limitation of the '760 patent is, and would have

been at the time of the alleged invention, a simple design choice representing a predictable variation within the skill of a person of ordinary skill in the art. Moreover, each limitation of the '760 patent was well known in the art, including well-known to persons of ordinary skill.

Additional prior art references rendering the asserted claims obvious, alone or in combination with other references, including identification of combinations showing obviousness, are identified in Exhibits E-1 to E-9, which includes exemplary claim charts for the asserted claims of the '760 Patent showing specifically where in each reference or combinations of references each asserted claim is found, and an explanation of why the prior art renders the asserted claim obvious.

In addition to the charted '760 obviousness references and other prior art references disclosed herein, Samsung may also rely on background materials to demonstrate the state of the art, which is relevant to obviousness of the asserted claims. The concepts claimed in the '760 patent were prevalent in the field of human-computer interaction, and well-known to ordinary artisans long before the earliest alleged conception date of the '760 patent. While there are too many examples of background materials to list (and the local rules impose no obligation to disclose materials used purely for background or state of the art), representative examples include the following: Cadiz, *Exploring PC-Telephone Convergence with the Enhanced Telephony Prototype* (2004); Holzinger, *Finger Instead of Mouse: Touch Screens as a Means of Enhancing Universal Success* (2003); Ming User Manual (2006); Motorola A1000 User Guide (2002); Nokia 9000i User's Manual (1997); Nokia 9110 User's Manual (1998); P900/P908 White Paper (2003); pdQ Application's Handbook (1999); The Kyocera 7135 Smartphone: Reference Guide; Using Your Palm Treo 700w Smartphone (2006); using your Treo 650 smartphone (2004); XPlore M98 User Manual (2005). The long-known concepts recited in these and similar background materials describe the background knowledge of one of skill in the art, which taken alone or in combination with prior art references described herein, render the asserted claims of the '760 patent obvious.

### C. Local Patent Rule 3-3(c): Charts Identifying where Specifically in each Alleged item of Prior Art each Asserted Claim is Found

Pursuant to Local Patent Rule 3-3(c), charts identifying where specifically in each alleged item of prior art each limitation of each asserted claim is found, including for each limitation that Samsung contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function is attached in Exhibits E-1 to E-9.

### D. Local Patent Rule 3-3(d): Other Grounds for Invalidity

Samsung identifies the following grounds for invalidity of the asserted claims of the '760 Patent based on 35 U.S.C. §§ 101 and/or 112 ¶¶ 1 and 2. Samsung reserves the right to supplement these disclosures based on further investigation and discovery.

#### 1. Invalidity Based on Enablement or Written Description Under 35 U.S.C. § 112(1) and/or Invalidity Based on Indefiniteness Under 35 U.S.C. § 112(2)

Samsung asserts that each asserted claim of the '760 Patent is invalid in that the '760 specification fails to particularly point out and distinctly claim the alleged invention of the '760 Patent. Samsung further asserts that each asserted claim of the '760 Patent is invalid as not containing a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the alleged invention.

Based on Samsung's present understanding of Apple's infringement contentions, Samsung asserts that claims 8, 10, 14, 18, 19, 21 of the '760 Patent are invalid as indefinite because they combine method and apparatus limitations. Samsung further asserts that claims 1, 3, 7, 8, 10, 12-22 of the '760 Patent are invalid as indefinite for reciting at least the following claim terms/phrases:

- "interactive displayed portion"

- "immediately in response to detecting" / "detecting a user tap input . . . and immediately in response to that input"

- "initiating a return telephone call"

- "finger gesture" / "finger tap input" / "user tap input"

- "detecting user selection"

- "completely substituting display of the list of interactive items with display of contact information"

- "a first contact object comprising a telephone number object having the return telephone number" / "a first contact object comprising a telephone number associated with the caller"

- "non-telephonic communication modality"

- "a second contact object associated with a non-telephonic communication modality"

- "initiating a communication "

- "instant messaging" / "instant message"

- "the second interactive displayed portion of the respective user selected item is identified by an icon displayed within the respective user selected item"

- "associated with a missed call" / "associated with contact information"

- "associated with sending an email" / "associated with sending an instant message"

- "that input"

- "the finger tap input"

- "that interactive displayed item"

- "the selected interactive displayed item"

These claim terms/phrases as apparently construed by Apple violate the written description, enablement and/or definiteness requirements of 35 U.S.C. § 112.

Based on Samsung's present understanding of Plaintiff's infringement contentions, at least one or more of these claim terms/phrases are indefinite because they are inconsistent with and broader than the alleged invention disclosed in the specification and given Plaintiff's apparent constructions of the claims, any person of ordinary skill in the art at the time of the invention would not understand what is claimed, even when the claims are read in light of the specification. Moreover, based on Samsung's present understanding of Plaintiff's infringement contentions,

each of the asserted claims in which these claim terms/phrases appear lack written description because the specification of the '760 Patent demonstrates that the patentee neither conceived of nor demonstrated possession of all that Apple now contends the claims cover.

Samsung further asserts that claims 8-11, 14, 18-19, 21 are invalid for reciting at least the following claim terms/phrases:

- "instructions, which . . . cause the device to: display . . ." / "instructions for . . . displaying . . ." / "instructions to display . . ."

- "instructions, which . . . cause the device to: . . . completely substituting display . . ." / "instructions for . . . completely substituting display . . ." / "instructions to . . . completely substituting display . . ."

- "instructions, which . . . cause the device to: . . . initiate a return telephone call . . ." / "instructions for . . . initiating a telephone call . . ." / "instructions to . . . initiate a telephone call . . ."

- "instructions, which . . . cause the device to: . . . initiate a communication . . ." / "instructions for . . . initiating a communication . . ." / "instructions to . . . initiate a communication . . ."

- "instructions to receive a finger tap input . . ." / "the portable electronic device is configured to: receive a finger tap input . . ." / "instructions, which . . . receive a finger tap input . . ."

- "instructions to detect a finger tap input . . ." / "instructions for . . . detecting . . ." / "instructions that . . . cause the device to . . . detect . . ."

Each of these claim limitations is governed by 35 U.S.C. § 112, paragraph 6. The '760 patent specification, however, fails to set forth the structure, material or acts for accomplishing the claimed instructions. Each of these claims is therefore invalid as indefinite under 35 U.S.C. § 112(2).

In addition, based on Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted claims in which these claim terms/phrases appear are invalid because the specification fails to provide sufficient disclosure to enable any person of ordinary skill in the art to which it pertains, or with which it is most nearly connected, to implement the invention without undue experimentation.

For at least the reasons set forth above, the claims fail to satisfy the requirements of § 112 ¶¶ 1 and 2.

## VI.    THE '721 PATENT

### A.    Local Patent Rule 3-3(a):  Identification of Prior Art

At this time, Samsung contends that at least the following prior art references anticipate under 35 U.S.C. § 102(a), (b), (e), (f) and/or (g) or render obvious under 35 U.S.C. § 103, either alone or in combination, the asserted claims of the '721 Patent.  Samsung further hereby incorporates by reference, as if fully set out herein, all invalidity contentions, identification of prior art references and individuals identified as knowledgeable of those prior art references for the '721 patent contained within Samsung's opposition to Apple's Motion for a Preliminary Injunction (Dkt. No. 115), including all exhibits thereto, Dr. Cohen's declarations in support thereof and all exhibits thereto, and all expert depositions regarding such declarations and all exhibits thereto.

1.    **Patent References**[12]

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 6,421,453 | July 16, 2002 | May 15, 1998 |
| US | 6,545,669 | Apr. 8, 2003 | Mar. 26, 1999 |
| US | 7,084,859 | Aug. 1, 2006 | Sep. 18, 1992 |
| US | 7,113,177 | Sep. 26, 2006 | Apr. 4, 2002 |
| US | 7,216,116 | May 8, 2007 | May 2, 1997 |
| US | 7,365,736 | Apr. 29, 2008 | Mar. 23, 2004 |
| US | 7,425,944 | Sep. 16, 2008 | July 1, 2005 |
| US | 7,546,548 | June 9, 2009 | June 28, 2002 |
| US | 7,653,818 | Jan. 26, 2010 | July 21, 2005 |
| US | 7,800,587 | Sep. 21, 2010 | Aug. 11, 2005 |
| US | 8,117,701 | Feb. 21, 2012 | July 7, 2006 |
| US | 8,127,141 | Feb. 28, 2012 | Oct. 29, 2002 |
| US | 2002/0029341 | Mar. 7, 2002 | Feb. 10, 2000 |
| US | 2002/0104005 | Aug. 1, 2002 | Jan. 31, 2001 |
| US | 2006/0012577 | Jan. 19, 2006 | July 16, 2004 |
| US | 2006/0064004 | Mar. 23, 2006 | Sep. 15, 2005 |
| US | 2006/0075250 | Apr. 6, 2006 | Sep. 24, 2004 |
| US | 2006/0092177 | May 4,2006 | Oct. 30, 2004 |
| US | 2006/0209014 | Sep. 21, 2006 | Mar. 16, 2005 |
| US | 2007/0135091 | June 14, 2007 | Dec. 8, 2005 |

---

[12]    Samsung incorporates by reference all prior art references cited in the patents listed herein and/or their file histories.

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 8,095,879 | Jan. 10, 2012 | Dec. 10, 2002 |
| WO | 01/77792 | Oct. 18, 2001 | Apr. 7, 2000 |
| WO | 03/038569 | May 8, 2003 | Oct. 30, 2001 |
| EP | 1 964 022 | Mar. 10, 2010 | Dec. 23, 2005 |
| US | 5,293,908 | Mar. 15, 1994 | Feb. 24, 1993 |
| US | 5,465,084 | Nov. 7, 1995 | Mar. 27, 1990 |
| US | 5,559,961 | Sep. 24, 1996 | Aug. 30, 1995 |
| US | 5,677,710 | Oct. 14, 1997 | May 10, 1993 |
| US | 5,821,933 | Oct. 13, 1998 | Sep. 14, 1995 |
| US | 5,907,327 | May 25, 1999 | Aug. 15, 1997 |
| US | 5,923,908 | July 13, 1999 | Oct. 30, 1997 |
| US | 6,151,208 | Nov. 21, 2000 | June 24, 1998 |
| US | 6,160,555 | Dec. 12, 2000 | Nov. 17, 1997 |
| US | 6,192,478 | Feb. 20, 2001 | Mar. 2,1998 |
| US | 6,249,606 | June 19, 2001 | Feb. 19, 1998 |
| US | 6,323,846 | Nov. 27, 2001 | Jan. 25, 1999 |
| US | 6,347,290 | Feb. 12, 2002 | June 24, 1998 |
| US | 6,421,453 | July 16, 2002 | May 15, 1998 |
| US | 6,570,557 | May 27, 2003 | Feb. 10, 2001 |
| US | 6,573,883 | June 3, 2003 | June 24, 1998 |
| US | 6,633,310 | Oct. 14, 2003 | May 31, 2000 |
| US | 6,677,932 | Jan. 13, 2004 | Jan. 28, 2001 |
| US | 6,720,860 | Apr. 13, 2004 | June 30, 2000 |
| US | 6,735,695 | May 11, 2004 | Dec. 20, 1999 |
| US | 7,124,433 | Oct. 17, 2006 | Dec. 10, 2002 |
| US | 7,151,843 | Dec. 19, 2006 | Jan. 25, 2005 |
| US | 7,174,462 | Feb. 6, 2007 | Nov. 12, 2002 |
| US | 7,245,293 | July 17, 2007 | July 28, 2005 |
| US | 7,263,670 | Aug. 28, 2007 | June 10, 2004 |
| US | 7,302,642 | Nov. 27, 2007 | June 3, 2003 |
| US | 8,095,879 | Jan. 10,2012 | Dec. 10, 2002 |
| US | 2001/0011308 | Aug. 2, 2001 | May 20, 1997 |
| US | 2001/0012022 | Aug. 9, 2001 | Dec. 10, 1998 |
| US | 2002/0015024 | Feb. 7, 2002 | Jan. 25, 1999 |
| US | 2002/0191029 | Dec. 19, 2002 | May 16, 2001 |
| US | 2002/0196274 | Dec. 26, 2002 | June 8, 2001 |
| US | 2003/0142138 | July 31, 2003 | Jan. 28, 2002 |
| US | 2004/0030934 | Feb. 12, 2004 | Oct. 19, 2000 |
| US | 2004/0034801 | Feb. 19, 2004 | Aug. 5, 2003 |
| US | 2004/0085351 | May 6, 2004 | Sep. 19, 2003 |
| US | 2004/0088568 | May 6, 2004 | Sep. 29, 2003 |
| US | 2004/0230843 | Nov. 18, 2004 | July 8, 2004 |
| US | 2004/0250138 | Dec. 9, 2004 | Apr. 18, 2003 |
| US | 2004/0260955 | Dec. 23, 2004 | June 18,2004 |
| US | 2004/0268267 | Dec. 30, 2004 | June 25, 2003 |
| US | 2005/0050477 | Mar. 3, 2005 | July 19, 2000 |
| US | 2005/0060554 | Mar. 17, 2005 | Aug. 30, 2004 |
| US | 2005/0079896 | Apr. 14, 2005 | Oct. 14, 2003 |
| US | 2005/0134578 | June 23, 2005 | July 13, 2001 |
| US | 2005/0212760 | Sep. 29, 2005 | Mar. 23, 2004 |
| US | 2005/0216862 | Sep. 29, 2005 | Mar. 18, 2005 |

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 2005/0248542 | Nov. 10, 2005 | Apr. 29, 2005 |
| US | 2005/0253817 | Nov. 17, 2005 | June 16,2 003 |
| US | 2005/0264833 | Dec. 1, 2005 | Mar. 7, 2005 |
| US | 2005/0289476 | Dec. 29, 2005 | June 28, 2004 |
| US | 2006/0174339 | Aug. 3, 2006 | Oct. 5, 2005 |
| US | 2006/0267955 | Nov. 30, 2006 | Mar. 6, 2006 |
| US | 2008/0034292 | Feb. 7, 2008 | Aug. 4, 2006 |
| US | 2008/0072172 | Mar. 20, 2008 | Mar. 18, 2005 |
| US | 5,923,908 | July 13, 1999 | Oct. 30, 1997 |
| US | 5,943,052 | Aug. 24, 1999 | Aug. 12, 1997 |
| US | 6,298,146 | Oct. 2, 2001 | June 19, 1997 |
| US | 6,313,853 | Nov. 6, 2001 | Apr. 16, 1998 |
| US | 6,351,634 | Feb. 26, 2002 | June 1, 1999 |
| US | 6,639,584 | Oct. 28, 2003 | July 6, 1999 |
| US | 6,985,137 | Jan. 10, 2006 | Aug. 13, 2001 |
| US | 7,031,756 | Apr. 18, 2006 | Mar. 20, 2000 |
| US | 7,453,443 | Nov. 18, 2008 | June 16, 2003 |
| US | 2004/0010722 | Jan. 15, 2004 | Dec. 23, 2002 |
| US | 2005/0134578 | June 23, 2005 | Nov. 6, 2002 |
| US | 2006/0103633 | May 18, 2006 | Feb. 14, 2005 |
| US | 5,821,933 | Oct. 13, 1998 | Sep. 14, 1995 |
| US | 2002/0191029 | Dec. 19, 2002 | May 16, 2001 |
| US | 2002/0104005 | Aug. 1, 2002 | Jan. 31, 2001 |
| US | 2005/0253817 | Nov. 17, 2005 | June 16, 2003 |
| WO | 2004/001560 | Dec. 31, 2003 | June 19, 2002 |
| WO | 2004/111816 | Dec. 23, 2004 | June 13, 2003 |
| US | 7,395,506 | July 1, 2008 | May 10, 2004 |
| US | 2005/0251451 | Nov. 10, 2005 | May 10, 2004 |
| US | 7,296,233 | Nov. 13, 2007 | May 10, 2004 |
| US | 2005/0251742 | Nov. 10, 2005 | May 10, 2004 |
| US | 6,920,619 | Jul. 19, 2005 | Aug. 28, 1997 |
| US | 5,561,758 | Oct. 1, 1996 | Aug. 25, 1994 |
| US | 8,352,745 | Apr. 10, 2012 | Feb. 23, 2000 |

2.    **Publications**[13]

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| IBM Research Report – A Wristwatch-Computer Based Password-Vault | Mar. 10, 2005 | Gabor Blasko | IBM |
| Passdoodles; a Lightweight Authentication Method | July 27, 2004 | Christopher Varenhorst | |
| Neonode announces WLAN Mobile Phone | Apr. 12, 2005 | Luigi Lugmayr | 14U News |
| Neonode N1 sells for $620 | Nov. 1, 2004 | Luigi Lugmayr | 14U News |
| Neonode N1 Sells now Europe-Wide | Nov. 16, 2004 | Luigi Lugmayr | 14U News |

---

[13]   Samsung incorporates by reference all prior art references identified in the publications listed herein.

| Title | Date of Publication | Author | Publisher |
|-------|--------------------|--------|-----------|
| Neonode N1 Smartphone starts selling | Oct. 29, 2004 | Luigi Lugmayr | 14U News |
| Neonode Smartphone goes Skateboardering | Sep. 3, 2004 | Luigi Lugmayr | 14U News |
| New Neonode N1m | Apr. 7, 2005 | Luigi Lugmayr | 14U News |
| New Ultra-Mobile Smartphone Neonode N1 | Dec. 21, 2002 | Luigi Lugmayr | 14U News |
| Sharp will manufacture the new Danger HipTop | July 25, 2004 | Luigi Lugmayr | 14U News |
| The Neonode Nl Smart Phone is Shipping, kinda | June 25, 2004 | Luigi Lugmayr | 14U News |
| Top 10 Future Technology Stories On I4U | Mar. 19, 2003 | Luigi Lugmayr | 14U News |
| Neonode launches the N1 in Sweden | Oct. 10, 2004 | | Neonode |
| Neonode N1 Review | Oct. 11, 2004 | Biorn Johnson | |
| Neonode Newsletter #3 | Undated | The Crew | Neonode |
| Neonode Nl Handset Development Description | Feb. 19, 2003 | | Neonode |
| Neonode Existence – N1 Factsheet V1.1 | 2003 | | Neonode |
| RedNeo Forum | Feb. 3, 2005 | | RedNeo |
| Neonode launches The N1 In Sweden | Oct. 29, 2004 | | Neonode |
| Neonode User Guide | Undated | | Neonode |
| N1 Quick Start Guide V 0.5 | Undated | | Neonode |
| NeoNode N1 -  Can a unique interface put this compelling smart phone on the map? | Undated | Conrad H. Blickenstorfer | Pen Computing Magazine |
| RedNeo Forum | Jan. 22, 2005 | | RedNeo |
| RedNeo Forum | Sep. 23, 2004 | | RedNeo |
| The Lemur Owner's Manual | Aug. 1, 2005 | | JazzMutant |
| Lemur Owner's Manual Version 1.2 | 2005 | | JazzMutant |
| Soft Machines: A Philosophy of User-Computer Interface Design | Dec. 1983 | Lloyd H. Nakatani and John A. Rohrlich | |
| Touchscreen Toggle Switches: Push or Slide? Design issues and usability study | Nov. 1990 | Catherine Plaisant & Daniel Wallace | University of Maryland |
| TOUCHSCREEN TOGGLE DESIGN | May 1992 | Catherine Plaisant & Daniel Wallace | |
| Specification of Interface Interaction Objects | Sep. 1993 | David A. Carr | University of Maryland |
| Kenwood - KVT-911DVD Instruction Manual | 2000 | | Kenwood |
| Kenwood's High-End Triumph | July 22, 2002 | Amy Gilroy | TWICE |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| VAIO pocket for Windows | Undated | | Sony |
| Sony Plans HOD Music Portables In U.S. | May 17, 2004 | Joseph Palenchar | TWICE |
| Apple-Samsung Dutch Decision | Aug. 24, 2011 | | |
| Digital Photo Browsing with Souvenirs | 2003 | Elise van den Hoven & Berry Eggen | IOS Press |
| IBM - Access/Control Icons (Icon Keys) | Apr. 4, 1995 | J. McLean, C. A. Pickover and D. Winarski | IBM |
| The design and Analysis of Graphical Passwords | Aug. 1999 | Ian Jermyn, Alain Mayer, Fabian Monrose, Michael K. Reiter, and Aviel D. Rubin | USENIX |
| Motion Gestures | 2005 | | Apple |
| Motion Getting Started Manual | 2004 | | Apple |
| Contact Area Interaction with Sliding Widgets | Undated | Tomer Moscovich | |
| Scheduling home control devices: design issues and usability evaluation of four touchscreen interfaces | 1992 | Catherine Plaisant and Ben Shneiderman | University of Maryland |
| SMART Board Software Version 8.1.3 Introduces Touch Gestures | Aug. 10, 2004 | | Smart Technologies |
| Touch-Sensing Input Devices | 1999 | Ken Hinckley and Mike Sinclair | |
| Layered Touch Panel: The Input Device with Two Touch Panel Layers | Apr. 2002 | | |
| The Design of Everyday Things | 1988 | Donald Norman | Basic Books |
| The Psychology of Everyday Things | 1998 | Donald Norman | Basic Books |
| Skeuomorphs and Cultural Algorithms | 1998 | Nicholas Gessler | Springer-Verlag |
| "IBM RealThings" CHI 98 | April 1998 | John Mullaly | ACM New York |
| Direct Manipulation. A Step Beyond Programming Languages | August 1983 | Matthias Dreier & Ben Shneiderman | IEEE |
| The history and future of direct manipulation | 1993 | David M. Frohlich | HP Laboratories |

| Title | Date of Publication | Author | Publisher |
|-------|---------------------|--------|-----------|
| Designing the user interface: strategies for effective human-computer-interaction | 1983 | Ben Shneiderman | Addison-Wesley |
| Direct manipulation interfaces | 1985 | Edwin Hutchins & Donald Norman | Lawrence Erlbaum Associates |
| Direct Manipulation and Other Lessons | November 1996 | David Frolich | HP Laboratories |

### 3. Systems

Samsung also contends that the asserted claims of the '721 patent are invalid in view of public knowledge and uses and/or offers for sale or sales of products and services that are prior art under 35 U.S.C. Sec. 102(a) and/or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. Sec. 102(g), and that anticipate or render obvious the asserted claims.

The following lists prior art products or services that invalidate under 35 U.S.C. Sec. 102(a), (b), and/or (g) by the name of the item, and Samsung may rely on all versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '721 Patent, including documents and source code describing the same:

- Plaisant
- Gridlock
- Neonode
- JazzMutant Lemur

Additional details on these invalidating references are included in Exhibit F, including to the extent now known when the item became publicly known or was used, offered for sale, or sold; the identities of the persons or entities that made the item public, publicly used it, or made the offer for sale, and the identities of the person(s) or entities involved in, and the circumstances surrounding the making of, the invention. Samsung's positions with respect to these references are stated on information and belief, and are supported by the information and documents that will be produced by Samsung and/or third parties. As discovery is not complete, Samsung continues to investigate these events. Samsung may use physical samples, executable software, or source code

as evidence of the relevant functionality of these prior art products or services, as described in Exhibit F.  At a mutually convenient time, Samsung will make available for inspection any physical samples of products, systems, or software listed above, and/or any source code therefor, that it has in its possession or that becomes available to Samsung in the future during discovery.

Samsung reserves the right to amend these invalidity contentions to assert these references depending on the claim construction and infringement positions Apple may take as the case proceeds.  Moreover, Samsung reserves the right to use these references in combination with other references to render the claims of the '721 Patent obvious in the event Apple takes the position that certain claim limitations are missing from the references charted in Exhibit F.

**B.      Local Patent Rule 3-3(b):  Whether Each Item Anticipates or Renders Obvious the Asserted Claims**

Plaintiff asserts claims 1-15 of the '721 Patent against Samsung in this lawsuit.  All of those claims are invalid because the '721 Patent fails to meet one or more of the requirements for patentability.  The individual bases for invalidity are provided below and in the claim charts attached as Exhibit F.  Each of the foregoing listed prior art documents, the underlying work, and/or the underlying apparatus or method qualifies as prior art under one or more sections of 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

Although Samsung has identified at least one citation per limitation for each reference, each and every disclosure of the same limitation in the same reference is not necessarily identified.  Rather, in an effort to focus the issues, Samsung has generally cited representative portions of identified references, even where a reference may contain additional support for a particular claim element.  In addition, persons of ordinary skill in the art generally read a prior art reference as a whole and in the context of other publications and literature.  Thus, to understand and interpret any specific statement or disclosure within a prior art reference, such persons would rely on other information within the reference, along with other publications and their general scientific knowledge.  Samsung may rely upon uncited portions of the prior art references and on other publications and expert testimony to provide context, and as aids to understanding and interpreting the portions that are cited.  Samsung may also rely on the prior art of record for any permissible

purpose, including prior art discussed in the '721 patent specification itself, including to show that

the '721 patent is anticipated or obvious, show the state of the art, show motivation to combine a

reference with one or more other references, and to show the proper scope of the claims. Samsung

may also rely on uncited portions of the prior art references, other disclosed publications, and the

testimony of experts to establish that a person of ordinary skill in the art would have been

motivated to modify or combine certain of the cited references so as to render the claims obvious.

### 1. Anticipation

Some or all of the asserted claims of the '721 Patent are invalid as anticipated under 35

U.S.C. § 102 in view of each of the prior art references identified above and in the claim charts

included in Exhibit F, which identify specific examples of where each limitation of the asserted

claims is found in the prior art references. As explained above, the cited portions of prior art

references identified in the attached claim charts are exemplary only and representative of the

content and teaching of the prior art references, and should be understood in the context of the

reference as a whole and as they would be understood by a person of ordinary skill in the art.

### 2. Obviousness

To the extent any limitation is deemed not to be exactly met by an item of prior art listed

above and in Exhibit F, then any purported differences are such that the claimed subject matter as

a whole would have been obvious to one skilled in the art at the time of the alleged invention, in

view of the state of the art and knowledge of those skilled in the art. The item of prior art would,

therefore, render the relevant claims invalid for obviousness under 35 U.S.C. § 103(a).

In addition, the references identified above render one or more asserted claims of the '721

Patent obvious when the references are read in combination with each other, and/or when read in

view of the state of the art and knowledge of those skilled in the art. Each and every reference

identified is also relevant to the state of the art at the time of the alleged invention. Any of the

references disclosed above may be combined to render obvious (and therefore invalid) each of

Plaintiff's asserted claims. Samsung may rely upon a subset of the above identified references or

all of the references identified above, including all references in Exhibit F, for purposes of

obviousness depending on the Court's claim construction, positions taken by Apple during this

litigation, and further investigation and discovery.  Samsung may rely on combinations with any reference in Exhibit F and any of the other references disclosed herein with respect to the '721 patent, including combinations with any of the patents, publications or systems identified herein as prior art to the '721 patent.

Moreover, to the extent the foregoing references are found not to anticipate the asserted claims, the foregoing references render the asserted claims obvious either alone or in combination with one or more of the other references identified above pursuant to P.R. 3-3(a).  As explained herein and/or in the accompanying charts, it would have been obvious to a person of skill in the art at the time of the alleged invention of the asserted claims of the '721 Patent to combine the various references cited herein so as to practice the asserted claims of the '721 Patent.

Motivations to combine the above items of prior art are present in the references themselves, the common knowledge of one of ordinary skill in the art, the prior art as a whole, or the nature of the problems allegedly addressed by the '721 Patent.  Combining the references disclosed in Exhibit F would have been obvious, as the references identify and address the same technical issues and suggest very similar solutions to those issues.  Samsung reserves the right to amend or supplement these invalidity contentions to identify additional reasons that combining the references would be obvious to one of ordinary skill in the art.

In addition to the specific combinations of prior art and the specific combinations of groups of prior art disclosed, Samsung reserves the right to rely on any other combination of any prior art references disclosed herein.  Samsung further reserves the right to rely upon combinations disclosed within the prosecution history of the references cited herein.

The obviousness combinations set forth in these contentions reflect Samsung's present understanding of the potential scope of the claims that Plaintiff appears to be advocating and should not be seen as Samsung's acquiescence to Plaintiff's interpretation of the patent claims.  Samsung reserves the right to amend or supplement these contentions regarding anticipation or obviousness of the asserted claims, in view of further information from Plaintiff, information

discovered during discovery, or a claim construction ruling by the Court. Plaintiff has not identified what elements or combinations it alleges were not known to one of ordinary skill in the art at the time. Therefore, for any claim limitation that Plaintiff alleges is not disclosed in a particular prior art reference, Samsung reserves the right to assert that any such limitation is either inherent in the disclosed reference or obvious to one of ordinary skill in the art at the time in light of the same, or that the limitation is disclosed in another of the references disclosed above and in combination would have rendered the asserted claim obvious.

In accordance with Patent L.R. 3-3(b), prior art references rendering the asserted claims of the '721 patent obvious, alone or in combination with other references, are discussed above and include in Exhibits F-1 to F-8. Exhibits F-1 to F-8 include exemplary claim charts for the '721 patent showing specific combinations of references, including citations to relevant disclosures in those references.

In particular, Samsung contends that the asserted claims of the '721 patent would have been obvious in view of the prior art references identified herein. For example, Exhibits F-1 to F-13 include exemplary claim charts that describe how the asserted claims of the '721 patent would have been obvious. The primary references cited in Samsung's exemplary claim charts, Exhibits F-1 to F-13, are the Tokkonen patent publication, the Hypponen patent publication, the Plaisant short paper, study, and video, the Palm Gridlock system, the Neonode N1 and N1m devices, the Keller patent, the Juels patent publication, the Tan patent, the JazzMutant Lemur system, the Hocker patent, the McKeeth Patent, the Rytivaara patent publication, and the Milekic patent..

Each of these primary references teaches all of the limitations of the '721 patent's asserted claims. To the extent any claim limitations are found to be missing from the primary references, in addition to the references designated for combination with the primary references, described in each exhibit, it would have been obvious to one of ordinary skill to add the missing limitation based on the corresponding disclosure of that limitation in Exhibits F-1 to F-13. For example, to the extent the primary reference in Exhibit F-1 is found to be missing limitation 1[B], it would have been obvious to combine that primary reference with the disclosure of limitation 1[B] in any

1    one of the many references explicitly disclosing that element, including the disclosures of that

2    element set out in Exhibits F-2 to F-13.

3            Each of these combinations was obvious to try for a person of ordinary skill in the art.  In

4    the field of the '721 patent, there was a design need or market pressure to solve a problem and

5    there were a finite number of identified, predictable solutions.   A person of ordinary skill had

6    good reason to pursue the known options within his or her technical grasp including combinations

7    of the disclosures in Exhibits F-1 to F-13.  Each of these combinations is also the combination of

8    familiar elements according to known methods and yields predictable results.  In the field of the

9    '721 patent, a great deal of prior research and commercial software was available and design

10   incentives and other market forces would prompt variations of it.  Further reasons to combine the

11   references identified in Exhibits F-1 to F-13 include the nature of the problem being solved, the

12   express, implied ,and inherent teachings of the prior art, and the knowledge of persons of ordinary

13   skill in the art that such combinations would have yielded predictable results, and that such

14   combinations would have represented known alternatives to a person of ordinary skill in the

15   art.  For each combination, there is a teaching, suggestion, and motivation to combine both in the

16   references to be combined themselves, as well as in the art generally that was known to a person

17   of ordinary skill in the art.   In any event, each limitation of the '721 patent is, and would have

18   been at the time of the alleged invention, a simple design choice representing a predictable

19   variation within the skill of a person of ordinary skill in the art.  Moreover, each limitation of the

20   '721 patent was well known in the art, including well-known to persons of ordinary skill.

