[COUNSEL LISTED ON SIGNATURE PAGES]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation, | CASE NO. 5:12-cv-00630-LHK |
| Plaintiff, | **JOINT STATUS REPORT CONCERNING REPRESENTATIVE PRODUCTS** |
| v. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Defendants. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Counterclaim-Plaintiffs, | |
| v. | |
| APPLE INC., a California corporation, | |
| Counterclaim-Defendant. | |

Pursuant to this Court's Order of April 24, 2013 (Dkt. No. 471), the parties jointly submit this Joint Status Report concerning their discussions about a potential stipulation regarding representative products.

### 1.   Apple's Position

At the April 24, 2013 Case Management Conference ("April 24 CMC" or "CMC"), in order to simplify the case for trial and avoid "a really complicated verdict form," the Court ordered the parties to reduce the number of accused products in stages, with an eventual reduction of accused products to ten at trial.  *See* April 24, 2013 Hr'g Tr. at 67.

In response to concerns from Apple that a reduction in accused products would allow Samsung to evade a remedy on products in this case, and also result in follow-on litigation for such products, the Court:  (1) made clear that withdrawn products would be dismissed without prejudice, and (2) "strongly encourage[d]" the parties to reach a stipulation on representative products to avoid the need for follow-on litigation regarding currently-accused products that would not be tried in this case.  *Id.* at 13, 67.

Since the April 24 CMC, however, Samsung has seized upon the Court's trial management tool, by concocting highly misleading positions regarding both the identification of products and the use of representative products, in order to drastically limit its exposure in this case.

At the time of the April 24 CMC (and still), Apple identified 22 Samsung accused products.[1] As explained below, Apple identified products as they have been understood throughout this case and consistent with how Samsung identifies its own products; thus, for example, the Galaxy Nexus, Galaxy SIII and Galaxy Note II are three separate products.

At no time during the April 24 CMC and its lengthy discussion of the numbers of accused products (or any other time before the CMC) did Samsung disagree with the manner in which Apple counted products.  But once the Court limited the number of products for trial, Samsung suddenly devised a new approach to counting its "products" that would transform each Samsung product into

---

[1] Apple is not attempting to add a "23rd product" to the case, as Samsung claims.  Apple has moved for leave to add Samsung's recently introduced Galaxy S4 product into the case.  In its motion papers, Apple made clear that it would withdraw one of the currently accused products in its place.  *See* Dkt. No. 525 at 9 (May 21, 2013).

1    many products.  With a ten-product limit, Apple would then be able to address only a small fraction

2    of the currently accused Samsung products at trial, thereby severely limiting Samsung's exposure in

3    this case.

4           Specifically, in its May 13 submission, Samsung claimed *for the first time* that Apple must

5    *separately* count each Samsung product on each carrier and each Android version.  *See* Dkt. No. 513

6    at 2-5 (May 13, 2013).  Thus, according to Samsung, the Galaxy Nexus – which was the subject of

7    the preliminary injunction motion and consistently identified as a single product by Samsung, by this

8    Court, and by the Federal Circuit – is not really one product, but numerous products because it has

9    been offered on different carriers and updated to different versions of Android.  The Galaxy SIII

10   alone could constitute 28 separate products (based on Samsung's interrogatory responses).  In fact,

11   under Samsung's approach, Apple's 22 accused products – which at the CMC Samsung considered

12   22 products – would morph into well over 100 supposedly separate and distinct products.

13          The *sole* ostensible justification Samsung offers is that there are "highly relevant"

14   infringement issues among carrier and operating system versions of the same product (*e.g.,* Galaxy

15   SIII); but that is not only false (as explained below), it is irrelevant as patents do not define products.

16   Again, the real reason for Samsung's new position, of course, is to severely limit the accused

17   products – and, thus, Samsung's exposure – at trial.

18          Samsung's new product counting approach is especially specious when considered with

19   Samsung's related, and equally untenable, position regarding representative products.  At the CMC,

20   the Court encouraged the parties to reach such a stipulation in order to avoid follow-on litigation

21   regarding withdrawn products.  Given the overlap in infringement issues regarding Samsung's

22   products, Apple is prepared to stipulate (or at least endeavor to stipulate) to representative products at

23   this time.  Indeed, with an appropriate stipulation, Apple believes that it will likely be able to proceed

24   to trial on fewer than ten accused Samsung products, which could "represent" other products now-

25   accused, and will do so with one set of proof for each set of representative products.  That Apple will

26   be able to proceed on few products, and should be given an opportunity to demonstrate this fact,

27   undercuts entirely Samsung's assertion that the verdict form will be complex and unmanageable.  It

28   will not.

Samsung, however, is not even willing to attempt to stipulate to representative products at this time.  Even worse, Samsung proposed approach regarding representative products is fundamentally inconsistent with the purpose of such a stipulation discussed at the CMC – to allow the parties to obtain a remedy for currently accused products for which infringement issues are the same as those ultimately tried, which would obviate considerably (if not entirely) follow-on litigation as to such products.  In fact, Samsung now contends that a representative products stipulation *cannot* have *any* effect on follow-on litigation because, in Samsung's view, products at trial cannot represent products currently accused but ultimately withdrawn.  Instead, Samsung argues that the *only* use of representative products is to allow fewer than ten products to be presented at trial and to have those products "represent" any of the ten products not presented.

Samsung's proposed approach would defeat the very purpose of a representative products stipulation (or order), which, as discussed at the CMC, is to avoid follow-on litigation and ameliorate the impact of having to drop accused products.  If the evidence for products at trial is the same for products now-accused but ultimately withdraw, they clearly should be addressed pursuant to such a stipulation.  This is not an attempt by Apple to subvert the Court's Order limiting products, as Samsung contends, but an effort to effectively permit Apple to obtain a remedy for Samsung's pervasive infringement while also efficiently managing the Court's docket by avoiding substantial follow-on litigation.  Samsung objects simply because that would allow Apple to seek a remedy for products it now accuses but will need to drop.

Indeed, the combined (and intended) effect of Samsung's arguments regarding products and representative products would be to gut Apple's case by (1) drastically reducing the number of accused Samsung products allowed at trial – perhaps to as few as one product because all ten product slots would be filled by versions of a single product, such as the Galaxy SIII – thus requiring virtually all products on Apple's list to be withdrawn, and then (2) precluding the product(s) at trial from representing any of the withdrawn products.

This is exactly what Samsung wants.  It would allow Samsung to stay ahead of any meaningful remedy, and reward its serial and frequent launch of infringing devices – including devices that contain features *this Court* already found, *in this case,* likely to infringe Apple's patents

– because Apple would need to bring case after case (indeed, more than a dozen cases) just to capture the Samsung products accused in this case, even as Samsung continues to launch new infringing devices.

This Court put limits in place in this case (regarding products and patent claims) in order to simplify the case and avoid complexity for the jury, not to insulate Samsung from damages and an injunction.  Apple's approach regarding products and representative products would result in an entirely manageable jury verdict form, while allowing Apple to pursue a remedy regarding products at trial and those dropped but fairly represented by products at trial.

