Ex. A

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
Kevin A. Smith (Bar No. 250814)
kevinsmith@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129 (CA);
2542082 (NY))
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

William C. Price (Bar No. 108542)
williamprice@quinnemanuel.com
Patrick M. Shields (Bar No. 204739)
patrickshields@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS CO.,
LTD., SAMSUNG ELECTRONICS AMERICA,
INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

STEPTOE & JOHNSON, LLP
John Caracappa (*pro hac vice*)
jcaracappa@steptoe.com
1330 Connecticut Avenue, NW
Washington, D.C. 20036
Telephone: (202) 429-6267
Facsimile: (202) 429-3902

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>              Plaintiff,<br><br>        vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>              Defendants. | CASE NO. 12-CV-00630-LHK<br><br>**SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES** |

# I.      THE '502 PATENT

## A.      Local Patent Rule 3-3(a):  Identification of Prior Art[1]

At this time, Samsung contends that at least the following prior art references anticipate or render obvious, either alone or in combination, the asserted claims of the '502 Patent:

### 1.      Patent References[2]

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 4,330,845 | May 18, 1982 | Dec. 31, 1979 |
| US | 4,559,598 | Dec. 17, 1985 | Feb. 22, 1983 |
| US | 4,737,980 | Apr. 12, 1988 | July 19, 1985 |
| US | 4,862,498 | Aug. 29, 1989 | Nov. 28, 1986 |
| US | 4,896,291 | Jan. 23, 1990 | May 20, 1988 |
| US | 5,007,019 | Apr. 9, 1991 | Jan. 5, 1989 |
| US | 5,041,967 | Aug. 20, 1991 | Oct. 13, 1987 |
| US | 5,103,498 | Apr. 7, 1992 | Aug. 2, 1990 |
| US | 5,265,014 | Nov. 23, 1993 | Apr. 10, 1990 |
| US | 5,317,646 | May 31, 1994 | Mar. 24, 1992 |
| US | 5,357,431 | Oct. 18, 1994 | Jan. 25, 1993 |
| US | 5,386,298 | Jan. 31, 1995 | Apr. 26, 1993 |
| US | 5,396,419 | Mar. 7, 1995 | Sep. 8, 1992 |
| US | 5,455,901 | Oct. 3, 1995 | Sep. 12, 1994 |
| US | 5,459,488 | Oct. 17, 1995 | Jan. 19, 1993 |
| US | 5,479,536 | Dec. 26, 1995 | Nov. 27, 1991 |
| US | 5,495,565 | Feb. 27, 1996 | June 21, 1994 |
| US | 5,513,308 | Apr. 30, 1996 | Sep. 1, 1993 |
| US | 5,537,618 | July 16, 1996 | Dec. 23, 1993 |
| US | 5,555,496 | Sep. 10, 1996 | May 6, 1994 |
| US | 5,557,515 | Sep. 17, 1996 | Aug. 11, 1989 |
| US | 5,574,482 | Nov. 12, 1996 | May 17, 1994 |
| US | 5,608,898 | Mar. 4, 1997 | Nov. 12, 1992 |
| US | 5,619,708 | Apr. 8, 1997 | Oct. 25, 1994 |
| US | 5,623,681 | Apr. 22, 1997 | Nov. 19, 1993 |
| US | 5,632,022 | May 20, 1997 | Nov. 13, 1991 |
| US | 5,644,735 | July 1, 1997 | May 27, 1992 |
| US | 5,675,362 | Oct. 7, 1997 | Nov. 14, 1988 |
| US | 5,682,510 | Oct. 28, 1997 | Mar. 30, 1995 |
| US | 5,682,538 | Oct. 28, 1997 | Aug. 12, 1994 |
| US | 5,704,029 | Dec. 30, 1997 | May 23, 1994 |
| US | 5,724,449 | Mar. 3, 1998 | Nov. 27, 1991 |
| US | 5,748,512 | May 5, 1998 | Feb. 28, 1995 |

---

[1]   To the extent one or more prior art patents, publications, or systems are identified in the claim charts attached as Exhibits A-H to this document, but are not included in the tables and lists below for each patent, those prior art patents, publications, or systems should also be considered as prior art to the asserted patents.

[2]   Samsung incorporates by reference all prior art references cited in the patents listed herein and/or their file histories.

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 5,752,054 | May 12, 1998 | June 6, 1995 |
| US | 5,799,107 | Aug. 25, 1998 | Oct. 15, 1997 |
| US | 5,805,676 | Sep. 8, 1998 | May 19, 1995 |
| US | 5,818,437 | Oct. 6, 1998 | July 26, 1995 |
| US | 5,835,635 | Nov. 10, 1998 | June 27, 1995 |
| US | 6,008,799 | Dec. 28, 1999 | May 24, 1994 |
| US | 6,018,342 | Jan. 25, 2000 | July 3, 1995 |
| US | 7,136,710 | Nov. 14, 2006 | Dec. 23, 1991 |

2.      **Publications**[3]

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| A Modular and Flexible Architecture for an Integrated Corpus Query System | July 1994 | Oliver Christ | Cornell University |
| A Pen-Based Database Interface for Mobile Computers | 1994 | Rafael Alonso and V.S. Mani | Institute of Electrical and Electronics Engineers |
| Adaptive and Predictive Techniques in a Communication Prosthesis | 1987 | Andrew L. Swiffin, John L. Arnott, J. Adrian Pickering, and Alan F. Newell | Informa Healthcare |
| Adaptive predictive text generation and the reactive keyboard | 1989 | John Darragh, John Joseph | University of Calgary |
| A Stylus-Based User Interface for Text: Entry and Editing | June 1991 | Aaron Goodisman | Massachusetts Institute of Technology |
| Adaptive predictive text generation and the reactive keyboard | 1991 | John J. Darragh and Ian H. Witten | Elsevier |
| Context and Orientation in Hypermedia Networks | 1989 | Kenneth Utting and Nicole Yankelovich | Association for Computing Machinery |
| Designing the User Interface | 1992 | Ben Schneiderman | Addison-Wesley |
| Enhancing the Usability of an Office Information System Through Direct Manipulation | Dec. 1983 | Alison Lee and F.H. Lochovsky | Association for Computing Machinery |
| Facilitating the Development of Representations in Hypertext with IDE | Nov. 1989 | Daniel S. Jordan, Daniel M. Russell, Anne-Marie S. | Association for Computing Machinery |

---

[3]   Samsung incorporates by reference all prior art references identified in the publications listed herein.

| Title | Date of Publication | Author | Publisher |
|-------|---------------------|--------|-----------|
| | | Jensen, and Russell A. Rogers | |
| IBM Simon User's Manual | 1994 | | IBM |
| Investigations into History Tools for User Support | Apr. 1992 | Alison Lee | University of Toronto |
| Marquise: Creating Complete User Interfaces by Demonstration | Apr. 1993 | Brad A. Myers, Richard G. McDaniel, and David S. Kosbie | Association for Computing Machinery |
| Microsoft Foundation Class Primer | 1993 | Jim Conger | Waite Group Press |
| Pen Computing: A Technology Overview and a Vision | July 1995 | Andre Meyer | Association for Computing Machinery |
| Predictive interfaces: What will they think of next? | Nov. 1991 | Saul Greenberg, John Darragh, David Maulsby, and Ian H. Witten | University of Calgary |
| Predictive interfaces: What will they think of next? | 1995 | Saul Greenberg, John Darragh, David Maulsby, and Ian H. Witten | Association for Computing Machinery |
| Reducing Keystroke Counts with a Predictive Computer Interface | 1982 | Ian H. Witten, John G. Cleary, John J. Darragh, and David R. Hill | Institute of Electrical and Electronics Engineers |
| Software Interface for the Touch-Sensitive Menu of the Technician's Assister System | Dec. 20, 1990 | Joseph A. Molnar and Sonia Faletti | Defense Technical Information Center |
| Split Menus: Effectively Using Selection Frequency to Organize Menus | Mar. 1994 | Andrew Sears and Ben Schneiderman | Association for Computing Machinery |
| Supporting command reuse: empirical foundations and principles | Feb. 1993 | Saul Greenberg and Ian H. Witten | Academic Press |
| Supporting Command Reuse: Mechanisms for Reuse | Feb. 1993 | Saul Greenberg and Ian H. Witten | Academic Press |
| The Computer User as Toolsmith: The Use, Reuse, and Organization of Computer-based Tools | 1993 | Saul Greenberg | Cambridge University Press |
| The Design of a Graphical Browsing Interface for a Hypertext System | Feb. 25, 1994 | Joslyn A.A. Smith | University of New Brunswick |
| The Human Factors of Graphic Interaction: Tasks | Dec. 1980 | James D. Foley and Peggy Chan | Defense Technical |

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| and Techniques | | | Information Center |
| The Information Grid: A Framework for Information Retrieval and Retrieval-Centered Applications | Nov. 1992 | Ramana Rao, Stuart K. Card, Herbert D. Jellinek, Jock D. Mackinlay, and George G. Robertson | Association for Computing Machinery |
| The XKWIC User Manual | Aug. 2, 1995 | Oliver Christ | Institut für maschinelle Sprachverarbeitung, Universität Stuttgart |
| Tools for Supporting the Collaborative Process | Nov. 1992 | James R. Rhyne and Catherine G. Wolf | Association for Computing Machinery |
| Touch-sensitive screens: the technologies and their application | 1986 | J.A. Pickering | Elsevier |
| User modeling in interactive computer systems | 1984 | Saul Greenberg and Ian H. Witten | University of Calgary |
| Using a touchscreen for simple tasks | 1990 | John D. Gould, Sharon L. Greene, Stephen J. Boies, Antonia Meluson and Manvan Rasamny | IBM T.J. Watson Research Center |
| Using Graphic History in Browsing the World Wide Web | May 1995 | Eric Z. Ayers and John T. Stasko | Georgia Institute of Technology |

3.      **Systems**

All versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '502 Patent, including documents and source code describing the same:

- Windows 95 Preview Program Builds

Samsung reserves the right to amend these invalidity contentions to assert these references depending on the claim construction and infringement positions Apple may take as the case proceeds.  Moreover, Samsung reserves the right to use these references in combination with other

references to render the claims of the '502 Patent obvious in the event Apple takes the position that certain claim limitations are missing from the references charted in Exhibit A.

### B. Local Patent Rule 3-3(b): Whether Each Item Anticipates or Renders Obvious the Asserted Claims

Plaintiff asserts claims 1-2, 4-5, 8, 11, 13-17, 20, 22-24 and 26 of the '502 Patent against Samsung in this lawsuit. All of those claims are invalid because the '502 Patent fails to meet one or more of the requirements for patentability. The individual bases for invalidity are provided below and in the claim charts attached as Exhibit A. Each of the foregoing listed prior art documents, the underlying work, and/or the underlying apparatus or method qualifies as prior art under one or more sections of 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

Although Samsung has identified at least one citation per limitation for each reference, each and every disclosure of the same limitation in the same reference is not necessarily identified. Rather, in an effort to focus the issues, Samsung has generally cited representative portions of identified references, even where a reference may contain additional support for a particular claim element. In addition, persons of ordinary skill in the art generally read a prior art reference as a whole and in the context of other publications and literature. Thus, to understand and interpret any specific statement or disclosure within a prior art reference, such persons would rely on other information within the reference, along with other publications and their general scientific knowledge. Samsung may rely upon uncited portions of the prior art references and on other publications and expert testimony to provide context, and as aids to understanding and interpreting the portions that are cited. Samsung may also rely on uncited portions of the prior art references, other disclosed publications, and the testimony of experts to establish that a person of ordinary skill in the art would have been motivated to modify or combine certain of the cited references so as to render the claims obvious.

#### 1. Anticipation

Some or all of the asserted claims of the '502 Patent are invalid as anticipated under 35 U.S.C. § 102 in view of each of the prior art references identified above and in the claim charts included in Exhibit A, which identify specific examples of where each limitation of the asserted

1    Each of those claim limitations is governed by 35 U.S.C. section 112, paragraph 6.  The

2    '414 patent specification, however, fails to set forth the structure, material or acts for

3    accomplishing the recited function.  Each of these claims is therefore invalid as indefinite under 35

4    U.S.C. § 112(2).

5    **V.    THE '760 PATENT**

6    **A.    Local Patent Rule 3-3(a):  Identification of Prior Art**

7    At this time, Samsung contends that at least the following prior art references anticipate or

8    render obvious, either alone or in combination, the asserted claims of the '760 Patent:

9    1.    **Patent References**[10]

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 6,430,405 | Aug. 6, 2002 | Dec. 7, 1998 |
| US | 6,448,988 | Sep. 10, 2002 | Jan. 29, 1997 |
| US | 6,526,274 | Feb. 25, 2003 | Oct. 25, 1999 |
| US | 6,542,591 | Apr. 1, 2003 | July 27, 2000 |
| US | 6,549,612 | Apr. 15, 2003 | May 6, 1998 |
| US | 6,738,461 | May 18, 2004 | Nov. 1, 2001 |
| US | 6,772,188 | Aug. 3, 2004 | July 14, 2000 |
| US | 6,792,082 | Sep. 14, 2004 | Sep. 11, 1998 |
| US | 6,879,691 | Apr. 12, 2005 | May 12, 2000 |
| US | 6,961,420 | Nov. 1, 2005 | Nov. 13, 2001 |
| US | 7,007,239 | Feb. 28, 2006 | Sep. 21, 2000 |
| US | 7,117,445 | Oct. 3, 2006 | June 30, 2003 |
| US | 7,212,808 | May 1, 2007 | Oct. 15, 2002 |
| US | 7,221,748 | May 22, 2007 | Nov. 12, 2002 |
| US | 7,225,409 | May 29, 2007 | Aug. 25, 1999 |
| US | 7,231,229 | June 12, 2007 | Mar. 16, 2003 |
| US | 7,280,652 | Oct. 9, 2007 | Sep. 13, 2004 |
| US | 7,280,850 | Oct. 9, 2007 | Sep. 27, 2001 |
| US | 7,289,614 | Oct. 30, 2007 | Sep. 29, 2000 |
| US | 7,403,767 | July 22, 2008 | Apr. 29, 2005 |
| US | 7,409,050 | Aug. 5, 2008 | Apr. 21, 2005 |
| US | 7,493,567 | Feb. 17, 2009 | Jan. 28, 2004 |
| US | 7,502,633 | Mar. 10, 2009 | Oct. 15, 2002 |
| US | 7,526,306 | Apr. 28, 2009 | Dec. 8, 2003 |
| US | 7,606,598 | Oct. 20, 2009 | Mar. 31, 2006 |
| US | 7,680,513 | Mar. 16, 2010 | Aug. 8, 2005 |
| US | 7,623,643 | Nov. 24, 2009 | July 26, 2005 |
| US | 7,680,513 | Mar. 16, 2010 | Aug. 8, 2005 |
| US | 7,685,530 | Mar. 23, 2010 | June 10, 2005 |
| US | 7,715,535 | May 11, 2010 | Sep. 27, 2005 |

---

[10]   Samsung incorporates by reference all prior art references cited in the patents listed herein and/or their file histories.

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 7,724,887 | May 25, 2010 | July 21, 2005 |
| US | 7,778,399 | Aug. 17, 2010 | July 2, 2004 |
| US | 7,778,671 | Aug. 17, 2010 | Oct. 8, 2004 |
| US | 7,779,630 | Sep. 14, 2010 | June 24, 2004 |
| US | 7,783,283 | Aug. 24, 2010 | Sep. 8, 2004 |
| US | 7,839,987 | Nov. 23, 2010 | Nov. 1, 2001 |
| US | 7,894,597 | Feb. 22, 2011 | Oct. 12, 2005 |
| US | 7,920,886 | Apr. 5, 2011 | Jan. 24, 2006 |
| US | 7,991,432 | Aug. 2, 2011 | Apr. 2, 2004 |
| US | 8,001,120 | Aug. 16, 2011 | Feb. 12, 2004 |
| US | 8,019,388 | Sep. 13, 2011 | Feb. 6, 2003 |
| US | 8,064,886 | Nov. 22, 2011 | Feb. 14, 2006 |
| US | 8,095,879 | Jan. 10, 2012 | Dec. 10, 2002 |
| US | 8,175,656 | May 8, 2012 | Feb. 24, 2006 |
| US | 2002/0076015 | June 20, 2002 | Dec. 15, 2000 |
| US | 2002/0111991 | Aug. 15, 2002 | Nov. 1, 1999 |
| US | 2002/0116464 | Aug. 22, 2002 | Feb. 20, 2001 |
| US | 2004/0137955 | July 15, 2004 | Oct. 15, 2002 |
| US | 2004/0235520 | Nov. 25, 2004 | May 20, 2003 |
| US | 2005/0047562 | Mar. 3, 2005 | Aug. 28, 2003 |
| US | 2005/0250483 | Nov. 10, 2005 | May 7, 2004 |
| US | 2004/0267887 | Dec. 30, 2004 | June 30, 2003 |
| US | 2003/0032527 | Feb. 10, 2005 | Aug. 8, 2003 |
| US | 2005/0074109 | Apr. 7, 2005 | Sep. 24, 2004 |
| US | 2005/0141686 | June 30, 2005 | June 7, 2004 |
| US | 2006/0010395 | Jan. 12, 2006 | July 9, 2004 |
| US | 2006/0140189 | June 29, 2006 | Dec. 23, 2004 |
| US | 2006/0281449 | Dec. 14, 2006 | June 14, 2005 |
| US | 2007/0071186 | Mar. 29, 2007 | Sep. 21, 2005 |
| US | 2007/0083600 | Apr. 12,2007 | Oct. 6, 2005 |
| US | 2007/0092072 | Apr. 26, 2007 | Sep. 30, 2005 |
| US | 2007/0133771 | June 14, 2007 | Dec. 12, 2005 |
| US | 2007/0243858 | Oct. 18, 2007 | Apr. 18, 2006 |
| US | 2007/0280457 | Dec. 6, 2007 | June 2, 2006 |
| US | 2008/0295017 | Nov. 27, 2008 | Sep. 5, 2006 |
| EP | 1 069 791 | Jan. 17, 2001 | July 13, 1999 |
| EP | 1 365 564 | Nov. 26, 2003 | Apr. 30, 2003 |

2.      Publications[11]

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Exploring PC-Telephone Convergence with the Enhanced Telephony Prototype | Apr. 2004 | JJ Cadiz, Attila Narin, Gavin Jancke, Anoop Gupta, and Michael Boyle | Association for Computing Machinery |
| Finger Instead of Mouse: | 2003 | Andreas | Springer-Verlag |

[11]   Samsung incorporates by reference all prior art references identified in the publications listed herein.

| Title | Date of Publication | Author | Publisher |
|-------|---------------------|--------|-----------|
| Touch Screens as a Means of Enhancing Universal Success | | Holzinger | |
| Ming User Manual | 2006 | | Motorola |
| Model 8690 Inter-Tel Protocol Mode User Guide | Mar. 2006 | | Inter-Tel |
| Motorola A1000 User Guide | 2002 | | Motorola |
| Nokia 9000i User's Manual | 1997 | | Nokia |
| Nokia 9110 User's Manual | 1998 | | |
| P900/P908 White Paper | Dec. 2003 | | Motorola |
| pdQ$^{TM}$ Applications Handbook | 1999 | | Sony Ericsson |
| TAKEphONE User Manual | June 15, 2006 | | Iambic |
| TealPhone User's Manual | Jan. 24, 2006 | | TealPoint Software |
| The Kyocera 7135 Smartphone: Reference Guide | 2002 | | Kyocera |
| User's Guide Agendus for Symbian OS UIQ Edition | Apr. 1, 2004 | | Iambic |
| Using Your Palm® Treo$^{TM}$ 700w Smartphone | 2006 | | Palm |
| using your Treo$^{TM}$ 650 smartphone | 2004 | | Palm |
| XPlore M98 User Manual | July 14, 2005 | | Group Sense PDA |

3.      **Systems**

All versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '760 Patent, including documents and source code describing the same:

- Agenda Fusion

- Agendus Professional

- Motorola A1200

- TealPhone

- Windows Mobile 5

Samsung reserves the right to amend these invalidity contentions to assert these references depending on the claim construction and infringement positions Apple may take as the case proceeds.  Moreover, Samsung reserves the right to use these references in combination with other

references to render the claims of the '760 Patent obvious in the event Apple takes the position that certain claim limitations are missing from the references charted in Exhibit E.

**B.      Local Patent Rule 3-3(b):  Whether Each Item Anticipates or Renders Obvious the Asserted Claims**

Plaintiff asserts claims 1-5 and 7-22 of the '760 Patent against Samsung in this lawsuit.  All of those claims are invalid because the '760 Patent fails to meet one or more of the requirements for patentability.  The individual bases for invalidity are provided below and in the claim charts attached as Exhibit E.  Each of the foregoing listed prior art documents, the underlying work, and/or the underlying apparatus or method qualifies as prior art under one or more sections of 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

Although Samsung has identified at least one citation per limitation for each reference, each and every disclosure of the same limitation in the same reference is not necessarily identified.  Rather, in an effort to focus the issues, Samsung has generally cited representative portions of identified references, even where a reference may contain additional support for a particular claim element.  In addition, persons of ordinary skill in the art generally read a prior art reference as a whole and in the context of other publications and literature.  Thus, to understand and interpret any specific statement or disclosure within a prior art reference, such persons would rely on other information within the reference, along with other publications and their general scientific knowledge.  Samsung may rely upon uncited portions of the prior art references and on other publications and expert testimony to provide context, and as aids to understanding and interpreting the portions that are cited.  Samsung may also rely on uncited portions of the prior art references, other disclosed publications, and the testimony of experts to establish that a person of ordinary skill in the art would have been motivated to modify or combine certain of the cited references so as to render the claims obvious.

1.      **Anticipation**

Some or all of the asserted claims of the '760 Patent are invalid as anticipated under 35 U.S.C. § 102 in view of each of the prior art references identified above and in the claim charts included in Exhibit E, which identify specific examples of where each limitation of the asserted

1   DATED:  August 10, 2012                QUINN EMANUEL URQUHART & SULLIVAN LLP

2

3                                          By  /s/  Patrick M. Shields

4                                             Patrick M. Shields
                                              Attorneys for Defendants
5                                             SAMSUNG ELECTRONICS CO., LTD.,
                                              SAMSUNG ELECTRONICS AMERICA, INC. and
6                                             SAMSUNG TELECOMMUNICATIONS
                                              AMERICA, LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Ex. B

**DECLARATION OF BRIAN M. BUROKER IN SUPPORT OF APPLE INC.'S
OPPOSITION TO SAMSUNG'S MOTION TO PRECLUDE APPLE FROM ASSERTING
UNTIMELY DATES OF CONCEPTION
CONTAINS CONFIDENTIAL INFORMATION - FILED UNDER SEAL**

Ex. C

Attorneys' Eyes Only

Page 1

1           UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3                SAN JOSE DIVISION

4   APPLE INC., a California
    Corporation,

5                                    No. 12-CV-00630-LHK

              Plaintiff,

6   vs.

7   SAMSUNG ELECTRONICS CO., LTD,
    a Korean business entity; SAMSUNG

8   ELECTRONICS AMERICA, INC., a
    New York corporation; SAMSUNG

9   TELECOMMUNICATIONS AMERICA, LLC,
    a Delaware limited liability company,

10

              Defendants.

11

    _____/

12

13

14

15          ** ATTORNEYS' EYES ONLY **

16          DEPOSITION OF STEPHEN CAPPS

17             Palo Alto, California

18           Friday, December 7, 2012

19

20

21

22

23   Reported By:

24   LINDA VACCAREZZA, RPR, CLR, CRP, CSR. NO. 10201

25   JOB NO. 55402

Attorneys' Eyes Only

Page 2

1

2

3

4                        December 7, 2012

5                        9:35 a.m.

6

7

8        Deposition of STEPHEN CAPPS, held

9    at Gibson Dunn & Crutcher, 1881 Page

10   Mill Road, Palo Alto, California,

11   pursuant to Subpoena before Linda

12   Vaccarezza, a Certified Shorthand

13   Reporter of the State of California.

14

15

16

17

18

19

20

21

22

23

24

25

Attorneys' Eyes Only

1    A P P E A R A N C E S:

2    QUINN EMANUEL URQUHART & SULLIVAN

3    Attorneys for Defendants

4         51 Madison Avenue

5         New York, New York 10010

6    BY:  PATRICK CURRAN, ESQ.

7         JOHN MCKEE, ESQ.

8

9

10

11   GIBSON DUNN & CRUTCHER

12   Attorneys for Plaintiff

13        2100 McKinney Avenue

14        Dallas, Texas 95201

15   BY:  ROBERT VINCENT, ESQ.

16        JASON LO, ESQ.

17

18

19

20

21

22

23

24

25

Attorneys' Eyes Only

1           greater than sign, whatever it is, and

2           the user enters something, and the

3           computer does what the user entered.

4           Q.    And you've used a number of

5     command line interfaces in your career; is that

6     fair?

7           A.    As few as possible.

8           Q.    What are some of the command line

9     interfaces you've used?

10          A.    Sigma 7 Xerox mainframe.  I forgot

11    the name of the OS that it was running.  DOS, of

12    course.  Couldn't exist without running DOS at

13    least once in your life.  UNIX Windows, but

14    that's really just DOS, and modern servers, you

15    know, web servers.  Your UNIX flavors are all

16    command line, just to get it going.

17          Q.    I understand you developed a

18    number of different graphical user interfaces.

19    But would you say that you're also familiar with

20    how command line interfaces work?

21          MR. LO:  Objection.  Vague.

22          THE WITNESS:  As I said, I try to

23          avoid command line interfaces.  So more

24          often than not, I get help with, say, a

25          UNIX command line, just because I don't

Attorneys' Eyes Only

Page 14

1          particularly care to learn them.

2          Q.    You worked at Xerox before and

3    after you graduated from RIT; is that right?

4          A.    Kind of during, but yeah.

5    Actually, once I started at Xerox, I never left

6    until I left left.

7          Q.    And what did you do at Xerox?

8          A.    Originally, I was automating the

9    library, which was the aforementioned Sigma 7,

10   was a mainframe system.  But shortly, maybe

11   within a year or two, I discovered an Alto

12   sitting in a closet, and I said, that looks like

13   fun.  So on the side, I started programming the

14   Alto.

15          And my last position was, we were

16   a research group working on graphical laser

17   printer type things.  It was mostly laser

18   printers; how to drive them, how to make them

19   create images.

20          Q.    And I think your resume says you

21   also did some user interface research at Xerox.

22   What was the user interface research that you did

23   at Xerox?

24          A.    There's a concept called -- well,

25   there's a concept in computer science called a

Attorneys' Eyes Only

Page 15

1   compiler compiler, which is a compiler that lets

2   you build compilers.   And I wanted to do what was

3   called -- what I called an illustrator

4   illustrator, which would be a graphical program

5   that lets you draw.

6                  Say you wanted to do a program to

7   create flow charts.  So you would go to the

8   illustrator illustrator to draw the templates,

9   essentially what a flow chart was, to create the

10  flow charting program.  And I was well over my

11  head in terms of, you know, my goals were much

12  higher than my abilities at that point.

