Ex. 1

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
Kevin A. Smith (Bar No. 250814)
kevinsmith@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129 (CA);
2542082 (NY))
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

William C. Price (Bar No. 108542)
williamprice@quinnemanuel.com
Patrick M. Shields (Bar No. 204739)
patrickshields@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

STEPTOE & JOHNSON, LLP
John Caracappa (*pro hac vice*)
jcaracappa@steptoe.com
1330 Connecticut Avenue, NW
Washington, D.C. 20036
Telephone: (202) 429-6267
Facsimile: (202) 429-3902

Attorneys for SAMSUNG ELECTRONICS CO.,
LTD., SAMSUNG ELECTRONICS AMERICA,
INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation, | CASE NO. 12-CV-00630-LHK |
| Plaintiff, | |
| vs. | **SAMSUNG'S PATENT LOCAL RULE 3-3 AND 3-4 DISCLOSURES** |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Defendants. | |

# I. THE '502 PATENT

## A. Local Patent Rule 3-3(a):  Identification of Prior Art[1]

At this time, Samsung contends that at least the following prior art references anticipate or render obvious, either alone or in combination, the asserted claims of the '502 Patent:

### 1. Patent References[2]

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 4,330,845 | May 18, 1982 | Dec. 31, 1979 |
| US | 4,559,598 | Dec. 17, 1985 | Feb. 22, 1983 |
| US | 4,737,980 | Apr. 12, 1988 | July 19, 1985 |
| US | 4,862,498 | Aug. 29, 1989 | Nov. 28, 1986 |
| US | 4,896,291 | Jan. 23, 1990 | May 20, 1988 |
| US | 5,007,019 | Apr. 9, 1991 | Jan. 5, 1989 |
| US | 5,041,967 | Aug. 20, 1991 | Oct. 13, 1987 |
| US | 5,103,498 | Apr. 7, 1992 | Aug. 2, 1990 |
| US | 5,265,014 | Nov. 23, 1993 | Apr. 10, 1990 |
| US | 5,317,646 | May 31, 1994 | Mar. 24, 1992 |
| US | 5,357,431 | Oct. 18, 1994 | Jan. 25, 1993 |
| US | 5,386,298 | Jan. 31, 1995 | Apr. 26, 1993 |
| US | 5,396,419 | Mar. 7, 1995 | Sep. 8, 1992 |
| US | 5,455,901 | Oct. 3, 1995 | Sep. 12, 1994 |
| US | 5,459,488 | Oct. 17, 1995 | Jan. 19, 1993 |
| US | 5,479,536 | Dec. 26, 1995 | Nov. 27, 1991 |
| US | 5,495,565 | Feb. 27, 1996 | June 21, 1994 |
| US | 5,513,308 | Apr. 30, 1996 | Sep. 1, 1993 |
| US | 5,537,618 | July 16, 1996 | Dec. 23, 1993 |
| US | 5,555,496 | Sep. 10, 1996 | May 6, 1994 |
| US | 5,557,515 | Sep. 17, 1996 | Aug. 11, 1989 |
| US | 5,574,482 | Nov. 12, 1996 | May 17, 1994 |
| US | 5,608,898 | Mar. 4, 1997 | Nov. 12, 1992 |
| US | 5,619,708 | Apr. 8, 1997 | Oct. 25, 1994 |
| US | 5,623,681 | Apr. 22, 1997 | Nov. 19, 1993 |
| US | 5,632,022 | May 20, 1997 | Nov. 13, 1991 |
| US | 5,644,735 | July 1, 1997 | May 27, 1992 |
| US | 5,675,362 | Oct. 7, 1997 | Nov. 14, 1988 |
| US | 5,682,510 | Oct. 28, 1997 | Mar. 30, 1995 |
| US | 5,682,538 | Oct. 28, 1997 | Aug. 12, 1994 |
| US | 5,704,029 | Dec. 30, 1997 | May 23, 1994 |
| US | 5,724,449 | Mar. 3, 1998 | Nov. 27, 1991 |
| US | 5,748,512 | May 5, 1998 | Feb. 28, 1995 |

---

[1]   To the extent one or more prior art patents, publications, or systems are identified in the claim charts attached as Exhibits A-H to this document, but are not included in the tables and lists below for each patent, those prior art patents, publications, or systems should also be considered as prior art to the asserted patents.

[2]   Samsung incorporates by reference all prior art references cited in the patents listed herein and/or their file histories.

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 5,752,054 | May 12, 1998 | June 6, 1995 |
| US | 5,799,107 | Aug. 25, 1998 | Oct. 15, 1997 |
| US | 5,805,676 | Sep. 8, 1998 | May 19, 1995 |
| US | 5,818,437 | Oct. 6, 1998 | July 26, 1995 |
| US | 5,835,635 | Nov. 10, 1998 | June 27, 1995 |
| US | 6,008,799 | Dec. 28, 1999 | May 24, 1994 |
| US | 6,018,342 | Jan. 25, 2000 | July 3, 1995 |
| US | 7,136,710 | Nov. 14, 2006 | Dec. 23, 1991 |

2.    **Publications[3]**

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| A Modular and Flexible Architecture for an Integrated Corpus Query System | July 1994 | Oliver Christ | Cornell University |
| A Pen-Based Database Interface for Mobile Computers | 1994 | Rafael Alonso and V.S. Mani | Institute of Electrical and Electronics Engineers |
| Adaptive and Predictive Techniques in a Communication Prosthesis | 1987 | Andrew L. Swiffin, John L. Arnott, J. Adrian Pickering, and Alan F. Newell | Informa Healthcare |
| Adaptive predictive text generation and the reactive keyboard | 1989 | John Darragh, John Joseph | University of Calgary |
| A Stylus-Based User Interface for Text: Entry and Editing | June 1991 | Aaron Goodisman | Massachusetts Institute of Technology |
| Adaptive predictive text generation and the reactive keyboard | 1991 | John J. Darragh and Ian H. Witten | Elsevier |
| Context and Orientation in Hypermedia Networks | 1989 | Kenneth Utting and Nicole Yankelovich | Association for Computing Machinery |
| Designing the User Interface | 1992 | Ben Schneiderman | Addison-Wesley |
| Enhancing the Usability of an Office Information System Through Direct Manipulation | Dec. 1983 | Alison Lee and F.H. Lochovsky | Association for Computing Machinery |
| Facilitating the Development of Representations in Hypertext with IDE | Nov. 1989 | Daniel S. Jordan, Daniel M. Russell, Anne-Marie S. | Association for Computing Machinery |

---

[3]    Samsung incorporates by reference all prior art references identified in the publications listed herein.

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| | | Jensen, and Russell A. Rogers | |
| IBM Simon User's Manual | 1994 | | IBM |
| Investigations into History Tools for User Support | Apr. 1992 | Alison Lee | University of Toronto |
| Marquise: Creating Complete User Interfaces by Demonstration | Apr. 1993 | Brad A. Myers, Richard G. McDaniel, and David S. Kosbie | Association for Computing Machinery |
| Microsoft Foundation Class Primer | 1993 | Jim Conger | Waite Group Press |
| Pen Computing: A Technology Overview and a Vision | July 1995 | Andre Meyer | Association for Computing Machinery |
| Predictive interfaces: What will they think of next? | Nov. 1991 | Saul Greenberg, John Darragh, David Maulsby, and Ian H. Witten | University of Calgary |
| Predictive interfaces: What will they think of next? | 1995 | Saul Greenberg, John Darragh, David Maulsby, and Ian H. Witten | Association for Computing Machinery |
| Reducing Keystroke Counts with a Predictive Computer Interface | 1982 | Ian H. Witten, John G. Cleary, John J. Darragh, and David R. Hill | Institute of Electrical and Electronics Engineers |
| Software Interface for the Touch-Sensitive Menu of the Technician's Assister System | Dec. 20, 1990 | Joseph A. Molnar and Sonia Faletti | Defense Technical Information Center |
| Split Menus: Effectively Using Selection Frequency to Organize Menus | Mar. 1994 | Andrew Sears and Ben Schneiderman | Association for Computing Machinery |
| Supporting command reuse: empirical foundations and principles | Feb. 1993 | Saul Greenberg and Ian H. Witten | Academic Press |
| Supporting Command Reuse: Mechanisms for Reuse | Feb. 1993 | Saul Greenberg and Ian H. Witten | Academic Press |
| The Computer User as Toolsmith: The Use, Reuse, and Organization of Computer-based Tools | 1993 | Saul Greenberg | Cambridge University Press |
| The Design of a Graphical Browsing Interface for a Hypertext System | Feb. 25, 1994 | Joslyn A.A. Smith | University of New Brunswick |
| The Human Factors of Graphic Interaction: Tasks | Dec. 1980 | James D. Foley and Peggy Chan | Defense Technical |

