# CONFIDENTIAL EXHIBIT – SUBJECT TO PROTECTIVE ORDER

# FILED UNDER SEAL

## EXHIBIT D-2

# EXHIBIT D-3

HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF NORBERT FUHR
CONDUCTED ON FRIDAY, JULY 12, 2013

1 (Pages 1 to 4)

**1**

1    UNITED STATES DISTRICT COURT
2    NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION
3    - - - - - - - - - - - - - - - -X
4    APPLE INC., a California     :
5    Corporation,                 :
6         Plaintiff,      :
7    v.                           :
8    SAMSUNG ELECTRONICS CO., LTD., a :
9    Korean corporation; SAMSUNG     :Civil Action No.
10   ELECTRONICS AMERICA, INC., a New :12-cv-00630-LHK(PSG)
11   York corporation; and SAMSUNG   :
12   TELECOMMUNICATIONS AMERICA, LLC, :
13   A Delaware limited liability     :
14   Company,                     :
15         Defendants.       :
16   - - - - - - - - - - - - - - - -X
17   (Caption continued on next page)
18
19   HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
20        Videotaped Deposition of NORBERT FUHR
21        London, United Kingdom
22        Friday, July 12, 2013, 9:00 a.m.
23
24   Job No.: 40426        Pages 1 - 212
25   Reported by: Georgina Ford, ACR, CLR, MAVSTTR, MBIVR

**2**

1    (Caption continued from previous page)
2    - - - - - - - - - - - - - - - -X
3    SAMSUNG ELECTRONICS CO., LTD., a :
4    Korean corporation; SAMSUNG     :
5    ELECTRONICS AMERICA, INC., a New :
6    York corporation; and SAMSUNG   :
7    TELECOMMUNICATIONS AMERICA, LLC, :
8    A Delaware limited liability     :
9    Company,                     :
10        Counterclaim-Plaintiffs, :
11   V.                           :
12   APPLE INC., a California        :
13   Corporation,                 :
14        Counterclaim-Defendant. :
15   - - - - - - - - - - - - - - - -X
16
17   Videotaped Deposition of NORBERT FUHR held at the
18   offices of:
19
20        QUINN EMANUEL URQUHART & SULLIVAN
21            One Fleet Place,
22            London EC4M 7RA
23            London, WC1H 8AG
24             United Kingdom
25

**3**

1         A P P E A R A N C E S
2    ON BEHALF OF PLAINTIFF AND
3    COUNTERCLAIM-DEFENDANT APPLE INC.:
4        JOSHUA FURMAN, ESQUIRE
5        GIBSON, DUNN & CRUTCHER LLP
6        200 Park Avenue
7        New York, NY 10166-0193
8        (212) 351-2461
9
10   ON BEHALF OF DEFENDANT SAMSUNG ELECTRONICS CO., LTD.,
11   SAMSUNG ELECTRONICS AMERICA, INC., AND SAMSUNG
12   TELECOMMUNICATIONS AMERICA LLC:
13       JOSHUA JAFFE, ESQUIRE
14       QUINN EMANUEL URQUHART & SULLIVAN, LLP
15       51 Madison Avenue, 22nd Floor
16       New York, New York 10010
17       (212) 849-7124
18
19
20
21   ALSO PRESENT:
22       ULRIKE DEHMEL, Interpreter
23       MARK ROSS, Videographer
24
25

**4**

1              C O N T E N T S
2    EXAMINATION OF NORBERT FUHR
3       BY MR. FURMAN                    6
4       BY MR. JAFFE                   146
5       BY MR. FURMAN                  193
6       BY MR. JAFFE                   207
7         E X H I B I T S
8       (Attached to transcript)
9    FUHR DEPOSITION EXHIBIT                PAGE
10
11   Exhibit 1    Document entitled: "Searching ...47
12               structured documents with the
             enhanced retrieval
             functionality of freeWAIS-sf
             and SFgate"
13
14   Exhibit 2    Document entitled: ............118
15               "Information Retrieval in
             Networked Heterogeneous
             Databases"
16   Exhibit 3    Document Bates stamped .........181
             SAMNDCA630-07601359
17
18   Exhibit 4    Document, in German, entitled ..190
             "Erweiterung des
             FreeWAIS-Servers"
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF NORBERT FUHR
CONDUCTED ON FRIDAY, JULY 12, 2013

117

1  that time.
2       So we developed it for Unix but Unix at that
3  time came quite a number of different variants and so
4  much of the discussion was about the different Unix
5  variants, how to get it running on the different
6  variants.
7       Q. Do you have any evidence of particular
8  features of FreeWAIS-sf that people were aware of in
9  the United States?
10       MR. JAFFE:  Objection: calls for a legal
11  conclusion.
12       THE WITNESS:  As I said before, I did not
13  specifically look at the origin of people, people from
14  where discussed which aspects.  This was just
15  a general discussion where people from all over the
16  world, and at that time it was Europe and the U.S.A.
17  who were active in this news group.
18  BY MR. FURMAN:
19       Q. So other than your general recollection --
20  strike that.
21       Other than your general recollection that
22  there were people from the United States involved in
23  news group discussions about FreeWAIS-sf, do you have
24  any other specific information or particular examples
25  of people in the United States knowing about

118

1  FreeWAIS-sf or particular features of FreeWAIS-sf?
2       A. No.
3       (Exhibit 2 marked for identification.)
4       Q. You have just been handed what has been
5  marked as Fuhr 2 bearing the Bates stamp
6  SAMNDCA630-05349619 through to 05349629.
7       Do you recognize this document?
8       A. Not really.  I see that it has been written
9  by my assistant Norbert Govert at that time but it's
10  probably just a technical report and then -- it's only
11  authored by him, so I certainly saw it at that time
12  but I do not remember it now.
13       Q. But sitting here today you have no
14  recollection of ever seeing this document?
15       A. I don't remember, no.
16       Q. Do you have any idea if this document was
17  ever published in the United States?
18       A. It was certainly published on our web server
19  which was accessible throughout the world but not --
20  but not that specific United States form.
21       Q. I just would like to point you to the last
22  page showing that this document is a translation that
23  was provided to Apple by Samsung.
24       So it is possible that -- is it possible
25  that the only version of this document was in German?

119

1       MR. JAFFE:  Objection: calls for
2  speculation.
3       THE WITNESS:  Well, I don't know.
4  BY MR. FURMAN:
5       Q. Okay.  If you turn to page 2, which is
6  marked on the bottom document 5349620, and you look at
7  the second paragraph of the introduction, it says:
8       "FreeWAIS-sf represents an enhancement of
9  WAIS.  With more than 1500 installations worldwide, it
10  is currently one of the most frequently used web-based
11  IR systems on the internet."
12       Do you know what the basis for that
13  statement was?
14       A. Yes, in the -- FreeWAIS-sf software there
15  was an installation procedure which automatically sent
16  a UDP message to our site to inform us about the
17  installation.  One could disable this message but the
18  thought was that we got -- received a message on which
19  machine FreeWAIS-sf was installed and then that's --
20  and we aggregated these messages and counted the
21  different machines and this was the outcome.
22  I remember such a figure from that time.
23       Q. What is a UDP message?
24       A. Yes, that's a message on the internet.  In
25  contrast to TCP/IP, it doesn't wait for

120

1  a confirmation; just it's just sent off and whether it
2  receives the recipient or not, it's done.  Whereas
3  TCP/IP you would retry until you get acknowledgment
4  from the recipient.
5       Q. Is it fair to say that when a user installed
6  FreeWAIS-sf a packet would be sent back to a server
7  that maintained by your group notifying your group
8  that an installation had occurred?
9       A. Yes.
10       Q. What information was in that packet?
11       A. I don't know the details.  It certainly was
12  the identification of the IP number of the machine but
13  I don't know what else.
14       Q. Did anyone in your group ever attempt to
15  correlate the IP addresses in those UDP packets with
16  countries?
17       A. I don't know.
18       Q. Are you aware of any data collected by your
19  group that would indicate that any of those 1500
20  installations worldwide based on those UDP packets
21  were done in the United States?
22       A. I don't know.
23       Q. Was anyone ever directed to collect that
24  type of information?
25       A. I don't know.

Case 5:12-cv-00630-LHK   Document 803-14   Filed 10/10/13   Page 5 of 133
HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF NORBERT FUHR
CONDUCTED ON FRIDAY, JULY 12, 2013

52 (Pages 205 to 208)

205

1  in this litigation; is that correct?
2      A. Pardon, I'm ...?
3      Q. Not submitting an expert report in this
4  litigation; is that correct?
5      A. I am not ...
6      (Interpreter clarification in German.)
7      A. No. At least so far I have not been asked.
8      Q. Have you reviewed any court orders from this
9  litigation?
10     A. No.
11     Q. Are you familiar with the term "claim
12  construction"?
13     A. Only very roughly.
14     Q. Have you reviewed any claim constructions in
15  this litigation?
16     A. No.
17     Q. We could go through specific examples if you
18  want but your attorney asked you a number of
19  hypotheticals about how the FreeWAIS-sf or the WAIS
20  client could be configured. Is there only one
21  FreeWAIS-sf installation?
22         MR. JAFFE: Objection to the
23  characterization as "hypotheticals", and vague.
24         THE WITNESS: The last part was there
25  only one?

206

1  BY MR. FURMAN:
2      Q. One FreeWAIS-sf installation.
3         MR. JAFFE: Same objections.
4         THE WITNESS: No. As we discussed earlier
5  today, there were up to 2,000 installations.
6  BY MR. FURMAN:
7      Q. Can you testify that all those FreeWAIS-sf
8  installations were configured exactly the same way?
9         MR. JAFFE: Objection: calls for
10  speculation; not sure that's a question.
11         THE WITNESS: No, it's more likely that they
12  all used different configurations.
13  BY MR. FURMAN:
14     Q. So clearly it must have been a hypothetical
15  when your counsel was asking you about the FreeWAIS-sf
16  installation; is that correct?
17         MR. JAFFE: Objection: vague; argumentative;
18  form.
19         THE WITNESS: My understanding was that this
20  was about possible installations; like whenever you
21  have configuration parameters, it's, yes, an issue
22  what's possible with this configuration.
23  BY MR. FURMAN:
24     Q. So for the examples that your counsel
25  provided to you about possible configurations, do you

207

1  have any evidence at any of those configurations were
2  actually -- do you have -- strike that. I'll start
3  again.
4         For the examples that your counsel provided
5  to you that we were just discussing about possible
6  configurations, do you have any evidence that any
7  FreeWAIS-sf installation in the United States prior to
8  January 5, 2000 actually was configured according to
9  those possibilities?
10         MR. JAFFE: Objection: vague; calls for
11  a legal conclusion.
12         THE WITNESS: No.
13         MR. FURMAN: No further questions.
14  Examination by MR. JAFFE:
15     Q. I just have a few questions.
16         Is your understanding that you are a fact
17  witness in this case or an expert witness in this
18  case?
19         (Interpreter clarification in German.)
20     A. I'm a fact witness.
21         MR. JAFFE: That's all my questions.
22         MR. FURMAN: I have no further questions.
23  Professor Fuhr, thank you very much for your time.
24         THE VIDEOGRAPHER: This is the end of tape
25  4, volume 1 in the video deposition of Norbert Fuhr.

208

1  We're now going off the record at 15:03 as indicated
2  on the video screen.
3         (Signature having not been waived, the
4  videotaped deposition of NORBERT FUHR was concluded
5  at 3:03 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT D-4

VIDEOTAPED DEPOSITION OF ULRICH PFEIFER
CONDUCTED ON SUNDAY, JULY 14, 2013

1 (Pages 1 to 4)

**Page 1**

1          UNITED STATES DISTRICT COURT
2     NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION
3     ----------------------------------x
4     APPLE INC., a California       :
5     Corporation,                   :
6                 Plaintiffs, :
7     v.                             :
8     SAMSUNG ELECTRONICS CO., LTD, a  :   Civil Action No.
9     Korean corporation; SAMSUNG      :   12-cv-00630-LKH (PSG)
10    ELECTRONICS AMERICA, INC., a New  :
11    York corporation; and SAMSUNG    :
12    TELECOMMUNICATIONS AMERICA, LLC, a :
13    Delaware limited liability company.:
14                 Defendants. :
15    ----------------------------------x
16    (Caption continued on next page.)
17
18         Videotaped Deposition of ULRICH PFEIFER
19              London, England, UK
20         Sunday, July 14, 2013, 9:05 a.m.
21
22
23    Job No.: 40646
24    Pages: 1 - 259
25    REPORTED BY:  SUSAN A. McINTYRE, RPR, CRR, QRR.

**Page 2**

1     (Caption continued from previous page.)
2     ----------------------------------x
3     SAMSUNG ELECTRONICS CO., LTD, a   :
4     Korean corporation; SAMSUNG       :
5     ELECTRONICS AMERICA, INC., a New   :
6     York corporation; and SAMSUNG     :
7     TELECOMMUNICATIONS AMERICA, LLC, a :
8     Delaware limited liability company, :
9              Counterclaim Plaintiffs, :
10    v.                                :
11    APPLE INC., a California          :
12    corporation,                      :
13            Counterclaim Defendant. :
14    ----------------------------------x
15
16         Videotaped deposition of ULRICH PFEIFER,
17    held at the office of
18
19         QUINN EMANUEL URQUHART & SULLIVAN, LLP
20         One Fleet Place
21         London, England EC4M 7RA
22         (44) 0-20-7653-2000
23
24    Before Susan A. McIntyre, CSR, RPR, CRR, MBIVR.
25

**Page 3**

1     A P P E A R A N C E S :
2     FOR THE PLAINTIFF AND COUNTERCLAIM DEFENDANT:
3         JOSHUA FURMAN, ESQUIRE
4         GIBSON DUNN & CRUTCHER LLP
5         200 Park Avenue
6         New York, New York  10166-0193
7         (212) 351-2461
8
9
10    FOR THE DEFENDANTS AND COUNTERCLAIM PLAINTIFFS:
11        JOSHUA JAFFE, ESQUIRE
12        QUINN EMANUEL URQUHART & SULLIVAN LLP
13        51 Madison Avenue, 22nd Floor
14        New York, New York  10010
15        (212) 849-7124
16
17
18    ALSO PRESENT:
19        Ms Ulrike Dehmel, Interpreter
20        David Elliott Ross, Videographer
21
22
23
24
25

**Page 4**

1              C O N T E N T S
2     EXAMINATION OF ULRICH PFEIFER          PAGE
3     By Mr Furman                7
4     By Mr Jaffe                202
5     By Mr Furman               235
6
7
8              E X H I B I T S
9         (Attached to transcript)
10    PFEIFER DEPOSITION EXHIBIT            PAGE
11    Exhibit 1    Document dated May 5, 1997, Bates    70
12         No. PFEIFERNDCA630-00000045
13    Exhibit 2    Document dated March 13, 1997,    70
14         Bates No. PFEIFERNDCA630-00000057
15    Exhibit 3    Subpoena              82
16    Exhibit 4    E-mail dated March 14, 1997, Bates   100
17         Nos. PFEIFERNDCA630-00004625 - 4626
18    Exhibit 5    Thesis by Huynh Tung: Expansion of   150
19         the FreeWAIS Server, Bates Nos.
20         SAMNDCA630-06929163 - 06029352
21    Exhibit 6    Document: Information Retrieval in   177
22         Networked Heterogeneous Databases,
23         Bates Nos. SAMNDCA630-05349619 -
24         05349629
25

VIDEOTAPED DEPOSITION OF ULRICH PFEIFER
CONDUCTED ON SUNDAY, JULY 14, 2013

181

1 Mischaracterizes the witness's previous testimony.
2         THE WITNESS:  Well, it was the mails
3 I received, which I provided in part (the part
4 I had available), it was the news group postings,
5 it was, yeah, the fact of this publication in the
6 conference.  I think that's it.
7 BY MR FURMAN:
8         Q.  When people submitted news group
9 postings or send you e-mails about freeWAIS-sf,
10 were they obligated to disclose to you the entire
11 configuration of their installation?
12         A.  If they asked for me to troubleshoot
13 something I would ask what they had done
14 specifically, but there was no obligation.
15         Q.  Can you think of any examples of use
16 in the US of free-- let me re-ask that.
17         Do you have any evidence that people
18 in the United States, prior to January 5, 2000,
19 ran freeWAIS-sf using phonetic searching?
20         MR JAFFE:  Objection.  Asked and
21 answered.  Calls for a legal conclusion.
22         THE WITNESS:  The only evidence
23 I can think of would be bespoke postings or mails
24 asking for assistance.
25

182

1 BY MR FURMAN:
2         Q.  But sitting here today can you think
3 of any examples of people running freeWAIS-sf
4 using phonetic searching in the United States
5 prior to January 5, 2000?
6         MR JAFFE:  Same objections.
7         THE WITNESS:  I don't have a
8 specific example in mind.  It should be relatively
9 easy to find names and e-mail addresses and the
10 e-mails.
11 BY MR FURMAN:
12         Q.  Sitting here today, do you have any
13 specific examples in mind of people running
14 freeWAIS-sf using stemming in the United States
15 prior to January 5, 2000?
16         MR JAFFE:  Same objections.
17         THE WITNESS:  Same answer.  So there
18 were -- may have been discussions in the -- per
19 e-mail or in the news group involving people in
20 the US that mentioned stemming and problems with
21 stemming or, yeah, questions for stemming.
22 I haven't reviewed all the e-mails and all the
23 postings.
24 BY MR FURMAN:
25         Q.  But sitting here today you have no

183

1 specific recollection of any examples of people
2 using either stemming or phonetic searching in
3 freeWAIS-sf prior to January 5, 2000.  That is
4 besides having to go back and looking at news
5 group postings?
6         A.  That is correct.
7         MR JAFFE:  Same objections.  That's
8 the third time that's been asked or the fourth.
9 BY MR FURMAN:
10         Q.  Do you have any specific examples of
11 someone in the United States running a WAIS client
12 and a WAIS server on the same computer prior to
13 January 5, 2000?
14         A.  Similar answer.  I would need to
15 search the archives.  There may have been people
16 asking for assistance.
17         Q.  Do you remember, generally, having
18 seen any news group postings or e-mails discussing
19 running a WAIS client and a WAIS server on the
20 same computer prior to January 5, 2000, in the
21 United States?
22         A.  I seem to recollect I was asked
23 about what this means.  It was a compile time
24 configuration and it was likely people had
25 questions about what does it mean.  But I don't

184

1 recollect a specific example.
2         Q.  When you say it was a compile time
3 configuration, what was a compile time
4 configuration?
5         A.  The compile time configuration was
6 if you want to enable local search.  So the system
7 defaulted to "enable local search," but you could
8 switch it off.
9         Q.  What do you mean by "local search?"
10         A.  Local search -- the WAIS system was
11 made for communicating via a protocol called WAIS,
12 it's a derivative of a bibliography protocol.  And
13 so normally the transaction was the client sends a
14 request to the server via the Internet, get a
15 response back via the Internet.  And by default
16 the server was included in the client binary.  So
17 you had both in one binary and you could start the
18 client containing the server, and the request
19 would not go via the Internet, it would go into
20 the server part of the binary and the server part
21 would answer the question directly.
22         Q.  When there was local search would
23 the server -- would the database that the server
24 was querying necessarily be located on the same
25 computer as the client and the server?

VIDEOTAPED DEPOSITION OF ULRICH PFEIFER
CONDUCTED ON SUNDAY, JULY 14, 2013

185

1    A. I don't recall the start of the
2 question, sorry for that.
3    Q. You said local search was where the
4 client would start the server binary on the same
5 computer, is that correct?
6    A. It is the same binary. So you had
7 the client, which does include the server.
8    Q. But a WAIS server didn't necessarily
9 have to query a database on the same computer as
10 the WAIS server, is that correct?
11    MR JAFFE: Objection.
12 Mischaracterizes the witness's previous testimony.
13    THE WITNESS: Sorry, maybe I was not
14 clear.
15    So normally the client would
16 generate and send a request to a server over the
17 Internet, and the server would respond over the
18 Internet. But the distribution contained, of
19 course, the -- of course we discussed that
20 before -- the code for the client and the server.
21 And, by default, the server code would be included
22 in the client, so in case the database that was
23 queried was locally, the server would sort of --
24 or the client would shortcut and say: Okay, I'm
25 not sending a request to a remote server, I'm

186

1 asking the server included in this binary, and
2 this search would be handled on the same machine
3 locally.
4 BY MR FURMAN:
5    Q. And whether or not the server was
6 compiled with the client was a compile time
7 option?
8    A. It was a compile time option, so
9 users could switch it off.
10    Q. Was it an option for compiling the
11 client or was it an option for compiling the
12 server?
13    A. It was for compiling the client.
14    Q. You testified earlier that you made
15 no modifications to the WAIS clients, is that
16 correct?
17    A. That is correct.
18    Q. So how could the WAIS clients that
19 you didn't modify have a compile time option to
20 compile freeWAIS-sf?
21    A. The option was present before we got
22 involved. So it was available in freeWAIS.
23    Q. Would that option compile
24 freeWAIS-sf?
25    A. Sorry, would that option ...

187

1    Q. Would the compile time option that
2 was available with freeWAIS clients also compile
3 freeWAIS-sf?
4    A. I think that doesn't compute. So
5 compile time option is basically you mark sections
6 in the source code that are compiled or not
7 compiled, and there was one compile time variable
8 which says include -- it's called "local_search"
9 -- and if it was set to "true" when you start
10 compilation, then the server code would be
11 included and linked to the client binary, and if
12 it was "false" it would not be included and
13 linked.
14    Q. Could that server source code that
15 was included and linked be freeWAIS-sf source
16 code?
17    A. In the freeWAIS-sf distribution it
18 would be the freeWAIS-sf.
19    Q. What was the default?
20    A. The default was "enable local
21 search."
22    Q. Do you have any evidence that anyone
23 in the United States prior to January 5, 2000,
24 enabled local search?
25    MR JAFFE: Objection. Calls for a

188

1 legal conclusion.
2    THE WITNESS: As I said, it was the
3 default. It could be that every one of the
4 200-some administrators choose to switch it off,
5 but there was little reason to do so because the
6 only down side of excluding local search --
7 including local -- well, the only down side of
8 leaving the default untouched and including it is
9 that the clients got slightly larger.
10 BY MR FURMAN:
11    Q. Do you have any evidence of anyone
12 in the United States prior to January 5, 2000,
13 using local search?
14    THE WITNESS: I can't remember.
15    MR JAFFE: Same objection.
16    THE WITNESS: Not as I'm -- while
17 I'm sitting here. There may be evidence in the
18 e-mails or in the news group postings that
19 somebody from the US asked me about it or problems
20 with switching it off. That's always possible.
21 BY MR FURMAN:
22    Q. Just because someone enabled local
23 search and had a server running on their local
24 machine does not necessarily mean that they had a
25 database to be searched on their local machine; is

VIDEOTAPED DEPOSITION OF ULRICH PFEIFER
CONDUCTED ON SUNDAY, JULY 14, 2013

48 (Pages 189 to 192)

189

1    that correct?
2            MR JAFFE:  Objection to form.
3            THE WITNESS:  Yes.  The default
4    option made this possibility available to the
5    clients but you are not forced to use it.
6    BY MR FURMAN:
7        Q.  Do you have any evidence of anyone
8    running a WAIS searchable database on the same
9    computer as a WAIS client in the United States
10   prior to January 5, 2000?
11           MR JAFFE:  Objection.  Asked and
12   answered and calls for a legal conclusion.
13           MR FURMAN:  That has actually never
14   been asked and never been answered.
15   BY MR FURMAN:
16       Q.  So I would ask that you to answer
17   it, please.
18       **A.  Okay, then can you repeat, please?**
19   **I must have missed it also.**
20   BY MR FURMAN:
21       Q.  Do you have any evidence of anyone
22   running a WAIS searchable database on the same
23   computer as the WAIS client in the United States
24   prior to January 5, 2000?
25           MR JAFFE:  Same objections.

190

1            THE WITNESS:  Now, sorry, can you
2    repeat it once more?  The last part had something
3    which technically confused me.
4    BY MR FURMAN:
5        Q.  Do you have any evidence of anyone
6    in the United States, before January 5, 2000,
7    running a WAIS searchable database --
8        **A.  Ah, that's it.**
9        Q.  -- and a WAIS client on the same
10   computer?
11       **A.  Okay.  The part that confused me was**
12   **running a WAIS database.  It's not "run," it's**
13   **just a set of files.**
14       Q.  So let me re-ask the question then.
15           Do you have any evidence of anyone
16   in the United States, before January 5, 2000,
17   having the set of files that comprises a WAIS
18   searchable database and a WAIS client on the same
19   computer?
20           MR JAFFE:  Same objections.
21           THE WITNESS:  The only -- I don't
22   know any evidence offhand.  There could be hints
23   for that in the e-mails or the postings.
24   BY MR FURMAN:
25       Q.  Can you think of any specific

191

1    e-mails or postings, sitting here today, that
2    would provide such evidence?
3        **A.  Not offhand, no.**
4        Q.  SFgate was open source also,
5    correct?
6        **A.  Yes, I think so.**
7        Q.  Where was the first release of
8    SFgate?
9        **A.  I don't recall it.  It was mentioned**
10   **in the World Wide Web Conference proceedings, so**
11   **must have been before that, or with that it was --**
12   **let me see.  It refers in the URL on the**
13   **departmental server, so it was available at the**
14   **time of the conference.**
15       Q.  So when you say "it refers to URL,"
16   are you speaking about what has been marked as
17   Pfeifer Exhibit 7?
18       **A.  If that's 7, yes.**
19       Q.  It's what you have been calling the
20   World Wide Web Conference paper?
21       **A.  Yes, and the reference I'm referring**
22   **to is footnote 11 on page 1031.**
23       Q.  And that URL indicates that a copy
24   of the SFgate source code was available on the
25   University of Dortmund server, is that correct?

192

1        **A.  Yes.**
2        Q.  Who maintained that copy of that
3    SFgate source code on that server?
4        **A.  That would have been me or**
5    **Norbert Gövert, typically.**
6        Q.  Was Mr Gövert associated with your
7    group at the time that this paper was published?
8        **A.  I don't recall from memory, but he**
9    **is not listed here on the authors list and I am**
10   **certain I would have listed him if he had**
11   **contributed back then.  So your question was was**
12   **he associated or was he contributing -- sorry?**
13       Q.  My first question was was he
14   associated with the group at that time?
15       **A.  I'm not sure -- he was not working**
16   **or wasn't paid for that.  He may have been a**
17   **student already at that time.**
18       Q.  Understood.
19           Do you know if he had contributed to
20   SFgate or freeWAIS-sf at the time that the paper
21   market as Pfeifer Exhibit 7 was published?
22       **A.  Same answer:  I would have named him**
23   **if he had contributed, so I strongly suspect that**
24   **he didn't contribute at that time.**
25       Q.  The server that hosted the SFgate

# EXHIBIT D-5

VIDEOTAPED DEPOSITION OF NORBERT GÖVERT
CONDUCTED ON MONDAY, JULY 15, 2013

1 (Pages 1 to 4)

**1**

1   UNITED STATES DISTRICT COURT
2   NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION
3
4   -------------------------------------x
5   APPLE INC., a California Corporation, :
6        Plaintiff,         :
7     v.              :
8   SAMSUNG ELECTRONICS CO., LTD., a     : C.A. No.
9   Korean Corporation; SAMSUNG         : 12-cv-00630-LHK (PSG)
10  ELECTRONICS AMERICA, INC., a        :
11  New York Corporation; and SAMSUNG    :
12  TELECOMMUNICATIONS AMERICA, LLC,     :
13  a Delaware Limited Liability Company, :
14       Defendants.        :
15  -------------------------------------x
16  (Caption continued on next page.)
17
18       Videotaped Deposition of NORBERT GÖVERT
19            London, UK
20       Monday, 15 July, 2013
21            9:00 a.m.
22
23  Job No.: 40429
24  Pages: 1 - 164
25  Reported by: Ailsa Williams

**2**

1   (Caption continued from previous page.)
2   -------------------------------------x
3   SAMSUNG ELECTRONICS CO., LTD, a     :
4   Korean Corporation; SAMSUNG         :
5   ELECTRONICS AMERICA, INC., a New     :
6   York Corporation; and SAMSUNG       :
7   TELECOMMUNICATIONS AMERICA, LLC     :
8   a Delaware Limited Liability Company, :
9       Counterclaim-Plaintiffs,   :
10    v.              :
11  APPLE INC., a California         :
12  Corporation,            :
13       Counterclaim-Defendant.   :
14  -------------------------------------x
15       Videotaped Deposition of NORBERT GÖVERT, held
16  at the offices of:
17
18       QUINN EMANUEL URQUHART & SULLIVAN
19       ONE FLEET PLACE
20       LONDON EC4M 7RA
21       +44 (0) 20 7653 2000
22
23  Pursuant to Notice, before Ailsa Williams, Accredited
24  LiveNote Reporter, Member of Institute of British
25  Reporters.

**3**

1   A P P E A R A N C E S :
2   ON BEHALF OF PLAINTIFF AND
3   COUNTERCLAIM-DEFENDANT APPLE INC:
4        JOSHUA FURMAN, ESQUIRE
5        GIBSON DUNN & CRUTCHER LLP
6        200 Park Avenue
7        New York, NY 10166
8        (212) 351-4000
9
10  ON BEHALF OF DEFENDANT SAMSUNG ELECTRONICS CO., LTD.,
11  SAMSUNG ELECTRONICS AMERICA, INC., AND SAMSUNG
12  TELECOMMUNICATIONS AMERICA, LLC:
13       JOSHUA JAFFE, ESQUIRE
14       KRISTIN J. MADIGAN, ESQUIRE
15       QUINN EMANUEL URQUHART & SULLIVAN, LLP
16       51 Madison Avenue, 22nd Floor
17       New York, NY 10010
18       (212) 849-7000
19
20  ALSO PRESENT:
21       ULRIKA DEHMEL (Interpreter)
22       GISELA GREATOREX (Check Interpreter)
23       VIDEOGRAPHER: MARK ROSS
24
25

**4**

1          C O N T E N T S
2   EXAMINATION OF NORBERT GÖVERT          PAGE
3       BY MR. FURMAN              6
4       BY MR. JAFFE         117
5       BY MR. FURMAN        138
6       BY MR. JAFFE         150
7       BY MR. FURMAN        159
8
9
10         E X H I B I T S
11      (Attached to transcript)
12  GÖVERT DEPOSITION EXHIBIT          PAGE
13  Exhibit 1  Inventory Record       25
14  Exhibit 2  Paper published       55
15     by Norbert Gövert
16  Exhibit 3  SFGate Manual         125
17
18
19
20
21
22
23
24
25

Case 5:12-cv-00630-LHK   Document 803-14   Filed 10/10/13   Page 13 of 133
VIDEOTAPED DEPOSITION OF NORBERT GÖVERT
CONDUCTED ON MONDAY, JULY 15, 2013

24 (Pages 93 to 96)

93

1  FreeWAIS - sf that required a user to utilize any one
2  particular client.  Is that correct?
3         A.  Yes.
4         Q.  Is it possible that a WAIS client that
5  contacted the FreeWAIS - sf server could not take
6  advantage of some of the functionality that was added
7  to FreeWAIS - sf above what was available in FreeWAIS?
8         **A.  This is possible.**
9         Q.  For example, it is possible that
10  a client could not take advantage of the phonetic
11  searching aspect of FreeWAIS - sf.  Is that correct?
12         **A.  It is possible but I don't remember it**
13  **for this special type of functionality.  I don't**
14  **remember whether stemming and phonetic searching has**
15  **been implemented already in the predecessor of**
16  **FreeWAIS or in the WAIS server, the original WAIS**
17  **server.**
18         Q.  Sitting here today, you don't remember
19  whether or not phonetic searching or stemming was
20  something that the IR Group at the University of
21  Dortmund added to FreeWAIS - sf or whether or not that
22  functionality existed in FreeWAIS.  Correct?
23         **A.  Correct.**
24         Q.  You had mentioned that you believe that
25  FreeWAIS - sf was distributed with XWAIS and one other

94

1  client.  You had also mentioned that you worked on
2  SFGate, which was a WAIS client.  Is that correct?
3         **A.  This is correct.**
4         Q.  Did you or anyone at the University of
5  Dortmund work on any other WAIS clients that you can
6  recall?
7         **A.  I am not aware of any other WAIS client**
8  **someone from the University of Dortmund worked on.**
9         Q.  What evidence do you have that people in
10  the United States knew about FreeWAIS - sf prior
11  to January 5, 2000?
12         MS MADISON:  Objection, form, calls for
13  legal conclusion?
14         **A.  I have information that we were proud**
15  **that FreeWAIS - sf as well as SFGate has been**
16  **installed several hundred times around the world.**
17         Q.  Other than having been installed several
18  hundred times around the world, do you have any
19  specific evidence that people in the United States
20  knew about FreeWAIS - sf prior to January 5, 2000?
21         MS MADISON:  Objection, form, calls for
22  legal conclusion?
23         **A.  I have no information on this.**
24         Q.  If you can do me a favor and turn to
25  what has been marked as Gövert Exhibit 2, which is the

95

1  paper.  If you look at the first page of the paper, it
2  lists your name as the author.  Is that correct?
3         **A.  Yes.**
4         Q.  Please turn to the second page of the
5  document, which is labeled 2 and also has the control
6  number 5349620.  If you see the second paragraph of
7  what is labeled the introduction, it says: "FreeWAIS -
8  sf represents an enhancement of WAIS, and with more
9  than 1,500 installations worldwide is currently one of
10  the most frequently used web based IR systems on the
11  internet."  Do you see that sentence?
12         **A.  Yes.**
13         Q.  What was your basis for saying that
14  there were more than 1,500 installations worldwide of
15  FreeWAIS - sf?
16         **A.  As I said before, we reviewed the log**
17  **files and the server where the FreeWAIS - sf software**
18  **was located and put to the public.**
19         Q.  It is possible, however, that a person
20  could access the FreeWAIS - sf source code on those
21  servers, download it and then never compile it or use
22  it.  Correct?
23         **A.  This is true.**
24         Q.  How is it possible to know that there
25  were 1,500 installations, based solely on the log

96

1  files of the access to the FDP server?
2         **A.  I don't remember whether the log files**
3  **of the server were the only source for this**
4  **information, 1,500 installations worldwide.**
5  **I remember that with SFGate we asked people who did**
6  **the installation to send us an email, and this email**
7  **has been generated automatically, if the person who**
8  **installed the software agreed with it.  I don't**
9  **remember whether we had something similar with the**
10  **FreeWAIS - sf software.**
11         Q.  When you say "something similar with
12  FreeWAIS - sf", you don't remember if there was any
13  type of notification that FreeWAIS - sf sent
14  automatically.  Is that correct?
15         **A.  Yes.**
16         Q.  Are you aware of any documents showing
17  that FreeWAIS - sf was used in the United States prior
18  to January 5, 2000?
19         **A.  I don't remember the specific**
20  **application of FreeWAIS - sf in the United States, in**
21  **the same way I do not remember other specific**
22  **installations, say, in Australia.**
23         Q.  When you say you don't remember the
24  specific application of FreeWAIS - sf, do you mean
25  that you don't remember any specific uses of FreeWAIS

VIDEOTAPED DEPOSITION OF NORBERT GÖVERT
CONDUCTED ON MONDAY, JULY 15, 2013

97

1  - sf in the United States?
2      A.  Yes.
3      Q.  Are you aware of any documents showing
4  the sale of FreeWAIS - sf in the United States prior
5  to January 5, 2000?
6      A.  I didn't understand.  Did you say
7  "sale"?
8      Q.  Sale, as in if I were to sell you
9  something.  Let me reask the question and maybe you
10  need a translation.  Let me ask the question and we
11  can get a clean translation.  Are you aware of any
12  documents showing the sale of FreeWAIS - sf in the
13  United States prior to January 5, 2000?
14      (Question translated)
15      A.  No, I don't know about any such
16  documents.
17      Q.  I am going to go back to the original
18  question because I think our question and answer may
19  have not hit exactly.  I asked if you were aware of
20  any documents showing the use of FreeWAIS - sf in the
21  United States prior to January 5, 2000, and I believe
22  you testified that you yourself are not aware of any
23  use of FreeWAIS - sf in the United States prior
24  to January 5, 2000.  That is correct?
25      A.  I have no documents that show that it

98

1      has been -- that there are users of FreeWAIS - sf in
2      the United States before January 5, 2000.
3      Q.  And you yourself have no knowledge of
4  FreeWAIS - sf being used in the United States prior
5  to January 5, 2000, correct?
6      A.  This is correct.
7      Q.  The document that has been labeled
8  Gövert Exhibit 2 was originally written in German, is
9  that correct?
10      A.  Yes.
11      Q.  If you look at the final page you will
12  see that this is what appears to be a certified
13  translation.  Were you involved at all in translating
14  this document into English?
15      A.  No.
16      Q.  Where was the original German version of
17  this document -- strike that.  Was the original German
18  version of this document published anywhere?
19      A.  Yes.
20      Q.  Where was that?
21      A.  It has been published on a conference in
22      1996 in Berlin, ISI conference, and it has been
23      published on the web server of the Information
24      Retrieval Group at University of Dortmund.
25      Q.  On what date was it published on the web

99

1  server of the University of Dortmund?
2      A.  I don't remember the exact date.
3      Q.  Do you have a recollection of the year,
4  the timeframe?
5      A.  It has been in 1996.
6      Q.  Are you aware of any documents
7  indicating that someone in the United States knew
8  about FreeWAIS - sf prior to January 5, 2000?
9      MS MADISON:  Objection, vague.
10      A.  I have no documents that show that it
11      has been used before that date you mentioned.
12      Q.  My question is a little different.  My
13  question is are you aware of any documents that would
14  demonstrate that someone in the United States knew
15  about FreeWAIS - sf before January 5, 2000?
16      THE INTERPRETER:  (Interpreted).
17      A.  At this point I am not aware of such
18      documents.
19      Q.  Just to make sure that my previous
20  question was clear and I apologize for retreading
21  this, are you aware of any documents showing use of
22  FreeWAIS - sf prior to January 5, 2000 in the United
23  States?
24      A.  I am not aware of such documents.
25      Q.  Are you aware of any other evidence that

100

1  would demonstrate use of FreeWAIS - sf in the United
2  States prior to January 5, 2000?
3      A.  No.
4      Q.  Are you aware of anyone in the United
5  States using phonetic searching in FreeWAIS - sf prior
6  to January 5, 2000?
7      A.  No.
8      Q.  Are you aware of anyone in the United
9  States using the stemming functionality of FreeWAIS -
10  sf prior to January 5, 2000?
11      A.  No.
12      Q.  Are you aware of anyone in the United
13  States having knowledge of the phonetic searching or
14  stemming functionality of FreeWAIS - sf prior
15  to January 5, 2000?
16      A.  No.
17      Q.  Can you provide any specific examples or
18  evidence of someone in the United States running
19  a WAIS client and a WAIS server on the same computer
20  prior to January 5, 2000?
21      MS MADISON:  Objection, form, calls for
22  a legal conclusion.
23      A.  No.
24      Q.  SFGate was open source, is that correct?
25      A.  That is correct.

