# EXHIBIT YY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

APPLE INC., a California Corporation,

Plaintiff,

v.

SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,

Defendants.

SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,

Counterclaim-Plaintiffs,

v.

APPLE INC., a California corporation,

Counterclaim-Defendant.

CASE NO. 12-cv-00630-LHK (PSG)

**REBUTTAL EXPERT REPORT OF DR. TODD C. MOWRY REGARDING VALIDITY OF U.S. PATENT NO. 5,946,647**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

37. The ’647 patent claims cover the detection of recognizable structures with *semantic significance*. ’647 patent at 1:14-16. As the ’647 applicants stated during the prosecution of the patent, the “specification and claims use the term structure to mean a recognizable pattern having ‘semantic significance such as phone numbers, e-mail addresses, post-office addresses, zip codes and dates.’” 05/06/1998 Response to Office Action at 3 (citing Feb. 1, 1996 App. No. 08/595,257 at 1). However, for purposes of obviousness, Dr. Jeffay reverses course and contends that the Stamps and Koved spell-checking functionality, which involves locating *unrecognizable structures* with *no semantic significance*, invalidates the asserted claims of the ‘647 patent.

38. As I describe below, Dr. Jeffay ignores this limitation for purposes of invalidity, for which he contends that the Perspective software, which prevents a user from selecting a detected structure, invalidates the patent. Dr. Jeffay’s remaining invalidity contentions are marked by other similar examples of his attempt to broaden the invention to contend that unrelated and distinguishable references invalidate the ’647 patent claims.

**B. ’647 Patent Prosecution History**

39. In his report Dr. Jeffay provides a section purporting to describe the file history of the ‘647 patent. I describe below certain sections of significance in the prosecution history that are inconsistent with Dr. Jeffay’s attempt to broaden the claimed invention to contend that materially distinguishable references invalidate the ’647 patent claims. For example, the prosecution history provides explicit guidance on the meaning of the terms “structure” and “action” as used in the ’647 patent that are inconsistent with Dr. Jeffay’s invalidity opinions.

40. For example, the Applicants distinguished U.S. Patent No. 5,574,843 (“Gerlach”) and U.S. Patent No. 5,369,575 (“Lamberti”) in response to the Examiner’s Non-Final Office Action on January 28, 1998. In response to the Examiner’s rejection, applicants explained that the claimed structures in the ’647 patent, unlike Gerlach, are *recognizable* and have *semantic significance*. Specifically, Applicants noted that, although “*[t]he word ‘structure’ is a critical term* used by both Gerlach and Applicants,” it is used in Gerlach to refer to “*data structures* that are added to the data in order to give the data a form to support the events and commands associated with icons in the multimedia editing system. These data structures are generated and interpreted by, and totally

¶ 198. I disagree. For example, Dr. Jeffay misstates that U.S. Patent No. 5,101,424 ("Clayton") disclosed a system that "automatically link[s] actions to the detected structures and perform[s] them." Clayton discloses a system of monitoring log reports and performing user-defined actions (although not as that term is used in the '647 patent) if a specified pattern is found. Clayton requires that "a user must first create a monitor session," defining start-up actions, patterns to scan, and actions to perform when an associated pattern is matched." Clayton, 2:45-49. These so-called "actions" are not linked to any detected structure and are not selectable via a user interface. The purported "actions" identified in Clayton are not computer subroutines that cause the CPU to perform a sequence of operations on the particular structure to which they are linked, and they do not use the detected structure as input. Instead, these "actions" simply happen unconditionally when the pattern matches, without user input, selection, or involvement.

52. Dr. Jeffay also discusses several references that disclose spell checking capabilities, such as those described in sed & awk, U.S. Patent No. 5,437,036 ("Stamps"), and U.S. Patent No. 5,649,222 ("Mogilevsky"). *See id.*, ¶¶ 196, 211-214. I discuss the Stamps reference in further detail below, but as a general matter, spell-checking technology as it existed at the time of the invention is very different than the inventions claimed in the '647 patent. Spellcheckers do not detect structures as they ignore all words that match their dictionary and only inform the user of text does not match. Locating unrecognized words is not "detecting structures" and is not within the scope of the '647 patent. Misspelled words are not "structures" and correcting a misspelled word is not an "action" as those terms are used in the '647 patent. Instead, the actions of the '647 patent all involve doing something with a "recognizable structure[] that [has] semantic significance." '647 patent, 1:14-15. Dr. Jeffay appears to be making the same point with regard to the Hopcroft reference when he states that " it was simple to, for any given regular expression, write a second regular expression that recognized only structures not recognized by the first—a simple way to detect different types of structures." Jeffay Validity Report, ¶ 201. This example does not "detect structures" as claimed by the '647 patent. Tellingly, not once does the '647 patent discuss misspellings or spellcheckers, a separate field of textual analysis that is not the same as the '647 patent.

53.

REBUTTAL EXPERT REPORT OF TODD C. MOWRY REGARDING VALIDITY OF U.S. PATENT NO. 5,946,647

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

15

Gibson, Dunn & Crutcher LLP

**1. Claim 1: "A computer-based system for detecting structures in data and performing actions on detected structures:"**

131. As I have previously explained, I understand that the preamble to a claim typically does not limit the scope of the claim, except under certain circumstances. While I do not believe those circumstances are present here, if the preamble is considered a limitation, the Sidekick system does not comprise "[a] computer-based system for detecting structures in data and performing actions on detected structures."

132. At the outset, claim 1 of the '647 Patent describes a computer-based system for detecting "structures", i.e, more than one type of structure. Accordingly, the '647 Patent discloses the use of multiple saved "patterns" to detect different types of structures (e.g., phone numbers, email addresses, etc.), that are associated with candidate actions that a user would normally perform on such a structure. '647 Patent at 1:25-35. In this way, the invention disclosed in the '647 patent had "significant advantages over previous systems, in that [it] may incorporate an open-ended number and type of recognizable patterns, an open-ended number and type of pattern analysis units, and further that the system may enable an open-ended number and type (i.e. scripts, macros, code fragments, etc.) of candidate actions to associate with, and thus perform, on each identified structure." '647 Patent at 2:12-20.

