# EXHIBIT 1

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
_____

| | | |
|---|---|---|
| APPLE INC. and NeXT SOFTWARE INC. (f/k/a NeXT COMPUTER, INC.), | ) ) ) | |
| *Plaintiffs*, | ) ) | No. 1:11-cv-08540 |
| v. | ) ) ) | Judge Richard A. Posner. |
| MOTOROLA, INC. and MOTOROLA MOBILITY, INC., | ) ) ) | |
| *Defendants*. | ) | |

ORDER OF MARCH 19, 2012

On the basis of the hearing on claims construction that I conducted on March 12, 2012, and the parties' briefs, I adopt the following claims constructions. Cf. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978–79 (Fed. Cir. 1995) (en banc), affirmed, 517 U.S. 370 (1996). This is the second round of claims construction in this litigation; the first was conducted by Judge Crabb before she transferred the case to me. See *Apple, Inc. v. Motorola, Inc.*, No. 3:10-cv-00662 (W.D. Wis. Oct. 13, 2011).

**Apple's U.S. Patent No. 6,493,002**

Apple's '002 patent ("Method and Apparatus for Displaying and Accessing Control and Status Information in a Computer System") covers the well-known control strips and toolbars found in personal computer operating systems. The purpose of a toolbar is to provide the user with easy access to basic information about his device, such as its sound volume level or internet connection, in a single location. The parties propose competing constructions of four terms that pertain to characteristics of the covered toolbars and the underlying programming.

The first term is "programming module." Claim 1 of the patent describes:

> a window generation and control logic…to create an operating environment for a plurality of individual *programming modules* associated with different application programs that provide

> status and/or control functions, wherein the window genera-
> tion and control logic generates and displays a first window
> region having a plurality of display areas…and wherein each
> of the plurality of display areas is associated with one of the
> plurality of individual *programming modules* (emphases add-
> ed).

The nontechnical reader confronted with this textual edifice sees through a glass, darkly; but the parties agree that "programming module" refers to computer code, and their disagreement appears to be a narrow one. Apple says the term denotes "a self-contained unit of code," while Motorola says it denotes "a program file (or files) associated with the control strip that contains the code necessary to perform the module's specified functions."

The parties appear to agree that "programming module" refers to a body of software code that is sufficient in itself to perform some task. Apple's definition is consistent with one of the common meanings of "module" in ordinary use: a distinct component of a larger system that performs a given task and is interchangeable with other components (that is, other modules). Motorola's proposal would limit programming modules to those chunks of code that constitute full program files. The parties don't define "program file," and as Apple's definition seems correct and Motorola has failed to explain what it means by "full program files," I adopt Apple's definition.

The next term to be construed is "implemented in a window layer that appears on top of application programming windows that may be generated." The parties' proposals aren't easy to distinguish on the semantic level: compare Apple's "when generated, the first window region appears in a window layer that is in front of active application windows," with Motorola's "implemented in a specific layer such that the first window and associated display areas, while generated, are always on top of and cannot be obscured by any application windows that may be generated."

I construed this phrase of the '002 patent in my January 25, 2012, summary judgment order, when I said that "a toolbar is a window that, when it appears at all, appears in a top 'window layer' that other windows—those displaying files or running programs—cannot overlap or block though they can overlap one another." I added that the asserted claims "do not require that that the window be always visible but only that it appear on top of other windows and never be obstructed when it is generated." Most windows in common operating systems can be partially obstructed by other windows; a key feature of the toolbar, distinguishing it from other windows, is that it cannot be *partially* blocked by other windows; such obstruction would interfere with its function of conveying in-

formation to the user in one convenient location. The toolbar is always on top of other windows in the sense that it cannot be partially obstructed by another window; but of course by opening certain programs, from the toolbar or elsewhere, the user can make the toolbar disappear completely while that program is open.

I reject both parties' proposals and adhere to my own, as set forth in the previous paragraph.

The third term is "interactive display activity," but at the claims construction hearing the parties informed me that the term's meaning is no longer disputed; the parties' proposed definitions were similar, and they have agreed to accept Apple's construction: "enabling at least one of the display areas and associated programming modules to be responsive to user output."

The fourth term is "message-based communication." Apple proposes the construction "communications that do not require immediate action by the recipient." Motorola counters with "a method of communication that involves passing a specific data structure ('message') from one component to another component to either tell the receiving component what to do or to obtain information about the receiving component." At the claims construction hearing, however, both parties conceded that neither proposed construction is particularly satisfactory, and seemed to agree that the term "message-based communication" is more straightforward than either proposal. I construe "message-based communication" to mean "communication that contains a message."

**Apple's U.S. Patent No. 6,343,263**

The parties seek construction of two terms in Apple's '263 patent ("Real-Time Signal Processing System for Serially Transmitted Data"), which describes a data-transmission system that performs realtime signal processing on serially transmitted data. The system is made up of two subsystems—a "host central processing unit" and a "realtime signal processing subsystem"—connected by a realtime application program interface, or "realtime API." As described in my order of January 25 construing the claim term "realtime API," the invention functions as follows: If an application running on the host subsystem needs "realtime services"—voice or video-image processing, for example—the host tells the realtime API, which in turn requests realtime data processing from the realtime signal processing subsystem. The realtime API then provides the realtime signal processing subsystem with signal-processing parameters supplied by the host.

