QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

William C. Price (Bar No. 108542)
williamprice@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | CASE NO. 12-CV-00630-LHK (PSG)<br><br>**DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY**<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

02198.51990/5594689

DECLARATION OF PROFESSOR DAN SCHONFELD

I, Dan Schonfeld, declare as follows:

1.      I submit this Declaration in support of Samsung's Opposition to Apple's Motions for Summary Judgment and  to Exclude Expert Testimony.  If asked at hearing or trial, I am prepared to testify regarding the matters I discuss in this Declaration.

**I.      Background and Qualifications**

2.      I have been retained by Defendant and Counterclaimant, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, "Samsung") to serve as an expert in this case.

3.      I am currently a Professor in the Department of Electrical and Computer Engineering at the University of Illinois at Chicago.  I have been elected Fellow of the Institute of Electrical and Electronics Engineers ("IEEE") as well as Fellow of the International Society for Optics and Photonics ("SPIE").  I have also been elected University Scholar of the University of Illinois.

4.      I received my B.S. degree in Electrical Engineering and Computer Science from the University of California, Berkeley, California, and my M.S. and Ph.D. degrees in Electrical and Computer Engineering from The Johns Hopkins University, Baltimore, Maryland, in 1986, 1988, and 1990, respectively.

5.      In August 1990, I joined the Department of Electrical Engineering and Computer Science at the University of Illinois, Chicago, Illinois, where I am currently a Professor in the Departments of Electrical and Computer Engineering, Computer Science, and Bioengineering.  I serve as Co-Director of the Multimedia Communications Laboratory ("MCL") and member of the Signal and Image Research Laboratory ("SIRL").  I have also served as Director of the University-Industry Engineering Research Center ("UIERC"), formerly known as the Manufacturing Research Center ("MRC"), in the College of Engineering.

6.      I have been appointed Editor-in-Chief of the IEEE Transactions on Circuits and Systems for Video Technology.  I have served as Area Editor for special issues of the IEEE Signal Processing Magazine.  I have also served as Associate Editor of the IEEE Transactions on Circuits

02198.51990/5594668.7

-1-

DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO
APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY

1   and Systems for Video Technology, IEEE Transactions on Image Processing, and IEEE

2   Transactions on Signal Processing.  I also served on the editorial board of the IEEE Signal

3   Processing Magazine, EURASIP Journal of Image and Video Processing, and Research Letters in

4   Signal Processing.  I have served as guest editor of numerous special issues in various journals in

5   the area of multimedia systems.

6         7.      I currently serve as Technical Program Chair of the IEEE International Conference

7   on Acoustics, Speech, and Signal Processing (ICASSP) 2018.  I have served as General Co-Chair

8   of the IEEE International Conference on Multimedia and Expo (ICME) 2012.  I have also served

9   as Chair of the IEEE Workshop on Video Mining 2008 and the SPIE Conference on Visual

10  Communication and Image Processing 2007.  I have also served on the organizing committees of

11  various conferences including the IEEE International Conference on Image Processing 1998 and

12  2012.

13        8.      I have authored and co-authored over 200 technical papers for various journals and

14  conferences.  I was co-author (with Carlo Giulietti and Rashid Ansari) of a paper that won the Best

15  Paper Award at the ACM Multimedia Workshop on Advanced Video Streaming Techniques for

16  Peer-to-Peer Networks and Social Networking 2010.  I was also co-author (with Junlan Yang) of a

17  paper that won the Best Student Paper Award at the IEEE International Conference on Image

18  Processing 2007.  I was also co-author (with Wei Qu) of a paper that won the Best Student Paper

19  Award at the IEEE International Conference on Image Processing 2006.  I was also co-author

20  (with Nidhal Bouaynaya) of a paper that won the Best Student Paper Award in Visual

21  Communication and Image Processing 2006.  My publications in the area of image and video

22  processing and communications dates back to 1988. For example, among these publications is the

23  article (co-authored with Dan Lelescu) entitled: "VORTEX: Video retrieval and tracking from

24  compressed multimedia databases—multiple object tracking from MPEG-2 bitstream," (Invited

25  Paper). *Journal of Visual Communications and Image Representation*, Special Issue on

26  Multimedia Database Management, vol. 11, pp. 154-182, 2000. Similarly, the publications listed

27  include a book chapter entitled: "Image and Video Communication Networks," (Invited Chapter).

28

1  *Handbook of Image and Video Processing.* A. Bovik (ed.), Academic Press: San Diego,

2  California, Chapter 9.3, pp. 717-732, 2000.

3         9.      I was invited as a Plenary Speaker and Keynote Speaker to the International

4  Conference on Intelligent Control and Information Processing (ICICIP) 2013 and International

5  Conference on Brain Inspired Cognitive Systems (BICS) 2013, IEEE/EIT International

6  Conference on Audio, Language, and Image Processing 2010, the IEEE International Conference

7  on Advanced Video and Signal-Based Surveillance 2009, and the ASME International Conference

8  on Communications, Signals and Systems 1995 and 2001.

9         10.     I have served as Region 1-6 representative on the Chapters Committee of the IEEE

10 Signal Processing Society.  I have also served as Chairman of the IEEE Signal Processing Chicago

11 Chapter.  I have also served on the IEEE Image, Video and Multidimensional Signal Processing

12 Technical Committee as well as the IEEE Multimedia Communications Technical Committee.  I

13 also serve on the American National Standards Institute (ANSI)/Underwriters Laboratory (UL)

14 Standards Technical Panel ("STP") on Multimedia Systems.

15 **II.     Opinions Regarding the '757 Patent**

16         11.     U.S. Patent No. 7,577,757 (the "'757 Patent") is based on U.S. Application No.

17 11/550,921, filed October 19, 2006, as a continuation of U.S. Application No. 09/884,661 filed on

18 June 19, 2001, now U.S. Patent No. 7,136,934 (the "'934 Patent").  According to documents and

19 testimony from the inventors, the '757 Patent was conceived on or around March 1, 2001.

20 Attached hereto as Exhibit A is a true and correct copy of the '757 Patent.

21         **A.     Person of Ordinary Skill in the Art**

22         12.     A person of ordinary skill in the art relevant to the '757 Patent at the time of the

23 invention would have a Bachelor's Degree in electrical engineering (or equivalent experience) and

24 at least two years of experience in the field of multimedia devices.

25         **B.     Legal Standards**

26         13.     I understand that a patent claim is anticipated by prior art when a single piece of

27 prior art describes every element of the claimed invention, either expressly or inherently, such that

28 a person of ordinary skill in the art could practice the invention without undue experimentation.  I

understand that, to be considered anticipatory, the prior art reference must be enabling and describe the applicant's claimed invention sufficiently to have placed it in possession of a person of ordinary skill in the field of the invention.  I understand that to be an anticipatory reference a prior art reference not only must disclose all of the claim limitations, but also must disclose all of the limitations arranged or combined in the same way as stated in the claim.

14.    I understand that a reference that does not expressly disclose a claim limitation may inherently disclose the limitation if the reference discloses prior art that must necessarily include the unstated limitation.  I also understand that inherency may not be established by probabilities or possibilities, and the mere fact that a certain thing may result from a given set of circumstances is not sufficient to establish anticipation.  I further understand that disclosure is sufficient if it shows that the natural result flowing from the operation of the system or method disclosed in the reference as taught necessarily results in the performance of the claim limitations.

15.    I understand that material not explicitly contained in the single prior art document may be considered for purposes of anticipation only if that material is incorporated by reference.  I also understand that whether and to what extent material is incorporated by reference into a host document is a question of law to be decided by the Court.  I further understand, however, that to incorporate material by reference, the host document must contain language clearly identifying the subject matter which is incorporated and where it is to be found.  I also understand that a mere reference to another application, or patent, or publication is not an incorporation of anything therein.  I understand that the Court examines the host reference as one reasonably skilled in the art to determine whether the host document describes the material to be incorporated by reference with sufficient particularity.

**C.    Background of the Technology**

16.    Data synchronization of generic data files (*e.g.* "text document," "contact information," "calendar," *etc.*) is often performed by "updating" entire data files on multiple devices.  Synchronization of entire data files includes the "update" of the contents of the file as well as related information (*e.g.* file name, date created, date modified, *etc.*).

-4-

17.     This approach to data synchronization of generic data files (*e.g.* "text document," "contact information," "calendar," *etc.*) could not be readily applied to multimedia data.  In particular, at the time of the invention of the '757 Patent, generic data files (*e.g.* "text document," "contact information," "calendar," *etc.*) were relatively small and typically stored on desktop computers with large disk storage space and high-rate connection to the Internet.  On the other hand, multimedia data files such as audio, video, or photographs are much larger (especially given the lower compression capability available at the time of the invention of the '757 Patent), and are often stored on limited storage capacity media player devices that have less reliable, low-rate network connection.

18.     For example, whereas a typical generic data file (*e.g.* "text document," "contact information," "calendar," *etc.*) may require only a few KBs (*i.e.* Kilo-bytes), a typical file used for storage of audio or photograph (even in compressed form) requires a few MBs (*i.e.* Mega-bytes), and a video file (even in compressed form) will typically require a few GBs (*i.e.* Giga-bytes).  For clarity, a MB is one thousand times larger than a KB, and would therefore require 1,000 times as much storage space and need 1,000 times longer for data transmission over the same communication channel.  Similarly, a GB is one thousand times larger than a MB or one million times larger than a KB, and would therefore require 1,000,000 times larger storage capacity and need 1,000,000 larger bandwidth to download data in the same amount of time.

19.     The dramatic implications of these observations on multimedia data synchronization are exacerbated when considering that, at the time of the invention of the '757 Patent, the data compression ratios reached in multimedia data compression were significantly lower than those commonly used today.  Similarly, the data storage capacity available (especially on hand-held mobile devices and media player devices) were substantially lower than today, and the transmission data rates available for network communication (especially for hand-held mobile devices and media player devices) were considerably lower than today.

20.     As a consequence of all of these technical limitations, multimedia data synchronization was restricted to synchronization and update of multimedia information that would supply users with knowledge about the multimedia files available for download and

1  streaming, and provide users access to download or stream the available multimedia files.  For

2  instance, a typical "multimedia data synchronization" prior to the invention of the '757 Patent may

3  allow for synchronization among a user's computer devices of a list of songs available for

4  download or streaming from a computer server.  After synchronization, the actual songs would

5  still reside on the computer server, but would not be present on all of the user's computer devices.

6  Instead, whenever a user wishes to play a song among the synchronized list of songs, the user

7  would need to make a request (for example, by pressing a button associated with the song), and

8  the desired song would then be downloaded or streamed from the computer server and

9  subsequently played on the user's computer device from which the request originated.

10     21.     In summary, multimedia data synchronization prior to the invention of the '757

11  Patent did not allow for synchronization of the multimedia data files themselves.  Although

12  multimedia synchronization of a list of songs allowed users to download or stream and

13  subsequently play a song whenever the computer devices were connected to a communication

14  network, the actual multimedia files were not present on all of the user's computer devices and

15  were inaccessible whenever network connectivity was unavailable.  For example, while a user

16  carrying a smartphone was traveling on an airplane without a network connection, songs that were

17  stored on any other computer device were inaccessible even if the list of songs and related

18  information had been previously synchronized between the smartphone and the user's computer

19  devices.

20     22.     Even today, many commercially-available multimedia data synchronization

21  systems do not provide for synchronization of the multimedia data files themselves for various

22  reasons, which are often motivated by the same technical limitations that precluded

23  synchronization of "content information" in multimedia systems prior to the invention of the '757

24  Patent.  For example, the Internet portal service "Spotify" (https://www.**spotify**.com/) allows for

25  synchronization of multimedia data, but does not allow for synchronization of the actual

26  "content."

27     23.     On the other hand, the invention of the '757 Patent is limited to "synchronization"

28  and "update" of multimedia data that actually includes the multimedia files themselves.  This

-6-

fundamental shift in approach to multimedia data synchronization allowed users to have their multimedia data files present on all of their computer devices, irrespective of the network connectivity at the time the user wishes to access a multimedia data file.  Therefore, users of a computer device such as a smartphone while traveling on an airplane without access to the Internet can still play a song that was purchased and downloaded on a different computer device such as a desktop computer at home earlier in the day.

### D.    The '757 Patent

24.    The '757 Patent is directed to systems and methods for synchronizing audio, video, or photographic content among multiple devices in a multimedia environment such that a user's multimedia collection is "available in multiple locations or zones that the consumer may go." Exhibit A, '757 Patent, *Abstract* and 3:2-7.

25.    The claimed system is comprised of "at least one central storage and interface device," "zone specific storage and interface devices," and "at least one zone." *Id.* at Claim 1.  In the claimed system, a user's audio, video, or photographic information is "updated in relation to the zone specific storage and interface devices and the central storage and interface device." *Id.*

26.    The specification of the '757 Patent describes the invention as "a system and method for synchronizing a multiplicity of devices in a multimedia environment. The system has at least one central storage and interface device, wherein audio, video, and photographic information including content information and content management information, relating to at least one user, are stored in digital form. The system further has a plurality of zones each having a zone specific storage and interface device being capable of storing or interfacing with information stored in the central storage and interface device, wherein audio, video, or photographic information, relating to at least one user, contained within each one of the plurality of zone specific storage and interface devices and the central storage and interface device, are updated in relation with other zone specific storage and interface devices and the central storage and interface device." *Id*. at 4:17-32.

DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO
APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY

27.     As a result of the invention of the '757 Patent, "at least one user can be situated at anyone of the zones and access substantially identical audio, video, and photographic information related to the at least one user." *Id*. at 4:32-34.

28.     The specification also recites that "[i]t is preferable to have the content locally stored so that interruptions and skips associated with streaming content over the network does not occur" and that "it is an object of [the '757 Patent] to provide a multimedia player device and system which is capable of storing a relatively large amount of digital multimedia programming, whether audio or video, with relatively instant access to any piece of stored data for playback, where the stored data may be replaced with new data when the desires of the user change… where the transfer of data to the multimedia player device is accomplished through alternative communication means, such that the user can choose from a vast array of data encompassing all formats of audio and video programming and can choose to synchronize the multimedia player device with other multimedia devices on a network for the upload and download of multimedia content from connected network devices." *Id.* at 3:10-12 and 3:17-30.

29.     One of ordinary skill in the art at the time of the invention would have understood the term "updated" is used, in the context of the '757 Patent, to refer to synchronization of devices such that a change in one device is automatically reflected as a change in another device, whereby the change includes both "content information" and "content management information" of audio, video, or photographic data.

30.     It is important to note that the term "update" is used to mean "to bring up to date." *See, e.g.,* Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/update.  The term "updated information" is a passive term implying a perpetual state of the information. Therefore, the reference to "audio, video, or photographic information" are "updated" is used to indicate that the information is "automatically brought up to date."  More particularly, the asserted claims of the '757 Patent require that "audio, video, or photographic information" be "updated in relation to the zone specific storage and interface devices and the central storage and interface device, whereby the at least one user can be situated in any one of the zones and access the audio, video, or photographic information related to the at least one user." Exhibit A, '757 Patent, Claim

-8-
DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO
APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY

1. Therefore, the asserted claims of the '757 Patent require that the reference to "audio, video, or photographic information" are "updated" is used to indicate that the information is be automatically brought up to date to ensure that "the at least one user can be situated in any one of the zones and access the audio, video, or photographic information related to the at least one user." *Id.*

31.     In particular, in earlier multimedia systems designed to allow users to manually "synchronize" multimedia information, the multimedia information would be up to date at the user's discretion, yet the multimedia information would not be "updated multimedia information" because the multimedia information would generally not be up to date.  As a result, a user of a multimedia system that provided for manual "synchronization" of multimedia information could not rely on the system to ensure that "the user can be situated anywhere and access his or her multimedia information."

32.     The inventors of the '757 Patent realized the shortcomings of manual "synchronization" of multimedia information and therefore disclosed and claimed a multimedia "synchronization" system whereby the "multimedia information is updated" to allow the multimedia information to be automatically brought up to date and thus ensure that "the user can be situated anywhere and access his or her multimedia information."  This is also consistent with the disclosures in the specification.  *See, e.g.,* Exhibit A, '757 Patent at 3:1-7 ("Therefore it is desirous to have a consumer digitally encode their entire audio, video, and photographic collections to be stored on multimedia storage devices, and have the entire collection *synchronized automatically by having the devices communicate to and from each other so that the content is available in multiple locations or zones that the consumer may go*."); *see also id.* at 6:33-39 ("The digital multimedia device **104** allows the user, … [to] program the digital multimedia device **104** to *synchronize and update the user's audio/video files automatically from a multimedia database 106, a personal computer or other devices connected to the network*."); *see also id.* at 6:55-59 ("Turning to FIG. **5,** an alternative embodiment of the present invention is discussed in further detail wherein *the digital multimedia player 104 automatically*

02198.51990/5594668.7

DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY

1    *performs the synchronization and download function between 'master' and 'subordinate'*

2    *digital multimedia devices 104, 112.*").

