QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
Kevin A. Smith (Bar No. 250814)
kevinsmith@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

William C. Price (Bar No. 108542)
williamprice@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | CASE NO. 12-CV-00630-LHK (PSG)<br><br>**SAMSUNG'S OPPOSITION TO APPLE INC.'S MOTION TO EXCLUDE CERTAIN UNRELIABLE AND IMPERMISSIBLE SAMSUNG EXPERT TESTIMONY**<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**<br><br>Date:  January 23, 2014<br>Time:  1:30 p.m.<br>Place: Courtroom 8, 4th Floor<br>Judge: Honorable Lucy H. Koh |

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES .................................................... 1

I.  Dr. Chevalier Properly Took Licenses Into Account; Apple's Criticisms Go to
    Weight Not Admissibility ................................................................................ 1

    A.  Apple Improperly Seeks To Exclude Market Evidence of Patent Values ............... 1

    B.  Dr. Chevalier Appropriately Reviewed the Universe of Produced Licenses
        and Considered Different Groups of Licenses for Different Purposes ................... 2

    C.  Apple's Expert, Case Law and Other Authorities Confirm that Dr.
        Chevalier's Analysis Is Proper ................................................................. 6

    D.  Apple's Argument Would Eviscerate the *Georgia-Pacific* Standard ..................... 7

    E.  The Case Law Apple Cites Is Inapposite ................................................... 8

    ■  ███████████████████████████████████ ..................... 9

    G.  Dr. Chevalier Properly Accounted for Apple's Offer to License Smartphone
        █████████ to Samsung ................................................................. 10

II.  There is No Basis to Exclude Dr. Kearl's Damages Opinions Regarding The '239,
     '757 and '449 Patents. ................................................................................. 12

III.  Dr. Kearl's Valuations of the '596 and '087 Patents Are Likewise Reliable ................... 16

IV.  Dr. Schonfeld Should Not Be Precluded from Offering Testimony on the '757 and
     '239 Patents ................................................................................................. 17

    A.  Apple Should Not Be Permitted to Circumvent the Instruction of the Court
        by Turning *Daubert* Motions into Additional Claim Construction
        Proceedings ...................................................................................... 17

    B.  Apple Improperly Seeks Construction of The Terms "At Least One Zone
        Specific Storage and Interface Device" and "Updated in Relation To" From
        The '757 Patent ................................................................................. 18

    C.  Apple Improperly Seeks Further Construction Of "Zone Specific Storage
        and Interface Device," And Improperly Seeks A Finding of Non-
        Infringement of the '757 Patent ............................................................. 19

    D.  Apple Improperly Seeks Further Construction of "Means For Capturing,
        Digitizing, and Compressing At Least One Composite Signal" From The
        '239 Patent ....................................................................................... 19

    E.  Apple Improperly Seeks Construction Of Numerous Means Plus Function
        Terms From the '239 Patent .................................................................. 20

V.     There Is No Basis To Exclude Dr. Rinard's Demonstrative Exhibits Under
       *Daubert*....................................................................................................................... 21

VI.    The Court Should Not Exclude Testimony About Apple's Prior Positions........................ 24

SAMSUNG'S OPPOSITION TO APPLE'S MOTION TO EXCLUDE EXPERT TESTIMONY

# TABLE OF AUTHORITIES

**Page**

## Cases

*ActiveVideo Networks, Inc. v. Verizon Commc'ns., Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012) ...........................................................................................4, 7

*Bazemore v. Friday*,
  478 U.S. 385 (1986) ...............................................................................................................16

*Broadcom Corp., v. Emulex Corp.*,
  2011 WL 11025895 (C.D. Cal. Dec. 13, 2011) .....................................................................7, 8

*Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*,
  2012 WL 5451567 (W.D. Pa. Nov. 7, 2012) ...........................................................................10

*Dataquill Ltd. v. High Tech Comp. Corp.*,
  887 F. Supp. 2d 999 (S.D. Cal. 2001) ......................................................................................9

*Eolas Technologies Inc. v. Microsoft Corp.*,
  399 F.3d 1325 (Fed. Cir. 2005) ...............................................................................................22

*Ericsson Inc. v. D-Link Sys. Inc.*,
  2013 WL 4046225 (E.D. Tex. Aug. 6, 2013) ..........................................................................10

*Finjan, Inc. v. Secure Computing Corp.*,
  626 F.3d 1197 (Fed. Cir. 2010) ...............................................................................................22

*Finjan, Inc. v. Symantec Corp.*,
  10-C 2013 WL 5302560 (D. Del. Sept. 19, 2013) ..................................................................23

*Gen Probe Inc. v. Becton Dickinson & Co.*,
  2012 WL 9335913 (S.D. Cal. Nov. 26, 2012) ..........................................................................4

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
  318 F. Supp. 1116 (S.D.N.Y. 1970) ..................................................................3, 4, 5, 7, 10, 11

*Heartland Surgical Specialty Hosp. LLC v. Midwest Div. Inc.*,
  2007 WL 6215929 (D. Kan. Dec. 19, 2007) ...........................................................................11

*Hemmings v. Tidyman's Inc.*,
  285 F.3d 1174 (9th Cir. 2002) .................................................................................................16

*HTC Corp. v. Tech. Props., Ltd.*,
  2013 WL 4787509 (N.D. Cal. Sept. 6, 2013) .........................................................................10

*Internet Machs., LLC v. Alienware Corp.*,
  2013 WL 4056282 (E.D. Tex. June 19, 2013) ..........................................................................7

*Interwoven, Inc. v. Vertical Computer Sys.*,
  2013 WL 3786633 (N.D. Cal. July 18, 2013) ...........................................................................4

*Island Intellectual Prop. LLC v. Deutsche Bank  AG*,
  2012 WL 526722 (S.D.N.Y. Feb. 14, 2012) ................................................................4

*LaserDynamics, Inc. v Quanta Computer Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) ...........................................................................3, 8, 9, 10

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 2d 966 (C.D. Cal. 2012) .......................................................................16

*Lucent Techs., Inc. v. Gateway Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) .............................................................................7, 9

*Multimedia Patent Trust v. Apple Inc.*,
  2012 WL 5873711 (S.D. Cal. Nov. 20, 2012) .........................................................5, 7

*Phillip M. Adams & Assocs. v. Winbond Elecs. Corp.*,
  2010 WL 3743677 (D. Utah Sept. 20, 2010) ..............................................................5

*Putnam v. Henkel Consumer Adhesives, Inc.*,
  2007 WL 4794115 (N.D. Ga. Oct. 29, 2007) ............................................................11

*Quimby v. U.S.*,
  107 Fed. Cl. 126 (Fed. Cl. 2012) ...............................................................................15

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010) .....................................................................16

*ResQNet.com, Inc. v. Lansa, Inc.* (Fed. Cir. 2010)
  594 F.3d at 869 ........................................................................................................8, 9

*Ricoh Co., Ltd. v. Quanta Computer, Inc.*,
  2010 WL 1233326 (W.D. Wis. Mar. 23, 2010) ...........................................................7

*SSL Servs., LLC v. Citrix Sys., Inc.*,
  2013 WL 1680075 (E.D. Tex. Apr. 17, 2013) .............................................................7

*TV Interactive Data Corp. v. Sony Corp.*,
  929 F. Supp. 2d 1006 (N.D. Cal. 2013) .......................................................................8

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
  2007 WL 704525 (N.D. Ill. Mar. 1, 2007) ...................................................................2

*Utah Medical Products, Inc. v. Graphic Controls Corp.*,
  350 F.3d 1376 (Fed. Cir. 2003) ...................................................................................9

*Versata Software, Inc. v. Internet Brands, Inc.*,
  902 F. Supp. 2d 841 (E.D. Tex. 2012) ......................................................................23

*Versata Software, Inc. v. SAP Am., Inc.*,
  717 F.3d 1255 (Fed. Cir. 2013) ...........................................................................23, 24

*In re Zyprexa Products Liability Litigation*,
  2008 WL 2696916 (E.D.N.Y. July 02, 2008) ...........................................................15

**Statutes**

Fed. R. Evid. 702...................................................................................................25

Fed. R. Evid. 703.............................................................................................11, 12

**Miscellaneous**

7 *Chisum on Patents*, § 20.07[2][b] .......................................................................2

Eli Cohen, "Applying Best-Worst Scaling to Wine Marketing,
    *Int'l J. of Wine Bus. Res.,* 21:1 (2009) ...........................................................12

Tim Coltman, "Best-Worst Scaling Approach to Predict Customer Choice for 3PL Services,"
    *J. of Bus. Logistics*, 32(2) (2011) ..................................................................13

John Gaito, "Measurement Scales and Statistics:  Resurgence of an Old Misconception,"
    *Psychological Bulletin*, 87:3 (1980) ...............................................................14

Michael Garver, "A Maximum Difference Scaling Application for Customer Satisfaction
    Researchers," *Int'l J. of Market Res.* 51:4 (2009) ..........................................12

Steven Goodman, "Best-Worst Scaling: A Simple Method to Determine Drinks
    and Wine Style Preferences," *Int'l Wine Mktg. Symp.*(2005) .........................13

Jack Horne, "How Anchored Tradeoffs Reveal Customer Preferences,"
    *White Paper of Market Strgs. Int'l* (July 2012) ..............................................12

Fred N. Kerlinger, *Foundations of Behavioral Research* (1973)...............................15

M. Kolassa, "Pharmaceutical Pricing Principles," in  *Pharmaceutical Marketing*: *Principles,*
    *Environment,  and Practice* (2002)  ..............................................................16

Johan Lagerkvist, "Anchored vs. Relative Best-Worst Scaling,"
    *Food Quality and Preference* (2012) ..............................................................12

