# EXHIBIT K



# VALUATION & DEALMAKING

## of

## TECHNOLOGY-BASED INTELLECTUAL PROPERTY

*Principles, Methods, and Tools*

DR. RICHARD RAZGAITIS

interest, all things considered. Here, the unique-universal paradox means that though no two deals are ever exactly alike,[6] behind the differences are certain business universals such as projected sales and profit, required resources investments, and overall perceived risks and uncertainties that guide the parties in reaching the terms of their agreement. It is this unique-universal feature that we will discuss in this first method of valuation.

### Segmentation of the "Industry Standards Method"

The Industry Standards Method, can be thought to comprise three different sub-methods: (1) the market or comparables approach, (2) paradigm licensing, and (3) rating/ranking. (See Exhibit 4.1.) We shall now consider broadly how each of these three could be applied in technology licensing.

**MARKET (OR COMPARABLES) LICENSING** One of the traditional approaches to the valuation for anything is commonly known as the market (or, sometimes, the *comparables*) method. The simple underlying idea is that there exists a historical transaction that was valued by other parties that can be used as a direct prediction of the value of the present opportunity. Referring to the above discussion of real property, we can generally determine by public records filed with the appropriate property tax agency the price that was paid for a property together with the legal description of what was sold. If we can find a property that was sold recently that is comparable in size, quality, features, accessories, and so forth, it is likely to be a good indication of the value of our property's value. In residential real property, such comparables are



**EXHIBIT 4.1** Method 1: Use of "Industry Standards" to Determine Royalties
*Source:* © 2003 Razgaitis, richard@razgaitis.com.

generally widely available because many homes can be considered as belonging to similar, widely relevant categories such as: four bedrooms, two and one-half baths, two-car attached garage, on a quarter-acre lot, in good condition. In commercial real estate, the situation can be more challenging. In 2002, the Empire State Building in New York City was sold; by definition, there is an inherent uniqueness to this property—it has been designated one of the Seven Wonders of the Modern World, and is a City icon—and by the terms of the sale as there is a pre-existing lease that will extend until the year 2076. Yet there is a cost per square foot and a projected rate of return on the purchase price that can be used to establish a reasonable estimate of value, which was $57.5 million. Taking another New York example, the Mets baseball team, which has a strong component of intellectual property value associated with its trademark and tradename, was valued in 2006.[7] The Mets are at the same time unique, and seemingly beyond a market-based valuation model, yet there are 29 other major league baseball teams, and many other professional sports teams, with which comparisons can be made, as well as return on investment calculations based upon forecasted revenues and profits.

Applying such examples to technology licensing, the market valuation approach is the use of the terms of one or more comparable license agreements to estimate the value of the subject technology licensing opportunity. In some instances one is able to find one or more agreements that appear to be very closely related to the subject opportunity and deal structure. However, even in this fortuitous case one needs to ask whether the price (and terms) of the found agreement(s) reflects present market value. It is possible that the seller in that historic case sold too cheaply, for whatever reason; or, in the alternative, that the buyer paid dearly, perhaps because of something akin to dot-com fever.

In many cases, applying the market valuation approach leads to numerous, say a dozen or more, agreements in the same broad technology category but no one of which, for different reasons, is exactly or near exactly comparable. In this circumstance, one may yet be able to estimate a royalty range from this family of agreements.

**PARADIGM LICENSING**  Paradigm has become a widely used buzz word as a result of one of the most influential books of the twentieth century: Thomas Kuhn's *The Structure of Scientific Revolutions* (University of Chicago Press, 1962). In that scholarly book, which sold more than one million copies (every author's dream), Kuhn applied a term used by linguists to describe how irregular verbs are declined ("I am," "You are," "He is," etc.) to how scientists adopt and cling to models of world (e.g., Ptolemaic geocentric vs. Copernican heliocentric structure, or quantum vs. classical mechanics). Such scientific models, according to Kuhn, become paradigms, meaning they are widely adopted as explaining the way the world works and are not subject to scrutiny any more than we wonder why we say "I am" but "you are" when in both cases we are conveying the idea of being.

Extending the proliferation of paradigm usage into yet another domain, we can consider a segment of the Industry Standards valuation method as being the use of widely accepted standard rates and terms. Paradigm rates exist in many domains. When one eats in a restaurant, there is the understanding that the table server and other wait staff will be compensated for such service by an amount proportional to the cost of the meal, somewhat like a royalty. Historically, such rate was 10 percent,

but in the past 20 years or so it has been 15 percent and now one frequently hears 15 to 20 percent as an appropriate range for a tip. Another example of paradigm rates is the maintenance cost of enterprise software. If a company licenses a software product for, say, a payment of $1 million, there is in addition an annual payment (which typically begins after the first year) for maintenance that is based on a percentage of the license fee. Historically such annual maintenance fee was 15 percent of the license fee ($150,000 a year, in our present example); more recently, like table service, it appears to be increasing into the 15 to 20 percent (or greater) range.

Closer to our subject is the area of trademark licensing. There is a general understanding that many such transactions will be valued within widely accepted ranges. One example of this is shown in Exhibit 4.2, taken from a book on trademark licensing rates by Battersby and Grimes.[8] Exhibit 4.2, taken from the first page of their book, shows three products for which trademark licensing of different types could occur: adhesive bandages, afghans (the blankets, not the nation), and aftershave lotion. For each product type there are seven columns that correspond to the various types of sources of trademark value: art, celebrity (such as George Foreman), character (such as Waldo), collegiate, corporate, designer (Ralph Lauren), event (Olympics), and sports (Yankees). Then for each product row, Battersby and Grimes show the range of royalty rates, as determined by a combination of surveying and expert panel, that appear to be widely accepted in the industry. However, notice these values have fairly wide ranges such as 3 to 10 percent or even 1 to 10 percent, so it makes an important economic difference where you end up in that range. Further, Battersby and Grimes point out, as one would expect, there may be certain "hot properties" where rates above the range can occur and in other cases "tight margins" (and, presumably, "not so hot" properties) where the opposite occurs. Two very different examples of hot properties are Jennifer Lopez and George Foreman. Signatures Network Inc. has entered into a licensing agreement with Ms. Lopez for the use of her intellectual property (photographs of her) in T-shirts, posters, calendars, back-to-school items, and other to-be-announced products with sales estimated to reach $20 to 40 million in just six months.[9] Although the royalty terms of this license were not disclosed, it would not be surprising if the royalty rate exceeds the range suggested by the Battersby and Grimes tables because of the then current fervor and fame of J-Lo.[10] (Separately, Ms. Lopez, following a classic field of use licensing model, has licensed her IP for a new fragrance, Glow, various restaurants, and probably thousands of other uses.) However, by 2009 it is likely that female celebrity licensing pricing leadership has diffused to other individuals, although Glow is still on the market. George Foreman, a very different kind of celebrity IP than Ms. Lopez, achieved his own licensing notoriety in 1999 by licensing his name and image to the makers of George Foreman Grills for a paid-up amount of $137.5 million and stock, a gargantuan sum which is probably outside common trademark licensing guidelines.

In the 2008 edition of the Battersby and Grimes book (copyrighted by Aspen Publishers), they have changed the royalty ranges even of such everyday products as adhesive bandages, afghans, and aftershave lotions. For instance, for adhesive bandages, in the 2008 edition the ranges listed for "celebrity" contexts is 7 to 11 percent (compared to 3 to 10 percent in Exhibit 4.2 from 2001), "corporate" is 2 to 6 percent, and "event" and "sports" are 2 to 10 percent. In its preface to the 2008 edition it further cautions that ranges observed for January might differ from that in December.