| | |
|---|---|
| 1 | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| 2 | Charles K. Verhoeven (Bar No. 170151) |
| | charlesverhoeven@quinnemanuel.com |
| 3 | Kevin A. Smith (Bar No. 250814) |
| | kevinsmith@quinnemanuel.com |
| 4 | 50 California Street, 22nd Floor |
| | San Francisco, California 94111 |
| 5 | Telephone: (415) 875-6600 |
| | Facsimile: (415) 875-6700 |
| 6 | |
| | Kevin P.B. Johnson (Bar No. 177129) |
| 7 | kevinjohnson@quinnemanuel.com |
| | Victoria F. Maroulis (Bar No. 202603) |
| 8 | victoriamaroulis@quinnemanuel.com |
| | 555 Twin Dolphin Drive, 5th Floor |
| 9 | Redwood Shores, California 94065 |
| | Telephone: (650) 801-5000 |
| 10 | Facsimile: (650) 801-5100 |
| 11 | William C. Price (Bar No. 108542) |
| | williamprice@quinnemanuel.com |
| 12 | 865 South Figueroa Street, 10th Floor |
| | Los Angeles, California 90017-2543 |
| 13 | Telephone: (213) 443-3000 |
| | Facsimile: (213) 443-3100 |
| 14 | |
| | Attorneys for SAMSUNG ELECTRONICS |
| 15 | CO., LTD., SAMSUNG ELECTRONICS |
| | AMERICA, INC. and SAMSUNG |
| 16 | TELECOMMUNICATIONS AMERICA, LLC |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation, | CASE NO. 12-CV-00630-LHK (PSG) |
| Plaintiff, | **DECLARATION OF DR. SANJAY K. RAO IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE INC.'S MOTION TO EXCLUDE CERTAIN UNRELIABLE AND IMPERMISSIBLE SAMSUNG EXPERT TESTIMONY** |
| vs. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | Date: January 23, 2014<br>Time: 1:30 p.m.<br>Place: Courtroom 8, 4th Floor<br>Judge: Honorable Lucy H. Koh |
| Defendants. | |

02198.51990/5599168.1

Case No. 12-CV-00630-LHK (PSG)
DR. SANJAY K. RAO DECL. IN SUPPORT OF SAMSUNG'S OPP. TO APPLE'S MOT. TO EXCLUDE

I, Dr. Sanjay K. Rao, declare as follows:

1.     I am a Vice President in the Life Sciences practice at Charles River Associates ("CRA").  CRA is a leading global consulting firm that offers economic, financial, and business management expertise to major industries, accounting firms, law firms, and governments around the world.  For more than 30 years, CRA's Life Sciences Practice has consulted directly with major life sciences corporations, the governmental agencies that regulate them, and the legal counsel to these corporations.  The Life Sciences practice combines deep industry focus with state-of-the-art analytical tools to help our clients address critical business, competitive, and litigation issues.  Among other responsibilities, I oversee the strategic marketing research capabilities of CRA's Life Sciences practice, including qualitative research and analysis, survey design and execution, reporting, modeling, insights and strategy development.  Attached as Exhibit A is a true and correct copy of my curriculum vitae.

2.     I graduated with a Bachelor's degree in Aeronautical Engineering from the Indian Institute of Technology, Bombay, in 1982.  I graduated with a Ph.D. in Marketing from the Wharton School of the University of Pennsylvania in 1987, with a minor in Statistics and Econometrics.  My doctoral dissertation titled 'An Appraisal of Conjoint Choice Simulators' studied alternative methods for simulating consumer choices and market shares from their evaluations of product features and concepts.

3.     Over the past two decades, I have been engaged in the pharmaceutical and biotechnology industries as an analyst, consultant, manager and executive.  I have designed and led the execution of numerous surveys involving the use of preference and choice models such as conjoint analysis, discrete choice modeling, choice-based conjoint analysis and alternative methods of paired comparison.  The results of such efforts have informed new product design; feature, product, franchise and portfolio valuations; consumer segmentation, product and portfolio pricing, differentiation and positioning strategies.  Inputs from my work in preference, choice and feature evaluations have also been used to develop detailed forecasts of product, franchise and portfolio sales and market share.  Some of my work based on measuring consumer evaluations of

product features has been used to determine the impact of alternative marketing and sales force strategies on product performance.

