# EXHIBIT A-2

```
 1         UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF CALIFORNIA
 3             SAN JOSE DIVISION
 4   --------------------------------X
     APPLE INC., a California
 5   corporation,
 6                  Plaintiff,
                                  Case No. 12-cv-00630
 7          VS.
 8   SAMSUNG ELECTRONICS CO., LTD.,
     A Korean corporation; SAMSUNG
 9   ELECTRONICS AMERICA, INC., a
     New York corporation; SAMSUNG
10   TELECOMMUNICATIONS AMERICA,
     LLC, a Delaware limited
11   liability company,
12                  Defendants.
     --------------------------------X
13
14
15          VIDEOTAPED DEPOSITION
16                    OF
17              JOHN HAUSER
18       Friday, September 27, 2013
19             200 Park Avenue
20           New York, New York
21
22
23   Reported by:
     AYLETTE GONZALEZ, CLR
24   JOB NO. 66029
25
```

Page 2

1      DATE:  September 27, 2013
2      TIME:  10:08 a.m.
3
4
5     Videotaped Deposition of JOHN HAUSER,
6   held at the offices of GIBSON, DUNN &
7   CRUTCHER, LLP., 200 Park Avenue, New York,
8   New York  10166, pursuant to NOTICE,
9   before AYLETTE GONZALEZ, a Certified
10  LiveNote Reporter and Notary Public of the
11  State of New York.

Page 3

1   A P P E A R A N C E S:
2
3   GIBSON DUNN & CRUTCHER
4   Counsel for Plaintiff
5     200 Park Avenue
6     New York, New York  10166
7   BY:  PAUL TORCHIA, ESQ.
8
9
10
11  QUINN EMANUEL URQUHART & SULLIVAN
12  Counsel for Defendants
13    865 South Figueroa Street
14    Los Angeles, California  90017
15  BY:  KARA BORDEN, ESQ.
16  BY:  STEPHEN SWEDLOW, ESQ.
17  BY:  JOHN QUINN, ESQ.
18
19
20
21  ALSO PRESENT:
22    CARLOS LOPEZ, Videographer

Page 4

1       THE VIDEOGRAPHER:  This is the
2   start of tape label number one of the
3   videotaped deposition of John Hauser
4   in the matter Apple, Inc. verses
5   Samsung Electronics Company, Ltd.
6       This deposition is being held at
7   200 Park Avenue, New York, New York,
8   on September 27, 2013, at
9   approximately 10:08 a.m.
10      My name is Carlos Lopez.  I am the    10:08
11  legal video specialist from TSG
12  Reporting, Inc.
13      The Court Reporter is Aylette
14  Gonzalez in association with TSG
15  Reporting.
16      Appearances are noted.
17      Will the Court Reporter please
18  swear in the witness.
19  J O H N   H A U S E R,
20    called as a witness, having been
21    duly sworn by a Notary Public,
22    was examined and testified as
23    follows:
24         ****************

Page 5

1   EXAMINATION BY
2   MR. SWEDLOW:
3       Q.  Good morning, Mr. Hauser.
4       A.  Good morning.
5       Q.  Approximately how many times have    10:08
6   you provided expert testimony either in
7   deposition or at trial?
8       A.  Fifty or 60.
9       Q.  How many times have you been
10  disclosed as an expert in litigation?        10:09
11      A.  Probably that ballpark, ballpark of
12  50 or 60.
13      Q.  Are you saying there haven't been
14  any times where you've been disclosed as an
15  expert where you didn't testify?             10:09
16      A.  Okay; it's possible.
17      Q.  I'm going to give you a short
18  version of the instructions because you've
19  testified 50 or 60 times.  I'm going to ask
20  you questions.  You're under oath.  You're   10:09
21  obligated to give your full, complete and
22  honest answers unless your Counsel instructs
23  you not to answer the question.  Do you
24  understand that?
25      A.  I understand.                        10:09

2 (Pages 2 to 5)

Page 74

1   research to determine what features and
2   functionality Verizon emphasizes in its sale
3   of Samsung accused products?
4       A. Well, that would be relevant
5   perhaps to the consideration stage, but I'm                 11:33
6   focusing on the moment of truth when they get
7   to buy the phone.
8       So I guess the answer is, in a
9   general way we did because we had to choose
10  the distraction features, but a very                        11:33
11  systematic analysis of that could go into the
12  consideration phase.
13      But that's not -- that's not my
14  study, that's not what we're trying to --
15  we're not trying to figure out how someone                  11:33
16  comes to consider a phone.
17      Q. I'm asking both in the
18  consideration phase and the moment of truth
19  phase whether you considered what features
20  Verizon emphasizes in these accused products?               11:34
21      A. Those -- that -- the answer to
22  that, that's built into my study. Okay? And
23  we can get into how that's built into my
24  study, but the answer is I did not need to
25  because I'm using the ceteris paribus -- all                11:34

Page 75

1   else equal.
2       Q. Ceteris paribus. Okay.
3       A. I always get the Latin mixed up,
4   the -- the all else equal.
5       Q. I don't -- I think there may be                      11:34
6   some confusion into what I'm asking.
7       I'm asking before you identified
8   the features in your conjoint, did you do any
9   research to determine what features of the
10  accused products Samsung emphasizes, either                 11:34
11  for purposes of the consideration phase or at
12  the moment of truth, which is the purchase
13  time?
14      A. Well, yes, we did -- we looked
15  at -- we -- we had to choose good distraction               11:35
16  features, so we did look at that. We did look
17  at a variety of things that were emphasized.
18      Q. What did you do to identify the
19  features that Samsung emphasizes when it
20  sells -- or excuse me, that Verizon emphasizes              11:35
21  when it sells Samsung accused products?
22      A. The -- the details are in my report
23  and, you know, we can turn to that if you'd
24  like.
25      Q. Did you do that work or did AMS do                   11:35

Page 76

1   that work?
2       A. That work was done by Cornerstone.
3       Q. Did you actually look at any of the
4   materials that Cornerstone gathered other than
5   the summary material?                                       11:35
6       A. Well, the raw materials, yeah, they
7   showed me the raw materials.
8       Q. Are the raw materials identified in
9   your report?
10      A. I believe they are, I believe                        11:36
11  they're part of all the backup. There's a
12  long electronic file with a zillion web pages
13  in it.
14      Q. And that's the extent to which you
15  identified information that analyzes to what                11:36
16  extent features are emphasized when Samsung
17  accused products are sold; is that correct?
18      MR. TORCHIA: Objection --
19      A. What I'm trying --
20      MR. TORCHIA: Hold on.
21      Objection to the form of the
22  question.
23      You can answer.
24      A. What I'm trying to do is, I'm
25  trying to identify distraction features. And               11:36

Page 77

1   so I need a reasonable set of distraction
2   features and I -- so we have to see, you know,
3   what's some of the features that are -- are
4   out there.
5       When I come into the study, I'd                         11:36
6   like to have distraction features that act as
7   distraction features so that they're
8   reasonably important. Of course I make some
9   guesses ahead of time based on all the data we
10  do. And I think if we look back, they -- they               11:37
11  had reasonable importance, so we -- we made
12  those correct guesses.
13      Now for the patented features, I
14  could get zeros. I mean, it's quite possible
15  that the distraction features are much more                 11:37
16  important to the respondent or price is much
17  more important. I can get zeros.
18      Q. Did you say I can get zeros for?
19      A. For the importances.
20      And, you know, I guess we can go                        11:37
21  through all the backup, it's -- it's plotted
22  there. For some of people, you will get
23  importance, you will get importances that are
24  close to zero; for others, obviously we didn't
25  because there's a small set of people who                   11:37

