# EXHIBIT C-2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

APPLE INC., a California corporation,

               Plaintiff,

    v.

SAMSUNG ELECTRONICS CO., LTD., a
Korean corporation; SAMSUNG
ELECTRONICS AMERICA, INC., a New
York corporation; and SAMSUNG
TELECOMMUNICATIONS AMERICA,
LLC, a Delaware limited liability company,

               Defendants.

CASE NO. 12-cv-00630-LHK

**EXPERT REPORT OF DR. ALEX C.
SNOEREN CONCERNING U.S. PATENT
NOS. 6,847,959 AND  7,761,414**

**HIGHLY CONFIDENTIAL—OUTSIDE
ATTORNEYS' EYES ONLY—SOURCE
CODE**

**GOOGLE'S HIGHLY CONFIDENTIAL—
OUTSIDE ATTORNEYS' EYES ONLY—
SOURCE CODE**

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     EXECUTIVE SUMMARY .....................................................................................1

        A.      The '959 Patent.............................................................................................1

                1.      Overview of the '959 Patent ..............................................................1

                2.      Usage of the '959 Patent Technology ................................................3

                3.      Infringement Overview ......................................................................5

        B.      The '414 Patent.............................................................................................7

                1.      Overview of the '414 Patent ..............................................................7

                2.      Usage of the '414 Patent Technology ................................................9

                3.      Infringement Overview ....................................................................10

III.    BACKGROUND AND QUALIFICATIONS .......................................................12

IV.     MATERIALS REVIEWED..................................................................................13

V.      SUMMARY OF OPINIONS ...............................................................................13

VI.     LEGAL STANDARDS ........................................................................................14

        A.      Claim Construction .....................................................................................14

        B.      Infringement................................................................................................14

VII.    SAMSUNG ENTITIES ........................................................................................16

VIII.   The ACCUSED PRODUCTS...............................................................................17

IX.     THE '959 PATENT ..............................................................................................18

        A.      One Of Ordinary Skill In The Art...............................................................18

        B.      Description and Technological Concepts of The '959 Patent .....................18

                1.      Technological Concepts In The '959 Patent.....................................19

                2.      Description Of The '959 Patent .......................................................22

        C.      Asserted Claims of The '959 Patent ............................................................24

        D.      Claim Analysis ............................................................................................24

                1.      Claim 24............................................................................................25

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

|  |  | 2. | Claim 25 | 35 |

| E. | Accused Instrumentalities | | | 36 |
|  | 1. | The Accused Products | 36 |
|  | 2. | The Google Search Application | 38 |
|  | 3. | The Operation of the QSB | 42 |
|  | 4. | Content Providers | 58 |

| F. | Infringement | | | 87 |
|  | 1. | Claim 24 | 89 |
|  | 2. | Claim 25 | 105 |
|  | 3. | Inducement | 106 |
|  | 4. | Contributory infringement | 110 |

| G. | Samsung's Alleged Non-Infringing Alternatives To The '959 Patent | 111 |
|  | 1. | First Alleged Alternative (Page 156, line 24 – page 157, line 8) | 111 |
|  | 2. | Second Alleged Alternative (Page 157, lines 9-28) | 113 |
|  | 3. | Third Alleged Alternative (Page 158, lines 1-20) | 114 |
|  | 4. | Fourth Alleged Alternative (Page 159, line 21 – Page 160, line 2; page 174, line 9 – page 175, line 2) | 115 |
|  | 5. | Fifth Alleged Alternative (Page 159, lines 3-6) | 117 |
|  | 6. | Sixth Alleged Alternative (Page 159, lines 7-12) | 118 |
|  | 7. | Seventh Alleged Alternative (Page 159, lines 13-16) | 118 |
|  | 8. | Eighth Alleged Alternative (Page 159, lines 17-22) | 119 |
|  | 9. | Ninth Alleged Alternative (Page 175, lines 3-5) | 120 |
|  | 10. | Tenth Alleged Alternative (Page 175, lines 5-10) | 121 |
|  | 11. | Eleventh Alleged Alternative (Page 175, lines 11-18) | 122 |

| H. | Samsung's Non-Infringement Contentions | 123 |
|  | 1. | First Non-Infringement Contention | 123 |
|  | 2. | Second Non-Infringement Contention | 124 |
|  | 3. | Third Non-Infringement Contention | 124 |

