# EXHIBIT D-9

VIDEOTAPED DEPOSITION OF ULRICH PFEIFER
CONDUCTED ON SUNDAY, JULY 14, 2013

1 (Pages 1 to 4)

## Page 1

1  UNITED STATES DISTRICT COURT
2  NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION
3  ----------------------------------x
4  APPLE INC., a California          :
5  Corporation,                      :
6           Plaintiffs, :
7  v.                                :
8  SAMSUNG ELECTRONICS CO., LTD, a  : Civil Action No.
9  Korean corporation; SAMSUNG      : 12-cv-00630-LKH (PSG)
10 ELECTRONICS AMERICA, INC., a New :
11 York corporation; and SAMSUNG    :
12 TELECOMMUNICATIONS AMERICA, LLC, a :
13 Delaware limited liability company.:
14          Defendants. :
15 ----------------------------------x
16 (Caption continued on next page.)
17
18      Videotaped Deposition of ULRICH PFEIFER
19           London, England, UK
20        Sunday, July 14, 2013, 9:05 a.m.
21
22
23 Job No.: 40646
24 Pages: 1 - 259
25 REPORTED BY:  SUSAN A. McINTYRE, RPR, CRR, QRR.

## Page 2

1  (Caption continued from previous page.)
2  ----------------------------------x
3  SAMSUNG ELECTRONICS CO., LTD, a   :
4  Korean corporation; SAMSUNG       :
5  ELECTRONICS AMERICA, INC., a New  :
6  York corporation; and SAMSUNG     :
7  TELECOMMUNICATIONS AMERICA, LLC, a :
8  Delaware limited liability company, :
9       Counterclaim Plaintiffs, :
10 v.                                :
11 APPLE INC., a California          :
12 corporation,                      :
13       Counterclaim Defendant. :
14 ----------------------------------x
15
16      Videotaped deposition of ULRICH PFEIFER,
17 held at the office of
18
19     QUINN EMANUEL URQUHART & SULLIVAN, LLP
20     One Fleet Place
21     London, England EC4M 7RA
22     (44) 0-20-7653-2000
23
24   Before Susan A. McIntyre, CSR, RPR, CRR, MBIVR.
25

## Page 3

1            A P P E A R A N C E S :
2  FOR THE PLAINTIFF AND COUNTERCLAIM DEFENDANT:
3      JOSHUA FURMAN, ESQUIRE
4       GIBSON DUNN & CRUTCHER LLP
5       200 Park Avenue
6       New York, New York 10166-0193
7       (212) 351-2461
8
9
10 FOR THE DEFENDANTS AND COUNTERCLAIM PLAINTIFFS:
11     JOSHUA JAFFE, ESQUIRE
12     QUINN EMANUEL URQUHART & SULLIVAN LLP
13     51 Madison Avenue, 22nd Floor
14     New York, New York 10010
15     (212) 849-7124
16
17
18 ALSO PRESENT:
19     Ms Ulrike Dehmel, Interpreter
20     David Elliott Ross, Videographer
21
22
23
24
25

## Page 4

1              C O N T E N T S
2  EXAMINATION OF ULRICH PFEIFER              PAGE
3      By Mr Furman                         7
4      By Mr Jaffe                        202
5      By Mr Furman                       235
6
7
8              E X H I B I T S
9          (Attached to transcript)
10 PFEIFER DEPOSITION EXHIBIT                 PAGE
11 Exhibit 1   Document dated May 5, 1997, Bates    70
12      No. PFEIFERNDCA630-00000045
13 Exhibit 2   Document dated March 13, 1997,      70
14      Bates No. PFEIFERNDCA630-00000057
15 Exhibit 3   Subpoena                       82
16 Exhibit 4   E-mail dated March 14, 1997, Bates  100
17      Nos. PFEIFERNDCA630-00004625 - 4626
18 Exhibit 5   Thesis by Huynh Tung: Expansion of  150
19      the FreeWAIS Server, Bates Nos.
20      SAMNDCA630-06929163 - 06029352
21 Exhibit 6   Document: Information Retrieval in  177
22      Networked Heterogeneous Databases,
23      Bates Nos. SAMNDCA630-05349619 -
24      05349629
25

