# EXHIBIT F

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE, INC., a California corporation,       ) | Case No.: 11-CV-01846-LHK |
|                              ) | |
|           Plaintiff,        ) | ORDER DENYING MOTION FOR |
|      v.                    ) | PERMANENT INJUNCTION |
|                              ) | |
| SAMSUNG ELECTRONICS CO., LTD., A   ) | |
| Korean corporation; SAMSUNG        ) | |
| ELECTRONICS AMERICA, INC., a New York ) | |
| corporation; SAMSUNG            ) | |
| TELECOMMUNICATIONS AMERICA, LLC,  ) | |
| a Delaware limited liability company,     ) | |
|                              ) | |
|          Defendants.      ) | |
|                              ) | |

      Plaintiff Apple, Inc. ("Apple") filed this action against Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively "Samsung") on April 15, 2011, alleging infringement of several Apple patents and dilution of Apple's trade dress. On August 21, 2012, a jury returned a verdict that 26 Samsung products infringed Apple's patents or diluted Apple's trade dress. Apple now brings this motion for a permanent injunction seeking to enjoin Samsung "from infringing, contributing to the infringement, or inducing the infringement of any of Apple's U.S. Patent No. 7,469,381, U.S. Patent No. 7,844,915, U.S. Patent No. 7,864,163, U.S. Design Patent No. 604,305, U.S. Design Patent No. 593,087, and U.S. Design Patent No. 618,677, including by making, using, offering to

sell, selling within the United States, or importing into the United States any of the Infringing Products or any other product not more than colorably different from an Infringing Product as to a feature or design found to infringe."  Proposed Order Granting Apple's Motion for a Preliminary Injunction and Damages Enhancement, ECF No. 2133.  Apple also seeks to enjoin Samsung from diluting Apple's registered iPhone trade dress and Apple's unregistered iPhone 3G trade dress, including by selling or offering to sell in the United States any of six products the jury found to dilute Apple's trade dresses.[1]  *Id.*  After hearing oral argument on the matter and reviewing the briefing by the parties, the evidence offered in support of the briefing, and the relevant law, the Court DENIES Apple's Motion for a Permanent Injunction.

The Patent Act provides that in cases of patent infringement a court "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."  35 U.S.C. § 283.  Though injunctions were once issued in patent cases as a matter of course, the Supreme Court ruled in 2006 that "broad classifications" and "categorical rule[s]" were inappropriate in analyzing whether to grant a permanent injunction.  *eBay v. MercExchange, L.L.C.*, 547 U.S. 388, 393 (2006).  Instead, a patentee seeking a permanent injunction must make a four-part showing:

> (1) That it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.* at 391.  In considering Apple's motion, the Court will consider each of these four factors in turn, and will then consider whether, on balance, the principles of equity support the issuance of a permanent injunction in this case.

## A. <u>Irreparable Harm</u>

Historically, once a plaintiff in a patent case succeeded on the merits or established a likelihood of success, irreparable harm in the absence of an injunction was presumed.  As the

---

[1] In the same motion, Apple also requested an enhancement of $535 million to the jury's damages award under both the Patent Act and the Lanham act.  Because this request is intertwined with the other damages issues in this case, the Court will address Apple's enhancement request in a separate Order.

Case No.: 11-CV-01846-LHK
ORDER DENYING MOTION FOR PERMANENT INJUNCTION

United States District Court
For the Northern District of California

1  Federal Circuit has recently made clear, however, there is no longer any presumption of irreparable

2  harm, even if a patentee is able to prove that a patent is valid and infringed. *Robert Bosch LLC v.*

3  *Pylon Manufacturing Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011). While the presumption of

4  irreparable harm no longer applies, the Federal Circuit noted that "it does not follow that courts

5  should entirely ignore the fundamental nature of patents as property rights granting the owner the

6  right to exclude." *Id.* Thus, the patentee's right to exclude must be considered by a district court in

7  determining whether an injunction is an appropriate remedy, but does not alone satisfy the

8  irreparable harm requirement.

9  Further, a showing that the patentee has suffered harm is insufficient. Rather, "to satisfy

10  the irreparable harm factor in a patent infringement suit, a patentee must establish both of the

11  following requirements: 1) that absent an injunction, it will suffer irreparable harm, and 2) that a

12  sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Apple, Inc.*

13  *v. Samsung Electronics Co., Ltd.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012) ("Apple II").[2] This test

14  requires a showing that consumers buy the infringing product "because it is equipped with the

15  apparatus claimed in the . . . patent," and not merely because it includes a feature of the type

16  covered by the patent. *Id.* at 1376.

17  This Court has already performed significant irreparable harm analysis in this case.

18  Specifically, in considering Apple's motion for a preliminary injunction, this Court found, and the

19  Federal Circuit agreed, that Apple had not demonstrated irreparable harm from the likely

20  infringement of the D'677 or D'087 patents. *See* ECF No. 452 at 27-38; *Apple I,* 678 F.3d at 1324-

21  26. The Court considered Apple's arguments that it had suffered irreparable harm in the form of

22  erosion of design distinctiveness and irreversible loss of market share and loss of customers. The

23  Court concluded that Apple had not explained how erosion of design distinctiveness actually

24  caused any irreparable harm, and rejected Apple's theory that infringement diminished the value of

25  ─────────────────────

26  [2] The Federal Circuit's *Apple II* opinion addresses a preliminary injunction. However, the
irreparable harm requirement applies to both preliminary and permanent injunctions, and there is
nothing in the *Apple II* opinion suggesting that its discussion of irreparable harm should be limited

27  to the preliminary injunction context. Indeed, Courts regularly cite cases from the two contexts
interchangeably. *See, e.g.*, *Apple v. Samsung Electronics Co.*, 678 F.3d 1314, 1323 (Fed. Cir.

28  2012) ("Apple I") (preliminary injunction opinion citing *Voda v. Codis Corp.*, 536 F.3d 1311 (Fed.
Cir. 2008) (permanent injunction opinion)).

