# EXHIBIT 15

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

|  |  |
|---|---|
| APPLE INC. <br><br> Plaintiff, <br><br> vs. <br><br> SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG TELECOMMUNICATIONS AMERICA, LLC <br><br> Defendants. | CASE NO. 12-cv-00630-LHK |

# OPENING EXPERT REPORT OF
# CHRISTOPHER A. VELLTURO, PH.D.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

**INTENTIONALLY OMITTED FROM EXHIBIT/RECORD**

### 1. U.S. Patent No. 7,761,414 ("the '414 Patent")

71.     The '414 Patent issued on July 20, 2010, to Apple.  The patent is titled "Asynchronous Data Synchronization amongst Devices."  I understand that Apple accuses Samsung of infringing claims 11 and 20 of the '414 Patent.

**INTENTIONALLY OMITTED FROM EXHIBIT/RECORD**

**INTENTIONALLY OMITTED FROM EXHIBIT/RECORD**

74. I understand that Apple's iPhone, iPad, and iPod Touch products with iOS 3 and later practice the '414 Patent by allowing users to use and interact with an application while data from the same application is being synchronized.[122]

**INTENTIONALLY OMITTED FROM EXHIBIT/RECORD**

---

[122] Apple's Supplemental Response to Samsung's Interrogatory No. 25, served July 15, 2013.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**                                                                 29

**INTENTIONALLY OMITTED FROM EXHIBIT/RECORD**

310. In sum, the Samsung accused sales that are candidates for Apple lost profits consist of the following:

- During a "blackout period" (presently assessed as being either one or four months from the infringement notice date in different scenarios), Samsung is unable to produce and sell any accused devices, and thus all of its accused unit sales are candidates for Apple lost profits;[528] and

- For the period subsequent to any blackout period, Samsung accused sales that are candidates for lost profits reflect the demand diminution associated with each claimed alternative as reflected in Dr. Hauser's conjoint studies; this consideration applies only to the '647, '959, and '414 patents, where the claimed design-arounds have not been commercially launched and sustained.

**INTENTIONALLY OMITTED FROM EXHIBIT/RECORD**

---

[528] Again, this blackout date applies only once, and is not repeatedly considered as multiple patents are found valid and infringed. Also, this consideration is suspended for the '647 patent, which has an earlier date at which the "but for" world commences.

### (3) Diminution in Samsung Sales of Accused Products With Non-Infringing Designs Implemented

311.  To determine the diminished sales at Samsung in the "but for" world that are candidates for lost profits at Apple during periods where the claimed alternatives would have been implemented and commercialized by Samsung, I utilize results of the survey and conjoint analysis conducted by Dr. Hauser.[529] As mentioned in my discussion of *Panduit* Factor 2 above, Dr. Hauser's survey and conjoint analysis allow me to estimate demand curves for the Accused Products with the Accused Features and with non-infringing alternatives in their stead and effectively observe the shifts in those demand curves associated with replacing an Accused Feature with a non-infringing alternative (*i.e.*, the decreases in Willingness to Buy Samsung's Accused Products) at any given price level, among those who have historically been Samsung smartphone and tablet owners.  This allows me to estimate the diminished unit sales Samsung would have faced by replacing Accused Features with non-infringing alternatives for each Asserted Patent (recall that, for the '721, '172, and '760 patents, where alternatives have actually been introduced and products successfully sold, I do not assess damages based on lost profits for these post-design around periods).

312.  In my opinion, the appropriate measure of Samsung's loss of unit sales from replacing Accused Features with non-infringing alternatives is the distance of the leftward shift in the demand curve for each Accused Product derived from the conjoint analysis, holding the price at which it was sold to consumers fixed at its actual historical level.[530] This is because prices to consumers of devices such as smartphones and tablets are typically set at "focal" price

---

[529] As mentioned, for the '414 and '959 Patents it appears that Samsung's best non-infringing alternative would have been to remove the Accused Feature from the product rather than attempting a non-infringing way of providing the functionality covered by these patents.  For simplicity, I include these removals of Accused Features under the heading of non-infringing alternatives.

