# EXHIBIT 29

# EXHIBIT 29A

1          UNITED STATES DISTRICT COURT
2   NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION
3          CASE NO. 12-CV-00630-LHK (PSG)
4   ----------------------------------------)
    APPLE INC., a California corporation,   )
5                                           )
                   Plaintiff,               )
6                                           )
                   vs.                      )
7                                           )
    SAMSUNG ELECTRONICS CO., LTD., a        )
8   Korean business entity; SAMSUNG         )
    ELECTRONICS AMERICA, INC., a New        )
9   York corporation; SAMSUNG               )
    TELECOMMUNICATIONS AMERICA, LLC, a      )
10  Delaware limited liability company,     )
                                            )
11                 Defendants.              )
    ----------------------------------------)
12
13
14

15      VIDEOTAPED DEPOSITION OF NATHANIEL POLISH
16              New York, New York
17              April 3, 2012
18
19
20
21
22
23  Reported by:
24  KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25  JOB NO. 47971

1  fuzzy matching process in the Soliloquy system?

2      A.    I think that at least for some

3  definitions of "heuristic" phonetic searching

4  could well be referred to as a heuristic.  I

5  don't think I -- I don't think I thought of it

6  or referred to it as heuristic search in any of

7  this, in any of this work, but certainly some

8  people might refer to looking for phonetic

9  matches as being heuristic.

10     Q.    Your '531 patent was filed in 2000; is

11 that correct?

12          MR. BUROKER:  Object to form.

13     A.    I'm relying entirely upon the face of

14 the patent because it was a long time ago.  It

15 looks like the provisional was filed in '99 and

16 the -- the final was filed in February 2000.

17     Q.    Was there an ordinary meaning in

18 computer science for "heuristic" in 2000?

19     A.    Certainly heuristic was a well-known

20 artificial intelligence concept by 2000.

21     Q.    In your earlier answer, you had stated

22 that for some definitions of "heuristic" the

23 searches in the Soliloquy -- the phonetic

24 searches could be considered heuristic searches.

25          Under what definitions of "heuristic"?

1      A.    Well, I taught computer science around

2  this time and I taught artificial intelligence,

3  and we taught something referred to as heuristic

4  search.  And I think when I looked at the file

5  history for the '604 patent, there was a

6  description in there of some definitions of

7  "heuristic" and I think they were all within the

8  range of what people would accept, which is

9  generally some kind of rule of thumb that helps

10  you find an answer.  I know it's a very vague

11  answer, but heuristic is kind of a broad

12  concept.

13      Q.    Now, you've reviewed the prosecution

14  history for the '604 patent in connection with

15  your work on this case?

16      A.    Yes.

17      Q.    And I believe you stated that you saw

18  some definitions for "heuristic" in there,

19  correct?

20      A.    Yes.

21      Q.    Is there anything that you saw in the

22  prosecution history that informed your

23  interpretation of the claims of the '604 patent?

24      A.    Well, I -- I mean, I learned a lot

25  looking at the prosecution history as to what --

1  what the arguments were and why certain

2  approaches were taken.  I mean, I looked at a

3  range of documents that I have put in the

4  declaration that all informed my understanding

5  of the patent.  Certainly the prosecution

6  history did as well.

7      Q.    And you understand the prosecution

8  history should be considered in determining how

9  claims should be interpreted in the context of

10  the particular patent, correct?

11      A.    Yes, my understanding is the

12  prosecution history needs to be taken into

13  account.  There's different -- different aspects

14  of it have different -- have different weight

15  and different importance, but certainly it's

16  part of the record that's important.

17      Q.    In your declaration in this case, you

18  didn't identify any particular portion of the

19  prosecution history that informed your claim

20  interpretation, correct?

21          MR. BUROKER:  Object to form.

22      A.    I don't recall specifically and I

23  haven't got the declaration in front of me.  It

24  might be helpful if I had it.

25          (Polish Exhibit 3, Expert Declaration

1   of Dr. Nathaniel Polish Concerning U.S.

2   Patent No. 8,086,604, marked for

3   identification, as of this date.)

4   BY MS. FERNANDS:

5       Q.    You now have what we marked as Polish

6   Exhibit 3.

7       A.    Okay.

8       Q.    Is this the declaration to which you

9   referred?

10      A.    Yes, it is.

11      Q.    And in this declaration, you did not

12  point to any particular portion of the

13  prosecution history that informed your

14  interpretation of the claims, correct?

15      A.    I believe I refer to the fact that

16  I -- that it's important and that I looked at

17  it.  I don't recall citing a particular spot.

18          Yes, I don't think I referred to any

19  particular spot on the prosecution history.

20      Q.    You also reviewed the prosecution

21  history for the parent application that resulted

22  in the '959 patent; is that correct?

23      A.    That's correct.

24      Q.    I think you said earlier you have

25  testified about 35 times; is that right?

1    Q.    You have just been handed what we

2  marked as Polish Exhibit 5.  Do you recognize

3  this?

4    A.    I recognize this as being part of a

5  file history.  It looks like it's part of the

6  file history for this patent, but I'm --

7    Q.    If you look at the application number

8  at the top and the application number of the

9  '604 patent, I think you'll see that they are

10 the same.

11   A.    Okay.  I looked at this, at the file

12 history in its entirety.  It was a

13 400-and-some-odd-page document.  I, you know, I

14 can't exactly place this within it, but I'll

15 accept the notion that this is from somewhere

16 within those 400-and-some-odd pages.

17   Q.    It is.  I thought we would all be

18 better off if I didn't bring the whole thing.

19   A.    Sounds right.

20   Q.    You have reviewed this whole file

21 history, you said, in connection with your work

22 on this patent?

23   A.    Yes, I did.

24   Q.    So, although you don't necessarily

25 recognize this document, it -- if it's part of

1  the file history, it's something that you

2  reviewed?

3      A.    Yes, it's something that I certainly

4  would have seen.

5      Q.    And you referred earlier to

6  definitions of "heuristic" provided in the file

7  history.  If you look at page 10, you'll see

8  dictionary definitions of "heuristic."  Do you

9  see that?

10     A.    Yes.

11           MR. BUROKER:  Object to form.

12           Go ahead.

13     Q.    So on page 10, there are the

14  dictionary definitions of "heuristic," correct?

15     A.    Yes, I see that.  Let me just...

16           (Document review.)

17     A.    Yes, I see that.

18     Q.    Okay.  Are these dictionary

19  definitions of "heuristic" on page 10 of what we

20  marked as Exhibit 5 consistent with your

21  understanding of "heuristic" as it would have

22  been understood by a person of skill in the art

23  in 2000?

24     A.    I think so.  I'm not sure I

25  necessarily buy all of it, but it -- I think

1  these are not inconsistent with -- with my view

2  of it.

3       Q.    Which ones do you not necessarily buy?

4       A.    Well, I mean, these definitions that

5  are here are not necessarily even internally

6  consistent.  I mean, there's some -- there's --

7  I mean, they're describing here -- "used to

8  describe a computer program that can modify its

9  software response to the user."  Okay.

10  That's -- that's fine, but then there's also

11  "using or arrived at by means of process of

12  trial and error rather than set rules."  That is

13  not necessarily the same as or fully consistent

14  with the notion that it's -- that it's

15  self-modifying.

16            So there's -- there's a number of

17  the -- you would have to think real hard about

18  drawing the then diagrams of these different

19  definitions.  I wouldn't necessarily say that

20  they're all precisely describing the same thing.

21  I would have to, you know -- certainly when we

22  do claim construction in this case, I look

23  pretty carefully at it, and I don't, as I say, I

24  don't think it matters for the purposes of the

25  infringement of the accused product simply

1  because the spec lists those three and they

2  match what's in the accused product.

3           I do think that these definitions here

4  give you a pretty good sense of it, but I

5  wouldn't necessarily accept this paragraph as,

6  you know, fully controlling of what the word

7  means.

8      Q.    Leaving aside the three that you say

9  match the accused product, how would a person of

10  ordinary skill in the art understand, if they

11  did not match those three, whether their

12  algorithm was heuristic?

13      A.    I think the sense that you get from

14  this paragraph and I think the sense people

15  would have is if the heuristic -- if the

16  algorithm was designed to always give a single

17  precise answer, like -- a single precise answer,

18  that would likely not be a heuristic.  And this

19  sort of gets to it here about not having proven

20  performance bounds and valuable most of the time

21  but the results or performance cannot be

22  guaranteed.

23           I think if you have an algorithm that

24  always gives you the exact right answer all the

25  time in a fixed amount -- in a bounded amount of

1    time, that quite likely wouldn't be a heuristic.

2    Somebody somewhere might have some different

3    opinion there, but I think generally an

4    algorithm that is, you know, knowing that three

5    plus four is seven, that's not a heuristic.

6    There is one answer.  You can compute it.  It's

7    done.  There's no -- there's no ambiguity there.

8             So I think people would understand

9    there's classes of algorithms that are outside

10   of heuristic and somebody looking at the patent

11   would understand that.

12        Q.    Other than algorithms that always give

13   the precise right answer all of their time, are

14   there other classes of algorithms that are

15   outside of heuristic?

16        A.    Probably.  I'd have to think of some

17   examples, but generally, generally, "heuristic"

18   refers to algorithms that are -- that don't

19   always give you the precise right answer; that

20   give you -- that advance you towards your goal.

21   Some people call those heuristic, some people

22   have other words to describe them, but I think

23   certainly there are plenty of algorithms that

24   are not heuristic.

25        Q.    In your opinion, would an algorithm

# EXHIBIT 296

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

1                UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF CALIFORNIA
3                    SAN JOSE DIVISION
4
5    APPLE, INC., a California     )
     corporation,                  )
6                                  )
7           Plaintiff,             )
                                   )
     vs.                           ) No. 12-CV-00630-LHK
8                                  )
     SAMSUNG ELECTRONICS CO.,      )
9    LTD., a Korean business       )
     entity; SAMSUNG ELECTRONICS   )
10   AMERICA, INC., a New York     )
     corporation; and SAMSUNG      )
11   TELECOMMUNICATIONS AMERICA,   )
     LLC, a Delaware limited       )
12   liability company,            )
                                   )
13          Defendants.            )
     ___                           )
14
15       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
16                 UNDER PROTECTIVE ORDER
17     *** CONTAINS HIGHLY CONFIDENTIAL SOURCE CODE ***
18                  VIDEO DEPOSITION OF
19                    KENNETH McLEOD
20                    Palo Alto, CA
21                 Friday, July 12, 2013
22
23   REPORTED BY:
24   SUSAN F. MAGEE, RPR, CCRR, CLR, CSR No. 11661
25   Job No. 63369

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

Page 7

1    Q.  Second of all, your counsel may interpose        09:37

2  objections to the form of my question.  Unless he     09:37

3  instructs you not to answer the question, however,    09:37

4  you should still answer the question following your   09:38

5  counsel's objection.                                  09:38

6       Does that make sense?                            09:38

7    A.  Yes.                                            09:38

8    Q.  Okay.  Third and most importantly, we          09:38

9  should make an effort not to speak over each other.   09:38

10  The court reporter writes down everything that we    09:38

11  say.  If you and I talk at the same time, the        09:38

12  transcript is very difficult to read, and so it's    09:38

13  important that you let me finish the question, and   09:38

14  also I will always let you finish your answer.  And  09:38

15  if -- if I ask a question and I erroneously didn't   09:38

16  let you complete your answer, please tell me that,   09:38

17  and I will let you complete your answer.             09:38

18       Do you understand that?                         09:38

19    A.  Yes.                                           09:38

20    Q.  Okay.  If there's anything about my           09:38

21  question that you don't understand, please also let  09:38

22  me know that.  But if you don't let me know that, I  09:38

23  will think that you understand my question, and in   09:38

24  answering it understand it.                          09:38

25       Does that make sense to you?                    09:38

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

Page 8

1     A.  Yes.                                                09:38

2     Q.  Is there any reason why you cannot give           09:38

3  your best and most accurate testimony this morning?     09:39

4     A.  No.                                                09:39

5     Q.  Okay.  Who is your present employer?              09:39

6     A.  Apple.                                             09:39

7     Q.  How long have you worked at Apple?                09:39

8     A.  Since February 4th, 1991.                          09:39

9     Q.  Okay.  And -- sorry.                               09:39

10    A.  I can't do the math.  I can't think of how        09:39

11 many years that is.  It's too many years.               09:39

12    Q.  See, there was -- there was a perfect             09:39

13 example is I started to ask another question before     09:39

14 I realized that you were going to say something         09:39

15 else.  And, you know, when that happens, I'll always    09:39

16 try to catch myself, but in case I don't, please        09:39

17 just say, you know, I wasn't finished.                  09:39

18        Is there a particular reason why you             09:39

19 remember that exact date?                               09:39

20    A.  It's one of those dates you remember like a      09:39

21 birthday or an anniversary.                             09:39

22    Q.  What was your first position at Apple?           09:39

23    A.  I was hired into the support tools and           09:39

24 engineering group, so we did the internal software.     09:39

25    Q.  What kind of internal software?                  09:39

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

Page 9

1    A.  The first project that I worked on was                09:39

2    called the information source, and it was a --            09:40

3    essentially a CD-ROM that had all of Apple's support      09:40

4    information and tools and things for accessing it.        09:40

5        Q.  And when you say "support information," I'm       09:40

6    picturing information about how to respond to             09:40

7    questions about computers or information about how        09:40

8    to --                                                     09:40

9        A.  Sure.                                             09:40

10       Q.  -- fix computers or all of the above?            09:40

11       A.  Some of the above.                               09:40

12       Q.  Was the information source CD intended for       09:40

13   use within Apple or for distribution outside Apple?       09:40

14       A.  It was within Apple.                             09:40

15       Q.  And so would this be issued to all               09:40

16   engineers, or was this something that internal           09:40

17   support people would use in -- in -- let me stop          09:40

18   there.                                                    09:40

19            MR. BUROKER:  Objection.  Vague.                 09:40

20            THE WITNESS:  It was primarily for internal      09:40

21   support people.                                           09:40

22            BY MR. WARREN:  Q.  Okay.  And you were one      09:40

23   of those internal support people.                         09:40

24       A.  Sure.                                             09:40

25       Q.  Okay.  And what was your next project after      09:40

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

Page 10

| | | |
|---|---|---|
| 1 | the information -- actually, move back. | 09:40 |
| 2 | What was the format of the information | 09:40 |
| 3 | source CD? | 09:40 |
| 4 | A.  I'm not sure I understand what format is in | 09:40 |
| 5 | this context.  It's -- | 09:40 |
| 6 | Q.  Was it -- let me ask a better question. | 09:41 |
| 7 | A.  Okay. | 09:41 |
| 8 | Q.  How was the information on the information | 09:41 |
| 9 | source CD packaged or stored? | 09:41 |
| 10 | A.  In directories you would insert the CD into | 09:41 |
| 11 | your computer, and there would be different folders, | 09:41 |
| 12 | and you look in the information -- or just look in | 09:41 |
| 13 | the -- in the file system. | 09:41 |
| 14 | Q.  So there wasn't like an application that | 09:41 |
| 15 | you put in the CD and there was an application -- | 09:41 |
| 16 | A.  No. | 09:41 |
| 17 | Q.  -- and you use that application.  It was | 09:41 |
| 18 | just literally a directory, basically a tree | 09:41 |
| 19 | structure and you navigate the tree structure to | 09:41 |
| 20 | find information? | 09:41 |
| 21 | A.  No. | 09:41 |
| 22 | Q.  So that was a terrible question, so I'll | 09:41 |
| 23 | re-ask the question, and your -- your counsel sort | 09:41 |
| 24 | of indicated that it's not a good idea to start | 09:41 |
| 25 | answering the question in the middle. | 09:41 |

