# EXHIBIT 36

```
                                                          Page 1
 1            UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN JOSE DIVISION
 4   APPLE INC., a California
     corporation,
 5
              Plaintiff,
 6                                     Case No.
      vs.                              12-cv-00630-LHK (PSG)
 7
     SAMSUNG ELECTRONICS CO., LTD.,
 8   a Korean corporation; SAMSUNG
     ELECTRONICS AMERICA, INC.,
 9   a New York corporation; and
     SAMSUNG TELECOMMUNICATIONS
10   AMERICA, LLC, a Delaware
     limited liability company,
11
              Defendants.
12   ------------------------------------
13
14
15    ** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **
16
17
18         VIDEOTAPED DEPOSITION OF TIM OREN
19               Palo Alto, California
20               Thursday, June 6, 2013
21
22
23      REPORTED BY:
24   CYNTHIA MANNING, CSR No. 7645, CLR, CCRR
25   JOB NO. 61580
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 219

1  I typed in Apple. The weight of that term, if it
2  was used to search against a remote data source that
3  was very generic, might be reasonably high. If I
4  was working at Apple computer, it probably would be
5  useless because two-thirds of the documents mention
6  Apple. So that's -- that's a specific instance of
7  the kind of thing we're talking about. It's not one
8  size fits all. It's it fits your collection because
9  we know something about you because of what
10 documents you kept.
11     Q. Okay. So is this talking generally about
12 the idea of using different indexing or different
13 searching algorithms to -- based on the
14 characteristics of the particular database you're
15 searching?
16     A. Not even necessarily different algorithms,
17 just different parameters within it. There were
18 forms of this that were reasonably well-known.
19     Q. The second factor or the second element in
20 the third bullet states:
21         "Inference of apparent correlations between
22         information elements as manifested in
23         user's actions over time."
24         What is that referring to?
25     A. Let's go back to that example from before

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 220

1  we talked about.  This document, this word and, by
2  the way, I've got the e-mail up.  So if after --
3  after a period of weeks of using this system, if it
4  had noticed, hey, every time he uses this function
5  with an e-mail up, there is words being pulled out
6  of that e-mail.  Now, it's no longer a rule of
7  thumb.  It's a reasonable inference that that is the
8  common work pattern.  So you shouldn't make them
9  tell you; guess it, infer it.
10        That's just an example, but that's the
11 idea.  Is that people using a desktop system, for
12 the most part aren't commanding it in words, they
13 are commanding it in gestures, things they do over a
14 period of time.
15      Q.  So what's the difference, then, between a
16 rule of thumb and an inference?
17          MR. LU:  Objection; vague.
18          THE WITNESS:  A very blurry one.
19 BY MR. YANG:
20      Q.  Can you define it?
21      A.  No, not really.  What's that famous quote?
22 I'll know it when I see it.
23      Q.  Would that also apply to heuristics?
24          MR. LU:  Objection; calls for a legal
25 conclusion.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 221

1    THE WITNESS: Kind of depends on the
2 domain, the sense of the word.
3 BY MR. YANG:
4    Q. So is that a "yes," then?
5    MR. LU: Objection; asked and answered.
6    THE WITNESS: I think so.
7 BY MR. YANG:
8    Q. Turning to page 2 of this document -- I'm
9 sorry. When I say "this document," I mean Exhibit
10 6. There is a list of current and potential
11 clients.
12    A. Where am I looking here?
13    Q. It's the bullet points.
14    A. Oh, okay. Yeah.
15    Q. Now, is this a list of current and
16 potential clients for the information retrieval
17 technology that you were working on?
18    A. Mostly hypothetical.
19    Q. Right.
20    A. People we hoped to sell it to.
21    Q. So who was the Blue Finder team?
22    A. We already talked about blue was the
23 current system software. That never happened.
24    Q. Who was the consumer product division?
25    A. At the time, there was an attempt to do a