# EXHIBIT E-7

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

# REBUTTAL EXPERT REPORT OF DAN SCHONFELD REGARDING THE VALIDITY OF U.S. PATENT NO. 7,577,757

*Apple Inc. v. Samsung Elecs. Co. Ltd. et al*,

Case No. 12-CV-00630 LHK (N.D. Cal.)

September 13, 2013

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

## Table of Contents

I.   Introduction ........................................................................................................................5

II.  Basis for Opinions ..............................................................................................................6

    A.   Qualifications .............................................................................................................6

    B.   Materials Considered .................................................................................................8

    C.   Level of Ordinary Skill in the Art ..............................................................................9

III. Understanding of the Law ................................................................................................10

    Anticipation ........................................................................................................................11

    A.   Obviousness .............................................................................................................12

    B.   Written Description Requirement ...........................................................................15

    C.   Prosecution History Estoppel ..................................................................................15

    D.   Prosecution Disclaimer ............................................................................................15

IV.  Background of the Art of the '757 Patent ........................................................................15

    A.   Multimedia Data Exchange and Synchronization ...................................................15

        1.   Multimedia Data Exchange: Portable Storage, File Download, and Data Streaming ..............................................................................................16

        2.   Multimedia Data Synchronization ............................................................19

    B.   Synchronization of "Content Information" in Multimedia Systems .......................20

    C.   "Updated Multimedia Information" in Multimedia Systems ..................................23

    D.   Distinct Meaning and Usage of the Term "Synchronization" in the Field of Multimedia Systems .................................................................................................25

        1.   Multimedia Segment Synchronization ......................................................26

        2.   Multimedia Process Synchronization .......................................................27

        3.   Multimedia Stream Synchronization ........................................................28

        4.   Multimedia Exchange Synchronization ....................................................29

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

|   |   | 5. | Multimedia Data Synchronization ............................................................. 31 |

| V. | Validity of the '757 Patent ................................................................................... 32 |
| | A. | The '757 Patent .......................................................................................... 32 |
| | | 1. | PCT International Patent Application No. WO 96/21898 to Boothby ......................................................................................... 34 |
| | B. | Claim Constructions ................................................................................... 34 |
| | C. | Response to Dr. Taylor's Overview of the Prior Art .............................................. 38 |
| | | 1. | Synchronization ............................................................................. 38 |
| | | 2. | Replicated Databases ..................................................................... 39 |
| | | 3. | File Synchronization Systems ........................................................ 40 |
| | | 4. | Device Synchronization Systems ................................................... 40 |
| | | 5. | Digital Multimedia Data and Metadata .......................................... 41 |
| | | 6. | Wireless Mobile Devices and Digital Media Players .................... 42 |
| | | 7. | General Purpose and Multimedia Data Synchronization ............... 42 |
| | D. | U.S. Patent No. 7,587,446 to Onyon et al. Does Not Anticipate the Asserted Claims of the '757 Patent ........................................................... 43 |
| | | 1. | Opinions Regarding The Onyon Patent ......................................... 46 |
| | | 2. | Opinions Regarding The Onyon Patent in Combination with the Multer Patent ............................................................................ 51 |
| | E. | U.S. Patent Publication 2002/0026442 A1 Does Not Anticipate the Asserted Claims of the '757 Patent ........................................................... 57 |
| | F. | Opinions Regarding The Lipscomb Publication ....................................... 60 |
| | G. | U.S. Patent No. 7,020,704 to Lipscomb et al. Does Not Anticipate the Asserted Claims of the '757 Patent ........................................................... 70 |
| | | 1. | Opinions Regarding The Lipscomb Patent .................................... 72 |
| | H. | The Prior Art Does Not Render Obvious the Asserted Claims of the '757 Patent ....................................................................................................... 79 |

