# EXHIBIT 5

## TO FAZIO DECLARATION IN SUPPORT OF SAMSUNG'S MOTION TO ENFORCE REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | | |
|---|---|---|
| _____ ) | | |
| | ) | |
| APPLE INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO.12-cv-00630-LHK |
| | ) | |
| SAMSUNG ELECTRONICS CO., LTD., | ) | |
| SAMSUNG ELECTRONICS AMERICA, | ) | |
| INC., SAMSUNG | ) | |
| TELECOMMUNICATIONS AMERICA, | ) | |
| LLC | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ ) | | |

# OPENING EXPERT REPORT OF
# CHRISTOPHER A. VELLTURO, PH.D.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER**



13.     In considering the extent to which Apple sustained lost profits relating to the diminished demand for Samsung's theoretical non-infringing substitutes in the "but for" world, it is reasonable to use consumer survey data measuring consumer preferences, as generated and analyzed in accordance with generally accepted methodologies in the field of statistics and marketing generally, and as to the conduct of conjoint studies specifically.  In this regard, I have been provided with data and information from a conjoint study performed under the direction of John Hauser, Ph.D., and I have relied on the results of this study in the formation of my opinions and the calculations of "diminished demand" lost profits.  It is my opinion that Dr. Hauser's study was conducted in accordance with reliable principles and methods and yielded information

of a type reasonably relied upon by experts in the field of economics to estimate lost profits with reasonable certainty.



164.    Finally, although specific evidence of consumer preference for the Patented Inventions is not required, that evidence nevertheless exists in this case.  As discussed below, Dr. John Hauser, a Professor of Marketing at the Sloan School of Management at Massachusetts Institute of Technology, conducted a rigorous survey that shows demand for each of Apple's patented features (or the price premium users would be willing to pay for those features) as well as the clear connection between each of Apple's Patented Inventions and demand for smartphones and tablets (or consumers' willingness to buy smartphones and tablets due to the incorporation of those Patented Inventions).[289]



---

[289] Expert Report of John R. Hauser, Aug. 11, 2013, Exhs. N1-2, O1-2, P, Q.



■

255.    Thus, in my opinion, the evidence in this Section demonstrates that the implementation of the Asserted Patents by Apple contributed materially to demand for its devices and, once installed by Samsung in its devices, ameliorated Samsung's comparative competitive disadvantage vis-à-vis Apple.  My opinion in this regard I further supported by the consumer research performed by Dr. Hauser, discussed below.

### (2) Survey-Based Evidence of the Impact of the Patented Features on Demand

256.    To consider the role of the Asserted Patents with respect to demand for the accused products quantitatively, I have studied the results of consumer surveys prepared by Dr. John Hauser.[449]  Dr. Hauser used conjoint analysis, a widely studied and applied form of quantitative consumer preference measurement,[450] to determine the impact of the features covered by the Asserted Patents on demand for smartphones and tablets by Samsung smartphone and tablet owners, relative to their demand for similar products without those features.  I discuss the results and relevance of these surveys extensively below, in consideration of *Panduit* Factor 2.  These surveys provide considerable evidence that the patented features contributed significantly to the demand for smartphones and tablets at Samsung (since the surveys were directed at Samsung users) and that a material portion of purchasers of Samsung smartphones and tablets would not purchase devices that did not incorporate each of the patented features.  As a result, these survey results demonstrate that each of the patented features has a significant positive impact on demand.

---

[449] Expert Report of John R. Hauser, Aug. 11, 2013, Exhs. N1-2, O1-2, P, Q.

[450] Expert Report of John R. Hauser, Aug. 11, 2013, ¶ 16.  In response to my Opening Declaration and Apple's motion for a preliminary injunction in this matter, Samsung's damages expert, Mr. Michael Wagner, endorsed surveys and conjoint analysis as suitable methods for proving the link between patented features and consumer demand for products, and for calculating the number of Samsung customers who made their decision to purchase a Samsung smartphone based on features enabled by Apple's patented inventions (Declaration of Michael J. Wagner in Support of Samsung's Opposition to Apple's Motion for a Preliminary Injunction, June 7, 2012 ("Wagner Declaration"), ¶ 116).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

257.    In addition to making possible an assessment of the sales Samsung would have lost without the Accused Features, Dr. Hauser's survey makes possible a determination of the price premium that Samsung consumers are willing to pay for the tested features that are covered by the Asserted Patents.  The following Table 1 summarizes estimates by Dr. Hauser of the price premium (which is sometimes referred to as Willingness to Pay) for the Asserted Patents in tablets and smartphones.

