QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
Kevin A. Smith (Bar No. 250814)
kevinsmith@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

William C. Price (Bar No. 108542)
williamprice@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC. and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | CASE NO. 12-CV-00630-LHK (PSG)<br><br>**SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>REDACTED    **VERSION OF DOCUMENT SOUGHT TO BE SEALED**<br><br>Date:  December 12, 2013<br>Time: 1:30 p.m.<br>Place: Courtroom 8, 4th Floor<br>Judge: Honorable Lucy H. Koh |

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 1

I.   THE ACCUSED PRODUCTS DO NOT INFRINGE THE '647 PATENT ...................... 1

    A.   The Accused Products Lack an "Analyzer Server For Detecting Structures In The Data, And For Linking Actions To The Detected Structures" ...................... 2

    B.   The Accused Products Lack the "User Interface" Limitation of Claim 1 ................. 5

    C.   The Accused Products Lack the "Action Processor" Limitation of Claim 1 ........... 6

II.  THE ACCUSED PRODUCTS DO NOT INFRINGE THE '414 PATENT ...................... 7

    A.   The Accused Devices Lack the Required Three "Synchronization Software Components" That Are Each "Configured to Synchronize Structured Data" .......... 7

    B.   The Accused Products Do Not Contain "Synchronization Processing Threads" ................................................................................................................... 9

III. THE ACCUSED PRODUCTS DO NOT INFRINGE THE '172 PATENT ..................... 11

    A.   Claim 18 of the '172 Patent Covers a Narrow Embodiment of the Patent ............. 11

    B.   The Preamble of Claim 18, Which Is Limiting, Requires a Physical Keyboard ................................................................................................................. 12

IV.  APPLESEARCH AND WAIS INVALIDATE THE '959 PATENT ................................ 14

    A.   The Asserted Claims Recite Software With Specific Capabilities; A Demonstration of Capability Is All That Is Required For Anticipation ................. 14

    B.   AppleSearch Was Known, Used, Sold, and Offered For Sale In The Prior Art Period With The Capabilities Recited In The '959 Patent ............................... 16

    C.   WAIS Software Was Known, Used, Sold, and Offered For Sale In The Prior Art Period With The Capabilities Recited In The '959 Patent ............................... 17

    D.   Apple's "Summary Judgment" Arguments Regarding Obviousness Are Meritless, And Contradict Apple's Court Filings And Litigation Positions .......... 19

V.   THE '446 PATENT DOES NOT ANTICIPATE THE '757 PATENT ............................. 20

    A.   Incorporation of the Multer Patent is Inappropriate ............................................... 20

    B.   The '446 Patent Does Not Teach Automatic Synchronization Of Multimedia Data ...................................................................................................... 21

    C.   The '446 Patent Does Not Teach A System That Is Capable Of Synchronizing Data Across All Devices Of The System ......................................... 22

1     1.  No disclosure of bidirectional synchronization between a zone and

2        central device ............................................................................................. 22

3     2.  No disclosure of a system that has the capability to update all

        devices ......................................................................................................... 23

4  VI.  APPLE'S MOTION SEEKS EXCESSIVE CLAIM CONSTRUCTION ........................... 25

5  VII.  CONCLUSION ................................................................................................. 25

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Advanced Display Sys., Inc. v. Kent State Univ.*,
  212 F.3d 1272 (Fed. Cir. 2000) ......................................................................................20, 21

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...............................................................................................................1

*Apple Inc. et al. v. Motorola, Inc. et al.*,
  No. 1:11-cv-08540 (N.D. Ill.) .................................................................................................2

*Aventis Pharms. Inc. v. Amino Chem. Ltd.*,
  715 F.3d 1363 (Fed. Cir. 2013) ...........................................................................................14

*Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*,
  616 F.3d 1249 (Fed. Cir. 2010) ...........................................................................................12

*Brocade Commc'n Sys., Inc. v. A10 Networks, Inc.*,
  873 F. Supp. 2d 1192 (N.D. Cal. 2012) .................................................................................1

*C.W. Zumbiel Co. v. Kappos*,
  702 F.3d 1371 (Fed. Cir. 2012) ...........................................................................................12

*eMachines, Inc. v. Ready Access Memory, Inc.*,
  No. 5:00-cv-00374, 2001 WL 456404 (C.D. Cal. Mar. 5, 2001) ..........................................1

*Finjan, Inc. v. Secure Computing Corp.*,
  626 F.3d 1197 (Fed. Cir. 2010) ...........................................................................................15

*Gaus v. Conair Corp.*,
  363 F.3d 1284 (Fed. Cir. 2004) ...........................................................................................13

*Harari v. Mihnea*,
  656 F.3d 1331 (Fed. Cir. 2011) ...........................................................................................21

*Helicos Biosciences Corp. v. Illumina, Inc.*,
  888 F. Supp. 2d 519 (D. Del. 2012) .....................................................................................21

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
  527 F.3d 1379 (Fed. Cir. 2008) ...........................................................................................13

*Intamin Ltd. v. Magnetar Techs., Corp.*,
  483 F.3d 1328 (Fed. Cir. 2007) ...........................................................................................13

*Language Line Servs., Inc. v. Language Servs. Assocs., Inc.*,
  __ F. Supp. 2d __, 2013 WL 1891369 (N.D. Cal. May 6, 2013 ) ...........................................1

*Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*,
  520 F.3d 1367 (Fed. Cir. 2008) ...........................................................................................14

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008) ................................................................22, 24

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*,
    429 F.3d 1364 (Fed. Cir. 2005) ........................................................................13

*In re Seversky*,
    474 F.2d 671 (CCPA 1973) ...............................................................................21

*TypeRight Keyboard Corp. v. Microsoft Corp.*,
    374 F.3d 1151 (Fed. Cir. 2004) ..................................................................17, 19

*Ultradent Prods. Inc. v. Life-Like Cosmetics, Inc.*,
    127 F.3d 1065 (Fed. Cir. 1997) ........................................................................21

*Univ. of Texas v. Camenisch*,
    451 U.S. 390 (1981) .............................................................................................1

*Versata Software, Inc. v. SAP America, Inc.*,
    717 F.3d 1255 (Fed. Cir. 2013) ........................................................................15

*Yodlee, Inc. v. CashEdge, Inc.*, No. C 05-01550 SI,
    2006 WL 3456610 (N.D. Cal. Nov. 29, 2006) ................................................15

## **Statutes**

35 U.S.C. § 103 ........................................................................................................20

Fed. R. Civ. P. 56(a) ...................................................................................................1

## MEMORANDUM OF POINTS AND AUTHORITIES

Apple's motion must be denied unless it "shows that there is *no* genuine dispute as to *any* material fact" and that Apple "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). There is a genuine dispute of a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "The opposing party need not show the issue will be resolved conclusively in its favor. All that is necessary is submission of sufficient evidence to create a material factual dispute, thereby requiring a jury or judge to resolve the parties' differing versions at trial." *Brocade Commc'n Sys., Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192, 1199-1200 (N.D. Cal. 2012) (citation omitted).

This standard differs substantially from the preliminary injunction standard. "The limited purpose of a preliminary injunction is to preserve the status quo and prevent irreparable injury, not to provide an evidentiary basis for granting summary judgment." *eMachines, Inc. v. Ready Access Memory, Inc.*, No. 5:00-cv-00374, 2001 WL 456404 at *4 (C.D. Cal. Mar. 5, 2001) (*citing Univ. of Texas v. Camenisch*, 451 U.S. 390, 394 (1981)). Thus, this Court's June 29, 2012 preliminary injunction ruling (Dkt. 221) ("PI Order") is no basis for summary judgment. *See, e.g., Language Line Servs., Inc. v. Language Servs. Assocs., Inc.*, __ F. Supp. 2d __, 2013 WL 1891369, at *9 (N.D. Cal. May 6, 2013 ) (preliminary injunction phase is a "procedurally and legally distinct stage of the case from" summary judgment; party went a "step too far" by claiming summary judgment was decided by the earlier "preliminary ruling," as "the findings of fact and conclusions of law made by the court at that stage are not binding").

## I.    THE ACCUSED PRODUCTS DO NOT INFRINGE THE '647 PATENT

Apple moves for partial summary judgment of infringement of claim 1 of the '647 patent, on only one of Apple's two infringement allegations,[1] based primarily on argument rather than

---

[1]    Apple's contentions accuse both the Browser and Messenger applications across several versions of Android in Samsung's products, but Apple's motion only addresses the Browser application; Apple never mentions the Messenger application, which functions differently.

evidence.  That argument includes heavy reference to the PI Order.  But that Order was based on a different factual record and applied a different legal standard, and thus has no bearing on the summary judgment determination.  *Supra* at 1.  Apple ignores or mischaracterizes Samsung's current arguments, repeatedly relying on its own expert to establish allegedly "undisputed" facts.  This falls woefully short of satisfying the requirements for summary judgment.  Apple's motion implicates a litany of materials factual disputes, and thus cannot be granted.

### A.    The Accused Products Lack an "Analyzer Server For Detecting Structures In The Data, And For Linking Actions To The Detected Structures"

Claim 1 recites "an analyzer server for detecting structures in the data, and for linking actions to the detected structures . . ."  (Rho Decl. Ex. B-6 (Dkt. 803-11, '647 Patent) at 7:16-17.)  The district court in *Apple Inc. et al. v. Motorola, Inc. et al.*, No. 1:11-cv-08540 (N.D. Ill.) ("Motorola Court") previously construed "analyzer server" and "linking actions to the detected structures."[2]  The Federal Circuit is reviewing those constructions.[3]  Whatever the outcome of that appeal, Samsung's accused products do not infringe, as they do not meet the Motorola Court's constructions *or* the rejected constructions Apple proposed to the Motorola Court.[4]

As an initial matter, Apple simply ignores many of Samsung's non-infringement positions concerning the "analyzer server" claim term.[5]  Apple never even recites the Motorola Court's construction for "analyzer server" or acknowledges Samsung's position – not raised during the PI phase – that the accused "shared libraries" never "receive data having structures from the client" as

---

[2]    The Motorola Court construed "analyzer server" to be "a server routine separate from a client that receives data having structures from the client."  (Fazio Decl. Ex. 1 at 9.)  The Motorola Court also construed "linking actions to the detected structures" to mean "creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on that detected structure."  (*Id.*)

[3]    In a footnote, Apple "urges the Court to construe these terms" based on statements in Apple's expert report.  (Mot. at 5 n. 6.)  But as Apple itself acknowledges, the proper construction of these terms is currently before the Federal Circuit.  (*Id.* at 5.)  Construing those terms now would needlessly waste the Court's time when a Federal Circuit opinion is forthcoming.

[4]    Apple does not even address non-infringement under the constructions it offered in the Motorola action other than a single unsupported sentence that "the undisputed facts prove infringement under either set of constructions."  (Mot. at 5 n. 6.)

[5]    Dr. Jeffay's attached declaration provides a number of reasons, ignored by Apple in its motion, why Samsung's accused products do not infringe.  The declaration mirrors the opinions set forth in Dr. Jeffay's rebuttal expert report.

1   expressly required by that construction. ██████████████████████████████

2   ████████████████████████████████████████████████████████████████████

3   ████████ (*See* Jeffay Decl. ¶¶ 100-101, 112-113, 120, 135-136, 173-174, 185-186.)  Apple may

4   dispute this analysis, but it cannot simply be ignored.

5        Apple ignores other factual disputes concerning Samsung's devices. ████████████

6   ████████████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████

8   ████████████████████████████████████████████ (*See* Jeffay Decl. ¶¶

9   103-109, 126-132, 176-182.)  Rather than address this and other factual disputes, Apple tries to

10  disguise them as claim construction issues.  In this instance, Apple asserts Samsung reads the

11  Motorola Court's construction of "analyzer server" to mean the accused routines must run in a

12  separate process at run-time for there to be infringement.  (*See* Mot. at 5-6.) ████████████

13  ████████████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████

15  ████████████ A jury must resolve this and other material disputes of fact.

16        Apple also tries to summarize ***58 paragraphs*** of Samsung's non-infringement expert report

17  ***in one sentence*** and then claim "[t]his Court rejected Samsung's ***exact*** arguments in its PI Order."

18  (Mot. at 5 (emphasis added).)  In fact, this Court has not considered Samsung's current arguments.

19  Samsung's expert Dr. Jeffay did not participate during the PI phase.  His opinions are substantially

20  more advanced than those offered in the PI phase. ██████████████████████████████

21  ████████████████████████████████████████████████████

22  ████████████████████████████████████████████ (*See* Jeffay Decl.

23  ¶¶ 19-24, 35-39, 60-71.)[6]  Apple likewise alleges that Samsung "argues, just as it did in the PI

24  phase, that the claims permit absolutely no overlap between the analyzer server and the 'client.'"

25  (Mot. at 6.)  Apple again distorts a factual dispute.  Apple's expert opines that the accused code in

---

26  [6]  Dr. Jeffay also explained why a person of ordinary skill in the art at the time of the alleged

27  invention would not have confused a "server" with a shared library generally and certainly not with
    the accused "shared libraries."  (Jeffay Decl. ¶¶ 96-97, 116-117, 169-170.)

28

1  the client application is something he calls "glue code," a piece of jargon with no standard, definite

2  meaning in the art (*see* Rho Decl. Ex. B-1 (Dkt. 803-11, Mowry Opening Report) ¶ 227) that,

3  according to Apple's expert, simply allows the application to interface with the shared library.  (*See*

4  *id.*) ██████████████████████████████████████████████████████████████████████

5  ██████████████████████████████████████ (*See* Jeffay Decl. ¶¶ 103, 126, 176.) ████████████

6  ██████████████████████████████████████████████████████████████████████████████

7  ████████████████████████  (Mot. at 6.)  Apple ignores this factual dispute.

8       Apple also misrepresents this Court's order construing the term "action processor" to

9  improperly frame the "analyzer server" term.  In attempting to rebut the Motorola Court's

10  "separateness" requirement for "analyzer server," Apple quotes this Court as "explain[ing] that

11  '[t]he claims strongly suggest that [the claimed program routines are] not necessarily separate from

12  the application containing the data."  (Mot. at 6.)  But Apple incredibly *misrepresents this Court's*

13  *own words*; the Court is not referring to "the claimed program routines" as identified by Apple in

14  brackets but rather is referring only to the "action processor."  Here is the Court's language in full:

15  "The claims strongly suggest that *an action processor* is not necessarily separate from the

16  application containing the data."  (Dkt. 447 at 16 (emphasis added).)  Apple's misrepresentation is

17  especially egregious considering the Motorola Court's primary basis for finding the analyzer server

18  to be separate from the client application is the use of the word "server" and its indication of a

19  client-server relationship, which does not appear in the "action processor" claim limitation.  (*See*

20  Fazio Decl. Ex. 1 at 9.)

21       Apple similarly mischaracterizes Samsung's non-infringement positions for the "linking"

22  phrase, this time summarizing 12 paragraphs of Dr. Jeffay's non-infringement expert report in *two*

23  *sentences*.  (*See* Mot. at 7.)  Apple again fails to even mention the Motorola Court's construction of

24  the "linking" phrase.  Instead, Apple implies that Samsung requires a "pointer" for infringement.

25  (*See id.*)  This is false.  Dr. Jeffay merely opined, by way of explanation, that "[i]n its simplest and

26  most straightforward realization, a link is a pointer."  (Jeffay Decl. ¶¶ 138, 188.)  Nowhere does Dr.

27

28

1   Jeffay or Samsung allege that a pointer is required.[7]

2       Apple apparently relies on these mischaracterizations to hide that material disputes of fact

3   remain concerning the alleged "linking" performed by Samsung's accused devices.  ███████

4   ████████████████████████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████   (*See* Jeffay Decl. ¶¶ 141-143, 191-193.)

6   This is plainly contrary to the language of claim 1, which requires "a user interface enabling the

7   selection of a detected structure and a ***linked*** action."  Apple never mentions this, or related factual

8   disputes about the operation of the accused code, instead alleging that the facts are "undisputed" by

9   – incredibly – citing to Apple's ***own expert's report***.  (*See* Mot. at 7.)  Apple's say-so is not

10  enough:  Samsung's expert methodically demonstrated Apple's expert is wrong both on the facts

11  and the interpretation of them.  (*See, e.g.*, Jeffay Decl. ¶¶ 19-30, 35-48, 60-92.)  These disputes of

12  fact are for the jury to resolve; summary judgment is not appropriate here.

13      **B.    The Accused Products Lack the "User Interface" Limitation of Claim 1**

14      Claim 1 also recites "a user interface enabling the selection of a detected structure and a

15  linked action…."  (Rho Decl. Ex. B-6 (Dkt. 803-11, '647 Patent) at 7:18-19.)  Samsung's Accused

16  Jelly Bean Browser Products, introduced ***after*** the PI briefing, do not include "a user interface

17  enabling the selection of a detected structure."  (Dkt. 805-04 at1-8.)  Rather, those products require

18  the user to select a "structure" *before* it is "detected."  *Id.*

19      Facing summary judgment of non-infringement, Apple argues Samsung is "applying an

20  overly restrictive construction of 'selection'" in asserting non-infringement.  (Mot. at 9.)  But

21  Samsung is applying the plain language of the claim:  the user interface must enable the selection

22  of a ***detected*** structure (*i.e.*, the structure must be detected ***before*** being selected).  Apple itself

23  admits that in Samsung's accused products, "the user can select the [structure], which ***will be***

24  ***detected***…."  (Mot. at 9 (emphasis added).)  ████████████████████████████████

25

26      ───────────────────────
        [7]   Apple similarly alleges that Samsung is reading a "direct link" requirement into the claim

27  language which, according to Apple, was rejected by the Court during the PI phase.  (Mot. at 7.)
    But this is wrong – the Court never even addressed any such argument, let alone rejected it.  (*See*

28  Dkt. 221 (PI Order) at 35-36.)

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 (*Id* (emphasis added).)  Thus, there is no dispute that selection occurs **before** detection.  Summary

4 judgment of ***non-infringement*** is plainly appropriate here.

5      Apple's only retort, via unsupported attorney argument, is that a user's selection continues

6 throughout a "long-press" and ultimately overlaps with detection by the system, which somehow

7 means that the accused user interface enables the selection of a detected structure.  (*See* Mot. at 9-

8 10.)  Apple's argument conflicts with the plain language of the claim, which requires the ability for

9 a user to select a "***detected*** structure."  Apple's motion should be denied and Samsung's motion for

10 summary judgment of non-infringement granted.[8]

11     **C.**    **The Accused Products Lack the "Action Processor" Limitation of Claim 1**

12      Claim 1 requires "an action processor for performing the selected action linked to the

13 selected structure . . ."  (Rho Decl. Ex. B-6 (Dkt. 803-11, '647 Patent) at 7:20-21.)  Once again,

14 Apple cites its own expert's report as "undisputed" fact, mischaracterizes Samsung's positions, and

15 then declares that Samsung is wrong.  Apple also ignores disputed issues of material fact regarding

16 the operation of the code Apple accuses as the "action processor" – including whether the code

17 Apple accuses actually "performs the selected action" on the structures in question, as required by

18 the Court's construction.  (*Compare* Rho Decl. Ex. B-1 (Dkt. 803-11, Mowry Opening Report) ¶¶

19 257-262 *with* Jeffay Decl. ¶¶ 84-92, 161-165, 205-209.)  Apple does not address these disputes –

20 but ignoring them will not make them go away.  They must be resolved in Samsung's favor,

21 precluding summary judgment.  *Supra* at 1.

22      Instead, Apple tries to summarize five paragraphs of Dr. Jeffay's report in one sentence:

23 "Samsung claims that Dr. Mowry identifies one routine ███████████ as the 'action' as well as the

24 'action processor,' then argues that one routine cannot be both."  (Mot. at 8.)  Apple then relies on

25         [8]  Apple also misrepresents Samsung's position concerning the detection of multiple structures.

26 (*See* Mot. at 8-9.)  Contrary to Apple's allegations, Samsung's position, as set forth in its summary
judgment motion, is that the Accused Jelly Bean Browser Products do not allow a user to select a

27 detected "structure" from a set of detected "structures."  (*See* Dkt. 805-04 at 6-9.)  Samsung's

28 summary judgment motion should be granted on this separate ground as well.

1    five paragraphs of Dr. Mowry's report to assert that Samsung and Dr. Jeffay are wrong.  (*Id.*)

2    Putting aside all the problems with Dr. Mowry's analysis, Apple's approach demonstrates why its

3    motion should be rejected.[9]  Declaring an expert's opinions wrong by pointing to one's *own* expert

4    shows material disputes of fact that *preclude* summary judgment.

5    **II.     THE ACCUSED PRODUCTS DO NOT INFRINGE THE '414 PATENT**

6           The Accused Products do not infringe claim 20 of the '414 patent.  Apple's cursory motion

7    for summary judgment of infringement does not address the actual record; it depends entirely on

8    the opinions of its testifying expert, Dr. Alex Snoeren.  But Dr. Snoeren's opinions only confirm

9    multiple disputed issues of material fact that require the Court to deny Apple's motion.

10           **A.     The Accused Devices Lack the Required Three "Synchronization Software
                  Components" That Are Each "Configured to Synchronize Structured Data"**

11

12          Apple's motion overlooks a core factual dispute:  the number of "synchronization software

13   components configured to synchronize structured data" in the accused products.  The parties agree

14   Claim 20 requires at least *three* different "synchronization software components," each of which

15   must be configured to synchronize structured data for a different data class, such as mail, contacts,

16   or calendar.  (Fazio Decl. Ex. 2 at 288:1-289:2; Chase Decl. ¶ 105.)  The parties dispute whether

17   three such components exist in the Accused Products.

18          Apple claims six different "Sync Adapters" in the Accused Products each are "configured to

19   synchronize" structured data for a different data class.  (Mot. at 11.)  Its argument rests entirely on

20   Dr. Snoeren, who broadly opined that ███████████████████████████████████████

21   ██████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████

     _____

24          [9]    In short, Apple and Dr. Mowry are claiming that ████████████████████

25   █████████████ is both the claimed "action" and the claimed "action processor."  (*See* Rho Decl.
     Ex. B-1 (Dkt. 803-11 ¶¶ 146, 160.)  But the Court's construction of "action processor" requires

26   "program routine(s) that perform the selected action on the detected structure."  (Dkt. 447 at 20.)
     ████████████████████████████████████████████████████████

27   ███████████████████ (Jeffay Decl. ¶ 163, 207.) ██████████████████████

28   ██████████████████████████████ (*Id.*)

1   (Mot. at 10; Fazio Decl. Ex. 3 ¶¶ 423, 462 & 473.)  But Dr. Snoeren's cursory analysis is incorrect.

2   ███████████████████████████████████████████████

3   ████████████████████ (Fazio Decl. Ex. 3 ¶¶ 422-25), █████████████████████

4   ████████████████████████████████████████████████

5   █████████████ (Chase Decl. ¶¶ 76-103, 106.) ███████████████████

6   ████████████████████████████████████████████████

7   ████████████████████████████████████████████████

8   ████████████████████████████████████████████████

9   ████████████████████ (*Id.* ¶¶ 24-53.) ████████████████

10  ███████████████████████████ (*Id.* ¶¶ 24-32, 76-81) ██████

11  ██████████████████████ (*Id.* ¶¶ 33-53, 82-103). ███████████

12  ████████████████████████████████████████████████

13  ████████████████████████████████████ Apple *does*

14  *not accuse* the components that actually synchronize Gmail or Exchange data, because it cannot

15  stretch the claims to cover them.

16      Apple and Samsung thus submit a genuine dispute of material fact.  Apple contends all six

17  accused Sync Adapters perform synchronization operations. ████████████████████

18  █████████████████████, meaning the Accused Devices lack three "synchronization

19  software components" that are "configured to synchronize structured data." (*Id.* ¶¶ 105-06.)  This

20  dispute alone requires denial of summary judgment.  *See supra* at 1.

21      Seeking to distract the Court from this critical dispute of material fact, Apple rails against

22  an argument that Samsung has not made:  that the claim requires synchronization software

23  components to "perform *all* the synchronization steps on their own." (Mot. at 11, 12 (emphasis

24  ─────────────────────
    [10] ██████████████████████████████████████

25  ██████████████████████████████████████████

26  ███████████████████ (Westbrook Decl. ¶¶ 3-4.) ████████████

27  ████████████████████████████████████████████████

28  ████████████████████ (*Id.* ¶ 6-7.) ████

1   added).)  This misstates Samsung's view.  In fact, each "synchronization software component" that

2   is "configured to synchronize structured data" must perform *at least some* synchronization

3   operations with that data.  This is clear from the claim language, which requires not only that the

4   component be a "synchronization software component" but *further* requires the component be

5   "*configured* to synchronize" data.  The specification – including Apple's cited excerpts – also

6   supports Samsung's view of the claim.  (Rho Decl. Ex. C-3 (Dkt. 803-11, '414 Patent) at tbl. A

7   (describing functionalities of disclosed "synchronization software components").)  Indeed, as

8   Apple admits in its motion, the synchronization software components in the specification – "Data

9   Sources" that  "open the database on the device," "send changed/new/deleted records" to and

10  "process and commit data" received from a host (Mot. at 12), and a "Sync Agent," which the patent

11  describes as "maintain[ing] a data connection between the device and the host" and "determin[ing]

12  the order of synchronization of the various data classes by specifying directly or indirectly the

13  order" (Rho Decl. Ex. C-3 (Dkt. 803-11, '414 Patent) at 8:51-61) – each *actually perform*

14  *synchronization operations* on structured data.  (*Id*. at 8:23-61, tbl. A.)  Thus the specification

15  merely reinforces Samsung's disputed issue of material fact:  ███████████████████████████

16  ███████████████████████████████████████  (*See supra*.)  In light

17  of this dispute, the Court must deny Apple's motion regarding the '414 patent.

**B.**     **The Accused Products Do Not Contain "Synchronization Processing Threads"**

19       Apple's motion fails for a second, separate reason:  the Accused Products lack what Apple

20  describes as the "threads" for "synchronization processing" in Claim 20.  Apple alleges Claim 20

21  requires at least three of these threads, each of which must meet several exacting requirements.

22  (Fazio Decl. Ex. 4 ¶¶ 493, 566, 572; Fazio Decl. Ex. 2 at 307:14-19.)  The Accused Products lack

23  these "threads," dooming Apple's motion.

24       According to Apple, a synchronization processing thread must be "provide[d]" by a

25  component that itself "create[s] or instantiate[s] the synchronization processing thread."  (Fazio

26  Decl. Ex. 4 ¶ 566; Fazio Decl. Ex. 2 at 300:14-23, 307:14-19.)  Thus three of the accused Sync

27  Adapters must each "create or instantiate" a separate "synchronization processing thread."  (*Id.*)

28  Apple's motion does not show this requirement is satisfied; its brief merely cites Dr. Snoeren's

1  opinion that █████████████████████████████████████████████

2  ██████████████████████████████████████ (Fazio Decl. Ex.

3  3 ¶ 455.)[11]  And for good reason:  as explained by Google's corporate witness, the Sync Adapters

4  accused by Apple ██████████████████████████████████

5  █████████

6  ██  ████████████████████████████████████

7  ██  ██

8  ██  ██

9  ██  █████████████████████████████████████

10  ████████████████████

11  ██  ███████████████

12  ██  ████████████████████████████████

13  ██  ███████████

14  (Fazio Decl. Ex. 5 at 249:24-250:22 (objections omitted).)  This alone provides a disputed issue of

15  material fact:  whether the accused Sync Adapters ██████████████████████

16  ███████████ (Fazio Decl. Ex. 4 ¶ 566.)

17       In addition, Apple argues that the components creating "synchronization software threads"

18  must be part of a single "plug-in architecture" that is part of an "extensible" and "consistent

19  framework."  (*Id.* ¶¶ 449, 552, 572.)  Again, Apple's motion does not address this requirement, but

20  merely cites Dr. Snoeren opining that ████████████████████████████████

21  ████████████████████████████████████████████████

22  (Rho Decl. Ex. C-1 (Dkt. 803-111) ¶ 473.)  And again, however, the facts are contrary to Apple's

23  assumptions:  ████████████████████████████████

24  ████████████████████████████████████████████████

25

26  [11]   To the extent Apple relies on Dr. Chase's testimony to satisfy this limitation (Mot. at 14 n.
     9), Apple mischaracterizes the testimony.  For instance, Apple did not even attempt to question Dr.
27  Chase regarding whether the accused Sync Adapters "created" the claimed "synchronization
     processing threads."   (Rho Decl. Ex. C-4 (Dkt. 803-11, Chase Dep.) at 60:9-62:10.)
28

1   ███████████████████████████   (Westbrook Decl. ¶¶ 2-7.) ████████████

2   ████████████████████████████████████████████████████████████

3   ██████████   (Fazio Decl. Ex. 4 ¶ 552.)  As above, this dispute is fatal to Apple's motion.

4          Finally, the "synchronization processing threads" must execute "concurrently" with a non-

5   synchronization processing thread that allows accessing and editing of the structured data in the

6   application's database.  Apple's motion focuses on "execut[ing] concurrently" (Mot. at 13), but

7   ignores "accessing and editing structured data" in a first **database**.  This is curious; Apple's expert

8   elsewhere touts the alleged value of "access[ing] and edit[ing] data while synchronization of **that**

9   **data** is occurring" so as to avoid a "wait" in the user interface.  (Fazio Decl. Ex. 4 ¶ 620; *see also*

10  Fazio Decl. Ex. 6 (emphasis added).)  But the applications Apple accuses of infringement actually

11  ████████████████████████████████████████████████████████████

12  ████████████████████████████████████████   (Chase Decl. ¶¶ 63-71.)

13  ████████████████████████████████████████████████████████████

14  █████████████████   – the opposite of Apple's assumption.  (Fazio Decl. Ex. 7 at 94:8-21.)[12]

15  As before, this material factual dispute is by itself enough to require denial of Apple's motion.  For

16  at least these additional reasons, the Accused Products lack the limitations Apple itself ascribes to

17  Claim 20, making summary judgment improper.

18  **III.   THE ACCUSED PRODUCTS DO NOT INFRINGE THE '172 PATENT**

19          Apple's motion turns on its allegation that claim 18 of the '172 patent covers both physical

20  keyboards and virtual keyboards integrated into the touchscreen display on a smartphone.  Apple's

21  allegation conflicts with the plain language of the claim and should be rejected.[13]

22          **A.     Claim 18 of the '172 Patent Covers a Narrow Embodiment of the Patent**

23          The '172 patent addresses the "need for more efficient ways of entering text into portable

---

24          [12]   Apple claims Dr. Chase "admitted" this claim limitation was satisfied (Mot. at 13 (*citing*

25  Chase Dep. 86:9-20, 88:6-17, 89:19-90:9 ), but the testimony cited by Apple merely agreed that

26  ██████   (Rho Decl. Ex. C-4 (Dkt. 803-11) at 90:3-9; *see also id.* at 87:2-24 (same).)  This is
    insufficient for summary judgment.  *Supra* at 1.

27          [13]   Apple does not accuse any physical keyboards of infringing claim 18 of the '172 patent.
    (Wigdor Decl. ¶ 7.)

28

---

1    devices."  (Rho Decl. Ex. A-3 (Dkt. No. 803-11, '172 Patent) at 1:36-37.)  The patent discloses

2    numerous embodiments, including embodiments covering a physical keyboard and embodiments

3    covering "a virtual or soft keyboard" displayed in a region of a touch screen display.  (*Id.* at 7:14,

4    33-39.)  The '172 patent contains 10 independent claims covering the various embodiments.

5         Apple only asserts independent claim 18, a narrow claim limited to the physical keyboard

6    embodiment.  Claim 18 has no dependent claims.  Most of the other independent claims include

7    dependents establishing the presence of both virtual and physical keyboards, but claim 18 does not.

8    (*See, e.g.*, *id.* at Claims 21, 23, 28-29.)  The preamble of claim 18 – "[a] graphical user interface on

9    a portable electronic device with a keyboard and a touch screen display" – is also unique among the

10   independent claims:  no other independent claim preamble separately calls out the "keyboard" and

11   the "touch screen display."  (*See, e.g.*, *id.* at 11:20-16:60.)

12        **B.        The Preamble of Claim 18, Which Is Limiting, Requires a Physical Keyboard**

13        Apple does not dispute that the preamble of claim 18 is limiting.[14]  (Mot. at 3.)  By its plain

14   language, this preamble covers only physical keyboards, not "virtual or soft keyboard(s)."  *See*

15   *Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010)

16   ("Claim construction 'begins and ends in all cases with the actual words of the claim'").  The

17   preamble separately calls out a "keyboard *and* a touch screen display."  (Rho Decl. Ex. A-3 (Dkt.

18   No. 803-11, '172 Patent) at 12:49-50 (emphasis added).)  Based on this language, a person of skill

19   in the art at the time of the alleged invention would have understood it to exclude virtual

20   keyboards, because a virtual keyboard must be ***part of*** the touch screen display rather than separate

21   from it.  (Wigdor Decl. ¶ 4.)  *See Becton, Dickinson*, 616 F.3d at 1254 ("Where a claim lists

22   elements separately, 'the clear implication of the claim language' is that those elements are 'distinct

23   component[s]' of the patented invention.") (internal citations omitted).  Indeed, the '172 patent

24   confirms that a "physical keyboard," unlike a virtual keyboard, "is not part of the touch screen

25

26        _____

          [14]   The terms "keyboard" and "touch screen display" both provide antecedent basis for
27   limitations in the body of the claim, and are therefore limiting.  *See C.W. Zumbiel Co. v. Kappos*,
     702 F.3d 1371, 1385 (Fed. Cir. 2012) ("the preamble constitutes a limitation when the claim(s)
28   depend on it for antecedent basis").

1    display."  (Rho Decl. Ex. A-3 (Dkt. No. 803-11, '172 Patent) at 7:35-36.)

2           The Federal Circuit addressed similar claim language in *Gaus v. Conair Corp.*, 363 F.3d

3    1284, 1287-88 (Fed. Cir. 2004).  Considering the phrase "an electrical operating unit and a pair of

4    spaced-apart electronically exposed conductive probe networks," the Court concluded that because

5    the claim listed the "pair of probe networks" and "electrical operating unit" elements ***separately***,

6    the "clear implication of the claim language [was] that the pair of probe networks [was] a distinct

7    component," and not "a portion of the 'electrical operating unit.'"  *Id.* at 1288.  The same is true in

8    claim 18:  "keyboard" and "touch screen display" are listed separately, and the claim does not

9    suggest that the former is a part of the latter; rather, the two are separate.

10          Apple ignores the principle that every claim need not cover every embodiment.  *See*

11   *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) ("It is often

12   the case that different claims are directed to and cover different disclosed embodiments.").  Claim

13   18 covers the physical keyboard embodiment described by the '172 patent; other independent

14   claims in the '172 patent with less restrictive preambles cover both the virtual and physical

15   keyboard embodiments.  (*See generally* Rho Decl. Ex. A-3 (Dkt. No. 803-11, '172 Patent) at 11:20-

16   16:60.)  For example, independent claim 28 covers both physical and virtual keyboards, confirmed

17   by dependent claim 29, which recites that "the keyboard is a virtual keyboard displayed on the

18   touch screen display."  *See Intamin Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328, 1335 (Fed. Cir.

19   2007) ("An independent claim impliedly embraces more subject matter than its narrower dependent

20   claim.").  Of course, claim 18 has no such dependent claim.

21          Apple relies on a single case, *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364 (Fed.

22   Cir. 2005), to say limiting claim 18 to a physical keyboard would improperly exclude a "preferred

23   embodiment."  (Mot. at 2.)  But in *Pfizer*, the Federal Circuit affirmed the construction of the term

24   "saccharide," which appears in the only two independent claims in the patent, corresponding

25   composition and process claims.  *See Pfizer* at 1373, 1376.  The accused infringer, Ranbaxy,

26   argued for a narrower construction, but the Court determined Ranbaxy's construction conflicted

27   with the embodiment described in the patent.  *Id.* at 1374.  Here there are multiple embodiments,

28

1   none of them preferred,[15] and 10 distinct independent claims correspond to multiple embodiments.

2   Reading claim 18 to cover physical keyboards does not read out a preferred embodiment.  It

3   comports with the plain claim language to cover a distinct embodiment:  a physical keyboard.

4          Apple also argues that claim 18 includes physical and virtual keyboards because other

5   independent claims using the same "keyboard" term cover both.  (Mot. at 2.)  But "the same claim

6   term can have different constructions depending upon the context of how the term is used within

7   the claims and specification."  *Aventis Pharms. Inc. v. Amino Chem. Ltd.*, 715 F.3d 1363, 1374

8   (Fed. Cir. 2013); *see also Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d

9   1367, 1375-76 (Fed. Cir. 2008) (construing the term "condition code" differently for "each

10  occurrence in context").  Here, the preamble of claim 18 distinguishes the keyboard from the touch

11  screen display in a way that excludes virtual keyboards.

12  **IV.   APPLESEARCH AND WAIS INVALIDATE THE '959 PATENT**

13         Apple's motion misrepresents Samsung's positions, misrepresents the factual record,

14  misrepresents the nature of the claims at issue, and even misrepresents Apple's own binding

15  stipulations.  This meritless effort to avoid invalidating prior art should be denied.

16         **A.   The Asserted Claims Recite Software With Specific Capabilities; A
             Demonstration of Capability Is All That Is Required For Anticipation**

17         Apple's entire argument depends on the proposition that Samsung cannot rely on prior art

18  software unless Samsung can exhume the exact computer running that exact software, and show

19  that computer actually performed a specific set of steps, in the prior art period.  This argument

20  collapses, however, for the simple reason that this proposition is legally and factually not correct.

21  The asserted claims of the '959 patent recite a "computer readable medium . . . containing program

22  instructions to" perform several functions.  Claims written in this way recite the "***capability***" of

23

24

_____

25         [15]   Apple argues that limiting claim 18 to a physical keyboard would improperly exclude

26  "preferred embodiments."  (Mot. at 2.)  But no embodiments in the '172 patent are ever described
    as "preferred."  In fact, the '172 patent never uses the word "preferred" at all.  Rather, the '172

27  patent discloses "some embodiments" with physical keyboards and "some" with virtual ones.  (Rho
    Decl. Ex. A-3 (Dkt. No. 803-11, '172 Patent) at 7:10-20; 7:33-39.)

28

performing a function.[16]  Claim 24 of the '959 patent thus covers a computer readable medium containing software instructions *capable* of performing certain actions.  Apple knows this full well; its entire infringement case rests on alleged *capabilities* of devices sold in the United States.  Apple made no effort to show the steps of claims 24 and 25 are *actually* performed, or how often, as it knows this is not required for the asserted claims.

As described below, Samsung analyzed the source code for prior art software that was known, used, sold, and offered for sale before the priority date of the '959 patent, and identified the exact instructions in source code *capable* of performing the actions described in the '959 patent, proving anticipation.  Samsung further confirmed its analysis by executing these software instructions, to confirm the instructions were in fact *capable* of performing the steps described in the '959 patent.  This showing of capability is all that is required under the law.[17]

Apple mentions source code *nowhere* in its motion, and raises zero complaints regarding Samsung's extensive analysis of that code.  Instead, Apple focuses on *demonstratives* that run this code.  (Mot. at 15-17.)  But the software is the relevant prior art – not demonstratives running that software.  Apple further claims the Court should exclude AppleSearch and WAIS entirely as prior art because of a PI phase ruling on a *different* demonstrative exhibit running *different* software in relation to a *different* patent claim with *different* requirements, prepared by a *different* witness.[18]

---

[16]  *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204-05 (Fed. Cir. 2010) (a "storage medium" claim covers the "capability" of performing a given function using instructions stored on that medium).  This Court, in ruling on the parties' summary judgment motions in the predecessor litigation, explained that claims directed to a "computer-readable storage device storing instructions" cover "a device that has the *capability* of performing the steps," such that "[w]hether a user *actually* activates the [software instructions] is of absolutely no import."  (Case No. 5:11-cv-01846, Dkt. 1156, at 11-12.)  Such claims cover "a device that is *capable* of responding to the specified user action in the specified way … regardless of whether the user ultimately takes that particular action."  (*Id.* at 12.)  *See also Yodlee, Inc. v. CashEdge, Inc.*, No. C 05-01550 SI, 2006 WL 3456610, at *4 (N.D. Cal. Nov. 29, 2006).

[17]  *See, e.g., Versata Software, Inc. v. SAP America, Inc.*, 717 F.3d 1255, 1261-62 (Fed. Cir. 2013) (where claims recite "computer instructions," expert properly relied on "demonstrative data setup" to "confirm[] … that the accused software was capable of performing the claimed functionality by making the software perform the function without modifying the software").

[18]  On the preliminary injunction, the Court found that an alleged *apparatus* consisting of two different WAIS software versions installed on two computers connected together as a single
   (footnote continued)

1    (*Id.* at 15.)  This is factually nonsensical, and legal error.  *See supra* at 1.  When comparing the

2    claims at issue to the actual prior art, and the actual evidence (including source code) regarding that

3    prior art, Apple's claims are invalid and its motion lacks merit.

4    **B.    AppleSearch Was Known, Used, Sold, and Offered For Sale In The Prior Art**
     **Period With The Capabilities Recited In The '959 Patent**

5

6    Apple *admits* AppleSearch is prior art; it *stipulated* to that fact.[19]  AppleSearch source code

7    contains "instructions" with the capabilities recited in by the '959 Patent.  (Rinard Decl. Ex. 1 at 2.)

8    Dr. Rinard confirmed this code analysis by causing AppleSearch's relevant "instructions" to

9    execute, demonstrating the software's capabilities.  (*Id.*)  These capabilities include heuristic local

10   search, as shown by code analysis (*Id.* at 1-26), demonstrative execution of this code (*Id.* at Ex. 1

11   (showing screenshots)), and contemporaneous documents created by Apple's own employees.

12   (Fazio Decl. Ex. 8 (APLNDC630-0000441957; APLNDC630-0000441843).)  AppleSearch was

13   also designed to query WAIS servers for Internet search – a capability *prominently illustrated on*

14   *the box in which the software shipped*.  (Fazio Decl. Ex. 9 (SAMNDCA630-07890674).)  As this

15   packaging shows, AppleSearch queried both "local information" and the "Internet" via "WAIS

16   servers," giving it the capability for "***simultaneous access to local and Internet information***

17   ***sources through the easy-to-use AppleSearch interface***" – the very functionality Apple claims as

18   novel in the '959 patent.  These amply-corroborated capabilities[20] are similar to those Apple

19   "apparatus for locating information in a network," was not supported by proof that such an
     *apparatus* actually existed in the prior art.  (Dkt. 221 at 24-28 (PI Order))  Here, Dr. Rinard took

20   authentic software that was known to exist and analyzed the *capabilities* of that software.  (Rinard

21   Decl. ¶¶ 112-124; Ex. 1-2)  To confirm what his source code analysis already proved, Dr. Rinard
     caused these instructions to execute, demonstrating the *capabilities* of those instructions have the

22   same *capabilities* described in the asserted '959 patent claims.  (Rinard Decl. ¶¶ 112-124.)

23   [19]   Dkt. 705 at 2 ("source code for AppleSearch versions 1.0 and 1.5 . . . is authentic source
     code that was implemented in AppleSearch software that was used publicly, commercially sold,

24   offered for sale, or publicly accessible prior to January 5, 1999"), *id. at* 4 ("executable software for
     AppleSearch versions 1.5 and earlier … is an authentic copy of software that was used publicly,

25   commercially sold, offered for sale, or publicly accessible prior to January 5, 1999.")

26   [20]   Fazio Decl. Ex. 8 (AppleSearch Administrator's Guide) at APLNDC630-0000441957-60
     (describing capability to search information located in local storage media on the AppleSearch

27   server computer and in WAIS databases located on the Internet)); *id.* Ex. 10 (AppleSearch User's
     Guide) at APLNDC630-0000441863-74 (step-by-step instructions for simultaneously searching a

28   database located on the computer with the AppleSearch server application and a remote WAIS
     (footnote continued)

accuses of infringement, and a jury accepting Apple's infringement arguments would readily

conclude AppleSearch invalidates for the same reasons.  (Rinard Decl. ¶¶ 136, 137,137 144, 147-

149, 155-168, Ex. 1).[21]  This evidence of anticipation must go to the jury.[22]

### C.    WAIS Software Was Known, Used, Sold, and Offered For Sale In The Prior Art Period With The Capabilities Recited In The '959 Patent

Apple's WAIS complaints rely on conflating the current record with the preliminary

injunction record.  Apple ignores the current facts, the current expert's testing, and even the current

patent, to say WAIS is not prior art as a matter of law.  Apple is wrong.  Ample evidence *not*

available at the preliminary injunction phase – including freeWAIS-sf software, and testimony and

documents from the developers of that software – shows the '959 patent, which also was not at

issue in the preliminary injunction phase, is invalid in light of WAIS.

Brewster Kahle created, sold, and ultimately openly published the source code for WAIS

software by 1991.  (Fazio Decl. Ex. 12 (Kahle Dep.) at 80:20-81:5; 85:3-15).)  In 1993, WAIS

development was transferred to the University of Dortmund, which released "an expanded version

of WAIS" called freeWAIS-sf.  (Fazio Decl. Ex. 13 (Fuhr Dep.) at 83:8-84:23, 73:13-76:8; Fuhr

Decl. ¶ 4; Pfeifer Decl. ¶ 3.)  This software included "all the functionalities of WAIS" as first

released by Brewster Kahle, with enhancements.  (Fazio Decl. Ex. 15 (*Expansion of the FreeWAIS

Server*, Tung, 1994, SAMNDCA630-06029163) at 126.)  An authentic copy of the freeWAIS-sf

software was produced at FUHRNDCA630-00000001.  (Fazio Decl. Ex. 13 (Fuhr Dep.) at 195:5-

202:18; Fuhr Decl. ¶¶ 8-10; Ex. 14 (Pfeifer Dep.) at 44:9-45:4, 50:6-19, 226:13-233:20.; Pfeifer

---

database using the AppleSearch client application)); *id*. Ex. 11 (SAMNDCA630-07216825-
SAMNDCA630-07216829 (Usenet postings by Apple employee and others, confirming capability
to run AppleSearch server and client on same computer to search local storage media)).

[21]   This is true *regardless* of the type of WAIS server AppleSearch could be used to
connect to – AppleSearch's own capabilities include instructions in a "WAIS Gateway Module" for
connecting to and receiving results from *any* WAIS server (Rinard Decl. ¶¶ 155-168) to convert
"scores" for the documents returned by the remote WAIS server, rank results, and determining how
many results to return – operations Apple itself alleges are heuristic.  (*Id*.)

[22]   *See, e.g.*, *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1159 (Fed. Cir.
2004) (where "the evidence is sufficient to support a jury finding" that a reference is prior art, or
conversely is not prior art, "'[t]he court may not assess the credibility of testimony when granting
summary judgment' . . . TypeRight is entitled to a trial to determine if [the reference] is prior art.")

Decl. ¶ 4)  This software anticipates claims 24 and 25 of the '959 patent:  it included instructions with all the claimed capabilities.  Code analysis demonstrates this.  (Rinard Decl. Ex. 2.) Installations of the software causing these instructions to execute further confirm the software's capabilities.  (*Id.* at 2.)  There is no "cobbling together" or "junkyard" assembly:  Dr. Rinard analyzed a ***single software distribution available to the public by 1996*** that contained every instruction required by the claim.[23]

Contrary to Apple's assertions, a plethora of evidence shows this free-WAIS-sf software was known and used in the United States by 1996.  The software's creators, who were deposed in this case, established that the free-WAIS-sf distribution containing the invalidating source code and documentation was published on an FTP server by February 1996.  (Pfeifer Decl. ¶¶ 8-9 & Exs. 2-4; Fuhr Decl. ¶¶ 8-11.)  Emails and newsgroup postings confirm users in the United States knew of and used the same free-WAIS-sf distribution Dr. Rinard analyzed.[24]  (Fuhr Decl. ¶ 13; Pfeifer Decl. ¶¶ 12-23.)  Log data collected by the creators of free-WAIS-sf also shows hundreds of servers running free-WAIS-sf in the United States by 1997.  (Fuhr Decl. ¶ 12; Fuhr Decl. Ex. 4; Pfeifer

---

[23]   The freeWAIS-sf 2.0.65 distribution "includes all source code necessary to operate a WAIS system, including the complete source code for a WAIS server, complete source code for the graphical WAIS client, Xwais, complete source code for a WAIS indexer which builds WAIS databases, and files sufficient to configure and install the WAIS server, WAIS indexer, and Xwais client," such that "the freeWAIS-sf 2.0.65 distribution contains the claimed program instructions." (Rinard Decl. Ex. 1 at 1.)

[24]   *See, e.g.*, Pfeifer Decl. Ex. 6 (3/13/1996 email from Torsten Heycke at the Stanford University School of Medicine in Stanford, California explaining that he is "using free-WAIS-sf 2.0.65" and besides some issues with headlines "Everything else is working nicely. :-)"); Pfeifer Decl. Ex. 7 (7/31/1996 email from Chad Adams, systems administrator of the United States Army Cold Regions Research and Engineer Laboratory located in Hanover, New Hampshire, describing how he installed free-WAIS-sf 2.0.65 and explained how "If I run the same query directly on the server, or using a windows wais program all the results are protrayed (sic) correctly."); Pfeifer Decl. Ex. 10 (3/28/1996 email from Frank Peters, the UNIX Systems Group Leader at Mississippi State University regarding his use of free-WAIS-sf 2.0.65); Pfeifer Decl. Ex. 11 (3/29/1996 email from Jon Meek at American Cyanamid Company regarding his successful compilation of free-WAIS-sf 2.0.65; Pfeifer Decl. Ex. 13 (2/18/1997 email from Michael Danahy, the System and Network Manager at Educational Service Unit #2 in Nebraska regarding his use of free-WAIS-sf 2.0.65); Pfeifer Decl. Exs. 14-15 (3/1997 emails from Bill Wood at the Center for Design Research at Stanford University in Stanford, California regarding his use of freeWAIS-sf 2.0.65); Pfeifer Decl. Ex. 16 (3/29/1997 email from Bowen Dwelle, Engineering Project Manager for WIRED Digital in California, explaining that she is currently using free-WAIS-sf 2.0.65.).

1   Decl. ¶ 13; Pfeifer Decl. Ex. 17.)  This is more than enough to defeat Apple's motion.  *See, e.g.,*

2   *Typeright Keyboard Corp. v. Microsoft Corp.*, 374 F.3d at 1157-8.

3        Nothing about Samsung's demonstrative configuration of this software, or Samsung's

4   execution of the software's capabilities, is "hypothetical."  (Mot. at 15.)  Samsung configured the

5   software as described in the included installation guide and other freeWAIS-sf documentation.

6   (Fazio Decl. Ex 16 (freeWAIS-sf Installation Guide, SAMNDCA630-00028135-86).)  These

7   installation instructions corroborate the software's heuristic capabilities, including use of synonym

8   files (*id.* at 9), stemming (*id.* at 27) and phonetics (*id.*).  Apple never disputes these capabilities

9   existed.  Nor could it; these capabilities are clearly present in the software, and corroborated by

10  extensive documentation. [25]

11       **D.    Apple's "Summary Judgment" Arguments Regarding Obviousness Are
             Meritless, And Contradict Apple's Court Filings And Litigation Positions**

12

13       Apple asks for "summary judgment" that obviousness arguments somehow were not

14  preserved during case narrowing.  This is a motion to strike – not a summary judgment motion –

15  and it is meritless.  AppleSearch and WAIS were listed on Samsung's narrowing statement.  (Dkt.

16  793.)  This preserved using each reference for anticipation and for single-reference obviousness.

17  Apple admits this in its own case narrowing statement, where Apple informed the Court that listing

18  a reference on its own preserves it as an "***anticipatory or single-reference obvious reference[]*.**"

19  (Dkt. 670 at 5 (emphasis added).)[26]  This is exactly what Samsung has done.  Samsung's invalidity

20  contentions have long put Apple on notice of both anticipation and single-reference obviousness

---

21       [25]    Apple's complaints regarding demonstrative exhibits are, at best, evidentiary objections to

22  be handled before trial – just as they were in the prior case between the parties, and not at summary
    judgment.  (Case No. 5:11-cv-01846, Dkt. 1774 at 5) (in ruling on pretrial evidentiary objection,

23  allowing demonstrative set-up to be presented to the jury by Apple's expert "if Apple is able to
    present relevant, admissible evidence such that a reasonable jury could find that the iBook is prior

24  art").)
        [26]    Apple's recent prior art narrowing statement lists as one entry "U.S. Patent No. 7,020,704

25  (Ex. D-3)."  (Dkt. 792 at 1.)  Apple's contentions and its expert's report use this entry for two

26  theories:  anticipation ***and*** single-reference obviousness.  (Fazio Decl. Ex. 17 (Opening Expert
    Report of Richard Taylor) ¶ 185.)  Apple ***never*** listed the '704 patent twice, once for anticipation

27  and again for single-references obviousness, because Apple knew disclosing a reference once
    preserved the reference for anticipation ***and*** single-reference obviousness.  (Dkt. 670, 792).

28

1    theories,[27] and Apple's last-ditch effort to avoid obviousness is meritless, procedurally improper,

2    and inconsistent with Apple's own filings with this Court.[28]

3    **V.    THE '446 PATENT DOES NOT ANTICIPATE THE '757 PATENT**

4          The '446 Patent in combination with Multer does not anticipate the asserted claims of

5    Samsung's '757 Patent.  First, the '446 Patent and Multer *cannot* be treated as a single reference as

6    a matter of law.  Second, the '446 Patent and Multer fail to disclose automatic synchronization of

7    content information and content management information between the central and zone devices.

8    Third, the '446 Patent and Multer do not disclose a system that is capable of updating content

9    information and content management information between a central device and multiple zone

10   devices.  This results in a system that, unlike the '757 Patent, does not allow a user's multimedia

11   collection to be "synchronized automatically by having the devices communicate to and from each

12   other so that the content is available in multiple locations or zones that the consumer may go."

13   (Rho Decl. Ex. E-1 (Dkt. No. 803-14, '757 Patent) at 3:3-6; *see also id.* at 9:52-56 ("this invention

14   teaches a complete system for providing recorded multimedia programming in digital form that is

15   updated on *all* devices owned by an user, over a network")) (emphasis added).  Instead, the '446

16   Patent discloses a simplistic system that does not synchronize all devices, let alone automatically.

17   At a minimum, Apple's motion presents numerous factual disputes and should be denied.

18         **A.    Incorporation of the Multer Patent is Inappropriate**

19         A patent claim is only invalid due to anticipation if, within "the four corners of a single,

20   prior art document ... every element of the claimed invention [is described]."  *Advanced Display*

21   *Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000).  To incorporate material by

22   reference, the host document must "clearly identify[] the subject matter which is incorporated and

23   [27]   Fazio Decl. Ex 19 (Samsung's Invalidity Contentions, Exhibit C-9) at 5 ("WAIS anticipates
24   . . . and renders obvious . . . under 35 U.S.C. § 103, ***alone*** and/or in combination" with other
     references); *id.* Ex. 20 (Samsung's Invalidity Contentions, Exhibit C-21) at 4 (same, AppleSearch).

25   [28]   Apple argues Samsung preserved anticipation only, because "if obviousness was intended
     there would be no need to mention [relying on] multiple documents [to prove a system's
26   functionality] as that is part and parcel of an obviousness inquiry."  (Mot. at 18 n. 14.)  This is
     nonsensical.  It also contradicts Apple's narrowing statement (Dkt. No. 792 at 2), which lists a
27   system (Kodak SV9600) "***with supporting documentation***" as a reference, despite arguing
     obviousness for that reference.  (*Id.* at 1).

28

where it is to be found."  *Id.* (citing *In re Seversky*, 474 F.2d 671, 674 (CCPA 1973).)   The "mere reference to another application, or patent, or publication is not an incorporation of anything therein . . ."  *In re Seversky,* 474 F.2d at 674.  The Court must determine what material, if any, is incorporated by reference.  *Advanced Display*, 212 F.3d at 1283.  Further, "the standard of one reasonably skilled in the art should be used to determine whether the host document describes the material to be incorporated by reference with sufficient particularity."  *Id.*

Apple's anticipation argument relies heavily on subject matter found in the Multer Patent, not the '446 Patent.[29]   But Apple fails to identify *any* incorporation language in the '446 Patent much less present *any* evidence that one of skill in the art would find incorporation of any relevant subject matter from Multer to be sufficiently particular.  Nor could it.  As Dr. Schonfeld explains, one of ordinary skill would not find any incorporation from Multer to be sufficiently particular. (Schonfeld Decl. at ¶¶ 49-51, 55-57.)  Thus, Apple's motion should be denied.  *See Helicos Biosciences Corp. v. Illumina, Inc*., 888 F. Supp. 2d 519, 533 (D. Del. 2012).

### B.   The '446 Patent Does Not Teach Automatic Synchronization Of Multimedia Data

The '446 Patent fails to disclose the automatic synchronization of both content information ("CI") and content management information ("CMI") "relating to at least one user" between the central and zones devices.  (Schonfeld Decl. at ¶¶ 38-48.)  The parties' experts agree that the plain meaning of the limitation "updated in relation to" requires *automatic* synchronization of "audio, video, or photographic data", including CI and CMI.  (Fazio Decl. Ex. 18 (Taylor Dep.) at 44:15-46:11 (automatic synchronization required);  Schonfeld Decl. at ¶¶ 29-34; *see also* Rho Decl. Ex. E-1 (Dkt. No. 803-14, '757 Patent) at 3:1-7 (the user's "entire [multimedia] collection [is] synchronized automatically").)[30]

---

[29]   Apple fails to address the relevant authority in its motion and instead relies on cases that are inapposite.  First, *Ultradent Prods. Inc. v. Life-Like Cosmetics, Inc.*, 127 F.3d 1065, 1069 (Fed. Cir. 1997) pre-dates the seminal *Advanced Display Sys.* opinion and is cited therein.  Second, *Harari v. Mihnea*, 656 F.3d 1331, 1335-1336 (Fed. Cir. 2011) addresses the sufficiency of a written description in an interference, not the clear and convincing standard for anticipation.

[30]   Apple wrongly asserts that Samsung did not dispute that the "updated in relation to" limitation is disclosed by the '446 Patent.  (Mot. at 22; Ex. E-4 at 171, lines 19-23).

Apple relies on irrelevant '446 Patent disclosures relating to *manual* synchronization.  (Mot. at 22-23; Schonfeld Decl. at ¶¶ 29-34 and 38-48.)  But even Apple's own expert agrees that manual synchronization does not meet this limitation.  (Fazio Decl. Ex. 21 (Taylor Rebuttal Report) ¶¶ 159, 170, 187, 192, and 238.)  Apple also relies on disclosures describing the transfer of data from a public server to the personal information space ("PIS") that are irrelevant to whether there is automatic synchronization of CI and CMI between the storage server and network devices in the '446 Patent (which Apple contends correspond to the central device and zone devices in claim 1 of the '757 Patent).  (Mot. at  22; Schonfeld Decl. at ¶¶ 37-48.)

Indeed, because the '446 Patent does not mention automatic synchronization of any kind between the storage server and network devices – and Apple does not argue otherwise – Apple resorts to a portion of Multer that involves "pull synchronization" of non-multimedia files, such as email, calendars and contacts, on one device after another device is manually synchronized.[31]   But this portion of Multer cannot anticipate because it does not involve the synchronization of "audio, video, or photographic" data as required by claim 1 of the '757 patent, nor does it involve the automatic synchronization of all devices in the system.  Combining different parts of a reference that discuss disparate embodiments cannot sustain a finding of anticipation as a matter of law.  *See Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008)  ("it is not enough that the prior art reference . . . includes multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention".)

### C.    The '446 Patent Does Not Teach A System That Is Capable Of Synchronizing Data Across All Devices Of The System

The '446 Patent also does not disclose a system that is capable of updating content and content management information between the central device and *all* of the zone devices.

### 1.    No disclosure of bidirectional synchronization between a zone and central device

Claim 1 of the '757 Patent expressly requires that audio, video, or photograph information be "updated in relation to the zone specific storage and interface devices *and* the central storage

---

[31]    Apple's reliance on this portion of the Multer Patent is improper because Apple did not identify it in its invalidity contentions.

1   and interface device." (emphasis added.)  Thus, an update to one device results in a corresponding

2   update to the another device, and vice versa.  (Schonfeld Decl. at ¶¶ 26-35.)  The specification

3   confirms this.  (Rho Decl. Ex. E-1 (Dkt. No. 803-14, '757 Patent Abstract) ("audio, video, or

4   photographic information, relating to at least one user, *contained within each one* of the plurality of

5   zone specific storage and interface devices and the central storage and interface device, *are updated*

6   *in relation with other* zone specific storage and interface devices *and* the central storage and

7   interface device") (emphasis added).)

8          The '446 Patent, in contrast, provides a simplistic system that relies on unidirectional

9   synchronization between two devices.  Figure 4 depicts a system comprised of two zones:  an

10  Office PC that resides in the user's office and a Home PC that resides in a room of the user's home.

11  (Rho Decl. Ex. E-2 (Dkt. No. 803-14, '446 Patent) at Fig. 4.)  The specification states that data

12  "may be synchronized or transferred (uni-directionally) to any network coupled appliance 400",

13  such as a PC, but does *not* provide for automatic, bidirectional synchronization between devices as

14  required by claim 1.  (*Id.* at 9:53-55.)

15                 **2.      No disclosure of a system that has the capability to update all devices**

16         The '446 patent also fails to disclose a system that synchronizes *all* of the zone devices with

17  the central device and each other.  (Schonfeld Decl. at ¶¶ 35, 41, 43-48; Rho Decl. Ex. E-1 (Dkt.

18  No. 803-14, '757 Patent) at 9:52-56 ("this invention teaches a complete system for providing

19  recorded multimedia programming in digital form that is updated on *all* devices owned by an user,

20  over a network".)  Claim 1 requires that "audio, video, or photographic information, relating to at

21  least one user, contained within the zone specific storage and interface device . . . are updated in

22  relation to the zone specific storage and interface devices central storage and interface device."

23  (Rho Decl. Ex. E-1 (Dkt. No. 803-14, '757 Patent) at 10:42-47.)  In other words, each zone device

24  must be updated in the same way as the central device and all other zone devices.  The '757 patent

25  teaches that this is an important feature of the inventive system of claim 1 because it:

26         allows multiple devices to synchronize its internal collection with each other, *so that the*
           *end result is that all the devices have the same content and content management means*
27         (playlists, settings, etc.) . . . . Therefore, a complete copy of the content is stored locally in a
           device within a zone or any zone, so that the output can be played in multiple zones or
28         rooms in a networked building or in multiple locations traveling through a wide area

network such as the Internet."

(*Id.* at 9:62-10:5 (emphasis added); *see also id.* at claim 1 ("whereby the at least one user can be situated in *any one of the zones* and access the audio, video, or photographic information related to the at least one user" (emphasis added)).

As explained above, the '446 patent simply discloses one-way synchronization between two devices.  Figure 4 of the '446 Patent, for example, discloses updating between two, not all, devices. (Rho Decl. Ex. E-2 (Dkt. No. 803-14, '446 Patent) at Fig. 4.)  In fact, rather than storing a copy of the content on each device, the '446 patent teaches that the all devices of the PIS collectively, rather than individually, store the user's data, which further demonstrates that the devices of the system are not updated in relation to the central device or each other.  (*Id.* at 1:50-55; Schonfeld Decl., ¶¶ 40-41 and 63.)  Apple again seeks to supplement the '446 Patent by combining it with an incompatible device taught in the Multer Patent, but such a combination is impermissible as a matter of law and should be rejected.  *See Net MoneyIN*, 545 F.3d at 1371.

Apple also argues claim 1 does not require the zone devices of a multiple zone system to be updated in relation to the other devices.  But claim 1 plainly states that each zone device must be "*capable* of storing and interfacing" with CI and CMI stored in the central device wherein that data is updated in relation to the other "zone specific storage and interface *devices*."  (Rho Decl. Ex. E-1 (Dkt. No. 803-14, '757 Patent) at 10:42-47 (emphases added).)[32]  Dr. Schonfeld opines that one of ordinary skill would understand this language to mean that all of the zone devices of a system must be capable of automatically synchronizing with the central device and each other.  (Schonfeld Decl. ¶¶ 33-35.)  Apple's expert, Dr. Taylor, did not dispute this understanding.  Nevertheless, Apple argues that Dr. Schonfeld's understanding is inconsistent with the prosecution history.  (Mot. at 23-24.)  Not so.  The referenced claim amendment merely broadened the scope to cover a one zone system; that change does not alter the fact that claim 1 explicitly requires a system capable of

---

[32]  *See also* '757 patent at claim 6 ("audio, video, and photographic information contained within each one of the plurality of zone specific storage and interface *devices* and the central storage and interface device are stored therein and updated at a predetermined time in relation with other zone specific storage and interface *devices* as well as the central storage and interface device.") (emphasis added).

1    automatically synchronizing CI and CMI with multiple zone devices.

2    **VI.     APPLE'S MOTION SEEKS EXCESSIVE CLAIM CONSTRUCTION**

3           This Court warned Apple not to use summary judgment for additional claim construction.

4    (Dkt. 719 (Hr'g Tr. at 22:13-16) (THE COURT: "If you want another full-blown claim

5    construction, I'm happy to do that, but I'm going to move this trial date and I will turn the time that

6    I had dedicated to this trial to dedicate it to claim construction . . . .").)  Apple's motion ignores this

7    admonition, just as it ignores numerous factual disputes, and seeks constructions of multiple claim

8    terms in the '647, '414, '172, and '757 Patents.  While the Court should deny Apple's summary

9    judgment motion due to multiple disputes of material fact, the Court should also deny the motion

10   for ignoring this Court's clear command not to turn summary judgment into a *Markman* hearing.  If

11   Apple's motion is considered despite its request for excessive construction, the Court should

12   schedule a *Markman* hearing and order further briefing in lieu of trial, so that terms are not

13   construed on an undeveloped record.  (Dkt. 719 (Hr'g Tr. at 24:22-25:7).)

14   **VII.    CONCLUSION**

15          For the foregoing reasons, Apple's motion for partial summary judgment should be denied.

16   DATED:  November 1, 2013            QUINN EMANUEL URQUHART &
17                                       SULLIVAN, LLP

18                                       By */s/ Victoria F. Maroulis*
19                                          Charles K. Verhoeven
20                                          Kevin P.B. Johnson
                                            Victoria F. Maroulis
21                                          William C. Price
                                            Michael L. Fazio
22
                                         Attorneys for
23                                       SAMSUNG ELECTRONICS CO., LTD.,
                                         SAMSUNG ELECTRONICS AMERICA, INC.,
24                                       and SAMSUNG TELECOMMUNICATIONS
                                         AMERICA, LLC
25

26

27

28

## ATTESTATION OF E-FILED SIGNATURE

I, Patrick D. Curran, am the ECF user whose ID and password are being used to file Samsung's Opposition to Apple's Motion For Partial Summary Judgment.  In compliance with Civil L.R. 5-1(i), I hereby attest that Victoria F. Maroulis has concurred in this filing.

Dated:  November 1, 2013

*/s/ Patrick D. Curran*
Patrick D. Curran