QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

William C. Price (Bar No. 108542)
williamprice@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation, | CASE NO. 12-CV-00630-LHK (PSG) |
| Plaintiff, | |
| vs. | **DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY** |
| SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Defendants. | **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO
APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY

<u>DECLARATION OF PROFESSOR DAN SCHONFELD</u>

I, Dan Schonfeld, declare as follows:

1.      I submit this Declaration in support of Samsung's Opposition to Apple's Motions for Summary Judgment and  to Exclude Expert Testimony.  If asked at hearing or trial, I am prepared to testify regarding the matters I discuss in this Declaration.

**I.      Background and Qualifications**

2.      I have been retained by Defendant and Counterclaimant, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, "Samsung") to serve as an expert in this case.

3.      I am currently a Professor in the Department of Electrical and Computer Engineering at the University of Illinois at Chicago.  I have been elected Fellow of the Institute of Electrical and Electronics Engineers ("IEEE") as well as Fellow of the International Society for Optics and Photonics ("SPIE").  I have also been elected University Scholar of the University of Illinois.

4.      I received my B.S. degree in Electrical Engineering and Computer Science from the University of California, Berkeley, California, and my M.S. and Ph.D. degrees in Electrical and Computer Engineering from The Johns Hopkins University, Baltimore, Maryland, in 1986, 1988, and 1990, respectively.

5.      In August 1990, I joined the Department of Electrical Engineering and Computer Science at the University of Illinois, Chicago, Illinois, where I am currently a Professor in the Departments of Electrical and Computer Engineering, Computer Science, and Bioengineering.  I serve as Co-Director of the Multimedia Communications Laboratory ("MCL") and member of the Signal and Image Research Laboratory ("SIRL").  I have also served as Director of the University-Industry Engineering Research Center ("UIERC"), formerly known as the Manufacturing Research Center ("MRC"), in the College of Engineering.

6.      I have been appointed Editor-in-Chief of the IEEE Transactions on Circuits and Systems for Video Technology.  I have served as Area Editor for special issues of the IEEE Signal Processing Magazine.  I have also served as Associate Editor of the IEEE Transactions on Circuits

1   and Systems for Video Technology, IEEE Transactions on Image Processing, and IEEE

2   Transactions on Signal Processing.  I also served on the editorial board of the IEEE Signal

3   Processing Magazine, EURASIP Journal of Image and Video Processing, and Research Letters in

4   Signal Processing.  I have served as guest editor of numerous special issues in various journals in

5   the area of multimedia systems.

6       7.       I currently serve as Technical Program Chair of the IEEE International Conference

7   on Acoustics, Speech, and Signal Processing (ICASSP) 2018.  I have served as General Co-Chair

8   of the IEEE International Conference on Multimedia and Expo (ICME) 2012.  I have also served

9   as Chair of the IEEE Workshop on Video Mining 2008 and the SPIE Conference on Visual

10  Communication and Image Processing 2007.  I have also served on the organizing committees of

11  various conferences including the IEEE International Conference on Image Processing 1998 and

12  2012.

13      8.       I have authored and co-authored over 200 technical papers for various journals and

14  conferences.  I was co-author (with Carlo Giulietti and Rashid Ansari) of a paper that won the Best

15  Paper Award at the ACM Multimedia Workshop on Advanced Video Streaming Techniques for

16  Peer-to-Peer Networks and Social Networking 2010.  I was also co-author (with Junlan Yang) of a

17  paper that won the Best Student Paper Award at the IEEE International Conference on Image

18  Processing 2007.  I was also co-author (with Wei Qu) of a paper that won the Best Student Paper

19  Award at the IEEE International Conference on Image Processing 2006.  I was also co-author

20  (with Nidhal Bouaynaya) of a paper that won the Best Student Paper Award in Visual

21  Communication and Image Processing 2006.  My publications in the area of image and video

22  processing and communications dates back to 1988. For example, among these publications is the

23  article (co-authored with Dan Lelescu) entitled: "VORTEX: Video retrieval and tracking from

24  compressed multimedia databases—multiple object tracking from MPEG-2 bitstream," (Invited

25  Paper). *Journal of Visual Communications and Image Representation*, Special Issue on

26  Multimedia Database Management, vol. 11, pp. 154-182, 2000. Similarly, the publications listed

27  include a book chapter entitled: "Image and Video Communication Networks," (Invited Chapter).

28

-2-

1  *Handbook of Image and Video Processing.* A. Bovik (ed.), Academic Press: San Diego,

2  California, Chapter 9.3, pp. 717-732, 2000.

3      9.      I was invited as a Plenary Speaker and Keynote Speaker to the International

4  Conference on Intelligent Control and Information Processing (ICICIP) 2013 and International

5  Conference on Brain Inspired Cognitive Systems (BICS) 2013, IEEE/EIT International

6  Conference on Audio, Language, and Image Processing 2010, the IEEE International Conference

7  on Advanced Video and Signal-Based Surveillance 2009, and the ASME International Conference

8  on Communications, Signals and Systems 1995 and 2001.

9      10.     I have served as Region 1-6 representative on the Chapters Committee of the IEEE

10  Signal Processing Society.  I have also served as Chairman of the IEEE Signal Processing Chicago

11  Chapter.  I have also served on the IEEE Image, Video and Multidimensional Signal Processing

12  Technical Committee as well as the IEEE Multimedia Communications Technical Committee.  I

13  also serve on the American National Standards Institute (ANSI)/Underwriters Laboratory (UL)

14  Standards Technical Panel ("STP") on Multimedia Systems.

15  **II.     Opinions Regarding the '757 Patent**

16      11.     U.S. Patent No. 7,577,757 (the "'757 Patent") is based on U.S. Application No.

17  11/550,921, filed October 19, 2006, as a continuation of U.S. Application No. 09/884,661 filed on

18  June 19, 2001, now U.S. Patent No. 7,136,934 (the "'934 Patent").  According to documents and

19  testimony from the inventors, the '757 Patent was conceived on or around March 1, 2001.

20  Attached hereto as Exhibit A is a true and correct copy of the '757 Patent.

21      **A.     Person of Ordinary Skill in the Art**

22      12.     A person of ordinary skill in the art relevant to the '757 Patent at the time of the

23  invention would have a Bachelor's Degree in electrical engineering (or equivalent experience) and

24  at least two years of experience in the field of multimedia devices.

25      **B.     Legal Standards**

26      13.     I understand that a patent claim is anticipated by prior art when a single piece of

27  prior art describes every element of the claimed invention, either expressly or inherently, such that

28  a person of ordinary skill in the art could practice the invention without undue experimentation.  I

1  understand that, to be considered anticipatory, the prior art reference must be enabling and

2  describe the applicant's claimed invention sufficiently to have placed it in possession of a person

3  of ordinary skill in the field of the invention.  I understand that to be an anticipatory reference a

4  prior art reference not only must disclose all of the claim limitations, but also must disclose all of

5  the limitations arranged or combined in the same way as stated in the claim.

6         14.     I understand that a reference that does not expressly disclose a claim limitation may

7  inherently disclose the limitation if the reference discloses prior art that must necessarily include

8  the unstated limitation.  I also understand that inherency may not be established by probabilities or

9  possibilities, and the mere fact that a certain thing may result from a given set of circumstances is

10  not sufficient to establish anticipation.  I further understand that disclosure is sufficient if it shows

11  that the natural result flowing from the operation of the system or method disclosed in the

12  reference as taught necessarily results in the performance of the claim limitations.

13         15.     I understand that material not explicitly contained in the single prior art document

14  may be considered for purposes of anticipation only if that material is incorporated by reference.  I

15  also understand that whether and to what extent material is incorporated by reference into a host

16  document is a question of law to be decided by the Court.  I further understand, however, that to

17  incorporate material by reference, the host document must contain language clearly identifying the

18  subject matter which is incorporated and where it is to be found.  I also understand that a mere

19  reference to another application, or patent, or publication is not an incorporation of anything

20  therein.  I understand that the Court examines the host reference as one reasonably skilled in the

21  art to determine whether the host document describes the material to be incorporated by reference

22  with sufficient particularity.

23       **C.**     **Background of the Technology**

24         16.     Data synchronization of generic data files (*e.g.* "text document," "contact

25  information," "calendar," *etc.*) is often performed by "updating" entire data files on multiple

26  devices.  Synchronization of entire data files includes the "update" of the contents of the file as

27  well as related information (*e.g.* file name, date created, date modified, *etc.*).

28

-4-

DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO
APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY

17.     This approach to data synchronization of generic data files (*e.g.* "text document," "contact information," "calendar," *etc.*) could not be readily applied to multimedia data.  In particular, at the time of the invention of the '757 Patent, generic data files (*e.g.* "text document," "contact information," "calendar," *etc.*) were relatively small and typically stored on desktop computers with large disk storage space and high-rate connection to the Internet.  On the other hand, multimedia data files such as audio, video, or photographs are much larger (especially given the lower compression capability available at the time of the invention of the '757 Patent), and are often stored on limited storage capacity media player devices that have less reliable, low-rate network connection.

18.     For example, whereas a typical generic data file (*e.g.* "text document," "contact information," "calendar," *etc.*) may require only a few KBs (*i.e.* Kilo-bytes), a typical file used for storage of audio or photograph (even in compressed form) requires a few MBs (*i.e.* Mega-bytes), and a video file (even in compressed form) will typically require a few GBs (*i.e.* Giga-bytes).  For clarity, a MB is one thousand times larger than a KB, and would therefore require 1,000 times as much storage space and need 1,000 times longer for data transmission over the same communication channel.  Similarly, a GB is one thousand times larger than a MB or one million times larger than a KB, and would therefore require 1,000,000 times larger storage capacity and need 1,000,000 larger bandwidth to download data in the same amount of time.

19.     The dramatic implications of these observations on multimedia data synchronization are exacerbated when considering that, at the time of the invention of the '757 Patent, the data compression ratios reached in multimedia data compression were significantly lower than those commonly used today.  Similarly, the data storage capacity available (especially on hand-held mobile devices and media player devices) were substantially lower than today, and the transmission data rates available for network communication (especially for hand-held mobile devices and media player devices) were considerably lower than today.

20.     As a consequence of all of these technical limitations, multimedia data synchronization was restricted to synchronization and update of multimedia information that would supply users with knowledge about the multimedia files available for download and

-5-

1  streaming, and provide users access to download or stream the available multimedia files.  For

2  instance, a typical "multimedia data synchronization" prior to the invention of the '757 Patent may

3  allow for synchronization among a user's computer devices of a list of songs available for

4  download or streaming from a computer server.  After synchronization, the actual songs would

5  still reside on the computer server, but would not be present on all of the user's computer devices.

6  Instead, whenever a user wishes to play a song among the synchronized list of songs, the user

7  would need to make a request (for example, by pressing a button associated with the song), and

8  the desired song would then be downloaded or streamed from the computer server and

9  subsequently played on the user's computer device from which the request originated.

10  21.  In summary, multimedia data synchronization prior to the invention of the '757

11  Patent did not allow for synchronization of the multimedia data files themselves.  Although

12  multimedia synchronization of a list of songs allowed users to download or stream and

13  subsequently play a song whenever the computer devices were connected to a communication

14  network, the actual multimedia files were not present on all of the user's computer devices and

15  were inaccessible whenever network connectivity was unavailable.  For example, while a user

16  carrying a smartphone was traveling on an airplane without a network connection, songs that were

17  stored on any other computer device were inaccessible even if the list of songs and related

18  information had been previously synchronized between the smartphone and the user's computer

19  devices.

20  22.  Even today, many commercially-available multimedia data synchronization

21  systems do not provide for synchronization of the multimedia data files themselves for various

22  reasons, which are often motivated by the same technical limitations that precluded

23  synchronization of "content information" in multimedia systems prior to the invention of the '757

24  Patent.  For example, the Internet portal service "Spotify" (https://www.**spotify**.com/) allows for

25  synchronization of multimedia data, but does not allow for synchronization of the actual

26  "content."

27  23.  On the other hand, the invention of the '757 Patent is limited to "synchronization"

28  and "update" of multimedia data that actually includes the multimedia files themselves.  This

1   fundamental shift in approach to multimedia data synchronization allowed users to have their

2   multimedia data files present on all of their computer devices, irrespective of the network

3   connectivity at the time the user wishes to access a multimedia data file.  Therefore, users of a

4   computer device such as a smartphone while traveling on an airplane without access to the Internet

5   can still play a song that was purchased and downloaded on a different computer device such as a

6   desktop computer at home earlier in the day.

7       **D.     The '757 Patent**

8       24.     The '757 Patent is directed to systems and methods for synchronizing audio,

9   video, or photographic content among multiple devices in a multimedia environment such that a

10  user's multimedia collection is "available in multiple locations or zones that the consumer may

11  go." Exhibit A, '757 Patent, *Abstract* and 3:2-7.

12      25.     The claimed system is comprised of "at least one central storage and interface

13  device," "zone specific storage and interface devices," and "at least one zone." *Id.* at Claim 1.  In

14  the claimed system, a user's audio, video, or photographic information is "updated in relation to

15  the zone specific storage and interface devices and the central storage and interface device." *Id.*

16      26.     The specification of the '757 Patent describes the invention as "a system and

17  method for synchronizing a multiplicity of devices in a multimedia environment. The system has

18  at least one central storage and interface device, wherein audio, video, and photographic

19  information including content information and content management information, relating to at

20  least one user, are stored in digital form. The system further has a plurality of zones each having a

21  zone specific storage and interface device being capable of storing or interfacing with information

22  stored in the central storage and interface device, wherein audio, video, or photographic

23  information, relating to at least one user, contained within each one of the plurality of zone

24  specific storage and interface devices and the central storage and interface device, are updated in

25  relation with other zone specific storage and interface devices and the central storage and interface

26  device." *Id.* at 4:17-32.

27

28

-7-

DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO
APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY

27.     As a result of the invention of the '757 Patent, "at least one user can be situated at anyone of the zones and access substantially identical audio, video, and photographic information related to the at least one user." *Id*. at 4:32-34.

28.     The specification also recites that "[i]t is preferable to have the content locally stored so that interruptions and skips associated with streaming content over the network does not occur" and that "it is an object of [the '757 Patent] to provide a multimedia player device and system which is capable of storing a relatively large amount of digital multimedia programming, whether audio or video, with relatively instant access to any piece of stored data for playback, where the stored data may be replaced with new data when the desires of the user change… where the transfer of data to the multimedia player device is accomplished through alternative communication means, such that the user can choose from a vast array of data encompassing all formats of audio and video programming and can choose to synchronize the multimedia player device with other multimedia devices on a network for the upload and download of multimedia content from connected network devices." *Id.* at 3:10-12 and 3:17-30.

29.     One of ordinary skill in the art at the time of the invention would have understood the term "updated" is used, in the context of the '757 Patent, to refer to synchronization of devices such that a change in one device is automatically reflected as a change in another device, whereby the change includes both "content information" and "content management information" of audio, video, or photographic data.

30.     It is important to note that the term "update" is used to mean "to bring up to date." *See, e.g.,* Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/update.  The term "updated information" is a passive term implying a perpetual state of the information. Therefore, the reference to "audio, video, or photographic information" are "updated" is used to indicate that the information is "automatically brought up to date."  More particularly, the asserted claims of the '757 Patent require that "audio, video, or photographic information" be "updated in relation to the zone specific storage and interface devices and the central storage and interface device, whereby the at least one user can be situated in any one of the zones and access the audio, video, or photographic information related to the at least one user." Exhibit A, '757 Patent, Claim

1. Therefore, the asserted claims of the '757 Patent require that the reference to "audio, video, or photographic information" are "updated" is used to indicate that the information is be automatically brought up to date to ensure that "the at least one user can be situated in any one of the zones and access the audio, video, or photographic information related to the at least one user." *Id.*

31.     In particular, in earlier multimedia systems designed to allow users to manually "synchronize" multimedia information, the multimedia information would be up to date at the user's discretion, yet the multimedia information would not be "updated multimedia information" because the multimedia information would generally not be up to date.  As a result, a user of a multimedia system that provided for manual "synchronization" of multimedia information could not rely on the system to ensure that "the user can be situated anywhere and access his or her multimedia information."

32.     The inventors of the '757 Patent realized the shortcomings of manual "synchronization" of multimedia information and therefore disclosed and claimed a multimedia "synchronization" system whereby the "multimedia information is updated" to allow the multimedia information to be automatically brought up to date and thus ensure that "the user can be situated anywhere and access his or her multimedia information."  This is also consistent with the disclosures in the specification.  *See, e.g.,* Exhibit A, '757 Patent at 3:1-7 ("Therefore it is desirous to have a consumer digitally encode their entire audio, video, and photographic collections to be stored on multimedia storage devices, and have the entire collection *synchronized automatically by having the devices communicate to and from each other so that the content is available in multiple locations or zones that the consumer may go*."); *see also id.* at 6:33-39 ("The digital multimedia device **104** allows the user, … [to] program the digital multimedia device **104** to *synchronize and update the user's audio/video files automatically from a multimedia database 106, a personal computer or other devices connected to the network*."); *see also id.* at 6:55-59 ("Turning to FIG. **5,** an alternative embodiment of the present invention is discussed in further detail wherein *the digital multimedia player 104 automatically*

1     *performs the synchronization and download function between 'master' and 'subordinate'*

2     *digital multimedia devices 104, 112.*").

3          33.      The term "synchronization" is widely used in the field of multimedia systems to

4     convey distinct concepts and technologies, and its precise meaning can only be ascertained from

5     the context in which the reference to "multimedia data synchronization" is used.  More

6     specifically, the term "synchronization" is used to refer to:  (1) the identification of key segments

7     in multimedia data (*i.e.* addresses the issue of *where are the various portions of the multimedia*

8     *data located*, and I shall refer to it as "multimedia segment synchronization"); (2) the matching of

9     processing and transmission rates between processors and multimedia data streams (*i.e.* addresses

10    the issue of how fast to process multimedia data streams, and I shall refer to it as "multimedia

11    process synchronization"); (3) the buffering and simultaneous presentation of multimedia data

12    streams (*i.e.*, addresses the issue of *how to display multimedia data*, and I shall refer to it as

13    "multimedia stream synchronization"); (4) the efficient transfer of multimedia data between

14    multiple devices (*i.e.* addresses the issue of *how to transfer multimedia data*, and I shall refer to it

15    as "multimedia exchange synchronization"); and, finally, (5) the "update" of multimedia data to

16    automatically reflect changes to the multimedia data in other computer devices (*i.e.* addresses the

17    issue of *when to transfer multimedia data,* and I shall refer to it as "multimedia data

18    synchronization").  It is only the latter usage of the term "synchronization" (*i.e.* "update" of

19    multimedia data to automatically reflect changes to the multimedia data in other computer

20    devices) that is relevant to the invention in the asserted claims of the '757 Patent.

21          34.      Synchronization of multimedia content introduces unique challenges that are not

22    present in general data synchronization.  For example, it is difficult to store and transmit the large

23    data files associated with multimedia content.  In addition, multimedia content may be more

24    tolerant of data errors than some generic data files (*e.g.* text documents); yet multimedia content is

25    much more sensitive to data degradation related to latency and jitter.  Further, the impact of errors

26    introduced during multimedia data storage and delivery is highly sensitive to the exact location of

27    the errors.

28

-10-

35.     The plain language of the '757 Patent requires that a system include a plurality of zone specific storage and interface devices.  Claim 1 of the '757 Patent states that "audio, video, or photographic information … are updated in relation to the zone specific storage and interface device*s* and the central storage and interface device." Exhibit A (emphasis added).  This language requires the system to include a plurality of zone specific storage and interface devices.  Claim 6 of the '757 Patent confirms that a plurality of zone specific devices are required by the claims.  *Id.* ("The system of claim 1 … wherein audio, video, and photographic information contained within each one of the plurality of zone specific storage and interface devices…").  This understanding is also consistent with the disclosures in the specification.  *See, e.g.,* Exhibit A, '757 Patent, *Abstract* ("audio, video, or photographic information, relating to at least one user, contained within each one of the plurality of zone specific storage and interface devices and the central storage and interface device, are updated in relation with other zone specific storage and interface devices and the central storage and interface device.").  In addition, the '757 Patent explicitly teaches that the invention is designed to update the multimedia content on multiple devices so that the content is available to the user on multiple devices.  *See, e.g., id.* at 3:1-15 ("Therefore it is desirous to have a consumer digitally encode their entire audio, video, and photographic collections to be stored on multimedia storage devices, and have the entire collection *synchronized automatically by having the devices communicate to and from each other so that the content is available in multiple locations or zones that the consumer may go*. These may include devices such as personal computers located in other rooms or other locations (for example summer home, car, yacht, etc.), or on an online server/website/database. It is preferable to have the content locally stored so that interruptions and skips associated with streaming content over the network does not occur. Additionally, should the storage device such as a hard drive of one unit fails, then the *other devices still have complete copies of the content collection* to easily replace the failed unit.") (emphasis added).  This is also consistent with the overall purpose of the '757 Patent, as stated in the asserted claims, which is to ensure that "the at least one user can be situated in any one of the zones and access the audio, video, or photographic information related to the at least one user." *Id.* at Claim 1.

-11-

**III.    The '446 Patent and the Multer Patent Do Not Anticipate the '757 Patent**

   **A.    The '446 Patent Does Not Anticipate the '757 Patent**

36.    U.S. Patent No. 7,587,446 (the "'446 Patent"), entitled "Acquisition and synchronization of digital media to a personal information space," was filed on November 10, 2000, and issued on September 8, 2009.  Attached hereto as Exhibit A is a true and correct copy of the '446 Patent.

37.    The '446 Patent is directed toward "the transfer of public and private data to a private information space and in particular to the transfer, storage and synchronization of media data."  Exhibit B, '446 Patent at 1:19-24 (Background of the Invention).

38.    According to the '446 Patent, the "personal information space" can comprise of a "series of machines," which in turn "can have their storage device[s]," and contains "information selected by the user to be input into the user's own hard drive.  Hence, the personal information space may comprise public or private data selected by the user which is inserted into any one or more of a user's network-coupled devices."  Exhibit B, '446 Patent at 1:49-57.).  The '446 Patent repeatedly and clearly discloses that the "personal information space" is a virtual catalog of devices containing data selected by the user, and copied from other sources into a personal information space.  *See, e.g.,id.* at 1:50-55 ("This series of machines can comprise a 'personal information space' which is made up of information selected by the user to be input into the user's own hard drive. Hence, the personal information space may comprise public or private data selected by the user which is inserted into any one or more of a user's network-coupled devices."); 4:42-48 ("unique system and method for transferring digital media content, which is readily available in any number of sources, into a user's personal private information space.").

39.    Thus, the disclosures of the '446 Patent are directed toward two separate features: (1) "[A] unique system and method for transferring digital media content, which is readily available in any number of sources, into a user's personal private information space."  Exhibit B, '446 Patent at 4:42-45.  (2) "[A] mechanism for moving data between different network-coupled devices within the personal information space."  *Id.* at 4:46-48.

02198.51990/5594668.7

DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY

40.     The '446 Patent primarily describes "synchronizing" data, *i.e.*, moving data under the '446 Patent's disclosure, from public sources into one of the devices of the personal information space.  *See, e.g.,* Exhibit B, '446 Patent at 5:56-64 ("In a further aspect, the step of determining may comprise searching using a web-based search engine to ascertain publicly available media, or secure media provided by a site the user is authorized to access, and which the user wishes to transfer into the user's personal information space.  Alternatively, the user may select to include all, or one or more aspects of, a user's personal media data.  In a further embodiment, selection of the data to be synchronized can be automatic.  For example, a user may associate an event such as a media release with an automatic synchronization request which will automatically add to or update the user's personal information space when the event occurs.  Optionally, a verification step 11 may prompt the user to confirm the data selection is correct."); 6:34-37 (describing Fig. 2) ("As noted above, personal or public media information from, for example, a file system stored on a server or private data store may be utilized in accordance with the system of the present invention…. designating that all files in the file system folder are to be synchronized into the personal information space."); 8:12-39 ("Affiliate server 110 may also comprise a specialized web server such as a music, video or other media file service provider, a performance group's web server, an online retailer's web server, a shared network server running a media-sharing application such as Napster or Gnutella, or any number of different types of Internet-based sources providing media content which a user will desire to synchronize with the user's personal information space. The affiliate server could also be a simple file server which provides access to data files and enables synchronization to the personal information space by implementing HTTP code in accordance with the following description using a secondary link or re-direct.  Affiliate server 110 may include, for each piece of content which the affiliate server system administrator deems appropriate for such synchronization, code enabling the display of a synchronization implementation interface, such as button 65 on a file system display 10′, shown in FIG. 2.  In this example, when a piece of data is provided by the affiliate server which a user wishes to synchronize to the private information space, the user marks the data by, for example, highlighting it, and then 'clicks' button 65 to initiate the synchronization process.  Following

-13-

DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO
APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY

1   clicking on button 65, a sync pop-up window 120 will be provided by a sync service server 130.");

2   and 9:8-19 ("One example of media information which may be provided into personal information

3   space is to utilize the aforementioned system on a public information server which allows

4   transference of data files, such as executables, documents, or digital music files (MP3's) from the

5   public information space to the personal information space. As shown in FIG. 4, data from storage

6   server 200 is then considered part of the personal information space and may be thereafter

7   synchronized to any one or all of the devices coupled within the user's space, including personal

8   computers, PDA's, automotive PC's, and the like.").

9      41.     Further, the '446 Patent describes "synchronization" between devices within the

10  personal information space as "the ability to share information" (Exhibit B, '446 Patent at 5:29-

11  41) and as an alternative to "transfer[ring]" "digital media files." *Id.* at 9:51-56 ("In accordance

12  with the present invention, digital media files of varying formats, and other data, may be

13  synchronized or transferred (uni-directionally) to any network coupled appliance 400 utilizing the

14  system of the present invention.").

15     42.     As described above, the '446 Patent is primarily directed toward moving data from

16  public sources into a device of the personal information space. *See, e.g.,* ¶40.  In contrast, the '757

17  Patent is directed toward ensuring that the same media's content information and content

18  management information is present wherever the user might be.  Exhibit A, '757 Patent, *Abstract.*

19     43.     The '446 Patent fails to disclose the second limitation of Claim 1 of the '757 Patent

20  which requires "at least one zone, each zone having at least one zone specific storage and interface

21  device capable of storing or interfacing with information stored in the central storage and interface

22  device, wherein audio, video, or photographic information, relating to at least one user, contained

23  within the zone specific storage and interface device and the central storage and interface device,

24  are updated in relation to the zone specific storage and interface devices and the central storage

25  and interface device, whereby the at least one user can be situated in any one of the zones and

26  access the audio, video, or photographic information related to the at least one user."

27     44.     In particular, the '446 Patent fails to disclose that any of the devices within the

28  personal information space store content information and content management information

-14-

1   relating to at least one user, or that the devices are updated in relation to each other, as required by

2   the '757 Patent.

3          45.     The '446 Patent consistently refers to the movement of data between devices

4   within the personal information space as "transfer[ring]," not updating.  The transfer of data is

5   merely the movement of data between devices.  In contrast, the '757 Patent requires "updat[ing]"

6   the central and zone devices, *e.g.*, automatic download.  The only disclosure in the '446 Patent that

7   could be construed as updat[ing], *i.e.*, "automatic" synchronization, is the transfer of data from

8   outside of the personal information space (public data on a public server) onto a device within the

9   personal information space. *See, e.g.,* Exhibit B, '446 Patent at 5:56-64 ("In a further aspect, the

10  step of determining may comprise searching using a web-based search engine to ascertain publicly

11  available media, or secure media provided by a site the user is authorized to access, and which the

12  user wishes to transfer into the user's personal information space.  Alternatively, the user may

13  select to include all, or one or more aspects of, a user's personal media data.  In a further

14  embodiment, selection of the data to be synchronized can be automatic. For example, a user may

15  associate an event such as a media release with an automatic synchronization request which will

16  automatically add to or update the user's personal information space when the event occurs.

17  Optionally, a verification step 11 may prompt the user to confirm the data selection is correct.").

18         46.     Moreover, the '446 Patent only discloses that the data in the user's personal

19  information space is stored among one or more of the user's devices, but does not disclose that the

20  same data is stored in each of the user's devices. *See, e.g.,* Exhibit B, '446 Patent at 1:50-55

21  ("This series of machines can comprise a 'personal information space' which is made up of

22  information selected by the user to be input into the user's own hard drive.  Hence, the personal

23  information space may comprise public or private data selected by the user which is inserted into

24  any one or more of a user's network-coupled devices.").

25         47.     In addition, the "transfer" of data among the user's devices disclosed in the '446

26  Patent allows for the "sharing of information" among one or more devices in the user's personal

27  information space, but does not disclose the "update" of multimedia information, *e.g.*, content

28  information and content management information, related to the user among all of the user's

-15-

1   devices, as required by this claim limitation. *See, e.g.,* Exhibit B, '446 Patent at 5:29-41; *see also*

2   *id.* at 9:51-56 ("In accordance with the present invention, digital media files of varying formats,

3   and other data, may be synchronized or transferred (uni-directionally) to any network coupled

4   appliance 400 utilizing the system of the present invention.").

5       48.     Moreover, the '446 Patent fails to disclose "updating" of media assets across a

6   plurality of zone specific and interface devices, and instead discloses "transferring" data to a

7   single "network coupled apparatus." *See, e.g.,* Exhibit B, '446 Patent, *Abstract* ("A method for

8   *transferring media data to a network coupled apparatus* is described. … Upon a user request, the

9   method *transfers at least a portion of the media data from the personal information space to the*

10  *network coupled apparatus* in a differencing transaction."); *see also id.* at 9:51-56 ("In

11  accordance with the present invention, digital media files of varying formats, and other data, may

12  be *synchronized or transferred (uni-directionally) to any network coupled appliance 400*

13  utilizing the system of the present invention.")(emphasis added.).  The '757 Patent, by contrast, is

14  directed to having multiple zone devices updated in relation to each other. *See, e.g.,* Exhibit A,

15  '757 Patent, Claim 1 ("updated in relation to the zone specific storage and interface devices") and

16  Claim 6 ("audio, video, and photographic information contained within each one of the plurality

17  of zone specific storage and interface devices and the central storage and interface device are

18  stored therein and updated at a predetermined time in relation with other zone specific storage and

19  interface devices as well as the central storage and interface device.").

20       **B.     The '446 Patent and the Multer Patent Do Not Anticipate the '757 Patent**

21       49.     The '446 Patent purports to incorporate by reference the entirety of multiple patents

22  and patent applications, including U.S. Pat. No. 6,671,757 (the "Multer Patent").  Attached hereto

23  as Exhibit C is a true and correct copy of the Multer Patent.

24       50.     The '446 Patent merely incorporates the Multer Patent by reference as part of

25  general incorporations by reference, and does not clearly identify the subject matter that is

26  incorporated nor where it is to be found such that one of ordinary skill in the art could find the

27  general incorporation by reference to be sufficiently particular.  For example, the mention of the

28  Multer Patent in column 5 refers to the "transactional based extraction, transfer, broadcast,

-16-

storage, and synchronization systems set forth" in the Multer Patent.  Exhibit B, '446 Patent at 5:34-41.  This reference is so broad that it is essentially a general incorporation, and it is not sufficiently particular to assist one of ordinary skill in the art to determine which portions of the 17 figures and 50 columns of the Multer Patent are being described and incorporated into the '446 Patent.

51.     In my opinion, even if the '446 Patent is found to have properly incorporated the Multer Patent, the combination of the '446 Patent and Multer Patent does not anticipate Claims 1, 14 and 15 of the '757 Patent by clear and convincing evidence.

52.     The Multer Patent discloses a method for "synchronization" that provides a specific technique for the exchange of information between devices.  *See, e.g.,* Exhibit C, Multer Patent, *Abstract* ("A system and method for synchronizing devices which can couple to the Internet, or any network.  The system includes a first sync engine on the first system interfacing with data on the first system to provide difference information.  A data store is coupled to the network and in communication with the first and second systems.  A second sync engine is provided on the second system coupled to receive the difference information from the data store via the network, and interface with data on the second system to update said data on the second system with said difference information.  Difference information is transmitted to the data store by the first sync engine and received from the data store from the second sync engine.").

53.     The "synchronization" disclosed by the Multer Patent is designed for the efficient transfer of difference information related to data such as "contact information."  *See, e.g.,* Exhibit C, Multer Patent at 6:31-46.

54.     The Multer Patent discloses that "[a]n events module **925** controls synchronization initialization events. Items such as when to sync, how to sync, trigger the delta module **950** to perform a synchronization operation."  *See* Exhibit C, Multer Patent at 13:6-9.).  The Multer Patent provides the following detail about the operation of the events module or how and when to trigger the sync operation: "Each device has its own triggering mechanism for initiating synchronization.  Some devices, such as Windows clients and Palm® pilots are triggered manually when the user presses a 'sync' button.  Other devices, such as a cellular telephone, may be

1   triggered automatically after another device completes a sync.  Regular, time-based triggers are

2   supported as well.  A web-based application portal will sync when a user logs into the website

3   security authorization mechanism, and may optionally sync on a log-out of the user or on the

4   session time-out, but only if the user has changed data during the session." *Id.* at 35:12-22.

5       55.     As an initial matter, the '446 Patent describes the "transfer" of various data

6   including MP3s among multiple devices within a personal information space.  The Multer Patent

7   discloses an efficient method for "synchronization" of data such as "contact information" between

8   computer devices.  Even if one were to consider the hypothetical combination of the '446 Patent

9   and Multer Patent, a person of ordinary skill in the art would not consider the combination to

10  disclose the "synchronization" of multimedia data.  In particular, the "synchronization" of "contact

11  information" disclosed in the Multer Patent is applicable to small data files, and a person of

12  ordinary skill in the art would not consider its application to the "transfer" of large multimedia

13  data files to have been disclosed or enabled.

14      56.     In addition, the '446 Patent simply relies on the Multer Patent to perform a method

15  that can be used for "transfer" and "synchronization" of data between devices in a manner

16  consistent with the disclosure in the '446 Patent.  *See, e.g.,* Exhibit B, '446 Patent at 5:34-41

17  ("One example of a personal information space is the transactional based extraction, transfer,

18  broadcast, storage and synchronization systems for forth in patent application Ser. Nos.

19  *09/490,550* now U.S. Pat. No. 6,694,336, Ser. No. *09/491,675* now copending, and *09/491,694,*

20  now U.S. Pat. No. 6,671,757, each of which is hereby specifically incorporated by reference.");

21  6:24-29 ("Once inserted into the private information space, the data can be synchronized to any

22  number of different devices as described in patent application Ser. No. *09/490,550* now U.S. Pat

23  No. 6,694,336; Ser. No. *09/491,675* now copending; and Ser. No. *09/491,694* now U.S. Pat No.

24  6,671,757.").  Therefore, the combination of the '446 Patent and Multer Patent fails to meet the

25  limitations of the asserted claims for the same reasons as stated above in relation to the disclosure

26  of the '446 Patent alone.

27      57.     Because the Multer Patent and the '446 Patent are directed toward different

28  disclosures and different embodiments, it is impossible to know if any particular storage "server"

-18-
DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO
APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY

1  discussed in the Multer Patent shares any of the characteristics of the "storage server" of the '446

2  Patent.  *See, e.g.,* Exhibit C, Multer Patent at 8:56-60 ("[T]he storage servers **300** utilized in the

3  system of the present invention may be any type of storage server, such as an Internet server or an

4  FTP server, and may be provided from any source, such as any Internet service provider (ISP)").

5  For example, the Multer Patent does not disclose the use of a personal information space, a key

6  feature of the '446 Patent's disclosure.

7        58.    Furthermore, the Multer Patent does not disclose "content information."   "Content

8  information," as used in the '757 Patent, requires both the media content and information that is

9  specific to the particular content.  The portion of the Multer Patent relied on by Apple for the

10 disclosure of "content information" merely discloses that "[s]erver application objects can also be

11 designed to create collections.  For example, if the user wishes to create a 'my pictures' collection

12 which consists of some collection of information and synchronize this collection of information,

13 such an arbitrary grouping of classes of information into appropriate representations is supported."

14 *See, e.g.*, Exhibit C, Multer Patent at 28:45-50   This example (*i.e.* the "my pictures" collection)

15 does not disclose information that is specific to a particular content (namely, such information is

16 shared by all of the pictures in the "my pictures" collection), and therefore, falls short of disclosing

17 "content information."  In addition, there is nothing in the Multer Patent that teaches that the "my

18 pictures" collection includes actual pictures, and instead the Multer Patent simply refers to "my

19 pictures" as "consist[ing] of some collection of information."

20       59.    Neither the '446 Patent nor the Multer Patent disclose "at least one zone, each zone

21 having at least one zone specific storage and interface device capable of storing or interfacing with

22 information stored in the central storage and interface device, wherein audio, video, or

23 photographic information, relating to at least one user, contained within the zone specific storage

24 and interface device and the central storage and interface device, are updated in relation to the

25 zone specific storage and interface devices and the central storage and interface device, whereby

26 the at least one user can be situated in any one of the zones and access the audio, video, or

27 photographic information related to the at least one user," as required by Claim 1 of the '757

28 Patent.

02198.51990/5594668.7

DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO
APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY

60.     As with the '446 Patent, the Multer Patent does not disclose updat[ing] devices, as required by the '757 Patent.  Rather, the Multer Patent does not disclose that "synchronization" requires that the data be "updated," as required by this claim limitation.  The Multer Patent simply states that an "events module" will determine how to perform the "synchronization."  *See* Exhibit C, Multer Patent at 13:6-9.  In fact, the Multer Patent teaches that "[s]ome devices, such as Windows clients and Palm® pilots are triggered manually when the user presses a 'sync' button." *See id.* at 35:12-22.  In contrast, the '757 Patent requires "updat[ing]" the central and zone devices, *e.g.*, automatic download.

61.     In addition, the Multer Patent does not disclose "updating" of media assets across a plurality of zone specific storage and interface devices, as required by Claim 1.   The '757 Patent, by contrast, is directed to having multiple user devices updated in relation to each other. *See, e.g.,* Exhibit A, '757 Patent, Claim 1 ("updated in relation to the zone specific storage and interface devices and the central storage and interface device"; Claim 6 ("audio, video, and photographic information contained within each one of the plurality of zone specific storage and interface devices and the central storage and interface device are stored therein and updated at a predetermined time in relation with other zone specific storage and interface devices as well as the central storage and interface device.").

62.     The '446 Patent does not disclose the automatic synchronization of both content information ("CI") and content management information ("CMI") "relating to at least one user" between the central and zones devices.  Rather, the "transfer" of data among the user's devices disclosed in the '446 Patent describes the "sharing of information" among one or more devices in the user's personal information space, but does not disclose the "update" of multimedia information, e.g., content information and content management information, related to the user among all of the user's devices, as required by this claim limitation.  *See, e.g.*, Exhibit B, '446 Patent at 5:29-41; *see also id.* at 9:51-56 ("In accordance with the present invention, digital media files of varying formats, and other data, may be synchronized or transferred (uni-directionally) to any network coupled appliance 400 utilizing the system of the present invention.")).

63.     At most, the '446 Patent describes that all of the devices that comprise the personal information space collectively have content information, as required by Claim 1 of the '757 Patent.  The '446 Patent discloses "that the data in the user's personal information space is stored among one or more of the user's devices, but does not disclose that the same data is stored in each of the user's devices. *See, e.g.,* Exhibit B, '446 Patent at 1:50-55 ("This series of machines can comprise a 'personal information space' which is made up of information selected by the user to be input into the user's own hard drive. Hence, the personal information space may comprise public or private data selected by the user which is inserted into any one or more of a user's network-coupled devices.").

## IV.     Apple's Documents Prove Infringement of the '757 Patent

64.     I understand that Apple asserts certain accused devices (*e.g.*, iOS devices and laptop computers) are not "zone…devices," because they do not have "some degree of being contained within a certain location."  I disagree.  *See* Order Construing Disputed Claim Terms Of U.S. Patent Nos.  5,579,239; 5,666,502; 5,946,647; 7,577,757; 7,756,087; 7,761,414; 8,014,760 (Dkt. 447) at 40 ("While the claims do state that a 'storage and interface device' must be 'specific' to a 'zone,' *nothing in the language of the claims themselves requires that the specific zone be a fixed location, that the device be fixed within that zone, or that the zone must be bounded*." (emphasis added)).

65.     Apple's own documents show that Apple's customers use the accused devices, including iOS devices and laptop computers, while the devices are contained to some degree within a certain location.  *See, e.g.,* Exhibit D, APLNDC0002596538 at pg. 104-106 ("████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████); Exhibit E, APLNDC0002597583 at pg. 97-99 (same); Exhibit F, APLNDC0002363727 at pg. 120-122 (same); Exhibit G, APLNDC0002621336 at pg. 137139 (same); Exhibit H, APLNDC0002117730 at pg. 145-147 (same); Exhibit I, APLNDC0002598132 at pg. 173-175 (same); Exhibit J, APLNDC630-0000177773 at pg. 162-164 (same); Exhibit K, APLNDC630-0000177303 at pg. 169-171 (same); Exhibit L, APLNDC0001345149 at pg. 41-43 (same); Exhibit M,

1  APLNDC0002690182 at pg. 69 ████████████████████████████████████ ;

2  Exhibit N, APLNDC0001430158 at pg. 26 █████████████████████████████████

3  ██████████ ; Exhibit O, APLNDC0001572966 at pg.46 ████████████████████

4  ██████████████████████████████████████████ ; Exhibit P, APLNDC0002956018

5  at pg. 38 █████████████████████████████████ ; Exhibit Q,

6  APLNDC0001759006 at pg. 25 (same); Exhibit R, APLNDC0001416346 at pg. 61 (same);

7  Exhibit S, APLNDC0001800736 at pg. 44 (same); Exhibit T, APLNDC0001416346 at pg. 61-70

8  ██████████████████ ; Exhibit U, APLNDC0001800736 at pg.44-53 (same); Exhibit V,

9  APLNDC0001339253 at pg. 29 ██████████████████████████████████████████

10 ██████████████████████████████ ; Exhibit W,

11 APLNDC0001509855 at pg. 14, 48, 86 ████████████████████████████████████

12 █████████████████████████████████████████████████

13 ██████████████████████████████████ ; Exhibit X, APLNDC0002426913

14 at pg. 170 ██████████████████████████████████████

15 ██████████████████████████████████ ; Exhibit Y, APLNDC0001757341 at

16 pg. 112 █████████████████████████████████████

17 ██████████ Exhibit Z, APLNDC0002953811 at pg. 22, 44, 66, 88, 110, 132 ██████████

18 ██████████████████████████████ ; Exhibit AA, APLNDC0002953960 at pg. 18,

19 55, 74, 99, 116, 137 (same); Exhibit BB, APLNDC0002954288 at pg. 16, 51, 64, 90, 106, 144

20 (same); Exhibit CC, APLNDC630-000177553 at pg. 29 ████████████████████

21 ████████████████████████████████████████████████████ ); Exhibit

22 DD, APL-ITC796-0000503007 at pg. 7, 66-68 (██████████████████████████████

23 ██████████████████████████████████████████

24 ████████████████████ Exhibit EE, SAMNDCA630-07399402 at pg.3, 12,

25 14-15 ("the proportion of overall usage [at home] … represents about 60% of overall usage";

26 results applicable to Apple tablets; music and movies more likely to be played/displayed at home

27 than traveling).

28

-22-

1    66.    Apple's own patents also explain that "people often use a media player when they

2    are at home or at some other stationary location. When stationary, docking stations are available

3    for connecting the media player, *e.g.*, to a sound system. In this manner, songs on the media player

4    may be listed [sic] to as one resides in the same room, but without having to use headphones."

5    Exhibit FF, U.S. Patent No. 8,323,040 to Prest at 1:19-24. Similarly, Mr. Wysocki, Apple's

6    corporate representative, agreed that one use customers make of their iPod or iOS devices is to

7    connect them to docking stations or with cables so that they can listen to their music as they

8    "reside" in a room. Exhibit GG, Wysocki Dep. at 22:15-25:22.

9    67.    I declare under penalty of perjury that the foregoing is true and correct. Executed

10    on the 1st day of November, 2013, in Chicago, Illinois

11

12

13

14

15    _____

16                                    Dan Schonfeld

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF PROFESSOR DAN SCHONFELD IN SUPPORT OF SAMSUNG'S OPPOSITION TO
APPLE'S MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY