REDACTED VERSION OF DOCUMENT TO BE FILED UNDER SEAL

JOSH A. KREVITT (CA SBN 208552)
jkrevitt@gibsondunn.com
H. MARK LYON (CA SBN 162061)
mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, California 94304-1211
Telephone: (650) 849-5300
Facsimile: (650) 849-5333

MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

WILLIAM F. LEE (*pro hac vice*)
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

MARK D. SELWYN (SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

*Attorneys for Plaintiff and Counterclaim-Defendant Apple Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | CASE NO. 5:12-cv-00630-LHK<br><br>**PLAINTIFF AND COUNTERCLAIM-DEFENDANT APPLE INC.'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:     December 12, 2013<br>Time:    1:30 p.m.<br>Place:   Courtroom 4, 5th Floor<br>Judge:  Hon. Lucy H. Koh<br><br>**ORAL ARGUMENT REQUESTED** |
| SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Counterclaim-Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation,<br><br>Counterclaim-Defendant. | **HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY** |

1

**NOTICE OF MOTION AND MOTION**

2   PLEASE TAKE NOTICE THAT at 1:30 pm on December 12, 2013, Plaintiff and

3   Counterclaim-Defendant Apple Inc. ("Apple") shall and hereby does move pursuant to Federal

4   Rule of Civil Procedure 56 for an order granting Apple partial summary judgment of

5   infringement of claim 18 of U.S. Patent No. 8,074,172 (the "'172 Patent"), claim 1 of U.S.

6   Patent No. 5,946,647 (the "'647 Patent"), and claim 20 of U.S. Patent No. 7,761,414 (the "'414

7   Patent"); partial summary judgment that the WAIS and AppleSearch "systems" fail to

8   anticipate or obviate claims 24 and 25 of U.S. Patent No. 6,847,959 (the "'959 Patent"); and

9   partial summary judgment that U.S. Patent No. 7,587,446 (the "'446 Patent") anticipates claims

10   1, 14, and 15 of U.S. Patent No. 7,577,757 (the "'757 Patent").

11

**RELIEF REQUESTED**

12   Apple seeks partial summary judgment of (1) infringement of '172 Patent claim 18,

13   '647 Patent claim 1, and '414 Patent claim 20; (2) no anticipation or obviousness of '959 Patent

14   claims 24 and 25 based on the so-called WAIS and AppleSearch "systems"; and (3)

15   anticipation of '757 Patent claims 1, 14, and 15 based on the '446 Patent.

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page

MEMORANDUM AND POINTS AND AUTHORITIES.............................................................1

    A.    Infringement of U.S. Patent No. 8,074,172 (Word
           Recommendations).............................................................................................1

    B.    Infringement of U.S. Patent No. 5,946,647 (Links for Structures)....................4

          1.    This Court Has Already Explicitly Rejected Most of Samsung's
               Arguments. .........................................................................................5

               a.    The Accused Shared Libraries Are Analyzer Server
                     Routines That Are "Separate from a Client.".............................. 5

               b.    The '647 Accused Products "Link Actions to the
                     Detected Structures"................................................................. 7

               c.    The '647 Accused Products Contain an "Action
                     Processor." ................................................................................ 7

          2.    Samsung's New Arguments Related to Jelly Bean Products Are
               Similarly Based on Erroneous Claim Interpretations. ...........................8

    C.    Infringement of U.S. Patent No. 7,761,414 (Synchronization)........................10

          1.    The Representative Galaxy S III Product Infringes Claim 20. ..............11

                a.    Samsung's Only Non-Infringement Argument Is
                     Based on Erroneous Claim Construction and Should
                     Be Rejected as a Matter of Law. ............................................... 11

               b.    There Is No Dispute the Rest of the Limitations of
                     Claim 20 Are Met. .................................................................... 13

          2.    All of the Other '414 Accused Products Infringe for the Same
                Reasons. .............................................................................................14

    D.    Validity of U.S. Patent No. 6,8447,959 (Unified Search).................................15

    E.    Invalidity of U.S. Patent No. 7,577,757 ...........................................................19

          1.    The '446 Patent Anticipates Claim 1 of the '757 Patent.......................20

               a.    "A system for synchronizing devices in a multimedia
                     environmental".......................................................................... 20

                b.    "at least one central storage and interface device,
                     wherein audio, video, or photographic data, including
                     content information and content management
                     information, related to at least one user, are stored in
                     digital form"............................................................................. 20

               c.    "at least one zone, each zone having at least one zone
                     specific storage and interface device capable of

storing or interfacing with information stored in the central storage and interface device" ........................................ 21

d.   "wherein audio, video, or photographic information, relating to at least one user, contained within the zone specific storage and interface device and the central storage and interface device, are updated in relation to the zone specific storage and interface devices and the central storage and interface device" ........................................ 22

e.   "whereby the at least one user can be situated in any of the zones and access the audio, video, or photographic information related to the at least one user" .................................................................................. 24

2.   The '446 Patent Anticipates Claims 14 and 15 ..................................... 25

**Cases**

*Catalina Mktg. Int'l v. Coolsavings.com, Inc.,*
  289 F.3d 801 (Fed. Cir. 2002)..........................................................................................3

*Continental Can Co. USA, Inc. v. Monsanto Co.,*
  948 F.2d 1264 (Fed Cir. 1991)........................................................................................16

*Elan Pharmaceuticals, Inc. v. Mayo Foundation for Medical Educ. and Research,*
  304 F.3d 1221 (Fed. Cir. 2002).......................................................................................17

*Enzo Biochem Inc. v. Appelra Corp.,*
  599 F.3d 1325 (Fed. Cir. 2010).......................................................................................15

*Harari v. Mihnea,*
  656 F.3d 1331 (Fed. Cir. 2011).......................................................................................19

*Pfizer v. Teva Pharm.,*
  429 F.3d 1364 (Fed. Cir. 2005).........................................................................................2

*SynQor, Inc. v. Artesyn Techs., Inc.,*
  709 F.3d 1365 (Fed. Cir. 2013).......................................................................................12

*Ultradent Prods. Inc. v. Life-Like Cosmetics, Inc.,*
  127 F.3d 1065 (Fed. Cir. 1997).......................................................................................19

**Statutes**

35 U.S.C. § 103 ...................................................................................................................16

**Other Authorities**

*Manual of Patent Examining Procedures* § 608.01(p) (8th ed. 2001).......................................19

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

APPLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 12-CV-630-LHK (PSG)

## MEMORANDUM AND POINTS AND AUTHORITIES

Apple is entitled to summary judgment on each of the five issues addressed herein, and entering judgment now would materially reduce the scope of this case and the issues to be tried. In some instances, this Court has already found that Apple is likely to succeed on the merits, and in response Samsung merely offers the same arguments this Court previously addressed and rejected.  Indeed, Apple has limited this motion only to issues for which there is no genuine factual dispute and on which Apple is clearly entitled to judgment as a matter of law.

### A.    Infringement of U.S. Patent No. 8,074,172 (Word Recommendations)

This Court has already found that Samsung devices with the Google Keyboard likely infringe the '172 Patent in its preliminary injunction order.  *See* D.I. 222 at 55 ("PI Order").  In so doing, the Court rejected the single non-infringement position Samsung set forth at that time. Samsung has abandoned that one non-infringement argument in favor of another one that is even more clearly without merit.[1]  Samsung's *sole* non-infringement argument is based entirely upon a new claim construction and can be disposed of as a matter of law on summary judgment.

Specifically, Samsung now contends that the "keyboard" in asserted claim 18 is limited to a physical keyboard.  *See, e.g.,* Daniel Wigdor Rebuttal Expert Report ("Wigdor Reb. Rep."), ¶¶ 49-53, 123, 126-32 (Ex. A-1).[2]  Samsung's expert concedes that this claim construction is Samsung's *only* basis for non-infringement:

> To be clear, it is my opinion that the claim requires a physical keyboard, and those [Samsung devices] don't have a physical keyboard and therefore don't infringe.  There are no other bases for my opinion.

[1]  All accused products use the Google Keyboard or the Swype Keyboard (which operates identically to the Google Keyboard for purposes of Apple's infringement analysis) and Apple laid out a clear case of infringement for all of the products that incorporate those keyboards. *See* Expert Report of Andrew Cockburn ("Cockburn Rep."), ¶¶ 4, 17-22, 376-435, Ex. 4-05, 4-06 (Cockburn Declaration, Ex. 1) (presenting infringement evidence for the Admire, Captivate Glide, Conquer 4G, Exhibit II 4 ▮▮▮▮▮axy Note (excluding ▮▮▮▮▮ ▮▮▮▮▮ Galaxy SII (excluding ▮▮▮▮▮▮▮▮▮▮▮ Galaxy SII Epic 4G Touch (excluding ▮▮▮▮▮▮▮ Stratosphere and Transform Ultra) (collectively, the "172 Accused Products"). Representative infringement claim charts for two exemplary Accused Products are provided in Exhibits 2-3 to the Cockburn Report.  Samsung's non-infringement argument is the same for all '172 Accused Products.  Wigdor Reb. Rep.. ¶¶ 123-33; Wigdor Tr., 107:17-108:14 (Ex. A-2).
[2]  With the exception of the Cockburn Report and its exhibits, all citations herein are to exhibits to the concurrently-filed Declaration of Jennifer Rho.

1     Deposition of Daniel Wigdor ("Wigdor Tr."), 107:17-108:14 (Ex. A-2).

2         Samsung's sole non-infringement argument – and the claim construction upon which it

3 is entirely based – is wrong as a matter of law.  Claim 18 clearly does not require that the

4 keyboard be a physical keyboard.  There is absolutely nothing in the claim that states, or even

5 suggests, that it is limited to physical keyboards, and such a requirement would be inconsistent

6 with the entire intrinsic record in which the '172 Patent focuses on virtual keyboards.

7         Claim 18 recites a "keyboard" – not a physical keyboard.  Samsung only relies on the

8 preamble, which recites "a graphical user interface on a portable electronic device with a

9 keyboard and a touch screen display."  But, the preamble does not limit the keyboard to a

10 physical keyboard.  The word physical does not appear in the preamble or anywhere else in the

11 claim.  Nor does anything else in the claim limit the keyboard to a physical keyboard.

12         Moreover, other '172 Patent claims demonstrate that the term "keyboard" is *not* limited

13 to physical ones, but also covers virtual keyboards.  For example, claim 28 recites a "keyboard"

14 and dependent claim 29 recites the "keyboard" is a "virtual keyboard."  '172 Patent, 14:56-

15 15:27 (Ex. A-3).  The '172 Patent claims preclude limiting "keyboard" to something physical.

16         Limiting claim 18 to a physical keyboard also is inconsistent with the specification,

17 which focuses almost entirely on *virtual* keyboards, not physical keyboards.  *Every one* of the

18 preferred embodiments has a virtual keyboard, not a physical keyboard.  '172 Patent, 7:6-32,

19 7:50-65, 8:59-10:59, Figs. 2-5B (Ex. A-3).  And, as Samsung's expert concedes, *every figure in*

20 *the patent* also discloses a virtual keyboard, not a physical keyboard.  *See* Wigdor Tr. at 93:6-

21 19 (Ex. A-2) ("Q: Every figure of the '172 Patent that shows a portable electronic device shows

22 a virtual keyboard, not a physical keyboard, correct?  A: I believe that that's correct, yes.").

23         Thus, limiting the term "keyboard" to "physical keyboards" would exclude the '172

24 Patent's preferred embodiments, which is never correct absent a clear and unmistakable

25 disavowal.  *Pfizer v. Teva Pharm.*, 429 F.3d 1364, 1374 (Fed. Cir. 2005).  Samsung cites to no

26 disavowal of virtual keyboards for claim 18 in the intrinsic record because there is none.[3]

27

28 _____

[3] While the '172 Patent specification mentions using physical keyboards as alternatives to the preferred embodiments, Samsung cites to no evidence in the intrinsic record that Apple

In the face of contrary language in both the claim and specification, Samsung contends that because claim 18 recites "a portable electronic device with a keyboard" in the preamble, the electronic device must have a keyboard "even if all software were removed from the device," and thus it must have a physical keyboard.  Wigdor Reb. Rep. ¶ 51 (Ex. A-1).  First, the term "a portable electronic device" appears only in the preamble, and is not even limiting. *Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801 at 810 (Fed. Cir. 2002).  But, even if it were limiting, there is nothing in the claim or in the phrase "a portable electronic device with a keyboard" that relates to whether software has been removed, or whether the keyboard must be present when it is removed.  Adding a "when the device has no software" requirement to the claim would exclude *every* preferred embodiment and figure in the patent – *all* of which disclose devices with virtual keyboards that would *not* exist if the software were removed.

Next, Samsung claims that claim 18 is limited to a physical keyboard because the claim recites a keyboard *and* a touch screen display, so they must be separate.  But the fact that there is a keyboard and a touch screen display does not mean that they must be separate, nor does it mean that the keyboard cannot be part of the touch screen display.  In fact, all of the preferred embodiments of the patent show a virtual keyboard and a touch screen display, with the keyboard displayed on part of the touch screen display.  '172 Patent (Ex. A-3).  And even if claim 18 did require these to be separate, in the '172 Accused Products they are separate in exactly the same way that is disclosed in the '172 Patent's preferred embodiments and figures.

Finally, Samsung argues that claim 18's use of the terms "activating" and "keys" to describe actions on the "keyboard" indicates that the keyboard must be physical, but that makes no sense.  Virtual keyboards have "keys" that can be "activated," like physical keyboards.  In fact, the patent repeatedly describes keyboards as having "keys" that can be "activated" for all embodiments without regard to the virtual or physical nature of the keyboard.  *See, e.g.,* '172 Patent, 10:40-43 (Ex. A-3) (describing tapping "any key of the keyboard" on a virtual keyboard).

---

intended for claim 18 to focus on a physical keyboard in a way to exclude the preferred embodiments and every figure in the patent as would be necessary for a clear disavowal of those embodiments.  *Pfizer,* 429 F.3d at 1375.

1  Samsung's own expert conceded that the term "activate" is used to in connection with virtual

2  keyboards.  *See* Wigdor Tr. at 105:5-12 (Ex. A-2).

3        In short, Samsung's *sole* non-infringement argument is based entirely on the improper

4  addition of the term "physical" to claim 18, which contains no such limitation.  Samsung's non-

5  infringement basis should be rejected as a matter of law, and summary judgment should be

6  granted of infringement of claim 18 of the '172 patent for all '172 Accused Products.

7  **B.    Infringement of U.S. Patent No. 5,946,647 (Links for Structures)**

8        This Court has also already found a likelihood that the Galaxy Nexus infringes claim 1

9  of the '647 Patent.  *See* D.I. 222 at 36.  Samsung's other accused devices infringe in the same

10 way.[4]  Samsung recycles arguments it made during the preliminary injunction phase to assert

11 that its devices do not satisfy the "analyzer server," "user interface," and "action processor"

12 limitations.  But, as this Court previously found, Samsung's arguments are without merit as a

13 matter of law, and Samsung's '647 Accused Products infringe at least claim 1.[5]

14       As this Court accurately described, the '647 Patent relates to detecting "structures" in

15 data (*e.g.*, telephone numbers, postal addresses, or email addresses), and linking actions to

16 those structures (*e.g.*, launching a dialer with a detected phone number or composing an email

17 with a detected email address).  D.I. 447, 13-15; '647 Patent, Abstract, 1:5-2:62; Figs. 5-7 (Ex.

18 B-6).  Likewise, the '647 Accused Products can detect phone numbers, email addresses, and

19 postal addresses on a webpage.  When a user long-presses (touches and holds) one of these

20 "structures," a pop-up menu displays a list of operations for the particular type of structure.  For

21

22 [4] ████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████

26 [5]  At least the following Samsung devices infringe claim 1 of the 647 Patent:  Admire,
   Captivate Glide, Conquer 4G, Dart, Exhibit II 4G, Galaxy Nexus, Galaxy Note, Galaxy Note II,

27 Galaxy Rugby Pro, Galaxy S II, Galaxy S II Epic 4G Touch, Galaxy S II Skyrocket, Galaxy S
   III, Illusion, Stratosphere, and Transform Ultra (collectively, "647 Accused Products").  *See*

28 Mowry Rep., ¶¶ 1-21, 107-164, 225-297 (Ex. B-1).

example, when a user long-presses a phone number, a pop-up menu displays options specific to phone numbers (*e.g.,* "Dial," etc.). When the user selects "Dial," the system launches the dialer with the selected phone number filled in. *See, e.g.*, Mowry Rep., ¶¶ 7-10 (Ex. B-1).

1.      **This Court Has Already Explicitly Rejected Most of Samsung's Arguments.**

There is no genuine dispute regarding the functionality of the '647 Accused Products. Rather, Samsung bases most of its non-infringement positions on claim construction positions that this Court has already addressed—and rejected. Indeed, most of Samsung's arguments are based on a strained application of claim constructions issued in *Apple Inc. v. Motorola, Inc. et al.*, Case No. 1:11-cv-08540 (N.D. Ill), currently on appeal to the Federal Circuit. While Apple contends that the *Motorola* court's constructions of "analyzer server" and "linking actions to the detected structures" contain limitations contrary to the intrinsic evidence, the '647 Accused Products infringe even under these more stringent constructions.[6] Indeed, at Apple's invitation, this Court applied the *Motorola* constructions for purposes of the preliminary injunction phase and rejected the same arguments Samsung makes below. *See* D.I. 222 at 30-36.

a.      **The Accused Shared Libraries Are Analyzer Server Routines That Are "Separate from a Client."**

Once again, while the relevant operation of the accused devices is not disputed, Samsung argues that the analyzer server routines for detecting and linking are not "server" routines that are sufficiently "separate from a client." Jeffay Reb. Rep., ¶¶ 265-322 (Ex. B-4). This Court rejected Samsung's exact arguments in its PI Order. *See* D.I. 222 at 35.

Just as it did in the preliminary injunction phase, Samsung

Jeffay Reb. Rep., ¶¶ 154, 308 (Ex. B-4). Even if true, the claims – even under the more stringent *Motorola* constructions – simply do not require the analyzer server to run in a separate

---

[6] Apple urges the Court to construe these terms consistently with the intrinsic evidence as explained by Apple's expert. *See* Mowry Rep., ¶¶ 68-83 (Ex. B-1). But for purposes of this motion, the undisputed facts prove infringement under either set of constructions.

1   "process" in different "address space" at run-time. ████████████████████████

2   ████████████████████████████████████████████████████████████████

3   ███████████████████████████████ *Id.*, ¶¶ 159, 182.  This Court already recognized

4   that these shared library routines can be "reused across [multiple Android] applications" and

5   satisfy even the *Motorola* court's construction of "analyzer server."  *See* D.I. 222 at 35.

6           Samsung also argues, just as it did in the PI phase, that the claims permit absolutely no

7   overlap between the analyzer server and the "client." ████████████████████████

8   ████████████████████████████████████████████here cannot be a "separate" analyzer

9   server.  In its PI order, the Court rejected this same argument, and agreed with Apple's expert

10  that there must be some code that allows these shared libraries to interface with particular

11  applications.  *Id.*; *see also* Mowry Rep., ¶¶ 132-152, 238-247 (Ex. B-1).  The Court found that

12  having some of the relevant analyzer server code "intertwined" with an application "does not

13  remove the accused device from the scope of the '647 Patent."  D.I. 222 at 35.

14          Incredibly, in support of its erroneous "separateness" argument, Samsung's expert takes

15  positions this Court expressly rejected in its claim construction order.  Samsung's expert states:

16          [T]he '647 patent generally conceives of the "analyzer server" as part of a
            program that is *separate from other programs (i.e., applications)* on the claimed
17          computer-based system and thus provides for code—*which is still part of the
            claimed program, not the application*—for interfacing with applications.  This is
18          demonstrated in Figures 1 and 2 of the '647 patent, which *depict the program of
            the claimed invention separate from applications*, and containing an application
19          programming interface to allow applications to communicate with it.

20  Jeffay Reb. Rep., ¶ 278 (Ex. B-4) (emphasis added).  The Court rejected these precise arguments

21  in claim construction, when Samsung tried to add the "separate from a client" limitation to the

22  "analyzer server" element.  *See* D.I. 447, 16-18.  In rejecting Samsung's reliance on the figures

23  and preferred embodiments, the Court explained that "nothing in the specification clearly states

24  that the patentee intended the invention only to operate in conjunction with a separate

25  application."  *Id.*, 17-18.  The Court also explained that "[t]he claims strongly suggest that [the

26  claimed program routines are] not necessarily separate from the application containing the data."

27  *Id.*, 16.  There is nothing in the claims, the specification, or the file history requiring the analyzer

28  sever to "run in a separate process at run-time."

b.      **The '647 Accused Products "Link Actions to the Detected Structures"**

In yet another recycled argument explicitly addressed and rejected by this Court, Samsung argues that the '647 Accused Products do not "link actions to the detected structures" or enable selection of a "linked action," because they do not satisfy Samsung's additional claim limitations.  Samsung argues that there are no "pointers" or pointer-like objects that point "directly" to a particular application.  Jeffay Reb. Rep., ¶¶ 323-34 (Ex. B-4) ("In the context of the '647 Patent, the simplest realization of a link would be a pointer to a function to perform an action on a detected structure.").  Even if true, claim 1 does not require pointers or "direct" linking to a particular application.  Indeed, this Court expressly found that there is "*nothing* in the '647 Patent that requires the use of pointers."  D.I. 222 at 35 (emphasis added).

This Court also rejected Samsung's argument that there is no menu of "linked actions" because there is no direct link to the particular application that will perform a selected activity.  *See* D.I. 222 at 35; Jeffay Reb. Rep., ¶¶ 323-33 (Ex. B-4).  The claims are not limited to Samsung's narrow conception of "linking."

Mowry Rep., ¶¶ 139-152, 238-247 (Ex. B-1).  That is all the "linking" the claims require.  As this Court already recognized, the '647 Accused Products "create a uniquely defined association between the detected structure and one or more actions, and thus satisfies the 'linking' limitation.  That a 'specified connection' is formed is clear from the functionality of the [devices themselves]: clicking on a detected structure presents the user with a menu of options, any of which, if clicked on by the user, will perform the specified action."  D.I. 222 at 36.

c.      **The '647 Accused Products Contain an "Action Processor."**

This Court agreed with Apple that "action processor" should be construed as "program

routine(s) that perform the selected action on the detected structure." D.I. 447, at 20. It is undisputed that when a user selects a menu option (*e.g.*, "Dial") on the accused devices, program routines perform a particular sequence of operations on the detected structure (*e.g.*, launch the dialer with the number filled in). Mowry Rep., ¶¶ 159-161, 257-262 (Ex. B-1). Samsung responds as in the PI phase, not by contesting the devices' operation, but by misreading the patent and mischaracterizing Apple's analysis. Samsung claims that Dr. Mowry identifies one routine ████████ as the "action" as well as the "action processor," then argues that one routine cannot be both. Jeffay Reb. Rep., ¶¶ 350-354 (Ex. B-4). In fact, Dr. Mowry explicitly distinguishes between the "action" and "action processor." Mowry Rep., ¶ 258-262.

Dr. Mowry explained that an "action" refers to a specific sequence of operations performed on a particular structure (*e.g.* Call 415-555-1234). *Id.*, ¶ 261. It is not simply passive source code; it describes an active operation on specific data. *Id.* The "action processor" is a software mechanism that can perform any action on any detected structure. *Id.*, ¶ 260.



*Id.*, ¶ 259-260.

Samsung's argument is simply an attempt to obscure the indisputable fact that its devices contain program routines that perform selected actions on detected structures.

### 2. Samsung's New Arguments Related to Jelly Bean Products Are Similarly Based on Erroneous Claim Interpretations.

While the above non-infringement arguments apply to all Android OS versions, Samsung also argues that the '647 Accused Products running the Jelly Bean version of Android do not "detect structures" or "enable the selection of a detected structure." Jeffay Reb. Rep., ¶¶ 300-349 (Ex. B-4). Like Samsung's prior arguments, these contrived arguments are based on applying improperly added claim limitations to the undisputed operation of the devices.

1      █████████████████████████ *Id.*, ¶ 301.  But the claims require "detecting

2 structures," not detecting multiple structures at the same time. █████████████████

3 ████████████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████████

5 ████████████████████████████████  Even if true, it is undisputed that if a webpage

6 contains multiple structures, such as a phone number and email address, the user can select the

7 phone number, which will be detected, and then select the email address, which will also be

8 detected.  Jeffay Tr. at 182:4-183:4 (Ex. B-5).  The system can "detect structures" as the claims

9 require.  Samsung's argument impermissibly limits the claims to a preferred embodiment:

10 ████████████████████████████████████████████████████████

     In the patented invention you have an analyzer server that receives a document
11      from, say, an input device.  It processes the document.  Does all of the detection.
     Possibly highlights it.  And then it's done.  Okay?  But the analyzer server saw
12      the whole document.  And in that data it detected -- assuming there's multiple
     structures, it will detect multiple structures.

13 *Id.*, 186:12-187:1.  While analyzing the "whole document" to detect multiple structures at once

14 is disclosed in a preferred embodiment (see '647 Patent, 5:19-31), the claims are not restricted

15 to only the preferred embodiment.

16      Samsung further argues that the Jelly Bean products do not "enable the selection of a

17 detected structure," by applying an overly restrictive construction of "selection" to the devices'

18 undisputed operation. ████████████████████████████████████████████

19 ████████████████████████████████████████████████████████

20 ██████████  According to Samsung, the user's "selection" of the structure begins and end the

21 instant the system determines the location of the user's touch on the screen.  Jeffay Reb. Rep.,

22 ¶¶ 344-45 (Ex. B-4).  Because this "selection" occurs before the structure is detected, Samsung

23 argues that there is no selection of a "detected" structure.

24      But nothing in the patent limits "selection" to such a limited window.  Samsung's

25 argument ignores that the accused menu of linked candidate actions is not presented unless a

26 user *long-presses* (touches and holds) a structure.  If the user merely taps or touches a structure,

27 this accused menu will not appear.  In other words, the user cannot merely touch or tap the

28 screen; the accused "selection" is not complete until the user long-presses the structure.  It is

undisputed that by the time the user accomplishes the long-press, the structure has been detected.  Thus, the accused Jelly Bean products "enable the selection of a detected structure." Mowry Rep., ¶¶ 135-137, 250-254 (Ex. B-1).

## C.    Infringement of U.S. Patent No. 7,761,414 (Synchronization)

All of the '414 Accused Products clearly infringe claim 20 of the '414 Patent.[7]  Indeed, with only one exception, Samsung's expert does not dispute Apple's expert's determination that the Galaxy S III satisfies all of the elements of claim 20.  *See* Expert Report of Alex Snoeren ("Snoeren Rep."), ¶¶ 437-475 (Ex. C-1).  Samsung also offered no evidence to rebut Apple's evidence that all other '414 Accused Products infringe for the same reasons as the Galaxy S III.

Claim 20 recites software instructions that include user applications and dedicated "software synchronization components" that provide different processing threads to allow the user to access and edit different data classes (e.g., mail, calendar, contacts) "concurrently with" the synchronization of each software synchronization component's corresponding data class. Earlier in the case, Samsung tried to manufacture a non-infringement argument by urging this Court to construe "concurrently with" to require that the non-synchronization threads provided by the user applications and the synchronization threads provided by the software synchronization components to execute at precisely the same instant.  *See* D.I. 447 at 21.  That construction was inconsistent with the intrinsic record, and this Court properly rejected it.

As a result, Samsung has come up with one new non-infringement argument that, like the last one the Court rejected, is based entirely on an improper claim construction.  Samsung's *only* argument relates to whether the "sync adapters" in the '414 Accused Products are "software synchronization component[s] configured to synchronize" different data classes.  As their name suggests, the sync adapters are, in fact, "software synchronization component[s] configured to synchronize," and therefore Samsung's devices infringe.

There is no dispute that each of the '414 Accused Products contains at least six sync

---

[7]  The "'414 Accused Products" for the '414 Patent are the Samsung Admire, Conquer 4G, Dart, Exhibit II 4G, Galaxy Nexus, Galaxy Note, Galaxy Note II, Galaxy SII, Galaxy SII Epic 4G Touch, Galaxy SII Skyrocket, Galaxy S III, Galaxy Tab 2 10.1, Illusion, Stratosphere and Transform Ultra.

adapters, and that each of these components is involved in the process of synchronizing a

particular data class.  Samsung's expert does not even offer a non-infringement opinion for two

of these six sync adapters.  But, with respect to the other four, Samsung's position is that,

notwithstanding their name and the fact that ██████████████████████████████████

████████████████████████████████████████████████████ he sync adapters are not

"synchronization software components configured to synchronize" because they ██████████

██████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

        Samsung's non-infringement position is, therefore, based entirely on its claim

construction position that the "software synchronization component configured to synchronize"

must perform the synchronization all by itself.  Claim 20, however, contains no such limitation.

In fact, such a limitation is inconsistent with the intrinsic record because it would exclude the

preferred embodiment.  Aside from its proposed claim construction, Samsung has no other basis

for non-infringement, because there is none.  Under a plain reading of claim 20, there is no

material question that the '414 Accused Products infringe.

> **1.      The Representative Galaxy S III Product Infringes Claim 20.**
>
>> **a.      Samsung's Only Non-Infringement Argument Is Based on Erroneous Claim Construction and Should Be Rejected as a Matter of Law.**

        As noted, Samsung argues that four of the six sync adapters in the '414 Accused

Products (*i.e.*, for Gmail, Exchange Mail, Exchange Calendar, and Exchange Contacts) are not

"configured to synchronize" data.[8]  Samsung contends that even though each of these sync

adapters is configured to ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ That argument and

_____

[8] ████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████

1   the claim construction on which it is based are precluded by the claim and the specification.

2       There is no requirement that the sync adapters perform all the synchronization steps on

3   their own.  Both claim 2, and claim 11 from which it depends, merely require a "software

4   synchronization component configured to synchronize" data.  A plain reading of that language

5   allows for a "software synchronization component configured to synchronize" either by

6   performing all of the synchronization operations to synchronize the data itself or performing

7   synchronization operations to call other components for the purpose of accomplishing the

8   same.  Samsung's own expert concedes that "under any reasonable interpretation it would not

9   be necessary for a single component to perform all of the operations related to a particular

10  synchronization."  Deposition of Jeffrey Chase ("Chase Tr."), 119:22-120:2 (Ex. C-4).

11      Samsung's effort to insert a requirement that the sync adapters perform all the

12  synchronization steps on their own is also irreconcilable with the specification.  In fact, like the

13  Galaxy S III, one of the preferred embodiments has "software synchronization component[s]

14  configured to synchronize" data that do not perform all of the steps of synchronization.  Figure 4

15  discloses a preferred embodiment with multiple components involved in synchronizing data

16  between a device and a host computer.  *See, e.g.*, '414 Patent, Fig. 4 (Ex. C-3) (depicting Sync

17  Agent 109 and Data Sources 113, 115 and 117 on the device side).  Although each of these

18  components is involved in synchronization, none performs all of the synchronization operations

19  by itself.  For example, the specification states that the "Sync Agent" is a "software

20  synchronization component," even though it is the Data Sources, not the Sync Agent, that

21  perform certain synchronization operations such as "open[ing]" the database on the device and

22  "send[ing] changed/new/deleted records" to and "process[ing] and commit[ing] data" received

23  from the host.  '414 Patent, 11:40-55, 25:5-6, Fig. 13A (Ex. C-3).  Reading a limitation into the

24  claims requiring a software synchronization component configured to synchronize entirely by

25  itself would improperly exclude this preferred embodiment from the claims and is thus incorrect.

26  *See, e.g., SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1378-79 (Fed. Cir. 2013).

27      Once Samsung's erroneous claim construction is rejected, its expert's own analysis

28  demonstrates infringement.  Samsung's expert admits that the sync adapters "play a role in the

Further, he admits there are no substantive errors in Apple's expert's source code analysis detailing the function of these components.  Chase Tr. 133:16-134:7 (Ex. C-4); *see* Snoeren Rep. Ex. 6 at 8-24 (C-2).

Because Samsung's only non-infringement argument is based entirely on an erroneous claim construction, summary judgment that the S III infringes claim 20 is appropriate.

> **b.** **There Is No Dispute the Rest of the Limitations of Claim 20 Are Met.**

There is no dispute that each of the elements of claim 20 is satisfied.  In fact, in deposition, Samsung's expert explicitly abandoned all other non-infringement issues raised in his rebuttal report, conceding that the Galaxy S III meets all of the other claim limitations.

First, Samsung's expert claimed in his report that there was no showing that the non-synchronization and synchronization threads can execute concurrently, but then admitted the

hase Tr., 86:9-20; 88:6-17; 89:19-90:9 (Ex. C-4).  Second, Samsung's expert suggested that the Accused Products do not allow the user to edit data during

*d.* at 100:10-101:3; 103:11-104:1; 110:13-111:7.  Finally, Samsung's expert said in his report that Apple had failed to show that the '414 Accused Products can synchronize their local databases with a "second database" in the Gmail and Google Calendar services and Microsoft Exchange, but then admitted that the "second database"

1   limitation is met for each of these.  *Id.* at 153:7-20; 155:3-9; 156:7-157:17; 158:21-159:12.[9]

2   **2.      All of the Other '414 Accused Products Infringe for the Same Reasons.**

3        There are no relevant differences between the '414 Accused Products for purposes of

4   infringement, and each of the '414 Accused Products infringes claim 20 in exactly the same

5   way as the Galaxy S III.  Apple's expert painstakingly analyzed all of the versions of the

6   relevant source code for all of the '414 Accused Products, determined that the pertinent aspects

7   of the accused functionality were the same for each, and backed up his analysis with over 700

8   pages of claim charts[10] that include "references to the specific source code supporting [his]

9   analysis for each Launch Release and Maintenance Release."  Snoeren Rep., ¶ 436 (Ex. C-1);

10  *see also id.* at ¶¶ 409-411 (further explaining his analysis).

11       Not surprisingly, Samsung has not been able to identify even a single relevant

12  difference to try to rebut Apple's evidence that the Galaxy S III is representative of all the '414

13  Accused Products for purposes of claim 20 of the '414 Patent.[11]  To the contrary, Samsung's

14  expert *admitted* that he had not even analyzed the code for the other accused products, and has

15  no basis to rebut Apple's proof that if the Galaxy S III infringes, the other '414 Accused

16  Products do also.  *See, e.g.,* Chase Tr. 53:3-54:10; 139:12-140:8 (Ex. C-4).  Given the extensive

17  evidence Apple has put forward, and Samsung's failure even to try to rebut it, Samsung cannot

18  now avoid summary judgment with a conclusory claim that the Galaxy S III is somehow not

19  representative of all the '414 Accused Products.  *See, e.g., Enzo Biochem Inc. v. Applera Corp.*,

20  599 F.3d 1325, 1337 (Fed. Cir. 2010) ("[M]ere denials or conclusory statements are insufficient

21

22  ────────────────────
    [9]  Samsung's expert testified that all other limitations of claim 20 are also met.  *See* Chase Tr.,
23  29:9-19 (Ex. C-4) (computer readable storage medium); *id.* at 33:18-34:19; 43:7-44:6; 45:9-
    46:11 (user application providing user-level non-synchronization thread and user interface to
24  access and edit structured data); *id.* at 47:4-48:14 (mail, calendar and contacts data classes stored
    in databases on the '414 Accused Products); *id.* at 58:15-59:4; 60:13-62:10 ( '414 Accused
25  Products include the six identified sync adapters each of which corresponds to a particular data
    classes and creates a thread separate from the user-level non-synchronization thread).
    [10] Exhibits C-5 and C-6 are examples of the charts Apple's expert provided with his report
26  [11]

27

28                                                              Chase Tr., 148:24-150:3 (Ex. C-4).

1    to survive summary judgment").  Accordingly, summary judgment of infringement should be

2    granted as to all of the '414 Accused Products.

3    **D.**      **Validity of U.S. Patent No. 6,8447,959 (Unified Search)**

4          Apple is entitled to summary judgment that two of Samsung's key pieces of prior art

5    asserted against the '959 Patent – the so-called "WAIS system" and "AppleSearch system" –

6    do not anticipate or render the asserted claims obvious *as a matter of law*.  In fact, this Court

7    has already addressed Samsung's improper use of this prior art in the preliminary injunction

8    phase, and explicitly rejected *as a matter of law* the very same legally untenable approach

9    Samsung continues to employ.  Summary judgment is not only appropriate, but is essential to

10   prevent Samsung's from presenting to the jury a legally erroneous and highly misleading

11   contention that prior art exists when it simply does not.

12         Apple's '959 Patent, the parent of the '604 Patent on which the Court granted a

13   preliminary injunction, relates to a universal search system that accepts a user's query and

14   provides it to a plurality of heuristics to search for information in at least a local storage media

15   and the Internet.  During the preliminary injunction phase, Samsung alleged that something it

16   generically referred to as the "WAIS system" anticipated the '604 Patent, but Samsung had no

17   evidence that any system with the specific features and functionality it claimed – and needed to

18   establish invalidity – had ever actually existed.  As a result, Samsung built a "WAIS system"

19   and declared it to be prior art, even though it was built by Samsung's own expert during this

20   litigation, over a decade after the priority date.  This Court correctly held that this hypothetical

21   "WAIS system" that *could have been built* at the relevant time, but for which no evidence

22   existed that it actually was built, was not prior art as a matter of law.  This Court held that a

23   "post-hoc, reconstructed interpretation of how a WAIS system *might* have been constructed

24   does not constitute prior art for purposes of anticipation."  D.I. 230, Order Denying Samsung's

25   Motion to Stay at 6 (emphasis in original); D.I. 222 at 25-27.

26         Despite this Court's unequivocal rulings, Samsung's anticipation theory remains based

27   entirely on a hypothetical "WAIS system" (alone and with AppleSearch) that Samsung

28   contends might have been constructed in a way that would invalidate, while offering absolutely

no evidence that such a configured system *actually was ever known or used*, as required.

  To show anticipation a party must show that the invention was disclosed in a single patent or printed publication, or that the invention was known, used, in public use, or on sale. 35 U.S.C. § 102(a), (b).  Samsung is not relying on a single printed publication because there is none that discloses the invention.  Instead, Samsung relies on a specific configuration of components it claims to be described piecemeal in various documents that Samsung cobbles together to form what it calls the "WAIS system" and "AppleSearch system."[12]

  By relying on a specifically configured system rather than a single reference for anticipation, Samsung must prove that the system both (1) was known, used or on sale and (2) contains every element of the asserted claims.  This inquiry, of course, is distinct from an obviousness inquiry.  For anticipation, it is not sufficient to show what *could* have been done, or *could* have been known, by one skilled in the art at the time of the invention.  Instead, Samsung must show that the claimed invention was, *in fact, actually known or used.  See Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1267 (Fed Cir. 1991).  Samsung has absolutely no evidence of such actual use or knowledge, and thus cannot show anticipation.

  Samsung does not even claim that it has *any* evidence to establish that either of its specifically configured systems ("WAIS system" and "AppleSearch system") *actually* existed or was used in the U.S. prior to 2000.  *See* Expert Report of Martin Rinard ("Rinard Rep.") ¶¶ 300-39, 411-27, 498-502, 507, Ex. 1, 9 (Ex. D-1).  As a result, Samsung's new expert (just like Samsung's prior expert) built a "demonstration system" for use in this case.  *See* Rinard Rep. ¶¶ 479-91 (Ex. D-1).  Because Samsung concedes that it has no evidence that the specifically configured systems it has built actually existed, it claims that demonstration systems are

---

[12]  Samsung's purported "WAIS system" was put together with an a XWAIS client running on a Unix computer that was connected to two FreeWAIS-sf 2.0.65 servers, one running on the same computer as the client and another running on a Unix computer accessed over a network where both servers searched databases that had specific searching and indexing techniques enabled called stemming and synonyms.  Rinard Rep. ¶¶ 481-82, Ex. 9 at 36, 39-40 (Ex. D-1).  Samsung's purported AppleSearch system was similarly put together with an AppleSearch client running on a Mac computer accessing an AppleSearch server running on the same computer as the AppleSearch client and set up to connect to a FreeWAIS-sf 2.0.65 running on a Unix computer accessed over a network where that server that employed stemming and synonyms.  *See, e.g., id.,* ¶¶ 486-91; Ex. 1 at 1-6, 13-16, 18-21, 26-55.

"representative" of what could have been built.  *See* 10/2/13 Depo. of Martin Rinard ("Rinard Tr."), 204:8-205:23 (Ex. D-2).  As this Court held, such "could have been," after-the-fact systems are not prior art, and it is improper for Samsung to rely upon them.  *See* D.I. 230 at 6.

Aside from the systems Samsung built, Samsung tries to support an anticipation claim based on a group of disjoint documents that describe a plethora of software, concepts and features spanning multiple decades, produced by different people, working on different projects in different countries.[13] Samsung plucks bits and pieces from these disparate sources, like assembling a car from parts in a junkyard – to cobble together a specific configuration of components, which it then calls the "WAIS system" (alone and with the "AppleSearch system"). *See e.g.*, Rinard Rep. ¶¶ 300-39, 411-2, Ex. 1 at 1-6, Ex. 9 at 1 (Ex. D-1).

This anticipation approach fails as a matter of law.  For purposes of obviousness, it is appropriate to consider various sources and ask what *might* have been obvious to do, and how various components *might* have been configured.  But, for anticipation, the inquiry is limited to what *actually* was done or known, and whether various components were *in fact actually* configured in a way identical to the patent.  *Elan Pharmaceuticals, Inc. v. Mayo Foundation for Medical Educ. and Research*, 304 F.3d 1221, 1227 -1228 (Fed. Cir. 2002); D.I. 230 at 6.

Samsung has offered no evidence – despite almost two years searching the world for it – that anyone at any relevant time was even aware of all the sources on which Samsung relies, let alone that such a hypothetical person actually was aware of the particular configuration as claimed in the '959 Patent.

Indeed, because Samsung cannot show that anyone ever *actually* knew or used the particular configuration required for invalidity, Samsung misleadingly refers to some generic "WAIS system."  But, WAIS has many components that can be used and configured in many

---

[13]  Dr. Rinard concedes that by his definition WAIS "is a system that was developed over time at a variety of places, including Dortmund, including by Brewster Kahle as is demonstrated by… all the documents that I cite here in my expert report and by the source code itself." Rinard Tr., 209:19-210:2 (Ex. D-2). He therefore relies on software design from the 1980s, over 16 documents describing software from 1991 to 1995, and documents and source code describing a FreeWAIS-sf server from 1998.  Rinard Rep. ¶¶ 331-32, Ex. 9 at 1-2, 36-73 (Ex. D-1); Rinard Tr., 209:19-211:24 (Ex. D-2).

1    ways.  Imagining how those components may have been combined to satisfy all the claim

2    elements might work for obviousness, but because Samsung has no proof that anyone, anywhere,

3    at any relevant time *actually knew or used the specific configuration Samsung needs to satisfy*

4    the claim elements, Samsung's anticipation approach fails as a matter of law.

5         In fact, when Samsung's expert, Dr. Rinard, was asked at deposition whether he had any

6    evidence that anyone in the U.S. knew about, much less used, the specific configuration of

7    WAIS and AppleSearch systems need by Samsung before built for this litigation, Dr. Rinard

8    struggled to evade the question, and ultimately could not provide a single example of such

9    knowledge or use.  Rinard Tr., 203:17- 205:10, 211:3-216:6, 223:14-226:16 (Ex. D-2) (no

10   evidence for WAIS); 177:10-188:23 (no evidence for AppleSearch).  The creators of FreeWAIS-

11   sf, the server at the heart of the Samsung-built demonstration systems all testified at deposition

12   that they also were not aware of any evidence of anyone actually knowing about or using the

13   FreeWAIS-sf in the configuration relied on by Samsung and Dr. Rinard. *See* 7/12/13 Fuhr Tr. at

14   117:19-118:2, 207:4-12 (Ex. D-3); 7/14/13 Pfeifer Tr. at 188:11-191:3, 182:12-183:6 (Ex. D-4);

15   7/15/13 Gövert Tr. 94:9-23, 96:16-98:6, 99:12-100:23 (Ex. D-5).

16        As a result, Samsung's anticipation case fails as a matter of law because it has no

17   evidence that anyone *actually* knew or used the claimed invention in WAIS or AppleSearch.

18        Samsung also should be precluded from arguing that these "systems" render claims 24

19   and 25 obvious.   Pursuant to the Court's Case Management Order (D.I. 471) both parties were

20   required to reduce the number of prior art "reference/systems/combinations" upon which they

21   rely.  Samsung filed its Reduction of Invalidity References (D.I. 671) that listed only

22   "AppleSearch System" and "WAIS System" but no other combination related to WAIS or

23   AppleSearch, nor did Samsung cite a single document.  *Id.* at 2.[14]  By contrast, for other entries,

24   Samsung did list combinations of software or software combined with one or more references.

---

25   [14]  Samsung noted that "[f]or prior art identified herein as a system or software, Samsung may
26   rely on multiple documents describing that system or software to establish the relevant
     functionality of such a system or software." *Id.* at 1.  Meaning something listed as a system is
27   intended to be an anticipatory reference but Samsung may utilize multiple documents; if
     obviousness was intended there would be no need to mention multiple documents as that is part
28   and parcel of an obviousness inquiry.

1   It did not do so for WAIS and AppleSearch.  Thus, Samsung should be precluded from relying

2   on unlisted documents or arguing that unidentified combinations render the claims obvious.

3   **E.**   **Invalidity of U.S. Patent No. 7,577,757**

4           Samsung has accused Apple of infringing U.S. Patent No. 7,577,757 ("'757 patent"),

5   which was filed in October 2006 and claims priority to an application filed in June 2001.

6   According to the '757 patent, users at the time could not access their multimedia collection

7   (e.g., movies, music) "in multiple locations or zones the [user] may go" without taking their

8   physical multimedia library (e.g., CDs, DVDs) with them.  '757 patent, 1:13-3:30 (Ex. E-1).

9   As shown in Figure 7, the '757 patent purports to address that so-called "problem" by having

10  users store their multimedia files in a central storage and interface device 702, and use a

11  network connection (e.g., LAN 704 or WAN 718) to synchronize multimedia files between the

12  central device and at least one zone-specific device.  *Id.*, 8:62-9:6; claim 1; Fig. 7.

13          But the prior art had already addressed *and solved* that same problem.  For example, U.S.

14  Patent No. 7,587,446 ("'446 patent"), entitled "Acquisition and Synchronization of Digital

15  Media to a Personal Information Space," was filed in November 2000—i.e., 7 months before the

16  claimed priority date of the '757 patent—and is prior art under 35 U.S.C. § 102(e).  In the '446

17  patent (and U.S. Patent No. 6,671,757 ("the Multer patent"), which it incorporates by

18  reference),[15] the inventors identified the same problem as the '757 patent:  explaining that "a user

19  may acquire and store digital media on one network-coupled device, such as a personal computer

20  [at work] but may desire to transfer that information and maintain a library of this digital media

21  on other network-coupled devices, such as a personal computer at the user's home."  '446 patent,

22  1:35-41 (Ex. E-2).  The inventors also disclosed the same solution as the '757 patent:  teaching

23  users to store their multimedia files in a central storage server and keeping that centrally-stored

24  data "fully synchronized" with other devices in different locations via a network connection.  *Id.*

25  ────────────────────

[15]  The '446 patent and incorporated Multer patent constitute a single reference for anticipation

26  purposes.  *See Ultradent Prods. Inc. v. Life-Like Cosmetics, Inc.*, 127 F.3d 1065, 1069 (Fed.
    Cir. 1997); *Harari v. Mihnea*, 656 F.3d 1331, 1335-1336 (Fed. Cir. 2011); *Manual of Patent*

27  *Examining Procedures* § 608.01(p) (8th ed. 2001).  Neither reference was before the Patent
    Office during prosecution of the '757 patent.

28

at 5:4-16, 9:14-23; Multer patent, 10:65-11 (Ex. E-3); *see also* '446 patent, 1:8-17, 2:44-3:2, 5:41, 6:24-29, 8:50-58, 9:65-10:3 (incorporating and referencing the Multer patent).

### 1.   The '446 Patent Anticipates Claim 1 of the '757 Patent.

As shown below, the '446 patent teaches each of these limitations as a matter of law.

### a.   "A system for synchronizing devices in a multimedia environmental"

The '446 patent teaches the preamble of claim 1 by describing a system that synchronizes the multimedia data found in a user's "personal information space" among multiple user devices coupled within that space.  *E.g.*, '446 patent, 5:4-16, 9:14-23.  Samsung does not dispute this fact.  Suppl. Resp. to Apple's 5th Set of Interrog. (No. 38) at 170 (Ex. E-4).

### b.   "at least one central storage and interface device, wherein audio, video, or photographic data, including content information and content management information, related to at least one user, are stored in digital form"

The '446 patent teaches this limitation by disclosing storage server 200 (variously called an "intermediate storage server," "intermediate server," and database 200) that stores audio and video "media data" (e.g., MP3 "digital music files") for at least one user in the user's own "personal information space"—which the patent defines as "an individual's user-defined set of information, which is uniquely identified with that individual."  '446 patent, 1:42-47, 5:4-6, 8:1-58, 9:20-51; Schonfeld Tr., 336:6-37:23 (agreeing storage server 200 stores digital music files, such as MP3s) (Ex. E-5); *id.* at 225:12-17 (admitting database 200 is storage server 200).[16]  In fact, the '446 patent expressly states that the "'personal information space' may be housed physically *on an intermediate server*," and that "FIG. 4 shows . . . a mechanism for *synchronizing* personal information space provided *in storage server 200*."  '446 patent, 5:27-28, 9:20-24 (emphases added).

---

[16]  Before media data is stored on the storage server, it is identified by and associated with a user so it can be "transferred to the user's specific personal information space." '446 patent, 8:45-58.  Dr. Schonfeld admits that this language teaches a "mechanism by which the data comes from the public space into a portion of the server, in order to allow the user to actually access it."  Schonfeld Tr., 338:24-39:4 (Ex. E-5); *id.* at 337:13-23 (admitting the '446 patent teaches allowing a user to select "a particular song" to store "in a particular storage server" and to "ultimately bring it to *that user's* device" so the user can access it).

Nor is there any dispute that the "media files" discussed in the '446 patent contain both "content information" and "content management information."  Samsung's expert agrees that the MP3 files described in the '446 patent "contain content information for sure," and also include information such as an artist's name, which he admits is "content management information." Schonfeld Tr., 226:4-27:11 (Ex. E-5); Schonfeld Rep., ¶¶ 2106, 2108, 2112, 2123 (Ex. E-6).  The Multer patent also discloses user-created collections of multimedia data stored on the server, such as a "'my pictures' collection" of photos, which contain both "content information" (e.g., the photo data) and "content management information" (e.g., "grouping of classes of information into appropriate representations").  Multer patent, 28:45-50; Schonfeld Reb. Rep., ¶ 159 (admitting the "grouping" information is "shared by all of the pictures in the 'my pictures' collection") (Ex. E-7); Schonfeld Rep., ¶¶ 2106, 2108, 2112, 2123 (conceding that "content management information" includes collections of multimedia, such as a playlist or meta data that are associated with a specific set of music, movies, or photos) (Ex. E-6).  The storage server "connects" with the "network interface" of user devices in order to exchange media files. '446 patent, 9:20-51.

        **c.**    **"at least one zone, each zone having at least one zone specific storage and interface device capable of storing or interfacing with information stored in the central storage and interface device"**

The '446 patent discloses multiple user devices that are identified by the specific zone in which they reside, such as the "Home PC" and "Office PC" depicted in Figures 3 and 4.  '446 patent, Figs. 3 & 4; *id.*, 1:35-41 (describing "a personal computer *at the user's home*"); Multer patent, 8:5-9 (discussing "a user's office PC 602," and "a home personal computer 606," and other user devices).  The patent further explains that these zone-specific devices contain an "interface" (e.g., network interface 420) capable of interfacing with the information stored in storage server 200, and "storage" (e.g., volatile or non-volatile memory 415) that can store "media data" received from "the personal information space [for the specific user] provided in storage server 200."  *Id.*, 9:20-35; *id.*, 9:36-39 (describing "an Internet-coupled stereo 300" device with "volatile and/or non-volatile memory 320, and a network interface"); Schonfeld Tr., 219:13-20:10 (admitting user devices "interface" with the storage server) (Ex. E-5).  Dr. Schonfeld does not dispute that the '446 patent discloses a "zone" or that the disclosed user

1   devices are "zone specific."  Schonfeld Reb. Rep., ¶¶ 140-45 (Ex. E-7).

2
      **d.**      **"wherein audio, video, or photographic information, relating to at**
      **least one user, contained within the zone specific storage and**
3       **interface device and the central storage and interface device, are**
      **updated in relation to the zone specific storage and interface devices**
4       **and the central storage and interface device"**

5        The '446 patent teaches updating one or more user devices with audio, video, or

6   photographic information stored in storage server 200, and vice versa.  For example, the patent

7   explains that data such as MP3 "digital music files" can be "synchronized to any one *or all* of

8   the devices coupled within the user's space, including personal computers, PDA's, automotive

9   PC's, and the like."  '446 patent, 9:14-19; *id.*, 6:25-29 ("Once inserted into the private

10  information space, the data can be synchronized to *any number* of different devices . . . .").  The

11  patent also discloses updating via two-way synchronization whereby data stored on either the

12  user device or storage server (but not on both) is exchanged by passing "difference

13  information" between them.  *Id.*, 9:44-51; Multer patent, 7:61-8:16.  Via the incorporated

14  Multer patent, the '446 patent also details how the device engine operates, explaining that

15  synchronization may be triggered "automatically after another device completes a sync,"

16  "manually," or via "[r]egular time-based triggers." Multer patent, 35:12-22.[17]

17        In its validity contentions, Samsung does not dispute that the '446 patent discloses

18  updating the information contained in the zone specific storage and interface device and central

19  storage and interface device.  Suppl. Resp. to Apple's 5th Set of Interrog. (No. 38) at 171 (Ex.

20  E-4).  Consistent with the lack of dispute, Dr. Schonfeld admits that the '446 patent discloses at

21  least a "manual synchronization method," and that the Multer patent "discloses a method of

22  'synchronization' that provides a specific technique for the exchange of information between

23  devices," including the "efficient transfer of difference information."  Schonfeld Reb. Rep., ¶¶

24  128, 150-51 (Ex. E-7).  He also concedes that if users manually synchronize multimedia

25
─────────────────────────────
[17]  The device engine in the '446 patent and Multer patent contains an "event module" that
26  "trigger[s] the delta module 550 to perform a synchronization operation."  ('446, 9:65-10:3,
11:36-38, Fig. 5; Multer patent, 13:6-9, Fig 9a; (Schonfeld Reb. Rep., ¶ 152 (admitting the
27  Multer Patent gives "detail about operation of the events module, or how and when to trigger
the sync operation") (Ex. E-7).)

28

information, "the multimedia information would be up to date at the user's discretion" (*id.* ¶ 72), and that the exchange of "differential updates" for the efficient exchange of data results in the "data not present on each computer device [to be] downloaded from the other device" (*id.* ¶¶ 94-95).  However, in an effort to save the validity of the patent, Dr. Schonfeld and Samsung have since attempted to import two limitations into the claim, neither of which is supported.

*First*, Dr. Schonfeld claims that the '446 patent does not teach the "updat[ing]" requirement because "updat[ing]" requires what he calls "automatic synchronization."  *Id.* ¶ 142.  But nothing in the '757 patent requires "updating" to occur automatically.  Claim 1 says nothing about when (or how) an update must be initiated, and the '757 specification expressly states that an update may be manual, periodic, or event-based: "Different synchronization schemes are possible (automatic, daily, weekly, etc.).  It is noted that users can synchronize or make the update on a demand."  '757 patent, 9:5-6.  In fact, Dr. Schonfeld cites a dictionary that defines "update" as "bring up to date," without any automated requirement.  Schonfeld Reb. Rep., ¶ 71 (Ex. E-7).  Moreover, even under Dr. Schonfeld's construction of "update," the '446 patent and Multer patent disclose an "event module" that can sync "automatically after another device completes a sync" and that supports "[r]egular time-based triggers."  '446 patent, 11:36-38; Multer patent, 13:6-9, 35:12-22.  Dr. Schonfeld admits that "a daily or weekly update" meets his new construction.  Schonfeld Tr., 210:15-23 (Ex. E-5).

*Second*, Dr. Schonfeld contends that because the last limitation refers to "the zone specific storage and interface devices"—i.e., plural— claim 1 requires a "plurality of zone specific storage and interface devices."  Schonfeld Reb. Rep., ¶ 145 (Ex. E-7).  As even Dr. Schonfeld concedes, however:  (i) the same limitation earlier refers to "*at least one* zone specific storage and interface device" and "*the* zone specific storage and interface device"—i.e., both singular; and (ii) the antecedent basis for "the zone specific storage and interface devices" language later in the claim is the "*at least one* zone specific storage and interface device" requirement.  Schonfeld Tr., 326:20-25 (emphasis added) (Ex. E-5).  Thus, the updating function need only cover *one* zone device—something the '446 patent indisputably teaches.

In addition, the prosecution history for the '757 patent shows that the applicants amended

claim 1 substituting "at least one" for the requirement of a "plurality" of zone devices, and

eliminating that the requirement that the devices update in relation "with other" zone devices:

> at least one zone ~~a plurality of zones~~ each zone having at least one zone
> specific storage and interface device ~~being~~ capable of storing or interfacing
> with the information stored in the central storage and interface device,
> wherein audio, video, or photographic information, relating to at least one
> user, contained within the ~~each one of the plurality of~~ zone specific storage
> and interface device ~~devices~~ and the central storage and interface device, are
> updated in relation to the ~~with other~~ zone specific storage and interface
> devices and the central storage and interface device . . . .

12/19/07 Amend. at 2 (Ex. E-8).  The applicants relied on their amendments to avoid invalidity

based on double patenting.  12/27/07 Reply at 12 (Ex. E-9).  Dr. Schonfeld's reading of claim 1

would effectively re-insert language that the applicants eliminated to obtain their patent.

In any event, the '446 patent satisfies Dr. Schonfeld's (incorrect) multiple updating

requirement by teaching that "[a]ny number and type of devices . . . may be used in accordance

with the present invention" ('446 patent, 9:59-64, 9:14-19, 6:25-29), and that "difference

information" may be exchanged between multiple devices such that they are all synchronized or

brought up to date.  Multer patent, 9:19-62 ("In essence, the device engine software of the

present invention forms a distributed processing network which maintains *consummate*

*synchronization of all information in the system*."); '446 patent, 9:44-51, Fig. 4; Multer patent,

7:61-8:16, Figs. 7-8; Schonfeld Reb. Rep., ¶ 94 (conceding that following an exchange of

"differential updates," "multimedia data not present on *each computer device* is then downloaded

to each of the *devices*") (emphases added) (Ex. E-7).  Accordingly, each zone device receives

updates from other zone devices, as well as the central device.  Multer patent, 10:65-11:6 ("In

one embodiment, each device engine implements all processing required to keep *all the systems*

*fully synchronized*.") (emphasis added).

> **e.     "whereby the at least one user can be situated in any of the zones
> and access the audio, video, or photographic information related to
> the at least one user"**

The '446 patent teaches a system that allows users to access their specific stored media

data in any of the zones (e.g., they can access on their "Home PC" and "Office PC") by

synchronizing the exchange of "difference information" between multiple devices.  Multer

1    patent, 7:61-8:16, 9:19-62 ("In essence, the device engine software of the present invention

2    forms a distributed processing network which maintains *consummate synchronization of all*

3    *information in the system*."); *id.*, Figs. 7-8; '446 patent, 9:44-51, Fig. 4.  Dr. Schonfeld admits

4    the '446 patent discloses "manual synchronization" and that synchronization would mean that

5    "the multimedia information would be up to date at the user's discretion," implying that the

6    same information would be available on both devices.  Schonfeld Reb. Rep., ¶¶ 72, 128 (Ex. E-

7    7).  Figures 3 and 4 of the '446 patent clearly show multiple user devices, including zone

8    devices "Office PC" and "Home PC," synchronizing digital media files (i.e., exchanging

9    difference information) with the storage server.  '446 patent, 9:40-64, Figs. 3-4.  After these

10   updates, devices in each zone are "fully synchronized," (Multer patent, 10:65-11:6), and the

11   user's digital media files can be accessed from any of the zones.

12             **2.      The '446 Patent Anticipates Claims 14 and 15.**

13             Claim 14 requires "[t]he system of claim 1 wherein the central storage and interface

14   device is disposed to be coupled to a wireless mobile device via LAN," and claim 15 requires

15   "[t]he system of claim 1 wherein the central storage and interface device is disposed to be

16   coupled to a wireless mobile device via WAN."  The '446 patent anticipates both claims.

17             As discussed above, the '446 patent teaches the "system of claim 1."  It also teaches the

18   use of "network-coupled devices," including wireless mobile devices including "notebook

19   computers, palm-top computers, [and] hand-held computers" that are "capable of receiving or

20   processing digital media via a network connection" such as "a LAN, WAN or open source

21   global network."  '446 patent, 4:51-57).  The patent specifically describes that "the data from

22   storage server 200" may be synchronized with any "devices coupled within the user's space"

23   including "PDAs."  *Id.* 9:14-19, Fig. 4 (illustrating coupling between storage server and "Hand

24   Held PC").  Faced with these teachings, Dr. Schonfeld does not dispute that the '446 patent

25   teaches the added limitations of claims 14 and 15.  Schonfeld Reb. Rep., ¶¶ 137-45 (Ex. E-7).

26                                                    * * *

27             For the foregoing reasons, Apple respectfully requests that the Court grant its Motion

28   for Partial Summary Judgment.

Dated: October 10, 2013                    GIBSON, DUNN & CRUTCHER LLP

                                           By:   /s/   H. Mark Lyon
                                                  *Attorney for Apple Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document and its supporting documents were filed electronically in compliance with Civil Local Rule 5.1, and will be served upon all counsel of record for the parties who have consented to electronic service in accordance with Civil Local Rule 5.1 via the Court's ECF system.

Dated: October 10, 2013                    */s/   H. Mark Lyon*