REDACTED VERSION OF DOCUMENT TO BE FILED UNDER SEAL

# EXHIBIT B-4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation, | |
| Plaintiff, | |
| vs. | CASE NO. 12-cv-00630-LHK |
| SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Defendants. | |

**REBUTTAL EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT NO. 5,946,647**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

I.      INTRODUCTION....................................................................................................... 1

II.     SUMMARY OF OPINIONS ..................................................................................... 2

III.    BASES FOR OPINIONS ........................................................................................... 3

        A.      Qualifications ................................................................................................ 3

        B.      Materials Considered..................................................................................... 5

        C.      Level of Ordinary Skill in the Art ................................................................ 5

IV.     LEGAL STANDARDS .............................................................................................. 6

        A.      Infringement ................................................................................................... 6

        B.      Doctrine of Equivalents ................................................................................. 7

        C.      Prosecution History Estoppel ....................................................................... 7

        D.      Indirect Infringement..................................................................................... 8

        E.      Indefiniteness ................................................................................................. 8

V.      THE '647 PATENT .................................................................................................... 9

        A.      Disclosure of the Claimed Invention............................................................ 9

                1.      Abstract ............................................................................................... 9

                2.      Background of the Invention.............................................................. 10

                3.      Summary of the Invention.................................................................. 11

                4.      Detailed Description of the Preferred Embodiment...................... 12

        B.      The Asserted Claims ................................................................................... 21

        C.      Summary of the '647 Prosecution History.................................................. 22

                1.      April 23, 1996 Preliminary Amendment...................................... 22

                2.      January 28, 1998 Office Action ..................................................... 22

                3.      April 28, 1998 Response ................................................................. 22

                4.      August 4, 1998 Office Action ......................................................... 26

                5.      September 23, 1998 Amendment ................................................... 26

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

6.   December 15, 1998 Office Action .................................................. 26

7.   March 15, 1999 Amendment ........................................................ 26

8.   March 29, 1999 Notice of Allowability ....................................... 30

D.   Reexamination of the '647 Patent .......................................................... 30

1.   December 10, 2010 Office Action ................................................ 31

2.   February 10, 2010 Response ........................................................ 31

3.   June 27, 2011 Office Action ........................................................ 32

4.   August 29, 2011 Response ........................................................... 32

5.   December 16, 2011 Office Action ................................................ 33

6.   February 16, 2012 Response to Final Rejection .......................... 35

7.   June 20, 2013 Board of Patent Appeals and Interferences Decision –
     Affirmance ................................................................................... 36

E.   Apple's Characterization of the Patented Feature is Misleading ............. 38

1.   Prof. Hauser ................................................................................. 38

2.   Dr. Vellturo ................................................................................. 39

VI.   CLAIM CONSTRUCTION ............................................................................ 42

A.   "an analyzer server" ................................................................................. 43

B.   "linking actions to the detected structures" ............................................ 44

C.   "an action processor" ............................................................................... 46

VII.   TERMS NOT CONSTRUED .......................................................................... 46

A.   "actions"/"structures" .............................................................................. 46

B.   "fast string search function" .................................................................... 47

VIII.   OVERVIEW OF THE ACCUSED SAMSUNG PRODUCTS ........................... 47

A.   Problems with Apple's Identification of "Representative" Products for Browser ... 48

B.   Problems with Apple's Identification of "Representative" Products for Messenger 53

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

C.  The Browser Application – Froyo, Gingerbread, and Ice Cream Sandwich............ 56

    1. ████████████████████████████████ 58

    2. ████████████████████████████████
..................................................................... 64

    3. ████████████████████████████████ 73

D.  The Browser Application – Jelly Bean .................................................. 86

    1. ██████████████
.......................................................................... 88

    2. ████████████████████████████████ 92

    3. ████████████████████████████████ 99

E.  The Messenger Application ................................................................. 107

    1. ████████████████████████████ 114

    2. ████████████████████████████
.............................................. 122

    3. ███████████████████████
...... 125

    4. ██████████████████████████████
........................ 150

    5. ██████████████████████████
...... 162

F.  █████████████████████████████
............. 171

IX. SAMSUNG ACCUSED PRODUCTS WITH BROWSER DO NOT INFRINGE THE
ASSERTED CLAIMS OF THE '647 PATENT................................................ 184

    A.  Samsung Accused Products with Browser Do Not Infringe Claim 1 ................... 184

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

1.      Browser (Froyo, Gingerbread, and Ice Cream Sandwich) Does Not Satisfy Claim 1 Because Browser Does Not Have "An Analyzer Server for Detecting Structures in the Data and for Linking Actions to Detected Structures" ............................................................................. 185

2.      Browser (Jelly Bean) Does Not Satisfy Claim 1 Because Browser Does Not Have "An Analyzer Server for Detecting Structures in the Data and for Linking Actions to Detected Structures".................................................... 199

3.      Browser (All Versions) Does Not Satisfy the Analyzer Server Limitation Because It Does Not Link Actions to Detected Structures ....................... 213

4.      Browser (All Versions) Does Not Satisfy the User Interface Limitation Because the User Interface Dr. Mowry Accuses Does Not Enable Selection of a "Linked Action" ................................................................................ 220

5.      Browser (Jelly Bean) Does Not Satisfy the User Interface Limitation Because the User Interface Does Not Enable Selection of a "Detected Structure."................................................................................................ 223

6.      Browser (All Versions) Does Not Satisfy the Action Processor Limitation as Construed By the Court Because the Routines Dr. Mowry Identifies Does Not "perform the selected action on the detected structure." ................... 228

7.      Browser (All Versions) Does Not Satisfy the Limitation Requiring a Memory Storing Information Including Program Routines Because the Claimed Program Routines Do Not Exist on the Accused Devices........... 230

8.      Browser (All Versions) Does Not Satisfy the Limitation Requiring A Processing Unit Coupled to the Input Device, the Output Device, and the Memory for Controlling the Execution of the Program Routines Because the Claimed Program Routines Do Not Exist on the Accused Devices..... 230

B.      Browser (All Versions) Does Not Infringe Claim 4 Because the Analyzer Server Routines Dr. Mowry Identifies Do Not Include Grammars and Browser Does Not Satisfy All of the Limitations of Claim 1 ............................................................ 231

C.      Browser (All Versions) Does Not Infringe Claim 6 Because the Analyzer Server Routines Dr. Mowry Identifies Do Not Include a "String Library" and Browser Does Not Satisfy All of the Limitations of Claim 1 ............................................... 233

D.      Browser (for Each of the Products In A Subset Identified by Dr. Mowry) Does Not Infringe Claim 8 Because the User Interface Does Not Highlight Detected Structures and Browser Does Not Satisfy All of the Limitations of Claim 1 ........ 235

E.      Browser (All Versions) Does Not Satisfy Claim 9 Because the Pop-Up Menu Does Not Display "Linked Actions" and Browser Does Not Satisfy All of the Limitations of Claim 1 ...................................................................................... 238

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

F.       Indirect Infringement ............................................................................ 239

X.   SAMSUNG ACCUSED PRODUCTS WITH MESSENGER DO NOT INFRINGE THE
      ASSERTED CLAIMS OF THE '647 PATENT ............................................................. 242

      A.      Samsung Accused Products with Messenger Do Not Infringe Claim 1 ............... 242

              1.      Messenger (All Versions) Does Not Satisfy Claim 1 Because Messenger
                      Does Not Have "An Analyzer Server for Detecting Structures in the Data
                      and for Linking Actions to Detected Structures" ...................................... 242

              2.      Messenger (All Versions) Does Not Satisfy the Analyzer Server Limitation
                      Because It Does Not Link Actions to Detected Structures ....................... 255

              3.      Messenger (All Versions) Does Not Satisfy the User Interface Limitation
                      Because the User Interface Dr. Mowry Accuses Does Not Enable Selection
                      of a "Linked Action" ................................................................................. 263

              4.      According to Dr. Mowry, Messenger (By Product) Does Not Satisfy the
                      User Interface Limitation if the User Interface Must Enable the Selection of
                      Multiple Actions ........................................................................................ 266

              5.      Messenger (All Versions) Does Not Satisfy the Action Processor Limitation
                      as Construed By the Court Because the Routines Dr. Mowry Identifies Does
                      Not "perform the selected action on the detected structure." .................... 266

              6.      Messenger (All Versions) Does Not Contain A Memory Storing
                      Information Including Program Routines Because It Does Not Contain the
                      Claimed Program Routines ........................................................................ 269

              7.      Messenger (All Versions) Does Not Satisfy the Limitation Requiring A
                      Processing Unit Coupled to the Input Device, the Output Device, and the
                      Memory for Controlling the Execution of the Program Routines Because
                      the Claimed Program Routines Do Not Exist on the Accused Devices ..... 269

      B.      Messenger (All Versions) Does Not Satisfy Claim 4 Because the Analyzer Server
              Routines Dr. Mowry Identifies Do Not Include Grammars and Messenger Does
              Not Satisfy All of the Limitations of Claim 1 ......................................................... 269

      C.      Messenger (All Versions) Does Not Satisfy Claim 6 Because the Analyzer Server
              Routines Dr. Mowry Identifies Do Not Include a "String Library" and Messenger
              Does Not Satisfy All of the Limitations of Claim 1 ............................................... 272

      D.      Messenger (All Versions) Does Not Satisfy Claim 8 Because the User Interface
              Does Not Highlight Detected Structures and Messenger Does Not Satisfy All of the
              Limitations of Claim 1 ........................................................................................... 273

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

E.      Messenger (By Product) Does Not Satisfy Claim 9 Because the Pop-Up Menu Does Not Display "Linked Actions" and Messenger Does Not Satisfy All of the Limitations of Claim 1 ......................................................................... 274

F.      Indirect Infringement............................................................................. 275

XI.    AS DR. MOWRY ACCUSES IT, CLAIM 1 IS A MIXED APPARATUS / METHOD CLAIM AND IS INVALID ............................................................ 277

XII.   NON-INFRINGING ALTERNATIVES.......................................................... 279

A.      Summary of Non-Infringing Alternatives Based on Available Art ...................... 280

B.      Non-Infringing Alternative: Analyze Text and Provide a Context Menu for Any Text String Selected by the User........................................................... 284

C.      Non-Infringing Alternative:  Provide a Single Action for a User to Perform........ 288

D.      Non-Infringing Alternative:  Allow Users to Link Actions to Structures.............. 289

E.      Non-Infringing Alternative:  Detect Only One Type of Information; Allow a User to Perform Gestures on Other, Undetected Information ........................................ 292

F.      Non-Infringing Alternative:  Provide the Same Context Menu of Options Regardless of the Text Selected ........................................................... 293

G.      ██████████████████████████████████████████████████ .. 295

H.      Non-Infringing Alternative:  Alternative User Interfaces that Do Not Select Detected Structures or Use a Pop-Up.................................................... 297

XIII.  APPLE'S ALLEGED PRACTICE OF THE '647 PATENT ............................................. 299

XIV.   MISCELLANEOUS COMMENTS ................................................................. 301

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

# I.    INTRODUCTION

1.    My name is Kevin Jeffay. I am a tenured professor in the Department of Computer Science at the University of North Carolina at Chapel Hill where I currently hold the position of Gillian T. Cell Distinguished Professor of Computer Science.

2.    I have been retained on behalf of defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC, (hereafter collectively referred to as "Samsung"), to offer an expert opinion on the alleged infringement of claims 1, 4, 6, 8, and 9 (hereafter, "the asserted claims") of U.S. Patent No. 5,946,647 (hereafter, "the '647 Patent").  I submit this report to describe my opinions on these matters.

3.    In reaching the conclusions described herein, I have considered the documents and materials identified in Appendix 1, attached to this report.  My opinions are further based upon my over 30 years of education, training, research and related publications, knowledge, and personal and professional experience in the relevant art.

4.    If asked at hearings or trial, I am prepared to testify on issues pertaining to the non-infringement of the '647 Patent and related issues concerning the "Accused Devices." I am further prepared to testify on the operation of the systems and methods of the '647 Patent, and discuss relevant background material. To support or summarize my opinions, any testimony I give may include appropriate visual aids, some or all of the data or other documents and information cited herein or identified in Appendix 1, and additional data or other information identified in discovery.

5.    I reserve the right to supplement the opinions in this report based on any subsequent testimony or facts revealed through discovery, as well as any subsequent reports produced by Apple's experts.

6.    I am being compensated for my work on this case at my standard consulting rate of $550 per hour. I am also being reimbursed for expenses that I incur. My compensation is not contingent upon the results of my study or the substance of my testimony.

HIGHLY CONFIDENTIAL   OUTSIDE ATTORNEYS'
EYES ONLY    SOURCE CODE

1

1  opinion that multiple *types* of structures need not be detected—a position with which I understand

2  Apple and Dr. Mowry disagree.

3      136.    I note that Dr. Mowry expresses that in his opinion, linking only a single action

4  does not infringe the '647 patent. *See, e.g.* Mowry paragraphs 19, 273. I also note, however, that

5  Dr. Mowry opines that devices that he acknowledges only link a single action infringe the '647

6  patent. Mowry, fns. 10 and 11. And, as I noted in my opening report, Apple contends that much

7  of the prior art does not anticipate the claims of the '647 patent because the particular system either

8  only detects one type of structure or only associates one type of action with the detected structures.

9  Apple's Supplemental Objections and Responses to Samsung's Interrogatory No. 26. I disagree as

10 set forth in my opening report.

11     **B.**    **"fast string search function"**

12     137.    I expressed my opinion in my opening report that the term "fast string search

13 function" does not point out and distinctly claim the subject matter covered by claim 6 of the '647

14 patent, and is thus indefinite. I incorporate that discussion here. I note that Dr. Mowry nowhere

15 actually identifies a "fast string search function" in the Accused Devices, instead pointing to

16 general functions that perform string searching. *See* Mowry paragraphs 167-169, 218-219. I also

17 note that in paragraph 265 of his report, Dr. Mowry states that the "fast string search function"

18 term "do[es] not carry any special meaning in the '647 patent."

19 **VIII.   OVERVIEW OF THE ACCUSED SAMSUNG PRODUCTS**

20     138.    I understand that Dr. Mowry (and Apple) is accusing a number of Samsung

21 Android phones and tablets running Android versions Froyo through Jelly Bean of infringing the

22 asserted claims of the '647 patent. In paragraph 93 of his Report, Dr. Mowry provides the

23 following list of accused products, which he calls the "Accused Browser Products": Admire,

24 Captivate Glide, Conquer 4G, Dart, Exhibit II 4G, Galaxy Nexus, Galaxy Note, Galaxy Note II,

25 Galaxy Rugby Pro, Galaxy S II, Galaxy S II Epic 4G Touch, Galaxy S II Skyrocket, Galaxy S III,

26 Illusion, Stratosphere, and Transform Ultra.

27

28                           47

Sandwich.  Dr. Mowry's analysis omits a considerable amount of detail that is relevant to the

infringement analysis.  In my opinion, as detailed below, when this additional detail is considered,

the only reasonable conclusion is that the accused Samsung products do not infringe.

**1.**

154.



58

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE



2.

160.

3

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647



**Screenshots of the Browser application in the Samsung Galaxy S III, before and after a user long presses on a phone number in a web page**

177.    In pararaphs 135 to 137 and 139 to 143 of his Report, Dr. Mowry provides a cursory analysis of the of the source code for the accused functionality in the Browser application of the accused Samsung products running Android version Jelly Bean.   Dr. Mowry's analysis omits a considerable amount of detail that is relevant to the infringement analysis.   In my opinion, as detailed below, when this additional detail is considered, the only reasonable conclusion is that the accused Samsung products do not infringe.

**1.**

178.



88

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

179.

180.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

181.

182.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

1    determine whether his analysis in that case was the same.  Additionally, it is apparent from

2    reviewing those redacted reports that Dr. Mowry was applying constructions that he has not

3    adopted or advocated for in this case, and which I understand do not apply.  As just one example, I

4    understand the Court in this matter has adopted a construction of "action processor" which was not

5    adopted by the ITC.  Moreover, Judge Posner adopted the constructions I addressed above in

6    Section VI, rejecting the constructions the ITC was applying in that case.

7        261.   Based on my review of the materials that are available in the case and cited by Dr.

8    Mowry, I cannot conclude that there is any basis for Dr. Mowry's opinion that findings regarding

9    the HTC Browser have any relevance here.

10        262.   Regardless, to the extent Dr. Mowry is correct, I note that a review of his reports

11    shows that Dr. Mowry in the ITC advocated for the validity of a number of claims that have now

12    been rejected by both the ITC and the Patent Office.

13        263.   I further note that Dr. Mowry includes no mention in his analysis that the District

14    Court for the Northern District of Illinois found that Apple was incapable of showing any damages

15    relating to the '647 patent, and further rejected both of the constructions Dr. Mowry suggests he

16    continues to stand by in this case.

17        264.   For the reasons set forth below, it is my opinion that the Accused Devices with

18    Browser do not infringe claim 1 of the '647 patent.

19        **1.**    **Browser (Froyo, Gingerbread, and Ice Cream Sandwich) Does Not**

20              **Satisfy Claim 1 Because Browser Does Not Have "An Analyzer Server**

21              **for Detecting Structures in the Data and for Linking Actions to**

22              **Detected Structures"**

23        265.   In paragraphs 132-134, 138-143, 227, 229, and 231, Dr. Mowry opines that Froyo,

24    Gingerbread, Ice Cream Sandwich Accused Devices with Browser satisfy the limitation "an

25    analyzer for detecting structures in the data and for linking actions to the detected structures."  For

26    the reasons set forth below, I disagree.  I understand that Apple proposes that the claim term

27

28

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

1  "analyzer server" be construed to mean "a program routine(s) that receives data, uses patterns to

2  detect structures in the data, and links actions to the detected structures."  I understand Judge

3  Posner rejected this construction.  I discuss Dr. Mowry's analysis under both constructions in this

4  section, and the construction adopted by Judge Posner more specifically in the section following.

5      266.    As an initial matter, Dr. Mowry nowhere squares his analysis with the fact he does

6  not identify anything a person of ordinary skill in the art would consider a "server."  Dr. Mowry's

7  entire analysis is premised on first finding the presence of functions for "analyzing" (*e.g.*,

8  functions for detecting and linking) and then simply calling whatever it is he found a "server."

9  That is, Dr. Mowry appears to believe that if the functions of an "analyzer" are present then an

10  analyzer server is necessarily present. Never does Dr. Mowry actually identify any server

11  functions or other indicia of a "server" in the Accused Devices as that term would be understood

12  by a person of ordinary skill in the art.  I do not believe Dr. Mowry has applied any objective

13  criteria that would be accepted by persons in the community of experts to determine whether there

14  is a server that is the claimed "analyzer server" in the Accused Devices.

15      267.  █████████████████████████████████████████████

16  ████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  █████████████████████  A person of ordinary skill in the art would not find that a "shared

19  library" is a "server."  "Shared libraries" and "servers" are different, well-known concepts in

20  computer science, and even a computer science major (for instance, a student of Dr. Mowry's at

21  Carnegie Mellon University) would not confuse the two. Shared libraries exist solely as a

22  convenience to the programmer.  A shared library is a collection of routines that provide functions

23  that are expected to be used in multiple applications. And when an application uses a shared

24  library, the code of that library is integrated into the application and becomes part of the

25  application. In particular, at run-time code in a shared library used by an application is

26  indistinguishable from any other piece of application code. Shared libraries save the programmer

27

28

186                **HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

1  the effort of having to write routines to implement common functions. Beyond this time saving

2  convenience (that can be achieved in other ways without using a shared library), there is no

3  functional benefit to using a shared library. For example, had the programmer not used a shared

4  library and had instead written or incorporated routines found in a shared library as part of her

5  application, then one could not tell the difference between one program using routines from the

6  shared library and another program using the same routines that were part of the application. As

7  such, the use of shared libraries (versus code placed in the application directly) adds no value to

8  the user experience. Moreover, a shared library is passive; it does nothing by itself. Until the

9  library is integrated into the application and used by the application, the code in the shared library

10  does nothing (and is incapable of doing anything).

11      268.    In contrast, a server is an active component of a computer system. It is the

12  execution of program that communicates with (provides services to) and is separate from,

13  programs interacting with the server. *The Authoritative Dictionary of IEEE Standard Terms* (7th

14  Ed., 2000) at 1031 (entry for "server"(5)).  A server is a program whereas a shared library is a part

15  of a program. Without a program to execute a shared library, a shared library is not capable of

16  performing any function; a server, however, provides functions on its own. I note that in the

17  computer science field in September 1994, as well as today, computer science and engineering

18  students would typically first encounter the concept of a "server" in an operating systems or

19  networking/distributed systems course. I taught such courses in September 1994 and I know that

20  texts commonly used in that period, such as Abraham Silberschatz & Peter Galvin, *Operating*

21  *System Concepts*, Addison Wesley (4th Ed. 1994), Andrew S. Tanenbaum, *Distributed Operating*

22  *Systems*, Prentice Hall (1994), Douglas E. Comer, *Internetworking with TCP-IP: Principles,*

23  *Protocols and Architecture* (1988), all described a server in manner consistent with the IEEE

24  Dictionary and my explanations here. ***None*** of these texts teach or suggest that a shared library is

25  ever considered a server.  It is a basic error to conflate a shared library with a server.

26

27

28

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

269.    Accordingly, it is my opinion Dr. Mowry's analysis is insufficient to show an "analyzer server" under any construction.  Dr. Mowry has failed to apply any discernible, objective criteria that would be accepted by persons in the community of experts in the field to determine if there is an "analyzer server" in the Accused Devices.  His entire analysis appears to be driven by a search for functionality without any application of the sort of expertise that would be available to a person operating in this field.  Merely citing to functions in code and related functionality does not demonstrate the existence of an "analyzer server," and my own analysis—set forth above in Sections VIII.C.1, VIII.C.2 and VIII.F—demonstrates that in fact there is no indicia of an "analyzer server" in the Accused Devices.

270.    I further note that Apple's construction, in stating that the analyzer server "links actions to the detected structure" appears to require that multiple actions be linked to a detected structure.

Dr. Mowry nowhere

188

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

addresses this in his report.  For this additional reason, Dr. Mowry's analysis does not show an "analyzer server" under any construction.

(a)  Browser (Froyo, Gingerbread, and Ice Cream Sandwich) Does Not Satisfy the Analyzer Server Limitation Under Apple's Construction

271.  Apple's construction of "analyzer server" is "a program routine(s) that receives data, uses patterns to detect structures in the data, and links actions to the detected structure."  Under Apple's construction of analyzer server, the analyzer server must be "program routine(s) that receive[] data," but, as set forth in Section (b)(iii) immediately below, Dr. Mowry does not even attempt to show that the routines he identifies receive data.

272.  A person of ordinary skill in the art would understand that the notion of the claimed analyzer server "receiving" data in the  '647 patent is a server receiving data from a sending/requesting entity.

For this reason, Browser in the accused Froyo, Gingerbread and Ice Cream Sandwich system do not contain program routine(s) that receives data, and hence do not contain the "analyzer server" limitation of claim 1 under Apple's construction of the term "analyzer server."

(b)  Browser (Froyo, Gingerbread, and Ice Cream Sandwich) Does Not Satisfy the Analyzer Server Limitation Under Judge Posner's Construction For Multiple Reasons

273.  In paragraphs 144-152, and 227-228, Dr. Mowry purports to analyze whether or not Browser on Froyo, Gingerbread, and Ice Cream Sandwich Devices satisfies Judge Posner's construction of the "analyzer server" term.  Judge Posner of the District Court for the Northern

189

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

1 District of Illinois has construed this term to mean "a server routine separate from a client that

2 receives data having structures from the client."  Under Judge Posner's construction of this term, it

3 is my opinion that the Accused Products do not satisfy the "analyzer server" limitation, for a

4 number of reasons.

5         (i)     The Detection and Linking Code Dr. Mowry Identifies Is

6                       Not Separate From the Browser Application

7     274.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

Accordingly, it is my opinion that the routines identified by Dr. Mowry as forming the "analyzer server" are not "separate from a client."

275.    Dr. Mowry address his finding of "separateness" in paragraph 145 of his report. He states, without providing any explanation or evidence, that "[t]hese shared libraries which are generally available for different applications to use, exist independently of—that is, they are 'separate from'—the 'client' required by Samsung's construction." There appears to be no dispute that the "client" at issue here is Browser.

276.

22

191

277.    In the same paragraph, Dr. Mowry also states that "there must be interface 'glue code'" in any client-server relationship.  This is nonsense, both as a matter of computer science and as applied to the Browser.  "Glue code" is jargon and not an accepted term of art with any definite, or agreed upon meaning. For example, I note that an authoritative source of accepted definitions in the computing field, *The Authoritative Dictionary of IEEE Standard Terms* (7th Ed., 2000), contains no entry for "glue code." I take Dr. Mowry's use of such jargon, a term that essentially Dr. Mowry can use to mean whatever he wants it to mean, to be a tacit admission that in fact there is no client/server relationship between routines he has identified in a shared library and the rest of Browser. If there were a client/server relationship it would be plainly obvious from an examination of the code. There are well accepted means of interfacing clients to servers in the art and were such an interface present between Browser and the shared library relied on by Dr. Mowry, Dr. Mowry should have no trouble pointing precisely and specifically to the client/server interface.

There is no need for "glue code," and in my opinion Dr. Mowry is simply trying to explain away large holes in his analysis via hand-waving while trying to sound credible through the use of jargon. Nonetheless, a person of ordinary skill in the art would not find Dr. Mowry's analysis credible, and would not consider any of the code he identifies to be "glue code" that serves the purpose Dr. Mowry claims.

278.    In fact, I note that the '647 patent uses a very different term for the type of code Dr. Mowry claims must exist—an "application programming interface."  '647 patent, Col. 2:41-54 ("Since the program may be executed during the run-time of another program, i.e. the application which presents the document, such as Microsoft Word, an application program interface provides

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE
EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

mechanisms for interprogram communications.  The application program interface retrieves and transmits relevant information from the other program to the user interface for identifying, presenting and enabling selecting of detected structures.").  This is because the '647 patent generally conceives of the "analyzer server" as part of a program that is separate from other programs (*i.e.*, applications) on the claimed computer-based system and thus provides for code— which is still part of the claimed program, not the application—for interfacing with applications. This is demonstrated in Figures 1 and 2 of the '647 patent, which depict the program of the claimed invention separate from applications, and containing an application programming interface to allow applications to communicate with it.  Dr. Mowry chooses to refer to code that allows applications to communicate with the analyzer server in the '647 patent as "glue code," and claims it exists in the applications, however, because, I presume, he is aware that the patent's repeated discussion of an application programming interface and a separate program generally reinforces that the inventors conceived of the "analyzer server" as separate from the clients it served, and thus reinforces that he is wrong in his opinion that the "analyzer server" need not be separate from applications in the first place.

279.   At paragraph 226-229 of his report, Dr. Mowry purports to address this noninfringement argument in general (without referring specifically to Browser).  I do not find any of his points persuasive.  Dr. Mowry's technical arguments boil down to the exact same points as recited above regarding "shared libraries" and "glue code."  As I set forth above, (a) Dr. Mowry appears to have failed to even perform the necessary analysis to support the claims he makes, (b) Dr. Mowry has failed to apply or disclose any objective criteria by which one can determine when routines that perform "detection" and "linking" form a "server routine," (c) Dr. Mowry's opinion that a shared library is the same as a "server" is far outside the professional norm, (d) Dr. Mowry's analysis is factually wrong, an ████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE
EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

280. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

If the Accused Devices contained server routines separate from a client the code would clearly show this. In fact the code does not show this and Dr. Mowry has never cleanly or clearly articulated any substantive measure by which the shared libraries he relies on are separate from the rest of Browser.

(ii)     The Routines Dr. Mowry Identifies Do Not Form a "Server Routine"

281.    As was the case with "server," Dr. Mowry nowhere squares his analysis with the fact that he does not identify anything a person of ordinary skill in the art would consider a "server routine."  Dr. Mowry's entire analysis is premised on first finding the presence of functions for "analyzing" (*e.g.*, functions for detecting and linking) and then simply calling whatever it is he found a "server" and therefore he finds "server routines." That is, Dr. Mowry appears to believe that if the *functions* of an "analyzer" are present then an analyzer server is necessarily present and any routines employed by the alleged server must therefore be "server routines." Never does Dr. Mowry actually identify any server functions or other indicia of a "server" in the Accused Devices as that term would be understood by a person of ordinary skill in the art.  I do not believe Dr. Mowry has applied any objective criteria that would be accepted by persons in the community of experts to determine whether the server routines required by Judge Posner's construction of the analyzer server are present in the Accused Devices.

282. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

1

2

      (iii)    The "Analyzer Server" Routines Dr. Mowry Identifies Do Not Receive Data from a Client

283.    Dr. Mowry nowhere addresses the requirement of Judge Posner's construction that the "server routine" Dr. Mowry purports to identify must "receive data from a client."  Therefore, Dr. Mowry does not appear to claim that this part of Judge Posner's construction is met. This is not surprising because in fact, the required "receive data from a client" is not met. This is because the routines Dr. Mowry identifies in fact do not receive data from a client.

284.    A person of ordinary skill in the art would understand that the notion of the server routine in Judge Posner's construction receiving data from a client requires that the server routine be executed by an active entity such as a server, an entity capable of performing actions on its own (unlike a shared library which cannot perform any operation on its own).

For this reason, Browser in the accused Froyo, Gingerbread and Ice Cream Sandwich system do not contain program routine(s) that receives data, and hence do not contain the "analyzer server" limitation of claim 1 under Judge Posner's construction of the term "analyzer server."

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

(iv)    The "Analyzer Server" Routines Dr. Mowry Identifies Do

Not Infringe Under The Doctrine of Equivalents

285.    In paragraphs 148-150 Dr. Mowry purports to analyze this limitation of claim 1 under the doctrine of equivalents. In my opinion, Dr. Mowry's analysis is flawed. [23]

286.    Dr. Mowry argues in paragraphs 148-152 and 207 that the Accused Devices meet the "analyzer server" limitation under Judge Posner's constructions under the Doctrine of Equivalents. I disagree.

287.    First, in the passages of Dr. Cohen's declaration relied on by Dr. Mowry, Dr. Cohen was opining about specific structures in a specific prior art system.  Dr. Cohen was not making general statements of the equivalence of anything. Second, even if Dr. Cohen was making a statement of general applicability, that fact that two options are design choices shows that they are in fact not equivalent. While designing analysis functions as a server or as a shared library to be integrated into an application are in fact two obvious design choices, a person of ordinary skill in the art would understand that these options are fundamentally different ways of performing analysis. For example, a person of ordinary skill in the art would understand that using a shared library versus a server are different ways of providing function and that the choice of one versus the other will have significant performance implications, as Apple itself learned when they chose the server option. Moreover, a person of ordinary skill in the art would understand that the use of a server versus a shared library, while

---

[23]   I understand that Apple did not include doctrine of equivalents positions in its previous contentions regarding the '647 patent, and they are not so included in Dr. Mowry's charts (Ex. 3).

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

1    obvious design choices, are not interchangeable design choices. In a system designed to use a true

2    analyzer sever (*i.e.*, a server), a person of ordinary skill in the art would understand that the server

3    is not interchangeable with a shared library (as Apple discovered when they contemplated the

4    months of work it would take to design the Live Doc system to use a shared library instead of a

5    server). Thus, Dr. Cohen's declaration in no way supports Dr. Mowry's Doctrine of Equivalents

6    argument and in fact contradicts Dr. Mowry's argument.

7        288.    Similarly, the portions of Dr. Cohen's deposition testimony relied on by Dr. Mowry

8    do not support any notion of equivalence between the claimed server structure and the shared

9    library employed by Browser. First, Dr. Cohen's cited deposition testimony was discussing

10   specific aspects of a prior art system and specific design choices available to the developers of that

11   system. Moreover, given the totality of Dr. Cohen's testimony on this topic, Dr. Cohen made clear

12   that "there's clearly difference" in the design options available to the prior art system designers

13   (see, Cohen Tr., p. 225:7-14).

14       289.    Dr. Mowry further relies of Dr. Cohen for the premise that "'creating a specified

15   connection" would have been obvious given one of ordinary skill in the art's familiarity with the

16   use of 'pointers,' a 'standard technique' at the time" for an unstated purpose (*see*, Mowry ¶ 151

17   quoting Cohen ¶ 128). Nonetheless, Dr. Cohen's opinion here is not relevant to any Doctrine of

18   Equivalents analysis of Browser. The cited passage in Dr. Cohen's declaration is a discussion of a

19   specific prior art system and does not address or consider the alleged "linking" mechanism used by

20   Browser and thus does not inform any Doctrine of Equivalents analysis of the Browser. Second,

21   Dr. Cohen's opinion that the use of any particular technique is obvious or standard practice in no

22   way can be considered a statement about the equivalence of these techniques.  To the contrary, the

23   fact that multiple "linking" techniques were known in the prior art shows that the use of any one

24   would have been an obvious choice, not that they are equivalent. In any event, Browser does not

25   use any of the techniques discussed by Dr. Cohen in his paragraph 128.

26

27

28

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

290.    As to his specific analysis, I note that Dr. Mowry misstates the function from the one recited in this limitation. The limitation at issue is the "analyzer server" limitation. The function of the analyzer server is to detect structures in the data and link actions to the detected structures. As set forth in my analysis below for "linking", the routines Dr. Mowry accuses of being an analyzer server don't perform the function of "linking" that Dr. Mowry purports to identify.   One of the functions of the claimed analyzer server is to link actions to the detected structures such that those actions can be later selected by a user via a user interface. The function is *not* to link a function that will later, after a user has completed their interaction with the system, determine what action will be performed.   Moreover, even if that were the function, as set forth below there are no linked actions under Dr. Mowry's analysis.   Moreover, as explained in detail below, the accused products do not perform linking in the same way under any construction.

291.    Similarly, Dr. Mowry misstates the way in which the analyzer server performs its function. Dr. Mowry alleges the way the analyzer server performs its function is to locate instances of structures and allow a ser to select these structures and linked actions to launch using the structures. This is merely a restatement of the function of the analyzer server. The way in which the analyzer server performs these functions is by executing as a server that is separate from a client (in the sense of Judge Posner's construction) and to receive data from the client and to detect structures in the received data and link actions to the detected structures.

A person of ordinary skill in the art would understand that performing a function via a server separate from a client versus via functions that are part of the client application itself, are fundamentally different.

292.    Finally, Dr. Mowry misidentifies the proper result and ignores that actions must be linked to detected structures.   Again, because there is no linking performed actions are never

198

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

1  linked to detected structures.  Accordingly, the accused products perform substantially different

2  functions in substantially different ways to achieve a substantially different result from the

3  claimed "analyzer server" of the asserted claims.

4    **2.    Browser (Jelly Bean) Does Not Satisfy Claim 1 Because Browser Does**

5       **Not Have "An Analyzer Server for Detecting Structures in the Data**

6       **and for Linking Actions to Detected Structures"**

7    293.    In paragraphs 132, 135-137, 138-143, 227, 229 and 231, Dr. Mowry opines that

8  Jelly Bean Accused Devices with Browser satisfy the limitation "an analyzer for detecting

9  structures in the data and for linking actions to the detected structures."  For the reasons set forth

10 below, I disagree.  I understand that Apple proposes that the claim term "analyzer server" be

11 construed to mean "a program routine(s) that receives data, uses patterns to detect structures in the

12 data, and links actions to the detected structures."  I understand Judge Posner rejected this

13 construction.  I discuss Dr. Mowry's analysis under both constructions in this section, and the

14 construction adopted by Judge Posner more specifically in the section following.

15   294.    As an initial matter, as with pre-Jelly Bean products, Dr. Mowry nowhere squares

16 his analysis with the fact he does not identify anything a person of ordinary skill in the art would

17 consider a "server."  Dr. Mowry's entire analysis is premised on first finding the presence of

18 functions for "analyzing" (*e.g.*, functions for detecting and linking) and then simply calling

19 whatever it is he found a "server." That is, Dr. Mowry appears to believe that if the functions of an

20 "analyzer" are present then an analyzer server is necessarily present. Never does Dr. Mowry

21 actually identify any server functions or other indicia of a "server" in the Accused Devices as that

22 term would be understood by a person of ordinary skill in the art.  I do not believe Dr. Mowry has

23 applied any objective criteria that would be accepted by persons in the community of experts to

24 determine whether there is a server that is the claimed "analyzer server" in the Accused Devices.

25   295.

26

27

28

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

1 ████████████████████████████████████████████████████████████

2 ██████████████████████████ A person of ordinary skill in the art would not find that a "shared

3 library" is a "server." "Shared libraries" and "servers" are different, well-known concepts in

4 computer science, and even a computer science major at Carnegie Mellon university would not

5 confuse the two. A shared library is a collection of routines that provide functions that are

6 expected to be used in multiple applications. And when an application uses a shared library, the

7 code of that library is integrated into the application and becomes part of the application. In

8 particular, at run-time code in a shared library used by an application is indistinguishable from any

9 other piece of application code. Shared libraries exist solely as a convenience to the programmer.

10 Shared libraries save the programmer the effort of having to write routines to implement common

11 functions. Beyond this time saving convenience (that can be achieved in other ways without using

12 a shared library), there is no functional benefit to using a shared library. For example, had the

13 programmer not used a shared library and had instead written or incorporated routines found in a

14 shared library as part of her application, then one could not tell the difference between one

15 program using routines from the shared library and another program using the same routines that

16 were part of the application. As such, the use of shared libraries (versus code placed in the

17 application directly) adds no value to the user experience. Moreover, a shared library is passive; it

18 does nothing by itself. Until the library is integrated into the application and used by the

19 application, the code in the shared library does nothing (and is incapable of doing anything).

20 296. In contrast, a server is an active component of a computer system. It is the

21 execution of program that communicates with (provides services to) and is separate from,

22 programs interacting with the server. *The Authoritative Dictionary of IEEE Standard Terms* (7th

23 Ed., 2000). A server is a program whereas a shared library is a *part* of a program. Without a

24 program to execute a shared library, a shared library is not capable of performing any function; a

25 server, however, provides functions on its own. I note that in the computer science field in

26 September 1994, as well as today, computer science and engineering students would typically first

200

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

encounter the concept of a "server" in an operating systems or networking/distributed systems course. I taught such courses in September 1994 and I know that texts commonly used in that period, such as Abraham Silberschatz & Peter Galvin, *Operating System Concepts*, Addison Wesley (4th Ed. 1994), Andrew S. Tanenbaum, *Distributed Operating Systems*, Prentice Hall (1994), Douglas E. Comer, *Internetworking with TCP-IP: Principles, Protocols and Architecture* (1988), all described a server in manner consistent with the IEEE Dictionary and my explanations here. ***None*** of these texts teach or suggest that a shared library is ever considered a server. It is a basic error to conflate a shared library with a server.

297.    Accordingly, it is my opinion Dr. Mowry's analysis is insufficient to show an "analyzer server" under any construction. Dr. Mowry has failed to apply any discernible, objective criteria that would be accepted by persons in the community of experts in the field to determine if there is an "analyzer server" in the Accused Devices. His entire analysis appears to be driven by a search for functionality without any application of the sort of expertise that would be available to a person operating in this field. Merely citing to functions in code and related functionality does not demonstrate the existence of an "analyzer server," and my own analysis— set forth above in Sections VIII.D.1, VIII.D.2 and VIII.F—demonstrates that in fact there is no indicia of an "analyzer server" in the Accused Devices.

298.    I further note that Apple's construction, in stating that the analyzer server "links actions to the detected structure" appears to require that multiple actions be linked to a detected structure.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE
EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

Dr. Mowry nowhere addresses this in his report.  For this additional reason, Dr. Mowry's analysis does not show an "analyzer server" under any construction.

299.   I also note that under Apple's own construction of analyzer server, the analyzer server must be "program routine(s) that receive[] data," but, as set forth in Section (b)(iii) immediately below, Dr. Mowry does not even attempt to show that the routines he identifies receive data.

(a)

300.

301.

While I disagree with Dr. Mowry that multiple *types* of structures must be detected in the data, the language is plain that the routine must be capable of detecting and linking "structures" (*i.e.* more than one instance of a structure).  In fact, when attempting to dismiss

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE
EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

1  anticipatory prior art, Apple argued that detecting only one structure at a time was not sufficient

2  for "detection," particularly when it requires user input ████████████████████████████

3

4          Unlike the system disclosed in the '647 Patent, Sidekick does not
            itself perform any detection. Instead, Sidekick's Dialer feature
5          requires a user to enter various prompts to enable a single
            telephone number to be highlighted at any given time. Thus, unlike
6          the '647 Patent, the Sidekick system requires user prompts to select
            a single piece of data

7  Apple's Supplemental Response to Interrogatory No. 26 (at page 104-105).

8

9

10     302.

11

12

13

14

15

16

17

18

19

20     303.

21

22

23

24

25

26

27

28

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

(b)      Browser (Jelly Bean) Does Not Satisfy the Analyzer Server

Limitation Under Judge Posner's Construction For Multiple Reasons

304.    In paragraphs 144-152, and 227-228, Dr. Mowry purports to analyze whether or not Browser on Jelly Bean (and other) Devices satisfies Judge Posner's construction of the "analyzer server" term.  Judge Posner of the District Court for the Northern District of Illinois has construed this term to mean "a server routine separate from a client that receives data having structures from the client."   Under Judge Posner's construction of this term, it is my opinion that the Accused Products do not satisfy the "analyzer server" limitation, for a number of reasons.

(i)      The Detection and Linking Code Dr. Mowry Identifies Is

Not Separate From the Browser Application

305.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

Accordingly, it is my opinion that the routines identified by Dr. Mowry as forming the "analyzer server" are not "separate from a client."

306.    Dr. Mowry address his finding of "separateness" in paragraph 145 of his report. He states, without providing any explanation or evidence, that "[t]hese shared libraries which are generally available for different applications to use, exist independently of—that is, they are 'separate from'—the 'client' required by Samsung's construction." There appears to be no dispute that the "client" at issue here is Browser.

24

205

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

307. ███████████████████████████

308.     In the same paragraph, Dr. Mowry also states that "there must be interface 'glue code'" in any client-server relationship.  This is nonsense, both as a matter of computer science and as applied to the Browser.  "Glue code" is jargon and not an accepted term of art with any definite, or agreed upon meaning. For example, I note that an authoritative source of accepted definitions in the computing field, *The Authoritative Dictionary of IEEE Standard Terms* (7th Ed., 2000), contains no entry for "glue code." I take Dr. Mowry's use of such jargon, a term that essentially Dr. Mowry can use to mean whatever he wants it to mean, to be a tacit admission that in fact there is no client/server relationship between routines he has identified in a shared library and the rest of Browser. If there were a client/server relationship it would be plainly obvious from an examination of the code. There are well accepted means of interfacing clients to servers in the art and were such an interface present between Browser and the shared library relied on by Dr. Mowry, Dr. Mowry should have no trouble pointing precisely and specifically to the client/server interface. To date, he never been able to do so. █████████████████████████ ████████████████████████████████████████ There is no need for "glue code," and in my opinion Dr. Mowry is simply trying to explain away large holes in his

206

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

analysis via hand-waving while trying to sound credible through the use of jargon.  Nonetheless, a person of ordinary skill in the art would not find Dr. Mowry's analysis credible, and would not consider any of the code he identifies to be "glue code" that serves the purpose Dr. Mowry claims.

309.    In fact, I note that the '647 patent uses a very different term for the type of code Dr. Mowry claims must exist—an "application programming interface."  '647 patent, Col. 2:41-54 ("Since the program may be executed during the run-time of another program, i.e. the application which presents the document, such as Microsoft Word, an application program interface provides mechanisms for interprogram communications.  The application program interface retrieves and transmits relevant information from the other program to the user interface for identifying, presenting and enabling selecting of detected structures.").  This is because the '647 patent generally conceives of the "analyzer server" as part of a program that is separate from other programs (*i.e.*, applications) on the claimed computer-based system and thus provides for code— which is still part of the claimed program, not the application—for interfacing with applications. This is demonstrated in Figures 1 and 2 of the '647 patent, which depict the program of the claimed invention separate from applications, and containing an application programming interface to allow applications to communicate with it.  Dr. Mowry chooses to refer to code that allows applications to communicate with the analyzer server in the '647 patent as "glue code," and claims it exists in the applications, however, because, I presume, he is aware that the patent's repeated discussion of an application programming interface and a separate program generally reinforces that the inventors conceived of the "analyzer server" as separate from the clients it served, and thus reinforces that he is wrong in his opinion that the "analyzer server" need not be separate from applications in the first place.

310.    At paragraph 226-229 of his report, Dr. Mowry purports to address this noninfringement argument in general (without referring specifically to Browser).  I do not find any of his points in these persuasive.  Dr. Mowry's technical arguments boil down to the exact same points as recited above regarding "shared libraries" and "glue code."  As I set forth above, (a) Dr.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

Mowry appears to have failed to even perform the necessary analysis to support the claims he makes, (b) Dr. Mowry has failed to apply or disclose any objective criteria by which one can determine when routines that perform "detection" and "linking" form a "server routine," (c) Dr. Mowry's opinion that a shared library is the same as a "server" is far outside the professional norm, (d) Dr. Mowry's analysis is factually wrong, and

311.

If the Accused Devices contained server routines separate from a client the code would clearly show this. In fact the code does not show this and Dr. Mowry has never cleanly or clearly articulated any substantive measure by which the shared libraries he relies on are separate from the rest of Browser.

(ii)     The Routines Dr. Mowry Identifies Do Not Form a "Server Routine"

312.    As was the case with "server," Dr. Mowry nowhere squares his analysis with the fact he does not identify anything a person of ordinary skill in the art would consider a "server routine."  Dr. Mowry's entire analysis is premised on first finding the presence of functions for "analyzing" (*e.g.*, functions for detecting and linking) and then simply calling whatever it is he found a "server" and therefore found "server routines." That is, Dr. Mowry appears to believe that if the functions of an "analyzer" are present then an analyzer server is necessarily present and any routines employed by the alleged server must therefore be "server routines." Never does Dr. Mowry actually identify any server functions or other indicia of a "server" in the Accused Devices

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

as that term would be understood by a person of ordinary skill in the art.  I do not believe Dr. Mowry has applied any objective criteria that would be accepted by persons in the community of experts to determine whether the server routines required by Judge Posner's construction of the analyzer server are present in the Accused Devices.

313.

For these reasons, there can be no "server routines" as required by Judge Posner's construction of "analyzer server" in Browser.

(iii)    The "Analyzer Server" Routines Dr. Mowry Identifies Do Not Receive Data from a Client

314.    Dr. Mowry nowhere addresses the requirement of Judge Posner's construction that the "server routine" Dr. Mowry purports to identify must "receive data from a client."  Therefore, Dr. Mowry does not appear to claim that this part of Judge Posner's construction is met. This is not surprising because in fact, the required "receive data from a client" is not met. This is because the routines Dr. Mowry identifies in fact do not receive data from a client.

315.    A person of ordinary skill in the art would understand that the notion of the server routine in Judge Posner's construction receiving data from a client requires that the server routine be executed by an active entity such as a server, an entity capable of performing actions on its own (unlike a shared library which cannot perform any operation on its own)

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

For this reason, Browser in the accused Jelly Bean systems do not contain program routine(s) that receives data, and hence do not contain the "analyzer server" limitation of claim 1 under Judge Posner's construction of the term "analyzer server."

(iv)    The "Analyzer Server" Routines Dr. Mowry Identifies Do Not Infringe Under The Doctrine of Equivalents

316.    Dr. Mowry argues in paragraphs 148-152 and 207 that the Accused Devices meet the "analyzer server" limitation under Judge Posner's constructions under the Doctrine of Equivalents. I disagree.

317.

First, in the passages of Dr. Cohen's declaration relied on by Dr. Mowry, Dr. Cohen was opining about specific structures in a specific prior art system He was not making general statements of the equivalence of anything. Second, even if Dr. Cohen was making a statement of general applicability, that fact that two options are design choices shows that they are in fact not equivalent. While designing analysis functions as a server or as a shared library to be integrated into an application are in fact two obvious design choices, a person of ordinary skill in the art would understand that these options are fundamentally different ways of performing analysis. For example, a person of ordinary skill in the art would understand that using a shared library versus a server are different ways of providing function and that the choice of one versus the other will have significant performance implications, as Apple itself learned when they chose the server option. Moreover, a person of ordinary skill in the art

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE
EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

would understand that the use of a server versus a shared library, while obvious design choices, are not interchangeable design choices. In a system designed to use a true analyzer sever (*i.e.*, a server), a person of ordinary skill in the art would understand that the server is not interchangeable with a shared library (as Apple discovered when they contemplated the months of work it would take to design the Live Doc system to use a shared library instead of a server). Thus, Dr. Cohen's declaration in no way supports Dr. Mowry's Doctrine of Equivalents argument and in fact contradicts Dr. Mowry's argument.

318.   Similarly, the portions of Dr. Cohen's deposition testimony relied on by Dr. Mowry do not support any notion of equivalence between the claimed server structure and the shared library employed by Browser. First, Dr. Cohen's cited deposition testimony was discussing specific aspects of a prior art system and specific design choices available to the developers of that system. Moreover, given the totality of Dr. Cohen's testimony on this topic, Dr. Cohen made clear that "there's clearly difference" in the design options available to the prior art system designers (see, Cohen Tr., p. 225:7-14).

319.   Dr. Mowry further relies of Dr. Cohen for the premise that "'creating a specified connection'" would have been obvious given one of ordinary skill in the art's familiarity with the use of 'pointers,' a 'standard technique' at the time" for an unstated purpose (see, Mowry ¶ 151 quoting Cohen ¶ 128). Nonetheless, Dr. Cohen's opinion here is not relevant to any Doctrine of Equivalents analysis of Browser. The cited passage in Dr. Cohen's declaration is a discussion of a specific prior art system and does not address or consider the alleged "linking" mechanism used by Browser and thus does not inform any Doctrine of Equivalents analysis of the Browser. Second, Dr. Cohen's opinion that the use of any particular technique is obvious or standard practice in no way can be considered a statement about the equivalence of these techniques.  To the contrary, the fact that multiple "linking" techniques were known in the prior art shows that the use of any one would have been an obvious choice, not that they are equivalent. In any event, Browser does not use any of the techniques discussed by Dr. Cohen in his paragraph 128.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE
EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

320.    As to his specific analysis, I note that Dr. Mowry misstates the function from the one recited in this limitation. The limitation at issue is the "analyzer server" limitation. The function of the analyzer server is to detect structures in the data and link actions to the detected structures. As set forth in my analysis below for "linking", the routines Dr. Mowry accuses of being an analyzer server don't perform the function of "linking" that Dr. Mowry purports to identify.  One of the functions of the analyzer server is to link actions to the detected structures, ***not*** to allow a user to select structures in an application and launch a desired linked action on the structure.  Moreover, even if that were the function, as set forth below there are no linked actions under Dr. Mowry's analysis.  Moreover, as explained in detail below, the accused products do not perform linking in the same way under any construction.

321.    Similarly, Dr. Mowry misstates the way in which the analyzer server performs its function. Dr. Mowry alleges the way the analyzer server performs its function is to locate instances of structures and allow a ser to select these structures and linked actions to launch using the structures. This is merely a restatement of the function of the analyzer server. The way in which the analyzer server performs these functions is by executing as a server that is separate from a client (in the sense of Judge Posner's construction) and to receive data from the client and to detect structures in the received data and link actions to the detected structures.

A person of ordinary skill in the art would understand that performing a function via a server separate from a client versus via functions that are part of the client application itself, are fundamentally different.

322.    Finally, Dr. Mowry misidentifies the proper result and ignores that actions must be linked to detected structures.  Again, because there is no linking performed actions are never linked to detected structures.  Accordingly, the accused products perform substantially different

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE
EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

1  functions in substantially different ways to achieve a substantially different result from the

2  claimed "analyzer server" of the asserted claims.

3        **3.    Browser (All Versions) Does Not Satisfy the Analyzer Server**

4             **Limitation Because It Does Not Link Actions to Detected Structures**

5        323.   Accused Products using all versions of Browser do not satisfy the limitation "an

6  analyzer server… for linking actions to detected structures."  I understand that Apple proposes that

7  the claim term "linking actions to the detected structures" be construed to mean "associating the

8  detected structures to computer subroutines that cause the CPU to perform a sequence of

9  operations on the particular structures to which they are associated."  I understand Judge Posner

10 rejected this construction.  I discuss Dr. Mowry's analysis under both constructions in this section,

11 and the construction adopted by Judge Posner more specifically in the section following.

12

13

14

15

16

17

18                     One of ordinary skill in the art would not consider what the Accused Products do to be

19 "linking actions to detected structures."

20       324.   As an initial matter, I note that Dr. Mowry's analysis once again searches for a

21 function—this time, performing the task of determining how to respond to a user's input—and

22 then tries to shoehorn the function into the claims of the '647 patent.  In this instance, Dr. Mowry's

23 functional analysis is particularly ill-founded, however, as he does not even look for the right

24 function.  Instead of looking for the creation of a "link" between structures and actions a user

25 desires to have performed (i.e. "linking"); Dr. Mowry looks instead at the fact that the system

26 performs a determination task in response to user interaction.  But simply performing a task in

27

28                                      213

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

response to user interaction does not show "linking."  Yet Dr. Mowry's entire analysis depends on how the system responds *after* user interaction, and nowhere actually identifies a "link" that is created between a structure and an action.  The concept of a link is not a difficult or obscure concept in computer science.  In its simplest and most straightforward realization, a link is a pointer.  In the context of the '647 patent, the simplest realization of a link would be a pointer to a function to perform an action on a detected structure. If the claimed "linking" or "linked action" were present in Browser it should be easy to point to with precision (because we have the source code). Dr. Mowry does not do this.  Moreover, the '647 patent does not require—nor even contemplate—that user interaction would be necessary for the creation of a "link" (for "linking to be performed").[25]  To the point, it is simply incorrect to mistake, as Dr. Mowry's entire analysis does, "performing a task as requested by a user" with "linking actions to detected structures."  The two are, in fact, completely different.  In the former case the system must determine which action is requested by the user (*i.e.*, request processing is required) while in the latter case no such processing is required at the time of a user selection because the action to be performed is known and linked to the selection.

325.   In paragraphs 138-143, 146, and 234-247, Dr. Mowry discusses what he identifies as the routines that perform "linking" in the Accused Devices (his allegations are essentially the same against each version of Browser).  And in no case does Dr. Mowry identify a "link" between detected structures and actions.  Dr. Mowry's analysis hides this fact by obscuring the timing of the operations he identifies, and by ignoring what "actions" Dr. Mowry claims are being linked.

---

[25]   As discussed below, the patent requires "a user interface enabling the selection of a detected structure and a linked action," and there cannot be a linked action selected by a user, given Dr. Mowry's analysis.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647



326.

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647



327.    Dr. Mowry's description of this process is not particularly clear.

Intents are not links and instead are "abstract description[s] of [] operation[s] to be performed."  Ex. 7 to Mowry PI Declaration – Android Developers Reference – Intent, *available at* http://developer.android.com/reference/android/content/Intent.html.   In particular, Intents are descriptions (text strings) of actions, they are not actions themselves. Intents are a distinct alternative to links and are used instead of links to delay the binding between functions and user inputs.  Intents do not "link" what sequence of operations the CPU will perform on the structure to the structure—

Given an implicit Intent, the application must determine which of the system components available to perform the action described by the Intent is the best component

 HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

to use.  Ex. 7 to Mowry PI Declaration – Android Developers Reference – Intent, *available at* http://developer.android.com/reference/android/content/Intent.html. That this determination of the best component to use is performed is further evidence of a lack of linking.  If actions were linked, no determination would be necessary.

328.    In my opinion, as compared to a system that "link[s] actions to detected structures," the application accused of infringement by Dr. Mowry use a completely different mechanism to act on a user's input.

ecause there is no "link" from a detected structure to any action, it is therefore not surprising that Dr. Mowry cannot clearly point out any link.

329.

---

27

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647



218

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647



331.

       (a)       <u>Browser (All Versions) Does Not Link Actions to Detected</u>

<u>Structures Under Judge Posner's Construction</u>

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

332.    Judge Posner construed the claim term "linking actions to detected structures" as "creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on the detected structure."

333.    Dr. Mowry purports to address infringement under this construction in paragraphs 146 and 248-249 of his report, and his allegations are essentially the same against each version of Browser.

**4.      Browser (All Versions) Does Not Satisfy the User Interface Limitation Because the User Interface Dr. Mowry Accuses Does Not Enable Selection of a "Linked Action"**

334.    Accused Products using all versions of Browser do not satisfy the limitation "a user interface enabling the selection of a detected structure and a linked action" for at least two reasons.

335.    First, because the Accused Devices do not perform the claimed "linking," the user interface routines that Dr. Mowry accuses in paragraphs 153-158 of his report cannot enable selection of a "linked action."

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647



336.

337.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

338.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

339.

340.  I

Accordingly, the Accused Devices do satisfy the "user interface" limitation even under Dr. Mowry's analysis because the user interface does not enable "the selection of a detected structure and a linked action."

### 5. Browser (Jelly Bean) Does Not Satisfy the User Interface Limitation Because the User Interface Does Not Enable Selection of a "Detected Structure."

341.    Accused Jelly Bean Devices with Browser do not satisfy the limitation "a user interface enabling the selection of a detected structure and a linked action" for an additional reason.  Dr. Mowry opines that this limitation is met in paragraphs 157-158, 232-233, and 250-255 of his report, but his discussion is misleading because he obscures when the routines he identifies are called in relation to the "detection" that Dr. Mowry alleges takes place (as I detailed above in Section VIII.D.3).  To put the discussion in Section VIII.D.3 in plain terms, the user first makes a "selection" of a structure the user has identified on the screen.

*After* Dr.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

Mowry's "detection" has taken place, the user cannot somehow re-select the structure Dr. Mowry says has been "detected"—the user input has already been made, and then detection has been performed according to Dr. Mowry.

342.    At this point, a context menu is then presented to the user, and the user *cannot* select the structure that Dr. Mowry alleges has been detected.  Although the structure the user originally detected is presented to the user (as shown below), the user is only ever selecting one of the displayed menu items and is not selecting any detected structure.  In fact, it would make no sense for the user to select the structure displayed in the menu because the user has already previously made their selection.  Such a redundant selection would serve no purpose.



**Screenshot of the Browser application in the Samsung Galaxy Nexus, after a user long presses on a phone number in a web page**

In other words, it is *impossible* for a user to select a "detected structure," because after the structure has been "detected" by Browser, the only user interface that is presented to the user actually blocks the user from further selecting the "detected structure." The user can only make selections of options from the menu—not any "structures."  Thus, though the "detected structure" identified by Dr. Mowry is displayed to the user, *it cannot be selected*.  I have confirmed this both

224

by using the accused devices and by examining the source code for the context menu that is created (the process of which is described in paragraph 158 of Dr. Mowry's report).  Moreover, Dr. Mowry has provided no evidence, despite having ample access to the source code, that any "detected structure" is actually selected by the user via the context menu at issue.  If selections were possible and occurring, Dr. Mowry would be able to prove this via a code trace.  He has not done so because he cannot do so.  For these reasons, it is my opinion that Accused Jelly Bean Devices with Browser do not satisfy the limitation "a user interface enabling the selection of a detected structure and a linked action."

343.    Dr. Mowry attempts to further address this limitation in paragraphs 232-233, and 250-255 of his report. ██████████████████████████████████████████

███████████████████████████  Dr. Mowry compares this to Figure 5 and accompanying text in the '647 patent, and says the operation of ████████████ is equivalent to the use of the "Detect Structures" button in Figure 5.  But Dr. Mowry ignores that the "Detect Structures" button is specifically *not* described as the "user interface that enabling selection of a detected structure and a linked action."  In fact, the "Detect Structures" button is described as initiating the claimed program routines—*not*  as part of the user interface routines that would be initiated.  '647 patent, Col. 5:19-37.  The "user interface" is not depicted until Figure 6 (**240**), as described in Col. 5, lines 29-37, which isn't presented until *after* the "Detect Structures" button is selected and the program routines are run as described.  In other words, Dr. Mowry points to a portion of the '647 patent that only confirms that the user interface allow selection of a structure *after* it has been detected.

344.    In paragraphs 250-255, Dr. Mowry opines that the "structures are detected as the user makes the selection." ███████████████████████████████████████

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE
EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

Therefore, *user selection occurs before detection.*

345.    I note that the '647 patent specifically contemplates that selection occurs at the time the coordinates of a user's input have been determined:

> User interface 240 communicates with application 167 through application program interface 230 to determine if a user has performed a mouse-down operation in a particular mouse-sensitive presentation region, **thereby selecting the structure presented at those coordinates**. Upon selection of this structure, user interface 240 presents and enables selection of the linked candidate actions using any selection mechanism, such as a conventional pull-down or pop-up menu.

'647 patent, Col. 4:22-31.

346.

    (a)      The "User Interface" Routines Dr. Mowry Identifies Do Not Infringe Under The Doctrine of Equivalents

347.    In paragraphs 252-254 Dr. Mowry purports to analyze this limitation of claim 1 under the doctrine of equivalents.  I disagree.  In my opinion, Dr. Mowry misstates the function from the one recited in this limitation.  Dr. Mowry states "the function of this claim limitation is to present to the user a way to select structured data that is detected from a larger body of text, and to

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

select an action to perform on the selected data using the device."  This is plainly wrong—the claim language itself recites that the function is to "enable selection of a detected structure and a linked action"—that is, to provide *some* way for the user to select structures that have been detected.

Thus, as set forth in my analysis above, the routines Dr. Mowry accuses of being a user interface do not perform the function of "enabling selection of a detected structure" that Dr. Mowry purports to identify.

I note that the function Dr. Mowry asserts is provided by this limitation is contrary to the teachings of the '647 patent regarding the benefits of the claimed user interface.  *See* Col. 1:1-2:63.

348.    Additionally, as explained in detail above, the accused products do not perform enabling selection of a detected structure in the same way.  Dr. Mowry says that the "way" of this claim limitation is "providing the user with a viewable representation of detected structures and linked actions."  Mowry paragraph 253.  Dr. Mowry misstates the "way" recited in the claim—which is providing a "user interface" to the user—which , as set forth above is not done, because detection and what Dr. Mowry calls "linking" do not occur until after a user makes a selection.

349.    Similarly, Dr. Mowry misidentifies the proper result, again ignoring that detection must precede selection.  At paragraph 254, Dr. Mowry says that the "result of this claim limitation

227

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE

is rendering data in which a user may select structures, and menus to allow a user to select linked actions to perform using the selected structures." This "way" is wrong. For instance, claim 1 doesn't use "menus" necessarily, as claim 9 makes clear. Similarly, Dr. Mowry says that a user may "select structures" as a result, but this ignores that the claim limitation requires that the structures be "detected."

Accordingly, the accused products perform substantially different functions in substantially different ways to achieve a substantially different result from the claimed "user interface" of the asserted claims.

> **6.** **Browser (All Versions) Does Not Satisfy the Action Processor Limitation as Construed By the Court Because the Routines Dr. Mowry Identifies Does Not "perform the selected action on the detected structure."**

350. The court has construed the "action processor" limitation as "program routine(s) that perform the selected action on the detected structure." In paragraphs 159-161 of his report, Dr. Mowry purports to identify an "action processor" in the Accused Devices with Brower, but he does not appear to apply this construction. *See also*, Mowry paragraphs 257-262.

351.

352.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE
EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647



353.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

354.

**7.**     **Browser (All Versions) Does Not Satisfy the Limitation Requiring a**
           **Memory Storing Information Including Program Routines Because the**
           **Claimed Program Routines Do Not Exist on the Accused Devices**

355.    For the reasons set for the above, the Accused Products with Browser do not contain a memory storing information including the claimed program routines, because the claimed program routines do not exist on the Accused Products.  *See* Mowry paragraphs 129-131.

**8.**     **Browser (All Versions) Does Not Satisfy the Limitation Requiring A**
           **Processing Unit Coupled to the Input Device, the Output Device, and**

230

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

1

2

3   DATED:  September 13, 2013

4                                                        _____
                                                         Kevin Jeffay
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

303                    **HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
                       EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647