UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Paul S. Grewal, Magistrate Judge

| | | |
|---|---|---|
| APPLE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | No. C 12-0630 LHK (PSG) |
| | ) | |
| SAMSUNG ELECTRONICS CO., LTD., | ) | |
| a Korean corporation; SAMSUNG | ) | |
| ELECTRONICS AMERICA, INC., a | ) | |
| New York corporation; SAMSUNG | ) | |
| TELECOMMUNICATIONS AMERICA, | ) | |
| LLC, a Delaware limited | ) | |
| liability company, | ) | |
| | ) | |
| Defendants. | ) | |

San Jose, California
Tuesday, December 10, 2013

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING**

**APPEARANCES**:

For Plaintiff Apple, Inc.:

Gibson, Dunn & Crutcher LLP
1881 Page Mill Road
Palo Alto, California  94304
BY:  **JOSH A. KREVITT, Esq.**
**HERVEY MARK LYON, Esq.**
**Daniel J. Thomasch, Esq.**
**Brian Buroker, Esq.**

(Appearances continued on next page)

Transcribed By:      Candace Yount, CSR# 2737, RMR, CCRR
Contracted Court Reporter/Transcriber
candace.yount@gmail.com

Computerized Transcription By Eclipse

**APPEARANCES (Continued):**

For Plaintiff Apple, Inc.
(Continued)                    Wilmer Cutler Pickering Hale & Dorr LLP
                               950 Page Mill Road
                               Palo Alto, California 94304
                    BY:  **MARK D. SELWYN**

For Plaintiff Apple Corporation:
                               Wilmer Cutler Pickering Hale & Dorr LLP
                               60 State Street
                               Boston, MA 02109
                    BY:  **WILLIAM F. LEE, Esq.**

                               Wilmer Cutler Pickering Hale & Dorr LLP
                               950 Page Mill Road
                               Palo Alto, California 94304
                    BY:  **MARK D. SELWYN , Esq.**

For Defendant Samsung Electronics Co., Ltd.:
                               Quinn, Emanuel, Urquhart & Sullivan LLP
                               555 Twin Dolphin Drive
                               Fifth Floor
                               Redwood Shores, California  94065
                    BY:  **VICTORIA MAROULIS, Esq.**
                         **TODD M. BRIGGS, Esq.**

For Defendant Samsung Electronics Co., Ltd.:
                               Quinn, Emanuel, Urquhart & Sullivan LLP
                               50 California Street - 22nd Floor
                               San Francisco, California  94111
                    BY:  **SEAN SANG-CHUL PAK, Esq.**

                               Quinn Emanuel, Urquhart & Sullivan LLP
                               51 Madison Avenue
                               22nd Floor
                               New York, New York  10010
                    BY:  **PATRICK D. CURRAN, Esq.**
                         **RICHARD W. ERWINE, Esq.**

                               Quinn Emanuel Urquhart & Sullivan LLP
                               777-6th Street NW
                               Eleventh Floor
                               Washington, D.C.  20001
                    BY:  **ALAN L WHITEHURST, Esq.**

1  Tuesday - December 10, 2013                          9:59 a.m.

2                    P R O C E E D I N G S

3                        ---oOo---

4       THE CLERK:  Calling Apple, Inc. versus Samsung

5  Electronics, et al., Case Number CV-12-630 LHK, on for motions

6  to strike.

7     Counsel, please state your appearances.

8       MR. KREVITT:  Morning, Your Honor.  Josh Krevitt from

9  Gibson Dunn on behalf of Apple.  With me today are my

10 colleagues Mark Lyon, Dan Thomasch and Brian Buroker.

11      THE COURT:  Good morning.

12      MR. KREVITT:  Good morning.

13      MR. LEE:  Good morning, Your Honor.  Bill Lee and Mark

14 Selwyn from Wilmer Hale for Apple Corp.

15      THE COURT:  Good morning.

16      MS. MAROULIS:  Good morning, Your Honor.  Victoria

17 Maroulis with Quinn Emanuel, counsel for Samsung.  And with me

18 are my partners Sean Pak, Patrick Curran, Rich Erwine, Alan

19 Whitehurst and Todd Briggs.

20      THE COURT:  Miss Maroulis, good morning to you and to

21 your colleagues as well.

22     Was it just my imagination or did I actually get to go

23 home and sleep?

24                      (Laughter.)

25      THE COURT:  We have a lot to cover in what is a

1  different case this morning, which is 12-630.

2      You all have presented me with a thicket of issues.  I'd

3  like to begin by, frankly, asking and initially asking:

4      What meet and confer took place here that led us to the

5  state where I have many hundreds of pages of disagreements,

6  fundamental disagreements regarding what was claimed, what was

7  disclosed and so forth?

8      Who wants to go first?

9          MR. KREVITT:  Your Honor, there were several

10  conversations, some letters exchanged.

11          THE COURT:  Who participated in the meet and confer in

12  particular?

13          MR. KREVITT:  A variety of attorneys, Your Honor.  So,

14  for example, Brian Buroker, my partner from Gibson Dunn,

15  participated, and -- as did our client, in those meet and

16  confers.

17          THE COURT:  Okay.  And from Samsung, who participated

18  on its side?

19          MR. ERWINE:  Your Honor, I did.  Richard Erwine.

20          THE COURT:  All right.  I start with the meet and

21  confer because -- And I recognize that I don't see what I don't

22  see, but it's difficult for me to figure out and parse here

23  exactly what give-and-take, if any, took place in the

24  discussions.

25      What I see are just accusations and claims and

```
 1   counterclaims being thrown out on each side's contentions that,
 2   well, bewilder me.
 3        So I'd like to know a little bit more of what was given up
 4   in the negotiation, or was this just a flyby discussion?
 5                     (Pause in proceedings.)
 6             MR. BUROKER:  Your Honor, Brian Buroker.
 7        Also, Mr. Kolovos from the Wilmer Hale firm was on the
 8   meet and confers as well for the defensive part of the case.
 9   As you know, Gibson Dunn handles the offensive part of the
10   case.
11        We had multiple discussions; there were letters that were
12   exchanged.  And it was -- We each discussed each of the issues
13   and tried to get an understanding of why the other side thought
14   that a particular issue hadn't been appropriately raised in the
15   contentions and was being raised in the expert reports.
16        And fundamentally, we just had a disagreement on all of
17   these issues.  There were --
18             THE COURT:  I can -- I can figure that part out.
19        I'd like -- What I'd like to understand is, if you look at
20   the set of positions and issues that were in play at the
21   beginning of this series of conversations, did anything get
22   negotiated successfully?
23             MR. BUROKER:  We did drop a number of issues, Your
24   Honor.
25             THE COURT:  I'd like to understand more clearly
```

1  what -- what was dropped.

2       MR. BUROKER:  I -- I don't have a complete list, but

3  we raised a number of issues having to do with what -- what

4  prior art arguments could be presented in an Expert Report

5  outside of what was agreed to by the parties.

6       There was a case narrowing order, and one of the issues

7  was, could either party present prior art reference that wasn't

8  in the case-narrowing order and we initially had taken the

9  position that you could not do so.  And through -- Subject to

10 our back and forth, we decided not to take that position and

11 urge it going forward.

12      I don't have the complete list, Your Honor, but there were

13 other things that we decided not to pursue because we wanted to

14 focus on other issues that we did pursue.

15      UNIDENTIFIED SPEAKER:  Your Honor, I'll -- I'll add to

16 that, that there were a number of different conversations, both

17 before and after the briefs were filed.  We tried to find a way

18 to -- to resolve some of these disputes.  We haven't been able

19 to do so.  But we have engaged in extensive meet-and-confer

20 discussions before and after filing.

21      And I'll echo what Mr. Buroker said.  When we started this

22 process, there were very long letters on both sides.  And in

23 the course of the discussions, there was a standdown on many,

24 many issues, and some agreements not to pursue certain issues

25 at trial.

1      So there are still a number of issues left, but we have

2   tried in good faith to reduce them.

3          **THE COURT:**  Well, I do enjoy working with you.   I

4   sincerely mean this.   And I have lamented now many, many times

5   from this bench:   The -- the -- the real collateral damage this

6   case is putting on other parties in this district who don't get

7   my time -- I mean, the notion that I am up till 4:00 in the

8   morning reading briefs in this matter after spending a good

9   evening with you all yesterday is something I'm committed to

10  because that's what I signed up to do.   But those people pay

11  for it.   And I'm struggling to understand how I am to balance

12  the demands of this dispute with their needs.

13      And I haven't heard and, frankly, seen a lot of

14  give-and-take in what's presented to me.   What I see are

15  25-page briefs upon 25-page briefs with unending declarations

16  and exhibits.

17      So something has to change.   And I've been lamenting this

18  now for, what, a year and a half with you all and what has

19  changed?   They're still waiting, and I'm still reading papers

20  till 4:00 in the morning.

21      Is there anything we can do to fix this dynamic?   Does

22  anyone have any discussions at all other than my taking 24

23  hours every day in working on this matter?

24                  (Pause in proceedings.)

25          **THE COURT:**  All right.   Let's get at it then.   Let's

1    start with Apple's motion to strike.

2                    (Pause in proceedings.)

3            **UNIDENTIFIED SPEAKER:**  Your Honor, very -- one thing

4    just to add in terms of suggestions, which wouldn't necessarily

5    mean you would read less but it may mean that you'd have to

6    read less the night before, is, Apple did suggest that we

7    confer regarding specific motions to argue to Your Honor, and

8    each side picked two, for example, three, given how many

9    motions.

10        There's three dozen or so motions that have been presented

11   to Your Honor.  It seemed unfair.  And -- And that we weren't

12   going to be able to get to all of them in the level of detail

13   necessary, anyway, and, of course, we would defer to Your

14   Honor's inclinations if Your Honor had any questions.

15        And Samsung did not agree to that proposal.

16        So we -- we -- we have a variety of motions in our motion

17   to strike, obviously, that we want to address with Your Honor.

18        The first one, Your Honor, concerns Samsung's new

19   invalidity theories regarding the '414.  And, Your Honor, we

20   have the same concern, I believe, that Your Honor has.  You --

21   You have been presented with a mountain of paper, and we write

22   a brief saying they didn't do certain things, and they write a

23   brief saying, "That's false, we did all those things that --

24   that Apple said we didn't do," and then we write a reply brief

25   saying, "That's not true; they just didn't do those things."

1    And how are you, short of reading through that mountain of

2  paper, to make sense of that?  And, frankly, from our

3  perspective --

4         **THE COURT:**  I'm happy to read through the mountain of

5  paper.  I've done that now multiple times.

6    I have extremely capable counsel repeatedly telling me

7  completely opposite stories of what's happened here.

8         **UNIDENTIFIED SPEAKER:**  That's right, Your Honor.

9         **THE COURT:**  So, on the paper, or even with the

10  assistance of argument, I'm at a loss, frankly, as to how I am

11  to parse through all this, other than to make arbitrary calls

12  which serves no one's interest.

13         **UNIDENTIFIED SPEAKER:**  And I have a suggestion in that

14  regard, Your Honor.  And if we start with the first motion, I

15  think you'll understand our approach and why, frankly, we're

16  very comfortable putting our money where our mouth is, if you

17  will, and it's this, Your Honor:

18    We made a motion that Apple -- excuse me -- that Samsung

19  in its expert reports identified software synchronization

20  components that were not in its invalidity contentions.  That's

21  our motion.

22    It's a big deal, Your Honor, because the parties agree

23  that Claim 20 of the '414 patent requires at least three

24  software synchronization components that have to be identified

25  in the contentions -- nobody disagrees about that -- and that

```
 1    Samsung did not identify three synchronization software
 2    components in its contention.  And where it did identify
 3    components, it changed the synchronization software components
 4    in its expert reports.
 5         That's our claim.  It's simple.
 6             THE COURT:  So none of the synchronization components
 7    which were identified in the expert reports were in the
 8    contentions.
 9             UNIDENTIFIED SPEAKER:  There are three pieces of prior
10    art, and I have to be specific, Your Honor.
11         As to Windows Mobile, correct.
12         As to Evolution, there are -- we -- we are moving with
13    respect to the components as to the calendar, and the
14    components identified in the Expert Report are not in the
15    contentions, period.
16         By the way, we said that in our brief.  Samsung responded
17    with the following sentence:  "That is false."  And that -- I
18    read that brief.  It's why I'm arguing it to Your Honor.
19         They allege that something that we said in a brief to Your
20    Honor is false.  I'm going to demonstrate to you it is not
21    false.
22         And then as to iSync, the remaining piece of prior art,
23    that's a little different.  What that relates to is, they have
24    to disclose three data classes, the -- the actual data that is
25    being synchronized.  And in their Expert Report, they identify
```

```
 1  bookmarks in their contentions.  They do not identify bookmarks

 2  with respect to the relevant claim.  Indisputable, Your Honor.

 3      So I thought to myself, how can I demonstrate that with

 4  three dozen motions, an army of lawyers here, because they're

 5  going to stand up.

 6      And so what I prepared, if I may hand it up to Your

 7  Honor --

 8          THE COURT:  You may.

 9          UNIDENTIFIED SPEAKER:  -- is . . .

10          THE COURT:  Thank you, Mr. (inaudible).

11          UNIDENTIFIED SPEAKER:  What I prepared, Your Honor, is

12  simply Samsung's material.  I didn't include our briefs, any of

13  Apple's briefs.  We filed an opening brief and a reply brief.

14  Your Honor obviously has those.

15      But my point, Your Honor, is, you don't need to read our

16  briefs.  You don't need to read them.

17          THE COURT:  Then why do you file them?

18          UNIDENTIFIED SPEAKER:  Because -- Here's why, Your

19  Honor.

20          THE COURT:  If I don't have to read a brief, why do

21  you file it?

22          UNIDENTIFIED SPEAKER:  Your Honor, if -- if I may be a

23  bit more precise.

24      We filed a motion to strike in which we said that they are

25  identifying components in their expert reports that were not in
```

1  their contentions.  I needed to file a brief to say that.

2       They then filed an opposition brief, and we have included

3  that, Your Honor, as the first tab, the relevant pages from

4  their opposition brief.

5       What I am telling you, Your Honor, is, if you -- And this

6  is what we tried to explain in our reply brief.

7       If you simply read their opposition and you go to the

8  citations that they cite in their opposition brief in their

9  contentions -- and we have included every single page they cite

10  in their contentions -- you will not find the components that

11  they are alleging were in their contentions.  They're simply

12  not there.  If --

13           THE COURT:  So they have accused you of making a false

14  statement.  You are now accusing them of making a false

15  statement.

16           UNIDENTIFIED SPEAKER:  What I'm --

17           THE COURT:  Someone is lying to this Court.

18           UNIDENTIFIED SPEAKER:  I believe, Your Honor, that the

19  brief that they have filed --

20           THE COURT:  Is that correct or not?

21           UNIDENTIFIED SPEAKER:  I believe -- Yes, Your Honor,

22  insofar as the brief that they have filed is highly misleading,

23  Your Honor --

24           THE COURT:  All right.

25           UNIDENTIFIED SPEAKER:  -- yes.

1      **THE COURT:**  So at the very least, we can agree that

2  one outcome of this hearing is, someone will be sanctioned for

3  lying to this Court.  Can we at least agree on that one?  Are

4  you putting your money on that one?

5      **UNIDENTIFIED SPEAKER:**  Your Honor, with respect to

6  this motion, I am willing to put my money -- and Your Honor

7  will decide whatever relief is appropriate -- that the brief

8  that they filed in opposition is not -- does -- does not

9  accurately portray their contentions.  And --

10     **THE COURT:**  Are you saying that they're citing to

11 contentions and characterizing what is in those contentions in

12 a way that is false?

13     **UNIDENTIFIED SPEAKER:**  I'm saying it is highly

14 misleading, the characterization.  So each sentence, Your

15 Honor, is not necessarily false.

16     But if I can walk through very quickly, Your Honor, I can

17 show Your Honor what I'm talking about.  And we can pick any

18 of -- Let's -- We can pick any one or we can go through all

19 three.

20     If we -- If we turn to Evolution, for example, that's the

21 second one, because that one, I'll be able to walk through.

22     The first tab, Your Honor, under Evolution in pink is the

23 portion of Samsung's Expert Report that we are moving to

24 strike.

25     And if you look at the last paragraph, it says (reading):

1          "The exchange connector process, e-data-cal

2      object, and exchange calendar background -- back

3      end" -- excuse me -- "each comprise a synchronization

4      software component."

5      That's their allegation in their Expert Report, that those

6  three things are the synchronization software components, a

7  claim element, Your Honor.

8      The -- Two of those, e-data-cal and exchange calendar back

9  end, are not in their contentions.  Period.  The words do not

10 appear in their contentions.

11     I have every page that they cited in their contentions

12 immediately following that.  Your Honor, obviously, can look

13 through those, we -- and I'm -- I'm happy to direct you to the

14 portions that -- on which they rely.

15     Not only are those not in their contentions, but the

16 contentions identify different components for synchronizing the

17 calendar.

18     If I may direct your attention to the next tab, the

19 contentions, Your Honor, these are Samsung's contentions.

20     And if Your Honor turns to Page 105, for example -- And,

21 again, we -- we didn't choose the pages.  These are the pages

22 out of their brief, Your Honor.

23     At the very bottom (reading):

24          "Evolution further discloses the Live Cal

25      synchronization software component is configured to

1        synchronize local calendar data."

2        That was the component they identified, Live Cal.

3        If Your Honor flips to the next page, "Evolution" -- at

4   the top (reading):

5              "Evolution discloses that calendar data can be

6         synchronized with a Palm OS device by the calendar

7         conduit synchronization software component."

8        They identified two synchronization components,

9   synchronization software components, explicitly with respect to

10  calendar.  Nothing else, Your Honor.  Period.

11       That's what we represented to Your Honor in our opening

12  brief.  That's what I'm representing to you now.  That's what

13  we identify -- what we explained in our reply brief.

14       If you -- If you look at the first tab, Your Honor, the

15  Expert Report that we are moving to strike, you will not find

16  in the contentions those components.  They have changed the

17  components.

18       I don't want to move on before Your Honor is -- is ready,

19  but I'm happy to answer any questions.

20       The -- The contentions in this regard -- and that's why

21  you have to take each piece of the prior art separately -- with

22  respect to Evolution, with respect to the calendar, they

23  identified two synchronization software components.

24       We are not contending they did not identify components.

25  They did.  They're right here.  Calendar conduit and Live Cal.

1       In their Expert Report, Your Honor, the portion to which I

2  directed Your Honor a moment ago, they identified different

3  components.  That's -- That's black and white from their own

4  material.

5       **THE COURT:**  So when you pointed this out in this

6  robust meet-and-confer that we were talking about earlier, what

7  was Samsung's response?

8       **UNIDENTIFIED SPEAKER:**  Well, Your Honor, I don't -- I

9  don't know.  I'd have to confer with my colleagues on the exact

10 response.  I can say --

11      **THE COURT:**  What I'm curious about in particular is,

12 these lengthy, articulate, well-crafted arguments that are

13 presented to the Court in thousands of pages of briefs.  Are

14 these being discussed in the meet and confer?

15      **UNIDENTIFIED SPEAKER:**  They are, Your Honor.  Again,

16 as a general matter, I know they are.

17      And my -- my response with respect to this is that Samsung

18 would say what they say in their brief.  They would point to

19 functionality.  "Oh, we disclosed synchronizing the calendar."

20      When you read their brief, Your Honor, in light of what I

21 am showing you, the -- the -- the extent to which it is highly

22 misleading becomes clear, but this is important to Samsung.  So

23 Samsung takes a flier, if you will.

24      They have Interrogatory Responses.  We attached those,

25 Your Honor.  That's the next tab.  This also is what they point

1  to and rely upon.

2      And if you look at what that is, Your Honor -- this is

3  what they are relying on, this isn't even their contentions,

4  this portion -- is a mass of source code.

5      Obviously, that doesn't satisfy the local rules of

6  identifying with specificity the components on which Samsung

7  relies for its invalidity contentions.  That's what they point

8  to.

9      If Your Honor -- If we -- If we turn to Windows Mobile,

10  the first one -- And, again, we did it the same way, Your

11  Honor.  If we start with the first tab, the pink, at the -- at

12  the bottom of Page 194, you will see the four synchronization

13  software components on which Samsung now relies.

14      I'm sorry, Your Honor.  This is the -- In the windows --

15  You're obviously free to look at whatever you want.  I just

16  want to make sure I'm not --

17          **THE COURT:**  I have it.

18          **UNIDENTIFIED SPEAKER:**  Oh, okay.  They identify

19  specific components.

20      I will represent to Your Honor, as we did in our brief,

21  that they do not identify those components in their

22  contentions.  Period.  It's not that they identify them in a

23  different place, or they don't provide the specificity, or they

24  don't explain it well, or we're saying they provided more

25  information.  Those components are absent.  They don't exist.

1  It's a claim element.

2      In their contentions, Your Honor, if we turn to their

3  contentions, and you look at Page 29 and 30, they identify a

4  single synchronization software component.  It's the sync

5  client.

6      You don't have to take my word for it.  Look at what they

7  say, what Samsung says, at the bottom of 29 (reading):

8          "The sync client is configured to synchronize

9      the user's local context data."

10     And at the bottom of 30 (reading):

11         "The sync client provides a synchronization

12     (inaudible) that executes in the background."

13     Those are the claim elements.  You have to provide a

14  thread, and you have to synchronize the data.  That is the only

15  synchronization software component identified.

16     And this is important, Your Honor, because if you look at

17  their brief, they attach this chart.  They reproduced this

18  chart, as Your Honor may recall.

19     But what they leave out is the portion under it in which

20  their contentions explain the chart and identify the sync

21  client as the synchronization software component.

22     So what do they do here again?  They point, at the end of

23  the day, because there is no disclosure -- that again is

24  inarguable -- to a mass of source code where those components

25  can be found.

1        That is -- That is plainly insufficient, Your Honor, to

2   satisfy the local rules.  Here --

3           **THE COURT:**  Would -- Would you agree that the source

4   code for each of these components -- Whether we're talking

5   about Evolution or Windows Mobile, the source code that's been

6   cited in the interrogatory response does include source code

7   for the components which are addressed in the expert reports?

8           **UNIDENTIFIED SPEAKER:**  Yes.  In the mass of source

9   code that is cited, Your Honor.

10          **THE COURT:**  Okay.  So we're not really talking about a

11  failure to disclose.  We're talking about the specificity or

12  quality of the disclosure.

13          **UNIDENTIFIED SPEAKER:**  No.  I disagree entirely, Your

14  Honor.

15          **THE COURT:**  Tell me why.

16          **UNIDENTIFIED SPEAKER:**  Here's why:  The contentions in

17  the local rule must set out the contentions.  It's not

18  enough -- For example, Your Honor, it wouldn't be enough if

19  they just produced source code and on a claim chart said, "See

20  source code, see source code, see source code."

21       And here they did something different.  They actually

22  pointed to something else.  They pointed to components.  They

23  identified the component.

24       Then they point to all of the source code regarding

25  Windows Mobile, all of it, in -- in which -- in which can be

1  found the components to which they are now pointing.

2      That actually supports us, Your Honor.  They had the

3  source code at all times.  They were aware of the source code.

4  Presumably, they analyzed the source code, and they made

5  judgments to identify the different component.

6      And the reason it matters, Your Honor, is, the component

7  that they pointed to for Windows Mobile, for example, the sync

8  client, it doesn't work, it -- as a -- as an anticipatory

9  theory.

10      Because, as I told you --

11          **THE COURT:**  You're saying -- It's not a functional

12  point you're making; it's that it doesn't meet the requirements

13  of the limitations.

14          **UNIDENTIFIED SPEAKER:**  Yes, Your Honor.  I didn't

15  express that artfully.

16      There was -- Claim 11 was at issue in this case, which is

17  an independent claim which did not have the requirement of

18  multiple synchronization software components.  That's in

19  dependent Claim 20, the only asserted claim in the '414

20  (inaudible).

21      So the sync client may have worked -- again, I'm not

22  talking function -- as an anticipatory theory for Claim 11 and

23  presumably they just missed that.  I don't know.  It's not --

24  not my job nor, frankly, yours for us to speculate as to why.

25      The point is, the invalidity contentions were sufficient

1   in identifying the synchronization software component on which

2   they were relying for the Windows Mobile.  It's the sync

3   client.  They now have identified four others, different.

4        With respect to Evolution, as I pointed out, they are

5   specific.  They identify it with specificity.  We do not

6   complain about the specificity of the contentions.  They do

7   identify Live Cal and say it is a synchronization software

8   component for synchronizing calendar.

9        Then you look at their Expert Report.  Live Cal's gone.

10  Cal conduit's gone.  And they're relying on a new component --

11  excuse me -- three new components that were never identified as

12  the software synchronization component.

13            **THE COURT:**  You raise a similar problem with respect

14  to iSync, right.

15            **UNIDENTIFIED SPEAKER:**  I do.  If I could take maybe

16  just two minutes on iSync, Your Honor, and explain that it is

17  slightly different.

18       So, we have been talking about components, the

19  identification of components.  You also need data, specific

20  data, calendar, contacts, that get synchronized.

21       ISync, they did not identify bookmarks as a data class

22  that is synchronized for Claim 20.

23            **THE COURT:**  Were other data classes identified?

24            **UNIDENTIFIED SPEAKER:**  Yes, they were, Your Honor.

25       In their Expert Report, bookmark shows up.

 1        And iSync is a perfect example, if maybe just for
 2   completeness, Your Honor.
 3        If -- If we can turn to iSync -- and this is again -- we
 4   put this as Chase report iSync.  And, again, I think it -- I
 5   hope it's clear, but that's -- that's Samsung's Expert Report.
 6   Again, I only wanted to provide to you Samsung materials.  And
 7   if you look in the pink, bookmarks is identified at the second
 8   line there as -- as data that gets synchronized.
 9        If you then look at their contentions, because they say to
10   you, Your Honor, in the brief -- This is a perfect example of
11   when you asked me, do they lie?  And I was, you noticed,
12   uncomfortable saying yes.
13        Because what they say in their brief is, "We identified
14   bookmarks.  Apple's crazy, Judge."  You read their brief,
15   you -- one would be forgiven for thinking we are crazy.
16        They identify books marks.  They point to you in their
17   contentions where they identify bookmarks.  How could I
18   possibly make the argument I'm making?
19        Because what they don't tell you, Your Honor, is that they
20   identified bookmarks from Claim 7, which has entirely different
21   claim elements, not Claim 20.  They never identified it for
22   Claim 20.
23        So when we point that out in our opening brief, they write
24   an opposition brief in which they say, "Apple's nuts.  We
25   identified bookmarks."

1          **THE COURT:**  Maybe I don't understand Claim 7 as well

2    as I should.

3       But Claim 7 requires data classes; right?

4          **UNIDENTIFIED SPEAKER:**  It does, Your Honor, but it

5    has --

6          **THE COURT:**  Isn't that the reason why bookmarks were

7    identified with respect to Claim 7?

8          **UNIDENTIFIED SPEAKER:**  No, Your Honor.  It -- Well,

9    yes and no, Your Honor.

10      Claim 7 has a different element.  It has -- First of all,

11   with respect, we would contend it doesn't matter.  They didn't

12   identify it with respect to Claim 20; they could have.  That

13   (inaudible), in effect, ends the inquiry.

14      But to go -- to go further and respond to Your Honor's

15   question:

16      Claim 7 has peer-to-peer requirement where -- where the

17   two devices being -- Claim 20, for example, could be your

18   iPhone synchronizing with your computer.

19      Claim 7 has peer-to-peer synchronization, which requires

20   the two devices to be much more similar.

21      The disclosure that they cite -- if we can turn to it,

22   Your Honor, in the contentions at Page 103 -- is very clear --

23   excuse me -- very clearly about a peer-to-peer because it's

24   talking about two Mac users, and the two Macs would -- would

25   constitute a peer-to-peer system.

```
 1        So Claim 7, it makes perfect sense for them to have
 2   included bookmarks.  It makes perfect sense.  And if that's --
 3        By the way, Your Honor, if you look at Page 103, this
 4   quote, "If you're a Mac member, .macsync allows you to sync
 5   your computer with your Mac account across all your Macs."
 6        That's the point I was making that it's about Macs.
 7        That is the only reference in the hundred -- over a
 8   hundred pages to bookmarks, in a quote regarding Claim 7 about
 9   multiple Macs communicating with each other.
10        It's highly -- It's highly relevant for Claim 7, again,
11   because it's about peer-to-peer.  I think it made sense for
12   them not to include it with respect to 20 for that reason.  And
13   they didn't include it with respect to 20.
14        And it is -- Again, Your Honor, an example.  I don't want
15   to make the focus about the extent to which the briefs are
16   misleading, but it's an example how, when we read opposition
17   briefs, it's maddening from our perspective because they say to
18   you, "We did disclose bookmarks," and they then cite to a place
19   where they disclose bookmarks, and then they quote a portion
20   where they disclose bookmarks.
21        And Your Honor, we worry, would read that and think,
22   "Well, sounds like they disclose bookmarks."  It's highly
23   misleading.
24        Our point is, with respect to iSync, is that as to
25   Claim 20, it is inarguable that they did not disclose
```

1   bookmarks.

2      They also, by the way, did not disclose Safari conduit

3   component.  They say that they didn't do that because we didn't

4   produce the source code.

5      We have a disagreement about that, Your Honor, not as to

6   whether we produced the source code, but whether it was

7   necessary.  Their Expert Report doesn't even cite the source

8   code, so it obviously wasn't necessary.

9      But the reason I don't focus on that, Your Honor, is, I'm

10  doing my best to avoid getting in the weeds and having a fight

11  where they can say, "Well, we did need this or we didn't need

12  this."  I'm focusing entirely on their contentions and their

13  Expert Report, and the delta between them, and the fact that

14  there is no justification for that.

15     The contentions brief -- There were other areas of the

16  contention -- we're going to get to them on some other

17  motions -- where we debated -- and I'll be happy to give Your

18  Honor an example -- about whether to move to strike, and we

19  decided not to.  And as we've thought about it, that may have

20  been the right call; it may not have.  In light of Your Honor's

21  comments this morning, maybe it was the right call.

22     We did not look for every single delta, do a red line, and

23  move to strike.

24     There is a claim element.  You need three synchronization

25  software components.  For Windows Mobile, they identified the

1  sync client; in their Expert Report, they abandoned it and

2  identified four others.

3      For Evolution, they identified two per calendar that I

4  pointed out to Your Honor.  This is their contention Live Cal

5  and the Cal conduit.  In their Expert Report, they identify

6  three others and, for iSync, they rely on bookmark, not in

7  their contentions brief.

8              **THE COURT:**  I think I get it.

9              **UNIDENTIFIED SPEAKER:**  Okay.  Thank you, Your Honor.

10             **THE COURT:**  Mr. Pak.

11                     (Pause in proceedings.)

12         **MR. PAK:**  Morning, Your Honor.

13             **THE COURT:**  Good morning, Mr. Pak.

14         **MR. PAK:**  I know we have a helpful binder from

15  counsel.  I also have a binder for your reference.

16             **THE COURT:**  Sure.

17                     (Pause in proceedings.)

18         **MR. PAK:**  Your Honor, if I may, with some introductory

19  comments, I think I can really cut to the chase here of what's

20  really in dispute and what's not in dispute.

21      And there are two fundamental points that I'd like to make

22  to you first.

23      First is, as Your Honor well knows in the cases that you

24  have dealt with, both in the Genentech case as well as in the

25  Oracle case, there's a fundamental difference between changes

1   in theory versus changes in citation of evidence.

2       It's very clear from the guidance that we've seen from

3   you, as well as other courts in this district, that when you

4   cite source code file names for functionality that's already

5   been disclosed, in support of the same theory, that is not

6   required in terms of changing the contentions for invalidity.

7       That may be, as Apple has requested in a separate rog --

8   that's at rog 28 -- you see, Your Honor, where they're asking

9   for supplementation of evidence to support our defenses.

10      So we've done that, which is we've identified by source

11  code each of the file names that we ultimately rely on in rog

12  responses.

13      But as Your Honor well knows, that doesn't mean, as -- as

14  I think Judge White put it, it doesn't mean just because you've

15  identified the hammer and later identify that the hammer is

16  found in the toolbox, that somehow there's a failure of

17  disclosure of contentions.

18      And what I want to demonstrate to you today, Your Honor,

19  is the following point with respect to the three pieces of

20  prior art, and I want to focus first on Evolution and Windows

21  Mobile.

22      And there's a -- I think, a fundamental disconnect between

23  our side and their side on what software is.

24      As Your Honor well knows, a piece of software -- for

25  example, the sync client for Windows Mobile, or exchange

components or module in the Evolution software -- consists of

multiple components.

   We've established that through expert depositions.

Everybody understands that as a basic point.

   And when I talk about the sync client, it may have dozens

of components that actually perform different functionality.

   So the issue here is not -- and we've never said in the

contentions -- that the active sync client is a single

component design.  It is not.  In fact, we cite a specific

evidence with directory citations.  We didn't cite the entire

source code tree.  We cited specific source code trees that, if

you look, you'll see it consists of about a dozen component

names.  And in each of the component files that you will see,

it has very descriptive names.  For example, it will say,

"Here's a provider for calendar.  There's a provider for

e-mail.  There's a provider for contacts."

   And let me begin by taking you back to the materials that

counsel cited back to you, and it helps you -- We've also

highlighted this in our materials but we can just start with

their tab.

   And let's begin with the Windows Mobile interrogatory

response, or actually the invalidity contentions tab.

                    (Pause in proceedings.)

      **MR. PAK:**  And if Your Honor could first turn to

Page 28.

1              (Pause in proceedings.)

2         **MR. PAK:**  So I think it's important to understand the

3    structure of the claim.

4         We have an independent claim, Claim -- Independent

5    Claim one recites one synchronization component, and that

6    synchronization component is configured to synchronize data as

7    well as providing a thread.

8         So what we did here is, if you look at the bottom of

9    Page 28, we specifically identified exchange active sinc,

10   exchange active sinc, and this is the citation from our

11   contentions (reading):

12             "The following figure shows the functional

13        components of the client and server communications

14        model that is used in the sync protocol."

15        And if you look to the next page, Your Honor, we've taken

16   a page out of the Microsoft documentation.  And you can see

17   that there is a sync client, client component or module on the

18   left-hand side, and then there's the exchange front-end server

19   module on the right-hand side.

20        And as with most pieces of software, each of these client

21   and server applications consists of multiple components.

22        And we see here in the figure that there are components

23   for e-mail, components for contact, components for calendar, as

24   well as what's called a PIM.  That's the interface that allows

25   a sync client, which is the piece that actually manages the

1   back-end components, to provide the service.

2       Then -- Now moving to the specific contentions in

3   Claim 10, which is 111, Page 111.

4       And with respect to Claim 10, what -- all Claim 10 does

5   is, it says in addition to the one software component for one

6   type of data, you now need to have other synchronization

7   components that are configured to synchronize structure data of

8   other corresponding data classes.

9       That is all that is required by Claim 10.

10      So we start with one synchronization component for

11  handling one type of data, and all we need to show for Claim 10

12  is that there are at least two other components that deal with

13  two different types of data classes.

14          THE COURT:  Mr. Pak, would you agree that, under our

15  local rule, you have to tell Apple what those two components

16  are and --

17          MR. PAK:  Absolutely.  And we did that, Your Honor,

18  which is -- As you can see here, we've told them under -- on

19  Page 111, one for contacts, one for calendar and one for e-mail

20  folder.  And that's exactly the three component functionalities

21  that we have ultimately identified in the expert reports.

22      The synchronization component -- There are three

23  synchronization components that make up the sync client.  They

24  handle three different types of data:  Calendar, contacts and

25  e-mail.

1      And, really, the dispute here is, Apple says, "You didn't

2   identify the specific source code file names for those

3   components."  But as you can see on the next page, on Page 112,

4   Your Honor, we did provide them with specific citations not to

5   the entire source code tree in Microsoft Windows but, in the

6   second paragraph, you see the "See Windows Mobile source code

7   at," and we provide various locations.  The Private Apps Sync

8   folder contains the subcomponents that make up the sync

9   application.

10      So we identified the specific location where the

11   components are located for the sync client functionality that

12   we've identified, which is calendar, e-mail and contacts.

13          THE COURT:  As I read this disclosure, Mr. Pak, I

14   would understand this to say that each of these components is

15   being claimed as satisfying the limitations of Claim 10.  Is

16   that --

17          RIGHT1:  Right.

18          THE COURT:  -- what you're saying?

19          RIGHT1:  Yes, absolutely, Your Honor.  Exactly what

20   we're saying, Your Honor.  And --

21          THE COURT:  And so to the extent that, in your Expert

22   Report, you identify specific code files, you're saying those

23   code files are located within this --

24          MR. PAK:  Ab --

25          THE COURT:  -- Paragraph 2?

1          **MR. PAK:**  Absolutely.

2      And, then, to make the point even clearer, because

3  we've -- There is -- If you remember, this is the whole dispute

4  we had with Microsoft about the discovery process.  There was

5  scheduling of depositions.  This is highly confidential

6  information of Microsoft.  Both parties had the opportunity to

7  depose witnesses on exactly this functionality.

8      Their -- Their attorneys deposed these witnesses on

9  exactly these components.  Then --

10          **THE COURT:**  And are you saying, Mr. Pak --

11          **MR. PAK:**  Yes.

12          **THE COURT:**  -- then, that each one of these components

13  listed in Paragraph 2 meets the ele -- meets the requirements

14  of Claim 10?

15          **MR. PAK:**  So --

16          **THE COURT:**  Is that what you're saying?  That every

17  one of those is a data class or a sync component which --

18          **MR. PAK:**  There are really three data classes:

19  Contacts, calendar and e-mail folder.  Those are the three

20  types of data that correspond to the language of Claim 10.

21      Your Honor, this is a very complicated piece of software.

22  And in terms of streamlining our case, at the very beginning,

23  we identified numerous inf -- anticipating functionality within

24  each piece of the software.

25      So in addition to these three, there are other types of

1 data classes that are being handled by the software.

2        As we get closer --

3            **THE COURT:**  And are those other types of data classes

4 being handled by the software disclosed here?

5            **MR. PAK:**  Well, there's some here.  For example,

6 there's DBASE.CPP, SyncApps.CPP.  Some of these things we have

7 ultimately decided that we don't want to pursue for trial

8 purposes.  But in terms of disclosure, we provided alternative

9 basis for anticipation.

10       But what's clear is, if you read Page 111, as Your Honor

11 just understood from reading it, that there are three specific

12 data class types:  Calendar, contacts and e-mail.  And those

13 are the same three components that we ultimately identified by

14 name in the rog responses that are provided, and that's the

15 information Mr. Krevitt provided to you.

16       If you look on Page 52 in the next tab . . . you see, Your

17 Honor, at the end on Page 52, we have this file -- specific

18 file names under that same sync -- active sinc folder that we

19 were just looking at with the apps where we identify, for

20 example, "in box" -- "in box provider," that's CPP.  That's the

21 component that handles the e-mail.  We provided the

22 SyncControl.CPP.

23       And then on the next page, Your Honor, you see

24 CalendarProvider.H, ContactProvider.H.

25           **THE COURT:**  So how am I, in looking at this response,

1    to understand that the particular components or files you've

2    just cited are the ones that you're claiming practice these

3    limitations as opposed to all of these other files that you've

4    listed as well.

5            MR. PAK:  Your Honor, what we're saying is, this is

6    difference.  This is not about contentions.  This is in

7    response to our ability or responsibility to respond to their

8    interrogatory on asking us, "What is the evidence that you're

9    relying on?"

10       The local rules and the Federal Circuit law is very clear

11   on this.  Infringement or invalidity contentions are not

12   coextensive with expert reports.  Our job is not to spell out

13   every piece of source code file name or to provide every piece

14   of evidence even to support --

15           THE COURT:  Maybe, Mr. Pak, you can help me --

16           MR. PAK:  Sure.

17           THE COURT:  -- help you.

18           MR. PAK:  Yes, absolutely.

19           THE COURT:  Which is -- which is as follows:

20       I have struggled, apparently in -- with no success

21   whatsoever, in trying to articulate my ideas for how to

22   streamline cases involving software, to -- to explain the

23   differences between theory and evidence.

24           MR. PAK:  Yes.

25           THE COURT:  I've apparently failed completely.  And,

1  so, what is the line between theory and evidence in this

2  context?

3            **MR. PAK:**  Absolutely, Your Honor.

4      I think the difference is, for example -- There are some

5  examples that you will hear about later from both sides where

6  there are changes in theory.

7      For example, one of the things that you will see in

8  Claim 10 is that the language only requires -- the plain

9  language only requires that you have two other software

10  components that are configured to provide synchronization for

11  two other data classes.

12      Apple's contention is that there are further limitations

13  that are necessary for this claim.  For example, they argue

14  that it has to be a pluggable architecture, even though the

15  word "pluggable" does not appear.

16      They also argue that each of these other two components

17  has to provide its own thread, even though, as you can see, the

18  language does not appear here.  Claim one has language for one

19  component.

20      We think those are changes in theory, that when you start

21  to add limitations to a claim, or you start to redefine

22  language of a claim, those are changes in theory.  And those

23  are prejudicial because that means that we didn't have the

24  opportunity to consider other pieces of prior art; we didn't

25  have the opportunity to pursue claim construction arguments.

```
 1        But what it comes down to, this issue, which is, "We've
 2   told you what the functionality is.  There are three data
 3   classes:  Calendar, e-mail, contacts.  We've given you the
 4   directory path where those files are located.  We've given you
 5   the application name:  The sync client."
 6        This is the same product.  That's another change in
 7   theory.
 8        On the defense side, if we had come before Your Honor and
 9   said, "In addition to active sinc functionality, Your Honor,
10   we're now going to accuse or identify another piece of prior
11   art from the Windows Mobile family that was never previously
12   disclosed before," that's a change in theory.
13        I think if you identified new products or wholly new
14   functionality within a suite of products, then those, I think,
15   are highly prejudicial changes.
16        THE COURT:  I -- I -- I hear what you're saying, but
17   the challenge -- right? -- is that in this context, describing
18   or defining functionality without specifying particular
19   routines or -- or directories or subdirectories effectively is
20   meaningless; right?
21        I mean, what -- how else can one describe the
22   functionality of a -- of a -- of a particular component of code
23   other than to identify the routine that's executing that code?
24        MR. PAK:  Well, this issue is exactly what was decided
25   in the Oracle case, Your Honor.
```

1    If you remember, in the Oracle decision -- This is Oracle

2  vs. Google.  This is the same decision that you cited in the

3  Genentech case.

4    This is the very issue where we had a file, DVMTEXT.H,

5  which was not cited in any of the invalidity contentions.

6  There was no dispute about that:  That the name of that file

7  and the file itself was not identified.  What was identified

8  was the functionality that was associated with that file.

9    And what the Court found was, later on, the Expert Report

10 could, in fact, identify the specific source code file name

11 that corresponds to functionality.  Because it's really about

12 notice to the other side with respect to the invalidity

13 contentions.

14    They were on notice, on sufficient notice to be able to

15 conduct depositions.  They were on sufficient notice to be able

16 to find the source code files.

17    Their expert reports -- Your Honor, their expert was able

18 to opine on all of these components.  He was deposed.  He never

19 raised the issue that he couldn't understand what our

20 contentions were.  He knew exactly what our contentions were.

21    So, you know, for us, it really comes down to the issue

22 of:  There may be closer calls in terms of other types of

23 cases.

24    But in this case, it's really a question of, were we

25 required to identify by name the specific source code file that

```
 1  ultimately corresponds to a particular functionality that we
 2  identified as (unintelligible)?
 3          THE COURT:  Mr. Pak, if I were to opine --
 4          MR. PAK:  Yes.
 5          THE COURT:  -- through the . . . infringement
 6  contentions from Apple on these same claims, would I find
 7  specific code files?
 8          MR. PAK:  There are many source code files.  I will
 9  tell you, Your Honor, that I -- And we can bring Dr. Snoeren's
10  report.
11      There are extensive source code citations that were never
12  provided in the infringement contentions.  There are snapshots
13  of devices that are accused that were never provided in the
14  infringement contentions.
15      We didn't move on those.  We understand that every expert
16  has the right to provide further explanation.  And I think it
17  really does -- We'd set a really bad precedent for this Court
18  to require every single piece of evidence by source code name
19  or snapshot of devices to be included in contentions that are
20  well due before discovery happens.
21      And then what would happen is, if Your Honor said, "Well,
22  you should move to supplement," what that means is that every
23  time there's a deposition that takes place, every time one of
24  our experts goes into a source code review room, identifies one
25  more piece of routine or one more piece of source code file
```

name, you will be flooded with motions to supplement.  Because

the rule would be, if you had a chance to find this one routine

or you took a snapshot of a phone that you're going to rely

upon for your Expert Report and you don't move immediately,

there's good cause to strike it in your Expert Report.

That is not the type of rule that is mandated by either

Federal Circuit law or local rules.  Absolutely not.

There's legal precedent.  These cases, Your Honor, we

cited in our opposition.  They never discussed it in the reply

briefs because these cases are directly on point.

**THE COURT:**  Mr. Pak, one --

**MR. PAK:**  Yes.

**THE COURT:**  -- further final question before I ask --

**MR. PAK:**  Absolutely.

**THE COURT:**  -- for rebuttal.

Would you agree -- Well, let me ask it this way:

You suggested in your opposition that Apple's arguments in

its opening brief were, quote, false.

Do you stand by that statement?

**MR. PAK:**  Your Honor, I think it was a poor choice of

wording.  I would never accuse the other side of lying

whatsoever.  This is not an issue of honesty or ethics.

It's really about -- As I said, I think there are two

ships going in the middle of the night, where the fundamental

misunderstanding is two-fold.

1    One is a legal understanding of whether it's evidence or a

2 change in theory, and I think we could have an honest dispute

3 about that.

4    But the other is really about software.  And when we talk

5 about software and we say, "This is an active sinc."  Or the

6 same thing is true, by the way, Your Honor, with Evolution.

7    We exclude specifically the exchange component, including

8 calendar.  And what they're saying is that these three file

9 names that correspond to exactly that functionality was not

10 identified.

11    But our point is very simple, which is, we told you the

12 application, which is Evolution, Exchange, and Exchange is a

13 Microsoft Exchange.  That's one of the components that you can

14 (inaudible) Evolution to deal with Microsoft Exchange.

15    For Windows Mobile, we told you what it is:  The active

16 sinc application.

17    And so this -- When -- When we made that unfortunate

18 statement, it wasn't in any way intended to criticize the

19 lawyers from the other side.  It's just simply to point out

20 that, from our perspective, we were identifying the

21 applications.

22    The specific components which make up those applications

23 are found in the source code directories, and I think that's

24 really where the dispute is, Your Honor.

25         THE COURT:  Thank you, Mr. Pak.

1          **MR. PAK:**  Thank you.

2          **THE COURT:**  Brief rebuttal?

3          **UNIDENTIFIED SPEAKER:**  Yes, Your Honor.  Thank you.

4      It's a perfect example, that argument, of what I've been

5  talking about.

6          First of all, let me address one question that you asked.

7  We identified both the components and the source code files for

8  each accused synchronization software component in our

9  infringement contentions.  Of course, we did.  We had to.

10         The component is a claim element.  What Mr. Pak talked

11  about is functionality.  He kept trying to drive you to source

12  code files.  "All the functionality was disclosed.  Maybe we

13  have a quibble about whether they identified source code file

14  names."  That's not true, Your Honor.

15         Our complaint --

16         **THE COURT:**  That's false.

17         **UNIDENTIFIED SPEAKER:**  It's not correct, Your Honor.

18         **THE COURT:**  Is it false?

19         **UNIDENTIFIED SPEAKER:**  It is false, Your Honor,

20  because our complaint is that the contentions identified

21  components.  The Expert Report identifies different components.

22         But with respect to Windows Mobile, it identified the sync

23  client.  That was a component that synchronized those different

24  data classes.

25         This is important, Your Honor.  Mr. Pak said that the

1  contacts and the calendar, those are data classes, types of

2  data.

3       That's correct.  That's right.  The data has to be

4  synchronized, and the question is, by what?  That's what the

5  claim requires.

6       In their contentions, they said "By what?"  I'm not

7  talking about whether they gave file names correctly.  They had

8  to identify the components, and they did.

9       With respect to Windows Mobile, it was a sync client.  We

10  don't have a quibble about file names.  It was super clear.

11  It's the sync client.  We know just where that is and how to

12  find it, and we were able to do that.

13       With respect to Evolution, it was Live Cal, explicitly.

14  Their words.  Live Cal is -- is the synchronization software

15  component.  In their Expert Report, they abandon it.  They have

16  different synchronization software components.

17       The case on which Samsung relies is a case in which

18  identifying functionality is sufficient.  And so, of course, if

19  the expert provides evidence --

20            **THE COURT:**  Sufficient because of the nature of the

21  claim at issue?

22            **UNIDENTIFIED SPEAKER:**  Correct, Your Honor.  These

23  claims -- And there is no dispute.  The parties have agreed on

24  this.  This is one of the few issues in the briefing on which

25  the parties are foursquare in agreement.

1      The claim requires the identification of at least three

2  synchronization software components, not just the functionality

3  of synchronizing three different data classes.

4      That's what they are telling you was sufficient now.   In

5  their contentions, they identified the components explicitly,

6  with specificity.   They have changed those.   That's why I

7  wanted to hand up this binder, Your Honor, of just their

8  material.   And when you compare the pink, what's in their

9  Expert Report, with the contentions, it's not there.

10      Mr. Pak said our expert was able to address the

11  contentions that they have now in their Expert Report.

12      Well, of course he was.   We had their Expert Report.   We

13  understood their new contentions.   We weren't going to play

14  chicken and not address them and hope for the right result

15  eventually.   Of course, we addressed them.

16      Once they identified the components they are now relying

17  on, we know the components they are now relying on and can

18  address them.

19          **THE COURT:**   So what's the prejudice here?

20          **UNIDENTIFIED SPEAKER:**   There is substantial prejudice,

21  Your Honor.

22      We took discovery from the third parties responsible for

23  these prior art systems.   We asked questions directed to the

24  components that were identified.

25      There were -- and they point this out -- some testimony at

1  those depositions about these other components which we used --

2  and didn't follow up in certain respects -- as evidence

3  ultimately to prove that the infrin -- invalidity theories in

4  their contentions do not work.

5       It doesn't follow, Your Honor, that they have a contention

6  on X, we take discovery and discover that they're wrong because

7  it's really Y, and they say, "Well, it's all right.  Then it's

8  Y.  You knew that."

9       It doesn't work that way.  We would have asked different

10  questions.  We would have potentially sought different

11  discovery.

12      And that's -- By the way, Your Honor, if they were coming

13  in and saying that to Your Honor, that would be a different

14  issue.

15      This goes back to the comments I made at the outset.  If

16  they were saying, "We got it wrong.  That happens.  It's

17  complicated.  We took some discovery and we realized we were

18  relying on this component and we should have been relying on

19  that component."

20      That would be different.  I don't know what our position

21  would be.  We may be saying that's too late candidly.  I don't

22  know.  But that would be honest, that would be forthright.  And

23  that's not what you're hearing, Your Honor.  And --

24          **THE COURT:**  So they're false, they're dishonest, and

25  they're not forthright.

```
 1              UNIDENTIFIED SPEAKER:  The position --

 2              THE COURT:  These characterizations, as you might have

 3   picked up, bother me.

 4              UNIDENTIFIED SPEAKER:  Well, Your Honor --

 5              THE COURT:  They seem particular pronounced in this

 6   suit and particular with the (inaudible).

 7         I think it's important to appreciate:  If you're going to

 8   make that call and call them out and accuse them of that, you

 9   should do so consciously.

10         Is that what you're saying?

11              UNIDENTIFIED SPEAKER:  Your Honor --

12              THE COURT:  They were false.  They were disingenuous.

13   They were --

14              UNIDENTIFIED SPEAKER:  Your Honor --

15              THE COURT:  Pick your adjective.

16              UNIDENTIFIED SPEAKER:  I -- I apologize.

17         What I was simply saying there is that I believe that it

18   would have been more consistent with reality if they had come

19   and said, "We made a mistake."

20              THE COURT:  Now they're detached from reality.

21              UNIDENTIFIED SPEAKER:  Your Honor --

22              THE COURT:  I mean, seriously, this has -- this has

23   collateral effect.

24         We're now 52 minutes into a lot of other people's billable

25   time out there --
```

1          **UNIDENTIFIED SPEAKER:**  I understand.

2          **THE COURT:**  -- and we're -- and we're still -- we're

3    still down in the mud on these invectives.

4          It's hard enough to figure out which data class is being

5    synchronized by what component under what dependent claim

6    without having to work through these accusations, unless you're

7    willing to stand by them.

8          If you're willing to say this and stand by it and live

9    with the consequences, I'll hear it but, otherwise, let's not

10   waste time.

11         **UNIDENTIFIED SPEAKER:**  Okay, Your Honor.  And I

12   apologize.

13         I just want to make this point:  The claim requires the

14   identification of components.  They identified components.

15   They have different components.

16         Mr. Pak told you that the components for Windows Mobile on

17   which they are now relying are subcomponents of the sync

18   client.  That's what Mr. Pak said.  That is not in their

19   contentions.  They identified the sync client.

20         If the sync client is the software synchronization

21   component on which they're relying, we believe they cannot

22   establish invalidity.  That's why they have switched, in our

23   view, to four different software synchronization components.

24   Identifying functionality and the fact that the data classes

25   are synchronized is insufficient.

1          **THE COURT:**  And you would have done what differently

2   in that deposition?

3               **UNIDENTIFIED SPEAKER:**  We would --

4          **THE COURT:**  What specific question would the Microsoft

5   witness, for example, have been asked that wasn't --

6               **UNIDENTIFIED SPEAKER:**  We would have asked --

7          **THE COURT:**  -- because of this misdirection?

8               **UNIDENTIFIED SPEAKER:**  Your Honor, we would have asked

9   questions about those components.  We would have tried to

10  investigate the extent to which the components meet other claim

11  elements.  For example, the extent to which they provide -- and

12  you're going to hear argument on these issues today -- the

13  extent to which they provide the software synchronization

14  thread, for example, on -- There would have been numerous

15  things.

16     We do not believe that they do provide the synchronization

17  thread.  That is an important issue.  That's the subject of a

18  summary judgment motion, in fact.

19     We believe -- This is more in the weeds.  I apologize.

20     We believe that the sync client -- which is one component

21  and, therefore, insufficient -- may provide a thread.  We

22  believe that the four new components that they identified --

23  which may be sufficient numerically as being more than three of

24  course -- do not provide a thread.

25     That's why this is very important, because we would have

1   investigated that, taken more discovery on that issue.

2       For us, it was sufficient that they were identifying a

3   synchronization software component that, because it is

4   singular, was -- for Windows Mobile I'm talking about -- was

5   insufficient to satisfy the claims.

6       With respect to Evolution, we didn't take any discovery on

7   the components that they are now mentioning, because those --

8   those weren't components on which we were focused obviously.

9       They identified, explicitly again, components and we did

10  take discovery on those components.

11          THE COURT:  All right.  I understand your position.

12  Thank you.

13          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

14          THE COURT:  Let's turn next to Samsung's motion to

15  strike.  Let's start with docket Number 878 if we could.

16      Miss Maroulis, do you want to present argument on that?

17          UNIDENTIFIED SPEAKER NO. 2:  Your Honor, just so -- I

18  believe there are two Apple motions to strike.  There's

19  (inaudible) sequence the Court --

20          THE COURT:  No, I understand -- I'm trying to give

21  everybody a fair chance.

22          UNIDENTIFIED SPEAKER NO. 2:  Thank you.

23          THE COURT:  -- as people --

24          MS. MAROULIS:  Your Honor, may we begin with --

25          THE COURT:  -- now wait 55 minutes into their billable

1  time.

2        **MS. MAROULIS:**  Your Honor, may we begin with

3  Interrogatory 46, because it's a disparate issue that I think

4  we can do fairly quickly.

5        **THE COURT:**  Go ahead.

6        **MS. MAROULIS:**  Your Honor, this is giving everyone a

7  break from the purpose of infringement contentions and

8  addresses a very simple subject, which is:

9        When a party is given a contention interrogatory, they

10  need to respond to it.  And if the party fails or refuses to

11  respond to it, the party bears a risk that they will be

12  precluded from espousing theories and contentions that they did

13  not disclose.

14        Samsung served Interrogatory Number 46 in connection with

15  its offensive Samsung patents and asked Apple to provide all

16  claim constructions that they claim govern, other than the

17  ones -- the ones that were construed by the Court, and other

18  than the ones of plain and ordinary meaning.

19        When Samsung received Apple's response, their only

20  response was a bunch of objections and a statement that they're

21  willing to meet and confer about some further schedule about

22  construing terms later on.  They --

23        **THE COURT:**  Miss Maroulis, on this point --

24        **MS. MAROULIS:**  Yes.

25        **THE COURT:**  -- as I understand the way this has played

1  out with Judge Koh, Judge Koh has obviously rendered

2  constructions on any number of terms in this case.

3      What you're talking about are constructions of terms for

4  which the Court has yet to rule, and so you are looking to

5  understand what Apple's positions were on those terms; is

6  that --

7          MS. MAROULIS:  Absolutely --

8          THE COURT:  -- correct?

9          MS. MAROULIS:  -- Your Honor.

10     There are only about 10 terms that the Court construed

11 under the local rules, but there are many, many patents in this

12 case.

13     So we wanted to understand prior to our infringement

14 reports, what were Apple's infringement positions because they

15 vary a great deal depending on how you construe certain claims.

16 That is why we served Interrogatory 46.

17     Apple did not serve a similar interrogatory, so when the

18 meet and confer came, Apple started saying, "Well, if you give

19 us your constructions, we'll give you ours."  But there was no

20 (inaudible) there because we have an actual outstanding

21 discovery request and they do not.

22     Apple's position was many fold.  At the meet and confer,

23 they simply said that, "Now is not the time to conduct the

24 claim construction; the claim construction should happen later;

25 that we did some claim construction in the prior case on the

1  eve of trial."

2      Never during that meet and confer did anyone mention the

3  words "plain and ordinary meaning."  Never at that point did

4  anyone say, "Actually, we don't owe you any responses because

5  they're all plain and ordinary meaning."

6      That would have been very important for us to know because

7  we would likely dispute that some of these very complex terms

8  would have a plain and ordinary meeting.

9          THE COURT:  How would you have exactly done that,

10  Miss Maroulis?

11      So let's assume they --

12          MS. MAROULIS:  Um-hmm.

13          THE COURT:  -- had done what you wished they had done.

14  What would you have done differently?

15          MS. MAROULIS:  Your Honor, if we -- First of all, if

16  they provided us with a construction, which they now provide in

17  their Expert Reports, our Expert Reports would have been

18  written differently.

19      Our experts had to guess what the constructions were.

20          THE COURT:  Well --

21          RIGHT1:  They didn't have them in front of them.

22          THE COURT:  But your experts were offering opinions

23  based on Samsung's construction; right?

24          MS. MAROULIS:  Yes, Your Honor, but --

25          THE COURT:  They weren't specifically rebutting an

1   Apple position.

2         **MS. MAROULIS:**  We could have taken into account how

3   they would address the noninfringement arguments and

4   anticipated them better.  As it is, our experts had to guess.

5       But to Your Honor's question on the meet and confer:  If

6   we understood that they were saying there's plain and ordinary

7   meaning, we would have pushed further.  We probably would have

8   brought a motion to compel.

9       As it is, we relied on their silence and proceeded

10  forward.  And what we received was a set of completely new and

11  very elaborate constructions.

12      Apple makes four different arguments why they were not

13  obligated to provide us these responses.  One of them is that

14  they implicitly provided constructions through their response

15  to Interrogatory 12 and --

16        **THE COURT:**  How does one implicitly construe a term?

17        **MS. MAROULIS:**  That is my question as well.

18      So their -- their point is that for "means-plus" terms,

19  they provided explicit constructions.  For other terms, it was

20  implicit in their noninfringement position.

21      There are many different issues with that.  One is, a

22  construction cannot be implicit.  We need to understand what it

23  is.

24      Two, if you incorporate something by reference, you

25  actually have to point to that interrogatory elsewhere.

1     But most importantly, perhaps, it has been the law of the

2  case in this case that the disclosed elsewhere doesn't apply.

3  This case is too big, there are too many things, there are too

4  many depositions, interrogatories.  The Rog 12 response alone

5  spans almost 200 pages.

6     And, as Your Honor recalls, last year, we made similar

7  argument on behalf of Samsung, that certain design patent

8  invalidity theories were disclosed elsewhere, such as in other

9  interrogatories and permanent injunction contexts, depositions,

10 you name it.

11    And the Court said, "No, you need to respond to the

12 interrogatories before you."

13    So the Interrogatory 12 argument simply does not work.

14 They cannot rely on another interrogatory which doesn't address

15 claim construction, which even they say was implicit as opposed

16 to explicit, and that was not responsive to our interrogatory.

17        **THE COURT:**  Do you want to come back to the world of

18 contentions and (inaudible)?  I think I understand your

19 position on Interrogatory 46.

20        **MS. MAROULIS:**  Yes, Your Honor.

21    But . . . would -- would you like to hear the other

22 issues?

23    One of the arguments they make is a plain and ordinary

24 meaning, and it's important to understand why that is not the

25 case.

1    We don't have the time today to walk the Court through

2  each of the constructions, explain how it's not, but just to

3  give you a few examples.

4    For example, for the term "digital camera," they rely in

5  their Expert Report on prosecution history estoppel.  It's

6  axiomatic.  That cannot be a plain and ordinary meaning if you

7  have to reach into the prosecution history.

8    The term "list," for example, they construe it implicitly

9  in infringement one way, as a text with the top-down

10  progression; and for invalidity, they say (inaudible) that have

11  list in (inaudible) form.

12    And, of course, plain and ordinary meaning of a list

13  doesn't have to be top down and text only.  It could be

14  anything.

15    So each of these constructions is elaborate

16  litigation-inspired construction, many of which have the word

17  "not" or "cannot" and state that their --

18    **THE COURT:**  Every construction is litigation inspired;

19  isn't it?

20    **MS. MAROULIS:**  That is true, Your Honor.

21    However, when you say something has plain and ordinary

22  meaning, it is not likely to have limitations and constructions

23  that state that something can or cannot be performing, and

24  theirs are particularly significant here.

25    So, I've given you a couple of -- of examples.  But we

1  understand it would be difficult for the Court to go through

2  all of them and to decide what is plain and ordinary meaning if

3  it's not.

4      So the response here is that they never said it was plain

5  and ordinary meaning.  They simply chose not to comply with the

6  interrogatory.

7      The other portions of our motion on the Samsung patents

8  address the fact that one of the Apple's experts, Dr. Storer,

9  chose to construe the terms contrary to what the Court

10  construed and inserted his own definitions and constructions

11  in -- into his report.

12      If Your Honor wants to talk about the --

13          THE COURT:  Can we talk about Dr. Storer for just a

14  moment?

15          MS. MAROULIS:  Yes.

16          THE COURT:  I'm curious.

17      In deposition, did he confess that he was disregarding

18  Judge Koh's construction?

19          MS. MAROULIS:  I wouldn't use the word "confess."

20      But what he said when he was asked, "Is this the meaning

21  of 'modem, that the Court addressed that you provide in your

22  report," he said, "I guess the answer's no."  So it's

23  basically --

24          THE COURT:  Sounds like a confession to me.  Isn't it?

25          MS. MAROULIS:  That is true but I don't want to put

1  Dr. Storer on the spot here.  It's the counsel who's

2  responsible for disclosing proper constructions to the -- to

3  the experts.

4       So -- And that's just one example.  He also added log

5  (inaudible) instead of the (inaudible) and other examples in

6  our papers.

7       But the point being here is that simply you cannot help

8  yourself to different constructions than what the Court

9  construed.  Even though the Court construed only a handful of

10  terms here, those are the ones you have to apply.  You cannot

11  come up with your own constructions.

12       And did Your Honor want to talk about Apple's patents at

13  the same time, the motion on those?  Because one of my partners

14  is going to address that.

15            THE COURT:  No.  I think I'll take that up in due

16  course.  I want to hear from Apple on this motion first.

17            MS. MAROULIS:  Sure.

18            THE COURT:  Thank you.

19       Mr. Selwyn.

20         MR. SELWYN:  Good morning, Your Honor.

21         THE COURT:  Good morning.

22         MR. SELWYN:  Good morning, we need to begin by

23  focusing on the language of Interrogatory 46 that's at issue.

24       Interrogatory 46 did not broadly call for Apple's claim

25  constructions for every word of every asserted claims.  It's

expressly limited for claims that Apple contends have a meaning
other than plain meaning.

    And with the exception of the means-plus-function terms in
the '239 patent in the terms that the Court, Judge Koh,
construed, Apple's experts apply the plain meaning of the claim
language.  And we set forth in our opposition brief citations
to the experts' deposition testimony and reports where they say
they did that.

    And, frankly, with the exception of the
means-plus-function terms and the terms that the Court
construed, Samsung's brief don't point to any terms that they
say should be given something other than plain meaning.

    So the parties are in agreement about the terms that
deserve their plain meaning.

    Now, Samsung may well disagree with the plain meaning
offered by Apple's experts, but those are our contentions, and
the interrogatories sought our contentions.  We revealed our
contentions.

    Now, with respect to the means-plus-function --

        **THE COURT:**  So on that point, Mr. Selwyn, what you're
saying is, you all agree that these terms, the ones we're
discussing here, are properly subject to a plain and ordinary
meaning interpretation.

    The question is what that plain and ordinary meaning is?
Is that the gist of what you're saying?

1          MR. SELWYN:  Well, on -- on both sides certainly.

2     Both sides have experts that have described what the claims

3     meaning and how they're applying those.

4          And when -- when I say "implicitly reflect a plain

5     meaning," in the recitation of an infringement theory, an

6     invalidity theory, a noninfringement theory, implicitly the

7     parties are providing their understanding of the plain meaning

8     of the terms.

9          And we tell juries that -- the same thing.  We don't give

10    juries definitions of plain meaning.  We tell them these terms

11    are to be --

12          THE COURT:  That's why it's plain meaning.

13          RIGHT3:  That's why it's plain meaning.  And they are

14    to interpret that based on that.

15          Now, with respect to the means-plus-function terms, for

16    those we say, "No, those -- those do need a construction;

17    right?  You have to figure out the corresponding structure."

18          And Samsung -- Samsung's complaint here boils down to that

19    Apple disclosed its constructions in the context of its

20    noninfringement interrogatory response rather than in response

21    to Interrogatory 46.

22          And we did so for each and every one of the

23    means-plus-function terms, and our expert used the same

24    constructions that were revealed in our noninfringement --

25          THE COURT:  Can --

1           MR. SELWYN:  -- interrogatories.

2           THE COURT:  -- we at least agree, Mr. Selwyn, they

3   were not disclosed in response to Number 46.

4           MR. SELWYN:  They were not disclosed in response to

5   46, but --

6           THE COURT:  And --

7           MR. SELWYN:  -- this is --

8           THE COURT:  -- why not?  And why shouldn't Apple have

9   to bear the brunt of that?

10          MR. SELWYN:  Well, they were not because they were

11  disclosed in the context of the noninfringement arguments that

12  were being raised.  So, for each of the claim terms, we first

13  indicated what the corresponding structure was and then applied

14  that.

15      So the more logical place to put it was in response to

16  Interrogatory Number 12.

17      Could we have included a cross-reference to

18  Interrogatory 46?  Sure, we could.  But this is really form

19  over substance.

20      And the reason that I say that is, if you look at

21  Dr. Schonfeld's Expert Report, he responded to each of the

22  constructions that we offered in response to the

23  noninfringement interrogatory.

24      In fact -- and I'll just quote his report -- he has a

25  table that compares the parties' constructions, and he says,

1  quote (reading):

2          "Apple's proposed constructions in his table are

3      taken from Apple's response to Samsung's Interrogatory

4      Number 12."

5      So there was no confusion on the part of Dr. Schonfeld.

6  There was no trickery here.  We' disclosed those -- all of our

7  constructions clearly in response to Interrogatory 12.

8      And, you know, it's a little bit ironic that Samsung is

9  complaining about us not revealing constructions because, as

10  Your Honor knows, Patent Local Rule 3-1(c) says that the

11  patentee is supposed to identify the corresponding structure

12  for each of the means-plus-function elements.

13      The first time that we learned the corresponding structure

14  that Samsung was asserting was in Samsung's expert's report in

15  response to the proposed constructions that we had offered in

16  response to Interrogatory Number 12.

17          THE COURT:  Mr. Selwyn, would you suggest that, so

18  long as the responding expert is in a position to address the

19  limitations and how those limitations mapped either the product

20  or the reference at issue, there's really no prejudice?

21          MR. SELWYN:  I don't see any prejudice in this

22  particular instance where we revealed --

23          THE COURT:  Well, let me --

24          MR. SELWYN:  -- those.

25          THE COURT:  -- harken back to the argument we had

1  about 17 minutes ago.

2      It seemed to me you all were taking a very different

3  position at that point in time.

4          MR. SELWYN:  No, I don't think so --

5          THE COURT:  Tell --

6          MR. SELWYN:  -- because --

7          THE COURT:  Tell me why not.

8          MR. SELWYN:  I'll try to.

9      Because in this instance, we listed constructions in our

10 noninfringement interrogatory response that are verbatim that

11 which our expert used.

12     We gave full disclosure as to what constructions he would

13 be using, and Samsung's expert had an opportunity to respond to

14 those and did respond to those in his Expert Report.

15     So what this boils down to is a complaint that we

16 responded in response to one interrogatory instead of the

17 other.  There clearly was a relationship between those two.

18     As Miss Maroulis said, our noninfringement interrogatory

19 response was about 200 pages.  We tried to be very detailed and

20 comprehensive in those responses.  And we thought to provide

21 noninfringement contentions for the '239 patent for the

22 means-plus-function terms.  We had to provide a construction in

23 that context.  So that's why it was put there.

24     Turning to the issue about Dr. Storer.  Two points here.

25     First, this is the same argument that Samsung is making in

1    its Daubert motion that's pending before Judge Koh.  The same

2    argument, same cases cited, same relief sought.  That motion

3    will be heard on January 23rd.

4         So I'll address the merits of the argument now, but the

5    way that the case is now set, I'll be saying the very same

6    thing to Judge Koh on -- on January 23rd.

7         And what I'll say is that Samsung has yet to identify any

8    constructions of the terms that it complains about because

9    there are no such constructions.

10        What Samsung is pointing to are terms in Judge Koh's

11   constructions and saying that we -- our expert didn't have the

12   right to explain the technology related to those terms, just as

13   Samsung's expert, Dr. Schonfeld, explained the technology

14   related to those terms.

15        These are not terms that are in the claims, with the

16   exception of composite signal.  All the other terms are part of

17   the Judge's construction.

18        So Samsung's entire argument is that Dr. Storer

19   contradicted claim constructions that Samsung has never quoted,

20   never cited, never mentioned, and that's because there are no

21   constructions that he has to contradict.

22        Samsung says it's not trying to prevent Dr. Storer about

23   testifying regarding the relevant technology or the operation

24   of the components, but that's exactly what the motion seeks to

25   have him do.

1     And, Your Honor, that -- that is the place of an expert

2  here.  It's impossible to determine whether a specific

3  component is found in the accused device without explaining to

4  the jury what that component is, how it's used, how it

5  operates.  That is the proper role of the expert, to take the

6  claim construction of the Court and to apply that claim

7  construction.

8     Both experts have done that in this instance and that's

9  all that Dr. Storer is doing.

10     **THE COURT:**  What about with respect to compressing the

11  composite signal?

12     That -- That is the term -- right? -- that was offered or

13  addressed by Judge Koh; wasn't it?

14     **MR. SELWYN:**  It -- It's not a construction of

15  composite signal, though.  And there's nothing in Dr. Storer's

16  report that contradicts, changes, modifies, done anything to a

17  construction of composite signal.

18     **THE COURT:**  Judge Koh did not adopt a construction

19  that was agreed to by the parties that define that term as

20  capturing, digitizing and --

21     **MR. SELWYN:**  Oh.

22     **THE COURT:**  -- compressing at least one composite --

23     **MR. SELWYN:**  Yes, that is correct.  And there's

24  nothing -- And he complied that construction.  His report

25  explicitly says he complies that construction, and nothing in

1  Samsung's brief points to anything that's contradictory to that

2  construction.

3         THE COURT:  Well, Samsung's brief says that Dr. Storer

4  reconstrued the function to be receiving an analog electrical

5  signal that represents viewable video frames, output from an

6  analog video source such as a video camera or VCR.

7         MR. SELWYN:  Um-hmm.

8         THE COURT:  That seems to me to be a different

9  construction.  What am I missing?

10         MR. SELWYN:  I don't think so, Your Honor.  That is

11  the technology that's described in the patent, the technology

12  that's described in that construction.  He is applying that

13  construction and describing what a composite signal is in that

14  context.

15                    (Pause in proceedings.)

16         THE COURT:  All right.  I guess I'll have to study

17  that one more carefully.

18     Anything else, Mr. Selwyn?

19         MR. SELWYN:  And I believe I've addressed the

20  arguments that Miss Maroulis raised.

21         THE COURT:  Thank you.

22     Miss Maroulis, any rebuttal?

23         MS. MAROULIS:  Yes, Your Honor, very briefly.

24     First of all, the fact that there are local rules for

25  disclosing claim constructions for Court's construction does

1    not obviate the need for a party to respond to interrogatories.

2    There's plenty of case law that says that does -- one does not

3    replace the other.  One is for the benefit of the Court to

4    order claim construction and the discovery requests are for the

5    benefit of the party propounding the request.

6         Secondly, Samsung does not agree that all of these terms

7    are plain and ordinary meaning.  A number of these terms could

8    not possibly be such.

9         I would invite anyone in the room here to say whether they

10   think plain and ordinary meaning for imaging device, for

11   example, is something that must expose all pixels to an image

12   at once and/or capture the charge associated with each pixel

13   concurrently.

14            THE COURT:  Any takers?

15                      (Laughter.)

16            MS. MAROULIS:  Is that plain and ordinary meaning?

17   Not clear.

18        This actually reminds me of Justice Potter Stewart said,

19   "I know it when I see it and the motion picture before me is

20   not it."

21        It's hard to come up with a test for plain meaning but a

22   number of the ones listed in our brief on Pages 4, 5 and 6 are

23   clearly not yet -- not plain and ordinary meaning.

24        There's quite a bit of prejudice that we endured because

25   of that.  Mr. Selwyn pointed to Dr. Schonfeld and his ability

1  to incorporate some of the means-plus positions, but Drs. Min

2  and Parulski could not do the same and they did not --

3          THE COURT:  What prevented them from doing so?

4          MS. MAROULIS:  Because we did not have Apple's

5  positions.  They identified some of the structures in the

6  noninfringement Interrogatory Number 12, but they did not have

7  constructions for any of the nonmeans-plus elements.

8      And even though Apple claims that it doesn't matter which

9  interrogatory you respond to as long as it's out there

10 somewhere, that is not the law of the case.

11     We've -- We've had in this case established that, if

12 you're served a contention interrogatories, you're held to it.

13 And in this case, we submit that Apple must be held to their

14 refusal and inability to answer this interrogatory that put

15 Samsung into a space of prejudice in having to deal with the

16 lack of constructions.

17     So I heard even Apple concede that Interrogatory Number 12

18 response does not have constructions of any kind other than the

19 identification of structures, if you can call it that.

20     If Your Honor doesn't have any further questions --

21         THE COURT:  No.  I think I understand your position.

22         MS. MAROULIS:  -- then we'll proceed.

23         THE COURT:  Thank you.

24     Let's turn next to Apple's second motion, 882, if we

25 could.

 1        Mr. Selwyn.

 2          **MR. SELWYN:**   Your Honor, in large part, this motion

 3    seeks to enforce what the Court has already decided in its

 4    June 26th order.

 5        Time and again in Samsung's infringement Expert Report,

 6    Samsung does not follow the June 26th order.  It includes in

 7    its Expert Reports infringement theories that were struck by

 8    the Court.

 9        For clarity, we have provided the Court, as Exhibits A, B

10    and C to our motion, copies of Samsung's Expert Reports which

11    we've annotated to -- to indicate what we believe should be

12    struck.

13        We've indicated with a "1" or "2" those issues that fall

14    into the category of issues that the Court has already decided

15    in its prior order, and those denoted with a "3" are new

16    infringement theories.

17        So let me turn first -- and I can do this quickly -- to

18    the first bucket of issues:  Infringement theories that the

19    Court struck in its June 26th order.

20        First, there's the issue, it's a Doctrine of Equivalence.

21    As the Court will recall, Samsung's original first and second

22    sets of infringement contentions included no equivalence theory

23    for any patents.  Samsung then tried to amend to include

24    infringement theories in its third amended contentions, and the

25    Court denied that on the basis of a lack of good cause except

with respect to those three limitations that Judge Koh had

construed in her Markman order.

The Court's language was unambiguous.  You said (reading):

"Samsung should have provided its DOE theories

and its contentions at the beginning of the case if it

had a good-faith basis to assert them."

The order said (reading):

"Samsung has not explained why it has a

good-faith basis to assert DOE theories only now

rather than when it first provided its contentions or

during its previous two amendments."

But in Samsung's Expert Reports, over and over again, we

have equivalence theories.

In response to that, Samsung concedes that they relied on

equivalence but argued that they had done so in anticipation of

claim construction arguments by Apple.

That, too, was rejected by Your Honor in the June 26th

order.  You said that the possibility of different claim

constructions does not provide good cause to amend.  In the

Court's words (reading):

"Concern over the possibility of a loss at claim

construction does not -- not -- does not amount to

good cause.  The issue is only ripe if and when

Samsung faces an adverse claim construction."

So the issue of equivalence has been briefed once before,

1   decided by Your Honor once before.  Despite that, it's in the

2   Expert Reports.  It should be struck.

3        In addition, there are a number of new theories related to

4   the '596, '239 and '449 patents that the Court also rejected in

5   its June 26th order.  For the '596 patents, the Court barred

6   Samsung for relying on the Intel X-GOLD 61x specification.

7   Your Honor will recall that was a document that was produced

8   long, long ago.

9        Notwithstanding that, Samsung's expert Dr. Min cites the

10  same Intel documents in 17 paragraphs of his report.

11       Samsung's opposition doesn't respond to that point at all,

12  doesn't try to defend Dr. Min's citation of those -- of that

13  document.

14       But what it does say is that Samsung should be entitled to

15  cite to Intel deposition testimony that relies on the same

16  document.  We think that's just an end-run around your Court's

17  order and that, too, should be struck.

18       The '239 patent, the Court previously barred Samsung from

19  adding structural equivalence arguments to its contentions, but

20  Samsung's expert advances the same structural equivalence

21  arguments that the Court rejected.

22            THE COURT:  Does he identify them as 112-6 structural

23  arguments?

24            MR. SELWYN:  Yes.  And those arguments, too, should be

25  struck.

1          For the '449 patent, the Court previously barred Samsung

2     from identifying new components to satisfy the recording

3     circuit, imaging device and reproducing circuit limitations.

4          In the Court's words (reading):

5               "Because Samsung has not shown sufficient good

6          cause, Samsung's Request for Leave to Amend its

7          contentions to add components that it believes

8          infringed the '449 patent is denied."

9          But for each of those claim terms, Mr. Parulski, Samsung's

10    expert, offers infringement theories.  I won't go through all

11    of them in the interest of time but let me just give you one

12    example for recording circuit.

13         The Court previously rejected Samsung's motion to amend to

14    identify an interface circuit as the claimed recording circuit.

15    That, again, appears in Dr. Parulski's report.  In its

16    opposition, Samsung backs away, does not attempt to defend

17    those citations, and says that Mr. Parulski would not rely on

18    it.

19         But what Samsung says instead is that it previously

20    disclosed NAND flash memory or storage for the recording

21    circuit limitation.  And when it said -- when it said NAND

22    flash module, that the Court should interpret "module" as

23    package, and that a "package" should be interpreted as having a

24    controller.

25         Well, the contentions don't say anything about a NAND

1  flash package.  They certainly don't say anything about a

2  controller.  This is just another instance of Samsung trying to

3  accuse new undisclosed components.  And the same occurs -- and

4  we briefed it -- for imaging device, A to D converter and

5  reproducing circuit.

6       Let me turn now to the second bucket of issues, which are

7  Samsung's new infringement theories.

8       And, here, I will just apply what the Court wrote in

9  rejecting Samsung's attempt last time to introduce new

10  infringement theories, and that is, quote (reading):

11            "Absent a change in circumstances and the

12       diligence of the party who needs to amend, the change

13       in theory after the case has progressed is

14       unjustified."

15       And our brief cites a number of examples for each of the

16  patents.  I'm just going to hit one very briefly for each

17  patent.

18       For the '757 patents, Samsung's infringement contentions

19  allege that the claim term "central storage interface device"

20  is either a single device; namely, an Apple Mac product or

21  Apple TV or a device within Apple's iCloud service or iTunes

22  service.

23       Dr. Schonfeld's report, on the other hand, offers numerous

24  entirely new theories for how that limitation is met, which

25  involve three different third parties.

1     He proposes now that each of eight multiserver

2  configurations is a central storage interface device, and each

3  of those eight multiservice -- multiserver configurations

4  involves at least one third-party, some as many as three

5  third-parties.  And, in addition to that, he makes four new

6  alternative theories, each of those new multiserver

7  combinations.

8     Samsung's infringement contentions offered no clue of this

9  theory.  They never suggested that a central storage device

10 could be a decentral set of multiple devices, much less that

11 the central storage inde -- central storage interface device

12 could be separated physically and controlled by multiple

13 parties.

14    And, in fact, Patent Local Rule 3-1(d) specifically

15 requires that (reading):

16         "Insofar as alleged direct infringement is based

17      on joint acts of multiple parties, the role of

18      each . . . party in the direct infringement must be

19      described."

20    None of that.

21    With respect to the '239 patents, Dr. Schonfeld contends

22 that the structure in the accused products that satisfies the

23 means for capturing, the means for decompressing limitations of

24 Claim 1, and the video capture module limitation of Claim 15 is

25 a logic board -- quote, "a logic board and the connections of

1  various components to that logic board."

2      Samsung's infringement contentions nowhere -- nowhere

3  mention a logic board, much less explains specifically, to use

4  the Patent Local Rules word, or even explain vaguely how that

5  logic board meets the limitations.

6      As Your Honor has mentioned in the previous order, Samsung

7  had Apple's billing materials since at least last year, knew

8  the components that were in the device.

9      In its opposition, Samsung argues that it disclosed its

10 logic board infringement theories by including pictures, not of

11 a logic board but of the front and back camera assemblies and

12 application processor that connects to the logic board.  Those

13 pictures of something different from a logic board is far from

14 sufficient disclosure of a logic board.

15     The contentions don't discuss a logic board; they don't

16 show a logic board; they don't explain how those pictures

17 relate to the logic board.

18     '449 patent.  We have a new compressor and decompressor

19 theory.

20     Samsung's infringement contentions identified a video

21 encoder and a video decoder as the compressor and the

22 decompressor.

23     Mr. Parulski, Samsung's expert, no longer relies on either

24 of those to support the limitation and, instead, identifies a

25 new component.  He identifies -- I'll just spell it -- the

1   HPERFNRT portion of the SOC as a claimed compressor and

2   decompressor.

3          THE COURT:  It is not a codex (inaudible)?

4          MR. SELWYN:  It is -- It's an SOC.

5       So what he previously did -- What the contentions

6   previously did is identified the decompressor, the video

7   decoder and the video encoder that are part of the SOC.

8       So now he has drawn a box that's much bigger and he no

9   longer points to the same thing.  He points to something that

10  includes the video decoder and video encoder as the claimed

11  compressor.

12      Now, all of this was described in the SOC User Manuals

13  that were produced at least by the time that Samsung last filed

14  its motion to amend.

15      So let -- let's be clear about what Samsung is trying to

16  do here.  This block includes the video encoder and the video

17  decoder and includes a ton of other components as well.

18      So, in response to Apple's noninfringement argument that

19  the video encoder and the video decoder by themselves cannot

20  meet the compressor and decompressor limitations, Samsung is

21  now trying to redraw the box around something different that it

22  didn't identify the first time.  That is unmistakably a new

23  theory.

24      Last, for the '596 patent, Dr. Min offers a new channel

25  encoder theory for the accused products containing an Intel and

1   Qualcomm baseband chips.

2       Samsung's contentions do not adequately disclose that

3   theory.  They never explicitly refer to a channel coder and

4   they do not -- a channel encoder and they do not implicitly,

5   either.

6       For the products containing Intel chips, Samsung's

7   contentions refer only to a different hardware component, which

8   I won't mention here -- confidentiality reasons -- and they

9   refer to source code not relating to the channel encoder.

10      For the products containing Qualcomm chips, Samsum's --

11  Samsung's contentions refer only to source code not related to

12  a channel encoder.

13      Very last point:  Samsung also tries to include new

14  indirect infringement theories for the '087 patent and the '596

15  patent in its Expert Report.

16      For the '087 patent, Samsung's third-amended infringement

17  contentions dropped any claim of indirect infringement.  They

18  now are reappearing in the report.

19      For the '596 patent, there never was a theory of

20  contributory infringement.  Dr. Min now has one for indirect

21  infringement in -- infringement contentions, just had a

22  boilerplate one sentence that did not meet the requirements of

23  Patent Local Rule 3-1(d).  Now we have a full-blown discussion

24  of inducement that wasn't even hinted at in the contentions.

25      Thank you.

1          **THE COURT:**  Thank you, Mr. Selwyn.

2      Response?

3          **MS. MAROULIS:**  Your Honor, earlier in this hearing,

4  the Court asked the question:  How could the two sides have

5  such complete different picture of what is going on and who's

6  telling the truth?  I think this motion exemplifies the issue.

7  And the issue is that the parties have erratically different

8  perspective on what infringement contentions are.

9      Samsung understands infringement conditions, with the

10 guidance of the Court, to be a noticed pleading that explains

11 to the other side what your basic theories are.

12     Later on, as you get discovery from the other side, you

13 fill it up with your actual Expert Reports, with citations to

14 evidence, citations to specific source code files, citations to

15 deposition testimony in the other side's documents.  That's how

16 discovery operates.

17     When we start the process shortly after the Case

18 Management Statement in each case, we don't have any of those

19 documents.  We don't have any of those depositions yet.  And as

20 discovery progresses, the party gains the knowledge, and the

21 Expert Report is a culmination of a combination of the parties'

22 contentions with all of the evidence that the parties have

23 amassed.

24     The Court in this case have stated that the contentions

25 should not be a running dialogue between the parties; that the

1  parties don't have to prove up their case in the contentions

2  because they get to do that later in the expert reports.

3      **THE COURT:**  Miss Maroulis, would you go so far as to

4  suggest that this district's entire decade and a half

5  experiment with the contentions and disclosure contentions has

6  been a failure in the context of software?

7      **MS. MAROULIS:**  Your Honor, it's been frustrating from

8  time to time but not in every case.  I think this case is

9  unusually litigious.  And there's a lot more --

10      **THE COURT:**  It seems to me that we have grafted onto

11  an already expensive and burdensome process a set of exchanges

12  that appear to have accomplished absolutely nothing.

13      **MS. MAROULIS:**  It has worked better in some cases than

14  in others.  But I agree that software and some biotechnology

15  cases, where the proof is in the processes, that you don't have

16  and there's no way to reverse engineer or obtain from the

17  shelf.

18    Those cases are particularly difficult because you don't

19  have the information you need to start the contentions.  And

20  maybe the policy solution is to move the contentions four,

21  five, six months out so it's sufficiently before the end of

22  discovery but after you have some information, because

23  currently --

24      **THE COURT:**  I'm thinking of something more streamline.

25  Get rid of them altogether.  Just leave you all in the dark as

1  to each other's positions until Expert Reports and let the

2  chips fall where they may.

3      **MS. MAROULIS:**  That does not seem like a good idea,

4  Your Honor, but --

5      **THE COURT:**  It doesn't seem much worse than what we're

6  talking about here because, if I hear each of you, what you're

7  telling me is, you're completely in the dark as to the other

8  side's queries across a whole swath of patents and liability

9  issues.

10      **MS. MAROULIS:**  It's not the case that we're completely

11  in the dark but certainly -- The reason I started with this

12  explanation rather than dive into the specific patents, because

13  I think it helps to understand why we get this motion.

14      Because when we got the motion from Apple and saw all the

15  different things they're complaining about, I thought to

16  myself, well, of course, you have to have added citation to

17  Apple's documents later.  You could not have done it then.

18      To take just one example, the zone-specific devices in the

19  '757 patent.  Our expert has multiple citations explaining how

20  they used the specific zone.  So the contentions say "used in a

21  room or similar location," and the report says you can use them

22  in a dorm room, you can use them in a residence, you can use

23  them in the workplace.

24      I'd have never thought that you'd want to put that detail

25  in the contentions.  First of all, we didn't have those

1  documents then, but also it seems contrary to what the

2  contentions are supposed to be about.

3      Contentions are about theories, which pieces of art that

4  you're relying on, which products do you accuse, which claims

5  are you asserting, what components in the product are you going

6  after?

7          **THE COURT:**  What I'm getting at is, it seems to me

8  that contentions are particularly worthless when, as you point

9  out, you don't have access to the software, just as they don't

10 have access to your software.

11     In that situation, to go back to Mr. Pak's description,

12 all that the parties are left with are functional descriptions

13 that would seem to move the needle extremely little.

14         **MS. MAROULIS:**  Not far.  That's true, Your Honor.  And

15 that's -- that's an example, again, with '449 patent that

16 concerns third-party chips and other confidential information.

17     Apple provided the Court with the Expert Report excerpts

18 highlighted in pink.  And I also understand that the box is

19 showing what's confidential for sealing purposes.  And it's not

20 surprising that the pink overlaps with the sealing boxes a lot,

21 because this is all the information we got late in the

22 discovery.

23     For example, in the Samsung (inaudible), we did not get

24 some third-party discovery until late June or early July.  Why?

25 Because third parties are harder to get to the table.  They're

1    not very keen on showing up and giving depositions and

2    producing their confidential information, and so it's not

3    surprising that we didn't get that until very late in the game.

4         So, for the '449 patent, we accused chips and said that

5    there's a circuitry in this chip that does the function.  It

6    was image --

7              THE COURT:  Problem is, there's a lot of circuitry in

8    the chip.

9              MS. MAROULIS:  Absolutely, Your Honor.

10        And Mr. Krevitt, for example, said if they admitted that

11   they guessed wrong, they would feel differently.

12        At least one of them, we did guess wrong.  We said it was

13   GPU, the graphic processing unit.  It was something else, a

14   confidential source code file.  So we accused the application

15   processor chip, which is a specific chip, but we guessed wrong

16   as to the circuitry within it.

17        After we had deposition of Mr. Tom Lalay (phonetic), Apple

18   30(b)(6), at the end of June, he explained to us, "No, it's not

19   that part of the chip.  It's this part of the chip."  And

20   that's what's in our Expert Report.

21        Is it a new theory?  We believe no.  We believe that it's

22   a component that we were able to zero in on with the discovery,

23   with highly confidential information that we could have never

24   had at the start of the case 45 or 40 days after the Case

25   Management Statement.

1     And that is basically, if the Court doesn't have time to

2  go limitation by limitation -- which understandably, with a

3  courtroom full of people behind us -- for the '449 patent,

4  it's -- we accused a specific chip, and there are citations in

5  our briefs to specific part of the contention.  I don't think

6  there's any dispute that we accused those chips.

7     What Apple is saying is that that was not enough and we

8  need to accuse something further in.  We did not have that

9  further in until discovery.

10     With respect to '757 patent, there are multiple -- there

11  are about six different arguments that Apple makes, and they

12  call them each new theory.

13     We respectfully disagree.  It's not new theory.  It's

14  examples.  I already discussed the room versus dorm room.

15  Another one is the photo stream (phonetic) where it's my stream

16  versus shared stream.

17     We point in the contentions to the shared stream, the

18  actual picture of that.  It said shared stream in it.  But in

19  our Expert Reports, we went a great deal further because we now

20  had documents.

21     The automatic transfer feature, we cited to a link in the

22  Apple documents that you pull up and it says that once you

23  purchase something in iTunes, it would synchronize against --

24  among the different devices.  Again, in our actual report, we

25  have more of those examples.  We have confidential proprietary

1  information.

2      But these are all examples, they're not new theories, and

3  our papers explain as to each one of them.  If Your Honor has

4  questions as to any one of the '449, '757 or '239,

5  Mr. Whitehurst was going to address those patents if -- if Your

6  Honor has questions on those.

7      But there is a link to our contentions in each one of

8  them.  It is at the level that is appropriate for initial

9  infringement contentions.  It is not full of evidence and

10  testimony because we didn't have it and, frankly, that's not

11  what the contentions required.

12      My partner, Mr. Pak, explained that the Court probably

13  doesn't want to see us any more than necessary with motions to

14  supplement, and those motions would be extremely burdensome on

15  this Court, and -- and the repercussions would go beyond this

16  case, of course, but to all the cases where litigants with a

17  lot less means would need to prepare and supplement contentions

18  periodically from time to time.

19      With respect to the Doctrine of Equivalence issue that

20  Mr. Selwyn said.

21      As we explain in our brief, this is essentially a

22  placeholder.  We understood the order to say we could not add

23  those.  But the Order did say that to the extent there's a

24  construction further down the line that is adverse to us, that

25  might give it good cause.  And because you only get to do

1  Expert Report once and not again, that is included.  So we're

2  not currently, under the Court's order, relying on those.

3      But they are in the reports because if, later on, Judge

4  Koh construes something adversely to Samsung, we would seek

5  leave to have those in.  And at that point, it wouldn't be a

6  surprise or shock to Apple because they already would have seen

7  our reports and it is a more orderly procedure, in a sense, to

8  address those.  So . . .

9      Does Your Honor have any questions as to specific elements

10 of any of the patents?

11         THE COURT:  Yeah.  I've got -- Well, I've got a more

12 general question.

13         MS. MAROULIS:  Yes.

14         THE COURT:  Miss Maroulis, do you play the game Clue?

15 You ever played the game Clue?

16         MS. MAROULIS:  Clue?

17         THE COURT:  You know, with the guests, who did it, in

18 what room?

19         MS. MAROULIS:  I have not.  That sounds like fun.

20         THE COURT:  Well, let me ask you this:

21     If -- If -- If Samsung is contending that it was Professor

22 Plum in the study with the rope and they changed the rope to

23 the lead pipe because discovery reveals that the rope was not

24 available or otherwise used, is that a change in example or a

25 change in theory?

1        **MS. MAROULIS:**  I think it's a change in the example.

2     But there's only one instance here where there's such

3  change, the GPU versus something else.  Everything else is --

4  We know someone used a blunt instrument, but we don't know

5  which one, and we're going to find out in discovery.

6        **THE COURT:**  All right.  I think I understand your

7  position.  Thank you.

8        **MS. MAROULIS:**  And it's -- it's -- We -- We have -- We

9  have citations to, and given how the time is, I do not want to

10 take Your Honor through all of them.

11    But Apple cannot dispute that we disclosed these areas in

12 the contentions.  What they dispute is the level of detail.

13    And as we explained before, the level of detail is -- that

14 they require is simply unsustainable, neither for Samsung or

15 the litigants at large.  Certainly not in cases where all the

16 proof comes in in the form of highly confidential source code

17 documents and particularly third-party information that we

18 cannot get until the very end of discovery.

19        **THE COURT:**  Thank you.

20        **MR. WHITEHURST:**  As Mr. -- Excuse me.  Alan Whitehurst

21 for Samsung.

22    I'm going to briefly address the standard patents which

23 are the '087 --

24        **THE COURT:**  I have to give you two minutes and no

25 more.

1    We have a courtroom of people.  I cannot have multiple

2  attorneys giving full arguments.

3        **MR. WHITEHURST:**  Well, I -- I --

4        **THE COURT:**  I'm welcoming you to my Court.

5        **MR. WHITEHURST:**  Thank you, Your Honor.

6        **THE COURT:**  But I need to be mindful of 50 some people

7  waiting here now for 97 minutes.

8        **MR. WHITEHURST:**  I can keep it extremely short.

9        **THE COURT:**  Okay.

10        **MR. WHITEHURST:**  If I may, I'd like to hand you --

11        **THE COURT:**  Give is to Mr. Rivera if you would.  Thank

12  you.

13        **MR. WHITEHURST:**  -- Exhibit C, which was attached to

14  Apple's motion to strike.  You will recall that this is

15  excerpts from Dr. Min's infringement report.

16    Apple has gone through these -- these excerpts and marked

17  various paragraphs Number 2.  I just want to go through this

18  real quickly just to show how Apple is overreaching.

19    I understand that time is precious here.  But if you'll

20  turn to Paragraph 243.  243.  You'll see that in Paragraph 243,

21  there's no motion of the X-GOLD spec -- specification.

22    They're citing to deposition testimony.  Dr. Min is citing

23  the deposition testimony in this paragraph that in no way

24  implicates the X-GOLD specification.  There's no mention of it

25  anywhere in here, but yet Apple has marked this paragraph as

1    Number 2.  And we see this time and time again throughout

2    Apple's motion to strike where they're overreaching.

3         We understand that the X-GOLD specification was struck by

4    you.  It's not in our infringement contentions.  We don't

5    intend to rely on it at trial.

6         **THE COURT:**  That deposition excerpt or citation

7    doesn't refer to testimony in which that specification was

8    discussed?

9         **MR. WHITEHURST:**  Absolutely, Your Honor.  And I know

10   we don't have time to go through it now, but that's what I was

11   going to do.  I was going to go through the deposition

12   testimony with you to show that the witness -- and, by the way,

13   this deposition was on June 24th -- is talking about the source

14   code and only the source code and in no way is he referring to

15   the X-GOLD specification.

16        So this is just one example.  And I had 10, 12 more

17   examples that I wanted to go through with you.  They're

18   instances where there were statements that have been in our

19   initial contentions from the very beginning where we're citing

20   to public documents and source code.

21        But Dr. Min happened to attack on to a long string cite

22   the X-GOLD specification.  And now Apple is trying to strike

23   the entire statement, even though it was in our contentions,

24   even though it's supported by lots of numerous other documents

25   just because Dr. Min cited to the X-GOLD specification.  And we

 1   believe that's wrong.

 2        We understand.  We don't intend to introduce the X-GOLD

 3   specification at trial, but we do believe it's wrong to strike

 4   statements like the one I just showed to you and other

 5   statements where it's just one cite of many in a string cite.

 6              THE COURT:  All right.  I understand.

 7        Mr. Selwyn, I'll give you one  -- I have to move on.

 8              MR. WHITEHURST:  I wanted to address --

 9              THE COURT:  I have to move on.

10              MR. WHITEHURST:  Okay.

11              THE COURT:  Mr. Selwyn, I'll give you 60 seconds on

12   this.

13              MR. SELWYN:  First, with respect to that last point,

14   the Intel deposition testimony we cited did refer to that

15   specification.

16              THE COURT:  So now you all are telling me that if I go

17   and look at that deposition transcript, I will see that one of

18   you has lied to me.

19              MR. SELWYN:  Well, I'm not --

20              THE COURT:  Someone is telling me a falsehood.

21              MR. SELWYN:  I asked the same question that

22   Mr. Whitehurst did.

23        We went back and looked and each of those -- each of the

24   testimony does cite to that specification.  We did not move to

25   strike those portions of testimony that do not cite to that

1  specification.  That's --

2          THE COURT:  Again, I just want to make sure I

3  understand your position, Mr. Selwyn.

4      You're saying, contrary to what counsel just told me, that

5  transcript reveals testimony citing to the specification I said

6  was improper.

7          MR. SELWYN:  Yes.  That was the criteria we employed.

8          THE COURT:  All right.

9          MR. SELWYN:  With respect --

10          THE COURT:  I think you've used your minute.  I do

11  need to move on, with all apologies.

12          MR. SELWYN:  Very well.

13          THE COURT:  Let's turn to the last motions.  Who's

14  going to argue that one.

15      Mr. Curran.

16          MR. CURRAN:  Thank you, Your Honor.

17      Everyone's been very patient so we'll be brief.

18          THE COURT:  I don't know about patient but running out

19  of time --

20          MR. CURRAN:  I'll apologize to the courtroom full of

21  people.

22      You know, there's a few issues -- I'll start with the '959

23  patent.

24      Apple raised for the first time in Dr. Snoeren's report

25  numerous contentions about the Siri software, claiming that the

1    Siri software practices Claim 34 of the '959 patent.

2        But Claim 34 had never been at issue before in this case.

3    It wasn't identified in Patent Rule 3-1 disclosures; it wasn't

4    identified in Interrogatory Responses.  So the first time it

5    came up was in the Expert Reports.

6        Now, Apple admits that this wasn't disclosed previously.

7    And they only claim that there's no prejudice.

8        So on Page 22 of Apple's opposition, they say there can't

9    be any prejudice here because Samsung knew that we said

10    something in '959 patent practiced -- was practiced by Siri.

11        And Dr. Snoeren's expert opinion merely confirms that

12    Apple's Siri practices the '95 (sic) patent and points to

13    Claim 34 as support for that opinion.

14        We talked a lot today about the difference between

15    theories and evidence.  We don't think pointing to a claim of

16    the patent is fairly characterized as evidence.  That is your

17    theory.

18        If we were to show up in our Expert Report and say,

19    actually, the iPhone infringes Claim 22, which we've never

20    talked about, that would (inaudible).  That's a new theory.

21        Same situation here in the Expert Report, an entirely new

22    claim, Point 2.  Since that is a new theory, it should be

23    stricken.  It was prejudicial.  Apple says there were other

24    claims, one with (inaudible).

25        Well, we'll submit that the reason for the switch, Your

1  Honor, was because these claims are different.  The reason to

2  switch to 34 is that it is a very different architecture.  It

3  has different claim limitations, a global heuristic that

4  searches selectively, which other claims do not.  And since we

5  didn't know that was the target to shoot for, we couldn't take

6  discovery.

7      We de -- We deposed third parties who developed Siri.  We

8  weren't able to ask them about any of these technologies, the

9  source code for this new functionality that Dr. Snoeren points

10 to.  As best we can tell, it was not produced because it wasn't

11 at issue.

12         THE COURT:  I'm sorry.  Perhaps you just explained

13 this to me.

14     But is Claim 34 the only claim of the '959 patent that

15 Apple now alleges it practices?

16         MR. CURRAN:  That's correct, Your Honor.

17     Throughout the case, they said they practiced other

18 claims, which were asserted for infringement.  We found prior

19 art that looked a lot like that, a lot like what they seemed to

20 be saying Siri did.  And (inaudible) perhaps analyze that prior

21 art, we got a different -- we got a different story about

22 what --

23         THE COURT:  Okay.

24         MR. CURRAN:  -- it says.

25         THE COURT:  Again, I want to make sure I understand

1   the -- the -- the current situation.

2       There are plenty of other claims in the '959 that are

3   still at issue in this case.

4           **MR. CURRAN:**  That's correct, Your Honor.

5           **THE COURT:**  Okay.  So Claim 34 is the only one,

6   allegedly, which Apple is saying it practices for purposes

7   of -- for whatever purposes.

8           **MR. CURRAN:**  That's correct, Your Honor.

9       I'll move on to infringement contentions.

10      Apple had -- If Your Honor will recall, we were back here

11  in June talking about proposed amendments to infringement

12  contentions, and there was a discussion about new theories on

13  what a heuristic would be.

14      And both sides discussed that they thought Apple was

15  changing its infringement theory in June.  Your Honor said you

16  were concerned that some of the statements in the proposed

17  contentions did portend a change in what a heuristic would be,

18  a new theory, and did not give Apple leave to add those new

19  statements about what a heuristic would be.

20      But it did give Apple leave to cite new evidence.  And

21  that was the -- barring the parties, you know (inaudible)

22  operated under and we received new infringement contentions in

23  July.

24      A month later, Dr. Snoeren's report did yet still add new

25  theories of heuristic search.  There were that we think --

1  Those two additional theories should no longer be -- shouldn't

2  be allowed at trial.

3       One, the Google suggestion server as a heuristic.

4       Throughout the case, Apple pointed to the phone, the

5  client device, things on the device as the heuristic.  That's

6  where the heuristic had to be.

7       And in Dr. Snoeren's report, suddenly, the heuristic was

8  somewhere else.  It was located off in the server that hadn't

9  been the subject of discovery and hadn't been pointed to in any

10 infringement contentions.

11      I would never --

12           THE COURT:  You're saying that's a new theory and not

13 simply a new component --

14           MR. CURRAN:  Exactly, Your Honor.

15           THE COURT:  -- an example of functionality.

16           MR. CURRAN:  This is not a dispute over these, the

17 files that gave the server the functionality.  It's a dispute

18 over whether the server is relevant at all and whether it --

19 that functionality is a heuristic.

20           THE COURT:  But we're still talking about files;

21 right?

22           MR. CURRAN:  Here, we're actually talking about the

23 idea.

24      For the server?  We're talking just the idea that the

25 server could be a heuristic.  That theory was never disclosed

1  anywhere in Apple's contentions.

2          THE COURT:  Right.

3          MR. CURRAN:  And they --

4          THE COURT:  The server can only provide the heuristic

5  if its files -- Servers only act through files; right?

6          MR. CURRAN:  Absolutely.

7          THE COURT:  So --

8          MR. CURRAN:  There --

9          THE COURT:  So what I'm -- what I'm -- what I'm

10  struggling again to understand is the parties' willingness to

11  bend and twist on what's a theory and what's evidence, what's

12  functionality, what's an example.  It seems to sort of twist in

13  the wind depending on --

14          MR. CURRAN:  Well --

15          THE COURT:  -- who's bringing the motion.

16          MR. CURRAN:  I submit, Your Honor, that if -- if this

17  was a case where Apple was still seeing Siri practiced on 24

18  but citing different files, then that would be different.

19      If they were say -- If it always said that the server was

20  a heuristic but now they say there are different files that

21  show that, that might be different.

22      And here we're saying -- It's an easy call, is that at a

23  high level, the functionality was not disclosed.  And Apple

24  admits this.  Apple admits that the server's not part of their

25  '959 contentions.

1     They say there's no prejudice because, at the earlier

2  portion of the case, in the preliminary injunction phase, they

3  pointed -- On a different claim of a different patent using a

4  different expert, there was a declaration that made this same

5  allegation.

6     So on Claim 6 of the '604 patent, Dr. Nathaniel Polish

7  said, "I think that Samsung's expert at the time,

8  Dr. Carvinello (phonetic), has admitted that all search engines

9  must be heuristic and, therefore, there must be a heuristic

10 module somewhere."

11    That allegation was a year ago, on a different claim of a

12 different patent, and it was rejected by Judge Koh.  That

13 Paragraph 52 of Nathaniel Polish's declaration mischaracterizes

14 the record and is incorrect.

15    And Apple never repeated that allegation until we saw

16 Dr. Snoeren's report.  They didn't include it into their '959

17 infringement contentions, so we don't think that was sufficient

18 to (inaudible) prejudice.

19    The other infringement theory that was added is what we'll

20 call a blending theory.  Throughout the case, Apple focused on

21 constructing a query.

22    And if I may, Your Honor, just to speed this up quickly,

23 there's a . . .

24                    (Pause in proceedings.)

25         **MR. CURRAN:**  Short side-by-side I think will clarify

1   the issues here.  If I may approach.

2            THE COURT:  No.  You can give it to Mr. Rivera.  Thank

3   you.

4        MR. CURRAN:  For the duration of the case, including

5   our discussions in June about changing theories of heuristics,

6   apple was very clear about what the heuristic was and was

7   constructing a query.

8        When we received Dr. Snoeren's report, there was an

9   additional theory that was, "Constructing the query isn't

10  heuristic.  It is taking local search results stored on a

11  device and blending them with remote suggestions that are

12  returned remotely.  The union of those things is now the

13  heuristic."

14       We believe that's a new theory and that it should be

15  struck.

16           THE COURT:  But isn't the net net of the Union the

17  constructed query?

18       Maybe I misunderstood the --

19        MR. CURRAN:  Apple is saying that the -- throughout

20  discovery, the thing that made the -- the source code

21  heuristic, the thing that was these operations heuristic, was

22  there was something special about constructing that query.

23       And we tried through discovery to tease that out, what it

24  was.  That was before the query was transmitted; instructing it

25  was heuristic.

1    Then we got back something that said, "Okay.  After it's

2  constructed, and after it's sent, after it's executed and after

3  it's received, there's some processing that makes it heuristic,

4  and that is, in our mind, a new theory.

5    Now, Apple says there was confusion over the source code

6  and so they couldn't have identified this theory earlier, and

7  source code is difficult and it can be confusing.  We agree

8  completely.

9    We don't think that there was confusion here because the

10  confusion that Apple is pointing to is confusion over which

11  Code base to look at.

12    Samsung has source code on its (inaudible) machines, which

13  it produced here, and also, in the Android system, there are

14  some proprietary applications that Google provides.

15    Apple talked to you about those applications during the

16  June hearing.  Mr. Lyon described them as binary drops.  So

17  there are some applications that are only received in object

18  form.  That's what is being accused in the '959 patent.

19    Quick Search Box and Google Now are binary drops.  Apple

20  knew this and pursued that information during discovery,

21  received that source code, and then came to Your Honor in June

22  and said, "We've received the Google applications.  We'd like

23  to amend."

24    So that we don't think there was fair confusion over the

25  source code.  But I'll submit that we can rise above that

1  because this functionality . . . this functionality was visible

2  from the phone.

3       Apple's own expert says, "I can tell from looking at the

4  device that this uses heuristic blending.  I can see that if I

5  type in 'Appalachian Trail,' it'll store that, that search

6  string, but present it with other remote suggestions.  I can

7  see on the phone that that is a heuristic."

8       I'll quote what he says (reading):

9            "The above functionality is clearly demonstrated

10           through simply using the accused devices."

11      But then he says (reading):

12           "In the interest of completeness, I provide a

13           source code analysis of described functionalities."

14      Well, so source code wasn't the basis for that blending

15  theory even in their own expert's report.  It's just for

16  completeness.

17      And so --

18           THE COURT:  How does one observe the blending?

19           MR. CURRAN:  If you are using the Quick Search Box

20  application and you -- There actually -- I will hand up -- This

21  might help Your Honor.  This is Dr. Snoeren's screen shots.

22           THE COURT:  Why don't you just describe it to me.

23           MR. CURRAN:  Sure.

24      So if you are using this application, you type in a search

25  string.  If you haven't ever searched for something before,

1  you'll get a certain set of results.  But if you've searched

2  for, for example, Appalachian Trail, then that'll appear the

3  next time as you search for something that begins with A-P-P.

4          THE COURT:  And you know that that's locally stored as

5  opposed to being stored on Google's servers?

6          MR. CURRAN:  That's correct.

7          THE COURT:  How do you know that?

8          MR. CURRAN:  Well, if you were on Airplane Mode, for

9  example, and you have no data connection, you can see that it's

10 there.

11         THE COURT:  Thank you.

12         MR. CURRAN:  Thank you, Your Honor.

13     There's -- I should just say there's (inaudible) on the

14 '647 patent my colleague, Richard Erwine, would address.  He'd

15 like to do it now.

16         THE COURT:  Very briefly.  Thank you.

17         MR. ERWINE:  Richard Erwine, Your Honor.  Very

18 briefly.

19     On the '647 patent, Apple for the first time in its Expert

20 Report disclosed Doctrine of Equivalence theories.  It was not

21 included in their infringement contentions at all.  It never

22 supplemented, never tried to add it at all.  The first time we

23 saw it was in their Expert Reports.

24     In Apple's opposition, they claim that the reason they did

25 that was in response to one of Samsung's noninfringement

1  arguments.

2      As you may recall, you had a similar argument.  The

3  parties were switched.  Samsung was trying to add Doctrine of

4  Equivalence arguments; Apple, of course, opposed and said,

5  "Your Honor, you cannot add Doctrine of Equivalence in response

6  to a noninfringement theory.

7      So it's as simple as that.

8          THE COURT:  All right.

9          MR. ERWINE:  Thank you.

10         THE COURT:  Thank you.

11         MR. THOMASCH:  Still good morning, Your Honor.

12         THE COURT:  Good morning.

13         MR. THOMASCH:  Daniel Thomasch.

14     There are a number of arguments made.  By far, the most

15  important to Apple is to be heard with respect to this blending

16  theory, and I'm going to address that.

17     It's not simple confusion.  It's not something we rise

18  above.  This is a very significant motion.

19     It is essentially -- The reason it wasn't resolved ahead

20  of time, it's a sub rosa motion for summary judgment.  That's

21  what this is.

22     I'll hand up two for Your Honor, one for your clerk.

23             (Pause in proceedings.)

24         MR. THOMASCH:  And, Your Honor, this does deal with

25  source code and it's -- it's (inaudible).  There's a lot of

 1  confidential information.  It's why I have the -- the handup

 2  prepared so I can walk you through and, in fact, point to

 3  things where we might have to clear the courtroom and that's

 4  not something we would like to ask to do.

 5      But to frame this:

 6      Samsung seeks to preclude Dr. Alex Snoeren from going

 7  beyond Apple's July 10, 2013, amended contentions with regard

 8  to the Ice Cream Sandwich and Jelly Bean operating system

 9  phones to testify about opinions to what they call this

10  blending theory, which re -- which we -- concerns infringement

11  of Claim 24 of the '959 patent.

12      Now, first, to be clear:  The amended contentions that are

13  at issue that they say, in effect, we should be stuck to and

14  Dr. Snoeren should be wedded to those and can't go beyond

15  those, those are from July 10, 2013.

16      It is not capable of being disputed that the contentions

17  which have with them an appendix of source code citation are

18  referring to the wrong source code, completely wrong source

19  code, materially different wrong source code with respect to

20  Jelly Bean and Ice Cream Sandwich.

21      The wrong source code could not have been the basis.  You

22  could not look at that code and come up with the blending

23  theory.  It wasn't possible.

24      With the right code, it was obvious; but the wrong code,

25  it was impossible.

1          **THE COURT:**  So who is to blame for the wrong code?

2          **MR. THOMASCH:**  Samsung.

3      It is very, very clear.  I will walk you through it.  The

4  chronology is key here.

5      But it is important that on July 15th was the first time

6  that we found out about the mistake in the source code that we

7  had relied on and, 28 days later, we had examined all the right

8  source code, formulated the right opinions, gotten the blending

9  for Ice Cream Sandwich and Jelly Bean into the Expert Reports.

10     This concept about a new theory, this isn't a new theory

11  in any normal sense of the word where someone has just thought

12  about something a little more and come to a conclusion, or

13  worked a little harder and come up with a new idea.  This is a

14  theory that is only available if you have the code in front out

15  of, and we had the wrong code in front of us.

16     If we go to the first page -- Page 2 actually since the

17  cover got a number here -- this is what we're talking about.

18     There are three operating systems at issue on the

19  left-hand column.  And then across the top, we have the three

20  types, the three versions of source code:  The Samsung version

21  produced in one office of Quinn Emanuel on a perforce server;

22  the Google open source version; and the Google proprietary

23  version.  And in each box for purposes of this blend, you will

24  see what is in that source code.

25     Now, for gingerbread, the three forms don't vary.  Indeed,

1    one, it's almost a matter of semantics as to whether there is

2    even a proprietary code for gingerbread, because the

3    proprietary code simply adopts and incorporates the open source

4    code.

5         However, with Ice Cream Sandwich and Jelly Bean, there is

6    no dispute that the proprietary code differs from the open

7    source code in the way indicated on Page 2.  And because of

8    that difference, you could not make a blend.  You can't blend

9    something that's not there in the situation with the code that

10   we were looking at, and that's the code that's in yellow.

11        And the reason is, not that we were in the dark.  We were

12   in the dark to start with; then someone came up, grabbed our

13   shoulders, pivoted us and led us into a room that said source

14   code for QSB.

15        It just happened it was the wrong room.  There are many

16   rooms inside, at least three big ones, that have source code

17   for QSB, and we were turned and directed into the wrong room.

18   We -- We went in there, we worked with that code, and we put it

19   in our contentions.  And it was all wrong.

20        Going back to April 5th -- I'll go through this quickly --

21   at Page 3, you'll see we tried to get first source code from

22   Samsung, Request for Production.  Then we tried to get some

23   from Google.

24        What we got was an enormous amount of code.  We're getting

25   this build environment which has all sorts of code but it isn't

1   limited to the code that's actually used.  There's all sorts of

2   code that's in development, code that was done but never used,

3   code that was modified.  Everything comes in and we don't know

4   what's the code on the phones.

5       That's what we struggled to find out.  Ultimately, to skip

6   ahead quickly, time is short.  March 2013, we serve

7   Interrogatory Number 41.  The purpose of that interrogatory is

8   to determine what code is on the accused devices and, in part,

9   specifically what code related to the quick search box.

10          THE COURT:  Why didn't you ask them, what code have I

11  been looking at for three months?

12          MR. THOMASCH:  Excuse me, Your Honor?

13          THE COURT:  Well, it seems to me your problem was, as

14  you described it, you were in the wrong room and you --

15          MR. THOMASCH:  And, ultimately -- That is ultimately

16  what he did.  We went about this a number of ways.  I don't

17  know want to -- First, there was Interrogatory Number 22.  They

18  moved against that.  Your Honor sustained their motion.

19      We then went to 41.  We said, "Ask us."  They came back.

20      Now, 41 asked for all the source code.  And if you look at

21  the definition of source code, it's as broad as one -- as

22  lawyers can write.  It's typical lawyer language for any

23  particular software, operating system, application, app,

24  component or other module.

25      We asked for it all, and here's what we get back on

1   Page 5.  This is what we get.  It's important to look at this.

2   It shows you by phone, the version, the date it was available,

3   and the perforce server.

4       So Page 5, what's highlighted in yellow is telling us

5   where the code is on each phone, by model of phone and by

6   carrier.  This is, apparently -- apparently -- a roadmap.  It

7   is a path that you can follow to specific code.

8       We followed that path, and there are boxes there that says

9   "Quick Search Box."  The code is right where we expected it to

10  be based on what they told us.

11      Every bit of this yellow highlighting on Page 5, every bit

12  of that, is Samsung code.  That is the only thing they directed

13  us to.  And they gave it to us in chapter and verse.

14      But they gave us so much that we were still having trouble

15  figuring out where -- You looked at that and you could see that

16  there was what you wanted, and there was additional stuff and

17  you couldn't be certain what was what.

18      We went back to them; we had discussions with them.  There

19  was a meet and confer.  We didn't bring a motion.  There was a

20  threatened motion.  It was resolved by -- There was a letter

21  from us to them.  There were phone conversations.

22      And what came out of that is, we're going to have another

23  interrogatory.  And in that other interrogatory, we'll get to

24  the bottom of this.

25      Then they objected to the other interrogatory.  We worked

1  that out, and they said, "We'll tell you what you got wrong."

2  In effect, what Your Honor suggested moments ago.

3       **THE COURT:**  Why did you have to go through two rounds

4  of interrogatory service?  Why can't --

5       **MR. THOMASCH:**  I don't know.

6       **THE COURT:**  -- you just talk about that?  Why can't

7  you just ask them a question and get an answer?

8    Let me ask --

9       **MR. THOMASCH:**  I don't know.

10       **THE COURT:**  -- Samsung.

11    Would you have told him the answer if he just picked up

12  the phone?

13       **MS. MAROULIS:**  Yes, Your Honor.  We did.

14       **THE COURT:**  So why didn't you make that offer?

15       **MS. MAROULIS:**  We --

16       **THE COURT:**  Why put them to the task of an additional

17  round of interrogatory?

18       **MS. MAROULIS:**  Your Honor, they never asked this much;

19  we answered all the questions.

20       **THE COURT:**  This question never came up in the meet

21  and confer that I was told was so robust now two hours ago?

22       **MS. MAROULIS:**  No.

23       **MR. THOMASCH:**  Oh, Your Honor, the -- the -- the

24  notion -- The notion that Apple did not ask.

25    But that's all we needed to do.  All we needed to do is

1  ask, "Tell us what source code is" on the phone and they would

2  respond.  I suggest Your Honor, it's in the record, look at 41,

3  look at the response.  We can supply Your Honor with the

4  meet-and-confer letters.  This is all we were after.

5      Now, before we found out what happened, we served our

6  interrogatory -- I'm sorry -- our contentions on July 10th.

7  That's Page 8.  I'm sorry, that's Page 6 of the handout.

8      You can see, if you look on those contentions, this

9  blowout here.  This is the source code appendix to our

10  contentions.  This says exactly what we're relying on.

11      If you look at the highlights, you will see the highlights

12  on Page 6 show a source code.  It matches up directly -- What's

13  in the red box matches up directly to what they put on Page 5.

14      So Page 5 is what they told us where the code was.  This

15  is overall code for the phone.  And look at the red box that I

16  put there.  That shows you for one phone.  This is Galaxy S3

17  from AT&T.  This tells you for the launch version and the first

18  maintenance release.  It gives you the pathway and the -- This

19  is in Samsung perforce code.  It tells us where to go.

20      When we went there, what we found is on Page 6.  And we

21  found this pathway.  It says Quick Search Box on it.  All of

22  these numbers are identical to the numbers that they gave us.

23  We thought we had it.

24      July 10, we served the contentions with this level of

25  detail attached.

1      July 15 comes along, five days later, Page 7.  Samsung

2  responds to Interrogatory Number 48 indicating that the source

3  code for the Quick Search Box that they had identified to us

4  and that we had used in our contentions is, in their words,

5  universally incorrect for all devices and software versions.

6      Important part of their response is -- is blown out on

7  Page 7 in yellow highlighting.  I won't read the second

8  sentence because it contains confidential material in it.

9      But to say several of the files are universally incorrect

10 and then the third sentence.

11     The reason for this is simple.

12         "The Quick Search Box package associated with

13         the directory in which these files are contained is

14         never used on Samsung devices."

15     Well, Your Honor, if it was never used on Samsung devices,

16 why is it on Page 5?  Why is it given to us?  And why are we

17 directed to something that was never used on their phone?

18     Now, we turn to Page 8.  We're back to the original chart.

19 And the original chart after the 15th, we figured out what was

20 going on.  After that, we went and we got -- We looked at the

21 Google proprietary version, and we see there that the Google

22 proprietary version has both what's at the top before the plus

23 and what's after the plus.  Those are the things that we

24 blanked.

25     In the proprietary version, it's right there.  We can do

```
1   it.  We cannot do it if you look at the four boxes that relate
2   to Ice Cream Sandwich and Jelly Bean.  You could not make that
3   argument.
4          THE COURT:  Is it correct that the functionality is
5   revealed simply by looking at the -- at the UI?
6          MR. WHITEHURST:  That is not correct, Your Honor.
7          THE COURT:  Your expert never says that?
8          MR. THOMASCH:  Our expert is talking -- is not talking
9   about the ability to deal with the claim limitations.  It is --
10  It is absolutely not the situation.  You can certainly tell
11  certain functionality, but there's more to this claim than
12  functionality.
13       And to meet the limitations of the claim, you must go to
14  the source code.  You must know where things are stored on the
15  devices.  You must understand, most importantly, how the search
16  is performed and then how the results are presented.
17       And you may be able to see the presentation of results but
18  you can't tell how the search was performed.  That's under the
19  covers.  You can't see where it's going out to get that
20  information.
21         THE COURT:  But, of course, the search was
22  functionality that was available in the versions you knew about
23  for several months; right?
24       I mean, your -- your chart tells me that Internet search
25  was in the other versions that were disclosed by Apple; right?
```

1    **MR. THOMASCH:**  Internet search absolutely was.

2  Internet search isn't the issue.  Internet search alone doesn't

3  allow you to have a blank.

4    **THE COURT:**  But the UI will tell you that the -- the

5  blending was at least in part coming from data from the local

6  database; right?

7    **MR. THOMASCH:**  No, we could not tell that.  That is --

8  We could not tell what module it came from.

9    There are different modules and the question is --

10    **THE COURT:**  Right.  The module --

11    **MR. THOMASCH:**  It's done on module-by-module basis.

12    **THE COURT:**  The module -- If I might, with apologies.

13    **MR. THOMASCH:**  No.  My apologies.

14    **THE COURT:**  If -- If -- If the module itself may not

15  be revealed, that's one thing.  But the fact that local -- a

16  local database is supplying the data that is blended to perform

17  the limitation, that's revealed by looking at the UI.  Isn't

18  that what your expert said?

19    **MR. THOMASCH:**  No, he did not say that.

20    The -- The arguments -- Quickly, because we didn't get a

21  chance to respond to the reply, which says this is a total

22  fiction, in their words, a tale.

23    They make a number of arguments.  They make an argument.

24  And this is a quote -- The blockout of Lines 17, 18, 19, that's

25  a quote from the reply brief, and they testify about 2012

1   testimony.  This is testimony before we would have even gotten

2   Samsung's code.  This is -- Well, we started to get Samsung's

3   code back in 2012.

4       He testified -- You'll read this, but the -- The

5   nonconfidential words here that they don't don't block out

6   are -- that on Samsung devices -- He testifies as to what's on

7   Samsung's devices, is what they say in their brief.

8       The testimony is down here on Page 115.  I'm sorry.  On

9   the same page, they blow up Page 115 of his testimony.  He is

10  talking about the Galaxy Nexus, not about all the devices.

11      This was testimony in the preliminary injunction.  The

12  only product from the preliminary injunction was the Galaxy

13  Nexus.  This is way before any of these contentions are formed.

14  The Galaxy Nexus is almost sui generis.  That's a Google phone.

15  That has nothing to do with all Samsung devices.

16      Their second argument is -- And this is the killer for me.

17  I -- I . . .

18      Samsung argues it didn't mislead us in response to

19  Interrogatory Number 41.

20      What they say in their -- in Footnote 10 is that we asked

21  them to identify the Google source code used for the GSA.

22      Not true.  This interrogatory requested no information

23  about GSA or any other accused application.  It asked for the

24  location for the version of the Android operating system,

25  because all we wanted was the operating system.  We didn't want

1   anything else about . . .

2        That just belies the whole case.  It belies everything

3   that we've been dealing with.  We've been dealing with of all

4   these separate modules.  We wanted all of it.  The definition

5   asks for.

6        I mean, we asked -- We said "application" and "app" in

7   case someone might make a distinction.  "Oh, that's not an

8   application, it's an app."

9        We asked for it every way we know how to ask for it.  And

10  what we got back -- What we got back was Samsung perforce

11  server pathways.  And that led us into the wrong room.

12       And in that room was something that said Google Quick

13  Search Box, and we were stupid enough to then use that.  That's

14  what happened.

15            **THE COURT:**  And so --

16            **MR. THOMASCH:**  Now --

17            **THE COURT:**  -- in providing you with that response,

18  you're saying that Samsung gave you a false response.  They

19  gave you false information under oath, under Rule 26(e)

20  certification allegation.

21            **MR. THOMASCH:**  I believe they gave us flatly incorrect

22  information.

23            **THE COURT:**  They were flatly incorrect, which is

24  false.

25            **MR. THOMASCH:**  I'll accept that.

```
 1          THE COURT:  I'm reading -- You don't have to accept my
 2   representation.  I'm reading --
 3          MR. THOMASCH:  No.  There's --
 4          THE COURT:  You're saying -- You're saying on Page 13
 5   of your slide that Samsung gave you an objectively false --
 6   even though they signed that response under Rule 26(e).
 7          MR. THOMASCH:  It is objectively false as to the QSB.
 8   If this is where the QSB is supposed to be, it's false.  I
 9   think they're -- they're -- They're not going to say, "Oh, no,
10   it is where the QSB is."
11        As I understand their papers, what they've said is, "No,
12   no, no.  The QSB is an application and the operating --
13   operating system is different from that.  So we never gave you
14   any information about the QSB.  We only gave you information
15   about the operating system."
16        So it's not false.  It's just woefully incomplete.
17        And I don't think it matters which it is because, frankly,
18   when we figured it out, we --
19          THE COURT:  The record matters to me.  I mean --
20          MR. THOMASCH:  Well --
21          THE COURT:  -- if I haven't made anything else clear
22   this morning, I hope the record -- I have made that point
23   clear.  The record does matter.
24        To call someone incorrect is one thing.  To label them
25   false, to lobby all these other accusations, if you're willing
```

1  to stand by them, as I said, I'll consider that but --

2          **MR. THOMASCH:**  At --

3          **THE COURT:**  -- the record does matter.

4          **MR. THOMASCH:**  As to QSB, it is inaccurate,

5  completely, 100 percent.

6      As I say, I think their claim is, it's not a lie.  It's

7  simply a statement that isn't directed to QSB.  It's directed

8  only to the Android operating system.  And if they get to slice

9  the cheese that thin, then it's accurate but it really is

10  misleading.

11      No one had any doubt what we were looking for.  We wanted

12  to figure out which code.

13      Now, at that time, Your Honor, all we thought we were

14  looking for was the right citations to put into our contentions

15  so that we wouldn't have problems down the road.

16      We had no idea when they told us we were wrong.  We didn't

17  at first think, "Oh, that's a big deal."  We thought, "That's a

18  pain in the neck because it means we have to get the right one

19  and we have to, in effect, change all our citations."

20      It's only when our expert then looked at the right one, he

21  said, "Wait a minute.  This is completely different.  This is

22  different and allows a different argument."

23      The fact of the matter is, in -- We could not have known.

24  If we had known what the right code is, we would have used the

25  right code.

1    Our -- There's no doubt that when we -- when we went in

2  and we put our contentions in on July 10, we did so, and we had

3  told them what those contentions were, Your Honor.  We told

4  them in May.  We showed them our documents.  They knew what we

5  were using.

6    They never said a word about it until after our final

7  contentions came in and then, five days later, on the last day

8  of the discovery period, they say it's universally incorrect.

9    Well, we were wrong.  We had the wrong stuff.  And I don't

10 think that Your Honor needs to make any finding.  I know you --

11 It may be important to you but it isn't important in a sense.

12 What's important to me is that we not have our entire

13 infringement argument stricken for something that we could not

14 have avoided.  But -- And I don't think it matters why there

15 was -- why we were directed to the wrong code, but we were.

16 And we -- And there's no doubt about it.  It's not some

17 after-the-fact excuse.

18    We put an appendix in, and it has the exact source code,

19 and it cites to QSB, and it's what they told us in the response

20 to 41.

21         **THE COURT:**  All right.

22         **MR. THOMASCH:**  And that's it.  And I'll just say in

23 the last argument -- I don't need to make it -- they said that

24 we --

25         **THE COURT:**  If you don't need to make it, then --

 1          **MR. THOMASCH:**  Well --

 2          **THE COURT:**  -- we can call it a day on that point.

 3      I'll give Samsung an opportunity for a brief rebuttal.

 4  Thank you very much.

 5          **MR. THOMASCH:**  Thank you, Your Honor.

 6                    (Pause in proceedings.)

 7          **THE COURT:**  He's saying you gave him a false response

 8  or that you were, at the very least, utterly misleading.

 9          **UNIDENTIFIED SPEAKER:**  Your Honor, we certainly did

10  not mean to be -- certainly -- I don't think we were.

11      Take a look at the -- A couple things here:

12      First of all, take a look at the wording of the

13  interrogatory, which is in March 2013.  And I also -- I

14  apologize for all the (inaudible).  If I may provide this, Your

15  Honor.

16                    (Pause in proceedings.)

17          **UNIDENTIFIED SPEAKER:**  Your Honor, we talked about

18  this in -- in June, that there's a difference between code and

19  the open source that Samsung does.  Samsung documents the open

20  source, and it's the whole open source framework.

21      And there are also closed source applications where

22  Samsung only receives object code.  And I'll call those binary

23  drops.  So Apple learned well before June that they were binary

24  drops.

25      And what we've pointed to here is -- is an example of

1   that, a letter where they say, "We're accusing certain

2   closed-source applications we can only get from Google:  Quick

3   Search Box, Google Now, Play Music," a number of other

4   proprietary applications.  So they knew that those were Google

5   applications.

6       Here, in Interrogatory 41, as I say, that letter was in

7   March, this interrogatory was also in March.  And in March,

8   they said, "Samsung, please provide to us the source code

9   version for the Android operating system for each of the

10  devices and point to where the source code is located in

11  Samsung's production."

12      And we provided a table that was, we hope, very helpful

13  and that they didn't move to compel on, that says specifically,

14  "For each build of each device, here is each specific perforce

15  pathway where we store that source code.  And in that pathway,

16  you'll find the binary drop.  You'll find a folder that says

17  vendor unbundled.  Google (inaudible) was making the binary

18  drop.  And all of the applications that you see -- Every single

19  one of the applications you see listed here in this letter,

20  Google Now, Quick Search Box, Place -- Play Music, you'll see

21  those applications as a binary drop."  So there shouldn't have

22  been confusion.

23      Now, yes, there's a folder of open source Quick Search Box

24  code, because it's part of the framework, and Apple knows it's

25  part of the framework because they've seen the open source code

1  as part of that open source release on these devices.  And,

2  yes, it does exist on these devices.

3      But there was no confusion about whether Samsung -- In

4  fact, they download old open source code, which is the one that

5  made the Quick Search Box.  Apple's own letters say this is a

6  proprietary application.  Closed source -- The accused closed

7  source application.

8      And then, when they came here in June, they explained to

9  Your Honor they wanted to amend because they had received

10  closed source binary drops from Google.

11      **THE COURT:**  All right.  Thank you.

12      The motions are submitted.  You'll get an order from me

13  shortly.

14      Have a good afternoon.

15                  (Court adjourned at 12:14 p.m.)

16

17

18

19

20

21

22

23

24

25

### CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U. S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

_____
Candace Yount, Contracted Transcriber
to the United States District Court
Northern District of California

Friday, December 20, 2013