United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE, INC., a California corporation,<br><br>       Plaintiff and Counterdefendant,<br><br>      v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>       Defendants and Counterclaimants. | Case No.: 12-CV-00630-LHK<br><br>ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING SAMSUNG'S MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>**[PUBLIC REDACTED VERSION]** |

The parties in this patent suit have cross moved for partial summary judgment on various issues. Plaintiff and Counterdefendant Apple, Inc. ("Apple") filed a motion for partial summary judgment against Defendants and Counterclaimants Samsung Electronics Co., Ltd.; Samsung Electronics America, Inc.; and Samsung Telecommunications America, LLC (collectively "Samsung") on October 10, 2013. *See* ECF No. 803-4 ("Apple MSJ"). Samsung filed a motion for partial summary judgment on the same date. *See* ECF No. 805-3 ("Samsung MSJ"). The parties filed corresponding oppositions on November 1, 2013, *see* ECF Nos. 854-3 ("Samsung Opp'n"), 853-3 ("Apple Opp'n"), and replies on November 14, 2013, *see* ECF Nos. 944-4 ("Apple Reply"),

1

United States District Court
For the Northern District of California

946-3 ("Samsung Reply"). The Court heard oral arguments on these motions on December 12, 2013. After hearing oral argument on the matter, and reviewing the briefing by the parties, the evidence offered in support of the briefing, and the relevant case law, the Court GRANTS in part and DENIES in part Apple's motion for summary judgment and DENIES Samsung's motion for summary judgment.

## I.   BACKGROUND

At the center of the parties' dispute in this lawsuit are some of Apple and Samsung's latest smartphones, media players, tablets, and computers. The Court is also presiding over an earlier-filed case between the same parties that involves older devices. *See*, *e.g.*, *Apple, Inc. v. Samsung Electronics Co.*, No. 11-CV-01846, 2013 WL 6225202 (Nov. 25, 2013). In the present case, each side's claims include allegations that the other has infringed its utility patents by using, selling, offering to sell, and importing the accused devices in violation of 35 U.S.C. § 271. Apple moved to preliminarily enjoin Samsung's allegedly infringing sales of one of the accused products, the Galaxy Nexus. This Court granted Apple's preliminary injunction motion as to one of Apple's patents-in-suit, U.S. Patent No. 8,086,604 (the "'604 Patent"), *see Apple, Inc. v. Samsung Electronics Co., Ltd.*, 877 F. Supp. 2d 838 (N.D. Cal. 2012), but the Federal Circuit reversed, in part because this Court erroneously construed a claim term from the '604 patent, *see Apple Inc. v. Samsung Electronics Co.*, 695 F.3d 1370, 1378 (Fed. Cir. 2012).

In order to streamline the case for trial, the Court has required the parties to limit their infringement contentions to 5 patents, 10 asserted claims, and 15 accused products per side. *See* ECF No. 471 at 2.[1] The parties have accordingly limited their infringement contentions as follows. Apple currently asserts claim 18 of U.S. Patent No. 8,074,172 (the "'172 Patent"); claims 1, 4, 6, 8, and 9 of U.S. Patent No. 5,946,647 (the "'647 Patent"); claim 20 of U.S. Patent No. 7,761,414 (the "'414 Patent"); claims 24 and 25 of U.S. Patent No. 6,847,959 (the "'959 Patent"); and claim 8 of U.S. Patent No. 8,046,721 (the "'721 Patent") against the following Samsung products: Admire, Conquer 4G, Dart, Exhibit II 4G, Galaxy Nexus, Galaxy Note, Galaxy Note II, Galaxy SII, Galaxy

---

[1] By February 6, 2014, the parties will be required to limit their asserted claims to 5 per side and limit their accused products to 10 per side. *See* ECF No. 471 at 2.

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

1  SII Epic 4G Touch, Galaxy SII Skyrocket, Galaxy S III, Galaxy Tab 2 10.1, Illusion, Stratosphere,

2  and Transform Ultra. *See* ECF No. 786.[2] Samsung currently asserts claims 10 and 35 of U.S. Patent

3  No. 7,756,087 (the "'087 Patent"); claim 13 of U.S. Patent No. 7,551,596 (the "'596 Patent");

4  claims 1, 14, and 15 of U.S. Patent No. 7,577,757 (the "'757 Patent"); claims 25 and 27 of U.S.

5  Patent No. 6,226,449 (the "'449 Patent"); and claims 1 and 15 of U.S. Patent No. 5,579,239 (the

6  "'239 Patent") against the following Apple products: iPhone 4, iPhone 4S, iPhone 5, iPad 2, iPad 3,

7  iPad 4, iPad Mini, iPod Touch (5th Generation), iPod Touch (4th Generation), MacBook Air,

8  MacBook Pro, iMac, Mac Mini, iTunes (including iTunes Match), and iCloud. *See* ECF No. 787.

9  In a prior order, the Court construed various terms in these claims. *See* ECF No. 447 ("Claim

10  Construction Order").

11        In its summary judgment motion, Apple asks this Court to rule that various accused

12  products infringe claim 18 of the '172 Patent, claim 1 of the '647 Patent, and claim 20 of the '414

13  Patent; that two purported prior art systems fail to anticipate or render obvious claims 24 and 25 of

14  the '959 Patent; and that U.S. Patent No. 7,587,446 (the "'446 Patent") anticipates claims 1, 14,

15  and 15 of the '757 Patent.

16        Samsung's summary judgment motion seeks an order from this Court that certain accused

17  products do not infringe claims 1, 4, 6, 8, and 9 of the '647 Patent; that Microsoft's Windows

18  Mobile 5.0 platform anticipates claims 11 and 20 of the '414 Patent; that claims 24 and 25 of the

19  '959 Patent are invalid as indefinite; and that claim 13 of the '596 Patent enjoys a priority date that

20  is one year earlier than the date the claim was first presented to the USPTO. Additional facts are

21  discussed below, as necessary, in the Court's analysis.

22  **II.    LEGAL STANDARD**

23        The standard for evaluating motions for summary judgment is well settled and set forth

24  below. In addition, because, "in ruling on a motion for summary judgment, the judge must view the

25  evidence presented through the prism of the substantive evidentiary burden," *Anderson v. Liberty*

26

27  ───────────────

28  [2] Apple maintains that at least some of these products are representative of other accused products for purposes of Apple's infringement claims. The parties are still seeking to reach an agreement on Apple's representative-products contentions.

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

*Lobby, Inc.*, 477 U.S. 242, 254 (1986), the Court sets forth the substantive evidentiary burdens for literal infringement and anticipation—issues common to both parties' motions.

### A.     Summary Judgment

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Material facts are those that might affect the outcome of the case. *See Liberty Lobby,* 477 U.S. at 248. A dispute as to a material fact is "genuine" if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Id.* The question is "whether a jury could reasonably find either that the [moving party] proved his case by the quality and quantity of evidence required by the governing law or that he did not." *Id.* at 254 (emphasis omitted). "'[A]ll justifiable inferences are to be drawn in [the nonmovant's] favor.'" *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989) (en banc) (quoting *Liberty Lobby*, 477 U.S. at 255).

The moving party bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, interrogatory answers, admissions, and affidavits, if any, that it contends demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of that party's pleading, but must "cit[e] to particular parts of materials in the record" showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c)(1)(A); *see also Liberty Lobby*, 477 U.S. at 250. The opposing party need not show the issue will be resolved conclusively in its favor. *See Liberty Lobby*, 477 U.S. at 248-49. All that is necessary is submission of sufficient evidence to create a material factual dispute, thereby requiring a jury or judge to resolve the parties' differing versions at trial. *See id.*

### B.     Literal Infringement

A party must prove patent infringement by a preponderance of the evidence. *See Siemens Medical Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1279 (Fed. Cir. 2011). At this stage, the parties' infringement disputes center on whether certain Samsung

4

**United States District Court**
For the Northern District of California

products literally infringe certain patents. "Literal infringement requires the patentee to prove that the accused device contains each limitation of the asserted claim(s)." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Id.*

### C.      Anticipation

Patents are presumed valid. *See* 35 U.S.C. § 282(a). A party challenging the validity of a patent claim bears the burden of proving invalidity by clear and convincing evidence. *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011). An accused infringer may show that a patent claim is invalid as anticipated under 35 U.S.C. § 102 and to do so "must show by clear and convincing evidence that a single prior art reference discloses each and every element of a claimed invention." *Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1265 (Fed. Cir. 2012).

## III.      DISCUSSION

### A.      Preliminary Matters

Before addressing the merits of the parties' summary judgment arguments, the Court addresses two threshold issues that arise at various points in the parties' briefs: (1) whether additional claim construction is necessary and (2) the weight the Court should give to its conclusions at the preliminary injunction stage.

#### 1.      Claim Construction

Many of the present issues rest on claim construction positions that the parties never raised during the claim construction phase of this case. For example, Samsung seeks to construe "DDI field" in the '596 Patent to mean a "logical identifier representing the first PDU." Samsung MSJ at 23. The Court finds these arguments untimely. If the parties wanted to tee up summary judgment positions based on particular constructions, they "could (and should) have sought . . . construction[s] to [those] effect[s]." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 520 (Fed. Cir. 2012).

The Court recognizes its duty to resolve fundamental disputes regarding claim scope. *See O2 Micro Int'l v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). The Court

5

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    fulfilled that duty when it provided a thorough claim construction opinion earlier in these

2    proceedings. Yet "district courts are not (and should not be) required to construe *every* limitation

3    present in a patent's asserted claims." *Id.* at 1362 (emphasis in original). Nor are they obligated to

4    rule on claim construction arguments presented for the first time in summary judgment briefs. *See*

5    *Function Media, L.L.C. v. Google Inc.*, 708 F.3d 1310, 1325 (Fed. Cir. 2013) ("We hold that the

6    denial of a pre-trial motion for summary judgment of noninfringement does not, by itself, show

7    that the district court delegated claim construction to the jury."). This is not a case like *O2 Micro*,

8    where the district court erred when it declined to resolve a dispute over claim scope raised during

9    claim construction. Indeed, *Function Media* distinguished *O2 Micro* in part because "the parties [in

10   *O2 Micro*] disagreed [about the term in dispute] *during claim construction*." *Id.* (emphasis added).

11   Here, the Court resolved the parties' disputes over claim scope at the claim construction stage.

12         The Federal Circuit has held that it can be error to engage in hypertechnical refinements of

13   the meaning of claims following claim construction to support a grant of summary judgment. In

14   *AFG Industries, Inc. v. Cardinal IG Co.*, 375 F.3d 1367 (Fed. Cir. 2004), the court, after previously

15   construing the term "layer," held that a district court erred in granting summary judgment of

16   noninfringement under a supplemental definition of the term that excluded a certain class of

17   accused devices. "This court's remand did not invite further refinements in the meaning of the term

18   'layer.' . . . . Rather, this court requested the trial court to apply the established claim construction

19   to the accused products." *Id.* at 1372. Similarly, the Court here, based on the parties' prior selection

20   of terms in need of construction, has left many of the terms at issue to their plain and ordinary

21   meaning. For the majority of terms the parties now address in their summary judgment briefs, the

22   Court does not see the need for further refinement at the risk of taking factual issues away from the

23   jury.

24         Sound practical reasons counsel against construing additional terms based on claim

25   construction arguments raised for the first time in summary judgment briefs. The Northern District

26   of California's local rules require the parties to narrow the number of disputed terms to 10 as part

27   of their joint claim construction statement. *See* Patent L.R. 4-3(c). In accordance with those rules,

28   the parties made their selections at claim construction as to "the terms whose construction will be

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

most significant to the resolution of the case." *Id.* This requirement forces parties to identify potential case-dispositive terms at an early stage and also forces parties to help manage the scope of patent cases. The Court painstakingly adjudged the parties' claim construction disputes during the claim construction phase based on their in-depth technology tutorials and voluminous submissions of intrinsic and extrinsic evidence. The local rules and this Court did not set out a particular process for resolving claim construction disputes only to let the parties make additional arguments at the summary judgment phase untethered to those carefully structured rules.

Practical considerations specific to this case also counsel against engaging in additional claim construction now. The Court warned the parties at their July 31, 2013 case management conference that, given the fast-approaching Spring 2014 trial date, the Court would not treat the summary judgment phase of this case as a chance for the parties to make additional claim construction arguments. *See* Hr'g Tr. at 22:13-16, 24:22-25:7. The Court has learned through two prior trials with these parties, both in Case No. 11-CV-1846, that, given the chance, each side will continue to generate creative linguistic arguments about nearly every term in a claim in order to accuse the other side of "ignoring the Court's claim construction rulings" or "adding limitations to the plain language of the claim." Resolving those disputes has taken on a "whack-a-mole" character, one for which the returns have quickly diminished.

All this is not to say that the Court refuses to consider the parties' summary judgment arguments merely because an apparent dispute has arisen about the scope of a term's plain and ordinary or construed meaning. The Court does carefully consider these disputes, but does so as "part of the infringement analysis, not part of the claim construction." *Thorner v. Sony Computer Entertainment Am., LLC*, 669 F.3d 1362, 1369 (Fed. Cir. 2012). The Federal Circuit's decision in *Thorner* is instructive. There, the district court had construed the term "flexible" to mean "capable of being noticeably flexed with ease." *Id.* On appeal, the Federal Circuit concluded that the district court's construction was too rigid. The court highlighted, however, that even though the plain and ordinary meaning of "flexible" controlled, that ruling did not preclude summary judgment of noninfringement on remand. "The district court is of course free on summary judgment to decide

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

that there is no genuine issue of material fact that the accused products in this case do not meet the plain and ordinary meaning of the term 'flexible.'" *Id.*

With this guidance, the Court will view the parties' disputes through the lens of whether a reasonable jury, armed with the Court's claim construction as to certain terms and an instruction that the plain and ordinary meaning controls as to others, could or would necessarily conclude that the asserted claim reads on an accused device (or that a prior art reference reads on an asserted claim). Similar to claim construction, in determining whether an infringement or anticipation argument fits within the plain and ordinary meaning of a term the Court reviews "[t]he written description and other parts of the specification," as those tools "may shed contextual light on the plain and ordinary meaning." *Aventis Pharms. Inc. v. Amino Chemicals Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013). But the goal at this stage is not to complete the Sisyphean task of providing definitive guidance as to a term's plain and ordinary meaning. Instead, the Court must determine whether a jury, "free to rely on the plain and ordinary meaning of the term[s]," *ePlus, Inc.*, 700 F.3d at 520, may or must conclude that the accused devices (or prior art references) infringe (or anticipate) the asserted claims.

### 2.    The Court's Preliminary Injunction Ruling

The parties dispute whether the Court should here apply various factual conclusions made in the likelihood-of-success portion of the Court's preliminary injunction ruling. For example, Apple argues that, in ruling on Apple's motion for summary judgment of infringement of the '172 Patent, the Court should consider that "[t]his Court has already found that Samsung devices with the Google Keyboard likely infringe the '172 Patent in its preliminary injunction order." Apple MSJ at 1. This and similar arguments are without merit. The Court's conclusion that Apple was likely to prevail on certain points "at trial," 877 F. Supp. 2d at 877, does not entitle Apple, or even suggest Apple is entitled, to a summary judgment victory. "The limited purpose of a preliminary injunction is to preserve the status quo and prevent irreparable injury, not to provide an evidentiary basis for granting summary judgment." *eMachines, Inc. v. Ready Access Memory, Inc.*, No. EDCV00-00374-VAPEEX, 2001 WL 456404, *4 (C.D. Cal. Mar. 5, 2001) (citing *Univ. of Texas v.*

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

*Camenisch*, 451 U.S. 390, 394 (1981)). To hold otherwise would improperly transform the Court's preliminary injunction ruling into a self-fulfilling prophecy.

Since the Court's ruling on Apple's motion for a preliminary injunction, the parties have engaged in extensive fact and expert discovery. Neither the parties nor the Court had the benefit of this discovery at the preliminary injunction phase, and the parties have used that discovery to refine and develop previously presented and additional theories of the case. Accordingly, in reaching its conclusions on summary judgment, the Court focuses on the parties' evidentiary submissions in their summary judgment briefs to determine whether genuine disputes of material fact exist as to the various issues raised by the parties, not on the evidentiary arguments raised during the preliminary injunction phase.

**B.     Apple's Motion for Summary Judgment of Infringement on the '172 Patent (Word Recommendations)**

Apple's '172 Patent, entitled "Method, System, and Graphical User Interface for Providing Word Recommendations," was filed on January 5, 2007, and issued on December 6, 2011. The '172 Patent discloses a method, system, and interface for providing word recommendations to users inputting text into a portable communication device and for allowing the user to select the recommended words. *See generally* '172 Patent Abstract. Although not characterized by the parties as such, the features disclosed in the '172 Patent appear to be a form of what is known colloquially as "auto correct."

Apple contends that it is entitled to summary judgment that the following devices infringe Claim 18 of the '172 Patent: Admire, Captivate, Glide, Conquer 4G, Exhibit II 4G, Galaxy Nexus, Galaxy Note (excluding one release), Galaxy SII (excluding one release), Galaxy SII Epic 4G Touch (excluding one release), Stratosphere, and Transform Ultra (the "'172 Accused Products"). Apple MSJ at 1 n.1. Claim 18 is recited below, with the relevant portion for purposes of Apple's summary judgment motion emphasized:

9

18. A graphical user interface on *a portable electronic device with a keyboard and a touch screen display*, comprising:
  a first area of the touch screen display that displays a current character string being input by a user with the keyboard; and
  a second area of the touch screen display separate from the first area that displays the current character string or a portion thereof and a suggested replacement character string for the current character string;
  wherein;
  the current character string in the first area is replaced with the suggested replacement character string if the user activates a key on the keyboard associated with a delimiter;
  the current character string in the first area is replaced with the suggested replacement character string if the user performs a gesture on the suggested replacement character string in the second area; and
  the current character string in the first area is kept if the user performs a gesture in the second area on the current character string or the portion thereof displayed in the second area.

As part of its summary judgment motion, Apple includes the infringement analysis of its expert, Professor Andrew Cockburn. Professor Cockburn's analysis provides sufficient evidence to conclude that every '172 Accused Product contains all the elements of claim 18. For example, Professor Cockburn demonstrates that the Galaxy Nexus is a portable electronic device with a keyboard and a touch screen display that includes the following graphical user interface:



Expert Report of Professor Andrew Cockburn ¶ 394 (ECF No. 1087-6) ("Cockburn Report").

Professor Cockburn includes a thorough infringement analysis in his report, demonstrating why in

10

United States District Court
For the Northern District of California

his opinion the '172 Accused Products all infringe claim 18 of the '172 Patent in the same way. *See id.* ¶¶ 17-22, 376-435, Exs. 2 (ECF No. 1087-7), 3 (ECF No. 1087-8).[3]

Of this analysis, Samsung disputes only whether the '172 Accused Products include the claimed "keyboard." Although Samsung concedes that all the '172 Accused Products have a virtual keyboard—meaning that the keyboard appears on the display of the device through software running on the device—Samsung contends that the claim requires a physical keyboard, which the '172 Accused Products indisputably lack. *See* Rebuttal Expert Report of Dr. Daniel Wigdor Concerning Non-Infringement of U.S. Patent No. 8,074,172 ¶ 130 (ECF No. 1087) ("Wigdor Rebuttal Report"); Deposition of Daniel Wigdor ("Wigdor Tr."), 107:17-108:14 (ECF No. 1087-1); *see also* Cockburn Report ¶ 386. Neither party sought a construction of the term "keyboard" to address this issue in their claim construction briefs. The Court therefore applies "the full range" of the term's plain and ordinary meaning, "unless compelled to do otherwise." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001). For the following reasons, the Court

---

[3] For example, Professor Cockburn includes the following general description of the '172 Accused Products in his report:

> For example, if the user types "messaf" (the current character string) in the Messaging application found on each of these devices, "messaf" appears in the portion of display showing the entirety of the text message the user is composing (the "first area"). All of the accused devices also display the current character string in a suggestion bar, which is located between the first area and the keyboard (the "second area"). The suggestion bar contains both the current character string and suggested replacement words for the current character string. Using our example, if the user typed "messaf", the second area would display "messaf", as well as suggestions for replacements for "messaf", such as "message" or "messages". Next, in every accused device, when the user selects a delimiter, the current character string in the first area is replaced by one of the suggestions in the second area. Continuing the example, if the user selects spacebar after typing "messaf", "message", one of the suggestions displayed in the second area, would replace "messaf" displayed in the first area. Alternatively, if the user instead taps on "message" displayed in the second area, "message" would replace "messaf" in the first area. Finally, in all of the accused devices, if the user taps on "messaf" displayed in the second area, "messaf" is kept in the first area.

Cockburn Report ¶ 19.

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

1    concludes that no reasonable jury could understand the plain and ordinary meaning of the term

2    "keyboard" as used in claim 18 to exclude virtual keyboards.

3            Other independent claims of the '172 Patent clearly encompass both virtual and physical

4    keyboards. The scope of "keyboard" in those other claims is crucial to understanding the term's

5    scope in claim 18. "[A] claim term should be construed consistently with its appearance in other

6    places in the same claim or in other claims of the same patent." *Rexnord Corp.*, 274 F.3d at 1342.

7    In particular, independent claim 28 recites "[a] portable electronic device, comprising . . . a display

8    . . . [and] a keyboard" (among other things), and claim 29 recites "[t]he portable electronic device

9    of claim 28, wherein the display is a touch screen display, and wherein the keyboard is a virtual

10   keyboard displayed on the touch screen display." Similarly, independent claim 2 recites, among

11   other things, a "portable electronic device with a touch screen display" and a "keyboard," and

12   subsequent dependent claims alternatively limit the keyboard of claim 2 to "a soft keyboard that is

13   part of the touch screen display" (claim 6) and "a physical keyboard that is not a part of the touch

14   screen display" (claim 7). Because a dependent claim necessarily sets out a "further limitation" of

15   the subject matter of the independent claim, 35 U.S.C. § 112(d), the scope of the unmodified term

16   "keyboard" in independent claims 2 and 28 is necessarily broad enough to include a virtual or soft

17   keyboard.

18           This broad understanding of the term "keyboard" is fully consistent with the '172 Patent's

19   specification. All but one of the disclosed embodiments include a virtual or soft keyboard. *See* 7:6-

20   32, 7:50-65, 8:59-10:59 (discussing "virtual or soft keyboard 210"). The one time the inventors

21   described an embodiment with a physical keyboard, they did so expressly as an "alternative[]" and

22   explicitly stated that "[t]he physical keyboard is not a part of the touch screen display." '172 Patent

23   at 7:33-39.[4] In addition, every figure in the '172 Patent that shows a portable electronic device

24   includes a virtual keyboard. *See* Figs. 2, 4A-4I, 5A-5B. This evidence leads inescapably to the

25

26

27   _____
     [4] In full, the '172 Patent describes this "alternative[]" physical keyboard embodiment as follows:
     "Alternatively, in some other embodiments, the keyboard may be a physical keyboard that includes
28   a set of push buttons, a keypad, or the like. The physical keyboard is not a part of the touch screen
     display." 7:33-39.

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

1    conclusion that claim 18's reference to a "portable electronic device with a keyboard and a touch

2    screen display" naturally includes a virtual keyboard.

3          Samsung acknowledges that the other claims in the '172 Patent cover a virtual keyboard,

4    but contends that the scope of asserted claim 18—which does not have any dependent claims—is

5    different and cannot include a virtual keyboard because of how the term "keyboard" appears in the

6    claim. Samsung emphasizes that the preamble of claim 18 recites "a portable electronic device with

7    a keyboard *and* a touch screen display." Relying on the principle that "[w]here a claim lists

8    elements separately, the clear implication of the claim language is that those elements are distinct

9    component[s] of the patented invention," *Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*,

10   616 F.3d 1249, 1254 (Fed. Cir. 2010) (internal quotation marks omitted), Samsung contends the

11   claim's listing of a keyboard "and" a touch screen display requires the two parts of the portable

12   electronic device to be separate, Samsung Opp'n at 12. The Court concludes that the "distinct

13   component" principle stated in *Becton, Dickinson* is not applicable here and does not alter the plain

14   and ordinary meaning of "keyboard," for two reasons.

15         *First*, applying the "distinct component" principle as Samsung proposes proves too much.

16   Under Samsung's reading, even claims 2 and 28—which also conjunctively list a "keyboard" and a

17   "display"—would exclude a virtual keyboard. As explained above, that reading cannot be squared

18   with dependent claims 6 and 29, both of which require the keyboard from their respective

19   independent claims to be a virtual or soft keyboard that is part of the touch screen display.

20   Although Samsung separately contends that "every claim need not cover every embodiment," and

21   therefore that claim 18 should be read to have a different scope than the other sets of claims in the

22   '172 Patent, the Court concludes that nothing in claim 18 or the rest of the specification suggests a

23   departure from the default reading that counsels "against interpreting a claim term in a way that

24   excludes disclosed embodiments." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379,

25   1383 (Fed. Cir. 2008).

26         *Second*, the two cases Samsung cites for support did not apply the "distinct components"

27   principle in isolation, but instead relied on additional indications of distinctness in the claims and

28   specification that are missing from this case. In *Becton, Dickinson*, the claims recited a "hinged

13

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

arm . . . and spring means *connected to* said hinged arm." 616 F.3d at 1254 (emphasis added). The Federal Circuit relied on the "connected to" language—as well as the fact that the only embodiments in the specification had spring means separate from the hinged arm—to construe the two elements as separate. *Id.* No such "connecting to" language is present in claim 18, and, unlike in *Becton, Dickinson*, the specification of the '172 Patent, as described above, overwhelmingly supports a virtual or soft keyboard.

The '172 Patent's specification distinguishes this case also from *Gaus v. Conair Corp.*, 363 F.3d 1284 (Fed. Cir. 2004), the other case on which Samsung heavily relies. *See* Samsung Opp'n at 13. In *Gaus*, the claim at issue included the language "an electrical operating unit *and* a pair of spaced-apart electrically exposed conductive probe networks." The Federal Circuit construed the term as a whole to require an electrical operating unit separate from the pair of spaced-apart electrically exposed conductive probe networks, relying in part on the fact that "the specification plainly describes the two components as separate" and the "structural separation . . . [was] essential to the operation of the device in the prescribed manner." *Id.* at 1288-89. The '172 Patent, in contrast, explicitly contemplates combining the keyboard with the touch screen display and nowhere suggests that separating them is essential to the invention. While the plain and ordinary meaning of keyboard as used in claim 18 therefore encompasses a physical keyboard separate from the touch screen display, it is by no means limited to that structure.

Accordingly, the Court holds that no reasonable jury could conclude that the virtual keyboards of the '172 Accused Products fall outside of the plain and ordinary meaning of the term "keyboard" in claim 18. Because Samsung does not otherwise dispute Apple's satisfactory showing of infringement as to that claim, the Court GRANTS Apple's motion for summary judgment that the '172 Accused Products infringe claim 18 of the '172 Patent.

### C.    The '647 Patent (Links for Structures)

The '647 Patent, entitled "System and Method for Performing an Action on a Structure in Computer-Generated Data," was filed on February 1, 1996, and issued on August 31, 1999. The '647 Patent is directed to a computer-based system and method for detecting structures, such as phone numbers, post-office addresses, or dates, and performing actions on the detected structures.

14

1

2

3

4

5

6

*See* '647 Patent Abstract, 1:8-16. The '647 Patent sought to overcome certain deficiencies in the prior art that inhibited a user's ability to easily perform different desired actions on information encountered in a given software application. According to the '647 Patent, conventional systems existed to help search a file or document for information using pattern analysis, but upon identifying such information, the user would have to "cut[]" and "past[e]" that information into another field or software application in order to use the information. *Id.* 1:42-50.

7

8

9

10

11

12

13

14

15

The '647 Patent discloses a system and method for recognizing when certain patterns— called "structures"—are present in a data set and for automatically providing optional actions for a user to perform that are linked to the structures. *See id.* at 2:21-54. For example, the disclosed system may scan and recognize when phone numbers or email addresses appear in a Microsoft Word document. *See id.* at 1:24-35; *see also id.* at 2:42-53. Then, the disclosed system links actions to these structures and allow the user to select an action. *See id.* at 2:42-53. So when an email address is detected in a Word document, the disclosed system allows the user to select the email address and then choose from a list of options, such as send an email to the identified address or store the email address in an electronic address book. *Id.* at 5:5-18.

16

17

18

19

20

21

22

23

As described in the claims and the specification, the '647 Patent achieves the described functionality principally through the use of three "program routines": (1) an analyzer server; (2) a user interface; and (3) an action processor. *Id.* claim 1. Client applications described in the '647 Patent (e.g., word processors) submit documents to the analyzer server to "detect[] structures in the data" and "link[] actions to the detected structures." *Id.* The disclosed analyzer server then returns any detected structures and links to the client application. The user interface "enable[s] the selection of a detected structure and a linked action." *Id.* Finally, the action processor "perform[s] the selected action linked to the selected structure." *Id.* at 7:20-21.

24

25

26

27

28

The parties' motions implicate claim 1 of the '647 Patent, which is reproduced below with the relevant limitations emphasized:

15

1. A computer-based system for detecting structures in data and performing actions on detected structures, comprising:
   an input device for receiving data;
   an output device for presenting the data;
   a memory storing information including program routines including
      an *analyzer server* for detecting structures in the data, and for linking actions to the detected structures;
      a user interface *enabling the selection of a detected structure* and a linked action; and
      an action processor for performing the selected action linked to the selected structure; and
   a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines.

## 1.    Apple's Motion for Summary Judgment of Infringement

Apple contends that it is entitled to summary judgment that the following products each infringe claim 1 of the '647 Patent: Admire, Captivate Glide, Conquer 4G, Dart, Exhibit II 4G, Galaxy Nexus, Galaxy Note, Galaxy Note II, Galaxy Rugby Pro, Galaxy S II, Galaxy S II Epic 4G Touch, Galaxy S II Skyrocket, Galaxy S III, Illusion, Stratosphere, and Transform Ultra. Apple MSJ at 4 n. 5. Apple's motion is based on the allegedly undisputed operation of the web browser included with four different versions of the Android operating system: Froyo, Gingerbread, Ice Cream Sandwich, and Jelly Bean. *See* Initial Expert Report of Dr. Todd C. Mowry Regarding Infringement of U.S. Patent No. 5,946,647 ("Mowry Rep.") ¶ 101, nn.12-13 (ECF No. 1108-1); Rebuttal Expert Report of Dr. Kevin Jeffay Concerning Noninfringement of U.S. Patent No. 5,946,647 ("Jeffay Rebuttal Rep.") ¶¶ 154 n.2, 178 n.7 (ECF No. 1074-8). As part of its infringement claim, Apple also accuses the short messaging service software included with these four operating systems, but its summary judgment motion is limited to the web browser.

### a.    Claim Construction

Apple's arguments in support of summary judgment on the '647 Patent implicates the construction of "analyzer server," a term that was construed by Judge Richard A. Posner in *Apple, Inc. v. Motorola, Inc.*, No. 1:11-cv-08540 (N.D. Ill. March 19, 2012), *appeal pending* No. 12-1548 (Fed. Cir. Oral Arg. Held Sep. 11, 2013) ("Motorola Order"); *see* ECF No. 118-11.[5] Judge Posner construed "analyzer server" to mean "a server routine separate from a client that receives data

---

[5] Judge Posner is sitting by designation in *Apple v. Motorola* from the U.S. Court of Appeals for the Seventh Circuit.

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

having structures from the client." Motorola Order at 10. In its order granting Apple's motion for a preliminary injunction, this Court applied Judge Posner's construction, noting that it did so only for purposes of the preliminary injunction motion because Apple maintained that the Galaxy Nexus infringed even under that construction. *See* 877 F. Supp. 2d at 875.

The Court will also apply Judge Posner's construction of "analyzer server" for purposes of Apple's summary judgment motion. Although Apple now maintains Judge Posner's construction is wrong (and has challenged the constructions on appeal in the *Apple v. Motorola* case), its challenge in its summary judgment motion consists of no more than a sentence in the body of its brief and a footnote cite to 16 paragraphs in its infringement expert's report for the '647 Patent. *See* Apple MSJ at 5, n.6. Apple's attempt to argue for a new claim construction at this stage is doubly improper, both because it did not raise its arguments at the claim construction stage and because Apple is trying to sidestep the summary judgment page limitations by incorporating legal arguments in a separate declaration.

Apple contends that this Court already rejected Samsung's "*precise* arguments in claim construction, when Samsung tried to add the 'separate from a client' limitation to the 'analyzer server' element." Apple MSJ at 6 (citing Claim Construction Order at 16-18) (emphasis added). Apple is incorrect. This Court was not asked to construe "analyzer server." Rather, the Court construed only one term from the '647 Patent, the term "action processor." Although the Court adopted Apple's proposed construction for that term over Samsung's objection, it never addressed the "precise" argument Samsung is raising now.

Further, in describing the Court's claim construction order, Apple's motion altered the Court's description of claim 1 so as to suggest that the Court applied its ruling to the analyzer server term. *Compare* Claim Construction Order at 16 ("The claims strongly suggest that an *action processor* is not necessarily separate from the application containing the data.") (emphasis added) *with* Apple MSJ at 6 ("The Court also explained that '[t]he claims strongly suggest that [*the claimed program routines are*] not necessarily separate from the application containing the data.'") (Apple's alterations; emphasis added). Although Apple is correct that claim 1 of the '647 Patent describes both the action processor and the analyzer server as "program routines," the Court did not

17

United States District Court
For the Northern District of California

1    say that its ruling applied to the analyzer server. To the contrary, the Court explicitly noted that

2    Samsung's arguments related to "action processor" seemed to ignore the difference between the

3    plain language of a "processor" and a "server." *See* Claim Construction Order at 18. If anything,

4    that discussion suggests that the Court might have resolved the construction of "analyzer server"

5    differently if the question had been presented.

6          Apple tries to recover from its dubious characterization of the Court's opinion in its reply

7    by contending that it was merely trying to "point[] out [that] the Court's *logic*" applies equally to

8    the analyzer server term. Apple Reply at 4 (emphasis added). But that explanation merely

9    exemplifies Apple's earlier misstatement. Asking the Court to apply logic from an earlier ruling to

10   a different controversy is one thing; telling the Court that it already rejected the "precise

11   argument[]" currently before the Court is quite another. In any matter before the Court—but even

12   more so in a matter such as this, with nearly 4,000 docket entries across the two *Apple v. Samsung*

13   cases—parties are expected to describe the Court's prior rulings accurately and forthrightly. Failure

14   to do so carries consequences. To the extent Apple wants this Court to construe "analyzer server"

15   using the same arguments Apple raised with respect to "action processor," the Court rejects this

16   argument as untimely and improperly raised.

17         In any event, Apple contends that it is entitled to summary judgment of infringement even

18   under Judge Posner's construction of "analyzer server." The Court now addresses that contention

19   and finds that it, too, is without merit.

20         **b.   Analyzer Server**

21         As noted above, claim 1 requires "an analyzer server for detecting structures in data, and

22   for linking actions to the detected structures," and the Court has now adopted Judge Posner's

23   construction of an "analyzer server" to be "a server routine *separate from a client* that *receives*

24   *data* having structures from a client." Motorola Order at 10 (emphases added).

25         Through its expert Dr. Todd Mowry, Apple contends that a set of shared library subroutines

26   in the Android operating systems function as the "analyzer server" element of claim 1. Mowry

27   Rep. ¶¶ 132-143. ████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████   According to

Dr. Mowry, █████████████████████████████████, these shared libraries are "separate from" the "client" (e.g., the browser application).

Samsung contends that the shared libraries identified by Apple do not meet the "analyzer server" limitation as construed by Judge Posner because they are not "separate from" the browser application and do not "receive[] data having structures from" that application. In support of its position, Samsung has submitted a declaration from its noninfringement expert for the '647 Patent, Dr. Kevin Jeffay. Dr. Jeffay sets forth a thorough analysis of the shared library routines identified by Dr. Mowry and explains why in his opinion they are part of, rather than "separate from," the browser applications and therefore are not the required "server." *See* Declaration of Dr. Kevin Jeffay In Support of Samsung's Opposition to Apple's Motion for Summary Judgment Concerning U.S. Patent No. 5,946,647 ("Jeffay Decl.") ¶¶ 19-24, 35-39, 60-71, 103-109, 126-132, 176-182 (ECF No. 855-1). Dr. Jeffay also explains that his analysis of the source code leads him to believe that the accused libraries do not "receive data from a client" as required by Judge Posner's construction. *Id.* ¶¶ 100-101, 112-113, 120, 135-136, 173-147, 185-186.

This disagreement between the parties' experts constitutes a genuine dispute as to the application of Judge Posner's claim construction of "analyzer server" to the accused products, one that this Court cannot resolve at summary judgment. Accordingly, Apple has failed to show that it is entitled to summary judgment of infringement, and its motion as to the '647 Patent is DENIED.

### 2.   Samsung's Motion for Non-Infringement of Jelly Bean Operating System

Samsung contends that it is entitled to summary judgment that the operation of the Browser on the accused products running the Jelly Bean operating system does not infringe the asserted claims of the '647 Patent.

The Jelly Bean operating system, which Samsung introduced in the summer of 2012 after Apple's preliminary injunction motion was fully briefed, is the newest operating system at issue in this case. The parties agree that the Jelly Bean Browser operates differently than the browser on the other accused Android operating systems. ████████████████████████
████████████████████████████████████████████████████████

1  ████████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████

4  ████████████████████████

5  Samsung contends that Apple's concession that the Jelly Bean Browser detects structures

6  only after a user touches an area on a screen entitles Samsung to summary judgment of

7  noninfringement. The parties agree that the plain and ordinary meaning of the claim limitation "a

8  user interface enabling the selection of a *detected* structure" requires "the user interface to enable

9  selection of a structure, by the user, ***after*** the structure has already been detected." Reply

10  Declaration of Dr. Todd C. Mowry Concerning U.S. Patent No. 5,946,647 at ¶ 217 (ECF No. 805-

11  14) (emphasis in original). According to Samsung, ██████████████████████████

12  ████████████████ the Accused Jelly Bean Browser Products do not infringe claim 1 of the '647

13  Patent or any of its dependents because they do not provide a 'user interface enabling the selection

14  of a ***detected*** structure and a linked action.'" Samsung MSJ at 3 (emphases in original).

15  Apple disagrees with Samsung's analysis. As Apple's expert explains, ████████████████

16  ████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  ████████████████████████████████ Mowry Rep. ¶ 251 (alteration added).

19  According to Apple, ████████████████████████████████████████████

20  ████████████████████████ the user makes another "selection" through a long press ████████

21  ████████████████████████████████████████████. *See* Mowry Rep.

22  ¶¶ 250-51. Apple analogizes the long-press to a double tap, where the first tap triggers the detection

23  of a structure and the second tap allows the user to select the detected structure and launch the

24  menu of linked actions. Apple Opp. at 5. The second touch, Apple continues, "would indisputably

25  be a 'selection of a detected structure,'" and the long-press is no different.

26  The Court is satisfied that Apple's "long-press" argument establishes a genuinely disputed

27  issue of material fact for the jury. In light of the evidence Apple has presented—namely, its

28  expert's description of the long-press functionality and analysis of the source code for that

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

functionality, *see* Mowry Rep. ¶¶ 157-58, 250-51—a jury could conclude that the Jelly Bean

Browser has the claimed "user interface enabling the selection of a detected structure." Samsung

contends that Apple's "dual selection" theory is faulty because Apple fails to identify at what point

during the long press the second selection occurs. Samsung Reply at 2. Whether this and other

criticisms are sufficient to dispel Apple's long-press theory is a question for the jury, not this

Court, to decide. Accordingly, the Court DENIES Samsung's motion for summary judgment as to

the '647 Patent.

> ### D.       The '414 Patent (Synchronization)

The '414 Patent, entitled "Asynchronous Data Synchronization Amongst Devices," was

filed on January 7, 2007 and issued on July 20, 2010. The '414 Patent discloses "[s]ystems [and]

methods . . . for synchronization tasks and non-synchronization tasks [to] be[] executed

concurrently." '414 Patent Abstract. The system allows, for example, "a user [to] manipulate or

view a calendar while a synchronization operation, which synchronizes structured data from, for

example, the calendar or other databases such as a contact database, is being performed." *Id.* at

2:37-40. In this way, the '414 Patent teaches a system that allows data on two devices, such as a

handheld computer connected to a desktop computer, to be synchronized while allowing user

applications "to run concurrently with the synchronization process." *Id.* at 1:65; *see id.* at 24:42-68.

The patent explains that "non-synchronization" software, such as a calendar application, and

"synchronization" software run concurrently in different "threads or processes" on one or both of

the devices. *Id.* at 25:1-5.

Claim 20 of the '414 Patent is at issue. Claim 20 depends from claim 11, which reads as

follows (emphasis added):

> 11. A computer readable storage medium containing executable program
> instructions which when executed cause a data processing system to perform a
> method comprising:
>
> executing at least one user-level non-synchronization processing thread,
>         wherein the at least one user-level nonsynchronization processing
>         thread is provided by a user application which provides a user
>         interface to allow a user to access and edit structured data in a first
>         store associated with a first database; and

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

United States District Court
For the Northern District of California

executing at least one synchronization processing thread concurrently with the executing of the at least one user-level non-synchronization processing thread, *wherein the at least one synchronization processing thread is provided by a synchronization software component* which is configured to synchronize the structured data from the first database with the structured data from a second database.

Asserted claim 20 requires (with emphasis)

20. The storage medium as in claim 11 wherein *the synchronization software component is configured to synchronize structured data* of a first data class and *other synchronization software components are configured to synchronize structured data* of other corresponding data classes.

### 1. Apple's Motion for Summary Judgment of Infringement

Apple claims it is entitled to summary judgment that the following products infringe claim 20 of the '414 Patent: the Samsung Admire, Conquer 4G, Dart, Exhibit II 4G, Galaxy Nexus, Galaxy Note, Galaxy Note II, Galaxy SII, Galaxy SII Epic 4G Touch, Galaxy SII Skyrocket, Galaxy S III, Galaxy Tab 2 10.1, Illusion, Stratosphere, and Transform Ultra. Apple MSJ at 10 n.7; *see* Expert Report of Dr. Alex C. Snoeren Concerning U.S. Patent Nos. 6,847,959 and 7,761,414 ("Snoren Rep.") at ¶ 409 n.86 (ECF No. 1099-3).

The parties disagree as to whether any of these accused products are representative for purposes of the '414 Patent. *See* Declaration of Jeffrey S. Chase, Ph.D., in Support of Samsung's Opposition to Apple's Motion for Summary Judgment ("Chase Opp'n Decl.") at ¶ 18 (ECF No. 1069-1). This disagreement, if genuine, creates a first problem for Apple's summary judgment motion, because Apple would need to show the absence of a genuinely disputed issue of material fact for each product in order to prevail fully on Apple's motion. But the Court does not need to address whether Apple has established a representative product, because even for the product that Apple claims is representative (the Galaxy S III), the Court concludes that a genuine dispute as to infringement precludes summary judgment.

As set out above, claim 20 requires that "the synchronization software component [of claim 11] is configured to synchronize structured data of a first data class and other synchronization software components are configured to synchronize structured data of other corresponding data classes." The parties appear to agree that, based on its plain language, claim 20 requires at least

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

United States District Court
For the Northern District of California

1    three "synchronization software components." *See* Chase Opp'n Decl. at ¶ 105; Apple Reply at 6.

2    The first is the claimed synchronization software component "configured to synchronize structured

3    data of a first data class" and the other two are the "other synchronization software components"

4    configured "to synchronize structured data of other corresponding data classes."

5        Apple targets six so-called "Sync Adapters" in the Galaxy S III as the claimed

6    synchronization software components, each of which Apple claims is configured to synchronize

7    structured data corresponding to a particular data class: Google Calendar, Google Contacts, Gmail,

8    Exchange Mail, Exchange Calendar, and Exchange Contacts. *See* Snoren Rep. at ¶ 471. Samsung,

9    however, contends through its expert Dr. Chase that four of the six accused Sync Adapters—the

10   Gmail Sync Adapter, Exchange Contacts Sync Adapter, Exchange Calendar Sync Adapter, and

11   Exchange Mail Sync Adapter—perform no synchronization operations at all, and are therefore not

12   "configured to synchronize structured data," as claim 20 requires. *See* Chase Opp'n Decl. at ¶¶ 76-

13   103, 106. According to Samsung, the four erroneously accused Sync Adapters merely ████████

14   █████████████████████████████████████████████████████████████████████████████

15   ██████████████████████████████████ *Id.* at ¶¶ 24-53, 82-103. Accordingly,

16   Samsung's argument concludes, Apple can establish only that the accused products have at most

17   two, not three, "synchronization software components."

18       The parties did not seek a construction of "configured to synchronize structured data," and

19   therefore the plain and ordinary meaning applies. Apple contends that a reasonable jury would

20   necessarily conclude that a synchronization software component is "configured to synchronize

21   structured data" even if it merely "direct[s] other parts of the software" to synchronize structured

22   data. Apple Reply at 6 (emphasis omitted).

23       Apple has pointed to nothing that would require a jury to read the plain and ordinary

24   meaning of the claim so broadly. In support of its position, Apple highlights only a preferred

25   embodiment in the '414 Patent that includes a "Sync Agent," which, Apple argues, does not itself

26   perform synchronization operations on structured data. But even the Sync Agent on which Apple

27   relies "determin[es] the order of synchronization of the various data classes." '414 Patent at 11:60-

28   12:10. Apple does not contend that the accused Sync Adapters in the Galaxy S III perform that

                                         23

function. Therefore, a jury finding of noninfringement would not, as Apple contends, amount to an exclusion of a preferred embodiment. Based on the summary judgment record, a jury could reasonably conclude that the accused Sync Adapters merely direct other components to perform synchronization operations and are not themselves "configured to synchronize structured data" as required by the claim. Apple's motion for summary judgment of infringement as to the '414 Patent is therefore DENIED.

### 2.    Samsung's Motion for Summary Judgment of Anticipation

Samsung asserts that a platform called Windows Mobile 5.0, developed by Microsoft and on sale no later than October 2005, mandates summary judgment that claim 20 of the '414 patent is invalid as anticipated under either 35 U.S.C. § 102(b) or (g)(2) (2006).[6] Microsoft's mobile platform allowed Windows-based handheld devices to synchronize certain data—such as e-mail, contacts, and calendar information—with a Microsoft Exchange Server. *See* Fazio Decl. Ex. 22 (ECF No. 809-1); Rebuttal Expert Report of Dr. Alex C. Snoren Concerning U.S. Patent Nos. 6,847,959 and 7,761,414 ("Snoren Reb. Rep.") ¶¶ 540-543 (ECF No. 1073-9).

According to Samsung, Windows Mobile 5.0 includes multiple synchronization software components configured to synchronize structured data of a different class, ██████████ ████████████████████████████████████████████████████████████████████ *See* Declaration of Jeffrey S. Chase, Ph.D., in Support of Samsung's Motion for Summary Judgment ("Chase SJ Decl.") at ¶¶ 106-107 (ECF No. 1066-12).[7] Apple acknowledges the presence of these components in Windows Mobile 5.0, but contends that Samsung cannot establish that any "provid[e]" a synchronization processing thread, as required by independent claim 11 of the '414 Patent. *See* '414 Patent, claim 11 ("at least one synchronization processing thread *is provided by* a synchronization software component.") (emphasis added).[8] Apple highlights that its expert for the

---

[6] Samsung's summary judgment motion also challenges the validity of claim 11 of the '414 Patent. At the summary judgment hearing, however, Apple agreed to withdraw its reliance on claim 11 for any purpose. *See* ECF No. 1057 at 2. The Court therefore DENIES without prejudice Samsung's motion for summary judgment as to claim 11 of the '414 Patent.

[7] Apple initially challenged the timeliness of Samsung's reliance on these discrete components of Windows Mobile 5.0, *see* Apple Opp'n at 8-10, but subsequently dropped this timeliness objection, *see* ECF No. 1056, Exhibit A at 1.

[8] The parties agree that a "thread" is "a series of steps that a computer process needs to complete." *See* ECF No. 333 at 19; Samsung's Reply at 7; *see also* ECF No. 333 at 19, n.6 (noting that the

24

'414 Patent, Dr. Alex Snoren, testified at deposition that his understanding of "providing a thread" is to "cause[] the generation of the thread," ECF No. 1082-6 at 300, yet Samsung's expert conceded that the synchronization components in Windows Mobile 5.0 do not "'create[] or instantiate[] a thread,'" Apple's Opp. at 11 (quoting deposition of Jeffrey Chase at 239 (ECF No. 1073-11)).

Whether any of the Windows Mobile 5.0 synchronization components identified by Samsung provide the claimed synchronization processing thread as required by claim 20 (as per claim 11) is a question of fact for the jury. Samsung contends that those components necessarily "provid[e]" a synchronization processing thread because they indisputably ███████████ ████████████████████ Samsung MSJ at 15 (citing Chase SJ Decl. ¶¶ 85-91, 97-98), and ████████████████████████ Samsung Reply at 7 (citing Chase Decl. ¶¶ 97-98). Once again, the parties did not seek a construction of the term at issue, leaving the jury to apply the plain and ordinary meaning of that term to the accused devices. Samsung has not established that a reasonable jury would necessarily find that a synchronization software component that ████████████████████████████ discloses the claim limitation that the component "provide[]" the thread itself. Accordingly, Samsung's motion for summary judgment of invalidity of claim 20 of the '414 Patent is DENIED.[9]

### E.    The '959 Patent (Unified Search)

The '959 Patent, entitled "Universal Interface for Retrieval of Information in a Computer System," was filed on January 5, 2000, and issued on January 25, 2005. It is the predecessor patent to the '604 Patent that was at issue at the preliminary injunction phase of this case. The '959 Patent

---

1996 edition of the IEEE Standard Dictionary of Electrical and Electronics Terms defines a "thread" as "'a single flow of control in a process' or program.").

[9] In its opposition brief, Apple contends that, not only should Samsung's motion be denied, but summary judgment that Windows Mobile 5.0 does not anticipate should be granted in Apple's favor. Apple Opp'n at 7. Under Rule 56(f)(1), a Court may grant summary judgment for a nonmovant after giving notice and a reasonable time to respond. Grants of summary judgment to a nonmoving party, however, are "generally disfavored, because they risk depriving a losing party of adequate notice and opportunity to oppose summary judgment." *Mikkelsen Graphic Engineering, Inc. v. Zund Am., Inc.*, -- Fed. Appx. --, 2013 WL 4269406, at *7 (Fed. Cir. Aug. 16, 2013). Apple could have moved for summary judgment on this ground, but chose not to, despite moving on a host of other grounds. The Court declines to consider Apple's attempt to supplement its summary judgment motion through its opposition to Samsung's motion.

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

is directed to a unitary search interface that can access information in a variety of locations—such as a local hard disk, a local network server, and the Internet—and that can use different search algorithms to list the most relevant candidate results. More specifically, the '959 Patent is directed to "a universal interface which uses a plurality of heuristic algorithms to identify an item of information (e.g., document, application or Internet web page) in response to at least one information descriptor." '959 Patent, 1:10-14.

The inventors of the '959 Patent contended that they overcame two different problems in the prior art relating to a computer user's need to search quickly through vast amounts of information for relevant results. First, the inventors contended that the prior art did not provide "a single interface . . . to allow a computer user to find a needed or desired item of information from among all different types of information storage systems." *Id.* at 2:5-8. For example, some computers had one interface for searching for files stored locally on a computer, *see id.* at 1:23-34, and a different interface to access worldwide websites and interact with search engines provided by the website, *see id.* at 1:46-53. But the inventors contended that there had been "no combination of desktop find routines . . . and Internet browsing routines." *Id.* at 2:4-9. Thus, according to the '959 Patent, a user had to access a different interface to search for different types of information depending on that information's stored location.

Second, the patent states that the prior art lacked sufficient ability to effectively filter search results, "fail[ing] to significantly reduce the time and effort a user expends to identify and retrieve useful information." *Id.* at 1:37-39. The inventors of the '959 Patent identified a need for technology that "allows the computer to help the user determine . . . additional criteria or to automatically provide additional criteria, so that search results have a higher percentage of items that are of interest to the user." *Id.* at 1:61-65.

Figure 2 of the '959 Patent discloses a "retrieval manager" component that receives search terms from the user, either in the form of text or speech, and dispatches that input to a plurality of "plug-in modules." *Id.* at 3:63-4:7. Each of these modules has an "associated heuristic which it employs to locate information that corresponds to the user input." *Id.* at 4:8-10. For instance, one module may be configured to search the titles of local documents that match the user input;

26

another may be configured to index and search the contents of locally stored files; a third may

search a list of most recently accessed files, applications, and web sites for a match; and a fourth

may employ a search engine to locate Internet web pages that match the user input. *See id.* at 4:6-

19. The patent teaches that the results from the modules are returned to the retrieval manager,

which in turn presents the results to the user, potentially after employing "additional heuristics to

determine which results are most relevant." *Id.* at 4:23-26.

Claims 24 and 25 are at issue. Claim 24 reads as follows:

> 24.  A computer readable medium for locating information from a plurality of locations containing program instructions to:
>
>> receive an information identifier;
>>
>> provide said information identifier to a plurality of heuristics to locate information in the plurality of locations which include the Internet and local storage media;
>>
>> determine at least one candidate item of information based upon the plurality of heuristics; and
>>
>> display a representation of said candidate item of information.

Claim 25 reads,

> 25.  The computer readable medium of claim 24, wherein the information identifier is applied separately to each heuristic.

### 1.      Apple's Motion for Summary Judgment of No Invalidity

Samsung contends that asserted independent claim 24 and dependent claim 25 of the '959

Patent are invalid as anticipated or obvious based on two different products that Samsung asserts

were "known or used by others in this country" before the invention claimed in the '959 Patent,

*see* 35 U.S.C. § 102(a) (2006), or "in public use or on sale in this country" a year before the filing

date of the '959 Patent, *see id.* § 102(b). *See* Declaration of Martin Rinard, Ph.D. in Support of

Samsung's Opposition to Apple's Motion for Summary Judgment Concerning U.S. Patent No.

6,847,959 ("Rinard Decl.") at ¶¶ 112-124, Exs. 1-2 (ECF Nos. 1104-3, 855-7). In particular,

Samsung relies on AppleSearch, which, according to Samsung's expert for the '959 Patent, Dr.

Martin Rinard, was "a commercial product sold by Apple [that] allowed users to search for

information stored on both their local computer and a remote WAIS [Wide Area Information

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

United States District Court
For the Northern District of California

Server] server across the Internet, and return results in a single unified interface." *Id.* Ex. 1 at 1. Samsung also relies on the WAIS system itself, which, according to Dr. Rinard, "was a universal search system available throughout the 1990s." *Id.* Ex. 2 at 2; *see* Expert Report of Martin Rinard, Ph.D. Regarding the Validity of Claims 24 and 25 of U.S. Patent No. 6,847,959 ("Rinard Rep.") ¶¶ 300-39 (ECF No. 1108-9). To support Samsung's invalidity claim, Dr. Rinard built and configured systems using the AppleSearch and WAIS products.

Apple contends that it is entitled to summary judgment that neither AppleSearch nor WAIS anticipate or render obvious claims 24 and 25 of the '959 Patent because Samsung cannot meet its burden of demonstrating that Dr. Rinard's configured AppleSearch and WAIS systems were ever known or used prior to 2000. Among other things, Apple points to Dr. Rinard's deposition testimony, in which he was unable to provide a particular example of such prior use, despite building a demonstration system that he asserts shows an example of what the public used during the critical time. *See* Deposition of Martin Rinard, Ph.D. ("Rinard Tr."), 177:10-188:23, 203:17-205:10, 211:3-216:6, 223:14-226:16 (ECF No. 1087-2).

Samsung responds that it has provided sufficient evidence for a jury to conclude that these systems were on sale and in public use prior to the critical date. The Court agrees. Even the deposition testimony on which Apple relies provides support for Samsung's position. For example, Dr. Rinard testified that "[w]hen you purchased AppleSearch 1.5, the box came with documentation that showed how to connect to WAIS servers," *id.* at 179, and that "[i]f you look at the documentation I cite in my report, if you look at the contents of the free-WAIS-sf-2.0.65 distribution, if you look at all the evidence that shows people using these systems, if you look at the documentation that comes with the system, you'll see instructions for building and configuring systems to include the ability to access local databases efficiently in combination with remote databases on the Internet to satisfy the limitations of the asserted claims," *id.* at 214-15.

Apple's argument that "Samsung has absolutely no evidence that anyone at any relevant time *actually knew of or used* either system configured to have the claimed functionality," Apple Reply at 9 (emphasis in original), simply ignores the circumstantial evidence Samsung has provided through Dr. Rinard's testimony and the documentation on which Dr. Rinard relies.

28

United States District Court
For the Northern District of California

1    Circumstantial evidence can be just as probative as direct evidence, if not more so. *See Desert*

2    *Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("The reason for treating circumstantial and direct

3    evidence alike is both clear and deep rooted: 'circumstantial evidence is not only sufficient, but

4    may also be more certain, satisfying and persuasive than direct evidence.'") (quoting *Rogers v.*

5    *Missouri Pacific R. Co.*, 352 U.S. 500, 508, n.17 (1957)). Drawing all reasonable inferences in

6    Samsung's favor, a jury could rely on Dr. Rinard's testimony, as well as the documentation he

7    references, to conclude that his demonstration systems accurately represent systems that were

8    actually known to and used by the public prior to the critical date. *See also* Rinard Tr. at 177-88,

9    204, 212-13. Accordingly, Apple's motion for summary judgment that the AppleSearch and WAIS

10   systems do not invalidate claims 24 and 25 of the '959 Patent is DENIED.[10]

11              **2.        Samsung's Motion for Summary Judgment of Indefiniteness**

12              Samsung contends that it is entitled to summary judgment that claims 24 and 25 are invalid

13   as indefinite based on those claims' use of the term "heuristic." Under 35 U.S.C. § 112(b), claims

14   must "particularly point[] out and distinctly claim[] the subject matter which the inventor . . .

15   regards as the invention." A claim that fails to meet this requirement, called the "definiteness"

16   requirement, is invalid. *See*, *e.g.*, *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1356

17   (Fed. Cir. 2005) (affirming summary judgment of invalidity based on claims' use of the term

18   "aesthetically pleasing"). The purpose of the definiteness requirement is "to ensure that the claims

19   delineate the scope of the invention using language that adequately notifies the public of the

20   patentee's right to exclude." *Id.* at 1347. "'The statutory requirement of particularity and

21   distinctness in claims is met only when [the claims] clearly distinguish what is claimed from what

22   went before in the art and clearly circumscribe what is foreclosed from future enterprise.'" *Id.*

23   (quoting *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942) (alteration in

24   original)).

25

26

27   ───────────────

[10] Apple initially contended that Samsung should be precluded from relying on the AppleSearch
and WAIS systems as obviousness references because Samsung failed to properly disclose its
reliance on those systems. *See* Apple MSJ at 18-19. The parties apparently have resolved that
dispute. *See* ECF No. 1056, Exhibit A at 1.

28

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

1        The definiteness requirement does not compel absolute clarity. *See Star Scientific, Inc. v.*

2  *R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1373 (Fed. Cir. 2011). Instead, "[a] claim is indefinite

3  only when it is not amenable to construction or insolubly ambiguous." *Biosig Instruments, Inc. v.*

4  *Nautilus, Inc.*, 715 F.3d 891, 898 (Fed. Cir. 2013) (internal quotation marks omitted). To prevail

5  on its indefiniteness argument, Samsung must show that "one of ordinary skill in the relevant art

6  could not discern the boundaries of the claim based on the claim language, the specification, the

7  prosecution history, and the knowledge in the relevant art." *Haemonetics Corp. v. Baxter*

8  *Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010).

9        Types of terms that typically trigger indefiniteness concerns include means-plus-function

10  elements that may lack "corresponding structure in the specification," numeric limitations that fail

11  to identify "which of multiple methods of measuring that number should be used," terms that lack

12  a proper antecedent basis, or terms that may be "completely dependent on a person's subjective

13  opinion." *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

14  Additional terms that sometimes trigger scrutiny, although not necessarily a separate category

15  from the preceding list, include "word[s] of degree" or limitations defined in "purely functional

16  terms." *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332-33 (Fed. Cir. 2010).

17        Definiteness is a question of law, *see Kinetic Concepts, Inc. v. Blue Sky Medical Group,*

18  *Inc.*, 554 F.3d 1010, 1022 (Fed. Cir. 2009), and the accused infringer bears the burden of

19  demonstrating indefiniteness by "clear and convincing evidence," *Haemonetics*, 607 F.3d at 783.

20  In this context, the "clear and convincing evidence" standard is not "a rigid evidentiary test," but

21  "a useful reminder to courts" that, where substantial doubt exists about whether a term is

22  indefinite, the general presumption of patent validity controls. *Block v. Community Nutrition*

23  *Institute*, 467 U.S. 340, 351 (1984); *see id.* (explaining the meaning of the "clear and convincing

24  evidence" standard in a different legal context); *Exxon Research & Eng'g Co. v. United* States, 265

25  F.3d 1371, 1375 (Fed. Cir. 2001) ("[W]e accord respect to the statutory presumption of patent

26  validity.").

27

28

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

United States District Court
For the Northern District of California

### a.     Claim Construction

"General principles of claim construction apply when determining indefiniteness." *Biosig Instruments*, 715 F.3d at 898. Significantly, the Court has already construed the term "heuristic algorithm" in the context of Apple's preliminary injunction motion, which concerned a related patent with a virtually identical specification. *See Apple*, 877 F. Supp. 2d at 863-66. In ruling on that motion, the Court noted that Apple was "less than clear as to how, exactly, it defines 'heuristic'" and that "[t]he specification is not particularly illuminating in this regard" either. *Id.* at 863-64. Nonetheless, the Court construed the term "heuristic algorithm" as "a search algorithm that employs some 'rule of thumb' and does not consist solely of constraint satisfaction parameters." *Id.* at 866. Neither party contends that the Court should construe "heuristic" differently in any substantive respect. Accordingly, the Court draws from its prior construction and construes "heuristic" in the '959 Patent to mean "some 'rule of thumb' that does not consist solely of constraint satisfaction parameters."

### b.     Is the Court's Construction Insolubly Ambiguous?

Having settled on a construction, the Court has taken an important first step in the indefiniteness analysis. "If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." *Halliburton*, 514 F.3d at 1249 (internal quotation marks and alterations omitted). Nevertheless, the Federal Circuit has made clear that a term can be indefinite even if it is susceptible to a construction. "[I]f reasonable efforts at claim construction result in a definition that does not provide sufficient particularity and clarity to inform skilled artisans of the bounds of the claim, the claim is insolubly ambiguous and invalid for indefiniteness." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1371 (Fed. Cir. 2008). The Court must therefore determine whether its construction of "heuristic" is insolubly ambiguous.

The Court is satisfied that its construction "provide[s] sufficient clarity delineating the bounds of the claim to one skilled in the art." *Biosig Instruments*, 715 F.3d at 899. According to the Court's construction, the accused computer instructions must allow searching using a "rule of

31

thumb" that is "not . . . solely [through] constraint satisfaction parameters." Under this construction, a search that, for example, returns results based solely on whether the author of a document matches a user-provided input (e.g., family name "JOBS" and given name beginning with "STE") would not be a heuristic because it uses "solely constraint satisfaction parameters." *See Apple*, 877 F. Supp. 2d at 866 (discussing U.S. Patent No. 7,020,670 (the "'670 Patent"), prior art to the '604 Patent); '670 Patent at 15:15-24. That distinction provides sufficient clarity to avoid an indefiniteness problem.

Samsung does not appear to dispute that searches such as the one just described would fail to qualify as the claimed heuristic. *See* Samsung Reply at 10. Nevertheless, Samsung, relying heavily on the Federal Circuit's decision in *Halliburton*, contends that the term is indefinite because the precise boundary between what is and what is not a heuristic is insufficiently discernible. The Court concludes that Samsung's reliance on *Halliburton* is misplaced for two reasons.

*First*, *Halliburton* involved a "word of degree," namely, "fragile gel," which the patentee proposed should be construed to require, among other things, a gel that "*easily* transitions to a liquid state upon the introduction of force." 514 F.3d at 1250 (emphasis added); *see Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d at 1332 ("When a 'word of degree' is used, the court must determine whether the patent provides some standard for measuring that degree.") (internal quotation marks omitted). Here, neither the term "heuristic" nor the Court's construction of it involves a word of degree, pure functional language, or other danger sign that typically triggers indefiniteness concerns. Although not conclusive, the Court looks to this categorization as an important threshold indicator as to the level of definiteness the term must provide.

*Second*, and more crucial, in *Halliburton*, the term at issue ("fragile gel") was the only element distinguishing the claimed invention from the prior art. *See* 514 F.3d at 1253 ("[I]ndependent claims 1-3 and 5 are distinguishable from the prior art only because they are 'fragile gels.'"). The Federal Circuit found this point "important" to its decision because "in attempting to define a claim term, a person of ordinary skill is likely to conclude that the definition does not encompass that which is expressly distinguished as prior art." *Id.* at 1252. The patentee in

32

**United States District Court**
For the Northern District of California

*Halliburton*, however, failed to "distinguish how the 'fragile gels' claimed in the . . . patent performed differently than the disclosed prior art," *id.* at 1253, a failure the Federal Circuit found to be "fatal" to the claims' validity. *Id.*

Here, in contrast, the precise boundary of the term "heuristic" is less important because Apple relies on other elements of the claim to distinguish it from the prior art. During prosecution, Apple relied heavily on the primary prior art's failure to search both the Internet and local storage media. *See* ECF No. 1062 at APLNDC630-0000041332 ("[T]he Blumenfeld et al. publication contains no disclosure of locating information in any other location than the Internet."). Apple also highlighted the prior art's failure to provide a single search query to multiple types of searches. *Id.* ("[T]he search information (i.e., a search string) input to [sic] via the interface in Blumenfeld et al. is <u>not</u> provided to more than one of the types of searches identified in the Action (i.e., Author, Title, Subject, Keyword, ISBN and Boolean keyword . . .).") (emphasis in original). To be sure, Apple did rely on the "heuristic algorithm" limitation in distinguishing the related '604 Patent from the prior art. However, Apple filed the application for the '604 Patent four years after it filed for the '959 Patent, and Apple made its "heuristic algorithm" arguments in prosecuting the '604 Patent after the '959 Patent issued. *See Apple*, 877 F. Supp. 2d at 864-65 (discussing statements Apple made to the PTO while prosecuting the '604 Patent in 2007 and 2008). The Court is not aware of any case issuing an indefiniteness ruling in an ancestor patent based on statements made in a *subsequent* application. *See Trading Technologies Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1323 (Fed. Cir. 2013) (noting that prosecution history estoppel and disclaimer "can extend *from* a parent application *to* subsequent patents") (emphases added). As for the earlier, '959 Patent, Samsung has failed to show that a stricter definition of "heuristic" is necessary to distinguish the asserted claims over the prior art or otherwise allow a person of ordinary skill to appreciate their bounds.[11]

Finally, Samsung points to various witnesses having difficulty discerning what is and is not a heuristic. *See* Samsung MSJ at 19-21. Samsung, however, did not ask the witnesses to define or

---

[11] Samsung remains free to raise the issue of indefiniteness again should the term "heuristic" become central to Apple's attempts to distinguish the '959 Patent from any prior art Samsung asserts at trial.

United States District Court
For the Northern District of California

1    apply the term in the context of the claims. Whether a person of ordinary skill can provide a

2    definition of "heuristic" in the abstract has little relevance to whether a person of ordinary skill can

3    apply the Court's construction of "heuristic" in the context of the claims in light of the

4    specification. "[D]efining a word is often more difficult than grasping its meaning in a specific

5    context." *Apple Inc. v. Motorola, Inc.*, No. 11-CV-8540, D.I. 526 (N.D. Ill. Jan. 16, 2012); *see id.*

6    (rejecting indefiniteness challenge to term "heuristic" as used in a different Apple patent that

7    claimed a "heuristic" to translate imprecise finger gestures into actions desired by the user); *In the*

8    *Matter of Certain Electronic Digital Media Devices & Components Thereof*, Inv. No. 337-TA-796,

9    Order No. 16, 2012 WL 754088 at *11 (U.S.I.T.C. Mar. 6, 2012) (same). To establish

10   indefiniteness here, Samsung must show that "the claims, read in the light of the specification[],

11   [do not] reasonably apprise those skilled in the art both of the utilization and scope of the

12   invention." *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 624 (Fed. Cir.

13   1985). Samsung has failed to provide clear and convincing evidence that the asserted claims

14   violate this context-specific inquiry.[12]

15       Accordingly, the Court DENIES Samsung's motion for summary judgment of

16   indefiniteness as to the '959 Patent.

17       **F.    Apple's Motion for Summary Judgment of Invalidity of the '757 Patent**
           **(Multimedia Synchronization)**

18

19       The '757 Patent, entitled "Multimedia Synchronization Method and Device," discloses "[a]

20   system . . . for synchronizing a multiplicity of devices in a multimedia environment" so that users

21   can access their multimedia collection (e.g., movies and music) in different locations. '757 Patent

22   Abstract. The application for the '757 Patent was filed on October 19, 2006 (as a continuation of

23   an application filed on June 19, 2001) and issued on August 18, 2009.

24   _____
     [12] The Federal Circuit faced the word "heuristic" in its preliminary injunction opinion in this case.
25   *See, e.g., Apple*, 695 F.3d at 1380 ("Apple . . . has distinguished [prior art] Andreolli not just
     because the [claimed] apparatus uses heuristics, but also because it employs different heuristic
26   algorithms in different search areas."). Yet the Federal Circuit nowhere suggested that the '604
     patent's repeated use of the word "heuristic" created an indefiniteness problem. Although Samsung
27   did not raise an indefiniteness challenge in that appeal, this Court notes that, if the term were
     insolubly ambiguous, the Federal Circuit very likely would have had more difficulty concluding
28   that this Court's construction of "'each'" with respect to "'plurality of heuristic modules' . . .
     contravenes the *plain terms* of the claim." *Id.* at 1378 (emphasis added).

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

United States District Court
For the Northern District of California

Claims 1, 14, and 15 are at issue. Of the three, claim 1 is independent and reads as follows:

> 1.  A system for synchronizing devices in a multimedia environmental [sic], the system comprising:
>
> at least one central storage and interface device, wherein audio, video, or photographic data, including content information and content management information, relating to at least one user, are stored in digital form; and
>
> at least one zone, each zone having at least one zone specific storage and interface device capable of storing or interfacing with information stored in the central storage and interface device, wherein audio, video, or photographic information, relating to at least one user, contained within the zone specific storage and interface device and the central storage and interface device, *are updated in relation to the zone specific storage and interface devices and the central storage and interface device*, whereby the at least one user can be situated in any one of the zones and access the audio, video, or photographic information related to the at least one user.

'757 Patent, claim 1 (emphasis added).[13]

Apple asserts that it is entitled to summary judgment that claims 1, 14, and 15 of the '757 Patent are anticipated by the '446 Patent, which was filed in November 2000, 7 months before the claimed priority date of the '757 Patent. *See* 35 U.S.C. § 102(e) (2006). The '446 Patent, entitled "Acquisition and Synchronization of Digital Media to a Personal Information Space," is directed to the problem that arises when "a user . . . acquire[s] and store[s] digital media on one network-coupled device, such as a personal computer . . . [at work], but . . . desire[s] to transfer that information and maintain a library of this digital media on other network-coupled devices, such as a personal computer at the user's home, a notebook computer which travels with the user, or even a palm-top computer." '446 Patent at 1:35-41. As a solution, the '446 Patent teaches synchronizing "an individual's user-defined set of information" (which the patent refers to as the individual's "personal information space") to "any one or all of the devices coupled within the user's space, including personal computers, PDA's, automotive PC's, and the like." *Id.* at 5:4-16, 9:14-23. The '446 Patent "cross-reference[s] and incorporate[s] by reference . . . in their entirety" three

---

[13] The Court has construed the term "zone specific storage and interface device" to mean "a storage and interface device that resides in an area, such as a room or similar location." Claim Construction Order at 45.

1   documents, *id.* at 1:10-11, one of which—U.S. Patent No. 6,671,757 entitled "Data Transfer and

2   Synchronization System" (the "Multer Patent")—is relevant to Apple's motion. The Multer Patent

3   discloses a system that "allows the replication of information across all systems coupled to the

4   system," Multer Patent at 8:54-56, with a focus on synchronizing "personal contact information"

5   and e-mail, *id.* at 5:41.

### 1.   Incorporation by Reference

7       Apple's invalidation-by-anticipation challenge rests heavily on the assumption that the

8   '446 Patent incorporates the Multer Patent by reference. Although "invalidity by anticipation

9   requires that the four corners of a single, prior art document describe every element of the claimed

10  invention," material not explicitly contained in the single, prior art document "may still be

11  considered for purposes of anticipation if that material is incorporated by reference into the

12  document." *Advanced Display Systems, Inc. v. Kent State University*, 212 F.3d 1272, 1282 (Fed.

13  Cir. 2000). Whether material is incorporated by reference into a host document is a question of law

14  that this Court must resolve before it determines whether a genuinely disputed material issue exists

15  as to anticipation. *See Zenon Environmental, Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1379 (Fed.

16  Cir. 2007).

17      To incorporate matter by reference, "a host document must contain language 'clearly

18  identifying the subject matter which is incorporated and where it is to be found'; a 'mere *reference*

19  to another application, or patent, or publication is not an *incorporation* of anything therein . . . .'"

20  *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1346 (Fed. Cir. 2009) (quoting *In re De*

21  *Seversky*, 474 F.2d 671, 674 (C.C.P.A. 1973)) (emphasis in original). In determining whether

22  material is incorporated by reference into a host document with sufficient particularity, the Court

23  should use "the standard of one reasonably skilled in the art." *Advanced Display Systems*, 212 F.3d

24  at 1283.

25      In light of these guidelines, the Court has little trouble concluding that the '446 Patent

26  incorporates the Multer Patent in its entirety. The '446 Patent references the Multer Patent eight

27  times. The beginning of the patent's written description includes a section entitled "CROSS-

28  REFERENCE TO RELATED APPLICATIONS," in which it lists the Multer Patent along with

36

two other documents (the "'336 Patent" and the "'675 Application") as "cross-referenced and incorporated by reference herein in their entirety" and then repeats at the end of the list that "[e]ach of these [three] related Patents/Applications are incorporated herein by reference." Next, in a section entitled "Description of the Related Art," the specification references the Multer Patent three times in the context of synchronizing a personal information space, the very subject central to the '446 Patent itself:

> [The '336 Patent, the '675 Application, and the Multer Patent] disclose a novel method and system for synchronization of personal information including that which is conventionally found in desktop applications, personal digital assistants, palm computers, and website calendar and address services, as well as any content in the personal information space including file systems, contact information and/or calendaring information. In one aspect, the system disclosed in [the '336 Patent, the '675 Application, and the Multer Patent] comprises a series of device engines which can be utilized on or in conjunction with any personal information manager application or device, on servers, or both, which can connect via a communications network, such as the Internet, to transfer information in the form of differenced data between respective applications and respective devices. In essence, the system of [the '336 Patent, the '675 Application, and the Multer Patent] creates a personal information space or personal information store that is comprised of a set of transactions which defines the movement of information between one device, the intermediate storage server, and other devices, and which is unique to an individual user or identifier.

'446 Patent at 2:44-3:2. The "Detailed Description" section of the specification references the Multer Patent four additional times, reasserting that "the transactional based extraction, transfer, broadcast, storage and synchronization systems for [sic] forth in [the '336 Patent, the '675 Application, and the Multer Patent]" is an example of a personal information space and is "hereby specifically incorporated by reference." *Id.* at 5:34-41; *see id.* at 6:24-29 ("Once inserted into the private information space, the data can be synchronized to any number of different devices as described in [the '336 Patent, the '675 Application, and the Multer Patent]."); *id.* at 8:50-56 ("[S]ync server 130 can provide the information set forth above directly to a server device engine 140 which can then transfer the information to the personal information space stored in a database 200 as described in [the '336 Patent, the '675 Application, and the Multer Patent]."); *id.* at 9:65-10:3 ("The specific structure and operation of the server and client based device engines are

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

described generally with respect to FIG. 5 and are disclosed in further detail in [the '336 Patent, the '675 Application, and the Multer Patent.").

The above-quoted language from the '446 Patent is sufficient to incorporate the Multer Patent. The language "identifies with specificity both what material is being incorporated by reference" (a system for synchronization of personal information) "and where it may be found" (the Multer Patent). *Callaway Golf Co.*, 576 F.3d at 1346. The Federal Circuit has called language similar to that found at the beginning of the '446 Patent "broad and unequivocal" and sufficient to incorporate an entire document by reference. *Harari v. Lee*, 656 F.3d 1331, 1335 (Fed. Cir. 2011); *see id.* ("We . . . conclude that the entire '579 application disclosure was incorporated by the broad and unequivocal language: 'The disclosures of the two applications are hereby incorporate[d] by reference.'"). The '446 Patent goes even further, reinforcing its incorporation of the Multer Patent by repeatedly referencing the synchronization system—which is the exclusive subject of the Multer Patent—both as a whole and with reference to particular aspects of the system. *See id.* ("While it may seem redundant, nothing prevents a patent drafter from later incorporating again certain 'relevant portions' of an application so as to direct the reader to the exact portion of the incorporated document the drafter believes relevant."). The Court concludes that a person reasonably skilled in the art would understand this language from the '446 Patent to incorporate the Multer Patent in its entirety.

Samsung contends that *Harari* is inapposite because that case "addresses the sufficiency of a written description in an interference, not the clear and convincing standard for anticipation." Samsung Opp. at 21 n.29. The Court is not persuaded. The Federal Circuit has not created different rules for different applications of its incorporation-by-reference doctrine. *See Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1344 (Fed. Cir. 2008) (referring generally to the court's incorporation-by-reference doctrine "in the patent context"). Instead, the Federal Circuit treats incorporation by reference as a question of law and a "separate inquir[y]" from the fact issue of anticipation. *Zenon Environmental*, 506 F.3d at 1379. The "clear and convincing" standard therefore does not apply to whether a prior art document incorporates another by reference. *See Microsoft Corp. v. i4i Ltd. P'ship*, -- U.S. --, 131 S. Ct. 2238, 2253 (2011) (Breyer, J., concurring)

38

**United States District Court**
For the Northern District of California

("By preventing the 'clear and convincing' standard from roaming outside its fact-related reservation, courts can increase the likelihood that discoveries or inventions will not receive legal protection where none is due."). In any event, Samsung has not pointed the Court to a more analogous Federal Circuit holding in the anticipation context. To the contrary, the Federal Circuit has found that even less specific language ("[r]eference is made to") "can be sufficient to indicate to one of skill in the art that the referenced material is fully incorporated in the host document," even for anticipation purposes. *Callaway Golf*, 576 F.3d at 1346.

Samsung also points to a statement by its expert for the '757 Patent, Professor Dan Schonfeld, that the '446 Patent "does not clearly identify the subject matter that is incorporated nor where it is to be found such that one of ordinary skill in the art could find the general incorporation by reference to be sufficiently particular." Declaration of Professor Dan Schonfeld in Support of Samsung's Opposition to Apple's Motions for Summary Judgment and to Exclude Expert Testimony ("Schonfeld Decl.") ¶ 50 (ECF No. 1070). This statement is of no help to Samsung. As noted, incorporation by reference is a question of law. "The opinion of an expert does not convert a question of law into a question of fact." *Van Der Salm Bulb Farms, Inc. v. Hapag Lloyd, AG*, 818 F.2d 699, 701 (9th Cir. 1987). Although expert testimony may in some circumstances help a court determine whether a host document incorporates another document by reference, the Court in this instance concludes that Dr. Schonfeld's conclusory statement cannot overcome the broad and unequivocal language in the specification of the '446 Patent incorporating the entire Multer Patent.

### 2.    Anticipation

Having determined the '446 Patent includes the Multer Patent in its entirety, the Court next analyzes whether Apple is entitled to summary judgment that the '446 Patent anticipates the asserted claims of the '757 Patent. Viewing the evidence most favorable to Samsung, the Court concludes that Apple has established the absence of a genuine issue of fact that the '446 Patent discloses each and every limitation of independent claim 1 and dependent claims 14 and 15 of the '757 Patent.

United States District Court
For the Northern District of California

### a.    Claim 1

Independent claim 1 of the '757 Patent contains a preamble and two limitations, of which only the second limitation is in dispute. Samsung does not dispute that the '446 Patent discloses the preamble and the first limitation of claim 1. In particular, Samsung does not contest that the '446 Patent discloses the preamble of claim 1 (a "system for synchronizing devices in a multimedia environmental [sic environment]") by describing a system that synchronizes "media information" found in a user's "personal information space" to "any one or all of the devices coupled within the user's space, including personal computers, PDA's, automotive PC's, and the like." '446 Patent, 9:9-20. Also undisputed, the '446 Patent discloses the first limitation of claim 1 ("at least one central storage and interface device, wherein audio, video, or photographic data, including content information and content management information, related to at least one user, are stored in digital form") by disclosing "storage server(s) 200," *id.* Fig. 3, that can "house[]" a user's personal information space, *id.* 5:26-29.[14]

Samsung does dispute whether the '446 Patent discloses the emphasized portion of the final limitation of claim 1 of the '757 Patent, which is reproduced below:

> at least one zone, each zone having at least one zone specific storage and interface device capable of storing or interfacing with information stored in the central storage and interface device, wherein audio, video, or photographic information, relating to at least one user, contained within the zone specific storage and interface device and the central storage and interface device, *are updated in relation to the zone specific storage and interface devices and the central storage and interface device,* whereby the at least one user can be situated in any of the zones and access the audio, video, or photographic information related to the at least one user.[15]

---

[14] Samsung also does not dispute that the incorporated Multer Patent discloses media files stored on the storage server that have "content information" (e.g., photo data) and "content management information" (e.g., information that allows for "grouping of classes of information into appropriate representations"). Multer Patent at 28:45-50.

[15] Samsung does not dispute that the '446 Patent discloses the other elements of this limitation. In particular, Samsung does not dispute that the '446 Patent discloses multiple "devices" identified by the specific "zone" in which each device resides, *see* '446 Patent, Figs 3 & 4 (depicting "Home PC" and "Office PC"), each device having an "interface" capable of interacting with the storage server and "storage" capable of storing media data, *see id.* 9:20-39 (discussing devices' storage of "media data" received from "the personal information space provided in storage server 200"). Nor does Samsung dispute that the '446 Patent discloses a system where a user "can be situated in any one of the zones and access the audio, video, or photographic information related" to that user. *See* '446 Patent, 9:40-64 ("In accordance with the present invention, digital media files of varying

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

United States District Court
For the Northern District of California

1  In particular, Samsung contends that the emphasized portion of claim 1 of the '757 Patent ("*are*

2  *updated in relation to the zone specific storage and interface devices and the central storage and*

3  *interface device*") implicitly requires "*automatic* synchronization," Samsung Opp'n at 21

4  (emphasis in original), but the prior art '446 Patent discloses only "*manual* synchronization," *id.* at

5  22 (emphasis in original).[16] The Court concludes that claim 1 of the '757 Patent does not require

6  automatic synchronization, and thus Samsung's claim that automatic synchronization is required

7  does not create a genuine material factual dispute.

8        No reasonable jury could find an "automatic synchronization" requirement in the plain

9  language of claim 1 of the '757 Patent sufficient to avoid potentially invalidating prior art, the '446

10  Patent.[17] The specification of the '757 Patent discloses an array of "synchronizing schemes," only

11  one of which is "automatic." *See* '757 Patent, 9:4-6 ("Different synchronizing schemes are

12  possible (automatic, daily, weekly, etc)." The claim itself does not explicitly require any one of

13  those synchronization schemes.

14        Samsung argues that claim 1 requires "automatic" synchronization because it requires

15  media information on each device to be "updated in relation to" the information on the other

16  devices. According to Samsung's expert Dr. Schonfeld, applying the plain and ordinary meaning

17  of the term "updated" means that "a change in one device is automatically reflected as a change in

18  another device." Schonfeld Decl. ¶ 29. As set forth below, this opinion is unsupported and

19  therefore insufficient to create a triable issue. *See Regents of University of Minnesota v. AGA*

20

21

---

22  formats, and other data, may be synchronized or transferred (uni-directionally) to any network
    coupled appliance 400 utilizing the system of the present invention.").

23  [16] Samsung also contends that, without the Multer Patent, the '446 Patent does not disclose a
    system that meets two requirements that Samsung contends are part of claim 1: bidirectional

24  synchronization and automatic synchronization of all devices connected to the system. *See*
    Samsung Opp'n at 22-25. Because the Court has concluded that the '446 Patent incorporates the

25  Multer Patent by reference, *see supra* Part III.F.1, and because Samsung does not dispute that the
    Multer Patent discloses bidirectional synchronization, *see* Multer Patent, 6:36-38 ("[T]he

26  synchronizer will allow difference information Δ to be both transmitted and received"), and multi-
    device synchronization, *see id.* 10:65-11:6 ("In one embodiment, each device engine implements

27  all processing required to keep all the systems fully synchronized."), the Court does not address
    these arguments.

28  [17] Neither party sought a construction of claim 1 that would have imposed an "automatic
    synchronization" requirement.

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

1  *Medical Corp.*, 717 F.3d 929, 941 (Fed. Cir. 2013) ("Conclusory expert assertions cannot raise

2  triable issues of material fact on summary judgment.") (internal quotation marks omitted).

3      Dr. Schonfeld claims that three considerations support his understanding of the plain and

4  ordinary meaning of "updated," but all of them entirely fail to provide a basis on which a

5  reasonable jury could side with Samsung. First, Dr. Schonfeld points to an "important" dictionary

6  definition that states "update" means "'to bring up to date.'" Schonfeld Decl. ¶ 30 (quoting

7  Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/update). That

8  definition, however, simply begs the question whether something must be brought up to date

9  automatically.

10      Second, Dr. Schonfeld contends that the claim's "passive" use of the term "updated"

11  implies "a perpetual state of the information." *Id.* Again, the Court does not see how this

12  consideration could bring a reasonable jury to read an "automatic" requirement into claim 1. The

13  use of passive voice generally creates ambiguity rather than resolves it. *See*, *e.g.*, Bryan A. Garner,

14  *The Oxford Dictionary of American Usage & Style* 246 (2000) (calling the passive voice "a prime

15  source of unclarity"). Dr. Schonfeld does not cogently explain how the use of passive voice here

16  could even possibly impose a narrow and precise use of the term "updated."

17      Finally, Dr. Schonfeld unavailingly points to three excerpts from the specification. *See*

18  Schonfeld Decl. ¶ 32 (citing '757 Patent, 3:1-7 ("Therefore it is desirous to have . . . the entire

19  collection synchronized automatically . . . ."), 6:33-39 ("The digital multimedia device 104 allows

20  the user, . . . to synchronize and update the user's audio/video files automatically . . . ."), 6:55-59

21  ("[A]n alternative embodiment of the present invention [shows] . . . the digital multimedia player

22  104 automatically performs the synchronization . . . .")). Those excerpts' references to a "desirous"

23  automatic synchronization feature, an embodiment that "update[s] . . . automatically," and a

24  similar "alternative embodiment" all suggest that, at most, the plain meaning of the term "updated"

25  encompasses automatic synchronization as Dr. Schonfeld describes, not that its plain meaning is

26  limited to that type of automatic synchronization, as Samsung's theory requires. Indeed, that the

27  specification describes (in active voice) an embodiment that "*update[s]* the user's audio/video files

28

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

United States District Court
For the Northern District of California

1 | *automatically*" shows that the plain meaning of the claim itself—which uses the term "updated"

2 | without the adjective "automatically"—is broader.

3 |      In addition to Dr. Schonfeld's opinion, Samsung contends that even Apple's expert agrees

4 | that claim 1 requires automatic synchronization. Samsung Opp'n at 21 (citing Deposition of

5 | Richard Taylor ("Taylor Dep.") at 44:15-46:11 (ECF No. 854-19)). Apple's expert Dr. Taylor

6 | testified that, under claim 1, "if I identify the set of media that is mine, then the synchronization of

7 | that media goes on automatically *after that synchronization process is initiated*." Taylor Dep. at 46

8 | (emphasis added). But this testimony, even viewed in a light most favorable to Samsung, does not

9 | create an issue of material fact. To survive summary judgment Samsung needs "updated" to

10 | convey a narrower understanding of "automatic," namely, that "a change in one device is

11 | automatically reflected as a change in another device." Schonfeld Decl. ¶ 29. Dr. Taylor did not

12 | testify that the claim requires synchronization to be automatically initiated whenever the content

13 | on one device is changed. In fact, Dr. Taylor explicitly clarified that "the synchronization activity

14 | [of claim 1] . . . may be started at multiple times or different frequencies," and only then ("after

15 | that synchronization process is initiated") does the synchronization occur automatically. Taylor

16 | Dep. at 45; *see id.* ("[O]nce it's started [the system] does all the work . . . without manual

17 | intervention.").

18 |      One final point demonstrates why no reasonable jury could conclude that the plain meaning

19 | of claim 1 includes an automatic synchronization requirement. Dependent claim 6 of the '757

20 | Patent requires that the "audio, video, and photographic information" stored on "a server" be

21 | "updated *at a predetermined time* in relation with other zone specific storage and interface

22 | devices." Limiting claim 1—which requires that the audio, video, or photographic information in

23 | "each zone" be "updated in relation to the zone specific storage and interface devices"—to

24 | automatic updates of the type Samsung envisions would conflict with the "predetermined time"

25 | update that claim 6 allows with respect to one zone. In this way, Samsung makes the same mistake

26 | it does with respect to its attempt to limit the '172 Patent to physical keyboards: it seeks to impose

27 | a requirement in an independent claim that directly conflicts with the plain meaning of a dependent

28 | claim. *See* 35 U.S.C. § 112(d); *supra* Part III.B.

1    Samsung acknowledges that the '446 Patent discloses a system that allows a user to trigger

2    the synchronization of media files across devices. *See* Samsung Opp. at 22; Multer Patent, 35:12-

3    22 (describing various "triggering mechanisms for initiating synchronization," including a

4    "'sync'" button, "time-based triggers," or "sync on a log-out of the user"). Because a reasonable

5    jury could not find a more stringent synchronization requirement in the plain and ordinary meaning

6    of claim 1, no genuine dispute exists for trial as to this limitation.

7    Having concluded that no genuine dispute exists as to whether the '446 Patent discloses

8    each and every limitation of claim 1 of the '757 Patent, the Court GRANTS Apple's motion for

9    summary judgment that claim 1 is invalid as anticipated.

10                    **b.     Claims 14 and 15**

11    Claims 14 and 15 require "[t]he system of claim 1 wherein the central storage and interface

12    device is disposed to be coupled to a wireless mobile device via LAN [Local Area Network]" and

13    "via WAN [Wide Area Network]," respectively. The '446 Patent discloses the use of devices such

14    as "notebook computers, palm-top computers, [and] hand-held computers" capable of receiving or

15    processing digital media via a network connection" such as "a LAN, WAN or open source global

16    network." '446 Patent, 4:51-57; *see id.* 9:14-19 (describing synchronization with "PDA's").

17    Samsung does not dispute that these disclosures meet the additional limitations of claims 14 and

18    15. Because the '446 Patent discloses each and every limitation of independent claim 1 and of

19    dependent claims 14 and 15, the Court GRANTS Apple's motion for summary judgment that the

20    '446 Patent anticipates claims 14 and 15.

21        **G.     Samsung's Motion for Summary Judgment that the '596 Patent (Control
22                 Signals) Has a Priority Date of November 9, 2004**

23    Samsung accuses Apple of infringing claim 13 of the '596 Patent. The '596 Patent, entitled

24    "Method and Apparatus for Signaling Control Information of Uplink Packet Data Service in

25    Mobile Communication System," was filed on November 9, 2005, but it claims priority to a

26    Korean patent application filed on November 9, 2004 in the Korean Intellectual Property Office.

27    *See* '596 Patent, 1:5-13. The parties dispute whether Samsung is entitled to the Korean filing date

28    for purposes of evaluating the validity of claim 13.

United States District Court
For the Northern District of California

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

1    Under 35 U.S.C. § 119, a patent can benefit from an earlier-filed foreign application so

2    long as, among other conditions not in dispute here, the earlier-filed application provides a

3    "written description" of the later-filed claims under 35 U.S.C. § 112(a). *See In re Wertheim*, 541

4    F.2d 257, 261 (CCPA 1976).[18] A patent meets this written description requirement if a person of

5    ordinary skill in the art reading the earlier-filed application would conclude that the invention

6    includes that which the applicant later claimed. *See id.* at 265. A patentee may not add "new

7    matter" in a later application and still enjoy an earlier filing date. *Id.*

8    Whether a disclosure meets the written description requirement is a question of fact. *See*

9    *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1355 (Fed. Cir. 2010) (en banc). Samsung,

10   however, contends that there is no genuine dispute that the Korean application sufficiently

11   discloses the invention recited in claim 13 and therefore that it is entitled to the earlier effective

12   filing date as a matter of law. A brief discussion of the technology behind the '596 Patent is

13   necessary to understand the nature of Samsung's summary judgment argument.

14   As the '596 Patent explains in the "Background of the Invention" section of the

15   specification, certain mobile communication systems dedicate communication channels between

16   mobile devices and intermediate network equipment in order to ensure superior data transmission

17   from the devices to the network. These channels are called enhanced uplink dedicated channels or

18   "E-DCH."'596 Patent, 1:23-31. To maintain these channels effectively, the intermediate network

19   equipment (which the '596 Patent calls "Node B" stations) must receive certain information about

20   the mobile devices seeking to transmit data (which the '596 Patent calls "user equipment" or

21   "UEs"). *Id.* at 1:31-52. This preliminary information includes the strength of the various

22   communication channels, the data rate requested by the various UEs, and the transmission

23   capabilities of the UEs. *Id.* at 2:23-39. Based on this information, the Node B will police the UEs'

---

[18] Samsung's motion relies on 35 U.S.C. § 120 for priority. *See* Samsung MSJ at 22. Section 120 allows a later-filed application to enjoy the benefit of "an application previously filed *in the United States*." 35 U.S.C. § 120 (emphasis added). Because Samsung claims the benefit of a foreign-filed application, Section 119 applies. *See id.* § 119 (providing conditions whereby "[a]n application for patent for an invention filed in this country by any person who has . . . previously regularly filed an application for a patent for the same invention *in a foreign country*" may claim an earlier filing date) (emphasis added).

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

United States District Court
For the Northern District of California

1  data transmissions, such that a plurality of UEs may not simultaneously transmit packet data at

2  high data rates. *Id.* at 2:14-21.

3         Typically, in establishing these dedicated communication channels, a Node B and UE will

4  transmit and receive preliminary messages through a dedicated transport channel, including

5  estimates as to required transmission resources and scheduling information. The patent refers to

6  this initial information as "MAC-e control information." *Id.* at 3:34-38; *see* 2:63-3:40. "MAC-e"

7  stands for "Medium Access Control for E-DCH." *Id.* at 3:35-38. The Node B will use this

8  information to allocate transmission resources. Once transmission resources are allocated, the UE

9  can begin transmitting data through an E-DCH. The ultimately transmitted data is called a "MAC-

10  e PDU," or a "Media Access Control-enhanced Protocol Data Unit." *Id.* at 3:28-30.

11         The '596 Patent relates to a method and system for "more efficiently signaling the MAC-e

12  control information" by piggybacking the MAC-e control information onto the MAC-e PDUs. *Id.*

13  at 3:38-40. More particularly, a MAC-e PDU can be logically divided into two segments, a MAC-e

14  header and a MAC-e payload. *Id.* at 7:55-60. Using a crude analogy, the MAC-e header is like a

15  table of contents for the MAC-e payload. When a Node B receives a MAC-e PDU, it will look to

16  the MAC-e header to figure out the contents of the MAC-e payload, including the source of the

17  different parts of the payload and the relationship of those parts to other information within the

18  same and other MAC-e PDUs. *Id.* at 8:7-21. These different parts of the MAC-e payload are also

19  called PDUs, but they are different (and smaller) than the MAC-e PDUs containing them.

20         As relevant to the current dispute, the MAC-e header is itself divided into multiple parts,

21  with each part corresponding to a PDU in the MAC-e payload. In one embodiment discussed in the

22  '596 Patent, each MAC-e header part contains three sub-parts: a "multiplexing identifier," a

23  variable that represents the number of data units in each part of the payload, and a flag that

24  represents whether additional header parts follow the current header part. *Id.* at 8:35-9:10. The

25  '596 Patent teaches how to generate and decipher MAC-e header information so that the Node B

26  will be able to recognize and use the MAC-e control information in the MAC-e payload.

27         Claim 13 of the '596 Patent reads as follows:

28

46

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

13.  A user equipment (UE) for transmitting control information for an uplink packet data service in a mobile communication system, the UE comprising:

> at least one block for forming a first protocol data unit (PDU) including uplink packet data;
>
> a control unit for forming a control service data unit (SDU) including control information for an uplink packet data service; and
>
> a multiplexing and transmission sequence number (TSN) setting unit for forming at least one first header part corresponding to the first PDU *by using a data description indicator (DDI) field* representing the first PDU and an N field representing the number of uplink packet data included in the first PDU, forming a second header part corresponding to the control SDU by using a DDI field set as a predetermined specific value representing that the control SDU is transmitted, and forming a second data packet unit (PDU) by concatenating a header and a payload, the header including the header parts, the payload including the first PDU and the control SDU, wherein the second PDU is transmitted to a Node B.

Although the term "DDI" appears in the specification of the '596 Patent, it does not appear in the original Korean patent application. *See* ECF No. 811-4 (priority application). Nevertheless, Samsung contends claim 13 is entitled to the filing date of the Korean patent application because "the '596 Patent and the priority application use different words to describe the same thing (*i.e.*, a logical identifier)." Samsung MSJ at 25. Samsung asks the Court to construe "DDI field" to mean a "logical identifier representing the first PDU." Under that construction, Samsung contends, claim 13 is entitled to the filing date of the Korean application.

Samsung has failed to establish the absence of a genuine dispute as to this issue. Samsung did not seek a construction of "DDI field" during the claim construction proceedings, and therefore the jury will consider the plain and ordinary meaning of the claim term "data description indicator (DDI) field." Because the Korean application did not use that term, a reasonable jury could conclude that a person of ordinary skill would not have perceived the inventors to have invented a UE capable of forming a header using a DDI field.

Samsung argues that "[t]he fact that Samsung used certain words in its priority application, and then used the words 'DDI field' in its later application, does not mean that new matter was added." Samsung Reply at 14. Samsung is correct that the new-matter conclusion does not *necessarily* follow from the different-word premise. But that proves only that Samsung is entitled

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

United States District Court
For the Northern District of California

1    to a trial on this issue, not summary judgment. Indeed, the case Samsung cites in support, *Martek*

2    *Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363 (Fed. Cir. 2009), affirmed a jury verdict.

3    Summary judgment is not appropriate.

4         Accordingly, Samsung's motion for summary judgment that the '596 Patent is entitled to a

5    November 9, 2004 priority date is DENIED.

6    **IV.    SEALING**

7         Both parties have requested that the Court seal portions of the briefs and exhibits for their

8    summary judgment motions. After reviewing the parties' original filings and concluding the

9    requests were overbroad, the Court denied the parties' administrative motions without prejudice

10   and instructed them to file narrower sealing requests in renewed motions to seal. *See* ECF No.

11   1057. The parties complied. *See* ECF Nos. 1066-71, 1073-74, 1079, 1093, 1097-1100. The parties,

12   Google, and Microsoft filed declarations in support of these renewed motions. *See, e.g.,* ECF Nos.

13   1094, 1096. After reviewing the parties' renewed sealing requests and the declarations in support

14   thereof, the Court is satisfied that the material the parties now seek to seal—which consists largely

15   of party and third-party source code, product-release, strategy, and financial information—may

16   remain confidential, save one exception. That one exception is certain material that discloses

17   Apple's expert Dr. Snoren's opinion on what constitutes a "heuristic," which is based solely on

18   purely public, non-proprietary information. *See* Samsung MSJ at 20:16-19; ECF No. 1073-13

19   ¶¶ 105-07. This material relates to Samsung's indefiniteness argument, a dispositive issue, and no

20   one has articulated "compelling reasons" to keep this information secret. *See Kamakana v. City &*

21   *Cnty. Of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006). Accordingly, the parties' administrative

22   motions to seal are GRANTED in part but DENIED with respect to Samsung's motion for

23   summary judgment at 20:16-19 and ECF No. 1073-13 at paragraphs 105-07.

24   **V.    CONCLUSION**

25        Apple's motion for summary judgment of infringement of the '172 Patent and invalidity of

26   the '757 Patent is GRANTED. Apple's motion for summary judgment of infringement of the '647

27   Patent, infringement of the '414 Patent, and no invalidity of the '959 Patent is DENIED.

28

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ

Samsung's motion for summary judgment is DENIED. The parties' administrative motions to seal documents related to their cross motions are GRANTED in part and DENIED in part.

**IT IS SO ORDERED.**

Dated: January 21, 2014

LUCY H. KOH
United States District Judge

Case No.: 12-CV-00630-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART APPLE'S MSJ AND DENYING SAMSUNG'S MSJ