1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5

   APPLE INC., A CALIFORNIA          )  C-12-00630 LHK
6  CORPORATION,                      )
                                     )  SAN JOSE, CALIFORNIA
7                  PLAINTIFF,        )
                                     )  JANUARY 23, 2014
8            VS.                     )
                                     )  PAGES 1-129
9  SAMSUNG ELECTRONICS CO., LTD.,    )
   A KOREAN BUSINESS ENTITY;         )
10 SAMSUNG ELECTRONICS AMERICA,      )
   INC., A NEW YORK CORPORATION;     )
11 SAMSUNG TELECOMMUNICATIONS        )
   AMERICA, LLC, A DELAWARE          )
12 LIMITED LIABILITY COMPANY,        )
                                     )
13                 DEFENDANTS.       )
   _____  )

14

15

16            TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE LUCY H. KOH
17          UNITED STATES DISTRICT JUDGE

18

19

20          APPEARANCES ON NEXT PAGE

21

22

23  OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
24

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
            TRANSCRIPT PRODUCED WITH COMPUTER

 1

 2      A P P E A R A N C E S:

 3      FOR PLAINTIFF          MORRISON & FOERSTER
        APPLE:                 BY:  HAROLD J. MCELHINNY
 4                                  RACHEL KREVANS
                               425 MARKET STREET
 5                             SAN FRANCISCO, CALIFORNIA  94105

 6
                               GIBSON, DUNN & CRUTCHER
 7                             BY:  H. MARK LYON
                               1881 PAGE MILL ROAD
 8                             PALO ALTO, CALIFORNIA  94304

 9
                               WILMER, CUTLER, PICKERING,
10                             HALE AND DORR
                               BY:  MARK D. SELWYN
11                             950 PAGE MILL ROAD
                               PALO ALTO, CALIFORNIA  94304
12

13

14      FOR SAMSUNG:           QUINN, EMANUEL, URQUHART,
                               OLIVER & HEDGES
15                             BY:  JOHN B. QUINN
                                    SCOTT L. WATSON
16                             865 S. FIGUEROA STREET, FLOOR 10
                               LOS ANGELES, CALIFORNIA  90017
17
                               BY:  VICTORIA F. MAROULIS
18                                  KEVIN B. JOHNSON
                               555 TWIN DOLPHIN DRIVE
19                             SUITE 560
                               REDWOOD SHORES, CALIFORNIA  94065
20
                               BY:  SEAN PAK
21                             50 CALIFORNIA STREET, FLOOR 22
                               SAN FRANCISCO, CALIFORNIA  94111
22

23

24

25

```
 1    SAN JOSE, CALIFORNIA                    JANUARY 23, 2014

 2                    P R O C E E D I N G S

 3        (COURT CONVENED AT 2:28 P.M.)

 4            THE CLERK:  CALLING CASE NUMBER C-12-00630 LHK,

 5    APPLE, INCORPORATED VERSUS SAMSUNG ELECTRONICS COMPANY LIMITED,

 6    ET AL.

 7            COUNSEL, IF YOU COULD STATE YOUR APPEARANCES, PLEASE.

 8            MR. MCELHINNY:  GOOD AFTERNOON, YOUR HONOR.

 9    HAROLD MCELHINNY AND RACHEL KREVANS OF MORRISON & FOERSTER FOR

10    PLAINTIFF APPLE.

11            MR. QUINN:  GOOD AFTERNOON, YOUR HONOR.  JOHN QUINN,

12    VICKY MAROULIS, KEVIN JOHNSON, SCOTT WATSON, AND SEAN PAK FOR

13    QUINN, EMANUEL FOR SAMSUNG.

14            MR. LYON:  ALSO MARK LYON FROM GIBSON, DUNN &

15    CRUTCHER ON BEHALF OF APPLE.

16            MR. SELWYN:  AND ALSO MARK SELWYN FROM WILMER, HALE

17    ON BEHALF OF APPLE.

18            THE COURT:  OKAY.  GOOD AFTERNOON.

19        LET'S DO SOME SCHEDULING FIRST.  I'D LIKE TO ADVANCE THE

20    DATES FOR YOUR PRETRIAL CONFERENCE FILINGS RATHER THAN GOING BY

21    THE 14 AND 10 DAYS THAT ARE IN MY STANDING ORDER JUST BECAUSE I

22    THINK THAT WOULD, I AND MY STAFF, WE WOULD BENEFIT FROM SOME

23    ADDITIONAL TIME.  OKAY?

24        SO LET ME FIRST ASK, WHAT RULINGS WOULD MOST HELP WITH

25    YOUR ADR PROCESS SO WE CAN PRIORITIZE ISSUING THOSE ORDERS
```

1    FIRST?  BETWEEN, YOU KNOW, ANY OF THE POST-TRIAL MOTIONS IN THE

2    FIRST CASE, THE PERMANENT INJUNCTION IN THE FIRST CASE, OR THE

3    DAUBERTS, WHAT SHOULD WE PRIORITIZE?

4         MR. QUINN:  YOUR HONOR -- SPEAKING FOR SAMSUNG, I

5    THINK THE FIRST PRIORITY, THE MOST HELPFUL FOR US, WOULD BE A

6    RULING ON THE DAUBERT MOTIONS, ESPECIALLY WITH RESPECT TO

7    DR. HAUSER AND DR. VELLTURO.

8         THE COURT:  OKAY.  AND WHAT ABOUT FOR APPLE?

9         MR. MCELHINNY:  NOT SURPRISINGLY, YOUR HONOR, WE HAVE

10   A DIFFERENT VIEW.  WE THINK THE MOST HELPFUL RULING WOULD BE

11   THE RULING ON THE PRELIMINARY INJUNCTION -- I'M SORRY -- THE

12   PERMANENT INJUNCTION FROM THE FIRST CASE, AND THEN THE RULING

13   ON THE JMOL FOR THE FIRST CASE.

14        THE COURT:  ALL RIGHT.  WELL, THAT DOESN'T REALLY

15   HELP ME BECAUSE THEN WE HAVE TO DO EVERYTHING, WHICH WE'LL TRY

16   TO DO.

17        MR. MCELHINNY:  RIGHT.

18        THE COURT:  BUT --

19        MR. MCELHINNY:  I -- AND I WOULD PRIORITIZE THOSE.

20   I THINK IN TERMS OF WHETHER OR NOT IT'S GOING TO HAVE ANY

21   EFFECT ON THE MARKETPLACE OR PEOPLE'S BEHAVIOR OR CHANGE THE

22   WAY THAT THINGS ARE STUCK RIGHT NOW, IT'S THE PRELIMINARY

23   INJUNCTION.  THE REST OF IT ARE PROCESS MOTIONS THAT WILL LEAD

24   TO CONTINUATIONS OF LITIGATION.

25        THE COURT:  ALL RIGHT.  OKAY.  SO I'D LIKE TO JUST DO

1       SOME HOUSEKEEPING.

2            FOR THE VERDICT FORM, I WOULD LIKE TO -- SO INSTEAD OF

3       HAVING 14 AND 10 DAY DEADLINES BEFORE THE PRETRIAL CONFERENCE,

4       I WOULD LIKE TO MOVE THAT UP TO FEBRUARY 18TH AND

5       FEBRUARY 25TH.

6            SO, FOR EXAMPLE, THE JOINT PRELIMINARY JURY INSTRUCTIONS

7       WITH ANY COMPETING PROPOSALS, FEBRUARY 18TH; AND THE JOINT

8       PROPOSED FINAL JURY INSTRUCTIONS WITH COMPETING PROPOSALS BY

9       FEBRUARY 25TH.

10           NOW, I'M PLANNING TO ADOPT THE PRELIMINARY AND FINAL JURY

11      INSTRUCTIONS FROM THE FIRST TRIAL UNLESS YOU CAN POINT TO

12      EITHER A CHANGE IN THE LAW OR SOMETHING ELSE THAT JUSTIFIES A

13      CHANGE, BUT THERE'S GOING TO BE A HEAVY PRESUMPTION THAT WHAT

14      WAS PREVIOUSLY GIVEN WILL BE GIVEN THIS TIME.  OKAY?

15           THE JOINT PROPOSED VERDICT FORM FILED BY FEBRUARY 25 --

16      AND I'LL ISSUE A CASE MANAGEMENT ORDER WITH ALL OF THESE SET

17      OUT.

18           WE'LL HAVE TEN JURORS AGAIN, FOUR PEREMPTORIES PER SIDE.

19           I'LL ALLOW 20 MINUTES OF ATTORNEY VOIR DIRE PER SIDE.

20      PLEASE SUBMIT YOUR PROPOSED VOIR DIRE QUESTIONS BY FEBRUARY 25.

21           WE'LL DO THE SAME TIME LIMITS AS LAST TIME, ONE AND A HALF

22      HOURS PER SIDE FOR OPENING, TWO HOURS PER SIDE FOR CLOSING, 25

23      HOURS OF EVIDENCE PER SIDE.

24           FOR MOTIONS IN LIMINE, I'M GOING TO LIMIT -- BLESS YOU --

25      THE NUMBER TO SEVEN MOTIONS PER SIDE.  EACH SIDE WILL BE

1    LIMITED TO A MAXIMUM OF 30 PAGES OF BRIEFING ON THE MOTIONS.

2         THE MOTIONS ARE TO BE FILED ON FEBRUARY 18, AND THE

3    OPPOSITIONS, ALSO LIMITED TO 30 PAGES, WILL BE DUE ON

4    FEBRUARY 25.  NO REPLIES.

5         NOW, I WOULD LIKE YOU TO EXCHANGE AND FILE WITNESS LISTS

6    BY FEBRUARY 13TH AT NOON.  I TRIED TO TAKE INTO CONSIDERATION

7    WHEN YOU'RE GOING TO BE NARROWING YOUR CASE.  HOPEFULLY THIS

8    GIVES YOU ENOUGH TIME.

9         AND THE NUMBER OF LIVE WITNESSES WILL BE LIMITED TO 50,

10   SAME AS THE FIRST TRIAL.

11        NUMBER OF DEPOSITION DEPONENTS WILL BE 45.  EXCHANGE AND

12   FILE YOUR DEPOSITION DESIGNATIONS BY FEBRUARY 18; OBJECTIONS,

13   COUNTER-DESIGNATIONS, PLEASE FILE THEM BY FEBRUARY 25; AND EACH

14   SIDE IS LIMITED TO NO MORE THAN 25 HOURS OF DEPOSITION

15   DESIGNATIONS.

16        SAME EXHIBIT LIMITS.  JOINT EXHIBITS, NO MORE THAN 100,

17   AND THERE HAS TO BE COMPLETE AGREEMENT FOR IT TO BE ON THE LIST

18   OF JOINT EXHIBITS; EACH SIDE MAY HAVE INDIVIDUAL EXHIBIT LISTS

19   OF NO MORE THAN 200 EACH, FOR A TOTAL OF 500 EXHIBITS IN THE

20   WHOLE TRIAL.  EXCHANGE YOUR EXHIBIT LISTS BY FEBRUARY 13TH AT

21   NOON.

22        WE'LL DO THE SAME PROCEDURE WE'VE BEEN DOING FOR

23   EVIDENTIARY OBJECTIONS IN THAT THE PARTIES WILL FILE THEIR

24   OBJECTIONS AND RESPONSES TO WITNESSES, EXHIBITS, OR

25   DEMONSTRATIVES NO LATER THAN 8:00 A.M. TWO DAYS BEFORE THE

1   WITNESS IS TO TESTIFY OR THE DEMONSTRATIVE OR EXHIBIT IS TO BE

2   USED.

3           AND I'M GOING TO LIMIT IT TO THREE, THREE EXHIBITS PER

4   WITNESS MAY BE OBJECTED TO AND TWO OBJECTIONS PER EXHIBIT, AND

5   THREE OBJECTIONS TO THE DEPOSITION TESTIMONY OF A SINGLE

6   WITNESS.   THERE WILL BE A FIVE PAGE LIMIT.

7           ACTUALLY, THAT DIDN'T WORK AS WELL IN THE RETRIAL.  MAYBE

8   I SHOULD SAY A -- DID I LIMIT IT TO FIVE ON THE RETRIAL?  I

9   THOUGHT WE WERE UP TO SEVEN.  DOES ANYONE REMEMBER?

10              MS. MAROULIS:  YOU DID LIMIT US.

11              THE COURT:  WAS IT FIVE OR SEVEN?  DO YOU RECALL?

12              MS. MAROULIS:  IT WAS NOT SEVEN.  IT WAS EITHER FIVE

13   OR SIX.

14              THE COURT:  LET'S KEEP IT AT FIVE THEN, BUT -- LET'S

15   KEEP IT AT FIVE.

16          ANY ADDITIONAL OBJECTIONS YOU'D LIKE TO MAKE WILL HAVE TO

17   BE MADE LIVE DURING THE TRIAL BEYOND THESE LIMITS IN FRONT OF

18   THE JURY.

19          OKAY.  SO AT THE --

20              MS. MAROULIS:  YOUR HONOR, MAY WE RAISE THE ISSUE OF

21   DEPOSITION DESIGNATIONS?

22              THE COURT:  YES.

23              MS. MAROULIS:  THEY WERE PREVIOUSLY DUE IN THE MIDDLE

24   OF MARCH AND THE COURT WANTS THEM FEBRUARY 18TH.  CAN WE HAVE

25   MAYBE ANOTHER COUPLE OF WEEKS?  IT'S A PRETTY VOLUMINOUS

```
1    ASSIGNMENT FOR BOTH SIDES.
2              THE COURT:  THAT'S FINE.  ALL I'M TRYING TO DO IS --
3    ANYTHING FOR MARCH 5TH, I'M TRYING TO GET THAT A LITTLE BIT
4    SOONER.  IS THERE -- I'M NOT GOING TO HAVE TO DO ANYTHING WITH
5    THE DEPOSITION DESIGNATIONS, RIGHT?
6              MS. MAROULIS:  NO, YOUR HONOR.  THOSE ARE USUALLY
7    SUBJECT TO OBJECTIONS DURING TRIAL.
8              THE COURT:  THAT'S FINE.  SO HOW MUCH TIME -- THAT'S
9    FINE.  I DO WANT THE NUMERICAL LIMITS, BUT IF YOU WANT TO
10   CHANGE THE DEADLINES, THAT'S FINE.  WHAT DO YOU WANT ME TO
11   CHANGE IT TO?
12             MS. MAROULIS:  THE 1ST OF MARCH?
13             THE COURT:  OKAY.  IS THAT A WEEKDAY?  I'M SORRY.  I
14   DIDN'T BRING A CALENDAR UP HERE.
15             MS. MAROULIS:  THE FIRST WEEK OF MARCH, YOUR HONOR.
16   I'M SORRY, I DON'T HAVE MY CALENDAR.
17             MR. MCELHINNY:  THAT WOULD BE MARCH 3RD.
18             THE COURT:  OKAY.  SO MARCH 3RD FOR THE DEPO
19   DESIGNATIONS, AND DO YOU WANT A WEEK AFTER THAT FOR ANY
20   COUNTER-DESIGNATIONS AND OBJECTIONS?
21             MS. MAROULIS:  YES, YOUR HONOR.
22             THE COURT:  OKAY.  SO I BELIEVE THAT WOULD BE
23   MARCH 10.  THAT'S FINE.
24             MS. MAROULIS:  THANK YOU.
25             THE COURT:  OKAY.  SO THE SUBJECT FOR THE PRETRIAL
```

1    CONFERENCE ON MARCH 5TH WILL BE THE 14 TOTAL MOTIONS IN LIMINE

2     FILED BY ALL SIDES, THE VERDICT FORM, AND THE PRELIMINARY JURY

3     INSTRUCTIONS.

4         FILE YOUR JOINT PRETRIAL STATEMENT FEBRUARY 25.  I DON'T

5     THINK THE TRIAL BRIEF IS NECESSARY.  I MEAN, DO YOU -- IF

6     YOU'RE ALREADY GOING TO FILE A JOINT PRETRIAL STATEMENT.  BUT

7     IF YOU FEEL LIKE IT WOULD BE HELPFUL, THAT'S FINE.  DOES ANYONE

8     WANT TO FILE A TRIAL BRIEF?

9             MR. QUINN:  NOT HERE, YOUR HONOR.

10            THE COURT:  OKAY.  WHY DON'T WE -- WHY DON'T WE --

11     YOU CAN IGNORE THAT.  IT'S IN MY STANDING ORDER, BUT YOU CAN

12     IGNORE THAT.  THE JOINT PRETRIAL STATEMENT SHOULD SUFFICE.

13        THERE WILL NOT BE A JURY QUESTIONNAIRE.

14        I WILL ASK YOU TO PREPARE THE SAME JURY BOOKS THAT YOU'VE

15     ALREADY DONE FOR THE OTHER TRIALS, AND BRING 14 COPIES OF

16     THOSE, PLEASE, TO CHAMBERS ON FRIDAY, MARCH -- IS THAT THE

17     28TH?

18            THE CLERK:  YES.

19            THE COURT:  ON FRIDAY, MARCH 28TH.  YOU KNOW WHAT

20     SHOULD BE IN THERE.

21        I ASSUME YOU WANT TO SHOW THE FJC VIDEO ON PATENTS.

22            MR. MCELHINNY:  WE DO, YOUR HONOR.

23            THE COURT:  OKAY.  ALL RIGHT.  SO THAT'LL INCLUDE

24     YOUR LIST OF WITNESSES, ATTORNEYS, TRIAL DATES AND TIME, THE

25     SAMPLE PATENT FOR THE FJC VIDEO, THE PRELIMINARY JURY

1    INSTRUCTIONS, THE CLAIM CHART, GLOSSARY, ALL OF THE ASSERTED

2    PATENTS, THE TAB FOR THE WITNESS PHOTOS, TAB FOR THE FINAL JURY

3    INSTRUCTIONS, AND THE BLANK LINED PAPER.

4        SAME TRIAL SCHEDULE, 9:00 TO 4:30 WITH A LUNCH BREAK FROM

5    NOON TO 1:00 ON MONDAY, TUESDAY, FRIDAY, AND WE'LL HAVE IT IN

6    THIS COURTROOM.

7        I'D LIKE TO ADVANCE YOUR OBJECTIONS TO OPENING STATEMENT

8    DEMONSTRATIVES.  COULD YOU PROVIDE THAT BY THURSDAY, MARCH 27TH

9    FOR THE MONDAY JURY SELECTION?

10        MR. QUINN:  YES, YOUR HONOR.

11        THE COURT:  IS THAT OKAY?

12        MR. MCELHINNY:  JUST TO REMIND YOUR HONOR, THE

13    PROBLEM WITH THAT --

14        THE COURT:  YEAH.

15        MR. MCELHINNY:  -- IS THAT WE END UP GETTING, LIKE, A

16    LOAD OF 500 POTENTIAL SLIDES AND IT DOESN'T REALLY FOCUS ON

17    WHAT -- SO IF YOU WANT TO PUT A LIMIT ON THE NUMBER OF SLIDES

18    THAT COULD BE EXCHANGED, THAT MIGHT MAKE THIS MORE REALISTIC.

19        THE COURT:  WELL, WHAT'S THAT NUMBER?

20        MR. MCELHINNY:  I WOULD SAY 50.

21        THE COURT:  I THINK THAT'S TOO LOW.  THAT'S TOO LOW.

22    BUT IF YOU ALL CAN AGREE UPON A NUMBER -- YOU'LL HAVE AN HOUR

23    AND A HALF, 90 MINUTES.  DO YOU WANT TO SAY 125 SLIDES?  150

24    SLIDES?

25        MR. QUINN:  YOUR HONOR, PERHAPS THIS IS SOMETHING

1    THAT WE CAN TALK ABOUT, YOUR HONOR.  IT'S, FRANKLY, NOT

2    SOMETHING WE'VE EVEN BEGUN TO THINK ABOUT HOW MANY SLIDES WE

3    MIGHT USE.

4         THE COURT:  WHY DON'T YOU MAKE A PROPOSAL ON

5    MARCH 5TH AT THE PRETRIAL CONFERENCE?

6         MR. QUINN:  OKAY.

7         MR. MCELHINNY:  THANK YOU, YOUR HONOR.

8         THE COURT:  OKAY.  I'LL GO AHEAD AND SET THE TIME

9    FOR -- I'LL SET IT FOR NOON ON THURSDAY, MARCH 27TH.  I GUESS

10   IF THAT'S GOING TO BE INCREDIBLY BURDENSOME, YOU CAN LET ME

11   KNOW, BUT LET'S TRY TO REACH SOME LIMIT.

12        I DO THINK THE 500 WAS VERY DIFFICULT TO GO THROUGH THE

13   NIGHT BEFORE THE CLOSINGS, SO IF WE COULD LIMIT THAT, THAT

14   WOULD BE HELPFUL.

15        OKAY.  AND IF YOU DON'T NOTIFY THE COURT THAT YOU HAVE

16   SETTLED AND RESOLVED YOUR CASE BEFORE 3:00 P.M. ON MARCH 28TH

17   OF 2014, THE PARTIES WILL BE ORDERED TO PAY THE JUROR FEES,

18   MILEAGE, AND PARKING FOR THE JURORS WHO DO COME FOR JURY

19   SELECTION ON THE 31ST.  OKAY?

20        ALL RIGHT.  OTHERWISE WE'RE ON FOR MARCH 5TH AT 2:00 FOR A

21   FINAL PRETRIAL CONFERENCE, AND A JURY TRIAL ON MARCH 31 AT

22   9:00.

23        OKAY.  THOSE ARE THE ONLY --

24        MR. MCELHINNY:  MAY I BE HEARD ON JUST ONE LITTLE

25   PIECE?

```
1              THE COURT:  YES.

2              MR. MCELHINNY:  ON THE IN LIMINE MOTIONS, I HAVE NO

3    OBJECTION TO PAGE LIMITS.

4              THE COURT:  YES.

5              MR. MCELHINNY:  BUT IF YOUR HONOR WOULD CONSIDER

6    INCREASING THE NUMBER OF MOTIONS TO TEN, AND THE REASON I SAY

7    THAT IS YOU ACTUALLY HAVE MORE TIME THERE -- WE HAVE MORE

8    WITNESSES IN THIS CASE, AND IN LIMINE MOTIONS ACTUALLY TURN OUT

9    TO BE, I THINK, QUITE HELPFUL.  THEY HAVE PROVEN HELPFUL IN THE

10   TWO PRIOR CASES.

11          BUT THIS IS MORE LIKE THE FIRST CASE THAN THE SECOND CASE.

12   WE HAVE CROSS-MOTIONS.  WE HAVE CROSS-CASES.  WE HAVE MORE

13   WITNESSES AND I THINK THERE WILL BE ISSUES THAT WILL BE

14   HELPFUL, NEW ISSUES THAT IT WOULD HELP TO GET YOUR GUIDANCE ON

15   IN LIMINE.

16          I'M PERFECTLY FINE WITH THE 30 PAGES.  I JUST WANT -- I

17   THINK THERE WILL BE MORE ISSUES.

18          WE MIGHT EVEN AGREE ON THIS.

19              MR. QUINN:  WE DON'T HAVE ANY OBJECTION TO THAT, YOUR

20   HONOR.

21              THE COURT:  WHAT ABOUT A COMPROMISE AT EIGHT OR NINE?

22              MR. MCELHINNY:  I WOULD ACCEPT A COMPROMISE AT NINE,

23   YOUR HONOR.

24          (LAUGHTER.)

25              THE COURT:  I PREFER THE COMPROMISE AT EIGHT.
```

1          (LAUGHTER.)

2               MR. MCELHINNY:  I'LL ACCEPT YOUR COMPROMISE, YOUR

3      HONOR.

4          I'M SORRY.  I ACTUALLY THINK THIS IS BETTER FOR YOU.

5      THAT'S WHY I'M PROPOSING IT, BECAUSE I KNOW IT'S A LOT OF WORK,

6      BUT IT IS -- IT'S WEEKS -- IT'S A WEEK BEFORE THE TRIAL AS

7      OPPOSED TO --

8               THE COURT:  WELL, OKAY.  I MEAN, I WILL TELL YOU MY

9      PERSONAL VIEW IS THAT WE'LL GET OVERBROAD, SWEEPING MOTIONS

10     WHICH WILL BE DENIED AND WILL HAVE TO BE DECIDED ON A CASE BY

11     CASE, INDIVIDUAL OBJECTION BASIS AT TRIAL.

12         IT'LL BE LIKE ALL THE OTHER MOTIONS IN LIMINE WHICH ARE,

13     YOU KNOW, EXCLUDE ALL EVIDENCE OF INDEPENDENT DEVELOPMENT.

14     EXCLUDE ALL EVIDENCE OF -- I HAVEN'T PERSONALLY FOUND THE

15     MOTIONS IN LIMINE TO BE HUGELY HELPFUL IN THE EARLIER CASES

16     BECAUSE THEY'RE WAY TOO GENERAL AND IT'S NOT CLEAR WHAT'S BEING

17     REQUESTED TO BE EXCLUDED.

18              MR. MCELHINNY:  I THINK YOUR HONOR HAS ACCURATELY

19     STATED THE HISTORY.

20         BUT WHAT I WOULD SUGGEST IS EVEN IN THAT SITUATION, IT HAS

21     HELPED EDUCATE YOUR HONOR TO WHAT THE ISSUES ARE AS THEY COME

22     UP AT TRIAL.

23         IF IT'S NOT, THEN WE DON'T NEED TO DO IT BECAUSE THAT'S --

24     I'M NOT TRYING TO JUSTIFY BROAD, SWEEPING MOTIONS.

25              THE COURT:  WHY DO YOU NEED TO MAKE IT A MOTION?  WHY

```
1         DON'T YOU JUST MAKE A NOTICE?

2              MR. MCELHINNY:  I AM NOT ATTEMPTING TO JUSTIFY BROAD,

3         SWEEPING MOTIONS.

4              THE COURT:  NO, BUT I'M JUST SAYING, WHY CAN'T IT

5         JUST BE A MOTION?  IT COULD JUST -- I MEAN, WHY DOES IT HAVE TO

6         BE A MOTION?  YOU COULD PUT IN THE JOINT PRETRIAL STATEMENT AND

7         SAY "WE ENVISION THE FOLLOWING EVIDENTIARY ISSUES WILL ARISE AT

8         TRIAL.  WE WILL BE MAKING OBJECTIONS TO" --

9              MR. MCELHINNY:  PERFECT.

10             THE COURT:  -- "X PARTY'S EVIDENCE OF WHATEVER."

11             MR. MCELHINNY:  THAT'S PERFECT.

12             THE COURT:  I JUST -- YOU KNOW, I FELT LIKE RULING ON

13        THESE BROAD GENERALIZATIONS MIGHT ACTUALLY BE MORE PROBLEMATIC

14        BECAUSE THEY SWEEP IN TOO MUCH BECAUSE WE'RE TAKING A VERY

15        BROAD LOOK RATHER THAN AN INDIVIDUAL DOCUMENT OR A WITNESS SORT

16        OF REVIEW AND IT MIGHT JUST BE AN OVERBROAD RULING.

17             SO, I MEAN, I WAS INTENDING -- IF YOU DO THAT AGAIN, I'M

18        JUST GOING TO DENY THEM ALL WITHOUT PREJUDICE AND LET YOU MAKE

19        INDIVIDUAL OBJECTIONS DURING THE TRIAL.

20             MR. MCELHINNY:  THIS HAS BEEN VERY HELPFUL.  I

21        WITHDRAW MY MOTION.  WE'LL STICK WITH THE SEVEN, YOUR HONOR.

22             THE COURT:  WELL, CAN I GO DOWN TO FIVE THEN NOW THAT

23        THERE'S --

24             (LAUGHTER.)

25             THE COURT:  -- AN AGREEMENT?  I MEAN, I JUST KNOW --
```

1    NO.  I REALLY APPRECIATE IT.  YOUR PUTTING US ON NOTICE IN

2    ADVANCE IS HELPFUL.

3         BUT I THINK THAT COULD BE DONE WITH A NOTICE IN THE JOINT

4    PRETRIAL STATEMENT.  I DON'T THINK WE HAVE TO DO THIS LONG,

5    ELABORATE --

6              MR. MCELHINNY:  I THINK THE TRUTH --

7              THE COURT:  -- MOTION.

8              MR. MCELHINNY:  I THINK THE TRUTH IS IN THE MIDDLE.

9    I THINK YOUR HONOR HAS MADE SUBSTANTIVE RULINGS IN THE IN

10   LIMINE MOTIONS.  WHEN THEY'RE SERVED UP CORRECTLY IN TERMS OF

11   PARTICULAR DOCUMENTS, PARTICULAR LINES OF ARGUMENT, PARTICULAR

12   THINGS LIKE THAT THAT HAVE, IN FACT, PROVEN VERY HELPFUL.

13        SO I -- I MEAN, I'M STUCK NOW BECAUSE NOW ALL OF A SUDDEN

14   I TOOK THAT SEVEN AND PUT IT INTO PLAY, BUT -- I ACTUALLY -- I

15   WOULD PREFER TEN, BUT I UNDERSTAND YOUR HONOR'S LOGIC AND SO I

16   UNDERSTAND HOW YOU GOT TO SEVEN.

17             THE COURT:  WELL, WHAT CAN WE DO TO AVOID HAVING THE

18   SORT OF OVERBROAD MOTIONS THAT WE'VE PREVIOUSLY HAD IN THE

19   PRIOR TWO TRIALS?  I DON'T THINK THAT'S NECESSARY FOR THE

20   PURPOSES OF EDUCATION.  I THINK IF YOU JUST ALERT US TO THE

21   ISSUE THAT THAT'S SUFFICIENT.

22             MR. MCELHINNY:  I DON'T --

23             THE COURT:  WHAT CAN WE DO TO AVOID --

24             MR. MCELHINNY:  I DON'T SEE ANY WAY TO GET OUT OF

25   THIS CONVERSATION NOW THAT WE'VE STARTED.

```
 1                    THE COURT:  HM?

 2                    MR. MCELHINNY:  I DON'T SEE ANY GOOD WAY FOR ME TO

 3         GET OUT OF THIS CONVERSATION.

 4                    THE COURT:  WELL, YOU CAN AGREE TO FIVE MOTIONS FOR

 5         25 PAGES.

 6                    MR. MCELHINNY:  IS MY AGREEMENT REQUIRED, YOUR HONOR?

 7              (LAUGHTER.)

 8                    THE COURT:  WELL, I -- YOU KNOW, YOU SEE MY CONCERN,

 9         RIGHT?

10                    MR. MCELHINNY:  I DO.

11                    THE COURT:  I FEEL LIKE IT WOULD BE IMPROPER FOR ME

12         TO MAKE THESE BROAD RULINGS, WHICH MIGHT, YOU KNOW --

13                    MR. MCELHINNY:  I DO --

14                    THE COURT:  -- BE WRONG FOR AN INDIVIDUAL DOCUMENT

15         OR --

16                    MR. MCELHINNY:  LET ME PUT IT THIS WAY.  I DO SEE

17         YOUR CONCERN.

18                    THE COURT:  YEAH.

19                    MR. MCELHINNY:  I DON'T INTEND TO FILE -- NOW WE'RE

20         BACK TO THIS -- ANY IN LIMINE MOTIONS THAT WOULD ELICIT THAT

21         CONCERN, PARTICULARLY AFTER THIS CONVERSATION.

22              BUT I -- FROM THE TIME I'VE BEEN IN THIS CASE, I DO SEE

23         THAT THERE ARE PARTICULAR DOCUMENTS, THERE ARE PARTICULAR

24         DEMONSTRATIONS, THERE ARE PARTICULAR ISSUES THAT IT WOULD BE

25         GOOD TO HAVE A RESOLUTION OF BEFORE WE GO FORWARD.
```

```
 1            THE COURT:  RIGHT.  BUT HISTORICALLY, THE MOTIONS

 2     HAVE BEEN THEME-BASED AND LESS DOCUMENT-BASED.

 3            MR. MCELHINNY:  I'M THE ONE WHO WRITES THE OBJECTIONS

 4     THAT SAY "THIS IS TOO BROAD, IT'S NOT HELPFUL, IT'S NOT GOING

 5     TO GIVE GUIDANCE, PLEASE DENY IT."  I UNDERSTAND EXACTLY WHAT

 6     YOU'RE TALKING ABOUT.

 7            THE COURT:  BUT YOUR SIDE HAS FILED SOME OF YOUR OWN

 8     OVERBROAD MOTIONS AS WELL.  MAYBE THAT WAS SOMEBODY ELSE ON

 9     YOUR TEAM.

10            MR. MCELHINNY:  NO, NO.  IF IT WAS FILED, IT WAS

11     FILED WITH MY SIGNATURE.

12            THE COURT:  ALL RIGHT.  OKAY.

13            MR. MCELHINNY:  THAT'S THE WAY OF THE CASE.

14            THE COURT:  I WILL NOT GO BACK ON THE SEVEN AND 30.

15         BUT I WILL ASK BOTH SIDES, IF YOU WANT TO DO EDUCATION,

16     CAN YOU PLEASE PUT IT IN THE JOINT PRETRIAL?  I MEAN, WE DO

17     READ EVERYTHING YOU FILE, SO IF YOU GIVE US A HEADS UP, WE WILL

18     BE THINKING ABOUT IT IN ADVANCE.  BUT PLEASE TRY TO AVOID THOSE

19     OVERLY GENERAL MOTIONS IN LIMINE.

20         OKAY.  WHAT OTHER HOUSEKEEPING?  ANYTHING ELSE?  NO?

21     OKAY.

22            MS. MAROULIS:  NO, YOUR HONOR.

23            THE COURT:  ALL RIGHT.  SO I THOUGHT WHAT WOULD BE

24     HELPFUL IS FOR ME TO GIVE YOU A TENTATIVE RULING AND THEN YOU

25     CAN ARGUE AGAINST THE TENTATIVE OR FOR THE TENTATIVE, HOWEVER
```

1    YOU WANT TO COME OUT.

2         AND THIS IS WHAT I'M PLANNING -- AND I ALSO HAVE SOME

3    OTHER QUESTIONS TO ASK AS WELL.

4         I AM TENTATIVELY PLANNING TO GRANT APPLE'S MOTION TO

5    PROHIBIT OR EXCLUDE DR. CHEVALIER'S TESTIMONY ON THE HTC

6    AGREEMENT FOR THE REASONS THAT I SET FORTH IN THE HTC ORDER

7    FROM THE RETRIAL, THE APRIL 2010 LICENSING OFFER PURSUANT TO

8    FEDERAL RULE OF EVIDENCE 408, AND HER ACTUAL ANALYSIS OF ALL

9    THE OTHER LICENSE AGREEMENTS BECAUSE THEY'RE NOT SPECIFIC TO

10   THE TECHNOLOGY AT ISSUE AND DON'T DO THE REQUIRED COMPARABILITY

11   ANALYSIS REQUIRED BY RESQNET OR LASER DYNAMICS.

12        I'M INTENDING TO GRANT SAMSUNG'S MOTION TO EXCLUDE

13   DR. HAUSER AND DR. VELLTURO FROM RELYING ON DR. HAUSER'S

14   SURVEYS RELATED TO THE '414 PATENT BECAUSE DR. HAUSER'S SURVEY

15   DOES NOT INFORM THE SURVEY PARTICIPANTS OF THE LIMITATIONS OF

16   CLAIM 20.

17        I'M ALSO INCLINED TO GRANT SAMSUNG'S MOTION TO EXCLUDE

18   DR. VELLTURO'S -- APPLE'S WILLINGNESS TO ACCEPT CALCULATIONS AS

19   A BASIS FOR HIS REASONABLE ROYALTY CALCULATION BECAUSE IT'S

20   REALLY JUST LOST PROFITS, WHICH WOULD NOT BE PERMITTED BECAUSE

21   IT'S OUT -- YOU KNOW, SAMSUNG WOULD HAVE A NON-INFRINGING

22   ALTERNATIVE AT THAT POINT AND LOST PROFITS WOULD NOT BE

23   APPROPRIATE, SO I'M NOT GOING TO ALLOW DR. VELLTURO TO SQUEEZE

24   IN A LOST PROFITS CALCULATION UNDER THE NAME OF A REASONABLE

25   ROYALTY CALCULATION.

1          THE DESIGN AROUND DATES BEGIN ON THE DATE OF INFRINGEMENT

2     AND NOT ON THE DATE OF NOTICE, AND FOR THAT I JUST POINT TO THE

3     ORDER THAT I ISSUED BEFORE THE RETRIAL.  IT'S THE SAME LEGAL

4     ANALYSIS.

5          BUT FOR ALL OTHER MOTIONS, I'M PLANNING TO DENY THE

6     REQUEST FOR EXCLUSION.

7          NOW, I HAVE -- WHY DON'T I ASK MY SPECIFIC QUESTIONS FIRST

8     AND THEN I'LL LET THE PARTIES GIVE YOUR BEST CASE AS TO WHY

9     THIS TENTATIVE IS WRONG, WHATEVER PIECE YOU WANT TO ARGUE.

10          SO LET'S ASK, WITH REGARD TO DR. CHEVALIER, SO IF HER

11     MARKET APPROACH IS EXCLUDED, SHE COULD STILL RELY ON HER INCOME

12     APPROACH.  SO MY QUESTION IS, WOULD SHE REACH THE SAME DAMAGES

13     RESULT?

14               MR. WATSON:  GOOD AFTERNOON, YOUR HONOR.

15      SCOTT WATSON TO ADDRESS THE CHEVALIER MOTION.

16          ACTUALLY, YOUR HONOR, THE INTERESTING THING HERE IS THAT

17     THE CONSIDERATION OF THE LICENSING DATA IN THIS CASE ACTUALLY

18     PUSHES DR. CHEVALIER'S RATE UP, NOT DOWN.

19          AND IF YOU LOOK AT FOOTNOTE 1 IN APPLE'S BRIEF, THIS HAS

20     GOT TO BE A FIRST IN THE HISTORY OF DAUBERT.  APPLE SAYS, "WE'D

21     LIKE TO EXCLUDE THIS EVIDENCE.  WE DON'T TAKE ISSUE WITH THE

22     RESULTS OF HER ANALYSIS."

23          THEY'RE NOT ASKING TO EXCLUDE THE REASONABLE ROYALTY

24     NUMBERS THAT DR. CHEVALIER ENDED UP WITH, THEY JUST WANT TO

25     EXCLUDE THE ACTUAL LICENSING DATA IN THE CASE.

1        AND, YOUR HONOR, THE REASON FOR THAT IS BECAUSE IT IS OUT

2    OF ALL BOUNDS FROM THE DAMAGES NUMBERS THAT APPLE WOULD LIKE TO

3    PUT UP.  EACH -- EACH OF THESE DIFFERENT TYPES OF LICENSING

4    EVIDENCE DIRECTLY IMPEACH THE NUMBER APPLE WANTS TO PUT UP.  IT

5    WANTS TO PUT UP $40 A UNIT --

6        THE COURT:  WELL, I'M LOOKING AT HER CHARTS --

7        MR. WATSON:  YES, YOUR HONOR.

8        THE COURT:  -- EXHIBITS 72 AND 85, AND FOR THE VAST

9    MAJORITY OF PATENTS, SHE JUST SAYS, "WELL, THE TECHNOLOGY

10   WASN'T SPECIFIED.  THE TECHNOLOGY WASN'T SPECIFIED.  THE

11   TECHNOLOGY WASN'T SPECIFIED."  SO SHE DOESN'T DO ANY

12   COMPARABILITY ANALYSIS, AND I THINK UNDER FEDERAL CIRCUIT LAW,

13   IT WOULD NOT QUALIFY UNDER 702 TO BE COMING IN AS EXPERT

14   TESTIMONY.

15       MR. WATSON:  SO, YOUR HONOR, IF I COULD ADDRESS THAT?

16       THE COURT:  UM-HUM.

17       MR. WATSON:  180 LICENSES IN THE CASE.  DR. CHEVALIER

18   DOES STEP AFTER STEP TO NARROW THOSE DOWN -- AND THE COURT IS

19   ABSOLUTELY RIGHT IN THE EXHIBITS THAT IT'S IDENTIFYING.

20       BUT IF YOU LOOK AT THE BODY OF THE REPORT THAT LEADS TO

21   THOSE, THOSE NUMBERS, SHE'S TAKING STEP AFTER STEP, SHE'S

22   EXCLUDING LICENSES THAT ARE PORTFOLIO PROCESSES, SHE'S

23   EXCLUDING LICENSES WHERE SAMSUNG IS NOT A PARTY, SHE'S

24   EXCLUDING LICENSES OUTSIDE -- YOU KNOW, THEY'RE OUTSIDE OF THE

25   UNITED STATES, AND SHE'S EXCLUDING OLDER LICENSES.

1       AND THEN SHE'S LOOKING AT LICENSES THAT WERE PRODUCED IN

2   THIS CASE BY THESE PARTIES IN DISCOVERY.  THESE ARE ALREADY

3   DETERMINED TO BE RELEVANT.

4           THE COURT:  BUT SHE'S SORT OF EXCLUDING SOME THAT

5   SEEM MOST COMPARABLE, ONES THAT INVOLVE COMPETITORS, ONES

6   THAT -- YOU KNOW, FOR EXAMPLE, THE MICROSOFT.  IT SEEMS LIKE

7   SHE'S PREFERRING THE LUMP SUM AGREEMENTS WITH NON-PRACTICING

8   ENTITIES.  I MEAN, THERE'S JUST REALLY NOT A LOT OF ANALYSIS AS

9   TO WHAT IS THE TECHNOLOGY?  IS THIS A COMPARABLE CIRCUMSTANCE?

10  AND WITHOUT THAT, I JUST DON'T SEE HOW IT COMES IN.

11          MR. WATSON:  AND, YOUR HONOR, IF I MAY?

12          THE COURT:  YEAH.

13          MR. WATSON:  SO THERE'S AN AWFUL LOT OF LICENSES IN

14  THIS CASE.

15          THE COURT:  AGREED.

16          MR. WATSON:  WE HAVE 46 PAGES OF SCHEDULES

17  IDENTIFYING THE LICENSES AND IDENTIFYING THE MATERIAL TERMS.

18      WE ALSO HAVE DR. CHEVALIER TALKING ABOUT THE THINGS SHE'S

19  TAKING INTO CONSIDERATION IN THE BODY OF HER REPORT.

20      NOW, I WOULD ASK THE COURT TO COMPARE THAT TO THE ANALYSIS

21  THAT APPLE IS MAKING.  DR. VELLTURO, IN ONE PAGE, SAYS 99

22  LICENSES, NOT RELEVANT, NOT GOING TO LOOK AT THEM, OUT.

23      THAT'S THEIR COMPARABILITY ANALYSIS.

24      OUR COMPARABILITY ANALYSIS GOES 50-PLUS PAGES.  AND, YOUR

25  HONOR, I UNDERSTAND GIVEN THE NUMBER OF LICENSES, YOU KNOW, TO

1    DO A MORE -- TO DO A LICENSE-BY-LICENSE ANALYSIS BEYOND ALREADY

2    IDENTIFYING ALL THE MATERIAL TERMS, YOU KNOW, DR. CHEVALIER

3    TESTIFIED AT HER DEPOSITION --

4         THE COURT:  BUT ISN'T THE TECHNOLOGY THAT'S BEING

5    LICENSED A MATERIAL TERM?  FOR THE VAST MAJORITY, IT JUST KEEPS

6    SAYING -- IT JUST HAS THE SAME, SAME LANGUAGE.

7         MR. WATSON:  WELL, YOUR HONOR --

8         THE COURT:  YOU KNOW, TECHNOLOGY NOT SPECIFIED IN THE

9    AGREEMENT; TECHNOLOGY NOT SPECIFIED IN THE AGREEMENT;

10   TECHNOLOGY NOT SPECIFIED IN THE AGREEMENT; TECHNOLOGY NOT

11   SPECIFIED IN THE AGREEMENT.

12        I MEAN, THAT'S A VERY MATERIAL TERM.  HOW CAN YOU BE

13   COMPARING WHAT IT'S WORTH WHEN YOU DON'T EVEN KNOW WHAT'S BEING

14   COMPARED?

15        MR. WATSON:  WELL, YOUR HONOR, IF I MAY?

16        THE COURT:  YEAH.

17        MR. WATSON:  DR. CHEVALIER TESTIFIED IN HER

18   DEPOSITION -- THEY PUT THIS TESTIMONY IN THE RECORD -- SHE

19   REVIEWED THESE LICENSES.

20        THE COURT:  OKAY.  SHE AN ECONOMIST.  I MEAN, IS SHE

21   EVEN QUALIFIED TO SAY THIS IS SIMILAR AND COMPARABLE

22   TECHNOLOGY?  WHY DIDN'T YOU HAVE A TECHNICAL EXPERT LOOK AT

23   THIS AND SAY, "YEAH, THIS TECHNOLOGY I THINK IS COMPARABLE,

24   WOULD HAVE EQUAL VALUE."  YOU KNOW WHAT I MEAN?  I MEAN, SHE

25   HAS, OBVIOUSLY, EXCELLENT CREDENTIALS, BUT NOT TO DO A

1    TECHNOLOGY COMPARISON.

2              MR. WATSON:  WELL, YOUR HONOR, IF I MAY, SHE IS A

3    PROFESSOR WHO TEACHES IN THE TECHNOLOGY SPACE AT THE YALE

4    BUSINESS SCHOOL.  SHE IS THE PERSON WHO CHAIRED YALE'S

5    COMMITTEE ON COOPERATIVE RESEARCH, WHICH IS THE LICENSING ARM

6    OF YALE.  SO SHE WAS THE CHAIR FOR LICENSING ALL OF YALE'S

7    INTELLECTUAL PROPERTY FOR THREE YEARS.  THIS IS A WOMAN WHO HAS

8    READ LICENSE AGREEMENTS, WHO IS FAMILIAR WITH THE TECHNOLOGY.

9              AND, YOUR HONOR, THEY HAVEN'T PUT A SINGLE LICENSE IN

10   FRONT OF YOU IN THEIR PAPERS AND SAID, "LOOK AT THIS LICENSE,

11   THIS ISN'T COMPARABLE.  LOOK AT THIS TYPE OF TECHNOLOGY, IT'S

12   NOT COMPARABLE."

13             IF YOU LOOK AT THE BODY OF HER REPORT AT PARAGRAPH 327,

14   SHE'S IDENTIFYING THE TYPES OF PATENTS WE HAVE IN THIS CASE.

15   THESE ARE SMALL FEATURES ON A VERY COMPLEX PRODUCT.

16             AND IF YOU LOOK AT THE DISCUSSION IN PARAGRAPH 327 OF HER

17   REPORT, SHE HAS ILLUSTRATIVE EXAMPLES.

18             NOW, YOUR HONOR SAID, WELL, SHE'S EXCLUDED SOME OF THE

19   LARGER LICENSES.  THOSE ARE PORTFOLIO CROSS-LICENSES.

20             APPLE DOESN'T DISPUTE THAT THOSE SHOULD BE EXCLUDED.

21   DR. VELLTURO JUST EXCLUDES EVERY LICENSE FROM HIS ANALYSIS

22   BECAUSE TO GET TO $40 A UNIT, WHICH IS WHAT THEY WANT, THE JURY

23   CANNOT SEE A LICENSING AGREEMENT IN THIS CASE.  THERE'S NO WAY.

24   IT'S TOTALLY DISPARATE TO ACTUAL MARKET INFORMATION.

25             THE COURT:  SO LET ME ASK YOU A QUESTION.

1          MR. WATSON:  THEY CAN ABSOLUTELY -- EXCUSE ME, YOUR

2     HONOR.

3          THE COURT:  SORRY TO INTERRUPT YOU.

4          MR. WATSON:  OF COURSE.

5          THE COURT:  SO YOU'RE SAYING HER, I GUESS, WHAT IS

6     IT, $.35 ROYALTY RATE WOULD DECREASE IF THE MARKET APPROACH IS

7     TAKEN OUT AND SHE RELIES ON HER INCOME APPROACH ANALYSIS?

8          MR. WATSON:  WELL, I MEAN, OBVIOUSLY WE'D HAVE TO ASK

9     HER.

10         BUT I'D ASK THE COURT --

11         THE COURT:  SURE.

12         MR. WATSON:  -- TO LOOK AT EXHIBIT 97, AND

13    UNFORTUNATELY, I CAN'T PUT IT UP ON THE SCREEN, BUT IT IS IN

14    THE RECORD IN THE FAZIO DECLARATION.

15         THE REPORTER:  I'M SORRY, IN WHICH DECLARATION?

16         THE COURT:  F-A-Z-I-O.

17         MR. WATSON:  WE HAVE COPIES TO HAND UP IF THAT'LL BE

18    HELPFUL TO THE COURT.

19         THE COURT:  LET ME ASK YOU WHAT MY QUESTION WAS.

20         OKAY.  I WILL -- THESE ARE TENTATIVES, AND I'LL GIVE YOU A

21    MINUTE TO SPEAK FURTHER ABOUT WHY IT SHOULDN'T -- WHY THE

22    MARKET APPROACH SHOULDN'T BE EXCLUDED.

23         MR. WATSON:  THANK YOU.

24         THE COURT:  BUT IF IT IS, TELL ME, WHAT WOULD YOU

25    NEED?  WOULD YOU NEED -- SO YOU'RE SAYING SHE'S NOT GOING TO

1      RELY JUST ON HER INCOME APPROACH ANALYSIS?

2              MR. WATSON:  WELL, YOUR HONOR, I MEAN, THEY'RE -- SHE

3      OBVIOUSLY HAS A LOT OF DATA POINTS THAT ARE GOING INTO A VERY

4      SOPHISTICATED, I SUBMIT, GEORGIA PACIFIC ANALYSIS AND IT'S IN

5      THE RECORD AND THE COURT CAN LOOK AT IT.

6          BUT ALL I'M SAYING IS THIS IS A CASE -- IF YOU LOOK AT

7      RESQNET AND YOU LOOK AT THE OTHER FEDERAL CIRCUIT CASES, WHAT

8      ARE THEY CONCERNED ABOUT?  THEY'RE CONCERNED ABOUT CHERRY

9      PICKING LICENSES IN YOUR FAVOR.  YOU'RE GOING TO LOOK AT THE

10     BENQ LICENSE AND NOT AT THE OTHER 29 BECAUSE IT'S SIX TIMES

11     BIGGER AND YOU'RE TRYING TO SKEW THE NUMBERS.

12         THAT'S NOT WHAT'S GOING ON HERE.  DR. CHEVALIER IS MOVING

13     HER NUMBER UP BECAUSE OF THE LICENSING DATA.

14         THE ONLY REASON APPLE IS BRINGING THIS MOTION IS BECAUSE

15     THE LICENSING DATA IS COMPLETELY INCONSISTENT WITH THE IDEA

16     THAT ANYONE WOULD PAY $40 FOR FIVE SMARTPHONE PATENTS PER UNIT.

17             THE COURT:  WELL, I'M NOT GOING TO MAKE ANY PERSONAL

18     COMMENT ON EITHER SIDE'S REASONABLE ROYALTY RATE.  I THINK BOTH

19     SIDES ARE STRETCHING REGARDLESS OF THAT.

20         HER REASONABLE ROYALTY RATE OF $.35, HOW IS THAT ACTUALLY

21     CALCULATED?  BECAUSE SHE HAS DIFFERENT APPROACHES, BUT

22     DOESN'T -- SHE DOESN'T REALLY EXPLAIN HOW SHE ARRIVED AT THAT

23     NUMBER.

24             MR. WATSON:  WELL, YOUR HONOR --

25             THE COURT:  IT'S SORT OF LIKE, "WELL, I LOOKED AT ALL

1    THIS, AND HERE'S MY RATES."

2              MR. WATSON:  COULD I HAND UP EXHIBIT 97?  BECAUSE I

3    THINK IT REALLY EXPLAINS THAT.

4              THE COURT:  OKAY.  I MEAN, I HAVE HER REPORT.  YOU

5    WANT TO JUST POINT ME TO A PARAGRAPH IN HER REPORT?

6              MR. WATSON:  WELL, IF --

7              THE COURT:  I'M SORRY.  I HAVE -- I HAVE --

8              MR. WATSON:  I THINK THIS IS THE EASIEST WAY TO DO

9    THIS, YOUR HONOR, BECAUSE IT GRAPHICALLY ILLUSTRATES WHAT'S

10   ACROSS MANY, MANY --

11             THE COURT:  OH, I HAVE EXHIBIT 97.  EXCUSE ME.

12             MR. WATSON:  THANK YOU, YOUR HONOR.

13             THE COURT:  I'M SORRY.  I HAVE THAT CHART.

14      BUT WHAT I'M SAYING, EVEN WITH THIS CHART, IT SAYS, "I

15   LOOKED AT INCOME APPROACH AND LOOKED AT, YOU KNOW, THESE

16   DIFFERENT FACTORS.  HERE'S MY MARKET APPROACH."  BUT IT STILL

17   DOESN'T SAY HOW SHE GOT TO THE $.35.

18             MR. WATSON:  WELL, YOUR HONOR, IF I MAY?

19             THE COURT:  YES.

20             MR. WATSON:  IT'S HARD TO SUMMARIZE ALL OF THE

21   ANALYSIS THAT OCCURS IN THE GEORGIA PACIFIC, BUT WHAT YOU CAN

22   SEE --

23             THE COURT:  JUST POINT ME TO SOME PARAGRAPHS IN HER

24   EXPERT REPORT WHERE SHE SAYS "THIS IS HOW I DERIVED 35."

25             MR. WATSON:  I MEAN, I WOULD DIRECT THE COURT TO, TO

1    THE DISCUSSION -- FOR EXAMPLE, AS TO COMPARABLE LICENSES, IF WE

2    LOOK AT THE DISCUSSION IN PARAGRAPH 334, OKAY, WE'VE GOT THE

3    HTC LICENSE, WE HAVE THE 2010 PROPOSAL, WE HAVE THE COMPARABLE

4    LICENSES.  THAT'S THE SUMMARY OF THE OUTPUT THERE.  WE'RE

5    GETTING -- WE'RE GETTING RANGES IN VALUES FROM EACH OF THESE

6    STEPS OF ANALYSIS AND THOSE ARE REFLECTED ON 97.  YOU CAN SEE

7    THE RANGES.

8        AND WHAT DR. CHEVALIER DOES THEN IS EMPLOY THE OTHER

9    INCOME APPROACHES, AND WHAT YOU SEE IS THAT AFTER YOU TAKE THE

10   GEORGIA PACIFIC FACTORS INTO ACCOUNT, THINGS LIKE THE FACT THAT

11   APPLE OBVIOUSLY IS A COMPETITOR OF SAMSUNG'S, YOU HAVE

12   DIFFERENT, YOU KNOW, DIFFERENT SITUATIONS, AND THIS IS WHAT

13   EXPERTS DO.  THEY TAKE ALL OF THIS DATA AND THEN THEY, YOU

14   KNOW, SYNTHESIZE IT INTO AN EXPERT OPINION.

15       AND APPLE'S FREE -- APPLE'S FREE TO CROSS HER ON THIS

16   OPINION, YOUR HONOR.

17       BUT IF YOU LOOK AT EXHIBIT 97, YOU HAVE A REMARKABLY

18   CONSISTENT VALUATION SUGGESTED BY EIGHT DIFFERENT

19   METHODOLOGIES, INCLUDING THE METHODOLOGY --

20           THE COURT:  OKAY.  SO THEN SHE -- THEN SHE SHOULD --

21   THEN SHE SHOULD COME UP WITH THE SAME REASONABLE ROYALTY RATE

22   WHETHER SHE'S GETTING IT FROM THE INCOME APPROACH OR THE MARKET

23   APPROACH.

24           MR. WATSON:  YOUR HONOR, I ABSOLUTELY AGREE THAT HER

25   REASONABLE ROYALTY RATE IS SUPPORTED BY BOTH.

```
 1          THE COURT:  THAT WOULD BE THE SAME.  OKAY.

 2          MR. WATSON:  BUT YOUR HONOR, I DO THINK IT'S

 3     IMPORTANT TO KEEP IN MIND THAT THIS IS THE ONLY CASE THAT I'M

 4     AWARE OF WHERE A PARTY HAS SOUGHT TO THROW OUT LICENSING

 5     EVIDENCE THAT DOES NOT APPEAR TO HAVE ANY IMPACT IN A NEGATIVE

 6     DIRECTION ON THEIR NUMBER.

 7          I'D LIKE TO ADDRESS THE HTC LICENSE IF I COULD, YOUR

 8     HONOR.  I DON'T KNOW IF YOU'RE DONE WITH COMPARABLE, BUT I

 9     WOULD LIKE TO ADDRESS THAT.

10          THE COURT:  OKAY.  AND LET ME JUST CONFIRM.  SO THEN

11     HER INCOME APPROACH REACHES THE SAME RESULTS; CORRECT?

12          MR. WATSON:  WELL, YOU HAVE THE SAME RANGE OF

13     RESULTS, YOUR HONOR.  IT'S A RANGE OF VALUES THAT'S SUGGESTED

14     BY EACH OF THESE.

15          THE COURT:  WELL, I MEAN, I THOUGHT SHE SAYS $.35.

16          MR. WATSON:  WELL --

17          THE COURT:  I MEAN --

18          MR. WATSON:  RIGHT, HER ULTIMATE NUMBER IS $.35.

19          BUT IF YOU LOOK AT EACH OF THE APPROACHES, THEY SUGGEST A

20     RANGE, AND THAT $.35 NUMBER, YOUR HONOR, YOU KNOW, DOES TAKE

21     INTO ACCOUNT, OR HAS -- WELL, YEAH.  I MEAN, IT'S TAKING INTO

22     ACCOUNT ALL OF THESE DATA POINTS.

23          I MEAN, YOU KNOW, IT'S IMPORTANT, YOUR HONOR, I THINK TO

24     NOTE THAT IF THIS MOTION IS GRANTED IN FULL AS TO THE LICENSING

25     ANALYSIS, THIS JURY WILL NOT HEAR ANYTHING ABOUT ANY LICENSE
```

```
 1        EVER IN THE SMARTPHONE SPACE, AND THAT'S A REMARKABLE -- THAT'S

 2        A REMARKABLE THING.

 3                THE COURT:  WELL, SOME OF THESE LICENSES AREN'T IN

 4        THE SMARTPHONE SPACE THAT SHE LOOKS AT.

 5                MR. WATSON:  WELL, YOUR HONOR --

 6                THE COURT:  SHE'S LOOKING AT THE -- AT SOME OF THEM

 7        THAT INVOLVE DESKTOP COMPUTERS AND SHE INCLUDES THAT IN HER

 8        LIST.

 9                MR. WATSON:  BUT YOUR HONOR, SOME OF THESE PATENTS

10        WERE DEVELOPED AT DIFFERENT TIMES.  SO THE PATENT MIGHT SAY

11        DESKTOP COMPUTER, BUT AS WE ALL KNOW, THE DESKTOP COMPUTER AND

12        THE HANDHELD DEVICE HAVE CONVERGED VERY RAPIDLY OVER THE YEARS.

13                THE COURT:  WELL, I MEAN, "A DOUBLE CLICK INPUT TO A

14        POINT AND CLICK USER INTERFACE" DOESN'T REALLY SMELL

15        SMARTPHONEY TO ME.

16                MR. WATSON:  WELL, YOUR HONOR, THAT'S --

17                THE COURT:  THAT'S A DESKTOP PATENT, ISN'T IT?

18                MR. WATSON:  I'M SORRY, YOUR HONOR, TO SPEAK OVER

19        YOU.

20            THE '647 PATENT WAS DEVELOPED FOR THE DESKTOP.  IT'S NOW A

21        SMARTPHONE INTERFACE.

22            AND OBVIOUSLY WE'RE CONSTANTLY INTERACTING WITH

23        SMARTPHONES IN THAT WAY.

24            BUT, YOUR HONOR, ORDINARILY WHEN YOU SEE THESE CASES, WHEN

25        YOU READ THE FEDERAL CIRCUIT CASES, YOU HAVE A PARTICULAR
```

1    LICENSE OR HANDFUL OF LICENSES AND THE PARTY PUTS IT IN FRONT

2    OF THE COURT AND SAYS, "LOOK, THIS IS DIFFERENT.  THIS IS A

3    DIFFERENT KIND OF THING."

4         APPLE HASN'T MADE THAT SHOWING HERE.  THEY HAVEN'T PUT A

5    SINGLE LICENSE IN FRONT OF YOU AND SAID "THIS IS NOT A

6    COMPARABLE LICENSE."  THEY JUST GENERALLY OBJECT TO THE IDEA

7    THAT ANY OF THESE LICENSES ARE RELEVANT.

8         THE COURT:  SO LET ME ASK YOU, DO YOU BELIEVE -- IF

9    THE TENTATIVE REMAINS AND THE MARKET APPROACH GETS EXCLUDED,

10   WOULD YOU NEED TO DO ANYTHING ELSE?  OR DO YOU HAVE -- I MEAN,

11   THE EXPERT REPORTS AREN'T GOING IN ANYWAY, SO IT'S REALLY JUST

12   A MATTER OF WHAT QUESTIONS WILL ELICIT THE TESTIMONY DURING THE

13   TRIAL.

14        I MEAN, I GUESS YOU WOULD HAVE TO REVISE EXHIBIT 97 TO

15   TAKE THE MARKET APPROACH OFF, BUT THE INCOME APPROACH COULD

16   REMAIN THE SAME.

17        WOULD YOU NEED TO DO ANYTHING IS WHAT I'M ASKING?

18        MR. WATSON:  WELL, YOUR HONOR, I MEAN, I THINK I'D

19   WANT TO TALK TO DR. CHEVALIER ABOUT IF SHE THINKS THAT HER

20   NUMBER ACTUALLY WOULD COME DOWN AS A RESULT OF THIS.  AS YOU

21   CAN SEE ON 97, THESE LICENSES ARE ACTUALLY PUSHING THE NUMBER

22   UP.

23        BUT, YOU KNOW, THAT SEEMS TO ME TO BE THE, THE THING THAT

24   JUMPS OUT.

25        I'D LIKE TO SPEAK ABOUT THE HTC LICENSE IF I COULD.

1           THE COURT:  YES, NO, I WILL LET YOU DO THAT.

2        BUT LET ME HEAR FROM APPLE ON THIS ONE POINT.  DO YOU

3    AGREE THAT IF THE MARKET APPROACH IS EXCLUDED, THAT HER,

4    DR. CHEVALIER'S REASONABLE ROYALTY RATE WOULD STILL BE $.35?

5           MS. KREVANS:  IT APPEARS THAT WAY TO US FROM HER

6    OPINION, YOUR HONOR, AND WE THINK SHE HAS ENOUGH IN HER REPORT,

7    INDEPENDENT OF THAT, TO GIVE THE OPINIONS THAT SHE WANTS TO

8    GIVE.  I DON'T THINK IT WOULD CHANGE HER ULTIMATE OPINION AT

9    ALL, AND IF IT CAUSED IT TO GO UP A LITTLE BIT, SO BE IT.

10       I THINK -- I WOULD LIKE TO JUST COMMENT BRIEFLY ON A

11   COUPLE OF THE THINGS MR. WATSON SAID.

12          THE COURT:  OKAY.  BUT LET ME ASK YOU, THEN WHAT DO I

13   NEED TO DO, IF THAT IS WHAT'S GOING TO HAPPEN, DO WE NEED TO

14   DO -- WELL, ALSO LET ME ASK YOU, SO IF WE EXCLUDE DR. HAUSER'S

15   SURVEYS RELATING TO THE '414 AND DR. VELLTURO'S, HIS

16   EFFECTIVELY LOST PROFITS CALCULATION AND HIS REASONABLE ROYALTY

17   RATE CALCULATIONS, IF THOSE ARE EXCLUDED FROM YOUR EXPERT'S

18   REPORTS, DO YOU NEED TO DO ANYTHING DIFFERENT OR NEW?

19          MS. KREVANS:  WE WOULD HAVE TO CERTAINLY REVISE

20   THINGS SUBSTANTIALLY WITH RESPECT TO THE '414.  WHETHER WE

21   WOULD HAVE TO DO SOMETHING NEW ON THE ROYALTIES, I THINK WE'D

22   HAVE TO CONFER ON THAT.

23       I WOULD LIKE TO BE HEARD ON THAT, THOUGH, BECAUSE I THINK

24   WE HAVE CLEAR FEDERAL CIRCUIT CASE LAW THAT SAYS THAT SAMSUNG'S

25   MOTION WAS INCORRECT ON THAT POINT.

```
 1            THE COURT:  WELL, I'LL LET YOU BE HEARD ON THAT.

 2        OKAY.  SO FOR BOTH SIDES THEN, I WOULD -- BECAUSE I DON'T

 3    WANT TO MOVE MARCH 31.

 4            MS. KREVANS:  AND NEITHER DO WE, YOUR HONOR.

 5            THE COURT:  SO I NEED TO FIGURE OUT THEN, DO I NEED

 6    TO ORDER YOU TO AMEND THE REPORTS AND GIVE YOU ALL LIMITED

 7    DEPOSITIONS WITH EACH OTHER'S EXPERTS AGAIN?

 8        AND THEN, UNFORTUNATELY, I KNOW WHAT'S GOING TO HAPPEN.

 9    WE'LL GET THESE MOTIONS TO STRIKE SAYING "THESE ADDITIONAL

10    CHANGES IN THE REPORTS WERE NOT AUTHORIZED BY THE COURT'S

11    DAUBERT MOTION," AND THEN WE'LL BE BACK WHERE WE'VE BEEN.

12        SO --

13            MS. KREVANS:  WE DON'T THINK THAT WE WOULD NEED ANY

14    ADDITIONAL DEPOSITION TIME WITH DR. CHEVALIER IF YOU STICK WITH

15    YOUR CURRENT RULING, YOUR HONOR.

16        I THINK WITH RESPECT TO DR. HAUSER AND DR. VELLTURO, WE

17    WOULD NEED TO SEE THE FINAL CONTOURS OF THE COURT'S RULING AND

18    THEN MAKE A PROPOSAL TO THE COURT ABOUT WHAT COULD OR COULD NOT

19    BE DONE.

20        BUT WE DEFINITELY DO NOT WANT TO CONTINUE THE MARCH 31

21    DATE, AND WHATEVER HAS TO BE DONE TO NOT CONTINUE, WE WILL DO

22    IT.

23            THE COURT:  NOW, THE DESIGN AROUND DATES BEGIN ON THE

24    DATE OF INFRINGEMENT, NOT ON THE DATE OF NOTICE, SO I ASSUME

25    DR. VELLTURO WOULD HAVE TO UPDATE HIS -- WHAT IS THAT? -- HIS
```

```
 1    TABLE.

 2              MS. KREVANS:  HE WOULD, YOUR HONOR, AND WE ARE

 3    PREPARED TO DO SO BY THE SAME DATE THAT WE'VE OTHERWISE AGREED

 4    TO SUPPLEMENT BOTH SIDES' REPORTS TO ACCOUNT FOR UPDATED

 5    FINANCIAL INFORMATION WHICH THE PARTIES HAVE AGREED TO DO.

 6              THE COURT:  AND WHAT'S THAT DATE?

 7              MS. KREVANS:  FEBRUARY 17TH.  IS THAT RIGHT?

 8    FEBRUARY 17TH.  AND IT'S A NO METHODOLOGY CHANGE UPDATE

 9    AGREEMENT.

10              THE COURT:  ALL RIGHT.  WELL, LET'S FIGURE THIS OUT

11    THEN.  SO IF THERE ARE EXCLUSIONS FROM THE CHEVALIER, HAUSER,

12    AND VELLTURO REPORTS, HOW MUCH TIME DO BOTH SIDES NEED TO

13    ASSESS WHAT ADJUSTMENTS THEY MIGHT NEED TO MAKE TO THEIR

14    REPORTS?

15              MR. WATSON:  YOUR HONOR, FROM OUR PERSPECTIVE, WE

16    WOULDN'T NEED ANY TIME.  I DON'T THINK THAT THE REPORTS NEED TO

17    BE REDONE HERE.  THERE'S A TREMENDOUS AMOUNT OF EFFORT THAT'S

18    GOING INTO THIS AT THIS POINT.  YOU CAN SEE THAT FROM THE WORK

19    PRODUCT.

20              THE COURT:  ALL RIGHT.  I WOULD ALSO PREFER THAT

21    APPLE'S REPORT NOT BE REDONE BECAUSE I KNOW WHAT'S GOING TO

22    HAPPEN.  WE'RE GOING TO HAVE A HUGE FIGHT ABOUT A MOTION TO

23    STRIKE UNAUTHORIZED CHANGES TO YOUR REPORT AND I -- YOU KNOW,

24    THAT MIGHT MAKE THE TRIAL DATE SLIP BECAUSE THERE'S ONLY SO

25    MUCH WE CAN HANDLE WITH EVERYTHING ELSE THAT'S BEEN SCHEDULED.
```

1          MS. KREVANS:  WELL, YOUR HONOR, WE -- I HOPE THAT WE

2     CAN CHANGE YOUR MIND ABOUT SOME OF THIS TODAY.

3          BUT IF -- ASSUMING THAT YOU STAY WITH YOUR TENTATIVE, WE

4     WOULD NEED FIVE DAYS, WE THINK, TO COME BACK TO THE COURT AND

5     TO SAMSUNG WITH A REPORT ON -- A PROPOSAL, A STATEMENT ABOUT

6     WHAT WE WOULD NEED TO DO, IF ANYTHING.

7          THE COURT:  WELL, TELL ME WHAT YOU WERE THINKING

8     ABOUT WHAT WOULD NEED TO BE DONE.  I MEAN, IT'S TOO LATE.  I'M

9     NOT GOING TO ALLOW YOU TO DO ANOTHER HAUSER SURVEY ON THE '414.

10    IT'S TOO LATE.  SO WHAT WOULD YOU DO?

11         MS. KREVANS:  WE WOULD CERTAINLY NOT BE PROPOSING TO

12    DO ANOTHER SURVEY, YOUR HONOR.

13         WE WOULD NEED TO GO ANALYZE WHAT DR. VELLTURO, WHO'S

14    GIVING THE ULTIMATE OPINIONS HERE, COULD DO GIVEN WHATEVER THE

15    SCOPE OF ANY EXCLUSION YOUR HONOR MAKES TURNS OUT TO BE.

16         THE COURT:  WELL, I'M TELLING YOU THE SCOPE.  IT

17    WOULD BE AN EXCLUSION OF DR. HAUSER'S SURVEY RESULTS WITH

18    REGARD TO CLAIM 20 OF THE '414, AND IT WOULD BE AN EXCLUSION OF

19    THE WILLING TO PAY CALCULATION FROM HIS REASONABLE ROYALTY.

20    WILLING TO ACCEPT, EXCUSE ME.

21         MS. KREVANS:  AND AGAIN, YOUR HONOR, I THINK WE WOULD

22    JUST -- WE NEED TO CONFER AND TALK TO DR. VELLTURO AND MAKE

23    SURE THAT WE CAN COME BACK WITH SOMETHING ACCURATE ABOUT HOW WE

24    CAN GO FORWARD.

25         BUT WE WILL COME UP WITH A PROPOSAL THAT LETS US GO

1       FORWARD ON MARCH 31.

2               MR. QUINN:  AND WE -- YOUR HONOR, WE DO SHARE THE

3       COURT'S CONCERNS ABOUT REDOING REPORTS.  IT STRIKES US THAT IF

4       THESE TWO ELEMENTS DROP OUT, IT'S A FAIRLY SIMPLE ARITHMATICAL,

5       AS WE UNDERSTAND IT, DELETION FROM THE DAMAGES CALCULATION.

6           BUT WE REALLY WOULD NOT LIKE -- WE'D PREFER NOT TO GO IN

7       THE DIRECTION OF SEEING NEW REPORTS AND HAVING TO DO THAT.

8               THE COURT:  WELL, I AGREE WITH YOU.  I DON'T WANT TO

9       HAVE NOW A NEW SEPARATE FIGHT ON WHAT WAS AN AUTHORIZED CHANGE.

10          ALL RIGHT.  WELL, YOUR POSITION IS YOU WOULD NEED FIVE

11      DAYS TO FIGURE THAT OUT?

12              MS. KREVANS:  THAT'S RIGHT, YOUR HONOR.  WE WILL DO

13       IT FASTER IF WE CAN.

14              THE COURT:  ALL RIGHT.  SO LET ME GO BACK AND I'LL

15      LET MR. WATSON FINISH WHAT HE WANTED TO SAY ON HTC.

16              MS. KREVANS:  OKAY.  COULD I BE HEARD FIRST ON THE

17      CHEVALIER BIG POOL OF LICENSES QUESTION, OR SHOULD I WAIT?

18              THE COURT:  WHY DON'T YOU WAIT?  I'LL LET HIM FINISH

19      ON HTC AND THEN YOU CAN ADDRESS DR. CHEVALIER.

20              MR. WATSON:  THANK YOU, YOUR HONOR.

21          SO OBVIOUSLY THE FEDERAL CIRCUIT HAS HELD THAT LICENSES TO

22      THE TECHNOLOGY AT ISSUE ARE AMONG THE MOST PROBATIVE PIECES OF

23      EVIDENCE AS TO A REASONABLE ROYALTY, AND THERE'S NO DISPUTE

24      HERE THAT THE HTC LICENSE IS A LICENSE WITH ANOTHER COMPANY IN

25      THE SMARTPHONE SPACE COVERING THE PATENTS AT ISSUE AND, YOU

1    KNOW, IT'S VERY CLOSE IN TIME -- AND THIS IS A DISTINCTION FROM

2    THE LAST CASE -- TO THE HYPOTHETICAL NEGOTIATION HERE.

3        SO IF I CAN, IF I CAN SPEAK TO THE COURT'S ORDER IN THE

4    PRIOR CASE?

5        AS I COUNTED IT, THERE'S FIVE WAYS THAT WE'RE DIFFERENT

6    HERE.  THE FIRST IS THIS CASE DOES NOT HAVE DESIGN PATENTS.

7    THERE'S NONE OF THOSE TYPES OF ISSUES.  THAT WAS ONE OF THE

8    THINGS THE COURT NOTED THERE, THAT THE HTC LICENSE, YOU KNOW,

9    WAS LESS ON ALL FOURS.

10       HERE ALL WE'VE GOT IS UTILITY PATENTS, AND SO THAT ISSUE

11   DROPS AWAY.

12       IN THE LAST CASE, EXPERT -- AND REALLY THIS WAS THE --

13   THIS WAS, I THINK, THE CRUX OF THE COURT'S CONCLUSION.  THE

14   EXPERTS ON BOTH SIDES SAID, "LOOK, THIS LICENSE DOESN'T HAVE AN

15   IMPACT ON MY ANALYSIS FUNDAMENTALLY."  THEY BOTH AGREED TO

16   THAT.

17       THAT'S NOT THE CASE HERE.  DR. CHEVALIER ABSOLUTELY

18   BELIEVES THAT THE LICENSE IS RELEVANT AND THAT THERE ARE THINGS

19   THAT WE CAN LEARN FROM THE LICENSE ABOUT THE MARKET FOR HER

20   LICENSING SMARTPHONE PATENTS.

21       THIRD, YOU HAVE THE -- YOU HAVE THE UNIQUE PROCEDURAL

22   POSTURE IN THE LAST CASE WHERE THE COURT IS TRYING TO KEEP THE

23   RECORD THE SAME FOR APPEAL BETWEEN TWO TRIALS.  WE DON'T HAVE

24   THAT ISSUE HERE.

25       FOURTH, AS I ALREADY MENTIONED, THIS IS MUCH CLOSER IN

1    TIME.  THE HYPOTHETICAL NEGOTIATIONS HERE ARE HAPPENING A YEAR

2    OR LESS FROM THE, FROM THE HTC LICENSE DATE.

3         IN THE LAST CASE, WE'VE GOT OVER TWO YEARS.  THAT'S A BIG

4    DIFFERENCE.  SMARTPHONE SPACE WAS EVOLVING RAPIDLY DURING THAT

5    TIME.

6         AND FINALLY, YOU KNOW, THERE WAS -- IN THE LAST CASE,

7    OBVIOUSLY THE HTC LICENSE CAME LATE IN THE GAME.  EXPERT

8    DISCOVERY HAD CLOSED.  THOSE TYPES OF ISSUES WERE RESOLVED.

9         THAT'S NOT A PROBLEM HERE.  EVERYBODY HAS HAD A CHANCE TO

10   LOOK AT THIS LICENSE.  EVERYBODY HAS EXPRESSED AN OPINION ON

11   IT.

12        I WOULD SUBMIT THAT, YOU KNOW, DR. VELLTURO JUST SAYS,

13   "YEAH, I'M NOT GOING TO LOOK AT THAT."

14        AND WHAT DR. CHEVALIER SAYS IS, "LOOK, ARE THERE

15   DIFFERENCES?  ABSOLUTELY."  THAT'S WHY -- THAT'S WHAT EXPERTS

16   DO.  THEY TAKE A LICENSE AND THEY MAKE ADJUSTMENTS FOR THE

17   DIFFERENCES.

18        AND IF YOU LOOK AT PARAGRAPH 312, PARAGRAPH 313, PARAGRAPH

19   314, PARAGRAPH 315, THERE ARE THREE PAGES PLUS OF HER REPORT,

20   INCLUDING SUPPORTING MATERIALS, OR IN ADDITION TO THE

21   SUPPORTING MATERIALS, WHERE SHE IS GOING THROUGH AND MAKING THE

22   KIND OF ADJUSTMENTS THAT EXPERTS MAKE.

23        AND IT SEEMS TO ME THAT SAMSUNG HAS TO BE PERMITTED TO

24   SHOW TO THE JURY WHAT THE CLOSEST CONCEIVABLE LICENSING

25   EVIDENCE IS AND DR. CHEVALIER HAS TO BE ABLE TO TAKE THAT INTO

1    ACCOUNT AND WE HAVE TO BE PERMITTED TO CONFRONT DR. VELLTURO

2    WITH HIS REFUSAL TO INCLUDE IT AND THE MASSIVELY DISPARATE

3    NUMBER THAT HE'S PUTTING UP IN THIS CASE.

4         THE COURT:  WELL, WON'T THAT SHRINK ONCE THEIR LOST

5     PROFITS ANALYSIS IS EXCLUDED?

6         MR. WATSON:  WELL, YOUR HONOR, IF THEIR LOST PROFITS

7     AND THEIR REASONABLE ROYALTY NUMBERS ARE EXCLUDED, I WOULD

8     AGREE THAT THE NUMBER WILL SHRINK.

9        IT'S STILL OUT OF ALL PROPORTION TO SMARTPHONE PATENT

10    LICENSES.

11       I THINK THE BEST EXAMPLE OF THIS, YOUR HONOR -- LOOK AT

12    THE '647 PATENT.  IN MOTOROLA, APPLE SAYS THAT PATENT IS WORTH

13    $.60.  IN THIS CASE, THEY'RE ASKING FOR $12.49 FOR IT.

14       SO WHATEVER APPLE IS GOING TO PRESENT AFTER THE COURT'S

15    RULINGS, WE HAVE TO BE ABLE TO SHOW THE JURY, LOOK, THERE'S A

16    MARKET OUT THERE FOR THESE THINGS.  THIS HAPPENS.  PEOPLE

17    LICENSE PATENTS ALL THE TIME.

18       AND APPLE SHOULDN'T BE PERMITTED TO JUST THROW UP A HUGE

19    NUMBER AND THEN SIT DOWN AND WE'VE GOT OUR HANDS TIED AND WE

20    CAN'T EVEN SHOW THE JURY THAT IT'S TOTALLY DISPROPORTIONATE TO

21    WHAT ACTUALLY HAPPENS IN THE MARKETPLACE.

22       AND I SUBMIT THERE'S SIMPLY NO FEDERAL CIRCUIT CASE, OR

23    EVEN A DISTRICT COURT CASE, WHERE A COURT HAS EXCLUDED A

24    LICENSE ON THE EXACT PATENTS AT ISSUE WHERE THERE -- WHERE

25    APPROPRIATE ADJUSTMENTS HAVE BEEN MADE AND THE JURY IS NOT

1      PERMITTED TO SEE THAT AND THE DEFENDANT HAS TO GO TO TRIAL WITH

2      NO LICENSING EVIDENCE TO SHOW THE JURY AT ALL.

3              THE COURT:  ALL RIGHT.  THANK YOU.

4          ALL RIGHT.  LET ME HEAR FROM MS. KREVANS OR WHOEVER WANTS

5      TO SPEAK FOR APPLE.

6              MS. KREVANS:  IT'S ME AGAIN, YOUR HONOR.

7          FIRST, ON -- LET'S START WITH HTC WHERE THIS ENDED UP.

8          THE COURT'S REASONS FOR EXCLUDING THIS BEFORE ARE STILL

9      TRUE, AND MANY OF THEM ARE THINGS I CAN'T SAY OUT LOUD IN

10     COURT, BUT WE TALK ABOUT THEM IN OUR BRIEFS.

11             THE COURT:  WHY DON'T YOU JUST ADDRESS THE ONES THAT

12     MR. WATSON DISTINGUISHED?

13             MS. KREVANS:  OKAY.  IT IS TRUE THAT THERE WERE

14     DESIGN PATENTS IN THE FIRST CASE AND NOT IN THIS CASE.

15             THE COURT:  UM-HUM.

16             MS. KREVANS:  BUT THAT DOES NOT MEAN THAT THE TERMS

17     OF THAT LICENSE ARE IN ANY WAY COMPARABLE TO THIS CASE, IN PART

18     BECAUSE THERE WAS LITIGATION SETTLEMENT, IN PART BECAUSE

19     THEY'RE DIFFERENT PATENTS, BUT MOSTLY BECAUSE, AS THE COURT

20     KNOWS FROM LOOKING AT THE DETAILS IN THE BRIEFING AND FROM THE

21     LICENSE ITSELF, SIGNIFICANT ECONOMIC TERMS ARE NOT ACTUALLY

22     ESTABLISHED IN THE LICENSE.  WITHOUT GOING INTO WHAT THEY ARE,

23     THEY ARE TO BE DETERMINED LATER.

24             THE COURT:  OKAY.  WHAT OTHER --

25             MS. KREVANS:  AND THAT MEANS THAT THERE -- THERE'S NO

1    WAY TO SAY THAT THAT LICENSE IS SOMETHING THAT CAN GIVE ANY

2    KIND OF ECONOMIC ANALYSIS THAT CAN BE TRANSFERRED OVER TO THIS

3    CASE BECAUSE THE ECONOMICS OF THAT LICENSE ARE NOT YET SET.

4            THE COURT:  WHAT ABOUT THE FACT THAT IT WAS A LITTLE

5    BIT OF AN EASIER CALL ON THE RETRIAL BECAUSE NEITHER EXPERT

6    RELIED ON IT, WHEREAS HERE YOU DO HAVE AN EXPERT SAYING --

7            MS. KREVANS:  WELL, I THINK, YOUR HONOR, IT MADE IT

8    EASIER BECAUSE NO ONE WAS COMPLAINING ABOUT IT QUITE SO MUCH,

9    ALTHOUGH SAMSUNG CERTAINLY FOUGHT HARD TO GET IT IN.

10           THE COURT:  UM-HUM.

11           MS. KREVANS:  THEY SAY NOW NO ONE RELIED ON IT, BUT

12   AS YOU RECALL, THEY FOUGHT QUITE HARD TO GET IT IN IN THE

13   RETRIAL.

14       BUT IT DOESN'T CHANGE THE BASIC FACT THAT IT IS NOT

15   COMPARABLE AND THERE HAS BEEN NO SHOWING THAT IT IS.

16       AND IT WOULD BE EXTREMELY PREJUDICIAL TO USE SOMETHING

17   THAT WAS NOT COMPARABLE AND IN WHICH, FRANKLY, MANY OF THE

18   TERMS ARE NOT SET FOR REASONS I CAN'T GO INTO IN OPEN COURT,

19   AND HAVE IT BE PRESENTED AS IF IT WERE A LICENSE THAT HAD SET

20   TERMS THAT ACTUALLY APPLIED, PARTICULARLY BECAUSE IT DOES, IN

21   FACT, INVOLVE ONE OF THE PARTIES TO THE CASE.

22       I DON'T THINK THAT THERE IS ANY REASON THAT IS A

23   COMPELLING DISTINCTION BETWEEN YOUR DECISION BEFORE AND YOUR

24   DECISION NOW.

25           AND, OF COURSE, THE OTHER THING THAT IS TRUE THEN, TRUE

```
1      NOW, HTC IS NOT SAMSUNG.  HTC IS NOT ONE OF THE TWO HORSES IN

2      THE TWO-HORSE RACE.  THERE IS NO SHOWING THAT HAS BEEN MADE

3      THAT ANY OF THESE TERMS WOULD HAVE BEEN TERMS THAT WOULD HAVE

4      BEEN ACCEPTABLE IN THE HYPOTHETICAL NEGOTIATION.

5          SO WE THINK YOUR HONOR IS ABSOLUTELY RIGHT TO STICK WITH

6      YOUR ORIGINAL RULING.

7              THE COURT:  ALL RIGHT.  DO YOU WANT TO ADDRESS

8      ANYTHING ELSE AS TO DR. CHEVALIER?

9              MS. KREVANS:  AS TO DR. CHEVALIER, I THINK A REALLY

10     BASIC POINT THAT GOES TO A LOT OF WHAT MR. WATSON SAID IS --

11     THE MOST IMPORTANT THING HE SAID IS WHAT HE SAID FIRST, THAT

12     THEY NEED -- THEY, QUOTE, "NEED" THESE LICENSES BECAUSE THEY

13     WANT TO USE THEM TO IMPEACH DR. VELLTURO'S ANALYSIS.

14         THE PROBLEM WITH THAT IS THERE'S NOTHING ABOUT A

15     NON-COMPARABLE LICENSE THAT COULD BE PROPER IMPEACHMENT OF

16     SOMEBODY'S OPINION ON REASONABLE ROYALTY.

17         AND AS FOR THE NOTION THAT APPLE HASN'T COME FORWARD AND

18     MADE A SHOWING TO YOU THAT EACH OF THESE LICENSES IS NOT

19     COMPARABLE, THAT JUST TURNS THE TEST ON ITS HEAD.

20         IT WAS SAMSUNG'S BURDEN TO HAVE ITS EXPERT DO A

21     COMPARABILITY ANALYSIS FOR ANY LICENSE SHE WANTED TO TALK

22     ABOUT.  THEY CHOSE TO HAVE HER INCLUDE A HUGE GROUP OF LICENSES

23     IN HER REPORT, DO THESE BIG TABLES THAT, AS YOU SAID, GIVE

24     RECITATIONS OF A NUMBER OF THE TERMS OF EACH OF THEM, BUT DO NO

25     ANALYSIS AT ALL THAT SHOWS THAT THEY'RE COMPARABLE, AND IN MANY
```

1    CASES, JUST ADMIT THAT SHE DOESN'T EVEN KNOW WHAT TECHNOLOGY IS

2    IN THEM.

3         EVEN IF SHE WERE, IN FACT, THE RIGHT PERSON TO ANALYZE THE

4    TECHNOLOGY AND SAY THIS IS COMPARABLE TECHNOLOGY, SHE DIDN'T DO

5    IT, AND SHE DIDN'T ANALYZE WHETHER THE ECONOMICS WERE

6    COMPARABLE.

7         AND AS FOR THIS WINNOWING THAT SAMSUNG SAYS THAT THEY DID

8    SO THAT THEY STARTED WITH THIS BIG GROUP, BUT THEN, THROUGH

9    ANALYSIS, GOT IT DOWN TO A GROUP THAT WAS THE MORE COMPARABLE

10   GROUP AND ONLY USED THAT SMALLER GROUP FOR HER OPINIONS, THAT'S

11   NOT TRUE.

12        THEY DID USE, AND SHE DOES USE IN HER OPINIONS, PIECES OF

13   THE LARGE GROUP OF LICENSES, NOT JUST THE GROUP OF 35.

14        BUT EVEN IN THE GROUP OF 35, SHE MADE NO SHOWING, AS YOU

15   SAID, THAT THEY WERE COMPARABLE IN TERMS OF TECHNOLOGY OR THAT

16   THEY WERE COMPARABLE IN TERMS OF THE KIND OF DEAL, THE KIND OF

17   STRUCTURE, THE -- WHO THE PARTIES WERE, THE PARTIES'

18   RELATIONSHIPS TO ONE ANOTHER, ANYTHING THAT WOULD BE THE KIND

19   OF THING THAT WOULD MAKE YOU SAY A RATE THAT I TAKE FROM THIS

20   LICENSE, OR ANY ECONOMIC TERM I TAKE FROM THIS LICENSE, IS

21   PROOF THAT BELONGS IN THIS CASE.  THEY JUST DIDN'T DO IT.

22        AND HAVING NOT DONE IT, UNLESS THE COURT GIVES THEM LEAVE

23   TO GO NOW AND DO A MASSIVE REVISION OF HER REPORT TO ADD THAT

24   ANALYSIS, THEY CAN'T OFFER THESE LICENSES.

25        AND SO FOR ALL THOSE REASONS, WE THINK YOUR TENTATIVE IS

```
 1     EXACTLY RIGHT.
 2               THE COURT:  ALL RIGHT.  I'M GOING TO GIVE MR. WATSON
 3     THE LAST BRIEF WORD AND THEN I'D LIKE TO MOVE ON TO DRS. HAUSER
 4     AND VELLTURO.
 5               MR. WATSON:  THANK YOU, YOUR HONOR.
 6     BRIEFLY ON THE HTC LICENSE, I IDENTIFIED FIVE WAYS IN
 7     WHICH THE COURT'S PRIOR ORDER IS DISTINGUISHABLE FROM HERE.  I
 8     DIDN'T HEAR MS. KREVANS ADDRESS A SINGLE ONE OF THOSE TO THE
 9     COURT.
10     WHAT SHE INSTEAD DID WAS TO SAY, NOT THAT THOSE FIVE
11     FACTORS STILL OBTAIN HERE -- THEY DON'T, THEY CLEARLY DO NOT --
12     BUT INSTEAD SHE FOCUSSED ON THE ECONOMIC TERMS OF THE LICENSE,
13     WHICH OBVIOUSLY WE'RE NOT GOING TO BE DISCUSSING HERE.
14     BUT I WOULD ABSOLUTELY DIRECT THE COURT TO DR. CHEVALIER'S
15     ANALYSIS AT PAGE 314, 315 -- EXCUSE ME -- PARAGRAPH 314 AND 315
16     WHERE SHE ADDRESSES EACH OF THE ECONOMIC OBJECTIONS THAT
17     DR. VELLTURO MADE AND EXPLAINS HOW WE HAVE TOOLS, AS
18     ECONOMISTS, AS LICENSING EXPERTS, TO MAKE ADJUSTMENTS ON A
19     LICENSE.
20     THERE'S NEVER AN EXACT LICENSE.  IF THAT WERE THE
21     STANDARD, YOU WOULD NEVER HAVE ANY LICENSING EVIDENCE, OR
22     ALMOST NEVER HAVE ANY LICENSING EVIDENCE.  THAT'S NOT THE
23     STANDARD.
24     AND I SUBMIT THAT ESSENTIALLY MS. KREVANS HAS CONCEDED
25     THAT THE FIVE POINTS THAT WERE IN THE COURT'S PRIOR ORDER, NONE
```

1    OF THEM ARE INVOLVED HERE.

2         FINALLY, IT IS REMARKABLE THAT MS. KREVANS SAYS IT'S EXTRA

3    PREJUDICIAL TO LET THIS IN BECAUSE APPLE IS A PARTY TO THE

4    AGREEMENT.

5         WHAT COULD BE MORE PROBATIVE OF WHAT APPLE THINKS IS THE

6    VALUE OF THE PATENTS IN THIS CASE THAN AN AGREEMENT APPLE

7    ENTERED INTO TO LICENSE THE PATENTS IN THIS CASE?  THAT'S NOT

8    PREJUDICIAL.  THAT'S WHY IT'S SO CRITICALLY PROBATIVE.

9         AND FINALLY, YOUR HONOR, ON THE COMPARABLE LICENSES, I

10   JUST -- I REALLY SUBMIT THAT IF YOU LOOK AT WHAT DR. CHEVALIER

11   DID AND LOOK AT DR. -- COMPARE IT TO WHAT DR. VELLTURO DID ON

12   THE OTHER COMPARABLE LICENSES, YOU'LL SEE SHE DID FAR MORE THAN

13   APPLE DID IN WASHING THESE THINGS AWAY.  SHE DID A VERY SERIOUS

14   ANALYSIS BY A VERY WELL QUALIFIED PERSON AND MADE VERY

15   REASONABLE ASSUMPTIONS ABOUT THE VALUE OF THE LICENSES THAT ARE

16   ENTIRELY CONFIRMED BY ALL OF THE OTHER EVIDENCE IN THE CASE.

17        THE COURT:  ALL RIGHT.  THANK YOU.

18        LET ME ASK -- LET'S DO ONE CLEAN UP ITEM.  SO IF THEY HAVE

19   TO -- IF APPLE HAS TO SUBMIT, WHICH IT WILL, A REVISED DAMAGES

20   OPINION BASED ON THE DESIGN AROUND PERIOD STARTING ON THE DATE

21   OF INFRINGEMENT RATHER THAN ON THE DATE OF NOTICE, AND THEY DO

22   THIS BY THE DATE YOU ALL HAVE AGREED FOR UPDATING OF FINANCIAL

23   DATA, FEBRUARY 17TH, YOU DON'T NEED A DEPOSITION OR ANYTHING

24   ELSE ON THAT, DO YOU?

25        MR. WATSON:  ON THAT NARROW ISSUE?

```
1            THE COURT:  UM-HUM.

2            MR. WATSON:  NO, WE WOULDN'T NEED IT.  AS LONG AS

3     THEY'RE APPLYING THE SAME METHODOLOGY, WE WOULD NOT NEED A

4     DEPOSITION.

5            THE COURT:  OKAY.  ALL RIGHT.

6         OKAY.  LET ME GO TO THE -- I HAVE SOME QUESTIONS WITH

7     REGARD TO VELLTURO AND HAUSER WHICH ARE NOT ONE OF THE ONES

8     THAT I'M TENTATIVELY PLANNING TO GRANT, BUT I DID WANT TO ASK

9     SOME QUESTIONS.

10           SO WITH REGARD TO THE QUESTION OF WHETHER DR. VELLTURO WAS

11    RELYING ON DR. HAUSER'S CONJOINT SURVEY TO DETERMINE SAMSUNG'S

12    MARKET SHARE, I WANTED TO ASK SAMSUNG WHERE IN DR. VELLTURO'S

13    REPORT HE ACTUALLY DOES THAT, BECAUSE IT SEEMS THAT

14    DR. VELLTURO RELIES ON THE HAUSER SURVEYS MORE FOR PANDUIT

15    FACTORS 1 AND 2 AND NOT FOR PANDUIT FACTOR 4, WHICH DOES

16    INCLUDE THE MARKET SHARE DISCUSSION.

17           SO I WANTED TO JUST FIND OUT WHERE, WHERE IN VELLTURO'S

18    REPORT SHOULD I LOOK TO FIND THAT RELIANCE ON HAUSER'S SURVEY

19    FOR MARKET SHARE?

20           MR. QUINN:  YOUR HONOR, I'M TOLD IT'S AT PARAGRAPHS

21     311 TO 317 AND 319.

22           AND ACTUALLY, YOUR HONOR, IT'S -- THIS IS PART OF, I

23    THINK, A BROADER QUESTION, AND I'M GOING TO MAKE A, KIND OF A

24    BOLD STATEMENT THAT WHAT VELLTURO DOES WITH RESPECT TO THE

25    HAUSER WILLINGNESS TO BUY -- AND IT'S NOT WILLINGNESS TO PAY --
```

 1    WHAT VELLTURO DOES IS REALLY NOT EXPERT WORK AT ALL IN THAT ALL

 2    HE IS DOING IS USING A CALCULATOR AND TAKING THE INFORMATION

 3    THAT APPLE GOT IN DISCOVERY ABOUT SAMSUNG'S UNIT SALES AND

 4    TAKING INFORMATION THAT'S AVAILABLE THROUGH A SUBSCRIPTION

 5    SERVICE AS TO WHAT THE MARKET SHARE IS, AND TAKING THE INPUT

 6    FROM HAUSER, WHO GIVES HIM THE NUMBERS ABOUT -- GIVES HIM THE

 7    NUMBERS BY WHICH HAUSER DETERMINES, IN HIS SURVEY, SAMSUNG'S

 8    SALES PERCENTAGE-WISE WOULD DECREASE IF THE ACCUSED FEATURE

 9    WERE ABSENT, AND HE USES THE OUTSIDE OPTION TO DO THAT.

10         THE COURT:  UM-HUM.

11         MR. QUINN:  AND VELLTURO IS PRETTY CLEAR ABOUT THAT.

12    HE ACTUALLY SAID -- THERE'S A -- WE ASKED HIM AT HIS

13    DEPOSITION, YOU KNOW, WHAT ADDITIONAL INFORMATION THAT HE HAD,

14    AND HIS ANSWER WAS THAT HE DIDN'T HAVE ANY, ANY OTHER

15    ADDITIONAL INFORMATION.

16       THAT'S -- IF I COULD SHOW THE COURT?  IF I COULD PUT THE

17    DEPOSITION TESTIMONY ON THE SCREEN, YOUR HONOR?

18         THE COURT:  THAT'S FINE.

19         MR. QUINN:  IT WOULD BE SLIDE 16, AND THIS IS

20    MR. VELLTURO'S DEPOSITION, PAGE 99, LINE 17 TO 100:1.

21       "DO YOU HAVE ANY QUANTITATIVE DATA THAT YOU USE OTHER THAN

22    WHAT YOU REFERRED TO AS THE OUTPUT FROM PROFESSOR HAUSER AND

23    THE ACTUAL SALES INFORMATION?"

24       HE SAYS, "LITERALLY IN THE COMPUTATIONS, NO."  AND HE GOES

25    ON TO SAY, WELL, HE ALSO HAD PROFESSOR HAUSER'S WILLINGNESS TO

1    PAY DATA, BUT HE HAD NO OTHER DATA.

2         THE MARKET SHARE INFORMATION COMES FROM THE SUBSCRIPTION

3    SERVICE.  THE OUTPUT FROM HAUSER IS, "I PREDICT THAT, BASED ON

4    MY SURVEY, THAT IF THESE ACCUSED FEATURES WERE NOT IN SAMSUNG

5    PHONES, THEIR SALES WOULD GO DOWN BY STATED PERCENTAGES."

6         AND IF WE COULD PUT THAT SLIDE UP THAT HAS THOSE

7    PERCENTAGES?  THAT'S THE WILLINGNESS TO BUY.  SLIDE 2.

8         THAT'S THE OUTPUT FROM PROFESSOR HAUSER.  HE SAYS, YOU

9    KNOW -- AND THE REASON THERE'S A RANGE UNDER SMARTPHONES AND

10   TABLETS IS HE COMES UP WITH DIFFERENT NUMBERS FOR DIFFERENT

11   SCREEN SIZES.

12        BUT HE SAYS, "BASED UPON THE RESULTS OF MY SURVEY IN THAT

13   FINAL QUESTION, THE OUTSIDE OPTION, WOULD YOU BUY OR NOT BUY,

14   IF I SUBTRACT THE ACCUSED FEATURE, SAMSUNG SALES WILL GO DOWN

15   BY THIS MUCH."

16        THAT'S THE OUTPUT.

17        THAT THEN GOES TO VELLTURO.  ALL HE HAS IS THEY GAVE HIM

18   SAMSUNG UNIT SALES, AND HE CAN DO THE ARITHMETIC, MULTIPLY IT,

19   GIVEN THIS X PERCENTAGE, HOW MANY OF THOSE SALES WOULD SAMSUNG

20   NO LONGER HAVE?

21        AND SO YOU'VE THEN GOT A BASKET OF SALES THAT SAMSUNG

22   DOESN'T HAVE IN THE BUT FOR WORLD, AND HE USES A MORE FLOW

23   ANALYSIS THEN TO SAY, "OKAY, I TAKE THE MARKET SHARE DATA FROM

24   THE SUBSCRIPTION SERVICE, RUN IT THROUGH THAT, THOSE SALES

25   WOULD HAVE GONE TO APPLE IN THE BUT FOR WORLD," AND HE COMES UP

1     WITH A LOST PROFITS NUMBER.

2           SO, YOUR HONOR, THIS IS -- AND THIS IS AN EXTREMELY

3     IMPORTANT POINT HERE.  THIS IS A METHODOLOGY THAT NO COURT AS

4     EVER ENDORSED, NO ACADEMIC WRITING, PAPER, STUDY HAS EVER

5     ENDORSED, AND I'M -- THEY'VE CITED A COUPLE OF PAPERS AND I'M

6     PREPARED TO DISCUSS THOSE IN DETAIL, BUT THERE IS ABSOLUTELY NO

7     AUTHORITY.

8           AND THIS IS COMPLETELY DIFFERENT THAN THE WILLINGNESS TO

9     PAY.  REMEMBER BACK IN N.D. CAL, THE FIRST CASE, YOU MADE A

10    DAUBERT MOTION WITH RESPECT TO HIS WILLINGNESS, DR. HAUSER'S

11    WILLINGNESS TO PAY STUDY, AND WE RAISED THE ORACLE VERSUS

12    GOOGLE DECISION.  YOU REMEMBER IN THAT CASE JUDGE ALSUP SAID

13    THAT THE ORACLE -- THE CONJOINT STUDY DONE BY ORACLE IN THAT

14    CASE IMPROPERLY FOCUSSED CONSUMERS ON ARTIFICIALLY SELECTIVE

15    SMALL FEATURES WHICH COULD NOT DETERMINE REAL WORLD BEHAVIOR

16    AND HE EXCLUDED IT IN THAT CASE.

17          NOW, IN THE BRIEFING, INTERESTINGLY, APPLE DOES NOT

18    DISPUTE THAT PROPOSITION, THAT YOU SHOULD NOT BE ABLE TO USE A

19    CONJOINT SURVEY FOR A PROJECT -- A PRODUCT WITH MANY FEATURES

20    AND ASK CONSUMERS ONLY ABOUT SMALL FEATURES AND, BASED ON THAT,

21    MAKE PREDICTIONS ABOUT MARKET SHARE.  APPLE DOESN'T DISPUTE

22    THAT.  THEY REALLY CAN'T OR THEY RUN HEAD INTO JUDGE ALSUP'S

23    DECISION.

24          IN FACT, IN THE FIRST CASE, APPLE WENT OUT OF ITS WAY TO

25    TELL YOUR HONOR, "THAT'S NOT WHAT WE'RE DOING HERE."  AND THEY

1      TOLD THE COURT -- THEY, IN DISTINGUISHING THE ORACLE DECISION,

2      THEY TOLD THE COURT THAT ORACLE'S DAMAGES EXPERT CITED THE

3      RESULTS OF THE CONJOINT ANALYSIS TO ESTIMATE ANDROID'S INCREASE

4      IN MARKET SHARE DUE TO INFRINGEMENT AND SAID, "YOUR HONOR,

5      THAT'S NOT WHAT WE'RE DOING."

6          BUT THAT'S EXACTLY WHAT THEY'RE DOING HERE.  THAT'S

7      EXACTLY WHAT THEY WANT TO DO HERE.

8          APPLE STILL SAYS -- AND THE ISSUE IS JOINED ON THIS --

9      APPLE STILL SAYS, "WE ARE NOT USING THIS CONJOINT SURVEY TO

10     PREDICT MARKET SHARE."

11         THEY'RE NOT DISPUTING THE PROPOSITION THAT YOU CAN'T DO IT

12     FOR ONE OF THESE COMPLEX PRODUCTS WITH SMALL FEATURES.  THEY'RE

13     ACCEPTING THAT.

14         THEY'RE SAYING, "WE ARE NOT USING IT TO PREDICT MARKET

15     SHARE."

16         SO I SUBMIT, YOUR HONOR, THE ISSUE IS JOINED.  THE ISSUE

17     IS JOINED ON THAT.

18         DOES APPLE USE THE HAUSER DATA TO PREDICT SHIFTS IN MARKET

19     SHARE?  THERE'S NO QUESTION THAT THEY DO.  THEY TAKE THE HAUSER

20     INPUT -- HAUSER ARRIVES AT THE DECREASE IN THE PERCENTAGE OF

21     SAMSUNG SALES WITHOUT THE ACCUSED FUTURES -- FEATURES, AND

22     VELLTURO SIMPLY APPLIES THAT PERCENTAGE TO THE TOTAL NUMBER OF

23     UNIT SALES, ALLOCATES IT BASED ON MARKET SHARE DATA, AND GOES

24     THROUGH A MORE FLOW ANALYSIS.

25         YOU DIDN'T NEED AN EXPERT TO DO THAT.

1        AND IF WE LOOK AT THE DEPOSITION TESTIMONY AND THE

2   REPORTS, YOUR HONOR, IT'S ABSOLUTELY CLEAR THAT THIS IS WHAT

3   THEY DO.

4        IF WE COULD LOOK AT MR. HAUSER'S DEPOSITION TRANSCRIPT --

5   THIS IS SLIDE 13, PAGE 256, LINES 16 TO 24 -- AND HE SAYS THAT,

6   YOU KNOW -- THIS IS SLIDE 13.

7        HE SAYS, HAUSER SAYS, "YOU CAN USE ADDITIONAL DATA, AND

8   CHRIS VELLTURO DOES, TO SAY HOW DID THIS RELATES TO MARKET

9   SHARE, AND CHRIS USES MY DATA," AND HE SAYS, "HE'S DONE IT

10  PERFECTLY CORRECTLY."

11       AND IN HIS REPORT -- THIS IS SLIDE 14 -- AT PARAGRAPH --

12  I'M SORRY.  IT'S THE VELLTURO DEPOSITION, THIS WOULD BE SLIDE

13  15, VELLTURO SAYS, "THIS IS WHAT I'VE DONE.  HAUSER'S SURVEY,

14  WHAT IT DOES IS IT IDENTIFIES PERCENTAGE CHANGES IN" -- IT SAYS

15  "AND," I THINK IT SHOULD BE "IN" -- "WILLINGNESS TO BUY, AND I

16  USE THAT INFORMATION TO EVALUATE PERCENTAGE CHANGES IN SALES,

17  AND PART OF WHAT I DO IS TAKE THAT PERCENTAGE CHANGE AND APPLY

18  IT TO THE UNITS THAT I HAVE COLLECTED TO GET THE NUMBER OF

19  UNITS THAT WOULD BE AFFECTED."

20       AND THEN FINALLY -- THERE ARE OTHER PASSAGES THAT ARE

21  CITED IN OUR PAPERS, YOUR HONOR.

22       BUT THAT IS CLEARLY WHAT IS GOING ON.  IT'S NO DIFFERENT

23  THAN -- THE EXPERT IN THE ORACLE CASE WAS A DR. SHUGAN, AND HE

24  DID THE EXACT SAME THING AND JUDGE ALSUP, YOU KNOW, CRITICIZED

25  HIM FOR THE WAY HE EXCLUDED THE OPINION BECAUSE SHUGAN FOCUSSED

1    ON MINOR FEATURES, LIKE I THINK VOICE COMMAND WAS ONE FEATURE

2    AND BOOT UP TIME OR WAITING TIME FOR BOOTING UP AN APP.

3         AND JUDGE ALSUP SAID YOU JUST CAN'T MAKE CONCLUSIONS BASED

4    ON A SURVEY AND LEAVE OUT THE MAJOR FEATURES THAT PEOPLE CARE

5    ABOUT.

6         IF WE COULD LOOK AT SLIDE 21, THIS IS A COMPARISON OF WHAT

7    PROFESSOR SHUGAN DID AND WHAT PROFESSOR HAUSER DID.  THEY BOTH

8    COME UP WITH A BASE CASE ABOUT THE PERCENTAGE OF RESPONDENTS,

9    IN SHUGAN'S CASE, THAT WOULD PREFER AN ACCUSED ANDROID PHONE.

10         PROFESSOR HAUSER SAYS IF YOU HAVE ALL THE, YOU KNOW, IF

11   YOU HAVE ALL THE ACCUSED FEATURES, ALL THE FEATURES THAT ARE

12   BEING STUDIED, 72 PERCENT WOULD BUY THAT.

13         THEN THEY DO A CALCULATION AFTER REMOVAL OF THE ACCUSED

14   FEATURES.  SHUGAN SAYS, "ALL RIGHT, IF WE DON'T HAVE THE FASTER

15   APP START UP TIME," WHICH ORACLE WAS ASSERTING WAS PART OF ITS

16   INTELLECTUAL PROPERTY, "THAT DECREASES DOWN TO 35.5 PERCENT.

17   THAT'S THE SHIFT."

18         AND PROFESSOR HAUSER SAYS, "WELL, IF YOU DON'T HAVE

19   BACKGROUND SYNCING, IF YOU DON'T HAVE THAT PATENT, THE SHIFT,

20   YOU LOSE -- SAMSUNG LOSES SALES.  IT GOES DOWN TO 64 PERCENT."

21         AND AT THE BOTTOM THERE YOU HAVE THE DIMINISHED DEMAND

22   NUMBERS THAT THEY THEN FEED IN TO, IN THIS CASE, TO

23   PROFESSOR VELLTURO.

24         AND IF YOU THINK ABOUT IT, YOUR HONOR, THIS MAKES --

25   JUDGE ALSUP'S DECISION MAKES PERFECT SENSE.

1    IF WE COULD LOOK AT SLIDE 4, WHAT JUDGE ALSUP SAID, "IT IS

2    HIGHLY LIKELY THAT STUDY PARTICIPANTS WOULD HAVE PLACED GREATER

3    IMPORTANCE ON A FEATURE LIKE START UP TIME IF IT WERE SHOWN

4    WITH SIX OTHER FEATURES AS OPPOSED TO 38 OTHER FEATURES."

5    THESE ARE COMPLEX PRODUCTS.  PROFESSOR SHUGAN HAD FIRST

6    DONE A SURVEY -- ACTUALLY, IN HIS CASE, HE DID A SURVEY TO FIND

7    OUT, WHAT DO PEOPLE CONSIDER IMPORTANT IN SMARTPHONES?  AND HE

8    CAME UP WITH A LIST OF 39 FEATURES.

9    THE PROBLEM WITH THE SURVEY WAS HE THEN DIDN'T USE THOSE.

10   HE ONLY USED A COUPLE OF THEM, AND HE USED THESE SMALL

11   FEATURES.

12   AND JUDGE ALSUP IS SAYING YOU CAN'T -- WITHOUT SHOWING

13   PEOPLE THE DECISIVE -- THE THINGS THAT REALLY INFLUENCE BUYING

14   DECISIONS, YOU CAN'T REACH ANY CONCLUSIONS, BY JUST DEDUCTING A

15   SMALLER FEATURE, ABOUT WHETHER THEY WOULD HAVE BOUGHT THE PHONE

16   OR NOT.

17   AS JUDGE ALSUP SAID -- IF WE COULD LOOK AT SLIDE 5 -- "IF

18   DR. SHUGAN HAD INSTEAD SHOWED 39 DIFFERENT FEATURES TO A STUDY

19   PARTICIPANT, THEN START UP TIME, "THE PATENTED FUNCTIONALITY

20   THAT WAS CHALLENGED, "MAY HAVE BEEN DROWNED OUT BY THE

21   MULTITUDE OF OTHER FEATURES THAT ARE CONSIDERED BY REAL-WORLD

22   CONSUMERS.  IN THE REAL WORLD, A CONSUMER IS FACED WITH MANY

23   FEATURES WHEN MAKING A DECISION TO PURCHASE, NOT ARTIFICIALLY

24   FOCUSSED ON A PARTICULAR FEATURE."

25   AND THEN SLIDE 6, "THIS PROBLEM IS EXACERBATED BY THE FACT

1      THAT IMPORTANT FEATURES, SUCH AS BATTERY LIFE, WI-FI, WEIGHT,

2      AND CELLULAR NETWORK, ALL OF WHICH WERE NOT COVERED BY THE

3      PATENTED FUNCTIONALITIES, WERE PURPOSELY LEFT OUT AND REPLACED

4      WITH AN ARGUABLY UNIMPORTANT FEATURE, VOICE DIALLING."

5           NOW, WHAT DOES APPLE SAY IN RESPONSE TO THIS?  ONE THING

6      THEY SAY IS, "YOU'RE RIGHT, IT'S A COMPLEX PRODUCT WITH MANY,

7      MANY DIFFERENT FEATURES.  WE CAN'T POSSIBLY TEST ALL THOSE

8      FEATURES.  YOU KNOW, YOU CAN'T GET MEANINGFUL RESULTS WITH A

9      CONJOINT SURVEY."

10          AND I SUBMIT, YOUR HONOR, THAT MAKES OUR POINT PERFECTLY.

11     BY DOING A SURVEY AND SHOWING PEOPLE PICTURES OF PHONES AND,

12     YOU KNOW, SHOWING THEM, YOU KNOW, ALL THESE 39 DIFFERENT

13     FEATURES, YOU CAN'T -- OR MAJOR FEATURES OF A PHONE, IT'S

14     JUST -- THAT IS NOT THE WAY TO VALUE OR MAKE DECISIONS ABOUT

15     HOW PEOPLE PURCHASE PHONES.

16          A CONJOINT SURVEY WHERE YOU'RE TESTING WILLINGNESS TO BUY,

17     THERE ARE LIMITS TO THE NUMBER OF QUESTIONS THAT YOU CAN ASK.

18     THERE ARE LIMITS TO THE NUMBER OF FEATURES YOU CAN QUESTION

19     THEM ABOUT.

20          SO APPLE ALSO SAYS, "WELL, IT'S JUST YOUR SAY-SO, SAMSUNG,

21     THAT WE ONLY TESTED MINOR FEATURES, THAT WE LEFT MINOR FEATURES

22     OUT.  THAT'S JUST YOUR SAY-SO.  WHO ARE YOU TO SAY THAT THESE

23     AREN'T MAJOR, IMPORTANT FEATURES?"

24          WELL, ONE ANSWER TO THAT --

25               THE COURT:  WRAP THIS UP, PLEASE.

```
 1              MR. QUINN:  OKAY.  YOUR HONOR, JUDGE ALSUP IDENTIFIED

 2     WHAT LARGE FEATURES ARE, BATTERY LIFE, WI-FI, WEIGHT, CELLULAR

 3     NETWORK.

 4          I MEAN, CONTRAST THAT WITH THESE MINOR FEATURES THAT THEY

 5     DID TEST.

 6          AND THEN THE MOST IMPORTANT THING I WOULD SAY, YOUR HONOR,

 7     IS LOOK AT WHAT APPLE ITSELF, WHEN ITS OWN SURVEY -- APPLE

 8     KNOWS -- IF WE COULD LOOK AT SLIDE 23.  THIS IS APPLE'S OWN

 9     SURVEY THAT IT DOES.  WHAT ARE THE IMPORTANT FEATURES?  WHY DO

10     CUSTOMERS -- WHAT FEATURES DID THEY LOOK FOR?  WHAT DO THEY

11     BUY?

12          IF YOU GO DOWN THAT LIST, YOU KNOW, SIRI, MEGAPIXEL,

13     LIGHT, THE WEIGHT, THE RETINA DISPLAY, THE THINNESS, THE

14     APPEARANCE, LTE SUPPORT, YOU GO DOWN THAT LIST, THINGS THAT

15     APPLE ITSELF IDENTIFIES AS THE INFLUENCERS THAT PEOPLE WANT,

16     THESE THINGS THEY DIDN'T TEST.

17          THEY TESTED MINOR FEATURES, AND YOU SIMPLY CANNOT REACH

18     CONCLUSIONS FROM TESTING THESE TYPES OF FEATURES AS TO, YOU

19     KNOW, HOW -- YOU KNOW, WHETHER IT WOULD HAVE MADE A DIFFERENCE

20     IN A BUY DECISION IF YOU TOOK OUT BACKGROUND SYNCING OR A

21     PARTICULAR WAY OF DOING WORD SUGGESTIONS WHEN THIS IS WHAT

22     PEOPLE CARE ABOUT.

23          BUT HAUSER DIDN'T TEST THIS.  IN FACT, I ASKED HIM AT HIS

24     DEPOSITION, I SAID, "DID YOU ASK THEM ABOUT THE THINGS THAT

25     WERE MOST IMPORTANT?"
```

1    HE SAID, "NO, THAT WOULDN'T BE" -- HE SAID, "FIRST OFF, I

2    WOULDN'T BE ABLE TO DO THAT UNLESS I FIRST DID A PRE-CONJOINT

3    SURVEY LIKE DR. SHUGAN DID AND IDENTIFIED WHAT THE IMPORTANT

4    FEATURES WERE.  SO I DIDN'T DO THAT.  AND MOREOVER," HE SAID,

5    "IT WOULDN'T BE APPROPRIATE TO DO THAT.  I DIDN'T NEED TO DO

6    THAT."

7         SO, YOUR HONOR, THE POINT IS THAT I THINK THE COURT REALLY

8    HAS TO LOOK AT WHAT THEY DID HERE, AND THE WORK IS ALL DONE IN

9    HAUSER.  IT'S NOT DONE IN VELLTURO.  VELLTURO IS THE MAN WITH

10   THE CALCULATOR.

11        ALL HAUSER DOES IS COMPARE MINOR, LARGELY MINOR FEATURES

12   AND REACHES THESE CONCLUSIONS ABOUT THIS HUGE MARKET SHARE

13   SHIFT IF THESE MINOR FEATURES ARE REMOVED FROM THE PRODUCTS.

14        AND THERE IS SIMPLY NO CASE THAT SUPPORTS THAT AND IT RUNS

15   SQUARELY INTO THE ORACLE VERSUS GOOGLE DECISION.

16        THANK YOU, YOUR HONOR.

17          THE COURT:  ALL RIGHT.  THANK YOU.

18        LET ME ASK MS. SHORTRIDGE, DO YOU WANT TO TAKE A BREAK

19   NOW?

20        WHY DON'T WE TAKE A BREAK NOW?  OKAY.

21        I HAVE ONE QUESTION FOR APPLE ON THIS ISSUE, AND THEN I DO

22   HAVE A QUESTION ON THIS LOST PROFITS AS REASONABLE ROYALTY, AND

23   THEN ONE LAST QUESTION ON MOWRY AND THEN THAT'S IT.  IT'S DONE.

24        OKAY.  LET'S GO AHEAD AND TAKE A TEN MINUTE BREAK.  THANK

25   YOU.

```
 1              (RECESS FROM 3:43 P.M. UNTIL 3:57 P.M.)

 2              THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

 3         LET ME ASK APPLE HOW THE LOST SAMSUNG SALES IN THE ABSENCE

 4    OF THE ACCUSED FEATURE IN THE ACCUSED PHONE WAS CALCULATED IN

 5    THE FIRST TRIAL, BECAUSE I DON'T RECALL HOW IT WAS DONE JUST

 6    OFF OF MARKET SHARE DATA FROM THE SUBSCRIPTION SERVICES, AND

 7    HOW IS DR. VELLTURO DOING IT HERE, WHO IS -- BECAUSE IF IT'S

 8    CORRECT THAT THE PERCENTAGE DECREASE IS BEING -- IS FROM

 9    DR. HAUSER'S CONJOINT SURVEY, THEN I WOULD AGREE WITH SAMSUNG

10    THAT THAT'S GOT, YOU KNOW, PRETTY SERIOUS 702 PROBLEMS.

11              MS. KREVANS:  SO IN THE FIRST TRIAL --

12              THE COURT:  UM-HUM.

13              MS. KREVANS:  -- THE MUSIKA AND DAVIS REPORT LOOKED

14     AT THE -- WELL, LET ME BACK UP.

15         THERE ARE TWO KINDS OF LOST PROFIT REMEDIES AT ISSUE IN

16    THIS CASE:  ONE IS AN OFF THE MARKET ENTIRELY CALCULATION; AND

17    THE OTHER IS A -- WHEN YOU CAME BACK ON THE MARKET WITH YOUR

18    DESIGNED AROUND OR DEFEATURED PRODUCT, YOU WOULD HAVE SOLD

19    FEWER CALCULATION.

20         ONLY THE FIRST ONE WAS AT ISSUE IN THE 1846 CASE.  SO THE

21    ONLY LOST PROFIT REMEDY THAT WAS AT ISSUE IN THE 1846 CASE WAS

22    A REMEDY THAT HAD TO DO WITH A PERIOD IN WHICH SAMSUNG WOULD

23    HAVE BEEN ENTIRELY OFF THE MARKET AND, THEREFORE, 100 PERCENT

24    OF THE INFRINGING SALES IN THAT TIME PERIOD WOULD HAVE BEEN

25    SUBJECT TO THE ANALYSIS TO SEE, DID THEY MEET THE PANDUIT
```

1    FACTORS?  HOW MANY OF THE SALES, IF SAMSUNG DIDN'T MAKE THEM,

2    WOULD APPLE HAVE MADE INSTEAD AS OPPOSED TO SAMSUNG ITSELF, OR

3    OTHER MARKET PARTICIPANTS?  AND THEN HOW MANY -- WHAT WOULD THE

4    PROFIT HAVE BEEN ON THOSE SALES?  DID APPLE HAVE THE CAPACITY

5    TO MAKE THE EXTRA SALES?  ET CETERA.

6        THAT, WHICH IN THIS CASE IS BEING CALLED OFF THE MARKET

7    LOST PROFITS, IS THE ONLY KIND OF LOST PROFIT REMEDY THAT WAS

8    AT ISSUE IN 1846.

9        IN THIS CASE, WE HAVE FOR --

10        THE COURT:  AND HOW WAS THAT -- HOW WAS THAT

11    CALCULATED?

12        MS. KREVANS:  IT WAS CALCULATED BY -- ALL THE PARTIES

13    AGREED AND ALL THE EXPERTS AGREED THAT IN WHATEVER THE DESIGN

14    AROUND PERIOD WAS AFTER THE NOTICE DATE -- AND SO THERE WAS A

15    TIME PERIOD THAT THE COURT ACTUALLY SPECIFIED -- ANY SALE THAT

16    SAMSUNG MADE OF INFRINGING PRODUCT IN THAT PERIOD WAS A

17    STARTING POINT OF THE ANALYSIS.

18        SO THERE WERE X SALES OF INFRINGING PRODUCTS IN THAT TIME

19    PERIOD.  THE QUESTION THEN WAS, BECAUSE SAMSUNG SHOULD NOT HAVE

20    MADE THOSE SALES BECAUSE THEY WERE INFRINGING, IF IT HADN'T

21    MADE THEM, WHAT WOULD HAVE HAPPENED IN THE MARKET INSTEAD?

22        AND THE EXPERTS FOR BOTH SIDES TRIED TO PREDICT THAT, AND

23    THAT REALLY HAD TO DO WITH GIVEN MARKET SHARE INFORMATION FROM

24    THIRD PARTY SOURCES, AND GIVEN POTENTIAL NON-INFRINGING

25    ALTERNATIVES, FOR EACH INFRINGING SALE THAT SAMSUNG COULDN'T

1    HAVE MADE IN THE DESIGN AROUND PERIOD, WHO WOULD HAVE MADE IT

2    INSTEAD?  SAMSUNG ITSELF WITH SOME DIFFERENT PHONE?  SOME THIRD

3    PARTY IN THE MARKET?  OR APPLE?

4         AND THAT WAS ALL DONE WITH THIRD PARTY MARKET SHARE DATA.

5         THERE'S A SECOND KIND OF LOST PROFIT DAMAGES CLAIM BEING

6    MADE IN THIS CASE.

7         THE COURT:  SO BASICALLY WHATEVER THE THIRD PARTY

8    MARKET SHARE DATA SHOWED AS THE RELATIVE MARKET SHARE

9    PERCENTAGES, THOSE PERCENTAGES WERE THEN JUST MULTIPLIED BY 100

10   PERCENT OF THE INFRINGING SALES DURING THE PERIOD WHERE THE

11   DESIGN AROUND WOULD HAVE BEEN IN DEVELOPMENT?

12        MS. KREVANS:  YES, WITH A VERY IMPORTANT CAVEAT --

13        THE COURT:  YEAH.

14        MS. KREVANS:  -- WHICH IS THAT IN THIS MARKET, YOU

15   HAVE, FOR SOME PURPOSES, INCLUDING LOST PROFITS, TO LOOK AT THE

16   MARKET NOT JUST AS A WHOLE, BUT BY CARRIER, BECAUSE NOT ALL

17   CARRIERS CARRY EVERY PHONE.

18        SO IF, FOR EXAMPLE, SAMSUNG WAS SELLING A PHONE THAT

19   WAS AN AT&T PHONE -- IF SAMSUNG AND APPLE WERE BOTH SELLING

20   AT&T PHONES AND THE SAMSUNG INFRINGING PHONE WAS AN AT&T PHONE,

21   THEN YOU LOOK AT WHO DOES AT&T CARRY, SAMSUNG, APPLE, AND MAYBE

22   SOMEONE ELSE, AND YOU LOOK AT THAT MARKET SHARE BECAUSE WE KNOW

23   FROM REAL WORLD DATA THAT PEOPLE HAVE RELUCTANCE TO SWITCH

24   CARRIERS JUST TO GET A NEW PHONE.  SOME DO.  THE MAJORITY

25   DON'T.

```
1          IF, ON THE OTHER HAND, THE PHONE WAS SOLD BY A CARRIER
2     THAT CARRIED ONLY SAMSUNG -- BECAUSE BY DEFINITION IT HAD TO BE
3     A SAMSUNG CARRIER BECAUSE IT WAS A REAL PHONE THAT WAS REALLY
4     SOLD -- AND THE CARRIER DID NOT ALSO CARRY APPLE, SO I THINK
5     SPRINT WAS THE EXAMPLE LIKE THAT, THEN WHAT OUR EXPERT DID WAS
6     SAY, "I HAVE TO NOW LOOK AT WHAT WOULD HAPPEN WHERE THE PERSON
7     WOULD HAVE HAD TO SWITCH A CARRIER AWAY FROM SPRINT IN ORDER TO
8     BUY AN APPLE PHONE INSTEAD IN THIS HYPOTHETICAL WORLD.  AND I'M
9     NOT JUST GOING TO USE TOTAL MARKET SHARE FOR THAT BECAUSE
10    SWITCHING CARRIERS IS A BARRIER AND SOME PEOPLE WILL DO IT,
11    SOME PEOPLE WON'T."
12         AND SO IN THAT CIRCUMSTANCE, YOU MAY REMEMBER MS. DAVIS
13    TALKED ABOUT PUTTING 74 PERCENT OF THOSE PHONES RIGHT BACK IN
14    THE SAMSUNG BASKET BECAUSE OF RELUCTANCE TO SWITCH CARRIERS,
15    AND THEN ALLOCATING THE REMAINING PART BY MARKET SHARES IN THE
16    REST OF THE MARKET.
17         SO IT'S A BIT MORE COMPLICATED THAN JUST SAYING OVERALL
18    MARKET SHARE BECAUSE IN THE REAL WORLD, MARKET -- IT'S A MORE
19    COMPLICATED THING THAN JUST ONE BIG HUGE BASKET.
20         BUT THAT WAS, IN ESSENCE, THE ANALYSIS THAT WAS DONE, AND
21    BOTH PARTIES' EXPERTS AGREE THAT'S THE RIGHT WAY TO DO IT.
22         THE BIG DISPUTE THERE WAS OVER THE IMPACT OF
23    NON-INFRINGING ALTERNATIVES.
24              THE COURT:  UM-HUM.
25              MS. KREVANS:  AND THE IMPACT OF CARRIER SWITCHING.
```

```
 1              THE COURT:  AND HOW DID SHE CALCULATE, CONSIDERING

 2     THE CARRIER ISSUE, WHAT PERCENTAGE WOULD REMAIN WITH SAMSUNG?

 3              MS. KREVANS:  THERE WAS SURVEY DATA THAT WAS

 4     AVAILABLE THAT GAVE THE NUMBER THAT SAID WHEN YOU HAVE A

 5     POPULATION OF PEOPLE WHO ARE WITH A CARRIER, HOW LIKELY ARE --

 6     AND THEIR CURRENT PHONE IS NO LONGER AVAILABLE, HOW LIKELY ARE

 7     THEY TO LOOK OUTSIDE THAT CARRIER WHEN THEY CHOOSE WHICH NEW

 8     PHONE TO BUY?

 9              THE COURT:  AND THAT WAS JUST PROVIDED BY AN EXISTING

10     THIRD PARTY?  THAT WAS NOT CREATED FOR THIS LITIGATION?

11              MS. KREVANS:  IT WAS A SURVEY, AND AS I STAND HERE

12     NOW, I CAN'T REMEMBER WHETHER IT WAS PUBLIC OR WHETHER IT WAS A

13     SURVEY THAT ONE OF THE PARTIES HAD DONE.

14              THE COURT:  OH, I SEE.

15              MS. KREVANS:  BUT IT WAS A PREVIOUSLY EXISTING

16     SURVEY.

17              THE COURT:  I SEE.  ALL RIGHT.  NOW TELL ME ABOUT

18     THIS SITUATION.

19              MS. KREVANS:  OKAY.  SO IN THIS CASE WE HAVE THAT

20     KIND OF LOST PROFIT DAMAGES FOR A COUPLE OF THE PATENTS.

21              THE COURT:  UM-HUM.

22              MS. KREVANS:  GIVEN YOUR HONOR'S RULING ON THE DESIGN

23     AROUND DATE AND THE DESIGN AROUND PERIOD START --

24              THE COURT:  YEAH.

25              MS. KREVANS:  -- IT WILL ONLY BE A COUPLE OF THE
```

```
1     PATENTS, BECAUSE FOR THE OTHER THREE PATENTS THE DESIGN AROUND

2     PERIOD WILL START SO MUCH EARLIER -- SO MUCH -- LONG ENOUGH

3     BEFORE THE NOTICE DATE THAT THE DESIGN AROUND PERIOD WILL BE

4     OVER BEFORE WE GET TO THE NOTICE DATE BECAUSE INFRINGEMENT

5     STARTED BEFORE THE NOTICE.

6              THE COURT:  OKAY.

7              MS. KREVANS:  SO FOR THREE PATENTS WE WON'T HAVE OFF

8     THE MARKET LOST PROFITS.

9          BUT FOR THOSE THREE PATENTS, WE HAVE A SECOND KIND OF LOST

10    PROFIT REMEDY BEING SOUGHT IN THIS CASE, WHICH IS A DIMINISHED

11    DEMAND LOST PROFIT REMEDY, AND THE BASIS FOR THAT IS THAT --

12    YOU MAY REMEMBER FROM THE FIRST CASE THAT, BOTH AT THE FIRST

13    TRIAL AND THE RETRIAL, MR. MUSIKA AND MS. DAVIS TALKED ABOUT

14    ONE OF THE VERY CONSERVATIVE ASSUMPTIONS THAT THEY HAD MADE IN

15    THEIR DAMAGES CALCULATION FOR LOST PROFITS WAS THAT AFTER A

16    DESIGN AROUND WHEN SAMSUNG CAME BACK ON THE MARKET IN THE

17    HYPOTHETICAL WORLD WITH A PHONE THAT HAD BEEN DESIGNED AROUND,

18    WHETHER THEY WERE TAKING OUT THE FEATURE OR ALTERING IT IN SOME

19    WAY, THAT THEY WOULD INSTANTLY POP BACK TO THEIR FULL MARKET

20    SHARE, SO THEY WOULD GO FROM OFF THE MARKET TO 100 PERCENT BACK

21    TO WHERE THEY HAD BEEN.

22         AND THEY EXPLAINED THAT THAT WAS A CONSERVATIVE ASSUMPTION

23    BECAUSE IN THE REAL WORLD, YOU WOULDN'T NECESSARILY EXPECT THAT

24    TO HAPPEN, THAT WHEN YOU COME BACK, YOU INSTANTLY GET EXACTLY

25    BACK TO WHERE YOU WERE.
```

1      THEY DID NOT -- THEY MADE THAT ASSUMPTION.  IT REDUCED THE

2   DAMAGES SOUGHT.

3      IN THIS CASE, APPLE HAS A DAMAGE STUDY THAT PROVIDES

4   INFORMATION THAT GIVES THE EXPERT, IN THIS CASE DR. VELLTURO,

5   THE ABILITY TO SAY, WHEN THEY CAME BACK, HOW MUCH -- HOW FAR

6   BACK TO 100 PERCENT WOULD THEY GET?  WOULD THEY GET TO 100

7   PERCENT, OR WOULD THERE BE DIMINISHED DEMAND WHEN THEY COME

8   BACK INTO THE MARKET?

9      IN THIS CASE WE TREAT THOSE COMING BACK ON DAY 1 AFTER THE

10   NOTICE BECAUSE THE DESIGN AROUND PERIOD IS DONE.

11      SO THE EVIDENCE OF DIMINISHED DEMAND THAT THEY USED -- AND

12   OTHERWISE THEY DID THE SAME ANALYSIS, DR. VELLTURO DID THE SAME

13   KIND OF ANALYSIS AS MR. MUSIKA AND MS. DAVIS, BUT THE EVIDENCE

14   OF DIMINISHED DEMAND WAS PROVIDED BY DR. HAUSER'S SURVEY.

15      AND DR. HAUSER'S SURVEY IS CLEARLY AND INDISPUTABLY A

16   SURVEY THAT MEASURED DEMAND.  IT MEASURED THE SAME KIND OF

17   DEMAND THAT WAS ADMITTED IN THE FIRST AND SECOND TRIALS BASED

18   ON THE WILLINGNESS TO PAY ANALYSIS, AND THAT IS WHAT KIND OF

19   DEMAND WAS THERE FOR THE PATENTED FEATURES, SO THAT WAS

20   EXPRESSED IN POSITIVE TERMS IN DOLLARS.

21      BUT AS THE COURT WILL RECALL, THOSE DOLLARS WERE NOT

22   ACTUALLY USED IN THE DAMAGES CALCULATION.

23      DR. HAUSER DID WILLINGNESS TO PAY AGAIN THIS TIME.  AGAIN

24   IT WAS EVIDENCE OF DEMAND FOR THE PATENTED FEATURES.  AGAIN IT

25   WAS NOT USED AS A NUMBER, THE DOLLAR AMOUNT, IN THE CALCULATION

1     OF DAMAGES.

2          HE DID AN ADDITIONAL STEP IN THIS SURVEY THAT WAS NOT DONE

3     IN THE 1846 CASE, BUT IT WAS AN ADDITIONAL STEP CALLED A

4     WILLINGNESS TO BUY SURVEY THAT IS AN ABSOLUTELY ACCEPTED

5     METHODOLOGY IN THE FIELD.

6          WILLINGNESS TO BUY IS A SURVEY THAT ASKS, WOULD DEMAND BE

7     DECREASED IF A FEATURE WAS TAKEN AWAY AND THAT MADE THE PRODUCT

8     LESS ATTRACTIVE?

9          AND WILLINGNESS TO BUY IS WELL ESTABLISHED IN THE

10    LITERATURE, AND IT YIELDS A NUMBER, WHICH IS A MEASUREMENT OF

11    ASSUMING A FEATURE IS TAKEN OUT, WHAT PERCENTAGE OF PEOPLE WHO

12    WOULD OTHERWISE HAVE BOUGHT THAT PRODUCT WOULD NOT WANT TO BUY

13    IT?

14         AGAIN, IT'S MEASURING DEMAND.  IT'S THE SAME FUNDAMENTAL

15    CONCEPT THAT DR. HAUSER'S 1846 SURVEYS MEASURED.

16         BUT THIS IS TAKING AN ADDITIONAL STEP BY ASKING ADDITIONAL

17    QUESTIONS, AS PROVIDED FOR IN THE SAWTOOTH SOFTWARE AND IT'S

18    DISCUSSED IN THE LITERATURE, TO SAY, IF WE TAKE SOMETHING AWAY,

19    WILL THE DEMAND FOR THIS PRODUCT PROFILE GO DOWN?  AND IF SO,

20    BY HOW MUCH?

21         THAT'S WHAT DR. HAUSER DID.  HE MEASURED WHETHER DEMAND

22    WOULD CHANGE.  HE REPORTED THAT NUMBER.

23         HE DID NOT REPORT MARKET SHARE.  HE DID NOT MEASURE MARKET

24    SHARE.

25         WHAT HE DID WAS ABSOLUTELY AN ESTABLISHED TECHNIQUE.

```
1        DR. VELLTURO THEN TOOK THE NUMBERS HE GOT FROM DR. HAUSER

2   THAT SAID "MY SURVEY RESULTS SAY IF THIS FEATURE IS TAKEN AWAY,

3   DEMAND WILL DIMINISH BY SOME PERCENTAGE."  GENERALLY THEY WERE

4   SMALL PERCENTAGES, BUT THEY WERE REAL, THEY WERE STATISTICALLY

5   SIGNIFICANT, AND THAT ENTERED INTO THE DIMINISHED DEMAND LOST

6   PROFITS CALCULATION.

7        EVERYTHING ABOUT MARKET SHARE CAME FROM THE SAME SOURCES

8   AND WAS USED BY DR. VELLTURO IN THE SAME KIND OF ASSESSMENT

9   THAT WAS DONE IN THE FIRST TWO TRIALS.

10        THE COURT:  BUT IT SOUNDS LIKE DR. HAUSER'S CONJOINT

11   SURVEY PRODUCED A, A DELTA, A CHANGE IN SALES THAT WAS THEN

12   USED TO CALCULATE THE DECREASE IN MARKET SHARE.

13        MS. KREVANS:  IT WAS USED -- SO DR. VELLTURO SAYS, "I

14   AM GOING TO SOURCES FOR MARKET SHARE AND I'M GOING TO ANALYZE

15   THEM THE SAME WAY THAT WAS DONE IN THE FIRST TWO CASES.

16        "BUT I HAVE AN ADDITIONAL PIECE OF INFORMATION, WHICH IS

17   WHEN SAMSUNG PUTS THE PHONE THAT THEY'VE HAD TO CHANGE TO TAKE

18   AWAY INFRINGEMENT ON THE MARKET, WILL THERE BE SLIGHTLY LESS

19   DEMAND FOR IT THAN THERE WAS BEFORE?

20        "AND IF SO, I WILL TAKE THE MARKET SHARE DATA THAT I'M

21   USING FOR MY ANALYSIS AND I WILL SAY, OF THE REAL PHONES THAT

22   SAMSUNG SOLD, HOW MANY FEWER WOULD THEY HAVE SOLD IF THEIR --

23   IF THIS DEMAND HAD DIMINISHED BECAUSE THEY TOOK OUT THE

24   INFRINGEMENT."

25        REMEMBER, WE'RE IN A PARALLEL UNIVERSE BECAUSE THEY REALLY
```

1      DID INFRINGE.

2          AND THEN HE SAYS, "THEY WOULD HAVE SOLD X PHONES LESS THAN

3      THE NUMBER THEY REALLY SOLD."

4          THAT STILL DOESN'T MEAN YET THAT APPLE HAS ANY LOST

5      PROFITS BECAUSE THEN YOU HAVE TO SAY, WOULD APPLE HAVE SOLD

6      THAT PHONE INSTEAD?  MAYBE SAMSUNG STILL WOULD HAVE SOLD IT

7      WITH A DIFFERENT PHONE.  MAYBE ANOTHER PHONE COMPANY.  MAYBE

8      APPLE.

9          AND ALL THAT ANALYSIS IS DONE WITH MARKET SHARE DATA AND

10     IT'S THE SAME.

11         SO THE DIFFERENCE HERE IS WE HAVE A CONSERVATIVE

12     ASSUMPTION, A VERY CONSERVATIVE ASSUMPTION THAT WAS MADE IN THE

13     FIRST TWO CASES THAT WAS NOT MADE HERE.

14         THE REASON IT WAS NOT MADE HERE IS THAT HERE THERE WAS

15     ADDITIONAL DATA DERIVED FROM THE STUDY THAT LET THE EXPERTS

16     HAVE A NUMBER THEY COULD RELY ON FOR HOW MUCH DEMAND WOULD HAVE

17     BEEN DIMINISHED WHEN THE NON-INFRINGING PRODUCTS THAT HAVE BEEN

18     CHANGED, THAT HAVE HAD FEATURES TAKEN OUT OF THEM CAME ON THE

19     MARKET.

20            THE COURT:  AND DR. HAUSER DETERMINED THAT DELTA, THE

21      CHANGE IN DEMAND, BY DOING HIS CHART WITH THE FIVE OR SIX

22      FEATURES AND HOW MUCH WOULD YOU PAY?

23            MS. KREVANS:  YEAH.  WHAT HE DID -- AND YOU'LL SEE

24      THIS -- I MEAN, OBVIOUSLY IF YOU'RE NOT A STATISTICIAN, SOME OF

25      THESE THINGS AT THEIR REALLY CORE LEVELS ARE HARD TO

1    UNDERSTAND, BUT WHAT HE DID WAS THE SAME TYPE OF SURVEY THAT HE

2    DID IN THE FIRST TWO CASES.

3         THE COURT:  UM-HUM.

4         MS. KREVANS:  BUT HE ASKED AN ADDITIONAL QUESTION,

5    AND THE EASIEST WAY TO SEE THIS IS IN EXHIBIT A-22 -- I'M

6    SORRY -- A-20, WHICH IS A PUBLICATION BY SAWTOOTH SOFTWARE.

7    THEY ARE THE GOLD STANDARD MAKER OF SOFTWARE FOR CONJOINT,

8    CHOICE-BASED CONJOINT ANALYSES, AND EVERYONE AGREES THAT THEY

9    ARE THE STANDARD AND THEY PUT OUT A LOT OF PUBLICATIONS

10   EXPLAINING HOW THINGS WORK AND WHAT'S ACCEPTED AND NOT ACCEPTED

11   IN THE FIELD.

12        AND IN A PAPER THAT THEY PUT OUT CALLED "THE CBC SYSTEM

13   FOR CHOICE-BASED CONJOINT ANALYSIS," WHICH, AS I SAID, IS

14   EXHIBIT A-20 TO THE MCKRACKEN DECLARATION IN SUPPORT OF OUR

15   OPPOSITION, IN THE INTRODUCTORY SECTION, THERE'S A SECTION THAT

16   SAYS "THE ROLE OF CHOICE-BASED CONJOINT ANALYSIS" -- IT HAS

17   TALKED UP ABOVE ABOUT HOW WIDELY USED AND HOW WIDELY ACCEPTED

18   THIS IS IN THE FIELD TODAY, AND IT SAYS, AS ONE OF THREE BULLET

19   POINTS IN THE MAIN ROLES OF CONJOINT ANALYSIS, "CHOICE-BASED

20   CONJOINT ANALYSIS LETS THE RESEARCH INCLUDE A NON-OPTION FOR

21   RESPONDENTS WHICH MIGHT READ 'I WOULDN'T CHOOSE ANY OF THESE.'

22   BY SELECTING THAT OPTION, A RESPONDENT CAN CONTRIBUTE

23   INFORMATION ABOUT THE DECREASE IN DEMAND TO BE EXPECTED IF, FOR

24   EXAMPLE, PRICES OF ALL OFFERED PRODUCTS INCREASED OR THE

25   PRODUCTS BECAME UNATTRACTIVE IN OTHER WAYS."

```
 1        SO THIS IS STILL ABOUT DEMAND.  TO MEASURE THIS KIND OF

 2   DECREASE IN DEMAND, YOU HAVE TO ASK A QUESTION -- ADD A

 3   QUESTION TO EACH SURVEY RESPONDENT, WHICH WAS NOT ASKED IN THE

 4   1846 SURVEY, AND YOU'LL SEE THAT IS -- AN EXAMPLE OF THIS IS ON

 5   A-20 ON PAGE 9 IN THE SAWTOOTH PUBLICATION, AND ALSO YOU'LL SEE

 6   IT IN DR. HAUSER'S ACTUAL REPORT.

 7        WHEN THE USER IS SHOWN A SET OF PROFILES --

 8             THE COURT:  DID YOU ALL BRING COPIES OF THAT?

 9   BECAUSE THAT WAS NOT FILED.  THE HAUSER REPORT WAS NOT FILED,

10   SO --

11             MS. KREVANS:  YEAH, I THINK WE DELIVERED THEM EARLIER

12   TODAY TO THE CLERK'S OFFICE AND THEY WERE GOING TO LET CHAMBERS

13   KNOW THEY WERE HERE.

14             THE COURT:  OH.  WE DIDN'T GET THAT BEFORE THE

15   HEARING.

16             MR. WATSON:  YOUR HONOR, IT'S EXHIBIT A TO THE FAZIO

17   DECLARATION.

18             THE COURT:  THE ENTIRE HAUSER REPORT?  I THINK WE'VE

19   ONLY GOTTEN --

20             MR. WATSON:  WITHOUT EXHIBITS, YOUR HONOR.  BUT THE

21   ENTIRE REPORT IS EXHIBIT A.

22             MS. KREVANS:  I THINK WE ALSO HAVE THEM.

23             THE COURT:  OKAY.  I'LL TAKE THREE COPIES IF YOU HAVE

24   THEM.

25             MS. KREVANS:  OKAY.  I THINK WE ALREADY GAVE THEM TO
```

```
1        THE CLERK'S OFFICE.

2              MR. MCELHINNY:  WE DELIVERED THEM TO THE CLERK'S

3        OFFICE.

4              THE COURT:  OKAY.  IN THE FUTURE YOU SHOULD BRING

5        THEM TO CHAMBERS, BECAUSE IF IT GOES TO THE CLERK'S OFFICE, WE

6        MAY NOT GET IT FOR ANOTHER DAY OR TWO.

7              THE CLERK:  IF IT'S THIS CLOSE TO THE HEARING.

8              MS. KREVANS:  OKAY.

9              THE CLERK:  DO YOU WANT ME TO GO LOOK?

10             THE COURT:  SURE.  THANK YOU.

11             MS. KREVANS:  AND YOU MAY REMEMBER, YOUR HONOR, YOU

12       SAW ANOTHER EXAMPLE OF THIS TODAY, THERE ARE SETS OF QUESTIONS

13       FOR THE SURVEY RESPONDENTS AND THEY HAVE MULTIPLE PROFILES OF

14       PRODUCTS AND THEY ASK THEM, FOR EACH SET OF PROFILES, WHICH OF

15       THESE WOULD YOU PREFER?

16          THE DIFFERENCE THAT WAS ADDED THIS TIME IN THIS

17       ESTABLISHED METHOD FOR LOOKING AT WILLINGNESS TO BUY IS THAT

18       AFTER THEY'RE ASKED WHICH OF THESE PROFILES WOULD YOU PREFER,

19       EACH RESPONDENT IS THEN ASKED A SECOND QUESTION:  GIVEN WHAT

20       YOU KNOW ABOUT REAL PRODUCTS AVAILABLE, WOULD YOU BUY THE ONE

21       YOU JUST SAID YOU PREFERRED OUT OF THIS SET?

22          AND THAT SECOND QUESTION, THE WOULD YOU ACTUALLY BUY IT

23       QUESTION, IS WHAT LETS THE CONJOINT-BASED ANALYSIS THEN ALSO

24       DETERMINE THIS DEMAND QUESTION, THAT IS, WOULD DEMAND DIMINISH

25       IF THE FEATURE WERE TAKEN AWAY?
```

1           AND YOU WILL SEE THIS DISCUSSED AS AN ESTABLISHED

2      TECHNIQUE IN EXHIBIT A-20.

3           AND I HAVE -- THANK YOU, MR. MCELHINNY -- ANOTHER COPY OF

4      EXHIBIT A-20 WHICH MAY BE HELPFUL TO THE COURT.  THE SAMPLE

5      QUESTION I'M TALKING ABOUT YOU'LL FIND ON PAGE 9.

6           THE COURT:  OKAY.  BUT IN -- THANK YOU.

7           IN THAT -- IN THE QUESTIONS FOR THIS ISSUE, WERE THERE

8      JUST A FEW FEATURES ISOLATED TO MAKE THAT DETERMINATION?

9           MS. KREVANS:  NO.  IT'S THE SAME KIND OF PROPERLY

10      VALIDATED SURVEY OTHERWISE THAT DR. HAUSER DID THAT WAS USED IN

11      THE FIRST TWO TRIALS.

12           SO THERE WERE FEATURES THAT WERE BEING TESTED, AND THERE

13      WERE FEATURES THAT WERE SELECTED AS DISTRACTION FEATURES.  THE

14      SURVEY RESPONDENTS, OF COURSE, WERE NOT TOLD WHICH WERE THE

15      DISTRACTIONS AND WHICH WERE BEING TESTED BECAUSE THAT WOULD

16      BIAS THE RESULTS.

17           AND THE FEATURES THAT WERE INCLUDED IN THE SURVEY AS

18      DISTRACTION FEATURES WERE ACTUALLY QUITE IMPORTANT FEATURES.

19      MR. QUINN SAID -- HE KEPT SAYING THEY WERE MINOR AND THAT

20      BIASED THE SURVEY AND MAKE IT NO GOOD.

21           IN FACT, WHAT DR. HAUSER REALLY SAID IN HIS DEPOSITION IS,

22      "I DIDN'T TRY TO DETERMINE IN ADVANCE HOW IMPORTANT THE

23      DISTRACTION FEATURES WERE BECAUSE THE SURVEY ITSELF WOULD TELL

24      ME THAT.  IF THE SURVEY HAD SHOWN THAT THEY WERE NOT IMPORTANT

25      FEATURES, I WOULD HAVE HAD TO REDO IT.  BUT, IN FACT, THE

1       SURVEY RESULTS CONFIRMED THAT THEY WERE IMPORTANT."

2              AND, IN FACT, THEY WERE IMPORTANT FEATURES.  YOUR HONOR

3       HAS SAT THROUGH ENOUGH TESTIMONY IN THIS CASE TO KNOW THAT

4       THINGS LIKE PRICE AND SCREEN SIZE, WHICH WERE A COUPLE OF THEM,

5       AND CAMERA ARE IMPORTANT FEATURES.  THESE WERE NOT -- THE

6       DISTRACTION FEATURES WERE NOT MINOR.  SO THERE'S NOTHING ABOUT

7       THE FEATURES THAT WERE CHOSEN THAT INVALIDATES THIS SURVEY.

8              AND IN ANY EVENT, THAT WOULD BE A QUESTION FOR CROSS.

9              I THINK MR. QUINN WAS UP HERE TRYING TO MAKE A PITCH TO

10      YOU TO THROW THE WHOLE SURVEY OUT.  BUT, IN FACT, THE SURVEY

11      WAS ENTIRELY PROPER.

12             IN FACT, THE ADDITIONAL FEATURE OF THIS SURVEY COMPARED TO

13      1846, THE WILLINGNESS TO BUY FEATURE, IS AN ESTABLISHED

14      TECHNIQUE.  IN FACT, IT IS USED IN THE REAL WORLD FOR PRODUCTS

15      THAT ARE JUST AS COMPLEX AS SMARTPHONES.

16             YOU'LL SEE IN THE HAUSER REPORT, AND IN THE LITERATURE AS

17      WELL, THAT THERE HAVE BEEN STUDIES DONE OF THIS KIND WHERE

18      YOU'RE LIMITED TO THE NUMBER OF FEATURES YOU CAN TEST AND THE

19      NUMBER OF DISTRACTION FEATURES YOU CAN INCLUDE ON THINGS LIKE

20      HMO'S, HOTELS --

21             THE COURT:  BUT WHY ISN'T -- WHY ISN'T -- SO THEN HE

22      ACTUALLY IS USING, DR. VELLTURO, THE DIMINISHED DEMAND

23      PERCENTAGE OF DR. HAUSER AND USING THAT TO PREDICT MARKET

24      SHARE.  HE IS, RIGHT?  BECAUSE HE'S SAYING, "WELL, I'M GOING TO

25      REDUCE IT BY DR. HAUSER'S PERCENTAGE, AND THEN THE REMAINDER

```
 1          WOULD BE INTERESTED IN CONTINUING TO PURCHASE A SAMSUNG PHONE."

 2              SO HE IS USING --

 3              MS. KREVANS:  WELL, THERE'S -- I THINK THIS IS REALLY

 4      AN IMPORTANT POINT.  WHAT THESE CHOICE-BASED CONJOINT SURVEYS

 5      ARE ABOUT, WHETHER THEY USE -- WHETHER THEY LOOK AT JUST

 6      WILLINGNESS TO PAY OR BOTH WILLINGNESS TO PAY AND WILLINGNESS

 7      TO BUY, THEY'RE ABOUT MEASURING DEMAND.  THEY'RE VALIDATED

 8      TECHNIQUES FOR MEASURING DEMAND.  THEY'RE USED IN THE REAL

 9      WORLD.  THEY'VE BEEN STUDIED ACADEMICALLY.  THEY'RE THERE.

10              THE COURT:  BUT IT'S ONE THING TO JUST SAY, AS THEY

11      DID IN THE FIRST CASE, OKAY, THERE'S DEMAND FOR THE PATENTED

12      FEATURE, PANDUIT FACTOR 1, PANDUIT FACTOR 2, WE CAN CHECK THE

13      BOXES.  THAT'S ONE THING.

14          BUT THEN TO SAY, "OH, AND I THINK THAT THAT CONJOINT

15      SURVEY TELLS ME EXACTLY HOW TO QUANTIFY THAT DEMAND AND HOW

16      IT'S GOING TO INCREASE OR DECREASE BASED ON JUST THE PATENTED

17      FEATURE" IS AN ADDITIONAL STEP THAT I DON'T NECESSARILY THINK

18      CONJOINT SURVEYS ARE RELIABLE ENOUGH TO DETERMINE.  THEN I

19      WOULD ACTUALLY AGREE WITH JUDGE ALSUP.  YOU DON'T ISOLATE FIVE

20      OR SIX FACTORS AND THEN SAY, "AH-HAH, THIS IS WHAT'S GOING TO

21      TELL ME HOW THE OVERALL CONSUMER PERCENTAGES THAT WOULD REMAIN

22      WITH THIS PRODUCT OR THIS COMPANY'S PRODUCTS," TO DO THAT

23      QUANTIFIED STUDY SEEMS A LITTLE BIT --

24              MS. KREVANS:  BUT YOUR HONOR --

25              THE COURT:  -- OF A STRETCH WITH THAT KIND OF SURVEY.
```

1          MS. KREVANS:  I THINK, WITH RESPECT -- AND I WANT TO

2     PUT ASIDE JUDGE ALSUP'S OPINION JUST FOR A MOMENT BECAUSE HE

3     WAS LOOKING AT A VERY DIFFERENT KIND OF SURVEY.  IT WAS

4     CONJOINT, BUT IT WAS REALLY DIFFERENT FROM THIS.

5          IF YOU LOOK AT THIS SAWTOOTH PUBLICATION AND THE OTHER

6     THINGS THAT WE'VE CITED IN OUR BRIEF --

7          THE COURT:  UM-HUM.

8          MS. KREVANS:  -- YOU WILL SEE THAT WILLINGNESS TO BUY

9     SURVEYS AND THEIR USE TO MEASURE HOW MUCH DEMAND WOULD DIMINISH

10    IS WIDELY ACCEPTED IN THIS TECHNICAL FIELD.

11         AND SAMSUNG ACTUALLY HAS NO EVIDENCE TO THE CONTRARY.  THE

12    ONLY THING THEY HAVE, THE ONLY THING THEY CAN SAY TO YOU, OTHER

13    THAN POINTING TO JUDGE ALSUP'S OPINION ABOUT THIS SHUGAN --

14    SHUGAN, I ALWAYS SAY THAT WRONG -- THE SHUGAN SURVEY WHICH WAS

15    VERY DIFFERENT, THE ONLY THING THEY CAN SAY TO YOU IS "WE

16    HAVEN'T FOUND A CASE YET WHERE THIS KIND OF EVIDENCE WAS

17    PRESENTED IN COURT."

18         BUT OF COURSE THAT'S NOT THE TEST OF DAUBERT.  DAUBERT

19    DOESN'T TELL YOU TO ASK, HAS ANOTHER JUDGE SEEN EVIDENCE LIKE

20    THIS BEFORE?

21         DAUBERT TELLS YOU TO ASK, WAS THE TECHNICAL FIELD AT

22    ISSUE, IS THIS A TECHNIQUE THAT'S BEEN ACCEPTED AND VALIDATED

23    IN THAT FIELD?

24         THE FIELD HERE IS MARKETING RESEARCH.  A KEY THING THAT

25    THESE MARKET RESEARCHERS DO AND THE REASON THEY USE ALL THE

```
 1      STATISTICAL ANALYSIS AND THAT THERE ARE COMPANIES THAT MAKE A

 2      LOT OF MONEY SELLING SOFTWARE TO DO IT IS BECAUSE IN THE REAL

 3      WORLD, THESE KIND OF SURVEYS HAVE BEEN VALIDATED TO SEE, IF I

 4      TAKE THIS FEATURE OUT, WILL CUSTOMERS WANT MY PRODUCT LESS?

 5      REALLY COMPLEX PRODUCTS.

 6           THERE'S NO WAY TO SAY THAT A SMARTPHONE IS MORE COMPLEX,

 7      FOR EXAMPLE, THAN AN HMO, WHICH IS ONE OF THE EXAMPLES OF

 8      BUSINESSES THAT HAVE DONE SURVEYS LIKE THIS AND USED THEM,

 9      HOTEL CHAINS, COMPUTERS.

10           THESE ARE -- THESE ARE PRODUCTS THAT HAVE FEATURES THAT

11      ARE VERY NUMEROUS, THAT CAN'T ALL POSSIBLY BE TESTED IN A

12      SINGLE CONJOINT SURVEY, AND YET, THIS IS A VALIDATED TECHNIQUE,

13      INCLUDING WILLINGNESS TO BUY.

14           ALL YOU HAVE THAT TELLS YOU THERE'S SOMETHING WRONG WITH

15      THIS IS MR. QUINN.

16              THE COURT:  SO I HAVE DR. HAUSER'S REPORT NOW.  WHERE

17       DO I LOOK FOR THE EXACT QUESTIONS THAT WE'LL USE?

18           THIS ONE ALSO HAS NO EXHIBITS.

19              MS. KREVANS:  MAYBE WE MISUNDERSTOOD, BUT WE THOUGHT

20       WE WERE ASKED TO SUBMIT COPIES WITH NO EXHIBITS TODAY.

21           IF YOU LOOK AT DR. HAUSER'S REPORT --

22              THE COURT:  UM-HUM.

23              MS. KREVANS:  -- WHERE HE TALKS ABOUT THE OVERVIEW OF

24       THE METHODOLOGY, HE HAS A SUMMARY OPINION THAT STARTS AT

25       PARAGRAPH 12.
```

```
1              THE COURT:  OKAY.

2              MS. KREVANS:  AND THEN HE TALKS ABOUT, STARTING AT

3    16, OVERVIEW OF METHODOLOGY, THE HISTORY OF CONJOINT ANALYSIS,

4    WHICH, YOU KNOW, IS A FIELD IN WHICH HE'S A VERY DISTINGUISHED

5    PROFESSOR; THE KINDS OF VALIDATION STUDIES THAT HAVE BEEN DONE;

6    THE KINDS OF THINGS THAT HAVE BEEN STUDIED WITH CONJOINT

7    ANALYSIS -- THIS IS ALL IN PARAGRAPHS 16 THROUGH 19 -- AND IN

8    19 HE TALKS ABOUT THE FEATURE CATEGORIES HE INCLUDED IN THIS

9    SURVEY.

10             AND THEN IN 20 HE TALKS ABOUT THE SPECIFIC FORM OF

11   CONJOINT ANALYSIS THAT HE DID HERE, AND THEN HE STARTS TALKING

12   ABOUT THE TECHNICAL DETAILS OF HOW IT WORKS.

13             THEN, I HAVE TO SAY, THIS GOES ON FOR SOME TIME WITH A LOT

14   OF TECHNICAL DESCRIPTION.

15             IF YOU GO TO PARAGRAPH 34, THERE'S A HEADING B, AND THIS

16   IS ON PAGE 17.

17             THE COURT:  IS THERE A REASON -- I THINK SEEING HIS

18   ACTUAL SURVEY WOULD BE HELPFUL.

19             MS. KREVANS:  YEAH, AND WE HAVE IT.  IT'S IN AN

20   EXHIBIT AND WE HAVE IT HERE.  THIS ONE I ONLY HAVE ONE COPY OF,

21   YOUR HONOR, BUT THIS ONE HAS ALL OF THE EXHIBITS (INDICATING).

22             THE COURT:  OKAY.  SO JUST TELL ME WHAT I SHOULD

23   FOCUS ON, WHICH EXHIBITS.

24             MS. KREVANS:  SO IF YOU WOULD LOOK -- IF YOU LOOK AT

25   THE PARAGRAPH 16 UNDER HEADING B, WHICH TALKS ABOUT THE
```

1       CHOOSING WHETHER OR NOT TO BUY AND THE PARAGRAPHS THAT GO ON

2       AFTER THAT, 35, 36, THOSE DESCRIBE THE FEATURE, HOW THAT'S

3       DONE, AND THEN WHAT ONE CAN DEDUCE FROM THAT IN THIS ANALYSIS,

4       AND IT'S DESCRIBED IN THE NARRATIVE.

5              AND THEN IN THE EXHIBITS --

6              MR. KUWAYTI, COULD YOU TELL ME WHICH EXHIBIT HAS THE

7       ACTUAL --

8                    MR. KUWAYTI:  I BELIEVE IT'S E AND F.

9                    MS. KREVANS:  YOU HAVE MY COPY, YOUR HONOR, BUT I

10      BELIEVE IT'S EXHIBITS E AND F THAT SHOW THE SURVEY QUESTIONS.

11                   THE COURT:  UM-HUM.  THAT'S RIGHT.

12                   MR. QUINN:  IF IT WOULD BE HELPFUL, YOUR HONOR, THE

13      SURVEY WAS ACTUALLY TAKEN ONLINE AND IT WOULD BE -- IT WOULDN'T

14      BE HARD FOR US TO SET UP A LINK SO THAT THE COURT COULD

15      ACTUALLY TAKE THE SURVEY AND SEE THE IMAGES AND THE ANIMATIONS.

16      I THINK IT -- I TOOK IT MYSELF.  I THINK IT TOOK, LIKE, A HALF

17      HOUR, 35 MINUTES.

18                   THE COURT:  I THOUGHT IN THE SURVEY FOR THE FIRST

19      TRIALS, THEY HAD MANY MORE OF THE SORT OF COLORFUL CHARTS WHERE

20      YOU CHOOSE -- WAS THAT NOT --

21                   MS. KREVANS:  NO.  THAT IS WHAT THIS LOOKED LIKE AS

22      WELL, YOUR HONOR.

23                   THE COURT:  WELL, HOW COME EXHIBIT E AND F DON'T LOOK

24      LIKE THAT?

25                   MS. KREVANS:  IS THAT A BLACK AND WHITE COPY?

1      THE COURT:  WELL, IT ALSO IS ALL TEXT WITH THE

2   EXCEPTION OF ONE BOX AT THE END.  IT JUST LOOKS DIFFERENT

3   FROM --

4      MS. KREVANS:  WHAT THEY ACTUALLY LOOKED LIKE WHEN

5   PARTICIPANTS SAW THEM WAS THE SAME KIND OF COLORFUL CHOICES.

6      AND BEFORE THEY ACTUALLY TOOK THE SURVEY FOR EACH OF THE

7   FEATURES, BOTH THE ONES THEY WERE REALLY TESTING ON AND THE

8   DISTRACTION FEATURES, THEY WERE SHOWN AN ANIMATION THAT WOULD

9   SHOW THEM, HERE IS WHAT THIS FEATURE IS ABOUT, AND AT ANY TIME

10  DURING THE SURVEY IF THEY WANTED TO, THEY COULD GO BACK AND

11  LOOK AT THE ANIMATIONS AGAIN AND REMIND THEMSELVES WHAT THE

12  FEATURES ARE ABOUT.

13     SO YOUR RECOLLECTION IS CORRECT.  WHEN THEY TOOK IT, IT

14  LOOKED LIKE THE COLORFUL SETS OF PANELS AND EACH PERSON GOT A

15  SERIES OF QUESTIONS, EACH WITH A SET OF PROFILES TO CHOOSE

16  FROM.

17     THE DIFFERENCE BETWEEN THE FIRST CASE AND THIS IS THE

18  ADDITIONAL QUESTION AFTER EACH PROFILE, WOULD YOU ACTUALLY BUY

19  THE ONE THAT YOU SAID YOU LIKED THE BEST FROM THIS SET?

20     THE COURT:  SO HOW MANY OF THESE COLORFUL CHARTS

21  SHOULD YOU SEE, OR WOULD YOU SEE IF YOU WERE ONLINE?

22     MS. KREVANS:  SIXTEEN, YOUR HONOR.

23     THE COURT:  OH.  BECAUSE HERE THERE'S ONLY ONE.

24     MS. KREVANS:  RIGHT.  THAT'S JUST AN EXAMPLE SHOWING

25  FORMAT, BUT WE CAN CERTAINLY GIVE YOU THE WHOLE THING.

1          BUT I THINK THE BASIC POINT HERE IS THIS IS A WELL

2     ESTABLISHED WAY TO MEASURE DIMINISHED DEMAND, AND THE ONLY

3     THING THAT SAMSUNG HAS TO TRY TO PERSUADE YOU THAT YOU

4     SHOULDN'T ALLOW IT IS ATTORNEY ARGUMENT AND A

5     MISCHARACTERIZATION OF WHAT DAUBERT TESTS FOR.

6          BECAUSE DAUBERT DOESN'T SAY, IS THIS THE FIRST TIME IN

7     COURT?  DAUBERT SAYS, WHAT'S THE FIELD?  IS THIS ACCEPTED IN

8     THE FIELD?  IS IT VALIDATED IN THE FIELD?

9          THE ANSWER TO ALL THOSE QUESTIONS IS YES AND WE HAVE PUT

10    THAT IN THE RECORD.

11              THE COURT:  I THINK I WOULD LIKE TO SEE THE SURVEY.

12              MS. KREVANS:  OKAY.  WE WILL GET THAT TO YOU, YOUR

13    HONOR.

14              THE COURT:  WHEN?  GIVE ME A DEADLINE.

15              MS. KREVANS:  TOMORROW.

16              THE COURT:  ALL RIGHT.  I DO WANT TO WRAP THIS UP.

17    I'M GOING TO GIVE SAMSUNG THE LAST WORD SINCE THIS IS YOUR

18    MOTION.

19              MS. KREVANS:  YOUR HONOR, MAY I -- IN MR. QUINN'S

20    ARGUMENT, HE SAID QUITE A FEW THINGS ABOUT THE IMPACT OF

21    JUDGE ALSUP'S ORDER IN THE ORACLE/GOOGLE CASE --

22              THE COURT:  OKAY.  GO AHEAD.

23              MS. KREVANS:  -- WHICH I STRONGLY DISAGREE WITH.  I

24    WOULD LIKE TO ADDRESS THEM, AND I WILL TRY TO BE VERY BRIEF.

25          AND THEN I DO NEED TO ADDRESS THE POINT ABOUT DR. VELLTURO

1    USING PROFITS AS AN ELEMENT OF REASONABLE ROYALTY ANALYSIS,

2    WHICH YOU SAID YOU WERE INCLINED TO GRANT THAT MOTION, AND THE

3    '414.

4         WITH RESPECT TO ORACLE/GOOGLE, WE STILL THINK THAT ORDER

5    IS COMPLETELY INAPPOSITE HERE.  WE HAVE NEVER AGREED THAT YOU

6    CAN'T DO A SURVEY OF THIS KIND THAT TELLS YOU ANYTHING ABOUT

7    MARKET SHARE.

8         BUT, IN FACT, DR. HAUSER DID NOT ESTIMATE MARKET SHARE IN

9    HIS SURVEY.

10        THE EXPERT WHO PUT IN THIS SURVEY IN ORACLE/GOOGLE DID A

11   VERY DIFFERENT KIND OF SURVEY.  IT WAS A CHOICE-BASED CONJOINT

12   ANALYSIS, BUT IT TRIED --

13        THE COURT:  WELL, DIDN'T -- I THOUGHT DR. HAUSER

14   DETERMINED THE CHANGE IN MARKET SHARE.

15        MS. KREVANS:  HE DETERMINED DIMINISHED LEVEL OF

16   DEMAND JUST FOR SAMSUNG CONSUMERS.

17        THE COURT:  UM-HUM.

18        MS. KREVANS:  HE DIDN'T LOOK AT ANYTHING ABOUT THE

19   REST OF THE MARKET.

20      IN ORACLE/GOOGLE, THE SURVEY THAT THE EXPERT --

21        THE COURT:  BUT DIDN'T DR. VELLTURO USE DR. HAUSER'S

22   CHANGE IN LEVEL OF DEMAND AMONG SAMSUNG CONSUMERS TO MAKE

23   MARKET SHARE CALCULATIONS?

24        MS. KREVANS:  NO.  WHAT HE DID IS HE SAID, OF THE

25   REAL PHONES THAT SAMSUNG SOLD THAT WERE INFRINGING, WHAT WOULD

```
1        THE DIMINISHED DEMAND FOR THOSE PHONES HAVE BEEN IF THEY DIDN'T
2    INFRINGE?
3        AND THEN HE TOOK THAT NUMBER AND HE DID A MARKET SHARE
4    ANALYSIS, JUST LIKE THE ONES IN THE PRIOR CASE, TO SAY, WHAT
5    WOULD HAVE -- WHO WOULD HAVE SOLD THAT PHONE INSTEAD?  THAT WAS
6    THE MARKET SHARE ANALYSIS.
7        THIS REALLY HAD TO DO WITH HOW MANY UNITS FEWER WOULD
8    SAMSUNG HAVE SOLD ITSELF, JUST SAMSUNG.
9        THE BIG DIFFERENCE HERE IS THAT -- BETWEEN THIS AND
10   ORACLE/GOOGLE IS THAT IN ORACLE/GOOGLE, ALTHOUGH WE DON'T HAVE
11   ALL THE DETAILS -- DIFFERENT CASE, DIFFERENT SURVEY, THAT'S WHY
12   IT'S HARD TO TRANSLATE THESE THINGS --
13            THE COURT:  ALTHOUGH MR. JACOBS WAS INVOLVED IN THAT
14   CASE --
15            MS. KREVANS:  HE WAS.
16            THE COURT:  -- SO HE'S FAMILIAR WITH IT.
17       YOUR LAW FIRM WAS INVOLVED.
18            MS. KREVANS:  BUT ALL OF THAT INFORMATION IS NOT IN
19   THIS RECORD, YOUR HONOR, AND SOME OF IT IS NOT AVAILABLE.
20            THE COURT:  UM-HUM.
21            MS. KREVANS:  BUT IF YOU LOOK AT WHAT INFORMATION WE
22   HAVE, THAT WAS A SURVEY THAT THE EXPERT THERE TRIED TO DESIGN
23   SO THAT IN A SINGLE CONJOINT SURVEY, HE BOTH DETERMINED ACTUAL
24   SHARES OF MULTIPLE PARTICIPANTS IN THE MARKET, AND THEN ALSO
25   HOW THEY WOULD SHIFT AROUND IF PROFILES OF PRODUCTS WERE
```

```
 1         CHANGED.

 2              SO IF YOU LOOK AT EXHIBIT A-22, WHICH HAS AN EXCERPT FROM

 3    THE SURVEY THAT WAS PUT IN IN THE REPLY BRIEF IN THAT CASE, AND

 4    IT'S GOT AN EXHIBIT TO IT THAT SHOWS THE DIFFERENT PROFILES

 5    THAT WERE TESTED, YOU'LL SEE THAT THE PROFILES THAT WERE TESTED

 6    THERE ACTUALLY SAID AN APPLE PHONE WITH THIS, A MICROSOFT PHONE

 7    WITH THIS, I THINK ONE WAS A BLACKBERRY MAYBE, AND THEN THERE

 8    WAS AN ANDROID PROFILE AND THEN VARIATIONS ON THE ANDROID

 9    PROFILE.

10              AND THE SURVEY WAS ACTUALLY USED, BY ITSELF, TO TRY TO

11    SAY, WHICH OF THOSE MARKET PLAYERS WOULD PEOPLE LIKE THE BEST?

12    AND THEN HOW WOULD THEIR SHARES IN THE MARKET AS DETERMINED BY

13    THIS CONJOINT SURVEY CHANGE IF THE FEATURES WERE CHANGED?

14              COMPLETELY DIFFERENT FROM WHAT WAS DONE HERE.  IT WAS

15    TRYING -- IT WAS A ONE STOP SHOPPING TRYING TO USE CONJOINT TO

16    ACTUALLY DETERMINE MARKET SHARES AMONG MARKET PARTICIPANTS,

17    NOTHING LIKE WHAT WAS DONE HERE.

18              THE COURT:  SO WHAT WAS THE EXACT QUESTION HERE?

19              MS. KREVANS:  THERE WERE TWO QUESTIONS HERE.

20              THE COURT:  DR. HAUSER SAID, OF -- WHAT WAS THAT? --

21    OF DATA ACCESSIBILITY, CALL INITIATION AND SCREENING, INPUT

22    ASSISTANCE, SCREEN SIZE, CAMERA, AND PRICE, YOU WOULD NOT BUY

23    THE PHONE IF IT WAS MISSING WHAT?

24              MS. KREVANS:  THE PROFILES VARIED.

25              THE COURT:  UM-HUM.
```

1          MS. KREVANS:  SO YOU MAY RECALL FROM THE LAST CASE,

2     EACH OF THE PARTICIPANTS WAS GIVEN 16 PROFILES.  EACH OF THE

3     PROFILES WAS -- HAD DIFFERENT SETS IN THEM.  SO NOT EVERYBODY

4     GOT THE SAME SETS OF QUESTIONS AND THERE WERE A LOT OF

5     DIFFERENT QUESTIONS ABLE TO BE ASKED THAT WAY.

6          THEY WERE EACH ASKED, PLEASE CHOOSE YOUR MOST PREFERRED

7     SAMSUNG SMARTPHONE AMONG THE FOUR BELOW, AND THERE WERE FOUR

8     DIFFERENT PROFILES.  THIS IS ALL ABOUT SAMSUNG, QUITE UNLIKE

9     THE ORACLE SURVEY.

10         AND THEN AFTER THEY CHOSE THAT, THERE'S A SECOND QUESTION

11    THAT SAYS --

12         THE COURT:  BUT WHAT ARE THEY -- WHAT ARE THE

13    FEATURES THAT ARE IDENTIFIED ON THAT PHONE IN EACH OF THE FOUR

14    CHOICES?

15         MS. KREVANS:  THEY VARY DEPENDING ON THE QUESTION.

16         THE COURT:  UM-HUM.

17         MS. KREVANS:  THEY ARE LISTED -- THE DIFFERENT

18    FEATURES THAT WERE TESTED ARE LISTED BACK IN PARAGRAPH 19 OF

19    DR. HAUSER'S REPORT, DATA ACCESSIBILITY, CALL INITIATION AND

20    SCREENING, INPUT ASSISTANCE, SCREEN SIZE, CAMERA, AND PRICE.

21         AND THEN IN THE TABLET SURVEY THERE WAS A SLIGHTLY

22    DIFFERENT LIST.

23         THE COURT:  SO IT JUST SAID WHAT?  WHAT WAS THE

24    QUESTION WITH REGARD TO THOSE SIX FEATURES FOR A SMARTPHONE?

25         MS. KREVANS:  THERE WOULD BE -- AND YOU'LL SEE THIS

```
1       WHEN WE GIVE YOU THE WHOLE SURVEY TOMORROW, BUT I HAVE A SAMPLE
2       PAGE IN MY HAND.  FOR EACH PROFILE, IT WOULD SHOW WHAT YOU
3       WOULD GET IN THAT CATEGORY OF FEATURES, AND THOSE THINGS VARIED
4       ACROSS DATA SETS.
5            THIS IS EXACTLY LIKE THE SURVEY IN 1846.
6            THE COURT:  UM-HUM.
7            MS. KREVANS:  THE DIFFERENCE WAS AFTER THEY WERE
8       ASKED, WHICH OF THESE FOUR PROFILES THAT WE SHOW YOU ON THIS
9       PAGE WOULD YOU PREFER, IT THEN ASKED, WOULD YOU ACTUALLY BUY
10      THE ONE OF THE FOUR THAT YOU SAID YOU LIKED THE BEST?
11           THAT'S A QUESTION THAT WAS NOT ASKED IN 1846 AND IT GAVE
12      US ADDITIONAL INFORMATION HERE.  THAT'S WILLINGNESS TO BUY,
13      ALSO WIDELY ACCEPTED, A VALIDATED TECHNIQUE TO MEASURE DEMAND,
14      INCLUDING WHETHER DEMAND GOES DOWN IF A FEATURE IS ABSENT.
15      THAT'S HOW IT WAS USED HERE.
16           THE COURT:  SO I GUESS I DON'T UNDERSTAND.  SO THAT
17      IS WILLINGNESS TO BUY, AND HOW WAS THAT USED TO CALCULATE THE
18      CHANGE OF SAMSUNG CUSTOMERS WHO WOULD NOT WANT TO BUY A SAMSUNG
19      PHONE?
20           MS. KREVANS:  SO AFTER THE 400-SOME PARTICIPANTS
21      ANSWERED THESE 16 SETS OF QUESTIONS --
22           THE COURT:  SAYING "I WOULD BE WILLING TO BUY IT WITH
23      THESE FEATURES."
24           MS. KREVANS:  FIRST THEY PICK WHICH OF THE FOUR
25      PROFILES THEY LIKE THE BEST.
```

```
 1              THE COURT:  OKAY.

 2              MS. KREVANS:  AND THEN FOR EACH PROFILE, THEY WERE

 3    ASKED A SECOND QUESTION, WOULD YOU ACTUALLY WANT TO BUY THE ONE

 4    YOU PICKED?

 5              THE COURT:  OKAY.

 6              MS. KREVANS:  AND THAT SECOND QUESTION, WHEN RUN

 7    THROUGH THE REGRESSION ANALYSIS, LETS THE SOFTWARE PREDICT HOW

 8    MUCH, WHEN A FEATURE IS ABSENT, DEMAND WILL GO DOWN FOR WHAT'S

 9    OTHERWISE IN THE FEATURE SET OF A SAMSUNG PHONE.

10         THAT'S INFORMATION WE DID NOT --

11              THE COURT:  BUT ONLY ASKING ABOUT SIX FEATURES, DATA

12    ACCESSIBILITY, CALL INITIATION AND SCREENING, INPUT ASSISTANCE,

13    SCREEN SIZE, CAMERA, AND PRICE.

14              MS. KREVANS:  IN THE SMARTPHONE SURVEY, THAT'S RIGHT.

15         IN THE TABLET SURVEY, IT WAS DATA ACCESSIBILITY, LOCK

16    SCREEN INTERFACE, INPUT ASSISTANCE, SCREEN SIZE, CONNECTIVITY,

17    AND PRICE.  SO IT WAS A SLIGHTLY DIFFERENT SET.

18         AND THIS IS ALL SET OUT IN PARAGRAPH 19 OF THE REPORT.

19         IN THAT RESPECT, THIS IS EXACTLY LIKE THE 1846 SURVEY.

20    THE DIFFERENCE IS THE ADDITIONAL QUESTION THAT SAYS, WOULD YOU

21    ACTUALLY WANT TO BUY THE ONE YOU SAID YOU LIKED THE BEST OF

22    EACH OF THESE 16 SETS OF FOUR PROFILES?

23         AND IT'S THAT LAST QUESTION, THAT ADDITIONAL PIECE OF

24    INPUT, THAT LETS THE ANALYSIS PREDICT WHETHER DEMAND WOULD GO

25    DOWN IF A FEATURE WERE ABSENT.
```

```
1              NOW, THIS IS ABSOLUTELY ACCEPTED IN THE INDUSTRY AND IN

2        THE FIELD.

3              THE COURT:  AMONG PERSONS, SURVEY TAKERS WHO

4        CURRENTLY OWN A SAMSUNG PHONE?

5              MS. KREVANS:  THAT'S RIGHT.  THE ONLY PEOPLE TO WHOM

6        THE RESULTS OF THE SURVEY WERE APPLIED WERE SALES OF SAMSUNG

7        PHONES TO SAMSUNG CUSTOMERS.

8              SO THIS ISN'T ABOUT MARKET SHARE.  IT'S ABOUT DIMINISHED

9        DEMAND FOR SAMSUNG PHONES.

10             IT WAS THEN USED IN THE ANALYSIS.

11             THE COURT:  SO THEN TO SAY, WELL, IF THIS FEATURE

12       WASN'T OFFERED IN A SAMSUNG PHONE DURING THE PERIOD THAT DESIGN

13       AROUNDS WERE IN DEVELOPMENT, THEN THOSE SALES WOULD HAVE GONE

14       TO SOMEONE ELSE, AND THEN DR. VELLTURO USED THE MARKET SHARE

15       DATA TO CALCULATE HOW THAT REALLOCATION WOULD BE ASSIGNED.

16             MS. KREVANS:  ALL DR. HAUSER DID WAS SAY, "WHAT DOES

17       THIS MODEL TELL ME ABOUT HOW MUCH LESS DEMAND THERE WOULD BE

18       FOR THE PARTICULAR PHONES THAT INFRINGED?"

19             DR. VELLTURO THEN TOOK THAT INFORMATION, LOOKED AT ALL OF

20       THE MARKET -- AND OF COURSE SAMSUNG HAS PHONES THAT AREN'T

21       ACCUSED OF INFRINGEMENT.

22             THE COURT:  BUT I DON'T SEE HOW YOU CAN DO THAT.

23       THOSE ACCUSED PHONES HAVE MORE THAN SIX FEATURES.  I CAN'T

24       SEE -- BLESS YOU -- HOW YOU WOULD SAY, "WELL, IF YOU DON'T HAVE

25       INPUT ASSISTANCE" -- I DON'T EVEN KNOW WHAT THAT MEANS -- "IF
```

1      YOU DON'T HAVE INPUT ASSISTANCE, THEN THAT WHOLE GALAXY PHONE

2      WOULD NOT BE PURCHASED."

3              MS. KREVANS:  WELL, INPUT ASSISTANCE IS WHAT HE CALLS

4      IT IN HIS REPORT, BUT IN THE SURVEY, WHEN YOU GET IT TOMORROW,

5      YOU'LL SEE IT'S ALL DESCRIBED.

6              THE COURT:  I KNOW.  BUT I'M JUST SAYING THAT IT HAS

7      SO MANY DIFFERENT FEATURES, TO JUST ISOLATE IT TO SIX, TO THEN

8      DRAW THE CONCLUSION THAT OBVIOUSLY THAT WHOLE PHONE WOULD NOT

9      BE PURCHASED IF THAT ONE ITEM IS MISSING --

10             MS. KREVANS:  I THINK, YOUR HONOR, HERE'S WHERE YOU,

11     YOU HAVE TO LOOK TO SEE, WHAT DO PEOPLE IN THIS FIELD SAY ABOUT

12     THIS TECHNIQUE?  IS IT ACCEPTED?  DO MATHEMATICIANS AND

13     STATISTICIANS WHO REALLY DO THIS SAY THAT THIS IS A RELIABLE,

14     VALID METHOD TO MEASURE THE LOWERING OF DEMAND?

15          AND THE ANSWER IS THEY DO, AND WE HAVE THAT EVIDENCE IN

16     THE RECORD.

17             THE COURT:  AND THAT'S THAT SAWTOOTH?

18             MS. KREVANS:  SAWTOOTH, AND THERE ARE ALSO ARTICLES

19     THAT WE CITED IN OUR BRIEF AND THAT ARE CITED IN DR. HAUSER'S

20     REPORT.

21             THE COURT:  DID YOU PROVIDE COPIES OF THOSE ARTICLES?

22     I HAVEN'T LOOKED.  I'M SORRY.

23             MS. KREVANS:  THEY ARE EXHIBITS TO THE MCKRACKEN

24     DECLARATION.

25             THE COURT:  ALL RIGHT.  THANK YOU.

1        MR. QUINN:  YOUR HONOR, BEFORE WE CHANGE SUBJECTS,

2    COULD I --

3        THE COURT:  QUICKLY, BECAUSE I DO HAVE SOME MORE

4    QUESTIONS AND I KNOW YOU WANTED TO SPEAK ON OTHER ISSUES.

5        MS. KREVANS:  YES.  THANK YOU, YOUR HONOR.

6        THE COURT:  LET'S RESOLVE THIS ONE QUESTION.

7        MR. QUINN:  YOUR HONOR, WHEN YOU LOOK AT THESE

8    FEATURES THAT WERE TESTED, COUNSEL READ ALONG THE LEFT-HAND

9    COLUMN OF THE CHART WHAT THE MAJOR SORT OF CATEGORIES ARE.

10       THE COURT:  UM-HUM.

11       MR. QUINN:  THEY WEREN'T ASKED ABOUT THOSE THINGS ON

12   THE LEFT-HAND SIDE.  THEY WERE ASKED ABOUT THESE INDIVIDUAL

13   LITTLE FEATURES INSIDE, WHICH ARE THINGS LIKE VOICE TO TEXT,

14   THREE-WAY CALLING, BUDDY SMILE.

15       THEY DID NOT TEST ANY OF THESE THINGS THAT APPLE ITSELF --

16   IF WE COULD LOOK AT SLIDE 23 -- SAYS MATTERS.  NOT PIXEL

17   QUALITY.  NOT CONNECTIVITY.  NOT ANY OF THESE THINGS.

18       AND THAT'S WHAT RUNS RIGHT EXACTLY INTO WHAT JUDGE ALSUP

19   SAID IN THE ORACLE DECISION WHERE HE SAID -- IF WE COULD LOOK

20   AT --

21       THE COURT:  YOU DON'T NEED TO GO INTO JUDGE ALSUP'S

22   DECISION ANY MORE.

23       MR. QUINN:  ALL RIGHT.

24       THE COURT:  I AM FAMILIAR WITH THAT.

25       MR. QUINN:  IF WE COULD LOOK AT SLIDE 21?  THIS STUDY

1    IS ON ALL FOURS WITH WHAT WAS REJECTED IN THE ORACLE CASE.

2    THERE PROFESSOR SHUGAN PURPORTED TO MEASURE THE PERCENTAGE OF,

3    YOU KNOW, ANDROID PURCHASERS WHO WOULD NOT HAVE PURCHASED AN

4    ANDROID PHONE IF THE ACCUSED FUNCTIONALITY WASN'T IN THERE, AND

5    JUDGE ALSUP SAID YOU CAN'T IGNORE THE ELEPHANT IN THE ROOM.

6    YOU CAN'T ASK THEM ABOUT THESE TINY LITTLE FEATURES AND MAKE

7    CONCLUSIONS ABOUT SHIFT IN MARKET SHARE WHEN THESE KINDS OF

8    THINGS ARE NOT THE KINDS OF THINGS THAT DRIVE SALES.

9         AND, YOU KNOW, THAT'S -- THIS IS -- THIS HAS NEVER -- THIS

10   WAS NOT DONE IN THE PREVIOUS CASE.  THEY -- IN FACT, THEY TOLD

11   THE COURT, THEY WENT OUT OF THEIR WAY IN OUR IN LIMINE

12   MOTION -- IF WE COULD LOOK --

13             THE COURT:  NOW, YOU KNOW, HOW AM I SUPPOSED TO KNOW

14   THAT?  LIKE WHAT ACTUALLY -- LIKE WHAT IS WRONG WITH AN EXPERT

15   TRYING TO DO THIS CALCULATION OF WHAT THE DIMINISHED DEMAND

16   PERCENTAGE WOULD BE?  WHAT IS WRONG WITH THAT?  THAT IT'S

17   UNRELIABLE?

18             MR. QUINN:  IN THIS CASE, YES.

19        WE ARE NOT ARGUING THAT CONJOINT ANALYSIS IS

20   INAPPROPRIATE.

21             THE COURT:  OKAY.

22             MR. QUINN:  WE'RE NOT ARGUING THAT USE OF THIS

23   OUTSIDE OPTION IS INAPPROPRIATE.  WE'RE NOT ARGUING THAT.

24        WE'RE SAYING THAT IF YOU'RE DEALING WITH A COMPLEX PRODUCT

25   WITH MANY FEATURES, THIS CONJOINT CHOICE-BASED ANALYSIS WITH

1     THE OUTSIDE OPTION WILL NOT GIVE YOU A RELIABLE RESULT IF YOU

2     FOCUS ONLY ON A HANDFUL OF FEATURES AND YOU LEAVE OUT THE

3     THINGS THAT PEOPLE REALLY CARE ABOUT.  THAT'S WHAT JUDGE ALSUP

4     SAID.

5          AND WITH RESPECT, THAT I WILL -- THERE IS NO AUTHORITY

6     THAT SUPPORTS THAT.

7          IF YOU LOOK AT THAT SAWTOOTH --

8          THE COURT:  OKAY.  SEPARATE FROM THE NO AUTHORITY,

9     BECAUSE I AGREE THAT THAT IS NOT NECESSARILY THE TEST, TELL ME

10    WHY THIS DOES NOT MEET 702.  IT'S UNRELIABLE BECAUSE IT'S NOT

11    TAKING INTO ACCOUNT THE FULL, MULTIFACETED FEATURES OF THE

12    COMPLEX PRODUCT?

13         MR. QUINN:  YEAH, BECAUSE IT DOES NOT -- IT'S

14    COMPLETELY UNRELIABLE.

15         THE COURT:  OKAY.

16         MR. QUINN:  AND THEN IT DOES -- IT PURPORTS TO TELL

17    JURORS THAT IN THE BUT FOR WORLD, SAMSUNG WOULD HAVE LOST -- IF

18    WE CAN LOOK AT SLIDE 2 -- SAMSUNG WOULD HAVE LOST THESE

19    PERCENTAGE OF SHARES.

20         THIS IS WHAT'S NEW.  THIS IS THE WILLINGNESS TO BUY.

21    THEY'VE -- APPLE HAS NEVER OFFERED THIS BEFORE IN THE PREVIOUS

22    CASE.  THIS IS THE SHIFT.

23         THIS IS THE MARKET SHARE, YOUR HONOR.  IT'S THAT, THOSE

24    NUMBERS THAT VELLTURO THEN TAKES SUBSCRIPTION DATA AND APPLIES

25    IT TO.  IT COMES FROM HERE.

1       AND IT'S UNRELIABLE BECAUSE, AS JUDGE ALSUP SAID, YOU --

2   YOU CAN'T QUESTION PEOPLE -- YOU KNOW, YOU CAN'T SHOW THEM AN

3   ANIMATION OF A DINKY, SMALL FEATURE, HAVE THEM READ TEXT ABOUT

4   IT, GIVE THEM AN ICON, IGNORE THE ELEPHANTS IN THE ROOM ABOUT

5   THE REAL THINGS THAT DRIVE PURCHASES, AND THEN LOOK AT THEIR

6   ANSWERS AND PROJECT CHANGES, THESE TYPES OF CHANGES IN SALES.

7       IT'S COMPLETELY UNRELIABLE INFORMATION, AND THAT'S -- IT

8   DOESN'T -- AS ALSUP SAID, IT DOESN'T TELL YOU WHY PEOPLE MAKE

9   DECISIONS IN BUYING PHONES.

10          THE COURT:  OKAY.

11          MR. QUINN:  IT JUST -- AND, YOUR HONOR, THE --

12          THE COURT:  WHAT DIFFERENCE DOES THIS MAKE IN TERMS

13   OF THE DAMAGES?  IS THIS A $100 MILLION QUESTION?

14          MR. QUINN:  THIS IS A BIG QUESTION.  I MEAN, THIS

15   WOULD KNOCK OUT EVERYTHING BUT THE -- EVERYTHING BUT THE BLACK

16   OUT DAMAGES DEPENDS ON THIS.

17       BUT, YOUR HONOR, IT'S -- THERE'S SIMPLY -- THEY -- AND

18   WHEN I SAY THERE'S NO AUTHORITY FOR THIS --

19          THE COURT:  UM-HUM.

20          MR. QUINN:  -- I HOPE THE COURT WILL HAVE A CHANCE TO

21   READ THAT SAWTOOTH ARTICLE THEY REFER TO.

22          THE COURT:  OKAY.

23          MR. QUINN:  BECAUSE IN THAT, THERE ARE STATEMENTS

24   ABOUT THE VALUE OF THE OUTSIDE OPTION AS A WAY, IN SOME

25   CIRCUMSTANCES, OF MAKING PROJECTIONS ABOUT CHANGES.

1     THERE'S NOTHING IN THAT THAT WOULD SUPPORT THIS TYPE OF

2     USE OF THE OUTSIDE OPTION.

3     AGAIN, I'M NOT SAYING CONJOINT SURVEYS ARE NEVER

4     INAPPROPRIATE -- ARE NEVER APPROPRIATE OR USING OUTSIDE

5     OPTIONS.

6     THE OTHER STUDY THEY TALK ABOUT, IT'S THE GEDIDI STUDY

7     THAT THEY CITE IN THEIR PAPERS, IN THAT CASE THERE WAS A -- IT

8     WAS COMPAQ COMPUTER THAT DID A SURVEY WHERE THEY WERE ASKED TO

9     ASSUME FIVE ATTRIBUTES THAT DRIVE PURCHASE DECISIONS.  THEY'RE

10    ASKED TO ASSUME THAT.

11    AND THEN THEY DID A STUDY WITH THE OUTSIDE OPTION AND MADE

12    PROJECTIONS ABOUT HOW IF YOU REMOVE ONE OF THESE ATTRIBUTES,

13    WHICH ARE ASSUMED TO DRIVE PURCHASE DECISIONS, WHAT THE

14    CONSEQUENCES OF THAT WOULD BE.

15    WE DON'T HAVE THAT HERE.  WE DON'T HAVE THAT HERE.  HAUSER

16    SAID "I DIDN'T DO THAT PRE-STUDY," WHICH EVEN SHUGAN DID TO SEE

17    WHAT REALLY DRIVES PURCHASES.

18    HE IGNORED THE APPLE DATA.  HE IGNORED THE APPLE DATA

19    ABOUT WHAT ACTUALLY DRIVES PURCHASES.  PRICE WAS AN ISSUE.

20    THE OTHER STUDY THERE WAS A BATTERY STUDY WHERE, YOU KNOW,

21    THERE ARE FIVE FEATURES OF BATTERIES AND THE CONCLUSION WAS, IF

22    YOU VARY THE PRICE, IT CAN TELL YOU, YOU KNOW, HOW MANY

23    BATTERIES YOU'LL SELL AT DIFFERENT LEVELS.

24    BUT IF I CAN -- JUST TO WRAP UP, YOUR HONOR, I KNOW THE

25    COURT WANTS TO MOVE ON -- IF WE CAN GO BACK TO SLIDE 21 -- IN

1    THE SHUGAN STUDY THAT WAS DONE IN THE ORACLE CASE, PRICE,

2    SCREEN SIZE, OPERATING SYSTEM WERE ALL ATTRIBUTES THAT WERE

3    STUDIED, ALONG WITH THESE TRIVIAL FEATURES LIKE VOICE COMMAND

4    AND START UP TIME FOR APPLICATIONS AND THINGS LIKE THAT, AND

5    THEY TRIED TO ATTACH A VALUE TO, YOU KNOW, FASTER START UP TIME

6    AND JUDGE ALSUP SAID, "LOOK, THERE ARE -- YOU KNOW, SHUGAN HAS

7    IDENTIFIED 29 DIFFERENT FACTORS THAT INFLUENCE PURCHASE

8    DECISIONS.  YOU CAN'T JUST ASK PEOPLE ABOUT FIVE OR SIX OF

9    THEM, EVEN IF SOME OF THEM ARE REALLY IMPORTANT FEATURES."

10        AND THAT'S EXACTLY WHAT HAPPENED HERE.  THERE'S NO

11   AUTHORITY -- I STAND BY MY STATEMENT, THERE'S NO ACADEMIC

12   AUTHORITY THAT SUPPORTS THIS USE OF THE CONJOINT ANALYSIS.

13   IT'S NOT SOMETHING THAT THEY EVER USED BEFORE.

14        YOU KNOW, THE DIMINISHED DEMAND DAMAGES THAT WE'RE TALKING

15   ABOUT, WHAT DOES THIS GET?  IT'S A NUMBER OF ABOUT $600 TO $700

16   MILLION.  $600 TO $700 MILLION.

17        THEY ATTACH A VALUE ON ONE PATENT OF OVER $15 THROUGH

18   THAT, THROUGH THE HAUSER STUDY WHICH, YOU KNOW, IN THE MOTOROLA

19   CASE IN CHICAGO THEIR EXPERT SAID WAS WORTH $.60.

20        AND THE WHOLE REASON FOR THIS IS TO GET SOMETHING CLOSE TO

21   A $2 BILLION NUMBER OUT IN FRONT OF THE JURY.  THAT'S WHY IT'S

22   SO UNFAIR, YOUR HONOR.  IT'S NOT -- IT'S NOT APPROPRIATE TO LET

23   THIS KIND OF STUDY IN AND THEN SAY, LEAVE IT UP TO

24   CROSS-EXAMINATION.

25        YOU REMEMBER, WHEN THEY PUT HAUSER ON THE STAND IN THE

```
 1        FIRST TRIAL, I THINK HE WAS UP THERE FOR, WE LOOKED IT UP --

 2                THE COURT:  I REMEMBER.

 3                MR. QUINN:  -- TWO MINUTES, THREE --

 4                THE COURT:  CAN I ASK YOU ANOTHER QUESTION?

 5                MR. QUINN:  YES, YOUR HONOR.

 6                THE COURT:  THANK YOU.  I -- AS I'VE SAID, MY

 7        TENTATIVE IS TO RULE IN YOUR FAVOR THAT APPLE SHOULD NOT BE

 8        ABLE TO GET LOST PROFITS IN BY CALLING IT A REASONABLE ROYALTY.

 9             BUT MY -- I DO HAVE SOME HESITATION IN THAT A

10        GEORGIA PACIFIC FACTOR IS THE ANTICIPATED AMOUNT OF PROFITS

11        THAT THE PROSPECTIVE LICENSOR REASONABLY THINKS HE WOULD LOSE

12        AS A RESULT OF LICENSING THE PATENT AS COMPARED TO THE

13        ANTICIPATED ROYALTY INCOME, AND IN RITE-HITE, THE FEDERAL

14        CIRCUIT, EN BANC, DID SAY THE FACT THAT THE AWARD WAS BASED ON

15        WAS A SIGNIFICANT PORTION OF THE PATENTEE'S PROFITS ALSO DOES

16        NOT MAKE THE AWARD UNREASONABLE.

17             SO HOW AM I SUPPOSED TO SQUARE -- I MEAN, I STILL FEEL

18        LIKE IT'S NOT CORRECT, IF YOU'RE NOT ENTITLED TO LOST PROFITS,

19        YOU SHOULDN'T BE ABLE TO SQUEEZE IT IN BY CALLING IT A BANANA.

20             BUT HOW AM I SUPPOSED TO RECONCILE THAT WITH --

21                MR. QUINN:  RIGHT.

22                THE COURT:  -- THESE TWO?

23                MR. QUINN:  IF WE COULD LOOK AT THAT EDGEWORTH BOX

24        SLIDE.

25             THIS IS THE REASONABLE NEGOTIATION ANALYSIS THAT
```

1   DR. VELLTURO DOES.  HE CONCLUDED THAT SAMSUNG'S WILLINGNESS TO

2   PAY IS ON THE RIGHT-HAND SIDE.  APPLE'S WILLINGNESS TO ACCEPT

3   FOR ALL OF THESE PATENTS, WHICH ADDS UP TO $40, $40 PER UNIT IS

4   THE LOST PROFITS NUMBER WHICH HE TIES BACK TO HAUSER, AND HE

5   CONCLUDED THAT THE RESULT OF A REASONABLE NEGOTIATION WOULD BE

6   THAT SAMSUNG WOULD SIMPLY RAISE PRICES AND PAY EVERYTHING THAT

7   APPLE IS WILLING TO ACCEPT.

8        THE COURT:  BUT ANSWER MY QUESTION.  I'M RUNNING OUT

9   OF TIME HERE.  I WANT AN ANSWER TO MY QUESTION.  AM I SUPPOSED

10  TO JUST IGNORE THIS GEORGIA PACIFIC FACTOR AND --

11       MR. QUINN:  NO.  IT'S A CONSIDERATION.

12       THE COURT:  -- THAT'S ANOTHER BASIS OF REVERSAL TO

13  ADD TO THE PILE?  I MEAN --

14       MR. QUINN:  YOUR HONOR, LOST PROFITS IS A FACTOR.

15  BUT IT DOESN'T MEAN THAT YOU DEFAULT AND THAT'S THE END OF THE

16  INQUIRY.

17       IF YOU LOOK AT WHAT DR. VELLTURO DOES, HE GOES THROUGH ALL

18  THE GEORGIA PACIFIC FACTORS, OR AT LEAST TICKS THEM OFF, AND

19  CONCLUDES THAT NONE OF THEM ADJUST HIS ANALYSIS.  NONE OF THEM

20  MATTER.  NONE OF THE LICENSES MATTER.  NONE OF THE OTHER

21  FACTORS MATTER.  THE ONLY THING THAT MATTERS ARE THE LOST

22  PROFITS.

23       SO I ACKNOWLEDGE THAT THE LAW IS THAT IT'S SOMETHING TO BE

24  TAKEN INTO ACCOUNT UNDER GEORGIA PACIFIC, BUT THAT'S SOMETHING

25  VERY DIFFERENT THAN WHAT HE SAID HERE WHERE HE DEFAULTS TO

1    THAT'S THE ONLY THING THAT MATTERS, THEY SHOULD GET THE ENTIRE

2    LOST PROFITS NUMBER.

3              THE COURT:  AND HOW DO I DISTINGUISH RITE-HITE?

4              MR. QUINN:  BECAUSE IN THAT CASE THEY WEREN'T SEEKING

5    100 PERCENT OF THE PROFITS.  I MEAN, HE DIDN'T GO THROUGH THIS

6    PANDUIT ANALYSIS WHERE -- WE'RE ONLY TALKING ABOUT SALES HERE

7    WHICH VELLTURO HAS DETERMINED -- YOU KNOW, THEY CAN'T MAKE A

8    LOST PROFITS CASE UNDER PANDUIT, SO WHAT'S LEFT?  AND HE

9    DECIDES -- IT'S JUST A BACK DOOR WAY OF COLLECTING THE SAME

10   THING, 100 PERCENT OF THE LOST PROFITS.

11             THE COURT:  ALL RIGHT.  LET ME THEN ASK APPLE, I'LL

12   GIVE YOU AN OPPORTUNITY TO BE HEARD ON THIS.  I DO HAVE A

13   QUESTION, AND THAT IS, IF I DO EXCLUDE THE WILLINGNESS TO

14   ACCEPT, WILL THEN DR. VELLTURO JUST RELY ON SAMSUNG'S

15   WILLINGNESS TO PAY?

16             MS. KREVANS:  THAT IS CERTAINLY IN HIS REPORT, YOUR

17   HONOR.

18             THE COURT:  UM-HUM.

19             MS. KREVANS:  WE WOULD HAVE TO DISCUSS WITH HIM

20   WHETHER -- BECAUSE, IN FACT, HE DID LOOK AT MANY OTHER

21   CONSIDERATIONS -- WHETHER, IN FACT, HIS OPINION WOULD BE, IF

22   HE'S NOT ALLOWED TO TESTIFY TO WILLINGNESS TO ACCEPT, WHETHER

23   THE NUMBER, IN FACT, IS PROPERLY IN BETWEEN THE TWO.

24        SO THIS IS THE THING I -- WE REALLY DO HAVE TO TALK TO

25   HIM, AND THIS IS THE THING THAT I SAID BEFORE, WE WILL COME

```
 1         BACK VERY PROMPTLY TO YOU IF YOU DO MAINTAIN THIS RULING.

 2              BUT I'D LIKE TO HAVE A SHOT AT EXPLAINING WHY --

 3                   THE COURT:  LET ME ASK YOU ONE MORE QUESTION AND THEN

 4         I'LL GIVE YOU AN OPPORTUNITY TO TRY TO FIGHT THE TENTATIVE.

 5                   MS. KREVANS:  OKAY.

 6                   THE COURT:  WAS THERE ANYTHING UNEXPECTED GIVING

 7         APPLE A REASON TO EXPECT LOST PROFITS DURING THIS PERIOD, EVEN

 8         THOUGH IT WAS NOT ENTITLED TO LOST PROFITS DURING THIS PERIOD?

 9                   MS. KREVANS:  I'M NOT SURE I UNDERSTAND THE QUESTION,

10         YOUR HONOR.

11                   THE COURT:  I'M JUST WONDERING IF, DURING THE

12         RELEVANT PERIOD, THERE WAS SOMETHING THAT OCCURRED THAT GAVE

13         APPLE AN EXPECTATION OF LOST PROFITS, EVEN IF APPLE WASN'T

14         ENTITLED TO LOST PROFITS DURING THIS TIME PERIOD.

15                   MS. KREVANS:  SO LET ME TRY THIS.

16                   THE COURT:  UM-HUM.

17                   MS. KREVANS:  I THINK THERE ARE TWO DIFFERENT

18         ANALYSES GOING ON HERE.

19                   THE COURT:  UM-HUM.

20                   MS. KREVANS:  AND RITE-HITE, I WOULD SUBMIT TO YOU --

21         GEORGIA PACIFIC IS VERY INSTRUCTIVE.  RITE-HITE IS THE KEY

22         CASE.  A, IT'S EN BANC; AND, B, IT'S ACTUALLY A CASE IN WHICH

23         THE PLAINTIFF ASKED FOR, AND GOT, BOTH LOST PROFIT DAMAGES AND

24         REASONABLE ROYALTY DAMAGES ON THE UNITS THAT WERE NOT ELIGIBLE

25         FOR LOST PROFITS.  IT'S EXPLICIT IN THE OPINION, AND I'LL SHOW
```

1    YOU WHERE.

2        SO IN THE CASE LAW, INCLUDING IN RITE-HITE AND OTHER CASES

3    THAT WE CITED IN OUR BRIEF, WHAT THE COURT SAYS WOULD HAPPEN IN

4    THE HYPOTHETICAL NEGOTIATION IS THAT THE PARTIES WOULD SIT DOWN

5    AND THE THING THAT WOULD BE IN THE PATENTEE'S MIND WOULD BE,

6    ALONG WITH OTHER CONSIDERATIONS, HOW MUCH INCOME WILL I LOSE,

7    IF ANY, IF I GIVE THESE PEOPLE A LICENSE?  THAT'S THE LOST

8    PROFITS THAT THEY HAVE IN THEIR MIND AS THEY DO THE

9    NEGOTIATION.

10        AND THAT ENTERS INTO, AND IN SOME CASES IS THE DOMINANT

11    FACTOR, IN WHAT THEY WOULD BE WILLING TO ACCEPT.

12        AND THAT IS ABSOLUTELY AN APPROACH THAT IS BLESSED BY THE

13    FEDERAL CIRCUIT OVER AND OVER AGAIN.

14        IT -- THERE'S NO QUESTION THAT SAMSUNG'S MOTION IS

15    INVITING THE COURT TO COMMIT REVERSIBLE ERROR.  THEIR MOTION,

16    WHICH IS ALL OF ONE PARAGRAPH, SAYS, "DR. VELLTURO CALCULATES A

17    REASONABLE ROYALTY THAT IS BASED ON WHAT APPLE WOULD EXPECT TO

18    LOSE IN PROFITS FROM LICENSING TO SAMSUNG.  IN SO DOING, HE

19    DISPENSES WITH THE CONSIDERATION OF THE PANDUIT FACTORS FOR

20    THESE UNITS.  AS A MATTER OF LAW, THIS IS IMPROPER ," PANDUIT

21    FACTORS BEING, DID YOU TICK OFF ALL THE BOXES?  WAS THERE A

22    SALE THAT WOULDN'T HAVE BEEN MADE?  COULD YOU HAVE MADE IT?  ET

23    CETERA, ET CETERA.

24        AND THEY CITE RITE-HITE, BUT THEY'RE CITING THE DISSENT,

25    AND THE REASON THAT THE DISSENT SAID "I DON'T THINK THAT A

1    PATENT, WHEN A PATENTEE IS NOT ENTITLED TO LOST PROFITS,"

2    MEANING THAT THEY'RE NOT ENTITLED TO LOST PROFITS ON THOSE

3    UNITS OF PRODUCT, "LOST PROFITS MAY NOT, IN EFFECT, BE AWARDED

4    BY MERELY LABELING THE BASIS A REASONABLE ROYALTY."

5         THE REASON THAT WAS IN THE DISSENT IS BECAUSE THE MAJORITY

6    CAME OUT THE OTHER WAY, AND THEY WERE QUITE EXPLICIT ABOUT IT.

7    SO IF YOU LOOK AT RITE-HITE, IN THE MAJORITY OPINION, EARLY ON

8    IN THE OPINION -- AND IF THERE'S ANY DOUBT ABOUT THIS, YOU CAN

9    LOOK AT THE DISTRICT COURT OPINION WHICH IS AT 774 F.SUPP 1514.

10        THEY START OUT AT 1543 OF THE FEDERAL CIRCUIT OPINION

11   SAYING THERE WERE 3,825 INFRINGING DEVICES.  THESE NUMBERS ARE

12   QUITE IMPORTANT.

13        FOR -- OF THAT 3,825, THE DISTRICT COURT FOUND THAT THE

14   BUT FOR TEST FOR LOST PROFIT ENTITLEMENT TO DAMAGES WAS MET FOR

15   3,323.  THERE WERE 3,243 OF ONE PRODUCT AND 80 OF ANOTHER.

16        SO THERE WERE 3,825 INFRINGING PRODUCTS SOLD, THE DISTRICT

17   COURT AND THE FEDERAL CIRCUIT SAID 3,323 ARE ENTITLED TO BE

18   TREATED AS LOST PROFITS REMEDY UNITS.  THEY MET THE BUT FOR

19   TEST.

20        HERE IT'S COMPLICATED, BUT IN THE DISTRICT COURT OPINION,

21   THEY EXPLAINED THAT THE EVIDENCE THAT WE LOST A SALE WAS DID WE

22   GO TRY TO MAKE THE SALE TO THAT CUSTOMER FIRST, AND THEY

23   COULDN'T PROVE THAT THEY HAD TRIED FOR ALL 3,800.  FOR 502,

24   THEY COULDN'T PROVE THE BUT FOR TEST FOR LOST PROFITS.

25        SO WHAT HAPPENED IN THE DISTRICT COURT AND THE FEDERAL

1    CIRCUIT OPINION?

2         THE LOST PROFITS FOR THE 3300 UNITS ARE PROVED, BUT THERE

3    ARE 500 LEFT THAT ARE NOT ENTITLED TO LOST PROFITS BECAUSE THEY

4    DON'T MEET THE BUT FOR TEST.  THE UNIT WOULD NOT HAVE BEEN SOLD

5    OTHERWISE.

6         STILL HAVE TO GET A REASONABLE ROYALTY.  AT PAGE 1554 OF

7    RITE-HITE -- AND I HAVE COPIES OF THE CASE IF IT'S CONVENIENT

8    FOR THE COURT -- STARTING AT SECTION 4, COMPUTATION OF

9    REASONABLE ROYALTY.  "THE DISTRICT COURT FOUND THAT RITE-HITE,

10   AS THE MANUFACTURER, WAS ENTITLED TO AN AWARD OF A REASONABLE

11   ROYALTY ON 502 INFRINGING DEVICES, FOR WHICH IT HADN'T PROVED

12   IT CONTACTED THE CUSTOMER PRIOR TO THE INFRINGING SALE."

13        THE COURT AWARDED A ROYALTY EQUAL TO APPROXIMATELY 50

14   PERCENT OF RITE-HITE'S ESTIMATED LOST PROFITS PER UNIT SOLD TO

15   RETAILERS.

16        THEN THERE WAS ACTUALLY AN ADDITIONAL ROYALTY ALSO BASED

17   ON LOST PROFITS AWARDED ON THOSE SAME UNITS FOR THE

18   DISTRIBUTION LEVEL OF THE RITE-HITE COMPANY, ANOTHER 30

19   PERCENT, AND THIS WAS CHALLENGED AS ERROR AND THE FEDERAL

20   CIRCUIT SAID THIS WAS CORRECT.

21        NOW, WE KNOW RIGHT HERE WE'RE STARTING WITH UNITS THAT, BY

22   DEFINITION, THE COURT HAS ALREADY FOUND ARE NOT ELIGIBLE FOR

23   LOST PROFITS PER SE, DON'T MEET THE PANDUIT FACTORS.

24        SO RIGHT THERE, THAT DISPENSES OF SAMSUNG'S ARGUMENT.

25   THEY SAY YOU CAN'T GET LOST PROFITS AND SKIP THE PANDUIT

1    FACTORS.

2        THE FEDERAL CIRCUIT IN RITE-HITE SAYS THAT'S WRONG.

3        NOW, CAN YOU EXPLICITLY BASE YOUR REASONABLE ROYALTY ON

4    LOST PROFITS?  THE FEDERAL CIRCUIT IN RITE-HITE SAYS YES, AND

5    THERE ARE NUMEROUS OTHER CASES THAT DO THE SAME THING.

6        THIS -- THE ROYALTY HERE WAS BASED ON A PERCENTAGE OF THE

7    LOST INCOME THAT RITE-HITE WOULD HAVE HAD IN MIND ON THE

8    NEGOTIATION TABLE IF IT GAVE THE LICENSE, AND THAT'S ALL IT IS.

9        IT IS ENTIRELY BASED ON LOST PROFITS IN THE SENSE THAT

10    IT'S A PERCENTAGE OF THAT AMOUNT, AND THERE ARE A NUMBER OF

11    OTHER CASES LIKE THIS AS WELL.

12        THERE'S NOTHING WRONG WITH THAT.

13        NOW, IT'S NOT 100 PERCENT OF THE LOST PROFITS IN

14    RITE-HITE.

15        THAT'S NOT 100 PERCENT OF APPLE'S LOST PROFITS, EITHER,

16    YOUR HONOR.  AND I CAN'T SAY APPLE'S LOST PROFITS PER UNIT

17    NUMBER OUT LOUD IN COURT BECAUSE THAT'S CONFIDENTIAL, BUT I'M

18    SURE YOU REMEMBER THAT THEY WERE SIGNIFICANTLY DIFFERENT FROM

19    THESE NUMBERS, AND YOU CAN FIND THEM IN EXHIBIT A-17 TO

20    DR. VELLTURO'S EXPERT REPORT IF YOU WANT TO REMIND YOURSELF

21    THAT $40.10 IS NOT, IN FACT, APPLE'S ENTIRE LOST PROFITS.

22        BUT THE BASIC POINT HERE IS FEDERAL CIRCUIT LAW IS 100

23    PERCENT TO THE CONTRARY OF THE ARGUMENT THAT MR. QUINN IS

24    MAKING.  IT IS NOT TRUE THAT, AS A MATTER OF LAW, YOU CAN'T GET

25    A ROYALTY BASED ON LOST PROFITS, WHETHER IT'S A FACT THAT WAS

1  ENTERED INTO IN SOME SORT OF HOLISTIC WAY OR WHETHER IT WAS

2  ACTUALLY DONE BY MULTIPLYING A PERCENTAGE TIMES AN ACTUAL LOST

3  PROFIT NUMBER.  THE FEDERAL CIRCUIT SAYS OTHERWISE, SO IT WOULD

4  BE ERROR TO EXCLUDE IT.

5       IF SAMSUNG WOULD LIKE TO CROSS-EXAMINE MR. VELLTURO ON

6  WHETHER, WHEN HE LOOKED AT THE OTHER GEORGIA PACIFIC FACTORS,

7  WHICH HE DID, HE MADE THE RIGHT DECISION IN DECIDING THAT NONE

8  OF THEM JUSTIFIED REDUCING THAT NUMBER, THEY SHOULD DO THAT.

9       BUT THAT'S NOT DAUBERT.  THAT'S CROSS-EXAMINATION.

10       THE COURT:  DID THEY NOT ASK THAT DURING HIS

11  DEPOSITION?

12       MS. KREVANS:  THEY ASKED A LOT OF QUESTIONS IN HIS

13  DEPOSITION, AND I COULDN'T TELL YOU SPECIFICALLY HOW THEY CHOSE

14  TO SPEND THEIR TIME.  BUT WHATEVER THEY DID WAS THEIR CHOICE,

15  OBVIOUSLY.

16       BUT THE POINT HERE IS THEY SAY AS A MATTER OF LAW THAT

17  THIS IS WRONG.  FEDERAL CIRCUIT, EN BANC, SAYS, AS A MATTER OF

18  LAW, IT'S RIGHT.

19       SO THEY WANT TO QUARREL WITH THE FACTS ABOUT WHETHER, WHEN

20  YOU LOOKED AT THE OTHER FACTORS IN THE GEORGIA PACIFIC

21  ANALYSIS, HE SHOULD HAVE SAID, "GEE, THEY MEAN THAT NUMBER

22  SHOULD HAVE GONE DOWN A LITTLE BIT, SO THE NUMBER REALLY SHOULD

23  HAVE BEEN SOMEWHERE BETWEEN APPLE'S WILLINGNESS TO ACCEPT AND

24  SAMSUNG'S WILLINGNESS TO PAY INSTEAD OF ALL THE WAY AT APPLE'S

25  WILLINGNESS TO ACCEPT."

1          THAT'S CROSS-EXAMINATION, YOUR HONOR, IT'S NOT DAUBERT,

2     AND IT WOULD BE FLATLY -- THE REASON MR. QUINN COULDN'T TELL

3     YOU HOW YOU COULD SQUARE THEIR MOTION WITH GEORGIA PACIFIC AND

4     RITE-HITE IS BECAUSE THEIR MOTION CAN'T BE SQUARED WITH THOSE

5     CASES.

6               THE COURT:  OKAY.

7               MR. QUINN:  BRIEF QUICK POINTS, YOUR HONOR.

8               THE COURT:  GO AHEAD, PLEASE.

9               MR. QUINN:  I WOULD JUST SAY THAT IN TERMS OF WHETHER

10     THIS REPRESENTS ALL APPLE'S PROFITS ON EACH UNIT, OF COURSE

11     WHAT VELLTURO DOES IS DOES THE CALCULATION FOR THE PROFITS

12     ATTRIBUTABLE TO THESE PATENTS, AND THAT'S 100 PERCENT OF THAT.

13     THAT'S WHAT'S IN THAT MIDDLE COLUMN.

14          THE SECOND POINT I WOULD MAKE IS ABOUT THE RITE-HITE

15     DECISION.  IF THE COURT READS THAT, THE COURT WILL SEE THAT THE

16     MAJORITY OPINION SAID THAT THE PATENT AT ISSUE WAS A PIONEERING

17     PATENT WHERE THE PROFITS REALLY -- FOR THE PRODUCT REALLY WERE

18     ATTRIBUTABLE TO THAT PRODUCT, TO THAT PIONEERING PATENT, AND I

19     THINK THAT MAKES THAT DIFFERENT IN TERMS OF THE CONSIDERATION

20     THAT YOU GIVE IN DETERMINING THE REASONABLE ROYALTY, THE

21     CONSIDERATION YOU GIVE TO PROFITS WHEN, AS THE COURT SAID, THIS

22     IS A PIONEERING PATENT THAT HAD PARTICULAR COMMERCIAL VALUE.

23               THE COURT:  OKAY.  SO SAMSUNG'S POSITION IS IF IT'S A

24      PIONEERING PATENT, THEN YOU CAN GET LOST PROFITS FOR A

25      REASONABLE ROYALTY?

```
1            MR. QUINN:  THAT IS HOW I THINK THIS DECISION --

2       I'M SORRY.

3       (DISCUSSION OFF THE RECORD BETWEEN SAMSUNG COUNSEL.)

4            MR. QUINN:  YOUR HONOR, IT'S NOT THAT YOU GET IT.

5   IT'S ONE OF MANY FACTORS --

6            THE COURT:  THAT YOU COULD?

7            MR. QUINN:  -- THAT YOU WEIGH.

8            THE COURT:  OKAY.  SO LEGALLY, LEGALLY YOU CAN GET

9   LOST PROFITS FOR REASONABLE ROYALTY.

10       IT'S JUST THAT YOU THINK, IN THIS INSTANCE, IT'S NOT

11  JUSTIFIED.

12           MR. QUINN:  NO.  I THINK THAT THE LAW IS THAT IT'S

13  SOMETHING THE COURT CAN CONSIDER.  IT'S SOMETHING --

14           THE COURT:  WELL, "CAN CONSIDER" MEANS "CAN DO,"

15  RIGHT?  HAS DISCRETION TO DO?

16           MR. QUINN:  BUT NOTHING THAT -- WE'RE NOT AWARE OF

17  ANY AUTHORITY THAT SAYS THAT YOU DEFAULT UNDER ANY

18  CIRCUMSTANCES TO JUST AN AWARD OF THE LOST PROFITS.

19           THE COURT:  RIGHT.  NO, BUT MY QUESTION IS, IS IT --

20  IS IT LEGAL ERROR TO EVER HAVE A REASONABLE ROYALTY CALCULATION

21  BE THE PLAINTIFF'S LOST PROFITS?

22           MR. QUINN:  I WOULD SAY --

23           THE COURT:  I THINK THE ANSWER TO THAT HAS TO BE NO,

24  RIGHT?

25           MR. QUINN:  IT -- THERE CAN BE CIRCUMSTANCES WHERE IT
```

1    COULD BE AN AWARD OF LOST PROFITS.

2            THE COURT:  YEAH.

3            MR. QUINN:  IF YOU'RE TALKING ABOUT A PIONEERING

4    PATENT WHERE THE PROFITABILITY OF THE COMMERCIAL SUCCESS OF THE

5    PRODUCT IS SOLELY ATTRIBUTABLE TO THAT PATENT, I COULD SEE

6    THAT.

7            THE COURT:  OKAY.

8            MS. KREVANS:  YOUR HONOR, THAT -- NOW HE'S ARGUING

9    THE FACTUAL ISSUE.

10            THE COURT:  RIGHT.  I UNDERSTAND.  I MEAN, IF IT'S --

11    IF IT IS LEGAL TO DO, WHICH IT SOUNDS LIKE SAMSUNG IS CONCEDING

12    UNDER RITE-HITE AND THE GEORGIA PACIFIC FACTORS --

13            MR. QUINN:  YOUR HONOR --

14            THE COURT:  I MEAN, I GUESS YOU STILL HAVE YOUR 702

15    RELIABILITY, IS IT JUSTIFIED IN THIS INSTANCE CHALLENGE, BUT

16    YOU DON'T HAVE A STRAIGHT UP LEGAL CHALLENGE.

17            MR. QUINN:  OUR VIEW ON THIS, YOUR HONOR, IS THERE

18    ARE CLEAR REQUIREMENTS UNDER PANDUIT FOR AN AWARD OF LOST

19    PROFITS.  THOSE STILL HAVE TO BE MET.

20        YOU CAN IMAGINE A CIRCUMSTANCE WHERE THEY COULD BE MET IN

21    THE ROYALTY CONTEXT.

22        BUT YOU STILL HAVE TO MEET THOSE SPECIFIC LEGAL

23    REQUIREMENTS FOR RECOVERY OF LOST PROFITS.

24            THE COURT:  UM-HUM.

25            MR. QUINN:  AND WE DON'T HAVE THAT HERE.

1           AND THEN THE THIRD POINT I WAS GOING TO MAKE, YOUR HONOR,

2      AS TO THAT THIRD COLUMN, YOU BEGAN BY ASKING COUNSEL ABOUT

3      SAMSUNG'S WILLINGNESS TO PAY, AND I DIDN'T KNOW WHY THE COURT

4      WAS ASKING ABOUT THAT, BUT I WANTED TO MAKE SURE THE COURT WAS

5      AWARE THAT THOSE NUMBERS ARE ALSO DERIVED PURELY FROM HAUSER.

6      THOSE REPRESENT SAMSUNG'S -- WHAT HAUSER CALCULATED -- OR WHAT

7      THE DIMINISHED DEMAND, THE UNITS, THE LOST PROFITS ON THE, ON

8      THE SALES THAT SAMSUNG WOULD LOSE IF THE ACCUSED FEATURES WERE

9      TAKEN AWAY ACCORDING TO HAUSER.

10          SO ALL THESE NUMBERS TIE BACK TO HAUSER.  IF THE COURT

11     ACCEPTS OUR VIEW THAT HAUSER SHOULD BE EXCLUDED, THEN BOTH

12     COLUMNS HERE GO.

13             THE COURT:  ALL RIGHT.  DO YOU WANT TO RESPOND TO

14      THAT?  WHY DON'T YOU RESPOND TO, TO BOTH?

15          SO THERE'S AN AGREEMENT THAT LOST PROFITS CAN CONSTITUTE

16     REASONABLE ROYALTY.  THERE'S A DISPUTE AS TO WHETHER THAT'S

17     JUSTIFIED IN THIS INSTANCE.

18          DO YOU AGREE THAT THE PANDUIT FACTORS HAVE TO BE MET IF

19     YOU'RE GOING TO ARGUE FOR REASONABLE ROYALTY?

20             MS. KREVANS:  CLEARLY, YOUR HONOR, THEY DON'T HAVE TO

21      BE, AND THAT'S WHAT RITE-HITE SAYS.

22             THE COURT:  THEY DON'T HAVE TO BE?

23             MS. KREVANS:  THEY DO NOT.  AND WE KNOW THAT FROM

24      RITE-HITE BECAUSE IN RITE-HITE, OF THE 3800 INFRINGING PRODUCTS

25      SOLD, THE DISTRICT COURT AND THE FEDERAL CIRCUIT BOTH CLEARLY

1    DIVIDED THEM INTO THE ONES THAT WERE ELIGIBLE FOR LOST PROFITS

2    UNDER PANDUIT, THAT WAS 3300, AND THE 500 THAT WERE NOT.  THOSE

3    500 HAD FLUNKED PANDUIT, AND YET THEY GOT A ROYALTY THAT WAS

4    BASED ON LOST PROFITS.

5         THE COURT:  OKAY.

6         MS. KREVANS:  AND THAT IS ENTIRELY CONSISTENT WITH

7    ALL THE OTHER FEDERAL CIRCUIT CASE LAW ON WHAT A PARTY SITTING

8    AT THE BARGAINING TABLE WOULD CONSIDER.

9         AND EVERYTHING THAT YOU'VE HEARD, SINCE HE HAD TO GIVE

10   THAT POINT UP, FROM MR. QUINN HAS BEEN BASICALLY AN ARGUMENT

11   THAT ALTHOUGH DR. VELLTURO CONSIDERED THE OTHER KINDS OF

12   FACTORS THAT ONE SHOULD CONSIDER, THEY THINK YOU SHOULD STRIKE

13   HIS OPINION BECAUSE, IN THE END, HE DIDN'T THINK ANY OF THEM

14   JUSTIFIED LOWERING THE ROYALTY HE WOULD ASSESS BELOW THE AMOUNT

15   THAT ONE WOULD GET FROM THE INCOME APPROACH, WHICH IS THE NAME

16   YOU MORE COMMONLY HEAR FOR WHAT THEY'RE NOW CALLING LOST

17   PROFITS.

18        THAT'S A FACTUAL QUESTION.  IT'S NOT A DAUBERT QUESTION.

19   THEY JUST DISAGREE WITH HIS CONCLUSION.

20        BUT THEY CAN'T TELL YOU THAT THERE'S SOMETHING WRONG

21   LEGALLY WITH HIS ANALYSIS BECAUSE THE ONLY LEGAL ATTACK THEY

22   MADE IS THAT, AS A MATTER OF LAW, YOU CAN'T BASE A ROYALTY ON A

23   LOST PROFIT NUMBER IF YOU DON'T MAKE THE PANDUIT FACTORS, AND

24   RITE-HITE CLEARLY TELLS YOU THAT ARGUMENT IS WRONG.

25        THE COURT:  ALL RIGHT.  WHAT ABOUT THE FACT THAT THIS

1    IS ALL BASED ON DR. HAUSER'S, YOU KNOW, DEMAND CHANGE,

2    CALCULATION FROM HIS CONJOINT SURVEY?

3            MS. KREVANS:  IT IS TRUE THAT THE DIMINISHED DEMAND

4    THAT DR. HAUSER MEASURED ALSO ENTERED INTO THE SAMSUNG

5    WILLINGNESS TO PAY NUMBER.

6        IT IS BY NO MEANS THE ONLY THING THAT IS CONSIDERED.

7    THERE'S A LONG SECTION OF DR. VELLTURO'S REPORT THAT WALKS

8    THROUGH HOW HE DETERMINED SAMSUNG'S WILLINGNESS TO PAY.

9            ONE OF THE INPUTS, THOUGH, DEFINITELY WAS THE DIMINISHED

10   DEMAND NUMBER FROM DR. HAUSER.

11           I SHOULD SAY THAT YOU WILL ALSO --

12           THE COURT:  SOME OF THESE CALCULATIONS ARE NOT CLEAR

13   FROM THEIR REPORT.  DO YOU WANT ME -- DO YOU WANT, IF YOU CAN,

14   TO QUICKLY DESCRIBE HOW THE WILLINGNESS TO PAY IS CALCULATED

15   FROM DR. HAUSER'S DEMAND CHANGE NUMBERS?

16           MS. KREVANS:  WELL, IT'S NOT CALCULATED JUST FROM

17   THOSE NUMBERS.

18           THE COURT:  I HEAR YOU.

19           MS. KREVANS:  WHAT COMES FROM THOSE NUMBERS IS A

20   NUMBER OF UNITS TO BE CONSIDERED IN ASSESSING THE TOTAL DOLLARS

21   THAT SAMSUNG WAS WILLING TO PAY.

22       AND IN -- BUT OTHERWISE IT'S REALLY THE FLIP SIDE OF THE

23   GEORGIA PACIFIC/RITE-HITE ANALYSIS FROM THE POINT OF VIEW OF

24   SAMSUNG.

25           SO SAMSUNG IS SITTING AT THE BARGAINING TABLE -- AND I'M

1    SORRY, I DON'T HAVE CITES HERE FOR YOU BECAUSE THEY DIDN'T

2    CHALLENGE THIS IN THEIR DAUBERT MOTION, SO THIS IS A SURPRISE

3    TO ME -- BUT WHAT THE CASES TELL YOU AND WHAT DR. VELLTURO DID

4    IS YOU IMAGINE SAMSUNG AT THE HYPOTHETICAL BARGAINING TABLE

5    TRYING TO DECIDE HOW MUCH IT IS WILLING TO PAY TO LICENSE THIS

6    BASKET OF FEATURES, OR FOR A PATENT ALONE, TO LICENSE THAT

7    PATENT ALONE.

8         AND ONE OF THE THINGS THAT SAMSUNG WOULD BE TAKING INTO

9    ACCOUNT IS HOW MUCH MORE MONEY WILL THEY MAKE IF I CAN PUT

10   THESE FEATURES IN, OR HOW MUCH LESS MONEY WILL I MAKE IF I HAVE

11   TO TAKE THEM OUT?  SO SAMSUNG IS LOOKING AT ITS OWN PROFITS,

12   ITS OWN INCOME, ITS EXPECTATION OF PROFITS.

13        IT'S ALSO LOOKING AT, WHAT DO I THINK THESE FEATURES WILL

14   DO FOR ME IN THE MARKETPLACE?  WILL THEY LET ME COMPETE BETTER

15   WITH APPLE, MY MAIN COMPETITOR?

16        IT'S A WEIGHING ALL OF THOSE THINGS.  SO IT'S WEIGHING,

17   FROM ITS POINT OF VIEW, THE SAME BASKET OF CONSIDERATIONS THAT

18   APPLE IS WEIGHING.  THEY'RE A LITTLE DIFFERENT FROM SAMSUNG'S

19   POINT OF VIEW, IN PART BECAUSE SAMSUNG'S INCOME PICTURE IS

20   DIFFERENT.

21        AND SAMSUNG'S PRICING PICTURE FOR SOME PRODUCTS IS

22   DIFFERENT FROM APPLE'S.  FOR OTHER PRODUCTS IT'S THE SAME.

23        AND ALL THOSE CONSIDERATIONS TOGETHER END UP CAUSING

24   SOMEWHAT OF A GAP BETWEEN THESE NUMBERS.  IN THIS EDGEWORTH BOX

25   ANALYSIS, WHICH IS THIS CHART WE'RE LOOKING AT, WHERE YOU DO

1    THE ANALYSIS -- AND SAMSUNG DOESN'T DISAGREE THAT THIS IS THE

2    RIGHT TYPE OF ANALYSIS.  LOOK AT THE PATENT OWNER'S WILLINGNESS

3    TO ACCEPT.  LOOK AT THE LICENSOR'S, THE INFRINGER'S WILLINGNESS

4    TO PAY.  SEE WHAT THOSE NUMBERS ARE.

5         THE ISSUE ARISES THEN -- AND THIS IS NOT THE ONLY CASE IT

6    ARISES IN -- WHAT HAPPENS IF THE NUMBER APPLE IS WILLING TO

7    ACCEPT IS HIGHER THAN THE NUMBER THAT SAMSUNG IS WILLING TO

8    PAY?

9         IN THE REAL WORLD, THERE WOULDN'T BE A DEAL.

10        BUT WE CAN'T DO THAT REAL WORLD HERE BECAUSE THIS IS THE

11   HYPOTHETICAL WORLD WHERE THERE HAS TO BE A DEAL BECAUSE THERE

12   HAS TO BE A ROYALTY.

13        AND SO DR. HAUSER EXPLAINS IN HIS REPORT THE LOGIC OF HOW

14   YOU WOULD BRIDGE THAT GAP WHERE SAMSUNG HAS NO CHOICE BUT TO

15   LICENSE, AND WHAT THEY WOULD DO, IN EFFECT, AS A BUSINESS

16   ENTITY, IS SAY, "OKAY, WHATEVER WE HAVE TO PAY HERE, EVEN IF

17   IT'S A LITTLE MORE THAN WHAT WE WANT TO PAY" --

18             THE COURT:  UM-HUM.

19             MS. KREVANS:  -- "WE CAN GET IN RAISED PRICES.  OUR

20    INCOME WILL GO UP A LITTLE BIT, AND THAT BRIDGES THE GAP."

21        AND THAT'S ALL LAID OUT IN HIS REPORT.

22             THE COURT:  ALL RIGHT.  LET ME ASK MY LAST QUESTION,

23   AND THAT IS ON DR. MOWRY --

24             MS. KREVANS:  I'M SORRY, YOUR HONOR.  YOU HAD SAID

25   YOU HAVE A TENTATIVE AGAINST US ON THE '414 PATENT ON

1      DR. HAUSER.

2              THE COURT:  OH, YOU WANT TO TALK ABOUT THAT?

3              MS. KREVANS:  I HAVEN'T HAD A CHANCE TO ADDRESS THAT,

4      AND WE CERTAINLY WOULD LIKE TO SEE THAT TENTATIVE NOT BECOME A

5      REAL RULING.

6              THE COURT:  SURE.

7              MS. KREVANS:  SO THE '414 PATENT HAS CLAIM 11 AND

8      CLAIM 20.  CLAIM 20 IS THE ASSERTED CLAIM HERE, AND CLAIM 11 IS

9      THE CLAIM IT DEPENDS ON.

10          AND SO WHEN YOU LOOK AT CLAIM 20, CLAIM 20 DOES NOT

11     CONSIST JUST OF THE ADDITIONAL LIMITATION SET OUT IN THAT

12     CLAIM.  IT'S A COMBINATION OF ALL THE LIMITATIONS OF CLAIM 11,

13     PLUS THE CLAIM 20 LIMITATION.  SO IT'S THAT WHOLE SET.

14          WHAT WAS TESTED IN THE SURVEY, DR. HAUSER THOUGHT AND THE

15     TECHNICAL EXPERTS WHO GAVE TESTIMONY ON THIS THOUGHT, WAS A

16     FAIR REPRESENTATION OF BOTH CLAIMS.

17          THE LIMITATION THAT'S ADDED TO CLAIM 11 IS FUNCTIONALITY

18     THAT SAMSUNG COULD NOT HAVE REMOVED.

19          AND SO WHEN YOU SAY, DOES IT MAKE ANY DIFFERENCE TO THE

20     SURVEY, IN TERMS OF WHAT KIND OF DEMAND CHANGE IT MEASURES, TO

21     HAVE OR HAVE NOT THE ADDITIONAL LIMITATION OF CLAIM 20, THE

22     ANSWER IS IT DOESN'T MAKE ANY DIFFERENCE TO MEASURING DEMAND

23     BECAUSE SAMSUNG COULDN'T TAKE THAT LIMITATION OUT AND TURN THIS

24     BACK INTO CLAIM 11.

25              THE COURT:  WELL, WHY DON'T I JUST TELL YOU WHAT THE

```
1      TENTATIVE IS BASED ON?

2               MS. KREVANS:  OKAY.

3               THE COURT:  APPLE AND ITS EXPERTS HAVE CONCEDED THAT

4      CLAIM 20 REQUIRES THREE SYNCHRONIZATION COMPONENTS, WHILE

5      CLAIM 11 REQUIRES ONLY ONE, AND IT SHOWS UP IN THE SNOEREN

6      REBUTTAL REPORT, APPLE'S OPPOSITION, AT ONE OF THE HEARINGS.

7               AND THE CONCERN IS THAT DR. HAUSER'S STATEMENT REGARDING

8      THE '414 PATENT SUGGESTS THAT THE PATENT COVERS ONLY ONE

9      SYNCHRONIZATION COMPONENT BECAUSE IT SAYS "THE BACKGROUND

10     SYNCING FEATURE ALLOWS YOU TO CONTINUE TO USE AN APP WHILE DATA

11     RELATED TO THAT APP THAT IS STORED ON YOUR SMARTPHONE," ET

12     CETERA, ET CETERA.  "WITHOUT THIS FEATURE, YOU WOULD HAVE TO

13     WAIT TO USE AN APP, FOR EXAMPLE, THE CONTACTS APP, WHILE THE

14     DATA FOR THE APP IS SYNCHRONIZING WITH THE REMOTE COMPUTER AND

15     THAT WAIT MIGHT BE LONG OR SHORT."

16              SO, I MEAN, YOU HAVE REPEATED PLACES WHERE YOU SAY, NO,

17     WHAT THE DIFFERENCE IS, IS THAT CLAIM 20 REQUIRES AT LEAST

18     THREE DISTINCT SYNCHRONIZATION SOFTWARE COMPONENTS, YOU KNOW,

19     EACH OF WHICH PROVIDES ITS OWN SYNCHRONIZATION PROCESSING

20     THREADS TO SYNCHRONIZE A CORRESPONDING DATA CLASS.

21              BUT YET, IN HIS -- IN DR. HAUSER'S STATEMENT OF THE

22     PATENT, HE'S TELLING SURVEY RESPONDERS THAT THE PATENT COVERS

23     ONLY ONE SYNCHRONIZATION COMPONENT.  HE DOESN'T HAVE THE THREE.

24              SO THAT'S WHAT I THINK IS PROBLEMATIC.  THE ONE IS REALLY

25     MORE CLAIM 11, WHICH YOU'RE NOT ASSERTING.
```

1          MS. KREVANS:  I THINK, YOUR HONOR, THE KEY HERE IS TO

2     SAY --

3          THE COURT:  YEAH.

4          MS. KREVANS:  -- WHAT'S THE EVIDENCE YOU HAVE FROM

5     TECHNICAL EXPERTS ABOUT WHETHER WHAT DR. HAUSER TOLD THE SURVEY

6     PARTICIPANTS ADEQUATELY CAPTURED BOTH CLAIM 11 AND CLAIM 20,

7     BECAUSE DR. HAUSER HIMSELF, OF COURSE, IS NOT A TECHNICAL

8     EXPERT.

9          THE COURT:  WELL, CLAIM 20 IS DISTINGUISHED AND

10    DISTINCT FROM CLAIM 11 BECAUSE OF THE THREE SYNCHRONIZATION

11    COMPONENTS AS TO THE ONE.

12         MS. KREVANS:  THAT IS -- THAT IS --

13         THE COURT:  AND YOU'RE NOT ASSERTING CLAIM 11, WHICH

14    WAS THE ONE SYNCHRONIZATION COMPONENT, SO WHY SHOULD YOU BE

15    ABLE TO TELL SURVEY RESPONDERS THAT THAT'S WHAT THEY'RE

16    COMMENTING ON?

17         MS. KREVANS:  BUT I THINK THE KEY QUESTION HERE, YOUR

18    HONOR --

19         THE COURT:  THE SURVEY RESPONDERS.

20         MS. KREVANS:  -- FROM A TECHNICAL STANDPOINT --

21         THE COURT:  YEAH.

22         MS. KREVANS:  -- DID THE TECHNICAL EXPERTS HERE THINK

23    THAT WHAT DR. HAUSER TOLD THE RESPONDENTS ADEQUATELY CAPTURE

24    BOTH CLAIM 11 AND CLAIM 20?

25         AND THE TECHNICAL EXPERTS -- DR. SNOEREN SAID, YES, IT

1    DID, AND NOT ONLY THAT, THAT YOU COULDN'T TAKE OUT THE

2    FUNCTIONALITY, WHICH IS REALLY AN UNDER THE HOOD FUNCTIONALITY

3    OF CLAIM 20, IN ORDER TO MAKE IT SOMEHOW TURN BACK INTO CLAIM

4    11 BECAUSE THERE ARE TECHNICAL REASONS THAT I CAN'T TALK ABOUT

5    IN OPEN COURT, BUT BASICALLY THAT WAS CODE THAT SAMSUNG COULD

6    NOT CHANGE, AND SO THEY DIDN'T HAVE THE OPTION TO DO THAT.

7            AND SAMSUNG'S EXPERT --

8              THE COURT:  DR. SNOEREN'S REBUTTAL REPORT, PARAGRAPH

9    483, "CLAIM 20 REQUIRES AT LEAST THREE DISTINCT SYNCHRONIZATION

10   SOFTWARE COMPONENTS, EACH OF WHICH PROVIDES ITS OWN

11   SYNCHRONIZATION PROCESSING THREADS TO SYNCHRONIZE A

12   CORRESPONDING DATA CLASS."

13             MS. KREVANS:  BUT THE QUESTION IN THE SURVEY, YOUR

14   HONOR, IS --

15             THE COURT:  WELL, IT'S GOT TO ACCURATELY DESCRIBE THE

16   PATENT.  IF YOU'RE GOING TO DO ALL THIS COMPLICATED ANALYSIS OF

17   HOW MUCH DEMAND WOULD GO DOWN IF THIS FEATURE IS NOT PRESENT,

18   THEN YOU AT LEAST HAVE TO DESCRIBE THE FEATURE ACCURATELY.

19             MS. KREVANS:  YES.  BUT REMEMBER --

20             THE COURT:  I DON'T THINK THAT'S FAIR.

21             MS. KREVANS:  BUT THE FEATURE HERE FOR CLAIM 20 IS

22   ALL OF THE LIMITATIONS OF CLAIM 11, AND THE ADDITIONAL

23   LIMITATION OF CLAIM 20.

24             THE COURT:  RIGHT.

25             MS. KREVANS:  BUT IF YOU LOOK AT --

```
 1              THE COURT:  IT'S THE LIMITATION OF CLAIM 20.  IT'S

 2      NOT IN THIS DESCRIPTION OF THE '414.

 3              MS. KREVANS:  WELL, BUT DR. SNOEREN SAID HE THOUGHT

 4      THAT DR. HAUSER'S DESCRIPTION OF THE '414 DID CAPTURE CLAIM 20,

 5      AND YOU DON'T HAVE TECHNICAL EXPERT EVIDENCE FROM SOMEONE

 6      CONTESTING THAT.

 7              SO I THINK THE PERSON WHO HAS THE EXPERTISE TO DETERMINE

 8      THIS HAS SAID, YES, IT CAPTURED BOTH CLAIMS.

 9              AND THIS IS A QUESTION THAT WAS RAISED IN DAUBERT IN THE

10      1846 CASE WHEN THERE WAS A LOT OF ATTACK, AS THERE HAS BEEN

11      AGAIN HERE, ARE THESE DESCRIPTIONS ADEQUATELY CAPTURING THE

12      PATENTS?

13              IT'S REALLY A CROSS-EXAMINATION QUESTION FOR THE TECHNICAL

14      EXPERTS BECAUSE DR. HAUSER RELIED ON THEM, AND THIS IS A

15      CROSS-EXAMINATION MATTER.  THIS IS REALLY ABOUT WHETHER

16      DR. SNOEREN IS CORRECT WHEN HE SAYS THE SURVEY ACCURATELY

17      CAPTURED THIS.  THERE'S NOTHING WRONG WITH THE SURVEY.

18              AND OUR EXPERT SAYS IT ACCURATELY CAPTURED IT.  IF THEY

19      WANT TO CROSS-EXAMINE HIM OR TRY TO PUT ON CONTRARY TESTIMONY,

20      THEY SHOULD.

21              BUT THERE'S NO REASON TO KNOCK IT OUT.  THERE'S NOTHING

22      WRONG WITH THE METHODOLOGY.

23              THIS IS NOT ANYTHING LIKE THE COUPLE OF CASES THEY CITED

24      TO YOU WHERE WHAT WAS SURVEYED WAS JUST NOT RELATED TO THE

25      PATENTED INVENTION AT ALL.  SO, FOR EXAMPLE, THE FRACTUS CASE,
```

1    YOU CAN HAVE AN ANTENNA THAT'S EXTERNAL TO A PHONE OR INTERNAL,

2    AND THE PATENT WAS ON IMPROVEMENTS TO AN INTERNAL ANTENNA, AND

3    INSTEAD OF SURVEYING ABOUT WHETHER THOSE IMPROVEMENTS WERE

4    VALUABLE, THEY JUST ASKED SURVEY RESPONDENTS, DO YOU PREFER AN

5    EXTERNAL OR INTERNAL ANTENNA?  THAT WAS NO GOOD BECAUSE IT

6    CLEARLY HAD NOTHING TO DO WITH THE PATENTED INVENTION.

7         HERE WE HAVE A TECHNICAL EXPERT WHO SAYS THE DESCRIPTION

8    THAT WAS GIVEN TO THE RESPONDENTS ADEQUATELY CAPTURED BOTH 11

9    AND 20.

10        AND IF THEY WANT TO PUT ON AN EXPERT TO SAY TO THE

11   CONTRARY, THEY CAN, ALTHOUGH I DON'T THINK THEIR EXPERT WILL.

12        AND IF THEY WANT TO CROSS-EXAMINE OUR EXPERT, THEY SHOULD.

13        BUT IT IS NOT A REASON TO STRIKE THE SURVEY ALTOGETHER FOR

14   THAT PATENT.

15        THE COURT:  OKAY.  DOES SOMEONE FROM SAMSUNG WANT TO

16   SAY WHY YOU DIDN'T SUBMIT A DECLARATION FROM YOUR EXPERT SAYING

17   THAT THIS PATENT DESCRIPTION IS MISLEADING OR INCOMPLETE?

18        MR. PAK:  YOUR HONOR, SEAN PAK ON BEHALF OF SAMSUNG.

19   I ACTUALLY DEPOSED DR. SNOEREN ON THIS VERY QUESTION.

20        THE COURT:  UM-HUM.

21        MR. PAK:  IF YOUR HONOR RECALLS, CLAIM 11, HE DIDN'T

22   PROVIDE ANY KIND OF VALIDITY OPINIONS BECAUSE THE REASON FOR

23   THAT -- AND WE WENT THROUGH AND WE'RE HAPPY TO PROVIDE EXCERPTS

24   FROM DR. SNOEREN'S DEPOSITION ON THIS POINT -- IS THAT HE FOUND

25   CLAIM 20 TO BE A DIFFERENT INVENTION THAN CLAIM 11, AND

1      SPECIFICALLY HE RELIED ON EXACTLY THE LANGUAGE YOUR HONOR

2      IDENTIFIED OF THE THREE SYNCHRONIZATION COMPONENTS.  HE MADE

3      NUMEROUS ARGUMENTS IN HIS REPORT DISTINGUISHING PRIOR ART ON

4      THE GROUNDS THAT THE PRIOR ART DOESN'T SHOW THREE COMPONENTS.

5          SO WHEN I ASKED HIM AT HIS DEPOSITION, "IS IT POSSIBLE TO

6      DO BACKGROUND SYNCHRONIZATION IN THE ABSTRACT WITHOUT USING

7      THREE SYNCHRONIZATION COMPONENTS?" HE SAID, "ABSOLUTELY."

8          I ASKED HIM, "IS IT POSSIBLE TO DO BACKGROUND

9      SYNCHRONIZATION WITHOUT HAVING THREE COMPONENTS THAT RUN ON ITS

10     OWN THREAD," WHICH IS THE CONSTRUCTION THAT APPLE WANTS TO

11     ALLEGE FOR CLAIM 20.

12         HE SAID, "ABSOLUTELY."

13         AND WHEN I CONFRONTED HIM WITH THE HAUSER SURVEY

14     DESCRIPTION, WHAT HE ACTUALLY TESTIFIED, YOUR HONOR, WAS THAT

15     THE HAUSER SURVEY DOES NOT INCLUDE DESCRIPTIONS THAT REFLECT

16     THE SPECIFIC LIMITATIONS WE'RE TALKING ABOUT.

17         AND, YOUR HONOR, WE -- THE REASON WHY THIS ISSUE WAS NOT

18     ADDRESSED IN TERMS OF OUR EXPERT REPORTS, YOUR HONOR, IS THAT

19     IF YOU RECALL THE PROCEDURE, WE HAD DR. HAUSER'S SURVEY COMING

20     IN, WE HAD OUR INVALIDITY EXPERT OPINION COMING IN IN THE

21     OPENING ROUND, AND SO THAT WAS WHERE OUR EXPERT WAS OPINING ON,

22     ON SPECIFIC PRIOR ART REFERENCES AND THE DISTINCTION BETWEEN

23     CLAIM 11 AND CLAIM 20.

24         IT WAS NOT UNTIL THE REBUTTAL REPORT THAT WE FOUND OUT

25     THAT THEY WERE NOT TRYING TO CHALLENGE CLAIM 11 AND THAT THEY

1      WERE MAKING THESE DISTINGUISHING ARGUMENTS TO YOUR HONOR.

2           THE RECORD IS VERY CLEAR, AND I'M HAPPY TO PROVIDE YOUR

3      HONOR WITH EXCERPTS FROM HIS DEPOSITION TESTIMONY IF NECESSARY,

4      BUT I THINK THE PLAIN LANGUAGE, AS YOUR HONOR IDENTIFIED IN

5      CLAIM 20, AND THE ARGUMENTS THAT WE HEARD LAST TIME AROUND ON

6      SUMMARY JUDGMENT ABOUT THE DIFFERENCE BETWEEN CLAIM 11 AND

7      CLAIM 20 REALLY GO TO THE HEART OF THIS ISSUE, WHICH IS, IS IT

8      A PROPER METHODOLOGY, UNDER DAUBERT, TO PROVIDE A DESCRIPTION

9      OF A SINGULAR COMPONENT AS THE INVENTION WHEN NOW THE ONLY

10     CLAIM THAT APPLE IS ASSERTING IN THIS CASE REQUIRES THREE

11     COMPONENTS, AND AS FAR AS APPLE IS CONCERNED, THAT'S A MATERIAL

12     DIFFERENCE THAT DISTINGUISHES PRIOR ART THAT ONLY SHOWED A

13     SINGULAR COMPONENT.

14          WE THINK THAT, AS A METHODOLOGY, THAT'S A LEGAL QUESTION.

15     THE JURY WILL BE HIGHLY CONFUSED, IN AN ALREADY HIGHLY

16     TECHNICAL CASE, ABOUT THIS.  I THINK YOUR HONOR IS ABSOLUTELY

17     RIGHT WITH YOUR TENTATIVE RULING ON THIS ISSUE.

18          THE COURT:  CAN YOU SUBMIT WHATEVER, IF IT HASN'T

19     BEEN SUBMITTED AS AN EXHIBIT ALREADY, WHATEVER PORTION OF --

20          IS IT DR. SNOEREN'S DEPOSITION?

21          MR. PAK:  YES, YOUR HONOR.

22          THE COURT:  -- DR. SNOEREN'S DEPOSITION TESTIMONY ON

23     THIS POINT?

24          MR. PAK:  ABSOLUTELY WE WILL DO THAT, YOUR HONOR.

25     THANK YOU.

1    MS. KREVANS:  YOUR HONOR, MAY I VERY BRIEFLY RESPOND

2    TO THE INVALIDITY POINT THAT MR. PAK JUST MADE?

3    THE COURT:  THAT'S FINE.  I MEAN, WE HAVE GONE OVER

4    THIS AT THE SUMMARY JUDGMENT HEARING.

5    MS. KREVANS:  I'M NOT GOING TO ARGUE THE SUBSTANCE OF

6    INVALIDITY AT ALL, YOUR HONOR.

7    THE POINT I WANT TO MAKE IS THE ISSUE WITH RESPECT TO THIS

8    SURVEY IS NOT WHETHER THE ADDITIONAL LIMITATION OF CLAIM 20

9    MAKES THAT CLAIM HAVE A DISTINCTION OVER THE PRIOR ART THAT

10   MAKES IT VALID, EVEN IF CLAIM 11 WERE NOT, WHICH WE DON'T

11   CONCEDE.

12   THE ISSUE IN THE SURVEY IS, WERE THE BENEFITS OF THE CLAIM

13   AS A WHOLE TO THE CONSUMER ADEQUATELY DESCRIBED TO THE

14   CONSUMER?

15   THAT IS A DIFFERENT QUESTION FROM WHETHER THERE HAPPENS TO

16   BE ONE OF THE LIMITATIONS OF CLAIM 20 THAT CAN DISTINGUISH OVER

17   PRIOR ART IN A WAY THAT THE LIMITATIONS THAT ARE COMMON TO

18   CLAIM 20 AND CLAIM 11 CAN'T, BECAUSE THOSE MAY OR MAY NOT BE

19   PERCEPTIBLE TO THE CONSUMER.

20   SO WHETHER THIS IS A KEY DISTINCTION FOR VALIDITY IS NOT

21   THE CONTROLLING QUESTION AS TO WHETHER THIS IS AN ADEQUATE

22   DESCRIPTION.

23   THE COURT:  NO.  BUT, I MEAN, YOUR OWN EXPERT SAYS

24   THIS IS WHAT CLAIM 20 REQUIRES, SO IF YOU WANT -- IF YOU WANT

25   TO ACCURATELY REFLECT CLAIM 20, THEN YOU HAVE TO DESCRIBE WHAT

1    CLAIM 20 REQUIRES, AND THIS DESCRIPTION DOESN'T DO THAT.

2         MS. KREVANS:  YOU HAVE TO ACCURATELY DESCRIBE TO THE

3    CONSUMER WHATEVER ABOUT CLAIM 20, AND IN THIS CASE CLAIM 11 AS

4    WELL --

5         THE COURT:  UM-HUM.

6         MS. KREVANS:  -- WOULD BE PERCEPTIBLE TO THE CONSUMER

7    THAT THEY MIGHT VALUE.  THAT MAY NOT BE EVERY TECHNICAL DETAIL

8    OF THE CLAIM.

9         AND HERE IT WASN'T TECHNICAL DETAILS THAT HAPPENED TO BE

10   IN CLAIM 20, BUT NOT CLAIM 11.  THOSE DETAILS MAY BE IMPORTANT

11   TO VALIDITY, BUT THAT'S NOT THE QUESTION THE COURT'S TRYING TO

12   ANSWER HERE.

13        THE QUESTION THE COURT'S TRYING TO ANSWER HERE IS, WAS --

14   WERE THE BENEFITS OF CLAIM 20 ADEQUATELY CAPTURED TO THE SURVEY

15   RECIPIENTS?

16        AND THEY HAVE NOT PUT IN EXPERT TESTIMONY TELLING YOU THAT

17   THEY WERE NOT.

18        AND EVERYTHING THAT MR. PAK JUST SAID WHEN HE DESCRIBED

19   HIS CROSS-EXAMINATION OF DR. SNOEREN, THAT'S CROSS-EXAMINATION.

20   HE SHOULD DO IT AT TRIAL.  AND IF HE THINKS IT'S AS POWERFUL AS

21   IT IS IN HIS MIND, THEN MAYBE IT WILL CONVINCE THE JURY THAT,

22   FOR THIS PATENT, THEY SHOULD DISREGARD THE SURVEY.

23        BUT THAT'S NOT A METHODOLOGY ISSUE.  IT'S NOT A DAUBERT

24   ISSUE.

25        THIS IS CLASSIC CROSS-EXAMINATION AND WE'VE CITED TO YOUR

1     HONOR SOME CASES THAT SAY THAT.

2            THE COURT:  WELL, THIS IS ALSO A 403 ISSUE.  DO I

3     REALLY WANT A WHOLE SIDE SHOW ON THIS ISSUE?  I -- I FEEL LIKE

4     IT'S THE SAME PATTERN I SAW AT SUMMARY JUDGMENT.  I THINK

5     CLAIM 11 IS PROBABLY INVALID, WHICH IS WHY APPLE IS NO LONGER

6     ASSERTING IT, BUT YOU'RE TRYING TO GET THE DAMAGES OF CLAIM 11

7     THROUGH CLAIM 20, AND THAT'S WHAT WOULD HAPPEN AT SUMMARY

8     JUDGMENT AND THAT'S WHAT IS APPARENTLY HAPPENING WITH THIS

9     ISSUE AS WELL AND I JUST DON'T THINK THAT'S APPROPRIATE.

10           SO I THINK EVEN UNDER 403 -- I MEAN, I'LL GO BACK AND TAKE

11    A LOOK.  I AM CURIOUS TO SEE WHAT DR. SNOEREN'S DEPOSITION

12    TESTIMONY EXACTLY IS SINCE WORDS MATTER.

13           BUT I JUST DON'T THINK THAT YOU SHOULD GET THE BENEFIT OF

14    CLAIM 11 WHEN YOU'RE NOT ASSERTING IT AND NOT EVEN ACCURATELY

15    DESCRIBING CLAIM 20.

16           MS. KREVANS:  BUT -- I'M SORRY, YOUR HONOR.

17           THE COURT:  GO AHEAD.

18           MS. KREVANS:  THE KEY QUESTION HERE IS, WAS CLAIM 20

19    ACCURATELY DESCRIBED?  THE EVIDENCE IN THE RECORD IS THAT IT

20    WAS.

21           AND IF THEY THINK THAT THEY CAN QUARREL WITH THAT BY

22    CROSS-EXAMINATION, THEY SHOULD DO THAT.  THEY HAVEN'T SUBMITTED

23    ANYTHING TO YOU HERE SHOWING THAT IT WAS NOT.

24           AND I WOULD ASK, IF THEY'RE GOING TO SUBMIT DEPOSITION

25    EXCERPTS THAT ARE NOT ALREADY IN THE RECORD ON THIS MOTION,

```
 1        THAT WE GET AN OPPORTUNITY PROMPTLY TO SUBMIT TO YOU ANY

 2        ADDITIONAL EXCERPTS --

 3                    THE COURT:  THAT'S FINE.

 4                    MS. KREVANS:  -- FROM DR. SNOEREN FOR COMPLETENESS.

 5                    THE COURT:  THAT'S FINE.  I WANT A COMPLETE RECORD.

 6                    MS. KREVANS:  OKAY.  THANK YOU, YOUR HONOR.

 7                    THE COURT:  SO GIVE ME DEADLINES.  I LIKE DEADLINES.

 8        WHEN ARE YOU ALL GOING TO DO THAT?  DO YOU WANT TO DO A JOINT

 9        SUBMISSION ON DEPO DESIGNATIONS?

10                    MR. PAK:  I'M HAPPY TO WORK WITH MS. KREVANS.

11                    MS. KREVANS:  SEAN, WE HAVE DONE JOINT THINGS BEFORE,

12        IN ANOTHER CASE, BUT --

13                    MR. PAK:  WE HAVE WORKED COOPERATIVELY IN OTHER

14        CASES.

15            YOUR HONOR, I'M SURE IT WON'T BE A PROBLEM FOR US TO WORK

16        THIS OUT IN A COUPLE DAYS AND GET THIS TO YOU ON MONDAY.

17                    THE COURT:  MONDAY.  ALL RIGHT.  I WISH YOU WOULD DO

18        IT SOONER, BUT THAT'S OKAY.

19                    MS. KREVANS:  MONDAY MORNING, YOUR HONOR.

20                    MR. PAK:  MONDAY MORNING.

21                    THE COURT:  OKAY.

22                    MR. PAK:  THANK YOU.

23                    THE COURT:  ALL RIGHT.  LET ME --

24                    MR. QUINN:  YOUR HONOR, TEN SECONDS?

25                    THE COURT:  OKAY.
```

1          MR. QUINN:  THE COURT HAS BEEN VERY PATIENT, BUT I

2     DIDN'T WANT TO LEAVE THE COURT WITH THE IMPRESSION THAT WE WERE

3     AGREEING THAT LOST PROFITS WAS AN APPROPRIATE REASONABLE

4     ROYALTY.

5          I MEAN -- AND UNDER THAT DECISION, THEY -- IN FACT, ONLY

6     HALF OF THE LOST PROFITS WERE AWARDED IN THE READ-RITE CASE,

7     AND UNDER THE STATUTE, ROYALTIES ARE SUPPOSED TO BE AWARDED

8     WHERE YOU CAN'T MAKE A CASE FOR LOST PROFITS.

9          SO WE'RE NOT AGREEING THAT LOST PROFITS CAN BE AWARDED AS

10    A REASONABLE ROYALTY.

11         THANK YOU, YOUR HONOR.

12          THE COURT:  OKAY.  LET ME ASK ONE LAST QUESTION, AND

13    THAT IS WITH REGARD TO MR. MOWRY, OR DR. MOWRY, EXCUSE ME.

14         I AGREE WITH SAMSUNG THAT AT LEAST ONE OF DR. MOWRY'S

15    STATEMENTS IS INCONSISTENT, AND I AGREE THAT IT LOOKS, IT LOOKS

16    UNFAIR.

17         BUT ON THE OTHER HAND, I CAN'T FIND A LEGAL BASIS TO

18    EXCLUDE IT.  I DON'T THINK INCONSISTENCY IS A DAUBERT BASIS TO

19    EXCLUDE IT.

20         THERE'S NO JUDICIAL ESTOPPEL SINCE I DIDN'T RELY ON HIS

21    STATEMENT.

22         SO I JUST WANTED TO GIVE YOU AN OPPORTUNITY TO BE HEARD.

23         I DON'T THINK THERE'S ANY CASE LAW OR ANY OTHER LEGAL

24    BASIS TO EXCLUDE IT JUST BECAUSE IT WAS INCONSISTENT.

25          MR. JOHNSON:  WELL, YOUR HONOR, I THINK IT DEFINES

1    WHAT UNRELIABLE TESTIMONY IS, AND SO DAUBERT IS THERE TO

2    BASICALLY RESTRICT AND LIMIT THE ADMISSIBILITY OF EVIDENCE.

3    ONLY RELIABLE EVIDENCE SHOULD ULTIMATELY COME INTO THE COURT.

4         AND WHAT WE KNOW FROM MR. -- FROM DR. MOWRY'S TESTIMONY IS

5    THAT HIS TESTIMONY IS UNRELIABLE.  HE DIDN'T FOLLOW BASIC

6    HORNBOOK CASE LAW.  THE AMAZON VERSUS BARNES & NOBLE CASE SAYS

7    YOU HAVE GOT TO USE THE SAME CLAIM CONSTRUCTIONS FOR

8    INFRINGEMENT AND VALIDITY, AND HE DID NOT DO THAT.

9         HE CONSTRUED THE CLAIMS VERY NARROWLY BACK IN CONNECTION

10   WITH THE PRELIMINARY INJUNCTION PHASE.

11        AND, RYAN, IF WE COULD PUT UP SLIDE 5.

12        THE COURT:  BUT LET ME ASK A QUESTION.  WHAT ABOUT

13   WHAT APPLE SAYS, THAT, "HEY, WE DIDN'T HAVE THE BENEFIT OF THE

14   COURT'S CLAIM CONSTRUCTION AT THAT TIME, SO HE WAS DOING HIS

15   BEST AT THE TIME OF THE PRELIMINARY INJUNCTION HEARING, AND

16   IT'S NOT FAIR TO BOX HIM IN NOW THAT HE HAS THE COURT'S

17   CONSTRUCTION AND HE HAS TO ACCEPT THAT AND MAKE OPINIONS BASED

18   ON THAT"?

19        MR. JOHNSON:  WELL, THE PROBLEM IS, HE TOOK VERY

20   RESTRICTIVE -- EXCUSE ME -- HE TOOK VERY NARROW DEFINITIONS OF

21   THE CLAIMS TO GET AROUND PRIOR ART IN THE PRELIMINARY

22   INJUNCTION PHASE.

23        THE COURT:  UM-HUM.

24        MR. JOHNSON:  AND THEN HE IGNORED THOSE SAME

25   STATEMENTS THAT HE MADE, SAME RESTRICTIONS, WHEN HE TRIED TO

1    READ THE CLAIMS ON, PARTICULARLY ON THE JELLY BEAN PRODUCT.

2        SO WHEN THE JELLY BEAN OPERATING SYSTEM CAME OUT, HE THEN

3    EXPANDED THOSE DEFINITIONS, COMPLETELY IGNORED HIS EARLIER

4    STATEMENTS, AND WHAT WE HAVE IS A SITUATION WHERE, IN THE

5    PRELIMINARY INJUNCTION PHASE, HE SAID THE SKY IS BLUE, AND IN

6    CONNECTION THE INFRINGEMENT PHASE, HE SAID IT'S NOT BLUE.

7        SO WHAT WE'RE LEFT WITH IS A SITUATION WHERE -- AND WE CAN

8    GO THROUGH SOME OF THE TESTIMONY IN DETAIL -- BUT WE'RE LEFT

9    WITH A SITUATION WHERE HE TOOK POSITIONS IN A PRELIMINARY

10   INJUNCTION, AND THEN WHEN IT CAME TIME TO READING THEM IN HIS

11   INFRINGEMENT REPORT -- AND HE HAD THE BURDEN IN HIS

12   INFRINGEMENT REPORT TO ESTABLISH THAT EACH OF THE ACCUSED

13   PRODUCTS HAS THOSE SAME LIMITATIONS -- HE COMPLETELY IGNORED

14   THEM.

15       AND IT'S UNFAIR AND PREJUDICIAL TO SAMSUNG BECAUSE NOW IT

16   SHIFTS THE BURDEN TO US TO COME IN AND CROSS-EXAMINE THE

17   WITNESS IN A LARGE JURY TRIAL ON A LOT OF PRODUCTS AND A LOT OF

18   PATENTS, VERY TECHNICAL NATURE, AND TO COME IN NOW, AND WITH

19   TIME CONSTRAINTS AS WELL WHERE DR. MOWRY WILL BE ON THE STAND

20   FOR A SHORT AMOUNT OF TIME AND IT'S GOING TO FALL UPON US TO

21   THEN DIG OUT FROM THAT DIRECT TESTIMONY AND ESTABLISH THESE

22   INCONSISTENCIES.

23       AND IT GOES RIGHT TO THE HEART OF THE FACT THAT THESE

24   STATEMENTS ARE SIMPLY UNRELIABLE.  HE IS A WITNESS WHO'S

25   WILLING TO SAY WHATEVER HE NEEDS TO SAY FOR ANY PURPOSE.

1        WE KNOW FROM THE MOTOROLA CASE THAT JUDGE POSNER

2    ULTIMATELY EXCLUDED HIS ATTEMPT TO EXPAND HIS TESTIMONY RIGHT

3    BEFORE TRIAL.

4        AND SO THERE'S A HISTORY WITH HIM.

5        BUT, IT, AGAIN --

6            THE COURT:  BUT IS THERE A CASE THAT I COULD CITE TO

7    THAT WOULD GIVE ME AUTHORITY TO EXCLUDE HIM --

8            MR. JOHNSON:  YES.

9            THE COURT:  -- ON THE BASIS OF BEING INCONSISTENT?

10   WHAT WOULD THAT BE?

11           MR. JOHNSON:  IT WOULD BE -- WELL, IT WOULD BE IN

12   CONNECTION WITH THE -- WE CITED TWO CASES.  WE CITED THE

13   DATAQUILL CASE AND WE CITED THE OXFORD GENE CASE.  BOTH OF

14   THOSE CASES TALK ABOUT THE FACT THAT, AS THE GATEKEEPER,

15   UNRELIABLE TESTIMONY -- WHEN YOU HAVE A SITUATION, AS IN THE

16   DATAQUILL CASE, WHERE THE EXPERT BASICALLY -- HE WASN'T SURE

17   WHAT CLAIM CONSTRUCTIONS HE USED, AND HE GOT THE CLAIM

18   CONSTRUCTIONS ULTIMATELY FROM HIS COUNSEL.

19       IT FALLS IN LINE WITH THE FACT THAT THIS IS NOT RELIABLE

20   TESTIMONY.  WE'RE RELYING STRICTLY UPON THE PART OF 702 THAT

21   SAYS THE TESTIMONY HAS TO BE RELIABLE.

22       AND WHEN YOU HAVE A SITUATION, AGAIN, WHERE -- AND IT'S

23   NOT -- I MEAN, THESE ARE DIRECT CONTRADICTIONS WHERE, IF YOU

24   LOOK, FOR EXAMPLE, AT SLIDE 5 WHERE HE SAYS -- YOU KNOW, IN HIS

25   PRELIMINARY INJUNCTION REPLY DECLARATION, HE SAYS --

1          THE COURT:  BUT WHAT -- YOU KNOW, THE TWO CASES THAT

2     YOU CITED GO MORE TO CHALLENGING METHODOLOGY AND LESS TO

3     CHALLENGING CONSISTENCY.

4          IS THERE ANYTHING ELSE THAT I COULD --

5          MR. JOHNSON:  YOUR HONOR, WE'VE LOOKED AND WE --

6     THOSE ARE THE CASES THAT WE FOUND.

7          THE COURT:  OKAY.  ALL RIGHT.

8          MR. JOHNSON:  AND IT GOES BACK TO, AGAIN, 702 AND THE

9     FACT THAT IT'S UNRELIABLE -- EXCUSE ME -- AND IT GOES TO THE

10    FACT THAT PARTICULARLY WHEN YOU HAVE A SITUATION WHERE, AGAIN,

11    WE'RE GOING TO BE UNDER TIME CONSTRAINTS, UNDER THE GUN, AND

12    IT'S GOING TO FALL UPON US TO THEN GO THROUGH EACH AND EVERY

13    ONE OF THESE INCONSISTENCIES AND TRY TO CONVINCE THE JURY THAT

14    THERE'S A DIFFERENCE BETWEEN WHAT HE SAID HERE, WHICH IS THAT

15    THE PRIOR ART DOES NOT ALLOW A USER TO SELECT FROM A MULTITUDE

16    OF DETECTED STRUCTURES, AND THEN IN HIS DEPOSITION TESTIMONY IN

17    TALKING ABOUT THE CLAIM, HE SAYS IT DOESN'T SAY A PARTICULAR

18    STRUCTURE OUT OF A SET OF DETECTED STRUCTURES.

19         I MEAN, HE'S GOT A NUMBER OF INCONSISTENCIES, NOT JUST

20    ONE.

21         AND AGAIN, WHEN YOU SHIFT THE BURDEN TO US TO HAVE TO COME

22    IN NOW AND EXPLAIN TO THE JURY WHY THESE ARE INCONSISTENT, IT

23    GOES TO THE VERY HEART OF WHAT 702 IS ABOUT IN RESTRICTING THE

24    ADMISSIBILITY OF UNRELIABLE TESTIMONY.

25         THE COURT:  ALL RIGHT.  THANK YOU.

```
 1            OKAY.  I WOULD LIKE TO WRAP THIS UP NOW.

 2            MR. MCELHINNY:  ONE HOUSEKEEPING ISSUE.

 3            THE COURT:  OKAY.  WHAT'S THAT?

 4            MR. MCELHINNY:  AT THE COURT'S REQUEST, WE HAVE

 5   LODGED COPIES OF DR. VELLTURO'S FULL OPINION.  IF YOUR HONOR

 6   WOULD LIKE IT FILED, WE WOULD JUST LIKE AN OPPORTUNITY TO

 7   PREPARE A SEALING ORDER -- DR. HAUSER'S OPINION.

 8            SO WE'VE LODGED IT WITH YOU, BUT WE DIDN'T -- WE HAVEN'T

 9   FILED IT, AND IT'S QUITE LENGTHY AND WE GOT THE REQUEST THIS

10   MORNING, SO WE JUST -- IF THERE'S A PORTION -- IF YOU WANT IT

11   IN THE RECORD --

12            THE COURT:  I THINK IT WOULD PROBABLY BE SAFEST TO

13   PUT IT IN THE RECORD FOR PURPOSES OF APPELLATE REVIEW.

14            MR. MCELHINNY:  THEN MAY WE HAVE UNTIL MONDAY TO, TO

15   PROVIDE A SEALING MOTION THAT GOES WITH IT, YOUR HONOR?

16            THE COURT:  THAT'S FINE.  I MEAN, I HAVE A COPY.  I

17   GUESS -- DO WE HAVE A COPY? -- WE HAVE A COPY NOW OF ALL THE

18   EXHIBITS, SO WE'LL USE THIS ONE.

19            BUT I THINK FOR PURPOSES OF THE RECORD, IT WOULD PROBABLY

20   BE A GOOD THING TO DO.

21            MR. MCELHINNY:  OKAY.  THOSE ARE LODGED.  WE WILL

22   FILE A COPY WITH AN APPROPRIATE MOTION ON MONDAY.

23            MR. LYON:  YOUR HONOR, ONE MORE ADMINISTRATIVE

24   MATTER.

25            THE COURT:  WHAT'S THAT?
```

1    MR. LYON:  WITH RESPECT TO THE MOTION ON RINARD'S

2  DEMONSTRATIVES, WHICH I UNDERSTAND YOUR HONOR HAS DENIED, BASED

3  ON OUR -- WE'RE STILL REVIEWING THE COURT'S SUMMARY JUDGMENT

4  ORDER, BUT BASED ON THE REVIEW OF THAT ORDER, WE THINK THAT

5  MOTION IS PROBABLY MOOT.

6    THE COURT:  OH, I THINK THAT EVERYTHING IS -- I THINK

7  THAT KEARL, SCHONFELD, AND RINARD, THEY'RE ALL MOOT NOW.

8    MR. LYON:  I JUST WANTED TO EMPHASIZE --

9    THE COURT:  SNOEREN, STORER.  I MEAN, I THINK THAT,

10  BY YOUR STIPULATION AND BY THE SUMMARY JUDGMENT ORDER, ALL OF

11  THOSE ARE MOOT.  DOES ANYONE DISAGREE WITH THAT?

12    MR. LYON:  I DON'T BELIEVE SO, YOUR HONOR.  I WANTED

13  TO EMPHASIZE THAT BECAUSE I THOUGHT IT MIGHT MAKE YOUR JOB A

14  LITTLE EASIER.

15    THE COURT:  YEAH.  SO I AM -- WE'RE NOT GOING TO

16  ISSUE ANYTHING ON KEARL, RINARD, SCHONFELD, SNOEREN, OR STORER.

17  I MEAN, MAYBE JUST A ONE SENTENCE SAYING "THE PARTIES'

18  STIPULATION," ECF NUMBER BLAH BLAH, "AND THE COURT'S SUMMARY

19  JUDGMENT ORDER," ECF NUMBER BLAH BLAH BLAH, "RESOLVE THE

20  FOLLOWING ISSUES AND THE COURT WILL NOT ADDRESS THEM

21  OTHERWISE."

22    MR. LYON:  THANK YOU.

23    MR. QUINN:  YOUR HONOR, IT'S NOT POSSIBLE TO SEE THE

24  FULL HAUSER SURVEY IN PAPER COPY BECAUSE THERE'S ANIMATIONS AND

25  THINGS.  I REFERRED TO EARLIER THAT WE COULD GET IT TO THE

```
1    COURT ON THE WEB AND THAT WAY THE COURT COULD ACTUALLY SEE WHAT

2    THE SURVEY TAKERS SAW.

3              THE COURT:  I THOUGHT THEY WERE GOING TO -- I THOUGHT

4    MS. KREVANS WAS GOING TO PROVIDE IT ON CD.

5              MR. QUINN:  ELECTRONICALLY?

6              MS. KREVANS:  YES, YOUR HONOR.

7              THE COURT:  SO GIVE ME ALL THE DEADLINES THAT WERE

8    SET TODAY JUST SO I -- SO THE FULL HAUSER REPORT IS GOING TO BE

9    FILED ON, WHAT'S MONDAY, THE 27TH?

10             THE CLERK:  MONDAY IS THE 27TH.

11             MS. KREVANS:  THE 27TH, YOUR HONOR.

12             THE COURT:  OKAY, THE 27TH.

13         THE HAUSER SURVEY IS GOING TO BE PROVIDED

14   ELECTRONICALLY --

15             MS. KREVANS:  BY THE END OF THE DAY TOMORROW, YOUR

16   HONOR.

17             THE COURT:  OKAY.  THAT'S THE 24TH.  OKAY.

18         YOU'RE GOING TO GIVE ME JOINT --

19             MS. KREVANS:  JOINT SNOEREN --

20             THE COURT:  -- SNOEREN DEPO EXCERPTS --

21             MS. KREVANS:  BY MONDAY, YOUR HONOR.

22             THE COURT:  -- ON THE ISSUE OF CLAIM 20 OF THE '414

23   BY MONDAY, WHICH IS THE 27TH.

24         WHAT ELSE?  WHAT ELSE WERE YOU ALL GOING TO GIVE ME?

25   ANYTHING ELSE?
```

1          MR. QUINN:  NOTHING ELSE, YOUR HONOR, THAT WE CAN

2     THINK OF.

3          MS. KREVANS:  I THINK THAT'S IT, YOUR HONOR.

4          THE COURT:  OKAY.  ALL RIGHT.  THEN I WILL -- IS

5     THERE ANYTHING ELSE WE HAVE TO HANDLE TODAY?

6          MR. MCELHINNY:  NOTHING FURTHER FROM US, YOUR HONOR.

7          MR. QUINN:  NO, YOUR HONOR.

8          THE COURT:  OKAY.  THEN I WILL SEE YOU ALL NEXT WEEK.

9          MR. MCELHINNY:  THANK YOU, YOUR HONOR.

10         THE COURT:  OKAY.  THANK YOU.

11      (THE PROCEEDINGS WERE CONCLUDED AT 5:32 P.M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                       <u>CERTIFICATE OF REPORTER</u>

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8   STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9   280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10  CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12  A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13  ABOVE-ENTITLED MATTER.

14

15

16  _____

    LEE-ANNE SHORTRIDGE, CSR, CRR
17  CERTIFICATE NUMBER 9595

18       DATED:  JANUARY 28, 2014

19

20

21

22

23

24

25