1   QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
2   Charles K. Verhoeven (Bar No. 170151)
    charlesverhoeven@quinnemanuel.com
3   Kevin A. Smith (Bar No. 250814)
    kevinsmith@quinnemanuel.com
4   50 California Street, 22nd Floor
    San Francisco, California 94111
5   Telephone: (415) 875-6600
    Facsimile: (415) 875-6700
6
    Kevin P.B. Johnson (Bar No. 177129)
7   kevinjohnson@quinnemanuel.com
    Victoria F. Maroulis (Bar No. 202603)
8   victoriamaroulis@quinnemanuel.com
    555 Twin Dolphin Drive, 5th Floor
9   Redwood Shores, California 94065
    Telephone: (650) 801-5000
10  Facsimile: (650) 801-5100

11  William C. Price (Bar No. 108542)
    williamprice@quinnemanuel.com
12  865 South Figueroa Street, 10th Floor
    Los Angeles, California  90017-2543
13  Telephone:  (213) 443-3000
    Facsimile:  (213) 443-3100
14
    Attorneys for SAMSUNG ELECTRONICS
15  CO., LTD., SAMSUNG ELECTRONICS
    AMERICA, INC. and SAMSUNG
16  TELECOMMUNICATIONS AMERICA, LLC

17

18                  UNITED STATES DISTRICT COURT

19          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

20  APPLE INC., a California corporation,        CASE NO. 12-CV-00630-LHK (PSG)

21              Plaintiff,                       **SAMSUNG'S NOTICE OF MOTION AND
                                                 MOTION FOR SUMMARY JUDGMENT**
22          vs.
                                                 Date:  December 12, 2013
23  SAMSUNG ELECTRONICS CO., LTD., a             Time: 1:30 p.m.
    Korean business entity; SAMSUNG              Place: Courtroom 8, 4th Floor
24  ELECTRONICS AMERICA, INC., a New             Judge: Honorable Lucy H. Koh
    York corporation; SAMSUNG
25  TELECOMMUNICATIONS AMERICA,                  **REDACTED VERSION OF
    LLC, a Delaware limited liability company,   DOCUMENT SOUGHT TO BE SEALED**
26
                Defendants.
27

28

1

## NOTICE OF MOTION AND MOTION

2   PLEASE TAKE NOTICE that on December 12, 2013, at 1:30 p.m., or as soon as the

3   matter may be heard by the Honorable Lucy H. Koh in Courtroom 8, United States District Court

4   for the Northern District of California, Robert F. Peckham Federal Building, 280 South 1st Street,

5   San Jose, CA 95113, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and

6   Samsung Telecommunications America, LLC (collectively "Samsung") shall and hereby do move

7   the Court pursuant to Federal Rule of Civil Procedure 56 for summary judgment.  This motion is

8   based on this notice of motion and supporting memorandum of points and authorities; the

9   Declaration of Michael L. Fazio ("Fazio Decl."); the Declaration of Jeffrey S. Chase ("Chase

10  Decl."); and such other written or oral argument as may be presented at or before the time this

11  motion is deemed submitted by the Court.

12

## RELIEF REQUESTED

13   Pursuant to Federal Rule of Civil Procedure 56, Samsung seeks an order granting summary

14  judgment of:  (1) non-infringement of claims 1, 4, 6, 8, and 9 of the '647 Patent as to the "Accused

15  Jelly Bean Browser Products" running the "Jelly Bean" version of Android; (2) invalidity of

16  claims 11 and 20 of the '414 Patent; (3) invalidity of claims 24 and 25 of the '959 Patent; and

17  (4) claim 13 of the '596 Patent has a priority date of November 9, 2004.

18

19  DATED:  October 10, 2013          QUINN EMANUEL URQUHART &
20                                    SULLIVAN, LLP

21                                    By /s/ Victoria F. Maroulis
22                                       Charles K. Verhoeven
                                         Kevin P.B. Johnson
23                                       Victoria F. Maroulis
                                         William C. Price
24
25                                    Attorneys for SAMSUNG ELECTRONICS CO.,
                                      LTD., SAMSUNG ELECTRONICS AMERICA,
26                                    INC., and SAMSUNG
                                      TELECOMMUNICATIONS AMERICA, LLC
27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ................................................................................. i

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 1

I.      INTRODUCTION ...................................................................................................... 1

II.     THE ACCUSED "JELLY BEAN" BROWSER PRODUCTS DO NOT INFRINGE
        THE '647 PATENT ................................................................................................... 1

        A.      The Accused Jelly Bean Browser Products Do Not Enable The Selection of
                a Detected Structure .................................................................................. 2

                1.      The parties do not dispute the plain language of claim 1 .............................. 4

                2.      The parties also do not dispute the functionality of the accused Jelly
                        Bean Browser products ....................................................................... 4

                3.      Apple's infringement allegations ignore the plain language of
                        claim 1 ................................................................................................. 5

        B.      The Accused Jelly Bean Browser Products Do Not Enable the Selection of a
                Detected Structure From a Set of Detected Structures ............................................. 6

                1.      Apple narrowly interpreted the "user interface" limitation during the
                        PI phase to avoid the prior art .......................................................... 7

                2.      The accused Jelly Bean Browser application does not enable a user
                        to select from a set of detected structures ..................................... 7

III.    CLAIMS 11 AND 20 OF THE '414 PATENT ARE INVALID AS
        ANTICIPATED ......................................................................................................... 9

        A.      '414 Patent Background ................................................................................ 9

        B.      Windows Mobile 5.0 Anticipates Claim 11 of the '414 Patent ............................ 10

        C.      Windows Mobile 5.0 Anticipates Claim 20 of the '414 Patent ............................ 12

IV.     CLAIMS 24 AND 25 OF THE '959 PATENT ARE INVALID AS INDEFINITE .......... 16

V.      CLAIM 13 OF THE '596 PATENT HAS A PRIORITY DATE OF NOVEMBER
        9, 2004 .................................................................................................................... 22

        A.      The "DDI Field" is a Logical Identifier Representing the First PDU .................... 22

        B.      The Priority Application Discloses a Header Part that is a Logical Identifier
                Representing the First PDU ....................................................................... 25

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

## Cases

*Am. Med. Sys., Inc. v. Biolitec, Inc.,*
    618 F.3d 1354 (Fed. Cir. 2010)...................................................................23

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.,*
    672 F.3d 1335 (Fed. Cir. 2012)...................................................................23

*Biosig Instruments, Inc. v. Nautilus, Inc.,*
    715 F.3d 891 (Fed. Cir. 2013).....................................................................17

*Datamize, LLC v. Plumtree Software, Inc.,*
    417 F.3d 1342 (Fed. Cir. 2005)......................................................16, 19, 21

*E.I. du Pont de Nemours & Co. v. MacDermid Printing Solutions, L.L.C.,*
    525 F.3d 1353 (Fed. Cir. 2008)...................................................................22

*Ernie Ball, Inc. v. Earvana, LLC,*
    502 Fed. Appx. 971 (Fed. Cir. 2013) ..........................................................21

*Exxon Research & Eng'g Co. v. United States,*
    265 F.3d 1371 (Fed. Cir. 2001)...................................................................17

*Haemonetics Corp. v. Baxter Healthcare Corp.,*
    607 F.3d 776 (Fed. Cir. 2010).....................................................................18

*Halliburton Energy Servs. v. M-I LLC,*
    514 F.3d 1244 (Fed. Cir. 2008)......................................................16, 17, 21

*Implicit Networks Inc. v. F5 Networks Inc.,*
    Nos. C10-3365 ............................................................................................12

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
    358 F.3d 898 (Fed. Cir. 2004).....................................................................14

*Minn. Min. and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,*
    976 F.2d 1559 (Fed. Cir. 1992)...................................................................17

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
    521 F.3d 1351 (Fed. Cir. 2008)...................................................................22

*Omega Eng'g, Inc., v. Raytek Corp.,*
    334 F.3d 1314 (Fed. Cir. 2003)...................................................................14

*OptimumPath, LLC v. Belkin Intern., Inc.,*
    No. 09-1398, 2011 WL. 1399257 (N.D. Cal. Apr. 12, 2011) .....................16

*Phillips v. AWH Corp.,* 415 F.3d 1303, 1315 (Fed. Cir. 2005),
    415 F.3d 1303, 1315 (Fed. Cir. 2005) ........................................................24

*Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*,
    412 F.3d 1284 (Fed. Cir. 2005) ............................................................................10

*Richdel, Inc. v. Sunspool Corp.*,
    714 F.2d 1573 (Fed. Cir. 1983) ............................................................................10

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*,
    655 F.3d 1364 (Fed. Cir. 2011) .............................................................17, 22, 25

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
    247 F.3d 1316 (Fed. Cir. 2001) ............................................................................13

*The Saunders Group, Inc. v. Comfortrac, Inc.*,
    492 F.3d 1326 (Fed. Cir. 2007) ............................................................................24

*Union Pac. Res. Co. v. Chesapeake Energy Corp.*,
    236 F.3d 684 (Fed. Cir. 2001) ..............................................................................17

## **Statutes**

35 U.S.C. § 102(b) ..........................................................................................................10

35 U.S.C. § 102(g)(2) .....................................................................................................10

35 U.S.C. § 112 ...............................................................................................................22

35 U.S.C. § 112(b) ..........................................................................................................16

35 U.S.C. § 120 ...............................................................................................................22

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

Samsung seeks summary judgment on a targeted set of issues concerning non-infringement of Apple's '647 Patent, invalidity of Apple's '414 and '959 Patents, and the priority date for claim 13 of the '596 Patent. For the reasons set forth below, there is no triable issue of material fact as to any of these issues and summary adjudication is warranted.

**II.    THE ACCUSED "JELLY BEAN" BROWSER PRODUCTS DO NOT INFRINGE THE '647 PATENT**

The Court should grant summary judgment that the "Accused Jelly Bean Browser Products" do not infringe the '647 Patent.[1]

The Accused Jelly Bean Browser Products use a Browser application that has been modified since the Preliminary Injunction ("PI") stage of this case. ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████ For instance, the figure below demonstrates (1) the presentation by the Browser application of a web page to the user; (2) a selection by the user; and (3) the menu of options based on that selection:

---

[1]  Apple and Dr. Mowry identify the Samsung Galaxy S III as the representative product for the "Accused Browser Products" running Jelly Bean (Fazio Decl. Ex. 1 (Mowry Opening Report) ¶101 and n.13), including the Samsung Galaxy Nexus, Galaxy Note II, Galaxy Rugby Pro, Galaxy S II, Galaxy S II Epic 4G Touch, Galaxy S III, and any other accused device that later updates to Jelly Bean, including the Galaxy S II Skyrocket and Galaxy Tab 2 10.1 (Fazio Decl. Ex. 2 (Mowry Opening Report Ex. 4) at 1, entry 1). Apple maintains that Messenger on these Accused Products infringes. (Fazio Decl. Ex. 1 (Mowry Opening Report) ¶ 102 n.15 and ¶ 255. Apple has since dropped the Galaxy Rugby Pro as an accused product pursuant to the Court's case narrowing order. (*See* Dkt. 471, 786.)

  

(1) Presentation of web page          (2) Selection          (3) Menu of Options

Thus, those products using the Jelly Bean Browser application do not infringe because they do not "enable the selection of a detected structure" as required by the '647 Patent.

**A.      The Accused Jelly Bean Browser Products Do Not Enable The Selection of a Detected Structure**

Apple asserts independent claim 1 of the '647 Patent, along with dependent claims 4, 6, 8, and 9.  Independent claim 1 is directed to a "computer-based system for detecting structures in data and performing actions on detected structures."  (Fazio Decl. Ex. 3 ('647 Patent) at 7:8-9.)  The '647 Patent explains that "structures" are data that fit a particular pattern, such as a phone number or e-mail address.  (*Id*. at 1:31-33.)  The '647 Patent also explains that "actions" are operations performed on detected data, such as dialing the detected phone number or sending an email to the detected email address.  (*Id*. at Fig. 4.)

Claim 1 of the '647 Patent requires that three types of software "program routines" – an "analyzer server," a "user interface," and an "action processor" – perform specific roles in the claimed system.  (*Id*. at 7:16-21.)  The program routine of interest here is the "user interface

enabling the selection of a detected structure and a linked action."[2]  (*Id*. at 7:16-19.)  The parties do not dispute that a ***user*** performs the "selection of a detected structure" (as opposed to the system performing selection).  (*See* Fazio Decl. Ex. 4 (Mowry Dep.) at 154:3-15); *see also* Fazio Decl. Ex. 5 (Mowry Reply Decl.) ¶ 217 ("plain and ordinary meaning" of limitation "requires the user interface to enable selection of a structure, by the user").)

Apple accuses the Samsung Browser and Messenger applications of infringing each of the asserted claims of the '647 Patent.  Apple divides its accusations against the Browser into Accused Devices with the Jelly Bean Browser, and all earlier Browser versions.  (Fazio Decl. Ex. 1 (Mowry Opening Report) ¶ 101.)  This is because, in the "Jelly Bean" version of Android (introduced in Summer 2012), the system will ***not*** detect a "structure" until ***after*** a user selects that structure.[3]  In the words of Apple's expert for the '647 patent, Dr. Mowry, in the Jelly Bean Browser ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  (*See* Fazio Decl. Ex. 1 (Mowry Opening Report) ¶ 251; *id*. ¶ 250 █████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

█████████████████████████████  Fazio Decl. Ex. 4 (Mowry Dep.) at 186:23-189:16, 192:2-193:6, 194:16-23.)

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████  the Accused Jelly Bean Browser Products do not infringe claim 1 of the '647 Patent or any of its dependents because they do not provide a "user interface enabling the selection of a ***detected*** structure and a linked action."

---

[2]  Throughout this summary judgment motion, Samsung uses the claim terms (e.g., "structure," "action," etc.) in the way Apple relies on those terms to allege infringement.

[3]  Samsung introduced its first product with the "Jelly Bean" version of Android on July 23, 2012, after all Preliminary Injunction briefing was completed in the Preliminary Injunction phase of this case.  (Fazio Decl. Ex. 6 (Samsung's Third Supplemental Responses and Objections to Apple's Sixth Set of Interrogatories, No. 41) at 14, entry 24; *see also* Fazio Decl. Ex. 1 (Mowry Opening Report) ¶ 232 █████████████████████████████████████████████

████████████████████████████████████████████████████████████

(Fazio Decl. Ex. 3 ('647 Patent) at 7:18-19).)

### 1. The parties do not dispute the plain language of claim 1

Claim 1 requires that the system detect structures **before** the user selects a structure.  The plain language reflects this, and Apple and its expert have taken the position, including in sworn Declarations submitted to the Court, that "the plain and ordinary meaning of 'a user interface enabling the selection of a detected structure' requires the user interface to enable selection of a structure, by the user, **after** the structure has already been detected."  (Fazio Decl. Ex. 5 (Mowry Reply Decl.) ¶ 217 (emphasis in original); Fazio Decl. Ex. 4 (Mowry Dep.) at 153:12-154:16.)

### 2. The parties also do not dispute the functionality of the accused Jelly Bean Browser products

There is also no dispute regarding how the Accused Jelly Bean Browser Products work.

(*See* Fazio Decl. Ex. 1 (Mowry Opening Report) ¶¶ 250-251, ¶ 232; Fazio Decl. Ex. 4 (Mowry Dep.) at 186:23-189:16, 192:2-193:6, 194:16-23.)

(Fazio Decl. Ex. 1 (Mowry Opening Report) ¶ 251.)

This change also means the Accused Jelly Bean Browser Products do not "enable the user to select a **detected** structure" as required by claim 1.

The Accused Jelly Bean Browser Products cannot infringe because the **user** identifies the

_____

4

1  structure of interest, ███████████████████████████████████████ This is

2  contrary to claim 1, which requires that a structure must be detected **before** being selected by a

3  user.  In the words of Apple's expert Dr. Mowry, "the plain language of claim 1… requires that

4  the user be able to pick or choose a detected structure **after** the system identifies such structures

5  for the user."  (Fazio Decl. Ex. 5 (Mowry Reply Decl.) ¶ 217 (emphasis in original).)  The

6  Accused Jelly Bean Browser products do not work this way.

### 3.    Apple's infringement allegations ignore the plain language of claim 1

8      Despite the undisputed operation of the Accused Jelly Bean Browser application, Apple's

9  expert Dr. Mowry alleges that detection and selection occur at the same time in the Accused Jelly

10  Bean Browser Products (*i.e.*, detection occurs "as the user makes the selection"), and that this is

11  sufficient to satisfy the user interface limitation's requirement that the user be enabled to "select a

12  detected structure."  (*See* Fazio Decl. Ex. 1 (Mowry Opening Report) ¶ 251.)  For instance, Dr.

13  Mowry states the following in his Opening Report:

14  ███████████████████████████████████████████████████████████

15  ███████████████████████████████████████████████████████████

16  ███████████████████████████████████████████████████████████

17  ███████████████████████████████████████████████████████████

18  ███████████████████████████████████████████████████████████

19  (*Id.*)

20      Detection does not occur "as the user makes the selection."  Both parties agree:  the ***user***

21  performs selection, and a ████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████

23  ████████████████████████████████████████  This is hardly detection "as the

24  user makes the selection." ███████████████████████████████████████████

25  ███████████████████████████████████████████████  (*See* Fazio

26  Decl. Ex. 4 (Mowry Dep.) at 186:23-189:16, 192:2-193:6, 194:16-23.)

27      More importantly, what the Jelly Bean Browser does is certainly not detection ***before***

28  selection:  even if Apple's contention were correct, detecting a structure ***as*** the user makes the

1   selection of it is contrary to the plain language of the claim, which unambiguously requires that

2   the user can select a "dete<u>ced</u> structure," not a structure that the system is in the process of

3   detecting.  And Apple's contention is contrary to Apple's multiple representations to the Court

4   throughout the Preliminary Injunction phase of the case, where Apple distinguished both the

5   Sidekick and Pandit prior art references by arguing that "[t]he plain and ordinary meaning of 'a

6   user interface enabling the selection of a detected structure' requires the user interface to enable

7   selection of a structure, by the user, ***after*** the structure has already been detected."  (Fazio Decl.

8   Ex. 5 (Mowry Reply Decl.) ¶¶ 26, 217 (emphasis in original).)  Apple referred to this as a

9   "material" and "critical" difference.  (*Id*. at ¶ 26.)  In considering non-infringing alternatives and

10  changes to its products, Samsung should be able to rely on Apple and Dr. Mowry's representations

11  to the Court about the scope of the '647 Patent.

12          Accordingly, because the Accused Jelly Bean Browser Products do not provide "a user

13  interface enabling the selection of a detected structure," the Court should grant Samsung summary

14  judgment on non-infringement of claim 1 (and all dependent claims asserted).

### B.     The Accused Jelly Bean Browser Products Do Not Enable the Selection of a Detected Structure From a Set of Detected Structures

15

16

17          The Court should also grant summary judgment of non-infringement for the Jelly Bean

18  Browser on a separate ground—that application does not allow a user to select a detected

19  "structure" from a set of detected "structures."  During the PI phase of this case, Apple and Dr.

20  Mowry represented to the Court that "selection of a detected structure, as written in the claim

21  limitation, necessarily requires that a particular detected structure can be chosen from a set of

22  detected structures."  (Fazio Decl. Ex. 5 (Mowry Reply Decl.) ¶ 140 ("At no point does Sidekick

23  allow a user to select from a multitude of detected structures."); *see also id*. ¶ 213 ("The plain and

24  ordinary meaning of 'structures' in claim 1 requires the analyzer server to be capable of detecting

25  more than one structure in the data.").)  Even if Apple were somehow right that the products allow

26  selection of a "detected structure," the Accused Jelly Bean Browser never allows a user to choose

27  from "a set of detected structures" because, at most, only one structure is ever "detected" at a time.

28

### 1.    Apple narrowly interpreted the "user interface" limitation during the PI phase to avoid the prior art

During the PI phase, Apple and Dr. Mowry interpreted the "user interface" limitation in a narrow and specific way to overcome prior art offered by Samsung.  As one example, for the Sidekick prior art system, which detects phone numbers and enables a user to select a particular phone number for dialing, Apple and Dr. Mowry argued to the Court that the Sidekick system "does not itself perform any detection" because "unlike the '647 Patent, the Sidekick system requires user prompts to select a single piece of data," and thus "[a]t no point does Sidekick allow a user to select from a multitude of detected structures."  (*Id.* ¶ 141 ("This, again, is contrary to the teachings of the '647 Patent, in which multiple structures are detected, after which a user can choose any one on which to perform an operation via the user interface.").)

Similarly, Apple and Dr. Mowry argued that another prior art reference, U.S. Patent No. 5,859,636 ("Pandit"), did not anticipate claim 1 of the '647 Patent:

> "Pandit also does not disclose 'detecting structures' within the meaning of the '647 Patent claims because the apparatus in Pandit operates on only a single piece of text manually identified by a user at any given time.

(Fazio Decl. Ex. 5 (Mowry Reply Decl.) ¶ 26.)  He further argued:

> The plain and ordinary meaning of 'a user interface enabling the selection of a detected structure' requires the user interface to enable selection of a structure, by the user, *after* the structure has already been detected.  Pandit, by contrast, reverses these steps . . . [T]he plain language of claim 1 . . . requires that the user be able to pick or choose a detected structure *after* the system identifies such structures for the user.

(*Id.* at ¶ 217; *see also id.* at ¶ 26 (stating ""[t]his reverses the steps disclosed in the '647 patent in a material, and critical, way.").)  In essence, Apple and Dr. Mowry relied on the "user interface" limitation of claim 1 to distinguish the prior art by asserting that detection must occur prior to user selection, so that the system can present *multiple* detected structures to the user and allow the user to select "from a set of detected structures."

### 2.    The accused Jelly Bean Browser application does not enable a user to select from a set of detected structures

There is no dispute that in the Accused Jelly Bean Browser Products a user *cannot* select

1  from "a set of detected structures" or a "multitude of detected structures."  Instead, like the prior

2  art, "the user must manually find a single, yet-to-be-recognized 'structure'"  (Fazio Decl. Ex. 5

3  (Mowry Reply Decl.) ¶ 213.) ███████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████████████████████

5  ████████████████████  (Fazio Decl. Ex. 1 (Mowry Opening Report) ¶ 251 ██████████████

6  ███████████████████████████████; Fazio Decl. Ex. 4 (Mowry Dep.) at 186:23-189:16,

7  192:2-193:6, 194:16-23) ████████████████████████████████.)  Simply put,

8  there is no way to select from "a set of detected structures" because no such set exists – only one

9  structure is detected at a time.  Accordingly, the Jelly Bean Browser products cannot infringe

10  claim 1 of the '647 Patent under Apple's contentions.

11      While there is no dispute over the operation of the Accused Jelly Bean Browser Products,

12  Apple now appears to dispute what the patent requires.  After learning about the operation of

13  Samsung's new products, Apple now alleges that the ability to select from a "set of detected

14  structures" or a "multitude of detected structures" is ***not*** a requirement of claim 1. ████████

15  █████████████████████████████████████████████████████████████████████████████████

16  █████████████████████████████  (Fazio Decl. Ex. 4 (Mowry Dep.) at 128:2-129:16).)  But

17  prior to learning of the operation of Jelly Bean Browser, Apple made multiple, unambiguous

18  representations during the PI phase that conflict with its current position.  Those statements are

19  cataloged in Exhibit 7.  (Fazio Decl. Ex. 7.)  Samsung should be able to rely on a sworn expert

20  declaration to the Court, submitted by Apple, seeking an injunction on Samsung's products, that

21  states selection from a set of detected structures is a requirement of the patent.

22      Thus, the Court should grant Samsung summary judgment based on Apple and

23  Dr. Mowry's direct representations to the Court distinguishing claim 1 of the '647 Patent from the

24  prior art.  There is no dispute that a user of the Accused Jelly Bean Browser cannot select from a

25  "multitude of detected structures," ████████████████████████████████████████████████

26  ████████████████████████████  Those accused products do not infringe for this reason as well.

27

28

**III.     CLAIMS 11 AND 20 OF THE '414 PATENT ARE INVALID AS ANTICIPATED**

    **A.     '414 Patent Background**

       The '414 Patent, entitled "Asynchronous Data Synchronization Amongst Devices," relates to "systems and methods for synchronizing data between two or more data processing systems." (Fazio Decl. Ex. 8 ('414 Patent) at 1:6-8).) Apple filed the application for the '414 Patent on January 7, 2007.  Specific embodiments disclosed in the patent synchronize data between "one or more data processing systems, such as a device, which may be a handheld computer, and a host, which may be a desktop or laptop computer." (*Id.* at 7:40-44.)  Apple characterized the '414 Patent as providing "an important improvement over prior art synchronization systems" where, for example, "users could not access and modify their data while it was in the process of being synchronized, but instead would need to wait for the synchronization process to complete." (Dkt. 333 at 15.)  Apple alleges the '414 Patent "allow[s] a user to access data while synchronization is occurring." (*Id.*).

       Samsung seeks summary judgment of invalidity on two claims:  independent claim 11, and dependent claim 20.  Both claims are still at issue.  Whether as part of the case narrowing or as a concession of invalidity, Apple stopped pursuing infringement on independent claim 11 of the '414 Patent, and now only alleges infringement of dependent claim 20.  (Dkt. 786.)  But even after dropping claim 11 from its *infringement* allegations, Apple continues to base its *damages* claim, including its lost profits claim, on claim 11.  Apple's damages expert seeks extensive damages for the '414 Patent – ███████████████ – based heavily on the theory that Apple's products practice claim 11 of the '414 Patent.  (*See, e.g.*, Fazio Decl. Ex. 15 (Velluro Opening Report) ¶¶ 71, 74, 310-317, 324, 395-97, 489-92.)  This claim to practice the '414 Patent is based ***solely*** on claim 11.  Apple's technical expert asserts that claim 11 is embodied in Apple's products (Fazio

---

    [5]  (*See, e.g.*, Fazio Decl. Ex. 9 (Exhibit 140 to Apple's Infringement Contentions); Fazio Decl. Ex. 10 (Objections and Responses to Interrogatory No. 42); Fazio Decl. Ex. 11 (Third Supplemental Objections and Responses to Interrogatory No. 25); Fazio Decl. Ex. 12 (Supplemental Objections and Responses to Samsung's Interrogatory No. 25); Fazio Decl. Ex. 13 (Snoeren Opening Report) ¶¶ 525-28; Fazio Decl. Ex. 14 (Snoeren Rebuttal Report) ¶ 627.)

1   Decl. Ex. 13 (Snoeren Opening Report) ¶¶ 525-528; Fazio Decl. Ex. 14 (Snoeren Rebuttal Report)

2   ¶¶ 627)) but does **not** assert Apple practices claim 20 of the '414 Patent.  (Fazio Decl. Ex. 14

3   (Snoeren Rebuttal Report) ¶ 627.)  Moreover, Apple's attempted quantification of consumer

4   demand turns on a survey describing claim 11 – **not** claim 20.  (*See*, *e*.*g*., Fazio Decl. Ex. 16

5   (Hauser Opening Report) ¶¶ 42-43, 74.)  Tellingly, Apple *refused* Samsung's request that Apple

6   abandon any reliance on its alleged practice of claim 11 at trial.  (Fazio Decl. Ex. 17 (Oct. 8, 2013

7   Letter from A. Thakur to B. Buroker).)  Even if Apple is permitted to rely on claim 11, Apple's

8   damages theory crumbles if claim 11 is invalid:  a patentee cannot "practice" an invalid claim.[6]

9   Since Apple continues to base its damages analysis on claim 11, claim 11's validity is still highly

10  relevant to Samsung's defense to Apple's damages claims.[7]

11          **B.     Windows Mobile 5.0 Anticipates Claim 11 of the '414 Patent**

12          Long before Apple filed the '414 Patent, and no later than October 2005, Microsoft

13  developed and sold Windows Mobile 5.0.  (Fazio Decl. Ex. 18 (Microsoft Declaration) ¶ 29; Fazio

14  Decl. Ex. 19 (Ex. 9 (MSFT-00630-001175)).)  Windows Mobile 5.0 ran on a variety of handheld

15  devices, including the HP iPaq and Palm Treo.  (*See*, *e*.*g*., Fazio Decl. Ex. 20 (SAMNDCA630-

16  07673924); Fazio Decl. Ex. 21 (SAMNDCA630-07673928).)  Windows Mobile 5.0 is prior art to

17  the '414 Patent under 35 U.S.C. § 102(b) and § 102(g)(2).

18          Windows Mobile 5.0 synchronized personal information, such as e-mail, contacts, and

19  calendar information, between a mobile device and a Microsoft Exchange Server.  (*See*. *e*.*g*., Fazio

20  _____

21          [6]  *See Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 412 F.3d 1284, 1291 (Fed. Cir. 2005)
    ("[T]here can be no . . . infringement of invalid patent claims."); *Richdel, Inc. v. Sunspool Corp.*,
22  714 F.2d 1573, 1580 (Fed. Cir. 1983) ("The claim being invalid there is nothing to be
    infringed.").

23          [7]  Samsung has also moved to preclude Apple from relying on its alleged practice of claim 11,
    or survey evidence directed to claim 11 and not claim 20, as part of Samsung's Motion to Enforce
24  Case Narrowing Order.  Samsung has further moved to preclude Apple's damages experts from
    improperly relying on Apple's alleged practice of claim 11, or survey evidence relating to the
25  feature described in claim 11, as proof of damages for alleged infringement of claim 20.  If either
    of these motions are granted and Apple is entirely precluded from relying on its alleged practice of
26  claim 11 and surveys regarding the alleged value of claim 11 (as opposed to the value of claim
    20's more narrow scope), the validity of claim 11 would no longer be relevant to Samsung's
27  damages defenses and would not need to be decided by the Court at this time.

28

1    Decl. Ex. 22 (SAMNDCA630-00948288) at 1; Fazio Decl. Ex. 23 (Hall Dep.) at 55:3-20.)  For

2    example, Windows Mobile 5.0 performed background synchronization through its support for

3    ActiveSync-based synchronization with an Exchange server.  (*See, e.g.*, Fazio Decl. Ex. 22

4    (SAMNDCA630-00948288) at 5.)  As explained in Microsoft's "TechNet" article regarding

5    Exchange ActiveSync and Exchange, "[a]n event is generated in a user's Exchange account when

6    a new message arrives.  This event causes a Short Message Service (SMS) notification to be sent

7    to the user's device.  ***The device synchronizes in the background***.  The user data is updated to the

8    most current information, with no intervention on the part of the user."  (*Id*. (emphasis added).)

9    ███████████████████████████████████████████████████████████████ (Fazio Decl. Ex.

10   23 (Hall Dep.) at 12:14-21, 13:3-7, 13:25-14:21, 26:4-16, 55:19-20).)

11          As shown by the Windows Mobile 5.0 source code Microsoft produced for inspection in

12   this case (Fazio Decl. Ex. 18 (Microsoft Declaration) ¶¶ 10-11), Windows Mobile 5.0

13   implemented synchronization functionality using the same techniques discussed in the

14   '414 Patent.  Windows Mobile 5.0 contains multiple user applications for handling data, including

15   mail, calendar, and contacts applications, each of which has a user interface, is responsive to user

16   input through its graphical user interface, and relies on a thread for its user interface operations.

17   (*See* Fazio Decl. Ex. 24 (Chase Decl.) ¶¶ 31-33, 45-55.)  Windows Mobile 5.0 also contains

18   instructions to enable a user to access and edit underlying locally stored "structured data in a first

19   store associated with a first database," such as mail, calendar, or contacts data.  (*See id*. ¶¶ 36-37,

20   56-69.)  Windows Mobile 5.0 also contains instructions to execute a "synchronization processing

21   thread" in the ███████████████████████████████████████████████████████████

22   ███████ (*See id*. ¶¶ 35, 70-94.)  Windows Mobile 5.0 also contains synchronization software

23   components that are configured to synchronize the structured data from the first local database

24   with the structured data in a second Exchange Server database.  (*See id*. ¶¶ 95-104.)  Windows

25   Mobile 5.0 contains not just one, but multiple synchronization software components structured to

26   synchronize data of a different class, such as mail or contacts data.  (*See id*. ¶ 106.)  For these

27   reasons and as described in the attached declaration of Samsung's technical expert for the

28   '414 Patent, Dr. Jeffrey Chase, Windows Mobile 5.0 meets each limitation of claim 11 of the

1    '414 Patent.  (*See id*. ¶¶ 42-104.)

2          Apple's technical expert, Dr. Alex Snoeren, ***does not dispute*** that Windows Mobile 5.0

3    anticipates claim 11 of the '414 Patent.  Dr. Snoeren admits that he compared Windows Mobile

4    5.0 to claim 20 of the '414 Patent – a claim that *includes all limitations of claim 11* – but did not

5    identify any limitation in claim 11 that Windows Mobile 5.0 allegedly does not meet:

6          Q.     And there are, for example, specific references, like Windows
            Mobile, where you are not disputing that the prior art discloses all the
7          limitations of Claim 11, correct?

8          A.     I do not see in my report any explicit statement calling out a
            limitation in Claim 11 that Windows mobile doesn't meet.  [Reporter
9          requests clarification.]  Does not meet.  But again, I wasn't asked to analyze
            Claim 11 independently, and I don't express any opinions explicitly
10         regarding Claim 11.

11   (Fazio Decl. Ex. 25 (Snoeren Dep.) at 243:2-15 (objection omitted).)

12         Having failed to rebut Dr. Chase's analysis, or identify any genuine issue of material fact

13   to rebut Dr. Chase's showing that Windows Mobile 5.0 discloses each limitation of claim 11, there

14   is no dispute – Windows Mobile 5.0 anticipates claim 11 and summary judgment should be

15   entered.  *Implicit Networks Inc*. *v*. *F5 Networks Inc*., Nos. C10-3365 SI, C10-4234 SI, 2013 WL

16   1007250, at *7 (N.D. Cal. Mar. 13, 2013) (granting summary judgment of invalidity based on

17   evidence not contradicted by plaintiff's expert).

18         **C.     Windows Mobile 5.0 Anticipates Claim 20 of the '414 Patent**

19         Claim 20 depends on claim 11, and adds a single limitation:  "the synchronization software

20   component is configured to synchronize structured data of a first data class and other

21   synchronization software components are configured to synchronize structured data of other

22   corresponding data classes."  (Fazio Decl. Ex. 8 ('414 Patent) at 34:18-22).)  Windows Mobile 5.0

23   also anticipates this claim. █████████████████████████████████████

24   ███████████████████████████████████████████████████████████████

25   ███████████████████████████████████████████████████████████████

26   (Fazio Decl. Ex. 24 (Chase Decl.) ¶¶ 106.) █████████████████████████████

27   ███████████████████████████████████████████████████████████████

28

1     ███████████████████████████████████████████████████████

2     ████████████████████ (*Id.* ¶¶ 87-88, 106-109.)

3        Again, Apple does not dispute any of these facts.  Instead, Apple's rebuttal depends

4 entirely on new claim constructions appearing for the first time in Dr. Snoeren's expert reports.

5 Dr. Snoeren contends that "Windows Mobile with ActiveSync does not disclose *the plug-in model*

6 *architecture required by claim 20.*"  (Fazio Decl. Ex. 14 (Snoeren Rebuttal Report) ¶ 551

7 (emphasis added).)  To that end, Dr. Snoeren opines that claim 20 requires "a plug-in model

8 architecture" in which all software components "plug-in" to a "framework" that is "consistent" for

9 all synchronization requests.  (Fazio Decl. Ex. 13 (Snoeren Opening Report) ¶ 408; Fazio Decl.

10 Ex. 14 (Snoeren Rebuttal Report) ¶¶ 428, 572.)[8]

11        These requirements appear nowhere in claim 20 – they are cut from whole cloth.  Apple

12 tries to transform claim 20, which merely discloses the use of multiple "components" for

13 synchronization, into an "**architecture**" of "**plug-in**" components that form a "**consistent**

14 synchronization **framework**," where at least three synchronization software components each

15 "cause the generation of" a separate "synchronization processing thread."  Apple's new

16 constructions are improper and should not be considered.  Even if they are considered, they are

17 insufficient to create a genuine issue of material fact and summary judgment should be granted.[9]

18 Moreover, they are clearly meritless.  The '414 Patent does not limits claim 20 to a "consistent" or

19 "extensible" architecture where only "plug-in" components can be used to synchronize data

20

21 _____

22 [8] ████████████████████████████████████████████████████████████████

23 ███████████████████████████████████████████████████████████████████████

24 ███████████████████████████████████████████████████████████████████████

25 ███████████████████████████████████████████████████████████████████████

26 ███████████████████████████████████████████████████████████████████████

27 [9] *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001) ("Broad conclusory statements offered by . . . experts are not evidence and are not sufficient to establish a genuine issue of material fact.").

28

classes.  The language of claim 20 certainly never limits itself to such an architecture.[10]  Apple's new claim constructions are a transparent effort to import limitations from one embodiment into the claims.  If Apple's belated claim constructions are rejected, it has no validity defense on claim 20.

In any case, even if Apple's claim constructions *were* correct, Dr. Snoeren's statement that "[t]he Chase Report does not point to any evidence that Windows Mobile with ActiveSync disclosed [a plug-in] architecture" is entirely false.  (Fazio Decl. Ex. 14 (Snoeren Rebuttal Report) ¶ 551.)

██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
███████████████████████████████ (*See* Fazio Decl. Ex. 24 (Chase Decl.) ¶¶ 87-88, Fazio Decl. Ex. 24 (Chase Decl.) Ex. 2 at 7, 12, 18.)  If claim 20 somehow required each component to "plug in" to a "consistent" "framework," these requirements are met by Windows Mobile 5.0, and Apple presents no argument to the contrary.

Nor does claim 20 specify what threads each "synchronization software component" must run on.  The specification of the '414 Patent describes the relationship between synchronization software components and synchronization processing threads only to define synchronization processing threads as "synchronization tasks performed by one or more synchronization software components."  (Fazio Decl. Ex. 8 ('414 Patent) at 25:3-5.)  Consistent with the description of the '414 Patent, Apple's Rule 30(b)(6) representative on the '414 Patent's subject matter explained that a synchronization software component necessarily would provide a synchronization processing thread simply by executing synchronization tasks in that thread:

_____

[10]   *See, e.g., Liebel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 906 (Fed. Cir. 2004) (claims should not be limited to an embodiment); *see also* Dkt. 447 (noting that "[f]or the specification to limit the scope of a claim, there must be a clear disavowal of the claim scope," and that where specification described characteristics of a particular embodiment, there was no disavowal if "the specification nowhere expressly *limits* the claims to this one embodiment of the invention") (emphasis added) (citing *Omega Eng'g, Inc., v. Raytek Corp.,* 334 F.3d 1314, 1324 (Fed. Cir. 2003).

Q.  And what does it mean for a synchronization processing thread to be provided by a synchronization software component? . . .

A.  **A component, which is some software application, would have executing code, and that executing code must execute in a thread.  Thus, that thread would be provided by the synchronization component.**

(Fazio Decl. Ex. 28 (Freedman Dep.) at 129:6-15 (emphasis added).)  Dr. Snoeren applied this same interpretation in his *infringement* report:  threads were "provided by" a component if the component performed its tasks in that thread.  (*See* Fazio Decl. Ex. 13 (Snoeren Opening Report) ¶ 455 ██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ ").)[11]

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████ While the basis of his opinion is not clear from his report, at deposition, Dr. Snoeren explained that he had assumed in his analysis that a synchronization software component

---

[11]  In addition, Dr. Snoeren contends that each of the three synchronization software components required by claim 20 must "provide its *own* synchronization processing thread" (Fazio Decl. Ex. 14 (Snoeren Rebuttal Report ¶ 493), but only claim 11 – not claim 20 – mentions a "synchronization processing thread" or discusses how that thread is "provided" (Fazio Decl. Ex. 8 ('414 Patent) at 33:36-54, 34:18-22), and only *one* of the three synchronization components in claim 20 – namely, the component "configured to synchronize structured data of a *first* data class," which is the same "synchronization software component" referenced in claim 11 – is described by the claim as "providing" anything.  (*Id*. at 33:36-54.)  Nothing in the claim requires the "*other* synchronization software components" to run on any particular thread – much less that each component run on its *own* "synchronization processing thread" or that each component "provide" its own thread.  (*Id*. at 33:36-54, 34:18-22.)  And nothing in the specification clearly limits the claim language to one particular embodiment – indeed, there *is* no such embodiment.

1  must "cause[] the generation of the thread on which it is going to execute." (Fazio Decl. Ex. 25

2  (Snoeren Dep.) at 300:18-23.) However, this new requirement of "causing the generation" of the

3  synchronization processing thread – which did not appear until Dr. Snoeren's rebuttal report and

4  which Dr. Snoeren did not even fully elucidate until his deposition – is devoid of support in the

5  '414 Patent. It also squarely contradicts the testimony of Apple's own corporate representative on

6  the meaning of the '414 Patent, as Dr. Snoeren concedes. (Fazio Decl. Ex. 25 (Snoeren Dep.) at

7  349:15-350:3.)

8

9

10      Because Apple's newly invented, unsupportable claim constructions are its *only* basis to

11  assert claim 20 is valid over Windows Mobile, summary judgment of invalidity is appropriate.

12  *See OptimumPath, LLC v. Belkin Intern., Inc*., No. 09-1398, 2011 WL 1399257, at *10 (N.D. Cal.

13  Apr. 12, 2011) (granting summary judgment of invalidity, finding that plaintiff's sole argument

14  opposing anticipation failed due to the court's claim construction).

15  **IV.   CLAIMS 24 AND 25 OF THE '959 PATENT ARE INVALID AS INDEFINITE**

16      To be valid, claims must "particularly point[] out and distinctly claim[] the subject matter

17  which the inventor or a joint inventor regards as the invention." 35 U.S.C. § 112(b). Claims are

18  indefinite "where an accused infringer shows by clear and convincing evidence that a skilled

19  artisan could not discern the boundaries of the claim based on the claim language, the

20  specification, and the prosecution history, as well as her knowledge of the relevant art area."

21  *Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008). Phrases with

22  subjective meanings fail this test; the patent must provide some objective standard of measuring

23  its scope. *See Datamize, LLC v. Plumtree Software, Inc*., 417 F.3d 1342, 1351 (Fed. Cir. 2005).

24      There is no objective way to determine the scope of claims 24 and 25 of the '959 Patent.

25  The term "heuristic" appears in the following limitations of those claims:

26      provide said information identifier to a plurality of **heuristics** to locate
         information in the plurality of locations which include the Internet and
27       local storage media (claim 24);

28      determine at least one candidate item of information based upon the

-16-                    Case No. 12-CV-00630-LHK (PSG)

plurality of **heuristics** (claim 24)

wherein the information identifier is applied separately to each **heuristic**. (claim 25)

(Fazio Decl. Ex. 30 ('959 Patent) at 9:16-30.)

During the preliminary injunction phase of this case, the Court noted that "Apple has been less than clear as to how, exactly, it defines 'heuristic,'" and "[t]he specification is not particularly illuminating" with respect to the term's meaning.  (Dkt. 221 at 15, 16.)  These problems still exist today for the '959 Patent specification.   As the Court already has found:  "Although the specification refers frequently to the use of 'heuristics' to conduct the searches within each module's search area, the specification does not provide further explanation as to how 'heuristics.' is defined."  (Dkt. 221 at 17.)  The specification thus does not define the term "heuristic" – and while both Apple and Samsung agree that a "heuristic" in the context of claims 24 and 25 of the '959 Patent would cover at least "a rule of thumb and does not consist solely of constraint satisfaction parameters" (Fazio Decl. Ex. 13 (Snoeren Opening Report) ¶ 101),  the record shows that no one—not Apple, not experts, not inventors, not Apple employees, not third-party fact witnesses—can actually translate those words into a meaningfully precise claim scope with clear, objective boundaries.

On these facts, claims 24 and 25 are invalid:  "Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope." *Halliburton Energy Servs*., 514 F.3d at 1251 (Fed. Cir. 2008).[12]  Indefiniteness is established here because "clear and convincing evidence [shows] that one of ordinary skill in the relevant art could not discern the boundaries of the claim

---

[12]  "[A] construed claim can be indefinite if the construction remains insolubly ambiguous . . ." *Biosig Instruments, Inc*. *v*. *Nautilus, Inc*., 715 F.3d 891, 898 (Fed. Cir. 2013) (quoting *Star Scientific, Inc*. *v*. *R.J. Reynolds Tobacco Co*., 655 F.3d 1364, 1373 (Fed. Cir. 2011)); *see also Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1377-79 (Fed. Cir. 2001) (accepting the district court's claim construction and separately undertaking an analysis of the claims at issue to determine indefiniteness); *Union Pac. Res. Co*. *v*. *Chesapeake Energy Corp*., 236 F.3d 684, 689-90, 692 (Fed. Cir. 2001) (same); *Minn. Min. and Mfg. Co*. *v*. *Johnson & Johnson Orthopaedics, Inc*., 976 F.2d 1559, 1567 (Fed. Cir. 1992) (same).

based on the claim language, the specification, the prosecution history, and the knowledge in the relevant art." *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010).

The intrinsic record of the '959 Patent does not explain to one of ordinary skill how to identify a 'heuristic' for purposes of claim 24. Apple's own expert could not point to a single heuristic in the '959 Patent specification or prosecution history as a clear disclosure of a heuristic. (Fazio Decl. Ex. 14 (Snoeren Rebuttal Report) ¶¶ 348-364.) Instead, Apple's expert embraced the lack of disclosure within the '959 specification, stating that "the specification ***need not*** give specific examples of how to implement a heuristic algorithm for the person of ordinary skill in the art to be able to apply the Court's claim interpretation. (Fazio Decl. Ex. 14 (Snoeren Rebuttal Report) ¶ 363 (emphasis added).)

This is the rare case when the patentee itself concedes that the specification provides ***no examples*** of "heuristics" as that term is used in the claims. Nor does Apple's expert or Apple contend that the prosecution history of the '959 Patent provides some objective measure. Instead, a person of ordinary skill is left to their own subjective ends to figure out whether a given algorithm falls within the scope of the claims.

This is consistent with Apple's discovery responses, where Apple claimed it could not determine if the search techniques disclosed in the '959 Patent specification were "heuristics" as that term is used in the claims of the '959 Patent. For example, when asked to admit that "locat[ing] items of information on the basis of names of files" is a "heuristic" Apple responded:

> Apple responds that "locat[ing] items of information on the basis of names of files" can be what a "heuristic" does, but there may be certain circumstances in which "locat[ing] items of information on the basis of names of files" is not what a "heuristic" does. In view of the foregoing, and because this request lacks any application to a specific set of facts, Apple denies the request.

(Fazio Decl. Ex. 32 (Apple's Supplemental Responses to Samsung's First Requests for Admission) at 3-4.) Apple gave the same response for other search techniques described in the

'959 Patent specification.  (*Id*. at 3-9.)[13]  The '959 Patent specification, while mentioning the word "heuristic" numerous times, does not explain what factors a person of skill should consider when determining whether a given search technique ***actually is "heuristic" or not*** for purposes of claims 24 and 25, rendering the term indefinite.  *Datamize*, 417 F.3d at 1352.

The factual record confirms indefiniteness in spades.  The named inventors of the '959 Patent, for example, gave directly conflicting answers when asked if basic search techniques disclosed in the '959 Patent specification are heuristics or not.

|  | Keith Mortensen | Yan Arrouye |
|---|---|---|
| "searching by file name" | "Yes." | "I wouldn't say that is heuristic, no, absolutely not." |
| "searching the content of files" | "Yes." | "As an engineer, I would not -- I would call that a task, not a heuristic." |
| "searching an Internet search engine" or "searching the Internet" | "Yes." | "Again, follow those -- I think you can employ heuristics to perform the task you are trying to do.  So I would call that a task for which you can use or not use a heuristic." |

(Fazio Decl. Ex. 33 (Mortensen Dep.) at 187:2-5, 187:11-13, 188:4-9; Fazio Decl. Ex. 34 (Arrouye Tr.) at 47:25-48:3, 50:4-8, 50:10-16.)[14]  In fact, when asked to identify the differences between a heuristic and non-heuristic algorithm, the inventors were unable to do so:

> Q.  So what's the difference between a heuristic algorithm and a nonheuristic algorithm?
>
> A.  I couldn't honestly say what the hard differences are.

(Fazio Decl. Ex. 33 (Mortensen Dep.) at 66:24-67:2.)

> Q.  So, again, what is the heuristic for the plug-in modules in Figure 2 that's described in the '959 and '604 patents?

---

[13]  These include "locat[ing] items of information on the basis of contents of files," "locat[ing] items of information on the basis of most recently accessed items," "locat[ing] items of information that are stored locally on the computer system," "locat[ing] items of information that are stored on remote computer systems," and "locat[ing] Internet web pages." (Fazio Decl. Ex. 30 ('959 Patent) at 8:29-47.)

[14]  The '959 patent co-inventors, Yan Arrouye and Keith Mortensen, are persons of ordinary skill in the art for purposes of the '959 patent.  (Fazio Decl. Ex. 33 (Mortensen Dep.) at 7:8-65:11 (describing education and work history as software engineer); Fazio Decl. Ex. 31 (Arrouye Dep.) at 14:7-21:23, 27:3-39:20  (describing education and work history as software engineer).)

A.   So an example that's given is to match the descriptor with the names of information located within the large storage media.

Q.   So if I match a user descriptor with the names of information located within various storage media in a computer, I'm using a heuristic; is that right?

A.   You might be using a heuristic, absolutely.

Q.   I might not be, though?

**A.   Who knows?**

(Fazio Decl. Ex. 34 (Arrouye Dep.) at 84:9-22 (objections omitted).)[15]

Q.   Okay.  So now I'm asking exactly the same question regarding heuristics.  You have testified that there are some algorithms that include heuristics; you have testified that there are some algorithms that do not include heuristics.  So my question is:  *Can you articulate a definitional difference between these two categories other than you know it when you see it?*

*[A.]:  No.*

(Fazio Decl. Ex. 33 (Mortensen Dep.) at 82:11-21 (emphasis added).)

Apple's technical expert similarly could not decide whether a given search technique is a heuristic or not.  In his opening expert report, Dr. Snoeren described a document as "including the use of heuristics like synonym matching, correction of incorrect spellings, and compensation for missing words."  (Fazio Decl. Ex. 13 (Snoeren Opening Report) at n. 57.)  But when asked whether *these same search techniques* were "heuristics" at his deposition he could not say one way or another:  "Again, as I've mentioned, it would depend on how those things are actually implemented and what they did.  If you have a particular context, a particular implementation of those goals, they may or may not be heuristic.  I do not recall as I sit here today opining about any particular implementation of those functionalities.  But to the extent that I did, if you'd like to refresh my memory, I'd be happy to talk to you about those details."  (Fazio Decl. Ex. 25 (Snoeren Dep.) at 433:23-434:7.)  This type of analysis is the exact type that courts have consistently found

---

[15]   Mr. Arrouye later submitted an errata attempting to change his answer from "Who knows?" to "No."  (Fazio Decl. Ex. 35 (Arrouye Errata) at 1.)

indefinite.  *See Halliburton*, 514 F.3d at 1255 ("When a proposed construction requires that an

artisan make a separate infringement determination for every set of circumstances in which the

composition may be used, and such determinations are likely to result in differing outcomes

(sometimes infringing and sometimes not), that construction is likely to be indefinite.").

Other persons of ordinary skill further confirmed this insoluble ambiguity.  Nearly every

person of skill deposed in this case had a different understanding of "heuristic" and regularly

could not determine whether a given algorithm or software program used a heuristic or not.[16]  For

instance, former Apple engineer Tim Oren, who was responsible for research and development of

information retrieval algorithms and interfaces for Apple in the late 1980s to early 1990s, testified

as follows:

> Q. So what's the difference, then, between a rule of thumb and an inference?
>
> [A.]: A very blurry one.
>
> Q. Can you define it?
>
> A. No, not really. ***What's that famous quote? I'll know it when I see it.***

(Fazio Decl. Ex. 36 (Oren Dep.) at 220:15-22 (objections omitted).)

Case after case compels an indefiniteness finding on these facts.  In *Datamize*, the Federal

Circuit held the term "aesthetically pleasing" failed to provide a "workable objective standard"

because "it is completely dependent on a person's subjective opinion." *Datamize*, 417 F.3d at

1350.  As the Court explained, "[t]he scope of claim language cannot depend solely on the

unrestrained, subjective opinion of a particular individual purportedly practicing the invention."

*Id*.  In *Ernie Ball*, the Federal Circuit recently held a claim indefinite where the term "a line that

. . . does not form a sinusoidal arc" was dependent on subjective perception.  *Ernie Ball, Inc. v.

Earvana, LLC*, 502 Fed. Appx. 971, 980 (Fed. Cir. 2013).  Discerning infringement relied "on

which among a limitless number of possible lines extending through those intonation portions one

---

[16]   Additional testimony from former Apple employees and persons of ordinary skill is attached as Exhibit 29 to the Fazio Declaration.  (Fazio Decl. Ex. 29.)

1   has in mind at any given time." *Id.* Apple's attempt to use the ambiguity of the word "heuristic"

2   to seek a monopoly on some unknown set of search techniques should not be rewarded. The

3   Court should hold that claims 24 and 25 are invalid under 35 U.S.C. § 112.

4   **V.    CLAIM 13 OF THE '596 PATENT HAS A PRIORITY DATE OF NOVEMBER 9,**
        **2004**
5

6       The Court should grant summary judgment that claim 13 of Samsung's '596 Patent has a

7   priority date of November 9, 2004. This is a question of law that should be decided by the Court.

8   *See E.I. du Pont de Nemours & Co. v. MacDermid Printing Solutions, L.L.C.*, 525 F.3d 1353,

9   1359 (Fed. Cir. 2008) ("Determination of the priority date . . . is purely a question of law if the

10  facts underlying that determination are undisputed.").

11      Patent applications may claim priority to earlier filed applications under 35 U.S.C. § 120

12  when the requirements of 35 U.S.C. § 112 are met. Priority is given when no "new matter" is

13  claimed. *Star Scientific, Inc.*, 655 F.3d at 1371-72. Apple's arguments against the priority date of

14  the '596 Patent are based entirely on an improper claim construction of the claim term "DDI

15  field." When "DDI field" is properly construed, there is no factual issue that claim 13 is disclosed

16  in the priority application filed on November 9, 2004 ("the priority application"). Apple's claim

17  construction is at odds with the intrinsic record and the doctrine of claim differentiation. If this

18  claim construction issue is not resolved by the Court, it will only confuse the jury and lead to

19  reversible error. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed.

20  Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims,

21  the court, not the jury, must resolve that dispute."). Apple should not be permitted to present

22  invalidity references to the jury that are not even prior art to the '596 Patent. Three of Apple's

23  prior art combinations depend on the wrong priority date.

24      **A.    The "DDI Field" is a Logical Identifier Representing the First PDU**

25      Claim 13 states a "first header part corresponding to the first PDU by using a data

26  description indicator (DDI) field representing the first PDU." (Fazio Decl. Ex. 37 ('596 Patent).)

27  The claim language is clear: (1) a DDI field is a header part and (2) this header part represents the

28  first PDU. The '596 specification discloses a header part corresponding to a first MAC-es PDU

that is configured with a DDI field, which is a logical identifier.  (*Id*. at 10:61-63 ("DDI, which is a logical identifier"), 11:15-17 ("MAC-e header part #1 805 corresponding to a first MAC-es PDU 850 is configured with a DDI field 820").)  As defined by claim 13 and supported by the '596 specification, a DDI field is a header part that is a logical identifier representing the first PDU.

Apple's entire theory on priority hinges on an improper construction of "DDI field." Apple's construction ignores the clear definition in the '596 Patent and violates the canon of claim differentiation.  Specifically, Apple's construction narrows the definition of "DDI field" in independent claim 13 to the definition of "DDI field" set forth in *dependent* claim 18.  Claim 13 states that the DDI field represents the first PDU.  (Fazio Decl. Ex. 38 (Fuja Dep. 348:16-23, Sept. 20, 2013).)[17]  Dependent claim 18, on the other hand, states that the DDI field must represent three specific attributes of the first PDU:  (1) media access control-data (MAC-d) flow, (2) a logical channel relating to uplink packet data included in the first PDU, and (3) a size of the uplink packet data.  (*Id*. at 351:1-352:3.)  Apple argues that these limitations should be imported into claim 13 and these limitations are not disclosed in the priority application.  (*Id*. at 359:13-360:16.)

> The asserted claims of the '596 patent require a "data description indicator
> (DDI) field" that the specification defines as "a logical identifying a logical
> channel, a MAC-d flow, and an RLC PDU size."

(Fazio Decl. Ex. 39 (Fuja Op. Report) ¶ 511.)  Apple's construction does not allow for the "DDI field" in claim 13 to be construed anymore broadly than the definition in dependent claim 18.

Black letter law dictates that Apple's construction is wrong.  *See Aspex Eyewear, Inc. v. Marchon Eyewear, Inc*., 672 F.3d 1335, 1348 (Fed. Cir. 2012) (finding patentee's claim differentiation argument dispositive because accused infringer's construction rendered a dependent claim's limitation superfluous); *see also Am. Med. Sys., Inc. v. Biolitec, Inc*., 618 F.3d 1354, 1360-61 (Fed. Cir. 2010) (holding that independent claims were not limited to particular wavelengths because dependent claims recite specific wavelength ranges) (citing *Phillips v. AWH*

---

[17] Claim 1 is a method claim and claim 13 is an apparatus claim.  Claim 1 and claim 13 set forth the same limitations.  (Fazio Decl. Ex. 39 (Fuja Opening Rept.) ¶ 703.)  Similarly, claim 6, which depends from claim 1, and claim 18, which depends from claim 13, add the same limitation.

*Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (*en banc*)); *The Saunders Group, Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1331-32 (Fed. Cir. 2007) (holding that the district court incorrectly construed the asserted independent claim to a specific limitation when that limitation was stated in other dependent claims).  Under the doctrine of claim differentiation, the DDI field in claim 13 is broader than the DDI field in claim 18.  The DDI field in claim 13 does not have to specify the three attributes in claim 18.  Instead it is simply a logical identifier representing the first PDU.

Apple's expert stated he did not apply the law on claim differentiation when he formed his opinion related to priority.

> Q.    Before you submitted your reports in this case, were you aware that
> an independent claim should be construed broadly enough to include its
> dependent claims?
> A.    I'm -- no, no, I was not aware of that.

(Fazio Decl. Ex. 38 (Fuja Dep. 352:20-24).)

> Q.    So it's your testimony today that DDI in claim 1 should have the
> same meaning as claim 6 gives to DDI?
> A.    Essentially, yes, with the caveat that they do use rather unusual
> language, that is a size of the uplink packet data.

(Fazio Decl. Ex. 38 (Fuja Dep. 358:9-15 (objections omitted); *see also id.* at 352:25-354:9, 358:16-359:12).)  When questioned as to why he limited his construction to the specific attributes found in the dependent claim, Apple's expert stated that this was the only embodiment he found in the specification.

> Q.    So you looked at the preferred embodiment and then reached the
> conclusion that DDI in claim 1 should be limited to the preferred
> embodiment?
> A.    Again, that was the only definition of DDI that I could find in the
> '596.  I was given no guidance within the specification that it would be
> possible to interpret DDI any more broadly than that.

Fazio Decl. Ex. 38 (Fuja Dep. 358:23-359:6 (objections omitted).)  However, courts have regularly recognized that even when the specification discloses only one embodiment, it is improper to limit the claims to that embodiment when the specification did not indicate that the disclosed embodiment was the only way to practice the invention.  *See The Saunders Group*, 492 F.3d at 1331-32; *see also* Dkt. No. 447 at 3, 7, 17 (finding that "the language of the claims should

1    not be limited to only the preferred embodiment").

2        **B.    The Priority Application Discloses a Header Part that is a Logical Identifier Representing the First PDU**

3

4    One only needs to compare claim 1 in the priority application to claim 13 of the '596

5    Patent to see that the priority application discloses a header part that represents the first PDU.

6    (Fazio Decl. Ex. 40 (priority application) at 19.)  In both claims, there is "a header part

7    corresponding to the protocol data unit [PDU]."  The only thing that claim 13 adds are the words:

8    "by using a data description indicator (DDI) field representing the first PDU."  As set forth below,

9    the specification clearly discloses this additional language.

10   • First, the specification discloses a ***header part*** representing a first PDU.  (*Id.* at 13 ("k$^{th}$ header part 530 corresponds to a k$^{th}$ MAC-es PDU").)

11
12   • Second, the specification discloses that the ***header part*** includes a ***mutiplexing identifier***.  (*Id.* ("[e]ach header part 520 or 530 includes a mutiplexing identifier 522 or 532").).

13
14   • Finally, the ***multiplexing identifier*** may be a ***logical identifier***.  (*Id.* ("[t]he multiplexing identifier 532 may be a logical identifier").)

15
16   • Thus, the specification discloses ***a header part that is a logical identifier representing the first PDU***.

17   The fact that the '596 Patent refers to the header part as a "DDI field" and the priority

18   application refers to the same header part as a "multiplexing identifier" is immaterial.  *See Star*

19   *Scientific*, 655 F.3d at 1371-1372 (reversing the district court's priority findings because the

20   district court improperly narrowed the scope of the provisional application based on an added

21   example in the later-filed non-provisional application).  Both the '596 Patent and the priority

22   application use different words to describe the same thing (*i.e*., a logical identifier).  When "DDI

23   field" is properly construed to mean a "logical identifier representing the first PDU," there can be

24   no factual dispute that the claimed "DDI field" is disclosed in the priority application.

25                                **CONCLUSION**

26   For the foregoing reasons, Samsung respectfully asks the Court to grant its Motion for

27   Summary Judgment on all claims described above.

28

1  DATED:  October 10, 2013          QUINN EMANUEL URQUHART &
                                     SULLIVAN, LLP
2

3                                    By /s/ Victoria F. Maroulis

4                                       Charles K. Verhoeven
                                        Kevin P.B. Johnson
5                                       Victoria F. Maroulis
                                        William C. Price
6
                                        Attorneys for
7                                       SAMSUNG ELECTRONICS CO., LTD.,
                                        SAMSUNG ELECTRONICS AMERICA, INC.,
8                                       and SAMSUNG TELECOMMUNICATIONS
                                        AMERICA, LLC
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28