21           Additional prior art references rendering the asserted claims obvious, alone or in

22   combination with other references, including identification of combinations showing obviousness,

23   are identified in Exhibits F-1 to F-13, which includes exemplary claim charts for the asserted

24   claims of the '721 Patent showing specifically where in each reference or combinations of

25   references each asserted claim is found, and an explanation of why the prior art renders the

26   asserted claim obvious.

27

28

In addition to the charted '721 obviousness references and other prior art references disclosed herein, Samsung may also rely on background materials to demonstrate the state of the art, which is relevant to obviousness of the asserted claims. The concepts claimed in the '721 patent were prevalent in the field of human-computer interaction, and well-known to ordinary artisans long before the earliest alleged conception date of the '721 patent. While there are too many examples of background materials to list (and the local rules impose no obligation to disclose materials used purely for background or state of the art), representative examples include the following: Norman, Donald, *The Design of Everyday Things* (also published as The Psychology of Everyday Things), 1988; Shneiderman, Ben, "Designing the User Interface: Strategies for Effective Human-Computer Interaction," 1983; Dreier, M. "Direct Manipulation: A Step Beyond Programming Languages, 1983; Frolich, D. "The History and Future of Direct Manipulation," 1993; Hutchins, E, "Direct Manipulation Interfaces," 1985; Frolich, D. "Direct Manipulation and Other Lessons," 1996; Gessler, N. "Skeuomorphs and Cultural Algorithms," 1998; Mullaly, J. "IBM RealThings," 1988. The long-known concepts recited in these and similar background materials describe the background knowledge of one of skill in the art, which taken alone or in combination with prior art references described herein, render the asserted claims of the '721 patent obvious.

### C. Local Patent Rule 3-3(c): Charts Identifying where Specifically in each Alleged item of Prior Art each Asserted Claim is Found

Pursuant to Local Patent Rule 3-3(c), charts identifying where specifically in each alleged item of prior art each limitation of each asserted claim is found, including for each limitation that Samsung contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function is attached in Exhibits F 1-13.

### D. Local Patent Rule 3-3(d): Other Grounds for Invalidity

Samsung identifies the following grounds for invalidity of the asserted claims of the '721 Patent based on 35 U.S.C. §§ 101 and/or 112 ¶¶ 1 and 2. Samsung reserves the right to supplement these disclosures based on further investigation and discovery.

### 1. Invalidity Based on 35 U.S.C. § 101

The asserted claims of the '721 Patent are invalid under 35 U.S.C. § 101 because they only claim abstract ideas.  Many limitations in the asserted claims are common abstractions in computer systems and programming languages.  For example, "detecting a contact with the touch-sensitive display at a first predefined location corresponding to an unlock image," "continuously moving the unlock image on the touch-sensitive display in accordance with movement of the contact while continuous contact with the touch screen is maintained," "unlocking the hand-held electronic device if the moving the unlock image on the touch-sensitive display results in movement of the unlock image from the first predefined location to a predefined unlock region on the touch-sensitive display," "moving comprises movement along any desired path," "moving comprises movement along any desired path," "displaying visual cues to communicate a direction of movement of the unlock image required to unlock the device," "an arrow indicating a general direction of movement," each refer only to programming abstractions, the manipulation of information, or abstract ideas regarding user interaction; these are concepts, not physical objects or tangible matter.

### 2. Invalidity Based on Enablement or Written Description Under 35 U.S.C. § 112(1) and/or Invalidity Based on Indefiniteness Under 35 U.S.C. § 112(2)

Samsung asserts that each asserted claim of the '721 Patent is invalid in that the '721 specification fails to particularly point out and distinctly claim the alleged invention of the '721 Patent.  Samsung further asserts that each asserted claim of the '721 Patent is invalid as not containing a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the alleged invention.

Based on Samsung's present understanding of Plaintiff's infringement contentions, Samsung asserts that claim 1-15 of the '721 Patent are invalid under 35 U.S.C. § 112 ¶ 1 at least because they include the following claim terms/phrases:

- "A method for unlocking a handheld device,"

- "continuously moving the unlock image on the touch-sensitive display in accordance with movement of the contact while continuous contact with the touch screen is maintained, wherein the unlock image is a graphical, interactive user-interface object with which a user interacts in order to unlock the device,"

- "unlocking the hand-held electronic device if the moving the unlock image on the touch-sensitive display results in movement of the unlock image from the first predefined location to a predefined unlock region on the touch-sensitive display,"

- "moving comprises movement along any desired path,"

- "displaying visual cues to communicate a direction of movement of the unlock image required to unlock the device,"

- "an arrow indicating a general direction of movement."

These claim terms/phrases as apparently construed by Apple violate the written description and/or enablement requirements of 35 U.S.C. § 112 ¶ 1.

Based on Samsung's present understanding of Plaintiff's infringement contentions, at least one or more of these claim terms/phrases are indefinite because they are inconsistent with and broader than the alleged invention disclosed in the specification and given Plaintiff's apparent constructions of the claims, any person of ordinary skill in the art at the time of the invention would not understand what is claimed, even when the claims are read in light of the specification. Moreover, based on Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted claims in which these claim terms/phrases appear lacks written description because the specification of the '721 Patent demonstrates that the patentee neither conceived of nor demonstrated possession of all that Apple now contends the claims cover. In addition, based on Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted claims in which these claim terms/phrases appear is invalid because the specification fails to provide sufficient disclosure to enable any person of ordinary skill in the art to which it pertains,

1  or with which it is most nearly connected, to implement the invention without undue

2  experimentation.  Therefore, the claims fail to satisfy the requirements of § 112 ¶¶ 1 and 2.

3       Samsung further asserts that claims 11, 7, 8, 9, 10, 12, 14, 15 of the '721 Patent are invalid

4  for reciting at least the following claim limitations:

5       • "means for displaying an unlock image at a first predefined location on the touch-
         sensitive display while the device is in a user-interface lock state";
6

7       • "means for continuously moving the unlock image on the touch-sensitive display in
         response to detecting the contact in accordance with movement of the contact while
8        continuous contact with the touch screen is maintained, wherein the unlock image
         is a graphical, interactive user-interface object with which a user interacts in order
9        to unlock the device";

10      • "means for transitioning the device to a user-interface unlock state if the moving
         the unlock image on the touch-sensitive display results in movement of the unlock
11       image from the first predefined location to a predefined unlock region on the touch-
         sensitive display";
12

13      • "including instructions… to detect a contact with the touch-sensitive display at a
         first predefined location corresponding to an unlock image";
14

15      • "including instructions…. to continuously move the unlock image on the touch-
         sensitive display in accordance with movement of the detected contact while
16       continuous contact with the touch-sensitive display is maintained, wherein the
         unlock image is a graphical, interactive user-interface object with which a user
17       interacts in order to unlock the device"; and

18      • "including instructions… to unlock the hand-held electronic device if the unlock
         image is moved from the first predefined location on the touch screen to a
19       predefined unlock region on the touch-sensitive display";

20      • "A computer readable storage medium storing one or more programs, the one or
         more programs comprising instructions…. comprising… detecting… continuously
21       moving…. and unlocking."

22  Each of those claim limitations is or may be governed by 35 U.S.C. section 112, paragraph 6.  The

23  '721 patent specification, however, fails to set forth the structure, material or acts for

24  accomplishing the recited function.  Each of these claims is therefore invalid as indefinite under 35

25  U.S.C. § 112(2).

26

27

28

# VII. THE '172 PATENT

## A. Local Patent Rule 3-3(a): Identification of Prior Art

At this time, Samsung contends that at least the following prior art references anticipate under 35 U.S.C. § 102(a), (b), (e), (f) and/or (g) or render obvious under 35 U.S.C. § 103, either alone or in combination, the asserted claims of the '172 Patent. Samsung further hereby incorporates by reference, as if fully set out herein, all invalidity contentions, identification of prior art references and individuals identified as knowledgeable of those prior art references for the '172 patent contained within Samsung's opposition to Apple's Motion for a Preliminary Injunction (Dkt. No. 115), including all exhibits thereto, Dr. Kaliski's declarations in support thereof and all exhibits thereto, and all expert depositions regarding such declarations and all exhibits thereto.

### 1. Patent References[14]

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 5,367,453 | Nov. 22, 1994 | Aug. 2, 1993 |
| US | 5,437,036 | July 25, 1995 | Sep. 3, 1992 |
| US | 5,487,616 | Jan. 30, 1996 | June 1, 1995 |
| US | 5,594,640 | July 25, 1995 | Aug. 2, 1993 |
| US | 5,623,406 | Apr. 22, 1997 | Mar. 6, 1995 |
| US | 5,682,439 | Oct. 28, 1997 | Aug. 7, 1995 |
| US | 5,818,437 | Oct. 6, 1998 | July 26, 1995 |
| US | 5,953,541 | Sep. 14, 1999 | Jan. 24, 1997 |
| US | 6,002,390 | Dec. 14, 1999 | Nov. 21, 1997 |
| US | 6,011,554 | Jan. 4, 2000 | June 10, 1996 |
| US | 6,085,206 | July 4, 2000 | June 20, 1996 |
| US | 6,204,848 | Mar. 20, 2001 | Apr. 14, 1999 |
| US | 6,307,548 | Oct. 23, 2001 | Sep. 25, 1997 |
| US | 6,377,965 | Apr. 23, 2002 | Nov. 7, 1997 |
| US | 6,405,060 | June 11, 2002 | Dec. 19, 1997 |
| US | 6,556,841 | Apr. 29, 2003 | May 3, 1999 |
| US | 6,583,798 | June 24, 2003 | July 21, 2000 |
| US | 6,724,370 | Apr. 20, 2004 | Apr. 12, 2001 |
| US | 6,801,190 | Oct. 5, 2004 | May 27, 1999 |
| US | 6,801,659 | Oct. 5, 2004 | Jan. 4, 1999 |
| US | 6,822,585 | Nov. 23, 2004 | Sep. 15, 2000 |
| US | 6,836,759 | Dec. 28, 2004 | Aug. 22, 2000 |
| US | 6,920,452 | July 19, 2005 | Apr. 26, 2001 |
| US | 7,030,863 | Apr. 18, 2006 | July 16, 2003 |

---

[14] Samsung incorporates by reference all prior art references cited in the patents listed herein and/or their file histories.

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 7,088,345 | Aug. 8, 2006 | May 27, 1999 |
| US | 7,091,885 | Aug. 15, 2006 | June 2, 2004 |
| US | 7,098,896 | Aug. 29, 2006 | Jan. 16, 2003 |
| US | 7,119,794 | Oct. 10, 2006 | Apr. 30, 2003 |
| US | 7,130,798 | Oct. 31, 2006 | Aug. 22, 2000 |
| US | 7,202,853 | Apr. 10, 2007 | Mar. 4, 2003 |
| US | 7,277,088 | Oct. 2, 2007 | Feb. 4, 2004 |
| US | 7,293,231 | Nov. 6, 2007 | Mar. 18, 1999 |
| US | 7,296,019 | Nov. 13, 2007 | Oct. 23, 2001 |
| US | 7,403,888 | July 22, 2008 | June 28, 2000 |
| US | 7,443,316 | Oct. 28, 2008 | Sep. 1, 2005 |
| US | 7,486,277 | Feb. 3, 2009 | Apr. 30, 2003 |
| US | 7,581,180 | Aug. 25, 2009 | May 10, 2001 |
| US | 7,584,093 | Sep. 1, 2009 | Apr. 25, 2005 |
| US | 7,584,426 | Sep. 1, 2009 | Mar. 31, 2004 |
| US | 7,599,828 | Oct. 6, 2009 | Mar. 1, 2005 |
| US | 7,636,083 | Dec. 22, 2009 | Feb. 20, 2004 |
| US | 7,698,123 | Apr. 13, 2010 | Aug. 31, 2004 |
| US | 7,716,579 | May 11, 2010 | May 19, 2005 |
| US | 7,725,419 | May 25, 2010 | Sep. 3, 2003 |
| US | 7,880,730 | Feb. 1, 2011 | Feb. 9, 2004 |
| US | 7,886,233 | Feb. 8, 2011 | May 23, 2005 |
| US | 7,920,132 | Apr. 5, 2011 | May 27, 1999 |
| US | 7,996,589 | Aug. 9, 2011 | Apr. 22, 2005 |
| US | 8,036,878 | Oct. 11, 2011 | May 18, 2005 |
| US | 8,136,050 | Mar. 13, 2012 | Nov. 21, 2003 |
| US | 8,185,841 | May 22, 2012 | May 23, 2005 |
| US | 2003/0033288 | Feb. 13, 2003 | Aug. 13, 2001 |
| US | 2004/0021691 | Feb. 5, 2004 | May 21, 2001 |
| US | 2004/0140956 | July 22, 2004 | Jan. 16, 2003 |
| US | 2004/0183833 | Sep. 23, 2004 | Mar. 19, 2003 |
| US | 2005/0188330 | Aug. 25, 2005 | Feb. 20, 2004 |
| US | 2005/0192802 | Sep. 1, 2005 | Feb. 11, 2004 |
| US | 2005/0283358 | Dec. 22, 2005 | Aug. 26, 2005 |
| US | 2006/0063558 | Mar. 23, 2006 | Sep. 21, 2004 |
| US | 2006/0142997 | June 29, 2006 | Dec. 27, 2002 |
| US | 2006/0149551 | July 6, 2006 | Dec. 22, 2004 |
| US | 2006/0167676 | July 27, 2006 | Jan. 26, 2005 |
| US | 2006/0176283 | Aug. 10, 2006 | Aug. 6, 2004 |
| US | 2006/0190447 | Aug. 24, 2006 | Feb. 22, 2005 |
| US | 2006/0206815 | Sep. 14, 2006 | Mar. 8, 2005 |
| US | 2006/0206816 | Sep. 14, 2006 | Mar. 11, 2005 |
| US | 2006/0274051 | Dec. 7, 2006 | Jan. 12, 2004 |
| US | 2006/0269138 | Nov. 30, 2006 | Aug. 22, 2000 |
| US | 2007/0016862 | Jan. 18, 2007 | July 15, 2005 |
| US | 2007/0061753 | Mar. 15, 2007 | June 30, 2004 |
| US | 2007/0074131 | Mar. 29, 2007 | May 18, 2005 |
| US | 2008/0266263 | Oct. 30, 2008 | Mar. 23, 2006 |
| US | 2009/0019395 | Jan. 15, 2009 | Nov. 22, 2004 |
| US | 2011/0010655 | Jan. 13, 2011 | May 21, 2001 |
| JP | 2001-325062 | Nov. 22, 2001 | May 17, 2000 |

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| WO | 2005/008899 | Jan. 27, 2005 | June 30, 2004 |

2. **Publications**[15]

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| A Minimal Device-Independent Text Input Method | Nov. 10, 1999 | Poika Isokoski | University of Tampere |
| A Stylus-Based User Interface for Text: Entry and Editing | June 1991 | Aaron Goodisman | Massachusetts Institute of Technology |
| Adaptive Forms: An Interaction Paradigm for Entering Structured Data | 1998 | Martin Frank and Pedro Szekely | Association for Computing Machinery |
| An Efficient Text Input Method for Pen-based Computers | Apr. 1998 | Toshiyuki Masui | Association for Computing Machinery |
| Embedded Menus: Selecting Items In Context | Apr. 1986 | Larry Koved and Ben Schneiderman | Association for Computing Machinery |
| Empirically-based Re-design of a Hypertext Encyclopedia | Apr. 1993 | Keith Instone, Barbee Mynatt Teasley, and Laura Leventhal | Association for Computing Machinery |
| FitalyStamp User's Manual | Aug. 12, 2004 | | TextWare Solutions |
| FitalyVirtual User's Manual | Jan. 4, 2005 | | TextWare Solutions |
| From Letters to Words: Efficient Stroke-based Word Completion for Trackball Text Entry | Oct. 2006 | Jacob Wobbrock and Brad Myers | Association for Computing Machinery |
| Handbook for Palm[TM] Tungsten[TM] T Handhelds | 2002 | | Palm |
| Instant Text Mobile User's Manual | May 13, 2005 | | TextWare Solutions |
| Instant Text Mobile Options and Advanced Features | Aug. 16, 2005 | | TextWare Solutions |
| Integrating Pen Operations for Composition by Example | 1998 | Toshiyuki Masui | Association for Computing Machinery |
| Mobile Text Entry | Nov. 8, 2002 | Amal Sirisena | University of Canterbury |
| Model-based and Empirical Evaluation of Multimodal Interactive Error Correction | 1999 | Bernhard Suhm, Brad Myers, and Alex Waibel | Association for Computing Machinery |
| Motorola V3 GSM User Guide | 2005 | | Motorola |

---

[15]  Samsung incorporates by reference all prior art references identified in the publications listed herein.

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Natural Language Interfaces: Specifying and Using Conceptual Constraints | 1993 | Elisabeth Godbert, Robert Pasero, and Paul Sabatier | Elsevier |
| POBox: An Efficient Text Input Method for Handheld and Ubiquitous Computers | 1999 | Toshiyuki Masui | Springer-Verlag |
| Read This First – Welcome to Instant Text Mobile | Apr. 9, 2005 | | TextWare Solutions |
| Read This First – Welcome to FitalyStamp | Aug. 5, 2004 | | TextWare Solutions |
| Read This First – Welcome to FitalyVirtual | July 29, 2005 | | TextWare Solutions |
| Syntax PAL: A System to Improve the Written Syntax of Language-Impaired Users | 1992 | Corinne Morris, Alan Newell, Lynda Booth, Ian Ricketts and John Arnott | Rehabilitation Engineering and Assistive Technology Society |
| Text Entry for Mobile Computing: Models and Methods, Theory and Practice | 2002 | I. Scott MacKenzie and R. William Soukoreff | Lawrence Erlbaum Associates |
| Text prediction systems: a survey | 2006 | Nestor Garay-Vitoria and Julio Abascal | Springer-Verlag |
| Toshiba Pocket PC e570 Instruction Manual | Sep. 2001 | | Toshiba |
| TextPlus[TM] for the Palm OS Version 5.5 Users Guide | Aug. 31, 2004 | | TextWare Solutions |
| The Fitaly Keyboard for the Palm Organizer: Reference Manual | Jan. 20, 2000 | | TextWare Solutions |
| Treo[TM] 90 Handheld User Guide | 2002 | | Handspring |
| WiViK On-screen Keyboard | 2003 | | Prentke Romich Company |

### 3. Systems

Samsung also contends that the asserted claims of the '172 patent are invalid in view of public knowledge and uses and/or offers for sale or sales of products and services that are prior art under 35 U.S.C. § 102(a) and/or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. § 102(g), and that anticipate or render obvious the asserted claims.

The following lists prior art products or services that invalidate under 35 U.S.C. § 102(a), (b), and/or (g) by the name of the item, and Samsung may rely on all versions of the following

prior art systems commercially sold, publicly known or used before the priority date of the '172

Patent, including documents and source code describing the same:

- eZiTap, eZiText, and eZiType
- Fitaly for the Pocket PC
- FitalyStamp
- FitalyVirtual
- Interkey Professional
- Instant Text Mobile
- LookDA
- Mac OS X Autocomplete
- Spell Catcher X
- T-Mobile Dash
- T9
- TenGO
- TenGO Palm
- TenGO Thumb
- TextPlus
- TextPlus for the Palm OS
- The Fitaly Keyboard for the Palm Organizer
- WiViK 3 On-Screen Keyboard
- WordComplete
- XT9

Additional details on these invalidating references are included in Exhibit G, including to

the extent now known when the item became publicly known or was used, offered for sale, or

sold; the identities of the persons or entities that made the item public, publicly used it, or made

the offer for sale, and the identities of the person(s) or entities involved in, and the circumstances

surrounding the making of, the invention.  Samsung's positions with respect to these references

are stated on information and belief, and are supported by the information and documents that will

be produced by Samsung and/or third parties.  As discovery is not complete, Samsung continues to

investigate these events.  Samsung may use physical samples, executable software, or source code

as evidence of the relevant functionality of these prior art products or services, as described in

Exhibit G.  At a mutually convenient time, Samsung will make available for inspection any

physical samples of products, systems, or software listed above, and/or any source code therefor,

that it has in its possession or that becomes available to Samsung in the future during discovery.

Samsung reserves the right to amend these invalidity contentions to assert these references

depending on the claim construction and infringement positions Apple may take as the case

proceeds.  Moreover, Samsung reserves the right to use these references in combination with other

references to render the claims of the '172 Patent obvious in the event Apple takes the position

that certain claim limitations are missing from the references charted in Exhibit G.

### B.  Local Patent Rule 3-3(b):  Whether Each Item Anticipates or Renders Obvious the Asserted Claims

Plaintiff asserts claims 2-6, 9-12, 17-21, 23-25 and 27-37 of the '172 Patent against

Samsung in this lawsuit.  All of those claims are invalid because the '172 Patent fails to meet one

or more of the requirements for patentability.  The individual bases for invalidity are provided

below and in the claim charts attached as Exhibit G.  Each of the foregoing listed prior art

documents, the underlying work, and/or the underlying apparatus or method qualifies as prior art

under one or more sections of 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

Although Samsung has identified at least one citation per limitation for each reference,

each and every disclosure of the same limitation in the same reference is not necessarily identified.

Rather, in an effort to focus the issues, Samsung has generally cited representative portions of

identified references, even where a reference may contain additional support for a particular claim

element.  In addition, persons of ordinary skill in the art generally read a prior art reference as a

whole and in the context of other publications and literature.  Thus, to understand and interpret any

specific statement or disclosure within a prior art reference, such persons would rely on other

information within the reference, along with other publications and their general scientific

knowledge.  Samsung may rely upon uncited portions of the prior art references and on other

publications and expert testimony to provide context, and as aids to understanding and interpreting the portions that are cited.  Samsung may also rely on the prior art of record for any permissible purpose, including prior art discussed in the '172 patent specification itself, including to show that the '172 patent is anticipated or obvious, show the state of the art, show motivation to combine a reference with one or more other references, and to show the proper scope of the claims.  Samsung may also rely on uncited portions of the prior art references, other disclosed publications, and the testimony of experts to establish that a person of ordinary skill in the art would have been motivated to modify or combine certain of the cited references so as to render the claims obvious.

### 1.   **Anticipation**

Some or all of the asserted claims of the '172 Patent are invalid as anticipated under 35 U.S.C. § 102 in view of each of the prior art references identified above and in the claim charts included in Exhibit G, which identify specific examples of where each limitation of the asserted claims is found in the prior art references.  As explained above, the cited portions of prior art references identified in the attached claim charts are exemplary only and representative of the content and teaching of the prior art references, and should be understood in the context of the reference as a whole and as they would be understood by a person of ordinary skill in the art.

### 2.   **Obviousness**

To the extent any limitation is deemed not to be exactly met by an item of prior art listed above and in Exhibit G, then any purported differences are such that the claimed subject matter as a whole would have been obvious to one skilled in the art at the time of the alleged invention, in view of the state of the art and knowledge of those skilled in the art.  The item of prior art would, therefore, render the relevant claims invalid for obviousness under 35 U.S.C. § 103(a).

In addition, the references identified above render one or more asserted claims of the '172 Patent obvious when the references are read in combination with each other, and/or when read in view of the state of the art and knowledge of those skilled in the art.  Each and every reference identified is also relevant to the state of the art at the time of the alleged invention.  Any of the references disclosed above may be combined to render obvious (and therefore invalid) each of Plaintiff's asserted claims.  Samsung may rely upon a subset of the above identified references or

all of the references identified above, including all references in Exhibit G, for purposes of obviousness depending on the Court's claim construction, positions taken by Apple during this litigation, and further investigation and discovery.  Samsung may rely on combinations with any reference in Exhibit G and any of the other references disclosed herein with respect to the '172 patent, including combinations with any of the patents, publications or systems identified herein as prior art to the '172 patent.

Moreover, to the extent the foregoing references are found not to anticipate the asserted claims, the foregoing references render the asserted claims obvious either alone or in combination with one or more of the other references identified above pursuant to P.R. 3-3(a).  As explained herein and/or in the accompanying charts, it would have been obvious to a person of skill in the art at the time of the alleged invention of the asserted claims of the '172 Patent to combine the various references cited herein so as to practice the asserted claims of the '172 Patent.

Motivations to combine the above items of prior art are present in the references themselves, the common knowledge of one of ordinary skill in the art, the prior art as a whole, or the nature of the problems allegedly addressed by the '172 Patent.  Combining the references disclosed in Exhibit G would have been obvious, as the references identify and address the same technical issues and suggest very similar solutions to those issues.  Samsung reserves the right to amend or supplement these invalidity contentions to identify additional reasons that combining the references would be obvious to one of ordinary skill in the art.

In addition to the specific combinations of prior art and the specific combinations of groups of prior art disclosed, Samsung reserves the right to rely on any other combination of any prior art references disclosed herein.  Samsung further reserves the right to rely upon combinations disclosed within the prosecution history of the references cited herein.

The obviousness combinations set forth in these contentions reflect Samsung's present understanding of the potential scope of the claims that Plaintiff appears to be advocating and should not be seen as Samsung's acquiescence to Plaintiff's interpretation of the patent claims. Samsung reserves the right to amend or supplement these contentions regarding anticipation or obviousness of the asserted claims, in view of further information from Plaintiff, information

1    discovered during discovery, or a claim construction ruling by the Court. Plaintiff has not

2    identified what elements or combinations it alleges were not known to one of ordinary skill in the

3    art at the time. Therefore, for any claim limitation that Plaintiff alleges is not disclosed in a

4    particular prior art reference, Samsung reserves the right to assert that any such limitation is either

5    inherent in the disclosed reference or obvious to one of ordinary skill in the art at the time in light

6    of the same, or that the limitation is disclosed in another of the references disclosed above and in

7    combination would have rendered the asserted claim obvious.

8            In accordance with Patent L.R. 3-3(b), prior art references rendering the asserted claims of

9    the '172 patent obvious, alone or in combination with other references, are discussed above and

10   include in Exhibits G-1 to G-14. Exhibits G-1 to G-14 include exemplary claim charts for the

11   '172 patent showing specific combinations of references, including citations to relevant

12   disclosures in those references.

13           In particular, Samsung contends that the asserted claims of the '172 patent would have

14   been obvious in view of the prior art references identified herein. For example, Exhibits G-1 to G-

15   14 include exemplary claim charts that describe how the asserted claims of the '172 patent would

16   have been obvious. The primary references cited in Samsung's exemplary claim charts, Exhibits

17   G-1 to G-14, are the King '541 patent, the Robinson '190 patent, the Longe '863 patent, the

18   Robinson '345 patent, the Robinson '088 patent, the Robinson '730 patent, the Longe '132, the

19   Longe '051 patent application publication, Instant Text, TextPlus, the T-Mobile Dash, the King

20   '554 patent, the Xrgomics international patent publication, and the Zi Software.

21           Each of these primary references teaches all of the limitations of the '172 patent's asserted

22   claims. To the extent any claim limitations are found to be missing from the primary references,

23   in addition to the references designated for combination with the primary references, described in

24   each exhibit, it would have been obvious to one of ordinary skill to add the missing limitation

25   based on the corresponding disclosure of that limitation in Exhibits G-1 to G-14. For example, to

26   the extent the primary reference in Exhibit G-1 is found to be missing limitation 2[B], it would

27   have been obvious to combine that primary reference with the disclosure of limitation 2[B] in any

28

1  one of the many references explicitly disclosing that element, including the disclosures of that

2  element set out in Exhibits G-2 to G-14.

3      Each of these combinations was obvious to try for a person of ordinary skill in the art.  In

4  the field of the '172 patent, there was a design need or market pressure to solve a problem and

5  there were a finite number of identified, predictable solutions.  A person of ordinary skill had good

6  reason to pursue the known options within his or her technical grasp including combinations of the

7  disclosures in Exhibits G-1 to G-14.  Each of these combinations is also the combination of

8  familiar elements according to known methods and yields predictable results.  In the field of the

9  '172 patent, a great deal of prior research and commercial software was available and design

10  incentives and other market forces would prompt variations of it.  Further reasons to combine the

11  references identified in Exhibits G-1 to G-14 include the nature of the problem being solved, the

12  express, implied, and inherent teachings of the prior art, and the knowledge of persons of ordinary

13  skill in the art that such combinations would have yielded predictable results, and that such

14  combinations would have represented known alternatives to a person of ordinary skill in the

15  art.  For each combination, there is a teaching, suggestion, and motivation to combine both in the

16  references to be combined themselves, as well as in the art generally that was known to a person

17  of ordinary skill in the art.  In any event, each limitation of the '172 patent is, and would have

18  been at the time of the alleged invention, a simple design choice representing a predictable

19  variation within the skill of a person of ordinary skill in the art.  Moreover, each limitation of the

20  '172 patent was well known in the art, including well-known to persons of ordinary skill.

21      Additional prior art references rendering the asserted claims obvious, alone or in

22  combination with other references, including identification of combinations showing obviousness,

23  are identified in Exhibits G-1 to G-14, which includes exemplary claim charts for the asserted

24  claims of the '172 Patent showing specifically where in each reference or combinations of

25  references each asserted claim is found, and an explanation of why the prior art renders the

26  asserted claim obvious.

27      In addition to the charted '172 obviousness references and other prior art references

28  disclosed herein, Samsung may also rely on background materials to demonstrate the state of the

art, which is relevant to obviousness of the asserted claims.  The concepts claimed in the '172 patent were prevalent in the field of human-computer interaction, and well-known to ordinary artisans long before the earliest alleged conception date of the '172 patent.  While there are too many examples of background materials to list (and the local rules impose no obligation to disclose materials used purely for background or state of the art), representative examples include the following: *Adaptive predictive text generation and the reactive keyboard* (1989); Darragh & Witten, *Adaptive predictive text generation and the reactive keyboard* (1991); Goodisman, *A Stylus-Based User Interface for Text: Entry and Editing* (1991); Schneiderman, *Designing the User Interface* (1992); Osokoski, *A Minimal Device Independent Text Input Method* (1999); Frank & Szekely, *Adaptive Forms: An Interaction Paradigm for Entering Structured Data* (1998); Masui, *An Efficient Text Input Method for Pen-based Computers* (1998); Masui, *Integrating Pen Operations for Composition by Example* (1998); Masui, *POBox: An Efficient Text Input Method for Handheld and Ubiquitous Computers* (1999); Wobbrock & Myers, *From Letters to Words: Efficient Stroke-based Word Completion for Trackball Text Entry* (2006); Suhm et al., *Model-based and Empirical Evaluation of Multimodal Interactive Error Correction* (1999); Godbert et al., *Natural Language Interfaces: Specifying and Using Conceptual Restraints* (1993); Morris et al., *Syntax PAL: A System to Improve the Written Syntax of Language-Impaired Users* (1992); Mackenzie & Soukoreff, *Text Entry for Mobile Computing: Models and Methods, Theory and Practice* (2002); *Text prediction systems: a survey* (2006); *WiViK On-screen Keyboard* (2003). The long-known concepts recited in these and similar background materials describe the background knowledge of one of skill in the art, which taken alone or in combination with prior art references described herein, render the asserted claims of the '172 patent obvious.

### C.       Local Patent Rule 3-3(c):  Charts Identifying where Specifically in each Alleged item of Prior Art each Asserted Claim is Found

Pursuant to Local Patent Rule 3-3(c), charts identifying where specifically in each alleged item of prior art each limitation of each asserted claim is found, including for each limitation that Samsung contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or

material(s) in each item of prior art that performs the claimed function is attached in Exhibits G-1 to G-14.

### D.     Local Patent Rule 3-3(d):  Other Grounds for Invalidity

Samsung identifies the following grounds for invalidity of the asserted claims of the '172 Patent based on 35 U.S.C. §§ 101 and/or 112 ¶¶ 1 and 2.  Samsung reserves the right to supplement these disclosures based on further investigation and discovery.

#### 1.     Invalidity Based on 35 U.S.C. § 101

The asserted claims of the '172 Patent are invalid under 35 U.S.C. § 101 because they only claim abstract ideas.  Many limitations in the asserted claims are common abstractions in computer systems and programming languages.  For example, "displaying a current character string", "displaying the current character string or a portion thereof and a suggested replacement character string", "displaying a suggested replacement character string", "displaying an alternative suggested replacement character string", "replacing the current character string", "replacing the current character set", "keeping the current character string", "the current character string in the first area is replaced", "the current character string in the first area is kept", "appending a punctuation mark", "the suggested replacement character string in combination with a punctuation a first punctuation mark", "the suggested replacement character string in combination with a second punctuation mark", "adding at the end of said character set a punctuation mark" each refer only to programming abstractions or the manipulation of information; these are concepts, not physical objects or tangible matter.

#### 2.     Invalidity Based on Enablement or Written Description Under 35 U.S.C. § 112(1) and/or Invalidity Based on Indefiniteness Under 35 U.S.C. § 112(2)

Samsung asserts that each asserted claim of the '172 Patent is invalid in that the '172 specification fails to particularly point out and distinctly claim the alleged invention of the '172 Patent.  Samsung further asserts that each asserted claim of the '172 Patent is invalid as not containing a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the alleged invention.

Based on Samsung's present understanding of Apple's infringement contentions, Samsung asserts that claims 18, 19, 20, 27, 28, 32, 33 of the '172 Patent are invalid as indefinite because they combine method and apparatus limitations.  Samsung further asserts that claims 2-3, 6, 9, 18-21, 23-25 and 27-37 of the '172 Patent are invalid as indefinite for reciting at least the following claim terms/phrases:

- "current character string" / "current character set"

- "being input by a user with a keyboard"

- "replacing the current character string" / "the current character string in the first area is replaced"

- "key on the keyboard associated with a delimiter"

- "keeping the current character string" / "the current character string in the first area is kept"

- "performs a first gesture on the suggested replacement character string"

- "performs a second gesture in the second area on the current character string or the portion thereof"

- "soft keyboard" / "virtual keyboard" / "virtual key" / "virtual . . . key"

- "performs a predefined gesture on the alternative suggested replacement character string in the second area"

- "performs a gesture on the suggested replacement character string"

- "performs a gesture in the second area on the current character string or the portion thereof"

- "user input of a single touch" / "single touch input" / "single touch user selection input"

- "single user input at a first location / single user input at a second location / single user input at a third location"

- "in response to . . . user input" / "in response to the single touch user selection input"

- "accepting the current character string"

Case No. 12-cv-00630-LHK
SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

These claim terms/phrases as apparently construed by Apple violate the written description, enablement, and/or definiteness requirements of 35 U.S.C. § 112.

Based on Samsung's present understanding of Plaintiff's infringement contentions, at least one or more of these claim terms/phrases are indefinite because they are inconsistent with and broader than the alleged invention disclosed in the specification and given Plaintiff's apparent constructions of the claims, any person of ordinary skill in the art at the time of the invention would not understand what is claimed, even when the claims are read in light of the specification. Moreover, based on Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted claims in which these claim terms/phrases appear lack written description because the specification of the '172 Patent demonstrates that the patentee neither conceived of nor demonstrated possession of all that Apple now contends the claims cover.

Samsung further asserts that claims 2, 19-21, 27-28, 32-33 are invalid for reciting at least the following claim terms/phrases:

- "displaying a current character string . . ."

- "replacing the current character string . . ."

- "keeping the current character string . . ."

- "instructions for displaying . . ." / "instructions, which . . . display . . ." / "instructions, which . . . perform . . . displaying . . ." / "instructions that . . . perform . . . displaying . . ."

- "instructions for replacing" / "instructions, which . . . replace . . ." / "instructions, which . . . perform . . . replacing . . ." / "instructions that . . . perform . . . replacing . . ."

- "instructions for keeping . . ." / "instructions, which . . . keep . . ."

- "instructions that . . . perform . . . appending . . ."

- "instructions that . . . perform . . . accepting . . ."

Each of these claims is governed by 35 U.S.C. § 112, paragraph 6. The '172 patent specification, however, fails to set forth the structure, material or acts for accomplishing the claimed steps and instructions. Each of these claims is therefore invalid as indefinite under 35 U.S.C. § 112(2).

In addition, based on Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted claims in which these claim terms/phrases appear are invalid because the specification fails to provide sufficient disclosure to enable any person of ordinary skill in the art to which it pertains, or with which it is most nearly connected, to implement the invention without undue experimentation.

For at least the reasons set forth above, the claims fail to satisfy the requirements of § 112 ¶¶ 1 and 2.

## VIII.   THE '604 PATENT

### A.    Local Patent Rule 3-3(a):  Identification of Prior Art

At this time, Samsung contends that at least the following prior art references anticipate under 35 U.S.C. § 102(a), (b), (e), (f) and/or (g) or render obvious under 35 U.S.C. § 103, either alone or in combination, the asserted claims of the '604 Patent.  Samsung further hereby incorporates by reference, as if fully set out herein, all invalidity contentions, identification of prior art references and individuals identified as knowledgeable of those prior art references for the '604 patent contained within Samsung's opposition to Apple's Motion for a Preliminary Injunction (Dkt. No. 115), including all exhibits thereto, Dr. Carbonell's declarations in support thereof and all exhibits thereto, and all expert depositions regarding such declarations and all exhibits thereto.

1.    **Patent References**[16]

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 3,496,299 | Feb. 17, 1970 | Nov. 14, 1966 |
| US | 4,260,854 | Apr. 7, 1981 | May 20, 1975 |
| US | 5,019,806 | May 28, 1991 | Apr. 30, 1984 |
| US | 5,337,347 | Aug. 9, 1994 | June 25, 1992 |
| US | 5,577,241 | Nov. 19, 1996 | Dec. 7, 1994 |
| US | 5,634,053 | May 27, 1997 | Aug. 29, 1995 |
| US | 5,659,732 | Aug. 19, 1997 | May 17, 1995 |
| US | 5,671,426 | Sep. 23, 1997 | June 22, 1993 |
| US | 5,742,816 | Apr. 21, 1998 | Sep. 15, 1995 |
| US | 5,845,278 | Dec. 1, 1998 | Sep. 12, 1997 |
| US | 5,855,015 | Dec. 29, 1998 | May 12, 1995 |

---

[16]   Samsung incorporates by reference all prior art references cited in the patents listed herein and/or their file histories.

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 5,913,205 | June 15, 1999 | Mar. 28, 1996 |
| US | 5,913,215 | June 15, 1999 | Feb. 19, 1997 |
| US | 5,937,406 | Aug. 10, 1999 | Jan. 31, 1997 |
| US | 5,987,446 | Nov. 16, 1999 | Nov. 12, 1996 |
| US | 6,000,020 | Dec. 7, 1999 | Apr. 1, 1997 |
| US | 6,005,565 | Dec. 21, 1999 | Mar. 25, 1997 |
| US | 6,026,429 | Feb. 15, 2000 | Nov. 10, 1997 |
| US | 6,049,796 | Apr. 11, 2000 | Feb. 24, 1997 |
| US | 6,065,003 | May 16, 2000 | Aug. 19, 1997 |
| US | 6,070,158 | May 30, 2000 | Aug. 14, 1996 |
| US | 6,078,914 | June 20, 2000 | Dec. 9, 1996 |
| US | 6,098,065 | Aug. 1, 2000 | Feb. 13, 1997 |
| US | 6,266,094 | July 24, 2001 | June 14, 1999 |
| US | 6,311,182 | Oct. 30, 2001 | Nov. 17, 1997 |
| US | 6,324,534 | Nov. 27, 2001 | Sep. 10, 1999 |
| US | 6,345,269 | Feb. 2, 2002 | Mar. 26, 1999 |
| US | 6,366,915 | Apr. 2, 2002 | Nov. 4, 1998 |
| US | 6,370,543 | Apr. 9, 2002 | May 24, 1996 |
| US | 6,415,285 | July 2, 2002 | Dec. 8, 1999 |
| US | 6,424,968 | July 23, 2002 | Oct. 15, 1998 |
| US | 6,445,834 | Sep. 3, 2002 | Oct. 19, 1998 |
| US | 6,574,632 | June 3, 2003 | Nov. 18, 1998 |
| US | 6,578,048 | June 10, 2003 | June 5, 1995 |
| US | 6,615,172 | Sep. 2, 2003 | Nov. 12, 1999 |
| US | 6,665,640 | Dec. 16, 2003 | Nov. 12, 1999 |
| US | 6,697,835 | Feb. 24, 2004 | Oct. 28, 1999 |
| US | 6,842,758 | Jan. 11, 2005 | July 30, 1999 |
| US | 6,845,370 | Jan. 18, 2005 | Nov. 19, 1998 |
| US | 6,862,713 | Mar. 1, 2005 | Aug. 31, 1999 |
| US | 6,901,366 | May 31, 2005 | Aug. 26, 1999 |
| US | 7,653,614 | Jan. 26, 2010 | July 15, 1999 |
| US | 7,873,995 | Jan. 18, 2011 | Sep. 29, 2003 |
|  |  |  |  |
| EP | 0706139 | Published Apr. 10, 1996 | Sep. 9, 1994 |
| WO | 98/32289 | Published July 23, 1998 | Jan. 17, 1997 |
| US | 7,113,939 | Sep 26, 2006 | Sep 21, 1999 |
| US | 6,834,276 | Dec. 21, 2004 | Feb. 25, 1999 |
| US | 6,055,531 | Apr. 25, 2000 | Jun. 23, 1997 |
| US | 5,926,808 | Jul 20, 1999 | Jul 25, 1997 |
| US | 5,477,447 | Dec. 19, 1995 | May 27, 1992 |
| US | 6,131,044 | Oct. 10, 2000 | Apr. 22, 1998 |
| US | 6,014,616 | Jan. 11, 2000 | Nov. 13, 1997 |
| WO | 1999/005839 | Published Apr. 2, 1999 | July 21, 1998 |
| US | 6,006,227 | Dec 21, 1999 | Jun 28, 1996 |
| US | 6,638,313 | Oct 28, 2003 | Jun 28, 1996 |
| US | 6,725,427 | Apr 20, 2004 | Jun 28, 1996 |
| US | 6,691,151 | Feb. 10, 2004 | Jan. 5, 1999 |
| US | 5,404,295 | Apr. 4, 1995 | Aug. 16, 1990 |

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 5,727,129 | Mar. 10, 1998 | Jun. 4, 1996 |
| US | 5,729,741 | Mar. 17, 1998 | Apr. 10, 1995 |
| US | 5,764,906 | Jun. 9, 1998 | Nov. 7, 1995 |
| US | 5,870,755 | Feb. 9, 1999 | Feb. 26, 1997 |
| US | 5,893,107 | Apr. 6, 1999 | Jul. 1, 1996 |
| US | 6,009,422 | Dec. 28, 1999 | Nov. 26, 1997 |
| US | 6,285,785 | Sept. 4, 2001 | Mar. 28, 1991 |
| US | 6,311,178 | Oct. 30, 2001 | Sept. 29, 1997 |
| US | 6,628,305 | Nov. 9, 1998 | Sept. 30, 2003 |
| US | 6,732,088 | May 4, 2004 | Dec. 14, 1999 |
| US | 2002/0107872 | Aug. 8, 2002 | Feb. 6, 1998 |
| US | 6,021,405 | Feb. 1, 2000 | Aug. 23, 1996 |
| US | 6,304,870 | Oct. 16, 2001 | Dec. 2, 1997 |
| US | 6,636,853 | Oct. 21, 2003 | Aug. 30, 1999 |
| US | 7,020,670 | Mar. 28, 2006 | Apr. 23, 1998 |
| US | 7,165,064 | Jan. 16, 2007 | Jul. 7, 1999 |
| US | 7,209,876 | Apr. 24, 2007 | Nov. 13, 2001 |
| US | 7,487,148 | Feb. 3, 2009 | Feb. 28, 2003 |
| US | 2002/0138492 | Sept. 26, 2002 | Mar. 7, 2001 |
| US | 2005/0149511 | Jul. 7, 2005 | Jun. 31, 2000 |
| US | 6,185,567 | Feb. 6, 2001 | May 29, 1998 |

2. **Publications**[17]

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| An Information System Based on Distributed Objects | 1987 | Michael Caplinger | Computing Machinery |
| An Information System for Corporate Users: Wide Area Information Servers | Sep. 1991 | Brewster Kahle and Art Medler | Online |
| Annotating the World Wide Web using Natural Language | 1997 | Boris Katz | |
| ARIADNE: A System for Constructing Mediators for Internet Sources | 1998 | Jose Luis Ambite, Naveen Ashish, Greg Barish, Craig A. Knoblock, Steven Minton, Pragnesh J. Modi, Ion Muslea, Andrew Philpot and Sheila Tejada | SIGMOD |

---

[17]  Samsung incorporates by reference all prior art references identified in the publications listed herein.

Case No. 12-cv-00630-LHK
SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Browsing Local and Global Information | 1995 | Masum Hasan, Gene Golovchinsky, Emanuel Noik, Nipon Charoenkitkar n, Mark Chignell, Alberto Mendelzon and David Modjeska | Proceedings of the 1995 conference of the Centre for Advanced Studies on Collaborative Research |
| Building the infrastructure of resource sharing: union catalogs, distributed search, and cross-database linkage | Jan. 1, 1997 | Lynch, Clifford | Library Trends |
| The Computer User as Toolsmith | 1993 | Saul Greenberg | |
| CyberDesk: A Framework for Providing Self-Integrating Ubiquitous Software Services | 1997 | Anind K. Dey, Gregory Abowd, Mike Pinkerton and Andrew Wood | |
| Dataware Technologies Introduces Dataware II Knowledge Query Server | Sep. 21, 1998 | | PR Newswire |
| Discover: A Resource Discovery System based on Content Routing | | Mark A. Sheldon, Andrzej Duda, Ron Weiss, David K. Gifford | |
| The Distributed Information Search Component (Disco) and the World Wide Web | 1997 | Anthony Tomasic, Remy Amouroux, Philippe Bonnet, Olga Kapitskaia, Hubert Naacke, Louiqa Raschid | SIGMOD |
| Doctor Linux – 5th Edition | 1997 | John Purcell, ed. | Linux Systems |
| The Effectiveness of GlOSS for the Text Database Discovery Problem | | Luis Gravano, Hector Garcia-Molina and Anthony Tomasic | |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Emacs tutorial | 1985 | | Free Software Foundation |
| Experience the Internet's most powerful search tool | | | The WebTools Company |
| Exploring Computer Science with Scheme | 1998 | | Spinger-Verlag New York, Inc. |
| An Extensible Constructor Tool for the Rapid, Interactive Design of Query Synthesizers | 1998 | Michelle Baldonado et al. | ACM conference on Digital libraries, Pittsburgh, PA |
| Erweiterung des FreeWAIS-Servers, translated as Expansion of the FreeWAIS Server | 1994 | Huynh Quoc Thanh Tung | Diploma thesis, University of Dortmund |
| FreeWAIS-sf: A Wide Area Information Server for Structured Documents and Retrieval Functionality | 1999 | | |
| FreeWAIS-sf | Mar. 30, 1995 | Ulrich Pfeifer Tung Huynh | University of Dortmund |
| freeWAIS-sf – UNIDO Edition 0.5 | Oct. 1995 | Ulrich Pfeifer | University of Dortmund |
| freeWAIS-sf FAQ, available at http://iubio.bio.indiana.edu/soft/util/wais/freewais-sf.faq | May 1, 1995 | | |
| FreeWAIS-sf open source software | 1999 and earlier | | Open Source |
| Internet Tools: Where There's a Will, There's a WAIS | 1994 | Glyn Moody | The Guardian |
| A Homegrown Competitive Tool at Apple Computer's Corporate Library Becomes the Newest Librarian's Assistant | 1994 | Janet Vratny | IFLA Journal |
| Interfaces for Distributed Systems of Information Servers | September 26, 1993 | Brewster Kahle | |
| Client-Server Standards For Text: Foundation For Innovation | 1991 | Esther Dyson | |
| Emerald Article: Wide Area Information Servers: An Executive Information System for Unstructured Files | 1992 | Brewster Kahle | |
| Wide Area Information Server Concepts | 1989 | Brewster Kahle | |
| Information Retrieval in vernetzten heterogenen Datenbanken," Norbert Govert (1996), translated as "Information Retrieval in Networked Heterogenous Databases" | 1996 | Norbert Govery | University of Dortmund |

SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

Case 5:12-cv-00630-LHK   Document 449-15   Filed 04/29/13   Page 138 of 227

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| The Internet Strategy Handbook: Lessons from the New Frontier of Business | 1996 | Mary Cronin | Harvard Business School Press |
| WAIS CLIENT SOFTWARE FOR UNIX -- SWAIS & XWAIS, available at http://www.uwo.ca/its/doc/newsletters/Focus/Volume 8 (1993)/81-16.txt | March 4, 1993 | Peter Marshall | University of Western Ontario |
| Structural Components of the Isite Information System | 1995 | Kevin Gamiel | |
| Video: WAIS video demonstration | 1991 | | |
| Video: Special Interest Group on Wide Area Information Servers: conference held March 19, 1993 at U.S.G.S. | March 19, 1993 | | U.S.G.S. |
| Video: Wide Area Information Servers (WAIS) launch lecture at Xerox PARC, available at http://archive.org/details/wais_supercomputer_parc | 1991 | | Xerox PARC |
| Proceedings for Wide Area Information Server Workshop, February 3-4, 1992, MCNC Research Triangle Park, NC USA | 1992 | | Microelectronics Center of North Carolina, Center for Communications, National Science Foundation (U.S.), Institute for Academic Technology |
| GNU Emacs Manual – Searching and Replacement | Undated | | |
| GNU Readline Library | 1988 | | Free Software Foundation |
| A GUI-based version of the SenseMaker interface for information exploration | 1997 | M. Baldonado and T. Winograd | Stanford University |
| Hemlock – An Internet Search Tool for the Newton | 1999 | Sean Luke | |
| Hemlock An Internet Search Tool for the Newton | Undated | | |
| Heuristics – Intelligent Search Strategies for Computer Problem Solving | 1984 | Judea Pearl | Addison-Wesley |
| How to Create a WAIS Query | | | |
| Implementation of the SMART Information Retrieval System | May 1985 | Chris Bucley | |
| Incremental Searching in FoxPro | Oct. 1993 | | PC Magazine |

SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| The Info Agent: An Interface for Supporting Users in Intelligent Retrieval | 1995 | Daniela D' Aloisi and Vittorio Giannini | |
| Infoharness: Managing Distributed, Heterogeneous Information | 1999 | Kshitij Shah and Amit Sheth | IEEE Internet Computing |
| Information Retrieval Algorithms and Heuristics | 1998 | David A. Grossman and Ophir Frieder | Kluwer Academic |
| Information Retrieval (Z39.50): Application Service Definition and Protocol Specification | 1995 | | NISO Press |
| Information Retrieval Application Service Definition and Protocol Specification for Open Systems Interconnection, ANSI/NISO Z39.50-1992 | 1992 | | NISO Press |
| Information Retrieval on the World Wide Web | 1997 | Venkat N. Gudivada, Vijay V. Raghavan, William I. Grosky and Rajesh Kasanagottu | IEEE Internet Computing |
| INQUERY System Overview | Undated | John Broglio, James P. Callan and W. Bruce Croft | |
| Internet Fish | May 1996 | Brian A. LaMacchia | |
| An Introduction to the EMACS Editor | Jan. 1978 | Eugene Ciccarelli | MIT |
| An Introduction to Multisensor Data Fusion | 1997 | David L. Hall and James Llinas | IEEE |
| Macworld Mac OS 8.5 Bible | 1999 | Lon Poole | IDG Books Worldwide |
| Mac OS 8.5 – Black Book | 1999 | Mark R. Bell and Debrah D. Suggs | The Coriolis Group, |
| Mac OS 8.5: GO FOR IT! Part I | Oct. 29 1998 | Michael Lambert | The Mac Observer |
| Mac OS 8.5: GO FOR IT! Part II | Oct. 29 1998 | Michael Lambert | The Mac Observer |
| Mac OS 8.5 Special Report | 1998 | | MacInTouch |
| MAC OS 9: The Missing Manual – Finding Files and Web Sites with Sherlock 2 | | | |
| Mac OS 9 for Dummies | 1999 | Bob LeVitus | John Wiley & Son, Inc. |

Case No. 12-cv-00630-LHK
SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| MacWAIS Software Version 1.28 | Feb. 23, 1994 | | EINet |
| MacWAIS User Manual Version 1.29 | 1994 | | Microelectronics and Computer Technology Corporation |
| The MetaCrawler Architecture for Resource Aggregation on the Web | Nov. 8, 1996 | Erik Selberg and Oren Etzioni | |
| Metadata for Digital Libraries: Architecture and Design Rationale | 1997 | Michelle Baldonado et al. | Stanford University |
| Microsoft Universal Data Access Platform | 1998 | Jose A. Blakeley, Michael J. Pizzo | SIGMOD |
| Microsoft Windows 98 Companion | 1998 | Martin Matthews | Microsoft Press |
| Modern Heuristic Search Methods | 1996 | V.J. Rayward-Smith, I.H. Osman, C.R. Reeves and G.D. Smith | John Wiley and Sons |
| Multiobjective Heuristic Search | 1999 | Pallab Dasgupta, P.P. Chakrabarti and S.C. Desarkar | Vieweg |
| NetHopper Version 3.0 – User's Manual | 1997 | | AllPen |
| Newton Apple MessagePad Handbook | 1995 | | Apple |
| Newton Solutions Guide | | | Apple |
| Newton Programmer's Guide | 1996 | | Addison-Wesley |
| Northern Light: New Search Engine for the Web and Full-Text Articles | Feb. 1998 | Greg Notess | Online |
| Overview of Wide Area Information Servers | Apr. 1991 | Brewster Kahle | |
| Pen Pals | Oct. 12, 1993 | Christopher Barr and Michael Neubarth | PC Magazine |
| Peter Rand's Review of Hemlock | 1999 | Peter Rand | |
| Privacy Interfaces for Information Management | | Tessa Lau at al. | ACM October 1999 Vol. 42, No. 10 |

| Title | Date of Publication | Author | Publisher |
|-------|---------------------|--------|-----------|
| Rama: An Architecture for Internet Information Filtering | May 1, 1991 | Jim Binkley and Leslie Young | Kluwer |
| Search Algorithms Under Different Kinds of Heuristics – A Comparative Study | 1983 | A. Bagchi and A. Mahanti | Indian Institute of Management Calcutta |
| Searching Structured Documents with the Enhanced Retrieval Functionality of Free Wais-sf and SFgate | 1995 | Ulrich Pfeifer et al. | Computer Networks and ISDN Systems vol. 27, pp. 1027-1036. |
| The Search Engine Report | Sept. 1, 1998 | Danny Sullivan | Search Engine Watch |
| Sigerson, A Sherlock Power Booster | Dec. 2, 1998 | James Sentman | the Mac Observer |
| SFgate open source software | 1998 and earlier | | Open Source |
| SFgate: The WWW Gateway for freeWAIS-sf, Edition 1.108, for SFgate 5.1 | Jan. 1997 | Norbert Gövert and Ulrich Pfeifer | University of Dortmund, Germany |
| Sherlock Holmes am Newton | Dec. 1999 | | |
| Softscape's QuickFind Search and Retrieval Software | Nov. 1997 | Robert J. Boeri | EMedia Professional |
| Software Quality Engineering – A Total Technical and Management Approach | 1988 | Michael S. Deutsch and Ronald R. Willis | Prentice-Hall |
| Special Edition – Using Visual C++6 | 1998 | Kate Gregory | Que |
| Surviving the Storm: Using Metasearch Engines Effectively | May 1999 | Randal D. Carlson and Judi Repman | Computers in Libraries |
| Toward more comprehensive Web searching: single searching versus megasearching | 1998 | Greg R. Notess | Online |
| Unix for the Impatient | 1996 | Paul W. Abrahams and Bruce A. Larson | Addison-Wesley |
| User's Guide to the Macintosh version of the WAIS interface | 1991 | | Thinking Machines Corporation |
| WAIStation User's Guide, available from ftp://ftp.jcu.edu.au/doc/wais/wai station_users_guide.txt | 1991 | Brewster Kahle | Thinking Machines Corporation |
| WAIS, A Sketch Of An Overview | Sep. 23, 1991 | Jeff Kellem | |
| WAIS Search Help | | | |
| WAIS: The Wide Area Information Server or Anonymous What??? | June 18, 1992 | Peter Marshall | The University of Western Ontario |

Case No. 12-cv-00630-LHK
SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| What is freeWAIS-sf? | | | |
| Wide Area Information Servers (WAIS) | June 1994 | M. St. Pierre, J. Fullton, K. Gamiel, J. Goldman, B. Kahle, J. Kunze, H. Morris and F. Schiettecatte | |
| Windows 98 Annoyances | Oct. 1998 | David A. Karp | O'Reilly |
| Windows 98 for Dummies | 1999 | Andy Rathbone | Wiley |
| WordPerfect for Windows V 5.2 | 1992 | | WordPerfect |
| Xerox Delivers Global Competitive Advantage to Manufacturing Customers Through Solutions Portfolio | Apr. 27, 1999 | | Business Wire |
| Xerox Introduces Two Products to Expand Knowledge Sharing Software Portfolio | Nov. 9, 1999 | | Business Wire |
| Xerox unveils "askOnce", which brings a new search dimension to end-users by giving universal access to multiple information sources through one simple query | 1999 | | Xerox |
| The Z39.50 Information Retrieval Standard – Part I: A Strategic View of Its Past, Present and Future | Apr. 1997 | Clifford A. Lynch | D-Lib Magazine |
| SenseMaker: an information-exploration interface supporting the contextual evolution of a user's interests. | 1997 | Baldonado, Michelle Q Wang; Winograd, Terry. | CHI '97 Proceedings of the ACM SIGCHI Conference on Human factors in computing systems Pages 11-18  ACM New York, NY, USA ©1997 |
| An Interactive, Structure-Mediated Approach To Exploring Information In A Heterogeneous, Distributed Environment. | Dec. 1997 | Baldonado, Michelle Q Wang | Ph.D. Dissertation at Stanford University. December 1997. |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Techniques and Tools for Making Sense out of Heterogeneous Search Service Results. | 1996 | Baldonado, Michelle Q Wang; Winograd, Terry | Stanford Technical Report. Submitted to Digital Libraries '96. |
| An Interactive, Structure-Mediated Approach to Exploring Information in a Heterogeneous, Distributed Environment.  Dissertation Slides. | 1997 | Baldonado, Michelle Q Wang | Ph.D. Dissertation at Stanford University. December 1997. Dissertation Slides |
| Toward Comprehensive Web Search (doctoral dissertation) | 1999 | Erik Warren Selberg | University of Washington |
| The anatomy of a large-scale hypertextual Web search engine | Apr. 1998 | Sergey Brin and Lawrence Page | ACM |
| Object-Oriented Software Construction | 1997 | Bertrand Meyer | Prentice Hall PTR |
| Concepts and Paradigms of Object Oriented Programming | 1990 | Peter Wegner | OOPS Messenger, vol. 1 |
| WAIS and GOPHER SERVERS: A Guide for Internet End-Users | 1994 | Eric L. Morgan | Meckler Publishing/Meckler Corporation |
| AppleSearch | 1993 | Apple Computer, Inc. | Apple Computer, Inc. |
| Archived - AppleSearch 1.5: Quick Reference | | Apple Computer, Inc. | Apple Computer, Inc. |
| Archived - AppleSearch Bundle For Internet: Internet Essentials | | Apple Computer, Inc. | Apple Computer, Inc. |
| Archived - MacTCP: Information on Version 2.0.6 (8/94) | | Apple Computer, Inc. | Apple Computer, Inc. |
| Archived - AppleSearch WAIS Gateway: Description | | Apple Computer, Inc. | Apple Computer, Inc. |
| Archived - AppleSearch WAIS Gateway: Connecting to the Internet | | Apple Computer, Inc. | Apple Computer, Inc. |
| AppleSearch Windows Client Statement of Work (Document #117) | 1993 | Apple Computer, Inc. | Apple Computer, Inc. |
| Apple IP Gateway Administrator's Guide | 1994 | Apple Computer, Inc. | Apple Computer, Inc. |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Archived - AppleSearch: WAIS Directory Servers | | Apple Computer, Inc. | Apple Computer, Inc. |
| Archived - AppleSearch 1.5: Work with Network Firewalls | | Apple Computer, Inc. | Apple Computer, Inc. |
| Archived - Accessing the Internet with ClarisWorks (CM) | | Apple Computer, Inc. | Apple Computer, Inc. |
| Archived - AppleSearch Bundle For Internet: Installation Checklist | | Apple Computer, Inc. | Apple Computer, Inc. |
| Archived - AppleSearch 1.5 Administrator Guide: Troubleshooting | | Apple Computer, Inc. | Apple Computer, Inc. |
| Archived - Apple's Internet Products (4/97) | | Apple Computer, Inc. | Apple Computer, Inc. |
| Archived - AppleSearch Server 1.5.1 Patch: Read Me, | | Apple Computer, Inc. | Apple Computer, Inc. |
| Sprint PCS User Guide: Samsung Model SCH-2000 | 1998 | Sprint PCS | Sprint PCS |
| Sprint PCS User Guide: Samsung Model SCH-3500 | 1999 | Sprint PCS | Sprint PCS |
| SAMSUNG Electronics Develops Watch Phone | March 31, 1999 | | Social Responsibility News |
| SAMSUNG and Sprint PCS Sign $500 Million Agreement to Deliver Advanced, Internet Capable Wireless Phones | September 27, 1999 | | Samsung |
| AppleSearch Client Future Direction | August 25, 1993 | Kazu Yanagihara | Apple Computer, Inc. |
| AppleSearch Client 1.1 | August 20, 1993 | Kazu Yanagihara | Apple Computer, Inc. |
| Gilligan's Island Design | | Apple Computer, Inc. | Apple Computer, Inc. |
| WAIS 2.0: Technical Description. Table of Contents | 1995 | WAIS Inc | WAIS Inc |
| WAIS Protocol Users Manual | March 30, 1990 | Harry Morris | Thinking Machines Corporation |
| The Z39.50 Protocol in Plain English | | Clifford A. Lynch | |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Willow: A Uniform Search Interface | 1996 | Debra S. Ketchell et al. | Journal of the American Medical Informatics Association 3(1) pp. 27-27, Jan./Feb. 1996 |
| Massively Parallel Information Retrieval for Wide Area Information Servers | 1991 | Craig Stanfill | Conference Proceedings of 1991 IEEE International Conference on Systems, Man, and Cybernetics, 1991. Decision Aiding for Complex Systems.  Vol. 1, pp. 679-682. |
| Use of the ISite Z39.50 software to search and retrieve spatially-referenced data | 1995 | Douglas D. Nebert; James Fulton | Proceedings of Digital Libraries '95, Austin, Texas 1995 (http://csdl.tamu.edu/DL95/), pp. 107-114. |
| Information Fusion with ProFusion | 1996 | Susan Gauch; Guijun Wang | Proceedings of WebNet '96: The First World Conference of the Web Society |
| An Adaptive Multi-Agent Architecture for the ProFusion* Meta Search System | 1997 | Yizhong Fan; Susan Gauch | Proceedings of WebNet '97 |
| Newton MessagePad 2000 Tech Article | 1997 | Worldwide Apple Assist, Apple Computer, Inc. | Apple Computer, Inc. |
| Adaptive Agents for Information Gathering from Multiple, Distributed Information Sources | 1999 | Yizhong Fan; Susan Gauch | 1999 AAAI Symposium on Agents in Cyberspace, Stanford University, March 1999 |
| On Combining the Knowledge of Heterogeneous Information Repositories | 1996 | Uwe M. Borghoff; Johann H. Schlichter | Journal of Universal Computer Science 2(7) |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| GLIMPSE: A Tool to Search Through Entire File Systems | Oct. 1993 | Udi Manber Sun Wu | University of Arizona |
| ProFusion*: Intelligent Fusion from Multiple, Distributed Search Engines | 1996 | Susan Gauch Guijun Wang Mario Gomez | Journal of Universal Computer Science 2(9) |
| The ProFusion Website - Search Page available at http://web.archive.org/web/19981206030048/http://profusion.com/ProFusion1.html | Dec. 6, 1998 | | |
| The ProFusion Website – Help Page available at http://web.archive.org/web/19981202000627/http://www.profusion.com/help.html | Dec. 2, 1998 | | |
| The CBKB Website – Info Page available at http://web.archive.org/web/19980210080531/http://www.xerox.fr/ats/xtrim/ | Feb. 10, 1998 | | |
| The CBKB Website – How To Page available at http://web.archive.org/web/19980210090039/http://www.xerox.fr/ats/xtrim/query.html | Feb. 10, 1998 | | |
| The CBKB Website – Sources Page available at http://web.archive.org/web/19980210090024/http://www.xerox.fr/ats/xtrim/sources.html | Feb. 10, 1998 | | |
| The CBKB Website – Home Page available at http://web.archive.org/web/19981205120702/http://www.xrce.xerox.com/research/ct/prototypes/cbkb/home.html | Dec. 5, 1998 | | |
| The CBKB Website – Showroom Page available at http://web.archive.org/web/19980210075604/http://www.xerox.fr/showroom/techno/cbkb.html | Feb. 10, 1998 | | |
| The CBKB Website – Fact Sheet Page available at http://web.archive.org/web/19980210085331/http://www.xerox.fr/showroom/fs/cbkb.html | Feb. 10, 1998 | | |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| The CBKB Website – Intro Page available at http://web.archive.org/web/19990117063438/http://www.rxrc.xerox.com/research/ct/prototypes/cbkb/HELP/introduction.html | Jan. 17, 1999 | | |
| The CBKB Website – Session Manager Page available at http://web.archive.org/web/19990302050035/http://www.rxrc.xerox.com/research/ct/prototypes/cbkb/HELP/sessionManager.html | Mar. 02, 1999 | | |
| The CBKB Website – Query Panel Page available at http://web.archive.org/web/19990302025841/http://www.rxrc.xerox.com/research/ct/prototypes/cbkb/HELP/queryPanel.html | Mar. 02, 1999 | | |
| The CBKB Website – Complex Query Formation Page available at http://web.archive.org/web/19990503032027/http://www.rxrc.xerox.com/research/ct/prototypes/cbkb/HELP/complexQueryFormulation.html | May. 03, 1999 | | |
| The CBKB Website – Result Panel Page available at http://web.archive.org/web/19990302035848/http://www.rxrc.xerox.com/research/ct/prototypes/cbkb/HELP/resultPanel.html | Mar. 02, 1999 | | |
| The CBKB Website – Network Activity Page available at http://web.archive.org/web/19990506074804/http://www.rxrc.xerox.com/research/ct/prototypes/cbkb/HELP/networkActivity.html | May. 06, 1999 | | |
| The CBKB Website – Demo Requirements Page available at http://web.archive.org/web/19990302061054/http://www.rxrc.xerox.com/research/ct/prototypes/cbkb/distrib.html#requirements | Mar. 02, 1999 | | |
| The CBKB Website – Demo Page available at http://web.archive.org/web/19990203055751/http://www.xrce.xerox.com/cbkb-cgi/main | Feb. 03, 1999 | | |

| Title | Date of Publication | Author | Publisher |
|-------|---------------------|--------|-----------|
| An Open Agent Architecture. | 1994 | Philip R. Cohen; Adam Cheyer; Michelle Wang; Soon Cheol Baeg | N/A |
| "The Open Agent Architecture:A Framework for Building Distributed Software Systems," | 1999 | D.L. Martin, A.J. Cheyer, and D.B. Moran, | Applied Artificial Intelligence, vol. 13, nos. 1–2, Jan.–Mar. 1999, pp. 91–128. |
| "Development Tools for the Open Agent Architecture", | 1996 | Martin, David et al., | The Practical Application of Intelligent Agents and Multi-Agent Technology (PAAM96), London, Apr. 1996. |
| InfoWiz: An Animated Voice Interactive Information System | May 1999 | Adam Cheyer and Luc Julia | Agents'99 (WS Communicative Agents) : Seattle (USA), May 1999. |
| Multimodal Maps: An Agent-based Approach. | 1998 | Adam Cheyer and Luc Julia | Multimodal Human-Computer Communication Lecture Notes in Artificial Intelligence #1374, Bunt/Beun/Bor ghuis (Eds.), Springer, pp 111-121. |
| Multimodal User Interfaces in the Open Agent Architecture. | 1998 | Moran D., Cheyer A., Julia L., Martin D. & Park S. | Journal of Knowledge-Based SYSTEMS, #10, pp 295-303. |
| Faciltating Navigation and Information Access with CANOES: Collaborative Agents and Natural Operations in Enhanced Spaces. | 1999 | Julia L. & Cheyer A. | Inter-agency Workshop on "Smart Environment": Atlanta (USA), Submitted. |

| Title | Date of Publication | Author | Publisher |
|-------|---------------------|--------|-----------|
| Experiments In using agent-based retrieval from distributed and heterogeneous databases | 1997 | B. Das | Proceedings of 1997 Knowledge and Data Engineering Exchange Workshop |
| Optimizing queries over multimedia repositories | 1996 | S. Chaudhuri and L. Gravano | SIGMOD '96 Proceedings of the 1996 ACM SIGMOD International Conference on Management of Data, ACM, pp. 91-102 |
| A universal query interface for heterogeneous distributed libraries | 1996 | N. Katayama et al. | Proceedings of Seventh International Workshop on Database and Expert Systems Applications, IEEE, pp. 332-339 |
| Adaptive information agents in distributed textual environments | 1998 | F. Menczer & R. K. Belew | AGENTS '98, Proceedings of the Second International Conference on Autonomous Agents, pp. 157-164 |
| An overview and classification of mediated query systems | 1999 | R. Domenig & K.R. Dittrich | ACM SIGMOD Record 28(3), Sept. 1999, pp. 63-72 |
| An architecture for intelligent resource agents | 1997 | J. Pastor et al. | COOPIS '97, Proceedings of the Second IFCIS International Conference on Cooperative Information Systems, IEEE, pp. 151-159 |
| Parallel database systems 101 | 1995 | J. Gray | SIGMOD '95, ACM, May 1995, p. 436 |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| The FirstSearch user interface architecture:  universal access for any user, in many languages, on any platform | 2000 | G. Perlman | CUU '00, Proceedings on the 2000 conference on Universal Usability, ACM, pp. 1-8 |
| Parallel processing for efficient subdivision search | 1987 | N. Dadoun & D.G. Kirkpatrick | SCG '87 Proceedings of the third annual symposium on Computational geometry, ACM, pp. 205-214 |
| Exploiting inter-operation parallelism in XPRS | 1992 | Wei Hong | SIGMOD '92, Proceedings of the 1992 ACM SIGMOD International Conference on Management of Data Archive, pp. 19-28 |
| Efficient and accurate cost models for parallel query optimization | 1996 | S. Ganguly et al. | PODS '96, Proceedings of the fifteenth ACM SIGACT-SIGMOD-SIGART Symposium on Principles of Database Systems, pp. 172 - 181 |
| A uniform interface to networked library services | 1992 | M. Blumenfeld & R. Droms | SAC '92, Proceedings of the 1992 ACM/SIGAPP Symposium on Applied Computing: Technological Challenges of the 1990's, pp. 608-613 |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Design of OPAC database to permit different subject searching accesses in a multi-disciplines universities library catalog database | 1992 | M. Agosti & M. Masotti | SIGIR '92, Proceedings of the 15th Annual International ACM SIGIR Conference on Research and Development in Information Retrieval, pp. 245-255 |
| A competence knowledge base system as part of the organizational memory | 2000 | M. Liao et al. | German Research Center for Artificial Intelligence (DFKI) GmbH: F. Puppe (ed.) XPS-99, LNIA 1570, pp. 125-137, Springer-Verlag Heidelberg |

3.    **Systems**

Samsung also contends that the asserted claims of the '604 patent are invalid in view of public knowledge and uses and/or offers for sale or sales of products and services that are prior art under 35 U.S.C. Sec. 102(a) and/or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. Sec. 102(g), and that anticipate or render obvious the asserted claims.

The following lists prior art products or services that invalidate under 35 U.S.C. Sec. 102(a), (b), and/or (g) by the name of the item, and Samsung may rely on all versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '604 Patent, including documents and source code describing the same:

- Emacs
- GNU
- Hemlock
- Linux
- Mac OS 8.5

- Newton
- NetHopper
- Sherlock Utility
- WAIS
- Windows 98
- BugsEye / Neal system
- SenseMaker
- MetaCrawler
- AppleSearch
- Rosebud
- Isite system
- ProFusion
- CBKB System
- Open Agent Architecture

Additional details on these invalidating references are included in Exhibit H, including to the extent now known when the item became publicly known or was used, offered for sale, or sold; the identities of the persons or entities that made the item public, publicly used it, or made the offer for sale, and the identities of the person(s) or entities involved in, and the circumstances surrounding the making of, the invention.  Samsung's positions with respect to these references are stated on information and belief, and are supported by the information and documents that will be produced by Samsung and/or third parties.  As discovery is not complete, Samsung continues to investigate these events.  Samsung may use physical samples, executable software, or source code as evidence of the relevant functionality of these prior art products or services, as described in Exhibit H.  At a mutually convenient time, Samsung will make available for inspection any physical samples of products, systems, or software listed above, and/or any source code therefor, that it has in its possession or that becomes available to Samsung in the future during discovery.

Samsung reserves the right to amend these invalidity contentions to assert these references depending on the claim construction and infringement positions Apple may take as the case

proceeds.  Moreover, Samsung reserves the right to use these references in combination with other references to render the claims of the '604 Patent obvious in the event Apple takes the position that certain claim limitations are missing from the references charted in Exhibit H.

    **B.**    **Local Patent Rule 3-3(b):  Whether Each Item Anticipates or Renders Obvious the Asserted Claims**

Plaintiff asserts claims 1, 6, 11 and 16-21 of the '604 Patent against Samsung in this lawsuit.  All of those claims are invalid because the '604 Patent fails to meet one or more of the requirements for patentability.  The individual bases for invalidity are provided below and in the claim charts attached as Exhibit H-1 through H-20.  Each of the foregoing listed prior art documents, the underlying work, and/or the underlying apparatus or method qualifies as prior art under one or more sections of 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

Although Samsung has identified at least one citation per limitation for each reference, each and every disclosure of the same limitation in the same reference is not necessarily identified.  Rather, in an effort to focus the issues, Samsung has generally cited representative portions of identified references, even where a reference may contain additional support for a particular claim element.  In addition, persons of ordinary skill in the art generally read a prior art reference as a whole and in the context of other publications and literature.  Thus, to understand and interpret any specific statement or disclosure within a prior art reference, such persons would rely on other information within the reference, along with other publications and their general scientific knowledge.  Samsung may rely upon uncited portions of the prior art references and on other publications and expert testimony to provide context, and as aids to understanding and interpreting the portions that are cited.  Samsung may also rely on the prior art of record for any permissible purpose, including prior art discussed in the '604 patent specification itself, including to show that the '604 patent is anticipated or obvious, show the state of the art, show motivation to combine a reference with one or more other references, and to show the proper scope of the claims.  Samsung may also rely on uncited portions of the prior art references, other disclosed publications, and the testimony of experts to establish that a person of ordinary skill in the art would have been motivated to modify or combine certain of the cited references so as to render the claims obvious.

1.    **Anticipation**

Some or all of the asserted claims of the '604 Patent are invalid as anticipated under 35 U.S.C. § 102 in view of each of the prior art references identified above and in the claim charts included in Exhibit H, which identify specific examples of where each limitation of the asserted claims is found in the prior art references.  As explained above, the cited portions of prior art references identified in the attached claim charts are exemplary only and representative of the content and teaching of the prior art references, and should be understood in the context of the reference as a whole and as they would be understood by a person of ordinary skill in the art.

2.    **Obviousness**

To the extent any limitation is deemed not to be exactly met by an item of prior art listed above and in Exhibit H, then any purported differences are such that the claimed subject matter as a whole would have been obvious to one skilled in the art at the time of the alleged invention, in view of the state of the art and knowledge of those skilled in the art.  The item of prior art would, therefore, render the relevant claims invalid for obviousness under 35 U.S.C. § 103(a).

In addition, the references identified above render one or more asserted claims of the '604 Patent obvious when the references are read in combination with each other, and/or when read in view of the state of the art and knowledge of those skilled in the art.  Each and every reference identified is also relevant to the state of the art at the time of the alleged invention.  Any of the references disclosed above may be combined to render obvious (and therefore invalid) each of Plaintiff's asserted claims.  Samsung may rely upon a subset of the above identified references or all of the references identified above, including all references in Exhibit H, for purposes of obviousness depending on the Court's claim construction, positions taken by Apple during this litigation, and further investigation and discovery.  Samsung may rely on combinations with any reference in Exhibit H and any of the other references disclosed herein with respect to the '604 patent, including combinations with any of the patents, publications or systems identified herein as prior art to the '604 patent.

Moreover, to the extent the foregoing references are found not to anticipate the asserted claims, the foregoing references render the asserted claims obvious either alone or in combination

1    with one or more of the other references identified above pursuant to P.R. 3-3(a).  As explained

2    herein and/or in the accompanying charts, it would have been obvious to a person of skill in the art

3    at the time of the alleged invention of the asserted claims of the '604 Patent to combine the various

4    references cited herein so as to practice the asserted claims of the '604 Patent.

5         Motivations to combine the above items of prior art are present in the references

6    themselves, the common knowledge of one of ordinary skill in the art, the prior art as a whole, or

7    the nature of the problems allegedly addressed by the '604 Patent.  Combining the references

8    disclosed in Exhibit H would have been obvious, as the references identify and address the same

9    technical issues and suggest very similar solutions to those issues.  Samsung reserves the right to

10   amend or supplement these invalidity contentions to identify additional reasons that combining the

11   references would be obvious to one of ordinary skill in the art.

12        In addition to the specific combinations of prior art and the specific combinations of

13   groups of prior art disclosed, Samsung reserves the right to rely on any other combination of any

14   prior art references disclosed herein.  Samsung further reserves the right to rely upon combinations

15   disclosed within the prosecution history of the references cited herein.

16        The obviousness combinations set forth in these contentions reflect Samsung's present

17   understanding of the potential scope of the claims that Plaintiff appears to be advocating and

18   should not be seen as Samsung's acquiescence to Plaintiff's interpretation of the patent claims.

19   Samsung also reserves the right to amend or supplement these contentions regarding anticipation

20   or obviousness of the asserted claims, in view of further information from Plaintiff, information

21   discovered during discovery, or a claim construction ruling by the Court.  Plaintiff has not

22   identified what elements or combinations it alleges were not known to one of ordinary skill in the

23   art at the time.  Therefore, for any claim limitation that Plaintiff alleges is not disclosed in a

24   particular prior art reference, Samsung reserves the right to assert that any such limitation is either

25   inherent in the disclosed reference or obvious to one of ordinary skill in the art at the time in light

26   of the same, or that the limitation is disclosed in another of the references disclosed above and in

27   combination would have rendered the asserted claim obvious.

28

In accordance with Patent L.R. 3-3(b), prior art references rendering the asserted claims of the '604 patent obvious, alone or in combination with other references, are discussed above and include in Exhibits H-1 to H-20. Exhibits H-1 to H-20 include exemplary claim charts for the '604 patent showing specific combinations of references, including citations to relevant disclosures in those references.

In particular, Samsung contends that the asserted claims of the '604 patent would have been obvious in view of the prior art references identified herein. For example, Exhibits H-1 to H-20 include exemplary claim charts that describe how the asserted claims of the '604 patent would have been obvious. The primary references cited in Samsung's exemplary claim charts, Exhibits H-1 to H-20, are the Corey patent, the Legall patent, the MetaCrawler system, MultiSurf, the Neal patent, Newton, the Rubinstein patent, Sherlock, WAIS, the Bennett patent, the Evans patent, the Jensen patent, the SenseMaker system, the Smith patent, the Tung thesis, the BugsEye / Neal system, the Isite system, the ProFusion system, the CBKB system, and the Kirsch patent.

Each of these primary references teaches all of the limitations of the '604 patent's asserted claims. To the extent any claim limitations are found to be missing from the primary references, in addition to the references designated for combination with the primary references, described in each exhibit, it would have been obvious to one of ordinary skill to add the missing limitation based on the corresponding disclosure of that limitation in Exhibits H-1 to H-20. For example, to the extent the primary reference in Exhibit H-1 is found to be missing limitation 1[B], it would have been obvious to combine that primary reference with the disclosure of limitation 1[B] in any one of the many references explicitly disclosing that element, including the disclosures of that element set out in Exhibits H-2 to H-20.

Each of these combinations was obvious to try for a person of ordinary skill in the art. In the field of the '604 patent, there was a design need or market pressure to solve a problem and there were a finite number of identified, predictable solutions. A person of ordinary skill had good reason to pursue the known options within his or her technical grasp including combinations of the disclosures in Exhibits H-1 to H-20. Each of these combinations is also the combination of familiar elements according to known methods and yields predictable results. In the field of the

'604 patent, a great deal of prior research and commercial software was available and design incentives and other market forces would prompt variations of it.  Further reasons to combine the references identified in Exhibits H-1 to H-20 include the nature of the problem being solved, the express, implied, and inherent teachings of the prior art, the knowledge of persons of ordinary skill in the art, and that such combinations would have yielded predictable results, and that such combinations would have represented known alternatives to a person of ordinary skill in the art.  For each combination, there is a teaching, suggestion, and motivation to combine both in the references to be combined themselves, as well as in the art generally that was known to a person of ordinary skill in the art.   In any event, each limitation of the '604 patent is, and would have been at the time of the alleged invention, a simple design choice representing a predictable variation within the skill of a person of ordinary skill in the art.  Moreover, each limitation of the '604 patent was well known in the art, including well-known to persons of ordinary skill.

Additional prior art references rendering the asserted claims obvious, alone or in combination with other references, including identification of combinations showing obviousness, are identified in Exhibits H-1 to H-20, which includes exemplary claim charts for the asserted claims of the '604 Patent showing specifically where in each reference or combinations of references each asserted claim is found, and an explanation of why the prior art renders the asserted claim obvious.  In addition to the charted '604 obviousness references and other prior art references disclosed herein, Samsung may also rely on background materials to demonstrate the state of the art, which is relevant to obviousness of the asserted claims.  The concepts claimed in the '604 patent were prevalent in the field of information retrieval in computer systems, and well-known to ordinary artisans long before the earliest alleged conception date of the '604 patent.  While there are too many examples of background materials to list (and the local rules impose no obligation to disclose materials used purely for background or state of the art), representative examples include the following:  Grossman, "Information Retrieval Algorithms and Heuristics," 1998; Rayward-Smith, "Modern Heuristic Search Methods," 1996; Bagchi, "Search Algorithms Under Different Kinds of Heuristics – A Comparative Study," 1983; Pearl, "Heuristics – Intelligent Search Strategies for Computer Problem Solving," 1984; Dasgupta, "Multiobjective

1 Heuristic Search – An Introduction to Intelligent Search Methods for Multicriteria Optimization,"

2 1999; Meyer, "Object-Oriented Software Construction," 1997; Wegner, "Concepts and Paradigms

3 of Object-Oriented Programming," 1990; Brin and Page, "The anatomy of a large-scale

4 hypertextual Web search engine," 1998; Gudivada, "Information Retrieval on the World Wide

5 Web," 1997; Das, "Experiments In using agent-based retrieval from distributed and heterogeneous

6 databases," 1997. The long-known concepts recited in these and similar background materials

7 describe the background knowledge of one of skill in the art, which taken alone or in combination

8 with prior art references described herein, render the asserted claims of the '604 patent obvious.

### C. Local Patent Rule 3-3(c): Charts Identifying where Specifically in each Alleged item of Prior Art each Asserted Claim is Found

Pursuant to Local Patent Rule 3-3(c), charts identifying where specifically in each alleged

item of prior art each limitation of each asserted claim is found, including for each limitation that

Samsung contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or

material(s) in each item of prior art that performs the claimed function are attached in Exhibits H-1

through H-20.

### D. Local Patent Rule 3-3(d): Other Grounds for Invalidity

Samsung identifies the following grounds for invalidity of the asserted claims of the '604

Patent based on 35 U.S.C. §§ 101 and/or 112 ¶¶ 1 and 2. Samsung reserves the right to

supplement these disclosures based on further investigation and discovery.

#### 1. Invalidity Based on 35 U.S.C. § 101

The asserted claims of the '604 Patent are invalid under 35 U.S.C. § 101 because they

claim only abstract ideas. For example, "providing said information received from the user-input

device to a plurality of heuristic modules," and "determining at least one candidate item of

information," "searching by the heuristic modules," and "providing at least one candidate item of

information" each refer only to programming abstractions or the manipulation of information;

these are concepts, not physical objects or tangible matter.

2.  **Invalidity Based on Enablement or Written Description Under 35 U.S.C. § 112(1) and/or Invalidity Based on Indefiniteness Under 35 U.S.C. § 112(2)**

Samsung asserts that each asserted claim of the '604 Patent is invalid in that the '604 specification fails to particularly point out and distinctly claim the alleged invention of the '604 Patent.  Samsung further asserts that each asserted claim of the '604 Patent is invalid as not containing a written description of the invention and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the alleged invention.

Based on Samsung's present understanding of Plaintiff's infringement contentions, Samsung asserts that claims 1, 6, 11 and 16-21 of the '604 Patent are invalid for reciting at least the claim terms "heuristic," "heuristic module," "heuristic algorithm" "respective area of search," and/or "configured to search."  Claims 16, 18 and 20 of the '604 patent are invalid for reciting at least the claim term "particularized to its associated relevant area of search."  Claims 17, 19 and 21 of the '604 patent are invalid for reciting at least "receiving portions of the information descriptor as the portions are being inputted," "providing the portions of the information descriptor to the plurality of heuristic modules as the portions are being received," and "received portion of the information descriptor."  These claim terms/phrases as apparently construed by Apple violate the written description, enablement and/or definiteness requirements of 35 U.S.C. § 112.

Based on Samsung's present understanding of Plaintiff's infringement contentions, at least one or more of these claim terms/phrases are indefinite because they are inconsistent with and broader than the alleged invention disclosed in the specification and given Plaintiff's apparent constructions of the claims, any person of ordinary skill in the art at the time of the invention would not understand what is claimed, even when the claims are read in light of the specification.  Further, the asserted claims are not sufficiently precise to permit one of skill to determine the boundaries of the claims and ascertain whether or not a given party or product falls within the scope of the claims.  Moreover, based on Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted claims in which these claim terms/phrases appear

lack written description because the specification of the '604 Patent demonstrates that the patentee neither conceived of nor demonstrated possession of all that Plaintiff now contends the claims cover. In addition, based on Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted claims in which these claim terms/phrases appear are invalid because the specification fails to provide sufficient disclosure to enable any person of ordinary skill in the art to which it pertains, or with which it is most nearly connected, to implement the invention without undue experimentation. The '604 patent specification fails to describe the manner and process of making and using the claimed invention in such full, clear concise and exact terms as to enable a person of ordinary skill in the art to which it pertains to make and use the claimed invention.

For at least the reasons set forth above, the claims fail to satisfy the requirements of § 112 ¶¶ 1 and 2.

## IX.    MOTIVATIONS TO COMBINE

Because it would be unduly burdensome to create detailed claim charts for the many invalidating combinations, Samsung has provided illustrative examples of such invalidating combinations below and in Exhibits A-1 through A-11, B-1 through B-15, C-1 through C-20, D-1 through D-20, E-1 through E-9, F-1 through F-9, G-1 through G-14, and H-1 through H-20. For at least the reasons described above and below in the examples provided, as well as in the attached claim charts, it would have been obvious to one of ordinary skill in the art to combine any of a number of prior art references, including any combination of those identified in Exhibits A-1 through A-11, B-1 through B-15, C-1 through C-20, D-1 through D-20, E-1 through E-9, F-1 through F-9, G-1 through G-14, and H-1 through H-20, to meet the limitations of the asserted claims. As such, Samsung's identification of exemplary combinations is without limitation to Samsung's identifying other invalidating combinations as appropriate.

Samsung believes that no showing of a specific motivation to combine prior art is required to combine the references disclosed herein and in the attached charts. As reflected in the attached exhibits, and in the references themselves, there was a reason to make each combination – each combination of art would have produced no unexpected results, and each combination at most

would simply represent a known alternative to one of ordinary skill in the art. See *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 414-18 (2007) (rejecting the Federal Circuit's "rigid" application of the teaching, suggestion, or motivation-to-combine test, instead espousing an "expansive and flexible" approach). As reflected in the attached exhibits, in the references themselves, and the discussion herein, the asserted claims of Apple's patents combine familiar elements according to know methods, yielding predictable results. Moreover, one of ordinary skill would be prompted to modify each of these references based on design incentives or other market forces. This is true for references in the same field of endeavor as well as for references in a different field of endeavor, as one of skill would understand that techniques used to improve devices in a related or analogous field could improve similar devices in the same way. No specific reference explicitly spelling out all aspects of a proposed combination is required to show obviousness; indeed, the Supreme Court has explained that a person of ordinary skill is "a person of creativity, not an automaton," and "in many cases a person of ordinary skill in the art will be able to fit the teachings of multiple patents together like pieces of a puzzle." *Id.* at 420-21. As reflected in the attached exhibits, the discussion herein, and in the references themselves, the elements of Apple's asserted patent claims are all disclosed in the art before the patents' earliest possible priority dates, and one of skill would readily fit their teachings together.

Nevertheless, in accordance with the Patent Local Rules, and in addition to the information contained elsewhere in these contentions, Samsung hereby identifies below additional motivations and reasons to combine the cited art. To determine whether there is a reason to combine the known elements in the manner claimed by a patent, a court can "look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art." *Id.* at 418. For example, obviousness can be demonstrated by showing "there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims." *Id.* at 420. "[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* Common sense also teaches that "familiar items may have obvious uses

1  beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the

2  teachings of multiple patents together like pieces of a puzzle." *Id*.

3        Applying these principles, it would have been obvious to a person of ordinary skill in the

4  art at the time the application that issued as each of the Patents-In-Suit was filed to combine,

5  modify, or use the teachings of the prior art to make the purported inventions of those patents,

6  including by making each of the combinations identified above.  The motivation to combine the

7  teachings of the prior art references disclosed herein can be found in each of (1) the references

8  themselves, (2) the nature of the problem being solved, (3) the express, implied and inherent

9  teachings of the prior art, (4) the knowledge of persons of ordinary skill in the art, (5) the fact that

10 the prior art is generally directed towards the subject matter of each respective asserted patent, and

11 (6) the predictable results obtained in combining the elements of the prior art.

12     **A.**    **The '502 Patent**

13       As stated above, the Comerford patent, the Vargas patent, the Bristor patent, the *Toolsmith*

14 publication, XKWIC, Microsoft Windows 95, Codewright, Microsoft Windows for Pen

15 Computing, Turbo C++, Microsoft Visual C++, and Microsoft Office reference anticipate the

16 asserted claims. To the extent these references are found to not anticipate any one of the asserted

17 claims, they render the claims obvious, whether standing alone, or when combined with

18 knowledge of the ordinary artisan and/or the nature of the problem to be solved.

19       Any reference or combination of references that anticipates or renders obvious an asserted

20 independent claim also renders obvious any asserted claim dependent on that independent claim

21 because every element of each dependent claim was known by a person of ordinary skill at the

22 time of the alleged invention, and it would have been obvious to combine those known elements

23 with the independent claims at least as a matter of common sense and routine innovation.

24       To the extent the references discussed herein or in Exhibits A-1 to A-11 are found to lack

25 particular elements of the asserted claims, those elements would have represented mere obvious

26 modifications of the references themselves.  Each asserted claim would have been obvious in view

27 of the primary references alone.

28

For example, to the extent that the Comerford patent, the Vargas patent, the Bristor patent, the *Toolsmith* publication, XKWIC, Microsoft Windows 95, Codewright, Microsoft Windows for Pen Computing, Turbo C++, Microsoft Visual C++, or Microsoft Office are found not to explicitly disclose that history information was stored in a table, a person of ordinary skill in the art at the time of the alleged invention would have recognized that tables are merely one well-known variation on common data structures for storing data. Modifying the disclosed references to store history information in a table or table of a database instead of, for instance, in a file as a list delimited by commas or other symbols, would have been one of a finite number of known solutions for storing information. Modifying the disclosed references to store history information in a table would have been an obvious design choice implemented through known software programming techniques that would not yield unpredictable or unexpected results. Finally, a person of ordinary skill in the art would have found express motivation for storing history information in a table in light of various references, including the references discussed herein and references listed in Exhibits A-1 through A-11. By way of example, Vargas and Comerford each show that it was desirable to store information regarding historical input information in a table.

Furthermore, as another example, to the extent that the Comerford patent, the Vargas patent, the Bristor patent, the *Toolsmith* publication, XKWIC, Microsoft Windows 95, Codewright, Microsoft Windows for Pen Computing, Turbo C++, Microsoft Visual C++, or Microsoft Office are found not to explicitly disclose updating a history table based on a user's selection, a person of ordinary skill in the art at the time of the alleged invention would have recognized that updating history tables based on user selections was merely one well-known variation on common techniques to build and display lists of a user's historical inputs. Modifying the disclosed references to update history tables based on user selections would have been one of a finite number of known solutions for user interaction with history lists. Modifying the disclosed references to update history tables based on user selections would have been an obvious design choice implemented through known software programming techniques that would not yield unpredictable or unexpected results. Finally, a person of ordinary skill in the art would have

1  found express motivation for storing history information in a table in light of various references,

2  including the references discussed herein and references listed in Exhibits A-1 through A-11.

3        Furthermore, as another example, to the extent that the Comerford patent, the Vargas

4  patent, the Bristor patent, the *Toolsmith* publication, XKWIC, Microsoft Windows 95,

5  Codewright, Microsoft Windows for Pen Computing, Turbo C++, Microsoft Visual C++, or

6  Microsoft Office are found not to explicitly disclose history lists that are shared between different

7  applications, a person of ordinary skill in the art at the time of the alleged invention would have

8  recognized that sharing history lists between applications would have been an obvious design

9  choice implemented through known software programming techniques that would not yield

10 unpredictable or unexpected results.  For instance, Codewright and Visual C++ stored their history

11 lists in a text file in a known location using a known data storage format.  It would have been

12 within the capabilities of one of ordinary skill in the art to design a program to use that same

13 history list.  Similarly, Windows 95 stores its history lists in the Windows registry under known

14 registry keys.  It would likewise have been within the capabilities of one of ordinary skill in the art

15 to design a program that would access the history lists stored by Windows 95 in the Windows

16 registry.  A person of ordinary skill in the art would have been motivated to do so in order to

17 provide shared search and replace histories across different applications.   Finally, a person of

18 ordinary skill in the art would have found express motivation for storing history information in a

19 table in light of various references, including the references discussed herein and references listed

20 in Exhibits A-1 through A-11.

21       As another example, to the extent that the Comerford patent, the Vargas patent, the Bristor

22 patent, the *Toolsmith* publication, XKWIC, Microsoft Windows 95, Codewright, Microsoft

23 Windows for Pen Computing, Turbo C++, Microsoft Visual C++, or Microsoft Office are found to

24 lack an explicit teaching of a "history list", it would have been obvious to the ordinary artisan to

25 have a history list, because history lists were known before the earliest priority date for the '502

26 patent.  A person of ordinary skill in the art at the time of the alleged invention would have

27 recognized that history lists are merely one well-known variation on presenting historical usage

28 information.  Modifying the disclosed references to utilize history lists would have been one of a

1   finite number of known solutions for presenting historical usage information. Modifying the

2   disclosed references to utilize history lists would have been an obvious design choice implemented

3   through known software programming techniques that would not yield unpredictable or

4   unexpected results. Finally, a person of ordinary skill in the art would have found express

5   motivation for utilizing history lists in light of various references, including the references

6   discussed herein and references listed in Exhibits A-1 through A-11.

7      For example, prior to the alleged invention of the '502 patent, it was well known that

8   building a list of historical inputs from the user required tracking the user's input and updating a

9   list as the user continued to input data into a field. For instance, the Examiner recognized that

10   Turbo C++ tracked the user's input and updated a list as the user continued to input data into a

11   field.



SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

As another example, to the extent that the Comerford patent, the Vargas patent, the Bristor patent, the *Toolsmith* publication, XKWIC, Microsoft Windows 95, Codewright, Microsoft Windows for Pen Computing, Turbo C++, Microsoft Visual C++, or Microsoft Office are found to lack an explicit teaching of a history list which allows selection of previous entries and also permits entry of new items not on the history list, a person of ordinary skill in the art would have been motivated to combine any of these references with each other (based on the disclosures of the references set forth in the attached claim charts), or with any one of references that display history lists using "combo boxes", a common user interface design technique that would have been familiar to one of skill in the art long before the priority date of the '502 patent, and that was disclosed in Microsoft Windows 95, Microsoft Windows for Pen Computing, Microsoft Office, Codewright, Borland Turbo C++, and various other references disclosed herein and in the attached claim charts.

For example, to the extent that the Comerford patent, the Vargas patent, the Bristor patent, the *Toolsmith* publication, XKWIC, Microsoft Windows 95, Microsoft Windows for Pen Computing, Turbo C++, Microsoft Visual C++, or Microsoft Office are found to lack an explicit teaching of a "field class" as that term has been apparently construed by Apple, one of ordinary skill would have understood this information to be inherent in the disclosures of the references, or

obvious in view of the references alone, as one of skill could not implement a history list for a particular field without using a "field class" as Apple apparently construes the term. A person of ordinary skill in the art would have been motivated to combine any of these references with each other (based on the disclosures of the references set forth in the attached claim charts), or with Codewright (also based on the disclosures of the reference set forth in the attached claim charts) because those references all address the same problem: tracking a user's text input and offering prior entries as a means of increasing the speed of future input tasks. A person of ordinary skill in the art at the time of the alleged invention would have recognized that field classes are merely one well-known variation on associating a user interface element such as a field with data stored in memory such as a history table or history list. Modifying the disclosed references to utilize field classes would have been one of a finite number of known solutions for associating fields with history tables or history lists. Modifying the disclosed references to utilize field classes would have been an obvious design choice implemented through known software programming techniques that would not yield unpredictable or unexpected results. Finally, a person of ordinary skill in the art would have found express motivation for utilizing field classes in light of various references, including the references discussed herein and references listed in Exhibits A-1 through A-11.

As another example, to the extent that the Comerford patent, the Vargas patent, the Bristor patent, the *Toolsmith* publication, XKWIC, Microsoft Windows 95, Codewright, Microsoft Windows for Pen Computing, Turbo C++, Microsoft Visual C++, or Microsoft Office are found to lack an explicit teaching of a "form," as that term has been apparently construed by Apple, one of ordinary skill would have understood this information to be inherent in the disclosures of the references, or obvious in view of the references alone, as one of skill could not implement a graphical user interface without using a "form" as Apple apparently construes the term. It would have been obvious to the ordinary artisan to have a form, because forms were known, and were a popular form of data and text entry, before the earliest priority date for the '502 patent.. A person of ordinary skill in the art at the time of the alleged invention would have recognized that forms are merely one well-known variation on entering data into a user interface. Modifying the

1  disclosed references to utilize forms would have been one of a finite number of known solutions

2  for entering data into a user interface.  Modifying the disclosed references to utilize forms would

3  have been an obvious design choice implemented through known software programming and user

4  interface design techniques that would not yield unpredictable or unexpected results.  Finally, a

5  person of ordinary skill in the art would have found express motivation for utilizing forms in light

6  of various references, including the references discussed herein and references listed in Exhibits

7  A-1 through A-11.

8          As another example, to the extent that the Comerford patent, the Vargas patent, the Bristor

9  patent, the *Toolsmith* publication, XKWIC, Microsoft Windows 95, Codewright, Microsoft

10  Windows for Pen Computing, Turbo C++, Microsoft Visual C++, or Microsoft Office are found to

11  lack an explicit teaching of a "field," as that term has been apparently construed by Apple, one of

12  ordinary skill would have understood this information to be inherent in the disclosures of the

13  references, or obvious in view of the references alone, as one of skill could not implement a

14  graphical user interface that allows text entry without using a "field" as Apple apparently

15  construes the term.  It would have been obvious to the ordinary artisan to have a field, because

16  fields were known, and were a popular user interface element, before the earliest priority date for

17  the '502 patent..  A person of ordinary skill in the art at the time of the alleged invention would

18  have recognized that fields are merely one well-known variation on receiving text from a user in a

19  user interface.  Modifying the disclosed references to utilize fields would have been one of a finite

20  number of known solutions for receiving text from a user in a user interface.  Modifying the

21  disclosed references to utilize fields would have been an obvious design choice implemented

22  through known software programming and user interface design techniques that would not yield

23  unpredictable or unexpected results.  Finally, a person of ordinary skill in the art would have

24  found express motivation for utilizing fields in light of various references, including the references

25  discussed herein and references listed in Exhibits A-1 through A-11.

26      **B.**      **The '647 Patent**

27          As stated above, the Mosaic system, the Lynx system, the Sidekick system, the Perspective

28  system / EO Personal Communicator, the Newton Programmer's Guide, the IBM Simon system,

the Stamps patent, the Clayton patent, the mIRC 2.1 system, the Davoust patent, the Gomez and

Nokia patents, the Pandit patent, the Homer system, Hypertext, and the Embedded Buttons System

anticipate several if not all of the asserted claims. To the extent these references are found to not

anticipate any one of the asserted claims, they render the claims obvious, whether standing alone,

or when combined with knowledge of the ordinary artisan and/or the nature of the problem to be

solved.

Any reference or combination of references that anticipates or renders obvious an asserted

independent claim also renders obvious any asserted claim dependent on that independent claim

because every element of each dependent claim was known by a person of ordinary skill at the

time of the alleged invention, and it would have been obvious to combine those known elements

with the independent claims at least as a matter of common sense and routine innovation.

To the extent the references discussed herein or in Exhibits B-1 to B-15 are found to lack

particular elements of the asserted claims, those elements would have represented mere obvious

modifications of the references themselves. Each asserted claim would have been obvious in view

of the primary references alone.

For example, to the extent the Mosaic system, the Lynx system, the Sidekick system, the

Perspective system / EO Personal Communicator, the Newton Programmer's Guide, the IBM

Simon system, the Stamps patent, the Clayton patent, the mIRC 2.1 system, the Davoust patent,

the Gomez and Nokia patents, the Pandit patent, the Homer system, Hypertext, and the Embedded

Buttons System are found to lack an explicit teaching of "an analyzer server for detecting

structures in data, and for linking actions to the detected structures," a person of ordinary skill in

the art at the time of the alleged invention would have recognized that this element was a mere

known variation on a theme: software routines for detecting interesting data and structures in

computer text and assisting a user in performing actions on that data across applications. For

instance, the Newton discloses the use of an "Intelligent Assistant" that could identify data and

help the user use the data across applications, and the Sidekick art discloses a system-wide Dialer

for detecting data and assisting the user in performing actions on that data across applications. A

person of ordinary skill in the art would have recognized that an analyzer server was merely one

1   well-known variation for detecting interesting data and structures and assisting a user in

2   performing actions on that data across applications.

3         Additionally, as another example, to the extent the Mosaic system, the Lynx system, the

4   Sidekick system, the Perspective system / EO Personal Communicator, the Newton Programmer's

5   Guide, the IBM Simon system, the Stamps patent, the Clayton patent, the mIRC 2.1 system, the

6   Davoust patent, the Gomez and Nokia patents, the Pandit patent, the Homer system, Hypertext,

7   and the Embedded Buttons System are found to lack an explicit teaching of an "action processor

8   for performing the selected action linked to the selected structure," a person of ordinary skill in the

9   art at the time of the alleged invention would have recognized that this element was a mere known

10  variations on a theme: software routines for assisting a user in performing actions on detected data

11  across applications.  For instance, the Newton discloses the use of an "Intelligent Assistant" that

12  could identify data and help the user use the data across applications, and the Sidekick art

13  discloses a system-wide Dialer for detecting data and assisting the user in performing actions on

14  that data across applications.  A person of ordinary skill in the art would have recognized that an

15  action processor was merely one well-known variation for assisting a user in performing actions

16  on detected data across applications.

17        Furthermore, as another example, to the extent the Mosaic system, the Lynx system, the

18  Sidekick system, the Perspective system / EO Personal Communicator, the Newton Programmer's

19  Guide, the IBM Simon system, the Stamps patent, the Clayton patent, the mIRC 2.1 system, the

20  Davoust patent, the Gomez and Nokia patents, the Pandit patent, the Homer system, Hypertext,

21  and the Embedded Buttons System are found to lack an explicit teaching of "grammars and a

22  parser for detecting structures in the data," a person of ordinary skill in the art at the time of the

23  alleged invention would have recognized that this element was a mere known variation on a

24  theme:  detecting useful information and structures in computer text.  For instance, Grune chapters

25  2 and 3 describe generally applicable grammars and parsing techniques, including formal

26  grammars and parsing using grammars.  Detecting useful information in computer text using

27  grammars and a parser was merely one well-known variation on detecting useful information and

28  structures in computer text.  A person of ordinary skill would have been aware of the benefits of

1  using grammars and parsing techniques for detecting useful information and structures in

2  computer text.

3     For example, to the extent the Mosaic system, the Lynx system, the Sidekick system, the

4  Perspective system / EO Personal Communicator, the Newton Programmer's Guide, the IBM

5  Simon system, the Stamps patent, the Clayton patent, the mIRC 2.1 system, the Davoust patent,

6  the Gomez and Nokia patents, the Pandit patent, the Homer system, Hypertext, and the Embedded

7  Buttons System are found to lack an explicit teaching of a "string library and a fast string search

8  function for detecting string structures in the data," a person of ordinary skill in the art at the time

9  of the alleged invention would have recognized that this element was a mere known variation on a

10 theme:  detecting useful information and structures in computer text.  For instance, MHonArc

11 (lines 1846-1877) and Salton (e.g. p. 82) both teach the use of string libraries and fast string search

12 for detecting useful information and structures in computer text.  A person of ordinary skill in the

13 art would have recognized that string libraries and a fast string search function were merely well-

14 known variations on common techniques for detecting useful information and structures in

15 computer text.   A person of ordinary skill would have been aware of the benefits of using string

16 libraries and fast string searching for detecting useful information and structures in computer text.

17     As another example, to the extent the Mosaic system, the Lynx system, the Sidekick

18 system, the Perspective system / EO Personal Communicator, the Newton Programmer's Guide,

19 the IBM Simon system, the Stamps patent, the Clayton patent, the mIRC 2.1 system, the Davoust

20 patent, the Gomez and Nokia patents, the Pandit patent, the Homer system, Hypertext, and the

21 Embedded Buttons System are found to lack an explicit teaching of a "user interface [which]

22 highlights detected structures" or a "pop-up menu" to display linked actions, a person of ordinary

23 skill in the art at the time of the alleged invention would have recognized that this element was a

24 mere known variation on a theme: assisting users by calling useful information or computer

25 functions to their attention.  For example, the Sidekick art, Newton art, and HIG art all disclose the

26 use of highlighting and pop-up menus that can call out and display useful information, actions, and

27 computer functions.  A person of ordinary skill in the art would have recognized that highlighting

28 and pop-up menus were merely two well-known variations on assisting users by calling useful

1  information or computer functions to their attention.  A person of ordinary skill would have been

2  aware of the benefits of highlighting detected information and using pop-ups for the selection of

3  computer functions.

4         Moreover, the combinations of all of the references identified in charts B-1 to B-15

5  references would simply be a matter of combining known elements in a known manner to achieve

6  predictable results. To the extent that any limitation is determined not to be disclosed in any of

7  these references, it would have been obvious to combine any of these references to provide the

8  allegedly missing limitation.

9         A person of ordinary skill in the art who wanted to improve upon the invention described

10  in the '647 patent would have looked to other software and devices in the same field, such as the

11  prior art devices and other references, because all of references share the relevant components.

12  One of ordinary skill also would have been motivated to combine any of the above references

13  together to yield predictable results, as combining the references would simply entail combining

14  known elements by known methods in the art. In addition, any such combination would involve

15  the simple substitution of one known, equivalent element for another. Such combinations would

16  have been obvious to try because there were only a finite number of predictable solutions.  Any

17  such combination would yield predictable results using known techniques and would involve the

18  simple substitution of one known, equivalent element for another.

19         Additionally, a person of ordinary still in the art would have been motivated to combine

20  the references combined in exhibits B-1 to B-15 in order to expand the capabilities of certain

21  existing systems.  For instance, the asserted claims of the '647 patent are invalid as obvious based

22  upon U.S. Patent No. 5,437,036 ("Stamps") in combination with *Embedded Menus: Selecting*

23  *Items in Context* ("Koved").  A person of skill in the art at the time of the invention would have

24  been motivated to combine Stamps and Koved because, among other reasons, they both use

25  correction programs to assist users with identifying structures and data of interest and assist the

26  user with taking potential actions on the structured identified.  Moreover, Stamps discloses an

27  application programming interface ("API") for use with a computer system while Koved discloses

28  a user interface for a similar system.. Consequently, a person of skill in the art at the time of the

1  invention would also have been motivated to combine the API of Stamps with the user interface of

2  Koved.

3  　　　　Similarly, as another example, the Perspective Handbook in combination with the Lookup

4  Guide invalidate the asserted claims as obvious. A person of skill in the art at the time of the

5  invention would have been motivated to combines these references, because, among other reasons,

6  they both were provided to customers of AT&T EO Personal Communicators running Perspective

7  Business Edition software.  In a similar manner, as another example, a person of ordinary skill in

8  the art at the time of the invention would have been motivated to combine Sidekick with Davoust

9  '201, as described in exhibit B-11, because, among other reasons, both pieces of art were

10  developed by the Borland software company and relate to assisting a user with performing

11  computer applications in which data of interest is recognized for the user and computer functions

12  are performed on that data.

13  　　　　Additionally, as another example, the precise number of actions linked to detected

14  structures as described in exhibits B-1 to B-15  would have involved an obvious matter of design

15  choice.  For example, it would have been well within any ordinarily skilled person's ability to

16  choose from and implement a number of options for actions to perform on detected structures as

17  disclosed in, for instance, the MHonArc or Newton art.  To the extent that the actions disclosed in

18  the charted references are found to differ from the subject matter of the asserted claims, the

19  differences would be trivial.

20  　　　　As another example, the Lynx and Mosaic references render the asserted claims invalid

21  alone and in combination with the MHonArc reference.  Lynx and Mosaic were early internet, or

22  world wide web, browsers.  Around the same time these browsers were being developed and

23  deployed to the public, a programming language known as Perl was being developed as well.  Perl

24  gained popularity as a CGI-scripting language.  CGI-scripting is a way for web servers to generate

25  and receive web content by delegating the work to executable scripts.  That web content is then

26  sent to browsers to display to end-users.  Therefore, people of ordinary skill at the time would

27  have and did combine Perl scripts with web browsers.  Perl scripts generated the information and

28  web browsers displayed it.  MHonArc was a specific Perl script dedicated to converting e-mail to

1   HTML web content.  That web content was displayed by browsers like Lynx and Mosaic.

2   Because Lynx and Mosaic were both web browsers that were being developed at approximately

3   the same time, there was motivation to combine their functionalities as well.  These systems were

4   built by the same community of developers and tested by the same community of users.

5   Therefore, there is motivation to combine Lynx, Mosaic, and MHonarc.As another example, the

6   mIRC reference and the Homer reference alone and together, render obvious all the asserted

7   claims.  Both the mIRC and the Homer references were IRC clients that were developed and

8   deployed during the same time period in the 1990's.  IRC is an internet protocol for instant

9   messaging.  mIRC was an IRC chat client for Microsoft's Windows operating system and Homer

10  was an IRC chat client for Apple's Macintosh operating system.  Since both of these chat clients

11  were built to facilitate online chat using the same exact protocol, and built by the same community

12  of developers and tested by the same users (IRC users), there was motivation for a person of

13  ordinary skill in the art to combine their functionality.

14      As another example, the Perspective System/EO Personal Communicator reference, the

15  Newton reference, the Sidekick reference, the IBM Simon reference render the asserted claims

16  obvious alone and in combination.  These are all personal digital assistants (PDAs) or personal

17  information managers (PIMs) that were developed around the same time period in the 1990s.

18  These were products that not only existed at the same time but were competing products.  Because

19  of natural business benchmarking, competitor analysis, and a shared community of users and

20  testers, there was motivation to combine the functionalities of these prior art devices.

21      For similar reasons, the Davoust reference, the Perspective System/EO Personal

22  Communicator, the Newton reference, the Sidekick reference, the IBM Simon reference, the

23  mIRC reference, the Homer reference, the Lynx reference, the Mosaic reference, and the

24  MHonArc reference render the asserted claims obvious both alone and in combination.  Davoust

25  explicitly states that "those skilled in the art will find that the system and methods of the present

26  invention may be advantageously applied to a variety of systems, including different platforms

27  such as Macintosh, UNIX, NextStep, and the like.  Moreover, the methods of the present invention

28  will find application in other programs for managing information, such as database management

1   systems and the like." *Davoust* at 5:64-6:3. The Perspective System/EO Personal Communicator,

2   the Newton reference, the Sidekick reference, and the IBM Simon reference are all "database

3   management systems." mIRC was a program for the Windows operating system. Homer was a

4   program for the Macintosh operating system. Lynx and Mosaic were programs for the UNIX

5   operating system. The Newton and Sidekick had operating systems that were "like" Microsoft's

6   Windows and Apple's Macintosh. Therefore, the written description of the Davoust patent is an

7   indication that all of all of these references were within the same field of art and that there would

8   be a motivation for one of ordinary skill to combine the functionalities of any one of these

9   refernces with any other.

10       As another example, the Gomez reference and the Nokia reference render the asserted

11   claims invalid as obvious either alone or in combination. A person of ordinary skill would be

12   motivated to combine them because they related to very similar, competing products. Both of

13   these references related to portable communication devices, telephones, that could also receive

14   messages. These references were developed during approximately the same time period in the

15   early 1990's. The Gomez reference was assigned to Motorola. Motorola and Nokia were, and

16   still are, known competitors in a very similar market for electronics (in this case portable

17   telecommunications devices). Because of basic product benchmarking, competitor analysis, and a

18   shared user and tester base, there was motivation to combine these references. For these same

19   reasons, there was motivation to combine both the Gomez reference and the Nokia reference with

20   the IBM Simon reference and the Sidekick reference. Moreover, Sidekick, was purchased by

21   Motorola in the early mid 1990's so Motorola would have been motivated to combine two of its

22   own similarly situated products.

23       As yet another example, the Pandit reference, alone and in combination with any of the

24   other cited references render the asserted claims invalid as obvious alone or in combination. All

25   of these references relate to processing incoming and outgoing text data and were created in the

26   same time period. The Pandit reference related generally to text data processing. Pandit showed

27   how the text data processing disclosed therein could be applied to internet communications.

28   Pandit even cited to Apple's subsequent demonstration of "Internet Address Detectors." Pandit

lists "text such as telephone numbers, telefax numbers, and dates" as examples of relevant data. *Pandit* at Abstract. Pandit also gives the example of email addresses. *Pandit* at Fig. 1C. As a result, there is motivation to combine Pandit with any reference where data processing is a necessary component especially where email addresses, telephone numbers, and dates will be important parts of the data to be processed. This includes every reference cited as prior art against the '647 patent including the Mosaic reference, the Lynx reference, the Davoust reference, the Perspective System/EO Personal Communicator, the Newton reference, the Sidekick reference, the IBM Simon reference, the mIRC reference, the Homer reference, the Gomez reference, the Nokia reference, the MHonArc reference, the Clayton reference, the Stamps reference, the Hypertext reference, and the EmbeddedButtons reference. Pandit makes clear that a person of ordinary skill in the art related to any of these references, when building the text data processing portions, would look to a wide breadth of art dealing with text data processing.

As another example, the Clayton reference, the Homer reference, the Lynx reference, and the MHonarc reference render the asserted claims invalid as obvious either alone or in combination. All these references related to UNIX-based systems. Unix is a command-line based operating system. These systems were all also related to text data processing. The Clayton reference related to parsing English language text to create code; the Homer reference was related to a protocol for sending instant text messages; and the Lynx reference was a browser that parsed incoming text to present world wide web content to a user. Because these are all systems built for the same operating system, they shared a users and testers and were created around the same time period in the early 1990's, and were all related to text data processing, there was motivation to combine these references to solve the problems of text data processing.

As another example, the Sidekick reference and the MHonArc reference render the asserted claims obvious. Both of these references relate to command-line operating systems and systems that function with the world wide web. The Sidekick started as a DOS-based system. DOS was a command-line operating system. MHonArc related to a command-line operating system known as UNIX. Moreover, at least as of 1995, the Sidekick was sold with internet browsing capabilities. MHonArc relates to creation of web content from emails. So while the

Perl script in MHonArc creates web content for consumption, the Sidekick was built to consume that content. These systems would work together to create content, present it to a user, and to receive content from a user and process it. As a result, a person of ordinary skill in the art would have motivation to combine these references.

### C.      The '959 Patent

The '959 patent is also obvious in light of the state of the art and/or knowledge of a person of ordinary skill in the art, as demonstrated by relevant background prior art and references in Exhibit C, to the extent the claims are not invalid under 35 U.S.C. §§ 101, 102 and/or 112.

As stated above, the references in Exhibits C-1 to C-20, are the Corey patent, the Legall patent, the MetaCrawler system, MultiSurf, the Neal patent, Newton , the Rubinstein patent, Sherlock, WAIS, the Bennett patent, the Evans patent, the Jensen patent, the SenseMaker system, the Smith patent, the Tung thesis, the Isite system, the ProFusion system, the CBKB system, and the Kirsch patent anticipate several of the asserted claims. To the extent these references are found to not anticipate any one of the asserted claims, they render the claims obvious, whether standing alone, or when combined with knowledge of the ordinary artisan and/or the nature of the problem to be solved.

Any reference or combination of references that anticipates or renders obvious an asserted independent claim also renders obvious any asserted claim dependent on that independent claim because every element of each dependent claim was known by a person of ordinary skill at the time of the alleged invention, and it would have been obvious to combine those known elements with the independent claims at least as a matter of common sense and routine innovation.

To the extent the references discussed herein or in Exhibits C-1 to C-20 are found to lack particular elements of the asserted claims, those elements would have represented mere obvious modifications of the references themselves. Each asserted claim would have been obvious in view of the primary references alone. All of the references identified in Exhibits C-1 to C-20 are in the same field of endeavor, and in particular, information and text retrieval. Further, all of these references relate to the same problem of providing the user access to particular information that

the user is interested in.  Moreover, the combination of these references would simply be a matter of combining known elements in a known manner to achieve predictable results.  To the extent that any limitation is determined not to be disclosed in any of these references, it would have been obvious to combine any of these references to provide the allegedly missing limitation.

Similarly, all of the references identified herein with respect to the '959 patent address the same problem of information retrieval using the same basic technology (*i.e.*, computer implemented searching methods).  A person of ordinary skill in the art would have looked to other devices in the same field, such as the prior art devices and other references, because all of these references share the same components, including modular software, heuristic search algorithms, and remote and local search capabilities.  The use of such components is expressly described in Exhibits C-1 to C-20 and above.  A person of ordinary skill in the art would therefore have been motivated to combine these components, knowing that these well-known elements would achieve their purposes in combination, without any difficulty and without any unexpected results.

One of ordinary skill also would have been motivated to combine any of the above references together to yield predictable results, as combining the references would simply entail combining known elements by known methods in the art.  In addition, any such combination would involve the simple substitution of one known, equivalent element for another. Such combinations would have been obvious to try because there were only a finite number of predictable solutions.  Any such combination would yield predictable results using known techniques and would involve the simple substitution of one known, equivalent element for another.

As one example, a person of ordinary still in the art would have been motivated to combine the prior art identified herein in response to predictable design incentives and/or market forces. For example, numerous references identified herein describe the ever-increasing amount of information available to users, which users need ready access to.  The rise in the popularity of the internet and the increase in local storage on users' personal computers were prominent drivers in increasing the amount of information available to users, which in turn lead to design incentives for enabling easier access to information in each of these sources of information.  Similarly, the

1  ability to store large amounts of information both locally (*e.g.,* on their hard drives, and other

2  media) as well as remotely (*e.g.,* on email servers and the like) presented design incentives driving

3  a person of ordinary skill to provide information retrieval facilities for both sources of information

4  in a fast and efficient manner.  One of skill would understand that the techniques claimed in the

5  '959 patent were straightforward applications of well-known information retrieval principles,

6  including principles disclosed in Exhibits C-1 through C-20 hereto, and would be able to readily

7  combine those known design elements.

8       The asserted claims recite an obvious matter of design choice.  For example, it would have

9  been well within any ordinarily skilled person's ability to choose from and implement a number of

10  different software design patterns, including a modular design or a non-modular design.  The use

11  of a modular design in software was a well-known design choice by the 1990s and was widely

12  employed in the software industry.  To the extent the primary references in Exhibits C-1 to C-20

13  are found to lack an explicit teaching of a modular design, one of ordinary skill would have been

14  motivated to combine references disclosing modular design with these references.  Modifying the

15  disclosed references to incorporate this design pattern would have been one of a finite number of

16  known solutions for software design.   Modifying the disclosed references to include a modular

17  design also would have been an obvious design choice implemented through known techniques

18  that would not yield unpredictable or unexpected results.  Finally, a person of skill in the art would

19  have found express motivation to use this functionality.  For example, modular software design

20  stems from general software engineering design principles, such as "modular programming" and

21  "separation of concerns."  Modular programming is a software design technique that emphasizes

22  separating the functionality of a program into independent, interchangeable modules, such that

23  each contains everything necessary to execute only one aspect of the desired functionality (*See*,

24  *e.g*., http://en.wikipedia.org/wiki/Modularity_%28programming%29.)  "Traditional programming

25  languages have been used to support modular programming - since at least the 1960s."  (*Id*.)

26  Separation of concerns reflects the notion that where elements of a program can be separate, those

27  elements typically should be separate.  (*See*, *e.g*.,

28  http://en.wikipedia.org/wiki/Separation_of_concerns; see also http://msdn.microsoft.com/en-

us/magazine/ekstremalna-przerobka-asp-net--czesc6-podzial-obowiazkow.aspx.)  The goal of the "separation of concerns" paradigm is to design systems in which one set of functions can be optimized independently of other functions, such that failure of one function does not cause other functions to fail.  One of skill would be familiar with these principles and would naturally draw on them to design software in a modular fashion well before the priority date of the '959 patent.

Moreover, it would have been well known to a person of ordinary skill using object oriented programming to use software modules, such as heuristic modules.  All programming requires a programming language to write software.  One common programming language model is "object oriented" or "OO" programming.  Simula, generally considered to be the first object-oriented programming language, was developed in 1967.  Since that time, a long line of "OO" programming languages have been developed, including Smalltalk, Objective C, Java and C++.  For many years, "OO" programming languages have been the predominant language model in computer science.  One of the central design principles of object-oriented programming is the use of modules, *i.e.*, modularity.  (*See*, *e.g.*, Meyer, "Object-Oriented Software Construction" at 19, 1997 ("Meyer") ("A list of basic external quality factors was presented.  Those for which current software is most badly in need of better methods, and which the object-oriented method directly addresses, are . . . the factors requiring more decentralized software architectures:  reusability and extendibility, together known as modularity."); Wegner, "Concepts and Paradigms of Object-Oriented Programming" at 13, 1990 ("Wegner") ("Object-oriented programming reintroduces systematic techniques for managing software components.  Objects provide a high-level primitive notion of modularity for directly modeling applications.")  As Wegner explains, "[s]plitting a large task into components is a time-honored method of managing complexity, variously referred to as 'divide and conquer' and 'separation of concerns.'"  (Wegner at 13.)

Similarly, the use of different heuristic algorithms was also a known design choice in the industry.  To the extent the primary references in Exhibits C-1 to C-20 are found to lack an explicit teaching of heuristic algorithms, one of ordinary skill would have been motivated to combine references disclosing heuristic algorithms with these references.  Modifying the disclosed references to incorporate these algorithms would have been one of a finite number of known

1   solutions for search.   Modifying the disclosed references to include heuristic algorithms also

2   would have been an obvious design choice implemented through known techniques that would not

3   yield unpredictable or unexpected results.  Finally, a person of skill in the art would have found

4   express motivation to use this functionality.  For example, Apple's own U.S. Patent No. 5,477,447

5   states that "making a guess based on upon a selected heuristic approach . . . would be well-known

6   to one skill in the art." ('447 Patent at 12:16-19; *see also* 12:11-44.).  As another example, many

7   textbooks described these sorts of heuristic algorithms. (See for example Grossman, "Information

8   Retrieval Algorithms and Heuristics," 1998 ("Grossman") and Rayward-Smith, "Modern Heuristic

9   Search Methods," 1996 ("Rayward") generally.)

10        To the extent the primary references in Exhibits C-1 to C-20 are found to lack an explicit

11   teaching of each plug-in module employing "using a different heuristic to locate information," a

12   person or ordinary skill in the art would recognize that using different heuristics was a known

13   variation on the use of algorithms to enable efficient information retrieval.  For example, a person

14   of ordinary skill would have recognized that different types of searches or search locations could

15   have different characteristics such that different heuristics could have different effectiveness in

16   retrieving information.  Indeed, it was well known that different databases could contain different

17   types of information and organize information in different ways.  Different heuristics for searching

18   these heterogeneous databases were well known in the art.  For example, "SFgate: The WWW

19   Gateway for freeWAIS-sf, Edition 1.108, for SFgate 5.1, January 1997," Norbert Gövert and

20   Ulrich Pfeifer, University of Dortmund, Germany, 1997, discloses that "the more common case is

21   that there are different fields in different databases. *The schemas of the databases differ." Id.* at

22   29 (emphasis in original).  "In most cases this is due to different types of the documents stored in

23   the databases, e.g. the one database holds references to literature while another one holds product

24   descriptions." *Id.*  As another example, the '959 patent states that "web-browser applications are

25   not designed to search for non-web-based documents or applications located on the computer or an

26   associated computer network and, conversely, File Find-type utility programs are not capable of

27   searching the Internet for web-based documents or applications."  '959 patent at 1:66-2:4.

28   Modifying the disclosed references to incorporate this functionality would have been one of a

1    finite number of known solutions for information retrieval.  Modifying the disclosed references to

2    use different heuristics also would have been an obvious design choice implemented through

3    known techniques that would not yield unpredictable or unexpected results.  Finally, a person of

4    skill in the art would have found express motivation to use this functionality.  A person of

5    ordinary skill would be motivated to combine references disclosing search functions with those

6    describing heuristics in order to increase the efficiency, ease of use and effectiveness of the search

7    function.  Additionally, one of ordinary skill would have been motivated to use different heuristics

8    in order to provide faster and better search results.  For example, the MetaCrawler search engine

9    uses heuristics to search local information, such as the user's browsing history, and can use

10    different heuristics to search remote information, such as the internet, including through the use of

11    different internet search engines.

12           To the extent the primary references in Exhibits C-1 to C-20 are found to lack an explicit

13    teaching of "plug-inmodules" because the modules are part of some service or server to which the

14    application connects and not part of the application, a person or ordinary skill in the art would

15    recognize that placing plug-in modules in the application rather than as part of some service or

16    server was a known variation on the use of modules to enable efficient information retrieval.

17    Indeed, under Apple's apparent construction of the claims, this could be achieved by installing the

18    modules locally, which was a well known design choice and was in fact done, as described in

19    Exhibits C-1 to C-20.  Indeed, one of the benefits of modular design is that the modules can be

20    treated separately and thus a person of ordinary skill would understand that modules could be

21    placed in the application or a server.  The use of a modular design in software was a well-known

22    design choice by the 1990's and was widely employed in the software industry.  (*See*, *e.g.*,

23    http://en.wikipedia.org/wiki/Modularity_%28programming%29.)  "Traditional programming

24    languages have been used to support modular programming - since at least the 1960s." (*Id.*)

25    Similarly, it would have been obvious to combine a local module with the server to which it

26    communicates to behave as the claimed "plug-in module" under Apple's apparent construction of

27    the claims.  Similarly, to the extent that Apple argues that the primary references in Exhibits C-1

28    to C-20 are lack an explicit teaching of "plug-in modules" because they comprise distributed

systems with remote "heuristics," "modules" or "plug-in modules," it would have been obvious for a person of ordinary skill in the art run the system entirely on one computer, making the entire system, including "heuristics," "modules" or "plug-in  modules" on the client device and thus comprising the claimed "plug-in modules each using a different heuristic to locate information." Combining all components onto a single computer would have been a simple design choice.  For example, if the different sets of searchable data were available locally, a person of ordinary skill would have been motivated to locate all the already described components described in the prior art, including plug-in modules and "plug-in modules each using a different heuristic to locate information," on one computer rather than a more distributed design, as described in Exhibits C-1 to C-20.

Moreover, the concept of locating information, either on a local computer system or on a remote network, was well known to a person of ordinary skill in the art and would be readily employed by one of skill.  To the extent the primary references in Exhibits C-1 to C-20 are found to lack an explicit teaching of local and remote search, one of ordinary skill would have been motivated to combine references disclosing local and remote search with these references. Modifying the disclosed references to incorporate these techniques would have been one of a finite number of known solutions for search.   Modifying the disclosed references to include local and remote search also would have been an obvious design choice implemented through known techniques that would not yield unpredictable or unexpected results.  Finally, a person of skill in the art would have found express motivation to use this functionality.  See, for example, Grossman and Rayward.  Moreover, searching remotely stored information over a network was also well known.  See, for example, Grossman.  The '959 patent agrees.  ('959 patent at 1:47-53.)  One of skill would employ these strategies at least because they were known and predictable solutions to known problems in the field of information retrieval.  For the same reason, it would have been obvious to locate information in a plurality of locations which include the Internet and local storage media in light of the state of the art and/or knowledge of a person of ordinary skill in the art, as demonstrated by the relevant background prior art and references in Exhibit C.  See for example Bennett and Evans.  Additionally, searching over a plurality of locations was well-known

SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

in the art, including searching a plurality of remote locations as well as searching a plurality of

locations that included both local and remote locations. One of skill would understand that

searching locally is simpler than searching remotely, and was well known at the time, and would

consider including local search alongside remote search at least for that reason. See for example

Rayward. Indeed, as the '959 patent acknowledges, local find operations were prevalent, such that

one of skill would readily understand and appreciate that remote search techniques could be used

for local search, including simultaneous local and remote search. ('959 patent at 1:21-28.)

As another example, one of ordinary skill would consider it obvious to employ, either

separately or collectively, heuristics, heuristic algorithms, and heuristic modules to search or

locate information. Implementation of heuristics, either separately or collectively, as applied to

searches were established concepts prior to the invention of the '959 patent. To the extent the

primary references in Exhibits C-1 to C-20 are found to lack an explicit teaching of heuristics,

heuristic algorithms, or heuristic modules employed either separately or collectively with the

search query, one of ordinary skill would have been motivated to combine references disclosing

heuristics, heuristic algorithms, or heuristic modules, applied either separately or collectively, with

these references. Modifying the disclosed references to incorporate heuristics, heuristic

algorithms, or heuristic modules would have been one of a finite number of known solutions for

search, including applying a search query to different heuristics separately or collectively.

Modifying the disclosed references to include heuristics, heuristic algorithms, or heuristic modules

also would have been an obvious design choice implemented through known techniques that

would not yield unpredictable or unexpected results. Applying the search query to these heuristics

either separately or collectively also was a trivial variation and a known technique that would not

yield unpredictable or unexpected results, as shown in the references described in Exhibit C. Both

approaches were known solutions in the search field and well within the grasp of a person of

ordinary skill in the art. See Exhibit C. Finally, a person of skill in the art would have found

express motivation to use this functionality. For example, as early as 1983, Bagchi, "Search

Algorithms Under Different Kinds of Heuristics – A Comparative Study," 1983 ("Bagchi"), stated

that "[h]euristic search algorithms have been quite extensively studied in the recent past by several

investigators." (Bagchi at 2.)  Pearl, "Heuristics – Intelligent Search Strategies for Computer

Problem Solving," 1984 ("Pearl"), also discloses the use of heuristics to search or locate

information.  Pearl discloses "an analysis of the nature and the power of typical heuristic methods

. . . to solve problems of search."  (Pearl at vii; see also Rayward; Dasgupta, "Multiobjective

Heuristic Search – An Introduction to Intelligent Search Methods for Multicriteria Optimization,"

1999.)  Pearl discusses "heuristics, popularly known as rules of thumb, educated guesses, intuitive

judgments, or simply *common sense*."  (*Id*. (emphasis in original.)  Pearl includes several chapters

and sub-chapters dedicated to the use of heuristics for searching and locating information, such as

"Basic Heuristic-Search Procedures," "Informed, Best-First Search:  A way of Using Heuristic

Information," and "Formal Properties of Heuristic Methods, A* - Optimal Search for an Optimal

Solution."  Grossman also addresses the use of heuristics to search or locate information.

Grossman "focuses on the technology of information retrieval:  a user enters a query that describes

a request for information, and an information retrieval system responds by identifying documents

that are relevant to the query."  (Grossman at Preface.)  Grossman discloses "techniques or

algorithms and heuristics used to find documents that are relevant to the user request and to find

them quickly" and that "[a]cademic research since the late 1950s has focused on this problem."

(*Id*.)  Grossman discloses that "the first Text REtrieval Conference (TREC) met in 1992 to

evaluate text retrieval."  (*Id*.)  Grossman discloses that at least by 1998 "[t]he field was moving

quickly . . . and many new algorithms have been developed" and "new papers are constantly being

published."  (Id. at xi.)  Moreover, Grossman states that "the basic strategies used by the majority

of commercial products are described in the book."  (*Id*. at xii.)  These are representative examples

of disclosures that can be found in many other references, demonstrating that these techniques

were well-known among persons of ordinary skill.  Thus, using heuristics, heuristic algorithms,

and heuristic modules to search or locate information was well known to one of skill in the art and

it would have obvious to use heuristics to search or locate information.

Additionally, vocally entering the information identifier would have been obvious to a

person of ordinary skill in the art, as demonstrated by relevant background prior art and references

in Exhibit C.  To the extent the primary references in Exhibits C-1 to C-20 are found to lack an

1  explicit teaching of entering information by voice, one of ordinary skill would have been

2  motivated to combine references disclosing this technique with these references.  Modifying the

3  disclosed references to incorporate this technique would have been one of a finite number of

4  known solutions for inputting text.   Modifying the disclosed references to include verbally

5  entering information also would have been an obvious design choice implemented through known

6  techniques that would not yield unpredictable or unexpected results.  Finally, a person of skill in

7  the art would have found express motivation to use this functionality.  For example, speech

8  recognition and vocal entry of information was a well known alternative to entry through other

9  means such as by keyboard or mouse.  For example, Das, "Experiments In using agent-based

10  retrieval from distributed and heterogeneous databases," 1997 ("Das"), which was cited by the

11  Examiner during the prosecution of the '959 patent, discloses that "[u]sers should be able to

12  specify what they want in any preferred mode of communication with the system (speech, text,

13  graphics, etc.)."  By 2000, numerous books had been published on speech recognition and

14  computer input.  (*See*, *e.g*., "Markowitz, Using Speech Recognition:  A Guide for Application

15  Developers," 1995; Lea, "Trends in Speech Recognition," 1980; Schmandt, "Voice

16  Communication with Computers: Conversational Systems," 1994; Klevans, "Voice Recognition,"

17  1997.)  Numerous patents had also been filed that disclosed voice entry as an alternative input

18  method.  (*See*, *e.g.,* U.S. Patent No. 6,131,044, *Method for increasing the voice recognition rate of

19  a voice recognition calling device*; U.S. Patent No. 6,014,616, *Method for monitoring the

20  language used for character generation by an operating system*; and WO/1999/005839, *Cellular

21  telephone with voice dialing function*.)  Additionally, products were also available that included

22  voice input, such as Samsung's SCH-2000, SCH-3500 and SPH-WP10 mobile devices.  As these

23  references demonstrate one of skill would be motivated to use this technique at least because it

24  was a prevalent and predictable solution to the problem of text entry.

25        Additionally, searching by file name, content, or on the basis of most recently accessed

26  items would have been obvious to a person of ordinary skill in the art, as demonstrated by relevant

27  background prior art and references in Exhibit C.  To the extent the primary references in Exhibits

28  C-1 to C-20 are found to lack an explicit teaching of this technique, one of ordinary skill would

1    have been motivated to combine references disclosing this technique with these references.

2    Modifying the disclosed references to incorporate these techniques would have been one of a finite

3    number of known solutions for search.  Modifying the disclosed references to include these

4    techniques also would have been an obvious design choice implemented through known

5    techniques that would not yield unpredictable or unexpected results.  Finally, a person of skill in

6    the art would have found express motivation to use this functionality.  The Examiner noted that "it

7    is well known in the art to identify files by name, content or frequency of access."  (May 17, 2003

8    Non-Final Rejection at 5.)  A person of ordinary skill would have known to search by these

9    common identifiers when searching for information.  Many systems searched by these parameters,

10   as demonstrated at least by the references in Exhibit C.  As the '959 patent acknowledges, "many

11   computer operating systems contain routines that provide a simple way to locate objects.  For

12   example, the Finder of the Macintosh® Operating System implemented by Apple Computer, Inc.

13   includes a Find File utility which permits a user to locate various files located in the system

14   directories (e.g., folders) using keywords that occur in the desired file's name."  ('959 patent at

15   1:21-28.)  As another example, U.S. Patent No. 7,653,614 ("Smith") discloses a search wherein

16   "[t]he search may also be conducted giving regard to user interaction information such as most

17   recently viewed, most frequently viewed, preferences, etc."  (Smith at Abstract.)

18        To the extent the primary references in Exhibits C-1 to C-20 are found to lack an explicit

19   teaching of heuristics or heuristic algorithms, including pre-determined heuristic algorithms, a

20   person or ordinary skill in the art would recognize that the claimed heuristics and heuristic

21   algorithms were a known methods of search, including a known way to enable efficient

22   information retrieval.  A person of ordinary skill would be motivated to combine references

23   disclosing search functions with those describing heuristics and heuristic search algorithms in

24   order to increase the efficiency, ease of use and effectiveness of the search function.  Modifying

25   the disclosed references to incorporate this functionality would have been one of a finite number

26   of known solutions for information retrieval.   Modifying the disclosed references to use heuristics

27   or heuristic algorithms also would have been an obvious design choice implemented through

28   known techniques that would not yield unpredictable or unexpected results.  Finally, a person of

skill in the art would have found express motivation to use this functionality.  For the same reasons, one of ordinary skill would have been motivated to use different or unique heuristics for different areas of searchable information, in order to provide potentially faster search results.  For example, the MetaCrawler search engine uses heuristics to search local information, such as the user's browsing history, and can use different heuristics to search remote information, such as the internet, including through the use of different internet search engines.  This was a well-known design pattern that one of skill would readily employ.  As another example, Apple's own U.S. Patent No. 5,477,447 states, "making a guess based on upon a selected heuristic approach . . . would be well-known to one skill in the art." ('447 Patent at 12:16-19; *see also* 12:11-44.)

To the extent the primary references in Exhibits C-1 to C-20 are found to lack an explicit teaching of a global heuristic, one of ordinary skill would have been motivated to combine references disclosing global heuristics with these references.  Modifying the disclosed references to incorporate this functionality would have been one of a finite number of known solutions for information retrieval.  Modifying the disclosed references to utilize a "global heuristic" also would have been an obvious design choice implemented through known techniques that would not yield unpredictable or unexpected results.  Finally, a person of skill in the art would have found express motivation to use this functionality.  For example, the SenseMaker system discloses the use of global heuristics to organize and more efficient present information to the user, allowing for faster and more effective searching as well as easier processing of larger amounts of search results by the user.

To the extent the primary references in Exhibits C-1 to C-20 are found to lack an explicit teaching of searching both local and Internet resources, one of ordinary skill would have been motivated to combine references disclosing this capability with these references.  The ability to search multiple resources, including but not limited to local and remote resources, such as the internet, was also known in the art, as described above.  A person of ordinary skill would have been motivated to combine references disclosing search of one resource with a search facility that searched all resources available at once, including simultaneously searching known local and remote sources of information.  Modifying the disclosed references to incorporate this

functionality would have been one of a finite number of known solutions for information retrieval. Modifying the disclosed references to search multiple resources, including but not limited to local and remote resources, such as the internet, also would have been an obvious design choice implemented through known techniques that would not yield unpredictable or unexpected results. Finally, a person of skill in the art would have found express motivation to use this functionality. Such a single search mechanism would enable the system to use less time searching many different locations, separately, for the same query. Doing one search of all accessible resources, including local and remote resources, was a known, common-sense, predictable solution to the problem of locating information that may be stored in multiple searchable resources. For example, numerous prior art references describe searching multiple remote databases simultaneously. One of ordinary skill would have been motivated to search all known searchable locations, including local and remote locations, to provide convenience and ease of use. To the extent the primary references in Exhibits C-1 to C-20 are found to lack "providing said information identifier to a plurality of plug-in modules" because entering the same query more than once is required, it would have been obvious to take the information descriptor and reuse. Indeed, this concept is well known in the field and sometimes referred to as a "federated search." (*See*, *e.g.*

http://en.wikipedia.org/wiki/Federated_search ("Federated search is an information retrieval technology that allows the simultaneous search of multiple searchable resources. A user makes a single query request which is distributed to the search engines participating in the federation. The federated search then aggregates the results that are received from the search engines for presentation to the user."); *Multilingual Federated Searching Across Heterogeneous Collections*, James Powell, D-Lib Magazine, ISSN 1082-9873, September 1998 located at

http://dlib.org/dlib/september98/powell/09powell.html#Federated ("The Federated Searcher is a Java-based server application that mediates user queries to multiple heterogeneous search engines.) For example, WAIS clients allowed users to search multiple data source while only entering the query once. (*See*, *e.g.* Emerald Article: Wide Area Information Servers: An Executive Information System for Unstructured Files by Kahe et al. (1992) at 61.)

To the extent any of the primary references in Exhibits C-1 to C-20 are found to lack an explicit teaching of the claimed plug-in modules, one of ordinary skill would have been motivated to combine references disclosing such modules with these references. Modifying the disclosed references to incorporate this functionality would have been one of a finite number of known solutions for information retrieval. Modifying the disclosed references to include "plug-in" modules also would have been an obvious design choice implemented through known techniques that would not yield unpredictable or unexpected results. Finally, a person of skill in the art would have found express motivation to use this functionality. For example, the SenseMaker, WAIS and Newton systems include plug-in modules that a person of ordinary skill would be familiar with. One of skill would understand the benefits of using plug-in modules, as modular design was a well-known design pattern by the 1990s. Further a person of ordinary skill would have been motivated to employ plug-in modules with search software in order to provide the well-known benefits of modular plug-in design: added extensibility for the system, including adding further resources to be searched or changing the implementation of various search features, therein providing greater ease of use and flexibility for the programmer and the end-user.

**D.      The '414 Patent**

As stated above, Evolution, the Reiher publication, the Kumar publication, Bayou, Mozilla Thunderbird, the ColdSync system, Customer Explorer and the Vadlamani patent, the Terry publication, iTunes, iSync, Microsoft Exchange ActiveSync, BlackBerry, the Souder patent, NotifyLink, Coda, Microsoft Windows Vista, Sync, the Rashid publication, the Kast patent, and Microsoft Outlook anticipate several of the asserted claims. To the extent these references are found to not anticipate any one of the asserted claims, they render the claims obvious, whether standing alone, or when combined with knowledge of the ordinary artisan and/or the nature of the problem to be solved. Likewise, to the extent the references discussed herein or in Exhibits D-1 to D-20 are found to lack particular elements of the asserted claims, those elements would have represented mere obvious modifications of the references themselves.

Any reference or combination of references that anticipates or renders obvious an asserted independent claim also renders obvious any asserted claim dependent on that independent claim

because every element of each dependent claim was known by a person of ordinary skill at the time of the alleged invention, and it would have been obvious to combine those known elements with the independent claims at least as a matter of common sense and routine innovation.

For example, to the extent Evolution, the Reiher publication, the Kumar publication, Bayou, Mozilla Thunderbird, the ColdSync system, Customer Explorer and the Vadlamani patent, the Terry publication, iTunes, iSync, Microsoft Exchange ActiveSync, BlackBerry, the Souder patent, NotifyLink, Coda, Microsoft Windows Vista, Sync, the Rashid publication, the Kast patent, and Microsoft Outlook are found not to explicitly disclose executing at least one synchronization processing thread concurrently with the executing of at least one user-level non-synchronization processing thread, modifying the disclosed systems to incorporate this functionality would have been one of a finite number of known solutions for enabling multitasking on the systems. Modifying the disclosed systems to execute concurrent synchronization and non-synchronization processing threads also would have been an obvious design choice implemented through known multithreading, multiprocessing, and concurrent programming techniques that would not yield unpredictable or unexpected results. Furthermore, a person of ordinary skill in the art would have found it obvious to leverage these known techniques in light of market forces and design incentives prevalent at the time of the invention, which demanded computing devices that could multitask and execute multiple applications simultaneously. Finally, a person of skill in the art would have found express motivation for executing concurrent synchronization and non-synchronization processing threads in light of references discussed in Exhibits D-1 through D-20, including but not limited to Potter, Windows Vista: Centralizing Data Synchronization With The New Sync Center (October 2005), the '235 Publication, the '609 Publication, Struys, Developing Multithreaded Applications for the .NET Compact Framework (2005), and Masney, Introduction to Multi-Threaded Programming, Linux Journal Issue No. 61 (May 1999).

For example, a person skilled in the art would have been motivated to develop applications that were not affected by ongoing synchronization activities. Computing devices popular during and before the time of the invention ran multiple applications and processes simultaneously, oftentimes resulting in suspended or "hung" user interfaces. One common way to maintain user-

interface responsiveness was to relegate certain processes to the "background." These background processes freed up the device for user-intensive applications. Those skilled in the art recognized that data synchronization was one common process suitable for background execution. Microsoft Exchange, for example, performed background synchronization such that "[t]he user data [was] updated to the most current information, with no intervention on the part of the user." *See* "Exchange ActiveSync and Exchange 2003" (July 2005) at 5. Microsoft patent applications from this time period recognized the same benefit. *See*, *e.g.*, U.S. Patent Publication No. 2006/0238652 at [0016] ("In implementations of the present invention, sync operations may occur without user input, so that the user may continue working on other tasks while a sync operation is taking place."). In fact, the idea of background synchronization goes back more than a decade before the filing the '414 patent. The Coda distributed file system, for example, synchronized multiple users' updates to a centralized data store through a process called "Trickle Reintegration." Mahadev Satyanarayanan, "Mobile Information Access" (June 1996) at 29. Coda documentation describes "Trickle Reintegration" as "an ongoing background process" that "propagates updates to servers asynchronously, while minimally impacting foreground activity." (*Id.*) Indeed, systems like Coda commonly employed dedicated background processes or threads, referred to as "biods," for the purpose of performing synchronization read and write operations without impacting concurrently running application processes. *See*, *e.g.*, Eisler, et al., *Managing NFS and NIS*, 2nd Ed., O'Reilly Media (July 2001).

Furthermore, persons of skill in the art at the time of the invention would have been motivated to achieve concurrent synchronization and non-synchronization operations through a variety of hardware and software implementations. With respect to hardware, a person of ordinary skill in the art would have recognized that different processing systems would facilitate concurrent thread execution simultaneous multi-threading and simultaneous multi-processing. These processing systems include multi-processor systems and multi-core processors. A person of ordinary skill in the art would have considered the use of either processing system to be obvious design choice and one of a finite number of known hardware solutions that would not yield unexpected or unpredictable results when tasked with executing known software applications. A

person of ordinary skill in the art would also have been motivated to use these processing systems in light of market forces and design incentives that demanded higher performance and processor speed.  Finally, a person of ordinary skill in the art at the time of the invention would have found express motivation to use these processing systems in light of the references disclosed in Exhibits D-1 through D-20.  For example, a 2005 reference describes the benefit of multi-core preocessors as follows:  "[W]ith a dual-core dual-threaded processor, you actually have two physical processors on one chip. Because each core has its own cache, registers and other resources, there is less resource contention than you might see with a simple dual-threaded, single-core processor. Two separate single- or multithreaded programs can be running simultaneously, for up to twice the throughput of a same-speed single-core processor."  Chapman, *The Benefits of Dual-Core Processors in High Performance Computing* (2005).

With respect to software, a person of ordinary skill in the art would have recognized long before the filing date of the '414 patent that a number of known programming techniques were obvious choices for achieving concurrent thread execution.  These techniques include interleaving, time slicing, preemptive threading, and cooperative threading,  among others.  A person of ordinary skill in the art also would have recognized long before the filing date of the '414 patent that certain operating systems facilitated concurrent thread execution.  These operating systems and their kernels scheduled thread execution in order to optimize processor usage and thereby improve concurrency.  A person of ordinary skill in the art would have considered the use of these operating systems to be an obvious design choice and one of a finite number of known solutions that would not yield unexpected or unpredictable results.  A person of ordinary skill in the art would also have been motivated to use these operating systems in light of market forces and design incentives that demanded higher performance and simultaneous processing.  Finally, a person of ordinary skill in the art at the time of the invention would have found express motivation to use these operating systems in light of the references disclosed in Exhibits D-1 through D-20. For example, a 2005 Apple reference describes the benefit of the Mac OS X operating system as follows:  "Symmetric multiprocessing (SMP) in Mac OS X dynamically manages tasks across multiple processors—and multiple processor cores—without requiring any special optimization of

1  the application or any special action on the user's part. With SMP, you can run a processor-

2  intensive task in the background while you work with another application. Mac OS X assigns each

3  of these tasks to a different processor or core, allowing the tasks to execute simultaneously, and

4  automatically balances the load between processors. Preemptive multitasking further optimizes

5  performance by allowing Mac OS X to prioritize tasks on each processor or core."  Power Mac G5

6  Technology Overview, Apple (2005).

7          As another example, to the extent Evolution, the Reiher publication, the Kumar

8  publication, Bayou, Mozilla Thunderbird, the ColdSync system, Customer Explorer and the

9  Vadlamani patent, the Terry publication, iTunes, iSync, Microsoft Exchange ActiveSync,

10  BlackBerry, the Souder patent, NotifyLink, Coda, Microsoft Windows Vista, Sync, the Rashid

11  publication, the Kast patent, and Microsoft Outlook are found not to explicitly disclose a

12  synchronization software component that provides at least one synchronization processing thread

13  and is configured to synchronize structured data from the first database with structured data from a

14  second database, modifying the disclosed systems to incorporate this functionality would have

15  been one of a finite number of known solutions for performing data synchronization.  Modifying

16  the disclosed systems to incorporate a synchronization software component that provides at least

17  one synchronization processing thread and is configured to synchronize structured data from the

18  first database with structured data from a second database also would have been an obvious design

19  choice implemented through known programming techniques that would not yield unpredictable

20  or unexpected results.  The prior art is replete with systems that include sync managers, sync

21  clients, sync handlers, sync conduits, sync classes, and similar components that provide

22  synchronization processing threads and are configured to synchronize structured data across

23  databases.  Finally, a person of ordinary skill in the art would have found express motivation for

24  implementing these components in light of references discussed in Exhibits D-1 through D-20,

25  including but not limited to Potter, Windows Vista: Centralizing Data Synchronization With The

26  New Sync Center (October 2005), the Rashid publication, Customer Explorer and the Vadlamani

27  patent, and the U.S. Patent Application Publication No. 2006/0242609, U.S. Patent No. 6,000,000,

28  EP Patent No. 1130513, and Armin Bauer, OpenSync White Paper (2005).

1    For similar reasons, a person skilled in the art at the time of the invention would have

2    found it obvious to modify the systems disclosed in Exhibits D-1 through D-20 to incorporate

3    other synchronization software components configured to synchronize structured data of other

4    corresponding data classes.  Modifying these systems to include additional synchronization

5    software components would have been one of a finite number of known solutions for

6    synchronizing data from various sources such as databases, applications, and devices.

7    Furthermore, modifying these systems to include additional synchronization software components

8    would have been an obvious design choice implemented through known system architectures and

9    frameworks that would not yield unpredictable or unexpected results.  For example, one common

10   framework known at the time of the invention used a central sync manager or sync engine with

11   various plug-in modules, each configured to synchronize a different data class.  *See*, *e.g.*, Armin

12   Bauer, Open Sync White Paper (2005) at 1.2-2.2.  U.S. Patent Application Publication No.

13   2006/0242609 to Potter  et al. discloses a similar architecture that uses a Sync Manager to

14   coordinate multiple Sync Handlers, each configured to synchronize a different device, folder, or

15   data source.  *See*, *e.g.*, paragraph [0025]; *see also* U.S. Patent Application Publication No.

16   2006/0238652 to Parker et al. and Potter, Windows Vista: Centralizing Data Synchronization With

17   The New Sync Center (October 2005).  The conduit model was another known architecture that

18   implemented multiple synchronization software components for multiple data classes, as

19   demonstrated in U.S. Patent No. 6,000,000 to Hawkins.  Hawkins discloses a Sync Manager that

20   successively invokes multiple conduit libraries, each library used to synchronize a specific data

21   classes from a specific application database.  *See* col. 5:40-6:3 and Fig. 4.

22   A person of ordinary skill in the art at the time of the invention would have found express

23   motivation to modify the references disclosed in Exhibits D-1 through D-20 to include these

24   frameworks an architectures.  For example, Bauer provides express motivation for the plug-in

25   model, explaining that it is allows for synchronization of a variety of applications and devices in a

26   uniform and reusable manner.  *See* section 1.3.1; *see also* U.S. Patent Application Publication No.

27   2004/0139235 to Rashid et al.  Other references explain that these frameworks and architectures

28   resulted in a centralized system that allowed users and developers to perform synchronization of

1  multiple data classes in an organized fashion. *See*, *e.g.*, U.S. Patent Application Publication No.

2  2006/0242609 to Potter et al. at paragraphs [0013]-[0017]; *see also* U.S. Patent No. 7,506,006 to

3  Vadlamani et al. at 12:63-13:24 and 20:34-24:2. And finally, a person of ordinary skill in the art

4  would have been expressly motivated to implement multiple synchronization software

5  components simply to provide a more robust system capable of maintain up-to-date information

6  across a variety of applications and devices. *See*, *e.g.*, U.S. Patent No. 6,000,000 to Hawkins at

7  2:55-3:26; *see also* Vadlamani patent at 12:63-17:4 and EP Patent No. 1130513 at paragraphs

8  [0039]-[0046].

9        As another example, to the extent Evolution, the Reiher publication, the Kumar

10  publication, Bayou, Mozilla Thunderbird, the ColdSync system, Customer Explorer and the

11  Vadlamani patent, the Terry publication, iTunes, iSync, Microsoft Exchange ActiveSync,

12  BlackBerry, the Souder patent, NotifyLink, Coda, Microsoft Windows Vista, Sync, the Rashid

13  publication, the Kast patent, and Microsoft Outlook are found not to explicitly disclose at least one

14  user-level non-synchronization processing thread is provided by a user application which provides

15  a user interface to allow a user to access and edit structured data in a first store associated with a

16  first database, modifying the disclosed systems to incorporate this functionality would have been

17  one of a finite number of known solutions. For example, techniques for editing and synchronizing

18  non-structured data were applicable and adaptable to structured data. Likewise, data stores and

19  databases were well-known variations of common data structures used to store data, and

20  techniques for editing and synchronizing data in data stores and databases were readily applicable

21  and adaptable to other data structures and data classes. Thus, modifying the disclosed systems to

22  operate on structured data in a first store associated with a first database also would have been an

23  obvious design choice that would not yield unpredictable or unexpected results. Finally, a person

24  of ordinary skill in the art would have found express motivation for implementing these

25  components in light of references discussed in Exhibits D-1 through D-20, including but not

26  limited to the Rashid publication, Customer Explorer and the Vadlamani patent, and the U.S.

27  Patent Application Publication No. 2006/0242609, US Patent No. 6,000,000, EP Patent No.

28  1130513, and Armin Bauer, OpenSync White Paper.

For example, to the extent Evolution, the Reiher publication, the Kumar publication, Bayou, Mozilla Thunderbird, the ColdSync system, Customer Explorer and the Vadlamani patent, the Terry publication, iTunes, iSync, Microsoft Exchange ActiveSync, BlackBerry, the Souder patent, NotifyLink, Coda, Microsoft Windows Vista, Sync, the Rashid publication, the Kast patent, and Microsoft Outlook are found not to explicitly disclose a synchronization software component that acquires a lock on a data store and releases the lock after synchronization of a data class, modifying the disclosed systems to incorporate this functionality would have been one of a finite number of known solutions for preventing modifications to data subject to a synchronization operation during the operation.  Techniques for locking data items, data stores, and databases during synchronization operations were well known at the time of the invention, and would have been readily applicable to the systems disclosed in Exhibits D-1 and D-20.  Thus, modifying the disclosed systems to acquire and release locks on different quantities, formats, and/or classes of data would have been an obvious design choice that would not yield unpredictable or unexpected results.  Finally, a person of ordinary skill in the art would have found express motivation for implementing these components in light of references discussed in Exhibits D-1 through D-20, including but not limited to  the Rashid publication, Customer Explorer and the Vadlamani patent, U.S. Patent Application Publication No. 2008/0256547, the Open Group Specifications, and Masney, Introduction to Multi-Threaded Programming.

As yet another example, to the extent Evolution, the Reiher publication, the Kumar publication, Bayou, Mozilla Thunderbird, the ColdSync system, Customer Explorer and the Vadlamani patent, the Terry publication, iTunes, iSync, Microsoft Exchange ActiveSync, BlackBerry, the Souder patent, NotifyLink, Coda, Microsoft Windows Vista, Sync, the Rashid publication, the Kast patent, and Microsoft Outlook are found not to explicitly disclose peer-to-peer synchronization, modifying the disclosed systems to incorporate this functionality would have been one of a finite number of known solutions.  Peer-to-peer synchronization was well known at the time of the invention, and modifying the disclosed systems to perform peer-to-peer synchronization would have been an obvious design choice that would not yield unpredictable or unexpected results.  Finally, a person of ordinary skill in the art would have found express

1   motivation for implementing peer-to-peer synchronization in light of references discussed in

2   Exhibits D-1 through D-20, including but not limited to U.S. Patent No. 7,366,743, U.S. Patent

3   No. 7,849,140, and U.S. Patent Application Publication No. 2006/0242609.

4       **E.      The '760 Patent**

5           To the extent that the Hawkins patent, the Twerdahl patent, the Ambrose patent, the Kun

6   patent application publication, the Tseng patent application publication, the Jin patent application

7   publication, the *TAKEphONE* publication or software, the Motorola A1200, or the Windows

8   Mobile 5.0 operating system are found to not anticipate any one of the asserted claims, they render

9   the claims obvious, whether standing alone, or when combined with knowledge of the ordinary

10  artisan and/or the nature of the problem to be solved.

11          Any reference or combination of references that anticipates or renders obvious an asserted

12  independent claim also renders obvious any asserted claim dependent on that independent claim

13  because every element of each dependent claim was known by a person of ordinary skill at the

14  time of the alleged invention, and it would have been obvious to combine those known elements

15  with the independent claims at least as a matter of common sense and routine innovation.

16          To the extent the references discussed herein or in Exhibits E-1 to E-9 are found to lack

17  particular elements of the asserted claims, those elements would have represented mere obvious

18  modifications of the references themselves.  Each asserted claim would have been obvious in view

19  of the primary references alone.

20          For example, to the extent that the Hawkins patent, the Twerdahl patent, the Ambrose

21  patent, the Kun patent application publication, the Tseng patent application publication, the Jin

22  patent application publication, the *TAKEphONE* publication or software, the Motorola A1200, or

23  the Windows Mobile 5.0 operating system are found not to explicitly disclose displaying a list of

24  interactive items comprising missed telephone calls, wherein each item in the list of interactive

25  items includes a first interactive displayed portion and a second interactive displayed portion

26  distinct from the first interactive displayed portion, a person of ordinary skill in the art at the time

27  of the alleged invention would have recognized that displaying a list of interactive items with

28  distinct first and second interactive display portions was merely a known and predictable variation

for displaying information and/or options concerning missed telephone calls.  Missed call lists
were well known in the art.  Modifying the disclosed references to include distinct first and second
interactive display portions would have been one of a finite number of known solutions for
presentation of information and choices in a list such as a missed call list.  Modifying the
disclosed references to include distinct first and second interactive display portions would have
been an obvious design choice implemented through known software programming and user
interface design techniques that would not yield unpredictable or unexpected results.  Finally, a
person of ordinary skill in the art would have found express motivation for presentation of a list of
items including two interactive display portions in the references discussed in Exhibits E-1
through E-9.

Furthermore, as another example, to the extent that the Hawkins patent, the Twerdahl
patent, the Ambrose patent, the Kun patent application publication, the Tseng patent application
publication, the Jin patent application publication, the *TAKEphONE* publication or software, the
Motorola A1200, or the Windows Mobile 5.0 operating system are found not to explicitly disclose
initiating a return telephone call to a return telephone number associated with the respective user
selected item immediately in response to detecting a finger gesture (or a finger tap input) on the
first interactive displayed portion, a person of ordinary skill in the art at the time of the alleged
invention would have recognized that immediately returning a telephone call to an associated
telephone number in response to a finger gesture was a well-known variation.  Any number of
prior art references teach immediately returning a telephone call upon detecting a finger gesture on
an interactive display portion.  Modifying the disclosed references such that selection of a first
interactive display portion would immediately return a telephone call would have been one of a
finite number of known solutions for presentation of information and choices in a list such as a
missed call list.  Modifying the disclosed references to include returning a telephone call upon
selection of an interactive display portion would have been an obvious design choice implemented
through known software programming and user interface design techniques that would not yield
unpredictable or unexpected results.  Finally, a person of ordinary skill in the art would have

1   found express motivation for immediately returning a telephone call upon selection of a first

2   interactive display portion in the references discussed in Exhibits E-1 through E-9.

3          As another example, to the extent that any of the references discussed herein or in Exhibits

4   E-1 to E-9 are found to be explicitly lacking the detecting a "finger gesture" or "finger tap input"

5   limitations of the independent claims, it would have been obvious to a person of ordinary skill in

6   the art to utilize a touch screen that detected or received finger gesture or tap input because touch

7   screens and touch screen gestures or taps were well known before the earliest priority date for the

8   '760 patent.  Several of the references discussed herein and in Exhibits E-1 to E-9 explicitly teach

9   using gestures on touch screen devices.  Modifying the disclosed references such that the

10  described device(s) detected finger gestures or finger tap input would have been one of a finite

11  number of known solutions for input.  Modifying the disclosed references to detect finger gestures

12  or finger tap inputs on a touch screen device would have been an obvious design choice

13  implemented through known software programming and user interface design techniques that

14  would not yield unpredictable or unexpected results.  Furthermore, a person of ordinary skill in the

15  art would have been motivated to combine communication management user interfaces with touch

16  screen devices that received or detected input from finger gestures in response to predictable

17  design incentives and/or market forces.

18         As another example, to the extent that the Hawkins patent, the Twerdahl patent, the

19  Ambrose patent,  the Kun patent application publication, the Tseng patent application publication,

20  the Jin patent application publication, the *TAKEphONE* publication or software, the Motorola

21  A1200, or the Windows Mobile 5.0 operating system are found not to explicitly disclose

22  completely substituting display of the list of interactive items with display of contact information

23  that included a plurality of contact objects, a person of ordinary skill in the art at the time would

24  have recognized that providing a means to show contact information with contact objects

25  associated with a particular caller was a well known variation.  A number of the references

26  discussed herein and in Exhibits E-1 to E-9 explicitly teach providing contact information in

27  response to user selection of a display portion.  Modifying the disclosed references such that

28  contact information is completely substituted for a list of missed calls upon selection of a second

interactive display portion would have been one of a finite number of known solutions for presentation of information and choices in a list such as a missed call list.  It was well known in the art to display a screen of contact information, including contact objects, upon selection of a display portion associated with a caller.  Moreover, it would have been a simple design choice representing a predictable variation within the skill of a person of ordinary skill in the art to display contact information, including contact objects, in response to selection of a second distinct interactive display portion.  Modifying the disclosed references to include a second interactive display portion the selection of which would completely substitute contact information for a list of calls would have been an obvious design choice implemented through known software programming and user interface design techniques that would not yield unpredictable or unexpected results.  Finally, the references discussed in Exhibits E-1 through E-9 would have motivated a person of ordinary skill in the art to completely substitute contact information for the list of interactive items upon selection of the second interactive display portion.

As yet another example, to the extent that the Hawkins patent, the Twerdahl patent, the Ambrose patent, the Kun patent application publication, the Tseng patent application publication, the Jin patent application publication, the *TAKEphONE* publication or software, the Motorola A1200, or the Windows Mobile 5.0 operating system are found not to explicitly disclose the first and second contact objects, several of the references discussed herein and in Exhibits E-1 to E-9 explicitly teach providing multiple contact objects.  In addition, it would have been a predictable design choice that would not yield unpredictable or unexpected results to include, on a page containing contact information, two or more contact objects including a contact object comprising or associated with a telephone number and a contact object associated with a non-telephonic communication modality.  It would also have been a predictable design choice that would not yield unpredictable or unexpected results to include contact objects associated with sending e-mail and/or instant messages.  Furthermore, as discussed above, a person of ordinary skill in the art would have been motivated to combine call management interfaces with any of the references discussed herein or in Exhibits E-1 to E-9 with a touch screen in response to predictable market incentives and/or market forces.  Finally, the references discussed in Exhibits E-1 through E-9

1  would have motivated a person of ordinary skill in the art to include first and second contact

2  objects as part of the displayed contact information.

3      As another example, to the extent that Hawkins patent, the Twerdahl patent, the Ambrose

4  patent, the Kun patent application publication, the Tseng patent application publication, the Jin

5  patent application publication, the *TAKEphONE* publication or software, the Motorola A1200, or

6  the Windows Mobile 5.0 operating system are found not to explicitly disclose initiating a

7  communication, including a non-telephonic communication, upon selection of a second contact

8  object, a person of ordinary skill in the art at the time would have recognized that initiating a non-

9  telephonic communication upon selection of a contact object was a well known variation. A

10  number of the references discussed herein and in Exhibits E-1 to E-9 explicitly teach initiating

11  non-telephonic communications upon selection of a contact object. Modifying the disclosed

12  references such a communication, such as a non-telephonic communication, is initiated upon

13  selection of a contact object would have been one of a finite number of known solutions for

14  presentation of information and choices in the display of contact information. Moreover, it would

15  have been a simple design choice representing a predictable variation within the skill of a person

16  of ordinary skill in the art to allow initiation of a communication, such as a non-telephonic

17  communication, upon selection of a contact object contained within contact information.

18  Modifying the disclosed references to allow for initiated of communication upon selection of a

19  second contact object would have been an obvious design choice implemented through known

20  software programming and user interface design techniques that would not yield unpredictable or

21  unexpected results. Finally, the references discussed in Exhibits E-1 through E-9 would have

22  motivated a person of ordinary skill in the art to include a second contact object, the selection of

23  which could initiate a communication, including communication through a non-telephonic

24  communication modality.

25      The references identified in Exhibits E-1 to E-9 are in the same field of displaying and

26  managing information concerning communications such as missed telephone calls. The references

27  relate to the same problem of managing and displaying information on electronic devices,

28  especially portable electronic devices, with limited space. Moreover, the combinations of any of

SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

these references would simply be a matter of combining known elements in a known manner to achieve predictable results. To the extent that any limitation is determined not to be disclosed in any of these references, it would have been obvious to combine any of these references to provide the allegedly missing limitation.

One of ordinary skill also would have been motivated to combine any of the references cited above and/or in Exhibits E-1 through E-9 together to yield predictable results, as combining the references would simply entail combining known elements by known methods in the art. In addition, any such combination would involve the simple substitution of one known, equivalent element for another. Such combinations would have been obvious to try because there were only a finite number of predictable solutions. To the extent that any system or method for managing missed telephone calls disclosed in these references is found to differ from the subject matter of the asserted claims, the differences would be trivial.

Any such combination would yield predictable results using known techniques and would involve the simple substitution of one known, equivalent element for another. Moreover, given the many prior art references teaching various ways to display and manage information about telephonic and other communications, any such combination would have had a reasonable expectation of success and would have been nothing more than the combination of known elements to achieve their known purposes in the combination. Further, such combinations would have been obvious to try because there were only a finite number of predictable solutions.

## F. The '721 patent

As stated above, the Tokkonen patent publication, the Hypponen patent publication, the Plaisant short paper, study, and video, the Palm Gridlock system, the Neonode N1 and N1m devices, the Keller patent, the Juels patent publication, the Tan patent, the JazzMutant Lemur system, the Hocker patent, the McKeeth patent, the Rytivaara patent publication, and the Milekic patent anticipate several if not all of the asserted claims. To the extent these references are found to not anticipate any one of the asserted claims, they render the claims obvious, whether standing alone, or when combined with knowledge of the ordinary artisan and/or the nature of the problem to be solved.

Any reference or combination of references that anticipates or renders obvious an asserted independent claim also renders obvious any asserted claim dependent on that independent claim because every element of each dependent claim was known by a person of ordinary skill at the time of the alleged invention, and it would have been obvious to combine those known elements with the independent claims at least as a matter of common sense and routine innovation.

To the extent the references discussed herein or in Exhibits F-1 to F-13 are found to lack particular elements of the asserted claims, those elements would have represented mere obvious modifications of the references themselves. Each asserted claim would have been obvious in view of the primary references alone.

For example, to the extent that the Plaisant short paper, video, and study, the Tokkonen publication, Lemur system, Hocker patent, Milekic patent, and the Keller patent are found to lack an explicit teaching of "unlocking a portable electronic device," in the independent claims, it would have been obvious to the ordinary artisan to use the mechanisms of Plaisant, Keller, Lemur, Hocker, Milekic, and Tokkonen to unlock a portable electronic device, because unlocking a portable electronic device was known before the earliest priority date of the '721 patent. Several prior art references explicitly disclose unlocking a portable electronic device, including without limitation the Hypponen patent publication, the Palm Gridlock System, the Neonode N1 and N1m devices, the Juels patent publication, the Mckeeth patent, the Rytivaara patent publication, and the Tan patent. As another example, cellular telephones of the day commonly included keyguard modes that lock the portable electronic device to prevent accidental usage. One of ordinary skill would have immediately recognized the risk of accidental activation or usage in a portable touchscreen device, and would have found it obvious to use a sliding or drag-and-drop motion to enhance security, as explicitly disclosed in the Plaisant short paper, study, and video.

Furthermore, as another example, to the extent that the Neonode n1 and n1m devices are found to lack an explicit teaching of an unlock image, it would have been obvious to the ordinary artisan to use an unlock image, because the use of unlock images was known before the earliest priority date of the '721 patent. Several prior art references explicitly disclose an unlock image, including without limitation the Neonode volume control slider, the Hypponen patent publication,

1   the Palm Gridlock System, the Juels patent publication, the McKeeth patent, the Tan patent, the

2   Keller patent, and the Tokkonen patent publication.  The use of an unlock image applies the

3   principles of affordances and direct manipulation to give the user indication of the unlock action.

4   Thus prior art references that disclose continuously moving an image in accordance with a user

5   touch, such as the Plaisant paper, study, and video, JazzMutant Lemur system, and Milekic patent,

6   would also provide teaching of an unlock image.  Furthermore, one of ordinary skill in the art

7   would have understood that, in skeuomorphic design, an image must be used to represent a real-

8   world locking mechanism.

9       As another example, to the extent that the Neonode n1 and n1m devices, the Keller patent,

10  the Tokkonen patent publication, the Tan patent, Palm Gridlock, the Rytivaara patent publication,

11  the Milekic patent, and the Juels publication are found to lack an explicit teaching of the limitation

12  of "a predefined channel" of claim 3, it would have been obvious to the ordinary artisan to have a

13  predefined channel, because predefined channels were known before the earliest priority date of

14  the '721 patent.  Several prior art references explicitly disclose the use of a predefined channel, for

15  example, the Hypponen patent publication, the Neonode n1 and n1m volume slider, the McKeeth

16  patent, the JazzMutant Lemur system, the Hocker patent, and the Plaisant short paper, study, and

17  video all disclose moving an image along a predefined channel.  Furthermore, volume sliders and

18  controls having predefined channels were well-known at the time of invention and commonly

19  found in graphical user interfaces, whether touchscreen or pen-based.  The person of ordinary skill

20  would have been aware of the benefits of displaying a predefined channel to accurately convey the

21  motion necessary to perform the unlock action.  The inclusion of such a predefined channel would

22  have been motivated by the principle of affordances.  Furthermore, one of ordinary skill would

23  have recognized that a skeuomorphic rendering of a sliding lock would require the display of a

24  predefined channel.

25      To the extent the references discussed herein or in Exhibits F-1 to F-13 are found to lack

26  particular elements of the asserted claims, those elements would have represented mere obvious

27  modifications of the references themselves.

28

For example, to the extent that Palm Gridlock is found to lack an explicit teaching of continuously moving the unlock image in accordance with the detected contact, a person of ordinary skill in the art would recognize that moving an image in accordance with detected input or contact was merely one well-known variation on common techniques to provide visual feedback that an action is being performed.

As another example, to the extent that the Hypponen patent publication, the Plaisant study, short paper, and video, or the Neonode n1 and n1m is found to lack an explicit teaching of the limitation "wherein the moving comprises movement along any desired path" of claim 2, a person of ordinary skill in the art would recognize that moving along any desired path was merely one well-known variation on common techniques to provide an action actuated by a sliding motion. Additionally, numerous teachings of moving an image along any desired path exist in the prior art, including without limitation: the Tokkonen publication, the Palm GridLock system, the Keller patent, the Tan patent, the Lemur system, and the Milekic patent.

All of the references identified in charts F-1 to F-13 are in the same field of touch-sensitive device input. All but Milekic, Hocker, and the Lemur system pertain to device security, and in particular, preventing usage of touch-sensitive devices. Further, all but those three references relate to the same problem of unauthorized or unintentional activation. Moreover, the combinations of all of these references would simply be a matter of combining known elements in a known manner to achieve predictable results. To the extent that any limitation is determined not to be disclosed in any of these references, it would have been obvious to combine any of these references to provide the allegedly missing limitation.

Nearly all of the references also address the same problem (i.e., unauthorized or unintentional activation of an electronic device) using the same basic technology (i.e., touch-sensitive displays).

One of ordinary skill also would have been motivated to combine any of the above references together to yield predictable results, as combining the references would simply entail combining known elements by known methods in the art. In addition, any such combination would involve the simple substitution of one known, equivalent element for another. Such

1 combinations would have been obvious to try because there were only a finite number of

2 predictable solutions.

3       Any such combination would yield predictable results using known techniques and would

4 involve the simple substitution of one known, equivalent element for another.

5       A person of ordinary still in the art would have been motivated to combine any of the

6 references described in Exhibits F-1 to F-13 with each other in response to predictable design

7 incentives and/or market forces.

8       The precise makeup of the '721 patent would have involved an obvious matter of design

9 choice. For example, it would have been well within any ordinarily skilled person's ability to

10 choose from and implement a number of options for removing the keyguard function on a portable

11 electronic device.  A person of ordinary skill in the art would have balanced the need for security

12 with the ease of use and arrived at a number of finite, known solutions for preventing accidental

13 activation.  For example, entering a passcode via physical keys or a touch screen provides greater

14 security but is more cumbersome, while using a physical cover over the input device, such as a

15 clamshell mechanism, is less cumbersome while and less secure.  Physical switches or affordances

16 to lock portable touchscreen devices were also in use, but required additional hardware and

17 manufacturing.  The Neonode, one of the first pocketable touchscreen  mobile phones, struck a

18 balance between security and convenience, while simultaneously reducing the number of physical

19 controls on the device, by using a left-to right sweep gesture to unlock the device.  Palm GridLock

20 provided a user to specify this same gesture if security was not paramount.

21       To the extent that the unlocking mechanism or keyguard removal mechanism disclosed in

22 these references is found to differ from the subject matter of the asserted claims, the differences

23 would be trivial.

24       **G.**    **The '172 patent**

25       As stated above, the King '541 patent, the Robinson '190 patent, the Longe '863 patent,

26 the Robinson '345 patent, the Robinson '088 patent, the Robinson '730 patent, the Longe '132, the

27 Longe '051 patent application publication, Instant Text, TextPlus, the T-Mobile Dash, the King

28 '554 patent, the Xrgomics international patent publication, and the Zi Software anticipate several

if not all of the asserted claims. To the extent these references are found to not anticipate any one of the asserted claims, they render the claims obvious, whether standing alone, or when combined with knowledge of the ordinary artisan and/or the nature of the problem to be solved.

Any reference or combination of references that anticipates or renders obvious an asserted independent claim also renders obvious any asserted claim dependent on that independent claim because every element of each dependent claim was known by a person of ordinary skill at the time of the alleged invention, and it would have been obvious to combine those known elements with the independent claims at least as a matter of common sense and routine innovation.

To the extent the references discussed herein or in Exhibits G-1 to G-14 are found to lack particular elements of the asserted claims, those elements would have represented mere obvious modifications of the references themselves. Each asserted claim would have been obvious in view of the primary references alone.

For example, to the extent that the King '541 patent, the Robinson '190 patent, the Longe '863 patent, the Robinson '345 patent, the Robinson '088 patent, the Robinson '730 patent, the Longe '132, the Longe '051 patent application publication, Instant Text, TextPlus, the T-Mobile Dash, the King '554 patent, the Xrgomics international patent publication, or the Zi Software are found to not explicitly disclose displaying a current character string in both a first and second area, a person of ordinary skill in the art at the time of the alleged invention would have recognized that displaying a current character string in both a first and a second area was merely one well-known variation on displaying suggestions for the purposes of word recommendation. It would have been obvious to the ordinary artisan to display a current character string in two places, because displaying strings in two places was known before the earliest priority date for the '172 patent. Modifying the disclosed references to display a current character string in two places would have been one of a finite number of known solutions for a word recommendation or text correction system. Modifying the disclosed references to display a current character string in two places would have been an obvious design choice implemented through known software programming and user interface design techniques that would not yield unpredictable or unexpected results. Finally, a person of ordinary skill in the art would have found express motivation for displaying a

1  current character string in two places in light of the references discussed in Exhibits G-1 through

2  G-14.

3       Furthermore, as another example, to the extent that the King '541 patent, the Robinson

4  '190 patent, the Longe '863 patent, the Robinson '345 patent, the Robinson '088 patent, the

5  Robinson '730 patent, the Longe '132, the Longe '051 patent application publication, Instant Text,

6  TextPlus, the T-Mobile Dash, the King '554 patent, the Xrgomics international patent publication,

7  or the Zi Software are found to not explicitly disclose replacing a current character string with a

8  suggested replacement character string when a user gestures on a key on a keyboard associated

9  with a delimiter, such as punctuation, a person of ordinary skill in the art at the time of the alleged

10 invention would have recognized that replacing a current character string with a suggested

11 replacement character string when a user gestures on a key on a keyboard associated with a

12 delimiter, such as punctuation was merely one well-known variation of responses to user

13 interaction with a word recommendation system.  It would have been obvious to the ordinary

14 artisan to replace a current character string with a suggested replacement character string when a

15 user gestures on a key on a keyboard associated with a delimiter, because replacing a string in

16 response to user interaction was known before the earliest priority date for the '172 patent.

17 Modifying the disclosed references to replace a current character string with a suggested

18 replacement character string when a user gestures on a key on a keyboard associated with a

19 delimiter would have been one of a finite number of known solutions for a word recommendation

20 or text correction system.  Modifying the disclosed references to replace a current character string

21 with a suggested replacement character string when a user gestures on a key on a keyboard

22 associated with a delimiter would have been an obvious design choice implemented through

23 known software programming and user interface design techniques that would not yield

24 unpredictable or unexpected results.  Finally, a person of ordinary skill in the art would have

25 found express motivation for replacing a current character string with a suggested replacement

26 character string when a user gestures on a key on a keyboard associated with a delimiter in light of

27 the references discussed in Exhibits G-1 through G-14.

28

As another example, to the extent that the King '541 patent, the Robinson '190 patent, the Longe '863 patent, the Robinson '345 patent, the Robinson '088 patent, the Robinson '730 patent, the Longe '132, the Longe '051 patent application publication, Instant Text, TextPlus, the T-Mobile Dash, the King '554 patent, the Xrgomics international patent publication, or the Zi Software are found to not explicitly disclose replacing a current character string with a suggested replacement character string when a user gestures on a displayed string, a person of ordinary skill in the art at the time of the alleged invention would have recognized that replacing a current character string with a suggested replacement character string when a user gestures on a displayed string was merely one well-known variation of responses to user interaction with a word recommendation system.  It would have been obvious to the ordinary artisan to replace a current character string with a suggested replacement character string when a user gestures on a displayed string, because replacing a string in response to user interaction was known before the earliest priority date for the '172 patent.  Modifying the disclosed references to replace a current character string with a suggested replacement character string when a user gestures on a displayed string would have been one of a finite number of known solutions for a word recommendation or text correction system.  Modifying the disclosed references to replace a current character string with a suggested replacement character string when a user gestures on a displayed string would have been an obvious design choice implemented through known software programming and user interface design techniques that would not yield unpredictable or unexpected results.  Finally, a person of ordinary skill in the art would have found express motivation for replacing a current character string with a suggested replacement character string when a user gestures on a displayed string in light of the references discussed in Exhibits G-1 through G-14.

For example, to the extent that the King '541 patent, the Robinson '190 patent, the Longe '863 patent, the Robinson '345 patent, the Robinson '088 patent, the Robinson '730 patent, the Longe '132, the Longe '051 patent application publication, Instant Text, TextPlus the T-Mobile Dash, the King '554 patent, the Xrgomics international patent publication, or the Zi Software are found to not explicitly disclose keeping a current character string when a user gestures on a displayed string, a person of ordinary skill in the art at the time of the alleged invention would

Case No. 12-cv-00630-LHK

SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

have recognized that keeping a current character string when a user gestures on a displayed string was merely one well-known variation of responses to user interaction with a word recommendation system.  It would have been obvious to the ordinary artisan to keep a current character string when a user gestures on a displayed string, because keeping a string in response to user interaction was known before the earliest priority date for the '172 patent.  Modifying the disclosed references to keep a current character string when a user gestures on a displayed string would have been one of a finite number of known solutions for a word recommendation or text correction system.  Modifying the disclosed references to keep a current character string when a user gestures on a displayed string would have been an obvious design choice implemented through known software programming and user interface design techniques that would not yield unpredictable or unexpected results.  Finally, a person of ordinary skill in the art would have found express motivation for keeping a current character string when a user gestures on a displayed string in light of the references discussed in Exhibits G-1 through G-14.

As yet another example, to the extent that the King '541 patent, the Robinson '190 patent, the Longe '863 patent, the Robinson '345 patent, the Robinson '088 patent, the Robinson '730 patent, the Longe '132, the Longe '051 patent application publication, Instant Text, TextPlus, the T-Mobile Dash, the King '554 patent, the Xrgomics international patent publication, and the Zi Software are found to not explicitly disclose a first area separate from a second area, a person of ordinary skill in the art at the time of the alleged invention would have recognized that having a first area separate from a second area was merely one well-known variation of possible layouts of a word recommendation system.  It would have been obvious to the ordinary artisan to have a first area separate from a second area, because having two separate areas in a user interface was known before the earliest priority date for the '172 patent.  Modifying the disclosed references to have a first area separate from a second area would have been one of a finite number of known solutions for the layout of a word recommendation system.  Modifying the disclosed references to have a first area separate from a second area would have been an obvious design choice implemented through known software programming and user interface design techniques that would not yield unpredictable or unexpected results.  Finally, a person of ordinary skill in the art would have

1  found express motivation for a first area separate from a second area in light of the references

2  discussed in Exhibits G-1 through G-14.

3      As another example, to the extent that  any of the  references discussed herein or in

4  Exhibits G-1 to G-14 are found to lack an explicit teaching of the "gesture" limitation of the

5  independent claims, it would have been obvious to the ordinary artisan to have a touch screen that

6  implemented gestures, because touch screens and touch screen gestures were known before the

7  earliest priority date for the '172 patent.  Several prior art references explicitly teach gesturing on

8  touch screen devices, including on virtual keyboards and on suggested replacement character

9  strings.  Indeed, the person of ordinary skill in the art would have been aware of the necessity and

10  benefits of touch screens.  Furthermore, a person of ordinary still in the art would have been

11  motivated to combine any of the references discussed herein or in Exhibits G-1 to G-14, with a

12  touch screen in response to predictable design incentives and/or market forces.

13      All of the references identified in charts G-1 to G-14 are in the same field of text

14  correction.  Further, all of these references relate to the same problem of text correction when

15  using keyboards on portable electronic devices with limited space. Moreover, the combinations of

16  all of these references would simply be a matter of combining known elements in a known manner

17  to achieve predictable results.  To the extent that any limitation is determined not to be disclosed

18  in any of these references, it would have been obvious to combine any of these references to

19  provide the allegedly missing limitation.

20      One of ordinary skill also would have been motivated to combine any of the above

21  references together to yield predictable results, as combining the references would simply entail

22  combining known elements by known methods in the art.  In addition, any such combination

23  would involve the simple substitution of one known, equivalent element for another.  Such

24  combinations would have been obvious to try because there were only a finite number of

25  predictable solutions.  To the extent that the systems for providing suggestions or

26  recommendations for mistyped words disclosed in these references is found to differ from the

27  subject matter of the asserted claims, the differences would be trivial.

28

1    Any such combination would yield predictable results using known techniques and would

2 involve the simple substitution of one known, equivalent element for another. Moreover, given

3 the many prior art references teaching providing suggestions or  recommendations for mistyped

4 words, any such combination would have had a reasonable expectation of success and would have

5 been nothing more than the combination of known elements to achieve their known purposes in

6 the combination. Further, such combinations would have been obvious to try because there were

7 only a finite number of predictable solutions and/or because known work prompted the variations

8 of predictable design incentives and/or market forces.

9    **H.    The '604 patent**

10    The '604 patent is also obvious in light of the state of the art and/or knowledge of a person

11 of ordinary skill in the art, as demonstrated by relevant background prior art and references in

12 Exhibit H, to the extent the claims are not invalid under 35 U.S.C. §§ 101, 102 and/or 112.

13    The '604 patent specification is identical to the '959 patent specification, and the subject

14 matter of the '604 patent's claims substantially overlaps with the subject matter of the '959

15 patent's claims. As explained above, one of skill would be motivated to combine references in a

16 manner that renders the asserted claims of the '959 patent obvious. The same is true for the

17 asserted claims of the '604 patent, for substantially the same reasons, and Samsung incorporates

18 its discussion of the '959 patent's obviousness herein as support for its contentions regarding the

19 obviousness of the '604 patent's claims.

20    As stated above, the reference in Exhibits H-1 to H-20, the Corey patent, the Legall patent,

21 the MetaCrawler system, MultiSurf, the Neal patent, Newton , the Rubinstein patent, Sherlock,

22 WAIS, the Bennett patent, the Evans patent, the Jensen patent, the SenseMaker system, the Smith

23 patent, the Tung thesis, the BugsEye / Neal system, the Isite system, the ProFusion system, the

24 CBKB system, and the Kirsch patent anticipate several of the asserted claims. To the extent these

25 references are found to not anticipate any one of the asserted claims, they render the claims

26 obvious, whether standing alone, or when combined with knowledge of the ordinary artisan and/or

27 the nature of the problem to be solved.

28

1       Any reference or combination of references that anticipates or renders obvious an asserted

2   independent claim also renders obvious any asserted claim dependent on that independent claim

3   because every element of each dependent claim was known by a person of ordinary skill at the

4   time of the alleged invention, and it would have been obvious to combine those known elements

5   with the independent claims at least as a matter of common sense and routine innovation.

6       To the extent the references discussed herein or in Exhibits H-1 to H-20 are found to lack

7   particular elements of the asserted claims, those elements would have represented mere obvious

8   modifications of the references themselves.  Each asserted claim would have been obvious in view

9   of the primary references alone.

10      All of the references identified in Exhibits H-1 to H-20 are in the same field of endeavor,

11  and in particular, information and text retrieval.  Further, all of these references relate to the same

12  problem of providing the user access to particular information that the user is interested in or

13  requesting.  Moreover, the combinations of all of these references would simply be a matter of

14  combining known elements in a known manner to achieve predictable results.  To the extent that

15  any limitation is determined not to be disclosed in any of these references, it would have been

16  obvious to combine any of these references to provide the allegedly missing limitation.

17      Similarly, all of the references identified for the '604 patent address the same problem of

18  information retrieval using the same basic technology (*i.e.*, computer implemented searching

19  methods).  A person of ordinary skill in the art who wanted to improve upon all of the references

20  identified for the '604 patent would have looked to other devices in the same field, such as the

21  prior art devices and other references, because all of references share all of the relevant

22  components, including modular software, heuristic search algorithms, and internet and local search

23  facilities.  The use of such components is expressly described in Exhibits H-1 to H-20 and above.

24  A person of ordinary skill in the art would therefore have been motivated to combine these

25  components, knowing that these well-known elements would achieve their purposes in

26  combination, without any difficulty and without any unexpected results.

27      One of ordinary skill also would have been motivated to combine any of the above

28  references together to yield predictable results, as combining the references would simply entail

combining known elements by known methods in the art.  In addition, any such combination would involve the simple substitution of one known, equivalent element for another.  Such combinations would have been obvious to try because there were only a finite number of predictable solutions.  Any such combination would yield predictable results using known techniques and would involve the simple substitution of one known, equivalent element for another.

A person of ordinary still in the art would have been motivated to combine the prior art identified herein in response to predictable design incentives and/or market forces.  For example, numerous references identified herein describe the ever-increasing amount of information available to users, which the users need ready access to.  The rise in the popularity of the internet and the increase in local storage on user's personal computers were prominent drivers in increasing the amount of information available to users, which in turn leads to design incentives for enabling easier access to information retrieval from the newly developed large sources of information.  For many of the same reasons, the ability for users to store useful information both locally (on their hard drives, and other media) as well as remotely (on email servers and the like) presented design incentives driving a person of ordinary skill to provide information retrieval facilities for both sources of information in a fast and efficient manner, including using only a single request from a user.

The precise makeup of the asserted claims would have involved an obvious matter of design choice.  For example, it would have been well within any ordinarily skilled person's ability to choose from and implement a number of options for whether to include a modular design or a non-modular design.  The use of a modular design in software was a well-known design choice by the 1990's widely employed in the industry.  Similarly, the use of different heuristic algorithms was also a known design choice in the industry, as many textbooks described these sorts of algorithms and they were already widely implemented both in local and remote searching facilities.  (*See* Grossman, "Information Retrieval Algorithms and Heuristics," 1998 ("Grossman") and Rayward-Smith, "Modern Heuristic Search Methods," 1996 ("Rayward") generally.)

Moreover, the concept of locating information on a computer system or network was well known to a person of ordinary skill in the art. Grossman discloses that "the problem of finding relevant information is not new." (Grossman at Preface.) Grossman discusses "techniques or algorithms and heuristics used to find documents that are relevant to the user request and to find them quickly" and that "[a]cademic research since the late 1950s has focused on this problem." (Id.) Grossman recognized searching locally was well known in the art: "[f]or example, users of e-mail systems place mail in folders or categories – only to spend countless hours trying to find the same documents . . . . Effective and efficient search techniques are needed to help users quickly find the information they are looking for." Rayward discloses that "[d]uring the last three decades, local search has also been developed." (Rayward at Preface.) It would have been obvious to one of ordinary skill, in light of the state of the art, to search locally stored information.

Searching remotely stored information, for example over a network, was also well known. Grossman discloses that the "advent of the World Wide Web has increased the importance of information retrieval. Instead of going to the local library to find something, people search the web . . . . This has increased the need for automated information retrieval for extremely large document collections." (Grossman at Preface.) Grossman discloses that "[i]t is estimated that the Web now contains more than twenty million different *content areas*, presented on more than 320 million web pages, and one million web servers." (*Id*. (emphasis in original).) Grossman "describes the techniques that can be used to try and find the needle that a user is seeking in the enormous haystack that is the Web, as well as other large information collections" and "[t]hese techniques are found in numerous research papers, described by many authors, and presented with many different examples." (*Id*.) The '604 patent acknowledges that "with the advent of the Internet, various specialized find routines have been developed that can be loaded into a computer's memory and launched in order to facilitate user requests for particular information on servers located throughout the world. Additionally, web browser applications enable a user to access worldwide websites and interact with search engines provided by the website." ('604 patent at 1:53-59.)

As another example, one of ordinary skill would consider it obvious to employ heuristics, heuristic algorithms, and heuristic modules to search or locate information. Implementation of heuristics as applied to searches were established concepts prior to the invention of the '604 patent. The use of heuristics, heuristic algorithms, and heuristic modules to search or locate information were well known in the art. For example, as early as 1983, Bagchi, "Search Algorithms Under Different Kinds of Heuristics – A Comparative Study," 1983 ("Bagchi"), stated that "[h]euristic search algorithms have been quite extensively studied in the recent past by several investigators." (Bagchi at 2.) Pearl, "Heuristics – Intelligent Search Strategies for Computer Problem Solving," 1984 ("Pearl"), also discloses the use of heuristics to search or locate information. Pearl discloses "an analysis of the nature and the power of typical heuristic methods . . . to solve problems of search." (Pearl at vii; see also Rayward; Dasgupta, "Multiobjective Heuristic Search – An Introduction to Intelligent Search Methods for Multicriteria Optimization," 1999.) Pearl discusses "heuristics, popularly known as rules of thumb, educated guesses, intuitive judgments, or simply *common sense*." (*Id*. (emphasis in original.) Pearl includes several chapters and sub-chapters dedicated to the use of heuristics for searching and locating information, such as "Basic Heuristic-Search Procedures," "Informed, Best-First Search: A way of Using Heuristic Information," and "Formal Properties of Heuristic Methods, A* - Optimal Search for an Optimal Solution."

Grossman also addresses the use of heuristics to search or locate information. Grossman "focuses on the technology of information retrieval: a user enters a query that describes a request for information, and an information retrieval system responds by identifying documents that are relevant to the query." (Grossman at Preface.) Grossman discloses "techniques or algorithms and heuristics used to find documents that are relevant to the user request and to find them quickly" and that "[a]cademic research since the late 1950s has focused on this problem." (*Id*.) Grossman discloses that "the first Text REtrieval Conference (TREC) met in 1992 to evaluate text retrieval." (*Id*.) Grossman discloses that at least by 1998 "[t]he field was moving quickly . . . and many new algorithms have been developed" and "new papers are constantly being published." (*Id*. at xi.) Moreover, Grossman states that "the basic strategies used by the majority of commercial products

1    are described in the book." (*Id*. at xii.)  Thus, using heuristics, heuristic algorithms, and heuristic

2    modules to search or locate information was well known to one of skill in the art and it would

3    have obvious to use heuristics to search or locate information.

4         The use of software modules would also been obvious to a person of ordinary skill in the

5    art, as demonstrated by relevant background prior art and references in Exhibit H.  Additionally,

6    modular software design stems from general software engineering design principles, such as

7    "modular programming" and "separation of concerns."  Modular programming is a software

8    design technique that emphasizes separating the functionality of a program into independent,

9    interchangeable modules, such that each contains everything necessary to execute only one aspect

10   of the desired functionality (*See*, *e.g.*,

11   http://en.wikipedia.org/wiki/Modularity_%28programming%29.)  "Traditional programming

12   languages have been used to support modular programming - since at least the 1960s." (*Id*.)

13   Separation of concerns reflects the notion that where elements of a program can be separate, those

14   elements typically should be separate.  (*See*, *e.g.*,

15   http://en.wikipedia.org/wiki/Separation_of_concerns; see also http://msdn.microsoft.com/en-

16   us/magazine/ekstremalna-przerobka-asp-net--czesc6-podzial-obowiazkow.aspx.)  The goal of the

17   "separation of concerns" paradigm is to design systems in which one set of functions can be

18   optimized independently of other functions, such that failure of one function does not cause other

19   functions to fail.  This generally makes it easier to design and manage complex interdependent

20   systems.

21        Moreover, it would have been well known to a person of ordinary skill using object

22   oriented programming to use software modules, such as heuristic modules.  All programming

23   requires a programming language to write software.  One common programming language model

24   is "object oriented" or "OO" programming.  Simula, generally considered to be the first object-

25   oriented programming language, was developed in 1967.  Since that time, a long line of "OO"

26   programming languages have been developed, including Smalltalk, Objective C, Java and C++.

27   For many years, "OO" programming languages have been the predominant language model in

28   computer science.  One of the central design principles of object-oriented programming is the use

Case No. 12-cv-00630-LHK
SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES

of modules, *i.e.*, modularity.  (*See*, *e.g.*, Meyer, "Object-Oriented Software Construction at 19, 1997 ("Meyer") ("A list of basic external quality factors was presented.  Those for which current software is most badly in need of better methods, and which the object-oriented method directly addresses, are . . . the factors requiring more decentralized software architectures:  reusability and extendibility, together known as modularity."); Wegner, "Concepts and Paradigms of Object-Oriented Programming" at 13, 1990 ("Wegner") ("Object-oriented programming reintroduces systematic techniques for managing software components.  Objects provide a high-level primitive notion of modularity for directly modeling applications.")  As Wegner explains, "[s]plitting a large task into components is a time-honored method of managing complexity, variously referred to as 'divide and conquer' and 'separation of concerns.'"  (Wegner at 13.)

Additionally, incremental search, or searching based on portions of the information descriptor, would have been obvious to a person of ordinary skill in the art, as demonstrated by relevant background prior art and references in Exhibit H.  For example, U.S. Patent No. 5,671,426 ("Armstrong") states:  "Incremental search techniques have previously been proposed for various purposes, particularly for completion of commands in various computer applications . . . .  In general, the purpose of such incremental search or spelling completion facilities is to save the user from having to type in the complete word."  (Armstrong at 1:14-16, 21-23.)  "[I]t is considered that a new sequence has been generated each time a user enters an additional letter extending a previous sequence."  (*Id*. at 3:41-43.)  U.S. Patent No. 6,049,796 ("Siitonen") states:  "As the user types in the search key, the PDA virtually instantly displays the items matching the search found in the contact data base.  The user can refine the search by adding additional search criteria until finally producing for viewing a minimum number of data base records matching the search criteria.  For example, if the user types the letter 'j' all records having names beginning with the letter 'j' appear.  The user may continue to type additional letters defining a name, for example, the pair of letters 'on' chooses records such as 'Jones' but not records such as 'Jackson'.  Further typing the letter 'a' would eliminate 'Jones' as a possibility and display any names having as their first four letters 'jona' such as 'Jonathan'. This method of searching is referred to as an active search, and is distinguished from a passive search where the search begins only after the

1  search key has been entered, the search function actuated, and a completed compilation produced."

2  (Siitonen at 2:51-67.)  Another example is provided by U.S. Patent No. 6,055,531 ("Bennett").

3  Bennett states "[s]earching may be conducted on natural language or boolean front-ends which

4  provide virtually instant feed-back as to the value of a search formulation before and after any

5  'searching' actually occurs."  (Bennett at Abstract.)  For example, Bennett discloses that via

6  incremental searching,  the user is "automatically updated as to the number of database units that

7  meet the currently displayed boolean search." (Bennett at 16:57-59.)  Bennett explains: "As the

8  displayed search changes, the terminal 15 automatically updates the displayed number of

9  hits."  (Bennett at 16:62-64.)

10        To the extent the primary references in Exhibits H-1 to H-20 are found to lack an explicit

11  teaching of heuristics or heuristic algorithms, including pre-determined heuristic algorithms, a

12  person or ordinary skill in the art would recognize that the claimed heuristics and heuristic

13  algorithms were a mere known variations on theme of the use of different methods of search,

14  including heuristics to enable efficient information retrieval.  Modifying the disclosed references

15  to incorporate this functionality would have been one of a finite number of known solutions for

16  information retrieval.  Modifying the disclosed references to use heuristics or heuristic algorithms

17  also would have been an obvious design choice implemented through known techniques that

18  would not yield unpredictable or unexpected results.  Finally, a person of skill in the art would

19  have found express motivation to use this functionality.  A person of ordinary skill would be

20  motivated to combine references disclosing search functions with those describing heuristics and

21  heuristic search algorithms in order to increase the efficiency, ease of use and effectiveness of the

22  search function.  For example, Apple's own U.S. Patent No. 5,477,447 states that "'making a

23  guess based on upon a selected heuristic approach . . . would be well-known to one skill in the

24  art."' ('447 Patent at 12:16-19; *see also* 12:11-44.).  As another example, many textbooks

25  described these sorts of heuristic algorithms. (See for example Grossman, "'Information Retrieval

26  Algorithms and Heuristics,"' 1998 ("'Grossman"') and Rayward-Smith, "'Modern Heuristic

27  Search Methods,"' 1996 ("'Rayward"') generally.)

28

''""''To the extent the primary references in Exhibits H-1 to H-20 are found to lack an explicit teaching of each heuristic module employing "'a different, predetermined heuristic algorithm corresponding to said respective area,"' a person or ordinary skill in the art would recognize that using different, predetermined heuristic algorithms was a known variation on the use of algorithms to enable efficient information retrieval. For example, a person of ordinary skill would have recognized that different areas of search could have different characteristics such that different heuristic algorithms could have different effectiveness in retrieving information. Indeed, it was well known that different databases could contain different types of information and organize information in different ways. Different heuristic algorithms for searching these heterogeneous databases were well known in the art. For example, "'SFgate: The WWW Gateway for freeWAIS-sf, Edition 1.108, for SFgate 5.1, January 1997,"' Norbert Gövert and Ulrich Pfeifer, University of Dortmund, Germany, 1997, discloses that "'the more common case is that there are different fields in different databases. *The schemas of the databases differ."' Id.* at 29 (emphasis in original). "'In most cases this is due to different types of the documents stored in the databases, e.g. the one database holds references to literature while another one holds product descriptions."' *Id.* As another example, the '604 patent states that "'web-browser applications are not designed to search for non-web-based documents or applications located on the computer or an associated computer network and, conversely, File Find-type utility programs are not capable of searching the Internet for web-based documents or applications."' '604 patent at 2:5-9. Modifying the disclosed references to incorporate this functionality would have been one of a finite number of known solutions for information retrieval. Modifying the disclosed references to use different, predetermined heuristic algorithms also would have been an obvious design choice implemented through known techniques that would not yield unpredictable or unexpected results. Finally, a person of skill in the art would have found express motivation to use this functionality. A person of ordinary skill would be motivated to combine references disclosing search functions with those describing different, predetermined heuristics and heuristic search algorithms in order to increase the efficiency, ease of use and effectiveness of the search function. Additionally, one of ordinary skill would have been motivated to use different heuristics for different areas of

searchable information, in order to provide faster and better search results.  For example, the MetaCrawler search engine uses heuristics to search local information, such as the user's browsing history, and can use different heuristics to search remote information, such as the internet, including through the use of different internet search engines.

To the extent the primary references in Exhibits H-1 to H-20 are found to lack an explicit teaching of heuristic modules, a person or ordinary skill in the art would recognize that the claimed "heuristic modules" were a mere known variations on a theme of the use of heuristics in search as well as modular programming.  Modifying the disclosed references to incorporate this functionality would have been one of a finite number of known solutions for information retrieval.  Modifying the disclosed references to include heuristic modules also would have been an obvious design choice implemented through known techniques that would not yield unpredictable or unexpected results.  Finally, a person of skill in the art would have found express motivation to use this functionality.   As described above, both were well known in the art and already combined in various systems such as Apple's own Newton product, which contained heuristic modules as described in Exhibit H-6.  Similarly, further examples include MetaCrawler, MultiSurf, the WAIS system and Smith reference, which also included the claimed "heuristic modules."   A person of ordinary skill would be motivated to combine any of the prior art references identified above with those that disclose heuristic modules to increase the modularity of the software, which, as described above, provides numerous benefits to the programmer and end-user, including "separation of concerns."

To the extent the primary references in Exhibits H-1 to H-20 are found to lack an explicit teaching of "heuristic modules" because the modules are part of some service or server to which the application connects and not part of the application, a person or ordinary skill in the art would recognize that placing heuristic modules in the application rather than as part of some service or server was a known variation on the use of heuristic modules to enable efficient information retrieval.  Indeed, under Apple's apparent construction of the claims, this could be achieved by installing the modules locally, which was a well known design choice and was in fact done, as described in Exhibits H-1 to H-20.  Indeed, one of the benefits of modular design is that the

1   modules can be treated separately and thus a person of ordinary skill would understand that

2   modules could be placed in the application or a server.  The use of a modular design in software

3   was a well-known design choice by the 1990's and was widely employed in the software industry.

4   (*See*, *e.g.*, http://en.wikipedia.org/wiki/Modularity_%28programming%29.)  "Traditional

5   programming languages have been used to support modular programming - since at least the

6   1960s." (*Id.*)   Similarly, it would have been obvious to combine a local module with the server to

7   which it communicates to behave as the claimed "heuristic module" under Apple's apparent

8   construction of the claims.  Similarly, to the extent that Apple argues that the primary references in

9   Exhibits H-1 to H-20 are lack an explicit teaching of "heuristic modules" because they comprise

10   distributed systems with remote "heuristics," "modules" or "heuristic modules," it would have

11   been obvious for a person of ordinary skill in the art run the system entirely on one computer,

12   making the entire system, including "heuristics," "modules" or "heuristic modules" on the client

13   device and thus comprising the claimed "heuristic modules" with "different, predetermined

14   heuristic algorithm corresponding to said respective area."  Combining all components onto a

15   single computer would have been a simple design choice.  For example, if the different sets of

16   searchable data were available locally, a person of ordinary skill would have been motivated to

17   locate all the already described components described in the prior art, including modules, heuristic

18   modules, and "different, predetermined heuristic algorithm corresponding to said respective area,"

19   on one computer rather than a more distributed design, as described in Exhibits H-1 to H-20.

20       Further, a person of skill in the art would have been motivated to include incremental

21   searching as a feature.  Modifying the disclosed references to incorporate this functionality would

22   have been one of a finite number of known solutions for information retrieval.  Modifying the

23   disclosed references to provide incremental searching also would have been an obvious design

24   choice implemented through known techniques that would not yield unpredictable or unexpected

25   results.  Finally, a person of skill in the art would have found express motivation to use this

26   functionality.  The art provides numerous examples of the advantages to combining incremental

27   searching with search functionalities.  One example is U.S. Patent No. 6,055,531

28   ("Bennett").  Bennett observes that an desirable feature of searching is the "virtually instant feed-

1   back as to the value of a search formulation before and after any "searching" actually occurs."

2   (Bennett at Abstract.)  Bennett explains an implementation of incremental searching and its

3   inherent advantages:

> As operators, additional words and parenthesis are added to the search, the attorney is automatically updated as to the number of database units that meet the currently displayed boolean search.  In fact, the boolean search window 81 provides counters 82 which indicate the current number of database units and hits based on the currently displayed search or based on a selected sub-portion thereof.  As the displayed search changes, the terminal 15 automatically updates the displayed number of hits.  Based on the hit number, the attorney may choose to select additional search words and/or operators or simplify the current search to obtain a reviewable number of hits.

9   (Bennett at 16:56-67.)  As Bennett states, the advantages of incremental searching allow a user to

10  modify or select the search as the search results are updated as a user adds to his search.  Bennett's

11  characterization of such "virtually instant feed-back" would motivate a person of skill to add

12  incremental searching to search functionalities.

13          The ability to search multiple resources, including but not limited to local and remote

14  resources, such as the internet, was also known in the art, as describe above.  A person of ordinary

15  skill would have been motivated to combine references disclosing search of one resource with a

16  search facility that searched all resources available at once, including local and remote resources.

17  Modifying the disclosed references to incorporate this functionality would have been one of a

18  finite number of known solutions for information retrieval.   Modifying the disclosed references to

19  ability to search multiple resources, including but not limited to local and remote resources, such

20  as the internet also would have been an obvious design choice implemented through known

21  techniques that would not yield unpredictable or unexpected results.  Finally, a person of skill in

22  the art would have found express motivation to use this functionality. Such a single search

23  mechanism would enable the system to use less time searching many different locations,

24  separately, for the same query.  Doing one search of all accessible resources, including local and

25  remote systems, would have been a common-sense solution to the problem of multiple searchable

26  resources of information available to the designer.  For example, numerous prior art references

27  describe searching multiple remote databases in the art.  One of ordinary skill, if he or she had

28  available a set of locally stored information would have been motivated to include that information

1   to be searched as well in order to provide convenience and ease of use for the user in searching for

2   a given piece of information.  Thus, a person of ordinary skill would have been motivated to

3   combine references disclosing only local searching or only remote searching with one-another.

4   Providing a single search mechanism to access many different storage locations or types of

5   information also assists users in locating information when they are unaware or uncertain of where

6   the most relevant location resides—so instead of multiple searches with the same query, the use.

7   To the extent the primary references in Exhibits H-1 to H-20 are found to lack "providing said

8   information descriptor received from the user-input device to a plurality of heuristic modules"

9   because entering the same query more than once is required, it would have been obvious to take

10   the information descriptor and reuse.  Indeed, this concept is well known in the field and

11   sometimes referred to as a "federated search."  (*See*, *e.g.*

12   http://en.wikipedia.org/wiki/Federated_search ("Federated search is an information retrieval

13   technology that allows the simultaneous search of multiple searchable resources.  A user makes a

14   single query request which is distributed to the search engines participating in the federation.  The

15   federated search then aggregates the results that are received from the search engines for

16   presentation to the user."); *Multilingual Federated Searching Across Heterogeneous Collections*,

17   James Powell, D-Lib Magazine, ISSN 1082-9873, September 1998 located at

18   http://dlib.org/dlib/september98/powell/09powell.html#Federated ("The Federated Searcher is a

19   Java-based server application that mediates user queries to multiple heterogeneous search

20   engines.)  For example, WAIS clients allowed users to search multiple data source while only

21   entering the query once. (*See*, *e.g.* Emerald Article: Wide Area Information Servers: An

22   Executive Information System for Unstructured Files by Kahe et al. (1992) at 61.)

23           **PATENT LOCAL RULE 3-4 DISCLOSURES**

24         Pursuant to Patent Rule 3-4(a), Defendants will produce, make available for inspection, or

25   identify publicly available information sufficient to show the operation of any specifically

26   identified aspects or elements of an Accused Instrumentality identified by Plaintiff in its Patent

27   L.R. 3-1(c) chart to the extent such information is in Defendants' possession, custody or control.

28   If such information comprises source code, Defendants will make such source code available for

1 | inspection pursuant to the protective order in this action.  Documents produced pursuant to Patent

2 | Local Rule 3-4(a) include the following:  SAMNDCA630-00920054 - SAMNDCA630-00926298.

3 |       Pursuant to Patent Rule 3-4(b), Defendants are producing or making available for

4 | inspection copies of each item of prior art identified pursuant to Patent Rule 3-3(a) which does not

5 | appear in the file history of the Asserted Patent to the extent such prior art is in Samsung's

6 | possession, custody or control.  Documents produced pursuant to Patent Local Rule 3-4(b) include

7 | the following: SAMNDCA630-00000616 - SAMNDCA630-00003856; SAMNDCA630-

8 | 00093416 - SAMNDCA630-00095124; SAMNDCA630-00805769 - SAMNDCA630-00809748;

9 | SAMNDCA630-00817832 - SAMNDCA630-00826455; SAMNDCA630-00926299 -

10 | SAMNDCA630-00946068; SAMNDCA630-00946064 – SAMNDCA630-00966713;

11 | SAMNDCA630-04258025 - SAMNDCA630-04258040; SAMNDCA630-04320126 –

12 | SAMNDCA630-04322222; SAMNDCA630-04329460 – SAMNDCA630-04330100;

13 | SAMNDCA630-04385219 – SAMNDCA630-04386303; SAMNDCA630-04523619 –

14 | SAMNDCA630-04526355; SAMNDCA630-05347297 – SAMNDCA630-05350828;

15 | SAMNDCA630-06025016; SAMNDCA630-06025017 – SAMNDCA630-06029983;

16 | SAMNDCA630-06402651 – SAMNDCA630-06405696; SAMNDCA630-06434456 –

17 | SAMNDCA630-06436931; SAMNDCA630-06436932 – SAMNDCA630-06437720;

18 | SAMNDCA630-06437722 – SAMNDCA630-06438603; SAMNDCA630-06438636 –

19 | SAMNDCA630-06439438; SAMNDCA630-06641972 – SAMNDCA630-06642090; and

20 | SAMNDCA630-06642091 – SAMNDCA630-06642196.  In addition, devices, systems and /or

21 | software are available for inspection upon reasonable notice.

22 |       Further pursuant to Patent Local Rule 3-4(b), Samsung identifies the following third-party

23 | documents : TEALPOINTNDCA630-00000001 – TEALPOINTNDCA630-00002597 (TealPhone

24 | – see Exhibits E-1 through E-9); TEXTWARENDCA630-00000001 – TEXTWARENDCA630-

25 | 00000957 (Instant Text Mobile – see Exhibit G-9; FitalyStamp and FitalyVirtual – see Exhibits G-

26 | 1 through G-14); SMARTCELLNDCA630-00000001 – SMARTCELLNDCA630-00000042

27 | (TextPlus – see Exhibit G-10); MSFT-00630-000001 – MSFT-00630-001135 (Win95 Pre-Release

28 | – see Exhibit A-6; Exchange ActiveSync – see Exhibit D-11; Windows Mobile 5 – see Exhibit

E-8); MSFT_CODE0000417-815 (Win95 Pre-Release – see Exhibit A-6); EMBARCNDCA630-0000001 (Turbo C++ – see Exhibit A-7); EMBARCNDCA630-0000002-3 (Codewright – see Exhibit A-7); CHRISTNDCA630-00000001 (XKWIC system – see Exhibit A-5); ETZIONINDCA630-00000001 – ETZIONINDCA630-00000235 (MetaCrawler system – see Second Amended Exhibits C-3 and H-3); PFEIFERNDCA630-00000001 – PFEIFERNDCA630-00000006 (WAIS system – see Second Amended Exhibits C-9 and H-9); WILMSENNDCA630-00000001 – WILMSENNDCA630-00003103 (Neal system – see Exhibits C-16 and H-16); CLS-00000001-00001089 (WAIS – see Second Amended Exhibit C-9 and H-9); HTC000001 – HTC001068 (T-Mobile Dash – see Exhibit G-11); CHINGNDCA630-00000001 – CHINGNDCA630-00000235 (Turbo C++ – see Exhibit A-9); KINZERNDCA630-00000001 – KINZERNDCA630-00000224 (Codewright – see Exhibit A-7); PARCNDCA630-00000001 – PARCNDCA630-00005871 (Interlisp – see Amended Exhibit A-4; Embedded Buttons – see Amended Exhibit B-15; and Bayou – see Exhibit D-4); ORCL000001 – ORCL00578 (WAIS – see Second Amended Exhibits C-9 and H-9); TMO-APL-SMSNG-00000001 – TMO-APL-SMSNG-000000235 (T-Mobile Dash – see Exhibit G-11); NEOMAGNDCA630-00000001 – NEOMAGNDCA630-00000020 (Neonode N1m, see Exhibit F-5); REQUISITE0000001 – REQUISITE000147 (Neal System – see Exhibits C-16, H-16); DOW000001 – DOW00127 (WAIS – see Second Amended ExhibitS C-9 and H-9); CYCLINGNDCA630-00000001 – CYCLINGNDCA630-00000045 (JazzMutant Lemur, see Second Amended Exhibit F-9); GAMIELNDCA630-00000001 – GAMIELNDCA630-00010342 (Isite – see Exhibits C-17 and H-17); STANFORDNDCA620-00000001 - STANFORDNDCA620-00000149.  Discovery is ongoing in this case, and Samsung reserves the right to rely on additional materials which may be identified and/or produced in the discovery process, including materials identified and/or produced by Apple or third parties.

Defendants reserve the right to identify and produce additional documents pursuant to the Patent Rules and the orders of the Court.

DATED:  April __, 2013                    QUINN EMANUEL URQUHART & SULLIVAN LLP


                                          By  /s/ Victoria F. Maroulis
                                              Victoria F. Maroulis
                                              Attorneys for Defendants
                                              SAMSUNG ELECTRONICS CO., LTD.,
                                              SAMSUNG ELECTRONICS AMERICA, INC. and
                                              SAMSUNG TELECOMMUNICATIONS
                                              AMERICA, LLC