## A.    Accused Products

Apple has identified 22 accused Samsung products, and (despite its objections) will reduce that list pursuant to the Court's Order.  As set forth in its May 13 submission, Apple has defined a product objectively, using the product designations (*i.e.,* trade names) that Samsung itself uses with its customers *and* internally for planning, product analysis, sales, financial reporting, and marketing.[2] Thus, for example, the Galaxy Nexus, Galaxy SIII and Galaxy Note II are three separate products – all within the Galaxy product line.[3]  In this way, Apple identified products not only in the way a product is generally understood, but also in exactly the same way that Samsung consistently identifies products in its own business and throughout this litigation.  This also is how Samsung has identified Apple's accused iPhone and iPad products, listing, for example, as separate products the iPhone 4, iPhone 4S, and iPhone 5, as well as the iPad, and iPad 2.

At no time prior to the Court's order limiting products did Samsung assert a disagreement with Apple's identification or counting of accused products.[4]  Following the Court's order limiting

---

[2]    Apple is prepared to provide myriad examples of internal Samsung documents identifying its products in exactly the way that Apple has done so in its list of accused products should the Court wish to view such documents.

[3]    Samsung's May 13 reference to a purported "Galaxy SIII product line" (Dkt. No. 513, 5/13/13, at 3) is a misnomer. Samsung provides no support whatsoever that the Galaxy SIII is its own product line, instead of being one product in the Galaxy product line.

[4]    To the contrary, Samsung accepted Apple's approach and the manner by which Apple counted accused products. Just last month, for example, Samsung represented to Judge Grewal that Apple had accused 26 products.  *See* Dkt. No. 424, 4/1/13, at 11 ("Apple is the party who chose to accuse 26 products of infringing its patents.").  Samsung never suggested that each of the 26 products then on Apple's list actually was multiple products.  Moreover, in

*(Cont'd on next page)*

products, however, Samsung claimed that Apple's identification was wrong, and claimed that Apple must *separately* count each Samsung product on each carrier and, within each carrier, *separately* count each Android version found on such products. *See* Dkt. No. 513, at 2-3 (May 13, 2013).

In its May 13 submission, Samsung asserted that a product is "a device with its own set of hardware and software," thus any variation in the hardware or software, no matter how insignificant, presumably constitutes the creation of a new "product." *Id.* at 2. Nowhere in Samsung's May 13 submission or this submission, however, does Samsung even identify how many "products" it contends are encompassed by the 22 Samsung products on Apple's May 13, 2013 list of accused products.[5] Similarly, during the parties' meet-and-confer conference, Samsung's counsel was not able or willing to state how many products Samsung contends are encompassed by Apple's May 13 list, noting only that the number was "more than 22." In any event, while there is no way to determine from Samsung's submissions how many products it claims are encompassed by Apple's list, it is clear that Samsung's approach would radically alter the framework of this case. For instance, in its interrogatory responses, Samsung has identified 142 different source code releases (*i.e.*, differences in software) for the 22 products Apple has accused, including 28 separate releases for the Galaxy SIII device alone, 10 releases for the Galaxy SIII and five for the Galaxy Nexus. If Samsung is asking this Court to treat each of these releases as a separate product, with a ten-product limit for trial, Apple would require more than one dozen trials to address those products alone. And, every month Apple's patent rights would be further compromised as Samsung introduces additional products, product updates, and source code modifications.

Nothing in the litigation of this case to date supports such a fragmentation of every Samsung

---

*(Cont'd from previous page)*

response to the Court's request during the tutorial that the parties identify the products accused, Apple submitted a list of 26 products. At the time Apple provided that list, and before the Court imposed its current product limitation, Samsung made no complaints regarding miscounting.

[5] In its current submission, Samsung references its Supplemental Response to Apple's Interrogatory No. 41 to assert that Apple is accusing more than *81 different versions of software*, running on more than *36 hardware models . . .*" By this assertion, Samsung still does not state how many products it contends Apple has accused. Additionally, this assertion misleadingly states that the identification was made on April 5, "long before case narrowing was ordered." The Court ordered narrowing in February during the claim construction hearings. *See* 2/14/13 Hr'g Tr. at 7.

1   product.  Most obviously, the Galaxy Nexus was treated as a single product by both parties, this

2   Court, and the Federal Circuit at the preliminary injunction stage of this case.  Samsung makes no

3   effort to explain why the parties and the court system were able to treat the Galaxy Nexus as a single

4   product for a preliminary injunction motion, but at trial that same device should count as numerous

5   distinct products.

6       The *only* "justification" Samsung offers for departing from the plain meaning of a product –

7   and the way it uses that term in its own business and this case – is its claim that "its products are

8   heavily customized to various carrier specifications," and that the alleged "carrier-specific

9   customizations that Samsung makes . . . are highly relevant to Apple's claims of infringement, and

10  will require separate proof for each product, regardless of its product line."  *See* Dkt. No. 513, at 3

11  (May 13, 2013).  In so arguing, Samsung conflates what constitutes a product with whether a product

12  infringes.  Products exist independent of the patent claims asserted against them; products are not

13  defined in terms of patent claims or infringement proofs (although those issues are relevant to the

14  representative products analysis).

15      And, in any event, Samsung's conclusory claim – upon which its product counting approach

16  is entirely based – is false.  Thus, for example, as Samsung knows (because it has received Apple's

17  detailed infringement charts), Apple's '414 patent claims a mechanism allowing a user to operate a

18  device while the device synchronizes; *all* accused Samsung devices include a Calendar, Contacts,

19  Email, and Gmail application that infringe *in the same way*.  The '172 patent provides word

20  recommendations, and *every* Samsung product accused of infringement includes *the same* word

21  recommendation feature.  In making its sweeping and unsupported claim in its May 13 submission

22  that there are "highly relevant" differences among carrier versions of a single Samsung product,

23  Samsung ignores these patents, as well as others with similarly consistent infringement proofs.

24      Instead, Samsung has provided this Court with highly misleading descriptions of Apple's

25  contentions.  Regarding the '502 patent, for example, Samsung represents to the Court that

26  "significant differences exist between accused devices running different versions of the Android

27  platform."  That statement is incorrect, as confirmed by the fact that Samsung itself in providing its

28  non-infringement positions did not even identify different Android versions, let alone rely upon any

differences among them.  The '502 patent claims shareable history lists, and while Samsung points to different files, *all accused devices infringe in the same way regardless of Android version*, by incorporating applications such as Google Maps, which has history lists that are shareable between fields.

In its May 13 submission, Samsung identified only two other patents, the '604 and '647 patents, for which it suggested that differences among carriers or operating systems within a single product (*i.e.,* the Galaxy SIII) were relevant to infringement issues.  Samsung's conclusory claims are wrong.  For example, in its responses to interrogatories seeking the bases for Samsung's non-infringement positions, Samsung did not identify, much less rely upon, *any* difference among carriers for any product for either the '604 or '647 patent.

More specifically, Samsung claims that infringement of the '604 patent depends on the carrier because different carriers have different applications.  But, for each Samsung product (*e.g.,* the Galaxy SIII), Apple provided just *one* claim chart, identifying *all* modules shipped with the Galaxy SIII, and showing that *all* modules utilize a different heuristic or heuristic algorithm.  The fact that some carriers include fewer than all of the modules does not mean that any of the devices do not infringe or that proof of the Galaxy SIII's infringement will require any carrier-specific proof.  Similarly, Apple's charts for the '647 patent show that *every* accused Samsung product, regardless of operating system, infringes by having at least one application (*e.g.,* the Browser app, Messaging app, or both) that links actions to detected structures.  Indeed, Apple asserted both the '604 and '647 patents in the preliminary injunction motion against one product, the Galaxy Nexus, and Samsung *never* suggested that the Nexus was actually multiple products or that the differences among versions were "highly relevant."

Samsung attacks Apple for having submitted separate claim charts, separated by carrier for certain products such as the Galaxy S II early in this case.  Early in this case, before it had the benefit of source code recently produced by Samsung and third-party Google, as well as other discovery produced over the months of litigation, Apple separated the charts to ensure that all of its infringement theories were clearly identified.  With the benefit of the discovery received, Apple has been able to consolidate the charts because no differences exist.  Notably, Samsung fails to identify

any proof or theory differences among the early charts.  Using the same infringement theories identified months earlier for each of its patents, Apple's recently served, consolidated claim charts simply take the overlapping proof developed during discovery and put those theories and evidence in a single package.

Samsung also contends that each product (as it defines products) will "need separate proof for issues such as damages," but that claim is inaccurate and, again, belied by its own discovery responses in this case.  Samsung has provided substantial discovery on damages in this case, and that evidence, including product sales data, has been provided by Samsung for each of the products on Apple's list.  For the Galaxy SIII, for example, Samsung provided data treating all such devices sold by all carriers as *one product*, and provided no data separated out by carrier or operating system, as Samsung argues would be required at trial.  The manner in which Samsung has provided damages discovery (without regard for carrier-specific or other distinctions) confirms that products have been, and should continue to be, identified as set forth in Apple's list of accused products.

Tellingly, Samsung does *not* even apply its product counting approach to its own identification of the Apple products Samsung accuses.  Apple has sold iPhones and iPads on multiple carriers and with multiple software versions.  Despite these differences in hardware and software, Samsung identifies the iPhone 3, 3G, 4, 4S and 5 each as single products (for a total of five), as is appropriate under Apple's definition, not Samsung's.  Applying Samsung's counting approach would require counting every iPhone and iPad product as multiple products even though they are each only one product.

But, while Samsung properly counts the iPhone devices as five products; the iPad devices as five products; the iPod touch devices as three products; and Apple TV devices as two products, Samsung tries to treat entire lines of computers – iMac, Mac Pro, MacBook Pro, and MacBook Air – as single accused products and multiple versions of iTunes and "iCloud" as single accused products.

While Samsung suggests that Apple has "refused" to explain what Apple means when it says that each of these accused Apple computer product lines comprise multiple discrete products, this is simply untrue.  Apple directed Samsung during that parties' meet and confers to public sources where it could find the proper nomenclature for the many generations of products within the computer

product lines (*e.g.*, MacBook Pro 1.1 through MacBook Pro 10.2; iMac G5 through iMac 13.2), and actually included this information in its May 13 filing with the Court on accused products (Dkt. No. 513, at 3-4).  Samsung has ignored this, and argues instead that by pointing to generations within the MacBook product line, for example, Apple applies its definition of products inconsistently. Again, it is Samsung that is inconsistent, and its list of accused products demonstrates that inconsistency.  Indeed, in its May 13th submission, Samsung identified different generations of the iPod touch – "iPod touch (5th generation)," "iPod touch (4th generation)," and "iPod touch (3rd generation)."  *See* Dkt. No. 513, at 5 (May 13, 2013).  In the end, Samsung leaves both the Court and Apple with no idea how many of the 13 generations of iMac products or 10 generations of MacBook Pro products Samsung purports to accuse.  Samsung's infringement contentions (although amended multiple times) also fail to answer this question.  Without knowing which generations are accused, it is not possible to know how many Apple products Samsung accuses.

Samsung also suggests that it need not differentiate between the different generations of each Apple computer product because any differences allegedly would not create materially different infringement proofs.  Samsung's premise is wrong, as there are myriad relevant differences between the generations of accused Apple computer products.  For example, hardware and software differences between different computer generations will provide an absolute defense to Samsung's claims based on the '239 and '757 patents for certain generations.  Samsung accuses Wi-Fi Sync for iTunes and FaceTime of infringing the '239 patent, and iCloud-features of infringing the '757 patent. Wi-Fi Sync requires OS X 10.5 or later, FaceTime requires OS X 10.6.6 or later, and iCloud requires OS X 10.7 or later.  However, the older Apple computer products that are not compatible with those versions of OS X cannot infringe, which belies Samsung's suggestion that all iMac generations (for example) can be representative of each other and can be treated as a single accused product.

Samsung's flawed accusations regarding the iMac product line are illustrative.  Apple released the first iMac generation in 1998.  But the '757 patent did not issue until 2009.  That first iMac generation cannot run any of the accused software because that generation utilized a PowerPC architecture that will not run any OS X version compatible with the accused iCloud features.  Given these fundamental differences, the first generation iMac and the current iMac (and all generations in

between) cannot logically be considered a single accused "product."

Further, because the '239 patent requires specific structure for infringement, the various generational differences between graphics processing components in the accused computer products provides another example why entire product lines cannot be representative.  Samsung must show that the accused computer products contain the particular type of structure for decompressing disclosed in the '239 specification.  But Apple has used different types of graphic processing systems between computer generations.  For example, the 13-inch MacBook Pro that Apple released in mid-2010 contained a NVidia GPU separate from the its standard CPU, whereas the 13-inch MacBook Pro from late 2011 contained only CPU-integrated Intel HD graphics processing.[6]

In short, Apple's identification and counting of accused products is appropriate, as is Samsung's approach regarding the iPhone and iPad products.

**B.    Representative Products**

At the CMC, the Court recognized that reducing the number of accused products could result in additional litigation regarding products now accused in this case but withdrawn pursuant to the Court's order.  In order to avoid such follow-on litigation, and to allow a remedy for withdrawn products, the Court stated that it was "going to strongly encourage a representative product stipulation."  *See* CMC Hr'g Tr. at 67.  Apple appreciates this Court's willingness to assist the parties in reaching a representative products stipulation, which will allow the parties to proceed at trial with ten (or fewer) accused products, and also take account of other products now accused, possibly obviating the need for follow-on litigation.

Consistent with its strategy to limit its exposure, however, Samsung proposes that representative products be used in a way that is fundamentally inconsistent with what was discussed at the CMC – and which, coupled with its approach to product counting above – would effectively

---

[6]  There are even significant differences within a single generation.  The late-2011 13-inch MacBook Pro is different from the late-2011 15-inch MacBook Pro of the same generation because the 15-inch MacBook Pro contained both CPU-integrated graphics processing and a separate GPU.  That 15-inch MacBook Pro also contained a feature that switched between the CPU-integrated graphics processing and the GPU depending the application needs.  Such structural differences within and between generations preclude Samsung from treating the entire product line as representative or as a single product.

preclude a meaningful remedy in this case despite Samsung's widespread and willful infringement. Samsung argues that representative products have nothing to do with products withdrawn from the case and have nothing to do with avoiding follow-on litigation.  According to Samsung, the parties may obtain a remedy for only ten products in this case, and the *only* use of representative products is to allow fewer than ten to be presented at trial and have those products "represent" any of the ten not presented – but not any withdrawn products, even if the proof of infringement for such products is identical.

Samsung's proposed approach would do nothing to diminish the need for follow-on litigation, and is the exact opposite of what was contemplated at the CMC.  In fact, Apple raised the issue of representative products at the CMC precisely to address – and propose a means to avoid – the need for follow-on litigation.  Apple's counsel (Mr. Lee) raised the issue following concerns raised by Apple's counsel (Mr. Krevitt) regarding follow-on litigation as a result of limiting the number of accused products.  *See* CMC Hr'g Tr. at 65-66.  Specifically, Mr. Lee stated:

> There's been discussions among us about representative products. . . . And I have in mind what Mr. Krevitt talked about, which is the follow-on litigation for everything that was dismissed without prejudice.  It seems to me that if we're going to follow this schedule, it might make sense for us to confer again after we hit the May date and have the new list and see if we can reach agreement on representative products.  That would still have us at your 12 products, but have them be representative of others so that you don't have to have a follow-on case.

*Id.*  Based on this discussion of representative products, the Court actually reduced even further the number of accused products for trial, from 12 to 10, but stated it would "strongly encourage a representative product stipulation."  *Id.* at 67.  At no time did Samsung's counsel object to Apple's suggestion regarding a representative products stipulation; nor did Samsung disagree that represented products be used to address products now accused, but ultimately withdrawn, in order to avoid follow-on litigation.

Even now, Samsung's *only* justification for not allowing withdrawn products to be represented by products addressed at trial is that it would require additional damages-related evidence regarding withdrawn products.  The limited evidence that may be necessary (*e.g.,* sales data) would not complicate the trial, and certainly not to an extent to deprive Apple of a remedy for products that may have identical issues of proof but which Apple was required to drop.

Samsung's effort to confine a representative products stipulation to the ten products presented at trial is not only inconsistent with the discussion at the CMC, but is a transparent attempt to avoid any remedy for products Apple now accuses but will need to withdraw pursuant to the Court's order. Viewed in connection with Samsung's product-counting approach discussed above, Samsung's goal is clear:  reduce the number of Samsung products at trial to one (*e.g.,* Galaxy SIII), and not allow that one product to "represent" any others, yet sweep in basically all Apple iPhone, iPad, and Mac computer products – far in excess of 22.

Samsung's contrived and self-serving approach should be rejected.  Consistent with the discussion at the CMC, a representative products stipulation should allow the parties to identify products now accused, but ultimately withdrawn, that will be represented by products actually presented at trial.  And, the parties should confer in good faith now regarding such a stipulation.

Indeed, in light of the similarities in proof for Samsung's accused products, Apple is prepared to identify and stipulate to representative Samsung products from among its list of accused products, and to provide the basis for such identification.  Much of that work already has been done in the infringement charts.

Aside from Samsung's view of the effect of stipulation, Samsung also is not willing to identify products that are representative of other products, or otherwise attempt in good faith to reach agreement regarding representative products at this time.  Samsung claims that it is premature to do so, and that it should wait until after expert discovery.  Apple is concerned that given Samsung's conclusory claim that there are "highly relevant" differences among carriers for each Samsung product, Samsung's current stalling tactic will inevitably be manifested as a flat unwillingness to agree to representative products.  As shown in Apple's infringement charts, there is an overwhelmingly overlap of infringement issues and proof for Samsung's products.  A stipulation regarding representative Samsung products *is* appropriate, and can be addressed now.

Regardless of the timing for a representative products stipulation, Apple respectfully requests that the Court adopt a mechanism to address and resolve any relevant issues to the extent the parties are unable to agree.  Thus, for example, if the stipulation will be addressed following expert discovery, if a party contends one product is representative of other products, that party's expert

1   should explain the basis for such contention; the other party can then challenge the

2   "representativeness" contention.  If after expert discovery, the parties are unable to stipulate to

3   representative products, the parties can present the issue and relevant evidence to the Court, which

4   can resolve the issue, perhaps in connection with summary judgment.  *See Fujitsu Ltd. v. NETGEAR,*

5   *Inc.*, Case No. 07-cv-710-bbc, 2008 WL 4186181, at *1 (W.D. Wis. Sept. 10, 2008).

6        Such a mechanism will ensure that both parties have an opportunity to seek relief at trial

7   regarding additional products to the extent they are fairly represented by the ten accused products.

8   Samsung claims that this mechanism is "potentially" problematic, but provides no alternative.  Given

9   Samsung's conclusory claims regarding "highly relevant" differences among products, a mechanism

10  is essential to ensure that a resolution regarding representativeness be achieved to the extent

11  warranted.  Apple respectfully requests, therefore, that a mechanism be put in place to allow for the

12  resolution of what products can "represent" other products.

13       **2.       Samsung's Position**

14       Samsung is willing to negotiate an appropriate stipulation concerning representative products

15  for both sets of accused products (Apple's and Samsung's).  But Apple's proposal for an immediate

16  identification of such products is not practical.  First, the parties have not yet set forth the final

17  infringement proof they intend to offer at trial, including expert opinion.  Second, Apple continues to

18  amend and alter its infringement theories and the proof it will rely on.  Indeed, only days ago Apple

19  submitted dozens of new proposed infringement charts, including new citations to material that

20  Samsung has had no opportunity to review in detail, and Apple's motion for leave to add these new

21  contentions to the case is still pending before Judge Grewal.  (*See* Dkt. 525, Apple's May 22 Motion

22  for Leave to Amend Infringement Contentions.)

23       Apple's current proposal appears to be an effort to cram complexity into a case that this Court

24  ordered the parties to streamline.  Apple previously *separately accused* Samsung products based on

25  carrier and/or Android version, using *separate infringement charts*, because it knew that these

26  products functioned differently.  Now, seeking to cram multiple different products into the trial in this

27  case, Apple is advancing a new collection of *consolidated* infringement charts that appear to have

28  simply *combined* disparate sources of proof that Apple previously acknowledged were separate and

distinct.  In these new combined charts, Apple offers conclusory assertions that the many different screenshots, source code files, and documents cited to describe different versions of Samsung's products are all somehow *one* body of proof that all allegedly amounts to the same thing.

This is in many ways an extension of Apple's effort to subvert the case narrowing order by defining a "product" as any group of devices, even devices with different relevant functionality, that are sold using the same trade name.   That approach, as well as Apple's call for an immediate identification of representative "products," long before Samsung's experts have the opportunity to evaluate Apple's evolving infringement evidence, is not productive.  It will not meaningfully streamline the case for trial, will not simplify the proof to be presented at trial (including causation evidence, damages evidence, and other issues), and will not reduce burdens on the Court, the parties or the jury.  What it will do is lead to is an unmanageable jury verdict form with multiple separate entries for each "product" – much like the prior case, where differences in carrier models required listing separate carrier-customized devices with different functionality, even though they were sold as part of the same product line.  *See, e.g.*, No. 11-cv-01846 Amended Verdict Form, Dkt. 1931 (separately listing the Galaxy S II (AT&T), the Galaxy S II (T-Mobile), and other versions of the Galaxy S II).

Samsung's position is simple:  product means product, not "group of sub-products" as Apple would propose.  A limitation of ten products for trial will only simplify the case if there are no "sub-products" that require separate treatment based on the different software loaded onto different devices, including different operating system versions and different carrier-customized software.

Samsung is open to reasonable stipulations on representative products.  But it is premature to approve stipulations on any particular set of products, or agree on a procedure for negotiating stipulations, while fact discovery is ongoing – and especially while Apple's infringement theories and infringement evidence continue to evolve.  At the close of expert discovery, once the evidence has been vetted, the parties should discuss representative products and the appropriate procedure for negotiating stipulations on that issue.  Apple knows this well.  Indeed, the procedure Apple originally proposed – and had previously agreed would be appropriate – was that the parties should discuss potential representative product stipulations at the close of discovery, after experts have evaluated the

1   relevant evidence.  (*See* Apr. 24, 2013 Hr'g Tr. at 17:4-6, 20:24-21:1, 24:21-25.)  Samsung agrees.

2   **C.     Apple's Characterization of the Accused Samsung "Products" Is At Odds With The**

3           **Technical Facts And With Apple's Own Past Treatment Of Those "Products"**

4         Under Apple's definition of "product," the jury would have to contend with multiple different

5   orders of proof of infringement, and multiple different infringement disputes, for various models of

6   Samsung's devices.[7]  For example, unlike Apple, Samsung ships devices with customized sets of

7   applications for each of T-Mobile, AT&T, and Verizon, and Apple accuses these different groups of

8   applications as the "modules" required by the '604 and '959 patents.  (*See* Dkt. 513 at 3-4; Galaxy

9   SIII Claim Chart for U.S. Patent No. 8,086,604, Dkt. 427-6 at 119.)  The different groups of

10  "modules" on each carrier's device are relevant to Apple's infringement claims.  As the Federal

11  Circuit emphasized, Apple must compare *each* accused "module" on a given device, to determine

12  that no two "modules" on that device use the same "heuristic."  (*Apple Inc. v. Samsung Elecs. Co.*,

13  695 F.3d 1370, 1379 (Fed. Cir. 2012).)  The different configuration of accused "modules" on each

14  carrier device requires different proof for each device, and will require the jury to provide a separate

15  analysis of infringement for each different configuration.  If a jury concludes, for example, that the

16  Slacker music application – one of the accused "modules" that is present on only some devices for

17  some carriers – uses the same "heuristic" as the Music Hub music application, the jury may conclude

18  that some carrier devices do not infringe, whereas other devices for other carriers might still be found

19  to infringe.  (*See* Dkt. 525, Apple's May 21 Motion for Leave to Amend Infringement Contentions

20  Exhibit E-647 -E12, "Galaxy S II Consolidated Infringement Claim Chart".)[8]  Thus, Apple's theory

21  requires Apple to prove up different sets of "heuristic module(s)" for each carrier.  The verdict form

22  will have to reflect the different configurations of each product.  Apple's suggested approach ignores

23  the risk of jury confusion and the complexity of the resulting jury verdict form.

24        As another example, with regard to the '647 patent, Apple accused "*ContentDetector*"

---

[7]   Apple is now attempting to add a 23rd product line, the Galaxy S 4 devices.

[8]   Samsung received these revised contentions recently, when Apple filed its motion for leave to amend, and is evaluating them.  The motion for leave to amend is currently pending before Judge Grewal.

software in the products running the "Jelly Bean" operating system, but accuses different software, "*CacheBuilder*," for other operating systems.  (*Compare* T-Mobile Samsung Galaxy SII Claim Chart for U.S. Patent No. 5,946,647, Dkt. 427-12 at 176, *with* Samsung Galaxy SIII Claim Chart for U.S. Patent No. 5,946,647, Dkt. 428-1 at 7).  A similar problem exists for the '721 patent.  Apple now combines the infringement contentions for certain devices to include both the Jelly Bean and Ice Cream Sandwich versions of Android into one chart, but the infringement proof and noninfringement disputes are entirely different for these Android versions; one uses a *moving* image file on the unlock screen, while the other uses a *static* image that changes the "alpha" value of certain elements as a finger moves across the screen.  The jury will see vastly different technical analysis on these two designs – yet Apple groups these visually-distinct and technically-distinct unlock designs into one chart, calling them one "product."  (*See* Dkt. 525, Apple's May 21 Motion for Leave to Amend Infringement Contentions at Appendix F-721-F6 pp. 5-6.)  Likewise, with regard to the '502 patent, significant differences exist between accused devices running different versions of the Android platform.  As one example, Apple alleges that accused functionality is provided by two particular framework classes – but neither of those two classes exist in accused devices running the Froyo and Gingerbread versions of Android.  Indeed, Apple acknowledges that these allegations are not applicable to Froyo and Gingerbread version of the Android platform; in its new consolidated charts against the Samsung Exhibit II 4G, Apple lists the path for these two source code files as "N/A," or not applicable.  (*See* Dkt. 525 Apple's May 21 Motion for Leave to Amend Infringement Contentions at Appendix C-502-C5, at 2.)  Thus, Apple's claim that the proof will be identical between all devices for the '502 patent is also incorrect.

These are simply examples.  Because the software in Samsung's models varies by carrier and by Android version, Samsung believes that additional discrepancies will emerge once Samsung and its experts have the opportunity to review and opine on Apple's new contentions, test those contentions in discovery, submit reports and rebuttals, and testify at depositions.

Apple's current request to simply ignore any differences between carrier models or Android versions is at odds with Apple's prior positions on those issues.  For instance, Apple previously presented its infringement theories for the Galaxy S II in four separate claim charts, separated by

carrier:  Galaxy S II (AT&T), Galaxy SII (T-Mobile), Galaxy S II Epic 4G Touch (Sprint), and Galaxy S II Skyrocket (AT&T).  (*See* Dkt. 269-10 at 3, Exhibit to Apple's October 8 Motion to Amend).  It was not until Apple heard the words "case narrowing" that Apple decided to amend those contentions and remove any reference to carrier differences, lumping together the disparate proofs regarding separate AT&T, T-Mobile, and Sprint models.  (*See* Dkt. 525, Apple's May 21 Motion for Leave to Amend Infringement Contentions.)  Indeed, Apple previously acknowledged that the differences between Android versions required leave to update its contentions with separate infringement charts, precisely because these products *were different than the products Apple had previously accused*.  On October 5, 2012, Apple requested leave to add the Galaxy Nexus running Android Jelly Bean to its infringement contentions, even though it had already accused the Galaxy Nexus running Android Ice Cream Sandwich.  (Dkt. 269, *see also* Dkt. 288.)  On November 23, 2012, Apple similarly requested leave to add the Galaxy SIII running Android Jelly Bean to its infringement contentions, even though it had already accused the Galaxy SIII running Ice Cream Sandwich.  (Dkt. 306.)  These amendments were necessary because, as Apple recognized, Jelly Bean is different from Ice Cream Sandwich or other versions of Android, and required separate proof for infringement.

Apple's decision to now label these different versions one "product" with no relevant differences between "sub-products" is a transparent ploy to avoid meaningful case narrowing.  The timing of this maneuver is telling:  Apple's new "consolidated" infringement charts came less than a month after the case narrowing order, despite almost a *year* during which Apple admitted that the relevant functionality for each of these devices was different and merited separate charts.[9]  Apple's

---

[9]  Specifically, as early as June 2012, Apple's infringement charts recognized the differences between carrier versions, separately charting the Galaxy SII for T-Mobile and AT&T , and in the coming months, Apple served multiple rounds of amended charts that likewise included separate allegations for particular carrier models and operating system versions (*see* Dkt. 269 Apple's October 2012 Motion for Leave & Amend Disclosure of Claims & Infringement Contentions; Dkt. 306 Apple's November 2012 Motion for Leave & Amend Disclosure of Claims & Infringe Contentions; Apple's December 28, 2012 Amended Infringement Contentions; Apple's January 28, 2013 Second Amended Infringement Contentions).  It was not until a few weeks after the Court's case narrowing order – on May 21, 2013 – that Apple suddenly decided that none of these product differences mattered, and that all software versions and carrier customizations should be ignored in favor of a single infringement chart for each alleged "product."

rhetoric in this filing is revealing: Apple intends to "obviate considerable (if not entirely) follow-on litigation" and "avoid follow-on litigation," and that goal clearly animates Apple's newfound insistence that differences between Samsung models no longer matter.

Apple fully understands the difference between the "Model Name" and "Model Number" of Samsung products.  During the parties' meet and confer discussions, Apple claimed not to understand how many different Samsung products with different accused functionality exist in this case, apparently asserting that Apple cannot determine the number of different products Apple is actually accusing.  (Apple likewise was unable to offer a number of accused laptop and desktop computers.)  Yet Apple knows full well that the product lines it has accused represent multiple different device models that have been sold at various times with multiple different software release versions.  For example, Samsung's response to Apple's Interrogatory No. 41 provides a chart of "Market Names" for the devices Apple has accused of infringement (e.g., Samsung Galaxy S3) along with a list of "Model Names" identifying the different devices sold under that common Market Name.[10]  For example, the Samsung Galaxy S3 line, identified as a "Market Name," contains five different Model Names – SCH-I535 (Verizon), SCH-I747 (AT&T), SPH-L710 (Sprint), SGH-T999 (T-Mobile), SCH-R530 (U.S. Cellular).  Each of these different device models runs separate software, and so for each model, Samsung identified a separate software version number (*e.g.*, LG1, LEN, I747UCALEM), a separate availability date (July 6, 2012 for some, June 9, 2012 for others, May 24, 2012 for still others), and separate Android operating system versions (Android 4.0 for some, Android 4.0.4, for others, Android 4.1 for others).  (Samsung's April 12, 2013 Supplemental Objections and Responses to Apple's Sixth Set of Interrogatories, Interrogatory No. 41 and Corrected Attachment A thereto.)  This chart demonstrates that Apple is accusing more than *81 different versions of software*, running on more than *36 hardware models*, by accusing "Market Names" that describe co-branded lines of separate device models.  Moreover, this chart – served April 5, well before the Court ordered a 10-product limit on April 24 – shows that Samsung's position on product

---

[10]  Samsung is prepared to show this April 5, 2013 chart to the Court to help identify the differences between Market Names and Model Names, and the various different versions of software that Apple seeks to combine into a single "product" for trial.

definitions is *not* a newfound position.  Samsung considers each of these devices as separate "Model Names," with separate software, in the ordinary course of business.  Samsung sells these separate models under a common "Market Name" for marketing purposes. This marketing decision does not convert a product line into a product.  Apple's reliance on branding and trade names to define a "product" ignores the technical reality:  Samsung sells different models for different carriers, loads them with different software, and releases operating system versions that impact the relevant functionality and relevant infringement proof.

Tellingly, Apple's standard for defining a "product" that Apple accuses – using the market name or trade name of a group of devices – is completely inconsistent with Apple's approach to its own products.  Even here, Apple simultaneously claims that proof of infringement, or differences in that proof, does not matter for defining one of Samsung's products.  Yet Apple asks this Court, and Samsung, to divide up Apple's computers in terms of how they allegedly differ for infringement: Apple states that its various computers must be different products, because some of them run Mac OS X 10.5 and later, and products that run earlier operating system versions supposedly do not infringe. Apple goes further, arguing that there are "even significant differences within a single generation" – but pointing solely to the different configuration of hardware (*e.g.*, processors).  Apple cannot have it both ways.  It cannot define Samsung products based *solely* on the product line's marketing designation, and define its own products based on model numbers and operating system versions within a larger product line.  For the same reasons that Apple says its computers sold under the same "trade name" are not one product, Samsung's different carrier-specific models sold under a single "Market Name" are not one product, and the various different versions of software that these different devices run will inevitably lead to disputes over infringement proof at trial.

**D.**    **Apple's Proposed Approach, And Its Proposed Product Groupings, Are A Blatant Effort To Subvert The Court's Directive To Narrow The Case To A Manageable Scope**

The Court's goal when ordering product narrowing was clear:  get the case to a manageable scope before trial, so that the jury does not face arguments that "will get confusing on infringement because there are variations across the product lines."  (*See* Apr. 24, 2013 Hr'g Tr. 40:4-6).  To avoid that possibility, the Court ordered the parties to narrow the dispute to just ten products – not ten

product lines – for trial.  As the Court explained, the complexity of this case, and the burdens it imposes, are directly tied to the number of asserted products: "the number of products does increase the burden on the Court and on the parties and on the jury."  (*See* Apr. 24, 2013 Hr'g Tr. (CMC) at 14:18-21.)

Apple's position is equally clear:  Apple will put forward as much evidence as it wants, accusing as many products as it wants.  Apple repeatedly stated that it would ***not*** limit the accused products for trial ***at all***, instead arguing to the Court that Apple is "entitled" to present its infringement case for ***all*** the products it originally identified.  (*See* Apr. 24, 2013 Hr'g Tr. (CMC) at 13:1-17:17.)  Now, having lost the Court's order, Apple is engaged in a blatant effort to evade it, by grouping many disparate infringement charts into a new set of "consolidated" charts that address many different models in one chart – including different models loaded with different software but given identical names for branding and distribution purposes.  (*See* Dkt. 52 5 at 4, Apple's May 21 Motion for Leave to Amend Infringement Contentions) ("Thus, the consolidated charts reduce the overall volume of contentions without altering their substance.')

Apple's effort to subvert the Court's goals for case narrowing is clear from Apple's definition of "product," as set out in prior briefing and argument (*See* Dkt. 514; Apr. 24, 2013 Hr'g Tr. (CMC) at 13:13-16, 14:6-17, 16:5-19.)  Apple believes that "product," for purposes of case narrowing, should be determined by the name under which various devices are marketed, regardless of whether different models have different relevant functionality or require different proof.  (*Supra* at __.) Samsung believes that case narrowing is only accomplished if the jury is, in fact, presented with a limited number of devices, and therefore a limited amount of proof.  Otherwise one "product" may constitute multiple models with distinct functionality, necessitating different proof for different models, and requiring the jury to navigate a complex verdict form with model-specific questions. (*See* 11-cv-01846, Dkt. 1931 (separately listing Galaxy S II (AT&T), Galaxy S II (T-Mobile), and other Galaxy S II models).

Tellingly, Apple cannot claim that it will offer only one set of proof per "product" if its position is adopted.  Apple claims that the different models it labels as one "product" constitute a grouping that "share[s] common features, and hence, common infringement theories and proof."

(Dkt. 514 at 3.)  Similarly, Apple made the ambiguous claim that "[t]he consolidated charts demonstrate that, as indicated from publicly available versions of the accused source code, the proof of infringement related to the accused functionalities overlaps substantially across operating systems and carriers."  (*See* Dkt. 525 at 4, Apple's May 21 Motion for Leave to Amend Infringement Contentions).  Yet Apple now admits that Samsung's products "in a few instances, infringe[] in one of a very limited number of ways" – *i.e.*, Samsung's products have different functionality that even Apple cannot call identical.  These purposely vague arguments that group together different models in one line and call them a "product" are efforts to gloss over the Court's concern that "product line will get confusing on infringement because there are variations across the product lines."  (*See* Apr. 24, 2013 Hr'g Tr. 40:4-6).  Apple's recent decision to combine separate charts into a single chart is simply an effort to blur the lines between multiple and distinct "ways" (*i.e.*, theories specific to certain models and software versions) that Apple accuses of infringement.

For purposes of negotiating a stipulation concerning representative products, and also for purposes of case narrowing, Apple's position – that distinct functionality and distinct proof is not relevant to the number of products – is a deeply unhelpful position.  Apple's approach negates any efficiency from limiting the case to a limited number of "products."  Samsung thus believes that the pending dispute over the meaning of "product" must be resolved before Apple will admit that different models with different functionality, requiring different proof of infringement, is the correct benchmark for a "product" in this case.  After that is decided, and once Samsung has the opportunity to examine the proofs Apple intends to put forward for infringement, the issue of representative proof and representative "products" can be fairly evaluated.

**E.     Apple's Approach Threatens To Confuse The Jury And Undo The Goals Of This Court's Case Narrowing Order**

The Court ordered the parties to limit the case to 10 discrete products, because jury confusion would arise if the jury was forced to track arguments about too many products.  (*See* Apr. 24, 2013 Hr'g Tr. (CMC) at 14:18-21 ("the number of products does increase the burden on the Court and on the parties and on the jury"); *id.* at 40:4-6, 67:22-68:3 ("It's product, not product line.  I think product line will get confusing on infringement because there are variations across the product lines.").)  Yet

Apple now appears intent on using "representative products" arguments to maintain the original scope of the case in its entirety.  For example, Apple now signals that it will endeavor to use representative products stipulations to seek relief on all 22 product lines in the case, to avoid any possibility of a follow-on action.

Samsung submits that this process would be unworkable.  Requesting relief in *this* trial for more than 10 products would require introducing evidence on more than the 10 products actually at issue, including additional sales data, information on market conditions impacting sales of each product, and ultimately, listing additional devices on the verdict form.  Asking the jury to apportion by device separately for each patent, including devices the jury never heard about during the trial, would cause jury confusion and defeat the purposes of narrowing.

Samsung is open to reasonable representative products stipulations, but those stipulations must result in a manageable grouping of products for the Court and the jury.  The case narrowing process is not served by shoehorning every previously-accused device into the trial by defining "product" in an unhelpful and broad way that leaves multiple "sub-products" for the jury's separate consideration, leaving a jury that heard argument on 10 devices to somehow apportion damages on 22 product lines.  The verdict form under such a system would be not only long and complex, but undoubtedly confusing.  The risk of confusion would only be exacerbated if one device were representative of other devices only for some asserted claims and not others.  A piecemeal set of "representative-for-some-patents-but-not-others" stipulations would require the jury to keep track of different sets of representative products for each patent during a fast-paced trial – again culminating in a convoluted verdict form and potential jury confusion.  In such a situation, the likelihood of error and potential for retrial must be weighed against the potential inconvenience of follow-on actions.

As the Court recognized in ordering case narrowing, the ultimate goal of case narrowing should be reducing this case to a reasonable scope and facilitating a meaningful and accurate deliberation by the jury.  Cramming every previously-accused device into this trial carries the risk of burden on the judicial system and confusion among jury members.  Apple's insistence on accusing all available devices in a single trial during the prior litigation did not serve the interests of accuracy or help the jury carry out its task with precision.  (Case No. 11-CV-01846, Dkt. 2271 (Order Re:

1  Damages) (setting aside portions of verdict based on various jury errors).)  In this case, unlike the last

2  case, the parties should endeavor to simplify the issues and the verdict form.  Apple's "narrowing"

3  proposal promises to complicate both.  Samsung submits that the parties should pare this case down

4  to a reasonable level; if this leaves both parties to pursue infringement claims in a follow-on action,

5  the parties may do so.  But this Court's case narrowing order and the need for a more jury-accessible

6  trial must be taken seriously.  The parties should not subvert that order by cramming voluminous

7  proof into this action under the banner of "representative" products.

8  **F.    Apple's Arguments Regarding A "Double Standard" Ring Hollow**

9           Apple's position also reveals Apple's desire for a double-standard on Apple's products.

10  Apple's claims that Samsung is being inconsistent because Samsung identifies Apple's products by

11  model without any further subdivision, including operating system version or carrier.  But Apple *does*

12  *not claim* that there are significant differences within the generations of its iPhone, iPad, or iPod

13  models.  Nor can it – there are none.  Moreover, with regard to Apple's Mac OS computer systems,

14  Apple tries to seek strategic advantage out of its own discovery stonewalling.  Samsung repeatedly

15  asked Apple to identify *what it means* by claiming there are different "versions" of Mac OS

16  computers, so the parties can ascertain the purported substantive differences between these allegedly

17  distinct products.  Thus far, Apple has refused to do so, aside from pointing to various online

18  references that do not explain *why* computers sold with the same name at various points in time

19  should be treated as separate "products."  If there are in fact differences between these products that

20  create materially different infringement proofs and disputes, Samsung will consider these differences

21  in its treatment of accused products and its negotiation of a representative product stipulation.  If

22  however, the differences between versions are not relevant (*e.g.* computers with identical software

23  functionality but different screen resolution, processor speed, or hard drive space), it would make no

24  sense to differentiate "products" based on those distinctions.  Until Apple actually identifies what it

25  considers a "version" of a computer, this discussion simply cannot take place.  And in any event, as

26  noted above, Apple applies a clear double-standard to Apple's products and to Samsung's products.

27           Apple's positions also ignore that Samsung's patents are more broadly applicable than

28  Apple's.  For instance, Samsung's asserted patents include two broadly-applicable standards-essential

1   patents (SEPs).  Apple's products that practice the cellular standards at issue necessarily practice the

2   two Samsung SEPs.  In contrast, Apple's patents target specific, small features that differ

3   substantively from product to product, which require far greater proof than demonstrating the

4   products declare themselves as standards-compliant.

5        Nor should Apple be shocked that Samsung's products differ from each other in ways that

6   Apple's products do not differ from each other.  The parties are two different companies with two

7   different business strategies.  Apple's business model is to create homogenous lines of products to

8   create a singular user experience.  Samsung's model, on the other hand, is to create different versions

9   of each product depending on carrier preferences, operating system updates, and customer needs.

10  Apple sells monolithic products designed to function identically across form factors; Samsung sells

11  different devices with different features so that consumers have choices.  These different business

12  models are not, by any means, a litigation-driven strategy.  Apple's efforts to portray these

13  marketplace realities as some nefarious litigation ploy simply distorts the facts.

14  **G.    Apple Misrepresents Samsung's Prior Positions**

15       Apple's claim that Samsung had not challenged Apple's list of products until the Court

16  ordered narrowing is a red herring and is false.  Apple's initial list of 26 products was just that –

17  Apple's list.  Apple was under no obligation to narrow the number of accused products to 26.

18  Samsung was under no obligation to explain to Apple that these "products" were actually groupings

19  of disparate models that would require different proof for infringement purposes.  It was not until the

20  court ordered a limit on the number of products, and an assessment of the issue of "products" versus

21  "product lines," that Samsung had reason to address these flaws in Apple's allegations.  Until that

22  point, Apple had made its own bed by listing different products together but not thinking through

23  issues of proof and manageability, including how Apple would prove each of these disparate models

24  to the jury with sufficient analysis during a brief trial – something Apple simply could not do.

25       Apple also complains, without basis, that Samsung did not point out this flaw in Apple's trial

26  strategy as part of Samsung's recent interrogatory responses.  Yet Samsung has explicitly pointed out

27  the differences between carrier versions and operating system versions in its interrogatory responses

28  to Apple – for example, in its '604 patent contentions, where Samsung identified different carrier-

specific models and different Android versions as having unique non-infringing designs. (Rog. No. 29 ("Some Samsung devices, including some versions of the Galaxy S III (e.g. model no. SCH-R530M [Metro PCS], build no. IMM76D.R530MVQALJ1 [Android Version 4.0.4 (Ice Cream Sandwich)]), some versions of the Galaxy S II (e.g. model no. SGH-T989 [T-Mobile], build no. IMM76D.UVLH1 [Android Version 4.0.4 (Ice Cream Sandwich)]), and some versions of the Exhibit II 4G (e.g. model no. SGH-T679 [T-Mobile], build no. GINGERBREAD.UVLG3 [Android Version 2.3.6 (Gingerbread)]), implement this design.")  Indeed, Samsung often broke out the non-infringement assertions set forth in its interrogatory responses by operating system and/or carrier. (*See, e.g.,* Samsung's May 2, 2013 Further Supplemental Responses to Apple's Set of 2nd and 3rd Interrogatories, Interrogatory No. 24 ['760 and '721], Samsung's September 24, 2012 Objections and Responses to Apple's 3rd Set of Interrogatories, Interrogatory No. 29 ['949 and '604]).

Apple repeatedly laments that Samsung's noninfringement interrogatory responses do not include descriptions of Apple's newest infringement theories, including why Apple's characterization of various versions as identical.  There is a good reason:  Samsung *just received these charts*.  Just over two weeks ago, Apple served revised charts on Samsung that cited substantial amounts of new evidence, including source code, for the first time – and simultaneously claimed that all of this evidence showed there were no relevant differences between versions of Samsung's software or its carrier-specific devices.  (*See* Dkt. 525, Apple's May 22 Motion for Leave to Amend Infringement Contentions.)  These new charts included *104 new appendices* purporting to identify and group Samsung source code.  Samsung is only now making its way through Apple's mountain of new evidence, but already, it is apparent that Apple is improperly grouping code from different operating systems based solely on filename, even if the code in those files is completely different.  Samsung obviously did *not* have these new contentions when Samsung was drafting its prior interrogatory responses (submitted 20 days before Apple's latest infringement charts), and Apple cannot seriously complain that Samsung's interrogatory responses did not predict Apple's brand-new evidence and

arguments.[11]

**H.    Apple's Proposed Approach Is Potentially Unmanageable**

Apple's proposal encourages a rush to the courthouse with any and every dispute over representative functionality, portending a mini-trial in advance of the hearing.  Samsung has no objection to reasonable summary judgment briefing, but Samsung does have concerns – grounded largely in Apple's recent effort to shoehorn many different models into new "consolidated" charts and call the result one "product" – that the process Apple describes will be unmanageable.  For now, Samsung submits that the parties and the Court will be in a better position to determine appropriate procedures once expert discovery concludes.  Only after the facts have been developed can the parties, or the Court, adequately assess whether or not there will be materially disparate proofs of infringement for various products.  At that point the Court can weigh whether any given process for presenting Apple's products and Samsung's products to the jury will pose undue risks of jury confusion.  Waiting until the end of discovery will allow the parties to fully vet any remaining disputes over differences between products and build a full record regarding the relevant issues.[12]

---

[11]   For instance, regarding the '502 patent, Apple complains that Samsung's non-infringement interrogatory response, served May 2, 2013, did not highlight differences between source code in different Android versions.  But at the time Samsung served that response, Apple's infringement contentions did not identify this source code, leaving Samsung without any basis to know that Apple would ultimately rely on the specific code classes Samsung references above.  It was not until May 21, 2013, when Apple served its motion to amend its infringement contentions, that Samsung learned that Apple would be relying on source code that was not supported by Froyo or Gingerbread to prove its '502 infringement case.

[12]   Tellingly, the only case that Apple cites in support of its proposal for early resolution of representative products issues *denied* a request to identify products as representative at an early stage, telling the parties to instead wait until after expert discovery to consider questions of infringement for groups of products accused of infringing standards-essential patents.  *See Fujitsu Ltd. v. NETGEAR*, Inc., No. 07-710, 2008 WL 4186181, at *1 (W.D. Wis. Sept. 10, 2008).

Dated: June 7, 2013

By: *s/ H. Mark Lyon*                                     By: */s/ Patrick Curran*

Attorney for Plaintiff and Counterclaim-Defendant          Attorney for Defendants and Counterclaim-
APPLE INC.                                                 SAMSUNG ELECTRONICS CO., LTD.,
                                                          SAMSUNG ELECTRONICS AMERICA,
                                                          INC., AND SAMSUNG
                                                          TELECOMMUNICATIONS AMERICA, LLC

JOSH A. KREVITT (CA SBN 208552)                           Charles K. Verhoeven (Bar No. 170151)
jkrevitt@gibsondunn.com                                   charlesverhoeven@quinnemanuel.com
H. MARK LYON (CA SBN 162061)                              Kevin A. Smith (Bar No. 250814)
mlyon@gibsondunn.com                                      kevinsmith@quinnemanuel.com
GIBSON, DUNN & CRUTCHER LLP                               QUINN EMANUEL URQUHART &
1881 Page Mill Road                                       SULLIVAN LLP
Palo Alto, CA  94304-1211                                 50 California Street, 22nd Floor
Telephone: (650) 849-5300                                 San Francisco, California 94111
Facsimile: (650) 849-5333                                 Telephone: (415) 875-6600
                                                          Facsimile: (415) 875-6700

MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com                                          Kevin P.B. Johnson (Bar No. 177129 (CA);
RICHARD S.J. HUNG (CA SBN 197425)                         2542082 (NY))
rhung@mofo.com                                            kevinjohnson@quinnemanuel.com
MORRISON & FOERSTER LLP                                   Victoria F. Maroulis (Bar No. 202603)
425 Market Street                                         victoriamaroulis@quinnemanuel.com
San Francisco, California 94105-2482                      QUINN EMANUEL URQUHART &
Telephone: (415) 268-7000                                 SULLIVAN LLP
Facsimile: (415) 268-7522                                 555 Twin Dolphin Drive, 5th Floor
                                                          Redwood Shores, California 94065
WILLIAM F. LEE (*pro hac vice*)                           Telephone: (650) 801-5000
William.lee@wilmerhale.com                                Facsimile: (650) 801-5100
WILMER CUTLER PICKERING
  HALE AND DORR LLP                                       William C. Price (Bar No. 108542)
60 State Street                                           williamprice@quinnemanuel.com
Boston, Massachusetts 02109                               QUINN EMANUEL URQUHART &
Telephone: (617) 526-6000                                 SULLIVAN LLP
Facsimile: (617) 526-5000                                 865 South Figueroa Street, 10th Floor
                                                          Los Angeles, California 90017-2543
MARK D. SELWYN (CA SBN 244180)                            Telephone: (213) 443-3000
mark.selwyn@wilmerhale.com                                Facsimile: (213) 443-3100
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

**ATTESTATION OF E-FILED SIGNATURES**

I, H. Mark Lyon, am the ECF user whose ID and password are being used to file this Joint Status Report Concerning Representative Products.  In compliance with General Order 45.X.B, I hereby attest that Patrick Curran has concurred in this filing.

Dated: June 7, 2013                                    _____/s/ H. Mark Lyon_____

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document was filed electronically in compliance with Civil Local Rule 5.1, and will be served upon all counsel of record for the parties who have consented to electronic service in accordance with Civil Local Rule 5.1 via the Court's ECF system.

Dated: June 7, 2013                                    _____/s/ H. Mark Lyon _____