13           Q.    Anything else you worked on at

14  Xerox before you left Xerox in 1991?

15           A.    Just a few games.  That's about

16  it.

17           Q.    And aside from the Alto and Sigma

18  7, do you recall any other computers that you

19  used when you were at Xerox?

20           A.    At Xerox?  Sigma 9.  We updated.

21  That's probably it.

22           Q.    Did you ever use the Interlisp-D

23  environment at Xerox?

24           A.    No.

25           Q.    And you started at Apple in 1981;

Attorneys' Eyes Only

Page 16

1    is that right?

2            A.    No.  1981.

3            Q.    I'm sorry.  1981.

4            A.    Yeah.

5            Q.    And what did you do at Apple when

6    you first joined?

7            A.    I worked on adapting or writing

8    the, quote, "drivers" to drive the printers for

9    the Lisa computer.

10           Q.    Did you have any other

11   responsibilities for the Lisa computer?

12           A.    Official responsibilities, no.

13   But I have a tendency to meddle, so I'm sure I

14   worked on, here and there on other things.

15           Q.    And before you left Apple for the

16   first time in 1985, 1986?

17           A.    '86, when Steve left, yeah.  We

18   all kind of dispersed.

19           Q.    So the first time you left Apple,

20   you left just after Steve Jobs?

21           A.    I hung around a lot longer than he

22   did, but yeah.

23           Q.    In that first stint at Apple, what

24   other projects did you work on?

25           A.    It's a long list.  I wrote a game

Attorneys' Eyes Only

Page 40

1    in terms of looking around.

2           Q.    So your own personal approach to

3    patenting, at least while you were at Apple,

4    would have been the idea seemed clever to you; is

5    that fair?

6                 MR. LO:  Objection.  Asked and

7           answered.

8                 THE WITNESS:  "Clever" is a little

9           loaded term to me.  But if we thought it

10          was patentable and thought it was worth

11          patenting, those were the metrics I would

12          use.

13          Q.    And how would you decide if

14   something was patentable?

15          A.    Well, that's not our decision;

16   that's the Patent Office's decision.  Whether we

17   decided to try for a patent?  It would be, like I

18   said, if we thought an element of, say, the user

19   interface was fundamental, and we didn't want

20   anybody else to have that or something, and we

21   thought nobody else had done it, we would try to

22   get a patent -- we would apply for a patent.  And

23   whether or not we were right, the examiner would

24   tell us.

25          Q.    When you applied for a patent at

Attorneys' Eyes Only

Page 41

1    Apple, did you receive a bonus if a patent was

2    applied for or granted?

3              A.    Yeah.  There was one amount when

4    you applied and one amount when it was granted,

5    and my memory is, it seemed inverted.  You got

6    more for applying than you did for granting.  But

7    that's my -- I could be wrong on that.

8              I do remember Microsoft was less

9    lucrative.

10             MR. CURRAN:  Why don't we mark as

11   Capps Exhibit 2, U.S. Patent Number 5666502.

12             (Exhibit 2 was marked for

13        identification.)

14   BY MR. CURRAN:

15             Q.    Mr. Capps, do you recognize this

16   patent?

17             A.    By sight, no.  But if I read the

18   first few lines, yes.

19             Q.    When is the last time you read

20   this patent?

21             A.    Probably been a long time ago.

22             Q.    Did you look at this patent at all

23   in connection for preparing for your deposition

24   today?

25             A.    Not beyond looking up the number

Attorneys' Eyes Only

Page 42

1    and seeing who else was in the inventors, and

2    saying, "Oh, yeah, I remember that."   That was

3    about it.

4            Q.    And you're the only inventor named

5    on this patent; is that right?

6            A.    Yes.

7            Q.    And does that seem accurate to

8    you?

9            A.    Yes.

10           Q.    And when you looked up the number

11   of this patent and took a look at it, and you

12   said, "Oh, yeah, that was about that," what do

13   you recall this patent being about?

14           A.    Basically, the prime directive of

15   the handwritten recognition system is to not let

16   the person enter anything about handwriting.   So

17   we were trying many different ways to prevent the

18   user from having to suffer the indignity of their

19   handwriting recognition not working, and this was

20   one of the ways I came up with.   And I am sure

21   there were others, but this was one of them.

22           Q.    What was that method that you came

23   up with to avoid requiring the user to input

24   handwritten text?

25                 MR. LO:   Objection.   Vague.

Attorneys' Eyes Only

Page 43

1            THE WITNESS:   In this case, a lot

2       of data entry is repetitive and a lot of

3       data entry is structured, and combining

4       those two concepts, saying you can

5       remember what was entered in this field

6       in this instance; can you keep track of

7       what the user had done before so they can

8       just pick it from a list.

9       Q.    Is there anything else that you

10   considered inventive about the 502 patent?

11            MR. LO:   Objection.  Vague.  Calls

12       for a legal conclusion.

13            THE WITNESS:   I would have to read

14       through it and -- -- yeah.   I... it would

15       be hard for me to say what else is in

16       there.   I can go to the claims and say,

17       well, this is what we claimed at that

18       point, but that's just me reading a piece

19       of paper to you.

20       Q.    But if you were to describe what

21   you thought was new about this system for

22   managing historical inputs, what's your

23   recollection of what struck you as new about this

24   approach in the 502 patent?

25            MR. LO:   Objection.  Vague.  Calls

Attorneys' Eyes Only

Page 44

1    for a legal conclusion.

2         THE WITNESS:  Like I said, there's

3    structure underlying a lot of what the

4    data is.  And the fact that we could keep

5    track of that in cooperation with the

6    application developer as to helping the

7    user do data entry in different

8    applications.

9         One of the key concepts of

10   Newton was shared data, and this was part

11   of that, that the data was shared.  So

12   the history should be sharable, again,

13   voluntarily by the application

14   developer.  And that, like I said, we

15   thought that was a good idea, and applied

16   for the patent, and the Patent Office

17   agreed that they thought it was a new

18   idea.

19        Q.    And do you recall in your design

20   how data was shared between different fields that

21   used similar structured data?

22        A.    I don't remember the

23   implementation details.  I don't -- if we could

24   get a hold of the code, I could tell you.

25        Q.    You mentioned the code for this.

Attorneys' Eyes Only

Page 45

1    Did you create a working version of this

2    interface?

3               MR. LO:  Objection.  Vague.

4               THE WITNESS:  I'm sure I wrote the

5          code for this, yeah.

6          Q.    And was this design used in any

7    versions of the Apple Newton?

8               MR. LO:  Objection.  Vague.

9               THE WITNESS:  I believe it was.

10         Again, we can go to eBay and buy a Newton

11         and find out.

12         Q.    When did you come up with this

13    idea for the user interface that used these

14    lists?

15               When did you come up with the idea

16    for the design of the 502 patent?

17         A.    I believe it was part of, as you

18    mentioned earlier, the Newton 2.0 design.  We

19    caught our breath after doing the first version,

20    and then decided, what can we do to make -- for

21    the second version, and this was one of the

22    features.  So since we shipped it in '93 and this

23    was filed in '95, somewhere in that time.

24         Q.    Was there a particular name or

25    code name or feature name for this design?

Attorneys' Eyes Only

Page 46

1       A.    For this feature?

2       Q.    Yes, sir.

3       A.    I doubt we would have done that.

4       Q.    And do you recall any Eureka

5   moment or a-ha moment relating to this design,

6   some moment when you first thought you would want

7   to use all these side elements together?

8       A.    No.   Chances are, I just stayed up

9   one night all night and coded it, and sent it

10  around the next day, saying, "What do you guys

11  think?"   But again, that's a vague memory of how

12  I worked, not specific memory of this particular

13  item.

14       Q.    And do you recall whether there

15  was a particular application or a group of

16  applications in Newton that you would have been

17  working on when you developed this design?

18       A.    I pretty much worked on

19  everything.  And this feature is something that

20  -- let me start again.  The way Newton was

21  architected, the input field is based on what's

22  called prototype.  It's prototype inheritance.

23  And there were prototypes, which are kind of the

24  -- I can't say the word without saying the word

25  "prototype."

Attorneys' Eyes Only

Page 47

1          Prototypical versions of an input

2    field that you would then say, this is -- I want

3    the label to be "name."  You would say what the

4    field represents, what database it's tied to.  In

5    fact, what database it was tied to was probably

6    in the prototype in many cases, too.  But anyway,

7    so I'm sure I just coded the lowest level

8    prototype, and by virtue of that, every single

9    application inherited that behavior.

10          Q.    So you mentioned a few things

11    there.  The name of a field, what it represents,

12    and what database it was tied to.  What did you

13    mean by the name of the field?

14          A.    I think I said "label," but if I

15    didn't say "label," I meant to say "label."

16          Q.    I apologize.  Label of the field.

17          A.    That's what you prompt the user

18    with.  Name, rank, serial number.

19          Q.    And then what the field

20    represents, what does that mean?

21          A.    That is what's the taxonomy of

22    what that name is.  It is a first name -- first

23    name is a bad name.  Is it a contact name,

24    meaning it's in your contacts list, or is it a

25    project name?  This could be a project management

Attorneys' Eyes Only

Page 48

1    program.  The label would still be "name."  But

2    conceptually, those are two different -- you

3    would not send a fax to a project called Windows

4    '95; you would send a fax to a person in your

5    contacts list, even though they both say "name."

6         Q.    So what the field represents is

7    some classification of the data that goes into

8    that field?

9              MR. LO:  Objection.  Vague.

10             THE WITNESS:  "Classification" is

11        kind of a loaded computer science term,

12        but it's describing what you expect that

13        data to be.  I mean, yeah, it's hard to

14        describe without using the same words

15        over and over again.

16        Q.    Some category of information you

17   expect for that field, like a name or a project;

18   is that accurate?

19             MR. LO:  Objection.  Vague.  Asked

20        and answered.

21             THE WITNESS:  Well, the example I

22        gave is that the label "name" could mean,

23        you know, let's not use project name,

24        because that's too nerdy.  Could be your

25        model of your car.  That is in a

Attorneys' Eyes Only

Page 49

1      different -- if you were drawing the Zen

2      diagram of all human knowledge, you would

3      not put Steve Jobs in the same bubble as

4      Model T.  But the label would still be

5      "name."

6                  It's the application of, is

7      this your car management application or

8      is this your contact management

9      application.  So what that category is is

10     one is a car model, the other is a

11     person's name.  But to the user, they

12     both are labeled "name."

13                  I'm not -- I don't know how to

14     make that point any --

15          Q.    It might be easier with pictures.

16     Maybe take a look at Figures 13 and 14 in the

17     patent.  It's the very last set of pictures.

18     These are just some examples of this.

19                  So the label for -- can I ask you

20     to take a look at Figure 13 A, for example.  Do

21     you see 13 A?

22          A.    Uh-huh.

23          Q.    So in Figure 13 A, the label is

24     "caller"?

25          A.    Uh-huh.

Attorneys' Eyes Only

Page 50

1      Q.    Is that correct?

2            And what that field represents is

3     a name?

4            MR. LO:  Objection.  Vague.

5            THE WITNESS:  In the context of

6        what I just said, that would be a contact

7        name, yes.

8      Q.    So the category of input that

9     would go into this caller field is a contact

10    name?

11     A.    Knowing --

12            MR. LO:  Objection.  Vague.

13            THE WITNESS:  Knowing what I

14        believe is represented by this example,

15        yes, that would be contact name.  Would

16        not be car model.

17     Q.    So the class of information that

18    you would expect in this field is a human name,

19    not a car model or a phone number.  Fair?

20            MR. LO:  Objection.  Vague.  Lacks

21        foundation to the extent the witness was

22        asked to describe how the patent

23        described the figure.  But you can

24        answer.

25            THE WITNESS:  It's, in this case,

Attorneys' Eyes Only

Page 52

1    recognition, the more context it had, the more

2    accurate it was.

3              So if you could -- I'm beating the

4    Henry Ford model to death here -- if you could

5    say "this is a car model" when you are trying to

6    disambiguate the handwriting recognition, you

7    would not think it's Steve Jobs; you would say,

8    "Oh, that's Model T."  And so we always wanted to

9    have as much context as possible.  So I assume we

10   had a --

11             We had a prototype text field.  I

12   assume we had a prototype name field that was

13   tied to the names database so the recognition

14   would be more accurate.  I do not remember

15   exactly what the mixture was of our high level

16   fields, but that was the intent of the design at

17   that point.

18             I don't know if I answered your

19   question, but I'm sure you'll ask it again.

20        Q.   I just want to use Figure 13 A as

21   a graphical benchmark.  I'm not asking about the

22   patent, but about the Newton and about the code

23   that you wrote.  How would I know what database

24   was associated with names?  Let me strike that.

25             Looking at Figure 13 A, if you can

Attorneys' Eyes Only

Page 53

1   use this to ground yourself in the Newton code

2   that you wrote.  For a field like "caller," how

3   would I have known what database to look to for a

4   list of relevant information?

5            MR. LO:  Objection.  Vague.

6            THE WITNESS:  It's just a

7       parameter to the system.

8       Q.    You mentioned before that

9   information was shared between applications in

10  the Newton; is that correct?

11       A.    Yes.

12       Q.    So in these patent figures, we

13  have a phone message application in 13 A and a

14  fax program information in 13 B.  How did those

15  two applications share names?

16            MR. LO:  Objection.  Vague.

17            THE WITNESS:  There was a names

18       database or a contact list, whatever you

19       want to call it, Rolodex, if you want to

20       validate somebody's trademark, that was

21       kept in the system.  And these two things

22       typically were consumers of that, not

23       creators of that data, so you would just

24       look up in your contact list.

25                 You want to send the fax to

Attorneys' Eyes Only

Page 54

1      Steve Wozniak.  Let's pick on somebody

2      else.  And you want to send it to Steve

3      Wozniak.  You would write "Woz," and

4      hopefully, the system would do the -- the

5      recognizer would work.  It would look it

6      up in your contacts list and know who you

7      were sending the -- who you got the

8      message from on the left -- in the 13 A

9      case, or wanted to send the fax to in the

10     13 B case.

11         Q.    And when an application developer

12  decided they wanted to have a field that could

13  use such shared historical data, how would they

14  identify the database that they wanted to be

15  using?  I'm developing a new fax program.  How do

16  I identify that I want to use the system's stored

17  set of name data for a field in my application?

18              MR. LO:  Vague.  Lacks foundation.

19              THE WITNESS:  Like I said, I don't

20     remember the actual details.  I'm sure if

21     you dug up the Newton documentation, it

22     would probably tell us, reveal to us all

23     the answer.  But I can imagine it was a

24     parameter that was to the low level

25     prototype as a, this is tied to the names

Attorneys' Eyes Only

Page 55

1       database.  Where that if the high level

2       prototype had that, I can't remember that

3       exactly.  I can't imagine we didn't do it

4       that way.

5            Q.   Can I ask you to take a look at

6  the portion of the patent that talks about some

7  of these figures, and see if we can help remember

8  any details here.

9            Take a look at Column 16.  And I

10 think at Lines 23 of Column 16, it starts to talk

11 about these Figures 13 A and 13 B.

12           A.   (Witness complies.)

13           Q.   Would you mind reading?

14           A.   Do I remember reading it?

15           Q.   Would you mind reading that

16 section?  Would you mind reading it out loud so

17 the court reporter can transcribe it?

18           A.   I'll try to use my best diction

19 here.

20           "Figures 13 A and 13 B are

21 illustrations illustrating using of the invention

22 across different programming applications.

23 Figure 13 A illustrates a phone messaging program

24 and Figure 13 B illustrates a fax program.

25           "The phone messaging program

Page 56

1    displays a form, number 312, to the user,

2    requiring the user to enter information

3    concerning the caller, the caller's phone number

4    and the message.

5              "In this case, the caller

6    information is entered in a caller field, number

7    314.  The caller field 314 is associated with a

8    name class for which a history table is

9    maintained.

10             "With the fax program, a form,

11   number 316, is displayed to the user, requiring

12   the user to input information concerning to whom

13   a fax is to be sent, from whom the fax is being

14   sent, and any notes for the cover sheet thereof.

15   Here, the destination for the fax is also entered

16   in a destination field, number 318.  The

17   destination field 318 is associated with the same

18   class.

19             "Hence, even though the phone

20   messaging program and the fax program are

21   different programs, the same history table is

22   used for the field within the forms associated

23   with these programs.

24             "Thus, the history developed for

25   our particular computer, program or user is

Attorneys' Eyes Only

Page 70

1    released?

2         A.    Guilt by association.  I must

3    have.

4         Q.    Do you recall when you started

5    working on an implementation for this feature?

6         A.    Specifically?  No.

7         Q.    Are you aware of any inventor

8    notebooks or other documents that would show when

9    you came up with this idea, or how you tracked

10   your work on it?

11        A.    We definitely didn't use

12   notebooks.  I can't recall what the process was

13   in this case.  Definitely not.

14             MR. LO:  Counsel, we have been

15             going about an hour and a half, so

16             whenever is convenient, maybe we could

17             take a break.

18             MR. CURRAN:  I think just a couple

19             questions.

20        Q.    And -- did you discuss the idea in

21   the 502 patent with anyone within Apple before

22   you submitted for a patent application?

23             MR. LO:  Just a yes or no for now.

24             THE WITNESS:  I assume yes.

25        Q.    And who would those persons have

1    been?

2              MR. LO:  Just names or identities.

3              THE WITNESS:  Most likely, Jeff

4         Ventanadis, because he's the guy that I

5         worked closely with on the UI.

6         Q.    He was a software developer?

7         A.    No, he was marketing.

8         Q.    Anyone else you suspect you would

9    have discussed this feature set with at Apple

10   before filing for a patent?

11        A.    Before filing for the patent?

12   Anybody.  Like I said repeatedly, it's a

13   cooperative effort there.  I'm sure, I'm sure I

14   would say, "Hey, check this out.  Add it to your

15   Newton.  Add it your field classes, to your apps,

16   you guys, and then all this magic will happen."

17        Q.    And what magic would that have

18   been if people added field classes to their apps?

19        A.    The user wouldn't have to enter a

20   name; they could pick it from a list, for

21   instance.

22        Q.    To get a list of names people had

23   entered in other people's -- users had entered in

24   other people's applications?

25              MR. LO:  Objection.  Vague.

Attorneys' Eyes Only

Page 72

1          MR. CURRAN:  Q.  I believe the

2     answer was yes?

3     A.    Yeah.

4          MR. CURRAN:  Why don't we take a

5     break?

6          THE VIDEOGRAPHER:  This is the end

7     of Disk Number 1.  Time is 11:02 a.m.,

8     and we are now going off the record.

9     (Recess taken from 11:02 a.m. to

10     11:16 a.m.)

11          THE VIDEOGRAPHER:  This is the

12     beginning of Disk Number 2.  The time is

13     11:16 a.m. and we are now going back on

14     the record.

15          MR. LO:  Just before we start,

16     Apple is requesting that the transcript

17     for this deposition be designated as

18     attorneys' eyes only.

19     BY MR. CURRAN:

20     Q.    Mr. Capps, by August 1995

21     graphical user interfaces weren't new; is that

22     fair?

23          MR. LO:  Objection.  Vague.

24          THE WITNESS:  I'm not sure when

25     Windows 95 came out, but, yeah, the world

Attorneys' Eyes Only

Page 174

1

2      a CS professor at Stanford probably is a

3      lot different than what it means to me.

4      But yes, people use this term.  It's a

5      very broad term, so it can mean a lot of

6      different things.

7              MR. LO:  No further questions.

8              MR. CURRAN:  No further questions

9      at this time, Mr. Capps.  Thank you very

10     much.

11             THE VIDEOGRAPHER:  This concludes

12     the deposition of --

13             THE WITNESS:  Sound like we'll be

14     seeing each other again, then.

15             THE VIDEOGRAPHER:  This concludes

16     the deposition.  The time is 2:21 p.m.,

17     and we are now going off the record.

18             (Time noted: 2:21 p.m.)

19

20

21         _____

22             STEPHEN CAPPS

23     Subscribed and sworn to before me

24     This      day of            , 201_.

25     _____

Attorneys' Eyes Only

Page 175

1      C E R T I F I C A T E

2    STATE OF CALIFORNIA        )

3                               )

4    COUNTY OF SAN FRANCISCO )

5        I, LINDA VACCAREZZA, a Certified

6    Shorthand Reporter for the State of

7    California, do hereby certify:

8        That STEPHEN CAPPS, the witness

9    whose deposition is hereinbefore set

10   forth, was duly sworn by me and that such

11   deposition is a true record of the

12   testimony given by such witness.

13       I further certify that I am not

14   related to any of the parties to this

15   action by blood or marriage; and that I

16   am in no way interested in the outcome of

17   this matter.

18       IN WITNESS WHEREOF, I have hereunto

19   set my hand this 7th day of December

20   2012.

21

22   _____

23    LINDA VACCAREZZA, CSR. NO. 10201

24

25

Attorneys' Eyes Only

Page 178

1       ERRATA SHEET FOR THE TRANSCRIPT OF:

2    Case Name:    Apple vs. samsung, et al.

3    Dep. Date:    December 7, 2012

4    Deponent:    STEPHEN CAPPS

5    Pg. Ln.  Now Reads      Should Read        Reason

6    ___ ___   _____   _____  _____

7    ___ ___   _____   _____  _____

8    ___ ___   _____   _____  _____

9    ___ ___   _____   _____  _____

10   ___ ___   _____   _____  _____

11   ___ ___   _____   _____  _____

12   ___ ___   _____   _____  _____

13   ___ ___   _____   _____  _____

14   ___ ___   _____   _____  _____

15   ___ ___   _____   _____  _____

16   ___ ___   _____   _____  _____

17

18                      _____

                        Signature of Deponent

19

        SUBSCRIBED AND SWORN BEFORE ME

20

        THIS_____ DAY OF_____, 201_.

21

22      _____

        (Notary Public)  MY COMMISSION

23

        EXPIRES:_____

24

25

Ex. D

Highly Confidential - Attorneys' Eyes Only

Page 1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3             SAN JOSE DIVISION

4

5   APPLE INC., a California
    corporation,

6
              Plaintiff,

7
    vs.                         CASE NO.  11-cv-00630-LHK

8
    SAMSUNG ELECTRONICS CO.,

9   LTD., a Korean business
    entity; SAMSUNG ELECTRONICS

10  AMERICA,INC., a New York
    corporation; SAMSUNG

11  TELECOMMUNICATIONS AMERICA,
    LLC, a Delaware limited

12  liability company,

13            Defendants.
    _____/

14

15

16      H I G H L Y   C O N F I D E N T I A L

17      A T T O R N E Y S'  E Y E S   O N L Y

18

19    VIDEOTAPED DEPOSITION OF GORDON FREEDMAN

20           PALO ALTO, CALIFORNIA

21         WEDNESDAY, JANUARY 16, 2013

22

23  BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR

24  CSR LICENSE NO. 9830

25  JOB NO. 56774

Highly Confidential - Attorneys' Eyes Only

1      WEDNESDAY, JANUARY 16, 2013

2             1:13 p.m.

3

4

5

6   VIDEOTAPED DEPOSITION OF GORDON FREEDMAN,

7   taken at Gibson, Dunn & Crutcher LLP,

8   1881 Page Mill Road, Palo Alto, CA,

9   Pursuant to Notice, before me,

10   ANDREA M. IGNACIO HOWARD, CLR, CCRR, RPR,

11   CSR License No. 9830.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Attorneys' Eyes Only

Page 3

1   A P P E A R A N C E S:

2

3        FOR APPLE INC.:

4        Gibson, Dunn & Crutcher

5        By:  Brian M. Buroker Esq.

6            Joshua Furman Esq.

7        1050 Connecticut Avenue, N.W.

8        Washington, DC  20036

9

10

11

12

13        FOR SAMSUNG ELECTRONICS CO. LTD:

14        Quinn Emanuel Urquhart & Sullivan

15        By:  Patrick D. Curran Esq.

16            JARED W. NEWTON, Esq.

17        51 Madison Avenue

18        New York, NY  10010

19

20

21

22        ALSO PRESENT:  Aric Kerhoulas, Videographer

23                       Erica Tierney, Apple, Inc.

24

                    ---oOo---

25

Highly Confidential - Attorneys' Eyes Only

1    Q   Since you've been deposed only once before,

2    I'll repeat some of the admonitions I think we went

3    over in the last deposition.

4         This is a videotaped and stenography --

5    stenographically recorded interview, so everything we

6    say is being written down.  So it's important to

7    answer verbally.  The written transcript won't pick up

8    nodding your head or saying things like "uh-huh"; do

9    you understand that?

10   A   Yes.

11   Q   Okay.  Try to speak slowly so we don't speak

12   over each other.

13        If you don't understand a question, please

14   ask for clarification.  If you don't ask for

15   clarification, I will assume you've understood the

16   question; do you understand that?

17   A   Yes.

18   Q   Unless your counsel specifically instructs

19   you not to answer, you should answer every question

20   that I pose to you; do you understand that?

21   A   Yes.

22   Q   Any reason you can't give your best, most

23   truthful, most accurate testimony today?

24   A   No.

25   Q   Mr. Freedman, do you understand that Apple

Highly Confidential - Attorneys' Eyes Only

1    has designated you as a corporate representative to

2    testify on Apple's behalf on certain topics today?

3        A   I don't know the -- the exact terminology or

4    the position.

5        Q   That wasn't quite my question.

6            Do you understand that Apple has designated

7    you as a corporate representative to testify on

8    Apple's behalf on certain topics today?

9        A   Yes.

10       Q   So let's review those topics.

11           MR. CURRAN:  I'll mark as Freedman Exhibit 1

12   the amended 30(b)(6) notice.

13           (Document marked Freedman Exhibit 1

14            for identification.)

15           THE WITNESS:  Thank you.

16           MR. CURRAN:  Do you need one?

17       Q   Mr. Freedman, have you reviewed the document

18   that's been marked as Freedman 1 before?

19       A   Yes.

20       Q   I'm going to ask you to take a look at topic

21   No. 1, and specifically to subtopic A.

22           Are you prepared to testify on behalf of

23   Apple today concerning the conception and reduction to

24   practice of the '414 patent, including any alleged

25   diligence from conception to reduction to practice of

Highly Confidential - Attorneys' Eyes Only

1   the alleged inventions of the '414 patent?

2        A    Yes.

3        Q    And when I refer to "the '414 patent," sir,

4   do you understand what I'm referring to?

5        A    Yes.

6        Q    On subtopic B, are you prepared to testify on

7   behalf of Apple today concerning the subject matter

8   disclosed in the '414 patent?

9        A    Yes.

10       Q    With respect to subtopic C, are you prepared

11  to testify on behalf of Apple today concerning the

12  problem allegedly solved by the '414 patent, including

13  each way in which the claimed invention of the

14  '414 patent allegedly differs from or improves upon

15  the prior art?

16       A    Yes.

17       MR. BUROKER:  Counsel, we had qualified his

18  designation in our letter to you on that subtopic.

19  Just for clarification, we had said he was designated

20  only as to the problems solved by the invention and

21  the prior art known to the inventor on C.  So that's

22  his designation.

23       MR. CURRAN:  Let me understand.  He's

24  being -- he's being designated as a corporate

25  representative to the extent he has personal, not

Highly Confidential - Attorneys' Eyes Only

Page 10

1   corporate knowledge?

2          MR. BUROKER:  Well, no, it's -- right.  It's

3   to the knowledge -- the way that this topic could be

4   read could in theory mean all prior art.  He's not

5   going to be testifying on Apple's behalf as to all

6   prior art that he's -- including the prior art he was

7   not aware of; only prior art to which he was aware.

8          MR. CURRAN:  Just so I understand, he's being

9   designated to testify as the corporate representative,

10  but only based on his personal knowledge, not based on

11  the corporate entity's knowledge?

12         MR. BUROKER:  Correct.

13         MR. CURRAN:  Okay.  We'll -- I think we --

14  we'll object to that designation as not truly a

15  30(b)(6) designation, but we'll move along, and we'll

16  reserve our rights on that issue.

17     Q   Topic D, are you prepared to testify on

18  behalf of Apple today concerning all known prior art

19  to the '414 patent, including any prior art of which

20  Apple or you first became aware after applying for the

21  patent?

22         MR. BUROKER:  That's the same qualification

23  that we made in the designation.  It was knowledge

24  that he had as to the prior art.

25         But you can answer.

Highly Confidential - Attorneys' Eyes Only

Page 11

1          THE WITNESS:  Yes, with the qualification
2     just noted.
3          MR. CURRAN:  And I'll make the same
4     objection.
5      Q   Moving on to E, are you prepared to testify
6     today on behalf of Apple with regard to the alleged
7     contribution of each named inventor to each claim of
8     the '414 patent?
9      A   Yes.
10     Q   With respect to subtopic F, are you prepared
11    to testify on behalf of Apple today concerning the
12    meaning of each claim of the '414 patent to you as the
13    named inventor?
14         MR. BUROKER:  And we qualified that, Counsel,
15    as to what he understands the claim terms to mean.  He
16    is designated as such.
17         But you can answer.
18         THE WITNESS:  Yes, with the qualifications
19    just noted.
20         MR. CURRAN:  And just to speed this up, I'll
21    just have a standing objection, if you don't mind, to
22    these qualifications.
23     Q   Okay.  Moving on to sub- --
24         MR. BUROKER:  And for the record, we think
25    that they're appropriate, and you think -- you're

Highly Confidential - Attorneys' Eyes Only

Page 12

1   objecting.  I understand that.  But we believe they're

2   appropriate qualifications.

3            MR. CURRAN:  Okay.  I think we've both stated

4   our objections.

5        Q    For subtopic G, are you prepared to testify

6   on behalf of Apple today concerning the novelty of

7   each claim of the '414 patent insofar as it relates to

8   the problems solved by the invention?

9            MR. BUROKER:  We have the same qualification

10  as to knowledge of -- his knowledge of the prior art,

11  not all prior art.

12           But subject to that qualification, you can

13  answer.

14           THE WITNESS:  Yes, with the qualification

15  just noted.

16           MR. CURRAN:  Q.  With respect to subtopic H,

17  are you testifying on behalf of Apple today regarding

18  the prosecution history of the patent, including but

19  not limited to any prior art of which the named

20  inventor was aware during any prior prosecution of the

21  patent?

22           MR. BUROKER:  He was not designated on that

23  topic.

24           You may -- you can answer.

25           THE WITNESS:  No.

Highly Confidential - Attorneys' Eyes Only

Page 13

1          MR. CURRAN:  And so just so I understand,

2    the -- the topic here that's -- that explicitly

3    references the named inventor's knowledge, he's not

4    being designated on?

5          MR. BUROKER:  Well, the prosecution history

6    of the patent he's not designated on.  You can ask him

7    about what knowledge he had of the prior art, but he

8    is not familiar with the prosecution history.

9          MR. CURRAN:  We'll certainly explore his

10   personal knowledge.

11         MR. BUROKER:  Sure.

12         MR. CURRAN:  But -- okay.  So he's not

13   designated on topic H.

14      Q    Topic I, are you prepared to testify on

15   behalf of Apple today with regard to all facts and

16   circumstances concerning the decision to seek patent

17   protection for the patent?

18      A    I'm reading through that, sorry, to be clear.

19           Can you clarify what that means.

20      Q    Well, let me ask you first:  Are you prepared

21   to testify on behalf of Apple today concerning all

22   facts and circumstances concerning the decision to

23   seek patent protection for the '414 patent?

24      A    I'm sorry, but I'm not really familiar with

25   how broad that is and what exactly that means.

Highly Confidential - Attorneys' Eyes Only

Page 14

1    Q    So you're not sure if you are test- -- if you

2  are prepared to testify today on behalf of Apple with

3  respect to all facts and circumstances concerning the

4  decision to seek patent protection for the patent?

5    A    Correct, because I'm not sure what that

6  means.

7         MR. CURRAN:  So Counsel, we'll object, but I

8  think we'll take that offline.

9    Q    On subtopic J, are you prepared to testify on

10 behalf of Apple today concerning all facts and

11 circumstances concerning the identification and

12 determination of the named inventors of the

13 '414 patent?

14   A    Yes.

15   Q    And for the record, you are not testifying on

16 behalf of Apple regarding subtopic L, is that correct,

17 the prosecution of the patent application that issued

18 as the '414 patent?

19   A    That is correct.

20   Q    Subtopic M, are you prepared to testify on

21 behalf of Apple today regarding any preferred

22 embodiments of the '414 patent and any other

23 embodiments reduced to practice during development of

24 the technology disclosed in the '414 patent?

25   A    Yes.

Highly Confidential - Attorneys' Eyes Only

Page 15

1      Q    And subtopic N, are you prepared to testify

2    on behalf of Apple today regarding the level of

3    ordinary skill in the art potentially applicable for

4    each claim of the '414 patent?

5      A    Yes.

6      Q    And I believe I skipped one topic along the

7    way.

8           Are you prepared to testify on behalf of

9    Apple today with regard to subtopic K, all facts and

10   circumstances concerning the first manufacturer, first

11   demonstration, first disclosure, first disclosure

12   outside Apple, first public disclosure outside Apple,

13   first written description, first publication, first

14   prototype, first use in the United States, first

15   public use in the United States, first offer for sale

16   in the United States, first sale in the United States,

17   and first importation into the United States?

18          MR. BUROKER:  Counsel, we designated him as

19   to his knowledge.  There's a lot of issues there,

20   obviously.  That's why we designated as to what he

21   knows.

22          You can answer.

23          THE WITNESS:  Yes, to the best of my ability

24   regarding what it is that I do know.

25          MR. CURRAN:  Q.  So, Mr. Freedman, can you

Highly Confidential - Attorneys' Eyes Only

Page 16

1    explain to me what you did to prepare for your

2    deposition testimony on behalf of Apple on these

3    topics.

4        A   I don't know if that covers any privilege

5    talking about that.

6        Q   If you have -- if you have a question about

7    privilege, we can go off the -- the record.

8            MR. BUROKER:  Let's go off the record.

9            THE VIDEOGRAPHER:  We're off the record.

10           The time is 1:28 p.m.

11           (Recess taken.)

12           THE VIDEOGRAPHER:  We're on the record.

13           The time is 1:28 p.m.

14           MR. CURRAN:  Q.  Mr. Freedman, the question

15   was:  Can you explain to me what you did to prepare

16   for your deposition testimony on behalf of Apple on

17   these topics we've reviewed in Freedman Exhibit 1?

18       A   I met with counsel.

19       Q   And who are you referring to when you say

20   "counsel"?

21       A   The counsel that's present here, Brian,

22   Joshua.

23       Q   Anyone else?

24       A   I don't remember everybody's name.

25       Q   There were others?

Highly Confidential - Attorneys' Eyes Only

Page 134

1               J U R A T

2

3

4   I, GORDON FREEDMAN, do hereby certify

5   under penalty of Perjury that I have read the

6   foregoing transcript of my deposition taken

7   on January 16, 2013; that I have made such

8   corrections as appear noted herein in ink,

9   initialed by me; that my testimony as

10  contained herein, as corrected, is true and

11  correct.

12

13

14  DATED this ____ day of _____, 2013,

15  at _____, California.

16

17

18

19  _____

20       SIGNATURE OF WITNESS

21

22

23

24

25

Highly Confidential - Attorneys' Eyes Only

Page 135

                    CERTIFICATE OF REPORTER

1

2

3

4        I, ANDREA M. IGNACIO HOWARD, hereby certify

5   that the witness in the foregoing deposition was by me

6   duly sworn to tell the truth, the whole truth, and

7   nothing but the truth in the within-entitled cause;

8

9        That said deposition was taken in shorthand

10  by me, a Certified Shorthand Reporter of the State of

11  California, and was thereafter transcribed into

12  typewriting, and that the foregoing transcript

13  constitutes a full, true and correct report of said

14  deposition and of the proceedings which took place;

15

16       That I am a disinterested person to the said

17  action.

18

19       IN WITNESS WHEREOF, I have hereunto set my

20  hand this 16th day of January 2013.

21

22       _____

23  ANDREA M. IGNACIO HOWARD, RPR, CCRR, CLR, CSR No. 9830

24

25

Highly Confidential - Attorneys' Eyes Only

Page 137

1              E R R A T A   S H E E T

2

3        I, GORDON FREEDMAN, make the following

4    changes to my deposition taken in the matter of

5    Apple Inc., vs. Samsung Electronics, et al., taken on

6    January 16, 2013:

7

8    DATE:_____        _____

9                                 Signature of Witness

10   Page           Line          Change

11   _____          _____         _____

12   _____          _____         _____

13   _____          _____         _____

14   _____          _____         _____

15   _____          _____         _____

16   _____          _____         _____

17   _____          _____         _____

18   _____          _____         _____

19   _____          _____         _____

20   _____          _____         _____

21   _____          _____         _____

22   _____          _____         _____

23   _____          _____         _____

24   _____          _____         _____

25   _____          _____         _____

Ex. E

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 138

1                    UNITED STATES DISTRICT COURT
2                    NORTHERN DISTRICT OF CALIFORNIA
3                         SAN JOSE DIVISION
4
5    APPLE INC., a California
     corporation,
6
                    Plaintiff,
7
     vs.                              CASE NO.   11-cv-00630-LHK
8
     SAMSUNG ELECTRONICS CO.,
9    LTD., a Korean business
     entity; SAMSUNG ELECTRONICS
10   AMERICA,INC., a New York
     corporation; SAMSUNG
11   TELECOMMUNICATIONS AMERICA,
     LLC, a Delaware limited
12   liability company,
13                  Defendants.
     _____/
14
15
              H I G H L Y   C O N F I D E N T I A L
16
              A T T O R N E Y S'  E Y E S   O N L Y
17
18
         VIDEOTAPED DEPOSITION OF GORDON FREEDMAN
19
              VOLUME II PAGES 138 - 197
20
                  PALO ALTO, CALIFORNIA
21
              THURSDAY, JANUARY 17, 2013
22
     JOB NO. 56775
23
     BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR
24
     CSR LICENSE NO. 9830
25

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 139

1      THURSDAY, JANUARY 17, 2013

2          1:11 p.m.

3

4

5

6    VIDEOTAPED DEPOSITION OF GORDON FREEDMAN,

7    taken at GIBSON DUNN & CRUTCHER LLP,

8    1881 Page Mill Road, Palo Alto, California,

9    Pursuant to Notice, before me,

10   ANDREA M. IGNACIO HOWARD, CLR, CCRR, RPR,

11   CSR License No. 9830.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 140

1    A P P E A R A N C E S:

2

3        FOR APPLE INC.:

4        GIBSON DUNN & CRUTCHER

5        By:  BRIAN M. BUROKER, Esq.

6        1050 Connecticut Avenue, N.W.

7        Washington, D.C. 20036-5306

8

9

10

11

12       FOR SAMSUNG ELECTRONICS CO. LTD:

13       QUINN EMANUEL URQUHART & SULLIVAN

14       By:  PATRICK D. CURRAN, Esq.

15           JARED W. NEWTON, Esq. (Washington, D.C.)

16       51 Madison Avenue

17       New York, New York 10010

18

19

20

21       ALSO PRESENT:  Aric Kerhoulas, Videographer

22                    Cyndi Wheeler, Apple, Inc.

23

                     ---oOo---

24

25

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 166

1    A    Yes.

2    Q    And you'd agree that a conduit in iSync was

3    software; true?

4    A    Yes.

5    Q    And you'd agree that a conduit in iSync was a

6    software component; true?

7         MR. BUROKER:  Objection; asked and answered.

8         THE WITNESS:  I'm not sure.

9         MR. CURRAN:  Q.  You'd agree that a conduit

10   in iSync included one or more -- strike that.

11        Do the conduits in iSync provide a

12   synchronization thread?

13        MR. BUROKER:  Objection; calls for a legal

14   conclusion.

15        THE WITNESS:  I don't know.

16        MR. CURRAN:  Q.  In Sync Services, you'd

17   agree that you used different software components to

18   synchronize different classes of data; true?

19        MR. BUROKER:  Objection; calls for -- I'm

20   sorry -- yeah, calls for a legal conclusion.

21        THE WITNESS:  Can you repeat the question

22   exactly.

23        MR. CURRAN:  Q.  In Sync Services, you'd

24   agree that you used different software components to

25   synchronize different classes of data; true?

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 167

1          MR. BUROKER:  Same objection.

2          THE WITNESS:  Yes.

3          MR. CURRAN:  Q.  In Sync Services, you'd

4    agree that different sync clients were configured to

5    synchronize different classes of data; true?

6          MR. BUROKER:  Same objection.

7          THE WITNESS:  Yes.

8          MR. CURRAN:  Q.  And that was true of Sync

9    Services as it was released in 2004; true?

10       A   I'm not sure.

11       Q   Mr. Freedman, in your work on the iPhone

12   sync, was there an "aha" moment or a "Eureka" moment

13   when you felt you'd first fully conceived of all the

14   ideas that would go into the iPhone sync software?

15          MR. BUROKER:  Objection; calls for a legal

16   conclusion.

17          THE WITNESS:  I don't remember.

18          MR. CURRAN:  Q.  Do you recall the

19   development time line for your work on the iPhone

20   synchronization software?

21       A   In broad terms.

22       Q   What's your recollection of that development

23   time line?

24       A   This is for the iPhone synchronization

25   software?

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 168

1    Q    Yes, sir.

2    A    I'm not exactly sure of the start date.

3    Q    What's your best recollection?

4    A    Near the end of 2005.

5    Q    Do you recall when you first had the ideas

6    that are expressed in Claim 1 of the '414 patent?

7    A    I'm not exactly sure.

8    Q    Do you recall when you believe you first had

9    a working version of the software described in Claim 1

10   of the '414 patent?

11   A    I'm not sure.

12   Q    And that's your testimony on behalf of Apple

13   as the corporate representative on the conception and

14   reduction to practice of the '414 patent; true?

15   A    I'm not sure if I understand that question.

16   Q    You understand that you are here today as

17   Apple's corporate representative on a number of

18   different topics; true?

19   A    Yes.

20   Q    You're here today as Apple's corporate

21   representative on the conception and reduction to

22   practice of the '414 patent, including any alleged

23   diligence from conception to reduction to practice of

24   the alleged inventions of the '414 patent; true?

25   A    Yes.

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 194

1              J U R A T

2

3

4   I, GORDON FREEDMAN, do hereby certify

5   under penalty of perjury that I have read the

6   foregoing transcript of my deposition taken

7   on January 17, 2013; that I have made such

8   corrections as appear noted herein in ink,

9   initialed by me; that my testimony as

10  contained herein, as corrected, is true and

11  correct.

12

13

14  DATED this _____ day of _____, 2013,

15  at _____, California.

16

17

18

19  _____

20       SIGNATURE OF WITNESS

21

22

23

24

25

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 195

1                    CERTIFICATE OF REPORTER

2

3

4        I, ANDREA M. IGNACIO HOWARD, hereby certify

5   that the witness in the foregoing deposition was by me

6   duly sworn to tell the truth, the whole truth, and

7   nothing but the truth in the within-entitled cause;

8

9        That said deposition was taken in shorthand

10  by me, a Certified Shorthand Reporter of the State of

11  California, and was thereafter transcribed into

12  typewriting, and that the foregoing transcript

13  constitutes a full, true and correct report of said

14  deposition and of the proceedings which took place;

15

16       That I am a disinterested person to the said

17  action.

18

19       IN WITNESS WHEREOF, I have hereunto set my

20  hand this 17th day of January, 13.

21

22       _____

23  ANDREA M. IGNACIO HOWARD, RPR, CCRR, CLR, CSR No. 9830

24

25

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 197

1           E R R A T A   S H E E T

2

3       I, GORDON FREEDMAN, make the following

4    changes to my deposition taken in the matter of

5    Apple Inc., vs. Samsung Electronics, et al., taken on

6    January 17, 2013:

7

8    DATE:_____          _____

9                                  Signature of Witness

10   Page          Line         Change

11   _____         _____        _____

12   _____         _____        _____

13   _____         _____        _____

14   _____         _____        _____

15   _____         _____        _____

16   _____         _____        _____

17   _____         _____        _____

18   _____         _____        _____

19   _____         _____        _____

20   _____         _____        _____

21   _____         _____        _____

22   _____         _____        _____

23   _____         _____        _____

24   _____         _____        _____

25   _____         _____        _____

Ex. F

Highly Confidential - Attorneys' Eyes Only

Page 1

1            UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4    APPLE INC., a California
     corporation,

5

           Plaintiff,

6                            Case No.
       vs.                   12-cv-00630-LHK (PSG)

7

     SAMSUNG ELECTRONICS CO., LTD.,

8    a Korean corporation; SAMSUNG
     ELECTRONICS AMERICA, INC.,

9    a New York corporation; and
     SAMSUNG TELECOMMUNICATIONS

10   AMERICA, LLC, a Delaware
     limited liability company,

11

           Defendants.

12   ------------------------------------

13

14

15     ** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **

16

17

18     VIDEOTAPED DEPOSITION OF MICHAEL J. MATAS

19            Palo Alto, California

20          Thursday, January 24, 2013

21

22

23

24   REPORTED BY:
     CYNTHIA MANNING, CSR No. 7645, CLR, CCRR

25   JOB NO. 57268

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF FLORIDA

3

4   MOTOROLA MOBILITY LLC,

5          Plaintiff,              Case No.

6     vs.                          1:12-20271-RNS-TEB

7   APPLE INC.,

8          Defendant.

9   ------------------------------

10

11

12   ** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **

13

14

15     VIDEOTAPED DEPOSITION OF MICHAEL J. MATAS

16          Palo Alto, California

17        Thursday, January 24, 2013

18

19

20

21

22

23

24   REPORTED BY:

     CYNTHIA MANNING, CSR No. 7645, CLR, CCRR

25   JOB NO. 57268

Highly Confidential - Attorneys' Eyes Only

Page 3

1              January 24, 2013

2                  9:36 a.m.

3

4

5         Deposition of MICHAEL J. MATAS, taken at

6   Cooley LLP, 3175 Hanover Street, Palo Alto,

7   California, before Cynthia Manning, Certified

8   Shorthand Reporter No. 7645, Certified LiveNote

9   Reporter, California Certified Realtime Reporter.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Attorneys' Eyes Only

Page 4

1    APPEARANCES FOR APPLE INC. v SAMSUNG ELECTRONICS

2

3

4    FOR PLAINTIFF and MICHAEL J. MATAS:
          GIBSON DUNN & CRUTCHER
5         BY:  JASON LO, ESQ.
               SARAH SIMMONS, ESQ.
6         333 South Grand Avenue
          Los Angeles, California 90071
7

8

9    FOR DEFENDANTS SAMSUNG ELECTRONICS COMPANY, LTD.,
     SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG
10   TELECOMMUNICATIONS AMERICA, LLC:
11        QUINN EMANUEL URQUHART & SULLIVAN
          BY:  ANASTASIA FERNANDS, ESQ.
12        51 Madison Avenue
          New York, New York 10010
13

14

15

16   FOR NON-PARTY FACEBOOK, INC.:
17        COOLEY
          BY: REUBEN CHEN, ESQ.
18        3175 Hanover Street
          Palo Alto, California 94304
19

20

21   ALSO PRESENT:
22        Pete Sais, Videographer
23

24

25

Highly Confidential - Attorneys' Eyes Only

Page 5

1    APPEARANCES FOR MOTOROLA MOBILITY v APPLE INC.:

2

3    FOR PLAINTIFF and MICHAEL J. MATAS:

4         WEIL GOTSHAL & MANGES
          BY:  ANNE CAPPELLA, ESQ.

5         201 Redwood Shores Parkway
          Redwood Shores, California 94065

6

7

8    FOR DEFENDANTS SAMSUNG ELECTRONICS COMPANY, LTD.,
     SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG

9    TELECOMMUNICATIONS AMERICA, LLC:

10        QUINN EMANUEL URQUHART & SULLIVAN
          BY:  GRAHAM PECHENIK, ESQ.

11        51 Madison Avenue
          New York, New York 10010

12

13

14   FOR NON-PARTY FACEBOOK, INC.:

15        COOLEY
          BY: REUBEN CHEN, ESQ.

16        3175 Hanover Street
          Palo Alto, California 94304

17

18

19

20

21

22

23

24

25

Highly Confidential - Attorneys' Eyes Only

1    Do you have any formal education after high

2  school?

3    A.  No.

4    Q.  Have you taken any courses since high

5  school of any form?

6    A.  No.

7    Q.  Could you describe for me briefly your work

8  history prior to your work with Apple?

9    A.  I had done some work at an independent

10 video production studio in Seattle, and worked for a

11 small software company in Seattle, and started a

12 software company also in Seattle.

13    Q.  What was the independent video production

14 studio?

15    A.  It was called 911 Media Arts.

16    Q.  What did you do for 911 Media Arts?

17    A.  Helped edit videos.

18    Q.  When did you work for them?

19    A.  Around 2000, 2001.

20    Q.  Was that while you were still in high

21 school?

22    A.  Mm-hmm.

23    Q.  And you have to answer yes or no for the

24 court reporter.

25    A.  Oh.  Yes.

Highly Confidential - Attorneys' Eyes Only

Page 14

1      Q.  And you also mentioned a small software

2    company.  What was that called?

3      A.  It was called The Omni Group.

4      Q.  What did you do for The Omni Group?

5      A.  User interface design.

6      Q.  What type of software was The Omni Group

7    creating?

8      A.  We made a web browser and a flowchart

9    application and a notetaking outlining application.

10     Q.  And did you work for UI design for all

11   three of those applications?

12     A.  Yep.  Yes.

13     Q.  When did you work for The Omni Group?

14     A.  Like 2002, 2003 to 2004, something like

15   that.

16     Q.  And was that also while you were in high

17   school?

18     A.  Yes.

19     Q.  You mentioned a startup as well; correct?

20     A.  Mm-hmm.

21     Q.  What was the startup?

22     A.  It was called Delicious Monster software.

23     Q.  What type of software did Delicious Monster

24   make?

25     A.  A library cataloging application.

Highly Confidential - Attorneys' Eyes Only

Page 15

1      Q.   What was your role with Delicious Monster?

2      A.   I was the president of the company and the

3  lead designer.

4      Q.   Did Delicious Monster commercialize a

5  product?

6      A.   Yes.

7      Q.   What was the product?

8      A.   It was called Delicious Library.

9      Q.   How long were you with Delicious Monster?

10      A.   About two years, I believe.

11      Q.   And after Delicious Monster did you go to

12  Apple?

13      A.   Yes.

14      Q.   When did you start with Apple?

15      A.   In 2005.

16      Q.   What was your job title when you started

17  with Apple?

18      A.   I believe something like senior user

19  interface designer.

20      Q.   Were you a member of a particular working

21  group or team?

22      A.   Yes, the human interface team.

23      Q.   Is that referred to as HI there?

24      A.   Correct, yeah.

25      Q.   Who else was on the user interface --

Highly Confidential - Attorneys' Eyes Only

Page 16

1    strike that.

2             Who was on the human interface team when

3    you joined Apple?

4         A.   Greg Christie, Bas, Imran, Marcel, Freddy,

5    Steve Lemay, Pat, Patrick.   I think that might be

6    it.

7             MR. CHEN:   Bless you.

8             MS. FERNANDS:   Pardon me.   Tickle.

9    BY MS. FERNANDS:

10        Q.   You said Greg Christie; is that correct?

11        A.   Correct.

12        Q.   And then you said Bas.   Do you recall Bas'

13   last name?

14        A.   Ording.

15        Q.   Do you recall Imran's last name?

16        A.   Not off the top of my head, no.

17        Q.   Marcel was also a name you mentioned; is

18   that correct?

19        A.   Yeah.

20        Q.   Do you recall his last name?

21        A.   Marcel Van Os, I believe.

22        Q.   And Freddy's last name?

23        A.   Anzures.

24        Q.   You said it was Steve Lemay?

25        A.   Mm-hmm.

Highly Confidential - Attorneys' Eyes Only

Page 17

1     Q.  Did you mention both a Pat and a Patrick?

2     A.  Yeah.  Patrick Coffman and Pat Coleman, I

3  think.

4     Q.  When you joined the human interface team at

5  Apple, what project did you start working on?

6     A.  A couple different projects.  The iPhone

7  was one of them.  Photo booth was another.  I guess

8  those are the two main -- main ones I did right off

9  the bat.

10     Q.  Between 2005 and 2007, were there other

11  projects that you worked on with the human interface

12  team at Apple?

13     A.  There was an iPod phone, which is sort of

14  part of the iPhone; some features in OS X, like Time

15  Machine.  And what else happened in 2007?

16        I guess that was the main chunk of it, with

17  the iPhone being most of the work, I should say.

18     Q.  Was there an internal name for the iPhone

19  project at Apple?

20     A.  Mm-hmm.

21     Q.  What was that?

22     A.  Purple.

23        MS. CAPPELLA:  I'd like to go ahead and

24  mark the transcript as -- I'm sorry, I don't know

25  how to do this -- confidential, probably for both of

Highly Confidential - Attorneys' Eyes Only

Page 18

1    the cases, Apple and CBI.

2    BY MS. FERNANDS:

3        Q.  You referred also to an iPod phone that I

4    think you said was sort of part of the iPhone.  What

5    was the iPod phone project?

6        A.  It was to make an iPod with a click wheel

7    that also could place calls and text message.

8        Q.  What, generally, were your job duties when

9    you started with Apple in 2005?

10       A.  User interface designer, doing mockups of

11   software, like prototypes and figuring out how stuff

12   should behave and interact, and also how stuff

13   should look officially, drawing icons and buttons

14   and things like that.

15       Q.  Were you writing any software code for

16   Apple at the time?

17       A.  No.

18       Q.  Did you ever write any code at Apple?

19       A.  Just prototype code for demos.  We did

20   nothing that would actually ship in the product.

21       Q.  Who was your supervisor in 2005?

22       A.  Greg Christie.

23       Q.  Did that change at all during the time you

24   were at Apple?

25       A.  Yeah.  Steve Lemay became my manager at one

Highly Confidential - Attorneys' Eyes Only

Page 19

1    point.

2         Q.  Do you recall when Steve Lemay became your

3    manager?

4         A.  Not exactly, no.

5         Q.  Do you recall whether it was before or

6    after the iPhone launched?

7         A.  I believe it was after.

8         Q.  When did you leave Apple?

9         A.  2009.

10        Q.  Why did you leave Apple?

11        A.  Just to do other things.

12             (Deposition Exhibit 2 was marked for

13             identification)

14   BY MS. FERNANDS:

15        Q.  You've just been handed what we've marked

16   as Matas Exhibit 2, and it is U.S. Patent No.

17   8,014,760, produced in this case with Bates Number

18   APLNDC630-0000173683 through -173770.

19             Do you recognize this document?

20        A.  Yes, I do.

21        Q.  What is it?

22        A.  It's a patent.

23        Q.  Have you seen this particular patent

24   before?

25        A.  Yes, I have.

Highly Confidential - Attorneys' Eyes Only

Page 20

1       Q.  Do you recall when you first saw this

2   patent?

3       A.  I don't recall.

4       Q.  Did you receive an announcement when this

5   patent was issued?

6       A.  I don't recall.

7       Q.  And if you see the date up in the upper

8   right-hand corner, it's September 6th, 2011.

9       A.  Mm-hmm.

10      Q.  You had already left Apple at that time; is

11   that correct?

12      A.  Correct.

13      Q.  Do you recall at all when you learned that

14   a patent -- that this '760 patent had issued?

15      A.  I don't recall, no.

16      Q.  And if I refer to this as the '760 patent,

17   you'll understand what I mean?

18      A.  That is this patent right here?

19      Q.  Yes.

20      A.  Yes.

21      Q.  Okay.  Great.

22          Now, if you look at the sort of upper left,

23   the item 75 where it says "Inventors" on the patent.

24      A.  Mm-hmm.

25      Q.  Do you see that?

Highly Confidential - Attorneys' Eyes Only

Page 21

1        A.   Yes.

2        Q.   A number of the people that you identified

3   earlier, I think, are listed there.

4             Let's start, though, with Scott Forstall.

5   You didn't mention him.  Was he not part of the

6   Human Interface Group when you joined?

7        A.   He was the -- he was the head of the iPhone

8   department, which included our team.

9        Q.   And did you have contact with Mr. Forstall

10  while you were working on the iPhone project?

11       A.   Yes.

12       Q.   How frequently?

13       A.   Probably two or three times a week.

14       Q.   Was that personal meetings or e-mail

15  contact?

16       A.   Personal meetings.

17       Q.   Was the team also in contact by e-mail?

18       A.   Yes.  With Scott Forstall or just in

19  general?

20       Q.   Good clarification.  Let's just start with

21  your -- the HI team that you identified earlier.

22            Was that team in contact by e-mail

23  concerning the iPhone project?

24       A.   Yes.

25       Q.   How often did that team communicate by

Highly Confidential - Attorneys' Eyes Only

Page 22

1    e-mail concerning the iPhone project?

2            MR. CHEN:  Objection; calls for

3    speculation.

4            THE WITNESS:  Frequently.

5    BY MS. FERNANDS:

6        Q.  With respect to e-mails that you were

7    either the author of or copied -- or copied on, how

8    often did the team communicate by e-mail concerning

9    the iPhone project?

10       A.  Many times a day.

11       Q.  You said that Scott Forstall was the head

12   of the iPhone department.

13           What was his role with respect to the work

14   that you were doing on the iPhone UI?

15       A.  He would review all the stuff we were doing

16   at least once a week and we would discuss various

17   changes and improvements we would make to what we

18   were designing.

19       Q.  And the next name on the "Inventors" list

20   on the '760 patent is Greg Christie.

21           I believe you said that he was your direct

22   supervisor; is that correct?

23       A.  Correct.

24       Q.  What was Mr. Christie's role with respect

25   to the work that you were doing on the iPhone

Highly Confidential - Attorneys' Eyes Only

Page 23

1  project?

2       A.   Similar to Scott Forstall, but just -- we

3  would work with him more frequently.  He would be in

4  meetings and discuss changes and improvements to the

5  designs we were doing.

6       Q.   Did you meet with Mr. Christie more often

7  than you met with Mr. Forstall?

8       A.   Yes.

9       Q.   About how often did you meet with

10 Mr. Christie?

11      A.   At least once a day.

12      Q.   Then the next name on the "Inventors" list

13 is Scott Herz.

14           Do you remember Mr. Herz?

15      A.   Yes.

16      Q.   Who was Mr. Herz?

17      A.   He was an engineer.

18      Q.   Did you work with Mr. Herz on the iPhone

19 projects on which you worked?

20      A.   Yes.

21      Q.   And what was Mr. Herz' role with respect to

22 his interaction with you on the work you were doing?

23      A.   He would sometimes be in our meetings to

24 discussion the designs, but mainly he was -- I

25 believe he was an engineer manager or an engineer at

Highly Confidential - Attorneys' Eyes Only

Page 24

1   that time and would build the designs that we were

2   coming up with.  But he would also throw in his two

3   cents about the designs.

4        Q.  The next name down is Imran Chaudhri.  I'm

5   pronouncing that wrong.

6           Is that the Imran to whom you referred

7   earlier?

8        A.  Yes.

9        Q.  What was his role on the iPhone project

10  when you joined in 2005?

11       A.  He was one of the designers.

12       Q.  When you say he was one of the designers,

13  was he also a UI designer, as you were?

14       A.  Yeah.

15       Q.  And then there is Marcel Van Os.

16          What was his role on the project in 2005

17  when you joined?

18       A.  The same as me and Imran.

19       Q.  And then there's Stephen Lemay.

20       A.  He was also a designer, just like the rest

21  of us.

22       Q.  In the period from 2005, when you joined,

23  until roughly 2007, around the time of the iPhone

24  launch, do you recall whether the roles of any of

25  these individuals changed?

Highly Confidential - Attorneys' Eyes Only

Page 25

1    A.   Steve Lemay -- sorry, between 2005 and

2  2007?

3    Q.   Yes.

4    A.   I don't believe any of them -- their roles

5  changed, no.

6    Q.   I believe you said that you met with

7  Mr. Christie about once a day.

8         Did this larger group of individuals meet

9  regularly?

10    A.   Which larger group?

11    Q.   The group of the named inventors on the

12  '760 patent.

13    A.   Yeah.  Yes.

14    Q.   About how often did the group of named

15  inventors on the '760 patent meet in the 2005-2006

16  time frame?

17    A.   About once a week.

18    Q.   Was anyone else present at those meetings

19  in addition to the named inventors on the '760

20  patent?

21         MR. CHEN:  Objection; calls for

22  speculation.

23         THE WITNESS:  Usually, everyone who was at

24  work that was on our team would be at the meetings.

25  //

Highly Confidential - Attorneys' Eyes Only

Page 26

BY MS. FERNANDS:

Q.  So the additional members of the HI team
that you identified would also be at the meetings if
they were present at work that day?

A.  Yes.

Q.  Were there any other Apple employees who
were not members of the HI team who would
participate in these weekly meetings?

A.  Yeah.  There was this guy Henri.  I don't
remember his last name.  He was one of the
engineering managers.  He would be there.

Q.  Anyone -- sorry.

A.  That's all I remember off the top of my
head.  There could have been more people, though.

Q.  You mentioned that the group communicated
frequently by e-mail.

Did the group prepare -- anyone prepare
presentations for these meetings that the HI group
would have?

A.  In -- I wouldn't call them presentations,
but our designs would be the presentation.

Q.  When you say the -- when you say the
designs would be the presentations, are those the
mockups that you had referred to earlier?

A.  Correct.

Highly Confidential - Attorneys' Eyes Only

Page 35

1   matter, usually.

2       Q.  Okay.  So you said iPhone.  Any particular

3   aspects of the iPhone?

4       A.  The aspects I worked on.  So --

5       Q.  And --

6       A.  I don't remember all the patents off the

7   top of my head --

8       Q.  Right.

9       A.  -- but they were concerning user interface

10  on the iPhone.

11      Q.  And what aspects of the iPhone UI did you

12  work on?

13      A.  Well, I worked on all sorts of different

14  pieces of it, but my main areas that I was in charge

15  of were the Maps application, the camera, the

16  photos, and settings.

17          But since the team was very small and sat

18  in pretty close quarters, we would tend to

19  cross-pollinate ideas quite a bit.

20      Q.  Do you know whether there are any pending

21  patent applications on which you're a named inventor

22  from your time at Apple?

23      A.  I don't know.

24      Q.  Do you have an understanding of the

25  invention that is described and claimed in the '760

Highly Confidential - Attorneys' Eyes Only

Page 36

1   patent?

2       A.  Sorry, repeat the question.

3       Q.  Do you have any understanding of what the

4   invention was that was described and claimed in the

5   '760 patent?

6           MS. CAPPELLA:  Objection; calls for a legal

7   conclusion.

8           THE WITNESS:  I have a rough understanding,

9   yes.

10  BY MS. FERNANDS:

11      Q.  And what's your rough understanding of the

12  invention of the '760 patent?

13          MS. CAPPELLA:  Objection.  Same objection.

14          THE WITNESS:  It's a -- well, I can read

15  the title -- missed telephone call management for

16  portable multifunction device.  Has to do with

17  missed calls.

18  BY MS. FERNANDS:

19      Q.  And did you work on UI for missed call

20  management while you were at Apple?

21      A.  Yes.

22      Q.  Do you recall during what period while you

23  were working at Apple you were working on the missed

24  call management UI?

25      A.  Towards the beginning of my time there.  I

Highly Confidential - Attorneys' Eyes Only

Page 37

1   don't remember exactly what time, though.

2       Q.  Do you recall the status of the UI for

3   missed call management when you joined the team --

4   the HI team at Apple?

5       A.  I do not.

6       Q.  Do you recall at some time being told to

7   work on a missed call management UI?

8       A.  Yes.

9       Q.  Do you recall who told -- asked you to do

10  that?

11      A.  I don't recall, but it was probably Greg

12  Christie, because he did that kind of thing.

13      Q.  What were you told about the goals of the

14  missed call management UI when you were asked to

15  work on it?

16      A.  The goals were just to solve the problem,

17  which is you receive a call and you miss it, how do

18  you deal with that, because you obviously want to

19  call them back.  It was pretty general, I guess.

20      Q.  Were you provided with any background

21  materials on any other systems for missed call

22  management when you started working on the UI for

23  the Apple missed call management?

24      A.  No.

25      Q.  Did Mr. Christie provide you with any

Highly Confidential - Attorneys' Eyes Only

1    suggestions for what features or functionality the

2    UI should contain?

3         A.  Don't recall.

4         Q.  Do you recall whether anyone provided you

5    with any suggestions for the types of features or

6    functionality that should be included?

7         A.  Don't recall.

8         Q.  Were you provided with any initial mockups

9    or drawings before you started working on the

10   project?

11        A.  Don't recall.

12        Q.  When you started working with UI for missed

13   call management, was Mr. Chaudhri also involved in

14   that project?

15        A.  No.

16        Q.  Was Mr. Chaudhri at any time involved in

17   designing the interface for the missed call

18   management?

19        A.  I don't remember his particular

20   involvement, although he was quite involved in lots

21   of different things.  So...

22        Q.  Going back to the '760 patent, have you

23   actually read this patent?

24        A.  Not cover to cover, no.

25        Q.  Okay.  When was the last time that you had

Highly Confidential - Attorneys' Eyes Only

Page 39

1    looked at this patent?

2        A.  Yesterday.

3        Q.  And do you have an understanding of what

4    the claims of the patent are, generally?

5        A.  Very -- a few particular ones generally,

6    but, yeah, I haven't really looked at it in detail

7    in a very long time.

8        Q.  If you turn to Column 36, which is toward

9    the end of this very thick patent.

10       A.  Yes.

11       Q.  And you see there in Column 36 at about

12   line 18, "What is claimed..."?

13       A.  Mm-hmm.

14       Q.  And then you have Claim 1 there.

15       A.  Yes.

16       Q.  Do you see that?

17       A.  Yeah.

18       Q.  If you could just take a minute to read to

19   yourself Claim 1 to refresh your memory as to the

20   nature of that claim.

21       A.  This whole thing going down to Number 2?

22       Q.  Going down to Number 2, yes.

23       A.  (Witness reviewing document.)

24           Okay.

25       Q.  Okay.  And having read Claim 1, does that

Highly Confidential - Attorneys' Eyes Only

Page 40

1   change or refresh your memory in any way as to what

2   the -- your understanding of the invention was for

3   the '760 patent?

4           MS. CAPPELLA:  Objection, same; calls for a

5   legal conclusion or expert opinion.

6           THE WITNESS:  No.  I looked over this

7   portion of it yesterday.  So...

8   BY MS. FERNANDS:

9       Q.  And so it's fair that we're referring to

10  this generally in shorthand as "missed call

11  management," and you understand that that's

12  referring to what's described as the invention of

13  the '760 patent?

14      A.  Yes.

15      Q.  Okay.  Other than the broad description as

16  missed call management, what is your understanding

17  of what it is that you and your co-inventors

18  invented?

19          MS. CAPPELLA:  Objection; calls for a legal

20  conclusion.

21          THE WITNESS:  My understanding is that

22  it's -- you tap one area of the screen to return a

23  call and another area to view contact information

24  and perform other actions.

25  //

Highly Confidential - Attorneys' Eyes Only

Page 41

1  BY MS. FERNANDS:

2      Q.  What was Mr. Forstall's role in arriving at

3  the invention that's described in the '760 patent?

4          MR. CHEN:  Objection; calls for

5  speculation.

6          THE WITNESS:  I don't recall.

7  BY MS. FERNANDS:

8      Q.  Do you have any memory of Mr. Forstall's

9  contribution to the invention described in the '760

10  patent?

11          MR. LO:  Objection; asked and answered.

12          THE WITNESS:  No.

13  BY MS. FERNANDS:

14      Q.  Do you recall Mr. Christie's role in the

15  team arriving at the invention that's described in

16  the '760 patent?

17          MS. CAPPELLA:  Objection; calls for a legal

18  conclusion.

19          THE WITNESS:  I don't recall his particular

20  involvement.  I'll just say that all of these people

21  were in the -- these group meetings, where lots of

22  the stuff was conceived in a group setting.  So it's

23  hard to place the invention on one particular

24  person.

25  //

Highly Confidential - Attorneys' Eyes Only

Page 45

1    contact call screen?

2        A.  It was just a list of times and durations,

3    I believe.

4            MR. CHEN:  Anastacia, when we get to a good

5    spot can we take a break?

6            MS. FERNANDS:  Sure.  We can take a break

7    now.

8            MR. CHEN:  Thanks.

9            THE VIDEOGRAPHER:  The time is 10:29 a.m.,

10   and we're off the record.

11           (Recess taken)

12           THE VIDEOGRAPHER:  The time is 10:47 a.m.,

13   and we're on the record.

14           (Deposition Exhibit 3 was marked for

15           identification)

16           MS. FERNANDS:  So before we go back on,

17   this Exhibit 3 that we have just marked is not

18   marked confidential, but we spoke off the record

19   about confidential exhibits.

20           And I believe there was no problem with

21   Apple's counsel that documents that have been marked

22   confidential in connection with the Samsung case can

23   be used with this group in this room for this

24   deposition, and then there will be a discussion as

25   to how to appropriately designate those with respect

Highly Confidential - Attorneys' Eyes Only

Page 46

1    to the Motorola case if and when that becomes

2    appropriate.

3            We also mistakenly discussed splitting up

4    time, which this doesn't count against our time.

5    BY MS. FERNANDS:

6        Q.   So, Mr. Matas, you've been handed what is

7    marked Exhibit 3.  Do you recognize this?

8        A.   Yes, I do.

9        Q.   What is it?

10       A.   It's the iPod phone missed call screen, or

11   recent calls.

12       Q.   And did you work on the UI for the iPod

13   phone missed call screen?

14       A.   Yes.  I created this screen.

15       Q.   When did you create the screen?

16       A.   Probably in 2005, 2006.

17       Q.   Were you also working on the iPhone project

18   at the same time?

19       A.   I believe so.

20       Q.   Did the iPod phone have an internal name at

21   Apple when you were working on it?

22       A.   It was usually referred to as P1.

23       Q.   And I believe you said the iPhone was

24   referred to as Purple; is that correct?

25       A.   Yes.

Highly Confidential - Attorneys' Eyes Only

Page 47

1    Q.  Was the iPhone also referred to as P2?

2    A.  Yes.

3    Q.  Was the iPod phone that was contemplated

4 going to use a touchscreen?

5    A.  No.

6    Q.  With respect to this recent call list and

7 the UI that you were designing, would a user be able

8 to make a call from the recent call list on the iPod

9 phone?

10    A.  Yes, I believe so.

11    Q.  How would that be done?

12    A.  By selecting a name and pressing the center

13 button.

14    Q.  Were any other actions available from the

15 call list on the iPod phone?

16    A.  You would be able to, for -- on recognized

17 missed calls, go to another screen and perform some

18 actions.

19        I believe with the people in your address

20 book you could also do that.  I don't recall the

21 exact interaction.

22    Q.  There is a way to go from the call list to

23 an address book entry for a recognized missed call;

24 is that correct?

25    A.  I believe so.

Highly Confidential - Attorneys' Eyes Only

Page 92

1          MR. CHEN:  Counsel, can I point it out?

2          MS. FERNANDS:  Feel free.  Yes.

3          THE WITNESS:  Oh, right there.  Okay.

4          All right.  What was I working on then?

5    Don't remember.

6    BY MS. FERNANDS:

7          Q.  Do you recall the status of the iPhone UI

8    development as of September 6, 2006?

9          MR. LO:  Objection; vague.

10          THE WITNESS:  It was halfway done.

11    BY MS. FERNANDS:

12          Q.  Do you recall the status of the UI

13    development for the missed call list as of September

14    of 2006?

15          MR. LO:  Objection; vague.

16          THE WITNESS:  No, I don't.

17    BY MS. FERNANDS:

18          Q.  What about for the contact card as of that

19    time?

20          A.  I don't remember.

21          Q.  Did you ever have any contact with

22    Apple's -- and this is a "yes" or "no."  I'm not

23    asking for communications.

24          Did you have any contact with Apple's

25    patent counsel in connection with the prosecution of

Highly Confidential - Attorneys' Eyes Only

Page 93

1    the '760 patent?

2         A.  I -- probably.  I don't remember.

3         Q.  You don't recall any communications with

4    Apple's patent counsel regarding --

5         A.  I mean, I must have, so, yes, to sign it.

6         Q.  Again, "yes" or "no," do you recall any

7    specific communications with Apple's patent counsel

8    in connection with the prosecution of the '760

9    patent?

10        A.  No.

11        Q.  Did you review the specification for the

12   '760 patent before the patent application was filed?

13        A.  I don't recall.  I assume I did, because I

14   did that with the patents that were filed.

15        Q.  You just don't recall specifically as to

16   this one?

17        A.  Correct.

18        Q.  After the application was filed, did you

19   have any role in the prosecution of the patent?

20             MS. CAPPELLA:  Objection; vague.

21             THE WITNESS:  No.  I don't know what that

22   means.

23   BY MS. FERNANDS:

24        Q.  While the patent application was before the

25   Patent Office, were you consulted -- again, "yes" or

Highly Confidential - Attorneys' Eyes Only

Page 94

1    "no" -- were you consulted by any Apple attorneys in

2    connection with their prosecution of the patent?

3         A.  No.

4         Q.  Were you shown any materials that the

5    Patent Office issued in connection with the

6    prosecution of the patent before the patent issued?

7         A.  No.

8         Q.  Are you familiar with the term "prior art"?

9         A.  Yes.

10        Q.  Okay.  What is your understanding of prior

11   art?

12        A.  It's like an invention that came before

13   another invention that might be related or similar.

14        Q.  So if we roughly go with, you know, work in

15   the same field that came before for prior art, can

16   we use that as a working definition?

17        A.  Sure.

18        Q.  Do you recall being asked to collect any

19   prior art that -- in your possession in connection

20   with the prosecution of the '760 patent?

21        A.  I don't recall.

22        Q.  Did you -- do you recall ever having

23   conducted a search for any prior art to the '760

24   patent?

25        A.  I don't recall, no.

Highly Confidential - Attorneys' Eyes Only

Page 95

1      Q.  Did you receive notification from Apple

2  when the '760 patent issued in September of 2011?

3      A.  I don't recall.

4      Q.  Have you received notification from Apple

5  as to any patents issuing with you as a named

6  inventor since then, any Apple patents?

7      A.  Yes, I have.

8      Q.  Which ones were those?

9      A.  I don't remember specifically.

10     Q.  But you remember that since 2011, you've

11  received notifications of patents issued --

12     A.  Oh, since 2011?  I don't remember

13  specifically if it was before 2011.

14     Q.  When you started working at Apple in 2005,

15  is that the first time you worked on UI for a

16  telephone?

17     A.  Yes.

18     Q.  Had you worked on UI for any other portable

19  devices before then?

20     A.  No.

21     Q.  When you started working with Apple, did

22  you attend any conferences or -- well, let's just

23  start with did you attend any conferences concerning

24  the technology for telephones or portable devices?

25     A.  No.

Highly Confidential - Attorneys' Eyes Only

Page 96

1          Q.   Did you attend any sort of trade shows or

2     other industry meetings in your early work with --

3          A.   Just --

4          Q.   -- Apple?

5          A.   Just Macworld.

6          Q.   Just Macworld?

7          A.   Yeah.

8          Q.   Okay.   Did you follow any magazines or

9     trade press at the time?

10         A.   No.

11         Q.   Did you have a cell phone in 2006?

12         A.   I did.

13         Q.   Do you remember what you had?

14         A.   I had a Sidekick.

15         Q.   Who made Sidekick?

16         A.   I think it was called Danger.

17         Q.   And did Sidekick have a call list?

18         A.   I believe so.

19         Q.   Did you look into the interfaces on any

20    other portable phones in the 2005-2006 time frame?

21         A.   No.

22         Q.   Do you know whether anyone else on the HI

23    team with you at the time was looking at any other

24    portable devices that were available in 2005-2006 in

25    connection with the work at Apple?

Highly Confidential - Attorneys' Eyes Only

Page 97

1      A.  I don't recall us looking at other people's

2  work that much.

3      Q.  Did you ever use a Palm device before 2006?

4      A.  No.

5      Q.  Are you familiar with the Palm Treo?

6      A.  I've heard of it.  I've never used one.

7      Q.  Had you ever heard of Windows Mobile 5?

8      A.  I've heard of Windows Mobile.  I don't know

9  about 5.

10         (Deposition Exhibit 13 was marked for

11         identification)

12  BY MS. FERNANDS:

13      Q.  So you've been handed what we've marked as

14  Exhibit 13.  These are simply some screenshots, not

15  produced in this form, so there is no Bates number

16  on them, but these are, I'll represent, from Windows

17  Mobile 5.

18         And that first screen is a call list.

19      A.  Mm-hmm.

20      Q.  Have you ever seen this before -- or any of

21  these screens before?

22      A.  No.

23      Q.  If I represent that if you touch, for

24  instance, Example 3 here, you will get the pop-up

25  that is shown on the third screenshot --

Highly Confidential - Attorneys' Eyes Only

Page 105

1          DECLARATION UNDER PENALTY OF PERJURY

2

3          I, MICHAEL J. MATAS, do hereby certify under

4    penalty of perjury that I have read the foregoing

5    transcript of my deposition taken on January 24,

6    2013; that I have made such corrections as appear

7    noted herein in ink, initialed by me; that my

8    testimony as contained herein, as corrected, is true

9    and correct.

10

11         DATED this          day of

12   2013, at                          , California.

13

14

15

                    _____

16                       MICHAEL J. MATAS

17

18

19

20

21

22

23

24

25

Page 106

1   STATE OF CALIFORNIA   )

2             :ss

3   COUNTY OF SAN MATEO   )

4          I, CYNTHIA MANNING, a Certified Shorthand

5   Reporter of the State of California, do hereby

6   certify:

7          That the foregoing proceedings were taken

8   before me at the time and place herein set forth;

9   that any witnesses in the foregoing proceedings,

10  prior to testifying, were placed under oath; that a

11  verbatim record of the proceedings was made by me

12  using machine shorthand which was thereafter

13  transcribed under my direction; further, that the

14  foregoing is an accurate transcription thereof.

15         I further certify that I am neither

16  financially interested in the action, nor a relative

17  or employee of any attorney of any of the parties.

18

19         IN WITNESS WHEREOF, I have subscribed my

20  name this 24th day of January 2013.

21

22

     _____

23         CYNTHIA MANNING, CSR No. 7645, CCRR, CLR

24

25

Highly Confidential - Attorneys' Eyes Only

Page 111

1   IN THE MATTER OF:  Apple Inc.,
                       vs.
2                      Samsung Electronics Company, Ltd.
3                      Motorola Mobility,
                       vs.
4                      Apple Inc.
5   Date:  January 24, 2013
6   Witness:  MICHAEL J. MATAS
7   Reason codes:
8           1.   To clarify the record.
            2.   To conform to the facts.
9           3.   To correct transcription errors.
10

    Page            Line               Reason
11  From                          to
12  Page            Line               Reason
    From                          to
13

    Page            Line               Reason
14  From                          to
15  Page            Line               Reason
    From                          to
16

    Page            Line               Reason
17  From                          to
18  Page            Line               Reason
    From                          to
19

    Page            Line               Reason
20  From                          to
21

22


                    _____
23                       MICHAEL J. MATAS
24
25

Ex. G

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

Page 1

1           UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               SAN JOSE DIVISION

4                  --o0o--

5   APPLE INC., A CALIFORNIA          )

    CORPORATION,                      )

6                                     )

                  Plaintiff,     )CASE NO.

7                                ) 12-CV-00630-LHK

         vs.                     )  (PSG)

8                                     )

    SAMSUNG ELECTRONICS CO., LTD., A  )

9   KOREAN CORPORATION; SAMSUNG       )

    ELECTRONICS AMERICA, INC., A NEW  )

10  YORK CORPORATION; AND SAMSUNG     )

    TELECOMMUNICATIONS AMERICA, LLC,  )

11  A DELAWARE LIMITED LIABILITY      )

    COMPANY,                          )

12                                    )

                  Defendants.    )

13  _____)

14

15     ** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **

16            VIDEOTAPED DEPOSITION OF

17                 SCOTT HERZ

18     -----------------------------------

19            Thursday, March 14, 2013

20

21

22

23

24  REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR 12470

25

Merrill Corporation - Chicago

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

Page 2

```
 1                UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF FLORIDA

 3                       --o0o--

 4     MOTOROLA MOBILITY LLC,            )
                                         )
 5                    Plaintiff,     )CASE NO.
                                     ) 1:12-20271-RNS-TEB
 6          vs.                          )
                                         )
 7     APPLE INC.,                       )
                                         )
 8                    Defendant.     )
       _____)

 9

10      ** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **

11             VIDEOTAPED DEPOSITION OF

12                  SCOTT HERZ

13      -----------------------------------

14            Thursday, March 14, 2013

15

16

17

18

19     REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR 12470

20     (2003-449125)

21

22

23

24

25
```

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

Page 6

1          BE IT REMEMBERED THAT, pursuant to Notice, and

2     on Thursday, March 14, 2013, commencing at Gibson Dunn,

3     1881 Page Mill Road, Palo Alto, California, before me,

4     Megan F. Alvarez, a Certified Shorthand Reporter,

5     Registered Professional Reporter, personally appeared

6                         SCOTT HERZ

7          _____

8     a witness in the above-entitled court case, called by

9     Defendants, who, having been first duly sworn, was

10    examined and testified in said cause.

11    APPEARANCES FOR APPLE INC. v SAMSUNG ELECTRONICS:

12

13    FOR THE PLAINTIFF AND SCOTT HERZ:

14         BRIAN M. BUROKER, ESQ.

           GIBSON DUNN & CRUTCHER

15         1050 CONNECTICUT AVENUE, N.W.

           WASHINGTON, D.C. 20036-5306

16         202.955.8500

           BBUROKER@GIBSONDUNN.COM

17

18    FOR DEFENDANTS SAMSUNG ELECTRONICS COMPANY, LTD.,

      SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG

19    TELECOMMUNICATIONS AMERICA, LLC:

20         ANASTASIA FERNANDS, ESQ.

           QUINN EMANUEL URQUHART & SULLIVAN

21         51 MADISON AVENUE, 22ND FLOOR

           NEW YORK, NEW YORK 10010

22         212.849.7157

           ANASTASIAFERNANDS@QUINNEMANUEL.COM

23

24

25

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

Page 7

1    APPEARANCES FOR MOTOROLA MOBILITY v APPLE INC.:

2

3    FOR APPLE INC.:

4              ANNA CAPPELLA, ESQ.
               WEIL GOTSHAL & MANGES
5              201 REDWOOD SHORES PARKWAY
               REDWOOD SHORES, CALIFORNIA 94065-1134
6              650.802.3141
               ANNA.CAPPELLA@WEIL.COM

7

8              WENDY ANNA HERBY, ESQ.
               APPLE
9              1 INFINITE LOOP, MS 36-3NYJ
               CUPERTINO, CALIFORNIA 95014
10             408.974.5419
               WHERBY@APPLE.COM

11

12   FOR MOTOROLA MOBILITY LLC:

13             GRAHAM M. PECHENIK, ESQ.
               QUINN EMANUEL
14             50 CALIFORNIA STREET, 22ND FLOOR
               SAN FRANCISCO, CALIFORNIA 94111
15             415.875.6409
               GRAHAMPECHENIK@QUINNEMANUEL.COM

16

17   ALSO PRESENT:

18             WAYNE TIDWELL, VIDEOGRAPHER

19

20                        --o0o--

21

22

23

24

25

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

Page 14

| | | |
|---|---|---|
| 10:19:45 | 1 | Q.   You can -- I think your counsel would say |
| 10:19:47 | 2 | that you can say "yes" or "no." |
| 10:19:48 | 3 | MR. BUROKER:  You can answer this one |
| 10:19:49 | 4 | "yes" or "no." |
| 10:19:50 | 5 | THE WITNESS:  Yes. |
| 10:19:50 | 6 | BY MS. FERNANDS: |
| 10:19:50 | 7 | Q.   Yes, you reviewed. |
| 10:19:51 | 8 | And did any of those documents that you |
| 10:19:53 | 9 | reviewed yesterday refresh your recollection about |
| 10:19:55 | 10 | any past events? |
| 10:19:56 | 11 | A.   No. |
| 10:20:03 | 12 | Q.   You didn't review any of your prior |
| 10:20:06 | 13 | deposition testimony in preparation for today? |
| 10:20:08 | 14 | A.   No. |
| 10:20:08 | 15 | Q.   Did you take any notes in preparation for |
| 10:20:11 | 16 | your deposition? |
| 10:20:11 | 17 | A.   No. |
| 10:20:17 | 18 | Q.   So could you describe briefly your |
| 10:20:20 | 19 | educational history after high school? |
| 10:20:22 | 20 | A.   I went to the -- to Oregon State and |
| 10:20:25 | 21 | University of Oregon.  I went to Oregon State for |
| 10:20:30 | 22 | two terms and then mostly University of Oregon. |
| 10:20:32 | 23 | Graduated in '98 with a Bachelor of Science in |
| 10:20:37 | 24 | computer science. |
| 10:20:45 | 25 | Q.   Have you taken any courses since you |

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

Page 15

| | | |
|---|---|---|
| 10:20:47 | 1 | received your Bachelor of Science in computer |
| 10:20:49 | 2 | science? |
| 10:20:49 | 3 | A.   No. |
| 10:20:55 | 4 | Q.   What was your first job after college? |
| 10:20:57 | 5 | A.   My first job after college was at a |
| 10:20:59 | 6 | company called PDH. |
| 10:21:03 | 7 | Q.   What was PDH? |
| 10:21:05 | 8 | A.   It was a -- kind of like a contracting |
| 10:21:09 | 9 | firm.  Did work primarily for the government. |
| 10:21:11 | 10 | Q.   How long did you work for PDH? |
| 10:21:16 | 11 | A.   A year or so. |
| 10:21:18 | 12 | Q.   What did you do for PDH? |
| 10:21:21 | 13 | A.   I wrote software for them. |
| 10:21:28 | 14 | Q.   After you left PDH, what -- what was your |
| 10:21:31 | 15 | next job? |
| 10:21:32 | 16 | A.   It was Apple. |
| 10:21:32 | 17 | Q.   When did you join Apple? |
| 10:21:34 | 18 | A.   September of '99. |
| 10:21:35 | 19 | Q.   What was your job title when you began at |
| 10:21:38 | 20 | Apple? |
| 10:21:38 | 21 | A.   I was a software engineer. |
| 10:21:42 | 22 | Q.   Did you work for a particular group within |
| 10:21:44 | 23 | Apple? |
| 10:21:44 | 24 | A.   I did. |
| 10:21:45 | 25 | Q.   What was the name of that group? |

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

Page 16

| | | |
|---|---|---|
| 10:21:46 | 1 | A.   I worked for the Interface Builder team. |
| 10:21:53 | 2 | Q.   What was the Interface Builder team? |
| 10:21:56 | 3 | A.   It was a tool that -- it was a team that |
| 10:21:59 | 4 | worked on a tool called Interface Builder. |
| 10:22:03 | 5 | Q.   What was Interface Builder? |
| 10:22:07 | 6 | A.   It's a developer tool, something that |
| 10:22:08 | 7 | allows developers to make interfaces for their |
| 10:22:12 | 8 | software. |
| 10:22:12 | 9 | Q.   About how long did you work on the |
| 10:22:13 | 10 | Interface Builder team? |
| 10:22:24 | 11 | A.   Two to three years.  Around in there. |
| 10:22:32 | 12 | Q.   Did you work on any other projects within |
| 10:22:34 | 13 | Apple while you were on the Interface Builder team? |
| 10:22:36 | 14 | A.   Yes. |
| 10:22:37 | 15 | Q.   What were they? |
| 10:22:37 | 16 | A.   So we worked on -- we would -- we worked |
| 10:22:40 | 17 | on Interface Builder, and then we would sort of help |
| 10:22:43 | 18 | out with other teams.  We worked primarily then |
| 10:22:45 | 19 | on -- Address Book was the big thing that we worked |
| 10:22:49 | 20 | on. |
| 10:22:50 | 21 | Q.   When did you begin working on Address |
| 10:22:51 | 22 | Book? |
| 10:22:54 | 23 | A.   Sometime after that two to three years. |
| 10:22:58 | 24 | I -- I know it as the Address Book that shipped with |
| 10:23:01 | 25 | 10.2. |

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

10:23:12   1          Q.   Was 10.2 Jaguar?

10:23:15   2          A.   Yes.

10:23:15   3          Q.   Okay.   And by 10.2, you mean Mac OS10.2;

10:23:23   4   is that correct?

10:23:23   5          A.   Correct.

10:23:26   6          Q.   What did you do while you were working on

10:23:29   7   Address Book?

10:23:29   8          A.   I did engineering for it.

10:23:31   9          Q.   Was there anything in particular that you

10:23:33   10   were doing the engineering for on Address Book?

10:23:39   11          A.   Various pieces of it.   We tended to all

10:23:41   12   kind of work on different parts of it.

10:23:47   13          Q.   Did Address Book already exist when you

10:23:49   14   joined the team for Address Book?

10:23:52   15          A.   There was a prior version.

10:24:04   16          Q.   Who else was working on Address Book at

10:24:06   17   that time?

10:24:07   18          MR. BUROKER:   Objection.   Vague.

10:24:08   19          You can answer.

10:24:10   20          THE WITNESS:   How do you mean?

10:24:10   21   BY MS. FERNANDS:

10:24:11   22          Q.   On the engineering team that you were on,

10:24:12   23   who else was working on Address Book?

10:24:15   24          A.   Vince DeMarco.

10:24:21   25          Q.   Was there anyone else?

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

Page 18

10:24:23    1          A.    Henri Lamiraux.

10:24:26    2          Q.    Was that it?

10:24:29    3          A.    That's who I remember, yeah.

10:24:32    4          Q.    For how long did you work on Address Book

10:24:35    5    projects?

10:24:37    6          A.    Worked on it until 2005.

10:24:42    7          Q.    Did that cover Address Book for different

10:24:44    8    versions of the Mac OS?

10:24:46    9          A.    It did.

10:24:47    10         Q.    For which versions?

10:24:50    11         A.    I don't exactly remember.  Up until

10:24:52    12   2005-ish.

10:24:54    13         Q.    So you worked on Address Book for all Mac

10:24:57    14   versions from 10.2 through whatever was the version

10:25:01    15   in 2005; is that correct?

10:25:04    16         A.    To the best of my recollection.

10:25:14    17         Q.    And in 2005, did you stop working on

10:25:16    18   Address Book?

10:25:19    19         A.    Yeah.  I started working on some other

10:25:21    20   stuff.

10:25:22    21         Q.    And what did you begin working on in 2005?

10:25:24    22         A.    I started working on iPhone.

10:25:27    23         Q.    What in particular did you start working

10:25:29    24   on for the iPhone in 2005?

10:25:31    25         A.    I started working on various foundation

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

Page 19

10:25:38  1    pieces of it.

10:25:41  2        Q.   What do you mean by "foundation pieces"?

10:25:44  3        A.   I started working on things that would

10:25:50  4    become, you know, kind of crucial user interface

10:25:56  5    elements of it.

10:25:57  6        Q.   Were there particular names for those

10:25:59  7    crucial interface elements?

10:26:00  8        A.   So the first one was the scrolling contact

10:26:05  9    list.

10:26:09  10       Q.   Okay.  Anything else?

10:26:14  11       A.   That was the -- you know, that was the

10:26:16  12   first one.  I worked on what -- I basically worked

10:26:19  13   on what became UI Kit.

10:26:25  14            I worked on Springboard.

10:26:30  15       Q.   Anything else that you worked on for

10:26:32  16   the -- for the iPhone in the 2005 time frame?

10:26:36  17       A.   I mean, it's kind of -- it was a continuum

10:26:38  18   from those things, and then it was a blur of

10:26:45  19   activity.  And then we, you know, announced it in

10:26:50  20   2007.  I mean, I worked on lots of, you know, pieces

10:26:55  21   here and there.

10:26:56  22       Q.   Do any of the other pieces stand out from

10:26:58  23   that blur of activity?

10:27:00  24       A.   I worked on the SMS app.

10:27:06  25            I worked on parts of the camera, the app.

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

Page 20

| | | |
|---|---|---|
| 10:27:19 | 1 | A lot of our event system. |
| 10:27:23 | 2 | Q.   What do you mean by the event system? |
| 10:27:26 | 3 | A.   So human interaction events, how it |
| 10:27:31 | 4 | touches work. |
| 10:27:40 | 5 | Q.   Who was your immediate supervisor when you |
| 10:27:42 | 6 | were working on the iPhone projects from 2005 to |
| 10:27:46 | 7 | 2007 time frame? |
| 10:27:47 | 8 | A.   Nitin Ganatra. |
| 10:27:51 | 9 | Q.   Did anyone report to you during that time |
| 10:27:54 | 10 | frame? |
| 10:27:59 | 11 | A.   Between 2007, no. |
| 10:28:05 | 12 | Q.   Was there a name for the team that you |
| 10:28:06 | 13 | were working on starting in 2005 when you started |
| 10:28:10 | 14 | with the iPhone? |
| 10:28:11 | 15 | A.   We were called the platform experience on |
| 10:28:17 | 16 | purple. |
| 10:28:18 | 17 | Q.   Who else was a member of the platform |
| 10:28:21 | 18 | experience on purple team? |
| 10:28:27 | 19 | A.   It grew to something like 40 people, you |
| 10:28:29 | 20 | know, give or take, at the end.  I don't know that I |
| 10:28:31 | 21 | have a whole list. |
| 10:28:32 | 22 | Q.   When you started out in 2005, do you |
| 10:28:34 | 23 | recall who was on the platform experience on purple |
| 10:28:36 | 24 | team? |
| 10:28:37 | 25 | A.   When I first started, it was me. |

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

Page 57

11:26:42   1       A.   I mean, I guess I would go to somebody

11:26:47   2   else on the team.  I don't know.

11:26:49   3       Q.   When you say "on the team," from the

11:26:50   4   Address Book team?

11:26:52   5       A.   Right.

11:26:52   6            MS. FERNANDS:  Let's take a break.

11:26:57   7            THE VIDEOGRAPHER:  Off the record at

11:26:57   8   11:27.

11:26:59   9            (Off the record at 11:27 a.m. and back

11:41:13  10            on the record at 11:40 a.m.)

11:41:16  11   BY MS. FERNANDS:

11:41:17  12       Q.   So I believe you've been handed a new

11:41:20  13   exhibit.

11:41:21  14            (Deposition Exhibit 9 was marked for

11:41:21  15            identification.)

11:41:21  16   BY MS. FERNANDS:

11:41:22  17       Q.   So I believe you've been handed a new

11:41:22  18   exhibit we've marked as Exhibit 9, Bates-numbered

11:41:25  19   APLNDC630-0000173683 through 770.

11:41:37  20            Do you recognize this document?

11:41:40  21       A.   Just go through it real quick.

11:42:10  22            I think it's our patent.

11:42:13  23       Q.   And when you say "it's our patent," who

11:42:16  24   are you referring to?

11:42:19  25       A.   It's Apple's patent.

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

Page 58

11:42:23  1        Q.   Okay.  Are you aware that Apple is

11:42:26  2    asserting this patent against Samsung?

11:42:30  3        A.   Yeah.

11:42:33  4        Q.   If you look at the number of the patent up

11:42:35  5    in upper right-hand side, it's U.S. Patent

11:42:38  6    No. 8,014,760.

11:42:42  7             Do you see that?

11:42:43  8        A.   I do.

11:42:44  9        Q.   And if I refer to this as the "'760

11:42:45  10   patent," will you understand what I'm referring to?

11:42:48  11       A.   I will.

11:42:49  12       Q.   Excellent.

11:42:50  13             So there are seven inventors listed here;

11:42:51  14   is that correct?  Item 75.

11:42:56  15       A.   That's correct.

11:42:57  16       Q.   And you are one of the named inventors; is

11:42:59  17   that right?

11:42:59  18       A.   I am.

11:43:02  19       Q.   Do you recall your contribution to this

11:43:04  20   patent?

11:43:07  21       A.   Um, I know I -- I worked in areas all

11:43:12  22   around our -- our phone stuff and our contact stuff,

11:43:21  23   but I don't know exactly -- don't remember exactly

11:43:26  24   like which piece.

11:43:27  25       Q.   When you say "areas all around the phone

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

Page 59

11:43:30   1   stuff," what are you referring to as "the phone

11:43:32   2   stuff"?

11:43:35   3        A.   Just our iPhone functionality having to do

11:43:38   4   with how the user worked with calls, contacts, those

11:43:46   5   kinds of things.

11:43:47   6        Q.   Okay.  And when you say "the contact

11:43:50   7   stuff," what were you referring to there?

11:43:54   8        A.   Much of our Address Book functionality.

11:44:14   9        Q.   Did you use any of the work that you had

11:44:16  10   done on Address Book for the Mac OS in your work for

11:44:20  11   the iPhone contact information?

11:44:21  12        A.   Um, when I started on the -- the

11:44:27  13   Address Book stuff for the -- the iPhone, we started

11:44:31  14   over, to the best of my knowledge, from scratch.

11:44:39  15        Q.   Contacts for iPhone did not use

11:44:41  16   Address Book from the Mac OS?

11:44:45  17        A.   The -- the scrolling contact list stuff

11:44:49  18   that I did earlier early, early on used a completely

11:44:55  19   different back end than the Mac OS10 stuff.

11:45:07  20        Q.   What about the user interface features of

11:45:09  21   the Address Book?  Where was it set up like --

11:45:13  22   strike that.

11:45:16  23        You said the scrolling contact list had a

11:45:18  24   different back end.  What about the front end?  Was

11:45:20  25   that different between the Mac OS and the iPhone?

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

Page 60

11:45:24   1          A.   Yes.

11:45:25   2          Q.   How was that different?

11:45:28   3          A.   So one of the things that became really

11:45:31   4    obvious to us was that because you were working with

11:45:37   5    something that's not as precise as like a mouse,

11:45:45   6    right, that it needs to be -- it can't be very --

11:45:46   7    the controls can't be very fine.   And so we spent a

11:45:50   8    lot of work making things very easy to -- to

11:45:53   9    interact with.   And that's not something that the --

11:45:56   10   you know, that wasn't a design consideration really

11:46:02   11   of the desktop one, and it definitely was of the one

11:46:06   12   that would go on to become the iPhone one.

11:46:09   13         Q.   What did you do to make things easy to

11:46:11   14   interact with in the contacts on the iPhone?

11:46:15   15         A.   So we used larger hit targets.   We kept

11:46:23   16   things -- things are a bit more, you -- you interact

11:46:34   17   with a -- with, you know, a person and you tend to

11:46:39   18   then slide over in this case to work with just that

11:46:44   19   person.   And then if you want to drill down a little

11:46:47   20   further, you tend to, you know, work with -- with

11:46:53   21   interfaces that are specific to that thing that

11:46:58   22   you're -- that you're clicking on.

11:47:03   23              It's -- like Address Book on the desktop,

11:47:07   24   you might work with it kind of all at once.   And on

11:47:14   25   the iOS, you tend to kind of work with it in chunks.

Highly Confidential - Attorneys' Eyes Only
Scott Herz    March 14, 2013

Page 61

11:47:20   1      Q.   So you referred to "sliding over to work

11:47:22   2   with just that person."

11:47:24   3       What did you mean by that?

11:47:26   4      A.   So the way the -- the contact stuff

11:47:30   5   worked, if you tapped on a person's name, then the

11:47:40   6   whole thing would slide over and you would see then

11:47:43   7   the information about that person.

11:47:48   8      Q.   What do you mean, "the whole thing would

11:47:50   9   slide over"?

11:47:52   10      A.   The piece representing iOS apps tend to

11:48:04   11   be -- they have certain sections which we now

11:48:09   12   call -- you know, the views kind of live within a

11:48:13   13   certain space.   So there's status bars and then

11:48:16   14   navigation bars and maybe tool bars down at the

11:48:19   15   bottom, and then sort of the piece in between is the

11:48:21   16   content area for whatever it is you're working with.

11:48:25   17   And so that would slide in and out when you tapped

11:48:28   18   on a person.

11:48:29   19      Q.   And then I believe you said that you

11:48:35   20   would -- when it slid over, you would see

11:48:38   21   information about that person.

11:48:39   22       What information would you see about that

11:48:40   23   person?

11:48:42   24      A.   You would see their name.   You could see a

11:48:51   25   picture that you'd set for them.   Other things about

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

Page  62

11:49:00  1    that person:   Phone numbers, e-mails.

11:49:11  2        Q.   So the other inventors who are listed on

11:49:14  3    this '760 patent, the first name is Scott Forstall.

11:49:19  4            Who is Mr. Forstall?

11:49:22  5        A.   At the time, he was either our director or

11:49:28  6    vice president.

11:49:39  7        Q.   What was Mr. Forstall's role in the

11:49:43  8    development of the invention that led to the

11:49:45  9    '760 patent?

11:49:47  10       A.   So I don't remember his specific role.

11:49:50  11       Q.   Did you interact with Mr. Forstall in your

11:49:54  12   work on the phone and contacts aspects of iPhone?

11:50:00  13       A.   I would have -- I don't remember specific

11:50:06  14   interactions with him, though, on it.

11:50:08  15       Q.   Do you remember generally any interactions

11:50:10  16   with him with respect to the phone and contacts

11:50:13  17   aspects of iPhone?

11:50:17  18       A.   I mean, we -- we would iterate on things

11:50:19  19   together.  We would -- we would come up with a

11:50:24  20   design.  We'd implement it.  We'd show it to him.

11:50:28  21   He'd have feedback.  We'd talk about it.  And then

11:50:33  22   just repeat.

11:50:38  23       Q.   When you say, "We would iterate on

11:50:40  24   things," who are you referring to as "we"?

11:50:42  25       A.   Just the team in general.

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

Page  63

| | | |
|---|---|---|
| 11:50:48 | 1 | Q.   Which team was that?  Who were the |
| 11:50:50 | 2 | members? |
| 11:50:50 | 3 | A.   So the platform experience team. |
| 11:51:00 | 4 | Q.   Were any of other inventors who are listed |
| 11:51:03 | 5 | here on the '760 patent on the platform experience |
| 11:51:06 | 6 | team? |
| 11:51:13 | 7 | A.   I don't know exactly what they called -- I |
| 11:51:14 | 8 | mean, Scott ran it.  The overall platform experience |
| 11:51:19 | 9 | on purple team.  I don't know the -- the specific |
| 11:51:27 | 10 | group names of the other people. |
| 11:51:29 | 11 | Q.   You say "Scott ran it."  That's |
| 11:51:31 | 12 | Mr. Forstall ran the platform experience on purple? |
| 11:51:34 | 13 | A.   Right. |
| 11:51:42 | 14 | Q.   When you said that "We would iterate on |
| 11:51:44 | 15 | things," what did you mean, "We would iterate on |
| 11:51:47 | 16 | things"? |
| 11:51:49 | 17 | A.   So it's just, in very general terms, like |
| 11:51:53 | 18 | there would be a problem we'd want to solve.  So |
| 11:51:56 | 19 | we'd talk about it.  We go off and try -- try some |
| 11:52:02 | 20 | things.  Code it up, come back, give him like a |
| 11:52:07 | 21 | demonstration of it. |
| 11:52:09 | 22 | And if it was great, then we move on to |
| 11:52:13 | 23 | the next thing.  If it was -- needed work, like we'd |
| 11:52:16 | 24 | talk about ways to like make it better, and then |
| 11:52:18 | 25 | just kind of keep doing that until what we had was |

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

Page 67

| | | |
|---|---|---|
| 11:57:07 | 1 | cute little animation, and I worked with him on |
| 11:57:10 | 2 | that. |
| 11:57:12 | 3 | Q.   Do you recall any other specific instances |
| 11:57:15 | 4 | where you worked with any of these other named |
| 11:57:17 | 5 | inventors on the '760 patent for aspects of the |
| 11:57:20 | 6 | phone or contacts of iPhone? |
| 11:57:35 | 7 | A.   No. |
| 11:57:39 | 8 | Q.   Who is Imran Chaudhri? |
| 11:57:42 | 9 | A.   He's one of the designers on the HI team. |
| 11:57:47 | 10 | Q.   And when you were working on the phone and |
| 11:57:53 | 11 | contacts aspects of iPhone, did you interact with |
| 11:57:56 | 12 | Mr. Chaudhri? |
| 11:57:57 | 13 | A.   I don't remember. |
| 11:58:01 | 14 | Q.   How about Mr. Matas?  Do you know who he |
| 11:58:05 | 15 | is? |
| 11:58:06 | 16 | A.   I do. |
| 11:58:06 | 17 | Q.   Who is he? |
| 11:58:10 | 18 | A.   He's another -- was another designer on |
| 11:58:11 | 19 | the HI team. |
| 11:58:13 | 20 | Q.   Do you know -- well, let me go back. |
| 11:58:15 | 21 | Do you know what Mr. Chaudhri's |
| 11:58:16 | 22 | contribution was to the inventions that are |
| 11:58:18 | 23 | described in the '760 patent? |
| 11:58:20 | 24 | A.   I don't. |
| 11:58:21 | 25 | Q.   And with respect to Mr. Matas, do you |

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

Page 68

```
11:58:23  1    recall any interactions with him in respect to the
11:58:26  2    work on the iPhone contacts or phone
11:58:29  3    functionalities?
11:58:31  4         A.   I don't remember.
11:58:35  5         Q.   Do you know what Mr. Matas' contribution
11:58:37  6    was to the inventions described in the '760 patent?
11:58:41  7         A.   I don't remember.
11:58:43  8         Q.   Who is Marcel Van Os?
11:58:45  9         A.   So he's another member of the HI team.
11:58:48  10        Q.   Is he someone with whom you interacted
11:58:51  11   while you were working on iPhone phone or contact
11:58:54  12   functionality?
11:58:56  13        A.   I don't remember.
11:58:58  14        Q.   Do you recall any interactions with
11:59:00  15   Mr. Van Os?
11:59:05  16        A.   Not related to -- no.
11:59:11  17        Q.   And then there's Stephen Lemay.  Who is
11:59:13  18   that?
11:59:14  19        A.   He's another member of the HI team.
11:59:16  20        Q.   Okay.  Do you recall any interactions with
11:59:20  21   Mr. Lemay in connection with your work on iPhone
11:59:24  22   phone or contacts functionality?
11:59:32  23        A.   No.
11:59:33  24        Q.   Do you know what Mr. Lemay's contribution
11:59:36  25   was to the inventions described in the '760 patent?
```

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

Page  69

11:59:47  1        A.   I don't.

11:59:57  2        Q.   Did you write any of the code for the

11:59:59  3   phone and contacts functionality in the iPhone?

12:00:02  4        A.   I did.

12:00:03  5        Q.   What aspects of the code did you write?

12:00:08  6        A.   So I wrote some of the early contact

12:00:14  7   scrolling, some of the early Address Book viewing

12:00:22  8   stuff.

12:00:26  9        Q.   Are those two different things, contact

12:00:28 10   scrolling and Address Book viewing?

12:00:33 11        A.   So the -- you know, the piece that we

12:00:37 12   started out with was the, you know, the scrolling

12:00:40 13   list of names and then when you tap, and then to see

12:00:43 14   like, you know, more about that person, I wrote the

12:00:49 15   views there.

12:00:56 16        Q.   Whose idea was the scrolling list of

12:00:58 17   names?

12:00:59 18             MR. BUROKER:  Objection.  Vague.

12:01:01 19             THE WITNESS:  Whose idea was -- I -- I

12:01:04 20   don't know who had the original idea to...

12:01:07 21   BY MS. FERNANDS:

12:01:08 22        Q.   Did someone communicate to you the idea

12:01:10 23   for the scrolling list of names?

12:01:15 24        A.   There would have been -- there would have

12:01:19 25   been a -- there was a demo of it.

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

Page 70

12:01:25  1      Q.   So before you became involved in the

12:01:26  2   coding, there was a demo with the scrolling list of

12:01:29  3   names; is that correct?

12:01:30  4      A.   There was a -- yeah, an early demo of a

12:01:33  5   scrolling list of names.

12:01:36  6      Q.   Do you recall who presented that demo?

12:01:38  7      A.   I don't remember who showed it.

12:01:44  8      Q.   Do you recall anything about when you saw

12:01:45  9   that demo?

12:01:48  10     A.   Early 2005.

12:01:50  11     Q.   Do you recall who else was present when

12:01:52  12  you saw the demo?

12:01:59  13     A.   So Bas Ording.

12:02:05  14     Q.   Anyone else?

12:02:08  15     A.   I don't remember.

12:02:12  16     Q.   With respect to the Address Book viewing

12:02:16  17  where you said that you could tap and see more about

12:02:19  18  a user, is that -- sorry -- a caller; is that

12:02:22  19  correct?

12:02:23  20          MR. BUROKER:  Objection.  Vague.  May

12:02:23  21  misstate testimony.

12:02:26  22          Go ahead.

12:02:26  23          THE WITNESS:  So the part I was talking

12:02:27  24  about had more to do with an actual -- like an early

12:02:30  25  demo of scrolling around with a -- with a list of

Highly Confidential - Attorneys' Eyes Only
Scott Herz    March 14, 2013

Page 71

| | | |
|---|---|---|
| 12:02:34 | 1 | names and tapping on a -- I mean, the original demo |
| 12:02:40 | 2 | scrolled the names. |
| 12:02:40 | 3 | BY MS. FERNANDS: |
| 12:02:42 | 4 | Q.   So the original -- what was the source of |
| 12:02:45 | 5 | the names that were being scrolled in the original |
| 12:02:48 | 6 | demo? |
| 12:02:50 | 7 | A.   So whose demo? |
| 12:02:51 | 8 | Q.   I believe you said that the original demo |
| 12:02:53 | 9 | scrolled the names.  So what was intended to be the |
| 12:02:57 | 10 | source?  Were those people in the Address Book? |
| 12:02:59 | 11 | A.   So the -- the demo that I wrote was -- |
| 12:03:01 | 12 | were people from an Address Book. |
| 12:03:10 | 13 | Q.   So this -- so the scrolling of the list of |
| 12:03:13 | 14 | names was a list of just the names of the people in |
| 12:03:15 | 15 | the Address Book; is that correct? |
| 12:03:17 | 16 | A.   The first screen was that. |
| 12:03:19 | 17 | Q.   Okay.  And then the second screen was more |
| 12:03:22 | 18 | detail about people in that list of names from the |
| 12:03:24 | 19 | Address Book; is that correct? |
| 12:03:26 | 20 | A.   Correct. |
| 12:03:26 | 21 | Q.   Okay.  Were there any organized meetings |
| 12:03:40 | 22 | between you and these other inventors named on the |
| 12:03:45 | 23 | '760 patent? |
| 12:03:47 | 24 | MR. BUROKER:  Objection.  Vague. |
| 12:03:49 | 25 | THE WITNESS:  There might have been.  I |

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

Page 158

1

2          I declare under penalty of perjury that the

3   foregoing is true and correct.  Subscribed at

4   _____, California, this _____ day of

5   _____, 2013.

6

7

8

9                              _____

10                                   SCOTT HERZ

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Attorneys' Eyes Only
Scott Herz   March 14, 2013

```
  1                CERTIFICATE OF REPORTER

  2

  3         I, MEGAN F. ALVAREZ, a Certified Shorthand

  4    Reporter, hereby certify that the witness in

  5    the foregoing deposition was by me duly sworn to tell

  6    the truth, the whole truth, and nothing but the truth in

  7    the within-entitled cause;

  8         That said deposition was taken down in

  9    shorthand by me, a disinterested person, at the time and

 10    place therein stated, and that the testimony of the said

 11    witness was thereafter reduced to typewriting, by

 12    computer, under my direction and supervision;

 13         That before completion of the deposition,

 14    review of the transcript (X) was ( ) was not requested.

 15    If requested, any changes made by the deponent (and

 16    provided to the reporter) during the period allowed are

 17    appended hereto.

 18         I further certify that I am not of counsel or

 19    attorney for either or any of the parties to the said

 20    deposition, nor in any way interested in the event of

 21    this cause, and that I am not related to any of the

 22    parties thereto.

 23         DATED:

 24    _____

 25    MEGAN F. ALVAREZ, RPR, CSR 12470
```

Ex. H

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1              UNITED STATES DISTRICT COURT              10:22

2              NORTHERN DISTRICT OF CALIFORNIA

3                    SAN JOSE DIVISION

4                        --oOo--

5    APPLE INC., a California
     corporation,

6
                    Plaintiff,

7
                Vs.                    Case No.

8                                      12-cv-00630-LHK (PSG)

9    SAMSUNG ELECTRONICS CO., LTD.,
     a Korean corporation; SAMSUNG

10   ELECTRONICS AMERICA, INC.,
     a New York corporation; and

11   SAMSUNG TELECOMMUNICATIONS
     AMERICA, LLC, a Delaware

12   limited liability company,

13                  Defendants.
     _____/

14

15     **HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **

16

17          VIDEOTAPED DEPOSITION OF SCOTT FORSTALL

                    Palo Alto, California,

18
                    Friday, March 29, 2013

19

20

21

22

23   Job No. CS1637369

     Reported By:  CAROL S. NYGARD

24                 California CSR No. 4018

                   Nevada CCR 915

25                 Registered Merit Reporter

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF FLORIDA

3    MOTOROLA MOBILITY, LLC,

4              Plaintiff,

5        vs.                        Case No.

                                    1:12-20271-RNS-TEB

6

     APPLE, INC.,

7

               Defendant.

8    _____/

9

10

11

12

13

14

15      **HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **

16

           VIDEOTAPED DEPOSITION OF SCOTT FORSTALL

17

                   Palo Alto, California,

18

                   Friday, March 29, 2013

19

20

21

22

23

     Reported By:  CAROL S. NYGARD

24                 California CSR No. 4018

                   Nevada CCR 915

25                 Registered Merit Reporter

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 3

1                    MARCH 29, 2013

2                      10:29 a.m.

3

4          Deposition of SCOTT FORSTALL, taken at Gibson,

5    Dunn & Crutcher, LLP, 1881 Page Mill Road, Palo Alto,

6    California, before Carol S. Nygard, Certified Shorthand

7    Reporter No. 4018, Certified Court Reporter No. 915,

8    Certified Merit Reporter.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 4

1    APPEARANCES FOR APPLE, INC. Vs. SAMSUNG ELECTRONICS
2
3    FOR PLAINTIFF and SCOTT FORSTALL:
4         GIBSON, DUNN & CRUTCHER, LLP
          BY:  H. MARK LYON, Attorney at Law
5         1881 Page Mill Road
          Palo Alto, California 94304
6         650.849.5300
          mlyon@gibsondunn.com
7
8    FOR DEFENDANTS SAMSUNG ELECTRONICS COMPANY, LTD.,
     SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG
9    TELECOMMUNICATIONS AMERICA, LLC:
10        QUINN EMANUEL URQUHART & SULLIVAN
          BY:  KEVIN JOHNSON, Attorney at Law
11            ROBERT KANG, Attorney at Law
          50 California Street
12        22nd Floor
          San Francisco, California  94111
13        415.875.6318
          kevinjohnson@quinnemanuel.com
14        robertkang@quinnemanuel.com
15
     Also Present:
16
          DAVID EDWARD MELAUGH
17        Principal Counsel, Litigation
          1 Infinite Loop, MS 36-3NYJ
18        Cupertino, California  95014
          408.862.1962
19        melaugh@apple.com
20
          SEAN GRANT, Videographer
21
22
23
24
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                                              Page 5
 1         APPEARANCES FOR MOTOROL MOBILITY v APPLE, INC.:
 2
 3    FOR PLAINTIFF MOTOROLA MOBILITY, LLC:
 4         QUINN EMANUEL URQUHART & SULLIVAN
           BY:  GRAHAM PECHENIK, Attorney at Law
 5         51 Madison Avenue
           New York, New York  10010
 6         grahampechnik@quinnemanuel.com
 7
      FOR DEFENDANT APPLE, INC., and SCOTT FORSTALL:
 8
           WEIL GOTSHAL & MANGES
 9         BY:  MARK G. DAVIS, Attorney at Law
           1300 Eye Street, N.W.
10         Suite 900
           Washington, D.C.  20005
11         202.682.7258
           mark.davis@weil.com
12
13    Also Present:
14         DAVID EDWARD MELAUGH
           Principal Counsel, Litigatikon
15         1 Infinite Loop, MS 36-3NYJ
           Cupertino, California  95014
16         408.862.1962
           melaugh@apple.com
17
18         SEAN GRANT, Videographer
19
20
21
22
23
24
25
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 111

| | | |
|---|---|---|
| 1 | talking about are touches to launch the phone app to | 01:46 |
| 2 | switch to the contacts tab maybe. | 01:46 |
| 3 | So I'm not sure what it really means by | 01:46 |
| 4 | "keystrokes." | 01:46 |
| 5 | I had heard some people comment that it took | 01:46 |
| 6 | several taps to make a phone call if you didn't have | 01:46 |
| 7 | them in Favorites. | 01:46 |
| 8 | Q.    And do you see that there was a suggestion to | 01:46 |
| 9 | leave the phone portion of the device unlocked? | 01:46 |
| 10 | A.    I see that. | 01:46 |
| 11 | Q.    Did Apple contemplate leaving certain portions | 01:46 |
| 12 | of the iPhone available when locked? | 01:46 |
| 13 | MR. LYON:  Objection.  Vague. | 01:46 |
| 14 | THE WITNESS:  We contemplated many things in | 01:46 |
| 15 | developing the iPhone. | 01:47 |
| 16 | BY MR. JOHNSON: | 01:47 |
| 17 | Q.    What that -- | 01:47 |
| 18 | A.    I don't recall if we ever seriously | 01:47 |
| 19 | contemplated leaving the phone portion unlocked, as it | 01:47 |
| 20 | was one of the prime motivations for the lock screen | 01:47 |
| 21 | itself. | 01:47 |
| 22 | Q.    From time-to-time would Tim Cook forward to | 01:47 |
| 23 | you E-mails that he received from users that identified | 01:47 |
| 24 | bugs or complaints? | 01:48 |
| 25 | A.    Yes. | 01:48 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 112

1    Q.    And can you just describe for me --                01:48

2          I mean, how often would that occur?                01:48

3    A.    I don't remember how often -- maybe a few a        01:48

4    week.                                                    01:48

5    Q.    Okay.  And -- and what did you do after            01:48

6    receiving those?                                         01:48

7          Would you investigate them or --                   01:48

8          Typically what was your -- your conduct?           01:48

9          You know, what was your --                         01:48

10         How did you deal with the E-mails that you got     01:48

11   with customer complaints?                                01:48

12   A.    Depended on the issue.                             01:48

13         If someone complained about something which        01:48

14   appeared to be a bug, I would forward it to the          01:48

15   appropriate team that could debug that and fix it.       01:48

16         If it was a feature request, I would consider      01:48

17   whether or not it was a worthwhile feature.              01:48

18         MR. JOHNSON:  Okay.  I'm going to mark as          01:49

19   Forstall Exhibit 10, the 760 patent.                     01:49

20         (Exhibit 10 was marked for Identification.)        01:49

21   BY MR. JOHNSON:                                          01:49

22   Q.    Okay.  Now, you're listed as one of the           01:49

23   inventors here on the 760?                               01:49

24   A.    Correct.                                           01:49

25   Q.    You're familiar with the 760 patent; right?       01:49

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 113

| | | | |
|---|---|---|---|
| 1 | A. | I am. | 01:50 |
| 2 | Q. | And you're listed as the first inventor here. | 01:50 |
| 3 | | Is there any significance to that? | 01:50 |
| 4 | A. | I'm not sure if there is. | 01:50 |
| 5 | Q. | Okay.  Just like last time, I'd just like to | 01:50 |
| 6 | | go through the names of the inventors and ask you a | 01:50 |
| 7 | | little bit about what their contributions were to the | 01:50 |
| 8 | | 760 patent subject matter. | 01:50 |
| 9 | | So let's start with you. | 01:50 |
| 10 | | What were your contributions, please? | 01:50 |
| 11 | A. | I don't remember my specific contributions on | 01:50 |
| 12 | | this. | 01:50 |
| 13 | | We discussed the Recents and the Recent phone | 01:50 |
| 14 | | list a lot, and went through a number of iterations | 01:50 |
| 15 | | trying to figure out a way of enabling the user to | 01:50 |
| 16 | | quickly call the person back or get more information | 01:50 |
| 17 | | about the contact. | 01:50 |
| 18 | | I don't remember who contributed which ideas | 01:50 |
| 19 | | to this one, but I was involved in these conversations | 01:50 |
| 20 | | and brainstorming. | 01:51 |
| 21 | Q. | Okay.  So, if you were to look at the claims | 01:51 |
| 22 | | and if I were to ask you, you know, what specific parts | 01:51 |
| 23 | | of the claims did you contribute to, could you answer | 01:51 |
| 24 | | them or would your answer be you don't know or you don't | 01:51 |
| 25 | | remember? | 01:51 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 114

1      A.    On this patent I don't think I'll recall who    01:51

2    contributed what specifically in this.                   01:51

3      Q.    Okay.   And if I ask you, Mr. Forstall, about    01:51

4    the -- you know, what the other inventors contributed,   01:51

5    so do I understand your answer to say you're not sure    01:51

6    what the others contributed as well?                     01:51

7      A.    That's correct.                                  01:51

8      Q.    Okay.   Can you --                                01:51

9            Who came up with the original idea for what      01:51

10   became the 76 patent -- 760 patent?                      01:51

11     A.    I don't recall.                                  01:52

12     Q.    And you don't know when that person came up      01:52

13   with the idea?                                           01:52

14     A.    I do not.                                        01:52

15     Q.    Okay.   Can you generally describe for us what   01:52

16   the 760 patent relates to?                               01:52

17     A.    It covers a number of things.                    01:52

18           One of those is the Recents list in the phone.   01:52

19           When you receive phone calls, you may receive    01:53

20   five, 10 phone calls, you miss three, maybe miss all 10  01:53

21   of them.                                                 01:53

22           There is a -- a UI that lists all those phone    01:53

23   calls and allows you to tap on a portion of the list to  01:53

24   immediately call the person back or tap on an Icon on    01:53

25   the righthand side that will give more information about 01:53

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 115

1    that person.                                              01:53

2       Q.    If you look at the -- the claims -- they have    01:53

3    a -- they have a requirement that says each of the        01:54

4    independent claims --                                     01:54

5           For example, if you look at column 36, line        01:54

6    34, it says "Completely substituting display of the list  01:54

7    of interactive items with display of contact information  01:54

8    for a respective caller corresponding to the respective   01:54

9    user selected item."                                      01:54

10          Was --                                             01:54

11          What's your understanding of "completely           01:54

12   substituting display of the list of interactive items     01:54

13   with display of contact information"?                      01:54

14          MR. LYON:  Objection to the extent it calls        01:54

15   for a legal conclusion.                                    01:54

16          THE WITNESS:  To restipulate, I'm happily not      01:54

17   a lawyer, but the way that I interpret this is when        01:54

18   you're creating this user interface we weren't creating    01:54

19   a bunch of pop-ups on the phone.                           01:54

20          So when you tapped on something, we weren't        01:54

21   going to have a small menu appear covering only a part     01:54

22   of it.  We had an immersive experience.                    01:55

23          And so in this case, when you wanted to get        01:55

24   information on a given person on the list, we would move   01:55

25   the entire list out of -- out of view.                     01:55

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 116

| | | |
|---|---|---|
| 1 | We could have covered it and done other | 01:55 |
| 2 | things, but we actually pushed the entire list out of | 01:55 |
| 3 | view so you were left with a UI focusing in on the | 01:55 |
| 4 | information about that person that you tapped on. | 01:55 |
| 5 | BY MR. JOHNSON: | 01:55 |
| 6 | Q.    And was the idea of moving the entire list out | 01:55 |
| 7 | of view -- was that something that was part of the call | 01:55 |
| 8 | management interface when -- that -- that led to the | 01:55 |
| 9 | application for this patent? | 01:55 |
| 10 | MR. LYON:  Objection.  Vague.  Calls for a | 01:55 |
| 11 | legal conclusion. | 01:55 |
| 12 | THE WITNESS:  It was part of the original user | 01:55 |
| 13 | interface of the iPhone. | 01:55 |
| 14 | BY MR. JOHNSON: | 01:55 |
| 15 | Q.    So when it says "completely substituting | 01:56 |
| 16 | display of the list of interview items with display of | 01:56 |
| 17 | contact information," what's your understanding of | 01:56 |
| 18 | "contact information"? | 01:56 |
| 19 | MR. LYON:  Objection to the extent it calls | 01:56 |
| 20 | for a legal conclusion. | 01:56 |
| 21 | THE WITNESS:  I'm sorry.  It says "interactive | 01:56 |
| 22 | item." | 01:56 |
| 23 | You said "interview items." | 01:56 |
| 24 | BY MR. JOHNSON: | 01:56 |
| 25 | Q.    Oh.  I'm sorry. | 01:56 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 117

| | | |
|---|---|---|
| 1 | Yeah. | 01:56 |
| 2 | Let me ask you again. | 01:56 |
| 3 | What is the -- | 01:56 |
| 4 | What's your understanding of "contact | 01:56 |
| 5 | information" as it's used in the phrase "completely | 01:56 |
| 6 | substituting the display of the list of interactive | 01:56 |
| 7 | items with display of contact information corresponding | 01:56 |
| 8 | to the respective user selected item"? | 01:56 |
| 9 | MR. LYON:  Same objection. | 01:57 |
| 10 | THE WITNESS:  On the iPhone, when you tap on | 01:57 |
| 11 | that right icon, we give you more information about that | 01:57 |
| 12 | person, more contact information. | 01:57 |
| 13 | It could have E-mail addresses, potentially | 01:57 |
| 14 | physical addresses. | 01:57 |
| 15 | BY MR. JOHNSON: | 01:57 |
| 16 | Q.   And if I were to ask you which of the named | 01:57 |
| 17 | inventors contributed to the idea of completely | 01:57 |
| 18 | substituting the display of the call list with the | 01:57 |
| 19 | display of contact information, could you tell me who | 01:57 |
| 20 | did? | 01:57 |
| 21 | A.   I could not. | 01:57 |
| 22 | Q.   Let me -- let me direct your attention to | 01:57 |
| 23 | Figures 12B and 12C. | 01:57 |
| 24 | Let's start with 12B, and let me ask you -- | 01:58 |
| 25 | A.   12B as in "boy"? | 01:58 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 118

| | | |
|---|---|---|
| 1 | Q.    Yeah.  Sorry. | 01:58 |
| 2 | Boy. | 01:58 |
| 3 | A.    Okay. | 01:58 |
| 4 | Q.    What does Figure 12B show? | 01:58 |
| 5 | A.    12B is an illustration of a potential UI for a | 01:58 |
| 6 | list of recent calls. | 01:58 |
| 7 | And it looks like we mistakenly left a real | 01:58 |
| 8 | person's name in here, too. | 01:58 |
| 9 | Q.    Who's the real person? | 01:58 |
| 10 | A.    Darin Adler. | 01:58 |
| 11 | Q.    So the claims talk about a first interactive | 01:59 |
| 12 | displayed portion. | 01:59 |
| 13 | Looking at 12B, what -- what is the first | 01:59 |
| 14 | interactive displayed portion? | 01:59 |
| 15 | MR. LYON:  Objection.  Calls for a legal | 01:59 |
| 16 | conclusion. | 01:59 |
| 17 | THE WITNESS:  So you're talking about column | 01:59 |
| 18 | 36, line what? | 01:59 |
| 19 | BY MR. JOHNSON: | 01:59 |
| 20 | Q.    23. | 01:59 |
| 21 | A.    23. | 01:59 |
| 22 | My interpretation of reading that claim and | 01:59 |
| 23 | trying to use 12B as in illustrative diagram of that | 02:00 |
| 24 | claim would be to say the part where the name appears up | 02:00 |
| 25 | to the greater than sign could be considered a first | 02:00 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 119

1    interactive display portion.                              02:00

2        Q.    And what's the second interactive display        02:00

3    portion?                                                    02:00

4            MR. LYON:   Same objection.   Vague.               02:00

5            THE WITNESS:   Again, with the same caveats, I     02:00

6    believe the greater than sign with a circle around it     02:00

7    could be interpreted as a second interactive display      02:00

8    portion.                                                   02:01

9    BY MR. JOHNSON:                                            02:01

10       Q.    And if we -- if we look at 12C, what do we see   02:01

11   in Figure 12C?                                             02:01

12           This is the contact information.                   02:01

13           MR. LYON:   Objection.   Calls for legal           02:01

14   conclusion.   Vague.                                       02:01

15           THE WITNESS:   12C shows contact information       02:01

16   for Bruce Walker.                                          02:01

17   BY MR. JOHNSON:                                            02:01

18       Q.    And are contact objects depicted?               02:01

19           MR. LYON:   Objection.   Calls for legal           02:01

20   conclusion.   Vague.                                       02:01

21           THE WITNESS:   It's interesting, because 12C       02:01

22   has the contacts item on the bottom selected, which --    02:01

23   doesn't seem right.                                        02:02

24   BY MR. JOHNSON:                                            02:02

25       Q.    Why doesn't that seem right, because you're     02:02

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 120

1    still in Recent?                                          02:02

2        A.    If, in fact, 12C is a navigation from 12B to    02:02

3    12C, that Recent on the bottom should still be selected.  02:02

4        Q.    Like it is in 12D?                              02:02

5        A.    Correct, and in 12B.                            02:02

6        Q.    So what -- what are the contact objects that    02:02

7    are depicted in 12C?                                      02:02

8              MR. LYON:  Objection.  Calls for a legal        02:02

9    conclusion.  Vague.                                       02:02

10             THE WITNESS:  I'm not sure what your            02:02

11   definition of "contact" is.                               02:02

12             There are -- there's contact information for    02:03

13   Bruce Walker.                                             02:03

14   BY MR. JOHNSON:                                           02:03

15       Q.    I'm just giving you the context.                02:03

16             "The displayed contact information including a  02:03

17   plurality of contact objects."                            02:03

18             It's about line 38 in column 36.                02:03

19             MR. LYON:  Same objections.                     02:03

20   BY MR. JOHNSON:                                           02:03

21       Q.    My question is, what are -- what are the        02:03

22   contact objects in Figure 12C?                            02:03

23             MR. LYON:  Same objections.                     02:03

24             THE WITNESS:  I could interpret phone numbers,  02:03

25   E-mails, as being contact information objects.            02:03

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 127

| | | |
|---|---|---|
| 1 | MR. LYON:  We try. | 02:11 |
| 2 | BY MR. JOHNSON: | 02:11 |
| 3 | Q.    Okay.  Do you recall anyone being skeptical | 02:11 |
| 4 | that the call management system described in the 760 | 02:11 |
| 5 | patent wouldn't work? | 02:11 |
| 6 | A.    I remember there being concerns about putting | 02:11 |
| 7 | a control on the righthand side of a scrolling list, as | 02:11 |
| 8 | we discussed earlier. | 02:11 |
| 9 | I think there were people who were skeptical | 02:11 |
| 10 | that would work properly. | 02:11 |
| 11 | Q.    But that -- the location of the greater than | 02:11 |
| 12 | symbols on the righthand side of the list that you're | 02:11 |
| 13 | pointing to in Figure 12B, that's not part of the claims | 02:11 |
| 14 | in the 760; right? | 02:12 |
| 15 | MR. LYON:  Objection.  Calls for a legal | 02:12 |
| 16 | conclusion. | 02:12 |
| 17 | THE WITNESS:  It's illustrative of claims. | 02:12 |
| 18 | BY MR. JOHNSON: | 02:12 |
| 19 | Q.    Yeah. | 02:12 |
| 20 | But my point is, it doesn't have to be on the | 02:12 |
| 21 | right, it could be somewhere else, I think, in your | 02:12 |
| 22 | view; right? | 02:12 |
| 23 | MR. LYON:  Same objection. | 02:12 |
| 24 | THE WITNESS:  Correct. | 02:12 |
| 25 | BY MR. JOHNSON: | 02:12 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 128

| | | |
|---|---|---|
| 1 | Q. So -- | 02:12 |
| 2 | And just to go back, can you describe for us | 02:12 |
| 3 | who was skeptical and when this was about the location | 02:12 |
| 4 | of those glyphs or icons on the righthand side? | 02:12 |
| 5 | A. I don't recall specifically who had the | 02:12 |
| 6 | concerns. | 02:12 |
| 7 | I think it was a general concern among us. | 02:12 |
| 8 | Q. Okay. Do you know when that -- when those | 02:12 |
| 9 | concerns were voiced? | 02:12 |
| 10 | A. I do not. | 02:12 |
| 11 | Q. Was there a specific problem that you and the | 02:12 |
| 12 | other inventors were trying to solve when you came up | 02:13 |
| 13 | with the ideas that are described in the 760 patent? | 02:13 |
| 14 | A. Yes. | 02:13 |
| 15 | We wanted to allow people to quickly call | 02:13 |
| 16 | people back. To do so you could provide a list of | 02:13 |
| 17 | missed calls. | 02:13 |
| 18 | The problem is we wanted to provide the | 02:13 |
| 19 | ability to contact people in ways other than a phone | 02:13 |
| 20 | call without slowing down the process of calling someone | 02:13 |
| 21 | back if that's what you chose to do. | 02:13 |
| 22 | This patent talks about how you can do both in | 02:13 |
| 23 | the same UI. | 02:13 |
| 24 | We solved the problem of a single tap on a | 02:13 |
| 25 | person's name to just call them back and within the same | 02:14 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 129

1  UI a tap to get more information about the person to    02:14

2  allow you to respond by E-mail, text message, some other    02:14

3  way.    02:14

4      Q.    When did you first become aware of that    02:14

5  problem?    02:14

6      A.    I don't recall.    02:14

7      Q.    Are you aware of anybody else, any other    02:14

8  companies, working on the same problem while you were    02:14

9  working on this solution that's described in the 760    02:14

10  patent?    02:14

11      A.    Not that I remember.    02:14

12          MR. JOHNSON:  I'll mark as Exhibit 11 a    02:14

13  document with production pages produced by Apple that    02:15

14  end in 1199 through -- 1201.    02:15

15          (Exhibit 11 was marked for Identification.)    02:15

16  BY MR. JOHNSON:    02:15

17      Q.    What's this document?    02:15

18      A.    Memory lane.    02:15

19          This is an E-mail from Patrick Coffman dated    02:15

20  the 9th of March, 2005 entitled "Purple Notes, March    02:15

21  7th, 2005."    02:15

22      Q.    Okay.  And, again, "purple" was the iPhone    02:15

23  project; right?    02:15

24      A.    Correct.    02:15

25      Q.    And what was the status of the iPhone project    02:15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 130

| | | |
|---|---|---|
| 1 | back in March of 2005? | 02:15 |
| 2 | A.   We were designing the user interface -- pretty | 02:16 |
| 3 | intensely at that time. | 02:16 |
| 4 | Q.   Okay.  The second item up from hardware says | 02:16 |
| 5 | "start talking to Tony's team, whoever is doing -- core | 02:16 |
| 6 | OS"? | 02:16 |
| 7 | A.   Correct, Core OS. | 02:16 |
| 8 | Q.   "Bring up needs to start getting development | 02:16 |
| 9 | boards," and you're listed as the DRI, person -- | 02:16 |
| 10 | A.   Yes. | 02:16 |
| 11 | Q.   -- person with direct responsibility? | 02:16 |
| 12 | A.   Correct. | 02:16 |
| 13 | Q.   And Tony's team refers to Tony Fadell? | 02:16 |
| 14 | A.   Correct. | 02:16 |
| 15 | Q.   Yeah. | 02:16 |
| 16 | Okay.  And what are "development boards"? | 02:16 |
| 17 | A.   They're hardware boards with the | 02:16 |
| 18 | motherboard that -- | 02:16 |
| 19 | Q.   Sort of bread board of -- | 02:16 |
| 20 | A.   Correct. | 02:17 |
| 21 | Q.   Yeah.  Okay. | 02:17 |
| 22 | So were development boards -- development | 02:17 |
| 23 | boards were not ready by this time; right? | 02:17 |
| 24 | A.   The hardware team may have had development | 02:17 |
| 25 | boards, but it looks like they had not provided them to | 02:17 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 172

1        I, CAROL S. NYGARD, a Certified Shorthand

2   Reporter of the State of California, duly authorized to

3   administer oaths, do hereby certify:

4        That the foregoing proceedings were taken

5   before me at the time and place herein set forth; that

6   any witnesses in the foregoing proceedings, prior to

7   testifying, were duly sworn; that a record of the

8   proceedings was made by me using machine shorthand which

9   was thereafter transcribed under my direction; that the

10   foregoing transcript is a true record of the testimony

11   given.

12        Further, that if the foregoing pertains to the

13   original transcript of a deposition in a Federal Case,

14   before completion of the proceedings review of the

15   transcript [ ] was [X] was not requested.

16        I further certify I am neither financially

17   interested in the action nor a relative or employee of

18   any attorney or party to this action.

19        IN WITNESS WHEREOF, I have this date

20   subscribed my name:

21        Dated:

22

23        _____

24        CAROL S. NYGARD CSR #4018

25

Ex. I

Page 1

1                UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                     SAN JOSE DIVISION

4

5     APPLE INC., a California
      corporation,

6

                        Plaintiff,

7                                    No. 12-cv-00630-LHK
           vs.                              (PSG)

8

      SAMSUNG ELECTRONICS CO., LTD.,

9     a Korean corporation; SAMSUNG
      ELECTRONICS AMERICA, INC., a

10    New York corporation; and
      SAMSUNG TELECOMMUNICATIONS

11    AMERICA, LLC, a Delaware
      limited liability company,

12

                        Defendants.

13    _____/

14

15

16                    -- CONFIDENTIAL --

17

18        Videotaped deposition of BAS ORDING, taken at the

19        offices of Weil, Gotshal & Manges LLP, 201 Redwood

20        Shores Parkway, Redwood Shores, California,

21        commencing at 9:41 a.m., on Thursday, April 4, 2013,

22        before Leslie Rockwood, RPR, CSR No. 3462.

23

24

25    Pages 1 - 250                        Job No. 1637378

Page 2

1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF FLORIDA

3

4    MOTOROLA MOBILITY LLC,

5                    Plaintiff,

6          vs.                        No. 1:12-20271-RNS-TEB

7    APPLE INC.,

8                    Defendant.
     _____/

9

10

                      -- CONFIDENTIAL --

11

12

13       Videotaped deposition of BAS ORDING, taken at the

14       offices of Weil, Gotshal & Manges LLP, 201 Redwood

15       Shores Parkway, Redwood Shores, California,

16       commencing at 9:41 a.m., on Thursday, April 4, 2013,

17       before Leslie Rockwood, RPR, CSR No. 3462.

18

19

20

21

22

23

24

25

Page 3

1    APPEARANCES FOR MOTOROLA MOBILITY v APPLE INC.:

2

3    FOR THE PLAINTIFF MOTOROLA MOBILITY LLC:

4         QUINN EMANUEL URQUHART & SULLIVAN, LLP

5         BY:  ROBIN M. DAVIS, ESQ.

6         51 Madison Avenue, 22nd Floor

7         New York, New York 10010

8         (212) 849-7141

9         robindavis@quinnemanuel.com

10

11   FOR THE DEFENDANT APPLE INC.:

12        WEIL, GOTSHAL & MANGES

13        BY:  MARK G. DAVIS, ESQ.

14        1300 Eye Street, NW, Suite 900

15        Washington, D.C.  20005-3314

16        (202) 682-7258

17        mark.davis@weil.com

18

19

20

21

22

23

24

25

```
                                            Page 4

 1   APPEARANCES FOR APPLE INC. V SAMSUNG ELECTRONICS:

 2

 3   FOR THE PLAINTIFF APPLE INC.:

 4        GIBSON, DUNN & CRUTCHER LLP

 5        BY:  FREDERICK S. CHUNG, ESQ.

 6        1881 Page Mill Road

 7        Palo Alto, California 94304-1211

 8        (650) 849-5392

 9        fchung@gibsondunn.com

10

11        APPLE INC.

12        BY:  ERICA TIERNEY, ESQ.

13        1 Infinite Loop, MS 36-3NYJ

14        Cupertino, California 95014

15        (408) 974-5332

16        etierney@apple.com

17

18

19

20

21

22

23

24

25
```

```
                                                        Page 5

 1   APPEARANCES FOR APPLE INC. V SAMSUNG ELECTRONICS

 2   (Continued):

 3

 4   FOR THE DEFENDANTS SAMSUNG ELECTRONICS COMPANY, LTD.,

 5   SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG

 6   TELECOMMUNICATIONS AMERICA, LLC:

 7        QUINN EMANUEL URQUHART & SULLIVAN

 8        BY:  ANASTASIA M. FERNANDS, ESQ.

 9        51 Madison Avenue, 22nd Floor

10        New York, New York 10010

11        (212) 849-7157

12        anastasiafernands@quinnemanuel.com

13

14   Also Present:

15        Sean Grant, Videographer

16

17

18

19

20

21

22

23

24

25
```

Page 52

1      Q.  And do you know what type of document this is?

2      A.  This is a patent.

3      Q.  And looking at the -- this patent, are you an

4   inventor?

5          MR. DAVIS:  Object to form.

6          THE WITNESS:  Yes, I am.

7      Q.  BY MS. DAVIS:  And how do you know that you're

8   an inventor of this patent?

9          MR. DAVIS:  Object to form.

10         THE WITNESS:  I'm listed as an inventor.

11     Q.  BY MS. DAVIS:  Along with anyone else?

12     A.  Along with Ken Kocienda.

13     Q.  So are you familiar with this patent?

14     A.  Yes.

15     Q.  And for clarity, at the top right this -- it

16  says that this is Patent Number US 8,074,172; is that

17  right?

18     A.  Yes.

19     Q.  And just for clarity, I'm going to be referring

20  to this as the '172 patent, and I'll be referring to this

21  document, Exhibit 1; is that okay?

22     A.  Yes.

23     Q.  All right.  So looking through the '172 patent,

24  the first few pages have figures.  Did you draft any of

25  these figures?

Page 53

```
 1           MR. DAVIS:  Object to form.
 2           THE WITNESS:  I didn't.
 3       Q.  BY MS. DAVIS:  And what is this patent about?
 4           MR. DAVIS:  Object to form.
 5           THE WITNESS:  As far as I know, it relates to
 6  word corrections or suggestions to the user.
 7       Q.  BY MS. DAVIS:  And as a listed inventor on this
 8  patent, what did you invent?
 9           MR. DAVIS:  Object to the form, calls for a
10  legal conclusion.
11           THE WITNESS:  Well, I know that I worked on the
12  ideas for auto corrections, and I assume that patent's
13  discovering -- discovering that idea.
14       Q.  BY MS. DAVIS:  Okay.  I just want to clarify,
15  you just referenced "auto corrections."  What are auto
16  corrections?
17           MR. DAVIS:  Object to form.
18           THE WITNESS:  Well, the way I think of it is
19  that when you're -- when the user is typing on the touch
20  screen, that it tries to automatically correct for the
21  user's mistakes that are caused by mainly if you're too
22  close to another key.  That's what it's trying to correct
23  for, or that's what we're working on, so --
24       Q.  BY MS. DAVIS:  And you used the phrase "word
25  suggestion."  What are word suggestions to you?
```

Page 54

1      A.   In my opinion, I think of -- it -- it means like

2   if I -- in the beginning of typing a word, that after the

3   first letter that we can -- that the system can already

4   suggest a word that you might mean to type.

5      Q.   And so are word suggestions different from auto

6   corrections?

7           MR. DAVIS:   Object to form.

8           THE WITNESS:   I'm not sure.   I guess they can be

9   similar in certain cases.

10     Q.   BY MS. DAVIS:   In your understanding of the

11  words, are they -- what is the difference between word

12  suggestions and auto corrections?

13          MR. DAVIS:   Object to form.

14          THE WITNESS:   I would say personally I think

15  that a correction is fixing something that I've already

16  typed, and a suggestion, I would say, is probably that it

17  gives me a -- a word that I might want to type so it

18  saves me time.

19     Q.   BY MS. DAVIS:   So you say it gives -- it saves

20  you time.   How does word suggestion save you time?

21     A.   I -- I -- I wouldn't have to type the whole

22  word.

23     Q.   And why wouldn't you have to type the whole

24  word?

25          MR. DAVIS:   Object to form.

Page 55

1          THE WITNESS:  Because I could use the -- this

2    suggestion that the system offers.

3          Q.  BY MS. DAVIS:  Okay.  And before you mentioned

4    "word corrections."  What are word corrections?

5          MR. DAVIS:  Object to form, asked and answered.

6          THE WITNESS:  Yeah.  Basically, what I explained

7    about the auto -- auto corrections.

8          Q.  BY MS. DAVIS:  Oh, so are word corrections and

9    auto corrections the same?

10          MR. DAVIS:  Object to form.

11          THE WITNESS:  Well, one's suggesting more that

12    it happens automatically, so there's probably a slight

13    difference in the meaning there.

14          Q.  BY MS. DAVIS:  So is it fair to say that word

15    corrections differ from auto corrections because auto

16    corrections happen automatically?

17          MR. DAVIS:  Object to the form.

18          THE WITNESS:  Yeah.  That -- that's what I would

19    say, yes.

20          Q.  BY MS. DAVIS:  Okay.  And --

21          A.  I have to add that that -- it might end up in

22    the correction, just one is automatic, the other is maybe

23    not, so --

24          Q.  And for a word correction which would not be

25    automatic, can you give an example of how that would

Page 56

 1   work?
 2              MR. DAVIS:  Object to form.
 3              THE WITNESS:  Well, the fact that it's not
 4   automatic suggests that the user has to perform some
 5   action in order to get it corrected.
 6        Q.  BY MS. DAVIS:  Okay.  And in the '172 patent,
 7   does it include any word corrections, word suggestions or
 8   auto corrections?
 9              MR. DAVIS:  Vague, compound, calls for a legal
10   conclusion.
11              THE WITNESS:  I'm not sure.
12        MS. DAVIS:  Let me ask a better question.
13        Q.  Does your invention in the '172 patent include
14   auto correction?
15              MR. DAVIS:  Object to form, calls for a legal
16   conclusion.
17              THE WITNESS:  I'm not sure what's exactly
18   covered in the patent.
19        Q.  BY MS. DAVIS:  Does your invention in the '172
20   patent include word suggestions?
21              MR. DAVIS:  Same objections.
22              THE WITNESS:  I'm not exactly sure what --
23   what's covered.
24        Q.  BY MS. DAVIS:  Does your invention in the '172
25   patent include word corrections?

Page 57

```
 1          MR. DAVIS:  Same objections.  Plus asked and
 2   answered -- oh, I'm sorry.  "Word corrections," it's
 3   different.
 4          THE WITNESS:  Yeah.  I'm not sure that's covered
 5   either so -- or in what way it's covered.
 6       Q.  BY MS. DAVIS:  Okay.  So if you will look
 7   towards the back of Exhibit 1, the '172 patent, there's
 8   columns of text, so if you look at the numbers on the
 9   tops of the columns, if you go to column 11.
10       A.  All right.
11       Q.  Got it?
12       A.  Yes.
13       Q.  Okay.  And do you see in column 11 where Claim 1
14   is printed?
15       A.  Yes, I see it.
16       Q.  All right.  If you'll take a -- a moment and
17   read Claim 1 to yourself.
18       A.  (Witness complies.)
19          Okay.
20       Q.  Okay.  So Claim 1 begins with, tell me if I read
21   anything wrong, okay, "A method comprising at a portable
22   electronic device with a touch screen display."
23          Did you invent a portable electronic device with
24   a touch screen display?
25          MR. DAVIS:  Object to form, calls for a legal
```

Page 58

1    conclusion.

2           THE WITNESS:  I don't think I invented a touch

3    screen display.

4        Q.  BY MS. DAVIS:  Did you invent a portable

5    electronic device with a touch screen display?

6           MR. DAVIS:  Object to form, calls for a legal

7    conclusion.

8           THE WITNESS:  I don't think I did.

9        Q.  BY MS. DAVIS:  The next element, "In a first

10   area of the touch screen display, displaying a current

11   character string being input by a user with the

12   keyboard."

13          Did you invent that?

14          MR. DAVIS:  Object to form, calls for a legal

15   conclusion.

16          THE WITNESS:  Not that specific part.

17       Q.  BY MS. DAVIS:  Okay.  That was known before

18   you -- before you invented the '172 patent?

19          MR. DAVIS:  Object to form, calls for a legal

20   conclusion, incomplete hypothetical.

21          THE WITNESS:  As far as I know, these set of

22   claims are trying to cover the idea that we worked on

23   with regards to the word corrections.

24       Q.  BY MS. DAVIS:  Okay.  But the specific piece,

25   "In a first area of a touch screen display, displaying a

Page 59

1   current character string being input by a user with the

2   keyboard," was known before you worked on the '172

3   patent?

4           MR. DAVIS:  Object to form, calls for a legal

5   conclusion.

6           THE WITNESS:  I don't know.

7       Q.  BY MS. DAVIS:  Okay.  The next piece, "In a

8   second area of the touch screen display that is between

9   the first area and the keyboard, displaying the current

10  character string or a portion thereof and a suggested

11  replacement character string for the current character

12  string on opposite sides of the second area."

13          Did I read that right?

14      A.  Yes.

15          MR. DAVIS:  Objection to form.  The document

16  speaks for itself.

17      Q.  BY MS. DAVIS:  All right.  Did you -- did you

18  invent that?

19          MR. DAVIS:  Object to the form, calls for a

20  legal conclusion.

21          THE WITNESS:  I worked on ideas to have a bar

22  above the keyboard.

23      Q.  BY MS. DAVIS:  Did you invent that particular

24  paragraph in the second area?

25          MR. DAVIS:  Same objections.  Plus asked and

Page 60

1   answered.

2           THE WITNESS:  All I can say is I worked on ideas

3   that are related to the bar that shows word corrections.

4       Q.  BY MS. DAVIS:  So you don't know whether you

5   invented that particular element?

6           MR. DAVIS:  Object to form, calls for a legal

7   conclusion.

8           THE WITNESS:  Like I said before, all I know is

9   I worked on those ideas, and I assume that the patent is

10  covering some of those ideas.

11      Q.  BY MS. DAVIS:  Okay.  The next paragraph, read

12  it to yourself.  It begins with "replacing."

13      A.  (Witness complies.)

14      Q.  Did you invent that?

15          MR. DAVIS:  Object to form, calls for a legal

16  conclusion.

17          THE WITNESS:  Well, I worked on ideas where the

18  spacebar would trigger the correction, so sounds related.

19      Q.  BY MS. DAVIS:  Okay.  When -- when was the first

20  time you had the idea for that paragraph?

21          MR. DAVIS:  Object to form, calls for a legal

22  conclusion.

23          THE WITNESS:  I don't remember when I came up

24  with the idea for the word corrections.

25      Q.  BY MS. DAVIS:  Approximately, when did you come

Page 61

1   up with the idea for replacing the current character

2   string in the first area with suggested replacement

3   character string if the user activates a spacebar key on

4   the keyboard?

5           MR. DAVIS:  Same objections.

6           THE WITNESS:  I don't remember when we were

7   working on -- on that -- that idea.

8       Q.  BY MS. DAVIS:  Okay.  Then the next paragraph:

9   "Replacing the current character string in the first area

10  with the suggested replacement," that paragraph, did you

11  invent that?

12          MR. DAVIS:  Well, just --

13      Q.  BY MS. DAVIS:  When you're done reading.

14          MR. DAVIS:  And -- and just to be clear, the

15  part where you left off --

16          MS. DAVIS:  Yes.

17          MR. DAVIS:  -- is still the same as --

18          MS. DAVIS:  Oh, that was unintentional.

19          MR. DAVIS:  -- as the paragraph --

20          MS. DAVIS:  Let me read the whole thing.

21          MR. DAVIS:  -- before that.

22          MS. DAVIS:  That was not on purpose.  They're

23  long clauses.

24      Q.  "Replacing the current character string in the

25  first area with the suggested replacement character

Page 248

1        I declare under the penalty of perjury under the

2    laws of the State of California that the foregoing is

3    true and correct.

4             Executed on _____, 2013, at

5    _____, _____.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 249

1   STATE OF CALIFORNIA      ) ss:

2   COUNTY OF MARIN          )

3

4          I, LESLIE ROCKWOOD, CSR NO. 3452, do hereby

5   certify:

6          That the foregoing deposition testimony was

7   taken before me at the time and place therein set forth

8   and at which time the witness was administered the oath;

9          That testimony of the witness and all objections

10  made by counsel at the time of the examination were

11  recorded stenographically by me, and were thereafter

12  transcribed under my direction and supervision, and that

13  the foregoing pages contain a full, true and accurate

14  record of all proceedings and testimony to the best of my

15  skill and ability.

16         I further certify that I am neither counsel for

17  any party to said action, nor am I related to any party

18  to said action, nor am I in any way interested in the

19  outcome thereof.

20         IN WITNESS WHEREOF, I have subscribed my name

21  this 11th day of April, 2013.

22

23

24         _____

25                     LESLIE ROCKWOOD, RPR, CSR NO. 3462

Page 250

```
 1              ERRATA SHEET
          VERITEXT CORPORATE SERVICES
 2               800-567-8658
      ASSIGNMENT NO. CS1637378
 3    CASE NAME: Motorola Mobility LLC v. Apple, Inc.
      DATE OF DEPOSITION: 4/4/2013
 4    WITNESS' NAME: Bas Ording
 5
      PAGE/LINE(S)/    CHANGE          REASON
 6    _____/_____/_____/_____
      _____/_____/_____/_____
 7    _____/_____/_____/_____
      _____/_____/_____/_____
 8    _____/_____/_____/_____
      _____/_____/_____/_____
 9    _____/_____/_____/_____
      _____/_____/_____/_____
10    _____/_____/_____/_____
      _____/_____/_____/_____
11    _____/_____/_____/_____
      _____/_____/_____/_____
12    _____/_____/_____/_____
      _____/_____/_____/_____
13    _____/_____/_____/_____
      _____/_____/_____/_____
14    _____/_____/_____/_____
      _____/_____/_____/_____
15    _____/_____/_____/_____
      _____/_____/_____/_____
16    _____/_____/_____/_____
      _____/_____/_____/_____
17    _____/_____/_____/_____
      _____/_____/_____/_____
18    _____/_____/_____/_____
      _____/_____/_____/_____
19    _____/_____/_____/_____
20         _____
                   Bas Ording
21
      SUBSCRIBED AND SWORN TO
22    BEFORE ME THIS_____DAY
      OF_____, 2013.
23
         _____
24         NOTARY PUBLIC
25    MY COMMISSION EXPIRES_____
```

Ex. J

HIGHLY CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5     APPLE INC., a California
      corporation,

6
                   Plaintiff,

7                                  No. 12-cv-00630-LHK
           vs.                              (PSG)

8
      SAMSUNG ELECTRONICS CO., LTD.,

9     a Korean corporation; SAMSUNG
      ELECTRONICS AMERICA, INC., a

10    New York corporation; and
      SAMSUNG TELECOMMUNICATIONS

11    AMERICA, LLC, a Delaware
      limited liability company,

12
                   Defendants.

13    _____/

14

15       -- HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY --

16       -- CONFIDENTIAL BUSINESS INFORMATION FOR APPLE --

17

18       Videotaped deposition of STEPHEN LEMAY, taken at the

19       offices of Weil, Gotshal & Manges LLP, 201 Redwood

20       Shores Parkway, Redwood Shores, California,

21       commencing at 9:35 A.M., on Thursday, May 9, 2013,

22       before Leslie Rockwood, RPR, CSR No. 3462.

23

24

25    Job No. CS1660327

HIGHLY CONFIDENTIAL

Page 2

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF FLORIDA

3

4    MOTOROLA MOBILITY LLC,

5                   Plaintiff,

6          vs.                        No. 1:12-20271-RNS-TEB

7    APPLE INC.,

8                   Defendant.

     _____/

9

10

11      -- HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY --

12      -- CONFIDENTIAL BUSINESS INFORMATION FOR APPLE --

13

14

15

16      Videotaped deposition of STEPHEN LEMAY, taken at the

17      offices of Weil, Gotshal & Manges LLP, 201 Redwood

18      Shores Parkway, Redwood Shores, California,

19      commencing at 9:35 A.M., on Thursday, May 9, 2013,

20      before Leslie Rockwood, RPR, CSR No. 3462.

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 3

1    APPEARANCES FOR MOTOROLA MOBILITY v APPLE INC.:

2

3    FOR THE PLAINTIFF MOTOROLA MOBILITY LLC:

4         QUINN EMANUEL URQUHART & SULLIVAN, LLP

5         BY:  ROBIN M. DAVIS, ESQ.

6         51 Madison Avenue, 22nd Floor

7         New York, New York 10010

8         (212) 849-7141

9         robindavis@quinnemanuel.com

10

11   FOR THE DEFENDANT APPLE INC.:

12        WEIL, GOTSHAL & MANGES

13        BY:  ANNE M. CAPPELLA, ESQ.

14        201 Redwood Shores Parkway

15        Redwood Shores, California 94065-1134

16        (650) 802-3141

17        anne.cappella@weil.com

18

19        BY:  WENDY ANNA HERBY, ESQ.

20        APPLE IP LITIGATION COUNSEL

21        1 Infinite Loop, MS 36-3NYJ

22        Cupertino, California 95014

23        (408) 974-5419

24        wherby@apple.com

25

HIGHLY CONFIDENTIAL

Page 4

1    APPEARANCES FOR APPLE INC. V SAMSUNG ELECTRONICS:

2

3    FOR THE PLAINTIFF APPLE INC.:

4         GIBSON, DUNN & CRUTCHER LLP

5         BY:  FREDERICK S. CHUNG, ESQ.

6         1881 Page Mill Road

7         Palo Alto, California 94304-1211

8         (650) 849-5392

9         fchung@gibsondunn.com

10

11

12   FOR THE DEFENDANTS SAMSUNG ELECTRONICS COMPANY, LTD.,

13   SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG

14   TELECOMMUNICATIONS AMERICA, LLC:

15        QUINN EMANUEL URQUHART & SULLIVAN

16        BY:  ANASTASIA M. FERNANDS, ESQ.

17        51 Madison Avenue, 22nd Floor

18        New York, New York 10010

19        (212) 849-7157

20        anastasiafernands@quinnemanuel.com

21

22

23   Also Present:

24        Sean Grant, Videographer

25

HIGHLY CONFIDENTIAL

Page 12

1    objection, I'll also introduce the Motorola notice so

2    that it's clear at this time to the extent the topics are

3    overlapping, that it's for both cases.

4         MS. CAPPELLA:  That's correct.  And if we can

5    identify the topic numbers at the same time, that would

6    be great.

7         MS. FERNANDS:  Certainly.

8         MS. DAVIS:  I'd also like to -- while we're

9    chatting with counsel -- just make a quick record on

10   behalf of Motorola that we object to the fact that we got

11   the designation that Mr. Lemay would be testifying on

12   certain 30(b)(6) topics in the Motorola case with less

13   than 24 hours' notice and without the opportunity to in

14   advance to meet and confer with Apple regarding numerous

15   topics where Apple had indicated that they wished to meet

16   and confer prior to providing a witness due to certain

17   objections such as scope and relevance.

18        Nevertheless, in the interest of efficiency,

19   Motorola is going to proceed today to take its 30(b)(6)

20   testimony on the topics, but we may have to hold the

21   deposition open to the extent that any delay or

22   objections that come up and -- you know, especially due

23   to that failure to meet and confer in advance, prevents

24   us from getting what we deem as complete testimony for

25   those topics.

HIGHLY CONFIDENTIAL

Page 13

1          MS. CAPPELLA:  And I think our position will be

2     that we don't agree with your objection, obviously, that

3     these are topics that were related to him as an inventor.

4     You've known he was an inventor for quite a period of

5     time.  So -- but in the -- you know, with efficiency,

6     we'd like to go ahead and proceed.

7          MS. FERNANDS:  So now I'm going to hand you what

8     we've marked as Exhibit Number 1.

9               (Exhibit 1, Samsung's Amended Third 30(b)(6)

10              Deposition Notice To Apple Inc., 10/18/12,

11              marked for identification.)

12         MS. FERNANDS:  And at the same time, I'll hand

13    you Exhibit Number 2.

14              (Exhibit 2, Motorola Mobility LLC's Notice of

15              Deposition Pursuant To Federal Rule of Civil

16              Procedure 30(b)(6), 3/29/13, marked for

17              identification.)

18         Q.  BY MS. FERNANDS:  Mr. Lemay, do you recognize

19    Exhibit Number 1, a document titled "Samsung's Amended

20    Third 30(b)(6) Deposition Notice to Apple Inc."?

21         A.  No, I do not.

22         Q.  If I ask you to turn to page 3 of that document.

23    At the bottom there's a heading "Topics."

24              Do you see that?

25         A.  Yes, I do.

HIGHLY CONFIDENTIAL

Page 14

1        Q.   And looking at the topics, have you seen these
2    topics before?
3        A.   I believe I have.
4        Q.   And do you understand that Apple has designated
5    you to testify on behalf of Apple with respect to
6    subtopics A, B, C, E, F, I, and K of this deposition
7    notice?
8            MR. CHUNG:   And I'll object that as to some of
9    those subtopics, it's just in part, not the entire topic
10   or subtopic.
11           THE WITNESS:   Excuse me.   I'm just making sure I
12   read these.
13       Q.   BY MS. FERNANDS:   That's okay.
14       A.   Did you say "F" or did you say "D-E"?
15       Q.   "E" at in Edward, "F" as in Frank.
16       A.   Uh-huh.
17       Q.   Then "I" as in ink and "K."
18       A.   Okay.
19       Q.   Okay.   And having had a chance to review those
20   topics, do you understand that you have been designated
21   subject to Apple's objections and limitations to testify
22   on behalf of Apple as to subtopics A, B, C, E, F, I, and
23   K to Topic 1 of this deposition notice?
24       A.   I understand.
25       Q.   Okay.   If you could also look at Exhibit 2,

HIGHLY CONFIDENTIAL

Page 15

1    please.  And have you seen this document before?

2         A.  Yes.

3         Q.  If you'd turn to page 12 of this document, do

4    you see the heading "Topics of Examination"?

5         A.  Yes.

6         Q.  And under the heading "Topics of Examination,"

7    we'll take groups of these at a time because there are a

8    number of them.  Do you understand that you were

9    identified to testify on behalf of Apple as to Topics 3,

10   4, 5, and 6 of this deposition notice we've marked as

11   Exhibit 2?

12        A.  Yes.

13        Q.  And do you also understand that you've been

14   designated to testify as to Topic 8 on the next page?

15             MS. CAPPELLA:  And sorry, just a correction that

16   these are only for the slide-to-unlock patents and --

17   sorry, not slide to unlock -- for '760 and the '332

18   patent.

19             MS. FERNANDS:  And I'm sorry, yes.

20        Q.  So with respect to what we looked at as Exhibit

21   Number 1 earlier, the notice from Samsung.

22        A.  Uh-huh.

23        Q.  Your testimony as to those subtopics we

24   identified is with respect to the '760 patent; is that

25   correct?

HIGHLY CONFIDENTIAL

Page 16

1        A.   As I understand it, yeah.

2             MS. FERNANDS:   Yes.   Thank you for clarifying.

3             MS. CAPPELLA:   And Exhibit 2 is for '760 and

4        '332.

5             MS. FERNANDS:   And is that your understanding as

6        well, Mr. Lemay, that with respect to the case, the

7        Motorola case, that you're designated to testify as to

8        the patents known as the '760 and the '332 patents?

9        A.   That's my understanding.

10       Q.   Okay.   And then I believe we were looking at

11       Topic Number 8 in what is Exhibit Number 2.   And you

12       understand you've been designated by Apple to testify as

13       to that topic; is that correct?

14       A.   Yes.

15       Q.   Could you turn to page 15.   At the bottom, Topic

16       Number 28, do you also understand that you've been

17       designated to testify with respect to the '760 and '332

18       patents on Topic Number 28?

19       A.   Yes.   It's referencing other topics, just to be

20       clear, that I haven't read carefully, but it's

21       referencing 19 through 25.

22       Q.   If you'd like to take a minute.

23       A.   Shall I take a minute to read everything?

24       Q.   Certainly.

25            MS. DAVIS:   And to clarify, for 19 through 25,

HIGHLY CONFIDENTIAL

Page 17

1  is that also subject to the '760 or '332 patent

2  limitation?

3          MS. CAPPELLA:  Yes, it would be.

4          THE WITNESS:  Okay.

5      Q.  BY MS. FERNANDS:  So you understand that you've

6  been designated to testify with respect to Topic

7  Number 28 of Exhibit Number 2; is that correct?

8      A.  I understand.

9      Q.  If you'd turn to page 17, please, and look at

10  Topic Number 38.  Do you also understand that you've been

11  designated to testify in connection with the Apple vs.

12  Motorola case as to Patents '760 and '332 for Topic 38?

13      A.  Yes.

14      Q.  If you could turn to page 20, please.  At the

15  bottom of page 20 is Topic 63.  Do you understand you've

16  been designated to testify as to that topic as well?

17      A.  Yes.

18      Q.  And then please turn to page 25.  If you could

19  read Topics 100 and 101.  Please let me know if you

20  understand if you've been designated to testify as to

21  those topics as well.

22      A.  You said 100 and 101?

23      Q.  100 and 101, yes.

24      A.  Yes.

25      Q.  Thank you.  What did you do to prepare to

HIGHLY CONFIDENTIAL

Page 24

1      Q.   That would take us into 2001 or 2002?

2      A.   Yeah, right around there, yeah.  I'm a little

3  vague on the exact details because I was basically moved

4  into a different group at that time.

5      Q.   What was the different group that you moved

6  into?

7      A.   That's the group I'm currently in, the human

8  interface group.

9      Q.   So you think you moved to the Human Interface

10  group around 2001 or 2002?

11      A.   That's sounds right.

12      Q.   Is the Human Interface group sometimes also

13  called the HI group?

14      A.   Yes, or HI team.

15      Q.   HI team?

16      A.   Uh-huh.

17      Q.   When you joined the HI team, what projects did

18  you start working on?

19      A.   Initially I retained mostly my duties from my

20  previous job.  So I continued to work on QuickTime

21  initially.

22      Q.   Was there a time when you stopped working on

23  QuickTime?

24      A.   Eventually I stopped working on QuickTime, but

25  it was sort of a slow process.  I took on other

HIGHLY CONFIDENTIAL

1    responsibilities within the group that overlapped that

2    work with QuickTime.

3        Q.  What were those other responsibilities?

4        A.  My recollection isn't very clear now looking

5    back, but, you know, it was things -- applications for

6    OS X, so things like Address Book, Mail.  Eventually

7    iChat and Safari.  I'm sure there was more, but those are

8    the highlights, I think.

9        Q.  What was your role working on Address Book for

10   OS X?

11       A.  The same role that I do for all the work that I

12   do:  An interface designer.

13       Q.  And you're familiar, then, with the design of

14   the user interface for the Address Book program in OS X?

15       A.  Yes, I am.

16       Q.  In addition to QuickTime and OS X, did there

17   come a time where you had additional responsibilities in

18   the HI team?

19       A.  Eventually, yes.

20       Q.  When was that?

21       A.  Well, our group took on responsibility of

22   producing the iPhone.  That would be the next major

23   platform I worked on.

24       Q.  When did your group take on the responsibility

25   for iPhone?

HIGHLY CONFIDENTIAL

Page 26

1          A.   I couldn't give you the exact date per se, but

2     it was around 2004, 2005.

3          Q.   Do you recall anything in particular about when

4     you learned the group would start working on iPhone?

5          A.   Excuse me, did I learn anything -- go ahead.

6          Q.   Do you recall any specifics about when you

7     personally learned that the group, your HI team, would

8     start working on iPhone?

9               MR. CHUNG:   Objection.  Vague.

10              THE WITNESS:   The -- the strongest memory I

11    have, I guess, is just being called into a meeting with

12    my co-workers and told that we were going to be working

13    on this new secret project.   And it was very -- and it

14    was only vaguely described because we hadn't invented it

15    yet.  So it was just really a concept.   It wasn't

16    anything tangible yet.

17         Q.   BY MS. FERNANDS:   Do you recall who was in that

18    meeting?

19         A.   I don't think I could list for you by person,

20    but it was my co-workers at the time, my manager, Greg

21    Christie, and his boss, Scott Forstall.

22         Q.   Other than being told that you'd be working on a

23    secret project, do you remember anything else that you

24    were told during that first meeting where the group was

25    told that there was this project coming up?

HIGHLY CONFIDENTIAL

1    A.   I just remember that thinking it was going to be

2    a phone, and I believe at that point we were told the

3    major idea it was going to be based on a touch screen.

4    And so that was basically all we knew at that point.

5    Q.   And other than that was sometime in 2004 or

6    2005, there's not anything in particular that you recall

7    that would identify the date more specifically?

8    A.   No -- not for -- no.   I mean, I'm sure it was

9    talked about before I found out at that time, but that

10   was -- it sort of became official for I and my group at

11   that time.

12   Q.   After you started working on the iPhone project,

13   about how much of your time was devoted to the iPhone

14   project?

15   A.   My recollection is that it took -- it took up

16   roughly 50 percent of the time and then ramped up

17   increasingly over time.   We still had responsibilities

18   for OS X.

19   Q.   When did it begin to ramp up?

20   A.   It began ramping up immediately.   I would say it

21   was pretty much a constant incline from day one.

22   Q.   So was there a time when you were spending more

23   than 50 percent of your time on the iPhone project?

24   A.   Yes.

25   Q.   When was that?

HIGHLY CONFIDENTIAL

Page 28

1        A.   I don't think I gave you an exact date, but it

2   was, I would say, within a year of that discussion I was

3   spending most of my time.

4        Q.   So sometime late 2005, early 2006; would that be

5   the --

6        A.   Yeah.

7        Q.   We spoke earlier about your work on Address Book

8   for OS X?

9        A.   Uh-huh.

10       Q.   Was there something known as virtual card within

11  the Address Book?

12       A.   A virtual card?  I'm not familiar with that

13  term.

14       Q.   Was there -- within Address Book, was there a

15  page that you could look at within Address Book that

16  would give you contact information for a particular

17  contact?

18       A.   Yes.

19       Q.   How did you refer to that?

20       A.   A contact card.

21       Q.   Contact card?

22       A.   Uh-huh.

23       Q.   Okay.  Do you recall the content of the contact

24  card in Address Book for OS X?

25       A.   Yes, it was basic contact information:  Phone

HIGHLY CONFIDENTIAL

Page 29

1   numbers, email addresses, physical addresses, I believe

2   chat addresses for chat services as well as, you know,

3   names, full names, titles, nicknames, company names, and

4   notes about the person and a photo, optional photo for

5   the person.  That's most of what I recall about the

6   content originally.

7       Q.  For the email addresses as shown in the contact

8   card, was it possible to select those in some way in

9   order to initiate an email to the -- to the contact?

10      A.  I believe you could click on them and they would

11  immediately open an email conversation with that person.

12      Q.  What about the chat services addresses; could

13  those be used to initiate chat with the contact?

14      A.  I don't recall now what they did.

15      Q.  Is there anything else within the contact card

16  that could be used to initiate communication with the

17  contact?

18      A.  I don't recall at this point.

19      Q.  Did your title change when you moved from the

20  QuickTime group to the HI team?

21      A.  No, it did not that I recall.

22      Q.  Has your title ever changed during the time

23  you've been at Apple?

24      A.  My official job title has changed as I've been

25  promoted over the years, but we don't really use those

HIGHLY CONFIDENTIAL

Page 34

1   to work on?

2        A.  I don't think I could tell you very specifically

3   what I worked on, but I helped out in a lot of different

4   areas.  It's a very collaborative effort so we worked

5   together quite a bit on all aspects of the phone.  That's

6   why it's hard for me to enumerate all the things.  I

7   worked a little bit on a lot of things.

8        Q.  Did there come a time where you worked on

9   something known as the call log?

10       A.  Yes.

11       Q.  Do you recall when you started working on the

12   call log?

13       A.  Well, we call that Recents.  I think that's what

14   you mean by a call log, as I understand it.  And I worked

15   on that as part of the Address Book application or

16   contacts.

17       Q.  So your work on Recents was part of your work

18   with the Address Book; is that correct?

19       A.  On the iPhone, yes.

20       Q.  On the iPhone.

21       A.  Specifically the Phone app, which is -- embodies

22   the Address Book.

23       Q.  What do you mean that the Phone app embodies the

24   Address Book?

25       A.  The -- your contacts list, which is an address

HIGHLY CONFIDENTIAL

Page 35

1    book, is contained inside -- on the iPhone, as we shipped

2    it, is contained inside the Phone application, and as is

3    the Recents call list.

4              (Exhibit 3, U.S. Patent No.: US 8,014,760 B2,

5              9/6/11, marked for identification.)

6         Q.   BY MS. FERNANDS:  So I've just handed you what

7    we've marked as Exhibit Number 3.

8         A.   Okay.

9         Q.   It is a document bearing Bates Numbers

10   APLNDC630-0000173683 through 3770.

11        A.   Okay.

12        Q.   And do you recognize this document?

13        A.   Yes, I do.

14        Q.   We referred earlier to a '760 patent.  Do you

15   recognize this to be the '760 patent?

16        A.   This appears to be the '760 patent.

17        Q.   Okay.  And so if I refer to it throughout the

18   deposition as the '760 patent, you'll know what I mean?

19        A.   That sounds great.

20        Q.   Now, at a high level, do you have an

21   understanding what the '760 patent relates to?

22        A.   At a high level, I believe it's about call

23   management in the iPhone.

24        Q.   What do you mean call management on the iPhone?

25        A.   Well, I'm reading the title.  It says "missed

HIGHLY CONFIDENTIAL

Page 36

1  call," to be specific, "missed telephone call management

2  for a portable multi-function device."  So I believe this

3  patent is concerned with what we would call the Recents

4  list, what you referred to as a call log earlier.

5      Q.  And is it the case that your work on the Address

6  Book in Recents for the iPhone is what led to the

7  application that became the '760 patent?

8      A.  I believe so.

9      Q.  And do you recall with any more particularity

10 than we've already discussed when you began the work on

11 the Recents list?

12     A.  I do not recall the specific date at this time.

13 There may be documents with those dates on it, supporting

14 evidence, but it was pretty early on.  I can tell you

15 that.

16     Q.  Now you'd said earlier that early in the project

17 that was the iPhone, you were spending about 50 percent

18 of your time on iPhone work; is that right?

19     A.  Yeah.  That was a guess, yeah.

20     Q.  Of your work on iPhone, about how much of your

21 time was spent to the Recents list?

22     A.  Well, we kind of -- with regard to the projects

23 I work on, they're kind of divided evenly.  So I had

24 multiple -- very often I'd have multiple projects working

25 simultaneously.  And as a project would become completed

HIGHLY CONFIDENTIAL

Page 37

1   and fall off, you know, I would have fewer for a period

2   of time.  So sometimes I'd be working a hundred percent

3   on this and sometimes, you know, 50 percent.  It would

4   kind of vary week to week depending on what was being

5   asked for in terms of demos.

6       Q.  About how much time overall did you spend

7   working on the Recents list?

8       A.  I don't know that I can quantify that --

9       Q.  Do you have any estimate?

10      A.  -- accurately.  How much time overall, in terms

11  of what's the time range you're looking at?

12      Q.  Let's start with the period -- let's start with

13  the year 2005.  During the year 2005 in the early

14  development, about how much time did you spend working on

15  the Recents list?

16      A.  As compared to other apps on IOS or --

17      Q.  Overall.

18      A.  -- my whole job?  I couldn't quantify for you

19  hours per week, if that's what you're asking.  Maybe you

20  could be more specific.

21      Q.  Can you give a percentage of the time that you

22  were spending at the time on Recents?

23      A.  I would like to try.  Could you tell me a

24  percentage of what?  That's what I'm kind of getting at.

25  A percentage of my week?

HIGHLY CONFIDENTIAL

Page 38

1        Q.  Of your overall time.  Of your over --

2        A.  A percentage of my projects?  Do you know what

3    I'm getting at?  I'm just looking for more specificity so

4    I can give you a more accurate number.

5        Q.  You know what?  Sorry.

6        A.  Sorry.

7        Q.  I'm not sure that you just said the percentage

8    of your weeks or a percentage of your projects.  What is

9    the distinction you're making between the percentage of

10   your week versus the percentage of your project?

11       A.  Well, if I was working on OS X at the same time,

12   let's say, you know, so a percentage of my overall time

13   would be spent doing OS X, and then a percentage of the

14   remaining would be spent on iPhone.  And then if you're

15   asking me what percentage of the iPhone percentage I

16   worked on, it would be a different number than -- do you

17   see what I'm saying?

18       Q.  So of your overall time spent working for

19   Apple --

20       A.  Working for Apple.

21       Q.  -- about how much time did you spend in the year

22   2005 as a percentage of your time working on the Recents

23   call list?

24       A.  I really hesitate to guess.  I would throw out a

25   number, 25 percent or something like that.

HIGHLY CONFIDENTIAL

Page 39

1      Q.  And what was it -- what was your role with
2   respect to the Recents list?
3      A.  I was tasked with designing a Recents list.
4   That was my role.
5      Q.  What did designing a Recents list entail?
6      A.  Well, it entailed doing the entire user
7   interface for it, doing -- creating supporting demos to
8   illustrate that interface and its ideas, and then
9   continuing to revise and evolve those designs through
10  executive feedback sessions that happened fairly
11  regularly.
12     Q.  You when say creating the entire UI, what
13  aspects of the UI do you consider part of the Recents
14  work?
15     A.  Well, there is a -- specific to Recents in the
16  phone app, there's a Recents tab, which when you tap on
17  that tab, the whole UI is about Recents management while
18  you're inside that tab.  So that's what I meant by the
19  entire UI.  So what you see on screen is what I worked on
20  there.
21     Q.  So when you said about 25 percent of your time
22  was spent on Recents, was that about 25 percent of your
23  time was spent on the work for that one screen shown when
24  you tap on Recents?
25            MR. CHUNG:  Objection.  Vague.

HIGHLY CONFIDENTIAL

Page 141

1          So if your question was when was the UI done for

2    the first release, I mean, it would be months before we

3    announced it, or months before we shipped it at the

4    least.

5          Q.  Did you -- was there a period of time during

6    your work on development of the first iPhone where the UI

7    for the Recents list and contact card were no longer part

8    of your responsibilities and you were working on other

9    aspects of iPhone?

10         A.  You asked me when?

11         Q.  When, yes.

12         A.  I don't recall a specific date, but there would

13   have been a time when I assume the contact card and

14   Recents list was mature enough that we were -- we were

15   happy with it and we were -- and then at that point, I

16   would have just focused on other projects as well that

17   weren't done yet.

18         Q.  And you don't recall at what time the Recents

19   list and contact card were mature enough for you to move

20   on?

21         A.  No, I don't have a recollection of that specific

22   date.

23         Q.  Do you know whether any of your co-inventors

24   continued to work on the Recents list and contact card

25   after the time that you moved onto other projects?

HIGHLY CONFIDENTIAL

Page 142

1      A.  I don't believe they did.

2      Q.  During the development of the Recents list, was

3  there a moment, an ah-ha moment, where you said this is

4  how we want this to look?

5           MR. CHUNG:  Objection.  Vague.

6           THE WITNESS:  I don't recall what you're

7  referring to as an ah-ha moment.  I recall just a series

8  of iterations, feedback and further iterations leading to

9  the final design.

10     Q.  BY MS. FERNANDS:  No breakthrough moment for the

11 Recents list?

12     A.  I mean, I listed previously the innovative

13 aspects of it, and I think those were talked about very

14 early on, you know, at the beginning.  And once we

15 established what we wanted to do there, most of the

16 design was just iterating on, you know, exactly how it

17 looked and what colors things were and stuff like that.

18     Q.  With respect to the contact card, was there any

19 breakthrough moment concerning the contact card?

20     A.  I don't recall a specific breakthrough moment.

21 Again, we knew what we wanted to do early on, and I think

22 our struggle was mostly around presenting that

23 information we wanted to present, you know, finding the

24 right way to do it.

25     Q.  When you said you knew what you wanted to do

                                                      Page 143

1   early on, what was it that you knew you wanted to do

2   early on?

3            MR. CHUNG:  Objection.  Vague.

4            THE WITNESS:  You know, it was important to us

5   to have the contact card be friendly looking, and so, you

6   know, it has a picture of the person, of the contact

7   person there.  You know, the name is clearly legible.  It

8   would have secondary information that you might want to

9   save about the person, their maiden names, nicknames,

10  things like that.

11           We wanted to indicate whether the person worked

12  for a company or whether the contact card was a company

13  contact card and not a person, and we knew we wanted to

14  have all the data we could possibly contain about that

15  person on the card so you could interact with it and

16  communicate with that person that way.

17       Q.  BY MS. FERNANDS:  Were you personally involved

18  in the decision to seek patent protection for the Recents

19  list and contact card?

20       A.  I am not involved in decisions to create patents

21  for the designs that we do.  That's handled by our

22  lawyers.

23       Q.  Were any of the other co-inventors involved in

24  the decision to seek patent protection that led to the

25  '760 patent?

HIGHLY CONFIDENTIAL

Page 311

1          I declare under the penalty of perjury under the

2     laws of the State of California that the foregoing is

3     true and correct.

4          Executed on _____, 2013, at

5     _____, _____.

6

7

8

9

10

11                        _____

12                        SIGNATURE OF THE WITNESS

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 312

1    STATE OF CALIFORNIA      ) ss:

2    COUNTY OF MARIN          )

3

4          I, LESLIE ROCKWOOD, CSR NO. 3452, do hereby

5    certify:

6          That the foregoing deposition testimony was

7    taken before me at the time and place therein set forth

8    and at which time the witness was administered the oath;

9          That testimony of the witness and all objections

10   made by counsel at the time of the examination were

11   recorded stenographically by me, and were thereafter

12   transcribed under my direction and supervision, and that

13   the foregoing pages contain a full, true and accurate

14   record of all proceedings and testimony to the best of my

15   skill and ability.

16         I further certify that I am neither counsel for

17   any party to said action, nor am I related to any party

18   to said action, nor am I in any way interested in the

19   outcome thereof.

20         IN WITNESS WHEREOF, I have subscribed my name

21   this 21st day of May, 2013.

22

23

24   _____

25            LESLIE ROCKWOOD, RPR, CSR NO. 3462

HIGHLY CONFIDENTIAL

Page 313

```
 1                    ERRATA SHEET
              VERITEXT CORPORATE SERVICES
 2                    800-567-8658
          ASSIGNMENT NO. CS1660327
 3        CASE NAME: Motorola Mobility LLC v. Apple, Inc.
          DATE OF DEPOSITION: 5/9/2013
 4        WITNESS' NAME: Stephen Lemay
 5
          PAGE/LINE(S)/    CHANGE            REASON
 6        _____/_____/_____/_____
          _____/_____/_____/_____
 7        _____/_____/_____/_____
          _____/_____/_____/_____
 8        _____/_____/_____/_____
          _____/_____/_____/_____
 9        _____/_____/_____/_____
          _____/_____/_____/_____
10        _____/_____/_____/_____
          _____/_____/_____/_____
11        _____/_____/_____/_____
          _____/_____/_____/_____
12        _____/_____/_____/_____
          _____/_____/_____/_____
13        _____/_____/_____/_____
          _____/_____/_____/_____
14        _____/_____/_____/_____
          _____/_____/_____/_____
15        _____/_____/_____/_____
          _____/_____/_____/_____
16        _____/_____/_____/_____
          _____/_____/_____/_____
17        _____/_____/_____/_____
          _____/_____/_____/_____
18        _____/_____/_____/_____
          _____/_____/_____/_____
19        _____/_____/_____/_____
20              _____
                      Stephen Lemay
21
          SUBSCRIBED AND SWORN TO
22        BEFORE ME THIS_____DAY
          OF_____, 2013.
23
          _____
24           NOTARY PUBLIC
25        MY COMMISSION EXPIRES_____
```

Veritext Corporate Services

Ex. K

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California  90017-2543 | TEL: (213) 443-3000  FAX: (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3227**

WRITER'S INTERNET ADDRESS
**michaelfazio@quinnemanuel.com**

March 20, 2013

Michael A. Valek
2100 McKinney Avenue
Dallas, Texas  75201-6912

Re:     Apple v. Samsung Elecs. Co. et al, Case No 12-cv-630 (N.D.Cal.)

Dear Counsel:

I write to follow-up on the parties' March 12 and March 18, 2013 telephonic meet and confers.
During the meet and confers, the parties' discussed both Samsung and Apple interrogatories.
The parties agreed on dates on which to exchange supplemental responses as set forth in the
following table.

| Samsung Interrogatory | Apple Interrogatory | Supplemental Response Due |
|---|---|---|
| 1 | 11 | April 10, 2013 |
| 2, 3 | 12, 13 | April 10, 2013 |
| 11, 5 | 15, 20 | April 30, 2013 |
| 10 | 19 | April 10, 2013 |
| 5 | 20 | April 30, 2013 |
| 12 | 24 | April 30, 2013 |
| 18 | 29 | April 30, 2013 |
| 7 | 23 | April 10, 2013 |
| 8, 14 | 17, 26 | April 30, 2013 |
| 16 | 28 | April 1, 2013 |

quinn emanuel urquhart & sullivan, llp

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York  10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California  94111-4788 | TEL (415) 875-6600 FAX (415) 875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California  94065-2139 | TEL (650) 801-5000 FAX (650) 801-5100
CHICAGO | 500 W. Madison Street, Suite 2450, Chicago, Illinois  60661-2510 | TEL (312) 705-7400 FAX (312) 705-7401
WASHINGTON, DC | 1299 Pennsylvania Avenue NW, Suite 825, Washington, District of Columbia  20004-2400 | TEL (202) 538-8000 FAX (202) 538-8100
LONDON | 16 Old Bailey, London EC4M 7EG, United Kingdom | TEL +44 20 7653 2000 FAX +44 20 7653 2100
TOKYO | NBF Hibiya Building, 25F, 1-1-7, Uchisaiwai-cho, Chiyoda-ku, Tokyo 100-0011, Japan | TEL +81 3 5510 1711 FAX +81 3 5510 1712
MANNHEIM | Mollstraße 42, 68165 Mannheim, Germany | TEL +49 621 43298 6000 FAX +49 621 43298 6100
MOSCOW | Voentorg Building, 3rd Floor, 10 Vozdvizhenka Street, Moscow 125009, Russia | TEL +7 495 797 3666 FAX +7 495 797 3667

With regard to Samsung Interrogatory No. 6 and Apple Interrogatory No. 18, the parties agreed that citations under Federal Rule of Civil Procedure 33(d) to each patents' respective file wrapper would constitue a suffcient response.

The parties also agreed that their respective supplemental responses to Samsung Interrogatory No. 16 and Apple Interrogatory No. 28 due on April 1 would be limited to up to three individuals with knowledge regarding each affirmative defense.  The parties agreed that supplemental responses to Samsung's Interrogatory Nos. 8 and 14, and Apple's Interrogatory Nos. 17 and 26 would be limited to citations under Federal Rule of Civil Procedure 33(d), except that responsive, non-written communications, if any, will be described.

Lastly, the parties agreed to discuss Samsung Interrogatory No. 26 and Apple Interrogatories Nos. 37 and 38 at the non-lead trial counsel meet and confer on March 21, 2013.

With respect to each interrogatory, both parties stated that fact discovery is on-going, and reserve the right to further supplement their responses pursuant to Federal Rule of Civil Procedure 26(e).

Very truly yours,

Michael L. Fazio

2

# Ex. L

**DECLARATION OF BRIAN M. BUROKER IN SUPPORT OF APPLE INC.'S
OPPOSITION TO SAMSUNG'S MOTION TO PRECLUDE APPLE FROM ASSERTING
UNTIMELY DATES OF CONCEPTION
CONTAINS CONFIDENTIAL INFORMATION - FILED UNDER SEAL**