| Title | Date of Publication | Author | Publisher |
|-------|--------------------|--------|-----------|
| and Techniques | | | Information Center |
| The Information Grid: A Framework for Information Retrieval and Retrieval-Centered Applications | Nov. 1992 | Ramana Rao, Stuart K. Card, Herbert D. Jellinek, Jock D. Mackinlay, and George G. Robertson | Association for Computing Machinery |
| The XKWIC User Manual | Aug. 2, 1995 | Oliver Christ | Institut für maschinelle Sprachverarbeitung, Universität Stuttgart |
| Tools for Supporting the Collaborative Process | Nov. 1992 | James R. Rhyne and Catherine G. Wolf | Association for Computing Machinery |
| Touch-sensitive screens: the technologies and their application | 1986 | J.A. Pickering | Elsevier |
| User modeling in interactive computer systems | 1984 | Saul Greenberg and Ian H. Witten | University of Calgary |
| Using a touchscreen for simple tasks | 1990 | John D. Gould, Sharon L. Greene, Stephen J. Boies, Antonia Meluson and Manvan Rasamny | IBM T.J. Watson Research Center |
| Using Graphic History in Browsing the World Wide Web | May 1995 | Eric Z. Ayers and John T. Stasko | Georgia Institute of Technology |

3.     **Systems**

All versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '502 Patent, including documents and source code describing the same:

- Windows 95 Preview Program Builds

Samsung reserves the right to amend these invalidity contentions to assert these references depending on the claim construction and infringement positions Apple may take as the case proceeds.  Moreover, Samsung reserves the right to use these references in combination with other

references to render the claims of the '502 Patent obvious in the event Apple takes the position that certain claim limitations are missing from the references charted in Exhibit A.

**B.      Local Patent Rule 3-3(b):  Whether Each Item Anticipates or Renders Obvious the Asserted Claims**

Plaintiff asserts claims 1-2, 4-5, 8, 11, 13-17, 20, 22-24 and 26 of the '502 Patent against Samsung in this lawsuit.  All of those claims are invalid because the '502 Patent fails to meet one or more of the requirements for patentability.  The individual bases for invalidity are provided below and in the claim charts attached as Exhibit A.  Each of the foregoing listed prior art documents, the underlying work, and/or the underlying apparatus or method qualifies as prior art under one or more sections of 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

Although Samsung has identified at least one citation per limitation for each reference, each and every disclosure of the same limitation in the same reference is not necessarily identified.  Rather, in an effort to focus the issues, Samsung has generally cited representative portions of identified references, even where a reference may contain additional support for a particular claim element.  In addition, persons of ordinary skill in the art generally read a prior art reference as a whole and in the context of other publications and literature.  Thus, to understand and interpret any specific statement or disclosure within a prior art reference, such persons would rely on other information within the reference, along with other publications and their general scientific knowledge.  Samsung may rely upon uncited portions of the prior art references and on other publications and expert testimony to provide context, and as aids to understanding and interpreting the portions that are cited.  Samsung may also rely on uncited portions of the prior art references, other disclosed publications, and the testimony of experts to establish that a person of ordinary skill in the art would have been motivated to modify or combine certain of the cited references so as to render the claims obvious.

**1.      Anticipation**

Some or all of the asserted claims of the '502 Patent are invalid as anticipated under 35 U.S.C. § 102 in view of each of the prior art references identified above and in the claim charts included in Exhibit A, which identify specific examples of where each limitation of the asserted

Each of those claim limitations is governed by 35 U.S.C. section 112, paragraph 6.  The '414 patent specification, however, fails to set forth the structure, material or acts for accomplishing the recited function.  Each of these claims is therefore invalid as indefinite under 35 U.S.C. § 112(2).

## V.    THE '760 PATENT

### A.    Local Patent Rule 3-3(a):  Identification of Prior Art

At this time, Samsung contends that at least the following prior art references anticipate or render obvious, either alone or in combination, the asserted claims of the '760 Patent:

1.    **Patent References[10]**

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 6,430,405 | Aug. 6, 2002 | Dec. 7, 1998 |
| US | 6,448,988 | Sep. 10, 2002 | Jan. 29, 1997 |
| US | 6,526,274 | Feb. 25, 2003 | Oct. 25, 1999 |
| US | 6,542,591 | Apr. 1, 2003 | July 27, 2000 |
| US | 6,549,612 | Apr. 15, 2003 | May 6, 1998 |
| US | 6,738,461 | May 18, 2004 | Nov. 1, 2001 |
| US | 6,772,188 | Aug. 3, 2004 | July 14, 2000 |
| US | 6,792,082 | Sep. 14, 2004 | Sep. 11, 1998 |
| US | 6,879,691 | Apr. 12, 2005 | May 12, 2000 |
| US | 6,961,420 | Nov. 1, 2005 | Nov. 13, 2001 |
| US | 7,007,239 | Feb. 28, 2006 | Sep. 21, 2000 |
| US | 7,117,445 | Oct. 3, 2006 | June 30, 2003 |
| US | 7,212,808 | May 1, 2007 | Oct. 15, 2002 |
| US | 7,221,748 | May 22, 2007 | Nov. 12, 2002 |
| US | 7,225,409 | May 29, 2007 | Aug. 25, 1999 |
| US | 7,231,229 | June 12, 2007 | Mar. 16, 2003 |
| US | 7,280,652 | Oct. 9, 2007 | Sep. 13, 2004 |
| US | 7,280,850 | Oct. 9, 2007 | Sep. 27, 2001 |
| US | 7,289,614 | Oct. 30, 2007 | Sep. 29, 2000 |
| US | 7,403,767 | July 22, 2008 | Apr. 29, 2005 |
| US | 7,409,050 | Aug. 5, 2008 | Apr. 21, 2005 |
| US | 7,493,567 | Feb. 17, 2009 | Jan. 28, 2004 |
| US | 7,502,633 | Mar. 10, 2009 | Oct. 15, 2002 |
| US | 7,526,306 | Apr. 28, 2009 | Dec. 8, 2003 |
| US | 7,606,598 | Oct. 20, 2009 | Mar. 31, 2006 |
| US | 7,680,513 | Mar. 16, 2010 | Aug. 8, 2005 |
| US | 7,623,643 | Nov. 24, 2009 | July 26, 2005 |
| US | 7,680,513 | Mar. 16, 2010 | Aug. 8, 2005 |
| US | 7,685,530 | Mar. 23, 2010 | June 10, 2005 |
| US | 7,715,535 | May 11, 2010 | Sep. 27, 2005 |

---

[10]   Samsung incorporates by reference all prior art references cited in the patents listed herein and/or their file histories.

| Country of Origin | Patent Number | Date of Issue | Priority Date |
|---|---|---|---|
| US | 7,724,887 | May 25, 2010 | July 21, 2005 |
| US | 7,778,399 | Aug. 17, 2010 | July 2, 2004 |
| US | 7,778,671 | Aug. 17, 2010 | Oct. 8, 2004 |
| US | 7,779,630 | Sep. 14, 2010 | June 24, 2004 |
| US | 7,783,283 | Aug. 24, 2010 | Sep. 8, 2004 |
| US | 7,839,987 | Nov. 23, 2010 | Nov. 1, 2001 |
| US | 7,894,597 | Feb. 22, 2011 | Oct. 12, 2005 |
| US | 7,920,886 | Apr. 5, 2011 | Jan. 24, 2006 |
| US | 7,991,432 | Aug. 2, 2011 | Apr. 2, 2004 |
| US | 8,001,120 | Aug. 16, 2011 | Feb. 12, 2004 |
| US | 8,019,388 | Sep. 13, 2011 | Feb. 6, 2003 |
| US | 8,064,886 | Nov. 22, 2011 | Feb. 14, 2006 |
| US | 8,095,879 | Jan. 10, 2012 | Dec. 10, 2002 |
| US | 8,175,656 | May 8, 2012 | Feb. 24, 2006 |
| US | 2002/0076015 | June 20, 2002 | Dec. 15, 2000 |
| US | 2002/0111991 | Aug. 15, 2002 | Nov. 1, 1999 |
| US | 2002/0116464 | Aug. 22, 2002 | Feb. 20, 2001 |
| US | 2004/0137955 | July 15, 2004 | Oct. 15, 2002 |
| US | 2004/0235520 | Nov. 25, 2004 | May 20, 2003 |
| US | 2005/0047562 | Mar. 3, 2005 | Aug. 28, 2003 |
| US | 2005/0250483 | Nov. 10, 2005 | May 7, 2004 |
| US | 2004/0267887 | Dec. 30, 2004 | June 30, 2003 |
| US | 2003/0032527 | Feb. 10, 2005 | Aug. 8, 2003 |
| US | 2005/0074109 | Apr. 7, 2005 | Sep. 24, 2004 |
| US | 2005/0141686 | June 30, 2005 | June 7, 2004 |
| US | 2006/0010395 | Jan. 12, 2006 | July 9, 2004 |
| US | 2006/0140189 | June 29, 2006 | Dec. 23, 2004 |
| US | 2006/0281449 | Dec. 14, 2006 | June 14, 2005 |
| US | 2007/0071186 | Mar. 29, 2007 | Sep. 21, 2005 |
| US | 2007/0083600 | Apr. 12,2007 | Oct. 6, 2005 |
| US | 2007/0092072 | Apr. 26, 2007 | Sep. 30, 2005 |
| US | 2007/0133771 | June 14, 2007 | Dec. 12, 2005 |
| US | 2007/0243858 | Oct. 18, 2007 | Apr. 18, 2006 |
| US | 2007/0280457 | Dec. 6, 2007 | June 2, 2006 |
| US | 2008/0295017 | Nov. 27, 2008 | Sep. 5, 2006 |
| EP | 1 069 791 | Jan. 17, 2001 | July 13, 1999 |
| EP | 1 365 564 | Nov. 26, 2003 | Apr. 30, 2003 |

2.      Publications[11]

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Exploring PC-Telephone Convergence with the Enhanced Telephony Prototype | Apr. 2004 | JJ Cadiz, Attila Narin, Gavin Jancke, Anoop Gupta, and Michael Boyle | Association for Computing Machinery |
| Finger Instead of Mouse: | 2003 | Andreas | Springer-Verlag |

---

[11]   Samsung incorporates by reference all prior art references identified in the publications listed herein.

| Title | Date of Publication | Author | Publisher |
|---|---|---|---|
| Touch Screens as a Means of Enhancing Universal Success | | Holzinger | |
| Ming User Manual | 2006 | | Motorola |
| Model 8690 Inter-Tel Protocol Mode User Guide | Mar. 2006 | | Inter-Tel |
| Motorola A1000 User Guide | 2002 | | Motorola |
| Nokia 9000i User's Manual | 1997 | | Nokia |
| Nokia 9110 User's Manual | 1998 | | |
| P900/P908 White Paper | Dec. 2003 | | Motorola |
| pdQ™ Applications Handbook | 1999 | | Sony Ericsson |
| TAKEphONE User Manual | June 15, 2006 | | Iambic |
| TealPhone User's Manual | Jan. 24, 2006 | | TealPoint Software |
| The Kyocera 7135 Smartphone: Reference Guide | 2002 | | Kyocera |
| User's Guide Agendus for Symbian OS UIQ Edition | Apr. 1, 2004 | | Iambic |
| Using Your Palm® Treo™ 700w Smartphone | 2006 | | Palm |
| using your Treo™ 650 smartphone | 2004 | | Palm |
| XPlore M98 User Manual | July 14, 2005 | | Group Sense PDA |

3.      **Systems**

All versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '760 Patent, including documents and source code describing the same:

- Agenda Fusion

- Agendus Professional

- Motorola A1200

- TealPhone

- Windows Mobile 5

Samsung reserves the right to amend these invalidity contentions to assert these references depending on the claim construction and infringement positions Apple may take as the case proceeds.  Moreover, Samsung reserves the right to use these references in combination with other

references to render the claims of the '760 Patent obvious in the event Apple takes the position that certain claim limitations are missing from the references charted in Exhibit E.

**B.      Local Patent Rule 3-3(b):  Whether Each Item Anticipates or Renders Obvious the Asserted Claims**

Plaintiff asserts claims 1-5 and 7-22 of the '760 Patent against Samsung in this lawsuit.  All of those claims are invalid because the '760 Patent fails to meet one or more of the requirements for patentability.  The individual bases for invalidity are provided below and in the claim charts attached as Exhibit E.  Each of the foregoing listed prior art documents, the underlying work, and/or the underlying apparatus or method qualifies as prior art under one or more sections of 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

Although Samsung has identified at least one citation per limitation for each reference, each and every disclosure of the same limitation in the same reference is not necessarily identified.  Rather, in an effort to focus the issues, Samsung has generally cited representative portions of identified references, even where a reference may contain additional support for a particular claim element.  In addition, persons of ordinary skill in the art generally read a prior art reference as a whole and in the context of other publications and literature.  Thus, to understand and interpret any specific statement or disclosure within a prior art reference, such persons would rely on other information within the reference, along with other publications and their general scientific knowledge.  Samsung may rely upon uncited portions of the prior art references and on other publications and expert testimony to provide context, and as aids to understanding and interpreting the portions that are cited.  Samsung may also rely on uncited portions of the prior art references, other disclosed publications, and the testimony of experts to establish that a person of ordinary skill in the art would have been motivated to modify or combine certain of the cited references so as to render the claims obvious.

1.      **Anticipation**

Some or all of the asserted claims of the '760 Patent are invalid as anticipated under 35 U.S.C. § 102 in view of each of the prior art references identified above and in the claim charts included in Exhibit E, which identify specific examples of where each limitation of the asserted

1  DATED:  August 10, 2012                QUINN EMANUEL URQUHART & SULLIVAN LLP

2

3                                         By  /s/  Patrick M. Shields
                                          Patrick M. Shields
4                                         Attorneys for Defendants
                                          SAMSUNG ELECTRONICS CO., LTD.,
5                                         SAMSUNG ELECTRONICS AMERICA, INC. and
                                          SAMSUNG TELECOMMUNICATIONS
6                                         AMERICA, LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ex. 2

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 | TEL: (213) 443-3000 FAX: (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3227**

WRITER'S INTERNET ADDRESS
**michaelfazio@quinnemanuel.com**

March 20, 2013

Michael A. Valek
2100 McKinney Avenue
Dallas, Texas 75201-6912

Re:     Apple v. Samsung Elecs. Co. et al, Case No 12-cv-630 (N.D.Cal.)

Dear Counsel:

I write to follow-up on the parties' March 12 and March 18, 2013 telephonic meet and confers. During the meet and confers, the parties' discussed both Samsung and Apple interrogatories. The parties agreed on dates on which to exchange supplemental responses as set forth in the following table.

| Samsung Interrogatory | Apple Interrogatory | Supplemental Response Due |
|---|---|---|
| 1 | 11 | April 10, 2013 |
| 2, 3 | 12, 13 | April 10, 2013 |
| 11, 5 | 15, 20 | April 30, 2013 |
| 10 | 19 | April 10, 2013 |
| 5 | 20 | April 30, 2013 |
| 12 | 24 | April 30, 2013 |
| 18 | 29 | April 30, 2013 |
| 7 | 23 | April 10, 2013 |
| 8, 14 | 17, 26 | April 30, 2013 |
| 16 | 28 | April 1, 2013 |

quinn emanuel urquhart & sullivan, llp

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111-4788 | TEL (415) 875-6600 FAX (415) 875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California 94065-2139 | TEL (650) 801-5000 FAX (650) 801-5100
CHICAGO | 500 W. Madison Street, Suite 2450, Chicago, Illinois 60661-2510 | TEL (312) 705-7400 FAX (312) 705-7401
WASHINGTON, DC | 1299 Pennsylvania Avenue NW, Suite 825, Washington, District of Columbia 20004-2400 | TEL (202) 538-8000 FAX (202) 538-8100
LONDON | 16 Old Bailey, London EC4M 7EG, United Kingdom | TEL +44 20 7653 2000 FAX +44 20 7653 2100
TOKYO | NBF Hibiya Building, 25F, 1-1-7, Uchisaiwai-cho, Chiyoda-ku, Tokyo 100-0011, Japan | TEL +81 3 5510 1711 FAX +81 3 5510 1712
MANNHEIM | Mollstraße 42, 68165 Mannheim, Germany | TEL +49 621 43298 6000 FAX +49 621 43298 6100
MOSCOW | Voentorg Building, 3rd Floor, 10 Vozdvizhenka Street, Moscow 125009, Russia | TEL +7 495 797 3666 FAX +7 495 797 3667

With regard to Samsung Interrogatory No. 6 and Apple Interrogatory No. 18, the parties agreed that citations under Federal Rule of Civil Procedure 33(d) to each patents' respective file wrapper would constitue a suffcient response.

The parties also agreed that their respective supplemental responses to Samsung Interrogatory No. 16 and Apple Interrogatory No. 28 due on April 1 would be limited to up to three individuals with knowledge regarding each affirmative defense.  The parties agreed that supplemental responses to Samsung's Interrogatory Nos. 8 and 14, and Apple's Interrogatory Nos. 17 and 26 would be limited to citations under Federal Rule of Civil Procedure 33(d), except that responsive, non-written communications, if any, will be described.

Lastly, the parties agreed to discuss Samsung Interrogatory No. 26 and Apple Interrogatories Nos. 37 and 38 at the non-lead trial counsel meet and confer on March 21, 2013.

With respect to each interrogatory, both parties stated that fact discovery is on-going, and reserve the right to further supplement their responses pursuant to Federal Rule of Civil Procedure 26(e).

Very truly yours,

Michael L. Fazio

Ex. 3

1    QUINN EMANUEL URQUHART &
     SULLIVAN, LLP
2    Charles K. Verhoeven (Bar No. 170151)
     charlesverhoeven@quinnemanuel.com
3    Kevin A. Smith (Bar No. 250814)
     kevinsmith@quinnemanuel.com
4    50 California Street, 22nd Floor
     San Francisco, California 94111
5    Telephone: (415) 875-6600
     Facsimile: (415) 875-6700
6
     Kevin P.B. Johnson (Bar No. 177129)
7    kevinjohnson@quinnemanuel.com
     Victoria F. Maroulis (Bar No. 202603)
8    victoriamaroulis@quinnemanuel.com
     555 Twin Dolphin Drive, 5th Floor
9    Redwood Shores, California 94065
     Telephone: (650) 801-5000
10   Facsimile: (650) 801-5100

11   William C. Price (Bar No. 108542)
     williamprice@quinnemanuel.com
12   865 South Figueroa Street, 10th Floor
     Los Angeles, California  90017-2543
13   Telephone:  (213) 443-3000
     Facsimile:  (213) 443-3100
14
     Attorneys for SAMSUNG ELECTRONICS
15   CO., LTD., SAMSUNG ELECTRONICS
     AMERICA, INC. and SAMSUNG
16   TELECOMMUNICATIONS AMERICA, LLC

STEPTOE & JOHNSON, LLP
John Caracappa (*pro hac vice*)
jcaracappa@steptoe.com
1330 Connecticut Avenue, NW
Washington, D.C. 20036
Telephone: (202) 429-6267
Facsimile: (202) 429-3902

17                    UNITED STATES DISTRICT COURT

18          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

19

20   APPLE INC., a California corporation,          CASE NO. 12-CV-00630-LHK

21              Plaintiff,

22         vs.                                       **SAMSUNG'S SECOND AMENDED
                                                     PATENT LOCAL RULE 3-3 AND 3-4
     SAMSUNG ELECTRONICS CO., LTD., a                DISCLOSURES**
23   Korean business entity; SAMSUNG
     ELECTRONICS AMERICA, INC., a New               **HIGHLY CONFIDENTIAL –
24   York corporation; SAMSUNG                       ATTORNEYS' EYES ONLY**
     TELECOMMUNICATIONS AMERICA,
25   LLC, a Delaware limited liability company,

26              Defendants.

27

28

"synchronized in a peer-to-peer manner," each refer only to programming abstractions or the manipulation of information; these are concepts, not physical objects or tangible matter.

### 2. Invalidity Based on Enablement or Written Description Under 35 U.S.C. § 112(1) and/or Invalidity Based on Indefiniteness Under 35 U.S.C. § 112(2)

Samsung asserts that each asserted claim of the '414 Patent is invalid in that the '414 specification fails to particularly point out and distinctly claim the alleged invention of the '414 Patent.  Samsung further asserts that each asserted claim of the '414 Patent is invalid as not containing a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the alleged invention.

Based on Samsung's present understanding of Plaintiff's infringement contentions, Samsung asserts that the asserted claims of the '414 Patent are invalid under 35 U.S.C. § 112 ¶¶ 1 and 2 at least because they include the following claim terms/phrases:

- "user-level,"
- "at least one user-level non-synchronization processing thread,"
- "at least one non-synchronization processing thread,"
- "the at least one user-level non-synchronization processing thread,"
- "concurrently with,"
- "first store associated with a first database,"
- "user interface to allow a user to access and edit structured data in a first store associated with a first database,"
- "one synchronization processing thread,"
- "synchronization software component which is configured to synchronize the structured data from the first database with the structured data from a second database,"
- "a lock on the first store,"
- "releases the lock after synchronization for a first data class is completed,"
- "synchronized in a peer-to-peer manner," and

- "synchronize structured data of a first data class and other synchronization software components are configured to synchronize structured data of other corresponding data classes."

These claim terms/phrases as apparently construed by Apple violate the written description, enablement, and/or definiteness requirements of 35 U.S.C. § 112 ¶¶ 1 and 2.  For instance, the term "peer-to-peer" is broader than and inconsistent with the alleged invention disclosed in the specification, and given Apple's infringement contentions, one of ordinary skill in the art would not understand what Apple has claimed.  Additionally, claims 7 and 17 of the '414 patent are invalid because they lack a proper antecedent basis for at least the term "first and second data processing systems."  As another example, the '414 patent contains no written description, disclosure, or teaching of execution "wherein the at least one user-level non-synchronization processing thread is provided by a user application which provides a user interface to allow a user to access and edit structured data in a first store associated with a first database," or of "executing at least one synchronization processing thread concurrently with the executing of the at least one user-level non-synchronization processing thread" as claimed in the '414 patent, including as claimed in claims 1, 4 and 6.  Likewise, the '414 patent contains no written description, disclosure, or teaching of executing a non-synchronization processing thread "concurrently with" a synchronization processing thread, under Apple's construction and interpretation of that term, which requires that the non-synchronization processing thread and the synchronization processing thread are both active during an overlapping time interval.

Based on Samsung's present understanding of Plaintiff's infringement contentions, at least one or more of these claim terms/phrases are indefinite because they are inconsistent with and broader than the alleged invention disclosed in the specification and given Plaintiff's apparent constructions of the claims, any person of ordinary skill in the art at the time of the invention would not understand what is claimed, even when the claims are read in light of the specification. As one example, claim 27 is indefinite because it uses the term "the at least one user-level non-synchronization processing thread" without antecedent basis.  In light of this language, a person of ordinary skill in the art would not be able to ascertain the metes and bounds of claim 27.  For

1    example, a person of ordinary skill in the art would be confused about whether the limitation is

2    intended to qualify the "at least one non-synchronization processing thread" previously recited in

3    claim 27, or to introduce an entirely new limitation into the scope of the claim.  Moreover, based

4    on Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted

5    claims in which these claim terms/phrases appear lack written description because the

6    specification of the '414 Patent demonstrates that the patentee neither conceived of nor

7    demonstrated possession of all that Apple now contends the claims cover.  In addition, based on

8    Samsung's present understanding of Plaintiff's infringement contentions, each of the asserted

9    claims in which these claim terms/phrases appear are invalid because the specification fails to

10   provide sufficient disclosure to enable any person of ordinary skill in the art to which it pertains,

11   or with which it is most nearly connected, to implement the invention without undue

12   experimentation.  Therefore, the claims fail to satisfy the requirements of § 112 ¶¶ 1 and 2.

13         Samsung further asserts that claims 21, 22, 31, and 32 are invalid for reciting at least the

14   following claim limitations:

- "means for executing at least one user-level non-synchronization processing thread that includes means for accessing structured data in a first store associated with a first database;"

- "means for executing at least one synchronization processing thread concurrently with the executing of the at least one user-level non-synchronization processing thread that includes means for synchronizing the structured data from the first database with the structured data from a second database;"

- "means for executing at least one non-synchronization processing thread;"

- "means for accessing structured data in a first store associated with a first database;"

- "means for executing at least one synchronization processing thread concurrently with the executing of the at least one non-synchronization processing thread that includes means for synchronizing the structured data from the first database with the structured data from a second database."

26   Each of those claim limitations is governed by 35 U.S.C. section 112, paragraph 6.  The

27   '414 patent specification, however, fails to set forth the structure, material or acts for

28

Perl script in MHonArc creates web content for consumption, the Sidekick was built to consume that content. These systems would work together to create content, present it to a user, and to receive content from a user and process it. As a result, a person of ordinary skill in the art would have motivation to combine these references.

### C.    The '959 Patent

The '959 patent is also obvious in light of the state of the art and/or knowledge of a person of ordinary skill in the art, as demonstrated by relevant background prior art and references in Exhibit C, to the extent the claims are not invalid under 35 U.S.C. §§ 101, 102 and/or 112.

As stated above, the references in Exhibits C-1 to C-20, are the Corey patent, the Legall patent, the MetaCrawler system, MultiSurf, the Neal patent, Newton , the Rubinstein patent, Sherlock, WAIS, the Bennett patent, the Evans patent, the Jensen patent, the SenseMaker system, the Smith patent, the Tung thesis, the Isite system, the ProFusion system, the CBKB system, and the Kirsch patent anticipate several of the asserted claims. To the extent these references are found to not anticipate any one of the asserted claims, they render the claims obvious, whether standing alone, or when combined with knowledge of the ordinary artisan and/or the nature of the problem to be solved.

Any reference or combination of references that anticipates or renders obvious an asserted independent claim also renders obvious any asserted claim dependent on that independent claim because every element of each dependent claim was known by a person of ordinary skill at the time of the alleged invention, and it would have been obvious to combine those known elements with the independent claims at least as a matter of common sense and routine innovation.

To the extent the references discussed herein or in Exhibits C-1 to C-20 are found to lack particular elements of the asserted claims, those elements would have represented mere obvious modifications of the references themselves. Each asserted claim would have been obvious in view of the primary references alone. All of the references identified in Exhibits C-1 to C-20 are in the same field of endeavor, and in particular, information and text retrieval. Further, all of these references relate to the same problem of providing the user access to particular information that

solutions for search.   Modifying the disclosed references to include heuristic algorithms also would have been an obvious design choice implemented through known techniques that would not yield unpredictable or unexpected results.  Finally, a person of skill in the art would have found express motivation to use this functionality.  For example, Apple's own U.S. Patent No. 5,477,447 states that "making a guess based on upon a selected heuristic approach . . . would be well-known to one skill in the art." ('447 Patent at 12:16-19; *see also* 12:11-44.).  As another example, many textbooks described these sorts of heuristic algorithms. (See for example Grossman, "Information Retrieval Algorithms and Heuristics," 1998 ("Grossman") and Rayward-Smith, "Modern Heuristic Search Methods," 1996 ("Rayward") generally.)

To the extent the primary references in Exhibits C-1 to C-20 are found to lack an explicit teaching of each plug-in module employing "using a different heuristic to locate information," a person or ordinary skill in the art would recognize that using different heuristics was a known variation on the use of algorithms to enable efficient information retrieval.  For example, a person of ordinary skill would have recognized that different types of searches or search locations could have different characteristics such that different heuristics could have different effectiveness in retrieving information.  Indeed, it was well known that different databases could contain different types of information and organize information in different ways.  Different heuristics for searching these heterogeneous databases were well known in the art.  For example, "SFgate: The WWW Gateway for freeWAIS-sf, Edition 1.108, for SFgate 5.1, January 1997," Norbert Gövert and Ulrich Pfeifer, University of Dortmund, Germany, 1997, discloses that "the more common case is that there are different fields in different databases. *The schemas of the databases differ."  Id.* at 29 (emphasis in original).  "In most cases this is due to different types of the documents stored in the databases, e.g. the one database holds references to literature while another one holds product descriptions." *Id.*  As another example, the '959 patent states that "web-browser applications are not designed to search for non-web-based documents or applications located on the computer or an associated computer network and, conversely, File Find-type utility programs are not capable of searching the Internet for web-based documents or applications."  '959 patent at 1:66-2:4.  Modifying the disclosed references to incorporate this functionality would have been one of a

1   finite number of known solutions for information retrieval.  Modifying the disclosed references to

2   use different heuristics also would have been an obvious design choice implemented through

3   known techniques that would not yield unpredictable or unexpected results.  Finally, a person of

4   skill in the art would have found express motivation to use this functionality.  A person of

5   ordinary skill would be motivated to combine references disclosing search functions with those

6   describing heuristics in order to increase the efficiency, ease of use and effectiveness of the search

7   function.  Additionally, one of ordinary skill would have been motivated to use different heuristics

8   in order to provide faster and better search results.  For example, the MetaCrawler search engine

9   uses heuristics to search local information, such as the user's browsing history, and can use

10  different heuristics to search remote information, such as the internet, including through the use of

11  different internet search engines.

12         To the extent the primary references in Exhibits C-1 to C-20 are found to lack an explicit

13  teaching of "plug-inmodules" because the modules are part of some service or server to which the

14  application connects and not part of the application, a person or ordinary skill in the art would

15  recognize that placing plug-in modules in the application rather than as part of some service or

16  server was a known variation on the use of modules to enable efficient information retrieval.

17  Indeed, under Apple's apparent construction of the claims, this could be achieved by installing the

18  modules locally, which was a well known design choice and was in fact done, as described in

19  Exhibits C-1 to C-20.  Indeed, one of the benefits of modular design is that the modules can be

20  treated separately and thus a person of ordinary skill would understand that modules could be

21  placed in the application or a server.  The use of a modular design in software was a well-known

22  design choice by the 1990's and was widely employed in the software industry.  (*See*, *e.g*.,

23  http://en.wikipedia.org/wiki/Modularity_%28programming%29.)  "Traditional programming

24  languages have been used to support modular programming - since at least the 1960s." (*Id*.)

25  Similarly, it would have been obvious to combine a local module with the server to which it

26  communicates to behave as the claimed "plug-in module" under Apple's apparent construction of

27  the claims.  Similarly, to the extent that Apple argues that the primary references in Exhibits C-1

28  to C-20 are lack an explicit teaching of "plug-in modules" because they comprise distributed

systems with remote "heuristics," "modules" or "plug-in modules," it would have been obvious for a person of ordinary skill in the art run the system entirely on one computer, making the entire system, including "heuristics," "modules" or "plug-in  modules" on the client device and thus comprising the claimed "plug-in modules each using a different heuristic to locate information." Combining all components onto a single computer would have been a simple design choice.  For example, if the different sets of searchable data were available locally, a person of ordinary skill would have been motivated to locate all the already described components described in the prior art, including plug-in modules and "plug-in modules each using a different heuristic to locate information," on one computer rather than a more distributed design, as described in Exhibits C-1 to C-20.

Moreover, the concept of locating information, either on a local computer system or on a remote network, was well known to a person of ordinary skill in the art and would be readily employed by one of skill.  To the extent the primary references in Exhibits C-1 to C-20 are found to lack an explicit teaching of local and remote search, one of ordinary skill would have been motivated to combine references disclosing local and remote search with these references. Modifying the disclosed references to incorporate these techniques would have been one of a finite number of known solutions for search.   Modifying the disclosed references to include local and remote search also would have been an obvious design choice implemented through known techniques that would not yield unpredictable or unexpected results.  Finally, a person of skill in the art would have found express motivation to use this functionality.  See, for example, Grossman and Rayward.  Moreover, searching remotely stored information over a network was also well known.  See, for example, Grossman.  The '959 patent agrees.  ('959 patent at 1:47-53.)  One of skill would employ these strategies at least because they were known and predictable solutions to known problems in the field of information retrieval.  For the same reason, it would have been obvious to locate information in a plurality of locations which include the Internet and local storage media in light of the state of the art and/or knowledge of a person of ordinary skill in the art, as demonstrated by the relevant background prior art and references in Exhibit C.  See for example Bennett and Evans.  Additionally, searching over a plurality of locations was well-known

1   in the art, including searching a plurality of remote locations as well as searching a plurality of

2   locations that included both local and remote locations.  One of skill would understand that

3   searching locally is simpler than searching remotely, and was well known at the time, and would

4   consider including local search alongside remote search at least for that reason.  See for example

5   Rayward.  Indeed, as the '959 patent acknowledges, local find operations were prevalent, such that

6   one of skill would readily understand and appreciate that remote search techniques could be used

7   for local search, including simultaneous local and remote search. ('959 patent at 1:21-28.)

8          As another example, one of ordinary skill would consider it obvious to employ, either

9   separately or collectively, heuristics, heuristic algorithms, and heuristic modules to search or

10   locate information.  Implementation of heuristics, either separately or collectively, as applied to

11   searches were established concepts prior to the invention of the '959 patent.  To the extent the

12   primary references in Exhibits C-1 to C-20 are found to lack an explicit teaching of heuristics,

13   heuristic algorithms, or heuristic modules employed either separately or collectively with the

14   search query, one of ordinary skill would have been motivated to combine references disclosing

15   heuristics, heuristic algorithms, or heuristic modules, applied either separately or collectively, with

16   these references.  Modifying the disclosed references to incorporate heuristics, heuristic

17   algorithms, or heuristic modules would have been one of a finite number of known solutions for

18   search, including applying a search query to different heuristics separately or collectively.

19   Modifying the disclosed references to include heuristics, heuristic algorithms, or heuristic modules

20   also would have been an obvious design choice implemented through known techniques that

21   would not yield unpredictable or unexpected results.  Applying the search query to these heuristics

22   either separately or collectively also was a trivial variation and a known technique that would not

23   yield unpredictable or unexpected results, as shown in the references described in Exhibit C.  Both

24   approaches were known solutions in the search field and well within the grasp of a person of

25   ordinary skill in the art.  *See* Exhibit C.  Finally, a person of skill in the art would have found

26   express motivation to use this functionality.  For example, as early as 1983, Bagchi, "Search

27   Algorithms Under Different Kinds of Heuristics – A Comparative Study," 1983 ("Bagchi"), stated

28   that "[h]euristic search algorithms have been quite extensively studied in the recent past by several

functionality would have been one of a finite number of known solutions for information retrieval.
Modifying the disclosed references to search multiple resources, including but not limited to local
and remote resources, such as the internet, also would have been an obvious design choice
implemented through known techniques that would not yield unpredictable or unexpected results.
Finally, a person of skill in the art would have found express motivation to use this functionality.
Such a single search mechanism would enable the system to use less time searching many
different locations, separately, for the same query.  Doing one search of all accessible resources,
including local and remote resources, was a known, common-sense, predictable solution to the
problem of locating information that may be stored in multiple searchable resources.  For example,
numerous prior art references describe searching multiple remote databases simultaneously.  One
of ordinary skill would have been motivated to search all known searchable locations, including
local and remote locations, to provide convenience and ease of use.  To the extent the primary
references in Exhibits C-1 to C-20 are found to lack "providing said information identifier to a
plurality of plug-in modules" because entering the same query more than once is required, it
would have been obvious to take the information descriptor and reuse.  Indeed, this concept is well
known in the field and sometimes referred to as a "federated search."  (*See*, *e.g.*
http://en.wikipedia.org/wiki/Federated_search ("Federated search is an information retrieval
technology that allows the simultaneous search of multiple searchable resources.  A user makes a
single query request which is distributed to the search engines participating in the federation.  The
federated search then aggregates the results that are received from the search engines for
presentation to the user."); *Multilingual Federated Searching Across Heterogeneous Collections*,
James Powell, D-Lib Magazine, ISSN 1082-9873, September 1998 located at
http://dlib.org/dlib/september98/powell/09powell.html#Federated ("The Federated Searcher is a
Java-based server application that mediates user queries to multiple heterogeneous search
engines.)  For example, WAIS clients allowed users to search multiple data source while only
entering the query once.  (*See*, *e.g.* Emerald Article: Wide Area Information Servers: An
Executive Information System for Unstructured Files by Kahe et al. (1992) at 61.)

To the extent any of the primary references in Exhibits C-1 to C-20 are found to lack an explicit teaching of the claimed plug-in modules, one of ordinary skill would have been motivated to combine references disclosing such modules with these references.  Modifying the disclosed references to incorporate this functionality would have been one of a finite number of known solutions for information retrieval.   Modifying the disclosed references to include "plug-in" modules also would have been an obvious design choice implemented through known techniques that would not yield unpredictable or unexpected results.  Finally, a person of skill in the art would have found express motivation to use this functionality.  For example, the SenseMaker, WAIS and Newton systems include plug-in modules that a person of ordinary skill would be familiar with.  One of skill would understand the benefits of using plug-in modules, as modular design was a well-known design pattern by the 1990s.  Further a person of ordinary skill would have been motivated to employ plug-in modules with search software in order to provide the well-known benefits of modular plug-in design: added extensibility for the system, including adding further resources to be searched or changing the implementation of various search features, therein providing greater ease of use and flexibility for the programmer and the end-user.

**D.     The '414 Patent**

As stated above, Evolution, the Reiher publication, the Kumar publication, Bayou, Mozilla Thunderbird, the ColdSync system, Customer Explorer and the Vadlamani patent, the Terry publication, iTunes, iSync, Microsoft Exchange ActiveSync, BlackBerry, the Souder patent, NotifyLink, Coda, Microsoft Windows Vista, Sync, the Rashid publication, the Kast patent, and Microsoft Outlook anticipate several of the asserted claims.  To the extent these references are found to not anticipate any one of the asserted claims, they render the claims obvious, whether standing alone, or when combined with knowledge of the ordinary artisan and/or the nature of the problem to be solved.  Likewise, to the extent the references discussed herein or in Exhibits D-1 to D-20 are found to lack particular elements of the asserted claims, those elements would have represented mere obvious modifications of the references themselves.

Any reference or combination of references that anticipates or renders obvious an asserted independent claim also renders obvious any asserted claim dependent on that independent claim

the application or any special action on the user's part. With SMP, you can run a processor-intensive task in the background while you work with another application. Mac OS X assigns each of these tasks to a different processor or core, allowing the tasks to execute simultaneously, and automatically balances the load between processors. Preemptive multitasking further optimizes performance by allowing Mac OS X to prioritize tasks on each processor or core." Power Mac G5 Technology Overview, Apple (2005).

As another example, to the extent Evolution, the Reiher publication, the Kumar publication, Bayou, Mozilla Thunderbird, the ColdSync system, Customer Explorer and the Vadlamani patent, the Terry publication, iTunes, iSync, Microsoft Exchange ActiveSync, BlackBerry, the Souder patent, NotifyLink, Coda, Microsoft Windows Vista, Sync, the Rashid publication, the Kast patent, and Microsoft Outlook are found not to explicitly disclose a synchronization software component that provides at least one synchronization processing thread and is configured to synchronize structured data from the first database with structured data from a second database, modifying the disclosed systems to incorporate this functionality would have been one of a finite number of known solutions for performing data synchronization. Modifying the disclosed systems to incorporate a synchronization software component that provides at least one synchronization processing thread and is configured to synchronize structured data from the first database with structured data from a second database also would have been an obvious design choice implemented through known programming techniques that would not yield unpredictable or unexpected results. The prior art is replete with systems that include sync managers, sync clients, sync handlers, sync conduits, sync classes, and similar components that provide synchronization processing threads and are configured to synchronize structured data across databases. Finally, a person of ordinary skill in the art would have found express motivation for implementing these components in light of references discussed in Exhibits D-1 through D-20, including but not limited to Potter, Windows Vista: Centralizing Data Synchronization With The New Sync Center (October 2005), the Rashid publication, Customer Explorer and the Vadlamani patent, and the U.S. Patent Application Publication No. 2006/0242609, U.S. Patent No. 6,000,000, EP Patent No. 1130513, and Armin Bauer, OpenSync White Paper (2005).

1    For similar reasons, a person skilled in the art at the time of the invention would have

2  found it obvious to modify the systems disclosed in Exhibits D-1 through D-20 to incorporate

3  other synchronization software components configured to synchronize structured data of other

4  corresponding data classes.  Modifying these systems to include additional synchronization

5  software components would have been one of a finite number of known solutions for

6  synchronizing data from various sources such as databases, applications, and devices.

7  Furthermore, modifying these systems to include additional synchronization software components

8  would have been an obvious design choice implemented through known system architectures and

9  frameworks that would not yield unpredictable or unexpected results.  For example, one common

10  framework known at the time of the invention used a central sync manager or sync engine with

11  various plug-in modules, each configured to synchronize a different data class.  *See*, *e.g.*, Armin

12  Bauer, Open Sync White Paper (2005) at 1.2-2.2.  U.S. Patent Application Publication No.

13  2006/0242609 to Potter  et al. discloses a similar architecture that uses a Sync Manager to

14  coordinate multiple Sync Handlers, each configured to synchronize a different device, folder, or

15  data source.  *See*, *e.g.*, paragraph [0025]; *see also* U.S. Patent Application Publication No.

16  2006/0238652 to Parker et al. and Potter, Windows Vista: Centralizing Data Synchronization With

17  The New Sync Center (October 2005).  The conduit model was another known architecture that

18  implemented multiple synchronization software components for multiple data classes, as

19  demonstrated in U.S. Patent No. 6,000,000 to Hawkins.  Hawkins discloses a Sync Manager that

20  successively invokes multiple conduit libraries, each library used to synchronize a specific data

21  classes from a specific application database.  *See* col. 5:40-6:3 and Fig. 4.

22    A person of ordinary skill in the art at the time of the invention would have found express

23  motivation to modify the references disclosed in Exhibits D-1 through D-20 to include these

24  frameworks an architectures.  For example, Bauer provides express motivation for the plug-in

25  model, explaining that it is allows for synchronization of a variety of applications and devices in a

26  uniform and reusable manner.  *See* section 1.3.1; *see also* U.S. Patent Application Publication No.

27  2004/0139235 to Rashid et al.  Other references explain that these frameworks and architectures

28  resulted in a centralized system that allowed users and developers to perform synchronization of

multiple data classes in an organized fashion.  *See*, *e.g.*, U.S. Patent Application Publication No. 2006/0242609 to Potter et al. at paragraphs [0013]-[0017]; *see also* U.S. Patent No. 7,506,006 to Vadlamani et al. at 12:63-13:24 and 20:34-24:2.  And finally, a person of ordinary skill in the art would have been expressly motivated to implement multiple synchronization software components simply to provide a more robust system capable of maintain up-to-date information across a variety of applications and devices.  *See*, *e.g.*, U.S. Patent No. 6,000,000 to Hawkins at 2:55-3:26; *see also* Vadlamani patent at 12:63-17:4 and EP Patent No. 1130513 at paragraphs [0039]-[0046].

As another example, to the extent Evolution, the Reiher publication, the Kumar publication, Bayou, Mozilla Thunderbird, the ColdSync system, Customer Explorer and the Vadlamani patent, the Terry publication, iTunes, iSync, Microsoft Exchange ActiveSync, BlackBerry, the Souder patent, NotifyLink, Coda, Microsoft Windows Vista, Sync, the Rashid publication, the Kast patent, and Microsoft Outlook are found not to explicitly disclose at least one user-level non-synchronization processing thread is provided by a user application which provides a user interface to allow a user to access and edit structured data in a first store associated with a first database, modifying the disclosed systems to incorporate this functionality would have been one of a finite number of known solutions.  For example, techniques for editing and synchronizing non-structured data were applicable and adaptable to structured data.  Likewise, data stores and databases were well-known variations of common data structures used to store data, and techniques for editing and synchronizing data in data stores and databases were readily applicable and adaptable to other data structures and data classes.  Thus, modifying the disclosed systems to operate on structured data in a first store associated with a first database also would have been an obvious design choice that would not yield unpredictable or unexpected results.  Finally, a person of ordinary skill in the art would have found express motivation for implementing these components in light of references discussed in Exhibits D-1 through D-20, including but not limited to the Rashid publication, Customer Explorer and the Vadlamani patent, and the U.S. Patent Application Publication No. 2006/0242609, US Patent No. 6,000,000, EP Patent No. 1130513, and Armin Bauer, OpenSync White Paper.

1    Any such combination would yield predictable results using known techniques and would

2  involve the simple substitution of one known, equivalent element for another.  Moreover, given

3  the many prior art references teaching providing suggestions or  recommendations for mistyped

4  words, any such combination would have had a reasonable expectation of success and would have

5  been nothing more than the combination of known elements to achieve their known purposes in

6  the combination.  Further, such combinations would have been obvious to try because there were

7  only a finite number of predictable solutions and/or because known work prompted the variations

8  of predictable design incentives and/or market forces.

9    **H.    The '604 patent**

10    The '604 patent is also obvious in light of the state of the art and/or knowledge of a person

11  of ordinary skill in the art, as demonstrated by relevant background prior art and references in

12  Exhibit H, to the extent the claims are not invalid under 35 U.S.C. §§ 101, 102 and/or 112.

13    The '604 patent specification is identical to the '959 patent specification, and the subject

14  matter of the '604 patent's claims substantially overlaps with the subject matter of the '959

15  patent's claims.  As explained above, one of skill would be motivated to combine references in a

16  manner that renders the asserted claims of the '959 patent obvious.  The same is true for the

17  asserted claims of the '604 patent, for substantially the same reasons, and Samsung incorporates

18  its discussion of the '959 patent's obviousness herein as support for its contentions regarding the

19  obviousness of the '604 patent's claims.

20    As stated above, the reference in Exhibits H-1 to H-20, the Corey patent, the Legall patent,

21  the MetaCrawler system, MultiSurf, the Neal patent, Newton , the Rubinstein patent, Sherlock,

22  WAIS, the Bennett patent, the Evans patent, the Jensen patent, the SenseMaker system, the Smith

23  patent, the Tung thesis, the BugsEye / Neal system, the Isite system, the ProFusion system, the

24  CBKB system, and the Kirsch patent anticipate several of the asserted claims. To the extent these

25  references are found to not anticipate any one of the asserted claims, they render the claims

26  obvious, whether standing alone, or when combined with knowledge of the ordinary artisan and/or

27  the nature of the problem to be solved.

28

search key has been entered, the search function actuated, and a completed compilation produced." (Siitonen at 2:51-67.)  Another example is provided by U.S. Patent No. 6,055,531 ("Bennett"). Bennett states "[s]earching may be conducted on natural language or boolean front-ends which provide virtually instant feed-back as to the value of a search formulation before and after any 'searching' actually occurs."  (Bennett at Abstract.)  For example, Bennett discloses that via incremental searching,  the user is "automatically updated as to the number of database units that meet the currently displayed boolean search." (Bennett at 16:57-59.)  Bennett explains: "As the displayed search changes, the terminal 15 automatically updates the displayed number of hits."  (Bennett at 16:62-64.)

      To the extent the primary references in Exhibits H-1 to H-20 are found to lack an explicit teaching of heuristics or heuristic algorithms, including pre-determined heuristic algorithms, a person or ordinary skill in the art would recognize that the claimed heuristics and heuristic algorithms were a mere known variations on theme of the use of different methods of search, including heuristics to enable efficient information retrieval.  Modifying the disclosed references to incorporate this functionality would have been one of a finite number of known solutions for information retrieval.  Modifying the disclosed references to use heuristics or heuristic algorithms also would have been an obvious design choice implemented through known techniques that would not yield unpredictable or unexpected results.  Finally, a person of skill in the art would have found express motivation to use this functionality.  A person of ordinary skill would be motivated to combine references disclosing search functions with those describing heuristics and heuristic search algorithms in order to increase the efficiency, ease of use and effectiveness of the search function.  For example, Apple's own U.S. Patent No. 5,477,447 states that "'making a guess based on upon a selected heuristic approach . . . would be well-known to one skill in the art."' ('447 Patent at 12:16-19; *see also* 12:11-44.).  As another example, many textbooks described these sorts of heuristic algorithms. (See for example Grossman, "'Information Retrieval Algorithms and Heuristics,"' 1998 ("'Grossman"') and Rayward-Smith, "'Modern Heuristic Search Methods,"' 1996 ("'Rayward"') generally.)

1    ''""'"To the extent the primary references in Exhibits H-1 to H-20 are found to lack an

2    explicit teaching of each heuristic module employing "'a different, predetermined heuristic

3    algorithm corresponding to said respective area,"' a person or ordinary skill in the art would

4    recognize that using different, predetermined heuristic algorithms was a known variation on the

5    use of algorithms to enable efficient information retrieval.  For example, a person of ordinary skill

6    would have recognized that different areas of search could have different characteristics such that

7    different heuristic algorithms could have different effectiveness in retrieving information.  Indeed,

8    it was well known that different databases could contain different types of information and

9    organize information in different ways.  Different heuristic algorithms for searching these

10   heterogeneous databases were well known in the art.  For example, "'SFgate: The WWW Gateway

11   for freeWAIS-sf, Edition 1.108, for SFgate 5.1, January 1997,"' Norbert Gövert and Ulrich

12   Pfeifer, University of Dortmund, Germany, 1997, discloses that "'the more common case is that

13   there are different fields in different databases. *The schemas of the databases differ."'  Id.* at 29

14   (emphasis in original).  "'In most cases this is due to different types of the documents stored in the

15   databases, e.g. the one database holds references to literature while another one holds product

16   descriptions."'  *Id.*  As another example, the '604 patent states that "'web-browser applications are

17   not designed to search for non-web-based documents or applications located on the computer or an

18   associated computer network and, conversely, File Find-type utility programs are not capable of

19   searching the Internet for web-based documents or applications."'  '604 patent at 2:5-9.

20   Modifying the disclosed references to incorporate this functionality would have been one of a

21   finite number of known solutions for information retrieval.  Modifying the disclosed references to

22   use different, predetermined heuristic algorithms also would have been an obvious design choice

23   implemented through known techniques that would not yield unpredictable or unexpected results.

24   Finally, a person of skill in the art would have found express motivation to use this functionality.

25   A person of ordinary skill would be motivated to combine references disclosing search functions

26   with those describing different, predetermined heuristics and heuristic search algorithms in order

27   to increase the efficiency, ease of use and effectiveness of the search function.  Additionally, one

28   of ordinary skill would have been motivated to use different heuristics for different areas of

1   searchable information, in order to provide faster and better search results.  For example, the

2   MetaCrawler search engine uses heuristics to search local information, such as the user's browsing

3   history, and can use different heuristics to search remote information, such as the internet,

4   including through the use of different internet search engines.

5          To the extent the primary references in Exhibits H-1 to H-20 are found to lack an explicit

6   teaching of heuristic modules, a person or ordinary skill in the art would recognize that the

7   claimed "heuristic modules" were a mere known variations on a theme of the use of heuristics in

8   search as well as modular programming.  Modifying the disclosed references to incorporate this

9   functionality would have been one of a finite number of known solutions for information retrieval.

10  Modifying the disclosed references to include heuristic modules also would have been an obvious

11  design choice implemented through known techniques that would not yield unpredictable or

12  unexpected results.  Finally, a person of skill in the art would have found express motivation to

13  use this functionality.   As described above, both were well known in the art and already

14  combined in various systems such as Apple's own Newton product, which contained heuristic

15  modules as described in Exhibit H-6.  Similarly, further examples include MetaCrawler,

16  MultiSurf, the WAIS system and Smith reference, which also included the claimed "heuristic

17  modules."   A person of ordinary skill would be motivated to combine any of the prior art

18  references identified above with those that disclose heuristic modules to increase the modularity of

19  the software, which, as described above, provides numerous benefits to the programmer and end-

20  user, including "separation of concerns."

21         To the extent the primary references in Exhibits H-1 to H-20 are found to lack an explicit

22  teaching of "heuristic modules" because the modules are part of some service or server to which

23  the application connects and not part of the application, a person or ordinary skill in the art would

24  recognize that placing heuristic modules in the application rather than as part of some service or

25  server was a known variation on the use of heuristic modules to enable efficient information

26  retrieval.  Indeed, under Apple's apparent construction of the claims, this could be achieved by

27  installing the modules locally, which was a well known design choice and was in fact done, as

28  described in Exhibits H-1 to H-20.  Indeed, one of the benefits of modular design is that the

modules can be treated separately and thus a person of ordinary skill would understand that modules could be placed in the application or a server.  The use of a modular design in software was a well-known design choice by the 1990's and was widely employed in the software industry.  (*See*, *e.g.*, http://en.wikipedia.org/wiki/Modularity_%28programming%29.)  "Traditional programming languages have been used to support modular programming - since at least the 1960s." (*Id.*)   Similarly, it would have been obvious to combine a local module with the server to which it communicates to behave as the claimed "heuristic module" under Apple's apparent construction of the claims.  Similarly, to the extent that Apple argues that the primary references in Exhibits H-1 to H-20 are lack an explicit teaching of "heuristic modules" because they comprise distributed systems with remote "heuristics," "modules" or "heuristic modules," it would have been obvious for a person of ordinary skill in the art run the system entirely on one computer, making the entire system, including "heuristics," "modules" or "heuristic modules" on the client device and thus comprising the claimed "heuristic modules" with "different, predetermined heuristic algorithm corresponding to said respective area."  Combining all components onto a single computer would have been a simple design choice.  For example, if the different sets of searchable data were available locally, a person of ordinary skill would have been motivated to locate all the already described components described in the prior art, including modules, heuristic modules, and "different, predetermined heuristic algorithm corresponding to said respective area," on one computer rather than a more distributed design, as described in Exhibits H-1 to H-20.

Further, a person of skill in the art would have been motivated to include incremental searching as a feature.  Modifying the disclosed references to incorporate this functionality would have been one of a finite number of known solutions for information retrieval.  Modifying the disclosed references to provide incremental searching also would have been an obvious design choice implemented through known techniques that would not yield unpredictable or unexpected results.  Finally, a person of skill in the art would have found express motivation to use this functionality.  The art provides numerous examples of the advantages to combining incremental searching with search functionalities.  One example is U.S. Patent No. 6,055,531 ("Bennett").  Bennett observes that an desirable feature of searching is the "virtually instant feed-

back as to the value of a search formulation before and after any "searching" actually occurs."

(Bennett at Abstract.)  Bennett explains an implementation of incremental searching and its

inherent advantages:

> As operators, additional words and parenthesis are added to the search, the attorney is automatically updated as to the number of database units that meet the currently displayed boolean search.  In fact, the boolean search window 81 provides counters 82 which indicate the current number of database units and hits based on the currently displayed search or based on a selected sub-portion thereof.  As the displayed search changes, the terminal 15 automatically updates the displayed number of hits.  Based on the hit number, the attorney may choose to select additional search words and/or operators or simplify the current search to obtain a reviewable number of hits.

(Bennett at 16:56-67.)  As Bennett states, the advantages of incremental searching allow a user to

modify or select the search as the search results are updated as a user adds to his search.  Bennett's

characterization of such "virtually instant feed-back" would motivate a person of skill to add

incremental searching to search functionalities.

The ability to search multiple resources, including but not limited to local and remote

resources, such as the internet, was also known in the art, as describe above.  A person of ordinary

skill would have been motivated to combine references disclosing search of one resource with a

search facility that searched all resources available at once, including local and remote resources.

Modifying the disclosed references to incorporate this functionality would have been one of a

finite number of known solutions for information retrieval.   Modifying the disclosed references to

ability to search multiple resources, including but not limited to local and remote resources, such

as the internet also would have been an obvious design choice implemented through known

techniques that would not yield unpredictable or unexpected results.  Finally, a person of skill in

the art would have found express motivation to use this functionality. Such a single search

mechanism would enable the system to use less time searching many different locations,

separately, for the same query.  Doing one search of all accessible resources, including local and

remote systems, would have been a common-sense solution to the problem of multiple searchable

resources of information available to the designer.  For example, numerous prior art references

describe searching multiple remote databases in the art.  One of ordinary skill, if he or she had

available a set of locally stored information would have been motivated to include that information

1  to be searched as well in order to provide convenience and ease of use for the user in searching for

2  a given piece of information.  Thus, a person of ordinary skill would have been motivated to

3  combine references disclosing only local searching or only remote searching with one-another.

4  Providing a single search mechanism to access many different storage locations or types of

5  information also assists users in locating information when they are unaware or uncertain of where

6  the most relevant location resides—so instead of multiple searches with the same query, the use.

7  To the extent the primary references in Exhibits H-1 to H-20 are found to lack "providing said

8  information descriptor received from the user-input device to a plurality of heuristic modules"

9  because entering the same query more than once is required, it would have been obvious to take

10 the information descriptor and reuse.  Indeed, this concept is well known in the field and

11 sometimes referred to as a "federated search."  (*See*, *e.g.*

12 http://en.wikipedia.org/wiki/Federated_search ("Federated search is an information retrieval

13 technology that allows the simultaneous search of multiple searchable resources.  A user makes a

14 single query request which is distributed to the search engines participating in the federation.  The

15 federated search then aggregates the results that are received from the search engines for

16 presentation to the user."); *Multilingual Federated Searching Across Heterogeneous Collections*,

17 James Powell, D-Lib Magazine, ISSN 1082-9873, September 1998 located at

18 http://dlib.org/dlib/september98/powell/09powell.html#Federated ("The Federated Searcher is a

19 Java-based server application that mediates user queries to multiple heterogeneous search

20 engines.)  For example, WAIS clients allowed users to search multiple data source while only

21 entering the query once.  (*See*, *e.g.* Emerald Article: Wide Area Information Servers: An

22 Executive Information System for Unstructured Files by Kahe et al. (1992) at 61.)

23              **PATENT LOCAL RULE 3-4 DISCLOSURES**

24              Pursuant to Patent Rule 3-4(a), Defendants will produce, make available for inspection, or

25 identify publicly available information sufficient to show the operation of any specifically

26 identified aspects or elements of an Accused Instrumentality identified by Plaintiff in its Patent

27 L.R. 3-1(c) chart to the extent such information is in Defendants' possession, custody or control.

28 If such information comprises source code, Defendants will make such source code available for

1   DATED:  April __, 2013                QUINN EMANUEL URQUHART & SULLIVAN LLP

2

3                                         By  /s/ Victoria F. Maroulis
                                             Victoria F. Maroulis
4                                            Attorneys for Defendants
                                             SAMSUNG ELECTRONICS CO., LTD.,
5                                            SAMSUNG ELECTRONICS AMERICA, INC. and
                                             SAMSUNG TELECOMMUNICATIONS
6                                            AMERICA, LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28