# EXHIBIT D-6

US006847959B1

(12) **United States Patent**        (10) **Patent No.:**    **US 6,847,959 B1**

Arrouye et al.                        (45) **Date of Patent:**        **Jan. 25, 2005**

(54) **UNIVERSAL INTERFACE FOR RETRIEVAL OF INFORMATION IN A COMPUTER SYSTEM**

(75) Inventors: **Yan Arrouye**, Cupertino, CA (US);
                **Keith Mortensen**, Sunnyvale, CA (US)

(73) Assignee: **Apple Computer, Inc.**, Cupertino, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/478,009**

(22) Filed: **Jan. 5, 2000**

(51) **Int. Cl.**$^7$ ......................... **G06F 17/30**; G06F 17/00
(52) **U.S. Cl.** ............................................. **707/2**; 3/104.1
(58) **Field of Search** ....................... 707/4, 3, 10, 104.1, 707/1–5; 709/201, 217; 712/215, 22, 24; 706/10–15, 46, 45; 719/316

(56)                  **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,404,295 A | * | 4/1995 | Katz et al. ..................... | 707/2 |
| 5,727,129 A | * | 3/1998 | Barrett et al. | |
| 5,729,741 A | * | 3/1998 | Liaguno et al. ............. | 707/104 |
| 5,764,906 A | | 6/1998 | Edelstein et al. | |
| 5,870,755 A | * | 2/1999 | Stevens et al. ............. | 707/104 |
| 5,893,107 A | | 4/1999 | Chan et al. | |
| 5,913,205 A | * | 6/1999 | Jain et al. ..................... | 707/2 |
| 5,987,446 A | * | 11/1999 | Corey et al. ............. | 707/3 |
| 6,009,422 A | * | 12/1999 | Ciccarelli ..................... | 707/4 |
| 6,285,785 B1 | * | 9/2001 | Bellegarda et al. ......... | 382/187 |
| 6,311,178 B1 | * | 10/2001 | Bi et al. ..................... | 707/3 |
| 6,628,305 B1 | * | 9/2003 | Hong et al. ................. | 345/734 |
| 6,732,088 B1 | * | 5/2004 | Glance .......................... | 707/3 |
| 2002/0107872 A1 | * | 8/2002 | Hudis et al. ............. | 707/104.1 |

OTHER PUBLICATIONS

Chaudhuri et al "Optimizing queries over multimedia repositories", ACM 1996 pp. 91–102.*

Katayama et al "A universal query interface for heterogeneous distributed digital libraries", IEEE 1996, pp. 332–339.*

Menczer et al, "Adaptive information agents in distributed textual environments" Autonomous Agents 1998, Minneapolis MN, USA, pp. 157–164.*

Das et al, "Experiments in using agent–based retrieval from distributed and heterogeneous databases", IEEE 1997, pp. 27–35.*

Domenig et al, "An overview and classification of mediated query systems", ACM SIGMOD Record, vol. 28, No. 3, Sep. 1999, pp. 63–72.*

Pastor et al, "An architecture for intelligent resource agents", IEEE 1997, pp. 151–159.*

Jim Gray "Parallel database systems 101", ACM 1995, p. 436.*

Gary Perlman, "The FirstSearch user interface architecture: universal access for any user, in many languages, on any platform", ACM 2000, pp. 1–8.*

Dadoun et al, "Parallel processing for efficient subdivision search", ACM 1987, pp. 205–254.*

Wei Hong, "Exploiting inter–operation parallelism in XPRS", ACM 1992, pp. 19–28.*

Ganguly et al, "Efficient and accurate cost models for parallel query optimization", ACM 1996, pp. 172–181.*

Blumenfeld et al, "A uniform interface to networked library services", ACM 1992, pp. 608–613.*

Agosti et al, "Desing of OPAC database to permit different subject searching accesses in a multi–disciplines universities library catalogue database", ACM 1992, pp. 245–255.*

* cited by examiner

*Primary Examiner*—Uyen Le
(74) *Attorney, Agent, or Firm*—Burns, Doane, Swecker & Mathis, L.L.P.

(57)            **ABSTRACT**

The present invention provides convenient access to items of information that are related to various descriptors input by a user, by means of a unitary interface which is capable of accessing information in a variety of locations, through a number of different techniques. Using a plurality of heuristic algorithms to operate upon information descriptors input by the user, the present invention locates and displays candidate items of information for selection and/or retrieval. Thus, the advantages of a search engine can be exploited, while listing only relevant object candidate items of information.

**49 Claims, 3 Drawing Sheets**



INPUT INFORMATION DESCRIPTOR — 310

PROVIDE INFORMATION DESCRIPTOR TO PLUG–IN MODULES — 320

PLUG–IN MODULES DETERMINE WHETHER ANY INFORMATION MATCHES CRITERIA OF HEURISTICS — 330

RETRIEVAL MANAGER IS SENT MATCHING ITEMS OF INFORMATION — 340



**FIG. 1**

**FIG. 2**



FIG. 3A



FIG. 3B



FIG. 4



FIG. 5

US 6,847,959 B1

1

# UNIVERSAL INTERFACE FOR RETRIEVAL OF INFORMATION IN A COMPUTER SYSTEM

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention is directed to a computer-human interface for quickly and easily retrieving desired information in a computer system. More specifically, the present invention is directed to a universal interface which uses a plurality of heuristic algorithms to identify an item of information (e.g., document, application or Internet web page) in response to at least one information descriptor.

### 2. Description of the Related Art

One of the basic needs of a computer user, especially with the recent growth in the amount of data and information available via networks and the Internet, is to be able to quickly search through the available information to identify useful items, and to thereafter easily locate those items. To satisfy this need, many computer operating systems contain routines that provide a simple way to locate objects. For example, the Finder of the Macintosh® Operating System implemented by Apple Computer, Inc. includes a Find File utility which permits a user to locate various files located in the system directories (e.g., folders) using keywords that occur in the desired file's name. The Find File utility includes the ability to search on local disks and mounted servers. The Windows® operating system, implemented by Microsoft Corporation, also employs a Find mechanism that allows a user to locate files stored in the computer system. The application uses inputted search criteria to generate and display a list of possible files that satisfy the search criteria. At times however, the list can become long and cumbersome, thereby requiring the user to sift through the list and identify useful information. Accordingly, this technique may fail to significantly reduce the time and effort a user expends to identify and retrieve useful information.

As another feature for quickly retrieving items of interest, some computer systems store a list of previously used documents or applications from which they can be easily invoked. However, this feature requires the user to access a different interface element to retrieve the item, and does not provide for the use of keywords to identify the specific document or program that the user desires.

Also, with the advent of the Internet, various specialized find routines have been developed that can be loaded into a computer's memory and launched in order to facilitate user requests for particular information on servers located throughout the world. Additionally, web browser applications enable a user to access worldwide websites and interact with search engines provided by the website.

Like the Find File utility discussed above, finding information on the Internet can prove frustrating because search criteria are often too broad. For example, when a keyword is entered, thousands of different web pages containing these keywords can be displayed in a list for a user to choose from. Accordingly, additional search criteria are needed to more effectively filter information available, for example, on the world wide web. However, there is little technology currently available which allows the computer to help the user determine such additional criteria or to automatically provide additional criteria, so that search results have a higher percentage of items that are of interest to the user.

Additionally, web-browser applications are not designed to search for non-web-based documents or applications

2

located on the computer or an associated computer network and, conversely, File Find-type utility programs are not capable of searching the Internet for web-based documents or applications. There has been no combination of desktop find routines that presents a single interface and Internet browsing routines to allow a computer user to find a needed or desired item of information from among all different types of information storage systems. Additionally, there is no program which is able to process the user's input and then determine, using many different factors, including use of the Internet, the intent of the user as to the file to be retreived. Accordingly, in order to present a more informative and personalized user interface, a unitary manner of finding a user's desired item of information is needed.

## SUMMARY OF THE INVENTION

The present invention provides convenient access to items of information that are related to various descriptors input by a user, by means of a unitary interface which is capable of accessing information in a variety of locations, through a number of different techniques. Using a plurality of heuristic algorithms to operate upon information descriptors input by the user, the present invention locates and displays candidate items of information for selection and/or retrieval. Thus, the advantages of a search engine can be exploited, while listing only relevant object candidate items of information.

In accordance with an exemplary embodiment of the present invention, methods and apparatuses for locating information in a computer system are described which receive an information identifier, locate at least one item of information based upon the information identifier by means of a plurality of heuristic algorithms each having a separate location scheme, provide at least one candidate information item, and display a representation of the information item.

In accordance with another exemplary embodiment of the present invention, methods and apparatuses for locating information in a computer system are described which input an information identifier, providing the information identifier to locate information in the plurality of locations which comprise the Internet and local storage media, wherein the information located matches the information identifier when applied to a plurality of heuristics, determining at least one candidate item of information based upon the plurality of heuristics, and displaying a representation of the candidate item of information.

In yet another exemplary embodiment of the present invention, methods and apparatuses for displaying information in a computer system is described which includes inputting an information identifier, providing the information identifier to a plurality of heuristics in accordance with a global heuristic, wherein each information identifier is matched to information based upon the plurality of heuristics, receiving at least one candidate item of information based upon the information provided to the heuristics in accordance with the global heuristic, and displaying a representation of the candidate items of information.

## BRIEF DESCRIPTION OF THE DRAWINGS

Other objects and advantages of the present invention will become more apparent from the following detailed description of the invention when read in conjunction with the accompanying drawings wherein like elements are designated by like numerals and wherein:

FIG. 1 illustrates the hardware components of a networked computer system of a type in which exemplary embodiments of the present invention can be implemented;

US 6,847,959 B1

3

FIG. 2 illustrates the software architecture in accordance with exemplary embodiments of the present invention;

FIG. 3A illustrates a partial view of a desktop including a GO-TO menu option, in accordance with an exemplary embodiment of the present invention;

FIG. 3B illustrates a partial view of a desktop including a GO-TO menu option containing a text input window, in accordance with an exemplary embodiment of the present invention;

FIG. 4 illustrates an active window that is displayed when the GO-TO menu option described with respect to FIG. 3 is launched; and

FIG. 5 illustrates a flow diagram describing the GO-TO application in accordance with an exemplary embodiment of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention will now be described with reference to the accompanying drawings describing a universal interface in which user inputs are received and provided to a plurality of separate heuristic algorithms to locate at least one item of information. It will be appreciated that the invention is not limited to only the embodiments set forth within this disclosure. Rather, the particular heuristic algorithms described herein are meant to be exemplary of many different heuristics that can be employed, for the purpose of retrieving information through a simplified user interface.

Referring to FIG. 1, a general computer system 2, in which the present invention can be implemented, is illustrated. Computer system 2 comprises a display device 4 and various input devices such as a keyboard 5, microphone 7 and mouse 3 in operable connection with a memory 6, data processor 9 and local storage media 12 which can include one or more magnetic and/or optical disk drives, for example. Additionally, the computer system 2 can be connected via an Input/Output device 10 (e.g., a modem or cable connection) to a Local Area Network (LAN) server 14. The LAN server 14 can also be connected to a LAN storage volume 8 which stores files for use on the network served by the LAN. The LAN server 14 can also include a Wide Area Network (WAN) router 13 and an Internet router 11. The WAN router and the Internet router can be connected to other servers (not shown) which access additional storage media containing files, application programs, web pages, etc. While other elements and components are normally attached to the computer system 2, only these elements are shown so as not to obscure the invention.

In general, the present invention provides a universal interface that enables the user to readily retrieve an item of desired information located on any of the various storage media that are accessible to the user's computer system, with minimal effort. The desired information could be an application that is stored on the local storage media 12, a file stored on the LAN storage volume 8, or a web page available through the Internet router 11. Rather than require a separate search mechanism to locate each of these different types of information, the present invention facilitates the user's ability to easily retrieve the information by means of a single universal interface which is capable of accessing files on all of these various storage resources.

The components which provide this functionality are illustrated in the architectural block diagram of FIG. 2. In operation, the user provides input which describes the information in which the user is interested. This input could be text data that is entered in a dialog box 15 or spoken words

4

provided to a speech processing program 16. This input is received by an information retrieval manager 18. In the case of spoken words, the speech processing program 16 first converts the speech to text, which is then presented to the information retrieval manager 18.

In response, the information retrieval manager 18 dispatches the input to a plurality of plug-in modules $22_1$–$22_N$. Each plug-in module has an associated heuristic which it employs to locate information that corresponds to the user input. For instance, one module $22_1$ may search the names of files stored on the local storage media 12 and the LAN storage volumes 8, to find those which match the user input. A second module $22_2$ may index and search the contents of files on the local and/or network storage volumes. A third module 223 can maintain a list of the files, applications and web sites which were most recently accessed, and search this list for a match. Yet another module might employ a search engine to locate Internet web pages which match the user input.

Each plug-in module $22_1$–$22_N$ attempts to locate information in a relevant area of search, using its associated heuristic. The results obtained by the modules are sent back to the retrieval manager 18. The information retrieval manager may employ additional heuristics to determine which results are most relevant, and present one or more choices to the user on the display device 4.

In accordance with an embodiment of the present invention, the universal interface can be implemented so as to operate constantly and in tandem with the computer's operating system. The functionality of the information retrieval interface can be accessed in several different ways. FIG. 3A illustrates a desktop display 20 that includes a graphical representation of a button 19 (entitled "GO-TO") within a menu bar 17. Also, located within the menu bar 17 are various conventional menu items such as File, Edit, View, Label, and Special. When the button 19 located in the menu bar 17 is selected by the user, the information retrieval function of the present invention is accessed and the dialog box 15 is displayed. It should be noted that while the access to the information retrieval feature is depicted as being by way of a button located in the menu bar in FIG. 3, there are many other ways in which the interface can be accessed. For example, the interface could be represented by an icon graphically located in a desktop display, and be launched each time the user and clicks on the icon representation via the mouse 3.

In another alternative embodiment illustrated in FIG. 3B, the menu bar 17 might contain a text input window itself, and the information retrieval function is accessed when the user begins to type characters in this window. More generally, the information retrieval system can operate in conjunction with any type of interface via which a user might enter a request for an item of information, by monitoring dialog boxes and other such input mechanisms, including those in individual applications. For example, if a user enters text in a browser window, the information retrieval system can provide this text to the modules to locate relevant items of information.

When the GO-TO button 19 (illustrated in FIG. 3A) is selected by a user, the dialog box, represented by active window 25 illustrated in FIG. 4, is displayed on the desktop of display device 4. The active window 25 provides a text box 27 for the user to enter an information descriptor which comprises a letter, a series of letters, a word, a plurality of words, a phrase or sentences to be used by the retrieval manager 18, in locating information. FIG. 5 illustrates the

5                                                             6

operations that are performed in response to the user input. In step **310**, the user inputs an information descriptor, either by voice input to the microphone **7** or by manual input to the keyboard **5**, which is displayed in the text box **27**. In step **320**, once the information descriptor is provided, the information retrieval manager **18** provides the information descriptor to one or more of the plug-in modules $22_1 \ldots 22_N$, in accordance with a global heuristic, described in detail below.

In step **330**, the selected plug-in modules $22_1 \ldots 22_N$ receive the information descriptor and determine whether any information matches the criteria of respective locator heuristics associated with the plug-in modules $22_1 \ldots 22_N$. The heuristic of each plug-in module is different. For example, as described previously, one heuristic can operate to match the user descriptor with the names of information located within various storage media in the computer, on servers and the Internet. Another heuristic can identify matches between the information descriptor and the content of files located on the computer, on servers and the Internet.

Additionally, heuristic algorithms can also be provided that store and review the history of information that has been recently accessed to determine which might match the descriptor. Other heuristics can employ a look-up-table to review mappings on a private network accessed either locally or remotely. Another heuristic module might review the favorite locations accessed by a browser application located on computer system **2**. The URLs stored by the browser application can be searched to determine if they match the input of the user. Each plug-in module $22_1 \ldots 22_N$ might identify one item of information, a plurality of possible items of information, or no information that matches the user input, according to the module's heuristic approach.

In step **340**, once a plug-in module $22_1 \ldots 22_N$ has determined that at least one item of information matches its heuristic, the information retrieval manager is notified and sent the information that matches the user input, according to that module's associated heuristic. In accordance with one embodiment of the invention, a "first to respond" approach can be employed to select an item of information to be displayed to the user. In this embodiment, the first plug-in module to notify the information retrieval manager **18** that matching information has been identified is chosen, and its matching information is displayed to the user or, if desired, automatically launched. Alternatively, the information retrieval manager **18** could rank the outputs from the plug-in modules $22_1 \ldots 22_N$ in the order their notifications are received. This would allow for more than one choice to be displayed for a user. Due to differences in communication speeds, this approach will tend to give greater priority to locally stored files than those which are located at more remote sites, such as those on an wide-area network or the Internet.

In other embodiments of the invention, different global heuristics can be employed by the information retrieval manager to determine the results that are to be provided to the user. These global heuristics can be classified into two general categories. In one category, the user input is selectively provided to the plug-in modules, and only the results from those modules are displayed to the user. For instance, all of the modules can be given a priority ranking. When user input is received, it is first provided to the module with the highest ranking. If that module responds within a certain period of time with one or more matches, those matches are displayed. However, if the module responds that it cannot find a match, or does not respond within the allotted period of time, the user input is provided to the next-highest ranking module. The procedure continues in this manner, until a module presents a match, which is then displayed to the user. As an alternative to sequentially accessing individual modules, two or more modules can be grouped at a given priority level, and be accessed in parallel when their priority level is selected.

In a further enhancement of the prioritized approach, the priority ranking of the modules can be context sensitive. For instance, if the user accesses the information retrieval system through an icon on the desktop or a system menu bar, the plug-in modules which perform searches on local storage media can be given higher priority than those which search remote sites. However, if the user enters text via a window in a browser application, it is more likely that the user desires to view a web page, and therefore the plug-in modules whose heuristics are oriented towards Internet sites are given higher priority.

In the second general category of global heuristics, the user input can be provided to most or all of the plug-in modules in parallel, and the results that are returned from each one are then processed in accordance with a given heuristic. For example, as described previously, one heuristic might function to select the first result that is returned. In another heuristic, a frequency of occurrence approach can be employed, wherein an item of information which is identified by a plurality of modules is selected in favor of one which is identified by only one module. In yet another embodiment, the results from the various modules can be weighted in accordance with various criteria, such as their relationship to the context in which the user input was received.

The global heuristic which is employed by the information retrieval manager **18** might also determine the amount of information to be presented to the user. Ideally, the various plug-in modules, through the use of confidence factors calculated for each item of information, would identify a single item of information that best fits the user's input, and only that item is presented to the user. In this case, the item can be automatically opened or launched as well. Various characteristics can be utilized in determining the confidence factors. For example, if a user input multiple words as an information descriptor, and an exact match to the input was found by a plug-in module, the confidence level could be indicated as being 100 percent. On the other hand, if only half of the words were found in an item of information, the confidence level would be less, thereby indicating that this might not be the item of information sought.

In practice, however, it is not likely that only one candidate will provide a good match, particularly if the user inputs a broad term. Accordingly, the calculation of a confidence factor associated with each item of information allows the information retrieval manager to select a relatively limited number of choices to the user, e.g. the top five candidates according to a predetermined minimum confidence level. If these choices do not include the particular item of interest, the user can further refine the input information.

Further in this regard, the information retrieval system can obtain results and display them to the user in real time as the input is being entered. In this embodiment, each

US 6,847,959 B1

7

keystroke or converted speech phoneme is provided to the appropriate plug-in modules as it is received by the manager **18**. For instance, if the user desires to look at prior tax return information, each of the letters "T", "A" and "X" are provided to the modules as they are typed. As soon as the letter "T" is entered, sets of matching items of information are returned by the modules, and the top five candidates are displayed. Entry of the letter "A" causes the list to be updated according to the candidates which match the sequence of letters "TA". After the letter "X" is typed, the displayed list might contain the five most recent tax returns that were filed by the user. If the desired return is not in the list, the user can continue by entering the year of the desired return, or other identifying information, until such time as the item of interest is displayed.

It will be appreciated that this embodiment, in which the displayed items are dynamically updated in real time, is best suited for the retrieval of locally stored information, where communication rates are relatively fast. For access to remotely stored information, it may be more appropriate to wait until the user presses a space key or an "Enter" key before supplying the input to the modules **22**, so that the retrieval is carried out on the basis of whole words or complete phrases.

Accordingly, the present invention provides swift access to information or a list of information that is related to various descriptors input by a user. Using the heuristic analysis combined with user input, the present invention is able to present to a user a manageable amount of information candidates for selection. Thus, the advantages of a search engine can be exploited, and information candidates can be retrieved in a reasonable amount of time.

A particular advantage to the use of plug-in modules to implement the various retrieval heuristics is the fact that it readily lends itself to expansion and adaptability to the user's environment. For instance, the computer's operating system may contain a few plug-in modules that operate according to the most popular heuristics. Other plug-in modules may be developed by various entities to operate according to types of information which they supply. Thus, if a search engine is designed for use on the Internet to locate particular types of web pages, a plug-in module can also be designed to access that search engine and return results to the information retrieval manager. As other techniques are developed for locating information, they can also be embodied in appropriate plug-in modules, to thereby enhance the user's ability to obtain relevant items of interest.

It will be appreciated by those of ordinary skill in the art that the present invention can be embodied in other specific forms without departing from the spirit or essential characteristics thereof. The presently disclosed embodiments are therefore considered in all respects to be illustrative and not restrictive. The scope of the invention is indicated by the appended claims rather than the foregoing description, and all changes that come within the meaning and range of equivalence thereof are intended to be embraced therein.

What is claimed is:

**1**. A method for locating information in a computer system, comprising the steps of:

inputting an information identifier;

providing said information identifier to a plurality of plug-in modules each using a different heuristic to locate information which matches said identifier;

8

providing at least one candidate item of information from said modules; and

displaying a representation of said candidate item of information.

**2**. The method of claim **1** wherein said information identifier is input via an application program having a text input window.

**3**. The method of claim **1** wherein said information identifier is input in by means of a dialog box displayed on a user interface.

**4**. The method of claim **1** wherein said information identifier is vocally entered by a user.

**5**. The method of claim **1** wherein said information identifier is one of a letter, a word, or a phrase.

**6**. The method of claim **1** wherein said information identifier is sequentially provided to said modules until one of said modules provides a candidate item of information.

**7**. The method of claim **6** wherein said modules are ranked in an order of priority, and said information identifier is sequentially provided to said modules in accordance with said ranking.

**8**. The method of claim **7** further including the steps of determining a context for the input of the information identifier, and varying said ranking in accordance with the determined context.

**9**. The method of claim **1** wherein one of said heuristics locates items of information on the basis of names of files.

**10**. The method of claim **9** wherein another of said heuristics locates items of information on the basis of contents of files.

**11**. The method of claim **9** wherein another of said heuristics locates items of information on the basis of most recently accessed items.

**12**. The method of claim **1** wherein one of said heuristics locates items of information that are stored locally on the computer system.

**13**. The method of claim **12** wherein said one heuristic also locates items of information that are stored on a local-area network to which the computer system is connected.

**14**. The method of claim **12** wherein another of said heuristics locates items of information that are stored on remote computer systems.

**15**. The method of claim **14** wherein said other heuristic locates Internet web pages.

**16**. The method of claim **14** wherein said other heuristic locates items of information that are stored on a wide-area network.

**17**. The method of claim **1** wherein said information identifier is provided in parallel to said modules, and further including the step of selecting candidate items of information provided by said modules for display in accordance with a global heuristic.

**18**. The method of claim **1** wherein each candidate item of information has an associated confidence level.

**19**. A method for locating information from a plurality of locations in a computer system, comprising the steps of:

inputting an information identifier;

providing said information identifier to a plurality of heuristics to locate information in a plurality of locations which include the Internet and local storage media;

determining at least one candidate item of information based upon the plurality of heuristics; and

US 6,847,959 B1

9

displaying a representation of said candidate item of information.

**20**. The method of claim **19**, wherein the information identifier is applied separately to each heuristic.

**21**. The method of claim **19** wherein the plurality of heuristics are ranked in an order of priority and wherein the information identifier is sequentially provided in accordance with the ranking.

**22**. The method of claim **19** wherein one of the plurality of heuristics locates items of information on the basis of names of files.

**23**. The method of claim **22** wherein another of the heuristics locates items of information on the basis of contents of files.

**24**. A computer readable medium for locating information from a plurality of locations containing program instructions to:

receive an information identifier;

provide said information identifier to a plurality of heuristics to locate information in the plurality of locations which include the Internet and local storage media;

determine at least one candidate item of information based upon the plurality of heuristics; and

display a representation of said candidate item of information.

**25**. The computer readable medium of claim **24**, wherein the information identifier is applied separately to each heuristic.

**26**. The computer readable medium of claim **24** wherein the plurality of heuristics are ranked in an order of priority and wherein the information identifier is sequentially provided in accordance with the ranking.

**27**. The computer readable medium of claim **24** wherein one of the plurality of heuristics locates items of information on the basis of names of files.

**28**. The computer readable medium of claim **24** wherein another of the heuristics locates items of information on the basis of contents of files.

**29**. An apparatus that locates information from a plurality of locations within a computer system, comprising:

means for inputting an information identifier;

means for providing said information identifier to a plurality of heuristics to locate information in the plurality of locations which comprise the Internet and local storage media;

means for determining at least one candidate item of information based upon the plurality of heuristics; and

means for displaying a representation of said candidate item of information.

**30**. The apparatus of claim **29**, wherein the information identifier is applied separately to each heuristic.

**31**. The apparatus of claim **29** wherein the plurality of heuristics are ranked in an order of priority and wherein the information identifier is sequentially provided in accordance with the ranking.

**32**. The apparatus of claim **29** wherein one of the plurality of heuristics locates items of information on the basis of names of files.

**33**. The apparatus of claim **29** wherein another of the heuristics locates items of information on the basis of contents of files.

**34**. A method for displaying information in a computer system, comprising the steps of:

10

inputting an information identifier;

selectively providing the information identifier to a plurality of heuristics in accordance with a global heuristic, wherein the information identifier is matched to information based upon the plurality of heuristics;

receiving at least one candidate item of information based upon the information provided to the heuristics in accordance with the global heuristic; and

displaying a representation of the candidate items of information.

**35**. The method of claim **34** wherein the global heuristic determines an order in which the information identifier is provided to the heuristics.

**36**. The method of claim **35** wherein the order is a ranking of the plurality of heuristics according to a context in which the information was input.

**37**. The method of claim **34** wherein the information is located over a plurality of locations which comprise at least two of the following: local storage media, a LAN storage volume, a wide area network and an Internet network.

**38**. An apparatus for displaying information in a computer system, comprising:

means for inputting an information identifier;

means for selectively providing the information identifier to a plurality of heuristics in accordance with a global heuristic, wherein the information identifier is matched to information based upon the plurality of heuristics;

means for receiving at least one candidate item of information based upon the information provided to the heuristics in accordance with the global heuristic; and

means for displaying a representation of the candidate items of information.

**39**. The apparatus of claim **38** wherein the global heuristic determines an order in which the information identifier is provided to the heuristics.

**40**. The apparatus of claim **39** wherein the order is a ranking of the plurality of heuristics according to a context in which the information was input.

**41**. The apparatus of claim **38** wherein the information is located over a plurality of locations which comprise at least two of the following: local storage media, a LAN storage volume, a wide area network and an Internet network.

**42**. A method for displaying information in a computer system, comprising the steps of:

inputting an information identifier;

providing the information identifier to a plurality of plug-in modules in accordance with a global heuristic, wherein the information identifier is matched to information by the plug-in modules based upon the plurality of heuristics;

receiving at least one candidate item of information based upon the information provided to the heuristics in accordance with the global heuristic; and

displaying a representation of the candidate items of information.

**43**. The method of claim **42** wherein the global heuristic determines an order in which the information identifier is provided to the heuristics.

**44**. The method of claim **43** wherein the order is a ranking of the plurality of heuristics according to a context in which the information was input.

**45**. The method of claim **42** wherein the information is located over a plurality of locations which comprise at least

US 6,847,959 B1

11

two of the following: local storage media, a LAN storage volume, a wide area network and an Internet network.

**46**. An apparatus for displaying information in a computer system, comprising:

means for inputting an information identifier;

means for providing the information identifier to a plurality of plug-in modules in accordance with a global heuristic, wherein the information identifier is matched to information by the plug-in modules based upon a plurality of heuristics;

means for receiving at least one candidate item of information based upon the information provided to the heuristics in accordance with the global heuristic; and

12

means for displaying a representation of the candidate items of information.

**47**. The method of claim **46** wherein the global heuristic determines an order in which the information identifier is provided to the heuristics.

**48**. The method of claim **47** wherein the order is a ranking of the plurality of heuristics according to a context in which the information was input.

**49**. The method of claim **46** wherein the information is located over a plurality of locations which comprise at least two of the following: local storage media, a LAN storage volume, a wide area network and an Internet network.

\* \* \* \* \*

# EXHIBIT E-1

US007577757B2

## (12) United States Patent
### Carter et al.

(10) Patent No.: **US 7,577,757 B2**
(45) Date of Patent: **\*Aug. 18, 2009**

(54) **MULTIMEDIA SYNCHRONIZATION METHOD AND DEVICE**

(75) Inventors: **Harry Nick Carter**, Saratoga Springs, NY (US); **Ronald Cococcia**, Ridgefield, CT (US); **Zachary Piech**, Troy, NY (US); **John Reine**, Wellesley, MA (US); **Silvan Sauter**, Kronbuchl (CH); **Steven Vasquez**, Kings Park, NY (US); **Craig Willis**, Troy, NY (US); **Hyung-Jun Brutus Youn**, Troy, NY (US)

(73) Assignee: **ReQuest, Inc.**, Ballston Spa, NY (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/550,921**

(22) Filed: **Oct. 19, 2006**

(65) **Prior Publication Data**

US 2007/0043847 A1 Feb. 22, 2007

**Related U.S. Application Data**

(63) Continuation of application No. 09/884,661, filed on Jun. 19, 2001, now Pat. No. 7,136,934.

(51) **Int. Cl.**
*G06F 15/16* (2006.01)

(52) **U.S. Cl.** ...................... 709/248; 709/237; 725/135; 707/201

(58) **Field of Classification Search** ................ 709/248, 709/237; 725/135, 136; 707/201
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,355,302 A 10 1994 Martin et al.

(Continued)

FOREIGN PATENT DOCUMENTS

WO 01 16804 A2 3 2001
WO 02 077862 A1 10 2002

OTHER PUBLICATIONS

"Novell iFolder Synchronizes Information Across the Net, Provides Reliable Anytime, Anywhere Access", press release, Mar. 19, 2001, at www.novell.com news press archive 2001 03 pr01021.html.
MAX-MMS Multimedia Server, AMX Corporation.

*Primary Examiner*—Krisna Lim
(74) *Attorney, Agent, or Firm*—David W. Carstens; Carstens & Cahoon, LLP

(57) **ABSTRACT**

A system and method for synchronizing a multiplicity of devices in a multimedia environment is described. The system has at least one central storage and interface device, wherein audio, video, and photographic information including content information and content management information, relating to at least one user, are stored in digital form. The system further has a plurality of zones each having a zone specific storage and interface device being capable of storing or interfacing with information stored in the central storage and interface device, wherein audio, video, or photographic information, relating to at least one user, contained within each one of the plurality of zone specific storage and interface devices and the central storage and interface device, are updated in relation with other zone specific storage and interface devices and the central storage and interface device. This results in the at least one user can be situated at anyone of the zones and access substantially identical audio, video, and photographic information related to the at least one user. The method includes providing the plurality of devices, providing the plurality of zones, determining whether a current synchronization point exists, if a previous synchronization point exists, receiving information from a server, if a previous synchronization point does not exists, sending information to a at least one client by a host, wherein the at least one user is disposed to have control, determining what information is needed by the at least one client, and establishing the resultant state as a synchronization point.

**15 Claims, 6 Drawing Sheets**



## US 7,577,757 B2
Page 2

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,557,541 A | 9 1996 | Schulhof et al. |
| 5,572,442 A | 11 1996 | Schulhof et al. |
| 5,661,787 A | 8 1997 | Pocock |
| 5,675,787 A | 10 1997 | Miller et al. |
| 5,721,815 A | 2 1998 | Ottesen et al. |
| 5,721,827 A | 2 1998 | Logan et al. |
| 5,726,909 A | 3 1998 | Krikorian |
| 5,729,735 A | 3 1998 | Meyering |
| 5,734,119 A | 3 1998 | France et al. |
| 5,887,060 A | 3 1999 | Ronning |
| 5,914,941 A | 6 1999 | Janky |
| 5,926,624 A | 7 1999 | Katz et al. |
| 5,931,901 A | 8 1999 | Wolfe et al. |
| 5,953,005 A | 9 1999 | Liu |
| 5,969,283 A | 10 1999 | Looney et al. |
| 5,978,805 A | 11 1999 | Carson |
| 5,987,525 A | 11 1999 | Roberts et al. |
| 6,000,000 A | 12 1999 | Hawkins et al. |
| 6,055,566 A | 4 2000 | Kikinis |
| 6,084,168 A | 7 2000 | Sitrick |
| 6,154,773 A | 11 2000 | Roberts et al. |
| 6,161,132 A | 12 2000 | Roberts et al. |
| 6,161,142 A | 12 2000 | Wolfe et al. |
| 6,170,005 B1 | 1 2001 | Meandzija |
| 6,199,076 B1 | 3 2001 | Logan et al. |
| 6,212,555 B1 | 4 2001 | Brooks et al. |
| 7,136,934 B2 * | 11 2006 | Carter et al. ............... 709 248 |
| 2004 0133924 A1 * | 7 2004 | Wilkins et al. ............. 725 135 |

\* cited by examiner



**FIG. 1**

SAMNDCA630-04258806



*FIG. 2*

*FIG. 3*

SAMNDCA630-04258807



**FIG. 4**

SAMNDCA630-04258808



FIG. 5

SAMNDCA630-04258809



*FIG. 6*



**FIG. 7**

SAMNDCA630-04258811

US 7,577,757 B2

<div style="columns:2">

**1**

# MULTIMEDIA SYNCHRONIZATION METHOD AND DEVICE

## CROSS-REFERENCE TO RELATED APPLICATION

This Application is a continuation of prior application Ser. No. 09/884,661 filed Jun. 19, 2001 now U.S. Pat. No. 7,136,934.

## BACKGROUND OF THE INVENTION

This invention relates generally to the field of multimedia record and playback devices, and more particularly to such devices which incorporate digitally stored multimedia data on a stationary or removable memory and playback device which can convert the stored data into audible sound and visible video images.

Historically, radio and television have been the major audio and video content providers to the general population. Both radio and television provide the listener/viewer with a selection of programming directed at different preferences and tastes. Unfortunately, listener/viewers have very little, if any, input into the broadcast formats selected by the radio stations and television networks. As such, the listener/viewer's optional programming choices are limited to the number and different formats played by local radio stations and national television networks.

Because of these and other limitations of music and video broadcasting, cassette players, compact disc (CD) players, video cassette recorders (VCR) and digital video disks (DVD) have become very popular. These devices allow the listener/viewer to select and control the type and frequency of music and video content they desire to listen to or watch at any given moment. However, several drawbacks to these devices include that the listener/viewer must individually purchase the cassette tapes, CDs, videotapes or DVDs which also have limited storage capacity. Likewise, the listener/viewer must transport a large number of cassettes, CDs, videotapes or DVDs to provide a range of musical and video selections.

U.S. Pat. No. 6,161,132, entitled System For Synchronizing Playback Of Recordings And Display By Networked Computer Systems, discloses entertainment content complementary to a musical recording being delivered to a user's computer by means of a computer network link. The user employs a browser to access the computer network. A plug-in for the browser is able to control an audio CD or other device for playing the musical recording. A script stored on the remote computer accessed over the network is downloaded. The script synchronizes the delivery of the complementary entertainment content with the play of the musical recording. However, this patent does not teach transferring of information related to a particular user.

U.S. Pat. No. 5,355,302, entitled System For Managing A Plurality Of Computer Jukeboxes, discloses a method and apparatus for managing a plurality of computer jukeboxes at different locations from a central station. Each jukebox includes processor means for controlling the computer jukebox, storage and retrieval means for data, display means for selection menus, audio production means for playing musical records, and a user interface enabling patrons to communicate with the processor means. However, substantially identical information related to a particular user are not synchronized and stored in all the zones in this patent.

U.S. Pat. No. 6,055,566, entitled Customizable Media Player With Online/Offline Capabilities, discloses an information dissemination system comprises an Internet-con-

**2**

nected server adapted for gathering information from plural sources, and sorting the information according to subscriber preferences. The sorted information is transmitted via the Internet to a subscriber's Internet Appliance (IA) as electronic documents, where the documents are downloaded to a connected playback device. However, this patent does not teach a local area network (LAN) for coupling a central storage and interface device with a zone specific storage and interface device.

U.S. Pat. No. 6,161,142, entitled Method And System For Using A Communication Network To Supply Targeted Streaming Advertising In Interactive Media, discloses a system and method for delivering programmed music and targeted advertising messages to Internet based subscribers includes a software controlled microprocessor based repository in which the dossiers of a plurality of the subscribers are stored and updated, musical content and related advertising are classified and matched. A subscriber has an appropriate microprocessor based device capable of selecting information and receiving information from the Internet. The subscriber receives the programmed music and matched advertisements from the repository over the Internet. However, this patent does not teach user specific synchronization, or LAN based communication network.

U.S. Pat. No. 6,199,076, entitled Audio Program Player Including A Dynamic Program Selection Controller, discloses an audio program and message distribution system in which a host system organizes and transmits program segments to client subscriber locations. The host organizes the program segments by subject matter and creates scheduled programming in accordance with preferences associated with each subscriber. Program segments are associated with descriptive subject matter segments, and the subject matter segments may be used to generate both text and audio cataloging presentations to enable the user to more easily identify and select desirable programming. However, this patent does not teach user specific information including substantially identical information at each zone wherein the user can access the information without any further communication between the zones. Similarly, U.S. Pat. No. 5,926,624, entitled Digital Information Library And Delivery System With Logic For Generating Files Targeted To The Playback Device, does not teach the same either.

U.S. Pat. No. 5,734,119, entitled Method For Streaming Transmission Of Compressed Music, discloses an Internet high fidelity audio transmission and compression protocol including a system for representing synthesized music in a relatively small file as compared to digital recording. The protocol includes a method for streaming the transmission of a music data file from a Server-Composer computer such that the music can begin being played back as soon as the file begins to arrive at a Client-Player computer. The system includes a graduated resolution improvement feature which allows the music to be recreated exactly as originally composed as the necessary wavetable data is downloading in the background and the music continues to play in the foreground. However, this patent does not teach using LAN as a means for transfer of information.

U.S. Pat. No. 5,721,815, entitled Media-On-Demand Communication System And Method Employing Direct Access Storage Device, discloses a method of transmission in discrete form between a vender and a user. However, this patent does not teach the user accessing substantially identical information at a plurality of zones. Similarly, U.S. Pat. No. 5,572,442, entitled System for Distributing Subscription and On-Demand Audio programming does not teach the same.

</div>

SAMNDCA630-04258812

US 7,577,757 B2

3

Therefore it is desirous to have a consumer digitally encode their entire audio, video, and photographic collections to be stored on multimedia storage devices, and have the entire collection synchronized automatically by having the devices communicate to and from each other so that the content is available in multiple locations or zones that the consumer may go. These may include devices such as personal computers located in other rooms or other locations (for example summer home, car, yacht, etc.), or on an online server/website/database. It is preferable to have the content locally stored so that interruptions and skips associated with streaming content over the network does not occur. Additionally, should the storage device such as a hard drive of one unit fails, then the other devices still have complete copies of the content collection to easily replace the failed unit.

In light of these considerations, it is an object of this invention to provide a multimedia player device and system which is capable of storing a relatively large amount of digital multimedia programming, whether audio or video, with relatively instant access to any piece of stored data for playback, where the stored data may be replaced with new data when the desires of the user change. It is a further object to provide such a device and system where the transfer of data to the multimedia player device is accomplished through alternative communication means, such that the user can choose from a vast array of data encompassing all formats of audio and video programming and can choose to synchronize the multimedia player device with other multimedia devices on a network for the upload and download of multimedia content from connected network devices.

SUMMARY OF THE INVENTION

The invention is an apparatus and system for providing recorded multimedia programming in digital form in a multimedia player device where the user chooses the particular programming so recorded, and further where the recorded programming is updated or replaced periodically with new content from different networked sources. The system comprises a device capable of digitally recording, storing, downloading and uploading multimedia programming in either audio or video formats and is able to transmit such digital data, either via a hardwired or wireless network, where the data is stored on a combination multimedia receiver/player/data storage device, hereafter referred to as a "digital multimedia device." The digital multimedia device comprises a readable/writable memory storage mechanism (e.g., disk drive, hard drive, memory) capable of receiving network transmissions, and a playback or player feature interfaced with a mobile or fixed radio receiver, television or personal computer.

The digital player device provides means to display alphanumeric information related to the data chosen to be played on the device itself or through a television or personal computer monitor connection. As data transmissions are received, the data files are stored in digital form within the storage unit as a buffer to be accessed by the playback mechanism, in effect, delaying the playback of the received data until the multimedia works are needed. The data is then converted to "real time" audio or video, utilizing a digital-to-analog converter in the case of audio files, and played back to the listener. As each file is played back, the user may choose to delete the file, and the storage device would then over-write or replace the file with a new file or files of similar size as downloaded by the user from other network resources. The user could also elect to skip the file and proceed to another file stored on the digital player device. As available memory allows, additional

4

multimedia works will continue to be received and stored until the data storage device is filled to capacity, even as the user simultaneously listens to a previously received file. The digital multimedia device is designed to have a relatively large storage capacity, such that hundreds or thousand of files for example, could be stored on the device at any one time.

Another feature of the digital multimedia player provides, as new files are constantly being accessed through a network, such as the world wide web, the data storage unit is refreshing the files stored on the digital multimedia device as old files are either deleted or updated by the user. Since the digital multimedia device is connected to the network, it has direct access to the network which allows the listener to request custom files between the listener and other digital player devices, personal computers and music source databases connected to the network.

The instant invention teaches a system and method for synchronizing a multiplicity of devices in a multimedia environment. The system has at least one central storage and interface device, wherein audio, video, and photographic information including content information and content management information, relating to at least one user, are stored in digital form. The system further has a plurality of zones each having a zone specific storage and interface device being capable of storing or interfacing with information stored in the central storage and interface device, wherein audio, video, or photographic information, relating to at least one user, contained within each one of the plurality of zone specific storage and interface devices and the central storage and interface device, are updated in relation with other zone specific storage and interface devices and the central storage and interface device. This results in the at least one user can be situated at anyone of the zones and access substantially identical audio, video, and photographic information related to the at least one user.

The method includes providing the plurality of devices, providing the plurality of zones, determining whether a current synchronization point exists, if a previous synchronization point exists, receiving information from a server, if a previous synchronization point does not exists, sending information to a at least one client by a host, wherein the at least one user is disposed to have control, determining what information is needed by the at least one client, and establishing the resultant state as a synchronization point.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a network diagram with attached devices capable of storing and transmitting digital multimedia files.

FIG. 2 is a diagram of the multimedia device shown connected to a user's home audio/video system.

FIG. 3 is a diagram of a typical digital multimedia device connected to the user's home audio/video system.

FIG. 4 is a flow chart illustrating the procedure for downloading digital content from a content database.

FIG. 5 is a flow chart representing the method for synchronizing and downloading multimedia content and updates from the master to subordinate digital multimedia devices connected to the network.

FIG. 6 is a flowchart depicting a synchronization of the instant invention, and

FIG. 7 is a block diagram depicting an embodiment of the instant invention.

DETAILED DESCRIPTION OF THE INVENTION

The invention will now be described in detail with regard to the best mode and the preferred embodiment. In general, the

US 7,577,757 B2

5

invention is a system and method comprising a digital multimedia player connected to a network and capable of transferring, receiving, storing, decoding and playing selected data files from plethora of devices connected to the network, including but not limited to, a computer server, a database, a personal computer and other multimedia receiver/player devices capable of transferring, receiving, storing, decoding and playing the data in an multimedia format.

With reference to FIG. 1, a digital multimedia device 104 is connected to network 102 along with a multimedia database 106. In addition, a portable multimedia player 108, a personal computer 110, and "master" digital multimedia player are connected to network 102. For purposes of this application, a personal computer is any computer coupled to a network, which receives a program, data or other application from another data source or computer coupled to the network. In the depicted example, multimedia database 106 provides data, such as digital audio and video files in their respective formats, to digital multimedia device 104 and other devices attached to the network capable of receiving audio and video content. The data network system 102 may include additional servers, clients, digital multimedia players and other devices not shown.

The network 102 is capable of delivering data files between the network devices, such as multimedia database 106, personal computer 110, portable and fixed digital multimedia devices 104, 112. Master digital multimedia device 112 can include a database such as the multimedia database 106. As can be appreciated the multimedia database 106 can be a stand-alone entity coupled to the network 102 as well. Furthermore, Master digital multimedia device 112 has the capability to store video/audio products in digital form. Preferably, the network 102 comprises a transmission network capable of sending data via an extremely high data transfer rate system, and may comprise satellite, radio, microwave, cellular or other known wireless transmissions using terrestrial or satellite means. It is contemplated that such transfer of data could also be accomplished through direct physical connections (e.g., telephone lines). Network system 102 may be the Internet representing a worldwide collection of networks and gateways that use the TCP/IP suite of protocols to communicate with one another. Of course, network 102 also may be implemented as a number of different types of networks, such as for example, a wireless internet network, an intranet, a local area network (LAN), or a wide area network (WAN). FIG. 1 is intended as an example, and not as an architectural limitation for the present invention.

Multimedia database 106 is an online collection of audio and video works which may accessed by network devices on a subscription or free file share basis. The recorded multimedia works may be categorized as to format, such as classical, jazz, contemporary, classic rock, etc. and video works such as, educational, drama, comedy, etc. The digital source database translates and stores the audio and video works in digital form, with the works subdivided into different formats. The content source database is further capable of communication with other network devices to deliver the data stored in the database to a digital player device, personal computer or microprocessor, or portable personal digital player.

With regard to FIG. 2, the digital multimedia device 104 is a powered electronic device designed to be a stand-alone unit for use in the home or office and powered conventionally by electricity, or a unit installed in an automobile in a manner similar to standard cassette, CD, DVD players. FIG. 2 is a diagram showing one example of the digital multimedia device attached to a user's home audio/video system with a menu display on the user's television. The depicted arrange-

6

ment allows the user to operate the digital multimedia device's playback functions by utilizing a televised menu driven hierarchy providing the user with program selection choices. As well, the user may program the digital multimedia device's download, synchronization and storage functions via the menu driven interface or alternatively keypad on the digital multimedia device.

FIG. 3 depicts key internal components providing for the operation of the invention disclosed herein. The digital multimedia device 104 comprises a microprocessor 302, a network communication unit 306, an audio video output 308, a digital to analog converter (D/A unit) 310 which decodes and converts digitized data to an analog signal output, memory unit 312, preferably consisting of a disk drive, hard drive, memory or flash card system capable of storing a large amount of multimedia programming in digital format in individual files, but with a readable/writable storage mechanism that will replace or write over the old data file with one or more new ones, until the data storage device is fully loaded. The data memory unit 322 means of the digital multimedia device 104 could be removable or detachable for transport or even interchangeable with other audio/video player devices. The control unit 314 provides means to select and play any particular multimedia work relatively instantaneously which includes keys and commands for start, stop, skip, repeat, shuffle and save keypad buttons, and a visual display means to display alphanumeric information about the work selected. The invention may also be packaged with a standard AM/FM radio, cassette player or compact disc player, such that the listener has other options for digital audio/video recording and audio/video output.

FIG. 4 is a flowchart depicting one embodiment of the present invention. The digital multimedia device 104 allows the user, via the control unit 314 means, to request and download entirely new recorded data into the digital multimedia device 104 or program the digital multimedia device 104 to synchronize and update the user's audio/video files automatically from a multimedia database 106, a personal computer or other devices connected to the network. For example, the user instructs the digital multimedia device to establish network contact with a selected multimedia database in the required communicating manner (Step 402). The user then selects the desired multimedia works to be synchronized and downloaded for storage on the digital multimedia device from the music multimedia database (Step 404). The selected digital data is downloaded from the music multimedia database into the data storage memory unit of the digital multimedia device (Step 406). The user may then be prompted to select other content for download. If the user desires to download more content, the process is repeated (Step 408). If the user declines to download or update content, the session is terminated. As a result, the user may listen to entirely different audio/video selections from those previously recorded in the digital multimedia device.

Turning to FIG. 5, an alternative embodiment of the present invention is discussed in further detail wherein the digital multimedia player 104 automatically performs the synchronization and download function between "master" and "subordinate" digital multimedia devices 104, 112. The subordinate digital multimedia device establishes network contact with a selected master digital multimedia device in the required communicating manner. The subordinate digital multimedia device then queries the master multimedia device to determine if content downloads or updates are available (Step 502). The master digital multimedia device responds to the query (Step 504). If content updates or downloads are available, the subordinate digital player device initiates the

SAMNDCA630-04258814

US 7,577,757 B2

7

synchronization and download of the appropriate files (Step 506) and the digital data is placed in the data storage memory unit of the subordinate digital multimedia device (Step 508). After download is complete and at various selectable intervals, the subordinate digital multimedia player may then again query the master digital multimedia device for available content downloads or updates (Step 510) and the process is again repeated. It should be noted that the user may access and play stored audio content with the digital multimedia player while the update synchronization functions are being performed and that the process may be initiated by the master digital multimedia device as opposed to the subordinate multimedia device. Likewise, subordinate multimedia devices may synchronize with other designated master multimedia devices such as a personal computer, a source database or other networked storage service or devices, and receive download updates or multimedia files as set forth in this specification.

Referring now to FIG. 6, a flowchart 600 depicting a synchronization of the instant invention is described. A process (Step 602) determines when to initiate the synchronization. Once a decision is made to initiate synchronization, a request is made and the depicted synchronization process starts (Step 604). A first determination is made in that if the request is rejected, the process reverts back to step 602 to wait for another initiation as to when to start the synchronization process (Step 606). If the request is accepted, the flowchart 600 progresses onward. A second determination (Step 608) is made in that if a previous synchronization point, or well established point exists, the synchronization process progresses to receive information from a server (Step 610). The received information from the server includes files containing audio and video entries. As can be appreciated, the instant invention teaches a set of zones wherein any zone has a zone specific device that contains all the audio and video, as well as text information which a user needs. If the information is not contained within the zone specific device, it is synchronized and made to contain the information. Therefore, if the device already has the information the user needs, an indication of the information may be transferred instead of the whole information, since the whole information is already in the device albeit not specifically used by a particular user. Continuing describing step 610, information may be received from the server regarding files on audio and video information from a database associated with the server. The information may include coded addition, deletion, or modification instructions for a specific device in a zone (Step 612). In other words, the database includes time sensitive information related to devices residing in different zones. For example, the user may change her preference in a particular zone at some recent time. This change is going to be noticed by the server, which stores related information in the database. A request for transmission of audio, video, or textual files is generated whereby each zone specific device is going to eventually be comprised of information specified by the user (Step 614). As can be appreciated, the information is the most recent information the user wants it to be. As a result, a new synchronization point is achieved. This synchronization resulted in establishing the most recent well-established synchronization point (Step 616). The synchronization process terminates (Step 618).

Referring back to step 608, if no previous synchronization exists, a host sends all the necessary information to at least one client, which comprises the relevant devices in each zone respectively (Step 620). The host can be any device in a zone capable of communicating information to other devices residing in different zones. This usually occurs during the initial or

8

setup period wherein different zone devices have not set themselves up for the user specific information. Or this may occur when substantial change in regard to user preference is initiated. By way of example, change preference from country music to rock-n-roll. Client then determines what information is needed and in turn requests and receives the needed information. As can be appreciated, the needed information comprises audio, video and other graphic and textual files, or segment of files, or indexing information related to the above (Step 622). Thereupon, the logic progresses toward step 614.

As can be appreciated, a change or alteration that triggers the synchronization process includes adding or deleting songs, adding or deleting playlists, editing song or playlist information, and changing system settings and preferences. It is noted that this triggering occurs when any device in any particular zone is being altered.

Referring now to FIG. 7, a block diagram 700 of an embodiment of the instant invention is depicted. A central storage and interface device 702, which can be a AudioReQuest Pro, produced by ReQuest, Inc. is shown. It is noted that AudioReQuest is a trademark of ReQuest, Inc. A local area network (LAN) 704 couples central storage and interface device 702 to zone specific storage and interface devices 706, 708, and 710, each of which resides in a specific zone (not shown). A personal computer 712 is coupled to LAN 704 as well. In addition, other device 714 such as an intelligent MP3 player is coupled to LAN 704 as well. An automobile 716 that has AudioReQuest capabilities is also coupled to LAN 704. It is noted that LAN 704 can be based on Ethernet or can be landline or wireless such as IEEE 802.11 radio frequency or other suitable standard.

A wide area network (WAN) 718 such as the Internet couples together a server 720 such as an on-line server, and a second central storage and interface device 722, which in turn can be coupled to a second LAN 724 having at least one zone specific storage and interface device 726 coupled thereto. A second automobile 728 is coupled to WAN 718 as well. As can be appreciated, this coupling can be via direct wireless Internet connections, or a cellular connection.

A practical example of implementing the instant invention is described infra. In the example, central storage and interface device 702 is AudioReQuest Pro, zone specific storage and interface devices 706, 708, 710 are a set of AudioReQuest Multizone which is produced by ReQuest, Inc.

AudioReQuest Pro (ARQ Pro) is a central storage device that digitally records music from CDs using its built-in CD player. In addition, it can record from analog sources such as radio, Long Playing records (LPs), and audiocassettes through its line-in recording capability. Further, it can record and transfer digital music from the PC and Internet sites. Playlists are created on the system by having a specific user who categorizes song choices for current or later playing. Song and Music Navigation information can be viewed on the built-in LCD, a television interface, or on other devices such as home automation control systems and personal computers through serial and Ethernet connections. Music can be either transferred or streamed to other devices 714 such as digital portable players, streaming network devices, web browsers, personal computers, online websites and servers, and other ReQuest products through network and universal serial bus (USB) connections.

AudioReQuest Multizone (ARQ Multi) is an accessory product that has the same storage, playback, and interface as the AudioReQuest Pro. It is noted that the substantial similarity between the AudioReQuest Pro and the AudioReQuest Multizone is achieved by synchronizing of AudioReQuest Pro with AudioReQuest Pro over a network, which may be

US 7,577,757 B2

9

network 704, 718, 724, or a combination of some or all of them. As can be appreciated, synchronization includes having devices in different zones store substantially identical content of entered music and playlists by a specific user. Different synchronizing schemes are possible (automatic, daily, weekly, etc). It is noted that users can synchronize or make the update on a demand. The ARQ Zone uses an Ethernet connection to a main unit for the synchronization of the music. As can be appreciated, online server 720 includes any main unit such as ARQ pro 702. Any number of ARQ Multizones can work with each ARQ Pro, allowing multiple outputs of the same music collection to be available. In a typical custom home installation, there may be upwards of 20 zones (e.g., rooms) with independent control and output. By way of example, instead of only playing one CD throughout the building, different songs can be played at the same time.

The AudioReQuest Pro and ARQ Multizone will have removable hard drives. This is desirous since if any one unit fails, a hard drive from another unit can be inserted and automatically work since they are synchronized such that the content of the hard drives are substantially the same. When an old hard drive is replaced with a new one, it will automatically synchronize and get the entire collection from the ARQ Pro. As can be appreciated, this system provides complete backup redundancy for the entire system, protecting the user's multimedia investment.

It is noted that ARQ Multi comprises interfaces for television display, for audio amplification, as well as for infrared connections.

Two AudioReQuest Pros can synchronize over the Internet, so that if a customer has their main home in Maine and a second home in Hawaii, both locations will have the same music collection available. Should a new CD be loaded in Hawaii, it will become available in Maine after it synchronizes, and vice versa. In addition, car and other mobile devices can also synchronize over wired or wireless connections. Furthermore, an online file server which exists either through a proprietary system or a public service, can be used to synchronize their music collections from their Pro, so that music can be streamed to their web browser, wireless cell phone, or other devices, anywhere on the Internet.

It is noted that the above listed devices such as zone specific storage and interface devices 706, 708, 710, or PC 712 can be located in separate zones respectively. Or, some can co-exist in a zone. One of the purpose of the zone is to give a user substantially exclusive or reclusive enjoyment of information shared by zone specific storage and interface devices 706, 708, 710, as well as by central storage and interface device 702, and other devices.

As can be appreciated, this invention teaches a complete system for providing recorded multimedia programming in digital form that is updated on all devices owned by an user, over a network. The main device digitally records, stores, plays, downloads, and uploads multimedia programming in audio, video, or picture format or other suitable formats (analog or digital). Furthermore, the main device is able to transmit such data, either via a hardwired or wireless network, to other devices that are capable of playing, storing, download and upload such data. The system allows multiple devices to synchronize its internal collection with each other, so that the end result is that all the devices have the same content and content management means (playlists, settings, etc.). Also devices having accessory playback only feature would synchronize the data, content, and content management with the

10

main recorder device. Therefore, a complete copy of the content is stored locally in a device within a zone or any zone, so that the output can be played in multiple zones or rooms in a networked building or in multiple locations traveling through a wide area network such as the Internet. The instant invention also contemplates other device for mobile applications such as car, boat, airplane, and other transportation, that would synchronize through either hardwired or wireless means resulting in storing the content locally. The instant invention further contemplates a set of digital multimedia devices comprises a readable/writable memory storage mechanism (e.g. disk drive, hard drive, memory) which are capable of transmitting and/or receiving network transmissions, and a playback or player feature interfaced with a mobile or fixed radio receiver, television, or personal computer.

Although preferred embodiments of the present invention have been described in the foregoing Detailed Description and illustrated in the accompanying drawings, it will be understood that the invention is not limited to the embodiments disclosed, but is capable of numerous rearrangements, modifications, and substitutions of steps without departing from the spirit of the invention. Accordingly, the present invention is intended to encompass such rearrangements, modifications, and substitutions of steps as fall within the scope of the appended claims.

We claim:

1. A system for synchronizing devices in a multimedia environmental, the system comprising:

    at least one central storage and interface device, wherein audio, video, or photographic data, including content information and content management information, relating to at least one user, are stored in digital form; and

    at least one zone, each zone having at least one zone specific storage and interface device capable of storing or interfacing with information stored in the central storage and interface device, wherein audio, video, or photographic information, relating to at least one user, contained within the zone specific storage and interface device and the central storage and interface device, are updated in relation to the zone specific storage and interface devices and the central storage and interface device, whereby the at least one user can be situated in any one of the zones and access the audio, video, or photographic information related to the at least one user.

2. The system of claim 1, further comprising a local area network (LAN) coupled to at least one zone specific storage and interface device with the central storage and interface device, wherein the interconnections within the LAN is hardwired or wireless.

3. The system of claim 1, further comprising a wide area network (WAN) coupling at least one zone specific storage and interface device with the central storage and interface device.

4. The system of claim 1, further comprising a set of zone specific output devices coupled to each of the zone specific storage and interface device, wherein audio, video, and photographic information is outputted, thereby the at least one user is disposed to have substantially identical content information and content management information displayed and manipulated in anyone of the zones.

US 7,577,757 B2

11

12

5. The system of claim 1, further comprising an output device coupled to the at least one central storage and interface, wherein audio, video, or photographic information is outputted.

6. The system of claim 1, further comprising a server, wherein audio, video, and photographic information contained within each one of the plurality of zone specific storage and interface devices and the central storage and interface device are stored therein and updated at a predetermined time in relation with other zone specific storage and interface devices as well as the central storage and interface device, coupled to the WAN.

7. The system of claim 1, further comprising an other device coupled to the central storage and interface device via a network connection other than the LAN or WAN.

8. The system of claim 1, wherein the at least one user pre-stores the audio, video, and photographic information by way of using a device comprising the central storage and interface device, and the zone specific storage and interface device.

9. The system of claim 1, wherein the central storage and interface device comprises means for transmitting or receiving information to or from the ozone specific storage and interface device.

10. The System of claim 1, wherein the zone specific storage and interface device comprises means for transmitting or receiving information to or from the central storage and interface device.

11. The system of claim 1, wherein the central storage and interface device is capable of converting analog information into digital form.

12. The system of claim 1, wherein the zone specific storage and interface device is disposed to be coupled to a personal computer (PC).

13. The system of claim 1, wherein the zone specific storage and interface device is disposed to be coupled to a wireless mobile device.

14. The system of claim 1 wherein the central storage and interface device is disposed to be coupled to a wireless mobile device via LAN.

15. The system of claim 1, wherein the central storage and interface device is disposed to be coupled to a wireless mobile device via WAN.

*   *   *   *   *

SAMNDCA630-04258817

# EXHIBIT E-2

US007587446B1

(12) **United States Patent**
Onyon et al.

(10) **Patent No.:** **US 7,587,446 B1**
(45) **Date of Patent:** **Sep. 8, 2009**

(54) **ACQUISITION AND SYNCHRONIZATION OF DIGITAL MEDIA TO A PERSONAL INFORMATION SPACE**

(75) Inventors: **Richard M. Onyon**, San Jose, CA (US); **David L. Multer**, Santa Cruz, CA (US)

(73) Assignee: **FusionOne, Inc.**, San Jose, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 580 days.

(21) Appl. No.: **09/710,162**

(22) Filed: **Nov. 10, 2000**

(51) **Int. Cl.**
*G06F 15/16* (2006.01)
*G06F 15/173* (2006.01)

(52) **U.S. Cl.** ........................ **709/203**; 709/217; 707/10; 707/204

(58) **Field of Classification Search** ......... 709/200–203, 709/217–228, 230–232, 236–238, 243, 244, 709/246, 248; 707/10, 200, 201, 203, 204; 719/310, 311, 312, 313, 317, 318, 328; 718/100, 718/105; 455/415; 370/254, 359; 708/204; 345/62

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,130,993 | A | 7/1992 | Gutman et al. |
| 5,392,390 | A | 2/1995 | Crozier |
| 5,519,606 | A | 5/1996 | Frid-Nielsen et al. |
| 5,574,906 | A | 11/1996 | Morris |
| 5,623,661 | A | 4/1997 | Hon |
| 5,628,005 | A | 5/1997 | Hurvig |
| 5,630,081 | A | 5/1997 | Rybicki et al. |
| 5,649,195 | A | 7/1997 | Scott et al. |

| | | | |
|---|---|---|---|
| 5,666,553 | A | 9/1997 | Crozier |
| 5,682,524 | A | 10/1997 | Freund et al. |
| 5,684,990 | A | 11/1997 | Boothby |
| 5,694,596 | A | 12/1997 | Campbell |
| 5,701,423 | A | 12/1997 | Crozier |
| 5,706,509 | A | 1/1998 | Man-Hak Tso |
| 5,710,922 | A | 1/1998 | Alley et al. |
| 5,727,202 | A | 3/1998 | Kucala |
| 5,729,735 | A | 3/1998 | Meyering |
| 5,729,739 | A | * 3/1998 | Cantin et al. ............ 707/103 R |
| 5,729,743 | A | 3/1998 | Squibb |
| 5,742,792 | A | 4/1998 | Yanai et al. |

FOREIGN PATENT DOCUMENTS

EP        0 986 225  A1      3/2000

(Continued)

OTHER PUBLICATIONS

Internate Mail Consortium: "vCard The Electronic Business Card," Retrieved from the Internet: www.imc.org/pdi/vcardwhite.html, Jan. 1, 1997.

(Continued)

*Primary Examiner*—Haresh N Patel
(74) *Attorney, Agent, or Firm*—Haverstock & Owens LLP

(57) **ABSTRACT**

A method for transferring media data to a network coupled apparatus is described. The method includes maintaining a personal information space identified with a user and having media data. The personal information space is coupled to the network. Upon a user request, the method transfers at least a portion of the media data from the personal information space to the network coupled apparatus in a differencing transaction.

**14 Claims, 5 Drawing Sheets**



**US 7,587,446 B1**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,745,906 A | 4/1998 | Squibb | |
| 5,758,150 A | 5/1998 | Bell et al. | |
| 5,768,597 A | 6/1998 | Simm | |
| 5,771,354 A | 6/1998 | Crawford | |
| 5,778,346 A | 7/1998 | Frid-Nielsen et al. | |
| 5,787,247 A | 7/1998 | Norin et al. | |
| 5,787,262 A | 7/1998 | Shakib et al. | |
| 5,809,497 A | 9/1998 | Freund et al. | |
| 5,812,773 A | 9/1998 | Norin | |
| 5,812,793 A | 9/1998 | Shakib et al. | |
| 5,832,489 A | 11/1998 | Kucala | |
| 5,832,519 A | 11/1998 | Bowen et al. | |
| 5,845,283 A | 12/1998 | Williams et al. | |
| 5,875,296 A | 2/1999 | Shi et al. | |
| 5,884,323 A | 3/1999 | Hawkins et al. | |
| 5,884,325 A | 3/1999 | Bauer et al. | |
| 5,893,119 A | 4/1999 | Squibb | |
| 5,897,640 A | 4/1999 | Veghte et al. | |
| 5,897,642 A | 4/1999 | Capossela et al. | |
| 5,907,793 A * | 5/1999 | Reams ........................ 725/122 |
| 5,937,405 A | 8/1999 | Campbell | |
| 5,943,676 A | 8/1999 | Boothby | |
| 5,961,590 A | 10/1999 | Mendez et al. | |
| 5,968,131 A | 10/1999 | Mendez et al. | |
| 5,974,238 A | 10/1999 | Chase, Jr. | |
| 5,974,563 A | 10/1999 | Beeler, Jr. | |
| 6,000,000 A | 12/1999 | Hawkins et al. | |
| 6,006,274 A | 12/1999 | Hawkins et al. | |
| 6,012,063 A | 1/2000 | Bodnar | |
| 6,016,394 A * | 1/2000 | Walker ........................ 717/104 |
| 6,016,478 A | 1/2000 | Zhang et al. | |
| 6,023,708 A | 2/2000 | Mendez et al. | |
| 6,023,723 A | 2/2000 | McCormick et al. | |
| 6,034,621 A | 3/2000 | Kaufman | |
| 6,038,665 A * | 3/2000 | Bolt et al. .................. 713/176 |
| 6,044,381 A | 3/2000 | Boothby et al. | |
| 6,052,735 A | 4/2000 | Ulrich et al. | |
| 6,058,399 A | 5/2000 | Morag et al. | |
| 6,061,790 A | 5/2000 | Bodnar | |
| 6,064,880 A | 5/2000 | Alanara ...................... 455/419 |
| 6,108,330 A | 8/2000 | Bhatia et al. .............. 370/352 |
| 6,108,703 A | 8/2000 | Leighton et al. ........... 709/226 |
| 6,131,096 A | 10/2000 | Ng et al. | |
| 6,131,116 A | 10/2000 | Riggins et al. | |
| 6,141,011 A | 10/2000 | Bodnar et al. | |
| 6,141,664 A | 10/2000 | Boothby | |
| 6,151,606 A | 11/2000 | Mendez | |
| 6,163,844 A | 12/2000 | Duncan et al. .............. 713/201 |
| 6,182,117 B1 | 1/2001 | Christie et al. | |
| 6,182,141 B1 | 1/2001 | Blum et al. ................. 709/227 |
| 6,185,598 B1 | 2/2001 | Farber et al. ............... 709/200 |
| 6,202,085 B1 | 3/2001 | Benson et al. | |
| 6,205,448 B1 | 3/2001 | Kruglikov et al. | |
| 6,212,529 B1 | 4/2001 | Boothby et al. | |
| 6,216,131 B1 | 4/2001 | Liu et al. | |
| 6,219,694 B1 | 4/2001 | Lazaridis et al. | |
| 6,223,187 B1 | 4/2001 | Boothby et al. | |
| 6,226,650 B1 | 5/2001 | Mahajan et al. | |
| 6,247,135 B1 | 6/2001 | Feague | |
| 6,260,124 B1 | 7/2001 | Crockett et al. ............. 711/162 |
| 6,272,545 B1 | 8/2001 | Flanagin et al. | |
| 6,275,831 B1 | 8/2001 | Bodnar et al. | |
| 6,282,698 B1 | 8/2001 | Baker et al. | |
| 6,295,541 B1 | 9/2001 | Bodnar et al. | |
| 6,304,881 B1 | 10/2001 | Halim et al. | |
| 6,317,755 B1 | 11/2001 | Rakers et al. .............. 707/204 |
| 6,324,544 B1 | 11/2001 | Alam et al. | |
| 6,330,568 B1 | 12/2001 | Boothby et al. | |
| 6,332,158 B1 | 12/2001 | Risley et al. .............. 709/219 |
| 6,363,249 B1 | 3/2002 | Nordeman et al. .......... 455/418 |
| 6,363,412 B1 | 3/2002 | Niwa et al. ................. 709/203 |

| | | | |
|---|---|---|---|
| 6,389,462 B1 | 5/2002 | Cohen et al. ................ 709/218 |
| 6,396,482 B1 | 5/2002 | Griffin et al. .............. 345/169 |
| 6,397,351 B1 | 5/2002 | Miller et al. | |
| 6,401,104 B1 * | 6/2002 | LaRue et al. ............... 707/203 |
| 6,405,218 B1 | 6/2002 | Boothby | |
| 6,434,621 B1 * | 8/2002 | Pezzillo et al. ............ 709/231 |
| 6,434,627 B1 | 8/2002 | Millet et al. ............... 709/245 |
| 6,437,818 B1 * | 8/2002 | Ludwig et al. ........... 348/14.09 |
| 6,449,622 B1 | 9/2002 | LaRue et al. | |
| 6,457,062 B1 | 9/2002 | Pivowar et al. | |
| 6,480,896 B1 * | 11/2002 | Brown et al. ................ 709/231 |
| 6,484,143 B1 | 11/2002 | Swildens et al. ............ 705/1 |
| 6,487,560 B1 | 11/2002 | LaRue et al. | |
| 6,549,933 B1 * | 4/2003 | Barrett et al. .............. 709/203 |
| 6,553,413 B1 | 4/2003 | Leighton et al. ............ 709/219 |
| 6,567,850 B1 * | 5/2003 | Freishtat et al. ............ 709/224 |
| 6,591,306 B1 | 7/2003 | Redlich ...................... 709/245 |
| 6,597,700 B2 | 7/2003 | Golikeri et al. ............ 370/401 |
| 6,640,302 B1 | 10/2003 | Subramaniam et al. ...... 713/169 |
| 6,643,707 B1 | 11/2003 | Booth ......................... 709/245 |
| 6,671,724 B1 | 12/2003 | Pandya et al. ............... 709/226 |
| 6,671,757 B1 * | 12/2003 | Cash et al. .................. 710/100 |
| 6,694,336 B1 * | 2/2004 | Multer et al. ............... 707/201 |
| 6,718,390 B1 | 4/2004 | Still et al. ................... 709/229 |
| 6,732,101 B1 | 5/2004 | Cook ........................... 707/10 |
| 6,738,789 B2 * | 5/2004 | Multer et al. ............... 707/201 |
| 6,757,696 B2 * | 6/2004 | Multer et al. ............... 707/201 |
| 6,757,698 B2 | 6/2004 | McBride et al. ............. 707/204 |
| 6,799,214 B1 | 9/2004 | Li .............................. 709/226 |
| 6,804,690 B1 | 10/2004 | Dysert et al. ............... 707/204 |
| 6,804,783 B1 | 10/2004 | Wesinger, Jr. et al. ...... 713/200 |
| 6,812,961 B1 * | 11/2004 | Parulski et al. ........... 348/231.2 |
| 6,839,568 B2 | 1/2005 | Suzuki ..................... 455/550.1 |
| 6,850,944 B1 * | 2/2005 | MacCall et al. ............. 707/100 |
| 6,870,921 B1 * | 3/2005 | Elsey et al. ............ 379/218.01 |
| 6,892,245 B1 | 5/2005 | Crump et al. ............... 709/245 |
| 6,920,488 B1 * | 7/2005 | Le Pennec et al. .......... 709/219 |
| 6,944,651 B2 * | 9/2005 | Onyon et al. ............... 709/217 |
| 6,954,783 B1 | 10/2005 | Bodwell et al. ............. 709/218 |
| 6,963,914 B1 | 11/2005 | Breitbart et al. ............ 709/226 |
| 6,996,631 B1 | 2/2006 | Aiken, Jr. et al. .......... 709/242 |
| 7,003,555 B1 | 2/2006 | Jungck ...................... 709/219 |
| 7,007,041 B2 * | 2/2006 | Multer et al. ............... 707/201 |
| 7,020,704 B1 * | 3/2006 | Lipscomb et al. .......... 709/226 |
| 7,023,868 B2 | 4/2006 | Rabenko et al. ............. 370/419 |
| 7,039,656 B1 * | 5/2006 | Tsai et al. ................... 707/201 |
| 7,051,275 B2 * | 5/2006 | Gupta et al. ................ 715/201 |
| 7,054,594 B2 | 5/2006 | Bloch et al. ................ 455/41.2 |
| 7,116,681 B1 | 10/2006 | Hovell et al. .............. 370/466 |
| 7,162,494 B2 | 1/2007 | Arellano ................ 707/104.1 |
| 7,197,574 B1 | 3/2007 | Ishiyama .................... 709/245 |
| 7,233,791 B2 | 6/2007 | Gilbert et al. .............. 455/419 |
| 7,249,175 B1 | 7/2007 | Donaldson .................. 709/225 |
| 7,269,433 B2 | 9/2007 | Vargas et al. ............... 455/502 |
| 7,284,051 B1 | 10/2007 | Okano et al. ................ 709/226 |
| 7,289,964 B1 | 10/2007 | Bowman-Amuah .......... 705/1 |
| 7,315,826 B1 * | 1/2008 | Guheen et al. ............... 705/7 |
| 7,356,559 B1 | 4/2008 | Jacobs et al. ............... 709/203 |
| 7,363,233 B1 | 4/2008 | Levine .......................... 705/1 |
| 7,392,034 B2 | 6/2008 | Westman et al. ............ 455/402 |
| 7,447,743 B1 | 11/2008 | Jordan, Jr. .................. 709/206 |
| 7,454,500 B1 | 11/2008 | Hsu et al. .................... 709/226 |
| 2001/0044805 A1 | 11/2001 | Multer et al. | |
| 2001/0047393 A1 * | 11/2001 | Arner et al. ................. 709/216 |
| 2002/0007303 A1 * | 1/2002 | Brookler et al. ............. 705/10 |
| 2002/0010868 A1 | 1/2002 | Nakashima et al. .......... 713/201 |
| 2002/0032751 A1 | 3/2002 | Bharadwaj .................. 709/218 |
| 2002/0038316 A1 * | 3/2002 | Onyon et al. ............... 707/204 |
| 2002/0040369 A1 * | 4/2002 | Multer et al. ............... 707/201 |
| 2002/0049852 A1 * | 4/2002 | Lee et al. .................... 709/231 |
| 2002/0056011 A1 * | 5/2002 | Nardone et al. ............. 709/248 |
| 2002/0059116 A1 * | 5/2002 | Bulatovic et al. ............ 705/27 |
| 2002/0091785 A1 * | 7/2002 | Ohlenbusch et al. ........ 709/208 |

**US 7,587,446 B1**

Page 3

| | | | |
|---|---|---|---|
| 2002/0138765 | A1 | 9/2002 | Fishman et al. |
| 2002/0162011 | A1 | 10/2002 | Tanaka et al. ............... 713/200 |
| 2003/0028451 | A1 | 2/2003 | Ananian ...................... 705/27 |
| 2003/0069874 | A1* | 4/2003 | Hertzog et al. |
| 2003/0204568 | A1 | 10/2003 | Bhargava et al. ........... 709/206 |
| 2003/0229898 | A1 | 12/2003 | Babu et al. .................... 725/87 |
| 2004/0054746 | A1 | 3/2004 | Shibata ...................... 709/207 |
| 2004/0093342 | A1* | 5/2004 | Arbo et al. ................. 707/102 |
| 2004/0093385 | A1 | 5/2004 | Yamagata .................. 709/206 |
| 2004/0111465 | A1 | 6/2004 | Chuang et al. ............. 709/203 |
| 2004/0188235 | A1 | 9/2004 | Sugimoto et al. ........ 455/412.1 |
| 2004/0192282 | A1 | 9/2004 | Vasudevan .................. 455/419 |
| 2004/0224665 | A1 | 11/2004 | Kokubo ...................... 455/411 |
| 2005/0086296 | A1 | 4/2005 | Chi et al. .................... 709/203 |
| 2005/0090253 | A1 | 4/2005 | Kim et al. ................. 455/435.1 |
| 2005/0099963 | A1* | 5/2005 | Multer et al. .............. 370/254 |
| 2005/0102257 | A1* | 5/2005 | Onyon et al. .................... 707/1 |
| 2005/0131990 | A1 | 6/2005 | Jewell ........................ 709/201 |
| 2006/0052091 | A1* | 3/2006 | Onyon et al. .............. 455/415 |
| 2006/0190626 | A1 | 8/2006 | Bhogal et al. ............. 709/248 |
| 2007/0050734 | A1 | 3/2007 | Busey ........................ 715/853 |
| 2007/0061331 | A1 | 3/2007 | Ramer et al. ................. 707/10 |
| 2007/0094042 | A1 | 4/2007 | Ramer et al. .................. 705/1 |
| 2008/0022220 | A1 | 1/2008 | Cheah ........................ 715/769 |
| 2008/0039020 | A1 | 2/2008 | Eskin ........................ 455/41.2 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1180890 A2 | 2/2002 |
| JP | 11242620 | 7/1999 |
| JP | 11242677 | 7/1999 |
| WO | WO 97 04391 | 2/1997 |
| WO | WO 97/41520 | 11/1997 |
| WO | WO 98/21648 | 5/1998 |

| | | |
|---|---|---|
| WO | WO 98/54662 | 12/1998 |
| WO | WO 99/05813 | 2/1999 |
| WO | WO 99/06900 | 2/1999 |
| WO | WO 99/36870 | 7/1999 |
| WO | WO 99/45451 | 9/1999 |
| WO | WO 99/45484 | 9/1999 |
| WO | WO 99/50761 | 10/1999 |
| WO | WO 00/11832 | 3/2000 |
| WO | WO 00/16222 | 3/2000 |
| WO | WO 00/29998 | 5/2000 |
| WO | WO 01/71539 | 9/2001 |
| WO | WO 2005/112586 A2 | 12/2005 |

OTHER PUBLICATIONS

Internate Mail Consortium: "vCard Overview," Retrieved from the internet: www.imc.org/pdi/vcardoverview.html, Oct. 13, 1998.

Internate Mail Consortium: "vCard The Electronic Bisiness Card," Retrieved from the Internet: www.imc.org/pdi/vcardwhite.html, Jan. 1, 1997, pp. 1-2.

Internate Mail Consortium: "vCard Overview," retrieved from the Internet: www.imc.org/pdi/vcardoverview.html, Oct. 13, 1998, pp. 1-3.

Finnigan, Anne, "The Safe Way to Shop Online," Sep. 1998, p. 162, Good Housekeeping, v. 227 No. 3.

Chase, Larry, "Taking Transactions Online,"Oct. 1998, pp. 124-132, Target Marketing, v.21 No. 10.

Gong, Li, "Increasing Availability and Security of an Authentication Service," Jun. 1993, pp. 657-662, IEEE Journal on Selected Areas in Communications, v. 11 No. 5.

DeMaio, Harry B., "My MIPS Are Sealed," Sep./Oct. 1993, pp. 46-51, Chief Information Officer Journal v. 5 iss.7.

* cited by examiner

# Figure 1





Figure 2

Figure 3





Figure 4



Figure 5
Device Engine

US 7,587,446 B1

**1**

## ACQUISITION AND SYNCHRONIZATION OF DIGITAL MEDIA TO A PERSONAL INFORMATION SPACE

### CROSS-REFERENCE TO RELATED APPLICATIONS

The following applications are cross-referenced and incorporated by reference herein in their entirety:

"Data Transfer and Synchronization System," U.S. Pat. No. 6,671,757, issued Dec. 30, 2003;

"Data Transfer and Synchronization System," U.S. Pat. No. 6,694,336, issued Feb. 17, 2004; and

"Data Transfer and Synchronization System," U.S. patent application Ser. No. 09/491,675, filed Jan. 26, 2000.

Each of these related Patents/Application are incorporated herein by reference.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention relates to the transfer of public and private data to a private information space and in particular to the transfer, storage and synchronization of media data.

2. Description of the Related Art

Digital media has become increasingly more popular and is considered by many to be one of the current "revolutions" taking place in the computing and entertainment industries. Digital audio and video are becoming as mainstream as text and graphics are on the World Wide Web. This "revolution" opens tremendous opportunities for industry innovation in the manner in which people use this technology at home, work, and on the road. Distribution of digital media via the Internet has been a driving factor of this revolution. As a result, however, a user may acquire and store digital media on one network-coupled device, such as a personal computer coupled to the user's business network connection, but may desire to transfer that information and maintain a library of this digital media on other network-coupled devices, such as a personal computer at the user's home, a notebook computer which travels with the user, or even a palm-top computer.

Digital media content can be acquired from a multiplicity of sources. In particular, digital media content can comprise a series of files such as MPEG, MP3, RealAudio, and the like, which may be saved to a storage device, such as a hard drive on a computer, and which a user may wish to have present on a multiplicity of the user's individual devices. At present, there is no way to ensure that all files of a particular type, or in a particular directory, are the same throughout a series of machines. This series of machines can comprise a "personal information space" which is made up of information selected by the user to be input into the user's own hard drive. Hence, the personal information space may comprise public or private data selected by the user which is inserted into any one or more of a user's network-coupled devices. The network-coupled devices can have their own storage or which may be connected to the network to receive data from the network and to process the data using the device's processor and software.

In other areas, management of a user's personal data between different systems which can couple directly to each other has been addressed. For example, numerous systems allow management of an individual's personal contact information, such as files, contact and address data. Personal information managers (PIMs) may comprise software applications such as Microsoft Outlook, Symantec's ACT!, and other similar programs running on a personal or laptop computer. PIMS may also comprise personal digital assistants (PDAs)

**2**

such as those using the Palm or Microsoft Windows CE (also known as Pocket PC) operating systems. Each PDA generally includes calendar, contact, personal tasks, notes, documents, and other information, while more sophisticated devices allow a user to fax, send e-mails, and communicate in other ways both by wireline and wirelessly. Even advanced cellular phones carry enough memory and processing power to store contact information, surf the web, and provide text messaging. Along with the growth in the sophistication of these devices, the need to transfer information between them has grown significantly as well.

In addition, many Internet web portals also now provide file storage, contact and calendar services. For example, major service portals such as Yahoo!™, Excite$^{SM}$, Lycos®, Snap!™ and others provide on-line calendar and contact manager services via a web browser and user account. This allows a user to log in to their own calendar and address book from any Internet-capable web browsing application since the user's individual data is stored on a host server maintained by the web portal provider.

Hence, each individual is presented with a multitude of different device types and options for maintaining a "personal information space"—a data store of information customized by, and on behalf of the user which contains both public data the user puts into their personal space, private events in the space, and other data objects such as text files or data files which belong to the user.

Once information in one part of one's personal information space is defined, users are presented with the daunting task of keeping information between the different devices in the space synchronized. For example, if an individual keeps certain data files as well as a calendar of information on a personal computer in his or her office using a particular personal information manager application, the individual would generally like to have the same information available on other devices, including, for example, a cellular phone, notebook computer, hand-held organizer, and home personal computer. Generally, the individual wants to ensure that the information stored on these devices is the most current version of the data as well.

Conventionally, synchronization of documents and personal information between different devices typically occurs through direct connection between the devices.

Patent application Ser. Nos. 09/490,550 now U.S. Pat No. 6,694,336; Ser. No. 09/491,675 now copending; and Ser. No. 09/491,694, now U.S. Pat No. 6,671,757 disclose a novel method and system for synchronization of personal information including that which is conventionally found in desktop applications, personal digital assistants, palm computers, and website calendar and address services, as well as any content in the personal information space including file systems, contact information and/or calendaring information. In one aspect, the system disclosed in patent application Ser. Nos. 09/490,550 now U.S. Pat. No. 6,694,336; Ser. No. 09/491,675 now copending; and Ser. No. 09/491,694, now U.S. Pat. No. 6,671,757 comprises a series of device engines which can be utilized on or in conjunction with any personal information manager application or device, on servers, or both, which can connect via a communications network, such as the Internet, to transfer information in the form of differenced data between respective applications and respective devices. In essence, the system of patent application Ser. Nos. 09/490,550 now U.S. Pat No. 6,694,336; Ser. No. 09/491,675 now copending; and Ser. No. 09/491,694, now U.S. Pat. No. 6,671,757 creates a personal information space or personal information store that is comprised of the set of transactions which defines the movement of information between one device, the

US 7,587,446 B1

**3**

intermediate storage server, and other devices, and which is unique to an individual user or identifier.

This personal information space is defined by the content which is specific to and controlled by an individual user, generally entered by or under the control of the individual user, and which includes "public" events and data—those generally known to others—and "private" events and data which are not intended to be shared with others. It should be recognized that each of the aforementioned criteria is not exclusive or required, but defines a characteristic of the term "personal information space" as that term is used herein.

A number of different system embodiments are disclosed in the aforementioned co-pending patent applications. However, the manner in which information is input to each of the devices which may be defined as part of the personal information space varies. Certain devices take direct input from other electronic devices such as scanners or electronic input such as vCARDs. In most cases, the information must be manually input via the user interface of one of the devices, e.g. typing contact information into a computer application.

The same is true for digital media: it is accessible from sources and a user may desire to transfer all or some portion of the media within a user's personal information space. Digital media comes in many forms. Two of the most common are Moving Picture Experts Group (MPEG 1, Audio Level 3 or "MP3") encoded format and Liquid Audio format. A number of means are available for accessing digital music, including direct conversion of one's personal music collection, music from public websites such as MP3.com and decentralized file sharing programs such as Napster. However once a digital media file is within an individual's personal information space, no effective mechanism exists to move the digital media file to other devices within the personal information space. Users would benefit from a mechanism allowing them to select individual files, or all or a portion of a directory of files, and move them to different devices in the personal information space effectively and efficiently. An effective means allowing users to move digital media files around the personal information space would be a great advantage in the continued development of personal information spaces and the Internet.

SUMMARY OF THE INVENTION

The invention, roughly described, comprises a method for acquiring and maintaining a digital music store in personal information space, comprising: maintaining a personal information space identified with a user including data capable of being used on a client device, and transferring at least a portion of the data from the personal information space to an Internet-coupled device in response to a user request.

In a further embodiment, the invention comprises a method for managing information on a plurality of Internet coupled devices. In this aspect, the method comprises the steps of determining digital media content to be synchronized by reference to a user specified set of personal information devices including at least one of said plurality of Internet coupled devices; storing information in a personal information store coupled to the Internet and identified with a particular user; and providing said determined digital media content to said at least one of said plurality of Internet coupled devices in a differenced transaction.

In yet another aspect, a method of managing information is described. In this aspect, the method comprises providing at least one information server including at least one private information store, the server being coupled to a network; and receiving change transactions from a digital

**4**

media access agent, the transactions indicating to add, delete or modify digital media in the private information store.

In another aspect, a system for transferring digital media between a plurality of network coupled devices is disclosed. The system comprises a personal information store containing digital media; a data transfer request initiator coupled to the personal information store; and a device engine operatively coupled to the data transfer request initiator and responsive to the initiator to transfer digital media between the store and one of said plurality of network coupled devices.

In yet another embodiment, the invention comprises a media server coupled to an open system communications network. The server includes an information store including a user defined set of digital media; code, responsive to a request from the user, to provide digital media comprising at least one member of the user defined set of digital media to the user via a user agent.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention will be described with respect to the particular embodiments thereof. Other objects, features, and advantages of the invention will become apparent with reference to the specification and drawings in which:

FIG. **1** is a block level diagram of one embodiment of the present invention.

FIG. **2** is a block diagram of one example of user interaction with the system and method of the present invention.

FIG. **3** is a diagram illustrating one manner by which digital music data enters the system of the present invention and is placed into personal information space.

FIG. **4** is a block diagram illustrating the different types of devices and device engines incorporated into the system of the present invention.

FIG. **5** is a block diagram of one example of a device engine in accordance with the present invention.

DETAILED DESCRIPTION

In one aspect, the invention defined herein comprises a unique system and method for transferring digital media content, which is readily available in any number of sources, into a user's personal private information space. In a further aspect, the system provides a mechanism for moving data between different network-coupled devices within the personal information space.

In this case, the network to which devices are coupled may comprise the Internet, and the devices may take any number of different forms, including personal computers, notebook computers, palm-top computers, hand-held computers, so-called "smart" devices, such as Internet-coupled stereos, automotive personal computers, web appliances, and the like, and/or any device which is capable of receiving and processing digital media via a network connection. As used herein, the term "network" includes any network, including a LAN, WAN or open source global network, public or private, or any combination thereof with access to a personal information space coupled to the network, and the devices coupled to the network, are included in such reference. It should be further understood that all of the disclosed method may be performed by a distributed system. Such a distributed system may be based on a local area network (LAN) operating within a single office location, a wide area network (WAN) encompassing several office locations, or an open systems network such as the Internet. It should be further understood that devices used

US 7,587,446 B1

5

in accordance with the present invention may couple directly or indirectly to the global data network, and the network may comprise a private network.

The personal information space, as used herein, is defined as an individual's user-defined set of information which is uniquely identified with that individual, and which is capable of being stored on one or more systems or devices having any mechanism for storing that information. Optimally, the systems are network-coupled devices which can communicate with each other directly or indirectly.

The system of the present invention provides the ability for the user to insert data, such as digital media content, into a user's personal information space, and move the data around the personal information space to the devices which are included in and store information in the information space in an efficient and automated manner. Such data can include text information as well as binary information. For example, an MP3 file may contain text information identifying the artist and title of the work, as well as other information such as an album title or recording rate information. The MP3 will also contain binary information which is interpreted by an application to produce an output of the recorded work. In the system of the present invention, changes to either the text information or the binary information are transferred or synced, as the case may be, in a series of differencing transactions as described below.

The "personal information space" can be housed physically on an intermediate server, or it can be stored on any one or more devices which communicate with other devices. One exemplary characteristic of the personal information space is the ability to share information in the space with any of the users' personal information devices or applications, and is therefore not limited to any one type of device in direct communication with any other type of device. One example of a personal information space is the transactional based extraction, transfer, broadcast, storage and synchronization systems for forth in patent application Ser. Nos. 09/490,550 now U.S. Pat. No. 6,694,336, Ser. No. 09/491,675 now copending, and 09/491,694, now U.S. Pat. No. 6,671,757, each of which is hereby specifically incorporated by reference.

FIG. 1 shows a block diagram of a general process by which data enters a user's personal information space. At step 10, a user determines which media data (public or private) the user desires to be inserted into the user's private information space. The step of determining 10 can include any number of different data selection operations. In one aspect, it can comprise selecting a file from a file system using a standard file system interface such as a command line interface, a web browser, Microsoft Explorer, FTP, a voice command, or a specifically-designed application interface. In a further aspect, the step of determining may comprise searching using a web-based search engine to ascertain publicly available media, or secure media provided by a site the user is authorized to access, and which the user wishes to transfer into the user's personal information space. Alternatively, the user may select to include all, or one or more aspects of, a user's personal media data. In a further embodiment, selection of the data to be synchronized can be automatic. For example, a user may associate an event such as a media release with an automatic synchronization request which will automatically add to or update the user's personal information space when the event occurs. Optionally, a verification step 11 may prompt the user to confirm the data selection is correct.

A user identification step ensures that the information selected in step 10 will in fact be provided to the correct personal information space for the user selecting the data.

6

Such identification can take place in the form of a separate login, or may use any unique identifier, such as a cookie inserted into a web browser on an individual's computer, to identify the user and the user's personal information space to which data selected at step 10 will be provided. Optionally, step 12 may be further used to allow the user to determine whether the data which has been selected in step 10 is in fact the correct data which the user wishes to be inserted into the private information space. The identifying step may comprise a pop-up window setting forth a user name and password login, can provide the user at least one opportunity to identify themselves, as well as ensure that erroneous information is not provided to his or her personal information space by incorporating the verification step 11 into the login prompt. If the data is not correct, the method returns to step 10. If the data is correct, the user may indicate his acceptance of such data by performing a user-perceptible action, such as clicking on a virtual button in the web browser or other application, depressing a hardware switch, providing a voice command, or any other indicative action signifying virtual correctness of the data. If the user's ID is not ascertained, then the user may be provided the option of establishing a personal information space at step 15. At step 14, if the user's ID is verified, the data is inserted into the private information space. Once inserted into the private information space, the data can be synchronized to any number of different devices as described in patent application Ser. No. 09/490,550 now U.S. Pat. No. 6,694,336; Ser. No. 09/491,675 now copending; and Ser. No. 09/491,694 now U.S. Pat. No. 6,671,757.

FIG. 2 shows one manner in which media information may be inserted into private information space. The method shown in FIG. 2 is shown from an individual user's perspective of how the steps in the method occur.

As noted above, personal or public media information from, for example, a file system stored on a server or private data store may be utilized in accordance with the system of the present invention. In the example shown in FIG. 2, an explorer window view 10' of a particular file system and a directory selection application, allowing access to particular file system folders via a window view 10" are shown as two alternative methods of selecting media data. In window 10', a user may select one or more of the files listed in the file system window and press a sync button 65 which may be provided on the menu bar of the window. Pressing sync button 65 in conjunction with selecting data in the window initiates a sync request which then allows data to be moved into the personal information space in accordance with steps 24-27 and 14. Window 10" shows a mechanism for selecting one or more folders by depressing the "okay" button 66 in selection window 10"', thereby designating that all files in the file system folder are to be synchronized into the personal information space. Alternate forms of selection of media data, such as, for example, those enunciated above or simply interacting with a web page enabling a sync request by clicking on a button 65 in a web page are contemplated. It should be further recognized that the synchronization may be two-way or one-way: that is, files from the space may be moved to the individual folders shown in FIG. 10"' or into the file system shown in FIG. 10' from file system shown in FIG. 10' and 10"'. Alternatively, the system may be utilized to ensure that media entering or changed in one or more of the file systems have changes reflected in selected devices which are part of the information space, as described below.

After data is selected at step 10, a sync request at step 22 is placed by the user. It should be recognized that other alternatives for initiating the sync request may be utilized in accordance with the present invention. The button may be physical

7

or virtual, and may comprise menu selection, a virtual button, a combination of keystrokes, or any other user-initiated user-interface event.

Following the sync request at step **22**, a determination of whether the user is known to the personal information space **14** must be made. At step **24**, a yes answer may comprise the affirmative identification of the user's identity from a cookie placed on the user's web browser on the user's personal computer. Other forms of identification may alternatively be used, such as remembering the user's identity from the previous login entry, or other forms of unique identification.

If the user's identity is not known, and the user is not a new user, at step **26** the user is provided with an opportunity to enter the username and password. It should be recognized that the username and password in this instance may provide a system login entry, however all that is required is the provision of a unique identifier to the personal information space to which the digital media is to be synchronized. It should be further recognized that the temporal relationship between the login process at step **26** and the determination of a new user at step **25** need not occur in any particular order. Graphics **45** shows how a username and password might be entered into the step **26**. As shown therein, a dialog box **47** may be provided adjacent to the explorer window so that such information might be added. Alternatively, a separate window may be provided with fields **45***a*, **45***b* and sync button **45***c* to enable the digital media information to be entered into the personal information space. The user may thus provide the unique identifier user name and password to the system of the present invention in order to identify the personal information space to which data is to be inserted at step **14**.

If the user is a new user, at step **25**, a registration interface **27** may be provided so that the user may identify a new unique personal information space for that particular user. Registration may include providing information as shown in window **60** to identify the user's personal information space. It should be recognized that the information shown in window **60** is exemplary and, at a minimum, all that is required is a unique user name to be associated with the personal information space.

Once the user information space is identified, the data can be inserted into the user's unique personal information space at step **14**.

FIG. **3** illustrates one manner by which data may enter the personal information space of a particular user. FIG. **3**, in one instance, represents an extension of the method shown in FIG. **2** wherein a user selects media data from a public (or private) source. It should be understood that information may be added to the private information space by any number of means, and the method shown in FIG. **3** is only one exemplary method for doing so.

In FIG. **3**, a user **550** interacts with, for example, a browser application **100**, such as a World Wide Web browser, which allows the user access to an information store. The store may be any public or private storage server coupled to a network, such as, for example, the Internet. While the present invention will be described with respect to its implementation in an Internet environment wherein the interface is a client browser **100**, it should be recognized that the user may act with other types of systems to access content, including a private file system via a command line or graphic interface, a telephone having access to media information via a wireless network connection (such as a cellular phone equipped with a Wireless Application Protocol (WAP) browser), a personal computer, network-connected content managers, or any other hardware or software applications which may provide data to the personal information space.

8

In the example of FIG. **3**, user **550** connects to server **110** which may be affiliated with an administrator of the private information space in order to more readily implement the functionality described herein. Alternatively, server **110** may be any publicly accessible server.

Generally, media information may be provided on any network-coupled storage device or server. In the affiliate server **110** shown in FIG. **3**, code, such as HTTP protocol code, is provided which allows the implementation of the transference of public data from the affiliate server to the user's private information space.

In one case, the affiliate server **110** may comprise an Internet World Wide Web server such as that as may be provided by a web portal service, such as Yahoo!™, Excite^SM Lycos®, MSNBC, or MP3.com, which provide an interface to public media content. Affiliate server **110** may also comprise a specialized web server such as a music, video or other media file service provider, a performance group's web server, an online retailer's web server, a shared network server running a media-sharing application such as Napster or Gnutella, or any number of different types of Internet-based sources providing media content which a user will desire to synchronize with the user's personal information space. The affiliate server could also be a simple file server which provides access to data files and enables synchronization to the personal information space by implementing HTTP code in accordance with the following description using a secondary link or re-direct.

Affiliate server **110** may include, for each piece of content which the affiliate server system administrator deems appropriate for such synchronization, code enabling the display of a synchronization implementation interface, such as button **65** on a file system display **10'**, shown in FIG. **2**. In this example, when a piece of data is provided by the affiliate server which a user wishes to synchronize to the private information space, the user marks the data by, for example, highlighting it, and then "clicks" button **65** to initiate the synchronization process. Following clicking on button **65**, a sync pop-up window **120** will be provided by a sync service server **130**.

Sync server **130** is maintained by a sync service administrator who may control portions of the system of the invention denoted as being within dashed line **250**. A servlet provided on the sync server **130** records selection of the media information to be transmitted to the personal information space and displays the data/login window. Each servlet requires that an affiliate ID (AID) be provided along with the actual media information, which can then be transferred to the user's specific personal information space upon provision of the identifier for the personal information space.

If the user is known, sync server **130** can provide the information set forth above directly to a server device engine **140** which can then transfer the information to the personal information space stored in a database **200** as described in the patent application Ser. Nos. 09/490,550 now U.S. Pat. No. 6,694,336; Ser. No. 09/491,675 now copending; and Ser. No. 09/491,694, now U.S. Pat No. 6,671,757. The interaction of the storage server **200** with the device engine **140** is described in further detail below.

If a user is not known, a new user registration routine is initiated at step **135**, and a new account pop-up window **145** is generated. Communication between the synchronization pop-up window **120** and the new account pop-up window **145** may occur by secure socket layer (SSL) communication. The new account pop-up window will be provided by a web server **150** which may comprise a user interface specifically tailored to the individual user's personal information space. Through web server **150**, the user is allowed to customize the types of

9

devices and the types of information which are provided to those devices in the personal information space **200**. Communication between the sync service server **130** and the server device engine **140** can occur behind the firewall provided by the sync service provider and hence there is no need for secure communication between the engine and the sync service server.

One example of media information which may be provided into personal information space is to utilize the aforementioned system on a public information server which allows transference of data files, such as executables, documents, or digital music files (MP3's) from the public information space to the personal information space. As shown in FIG. **4**, data from storage server **200** is then considered part of the personal information space and may be thereafter synchronized to any one or all of the devices coupled within the user's space, including personal computers, PDA's, automotive PC's, and the like.

FIG. **4** shows an exemplary embodiment of the system of the present invention including a mechanism for synchronizing personal information space provided in a storage server **200** with a generic Internet appliance **400** shown in FIG. **4**. Also shown are specific examples of Internet appliances which may be coupled to the storage server **200**. Generic user device **400** may be a personal computer which includes a microprocessor **410**, data included in volatile or non-volatile memory **415**, and a network interface **420**. Network interface **420** may comprise either a direct connection via a wireline or wireless coupling to the Internet **250** or an interface to another device which can connect to the storage server **200** either directly or via a local area network, a wide area network or open source global network. The device **400** requires only enough processing power and memory to decode the data stream provided from server **200**.

In one embodiment, the network coupled device may be an Internet-coupled stereo **300** having a microprocessor **315**, volatile and/or non-volatile memory **320**, and a network interface **325**.

Shown in conjunction with storage server **200** are server device engines **202** and **204**. Server device engines **202**, **204** are used primarily where the network coupled device does not include enough memory or power to efficiently run the device engine on the device itself. Each device engine includes components acting in conjunction with applications, file structures, and devices to extract media data to be synchronized and construct one or more transactions comprising difference data to be exchanged with other devices and device engines in the personal information space in order to move data between devices and the storage server **200**.

In accordance with the present invention, digital media files of varying formats, and other data, may be synchronized or transferred (uni-directionally) to any network coupled appliance **400** utilizing the system of the present invention. Alternatively, no storage need occur on the network device, but digital media may be broadcast by device engines **202**, **204** to device **300** which decodes the broadcast stream on the fly (or with buffering of the stream) to provide digital media content to an output of the device. Any number and type of devices, either capable of supporting a device engine **308** on the device, or coupled to a server device engine **202** on the storage server **200**, may be used in accordance with the present invention.

The specific structure and operation of the server and client based device engines are described generally with respect to FIG. **5** and are disclosed in further detail in patent application

10

Ser. Nos. 09/490,550 now U.S. Pat No. 6,694,336; Ser. No. 09/491,675 now copending and 09/491,694, now U.S. Pat. No. 6,671,757.

In general, PCs such as those illustrated in FIG. **4** will likely have their own device engine, while hand-held PCs and automotive PCs also disclosed in FIG. **4** will not.

FIG. **5** shows an example of a client device engine **324** utilized in accordance with the present invention for synchronizing media data.

In general, an individual device engine for each device which is a part of the private information space is provided, and is distributed across the collection of devices comprising the personal information space. Distribution of the device engines may occur via, for example, an installation package forwarded over the network from storage server **200** or another distribution point, or may be loaded by conventional means (a diskette, CD ROM, DVD installation disk) onto server **400**.

FIG. **5** illustrates a device engine wherein all processing occurs on the device and only difference information is transmitted to server **200**. The client device engine **324** shown in FIG. **5**, may be operable entirely within the construct **410** of Internet appliance **400**. Alternatively, portions of the device engine may be provided on the network appliance **400**, with other portions on the storage server. Alternatively, a server based device engine may be entirely located on storage server **200** as a stand-alone device engine which merely interacts with an application programming interface of network device **400**.

As shown in FIG. **5**, each device engine **324** includes an application object **510**. The application object is specific to each particular software application **810** running on the network-coupled device, and provides a standard interface between the device engine and the balance of the data transmission system of the invention, and the application **810**. Details of the application object will be described below. The application object is a pluggable architecture which supports a wide variety of vendor-unique applications and file structures. The job of the application object is to map data from the application into a temporary or "universal" data structure by connecting to the application via any number of standard interfaces to gain access to the applications data. The data structure of the application object puts the data in a generic or "universal data" format which may be used by the device engine components to generate data packages for provision to the storage server.

It should be specifically noted that the application object may interface directly unstructured binary data such as digital media files (using the aforementioned XDelta routine) or with structured application data such as contact and calendar information (resolving items at the field level of information in a given record). The differencing routine supports both uses of the delta module **550** in comparison generation.

Also provided is an application object store (AOS) **520** which includes a copy of the device's data at a point just after the previous data extraction and synchronization occurred. Application object store **520** is a mirrored interface which stores a snapshot of the previous state of the data from the application object **510** in the device engine. In the case of the device engine for network devices having minimal nonvolatile storage, the AOS may be provided on the server **200** to conserve space on the network device. The size of the AOS will depend on the data being collected by each device engine. The AOS is one component in particular which may be off-loaded to a server to conserve space on the network device in one hybrid device/server device engine embodiment.

US 7,587,446 B1

11

The generic output of the application object is provided to a delta module **550**. Delta module **550** is a differencing engine which calculates differences in data between the output of the application object **510** and the copy of the data which is provided in an application object store (AOS) **520**. The actual differencing and patch routine can comprise a routine such as XDelta or YDelta. The delta module **550** will be referred to herein alternatively in certain portions of the description as "CStructuredDelta." In addition, the difference information is alternatively referred to herein as a "change log." Each change log (or set of difference information) is a self describing series of sync transactions. As described below, the change log may be encrypted and compressed before output to the network and server **200**.

Hence, during a sync or transfer, the Application Object will, using a mechanism discussed below, extract the data of each application in the device and convert it to a universal data format. The delta module will then generate a difference set by comparing the output of the Application Object and the AOS. This difference information is forwarded to the encryption and compression routines for output to the storage server **550** in the form of a data package.

Device engine **560** further includes a versioning module which applies a version number per object in the data package. As explained further below, each object in the data package is assigned a universally unique ID (UUID). Hence, unlike many prior synchronization systems, the system of the present invention does not sync data solely by comparing time stamps of two sets of data. Versioning module **515** allows each device engine to check the state of the last synchronization against data packs which have been provided to the storage server to determine which data packages to apply. This allows the device engine to sync itself independently of the number of times another device engine uploads data packages to the storage server. In other words, a first device engine does not care how many times a second device engine uploads data packages to the server.

An events module **525** controls synchronization initialization events. Items such as when to sync, how to sync, trigger the delta module **550** to perform a synchronization operation.

A user interface **530** is provided to allow additional functional features to a system user of the particular device to which the device engine **560** is coupled. The user interface is coupled to a conflict resolution module **540**, a filtering module **545**, and a field mapping module **535**. Each of the modules provides the functionality both necessary for all synchronization programs, and which users have come to expect. In one aspect the user interface may be a unique application allowing the user to identify data to be transferred and presenting data manipulation options, or may be as simple as a sync button on a standard interface such as a file listing display window.

Where non-binary data is being transferred, filtering module **545** allows filtering for types of content based on, for example, a field level content search. The field mapping module **535** allows for the user to re-map certain interpretations of items which were provided in the document stream. It should be recognized that the field mapping module allows for changes in directing the output of the data package. The field mapping module **535** is not necessary to map particular data fields of, for example, contact information from one application, such as Microsoft Outlook, to a different application, such as Symantec's ACT, as is the traditional use of field mapping and synchronizing applications.

Delta module **550** is further coupled to a compression module **570** and an encryption module **560**. It should be recognized that the compression encryption modules need not be enabled. Any type of compression module **570**, such as the popular PK Zip or Winzip modules, or those available from HiFn Corporation may be utilized in accordance with the invention. Moreover, any type of encryption algorithms,

12

such as MD5, RCH 6, Two Fish, or Blowfish, or any other symmetric encryption algorithm, may be utilized. In one embodiment of the invention, encryption without compression is used. In a second embodiment of the invention, compression without encryption is used. In a third embodiment of the invention, neither compression or encryption is used, and in a fourth embodiment of the invention, both compression and encryption are used.

Versioning module **515** also allows the device engine **324** to support multiple users with distinct synchronization profiles. This allows multiple users accessing the same machine to each synchronize their own data set using the same device engine.

The output of the device engine **324** comprises a data package which is output to storage server **850**. As noted above, only one device engine need be connected to the storage server **850** at a given time. The data package can be stored on the storage server **850** until a request is made to a particular location of the storage server by another device engine. Likewise, delta engine **324** can query alternative locations on the storage server for access to synchronized data within the system of the present invention. In one embodiment, each sync operation requires that the device engine for each device login to a management component of the system server to authenticate the device and provide the device engine with the location of the individual device's data packages on the storage server.

Data packages may be advantageously provided to the device engine from the storage server in a streaming format, allowing processing to occur using a minimum of bandwidth and storage in the devices. This is particularly advantageous in applications involving large files, such as digital media files.

The device engine **534** and particularly the delta module **550** interpret data packages based on the versioning information and the mirrored data present in the application object store **520**. When data is returned to the delta module **550** from the storage server **300**, the delta module returns differenced data to the application object **510** for the particular application which then translates the delta information into the particular interface utilized for application **510**. Once a device engine has been fully applied all data packages from an input stream, it generates a series of data packages that describe the changes made on the local system. The device engine uses the local application object store **520** to keep track of the last synchronized version of each application's actual data, which is then used for the next data comparison by the delta module on the next sync request. Generated data packages can include operations and encode changes generated from resolving ambiguous cases as described above.

Each Application Object (AO) is a software component that interfaces with the third party application APIs (Application Programming Interface) to provide the programming services to the delta module for extraction and deposition of information data from and to the third party application domain during synchronization. In addition, the AO maps the third party application data fields in non-binary information to the system's domain. With binary files, the AO allows changes to be applied to binary files within the file structure of the target client. (For example, MP3 files can be uploaded from a Microsoft Windows machine to the storage server, then downloaded to a Linux file structure).

In the Microsoft Windows device engine, the AO service is a collection of COM (Component Object Model) objects that can be developed in conjunction with, for example, third party Windows application APIs as a form of a DLL (Dynamic Linked Library) in C or C++. The DLL may be loaded on demand at runtime during synchronization. It should be recognized that the application object need not be imple-

US 7,587,446 B1

13

mented using the COM model, but may be developed with other distributed object models.

Each AO has a COM interface-based design built-in. That is, instead of providing a set of traditional APIs as programming services, it provides a set of interface-based objects as programming services.

The delta module **550** instantiates these COM objects and uses them throughout the synchronization session exclusively through the COM interfaces on those objects to interface with the third party application database.

For calendar or PIM information, each AO component consists of a set of objects that translate the third party application data into the universal data middle format which underpins the entire spectrum of PIM data regardless of which third-party application the data comes from. The objects in universal data format are device, (application) data class, store, folder, item, and data fields. The AO digests the third party application data of any kind and reduces it into a few handful simple objects and field types. These objects and field types are fed into the delta module engine and are compared by the delta module in order of their hierarchy. The resulting differences (add, delete, modify) are logged as transactions in the difference information. The data packs are transported to a storage server that may be actively managed by a management server for each individual user account and devices.

The delta module **530** uses AO objects to access and modify the individual AO objects and data fields. AO objects serve as a buffer between individual application data and the delta module so that the delta module does not require knowledge of each application and database. All AO objects are temporary and created in the space of each AO by the delta module through COM interfaces. AO objects are referenced when they are in use and they are freed when the delta module stops using them. One can think of AO objects as merely placeholders of each application objects for the delta module to access. Once the delta module has a particular Application's data, the delta module frees AO objects immediately without storing them internally.

Hence, a user can, via the Internet, select music files for transference to the user's personal information space and output such files on any device which is coupled to a network.

The many features and advantages of the present invention will be apparent to one of average skill in the art. All such features and advantages are intended to be within the scope of the invention as defined by the above specification and the following claims.

What is claimed is:

1. A method of transferring media data to a network coupled apparatus, comprising:

   (a) maintaining a personal information space identified with a user including media data comprising a directory of digital media files, the personal information space being coupled to a server and a network;

   (b) generating a first version of the media data in the personal information space;

   (c) generating a digital media file, in response to an input from the user, comprising a second version of the media data in a same format as the first version in the personal information space, the second version including an update not included in the first version;

   (d) obtaining difference information comprising differences between the first version of the media data and the second version of the media data; and

   (e) transferring a digital media file over the network containing the difference information from the personal information space to the network coupled apparatus in

14

response to a sync request made from a web browser at the network-coupled apparatus by the user.

   **2.** The method of claim **1** further including the step, prior to step (a), of receiving information into the personal information space.

   **3.** The method of claim **2** wherein the step of receiving comprises receiving data from a first network coupled apparatus, and said step (e) includes transferring said media data to a second network coupled apparatus.

   **4.** The method of claim **1**, wherein the network coupled apparatus is an automotive computer.

   **5.** The method of claim **4** further including the step, following step (a), of identifying the personal information space associated with the user by prompting a user login from said automotive computer and retrieving login information input by the user.

   **6.** The method of claim **1** wherein the media data comprises a directory of digital media files.

   **7.** The method of claim **1** wherein said step (a) comprises providing a storage server having a network connection, and code on the storage server interacting with the personal information space.

   **8.** The method of claim **1** wherein the method further includes:

   (f) providing code on a network-coupled apparatus which receives said difference information and stores the difference information on the network-coupled apparatus.

   **9.** The method of claim **1** wherein said step of transferring comprises instantiating code on a network-coupled server storing said personal information space to output the difference information to the network-coupled apparatus.

   **10.** The method of claim **1** wherein said step of transferring comprises instantiating code on the network-coupled apparatus to retrieve the difference information.

   **11.** A system for transferring digital media between a plurality of network coupled devices, comprising:

   a personal information store identified with a user containing digital media comprising a directory of digital media files readable by an application program; and a processing device, a server and a network coupled with the personal information store, the processing device including:

   an application data store holding a version of the digital media in the personal information store, and a device engine to: a) generate a digital media file, in response to an input from the user, comprising a second version of the media data in a same format as the first version in the personal information store, the second version including an update not included in the first version; (b) obtain difference information comprising differences between the first version of the media data and the second version of the media data; and (c) transfer a digital media file over the network containing the difference information from the personal information space to the network coupled apparatus in response to a sync request made from a web browser at the network-coupled apparatus by the user.

   **12.** The system of claim **11** wherein the personal information store is provided on a server.

   **13.** The system of claim **12** wherein the server is coupled to the Internet.

   **14.** The system of claim **11** wherein the device engine is provided on a server which includes at least a portion of the personal information store.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,587,446 B1                                          Page 1 of 1
APPLICATION NO. : 09/710162
DATED                    : September 8, 2009
INVENTOR(S)        : Onyon et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title Page
Page 3, References

Page 3, which is a continuation of Cover Page field (56) References Cited, please replace
"2004/0188235" with "2004/0192260" so that the field correctly reads

-- 2004/0192260 A1   9/2004  Sugimoto et al. .......... 455/412.1 --

Signed and Sealed this

Twenty-third Day of February, 2010

David J. Kappos
*Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,587,446 B1                                                    Page 1 of 1
APPLICATION NO. : 09/710162
DATED              : September 8, 2009
INVENTOR(S)      : Onyon et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:

The first or sole Notice should read --

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1248 days.

Signed and Sealed this

Twenty-first Day of September, 2010

David J. Kappos
*Director of the United States Patent and Trademark Office*

# EXHIBIT E-3

US006671757B1

(12) **United States Patent**

Multer et al.

(10) Patent No.: **US 6,671,757 B1**

(45) Date of Patent: **Dec. 30, 2003**

(54) **DATA TRANSFER AND SYNCHRONIZATION SYSTEM**

(75) Inventors: **David L. Multer**, Santa Cruz, CA (US); **Robert E. Garner**, Lawrenceville, GA (US); **Leighton A. Ridgard**, Ellenwood, GA (US); **Liam J. Stannard**, Lawrenceville, GA (US); **Donald W. Cash**, Dunwoody, GA (US); **Richard M. Onyon**, San Jose, CA (US)

(73) Assignee: **fusionOne, Inc.**, San Jose, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/491,694**

(22) Filed: **Jan. 26, 2000**

(51) Int. Cl.$^7$ ............................................... **G06F 13/00**

(52) U.S. Cl. ...................... **710/100**; 710/200; 710/220; 710/1; 707/201; 707/203; 711/162

(58) Field of Search .......................... 710/100, 1, 220, 710/300; 707/8, 201, 203; 711/162

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,392,390 A | 2/1995 | Crozier ...................... 395/161 |
| 5,519,606 A | 5/1996 | Frid-Nielsen et al. ....... 364/401 |
| 5,628,005 A | * 5/1997 | Hurvig ........................... 707/8 |
| 5,630,081 A | 5/1997 | Rybicki et al. .............. 395/348 |
| 5,666,553 A | 9/1997 | Crozier ...................... 395/803 |
| 5,682,524 A | 10/1997 | Freund et al. .............. 395/605 |
| 5,684,990 A | 11/1997 | Boothby ..................... 395/619 |
| 5,694,596 A | 12/1997 | Campbell |
| 5,701,423 A | 12/1997 | Crozier ...................... 395/335 |
| 5,710,922 A | 1/1998 | Alley et al. ................. 395/617 |
| 5,727,202 A | 3/1998 | Kucala ....................... 395/610 |
| 5,729,743 A | 3/1998 | Squibb ....................... 395/619 |
| 5,742,792 A | * 4/1998 | Yanai et al. .................. 710/1 |
| 5,745,906 A | 4/1998 | Squibb ..................... 707/203 |
| 5,768,597 A | 6/1998 | Simm |
| 5,771,354 A | 6/1998 | Crawford |

| | | | |
|---|---|---|---|
| 5,778,346 A | 7/1998 | Frid-Nielsen et al. .......... 705/9 |
| 5,787,247 A | 7/1998 | Norin et al. |
| 5,787,262 A | 7/1998 | Shakib et al. |
| 5,809,497 A | 9/1998 | Freund et al. |
| 5,812,773 A | 9/1998 | Norin |
| 5,812,793 A | 9/1998 | Shakib et al. |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 986 225 A1 | 3/2000 |
| WO | WO 99/05813 | 2/1999 |
| WO | WO 99/06900 | 2/1999 |
| WO | WO 99/36870 | 7/1999 |
| WO | WO 99/45451 | 9/1999 |
| WO | WO 99/45484 | 9/1999 |
| WO | WO 99/50761 | 10/1999 |
| WO | WO 00/11832 | 3/2000 |
| WO | WO 01/71539 | 9/2001 |

OTHER PUBLICATIONS

Starfish, "TrueSync Data Synchronization", Software, http://www.starfishsoftware.com/solutions/data/data.html.*

Primary Examiner—Gopal C. Ray
Assistant Examiner—Justin I. King
(74) Attorney, Agent, or Firm—Vierra Magen Marcus Harmon & DeNiro LLP

(57) **ABSTRACT**

A system and method for synchronizing devices which can couple to the Internet, or any network. The system includes a first sync engine on the first system interfacing with data on the first system to provide difference information. A data store is coupled to the network and in communication with the first and second systems. A second sync engine is provided on the second system coupled to receive the difference information from the data store via the network, and interface with data on the second system to update said data on the second system with said difference information. Difference information is transmitted to the data store by the first sync engine and received from the data store from the second sync engine.

29 Claims, 13 Drawing Sheets



US 6,671,757 B1

Page 2

### U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,832,489 | A | | 11/1998 | Kucala ........................ | 707/10 |
| 5,884,323 | A | | 3/1999 | Hawkins et al. ............ | 707/201 |
| 5,884,325 | A | | 3/1999 | Bauer et al. | |
| 5,893,119 | A | | 4/1999 | Squibb ........................ | 707/203 |
| 5,897,640 | A | | 4/1999 | Veghte et al. | |
| 5,897,642 | A | * | 4/1999 | Capossela et al. .......... | 707/203 |
| 5,937,405 | A | | 8/1999 | Campbell | |
| 5,943,676 | A | | 8/1999 | Boothby ..................... | 707/201 |
| 5,961,590 | A | | 10/1999 | Mendez et al. | |
| 5,968,131 | A | | 10/1999 | Mendez et al. ............. | 709/246 |
| 5,974,238 | A | | 10/1999 | Chase, Jr. | |
| 6,000,000 | A | | 12/1999 | Hawkins et al. | |
| 6,006,274 | A | | 12/1999 | Hawkins et al. | |
| 6,012,063 | A | | 1/2000 | Bodnar | |
| 6,016,478 | A | | 1/2000 | Zhang et al. | |
| 6,023,708 | A | | 2/2000 | Mendez et al. ............. | 707/203 |
| 6,023,723 | A | * | 2/2000 | McCormick et al. .......... | 707/1 |
| 6,044,381 | A | * | 3/2000 | Boothby et al. ............. | 707/201 |
| 6,052,735 | A | | 4/2000 | Ulrich et al. | |
| 6,061,790 | A | | 5/2000 | Bodnar | |
| 6,131,096 | A | | 10/2000 | Ng et al. | |
| 6,131,116 | A | | 10/2000 | Riggins et al. | |
| 6,141,011 | A | | 10/2000 | Bodnar et al. | |
| 6,141,664 | A | | 10/2000 | Boothby | |
| 6,151,606 | A | | 11/2000 | Mendez | |
| 6,182,117 | B1 | | 1/2001 | Christie et al. | |
| 6,202,085 | B1 | | 3/2001 | Benson et al. | |
| 6,205,448 | B1 | | 3/2001 | Kruglikov et al. | |
| 6,212,529 | B1 | | 4/2001 | Boothby et al. | |
| 6,216,131 | B1 | | 4/2001 | Liu et al. | |
| 6,219,694 | B1 | | 4/2001 | Lazaridis et al. | |
| 6,223,187 | B1 | | 4/2001 | Boothby et al. | |
| 6,226,650 | B1 | | 5/2001 | Mahajan et al. | |
| 6,247,135 | B1 | | 6/2001 | Feague | |
| 6,275,831 | B1 | | 8/2001 | Bodnar et al. | |
| 6,295,541 | B1 | * | 9/2001 | Bodnar et al. .............. | 707/203 |
| 6,304,881 | B1 | | 10/2001 | Halim et al. | |
| 6,324,544 | B1 | * | 11/2001 | Alam et al. ................. | 707/201 |
| 6,330,568 | B1 | | 12/2001 | Boothby et al. | |
| 6,401,104 | B1 | * | 6/2002 | LaRue et al. ............... | 707/203 |
| 6,405,218 | B1 | | 6/2002 | Boothby | |
| 6,449,622 | B1 | * | 9/2002 | LaRue et al. ............... | 707/201 |
| 6,487,560 | B1 | * | 11/2002 | LaRue et al. ............... | 707/203 |

* cited by examiner



Figure1

Figure 2



Figure 3

Figure 4



Figure 5



Figure 6



Figure 7



Figure 8

Storage Server
850
710
Device Engine/Cellular
862
Device Engine/Palm
864
Device Engine/Windows
866
Device Engine/Web
868
Server
Client
Application data
822
Application data
824
Application data
826
Application data
828
MAPI storage
IMAP interface
Palm database
Cellular database
Web database
XML data
etc.
32
Cellular contacts, appointments, tasks
812
Palm applications
814
Windows, Outlook, ACT, Goldmine, Organizer, IE, Maximizer, Eudora, Netscape
816
Web portal applications
818
834
836
838
Telephone
802
PDA
804
Browser
808
806
Windows 95/98/NT



Figure 9A
Desktop
Device Engine

Figure 9B



Device Engine/Windows

Figure 10



Figure 11



Figure 12
Object Hierarchy



**U.S. Patent**     **Dec. 30, 2003**     **Sheet 9 of 13**     **US 6,671,757 B1**

Figure 13

**Note Item 1310**
Note Object
Categories
Color
Created
Do Not
AutoArchive
Icon
In Folder
Message Class
Modified
Outlook Internal
Version
Outlook Version
Read
Size
Subject

**Email Item 1320**
Account
Attachment
Bcc
Billing
Information
Categories
Cc
Changed By
Conversation
Created
Defer Until
Do Not
AutoArchive
Download State
Due By
Expires
Flag Status
Follow Up Flag
From
Have Replies
Sent To
Icon
Importance
In Folder
Junk E-mail
Type
Message Class
Mileage
Modified
Outlook Internal
Version
Outlook Version
Read
Received
Remote Status
Retrieval Time
Sensitivity
Sent
Size
Subject
To
Tracking Status

**Task Item 1330**
% Complete
Actual Work
Assigned
Attachment
Billing
Information
Categories
Company
Complete
Contacts
Conversation
Created
Date Completed
Do Not
AutoArchive
Due Date
Icon
in Folder
Message Class
Mileage
Modified
Outlook Internal
Version
Outlook Version
Owner
Priority
Read
Recurring
Reminder
Reminder
Override Default
Reminder Sound
Reminder Sound
File
Reminder Time
Request Status
Requested By
Role
Schedule+
Priority
Sensitivity
Size
Start Date
Status
Subject
Team Task
To
Total Work

**Calendar Item 1340**
All Day Event
Attachment
Billing
Information
Categories
Conversation
Created
Do Not
AutoArchive
Duration
End
Icon
Importance
In Folder
Location
Meeting Status
Message Class
Mileage
Modified
Optional
Attendees
Organizer
Outlook Internal
Version
Outlook Version
Read
Recurrence
Recurrence
Pattern
Recurrence
Range End
Recurrence
Range Start
Recurring
Remind
Beforehand
Reminder
Reminder
Override Default
Reminder Sound
Reminder Sound
File
Required
Attendees
Resources
Response
Requested
Sensitivity
Show Time As
Size
Start
Subject

**Bookmark Item 1350**
Name
URL
Created
Modified
Icon
in Folder
Version
Size

**Channel Item 1370**
Name
URL
Created
Modified
Icon
In Folder
Version
Size

**File Item 1360**
Name
Type
Version
Size
Created
Modified
Accessed
Permissions
Parent
ID
Attributes
Icon
Shortcut key
Start in
Run type
Sharing

**Folder Item 1380**
Name
Type
Version
Size
Created
Modified
Accessed
Permissions
Parent
ID
Attributes
Icon
Sharing

**Contact Item 1390**
Account
Address Selected
Address Selector
Anniversary
Assistant's Name
Assistant's Phone
Attachment
Billing Information
Birthday
Business Address City
Business Address
Country
Business Address PO Box
Business Address Postal
Code
Business Address State
Business Address Street
Business Fax
Business Home Page
Business Phone
Business Phone 2
Callback
Car Phone
Categories
Children
City
Company
Company Main Phone
Computer Network Name
Country
Created
Customer ID
Department
E-mail
E-mail 2
E-mail 3
E-mail Selected
E-mail Selector
File As
First Name
Flag Status
Follow Up Flag
FTP Site
Full Name
Gender
Government ID Number
Hobbies
Home Address
Home Address City
Home Address Country
Home Address PO Box
Home Address Postal
Code
Home Address State
Home Address Street
Home Fax
Home Phone
Home Phone 2
Icon
In Folder
Initials
Internet Free/Busy
Address
ISDN
Job Title
Journal
Language
Last Name
Location
Mailing Address
Mailing Address Indicator
Manager's Name
Message Class
Middle Name
Mileage
Mobile Phone
Modified
Nickname
Office Location
Organizational ID Number
Other Address
Other Address City
Other Address Country
Other Address PO Box
Other Address Postal
Code
Other Address State
Other Address Street
Other Fax
Outlook Internal Version
Outlook Version
Pager
Personal Home Page
Phone 1 Selected
Phone 1 Selector
Phone 2 Selected
Phone 2 Selector
Phone 3 Selected
Phone 3 Selector
Phone 4 Selected
Phone 4 Selector
Phone 5 Selected
Phone 5 Selector
Phone 6 Selected
Phone 6 Selector
Phone 7 Selected
Phone 7 Selector
Phone 8 Selected
Phone 8 Selector
PO Box
Primary Phone
Private
Profession
Radio Phone
Read
Referred By
Reminder
Reminder Time
Reminder Topic
Send Plain Text Only
Sensitivity
Size
Spouse
State
Street Address
Subject
Suffix
Telex
Title
TTY/TDD Phone
User Field 1
User Field 2
User Field 3
User Field 4
Web Page
ZIP/Postal Code

Figure 14





Figure 15
Pull Synchronization

Figure 16
Push Synchronization

Figure
17



US 6,671,757 B1

1

# DATA TRANSFER AND SYNCHRONIZATION SYSTEM

## LIMITED COPYRIGHT WAIVER

A portion of the disclosure of this patent document contains material to which the claim of copyright protection is made. The copyright owner has no objection to the facsimile reproduction by any person of the patent document or the patent disclosure, as it appears in the U.S. Patent and Trademark Office file or records, but reserves all other rights whatsoever

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The invention relates to the transference of data between two systems independent of the form in which the data is kept on the respective systems, and in particular to providing an efficient means of communicating data between systems and devices.

### 2. Description of the Related Art

The growth of computing-related devices has not been limited to personal computers or work stations. The number of personal computing devices has grown substantially in both type and format. Small, hand-held computers carry a multitude of contact, personal, document, and other information and are sophisticated enough to allow a user to fax, send e-mails, and communicate in other ways wirelessly. Even advanced cellular phones carry enough memory and processing power to store contact information, surf the web, and provide text messaging. Along with the growth in the sophistication of these devices, the need to transfer information between them has grown significantly as well.

With a multitude of different device types on the market, keeping information between the different devices synchronized has become increasingly problematic. For example, if an individual keeps a calendar of information on a personal computer in his or her office using a particular personal information manager application, the individual would generally like to have the same information available in a cellular phone, hand-held organizer, and perhaps a home personal computer. The individual may additionally have a notebook computer which requires synchronizing file data such as presentations or working documents between the notebook and the office computer.

Until now, synchronization between both documents and personal information managers has occurred through direct connection between the devices, and generally directly between applications such as a personal information manager in one device and a personal information manager in another device or using an intermediary sync-mapping program.

One example of this is the prevalent use of the 3Com Palm® OS-based organizer, such as the 3Com Palm® series of computing devices, which uses its own calendaring system, yet lets users synchronize the data therein with a variety of different personal information manager software packages, such as Symantec's ACT!™, Microsoft's Outlook®, and other systems. In this example, an intermediary synchronization program such as Puma Technology, Inc.'s Intellisync® is required. Intellisync® is an application program which runs on both the hand-held device and the computer which stores the information data and maps data systems between non-uniform data records. In other cases, direct transfer between applications such as transfer between

2

Microsoft's Outlook® computer-based client and Microsoft's Windows CE "Pocket Outlook" application, is possible. Nevertheless, in both cases, synchronization occurs through direct connection between a personal computer and the personal computing device. While this connection is generally via a cable directly connecting, for example, Palm® device in a cradle to the personal computer, the connection may be wireless as well.

One component of these synchronization systems is that the synchronization process must be able to delineate between when changes are made to specific databases and must make a decision about whether to replace the changed field. Normally, this is measured by a change in one database, and no-change in a second database. In some cases, both databases will have changed between syncs. In this case, the sync operation must determine which of the two changes which has been made is to "win" and replace the other during the sync. Generally, this determinant of whether a conflict exists allows some means for letting the user resolve the conflict.

In a technical sense, synchronization in this manner is generally accomplished by the copying of full records between systems. At some level, a user is generally required to map data fields from one application to another and specify which data fields are assigned to which corresponding field in a different device. Less mapping is required where developers more robustly support various platforms of applications.

In many instances, the data to be synchronized is generally in the form of text data such as records of addresses, contact information, calendar information, notes and other types of contact information. In certain instances, data to be synchronized will be binary format of executable files or word processor-specific documents. In many cases where document synchronization is required, the synchronization routine simply determines whether or not the documents in question have changed, and uses a time-based representation to determine which of the two files is newer, and replaces the older file with the newer file to achieve synchronization, as long as the older of the two files was in fact not changed. This is the model used in the familiar "Briefcase" function in Microsoft Windows-based systems. If both files have changed, then the synchronization routine presents the option of conflict resolution to the user.

Such synchronization schemes are generally relatively inefficient since they require full band-width of the document or binary file to be transferred via the synchronization link. In addition, at some level the synchronization programs require interaction by the user to map certain fields between different programs.

One of the difficulties in providing synchronization between different computing devices is that the applications and platforms are somewhat diverse.

Nevertheless, all synchronization programs generally require certain functions in order to be viable for widespread usage. In particular, synchronization programs must work with popular applications on various platforms. Sync applications must allow for conflicts resolution when changes are made to the same information on different devices between syncing events. They must provide synchronization for all types of formats of data, whether it be text data in the form of contacts, e-mails, calendar information, memos or other documents, or binary data in the form of documents or programs in particular types of formats.

In a broader sense, applications which efficiently synchronize data between disparate types of devices can provide

US 6,671,757 B1

3

advantages in applications beyond synchronizing individual, personal information between, for example, a personal information manager hardware device such as a Palm® computing device, and a personal computer. The same objectives which are prevalent in developing data transfer between personal information management (PIM) devices and desktop systems lend themselves to furthering applications requiring data transfer between other types of devices, on differing platforms. These objectives include speed, low bandwidth, accuracy, and platform independence.

For example, current e-mail systems use a system which is somewhat akin to the synchronization methods used for disparate devices in that an entire message or file is transferred as a whole between different systems. When a user replies to an e-mail, generally the entire text of the original message is returned to the sender, who now has two copies of the e-mail text he/she originally sent out. The same is true if an e-mail attachment is modified and returned. All of the text which is the same between both systems is essentially duplicated on the originator's system.

SUMMARY OF THE INVENTION

The invention comprises a system and method for efficiently, quickly and easily synchronizing devices which can couple to the Internet, or any network. Synchronization of the devices can occur at independent times using an intervening network based storage server to store changes to data for all the different devices in the system in a data independent format, and provide the data on request to the device requesting a sync at the time requested. Hence, two devices need not be coupled to each other to perform a sync.

In one aspect the invention comprises a system for synchronizing data between a first system and a second system. The system includes a first sync engine on the first system interfacing with data on the first system to provide difference information. A data store is coupled to network and in communication with the first and second systems. A second sync engine is provided on the second system coupled to receive the difference information from the data store via the network, and interfacing with data on the second system to update said data on the second system with said difference information.

Difference information is transmitted to the data store by the first sync engine and received from the data store from the second sync engine. The difference information is transmitted to the data store at a first point in time, and received from the data store at a second, subsequent point in time. In a further aspect, the second sync engine can interface with said data on the second system to provide second difference information to the data store and the first sync engine may thereafter couple to the data store to retrieve the second difference information and interface with the data on the first system to update said data on the first system with said second difference information.

The system may include a management server coupled to the network and in communication with the first sync engine, the second sync engine and the data store.

In a further aspect, the system may include a first device, coupled to the first system via the network, providing said data to the first system. In such instance, the first system may be a sync server.

The system may include a plurality of sync engines on a respective plurality of systems, each of said plurality of engines being coupled to receive difference information from each of said first, second and plurality of sync engines from the data store via the network. Each said engine

4

interfaces with data on the system on which it resides to update said data on said system on which it resides with said difference information, and interfaces with data on said system on which it resides to provide difference data information from the system on which it resides to the data store.

In a further embodiment, the invention comprises a system including a first device, a data store and a second device. The first device includes at least a first data file and first differencing code having an input and an output coupled to a network to receive first device data change transactions, based on said at least one data file, from and provide change transactions to, said network. The data store is coupled to the network and has at least one data structure coupled to store change transactions. The second device includes at least a second data file and second differencing code having an input and an output coupled to the network to receive said first device data change transactions, and provide second change transactions based on said at least second data file to said data store.

In a further embodiment, the invention comprises a method for synchronizing at least a first and a second resident on a first and a second systems, respectively, coupled to the Internet, respectively. The method includes the steps of: determining difference data resulting from changes to the first file on the first system; transmitting the difference data to a server via the Internet; querying the server from a second system to determine whether difference data exists for files on the second system; retrieving the difference data to the second system; and updating the second file on the second system with the difference data.

In a still further aspect, the invention comprises an Internet synchronization system. The system includes a storage server having an Internet connection; a first device coupled to the Internet and including a device sync engine; and a second device coupled to the Internet and including a second device sync engine. A management server may further be provided. In this aspect, each device sync engine may comprise an application object, an application object store, and a delta engine.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention will be described with respect to the particular embodiments thereof. Other objects, features, and advantages of the invention will become apparent with reference to the specification and drawings in which:

FIGS. 1–7 are block diagrams of various configurations of the system of the present invention utilizing the differencing routines of the present invention.

FIG. 8 is an overview of one embodiment of the system architecture in accordance with the present invention.

FIG. 9A is a block diagram of the desktop device engine of the present invention.

FIG. 9B is a block diagram of the configuration of server side device engines utilized in accordance with the present invention.

FIG. 10 is a block diagram of one embodiment of the device engine in an operating system such as Windows.

FIG. 11 is a block diagram of an application object incorporated into the device engine of the present invention.

FIG. 12 is a diagram of storage object hierarchy of a universal data format utilized with the system of the present invention.

FIG. 13 is a listing of exemplary item objects used in accordance with the routines of the present invention.

FIG. 14 is a block diagram of a management storage server architecture for used in the system of the present invention.

US 6,671,757 B1

5

FIG. 15 is a flow diagram illustrating a pull synchronization in accordance with the system of the present invention.

FIG. 16 is a flow diagram illustrating a push synchronization in accordance with the system of the present invention.

FIG. 17 is a diagram of the management server architecture in accordance with the present invention.

DETAILED DESCRIPTION

The present invention includes a system and a method for transferring data between two devices which require information to be shared between them. In accordance with the discussion herein, a "device" is defined as a collection of elements or components organized for a common purpose, and may include hardware components of a computer system, personal information devices, hand-held computers, notebooks, or any combination of hardware which may include a processor and memory which is adapted to receive or provide information to another device; or any software containing such information residing on a single collection of hardware or on different collections of hardware. Such software might include applications such as personal information managers, which include contact data and other such information, e-mail systems, and file systems, such as those utilized by Microsoft Windows NT operating systems, Unix operating systems, Linux operating systems, or other systems capable of storing file types having binary formats which translate to application formats of differing types.

In one embodiment, the invention comprises a set of programs specifically designed to transmit and/or receive differencing data from one device to another device, irrespective of the type of file system, data, content, or system hardware configuration.

In a further aspect, the system comprises store and forward technology which utilizes the differencing technology to implement services via a public or private network, such as the Internet.

The system of the present invention finds particular usages in synchronizing personal contact information between different systems, but it will be readily apparent to one of average skill in the art that the present invention provides advantages having broader applicability than merely synchronizing various types of systems. For example, replying and forwarding e-mail can be made more efficient by forwarding only the differences in e-mails between systems. As a further example, updates to systems software via a network can be made more efficient where, for example, instead of completely replacing different modules of an application, only the differences of the modules need be forwarded, resulting in more efficient use of existing bandwidth.

System Overview

FIGS. 1–7 show various configuration alternatives of the present invention.

FIG. 1 shows an embodiment of the present invention in a basic configuration. In FIG. 1, a first system or device, system A, and a second system or device, system B, are coupled by a communication line 110. It should be readily understood that communication line may be any direct coupling of the two systems which allows data to pass between the systems such as, for example, by means of serial ports, parallel ports, an Ethernet connection or other type of network, or an infrared link, or the like. System A includes a functional block 100 representing a differencing transmitter in accordance with the present invention. System B

6

includes a functional block 102 representing the differencing receiver in accordance with the present invention.

The differencing transmitter 100, upon receipt of a control signal enabling operation of the transmitter, examines a specified data structure of information which is to be transmitted to system B. Differencing transmitter 100 extracts such information from System A and converts the information extracted into difference information Δ. Difference information Δ comprises only the changes to System B's data which have occurred on System B and instructions for implementing those changes. Hence, if the data to be transferred is a change to a file which exists on system B, difference information Δ comprises only the differences in such file and where such differences occur. If the data does not exist at all on System B, the difference information Δ will be the entire file. Difference information Δ received by differencing receiver 102 at System B is reconstructed at System B, and the changes reflected therein are updated on System B.

For example, if System A and System B are two computers and an update for certain binary files on System A is required, the differencing transmitter on System A will extract the differences in the file known to exist on System B and any new files, and transmit only those differences (an instructions for where to insert those differences) to the differencing receiver 102. Differencing receiver 102 will interpret the difference information (Δ) and reconstruct the binary files on System B. In this manner, the information on System B is updated without the need to transfer the entire binary files between the Systems.

FIG. 2 shows a second example of the system of the present invention. In FIG. 2, both System A and System B include functional blocks 104, each representing a differencing synchronizer. The function of the synchronizer 104 is similar to that of the transmitter and receiver combined; the synchronizer will allow difference information Δ to be both transmitted and received. For example, System A and System B are a portable computer and a desktop computer, respectively, where information such as contact information needs to be synchronized between the two, the differencing synchronizer 104 will extract changes made to the contact information on either System A or System B and at predetermined times, transmit the information Δ between the systems, and reconstruct the data on the receiving system to update information from the sending system, in order to ensure that both systems contain the same data.

FIG. 3 shows yet another alternative embodiment of the system of the present invention. In FIG. 3, System A again includes a differencing transmitter and System B includes a differencing receiver 102. In this embodiment, a storage server 300 is coupled between System A and System B. Storage server 300 may store a separate database of the difference information Δ provided by System A, which allows System A to provide its difference information Δ to the storage server 300 at a first point in time, and storage server 300 to provide the same difference information Δ to System B at a second point in time, but not the same as the first point in time. In addition, multiple sets of difference information Δ may be provided at different points in time, and stored for later retrieval by System B. Still further, the difference information sets may be maintained on server 300 to allow data on either System A or System B to be returned to a previous state.

Once again, the storage server 300 is coupled by a direct connection 110 to both System A and System B. Storage server 300 may be a server specifically adapted to receive differencing information Δ from the receiver 100 and pro-

US 6,671,757 B1

7

vide it to the transmitter **102**. In one embodiment, server **300** includes specific functional routines for enabling this transfer. Alternatively, server **300** comprises standard information server types which respond to standard Internet communication protocols such as file transfer protocol (FTP), or hypertext transfer protocol (HTTP).

FIG. **4** shows yet another alternative embodiment of the system of the present invention wherein System A and System B, once again coupled directly to a storage server **300** by a direct connection line **110**, each include a differencing synchronizer **104**. Difference information $\Delta$ can be passed to and from System A through synchronizer **104** to and from the storage server **300** at a first point in time, and to and from System B at a second point in time. In this embodiment, storage server **300** may include routines, described below, for resolving conflicts between data which has changed on both System A and System B independently after the last point in times when the systems were synchronized.

FIG. **5** shows yet another alternative embodiment of the present invention including four systems: System A which includes a differencing synchronizer **104**; System B which includes a differencing receiver **102**; System C which also includes a differencing synchronizer **104**; and System D which includes a differencing transmitter **100**. Each is directly coupled to a storage server **300**, allowing control of transmission of differencing data $\Delta$ between the various systems. Server **300** may include routines, described in further detail below, to track the various types of systems which comprise System A through System D, and which control the transmission of various components of the difference information $\Delta$ to each of the various systems. For example, since System B includes only differencing receiver **102**, the difference information $\Delta_2$ which is provided to it may be a sub-component of that which is transferred between System A in the storage server **300**, or may be simply receiving broadcast information $\Delta_4$ from System D. In one embodiment of the system of the present invention, server **300** does not itself route the difference information derived from each receiver/transmitter/synchronizer. Server **300** acts as a repository for the information, and the determination of which difference information $\Delta$ is attributed to which receiver/transmitter/synchronizer is made by each receiver/transmitter/synchronizer.

FIG. **6** shows yet another alternative embodiment of the present invention. In FIG. **6**, a synchronizer is provided in storage server **300**. It should be recognized that a forwarder and/or receiver may be provided in server **300** as well. The particular embodiment shown herein may be advantageous where device processing power and memory are limited, such as cases where the device is a cell phone. It should be noted that the data transferred between system A and the device engine **104a** in such an embodiment may or may not be difference information, depending on whether System A has the capacity to detect and output difference information. Each of the devices may include a differencing receiver, a differencing transmitter, or a differencing synchronizer. It should be understood that a portion of the differencing synchronizer **104a** may reside on System A and another portion may reside on server **300**.

FIG. **7** shows yet another alternative embodiment of the present invention wherein the devices shown in FIG. **6** may be coupled to a combination of public or private networks **700** such as, for example, the Internet. The network **700** may include one or more storage servers $300_1, 300_2$, and in such cases the difference information $\Delta$ transmitted between each such device **602–610** via intermediate storage on one of such

8

servers. Network **700** may couple the devices to one or more specialized function servers, such as servers specifically designed to include a differencing forwarder, receiver or synchronizer. Such devices may comprise, by way of example and without limitation, a personal office PC **602**, a smart telephone **604**, a user's office PC **606**, a personal information Palm® computing device **608**, a telephone or cellular phone **604**, a home personal computer **606**, or a web browser **610**. Each differencing receiver, differencing transmitter, or differencing synchronizer present in devices **602–610** includes means to poll the data stored on storage servers $300_1, 300_2$ to determine whether the data present at storage server $300_1, 300_2$ includes difference information which the particular receiver or synchronizer is required to have to synchronize the data on the device on which it resides.

In the following description, an embodiment wherein the differencing receiver, transmitter, and synchronizer are described will be discussed with respect to its use in synchronizing contact information, calendar information, and binary file information between a plurality of different devices in the context of data synchronization. It will be readily understood that the system of the present invention is not limited to synchronization applications, or applications dependent upon specific types of data, such as contact information or scheduling information. In particular, it will be readily understood that the transmission of data comprising only the differences in data between two systems via routines which extract the data and reassemble data on the various systems, represents a significant advancement in the efficient transmission of data. The present invention allows for optimization in terms of a reduction in the bandwidth utilized to transmit data between two systems, since only changes to data are transferred. This consequently increases the speed at which such transactions can take place since the data which needs to be transmitted is substantially smaller than it would be were entire files transferred between the systems.

In a particular embodiment of the present invention, the ability of devices to connect to the Internet is leveraged to manage data transfer between the systems. In essence, each particular device which requires information access which can connect to the Internet may become part of the system of the present invention, and synchronize its data with other devices defined by a user as being part of the system.

Generally, the system comprises client software which provides the functions of the differencing transmitter **100**, differencing receiver **102**, and differencing synchronizer **104** in the form of a device engine. The device engine includes at least one component particular to the type of device on which the device engine runs, which enables extraction of information from the device and conversion of the information to difference information, and transmission of the difference information to the storage server. This allows the replication of information across all systems coupled to the system of the present invention. Although the storage servers **300** utilized in the system of the present invention may be any type of storage server, such as an Internet server or an FTP server, and may be provided from any source, such as any Internet service provider (ISP), particular aspects of a storage server which may be useful and which may be customized to optimize transfer of information between systems coupled as part of the present invention will be described below. Synchronization of devices utilizing the synchronization system of the present invention is possible as long as an Internet connection between the devices is available.

US 6,671,757 B1

9

In a key aspect of the invention, the Internet connection between the devices or between the devices and a server, need not exist at the same point in time, and new devices may be added to the system of the present invention at any point in time without the loss of information. The system provides totally transparent access to information and the device engine on each device provides an operating system independent extension which allows seamless integration of the personal information services in accordance with the present invention.

In a particular unique aspect of the present invention, only those changes to the information which are required to be forwarded to other systems on the system of the present invention are transmitted to enable exceptionally fast response times. In a still further aspect of the invention, information which is transferred in this manner is encrypted to ensure security over the public portions of the Internet.

Architecture Overview

FIG. 8 shows an overview of the architecture of the system of the present invention utilized for synchronizing or "syncing" information on different types of devices. In the embodiment hereinafter described, the system of the present invention allows the coupling of a collection of personal devices and applications one uses when working with personal information. Nevertheless, the system may be used to broadcast public or private information to various device types. System software in the form of a device engine for each device which is declared a part of the system of the invention is distributed across the collection of devices to enable synchronization. Distribution of the device engines may occur via, for example, an installation package forwarded over an Internet connection. In essence, the device engine software of the present invention forms a distributed processing network which maintains consummate synchronization of all information in the system. The processing load associated with delivering this service is pushed to the end-point devices which provides for easy scaling of the system to ever-larger applications.

The present invention contemplates the use of two types of device engine: one totally embodied on the server which outputs change data to the server; and a second totally embodied on the server receiving device generated change information from the device. In addition, a hybrid of the two, having a portion of the device engine on the device and a portion on the server, is disclosed.

As shown in FIG. 8, any number and type of devices 802–808 may be utilized in accordance with the system of the present invention. A telephone 802 may comprise a cellular phone or a standard POTS-connected telephone. Telephone 802 may include contact information and, as is supported with a newer generation of cellular telephones, appointments and task data stored in a data structure 812. The application 812 which utilizes the application data 822 comprising such information is all stored in the telephone unit 802. Likewise, a personal digital assistant such as a Palm® computing device 804 includes application 814 and application data 824 which may include information such as contacts, appointments and tasks, and may also include file information such as documents which are created and stored on the PDA 804. Device 806 is represented as a Windows personal computer running an operating system such as Microsoft Windows 95, 98, NT or 2000. Applications 816 which may be running on device 806 include the Windows operating system itself, Microsoft Outlook, Symantec's ACT Personal Information Manager, Goldmine Software's Goldmine, Lotus Organizer, Microsoft's Internet Explorer web browser, Netscape's Communicator Suite, Qualcomm's

10

Eudora e-mail, and various other programs, each of which has its own set of application data 826 which is required to be synchronized not only with devices outside the system 806, but also between devices and applications within the system itself. Finally, a dedicated web browser client 808 is shown which couples via the Internet to web portal applications 816 which have their own set of application data 828. Unlike devices 806 which store the application and application data substantially in their own hardware, web portal applications are provided on a separate server and provided to browser 808 via an Internet connection. Nevertheless, the web portal application stored on the portal application provider includes a set of application data 828 which a user may wish to synchronize. For example, a large web portal such as Yahoo! and Snap.com provide services such as free e-mail and contact storage to their users. A user may wish to synchronize this with applications running on their cellular phone, PDA, or Windows devices.

In order to access the specific application data of each of the systems shown in FIG. 8, a device engine is associated with each type of device. A cellular device engine 862 communicates and incorporates itself with the application data 822 of the cellular phone. Likewise, a PDA device engine 864 is provided, which may be based on either the Palm® operating system, Windows CE operating system, or other PDA-type operating systems as necessary. A Windows-based device engine 866 includes a mechanism, discussed below, for extracting application data 826 from supported Windows applications 816, and a web services device engine 868 incorporates to extract application data 828 from web portal applications 818.

As shown in FIG. 8, some device engines are provided entirely on the device (and are referred to herein as desktop device engines), while others include components a the back end server (which may comprise storage server 850 or a specialized server, as shown in FIG. 9B.) This is illustrated generally by lines 832, 834,836, and 838 in FIG. 8. Also, in FIG. 8, elements above dashed line 855 are provided by an administrator or service provider of the system of the present invention. Each of the device engines 862, 864, 866 and 868 is configured relative to the type of device on which it resides. For example, the Cell phone device engine 862 includes one or more components arranged on the phone while others are on server 850. Conversely, device engine 866 resides entirely on the windows device 806.

Data from each of the devices is coupled via an Internet connection 710 with a storage server 850. As noted above, storage server 850 may be a generic storage server or it may be a storage server specifically adapted for use with the system of the present invention as discussed below. One or more of the storage servers 850 are used to communicate transactions amongst the collection of systems 802, 804, 806, 808. It should be readily recognized that any number of different types of systems 802, 804, 806, 808 may be provided in accordance with the present invention and incorporated into the system. However, for brevity, not all the different types of commercially available computing devices which are currently in use or in development, in which the system of the present invention may be incorporated, are listed.

In its simplest embodiment, the storage server 850 is simply a dumb storage server and each of the device engines transmits only difference information thereto to be stored in a particular location accessible by other device engines in the system. In one embodiment, each device engine implements all processing required to keep all the systems fully synchronized. Only one device engine needs to be coupled

US 6,671,757 B1

11                                                          12

to the storage server **850** at one particular point in time. This permits synchronization of multiple systems in a disconnected fashion. Each device engine will download all transactions encapsulating changes that have occurred since the last synchronization from the server and apply them to the particular device.

The change or difference information (Δ) is provided in one or more data packages, the structure of which is described herein. Each data package describes changes to any and all transfer information across all device engines, including but not limited to application data, files, folders, application settings, and the like. Each device engine can control the download of data packages that include classes of information that apply to the specified local device **802**, **804**, **806** or **808** attached to that specific device engine. For example, device engine **862** will only need to work with changes to information describing contact names and phone numbers in application data **822**, while device engine **866** will be required to work with changes to e-mail, changes to document files, notes, as well as contact and address information since the application data **826** is much more extensive than application data **822**.

Each device engine includes compression/decompression and encryption/decryption components which allow encryption and/or compression of the data packages transmitted across Internet connection **710**. It should be recognized that compression and encryption of the data packages may be optionally provided. It is not required in accordance with the present invention. Each device engine performs mapping and translation steps necessary for applying the data packages to the local format required for that type of information in the application data stores **822–828**. The device engine also includes components which allow it to track ambiguous updates in cases where users have changed data to a particular data field on two different systems simultaneously since the last update. In this case, the device engine includes a mechanism for drawing this to the attention of the user and allowing the user to resolve the conflict.

Device Engine Architecture

FIG. 9A illustrates a single device engine utilized with a generic application **810** and a generic storage server **850**. FIG. 9A illustrates a desktop device engine, since all processing occurs on the device and only difference information is transmitted to server **850**. Nevertheless, an understanding of the desktop device engine will aid in understanding server side devices engines, hereinafter described. Shown in FIG. **9** are the functional components of a device engine in block form and their interrelationship to each other. The device engine **860** is equivalent to the functional block of a differencing sequencer **104** shown in FIGS. 1–7.

While the invention will be described with respect to the embodiment of the invention as a differencing synchronizer **104**, it will be readily understood that portions of the functionality are utilized as needed in a forward-only (a differencing transmitter) or a receive-only (a differencing receiver) capacity as required by the particular application.

As noted above, a device engine exists for each and every device that makes up a user's personal information network of devices in the system. As shown in FIG. 9A, each device engine **860** includes an application object **910**. The application object is specific to each particular application **810** and provides a standard interface between the device engine and the balance of the data transmission system of the invention, and the application **810**. Details of the application object will be described in further detail below. The application object is a pluggable architecture which supports a wide variety of vendor-unique applications. The job of the application object is to map data from the application into a temporary or "universal" data structure by connecting to the application via any number of standard interfaces to gain access to the applications data. The data structure of the application object puts the data in a generic or "universal data" format which may be used by the device engine components to generate data packages for provision to the storage server.

Also provided is an application object store (AOS) **920** which includes a copy of the device's data at a point just after the previous data extraction and synchronization occurred. Application object store **920** is a mirrored interface which stores a snapshot of the previous state of the data from the application object **910** in the device engine. The size of the AOS will depend on the data being collected by each device engine.

The generic output of the application object is provided to a delta module **950**. Delta module **950** is a differencing engine which calculates differences in data between the output of the application object **910** and the copy of the data which is provided in an application object store (AOS) **920**. The actual differencing and patch routine can comprise a routine such as XDelta or YDelta. The delta module **950** will be referred to herein alternatively in certain portions of the description as "C StructuredDelta." In addition, the difference information is alternatively referred to herein as a "change log." Each change log (or set of difference information) is a self describing series of sync transactions. As described below, the change log may be encrypted and compressed before output to the network.

Hence, during a sync, the Application Object will, using a mechanism discussed below, extract the data of each application in the device and convert it to a universal data format. The delta module will then generate a difference set by comparing the output of the Application Object and the AOS. This difference information is forwarded to the encryption and compression routines for output to the storage server **850** in the form of a data package. Alternatively, the data from one application can be used to synchronize to data in another application in, for example, a windows environment, as shown by arrow **1050** in FIG. **10**.

It should be specifically noted that the application object may interface directly unstructured binary data or with structured application data. The differencing routine supports both uses of the delta module **950** in comparison generation.

In some cases, operation of the application object and delta module is simplified by the fact that some applications, such as PDA's, have the ability to output changes to its data. In such cases, the delta module **950** need only provide the data into the data package, since comparison to an AOS is not required—the application already includes a mechanism for tracking changes made to its own data. However, in many cases the applications provide, at most, a standard interface to access the data, such as Microsoft's OBDC interface, the Microsoft standard Application Programming Interface (API), or other similar standard interfaces.

Device engine **860** further includes a versioning module which applies a version number per object in the data package. As explained further below, each object in the data package is assigned a universally unique ID (UUID). Hence, unlike many prior synchronization systems, the system of the present invention does not sync data solely by comparing time stamps of two sets of data. Versioning module **915** allows each device engine to check the state of the last synchronization against data packs which have been provided to the storage server to determine which data packages

13

14

to apply. This allows the device engine to sync itself independently of the number of times another device engine uploads changes to the storage server. In other words, a first device engine does not care how many times a second device engine uploads data packages to the server.

An events module **925** controls synchronization initialization events. Items such as when to sync, how to sync, trigger the delta module **950** to perform a synchronization operation.

A user interface **930** is provided to allow additional functional features to a system user of the particular device to which the device engine **860** is coupled. The user interface is coupled to a conflict resolution module **940**, a filtering module **945**, and a field mapping module **935**. Each of the modules provides the functionality both necessary for all synchronization programs, and which users have come to expect.

Filtering module **945** allows filtering for types of content based on, for example, a field level content search. The field mapping module **935** allows for the user to re-map certain interpretations of items which were provided in the document stream. For example, if the device engine **860** is operating on a personal computer, and a synchronization is occurring between the personal computer and a notebook computer, and the user has a "my documents" directory on the personal computer which he wishes to map to a different directory on the notebook computer, the field mapping module **935** allows for this re-mapping to occur. It should be recognized that the field mapping module allows for changes in directing the output of the data package. The field mapping module **935** is not necessary to map particular data fields of, for example, contact information from one application, such as Microsoft Outlook, to a different application, such as Symantec's ACT, as is the traditional use of field mapping and synchronizing applications.

Delta module **950** is further coupled to a compression module **970** and an encryption module **960**. It should be recognized that the compression encryption modules need not be enabled. Any type of compression module **970**, such as the popular PK Zip or Winzip modules, or those available from HiFn Corporation may be utilized in accordance with the invention. Moreover, any type of encryption algorithms, such as MD5, RCH **6**, Two Fish, or Blowfish, or any other symmetric encryption algorithm, may be utilized. In one embodiment of the invention, encryption without compression is used. In a second embodiment of the invention, compression without encryption is used. In a third embodiment of the invention, neither compression or encryption is used, and in a fourth embodiment of the invention, both compression and encryption are used.

Versioning module **915** also allows the device engine **860** to support multiple users with distinct synchronization profiles. This allows multiple users accessing the same machine to each synchronize their own data set using the same device engine. For example, if the application **810** on a particular device comprises Microsoft Outlook on a personal computer, coupled to a Microsoft Exchange server, and Outlook is configured to have multiple user profiles, versioning module **915** will track the data applied through the device engine when a sync request occurs. This allows two users of the same Outlook client software which access different data sets, either in the client computer or on a separate server, to utilize the same device engine and the system of the present invention via the same machine. In a further embodiment, a particular device engine supports the use of foreign devices accessing the system via the same connection. Palm® devices, for example, use a cradle to connect to a computer and/or Internet connection. If a particular user wishes to allow another user to use his Palm® pilot cradle connection to synchronize the other user's Palm® pilot, the device engine can generate data packages to update the local application object store for the foreign device. The application object store can therefore be used as a temporary storage for cases allowing synchronization of foreign devices.

The output of the device engine **900** comprises a data package which is output to storage server **850**. As noted above, only one device engine need be connected to the storage server **850** at a given time. The data package can be stored on the storage server **850** until a request is made to a particular location of the storage server by another device engine. Likewise, delta engine **900** can query alternative locations on the storage server for access to synchronized data within the system of the present invention. Access to areas of the storage server is controlled by a management server (MS) described more fully below. In one embodiment, each sync operation requires that the device engine for each device login to the management server to authenticate the device and provide the device engine with the location of the individual device's data packages on the storage server.

Data packages may be advantageously provided to the device engine from the storage server in a streaming format, allowing processing to occur using a minimum of bandwidth and storage in the devices. The device engine **860** and particularly the delta module **950** interpret data packages based on the versioning information and the mirrored data present in the application object store **920**. When data is returned to the delta module **950** from the storage server **850**, the delta module returns differenced data to the application object **910** for the particular application which then translates the delta information into the particular interface utilized for application **810**. Once a device engine has been fully applied all data packages from an input stream, it generates a series of data packages that describe the changes made on the local system. The device engine uses the local application object store **920** to keep track of the last synchronized version of each application's actual data, which is then used for the next data comparison by the delta module on the next sync request. Generated data packages can include operations and encode changes generated from resolving ambiguous cases as described above.

FIG. 9B depicts how server based device engines may be provided in the system of the present invention. The Palm® device example is shown in this embodiment, where the Palm® device has the capability of connecting directly to the Internet and a service provider's data center **900**. The data center includes a firewall **975** to prevent unauthorized communications with servers resident in the data center **900** and protect integrity of the data. The storage server **850** may communicate directly through the firewall as may the management server (MS) **1410**.

Shown therein are two sync servers **982** and **984** each of which is dedicated to syncing one particular type of application. Sync server **982** is dedicated to the Palm® device, while sync server **980** is dedicated to, for example, a portal application (Portal1).

Since the Palm® Device **804***a* includes a mechanism for transmitting changes to its data directly, data may be transmitted using HTTP request and response via the firewall **975** to the sync server **982** where differencing and updating of data in the AOS occur, after which changes can be downloaded to the Palm® **804***a*.

The synchronization server is an application handles concurrent synchronization of user's data. Each Sync Server

US 6,671,757 B1

15

includes plug-in support for multiple devices to be synchro-nized using the same sync server executable. Each device type has it's own device name that identifies which AO/AOS components will be used during the sync.

The sync server uses the concept of a universal data record in its internal sync differencing engine and when sending data to and retrieving from external entities such as the AOS and AO. Hence, in the Palm® application, the job of a server AO is simply to take the device-specific format of its record and convert into a universal record format.

The Sync Server has a plug-in architecture so that 3rd party application partners can easily add their services into the server. Currently, if the server is operated in a Microsoft Windows NT Server, the sync server discovers the sync components via the Windows NT registry. In alternative embodiments, this function is performed in a Component Manger which operates on each sync server to manage processing by each of the AO and AOS on the server. Each AO and AOS are implemented as a stand-alone DLL that the Sync Server loads at initialization time, or when adding a new component via the Component Manager.

Each sync server is shown as dedicated to a single application. However, a sync server may handle multiple device types.

In the embodiment of FIG. 9B, it should be noted that, depending on the device type, there are different configu-rations for the AOS and AO's. For example, the Palm®'s AO data store **1050** resides on the Palm® device **804a** itself and a separate AOS data store **1052** exists for this configu-ration (an Oracle database). In the case of Portal1, the AOS and AO use the data store **1054**.

Device engines can generate additional data packages intended to resolve synchronization problems in other sys-tems. For example, interfacing with the conflict resolution module **940**, if the user makes a change to a particular data store on an application object on his Palm® pilot, then makes an additional change to a personal information man-ager (PIM) application on his personal computer, the user can specify that the change made on the personal computer will "win" when the conflict is detected by the Δ engine and the versioning information between the two devices. This is essentially a definition that one particular set of data is correct and should replace the second set of data.

FIG. 10 shows a specific embodiment of a desktop device engine utilized in, for example, a Microsoft Windows-based operating system environment.

As shown in FIG. 10, a Windows operating system may have at least three specific applications which may require synchronization. In FIG. 10, the system includes Netscape Communicator application **1040** having data such as book-marks **1021**, contacts **1022**, and e-mail **1023**; a Microsoft Outlook application **1042** which includes contact informa-tion **1024**, calendar information **1025**, e-mail information **1026**, note information **1027**, and tasks information **1028**; and Windows operating system **1044** information including Favorites data **1029**, file system information **1030**, and individual files **1031**.

Each particular application **1040**, **1042**, **1044** has an associated application object **1010**, **1012**, **1014**. Each of the respective application objects provides data back to delta module **950** in a generic format which is usable by the delta module in accordance with the foregoing description of the apparatus shown in FIG. 9A. From FIG. 10, it will be additionally seen how the delta module **950** may be utilized to synchronize data between applications running on the same particular server. The device engine hence does an intra-system sync such as, for example, between the contact

16

information **1022** from Netscape and the contact information **1024** from Outlook.

FIG. 10 further illustrates the modularity of the system of the present invention allowing the device engine to include any number of different application objects to be provided on a single device to incorporate all applications run on that device.

In operation, during an installation of a device engine into a particular system, the installation program may be tailored to provide application objects which may be present on a given system. For example, and with reference to FIG. 10, the installation program for a Windows machine will carry any number of application objects for systems and applica-tions which may be present on a Windows machine. The installer will check for the presence of given applications, and allow the user to add additional applications which may be installed in locations that are not the normal default installation areas for application support by the application objects which the installer is carrying, or de-select certain applications which, for one reason or another, the user may not wish to install an application object for and render a part of the system of the present invention.

Application Object Structure

FIG. 11 is a conceptual depiction of the structure of an application object. As noted above, the application object is a pluggable architecture which supports a wide variety of vendor-unique applications. The consistent and scalable architecture of the system of the present invention for device engines is maintained by encapsulating system-dependent knowledge in a single component, i.e. the application object. As noted above, every application object supports a standard set of interfaces that every device engine understands. Each application object maps these standard interfaces of the capabilities of a particular vendor application. Hence, there will be as many application objects as there are application types.

As noted above, there are different types of server and desktop device engines, some having application objects entirely on the server, while others have application objects entirely on the desktop.

Each application object will include a connector **1110** which may comprise a generic interface to the particular application for which the application object store has been designed. For example, when connecting to a Palm® device, the connector will be an HTTP protocol request routine which interfaces with the Palm® device's own built-in synchronization manager, which provides an output of records which have been changed on the Palm® device. As in FIG. 9B, since the Palm® outputs all the changes to its data via its own sync manager, in the Palm® application, the job of a server AO is simply to take the device-specific format of its record and convert into a universal record format.

The connector provides access for the application object to remove the data field from a particular application and convert it to a universal record structure. In the desktop AO, where, for example the application object is designed for a Windows interface, the connector may be the Windows API and the job of the AO will be to translate data from, for example, the windows file system to a universal data format. This universal data structure is then used by the delta module **950** to build data packages to be used in synchronization between components of the systems provided in the network system of the present invention.

Universal data structure mapping, used on desktop appli-cation objects, and universal data record mapping, used by the server device engines, is further detailed below.

US 6,671,757 B1

17

18

Desktop Application Object

Each Application Object (AO) is a software component that interfaces with the third party application APIs (Application Programming Interface) to provide the programming services to the delta module for extraction and deposition of information data from and to the third party application domain during synchronization. In addition, the AO maps the third party application data fields to system's domain.

The AO service is a collection of COM (Component Object Model) objects that can be developed in conjunction with the third party Windows application APIs as a form of a DLL (Dynamic Linked Library) in C or C++. The DLL is loaded on demand at runtime during synchronization. It should be recognized that the application object need not be implemented using the COM model, but may be developed with other distributed object models.

There are a number of the related subsystems and documents that the developer must be familiar with and this document has made many references to those subsystems during the course of presenting the AO.

Change Log (CL) (or differencing information), a data file which contains a series of synchronization transactions.

DataPack, a compacted and encrypted Change Log.

StructuredDelta, the delta module differentiation engine that generates differences between Application Objects and Change Log and AOS.

AOS, a database which resides locally on, for example, a windows machine.

MS, a management server that manages users' accounts.

SS, an FTP or storage server that manages data packs.

User Manager, a standalone Windows client UI program that manages the synchronization process.

ePortal, a web-based PIM portal site.

pio_types.h, a header file which contains the definitions of the system's supported data fields known as tags.

Def.h, a header file contains the definitions of the system's constants.

interfaces.h, a COM interface file contains AO interface definitions.

Each AO has a COM interface-based design built-in. That is, instead of providing a set of traditional APIs as programming services, it provides a set of interface-based objects as programming services.

StructuredDelta, the delta module, the primary intended user of each AO. StructuredDelta instantiates these COM objects and uses them throughout the synchronization session exclusively through the COM interfaces on those objects to interface with the third party application database.

Each AO component consists of a set of objects that translate the third party application data into the universal data middle format which underpins the entire spectrum of PIM data regardless of which third-party application the data comes from. The objects in universal data format are device, (application) data class, store, folder, item, and data fields. The AO digests the third party application data of any kind and reduces it into a few handful simple objects and field types. These objects and field types are fed into Structured-Delta engine and are compared by StructuredDelta in order of their hierarchy. The resulting differences (add, delete, modify) are logged as transactions in the difference information. The data packs are transported to a storage server that may be actively managed by a management server for each individual user account and devices.

StructuredDelta uses AO objects to access and modify the individual AO objects and data fields. AO objects serve as a buffer between individual application data and Structured-Delta so that StructuredDelta does not require knowledge of each application and database. All AO objects are temporary and created in the space of each AO by StructuredDelta through COM interfaces. AO objects are referenced when they are in use and they are freed when StructuredDelta stops using them. One can think of AO objects as merely placeholders of each application objects for StructuredDelta to access. Once StructuredDelta has a particular Application's data, StructuredDelta would free AO objects immediately without storing them internally.

AppObj

AppObj is a root object of each AO component and there is one and only one per AO. AppObj provides an entry point into the individual application's database. StructuredDelta instantiates it and holds it on during the entire synchronization session and releases it afterward. AppObj offers a number of services such as what class of data it supports. The C++ example of AppObj's definition is shown below:

```
class CMyF1AppObj :
        public      Item,
        public      AppObj,
        protected   ModuleIdentity,
        protected   DataClassInfo,
        protected   ItemTypeInfo,
        protected   ItemFieldMap,
        protected   FolderInfo,
        protected   DataFileInfo,
        protected   SynchNotify,
        protected   ErrorMsg,
        protected   EnumItems,
        protected   ModifyItem
{
        public:
                CMyAppObj ( HWND hWndParent ) ;
                ~CMyFppObj () ;
};
```

AppObj can contain children objects. They are Store objects. EnumItems interface is used to enumerate Store objects. FindItem interface is used to find the contained objects. ModifyItem interface enables AppObj to create a new Store object. AppObj is created by StructuredDelta calling CreateAppObject(HWND hWndParent, AppObj **ppObj).

Store

The Store object represents a database of the individual application information. If the individual application can handle multiple databases at same time, one needs multiple Store objects. One can think of Store object as a specialized Folder object, the root folder of each particular application data domain. The C++ example of Store's definition is shown below:

```
class CMyStore :
        public      Item,
        public      ItemContainer,
        protected   EnumItems,
        protected   FindItem,
        protected   FindItemByData,
        protected   ModifyItem,
        protected   ReadWrite
```

US 6,671,757 B1

**19**

-continued

```
{
    CMyStore ();
    ~CMystore ();
};
```

Store is a container of Folder objects. EnumItems interface enables the enumeration of its contained folders while FindItem and FindItemByData interface is used to find contained Folders or Item objects. ModifyItem and Read-Write interface enables the modification of each application database.

Folder

Folder object is a specific data class of each individual application such as a table in the relational database or a collection of data records in each application. For example, the applications contact collection can be thought as a Folder object. The C++ example of Folder's definition is shown below:

```
class CMyFolder :
    public      Item,
    public      ItemContainer,
    protected   EnumItems,
    protected   FindItem,
    protected   FindItemByData,
    protected   ModifyItem,
    protected   ReadWrite
{
    public:
            CMyFolder();
            ~CMyFolder();
};
```

Folder object is also container. It can contain Item objects as well as Folder objects. EnumItem interface allows the enumeration of either Folder objects or Item objects or both. FindItem and FindItemByData interface is used to find contained Folder objects or Item objects. ModifyItem and ReadWrite interface enables the modification of an application's data tables.

Item

Item object represents an individual entity of each application's domain specific data. Item object can be thought as a record of each application's relational table. For example, a contact, email, calendar, to-do item in the particular

**20**

application can be thought of as an Item object. The C++ example of Item's definition is shown below:

```
class CMyItem :
    public      Item,
    protected   EnumItems,
    protected   FindItem,
    protected   ModifyItem,
    protected   ReadWrite
{
    public:
            CMyItem();
            ~CMyItem();
};
```

Item can contain Attachment objects only. EnumItems interface enables the enumeration of Attachment objects if any. ModifyItem and ReadWrite interface enables the modification of an application's records or data fields.

Attachment

Attachment object is a specialized Item object that encapsulates an attachment data or relationship. Only Item can have Attachment objects. Attachment object can be thought as attachment data such as attached-email files. Attachment can also be thought as attachment relationship to other Item objects. The example of that is the distribution list (Item object) can contain contacts (Item objects). The C++ example of Item's definition is shown below:

```
class CMyItemAttachment :
    public Item,
    protected   ReadWrite,
    protected   ModifyItem
{
    public:
            CMyItemAttachment();
            ~CMyItemAttachment();
};
```

Variant

Variant object represents a data field of each particular application data. For example, a 'first name' of a contact or the birthday date of a contact can be thought as Variant object. StructuredDelta only understands Variant object and the types of data fields it encapsulated. Variant object can contain any one of the following data field type:

```
struct Variant
{
        enumFieldTag              tag;
        enumFieldDataFlag         flag;      // flags item fields as not
known or otherwise special
        union
        {
                short int         i;         // eFieldType_WORD
                LONG              1;         // eFieldType_LONG
                DWORD             dw;        // eFieldType_DWORD
                unsigned___int64  qw;        // eFieldType_QWORD
                UUID              uuid;      // eFieldType_UUID
                DATE              time;      // eFieldType_DATE
                LPTSTR            psz;
eFieldType_String
                Binary            bin;       // eFieldType_Binary
                Float             flt;       // eFieldType_Float
                Double            dbl;       //
```

US 6,671,757 B1

21                                                                                                22

-continued

```
eFieldType__Double
                        F1Collection              coll;        //
eFieldType__Collection
        } Value;
        Stream*                  strm;        // eFieldType__Stream
};
```

Variant::tag is an identification tag of data field and variant::flag specifies the type of data field while Variant::value member variable stores each application's field value. One data field type is Collection. Collection object is an array of Variant objects. It can be used to represent a compound data fields.

```
struct Collection
{
        ULONG                    cValues;
        struct__Variant**        paVar;       // This array really
contains cValues entries
};
```

Another data field type that is worth exploring is Binary. Binary object can be used to represent a binary data as it is.

```
struct Binary
{
        ULONG                    cb;
        LPBYTE                   lpb;
};
```

## AO Interfaces

Each AO object has an AO COM interface. Each object must implement some of those interfaces to create certain capability or desired behavior that are expected by StructuredDelta.

### IItem

This is the base interface of all application objects. It provides the identification service to StructuredDelta. Every object must have a unique ID, parent unique ID, display name, and item type information (eItemType__FOLDER, eItemType__CONTACT, etc). The unique ID is a unique string only in a given device. It is not persistent cross the Internet to other devices. The ID usually comes from the third party application database domain such a unique ID of a record.

```
interface IItem : IUnknown
{
        STDMETHOD__(LPCTSTR, GetUniqueID) () const PURE;
        STDMETHOD__(LPCTSTR, GetParentUniqueID) () const PURE;
        STDMETHOD__(LPCTSTR, GetDisplayName) () const PURE;
        STDMETHOD__(enumItemType, GetItemType) () const PURE;
        STDMETHOD__(BOOL, IsContainer) () const PURE;
        STDMETHOD__(DATE, GetLastModificationTime) () const PURE;
        STDMETHOD__(QWORD, GetSize) () const PURE;
        STDMETHOD__(DWORD, GetFlags) () const PURE;
};
```

### IItemContainer

This is the base interface of all application container objects (store, folder). These container objects must have this interface implemented so that StructuredDelta would recursively descend in them if they have IItemContainer capability.

```
interface IItemContainer : IItem
{
        STDMETHOD__(BOOL, ContainsItemType) ( enumItemType eItemType ) PURE;
        STDMETHOD__(BOOL, ContainsDataClass) ( enumDataClass eDataClass
PURE;
        STDMETHOD__(enumSpecialFolderType, GetSpecialFolderType) () PURE;
        STDMETHOD__(GUID, GetMappingGUID) () PURE;
};
```

### IErrorMsg

This is an error-reporting interface for every application object. It is used by StructuredDelta to query the error string after a failure. The AO should implement this on every object after the error occurs and before returning the control to StructuredDelta.

```
interface IErrorMsg : IUnknown
{
        STDMETHOD(GetErrorString) ( LPTSTR pszError, int iBufLen
} const PURE;
};
```

### IEnumItems

This is an interface for collection enumeration, used by StructuredDelta to enumerate the objects of the third party application database. IEItemEnumFlags (eItemEnumFlags__FOLDER, eItemEnumFlags__ITEM, and eItemEnumFlags__ATTACHMENT) is used to enumerate only the requested type of objects.

US 6,671,757 B1

23                                                                      24

```
interface IEnumItems : IUnknown
{
    STDMETHOD(ItemQueryStart) ( enumItemType type, long
&1Count, eItemEnumFlags dwFlags ) PURE;
    STDMETHOD(ItemQueryNext) ( Item **ppItem ) PURE;
    STDMETHOD(ItemQueryFinish) () PURE;
};
```

### IFindItem

This is an interface for recursively finding object within the third party application database, used by StructuredDelta to find application object by its unique ID.

```
interface IFindItem : IUnknown
{
    STDMETHOD(FindStoreByID) ( LPCTSTR pszUniqueID,
    ItemContainer **ppFolder ) PURE;
    STDMETHOD(FindFolderByID) ( LPCTSTR pszUniqueID,
    ItemContainer **ppFolder ) PURE;
    STDMETHOD(FindItemByID) ( LPCTSTR pszUniqueID, Item
    **ppItem ) PURE;
};
```

### IFindItemByData

This is an interface for recursively finding the object that matches the search criteria data. The search criteria are represented as Collection that allows the multiple search field keys to be used during the search. The multiple objects may be found that match the search criteria. The interface also provides enumeration capability of the search results.

```
interface IFindItemByData : IUnknown
{
    STDMETHOD(FindByDataStart) ( enumItemType type, Variant*
    pSearchKey, int* pnFound ) PURE;
    STDMETHOD(FindByDataNext) ( LPTSTR pszEntryID, int
cbBufSize ) PURE;
    STDMETHOD(FindByDataFinish) ( ) PURE;
};
```

### IModifyItem

This is an interface for StructuredDelta to add, delete, and re-parent application data in the third party database during synchronization.

```
interface IModifyItem : IUnknown
{
    STDMETHOD(Add) ( BOOL bFolder, unumItemType type, Item
**ppItem ) PURE;
    STDMETHOD(Delete) ( ) PURE;
    STDMETHOD(Move) ( ItemContainer * pDestFolder ) PURE;
};
```

### IReadWrite

This is an interface for accessing, writing, and mapping the third party application data fields by StructuredDelta. It provides the capability of read and write data fields from and to the third party application database and the capability of mapping data field of the third party application to universal data format of the system of the present invention. Any object that has data fields and require field level synchronization must implement this interface.

```
interface IReadWrite : IUnknown
{
    STDMETHOD(Read) ( ) PURE;
    STDMETHOD(Commit) ( ) PURE;
    STDMETHOD(GetFieldData) ( enumFieldTag fieldTag, Variant
**ppVariant ) PURE;
    STDMETHOD(ReleaseFieldData) ( Variant *pVariant ) PURE;
    STDMETHOD(SetFieldData) ( const Variant *pVariant )
};
```

### IAppObj

This is an AppObj only interface. It provides the capability of logon and logoff to the third party applications during synchronization. The data class filter mechanism is used by StructuredDelta to filter the enumeration of contained data classes (eDataClass_CONTACT, eDataClass_CALENDAR, etc).

```
interface IAppObj : IUnknown
{
    STDMETHOD(Logon) ( HWND hWndParent ) PURE;
    STDMETHOD(Logoff) ( ) PURE;
    STDMETHOD(SetFilter) ( const VOID* pFilter, int BufLen )
        PURE;
    STDMETHOD_(int, GetFilter) ( VOID* pFilter, int BufLen )
        PURE;
};
```

### IModuleIdentity

This is an AppObj only interface. It provides DLL module identification information to the Manager object such as the name of the third party application, enum ID of this application, and the application installation detection support.

```
interface IModuleIdentity : IUnknown
{
    STDMETHOD(GetName) ( LPTSTR pszName, int iBufLen ) const
PURE;
    STDMETHOD(GetAppl) ( Appl *pAppl ) const PURE;
    STDMETHOD(IsInstalled) ( BOOL *bIsInstalled ) const
PURE;
};
```

### IItemTypeInfo

This is an AppObj only interface. It provides the information on the number of item types supported by AO, what type items are supported and the capabilities for a specific item type. This returns a DWORD containing bits set.

```
interface IItemTypeInfo : IUnknown
{
    STDMETHOD(GetSupportedTypeCount) ( int &iCount ) PURE;
    STDMETHOD(GetSupportedTypeInfo) ( int iIndex,
enumItemType &type, LPTSTR pszTypeName, int iBufLen ) PURE;
    STDMETHOD(GetItemTypeCaps) ( enumItemType type, DWORD
&dwFlags ) PURE;
};
```

### IDataClassInfo

This is a CAppObj only interface. It provides the information on the number of data classes that are supported by the application object and what the data classes are supported

US 6,671,757 B1

25                                                                      26

```
interface IDataClassInfo : IUnknown
{
    STDMETHOD(GetCount) ( int *piCount ) PURE;
    STDMETHOD(GetDataClass) ( int iIndex, enumDataClass
*peDataClass ) PURE;
};
```

### IDataFileInfo

This is a CAppObj only interface, it provides information on the number of database files and database filenames supported by AO to avoid being synched twice by application sync and file-set sync.

```
interface IDataFileInfo : IUnknown
{
    STDMETHOD(GetDataFileCount) ( int *piCount ) PURE;
    STDMETHOD(GetDataFilePath) ( int iIndex, LPTSTR
pszFilepath, int iBufLen ) PURE;
};
```

### IItemFieldMap

This is a CAppObj only interface that is used by StructuredDelta to query the data fields of given application object. For example, what are data fields in application object called eItemType_CONTACT?

```
interface IItemFieldMap : IUnknown
{
    STDMETHOD(FieldQueryStart) ( const enumItemType &type,
int &iCount ) PURE;
    STDMETHOD(FieldQueryNext) ( enumFieldTag &field, LPTSTR
pszName, int iBufLen, LPTSTR pszType, int iTypeBufLen )PURE;
    STDMETHOD(FieldQueryFinish) ( ) PURE;
};
```

### IFolderInfo

This is a CAppObj only interface, used by StructuredDelta to obtain the special and default folders' unique IDs and UUIDs.

```
interface IFolderInfo : IUnknown
{
    STDMETHOD(GetSpecialFolderID) ( enumSpecialFolderType
eFolder, LPTSTR pszUniqueID, int iBufLen ) PURE;
    STDMETHOD(GetDefaultFolderID) ( enumItemType type,
LPTSTR pszUniqueID, int iBufLen ) PURE;
    STDMETHOD(MapFolderGUID) ( UUID uuidFolder, LPTSTR
pszUniqueID, int iBufLen ) PURE;
};
```

### IFastSync

This is a CAppObj only interface that is used by StructuredDelta to query if the given AO also provides FastSync service or not. FastSync is a DLL component that is written using the third party APIs and loaded into the third party application to receive the changes in database while users are operating the application. It is used to speed up the synchronization performance by syncing only the objects that are known to IFastSync component.

```
interface IFastSync : IUnknown
{
    STDMETHOD(GetFastSync) ( enumDataClass eDataClass, BOOL*
pbFastSync ) PURE;
};
```

### SynchNotify

This is a CAppObj only interface that is called by Manager to notify the third party application the state of synchronization: start, finished, or reset so that the application can prepare itself accordingly.

```
interface ISynchNotify : IUnknown
{
    STDMETHOD(SynchNotify) ( enumSyncNotify eNotify ) PURE;
};
```

Server Application Objects share many characteristics with desktop application objects, including support for reading and mapping to the universal record structure set forth above.

Nevertheless, among various devices incorporated into the system of the present invention, each application object database will be quite different. For example, the Palm® database on the device is really just a memory space with records laid out sequentially in memory. In a web portal-type application, the application object may be an Oracle dat abase. Server application objects may generally have less difficult tasks since the applications supported are generally either devices providing their own change data output, (such as Palm®-type PDA's), or which do not have a great deal of data to export (such as cell phones, having only name and number information).

Nevertheless, each application object must support all calls defined in a class interface definition as follows:

| FUNCTION | DESCRIPTION |
|---|---|
| Open | Perform an initialization of the device before data retrieval functions are called. |
| Close | Done with database calls, cleanup if necessary. |
| Get First Modified Record | Get the first modified record from the device and insert into application object. |
| Get Next Modified Record | Get the next modified record from the device and insert into the application object. |
| Add Record | Add a record into the application object database. |
| Update Record | Update a record |
| Delete Record | Delete a record in the application object database. |
| Set Device Records | A function called during the synchronization manager to send a bytestream to the application object for interpretation. The bytestream will contain a list of records to add to the application object modified records list. At a later point in time, such records will be retrieved by the Get First Modified Record/Get Next Modified Record functions. |
| Get Device Records | For records bound to the device, this call gets a bytestream that contains a list of records to add back to the device. There is an outbound record list that is saved until this call is finished, at which time the sync |

US 6,671,757 B1

27

28

-continued

| FUNCTION | DESCRIPTION |
|---|---|
| | server will be finished with the application object. |
| Set Device Response | A function used to modify or repair a record input saved in the application object store that was sent to the device in the Get Device Records call, such as a record ID for a record. If 10 records were sent to the device during the Get Device Records call, one would expect to see 10 records coming back in during this function call. |

As noted above, because each application object database is different, the calling convention and the application object itself will likewise be different. The calling convention for a Palm® device's sync manager application object is given in the following pseudo-code:

```
Call AO::Open
Call AO::WriteRecords
Start synchronization process
While more records in AO Data Object
        Call AO::GetFirstModifiedRecord( )
        Call AO::GetNextModifiedRecord( )
END
IF new records THEN
        Call AO::AddRecord( )
IF deleted records THEN
        Call AO::DeleteRecord( )
IF update record THEN
        CALL AO::UpdateRecord( )
Call AO::Close
```

As shown therein, the calling convention is designed to be integrated with the Palm's® own sync manager.

A second example provided below shows mapping of a portion of a web portal's contact database:

```
MappingItem CContactTable::m_FieldMap[ ] =
{
    {1,  eFieldTag_Contact_FirstName,       "firstname"},
    {1,  eFieldTag_Contact_MiddleName,      "middlename"},
    {1,  eFieldTag_Contact_LastName,        "lastname"},
    {1,  eFieldTag_Contact_Title,           "title"},
    {1,  eFieldTag_Contact_Suffix,          "suffix"},
    {1,  eFieldTag_Contact_Anniversary,     "anniversary"},
    {1,  eFieldTag_Contact_Birthday,        "birthday"},
    {1,  eFieldTag_Contact_AssistantName,   "assistantname"},
    {1,  eFieldTag_Contact_Children,        "children"},
    {1,  eFieldTag_Contact_CompanyName,     "companyname"},
    {1,  eFieldTag_Contact_Department,      "department"},
    {1,  eFieldTag_Contact_FTPSite,         "ftpsite"},
    {1,  eFieldTag_Contact_Gender,          "gender"},
    {1,  eFieldTag_Contact_JobTitle,        "jobtitle"},
    {1,  eFieldTag_Contact_ManagerName,     "managername"},
    {1,  eFieldTag_Contact_NickName,        "nickname"},
    {1,  eFieldTag_Contact_Office,          "office"},
    {1,  eFieldTag_Contact_Profession,      "profession"},
    {1,  eFieldTag_Contact_Spouse,          "spouse"},
    {1,  eFieldTag_Contact_SelectedMailingAddress,
            "selectedmailingaddress"
};
int CContactTable::m_nNumFields =
sizeof(m_FieldMap)/sizeof(MappingItem);
HRESULT CPortalAddrOCI::InsertRecord( MappingItem theMap[ ], int
numFields, CDataAccessor *pInsertItem, CFIItemUniversal *pUnivItem,
bool bForceCreate )
{
    bool bHasData = SetRecordFields( theMap, numFields,
```

```
pInsertItem,    pUnivItem );
    if( bHasData || bForceCreate )
    {
    // Insert the record into the database and execute the command
        pInsertItem->InsertRow(0);
        pInsertItem->Exec( );
    }
    return S_OK;
}
```

The above example of mapping the contact field files maps contact fields from a particular web contact information database to fields in the universal record format from the master list headerfile (pio_types.h) in the system of the present invention. This mapping is for a specific contact table and it should be understood that other information, such as phone numbers, e-mail addresses, and other contact information may be stored in a separate table.

Once data is extracted from a particular application, the server application object must then convert the information into the universal record format which can be utilized by other server device engines to take content information into their own particular application.

Universal Record Format

The universal record format is used by each server device engine to handle various tasks of encapsulating records in a common format, comparing records, creating and holding differences between records, and other tasks of synchronization.

The universal record format allows the application objects to support a wide range of extensible application item types such as contacts, calendar, mail, bookmarks, and the like. Flexible type name and value associations permit synchronization without regard to individual vendor application information formats. Each application object encapsulates mapped knowledge from the vendor unique format to the universal format of the present invention. As such, an application object can be designed to support any combination of application and binary information types. In essence, application objects can be designed to support a vendor application using only binary file synchronization if the internal format of the application is not known.

Server application objects can also be designed to create collections. For example, if the user wishes to create a "my pictures" collection which consists of some collection of information and synchronize this collection of information, such an arbitrary grouping of classes of information into appropriate representations is supported.

Because the connector layer of the interfaces to the actual storage with a vendor application varies with application type, application access methods can include, but are not limited to, disk or database access, network protocols, wireless device protocols, and the like.

The Universal Records Format and the Universal Field Format class definitions are given below:

```
typedef map < enumFieldTag, CUniversalField, less_enumFieldTag >
UniversalRecordMap;
typedef UniversalRecordMap::value_type UniversalRecordPair;
typedef UniversalRecordMap::iterator UniversalRecordIterator;
typedef UniversalRecordMap::const_iterator
ConstUniversalRecordIterator;
class CUniversalRecord
{
```

US 6,671,757 B1

**29**

-continued

```
private:
    UniversalRecordMap recordMap_;
Public:
    bool conflicts(const CUniversalRecord& rhs);
    bool add(const CUniversalRecord &rhs);
    bool subtract(const CUniversalRecord& rhs);
    CUniversalRecord( );
    CUniversalRecord( const CUniversalRecord& rhs );
    virtual ~CUniversalRecord( );
    // add this element
    HRESULT insert( enumFieldTag eId, long value,
enumFieldDataFlag flag = eFieldDataFlag_Normal);
    HRESULT insert( enumFieldTag eId, LPCTSTR value,
enumFieldDataFlag flag = eFieldDataFlag_Normal);
    HRESULT insert( enumFieldTag eId, DATE value,
enumFieldDataFlag flag = eFieldDataFlag_Normal);
    HRESULT insert( enumFieldTag eId, string value,
enumFieldDataFlag flag = eFieldDataFlag_Normal);
    HRESULT insert( UniversalRecordPair p );
    CUniversalRecord exclusiveLeftWins( CUniversalRecord& rhs );
    CUniversalRecord inclusiveLeftWins( CUniversalRecord& rhs );
    bool removeSame(const CUniversalRecord &rhs);
    bool Find( const enumFieldTag eId, CUniversalField &field );
    UniversalRecordMap::iterator find( const enumFieldTag eId ) {
    return recordMap_.find(eId); }
    UniversalRecordMap::iterator begin( )    { return
recordMap_.begin( ); }
    UniversalRecordMap::iterator end( )    { return
recordMap_.end( ); }
    bool empty( )        { return
recordMap_.empty( ); }
    long size ( )        { return
recordMap_.size( ); }
    UniversalRecordMap::iterator erase(UniversalRecordMap::iterator&
it)
        { return recordMap_.erase(it); }
    void clear( )        ( recordMap_.clear( ); }
};
```

The UniversalField Structure

```
class CUniversalField
{
public:
    enum eUuniversalField
        {
            eUF_Unknown,
            eUF_Long,
            eUF_String,
            eUF_Date,
            eUF_Blob
        };
protected:
    eUniversalField        typeId_;
    enumFieldTag        fieldId_;
    enumFieldDataFlag    flag_;
    size_t            len_;
    union
        {
            long        l;
            DATE        d;
            TCRAR*        pCh;
        } value_;
public:
    CUniversalField( );
    CUniversalField( const CUniversalField& rhs );
    CUniversalField( enumFieldTag itemId, long value,
enumFieldDataFlag flag = eFieldDataFlag_Normal);
    CUniversalField( enumFieldTag itemId, DATE value,
enumFieldDataFlag flag = eFieldDataFlag_Normal);
    CUniversalField( enumFieldTag itemId, LPCTSTR value,
enumFieldDataFlag flag = eFieldDataFlag_Normal);
    CUniversalField( enumFieldTag itemId, string blob,
enumFieldDataFlag flag = eFieldDataFlag_Normal);
    ~CUniversalField( );
```

**30**

-continued

```
    bool operator==( const CUniversalField& rhs ) const;
    bool operator!=( const CUniversalField& rhs ) const { return
!operator==(rhs); }
    CUniversalField& operator=( const CUniversalField& rhs );
    eUniversalField getType( ) const        { return typeId_; }
    enumFieldTag getFieldID( ) const        { return fieldId_; }
    enumFieldDataFlag getFlag( ) const        { return flag_; }
    size_t getLength( ) const        { return len_; }
    LPCTSTR getString( ) const        { ASSERT( eUF_String ==
typeId_); return value_.pCh; }
    long getLong( ) const        { ASSERT( eUF_Long ==
typeId_); return value_.l; }
    DATE getDate( ) const        { ASSERT( eUF_Date ==
typeId_); return value_.d; }
    string getBlob( ) const        { ASSERT( eUF_Blob ==
typeId_); return string(value_.pCh, len_); }
    void get( LPCTSTR& p ) const        { ASSERT( eUF_String ==
typeId_); p = value_.pCh; }
    void get( long& l ) const        { ASSERT( eUF_Long ==
typeId_); l = value_.l; }
    void get( DATE& d ) const        { ASSERT( eUF_Date ==
typeId_); d = value_.d; }
    void get( string& b ) const { ASSERT( eUF_Blob ==
typeId_); b.assign(value_.pCh, len_); }
    bool isString( ) const        ( return typeId_ ==
        eUF_String; }
    bool isLong( ) const        ( return typeId_ == eUF_
        Long; }
    bool isDate( ) const        ( return typeId_ == eUF_
        Date; }
    bool isBlob( ) const        ( return typeId_ == eUF_
        Blob; }
};
```

EXAMPLE

An example of how data is removed from one particular application data type and converted into the universal record format is given below for an Oracle database:

```
#include "stdafx.h"
#include <string>
using namespace std;
#include "F1ItemUniversal.h"
#include "oci.h"
#include "OCIDefs.h"
#include "OCIConnect.h"
#include "OCISession.h"
#include "OCIColumn.h"
#include "OCICursor.h"
#include "DataAccessor.h"
#include "UniversalMapper.h"
#include "UniversalRecord.h"
#include "F1Util.h"
#include "BaseAOSTableOCL.h"
/*
 * Function: MapFields
 * Description: Map fields from an Oracle database record into an
 UniversalRecord format.
 */
void CBaseAOSTableOCI::MapFields( CDataAccessor *pAccessor,
MappingItem
theMap[ ], int numFields, CUniversalRecord &univRec)
{
    string sValue;
    DATE        dtvalue;
    LONG        lValue;
    double        dvalue;
    for( int inx=0; inx<numFields; inx++ )
        {
            enumFieldTag fieldID = theMap[inx].m_universalFieldID;
            switch( F1PropType( fieldID ) )
                {
```

US 6,671,757 B1

31                                                    32

-continued                                            -continued

```
        case eFieldType__Binary:
            {
// to fill properly, 1st name and last name should already be assigned
            CUniversalField emailField;
            string sValue;
            if ( SUCCEEDED(BuildEmailField( pAccessor,
sValue, emailField )) )
                univRec. insert ( fieldID,
emailField.getBlob( ) );
                break;
            }
        case eFieldType__String:
            if( pAccessor->GetFieldValue( fieldID, sValue
) )
                {
                if ( 0 == ::_tcslen(sValue.c__str( )) )
                    continue;
                univRec.insert( fieldID, sValue.c__str( )
);
                }
            break;
        case eFieldType__DATE:
            if( pAccessor->GetFieldValue( fieldID, dtValue
) )
                univRec.insert( fieldID, dtValue );
            break;
        case eFieldType__DWORD:
            if( pAccessor->GetFieldValue( fieldID, lValue
) )
                univRec.insert( fieldID, lValue );
            break;
        case eFieldType__Double:
            if( pAccessor->GetFieldValue( fieldID, dValue
) )
                univRec.insert( fieldID, dValue );
            break;
            }
        }
    }
HRESULT CBaseAOSTableOCI::InsertRecord( MappingItem theMap[ ],
int
numFields, CDataAccessor *pInsertItem, CF1ItemUniversal *pUnivItem, )
bool bForceCreate )
{
    bool bHasData = SetRecordFields( theMap, numFields, pInsertItem,
pUnivItem );
    if( bHasData || bForceCreate )
        {
        pInsertItem->InsertRow(0);
        pInsertItem->Exec( );
        }
    return S__OK;
}
/*
* Function: SetRecordFields
* Description: Map fields from an UniversalRecord format into an
Oracle database record (pInsertItem)
*/
bool CBaseAOSTableOCI::SetRecordFields( MappingItem theMap[ ], int
numFields, CDataAccessor *pInsertItem, CF1ItemUniversal *pUnivItem
{
    bool bHasData = false;
    CUniversalField field;
    for( int inx=0; inx<numFields; inx++ )
        {
        enumFieldTag fieldID = theMap[inx].m__universalFieldID;
        BOOL bExists = pUnivItem->m__record.Find( fieldID, field );
        if( bExists )
            {
            bHasData = true;
            if( field.isBlob( ) )
                {
                string blob = field.getBlob( );
                LPCTSTR szEmailAddr =
GetAddressFromRecipients((F1RECIPIENTS*)blob.c__str( ));
                if( szEmailAddr && *szEmailAddr != NULL )
                    pInsertItem->SetFieldValue( fieldID,
(string) szEmailAddr );
                else
```

```
                {
                bHasData = false;
                continue;
                }
            }
        else if( field.isString( ) )
            {
            string sValue = field.getString( );
            if( !sValue.empty( ) )
                pInsertItem->SetFieldValue ( fieldID,
sValue );
            }
        else if( field.isLong( ) )
            {
            LONG nValue = field.getLong( );
            pInsertItem->SetFieldValue( fieldID, nValue);
            }
        else if( field.isDate( ) )
            {
            DATE dValue = field.getDate( );
            if( dValue )
                pInsertItem->SetFieldValue( fieldID,
dValue );
            }
        }  // if( bExists )
    }  // For all fields
    return bHasData;
}
```

While the above-identified code is specific to, for example, an Oracle database, one of average skill in the art will readily recognize that the technique utilized above may be adapted to other types of databases containing records and fields of interest. In the above code examples, all fields which are mapped from a particular application are mapped to fields in the master mapping file.

Management Server

In order to provide security and identification of particular users in an Internet-implemented synchronization system, a management server may be provided in the system of the present invention. The management server is a centralized server which controls behavior and characteristics of the entire network of device engines across all users.

FIG. 14 shows the general representation of how a management server 1410 integrates itself into the system of the present invention. Shown in FIG. 14 is an exemplary device engine 1450 which has HTTP links to both a management server 1410, a storage server 1415, and a generic FTP server 1420. As will be discussed hereinafter with reference to the process of the present invention, and the specific implementation of the data below shown in FIGS. 15–17, the management server interacts with the device engine to control authorized access to information on the storage server, or a generic FTP server 1420,1425 to access device-specific information storage 1430 in accordance with the system of the present invention. This allows any device coupling to the Internet to have access to management protocols and to retain user information across all platforms which the data which is being synched by the system of the present invention must access.

The management server communicates using hypertext transfer protocol (HTTP) which may be implemented with a secure sockets layer (SSL) to ensure security.

In particular, the management server supports an authentication interface that requires each device engine to authenticate with the management server before performing synchronization. Certain storage server implementations may utilize locking semantics to control read and write access to storage for multiple device engines. For example, in a generic FTP request, if two device engines attempt to

**33**

connect to the same data at the same time, there must be some form of locking control to prevent device engines accessing the same data at the same time. In this instance, the management server controls the device engine acquisition, renewal, and releasing of locks against data stored in the network.

Each device engine is uniquely identified and tracked by the management server. This allows for tailoring behavior between the management server and specific types of storage systems and device engine components. All device engine components are tagged and version stamped for management via the management server.

Device actions can request updated copies of individual device engine components, permitting self-update and configuration of device engine systems. This permits minimal download designs for device engines that are on low bandwidth connections enabling the device engines to download additional required components at a later time.

In a further aspect of the system, a value added component may be provided where the management server can support client's advertising mechanisms, enabling the display of banner or similar advertising on a device engine system without the need for a web browser. Cycling of advertisements, statistic collection, and the like, are managed via management server protocols. Online purchase and subscription mechanisms are also supported using the management server protocol.

The management server further supports the accounting, sign-up registration, device edition, storage server selection, and similar functions for each user in the system. In one embodiment, the management server may retain password and encryption information for a given user account. In a second embodiment, such information is not retained. The second embodiment provides the advantage that users may feel more secure if the maintainer of the management server is not in possession of the password to access data in the user's account.

Further information with respect to the management server and the data flow from the management server to other components of the system of the present invention will become apparent with respect to the discussion of the process flow and data flow diagrams in FIGS. **15–17**.

FIG. **17** shows a general depiction of the data flow and the functional specification of the management server utilized in accordance with the present invention.

As shown in FIG. **17**, following a welcome request **1710**, a user is allowed to sign out which enables an add user module **1712**, and subsequently enables an add device module **1714**. If sign-up is not requested, information may be provided via module **1718**.

As indicated in FIG. **17**, the add user module **1712** adds user records to the user in device database **1750**. Additionally, the add device module **1714** adds users and devices to the user device database **1750**. A device list **1720**, and a device engine download and update database **1722**, provide selection data for the add device module **1714**. The account authentication module **1724** receives input both directly from a user log-in from the welcome screen at **1710** and from the add device module **1714**.

Once an account is authenticated and confirmed, the administrator of the system of the present invention having a private data store at **1770** may choose to provide a web desktop **1754** which allows access to a user's records such as file **1756**, e-mail **1758**, calendar **1760**, contacts **1762**, notes **1764**, and tasks **1766**. The information will be culled from a provider database **1752** which will be synched in accordance with the system of the present invention as

**34**

previously described. In essence, the provider database **1752** accesses data from the device engines **1780**, which include, as discussed above, the storage server, each individual device engine **1785**, and a settings database **1787**.

Other portions of the management server include the locking modules for beginning a sync **1732**, continuing a sync **1734**, and ending a sync **1736**, and for updating user information including modifying a user **1742**, adding devices **1744**, removing devices **1746**, and modifying devices **1748**.

Storage Server

Shown in FIG. **14** is the storage server **1415**. While storage server **1415** may include a generic storage model accessible through any number of standard Internet protocols, in accordance with the present invention, a flexible storage architecture is provided that permits various standard implementations of the system of the present invention. This allows deployment of network services without installation of new server applications and can be responsible for communicating change information between multiple device engines in a consistent fashion.

One or more storage servers **1415** may be used to communicate transaction amongst a collection of devices. Each user's personal information network is represented by a unique account within its own data package storage section. The storage server **1415** maintains persistent store collection of data packages which is, at a minimum, enough data packages to be capable of synchronizing the most out-of-date system in a user's given information network or add information to new devices which are provided in the network. Additional data packages can be maintained to permit rollback of previous versions of information. The storage server can automatically dispose of older data package storage and can support aging of an inactive accounts.

Each storage server **1415** may be implemented using a variety of implementations including a standard FTP server for any operating system platform. The storage server can be implemented using HTTP protocols for increased efficiency and firewall avoidance. The storage server may be implemented using techniques for local storage such as database access or single file storage of a user's entire file system tree. The storage server **1415** may utilize the stored foreign protocol model for moving copies of data packages to other storage servers in the system. In one embodiment, the storage server can allow tunneling of information using an alternative protocol to other storage servers in cases where firewall prevents originating protocol. For example, a storage server can relay an FTP traffic inside an HTTP protocol. Storage servers may include their own locking semantics to arbitrate multiple device engine access to the same server without the need for a separate management server. Each device engine can access only a specific user's data package storage area even though the storage server **1415** may maintain a larger number of data packages across a large number of users. This allows for increased scaling when the storage server is implemented using file system techniques.

In one aspect, the storage server is implemented using standard FTP or HTTP connections for each operation. HTTP is composed of request response pairs. All requests are supposed to be posting commands. Parameters can be set in the form known as "application/X-WWW-form-URLENCODED". The encoding is specified as in RFC1866. Functions for the storage server include testing if the storage server can reach other users which will retrieve a simple text string, a "get" command which transfers the contents of a file as in a binary stream of byes; a put command as a binary stream of data to the storage server, a

US 6,671,757 B1

35

36

directory listing command, a remove command, a rename command, an exist command, and the like.

Pull Synchronization

FIG. 15 represents a "pull" synchronization process in accordance with the present invention. Both the pull synchronization illustrated in FIG. 15 and the push synchronization illustrated in FIG. 16 are done from the perspective of the device engine.

A pull synchronization as illustrated in FIG. 15 is always performed prior to a push synchronization. This allows the device engine to know whether synchronization of its own data is necessary.

Each device has its own triggering mechanism for initiating synchronization. Some devices, such as Windows clients and Palm® pilots are triggered manually when the user presses a "sync" button. Other devices, such as a cellular telephone, may be triggered automatically after another device completes a sync. Regular, time-based triggers are supported as well. A web-based application portal will sync when a user logs into the website security authorization mechanism, and may optionally sync on a log-out of the user or on the session time-out, but only if the user has changed data during the session.

For each sync, the triggering event specifies which application types are to sync for the device. This enables a triggering event to trigger only a sync for a particular application type. The management server can specify that no sync is needed for a particular type of application to minimize traffic to the storage server. Syncs may be triggered via an HTTP request to the server. This request holds information about which device to sync and the user log-in information is bounced to the management server for authorization and validation. Syncs may be triggered by sending an HTTP request to the server and passing the authentication information in the data portion of the request to the management server. Each device may include a servlet that is responsible for retrieving the request and ensuring its proper format before passing the synchronization request on to the server.

The device name and device class uniquely identify a particular device type that is being synchronized, and is contained in the management server. Each user has one or more device entries in the management server authorization records and each device name is unique for this user's device. For example, if a user has five devices with his or her own personal identification number, there will be five authorization records. There may be two Windows devices, two different Palm® devices and a web service portal, each having their own personal identification number.

As shown in FIG. 15, the pull synchronization process starts at an idle state **1405** when the triggering event, described above, triggers a synchronization request. The synchronization request is confirmed at **1410** and if the request is verified, a connection is made to the storage server at step **1415**. Once a connection is established, the connection to the management server is made at step **1420** to authenticate the user identification via the management server. If authentication is successful, the management server may initiate a management server lock on the storage server so that no conflicting device engines may couple to the same data at the same time. A failure at any of the steps **1410**–**1425** will return the system to its idle state **1405**. Once the engine server lock is acquired, the storage server will be checked to determine whether a new version of the data exists on the storage server at step **1430**. If no new version exists, the synchronization process ends.

If a new version of the data exists, the device engine will retrieve the difference information at step **1435** "to get Δ."

Once a Δ is retrieved, conflicts are resolved at step **1450**. The resolve conflicts step allows a user to resolve conflicts to multiple types of data which have been changed on both the server portion of the device and in the local data.

Once the conflicts have been resolved at step **1450**, the Δ's are applied at step **1455**. The apply Δ step **1455** allows for filters and mappings to be accounted for on the local device engine side of the system. As shown at steps **1460**, **1465**, **1470**, and **1475**, the Δ may include updates at the item level **1460**, application level **1465**, device level **1470**, or network level **1475**. In each of the aforementioned steps, a loop back to the Δ retrieval step **1435** is provided. When no further Δ's are available, the management server lock is released at step **1440**.

The foregoing description of a pull synchronization is further described in the following pseudo-code:

```
*SymbolicSyncEngine::Sync
    Download Remote File System
    For each Symbolic app in the file system's list of symbolic apps
        CFDESymbolicSyncEngine::SyncSymbolicApp
            Create a structured delta object -- CStructuredDelta
delta( . . . )
            Compare local and remote versions of deltas SODs),
            if not the same then
                while localVersion != remoteVersion
                    download remote version
                    // apply delta (change log)
                    delta.ApplyChangeLog
                    // See details below
                    increment local version
                end while
            else
                nothing to do
            end if
            if any local items (change logs) are unsent then
                delta->ApplyUnsentItems (Reads the changes
[JCL where applied?]
            end if
            // Generate a new change log for the device:
            delta->delta.GenerateChangeLog( . . . strChangeLogFile
. . . )  // See details below
            FTP it back up to Storage Server
            Update the local version number
        end // SymbolicSyncEngine::SyncSymbolicApp
end // CFDESymbolicSyncEngine::Sync
CStructuredDelta::ApplyChangeLog
    Set up m_pAppObj;        // IFAO pointer
    Set up m_pAOS;          // IAOS pointer
    Other set up (statistics, time to complete, etc.)
    Read the change log and . . .
    ApplyChangeListToAOS (f1Changes)
        for each itme in list
            ApplyItemToAOS // (Does
m_pAOS . . . AddRecord/UpdateRecord/DeleteRecord)
        end for
    end // ApplyChangeListToAOS
    If not doing a full sync, also add changes from this file to
apply these to m_F1Changes
end //CStructuredDelta::ApplyChangeLog
CStructuredDelta::GenerateChangeLog
    Set up m_pAppObj;        // IFAO pointer
    Set up m_pAOS;          // IAOS pointer
    Other set up (statistics, time to complete, etc.)
    // Set up m_deviceChanges by call to:
    CStructuredDelta::CreateDeviceChangeList
        Create a CF1Item* pItem
        // Iterate FAO modifications:
        for (m_pAppObj->GetFirstModified(pItem),
m_pAppObj->GetNextModified(pItem))
            cast pItem to --> CF1ItemUniversal* pUniItem
            // Do certain things based on whether the operation
is an add, delete, or update.
            // Then in each case, call:
                CStructuredDelta::GetMatchingItemFromAOS
                // First get by F1ID
```

US 6,671,757 B1

37

-continued

```
         m__pAOS->GetRecordByF1ID
         // See if we have an AppID, if so:
         m__pAOS->GetRecordByAppID
         // If we can build search key on it
         iterate m__pAOS->GetFirstMatchingRecord
         end //
/ m__pAOS->GetNextMatchingRecord
         end //
CStructuredDelta:: GetMatchingItemFromAOS
      end for
   end // CStructuredDelta::CreateDeviceChangeList
   if m__deviceChanges is not empty
      // reconcile (compare) change lists while writing to AOS
      CStructuredDelta::ReconcileChangeLists
         For each item in m__deviceChanges . . .
         If we can find it in  m__F1Changes
            Reconcile the device item and the f1
item
         end if
         ApplyItemToAOS // (Does
m__pAOS . . . AddRecord/UpdateRecord/DeleteRecord)
      end for
   end // CStructuredDelta::ReconcileChangeLists
   // Create a new change log (F1 delta package)
   ApplyChangeListToF1 (m__deviceChanges)
      m__deviceChange.Store
      // Fires off its own whole world, see
F1ItemList.cpp
      end // m__deviceChange.Store
   end // ApplyChangeListToF1 (m__deviceChanges)
   report stats
end if
// Switch (SyncMode)
If SyncMode == full
   ApplyAOSToDevice
      iterate
m__pAOS->GetFirstRecord . . . m__pAOS->GetNextRecord
      Add or update the corresponding FAO record.
(Note. Never delete based on what's in AOS, apparently).
   end // ApplyAOSToDevied
else
   ApplyChangeListToDevice(m__f1Changes);
End // CStructuredDelta::GenerateChangeLog
```

Push Synchronization

FIG. **16** shows a push synchronization in accordance with
the system and method of the present invention. Beginning
at idle state **1505**, a synchronization event occurs and if
confirmed at step **1510**, Δ's are checked at step **1515**.
Depending on which type of changes occurred, a network Δ
**1520**, device Δ **1525**, location Δ **1530**, or item Δ **1535** will
be created.

Once the Δ's for a given application have been created, the
method of the present invention continues at step **1540**,
which enables a connection to a storage server. Upon
connection to the storage server, a further connection to
management server **1545** will occur to authenticate the user
in the system. Failure at any of the aforementioned points
will result in returning to idle state **1505**. Upon
authentication, a management server lock is enabled to
ensure that multiple device engines do not connect to the
same data at the same time.

Once a lock is acquired at step **1555**, Δ's are uploaded to
the system. As shown, this may include uploading an item Δ
**1575**, an application Δ **1570**, uploading a device Δ **1565**, or
a network Δ **1560**. Once Δ's have been uploaded to the
server, management lock server **1580** is released, and the
connection to the storage server is terminated at step **1585**.

It should be recognized that such a push synchronization
need not occur directly to a server, but may occur directly to
a second device engine in accordance with the depiction of
the multiple embodiments of the invention in FIGS. **1–7**.

Data Package Specification

Once information is provided into the universal data
format, the device engine organizes the format into a data

38

package. Each data package thus includes a description of
changes to any and all information for particular application,
and a collection of data packages describes changes across
all device engines including all different types of data. With
encoding and compression, data packages can become very
compact to minimize bandwidth and storage requirements
across the system of the present invention.

In one particular aspect of the present invention, encoding
of the data packages may be provided in a streaming format
to allow processing by the device engines with minimal
storage and memory configuration at the device engine
level.

The device engine can read the stream and determine
which records from which applications it needs to update the
particular information present on the system on which it
resides.

Data packages can be provided in a binary data format.
This allows data packages to encode changes to non-
application data at a bite level. Hence, if a single bit on a
system changes, the system of the present invention allows
synchronization of that bit on another system. Changes are
described as a sequence of bite-level change operations. One
such encoding is using a sequence of insert and copy
operations. Insert and copy operations generally define a
particular "insertion" of a number of bites from a source file,
then how many bites of a changed source file must be
inserted to a particular file, then how many bites to insert
from a particular new file, with a differencing engine taking
the bites in the stream and inserting them into the new file
to create the new version of the file.

As will be readily understood by one of average skill in
the art, this allows a user to, for example, change a binary
file such as a word processing document or other type of
attachment, and synchronize such an attachment at the
binary level. Specifically, if one forwards an e-mail of a
word document to a second individual, the second individual
modifies it and wishes to return this document with modi-
fications to the first individual, because the first individual
has the original file on his system, if both systems are
enabled in the system of the present invention, the second
system need only send the changes or the difference infor-
mation back to the first system in order for the first system
to reconstruct the document on the second system using this
change data to create the document as intended by the
second user.

Multiple caching of both the generation and application of
data packages can be utilized to deal with communication
issues in accordance with the system of the present inven-
tion. It should be further recognized that data packages can
be merged into larger meta-data packages. Such meta-data
information, such as the organization of multiple device
packages, may be encoded into a larger system package.
Each system package is essentially an encoded sequence of
data packages.

FIG. **12** shows the general format of the data package and
universal data format an object stream hierarchy used in
accordance with the present invention. With reference to
FIGS. **11** and **12**, one will note that each item in a particular
application data structure will have a particular
classification, such as a file, folder, contact, e-mail, calendar,
etc. as shown in FIG. **13**. The universal data structure
contains a mapped item field for each type of data possible
from each application supported by the system. Hence a
"master" list of every data field mapping possible will
contain a large number of items. Each application object
requires a subset of such fields. One exception is an appli-
cation object used for a Web portal application which

US 6,671,757 B1

39

provides access to all information available on all devices, including other Web portals.

Particular examples of item fields **1260** which may be included for any given item **1250** are shown in FIG. **13**. These exemplary item objects may, for example, be from an allocation such as Microsoft Outlook. Outlook allows for note items **1310**, e-mail items **1320**, task items **1330**, calendar items **1340**, bookmark items **1350**, file items **1360**, channel items **1370**, folder items **1380**, and contact items **1390**, all of which have fields such as those represented in FIG. **13**.

The data format also contains folder information **1240** which allows the classification of items and consequently their associated item fields into particular categories.

Application objects **1230** include information on the types of applications from which information in the stream is included. Device objects **1220** include information on the origin type of device which the information is originating from. Network objects **1210** include information on a user level to define that the information in the data stream is coming from a particular user.

As detailed above, each application object supports a folder store interface that permits management of collections of information on a folder level, and permits management of folder hierarchies of information. The application object also includes an item interface that permits management of individual information entries such as records or files or components of information entries such as fields within records. Each application object further supports an interface for detection of a vendor application.

A DataPack essentially contains a sequence of transactions describing changes to information. This information can span two basic types: structured or application data, and unstructured or binary file data.

Transactions are encoded using an efficient streaming format with tags to represent the actual content objects. This technique permits the continuous extension of the DataPack format as new content is supported.

The general architecture of the package provides for transactions, application data, file data, files, objects and identifiers to be carried in the data package. Generally, transactions, application data, file data, and files have previously been described.

The first portion of the data package will be the data package identifier. Each transaction has a basic architecture of objects and operations. Each piece of content is referred to as an object and is uniquely represented with a Universally Unique Identifier (UUID). Objects typically are represented by a dynamically generated UUID, but more common objects are represented by static UUIDs. The following static UUIDs are defined:

| |
|---|
| UUID__GenericDefaultFolder |
| UUID__DefaultContactFolder |
| UUID__DefaultInboxFolder |
| UUID__DefaultOutboxFolder |
| UUID__DefaultDraftsFolder |
| UUID__DefaultTrashFolder |
| UUID__DefaultSentFolder |
| UUID__DefaultCalendarFolder |
| UUID__DefaultTaskFolder |
| UUID__DefaultNoteFolder |
| UUID__DefaultJournalFolder |
| UUID__DefaultFavoriteFolder |
| UUID__DefaultCookieFolder |
| UUID__DefaultHistoryFolder |
| UUID__DefaultChannelFolder |

40

-continued

| |
|---|
| UUID__DefaultFileFolder |
| UUID__DefaultCallFolder |

Each UUID has a unique 128 bit value which may be assigned by the system provider.

Transactions are broken down into manageable blocks in the form of individual files. These files are then optionally compressed and encrypted and prefixed with appropriate headers. Transactions are grouped into specific files based on the following rules:

Transactions related to account information are grouped into a DataPack file.

Transactions related to a specific data class are grouped into a DataPack file.

Transactions referring to binary data are grouped into separate DataPack files for each file object.

A DataPack file is identified using specific rules based on the file name. The file name is of the form "UUID.VER" where UUID is the identifier for the specific object and VER is the transaction version number. The version number is of the form "D0001" with additional digits used for large version numbers. The "D000" value may be reserved for the base version for the object.

The UUID for the user account is generated by the Management Server (MS). The MS also maintains a current table of UUID values and version numbers that provides the root structure for understanding the DataPack files within a user account. The MS also provides necessary locking semantics needed to maintain consistency when multiple device engines attempt to synchronize.

All DataPacks are prefixed with a standardized header that provides basic content information regarding the Data-Pack. Compression and encryption headers follow the Data-Pack header if needed.

The data package header information will include version signature, applied versioning information, content type, Δ engine type, compression type, encryption type, applied size, encrypted size, compressed size, raw data size, and other data useful for the device engine in decrypting the data stream to provide the data into a format usable for the application.

The header may optionally have the format:

| Type | Bytes |
|---|---|
| Version | 4 |
| Signature | 4 |
| AppliedVersion | 8 |
| ContentType | 4 |
| DeltaType | 4 |
| CompressionType | 4 |
| EncryptionType | 4 |
| AppliedSize | 4 |
| EncryptedSize | 4 |
| CompressedSize | 4 |
| RawSize | 4 |
| Reserved | TBD |

US 6,671,757 B1

| 41 | 42 |

The following ContentType values are permissible:

| Field | Comment |
|---|---|
| DP_CONTENT_RAW | Raw |
| DP_CONTENT_COMPRESSED | Compressed |
| DP_CONTENT_ENCRYPTED | Encrypted |

The DeltaType encodes the type of binary file differencing used. The following DeltaType values are permissible using DataPackageDeltaType:

| Field | Comment |
|---|---|
| PackageDeltaTypeUninitialized | Uninitialized |
| PackageDeltaTypeRawData | Raw binary data |
| PackageDeltaTypeDeltaXDelta | Xdelta binary difference |
| PackageDeltaTypeDeltaBDiff | Bdiff binary difference |

The compression type specifies whether the DataPack has been compressed. A DataPack compression header follows the DataPack header if a compression type is specified. The following CompressionType values are permissible using DataPackageCompressionType:

| Field | Comment |
|---|---|
| PackageCompressionTypeUninitialized | Uninitialized |
| PackageCompressionTypeNone | None |
| PackageCompressionTypePK | PKZip format |
| PackageCompressionTypeLZS | LZS format |

The encryption type specifies whether the DataPack has been encrypted. A DataPack encryption header follows the DataPack header if an encryption type is specified. The following EncryptionType values are permissible using DataPackageEncryptionType:

| Field | Comment |
|---|---|
| PackageEncryptionTypeUninitialized | Uninitialized |
| PackageEncryptionTypeNone | None |
| PackageEncryptionTypeXORTest | XOR masked data |
| PackageEncryptionTypeBlowFish | Blowfish |
| PackageEncryptionTypeTwoFish | Twofish |

All DataPack compression headers are encoded using the following format:

| Field | Size (bytes) | Comment |
|---|---|---|
| Size | 4 | Size of data including this header |
| Version | 4 | Version (1) |
| Signature | 4 | Signature (4271) |
| HeaderType | 4 | Header type (HeaderTypeCompression) |
| Reserved | 12 | Reserved |
| DecompressedSize | 4 | Decompressed size |
| Reserved | 50 | Reserved |
| Reserved | 12 | Reserved |

The following HeaderType values are permissible using DataPackageHeaderType:

| Field | Comment |
|---|---|
| HeaderTypeUninitialized | Uninitialized |
| HeaderTypeEncryption | Encryption header |
| HeaderTypeCompression | Compression header |
| HeaderTypeRaw | Raw header |

All DataPack encryption headers are encoded using the following format:

| Field | Size (bytes) | Comment |
|---|---|---|
| Size | 4 | Size of data including this header |
| Version | 4 | Version (6) |
| Signature | 4 | Signature (4270) |
| HeaderType | 4 | Header type (HeaderTypeEncryption) |
| Reserved | 12 | Reserved |
| DecryptedSize | 4 | Decrypted size |
| InitValue | 16 | TBD |
| KeyLength | 4 | TBD |
| ClearTextKeyBits | 4 | TBD |
| Salt | 4 | TBD |
| PadBytes | 4 | TBD |
| HMAC | 20 | TBD |
| Reserved | 12 | Reserved |

The data package transaction format may take a number of forms. One example is the following:

```
DataPack transaction format - header - info - objects and operations
Diagram
  transaction ::= fileData | Header + InfoList + TransactionList
  fileData::= raw binary file data | binary difference data
  Header ::= ID + DataPackID + DataPackVersion
  ID ::= FUSE
  DataPackID ::= CLOG
  InfoList ::= FieldList
  TransactionList ::= Operation + [ItemInfo + [FieldList]]
  Operation ::= see table below
  ItemInfo ::= ItemType + ItemFlags + EntryID + ParentEntryID
  ItemType ::= same as enumItemType
  ItemFlags ::= same as enumFIItemFlags
  EntryID ::= UUID
  ParentEntryID ::= UUID
  UUID ::= 128-bit UUID as defined by standard
  FieldList ::= {FieldTag + FieldData} + ListEnd
  FieldTag ::= same as enumFieldTag
  FieldData ::= FieldDataType + [FieldDataLen + [FieldDataData]]
  FieldDataType ::= see below
  FieldDataLen ::= length as required by FieldDataType
  FieldDataData ::= data as required by FieldDataType
  ListEnd ::= DWORD(0)
```

The following Operation values are permissible using the Operation class:

| Field | Comment |
|---|---|
| clNop | None |
| clAdd | Add |

US 6,671,757 B1

43

44

-continued

| Field | Comment |
|---|---|
| clDelete | Delete |
| clChange | Change |
| clMove | Move |
| clRename | Rename |
| clForceChange | Force change without conflict |

The following FieldDataType values are permissible using clDataType:

| Field | Comment |
|---|---|
| clInvalidType | TBD |
| clString | Unicode String bytes with a 32-bit length prefix |
| clString8 | Unicode String bytes with an 8-bit length prefix |
| clString16 | Unicode String bytes with a 16-bit length prefix |
| clEmpty String | TBD |
| clBlob | 32-bit length followed by a byte stream |
| clBlob8 | 8-bit length followed by a byte stream |
| clBlob16 | 16-bit length followed by a byte stream |
| clEmptyBlob | TBD |
| clByte | 8-bit value |
| clShort | 16-bit value |
| clDword | 32-bit value |
| clQword | 64-bit value |
| clDate | DATE type (double) |
| clDouble | 8 byte real |
| clFloat | 4 byte real |
| clUuid | 16 byte uuid |
| clZero | Zero value |
| clOne | One value |
| clUnspecified | Unspecified value |
| clDefault | Default value |
| clCollection | Collection with 32-bit length |
| clCollection8 | Collection with 8-bit length |
| clCollection 16 | Collection with 16-bit length |
| clEmptyCollection | Collection with no length |

Data package objects are organized into a hierarchy as follows:

Account::=DeviceList+DataClassList

DeviceList::={Device}

DataClassList::={DataClass}+ProviderList

ProviderList::={Provider}+DataStoreList

DataStoreList::={Folder}+ItemList

ItemList::={Item}+FieldList

FieldList::={Field}

An account is the root structure, which identifies information about the user's account. It may have exemplary field tags (eFieldTag_[NAME]) such as Name, Password, User-Name and Version. The FieldTag ItemType value is specified as ItemType_PIN using enumItemType.

A device is a system identified as part of an account. Examples include PCs, handhelds, Web sites, and so on. It may have tags (eFieldTag_[Name]) such as: "name" and "type" and item type values (eDevice_[Name]) such as Portal, Palm, Windows, CellPhone.

A data class is a grouping of similar information types. Many data classes may be represented for a particular account. The data class may contain field tags (eFieldTag_[Name]) such as: Name; ItemType; SubType; IsManaged; Provider; Filter and Version.

The following ItemType values are permissible using enumDataClass (eDataClass_[Name]):

| Tag | Description |
|---|---|
| UNKNOWN | Unknown |
| CONTACT | Contact/address book |
| EMAIL | Electronic mail |
| CALENDAR | Calendar |
| TASK | Task/to do |
| NOTE | Note/memo |
| JOURNAL | Journal |
| BROWSER | Web browser favorites, cookies, etc. |
| FILESET | Collection of files |
| PIN | Account information |
| DEVICE | Device information |
| FILEBODY | Contents of file |

A Provider is the application that maintains specific information within a data class. There can be more than one provider for a particular data class. Field tags include: Name, AppObjID, Password, Username and Version. Examples of provider tags permissible for the provider (eProvider[Name]) include: Portal, Palm®, MicrosoftOutlook®, Lotus Organizer, Microsoft Internet Explorer, Microsoft Windows, and so on.

Data stores are the containers for storing information within a provider. There can be more than one data store for a particular provider. Folders represent structural organization of information within a data store. Data stores are not required to support folders. Tags (eFieldTag_[Name]) supported for each data store include: Name, ItemType, IsManaged and OriginalPath. Item types permissible for the data store include: unknown; Folder; MAPI; Database and Store_File.

Folders represent structural organization of information within a data store. Data stores are not required to support folders. A folder is represented by a UUID and may contain any of the following field tags (eFieldTag_[Name]): Name; ItemType; IsManaged; FileAttributes; CreationDate; ModificationDate; AccessDate; SpecialFolderType.

The eFieldTag_ItemType value is specified as eItemType_FOLDER using enumItemType.

Items are individual informational components consisting of the actual user data. They may contain field tags such as: Name, ItemType, IsManaged, and Version.

File items typically have the following additional field tags (eFieldTag_[Name]):

FileAttributes

CreationDate

ModificationDate

AccessDate

FileSize

FileBody

DeltaSize

Hash

Item types may take the format (eItemType_[Name]) and may include: extended; folder; attachment; contact; distlist; email; calendar; task; call; note; post; journal; form; script; rule; favorites; subscription; common_favorites; desktop; common_desktop; startmenu; common_startmenu; channels; cookies; programs; common_programs; startup; common_startup; sendto; recent; internet_cache; history; mapped_drives; printers; docs; doctemplates; fonts; window_settings; app_data_folder; app_settings; fileset; pin; device; data_store; file; provider; and data_class; internal.

US 6,671,757 B1

45

A field is based on one of a set of base type definitions. All field tag information is encoded using the following format:

| Field | Size (bits) | Comment |
|---|---|---|
| FieldTag | 16 | Unique tag number |
| FieldType | 6 | Field base type |
| FieldSubType | 10 | Field sub-type |

A number of Field types are possible, including: unknown; long; dword; date; string; binary; float; double; collection; uniqueid; qword; uuid; file; invalid. LONG is a four byte value encoded in big-endian format. FieldType DWORD is a four byte value encoded in big-endian format. FieldType String is a sequence of Unicode characters followed by a single NULL byte. Interfaces are provided with an MBCS value. FieldType Binary is a sequence of bytes. FieldType UniqueID is a sequence of bytes as defined by the Universally Unique Identifier (UUID) standard. AO interfaces are provided with a Locally Unique Identifier (LUID) value FieldType QWORD is an eight byte value encoded in big-endian format. FieldType File is a UUID that references a separate DataPack containing the file body data. AO interfaces are provided with a sequence of Unicode characters followed by a single NULL byte that describes the full path name for the file.

Any number of filed sub types are possible. Each of the sub-types includes all of the possible data types from all of the supported user applications. As should be well understood, the possibilities in the number of sub-types is quite large, and dynamic as each new application supported by the system of the present invention is added. Examples of sub-types include:

| SubField Description | Description |
|---|---|
| Base | No sub-type specified |
| EmailAddress | Email address |
| EmailAddressList | Email address list |
| SearchKey | Search key |
| CategoryList | Category list |
| StringList | String list |
| DistributionList | Distribution list |
| Gender | Gender (enumGender) |
| TimeZone | Time zone (enumTimeZone) |
| Boolean | Boolean (TBD) |
| NonZeroBool | Boolean with non-zero value (enumNonZeroBool) |
| Priority | Priority |
| Sensitivity | Sensitivity (enumSensitivity) |
| Importance | Importance (enumImportance) |
| SelectedMailingAddr | Selected mailing address (enumSelectedMailingAddr) |
| TaskStatus | Task status (enumTaskStatus) |
| FlagStatus | Flag status (enumFlagStatus) |
| RecurrenceType | Recurrence type (enumRecurrenceType) |
| DayOfWeek | Day of week (enumDayOfWeek) |
| DayOfMonth | Day of month (1 through 31) |
| InstanceOfMonth | Instance of month (enumInstanceOfMonth) |
| MonthOfYear | Month of year (enumMonthOfYear) |
| BusyStatus | Busy status (enumBusyStatus) |
| AttachmentType | Attachment type (enumAttachmentType) |
| MailBodyType | Mail body type (enumMailBodyType) |
| RGB | RGB color value |
| ManagedState | Managed state (enumManagedState) |
| FaoId | FAO ID for provider |
| SpecialFolderType | Special folder type (enumspecialFolderType) |

46

| SubField Description | Description |
|---|---|
| ResponseState | Response state (TBD) |
| ResponseStatus | Response status (TBD) |
| JournalStatus | Journal status |
| PageStyle | Page style |
| PageNumberMethod | Page number method |
| DelegationState | Delegation state |
| MeetingStatus | Meeting status |
| MeetingInvitation | Meeting invitation |
| CalendarType | calendar type |
| DateOnly | Date only |
| TimeOnly | Time only |
| PhoneNumber | Phone number |
| URL | URL |
| FilePath | File path |
| PopMessageID | POP message ID |
| MIMEType | MIME type |
| INVALID | All values must be below this |

The aforementioned invention provides a user-centric model of communication to deliver personal information via network services. This model accommodates devices that are disconnected from the network, such as the Internet, at various times. Personal information can continue to exist locally rather than imposing a server-centric model on existing information.

In accordance with the foregoing, a store and forward information broadcast is utilized. Changes to existing information are replicated to an Internet storage server and changes are then retrieved by other devices on the network at device-specific times. In this manner, direct client communication is accomplished without requiring one-to-one communication. While one communication is supported by the system of the present invention, it need not be required.

Although the present invention has been presented in the form of an Internet store and forward broadcast for the purposes of synchronizing personal information amongst various types of devices, it will be readily recognized that synchronization need not be accomplished as the only application for the aforementioned system. In particular, the system can be utilized to efficiently broadcast changes to information in so-called "push" type information applications where only portions of the data need to be changed on a client application. For example, in a system where information such as changes in a stock price need to be broadcast to a plurality of users, a client application implementing the aforementioned technology can be updated by only changing specific portions of the data in the client application relative to that particular stock price. This can be done using a smaller bandwidth than has previously been determined with other devices.

The many objects and advantages of the present invention will be readily apparent to one of average skill in the art. All such objects and advantages are intended to be within the scope of the invention as defined by the written description and drawings presented herein.

What is claimed is:

1. A system for synchronizing data between a first system and a second system, comprising:

a first sync engine on the first system interfacing with data on the first system to provide difference information in a difference transaction;

a data store coupled to the network and in communication with the first and second systems; and

a second sync engine on the second system coupled to receive the difference information in the difference

US 6,671,757 B1

47

transaction from the data store via the network, and interfacing with data on the second system to update said data on the second system with said difference information;

wherein each said sync engine comprises a data interface, a copy of a previous state of said data, and a difference transaction generator.

2. The apparatus of claim 1 wherein the first system and second system are coupled to the server via a private network.

3. The apparatus of claim 1 wherein the first system and second system are coupled to the server via an Internet connection.

4. The apparatus of claim 1 wherein the difference information is transmitted to the data store by the first sync engine and received from the data store from the second sync engine.

5. The apparatus of claim 4 wherein the difference information is transmitted to the data store at a first point in time, and received from the data store at a second, subsequent point in time.

6. The apparatus of claim 1 wherein said second sync engine interfaces with said data on the second system to provide second difference information to the data store.

7. The apparatus of claim 6 wherein the first sync engine couples to the data store to retrieve the second difference information and interfaces with the data on the first system to update said data on the first system with said second difference information.

8. The apparatus of claim 1 further including a management server coupled to the network and in communication with the first sync engine, the second sync engine and the data store.

9. The apparatus of claim 8 wherein said management server authorizes access of difference information on the data store by the first and second sync engines.

10. The apparatus of claim 8 wherein said management server locks access to difference information on the data store during communication with the first and the second sync engines.

11. The apparatus of claim 1 further including a first device, coupled to the first system via the network, providing said data to the first system.

12. The apparatus of claim 11 wherein the first system is a sync server.

13. The apparatus of claim 11 wherein said data comprises changes to a previous state of the data, and said difference information comprises said changes in an encoded, universal format.

14. The apparatus of claim 1 wherein said data on said first system comprises application data having a plurality of application specific formats, and said difference information is provided for each of said formats in a universal format to said data store.

15. The apparatus of claim 1 further including:

a plurality of sync engines on a respective plurality of systems, each of said plurality of engines being coupled to receive difference information from each of said first, second and plurality of sync engines from the data store via the network, and each said engine interfacing with data on the system on which it resides to update said data on said system on which it resides with said difference information, and interface with data on said system on which it resides to provide difference data information from the system on which it resides to the data store.

48

16. A system, comprising:

a first device including at least a first data file and first differencing code, the first device having an input and an output coupled to a network to receive first device data change transactions from, and provide change transactions generated by the first differencing code based on said at least one data file to, said network;

a data store coupled to the network having at least one data structure coupled to store change transactions; and

a second device including at least a second data file and second differencing code, the second device having an input and an output coupled to the network to receive said first device data change transactions from, and provide second change transactions generated by the second differencing code based on said at least second data file to, said data store;

wherein said first differencing code includes a first sync engine having a first data interface, a first copy of a previous state of said data, and a first difference transaction generator, and said second differencing code includes a second sync engine having a second data interface, a second copy of a previous state of said data, and a second difference transaction generator.

17. The apparatus of claim 16 wherein the first device and second device are coupled to the data store via an Internet connection.

18. The apparatus of claim 16 wherein the first change transactions are transmitted to the data store by the first device at a first point in time and received from the data store by the second device at a second, subsequent point in time.

19. The apparatus of claim 16 wherein the first differencing code receives second change transactions from the data store and interfaces with at least the first data file to update said data with said second change transactions.

20. The apparatus of claim 16 further including a management server coupled to the network and in communication with the first sync engine, the second sync engine and the data store.

21. The apparatus of claim 16 wherein said management server authorizes access of difference information on the data store by the first and second differencing code.

22. The apparatus of claim 16 wherein the first device is a sync server.

23. The apparatus of claim wherein said differencing code comprises:

an application object;

an application object store; and

a delta engine.

24. An Internet synchronization system, comprising:

a storage server having an Internet connection;

a first device coupled to the Internet and including a first device sync engine interfacing with data on the first device, the first device in communication with at least the storage server; and

a second device coupled to the Internet and including a second device sync engine interfacing with data on the second device, the second device in communication with at least the storage server;

wherein each said device sync engine comprises a data interface, a copy of a previous state of said data, and a difference transaction generator.

25. The Internet synchronization system of claim 24 further including:

a management server.

US 6,671,757 B1

49

26. The Internet synchronization system of claim 24 wherein communications between the first device, the second device and the storage server are encoded and compressed.

27. The Internet synchronization system of claim 24 wherein data transfer between the first device, the second device and the storage server comprises difference transactions.

28. The Internet synchronization system of claim 24 wherein each device includes applications having data in an application specific format, and wherein communication

50

between the first device, the second device and the storage server include changes to said data in an application independent format.

29. The Internet synchronization system of claim 24 wherein each device sync engine comprises:

an application object;

an application object store; and

a delta engine.

* * * * *

US006671757C1

(12) INTER PARTES REEXAMINATION CERTIFICATE (685th)

# United States Patent
Multer et al.

(10) Number: **US 6,671,757 C1**

(45) Certificate Issued: **Sep. 4, 2013**

(54) **DATA TRANSFER AND SYNCHRONIZATION SYSTEM**

(75) Inventors: **David L. Multer**, Santa Cruz, CA (US);
**Robert E. Garner**, Lawrenceville, GA
(US); **Leighton A. Ridgard**, Ellenwood,
GA (US); **Liam J. Stannard**,
Lawrenceville, GA (US); **Donald W.
Cash**, Dunwoody, GA (US); **Richard M.
Onyon**, San Jose, CA (US)

(73) Assignee: **Synchronoss Technologies, Inc.**,
Bridgewater, NJ (US)

Reexamination Request:
No. 95/002,339, Sep. 14, 2012

Reexamination Certificate for:
Patent No.: **6,671,757**
Issued: **Dec. 30, 2003**
Appl. No.: **09/491,694**
Filed: **Jan. 26, 2000**

(51) **Int. Cl.**
*G06F 13/00* (2006.01)
*G06F 12/00* (2006.01)
*G06F 15/16* (2006.01)

(52) **U.S. Cl.**
USPC ............... **710/100**; 710/200; 710/220; 710/1;
711/162; 707/999.201; 707/999.202

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited
during the proceeding for Reexamination Control Number
95/002,339, please refer to the USPTO's public Patent
Application Information Retrieval (PAIR) system under the
Display References tab.

*Primary Examiner* — Mary Steelman

(57) **ABSTRACT**

A system and method for synchronizing devices which can
couple to the Internet, or any network. The system includes a
first sync engine on the first system interfacing with data on
the first system to provide difference information. A data store
is coupled to the network and in communication with the first
and second systems. A second sync engine is provided on the
second system coupled to receive the difference information
from the data store via the network, and interface with data on
the second system to update said data on the second system
with said difference information. Difference information is
transmitted to the data store by the first sync engine and
received from the data store from the second sync engine.



US 6,671,757 C1

1

2

# INTER PARTES
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 316

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1**, **3**, **11**, **24**, **25** and **27** is
confirmed.

Claims **2**, **4-10**, **12-23**, **26**, **28** and **29** were not reexamined.

\* \* \* \* \*

# CONFIDENTIAL EXHIBIT – SUBJECT TO PROTECTIVE ORDER FILED UNDER SEAL

# EXHIBIT E-4

# CONFIDENTIAL EXHIBIT –

# SUBJECT TO PROTECTIVE ORDER

# FILED UNDER SEAL

# EXHIBIT E-5

# CONFIDENTIAL EXHIBIT –
# SUBJECT TO PROTECTIVE ORDER
# FILED UNDER SEAL

# EXHIBIT E-6

# CONFIDENTIAL EXHIBIT – SUBJECT TO PROTECTIVE ORDER FILED UNDER SEAL

# EXHIBIT E-7

# EXHIBIT E-8

*Patent*

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| Applicant(s): | Harry Nick Carter |
| Serial Number: | 11/550,921 |
| Filing Date: | October 19, 2006 |
| Title: | Multimedia Synchronization Method And Device |
| Examiner: | LIM,KRISNA |
| Art Unit: | 2153 |

Commissioner for Patents
PO Box 1450
Alexandria, VA  22313-1450

## PRELIMINARY AMENDMENT

Sir:

No fees are believed to be due for this application at this time.  However, if additional fees are necessary, Examiner is hereby authorized to charge such fees to CARSTENS & CAHOON, LLP Deposit Account No. 50-0392.

This Preliminary Amendment is filed to amend the claims in the application referenced above.  The applicable sections begin on the following pages:

AMENDMENTS TO THE CLAIMS ........................................................................................... 2
REMARKS ................................................................................................................................... 9

Applicant requests the following amendments:

SAMNDCA630-04259471

*Amendments to the Claims*

**This listing of claims will replace all prior versions, and listings, of claims in the application:**

Claim 1    (currently amended): A system for synchronizing ~~a multiplicity of~~ devices in a multimedia environment. the system comprising:

at least one central storage and interface device, wherein audio, video, or photographic data, ~~and photographic information~~ including content information and content management information, relating to at least one user, are stored in digital form; and

at least one zone, ~~a plurality of zones~~ each zone having at least one zone specific storage and interface device ~~being~~ capable of storing or interfacing with information stored in the central storage and interface device, wherein audio, video, or photographic information, relating to at least one user, contained within the ~~each one of the plurality of~~ zone specific storage and interface device ~~devices~~ and the central storage and interface device, are updated in relation to the ~~with other~~ zone specific storage and interface devices and the central storage and interface device, whereby the at least one user can be situated in any one ~~at~~ anyone of the zones and access the ~~substantially~~ ~~identical~~ audio, video, or [[and]] photographic information related to the at least one user.

Claim 2    (original): The system of claim 1, further comprising a local area network (LAN) coupled to at least one zone specific storage and interface device with the central storage and interface device, wherein the interconnections within the LAN is hardwired or wireless.

SAMNDCA630-04259472

Claim 3    (original): The system of claim 1, further comprising a wide area network (WAN) coupling at least one zone specific storage and interface device with the central storage and interface device.

Claim 4    (original): The system of claim 1, further comprising a set of zone specific output devices coupled to each of the zone specific storage and interface device, wherein audio, video, and photographic information is outputted, thereby the at least one user is disposed to have substantially identical content information and content management information displayed and manipulated in anyone of the zones.

Claim 5    (currently amended): The system of claim 1, further comprising an output device coupled to the at least one central storage and interface device, wherein audio, video, or [[and]] photographic information is outputted.

Claim 6    (original): The system of claim 1, further comprising a server, wherein audio, video, and photographic information contained within each one of the plurality of zone specific storage and interface devices and the central storage and interface device are stored therein and updated at a predetermined time in relation with other zone specific storage and interface devices as well as the central storage and interface device, coupled to the WAN.

Claim 7    (original): The system of claim 1, further comprising an other device coupled to the central storage and interface device via a network connection other than the LAN or WAN.

Claim 8    (original): The system of claim 1, wherein the at least one user pre-stores the audio, video, and photographic information by way of using a device comprising the central storage and interface device, and the zone specific storage and interface device.

Claim 9    (original): The system of claim 1, wherein the central storage and interface device comprises means for transmitting or receiving information to or from the zone specific storage and interface device.

SAMNDCA630-04259473

Claim 10   (original): The system of claim 1, wherein the zone specific storage and interface
device comprises means for transmitting or receiving information to or from the
central storage and interface device.

Claim 11   (original): The system of claim 1, wherein the central storage and interface device is
capable of converting analog information into digital form.

Claim 12   (original): The system of claim 1, wherein the zone specific storage and interface
device is disposed to be coupled to a personal computer (PC).

Claim 13   (original): The system of claim 1, wherein the zone specific storage and interface
device is disposed to be coupled to a wireless mobile device.

Claim 14   (original): The system of claim 1, wherein the central storage and interface device is
disposed to be coupled to a wireless mobile device via LAN.

Claim 15   (original): The system of claim 1, wherein the central storage and interface device is
disposed to be coupled to a wireless mobile device via WAN.

SAMNDCA630-04259474

Claim 16  (withdrawn): A method for synchronizing a plurality of devices some of which
resides in a plurality of zones, comprising the steps of:

> providing the plurality of devices, wherein the devices comprise a plurality of
> zone specific storage and interface devices, at least one central storage and
> interface device, and other device;

> providing the plurality of zones, wherein at least one zone specific storage and
> interface device resides therein, and information content specific to a user is
> maintained at a substantially identical level among the plurality of devices;

> determining whether a current synchronization point exists;

> if a previous synchronization point exists, receiving information from a server;

> if a previous synchronization point does not exists, sending information to a  at
> least one client by a host. wherein the at least one user is disposed to have
> control;

> determining what information is needed by the at least one client; and

> establishing the resultant state as a synchronization point.

Claim 17  (withdrawn): The method of claim 16. further comprising a step of determining when
to initiate synchronization.

Claim 18  (withdrawn): The method of claim 17, further comprising a step of:

> requesting synchronization;

> accepting synchronization; and

> if synchronization is declined. reverting back to the step of determining when to
> initiate synchronization.

SAMNDCA630-04259475

Claim 19   (withdrawn): The method of claim 16, wherein the step of determining whether a previous synchronization point exists involves determining what occurred in time between the last and the current synchronization point.

Claim 20   (withdrawn): The method of claim 16, wherein the information comprises data, content, and content management information.

Claim 21   (withdrawn): The method of claim 16, wherein the information comprises data structures in audio, video, or picture format.

Claim 22   (withdrawn): The method of claim 16, wherein the server comprises the at least one central storage and interface device.

Claim 23   (withdrawn): The method of claim 16, wherein the server comprises an on-line server having a database.

SAMNDCA630-04259476

Claim 24   (new): A method for synchronizing devices in a multimedia environment comprising the steps of:

> providing at least one host and at least one client, wherein the host comprises a central storage and interface device, and wherein the client comprises a zone specific storage and interface device;

> initiating a synchronization event between a host and a client;

> determining whether a synchronization point exists;

> if a synchronization point exists, comparing the synchronization-point specific host audio, video, or image information with the audio, video, or image information available on the client;

> if a synchronization point does not exist, comparing all available host audio, video, or image information with the audio, video, or image information available on the client;

> determining which audio, video, or image information is required by the client; and

> transferring and storing the required audio, video, or image information within the client.

Claim 25   (new): The method of claim 24, the steps further comprising:

> establishing the resultant client state as the synchronization point.

SAMNDCA630-04259477

Claim 26   (new): The method of claim 24, the steps further comprising:

      determining when to initiate synchronization;

      requesting synchronization;

      accepting synchronization; and

      if synchronization is declined, reverting back to the step of determining when to
          initiate synchronization.

Claim 27   (new): The method of claim 24, wherein the step of determining whether a
synchronization point exists involves determining what occurred during the time
between the two most recent synchronization points.

Claim 28   (new): The method of claim 24, wherein the information comprises data, content, and
content management information.

Claim 29   (new): The method of claim 24, wherein the information comprises data structures in
audio, video, or picture format.

Claim 30   (new): The method of claim 24, wherein the client determines which audio, video, or
image information it requires.

Claim 31   (new): The method of claim 24, wherein the at least one host comprises an on-line
server having a database.

SAMNDCA630-04259478

## **REMARKS**

Applicant respectfully requests Examiner accept the claim amendments and additions as provided in this preliminary amendment. No new material has been added, and each of the claims herein is supported by the application specification.

Claims 1-31 are now presented. Claims 1 and 5 are amended to more accurately reflect Applicant's invention. Claims 16-23 are withdrawn. Claims 24-31 are newly added by this preliminary amendment. Claims 1-15 and 24-31 are now pending.

SAMNDCA630-04259479

## CONCLUSION

Applicant hereby requests consideration of the application and allowance of the claims as amended and presented herein. If there are any outstanding issues that Examiner feels may be resolved by way of a telephone conference, Examiner is cordially invited to contact David W. Carstens at 972-367-2001.

The Commissioner is hereby authorized to charge any shortages or credit any overpayments related to this application to Deposit Account 50-0392.

Respectfully submitted,

Dated: December 19, 2007                  By:_____

                                          David W. Carstens
                                          Registration No. 34,134
                                          Attorney for Applicant

CARSTENS & CAHOON, LLP
PO Box 802334
Dallas, TX 75380
(972) 367-2001   *Telephone*
(972) 367-2002   *Facsimile*

SAMNDCA630-04259480

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 2617573 |
| **Application Number:** | 11550921 |
| **International Application Number:** | |
| **Confirmation Number:** | 9465 |
| **Title of Invention:** | MULTIMEDIA SYNCHRONIZATION METHOD AND DEVICE |
| **First Named Inventor/Applicant Name:** | Harry Nick Carter |
| **Customer Number:** | 22858 |
| **Filer:** | David William Carstens/Joann Young |
| **Filer Authorized By:** | David William Carstens |
| **Attorney Docket Number:** | AREQU.0101C |
| **Receipt Date:** | 19-DEC-2007 |
| **Filing Date:** | 19-OCT-2006 |
| **Time Stamp:** | 18:16:54 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes) /Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Preliminary Amendment | AREQU0101C_PrelimAmendment.pdf | 911919 <br> e6b3ef73b6b1f659715a565d6e7ded4a 253c6af6 | no | 10 |

**Warnings:**

**Information:**

SAMNDCA630-04259481

Total Files Size (in bytes): 911919

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

SAMNDCA630-04259482

# EXHIBIT E-9

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| Applicant(s): | Harry Nick Carter |
| Serial Number: | 11/550,921 |
| Filing Date: | 10/19/2006 |
| Title: | Multimedia Synchronization Method And Device |
| Examiner: | Lim, Krisna |
| Art Unit: | 2153 |

Commissioner for Patents
PO Box 1450
Alexandria, VA 22313-1450

## REPLY TO OFFICE ACTION

Sir:

This Reply is filed in response to the Office Action dated December 27, 2007 for the application referenced above. Reconsideration of the Application in view of the remarks is respectfully requested. The applicable sections begin on the following pages:

AMENDMENTS TO THE CLAIMS ........................................................................................................................... 2
REMARKS ........................................................................................................................................................................ 9

In response to the Office Action, Applicant offers the following:

SAMNDCA630-00834071

Serial No. 11/550,921

Patent

*Amendments to the Claims*

**This listing of claims will replace all prior versions, and listings, of claims in the application:**

Claim 1   (previously presented): A system for synchronizing devices in a multimedia environment, the system comprising:

> at least one central storage and interface device, wherein audio, video, or photographic data, including content information and content management information, relating to at least one user, are stored in digital form; and

> at least one zone, each zone having at least one zone specific storage and interface device capable of storing or interfacing with information stored in the central storage and interface device, wherein audio, video, or photographic information, relating to at least one user, contained within the zone specific storage and interface device and the central storage and interface device, are updated in relation to the zone specific storage and interface devices and the central storage and interface device, whereby the at least one user can be situated in any one of the zones and access the audio, video, or photographic information related to the at least one user.

Claim 2   (original): The system of claim 1, further comprising a local area network (LAN) coupled to at least one zone specific storage and interface device with the central storage and interface device, wherein the interconnections within the LAN is hardwired or wireless.

Claim 3   (original): The system of claim 1, further comprising a wide area network (WAN) coupling at least one zone specific storage and interface device with the central storage and interface device.

SAMNDCA630-00834072

Claim 4     (original): The system of claim 1, further comprising a set of zone specific output
            devices coupled to each of the zone specific storage and interface device, wherein
            audio, video, and photographic information is outputted, thereby the at least one user
            is disposed to have substantially identical content information and content
            management information displayed and manipulated in anyone of the zones.

Claim 5     (previously presented): The system of claim 1, further comprising an output device
            coupled to the at least one central storage and interface device, wherein audio, video,
            or photographic information is outputted.

Claim 6     (original): The system of claim 1, further comprising a server, wherein audio, video,
            and photographic information contained within each one of the plurality of zone
            specific storage and interface devices and the central storage and interface device are
            stored therein and updated at a predetermined time in relation with other zone specific
            storage and interface devices as well as the central storage and interface device,
            coupled to the WAN.

Claim 7     (original): The system of claim 1, further comprising an other device coupled to the
            central storage and interface device via a network connection other than the LAN or
            WAN.

Claim 8     (original): The system of claim 1, wherein the at least one user pre-stores the audio,
            video, and photographic information by way of using a device comprising the central
            storage and interface device, and the  zone specific storage and interface device.

Claim 9     (original): The system of claim 1, wherein the central storage and interface device
            comprises means for transmitting or receiving information to or from the zone
            specific storage and interface device.

Claim 10    (original): The system of claim 1, wherein the zone specific storage and interface
            device comprises means for transmitting or receiving information to or from the
            central storage and interface device.

Reply to Office Action dated December 27, 2007
                                                                                          Page 3 of 14

SAMNDCA630-00834073

Serial No. 11/550,921                                                                                    *Patent*

Claim 11   (original): The system of claim 1, wherein the central storage and interface device is capable of converting analog information into digital form.

Claim 12   (original): The system of claim 1, wherein the zone specific storage and interface device is disposed to be coupled to a personal computer (PC).

Claim 13   (original): The system of claim 1, wherein the zone specific storage and interface device is disposed to be coupled to a wireless mobile device.

Claim 14   (original): The system of claim 1, wherein the central storage and interface device is disposed to be coupled to a wireless mobile device via LAN.

Claim 15   (original): The system of claim 1, wherein the central storage and interface device is disposed to be coupled to a wireless mobile device via WAN.

SAMNDCA630-00834074

*Patent*

Claim 16   (withdrawn): A method for synchronizing a plurality of devices some of which
           resides in a plurality of zones, comprising the steps of:

>       providing the plurality of devices, wherein the devices comprise a plurality of
>           zone specific storage and interface devices, at least one central storage and
>           interface device, and other device;

>       providing the plurality of zones, wherein at least one zone specific storage and
>           interface device resides therein, and information content specific to a user is
>           maintained at a substantially identical level among the plurality of devices;

>       determining whether a current synchronization point exists;

>       if a previous synchronization point exists, receiving information from a server;

>       if a previous synchronization point does not exists, sending information to a  at
>           least one client by a host, wherein the at least one user is disposed to have
>           control;

>       determining what information is needed by the at least one client; and

>       establishing the resultant state as a synchronization point.

Claim 17   (withdrawn): The method of claim 16, further comprising a step of determining when
           to initiate synchronization.

Claim 18   (withdrawn): The method of claim 17, further comprising a step of:

>       requesting synchronization;

>       accepting synchronization; and

>       if synchronization is declined, reverting back to the step of determining when to
>           initiate synchronization.

Reply to Office Action dated December 27, 2007
                                                              Page 5 of 14

Claim 19    (withdrawn): The method of claim 16, wherein the step of determining whether a previous synchronization point exists involves determining what occurred in time between the last and the current synchronization point.

Claim 20    (withdrawn): The method of claim 16, wherein the information comprises data, content, and content management information.

Claim 21    (withdrawn): The method of claim 16, wherein the information comprises data structures in audio, video, or picture format.

Claim 22    (withdrawn): The method of claim 16, wherein the server comprises the at least one central storage and interface device.

Claim 23    (withdrawn): The method of claim 16, wherein the server comprises an on-line server having a database.

SAMNDCA630-00834076

Claim 24   (withdrawn): A method for synchronizing devices in a multimedia environment
comprising the steps of:

> providing at least one host and at least one client, wherein the host comprises a
> central storage and interface device, and wherein the client comprises a zone
> specific storage and interface device;

> initiating a synchronization event between a host and a client;

> determining whether a synchronization point exists;

> if a synchronization point exists, comparing the synchronization-point specific
> host audio, video, or image information with the audio, video, or image
> information available on the client;

> if a synchronization point does not exist, comparing all available host audio,
> video, or image information with the audio, video, or image information
> available on the client;

> determining which audio, video, or image information is required by the client;
> and

> transferring and storing the required audio, video, or image information within the
> client.

Claim 25   (withdrawn): The method of claim 24, the steps further comprising:

> establishing the resultant client state as the synchronization point.

SAMNDCA630-00834077

Serial No. 11/550,921                                                                                    *Patent*

Claim 26   (withdrawn): The method of claim 24, the steps further comprising:

                    determining when to initiate synchronization;

                    requesting synchronization;

                    accepting synchronization; and

                    if synchronization is declined, reverting back to the step of determining when to initiate synchronization.

Claim 27   (withdrawn): The method of claim 24, wherein the step of determining whether a synchronization point exists involves determining what occurred during the time between the two most recent synchronization points.

Claim 28   (withdrawn): The method of claim 24, wherein the information comprises data, content, and content management information.

Claim 29   (withdrawn): The method of claim 24, wherein the information comprises data structures in audio, video, or picture format.

Claim 30   (withdrawn): The method of claim 24, wherein the client determines which audio, video, or image information it requires.

Claim 31   (withdrawn): The method of claim 24, wherein the at least one host comprises an on-line server having a database.

SAMNDCA630-00834078

## REMARKS

Claims 1-31 are pending in the present application. Claims 16-23 were previously withdrawn from consideration. Claims 24-31 were withdrawn by Examiner based on Examiner's restriction requirement, which is addressed in its entirety below.

### ELECTION/RESTRICTIONS

Examiner issued a restriction requirement pursuant to 35 U.S.C. section 121 requiring Applicant to elect a single, disclosed embodiment for prosecution on the merits. Applicant respectfully traverses this restriction requirement as improper, but provisionally elects the claims of Group I (i.e., Claims 1-15) in order to advance prosecution of this application. Accordingly, the claims of Group II (i.e., Claims 24-31) are withdrawn.

Examiner believes that Group I claims would require use of search class 709, subclass 248, while Group II would require use of search class 707, subclass 201. Applicant respectfully disagrees with Examiner's characterization of the invention and the presented claims. Classification 707/201 is the proper classification for both Group I claims *and* Group II claims.

Patent classification 709/248 is incorrect for Group I claims. Classification 709/248 applies to multicomputer synchronization, which involves means or steps for matching timing between two or more computers. Further, this type of multicomputer synchronization requires exchange of tokens or semaphores between the computers to control each computer's processing activity. The exchange of tokens or semaphores allows multiple computers to process a common body of data without overrunning each other. To access common data, one computer must "possess" the token or semaphore. When the processing computer has completed its processing or is otherwise interrupted, it passes the token or semaphore to the next computer so that the next computer may have exclusive access to the common data. This is not what Claims 1-15 are drawn to.

Claims 1-15 are not drawn to a system for synchronizing multiple computers operating on common data (i.e., concurrency). Instead, Claims 1-15 are drawn to a system for

SAMNDCA630-00834079

synchronizing audio, video, or photographic information between devices in a multimedia system (i.e., coherency). This audio, video, or photographic information is data that is stored on at least one central storage and interface device. At least one other zone specific storage and interface device receives a copy of at least a portion of this same audio, video, or photographic information stored on the central storage and interface device. Thus, at least a portion of the actual audio, video, or photographic information is exchanged between the devices. In relation to the central storage and interface device, the receiving zone specific storage and interface device has exclusive access to this copy of the data. The zone specific storage and interface device may then process this coherent data without the exchange of a token or semaphore as required with concurrent access. Therefore, the proper patent classification for *all* claims (Claims 1-31) is 707/201.

Accordingly, because Classification 707/201 covers both the means and steps for maintaining database coherency, Applicant believes that an examination of all claims (i.e., system Claims 1-15 and method Claims 24-31) would not pose an undue burden on Examiner. Applicant respectfully requests reconsideration and withdrawal of this restriction requirement and examination of Claims 1-15 and 24-31 as presented.

### STATUTORY DOUBLE PATENTING

Examiner constructively elected the Group 1 claims (i.e., Claims 1-15) for prosecution on the merits. Examiner then rejected these claims for statutory double patenting under 35 U.S.C. section 101. Specifically, Examiner stated:

> Claims 1-15 are rejected under 35 U.S.C. 101 as claiming the same invention as that of claims 1-15 of prior U.S. Patent No.7,136,934. This is a double patenting rejection. Note: there are a few differences between the present invention and the patent. For example, the present invention uses the language of "at least one zone" instead of "a plurality of zones" as the patent, and some other modifications to make the claimed language sound better, for example, the use of "in anyone" instead of "at anyone", etc.

Obviousness-type double patenting entails a two-step analysis. *Eli Lilly & Co. v. Barr Lab., Inc.*, 222 F.3d 973, 985 (Fed. Cir. 2000). First, the court construes the claim in the earlier patent and the claim in the later patent, and it overlays the later claim on the earlier claim to

SAMNDCA630-00834080

*Serial No. 11/550,921*                                                                  *Patent*

determine whether the later claim encompasses subject matter previously claimed. *Id.* Second, the court determines whether the difference in subject matter between the two claims is such that the claims are patentably distinct. *Id.* The terms "patentably distinguishable," "patentable distinctions," and obvious variations (i.e., "whether such differences would have been obvious to one of ordinary skill in the art") are equivalent for obviousness-type double patenting analytical purposes. *General Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1279 (Fed. Cir. 1992).

Examiner's assertion that Claims 1-15 of U.S. Patent No. 7,136,934 (the '934 patent) and Claims 1-15 of the instant application are claiming the same invention is incorrect. Independent claim 1 from U.S. Patent No. 7,136,934 reads as follows:

1. A system for synchronizing a multiplicity of devices in a multimedia environment, comprising:

> at least one central storage and interface device, wherein audio, video, and photographic information including content information and content management information, relating to at least one user, are stored in digital form; and

> a plurality of zones each having a zone specific storage and interface device being capable of storing or interfacing with information stored in the central storage and interface device, wherein audio, video, or photographic information, relating to at least one user, contained within each one of the plurality of zone specific storage and interface devices and the central storage and interface device, are updated in relation with other zone specific storage and interface devices and the central storage and interface device, whereby the at least one user can be situated at anyone of the zones and access substantially identical audio, video, and photographic information related to the at least one user.

SAMNDCA630-00834081

As shown by this claim language, the '934 patent covers a system with "a *plurality* of zones having a zone specific storage device" (emphasis added). It is obvious from this language that the '934 patent requires *at least two* zones, ignoring a virtually identical system having only one zone. Claim 1 of the instant application covers "*at least one* zone, each zone having *at least one* zone specific storage and interface device" (emphasis added). The language of Claim 1 of the instant application covers this same plurality of zones having a zone specific storage device, satisfying the first prong of the obviousness-type double patenting test.

However, Claim 1 of the instant application broadens the claim language to include the system having a central storage and interface device and only *one* zone. Thus, Claim 1 of the instant application can be infringed without infringing claim 1 of the '934 patent, making the two claims patentably distinct, satisfying the second prong of the obviousness-type double patenting test.

This may also be readily construed as an "obvious variation" over the claim of the '934 patent. As this is an obvious variation and not the *same invention*, Examiner's statutory double patenting rejection is improper. A rejection under obviousness-type double patenting (i.e., "non-statutory double patenting") is clearly more appropriate in this situation. Accordingly, Applicant respectfully requests Examiner withdraw this statutory double patenting rejection as improper and examine the claims as presented herein.

A rejection based on a non-statutory type of double patenting can be avoided by filing a terminal disclaimer in the application or proceeding in which the rejection is made. *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970). The use of a terminal disclaimer in overcoming a non-statutory double patenting rejection is in the public interest because it encourages the disclosure of additional developments, the earlier filing of applications, and the earlier expiration of patents whereby the inventions covered become freely available to the public. *In re Jentoft*, 392 F.2d 633, 157 USPQ 363 (CCPA 1968).

Applicant concedes that Claim 1 of the instant application is an obvious variation over claim 1 of the '934 application. Further, Applicant concedes that an obviousness-type double

SAMNDCA630-00834082

patenting rejection of Claims 1-15 is proper. Accordingly, Applicant is willing to file a terminal disclaimer in order to overcome such obviousness-type double patenting rejection of these specific claims.

SAMNDCA630-00834083

## CONCLUSION

Applicant believes the claims are in condition for allowance. It is respectfully urged that the subject application is patentable as presented. Applicant requests reconsideration of the application and allowance of the claims. If there are any outstanding issues that the Examiner feels may be resolved by way of a telephone conference, Examiner is cordially invited to contact David W. Carstens at 972-367-2001.

The Commissioner is hereby authorized to charge any shortages or credit any overpayments to Deposit Account 50-0392.

Respectfully submitted,

Date: March 26 , 2008      By: _____

**David W. Carstens**
Registration No. 34,134
Attorney for Applicants
CARSTENS & CAHOON, L.L.P.
P.O. Box 802334
Dallas, TX 75380
(972) 367-2001    *Telephone*
(972) 367-2002    *Facsimile*

SAMNDCA630-00834084