133. As Dr. Jeffay describes it, the Dialer function of Sidekick recognizes only a single type of data – phone numbers – and allows only one type of action associated with each phone number, as discussed further below. Dr. Jeffay nowhere claims, nor do the selected Sidekick materials that he appends to his report state, that the Sidekick Dialer recognizes any type of data other than phone numbers. To the extent that Dr. Jeffay argues that detecting different phone numbers satisfies the requirements of claim 1, I disagree. The '647 patent does not distinguish between different "types" of phone numbers. It does, however, expressly disclose detection of different structures, such as phone numbers, email addresses, etc. Accordingly, the Sidekick system does not "detect[] structures in data" as required in the preamble to Claim 1.

134. As explained in above, the '647 Patent teaches that the system itself detects structures in data prior to linking those structures to candidate actions (i.e., actions that a user would normally

REBUTTAL EXPERT REPORT OF TODD C. MOWRY REGARDING VALIDITY OF U.S. PATENT NO. 5,946,647

48

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Gibson, Dunn & Crutcher LLP

perform on those structures). *See* '647 Patent at 2:49-53 ("Upon selection of a detected structure, the user interface presents and enables selection of candidate actions."). Dr. Jeffay fails to address the fact that, unlike the system disclosed in the '647 patent, the computer-based system of Sidekick does not itself perform detection as required by the '647 patent. In fact, the user invokes the "Dialer" before any structures are allegedly detected.

135. Sidekick's Dialer feature requires a user to enter various prompts to enable a single telephone number to be highlighted at any given time. Specifically, after installing the Sidekick application on a computer and opening a document, a user must enter a series of keystrokes – specifically, "Ctrl" and "Alt" – in order to activate Sidekick. *See* Sidekick 1.5 Owner's Handbook, 1985, Borland International ("Sidekick Handbook"), at 13. Then, the user must activate the Dialer feature in particular by pressing, e.g., "Alt" and "D". Sidekick Handbook, at 29. Only then does the Sidekick Dialer highlight a single item – the first telephone number appearing in a document. Sidekick Handbook, at 30 ("If you have more than one number on the screen that looks like a phone number, the first one will be chosen.").

136. Thus, unlike the '647 Patent, the Sidekick system requires user prompts to detect and highlight only the next piece of relevant data, as shown in the Sidekick screenshots below:

CP (415)-786-0909 CompuPro (S100,CPU,68000)
ERI (314) 725-5566 EnerTronics (graphics,3D,software)
INF 555-1212 Information
PH (609)-927-3770 Plum Hall (Unix,C,Books)
SCS (408) 287-4640 Santa Clara Systems Inc. (PC clones,network,LAN)
SDS (214)-340-0303 SDSystems (S100,Disk controllers, CPU)
SYB (415) 848-8233 SYBEX (Books)
F1-help F2-New file ←┘-dial ↓↑-scroll search: F3-ID F4-all F5-stop Esc-exit

**Figure 2-7: Dialer Window**

REBUTTAL EXPERT REPORT OF TODD C. MOWRY REGARDING VALIDITY OF U.S. PATENT NO. 5,946,647

49

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Gibson, Dunn & Crutcher LLP

**Sidekick Handbook, at 29.**

File Edit Search Options Help
MESSAGE.TXT

Please give me a call at (123) 456-7890 so we can set up a meeting.

Thanks,
John

John Smith
987-654-3210

F1-help ←-dial →-next number SPACE-view telephone directory Esc-exit

137. This is contrary to both the '647 Patent's teaching of a system that itself detects structures in data. ('647 Patent at Claim 1 ("A computer-based system for detecting structures in data and performing actions on detected structures"), 5:29-31 ("As illustrated in Fig. 6, analyzer server 220 identifies the phone number, post-office address, e-mail address and name."). This functionality is shown in Figure 6 of the '647 Patent, in which multiple data structures have been detected and presented to the user automatically:



510
Bob:
This is my new
phone number: (415) 555-1234
address: 1 Hilly Street
San Francisco, CA 94105
E-mail address: Jdoe@work.com
Sincerely,
John Doe
FIG. 6

**Fig. 6 from '647 Patent**

138. Further, Sidekick does not "perform[] actions on detected structures" because only one action – dialing – is available to a Sidekick user for a single phone number at any given time. As the Sidekick Handbook explains, once a single telephone number is highlighted by the Dialer feature, the user may press "Enter" to dial that number, or an arrow key to move to another phone number on the screen, if one was available. Sidekick Handbook, at 30. The Sidekick Handbook mentions no other actions that can be performed on a highlighted phone number, nor does Dr. Jeffay point to any.

139. The Sidekick Dialer is therefore precisely the type of background art that the '647 Patent improved upon. As the Patent explains in its "Description of the Background Art" at column 1, lines 52 to 65:

> "One type of system that has addressed this problem involves detecting telephone numbers. Such systems . . . do not enable the performance of other candidate actions such as moving the number to an electronic telephone book. That is, if a user wishes to perform a different action on an identified telephone number, such as storing the number in an address book, the user cannot automatically perform the action but must select and transfer the number to the appropriate data base."

140. As the above discussion shows, the '647 Patent discloses the use of multiple saved patterns to detect different types of structures (e.g., phone numbers, email addresses, etc.), each

REBUTTAL EXPERT REPORT OF TODD C. MOWRY REGARDING VALIDITY OF U.S. PATENT NO. 5,946,647

51

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Gibson, Dunn & Crutcher LLP

associated with candidate actions that a user would normally perform on such a structure. Sidekick's Dialer feature, on the other hand, discloses only the ability to detect, after the user enters various prompts, a single type of structure (a phone number), and allow only a single alleged action to be performed on that structure. The Sidekick Dialer is therefore not "[a] computer-based system for detecting structures in data and performing actions on detected structures."

**2. "an input device for receiving data; an output device for presenting the data; a memory storing information including program routines including;"**

141. The Sidekick Dialer feature does not practice or disclose "a memory storing information including program routines . . ." for at least the reason that the Sidekick system does not disclose the claimed program routines (for which claim elements (c), (d), and (e) must be satisfied) for the reasons described below.

**3. "an analyzer server for detecting structures in the data, and for linking actions to the detected structures;"**

142. In paragraph 316 of his report, Dr. Jeffay states that, "The Sidekick system discloses a server routine separate from a client that receives data having structures from a client, and therefore discloses an analyzer server under Judge Posner's construction." Jeffay Invalidity Report, ¶ 316. Dr. Jeffay also states that, "Apple and Dr. Mowry are incorrect when they argue that a shared library can satisfy Judge Posner's construction, because a shared library is necessarily part of a client application, and thus cannot be considered "separate" from it—nor can it "receive data" from it." *Id.*, ¶ 287. However, Dr. Jeffay also points out (correctly) that "Sidekick is a 'resident program'." *Id.*, ¶ 325. A "resident program" is not a process. Instead, "…it is loaded into memory and stays there until you switch off the computer" (*Id.*, ¶ 314), unlike processes, which can be swapped out of memory by the operating system. Hence Dr. Jeffay is admitting that Judge Posner's construction of "analyzer server" does not require the analyzer server to be in a separate process; it is okay, for example, if the analyzer server is loaded into a separate region of memory, where it can be accessed or reused by multiple applications (as is the case with Sidekick).

143. Dr. Jeffay claims that the Sidekick system included an analyzer server under either of two different constructions for this claim term applied by Apple and by Judge Posner, respectively.

REBUTTAL EXPERT REPORT OF TODD C. MOWRY REGARDING VALIDITY OF U.S. PATENT NO. 5,946,647

52

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Gibson, Dunn & Crutcher LLP

As Dr. Jeffay indicates, and as explained above, Judge Posner construed "analyzer server" as "a server routine separate from a client that receives data having structures from the client," while the Apple construes "analyzer server" as "a program routine(s) that receives data, uses patterns to detect structures in the data, and links actions to the detected structure."  Whether or not the Court in this case accepts either of these constructions, I disagree with Dr. Jeffay that this claim limitation is met by the Sidekick system.

144.     First, the Sidekick system does not receive "data having structures" because the Sidekick system only recognizes a single type of structure – a telephone number.  *See* Sidekick Handbook, at 30 ("Sidekick 'knows' a phone number, because it must contain special characters. These are usually parentheses or hyphens, but you can choose other characters within the installation program.").  The Sidekick Handbook even warns users to format phone numbers in a particular way so as to avoid confusing the system with other types of data that it cannot recognize or take action upon.  *See* Sidekick Handbook, at 30 ("To make things very clear: in order to distinguish a phone number from dates, amounts, and other numeric information, the phone number must not contain commas, periods, or slashes.").  For this same reason, as discussed above, the Sidekick system does not "detect structures" in the plural sense, as required by the asserted claims.  Notably, although Dr. Jeffay points to Judge Posner's construction as Judge Posner described in his claim construction decision, the '647 patent discloses, and claim 1 claims, a system able to detect multiple types of structures in data.

145.     Second, the Sidekick system does not have an analyzer server "for linking actions to the detected structures" because, as discussed above, the Sidekick system can perform only one action (dialing) on only one type of structure capable of being detected (a phone number).  Sidekick Handbook, at 30.  Thus, the Sidekick system fails to meet this claim element under either construction Dr. Jeffay discusses.

146.     First, I note that Dr. Jeffay admits that Sidekick does not anticipate the '647 patent under Judge Posner's construction of "linking actions to the detected structures."  Jeffay Validity Report, ¶¶ 326, 364.

149. Sidekick also fails to disclose this limitation because Sidekick does not "creat[e] a specified connection" to or association with any "action", i.e., "computer subroutine that causes the CPU to perform a sequence of operations *on the particular structure to which it is linked*." '647 Patent at 2:31-34 (emphasis added). Indeed, Dr. Jeffay has not pointed out any statement in the Sidekick Handbook that discloses that software is actually operating on a telephone number structure. Rather, systems such as Sidekick that enable the dialing of a telephone number would simply send the string of numbers it had identified to a hardware modem. *See*, *e.g.*, Sidekick Handbook at 29 ("The Dialer turns your computer into an automatic dialer provided you have a modem connected to your computer."). In my opinion, sending a string of digits to a piece of hardware, such as a modem, does not constitute an "action" as understood in light of Judge Posner's construction or the disclosure of the '647 Patent.

150. Ultimately, Dr. Jeffay's assessment of the Sidekick system, and specifically its Dialer functionality, ignores the fact that the '647 Patent inventors specifically informed the PTO about prior art references similar to Sidekick by including in the body of the patent a discussion of the limited functionality of these systems. '647 Patent at 1:52-65. Indeed, the patentees gave the specific example of systems only able to detect telephone numbers, and only able to allow dialing of those numbers, as prior art systems over which they were inventing. '647 Patent at 1:52-65. The patent was therefore granted over background art that was functionally identical to Sidekick.[5]

**4. "a user interface enabling the selection of a detected structure and a linked action; and;"**

151. The Sidekick Dialer does not disclose a "user interface enabling the selection of a detected structure and a linked action." First, the "selection of a detected structure," as written in the claim limitation, requires that a particular detected structure can be chosen from a set of structures. Sidekick, however, not the user, dictates which phone number will be highlighted. Sidekick will only "detect" one structure at a time, and the user has no control over which number will be selected.

[5] Notably, claims 1, 4, 6, 8, and 9, among others, were recently reaffirmed in reexamination as well.

REBUTTAL EXPERT REPORT OF TODD C. MOWRY REGARDING VALIDITY OF U.S. PATENT NO. 5,946,647

55

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Gibson, Dunn & Crutcher LLP

Jeffay Validity Report, ¶ 333 ("If you have more than one number on the screen that looks like a phone number, the first one will be chosen. You can then move to the next one by pressing [RIGHT ARROW]….") (citing SAMNDCA0963825, Sidekick Handbook, at 30). At no point does Sidekick allow a user to select from a multitude of structures. This can be seen from the screenshot that Dr. Jeffay relies upon in paragraph 331 of his declaration, wherein only one phone number has been identified by Sidekick and highlighted for the user, with no indication that Sidetrack has recognized, or will recognize, a second phone number appearing further down on the screen :

File Edit Search Options Help
MESSAGE
Dear Kevin,
You can reach me at my office at (206) 854-1234 or at home
at 206-255-2315 after 5pm.
Our Sweden office is +46(0)10-6933082
Thanks
F1-help ←┘-dial →-next number SPACE-view telephone directory Esc-exit

**Sidekick Screenshot**

152. This is contrary to the teachings of the '647 Patent, in which a user can select one structure from among multiple structures and can choose any one on which to perform an operation via the user interface. '647 Patent at 3:5-14 ("In a display-type environment, application program interface 230 retrieves the locations in document 210 of the presentation regions for the detected structures from application 167. Application program interface 230 then transmits this location information to user interface 240, which highlights the detected structures, although other presentation mechanisms can be used. User interface 240 enables selection of an identified structure

REBUTTAL EXPERT REPORT OF TODD C. MOWRY REGARDING VALIDITY OF U.S. PATENT NO. 5,946,647

56

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Gibson, Dunn & Crutcher LLP

by making the presentation regions mouse-sensitive, i.e. aware when a mouse event such as mouse-down operation is performed while the cursor is over the region.").

153. Similarly, Sidekick does not perform the claim limitation of a "user interface enabling the selection of . . . a linked action." As with the selection of a detected structure, the selection of an action requires that there be a set of multiple actions from which to select. When the Sidekick Dialer recognizes a telephone number, however, only a single operation – using the computer's modem to make a telephone call to the number – is available.[6] In addition, the '647 Patent teaches that when a user selects a portion of detected data, the system presents to the user a context menu of actions to perform on the data selected. '647 Patent at 4:23-31 ("Upon selection of this structure, user interface 240 presents and enables selection of the linked candidate actions using any selection mechanism, such as a conventional pull-down or pop-up menu.")). It is from that menu that a user will then be able to "select" a particular action. Sidekick does not perform this functionality, but instead has a single menu that is persistently present to the user at the bottom of the screen when the Sidekick software is running, both before and after a particular phone number is highlighted. Indeed, as described above, the user invokes the "Dial" feature before any phone numbers are "detected."

**5. "an action processor for performing the selected action linked to the selected structure; and;"**

154. It is my opinion that the Sidekick system does not disclose "an action processor for performing the selected action linked to the selected structure" for at least the reason that the Sidekick system does not allow the performance of a "selected" linked action. Instead, as discussed above, Sidekick allows only a single operation – calling a telephone number – to be performed relative to any information that has been highlighted in a document. This is contrary to the teachings of the '647 Patent of presenting a menu of candidate actions to be performed on a specific type of data detected. '647 Patent at 4:23-31 ("Upon selection of this structure, user interface 240 presents

---

[6] As shown in the screenshot above, the user may also hit an arrow key to move to another number, if one can be identified by Sidekick, as well as hit other keys to bring up a "Help" menu, visit a general telephone directory, or exit the program. However, none of these are actions that can be said to be "linked" to a particular detected "structure", or phone number.

REBUTTAL EXPERT REPORT OF TODD C. MOWRY REGARDING VALIDITY OF U.S. PATENT NO. 5,946,647

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

57

Gibson, Dunn & Crutcher LLP

and enables selection of the linked candidate actions using any selection mechanism, such as a conventional pull-down or pop-up menu.”).

**6. “a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines.”**

155. It is my opinion that the Sidekick system does not disclose “a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines” for at least the reason that the Sidekick system does not include the claimed program routines for the reasons described above.

**7. <u>Claim 4</u>: “The system recited in claim 1, wherein the analyzer server includes grammars and a parser for detecting structures in data.”**

156. It is my opinion that Sidekick does not disclose claim 4 for at least the reason it does not disclose each element of claim 1, as discussed in detail above. Moreover, the ’647 patent requires multiple “grammars.” But Sidekick discloses, at most, only a single grammar for phone numbers. This is contrary to the ’647 patent’s teachings. *See, e.g.*, ’647 patent, 4:58-5:18 (identifying a “telephone number grammar” as one example of a grammar). I disagree with Dr. Jeffay’s assertion that looking for “different types of phone numbers” (Jeffay Validity Report, ¶¶ 342, 371) satisfies either claim 1 or claim 4. Indeed, the “conventions” identified by Dr. Jeffay are not “grammars,” but are parameters set by the user that will then apply to any phone number Sidekick attempts to find:

**Telephone Number Format**

Sidekick uses certain conventions to distinguish a telephone number from other numbers on the screen or in your telephone directory. By default, a number must meet the following specifications to qualify as a phone number:

Minimum number of digits: 6 Required character: - ( )

The installation program lets you change these values if they don’t fit the format of your phone numbers.

**Minimum number of digits**
Set this value to the shortest telephone number you are likely to encounter. The allowable range is 1 through 80.

**Required character**
This defines which character(s) must be present in a phone number. If more than one character is specified, only one of them need be present. Specify up to ten characters as needed. Default required characters are: - ( )

*Id.* (citing SAMNDCA630-00963849).

**8. Claim 6: "The system recited in claim 1, wherein the analyzer server includes a string library and a fast string search function for detecting string structures in the data."**

157. It is my opinion that Sidekick does not disclose claim 6 for at least the reason it does not disclose each element of claim 1, as discussed in detail above. In addition, I disagree with Dr. Jeffay's assertion that, "The Sidekick system discloses the system recited in claim 1, wherein the analyzer server includes a string library and a "fast string search" function for detecting string structures in the data. The Sidekick system uses strings to detect phone numbers in text." Jeffay Validity Report, ¶¶ 343, 372. Sidekick does not use string search to detect phone numbers. String search involves comparing a sequence of input characters against a target sequence of multiple characters that are literal constants. For example, searching an input buffer for the 9-character ASCII sequence comprising the word "California" would be an example of string search; i.e. looking for an exact match of the ASCII character "C", followed immediately by an exact match of the ASCII character "a", followed immediately by an exact match of the ASCII character "l", etc.

158. In contrast, when Sidekick looks for phone numbers, it is not looking for constant strings (e.g., the specific phone number "(415) 555-1234"), but rather it is looking for a pattern of digits: e.g., (NNN) NNN-NNNN, where each "N" could be any digit between "0" and "9". The pattern that Sidekick looks for is described on page 174 of Dr. Jeffay's report: it looks for a minimum number of digits in a sequence (6 by default), where a required character (e.g., a parenthesis or a dash) occurs somewhere in the sequence. To recognize digits, the LineScan function illustrated on pages 158-160 in Dr. Jeffay's report checks the values of individual ASCII characters to see whether they fall within the *range* of numbers corresponding to the digits "0" and "9". This is not string matching (and that fact would be well understood by anyone skilled in the art). Regarding the special characters that must appear somewhere in the pattern (i.e. a dash or parenthesis), this also is not string matching but rather single-character matching (which is an entirely different and much easier problem).

159. Dr. Jeffay's argument that, "the Sidekick Handbook shows that the built-in address book allowed for string searching" (Jeffay Validity Report, ¶¶ 343, 372) is irrelevant because Dr.

163.     Browsers such as Mosaic do not search data for structures, as disclosed in the '647 patent, but instead search data for "anchors" and/or "tags" that have been embedded into the data by the publisher of the data, such as a web page publisher.  Systems such as Mosaic look specifically for hyperlinks (portions of the anchors and tags) that have been explicitly added into data by the author, in contrast with the system disclosed in the '647 patent, which searches through data that has not been marked or linked, and detects and links structures that may be of interest to a user.  While the data received by web browsers such as Mosaic have already been marked as with hyperlinks that can be selected by the user, the '647 patent instead discloses a system that receives unmarked data, specifically searches for structures, and links to these structures actions that a user would normally perform using that data.

164.     Dr. Jeffay's paragraph 256 illustrates this point.  Dr. Jeffay explains that, "A user could use Mosaic to visit the World Wide Web, and navigate its user interface in order to send HTTP requests to retrieve and HTML (Hyper Text Markup Language) documents from the web."  Jeffay Validity Report, ¶ 256.  The use of the term "Markup" refers to the fact that the creator of the document can "mark up" the document with things beyond just readable text. This is different from the disclosures of the '647 patent.  The Mosaic browser recognizes "mark ups" that the creator of the data has already added to the data before it is sent to and received by the user.

165.     The data that is "marked up" in Mosaic can be *any* data, as opposed to the '647 patent's teachings of a system that detects and adds links only to structures (instantiations of saved patterns with semantic significance).  '647 patent, at 1:27-36.  The '647 patent discloses a system that detects structures in received data that has not been "marked up" by the creator of the data.  *See e.g.* '647 patent, claim 1 ("linking actions to the detected structures").  Mosaic does not apply the concept of structures as it is described in the '647 patent.

166.     I also disagree with Dr. Jeffay's statement that "Mosaic detects structures such as anchors/tags in an HTML documents presented to it, links actions to the detected structures, as pictured above, and presents those structures to the user as hyperlinks that enable the user to take actions on the structures when clicked.""  Jeffay Validity Report, ¶ 422.  Each of these assertions is incorrect.

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.
PATENT NO. 5,946,647                                    61

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn &
Crutcher LLP

167. First, "an 'anchor' and its 'tags'" do not constitute 'structures' within the meaning of the '647 patent. The patent explains that 'structures' visibly appear in the actual data sent to and received by the user. The "`<a href=`", "`>`", and "`</a>`" characters and the URL of HTML anchors and tags, however, are specifically intended to be hidden from the user in the received data. Contrary to Dr. Jeffay's contentions, at least the detected portions of anchors and tags are never 'presented' to the user.

168. Secondly, Mosaic does not perform the "detecting" step as described by the '647 patent. The patent describes a system that searches received data for structures (or instantiations of saved patterns representing data) that are semantically meaningful to the user such as phone numbers, email addresses, etc. This is completely different from recognizing of portions of code such as "`<a href=`," which is a special hidden character sequence in HTML, and which is never made visible to the user. In Mosaic, if the website author has added the right special, hidden character sequence, then Mosaic knows that the related text is a hyperlink. If the website author does not add that sequence, then Mosaic does not treat any text as a hyperlink. This is directly contrary to the invention described in the '647 patent, which requires that the system, not the author, identify the semantically meaningful text.

169. Lastly, the Mosaic system does not "allow actions to be performed on" the anchor and tag portions of the data that is presented to the user. While these systems detect special hidden characters embedded in tags (such as "`<a href=`" and "`>`") they do not use these values in any subsequent operations. Systems such as Mosaic and Lynx instead use a different portion of the anchors/tags, a URL that is also hidden from the user, for subsequent operations such as linking to a webpage.

### 2. Overview of Hypertext Markup Language Applications such as the Mosaic Web browser

170. A fundamental motivation and insight of the '647 patent is to have the system automatically recognize (and make actionable) useful nuggets of information (e.g., email addresses, phone numbers, postal addresses, etc.) that have *not already been explicitly labeled* as such. Instead, these nuggets simply appear as *normal, unmarked text* within a document, email message, web page,

REBUTTAL EXPERT REPORT OF TODD C. MOWRY REGARDING VALIDITY OF U.S. PATENT NO. 5,946,647

62

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Gibson, Dunn & Crutcher LLP

that MHonArc "*receives data having structures from*" Mosaic. Hence Dr. Jeffay's contradictory statements within this same subsection of his report undermine his conclusion that "… the MHonArc program is therefore an 'analyzer server' under Judge Posner's construction, and the MHonArc/Mosaic system anticipates this limitation of the '647 patent." Jeffay Validity Report, ¶ 411. This mischaracterization of MHonArc and Mosaic as a single system also undermines other conclusions in Dr. Jeffay's report (e.g., regarding how "linking actions" allegedly occurs), as I will discuss below.

180. The MhonArc/Mosaic "system" fails to meet the requirements of at least claim 1 because it does not include the "analyzer server" functionality of detecting structures (instantiations of patterns) in data. Instead, the MhonArc/Mosaic system requires the creator or editor of a document to pre-mark (or "mark up") data in the document (whether a pattern or not) using HTML tags to specifically assign links to certain portions of data. This is contrary to the teachings of the '647 patent, as the patent teaches that the system itself does detection, and further that what is detected in received data are semantically important structures – instantiations of saved patterns – that actually appear in the data presented to the user. The anchors allegedly detected in Mosaic are pre-marked onto the data by the creator of the data, and do not appear in the data presented to the user.

**a. A computer-based system for detecting structures in data and performing actions on detected structures, comprising:**

181. It is my opinion that the preamble of claim 1 is not a limitation of the claim. Even if the preamble is considered a limitation, the MhonArc/Mosaic system does not comprise "[a] computer based system for detecting structures in data and performing actions on detected structures."

182. I disagree with Dr. Jeffay's statement that "Mosaic detects structures such as anchors/tags in an HTML documents presented to it, links actions to the detected structures, as pictured above, and presents those structures to the user as hyperlinks that enable the user to take actions on the structures when clicked." Jeffay Validity Report at ¶ 421. The Mosaic browser is coded to look for the tag markups, which are specifically added by the creator of the document.

REBUTTAL EXPERT REPORT OF TODD C. MOWRY REGARDING VALIDITY OF U.S. PATENT NO. 5,946,647

66

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Gibson, Dunn & Crutcher LLP

These tags are different from the structures in data (instantiations of a pattern).  Mosaic may detect these tags, but does not detect structures that appear in the actual data presented to the user as disclosed in the '647 patent.  '647 patent at 1:27-36.

183.     Contrary to Dr. Jeffay's assertions, the tags detected by the MhonArc/Mosaic system are not "detected structures," and are further not presented to the user.  The MhonArc/Mosaic system detects "tags" and "anchors," but specifically discloses that these "tags" and "anchors" are not presented to the user.  Mosaic only presents to the user data that may or may not correspond to the link value (the value of the "tag" or "anchor").  Even where the URL value in the "tag" or "anchor" is the same as that of the data that it tags, the "tags" or "anchors" are not structures, as they are not "instantiations of a pattern," as defined by the '647 patent.

184.     The "anchor text" referred to by Dr. Jeffay is not a detected structure, as "structure" is used in the '647 patent.  It is not an instance of a saved pattern, but instead is arbitrary text that the creator of the document has tagged with an anchor.  This anchor text is also not "detected" by systems such as Mosaic.  The URL that is part of the anchor/tag embedded in the hyperlinked data (data to which an anchor or tag has been added) is likewise arbitrary and not detected by the system. e.g., <a ref=http://internetscam.com>Please click this harmless link!</a>.

185.     The MhonArc/Mosaic system does not look for any patterns within the anchor text that actually appears in the received data – e.g.  "Please click this harmless link!" – but instead accepts whatever characters happen to exist between ">" and "</a>" (after "<a href=") as the anchor text, no matter what those characters are.  While "<a href=" is detected, the system does not operate on "<a href=," but instead simply takes the user to the provided URL.  Thus the system does not perform actions on the detected items, "<a href=," but instead performs actions on portions of the anchors/tags that are not detected, the URL.

**b.     a memory storing information including program routines including**

186.     As described with regards to at least elements (d)-(f) of this claim, neither the MhonArc/Mosaic system nor the Mosaic Handbook practice or disclose "a memory storing

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.
PATENT NO. 5,946,647                                          67

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn &
Crutcher LLP

information including program routines including . . . ." for at least the reason that Mosaic does not contain the claimed program routines.

**c. an analyzer server for detecting structures in the data, and for linking actions to the detected structures**

187. It is my opinion that the MhonArc/Mosaic system does not practice or disclose this element of claim 1. I disagree with Dr. Jeffay's statements that "[t]he MHonArc/Mosaic system is an 'analyzer server for detecting structures in the data, and for linking actions to the detected structures.'" Jeffay Validity Report at ¶ 400.

188. The combination does not "detect structures in the data," as taught by the '647 Patent. The combination instead requires data to be pre-marked with URL prefixes (such as "http://"), and finds those prefixes. MHonArc at mhonarc main script, lines 116-117. Finding pre-marked strings such as those listed in paragraph 405 of Dr. Jeffay's report is vastly different from detecting instances of interesting patterns in data (such as for phone numbers or email addresses), and requires less sophistication in a system. Instead, MHonArc performs only simple search-and replace operations on two very limited types of data that are effectively pre-marked: searching a header and replacing the content with a series of "mailto:" hyperlinks, and searching the body of a document for data pre-marked with URL prefixes to replace them with HTML hyperlinks. *See* e.g. mhonarc.txt at "Converting MH mail folders, or Mailbox files."

189. Dr. Jeffay argues that MHonArc detects *three* types of structures: "The MHonArc program detects three different types of structures in the input data (unstructured email text): untagged email addresses, HTTP URLs, and mailto URLs." Jeffay Validity Report, ¶ 403. I disagree. First, I would like to point out that Dr. Jeffay is incorrect when he claims that "HTTP URLs" and "mailto URLs" are separate types of structures. URLs are a single type of structure, where the only difference is the constant string that precedes the "://". An "HTTP URL" begins with "http://", a "mailto URL" begins with "mailto://", etc. Claiming that "http://" and "mailto://" are "different types of structures" because the same patterns simply differ in the prefix strings is equivalent to claiming that postal addresses with different strings for state names, city names, or street names count as different *types* of structures: e.g., counting "123 Maple Street, San Francisco, CA 94115" and "123

performed the selected action". (Jeffay Report, ¶ 132). It is my opinion that the Embedded Buttons system does not disclose "an action processor for performing the selected action linked to the selected structure" for at least the reason that the Embedded Buttons system does not allow the performance of a "selected" linked action. Instead, as discussed above, Embedded Buttons allows only a single operation – calling a telephone number – to be performed relative to any information that has been highlighted in a document. This is contrary to the teachings of the '647 Patent of presenting a menu of candidate actions to be performed on a specific type of data detected. '647 Patent at 4:23-31 ("Upon selection of this structure, user interface 240 presents and enables selection of the linked candidate actions using any selection mechanism, such as a conventional pull-down or pop-up menu.").

**5. "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines."**

281. It is my opinion that the Embedded Buttons system does not disclose "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines" for at least the reason that the Embedded Buttons system does not include the claimed program routines for the reasons described above.

**6. <u>Claim 4</u>: "The system recited in claim 1, wherein the analyzer server includes grammars and a parser for detecting structures in data."**

It is my opinion that Embedded Buttons does not disclose claim 4 for at least the reason it does not disclose each element of claim 1, as discussed in detail above. Moreover, the '647 patent requires multiple "grammars." But Embedded Buttons discloses, at most, only a single grammar for phone numbers. This is contrary to the '647 patent's teachings. See, e.g., '647 patent, 4:58-5:18 (identifying a "telephone number grammar" as one example of a grammar).

**7. <u>Claim 6</u>: "The system recited in claim 1, wherein the analyzer server includes a string library and a fast string search function for detecting string structures in the data."**

It is my opinion that Embedded Buttons does not disclose claim 6 for at least the reason it does not disclose each element of claim 1, as discussed in detail above. In addition, Embedded Buttons does not use string search to detect phone numbers. String search involves comparing a sequence of input characters against a target sequence of multiple characters that are literal constants.

REBUTTAL EXPERT REPORT OF TODD C. MOWRY REGARDING VALIDITY OF U.S. PATENT NO. 5,946,647

109

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Gibson, Dunn & Crutcher LLP

search data for words <u>not included in that list</u>. The ’647 patent, instead discloses the use of a list of patterns to aid a user in locating data expressed in those patterns.

292. As described in the ’647 patent, a “structure” is an instance of a pattern in a document, where a “pattern” refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document such as dates, addresses, phone numbers, names, etc. For example, Figure 6 in the ’647 patent shows “(415) 555-1234” as a structure that would be a positive match to the pattern “(NNN) NNN-NNNN”, where “N” is a digit between 0 and 9. (This phone number pattern can be represented as a *regular expression*.) As another example, Figure 6 in the ’647 patent also shows “1 Hilly Street, San Francisco, CA 94105” as a structure that would be a positive match to a pattern describing a postal address (comprised of a street address, city name, state abbreviation, and zip code digits – such a pattern can be represented as a *grammar*[8]). For all of the examples of structures described in the ’647 patent and for all examples of structures that I have observed being detected in embodiments of the ’647 patent, the detected structure is a semantically-significant “nugget” of data that positively matches a pattern that can be described by a context-free grammar, a regular expression, or string matching.

293. In contrast, locating a misspelled word in a document is fundamentally different from detecting a structure as taught by the ’647 patent for the following reason: because there is an unlimited set of possible misspelled words and because there is no rhyme or reason to how the letters in a misspelled word might be arranged, it is not possible to accurately recognize an arbitrary word as being misspelled by way of a positive match to a context-free grammar, a regular expression, or via string-matching. Therefore rather than attempting to positively identify misspelled words, spell checkers instead identify *correctly-spelled words* by performing string matching against a dictionary

---

[8] In the field of Computer Science, the term “grammar” as understood by one of ordinary skill at the time of the invention of the ’647 patent is synonymous with “context-free grammar,” such as a grammar that can be written in Backus-Naur Form. In fact, the standard textbook that has been used in university courses on compilers and parsing over the past couple decades, Alfred Aho et al.’s COMPILERS: PRINCIPLES, TECHNIQUES, AND TOOLS (also known as the “Dragon Book”), explicitly states that it considers the term “grammar” as shorthand for “context-free grammar.” ALFRED AHO ET AL., COMPILERS: PRINCIPLES, TECHNIQUES, AND TOOLS p. 26 (1st ed. 1986).

307.       As an initial matter, I disagree that Sidekick can be combined with the "knowledge of a person of ordinary skill" to overcome the deficiencies in Sidekick's disclosure.  Dr. Jeffay provides no explanation of why one of ordinary skill would be motivated to combine Sidekick with the dozens of "state of the art" references Dr. Jeffay discusses.  In my opinion, one of ordinary skill would not be motivated to combine these disparate disclosures, and in any event, they do not render obvious the asserted claims.

308.       I disagree with Dr. Jeffay's statement that detecting multiple phone numbers satisfies the asserted claims.  Jeffay Validity Report, ¶¶ 678, 693.  The '647 patent does not distinguish between different "types" of phone numbers.  It does, however, expressly disclose detection of different structures, such as phone numbers, email addresses, etc.  Accordingly, the Sidekick system does not "detect[] structures in data" as required by claim 1.  I also disagree with Dr. Jeffay that "Sidekick discloses detecting multiple types of phone numbers--for instance a US and a Swedish phone number."  Jeffay Validity Report, ¶¶ 678, 693.  Sidekick detects phone numbers according to parameters that are applied by default or set by the user.  *Id.*  It will detect any phone number (U.S., Swedish, or otherwise) that fits those parameters.

309.       Dr. Jeffay contends, without evidence or explanation, that "it would have been obvious to modify Sidekick to either detect different types of phone numbers or other structures that can be detected" and that "it would have been a predictable and easy modification to the system to add additional detected structures with associated actoins [sic]."  Jeffay Validity Report, ¶¶ 678, 693; *see also id.* ¶¶ 686, 699.  I disagree.  The patent specifically teaches linking to a detected structure "candidate actions" that a user would normally perform on that structure.  '647 Patent, 2:4-9 ("The present invention overcomes the limitations and deficiencies of previous systems with a system that identifies structures in computer data, *associates candidate actions with each detected structure*, enables the selection of an action, and automatically performs the selected action on the identified structure." (emphasis added)).   It is my opinion that at least as of the time of invention, it was novel to provide a system to detect multiple structures and associate with those structures different actions that are also tailored to those structures.  Further, one of skill in the art reading the patent would understand this novel limitation to require linking ***multiple*** candidate actions to each structure

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.
PATENT NO. 5,946,647                                   118

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn &
Crutcher LLP

detected. Dr. Jeffay's purported "demonstration of the state of the art as of 1994," to which I understand Apple will object, is based on pure hindsight, not any teachings of the prior art or the knowledge of one of ordinary skill at the time of the invention.

310. Moreover, providing a user interface with multiple linked actions is not a trivial design choice, as Dr. Jeffay contends. Indeed, Sidekick required that the user initiate the "Dialer" functionality before it attempted to detect a phone number. Providing multiple linked actions for multiple structures is contrary to what Sidekick was designed to do.

311. I also disagree with Dr. Jeffay's assertion that Sidekick renders claim 1 of the '647 patent obvious under Judge Posner's construction of "linking actions to the detected structures." The reason Sidekick does not create a "specific connection" using "function pointers," as Dr. Jeffay describes, is because there is only one structure and one action. This is very different from the '647 patent.

312. Finally, I disagree that it would have been obvious to display a pop-up menu of the linked actions. Since Sidekick discloses at most a single alleged linked action (i.e. dialing a phone number), there is no need for a pop-up menu of linked actions, since there are no other allegedly linked actions to choose.

**2. Embedded Buttons System combined with "the knowledge of a person of ordinary skill in the art**

313. Dr. Jeffay asserts that the Embedded Buttons System combined with "the knowledge of a person of ordinary skill in the art at the time of the alleged invention" renders obvious the asserted '647 patent clams. I disagree.

314. I incorporate here my analysis above regarding the reasons Embedded Buttons does not anticipate the asserted claims. I do not repeat that analysis here, but I address some arguments Dr. Jeffay makes with respect to obviousness based on the Embedded Buttons system.

315. As an initial matter, I disagree that Embedded Buttons can be combined with the "knowledge of a person of ordinary skill" to overcome the deficiencies in Embedded Buttons' disclosure. Dr. Jeffay provides no explanation of why one of ordinary skill would be motivated to combine Embedded Buttons with the dozens of "state of the art" references Dr. Jeffay discusses. In

REBUTTAL EXPERT REPORT OF TODD C. MOWRY REGARDING VALIDITY OF U.S. PATENT NO. 5,946,647

119

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Gibson, Dunn & Crutcher LLP

program for correctness." U.S. Patent No. 5,437,036 ("Stamps") at Abstract. As a spell checking reference, Stamps suffers from, among other things, the same flaw as all spell checkers - spell checkers do not detect *structures* in data.

340. While the '647 patent discloses the detection of *structures*, where structures are instances of saved patterns (e.g., grammars, regular expressions, strings) that represent classes of data that have a particular *semantic significance* (e.g., telephone numbers, email addresses, postal addresses, etc.), Stamps does not detect structures. Stamps searches data for two types of data: (1) as is common to all spell checkers, Stamps searches for words <u>that do not appear</u> in a saved list; and (2) Stamps searches for words that a user has entered into a database in the form of an "exclusion dictionary" of terms to catch. Stamps thus does not use structures, as disclosed in the '647 patent, as neither of these two types of detected data constitute *structures* with *semantic significance*. '647 patent at 1:14-16. Stamps either detects something that does not have a match in a list, or something that does have a match in a list of items but has no semantic significance; it does not however detect data in useful formats such as instantiations of useful saved patterns as taught by the '647 Patent '647 patent at 1:27-33.

341. Stamps further does not "link actions to structures," as Dr. Jeffay alleges. Further, the function that Dr. Jeffay alleges as "linking actions to the detected structures" in Stamps are not actions at all. Dr. Jeffay discusses options such as replacing the misspelled word, ignoring the misspelled word, or deleting the misspelled word. None of these actions use the data that was detected, as taught by the '647 patent, but instead ignore, or delete it.

**b. Overview of Koved**

342. Koved is a brief publication discussing explicit and embedded menus in a variety of contexts. Koved describes an explicit menu as an "explicit enumeration of menu items," much like one sees at the top of most programs (via a menu bar). Koved, at 64. An embedded menu is "embedded within the information being displayed on the screen." *Id*.

343. Koved discusses the use of embedded menus in, among other things, an interactive encyclopedia and spell checkers. *See, e.g.*, *id.* at 64-65. Koved is not focused on the underlying operations of these systems, only the application of embedded menus in them.

**(vii) a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines.**

365. It is my opinion that neither Koved nor Stamps discloses "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines" for at least the reason that Koved does not disclose the claimed program routines for the reasons described above. Consequently, Dr. Jeffay has failed to show that Koved discloses this limitation of claim 1.

**d. <u>Claim 4</u>: "The system recited in claim 1, wherein the analyzer server includes grammars and a parser for detecting structures in data."**

366. It is my opinion that neither Koved nor Stamps discloses claim 4 under any of the parties' proposed constructions for at least the reason that it does not disclose claim 1, as discussed in detail above. In addition, Stamps and Koved do not disclose a "parser for detecting structures in the data." As explained above, Stamps and Koved only discloses locating unrecognized text, which are not instances of patterns.

367. Further, Stamps and Koved do not disclose grammars. On the contrary, spell checkers use a dictionary of strings. The term "grammar" as understood by one of ordinary skill at the time of the invention of the '647 patent is generally synonymous with "context-free grammar," such as a grammar that can be written in Backus-Naur Form. In fact, the standard textbook that has been used in university courses on compilers and parsing over the past couple decades, Alfred Aho et al.'s COMPILERS: PRINCIPLES, TECHNIQUES, AND TOOLS (also known as the "Dragon Book"), explicitly states that it considers the term "grammar" as shorthand for "context-free grammar." (ALFRED AHO ET AL., COMPILERS: PRINCIPLES, TECHNIQUES, AND TOOLS 26 (1st ed. 1986).) The '647 patent explicitly distinguishes string matching, regular expressions, and grammars. ('647 patent, 1:28-29 ("'pattern' refers to data, such as a grammar, regular expression, string, etc."); see also '647 patent, cl. 4 ("includes grammars and a parser . . .") to cl. 6 ("includes a string library . . .").)

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 9/13/13

Todd C. Mowry

REBUTTAL EXPERT REPORT OF TODD C. MOWRY REGARDING VALIDITY OF U.S. PATENT NO. 5,946,647

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Gibson, Dunn &