In my January 25 order I adopted Apple's proposed construction of realtime API— "[an] API that allows realtime interaction between two or more subsystems"—rejecting Motorola's proposed construction: "[an] API facilitating constant bit rate data han-

dling." I observed that there was no disagreement over the meaning of "realtime," as both parties accepted the definition in Philip A. Laplante, *Real-Time Systems Design and Analysis: An Engineer's Handbook* 10 (1993): to be "realtime" a system "must satisfy explicit (bounded) response-time constraints or risk severe consequences," namely degraded performance. (The parties have not been able to explain what "bounded" adds to "explicit," but the precise meaning of these terms is not germane to the constructions.)

Now the parties ask me to construe the terms "realtime signal processing subsystem" and "realtime services." The latter term requires no construction, given the parties' agreement on the meaning of "realtime." As for "realtime signal processing subsystem," the patent specifies that the invention contains "a real-time data engine [the realtime signal processing subsystem] for processing isochronous streams of data." The word "isochronous" means transmitted at a constant bit rate. So the realtime signal processing subsystem must be capable of constant bit rate handling. But it doesn't follow that Motorola's proposed construction—"a subsystem that has explicit (bounded) response-time constraints and must assure constant bit rate handling of data"—is correct. The patent specification doesn't limit the realtime subsystem's handling capabilities to isochronous data; it purports instead to cover any type of data delivered over any type of transmission medium, including data transmitted at a variable bit rate ("asynchronous" streams of data). Motorola's proposed construction, in implying that the response-time constraints to which the realtime signal processing subsystem is subject must be internally imposed, is also inconsistent with language in the specification to the effect that the realtime API—a distinct component of the invention—supplies the realtime subsystem with its processing parameters.

I therefore construe "realtime signal processing subsystem" in claim 1 of the '263 patent to mean "subsystem that processes data subject to explicit (bounded) response-time constraints and is capable of handling data transmitted at a constant bit rate."

**Apple's U.S. Patent No. 5,566,337**

Apple's '337 patent ("Method and Apparatus for Distributing Events in an Operating System") describes a centralized method for alerting components in a computer of developments ("events") elsewhere in the system. The inventor, taking full advantage of his license to be his own lexicographer, *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996), has assigned many idiosyncratic meanings to commonly used words in the patent. The computer component generating the event is called a "producer" and the component to be notified is called the "consumer." The system receives

No. 1:11-cv-08540                                                                 5

events from producers, consults its database of consumers to be alerted for each type of event, and notifies the appropriate consumers of each event in the correct order.

The first two terms for construction appear in claim 1, which describes in relevant part:

> a system for distributing events comprising:
>> storing means for storing a specific set of events of which said at least one event consumer is to be informed;
>> *event manager control means for receiving the event from the event producer, comparing the received event to the stored set of events, and distributing an appropriate event to an appropriate event consumer*; and
>> *distributor means for receiving the event from the control means, directing said control means to distribute an appropriate event to an appropriate event consumer* (emphases added).

Both the "event manager control means..." and the "distributor means ..." are means-plus-function claims. 35 U.S.C. § 112, ¶ 6. For each I must therefore identify the claimed function and the structure disclosed in the '337 specification that implements the claimed function. *Biomedino LLC v. Waters Technologies Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007). When the claimed function is to be performed by a computer, the corresponding structure is the algorithm that enables the processor to perform the function, rather than the computer itself. *Dealertrack Inc. v. Huber*, Nos. 2009-1566, 2009-1588, 2012 WL 164439, at *11–12 (Fed. Cir. Jan. 20, 2012); *Aristocrat Technologies Australia Pty Ltd. v. International Game Technology*, 521 F.3d 1328, 1332–33 (Fed. Cir. 2008); see also *In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303, 1314–15 (Fed. Cir. 2011); *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1249 (Fed. Cir. 2005).

The parties agree that "event manager control means..." claims the function "receiving the event from the event producer, comparing the received event to the stored set of events, and distributing an appropriate event to an appropriate event consumer." Apple contends that the corresponding structure is the "event manager control unit [listed in Figure 2 of the '337 patent] consist[ing] of at least one software routine which manages the event manager data structures." The control unit is the computer itself. *Harris Corp. v. Ericsson Inc.*, *supra*, 417 F.3d at 1254. The "software routine which manages the event manager data structures" sounds like an algorithm, but as it says nothing about how the control unit (the computer) receives, compares, and distributes events, it is equivalent to claiming that a computer with "appropriate programming" is the relevant structure, a

gambit that the Federal Circuit rejected in *Aristocrat Technologies Australia Pty. Ltd. v. International Game Technology*, *supra*, 521 F.3d at 1334. I therefore reject Apple's proposed construction.

Motorola's proposed construction incorporates the '337 patent specification's description of how the event manager control unit performs the event receipt, comparison, and distribution functions. Though based in part on the specification's discussion of an embodiment, that embodiment is the only one disclosed that describes how the event manager control unit functions. Cf. *Nomos Corp. v. Brainlab USA, Inc.*, 357 F.3d 1364, 1368-69 (Fed. Cir. 2004). The quid pro quo for means-plus-function claiming is being bound by the structural details of the specification, including embodiment descriptions, and Motorola's construction appropriately narrows the event manager control unit's algorithm.

Motorola further proposes that the structure of the event manager control means includes APIs ("application programmer interfaces"—code that enables communication between software components) for enabling a producer to submit events, enabling consumers to register as either broadcast or sequential consumers (these terms are construed below), and distributing event notifications to event consumers. Because the claimed function clearly contemplates communication between producers, consumers, and the event control means, and the API discussion beginning at column 10:16 provides the only explanation of how these APIs would facilitate that communication, I agree that they too are part of the event manager control unit's algorithm.

I therefore accept Motorola's proposal that the structure applicable to the claimed event manager control means is the algorithm that controls the event manager control unit listed as 305 in Figure 2 of the patent. And I agree with Motorola that the details of that algorithm are set forth in the sections of the specification that it cites in its proposed construction. I caution, however, that Motorola's actual proposed construction will not be intelligible to a jury evaluating the '337 patent, and will have to be substantially simplified before I will permit it to be presented to a jury.

The second term for construction is the "distributor means...," which the parties also agree is a means-plus-function claim. And they agree that it claims the function of "receiving the event from the control means and directing said control means to distribute an appropriate event to an appropriate event consumer." This too is a computer-implemented function and the appropriate structure is the algorithm that enables the processor to perform the function.

I reject Apple's proposal that the appropriate structure is "software instructions that moderate the connection between producers and consumers of an event" for the same

reasons I rejected its proposal for the first term. "Software instructions" doesn't identify a structure found in the specification of the '337 patent.

I accept Motorola's proposal that the structure includes event distributors for each event type, which control communication with broadcast consumers and are controlled by an algorithm that performs the steps visualized in Figure 9D and described in Motorola's citations to the '337 specification. I also accept Motorola's contention that the structure applicable to the claimed distributor means includes APIs that enable communication with third-party distributors and thus allow the '337 system to handle new event types. The specification states at column 10:18–26 that "according to the present invention," the distributors may be written by third parties, and goes on to define APIs "which allow[] these third parties to communicate with the event manager." The prefatory clause means that every incarnation of the invention envisions communication with third-party distributor modules. *Honeywell Int'l, Inc. v. ITT Industries, Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006). APIs are necessary to facilitate communication with those modules, and are included in Motorola's proposed description of the structure. As before, although I adopt Motorola's proposed structure for the "distributor means" claim, it will have to be substantially simplified before it is presented to a jury.

Claim 3 of the patent contains terms "broadcast consumer" and "sequential consumer." Claim 6, which Apple asserts in this case, is based on claim 3, which describes:

> The system according to claim 1, wherein a plurality of event consumers are included in the computer and the plurality of consumers comprise:
>> *broadcast consumers* having no relationship with other consumers, the broadcast consumers operating independently of other consumers and of the order in which consumers are informed of the event; and
>> *sequential consumers* having relationships with other consumers, the sequential consumers requiring that no other consumer be told about an event while they themselves are processing the vent and having an ability to influence when they receive the event relative to the other consumers (emphases added).

Neither term appears in a means-plus-function claim, so the general principles of patent claim construction apply. Apple's proposal that a broadcast consumer "has no relationship with other consumers" and a sequential consumer "requires that no other con-

sumer be told about an event while it is still processing the event" adds nothing. Motorola proposes that a broadcast consumer is one "that has registered to receive events of a given event kind via a broadcast mode of distribution and will receive the event via a broadcast mode of distribution" and a sequential consumer is one that "has registered to receive events of a given kind via a sequential mode of distribution and will receive the event via a sequential mode of distribution." This narrows Apple's definition by clarifying that consumers of each type must register to receive, and in fact receive, event notifications through either the broadcast or sequential type of event notification.

This limitation is supported by the specification's description of the invention. The specification describes "the present [i.e. '337] invention" as allowing a program to "subscribe as a sequential consumer for some kinds of events and as a broadcast consumer for other kinds of events." Columns 6:48, 7:22–25. Subscription is synonymous with registration. Motorola finds no similar support in the specification for its requirement that the broadcast and sequential consumers actually receive event notifications through those particular forms. Its specification references for this limitation are either unresponsive or focused on a particular embodiment of the '337 invention, which is an improper foundation for claim limitations outside the means-plus-function context.

I therefore conclude that a broadcast consumer is "a consumer that has registered to receive events of a given event kind via a broadcast mode of distribution" and a sequential consumer is "a consumer that has registered to receive events of a given event kind via a sequential mode of distribution."

**Apple's U.S. Patent No. 5,946,647**

Apple's '647 patent ("System and Method for Performing an Action on a Structure in Computer-Generated Data") describes a system that recognizes phone numbers, email addresses, dates, and other patterns in text, and presents the user with a menu of actions that can be performed on the relevant data. For example a smartphone practicing the '647 system could recognize a phone number in a text message and present the user with a menu asking whether he would like to call the phone number or store it in his address book.

The '647 system relies on an "analyzer server" component that is programmed to recognize a wide range of data patterns (the patent calls these patterns "structures") in data from a wide range of files, such as text messages, emails, and web pages. Applications submit documents to the analyzer server for detection of structures and for linking. After the analyzer server recognizes structures in a document, it links each structure to operations (called "actions") commonly performed on data of that type (such as linking

phone numbers to the functions for calling or storing phone numbers). It then returns the document and links to the application that submitted it.

A benefit of the '647 system is that the analyzer server performs the pattern recognition and linking before the user actually requests any of it. That's useful because it reminds the user of the actions available and relevant to, say, a phone number, in a convenient list next to it in the document. So even if the user hadn't thought to call the number, the option to do so (and to do so without having to write down the number and then retype it into the phone application) is presented to him.

The parties request construction of two terms in claim 1 of the patent. Claim 1 describes "a memory storing information including program routines including an *analyzer server* for detecting structures in the data, and for *linking actions to the detected structures...*" (emphasis added).

The "analyzer server" performs the core functions of the '647 system, namely structure detection and linking. Apple describes the analyzer server as "a program routine(s) that receives data, uses patterns to detect structures in the data, and links actions to the detected structure." Motorola proposes that it is "a server routine separate from a client that receives data having structures from the client." Under Apple's interpretation, any set of routines that performs structure detection and linking would be an analyzer server. But that is just a definition of an "analyzer." "Server" becomes superfluous, as Apple's expert implicitly acknowledges by stating that "the inventors used ['server'] in a generic sense intending to describe a *service* that includes various functionalities." That understanding renders any piece of code a "server."

Motorola interprets "server" to mean a client-server relationship between the analyzer server and the applications that request structure detection and linking. The '647 specification supports this understanding by visualizing the "program" (item 165) that contains the analyzer server as a separate box from the "application" (item 167), which submits a data file to the program for structure detection and linking. Had the patent intended the analyzer server to be integrated into the application, rather than separate, the program box would logically appear inside the application box in Figure 1.



FIG. 1

Also, Motorola's construction entails that the analyzer server is a single routine. Apple's expert states that multiple routines would be necessary to implement '647's functions. "Routine" seems to be used imprecisely throughout this litigation, but the parties haven't requested construction. Routines often consist of subroutines--and in fact the '647 patent describes the analyzer server as a subroutine (Column 2:26), indicating that the inventor had a broader conception of the term "routine" than either party. In the present context "routine" is synonymous with "module" or "component," all of which describe a piece of programming necessary to perform a specific function; routines consist of subroutines, and I find nothing wrong with describing the analyzer server as one routine.

I therefore construe "analyzer server" to mean "a server routine separate from a client that receives data having structures from the client."

The second term for construction, also in claim 1, is "linking actions to the detected structures." Apple proposes that this means "associating detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are associated." Motorola proposes "creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on that detected structure." The constructions diverge on two points.

One is the interpretation of "linking." Apple interprets it to mean "associating." Motorola requires the creation of "a specified connection" from the structure to the code that performs the associated action. The '647 specification states that "upon detection of a structure, analyzer server links actions associated with the responsible pattern to the detected structure, using conventional pointers." A term of art in computer engineering, a "pointer" stores a computer memory address. Linking by pointers thus entails storing the memory address of the code that performs the action relevant to the recognized structure. The analyzer associates structures with actions, as Apple contends (which explains the repetition of "associating" in proximity with "linking" in the specification, but doesn't establish that they are one and the same). But '647 makes clear that linking is accomplished through pointers. Motorola's explanation of pointers—a concept that Apple's brief ignores—convinces me that such linking constitutes a "specified connection."

Second, Motorola's construction requires "at least one" action to be linked to each detected structure. Citing the consistent reference to actions (plural) throughout the claims and specification of '647, Apple argues that two or more actions must be linked to each structure. But Figure 4 of the patent, which contemplates an analyzer that links dates to just one action—"put in electronic calendar"—undermines this interpretation. And the

ability to link a structure to a single action still comports with the patent's plural reference, so long as other structures are linked to other actions. An analyzer that links dates to the calendar and phone numbers to the phone book still "links structures to actions."

I therefore adopt Motorola's proposal for the term "linking actions to the detected structures."

## Apple's U.S. Patent No. 5,519,867

Apple's '867 patent ("Object-Oriented Multitasking System") discloses a "wrapper" for procedural operating systems that enables object-oriented applications to access procedural operating system services. This permits these otherwise incompatible applications and systems to communicate with one another.

The parties submitted for construction four mean-plus-function claims from this patent. One is "means for storing said executable program logic in an object-oriented class library." When construing a means-plus-function claim, the first step is to determine the function identified by the claim term. Motorola argues that the function tracks the claim language: its proposed construction is "storing said executable program logic in an object-oriented class library." In its claim chart and at the hearing, Apple countered that the function is merely "storing said executable program logic." But a footnote in its brief disclaims any "meaningful dispute" with Motorola over function. I agree with Apple's latter characterization and adopt Motorola's proposed construction. The claim requires not just that the executable program logic be stored, but that it be stored in a specific location. The claim's locational condition thus limits the scope of the claimed function; and the Federal Circuit holds that "the function of a means-plus-function claim must be construed to include the limitations contained in the claim language." *Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003).

Apple needed the function to be truncated in order to free up the object-oriented class library to serve as its structure, "one or more object-oriented class libraries, which contain executable program logic." (The truncation is omitting "in an object-oriented class library" from its proposed function.) But a means-plus-function claim states a function "without the recital of structure," which instead must be disclosed in the specification. 35 U.S.C. § 112, ¶ 6; *Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360, 1365 (Fed. Cir. 2000); *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 531 (Fed Cir. 1996). So Apple's proposed structure won't work.

Motorola argues that no structure is disclosed in the specification, rendering this limitation indefinite and claim 1 invalid. To identify structure, one asks: "What performs the claimed function?" If the function is "storing…executable program logic in an object-

oriented class library," the pertinent question is, "What performs (or carries out) the storing in a class library?" Apple's answer—"object oriented class libraries, which contain executable program logic"—is wrong both for the reason described above (structure can't appear in the claim language) and because it doesn't make sense linguistically (under Apple's proposed construction, the claim would effectively read, "class libraries containing executable program logic for storing executable program logic in a class library").

Claim 1 is therefore invalid because the specification discloses no structure corresponding to "means for storing said executable program logic in an object-oriented class library." Having found claim 1 to be invalid, I need not construe the other three terms submitted by the parties for construction. A single indefinite limitation invalidates an entire claim. E.g., *NetMoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1366–67 (Fed. Cir. 2008). The other three claims submitted for construction all appear in claim 1, which I have just ruled indefinite under 35 U.S.C. § 112, ¶ 2, so no purpose would be served by my construing them.

**Apple's U.S. Patent No. 7,479,949**

Apple's '949 patent claims "heuristics" for translating a user's finger movements on a touch screen device (such as an iPhone or iPad) into computer commands, for instance to scroll up or to shift the location of an on-screen item. Claim 1 claims heuristics for determining whether the user wants to scroll vertically or shift the view diagonally "based on an angle of initial movement of finger contact" and a heuristic for translating finger movements into commands to switch from one item to the next, as when the user is flipping through a series of digital photos. Claim 2 claims a heuristic for determining whether the user intends to move an on-screen item rather than shift the frame of view itself. Claim 10 claims a heuristic, similar to the first one mentioned, for distinguishing between commands to scroll horizontally and commands to shift the view diagonally, again "based on the angle of initial movement of the finger contact." In my January 16 summary judgment order I rejected Motorola's argument that the term "heuristics" is indefinite and stated that Apple's definition of that word—"one or more rules to be applied to data to assist in drawing inferences from that data"—is correct.

The phrase "based on the angle of initial movement of the finger contact" is the first term to be construed. Apple urges that the phrase is clear as it stands and needs no construction, but in the alternative urges the construction "based on at least the detected direction of initial movement of the finger contact with respect to the X-Y plane." Mo-

torola's interpretation is "using the angle of the initial movement of a finger contact as the sole criteria [*sic*]."

Apple is right that this phrase needs no construction; it is just a slightly clunky way of saying that the heuristic allows the device to determine what the user wants to do, using as one input the angle at which he has swiped his finger on the touch screen—more specifically, the angle at which his swipe began ("the angle of initial movement"). Motorola wants me to construe "based on" to mean "based exclusively on." Motorola's interpretation is contrary to the usual usage of the phrase "based on," which does not exclude other possible bases for the decision.

I decline to construe the phrase "based on the angle of initial movement of the finger contact"; it's okay as is.

A second issue is Motorola's argument that claims 1, 2, and 10 are "means plus function" claims, see 35 U.S.C. § 112, ¶6, and that the patent specification fails to provide the structure necessary to perform the claimed functions.

The claims are as follows:

> **1.** A computing device, comprising: a touch screen display; one or more processors; memory; and one or more programs, wherein the one or more programs are stored in the memory and configured to be executed by the one or more processors, the one or more programs including: instructions for detecting one or more finger contacts with the touch screen display; instructions for applying one or more heuristics to the one or more finger contacts to determine a command for the device; and instructions for processing the command; wherein the one or more heuristics comprise:
>
> *[1] a vertical screen scrolling heuristic for determining that the one or more finger contacts correspond to a one-dimensional vertical screen scrolling command rather than a two-dimensional screen translation command based on an angle of initial movement of a finger contact with respect to the touch screen display;*
>
> *[2] a two-dimensional screen translation heuristic for determining that the one or more finger contacts correspond to the two-dimensional screen translation command rather than the one-dimensional vertical screen scrolling command based on the angle of*

> initial movement of the finger contact with respect to the touch screen display;
>
> and *[3] a next item heuristic for determining that the one or more finger contacts correspond to a command to transition from displaying a respective item in a set of items to displaying a next item in the set of items.*
>
> **2.** The computing device of claim 1, wherein the one or more heuristics include *[4] a heuristic for determining that the one or more finger contacts correspond to a command to translate content within a frame rather than translating an entire page that includes the frame.*
>
> **10.** The computer device of claim 9, wherein the first set of heuristics comprises *[5] a heuristic for determining that the one or more first finger contacts correspond to a one-dimensional horizontal screen scrolling command rather than the two-dimensional screen translation command based on the angle of initial movement of the finger contact with respect to the touch screen display.*

Motorola argues that each of the five italicized portions (I've numbered them for ease of reference) describes a function and that no structure for performing these functions is described in either the claim or the specification. If Motorola is correct on both points, the claims are invalid.

Are the quoted claim terms indeed means-plus-function terms? The usual format for a means-plus-function term includes the word "means" immediately prior to the description of the function, and that word is absent from the quoted claims. So there is a presumption that these are not means-plus-function limitations. But the presumption is rebutted if "the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Invento AG v. Thyssenkrupp Elevator Americas Corp.*, 649 F.3d 1350, 1356 (Fed. Cir. 2011), quoting *CCS Fitness v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002).

The quoted claims cover various functions, each of which can be described as the translation of a user's finger movements into computer commands. Do the quoted claims recite sufficient structure to perform the claimed functions? Apple points out that claim 1, from which the others ultimately depend, describes a computing device and lists the generic components of a generic touch screen computer. It's true that a touch screen computer is the device on which the claimed functions can be performed. But pa-

tents that claim a means for performing a computer-implemented function must, as I noted earlier, disclose the algorithm, or "step-by-step process," for performing that function—that is the "structure" required by the statute. The touch screen device is not itself a step-by-step method for translating a user's finger movements into particular computer commands. And while disclosure of the actual code that would perform the translations is unnecessary if a person of ordinary skill in the art would be able without difficulty to write a program to execute the described algorithm, *Medical Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1214 (Fed. Cir. 2003), the claims at issue do not describe an algorithm that would be executed by the code. It is inherent in the concept of a touch screen computer that the user would want to enter commands to tell it to do things, that he would enter those commands by moving his fingers on the touch screen, and that the device would need to apply some set of rules to a given finger input to determine which command was intended. Apple's patent cannot cover every means of performing the function of translating user finger movements into common computer commands on a touch-screen device—that would be a patent on all touch-screen computers.

The patent does provide a bit more detail as to three of the five functions that I italicized; it instructs on translating finger movements into commands based on the angle at which the user moves his fingers on the touch screen. But as I said in my January 16 summary judgment order, to say that a heuristic determines what a user wants to do based on his angle of finger movement hints at a step-by-step algorithm as required by *Aristocrat Technologies* but does not actually describe one; and two of the italicized terms, [3] and [4], don't even provide that much information. Because the claims describe functions without describing the structure necessary to perform the functions, these are means-plus-function claims despite not using the word "means."

The question is therefore whether the specification recites sufficient structure for the functions in claims 1, 2, and 10. In my January 16 summary judgment order I accepted Apple's argument that Figure 39C adequately specifies structure for the limitations that I numbered [1] and [2]. Motorola ignores my holding and makes the same arguments that I rejected at summary judgment.

The parties have not briefed the question whether the specification contains enough structure to justify the other limitations. The parties shall file simultaneous briefs on this question by March 26.

**Motorola's U.S. Patent No. 6,175,559**

Motorola's '559 patent ("Method for Generating Preamble Sequences in a Code Division Multiple Access System") concerns the creation of numerical "preamble codes" that precede cellular transmissions and identify the transmitting cell phone to the receiving tower. Verifying the source of each transmission is important because, in a CDMA phone system, multiple cell phones communicate with a tower on the same frequency. The preamble code is created by mathematically combining two strings of binary bits: an "inner code" that identifies the transmitting phone and an "outer code" that identifies the recipient tower. When the tower receives a transmission it runs the combination algorithm in reverse to extract the inner code (since it knows its own outer code) and thus identify the source of the transmission.

Both claim terms for construction relate to the '559 method for generating the inner code, which identifies the sending cell phone. The inner code is itself made up of individual "codewords" (actually series of digits, not letters) each a much shorter string of binary bits. Those codewords are "orthogonal" if, when two codewords are compared bit-by-bit, the number of matching bits is equal to the number of non-matching ones (in other words, if you multiply the corresponding elements of two codewords and then add the results, you get zero). For example, the code words $\{1, 1, -1, -1\}$ and $\{1, -1, 1, -1\}$ are orthogonal to each other because $1*1 + 1*(-1) + (-1)*1 +(-1)*(-1) = 1+(-1)+(-1)+1 = 0$, whereas the codeword $\{1, 1, 1, -1\}$ would not be orthogonal to either of them. And a codeword is never orthogonal to itself since all bits match, meaning that each corresponding term will multiply to 1, and so the sum of those terms will not equal zero. Orthogonal codewords are (among other properties) unique, which furthers the inner code's function of differentiating cell phones transmitting on the same channel.

Claim 4 of the '559 patent is "A method for generating preamble sequences in a CDMA system in accordance with claim 1, *wherein the inner codes comprise a set of Hadamard code words*" (emphasis added). Hadamard codewords are a class of codewords each of which is orthogonal to all the others. The parties request construction of passage in the claim that I've italicized. Motorola proposes "wherein the inner codes for the preamble sequences are taken from a set of Hadamard code words." Apple proposes "wherein the inner codes contain at least one Hadamard code word." Their dispute boils down to a disagreement over the term "comprise."

When it appears in a patent claim, "comprise" is generally understood to mean "including but not limited to." E.g., *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1319 (Fed. Cir. 2009); *Manual of Patent Examining Procedure* § 2111.03, p. 2100-44 (8th ed., revision 6, Sept. 2007), www.uspto.gov/web/offices/pac/mpep/mpep_e8r6_2100.pdf (vis-

ited March 13, 2012). Motorola's construction interprets comprise to mean "taken from" or "made from" or "derived from," all of which are far afield from the meaning quoted in *Exergen* and the patent examiner's manual. Although the patentee can supply his own definition for a patent term, *Vitronics Corp. v. Conceptronic*, *supra*, 90 F.3d at 1582, nowhere in the specification or claim terms does the '559 redefine comprise to take on this idiosyncratic meaning, so its ordinary meaning in patent law governs. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

Apple's definition equates "comprise" with "contain at least one," which comports with the term's common definition. It's true that Apple's construction may exclude the embodiments disclosed in the '559 patent specification at column 4:5–21, which contemplate inner codes taken from Gold codes, or codes subjected to certain manipulation techniques (upsampling and quadrature transformations, the details of which are irrelevant to construing this claim). While there is a strong presumption against constructions that have the effect of excluding embodiments specified in the patent, *In re Katz Interactive Call Processing Patent Litigation*, *supra*, 639 F.3d at 1324, the embodiments excluded by Apple's construction in this case are limited to "alternate embodiments," some of which may be excluded under Motorola's proposal as well (for example, "In an alternate embodiment of the present invention, the code words are taken from a set of orthogonal Gold codes"—Gold codes aren't taken from Hadamard codes.). Apple's construction includes the '559 patent's preferred embodiment, and the cases upon which *In re Katz* relies caution against construing a claim to exclude the preferred embodiment but are silent on the subject of alternates.

I therefore accept Apple's proposal that "wherein the inner codes comprise a set of Hadamard code words" in claim 4 of the '559 patent means "wherein the inner codes contain at least one Hadamard code word."

Claim 5 of the '559 patent describes a particular method for selecting and combining the codewords to create the inner code. It claims, in relevant part, the method of:

> forming an inner code in the mobile station utilizing the following equation:
>
> $$c_i(k) = \sum_{j=0}^{M-1} s_j(k - jP)$$
>
> *where $s_j$, j=0,1, … , M-1 are a set of orthogonal codewords of length P,*
>     *where M and P are positive integers*... (emphasis added).

No. 1:11-cv-08540                                                                                                    18

The claim construction dispute turns on whether the set of codewords forming the inner code ($s$ in the claim's terminology) must contain orthogonal elements, as Apple proposes, or whether it just must be drawn from a set of orthogonal elements, as Motorola posits. The constructions diverge when each draw from the set of orthogonal codewords is a repeat of the last one, resulting in a set entirely of repeats. Such a set contains no orthogonal elements, since a codeword, as explained above, cannot be orthogonal to itself. Motorola's construction encompasses such a set, while Apple's does not.

Motorola's construction requires that the disputed term in claim 5 cover all sets of codewords "taken from a set of orthogonal codewords of length P." This includes the preferred embodiment, which describes drawing the inner code's component codewords from a set of Hadamard codewords. (Each element of the Hadamard set is orthogonal to every other). And the set of drawn codewords needn't all be unique—the specification makes this clear at column 3:57; there can be repeats. Permitting repeats might not be thought wholly inconsistent with the requirement that the drawn set be "orthogonal," because a set containing some identical, hence non-orthogonal, codewords as well as some different ones might still be described as "a set of orthogonal codewords if the latter predominated. But a set consisting *entirely* of repeats contains no elements orthogonal to each other, and so it cannot be "a set of orthogonal codewords."

Consider {A, B, C, D} to represent four Hadamard codewords. (In reality each Hadamard code word is a collection of 1's and -1's, but I represent each codeword as a letter for simplicity's sake. A is orthogonal to B, C, and D, but not to itself.) Motorola argues that the set {A, A, A, A, A} is still "orthogonal" in the sense that it is orthogonal to a set that repeats a different Hadamard codeword, {B, B, B, B, B} for example. This would be more convincing if claim 5 covered "an orthogonal set of codewords," but in fact it claims "a set of orthogonal codewords," suggesting that the words, not the series, must be orthogonal. There is no intra-set orthogonality in {A, A, A, A, A}.

Apple's proposed construction—"the codewords consist of one or more codewords... wherein if there are more than one codwords, at least two must be orthogonal to each other"—comports with an ordinary understanding of these terms and is correct.

**Motorola's U.S. Patent No. 6,359,898**

Motorola's '898 patent ("Method for Performing a Countdown Function During a Mobile-Originated Transfer for a Packet Radio System") describes a method for efficiently allocating channels in a wireless communications system, such as a cell phone or Wi-Fi network. Wireless data transmissions are transmitted in small increments of time called "frames." Each frame includes eight "time slots"—those are the channels. Each

time slot transmits one block of data per frame, so a total of eight blocks are transmitted per frame. A network can allocate its time slots to different signals from mobile units (such as cell phones or Wi-Fi capable devices), either allocating each time slot to a different mobile unit or allocating multiple time slots to a single mobile unit. A time slot allocated to a given mobile unit transmission will transmit one block per frame until the transmission is completed; hence the more time slots that are allocated to a given transmission, the faster it will be completed. For example, a transmission of 10 blocks will require 10 frames if the signal is allocated only a single time slot, but will require only 5 frames if it is allocated 2 time slots.

When a transmission is completed, the mobile device no longer needs time slots and the network must reallocate them to other devices that still have data to transmit. The overall speed of the network depends on its being able to perform this reallocation with minimal downtime between the completion of one transmission on a given time slot and the beginning of another. Channel and processing delays create a lag time of several frames, so the network needs advance warning of a transmission's impending completion if it is to reallocate its time slots without downtime. A cell phone or other device can give advance warning by indicating in each frame the number of blocks remaining in the transmission. The '898 patent claims methods for providing this "countdown," particularly in cases in which multiple time slots are allocated to a single signal.

The parties debate the construction of the word "predetermined" in the term "predetermined number of channel resources," which appears several times in claims 1, 2, and 5. Claim 1 is "transmitting the plurality of units of information [the data blocks] via a predetermined number of channel resources [the time slots]" and "based on the predetermined number of channel resources, adjusting the number of the plurality of units remaining to produce an adjusted number of units remaining"—in other words, dividing the number of data blocks by the number of time slots to yield the number of frames remaining in a transmission; that countdown number can be transmitted to the network in each frame to enable the network to reallocate the time slots as soon as the countdown reaches zero.

Apple argues that "predetermined number of channel resources" requires that the number of time slots (channel resources) be "determined at the beginning of the transmission of the communication signal and…cannot be changed during the transmission of the communication signal." Motorola urges that "predetermined" just means that the number is determined "before transmission of the units of information." So the question is whether the number of time slots is determined before the entire transmission (Ap-

No. 1:11-cv-08540                                                                            20

ple's position), or just before some group ("plurality") of blocks, of which a transmission could contain many (Motorola's position).

Motorola's proposed construction is correct: "transmitting the plurality of units of information via a predetermined number of channel resources" implies only that the number of time slots is determined before transmission of blocks, not that it has to be determined before any portion of the message is transmitted. The fact that the claim says "the" plurality rather than "a plurality" may seem to imply all the blocks. But that is not correct. The claim says "a plurality" first, and then later says "the plurality" to make clear, by use of the definite article, that it is referring to the same "plurality" that had already been mentioned; and then it refers to "the plurality of units remaining," presumably a subset of "the plurality of units" that is, because only a subset, smaller than the transmission as a whole. Here is the language: "1. In a wireless communication system, a method for transmitting a communication signal comprising *a plurality of units of information*, the method comprising: transmitting *the plurality of units of information* via a predetermined number of channel resources;…based on the predetermined number of channel resources, adjusting the number of *the plurality of units remaining*…" (emphases added). As I said earlier, "comprise" in patentspeak means "including but not limited to," so "a plurality of units of information" need not be equal to the transmission as a whole—it can be just "a number of data blocks," for instance the several blocks transmitted in different time slots during a single frame. Nothing in the claim language suggests that the number of time slots assigned cannot change mid-transmission; Apple is trying to add that limitation to the text.

Motorola's construction is also reasonable in view of the operation of the patented method. The network base station determines how to allocate its time slots among different mobile units, but the mobile units perform the patented countdown and report it back to the base station in each frame. So when the patented method is practiced—when the mobile unit "adjusts" the number of blocks remaining by the number of time slots assigned—the number of time slots has already been "predetermined" by the base station. That doesn't preclude the base station from altering the number of time slots assigned to a given signal, since the new number will necessarily have been "predetermined" by the time the mobile unit uses it to calculate the new countdown number.

I adopt Motorola's proposed construction: "a number of channel resources determined before transmission of the units of information."

No. 1:11-cv-08540                                                                 21

United States Circuit Judge

March 19, 2012