3         33.     The term "synchronization" is widely used in the field of multimedia systems to

4    convey distinct concepts and technologies, and its precise meaning can only be ascertained from

5    the context in which the reference to "multimedia data synchronization" is used.  More

6    specifically, the term "synchronization" is used to refer to:  (1) the identification of key segments

7    in multimedia data (*i.e.* addresses the issue of *where are the various portions of the multimedia*

8    *data located*, and I shall refer to it as "multimedia segment synchronization"); (2) the matching of

9    processing and transmission rates between processors and multimedia data streams (*i.e.* addresses

10   the issue of how fast to process multimedia data streams, and I shall refer to it as "multimedia

11   process synchronization"); (3) the buffering and simultaneous presentation of multimedia data

12   streams (*i.e.*, addresses the issue of *how to display multimedia data*, and I shall refer to it as

13   "multimedia stream synchronization"); (4) the efficient transfer of multimedia data between

14   multiple devices (*i.e.* addresses the issue of *how to transfer multimedia data*, and I shall refer to it

15   as "multimedia exchange synchronization"); and, finally, (5) the "update" of multimedia data to

16   automatically reflect changes to the multimedia data in other computer devices (*i.e.* addresses the

17   issue of *when to transfer multimedia data,* and I shall refer to it as "multimedia data

18   synchronization").  It is only the latter usage of the term "synchronization" (*i.e.* "update" of

19   multimedia data to automatically reflect changes to the multimedia data in other computer

20   devices) that is relevant to the invention in the asserted claims of the '757 Patent.

21        34.     Synchronization of multimedia content introduces unique challenges that are not

22   present in general data synchronization.  For example, it is difficult to store and transmit the large

23   data files associated with multimedia content.  In addition, multimedia content may be more

24   tolerant of data errors than some generic data files (*e.g.* text documents); yet multimedia content is

25   much more sensitive to data degradation related to latency and jitter.  Further, the impact of errors

26   introduced during multimedia data storage and delivery is highly sensitive to the exact location of

27   the errors.

28

-10-

DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO
APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY

35.     The plain language of the '757 Patent requires that a system include a plurality of zone specific storage and interface devices.  Claim 1 of the '757 Patent states that "audio, video, or photographic information … are updated in relation to the zone specific storage and interface device*s* and the central storage and interface device." Exhibit A (emphasis added).  This language requires the system to include a plurality of zone specific storage and interface devices.  Claim 6 of the '757 Patent confirms that a plurality of zone specific devices are required by the claims.  *Id.* ("The system of claim 1 … wherein audio, video, and photographic information contained within each one of the plurality of zone specific storage and interface devices…").  This understanding is also consistent with the disclosures in the specification.  *See, e.g.,* Exhibit A, '757 Patent, *Abstract* ("audio, video, or photographic information, relating to at least one user, contained within each one of the plurality of zone specific storage and interface devices and the central storage and interface device, are updated in relation with other zone specific storage and interface devices and the central storage and interface device.").  In addition, the '757 Patent explicitly teaches that the invention is designed to update the multimedia content on multiple devices so that the content is available to the user on multiple devices.  *See, e.g., id.* at 3:1-15 ("Therefore it is desirous to have a consumer digitally encode their entire audio, video, and photographic collections to be stored on multimedia storage devices, and have the entire collection *synchronized automatically by having the devices communicate to and from each other so that the content is available in multiple locations or zones that the consumer may go*. These may include devices such as personal computers located in other rooms or other locations (for example summer home, car, yacht, etc.), or on an online server/website/database. It is preferable to have the content locally stored so that interruptions and skips associated with streaming content over the network does not occur. Additionally, should the storage device such as a hard drive of one unit fails, then the *other devices still have complete copies of the content collection* to easily replace the failed unit.") (emphasis added).  This is also consistent with the overall purpose of the '757 Patent, as stated in the asserted claims, which is to ensure that "the at least one user can be situated in any one of the zones and access the audio, video, or photographic information related to the at least one user." *Id.* at Claim 1.

02198.51990/5594668.7

-11-

DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO
APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY

**III.    The '446 Patent and the Multer Patent Do Not Anticipate the '757 Patent**

        **A.    The '446 Patent Does Not Anticipate the '757 Patent**

36.    U.S. Patent No. 7,587,446 (the "'446 Patent"), entitled "Acquisition and synchronization of digital media to a personal information space," was filed on November 10, 2000, and issued on September 8, 2009.  Attached hereto as Exhibit A is a true and correct copy of the '446 Patent.

37.    The '446 Patent is directed toward "the transfer of public and private data to a private information space and in particular to the transfer, storage and synchronization of media data."  Exhibit B, '446 Patent at 1:19-24 (Background of the Invention).

38.    According to the '446 Patent, the "personal information space" can comprise of a "series of machines," which in turn "can have their storage device[s]," and contains "information selected by the user to be input into the user's own hard drive.  Hence, the personal information space may comprise public or private data selected by the user which is inserted into any one or more of a user's network-coupled devices."  Exhibit B, '446 Patent at 1:49-57.).  The '446 Patent repeatedly and clearly discloses that the "personal information space" is a virtual catalog of devices containing data selected by the user, and copied from other sources into a personal information space.  *See, e.g.,id.* at 1:50-55 ("This series of machines can comprise a 'personal information space' which is made up of information selected by the user to be input into the user's own hard drive. Hence, the personal information space may comprise public or private data selected by the user which is inserted into any one or more of a user's network-coupled devices."); 4:42-48 ("unique system and method for transferring digital media content, which is readily available in any number of sources, into a user's personal private information space.").

39.    Thus, the disclosures of the '446 Patent are directed toward two separate features: (1) "[A] unique system and method for transferring digital media content, which is readily available in any number of sources, into a user's personal private information space."  Exhibit B, '446 Patent at 4:42-45.  (2) "[A] mechanism for moving data between different network-coupled devices within the personal information space."  *Id.* at 4:46-48.

-12-

40.     The '446 Patent primarily describes "synchronizing" data, *i.e.*, moving data under the '446 Patent's disclosure, from public sources into one of the devices of the personal information space.  *See, e.g.,* Exhibit B, '446 Patent  at 5:56-64 ("In a further aspect, the step of determining may comprise searching using a web-based search engine to ascertain publicly available media, or secure media provided by a site the user is authorized to access, and which the user wishes to transfer into the user's personal information space.  Alternatively, the user may select to include all, or one or more aspects of, a user's personal media data.  In a further embodiment, selection of the data to be synchronized can be automatic.  For example, a user may associate an event such as a media release with an automatic synchronization request which will automatically add to or update the user's personal information space when the event occurs.  Optionally, a verification step 11 may prompt the user to confirm the data selection is correct."); 6:34-37 (describing Fig. 2) ("As noted above, personal or public media information from, for example, a file system stored on a server or private data store may be utilized in accordance with the system of the present invention…. designating that all files in the file system folder are to be synchronized into the personal information space."); 8:12-39 ("Affiliate server 110 may also comprise a specialized web server such as a music, video or other media file service provider, a performance group's web server, an online retailer's web server, a shared network server running a media-sharing application such as Napster or Gnutella, or any number of different types of Internet-based sources providing media content which a user will desire to synchronize with the user's personal information space. The affiliate server could also be a simple file server which provides access to data files and enables synchronization to the personal information space by implementing HTTP code in accordance with the following description using a secondary link or re-direct.  Affiliate server 110 may include, for each piece of content which the affiliate server system administrator deems appropriate for such synchronization, code enabling the display of a synchronization implementation interface, such as button 65 on a file system display 10′, shown in FIG. 2.  In this example, when a piece of data is provided by the affiliate server which a user wishes to synchronize to the private information space, the user marks the data by, for example, highlighting it, and then 'clicks' button 65 to initiate the synchronization process.  Following

-13-

DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY

1  clicking on button 65, a sync pop-up window 120 will be provided by a sync service server 130.");

2  and 9:8-19 ("One example of media information which may be provided into personal information

3  space is to utilize the aforementioned system on a public information server which allows

4  transference of data files, such as executables, documents, or digital music files (MP3's) from the

5  public information space to the personal information space. As shown in FIG. 4, data from storage

6  server 200 is then considered part of the personal information space and may be thereafter

7  synchronized to any one or all of the devices coupled within the user's space, including personal

8  computers, PDA's, automotive PC's, and the like.").

9    41.    Further, the '446 Patent describes "synchronization" between devices within the

10  personal information space as "the ability to share information" (Exhibit B, '446 Patent at 5:29-

11  41) and as an alternative to "transfer[ring]" "digital media files." *Id.* at 9:51-56 ("In accordance

12  with the present invention, digital media files of varying formats, and other data, may be

13  synchronized or transferred (uni-directionally) to any network coupled appliance 400 utilizing the

14  system of the present invention.").

15    42.    As described above, the '446 Patent is primarily directed toward moving data from

16  public sources into a device of the personal information space. *See, e.g.,* ¶40.  In contrast, the '757

17  Patent is directed toward ensuring that the same media's content information and content

18  management information is present wherever the user might be.  Exhibit A, '757 Patent, *Abstract.*

19    43.    The '446 Patent fails to disclose the second limitation of Claim 1 of the '757 Patent

20  which requires "at least one zone, each zone having at least one zone specific storage and interface

21  device capable of storing or interfacing with information stored in the central storage and interface

22  device, wherein audio, video, or photographic information, relating to at least one user, contained

23  within the zone specific storage and interface device and the central storage and interface device,

24  are updated in relation to the zone specific storage and interface devices and the central storage

25  and interface device, whereby the at least one user can be situated in any one of the zones and

26  access the audio, video, or photographic information related to the at least one user."

27    44.    In particular, the '446 Patent fails to disclose that any of the devices within the

28  personal information space store content information and content management information

DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO
APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY

1    relating to at least one user, or that the devices are updated in relation to each other, as required by

2    the '757 Patent.

3          45.    The '446 Patent consistently refers to the movement of data between devices

4    within the personal information space as "transfer[ring]," not updating.  The transfer of data is

5    merely the movement of data between devices.  In contrast, the '757 Patent requires "updat[ing]"

6    the central and zone devices, *e.g.*, automatic download.  The only disclosure in the '446 Patent that

7    could be construed as updat[ing], *i.e.*, "automatic" synchronization, is the transfer of data from

8    outside of the personal information space (public data on a public server) onto a device within the

9    personal information space.  *See, e.g.,* Exhibit B, '446 Patent at 5:56-64 ("In a further aspect, the

10   step of determining may comprise searching using a web-based search engine to ascertain publicly

11   available media, or secure media provided by a site the user is authorized to access, and which the

12   user wishes to transfer into the user's personal information space.  Alternatively, the user may

13   select to include all, or one or more aspects of, a user's personal media data.  In a further

14   embodiment, selection of the data to be synchronized can be automatic. For example, a user may

15   associate an event such as a media release with an automatic synchronization request which will

16   automatically add to or update the user's personal information space when the event occurs.

17   Optionally, a verification step 11 may prompt the user to confirm the data selection is correct.").

18         46.    Moreover, the '446 Patent only discloses that the data in the user's personal

19   information space is stored among one or more of the user's devices, but does not disclose that the

20   same data is stored in each of the user's devices.  *See, e.g.,* Exhibit B, '446 Patent at 1:50-55

21   ("This series of machines can comprise a 'personal information space' which is made up of

22   information selected by the user to be input into the user's own hard drive.  Hence, the personal

23   information space may comprise public or private data selected by the user which is inserted into

24   any one or more of a user's network-coupled devices.").

25         47.    In addition, the "transfer" of data among the user's devices disclosed in the '446

26   Patent allows for the "sharing of information" among one or more devices in the user's personal

27   information space, but does not disclose the "update" of multimedia information, *e.g.*, content

28   information and content management information, related to the user among all of the user's

-15-

1   devices, as required by this claim limitation.  *See, e.g.,* Exhibit B, '446 Patent at 5:29-41; *see also*

2   *id.* at 9:51-56 ("In accordance with the present invention, digital media files of varying formats,

3   and other data, may be synchronized or transferred (uni-directionally) to any network coupled

4   appliance 400 utilizing the system of the present invention.").

5       48.     Moreover, the '446 Patent fails to disclose "updating" of media assets across a

6   plurality of zone specific and interface devices, and instead discloses "transferring" data to a

7   single "network coupled apparatus."  *See, e.g.,* Exhibit B, '446 Patent, *Abstract* ("A method for

8   ***transferring media data to a network coupled apparatus*** is described. … Upon a user request, the

9   method ***transfers at least a portion of the media data from the personal information space to the***

10  ***network coupled apparatus*** in a differencing transaction."); *see also id.* at 9:51-56 ("In

11  accordance with the present invention, digital media files of varying formats, and other data, may

12  be ***synchronized or transferred (uni-directionally) to any network coupled appliance 400***

13  utilizing the system of the present invention.")(emphasis added.).  The '757 Patent, by contrast, is

14  directed to having multiple zone devices updated in relation to each other.  *See, e.g.,* Exhibit A,

15  '757 Patent, Claim 1 ("updated in relation to the zone specific storage and interface devices") and

16  Claim 6 ("audio, video, and photographic information contained within each one of the plurality

17  of zone specific storage and interface devices and the central storage and interface device are

18  stored therein and updated at a predetermined time in relation with other zone specific storage and

19  interface devices as well as the central storage and interface device.").

20      **B.     The '446 Patent and the Multer Patent Do Not Anticipate the '757 Patent**

21      49.     The '446 Patent purports to incorporate by reference the entirety of multiple patents

22  and patent applications, including U.S. Pat. No. 6,671,757 (the "Multer Patent").  Attached hereto

23  as Exhibit C is a true and correct copy of the Multer Patent.

24      50.     The '446 Patent merely incorporates the Multer Patent by reference as part of

25  general incorporations by reference, and does not clearly identify the subject matter that is

26  incorporated nor where it is to be found such that one of ordinary skill in the art could find the

27  general incorporation by reference to be sufficiently particular.  For example, the mention of the

28  Multer Patent in column 5 refers to the "transactional based extraction, transfer, broadcast,

storage, and synchronization systems set forth" in the Multer Patent.  Exhibit B, '446 Patent at 5:34-41.  This reference is so broad that it is essentially a general incorporation, and it is not sufficiently particular to assist one of ordinary skill in the art to determine which portions of the 17 figures and 50 columns of the Multer Patent are being described and incorporated into the '446 Patent.

51.     In my opinion, even if the '446 Patent is found to have properly incorporated the Multer Patent, the combination of the '446 Patent and Multer Patent does not anticipate Claims 1, 14 and 15 of the '757 Patent by clear and convincing evidence.

52.     The Multer Patent discloses a method for "synchronization" that provides a specific technique for the exchange of information between devices.  *See, e.g.,* Exhibit C, Multer Patent, *Abstract* ("A system and method for synchronizing devices which can couple to the Internet, or any network.  The system includes a first sync engine on the first system interfacing with data on the first system to provide difference information.  A data store is coupled to the network and in communication with the first and second systems.  A second sync engine is provided on the second system coupled to receive the difference information from the data store via the network, and interface with data on the second system to update said data on the second system with said difference information.  Difference information is transmitted to the data store by the first sync engine and received from the data store from the second sync engine.").

53.     The "synchronization" disclosed by the Multer Patent is designed for the efficient transfer of difference information related to data such as "contact information."  *See, e.g.,* Exhibit C, Multer Patent at 6:31-46.

54.     The Multer Patent discloses that "[a]n events module **925** controls synchronization initialization events. Items such as when to sync, how to sync, trigger the delta module **950** to perform a synchronization operation."  *See* Exhibit C, Multer Patent at 13:6-9.).  The Multer Patent provides the following detail about the operation of the events module or how and when to trigger the sync operation: "Each device has its own triggering mechanism for initiating synchronization.  Some devices, such as Windows clients and Palm® pilots are triggered manually when the user presses a 'sync' button.  Other devices, such as a cellular telephone, may be

-17-
DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO
APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY

1   triggered automatically after another device completes a sync.  Regular, time-based triggers are

2   supported as well.  A web-based application portal will sync when a user logs into the website

3   security authorization mechanism, and may optionally sync on a log-out of the user or on the

4   session time-out, but only if the user has changed data during the session." *Id.* at 35:12-22.

5       55.     As an initial matter, the '446 Patent describes the "transfer" of various data

6   including MP3s among multiple devices within a personal information space.  The Multer Patent

7   discloses an efficient method for "synchronization" of data such as "contact information" between

8   computer devices.  Even if one were to consider the hypothetical combination of the '446 Patent

9   and Multer Patent, a person of ordinary skill in the art would not consider the combination to

10  disclose the "synchronization" of multimedia data.  In particular, the "synchronization" of "contact

11  information" disclosed in the Multer Patent is applicable to small data files, and a person of

12  ordinary skill in the art would not consider its application to the "transfer" of large multimedia

13  data files to have been disclosed or enabled.

14      56.     In addition, the '446 Patent simply relies on the Multer Patent to perform a method

15  that can be used for "transfer" and "synchronization" of data between devices in a manner

16  consistent with the disclosure in the '446 Patent.  *See, e.g.,* Exhibit B, '446 Patent at 5:34-41

17  ("One example of a personal information space is the transactional based extraction, transfer,

18  broadcast, storage and synchronization systems for forth in patent application Ser. Nos.

19  *09/490,550* now U.S. Pat. No. 6,694,336, Ser. No. *09/491,675* now copending, and *09/491,694,*

20  now U.S. Pat. No. 6,671,757, each of which is hereby specifically incorporated by reference.");

21  6:24-29 ("Once inserted into the private information space, the data can be synchronized to any

22  number of different devices as described in patent application Ser. No. *09/490,550* now U.S. Pat

23  No. 6,694,336; Ser. No. *09/491,675* now copending; and Ser. No. *09/491,694* now U.S. Pat No.

24  6,671,757.").  Therefore, the combination of the '446 Patent and Multer Patent fails to meet the

25  limitations of the asserted claims for the same reasons as stated above in relation to the disclosure

26  of the '446 Patent alone.

27      57.     Because the Multer Patent and the '446 Patent are directed toward different

28  disclosures and different embodiments, it is impossible to know if any particular storage "server"

discussed in the Multer Patent shares any of the characteristics of the "storage server" of the '446 Patent.  *See, e.g.,* Exhibit C, Multer Patent at 8:56-60 ("[T]he storage servers **300** utilized in the system of the present invention may be any type of storage server, such as an Internet server or an FTP server, and may be provided from any source, such as any Internet service provider (ISP)").  For example, the Multer Patent does not disclose the use of a personal information space, a key feature of the '446 Patent's disclosure.

58.    Furthermore, the Multer Patent does not disclose "content information."   "Content information," as used in the '757 Patent, requires both the media content and information that is specific to the particular content.  The portion of the Multer Patent relied on by Apple for the disclosure of "content information" merely discloses that "[s]erver application objects can also be designed to create collections.  For example, if the user wishes to create a 'my pictures' collection which consists of some collection of information and synchronize this collection of information, such an arbitrary grouping of classes of information into appropriate representations is supported." *See, e.g.*, Exhibit C, Multer Patent at 28:45-50   This example (*i.e.* the "my pictures" collection) does not disclose information that is specific to a particular content (namely, such information is shared by all of the pictures in the "my pictures" collection), and therefore, falls short of disclosing "content information."  In addition, there is nothing in the Multer Patent that teaches that the "my pictures" collection includes actual pictures, and instead the Multer Patent simply refers to "my pictures" as "consist[ing] of some collection of information."

59.    Neither the '446 Patent nor the Multer Patent disclose "at least one zone, each zone having at least one zone specific storage and interface device capable of storing or interfacing with information stored in the central storage and interface device, wherein audio, video, or photographic information, relating to at least one user, contained within the zone specific storage and interface device and the central storage and interface device, are updated in relation to the zone specific storage and interface devices and the central storage and interface device, whereby the at least one user can be situated in any one of the zones and access the audio, video, or photographic information related to the at least one user," as required by Claim 1 of the '757 Patent.

-19-

60.     As with the '446 Patent, the Multer Patent does not disclose updat[ing] devices, as required by the '757 Patent.  Rather, the Multer Patent does not disclose that "synchronization" requires that the data be "updated," as required by this claim limitation.  The Multer Patent simply states that an "events module" will determine how to perform the "synchronization."  *See* Exhibit C, Multer Patent at 13:6-9.  In fact, the Multer Patent teaches that "[s]ome devices, such as Windows clients and Palm® pilots are triggered manually when the user presses a 'sync' button." *See id.* at 35:12-22.  In contrast, the '757 Patent requires "updat[ing]" the central and zone devices, *e.g.*, automatic download.

61.     In addition, the Multer Patent does not disclose "updating" of media assets across a plurality of zone specific storage and interface devices, as required by Claim 1.   The '757 Patent, by contrast, is directed to having multiple user devices updated in relation to each other. *See, e.g.,* Exhibit A, '757 Patent, Claim 1 ("updated in relation to the zone specific storage and interface devices and the central storage and interface device"; Claim 6 ("audio, video, and photographic information contained within each one of the plurality of zone specific storage and interface devices and the central storage and interface device are stored therein and updated at a predetermined time in relation with other zone specific storage and interface devices as well as the central storage and interface device.").

62.     The '446 Patent does not disclose the automatic synchronization of both content information ("CI") and content management information ("CMI") "relating to at least one user" between the central and zones devices.  Rather, the "transfer" of data among the user's devices disclosed in the '446 Patent describes the "sharing of information" among one or more devices in the user's personal information space, but does not disclose the "update" of multimedia information, e.g., content information and content management information, related to the user among all of the user's devices, as required by this claim limitation.  *See, e.g.*, Exhibit B, '446 Patent at 5:29-41; *see also id.* at 9:51-56 ("In accordance with the present invention, digital media files of varying formats, and other data, may be synchronized or transferred (uni-directionally) to any network coupled appliance 400 utilizing the system of the present invention.")).

-20-
DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO
APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY

63.     At most, the '446 Patent describes that all of the devices that comprise the personal information space collectively have content information, as required by Claim 1 of the '757 Patent.  The '446 Patent discloses "that the data in the user's personal information space is stored among one or more of the user's devices, but does not disclose that the same data is stored in each of the user's devices. *See, e.g.,* Exhibit B, '446 Patent at 1:50-55 ("This series of machines can comprise a 'personal information space' which is made up of information selected by the user to be input into the user's own hard drive. Hence, the personal information space may comprise public or private data selected by the user which is inserted into any one or more of a user's network-coupled devices.").

## IV.     Apple's Documents Prove Infringement of the '757 Patent

64.     I understand that Apple asserts certain accused devices (*e.g.*, iOS devices and laptop computers) are not "zone…devices," because they do not have "some degree of being contained within a certain location."  I disagree.  *See* Order Construing Disputed Claim Terms Of U.S. Patent Nos.  5,579,239; 5,666,502; 5,946,647; 7,577,757; 7,756,087; 7,761,414; 8,014,760 (Dkt. 447) at 40 ("While the claims do state that a 'storage and interface device' must be 'specific' to a 'zone,' *nothing in the language of the claims themselves requires that the specific zone be a fixed location, that the device be fixed within that zone, or that the zone must be bounded*." (emphasis added)).

65.

DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY



02198.51990/5594668.7

DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO
APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY

66.    Apple's own patents also explain that "people often use a media player when they are at home or at some other stationary location. When stationary, docking stations are available for connecting the media player, *e.g.*, to a sound system. In this manner, songs on the media player may be listed [sic] to as one resides in the same room, but without having to use headphones." Exhibit FF, U.S. Patent No. 8,323,040 to Prest at 1:19-24.

67.    I declare under penalty of perjury that the foregoing is true and correct.  Executed on the 1st day of November, 2013, in Chicago, Illinois

Dan Schonfeld

_____

Dan Schonfeld

02198.51990/5594668.7
DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY

# EXHIBIT A

US007577757B2

(12) **United States Patent**
    Carter et al.

(10) Patent No.: **US 7,577,757 B2**
(45) Date of Patent: ***Aug. 18, 2009**

(54) **MULTIMEDIA SYNCHRONIZATION METHOD AND DEVICE**

(75) Inventors: **Harry Nick Carter**, Saratoga Springs, NY (US); **Ronald Cococcia**, Ridgefield, CT (US); **Zachary Piech**, Troy, NY (US); **John Reine**, Wellesley, MA (US); **Silvan Sauter**, Kronbuehl (CH); **Steven Vasquez**, Kings Park, NY (US); **Craig Willis**, Troy, NY (US); **Hyung-Jun Brutus Youn**, Troy, NY (US)

(73) Assignee: **ReQuest, Inc.**, Ballston Spa, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/550,921**

(22) Filed: **Oct. 19, 2006**

(65) **Prior Publication Data**

US 2007/0043847 A1    Feb. 22, 2007

**Related U.S. Application Data**

(63) Continuation of application No. 09/884,661, filed on Jun. 19, 2001, now Pat. No. 7,136,934.

(51) **Int. Cl.**
    *G06F 15/16*          (2006.01)
(52) **U.S. Cl.** ....................... **709/248**; 709/237; 725/135; 707/201
(58) **Field of Classification Search** ................. 709/248, 709/237; 725/135, 136; 707/201
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,355,302 A    10/1994 Martin et al.

(Continued)

FOREIGN PATENT DOCUMENTS

WO        01/16804 A2    3/2001
WO        02/077862 A1   10/2002

OTHER PUBLICATIONS

"Novell iFolder Synchronizes Information Across the Net; Provides Reliable Anytime, Anywhere Access", press release, Mar. 19, 2001, at www.novell.com/news/press/archive/2001/03/pr01021.html. MAX-MMS Multimedia Server, AMX Corporation.

*Primary Examiner*—Krisna Lim
(74) *Attorney, Agent, or Firm*—David W. Carstens; Carstens & Cahoon, LLP

(57) **ABSTRACT**

A system and method for synchronizing a multiplicity of devices in a multimedia environment is described. The system has at least one central storage and interface device, wherein audio, video, and photographic information including content information and content management information, relating to at least one user, are stored in digital form. The system further has a plurality of zones each having a zone specific storage and interface device being capable of storing or interfacing with information stored in the central storage and interface device, wherein audio, video, or photographic information, relating to at least one user, contained within each one of the plurality of zone specific storage and interface devices and the central storage and interface device, are updated in relation with other zone specific storage and interface devices and the central storage and interface device. This results in the at least one user can be situated at anyone of the zones and access substantially identical audio, video, and photographic information related to the at least one user. The method includes providing the plurality of devices, providing the plurality of zones, determining whether a current synchronization point exists, if a previous synchronization point exists, receiving information from a server, if a previous synchronization point does not exists, sending information to a at least one client by a host, wherein the at least one user is disposed to have control, determining what information is needed by the at least one client, and establishing the resultant state as a synchronization point.

**15 Claims, 6 Drawing Sheets**



**US 7,577,757 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,557,541 A | 9/1996 | Schulhof et al. |
| 5,572,442 A | 11/1996 | Schulhof et al. |
| 5,661,787 A | 8/1997 | Pocock |
| 5,675,787 A | 10/1997 | Miller et al. |
| 5,721,815 A | 2/1998 | Ottesen et al. |
| 5,721,827 A | 2/1998 | Logan et al. |
| 5,726,909 A | 3/1998 | Krikorian |
| 5,729,735 A | 3/1998 | Meyering |
| 5,734,119 A | 3/1998 | France et al. |
| 5,887,060 A | 3/1999 | Ronning |
| 5,914,941 A | 6/1999 | Janky |
| 5,926,624 A | 7/1999 | Katz et al. |
| 5,931,901 A | 8/1999 | Wolfe et al. |
| 5,953,005 A | 9/1999 | Liu |

| | | | |
|---|---|---|---|
| 5,969,283 A | 10/1999 | Looney et al. | |
| 5,978,805 A | 11/1999 | Carson | |
| 5,987,525 A | 11/1999 | Roberts et al. | |
| 6,000,000 A | 12/1999 | Hawkins et al. | |
| 6,055,566 A | 4/2000 | Kikinis | |
| 6,084,168 A | 7/2000 | Sitrick | |
| 6,154,773 A | 11/2000 | Roberts et al. | |
| 6,161,132 A | 12/2000 | Roberts et al. | |
| 6,161,142 A | 12/2000 | Wolfe et al. | |
| 6,170,005 B1 | 1/2001 | Meandzija | |
| 6,199,076 B1 | 3/2001 | Logan et al. | |
| 6,212,555 B1 | 4/2001 | Brooks et al. | |
| 7,136,934 B2 * | 11/2006 | Carter et al. | ................ 709/248 |
| 2004/0133924 A1 * | 7/2004 | Wilkins et al. | .............. 725/135 |

* cited by examiner



*FIG. 1*



**FIG. 2**

*Digital Multimedia Device*

*300*

| Processor 302 | Communication Unit 306 | Audio/Video Out 308 |

Bus

| Control Unit 314 | Memory Unit 312 | D/A Converter 310 |

**FIG. 3**

SAMNDCA630-04258807



**FIG. 4**

SAMNDCA630-04258808

**U.S. Patent**          Aug. 18, 2009          Sheet 4 of 6          US 7,577,757 B2



FIG. 5



*FIG. 6*

U.S. Patent          Aug. 18, 2009          Sheet 6 of 6          US 7,577,757 B2



*FIG. 7*

SAMNDCA630-04258811

US 7,577,757 B2

**1**

# MULTIMEDIA SYNCHRONIZATION METHOD AND DEVICE

## CROSS-REFERENCE TO RELATED APPLICATION

This Application is a continuation of prior application Ser. No. 09/884,661 filed Jun. 19, 2001 now U.S. Pat. No. 7,136, 934.

## BACKGROUND OF THE INVENTION

This invention relates generally to the field of multimedia record and playback devices, and more particularly to such devices which incorporate digitally stored multimedia data on a stationary or removable memory and playback device which can convert the stored data into audible sound and visible video images.

Historically, radio and television have been the major audio and video content providers to the general population. Both radio and television provide the listener/viewer with a selection of programming directed at different preferences and tastes. Unfortunately, listener/viewers have very little, if any, input into the broadcast formats selected by the radio stations and television networks. As such, the listener/viewer's optional programming choices are limited to the number and different formats played by local radio stations and national television networks.

Because of these and other limitations of music and video broadcasting, cassette players, compact disc (CD) players, video cassette recorders (VCR) and digital video disks (DVD) have become very popular. These devices allow the listener/viewer to select and control the type and frequency of music and video content they desire to listen to or watch at any given moment. However, several drawbacks to these devices include that the listener/viewer must individually purchase the cassette tapes, CDs, videotapes or DVDs which also have limited storage capacity. Likewise, the listener/viewer must transport a large number of cassettes, CDs, videotapes or DVDs to provide a range of musical and video selections.

U.S. Pat. No. 6,161,132, entitled System For Synchronizing Playback Of Recordings And Display By Networked Computer Systems, discloses entertainment content complementary to a musical recording being delivered to a user's computer by means of a computer network link. The user employs a browser to access the computer network. A plug-in for the browser is able to control an audio CD or other device for playing the musical recording. A script stored on the remote computer accessed over the network is downloaded. The script synchronizes the delivery of the complementary entertainment content with the play of the musical recording. However, this patent does not teach transferring of information related to a particular user.

U.S. Pat. No. 5,355,302, entitled System For Managing A Plurality Of Computer Jukeboxes, discloses a method and apparatus for managing a plurality of computer jukeboxes at different locations from a central station. Each jukebox includes processor means for controlling the computer jukebox, storage and retrieval means for data, display means for selection menus, audio production means for playing musical records, and a user interface enabling patrons to communicate with the processor means. However, substantially identical information related to a particular user are not synchronized and stored in all the zones in this patent.

U.S. Pat. No. 6,055,566, entitled Customizable Media Player With Online/Offline Capabilities, discloses an information dissemination system comprises an Internet-con-

**2**

nected server adapted for gathering information from plural sources, and sorting the information according to subscriber preferences. The sorted information is transmitted via the Internet to a subscriber's Internet Applicance (IA) as electronic documents, where the documents are downloaded to a connected playback device. However, this patent does not teach a local area network (LAN) for coupling a central storage and interface device with a zone specific storage and interface device.

U.S. Pat. No. 6,161,142, entitled Method And System For Using A Communication Network To Supply Targeted Streaming Advertising In Interactive Media, discloses a system and method for delivering programmed music and targeted advertising messages to Internet based subscribers includes a software controlled microprocessor based repository in which the dossiers of a plurality of the subscribers are stored and updated, musical content and related advertising are classified and matched. A subscriber has an appropriate microprocessor based device capable of selecting information and receiving information from the Internet. The subscriber receives the programmed music and matched advertisements from the repository over the Internet. However, this patent does not teach user specific synchronization, or LAN based communication network.

U.S. Pat. No. 6,199,076, entitled Audio Program Player Including A Dynamic Program Selection Controller, discloses an audio program and message distribution system in which a host system organizes and transmits program segments to client subscriber locations. The host organizes the program segments by subject matter and creates scheduled programming in accordance with preferences associated with each subscriber. Program segments are associated with descriptive subject matter segments, and the subject matter segments may be used to generate both text and audio cataloging presentations to enable the user to more easily identify and select desirable programming. However, this patent does not teach user specific information including substantially identical information at each zone wherein the user can access the information without any further communication between the zones. Similarly, U.S. Pat. No. 5,926,624, entitled Digital Information Library And Delivery System With Logic For Generating Files Targeted To The Playback Device, does not teach the same either.

U.S. Pat. No. 5,734,119, entitled Method For Streaming Transmission Of Compressed Music, discloses an Internet high fidelity audio transmission and compression protocol including a system for representing synthesized music in a relatively small file as compared to digital recording. The protocol includes a method for streaming the transmission of a music data file from a Server-Composer computer such that the music can begin being played back as soon as the file begins to arrive at a Client-Player computer. The system includes a graduated resolution improvement feature which allows the music to be recreated exactly as originally composed as the necessary wavetable data is downloading in the background and the music continues to play in the foreground. However, this patent does not teach using LAN as a means for transfer of information.

U.S. Pat. No. 5,721,815, entitled Media-On-Demand Communication System And Method Employing Direct Access Storage Device, discloses a method of transmission in discrete form between a vender and a user. However, this patent does not teach the user accessing substantially identical information at a plurality of zones. Similarly, U.S. Pat. No. 5,572,442, entitled System for Distributing Subscription and On-Demand Audio programming does not teach the same.

SAMNDCA630-04258812

US 7,577,757 B2

3

Therefore it is desirous to have a consumer digitally encode their entire audio, video, and photographic collections to be stored on multimedia storage devices, and have the entire collection synchronized automatically by having the devices communicate to and from each other so that the content is available in multiple locations or zones that the consumer may go. These may include devices such as personal computers located in other rooms or other locations (for example summer home, car, yacht, etc.), or on an online server/website/database. It is preferable to have the content locally stored so that interruptions and skips associated with streaming content over the network does not occur. Additionally, should the storage device such as a hard drive of one unit fails, then the other devices still have complete copies of the content collection to easily replace the failed unit.

In light of these considerations, it is an object of this invention to provide a multimedia player device and system which is capable of storing a relatively large amount of digital multimedia programming, whether audio or video, with relatively instant access to any piece of stored data for playback, where the stored data may be replaced with new data when the desires of the user change. It is a further object to provide such a device and system where the transfer of data to the multimedia player device is accomplished through alternative communication means, such that the user can choose from a vast array of data encompassing all formats of audio and video programming and can choose to synchronize the multimedia player device with other multimedia devices on a network for the upload and download of multimedia content from connected network devices.

SUMMARY OF THE INVENTION

The invention is an apparatus and system for providing recorded multimedia programming in digital form in a multimedia player device where the user chooses the particular programming so recorded, and further where the recorded programming is updated or replaced periodically with new content from different networked sources. The system comprises a device capable of digitally recording, storing, downloading and uploading multimedia programming in either audio or video formats and is able to transmit such digital data, either via a hardwired or wireless network, where the data is stored on a combination multimedia receiver/player/data storage device, hereafter referred to as a "digital multimedia device." The digital multimedia device comprises a readable/writable memory storage mechanism (e.g., disk drive, hard drive, memory) capable of receiving network transmissions, and a playback or player feature interfaced with a mobile or fixed radio receiver, television or personal computer.

The digital player device provides means to display alphanumeric information related to the data chosen to be played on the device itself or through a television or personal computer monitor connection. As data transmissions are received, the data files are stored in digital form within the storage unit as a buffer to be accessed by the playback mechanism, in effect, delaying the playback of the received data until the multimedia works are needed. The data is then converted to "real time" audio or video, utilizing a digital-to-analog converter in the case of audio files, and played back to the listener. As each file is played back, the user may choose to delete the file, and the storage device would then over-write or replace the file with a new file or files of similar size as downloaded by the user from other network resources. The user could also elect to skip the file and proceed to another file stored on the digital player device. As available memory allows, additional

4

multimedia works will continue to be received and stored until the data storage device is filled to capacity, even as the user simultaneously listens to a previously received file. The digital multimedia device is designed to have a relatively large storage capacity, such that hundreds or thousand of files for example, could be stored on the device at any one time.

Another feature of the digital multimedia player provides, as new files are constantly being accessed through a network, such as the world wide web, the data storage unit is refreshing the files stored on the digital multimedia device as old files are either deleted or updated by the user. Since the digital multimedia device is connected to the network, it has direct access to the network which allows the listener to request custom files between the listener and other digital player devices, personal computers and music source databases connected to the network.

The instant invention teaches a system and method for synchronizing a multiplicity of devices in a multimedia environment. The system has at least one central storage and interface device, wherein audio, video, and photographic information including content information and content management information, relating to at least one user, are stored in digital form. The system further has a plurality of zones each having a zone specific storage and interface device being capable of storing or interfacing with information stored in the central storage and interface device, wherein audio, video, or photographic information, relating to at least one user, contained within each one of the plurality of zone specific storage and interface devices and the central storage and interface device, are updated in relation with other zone specific storage and interface devices and the central storage and interface device. This results in the at least one user can be situated at anyone of the zones and access substantially identical audio, video, and photographic information related to the at least one user.

The method includes providing the plurality of devices, providing the plurality of zones, determining whether a current synchronization point exists, if a previous synchronization point exists, receiving information from a server, if a previous synchronization point does not exist, sending information to at least one client by a host, wherein the at least one user is disposed to have control, determining what information is needed by the at least one client, and establishing the resultant state as a synchronization point.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a network diagram with attached devices capable of storing and transmitting digital multimedia files,

FIG. 2 is a diagram of the multimedia device shown connected to a user's home audio/video system,

FIG. 3 is a diagram of a typical digital multimedia device connected to the user's home audio/video system,

FIG. 4 is a flow chart illustrating the procedure for downloading digital content from a content database,

FIG. 5 is a flow chart representing the method for synchronizing and downloading multimedia content and updates from the master to subordinate digital multimedia devices connected to the network,

FIG. 6 is a flowchart depicting a synchronization of the instant invention, and

FIG. 7 is a block diagram depicting an embodiment of the instant invention.

DETAILED DESCRIPTION OF THE INVENTION

The invention will now be described in detail with regard to the best mode and the preferred embodiment. In general, the

SAMNDCA630-04258813

US 7,577,757 B2

5

invention is a system and method comprising a digital multi-media player connected to a network and capable of transferring, receiving, storing, decoding and playing selected data files from plethora of devices connected to the network, including but not limited to, a computer server, a database, a personal computer and other multimedia receiver/player devices capable of transferring, receiving, storing, decoding and playing the data in an multimedia format.

With reference to FIG. 1, a digital multimedia device 104 is connected to network 102 along with a multimedia database 106. In addition, a portable multimedia player 108, a personal computer 110, and "master" digital multimedia player are connected to network 102. For purposes of this application, a personal computer is any computer, coupled to a network, which receives a program, data or other application from another data source or computer coupled to the network. In the depicted example, multimedia database 106 provides data, such as digital audio and video files in their respective formats, to digital multimedia device 104 and other devices attached to the network capable of receiving audio and video content. The data network system 102 may include additional servers, clients, digital multimedia players and other devices not shown.

The network 102 is capable of delivering data files between the network devices, such as multimedia database 106, personal computer 110, portable and fixed digital multimedia devices 104, 112. Muster digital multimedia device 112 can include a database such as the multimedia database 106. As can be appreciated the multimedia database 106 can be a stand-alone entity coupled to the network 102 as well. Furthermore, Muster digital multimedia device 112 has the capability to store video/audio products in digital form. Preferably, the network 102 comprises a transmission network capable of sending data via an extremely high data transfer rate system, and may comprise satellite, radio, microwave, cellular or other known wireless transmissions using terrestrial or satellite means. It is contemplated that such transfer of data could also be accomplished through direct physical connections (e.g., telephone lines). Network system 102 may be the Internet representing a worldwide collection of networks and gateways that use the TCP/IP suite of protocols to communicate with one another. Of course, network 102 also may be implemented as a number of different types of networks, such as for example, a wireless internet network, an intranet, a local area network (LAN), or a wide area network (WAN). FIG. 1 is intended as an example, and not as an architectural limitation for the present invention.

Multimedia database 106 is an online collection of audio and video works which may accessed by network devices on a subscription or free file share basis. The recorded multimedia works may be categorized as to format, such as classical, jazz, contemporary, classic rock, etc. and video works such as, educational, drama, comedy, etc. The digital source database translates and stores the audio and video works in digital form, with the works subdivided into different formats. The content source database is further capable of communication with other network devices to deliver the data stored in the database to a digital player device, personal computer or microprocessor, or portable personal digital player.

With regard to FIG. 2, the digital multimedia device 104 is a powered electronic device designed to be a stand-alone unit for use in the home or office and powered conventionally by electricity, or a unit installed in an automobile in a manner similar to standard cassette, CD, DVD players. FIG. 2 is a diagram showing one example of the digital multimedia device attached to a user's home audio/video system with a menu display on the user's television. The depicted arrange-

6

ment allows the user to operate the digital multimedia device's playback functions by utilizing a televised menu driven hierarchy providing the user with program selection choices. As well, the user may program the digital multimedia device's download, synchronization and storage functions via the menu driven interface or alternatively keypad on the digital multimedia device.

FIG. 3 depicts key internal components providing for the operation of the invention disclosed herein. The digital multimedia device 104 comprises a microprocessor 302, a network communication unit 306, an audio video output 308, a digital to analog converter (D/A unit) 310 which decodes and converts digitized data to an analog signal output, memory unit 312, preferably consisting of a disk drive, hard drive, memory or flash card system capable of storing a large amount of multimedia programming in digital format in individual files, but with a readable/writable storage mechanism that will replace or write over the old data file with one or more new ones, until the data storage device is fully loaded. The data memory unit 312 means of the digital multimedia device 104 could be removable or detachable for transport or even interchangeable with other audio/video player devices. The control unit 314 provides means to select and play any particular multimedia work relatively instantaneously which includes keys and commands for start, stop, skip, repeat, shuffle and save keypad buttons, and a visual display means to display alphanumeric information about the work selected. The invention may also be packaged with a standard AM/FM radio, cassette player or compact disc player, such that the listener has other options for digital audio/video recording and audio/video output.

FIG. 4 is a flowchart depicting one embodiment of the present invention. The digital multimedia device 104 allows the user, via the control unit 314 means, to request and download entirely new recorded data into the digital multimedia device 104 or program the digital multimedia device 104 to synchronize and update the user's audio/video files automatically from a multimedia database 106, a personal computer or other devices connected to the network. For example, the user instructs the digital multimedia device to establish network contact with a selected multimedia database in the required communicating manner (Step 402). The user then selects the desired multimedia works to be synchronized and downloaded for storage on the digital multimedia device from the music multimedia database (Step 404). The selected digital data is downloaded from the music multimedia database into the data storage memory unit of the digital multimedia device (Step 406). The user may then be prompted to select other content for download. If the user desires to download more content, the process is repeated (Step 408). If the user declines to download or update content, the session is terminated. As a result, the user may listen to entirely different audio/video selections from those previously recorded in the digital multimedia device.

Turning to FIG. 5, an alternative embodiment of the present invention is discussed in further detail wherein the digital multimedia player 104 automatically performs the synchronization and download function between "master" and "subordinate" digital multimedia devices 104, 112. The subordinate digital multimedia device establishes network contact with a selected master digital multimedia device in the required communicating manner. The subordinate digital multimedia device then queries the master multimedia device to determine if content downloads or updates are available (Step 502). The master digital multimedia device responds to the query (Step 504). If content updates or downloads are available, the subordinate digital player device initiates the

SAMNDCA630-04258814

US 7,577,757 B2

7

synchronization and download of the appropriate files (Step 506) and the digital data is placed in the data storage memory unit of the subordinate digital multimedia device (Step 508). After download is complete and at various selectable intervals, the subordinate digital multimedia player may then again query the master digital multimedia device for available content downloads or updates (Step 510) and the process is again repeated. It should be noted that the user may access and play stored audio content with the digital multimedia player while the update synchronization functions are being performed and that the process may be initiated by the master digital multimedia device as opposed to the subordinate multimedia device. Likewise, subordinate multimedia devices may synchronize with other designated master multimedia devices such as a personal computer, a source database or other networked storage service or devices, and receive download updates or multimedia files as set forth in this specification.

Referring now to FIG. 6, a flowchart 600 depicting a synchronization of the instant invention is described. A process (Step 602) determines when to initiate the synchronization. Once a decision is made to initiate synchronization, a request is made and the depicted synchronization process starts (Step 604). A first determination is made in that if the request is rejected, the process reverts back to step 602 to wait for another initiation as to when to start the synchronization process (Step 606). If the request is accepted, the flowchart 600 progresses onward. A second determination (Step 608) is made in that if a previous synchronization point, or well established point exists, the synchronization process progresses to receive information from a server (Step 610). The received information from the server includes files containing audio and video entries. As can be appreciated, the instant invention teaches a set of zones wherein any zone has a zone specific device that contains all the audio and video, as well as text information which a user needs. If the information is not contained within the zone specific device, it is synchronized and made to contain the information. Therefore, if the device already has the information the user needs, an indication of the information may be transferred instead of the whole information, since the whole information is already in the device albeit not specifically used by a particular user. Continuing describing step 610, information may be received from the server regarding files on audio and video information from a database associated with the server. The information may include coded addition, deletion, or modification instructions for a specific device in a zone (Step 612). In other words, the database includes time sensitive information related to devices residing in different zones. For example, the user may change her preference in a particular zone at some recent time. This change is going to be noticed by the server, which stores related information in the database. A request for transmission of audio, video, or textual files is generated whereby each zone specific device is going to eventually be comprised of information specified by the user (Step 614). As can be appreciated, the information is the most recent information the user wants it to be. As a result, a new synchronization point is achieved. This synchronization resulted in establishing the most recent well-established synchronization point (Step 616). The synchronization process terminates (Step 618).

Referring back to step 608, if no previous synchronization exists, a host sends all the necessary information to at least one client, which comprises the relevant devices in each zone respectively (Step 620). The host can be any device in a zone capable of communicating information to other devices residing in different zones. This usually occurs during the initial or

8

setup period wherein different zone devices have not set themselves up for the user specific information. Or this may occur when substantial change in regard to user preference is initiated. By way of example, change preference from country music to rock-n-roll. Client then determines what information is needed and in turn requests and receives the needed information. As can be appreciated, the needed information comprises audio, video and other graphic and textual files, or segment of files, or indexing information related to the above (Step 622). Thereupon, the logic progresses toward step 614.

As can be appreciated, a change or alteration that triggers the synchronization process includes adding or ==deleting songs,== adding or ==deleting playlists,== editing song or playlist information, and changing system settings and preferences. It is noted that this triggering occurs when any device in any particular zone is being altered.

Referring now to FIG. 7, a block diagram 700 of an embodiment of the instant invention is depicted. A central storage and interface device 702, which can be a AudioReQuest Pro, produced by ReQuest, Inc. is shown. It is noted that AudioReQuest is a trademark of ReQuest, Inc. A local area network (LAN) 704 couples central storage and interface device 702 to zone specific storage and interface devices 706, 708, and 710, each of which resides in a specific zone (not shown). A personal computer 712 is coupled to LAN 704 as well. In addition, other device 714 such as an intelligent MP3 player is coupled to LAN 704 as well. An automobile 716 that has AudioReQuest capabilities is also coupled to LAN 704. It is noted that LAN 704 can be based on Ethernet or can be landline or wireless such as IEEE 802.11 radio frequency or other suitable standard.

A wide area network (WAN) 718 such as the Internet couples together a server 720 such as an on-line server, and a second central storage and interface device 722, which in turn can be coupled to a second LAN 724 having at least one zone specific storage and interface device 726 coupled thereto. A second automobile 728 is coupled to WAN 718 as well. As can be appreciated, this coupling can be via direct wireless Internet connections, or a cellular connection.

A practical example of implementing the instant invention is described infra. In the example, central storage and interface device 702 is AudioReQuest Pro, zone specific storage and interface devices 706, 708, 710 are a set of AudioReQuest Multizone which is produced by ReQuest, Inc.

AudioReQuest Pro (ARQ Pro) is a central storage device that digitally records music from CDs using its built-in CD player. In addition, it can record from analog sources such as radio, Long Playing records (LPs), and audiocassettes through its line-in recording capability. Further, it can record and transfer digital music from the PC and Internet sites. Playlists are created on the system by having a specific user who categorizes song choices for current or later playing. Song and Music Navigation information can be viewed on the built-in LCD, a television interface, or on other devices such as home automation control systems and personal computers through serial and Ethernet connections. Music can be either transferred or streamed to other devices 714 such as digital portable players, streaming network devices, web browsers, personal computers, online websites and servers, and other ReQuest products through network and universal serial bus (USB) connections.

AudioReQuest Multizone (ARQ Multi) is an accessory product that has the same storage, playback, and interface as the AudioReQuest Pro. It is noted that the substantial similarity between the AudioReQuest Pro and the AudioReQuest Multizone is achieved by synchronizing of AudioReQuest Pro with AudioReQuest Pro over a network, which may be

SAMNDCA630-04258815

US 7,577,757 B2

9

network **704**, **718**, **724**, or a combination of some or all of them. As can be appreciated, synchronization includes having devices in different zones store substantially identical content of entered music and playlists by a specific user. Different synchronizing schemes are possible (automatic, daily, weekly, etc). It is noted that users can synchronize or make the update on a demand. The ARQ Zone uses an Ethernet connection to a main unit for the synchronization of the music. As can be appreciated, online server **720** includes any main unit such as ARQ pro **702**. Any number of ARQ Multizones can work with each ARQ Pro, allowing multiple outputs of the same music collection to be available. In a typical custom home installation, there may be upwards of 20 zones (e.g., rooms) with independent control and output. By way of example, instead of only playing one CD throughout the building, different songs can be played at the same time.

The AudioReQuest Pro and ARQ Multizone will have removable hard drives. This is desirous since if any one unit fails, a hard drive from another unit can be inserted and automatically work since they are synchronized such that the content of the hard drives are substantially the same. When an old hard drive is replaced with a new one, it will automatically synchronize and get the entire collection from the ARQ Pro. As can be appreciated, this system provides complete backup redundancy for the entire system, protecting the user's multimedia investment.

It is noted that ARQ Multi comprises interfaces for television display, for audio amplification, as well as for infrared connections.

Two AudioReQuest Pros can synchronize over the Internet, so that if a customer has their main home in Maine and a second home in Hawaii, both locations will have the same music collection available. Should a new CD be loaded in Hawaii, it will become available in Maine after it synchronizes, and vice versa. In addition, car and other mobile devices can also synchronize over wired or wireless connections. Furthermore, an online file server which exists either through a proprietary system or a public service, can be used to synchronize their music collections from their Pro, so that music can be streamed to their web browser, wireless cell phone, or other devices, anywhere on the Internet.

It is noted that the above listed devices such as zone specific storage and interface devices **706**, **708**, **710**, or PC **712** can be located in separate zones respectively. Or, some can co-exist in a zone. One of the purpose of the zone is to give a user substantially exclusive or reclusive enjoyment of information shared by zone specific storage and interface devices **706**, **708**, **710**, as well as by central storage and interface device **702**, and other devices.

As can be appreciated, this invention teaches a complete system for providing recorded multimedia programming in digital form that is updated on all devices owned by an user, over a network. The main device digitally records, stores, plays, downloads, and uploads multimedia programming in audio, video, or picture format or other suitable formats (analog or digital). Furthermore, the main device is able to transmit such data, either via a hardwired or wireless network, to other devices that are capable of playing, storing, download and upload such data. The system allows multiple devices to synchronize its internal collection with each other, so that the end result is that all the devices have the same content and content management means (playlists, settings, etc.). Also devices having accessory playback only feature would synchronize the data, content, and content management with the

10

main recorder device. Therefore, a complete copy of the content is stored locally in a device within a zone or any zone, so that the output can be played in multiple zones or rooms in a networked building or in multiple locations traveling through a wide area network such as the Internet. The instant invention also contemplates other device for mobile applications such as car, boat, airplane, and other transportation, that would synchronize through either hardwired or wireless means resulting in storing the content locally. The instant invention further contemplates a set of digital multimedia devices comprises a readable/writable memory storage mechanism (e.g. disk drive, hard drive, memory) which are capable of transmitting and/or receiving network transmissions, and a playback or player feature interfaced with a mobile or fixed radio receiver, television, or personal computer.

Although preferred embodiments of the present invention have been described in the foregoing Detailed Description and illustrated in the accompanying drawings, it will be understood that the invention is not limited to the embodiments disclosed, but is capable of numerous rearrangements, modifications, and substitutions of steps without departing from the spirit of the invention. Accordingly, the present invention is intended to encompass such rearrangements, modifications, and substitutions of steps as fall within the scope of the appended claims.

We claim:

**1**. A system for synchronizing devices in a multimedia environmental, the system comprising:

at least one central storage and interface device, wherein audio, video, or photographic data, including content information and content management information, relating to at least one user, are stored in digital form; and

at least one zone, each zone having at least one zone specific storage and interface device capable of storing or interfacing with information stored in the central storage and interface device, wherein audio, video, or photographic information, relating to at least one user, contained within the zone specific storage and interface device and the central storage and interface device, are updated in relation to the zone specific storage and interface devices and the central storage and interface device, whereby the at least one user can be situated in any one of the zones and access the audio, video, or photographic information related to the at least one user.

**2**. The system of claim **1**, further comprising a local area network (LAN) coupled to at least one zone specific storage and interface device with the central storage and interface device, wherein the interconnections within the LAN is hardwired or wireless.

**3**. The system of claim **1**, further comprising a wide area network (WAN) coupling at least one zone specific storage and interface device with the central storage and interface device.

**4**. The system of claim **1**, further comprising a set of zone specific output devices coupled to each of the zone specific storage and interface device, wherein audio, video, and photographic information is outputted, thereby the at least one user is disposed to have substantially identical content information and content management information displayed and manipulated in anyone of the zones.

SAMNDCA630-04258816

US 7,577,757 B2

11

**5**. The system of claim **1**, further comprising an output device coupled to the at least one central storage and interface, wherein audio, video, or photographic information is outputted.

**6**. The system of claim **1**, further comprising a server, wherein audio, video, and photographic information contained within each one of the plurality of zone specific storage and interface devices and the central storage and interface device are stored therein and updated at a predetermined time in relation with other zone specific storage and interface devices as well as the central storage and interface device, coupled to the WAN.

**7**. The system of claim **1**, further comprising an other device coupled to the central storage and interface device via a network connection other than the LAN or WAN.

**8**. The system of claim **1**, wherein the at least one user pre-stores the audio, video, and photographic information by way of using a device comprising the central storage and interface device, and the zone specific storage and interface device.

**9**. The system of claim **1**, wherein the central storage and interface device comprises means for transmitting or receiving information to or from the ozone specific storage and interface device.

12

**10**. The System of claim **1**, wherein the zone specific storage and interface device comprises means for transmitting or receiving information to or from the central storage and interface device.

**11**. The system of claim **1**, wherein the central storage and interface device is capable of converting analog information into digital form.

**12**. The system of claim **1**, wherein the zone specific storage and interface device is disposed to be coupled to a personal computer (PC).

**13**. The system of claim **1**, wherein the zone specific storage and interface device is disposed to be coupled to a wireless mobile device.

**14**. The system of claim **1** wherein the central storage and interlace device is disposed to be coupled to a wireless mobile device via LAN.

**15**. The system of claim **1**, wherein the central storage and interface device is disposed to be coupled to a wireless mobile device via WAN.

\*   \*   \*   \*   \*

SAMNDCA630-04258817

# EXHIBIT B

US007587446B1

(12) **United States Patent**
Onyon et al.

(10) Patent No.: **US 7,587,446 B1**
(45) Date of Patent: **Sep. 8, 2009**

(54) **ACQUISITION AND SYNCHRONIZATION OF DIGITAL MEDIA TO A PERSONAL INFORMATION SPACE**

(75) Inventors: **Richard M. Onyon**, San Jose, CA (US); **David L. Multer**, Santa Cruz, CA (US)

(73) Assignee: **FusionOne, Inc.**, San Jose, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 580 days.

(21) Appl. No.: **09/710,162**

(22) Filed: **Nov. 10, 2000**

(51) **Int. Cl.**
*G06F 15/16* (2006.01)
*G06F 15/173* (2006.01)

(52) **U.S. Cl.** ........................ **709/203**; 709/217; 707/10; 707/204

(58) **Field of Classification Search** ........ 709/200–203, 709/217–228, 230–232, 236–238, 243, 244, 709/246, 248; 707/10, 200, 201, 203, 204; 719/310, 311, 312, 313, 317, 318, 328; 718/100, 718/105; 455/415; 370/254, 359; 708/204; 345/62

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,130,993 A | 7/1992 | Gutman et al. | |
| 5,392,390 A | 2/1995 | Crozier | |
| 5,519,606 A | 5/1996 | Frid-Nielsen et al. | |
| 5,574,906 A | 11/1996 | Morris | |
| 5,623,661 A | 4/1997 | Hon | |
| 5,628,005 A | 5/1997 | Hurvig | |
| 5,630,081 A | 5/1997 | Rybicki et al. | |
| 5,649,195 A | 7/1997 | Scott et al. | |
| 5,666,553 A | 9/1997 | Crozier | |
| 5,682,524 A | 10/1997 | Freund et al. | |
| 5,684,990 A | 11/1997 | Boothby | |
| 5,694,596 A | 12/1997 | Campbell | |
| 5,701,423 A | 12/1997 | Crozier | |
| 5,706,509 A | 1/1998 | Man-Hak Tso | |
| 5,710,922 A | 1/1998 | Alley et al. | |
| 5,727,202 A | 3/1998 | Kucala | |
| 5,729,735 A | 3/1998 | Meyering | |
| 5,729,739 A * | 3/1998 | Cantin et al. ............ 707/103 R |
| 5,729,743 A | 3/1998 | Squibb | |
| 5,742,792 A | 4/1998 | Yanai et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

EP        0 986 225 A1    3/2000

(Continued)

OTHER PUBLICATIONS

Internate Mail Consortium: "vCard The Electronic Business Card," Retrieved from the Internet: www.imc.org/pdi/vcardwhite.html, Jan. 1, 1997.

(Continued)

*Primary Examiner*—Haresh N Patel
(74) *Attorney, Agent, or Firm*—Haverstock & Owens LLP

(57) **ABSTRACT**

A method for transferring media data to a network coupled apparatus is described. The method includes maintaining a personal information space identified with a user and having media data. The personal information space is coupled to the network. Upon a user request, the method transfers at least a portion of the media data from the personal information space to the network coupled apparatus in a differencing transaction.

**14 Claims, 5 Drawing Sheets**



APL630DEF-WH0000013654

## US 7,587,446 B1

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,745,906 A | 4/1998 | Squibb | |
| 5,758,150 A | 5/1998 | Bell et al. | |
| 5,768,597 A | 6/1998 | Simm | |
| 5,771,354 A | 6/1998 | Crawford | |
| 5,778,346 A | 7/1998 | Frid-Nielsen et al. | |
| 5,787,247 A | 7/1998 | Norin et al. | |
| 5,787,262 A | 7/1998 | Shakib et al. | |
| 5,809,497 A | 9/1998 | Freund et al. | |
| 5,812,773 A | 9/1998 | Norin | |
| 5,812,793 A | 9/1998 | Shakib et al. | |
| 5,832,489 A | 11/1998 | Kucala | |
| 5,832,519 A | 11/1998 | Bowen et al. | |
| 5,845,283 A | 12/1998 | Williams et al. | |
| 5,875,296 A | 2/1999 | Shi et al. | |
| 5,884,323 A | 3/1999 | Hawkins et al. | |
| 5,884,325 A | 3/1999 | Bauer et al. | |
| 5,893,119 A | 4/1999 | Squibb | |
| 5,897,640 A | 4/1999 | Veghte et al. | |
| 5,897,642 A | 4/1999 | Capossela et al. | |
| 5,907,793 A * | 5/1999 | Reams | 725/122 |
| 5,937,405 A | 8/1999 | Campbell | |
| 5,943,676 A | 8/1999 | Boothby | |
| 5,961,590 A | 10/1999 | Mendez et al. | |
| 5,968,131 A | 10/1999 | Mendez et al. | |
| 5,974,238 A | 10/1999 | Chase, Jr. | |
| 5,974,563 A | 10/1999 | Beeler, Jr. | |
| 6,000,000 A | 12/1999 | Hawkins et al. | |
| 6,006,274 A | 12/1999 | Hawkins et al. | |
| 6,012,063 A | 1/2000 | Bodnar | |
| 6,016,394 A * | 1/2000 | Walker | 717/104 |
| 6,016,478 A | 1/2000 | Zhang et al. | |
| 6,023,708 A | 2/2000 | Mendez et al. | |
| 6,023,723 A | 2/2000 | McCormick et al. | |
| 6,034,621 A | 3/2000 | Kaufman | |
| 6,038,665 A | 3/2000 | Bolt et al. | 713/176 |
| 6,044,381 A | 3/2000 | Boothby et al. | |
| 6,052,735 A | 4/2000 | Ulrich et al. | |
| 6,058,399 A | 5/2000 | Morag et al. | |
| 6,061,790 A | 5/2000 | Bodnar | |
| 6,064,880 A | 5/2000 | Alanara | 455/419 |
| 6,108,330 A | 8/2000 | Bhatia et al. | 370/352 |
| 6,108,703 A | 8/2000 | Leighton et al. | 709/226 |
| 6,131,096 A | 10/2000 | Ng et al. | |
| 6,131,116 A | 10/2000 | Riggins et al. | |
| 6,141,011 A | 10/2000 | Bodnar et al. | |
| 6,141,664 A | 10/2000 | Boothby | |
| 6,151,606 A | 11/2000 | Mendez | |
| 6,163,844 A | 12/2000 | Duncan et al. | 713/201 |
| 6,182,117 B1 | 1/2001 | Christie et al. | |
| 6,182,141 B1 | 1/2001 | Blum et al. | 709/227 |
| 6,185,598 B1 | 2/2001 | Farber et al. | 709/200 |
| 6,202,085 B1 | 3/2001 | Benson et al. | |
| 6,205,448 B1 | 3/2001 | Kruglikov et al. | |
| 6,212,529 B1 | 4/2001 | Boothby et al. | |
| 6,216,131 B1 | 4/2001 | Liu et al. | |
| 6,219,694 B1 | 4/2001 | Lazaridis et al. | |
| 6,223,187 B1 | 4/2001 | Boothby et al. | |
| 6,226,650 B1 | 5/2001 | Mahajan et al. | |
| 6,247,135 B1 | 6/2001 | Feague | |
| 6,260,124 B1 | 7/2001 | Crockett et al. | 711/162 |
| 6,272,545 B1 | 8/2001 | Flanagin et al. | |
| 6,275,831 B1 | 8/2001 | Bodnar et al. | |
| 6,282,698 B1 | 8/2001 | Baker et al. | |
| 6,295,541 B1 | 9/2001 | Bodnar et al. | |
| 6,304,881 B1 | 10/2001 | Halim et al. | |
| 6,317,755 B1 | 11/2001 | Rakers et al. | 707/204 |
| 6,324,544 B1 | 11/2001 | Alam et al. | |
| 6,330,568 B1 | 12/2001 | Boothby et al. | |
| 6,332,158 B1 | 12/2001 | Risley et al. | 709/219 |
| 6,363,249 B1 | 3/2002 | Nordeman et al. | 455/418 |
| 6,363,412 B1 | 3/2002 | Niwa et al. | 709/203 |
| 6,389,462 B1 | 5/2002 | Cohen et al. | 709/218 |
| 6,396,482 B1 | 5/2002 | Griffin et al. | 345/169 |
| 6,397,351 B1 | 5/2002 | Miller et al. | |
| 6,401,104 B1 * | 6/2002 | LaRue et al. | 707/203 |
| 6,405,218 B1 | 6/2002 | Boothby | |
| 6,434,621 B1 * | 8/2002 | Pezzillo et al. | 709/231 |
| 6,434,627 B1 | 8/2002 | Millet et al. | 709/245 |
| 6,437,818 B1 * | 8/2002 | Ludwig et al. | 348/14.09 |
| 6,449,622 B1 | 9/2002 | LaRue et al. | |
| 6,457,062 B1 | 9/2002 | Pivowar et al. | |
| 6,480,896 B1 * | 11/2002 | Brown et al. | 709/231 |
| 6,484,143 B1 | 11/2002 | Swildens et al. | 705/1 |
| 6,487,560 B1 | 11/2002 | LaRue et al. | |
| 6,549,933 B1 * | 4/2003 | Barrett et al. | 709/203 |
| 6,553,413 B1 | 4/2003 | Leighton et al. | 709/219 |
| 6,567,850 B1 * | 5/2003 | Freishtat et al. | 709/224 |
| 6,591,306 B1 | 7/2003 | Redlich | 709/245 |
| 6,597,700 B2 | 7/2003 | Golikeri et al. | 370/401 |
| 6,640,302 B1 | 10/2003 | Subramaniam et al. | 713/169 |
| 6,643,707 B1 | 11/2003 | Booth | 709/245 |
| 6,671,724 B1 | 12/2003 | Pandya et al. | 709/226 |
| 6,671,757 B1 * | 12/2003 | Cash et al. | 710/100 |
| 6,694,336 B1 * | 2/2004 | Multer et al. | 707/201 |
| 6,718,390 B1 | 4/2004 | Still et al. | 709/229 |
| 6,732,101 B1 | 5/2004 | Cook | 707/10 |
| 6,738,789 B2 * | 5/2004 | Multer et al. | 707/201 |
| 6,757,696 B2 * | 6/2004 | Multer et al. | 707/201 |
| 6,757,698 B2 | 6/2004 | McBride et al. | 707/204 |
| 6,799,214 B1 | 9/2004 | Li | 709/226 |
| 6,804,690 B1 | 10/2004 | Dysert et al. | 707/204 |
| 6,804,783 B1 | 10/2004 | Wesinger, Jr. et al. | 713/200 |
| 6,812,961 B1 * | 11/2004 | Parulski et al. | 348/231.2 |
| 6,839,568 B2 | 1/2005 | Suzuki | 455/550.1 |
| 6,850,944 B1 * | 2/2005 | MacCall et al. | 707/100 |
| 6,870,921 B1 | 3/2005 | Elsey et al. | 379/218.01 |
| 6,892,245 B1 | 5/2005 | Crump et al. | 709/245 |
| 6,920,488 B1 * | 7/2005 | Le Pennec et al. | 709/219 |
| 6,944,651 B2 * | 9/2005 | Onyon et al. | 709/217 |
| 6,954,783 B1 | 10/2005 | Bodwell et al. | 709/218 |
| 6,963,914 B1 | 11/2005 | Breitbart et al. | 709/226 |
| 6,996,631 B1 | 2/2006 | Aiken, Jr. et al. | 709/242 |
| 7,003,555 B1 | 2/2006 | Jungck | 709/219 |
| 7,007,041 B2 * | 2/2006 | Multer et al. | 707/201 |
| 7,020,704 B1 * | 3/2006 | Lipscomb et al. | 709/226 |
| 7,023,868 B2 | 4/2006 | Rabenko et al. | 370/419 |
| 7,039,656 B1 * | 5/2006 | Tsai et al. | 707/201 |
| 7,051,275 B2 * | 5/2006 | Gupta et al. | 715/201 |
| 7,054,594 B2 | 5/2006 | Bloch et al. | 455/41.2 |
| 7,116,681 B1 | 10/2006 | Hovell et al. | 370/466 |
| 7,162,494 B2 | 1/2007 | Arellano | 707/104.1 |
| 7,197,574 B1 | 3/2007 | Ishiyama | 709/245 |
| 7,233,791 B2 | 6/2007 | Gilbert et al. | 455/419 |
| 7,249,175 B1 | 7/2007 | Donaldson | 709/225 |
| 7,269,433 B2 | 9/2007 | Vargas et al. | 455/502 |
| 7,284,051 B1 | 10/2007 | Okano et al. | 709/226 |
| 7,289,964 B1 | 10/2007 | Bowman-Amuah | 705/1 |
| 7,315,826 B1 * | 1/2008 | Guheen et al. | 705/7 |
| 7,356,559 B1 | 4/2008 | Jacobs et al. | 709/203 |
| 7,363,233 B1 | 4/2008 | Levine | 705/1 |
| 7,392,034 B2 | 6/2008 | Westman et al. | 455/402 |
| 7,447,743 B1 | 11/2008 | Jordan, Jr. | 709/206 |
| 7,454,500 B1 | 11/2008 | Hsu et al. | 709/226 |
| 2001/0044805 A1 | 11/2001 | Multer et al. | |
| 2001/0047393 A1 * | 11/2001 | Arner et al. | 709/216 |
| 2002/0007303 A1 * | 1/2002 | Brookler et al. | 705/10 |
| 2002/0010868 A1 | 1/2002 | Nakashima et al. | 713/201 |
| 2002/0032751 A1 | 3/2002 | Bharadwaj | 709/218 |
| 2002/0038316 A1 * | 3/2002 | Onyon et al. | 707/204 |
| 2002/0040369 A1 * | 4/2002 | Multer et al. | 707/201 |
| 2002/0049852 A1 * | 4/2002 | Lee et al. | 709/231 |
| 2002/0056011 A1 * | 5/2002 | Nardone et al. | 709/248 |
| 2002/0059116 A1 * | 5/2002 | Bulatovic et al. | 705/27 |
| 2002/0091785 A1 * | 7/2002 | Ohlenbusch et al. | 709/208 |

## US 7,587,446 B1

Page 3

| | | | | |
|---|---|---|---|---|
| 2002/0138765 | A1 | 9/2002 | Fishman et al. | |
| 2002/0162011 | A1 | 10/2002 | Tanaka et al. | 713/200 |
| 2003/0028451 | A1 | 2/2003 | Ananian | 705/27 |
| 2003/0069874 | A1* | 4/2003 | Hertzog et al. | |
| 2003/0204568 | A1 | 10/2003 | Bhargava et al. | 709/206 |
| 2003/0229898 | A1 | 12/2003 | Babu et al. | 725/87 |
| 2004/0054746 | A1 | 3/2004 | Shibata | 709/207 |
| 2004/0093342 | A1* | 5/2004 | Arbo et al. | 707/102 |
| 2004/0093385 | A1 | 5/2004 | Yamagata | 709/206 |
| 2004/0111465 | A1 | 6/2004 | Chuang et al. | 709/203 |
| 2004/0188235 | A1 | 9/2004 | Sugimoto et al. | 455/412.1 |
| 2004/0192282 | A1 | 9/2004 | Vasudevan | 455/419 |
| 2004/0224665 | A1 | 11/2004 | Kokubo | 455/411 |
| 2005/0086296 | A1 | 4/2005 | Chi et al. | 709/203 |
| 2005/0090253 | A1 | 4/2005 | Kim et al. | 455/435.1 |
| 2005/0099963 | A1* | 5/2005 | Multer et al. | 370/254 |
| 2005/0102257 | A1* | 5/2005 | Onyon et al. | 707/1 |
| 2005/0131990 | A1 | 6/2005 | Jewell | 709/201 |
| 2006/0052091 | A1* | 3/2006 | Onyon et al. | 455/415 |
| 2006/0190626 | A1 | 8/2006 | Bhogal et al. | 709/248 |
| 2007/0050734 | A1 | 3/2007 | Busey | 715/853 |
| 2007/0061331 | A1 | 3/2007 | Ramer et al. | 707/10 |
| 2007/0094042 | A1 | 4/2007 | Ramer et al. | 705/1 |
| 2008/0022220 | A1 | 1/2008 | Cheah | 715/769 |
| 2008/0039020 | A1 | 2/2008 | Eskin | 455/41.2 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1180890 A2 | 2/2002 |
| JP | 11242620 | 7/1999 |
| JP | 11242677 | 7/1999 |
| WO | WO 97 04391 | 2/1997 |
| WO | WO 97/41520 | 11/1997 |
| WO | WO 98/21648 | 5/1998 |
| WO | WO 98/54662 | 12/1998 |
| WO | WO 99/05813 | 2/1999 |
| WO | WO 99/06900 | 2/1999 |
| WO | WO 99/36870 | 7/1999 |
| WO | WO 99/45451 | 9/1999 |
| WO | WO 99/45484 | 9/1999 |
| WO | WO 99/50761 | 10/1999 |
| WO | WO 00/11832 | 3/2000 |
| WO | WO 00/16222 | 3/2000 |
| WO | WO 00/29998 | 5/2000 |
| WO | WO 01/71539 | 9/2001 |
| WO | WO 2005/112586 A2 | 12/2005 |

### OTHER PUBLICATIONS

Internate Mail Consortium: "vCard Overview," Retrieved from the internet: www.imc.org/pdi/vcardoverview.html, Oct. 13, 1998.
Internate Mail Consortium: "vCard The Electronic Bisiness Card," Retrieved from the Internet: www.imc.org/pdi/vcardwhite.html, Jan. 1, 1997, pp. 1-2.
Internate Mail Consortium: "vCard Overview," retrieved from the Internet: www.imc.org/pdi/vcardoverview.html, Oct. 13, 1998, pp. 1-3.
Finnigan, Anne, "The Safe Way to Shop Online," Sep. 1998, p. 162, Good Housekeeping, v. 227 No. 3.
Chase, Larry, "Taking Transactions Online,"Oct. 1998, pp. 124-132, Target Marketing, v.21 No. 10.
Gong, Li, "Increasing Availability and Security of an Authentication Service," Jun. 1993, pp. 657-662, IEEE Journal on Selected Areas in Communications, v. 11 No. 5.
DeMaio, Harry B., "My MIPS Are Sealed," Sep./Oct. 1993, pp. 46-51, Chief Information Officer Journal v. 5 iss.7.

* cited by examiner

# Figure 1



APL630DEF-WH0000013657



Select Data From Public Data Source
10
Sync Request
22
User Known?
24
No
New User?
25
No
Enter Username and Password
26
Yes
Registration
27
Yes
Sync to Personal Information Space
14
12
65
50
50a
50b
52
10"
10'"
10'
47
45
45a
45b
45c
60

Figure 2

# Figure 3



APL630DEF-WH0000013659

**U.S. Patent**       Sep. 8, 2009       Sheet 4 of 5       **US 7,587,446 B1**



Figure 4

APL630DEF-WH0000013660



Figure 5
Device Engine

APL630DEF-WH0000013661

US 7,587,446 B1

1

## ACQUISITION AND SYNCHRONIZATION OF DIGITAL MEDIA TO A PERSONAL INFORMATION SPACE

### CROSS-REFERENCE TO RELATED APPLICATIONS

The following applications are cross-referenced and incorporated by reference herein in their entirety:

"Data Transfer and Synchronization System," U.S. Pat. No. 6,671,757, issued Dec. 30, 2003;

"Data Transfer and Synchronization System," U.S. Pat. No. 6,694,336, issued Feb. 17, 2004; and

"Data Transfer and Synchronization System," U.S. patent application Ser. No. 09/491,675, filed Jan. 26, 2000.

Each of these related Patents/Application are incorporated herein by reference.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention relates to the transfer of public and private data to a private information space and in particular to the transfer, storage and synchronization of media data.

2. Description of the Related Art

Digital media has become increasingly more popular and is considered by many to be one of the current "revolutions" taking place in the computing and entertainment industries. Digital audio and video are becoming as mainstream as text and graphics are on the World Wide Web. This "revolution" opens tremendous opportunities for industry innovation in the manner in which people use this technology at home, work, and on the road. Distribution of digital media via the Internet has been a driving factor of this revolution. As a result, however, a user may acquire and store digital media on one network-coupled device, such as a personal computer coupled to the user's business network connection, but may desire to transfer that information and maintain a library of this digital media on other network-coupled devices, such as a personal computer at the user's home, a notebook computer which travels with the user, or even a palm-top computer.

Digital media content can be acquired from a multiplicity of sources. In particular, digital media content can comprise a series of files such as MPEG, MP3, RealAudio, and the like, which may be saved to a storage device, such as a hard drive on a computer, and which a user may wish to have present on a multiplicity of the user's individual devices. At present, there is no way to ensure that all files of a particular type, or in a particular directory, are the same throughout a series of machines. This series of machines can comprise a "personal information space" which is made up of information selected by the user to be input into the user's own hard drive. Hence, the personal information space may comprise public or private data selected by the user which is inserted into any one or more of a user's network-coupled devices. The network-coupled devices can have their own storage or which may be connected to the network to receive data from the network and to process the data using the device's processor and software.

In other areas, management of a user's personal data between different systems which can couple directly to each other has been addressed. For example, numerous systems allow management of an individual's personal contact information, such as files, contact and address data. Personal information managers (PIMs) may comprise software applications such as Microsoft Outlook, Symantec's ACT!, and other similar programs running on a personal or laptop computer. PIMS may also comprise personal digital assistants (PDAs)

2

such as those using the Palm or Microsoft Windows CE (also known as Pocket PC) operating systems. Each PDA generally includes calendar, contact, personal tasks, notes, documents, and other information, while more sophisticated devices allow a user to fax, send e-mails, and communicate in other ways both by wireline and wirelessly. Even advanced cellular phones carry enough memory and processing power to store contact information, surf the web, and provide text messaging. Along with the growth in the sophistication of these devices, the need to transfer information between them has grown significantly as well.

In addition, many Internet web portals also now provide file storage, contact and calendar services. For example, major service portals such as Yahoo!™, Excite$^{SM}$, Lycos®, Snap!™ and others provide on-line calendar and contact manager services via a web browser and user account. This allows a user to log in to their own calendar and address book from any Internet-capable web browsing application since the user's individual data is stored on a host server maintained by the web portal provider.

Hence, each individual is presented with a multitude of different device types and options for maintaining a "personal information space"—a data store of information customized by, and on behalf of the user which contains both public data the user puts into their personal space, private events in the space, and other data objects such as text files or data files which belong to the user.

Once information in one part of one's personal information space is defined, users are presented with the daunting task of keeping information between the different devices in the space synchronized. For example, if an individual keeps certain data files as well as a calendar of information on a personal computer in his or her office using a particular personal information manager application, the individual would generally like to have the same information available on other devices, including, for example, a cellular phone, notebook computer, hand-held organizer, and home personal computer. Generally, the individual wants to ensure that the information stored on these devices is the most current version of the data as well.

Conventionally, synchronization of documents and personal information between different devices typically occurs through direct connection between the devices.

Patent application Ser. Nos. 09/490,550 now U.S. Pat No. 6,694,336; Ser. No. 09/491,675 now copending; and Ser. No. 09/491,694, now U.S. Pat. No. 6,671,757 disclose a novel method and system for synchronization of personal information including that which is conventionally found in desktop applications, personal digital assistants, palm computers, and website calendar and address services, as well as any content in the personal information space including file systems, contact information and/or calendaring information. In one aspect, the system disclosed in patent application Ser. Nos. 09/490,550 now U.S. Pat. No. 6,694,336; Ser. No. 09/491,675 now copending; and Ser. No. 09/491,694, now U.S. Pat. No. 6,671,757 comprises a series of device engines which can be utilized on or in conjunction with any personal information manager application or device, on servers, or both, which can connect via a communications network, such as the Internet, to transfer information in the form of differenced data between respective applications and respective devices. In essence, the system of patent application Ser. Nos. 09/490,550 now U.S. Pat. No. 6,694,336; Ser. No. 09/491,675 now copending; and Ser. No. 09/491,694, now U.S. Pat. No. 6,671,757 creates a personal information space or personal information store that is comprised of the set of transactions which defines the movement of information between one device, the

APL630DEF-WH0000013662

US 7,587,446 B1

**3**

intermediate storage server, and other devices, and which is unique to an individual user or identifier.

This personal information space is defined by the content which is specific to and controlled by an individual user, generally entered by or under the control of the individual user, and which includes "public" events and data—those generally known to others—and "private" events and data which are not intended to be shared with others. It should be recognized that each of the aforementioned criteria is not exclusive or required, but defines a characteristic of the term "personal information space" as that term is used herein.

A number of different system embodiments are disclosed in the aforementioned co-pending patent applications. However, the manner in which information is input to each of the devices which may be defined as part of the personal information space varies. Certain devices take direct input from other electronic devices such as scanners or electronic input such as vCARDs. In most cases, the information must be manually input via the user interface of one of the devices, e.g. typing contact information into a computer application.

The same is true for digital media: it is accessible from sources and a user may desire to transfer all or some portion of the media within a user's personal information space. Digital media comes in many forms. Two of the most common are Moving Picture Experts Group (MPEG 1, Audio Level 3 or "MP3") encoded format and Liquid Audio format. A number of means are available for accessing digital music, including direct conversion of one's personal music collection, music from public websites such as MP3.com and decentralized file sharing programs such as Napster. However once a digital media file is within an individual's personal information space, no effective mechanism exists to move the digital media file to other devices within the personal information space. Users would benefit from a mechanism allowing them to select individual files, or all or a portion of a directory of files, and move them to different devices in the personal information space effectively and efficiently. An effective means allowing users to move digital media files around the personal information space would be a great advantage in the continued development of personal information spaces and the Internet.

SUMMARY OF THE INVENTION

The invention, roughly described, comprises a method for acquiring and maintaining a digital music store in personal information space, comprising: maintaining a personal information space identified with a user including data capable of being used on a client device, and transferring at least a portion of the data from the personal information space to an Internet-coupled device in response to a user request.

In a further embodiment, the invention comprises a method for managing information on a plurality of Internet coupled devices. In this aspect, the method comprises the steps of determining digital media content to be synchronized by reference to a user specified set of personal information devices including at least one of said plurality of Internet coupled devices; storing information in a personal information store coupled to the Internet and identified with a particular user; and providing said determined digital media content to said at least one of said plurality of Internet coupled devices in a differenced transaction.

In yet another aspect, a method of managing media information is described. In this aspect, the method comprises providing at least one information server including at least one private information store, the server being coupled to a network; and receiving change transactions from a digital

**4**

media access agent, the transactions indicating to add, delete or modify digital media in the private information store.

In another aspect, a system for transferring digital media between a plurality of network coupled devices is disclosed. The system comprises a personal information store containing digital media; a data transfer request initiator coupled to the personal information store; and a device engine operatively coupled to the data transfer request initiator and responsive to the initiator to transfer digital media between the store and one of said plurality of network coupled devices.

In yet another embodiment, the invention comprises a media server coupled to an open system communications network. The server includes an information store including a user defined set of digital media; code, responsive to a request from the user, to provide digital media comprising at least one member of the user defined set of digital media to the user via a user agent.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention will be described with respect to the particular embodiments thereof. Other objects, features, and advantages of the invention will become apparent with reference to the specification and drawings in which:

FIG. **1** is a block level diagram of one embodiment of the present invention.

FIG. **2** is a block diagram of one example of user interaction with the system and method of the present invention.

FIG. **3** is a diagram illustrating one manner by which digital music data enters the system of the present invention and is placed into personal information space.

FIG. **4** is a block diagram illustrating the different types of devices and device engines incorporated into the system of the present invention.

FIG. **5** is a block diagram of one example of a device engine in accordance with the present invention.

DETAILED DESCRIPTION

In one aspect, the invention defined herein comprises a unique system and method for transferring digital media content, which is readily available in any number of sources, into a user's personal private information space. In a further aspect, the system provides a mechanism for moving data between different network-coupled devices within the personal information space.

In this case, the network to which devices are coupled may comprise the Internet, and the devices may take any number of different forms, including personal computers, notebook computers, palm-top computers, hand-held computers, so-called "smart" devices, such as Internet-coupled stereos, automotive personal computers, web appliances, and the like, and/or any device which is capable of receiving and processing digital media via a network connection. As used herein, the term "network" includes any network, including a LAN, WAN or open source global network, public or private, or any combination thereof which access to a personal information space coupled to the network, and the devices coupled to the network, are included in such reference. It should be further understood that all of the disclosed method may be performed by a distributed system. Such a distributed system may be based on a local area network (LAN) operating within a single office location, a wide area network (WAN) encompassing several office locations, or an open systems network such as the Internet. It should be further understood that devices used

APL630DEF-WH0000013663

US 7,587,446 B1

5

in accordance with the present invention may couple directly or indirectly to the global data network, and the network may comprise a private network.

The personal information space, as used herein, is defined as an individual's user-defined set of information which is uniquely identified with that individual, and which is capable of being stored on one or more systems or devices having any mechanism for storing that information. Optimally, the systems are network-coupled devices which can communicate with each other directly or indirectly.

The system of the present invention provides the ability for the user to insert data, such as digital media content, into a user's personal information space, and move the data around the personal information space to the devices which are included in and store information in the information space in an efficient and automated manner. Such data can include text information as well as binary information. For example, an MP3 file may contain text information identifying the artist and title of the work, as well as other information such as an album title or recording rate information. The MP3 will also contain binary information which is interpreted by an application to produce an output of the recorded work. In the system of the present invention, changes to either the text information or the binary information are transferred or synced, as the case may be, in a series of differencing transactions as described below.

The "personal information space" can be housed physically on an intermediate server, or it can be stored on any one or more devices which communicate with other devices. One exemplary characteristic of the personal information space is the ability to share information in the space with any of the users' personal information devices or applications, and is therefore not limited to any one type of device in direct communication with any other type of device. One example of a personal information space is the transactional based extraction, transfer, broadcast, storage and synchronization systems for forth in patent application Ser. Nos. 09/490,550 now U.S. Pat. No. 6,694,336, Ser. No. 09/491,675 now copending, and 09/491,694, now U.S. Pat. No. 6,671,757, each of which is hereby specifically incorporated by reference.

FIG. 1 shows a block diagram of a general process by which data enters a user's personal information space. At step 10, a user determines which media data (public or private) the user desires to be inserted into the user's private information space. The step of determining 10 can include any number of different data selection operations. In one aspect, it can comprise selecting a file from a file system using a standard file system interface such as a command line interface, a web browser, Microsoft Explorer, FTP, a voice command, or a specifically-designed application interface. In a further aspect, the step of determining may comprise searching using a web-based search engine to ascertain publicly available media, or secure media provided by a site the user is authorized to access, and which the user wishes to transfer into the user's personal information space. Alternatively, the user may select to include all, or one or more aspects of, a user's personal media data. In a further embodiment, selection of the data to be synchronized can be automatic. For example, a user may associate an event such as a media release with an automatic synchronization request which will automatically add to or update the user's personal information space when the event occurs. Optionally, a verification step 11 may prompt the user to confirm the data selection is correct.

A user identification step ensures that the information selected in step 10 will in fact be provided to the correct personal information space for the user selecting the data.

6

Such identification can take place in the form of a separate login, or may use any unique identifier, such as a cookie inserted into a web browser on an individual's computer, to identify the user and the user's personal information space to which data selected at step 10 will be provided. Optionally, step 12 may be further used to allow the user to determine whether the data which has been selected in step 10 is in fact the correct data which the user wishes to be inserted into the private information space. The identifying step may comprise a pop-up window setting forth a user name and password login, can provide the user at least one opportunity to identify themselves, as well as ensure that erroneous information is not provided to his or her personal information space by incorporating the verification step 11 into the login prompt. If the data is not correct, the method returns to step 10. If the data is correct, the user may indicate his acceptance of such data by performing a user-perceptible action, such as clicking on a virtual button in the web browser or other application, depressing a hardware switch, providing a voice command, or any other indicative action signifying virtual correctness of the data. If the user's ID is not ascertained, then the user may be provided the option of establishing a personal information space at step 15. At step 14, if the user's ID is verified, the data is inserted into the private information space. Once inserted into the private information space, the data can be synchronized to any number of different devices as described in patent application Ser. No. 09/490,550 now U.S. Pat No. 6,694,336; Ser. No. 09/491,675 now copending; and Ser. No. 09/491,694 now U.S. Pat No. 6,671,757.

FIG. 2 shows one manner in which media information may be inserted into private information space. The method shown in FIG. 2 is shown from an individual user's perspective of how the steps in the method occur.

As noted above, personal or public media information from, for example, a file system stored on a server or private data store may be utilized in accordance with the system of the present invention. In the example shown in FIG. 2, an explorer window view 10' of a particular file system and a directory selection application, allowing access to particular file system folders via a window view 10" are shown as two alternative methods of selecting media data. In window 10', a user may select one or more of the files listed in the file system window and press a sync button 65 which may be provided on the menu bar of the window. Pressing sync button 65 in conjunction with selecting data in the window initiates a sync request which then allows data to be moved into the personal information space in accordance with steps 24-27 and 14. Window 10" shows a mechanism for selecting one or more folders by depressing the "okay" button 66 in selection window 10'", thereby designating that all files in the file system folder are to be synchronized into the personal information space. Alternate forms of selection of media data, such as, for example, those enunciated above or simply interacting with a web page enabling a sync request by clicking on a button 65 in a web page are contemplated. It should be further recognized that the synchronization may be two-way or one-way: that is, files from the space may be moved to the individual folders shown in FIG. 10'" or into the file system shown in FIG. 10' from file system shown in FIG. 10' and 10'". Alternatively, the system may be utilized to ensure that media entering or changed in one or more of the file systems have changes reflected in selected devices which are part of the information space, as described below.

After data is selected at step 10, a sync request at step 22 is placed by the user. It should be recognized that other alternatives for initiating the sync request may be utilized in accordance with the present invention. The button may be physical

APL630DEF-WH0000013664

US 7,587,446 B1

7

or virtual, and may comprise menu selection, a virtual button, a combination of keystrokes, or any other user-initiated user-interface event.

Following the sync request at step **22**, a determination of whether the user is known to the personal information space **14** must be made. At step **24**, a yes answer may comprise the affirmative identification of the user's identity from a cookie placed on the user's web browser on the user's personal computer. Other forms of identification may alternatively be used, such as remembering the user's identity from the previous login entry, or other forms of unique identification.

If the user's identity is not known, and the user is not a new user, at step **26** the user is provided with an opportunity to enter the username and password. It should be recognized that the username and password in this instance may provide a system login entry, however all that is required is the provision of a unique identifier to the personal information space to which the digital media is to be synchronized. It should be further recognized that the temporal relationship between the login process at step **26** and the determination of a new user at step **25** need not occur in any particular order. Graphics **45** shows how a username and password might be entered into the step **26**. As shown therein, a dialog box **47** may be provided adjacent to the explorer window so that such information might be added. Alternatively, a separate window may be provided with fields **45**a, **45**b and sync button **45**c to enable the digital media information to be entered into the personal information space. The user may thus provide the unique identifier user name and password to the system of the present invention in order to identify the personal information space to which data is to be inserted at step **14**.

If the user is a new user, at step **25**, a registration interface **27** may be provided so that the user may identify a new unique personal information space for that particular user. Registration may include providing information as shown in window **60** to identify the user's personal information space. It should be recognized that the information shown in window **60** is exemplary and, at a minimum, all that is required is a unique user name to be associated with the personal information space.

Once the user information space is identified, the data can be inserted into the user's unique personal information space at step **14**.

FIG. **3** illustrates one manner by which data may enter the personal information space of a particular user. FIG. **3**, in one instance, represents an extension of the method shown in FIG. **2** wherein a user selects media data from a public (or private) source. It should be understood that information may be added to the private information space by any number of means, and the method shown in FIG. **3** is only one exemplary method for doing so.

In FIG. **3**, a user **550** interacts with, for example, a browser application **100**, such as a World Wide Web browser, which allows the user access to an information store. The store may be any public or private storage server coupled to a network, such as, for example, the Internet. While the present invention will be described with respect to its implementation in an Internet environment wherein the interface is a client browser **100**, it should be recognized that the user may act with other types of systems to access content, including a private file system via a command line or graphical interface, a telephone having access to media information via a wireless network connection (such as a cellular phone equipped with a Wireless Application Protocol (WAP) browser), a personal computer, network-connected content managers, or any other hardware or software applications which may provide data to the personal information space.

8

In the example of FIG. **3**, user **550** connects to server **110** which may be affiliated with an administrator of the private information space in order to more readily implement the functionality described herein. Alternatively, server **110** may be any publicly accessible server.

Generally, media information may be provided on any network-coupled storage device or server. In the affiliate server **110** shown in FIG. **3**, code, such as HTTP protocol code, is provided which allows the implementation of the transference of public data from the affiliate server to the user's private information space.

In one case, the affiliate server **110** may comprise an Internet World Wide Web server such as that as may be provided by a web portal service, such as Yahoo!™, Excite^{SM}Lycos®, MSNBC, or MP3.com, which provide an interface to public media content. Affiliate server **110** may also comprise a specialized web server such as a music, video or other media file service provider, a performance group's web server, an online retailer's web server, a shared network server running a media-sharing application such as Napster or Gnutella, or any number of different types of Internet-based sources providing media content which a user will desire to synchronize with the user's personal information space. The affiliate server could also be a simple file server which provides access to data files and enables synchronization to the personal information space by implementing HTTP code in accordance with the following description using a secondary link or re-direct.

Affiliate server **110** may include, for each piece of content which the affiliate server system administrator deems appropriate for such synchronization, code enabling the display of a synchronization implementation interface, such as button **65** on a file system display **10'**, shown in FIG. **2**. In this example, when a piece of data is provided by the affiliate server which a user wishes to synchronize to the private information space, the user marks the data by, for example, highlighting it, and then "clicks" button **65** to initiate the synchronization process. Following clicking on button **65**, a sync pop-up window **120** will be provided by a sync service server **130**.

Sync server **130** is maintained by a sync service administrator who may control portions of the system of the invention denoted as being within dashed line **250**. A servlet provided on the sync server **130** records selection of the media information to be transmitted to the personal information space and displays the data/login window. Each servlet requires that an affiliate ID (AID) be provided along with the actual media information, which can then be transferred to the user's specific personal information space upon provision of the identifier for the personal information space.

If the user is known, sync server **130** can provide the information set forth above directly to a server device engine **140** which can then transfer the information to the personal information space stored in a database **200** as described in the patent application Ser. Nos. 09/490,550 now U.S. Pat. No. 6,694,336; Ser. No. 09/491,675 now copending; and Ser. No. 09/491,694, now U.S. Pat No. 6,671,757. The interaction of the storage server **200** with the device engine **140** is described in further detail below.

If a user is not known, a new user registration routine is initiated at step **135**, and a new account pop-up window **145** is generated. Communication between the synchronization pop-up window **120** and the new account pop-up window **145** may occur by secure socket layer (SSL) communication. The new account pop-up window will be provided by a web server **150** which may comprise a user interface specifically tailored to the individual user's personal information space. Through web server **150**, the user is allowed to customize the types of

APL630DEF-WH0000013665

US 7,587,446 B1

9

devices and the types of information which are provided to those devices in the personal information space **200**. Communication between the sync service server **130** and the server device engine **140** can occur behind the firewall provided by the sync service provider and hence there is no need for secure communication between the engine and the sync service server.

One example of media information which may be provided into personal information space is to utilize the aforementioned system on a public information server which allows transference of data files, such as executables, documents, or digital music files (MP3's) from the public information space to the personal information space. As shown in FIG. **4**, data from storage server **200** is then considered part of the personal information space and may be thereafter synchronized to any one or all of the devices coupled within the user's space, including personal computers, PDA's, automotive PC's, and the like.

FIG. **4** shows an exemplary embodiment of the system of the present invention including a mechanism for synchronizing personal information space provided in a storage server **200** with a generic Internet appliance **400** shown in FIG. **4**. Also shown are specific examples of Internet appliances which may be coupled to the storage server **200**. Generic user device **400** may be a personal computer which includes a microprocessor **410**, data included in volatile or non-volatile memory **415**, and a network interface **420**. Network interface **420** may comprise either a direct connection via a wireline or wireless coupling to the Internet **250** or an interface to another device which can connect to the storage server **200** either directly or via a local area network, a wide area network or open source global network. The device **400** requires only enough processing power and memory to decode the data stream provided from server **200**.

In one embodiment, the network coupled device may be an Internet-coupled stereo **300** having a microprocessor **315**, volatile and/or non-volatile memory **320**, and a network interface **325**.

Shown in conjunction with storage server **200** are server device engines **202** and **204**. Server device engines **202**, **204** are used primarily where the network coupled device does not include enough memory or power to efficiently run the device engine on the device itself. Each device engine includes components acting in conjunction with applications, file structures, and devices to extract media data to be synchronized and construct one or more transactions comprising difference data to be exchanged with other devices and device engines in the personal information space in order to move data between devices and the storage server **200**.

In accordance with the present invention, digital media files of varying formats, and other data, may be synchronized or transferred (uni-directionally) to any network coupled appliance **400** utilizing the system of the present invention. Alternatively, no storage need occur on the network device, but digital media may be broadcast by device engines **202**, **204** to device **300** which decodes the broadcast stream on the fly (or with buffering of the stream) to provide digital media content to an output of the device. Any number and type of devices, either capable of supporting a device engine **308** on the device, or coupled to a server device engine **202** on the storage server **200**, may be used in accordance with the present invention.

The specific structure and operation of the server and client based device engines are described generally with respect to FIG. **5** and are disclosed in further detail in patent application

10

Ser. Nos. 09/490,550 now U.S. Pat No. 6,694,336; Ser. No. 09/491,675 now copending and 09/491,694, now U.S. Pat. No. 6,671,757.

In general, PCs such as those illustrated in FIG. **4** will likely have their own device engine, while hand-held PCs and automotive PCs also disclosed in FIG. **4** will not.

FIG. **5** shows an example of a client device engine **324** utilized in accordance with the present invention for synchronizing media data.

In general, an individual device engine for each device which is a part of the private information space is provided, and is distributed across the collection of devices comprising the personal information space. Distribution of the device engines may occur via, for example, an installation package forwarded over the network from storage server **200** or another distribution point, or may be loaded by conventional means (a diskette, CD ROM, DVD installation disk) onto server **400**.

FIG. **5** illustrates a device engine wherein all processing occurs on the device and only difference information is transmitted to server **200**. The client device engine **324** shown in FIG. **5**, may be operable entirely within the construct **410** of Internet appliance **400**. Alternatively, portions of the device engine may be provided on the network appliance **400**, with other portions on the storage server. Alternatively, a server based device engine may be entirely located on storage server **200** as a stand-alone device engine which merely interacts with an application programming interface of network device **400**.

As shown in FIG. **5**, each device engine **324** includes an application object **510**. The application object is specific to each particular software application **810** running on the network-coupled device, and provides a standard interface between the device engine and the balance of the data transmission system of the invention, and the application **810**. Details of the application object will be described below. The application object is a pluggable architecture which supports a wide variety of vendor-unique applications and file structures. The job of the application object is to map data from the application into a temporary or "universal" data structure by connecting to the application via any number of standard interfaces to gain access to the applications data. The data structure of the application object puts the data in a generic or "universal data" format which may be used by the device engine components to generate data packages for provision to the storage server.

It should be specifically noted that the application object may interface directly unstructured binary data such as digital media files (using the aforementioned XDelta routine) or with structured application data such as contact and calendar information (resolving items at the field level of information in a given record). The differencing routine supports both uses of the delta module **550** in comparison generation.

Also provided is an application object store (AOS) **520** which includes a copy of the device's data at a point just after the previous data extraction and synchronization occurred. Application object store **520** is a mirrored interface which stores a snapshot of the previous state of the data from the application object **510** in the device engine. In the case of the device engine for network devices having minimal nonvolatile storage, the AOS may be provided on the server **200** to conserve space on the network device. The size of the AOS will depend on the data being collected by each device engine. The AOS is one component in particular which may be offloaded to a server to conserve space on the network device in one hybrid device/server device engine embodiment.

APL630DEF-WH0000013666

US 7,587,446 B1

11

The generic output of the application object is provided to a delta module **550**. Delta module **550** is a differencing engine which calculates differences in data between the output of the application object **510** and the copy of the data which is provided in an application object store (AOS) **520**. The actual differencing and patch routine can comprise a routine such as XDelta or YDelta. The delta module **550** will be referred to herein alternatively in certain portions of the description as "CStructuredDelta." In addition, the difference information is alternatively referred to herein as a "change log." Each change log (or set of difference information) is a self describing series of sync transactions. As described below, the change log may be encrypted and compressed before output to the network and server **200**.

Hence, during a sync or transfer, the Application Object will, using a mechanism discussed below, extract the data of each application in the device and convert it to a universal data format. The delta module will then generate a difference set by comparing the output of the Application Object and the AOS. This difference information is forwarded to the encryption and compression routines for output to the storage server **550** in the form of a data package.

Device engine **560** further includes a versioning module which applies a version number per object in the data package. As explained further below, each object in the data package is assigned a universally unique ID (UUID). Hence, unlike many prior synchronization systems, the system of the present invention does not sync data solely by comparing time stamps of two sets of data. Versioning module **515** allows each device engine to check the state of the last synchronization against data packs which have been provided to the storage server to determine which data packages to apply. This allows the device engine to sync itself independently of the number of times another device engine uploads changes to the storage server. In other words, a first device engine does not care how many times a second device engine uploads data packages to the server.

An events module **525** controls synchronization initialization events. Items such as when to sync, how to sync, trigger the delta module **550** to perform a synchronization operation.

A user interface **530** is provided to allow additional functional features to a system user of the particular device to which the device engine **560** is coupled. The user interface is coupled to a conflict resolution module **540**, a filtering module **545**, and a field mapping module **535**. Each of the modules provides the functionality both necessary for all synchronization programs, and which users have come to expect. In one aspect the user interface may be a unique application allowing the user to identify data to be transferred and presenting data manipulation options, or may be as simple as a sync button on a standard interface such as a file listing display window.

Where non-binary data is being transferred, filtering module **545** allows filtering for types of content based on, for example, a field level content search. The field mapping module **535** allows for the user to re-map certain interpretations of items which were provided in the document stream. It should be recognized that the field mapping module allows for changes in directing the output of the data package. The field mapping module **535** is not necessary to map particular data fields of, for example, contact information from one application, such as Microsoft Outlook, to a different application, such as Symantec's ACT, as is the traditional use of field mapping and synchronizing applications.

Delta module **550** is further coupled to a compression module **570** and an encryption module **560**. It should be recognized that the compression encryption modules need not be enabled. Any type of compression module **570**, such as the popular PK Zip or Winzip modules, or those available from HiFn Corporation may be utilized in accordance with the invention. Moreover, any type of encryption algorithms,

12

such as MD5, RCH 6, Two Fish, or Blowfish, or any other symmetric encryption algorithm, may be utilized. In one embodiment of the invention, encryption without compression is used. In a second embodiment of the invention, compression without encryption is used. In a third embodiment of the invention, neither compression or encryption is used, and in a fourth embodiment of the invention, both compression and encryption are used.

Versioning module **515** also allows the device engine **324** to support multiple users with distinct synchronization profiles. This allows multiple users accessing the same machine to each synchronize their own data set using the same device engine.

The output of the device engine **324** comprises a data package which is output to storage server **850**. As noted above, only one device engine need be connected to the storage server **850** at a given time. The data package can be stored on the storage server **850** until a request is made to a particular location of the storage server by another device engine. Likewise, delta engine **324** can query alternative locations on the storage server for access to synchronized data within the system of the present invention. In one embodiment, each sync operation requires that the device engine for each device login to a management component of the system server to authenticate the device and provide the device engine with the location of the individual device's data packages on the storage server.

Data packages may be advantageously provided to the device engine from the storage server in a streaming format, allowing processing to occur using a minimum of bandwidth and storage in the devices. This is particularly advantageous in applications involving large files, such as digital media files.

The device engine **534** and particularly the delta module **550** interpret data packages based on the versioning information and the mirrored data present in the application object store **520**. When data is returned to the delta module **550** from the storage server **300**, the delta module returns differenced data to the application object **510** for the particular application which then translates the delta information into the particular interface utilized for application **510**. Once a device engine has been fully applied all data packages from an input stream, it generates a series of data packages that describe the changes made on the local system. The device engine uses the local application object store **520** to keep track of the last synchronized version of each application's actual data, which is then used for the next data comparison by the delta module on the next sync request. Generated data packages can include operations and encode changes generated from resolving ambiguous cases as described above.

Each Application Object (AO) is a software component that interfaces with the third party application APIs (Application Programming Interface) to provide the programming services to the delta module for extraction and deposition of information data from and to the third party application domain during synchronization. In addition, the AO maps the third party application data fields in non-binary information to the system's domain. With binary files, the AO allows changes to be applied to binary files within the file structure of the target client. (For example, MP3 files can be uploaded from a Microsoft Windows machine to the storage server, then downloaded to a Linux file structure).

In the Microsoft Windows device engine, the AO service is a collection of COM (Component Object Model) objects that can be developed in conjunction with, for example, third party Windows application APIs as a form of a DLL (Dynamic Linked Library) in C or C++. The DLL may be loaded on demand at runtime during synchronization. It should be recognized that the application object need not be imple-

US 7,587,446 B1

13

mented using the COM model, but may be developed with other distributed object models.

Each AO has a COM interface-based design built-in. That is, instead of providing a set of traditional APIs as programming services, it provides a set of interface-based objects as programming services.

The delta module **550** instantiates these COM objects and uses them throughout the synchronization session exclusively through the COM interfaces on those objects to interface with the third party application database.

For calendar or PIM information, each AO component consists of a set of objects that translate the third party application data into the universal data middle format which underpins the entire spectrum of PIM data regardless of which third-party application the data comes from. The objects in universal data format are device, (application) data class, store, folder, item, and data fields. The AO digests the third party application data of any kind and reduces it into a few handful simple objects and field types. These objects and field types are fed into the delta module engine and are compared by the delta module in order of their hierarchy. The resulting differences (add, delete, modify) are logged as transactions in the difference information. The data packs are transported to a storage server that may be actively managed by a management server for each individual user account and devices.

The delta module **530** uses AO objects to access and modify the individual AO objects and data fields. AO objects serve as a buffer between individual application data and the delta module so that the delta module does not require knowledge of each application and database. All AO objects are temporary and created in the space of each AO by the delta module through COM interfaces. AO objects are referenced when they are in use and they are freed when the delta module stops using them. One can think of AO objects as merely placeholders of each application objects for the delta module to access. Once the delta module has a particular Application's data, the delta module frees AO objects immediately without storing them down.

Hence, a user can, via the Internet, select music files for transference to the user's personal information space and output such files on any device which is coupled to a network.

The many features and advantages of the present invention will be apparent to one of average skill in the art. All such features and advantages are intended to be within the scope of the invention as defined by the above specification and the following claims.

What is claimed is:

**1**. A method of transferring media data to a network coupled apparatus, comprising:

(a) maintaining a personal information space identified with a user including media data comprising a directory of digital media files, the personal information space being coupled to a server and a network;

(b) generating a first version of the media data in the personal information space;

(c) generating a digital media file, in response to an input from the user, comprising a second version of the media data in a same format as the first version in the personal information space, the second version including an update not included in the first version;

(d) obtaining difference information comprising differences between the first version of the media data and the second version of the media data; and

(e) transferring a digital media file over the network containing the difference information from the personal information space to the network coupled apparatus in

14

response to a sync request made from a web browser at the network-coupled apparatus by the user.

**2**. The method of claim **1** further including the step, prior to step (a), of receiving information into the personal information space.

**3**. The method of claim **2** wherein the step of receiving comprises receiving data from a first network coupled apparatus, and said step (e) includes transferring said media data to a second network coupled apparatus.

**4**. The method of claim **1**, wherein the network coupled apparatus is an automotive computer.

**5**. The method of claim **4** further including the step, following step (a), of identifying the personal information space associated with the user by prompting a user login from said automotive computer and retrieving login information input by the user.

**6**. The method of claim **1** wherein the media data comprises a directory of digital media files.

**7**. The method of claim **1** wherein said step (a) comprises providing a storage server having a network connection, and code on the storage server interacting with the personal information space.

**8**. The method of claim **1** wherein the method further includes:

(f) providing code on a network-coupled apparatus which receives said difference information and stores the difference information on the network-coupled apparatus.

**9**. The method of claim **1** wherein said step of transferring comprises instantiating code on a network-coupled server storing said personal information space to output the difference information to the network-coupled apparatus.

**10**. The method of claim **1** wherein said step of transferring comprises instantiating code on the network-coupled apparatus to retrieve the difference information.

**11**. A system for transferring digital media between a plurality of network coupled devices, comprising:

a personal information store identified with a user containing digital media comprising a directory of digital media files readable by an application program; and a processing device, a server and a network coupled with the personal information store, the processing device including:

an application data store holding a version of the digital media in the personal information store, and a device engine to: a) generate a digital media file, in response to an input from the user, comprising a second version of the media data in a same format as the first version in the personal information store, the second version including an update not included in the first version; (b) obtain difference information comprising differences between the first version of the media data and the second version of the media data; and (c) transfer a digital media file over the network containing the difference information from the personal information space to the network coupled apparatus in response to a sync request made from a web browser at the network-coupled apparatus by the user.

**12**. The system of claim **11** wherein the personal information store is provided on a server.

**13**. The system of claim **12** wherein the server is coupled to the Internet.

**14**. The system of claim **11** wherein the device engine is provided on a server which includes at least a portion of the personal information store.

\*   \*   \*   \*   \*

# EXHIBIT C

US006671757B1

(12) **United States Patent**   (10) **Patent No.:**   **US 6,671,757 B1**
Multer et al.   (45) **Date of Patent:**   **Dec. 30, 2003**

(54) **DATA TRANSFER AND SYNCHRONIZATION SYSTEM**

(75) Inventors: **David L. Multer**, Santa Cruz, CA (US); **Robert E. Garner**, Lawrenceville, GA (US); **Leighton A. Ridgard**, Ellenwood, GA (US); **Liam J. Stannard**, Lawrenceville, GA (US); **Donald W. Cash**, Dunwoody, GA (US); **Richard M. Onyon**, San Jose, CA (US)

(73) Assignee: **fusionOne, Inc.**, San Jose, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/491,694**

(22) Filed: **Jan. 26, 2000**

(51) Int. Cl.$^7$ .............................................. **G06F 13/00**
(52) U.S. Cl. ...................... **710/100**; 710/200; 710/220; 710/1; 707/201; 707/203; 711/162
(58) Field of Search ........................... 710/100, 1, 220, 710/300; 707/8, 201, 203; 711/162

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,392,390 | A | 2/1995 | Crozier | 395/161 |
| 5,519,606 | A | 5/1996 | Frid-Nielsen et al. | 364/401 |
| 5,628,005 | A | * 5/1997 | Hurvig | 707/8 |
| 5,630,081 | A | 5/1997 | Rybicki et al. | 395/348 |
| 5,666,553 | A | 9/1997 | Crozier | 395/803 |
| 5,682,524 | A | 10/1997 | Freund et al. | 395/605 |
| 5,684,990 | A | 11/1997 | Boothby | 395/619 |
| 5,694,596 | A | 12/1997 | Campbell | |
| 5,701,423 | A | 12/1997 | Crozier | 395/335 |
| 5,710,922 | A | 1/1998 | Alley et al. | 395/617 |
| 5,727,202 | A | 3/1998 | Kucala | 395/610 |
| 5,729,743 | A | 3/1998 | Squibb | 395/619 |
| 5,742,792 | A | * 4/1998 | Yanai et al. | 710/1 |
| 5,745,906 | A | 4/1998 | Squibb | 707/203 |
| 5,768,597 | A | 6/1998 | Simm | |
| 5,771,354 | A | 6/1998 | Crawford | |
| 5,778,346 | A | 7/1998 | Frid-Nielsen et al. | 705/9 |
| 5,787,247 | A | 7/1998 | Norin et al. | |
| 5,787,262 | A | 7/1998 | Shakib et al. | |
| 5,809,497 | A | 9/1998 | Freund et al. | |
| 5,812,773 | A | 9/1998 | Norin | |
| 5,812,793 | A | 9/1998 | Shakib et al. | |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 986 225 A1 | 3/2000 |
| WO | WO 99/05813 | 2/1999 |
| WO | WO 99/06900 | 2/1999 |
| WO | WO 99/36870 | 7/1999 |
| WO | WO 99/45451 | 9/1999 |
| WO | WO 99/45484 | 9/1999 |
| WO | WO 99/50761 | 10/1999 |
| WO | WO 00/11832 | 3/2000 |
| WO | WO 01/71539 | 9/2001 |

OTHER PUBLICATIONS

Starfish, "TrueSync Data Synchronization", Software, http://www.starfishsoftware.com/solutions/data/data.html.*

*Primary Examiner*—Gopal C. Ray
*Assistant Examiner*—Justin I. King
(74) *Attorney, Agent, or Firm*—Vierra Magen Marcus Harmon & DeNiro LLP

(57) **ABSTRACT**

A system and method for synchronizing devices which can couple to the Internet, or any network. The system includes a first sync engine on the first system interfacing with data on the first system to provide difference information. A data store is coupled to the network and in communication with the first and second systems. A second sync engine is provided on the second system coupled to receive the difference information from the data store via the network, and interface with data on the second system to update said data on the second system with said difference information. Difference information is transmitted to the data store by the first sync engine and received from the data store from the second sync engine.

**29 Claims, 13 Drawing Sheets**



US 6,671,757 B1

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,832,489 A | 11/1998 | Kucala | 707/10 |
| 5,884,323 A | 3/1999 | Hawkins et al. | 707/201 |
| 5,884,325 A | 3/1999 | Bauer et al. | |
| 5,893,119 A | 4/1999 | Squibb | 707/203 |
| 5,897,640 A | 4/1999 | Veghte et al. | |
| 5,897,642 A * | 4/1999 | Capossela et al. | 707/203 |
| 5,937,405 A | 8/1999 | Campbell | |
| 5,943,676 A | 8/1999 | Boothby | 707/201 |
| 5,961,590 A | 10/1999 | Mendez et al. | |
| 5,968,131 A | 10/1999 | Mendez et al. | 709/246 |
| 5,974,238 A | 10/1999 | Chase, Jr. | |
| 6,000,000 A | 12/1999 | Hawkins et al. | |
| 6,006,274 A | 12/1999 | Hawkins et al. | |
| 6,012,063 A | 1/2000 | Bodnar | |
| 6,016,478 A | 1/2000 | Zhang et al. | |
| 6,023,708 A | 2/2000 | Mendez et al. | 707/203 |
| 6,023,723 A * | 2/2000 | McCormick et al. | 707/1 |
| 6,044,381 A * | 3/2000 | Boothby et al. | 707/201 |
| 6,052,735 A | 4/2000 | Ulrich et al. | |
| 6,061,790 A | 5/2000 | Bodnar | |
| 6,131,096 A | 10/2000 | Ng et al. | |
| 6,131,116 A | 10/2000 | Riggins et al. | |

| | | | |
|---|---|---|---|
| 6,141,011 A | 10/2000 | Bodnar et al. | |
| 6,141,664 A | 10/2000 | Boothby | |
| 6,151,606 A | 11/2000 | Mendez | |
| 6,182,117 B1 | 1/2001 | Christie et al. | |
| 6,202,085 B1 | 3/2001 | Benson et al. | |
| 6,205,448 B1 | 3/2001 | Kruglikov et al. | |
| 6,212,529 B1 | 4/2001 | Boothby et al. | |
| 6,216,131 B1 | 4/2001 | Liu et al. | |
| 6,219,694 B1 | 4/2001 | Lazaridis et al. | |
| 6,223,187 B1 | 4/2001 | Boothby et al. | |
| 6,226,650 B1 | 5/2001 | Mahajan et al. | |
| 6,247,135 B1 | 6/2001 | Feague | |
| 6,275,831 B1 | 8/2001 | Bodnar et al. | |
| 6,295,541 B1 * | 9/2001 | Bodnar et al. | 707/203 |
| 6,304,881 B1 | 10/2001 | Halim et al. | |
| 6,324,544 B1 * | 11/2001 | Alam et al. | 707/201 |
| 6,330,568 B1 | 12/2001 | Boothby et al. | |
| 6,401,104 B1 * | 6/2002 | LaRue et al. | 707/203 |
| 6,405,218 B1 | 6/2002 | Boothby | |
| 6,449,622 B1 * | 9/2002 | LaRue et al. | 707/201 |
| 6,487,560 B1 * | 11/2002 | LaRue et al. | 707/203 |

* cited by examiner





APL630DEF-WH-A0000039559



Figure 6



Figure 7

APL630DEF-WH-A0000039560



Figure 8

APL630DEF-WH-A0000039561



Figure 9A
Desktop
Device Engine

APL630DEF-WH-A0000039562

Figure 9B





Device Engine/Windows

Figure 10

APL630DEF-WH-A0000039564

Figure 11



Figure 12
Object Hierarchy



APL630DEF-WH-A0000039566

Figure 13

**Note Item 1310**

Note Object
Categories
Color
Created
Do Not AutoArchive
Icon
In Folder
Message Class
Modified
Outlook Internal Version
Outlook Version
Read
Size
Subject

**Email Item 1320**

Account
Attachment
Bcc
Billing Information
Categories
Cc
Changed By
Conversation
Created
Defer Until
Do Not AutoArchive
Download State
Due By
Expires
Flag Status
Follow Up Flag
From
Have Replies Sent To
Icon
Importance
In Folder
Junk E mail Type
Message Class
Mileage
Modified
Outlook Internal Version
Outlook Version
Read
Received
Remote Status
Retrieval Time
Sensitivity
Sent
Size
Subject
To
Tracking Status

**Task Item 1330**

% Complete
Actual Work
Assigned
Attachment
Billing Information
Categories
Company
Complete
Contacts
Conversation
Created
Date Completed
Do Not AutoArchive
Due Date
Icon
In Folder
Message Class
Mileage
Modified
Outlook Internal Version
Outlook Version
Owner
Priority
Read
Recurring
Reminder
Reminder Override Default
Reminder Sound
Reminder Sound File
Reminder Time
Request Status
Requested By
Role
Schedule+ Priority
Sensitivity
Size
Start Date
Status
Subject
Team Task
To
Total Work

**Calendar Item 1340**

All Day Event
Attachment
Billing Information
Categories
Conversation
Created
Do Not AutoArchive
Duration
Enc
Icon
Importance
In Folder
Location
Meeting Status
Message Class
Mileage
Modified
Optional Attendees
Organizer
Outlook Internal Version
Outlook Version
Read
Recurrence
Recurrence Pattern
Recurrence Range End
Recurrence Range Start
Recurring
Reminder
Reminder Beforehand
Reminder Override Default
Reminder Sound
Reminder Sound File
Required Attendees
Resources
Response Requested
Sensitivity
Show Time As
Size
Start
Subject

**Bookmark Item 1350**

Name
URL
Created
Modified
Icon
In Folder
Version
Size

**Channel Item 1370**

Name
URL
Created
Modified
Icon
In Folder
Version
Size

**File Item 1360**

Name
Type
Version
Size
Created
Modified
Accessed
Permissions
Parent
ID
Attributes
Icon
Shortcut key
Start in
Run type
Sharing

**Folder Item 1380**

Name
Type
Version
Size
Created
Modified
Accessed
Permissions
Parent
ID
Attributes
Icon
Sharing

**Contact Item 1390**

Account
Address Selected
Address Selector
Anniversary
Assistant's Name
Assistant's Phone
Attachment
Billing Information
Birthday
Business Address
Business Address City
Business Address Country
Business Address PO Box
Business Address Postal Code
Business Address State
Business Address Street
Business Fax
Business Home Page
Business Phone
Business Phone 2
Callback
Car Phone
Categories
Children
City
Company
Company Main Phone
Computer Network Name
Country
Creation
Customer ID
Department
E-mail
E-mail 2
E-mail 3
E-mail Selected
E mail Selector
File As
First Name
Flag Status
Follow Up Flag
FTP Site
Full Name
Gender
Government ID Number
Hobbies
Home Address
Home Address City
Home Address Country
Home Address PO Box
Home Address Postal Code
Home Address State
Home Address Street
Home Fax
Home Phone
Home Phone 2
ICQ
In Folder
Initials
Internet Free/Busy Address
ISDN
Job Title
Journal
Language
Last Name
Location
Mailing Address
Mailing Address Indicator
Manager's Name
Message Class
Middle Name
Mileage
Mobile Phone
Modified
Nickname
Office Location
Organizational ID Number
Other Address
Other Address City
Other Address Country
Other Address PO Box
Other Address Postal Code
Other Address State
Other Address Street
Other Fax
Other Phone
Outlook Internal Version
Outlook Version
Pager
Personal Home Page
Phone 1 Selected
Phone 1 Selector
Phone 2 Selected
Phone 2 Selector
Phone 3 Selected
Phone 3 Selector
Phone 4 Selected
Phone 4 Selector
Phone 5 Selected
Phone 5 Selector
Phone 6 Selected
Phone 6 Selector
Phone 7 Selected
Phone 7 Selector
Phone 8 Selected
Phone 8 Selector
PO Box
Primary Phone
Private
Profession
Radio Phone
Read
Referred By
Reminder
Reminder Time
Reminder Topic
Send Plain Text Only
Sensitivity
Size
Spouse
State
Street Address
Subject
Suffix
Telex
Title
TTY/TDD Phone
User Field 1
User Field 2
User Field 3
User Field 4
Web Page
ZIP/Postal Code

APL630DEF-WH-A0000039567

Case 5:12-cv-00630-LHK   Document 855-12   Filed 11/01/13   Page 68 of 69

Figure 14



APL630DEF-WH-A0000039568

Figure 15
Pull Synchronization