Jordan Louviere, "An Introduction to the Application of (Case 1) Best-Worst Scaling,"
    *Int'l J. of Res. in Marketing* 30 (2013) ..........................................................12

Paul McCullough, "Is Max/Diff Really All That,"
    *Marketing Research*, 22:3 (2010)...................................................................12

Bryan Orme, "Using Calibration Questions to Obtain Absolute Scaling in MaxDiff,"
    *Sawtooth Software European Conf.* (2009).......................................................12

Pyndick and Rubenfield,
    *Microeconomics* (2008).................................................................................16

Richard Razgaitis,
    *Valuation and Dealmaking of Technology-Based Intellectual Property* (2009).........................6

L.L. Thurstone, "A Law of Comparative Judgment," *Psychological Review* (1927)...................12

Wendy Umberger, "Using Best-Worst Scaling to Determine Market Channel Choice,"
   *Agricultural & Applied Econ. Assn. Meeting* (July 2010) ........................................................14

Paul Vellemen, "Nominal, Ordinal, Interval, and Ratio Typologies Are Misleading",
   *The American Statistician*, 47:1 (1993) ........................................................................14

Christopher Wolf, "Dairy Farmer Policy Preferences,"
   *J. Agric. & Resource Econs.* 38:2 (2013)........................................................................13

SAMSUNG'S OPPOSITION TO APPLE'S MOTION TO EXCLUDE EXPERT TESTIMONY

## MEMORANDUM OF POINTS AND AUTHORITIES

I.      **Dr. Chevalier Properly Took Licenses Into Account; Apple's Criticisms Go to Weight Not Admissibility**

  A.      **Apple Improperly Seeks To Exclude Market Evidence of Patent Values**

As set forth in Samsung's *Daubert* motion, Apple's damages analysis rejects all actual licensing transactions in favor of a misused and poorly-designed conjoint survey.  (Dkt. 806-3 at 1-14.)  The results of that survey, and the astronomical numbers it generates, could only appear plausible if one ignored the actual licenses that smartphone companies have entered into.  Apple's expert, Dr. Vellturo, considers <u>no</u> license agreement <u>ever</u> entered into by <u>anybody</u> to be relevant to reasonable royalty.  Apple seeks to exclude all licensing evidence because its damages case depends on creating a fantasy world in which every single smartphone license that has ever been entered into is disregarded.  Apple's desire to hide all such transactions from the jury tells the Court everything it needs to know about the soundness of its damages theory.

Consistent with this approach, this motion seeks to bar any consideration of all licenses by Samsung's economist, Dr. Judy Chevalier. ████████████████████████████████ ████████████████████████████████ (Vellturo Depo. at 10:25-11:12, Ex. OO to the Declaration of Michael Fazio, filed concurrently herewith ("Fazio Dec.")), Dr. Chevalier is a tenured professor at Yale Business School, who previously held teaching positions at the University of Chicago and Harvard.  (Chevalier Rpt. Ex. 1, Ex. A to Fazio Dec.)  For three years she chaired the Yale Committee on Cooperative Research, which oversees the office that licenses Yale's intellectual property.  (*Id.,* Fazio Dec. Ex. A; Chevalier Dep. Tr. at 20:11-21:1, Fazio Dec. Ex. B.)

As shown in Dr. Chevalier's Exhibit 97, her review of licenses yielded royalty numbers which are consistent with the four independent "Income Approaches" she also employed.  (Chevalier Rpt. Ex. 97, Fazio Dec. Ex. C.)  These "checks" confirmed that her selection of comparable licenses was appropriate and factually grounded.  The actual licensing agreements also show that Dr. Vellturo's conjoint survey-based damages numbers are completely fantastical.[1]  The jury should not be presented

---

[1]  Dr. Vellturo's royalty numbers are ████████████████████████████████████. The ████████ per smartphone royalty Dr. Vellturo asserts is reasonable (footnote continued)

1   with Dr. Vellturo's numbers at all, but if it is, Samsung must be permitted to show what really

2   happens in the marketplace.

### B. Dr. Chevalier Appropriately Reviewed the Universe of Produced Licenses and Considered Different Groups of Licenses for Different Purposes

4   Apple suggests that Dr. Chevalier's report relies on irrelevant licenses. An accurate review of

5   Dr. Chevalier's work, however, makes clear that she carefully examined the produced licenses and

6   that her calculations relied on only those that are usefully comparable.

7   As a starting point, Dr. Chevalier presents the ███ licenses produced. Material terms of these

8   licenses are summarized in Exhibits 69-73 of her report.[2]  Dr. Chevalier used this larger set of licenses

9   for one affirmative purpose – to establish industry practices regarding the form of licenses. All these

10  licenses were appropriately considered for this purpose. They reflect the preferences and licensing

11  practices of both Apple and Samsung. ████████████████████████████████████

12  ███ are the industry norm. (Dkt. 806-6, Ex. A-1 ¶¶ 298-99.) Industry licensing practices are relevant

13  in determining the likely form of royalty. *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 2007 WL 704525,

14  *2 (N.D. Ill. Mar. 1, 2007) ("While *Georgia-Pacific* does indicate that the patents to which we may

15  look to determine a reasonable royalty rate must be 'comparable,' courts have often interpreted this

16  factor broadly. While eSpeed's patents do not relate to graphical user interfaces or order entry for

17  electronic trading, they do relate to the futures trading industry, and therefore, may be of assistance in

18  determining a reasonable royalty rate.") (internal citations omitted); 7 *Chisum on Patents*,

19  § 20.07[2][b] ("Courts give weight to the licensing customs in the industry and actual licenses on

20  comparable patents in determining both the royalty rate and the base for the reasonable royalty.") Dr.

21  Chevalier did not use any cross-licenses, larger portfolio licenses, or any ██████████ (other than

22  the ██████████, discussed below) to inform her royalty rate.

23  _____

24  for the five patents Apple is asserting is ████████████████████ contained in recent

25  ████████ for rights to 20 or fewer patents. (Dkt. 806-6, Ex. A-1 ¶ 9, Ex. 79.) His roughly ████
      claim for the use of five patents for less than two years ███████████████████████████

26  ██████████████████████████████████████████████████ (Dkt. 806-6, Ex. A-1 ¶ 326.) This is precisely why Apple seeks to exclude *all*
    licenses from the jury's view.

27  [2] Dkt. 806-6, Ex. A-1 Ex. 69, (██████████████), Ex. 70, (████████
    ████), Ex. 71,(████████████████████), Ex. 72,(██████████████████), Ex.

28  73,(████████████████████████)

-2-                                    Case No. 12-CV-00630-LHK (PSG)

1    Apple can only criticize Dr. Chevalier because she "showed her work," *i.e.*, showed how she

2    reached her conclusions.  This is in sharp contrast to Apple's expert, Dr. Vellturo, whose entire

3    analysis of ███████ produced by Samsung is the following single sentence: "I have reviewed

4    the licenses that Samsung has produced in this matter and determined that none is informative as to

5    royalties that Samsung would agree to pay Apple for licenses to the Asserted Patents." (Vellturo Rpt.

6    ¶ 453-457, Fazio Dec. Ex. D.)  Dr. Chevalier did the opposite – she surveyed the produced materials,

7    explained which licenses were instructive on the reasonable royalty rate and why she did not rely on

8    others.[3]  Samsung invites the court to compare Dr. Chevalier's analysis and Dr. Vellturo's.  Dr.

9    Chevalier's analysis is careful and thorough.  (Dkt. 806-6, Ex. A-1 at ¶¶ 294-409 & Exs. 69-85.)  Dr.

10   Vellturo simply dismissed all evidence that is inconsistent with the large numbers he advocates.

11   (Vellturo Rpt. ¶ 453-457, Fazio Dec. Ex. D.)  *See LaserDynamics, Inc. v Quanta Computer Inc.,* 694

12   F.3d 51, 80-81 (Fed. Cir. 2012) (granting *Daubert* challenge where plaintiff's expert failed to consider

13   comparable licensing evidence inconsistent with his damages calculations).

14        Dr. Chevalier took multiple steps to exclude licenses likely to be irrelevant:[4]

15   •    She excluded all portfolio cross-licenses from consideration (Dkt. 806-6, Ex. A-1

16        ¶ 324)

17   •    She excluded all licenses conveying rights to more than 20 patents (*Id.* at ¶ 326)

18   •    She excluded all licenses in which Samsung was not the licensee (*Id.* at ¶¶ 328-329)

19   •    She excluded all licenses that did not convey U.S. patent rights (*Id.* at ¶ 329, Ex. 79)

20   •    She excluded all licenses entered into prior to 2007 (*Id.* at ¶ 330)

21        After this winnowing, she examined the terms of the ███ remaining agreements.[5]  In assessing

22   the comparability of these ███ agreements, Dr. Chevalier considered (1) the parties to the transaction

23   and their relative bargaining strength, as instructed by *Georgia-Pacific* factor 5 (adjusting upward for

24   the extent of competition between Apple and Samsung when appropriate); (2) the date of the

25        [3]  Dr. Chevalier expressly considered the factors the Federal Circuit has indicated are relevant to
     this inquiry.  Dkt. 806-6, Ex. A-1 ¶ 304 & n.693.
26        [4]  Dkt. 806-6, Ex. A-1 ¶¶ 303-334, 368, 371-372, Exs. 69-85.
     [5]  Dkt. 806-6, Ex. A-1 Exs. 84, 85. Apple's motion largely cites to Dr. Chevalier's preliminary
27   exhibits, which show licenses she specifically did not rely on in calculating a reasonable royalty. (*See,*
     *e.g.,* Mot. at 1:23-25, 7:19-21.)

28

1  transaction, existing and projected market conditions and the relative market success of the products at

2  that time; (3) the nature and scope of rights transferred, as instructed by *Georgia-Pacific* factor 3,

3  focusing on non-exclusive licenses with U.S. rights.[6]

4          This small subset of licenses shows what Samsung has been willing to pay for individual

5  patents or small groups of patents used in smartphones and tablets.  *Georgia-Pacific* expressly

6  contemplates that experts will do precisely what Dr. Chevalier did – review licenses and decide which

7  bear on the hypothetical negotiation.  *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.

8  Supp. 1116 (S.D.N.Y. 1970), mod. and aff'd, 446 F.2d 295 (2d Cir. 1971).  Apple is free to challenge

9  this work on cross examination, but it should not be excluded.

10         The Federal Circuit recently made clear that Apple's arguments go to weight, not

11  admissibility, in *ActiveVideo Networks*.  *ActiveVideo Networks, Inc. v. Verizon Commc'ns., Inc.*, 694

12  F.3d 1312 (Fed. Cir. 2012) (affirming denial *Daubert* motion).  Verizon argued that ActiveVideo's

13  expert improperly relied on certain license agreements as "royalty benchmarks" because they "did not

14  involve the patents-in-suit and did not cover any of the technologies in the case."  *Id.* at 1333.  The

15  Federal Circuit held that "Verizon's disagreements are with the conclusions reached by ActiveVideo's

16  expert and the factual assumptions and considerations underlying those conclusions, not his

17  methodology" and such "disagreements go to the weight to be afforded the testimony and not its

18  admissibility."  *Id.*  The Circuit explained that "[t]he degree of comparability of the [] license

19  agreements as well as any failure on the part of ActiveVideo's expert to control for certain variables

20  are factual issues best addressed by cross examination and not by exclusion."  *Id.*; *see also*

21  *Interwoven, Inc. v. Vertical Computer Sys.*, 2013 WL 3786633, *11 (N.D. Cal. July 18, 2013) ("Any

22  concern as to the degree of comparability between an existing and hypothetical license may be

23  addressed through cross-examination."); *Gen Probe Inc. v. Becton Dickinson & Co.*, 2012 WL

24  9335913, *3 (S.D. Cal. Nov. 26, 2012) ("Gen–Probe may highlight the technological and economic

25  distinctions at trial. Similarly, concerns about the effect litigation might have had on these licenses

26  'are better directed to weight, not admissibility.'"); *Island Intellectual Prop. LLC v. Deutsche Bank*

27

28         [6] Dkt. 806-6, Ex. A-1 ¶¶ 322-334, 366-409, Exs. 79-85.

1  *AG*, 2012 WL 526722, *4-5 (S.D.N.Y. Feb. 14, 2012) (same); *Phillip M. Adams & Assocs. v.*

2  *Winbond Elecs. Corp.*, 2010 WL 3743677, *3 (D. Utah Sept. 20, 2010) (denying *Daubert* motion,

3  finding that the parties "divergent views on what patents are comparable to the patents in suit and,

4  therefore, what are licenses are comparable" are "the types of matters that are properly developed in

5  cross-examination."); *Multimedia Patent Trust v. Apple Inc.*, 2012 WL 5873711, *7 (S.D. Cal. Nov.

6  20, 2012) (similar).

7       Apple asserts that Dr. Chevalier "does not even say, much less show, that any of these

8  [████████████] agreements are economically or technologically comparable." (Mot. at 6:9-11.)

9  Again, Apple misleadingly cherry-picks from the report.  For each of the license agreements she

10  ultimately used to calculate a reasonable royalty, Dr. Chevalier considered many relevant terms,

11  including economic terms (the payments due under the licenses, the geography of the license, the term

12  of the license and the number of smartphone units covered by the license) and technological terms (the

13  technology covered by the license, the patents licensed and the technological nature of the products

14  the license applied to).  (Dkt. 806-6, Ex. A-1 Exs. 72, 85.)  Apple may disagree with her conclusions

15  regarding comparability or the depth of her analysis, but that is a matter for cross-examination.[7]  (*See*

16  *supra*.)  Dr. Chevalier's analysis of the licenses is robust, especially when compared to Dr. Vellturo's

17  one sentence.[8]

18       While Dr. Chevalier does not rely on the larger universe of [██] party licenses in calculating

19  the reasonable royalty, she did refer to them to show that the steps taken to winnow them down were

20  reasonable and do not materially impact the range of values.  Dr. Chevalier should be permitted to

21  show that her analysis did not unfairly skew the results.

22  

---

23     [7]   While Apple argues that Dr. Chevalier did not rely on technical experts or fact witnesses to
establish comparability, Apple cites no authority that in order for an expert to conclude a license is
24  comparable for purposes of her analysis she must rely on fact witness or expert testimony.

25     [8]   Apple claims Dr. Chevalier' improperly allocates the value of the patents contained in multiple
patent licenses, (Mot. at 2:2-18.)  but cites no case for the proposition her allocation of value violates
*Daubert*. ████████████████████████████████████████████████████

26  ███████████████████████ (Vellturo VirnetX Report at ¶ 219, Fazio Dec. Ex. J), ██████████████
███████████████████████ But more importantly, Dr. Chevalier's

27  analysis is far more complex than Apple suggests.  The licensing data that Dr. Chevalier considers is
just one portion of her analysis, which incorporates numerous market and income approaches and

28  takes into account the fifteen *Georgia-Pacific* factors.

1    The licenses are also relevant for another reason. ███████████

2    ███████████████████████████████████████████████████████████

3    ███████████████████████████████████████████████████████████

4    ███████████████████████ (Sinclair Apr. 4, 2012 Dep. Tr. at 47:17-25, 52:2-8,

5    58:13-59:14, Fazio Dec. Ex. E; Rangel June 25, 2013 Dep. Tr. at 43:9-21, Fazio Dec. Ex. F; Schiller

6    July 23, 2013 Dep. Tr. at 305:9-306:17, 312:15-313:21, Fazio Dec. Ex. G; Joswiak Apr. 17, 2012

7    Dep. Tr. at 22:15-23:9, Fazio Dec. Ex. H; Joswiak July 9, 2013 Dep. Tr. 23:2-25:13, Fazio Dec. Ex.

8    I.) ████████████████████████████████████████████████████████

9    ███████████████████████████████████████████████████████████

10   █████████████████████████████████████████

11   **C.    Apple's Expert, Case Law and Other Authorities Confirm that Dr. Chevalier's
           Analysis Is Proper**

12   Apple's own expert has previously relied on ███████████████████████

13   ███████████ as Apple complains Dr. Chevalier did here. ████████████

14   ███████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████

16   ███████████████████████████████████████████████████████████

17   ███████████████████ (Velluro VirnetX Report ¶ 219, Fazio Dec. Ex. J (emphasis added).) ████████

18   ███████████████████████████████████████████████████████████

19   ██████████████████████████████████ Although Apple now argues that Dr. Chevalier should

20   not be permitted to consider licenses for "technology that generally differs somewhat" (Mot. at 4:7-

21   10), Dr. Velluro ████████████████████████████████████████████

22   ██████████ Other authors have agreed with Drs. Chevalier ███████████ that agreements related to

23   the broad technological category can be instructive.  *See* Richard Razgaitis, *Valuation and*

24   *Dealmaking of Technology-Based Intellectual Property* (2009) at 92, Fazio Dec. Ex. K ("In many

25   cases, applying the market valuation approach leads to numerous, say a dozen or more, agreements in

26   the same broad technology category but no one of which, for different reasons, is exactly or near

27   exactly comparable.  In this circumstance, one may yet be able to estimate a royalty range from this

1  family of agreements.").  Apple should not be permitted to exclude a methodology accepted in the

2  literature which its own expert has recently employed on Apple's behalf.

### D.   Apple's Argument Would Eviscerate the *Georgia-Pacific* Standard

4          Consideration of comparable license agreements is expressly contemplated by the G*eorgia-*

5  *Pacific* test.  *Georgia-Pacific Corp.*, 318 F. Supp. at 1119-20.  Experts routinely consider licenses

6  with varying degrees of comparability and courts routinely reject arguments that such analysis was

7  improper.  *See, e.g.*, *Broadcom Corp., v. Emulex Corp.*, 2011 WL 11025895, * 6 (C.D. Cal. Dec. 13,

8  2011) (finding that expert's use of comparable license was not improper, finding it sufficient that the

9  expert represented it was comparable only "in contribution to the performance of the overall product

10  at issue"); *Internet Machs., LLC v. Alienware Corp.*, 2013 WL 4056282, *14 (E.D. Tex. June 19,

11  2013) (finding that expert "properly relied upon the disputed license agreements" as "the testimony

12  and evidence established that the licenses covered the same general field of technology at issue" and

13  "[a]lthough the licenses did not directly cover the patented technology, they are sufficiently

14  comparable to the technology at issue"); *SSL Servs., LLC v. Citrix Sys., Inc.*, 2013 WL 1680075, *4-5

15  (E.D. Tex. Apr. 17, 2013); *Ricoh Co., Ltd. v. Quanta Computer, Inc.*, 2010 WL 1233326, *9-10 (W.D.

16  Wis. Mar. 23, 2010); *see also ActiveVideo Networks,* 694 F.3d at 1333(rejecting argument that expert

17  should have been excluded for considering allegedly non-comparable licenses, holding that assertions

18  regarding the "degree of comparability . . . are factual issues best addressed by cross examination and

19  not by exclusion").

20          According to Apple, if the technology "differs somewhat" from that at issue, the license is not

21  "comparable." (Mot. at 4:7-10.)  Apple cites no authority for this.  If this were the law, only licenses

22  that actually involve the patents in suit would be potentially technologically comparable.  This would

23  collapse *Georgia-Pacific* factor 2 (rates paid by licensee for use of other patents comparable to patents

24  in suit) into factor 1 (royalties received by the patentee for licensing the patents in suit).  *Georgia-*

25  *Pacific*, 318 F. Supp. at 1120.  This is contrary to established law.  "[U]nder Federal Circuit precedent,

26  a patentee may rely on licenses that are different from the hypothetical agreement as long as they are

27  not 'radically different.'" *Multimedia Patent Trust*, 2012 WL 5873711, at *7; *see also Lucent Techs.,*

28  *Inc. v. Gateway Inc.*, 580 F.3d 1301, 1327-28 (Fed. Cir. 2009) (rejecting reliance on "radically

1   different" licenses); *Broadcom*, 2011 WL 11025895, at*6 (rejecting post trial argument that expert's

2   reliance on comparable license was not proper, explaining that as presented to the jury, the license

3   "cannot be considered vastly or radically different from the patents in suit").

4         **E.     The Case Law Apple Cites Is Inapposite**

5         Apple does not cite a single case where a court concluded that an expert should not be

6   permitted to look at *any* real world licensing evidence in reaching a conclusion as to a reasonable

7   royalty.[9]   In contrast to the situation here, in several of the cases Apple cites the court excluded

8   *plaintiff's* expert testimony where the expert inflated damages numbers by ignoring probative

9   licensing evidence – often of the patents at issue – in favor of more attenuated licenses.  (Mot. at 3-4.)

10  That is precisely what Apple's damages expert, Dr. Vellturo, has done (Dkt. 802-3 at 14-15) and it is

11  <u>not</u> what Dr. Chevalier has done.  Instead, Apple is criticizing Dr. Chevalier for incorporating licenses

12  into her analysis at all.

13        In *LaserDynamics*, the Federal Circuit found that plaintiff's expert relied on "irrelevant

14  [license] evidence to the exclusion of the many licenses expressly for" the patents at issue and that

15  doing so "served no purpose other than to [] 'increase the reasonable royalty rate above rates more

16  clearly linked to the economic demand for the claimed technology.'"  694 F.3d at 80.  In contrast to

17  Dr. Chevalier, LaserDynamics's expert chose to rely on cherry-picked licenses, while ignoring

18  LaserDynamics' "long history of licensing" the patent at issue in order to hike up the damages

19  number. *Id.* at 80-81 (finding his opinion "cannot be reconciled with the actual licensing evidence").

20  Here, Dr. Chevalier considered ██████████████████████████████████████

21  ██ .

22        Similarly, in *ResQNet.com, Inc. v. Lansa, Inc.,* the plaintiff's expert relied on "licenses with no

23  relationship to the claimed invention to drive the royalty rate up to unjustified double-digit levels."

24  594 F.3d 860, 870 (Fed. Cir. 2010).  Once again, he relied on these licenses while ignoring two largely

25  inconsistent licenses for the patents in suit.  *Id.*  Again, the court found that "[t]he inescapable

---

26        [9] While Apple may point to *TV Interactive*, in that case, the district court granted plaintiff's motion
    *in limine* to exclude defendant's expert's reference to certain licenses after the expert himself admitted
27  they were not comparable. *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1015-16
    (N.D. Cal. 2013).  Dr. Chevalier made no such admission.
28

conclusion is that Dr. David used unrelated licenses on marketing and other services – licenses that had a rate nearly eight times greater than the straight license on the claimed technology in some cases – to push the royalty rate up into double figures." *Id.*

*Lucent* involved an appeal of a post-trial JMOL after a jury found for the plaintiff and awarded damages.  580 F.3d at 1308.  In a limited and fact-bound ruling, the court held that three "radically different" license agreements and other agreements that were inadequately explained to the jury were insufficient to support the reasonable royalty award.  *Id.* at 1327-28.  Importantly, the court did not hold that the licenses were improperly admitted or that, with further explanation to the jury, they might not be a sufficient basis for the award.  *Id.* at 1325.  *Lucent* is inapplicable here, where Dr. Chevalier's report makes clear the nature of the licenses considered and, in any event, they are simply part of a comprehensive analysis.

In *Utah Medical Products, Inc. v. Graphic Controls Corp.,* the Circuit merely held the district court did not abuse its discretion in excluding certain "expert testimony and evidence of license agreements."  350 F.3d 1376, 1385 (Fed. Cir. 2003).  The district court concluded the licensing evidence at issue had not been shown to be "in any way comparable" to the patent at issue and thus was "not relevant to the facts of this case."  *Id.*  The Circuit's opinion contains no discussion of the specifics of the licenses or the manner in which they were used, and thus it provides no guidance here. In *DataQuill*, the district court excluded testimony because while the expert had provided a sufficient factual basis for his conclusion that the technology was comparable, unlike Dr. Chevalier (Dkt. 806-6, Ex. A-1 ¶¶ 326, 329, 331, Exs. 79, 84), his report contained "*no analysis at all* of the economic differences between the [comparable licenses] and the license reached at the hypothetical negotiation." *Dataquill Ltd. v. High Tech Comp. Corp.,* 887 F. Supp. 2d 999, 1023 (S.D. Cal. 2001) (emphasis provided).

"Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty[.]" *LaserDynamics,* 694 F.3d at 79 (cited by Apple, Mot. at 3); *see also ResQNet,* 594 F.3d at 869 ("The

first *Georgia-Pacific* factor requires considering past and present royalties received by the patentee 'for the licensing of the patent in suit, proving or tending to prove an established royalty.") (alterations omitted); *HTC Corp. v. Tech. Props., Ltd.,* 2013 WL 4787509, *2 (N.D. Cal. Sept. 6, 2013) (where the license at issue included the "very same patents" being asserted in the present litigation but also conferred broader intellectual property or geographic rights, "so long as this broader scope is accounted for, the agreements may still be properly considered.") ████████████████ ████████████████████████████ *LaserDynamics*, 694 F.3d at 79-81.  Indeed, as this Court recently recognized, the Apple -- HTC license is "highly probative" and likely "one of the most informative [] pieces of evidence."  (Oct. 17, 2013 NDCA I Hrg. Tr. at 129:17-21, 131:23-25, Fazio Dec. Ex. L.)

In any event, ████████████████████████████████ could only go to weight, not admissibility.  As Judge Grewal recently held in *HTC*, arguments about the flaws of an expert's use of licenses which involve the patents at issue "can be drawn out through vigorous cross-examination."  2013 WL 4787509, at *2; *see also Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*, 2012 WL 5451567, *3 (W.D. Pa. Nov. 7, 2012) ("[T]he differences in features between the Intel Agreement and the hypothetical license (including the fact that it pertained to only one of the patents-in-suit) are more appropriately addressed by way of cross-examination than through exclusion."); *Ericsson Inc. v. D-Link Sys. Inc.*, 2013 WL 4046225, *16-17 (E.D. Tex. Aug. 6, 2013) (rejecting defendant's argument that it was entitled to JMOL because the licensing evidence Ericsson presented was not comparable as the licenses were not "limited to the asserted patents, and several licenses had a worldwide scope," holding such arguments are "more appropriate for cross-examination").

**G.      Dr. Chevalier Properly Accounted for Apple's Offer to License Smartphone** ██████████████ **to Samsung**

Apple seeks to exclude Dr. Chevalier's consideration of Apple's offer to license smartphone ███████ to Samsung, ████████████████████████, arguing this evidence is inadmissible under Rule 408.  (Mot. at 9-10.)[10]  This is not a *Daubert* issue – if Apple wants to

---

[10] Apple also takes issue with the manner in which Dr. Chevalier used this information in her analysis.  (Mot. at 10.)  Without citation to any case law, Apple claims that the adjustments Dr.

(footnote continued)

exclude certain evidence at trial, it can move *in limine*. There is no basis to hold that Dr. Chevalier's opinions do not meet the *Daubert* threshold because she considered probative evidence that the *Georgia-Pacific* test instructs should be considered. *Heartland Surgical Specialty Hosp. LLC v. Midwest Div. Inc.*, 2007 WL 6215929, *5 n.9 (D. Kan. Dec. 19, 2007) ("By its terms, the *Daubert* opinion applies only to the qualifications of an expert and the methodology or reasoning used to render an expert opinion. *Daubert* generally does not, however, regulate the underlying facts or data that an expert relies on when forming her opinion.") (internal citation omitted). ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████

    Rule 408 does not create an absolute bar to an expert's use of an offer to license between the parties in her reasonably royalty analysis. Here, the offer is merely a data point used in Dr. Chevalier's *Georgia-Pacific* analysis and thus Rule 408 is not implicated. *See, e.g., Putnam v. Henkel Consumer Adhesives, Inc.*, 2007 WL 4794115, *4 (N.D. Ga. Oct. 29, 2007) ("The terms of Rule 408 do not apply to the use of the DW royalty rate by Mr. Tanger. Mr. Tanger has included the rate among the eleven Henkel licensing agreements that he considered in his analysis. [] The settlement between Henkel and DW is not being offered to prove liability or the invalidity or amount of any claim. It is simply used as a data point. As such, Rule 408 does not bar its admission.") Moreover, experts are entitled to rely on inadmissible evidence in reaching their conclusions, even if the Court ultimately excludes some aspects of the evidence. Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury

---

Chevalier made to her analysis (*see, e.g.*, Dkt. 806-6, Ex. A-1 Exs. 74, 75) based on the information from Apple's offer to license was somehow improper and her opinion to the extent it accounts for this information should be excluded. (*Id.*) That is not how *Daubert* works. Apple may not exclude Samsung's rebuttal damages testimony because it believes that her analysis is shaky. That is an issue for cross-examination. (*See supra*.) Apple also claims that Dr. Chevalier "███████████████████████████████████ (Mot. at 10.) Not so. At deposition, Dr. Chevalier made clear she ██████████ ████████████████████ Chevalier Dep. Tr. at 282:22-283:11, Fazio Dec. Ex. B.)

evaluate the opinion substantially outweighs their prejudicial effect.")  Rule 703 expressly protects an

expert's opinions even if they rely on inadmissible evidence.[11]

## II.    There is No Basis to Exclude Dr. Kearl's Damages Opinions Regarding The '239, '757 and '449 Patents.

The relative value scores used by Dr. James Kearl are the product of a peer-reviewed,

generally accepted, survey based, measurement and scaling methodology known as Maximum

Difference Scaling ("MaxDiff"), or Best-Worst Scaling ("BWS").  Declaration of Dr. Sanjay Rao

("Rao Dec."), ¶ 9.  MaxDiff  is a "widely-used survey research tool for scaling items in terms of

preference."[12]  It is premised on the law of comparative judgment and improves on the established

methodology of paired comparisons.[13]

Apple argues that the MaxDiff values Dr. Kearl relied on cannot provide meaningful ratios

indicating how much more valuable one feature is over another.  Not so.  As the literature discussing

MaxDiff demonstrates, "the data produced from maximum difference scaling are ratio-level data,"

Fazio Dec. Ex. Q, Garver, *supra*, at 488, which "allows for ratio-like measurement."  Fazio Dec.

Y, Paul McCullough, "Is Max/Diff Really All That," *Marketing Research*, 22:3, at 24 (2010).[14]  For

---

[11] Moreover, both documents at issue were entered into evidence in the NDCA I trial.  Aug. 10, 2012 NDCA 1 Trial Tr. 1958:17-1959:17, 1968:20-1969:14, Fazio Dec. Ex. O. That the Court made a limiting instruction in that trial does not require exclusion of Dr. Chevalier's opinions because she considered these documents.

[12] Fazio Dec. Ex. P, Bryan Orme, "Using Calibration Questions to Obtain Absolute Scaling in MaxDiff," *Sawtooth Software European Conf.*, 1 (2009); s*ee also* Fazio Dec. Ex. Q, Michael Garver, "A Maximum Difference Scaling Application for Customer Satisfaction Researchers," *Int'l J. of Market Res.*, 51:4, 481, at 487 (2009); Fazio Dec. Ex. R, Eli Cohen, "Applying Best-Worst Scaling to Wine Marketing, *Int'l J. of Wine Bus. Res.,* 21:1, 8, at 11 (2009); Fazio Dec. Ex. S, Johan Lagerkvist, "Anchored vs. Relative Best-Worst Scaling," *Food Quality and Preference*, 25, 29, at 30-31 (2012) ("growing use of best-worst"); Fazio Dec. Ex. T, Jack Horne, "How Anchored Tradeoffs Reveal Customer Preferences," *White Paper of Market Strgs. Int'l*, 1 (July 2012) ("wide-spread adoption of MaxDiff"); Fazio Dec. Ex. U, Anchored MaxDiff Scaling – Absolutely More Power (RTiResearch) ("MaxDiff Scaling has become a widely used market research technique."); Fazio Dec. Ex. V, Jordan Louviere, "An Introduction to the Application of (Case 1) Best-Worst Scaling," *Int'l J. of Res. in Marketing*, 30, 292, 299 (2013) (discussing the "popularity" of BWS).

[13] *See* Fazio Dec. Ex. W, L.L. Thurstone, "A Law of Comparative Judgment," *Psychological Review*, 34, 273 (1927); *see also* Fazio Dec. Ex. X, Sawtooth Software, The MaxDiff System Technical Paper, v.8, at 2-6. Sawtooth Software is a leading company in providing software solutions for marketing research applications.  It provides the leading software for MaxDiff and other research. Rao Dec., ¶ 10.

[14] *See also* Fazio Dec. Ex. S, Lagerkvist, *supra*, at 36 (MaxDiff results are "on a common ratio scale"); Fazio Dec. Ex. R, Cohen, *supra*, at 20 (MaxDiff "allows the researcher to measure the relative importance of each attribute to the other as a ratio scale of the probabilities of choosing each

(footnote continued)

1   this reason, MaxDiff results measure how much more or less valuable one feature is compared to

2   another.[15]

3          Apple offers no expert opinion that disputes this basic attribute of MaxDiff.  Indeed, Apple

4   withdrew the report of its rebuttal expert and refused to offer him for deposition.[16]  Apple fails to

5   submit a single article or academic source that discusses MaxDiff, much less one that states that

6   MaxDiff results cannot be used to calculate how much more or less valuable one feature is compared

7   to another.  Instead, Apple relies on snippets from Dr. Sanjay Rao's deposition to manufacture

8   disingenuous arguments that do not withstand meaningful scrutiny.

9          Apple contends that, because Dr. Rao stated that the relative value scores from his MaxDiff

10  survey are on an "interval scale" and two elementary textbooks suggest that interval scales cannot be

11  used to establish meaningful ratios, Dr. Kearl's reliance on those scores is unsound.  Mot. at 13:6-22.

12  This argument ignores – as shown above – that MaxDiff scores by their nature possess meaningful

13  ratio properties.  Apple's argument elevates form over substance and is divorced from the nature of

14  the data being studied.  The two textbooks Apple cites do not even discuss MaxDiff and in any event

15  make clear that data on an interval scale may also be on a ratio scale.  Dkt. 806-7, Ex. B-6 at 268.

16  Moreover, "the assertion, common to many traditional statistics texts, that 'data values are nominal,

17  ――――――――――――――――――
    attribute").

18      [15]   *See* Fazio Dec. Ex. T, Horne, *supra*, at 6-7 (different approaches to MaxDiff "retain ratio
    properties"; "Ratio properties continue to apply when comparing features to one another.  A feature

19  with an importance of 166 is about twice as important as one with an importance of 88."); Fazio Dec.
    Ex. Z, Improved Capability with MaxDiff Exercises (MD Analytics) (MaxDiff results, however

20  analyzed, "keep their ratio properties, which means that we can still say that Item 1 is twice more
    important than Item 6."); Fazio Dec. Ex. R, Cohen, *supra*, at 17 (one feature "is about twice more

21  important" as another); Fazio Dec. Ex. V, Louviere, *supra*, at 298 ("one can conclude that a journal
    with a score of 1.00 has approximately twice the level of perceived quality of a journal with a score of

22  0.50"); Fazio Dec. Ex. AA, Steven Goodman, "Best-Worst Scaling: A Simple Method to Determine
    Drinks and Wine Style Preferences," *Int'l Wine Mktg. Symp.,* at 5 (2005) ("The coefficients are ratio

23  level and can be directly compared."); Fazio Dec. Ex. Q, Garver, *supra*, at 493 ("The maximum
    difference scaling results demonstrate that product is nearly four times as important as value to the

24  customer base.  Product is nearly nine times as important to customers as compared to supplemental
    services…."); Fazio Dec. Ex. BB, Tim Coltman, "Best-Worst Scaling Approach to Predict Customer

25  Choice for 3PL Services," *J. of Bus. Logistics*, 32(2), 139, 145 (2011) ("This means that *reliable
    performance* (3.82) is four times more important than *relationship orientation* (0.93) and twelve times

26  more important than *surcharge option* (0.33)…."); Fazio Dec. Ex. CC, Christopher Wolf, "Dairy
    Farmer Policy Preferences," *J. Agric. & Resource Econs.*, 38:2, 220, 223 (2013) ("if one policy has a

27  share twice that of another policy, it can be said that the former policy is twice as preferred as the
    latter").

28      [16]   Fazio Dec. Ex. DD (10-4-13 email chain).

――――――――――――――――――

1   ordinal, interval, or ratio' simplifies the matter so far as to be false."  Fazio Dec. Ex. FF, Paul

2   Vellemen, "Nominal, Ordinal, Interval, and Ratio Typologies Are Misleading", *The American*

3   *Statistician*, 41:1, 65, at 69 (1993).  As Dr. Rao testified, MaxDiff results in particular are not subject

4   to such rigid classifications.[17]   To start with a rigid scale type and preclude particular statistical

5   methods irrespective of the nature of the data, as Apple seeks to do here, is "bad science and bad data

6   analysis."  *Id*. at 70.[18]

7         Apple also argues that Dr. Rao testified that "comparison of how much more valuable one

8   feature is to another can and should be done using a ratio scale" and this shows that Dr. Kearl's

9   relative value ratios are unreliable.  Mot. at 13:8-10.  In fact, Dr. Rao testified that such a comparison

10  can be done two ways, *including the one used by Dr. Kearl*,[19] and that Dr. Kearl's approach provides

11  the exact same ratios as the method Dr. Rao referred to as "converting to a ratio scale":

12         And so if you want to know relatively how much is the 250.43 compared to the
           114.04, you can *either* divide 250.43 by 114.04 *or* you can convert the scale so that the
13         minimum is zero, the maximum is 100, and then compare the two percentages you get
           for these two features and *it will give you the same ratio*.
14
15  Fazio Dec. Ex. FF, Rao Tr. at 97:19-25; Rao Dec., ¶¶ 12-14.[20]  Apple could have compared these two

16  calculations and, if they produced different ratios, reported the results.  It did not do so.  Indeed, as Dr.

17  Rao testified, the two calculations produce identical ratios.  *See also* Rao Dec., ¶ 15, Exs. E, F, and G.

18         The ratio properties of MaxDiff data also reveal the fallacy of Apple's comparison to

19  temperature scales.  Mot. at 13:23-14:8.  As Apple notes, temperature scales have an arbitrary anchor

20  of zero, whereas ratio scales have a meaningful zero.  MaxDiff results are akin to ratio scales because

21     [17]  "[Y]ou're trying to ask what scale it is; I would say it's a value – relative value scale.  Now,
22  whether it's ordinal, whether it's nominal, whether it's interval is something that you shouldn't be
    inferring from that specific set of data."  Fazio Dec. Ex. FF, Rao Tr. at 105:13-19.  *See also* Fazio
23  Dec. Ex. GG, Wendy Umberger, "Using Best-Worst Scaling to Determine Market Channel Choice,"
    *Agricultural & Applied Econ. Assn. Meeting*, at 8-10 (July 2010) (using "interval scale values" to
    determine that, for example, one attribute is ".90 times as important" as another).
24     [18]  *See also* Fazio Dec. Ex. HH, John Gaito, "Measurement Scales and Statistics:  Resurgence of
    an Old Misconception," *Psychological Bulletin*, 87:3, 564 (1980) ("Many elementary statistics books
25  discuss the four types of scales; however, some statisticians apparently do not realize that there is no
    real relationship between type of scale and statistical techniques used.").
26     [19]  Dr. Kearl calculated relative value ratios by dividing the relative value score for an accused
    feature by the sum of the relative value scores for the two FaceTime accused features (FaceTime over
27  WiFi and FaceTime over cellular).  Mot. at 12:15-24; Fazio Dec. Ex. II, Kearl Tr. at 142:8-24.
       [20]  *See also* Fazio Dec. Ex. FF, Rao Tr. at 97:6-18 (describing "ratio scale" as "a percentage scale,
28  where the lowest value is zero percent and the highest value is 100 percent.").

1   they have a meaningful anchor.  That "meaningful anchor" is the probability of a respondent picking

2   any of the features being tested as more valuable than the other features by random chance.  In other

3   words, the anchor represents a feature that impacts value choices purely on the basis of chance and

4   thus does not have any value.  Fazio Dec. Ex. FF, Rao Tr. at 52:16-54:4, Rao Dec., ¶ 17.  This use of a

5   meaningful anchor with a "natural origin" acts in the same manner as a ratio scale's absolute zero  and

6   allows the results to be treated as though they are on a ratio scale.  Rao Dec., ¶¶17-18.  *See also* Fazio

7   Dec. Ex. JJ, Fred N. Kerlinger, *Foundations of Behavioral Research*, at 438-440 (1973); Fazio Dec.

8   Ex. S, Lagerkvist, *supra*, at 31, 36 (when MaxDiff results are anchored "a common scale origin exists

9   (theoretically) with the utility of the anchor being zero").

10          Apple argues that Dr. Rao testified that the relative value scores from his survey change

11   depending on the choice of using an anchor value of '0' or '100' and that this demonstrates that the

12   scores are not valid.  Mot. at 14:9-19.  To the contrary, as Dr. Rao made clear, whether the value

13   scores are anchored on '0' or '100', "the relative distance between any two attributes, the magnitude

14   of relativity, if you will, *is still going to be preserved*."  Fazio Dec. Ex. FF, Rao Tr. at 57:1-13; *see*

15   *also* Rao Dec., ¶¶ 16, 19.  That is because the anchor, whether set at '0' or '100', represents the same

16   thing, the probability of a respondent selecting a feature as being more valuable than others by random

17   chance.  That probability (here one in fourteen) is not an arbitrary number and it does not change

18   whether the anchor is represented by '0' or '100'.  Rao Dec., ¶¶ 17-19.  Dr. Rao further testified that

19   he calculated results using both '0' and '100' anchor points, produced data for both, and "it doesn't

20   change things."  *Id.* at 57:1-58:7; *see also* Rao Dec., ¶ 21.[21]

21          Dr. Kearl's calculations are mathematically sound, valid, and reliable.[22]  Any criticisms Apple

22

---

23   [21]   Dr. Rao used an anchor of '100', which is recommended by Sawtooth and is the preference of
analysts, because it makes the results easier to interpret.  *See* Fazio Dec. Ex. FF, Rao Tr., 67:11-68:12;
24   Rao Dec., ¶ 20; Fazio Dec. Ex. II, Kearl Tr: 144:14-25.  *See also* Fazio Dec. Ex. T, Horne, *supr*a, at 7;
Fazio Dec. Ex. Z, Improved Capabilities, *supra*, at 1.

25   [22]   Apple states that, "[o]ther than Dr. Kearl, Dr. Rao is not aware of anyone who has taken
relative values from a MaxDiff survey . . . and used them to calculate either the market price of a
26   tested feature or damages for patent infringement."  Mot. at 13:27-28, fn. 15.  However, there is
nothing novel about using value to estimate price.  *See Quimby v. U.S.*, 107 Fed. Cl. 126, 134 (Fed. Cl.
27   2012) ("It is ultimately always the subjective value judgments of individuals that determine the
formation of prices.") (quoting Ludwig von Mises, *Human Action*, at 332 (3d revised ed. 1966)); *In re
28   Zyprexa Products Liability Litigation*, 2008 WL 2696916, *114-15 (E.D.N.Y. July 02, 2008) ("Setting
(footnote continued)

may have go to weigh, not admissibility, and Apple's motion to exclude Dr. Kearl's testimony should be denied.

### III.     Dr. Kearl's Valuations of the '596 and '087 Patents Are Likewise Reliable

Apple's complaint that Dr. Kearl's analysis valuing the '596 and '087 patents is unreliable fails on the facts and the law.  *First*, Apple cites the exception but omits the general rule for when an expert's regression analysis is challenged for not controlling all variables:  "Normally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Bazemore v. Friday*, 478 U.S. 385 (1986); *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) ("Vigorous cross-examination of a study's inadequacies allows the jury to appropriately weigh the alleged defects and reduces the possibility of prejudice.").  The BLS survey that Dr. Kearl relies on determined the value of bandwidth to customers after controlling for a range of other variables, including promotional pricing, discounts from bundling other services, and regional differences. Dkt. 806-7, Ex. B-9, at 38-39.  By contrast, courts have excluded regression analyses when the analyses omit so many variables as to assume their conclusions.  *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273-74 (S.D. Cal. 2010) ("Dr. Nye predetermines the results of his analysis."); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 978 (C.D. Cal. 2012) ("Dr. Phillips impermissibly *assumes* that any observed increase in average ticket prices after 2000 is due entirely to Defendants' anticompetitive conduct, without meaningfully testing this assumption.").

*Second*, Apple offers no support for its contention that upload and download bandwidth are valued by consumers separately and thus independently quantifiable. ████████████ ████████████████████████████████████████ ████████████████████████████████████████ (Fazio Dec.

---

the price according to the relative value of the product is pricing at its most basic, and most logical.")(quoting M. Kolassa, "Pharmaceutical Pricing Principles," in *Pharmaceutical Marketing*: *Principles, Environment, and Practice* (2002) at 211-12). Furthermore, here Dr. Kearl had a market price for one of the accused features (99 cents for the FaceTime app) set by Apple itself.  As Dr. Kearl testified, "If I know that people are willing to pay 99 cents for functionality A, and I know that functionality B -- they've told me that functionality B is worth half functionality A, then they implicitly told me that functionality B is worth 49 cents." Fazio Dec. Ex. II, Kearl Tr. at 33:25-34:4. *See also* Fazio Dec. Ex, LL, Pyndick and Rubenfield, *Microeconomics*, at 151 (2008) (Setting forth the Equal Marginal Principle, which states that "*the ratio of the marginal utilities is equal to the ratio of the prices*."); Rao Dec. Ex. C., Rao Report at ¶ 48.

1   Ex. II, Kearl. Tr. at 247:3-14; 250:23-25; 257:4-12). ████████████████████████

2   ████████████████████████████████████████████████████████████████████████████████

3   ██████████████   (*See* Fazio Dec. Ex. II, Kearl Tr. at 260:19-261:1 (frequency of use is not

4   determinative of value).)

5       *Finally*, even assuming Apple's objections *arguendo*, Dr. Kearl has provided sufficient

6   evidence to support his royalty calculations.  In addition to the BLS survey, Dr. Kearl studied the

7   change in prices related to cellular 2G, 3G, and 4G plans.  Those plans indicated a consumer

8   willingness to pay for bandwidth between $1.94 and $6.35 per mbps.  (Fazio Dec. Ex. MM, Kearl Op.

9   Rep. Table 28.) Dividing these values by two, to "account" for upload and download bandwidth,[23]

10  yields consumer valuations greater than those conservatively applied by Dr. Kearl through the BLS

11  survey.

12  **IV.    Dr. Schonfeld Should Not Be Precluded from Offering Testimony on the '757 and '239
         Patents**

13

14      **A.    Apple Should Not Be Permitted to Circumvent the Instruction of the Court by
               Turning *Daubert* Motions into Additional Claim Construction Proceedings**

15      Apple's "*Daubert* motion" regarding Dr. Schonfeld is nothing more than a transparent attempt

16  to engage in a second *Markman* proceeding.  In its motion, Apple seeks the construction of 6 terms

17  from the '239 Patent and 2 terms from the '757 Patent, including 6 means plus function terms.  This

18  expansive request for additional claim construction on the '239 and '757 patents completely

19  disregards Court's instructions during the July 31, 2013 case management conference.  In response to

20  Apple's request for additional claim construction during that conference, the Court stated:

21          "I'm not going to do any additional claim construction until after you've fully
            narrowed the case because I don't want to do any hypothetical claim construction on
22          issues that aren't going to be tried, so I'm not anxious to do them beforehand. . . .  I
            mean, I did the last claim construction and that took an immense amount of resources
23          and time.  If you want another full-blown claim construction, I'm happy to do that, but
            I'm going to move this trial date and I will turn the time that I had dedicated to this
24          trial to dedicate it to claim construction and we'll push this trial off."

25  (Dkt. No. 750, July 31, 2013 Case Management Conference Transcript at 20:19–22:17.)

26      Apple's end run around the Court's instruction brings about the very situation the Court hoped

27  ───────────────────
    [23]   UMTS-enabled handsets using HSUPA and HSDPA, such as the accused products in this case,
28  offer symmetric upload and download bandwidth.

1    to avoid – wasting the Court's time and resources with claim constructions that might not be

2    relevant.[24]   Making matters worse, Apple also asks the Court to further construe terms it already

3    construed during the *Markman* proceedings.  By asking the Court to reconstrue these terms, Apple is

4    essentially making a late and improper motion for reconsideration of the Court's *Markman* order.  The

5    time for such a motion has long since passed.

6         Apple's *Daubert* motion evades the Court's case management order, ignores the Court's

7    instructions, and wastes judicial resources.  It should be denied on that basis alone.  However, if the

8    Court believes additional constructions are necessary, Samsung requests that the Court deny Apple's

9    *Daubert* motion and schedule a further claim construction proceeding in place of the scheduled trial.

10   **B.    Apple Improperly Seeks Construction of The Terms "At Least One Zone Specific Storage and Interface Device" and "Updated in Relation To" From The '757 Patent**

11

12        Apple's arguments with respect to these terms exemplify how Apple is improperly

13   transforming its *Daubert* motion into a claim construction brief.   Apple asserts error in Dr.

14   Schonfeld's analysis based on "the plain language of claim 1," "the prosecution history," "dependent

15   claim 6," and "the specification".  (Mot. at 16–18).  These are pure claim construction arguments,

16   which should be resolved after the case is fully narrowed, and not in a *Daubert* motion.

17        On the merits, Apple's claim construction arguments are incorrect.  Apple mischaracterizes the

18   construction Dr. Schonfeld applied for "at least one zone specific storage and interface device."

19   Apple ignores the language of claim 1 that explicitly states that each zone device must be "*capable* of

20   storing and interfacing" with content information and content management information stored in the

21   central device wherein that data is updated in relation to the other "zone specific storage and interface

22   *devices*." (emphases added.)  Apple also incorrectly asserts that "updated in relation to" does not

23   require automatic updating.

24

25

26   ───────────────

     [24]   The Court set February 6, 2014, as the date on which each party must limit their asserted

27   claims to five. (April 24, 2013 Case Management Order (D.I. 471)).  Given that there are currently 10
     claims being asserted against Apple, it is likely that many of the terms Apple is seeking construction

28   on will no longer be at issue after February 6, 2014.

1 ███████████████████████████████████████████████████████████

2 These issues are further addressed in Samsung's opposition to Apple's motion for summary judgment

3 filed concurrently herewith.  (*See* Samsung's MSJ Opp., Section V.)

      **C.**    **Apple Improperly Seeks Further Construction Of "Zone Specific Storage and Interface Device," And Improperly Seeks A Finding of Non-Infringement of the '757 Patent**

6       Apple's motion seeks further construction of "zone specific storage and interface device," a

7 term that has already been construed by the Court, and should be denied for the reasons discussed

8 above. (*Markman* Order, Dkt. No. 447 at 38-45.)  It should also be denied as an untimely request for

9 reconsideration of the Court's *Markman* order.

10       Apple's motion also violates the Court's case management order because it is a thinly-veiled

11 motion for summary judgment.  Apple is essentially asking the Court to rule that its accused mobile

12 devices (*e.g.*, iPhones and iPads) do not infringe.  This request fails to comply with Federal Rule of

13 Civil Procedure 56, and is yet another end around of the Court's case management order.

14       On the merits, Dr. Schonfeld's identifies extensive evidence showing that Apple's mobile

15 devices meet the Court's construction for this term. ██████████████

16 ███████████████████████████████████████████████████████████

      **D.**    **Apple Improperly Seeks Further Construction of "Means For Capturing, Digitizing, and Compressing At Least One Composite Signal" From The '239 Patent**

19       Apple once again seeks further construction of a term that was extensively briefed by the

20 parties and construed by the Court.  (*Markman* Order, Dkt. No. 447 at 46-55.)  During the *Markman*

21 process, Apple, Samsung, and the Court agreed that the claimed function is "capturing, digitizing, and

22 compressing at least one composite signal."  Now, Apple seeks further construction of this term to add

23 a new limitation of "capture of an existing composite signal." (Mot. at 20).   Apple did not advance

24 this new limitation during the *Markman* proceedings and should not be permitted to do so now.

25       Additionally, contrary to Apple's claim, Dr. Schonfeld's infringement opinion *is* based on the

26 agreed upon function.  Dr. Schonfeld applies this function when analyzing this limitation of Claim 1

27 in his infringement report.  He states that this limitation has the function of "capturing, digitizing, and

28 compressing at least one composite signal," (Fazio Dec. Ex. TT, ¶ 1302), and ████████████

1 ████████████████████████████████████████████████████

2 ████████████████████ There is nothing inconsistent with also noting that the ████████

3 ████████████████████████████████████████████████████

4 ████████████████ Further, Dr. Schonfeld testifies that Claim 1 refers to ████████████

5 ████████████████████████████████████████████████████

6 ██████████████████████ Fazio Dec. Ex. UU, Schonfeld Dep. Tr. 353:16–21. Dr.

7 Schonfeld is simply making clear that the compression of Claim 1 receives both audio and video

8 components and results in both compressed audio and compressed visual components, as the Court's

9 construction required. (*Markman* Order, Dkt. No. 447 at 48.) ("'means for capturing, digitizing, and

10 compressing at least one composite signal' must be capable of capturing, digitizing and compressing

11 both audio and visual components").

## E.    Apple Improperly Seeks Construction Of Numerous Means Plus Function Terms From the '239 Patent

Apple's *Daubert* motion seeks construction of 6 means plus function terms—five in Claim 1 and one in Claim 15—from the '239 patent. (Mot. at 20–21.) As explained above, additional *Markman* proceedings at this time will likely result in wasted judicial and party resources construing terms from claims that will be dropped by the trial date. As such, Apple's motion should be denied.

Apple also claims that Dr. Schonfeld applied the incorrect standard for his analysis of "equivalents thereof" under section 112, paragraph 6. (Mot. at 22.) Apple argues that Dr. Schonfeld only required the accused structure to perform substantially the same function to qualify as a structural equivalent, as opposed to the identical function. (*Id.*) However, Apple mischaracterizes Dr. Schonfeld's analysis, omits citations to his report where he demonstrates that he requires the identical function, and omits the portion of Dr. Schonfeld's deposition where he recites, from memory, the legally correct standard he applied in his analysis.

Structural equivalence under section 112, paragraph 6 requires the accused structure to perform the identical function as the claimed function in substantially the same way to achieve substantially the same result. Doctrine of equivalents ("DOE") employs the same test but only requires the function be substantially the same, as opposed to identical. For each claim limitation, Dr.



1   Schonfeld begins his analysis

2

3

4

5

6

7

8

9

10

11

12                                                                                      Dr. Schonfeld then goes

13   on to demonstrate

14

15         Thus, Dr. Schonfeld has accurately and reliably opined that the accused structures are structural

16   equivalents

17

18   **V.      There Is No Basis To Exclude Dr. Rinard's Demonstrative Exhibits Under *Daubert*.**

19   Apple's motion to exclude demonstrative exhibits under *Daubert* is both misplaced and overreaching.

20   The relevant prior art references here are the prior art software programs, WAIS and AppleSearch.

21   (Rho Decl. ISO Apple's Motion for Summary Judgment, Oct. 10, 2013 ("Rho Decl.") Ex. D-1 (Rinard

22

23   ———————————————
     [25]   Dr. Schonfeld

24   (Fazio Dec. Ex. VV, Schonfeld Dep. Tr. at 60:23–62:21)  When asked about his understanding of the
25   test for structural equivalence, Dr. Schonfeld stated that

26                                                          (*Id.* at 62:9–15 (emphases added))  Dr. Schonfeld
27   then confirmed that he applied this understanding in his infringement analysis.  (*Id.* at 62:22–25)

28                                      Dr. Schonfeld accurately applied the law regarding equivalents thereof.

SAMSUNG'S OPPOSITION TO APPLE'S MOTION TO EXCLUDE EXPERT TESTIMONY

Opening Report) at ¶¶ 300-339, Ex. 9, ¶¶ 411-427, Ex. 1.)[26]  Dr. Rinard opined that "the contents of the free-WAIS-sf 2.0.65 distribution invalidate the asserted claims of the '959 patent" and that "the AppleSearch version 1.5 software [] invalidates the asserted claims of the '959 patent."  (Rho Decl. Ex.D-1 (Rinard Opening Report) at ¶¶ 484, 490.  For each of these software programs, Dr Rinard analyzed the source code underlying the program, identifying particular "program instructions for a computer to perform a particular process" in that code.[27]  (Rho Decl. Ex. D-1 (Rinard Opening Report) at Ex. 9 [analyzing WAIS], Ex. 1 [analyzing AppleSearch].)  Dr. Rinard also analyzed other documentation describing the operation of these prior art software programs, such as user guides, confirming his understanding of these "program instructions" was correct.  (*Id.*)  Consistent with that detailed analysis, Dr. Rinard installed, configured, and used the software "to perform the steps outlined in claims 24 and 25 of the '959 patent, thereby verifying [that free-WAIS-sf 2.0.65 and AppleSearch version 1.5] contain the claimed program instructions."  (Rho Decl. Ex.D-1 (Rinard Opening Report) at Ex. 9, pg. 1 Ex. 1, pg. 2.)

Apple's motion suggests Dr. Rinard cannot demonstrate prior art at trial unless he uses a software installation that was perfectly preserved for use over a decade later.  This is false, as is plain from Apple's failure to present any authority precluding software demonstratives under Daubert.  As set forth in more detail in Samsung's Opposition to Apple's Motion for Partial Summary Judgment, the asserted claims cover software with the capability to perform certain functions; whether and when those capabilities were used is irrelevant.  *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1205 (Fed. Cir. 2010).  Where the capabilities of a given piece of vintage software are at issue, courts regularly permit experts to demonstrate that software's capabilities by installing and running the software.  For example, in *Eolas Technologies Inc. v. Microsoft Corp.*, 399 F. 3d 1325 (Fed. Cir. 2005), the Federal Circuit reversed the district court's grant of judgment as a matter of law that the

---

[26]  Apple's reference to the preliminary injunction phase, and to an exhibit used for another patent with a different set of claim limitations, is inapposite.  The preliminary injunction proceedings did not consider any analysis by Dr. Rinard, or consider the specific claims of the '959 patent being asserted —claims from a patent that was not considered during the preliminary injunction phase.

[27]  Apple's expert, Dr. Snoeren, agrees that "instructions" include source code.  (Fazio Dec. Ex. PP (Snoeren Opening Report) at ¶ 92 ("The instructions found in a computer readable medium are generally written by a programmer as source code."))

1  prior art did not anticipate the asserted patents where the defendant corroborated analysis of code's

2  "capability" by demonstrating the software for the jury.  *Id.* at 1329.  Similarly, in *Versata Software,*

3  *Inc. v. Internet Brands, Inc.*, 902 F. Supp. 2d 841 (E.D. Tex. 2012) the District Court upheld a jury

4  verdict finding a patent anticipated based in part on a demonstration of prior art software's capabilities

5  and testimony describing how that configuration was consistent with contemporaneous descriptions of

6  the software's capabilities.  *Id.* at 847.  Likewise, in *Finjan, Inc. v. Symantec Corp.*, 10-CV-593

7  (GMS), 2013 WL 5302560 (D. Del. Sept. 19, 2013), the Court upheld a finding of invalidity based in

8  part on a demonstration of the prior art "SWEEP-InterCheck" software an expert displayed at trial.[28]

9  *Id.* at *17.

10     The Federal Circuit allowed similar demonstrations in the analogous context of infringement

11  analysis.  In *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261-63 (Fed. Cir. 2013), the

12  Federal Circuit rejected an argument, similar to the one made by Apple here, complaining that the

13  plaintiff's expert's configuration of the software for a demonstration system "chang[ed] and

14  modif[ied] a noninfringing product into an infringing product."  *Id.* at 1262.  The Federal Circuit

15  rejected this argument, finding that the expert's demonstration system was the "most telling evidence"

16  of the capabilities of the accused software.  *Id.* at 1261.   By demonstrating the software,

17  "the expert confirmed his theories that the accused software was capable of performing the claimed

18  functionality by making the software perform the function without modifying the software." *Id.* at

19  1262.   Moreover, Apple does not, and cannot, allege that Dr. Rinard modified the WAIS or

20  AppleSearch software at issue in his demonstration of the capabilities of that software.

21     Dr. Rinard's demonstrative exhibits faithfully show the capabilities of prior art software as the

22  software existed prior to the filing of the '959 Patent.  Notably, in its *Daubert* motion, Apple does not

23  challenge the adequacy or propriety of Dr. Rinard's analysis of the "instructions" in the software itself

24  _____

25  [28]  "In view of the foregoing, the court finds that there was substantial evidence in the record, via Mr.
   Klausner and Dr. Hruska's testimony and Sophos' demonstration, that SWEEP-InterCheck meets each

26  of the limitations of the asserted claims. The jury heard from both sides' experts and was within its
   right to determine which opinion was credible as to anticipation. The court will not, therefore, grant

27  JMOL and overturn the jury's invalidity verdict with respect to the #194 Patent." *Finjan, Inc. v.*
   *Symantec Corp.*, 10-CV-593 (GMS), 2013 WL 5302560 at *20 (D. Del. Sept. 19, 2013)

28

1    or his mapping of those instructions to the functionality recited in the claims—just Dr. Rinard's

2    demonstration of those instructions by running them on a computer.  Indeed, Apple's true complaint

3    seems to be that the demonstrative exhibits to Dr. Rinard's report are **too** convincing, and that

4    demonstrations the software instructions in operation would clearly invalidate the asserted claims of

5    the '959 patent.  This is not a valid basis to preclude Dr. Rinard's opinions, or to preclude the use of

6    demonstrative exhibits that simply show prior art software in operation.  Tellingly, Apple presents no

7    authority where a Court has precluded demonstrative exhibits under *Daubert* in similar circumstances.

8    Apple's failure to cite any relevant authority speaks volumes.  As described above, this type of

9    demonstrative is regularly considered by jurors to aide their analysis of software capabilities, and

10   indeed may be the "most telling evidence" of such capabilities.  *Versata Software, Inc.*, 717 F.3d at

11   1261.  Apple's motion to exclude Dr. Rinard's opinions should be denied.[29]

12   **VI.    The Court Should Not Exclude Testimony About Apple's Prior Positions**

13         Apple improperly attempts to use a *Daubert* motion to preclude Samsung's experts from

14   testifying about the opinions Apple's experts have expressed in prior litigation.  While Apple's

15   requested relief is not limited to Dr. Chevalier, it appears that Apple's primary concern is hiding from

16   the jury that its damages methodology in prior cases is at odds with Dr. Vellturo's analysis here.

17   Apple's request is improper and baseless.  Apple fails to cite any authority supporting its position that

18   an expert can, much less should, be precluded from pointing to positions the opposing party's experts

19   have taken when undertaking a similar analysis.

20         Dr. Chevalier shows in her report how following ███████████████████████

21   ████████████████████████████████████████████████████████████████

22   ████████████████████████████████.  (Dkt. 806-6, Ex. A-1 at ¶¶ 343-

23   347, Chevalier Rpt. Ex. 97, Fazio Dec. Ex C)  According to Apple, inconsistencies between Dr.

---

[29]     At best, these complaints regarding prior art demonstratives should be handled by way of pretrial evidentiary objections –just as they were in the last case.  (*See* Fazio Dec. Ex. QQ (Apple v. Samsung, Case No. 11-cv-1846, Dkt. No 1774) at 5 (allowing Apple's prior art demonstrative to be presented to the jury by Apple's expert "if Apple is able to present relevant, admissible evidence such that a reasonable jury could find that the iBook is prior art").)  Apple's attempt to avoid the same pretrial objection process the parties used in the last case, and instead challenge Samsung's expert on *Daubert* grounds for using the same methodology Apple's own expert employed in the prior case, is impermissible.  Apple's complaints should be handled as an evidentiary objection before trial.

1   Vellturo's current damages approach and the ones ███████████████████████████████████
2   ████████████ including in this Court against Samsung, are not relevant.  (Mot. at 24-25.)  Apple
3   again fails to cite any authority supporting this argument.  Apple also argues that even if relevant,
4   Rule 403 requires exclusion.  (*Id.* at 25.)  If granted, Apple's request would allow it to attack Dr.
5   Chevalier's methodology and the evidence on which she relies to support her opinions (*id.* at 3-11),
6   while hiding from the jury the fact that ██████████████████████████████████████████
7   ██████████████████████████████████████████████████████████████████
8   ████████████ *That* would be prejudicial.
9   ████████████████████████████████████████████████████████████
10  ████████████████ (and more consistent with Dr. Chevalier's approach).  *Daubert* is not a
11  mechanism for shielding relevant evidence from the fact-finder except where such evidence is
12  scientifically unreliable.  Apple makes no argument that Dr. Chevalier's recognition of Apple's prior
13  positions is properly excluded under Rule 702 and *Daubert.*
14      Even more improper is Apple's broad-brush effort to preclude *all* of Samsung's experts from
15  making reference to any testimony by Apple witnesses given in any other litigation.  The Court should
16  weigh objections to admission of any such testimony at the time it is offered, not in the abstract as
17  Apple seeks.  This is not a proper *Daubert* motion but rather is properly addressed through the
18  ordinary process of objecting to testimony.

19  DATED:  November 1, 2013                QUINN EMANUEL URQUHART &
20                                          SULLIVAN, LLP

21                                  By      */s/ Victoria F. Maroulis*
22                                          Charles K. Verhoeven
                                            Kevin P.B. Johnson
23                                          Victoria F. Maroulis
                                            William C. Price
24                                          Michael L. Fazio

25                                          Attorneys for
26                                          SAMSUNG ELECTRONICS CO., LTD.,
                                            SAMSUNG ELECTRONICS AMERICA, INC.,
27                                          and SAMSUNG TELECOMMUNICATIONS
                                            AMERICA, LLC
28

## ATTESTATION

I, Michael L. Fazio, am the ECF User whose ID and password are being used to file this Declaration.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that Victoria F. Maroulis has concurred in this filing.


Dated:  November 1, 2013                                    By:_____/s/ Michael L. Fazio_____

                                                                                    Michael L. Fazio

SAMSUNG'S OPPOSITION TO APPLE'S MOTION TO EXCLUDE EXPERT TESTIMONY