4. Since 1991, I have designed, managed, and led projects influencing sales, marketing, pricing, market access, and commercial strategies of approximately 35 biotechnology and pharmaceutical products launched in the U.S. and other global markets. I have also designed, managed, and led projects impacting the commercial development of pipelines, franchises, and portfolios of three of the largest global bio/pharmaceutical firms. My experience stems from conducting in-depth research and analytically intensive projects; developing insights; framing, calibrating, and making predictions from econometric and marketing science models; and recommending strategic action steps impacting bio/pharmaceutical commercial planning, development and execution. My work has influenced product and portfolio development strategies, clinical trial investments, pharmaceutical brand development, new product commercialization, clinical and geographic market development, sales force design and optimization, product life cycle management, and new product and portfolio pricing, access, and evolution strategies.

5. Between 2001 and 2006, I was director and team leader for the Business Analysis and Information ("BAI") group at Amgen Inc., the world's largest biotechnology company. One of my primary responsibilities was to design, integrate and report results from initiatives that relied on forecasting methods, marketing research, competitive intelligence and sales operations. As a BAI team leader, I was part of the brand teams responsible for launching and managing the life-cycles of Neupogen/Neulasta and Aranesp, brands that generated annual sales in excess of $1 billion each. I also participated in designing annual U.S. and global brand plans in which I paid careful attention to the commercial resourcing and strategic management of brands in the light of changes in evolving competitive marketplaces. While at Amgen, I was a contributing member of Product Strategy Teams ("PSTs") overseeing pipeline projects in Oncology and Metabolic Diseases. Part of this role involved evaluating features and characteristics of compounds in development toward assessing their long term potential in the market.

6. My publications have appeared in peer-reviewed journals such as *The Journal of Business Strategy*, *The Journal of Commercial Biotechnology*, *The Journal of Medical Marketing, The Journal of New Product Innovation Management*, *Marketing Research*, *Marketing Insights, Marketing Health Services*, *Product Management Today*, *The Journal of Pharmaceutical Development & Regulation*, *SCRIP – Issues in Pharmaceutical Perspectives*, *PM360*, *The Pharmaceutical World Directory*, *Pharmaceutical Executive, Pharmaceutical Markets Europe, Corporate Disputes - Financier Worldwide* and in proceedings of the Pharmaceutical Market Research Group (PMRG), the PMRG Institute, the Pharmaceutical Management Science Association (PMSA), the European Pharmaceutical Marketing Research Association (EPhMRA), the Oxford Outcomes Patient Research Outcomes (PRO) Conference, and the Marketing Research Association (MRA).  In a special management consulting supplement, the November 2007 issue of Pharmaceutical Executive carries my profile as one of the leading strategy consultants in the global pharmaceutical industry.  Attached as Exhibit B is a list of my publications in the last 10 years and a list of my previous testimony as an expert witness in the areas of marketing, marketing and survey research, and business analysis and information.

7. I was retained by Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, "Samsung") in order to conduct an independent evaluation of U.S. based users of three Apple product groups - the iPhone (4/4S/5), the iPad (2/3/4/mini) and the iPod Touch (4th/5th generation).[1]  The goal of such an evaluation was to understand the relative value such users placed on fourteen specific features.  I reported my findings in the Expert Report of Sanjay K. Rao, served on August 12, 2013.  A true and correct copy of relevant excerpts from my report is attached as Exhibit C.

8. I have been asked by counsel for Samsung to comment on portions of Apple Inc.'s Motion to Exclude Certain Unreliable and Impermissible Samsung Expert Testimony relating to my work in this case.  In doing so, I have reviewed Apple's motion and the relevant exhibits

---

[1] I also conducted an independent evaluation of U.S. based users of the iPhone (3G/3GS) but understand that the iPhone (3G/3GS) are no longer at issue in this case.

attached to the Declaration of Casey J. McCracken, and the transcript of my October 1, 2013 deposition in this matter.  In addition, I have relied on relevant portions of my expert report and related data, my training while earning my doctorate in marketing and my knowledge, experience, and expertise regarding survey methodology, marketing research, statistics, and econometrics.

*Sawtooth Software*

9. To reach the conclusions I set forth in my report in this matter, I used a peer-reviewed, generally accepted, survey based, measurement and scaling methodology known as Maximum Difference Scaling ("MaxDiff"), which is also sometimes referred to as Best-Worst Scaling.  I used software from Sawtooth Software ("Sawtooth") to perform the MaxDiff analysis that produced the relative value scores that Dr. James Kearl uses to calculate damages in his report in this matter.

10. Sawtooth is a leading software company that provides software solutions for marketing research applications.  It provides the leading software for MaxDiff and other research and publishes technical and research papers.  The research and technical papers published by Sawtooth are highly regarded and widely utilized by market researchers.

11. In order to effectively utilize the Sawtooth MaxDiff software package, I relied, in part, on The MaxDiff Technical Paper, Sawtooth Software, Technical Paper Series, Version 8. This technical paper is one of the papers published by Sawtooth and is highly regarded and widely used by market researchers engaging in MaxDiff analysis.  A true and correct copy of The MaxDiff Technical Paper, Sawtooth Software, Technical Paper Series, Version 8 is attached as Exhibit D.

*Converting to Ratio Scale*

12. In its Motion, Apple states that the MaxDiff Hierarchical Bayes (HB) relative value scores by Dr. Kearl do not provide meaningful ratios that allow for the measurement of how much more or less valuable one feature is compared to another feature because those scores were not "converted to a ratio scale."  That is not correct.

13. The MaxDiff HB relative value scores for the fourteen tested features are derived from a probability function that describes how an individual makes choices among the features

shown to him or her on the basis of value. As is well documented in the relevant academic and industry literature, the MaxDiff HB relative value scores possess ratio scale properties. Thus, as I testified in my deposition, there are two ways to use the MaxDiff HB relative value scores to calculate ratios that can be used to measure how much more or less valuable any of the tested features are compared to any other tested feature.

    (a)    The first way to calculate relative value ratios was used by Dr. Kearl in his calculation of Samsung's damages for three of the feature patents in this matter. Dr. Kearl calculated the relative value ratios used in his reasonable royalty analysis by dividing the HB relative value score for a tested feature by the sum of the HB relative value scores for the two tested FaceTime features (FaceTime over WiFi and FaceTime over cellular). This method is reliable and valid.

    (b)    The second way to calculate relative value ratios is first to rescale the HB relative value scores by converting them to a common ratio scale, such as a percentage scale, where the minimum value is 0 percent and the maximum value is 100 percent. Relative value ratios are then calculated by dividing the relative value score on the percentage scale for a tested feature by the sum of the relative value scores on the percentage scale for the two tested FaceTime features.

14. The ratios that result from these two calculations, described in paragraphs 13(a) and 13(b), are identical. Regarding the second way described in paragraph 13(b), rescaling the MaxDiff HB relative value scores by converting them to a 0 to 100 ratio scale changes the relative value *score* but does *not* change the relative value imputed to any of the tested features in comparison to the two FaceTime features.

15. In Tables 1 through 3, Exhibits E through G attached to this Declaration, I show that rescaling the MaxDiff HB relative value scores from Tables 2b, 3b, and 4b of my expert report (*i.e.,* the relative value scores used by Dr. Kearl to calculate his relative value ratios) by converting them to a 0 to 100 ratio scale produces the exact same relative value ratios used by Dr. Kearl in his reasonable royalty analysis.

*Anchoring on a Value of '0' or '100'*

16. The Apple Motion also states that the choice of anchoring the HB relative value scores to a value of '0' or '100' is arbitrary and the fact that the same survey responses result in different relative value scores depending on whether the value of the anchor is set at '0' or '100' demonstrates that the relative value ratios calculated by Dr. Kearl are not valid, reliable or meaningful. Apple is incorrect; while changing the anchor value from '0' to '100' changes the relative value *scores*, it does not meaningfully change the *relativity* among those scores.

17. The Sawtooth MaxDiff software package generates relative value scores anchored on '0' and '100' by default. The anchor in either case represents the probability of a respondent picking a feature as being more valuable (compared to the other features) purely on the basis of chance. Value scores that are higher than the value score represented by the anchor ('0' or '100') represent features that play a significant part in driving value choices compared to the anchor, which represents a feature that impacts value choices simply by random chance and thus does not have any value. Value scores which are lower than the value represented by the anchor ('0' or '100') represent features that do not play a role in driving value choices.

18. The probability represented by the anchor is a ratio, depending upon the number of features under consideration (here one in fourteen). It is not an arbitrary number. It does not vary by whether one represents an anchor by '0' or '100'. It is a ratio representing a finite probability; it has meaning firmly grounded in the context of assessing how respondents make value driven choices among an identified set of features. As such, this probability has a meaningful, natural origin that acts in the same manner as a ratio scale's absolute zero.

19. Changing the anchor value from '0' to '100' shifts feature value scores to array similarly around '0' or '100'. It has no meaningful impact on the relativity among the value scores for the fourteen tested features. The two sets of relative value scores (centered on '0' or '100') are statistically the same. The underlying probabilities of picking a feature as being more valuable than others remain the same whether one uses relative value scores anchored on '0' or '100'. These probabilities have been estimated on the same unique data characterizing relative value choices among the same set of features made by the same respondents. The probability ratio

02198.51990/5599168.1                                              -7-                        Case No. 12-CV-00630-LHK (PSG)
DR. SANJAY K. RAO DECL. IN SUPPORT OF SAMSUNG'S OPP. TO APPLE'S MOT. TO EXCLUDE

describing the anchor is the same whether the anchor is represented by a score of '0' or '100', viz. the probability of randomly choosing one of fourteen features as being valuable in comparison to other features.[2] Thus, choosing an anchor value of '100' versus '0' does not change the relativity inherent in the resulting value scores.

20. Given the sameness between value scores anchored on '0' and '100', the fact that scores anchored on '100' are available on a positive scale makes for easier interpretation. Relative value ratios calculated from value scores anchored on '100' are all based on positive numbers. This is not the case when relative value ratios are calculated with value scores anchored on '0', where features with no value can have negative value scores, thus leading to negative relative value ratios. As such, we prefer to calculate relative value ratios using value scores anchored on '100'. There is no loss in information, nor any distortion in the relativity among feature values. The value ratios are interpreted easily and make intuitive sense.

21. In the event that one calculated relative value ratios for the fourteen tested features using relative value scores anchored on '0', the resulting ratios would be statistically the same as the relative value ratios calculated using relative value scores anchored on '100'. Table 4 (Exhibit H to this Declaration) presents Pearson's correlation coefficients computed to illustrate the similarity between relative feature value ratios anchored on '0' and relative feature value ratios anchored on '100' for the iPhone (4/4S/5), iPad (2/3/4/Mini) and iPod Touch (4th/5th Gen) user segments. Each of the three correlation coefficients is significant at a confidence level of 99% or higher. Thus, the relative value *ratios* calculated from relative value *scores* are statistically the same, whether one uses the scores that are estimated with an anchor of '0' or an anchor of '100'.

*Journals and Other Articles*

22. I have reviewed the articles and other material submitted as Exhibits P-CC, EE-HH and JJ to the Declaration of Michael Fazio in Support of Samsung's Opposition to Apple Inc.'s

---

[2] See, for example, The MaxDiff Technical Paper, Sawtooth Software, Technical Paper Series, V8, 2013, pages 13 and 14, Sawtooth Software Inc., Exhibit D attached hereto.

Motion to Exclude Certain Unreliable and Impermissible Samsung Expert Testimony. I am familiar with the articles, and the review process that resulted in their publication:

(a) The *International Journal of Market Research* follows a peer review process prior to publishing an article. All papers are assessed by the editor and double-blind reviewed by two referees.

(b) *International Journal of Research in Marketing* follows a peer-review process prior to publishing an article. All articles are peer-reviewed, double blind.

(c) The *American Statistician* follows a double blind, peer-review process.

(d) *Marketing Research* follows a blind, peer-review process. Reviewers, in collaboration with the editor, determine which manuscripts will be accepted, rejected, or encouraged to be reworked before resubmission.

(e) The *Journal of Business Logistics* follows a double blind, peer-review process.

(f) *Psychological Review* and *Psychological Bulletin* are published by the American Psychological Association; their articles are peer reviewed.

(g) The *Journal of Agriculture and Resource Economics* follows a double blind, peer-review process.

(h) The *International Journal of Wine Business Research* follows a peer-review process prior to publishing an article. Each paper is reviewed by the editor and if judged suitable for this publication, it is then sent to two referees for double blind peer review.

(i) *Food Quality and Preference* a follows a peer-review process prior to publishing an article.

(j) All papers published in the *International Wine Marketing Symposium* are peer reviewed by a scientific committee.

(k) Presentations at the *Agricultural & Applied Economic Association Meeting* (July 2010) were subject to peer review and chosen by a select committee.

(l) ESOMAR is a professional society which promotes marketing, social and opinion research. Presentations at its symposiums are peer reviewed by a committee of

experts in the relevant field.

23.  *Foundations of Behavioral Research*, by Fred N. Kerlinger, is a highly regarded textbook.

24.  Exhibits T, U, and Z to the Declaration of Michael Fazio are white papers provided by market research firms which indicate that they use MaxDiff in their practice of marketing research.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 1, 2013, at Washington D.C.

*/s/ Sanjay Kumar*
_____
Dr. Sanjay K. Rao

**ATTESTATION**

I, Michael L. Fazio, am the ECF User whose ID and password are being used to file this Declaration. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that Dr. Sanjay K. Rao has concurred in this filing.

Dated: November 1, 2013			By:		*/s/ Michael L. Fazio*