20 (Pages 74 to 77)

Page 78

1  would change their behavior.
2       Q.  We've switched again to the results
3  of your conjoint.  I'm not asking about the
4  results, I'm asking about the work that you
5  did in creating the conjoint survey                11:37
6  instrument.  So I'm not asking about the
7  people who got zero or some value after they
8  watched the videos and responded to the
9  survey.  I'm talking about the work that you
10 and Cornerstone and/or AMS did creating the        11:38
11 document, the survey instrument.
12      Do you understand at least the
13 context in which I'm asking this question?
14      A.  I understand the context and --
15      Q.  Let me ask the question now.             11:38
16      A.  Yeah, okay.
17      Q.  So we're not talking about the
18 conjoint results.
19      Before you chose the distraction
20 features, you did some research into what         11:38
21 features are promoted by those who sell
22 Samsung phones, correct?
23      A.  Yes, to get the distraction
24 features.
25      Q.  Did you try to identify the most         11:38

Page 79

1  important features based on the level of
2  promotion?
3       A.  Well, that wouldn't be appropriate.
4       Q.  Did you do that?
5       A.  I mean, the fact that they choose       11:38
6  to -- to promote something does not
7  necessarily mean it's the most important.
8  They could choose not to -- to promote an
9  important feature.  I mean, that's a very
10 rational decision.                                11:39
11      Q.  My question is two-part then.  Did
12 you seek to identify the most important
13 features to use as distraction features?
14      MR. TORCHIA:  Objection; form,
15 asked an answered.                                11:39
16      You can respond.
17      A.  As I said, I -- before we do the
18 conjoint analysis, we don't know how important
19 they are.  That's what conjoint analysis does,
20 it measures how important they are.  So we        11:39
21 make some guesses.  And had we guessed wrong
22 and had those distraction features been all
23 unimportant features, we may have had to redo
24 the study.
25      But that wasn't the case.  Those             11:39

Page 80

1  distraction features did have some reasonable
2  importance, so they were valid distraction
3  features.
4       Q.  I'm not asking whether or not they
5  had some importance based on the results of      11:39
6  your survey.  I'm asking, was it your
7  intention to identify as distraction features
8  the most important features of the phone?
9       MR. TORCHIA:  Objection; form,
10 asked and answered.                              11:40
11      A.  You -- to -- the conjoint analysis
12 to study -- to figure out what's most
13 important, not a -- you just can't go to the
14 website and say they promoted this, they
15 promoted that; therefore, this is important      11:40
16 and that isn't.  That -- that's not -- that's
17 not really a valid way of doing that analysis.
18 So why would I do an invalid study?
19      Q.  I'm not asking you to do an invalid
20 study.  What I'm asking you is, was it -- did    11:40
21 you attempt to identify the most important
22 features to purchasers of Samsung accused
23 products and use those as distraction
24 features?
25      MR. TORCHIA:  Objection to form;            11:40

Page 81

1  asked and answered.
2       A.  I -- without doing a preference
3  study, you can't do it, you can't identify the
4  most important features.  That's what the
5  preference study does.  So I wouldn't -- I      11:41
6  wouldn't have done it because it's not
7  something that would have been done.
8       What I did is, I made some
9  judgments based upon what we found out there,
10 that these studies -- these distraction         11:41
11 features would be of some reasonable
12 importance.
13      Q.  But you did not do any consumer
14 study and it was not your goal to identify as
15 distraction features the most important         11:41
16 features to purchasers of Samsung accused
17 products?
18      MR. TORCHIA:  Objection --
19 objection; form, compound.
20      A.  Okay.  One can determine the most      11:41
21 important or relative importance from a
22 preference study.  I did do a preference
23 study, but the preference is very focused.
24 And we can describe why it's focused and why
25 it's appropriate.                               11:41

21 (Pages 78 to 81)

Page 110

1     MR. TORCHIA: Objection to the
2  form of the question.
3     A. Yes. So, let's back up and let's
4  see what this would happen.
5        Suppose we have a different          12:22
6  description, slightly different technical way
7  of doing it. And particularly in word
8  correction, I am aware that there are
9  alternative ways to do it. Suppose that we
10 had an alternative in here that was actually  12:23
11 more annoying. In that case, I would have an
12 under estimate of the change. And I didn't
13 want to have an under estimate. I wanted to
14 be conservative.
15       So, we did our best to choose an      12:23
16 alternative here that would be of the type and
17 that would be a fair -- you know, a fair and
18 strong alternative to what automatic word
19 correction would be. So, the question is:
20 Did the respondent know all of my thinking.   12:23
21 That's not the issue. The issue is if I
22 substitute something in here that's different
23 than this, would it have a substantial effect.
24 And, hopefully, it would not have a
25 substantial effect, but you're going to have  12:23

Page 111

1  to -- this is going to be an issue that the
2  technical experts are going to have to deal
3  with, not me.
4     Q. If the alternative to the patented
5  feature of automatic word correction was less  12:24
6  annoying, then you would expect the utility of
7  the patented feature to be a negative utility;
8  would you not?
9        MR. TORCHIA: Objection to the
10    form of question.                         12:24
11    A. You're presupposing the answer
12 there. Are you ask -- I mean, if you're
13 asking me would I be able to measure
14 importance accurately, the answer is yes.
15       So, if there's a negative            12:24
16 importance, then we can say what a negative
17 importance would be, wouldn't we.
18    Q. It would be a negative utility
19 measurement?
20    A. It would be negative part worth.     12:24
21    Q. Negative part worth. Excuse me.
22    A. And it may have a little effect or
23 a big effect depending on everything else
24 that's going on. But that could be -- that
25 could be calculated.                         12:24

Page 112

1    Q. Well, if the -- if it had -- if the
2  patented feature of automatic word correction
3  had a negative part worth, then it would
4  reduce the percentage of consumers in the but
5  for world to zero, wouldn't it?            12:25
6       MR. TORCHIA: Objection to the
7    form of the question.
8    A. Well, okay. You know, here, let's
9  just see what we have and we don't have.
10 Particularly for automatic word correction,  12:25
11 you can have some consumers who have a
12 positive part worth and you can have other
13 consumers who have a negative part worth, and
14 that's taken into account.
15      So, if you show me that one           12:25
16 consumer or even a handful of consumers have
17 negative part worths, you know, that may
18 already be taken into account. And you can
19 actually look at all of my backup and
20 determine whether some people had positive or  12:25
21 negative utilities. So, it's not a simple --
22    Q. Are we -- is it positive or
23 negative utilities or part worths?
24    A. Positive or negative part worths.
25 Did I say utilities?

Page 113

1    Q. I used the wrong word. I didn't
2  want to make you use the wrong word.
3    A. No, no. Part utility.
4       So, just to be careful, they could
5  have positive or negative part worths for   12:26
6  this.
7    Q. I was basing my line of questioning
8  on the fact that you said if the alternative
9  provided an automatic word correction were
10 more annoying, then the part worth would    12:26
11 increase. And that's why I asked if the
12 alternative provided to the patented feature
13 of automatic word correction were less
14 annoying, then it should have a negative part
15 worth?                                       12:26
16      MR. TORCHIA: Objection to the
17    form of the question. Calls for
18    speculation.
19    A. Okay. I think I was a little bit
20 -- I should have been more complete when I   12:26
21 gave the first answer because, again, the
22 heterogeneity is in there. It would have to
23 -- we're talking about positive or negative
24 changes. It would just be for some
25 respondents -- it would have to be for many  12:27

Page 194

1  screening levels. The two input assistance
2  levels, a 4.8 inch screen and the two camera
3  levels?
4      A. That is correct, plus all else
5  equal.                                         14:53
6      Q. Plus everything else in their
7  current phone?
8      A. Yes.
9      Q. And what we know about their
10 current phone is that they bought it within    14:53
11 the past 12 months; is that correct?
12     A. I believe -- well, let's go back to
13 the screening to be sure. Well, it's in the
14 past 12 months they've owned this phone.
15     Q. And what distinction are you making  14:53
16 between what you just said and what I said?
17     A. Well, what the words say is,
18 "Now we're going to ask you about one of the
19 brands of smartphone you have owned in the
20 past 12 months which is specific model of     14:54
21 Samsung phones have you personally owned."
22         They could have bought it prior to
23 the twelve-month period.
24     Q. So, the phone could be two years
25 old, but they owned it in the past 12 months? 14:54

Page 195

1      A. That's correct. Now, there's
2  further questions if they owned more than one,
3  and I can find those and we can talk about
4  those, but basically we get down to "Which one
5  of the following Samsung phones that you owned 14:54
6  was purchased most recently?"
7          So, the phone that they're asked
8  about is, it has to have been owned within the
9  last 12 months. And the one that's purchased
10 most recently.                                14:54
11     Q. Which means that if the most recent
12 phone they bought was a Samsung two years
13 ago --
14     A. That will be in the study, yes.
15     Q. What was the date for fielding of    14:55
16 these responses?
17     A. It's in the report. Let's look it
18 up. I want to get the exact date.
19         Okay. I found the date of the
20 pre-test. I'm sure it's in here somewhere. I  14:56
21 just can't find the exact date, but it was
22 this past summer.
23     Q. It has to have been after the
24 pre-test, right?
25     A. Yes, it has to have been after the   14:56

Page 196

1  pre-test.
2      Q. What was the date of the pre-test?
3      A. The date of the pre-test was June
4  and July.
5      Q. So, either some time later in July  14:57
6  or in August the various was fielded?
7      A. Yes, it's in here someplace. I'm
8  just not finding it.
9      Q. Do you know what models of Samsung
10 smartphones were available in the marketplace 14:57
11 at the time of the survey fielding?
12     A. I don't have a list in front of me
13 right now, no. I couldn't do it from memory.
14     Q. Did you know, at the time you
15 conducted the survey, what other Samsung      14:57
16 models were available in the marketplace
17 beyond the model that the particular
18 respondent had?
19     A. What we know at the time for the
20 survey is respondent had this particular --   14:57
21 this phone.
22     Q. Whatever phone they reported they
23 had?
24     A. Whatever phone they reported.
25     Q. Beyond that, do you know what other 14:58

Page 197

1  Samsung phones were available in July,
2  August 2013?
3      A. I don't recall.
4      Q. For the final question, the
5  instructions that are given are that the      14:58
6  respondent "May wish to consider the
7  availability of other smartphone options in
8  the market that may influence your purchase
9  decision including smartphones by other
10 manufacturers other than Samsung."            14:58
11         Do you see that?
12     A. That's not quite read correctly,
13 but I see the phrase.
14     Q. Are you correct. I did read it
15 incorrectly. It's correct and incorrect.     14:58
16         What it says is that for answering
17 that question, the respondent "May wish to
18 consider the availability of other smartphone
19 options in the market that may influence your
20 purchase decision, including smartphone by   14:59
21 other manufacturers or other Samsung
22 smartphones."
23     A. Yes, it's read correctly.
24     Q. So, what the respondent is supposed
25 to consider here is everything that's        14:59

Page 198

```
 1  available in the market as of July,
 2  August 2013?
 3      A.  Yes, but it's their perception of
 4  what's available in the market as they take
 5  this survey.                              14:59
 6      Q.  If they don't know something is out
 7  there, then they can't consider it; is that
 8  right?
 9      A.  Again, this is how the outside
10  option works.  It's -- they're making a    14:59
11  decision, should I buy the phone or should I
12  buy something else.  So, naturally, it's their
13  perception of what else is out there.
14      Q.  And the only things that can be
15  considered as outside options by each      14:59
16  respondent are the options that the respondent
17  knows exists in the marketplace; isn't that
18  correct?
19      A.  Well, that's not quite correct.
20  You know, there's this sort of outside     15:00
21  options, but in the conjoint literature, it's
22  been actually in the whole literature for a
23  while.  The question is what does it mean.
24      And what it means is it's a
25  decision to purchase or continue searching. 15:00
```

Page 199

```
 1  That's kind of what's going on.  So, what
 2  they're doing is saying what is the value of
 3  going and buying something else and I'm going
 4  to search for that, et cetera.
 5      And there's a lot of things that we     15:00
 6  will get into as to why I designed the study
 7  so it would have a test control so it would
 8  not be sensitive to that.  If they're off a
 9  little bit and, you know, we can talk about
10  that at length, but it's -- the outside option 15:00
11  is I either choose this or I go buy something
12  else.
13      Q.  Well, I think you gave the answer
14  two different ways.  It's I either choose this
15  or I go buy something else.  That's what you  15:01
16  send at the end.  But earlier in the answer
17  you said, I either choose this or I choose to
18  continue to search.
19      A.  It's sort of -- it's a little bit
20  of both because what we're trying to do is    15:01
21  capture the realistic processes that people go
22  through which we spend -- talked at length
23  earlier this afternoon.  And if a person
24  doesn't choose this, they now have to go buy
25  something else.  They may have to search to do 15:01
```

Page 200

```
 1  that.
 2      Q.  Or they may not.
 3      A.  They're going to have to use
 4  whatever process they feel is appropriate.
 5  So, we're going to get an estimate of       15:01
 6  purchasing or not purchasing.  We'll do that
 7  for the test and we'll do that for the control
 8  and so we can then -- anything that's sort of
 9  ambiguous here will be in the test and the
10  control and, therefore, the difference will be 15:01
11  clean.
12      Q.  When the respondent here picks his
13  favorite phone based on the bundle of
14  attributes and then chooses not to buy, is
15  there any way for you to determine for that 15:02
16  respondent, whether they would buy another
17  phone as opposed to continue to search?
18      A.  Well, what they're saying is
19  they're not going to buy this phone.
20      Q.  Correct.  And we also know they    15:02
21  have a phone?
22          MR. TORCHIA:  Objection.
23          Sorry; is there a question
24      pending?
25      Q.  Isn't that correct?               15:02
```

Page 201

```
 1          MR. TORCHIA:  Objection to the
 2      form of the question.
 3      Q.  Excuse me; is that correct that we
 4  know that these respondents have owned a
 5  Samsung phone within the past 12 months and   15:02
 6  that Samsung phone was their most recent phone
 7  purchase?
 8      A.  We know that they owned a Samsung
 9  phone in the last 12 months and that this
10  phone was their most recent Samsung purchase. 15:02
11  And so now when they're answering these
12  questions, they have this notion, which is
13  sort the utility or the value of -- of going
14  out and buying something else.  It's a very
15  reasonable question they can answer.  That has 15:03
16  been shown time and again.
17          And if we now lay an incentive
18  alignment on top of it, we get it even more
19  accurate.  If we now lay a test control design
20  on top of it, then any -- you know, if the    15:03
21  outside option is a little bit too good or a
22  little bit too less, that's going to be in the
23  test and it's going to be in control and the
24  difference is not going to effect the final
25  answer in any large way.                     15:03
```

Page 202

1  Q. But the instrument that you
2  designed doesn't actually provide a mechanism
3  to measure how many of the people who selected
4  the outside option would buy a phone as
5  opposed to maintain the status quo of whatever    15:03
6  their phone circumstance is at the time?
7     MR. TORCHIA: Objection to form of
8     the question.
9  Q. Correct?
10    MR. TORCHIA: Objection to the    15:04
11    form of the question.
12 A. Now, there's something wrong with
13 that ques -- the description. Let me make
14 sure I capture it. There's something wrong
15 with the way you asked the question.    15:04
16    So, what we're saying is if this
17 were the phone you offered to me, would I buy
18 it or would I go try and buy some other phone.
19 Okay, now, there is -- I know, you know, we
20 have your experts who are misunderstanding    15:04
21 what this means, so I don't want to go.
22    But what it says is that they have
23 a good feeling of what else they would do.
24 And this is a total utility. Let's not make
25 -- let's not go into exactly the process they    15:05

Page 203

1  go through because the human being is not
2  going to go through a detailed process. This
3  is going to be the best possible estimate they
4  have of going and buying something else. I
5  would buy something else; okay.    15:05
6     Now, there's going to be some
7  uncertainty in that. You know, because it's
8  uncertainty, I designed a test versus control
9  so I would not be sensitive to that
10 uncertainty. I want to take that out.    15:05
11 Whatever -- whatever any, you know, ambiguity
12 in this outside option comes out. It's in the
13 test. It's in the control and, therefore, we
14 subtract out.
15 Q. The outside option answer, if the    15:05
16 outside option is selected here says, "No, I
17 would not buy the smartphone above"; isn't
18 that correct?
19 A. Yes.
20 Q. But the outside option contains no    15:06
21 indication from the respondent that they would
22 buy a different phone; is that correct?
23 A. It's not quite right, the way you
24 asked the question.
25    Let's say it the other way around.    15:06

Page 204

1  Would they buy this phone and the answer is
2  no, they would not buy this phone, okay. They
3  are considering the fact there are other
4  phones out there. They may actually go out
5  and buy those or they may search further and,    15:06
6  again, they have some process in mind. But
7  what we do know is they would not buy this
8  phone.
9  Q. They would not buy the phone that
10 they selected as their favorite among the    15:06
11 four. That's what selecting the outside
12 option indicates?
13 A. That's what it indicates.
14 Q. But it does not indicate that they
15 will buy another phone or what other phone    15:07
16 they would buy; is that correct?
17 A. It does not get into any
18 specificity as to what that other phone would
19 be.
20 Q. It also doesn't get into any    15:07
21 specificity as to whether they would buy
22 another phone, does it?
23    MR. TORCHIA: Objection to form.
24 A. What it does say is that when the
25 time comes to make a decision, and that's why    15:07

Page 205

1  you've got to look at the whole survey and you
2  can't just take this particular question in
3  isolation, when it comes the time to make a
4  decision, they will buy another phone, okay.
5     And, in fact, we may -- if they --    15:07
6  we're going to use their answer to the survey,
7  we may actually offer them one of those phones
8  for free, plus cash back. So, at some point
9  in time, they will buy it, but it doesn't say
10 that at the moment they're answering the    15:07
11 survey they'll buy it.
12 Q. And it doesn't say at what moment
13 they would buy another phone, does it?
14 A. No. The whole survey is set up so
15 that the next time they buy another phone,    15:08
16 they will act according to their answers here.
17 So, we can now take those answers as we're
18 forecasting forward, we can also look back to
19 how they would have made that decision in the
20 past. Because only those features are    15:08
21 varying.
22    This is why it's very important in
23 design that only these features are varying
24 and that other things are staying constant.
25 Q. And the other things that are    15:08

Page 254

1  real world obscure brands have less chance of
2  being purchased. Conjoint analysis cannot
3  fully account for differences in awareness
4  developed through advertising and promotion."
5      Do you see that?                         16:33
6  A. I see it says that, yes.
7  Q. Do you agree with that?
8      MR. TORCHIA: Objection; lacks
9  foundation.
10 A. Well, let's -- let's -- I mean,            16:33
11 again, I can give you a short answer or a long
12 answer.
13 Q. Can you give me the short answer
14 first?
15 A. I don't agree with this as relative        16:34
16 to my study.
17 Q. The next bullet point says,
18 "Conjoint analysis assumes that all products
19 are equally available. One brand is as
20 conveniently selected as another in a conjoint  16:34
21 interview."
22     Do you see that?
23     MR. TORCHIA: Same objection.
24 A. I see this.
25 Q. Do you agree with that?                    16:34

Page 255

1  A. Bryan is making sweeping general
2  statements and there are certainly some
3  conjoint analysis studies to which these
4  statements apply. They don't apply because --
5  I'm very aware of these issues, and I designed  16:34
6  a study that takes these issues into account.
7  And if you would like, I can explain why the
8  study does that. Why my study takes these
9  issues into account.
10     But he's making sweeping              16:34
11 generalizations. I mean, he -- the way he
12 writes, which is very reasonable for textbooks
13 because I've written textbooks as well, is
14 basically say, conjoint studies in general do
15 this. It doesn't mean every conjoint study     16:35
16 does that.
17 Q. Does your conjoint analysis assume
18 that all products are equally available?
19 A. Absolutely not.
20 Q. How does one distinguish between          16:35
21 the availability of the four choices in each
22 choice set?
23     MR. TORCHIA: Objection to the
24 form of the question.
25 A. Okay. Let's, again, seeing what           16:35

Page 256

1  he's talking about. He's talking about what
2  might be called a whole market study. And in
3  a whole market study, what we're trying to do
4  is we're going to sample from everybody in the
5  marketplace, not just Samsung users. Apple     16:35
6  users. We may worry about the consideration
7  phase. We may worry about all those things.
8      And then, we're going to try and
9  predict market share. So I think it's useful
10 to ask how does my study relate to market      16:35
11 share, which in some sense is what he's --
12 he's talking about.
13     So, what does my study do? My
14 study says, here are a set of respondents who
15 we know bought Samsung phones, but for some of  16:36
16 these features, and let someone else decides
17 which phones had which features, the person
18 with not have bought the phone. Now, one can
19 then use additional data, and Chris Vellturo
20 does, to say how does this relate to market    16:36
21 shares. And Chris' use of my data, from what
22 I understand, because when I spoke to him, is
23 perfectly correct. Once he has additional
24 data, he can do that.
25     What I have not done, because I did      16:36

Page 257

1  not do a whole market study is I, myself, have
2  not predicted market share. So, what Bryan is
3  saying here, that second bullet point, is that
4  if I had Apple, Samsung, whatever, you know,
5  all these phones in here, if I wanted to use   16:36
6  these conjoint analysis study and nothing
7  else, then I have to have that something else
8  in there. Now, again, my study was designed
9  to do something else, which is just to get how
10 many people did not purchase it. Vellturo     16:37
11 does use something else, and I think you're
12 going to have to ask him the details of all
13 the things he does with that.
14 Q. You identified at the beginning of
15 your answer that in order to figure out what   16:37
16 these respondents who originally bought a
17 Samsung phone would do after not buying the
18 Samsung phone, you would have to return to the
19 consideration phase; is that right?
20     MR. TORCHIA: Objection to the            16:37
21 form of the question.
22 A. That's not exactly what I -- that's
23 what I said, and that's not what I meant to
24 say.
25 Q. What something else would you have        16:37

Page 258

1  to know in order to determine what phone sold
2  by what brand maker these respondents would
3  buy?
4      MR. TORCHIA: Objection to the
5  form of the question. Also outside of                16:38
6  the scope of the report. He can
7  answer.
8      A. There are many ways that one could
9  get to those estimates. You know, given
10 enough time, I could design a study to do           16:38
11 that. That wouldn't be the only way to do
12 that. There may be other ways to do it. My
13 understanding that Chris Vellturo has done
14 that. And I think you're going to have to ask
15 him -- I think you're going to have to talk to      16:38
16 him about how he used additional data to get
17 to market share.
18     Q. When did you talk to him?
19     A. When was the last time I spoke to
20 him the? Last time I spoke to him I remember        16:38
21 because I was at the American Marketing
22 Association meeting in Boston. We could
23 probably look those dates up.
24     Q. I was asking more specifically
25 about the conference conversation you              16:39

Page 259

1  referenced in a prior answer. And by that I
2  mean, you said, "When I spoke to Chris
3  Vellturo, he told me he did that."
4      And I'm wondering when that
5  conversation took place.                           16:39
6      A. Oh, you're going about the fact
7  that did that or will do that. I probably I
8  should correct that and say last time I spoke
9  to him he told me he would do that, but I
10 understand now that he has do done that so        16:39
11 let's if we want to get the verb tense
12 correct.
13     Q. When did you speak to him?
14     A. The exact dates we are perfectly
15 can you have your associates look up when the    16:39
16 American Marketing Association was, but I
17 recall I was at the American Marketing
18 Association and Chris and I spoke.
19     Q. Is that the conversation that
20 relates to his work on this case, the one at    16:39
21 the American Marketing Association?
22     A. The conversation was there. He was
23 -- he didn't present there or anything. I
24 just happen to be there.
25     Yes I -- you know, at this point,   16:40

Page 260

1  you know, we basically had our preliminary
2  results. I can't remember whether the report
3  was written or filed yet, but the results were
4  definitely there. And Chris and I spoke on
5  the phone and Chris asked me a number of        16:40
6  questions. You know, does your study mean
7  this. Does your study mean that. And in each
8  case, my answer was affirmative. We had an
9  understanding and he told me in very general
10 terms how he was going to use it -- use the    16:40
11 results of my study and I said, yes, that's a
12 -- that's a reasonable interpretation of my
13 results.
14     Q. Do you remember anything further
15 about that conversation?                       16:41
16     A. I don't remember the exact words,
17 but I left that conversation with the belief
18 that Dr. Vellturo understood what the conjoint
19 analysis study did and how those results could
20 be used and interpreted.                       16:41
21     Q. Did you review his report before it
22 was served, if you know?
23     A. No.
24     Q. Did you make any edits to any of
25 the words?                                    16:41

Page 261

1      A. In his report, no?
2      Q. Have you reviewed his report since
3  he issued it?
4      A. No. All I can say is it's my
5  understanding when I spoke to Chris -- to        16:41
6  Dr. Vellturo, that he understood what the
7  conjoint analysis could be used for. I mean,
8  we -- it wasn't the only conversation.
9  Obviously we had conversations prior to that
10 and actually a fairly long meeting.             16:41
11     I really had the impression that he
12 understood what we were doing. He also was
13 not going to try and do things that the
14 conjoint study could do. Now, he's going to
15 have to defend -- what he did with the          16:42
16 conjoint analysis study, you could certainly
17 talk to him, but I believe he understood the
18 conjoint study.
19     Q. The next bullet point here in Mr.
20 Orme's book chapter under the heading           16:42
21 "Conjoint models do not predict market share
22 due to a variety of reasons including the
23 following," says "Respondents might not
24 accurately reflect potential buyers. Many
25 will not have the interest, authority or        16:42

Page 270

1    So then the question is; can my
2    study alone, without that additional
3    information, identify brand choice. I believe
4    Chris used additional information beyond just
5    my study.                                   16:53
6        Q. Your study doesn't enable Chris to
7    identify brand choice, does he?
8        MR. TORCHIA: Objection;
9        mischaracterize the testimony. You
10       can answer.                             16:54
11       A. Actually, I said that my study
12   does. It's input that he could use. He's
13   going to use -- he's going to need additional
14   information to do brand choice, but my study
15   is an input into that allocation.           16:54
16       Q. Your study doesn't provide any
17   willingness to pay or willingness to buy for
18   the brand attribute, does it?
19       A. My study provides willingness to
20   pay and willingness to buy for the Samsung   16:54
21   phones. It does not provide, by itself,
22   willingness to buy or willingness to pay for
23   Apple phones. Once you have the fact that my
24   -- the respondents in my study, they're not my
25   respondents. The respondents in my study are 16:55

Page 271

1    not going to buy the Samsung phone, then
2    there's -- in order to make that brand
3    allocation, Dr. Vellturo is going to need
4    additional information beyond my study.
5        Q. One of the reasons that you know    16:55
6    they're not going to buy the Samsung phone
7    because they chose -- some of them chose the
8    outside option, right?
9        MR. TORCHIA: Objection to the
10       form of the question.                  16:55
11       A. That's one of the -- that's greatly
12   simplifying, I think, a carefully crafted
13   survey.
14       But you've got it -- the survey
15   uses all of these questions. It has a test 16:55
16   control design to make it insensitive to any
17   variations in answering the outside option.
18   So, there's a lot in the study that allow me
19   to make that projection. Not just that
20   question, a single question. There's a lot  16:56
21   going on here.
22       Q. The respondents who selected the
23   outside option were supposed to consider
24   within the outside option other Samsung
25   smartphone available at the time of the     16:56

Page 272

1    response, correct?
2        MR. TORCHIA: Objection to the
3        form of the question.
4        A. The -- we've been through this
5    many, many times. I mean, I don't know why  16:56
6    you keep asking me the same questions.
7    Hopefully I can give you a complete answer
8    this time.
9        When respondents react to the
10   outside option, it's really an option not to 16:56
11   buy. A no-buy option. And they have
12   something in mind. And that something is what
13   they have in mind, okay, almost by definition.
14       So, this is the best they can
15   answer at the time from their decision      16:56
16   process. There is admittedly some uncertainty
17   in that. That's why I use a test control
18   because if there's any uncertainty in that, if
19   it's too high or it's too low, it's going to
20   be too high in the test and too high in the 16:57
21   control. And then when I do the subtraction,
22   that too highness drops out. The same thing
23   if it's too low. If it's too high in the
24   test, it's too high in the control. I do the
25   subtraction and it drops out. Now it's a    16:57

Page 273

1    little bit more than subtraction, but it's all
2    described in the report.
3        Q. Too highness of what?
4        A. Okay. Suppose I have this utility,
5    the outside option. And suppose for whatever 16:57
6    reason. This is a hypothetical now. Suppose
7    that my estimate is 10 percent larger than it
8    actually is. I can do this at 20 percent or
9    30 percent or whatever, but let's just take it
10   10 percent.                                 16:57
11       Q. Your estimate of what is 10 percent
12   higher than what?
13       A. Of the utility of the outside
14   option. Okay. Now, there's not a utility,
15   there's a utility for every respondent and  16:58
16   there's actually a distribution of utilities,
17   but, you know, let's just say a utility
18   because it's easier to talk about. Okay.
19       Suppose I move all of those up by
20   10 percent, just arbitrarily do that and rerun 16:58
21   all my choice simulators. Okay, so what's
22   going to happen? The test is going to be --
23   my prediction for the test is going to be
24   higher. I'm sorry; the outside option is more
25   important, it's bigger. Let's start over.  16:58

Page 274

1   Let's start over.
2   Q.  No problem.
3   A.  Okay.  So we have the utility of
4   the outside option.  So, let's make it
5   10 percent larger.  Okay, by making it         16:58
6   10 percent larger for every respondent, for
7   every draw, we make people more likely to
8   choose the inside option, right?  So if
9   they're more likely to choose the inside
10  option, we're going to have a higher          16:59
11  probability of predicting that they would have
12  purchased the phone as is.  Okay.
13      By making it 10 percent larger, I
14  make that probability larger.  I also make --
15  that's the control.  I also make the test, the  16:59
16  but for, 10 percent larger, roughly.  And then
17  so -- not 10 percent larger.  I make it
18  larger.  But I make it larger by basically
19  about the same thing.
20      So, even if the utility of the           16:59
21  outside option is 10 percent larger, the final
22  numbers, the numbers which Dr. Vellturo is
23  using, which is the percentage changes, are
24  basically unaffected.
25      Now, I've put a few caveats in here      16:59

Page 275

1   because there's some non-linear functions.
2   So, we simulated this and it's basically a
3   flat line.  Not perfectly flat, but it's
4   pretty darn gone flat over very reasonable
5   ranges, the prediction.                       17:00
6       So, if the outside option is off by
7   a little, it does not effect the final numbers
8   and that's because of the test control design.
9   Q.  What I'm trying to figure out is
10  what the utility of the outside option is     17:00
11  something you used in the answer.  What is
12  included in the outside option?
13  A.  Okay.  Let's think through what the
14  respondent answers and let's think through a
15  reasonable way this respondent is answering   17:00
16  the question.  Not the hyper-rationality that
17  you see in Dave's report, Dave Reibstein's
18  report, which I actually found interesting.
19  At one point he says the consumers are not
20  hyper-rational, at another point he writes    17:00
21  they are hyper-rational.  I think he has to
22  choose one or the other.
23      But that aside, the consumer comes
24  to this question and they have some feeling in
25  their mind of the utility of what's often     17:00

Page 276

1   called shadow price or the utility of doing
2   other things with the money they would have
3   spent, okay.  And these other things are as
4   described in the report.
5       So, given that, taken everything       17:01
6   they have, all their experiences into account,
7   everything into account, they have some
8   feeling for that utility.  That's the best I
9   can measure.  It's what economists measure all
10  the time.  It's what marketers measure all the  17:01
11  time.
12      Okay.  Suppose it were different.
13  Suppose that there were some upward bias or
14  downward bias.  Now, what's really the case is
15  there's no bias in it, but there's some, you  17:01
16  know, some uncertainty.  I then developed the
17  test control design.  I shouldn't say I
18  developed.  The test designs are in the
19  literature and they are all over the place.  I
20  used -- I chose to use the control test design  17:01
21  such that I would not be sensitive to any
22  possible misunderstandings of this outside
23  option.  And that's very important to the
24  study.
25  Q.  My question was what is in the          17:02

Page 277

1   utility of doing other things?
2       MR. TORCHIA:  Objection to the
3       form of the question.  Asked and
4       answered.
5   Q.  I don't know what your answer is.      17:02
6   I understand you say test control, but if the
7   utility of the outside option is higher in the
8   control, it's also higher in the test.
9   A.  Yes.
10  Q.  And so when you subtract it, your      17:02
11  testimony is it's not higher because it's
12  higher in the control and it's higher in the
13  test.  If it's 10 percent higher in one, it's
14  10 percent higher in the other with some
15  non-linear aspects to it, but it works out to  17:02
16  that so it drops out.
17      I understand that testimony.  What
18  I don't understand is what is -- please define
19  for me, the utility of the outside option?
20      MR. TORCHIA:  Objection to form.       17:03
21  A.  Okay.  I'll do the best I can.
22      Let's write out the overall utility
23  of the phone, okay.  So, we have a part worth
24  for all else equal.  We have a part worth for
25  each feature I've measured.  Part worth for   17:03

Page 278

```
 1  price.  Part worth for that.  So, that's the
 2  utility.
 3         Now, there's also the utility of
 4  doing something else.  And what the prediction
 5  is, in a probabilistic sense is if this           17:03
 6  utility, which is made up of the part worths
 7  of the all else, plus all these features is
 8  greater than the utility of the outside
 9  option, okay.  Going to correct that in a
10  little bit of time, but I'm trying to get to     17:03
11  the workup from complexities -- simplicities,
12  complexities.
13         Then you would say that if the
14  person chose the inside option, then I have a
15  data point that these -- this sum of utility    17:04
16  is greater than that utility of the outside
17  option, okay.
18         The alternative is that they chose
19  the outside option then the utility outside
20  option is bigger than the sum of the            17:04
21  utilities.  Has a little bit of complexity in
22  here because there's errors.  There's what's
23  known as "error terms" in the logit model.
24  And the fact is when you actually look at the
25  likelihood function, it's the likelihood of    17:04
```

Page 279

```
 1  choosing the max from the set versus the
 2  outside options.  I just get that on the
 3  record.  Don't worry about that, that's just a
 4  technical issue for the moment just so the
 5  likelihood function is correctly specified.     17:04
 6         So, that's the best I can do in
 7  terms of kind of how it's analyzed.  So, it's
 8  this utility of -- that's compared to what
 9  they chose and it's utility of doing something
10  else.                                           17:05
11     Q.  And the utility of doing something
12  else for these respondents, based on the way
13  you constructed the survey is doing anything
14  else which would include smartphone by other
15  manufacturers or other Samsung smartphones or   17:05
16  not purchasing; isn't that correct?
17         MR. TORCHIA:  Objection to the
18  form of the question.
19     A.  Well, let's again just, you know,
20  so we're -- get this exact since we're getting  17:05
21  to a point where being exact is probably very
22  important.
23         What exhibit was it again.
24     Q.  It's D, page 21.
25     A.  Okay.  It's I would buy this -- I        17:06
```

Page 280

```
 1  would buy this smartphone.  I would not buy
 2  this smartphone above.  Now, they're
 3  considering -- they're keeping in mind the
 4  availability of all these others, but, yes,
 5  they could choose not to buy a smartphone.      17:06
 6     Q.  What you've told them is for the
 7  outside option, the "no, I would not buy the
 8  smartphone above," that they should consider
 9  the availability of other smartphones
10  including smartphones by other manufacturers   17:06
11  or other Samsung smartphones, correct?
12     A.  Yes.
13     Q.  So, if the utility of doing other
14  things includes all of that, because you told
15  them to consider that as part of the utility.   17:06
16     A.  That's correct.  They have
17  something in their mind based upon their
18  experience.  And I want to make sure, when I
19  do an outside option study, that I design a
20  study that's not sensitive to any biases in     17:07
21  the outside option study.  And I did at least
22  two things to be fairly competent in that.
23  One is I made an incentivized aligned.  Two, I
24  used a test control design.  So, any biases,
25  any misunderstandings or whatever, one is that  17:07
```

Page 281

```
 1  they have a misunderstanding.  They've got
 2  real money on the, line okay, if they're a
 3  winner.
 4         Two, even all that, even if they
 5  have real money on the line, if they somehow   17:07
 6  are off, I get to subtract that offness out.
 7  The offness doesn't effect the final result in
 8  any big way.
 9     Q.  When you say they have real money
10  on the line, do you mean because one out of 20  17:08
11  people were given a free phone?  Is that --
12     A.  In this case -- let's just see how
13  much that phone -- how much money we were
14  willing to give.  It's a long day and I don't
15  remember the exact number.  $300.               17:08
16     Q.  They were given $300 cash?
17     A.  Well, I mean we can go through the
18  description here, but let me --
19     Q.  Where are you so I could go through
20  it with you.                                    17:09
21     A.  We're on page 7 of Exhibit E.
22     Q.  E or D?
23     A.  E.
24     Q.  Are you in the tablet survey?
25     A.  That could be tablet.  We can go         17:09
```

Page 310

1  A. Some.
2  Q. Which areas do you consider him to
3  have expertise that are the subject matter of
4  his report?
5  A. Well, I mean, Dave does a few                  17:52
6  things. I actually don't know if he's done a
7  lot of qualitative research. Those pre-tests
8  are -- I can show you. I brought some
9  examples where they're clearly biased. So, it
10 would surprise me coming out of Dave,            17:53
11 actually. But I don't know if he has
12 experience on qualitative research.
13     I have looked through some of his
14 technical descriptions of the conjoint
15 analysis and I think he understands in general   17:53
16 what conjoint analysis is doing, but I think
17 there's some errors in his report.
18  Q. Outside of this case, do you have a
19 professional opinion of Dr. Erdem?
20  A. I know Tulin. I respect her.                17:53
21 She's a very well-known structural modeler.
22 You know, she recently wrote a review article
23 on structural models. She has the, I think,
24 1993 -- I may be wrong with the year, but her
25 basically thesis paper which won both the       17:54

Page 311

1  Little and Bass award for structural models.
2  She is a very excellent structural modeler.
3   Q. How did you decide or did you
4  decide consciously not to include the same
5  distraction features in your most recent        17:54
6  conjoint as you did in the prior conjoint you
7  did for Apple in the prior litigation?
8   A. They are both acceptable sets of
9  distraction features. You know -- you know,
10 this case we chose some. The others were        17:54
11 perfectly acceptable. I guess we could have
12 used those as well. These just seem to be
13 pretty good distraction features. They fit
14 well with the design.
15  Q. Could I take a break to try to              17:55
16 eliminate some questions and try to send you
17 home after that?
18     MR. TORCHIA: How long?
19     MR. SWEDLOW: Ten minutes.
20     MR. TORCHIA: Yes, we can take a            17:55
21 break.
22     THE VIDEOGRAPHER: The time is
23 5:54 p.m. We're going off the record.
24     (Whereupon, a short break was
25 held.)                                    18:01

Page 312

1      THE VIDEOGRAPHER: The time is
2  6:01 p.m. We're back on the record.
3  BY MR. SWEDLOW:
4   Q. Have you ever seen the patents at
5  issue in this case?                              18:01
6   A. What do you mean? Do you mean have
7  I seen have I seen how phone slides to unlock
8  or do you mean have I actually seen the
9  technical patents?
10  Q. The patents.                                 18:02
11  A. Oh, if I did, I don't remember.
12  Q. What does price monotonicity mean?
13  A. Okay. What this means is that a
14 consumer would prefer a low -- all else
15 equal -- all else equal is very important, low  18:02
16 price to a high price.
17  Q. For the same attributes otherwise
18 identified?
19  A. Everything else has to be all else
20 equal, yes.                                      18:02
21  Q. Did you utilize a price
22 monotonicity constraint in your analysis of
23 the data in this case?
24  A. Well, what we do is we use the
25 consumer behavior theory and because this is a  18:02

Page 313

1  bayesian method, that's very valid. It would
2  be essentially -- it is conceptually the same
3  as a bayesian prior. So we did use a model
4  that includes information on price
5  preferences.                                     18:03
6   Q. The way that you would implement
7  the bayesian prior for price monotonicity is
8  within the Sawtooth software itself, correct?
9   A. Yes, there are -- there are various
10 ways that one can implement price                18:03
11 monotonicity. We chose the one that is proven
12 to be the most accurate.
13  Q. When you say you chose the one
14 that's proven to be the most accurate, it's
15 the one that's included in version 7 of the      18:03
16 Sawtooth software?
17  A. There is one included, yes. I
18 can't remember whether some of the others are
19 included as well. They certainly were there
20 in earlier versions. There's actually an        18:03
21 article -- I don't know if we cited it or
22 not -- that discusses some early tests
23 Sawtooth did on various ways to include price
24 monotonicity, but we included the one that's
25 standard.                                        18:04

Page 314

1   Q.  The one that's in the software is
2  standard?
3   A.  We use the software to include it,
4  yes.
5   Q.  I hope we're saying the same thing.      18:04
6  If you have the Sawtooth software, the price
7  monotonicity constraint which you described as
8  a bayesian prior --
9   A.  It's analogous to a bayesian prior.
10   Q.  And what you mean by a bayesian       18:04
11  prior is that you take information that you
12  know prior to the answer to whatever question
13  it is that you're asking and include that in
14  the statistical analysis correct?
15   A.  Well, we include information that    18:04
16  we know from behavioral theory, yes, we
17  include that information.  But you have to
18  remember, we also test whether or not it
19  predicts better, so -- and we did do -- we did
20  do tests and it does predict better.          18:04
21   Q.  You did tests, meaning, you ran the
22  data with the monotonicity constraint and
23  without it?
24   A.  Yes, we did.
25   Q.  Did you run any tests to determine   18:05

Page 315

1  how many of the respondents were consistent
2  with behavioral theory that they would want to
3  pay less for the same features?
4       MR. TORCHIA:  Objection; form.
5   A.  Yes, we did run those tests.          18:05
6   Q.  And what was the result of that
7  test?
8   A.  Well, the result was that if you
9  look at them -- if you look at -- do it
10  correctly and here's, you know, Dave Reibstein 18:05
11  did not do it correctly.  Dave Reibstein did
12  not take into account the uncertainty of the
13  estimates.  When you run those tests at the 05
14  level, the numbers of consumers that are
15  inconsistent are -- number of predicted        18:05
16  choices that are inconsistent are well under
17  5 percent.
18   Q.  When you say --
19   A.  And furthermore, in the data
20  themselves, absolutely no consumer violates    18:06
21  price monotonicity.  So, in the raw data,
22  there's no violations whatsoever.
23       Now, what Dave's exploiting is
24  randomness in the estimates.  In fact, the
25  estimates are estimates, they're not perfect.  18:06

Page 316

1  And then he counts these things up whether
2  they're significant north.  So, I went back
3  through, or Cornerstone went back through, at
4  my direction, and they counted those.  They
5  counted up them and said of the ones that Dave 18:06
6  Reibstein points out, which one is
7  statistically significant, almost none of
8  them.
9   Q.  When you say the 05, you mean
10  95 percent confident level?                    18:06
11   A.  95 percent bayesian posterior
12  confidence level, yes.
13   Q.  When you refer to the raw data, you
14  mean actual choices made by actual respondents
15  in the choice set; is that correct?            18:07
16   A.  Yes.
17   Q.  Is it possible for someone to
18  choose two different prices for the exact same
19  features in the context of a choice set?
20   A.  It is possible that they would have 18:07
21  a dominated alternative at -- so, take price
22  out of the equation for a moment.  And
23  alternative one is better than alternative
24  two.  And alternative one is at a lower price.
25  That's possible.  And in all cases they chose, 18:07

Page 317

1  they chose what's consistent with price
2  monotonicity.
3   Q.  You would only know if alternative
4  one is better than alternative two if you
5  determined the utility of each feature and     18:07
6  feature level, correct?
7   A.  Well, that's true.  That's true.
8   Q.  And my only point is you can't
9  actually do, at a respondent level, a
10  determination of whether or not a consumer or  18:08
11  a respondent had violated the behavioral
12  theory of less price for the same thing is
13  better?
14   A.  Well, yeah, you're mixing up now
15  aggregate and disaggregate.  If I now go       18:08
16  through and say given I've done this whole
17  survey, et cetera, some features on average
18  have higher part worths and are, therefore,
19  preferred.  Now I go to the individual level
20  and test that, nobody fails that.  But, you're 18:08
21  right.  That individual down there, they, for
22  example, might prefer not to have one of these
23  distraction features or something.  And that
24  might be rational.
25       But I think the point is that          18:08

Page 318

```
 1  nobody failed and what we're saying is even if
 2  they have failed, there could have been an
 3  explanation for that failure.  So, it was a
 4  reasonable test.  We didn't find it, but now
 5  let's go to the predictions.                    18:09
 6      Q.  Well, I wanted to finish with the
 7  individual level because I want to make sure
 8  we're saying the same thing.
 9          At the individual level, it isn't
10  actually possible to determine whether someone  18:09
11  violated that rule or concept of behavioral
12  theory because at the individual respondent
13  level, they could have a negative utility for
14  some of those features.  And the features are
15  never identical with the different price in     18:09
16  the choice set; isn't that right?
17          MR. TORCHIA:  Objection to form.
18      A.  Well, if -- I mean, you are right.
19  We have level -- in the sense there's level
20  balance and a few things.  The features are     18:09
21  not identical there's never a case where we
22  have identical features and we can test that
23  price.  But we can make other tests that are
24  pretty reasonable and we don't fail those
25  tests.                                          18:09
```

Page 319

```
 1          The more important thing is that
 2  when we now take the part worth and we predict
 3  what people would do and we ask is there any
 4  violation there, it's well understand that
 5  they take a chance.  And that's where I was     18:10
 6  really bothered to some extent.  I think Dave
 7  would know better that he just counts these
 8  things up without taking statistical chance
 9  into account.  And that particular figure in
10  his report is really just exploiting noise.     18:10
11          By the way, there's seven or eight
12  place in my report when I -- where I actually
13  caution against doing what he did for exactly
14  those reasons.
15      Q.  It is not correct -- well, scratch      18:10
16  that.
17          Is it correct to apply price
18  monotonicity to products in every market?
19          MR. TORCHIA:  Objection to form.
20      A.  Well, depends what's varying.  You      18:10
21  know, it's something that certainly one could
22  test.  I can't, at the moment, think of any
23  example when, if done really carefully, where
24  it wouldn't be appropriate.  It's not that I
25  just applied it blindly.  We tested this and    18:11
```

Page 320

```
 1  we got some pretty good evidence that this
 2  prior theory does improve the model.
 3          And furthermore, that then
 4  predictions coming out of the model, if we
 5  take away price monotonicity, which Dave did,   18:11
 6  and we look at the predictions, except for
 7  statistical chance, the part worths satisfied
 8  monotonicity.
 9      Q.  If you don't include brand as one
10  of your attributes and you're testing for       18:11
11  whether or not price monotonicity exists, is
12  it possible that imposing that restriction is
13  incorrect?
14          MR. TORCHIA:  Objection to form.
15      A.  You know, I'm not quite sure.           18:12
16  Maybe what you're asking is should we have
17  tested for these?  I do agree we should have
18  tested.  We did test price monotonicity.  So,
19  it wasn't applied blindly.  And I think had
20  we -- you know, we were careful in the          18:12
21  estimation of the model.  We used scientific
22  principals.
23      Q.  To the extent that the test for
24  price monotonicity would reveal the fact that
25  the estimations were inconsistent with price    18:12
```

Page 321

```
 1  monotonicity, could that be identification of
 2  a flaw in the survey design?
 3          MR. TORCHIA:  Objection; calls for
 4      speculation.
 5      A.  No, I don't think so.  In fact, I       18:12
 6  think you just -- I mean, one of the problems
 7  you're saying is that if people aren't price
 8  monotone?  Then, you know, there are -- there
 9  could be -- there could be times when people
10  prefer high prices to low prices because you    18:13
11  haven't been careful.  Well, even if you're
12  careful, price may be a signal.
13          That wasn't the case in our data.
14  We tested for -- we tested this assumption.
15  It held.  You know, Dave provides some data.    18:13
16  He's done it incorrectly.  When we re-did it
17  correctly, it's less than statistical chance.
18  You know, people are price monotone in our
19  data, up to an -- up to the ability of the
20  model to capture this.  Capture price           18:13
21  monotonicity.
22          MR. SWEDLOW:  Okay.  I have no
23      further questions.
24          Thank you for the long day of
25      attention.                                  18:14
```

Page 322

1  MR. TORCHIA: Thank you,
2  Dr. Hauser. I have nothing.
3      THE VIDEOGRAPHER: It's 6:13 p.m.
4  We're going off the record.
5      (Whereupon, at 6:13 p.m., the
6  Examination of this Witness was
7  concluded.)
8
9
   _____
10         JOHN HAUSER
11
12 Subscribed and sworn to before me
13 This _____ day of _____, 2013.
14
   _____
15       NOTARY PUBLIC
16
17
18
19
20
21
22
23
24
25

Page 323

1  -----------------I N D E X-----------------
2  WITNESS       EXAMINATION BY       PAGE
3  JOHN HAUSER    MR. SWEDLOW          5
4
5  DIRECTIONS: [None]
6  MOTIONS:   [None]
7  REQUESTS:  [None]
8
9  -----------------EXHIBITS-------------------
10 HAUSER EXHIBIT              FOR I.D.
11 Exhibit 1,
12 August 1997 Proceedings of the
13 Sawtooth Software Conference........83
14 Exhibit 2,
15 Expert Report of John Hauser........95
16 Exhibit 3,
17 Publication from the London School
18 of Economics.......................141
19 Exhibit 4,
20 Materials Relied Upon..............172
21 Exhibit 5,
22 Appendixes and Exhibits............179
23 Exhibit 6,
24 1982 publication...................223
25

Page 324

1  -----------------EXHIBITS-------------------
2  HAUSER EXHIBIT              FOR I.D.
3  Exhibit 7,
4  Syllabus from the May 2011 course....224
5  Exhibit 8,
6  Publication..........................224
7  Exhibit 9,
8  Shari Diamond's Survey Reference
9  Guide................................234
10 Exhibit 10,
11 1986 publication.....................247
12 Exhibit 11,
13 Document entitled "Reprinted from
14 Orme Bryan. Getting Started with
15 Conjoint Strategies for Product
16 Design and Pricing 2010".............252
17 Exhibit 12,
18 Choice Conference summary............265
19
20
21
22
23
24
25

Page 325

1       C E R T I F I C A T E
2
3  STATE OF NEW YORK    )
                        : SS.:
4  COUNTY OF RICHMOND   )
5
6      I, AYLETTE GONZALEZ, a Notary Public
7  for and within the State of New York, do
8  hereby certify:
9      That the witness, JOHN HAUSER, whose
10 examination is hereinbefore set forth was
11 duly sworn and that such examination is a
12 true record of the testimony given by that
13 witness.
14     I further certify that I am not
15 related to any of the parties to this action
16 by blood or by marriage and that I am in no
17 way interested in the outcome of this matter.
18     IN WITNESS WHEREOF, I have hereunto
19 set my hand this 27th day of September, 2013.
20
21    _____
          AYLETTE GONZALEZ
22    (Notary Public No. 01G06228612
        Expiration date: 9/27/2014)
23
24
25