4.      Fourth Non-Infringement Contention ........................................................... 124

5.      Fifth Non-Infringement Contention ............................................................. 124

6.      Sixth Non-Infringement Contention ............................................................ 124

7.      Seventh Non-Infringement Contention ......................................................... 125

8.      Eighth Non-Infringement Contention ........................................................... 125

9.      Ninth Non-Infringement Contention ............................................................ 125

10.     Tenth Non-Infringement Contention ............................................................ 125

11.     Eleventh Non-Infringement Contention ........................................................ 126

12.     Twelfth Non-Infringement Contention ......................................................... 126

13.     Thirteenth Non-Infringement Contention ..................................................... 126

14.     Fourteenth Non-Infringement Contention .................................................... 127

15.     Fifteenth Non-Infringement Contention ....................................................... 127

16.     Sixteenth Non-Infringement Contention....................................................... 128

17.     Seventeenth Non-Infringement Contention .................................................. 128

18.     Eighteenth Non-Infringement Contention .................................................... 128

19.     Nineteenth Non-Infringement Contention .................................................... 129

20.     Twentieth Non-Infringement Contention ..................................................... 129

21.     Twenty-first Non-Infringement Contention .................................................. 130

22.     Twenty-second Non-Infringement Contention ............................................. 130

I.      Use by Apple of The '959 Patented Technology .................................................. 130

X.   THE '414 Patent ........................................................................................................ 134

A.      One of Ordinary Skill in The Art ................................................................ 134

B.      Description and Technological Concepts of The '414 Patent ..................... 135

1.      Technological concepts of the '414 Patent ................................................... 135

C.      Asserted Claims of The '414 Patent ............................................................ 138

D.      Claim Analysis ............................................................................................. 138

1.      Claim 11 ........................................................................................................ 139

2.      Claim 20 ........................................................................................................ 148

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

E.      Accused Instrumentalities ................................................................. 149

    1.      Android Synchronization Framework ........................................ 151

    2.      The Gmail, Mail, Calendar and Contacts Applications ................. 152

F.      Infringement ................................................................................. 162

    1.      Claim 11 ............................................................................ 164

    2.      Claim 20 ............................................................................ 173

    3.      Inducement ........................................................................ 175

    4.      Contributory infringement .................................................... 179

G.      Samsung's Alleged Non-Infringing Alternatives ................................. 180

    1.      First Alleged Alternative (page 160, lines 3-17) ......................... 181

    2.      Second Alleged Alternative (page 160, line 18 – page 161, line 3) ........... 183

    3.      Third Alleged Alternative (page 161, lines 4-16) ......................... 183

    4.      Fourth Alleged Alternative (page 161, lines 17-28) ...................... 185

    5.      Fifth Alleged Alternative (page 162, lines 1-17) ......................... 186

    6.      Sixth Alleged Alternative (page 175, lines 20-26) ....................... 187

    7.      Seventh Alleged Alternative (page 175, line 27 – page 176, line 5) ........... 188

    8.      Eighth Alleged Alternative (page 176, lines 6-12) ....................... 189

    9.      Ninth Alleged Alternative (page 176, lines 13-22) ....................... 190

    10.     Tenth Alleged Alternative (page 176, line 23 – page 177, line 5) ............... 191

H.      Samsung's Non-Infringement Contentions .......................................... 192

    1.      First Non-infringement Contention .......................................... 192

    2.      Second Non-infringement Contention ....................................... 192

    3.      Third Non-infringement Contention .......................................... 192

    4.      Fourth Non-infringement Contention ........................................ 193

    5.      Fifth Non-infringement Contention .......................................... 194

    6.      Sixth Non-infringement Contention .......................................... 194

    7.      Seventh Non-infringement Contention ....................................... 194

    8.      Eighth Non-infringement Contention ......................................... 194

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

9.      Ninth Non-infringement Contention..................................................................195

10.     Tenth Non-infringement Contention................................................................195

I.    Use by Apple of The '414 Patented Technology.......................................................195

EXPERT REPORT  OF DR. ALEX SNOEREN
CONCERNING U.S. PATENT NOS. 6,847,959 AND
7,761,414                                              v

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

the Court's construction.  In developing this understanding I looked at the Court's constructions in this case and applied them.  In addition I looked at the claims from the eyes of one of skill in the art at the time the patent was filed, applying the principles I discussed above relating to claim construction and claim interpretation.  In particular, I put myself in the position of one of skill in the art at the time the '414 Patent was filed and used that framework in addition to my understating of the inventions disclosed in the specification of the '414 Patent to understand the meaning of the asserted claims.

## 1. **Claim 11**

### a. **A computer readable storage medium containing executable program instructions which when executed cause a data processing system to perform a method**

383.    In order to infringe claim 11 of the '414 Patent, a device must have a computer readable medium that stores instructions that when executed perform the actions in the elements described below, such as the memory (RAM or permanent storage) in a mobile device.  The instructions found in a computer readable medium are generally written by a programmer as source code in a computer language such as Java, C, C++, objective-C, or assembly language and compiled into either binary form or object code that can be processed by a data processing system.

384.    Figure 2 of the '414 Patent describes an example of a data processing system with the computer readable medium shown as item 49 "Memory." (shown below highlighted in red)  The memory feeds instructions to the processing system shown as item 47, which executes the instructions that when executed cause the system to perform the actions described below.

EXPERT REPORT  OF DR. ALEX SNOEREN
CONCERNING U.S. PATENT NOS. 6,847,959 AND
7,761,414                                          139

Gibson, Dunn
& Crutcher LLP

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE



FIG. 2

**b.**    **executing at least one user-level non-synchronization processing thread, wherein the at least one user-level non-synchronization processing thread is provided by a user application which provides a user interface to allow a user to access and edit structured data in a first store associated with a first database**

385.    Claim 11 further requires that the device containing the computer readable storage include executable program instructions (*i.e.*, software) that when executed carry out a method involving at least one user-level non-synchronization processing thread.  That thread is provided by a user application which provides a user interface to allow a user to access and edit structured data in a first store associated with a first database

386.    As discussed above, a thread specifies series of steps or instructions to be executed by a computer.  In the context of the '414 Patent, a user-level thread is one that is part of a user application.  As the name implies, the user-level non-synchronization processing thread is a user-level thread that is distinct from the thread(s) used for synchronization activities.

387.    According to claim 11, the user-level non-synchronization processing thread, which I will refer to as the "UI thread" for short, must be provided by a user application that has a user

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

interface.  Examples of user applications are shown highlighted in green in Figure 4 of the '414

Patent below:



FIG. 4

388.    The applications shown as items 125, 127 and 129 can be calendar, contacts, email or

other program that the user uses to manipulate data on their device. The '414 Patent describes

examples of such applications, including calendar, email and contacts applications, in the passage

quoted below:

> The device includes one or more user application programs which are used to access
> and edit structured data in a particular data class. FIG. 4 shows examples of three such
> user application programs. In particular, calendar application program 125 is used to
> access and edit calendar data in the calendar store database 119. Similarly, the contacts
> application program is used by a user to access and edit contacts or address book
> information stored in the contacts store database 121. Similarly, the other application
> programs 129, which may include a notes application program, widget programs for
> presenting widgets, a web browser having bookmarks, an email program which
> includes email account setup information, a To Do list program, and possibly other
> programs which have structured data, are represented by the other application
> programs 129 which have access to and provide the ability to edit information in other
> stored databases 123. These user application programs, such as application programs
> 125 and 127, are separate from the synchronization software components which are
> responsible for synchronizing structured data in each of the different classes.

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

'414 Patent, 8:3-23.

389.    Further, the user interface provided by the user application must allow a user to manipulate, *i.e.,* read and edit, corresponding data, *e.g.*, email or calendar events, stored in a database.

390.    While this user interface is provided by execution of the UI thread, one skilled in the art would understand that the operations to directly read data from and write data to the database need not be performed in the UI thread.  Indeed, the '414 Patent specification describes a preferred embodiment, referring again to Figure 4, in which an application interacts with a file management system to affect reading and writing of data to the database:

> The host may also include user application programs, such as a calendar application program 143, a contacts application program 145, and other application programs 147 which are used by a user to access and edit corresponding data classes having structured data stored in a corresponding stored database, such as a calendar stored database 143A. The architecture shown in FIG. 4 shows the data stores on the host side as being coupled directly to the application program; ***it will be appreciated that there is typically a file management system on a host data processing system which manages each database and which receives calls or other requests from software components such as the application programs 143 or 145 or other components,*** such as data class handlers or the sync services 141 ***in order to affect reading and writing of data to a particular stored database.***

'414 Patent, 11:21-36 (emphases added).[84]  Accordingly, in the context of claim 11, the user interface may be configured "to allow a user to access and edit structured data in a first store associated with a first database" either by directly reading and writing data in the database in the UI thread itself, or by requesting data from and sending edits to one or more additional threads that in turn read and write the requested data from the corresponding database.

391.    During prosecution of the '414 Patent, the Patent Office examiner made a similar observation.  There, the applicant attempted to overcome a rejection by arguing that earlier versions of the claims, which like claim 11 included the phrase "wherein a least one user-level non-synchronization processing thread is provided by a user application which provides a user interface to allow a user to access and edit structured data," required "two different processing threads that

---

[84] While this portion of the '414 Patent refers to "the host," the specification says that "[t]he term 'host' and the term 'device' are intended to refer generally to data processing systems rather than specifically to a particular form factor for the host versus a form factor for the device." '414 Patent, 4:48-50.

EXPERT REPORT  OF DR. ALEX SNOEREN
CONCERNING U.S. PATENT NOS. 6,847,959 AND
7,761,414                                      142

execute concurrently, both of which can modify data in a store." Amendment and Response dated

March 5, 2009, at 12. However, the Patent Office examiner rejected that argument, explaining:

> [A]pplicant argues that per Shalev only one thread can modify the data structure while claim 1 claims two different processing threads that execute concurrently both of which can modify data in a store. In response, ***claim 1 and 12 as written do not require both threads to modify the data structure concurrently***. Claims 1 and 12 merely provide a user interface to allow a user to access and edit structured data in the first store. No user is actually required to edit any data in the first store.

Office Action dated June 18, 2009, at 2 (emphasis added). The examiner further noted that "the claim

language of 'to allow' . . . do[es] not require any operation to actually be performed" by the UI

thread. *Id.* at 4.

392.    Rather than amend the "to allow" language to require the UI thread to directly modify

the stored data, the applicant subsequently chose to abandon its earlier argument and instead

overcame the Patent Office examiner's rejection by amending what became claim 11 to add other

limitations, *e.g.*, a first and second database. Accordingly, when read in the context of the full set of

negotiations between the applicant and the Patent Office, the prosecution history is clear: Claim 11

does not require the UI thread to directly read and write to the first database.

393.    Claim 11 further requires that the data in the first store in the first database be

"structured data." One of skill in the art would understand structured data to be data with a schema or

structure imposed on the data such that the semantics of the data can be determined from how

individual elements of the data are stored. The particular structure imposed will vary depending on

the class of data, as the specification of the '414 Patent explains:

> This synchronization system may be used to synchronize structured data, such as data in a contacts or address database. Different data typically have different structures or formats which specify how the data is organized and formatted. These are referred to as data classes, and FIGS. 9A and 9B provide examples of two different structured data formats for two different data classes. In particular, FIG. 9A shows a data format for a contacts data class, and FIG. 9B shows a format for a calendar data class format.

'414 Patent, 7:47-60.

394.    Examples of structured data formats for contacts and calendar data are provided in

Figures 9A and 9B of the '414 Patent. Figure 9A is reproduced below:

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE



FIG. 9A

395.     The structured data must be stored in a "store," that is, a table, set of tables, document, collection, or similar, in a database.  There are a variety of forms of databases, ranging from traditional relational databases like those implemented by SQLlite to key-value/tuple, column, and document stores.  (See, e.g., http://nosql-database.org)  Data is presented in the user interface by retrieving it from this database.  The data can be edited by making changes in the user interface, which are then written into the database.  As explained above, the UI thread itself need not directly read from and write to the first database.

c.     **and executing at least one synchronization processing thread concurrently with the executing of the at least one user-level non-synchronization processing thread,**

396.     Claim 11 further requires that the device containing the computer readable storage medium must contain software that executes a synchronization processing thread concurrently with the UI thread discussed above.  In its claim construction order, the Court explained that "a person of ordinary skill I the art at the time of the invention would have understood 'concurrently' to include the kind of rapid switching . . . which would permit the invention to be implemented on a single processor."  Order Construing Disputed Claim Terms (D.I. 447) at 25.  Accordingly, the Court construed the claim language, "concurrently with," to mean "the synchronization thread and the non-synchronization thread are both active during an overlapping time interval."  *Id.*  I have applied that construction to my analysis herein.

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

397.    Under the Court's construction, two threads can be considered active during an overlapping time interval even when in some instances one or the other threads is blocked waiting for an event to occur.  For example, a UI thread would be considered active even if it is waiting for user input.  Similarly a synchronization processing thread can be considered active even if it is waiting for a network communication or an I/O event.  This is true for at least two reasons.  First, an "active" thread need not be running at a particular moment, particularly if there is nothing for the thread to do while it is waiting for input.  Indeed, one of skill in the art appreciates that UI threads are event-driven, in that they spend most of their time blocked waiting on asynchronous user-input events.  Similarly, threads that process network data also typically block awaiting network activity.  In each case, in the context of the '414 Patent one of skill in the art would describe these threads as running, as they are able to be scheduled the moment such an event occurs.  Second, even if one or the other of two threads that are being executed is momentarily blocked, it does not mean that they are mutually exclusive and therefore can be concurrently executed.  So in the previous example, the UI thread waiting for user input and the synchronization thread waiting for I/O events could both unblock at the same time due to, for example, the simultaneous arrival of a network packet and a user's keystroke, and would therefore both be simultaneously available to execute.  The scheduler will choose which will execute first and rapidly switch between the two.

> **d.    wherein the at least one synchronization processing thread is provided by a synchronization software component which is configured to synchronize the structured data from the first database with the structured data from a second database.**

398.    Claim 11 further requires that the synchronization processing thread be provided by a synchronization software component that is configured to synchronize the structured data from the first database with the structured data from a second database.

399.    The '414 Patent distinguishes synchronization in the invention from prior art systems, stating that in prior systems:

> The handheld computer merely acts as a storage device by vending its storage memory, such as a hard drive or a flash memory, to the host computer which, through

EXPERT REPORT  OF DR. ALEX SNOEREN
CONCERNING U.S. PATENT NOS. 6,847,959 AND
7,761,414                                      145

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

the synchronization software 16, opens each database to perform the synchronization. There is often no active agent on the handheld computer 14 which participates in the synchronization process; in other words, the synchronization software 16 on the host computer 12 performs the synchronization operations for both sets of databases on both devices. When there is a synchronization agent on the handheld computer, it does not have the facilities and architecture described in this disclosure, including, for example, providing a plug-in model on both the handheld and the host for different data classes, and does not allow applications on the handheld computer to run concurrently with the synchronization process, and various other features described herein.

'414 Patent, 1:51-67.  Accordingly, for synchronization in the context of the '414 Patent, it is not sufficient for the device to merely act as a storage device and have the host perform all of the synchronization operations on both ends of the synchronization relationship.

400.    Figure 4 of the '414 patent, which is reproduced below, depicts an example of the claimed synchronization architecture, which includes an active agent on the device.



FIG. 4

401.    The synchronization software components depicted in Figure 4 are highlighted above in purple.  These components are described in the specification as follows:

Gibson, Dunn
& Crutcher LLP

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

These user application programs, such as application programs 125 and 127, are separate from the synchronization software components which are responsible for synchronizing structured data in each of the different classes. These software components are shown in FIG. 4 as data sources 113, 115, and 117. In particular, the calendar data source 113 is responsible for causing the retrieval and storage of the structured data from its particular data class, which is the calendar data class, during a synchronization process. Similarly, the contacts data source 115 is responsible for causing the retrieval and storage of structured data in the contacts stored database 121, which may represent the user's address book or other contact information database. Similarly, other data sources, such as other data sources 117, are responsible for causing the retrieval and storage of structured data from other structured data stores.

'414 Patent, 8:19-34.

402.    As described above the synchronization software components are responsible for "causing the retrieval and storage of structured data."  One way the synchronization software component can cause data to be stored is by directly writing that data to the first database.  If so, it may acquire a lock on the first store in that database, *see, e.g.*, '414 Patent claim 14,[85] but claim 11 (from which claim 14 depends) does not itself require the synchronization software component to acquire a lock on the first database.  For example, the '414 Patent explains that "in one embodiment, if a synchronization software component accesses a SQLite database, if [sic] may not need to acquire a lock because the database may handle this function itself.  In one embodiment, Contacts, Calendars and Notes may be stored in databases which handle their own locking at a lower level." '414 Patent, 25:21-26.

403.    Another way the synchronization software component can cause the retrieval and storage of structured data in the first database is by calling or requesting other software to read and write to the database.  For example, the '414 Patent specification explains that "it will be appreciated that there is typically a file management system on a host data processing system which manages each database and which receives calls or other requests from software components such as the application programs 143 or 145 or other components, such as data class handlers or the sync services 141 in order to affect reading and writing of data to a particular stored database."  '414 Patent, 11:21-36 (emphases added).

---

[85]    *See also* '414 Patent, 2:50-54 ("In at least certain embodiments, the synchronization software component acquires a lock on the first store in order to prevent the user application from affecting the first store while a synchronization process is occurring.").

Gibson, Dunn
& Crutcher LLP

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

2. **Claim 20**

a. **The storage medium as in claim 11 wherein the synchronization software component is configured to synchronize structured data of a first data class and other synchronization software components are configured to synchronize structured data of other corresponding data classes.**

404.    Claim 20 incorporates all of the limitations of claim 11, described above, and additionally adds limitations based on the preferred synchronization architecture described in the '414 Patent.

405.    Specifically, claim 20 requires multiple synchronization software components each of which is specific to a corresponding data class.  For example, Figure 4 depicts a dedicated synchronization software component configured to manage a calendar data class and a separate dedicated synchronization software component configured to manage a contacts data class.  In addition, Figure 4 depicts a plurality of other synchronization software components (item 117) that may be plugged into the existing synchronization framework described in the '414 Patent and claimed in claim 11 to synchronize other data classes that can be accessed and edited by other user applications.  As required by the language of claim 11, from which claim 20 depends, each of these synchronization software component provides at least one synchronization processing thread to affect synchronization of its corresponding data class.

406.    The '414 Patent refers to this architecture as a "plug-in model" and describes it as one of the things that distinguishes the invention from the prior art where:  "When there is a synchronization agent on the handheld computer, it does not have the facilities and architecture described in this disclosure, including, for example, providing a plug-in model on both the handheld and the host for different data classes, and does not allow applications on the handheld computer run concurrently with the synchronization process, and various other features described herein." '414 Patent, 1:60-67.

407.    One of the benefits of this plug-in model architecture is that it allows for a consistent synchronization architecture that can be extended to allow synchronization of other data classes on a

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

be pushed to the device as it is received resulting in sporadic, unpredictable disruptions to the ability to manipulate data in the user interface that would detract from the device's ease of use.  For these reasons, it is my opinion that this proposed design change would not be a practical non-infringing alternative.

### 9.   Ninth Alleged Alternative (page 176, lines 13-22)

509.    On page 176, lines 6-12 of Samsung's Response, Samsung alleges that another non-infringing alternative would be to "use a single SyncAdapter instead of distinct subclasses for each type of data to be synchronized."  Samsung does not explain what claim limitation(s) it contends that this design change would avoid meeting, but Samsung's Response refers only to claim 20.  Samsung does not contend that this proposed design change is a non-infringing alternative to claim 11.

510.    Moreover, the Sync Adapters for the Gmail Application and those that allow for synchronization of calendar and contacts with user's Google Calendar and Gmail accounts are closed source that is not available to Samsung to modify.  Westbrook, 159:21 – 160:10 - 161:5-8; Quintana, 78:22 – 79:4; 100:1-6.  While Google's corporate representative, Hiroshi Lockheimer, identified some alleged "alternatives" to the '414 patent, this proposed alternative was not amongst the alternatives Google identified.  *See* Lockheimer Dep., Ex. 4.  The fact that Google did not and was apparently unwilling to identify the combination of these Sync Adapters as a possible design alternative suggests that Samsung would be unable to expediently, if ever, implement this change at least for these aspects of the infringing functionality in Samsung's devices.

511.    In addition, this alleged alternative has significant technical drawbacks.  As explained above, the existing Android Sync Adapter architecture practices the plug-in model architecture described and claimed in the '414 Patent.  This architecture provides a standard framework that can be readily extended to provide synchronization functionality for new data classes and it has been part of the Android platform for every release since Eclair.  *See* Quintana, 262:22 – 264:5; GOOG-NDCAL630-00061189.   By enforcing the use of a single, combined Sync Adapter, Samsung would effectively disable this flexibility and restrict the ability to extend the existing architecture to the synchronization of new data classes, particularly for third party developers who might not have

EXPERT REPORT  OF DR. ALEX SNOEREN
CONCERNING U.S. PATENT NOS. 6,847,959 AND
7,761,414                                        190

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

access to the source code for the single SyncAdapter on Samsung's devices.  In addition, Google's

corporate representative testified that an advantage of having separate sync adaptors "is each sync

adaptor can be assigned to run in its own process so that if the sync manager wants to direct a sync

adaptor to run, it only has to use the memory and the footprint needed for that one specific

functionality and not have to . . . include all of the footprint for both of them in the same process."

Quintana, 255:6-13.  This has a tangible benefit for the user because it "means there's more memory

and CPU available for other processes to run."  Quintana, 255:16-23.  For these reasons, it is my

opinion that this proposed design change would not be a practical non-infringing alternative.

## 10.   Tenth Alleged Alternative (page 176, line 23 – page 177, line 5)

512.    On page 176, line 23 to page 177, line 5 of Samsung's Response, Samsung alleges that

another non-infringing alternative would be to "perform at least one synchronization activity on each

processing thread that display [sic] the user interface."  However, Samsung does not explain what it

believes would constitute "at least one synchronization activity."  The only example it offers of such

is "providing information to a synchronization server each time it is executed," but it is not clear what

that means.  To the extent Samsung is proposing to change the design of its infringing products such

that the same thread that provides the user interface for the Gmail, Mail, Calendar and Contacts

Application also communicate with the remote server with which it is synchronized, it is my opinion

that such a design change would have significant technical drawbacks.  Specifically, based on

Samsung's cursory description, if this change were implemented the user interface would block

during the synchronous exchange of data from the device to the remote server resulting in disruptions

to user's ability to operate the user interface that would detract from the device's ease of use.  While

it might be possible to design an asynchronous implementation that might allow the user interface to

remain responsible, Samsung's Response does not describe such.  Moreover, it would be a significant

departure from Android's current, multi-threaded architecture.  Accordingly, the description in

Samsung's Response is incomplete and does not, in my opinion, provide a sufficiently detailed design

to consider it to be a non-infringing alternative.

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

I declare under penalty of perjury that the foregoing is true and correct.

Dated:   August 12, 2013

Alex C.  Snoeren

EXPERT REPORT  OF DR. ALEX SNOEREN
CONCERNING U.S. PATENT NOS. 6,847,959 AND
7,761,414                                              197

Gibson, Dunn
& Crutcher LLP

# EXHIBIT 2

## C. DEPOSITION TRANSCRIPTS & EXHIBITS

| Description |
| --- |
| Deposition Transcript of Juan V. Esteve Balducci, dated July 18, 2013 and Exhibits |
| Deposition Transcripts of Bjorn Erik Bringert, dated May 10, 2012 and June 28, 2013; and Exhibits |
| Deposition Transcript of Joonkyo (Joseph) Cheong, June 24, 2013 and Exhibits |
| Deposition Transcript of Justin Denison, dated July 18, 2013 and Exhibits |
| Deposition Transcripts of Gordon Freedman, dated January 16-17, 2013 and July 25, 2013; and Exhibits |
| Deposition Transcript of Huijae Lee, dated July 5, 2013 and Exhibits |
| Deposition Transcript of Hiroshi Lockheimer, dated July 26, 2013 and Exhibits |
| Deposition Transcript of Sang-Guen Park, dated July 3, 2013 |
| Deposition Transcript of Fred Quintana, dated June 13, 2013 and Exhibits |
| Deposition Transcript of Paul Westbrook, dated June 11, 2013 and Exhibits |
| Trial Testimony of Justin Denison, *Apple Inc. v. Samsung Electronics Co., Ltd.*, et al., Case No. 11-cv-01846 LHK (SG) |
| Deposition Testimony of Tim Sheppard, December 21, 2011, *In the matter of Certain Electronic Digital Media Devices and Components*, Investigation No. 337-TA-796 |
| Deposition Testimony of Timothy Sheppard, January 24, 2012, *Apple Inc. v. Samsung Electronics Co., Ltd.*, et al., Case No. 11-cv-01846 LHK (SG) |

## D. DOCUMENTS

| Description |
| --- |
| Baker et. al., "Megastore: Providing Scalable, Highly Available Storage for Interactive Services," Proc. of CIDR 2011, available at http://research.google.com/pubs/pub36971.html and produced at APLNDC630-0000879847 |
| Corbett et. al., "Spanner: Google's Globally-Distributed Database," Proc. of OSDI. 2012, available at http://research.google.com/archive/ spanner.html and produced at APLNDC630-0000879868 |