**Page 13**

1  deposition today.
2      A.  Yeah.
3      Q.  My question is when did that
4  arrangement first occur?
5      A.  That was December last year.
6  I don't recall the exact date.
7      Q.  What is your familiarity with the
8  litigation between Apple and Samsung?
9      A.  I know the company names.  I don't
10 know any details about the case we are talking
11 about.  I know, of course, it's about freeWAIS.
12          (Court reporter clarification.)
13         THE WITNESS:  FreeWAIS.  It's
14 spelled F-R-E-E-W-A-I-S.
15 BY MR FURMAN:
16     Q.  Have you ever seen any patents
17 involved in this litigation?
18     A.  No, I have not seen the patents.
19     Q.  Have you seen any documents produced
20 by either Apple or Samsung in this litigation?
21     A.  I got the subpoena for appearing.
22 That's the only document I have seen in that
23 respect.
24     Q.  Have you seen any of the court
25 submissions in this litigation, meaning have you

**Page 14**

1  seen any of the documents that either Apple or
2  Samsung have submitted to the court in this
3  litigation?
4      A.  No.  It's literally just a subpoena.
5      Q.  When did you first hear about the
6  case between Apple and Samsung?
7      A.  When I was contacted by Quinn
8  Emanuel in December last year.
9      Q.  That would be December 2012?
10     A.  2012, correct.
11     Q.  What did you hear about the case
12 when you were contacted by Quinn Emanuel?
13         MR JAFFE:  Objection.  Vague.
14         THE WITNESS:  Sorry, can you repeat
15 the question?
16 BY MR FURMAN:
17     Q.  What did you hear about the case
18 when you were contacted by Quinn Emanuel?
19         MR JAFFE:  Same objection.
20         THE WITNESS:  I only was -- the name
21 freeWAIS-sf was mentioned and I was asked if I am
22 familiar with that system.
23 BY MR FURMAN:
24     Q.  What did you tell them?
25     A.  I told them, yes, I was developing

**Page 15**

1  that at my university time or I was developing at
2  -- to that system.
3      Q.  Do you have a consulting or other
4  financial relationship with Quinn Emanuel?
5      A.  I don't think it qualifies as
6  consulting.  I get compensated for the time
7  I spend in reviewing the facts with the Quinn
8  Emanuel lawyers.
9      Q.  Why do you believe that that doesn't
10 count as consulting?
11     A.  Because it is a substitution for
12 what I -- for my salary I'm not getting,
13 basically.  So it's just compensating for what I'm
14 losing.
15     Q.  How is that not consulting?
16         MR JAFFE:  Objection.  Vague.  Form.
17         THE WITNESS:  It depends on the
18 definition of "consulting," I would say.  So the
19 arrangement is strictly I get paid for the
20 hours -- or compensated for the hours I spend in
21 reviewing the facts.
22 BY MR FURMAN:
23     Q.  What's your definition of
24 "consulting?"
25     A.  I don't have a precise definition,

**Page 16**

1  that's why I was qualifying before.
2      Q.  Understood.
3          When did your financial relationship
4  with Quinn Emanuel begin?
5      A.  It was also in December.
6      Q.  Do you have a consulting or other
7  financial relationship with Samsung or
8  representatives of Samsung?
9      A.  No.
10     Q.  The relationship you have with Quinn
11 Emanuel, is that related to this litigation?
12     A.  Yes.
13     Q.  Who made the first contact between
14 you and Quinn Emanuel?
15     A.  That was Jacob Danziger.
16     Q.  That was the -- when they -- strike
17 that.
18         Mr Danziger contacted you in
19 December 2012?
20     A.  Yes.
21     Q.  When he contacted you, what did he
22 tell you?
23         MR JAFFE:  I will just caution the
24 witness -- actually, I don't need to caution you.
25 Go ahead.

VIDEOTAPED DEPOSITION OF ULRICH PFEIFER
CONDUCTED ON SUNDAY, JULY 14, 2013

5 (Pages 17 to 20)

Page 17

1  THE WITNESS: Can you repeat the
2  question?
3  BY MR FURMAN:
4      Q. Sure.
5      When Mr Danziger contacted you in
6  December 2012, what did he say?
7      A. He asked me if I would be willing to
8  be what I now would call a fact witness in a case.
9      Q. Did he mention the particular case?
10     A. No, he didn't mention a particular
11 case. He mentioned freeWAIS-sf when he made sure
12 that I'm the person he was looking for.
13     Q. Was this contact made over telephone
14 or through another means?
15     A. That was by -- the first contact was
16 an e-mail he sent to me asking if I would be
17 available for a call.
18     Q. What did you respond to that e-mail?
19     A. I responded positively, said I would
20 be willing to take a call, and gave him my number.
21     Q. When did you send your response to
22 Mr Danziger?
23     A. Also December. Must be early
24 December.
25     Q. Did the phone call that you and

Page 18

1  Mr Danziger discussed over an e-mail ever take
2  place?
3      A. Yes. He called me on that number
4  I gave him.
5      Q. When did Mr Danziger call you?
6      A. Also early December, after I sent my
7  mail -- or replied to his mail.
8      Q. Was anyone else on the phone call
9  besides you and Mr Danziger?
10     A. No.
11     Q. What did you discuss?
12     MR JAFFE: I'll just caution the
13 witness, when you talk about your communications
14 with the Quinn Emanuel attorneys that you just
15 make sure not to reveal any attorney-client
16 privileged information.
17     THE WITNESS: So the question was
18 again?
19 BY MR FURMAN:
20     Q. What did you and Mr Danziger discuss
21 on that phone call?
22     MR JAFFE: The same caution.
23     THE WITNESS: We didn't discuss
24 much. He explained to me what a fact witness is
25 and that he would need to send me some sort of

Page 19

1  contract which would oblige me not to discuss the
2  case with other people.
3  BY MR FURMAN:
4      Q. What did he explain to you was a
5  fact witness?
6      MR JAFFE: That is attorney-client
7  privileged information. I'll instruct you not to
8  answer.
9  BY MR FURMAN:
10     Q. What is your understanding of what a
11 fact witness is?
12     A. Fact witness, in my understanding,
13 is here as to testify about my factual knowledge
14 about the subject at hand.
15     Q. What is that subject at hand in your
16 understanding?
17     A. My understanding is I'm asked about
18 freeWAIS-sf and my involvement in that project
19 system.
20     Q. Besides talking about what a fact
21 witness was or is -- strike that.
22     Besides talking about what a fact
23 witness is and discussing a contract, did you
24 discuss anything else with Mr Danziger?
25     MR JAFFE: I'll just again caution

Page 20

1  you not to reveal any attorney-client privileged
2  information.
3      THE WITNESS: I don't think there
4  was anything else discussed.
5  BY MR FURMAN:
6      Q. Was there a discussion of your
7  hourly rate?
8      A. Sorry? It was too quick.
9      Q. Was there a discussion of your
10 hourly billing rate?
11     A. Yes. He asked me what my hourly
12 rate would be and I calculated my yearly income
13 and divide it by the number of hours, and
14 we arrived -- well...
15     Q. What was that hourly rate that you
16 arrived at?
17     A. That hourly rate was US$100 per
18 hour.
19     Q. Did you discuss freeWAIS or
20 freeWAIS-sf on that phone call?
21     A. No, not at all.
22     Q. Why was it your understanding that
23 freeWAIS-sf was the subject matter of the phone
24 call?
25     MR JAFFE: I'll just caution the

Page 93

1  not in evidence.
2       THE WITNESS: Yeah, a similar
3  answer. I don't positively remember that there
4  was an indication. It's unlikely.
5  BY MR FURMAN:
6       Q. Was there anything in that UDP
7  packet which indicated which particular clients
8  were used to access that freeWAIS-sf installation?
9       A. No. The UDP packet was sent upon a
10 server event, so there was no relation to a
11 client-triggered event.
12      Q. Was there anything in the UDP packet
13 that indicated which country the UDP packet came
14 from?
15      A. I'm not sure about in the packet.
16 The packet came from a certain IP address, and
17 that IP address could be traced down to a country.
18      Q. Did you or anyone in your group,
19 upon receipt of the UDP packet, ever correlate IP
20 addresses to countries?
21      A. We correlated them to domain names
22 as per the mail we talked about before, and domain
23 names, in turn, relate to countries.
24      Q. How is that?
25      A. There are domains for countries,

Page 94

1  like "dot US" for the United States, and there are
2  sort of shared domains, like "com," "mil" "edu."
3  And "com" was used back then mostly by the US, but
4  not necessarily all IP addresses would relate to
5  "com" domains, but "dot mil" and "dot edu" at that
6  time would be US-based servers.
7       Q. Does it indicate a US-based server
8  or a US-based entity running that server?
9       A. I'm not positive about the rules.
10 Back then I treated these two things as equal.
11      Q. For example, someone with a
12 "dot edu" domain could, in theory, have a server
13 outside the US; is that correct?
14      MR JAFFE: Objection. Vague.
15      THE WITNESS: In theory, but in my
16 experience that was not the case back then.
17 BY MR FURMAN:
18      Q. It's true, however, that companies,
19 for example, could have a "dot com" domain and be
20 a US company but have their servers residing
21 outside the US, is that correct?
22      A. That's correct, but also unlikely.
23      Q. Besides looking at the domain names,
24 was there any other effort to correlate where the
25 UDP packets were received from to -- strike that.

Page 95

1       Besides looking at the domain names,
2  was there any effort to correlate the received UDP
3  packets to countries?
4       A. I don't recall an effort.
5       Q. You had mentioned that there were
6  domain names with multiple installation, is that
7  correct?
8       A. Yes. Many sources of UDP packets,
9  to be precise.
10      Q. And many packets of -- many UDP
11 packets would indicate to you multiple
12 installations, is that correct?
13      A. Yeah, the count included distinct IP
14 addresses.
15      Q. Did you or anyone in your group
16 undertake any efforts to figure out how those
17 particular installations were configured?
18      MR JAFFE: Objection. Asked and
19 answered.
20      THE WITNESS: The only thing we did
21 derive from the UDP packets was compile an
22 operating system version, and of course the IP
23 address.
24 BY MR FURMAN:
25      Q. My question was actually a little

Page 96

1  bit different. I understand what was in the UDP
2  packet. You seem to have compiled a list of
3  domains and IP addresses with freeWAIS-sf servers
4  corresponding to that domain, is that correct?
5       A. Yes.
6       Q. Given that list of domains and IP
7  addresses indicating multiple installations of
8  freeWAIS-sf, did you or anyone in your group take
9  that list and attempt to ascertain how those
10 particular servers were configured?
11      A. No. Not that I'm aware of. So the
12 work group part -- I don't remember having done it
13 myself or tasked somebody to do it.
14      Q. The copy of that e-mail that you
15 viewed, do you recall whether or not it had a
16 control number or Bates number stamped on the
17 bottom?
18      A. No, I don't recall.
19      Q. Do you know if that e-mail has been
20 produced in this litigation?
21      A. I don't know.
22      Q. Do you recall the subject line of
23 that e-mail?
24      A. Not exactly.
25      Q. Did that e-mail come from your

97

1  files?
2      A.  That I don't know.
3      Q.  You were the author of that e-mail,
4  is that correct?
5      A.  I remember having written it, yes.
6      Q.  Who were the intended recipients?
7      A.  I think it was my -- mostly my
8  former boss, Norbert Furh.
9      Q.  Was there anyone else listed in the
10 copy of the e-mail that you saw in preparation for
11 this deposition other than Professor Furh?
12     A.  I don't recall who was there.
13 I think it wasn't a secret, but maybe, maybe not;
14 I don't recall.
15     Q.  If someone were to ask you to go
16 back through your records and find that e-mail,
17 how would you search for it?
18     A.  I would search for mails from me to
19 Norbert Fuhr.  Yes, that's basically it.
20     Q.  Can you remember, for example, one
21 of the domain names listed in that list of domain
22 names?
23     A.  Yeah, there was US military,
24 US educational, I assume Germany was in there,
25 certainly.  It was a pretty long list, so I guess

98

1  if I would search for the content of the e-mail
2  I could use a few German countries and see which
3  mails matches that search pattern.
4      Q.  Do you remember the specific URL,
5  let's say, for the US military domain name?
6      A.  I think the extension is "dot mil,"
7  but -- was that your question?  Specific URL?
8      Q.  Yes, that was my question.
9      A.  So you mean the server name or the
10 pass to the server?  No, I don't recall any
11 specific instance.  It was a summary mail and the
12 numbers were relatively high.
13     Q.  So the e-mail correlated things by
14 top-level domain, meaning how many IP addresses
15 had "dot mil," or did the e-mail correlate
16 specific URLs with IP addresses?
17     A.  Well, I think it correlated IP
18 addresses.  So number of distinct IP addresses
19 that resolved into that domain.
20     Q.  When you say "that domain," do you
21 mean "dot mil" or do you mean a more specific
22 domain?
23     A.  I looked -- sorry, can you repeat?
24     Q.  What I'm trying to understand is --
25 since I don't have this e-mail in front of me --

99

1  what information was contained in the domain
2  column of the table?  Was it "dot mil" correlates
3  to a number of IP addresses or was it a specific
4  "dot mil" URL that correlated to a number of IP
5  addresses?
6      A.  Okay.  Sorry.
7          Basically what it contained was the
8  list of all domains, so the "dot com," but
9  translated to the official meaning.  I think there
10 was some RFC, some document, which says "dot gov"
11 is US Governmental, and the paper contained this
12 US Governmental number of distinct IP addresses.
13     Q.  So it correlated top level domain
14 names to IP addresses?
15     A.  Yes, but the top level was expanded
16 to the, yeah, verbose meaning.
17     Q.  Understood.
18         MR JAFFE:  Counsel, can we take a
19 quick break and I can provide you that e-mail if
20 you would like.
21         MR FURMAN:  That would be great.
22         MR JAFFE:  Okay.
23         THE VIDEOGRAPHER:  Going off the
24 record at 11:38 as indicated on the video screen.
25         (Off the record - 11:39 a.m.)

100

1          (On the record - 11:45 a.m.)
2          THE VIDEOGRAPHER:  Back on the
3  record, 11:44 a.m.
4  BY MR FURMAN:
5      Q.  Mr Pfeifer, your counsel during the
6  break has graciously provided me a copy --
7  actually multiple copies -- of the e-mail that
8  I believe we were discussing.  I'm going to hand
9  you what has been marked as Pfeifer Exhibit 4.
10 Can you please take a look at that and let me know
11 if this is the e-mail that we were just talking
12 about?
13         (Exhibit No. 4 marked for
14         identification.)
15     A.  Yes, I think that's the e-mail.
16     Q.  So I understand now where it has the
17 top-level domains in a more verbose manner on the
18 left and the number of installations on the right,
19 and that number indicates the number of distinct
20 IP addresses that would fall under that top-level
21 domain, is that correct?
22     A.  That is correct.
23     Q.  How did you correlate the IP
24 addresses to the top-level domain?
25     A.  I did a simple DNS look-up.

101

1  Q. Can you explain what a DNS look-up
2  is?
3  A. DNS is an Internet service that
4  normally translates domain names into IP addresses
5  for Internet clients, but you also can do the
6  reverse, provide with IP addresses and it returns
7  the domain name.
8  Q. Do you maintain the DNS server
9  yourself?
10  A. No. I don't.
11  Q. Does every IP address have a domain?
12  A. No, not nowadays. Back then look
13  for is pretty good, so there is a line below there
14  which says "Unresolved"; this is where the domain
15  name system couldn't correlate the IP address to a
16  domain name.
17  Q. Was this number -- strike that.
18     Were the numbers on the right in
19  this e-mail marked as Exhibit 4 cumulative of a
20  certain time period, obviously ending around March
21  of 1997?
22  A. They were cumulative. I can't
23  restrict the time period, so it may be all the --
24  it probably was all the packets we ever received.
25  Q. The UDP packets that you used to

102

1  generate this information, did it indicate the
2  particular version of freeWAIS-sf that was sending
3  the UDP packet?
4  A. I'm not sure that -- it did not --
5  most likely it did not contain that information,
6  which seems to be an oversight in retrospect, but
7  I can't rule it out completely. But I'd say most
8  probably not.
9  Q. Did you maintain in your records or
10  did anyone in your group maintain in their records
11  a more detailed breakdown of the versions running
12  at any -- the versions of freeWAIS-sf running at
13  any of the IP addresses that are accounted for
14  here?
15  A. I do not think so. No.
16  Q. Did you or anyone in your group
17  maintain a more detailed record of the dates you
18  received the UDP packets corresponding to the IP
19  addresses accounted for here?
20  A. Back then they were collected,
21  apparently -- or had to be collected in a file.
22  I don't have a copy of that file. I'm not sure
23  who might have.
24  Q. Have you seen a copy of that file
25  since 1997?

103

1  A. Of the UDP file you mean?
2  Q. Correct.
3  A. No, I haven't.
4  Q. Do you know if a copy of that file
5  has been provided by you to Quinn Emanuel?
6  A. Well, I provided a lot of files but
7  it's very unlikely that any of the e-mails or any
8  of the distribution -- or any of the CVS
9  repositories contained a copy of that file.
10  Q. Do you think a copy of that file
11  still exists today?
12  A. I can't rule that out. So it was on
13  the servers of the department which was headed by
14  Norbert Fuhr, and Norbert Fuhr moved to the
15  University of Dortmund. I don't know how much
16  information he carried over, so I can't rule it
17  out.
18  Q. Besides this particular e-mail that
19  has been marked as Exhibit 4, are you aware of any
20  other documents indicating which countries
21  freeWAIS-sf was installed in?
22  A. Not in that summary form. Not that
23  I'm aware in this summary form. The e-mails
24  I provided contained conversations with people
25  which apparently were located in different

104

1  countries and were concerned with building or
2  using the system.
3  Q. When you say that those people were
4  "apparently" located in different countries, why
5  do you say "apparently"?
6  A. I didn't see them in person. There
7  mails originated from domains, for example, in the
8  US. They had domain names like "Indiana
9  University Biological Department," so I'm quite
10  sure they were in the US, but I can't -- I haven't
11  seen a passport.
12  Q. Do you ever verify that they were in
13  the US?
14  A. As I said, I couldn't really review
15  a passport. I couldn't trace the e-mails, where
16  they were routed. I didn't specifically look up
17  locations of IP addresses to verify.
18  Q. Did you ever ask the people you
19  communicated with what country they were from?
20  A. I did never question that the
21  information in the e-mail was correct or not. So
22  I didn't ask them. So the header said "I'm from
23  Indiana University" and I didn't challenge them on
24  if they are really speaking for Indiana
25  University.

VIDEOTAPED DEPOSITION OF ULRICH PFEIFER
CONDUCTED ON SUNDAY, JULY 14, 2013

64 (Pages 253 to 256)

253

1  BY MR FURMAN:
2      Q. Can you show me where that is?
3      **A. That's on the second page, somewhere**
4  **in the middle.**
5      Q. Can you read exactly what you are
6  talking about?
7      **A. It says: "#define STEM_WORDS."**
8      Q. What does that mean exactly?
9      **A. That means during the configuration**
10 **phase of the system stemming was not disabled or**
11 **removed.**
12     Q. Okay, so let me clarify the question
13 so as to save time.
14         I'm not talking about the
15 configuration of when this alleged freeWAIS-sf
16 system was set up, I'm talking about how the
17 databases that were accessed by this freeWAIS-sf
18 system were indexed. Is there anything in this
19 document that indicates that those databases were
20 indexed either using stemming or phonetic
21 searching?
22         MR JAFFE: Objection. Asked and
23 answered.
24         THE WITNESS: It's not phrase
25 searching. There's no direct indication of use of

254

1  these features.
2  BY MR FURMAN:
3      Q. And you've reviewed the entire
4  document to make that determination, correct?
5      MR JAFFE: Counsel, I said a few
6  minutes. It's now ten past. You know, you're
7  asking him to re-review the document. It's time
8  he has to leave.
9      MR FURMAN: So he can either answer
10 the question and then I'll be done or you can end
11 the deposition.
12     MR JAFFE: Okay, answer the
13 question, and then ...
14     MR FURMAN: So I'm going to ask the
15 question again to cut out your soliloquy.
16 BY MR FURMAN:
17     Q. So you've testified that there's
18 nothing in this document that indicates to you
19 that the database that was being accessed by the
20 freeWAIS-sf system described in this document used
21 phonetic searching or stemming. My question was
22 did you review the document carefully to make that
23 determination?
24     MR JAFFE: Objection.
25 Mischaracterizes the witness's previous testimony.

255

1      (To the witness) You can answer.
2      THE WITNESS: While the nature of
3  the document -- so this is configuration
4  information, it gives no information about the
5  actual use of the system. So if a database was
6  created using that software that uses any of the
7  features, if any database was created, I can't
8  tell.
9      MR JAFFE: Okay. We're done. I'm
10 stopping.
11     Do you have more questions?
12     MR FURMAN: I have no further
13 questions.
14     MR JAFFE: Okay.
15     THE WITNESS: Okay. Thank you.
16     THE VIDEOGRAPHER: This is the end
17 of tape four, DVD four, volume one of the video
18 deposition today of Mr Ulrich Pfeifer. Going off
19 the record now at 4:10 p.m. as indicated on the
20 video screen.
21     (Signature having not been waived, the
22 videotaped deposition of ULRICH PFEIFER was
23 concluded at 4:11 p.m.)

256

1          ACKNOWLEDGMENT OF DEPONENT
2      I, ULRICH PFEIFER, do hereby
3  acknowledge that I have read and examined the
4  foregoing testimony, and the same is a true, correct
5  and complete transcription of the testimony given by
6  me and any corrections appear on the attached Errata
7  sheet signed by me.
8
9
10 _____  _____
11  (DATE)           (SIGNATURE)

Case 5:12-cv-00630-LHK   Document 944-13   Filed 11/14/13   Page 9 of 9
VIDEOTAPED DEPOSITION OF ULRICH PFEIFER
CONDUCTED ON SUNDAY, JULY 14, 2013

65 (Pages 257 to 259)

```
                                257
 1           C E R T I F I C A T E
 2
 3        I do hereby certify that the
 4   testimony of the witness taken in the
 5   above-mentioned matter, contained herein, was
 6   reduced to writing in the presence of the witness
 7   by means of stenography; afterwards transcribed;
 8   and is a true and complete transcript of the
 9   testimony given by the witness.
10        I further certify that I am not
11   connected by blood or marriage with any of the
12   parties; their attorneys or agents; and that I am
13   not interested, directly or indirectly in the
14   matter of controversy.
15        In witness whereof I have hereunto
16   set my hand at London, England, United Kingdom,
17   this, the 15th day of July 2013.
18
19
20   _____
21   SUSAN A. McINTYRE, RPR, CRR, QRR
22
23
24
25
```

```
                                258
 1           E R R A T A   S H E E T
 2    IN RE:  Apple Inc. -v- Samsung
 3    WITNESS:  Ulrich Pfeifer
 4   PAGE   LINE    CORRECTION AND REASON
 5   ____  ____   _____
 6   ____  ____   _____
 7   ____  ____   _____
 8   ____  ____   _____
 9   ____  ____   _____
10   ____  ____   _____
11   ____  ____   _____
12   ____  ____   _____
13   ____  ____   _____
14   ____  ____   _____
15   ____  ____   _____
16   ____  ____   _____
17   ____  ____   _____
18   ____  ____   _____
19   ____  ____   _____
20   ____  ____   _____
21   ____  ____   _____
22   ____  ____   _____
23   ____  ____   _____
24   _____    _____
25     (DATE)          (SIGNATURE)
```

```
                                259
 1      E R R A T A   S H E E T   C O N T I N U E D
 2    IN RE:  Apple Inc. -v- Samsung
 3    WITNESS:  Ulrich Pfeifer
 4   PAGE   LINE    CORRECTION AND REASON
 5   ____  ____   _____
 6   ____  ____   _____
 7   ____  ____   _____
 8   ____  ____   _____
 9   ____  ____   _____
10   ____  ____   _____
11   ____  ____   _____
12   ____  ____   _____
13   ____  ____   _____
14   ____  ____   _____
15   ____  ____   _____
16   ____  ____   _____
17   ____  ____   _____
18   ____  ____   _____
19   ____  ____   _____
20   ____  ____   _____
21   ____  ____   _____
22   ____  ____   _____
23   ____  ____   _____
24   _____    _____
25     (DATE)          (SIGNATURE)
```