Case No.: 11-CV-01846-LHK
ORDER DENYING MOTION FOR PERMANENT INJUNCTION

**United States District Court**
For the Northern District of California

Apple's brand, which could not be separated from its products. ECF No. 452 at 29-30. The Court further found that though there was some evidence of loss of market share, Apple had not established that Samsung's infringement of Apple's design patents *caused* that loss. *Id.* at 33-34. The Court noted that the evidence regarding how consumers chose smartphones was ambiguous, and given that the D'677 and D'087 patents cover only part of the phone design, limited to the front face, even what evidence there was that *design* was important to choice did not create a strong link to infringement of these design patents.

The Court also found, at the preliminary injunction stage, that there was no irreparable harm from infringement of the '381 patent. Specifically, the Court noted that Apple had presented no evidence of any causal relationship between the features covered by the '381 patent and any loss of market share, customers, or goodwill, and had not established that that feature was "necessary to, or a core functionality of" Samsung's products. *Id.* at 63.

These decisions at the preliminary injunction stage are not necessarily determinative now, after all the evidence is in and the Court has the benefit of a more complete factual record. Apple has presented some additional arguments and new evidence in support of its irreparable harm argument. Further, there are two additional utility patents (the '915 and '163 patents) and one additional design patent (the D'305 patent), in addition to a finding of trade dress dilution, on which Apple did not previously seek a preliminary injunction and upon which this Court has not previously ruled. The Court's earlier analysis does, however, provide a starting point for the present inquiry. The Court will thus analyze Apple's claims of irreparable harm in light of its prior findings. The Court will first consider the harms Apple claims to have suffered, and will then consider whether Apple has demonstrated that Samsung's infringement caused those harms.

Apple's Alleged Harms

Apple alleges that it has suffered three types of irreparable harm as a result of Samsung's patent infringement: (1) loss of market share; (2) loss of downstream and future sales; and (3) injury to Apple's ecosystem.[3]

---

[3] Apple has also alleged harm stemming from Samsung's dilution of its trade dress. This harm raises different issues, and is addressed separately below.

Case No.: 11-CV-01846-LHK
ORDER DENYING MOTION FOR PERMANENT INJUNCTION

United States District Court
For the Northern District of California

1   As an initial matter, the Court considers the relationship between the parties, which bears

2   generally on the likelihood that Apple will suffer harm from Samsung's infringement. At the

3   preliminary injunction phase, Apple argued, and this Court found, that Apple and Samsung are

4   direct competitors, based largely on evidence that the two companies compete for first-time

5   smartphone buyers. ECF No. 452 at 32 (citing testimony from Samsung's expert Michael

6   Wagner). Apple has presented further evidence of this relationship, including Samsung's own

7   documents revealing Samsung's view of Apple as its primary competitor. *See* PX60 (Samsung

8   presentation describing the US market as a "two horse race between Apple and Samsung); PX184

9   (Samsung business plan emphasizing competition with Apple). Samsung has presented no new

10  evidence to refute that finding. Thus, the Court finds that Apple and Samsung continue to compete

11  directly in the same market. This finding increases the likelihood of harm from continued

12  infringement. *See, e.g.*, *Robert Bosch*, 659 F.3d at 1153.

13  Regarding market share, Apple introduced evidence at the preliminary injunction phase that

14  it had already lost some market share to Samsung during the span of 2010, and the Court

15  considered evidence from both parties' experts regarding further lost customers and market share.

16  ECF No. 452 at 32-33. The Court found that the evidence could support a finding of irreparable

17  harm. *Id.* At trial and in the permanent injunction briefing, Apple presented additional evidence

18  that Samsung's market share grew substantially from June of 2010 through the second quarter of

19  2012, Musika Decl. ¶ 30 & Exh. 4.1, and that Samsung had an explicit strategy to increase its

20  market share at Apple's expense. PX62.11-15. Samsung does not refute this evidence in its

21  opposition. Thus, the cumulative evidence shows that, consistent with the Court's finding at the

22  preliminary injunction phase, Apple has continued to lose market share to Samsung. As this Court

23  explained at the preliminary injunction phase, loss of market share or the permanent loss of

24  customers as a result of infringing conduct can support a finding of irreparable harm. *See Robert*

25  *Bosch*, 659 F.3d at 1153-54; *Polymer Techs. v. Bridwell*, 103 F.3d 970, 976 (Fed. Cir. 1996).

26  Regarding downstream sales, this Court found at the preliminary injunction stage that given

27  network compatibility issues (Apple phones and Samsung phones use different operating systems)

28  and brand loyalty, there were potentially long-term implications of an initial purchase, in the form

Case No.: 11-CV-01846-LHK
ORDER DENYING MOTION FOR PERMANENT INJUNCTION

of lost future sales of both future phone models and tag-along products like apps, desktop computers, laptops, and iPods. ECF No. 452 at 32. The Court also found that such damages would be difficult to calculate, rendering them potentially irreparable. *Id.* Since then, Apple has submitted further evidence to bolster its claim that both Apple and Samsung rely on customers being locked in to one platform. *See* PX60.18 (internal Samsung document discussing Apple's "very sticky/loyal subscribers"); Musika Decl. ¶ 24 (discussing testimony of Apple's Vice President Phil Schiller); Musika Decl. ¶¶ 25-26 (discussing testimony of Samsung's Justin Denison and Corey Kerstetter); Musika Decl. ¶ 28 (discussing Apple's internal study of iPhone owners). In its opposition, Samsung has made no attempt to refute this evidence that its conduct has cost Apple potential downstream sales. Thus, the evidence this Court found sufficient to justify a finding of irreparable harm at the preliminary injunction stage remains undisturbed, and has in fact been strengthened by the additional evidence. Accordingly, as at the preliminary injunction stage, the Court finds that Apple has suffered some irreparable harm in the form of loss of downstream sales.

Finally, Apple has argued that it has suffered irreparable injury to its "ecosystem." It is not clear how this alleged harm differs from the loss of downstream sales discussed above. Apple asserts harm from "network effects" and the fact that "customer demand increases as the number of other uses on the platform increases." Mot. at 5. But how this will harm Apple in a way distinct from the loss of downstream sales (of future iPhones and of other related products), Apple does not say. Thus, the Court considers any harms to Apple's so-called ecosystem to be included in the harm the Court has already found in loss of downstream sales.

Changes to products

Samsung argues that changes to Samsung's products preclude a finding of irreparable harm. Specifically, Samsung argues that since 23 of its 26 infringing products have already been discontinued and that the remaining three have been altered by design-arounds so as to no longer infringe, Apple cannot be irreparably harmed by Samsung's conduct going forward. But the law on this point is clear: a defendant's voluntary cessation of illegal behavior does not moot a request for an injunction. *See Allee v. Medrano*, 416 U.S. 802, 810-11 (1974). The fact that Samsung may

6

have stopped selling infringing products[4] for now says nothing about what Samsung may choose to do in the future. Absent an injunction, Samsung could begin again to sell infringing products, further exposing Apple to the harms identified above. Thus, Samsung's decision to cease selling its infringing phones does not alter the Court's irreparable harm analysis.

Causal Nexus

The Federal Circuit has been quite clear that a showing of harm is not enough; Apple must link any harm it suffers directly to Samsung's infringement. This Court and the Federal Circuit have analyzed this "causal nexus" issue on a patent-by-patent basis. *See Apple I*, 678 F.3d at 1323-33 (analyzing appropriateness of injunction for each of four patents separately). Apple has not analyzed its alleged harm on a patent-by-patent basis, but rather has argued for harm from each *group* of intellectual property rights: design patents, utility patents, and trade dress. Apple has also argued that the combined harm from the patents and trade dress combined justifies an injunction. However, Apple has identified no law supporting its position that an injunction could issue on a finding of harm caused by Samsung in the aggregate. Rather, injunctions are authorized by statute for specific acts of infringement and dilution. Moreover, the jury found that different products infringed or diluted different patents or trade dress rights. Thus, even if there was such a combined effect, it would not apply to all of the products Apple seeks to enjoin. Yet Apple has made no attempt to identify which products it believes would benefit from a hypothetical aggregate harm theory. Instead, consistent with the practice of this and other courts, including the Federal Circuit, the Court will consider whether Apple has established a causal nexus for each of its patents and trade dresses individually.

First, Apple argues that Samsung's infringement of Apple's design patents caused irreparable harm because Apple's designs drive demand for the infringing products. Mot. at 7; Reply at 2. At the preliminary injunction stage, this Court found that Apple had not established a causal nexus between the D'677 and D'087 patents and the harms Apple had experienced. However, Apple now provides evidence, much of which was not presented at the preliminary

---

[4] The Court takes no position on whether or not Samsung's design-arounds infringe any of Apple's patents.

7

Case No.: 11-CV-01846-LHK
ORDER DENYING MOTION FOR PERMANENT INJUNCTION

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  injunction stage, that customers choose smartphones based on appearance and design. *See* Mot. at

2  7-8. Thus, the Court's finding that Apple had not established a causal nexus at that time does not

3  determine the result here.

4  However, Apple's evidence does not establish that any of Apple's three design patents

5  covers a particular feature that actually drives consumer demand. Apple has presented significant

6  evidence that design, as a general matter, is important in consumer choice. *See* PX185.11

7  (Samsung study finding exterior design to be an important factor in phone choice); Bartlett Decl.

8  Exh. 4 at 395 (third-party survey identifying "design/style" as important factor). At the same time,

9  Samsung has come forward with a fair amount of countervailing evidence, suggesting that design

10  is considerably less important than Apple claims. *See* DX 592.023 (results of Apple internal

11  survey revealing "design/color" as the reason for choice in a very small percentage of cases);

12  Pierce Decl. Exh. 5 (results of Apple survey ranking design eighth on a list of important features

13  and attributes for iPhone buyers); DX572.26 (Apple's assessment of features important to

14  smartphone buyers, not including design). Thus, the evidence remains mixed concerning the

15  weight smartphone buyers place on the design of the phone.

16  But even if design was clearly a driving factor, it would not establish the required nexus.

17  The design of the phones includes elements of all three design patents, as well as a whole host of

18  unprotectable, unpatented features. Apple makes no attempt to prove that any more specific

19  element of the iPhone's design, let alone one covered by one of Apple's design patents, actually

20  drives consumer demand. The Federal Circuit made clear in *Apple II* that customer demand for a

21  *general* feature of the type covered by a patent was not sufficient; Apple must instead show that

22  consumers buy the infringing product specifically because it is equipped with the *patented* feature.

23  695 F.3d at 1376.

24  Instead, Apple argues that its patents "cover the iPhone's most prominent design elements,"

25  Reply at 3, and therefore, if design drives demand, so do the patents. Even if the Court accepted as

26  true Apple's contention that the patents cover the most central design features, it would not

27  establish that any specific patented design is an important driver of consumer demand. The only

28  evidence Apple provides that any particular designs are important to consumers take the form of a

8

few quotations from Samsung's consumer surveys and one quotation from industry review praising various elements of both Apple's and Samsung's phone designs. *See* Reply at 3. These quotations are insufficient for two reasons. First, though more specific than the general "design" allegations, they are still not specific enough to clearly identify actual patented designs. Instead, they refer to such isolated characteristics as glossiness, reinforced glass, black color, metal edges, and reflective screen. *Id.* Apple does not have a patent on, for example, glossiness, or on black color. Though the patented designs incorporate some of these features, *see* Order Regarding Design Patent Claim Construction, ECF No. 1425, at 9, the patent is for the entire design – not for any isolated characteristic. Each of the consumer quotations on which Apple relies refers only to a single characteristic. None of the consumer quotations considers more than one characteristic or discusses the way the characteristics are combined into a complete, patentable design. Apple cannot establish a causal nexus by showing an individual consumer's demand for glossiness, or for black color, as these qualities are not themselves patentable. Second, even if these quotations did specifically reference the precise designs covered by Apple's patents, they do not begin to prove that those particular features drive consumer demand in any more than an anecdotal way. One consumer mentioning a feature in a survey says very little about what drives consumer demand generally, and one journalist's description of features proves nothing beyond that individual's preferences. Thus, while Apple has presented evidence that design, as a general matter, is important to consumers more broadly, Apple simply has not established a sufficient causal nexus between infringement of its design patents and irreparable harm.

Apple has also attempted to make a showing, which it failed to make at the preliminary injunction stage, that Samsung's infringement of Apple's utility patents caused Apple's harm. This Court previously found that Apple had not established that the '381 patent was "necessary for the product to function, or a core technology of the product." ECF No. 452 at 64. Apple now attempts to prove that Samsung's infringement of Apple's utility patents caused Apple harm with three types of evidence: (1) documents and testimony showing the importance of ease of use as a factor in phone choice; (2) evidence that Samsung deliberately copied the patented features; and (3) a conjoint survey performed by Apple's expert, Dr. Hauser. Mot. at 9; Reply at 4-6.

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Apple's evidence of the importance of ease of use suffers from the same problems this Court identified with Apple's design patent nexus evidence.  First, the showing is simply too general.  Many factors go into making a product easy to use, but the features for which Apple is asserting patent protection are very specific.  A consumer may want a phone that is easy to use, but this does not establish that a tap-to-zoom feature, for example, or any given type of gesture, is a driver of consumer demand.  Thus, Apple's evidence of a survey showing the importance of ease of use as a general matter, PX 146.6, does not establish that infringement of any of Apple's *patents* caused any harm that Apple has experienced.  To establish the required nexus, Apple must make a showing specific to each patented feature.  *See Apple II*, 695 F.3d at 1376.  This, Apple has not done.

Second, to the extent that Apple's evidence of consumer preference discusses more specific ease-of-use-related features, it is insufficient to establish anything other than a single consumer's experience.  For instance, Apple has offered a report from a consulting firm hired by Samsung identifying features that Apple customers like about their phones, including individual consumers' observations that you "can enlarge pictures and move them around" and use "[g]estures like a two finger pinch and flick."  Mot. at 8, citing PX36.  But these quotations do not identify features at a level of specificity sufficient to determine whether they are actually covered by Apple's patents.  Apple does not have a patent on enlarging pictures and moving them around, but rather on a specific way of enlarging pictures.  Nor does Apple have a patent on the general concept of a two-finger pinch or flick.  The Federal Circuit has been quite clear that demand driven by a feature does not establish a causal nexus unless it is more specifically driven by "the apparatus claimed in the. . . patent."  *Apple II*, 695 F.3d at 1376.  Moreover, evidence of what Apple customers like about their phones does not establish that any consumers bought Samsung phones because of these same features.  Further, the language on which Apple relies consists of quotations that Samsung's consultant gathered from individual iPhone users; the quotations do not make any broader claims about the market and the factors that influence consumer choice generally.  Apple's only evidence of the market more broadly is limited to the general category of "ease of use," which, as explained above, is insufficient to establish a causal nexus under *Apple II*.  Accordingly, as with the design

10

United States District Court
For the Northern District of California

1  patents, the Court finds that Apple's evidence that consumers value a general category of features

2  related to Apple's utility patents cannot, under the Federal Circuit's guidance, establish the

3  requisite causal nexus.

4       Next, Apple attempts to prove a causal nexus by pointing to evidence that Samsung

5  intentionally copied some of Apple's patented features.  At the preliminary injunction phase, this

6  Court considered evidence that Samsung employees believed that Samsung needed the bounce-

7  back feature from the '381 patent to compete with Apple.  This Court and the Federal Circuit found

8  that such evidence was not sufficient to establish the required causal nexus.  *See Apple I*, 678 F.3d

9  at 1327-28.  Evidence of copying, like the evidence of Samsung employees' beliefs that this Court

10 previously considered, also proves what Samsung *thought* would attract purchasers, not what

11 *actually* attracted purchasers.  Here, as at the preliminary injunction phase, Samsung's impressions

12 of what might lure customers, while relevant, are not dispositive.  Accordingly, though evidence

13 that Samsung attempted to copy certain Apple features may offer some limited support for Apple's

14 theory, it does not establish that those features actually drove consumer demand.

15      Finally, Apple has presented evidence from a choice-based conjoint survey conducted by

16 Apple's expert Dr. John Hauser.  The survey purports to establish the prices that Samsung

17 consumers would pay for particular patented features, including the '915 patent alone, and all three

18 utility patents together.  *See* PX30.  Samsung disputes the validity of the study based on

19 methodology.  Opp'n at 13.

20      Even if the survey is taken at face value, it does not establish a causal nexus under the

21 standard articulated by the Federal Circuit in *Apple II*.  The parties have submitted competing

22 declarations concerning the applicability of Dr. Hauser's study to the question at hand.  *See* Wind.

23 Decl. in support of Samsung's opposition; Sukumar Decl. in support of Samsung's opposition;

24 Hauser Decl. in support of Apple's reply.  The Court agrees with Samsung that evidence of "the

25 price premium over the base price Samsung consumers are willing to pay for the patented

26 features," PX30, is not the same as evidence that consumers will buy a Samsung phone instead of

27 an Apple phone because it contains that feature.  *See* Sukumar Decl. at ¶ 4 (distinguishing between

28 willingness to pay for a feature and consumer demand for a complete product).  Apple's only

response to this argument is to point to Dr. Hauser's assertion that demand for a *product* is often defined as consumers' willingness to pay for that product, and thus the concepts of willingness to pay and demand are interchangeable. Hauser Reply Decl. at ¶ 8. However, the survey does not measure willingness to pay for *products*; it measures willingness to pay for *features* within a particular product amongst consumers who have already purchased the particular product – in this case, a Samsung phone. It does not address the relationship between demand for a feature and demand for a complex product incorporating that feature and many other features. To establish a causal nexus, Apple would need to show not just that there is demand for the patented features, but that the patented features are important drivers of consumer demand for the infringing products. Apple's survey evidence does not establish that any patented feature drives consumer demand for the entire product.

In sum, to establish irreparable harm, Apple must show that "the infringing feature drives consumer demand for the accused product." *Apple II*, 695 F.3d at 1375. Apple did not establish at the preliminary injunction stage that the '381 patent was central enough to Samsung's products to drive sales, and has not established that fact here either. Nor has Apple established that either the '915 or the '163 patents actually drive sales of any Samsung products. Neither statements about broad categories, nor evidence of copying, nor the conjoint survey provides sufficiently strong evidence of causation. Without a causal nexus, this Court cannot conclude that the irreparable harm supports entry of an injunction. *See Apple II*, 695 F.3d at 1377.

Trade Dress Dilution

Apple argues that once trade dress dilution has been established, no additional showing of harm need be made for the Court to issue an injunction for the six Samsung products the jury found to dilute Apple's trade dress. Apple argues that the dilution itself – the lessening of the capacity of the trade dress to identify Apple's brand – is the harm, as Congress acknowledged in drafting the dilution statute.[5] The Federal Trademark Dilution Act (FTDA)[6] provides, in relevant part, that a trademark owner who establishes dilution:

---

[5] This argument is distinct from Apple's argument at the preliminary injunction stage, which this Court rejected, that the erosion of design distinctiveness could constitute irreparable harm suffered in connection with design patent infringement. There, Apple had no authority for its argument that

Case No.: 11-CV-01846-LHK
ORDER DENYING MOTION FOR PERMANENT INJUNCTION

United States District Court
For the Northern District of California

shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1). Apple argues that the choice of the word "shall," along with the fact that the injunction shall issue "regardless of the presence or absence of . . . actual economic injury" demonstrates Congress's intention that injunctions issue where dilution is found, without a further showing of harm.

Samsung argues that Apple must still show irreparable harm that would occur if Samsung continued to use the diluting designs, and that Apple cannot possibly make this showing because Apple no longer makes or sells the phones that embody the protected trade dresses. In support of its argument that Apple must make a specific showing of harm, Samsung points to language in the FTDA that a dilution injunction issue "subject to the principles of equity," 15 U.S.C. § 1125(c)(1), and to three out-of-district cases applying the four *eBay* factors to trademark *infringement* cases. But the trademark infringement statute, unlike the dilution statute, does not contain the mandatory "shall" language, and says nothing about an injunction issuing without a showing of harm. 15 U.S.C. § 1116(a). Thus, cases applying the trademark infringement statute do not bear on the proper analysis of the dilution statute.

Though the Court is aware of no cases specifically discussing the irreparable harm requirement in the trade dress dilution context, the Court agrees with Apple that the language of the FTDA makes clear that Congress contemplated the issuance of an injunction upon a showing of dilution, without an additional showing of irreparable harm. The fact that the statute specifically states that no economic harm is necessary defeats Samsung's claim that Apple must make some additional showing of harm, beyond the harm of the dilution itself, in order to be entitled to an injunction. Since the statute contemplates both that an injunction issue "subject to the principles of equity" and that an injunction issue without a showing of economic harm, the Court cannot

---

the erosion of distinctiveness was a cognizable harm for a patentee. Because the FTDA explicitly addresses the requirements for an injunction, Apple's present argument is quite different, and draws on different authority and reasoning.
[6] The FTDA applies to trade dress as well as trademark. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763 (1992).

Case No.: 11-CV-01846-LHK
ORDER DENYING MOTION FOR PERMANENT INJUNCTION

United States District Court
For the Northern District of California

conclude that, even after *eBay*, equity requires an additional showing of harm for an injunction to issue. *eBay* was not interpreting the FTDA; it dealt with the Patent Act, which says that courts "may" grant injunctions, and says nothing to authorize relief in the absence of economic harm. 35 U.S.C. § 283. Thus, even if *eBay*'s message to consider the principles of equity in granting injunctions may apply beyond the Patent Act, it does not override the specific language of the FTDA authorizing injunctions even without a showing of economic harm. Instead, Courts have treated dilution itself as the harm. *See, e.g.*, *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 433 (2003) (the fact that actual dilution must be proved "does not mean that the consequences of dilution, such as an actual loss of sales or profits, must also be proved.").

Further, other parts of the FTDA also appear to envision an injunction as the primary remedy upon a finding of dilution. In particular, the statutory factors for determining whether a mark is famous include "the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person *against whom the injunction is sought.*" 15 U.S.C. § 1125 (emphasis added). This language confirms that Congress envisioned a dilution action, unlike a patent or trademark infringement action, to be an action for an injunction, such that a finding of dilution would normally result in an injunction.

Here, the jury found that Apple's registered iPhone and unregistered iPhone 3G trade dresses were diluted by several Samsung products. Accordingly, Apple has shown the necessary harm. The fact that Apple no longer sells products embodying these particular trade dresses may, as Samsung points out, make it difficult for Apple to show continuing economic harm, but as such harm is not necessary for an injunction to issue, Apple's discontinuation of those products is of no moment. The only case that either of the parties or the Court has found discussing dilution for a product no longer on the market found that harm *could* continue even though the Plaintiff had ceased to make or sell products using the protected design. *See Ferrari S.p.A. Esercizio Fabbriche Automobili e Corse v. McBurnie*, No. 86-1812, 1989 U.S. Dist. LEXIS 13442 (S.D. Cal. May 26, 1989) (issuing an injunction on a finding of dilution of dress, though the car embodying that trade dress had been discontinued). Thus, Apple's cessation of use of these trade dresses does not prevent the Court from considering injunctive relief.

14

United States District Court
For the Northern District of California

Regarding causal nexus for the trade dress claim, the jury found not just that Apple's trade dresses had been diluted, but that it was the Samsung entities that diluted Apple's trade dress. *See* Amended Jury Verdict, ECF No. 1931, at 11-12. This finding satisfies the requirement that the defendant's conduct cause the harm. Accordingly, Apple has established irreparable harm with regard to its trade dress dilution claims.

However, Samsung has represented, and Apple has not disputed, that none of the Samsung products found to dilute trade dress are still on the market in any form. *See* Opp'n at 13-14; Decl. of Hee-chan Choi at ¶¶2-9; Decl. of Corey Kerstetter at ¶¶ 2-13. The Court is aware of no cases discussing the propriety of an injunction under the FTDA where there is no allegation of continuing dilution. The cases in which the Ninth Circuit has upheld the issuance of an injunction for trademark dilution under federal law have involved ongoing diluting conduct. *See, e.g., Perfumebay.com Inc. v. eBay, Inc*., 506 F.3d 1165, 1177 (9th Cir. 2007). The parties have cited, and the Court is aware of, no case issuing a permanent injunction under the FTDA for products that are no longer available.

Further, the Ninth Circuit frequently identifies the appropriate test as whether "(1) its mark is famous; (2) the defendant is making commercial use of the mark in commerce; (3) the defendant's use began after the plaintiff's mark became famous," *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 874 (9th Cir. 1999), and whether there has been a showing of actual dilution, *Moseley v. v. Secret Catalogue, Inc.*, 537 U.S. 418, 433–34 (2003); *see also Nissan Motor Co. v. Nissan Computer Corp*., 378 F.3d 1002, 1010 (9th Cir. 2004); *Perfumebay.com*, 506 F.3d at 1180. This statement that an injunction is appropriate when the defendant "is making commercial use" confirms the Ninth Circuit's interpretation that the injunction remedy is intended to allow courts to put a stop to ongoing diluting behavior. Here, there is no ongoing diluting behavior to enjoin, and Apple cannot credibly claim to suffer any significant hardship in the absence of a trade dress injunction.

The parties have cited, and the Court is aware of, no cases applying the *eBay* factors to trade dress or trademark dilution injunctions. However, Apple appears to believe that, though there is no harm requirement for a trade dress injunction, the other three *eBay* factors – inadequacy of

15

Case 5:11-cv-01846-LHK Document 2197 Filed 12/17/12 Page 16 of 23

money damages, balance of the hardships, and public interest – still bear on the appropriateness of an injunction in this context. *See* Reply at 6. The law is clear that trade dress dilution injunctions issue "subject to the principles of equity." 15 U.S.C. § 1125(c)(1). Moreover, the Supreme Court's ruling in *eBay* held that patent cases are subject to the same four-part injunction analysis as other civil cases. This ruling would indicate that the same four-part analysis would apply to other intellectual property cases, such as those involving trade dress dilution. Accordingly, the Court will consider each of the three remaining *eBay* factors in turn.

### B. Inadequacy of Money Damages

Apple has argued that money cannot compensate Apple for the harm it has suffered and will continue to suffer. Mot. at 9-10. Specifically, Apple argues that its lost downstream sales cannot be calculated to a reasonable certainty, and thus cannot be compensated with a monetary award. "Difficulty in estimating monetary damages is evidence that remedies at law are inadequate." *Broadcom Corp. v. Qualcomm Inc.,* 543 F.3d 683, 703-04 (Fed. Cir. 2008).

As noted above, the Court agrees that Apple has likely suffered, and will continue to suffer, the loss of some downstream sales. The Federal Circuit has confirmed that "the loss of customers and the loss of future downstream purchases are difficult to quantify, [and] these considerations support a finding that monetary damages would be insufficient to compensate Apple." *Apple I,* 678 F.3d at 1337.

Samsung argues that the fact that Apple sought – and was awarded – significant damages demonstrates that damages can indeed compensate Apple. However, Apple has alleged multiple forms of harm. The fact that the jury was able to put a number on the harm Apple has suffered in terms of sales already lost directly to Samsung does not necessarily mean that those damages captured the full extent of Apple's harm. Indeed, if this were the case, no Court would ever award both damages and an injunction for the same infringement, but Courts do so routinely. *See, e.g.*, *i4i Limited Partnership v. Microsoft Corp.*, 598 F.3d 831 (Fed. Cir. 2010). Thus, Apple's evidence of lost downstream sales does provide some evidence that Apple may not be fully compensated by the damages award.

Case No.: 11-CV-01846-LHK
ORDER DENYING MOTION FOR PERMANENT INJUNCTION

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

However, Apple's licensing activity suggests that Apple does not believe that these patents are priceless, such that there can be no fair price set for Samsung's practice of the claimed inventions or designs.  Both parties discuss the evidence of Apple's previous licenses and offers for these and other patents.  Apple claims that it "would not willingly license the infringed patents and designs for use in iPhone knockoffs," Mot. At 10.  Apple attempts to draw a distinction between the current injunction request and the licenses to which Apple has agreed in the past.  But Apple's past licensing behavior does not demonstrate that it treats either these specific patents, or Samsung as a licensing partner, as somehow off limits.  Specifically, Apple offered Samsung a license to some of Apple's patents.  *See* DX 586 (Apple presentation describing license offer to Samsung).  Apple has also licensed the precise utility patents at issue here, in agreements with Nokia ('381 patent), IBM ('915 patent; '163 patent), and HTC ('381 patent; '915 patent; '163 patent).  *See* Pierce Decl., Ex. 12-1, 12-2; Beecher Decl., ECF No. 2194, at Exh. 1.  Further, when asked if Apple ever licenses its "unique user experience IP," Apple's top licensing executive, Boris Teksler, said, "Certainly over time we have."  Tr. at 1955:23-1956:1, 1957:5.  The fact that Apple is now expressing an unwillingness to license these properties does not change the fact that Apple has, in the past, felt that money was a fair trade for the right to practice its patents, and that Apple has in the past been willing to extend license offers to Samsung.

Moreover, although trade dress is not generally a form of intellectual property that is licensed to competitors, Mr. Teksler did testify that the "unique user experience IP" that Apple has previously licensed includes trade dress, along with design patents, and some utility patents.  *Id*. at 1956:9-12.  Thus, there is some evidence that Apple has not always insisted on exclusive use of its trade dress, but rather has found money to be an acceptable form of compensation.

In sum, the license evidence cuts in Samsung's favor.  Apple does not seek "to retain exclusive use of its invention," as did the plaintiff in *i4i*.  598 F.3d at 862.  Rather, Apple does appear willing, at times, to use its patents, including several of the patents at issue here, and even its trade dress, as tools in forging relationships and generating income.  Further, Apple has agreed to licenses with companies with whom it competes, including Samsung.  Though after *eBay* this

17

1   fact alone could not justify an injunction, *see eBay*, 547 U.S. at 393, it certainly weighs in

2   Samsung's favor.

3           Finally, courts have considered the defendant's ability to pay in considering the adequacy

4   of damages. *See, e.g.*, *Robert Bosch*, 659 F.3d at 1155. Here, there is no suggestion that Samsung

5   will have any difficulty paying the damages it owes. This fact serves to further reinforce the fact

6   that Apple will be substantially compensated for its injuries without an injunction.

7           In sum, the difficulty in calculating the cost of lost downstream sales does suggest that

8   money damages may not provide a full compensation for every element of Apple's loss, but

9   Apple's licensing activity makes clear that these patents and trade dresses are not priceless, and

10  there is no suggestion that Samsung will be unable to pay the monetary judgment against it.

11  Accordingly, the Court finds that this factor favors Samsung.

12      **C. <u>Balance of Hardships</u>**

13          This factor "assesses the relative effect of granting or denying an injunction on the parties."

14  *i4i*, 598 F.3d 831, 862. Here, neither party would be greatly harmed by either outcome. Apple has

15  not identified any hardship it would face in the absence of an injunction. Apple's only argument

16  that the balance of hardships weighs in its favor seems to be its claim that Samsung's conduct was

17  willful.[7] *See* Mot. at 10-11. An injunction, however, may not be used as a punishment. *See Hynix*

18  *Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 969 (N.D. Cal. 2009) ("[A]n injunction

19  may deter future harm, but it may not punish."). A finding of willfulness would not change the

20  effect the injunction will have on Apple. Apple's argument that willfulness tips the balance of

21  hardships in Apple's favor thus appears to depend on an impermissible use of an injunction as

22  punishment. Apple has not identified any other hardship.

23          If an injunction were granted, Samsung would not be able to sell any of the twenty-six

24  products found to infringe Apple's patents. But as Samsung has made clear in its briefing, it no

25  longer sells 23 of these products in any form, Opp'n at 13-14, and has already begun to implement

26

27  ───────────────
    [7] Apple's briefs argue that the balance of *equities* tips in its favor – not the balance of hardships.
    Though historically the factor has been denominated using both terms, recent Supreme Court and
28  Federal Circuit cases have consistently referred to the balance of *hardships*. *See eBay*, 547 U.S. at
    391; *i4i*, 598 F.3d at 862; *Robert Bosch*, 659 F.3d at 1156;

Case No.: 11-CV-01846-LHK
ORDER DENYING MOTION FOR PERMANENT INJUNCTION

United States District Court
For the Northern District of California

1    design-arounds for the three products it does still make.[8]  *Id.*  What is more, Samsung has entirely

2    stopped selling the six trade dress diluting products.  Having made this argument in the hopes of

3    establishing that Apple cannot be harmed, Samsung cannot now turn around and claim that

4    Samsung will be burdened by an injunction that prevents sale of these same products.

5            Samsung has further argued that an injunction would "disrupt[] its relationships with

6    carriers who may be selling pre-existing stock and with consumers who may still be using the

7    accused products."  *Id.* at 18.  But Samsung has not explained *how* an injunction would cause the

8    asserted disruptions, or what hardship they would actually present for Samsung, as opposed to

9    hardship for the carriers and consumers.  Further, carriers who sold the infringing products have

10   assumed the risk of this type of disruption.  Courts have found that "one who elects to build a

11   business on a product found to infringe cannot be heard to complain if an injunction against a

12   continuing infringement destroys the business so elected."  *Telebrands Direct Response Corp. v.*

13   *Ocation Commc'ns, Inc.*, 802 F. Supp. 1169, 1179 (D.N.J. 1992).  Harm to consumers is more

14   appropriately considered under the fourth factor, addressed below.  As neither party will suffer any

15   particularly great hardship based on either outcome, the Court finds that this factor is neutral.

16       **D.  Public Interest**

17           Courts have recognized that "the touchstone of the public interest factor is whether an

18   injunction, both in scope and effect, strikes a workable balance between protecting the patentee's

19   rights and protecting the public from the injunction's adverse effects."  *i4i*, 598 F.3d at 863.

20   Courts consider "the harm that an injunction might cause to consumers who can no longer buy

21   preferred products because their sales have been enjoined, and the cost to the judiciary as well as to

22   the parties of administering an injunction."  *Motorola*, 2012 WL 2376664 at *20.

23

24   _____
     [8] The Federal Circuit's recent decision in *Edwards Lifesciences v. Corevale*, 699 F.3d 1305 (Fed.

25   Cir. 2012), does not render this fact any less relevant.  The court in *Edwards* did reverse the denial
     of an injunction that had been granted in part in reliance on the defendant's statement that it was

26   going to stop manufacturing in the United States, depriving the injunction of its practical effect,
     and thus largely stripping the balance of hardships and public interest factors of their power.  Slip

27   Op. at 18-19.  The Federal Circuit reversed the denial, noting that the defendant had not, in fact,
     ceased manufacture in the United States, making that basis for denying an injunction erroneous.

28   *Id.* at 19.  It did not suggest that district courts should not consider the practical effect, or lack
     thereof, of an injunction.

                                                        19
     Case No.: 11-CV-01846-LHK
     ORDER DENYING MOTION FOR PERMANENT INJUNCTION

United States District Court
For the Northern District of California

Here, the injunction Apple has sought is extremely broad, and would prevent the sale of 26 specific products, as well as other potential future products incorporating the protected features. Relief of this breadth is significantly less likely to be in the public interest than a very narrowly tailored injunction. *See i4i*, 598 F.3d at 863 (finding that a very narrow injunction has less of an impact on the public than would a broad injunction).

Apple has articulated just one argument that an injunction would be in the public interest: the public's interest in preserving the rights of patentholders. Mot. At 11. As this Court found at the preliminary injunction stage, the public interest does favor the enforcement of patent rights to promote the "encouragement of investment-based risk." *See Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 1985).

On the other hand, Samsung has identified some potential consequences of the requested injunction that would not be in the public interest. Specifically, Samsung has argued that an injunction would be disruptive to suppliers, retailers, carriers, and customers. Opp'n at 19. The Federal Circuit has agreed that disruption to carriers and other third parties can weigh against an injunction. *See Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008). However, if Samsung is to be believed that it is no longer manufacturing or selling any infringing phones, then this disruption will be limited to existing stock, and would surely be brief.[9] Further, third-party retailers should not be protected from the disruption when they have been benefitting from Samsung's infringement. As explained above, Courts have recognized that "one who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against a continuing infringement destroys the business so elected." *Telebrands*, 802 F. Supp. at 1179.

Samsung has also argued that an injunction would cause great harm to the public because it would reduce competition in the phone market, leaving customers beholden to Apple, who cannot meet the demand for phones. Samsung overstates the danger. Consumers will have substantial choice of products, even if an injunction were to issue. Apple and Samsung, despite being direct competitors, are not the only suppliers of mobile phones in the market, nor are Samsung's

---

[9] At the December 6, 2012 hearing, Samsung represented that there were approximately 77,000 infringing units currently with retailers that could be subject to Apple's requested injunction.

Case No.: 11-CV-01846-LHK
ORDER DENYING MOTION FOR PERMANENT INJUNCTION

infringing phones the only phones Samsung offers. Even if Samsung were able to establish that Apple will not be able to supply as many iPhones as the market would like to buy – and the news reports of such rumors Samsung cites, *see* opp'n at 19, are clearly insufficient to establish any such thing – it does not follow that an injunction removing three of Samsung's products from the market would leave customers with no other smartphone options.

However, the injunction would make certain phones unavailable to consumers. It would not be equitable to deprive consumers of Samsung's infringing phones when, as explained above, only limited features of the phones have been found to infringe any of Apple's intellectual property. Though the phones do contain infringing features, they contain a far greater number of non-infringing features to which consumers would no longer have access if this Court were to issue an injunction. The public interest does not support removing phones from the market when the infringing components constitute such limited parts of complex, multi-featured products.

In addition, Samsung argues that an injunction would create an administrative burden on the Court, as it would require the Court's continuing supervision to enforce. This is likely true, though on its own, it does not carry significant weight.

Finally, regarding trade dress, the Court finds that, in the absence of case law authorizing a trade dress dilution injunction where there are no diluting products still on the market, an injunction cannot be in the public interest. The potential for future disruption to consumers would be significantly greater if this Court were to issue an injunction, and such disruption cannot be justified in the absence of clear authority.

In sum, while the public interest does favor the protection of patent rights, it would not be in the public interest to deprive consumers of phones that infringe limited non-core features, or to risk disruption to consumers without clear legal authority.

### E. **Summary**

Weighing all of the factors, the Court concludes that the principles of equity do not support the issuance of an injunction here. First and most importantly, Apple has not been able to link the harms it has suffered to Samsung's infringement of any of Apple's six utility and design patents that the jury found infringed by Samsung products in this case. The fact that Apple may have lost

Case No.: 11-CV-01846-LHK
ORDER DENYING MOTION FOR PERMANENT INJUNCTION

United States District Court
For the Northern District of California

customers and downstream sales to Samsung is not enough to justify an injunction. Apple must have lost these sales *because* Samsung infringed Apple's patents. Apple has simply not been able to make this showing. Though this is a case where the "plaintiff practices its invention and is a direct market competitor," *Edwards Lifesciences*, 699 F.3d at 1315, it is not a case where the patented inventions are central to the infringing product. Without the required causal nexus, the parties' status as direct competitors simply does not justify an injunction.

Further, the Court has found that neither the inadequacy of money damages nor the public interest favors an injunction here, for either patent infringement or trade dress dilution. Regarding trade dress dilution specifically, as explained above, the case for an injunction is especially weak, because there are no diluting products still available, even without an injunction.

Finally, this Court has previously noted the relevance to the present situation of Justice Kennedy's observation in *eBay*:

> "When the patented invention is but a small component of the product the companies seek to produce and the threat of an injunction is employed simply for undue leverage in negotiations, legal damages may well be sufficient to compensate for the infringement and an injunction may not serve the public interest."

547 U.S. at 396-97. The phones at issue in this case contain a broad range of features, only a small fraction of which are covered by Apple's patents. Though Apple does have some interest in retaining certain features as exclusive to Apple, it does not follow that entire products must be forever banned from the market because they incorporate, among their myriad features, a few narrow protected functions. Especially given the lack of causal nexus, the fact that none of the patented features is core to the functionality of the accused products makes an injunction particularly inappropriate here.

This case is simply not comparable to *i4i* or to *Edwards*, the Federal Circuit's most recent case discussing permanent injunctions in the patent context. In *i4i*, the plaintiff was a very small company whose business depended on its patented product, and the defendant was a large company of whose business, the infringing product was but a small part. Thus, the defendant's infringing product "significantly change[d] the relevant market. . . forcing i4i to change its business strategy." 598 F.3d at 862. Without an injunction, there was simply no way for the plaintiff to continue to

22

compete. Here, Samsung may have cut into Apple's customer base somewhat, but there is no suggestion that Samsung will *wipe out* Apple's customer base, or force Apple out of the business of making smartphones. The present case involves lost sales – not a lost ability to be a viable market participant. *Edwards* involved a patent that was much more central to the infringing product than the patents at issue here; there was no doubt that the patented technology in that case was a central force driving sales of the infringing product. 699 F.3d at 1308 (describing a prosthetic heart valve implanted by use of a collapsible stent, and a patent for the necessary collapsible stent). If the patents at issue here were similarly essential to the core of Samsung's products, the Court might see things differently.

In sum, to the limited extent that Apple has been able to show that any of its harms were caused by Samsung's illegal conduct (in this case, only trade dress dilution), Apple has not established that the equities support an injunction. Accordingly, Apple's motion for a permanent injunction is DENIED.

**IT IS SO ORDERED.**

Dated: December 17, 2012

_Lucy H. Koh_

LUCY H. KOH
United States District Judge

23

Case No.: 11-CV-01846-LHK
ORDER DENYING MOTION FOR PERMANENT INJUNCTION