[530] Strictly speaking, this statement refers to the inverse demand curve, in which quantity is represented as the independent variable and price as the dependent variable.  This corresponds to the standard textbook graphical depiction of a demand curve, which makes it convenient to describe demand curves in this manner.  In reality, suppliers of differentiated products such as smartphones and tablets consider prices and quantities jointly, along with promotional efforts, in seeking to maximize profits.

levels (such as $199 or $299).[531]  Within the range of possible price changes relevant to my analysis, suppliers of these devices would expect to generate too small an increase in unit sales by reducing their prices from these focal levels to offset the loss of revenue per unit and would, thus, leave prices unchanged.[532]

313.   In assessing the impact on Willingness to Buy of removing more than one Accused Feature, I also adjust for the overlap in demand reductions associated with the absence of each individual feature (or reduction in the quality of the feature).  For example, if replacing a feature covered by one Asserted Patent with a non-infringing alternative at a given price level would reduce the share of Samsung customers who would purchase that product by 5% and replacing a feature covered by a second Asserted Patent with its non-infringing alternative would reduce the share who would purchase it by 3%, and the demand for each feature is not dependent on the presence of any other feature (that is, demand for the two features are independent), then replacing both Accused Features would reduce the share who would purchase it by 7.85% in total.[533]

---

[531] The prevalence of focal prices of smartphones for consumers can be seen in the historical retail price data for the Accused Products in **Exhibit 13-B** and in Samsung business documents on pricing.  See, for example: SAMNDCA630-06643353 (translation); and SAMNDCA630-06643364 (translation).

[532] Recognizing that the Accused Products were not as attractive without the Accused Features, Samsung might well seek to mitigate their losses by enhancing these products in other ways.  However, such enhancements would be costly and their effect on demand is entirely speculative; since there is no basis for expecting that they would materially reduce Samsung's losses, I do not attempt to estimate their impact.

[533] 100% - 5% = 95%; 100% - 3% = 97%; 95% X 97% = 92.15%; 100% - 92.15% = 7.85%. Note that, in this calculation, because the reduction in share of those who would purchase an Accused Product that is attributable to removal of any Accused Feature is expressed as a percentage, the absolute incremental reduction in units purchased due to removal of any Accused Feature will depend on the initial number of units used in the calculation.  As a result, the incremental reduction in units purchased associated with removal of any individual Accused Feature depends on the order in which Accused Features were removed.  Thus, when considering the impact of simultaneous removal of multiple Accused Features, only the total impact of removing the Accused Features is economically meaningful.  It is appropriate to calculate the incremental reduction in units purchased associated with removal of any individual Accused Feature only for the purpose of studying the impact of removing that Accused Feature, given a starting point in which Accused Products are assumed to embody a specific set of Accused Features.

314.    Here too, I implement a conservative adjustment that simplifies the assessment of damages associated with different combinations of Accused Features: I calculate the combined impact on Willingness to Buy of removing or replacing all the Accused Features in the manner just described (which adjusts for overlap) and attribute to each Asserted Patent a share of the combined impact on Willingness to Buy equal to its share of the sum of the individual impact on Willingness to Buy of each Asserted Patent. This adjustment, which I refer to as a "linearization" of the weights given to each Asserted Patent, implies that the estimate of the effect on Willingness to Buy of the Accused Feature associated with any individual Asserted Patent that I use in my damages analysis will be less than it actually would have been unless all the Asserted Patents are found to be valid and infringed.[534]

315.    Because of the patent-specific and additive nature of the results derived from the conjoint analysis, I am able to adjust my calculation of the diminished unit sales had Samsung not infringed the Asserted Patents and implemented alternative designs, to reflect the fact that the Asserted Patents being infringed by Accused Products vary over time (because the notice date of the '647 Patent is earlier than that of the other Asserted Patents and because, at certain points during the damages period, Samsung has removed Accused Features from some of its Accused Products or introduced new products that do not embody the Accused Features). (See **Exhibit 7**.) For the same reasons, the results of the conjoint analysis can be used to recalculate damages as needed to address any outcome at trial regarding which Asserted Patents the Accused Products are found to have infringed.

316.    The results of Dr. Hauser's surveys provide an additional important data point that indicates that the demand-diminishing impact of removing the patented features associated with the '414, '647, and '959 patents and replacing them with the proposed design-arounds *collectively* is greater than the arithmetic sum of the effects of removing the three patents taken individually. This result is unsurprising, as consumers who might be willing to live with the absence of one or two features are unwilling to purchase devices where several layers of functionality have been compromised. I include this additional lost profits permutation in the calculations in the damages analyses of this Section.

---

[534] As discussed below, **Exhibits 13** and **14** provide the results of the linearization calculation. **Exhibits 13-A** and **14-A** provide the corresponding strict results.

317.  In this report, I assume that the Accused Products are found to have infringed each of the Asserted Patents in accordance with Apple's infringement contentions.  In **Exhibits 13** and **14**, I report the resulting estimates of the amounts by which Samsung's sales of each of the Accused Products would have been diminished (*i.e.*, the impact on Willingness to Buy) during the time it would have replaced each of the products' Accused Features with non-infringing alternatives.[535]  These calculations in the exhibit are averages that account for the fact that, in the conjoint survey results, the effects of replacing Accused Features on end users'

---

[535] In **Exhibits 13** and **14**, I report my estimates of the average retail prices of each of the Accused Products that determine, along with screen size, which estimated effects on Willingness to Buy results from the conjoint analysis are applied to each Accused Product for each Asserted Patent.  Given that the estimated effects of removing Accused Features tend to increase with the price of the product being considered by respondents, my assessment of the relevant prices of the Accused Products is conservative in that, where rebates off retail prices were offered to purchasers of smartphones, I assume that they were universally available and were redeemed by purchasers.  I have calculated the average retail price of each of the Accused Products based on the retail prices ("R/P") reported in the U.S. Weekly Smart Phone Sales Reports created by STA (see Deposition of Justin Denison, Transcript, Sept. 21, 2011, at 332:2-334:3; "Weekly US Smart Phone Report," Deposition of Justin Denison, Exh. 243, Sept. 21, 2011).  I have determined these retail prices to be net of any available rebates, considering that the prices net of rebates reported in publicly available sources align with the retail prices in the Weekly Smart Phone Sales Reports for a given device during comparable time periods.  See, e.g., the prices reported for the Samsung Conquer 4G (Sprint) in Week 35 2011 (www.samsung.com/us/news/19904) and Week 36 2011 (SAMNDCA630-06447120); the Samsung Stratosphere in Week 42 2011 (www.samsung.com/us/news/19927, SAMNDCA00279225); the Samsung Exhibit II 4G (T-Mobile) in Week 44 2011 (www.androidcentral.com/t-mobile-gets-its-first-no-contract-4g-smartphone-samsung-exhibit-ii-4g, SAMNDCA630-06615629); the Samsung Transform Ultra (Sprint) in Week 49 2011 (reviews.cnet.com/smartphones/samsung-transform-ultra-sprint/4505-6452_7-35059781.html, SAMNDCA10374507); the Samsung Admire (Metro PCS) in Week 10 2012 (web.archive.org/web/20120305120753/http:/www.metropcs.com/metro/detail/Samsung+Admire/SCHR720ZAAM, SAMNDCA630-06044074); the Samsung Galaxy S III (T-Mobile) in Week 25 2012 (www.tmonews.com/2012/06/t-mobile-breaks-up-galaxy-s-iii-launch/, SAMNDCA630-06625315); and the Samsung Galaxy S II Epic 4G Touch (Sprint) in Week 26 2012 (http://web.archive.org/web/20120628090213/http://shop.sprint.com/mysprint/shop/phone_details.jsp?prodId=dvc5890001prd&deviceSKUId=58900014&flow=AAL&planSKUId=null&tabId=dt_phones&ptn=,SAMNDCA630-06358839). See also the prices reported for the HTC Amaze 4G (T-Mobile) in Week 42 2011 (www.phonearena.com/news/T-Mobile-officially-announces-the-release-date-for-the-HTC-Amaze-4G-and-Samsung-Galaxy-S-II_id22429, SAMNDCA00279225) and the LG myTouch (T-Mobile) in Week 45 2011 (www.engadget.com/2011/11/01/lg-mytouch-mytouch-q-available-on-t-mobile-november-2nd-for-79/) and Week 47 2011 (SAMNDCA630-07554129).

Willingness to Buy vary with the price and screen size of the device in question.  In the next step of my damages analyses, I estimate the portion of the reductions in Samsung's sales reported in **Exhibit 10** that would have been made by Apple during the damages period.

**INTENTIONALLY OMITTED FROM EXHIBIT/RECORD**

**INTENTIONALLY OMITTED FROM EXHIBIT/RECORD**

**INTENTIONALLY OMITTED FROM EXHIBIT/RECORD**

324. As mentioned above, Dr. Hauser's survey results confirm the economic intuition that Samsung's loss of sales if its product lacked multiple Accused Features would exceed the

**INTENTIONALLY OMITTED FROM EXHIBIT/RECORD**

sum of the losses associated with a lack of Accused Features each considered on their own. In that discussion, I reported that, whereas the sum of individual reductions in Willingness to Buy for the '414, '647, and '959 Patents was 22%, the combined effect of removing the Accused Features covered by these patents, considered collectively, was 25%. In **Exhibit 17-A**, I generate Apple lost profits due to diminished demand for the '414, '647, and '959 Patents considered collectively. Total lost profits damages in this scenario are $653.7 million. (Note that I compute lost profits damages due to diminished demand (as opposed to products being taken off the market) only for the '414, '647, and '959 Patents. Note also that these calculations take account of the fact that not all Accused Products have infringed all three of these patents, or have not done so at all times: where not all three of the '414, '647, and '959 Patents are infringed, the calculations apply individual per-patent impacts on demand estimated from Dr. Hauser's conjoint analysis.)[543] **INTENTIONALLY OMITTED FROM EXHIBIT/RECORD**

---

[543] In general, my computations of lost profits due to diminished demand incorporate the combined, collective effect on demand of the '414, '647, and '959 Patents. However, in **Exhibit 18-C**, I report the results of an alternative lost profits calculation, in which I consider only the individual per-patent impacts on demand of these patents. In this scenario, lost profits damages total $573.8 million. In terms of lost profits, the combined effect on demand of the features covered by the '414, '647, and '959 Patents thus exceeds the sum of individual effects by about $79.9 million. **INTENTIONALLY OMITTED FROM EXHIBIT/RECORD**

**INTENTIONALLY OMITTED FROM EXHIBIT/RECORD**

**(1) Step 1: Samsung's Contraction in Sales Absent a License**

395.   As to the first step, my estimate of the percentage by which Apple and Samsung would have expected Samsung's unit sales of the Accused Products to decline if they lacked the access to the Patented Inventions for the Accused Features is based on results of Dr. Hauser's survey and conjoint analysis discussed above.  In the context of the hypothetical negotiation, I assume that Apple and Samsung would have applied an estimate for a "representative" product, rather than undertaking the laborious task of pinning down likely effects on various product lines Samsung was considering for commercial releases at that time.  In this context, the smartphone I have identified for this purpose is the Galaxy S II Epic 4G Touch, which has an intermediate screen size and typical retail price and has the largest unit sales of any of Samsung's accused Galaxy S II smartphones during the period for which I have sales data, and which Apple accuses of infringing all the Asserted Patents.  As shown in **Exhibit 13**, the estimated percentages by which Samsung's sales would have declined absent access to the Asserted Patents for use in the Accused Features for this representative product are:

- 7.39% for the '414 Patent;
- 6.14% for the '647 Patent;
- 3.99% for the '959 Patent;
- 8.98% for the '760 Patent;
- 7.11% for the '721 Patent; and
- 12.56% for the '172 Patent.[667]

**INTENTIONALLY OMITTED FROM EXHIBIT/RECORD**

---

[667] See **Exhibit 13**.

396. As stated in my discussion of the conjoint analysis results in Section III.B above, these figures are similar for tablets. (See also **Exhibit 14**.)[668]

397. Once I identify the percentage of accused product units that would not have been sold if Samsung had not taken a license to the Asserted Patents, I adjust this percentage decline to recognize that some consumers who would choose not to purchase a Samsung accused product offered with designed around features may elect to purchase an unaccused Samsung smartphone. I proceed with this calculation by considering unaccused Samsung units as a percentage of total smartphone units, excluding Samsung's accused units, over the baseline period.

**INTENTIONALLY OMITTED FROM EXHIBIT/RECORD**

**INTENTIONALLY OMITTED FROM EXHIBIT/RECORD**

      489.    My damages calculations are based on rigorous survey evidence of the value of the Accused Features that is attributable to each of the Patented Inventions. These calculations are conservative in some important respects:

- Even though Dr. Hauser's survey and conjoint analysis show that the effects of removing multiple Accused Features together exceed the sum of the effects of removing each Accused Feature individually, my calculations incorporate only a simple additive treatment of value of each Accused Feature to Samsung customers. In fact, my linear approximation of the correct weights further reduces damages for a combination of infringing patents by removing overlap demand effects. The possibility that the Accused Features—which, as discussed in Section III.B.1.b above, enhance the user experience in a variety of common uses of the Accused Products—have a cumulative value to users that exceeds the sum of their individual values is thus not captured in my damages analysis, which leads to a material understatement of damages owed;

- My lost profits calculations include only sales of the Accused Products and the resulting lost sales of iPhones and iPads during the damages period. They do not account for Apple's loss of subsequent replacement sales of iPhones and iPads or its lost sales of other devices, apps, or digital content for those devices that, as my analysis of demand and competition in Section III.C.2.a above and my assessment of reasonable royalties below show, are of great value to smartphone and tablet manufacturers;

- Like my lost profits calculations, my determination of reasonable royalty rates and damages does not account for Apple's lost sales of products other than iPhones and iPads. In addition, my reasonable royalty rates do not account for a consideration that would have weighed heavily in Apple's reluctance to license Samsung at any price, namely that doing so would increase the risk that network effects would begin to drive the marketplace toward a tipping point from Apple/iOS to Samsung/Android.

490. These aspects of harm to Apple that are not captured in my lost profits analysis correspond to the reasons I provided in my Reply Declaration as to why a survey and conjoint analysis would not be able to provide Apple with full recovery. As I stated there, at the time of trial, the trier of fact would need evidence to assess several elements of damages:

- The likelihood that purchasers of infringing Samsung products would have selected an Apple iPhone in a "but for" world (and which iPhone model they would have purchased);

- The likelihood that these end users in the "but for" world would purchase next-generation Apple iPhones; and

- The likelihood that these end users would purchase additional Apple products, including iPads, Macs, digital content, *etc*.[745]

491. While a carefully designed and executed survey may capture some elements of these tendencies, there are elements of these questions that are unlikely to be addressed reliably.[746] Importantly, the respondents who actually purchased an infringing Samsung phone will likely be invested in the Android platform at the time of survey, and this will bias their response in favor of selecting another Android device.[747] Moreover, assessing the likelihood of additional purchase will depend on the conditions of the state of the world provided to the respondent that will be in place at the time of a future purchase.

---

[745] Reply Declaration of Christopher Vellturo, Ph.D., May 14, 2012, Case 12-cv-00630, N.D. California, at ¶ 139.

[746] I do not mean to imply that a conjoint analysis, hedonic regression, or some other statistical analysis is necessary to seek lost profits. Rather, these are just tools that may be used to support a lost profits case. Here, they would be insufficient to provide Apple with full recovery for the reasons discussed below.

[747] In my experience, taking consumers "back in time" to their selection of the infringing smartphone and asking them to reconsider their choice based on the information and preferences they had *at that time* is a fruitless exercise. Yet, such a hypothetical would be essential to avoiding the result bias I identify here.

492.    Leaving aside these methodological and bias issues, there are much broader issues associated with Samsung's infringement and the damages sustained by Apple that surveys will not be able to capture, including, for example, the impact on the purchase of additional Android phones (both Samsung and others) due to network effects from the greater installed base of Android phones generated as a result of Samsung's infringement.  Such effects do not lend themselves to survey-based analysis because they relate to the feedback effects associated with platform adoption.  Indeed, I am unaware of any survey evidence that has captured these effects reliably in a patent damages context.

**INTENTIONALLY OMITTED FROM EXHIBIT/RECORD**

**INTENTIONALLY OMITTED FROM EXHIBIT/RECORD**

August 12, 2013

_____
Dr. Christopher A. Vellturo

---

with minimal effort. Putting aside the accuracy of that position, if it were true, then Samsung would face little by way of hardship in avoiding infringement of Apple's Asserted Patents, whereas Apple faces substantial hardship due to Samsung's infringement, as discussed herein.