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

Page 11

1        MR. BUROKER:  Right.  Let him finish, and        09:41

2    then you can -- wait until it's clear that the        09:41

3    question is done and then the answer, just for the    09:41

4    same reason Mr. Warren talked about, so there's a     09:41

5    clear record.                                         09:41

6        BY MR. WARREN:  Q.  Let me ask a better           09:41

7    question.                                             09:41

8        Do I understand correctly that the                09:41

9    information source CD included a tree structure of    09:41

10   files but did not include any sort of application or  09:42

11   access mechanism that you would use to access those   09:42

12   other than the normal finder interface?               09:42

13       MR. BUROKER:  Objection.  Vague.                  09:42

14       THE WITNESS:  My --                               09:42

15       MR. BUROKER:  Go ahead.                           09:42

16       THE WITNESS:  My recollection is there was        09:42

17   a HyperCard stack that you could use to navigate      09:42

18   through.                                              09:42

19       BY MR. WARREN:  Q.  Got it.  Anything other       09:42

20   than the HyperCard stack?                             09:42

21     A.  Not that I'm aware of.                          09:42

22     Q.  Okay.  And what group was this -- let me        09:42

23   back up.                                              09:42

24       Within Apple were you working for a               09:42

25   particular group?                                     09:42

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

Page 12

1       A.   At which time?                              09:42

2       Q.   We're still in the information source CD    09:42

3  phase.                                                09:42

4       A.   Okay.  I guess the name of the group was    09:42

5  support tools.                                        09:42

6       Q.   Okay.  And did that -- did that roll up --  09:42

7  I apologize again for -- did that roll up to a        09:42

8  larger group?                                         09:42

9       A.   Not at that time.                           09:42

10      Q.   Okay.                                        09:42

11      A.   Yeah.                                        09:42

12      Q.   And I -- I take it that changed eventually? 09:42

13      A.   There was a lot of organizational change at 09:42

14 that time, so --                                      09:42

15      Q.   Okay.                                        09:42

16      A.   Yeah.  I -- I had moved to another team     09:43

17 before any changes happened to that group.            09:43

18      Q.   Okay.  Let's just follow -- let's just      09:43

19 follow you then.                                       09:43

20      A.   Sure.                                        09:43

21      Q.   You worked on the information source CD.    09:43

22 That project concluded.                               09:43

23           What happened next?                         09:43

24      A.   At that point, I was recruited by Harry     09:43

25 Vitelli to work on a new project called Apple         09:43

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

Page 13

1    search.                                              09:43

2        Q.   Can you spell that name for the reporter,   09:43

3    please.                                              09:43

4        A.   Harry, H-a-r-r-y, last name Vitelli,        09:43

5    V-i-t-e-l-l-i.                                       09:43

6        Q.   And -- and when was that?                   09:43

7        A.   It would have been early in 1992.           09:43

8        Q.   Okay.  And when you say you were recruited  09:43

9    by Mr. Vitelli, he came to you and said work on this 09:43

10   exciting project with me or something of that        09:43

11   nature?                                              09:43

12           MR. BUROKER:  Objection.  Vague.             09:43

13           THE WITNESS:  Essentially, it was we're      09:43

14   looking for engineers to work on this project and    09:43

15   would this be something that would interest you.     09:43

16           BY MR. WARREN:  Q.  And how did he describe  09:44

17   the project?                                         09:44

18       A.   I really don't recall exactly.  I think he  09:44

19   painted in general terms that it was the ability to  09:44

20   search large quantities of information.              09:44

21       Q.   Okay.  And is there anything else you can   09:44

22   recall about the initial conversation you had with   09:44

23   Mr. Vitelli about working on Apple search?           09:44

24       A.   I don't recall, no.                         09:44

25       Q.   Okay.  And this interested you, I take it.  09:44

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

Page 14

1      A.   Yes, it did.                              09:44

2      Q.   Okay.   Why was that?                     09:44

3      A.   I think it -- you know, one, it seemed to  09:44

4    be a very exciting, you know, area of technology to  09:44

5    look at, and it also for me personally was a step   09:44

6    into the main engineering organization of Apple as  09:44

7    opposed to where I was in support tools which was   09:44

8    outside of kind of the, you know, where the core    09:44

9    engineering things were happening.               09:44

10     Q.   Yes.   As a former IT guy, I understand    09:44

11   exactly what you're talking about.               09:44

12          And so you started working on Apple search 09:45

13   in early 1992; is that correct?                  09:45

14     A.   Yes.                                       09:45

15     Q.   And what was the state of the Apple search 09:45

16   project when you started?                        09:45

17     A.   Well, there was no Apple search as such    09:45

18   yet.   There was a few demos that people put      09:45

19   together, and one of those demos was called Daily  09:45

20   Planet, and that was -- essentially what they had  09:45

21   was a demo to show what -- what could be, and this  09:45

22   is our idea for a project, but it hadn't started   09:45

23   yet.                                             09:45

24     Q.   So how many people were working on the     09:45

25   Apple search project before you started?         09:45

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

Page 31

1      A.  But yes.                                      10:04

2      Q.  But you don't recall what they are; is that  10:04

3   right?                                              10:04

4      A.  Specifically, I -- I know that there was     10:04

5   some information from Dow Jones is the other one I  10:04

6   recall.                                             10:04

7      Q.  Dow Jones news wire, Dow Jones stock         10:04

8   prices?  Anything specific?                         10:04

9      A.  I don't recall whether it was -- which of    10:04

10  those two that you said it was.                     10:04

11     Q.  Okay.  So it could have been either or       10:04

12  both?                                               10:04

13     A.  Correct.                                     10:04

14     Q.  Okay.  Do you recall any other types of      10:04

15  information that were indexed by the Rosebud system? 10:04

16     A.  I -- I don't.                                10:04

17     Q.  Do you think there were more and you don't   10:04

18  remember them, or you think that there probably     10:04

19  weren't anymore?                                    10:04

20     A.  I think there may have been -- just I am     10:05

21  trying to wrack my brains here.  It's been 20 years. 10:05

22  There may have been more, but I don't recall them at 10:05

23  this time.                                          10:05

24     Q.  Understood.                                  10:05

25     A.  Yeah.                                        10:05

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

Page 32

1    Q.  All right.  So you've now started at Apple        10:05

2  search.  It's your first day.  The Daily Planet demo    10:05

3  exists; the Rosebud demo exists.                        10:05

4        Did any other technology related to the           10:05

5  Apple search project exist at that time?                10:05

6        MR. BUROKER:  Objection.  Vague.                  10:05

7        THE WITNESS:  I -- I am not sure.  I mean,        10:05

8  technology is a very wide area, so is there a           10:05

9  specific kind you're looking at?                        10:05

10        BY MR. WARREN:  Q.  Fair enough.  Was --         10:05

11  was there any other specific software or demos that     10:05

12  existed at that time that were -- you know, built       10:05

13  for the purpose of the Apple search capability?         10:05

14        MR. BUROKER:  Same objection.  Vague.            10:06

15        THE WITNESS:  Those are the two that I           10:06

16  recall is Rosebud and Daily Planet.                     10:06

17        BY MR. WARREN:  Q.  Okay.  And -- okay, so        10:06

18  that's helpful.                                         10:06

19        What was your initial role on the Apple          10:06

20  search team?                                            10:06

21    A.  I was working on the server component of         10:06

22  the package, so it was divided into a client which      10:06

23  was the UI that the user would use and the server       10:06

24  which is where the documents live and the indexing      10:06

25  happened.  So I -- my responsibility was the server.    10:06

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

Page 33

1    Q.   Okay.  How many other people worked on the          10:06

2    server?                                                  10:06

3    A.   There would be probably three of us.                10:06

4    Q.   Okay.  Who were the other people?                   10:06

5    A.   Greg Vaughan, and David Casseres.                   10:06

6    Q.   Okay.  Can you spell their names for the            10:06

7    reporter.                                                10:06

8    A.   Greg Vaughan is V-a-u-g-h-a-n.  And David           10:06

9    Casseres is C-a-s-s-e-r-e-s.                             10:07

10   Q.   And --                                              10:07

11   A.   And -- and I would also mention                     10:07

12   Dwayne Bowman.  I had mentioned him before.  He was      10:07

13   initially involved.                                      10:07

14   Q.   Okay.  And what was the division of                 10:07

15   responsibility between the four of you regarding the     10:07

16   server for Apple search?                                 10:07

17   A.   I believe that I kind of designed the --            10:07

18   the overall architecture of it so that there would       10:07

19   be different modules for searching and for holding        10:07

20   information sources and that sort of thing.  Greg, I      10:07

21   think, specifically dealt with the interfacing for       10:08

22   the PLS library.                                         10:08

23       I should clarify that David didn't actually          10:08

24   join the project right away.  You know, if we're         10:08

25   still in the early time frame when Apple search was      10:08

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

Page 268

1      A.  Yes, you could say that.                      05:23

2      Q.  You got good feedback from your managers on   05:23

3  AppleSearch 1.5; is that correct?                     05:23

4      A.  Yes.                                          05:23

5      Q.  Okay.  You got good feedback from customers   05:23

6  on AppleSearch 1.5?                                   05:23

7      A.  That's my understanding.  As I mentioned      05:23

8  before, the feedback would be not coming directly to  05:23

9  engineers; it would be filtered through management    05:23

10  and . . .                                            05:23

11      Q.  I understand you didn't directly receive     05:23

12  it, but as far as you know, the feedback from        05:23

13  customers on AppleSearch 1.5 was good; correct?      05:23

14      A.  That's correct.                              05:23

15      Q.  We haven't talked about your career after    05:23

16  AppleSearch 1.5.                                     05:23

17          You've worked at Apple since then; correct?  05:23

18      A.  Yes.                                         05:23

19      Q.  So you've worked at Apple for essentially    05:23

20  your whole career; correct?                          05:23

21          MR. BUROKER:  Objection.  Vague.             05:23

22          THE WITNESS:  You'll have to define by what  05:23

23  you mean by my career.                               05:24

24          BY MR. WARREN:  Q.  How old were you when    05:24

25  you started working at Apple?                        05:24

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

Page 269

1      A.  '91, I would have been 26.                    05:24

2      Q.  Okay.  And what did you do before that?       05:24

3      A.  I had a career as an architect.               05:24

4      Q.  Okay.  So there we go.  There's --            05:24

5   there's -- there's the issue.                        05:24

6         So since you started work, you've worked at    05:24

7   Apple for 23 years now --                            05:24

8      A.  Yes.                                           05:24

9      Q.  -- is that right?  Okay.                       05:24

10        You like Apple?                                 05:24

11     A.  I do.                                          05:24

12     Q.  What is your current job at Apple?            05:24

13     A.  You want a job title?  I'm currently a        05:24

14  senior software engineer.                            05:24

15     Q.  On what project?                              05:24

16     A.  I work on the operating system, so the        05:24

17  group that I'm in is called Core OS, and we --       05:24

18  specifically I am working on the --                  05:24

19        MR. BUROKER:  Don't reveal any non- -- we      05:24

20  have a rule don't disclose nonreleased products, but 05:24

21  you can answer however you want without doing that.  05:24

22        THE WITNESS:  Okay.                             05:24

23        I work on functionality that provides          05:25

24  security for the system.                             05:25

25        BY MR. WARREN:  Q.  Okay.  And how long        05:25

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

Page 270

1  have you been doing that?                              05:25

2      A.  Quite a while now.  I'd say that that          05:25

3  particular aspect began in 1998.                       05:25

4      Q.  Okay.  And what did you do before that?        05:25

5      A.  So between '95 and '98?                         05:25

6      Q.  Correct.                                        05:25

7      A.  After 1.5 went out the door and shipped, we    05:25

8  were working for a time on AppleSearch continuing      05:25

9  development, whether that would be called 2.0, I       05:25

10  don't know but, you know, the next iteration of       05:25

11  that.                                                  05:25

12      Q.  Okay.                                          05:25

13      A.  And at some point in I would say near the     05:25

14  end of '95, '96, management decided that they         05:26

15  weren't going to continue developing AppleSearch.  I  05:26

16  would say at that time the Internet, you know, and    05:26

17  the worldwide web especially was becoming a thing     05:26

18  and it was kind of supplanting what, you know, the    05:26

19  intent of development on being able to talk to WAIS   05:26

20  servers was all about because now there's much more   05:26

21  information published on the Web and that was Kind    05:26

22  of the direction.  So I worked on -- I worked on a    05:26

23  product called Mac DNS which was a DNS server that    05:26

24  provided name service; so you'd look up a name, you   05:26

25  know, www.Apple.com.  It would read back the IP       05:26

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

Page 271

1    address.  It's a basic functionality there.                05:26

2        Q.  Okay.                                              05:27

3        A.  There were some -- there was some bundle           05:27

4    products.  At this time I was still in, you know,          05:27

5    the part of Apple that was kind of focused on              05:27

6    delivering solutions for enterprise.  And so we had        05:27

7    some bundles that bundled a lot of software together       05:27

8    to, you know, essentially sell our work group              05:27

9    server.                                                    05:27

10           There was a transition there, series of            05:27

11   managers that I had had essentially left the               05:27

12   company, and there was a lot of turn at Apple, and         05:27

13   the focus was changing, and at that time my manager        05:27

14   was investigating security because that was the next       05:27

15   coming thing that Apple needed to really understand        05:27

16   and kind of be involved with.                              05:28

17           The first kind of product that came out of         05:28

18   that new structure was something called the Apple          05:28

19   key chain, and the key chain was essentially a place       05:28

20   to store passwords in cryptographic keys and things        05:28

21   like that, secrets on behalf of the user.                  05:28

22           We were kind of folded into the main part          05:28

23   of the operating system development group around           05:28

24   that time, and so from that point I would say end of       05:28

25   '98, beginning of '99 it was in the OS group, and we       05:28

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

Page 272

1    delivered a whole series of Mac OS and OS X, and          05:28

2    that's what I've been working on.                         05:28

3        Q.  You mentioned that you were proud of your         05:29

4    work on AppleSearch; correct?                             05:29

5        A.  Yes.                                              05:29

6        Q.  What aspect of AppleSearch as a product are       05:29

7    you most proud of?                                        05:29

8        A.  I think I was proud of the fact that this         05:29

9    thing actually made it out the door, and it was a         05:29

10   product that you could use to find stuff because          05:29

11   there was no -- there was no real way of searching        05:29

12   large quantities of information at the time this          05:29

13   came out, and this was -- you know, it had a lot of       05:29

14   promise.                                                  05:29

15       I also was proud of -- I had designed the             05:29

16   interface for the server, the Windows and the user        05:29

17   interface for, you know, specifying the information       05:29

18   sources and the -- and how all that was displayed,        05:29

19   so . . .                                                  05:29

20       Q.  Didn't WAIS exist before AppleSearch 1.0?         05:30

21           MR. BUROKER:  Objection.  Vague.                  05:30

22           THE WITNESS:  WAIS the company?  WAIS the         05:30

23   implementation?                                           05:30

24           BY MR. WARREN:  Q.  WAIS the product.             05:30

25       A.  WAIS the product.                                 05:30

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

Page 273

1          MR. BUROKER:  Objection.  Vague.          05:30

2          THE WITNESS:  If for AppleSearch, yes.          05:30

3          BY MR. WARREN:  Q.  Because you mentioned          05:30

4    there was no way to search large bodies of          05:30

5    information, so that would be one example; right?          05:30

6       A.  As a product on the Macintosh the Macintosh          05:30

7    user could use.          05:30

8       Q.  Oh, okay.  Now I understand.  I appreciate          05:30

9    that clarification.          05:30

10          Are you familiar with the term "heuristic"?          05:30

11          MR. BUROKER:  Objection.  Calls for legal          05:30

12    conclusion.          05:30

13          THE WITNESS:  It has different meanings in          05:30

14    different contexts.  Can you --          05:30

15          BY MR. WARREN:  Q.  In your -- the context          05:30

16    of a software engineer, is that a term you use?          05:30

17       A.  Not particularly.          05:30

18       Q.  If someone -- if another software used the          05:30

19    term "heuristic," would you understand what they          05:30

20    meant, or would you have to ask them for          05:30

21    clarification?          05:30

22          MR. BUROKER:  Objection.  Incomplete          05:30

23    hypothetical.          05:31

24          THE WITNESS:  I would probably understand          05:31

25    in the context of their question.          05:31

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

Page 274

1    BY MR. WARREN:  Q.  Okay.  So what would be    05:31

2    some examples of the definitions of the word    05:31

3    "heuristic" that you might understand from the    05:31

4    context of the question?    05:31

5    MR. BUROKER:  Objection.  Calls for a legal    05:31

6    conclusion.    05:31

7    THE WITNESS:  I mean, I understand it.    05:31

8    MR. BUROKER:  Outside the scope.    05:31

9    Go ahead.    05:31

10   THE WITNESS:  In general terms it's a rule    05:31

11   you could apply to save time to get something done    05:31

12   faster.    05:31

13   BY MR. WARREN:  Q.  Can you give me an    05:31

14   example of a heuristic?    05:31

15   MR. BUROKER:  Same objections.  Outside the    05:31

16   scope.    05:31

17   THE WITNESS:  I suppose if I see text    05:31

18   that's input and I see that it's like ten digits in    05:31

19   a row, then maybe my software can assume that's a    05:31

20   phone number.    05:31

21   BY MR. WARREN:  Q.  Okay.  Any other    05:31

22   examples?    05:31

23   MR. BUROKER:  Same objection.    05:31

24   THE WITNESS:  In general it's something to    05:31

25   save time.  I talked about it needs to have context.    05:32

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

Page 275

1   If you have a heuristic for -- you know, if you're          05:32

2   writing a game, let's say like a chess engine or            05:32

3   something, you can use a heuristic to prune the             05:32

4   number of things you have to look at, so it narrows         05:32

5   things down.  Of course, you have less things to            05:32

6   look at, it's faster.                                       05:32

7           BY MR. WARREN:  Q.  Is stemming a heuristic         05:32

8   in the context of a search engine?                          05:32

9           MR. BUROKER:  Objection.  Vague.  Calls for         05:32

10  legal conclusion.  Outside the scope.                       05:32

11          THE WITNESS:  I don't think I would call it         05:32

12  that.                                                       05:32

13          BY MR. WARREN:  Q.  Okay.                           05:32

14      A.  It's not really saving time.                        05:32

15      Q.  Okay.  So when you say "saving time," maybe         05:32

16  I'm not understanding what you mean.                        05:32

17          You mean saving time in the context of              05:32

18  computer time?                                              05:32

19      A.  CPU cycles.                                         05:32

20      Q.  CPU cycles.  Okay.  So your definition of a         05:32

21  heuristic is something that makes an algorithm more         05:32

22  efficient than it might otherwise be?  Am I                 05:33

23  understanding that correctly?                               05:33

24          MR. BUROKER:  Same objections.  Outside the         05:33

25  scope.  Calls for legal conclusion.                         05:33

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

Page 276

1      THE WITNESS:  I think that's how I would          05:33
2  think of it.                                          05:33
3      BY MR. WARREN:  Q.  Okay.  How can you tell       05:33
4  whether or not an algorithm is more efficient than    05:33
5  it might otherwise be if you don't construct a whole  05:33
6  bunch of other algorithms and examine their           05:33
7  efficiency?                                            05:33
8      MR. BUROKER:  Incomplete hypothetical.            05:33
9  Same objections.                                       05:33
10      THE WITNESS:  You would have to do that and      05:33
11  see which is, you know, more efficient.              05:33
12      BY MR. WARREN:  Q.  Do you know Stanley Ng?      05:33
13    A.  I've heard that name, but I don't know in      05:33
14  what context.                                          05:33
15      MR. WARREN:  Okay.  I would like to take         05:33
16  five minutes to make sure I have no further          05:33
17  questions, and I think I'll have no further          05:33
18  questions.                                             05:33
19      MR. BUROKER:  You said that once before.         05:33
20      MR. WARREN:  I -- but I mean it this time.       05:33
21      THE VIDEOGRAPHER:  Off the record.               05:34
22  5:34 p.m.                                              05:34
23      (Recess taken from 5:34 p.m. to 5:41 p.m.)       05:34
24      THE VIDEOGRAPHER:  And we are back on the        05:41
25  record at 5:41 p.m.                                   05:41

Contains Confidential Portions Bound Separate - Highly Confidential AEO
Contains Highly Confidential Source Code

Page 277

1         MR. WARREN:  Mr. McLeod, thank you very          05:41

2    much for your time.                                    05:41

3         MR. BUROKER:  I have no follow-up, but we         05:41

4    did designate the transcript, and witness will want    05:41

5    an opportunity to read and sign the transcript.        05:41

6         MR. WARREN:  Understood.  And you may have        05:41

7    a letter-writing campaign about certain questions      05:41

8    and answers that he didn't know the answer to, but I   05:41

9    don't see the need to do that in front of him.         05:41

10        THE VIDEOGRAPHER:  This concludes the             05:41

11   deposition.  The time is 5:41, and we are now going    05:41

12   off the record.                                         05:41

13

14        (Time noted:  5:41 p.m.)

15                   --o0o--

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 297

Highly Confidential - Attorneys' Eyes Only

1           UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3             SAN JOSE DIVISION

4

5    - - - - - - - - - - - - - - - - - x

6    APPLE, INC., a California

     Corporation

7

                 Plaintiff,     Case No.

8      v.                       12-cv-00630-LHK (PSG)

9    SAMSUNG ELECTRONICS CO., LTD.,

     a Korean corporation; SAMSUNG

10   ELECTRONICS AMERICA, INC., a New

     York corporation; and SAMSUNG

11   TELECOMMUNICATIONS AMERICA, LLC, a

     Delaware limited liability company,

12                   Defendants.

     - - - - - - - - - - - - - - - - - x

13

14     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15     VIDEOTAPED DEPOSITION OF OLIVER W. STEELE

16         Thursday, June 20, 2013, 10:13 a.m.

17             Regus Business Center

18              101 Federal Street

19             Boston, Massachusetts

20

21

22

23   Reported by:

24   MICHAEL D. O'CONNOR, RPR/CSR

25   JOB NO. 62765

Highly Confidential - Attorneys' Eyes Only

Page 6

1          Q.   And do you understand that your

2     attorney will object from time to time during the

3     deposition, but you should answer any questions,

4     other than if she instructs you not to answer on

5     the grounds of attorney-client privilege.

6          A.   Hmm-hmm, I do.

7          Q.   Now, if you need a break at any time,

8     feel free to take one.  Feel free to ask for one.

9     The only thing I'd ask is if there's a question

10    pending before the break, that you answer the

11    pending question.

12         A.   Hmm-hmm.

13         Q.   And do you understand that you should

14    give verbal answers, not shrug your head or nod?

15         A.   I do.

16         Q.   Is there anything today that would

17    prevent you from giving truthful or accurate

18    testimony?

19         A.   There is not.

20         Q.   And you've never testified as a trial

21    witness, correct?

22         A.   That's correct.

23         Q.   Okay.  So let's start with your

24    background.  Let's start with your education.  So

25    where did you go to college?

Highly Confidential - Attorneys' Eyes Only

1        A.   University of North Carolina at

2   Chapel Hill.

3        Q.   When did you start college?

4        A.   1988 -- no, 1984.

5        Q.   And you obtained a degree at Chapel

6   Hill?

7        A.   That's correct.

8        Q.   And what was that?

9        A.   A Bachelor's in linguistics.

10       Q.   Could you just briefly describe what

11  linguistics is?

12       A.   It's the study of human languages,

13  their structure.

14       Q.   And when did you graduate Chapel

15  Hill?

16       A.   1989.

17       Q.   And during college, did you take any

18  course work in computer science?

19       A.   I did.

20       Q.   Did linguistics involve computer

21  science?

22       A.   It did not.

23       Q.   So you took course work that wasn't

24  part of your major?

25       A.   That's correct.

Highly Confidential - Attorneys' Eyes Only

Page 8

1        Q.  And what types of courses did you

2    take in computer science?

3        A.  Graphics, computer languages,

4    operating systems, theory and formal automata,

5    algorithms and data structures.  Probably others

6    I don't recall.

7        Q.  Did any of those courses involve

8    information retrieval?

9        A.  No.

10       Q.  What about search engines?

11       A.  No.

12       Q.  What about human computer interfaces?

13       A.  No, not really.

14       Q.  What about your graphics class?

15       A.  Right, that's why I was hesitating.

16   Those were pretty much purely how do you render

17   an object and whether the lighting models and 3D

18   geometry, and not the interactive part.

19       Q.  Understood.  You said you took course

20   work in operating systems.  Do you recall what

21   operating systems they were?

22       A.  I do not recall.  I would infer that

23   it would have been UNIX.  I don't recall that.

24       Q.  Do you recall if you used Apple

25   computers at the time?

Highly Confidential - Attorneys' Eyes Only

1        A.   I do recall that I owned a Macintosh

2   and used it in my dorm room and at home.  I do

3   not believe that Apple computers were used in the

4   computer science department.

5        Q.   After you graduated college, did you

6   go to a graduate school?

7        A.   Not immediately.

8        Q.   Okay.  So what did you do immediately

9   after you graduated college?

10        A.   I went to work for Apple Computer.

11        Q.   You said -- and that was in 1989?

12        A.   That's correct.

13        Q.   And you said eventually you obtained

14   a graduate degree -- well, you said eventually

15   you went to a graduate school?

16        A.   That's right.  The second, but not

17   the first.

18        Q.   And when was that?

19        A.   That was in the fall of -- sorry,

20   fall of 1996.

21        Q.   Were you working for Apple the entire

22   time between 1989 and 1996?

23        A.   Yes, I was.

24        Q.   And where did you go in the fall of

25   1996?

Highly Confidential - Attorneys' Eyes Only

Page 10

1          A.   To Amherst, Massachusetts, the

2     University of Massachusetts at Amherst.

3          Q.   And did you obtain a degree?

4          A.   I did not.

5          Q.   What type of degree were you seeking

6     to obtain?

7          A.   Linguistics.

8          Q.   Did any of your course work at the

9     University of Massachusetts involve computer

10    courses?

11         A.   No.

12         Q.   And when did you leave the University

13    of Massachusetts?

14         A.   1998.

15         Q.   Were you full time at the University

16    of Massachusetts?

17         A.   Yes, I was.

18         Q.   So you had left Apple?

19         A.   That's correct.

20         Q.   So you left Apple in the fall of '96?

21         A.   I left Apple in the spring of '96,

22    and then I entered university in the fall.

23         Q.   And you didn't -- did you work for

24    anyone else between the spring and fall of 1996?

25         A.   No, I did not.

Highly Confidential - Attorneys' Eyes Only

Page 11

1      Q.  So after you left the University of

2   Massachusetts in 1998, what did you do next?

3      A.  I transferred to Brandeis University.

4      Q.  And were you seeking the same degree

5   at Brandeis University?

6      A.  No.

7      Q.  So what type of degree were you

8   seeking at Brandeis University?

9      A.  Computer science.

10     Q.  Was there a specific area of computer

11  science you were seeking a degree in?

12     A.  No.

13     Q.  Did you obtain a degree at Brandeis

14  University?

15     A.  I did not.

16     Q.  What types of courses did you take at

17  -- well, scratch that.  When did your time at

18  Brandeis University end?

19     A.  When did it end?  1999 or 2000.

20     Q.  What types of course work did you

21  take in computer science while you were at

22  Brandeis University?

23     A.  Formal theory and foundations,

24  operating systems, artificial intelligence, and I

25  can't recall what else.

Highly Confidential - Attorneys' Eyes Only

Page 12

1          Q.  Did any of those courses involve

2     information retrieval?

3          A.  No.

4          Q.  Search engines?

5          A.  No.

6          Q.  What type of operating systems were

7     you studying?

8          A.  We were not studying specific --

9     well, let's see, were there any specific

10    operating systems?  We read papers about

11    properties of operating systems, but we didn't

12    study any specific ones.

13         Q.  Did your studies involve the Apple

14    operating system?

15         A.  The course work and the topics in

16    class did not.  I used an Apple computer at the

17    time.

18         Q.  And after you left Brandeis

19    University in 1999 or 2000, what did you do next?

20         A.  I worked for a company called Alpha

21    Mask.

22         Q.  What did you do for Alpha Mask?

23         A.  Software development.

24         Q.  Did that software development involve

25    information retrieval?

Highly Confidential - Attorneys' Eyes Only

Page 13

1      A.   It did not.

2      Q.   Was it in any specific area?

3      A.   Computer graphics.

4      Q.   Did it involve search engines?

5      A.   It did not.

6      Q.   And does Alpha Mask have any relation

7  to Apple?

8      A.   The other principal was a former

9  Apple employee.  The company did not have any

10 business relationship with Apple.

11     Q.   What was the name of the other

12 principal?

13     A.   Mike Reed.

14     Q.   And how long were you at Alpha Mask?

15     A.   About two years.

16     Q.   So that takes us to about 2002?

17     A.   No.  Mid to late 2001.

18     Q.   What did you do after you left Alpha

19 Mask?

20     A.   I did contract work for a company

21 called Laszlo Systems.

22     Q.   What was the general nature of the

23 contract work?

24     A.   It was compiling computer languages

25 and computer graphics.

Highly Confidential - Attorneys' Eyes Only

Page 14

1        Q.   What types of computer languages?

2        A.   JavaScript.

3        Q.   Did that work involve information

4    retrieval?

5        A.   It did not.

6        Q.   Search engines?

7        A.   No.

8        Q.   And going back to -- just going back

9    for now to your college and days when you were

10   taking some classes in computer science, what

11   programming languages did you program in?

12       A.   C, PASCAL, Scheme, LISP, Smalltalk,

13   PROLOG.  That's all I can recall.

14       Q.   What about during your time at

15   Brandeis?

16       A.   C, Python and LISP.

17       Q.   So in late 2001 you started contract

18   work for Laszlo Systems.  When did that end?

19       A.   That ended in mid-2002.

20       Q.   What did you do after mid-2002?

21       A.   I became an employee of Laszlo

22   Systems.

23       Q.   What type of work did you do once you

24   became an employee?

25       A.   I managed the team that worked on the

Highly Confidential - Attorneys' Eyes Only

Page 15

1    -- worked on a compiler.  I also directed the

2    Boston office of the company.

3            Q.  Did that work involve search engines?

4            A.  No.

5            Q.  Information retrieval?

6            A.  No.

7            Q.  When did that work end?

8            A.  That work ended in January of 2006.

9            Q.  After you left Laszlo Systems in

10   January of 2006, what did you do next?

11           A.  After a gap period of a few months, I

12   joined a company, Dotted Pair or started a

13   company Dotted Pair.

14           Q.  Just to clarify, you started the

15   company Dotted Pair?

16           A.  I and an acquaintance started it,

17   yes.

18           Q.  What was the general nature of your

19   work at Dotted Pair?

20           A.  Software engineering.

21           Q.  Could you just describe briefly what

22   software engineering is?

23           A.  Writing computer programs to execute

24   ideas.

25           Q.  Were any of those computer programs

Page 16

1    or ideas, did any of them involve information

2    retrieval?

3           A.  No.

4           Q.  Did any of them involve search

5    engines?

6           A.  What do you mean search engine?

7           Q.  An application program that searches

8    for information.

9           A.  Yes.

10          Q.  With that clarification, does that

11   change your answers to any --

12          A.  No, it doesn't change the other

13   answers.

14          Q.  And what type of search engine was

15   involved?

16          A.  The product was a browser for product

17   catalog items.  The search involved was retrieval

18   of items that whose titles or descriptions

19   contained a string that was entered by the user.

20          Q.  The search engine just searched a

21   catalog?

22          A.  That's correct.

23          Q.  Did Dotted Pair have any relationship

24   to Apple?

25          A.  No, it did not.

Highly Confidential - Attorneys' Eyes Only

Page 17

1       Q.   And how long were you at Dotted Pair?

2       A.   About a year.

3       Q.   So that takes us to about spring of

4   2007?

5       A.   (Witness nods).

6       Q.   Could you just verbalize your answer.

7   That takes us to about spring of 2007?

8       A.   Oh, yes, it does.

9       Q.   So the only search engine that you

10  worked on at Dotted Pair was the catalog, the

11  search of the catalog items?

12      A.   I wouldn't characterize that as

13  working on a search engine.  It was implementing

14  a search feature of a product using existing

15  search engines.

16      Q.   Understood.  Did you actually perform

17  coding?  Did you program it?

18      A.   I wrote code that used the search

19  features of MySQL, of MySQL database engine, and

20  of another search component, I believe it was

21  called, Ferret.

22      Q.   What language did you program in?

23      A.   Ruby and JavaScript.

24      Q.   So in the spring of 2007, what did

25  you do next?

Highly Confidential - Attorneys' Eyes Only

Page 18

1          A.   Started a company called Style &

2     Share.

3          Q.   Did you say Style & Share?

4          A.   S-t-y-l-e ampersand S-h-a-r-e.

5          Q.   What was the nature of your work at

6     that company?

7          A.   Software engineering.

8          Q.   And did any of your work in software

9     engineering involve creating or -- did any of

10    your work in software engineering, was any of it

11    related to creating a search engine or

12    information retrieval?

13         A.   It was no information retrieval.

14    Search in the same attenuated sense as browsed

15    goods in that there was a search feature of the

16    product.

17         Q.   When I say "information retrieval,"

18    what do you take that to mean?

19         A.   I take that to mean search against

20    documents or matching a set of typically

21    pre-indexed documents against a term or a

22    succession of terms or queries entered by a user.

23         Q.   Does it have to be documents or could

24    it be any type of information?

25         A.   I took it to mean documents.  If it

Highly Confidential - Attorneys' Eyes Only

Page 19

1    were any type of information, that would not

2    change any of my previous answers.

3         Q.  Okay.  Let's going forward when I say

4    "information retrieval," let's assume it's any

5    type of information.

6         A.  Hmm-hmm.

7         Q.  How long were you at Style & Share?

8         A.  About a year.

9         Q.  So that takes us to around the spring

10   of 2008?

11        A.  Yeah, the dates aren't quite coming

12   out right for me.  I think -- I was there until

13   about the fall of 2008 -- no, of 2007.

14        Q.  What was the product for Style &

15   Share; could you describe it?

16        A.  It was a visual shopping cart.  It

17   was a spatial area of the screen onto which the

18   user could drag items, typically clothes and

19   accessories, and arrange them.

20        Q.  So in the fall of 2007, what did you

21   do next?

22        A.  I began consulting work, contract

23   work.

24        Q.  Could you describe generally the

25   nature of your contract work?

Highly Confidential - Attorneys' Eyes Only

1    A.  Yes.  The first client was -- the

2  first project was a web calendar interface,

3  similar to what Google Calendar does not.

4    Q.  Was any of that contract work for

5  Apple?

6    A.  No.

7    Q.  Did any of that contract work involve

8  information retrieval?

9    A.  No.

10    Q.  What about search engines?

11    A.  No search engines.  Information

12  retrieval may be in the weak sense when you page

13  through items of a calendar, then you're

14  retrieving events that happened on those days.

15    Q.  And how long did your work on the web

16  calendar last?

17    A.  About six months, probably a little

18  less.

19    Q.  So that takes us to around 2008?

20    A.  That takes us to early 2008.

21    Q.  And what did you do in early 2008?

22    A.  I did more contract work for a

23  company that provided a visual web interface to

24  allow people to choose stadium -- to choose seats

25  at stadium events.

Highly Confidential - Attorneys' Eyes Only

Page 21

1        Q.   And how long did that work last?

2        A.   Two to four months.

3        Q.   And what did you do next?

4        A.   Then I joined a company called

5   Oblong.

6        Q.   That was around spring of 2008?

7        A.   That was spring, 2008.

8        Q.   And what did you do at Oblong?

9        A.   Software engineering.

10        Q.   Did any of your work involve search

11   engines or information retrieval?

12        A.   No to information retrieval, no --

13   no, neither one.

14        Q.   Could you just describe generally the

15   nature of your work at Oblong?

16        A.   Yes.  The company's product was a

17   system that would use cameras to recognize the

18   location and orientation and gestures of people's

19   hands and of objects in the workspace that had

20   tags applied to them, and my work there was

21   refining that system, writing demos and making it

22   easier to write applications against it.

23        Q.   And when did you leave Oblong?

24        A.   I left in early 2009.

25        Q.   And what did you do next?

Highly Confidential - Attorneys' Eyes Only

Page 22

1        A.  I did contract work for five months.

2        Q.  And did any of that contract work

3   involve information retrieval or search engines?

4        A.  Yes, it did.

5        Q.  Could you describe generally what

6   that work was?

7        A.  Yes.  That work was indexing

8   descriptions that childcare providers had posted

9   of their selves and availability, basically

10  that -- so that that could be matched against

11  descriptions posted by people who were looking

12  for childcare.

13       Q.  So what did you do next?

14       A.  After that?

15       Q.  Yes.

16       A.  Immediately after that I worked for

17  about a month, maybe a little bit more, on

18  another contract.

19       Q.  Did that contract involve information

20  retrieval or search engines?

21       A.  It arguably was related to

22  information retrieval.  It involved sort of a

23  general algorithm for making indices of

24  information so that it could be compared with

25  other pieces of information for similarity, and

Highly Confidential - Attorneys' Eyes Only

Page 23

1    it was demoed against faces.

2          Q.  And that was about mid-2009?

3          A.  Right.

4          Q.  And what did you do next?

5          A.  Then I began consulting work for a

6    company, Nest Labs.

7          Q.  And did any of your work for Nest

8    Labs involve information retrieval or search

9    engines?

10          A.  No.

11          Q.  About how long were you at Nest Labs?

12          A.  I was there as a contractor for about

13    six months, and then as an employee for about

14    another year and a half, through the summer of

15    2012.

16          Q.  Could you describe generally the

17    nature of your work for Nest Labs?

18          A.  Yes.  Sort of a director of technical

19    operations, I was responsible for moving the

20    server software -- deploying the server software

21    in the cloud and keeping it operational.

22          Q.  What was the cloud?

23          A.  Servers and data centers.

24          Q.  So in the summer of 2012, what did

25    you do next?

Highly Confidential - Attorneys' Eyes Only

Page 24

1       A.  So then I took a position at AOL.

2       Q.  Did any of your work for AOL involve

3   information retrieval or search engines?

4       A.  No.

5       Q.  Could you describe generally the

6   nature of your work for AOL?

7       A.  That one I believe is still

8   proprietary and confidential for AOL.  Should I

9   go ahead and describe it anyway?

10          MS. SLADIC:  No.

11      Q.  Not necessary.  So when did you leave

12  AOL?

13      A.  I left AOL in April of this year, of

14  2013.

15      Q.  And you've been unemployed since?

16      A.  Right.

17      Q.  Okay.  So your employment for Apple

18  was between 1989 and the spring of 1996?

19      A.  That's correct.

20      Q.  Do you consider yourself someone well

21  versed in the computer field?

22          MS. SLADIC:  Objection.  Vague.

23      A.  I do.

24      Q.  Do you remember approximately when

25  you started at Apple in 1989?

Highly Confidential - Attorneys' Eyes Only

Page 25

1        A.   Probably June.

2        Q.   So you were at Apple from June of

3   1989 until spring of 1996?

4        A.   (Witness nods).

5        Q.   What was your job title at Apple?

6        A.   I don't recall.

7        Q.   Were you part of any particular

8   division or team when you joined Apple?

9        A.   Yes.

10        Q.   What team or division was that?

11        A.   Systems software.

12        Q.   How long were you with systems

13   software?

14        A.   Two or three years.

15        Q.   So that was 1989 until approximately

16   1991 or two?

17        A.   Yes.

18        Q.   And was that a team or a division?

19        A.   That was a division -- well, I don't

20   know if it was formally a division.  It was

21   probably about 100 people, multiple projects.

22        Q.   Was systems software part of a larger

23   team?

24        A.   I don't recall.

25        Q.   And under systems software there were

Highly Confidential - Attorneys' Eyes Only

Page 26

1   several -- about how many projects were there?

2           MS. SLADIC:   Objection.   Calls for

3   speculation.   You can still answer if you know.

4        Q.   You can answer.

5        A.   Probably five to ten.

6        Q.   Did you have a supervisor when you

7   joined Apple on the systems software team?

8        A.   I did.

9        Q.   Who was that?

10       A.   I don't recall -- when I first

11  joined, my supervisor for a portion of that

12  period was Jim Bateson.

13       Q.   Could you spell Bateson?

14       A.   B-a-t-e-s-o-n, and I'm not sure about

15  the "e."

16       Q.   Was he the head of systems software?

17       A.   No.   He was the head of a project

18  within that.

19       Q.   And was there a head of systems

20  software?

21       A.   There was.

22       Q.   Do you recall who that was?

23       A.   It may have been Gifford Calenda.

24       Q.   Could you spell Calenda?

25       A.   C-a-l-e-n-d-a.

Highly Confidential - Attorneys' Eyes Only

Page 27

1        Q.   Which project were you working on

2   when you were working for systems software?

3        A.   The code name at the time was SKIA,

4   S-K-I-A.

5        Q.   What was SKIA?

6        A.   A graphics and geometry engine.

7        Q.   Could you elaborate a little bit more

8   on what type of engine that was?

9        A.   It was a library in a set of APIs

10   that application developers could use to affect

11   the screen to create drawings.

12        Q.   Did that involve information

13   retrieval?

14        A.   No.

15        Q.   Search engines?

16        A.   No.

17        Q.   About how long were you working on

18   the SKIA project?

19        A.   Two or three years.

20        Q.   So the entire time you were at

21   systems software?

22        A.   That's correct.

23        Q.   Were you working on any other

24   projects while you were at systems software?

25        A.   No, I was not.

Highly Confidential - Attorneys' Eyes Only

Page 28

1      Q.   About how many people were working on

2  the SKIA project?

3      A.   About five.

4      Q.   Could you name those five people?

5      A.   Cary Clarke, Mike Reed, Keith

6  McGregor, Michael Fairman, David van Brink, and

7  then later also were hired Chris Yerga and Dave

8  Good.

9      Q.   What was your role on the systems

10  software team?

11      A.   Software engineer, individual

12  contributor.

13      Q.   Did you supervise anyone?

14      A.   I did not.

15      Q.   Was there a particular mission of the

16  team?

17          MS. SLADIC:   Objection.   Vague.

18      Q.   Was there a purpose of the team

19  besides getting SKIA up and running?

20      A.   No.

21      Q.   After you left the systems software

22  team, did you join another team?

23      A.   I did.

24      Q.   And do you remember what that was

25  called?

Highly Confidential - Attorneys' Eyes Only

Page 29

1         A.   I don't remember what it was formally

2    called.

3         Q.   Do you remember what it was

4    informally called?

5         A.   It was the Dylan development team,

6    D-y-l-a-n.

7         Q.   Approximately how long were you on

8    that team?

9         A.   Two or three years, however long

10   brings us to whenever I left in 2006 -- 1996.

11        Q.   Were you on any other teams during

12   that time period?

13        A.   No.  Just those two.

14        Q.   Okay.  So you were just on the

15   systems software team and Dylan development team?

16        A.   Right.

17        Q.   So the Dylan development team was

18   from approximately 1992 through -- you left Apple

19   in the spring of 1996, correct?

20        A.   Right.

21        Q.   And you started at Apple in 1989?

22        A.   Right.

23        Q.   And that's a span of seven years.  So

24   you said you were with the systems software team

25   from 1989 to approximately 1992?

Highly Confidential - Attorneys' Eyes Only

Page 30

1        A.   Yeah.   I'm missing some years

2   somewhere.   I know those were the only two

3   projects I worked on.

4        Q.   So somewhere between -- so the Dylan

5   development team you worked on somewhere between

6   1992 and the spring of 1996, when you left Apple?

7        A.   That's correct.

8        Q.   And before that, the whole time you

9   were at Apple you were working on the systems

10  software team?

11       A.   That's correct.

12       Q.   Now, what was the -- what were you

13  working on when you were on the Dylan development

14  team?

15       A.   The development environment for the

16  Dylan programming language.

17       Q.   Could you describe generally what the

18  Dylan programming language was?

19       A.   It was a programming language for a

20  system and application developers to write code

21  that would be executed by computer.   It was based

22  on common LISP, Scheme and Smalltalk.

23       Q.   Did any of that work involve

24  information retrieval?

25       A.   Arguably.   It did provide an

Highly Confidential - Attorneys' Eyes Only

Page 31

1  interface to the programmer to search for

2  classes, methods and files in the source code

3  that that programmer or their team had written.

4       Q.  Was that interface a graphical

5  interface?

6       A.  It was.

7       Q.  And would it only search the classes

8  -- let me back up.  The classes, methods and

9  source code that the team had written, where

10 would those be stored?

11      A.  On the hard disk of the same

12 computer.

13      Q.  By "same computer," do you mean that

14 the team was working on?

15      A.  I mean the computer that the -- the

16 workstation that was presenting the interface.

17      Q.  Okay.  Would it search any

18 information on a remote workstation?

19      A.  It would not.

20      Q.  So it would only search local

21 information?

22      A.  Right.

23      Q.  Could you just verbalize your answer?

24      A.  That's correct.

25      Q.  Is there any reason it was called the

Highly Confidential - Attorneys' Eyes Only

Page 32

1    Dylan development team?

2         A.   The language was contracted form of

3    Dynamic language.   D-y-l-a-n.

4         Q.   What is Dynamic language?

5         A.   Dynamic was a set of features

6    including automatic memory management, and sort

7    of meant -- implicit variable type of value

8    typing.

9         Q.   This graphical interface which could

10   search classes and methods and source code that

11   the team wrote, did you write code for that

12   interface?

13        A.   I'm trying to recall.   It seems

14   likely, but I can't specifically recall.

15        Q.   Have you written code to search for

16   information?

17             MS. SLADIC:   Objection.   Vague.

18        Q.   While you were at Apple?

19             MS. SLADIC:   Same objection.

20        Q.   You can answer.

21        A.   Written code to search for

22   information?   Again, it seems likely that I did,

23   but I can't recall specifically.

24        Q.   Did you work on any other information

25   retrieval or search engine features while you

Highly Confidential - Attorneys' Eyes Only

Page 33

1    were working on the Dylan development team,

2    besides this interface that could search classes,

3    class methods, and source code?

4         A.  I don't believe so.

5         Q.  Do you know what WAIS is?

6         A.  I do.

7         Q.  What is WAIS?

8         A.  It is a protocol for retrieving

9    information over the internet.

10        Q.  I'm sorry, before I get into WAIS.

11   Going back to your work on the Dylan development

12   team, did you have a supervisor?

13        A.  I did.

14        Q.  Do you remember his name?

15        A.  Ike Nassi, N-a-s-s-i.

16        Q.  What's the first name?

17        A.  Ike.  Isaac.

18        Q.  About how many people were on that

19   team?

20        A.  About 20.

21        Q.  Do you recall if there was a team in

22   charge, a team that the Dylan development code

23   team was a part of, a larger team?

24        A.  There was.

25        Q.  Do you recall the name of that?

Highly Confidential - Attorneys' Eyes Only

Page 34

1      A.   Yes.   The advanced technology group.

2      Q.   Who else was on this Dylan

3   development team?

4      A.   What were the names of the other

5   employees?

6      Q.   Yes.

7      A.   Andrew Shalit, Gail Zacharias, John

8   Hotchkiss, Kim Barrett, David Moon, Glenn Burke.

9      Q.   Anyone else?

10      A.   Those are the names that I -- Orca

11   Starbuck.  Those are the names that I recall.

12      Q.   What was the purpose of the advanced

13   technology group?

14           MS. SLADIC:   Objection.   Vague.

15      Q.   What was the mission of the advanced

16   technology group, if there was one?

17           MS. SLADIC:   Same objection.

18      Q.   You can answer.

19      A.   I don't believe that I was ever told

20   explicitly.  I would infer that it was to work on

21   projects that were more of a research nature and

22   were not necessarily slated for inclusion in

23   products.

24      Q.   Was there a head of the advanced

25   technology group?

Highly Confidential - Attorneys' Eyes Only

Page 46

1   Brewster?

2           MS. SLADIC:   Objection.   Calls for

3   speculation.

4       A.  I don't recall -- yeah, I really

5   don't recall.

6       Q.  Could you have met him before you

7   joined Apple?

8       A.  I could have.

9       Q.  Is there a reason that you believe

10  you could have?

11      A.  He's a friend of my wife, who was my

12  girlfriend before I joined Apple.

13      Q.  Does your wife work for Apple?

14      A.  She has never worked for Apple, that

15  I know of.

16      Q.  Is it possible that you didn't meet

17  him until after you left Apple?

18      A.  I'm certain that I met him before I

19  left Apple.

20      Q.  Are you aware of whether anyone else

21  at Apple knew Brewster?

22          MS. SLADIC:   Objection.   Calls for

23  speculation.

24      A.  Whether anybody at Apple knew

25  Brewster?  I guess I couldn't swear to that.  It

Highly Confidential - Attorneys' Eyes Only

Page 47

1   seems exceedingly likely, but not based on any

2   direct evidence I have.

3          Q.  Were you involved at all in the

4   development of WAIS?

5              MS. SLADIC:  Objection.  Vague.

6          A.  Sort of.

7          Q.  Can you elaborate?

8          A.  As a -- one summer on my own time I

9   wrote some code with the intent that it might be

10  useful to WAIS and included in WAIS, but to my

11  knowledge it was never used.

12         Q.  Do you recall what summer that was?

13         A.  Summer of '89 or '90.

14         Q.  Is that while you were working for

15  Apple?

16         A.  That was while I was working for

17  Apple.

18         Q.  Is that part of your work for Apple?

19         A.  No, it was not.

20         Q.  Did anyone at Apple know you

21  performed any work?

22         A.  I don't believe anybody at Apple knew

23  about this.

24         Q.  And could you elaborate on what code

25  you wrote for WAIS?

Highly Confidential - Attorneys' Eyes Only

1          MS. SLADIC:  Objection.

2   Mischaracterizes the witness's testimony.

3          MR. JAFFE:  I'll rephrase.

4      Q.  Could you elaborate on the code that

5   you wrote related to WAIS?

6      A.  It was code that -- let's see, there

7   are -- there were at the time government

8   geographical database files publicly available in

9   various formats, and this was code to parse and

10  interpret those formats with the intent that at

11  some point someone could retrieve information

12  about geography.

13     Q.  So they would retrieve information

14  about geography using WAIS?

15         MS. SLADIC:  Objection.

16  Mischaracterizes the witness's testimony.

17     A.  The intent was that this could be

18  incorporated into a system such as WAIS.

19     Q.  Did WAIS -- so the intent was that a

20  person using WAIS could search the geographical

21  database?

22     A.  That was the intent, yes.

23     Q.  Was this a graphical interface you

24  were creating or just code?

25     A.  Just code.  It is possible that I

Highly Confidential - Attorneys' Eyes Only

Page 49

1  created a graphical interface for debugging it

2  for verifying that I had parsed the data

3  correctly, but I can't say for certain that I did

4  that.

5       Q.  Where were the government

6  geographical databases stored?

7       A.  I don't recall.  I'm guessing FTP

8  servers.

9       Q.  How did you access these FTP servers?

10       MS. SLADIC:  Objection.  Calls for

11  speculation.

12       A.  I don't recall.

13       Q.  But they were remote servers, not

14  servers that were local to the networks you were

15  working on?

16       MS. SLADIC:  Objection.  Calls for

17  speculation.

18       A.  If this is how I got the data, they

19  would have been remote servers.  I'm not certain

20  that's how I got the data.  It could have been

21  from a CD.

22       Q.  If they were remote servers, you

23  would have had to go through the internet,

24  correct?

25       A.  If they were remote FTP servers, I

Highly Confidential - Attorneys' Eyes Only

Page 66

1          MS. SLADIC:  Objection.  Calls for

2    speculation and asked and answered.

3          Q.  I will rephrase.  Do any of those

4    names refresh your recollection as to who

5    demonstrated Rosebud to you?

6          A.  None of those refreshes my

7    recollection.

8          Q.  Have you heard the name Matthew

9    Holloway?

10         A.  I don't recall it.

11         Q.  How about Ralph Sprague?

12         A.  No.

13         Q.  Do you have an understanding of what

14   a heuristic is?

15         MS. SLADIC:  Objection.  Calls for a

16   legal conclusion and vague as to context.

17         A.  I've heard the word used a lot.

18         Q.  Have you heard it used in a legal

19   sense?

20         A.  No.

21         Q.  In what sense have you heard it used?

22         A.  In computer science and software

23   engineering.

24         Q.  It's a word known in the computer

25   science and software engineering field?

Highly Confidential - Attorneys' Eyes Only

Page 67

1          MS. SLADIC:  Objection.  Vague.

2          MR. JAFFE:  Let me strike that

3    question.

4      Q.  How is heuristic used in the computer

5    science field?

6          MS. SLADIC:  Objection.  Calls for a

7    legal conclusion and expert testimony.

8      A.  How is heuristic used in computer

9    science?

10      Q.  Let me rephrase.  When did you first

11    hear the word "heuristic"?

12          MS. SLADIC:  Objection.  Calls for

13    speculation.

14      A.  I don't recall.  Possibly as an

15    undergraduate.  Possibly earlier.

16      Q.  So it wouldn't surprise you if you

17    heard the term "heuristic" before you joined

18    Apple in 1989?

19      A.  That would not surprise me.

20      Q.  What is your understanding of the

21    meaning of "heuristic"?

22          MS. SLADIC:  Objection.  Calls for

23    legal conclusion and expert testimony.

24      A.  It is, I believe it is, vaguely used

25    something around the idea of formalizing a rule

Highly Confidential - Attorneys' Eyes Only

Page 68

1  of thumb or of implementing an algorithm which

2  may sometimes give incorrect results, but is

3  useful as a first pass where you don't need to be

4  absolutely correct.

5       Q.  You mentioned it is vaguely used.

6  What did you mean by that?

7       A.  I mean that if you put two computer

8  scientists or software engineers in a room and

9  asked them whether something was -- some

10  particular thing was heuristic, I suspect a lot

11  of times they would disagree.

12       Q.  So you would get many different

13  answers?

14       MS. SLADIC:  Objection.

15  Mischaracterizes the witness's testimony.

16       Q.  Is that correct?

17       A.  Well, there's only two answers about

18  whether something is or isn't a heuristic.  Yes,

19  you would get both of those.

20       Q.  Could an algorithm to locate

21  information be a heuristic?

22       MS. SLADIC:  Objection.  Calls for a

23  legal conclusion.  Calls for expert testimony,

24  and vague as to context.

25       Q.  You can answer.

Highly Confidential - Attorneys' Eyes Only

Page 69

1          A.   Should I go ahead and try to answer?

2          Q.   Yes.

3          A.   Could an algorithm -- could you

4     repeat the question?

5          Q.   Sure.  I will rephrase.  Have you

6     ever heard of the term "heuristic" used with

7     respect to algorithms to locate information or

8     search engines?

9               MS. SLADIC:   Same objections.

10         A.   With respect to search engine

11    algorithms?

12         Q.   Yes.

13         A.   I can't specifically recall that I

14    have.  It seems likely.

15         Q.   So it wouldn't surprise you at all if

16    the term "heuristic" was used for search

17    algorithms?

18         A.   It would not surprise me.  Or for --

19    not for the class of search algorithms in

20    general, but to describe particular search

21    algorithms.

22         Q.   And based on your background in

23    computer science and what you've heard about the

24    term "heuristic," if someone were asked whether a

25    particular algorithm is heuristic, you would get

# EXHIBIT 298

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1            UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3                SAN JOSE DIVISION

4     APPLE INC., a California

      corporation,

5

            Plaintiff,

6                                    Case No.

       vs.                      12-cv-00630-LHK (PSG)

7

      SAMSUNG ELECTRONICS CO., LTD.,

8     a Korean corporation; SAMSUNG

      ELECTRONICS AMERICA, INC.,

9     a New York corporation; and

      SAMSUNG TELECOMMUNICATIONS

10    AMERICA, LLC, a Delaware

      limited liability company,

11

            Defendants.

12    -----------------------------------

13

14

15     ** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **

16

17

18          VIDEOTAPED DEPOSITION OF TIM OREN

19             Palo Alto, California

20             Thursday, June 6, 2013

21

22

23     REPORTED BY:

24    CYNTHIA MANNING, CSR No. 7645, CLR, CCRR

25    JOB NO. 61580

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   to instruct you not to answer and ask you to just

2   move on with your questioning.

3           MR. YANG:  So just that we're clear for the

4   record, are you asking him not to answer based on

5   any privilege issues?

6           MR. LU:  No.  Because he has already

7   answered this question at least four times.

8           MR. YANG:  Do you have any basis in law to

9   prevent him from answering based on your

10  understanding or your belief that he has answered

11  the question a couple of times?

12          MR. LU:  I'm just asking you to move on to

13  the next question because you've asked this four

14  times.

15          MR. YANG:  You're asking him not to respond

16  to my question, is what you're asking?

17          MR. LU:  Yes, I'm asking him not to respond

18  to that question.

19          MR. YANG:  And I'm asking for the legal

20  basis for the record that you are using to make that

21  instruction.

22          MR. LU:  You've already asked that question

23  four times.  I'm asking you to just move on to the

24  next question.

25          MR. YANG:  So are you instructing him not

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 55

1  to answer or are you instructing me not to ask?

2  Because if you're going instructing me not to ask,

3  I'm going to ask the question again and I'm going to

4  expect a response from him.

5       MR. LU:  You may go ahead and ask him.  I'm

6  objecting vigorously that you've asked this question

7  at least four or five times.

8       MR. YANG:  So you're objecting but you're

9  allowing him to answer; is that correct?

10       MR. LU:  He may answer if he wants to.

11  BY MR. YANG:

12    Q.  So, Mr. Oren, apologies for the back and

13  forth there.

14       So using your example again --

15    A.  We're back on Google cars?

16    Q.  If there is a better example, that's fine.

17    A.  I'm just trying to pick one out of the air

18  that we don't have to worry about how it reads

19  against the topic that we're apparently discussing

20  at the bottom.

21    Q.  Sure, sure.  If it's easier not to use an

22  example at all, that's fine.  But I'm just trying to

23  understand what the difference is between your

24  definition or your understanding of a heuristic in

25  the context of user interface versus the context of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 56

1   software -- or computer science?

2          MR. LU:  Objection; asked and answered,

3   calls for a legal conclusion.

4   BY MR. YANG:

5      Q.  So what is the difference between those two

6   definitions?

7          MR. LU:  Objection; asked and answered,

8   calls for a legal conclusion.

9          THE WITNESS:  It's difficult to give a

10  general answer because of the vagueness of the term.

11  What I've been trying to do is anchor it in

12  particular things.

13         In the algorithmic sense, my understanding

14  of the term is something that is not going to be --

15  that's not going to give the same answer, even when

16  asked the same way.  It implies a rule of thumb that

17  may or may not be other people's definition of the

18  term.

19         Okay.  In the user interface sense, I'm

20  using it in the sense of, here is a rule of thumb

21  that the system designers have come up with to

22  guesstimate either user intent or what we think

23  would serve the user well.

24         And that, again, may or may not be anybody

25  else's definition of the term.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 57

1    BY MR. YANG:

2        Q.  Sure.

3            MR. YANG:  So I guess we're coming up on an

4    hour now.  You requested a break.  We can take a

5    break now if you're still up for it.

6            MR. LU:  Yeah, sure.

7            THE VIDEOGRAPHER:  We'll go off the record.

8    The time is 11:00.  End of Tape 1.

9            (Recess taken)

10           THE VIDEOGRAPHER:  This marks the beginning

11   of Tape 2, Volume I in the deposition of Tim Oren.

12   We're on the record.  The time is 11:13 a.m.

13   BY MR. YANG:

14       Q.  In your example of the car on the freeway

15   with the system that would tell it to -- or the

16   collision avoidance system that we were discussing,

17   would the code that sent the GPS location of the car

18   to the back-end servers be a heuristic algorithm?

19           MR. LU:  Objection; calls for speculation,

20   calls for a legal conclusion, calls for expert

21   testimony.

22           THE WITNESS:  No.

23           THE VIDEOGRAPHER:  Don't forget your

24   microphone.

25   //

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          And I'm sure he would have said, "We did

2     that in 1966."

3          Q.  At the top of the page, page 1 of Exhibit

4     1 --

5          A.  Mm-hmm.

6          Q.  -- the second sentence states:  "As such,

7     this is targeted aficionado's collection" -- I'm

8     sorry, let me start over again.

9               "As such, this is a targeted aficionado's

10              collection, rather than a broad survey, and

11              many of the papers are deliberately chosen

12              for their heavy mathematical content."

13         A.  Mm-hmm.

14         Q.  Why were papers chosen for their heavy

15    mathematical content?

16         A.  So we already talked about that I had this

17    notion that neural nets might be a necessary, or at

18    least a -- a reasonable idea to approach some of the

19    problems we've been talking about.

20              And at the time, it wasn't completely

21    understood what the mathematical implication of

22    doing particular neural net architectures were.  So

23    I and some of these other guys who were quoted here

24    were interested in finding out when you run one of

25    these neural nets, is it really equivalent to this

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 91

1 other mathematical algorithm, in which case it gave

2 us some other options, some other bags of tricks.

3          I can get really specific if you want.  I'm

4 not sure you want it all.

5      Q.  No, I'll stop there.  Thank you.

6      A.  So this was -- like I said, this was to be

7 circulated to people in the labs that were working

8 primarily in the groups associated with myself and

9 Steve Wire, so text database and AI guys.

10     Q.  Gotcha.

11          And so it says, the next sentence:

12          "It is primarily intended for use -- for

13          the use of the IAA and IA Groups, but may

14          be of help to the Hearst and Human

15          Interface Groups, as well."

16          What is IAA?

17     A.  Let's see.  I think at the time, my group

18 was called Information Access, IA.  I -- I imagine

19 IAA refers to Steve Wire's group, but I cannot for

20 the life of me remember what the acronym means.

21     Q.  Do you know what the old -- that the group

22 was -- or what -- what was the group responsible

23 for?

24          MR. LU:  Objection; vague.

25          THE WITNESS:  Generally, investigations in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 92

1  the area of artificial intelligence and systems to

2  support that.

3  BY MR. YANG:

4      Q.  And what about the IA Group, what did that

5  stand for?

6      A.  Information Access.

7      Q.  And what was that group responsible for?

8          MR. LU:  Objection; vague.

9          THE WITNESS:  So that was the group I was

10 managing at the time, and text database, hypertext,

11 some work in areas called compound documents at the

12 time, and I'm sure I've left some things out.  It's

13 been a few years.

14 BY MR. YANG:

15     Q.  Would information retrieval also have been

16 part of the responsibilities of the IA Group?

17     A.  Definitely.  That was -- that was ground

18 zero, that and hypertext.

19     Q.  And there is also reference to "Hearst and

20 Human Interface Groups."

21          What was the Hearst Group?

22     A.  You know, I think it might have been an

23 early name for Rosebud, but I'm not sure.  I know

24 it -- it referred to some other proposal, a system

25 to be built.  I cannot remember any more of the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 93

1    taxonomy of all the various proposed systems.

2        Q.  And what about the Human Interface Group?

3        A.  That was a standing group that was

4    primarily concerned with front of screen, as it

5    says, UI, or UX these days.

6        Q.  And so why would this bibliography or the

7    articles listed in this bibliography be useful to

8    someone in the Hearst Group?

9            MR. LU:  Objection; calls for speculation.

10           THE WITNESS:  Assuming my recollection is

11   correct, that Hearst was one name for what became

12   Rosebud, that was a system that would -- would be

13   using an information retrieval engine.  So if they

14   really wanted to geek out, they could read this

15   stuff.

16   BY MR. YANG:

17       Q.  And would it have been helpful for a person

18   working on Rosebud or Hearst to know about the state

19   of the art at the time by reading these articles?

20       A.  Well, I thought so.  Some of them are very

21   deep, mathematical, and geeky.  So you can use

22   something without understanding the guts.

23       Q.  On page 3 of Exhibit 2 --

24       A.  Mm-hmm.

25       Q.  -- the page ending in -008 --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 219

1    I typed in Apple.  The weight of that term, if it

2    was used to search against a remote data source that

3    was very generic, might be reasonably high.  If I

4    was working at Apple computer, it probably would be

5    useless because two-thirds of the documents mention

6    Apple.  So that's -- that's a specific instance of

7    the kind of thing we're talking about.  It's not one

8    size fits all.  It's it fits your collection because

9    we know something about you because of what

10   documents you kept.

11       Q.   Okay.  So is this talking generally about

12   the idea of using different indexing or different

13   searching algorithms to -- based on the

14   characteristics of the particular database you're

15   searching?

16       A.   Not even necessarily different algorithms,

17   just different parameters within it.  There were

18   forms of this that were reasonably well-known.

19       Q.   The second factor or the second element in

20   the third bullet states:

21            "Inference of apparent correlations between

22            information elements as manifested in

23            user's actions over time."

24            What is that referring to?

25       A.   Let's go back to that example from before

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 220

1    we talked about.  This document, this word and, by

2    the way, I've got the e-mail up.  So if after --

3    after a period of weeks of using this system, if it

4    had noticed, hey, every time he uses this function

5    with an e-mail up, there is words being pulled out

6    of that e-mail.  Now, it's no longer a rule of

7    thumb.  It's a reasonable inference that that is the

8    common work pattern.  So you shouldn't make them

9    tell you; guess it, infer it.

10            That's just an example, but that's the

11   idea.  Is that people using a desktop system, for

12   the most part aren't commanding it in words, they

13   are commanding it in gestures, things they do over a

14   period of time.

15       Q.  So what's the difference, then, between a

16   rule of thumb and an inference?

17            MR. LU:  Objection; vague.

18            THE WITNESS:  A very blurry one.

19   BY MR. YANG:

20       Q.  Can you define it?

21       A.  No, not really.  What's that famous quote?

22   I'll know it when I see it.

23       Q.  Would that also apply to heuristics?

24            MR. LU:  Objection; calls for a legal

25   conclusion.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 221

1        THE WITNESS:  Kind of depends on the
2   domain, the sense of the word.
3   BY MR. YANG:
4        Q.  So is that a "yes," then?
5             MR. LU:  Objection; asked and answered.
6             THE WITNESS:  I think so.
7   BY MR. YANG:
8        Q.  Turning to page 2 of this document -- I'm
9   sorry.  When I say "this document," I mean Exhibit
10  6.  There is a list of current and potential
11  clients.
12       A.  Where am I looking here?
13       Q.  It's the bullet points.
14       A.  Oh, okay.  Yeah.
15       Q.  Now, is this a list of current and
16  potential clients for the information retrieval
17  technology that you were working on?
18       A.  Mostly hypothetical.
19       Q.  Right.
20       A.  People we hoped to sell it to.
21       Q.  So who was the Blue Finder team?
22       A.  We already talked about blue was the
23  current system software.  That never happened.
24       Q.  Who was the consumer product division?
25       A.  At the time, there was an attempt to do a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 222

1  consumer devices product line, mostly multimedia

2  oriented.  I don't recall all the details, but that

3  would have referred to that.

4     Q.  And it says "as a base technology for

5  retrieval from multimedia databases."

6     A.  Would have mostly been CD-ROMs at the time.

7     Q.  The next bullet says "Enterprise systems

8  servers group."

9     Who was that?

10     A.  That was the business product line.

11     Q.  And it says, "We will work on transfer and

12  partnership with the Rosebud project."

13     Do you know what that's referring to?

14     A.  Yeah.  That was the team that ultimately

15  took some of the tech transfer out of my group, less

16  the Rosebud guys.

17     Q.  So the enterprise systems and servers group

18  took some of the technology and the lessons learned

19  from the Rosebud project; is that correct?

20     A.  I'm not sure exactly how the tech transfer

21  went down because that was initiating about when I

22  left the company.  So exactly whether they took

23  pieces of code or they just took designs, don't

24  know.

25     Q.  And then the next one -- next bullet says

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 314

1    line.  I have no idea how long it went on.

2    BY MR. YANG:

3         Q.  Did WAIS predate 2000?

4              MR. LU:  Same objection.

5              THE WITNESS:  Yes.

6    BY MR. YANG:

7         Q.  And do you know if WAIS was capable of

8    searching both databases that were stored either on

9    the user's computer or in a remote server?

10             MR. LU:  Objection; lacks foundation.

11             THE WITNESS:  I don't know.  I know it was

12   capable.  It was mainly designed for remote search.

13   Whether it could do a local one, I have no

14   knowledge.

15   BY MR. YANG:

16        Q.  And just turning back to Exhibit 12, and

17   page 3 of the document, which ends in Bates stamp

18   944.

19        A.  Yes.

20        Q.  This article discloses:

21             "A WAIS server can be located anywhere that

22             one's workstation has access, on the local

23             machine, on a network, or on the other end

24             of a modem."

25             Now, to you, reading this article, does

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 315

1   that disclose that WAIS could search information

2   located both on the user's computer and remotely?

3           MR. LU:  Objection; calls for speculation,

4   lacks foundation.

5           THE WITNESS:  That is what they're claiming

6   here, yes.

7   BY MR. YANG:

8       Q.  And how long did you work in the

9   information retrieval field?

10      A.  Roughly, from 1985 -- it wasn't my sole

11  thing the whole time.  But, roughly, from 1985 to

12  when I left Apple in early 1993.

13      Q.  Did you publish any papers related to

14  information retrieval?

15      A.  I did.

16      Q.  Do you recall ballpark how many you

17  published?

18      A.  Good question.  Depends on how broadly you

19  want to draw information retrieval.  Because I was

20  also, in fact, as much working in the area of what

21  was then called hypertext.  So I probably have more

22  publications in that domain.

23          So depending on how specific you want to

24  be, the answer could be anywhere from one to maybe a

25  dozen or so.  Because we were -- we were not

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 316

1    attempting to innovate in algorithms.  So we were

2    mostly doing user interface concepts.  So I

3    contributed the papers that were published in the

4    human interface literature and other domains, and I

5    don't have the bibliography on me.

6         Q.  As you mentioned before, you had attended

7    conferences related to information retrieval?

8         A.  Yes.

9         Q.  Ballpark, do you remember how many

10   conferences you attended?

11        A.  Of those, probably two, three, four.  The

12   trouble is they're are all blurred together.  I went

13   to a number of different conferences.  I went to

14   SIGIR conferences, I went to human interface

15   conferences, hypertext conferences, and trying to at

16   this remove discern which is which, it's been 20

17   years.

18        Q.  Is the concept -- so at the time you were

19   working in the information retrieval field, so from

20   1985 to 1993, were you familiar with the concept

21   of -- or did you become aware of the concept of

22   searching files based on the name of the file?

23        A.  Yeah.  That was common knowledge.

24        Q.  Are you also aware of the term "incremental

25   search"?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 317

1     A.   I'm aware of the term, yes.

2     Q.   What does that term mean to you?

3     A.   I think most people would call it search

4  ahead or something of the sort, at least as I

5  understand the term.  In other words, you would go

6  ahead and do a search based on a partially completed

7  query.  We never implemented any such thing.

8     Q.   When did you first become aware of

9  incremental search or search ahead?

10    A.   I have no idea.

11    Q.   Would you say pre-2000?

12    A.   I have no idea.

13    Q.   Would it have been when you were working at

14 Apple?

15    A.   I have no idea.  I mean, as a practical

16 matter, the computers weren't capable of it.

17    Q.   And when you say they weren't capable of

18 it, do you mean the -- what do you mean by that?

19    A.   Simply was not the horsepower on commonly

20 available machines to do some of the stuff that, for

21 instance, Google does now that I would put under

22 that classification.

23         And remember, the Thinking Machines thing

24 was supposed to support hundreds of end users.  You

25 tried that on a TMI machine, you'd burn it down,

# EXHIBIT 299

Page 1

1          UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF CALIFORNIA
3              SAN JOSE DIVISION
4    APPLE INC., a California
     Corporation,
5                              No. 12-CV-00630-LHK
                Plaintiff,
6    vs.
7    SAMSUNG ELECTRONICS CO., LTD,
     a Korean business entity; SAMSUNG
8    ELECTRONICS AMERICA, INC., a
     New York corporation; SAMSUNG
9    TELECOMMUNICATIONS AMERICA, LLC,
     a Delaware limited liability company,

10
               Defendants.
11
     _____/
12
13
14
15          ** ATTORNEYS' EYES ONLY **
16         DEPOSITION OF STEPHEN CAPPS
17           Palo Alto, California
18          Friday, December 7, 2012
19
20
21
22
23   Reported By:
24   LINDA VACCAREZZA, RPR, CLR, CRP, CSR. NO. 10201
25   JOB NO. 55402

Attorneys' Eyes Only

Page 10

1    take a step back for a minute.  When did you

2    commence your search for materials in response to

3    the subpoena you got in this case?

4          A.    I assume shortly thereafter.

5          Q.    Do you remember when that was?

6          A.    Couple months ago.

7          Q.    And a couple months ago when you

8    looked for documents, did you find anything?

9          A.    No.

10          Q.    So you didn't locate any documents

11    in response to the subpoena that was issued to

12    you a few months ago when you looked, fair?

13          A.    No.  In the interim between the

14    last deposition and this one, I had moved my

15    office.  So I must have misplaced them.

16          Q.    And you didn't identify any

17    documents as responsive to the subpoena, or

18    things that you had found in the last few months?

19          A.    No.

20          Q.    What did you do to prepare for

21    your deposition today?

22          A.    Counsel and I met for a couple

23    hours yesterday.

24          Q.    When you say "counsel," who would

25    that be?

Page 11

1          A.     Two gentlemen to my left.

2          Q.     Anybody else other than Mr. --

3          A.     No.

4          Q.     About how long did you meet?

5          A.     Two hours.

6          Q.     And that was here at Gibson Dunn's

7     offices?

8          A.     Yes.

9          Q.     Other than that meeting yesterday,

10    did you do anything to prepare for this

11    deposition?

12         A.     Put it on my calendar.

13         Q.     Did you talk to anybody at Apple

14    to prepare for the deposition?

15         A.     No.

16         Q.     Talk to anybody that you used to

17    work with on the Newton team that's no longer at

18    Apple to prepare for the deposition?

19         A.     No.

20         Q.     I'm going through your background

21    quickly.  I know you've gone through this before,

22    so I'll try to keep it short.

23               You graduated from Rochester

24    Institute of Technology in 1979; is that correct?

25         A.     Somewhere around there, yeah.

Page 12

1      Q.    And did you get a degree in

2   computer science?

3      A.    Yes.

4      Q.    Did you take any classes on

5   interface design at RIT?

6      A.    No, I do not believe they existed

7   in 1979.

8      Q.    What was the state of user

9   interfaces in 1979?

10         MR. LO:  Objection.  Vague.

11         THE WITNESS:  Terminals with

12      mainframes.

13      Q.    And were those terminals command

14   line interfaces?

15      A.    I wouldn't -- you could say they

16   were command line.  It's -- yeah, I guess in

17   general, yes.

18      Q.    Well, how would you describe a

19   command line interface?

20         MR. LO:  Objection.

21      Q.    What does that term mean to you?

22         MR. LO:  Objection.  Vague.

23         THE WITNESS:  Command line

24      interface usually has a prompt.  The

25      world's familiar with A or C colon, or C

Attorneys' Eyes Only

1          greater than sign, whatever it is, and

2          the user enters something, and the

3          computer does what the user entered.

4          Q.    And you've used a number of

5    command line interfaces in your career; is that

6    fair?

7          A.    As few as possible.

8          Q.    What are some of the command line

9    interfaces you've used?

10          A.    Sigma 7 Xerox mainframe.  I forgot

11   the name of the OS that it was running.  DOS, of

12   course.  Couldn't exist without running DOS at

13   least once in your life.  UNIX Windows, but

14   that's really just DOS, and modern servers, you

15   know, web servers.  Your UNIX flavors are all

16   command line, just to get it going.

17          Q.    I understand you developed a

18   number of different graphical user interfaces.

19   But would you say that you're also familiar with

20   how command line interfaces work?

21          MR. LO:  Objection.  Vague.

22          THE WITNESS:  As I said, I try to

23          avoid command line interfaces.  So more

24          often than not, I get help with, say, a

25          UNIX command line, just because I don't

1      particularly care to learn them.

2          Q.    You worked at Xerox before and

3  after you graduated from RIT; is that right?

4          A.    Kind of during, but yeah.

5  Actually, once I started at Xerox, I never left

6  until I left left.

7          Q.    And what did you do at Xerox?

8          A.    Originally, I was automating the

9  library, which was the aforementioned Sigma 7,

10  was a mainframe system.  But shortly, maybe

11  within a year or two, I discovered an Alto

12  sitting in a closet, and I said, that looks like

13  fun.  So on the side, I started programming the

14  Alto.

15          And my last position was, we were

16  a research group working on graphical laser

17  printer type things.  It was mostly laser

18  printers; how to drive them, how to make them

19  create images.

20          Q.    And I think your resume says you

21  also did some user interface research at Xerox.

22  What was the user interface research that you did

23  at Xerox?

24          A.    There's a concept called -- well,

25  there's a concept in computer science called a

Page 15

1  compiler compiler, which is a compiler that lets

2  you build compilers.  And I wanted to do what was

3  called -- what I called an illustrator

4  illustrator, which would be a graphical program

5  that lets you draw.

6           Say you wanted to do a program to

7  create flow charts.  So you would go to the

8  illustrator illustrator to draw the templates,

9  essentially what a flow chart was, to create the

10  flow charting program.  And I was well over my

11  head in terms of, you know, my goals were much

12  higher than my abilities at that point.

13           Q.    Anything else you worked on at

14  Xerox before you left Xerox in 1991?

15           A.    Just a few games.  That's about

16  it.

17           Q.    And aside from the Alto and Sigma

18  7, do you recall any other computers that you

19  used when you were at Xerox?

20           A.    At Xerox?  Sigma 9.  We updated.

21  That's probably it.

22           Q.    Did you ever use the Interlisp-D

23  environment at Xerox?

24           A.    No.

25           Q.    And you started at Apple in 1981;

Attorneys' Eyes Only

Page 16

1    is that right?

2          A.    No.  1981.

3          Q.    I'm sorry.  1981.

4          A.    Yeah.

5          Q.    And what did you do at Apple when

6    you first joined?

7          A.    I worked on adapting or writing

8    the, quote, "drivers" to drive the printers for

9    the Lisa computer.

10         Q.    Did you have any other

11   responsibilities for the Lisa computer?

12         A.    Official responsibilities, no.

13   But I have a tendency to meddle, so I'm sure I

14   worked on, here and there on other things.

15         Q.    And before you left Apple for the

16   first time in 1985, 1986?

17         A.    '86, when Steve left, yeah.  We

18   all kind of dispersed.

19         Q.    So the first time you left Apple,

20   you left just after Steve Jobs?

21         A.    I hung around a lot longer than he

22   did, but yeah.

23         Q.    In that first stint at Apple, what

24   other projects did you work on?

25         A.    It's a long list.  I wrote a game

Attorneys' Eyes Only

Page 17

1   called Through the Looking Glass.  Wrote a laser

2   printer driver, which was not a product, it was

3   for internal use only.  Wrote many, many

4   utilities for the Macintosh.  Wrote the finder,

5   helped write the finder for the Macintosh.  Wrote

6   the resource editor, the debugger, the ROM text

7   editor.  Helped debug the ROM.  Helped debug the

8   system.  It was a big -- it was a great

9   cooperative effort, so I can't point to just one

10  thing.

11            The Intro to the Mac talk, the Mac

12  itself that Steve played on stage, I wrote a

13  large portion of that.  And then after that, we

14  worked on secondary Macs.  Laser printers again.

15  I would say hundreds of different projects;

16  dozens, if not hundreds.

17            Q.    You mentioned the finder.  I know

18  you helped design the finder?

19            A.    Uh-huh.

20            Q.    Are you also familiar with third-

21  party plug-ins that would extend the finder?  Did

22  you ever use any of those?

23            A.    Back in those days?  Probably not.

24            Q.    Do you recall hearing about a

25  plug-in for the finder called Boomerang?

Attorneys' Eyes Only

Page 18

1          A.    Name sounds familiar, but I

2     wouldn't be able to tell you what or when or why.

3          Q.    Let me show you a picture to see

4     if it refreshes your memory.

5               MR. CURRAN:   I'll mark as Capps 1

6     a book called the Computer User as Toolsmith by

7     Saul Greenberg.

8               (Exhibit 1 was marked for

9     identification.)

10    BY MR. CURRAN:

11         Q.    Mr. Capps, I would ask you to take

12    a look at the picture that's on Page 53 of this

13    document.

14         A.    Uh-huh.

15         Q.    Does that picture ring any bells?

16    Do you recall seeing a plug-in like this called

17    the Boomerang?

18         A.    No.

19         Q.    You can put this aside.

20         A.    Pardon me?

21         Q.    You can put that aside.

22         A.    All right.

23         Q.    Were you involved in creating the

24    user interface guidelines for Macintosh?

25         A.    Like I said, it was a cooperative

Attorneys' Eyes Only

Page 19

1  effort.  There was one person in charge of

2  writing them, and I am sure I contributed in

3  terms of making comments, making edits, making

4  suggestions.

5          Q.    You left Apple in 1986 and

6  rejoined in 1987; is that correct?

7          A.    Actually, I think I left maybe in

8  '85, or maybe early '86.  I think it was '85.

9  And then came back in late '87, but really didn't

10  start until '88.

11          Q.    And when you rejoined Apple in

12  '87, '88, you started working on the Newton

13  media; is that right?

14          A.    Yes.

15          Q.    And you worked on the Newton all

16  the way through you left again in 1996?

17          A.    Uh-huh.  That's correct.

18          Q.    And at a high level, what aspects

19  of the Newton did you work on in that stint from

20  '87, '88 to '96?

21          A.    In '87, '88, it was essentially an

22  exploratory project.  So there were so few of us,

23  we all kind of worked on everything.  My main

24  thrust was user interface.  There was just two

25  engineers at that point.  One guy was working on

Attorneys' Eyes Only

Page 20

1   handwriting, and I was working on pretty much

2   everything else.  We didn't -- it wasn't enough

3   of a product to have an operating system or

4   anything like that at that point.

5              As we developed, again, I became

6   the focal point for the user interface.  And then

7   there probably isn't a part of that system I

8   didn't touch, from -- maybe the lowest level OS,

9   I didn't do that much on, but from the -- what we

10  call applications to the user interface design, I

11  probably helped write the code and design.

12  Certainly helped design it.

13       Q.    So you had input into the design

14  of each Newton version, from the first version on

15  through to the most current release in 1996; is

16  that fair?

17       A.    Yeah, I would say all but the last

18  one or two, I had direct input on.

19       Q.    When you say "all but the last one

20  or two," you mean the last one or two releases

21  that happened after you --

22       A.    Yeah, sorry.  I wasn't clear.

23       Q.    And make sure I understand what

24  the release history was, roughly.  See if my

25  numbers --

Attorneys' Eyes Only

Page 21

1       A.     Okay.

2       Q.     -- match your memory.

3       A.     I don't have any memories of it,

4   but --

5       Q.     Okay.  So I understand that the

6   MessagePad 130 was released March 1st, 1996.

7   Does that sound about right?

8               MR. LO:  Objection.  Vague.

9               THE WITNESS:  Again, I wouldn't

10          remember it exactly, but if you've got

11          that said there, probably sounds about

12          right.

13      Q.     Okay.  Sounds about right?

14      A.     Yeah.

15      Q.     And then the MessagePad 2000, the

16  following March, March of '97.  Does that sound

17  about right?

18              MR. LO:  Objection.  Vague.

19              THE WITNESS:  That, again, that

20          one, I don't remember the dates.

21      Q.     And Newton 2.0, I believe it was

22  released -- the Newton 2.0, Version 2.0 of the

23  operating system, I believe was released March

24  14th, 1996.  Does that sound about right?

25              MR. LO:  Same objection.  Vague.

Page 26

1  grandfather, or maybe even just the father of the

2  Perforce modern day systems.  It was usual

3  thing.  Check it out, check it in.

4          Q.    And that was still in place and

5  being used when you left in June '96?

6          A.    I can't imagine it wasn't.

7          Q.    What software tools did you use to

8  write code at that time?  Was there an integrated

9  development environment or some other software

10  tool people were using?

11          A.    Yes, it was called MPW, Macintosh

12  Programming Workshop, maybe.  It was an Apple

13  product at that point.  Of course, we had our

14  other tools that were Newton specific that we

15  added, because Apple wasn't going to sell those

16  to the outside world yet.

17          Q.    And what programming languages

18  were you using when you were working on the

19  Newton?

20          A.    The low level stuff was written in

21  C++.  The high level stuff, in typical Apple

22  style, we wrote our own.  It was called

23  NewtonScript.

24          Q.    And MPW was your development

25  environment for NewtonScript as well as for C++?

Attorneys' Eyes Only

Page 27

1        A.     In the sense that the cobbler's

2    children have no shoes, we would promulgate a

3    development environment for the developers to

4    use, and we, of course, would use a different

5    one.  So we used essentially MPW to edit our

6    source and create Newton itself.

7                 But there was a programming tool,

8    I can't remember what it's called, that we

9    created for developers to create their Newton

10   applications.  But very few of us used that,

11   because since we bootstrapped with MPW, we were

12   much more used to the tools in MPW.

13       Q.     And was MPW used for the lower

14   level C++ code as well, or was there a different

15   compiler?

16       A.     Well, MPW isn't a compiler.  It

17   was a set of tools.  So there was a C++ compiler

18   as part of it, and there were tools we wrote for

19   NewtonScript as part of it.

20       Q.     So MPW was your IDA?

21       A.     Yeah.

22       Q.     For C++ development as well?

23       A.     Yes.

24       Q.     When did you start at Microsoft?

25   Shortly after June?

Attorneys' Eyes Only

Page 28

1          A.     June '96.

2          Q.     Before you joined Microsoft, had

3    you ever used any Microsoft products?

4          A.     Actually, probably not.

5          Q.     A purist?

6          A.     I must have used something, but it

7    would have been casual, in passing.  But did I

8    use -- like not the laptops existed back then.

9    But did I use a computer back then, no.

10         Q.     So what team were you working on

11   at Microsoft when you joined in 1996?

12         A.     It was kind of a team of myself

13   and Walter Smith.  We were hired to invent stuff,

14   basically.  And we worked in California.

15   Ostensibly, we were hired to do a hand-held

16   Internet device, but we never spent more than

17   probably two or three weeks talking about that

18   before we got, I say sucked into, but voluntarily

19   sucked into the browser wars.  So.

20         Q.     So you were working on Internet

21   Explorer at Microsoft?

22         A.     Yes.

23         Q.     Before you joined Microsoft, had

24   you used Internet Explorer before?

25         A.     No.  I can't imagine I did.

Attorneys' Eyes Only

Page 29

1          Q.    So while you were at Microsoft,
2   you used Microsoft products such as Internet
3   Explorer?
4          A.    Yes.
5          Q.    And you developed what features of
6   the Internet Explorer?
7          A.    The history bar.  The -- it kind
8   of was in vogue back in Internet 4, and now it's
9   come back again, but the concept of having a
10  sidebar that had your favorites or your
11  bookmarks, your history, search.
12              The trends were that screens were
13  getting wide.  People didn't know what to do with
14  it, so I came up with this idea, which is kind of
15  trivial, but it was novel at the time, of carving
16  off the left-hand side to be essentially your
17  table of contents for the Internet.
18              Walter and I built a prototype of
19  it, and that was our job was to build
20  prototypes.  And then they liked it so much, the
21  team say, "Hey, put it in."  So it became part of
22  the product.  That was for IE4.
23              In general, I would just critique,
24  and I wrote a document that I wish I still had
25  called 101 Things We Can Change in the Internet

Attorneys' Eyes Only

Page 30

1   Explorer, and I had 101, except then later on, I

2   discovered I duplicated one, so I really only had

3   100.

4           Q.    When you said the history bar in

5   the Internet Explorer, what were you referring

6   to?

7           A.    The history bar just kept track of

8   which websites you went to.  And the more

9   important thing was, it was searchable.  So if

10  you went to a page that was talking about

11  hedgehogs, and then subsequently, you went to a

12  page that was talking about kangaroos, you forget

13  about it, and you wanted -- you forgot where you

14  found this information, as often is the case with

15  the Internet.  And you say, "Oh, I remember this,

16  reading this article about hedgehogs that was

17  really interesting."

18              So you could type "hedgehogs," and

19  of course, the Alta Vistas or the -- I can't even

20  remember the old search engines of the world

21  would provide you pages, but they may not provide

22  you the page you saw.  So by searching the

23  history of -- keeping an index of pages you

24  visited, we could provide the ability to say,

25  "Oh, yeah.  That's the page I saw."

Attorneys' Eyes Only

Page 31

1       Q.    When you joined Microsoft and

2   started working on Internet Explorer, did it

3   already track the history of pages that a user

4   had visited?

5       A.    It didn't index it.  I'm sure it

6   had, by virtue of the cache that is writing

7   underneath the browsers, all browsers, yeah, that

8   is inherently keeping track.  But it's not, like

9   I said, since it was not indexed, then that was

10  essentially useless.

11      Q.    What about the history of URLs

12  that a user had visited?  Did Internet Explorer,

13  when you began to use it at Microsoft, provide a

14  list of the URLs that a user had typed into the

15  browser?

16              MR. LO:  Objection.  Vague.

17              THE WITNESS:  I can't recall when

18       that feature started showing up.

19      Q.    Are you familiar with the feature

20  I'm referring to, the pull down list of URLs in

21  the browser?

22      A.    Sure.

23      Q.    You don't recall adding that

24  feature to Internet Explorer?

25      A.    No.

Attorneys' Eyes Only

Page 100

1          foundation.  Calls for a legal

2          conclusion.

3               THE WITNESS:  I think it's saying

4          you can use different criteria in order

5          to make your best guess and, for example,

6          here are three different criteria.

7     BY MR. CURRAN:

8          Q.   And so here using a criteria like

9     the last used Isaac, I think that's shown in

10    Figure 7A, that would have been known to a

11    computer programmer at the time you filed this

12    patent?

13         A.   If you described him this idea

14    could a computer programmer implement that, yes.

15    Again, I don't know what the context is of that

16    in terms of this patent.

17         Q.   So a computer programmer would

18    have known how to implement a search for the

19    right Isaac by using the last used heuristic,

20    fair?

21               MR. LO:  Objection.  Misstates the

22          testimony.  Vague.

23               THE WITNESS:  Yeah.  If you said I

24          want you to make your best guess based on

25          when something was last used, go do it,

Attorneys' Eyes Only

1        somebody skilled in the art could

2        definitely do that.

3   BY MR. CURRAN:

4        Q.    And if you wanted somebody to

5   search for the correct Isaac among the potential

6   Isaacs using the number of times a particular

7   Isaac had been used in the system, I think that's

8   shown in Figure 7C, that would have been

9   something that somebody could have implemented

10  when you filed this patent, true?

11              MR. LO:  Objection.  Vague, lacks

12        foundation, calls for a legal conclusion.

13              THE WITNESS:  Again, given the

14        context of this, if you said make your

15        best guess based on how many times it's

16        been used, it's a pretty straightforward

17        task to implement that.

18  BY MR. CURRAN:

19        Q.    So the idea of using different

20  heuristics to decide the result of a search like

21  this, that was something somebody could have

22  implemented when you filed for this 447 patent,

23  true?

24        A.    Again, heuristic is that 50 dollar

25  word.  I've upped the ante here.  Heuristic is

1    just too vague of a term.  If you say make your

2    best guess based on the last used or times used,

3    yes, that's a relatively straightforward

4    problem.

5            Saying heuristic when I don't know

6    what heuristic even means half the time, but I

7    certainly don't -- I think it's one of those big

8    words that can mean a billion different things,

9    so I can't say yes to that about it being

10   somebody skilled using a heuristic.  It just

11   means too much.

12        Q.   So how would a computer programmer

13   know if an algorithm they were using was a

14   heuristic approach or was not a heuristic

15   approach?

16            MR. LO:  Objection.  Calls for a

17        legal conclusion to the extent you're

18        asking about how the word is used in this

19        patent.

20            THE WITNESS:  Heuristic is not a

21        word I use, so I'm not just enough of a

22        computer scientist to say what the answer

23        to that would be.

24            The only time I use that word

25        is when I want to sound like I know what

1          I'm talking about.

2     BY MR. CURRAN:

3          Q.    But somebody with your experience

4     and your education, if I just told you go use a

5     heuristic approach, that would be -- that

6     wouldn't be enough information, would it, for you

7     to know whether you were using a heuristic

8     approach or not?

9               MR. LO:  Objection.  Misstates the

10              testimony, vague.

11              THE WITNESS:  Heuristic, like I

12              said, heuristic could mean anything.

13              Heuristic could be like I like chocolate,

14              so I'm going to use chocolate.

15                   In the context of this patent

16              I'm sure it's defined, but I don't know

17              what -- I can't draw any -- I can't draw

18              any inference besides that, that that's

19              what word was used here.  I see what

20              these diagrams present.

21                   And as to what it really quote

22              means, that's not really my department.

23     BY MR. CURRAN:

24          Q.    Suppose I was just going to do a

25     straight compare and I was just going to take

Attorneys' Eyes Only

Page 104

1   database entry that says Isaac Asimov and compare

2   some string in a buffer and say is this string

3   also Isaac Asimov.  That kind of case and

4   sensitive straight compare, is that a heuristic?

5                 MR. LO:  Objection.  Calls for a

6           legal conclusion to the term applied as

7           used in the 447 patent.

8                 THE WITNESS:  Again, I'm not -- I

9           wish Isaac Asimov were answering that

10          question.  I'm not enough of a wordsmith

11          to say that -- like I said, a heuristic

12          is anything you want it to be.  If I like

13          chocolate and you asked me to make my

14          best guess of what flavor ice cream I'm

15          going to eat tomorrow, I'd say

16          chocolate.  Am I using a heuristic?  I

17          don't know.

18  BY MR. CURRAN:

19          Q.    Could you take a look at Figure 5

20  of the patent?

21          A.    (Witness complies.)

22          Q.    Looking here at Figure 5, 182A,

23  182B, 182C, what are these?

24                MR. LO:  Objection.  Lacks

25          foundation, calls for a legal conclusion.

1              THE WITNESS:  This is a schematic

2          representation of the way we stored what

3          we discussed prior to the break as

4          contacts or the names database.  So in

5          general it's the way we would store

6          names, people names.  That is actually

7          not people names.  You could have company

8          names, too, but what you would put in

9          your Rolodex, again, to violate

10          somebody's trademark.

11     BY MR. CURRAN:

12          Q.   And on the next page, Figure 6B, I

13     guess Figure 6A and 6B, what are we looking at

14     here?

15              MR. LO:  Same objection.  Lacks

16          foundation.  Calls for a legal

17          conclusion.

18              THE WITNESS:  6B I believe is a

19          list of names that is being provided to

20          the user.

21     BY MR. CURRAN:

22          Q.   That's this box 170 prime, I

23     guess?

24          A.   Yeah, 170 prime.

25          Q.   So that's a list of names that the

# EXHIBIT 29:

Highly Confidential - Attorneys' Eyes Only

Page 1

1              UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF CALIFORNIA
3                 SAN JOSE DIVISION
4      APPLE INC., a California
       corporation,
5
               Plaintiff,
6                                    Case No.
        vs.                          12-cv-00630-LHK (PSG)
7
       SAMSUNG ELECTRONICS CO., LTD.,
8      a Korean corporation; SAMSUNG
       ELECTRONICS AMERICA, INC.,
9      a New York corporation; and
       SAMSUNG TELECOMMUNICATIONS
10     AMERICA, LLC, a Delaware
        limited liability company,
11
               Defendants.
12     ------------------------------------
13
14
15      ** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **
16
17
18       VIDEOTAPED DEPOSITION OF DAVID G. CASSERES
19                 Palo Alto, California
20                Wednesday, May 29, 2013
21
22
23
24     REPORTED BY:
       CYNTHIA MANNING, CSR No. 7645, CLR, CCRR
25     JOB NO. 61611

Highly Confidential - Attorneys' Eyes Only

Page 13

1    Q.  Okay.  So, for example, these document

2  requests ask about WAIS.

3        Do you see that?

4    A.  Yes.

5    Q.  You don't have any documents related to

6  WAIS outside of your employment at Apple; is that

7  right?

8    A.  No, I don't.

9    Q.  Okay.

10       MR. JAFFE:  I'd like to now mark what's

11  going to be Exhibit Casseres 2.  It's entitled,

12  "David Casseres, LinkedIn."

13       (Deposition Exhibit 2 was marked for

14       identification)

15  BY MR. JAFFE:

16   Q.  So, Mr. Casseres, let me know when you've

17  had a chance to look at this document?

18   A.  I'm familiar with this already.

19   Q.  Do you recognize this document?

20   A.  Yes, I do.

21   Q.  What is it?

22   A.  It's my LinkedIn profile.

23   Q.  Did you author this profile?

24   A.  I did.

25   Q.  Okay.  So all the content on this page you

Highly Confidential - Attorneys' Eyes Only

Page 14

1    authored; correct?

2        A.  Yes, that's right.

3        Q.  Does this LinkedIn page accurately describe

4    your experience?

5        A.  Yes, it does.

6        Q.  I'd like to go through some of your

7    employment history and background, and I think we

8    can use this LinkedIn profile as a vehicle to do so.

9            Okay?

10       A.  Okay.

11       Q.  Are you currently employed?

12       A.  I am currently employed, yes.

13       Q.  Where are you currently employed?

14       A.  A company called Edmodo.

15       Q.  And what does Edmodo do?

16       A.  Edmodo produces educational software.

17       Q.  And what's your role at Edmodo?

18       A.  I am a mobile developer.

19       Q.  You said, "mobile developer"?

20       A.  That's correct.

21       Q.  What did you mean by that?

22       A.  I do software for the iPhone and iPad.

23       Q.  So you do iOS development?

24       A.  That's correct.

25       Q.  So Edmodo, do they develop iOS

Highly Confidential - Attorneys' Eyes Only

Page 15

1    applications?

2         A.   They do.

3         Q.   Do you do development on any other

4    platforms?

5         A.   Not currently.

6         Q.   So just iOS?

7         A.   Yes.

8         Q.   What kind of applications are you working

9    on right now, generally?

10        A.   The -- the Edmodo application is a social

11   network for learning.  So the client on the iPhone

12   and iPad is something that very vaguely resembles

13   other social networks.

14        Q.   Okay.

15             You've been at Edmodo since 2011; correct?

16        A.   That's correct.

17        Q.   During your time at Edmodo, have you done

18   anything other than iOS development?

19        A.   No.

20        Q.   Before joining Edmodo, you were a software

21   engineer at ClipLabs; is that right?

22        A.   That's correct.

23        Q.   What is ClipLabs?

24        A.   ClipLabs is a startup that was working on a

25   idea for reality augmentation.

Highly Confidential - Attorneys' Eyes Only

Page 16

1    Q.   What was your role at ClipLabs?

2    A.   I was a consultant.

3    Q.   What were you doing as a consultant?

4    A.   I developed an iPad program.

5    Q.   So, again, you were doing iOS development?

6    A.   That's correct.

7    Q.   Your resume says you were doing UI

8  consulting.

9         Do you see that?

10   A.   Yes.

11   Q.   What do you mean by UI consulting?

12   A.   User interface, which is also a part of the

13  iOS development.

14   Q.   So when you refer to UI consulting, you

15  were referring to that as part of your work doing

16  iOS development?

17   A.   Yes, that's right.

18   Q.   And before joining ClipLabs, you worked at

19  somewhere called -- I assume it's pronounced reQall?

20   A.   reQall.

21   Q.   R-E-Q-A-L-L.com?

22   A.   Right.

23   Q.   You worked as -- at reQall as a software

24  engineer; is that right?

25   A.   That's right.

Highly Confidential - Attorneys' Eyes Only

Page 17

1      Q.  And going back to ClipLabs, did you do

2  anything else other than the iOS development that we

3  talked about before?

4      A.  No.

5      Q.  Okay.

6          Returning to reQall, you were a software

7  engineer there?

8      A.  Yes, that's right.

9      Q.  What was your role at reQall?

10     A.  I was a member of a team developing an

11  iPhone application.

12     Q.  So, again, you were doing iOS development?

13     A.  That's right.

14     Q.  Did you do anything else other than iOS

15  development?

16     A.  No.

17     Q.  What kind of application were you working

18  on at reQall?

19     A.  reQall is a memory aid, provides

20  reminders.

21     Q.  I see.  Just makes me think of total

22  recall.

23          All right.  So, you were at reQall from

24  2008 to 2010; correct?

25     A.  I think so, yes.  Yes.

Highly Confidential - Attorneys' Eyes Only

Page 18

1    Q.  Before you joined reQall, you were at --

2    what were you doing?

3    A.  Before I was at reQall, I -- for some

4    part of the time I was a consulting technical writer

5    at Apple.

6    Q.  Mm-hmm.

7    A.  And some of the time I was not working.

8    Q.  This is the time between 2003 and 2008;

9    correct?

10    A.  That's right.

11    Q.  You said some of the time you were a

12    consulting technical writer for Apple; is that

13    right?

14    A.  That's right.

15    Q.  What were you doing as a consulting

16    technical Apple -- writer for Apple?

17    A.  I was doing some documentation related to

18    some of their advanced numeric libraries.

19    Q.  What were the name of those advanced

20    numeric libraries?

21    A.  I don't remember.

22    Q.  What did those advanced numeric libraries

23    do?

24        MS. SLADIC:  Objection; calls for

25    speculation.

Highly Confidential - Attorneys' Eyes Only

Page 19

1   BY MR. JAFFE:

2       Q.  You -- you may answer.

3           So, this was an example of her objecting to

4   my question, but unless she instructs you not to

5   answer, you -- you still have to answer.

6       A.  These libraries performed advanced

7   mathematical computations.

8       Q.  I see.

9           So we're talking about big Indian and

10  little Indian type of stuff?

11      A.  Yes, among other things.

12      Q.  Of course.  Okay.

13          What time period between 2003 and 2008 did

14  you work as a technical writer for Apple?

15      A.  That was from late 2003 or early 2004 until

16  about 2005.

17      Q.  So it was fairly close to after you left

18  Apple?

19      A.  Yes.

20      Q.  Were you working as a contractor?

21      A.  Yes.

22      Q.  Is that why it's not listed on your -- on

23  your resume here?

24      A.  That's right.

25      Q.  Okay.

Highly Confidential - Attorneys' Eyes Only

Page 20

1      A.   The resume is intended to get me a job in

2  engineering.

3      Q.   Understood.

4           Other than working on documentation for

5  advanced numeric libraries, did you do anything else

6  as a consultant technical writer to Apple?

7      A.   No.

8      Q.   So starting in -- in 2008 and on, you've

9  been doing iOS development; correct?

10     A.   That's correct.

11     Q.   Did you do iOS development before 2008?

12     A.   No.

13     Q.   And you left Apple as a employee in January

14 2003; correct?

15     A.   No, it was October 2003.

16     Q.   Okay.  So, looking at your LinkedIn here,

17 where it says, "January 2003," that should read

18 "October 2003"?

19     A.   Yes, that's right.

20     Q.   Okay.

21     A.   It's an error.

22     Q.   Are you aware of any other errors on your

23 LinkedIn page?

24     A.   No.

25     Q.   You left Apple in October 2003 as a

Highly Confidential - Attorneys' Eyes Only

Page 21

1    full-time employee; correct?

2         A.   Correct.

3         Q.   Why did you leave Apple?

4         A.   I was laid off.

5         Q.   You worked at Apple from 2003 stretching

6    back to 1979; is that right?

7         A.   That's right.

8         Q.   And was that continuous employment from

9    1979 to 2003?

10        A.   Yes, it was.

11        Q.   Okay.

12             How many people were at Apple in 1979?

13        A.   A few hundred.

14        Q.   Oh, a few hundred by that time?

15        A.   Yeah.

16        Q.   Okay.

17             All right.  So I'm going to skip the -- the

18   Apple portion and we'll -- we'll come back to that

19   in a minute.

20             But before you joined Apple in 1979, you

21   worked at Intel; correct?

22        A.   I did.

23        Q.   As a freelance technical writer?

24        A.   That's right.

25        Q.   What did you do as a freelance technical

Highly Confidential - Attorneys' Eyes Only

Page 22

1   writer?

2        A.  I produced a number of documents, and most

3   of the time was spent on documenting a language

4   called PLM.

5        Q.  What was PLM?

6        A.  That stood for programming language for

7   microcomputers.

8        Q.  Was this a type of assembly?

9        A.  No, it was a higher level language.

10       Q.  That Intel created?

11       A.  Yes.

12       Q.  Other than documenting PLM, did you do

13  anything else that you can recall as a technical

14  writer at Intel?

15       A.  Yes.  I created a program that took

16  markup -- marked up copy and ran a phototypesetter.

17       Q.  How did that work?

18            MS. SLADIC:  Objection; vague.

19            THE WITNESS:  Yeah, I'm not sure what you

20  mean by "how did it work?"

21  BY MR. JAFFE:

22       Q.  So what did -- what did you mean by "took a

23  marked up copy and ran a phototypesetter"?

24       A.  It took -- it took digital text with

25  formatting commands interspersed and produced a

Highly Confidential - Attorneys' Eyes Only

Page 23

1  punched paper tape that ran the Compugraphic

2  typesetter.

3      Q.  Other than the application you just

4  mentioned and interpreting the -- I'm sorry, not

5  interpreting, describing the -- the PLM language --

6      A.  Yes.

7      Q.  -- did you do anything else at Intel?

8      A.  No.

9      Q.  And before you joined Intel, you worked for

10 a gentleman named Doug Engelbart; is that correct?

11     A.  Yes.  That was not immediately before

12 Intel.

13     Q.  Okay.  What was in between working at Intel

14 and working for --

15     A.  I worked at something called the Institute

16 for Advanced Computation as a technical writer.

17     Q.  What did you work on at that institute?

18     A.  I worked on documenting the ILLIAC IV

19 supercomputer and its software.

20     Q.  And how long did you work at the Institute

21 for Advanced Computing?

22     A.  It was a couple of years.

23     Q.  And other than documenting the ILLIAC

24 supercomputer and its software, did you do anything

25 else at the Institute for Advanced Computers?

Highly Confidential - Attorneys' Eyes Only

Page 24

1     A.  No.

2     Q.  Immediately before that, is that when you

3  worked for Mr. Engelbart?

4     A.  There was a gap of a couple of years in

5  between.

6     Q.  What were you doing during in those years?

7     A.  I was living on the land in Oregon.

8     Q.  All right.  So pre -- pre the -- the Oregon

9  portion of your time, you were working with

10  Mr. Engelbart; is that right?

11     A.  Yes, I was.

12     Q.  And what did you do with Mr. Engelbart?

13     A.  I was a technical writer and I was

14  documenting his work.

15     Q.  And your LinkedIn states that the position

16  was with Doug Engelbart's Augmented Human Intellect

17  Group; is that right?

18     A.  That's correct.

19     Q.  Was that part of a company?

20     A.  No, it was a project at SRI.

21     Q.  What's SRI?

22     A.  It's now called "Stanford" -- it's now

23  called "SRI International."  At the time it was

24  "Stanford Research Institute."

25     Q.  What was Doug Engelbart's group interested

Highly Confidential - Attorneys' Eyes Only

Page 25

1    in?

2           MS. SLADIC:  Objection; vague and calls for

3    speculation.

4           THE WITNESS:  They were interested in a

5    wide range of questions.

6    BY MR. JAFFE:

7        Q.  Okay.  What did you work on there?

8        A.  I worked on a -- on documentation for a

9    program called "NLS."

10       Q.  What is NLS?

11       A.  NLS means the online system.

12       Q.  What was the online system?

13       A.  The online system was a demonstration of

14   what might be done with personal computers if they

15   existed.

16       Q.  You were working on documentation for an

17   online system that didn't exist?

18       A.  No, the system existed, but it was not on a

19   personal computer.

20       Q.  What did the system do?

21           MS. SLADIC:  Objection; vague.

22           THE WITNESS:  It did many things.

23   BY MR. JAFFE:

24       Q.  Can you name anything?

25       A.  It allowed you to input text and manipulate

Highly Confidential - Attorneys' Eyes Only

Page 26

1    it in complicated ways.

2         Q.  Word processing?

3         A.  In a fashion.  It was more -- it was more

4    freeform than what we call word processing today.

5         Q.  Anything else?

6         A.  Yes.  It could also do computing and it

7    could do some limited graphics.

8         Q.  Did it have a graphical user interface?

9         A.  Of a sort, yes, a very early one.

10        Q.  Anything else that it did?

11        A.  No.

12            Correction.  It allowed collaboration

13   between users.

14        Q.  How did it do that?

15        A.  Users could share files.

16        Q.  Anything else?

17        A.  No.

18        Q.  Okay.  Was working with Mr. Engelbart, was

19   that your first job out of college?

20        A.  It was my first job in computing.

21        Q.  Got it.

22            So you had other jobs, but they weren't

23   related to computers, software?

24        A.  Right.

25        Q.  You graduated from Reed College in 1965;

Highly Confidential - Attorneys' Eyes Only

Page 27

1   correct?

2        A.   That's right.

3        Q.   With a degree in literature?

4        A.   That's right.

5        Q.   And you went to Cal Tech for two years?

6        A.   That's right.

7        Q.   So you went to Cal Tech for two years and

8   then Reed after?

9        A.   That's -- yeah.

10       Q.   So the work at Cal Tech didn't result in a

11  degree?

12       A.   No.

13       Q.   Okay.  Did you learn anything about

14  computers when you were in -- in college?

15            MS. SLADIC:  Objection; vague.

16            THE WITNESS:  I had an opportunity to see a

17  computer in action.

18  BY MR. JAFFE:

19       Q.   Did you learn how to do computer

20  programming at that time?

21       A.   I got a very small idea of it.

22       Q.   What do you mean by "a small idea of it"?

23       A.   I had friends who were doing it.  I watched

24  what they did, asked them questions.

25       Q.   Did you do any computer programming

Highly Confidential - Attorneys' Eyes Only

Page 28

1    yourself?

2         A.   No.

3         Q.   When did you first start learning about

4    computer programming?

5         A.   While I was working for Doug Engelbart.

6         Q.   As a technical writer?

7         A.   Yes.

8         Q.   What programming languages are you able to

9    program in today?

10        A.   C, Objective-C.  Those are the only ones

11   where I'm really proficient.

12        Q.   And over time, have you programmed

13   applications in other programming languages?

14        A.   Yes.

15        Q.   Do you remember what any of those are?

16        A.   C++, Pascal.

17        Q.   Any others?

18        A.   Basic.

19        Q.   Any others that you can recall?

20        A.   PLM.

21        Q.   Any others?

22        A.   No.

23        Q.   Have you ever programmed in Java?

24        A.   I took a course once.

25        Q.   What about Smalltalk?

Highly Confidential - Attorneys' Eyes Only

1      A.   Yes.

2      Q.   Are you familiar with HTML?

3      A.   Yes.

4      Q.   Can you program Web pages?

5      A.   No.

6      Q.   What about SQL, S-Q-L?

7      A.   I know what it is.

8      Q.   Do you know -- can you interpret SQL

9  statements?

10      A.   No.

11      Q.   Have you ever done any other work with

12  databases?

13      A.   No.

14      Q.   In developing your IOS apps in 2008, you

15  haven't done any work with SQL light databases?

16      A.   No.

17      Q.   All right.  I'd like to go back to your

18  time at Intel.  You mentioned that you left there in

19  June 1978; correct?

20      A.   That sounds right.

21      Q.   Okay.  And then you joined Apple in January

22  of 1982?

23      A.   '79 -- September of '79.

24      Q.   Oh, I'm sorry.  I was reading the wrong

25  line.

Highly Confidential - Attorneys' Eyes Only

1     A.   Yeah.

2     Q.   So you joined Apple in September of 1979;

3 correct?

4     A.   Right.

5     Q.   How did you come to join Apple?

6     A.   They were looking for a technical writer

7 and somebody who was working there recommended me.

8     Q.   And during your time working as a technical

9 writer, what did you work on?

10    A.   At Apple?

11    Q.   That's right.

12    A.   I worked first on some documentation for

13 the basic interpreter that they had.  I worked on

14 documentation for the Pascal -- UCSD Pascal

15 language.  I worked on documentation for Smalltalk.

16    Q.   During this time, you were writing

17 documentation; is that right?

18    A.   Yes.

19    Q.   Who was the documentation intended to be

20 read by?

21    A.   Mostly by programmers.

22    Q.   Programmers outside of Apple?

23    A.   Yes.

24    Q.   So this was documentation that Apple was

25 creating to release to the developer community?

Highly Confidential - Attorneys' Eyes Only

Page 31

1        A.   Yes.

2        Q.   Is that a fairly common practice?

3        A.   Yes.

4             MS. SLADIC:   Objection; vague.

5    BY MR. JAFFE:

6        Q.   So other than the projects that you

7    mentioned that you worked on as a technical writer,

8    did you work on anything else that you can recall

9    during that time?

10       A.   Nothing else that I recall.

11       Q.   At some point you transitioned to being a

12   software engineer at Apple; correct?

13       A.   Yes, I did.

14       Q.   How did that come about?

15       A.   One of the engineers saw me writing some

16   Smalltalk programs and asked if I would like to work

17   for him as an engineer.

18       Q.   What Smalltalk programs were you writing?

19       A.   I was writing a simulation of orbital

20   mechanics as an illustration.

21       Q.   Who -- who asked you to work as a software

22   engineer?

23       A.   An engineer named Owen Densmore.

24       Q.   And so you started as an engineer in

25   January of 1982?

Highly Confidential - Attorneys' Eyes Only

Page 32

1      A.   That sounds right.

2      Q.   What was your title upon becoming an

3  engineer?

4      A.   Senior software engineer.

5      Q.   What did you work on when you became an

6  engineer first at Apple?

7      A.   Printer drivers.

8      Q.   How long did you work on printer drivers?

9      A.   It was several years.

10     Q.   What did you do after that?

11     A.   After that, I transitioned to a research

12  group.

13     Q.   Did that research group have a name?

14     A.   I believe that it was called Advanced

15  Technology Group, ATG.

16     Q.   If I refer to it as ATG, will you

17  understand what I'm referring to?

18     A.   Yes.

19     Q.   When did you join ATG?

20     A.   I'm not sure what year it was.

21     Q.   Do you have an approximate date?

22          MS. SLADIC:   Objection; asked and answered.

23          THE WITNESS:   I don't really know.

24  BY MR. JAFFE:

25     Q.   Was it before 1990?

Highly Confidential - Attorneys' Eyes Only

1          MS. SLADIC:  Objection; asked and answered.

2          THE WITNESS:  I'm not sure I remember.

3    BY MR. JAFFE:

4       Q.  Okay.  How did you come to join ATG?

5       A.  I was not satisfied with my work in the

6    printing group and looked for something else and

7    found it.

8       Q.  Did you ask to join ATG?

9       A.  Yes.

10      Q.  What did you understand ATG was doing at

11   that time?

12         MS. SLADIC:  Objection; vague.

13         THE WITNESS:  Research.

14   BY MR. JAFFE:

15      Q.  And you wanted to do research?

16      A.  Yes.

17      Q.  Okay.  Did you join a particular division

18   or team within ATG?

19      A.  Yes, I did initially.

20      Q.  What division or team was that?

21      A.  That was a team consisting of my manager

22   and me and we were trying to develop an application

23   for artificial intelligence.

24      Q.  You said the team consisted of your manager

25   and you.  Who was your manager?

Highly Confidential - Attorneys' Eyes Only

Page 294

1   the range of features that we had.

2   BY MR. JAFFE:

3       Q.   So putting aside the range of features that

4   -- that the Macintosh OS may have had in the '90s,

5   what other search products were you aware of that

6   could search for files locally?

7       A.   There's a German one, whose name I can't

8   remember.  Beyond that, I don't remember any

9   specifics.

10      Q.   Have you ever heard of something called "On

11  Location"?

12      A.   No.

13      Q.   Have you ever heard of something called

14  "Meta Crawler"?

15      A.   No.

16      Q.   Have you ever used the Newton?

17      A.   I played with it a little bit.

18      Q.   Did you ever use the search feature on the

19  Newton?

20      A.   No.

21      Q.   Now, we discussed WAIS earlier.

22           Do you recall that?

23      A.   Yes.

24      Q.   And you testified that the only time you

25  used WAIS was in the Apple Search products; is that

Highly Confidential - Attorneys' Eyes Only

Page 295

1  correct?

2      A.  That's right.

3      Q.  So you never used WAIS outside of Apple

4  Search product?

5          MS. SLADIC:  Objection; asked and answered

6  repeatedly now.

7          THE WITNESS:  Yeah.

8  BY MR. JAFFE:

9      Q.  Now, in the context of information

10 retrieval, do you have an understanding of what the

11 term "heuristic" means?

12         MS. SLADIC:  Objection; calls for a legal

13 conclusion, vague.

14         THE WITNESS:  I have no notion of heuristic

15 as something that has a special meaning in that

16 context.

17 BY MR. JAFFE:

18     Q.  Do you have an understanding what the word

19 means?

20     A.  In a very general --

21         MS. SLADIC:  Same objections.

22         THE WITNESS:  In a very general way.

23 BY MR. JAFFE:

24     Q.  And what is your -- your understanding of

25 the word "heuristic"?

Highly Confidential - Attorneys' Eyes Only

Page 296

1    A.   A heuristic to me is a method of doing

2  something that doesn't depend on analysis of the

3  problem but has simply been found to work.

4    Q.   And you testified earlier that you didn't

5  think that heuristic had a special meaning in the

6  context of information retrieval; is that right?

7    A.   None that I'm aware of.

8    Q.   So then your -- your understanding of

9  heuristic that you just mentioned would, in your

10  understanding, apply in the information-retrieval

11  context.

12         Is that fair?

13         MS. SLADIC:   Objection; mischaracterizes

14  the witness' testimony completely.

15         THE WITNESS:   I understand that as a

16  general meaning of the word "heuristic."

17  BY MR. JAFFE:

18    Q.   Which would apply including in the context

19  of information retrieval; is that correct?

20    A.   I guess so.

21         MS. SLADIC:   Same objections.

22  BY MR. JAFFE:

23    Q.   So you mentioned that a heuristic is a

24  method of doing something that doesn't depend on

25  analysis of the problem.

Page 297

1          What do you mean by "analysis of the

2     problem"?

3          A.  Well, it means analyzing the problem in

4     order to find a solution.

5          Q.  So can you give me an example of a

6     heuristic?

7               MS. SLADIC:  Objection; calls for

8     speculation, legal conclusion, and expert testimony.

9               THE WITNESS:  I can't think of an example

10     right now.

11     BY MR. JAFFE:

12          Q.  So you've been programming search products

13     at Apple for over 10 years.  If I gave you a piece

14     of software, do you think you'd be able to tell me

15     whether it used heuristics or not?

16               MS. SLADIC:  Objection; calls for expert

17     testimony, calls for a legal conclusion, vague as to

18     what you mean, calls for speculation, incomplete

19     hypothetical, several objections to this question.

20               THE WITNESS:  Am I running this piece of

21     software or reading the code or what?

22     BY MR. JAFFE:

23          Q.  Reading the source code.

24               MS. SLADIC:  Same objections.

25               THE WITNESS:  Yeah, I -- it's not an

Highly Confidential - Attorneys' Eyes Only

Page 298

1    answerable question.

2    BY MR. JAFFE:

3        Q.  And why isn't it an answerable question?

4        A.  Because I don't -- looking at the code,

5    supposing that I understand the code completely, I

6    don't really know whether a particular method was

7    arrived at by analyzing a problem or not.

8        Q.  I see.

9            So even with the source code, supposing

10   that you understood it completely, you wouldn't be

11   able to know whether it uses a heuristic or not.

12           Is that fair?

13           MS. SLADIC:  Objection; mischaracterizes

14   the witness' testimony, calls for expert testimony,

15   calls for speculation, incomplete hypothetical.

16           THE WITNESS:  All that.

17   BY MR. JAFFE:

18       Q.  I'm sorry?

19       A.  All of that.  I can't answer the question.

20       Q.  So what is it about the word "heuristic"

21   that makes it that you can't determine whether

22   source code includes it or not?

23           MS. SLADIC:  Objection; mischaracterizes

24   the witness' testimony.

25           THE WITNESS:  I can't tell a heuristic from

Highly Confidential - Attorneys' Eyes Only

Page 299

1    reading the source code because I don't know what --

2    how it was reached.  I don't know how that solution

3    was arrived at.

4    BY MR. JAFFE:

5        Q.  And that's something that was arrived at in

6    the head of the programmer.

7            Is that fair?

8        A.  Perhaps.

9        Q.  So whether a heuristic is used would depend

10   on how the programmer in their mind arrived at the

11   solution to the problem.

12           Is that fair?

13           MS. SLADIC:  Objection; mischaracterizes

14   the witness' testimony.

15           THE WITNESS:  It isn't a detailed analysis,

16   whether -- whether something is a heuristic or not.

17   It's -- you know, it's a heuristic if it was --

18   in -- in my definition of heuristic, it is a

19   heuristic if it was arrived at in a certain way or

20   not arrived at in a certain way.

21   BY MR. JAFFE:

22       Q.  So it's -- it could be, actually, two

23   pieces of source code could be one -- actually, let

24   me start over.

25           Okay?

Highly Confidential - Attorneys' Eyes Only

1          If a -- a method could be heuristic in one

2     sense and heuristic in another case even though it's

3     the same source code depending on how the programmer

4     arrived at that solution; is that correct?

5          MS. SLADIC:  Objection; mischaracterizes

6     the witness' testimony.

7          THE WITNESS:  I don't understand the

8     question.

9     BY MR. JAFFE:

10       Q.  Sorry.  Let me -- let me start over.

11         MS. SLADIC:  Are you going to continue to

12    ask for expert opinion testimony --

13         MR. JAFFE:  I'm sorry, this --

14         MS. SLADIC:  -- from this lay witness?

15         MR. JAFFE:  Is that an objection?

16         MS. SLADIC:  Yes.  I am objecting to this

17    line of questioning because he's asking a bunch of

18    expert testimony questions after we've been going

19    over --

20         MR. JAFFE:  Counsel, your speaking

21    objections are improper.  Please make your objection

22    and cease speaking objections.

23         MS. SLADIC:  I am objecting to the entire

24    line of questioning and I'm entitled to provide the

25    basis --

# EXHIBIT 29G

Page 1

1                 UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                     SAN JOSE DIVISION

4

5    APPLE, INC., a           )
     California corporation,)
6                             )
             Plaintiff,       )
7                             )
        vs.                   ) No. 12-cv-00630-LHK (PSG)
8                             )
     SAMSUNG ELECTRONICS      )
9    CO., LTD., a Korean      )
     corporation; SAMSUNG     )
10   ELECTRONICS AMERICA,     )
     INC., a New York         )
11   corporation; and         )
     SAMSUNG                  )
12   TELECOMMUNICATIONS       )
     AMERICA, LLC, a          )
13   Delaware limited         )
     liability company,       )
14                            )
             Defendants.      )
15                            )

16

17       HIGHLY CONFIDENTIAL VIDEO DEPOSITION OF

18                    TIM HARRINGTON

19                  San Francisco, CA

20                 Friday, June 21, 2013

21   REPORTED BY:

22   SUSAN F. MAGEE, RPR, CCRR, CLR, CSR No. 11661

23

24   Job No. 62679

25

Highly Confidential

Page 9

1    interrupt you.

2          But did you take any computer science courses

3    while you were at Cal Poly?

4    A.  I just can't recall whether I even took a class

5    there in computer science.  It was only a few quarters,

6    so . . .

7    Q.  Have you ever taken any computer science

8    classes?

9    A.  Post high school there was, yes.

10   Q.  Where did you take these classes?

11   A.  De Anza.

12   Q.  How many computer science classes did you take?

13   A.  I think only one.

14   Q.  Do you recall what the subject matter of the --

15   A.  FORTRAN.  No.  Yeah.  I believe it was FORTRAN.

16   Sorry.  I don't recall exactly, but I believe it was

17   FORTRAN.

18   Q.  What is FORTRAN?

19   A.  It's a computer language.

20   Q.  A computer programming language then?

21   A.  Computer programming language, yes.

22   Q.  Did you take any computer science classes in

23   high school?

24   A.  An introduction to computers in my senior year.

25   Q.  And did that involve any computer programming

Highly Confidential

Page 10

1  languages?

2       A.  Yes.

3       Q.  What languages did you -- what languages did

4  you learn at that time?

5       A.  This is going back even further.  You know,

6  I -- I can't honestly say.  I don't know.  Yeah.  I

7  just -- it was a long time ago.  Sorry.

8       Q.  And where did you first work after you left Cal

9  Poly?

10       A.  I got a job at a company called On3.

11       Q.  Could you spell that for the record.

12       A.  O-n-T-h-r-e-e.

13       Q.  Is that one word?  Just --

14       A.  I think it was one word.

15       Q.  How long did you work at On3?

16       A.  You know, I -- I can't remember.  It was

17  approximately a year.  Maybe two.

18       Q.  What kind of company was On3?

19       A.  We -- we were a developer, a software developer

20  and a magazine.  We published a magazine.

21       Q.  What were your responsibilities at On3?

22       A.  Programmer.  Computer programmer.

23       Q.  What type of software did you write?

24       A.  It was utility software.

25       Q.  What is utility software?

Highly Confidential

1      A.  It was just, you know, calculators and just

2  general utilities.  I don't know.  They weren't specific

3  in any way.  It wasn't like a word processor.

4      Q.  And when would you say you worked at On3?

5      A.  Like, the specific dates?

6      Q.  Years.

7      A.  Years?  Again, this is basing it off of what I

8  said earlier.  It was somewhere in the mid-'80s.

9  That's -- don't know exactly when.  The -- it would have

10  been '86.  '85, '86, '87.  In that area.  In that area.

11      Q.  Where did you work after you left On3?

12      A.  I took a job at Apple Computer.

13      Q.  When did you start at Apple Computer?

14      A.  I believe 1989.

15      Q.  How long did you work at Apple Computer?

16      A.  Approximately six years.

17      Q.  So until 1995?

18      A.  '95, '96 because it was late '89, 1989 when I

19  joined.

20      Q.  What was your title when you first joined

21  Apple?

22      A.  Software engineer.

23      Q.  What group did you join when you first joined

24  Apple?

25      A.  Networking and communications.

Highly Confidential

Page 12

1      Q.  How long were you in the networking

2  communications group?

3      A.  I would estimate two years.

4      Q.  What was the next group you were a part of

5  after you left the networking communications group?

6      A.  I can't recall the exact name, but it -- yeah.

7  I don't know if we had a name, quite frankly.  It was a

8  research group.

9      Q.  How long were you in that research group?

10      A.  Until I left, which was approximately four

11  years.

12      Q.  What were your responsibilities in the

13  networking and communications group?

14      A.  It would vary widely.  I had several roles.

15      Q.  Can you name them.

16      A.  They were all -- I was always a programmer.

17  Software engineer.

18      Q.  Did you work on different projects while you

19  were in the networking communications group?

20      A.  Yes.

21      Q.  Do you recall which projects you worked on

22  while you were in the networking and communications

23  group?

24      A.  Yes.

25      Q.  Which projects were those?

Highly Confidential

1   the networking communications group, do you recall which

2   projects you worked on?

3        A.   Yes.

4        Q.   And what were those projects?

5        A.   One in particular, it was in the operating

6   system, embedded operating system.

7        Q.   Which device was this operating system designed

8   for?

9        A.   For a yet to be -- it was yet to be determined.

10  The target was the operating system.

11       Q.   Did this operating system ultimately make its

12  way into a device?

13       A.   I'm not sure when that happened.

14       Q.   Did it happen?

15       A.   Not -- not directly.  The work when I joined

16  may or may not have found its way into a product.  I

17  can't recall the exact sequence of -- from

18  development -- developing the original operating

19  system --

20       Q.   Mm-hmm.

21       A.   -- to any release of a product.

22       Q.   What was the name of -- was there a name for

23  this operating system?

24       A.   I can't recall.  There might have been a code

25  name, but I don't recall it.

1       Q.  Other than this operating system for which you

2  don't recall the name for, did you work on any other

3  projects while you were in the research group?

4       A.  When I first -- time -- do you have a time

5  frame?

6       Q.  Any time that you were in the research group.

7  I'm just looking for a list of projects that you were in

8  while you were in the research group.

9       A.  So the group I joined eventually became the

10  Newton group, and during that time I had several roles.

11      Q.  What were your roles in the Newton group?

12      A.  Software developer initially.  I became a

13  manager.  And those were -- those -- those are the two

14  titles I had.

15      Q.  What projects did the Newton group work on?

16      A.  I'm not -- I don't -- there are many.  I

17  don't -- I wasn't -- didn't develop -- I wasn't involved

18  in all of them.

19      Q.  What projects were you involved in?

20      A.  There -- the -- what became the Newton

21  operating system.  And then I worked on the 2.0 version,

22  what was referred to as the 2.0 version of that

23  operating system.  Those are the projects I worked on,

24  software projects.

25      Q.  You said projects?  Other than the Newton

Highly Confidential

Page 33

1   operating system 2.0 project, was there another project

2   you worked on?

3       A.  There were many hardware projects that we

4   interfaced with, but we -- my specific project was the

5   software.

6       Q.  Which hardware project were these?

7       A.  There were many, and I -- yeah.  There were

8   many.  I don't -- can't remember all of them.

9       Q.  Can you remember any of them?

10      A.  The original Newton.  There was the -- there

11  were a couple of versions of the Newton.  There was --

12  there were several versions of the Newton.  And yeah,

13  that's it.  It was all different versions of the Newton.

14      Q.  What was the Newton?

15      A.  Pretty -- you know, I don't -- it did a lot

16  of -- it was a device, and that -- I don't know how to

17  describe it.

18      Q.  Was it a computer?

19      A.  I don't know if you'd call it a computer.  It

20  was -- it was a -- what was to become eventually

21  referred to as a handheld computer.

22      Q.  Was the Newton operating system 2.0 released

23  while you were still in the research group?  Sorry.

24  While you were still in the Newton group.

25      A.  Newton group.  I don't know exactly when it

Highly Confidential

Page 36

1    here.

2         Q.  While you were in the Newton group.

3         A.  While I was in the Newton group?

4         Q.  Yes.  While you were -- let's take a step back.

5         A.  It's -- yeah.

6         Q.  So while you were -- while you were in the

7    Newton group working as a developer --

8         A.  Yes.

9         Q.  -- or as a manager, what portions of the Newton

10   operating system 2.0 did you work on?

11        A.  As a developer, I worked on the operating

12   system.

13        Q.  And what portions of the operating system did

14   you work on?

15        A.  Just various versions.  I was primarily on the

16   lowest level of the operating system.

17        Q.  What do you mean by "lowest level"?

18        A.  Where the operating system interfaces or how it

19   interfaces with the hardware.

20        Q.  While you were a developer in the Newton group,

21   did you work on any applications for the Newton

22   operating system 2.0?

23        A.  You had a time frame in there.  What was the

24   question?

25        Q.  While you were a developer in the Newton group,

Highly Confidential

1  did you work on any applications for the Newton

2  operating system 2.0?

3       A.  As a developer, no.

4       Q.  While you were in the Newton group -- sorry.

5       A.  I don't believe I was involved.  Certainly

6  wasn't my direct responsibility.

7       Q.  And when you say "as a developer, no," was

8  there -- were there some other capacity in which you

9  worked on applications for the Newton operating system

10 2.0?

11      A.  No, I don't believe so.

12      Q.  So just to clear it up here, while you were in

13 the Newton group, did you ever work on any applications

14 for the Newton operating system 2.0?

15      A.  I don't think so.  It was a long time ago, but

16 not in any significant way.

17      Q.  After you left Apple, where did you work?

18      A.  I believe I worked at a company called AllPen.

19      Q.  How do you spell that?

20      A.  A-l-l-P-e-n.

21      Q.  All one word?

22      A.  I believe so, although I don't remember.

23      Q.  And when did you work at AllPen?

24      A.  The time, it was about '96 when I left Apple,

25 and I would estimate my time at AllPen was two or three

Highly Confidential

Page 38

1   years.  Two.  Two or three years, in that time frame.

2        Q.  So until about '98, '99?

3        A.  Yeah, I think so.

4        Q.  What kind of company was AllPen?

5        A.  We were a -- we developed custom software

6   primarily for customers.

7        Q.  What type of software was this?

8        A.  We specialized in handheld devices.

9        Q.  Did AllPen develop software for the Newton?

10       A.  Yes.

11       Q.  Did AllPen develop software for other handheld

12  devices?

13       A.  Yes.

14       Q.  What were those other handheld devices?

15       A.  I need a time frame because I was not there for

16  all of AllPen's existence.

17       Q.  While you were at AllPen.

18       A.  The Palm device, and I believe that's it.

19       Q.  So while you were at AllPen, AllPen developed

20  software for the Newton and for the Palm; is that

21  correct?

22       A.  That is correct.

23       Q.  What was your title at AllPen?

24       A.  Director of software engineering.

25       Q.  And what were your responsibilities as director

Highly Confidential

Page 39

1   of software engineering?

2        A.  To manage the engineering team and to ensure we

3   delivered projects on time.

4        Q.  What projects were you involved in while you

5   were at AllPen?

6        A.  I can't remember all of them, and -- I can't --

7   I can't remember all of them.

8        Q.  Can you remember some of them?

9        A.  Certainly, yes.

10       Q.  Can you tell me the name of the projects you

11  were involved with at AllPen that you can remember.

12       A.  NetHopper.  There was an application for a

13  museum.  There was an application for Ford Motor

14  Company.  I believe it was Ford.  There may have been

15  others, but I -- that's -- those -- that's all -- any --

16  that's the only thing I can remember at this point.

17       Q.  How do you spell NetHopper for the record?

18       A.  N-e-t-H-o-p-p-e-r.

19       Q.  Is that one word?

20       A.  Again, I don't know.  I can't remember how it

21  was, you know, written.

22       Q.  What was NetHopper?

23       A.  NetHopper was a browser for the Internet, a Web

24  browser.

25       Q.  Did NetHopper work with the Newton?

Highly Confidential

Page 45

1      A.  Yes.

2      Q.  This was a Newton operating system 2.0; is that

3  correct?

4      A.  I can't recall which version it was for.

5      Q.  But a version of the Newton operating system?

6      A.  Yes.

7      Q.  After you left AllPen, where did you work?

8      A.  AllPen -- AllPen at one point was acquired, so

9  I worked for that company, the acquiring company.

10     Q.  What -- sorry?

11     A.  Spyglass.

12     Q.  Is that one word?

13     A.  I believe it is one word.

14     Q.  How long did you work at Spyglass?

15     A.  Again, it was probably for about a year.

16     Q.  What kind of company was Spyglass?

17     A.  Oh, they did many things.  I -- I don't know

18  everything they worked on, but . . .

19     Q.  Was it a software company?

20     A.  I -- yes.  It's primarily -- it was a software

21  company, yes.

22     Q.  Did spyware develop applications for designs to

23  run on the Newton operating system?

24     A.  You said "spyware" but --

25     Q.  I'm sorry.  I'll start over again.

Highly Confidential

Page 46

1          Did Spyglass design software or applications

2     designed to run on the Newton operating system?

3          A.  At a time Spyglass acquired AllPen.  I'm not

4     sure whether we were continuing work on the Newton

5     operating system.

6          Q.  What kind of software did you develop at

7     Spyglass?

8          A.  The primary project that I can remember was

9     what was called an electronic program guide.

10         Q.  And what is an electronic program guide?

11         A.  It was for -- this particular one was for --

12    meant to allow the user to browse TV data.  That's it.

13         Q.  And when you say "TV data," do you mean TV

14    listings and times of when shows will be on TV?

15         A.  Data such as that.

16         Q.  And what hardware was the electronic program

17    guide designed to run on?

18         A.  I can't exactly remember, but there was -- it

19    was a -- it was a set-top box platform.

20         Q.  So not Newton?

21         A.  It was not the Newton operating system.

22         Q.  When did you leave Spyglass?

23         A.  I believe it was around 1999.

24         Q.  Where did you work after you left Spyglass?

25         A.  At a company called eCircles.  All one word.  I

Highly Confidential

Page 47

1  believe the company name was technically eCircles.com.

2      Q.  And what kind of company was eCircles.com?

3      A.  It was an Internet-based software company.

4      Q.  What kind of software did it develop?

5      A.  A Web site.

6      Q.  What kind of Web site?

7      A.  It was a consumer Web site.

8      Q.  How long did you work at eCircles?

9      A.  Boy.  Two or three years.  Again, times are --

10 they're difficult for me to remember.

11      Q.  Where did you work after eCircles?

12      A.  I tried to start a company, and I can't

13 remember the exact sequence.  The next company I worked

14 for was 1.0.

15      Q.  And how long -- or when did you work for 1.0?

16      A.  Those were -- that's the very fuzzy time.  I

17 can't remember exactly when.

18      Q.  Would it have been sometime in the mid-2000s?

19      A.  Mid-2000s, yes.

20      Q.  What kind of company was 1.0 or 1dot0?  Sorry.

21      A.  1dot0 was a software development company.

22      Q.  What type of software?

23      A.  It is many.  We worked on several projects.

24      Q.  Where did you work after 1dot0?

25      A.  Again, it's difficult to remember.  I believe I

Highly Confidential

Page 48

1    then worked at a company called FilmLoop.

2        Q.  Film group?

3        A.  FilmLoop, all one word.  F-i-l-m-L-o-o-p.

4        Q.  What kind of company was FilmLoop?

5        A.  It was a Web site.  Consumer Web site.

6        Q.  And how long did you work at FilmLoop?

7        A.  A year or two.  Somewhere in there.

8        Q.  When did you leave FilmLoop?

9        A.  When it was acquired by another company.

10        Q.  Do you recall what year that was?

11        A.  You know, I can't remember which year that was.

12    Yeah.  I just can't remember.

13        Q.  Where did you work after FilmLoop?

14        A.  At a company called Fabrik.

15        Q.  What kind of company was Fabrik?

16        A.  It was a -- primarily a hard disk company.

17    Storage.

18        Q.  How long did you work at Fabrik?

19        A.  Until it was acquired, which was two years,

20    2-1/2.

21        Q.  Years ago, you mean?

22        A.  No.  Total.

23        Q.  Oh.  The total time you worked at Fabrik?

24        A.  Right.  Before it was acquired.

25        Q.  What year was it acquired?

Highly Confidential

1        BY MR. YANG:   Q.   How is it you came to be

2    represented by Gibson Dunn for the purposes of this

3    deposition?

4            MS. MOUZARI:   Objection.   Asked and answered.

5            THE WITNESS:   I -- I'm sorry.   Go ahead and

6    ask -- if you can ask the question again.

7            BY MR. YANG:   Q.   Sure.

8        A.   Thank you.

9        Q.   How is it you came to be represented by the

10   attorneys at Gibson Dunn for this deposition?

11           MS. MOUZARI:   Same objection.

12           THE WITNESS:   They contacted me and . . .

13           BY MR. YANG:   Q.   Are you familiar with -- are

14   you familiar with the term "heuristics"?

15           MS. MOUZARI:   Objection.   Relevance.

16   Foundation.

17           THE WITNESS:   As a word, yes.

18           BY MR. YANG:   Q.   What is your understanding of

19   the meaning of heuristics?

20           MS. MOUZARI:   Objection.   Calls for expert

21   testimony.   Foundation.

22           THE WITNESS:   So I don't know how to answer

23   that as -- are you asking in my words?

24           BY MR. YANG:   Q.   What does heuristics mean to

25   you?

Highly Confidential

1      A.  To me?  To me it means a -- I don't know.  I'm

2  not very good when it comes to linguistics, but it just

3  means a method or algorithm to measure -- to determine a

4  result on -- through measuring data, if I had to offer a

5  definition.

6      Q.  Can you give an example of a heuristic?

7      A.  Not of -- not -- not -- no.  Not right now.  I

8  mean, if I've given enough time I'm sure I can,

9  but . . .

10      Q.  Anything more definitive than just a method of

11  algorithm to measure and determine a result to measure

12  data?

13          MS. MOUZARI:  So again, same objections.

14          THE WITNESS:  No, nothing more than that.

15          BY MR. YANG:  Q.  If you can pull back up

16  Exhibit 1.

17          THE REPORTER:  It's on the bottom there.

18          THE WITNESS:  Oh, sorry.

19          THE REPORTER:  It's okay.

20          BY MR. YANG:  Q.  Turning back to your quote at

21  the bottom of the page --

22      A.  Yes.

23      Q.  -- it states -- the phrase, To plug in custom

24  modules.

25          What does that mean?

Highly Confidential

Page 122

1        MS. MOUZARI:  So objection.  Foundation.  He

2   had testified earlier that he didn't recall ever saying

3   this.

4        THE WITNESS:  And I don't know, to answer your

5   question.

6        BY MR. YANG:  Q.  So just for the record to be

7   clear, the sentence states, NetHopper 3.0 now utilizes a

8   componentized architecture making it easier for Fortune

9   1,000 customers to plug in custom modules.

10       And it's your testimony that you don't

11   understand what that means?

12       MS. MOUZARI:  Asked and answered.

13       THE WITNESS:  I don't know what that -- what

14   that means.

15       BY MR. YANG:  Q.  Do you know what

16   functionality that was referring to in NetHopper?

17       MS. MOUZARI:  Asked and answered.

18       THE WITNESS:  No, I sure don't.

19       BY MR. YANG:  Q.  Do you know what it means to

20   -- and this is not referring to the document, but

21   generally -- do you know what it means to plug in

22   software?

23       MS. MOUZARI:  So objection.  Calls for expert

24   testimony.

25       THE WITNESS:  It can mean a lot of things.