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

|   |   |   |
|---|---|---|
| I. | U.S. Patent No. 7,020,704 to Lipscomb et al. Together with the Knowledge of a Person of Skill in the Art Does Not Render Obvious the Asserted Claims of the '757 Patent........................................................................81 |
| J. | U.S. Patent No. 7,020,704 to Lipscomb et al. in Combination with Aztec RadioMedia/Digigram HitPlayer Does Not Render Obvious the Asserted Claims of the '757 Patent..........................................................................82 |
| K. | U.S. Patent No. 7,020,704 to Lipscomb et al. in Combination with U.S. Patent Application No. 2002/0026442 A1 Does Not Render Obvious the Asserted Claims of the '757 Patent........................................................................84 |
| L. | U.S. Patent No. 7,020,704 to Lipscomb et al. in Combination with U.S. Patent No. 7,587,446 to Onyon et al. Does Not Render Obvious the Asserted Claims of the '757 Patent........................................................................85 |
| M. | U.S. Patent No. 7,020,704 to Lipscomb et al. in Combination with the Lansonic DAS-750 Digital Audio Server Does Not Render Obvious the Asserted Claims of the '757 Patent........................................................................86 |
| N. | U.S. Patent No. 7,020,704 to Lipscomb et al. in Combination with U.S. Patent No. 6,636,873 to Carini et al. Does Not Render Obvious the Asserted Claims of the '757 Patent........................................................................90 |
| O. | U.S. Patent No. 7,587,446 to Onyon et al. Together with the Knowledge of a Person of Skill in the Art Does Not Render Obvious the Asserted Claims of the '757 Patent ...............................................................................92 |
| P. | U.S. Patent No. 7,587,446 to Onyon et al. in Combination with the Oracle 8i System Does Not Render Obvious the Asserted Claims of the '757 Patent.............................................................................................................94 |
| Q. | U.S. Patent Publication 2002/0026442 A1 Together with the Knowledge of a Person of Skill in the Art Does Not Render Obvious the Asserted Claims of the '757 Patent......................................................................100 |
| R. | The Lansonic DAS-750 Digital Audio Server in Combination with PCT International Patent Application No. WO 96/21898 to Boothby Does Not Render Obvious the Asserted Claims of the '757 Patent.....................................102 |
| S. | There are Many Secondary Considerations of Non-Obviousness that Confirm my Opinion that the '757 Patent is Not Obvious ................................108 |
| VI. | Conclusion ............................................................................................................114 |

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

68. Even today, many commercially-available multimedia data synchronization systems do not provide for synchronization of the multimedia data files themselves for various reasons, which are often motivated by the same technical limitations that precluded synchronization of "content information" in multimedia systems prior to the invention of the '757 Patent. For example, the Internet portal service "Spotify" (https://www.**spotify**.com/) allows for synchronization of multimedia data, but does not allow for synchronization of "content information."

69. On the other hand, the invention of the '757 Patent is limited to "synchronization" and "update" of multimedia data that actually includes the multimedia files themselves. This fundamental shift in approach to multimedia data synchronization allowed users to have their multimedia data files present on all of their computer devices, irrespective of the network connectivity at the time the user wishes to access a multimedia data file. Therefore, users of a computer device such as a smartphone while traveling on an airplane without access to the Internet can still play a song that was purchased and downloaded on a different computer device such as a desktop computer at home earlier in the day.

C. **"Updated Multimedia Information" in Multimedia Systems**

70. As stated above and in my Opening Expert Report, the term "updated" is used, in the context of the '757 Patent, to refer to automatic change used for synchronization of devices such that a change in one device reflects a change in another device, whereby the change includes both "content information" and "content management information" of audio, video, or photographic data.

71. It is important to note that term "update" is used to mean "to bring up to date." (*See, e.g.,* Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/update.). The term "updated information" is a passive term implying a perpetual state of the information.

23

Therefore, the reference to "audio, video, or photographic information" are "updated" is used to indicate that the information is "automatically brought up to date." More particularly, the asserted claims of the '757 Patent require that "audio, video, or photographic information" be "updated in relation to the zone specific storage and interface devices and the central storage and interface device, whereby the at least one user can be situated in any one of the zones and access the audio, video, or photographic information related to the at least one user." ('757 Patent, Claim 1.). Therefore, the asserted claims of the '757 Patent require that the reference to "audio, video, or photographic information" are "updated" is used to indicate that the information is be automatically brought up to date to ensure that "the at least one user can be situated in any one of the zones and access the audio, video, or photographic information related to the at least one user." ('757 Patent, Claim 1.).

72. In particular, in earlier multimedia systems designed to allow users to manually "synchronize" multimedia information, the multimedia information would be up to date at the user's discretion, yet the multimedia information would not be "updated multimedia information" because the multimedia information would generally not be up to date. As a result, a user of a multimedia system that provided for manual "synchronization" of multimedia information could not rely on the system to ensure that "the user can be situated anywhere and access his or her multimedia information."

73. The inventors of the '757 Patent realized the shortcomings of manual "synchronization" of multimedia information and therefore disclosed and claimed a multimedia "synchronization" system whereby the "multimedia information is updated" to allow the multimedia information to be automatically brought up to date and thus ensure that "the user can be situated anywhere and access his or her multimedia information."

94.     The most common approach to "multimedia exchange synchronization" is to rely on "differential updates," whereby the computer devices ascertain the multimedia data not present on each device, and the multimedia data not present on each computer device is then downloaded to each of the devices.

95.     The following is an exemplary illustration of the use of "differential updates" for "multimedia exchange synchronization": A user connects a cable between two computer devices and presses a button instructing the computer devices to "synchronize." The computer devices then generate a list of songs stored in each computer device and exchange the list of songs stored with the other device. Each computer device compares the received list of songs stored from the other device to its own list of songs stored and determines the songs that are not present on its own storage device. Subsequently, each computer device sends a request to download a list of songs from the other device and stores the received songs on its storage device.

96.     The outcome of "multimedia exchange synchronization," whereby multiple devices share the same multimedia data can be achieved by using other methods beside "differential updates." For example, brute force deletion of the multimedia data stored on one of the computer devices and download of the multimedia data stored on the other device would also ensure that that each device contains the same multimedia data. However, the efficiency of "multimedia exchange synchronization" techniques such as "differential updates" is achieved because these methods avoid transmission of multimedia data to a computer device that is already present on the device.

97.     It is important to note that although the '757 Patent refers to "synchronization" and "update" of multimedia data, these terms are not used in the context of a specific method or technique of "multimedia exchange synchronization." More specifically, although any

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

synchronization systems he references are able to synchronize changes within files; however, as noted above, that is not the type of synchronization claimed in the '757 Patent. (*See* Taylor Opening Report, ¶54.).

128. Dr. Taylor also opines that data synchronization systems expressly for multimedia data were well known in the art, citing to U.S. Patent Nos. 7,587,446 (the "Onyon Patent"); 7,020,704(the "Lipscomb Patent"), and U.S. Patent Publication 2002/0026442 A1 (the "Lipscomb Publication"). (*See* Taylor Opening Report, ¶55.). However, as described in further detail below, none of these references describe the update of the actual content information as required by the inventions of the '757 Patent. In particular, the Onyon Patent discloses only a manual synchronization method, and the other two references do not synchronize the actual media assets as described and claimed by the '757 Patent.

### D. U.S. Patent No. 7,587,446 to Onyon et al. Does Not Anticipate the Asserted Claims of the '757 Patent

129. U.S. Patent No. 7,587,446, entitled "Acquisition and synchronization of digital media to a personal information space," was filed on November 10, 2000, and issued on September 8, 2009.

130. The Onyon Patent is directed toward "the transfer of public and private data to a private information space and in particular to the transfer, storage and synchronization of media data." (Onyon Patent, Background of the Invention.).

131. According to the Onyon Patent, the "personal information space" can comprise of a "series of machines," which in turn "can have their storage device[s]," and contains "information selected by the user to be input into the user's own hard drive. Hence, the personal information space may comprise public or private data selected by the user which is inserted into any one or more of a user's network-coupled devices." (Onyon Patent, 1:49-57.). The Onyon

43

information space is to utilize the aforementioned system on a public information server which allows transference of data files, such as executables, documents, or digital music files (MP3's) from the public information space to the personal information space. As shown in FIG. 4, data from storage server 200 is then considered part of the personal information space and may be thereafter synchronized to any one or all of the devices coupled within the user's space, including personal computers, PDA's, automotive PC's, and the like.").).

134. Further, the Onyon Patent describes "synchronization" between devices within the personal information space as "the ability to share information" (Onyon Patent, 5:29-41) and as an alternative to "transfer[ring]" "digital media files." (Onyon Patent, 9:51-56) ("In accordance with the present invention, digital media files of varying formats, and other data, may be synchronized or transferred (uni-directionally) to any network coupled appliance 400 utilizing the system of the present invention.").).

### 1. Opinions Regarding The Onyon Patent

135. In my opinion, Dr. Taylor has not proven by clear and convincing evidence that the Onyon Patent anticipates the '757 Patent.

136. As described above, the Onyon Patent is primarily directed toward moving data from public sources into a device of the personal information space. (*See, e.g.,* ¶133.). In contrast, the '757 Patent is directed toward ensuring that the same media content information and content management information is present wherever the user might be. ('757 Patent, *Abstract*.).

137. The Onyon Patent does not disclose the first limitation of Claim 1, which requires "at least one central storage and interface device, wherein audio, video, or photographic data, including content information and content management information, relating to at least one user, are stored in digital form." According to this limitation, "at least one central storage and interface device," must store content information and content management information that is

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

related to a user, in digital form. I disagree with Dr. Taylor's opinion that "[t]he storage server is a central storage and interface device." (*See* Taylor Opening Report, ¶110.) In ¶110, Dr. Taylor opines that "[t]he patent states that a user's 'personal information space' can be located either on an intermediate server (also called a 'storage server') or a connected device." However, Dr. Taylor provides no support for the proposition that "an intermediate server" is "also called a storage server." I also disagree with Dr. Taylor's opinion that "[i]n one embodiment, an intermediate server, the 'storage server,' is considered part of the 'personal information space[.]" To the contrary, the portion of the Onyon Patent that Dr. Taylor relies on clearly indicates that the "storage server" is <u>not</u> part of the personal information space, but rather that the data originating from the storage server is considered a part of the personal information space after the user transfers the data from the storage server into the personal information space. (*Compare* Taylor Opening Report, ¶110 (*citing* Onyon Patent, 9:14-19 ("As shown in FIG. 4,<u> data from storage server 200</u> is then considered part of the personal information space and may be thereafter synchronized to any one or all of the devices coupled within the user's space, including personal computers, PDA's, automotive PC's, and the like.")) *with* Onyon Patent, 9:8-14 ("One example of media information which may be provided into personal information space is to utilize the aforementioned system on a public information server which allows transference of data files, such as executables, documents, or digital music files (MP3's) from the public information space to the personal information space.")). Thus, the "storage server" (and "an intermediate server") is a "public information server," and data on the storage server is public, not related to a user, as required by the first limitation of Claim 1.

138.   For the same reasons as stated above, according to the disclosures of the Onyon Patent, the data in the storage server, including all data described by Dr. Taylor, is public data

SUBJECT TO PROTECTIVE ORDER
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

until it is copied onto a different device which is part of the personal information space. Thus, the Onyon Patent fails to disclose that the data of the storage server is "relat[ed] to at least one user," as required by Claim 1.

139.  Further, while Dr. Taylor opines that "any of the user's devices can serve as a central storage and interface device," he only points to quotes taken out of context. For example, Dr. Taylor points to a citation that fails to disclose his claim that the "Internet-coupled stereo" could be a central storage and interface device that meets all of the requirements of Claim 1 of the '757 Patent. (*See* Taylor Opening Report, ¶111.). Furthermore, the Onyon Patent does not disclose that any of the user's devices store multimedia content information and content management information, as required by a "central storage and interface device." More particularly, the Onyon Patent only discloses that the data in the user's personal information space is stored among one or more of the user's devices, but does not disclose that the same data is stored in each of the user's devices. (*See, e.g.,* Onyon Patent, 1:50-55 ("This series of machines can comprise a 'personal information space' which is made up of information selected by the user to be input into the user's own hard drive. Hence, the personal information space may comprise public or private data selected by the user which is inserted into any one or more of a user's network-coupled devices.")).

140.  The Onyon Patent fails to disclose the second limitation of Claim 1 of the '757 Patent which requires "at least one zone, each zone having at least one zone specific storage and interface device capable of storing or interfacing with information stored in the central storage and interface device, wherein audio, video, or photographic information, relating to at least one user, contained within the zone specific storage and interface device and the central storage and interface device, are updated in relation to the zone specific storage and interface devices and the

central storage and interface device, whereby the at least one user can be situated in any one of the zones and access the audio, video, or photographic information related to the at least one user."

141. In particular, the Onyon Patent fails to disclose that any of the devices within the personal information space store content information and content management information relating to at least one user, or that the devices are updated in relation to each other, as required by the '757 Patent.

142. Dr. Taylor's report highlights the deficiencies of the Onyon Patent as an anticipatory reference. For example, Dr. Taylor consistently refers to the movement of data between devices within the personal information space as "transfer[ring]," not updating. (*See, e.g.,* Taylor Opening Report, ¶¶ 114, 118, 119, and 120.). The transfer of data is merely the movement of data between devices. In contrast, the '757 Patent requires "updat[ing]" the central and zone devices, *e.g.*, automatic download. The only disclosure in the Onyon Patent that could be construed as updat[ing], *i.e.*, "automatic" synchronization, is the transfer of data from outside of the personal information space (public data on a public server) onto a device within the personal information space. (*See, e.g.,* Onyon Patent, 5:56-64 ("In a further aspect, the step of determining may comprise searching using a web-based search engine to ascertain publicly available media, or secure media provided by a site the user is authorized to access, and which the user wishes to transfer into the user's personal information space. Alternatively, the user may select to include all, or one or more aspects of, a user's personal media data. In a further embodiment, selection of the data to be synchronized can be automatic. For example, a user may associate an event such as a media release with an automatic synchronization request which will

automatically add to or update the user's personal information space when the event occurs. Optionally, a verification step 11 may prompt the user to confirm the data selection is correct.")).

143.   Moreover, as stated above, the Onyon Patent does not disclose that any of the devices within the personal information space store multimedia content information and content management information, as required by a "zone-specific storage and interface device," of the '757 Patent.  More particularly, the Onyon Patent only discloses that the data in the user's personal information space is stored among one or more of the user's devices, but does not disclose that the same data is stored in each of the user's devices.  (*See, e.g.,* Onyon Patent, 1:50-55 ("This series of machines can comprise a 'personal information space' which is made up of information selected by the user to be input into the user's own hard drive.  Hence, the personal information space may comprise public or private data selected by the user which is inserted into any one or more of a user's network-coupled devices.")).

144.   In addition, the "transfer" of data among the user's devices disclosed in the Onyon Patent allows for the "sharing of information" among one or more devices in the user's personal information space, but does not disclose the "update" of multimedia information, *e.g.*, content information and content management information, related to the user among all of the user's devices, as required by this claim limitation.  (*See, e.g.,* Onyon Patent, 5:29-41; *see also* Onyon Patent, 9:51-56 ("In accordance with the present invention, digital media files of varying formats, and other data, may be synchronized or transferred (uni-directionally) to any network coupled appliance 400 utilizing the system of the present invention.")).

145.   Moreover, the Onyon Patent fails to disclose "updating" of media assets across a plurality of zone specific and interface devices, and instead discloses "transferring" data to a single "network coupled apparatus."  (*See, e.g.,* Onyon Patent, *Abstract* ("A method for

*transferring media data to a network coupled apparatus* is described. … Upon a user request, the method *transfers at least a portion of the media data from the personal information space to the network coupled apparatus* in a differencing transaction."); *see also* Onyon Patent at 9:51-56 ("In accordance with the present invention, digital media files of varying formats, and other data, may be *synchronized or transferred (uni-directionally) to any network coupled appliance 400* utilizing the system of the present invention.")(emphasis added.)).  The '757 Patent, by contrast, is directed to having multiple zone devices updated in relation to each other. (*See, e.g.,* '757 Patent, Claim 1 ("updated in relation to the zone specific storage and interface devices") and Claim 6 ("audio, video, and photographic information contained within each one of the plurality of zone specific storage and interface devices and the central storage and interface device are stored therein and updated at a predetermined time in relation with other zone specific storage and interface devices as well as the central storage and interface device.")).

### 2. Opinions Regarding The Onyon Patent in Combination with the Multer Patent

146.   I have been informed that two prior art references can be considered as a single, anticipatory reference only if one of the references incorporates specific portions of the second reference and recites a specific reason for the incorporation.

147.   The Onyon Patent purports to incorporate by reference the entirety of multiple patents and patent applications, including U.S. Pat. No. 6,671,757 (the "Multer Patent").

148.   It is my opinion, based on the law explained to me by counsel, that Dr. Taylor improperly treats the Onyon Patent and the Multer Patent as a single anticipatory reference  The Onyon Patent merely incorporates the Multer Patent by reference as part of the general incorporation of multiple patents by reference, and does not clearly identify the subject matter that is incorporated and where it is to be found.  In addition, Dr. Taylor does not opine that the

SUBJECT TO PROTECTIVE ORDER
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

Multer Patent (1) proves that the Onyon Patent contains an "enabled disclosure," (2) explains the meaning of a term used in the Onyon Patent, or (3) shows that a characteristic not disclosed in the Onyon Patent is inherent.

149.   However, out of an abundance of caution, I will opine on the Onyon Patent and the Multer Patent as if they could be treated as a single reference below.

150.   The Multer Patent discloses a method for "synchronization" that provides a specific technique for the exchange of information between devices. (*See, e.g.,* Multer Patent, *Abstract* ("A system and method for synchronizing devices which can couple to the Internet, or any network. The system includes a first sync engine on the first system interfacing with data on the first system to provide difference information. A data store is coupled to the network and in communication with the first and second systems. A second sync engine is provided on the second system coupled to receive the difference information from the data store via the network, and interface with data on the second system to update said data on the second system with said difference information. Difference information is transmitted to the data store by the first sync engine and received from the data store from the second sync engine.")).

151.   The "synchronization" disclosed by the Multer Patent is designed for the efficient transfer of difference information related to data such as "contact information." (*See, e.g.,* Multer Patent, 6:31-46.).

152.   The Multer Patent discloses that "[a]n events module **925** controls synchronization initialization events. Items such as when to sync, how to sync, trigger the delta module **950** to perform a synchronization operation." (*See* Multer Patent, 13:6-9.). The Multer Patent provides the following detail about the operation of the events module or how and when to trigger the sync operation: "Each device has its own triggering mechanism for initiating

52

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

synchronization. Some devices, such as Windows clients and Palm® pilots are triggered manually when the user presses a 'sync' button. Other devices, such as a cellular telephone, may be triggered automatically after another device completes a sync. Regular, time-based triggers are supported as well. A web-based application portal will sync when a user logs into the website security authorization mechanism, and may optionally sync on a log-out of 20 the user or on the session time-out, but only if the user has changed data during the session." (Multer Patent, 35:12-22.).

153. In my opinion, Dr. Taylor has not proven by clear and convincing evidence that the combination of the Onyon Patent and Multer Patent anticipates the '757 Patent.

154. As an initial matter, the Onyon Patent describes the "transfer" of various data including MP3s among multiple devices within a personal information space. The Multer Patent discloses an efficient method for "synchronization" of data such as "contact information" between computer devices. Even if one were to consider the hypothetical combination of the Onyon Patent and Multer Patent, as suggested by Dr. Taylor, a person of ordinary skill in the art would not consider the combination to disclose the "synchronization" of multimedia data. In particular, the "synchronization" of "contact information" disclosed in the Multer Patent is applicable to small data files, and a person of ordinary skill in the art would not consider its application to the "transfer" of large multimedia data files to have been disclosed or enabled.

155. In addition, the Onyon Patent simply relies on the Multer Patent to perform a method that can be used for "transfer" and "synchronization" of data between devices in a manner consistent with the disclosure in the Onyon Patent. (*See, e.g.,* Onyon Patent, 5:34-41 ("One example of a personal information space is the transactional based extraction, transfer, broadcast, storage and synchronization systems for forth in patent application Ser. Nos.

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

an FTP server, and may be provided from any source, such as any Internet service provider (ISP)").) Thus, as with the Onyon Patent, such a server would not constitute a "central storage and interface device" that stores multimedia data "related to at least one user," as required by Claim 1 of the '757 Patent.

159.   Furthermore, the Multer Patent does not disclose "content information." As discussed in my Opening Expert Report regarding the infringement of the '757 Patent, "content information" requires both the content and information that is specific to the particular content. The portion of the Multer Patent relied on by Dr. Taylor for disclosure of "content information" merely discloses that "[s]erver application objects can also be designed to create collections. For example, if the user wishes to create a 'my pictures' collection which consists of some collection of information and synchronize this collection of information, such an arbitrary grouping of classes of information into appropriate representations is supported." (Taylor Opening Report, ¶113.). This example (*i.e.* the "my pictures" collection) does not disclose information that is specific to a particular content (namely, such information is shared by all of the pictures in the "my pictures" collection), and therefore, falls far short of disclosing "content information."

160.   Neither the Onyon Patent nor the Multer Patent disclose "at least one zone, each zone having at least one zone specific storage and interface device capable of storing or interfacing with information stored in the central storage and interface device, wherein audio, video, or photographic information, relating to at least one user, contained within the zone specific storage and interface device and the central storage and interface device, are updated in relation to the zone specific storage and interface devices and the central storage and interface device, whereby the at least one user can be situated in any one of the zones and access the