| Table 1 | | |
| --- | --- | --- |
| **Price Premium for Patent-Related Features** | | |
| **Market Simulation Approach**[451] | | |
| **Patent** | **Smartphones** (Retail price without Accused Feature: $149) | **Tablets** (Retail price without Accused Feature: $299) |
| '414 | $69 | $62 |
| '647 | $56 | $56 |
| '959 | $44 | $33 |
| '760 | $87 | Not Applicable |
| '721 | Not Tested | $32 |
| '172 | $102 | $63 |

258.    These results of Dr. Hauser's survey and conjoint analysis support the conclusion that there is demand for the Accused Features that practice the inventions taught by the Asserted Patents.

---

[451] Expert Report of John R. Hauser, Aug. 11, 2013, Exh. P.  The market simulation approach compares products that differ only with respect to a particular feature.  The conjoint analysis uses estimates of respondents' "partworths" (the partial contribution of a level of a feature to consumers' utility from a product) to estimate the price premium for the product with the feature at which 50% of the respondents will choose the product with the feature and 50% will choose it without the feature.  See Expert Report of John R. Hauser, Aug. 11, 2013, ¶¶ 125-131.  Exhibit Q to the Hauser Report reports similar results for an alternative method of estimating the price premiums associated with the Accused Features.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



### d. Acceptability: Dr. Hauser's Surveys and Conjoint Analysis

280.   Dr. Hauser's surveys quantify the changes in demand between the imperfect non-infringing alternatives for the Asserted Patents and their patented counterparts.  Dr. Hauser does so both by defining the feature in the terms of the patent and by incorporating into the survey certain descriptions of the features or level of functionality respondents claim they would (or did) have if the patented technology were used.[502]



[502] Expert Report of John R. Hauser, Aug. 11, 2013, Exh. E, at pp. 7-17 (smartphones), Exh. F, at pp. 7-16 (tablets).



281.

it is my opinion that Dr. Hauser's approach was both reasonable and provides a valuable metric for assessing the impact of non-infringing alternatives.

282.    Dr. Hauser's research allows me to estimate the percentage reduction in the share of customers who would purchase a product with the Patented Features but would <u>not</u> purchase a comparably equipped product with non-infringing alternatives in place of each of the Accused Features or any combination of Accused Features.  In this report, I refer to these reductions in share as changes in consumers' "Willingness to Buy" a product based on the presence or absence of the relevant features.[504]  Essentially, the survey results allow me to measure the contraction in demand (graphically, a leftward shift of the demand curve) for a product associated with removing one or more Accused Features and placing in its stead the posited non-infringing alternative.

283.    The survey results allow me to estimate changes in Willingness to Buy over a wide range of prices ($49 to $299) paid by consumers for their smartphones upon commencing (or renewing) cellular service contracts.  The result further allows me to evaluate the difference in the Willingness to Buy effect for smartphone and tablet screen sizes.[505]  The fact that the surveys cover ranges of price and screen size and the fact that separate surveys were performed for smartphones and tablets substantially enrich my analysis, as the data show that effects of

---

[503] Samsung's Further Supplemental Responses to Apple's Second and Third Sets of Interrogatories, May 2, 2013, pp. 105-131, Objections and Response to Interrogatory No. 29.

[504] As is typical in surveys performed for conjoint analysis, a variety of product features were studied in addition to the Accused Features.

[505] For convenience, I refer to the prices consumers pay upon commencing a contract for a new smartphone and the prices they pay upon purchasing tablets as the "retail prices" of these devices.

Accused Features on Willingness to Buy vary depending on the price of the device and its screen size and on whether the device is a smartphone or a tablet.[506]

284.    Dr. Hauser's research demonstrates that there are significant numbers of Samsung customers who do not find the posited non-infringing alternatives acceptable.[507]  The following illustrative Table 2, based on the responses to Dr. Hauser's survey, reports the estimated average percentages of Samsung customers who would not have purchased Samsung's accused smartphones and tablets if the Accused Features were replaced with non-infringing alternatives, assuming the smartphones and tablets had screen sizes of 4.8 inches and 10.1 inches, and prices of $149 and $499, respectively.

| Table 2 | | |
|---|---|---|
| **Willingness to Buy Accused Features** | | |
| **Estimated Average Reductions in Purchases of Accused Products with Non-Infringing Alternatives in Place of Accused Features[508]** | | |
| **Patent** | **Smartphones**<br>(Retail price: $149; Screen Size: 4.8") | **Tablets**<br>(Retail price: $499; Screen Size: 10.1") |
| '414 | 9% | 14% |
| '647 | 8% | 12% |
| '959 | 5% | 6% |
| '760 | 11% | Not Applicable |
| '721 | 9% | 6% |
| '172 | 16% | 15% |

[506] The "slide-to-unlock" Accused Feature associated with the '721 Patent was studied only in the tablet survey.  (Conversation with Dr. John R. Hauser.)  For this patent only, I therefore apply survey results from the tablet survey to smartphones.

[507] Dr. Hauser's research also demonstrates that the patented inventions play a material role in demand for the Samsung smartphones.

[508] Expert Report of John R. Hauser, Aug. 11, 2013, Exhs. N1, N2.  The result shown for the '721 Patent in smartphones is estimated from the results of the survey Dr. Hauser performed regarding tablets. See **Exhibit 13**.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

285.    The survey results also show that the cumulative impact on Willingness to Buy of replacing combinations of Accused Features, e.g., the Accused Features covered by the '414, '647, and '959 Patents collectively, with non-infringing alternatives exceeds the sum of the effects of replacing these Accused Features individually.  This is an economically sensible result, as the competitive positioning of, say, a phone that purports to be a high-end smartphone may be only modestly affected if it lacks one or two expected features but substantially affected if it lacks multiple expected features.  Because the survey provides actual data showing the impact of removing more than one feature, I use that data, rather than simply adding the individual values, when determining lost profits damages for products that infringe more than one patent.

286.    Table 3 illustrates –for smartphones and tablets with screen sizes of 4.8 inches and 10.1 inches, and prices of $149 and $499, respectively, as in Table 2 – the fact that the effect on demand of removing combinations of Accused Features exceeds the sum of the effects of removing features individually.

| Table 3 | | |
| --- | --- | --- |
| **Willingness to Buy Accused Features ("WtB")** | | |
| **Estimated Average Reductions in Purchases of Accused Products with Non-Infringing Alternatives in Place of Accused Features**[509] | | |
| **Patents** | **Smartphones** (Retail price: $149; Screen Size: 4.8") | **Tablets** (Retail price: $499; Screen Size: 10.1") |
| **'414, '647, '959** | | |
| '414 | 9% | 14% |
| '647 | 8% | 12% |
| '959 | 5% | 6% |
| Sum of Individual Reductions in WtB | 22% | 32% |
| Combined Effect | 25% | 34% |

[509] Expert Report of John R. Hauser, Aug. 11, 2013, Exh. N1 at 1-3, Exh. N2 at 1-3, Exh.O1 at 7, and Exh. O2 at 7.

287.     The impact of the absence of acceptable non-infringing substitutes for the patented inventions among a significant portion of Samsung customers is understated by Dr. Hauser's survey because the survey does not consider the time required to implement the non-infringing alternatives.  Thus the survey does not account for the fact that, as detailed in Section III.B.4.a below, a quantifiable minimum amount of time ("design-around period") would be required to implement a non-infringing alternative to each Accused Feature.  During these design-around periods, Samsung could not have sold its Accused Products without infringing one or more Asserted Patents and would thus have had to remove the feature immediately or stop selling the Accused Products.

288.     As I explain under *Panduit* Factor 4 in Section III.B.4.b below, with these data and industry data on the shares of smartphones sold by different manufacturers I am able to quantify reliably a conservatively low estimate of Apple's lost profits, consistent with a "market share apportionment" approach for determining lost profits damages in a market in which both non-infringing and infringing products compete with those of the patentee.[510]

_____

[510] *State Indus., Inc. v. Mor-Flo Indus., Inc.,* 883 F.2d 1573, 1577, 12 U.S.P.Q.2d 1026, 1028 (Fed. Cir. 1989), cert. denied, 493 U.S. 1022 (1990).



293.





310.

and

### (3) Diminution in Samsung Sales of Accused Products With Non-Infringing Designs Implemented

311.    To determine the diminished sales at Samsung in the "but for" world that are candidates for lost profits at Apple during periods where the claimed alternatives would have been implemented and commercialized by Samsung, I utilize results of the survey and conjoint analysis conducted by Dr. Hauser.[529]  As mentioned in my discussion of *Panduit* Factor 2 above, Dr. Hauser's survey and conjoint analysis allow me to estimate demand curves for the Accused Products with the Accused Features and with non-infringing alternatives in their stead and effectively observe the shifts in those demand curves associated with replacing an Accused Feature with a non-infringing alternative (*i.e.*, the decreases in Willingness to Buy Samsung's Accused Products) at any given price level, among those who have historically been Samsung smartphone and tablet owners.  This allows me to estimate the diminished unit sales Samsung would have faced by replacing Accused Features with non-infringing alternatives for each Asserted Patent ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████ .

312.    In my opinion, the appropriate measure of Samsung's loss of unit sales from replacing Accused Features with non-infringing alternatives is the distance of the leftward shift in the demand curve for each Accused Product derived from the conjoint analysis, holding the price at which it was sold to consumers fixed at its actual historical level.[530] ███████████



---

[529] ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

[530] Strictly speaking, this statement refers to the inverse demand curve, in which quantity is represented as the independent variable and price as the dependent variable.  This corresponds to the standard textbook graphical depiction of a demand curve, which makes it convenient to describe demand curves in this manner.  In reality, suppliers of differentiated products such as smartphones and tablets consider prices and quantities jointly, along with promotional efforts, in seeking to maximize profits.

[redacted][531] Within the range of possible price changes relevant to my analysis, suppliers of these devices would expect to generate too small an increase in unit sales by reducing their prices from these focal levels to offset the loss of revenue per unit and would, thus, leave prices unchanged.[532]

313. In assessing the impact on Willingness to Buy of removing more than one Accused Feature, I also adjust for the overlap in demand reductions associated with the absence of each individual feature (or reduction in the quality of the feature). For example, if replacing a feature covered by one Asserted Patent with a non-infringing alternative at a given price level would reduce the share of Samsung customers who would purchase that product by 5% and replacing a feature covered by a second Asserted Patent with its non-infringing alternative would reduce the share who would purchase it by 3%, and the demand for each feature is not dependent on the presence of any other feature (that is, demand for the two features are independent), then replacing both Accused Features would reduce the share who would purchase it by 7.85% in total.[533]

---

[531] [redacted]

[532] Recognizing that the Accused Products were not as attractive without the Accused Features, Samsung might well seek to mitigate their losses by enhancing these products in other ways. However, such enhancements would be costly and their effect on demand is entirely speculative; since there is no basis for expecting that they would materially reduce Samsung's losses, I do not attempt to estimate their impact.

[533] 100% - 5% = 95%; 100% - 3% = 97%; 95% X 97% = 92.15%; 100% - 92.15% = 7.85%. Note that, in this calculation, because the reduction in share of those who would purchase an Accused Product that is attributable to removal of any Accused Feature is expressed as a percentage, the absolute incremental reduction in units purchased due to removal of any Accused Feature will depend on the initial number of units used in the calculation. As a result, the incremental reduction in units purchased associated with removal of any individual Accused Feature depends on the order in which Accused Features were removed. Thus, when considering the impact of simultaneous removal of multiple Accused Features, only the total impact of removing the Accused Features is economically meaningful. It is appropriate to calculate the incremental reduction in units purchased associated with removal of any individual Accused Feature only for the purpose of studying the impact of removing that Accused Feature, given a starting point in which Accused Products are assumed to embody a specific set of Accused Features.

314.    Here too, I implement a conservative adjustment that simplifies the assessment of damages associated with different combinations of Accused Features:  I calculate the combined impact on Willingness to Buy of removing or replacing all the Accused Features in the manner just described (which adjusts for overlap) and attribute to each Asserted Patent a share of the combined impact on Willingness to Buy equal to its share of the sum of the individual impact on Willingness to Buy of each Asserted Patent.  This adjustment, which I refer to as a "linearization" of the weights given to each Asserted Patent, implies that the estimate of the effect on Willingness to Buy of the Accused Feature associated with any individual Asserted Patent that I use in my damages analysis will be less than it actually would have been unless all the Asserted Patents are found to be valid and infringed.[534]

315.    Because of the patent-specific and additive nature of the results derived from the conjoint analysis, I am able to adjust my calculation of the diminished unit sales had Samsung not infringed the Asserted Patents and implemented alternative designs, to reflect the fact that the Asserted Patents being infringed by Accused Products vary over time ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████  (See **Exhibit 7**.)  For the same reasons, the results of the conjoint analysis can be used to recalculate damages as needed to address any outcome at trial regarding which Asserted Patents the Accused Products are found to have infringed.

316.    The results of Dr. Hauser's surveys provide an additional important data point that indicates that the demand-diminishing impact of removing the patented features associated with the '414, '647, and '959 patents and replacing them with the proposed design-arounds *collectively* is greater than the arithmetic sum of the effects of removing the three patents taken individually.  This result is unsurprising, as consumers who might be willing to live with the absence of one or two features are unwilling to purchase devices where several layers of functionality have been compromised.  I include this additional lost profits permutation in the calculations in the damages analyses of this Section.

---

[534] As discussed below, **Exhibits 13** and **14** provide the results of the linearization calculation. **Exhibits 13-A** and **14-A** provide the corresponding strict results.

317.    In this report, I assume that the Accused Products are found to have infringed each of the Asserted Patents in accordance with Apple's infringement contentions.



---

[535] In **Exhibits 13** and **14**, I report my estimates of the average retail prices of each of the Accused Products that determine, along with screen size, which estimated effects on Willingness to Buy results from the conjoint analysis are applied to each Accused Product for each Asserted Patent.  Given that the estimated effects of removing Accused Features tend to increase with the price of the product being considered by respondents, my assessment of the relevant prices of the Accused Products is conservative in that, where rebates off retail prices were offered to purchasers of smartphones, I assume that they were universally available and were redeemed by purchasers.  I have calculated the average retail price of each of the Accused Products based on the retail prices ("R/P") reported in the U.S. Weekly Smart Phone Sales Reports created by STA (see Deposition of Justin Denison, Transcript, Sept. 21, 2011, at 332:2-334:3; "Weekly US Smart Phone Report," Deposition of Justin Denison, Exh. 243, Sept. 21, 2011).  I have determined these retail prices to be net of any available rebates, considering that the prices net of rebates reported in publicly available sources align with the retail prices in the Weekly Smart Phone Sales Reports for a given device during comparable time periods.  See, e.g., the prices reported for the Samsung Conquer 4G (Sprint) in Week 35 2011 (www.samsung.com/us/news/19904) and Week 36 2011 (SAMNDCA630-06447120); the Samsung Stratosphere in Week 42 2011 (www.samsung.com/us/news/19927, SAMNDCA00279225); the Samsung Exhibit II 4G (T-Mobile) in Week 44 2011 (www.androidcentral.com/t-mobile-gets-its-first-no-contract-4g-smartphone-samsung-exhibit-ii-4g, SAMNDCA630-06615629); the Samsung Transform Ultra (Sprint) in Week 49 2011 (reviews.cnet.com/smartphones/samsung-transform-ultra-sprint/4505-6452_7-35059781.html, SAMNDCA10374507); the Samsung Admire (Metro PCS) in Week 10 2012 (web.archive.org/web/20120305120753/http:/www.metropcs.com/metro/detail/Samsung+Admire/SCHR720ZAAM, SAMNDCA630-06044074); the Samsung Galaxy S III (T-Mobile) in Week 25 2012 (www.tmonews.com/2012/06/t-mobile-breaks-up-galaxy-s-iii-launch/, SAMNDCA630-06625315); and the Samsung Galaxy S II Epic 4G Touch (Sprint) in Week 26 2012 (http://web.archive.org/web/20120628090213/http://shop.sprint.com/mysprint/shop/phone_details.jsp?prodId=dvc5890001prd&deviceSKUId=58900014&flow=AAL&planSKUId=null&tabId=dt_phones&ptn=,SAMNDCA630-06358839). See also the prices reported for the HTC Amaze 4G (T-Mobile) in Week 42 2011 (www.phonearena.com/news/T-Mobile-officially-announces-the-release-date-for-the-HTC-Amaze-4G-and-Samsung-Galaxy-S-II_id22429, SAMNDCA00279225) and the LG myTouch (T-Mobile) in Week 45 2011 (www.engadget.com/2011/11/01/lg-mytouch-mytouch-q-available-on-t-mobile-november-2nd-for-79/) and Week 47 2011 (SAMNDCA630-07554129).





324.    As mentioned above, Dr. Hauser's survey results confirm the economic intuition that Samsung's loss of sales if its product lacked multiple Accused Features would exceed the



sum of the losses associated with a lack of Accused Features each considered on their own. █





**(1) Step 1: Samsung's Contraction in Sales Absent a License**

395.    As to the first step, my estimate of the percentage by which Apple and Samsung would have expected Samsung's unit sales of the Accused Products to decline if they lacked the access to the Patented Inventions for the Accused Features is based on results of Dr. Hauser's survey and conjoint analysis discussed above.  In the context of the hypothetical negotiation, I assume that Apple and Samsung would have applied an estimate for a "representative" product, rather than undertaking the laborious task of pinning down likely effects on various product lines Samsung was considering for commercial releases at that time. ██████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████

- ████████████████;
- ████████████
- ████████████
- ████████████
- ████████████ and
- ████████████[667]

---

█ ████████████████████████████████████████

[667] ████████████

396.



_____

[668] These estimated percentages incorporate the linearization of the weights given to each Asserted Patent discussed in Section III.B.4 above which, as mentioned, implies that the estimate of the effect on Willingness to Buy of the Accused Feature associated with any individual Asserted Patent will be less than it actually would have been unless all the Asserted Patents are found to be valid and infringed.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████

███████████████████████████

481.    I provide my testimony herein.  As mentioned, I have considered the results of conjoint surveys performed under the direction of Dr. John Hauser, Apple's survey expert in this matter.  I have also spoken with Dr. Hauser to clarify my understanding of his methods and opinions.  Further, I have studied the expert reports of the damages experts retained by counsel for Apple and Samsung in the 1846 case.  The results of my consideration of these expert reports and conversations are reflected in my analysis above. They give rise to no additional adjustment of my royalty assessment here.

███████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

████████████████████

█  ██████████████████████████████████

████████████████████████████████████████

██████████████

████████████████████████████████

██████████

█  ███████████████████████████████████

███████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████



489.    My damages calculations are based on rigorous survey evidence of the value of the Accused Features that is attributable to each of the Patented Inventions.  These calculations are conservative in some important respects:

- Even though Dr. Hauser's survey and conjoint analysis show that the effects of removing multiple Accused Features together exceed the sum of the effects of removing each Accused Feature individually, my calculations incorporate only a simple additive treatment of value of each Accused Feature to Samsung customers.  In fact, my linear approximation of the correct weights further reduces damages for a combination of infringing patents by removing overlap demand effects.  The possibility that the Accused Features—which, as discussed in Section III.B.1.b above, enhance the user experience in a variety of common uses of the Accused Products—have a cumulative value to users that exceeds the sum of their individual values is thus not captured in my damages analysis, which leads to a material understatement of damages owed;

- My lost profits calculations include only sales of the Accused Products and the resulting lost sales of iPhones and iPads during the damages period.  They do not account for Apple's loss of subsequent replacement sales of iPhones and iPads or its lost sales of other devices, apps, or digital content for those devices that, as my analysis of demand and competition in Section III.C.2.a above and my assessment of reasonable royalties below show, are of great value to smartphone and tablet manufacturers;

- Like my lost profits calculations, my determination of reasonable royalty rates and damages does not account for Apple's lost sales of products other than iPhones and iPads. In addition, my reasonable royalty rates do not account for a consideration that would have weighed heavily in Apple's reluctance to license Samsung at any price, namely that doing so would increase the risk that network effects would begin to drive the marketplace toward a tipping point from Apple/iOS to Samsung/Android.





500.    Moreover, I have determined, based on both qualitative evidence set forth in my prior declarations and above, as well quantitative evidence, including conjoint survey data provided by Dr. Hauser and discussed herein, that Samsung's infringement of the Asserted Patents bears a direct causal nexus to, and indeed drives, consumer demand for Samsung's products.  In particular, as the survey data provided by Dr. Hauser show, there is at least some direct nexus between each individual patent and consumer demand.  The degree of this nexus varies by patent and is not 100% for any one patent (i.e., the Patented Features do not drive demand for 100% of all Samsung smartphone or tablet purchasers).  But in no case do I find that monetary damages alone can be quantified in a way to fully and fairly compensate Apple for infringement of any one patent at issue in this case.  In addition, as the results of Dr. Hauser's survey show, the combined impact on demand of all of the Asserted Patents together exceeds the sum of the impact of all individual patents.  As discussed above, Samsung's use of the Patented Features provides Samsung with substantial value and has formed a key foundation of Samsung's competition strategy, particularly vis-à-vis Apple, in the smartphone and tablet markets and beyond.[751]





HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER