# Exhibit 3

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| 1 | JOSH A. KREVITT (CA SBN 208552) |
| | jkrevitt@gibsondunn.com |
| 2 | H. MARK LYON (CA SBN 162061) |
| | mlyon@gibsondunn.com |
| 3 | GIBSON, DUNN & CRUTCHER LLP |
| | 1881 Page Mill Road |
| 4 | Palo Alto, California  94304-1211 |
| | Telephone:  (650) 849-5300 |
| 5 | Facsimile:  (650) 849-5333 |

WILLIAM F. LEE (*pro hac vice*)
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, Massachusetts  02109
Telephone:  (617) 526-6000
Facsimile:  (617) 526-5000

MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

MARK D. SELWYN (CA SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California  94304
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100

*Attorneys for Plaintiff and Counterclaim-Defendant Apple Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>          Plaintiff,<br><br>     vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>          Defendants. | Case No. 12-cv-00630-LHK (PSG)<br><br>**APPLE INC.'S FURTHER SUPPLEMENTAL OBJECTIONS AND RESPONSES TO SAMSUNG'S FIRST SET OF INTERROGATORIES TO APPLE (NO. 12)**<br><br>**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY** |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**PLAINTIFF AND COUNTERCLAIM-DEFENDANT APPLE INC.'S FURTHER SUPPLEMENTAL OBJECTIONS AND RESPONSES TO SAMSUNG'S FIRST SET OF INTERROGATORIES (NO. 12)**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and Local Rule 33, Apple Inc. ("Apple") hereby provides further supplemental responses to Interrogatory No. 12 served by Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America LLC (collectively, "Samsung") on September 25, 2012. These responses are based on information reasonably available to Apple at the present time. Apple reserves the right to continue discovery and investigation into this matter and reserves the right to amend and supplement these responses when and if additional information becomes available. Apple's objections as set forth herein are made without prejudice to Apple's right to assert any additional or supplemental objections pursuant to Rule 26(e).

**GENERAL OBJECTIONS**

The General Objections set forth in Apple Inc.'s Objections and Responses to Samsung's First Set of Interrogatories, served on November 8, 2012, are incorporated herein by reference.

**OBJECTIONS AND RESPONSES TO INTERROGATORIES**

Subject to the foregoing qualifications and General Objections and the specific objections made below, Apple objects and responds to Samsung's First Set of Interrogatories as follows:

**INTERROGATORIES**

**INTERROGATORY NO. 12:**

If YOU contend or believe that YOU do not infringe any asserted claim of the SAMSUNG PATENTS, state with specificity the complete factual and legal bases for such contention or belief.

**RESPONSE TO INTERROGATORY NO. 12:**

Apple objects to this Interrogatory as premature to the extent that it: (a) conflicts with the schedule entered by the Court, (b) conflicts with the obligations imposed by the Federal Rules of Civil Procedure, the Civil Local Rules and/or the Patent Local Rules of this Court, and/or any

- 1 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Based on Apple's current understanding of the asserted claims of the '449 patent, including how Samsung has applied those claims in its contentions Samsung cannot prove infringement of asserted claims 25 or 27 for at least the following reasons in addition to the reasons set forth above.

## VIII.   CLAIM 25

### A.   "A digital camera"

The accused products are not "digital cameras," as required by claim 25.  The cameras of the accused products are merely component parts of a larger multimedia system that includes at least a phone, computer, digital music player, video player, global positioning device, game player, email device, online store, and numerous other component parts.

### B.   "an A/D converter which converts said analog signal from said imaging device to a digital signal"

Samsung has failed to identify "an A/D converter which converts said analog signal from said imaging device to a digital signal," as required by claim 25.  Samsung identifies only a "CMOS Image Sensor" as satisfying both the "imaging device" and "A/D converter" limitations, not "an A/D converter" which receives analog signals "from said imaging device," as required by the claims.  Because Samsung has failed to articulate an infringement theory with respect to each requirement of this limitation, Samsung cannot prove infringement and Apple cannot fully respond to Samsung's infringement contentions.  In any event, the accused Apple products do not have "an A/D converter which converts said analog signal from said imaging device to a digital signal."  The "CMOS Image Sensor" identified by Samsung does not output an analog signal to an A/D converter.

### C.   "a compressor which compresses said digital signal outputted from said A/D converter, and generates compressed data by using a different compressing method for moving image signals and for still image signals"

Samsung has failed to identify "a compressor which compresses said digital signal outputted from said A/D converter, and generates compressed data by using a different compressing method for moving image signals and for still image signals," as required by claim

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**E.**     **"a recording circuit which records compressed data, said compressed data including a moving image signal, and a still image signal"**

Samsung asserts only that "[o]n information and belief," the accused devices have "a recording circuit that records both compressed moving image data and compressed still image data to a NAND flash module for storage."  But Samsung has failed to identify any component(s) that supposedly meet the limitation "a recording circuit which records compressed data, said compressed data including a moving image signal, and a still image signal."  Because Samsung has failed to articulate its infringement theory with respect to each requirement of this limitation, Samsung cannot prove infringement and Apple cannot fully respond to Samsung's infringement contentions.

**F.**     **"a reproducing circuit which reproduces a moving image signal, a sound signal in synchronous to said moving image signal, and a still image signal"**

Samsung has failed identify "a reproducing circuit which reproduces a moving image signal, a sound signal in synchronous to said moving image signal, and a still image signal" in any accused product, as required by claim 25.  Samsung asserts only that "[o]n information and belief," the accused devices have "a reproducing circuit which can reproduce a moving image signal, a sound signal that is synchronous to a moving image signal, and a still image signal," and generally mentions a "graphical processing unit" in some of the accused products' processors.  Samsung has not identified any "circuit" that allegedly performs the required functionality.  Because Samsung has failed to articulate its infringement theory with respect to each requirement of this limitation, Samsung cannot prove infringement and Apple cannot fully respond to Samsung's infringement contentions.

**G.**     **"a display which displays said moving image signals and still image signals outputted from said reproducing circuit, and a list of said moving image signal and still image signal as a search mode, and a list of classifications as a classification mode"**

Samsung has failed to show that the accused products contain "a display which displays said moving image signals and still image signals outputted from said reproducing circuit, and a

APPLE'S FURTHER SUPPLEMENTAL RESPONSES TO
SAMSUNG'S FIRST SET OF INTERROGATORIES (NO. 12)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

list of said moving image signal and still image signal as a search mode, and a list of classifications as a classification mode." Samsung contends that the "Camera Roll" View satisfies the "list of said moving image signal and still image signal as a search mode" limitation. The Camera Roll View of the accused products is neither a "list," nor does it incorporate a "search mode." Camera Roll does not allow users to search for particular images or videos and uses a thumbnail grid structure for displaying images and videos.

Samsung further contends that the Album List View of certain iPhone and iPod touch products satisfies the "list of classifications as a classification mode" limitation. Samsung omits iPad products from its infringement contentions for this limitation. Because Samsung has failed to articulate its infringement theory with respect to each requirement of this limitation, Samsung cannot prove infringement and Apple cannot fully respond to Samsung's infringement contentions. In any event, the iPad products do not display a "list of classifications as a classification mode." The iPad products display albums as thumbnails in a grid structure, and the Album List View does not allow users to designate Album settings for particular image or video files.

**H.    "wherein said recording circuit records each one of said plurality of image signals with classification data"**

Samsung asserts that "[o]n information and belief," the accused devices have "a recording circuit that records the classification data (i.e., the identification of the Albums that contain a particular image signal) for each moving image signal and still image signal that is recorded." But Samsung has failed to identify any functionality or component(s) in the accused Apple products that supposedly satisfies the limitation "said recording circuit records each one of said plurality of image signals with classification data," as required by claim 25. In any event, none of the accused products has circuitry that records the identification of an image's corresponding Album when the image is captured. All captured images and videos are stored in the default Camera Roll, not in an Album.

- 62 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

features: (1) iTunes in the Cloud, (2) iTunes Match, (3) Photo Stream, (4) Syncing with iTunes, and (5) Home Sharing.  With respect to each of these features, Samsung fails to articulate any infringement theory with respect to each requirement of this limitation.  Therefore, Samsung cannot prove infringement, and Apple cannot fully respond to Samsung's infringement contentions.

### D.      iTunes in the Cloud/iTunes Match

Samsung contends that "Apple's iCloud service allows a user to store, interface with, and access all of the user's multimedia information stored on the iCloud from a Zone Device."  However, as noted above, "the iCloud" is not a central storage and interface device.

iCloud is a combination of many different features, including iTunes in the Cloud, and iTunes Match.  iTunes in the Cloud and iTunes Match operate in different ways, utilize different software, hardware, and services, and are available based on different criteria, and therefore cannot be lumped into a single accused instrumentality Samsung's failure to differentiate between iTunes in the Cloud and iTunes Match leaves Apple unable to fully respond to Samsung's contentions.  Even so, there are a number of reasons why Apple's devices do not infringe.

Samsung contends that "any of the user's songs stored in the iCloud can be streamed . . . to an iOS device or a computer running iTunes."  However, streaming is the transmission of audio or video data from one device to another, such that the data is, at most, only temporarily stored.  Because the data is, at most, only temporarily stored, a device receiving steamed audio or video information is not "updated in relation to" the device that transmits the audio or video information.  There is no such thing as a temporary update.

Similarly, Samsung appears to contend that merely making audio, video, or photographic information available for download or selecting particular files to download meet this limitation.  Neither meets the requirements of the limitation.  The claim language makes clear that the update must enable a user "to be situated in any of the zones and access the audio, video or photographic information."  If the user must still manually download the content in order to

APPLE'S FURTHER SUPPLEMENTAL RESPONSES TO
SAMSUNG'S FIRST SET OF INTERROGATORIES (NO. 12)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

access it on the device, the device has not been updated in relation to that content.  The specification also makes this point clear: "The system allows multiple devices to synchronize its internal collection with each other, so that the end result is that all the devices have the same content and content management means (playlists, settings, etc.)."  ('757 Patent, col. 9, ll. 61-65.) In the same way, selecting and downloading particular files manually through a drag-and-drop or point-and-click method does not constitute "synchronizing" as used throughout the '757 patent, and in claim 1.

In addition, Samsung contends that "[u]pdates resulting from new music purchases or changes to the user's existing multimedia library are automatically downloaded to a Zone Device."  However, the patent makes clear that to practice claim 1, more is required.  One additional requirement is that the audio, video, or photographic information "contained within the zone specific storage and interface device *and* the central storage and interface, are updated in relation to the zone specific storage and interface devices *and* the central storage and interface device."  Thus, it requires the capacity to update both devices based on the information on the other.  Samsung fails to identify any way in which the audio, video, or photographic information contained within the central storage and interface device is updated in relation to the zone specific storage and interface device.

Moreover, the claim requires that "audio, video, or photographic information, relating to at least one user" stored within both the zone specific storage and interface device and the central storage and interface device "are updated in relation to" both the zone specific storage and interface devices and the central storage and interface devices.  The claim further requires that the at least one user can be situated "in any one of the zones" and access "*the* audio, video, or photographic information related to the user."  iTunes in the Cloud does not allow for updates from the zone specific storage and interface device to the central storage and interface device, and thus does not provide access to all the audio, video, or photographic data related to the user in any zone.  Likewise, iTunes Match does not provide for complete synchronization of a user's audio, video, or photographic information as a result of the update.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

iTunes in the Cloud does not provide a user the ability to update the audio or video multimedia stored in the central server.  When a user purchases a song utilizing iTunes in the Cloud, that song is ███████████████████   No user action can update the iTunes in the Cloud multimedia database.

Also, Samsung fails to describe how the iTunes Match service meets this limitation entirely.

### E.     Photo Stream

Samsung contends that "Apple designed Photo Stream to allow the Central Device to be the 'master photo library.'"  However, Samsung fails to identify how the devices update in relation to each other, nor is it clear what devices Samsung is claiming are the zone devices.  Moreover, as explained above, the claim requires that all the audio, video, or photographic data stored within the central storage and interface device or any zone specific storage and interface device must be made available on all the zone specific storage and interface devices as a result of the "update[]."  The Photo Stream service only stores information for a limited time, and, thus, does not make all a user's content available in any zone.  Therefore, Samsung cannot prove infringement and Apple cannot fully respond to Samsung's infringement contentions.

### F.     Synching With iTunes

Samsung contends that a user can sync music, photos and video between a zone specific storage and interface device and a central storage and interface device using iTunes.  However, the only feature Samsung describes is Syncing with iTunes, which allows an iOS device to copy information from a computer.  However, as described above, iOS devices are not zone specific storage and interface devices.  Therefore, Samsung fails to identify a zone specific storage and interface device with respect to Synching with iTunes.

### H.     Home Sharing

Samsung contends that "Apple's Home Sharing software allows a user with a second desktop or laptop computer . . . to operate it as a zone specific storage and interface device that is capable of storing or interfacing with multimedia information stored on a Central Device."

Case No. 12-CV-00630-LHK
APPLE'S FURTHER SUPPLEMENTAL RESPONSES TO
SAMSUNG'S FIRST SET OF INTERROGATORIES (NO. 12)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

However, as articulated above, neither the streaming feature nor the drag-and-drop feature of Home Sharing meets the limitation language.  Moreover, the patent requires that the audio, video, or photographic information "contained within the zone specific storage and interface device ***and*** the central storage and interface, are updated in relation to the zone specific storage and interface devices ***and*** the central storage and interface device."  Home Sharing does not allow a device to update its content in relation to a second device ***and*** to update the second device in relation to the content on the first device.  Both are required by the patent.  Moreover, as explained above, the claim requires that all the audio, video, or photographic data stored within the central storage and interface device or any zone specific storage and interface device must be made available on all the zone specific storage and interface devices as a result of the "update[]"; Home Sharing does not make all a user's content and content management information be stored in every zone.

## XI.   CLAIM 3

As an initial matter, Samsung has not explained how the accused Apple products "compris[e] a wide area network (WAN)."  The only WAN mentioned by Samsung, the Internet, is not under the control of Apple.  None of the accused products is a WAN.

Samsung contends that the "Apple iCloud service allows a user to couple a Zone Device to the iCloud server (i.e., the Central Device) using a wide area network (e.g., the Internet)."  However, as discussed above, Samsung has not shown that an "iCloud server" meets the limitations of a central storage and interface device.  Also, Samsung articulates no theory as to how the claim limitation is met with respect to other accused central storage and interface devices.  In addition, aside from iTunes in the Cloud, Samsung has not described how the other accused features couple Zone Devices and Central Devices over a WAN (Wide Area Network).  Neither Home Sharing nor iTunes Sync operates over a wide area network.  Therefore, Samsung cannot prove infringement and Apple cannot fully respond to Samsung's infringement contentions.

## XII.   CLAIM 4

Case No. 12-CV-00630-LHK

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

input signal."); SAMNDCA630-00832632 [5/20/96 Amend.] at 9, 12; Boss 6/19/13 Tr. at 96:14-21; 97:6-15; M.C. Freeman 6/19/13 Tr. at 71:6-16; R. Freeman 6/18/13 Tr. at 95:5-9, 153:9-20; ZINGERMANNDCA630-00000149; APL630DEF-WH-A0000032341; APL630DEF-WH-A0000032199-201; APL630DEF-WH-A0000020896; SAMNDCA630-00830180; SAMNDCA630-00829683-84; SAMNDCA630-00829773; SAMNDCA630-00829896-97; SAMNDCA630-00829903; SAMNDCA630-00831181; SAMNDCA630-00831182; SAMNDCA630-00831185-88; SAMNDCA630-00831190; SAMNDCA630-00831474; SAMNDCA630-00831478; SAMNDCA630-00831775; SAMNDCA630-00832131; SAMNDCA630-0082155; SAMNDCA630-00828677; SAMNDCA630-00828679; APL630DEF-WH-A0000004783- 940; APL630DEF-WH-A0000004704 at 13; APL630DEF-WH-A0000004734 at 36.)

A "composite signal" is an analog signal that contains the components of a full-motion video that has already been created.  In other words, the video must already exist before it is captured.  (*See, e.g.*, '239 patent at Abstract ("The audio/visual signal can either be NTSC, PAL, or Y/C."), 2:26-28 ("It is the purpose of the present invention to provide a method and means for capturing full-color, full-motion audio/video signals . . ."), 4:31-34 ("The video signal received by the remote unit can be of any generally known format, such as NTSC, PAL, and Y/C video (or S video)."); SAMNDCA630-00832590 [Affidavit] ¶ 2 (describing invention as an apparatus that captures, digitizes and compresses a "full motion composite signal"); SAMNDCA630-00832592 [¶ Ex. A to Affidavit] ("Remote unit digitizes and compresses video/audio NTSC signal"); SAMNDCA630-00832596 [2/2/96 Amend.] at 6; Docket No. 447 [Claim Const. Order] at 51-52; APL630DEF-WH-A0000036852 at 54.)  A CMOS image sensor has thousands of individual pixels, each containing a photodetector, arranged in an array that receive light through a lens.  (*See, e.g.*, Millet Tr. at 14:13-15:11 (image sensor captures photons of light).)  The light received by each pixel is converted into a digital value.  These values are then compiled into a stream of image (pixel) data.  (*See, e.g.*, APL630DEF-WH0005226539 ███████ Datasheet]; APL630DEF-WH0005224613 ████████ Datasheet]; APL630DEF-

- 97 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WH0000097566 ███████████ Datasheet]; APL630DEF-WH0000097306; APL630DEF-WH0000097401; APL630DEF-WH0000097728; APL630DEF-WH0000097835; APL630DEF-WH0000097942; APL630DEF-WH0000098046; APL630DEF-WH0000098144; ████0001 – 1281 and other image sensor data sheets listed below.)  A CMOS image sensor cannot receive a composite signal from an external device, as required by the term "capture" in the patent, nor is the CMOS sensor capable of receiving an audio signal.  The "processor with a graphical processing unit (GPU)" also cannot receive a composite signal from an external device. Moreover, FaceTime does not use GPUs as Samsung claims.

Moreover, even under Samsung's apparent construction of "capture," the accused components do not perform the identical function of "capturing, digitizing, and compressing at least one composite signal."  The light received by the CMOS image sensor and the image stream it creates are not "composite signals," nor do they have any audio component.  In fact, no video yet exists during the creation and processing of the image stream.  (*See, e.g.*, Millet Tr. at 14:13-15:11 (image sensor captures photons of light), 48:24-49:16 (output of image sensor is not a video signal).)  In addition, because the claimed function requires digitization of the composite signal, that signal is necessarily analog; otherwise, there would be no need for the composite signal to be digitized.  None of the accused components is capable of receiving an analog composite signal and digitizing and compressing that signal.  The accused devices also do not use a separate "A/D converter" as Samsung contends.  Rather, each image sensor contains an A/D converter for each column of pixels (*See, e.g.*, Millet Tr. at 16:15-17:3; APL630DEF-WH0005226539 ███████████ Datasheet]; APL630DEF-WH0005224613 █████████ ████ Datasheet]; APL630DEF-WH0000097566 ███████████ Datasheet]; APL630DEF-WH0000097306; APL630DEF-WH0000097401; APL630DEF-WH0000097728; APL630DEF-WH0000097835; APL630DEF-WH0000097942; APL630DEF-WH0000098046; APL630DEF-WH0000098144; ████-0001 – 1281 and other image sensor data sheets listed below.)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    Samsung also cannot prove that the accused components constitute the same structure

2  required by the Court.  Samsung asserts only that the components listed above "infringe this

3  claim both literally and under the doctrine of equivalents," but fails to explain how any of these

4  components (or combinations thereof) is an audio capture card, a video card having a video

5  capture module, or both.  Nor are the accused components the same structure.  The audio capture

6  card and video card with video capture module identified by the Court as the corresponding

7  structure that performs the claimed function are (outdated) add-on components for personal

8  computers that can be connected to an external device (such as a video camera) and used to

9  receive ("capture") a "composite signal" representing a full-motion video as input from that

10  device.  The accused components, by contrast, are chips (or blocks on chips) integrated into the

11  accused iOS devices, not add-on cards, as Samsung admits.  (*See, e.g.*, Samsung's Third Am.

12  Infr. Contentions at 10 (describing the components as "chips")**;** APL630DEF-WH0005226539

13  ███████████████ Datasheet]; APL630DEF-WH0005224613 ██████████████████

14  Datasheet]; APL630DEF-WH0000097566 ████████████████ Datasheet]; APL630DEF-

15  WH0000097306; APL630DEF-WH0000097401; APL630DEF-WH0000097728; APL630DEF-

16  WH0000097835; APL630DEF-WH0000097942; APL630DEF-WH0000098046; APL630DEF-

17  WH0000098144:████-0001 – 1281; APL630DEF-WH0001749889 ███ User's Manual);

18  APL630DEF-WH0001738776 ████ User's Manual); APL630DEF-WH0003890052 ████

19  User's Manual); APL630DEF-WH0001732791; APL630DEF-WH0004002318 ████ User's

20  Manual); APL630DEF-WH0005307879 ████ User's Manual); APL630DEF-WH0001708681

21  ████ User's Manual); APL630DEF-WH0001726602 ████ User's Manual).)  Samsung has also

22  failed to identify any audio components of any kind in its amended infringement contentions.

23    Samsung similarly cannot prove that the accused components are structures equivalent to

24  the audio capture card and video card having a video capture module under 35 U.S.C. § 112, ¶ 6.

25  The accused components were not in existence at the time of the filing of the '239 patent

26  application, and therefore cannot be equivalents under 35 U.S.C. § 112, ¶ 6.  (*See* Docket No.

27  447 [Claim Constr. Order] at 60, n.13 (citing *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090,

- 99 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

camera 22A or 228, the frame grabber, the CODECs, the modem, and the encryptor/decryptor" –
in other words, with the same or very similar hardware as the '239 patent.  (SAMNDCA630-
00832570 [8/2/95 Office Action] at 6-7.)  The applicants responded by arguing that the frame
grabber (which performs the capture in the Gattis device) "only contemplates an uninterrupted,
continuous stream of information digitized on a line by line of resolution basis that ultimately
represents a sequence of 'pictures.'  Gattis does not contemplate the creation of full-motion
composite signal video information into digitized files which can be stored, transmitted, played
or replayed. . . . [I]n Applicants' invention, full-motion composite signal is captured into
digitized files . . . ."  (SAMNDCA630-00832596 [2/2/96 Amend.] at 10-11; *see also*
SAMNDCA630-00832632 [5/20/96 Amend.] at 9 ("The present invention includes an apparatus
capable of capturing a full-color, full motion composite signal in real time; digitizing that
composite signal into a data file; compressing the data file and transmitting it through a computer
interface via telephone lines, cellular, radio, and other telemetric frequencies from a remote unit
to a host unit.").)  Through these argument, the applicants relinquished any device that does not
create a data file, such as FaceTime.

   For each of the above reasons, Samsung cannot prove infringement under the doctrine of
equivalents.

   **B.      "means for storing said composite signal"**

   Samsung contends that the "Mobile Remote Unit has a means for storing the composite
signal, such as a NAND flash module or RAM."  But Samsung has failed to provide a means
plus function analysis for this limitation.  The only corresponding structure disclosed in the '239
patent for performing the function required by the "means for storing" limitation is a hard disk
drive and the software identified at 3:1-5, 4:52-57, and 6:14-16.  None of the Apple iOS devices
has a hard disk drive, and neither NAND flash memory nor RAM is a hard disk drive.  (*See, e.g.,*
APL630DEF-WH0005285127; APL630DEF-WH0001809981; APL630DEF-WH0001593264;
and other Bills of Material for iOS devices cited below.)  Moreover, both the NAND flash
memory and RAM store only digital data and does not store a "composite signal."  (*See, e.g.,*

- 102 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

First, a "communications port" in the required structure and as described in the patent connects the modem to the remote unit.  Samsung improperly lists numerous components -- "a modem, a port on the modem, an antenna, and/or a port on the phone" – without choosing any or identifying any of these components in any accused iOS device.  In any event, the accused products do not have a "communications port":  because all the accused functionalities in each iOS device are integrated into a single device, there is no need for a "communications port" to connect a modem to the device.  Moreover, none of the accused software satisfies this limitation for at least of the following reasons:

- None of the applications or functions "initialize[s] a communications port." Indeed, Samsung has failed to identify any portion of any of the applications or functions that satisfies the required software sequence.

- As discussed above, FaceTime uses buffering and never creates or stores a data file, and therefore cannot "obtain" or "transmit" the stored data file.  (*See, e.g.*, Garcia Tr. at  42:4-14, 44:21-45:5, 46:12-47:4.)  In addition, FaceTime encrypts the packets before they are transmitted.  Thus, even if the packets could be considered a "stored data file" after they are encoded, FaceTime does not transmit those encoded packets (the "stored data file").  (Garcia Tr. at 58:10-23, 89:12-25, 121:8-122:3.)

- Wi-Fi sync with iTunes is incapable of syncing videos taken by the iOS device with iTunes, and therefore cannot "transmit the stored data file."

- Apple's YouTube application included in versions of iOS prior to iOS 6 did not provide the ability to upload videos to YouTube.

- The accused Voice Memos, Camera and Photos applications do not perform any of the functions of the required software.  To the extent that Samsung's contentions are based on the Share button of those apps, these applications merely use the same mechanisms of the Mail and Messages applications.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- The accused Contacts application does not perform any of the functions of the required software. To the extent that Samsung's contentions with respect to Contacts are based on the FaceTime button in Contacts, that button merely launches FaceTime. Regardless of how FaceTime is started, the same code is executed to start a video call.

- Moreover, the accused iOS products without cellular capabilities (discussed above) do not have a Phone application.

- Finally, there are no applications called Email, iTunes or iPod on the accused iOS devices.

Samsung similarly cannot prove that the accused hardware and software components are structures equivalent to those required by the Court under 35 U.S.C. § 112, ¶ 6. First, the accused components were not in existence at the time of the filing of the '239 patent application, and therefore cannot be equivalents under 35 U.S.C. § 112, ¶ 6. (*See* Docket No. 447 [Claim Constr. Order] at 60, n.13 (citing *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1099-1100 (Fed. Cir. 2008)).) Moreover, Samsung has failed to demonstrate that the accused components perform the identical claimed function in substantially the same way to achieve substantially the same result as the hardware and software components required by the Court. Samsung contends that the "way" is "using transmitters and means as construed by the Court," but provides no explanation of the way any accused component performs any function or how that way is substantially similar to the way the required hardware and software components. Samsung also fails to explain how the only component it mentions – an undefined "transmitter" – corresponds to the required structure of one or more modems connected to one or more cellular telephones, telephone lines, and/or radio transmitters." To the extent the "transmitter" is a "radio transmitter," Samsung still fails to identify any of the other elements of the structure. Samsung also states that "[t]he components identified above are modems" or equivalent to a modem, without any analysis or identification of how any other element of the required structure is satisfied by any component of the accused iOS devices. Samsung does not mention software at

- 107 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

all.  In any event, as discussed above, none of the accused components (to the extent they can be identified) or combinations thereof perform the function of "transmitting said composite signal" in substantially the same way as the required structure, for at least the following reasons:

- To transmit the composite signal (stored in a data file), the software must first 'initializ[e] one or more communications ports on the remote unit."  But the accused iOS devices do not have a communications port or any similar structure to which a modem is connected, nor do any of the accused applications and functions initialize such a port.  The lack of any hardware structure or software sequence comparable to the required devices and software sequence is substantial.

- As described above, FaceTime uses buffering and never creates or stores a data file, and therefore cannot "obtain" or "transmit" the stored data file.  (*See, e.g.*, Garcia Tr. at  42:4-14, 44:21-45:5, 46:12-47:4.)

- Buffering of video and audio streams is substantially different from a stored data file:  a stored data file can be manipulated, edited, and retrieved at any time – including long after it has been created – for transmission.  In contrast, the buffered video used by FaceTime only exists as long as is needed to transmit it. (Garcia Tr. at 47:20-48:4.)  Moreover, the stored data file described in the patent contains the entire video, whereas the FaceTime buffers contains only portions of video.  FaceTime never creates a full video of the call.

- None of the accused applications and functions performs the step of "transmitting the stored data file."

- Modems connected to cellular telephones, telephone lines, and/or radio transmitters are substantially different from the components in the accused iOS devices.  For example, communications with a modem as described in the patent are accomplished use Hayes AT (Attention) commands originating in the PC. ('239 patent at 8:61-9:2; APL630DEF-WH-A0000026969, APL630DEF-WH-A0000033941, APL630DEF-WH-A0000033781.)  Before the stored data file

- 108 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   could be begin, the communications port connected to the modem must be

2   initialized (as required by the Court), which is also accomplished by AT

3   commands. ('239 patent at 8:61-9:2.)  The modem can then dial the telephone

4   number of the host unit, which would establish a dedicated connection to the host.

5   AT commands were used to dial the number.  ('239 patent at 8:23-30 ("Transfer

6   software sequence B contains all of the instructions necessary to initialize the

7   communications ports on the remote, obtain a cellular connection with each

8   cellular telephone to the host unit . . ."), 11:19-24; M.H. Freeman 6/20/13 Tr. at

9   101:11-22.)  For transmitting, the modem uses a modem protocol such as –

10  ZMODEM ('239 patent at 9:1-2), XMODEM or YMODEM – which transmits the

11  data in a series of packets.  In contrast, the accused iOS devices do not have ports

12  to be initialized, and use very different protocols for transmission (such as LTE

13  for cellular and 802.11 for Wi-Fi).

14  •   The accused iOS devices do not establish a connection with the host unit (the

15  recipient of the video) in order to transmit video, as a modem does.  When an

16  accused iOS device with cellular capabilities comes in range of a base station that

17  it can connect to, it will connect to a base station in the cellular network

18  (assuming the cellular capabilities are enabled).  Similarly, when an accused

19  device with its Wi-Fi capabilities enabled comes in range of a Wi-Fi network that

20  it can connect to, it will connect to the Wi-Fi network, which is connected to an

21  Internet Service Provider via a local Wi-Fi access point.  When a video is sent via

22  the Messages, Mail, or FaceTime applications or uploaded to YouTube, the video

23  is routed through the network to a server – a carrier server for MMS, an Apple

24  iMessage server for iMessages, ███████████████ a YouTube server for

25  YouTube upload, or a mail server for Mail.  ██████████████████ the

26  video remains on the server until the recipient retrieves it.  ████████████

27  ████████████████████████████████████   The device

28

APPLE'S FURTHER SUPPLEMENTAL RESPONSES TO
SAMSUNG'S FIRST SET OF INTERROGATORIES (NO. 12)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

sending the video never connects to the device receiving the video, as is required with a modem described in the patent.  Given the complexities of the routing that must occur that are not present in a modem, these differences are not insubstantial.

- The baseband and Wi-Fi chips are not "modems connected to" a cellular telephone – they are part of the cellular telephone (the accused iOS devices).  The chips are not standalone devices as are the modems described in the '239 patent.

Samsung also cannot prove that the accused Apple products satisfy this limitation under the doctrine of equivalents.  Samsung asserts only that the accused products infringe "by using a modem or substantially equivalent component, and performing the Court's software sequence, to obtain substantially the same result of transmitting the video and audio data."  As with equivalents under § 112, ¶ 6, Samsung's conclusory statement fails to provide any analysis, fails to identify which components it is accusing, and fails to even mention most of the required structure.  Because Samsung has failed to provide a specific analysis of any prong or even describe how either the claimed components or accused components work, Samsung cannot demonstrate that any accused Apple product infringes under the doctrine of equivalents.  In any event, as described in detail above, the accused Apple products do not perform substantially the same function in substantially the same way for substantially the same result as claim 1 requires for at least the reasons set forth above.

Finally, for the same reason discussed above with respect to "means for capturing, digitizing, and compressing, Samsung is estopped from asserting the doctrine of equivalents with respect to this limitation for videos taken with FaceTime.

For each of the above reasons, Samsung cannot prove infringement under the doctrine of equivalents.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**D.      "means for receiving at least one composite signal transmitted by the remote unit"**

Samsung asserts that "[o]n information and belief," the accused devices "each have a computer interface(s) for receiving a composite signal transmitted by the remote unit either over cellular or Wi-Fi frequencies," and that the accused iOS devices each have a baseband chip and a wireless chip "for receiving the compressed composite video."  Samsung has also identified Wi-Fi sync with iTunes and FaceTime as "software [that] . . . works in conjunction with that computer interface(s) to allow a host unit to receive information from a Mobile Unit such as an iPad mini."  Samsung has failed to provide a means plus function analysis for this limitation.  The only corresponding structure disclosed in the '239 patent for performing this limitation is one or more modems, corresponding to the number of modems used in the remote unit, connected to one or more cellular telephones, telephone lines, and/or radio transmitters, and File Reception Software Sequence E.  (*See* '239 patent at 10:33-61, 11:18-12:8.)  But Samsung has failed to identify any such structure in the accused devices.  Because Samsung has failed to articulate its infringement theory with respect to each requirement of this limitation, Samsung cannot prove infringement of claim 1 and Apple cannot fully respond to Samsung's infringement contentions.

In any event, for the same reasons discussed above with respect to the "means for transmitting" limitation, none of the accused iOS devices has the required hardware structure.  In addition, Samsung cannot prove infringement with respect to this limitation by Wi-Fi sync with iTunes because it is incapable of syncing videos taken by the iOS device using the camera (Samsung's theory of "capturing" "at least one composite signal") with iTunes or by FaceTime because it does not use data files.  ('239 patent at 6:14-16, 3:1-5, 4:52-57; *see also e.g. id.* at Figure 3, 2:26-38, 2:46-58, 2:66-3:21, 3:26-60, 4:42-46, 4:52-5:7, 5:46-54, 6:9-18, 6:27-29, 6:31-39, 7:21-33, 8:17-40, 9:3-24, 9:65-10:54, 11:1-8, 11:11-14, 11:26-12:23, 12:27-51; SAMNDCA630-00832596 [2/2/96 Amend.] at 10-11; SAMNDCA630-00832632 [5/20/96 Amend.] at 9; Docket No. 447 [Claim Const. Order] at 64 (requiring transmission of the "stored

- 111 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

data file").)  FaceTime uses buffering and never creates or stores a data file.  (*See, e.g.*, Garcia Tr. at  42:4-14, 44:21-45:5, 46:12-47:4.)  Nor do any of the accused Mac computers satisfy this limitation.  The accused Mac computers do not have a baseband chip.  For the same reasons discussed above with respect to the "means for transmitting" limitation, the Wi-Fi chip in the accused Mac computers do not satisfy this limitation.  In addition, Samsung cannot prove infringement with respect to this limitation by Wi-Fi sync with iTunes because it is incapable of syncing videos taken by the iOS device using the camera (Samsung's theory of "capturing" "at least one composite signal") with iTunes or by FaceTime because it does not use data files. ('239 patent at 6:14-16, 3:1-5, 4:52-57; *see also e.g. id*. at Figure 3, 2:26-38, 2:46-58, 2:66-3:21, 3:26-60, 4:42-46, 4:52-5:7, 5:46-54, 6:9-18, 6:27-29, 6:31-39, 7:21-33, 8:17-40, 9:3-24, 9:65-10:54, 11:1-8, 11:11-14, 11:26-12:23, 12:27-51; SAMNDCA630-00832596 [2/2/96 Amend.] at 10-11; SAMNDCA630-00832632 [5/20/96 Amend.] at 9; Docket No. 447 [Claim Const. Order] at 64 (requiring transmission of the "stored data file").)  FaceTime uses buffering and never creates or stores a data file.  (*See, e.g.*, Garcia Tr. at  42:4-14, 44:21-45:5, 46:12-47:4.)   Because the required components do not exist in the accused Mac computers or iOS devices, Apple does not infringe.

Samsung also cannot prove infringement with respect to this limitation for composite signals "transmitted by the remote unit" using Mail, Messages or YouTube.  Samsung has failed to identify any structure that performs corresponding functionality on the accused Mac computers for receiving videos transmitted by Mail, Messages, or YouTube.  To the extent Samsung is allowed to accuse Mail, Messages, or YouTube upload of satisfying the software structure required to perform the claimed function, those applications do not infringe for the same reasons as discussed with respect to the "means for transmitting" limitation.

Samsung has also failed to articulate any theory of equivalents under 35 U.S.C § 112 ¶ 6 or the doctrine of equivalents, and the accused devices do not contain the equivalent of the disclosed structure.  For this reason, Samsung cannot prove infringement under any theory of equivalents.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**E.**      **"a playback unit including means for exchanging data with said host unit"**

Samsung contends only that "[o]n information and belief," the accused products "each have a playback unit for playing the composite signal and displaying it to the user" but fails to identify any such unit in any of the accused Mac computers.  Because Samsung has failed to articulate its infringement theory with respect to each requirement of this limitation, Samsung cannot prove infringement of claim 1, and Apple cannot fully respond to Samsung's infringement contentions.

For the "means for exchanging data with said host unit," Samsung asserts that "[o]n information and belief," the accused products "each have a circuit for exchanging the data received by the host computer's interface with the playback unit" and "Apple's software, such as QuickTime and FaceTime, works in conjunction with that computer interface(s) and the circuit to allow a host unit to receive data from an iPhone . . .  and transmit it to playback unit."  But Samsung has failed to identify any such "circuit" or "interface" or software in any purported playback unit that "exchanges data with the host unit."  Because Samsung has failed to articulate its infringement theory with respect to each requirement of this limitation, Samsung cannot prove infringement of claim 1, and Apple cannot fully respond to Samsung's infringement contentions.

Samsung has also failed to provide a means plus function analysis for this limitation.  To the extent this limitation is definite, the only structure disclosed in the specification for "exchanging data with said host unit" is a16-bit Ethernet card, Novell Netware Lite software, and Host Boot Software Sequence D.  But Samsung has failed to identify any such card or software.  Moreover, Samsung cannot identify any such components because none of accused products uses the required components.  Video playback functionality is incorporated into the accused products, thereby eliminating any need for networking components for exchanging data between a "host unit" and "playback unit" within the accused products.  Because the required components do not exist in the accused Mac computers, Apple does not infringe claim 1.

Samsung has also identified QuickTime and FaceTime as "[o]n information and belief" "working in conjunction with that computer interface(s) and the circuit to allow a host unit to

- 113 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

receive data [from an iOS device] and transmit it to playback unit for [the] playback unit."

Samsung has failed to articulate a theory of how QuickTime and FaceTime on a playback unit

exchanges data with the host unit.  Moreover, neither QuickTime nor FaceTime exchanges data

between a host unit and a playback unit, either using an Ethernet card and Novel Netware Lite or

otherwise.  Because the required components do not exist in the accused Mac computers, Apple

does not infringe claim 1.

Samsung has also failed to articulate any theory of equivalents under 35 U.S.C § 112 ¶ 6

or doctrine of equivalents, and the accused devices do not contain the equivalent of the disclosed

structure.  For this reason, Samsung cannot prove infringement under any theory of equivalents.

**F.       "means for storing the composite signal received by the host unit"**

Samsung asserts only that "[o]n information and belief" the accused products "each have

a hard drive or NAND flash module for storing the composite signal that is received by the host

unit's interface from a Mobile Remote Unit and then exchanged with the playback unit."

Samsung has failed to provide a means plus function analysis for this limitation.  The only

corresponding structure disclosed in the '239 patent for performing the function required by the

"means for storing the composite signal received by the host unit" limitation is a hard disk drive

and the software identified at 11:5-8, 12:19-22 and 12:48-51.  The storage devices in the Mac

computers store only digital data and cannot store an analog "composite signal."  For these

reasons, Samsung cannot prove infringement of claim 1 with respect to this limitation.

Samsung also identifies FaceTime and iTunes Wi-Fi sync as part of the "means for

storing."  As discussed above, the FaceTime application does not store a data file in NAND flash

memory, and iTunes Wi-Fi sync does not sync videos taken on the devices and therefore cannot

store them on a playback unit.  For these reasons, Samsung cannot prove infringement of claim 1

by FaceTime or iTunes Wi-Fi sync with respect to this limitation.

Samsung also asserts that "composite signals that are received by the host unit via email

[or] messaging" satisfy this limitation. But as discussed above, Samsung has failed to identify

Mail or Messages as a "means for receiving" the composite signal transmitted by the remote unit.

- 114 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   Because Samsung has failed to articulate its infringement theory with respect to this limitation,

2   Samsung cannot prove infringement of claim 1, and Apple cannot fully respond to Samsung's

3   infringement contentions.

4       Samsung has also failed to articulate any theory of infringement of equivalents under 35

5   U.S.C § 112 ¶ 6 or doctrine of equivalents, and the accused devices do not contain the equivalent

6   of the disclosed structure.  For this reason, Samsung cannot prove infringement under any theory

7   of equivalents.

8       **G.      "means for decompressing said composite signal"**

9       Samsung asserts that "[o]n information and belief" the accused products "each have a

10  graphical processing unit such as a video card, including a video decoder, for decompressing the

11  compressed composite signal for playback" and also identifies FaceTime as "software [that] . . .

12  decompresses the composite signal."  Samsung has failed to provide a means plus function

13  analysis for this limitation.  The only corresponding structure disclosed in the '239 patent for

14  performing the claimed function is a "video decompression card" ('239 patent at 12:3) that is

15  "similar to the video card installed in the remote unit 2 with the exception that the capture

16  module is not necessary" ('239 patent at 12:37-42) and an "audio decompression card" ('239

17  patent at 12:3-4).  But Samsung has failed to identify any video decompression card or audio

18  decompression card in the accused Apple products.  Nor does any accused product use a video

19  card or audio card.  Because the required components do not exist in the accused products, Apple

20  does not infringe claim 1.

21      Samsung has also failed to articulate any theory of infringement equivalents under 35

22  U.S.C § 112 ¶ 6 or the doctrine of equivalents, and the accused devices do not contain the

23  equivalent of the disclosed structure.  For this reason, Samsung cannot prove infringement under

24  any theory of equivalents.

25  **II.    CLAIM 7**

26      Claim 7 is a dependent claim that depends on claim 1.  The accused Apple devices do not

27  infringe claim 7 at least for the reasons set out above for claim 1.

28

- 115 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

capture module.  A video capture module is an (outdated) add-on component for personal computers that is used to receive video signals ("capture") from an external device (such as a video camera).  (*See* '239 patent at 4:28-31, 4:39-40, 5:44-46, 12:37-42; SAMNDCA630-00832632 [5/21/96 Amend.] at 12 ("Yurt does not disclose the use of a video card including a video capture module in order to accomplish its capture. The frame grabber technology of Gattis and Palmer is likewise significantly different from a video card having a video capture module as recited in claim 19.  The differences between a video card and frame grabber were discussed in Applicant's Amendment and Response to the Office Action dated August 2, 1995, incorporated herein by reference. In light of the fact that a video capture card having a video capture module is not contemplated by Yurt nor Gattis or Palmer, the rejection of claim 19 under 35 U.S.C. §103 is believed overcome.").)[4]  For the same reasons discussed above with respect to "means for capturing, digitizing, and compressing," the accused products do not have a "video capture module" under either party's construction of "capture."

Samsung also cannot prove infringement with respect to to this limitation for FaceTime on Mac computers because unlike video capture modules, FaceTime dynamically switches between hardware and software decoding, depending on network conditions.  Moreover, FaceTime does not use GPUs as Samsung claims.

Samsung has also failed to articulate any theory of infringement under the doctrine of equivalents, and the accused devices do not contain the equivalent of the disclosed structure.  For this reason, Samsung cannot prove infringement under any theory of equivalents.

**B.    "means for transmission of said captured video over a cellular frequency"**

Samsung contends that the accused products "allow[] for the transmission of a captured video over a cellular frequency in a variety of ways," states that "[o]n information and belief, the Accused Devices have at least one cellular antenna and supporting hardware and software,

---

[4] Although the applicants amended the claim to remove the "video card" from the claim, they disclaimed any construction of the term "video capture module" other than those that can be included on video cards by arguing that the prior art did not disclose a video card including a video capture module.  Through this argument, the applicants defined the type of "video capture module" they intended to claim.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

including a baseband chip, for transmitting the captured video over a cellular frequency," and also identifies Mail, Message, FaceTime, and YouTube applications. But Samsung fails to provide a proper means plus function analysis.  The only corresponding structure disclosed in the '239 patent for performing the claimed function is  "one or more modems connected to one or more cellular telephones, and software performing a software sequence of initializing one or more communications ports on the remote unit, obtaining the stored data file, and transmitting the stored data file."

Samsung also states that "[t]o the extent Apple argues that the term 'means for transmission' in claim 15 is the same as 'means for transmitting' in claim 1, Samsung's amended contentions set forth with respect to claim 1 apply in a similar manner to this term.  But for the same reasons discussed above with respect to "means for transmitting," Samsung cannot prove infringement of claim 15 with respect to this limitation.  In addition, the accused Mac products do not have baseband chips.

Samsung also cannot prove infringement with respect to this limitation by FaceTime because, as discussed above, FaceTime does not use stored data files and therefore cannot "obtain" or "transmit" "the stored data file."

Finally, Samsung is estopped from asserting the doctrine of equivalents with respect to this limitation for videos taken with FaceTime for the same reasons discussed above for the "means for transmitting" limitation.  Applicants added claim 15 (original claim 19) in the same Amendment in which the limiting argument was made, and stated "[t]he arguments contained herein in response to the rejections under 35 U.S.C. §112, 102(a), and 103 apply to new claims 16-20."  (SAMNDCA630-00832596 [2/2/96 Amend.] at 12; *see also* SAMNDCA630-00832632 [5/20/96 Amend.] at 9 ("The present invention includes an apparatus capable of capturing a full-color, full motion composite signal in real time; digitizing that composite signal into a data file; compressing the data file and transmitting it through a computer interface via telephone lines, cellular, radio, and other telemetric frequencies from a remote unit to a host unit.").)  Thus, the applicants relinquished any argument that a device that does not create a data file, such as

- 118 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    Apple reserves the right to supplement and/or amend its response as appropriate.

2    **'449 PATENT:**

3    Samsung cannot prove infringement of claim 1 of the '449 patent for at least the

4    following reasons:

5    **CLAIM 25**

6    **A.    "A digital camera"**

7    The accused products are not "digital cameras," as required by claim 25.    The claimed

8    "digital camera" cannot be a system or device in which a digital camera is merely a component

9    part.  Claim 25 was narrowed from "[a]n image recording and reproducing apparatus" to a

10    "digital camera" to overcome certain prior art cited during prosecution, and Samsung may not

11    now recapture what was surrendered.  *See, e.g.*, '449 File History, July 31, 2000 Amendment at

12    10-11, 15-17.  Apple engineer Tim Millet unequivocally testified that the accused products are

13    not "digital cameras" as required by the asserted claims.  *See* Millet Dep. at 44-45.

14    **B.    "an A/D converter which converts said analog signal from said imaging**
         **device to a digital signal"**
15

16    As an initial matter, Samsung has failed to comply with the Court's order denying

17    Samsung's attempt to pursue an infringement theory premised on an A/D converter that is

18    integrated into a CMOS image sensor, as opposed to separate and apart from the image sensor as

19    the asserted '449 claims require.  Samsung attempted to amend its contentions to state that the

20    A/D converter "may be incorporated into the image sensor chip."  Samsung's Motion for Leave

21    to Amend and Supplement Infringement Contentions, Apr. 30, 2013, Exh. G at 3.  The Court

22    concluded that Samsung did not have good cause to assert its integrated A/D converter theory.

23    Order re: Samsung's and Apple's Motions for Leave to File Amended Infringement Contentions

24    and Samsung's Motions to Compel [Dkt. No. 636], June 26, 2013, at 25.  Samsung's continued

25    assertion of its "integrated A/D converter" theory is improper.

26    In any event, the claims require an A/D converter to receive an analog signal *from* the imaging

27    device, *i.e.*, an A/D converter distinct from the imaging device.  Samsung identifies the CMOS

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   image sensor in the accused products as the claimed "imaging device." The accused products

2   use ███████████████████████████████████████████████████

3   ████████████████████████████████████████████████████

4   ████████████████████   Samsung appears to now concede that the ████████████

5   ██████████████████████████████████   *See* Samsung's Third Amended

6   Infringement Contentions, July 4, 2013, Exh. G at 3. Accordingly, the accused products do not

7   have "an A/D converter which converts said analog signal from said imaging device to a digital

8   signal." *See, e.g.*, Image Sensor Datasheets at APL630DEF-WH0000097306-97400,

9   APL630DEF-WH0000097401-97727, APL630DEF-WH0000097728-97941, APL630DEF-

10  WH0000097942-98045, APL630DEF-WH0000098046-98143, APL630DEF-WH0000098144-

11  98243, APL630DEF-WH0001708357-1708434, APL630DEF-WH0001712049-1712162,

12  APL630DEF-WH0001712166-1712279, APL630DEF-WH0001712281-1712348, APL630DEF-

13  WH0001712349-1712426, APL630DEF-WH0001712430-1712507, APL630DEF-

14  WH0001712508-1712583, APL630DEF-WH00017261801726248, APL630DEF-

15  WH0001726252-1726351, APL630DEF-WH0001726353-1726452, APL630DEF-

16  WH0001726464-1726601, APL630DEF-WH0005214335-5214457, APL630DEF-

17  WH0005224613-5224751, APL630DEF-WH0005224752-5224847, APL630DEF-

18  WH0005226539-5226707, ██████0001-1385.

19  **C.**      **"a compressor which compresses said digital signal outputted from said A/D converter, and generates compressed data by using a different compressing method for moving image signals and for still image signals"**

20  In its third supplemental infringement contentions, Samsung contends that the accused

21  products have "a video encoder that utilizes at least the H.264 and MPEG-4 standards for

22  compressing moving images and the JPEG standard for compressing still images." Samsung is

23  wrong. As Apple system-on-chip (SOC) engineer Tim Millet testified, JPEG compression is not

- 165 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    iTunes Match: ████████████████████████████████████

2    ████████████████████████████████████████████████████

3    ████████████████████████████████████████;

4    Photo Stream: ██████████████████████████████████

5    ████████████████

6    In addition, to the extent that the term "storage and interface device" requires that the

7    user "ordinarily interface" with the media located on the device (*see* Samsung Supplemental

8    Responses to Apple's Fifth Set of Interrogatories, p. 160 (contending that the user must

9    "ordinarily interface with the media located on the" central storage and interface device)), the

10   user cannot "ordinarily interface" directly with the media stored on any of servers used in the

11   accused features.  For example, with respect to Photo Stream, the photographic content stored on

12   the ██████████████████████████████████████████

13   ██████████████████████████████████████████

14   ████████████████████████████████████████████

15   ██████████████████████████████████████████████

16   ████████████████████████████████████████

17   Samsung also accuses the iMac, MacBook Air, MacBook Pro, Mac Mini, Mac Pro, and

18   Apple TV, without identifying any "content information and content management information,

19   relating to at least one user" stored in digital form on the device, or articulating any theory of

20   infringement.  Nor has Samsung articulated how these devices ever interface with zone devices

21   through the accused features.  Indeed, with regard to iTunes automatic downloading of new

22   purchases, iTunes in the Cloud (redownloading), iTunes Match, and Photo Stream all the

23   accused iOS/OS X devices interact with the various servers, not with each other.  Further, in

24   iTunes automatic downloading of new purchases and iTunes in the Cloud (redownloading),

25   ██████████████████████████████████████████

26   With respect to the accused AppleTV device, Samsung has failed to present any theory of

27   how the product could meet the claim limitations.  The accused AppleTV device does not

28                                               - 172 -

APPLE'S FURTHER SUPPLEMENTAL RESPONSES TO
SAMSUNG'S FIRST SET OF INTERROGATORIES (NO. 12)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

support iTunes in the Cloud, iTunes Match, Photo Stream, or Home Sharing services.  Therefore, Samsung cannot prove infringement, and Apple cannot fully respond to Samsung's amended infringement contentions.

Further, Samsung fails to identify any "audio, video, or photographic data, including content information and content management information, relating to at least one user, are stored in digital form" on a central device.  Samsung appears to construe this term to require that the audio, video, or photographic data stored on the central device relate to a "particular user." However, under that interpretation, the audio information for iTunes automatic downloading of new purchases and iTunes in the Cloud (redownloading) is ███████████████████ ████████████████████████████████████████████████████ ███████████████████████████████  The content information on Home Sharing likewise is not related to a user.  Nor do iTunes automatic downloading of new purchases, iTunes in the Cloud (redownloading), or Photo Stream services store content or content management information related to a user under that interpretation, to the extent that they do not store playlists or photo albums related to a user.  Moreover, Apple IDs are not necessarily related to a "particular user," but could be used by multiple users (e.g., a family).

Similarly,  iTunes Sync does not store "audio, video, or photographic data . . . relating to a least one user" under Samsung's interpretation.  (*See* Samsung Supplemental Responses to Apple's Fifth Set of Interrogatories, p. 170 (distinguishing prior art that discloses non-multimedia information "that pertains to a particular device, not a particular user").)  iTunes Sync transfers information based on device settings, not relating to a particular user.  (*See, e.g.*, Wysocki Dep. 49:5-10.)

Case No. 12-CV-00630-LHK

APPLE'S FURTHER SUPPLEMENTAL RESPONSES TO
SAMSUNG'S FIRST SET OF INTERROGATORIES (NO. 12)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   relation to the audio, video, or photographic information on any iOS or OS X device.  Nor can it,

2   as iTunes automatic downloading of new purchases merely sends ███████████████████████

3   █████████████████████████████████████████████████████████████████████

4   ███████████████████████████████████ It contains no process for ████████████

5   █████████████████████████████████████████████████████████

6   ████████████████ The iTunes in the Cloud redownload service likewise does not provide any

7   means for updating any  server associated with iTunes in the Cloud in relation to the audio,

8   video, or photographic data located on any of the accused products.  And, iTunes Match does not

9   update any accused device in relation to servers associated with iTunes Match, at most it makes

10  certain songs in the iTunes store available for manual streaming or download.

11          Moreover, the claim requires that "audio, video, or photographic information, relating to

12  at least one user" stored within both the zone specific storage and interface device and the central

13  storage and interface device "are updated in relation to" both the zone specific storage and

14  interface devices and the central storage and interface devices.  The claim further requires that

15  the at least one user can be situated "in any one of the zones" and access "***the*** audio, video, or

16  photographic information related to the user."  iTunes in the Cloud does not allow for updates

17  from the zone specific storage and interface device to the central storage and interface device,

18  and thus does not provide access to all the audio, video, or photographic data related to the user

19  in any zone.  Likewise, iTunes Match does not provide for complete synchronization of a user's

20  audio, video, or photographic information as a result of the update.  iTunes in the Cloud does not

21  provide a user the ability to update the audio or video multimedia stored in any of the servers.

22  When a user purchases a song utilizing iTunes in the Cloud, that song ███████████████████

23  No user action can update the iTunes in the Cloud multimedia database.  In addition, Samsung

24  appears to construe this term to require updating of one zone device in relation to the audio,

25  video, or photographic information contained on another zone device.  iTunes in the Cloud does

26  not provide any means for synchronizing the content on one user device with the content on

27  another user device.

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**E.     Photo Stream**

Samsung contends that "Apple designed Photo Stream to allow the Central Device to be the 'master photo library.'"  However, Samsung fails to identify how the devices update in relation to each other, nor is it clear what devices Samsung is claiming are the zone devices.  Moreover, as explained above, the claim requires that all the audio, video, or photographic data stored within the central storage and interface device or any zone specific storage and interface device must be made available on all the zone specific storage and interface devices as a result of the "update[]."  The Photo Stream service only stores information for a limited time, and, thus, does not make all a user's content available in any zone.  In addition, like the drag-and-drop features discussed above, Photo Stream copies selected files to multiple devices; it does not synchronize devices.  Therefore, Samsung cannot prove infringement and Apple cannot fully respond to Samsung's infringement contentions.

**F.     Synching With iTunes**

Samsung contends that a user can sync music, photos and video between a zone specific storage and interface device and a central storage and interface device using iTunes.  However, the only feature Samsung describes is Syncing with iTunes, which allows an iOS device to copy information from a computer.  However, as described above, iOS devices are not zone specific storage and interface devices.  Therefore, Samsung fails to identify a zone specific storage and interface device with respect to Synching with iTunes.  Nor has Samsung provided any theory regarding how the accused AppleTV device could meet the claim through this feature.

**G.     Home Sharing**

Samsung contends that "Apple's Home Sharing software allows a user with a second desktop or laptop computer . . . to operate it as a zone specific storage and interface device that is capable of storing or interfacing with multimedia information stored on a Central Device."  However, for the reasons articulated above, neither the streaming feature nor the drag-and-drop feature of Home Sharing meets the limitation language.  Moreover, the patent requires that the audio, video, or photographic information "contained within the zone specific storage and

- 180 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

interface device *and* the central storage and interface, are updated in relation to the zone specific storage and interface devices *and* the central storage and interface device." Home Sharing does not allow a device to update its content in relation to a second device *and* to update the second device in relation to the content on the first device. Both are required by the patent. Moreover, as explained above, the claim requires that all the audio, video, or photographic data stored within the central storage and interface device or any zone specific storage and interface device must be made available on all the zone specific storage and interface devices as a result of the "update[]"; Home Sharing does not make all a user's content and content management information be stored in every zone.

**CLAIM 14**

Samsung contends that the "iPhone, iPad, iPad mini and iPod touch are each wireless mobile devices that can be coupled to a Central Device via LAN (e.g., a hardwired connection or Wi-Fi)." However, the "hardwired" USB connection used by the iOS devices does not constitute a local area network. Samsung has failed to articulate a theory under which these devices couple with a central storage and interface device via a LAN. Similarly, Samsung has not articulated any theory regarding how the iCloud connects with a wireless mobile device via a LAN.

**CLAIM 15**

Samsung contends that the "iPhone, iPad, iPad mini and iPod Touch are each wireless mobile devices that can be coupled to a Central Device via WAN (i.e., the Internet)." However, as discussed above, Samsung has failed to articulate how Home Share or iTunes Sync allows a central storage and interface device to couple with a wireless mobile device over a wide area network.

Apple identifies the following documents and other evidence to support its contentions set forth for claims 1, 14, and 15 above:

- Additional_Samsung630_Def_20120928/675-SamsungiTunes 2012-09-24
- Additional_Samsung630_Def_20130520/1009-SourceDrop_13894940

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  Dated:  July 15, 2013

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*/s/ Mark D. Selwyn*
Mark D. Selwyn (CA SBN 244180)
(mark.selwyn@wilmerhale.com)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California  94304
Telephone:  (650) 858-6000
Facsimile:   (650) 858-6100

*Attorneys for Plaintiff and
Counterclaim-Defendant Apple Inc.*

- 207 -

Case No. 12-CV-00630-LHK

APPLE'S FURTHER SUPPLEMENTAL RESPONSES TO
SAMSUNG'S FIRST SET OF INTERROGATORIES (NO. 12)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**<u>CERTIFICATE OF SERVICE</u>**

I, Andrew Liao, hereby certify that on July 15, 2013, a true and correct copy of the foregoing document, Apple Inc.'s Further Supplemental Objections and Responses to Samsung's First Set of Interrogatories (No. 12), was served on counsel for Samsung via electronic mail.

*/s/ Andrew Liao*
Andrew Liao

Case No. 12-CV-00630-LHK
APPLE'S FURTHER SUPPLEMENTAL RESPONSES TO
SAMSUNG'S FIRST SET OF INTERROGATORIES (NO. 12)

# Exhibit 5

REDACTED VERSION OF DOCUMENT
SOUGHT TO BE SEALED

**SUBJECT TO PROTECTIVE ORDER – OUTSIDE ATTORNEYS' EYES ONLY
CONTAINS HIGHLY CONFIDENTIAL SOURCE CODE INFORMATION**

**EXPERT REPORT OF KENNETH A. PARULSKI REGARDING INFRINGEMENT OF
U.S. PATENT NO. 6,226,449**

Signed:  August 12, 2013

Intentionally Omitted From Exhibit/Record

### (b)      Doctrine Of Equivalents Opinion

169.    To the extent the Accused Apple Products are determined not to meet the "A/D converter" limitation of claim 25 literally, it is my opinion that each Accused Apple Product meets the limitation under the doctrine of equivalents.  Each analog-to-digital converter in the Accused Apple Products performs the function of the claimed "A/D converter"—converting the analog signal from an imaging device to a digital signal, in the same way—through quantization of the analog signal into digital values, to obtain the same result—a digital signal corresponding to the analog signal from the imaging device.

### 5.      Claim 25 [D]: "a compressor which compresses said digital signal outputted from said A/D converter, and generates compressed data by using a different compressing method for moving image signals and for still image signals"

170.                         Intentionally Omitted From Exhibit/Record

69

███████████████████████████ (*See* APL630DEF-WH0001749909.)  A footnote to

the block diagram reads ██████████████████████████



176.    Table 3 of the ████████████████████████████████

██████████████████████████████████ (*See* APL630DEF-

WH0001749911.) ███████████████ is described as follows: ████████████

██████████████████████████████████████

██████ (*Id.*)  For ████████████████, the manual states: ███████████████

████████████████████████████████████ (*Id.*)

177.    Section 2.4 is titled "███████████████████ and describes the function

of the ████████████████ (APL630DEF-WH0001749917):



As described in the diagram below, the ▮▮▮▮▮ includes the ▮▮▮▮▮▮▮▮▮▮▮

178.    Section 2.5 of describes ▮▮▮▮▮▮ and includes a diagram of the ▮▮▮▮▮▮ shown below. (APL630DEF-WH0001749928.)  The ▮▮▮▮

▮▮▮ which are the functions performed by the ▮▮▮▮▮▮ in FIG. 4 of the '449 patent, also shown below.



179.    

Apple engineer Tim Millet stated that "we incorporate a ███████

████████████████████████████ (Millet Tr. 32:9-10.) and that the ████████

████████████████████████████████████████████

█████████████████ (Millet Tr. 65:18-23.)

180.    Apple's website states that the iPhone 5 supports "H.264 video up to 1080p, 30 frames per second, High Profile level 4.1 with AAC-LC audio up to 160 Kbps, 48kHz, stereo audio in m4v, mp4 and .mov file formats."[18]  The H.264 standard recommendation, titled "Advanced video coding for generic audiovisual services" is specified by ITU-T, the Telecommunication Standardization Sector of the International Telecommunication Union.[19] The standard defines a block-oriented motion-compensation-based compression and decompression method for video.  A motion-compensation algorithm describes a picture frame in terms of frames that precede or follow it in a sequence.  Therefore, a motion-compensation-based compression method for video is very different from a compression method used for still images.

181.    My analysis of a still image file from an iPhone 5 demonstrates that photos are store using █████████████████████, which uses ██████████████████████

---

[18]  (See www.apple.com/iphone/specs.html.)

[19]  (See "H.264: Advanced video coding for generic audiovisual services" at http://www.itu.int/rec/T-REC-H.264-201304-I/en.)

██████████████████   ████████████████████████

████████████████████████████

182.     The H.264 standard[22] used to compress and decompress videos uses a very different compressing method than the JPEG baseline compression standard used to compress and decompress photos.  A major difference, alluded to above, is that the H.264 standard includes variable block size motion compensated interframe coding, while the JPEG baseline standard uses only intraframe coding using a fixed block size.

183.     The Bill of Materials for the Apple iPhone 4S (APL630DEF-WH0000090406) includes a listing for a module which includes an ██████ component (*see* APL630DEF-WH0000090529), which Apple refers to as the "A5 chip" when describing the iPhone 4S.

184.     ████████████████████████ used in the iPhone 4S is described in an Apple document entitled ███████████████████████████████████APL630DEF-WH0001738776 – 1744368.)  According to this document, ███████████████████████ ██████████████████████████████████ and the list of major design features of the ███████████████████████████ ████████████████████████████████████████████ ████████████████████████████████" (*See* APL630DEF-WH0001738788.)  A block diagram of the ██████ is shown below. (APL630DEF-WH0001738789.)

---

[20] (See ISO/IEC 10918-1:1994 Information technology -- Digital compression and coding of continuous-tone still images: Requirements and guidelines at http://www.iso.org/iso/home/store/catalogue_tc/catalogue_detail.htm?csnumber=18902).

[21]  (See http://www.cipa.jp/english/hyoujunka/kikaku/pdf/DC-008-2012_E.pdf.)

[22] H.264 is also known as MPEG-4 Part 10 (JVT).



185.    Section 2.5 of the ▮▮▮ User's Manual describes ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ and includes a diagram of the ▮▮▮▮▮▮" portion of the ▮▮▮▮, shown

below. (APL630DEF-WH0001738810.)  The ▮▮▮▮▮ portion of the ▮▮▮▮ includes a

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ portion of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ which are functions performed by the ▮▮▮▮▮▮▮▮▮▮▮▮ in FIG. 4 of

the '449 patent.



186.    The ⬛⬛⬛ portion of the ⬛⬛⬛ includes a ⬛⬛⬛,

which is used to ⬛⬛⬛

⬛⬛⬛ which I understand is used to ⬛⬛⬛

⬛⬛⬛ Apple engineer Tim Millet stated that ⬛⬛⬛

⬛⬛⬛

(Millet Tr. 28:24-29:1) and a ⬛⬛⬛ (Millet

Tr. 30:19-31:3.)



187.    The Bill of Materials for the Apple iPod touch (5th Gen) (*see* APL630DEF-

WH0004031634 – 4031703) includes a listing for a module which includes an ⬛⬛⬛ (*See*

APL630DEF-WH0004031654).  It appears that the ⬛⬛⬛ portion of the ⬛⬛⬛ is

⬛⬛⬛, and includes a ⬛⬛⬛ and a

⬛⬛⬛.

188.    The Bill of Materials for the Apple iPod touch (4th Gen) (*see* APL630DEF-

WH0004031426 – 4031494) includes a listing for a module which includes an ⬛⬛⬛ (*See*

APL630DEF-WH0004031441), and the Bill of Materials for the Apple iPhone 4 includes a

listing for an ▮▮ component.  These ▮▮ are described in an Apple document entitled ▮▮

User's Manual, Revision 1.22, February 23, 2010." (APL630DEF-WH0001726602 – 1732790.)

According to the ▮▮ User's Manual, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(*See* APL630DEF-WH0001726630.)  A block diagram of the ▮▮ is shown below.

(APL630DEF-WH0001738789.)



189.    Section 5.5 of the ▮▮ User's Manual describes the ▮▮ portion of the ▮▮

▮▮ and states: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮  The same section includes the "Figure 9: ▮▮

Block Diagram" shown below.  (APL630DEF-WH0001726685).  In my opinion, the ▮▮

portion of the ███████████████████████████

███████████████████████



190.    The Bill of Materials for the Apple iPhone 3GS (APL-ITC796-0000410781)

includes a listing for an "███ component. (APL-ITC796-0000410976.)  The ████████ is

described in an Apple document entitled "████ User's Manual, Revision 1.73, July 16, 2009."

(*See* APL630DEF-WH0001708681 - 1712045).  According to the ████ User's Manual, the "███

████████████████████." (APL630DEF-WH0001708700.)  The features of

███ include a ████████████████████████

████████████████████████████████████

████████████████████████████████████

███    A block diagram of the ██████ is shown below. (APL630DEF-WH0001708700.)

79



191.   The ███ block diagram includes a ████████ block, which is shown below.  The ██████████ includes an ████████ (*see* APL630DEF-WH00017111485-1571) which ██████████████ (*see* APL630DEF-WH0001711131-189) which ██████████ In my opinion, the ██████████ includes a ████████ ████████████████████████████████████████████ ████████



### (a)  Response To Apple Non-Infringement Arguments



192.    Apple states that ███████████ is not performed by any of the ████

████ in the accused products, which are supplied by ███████████████ and is

instead performed by a separate and distinct component supplied by a different third-party,

████████ (*See* Apple Inc.'s Further Supplemental Objections And Responses To Samsung's

First Set Of Interrogatories To Apple (No. 12), dated July 15, 2013, pp. 164-169.)  To the extent

Apple argues that this is somehow a non-infringement argument, I disagree.

193.    First, I note that the plain language of the claim does not require that the

"compressor" limitation must to correspond to a "single component."  Nothing in the claims,

specification or file history of the '449 Patent prevents the "compressor" limitation from being

met, for example, by more than one integrated circuit component.  Moreover, in the Accused

Apple Products, both ████████████████ are performed using a portion of each

device's ██████████████ integrated circuit.  In the case of the █████████ that

portion is the ███████████, as described above and as Apple engineer Tim Millet testified.

(*See* Millet Tr. At 65-66).  The ████████████████████████████████

███████████████████████████████████████████████████████

███████████████ in FIG. 4 of the '449 patent.

### (b)  Doctrine Of Equivalents Opinion

194.    To the extent the Accused Apple Products are determined not to meet the

"compressor" limitation of claim 25 literally, it is my opinion that each Accused Apple Product

meets the limitation under the doctrine of equivalents.  Each █████████████ or

corresponding block in each Accused Apple Product performs the function of the claimed

"compressor"—compressing a digital signal output by an A/D converter and generating

compressed data using a different compressing method for moving or still images, in the same

way—by executing a different compression algorithm for still images or video, to obtain the same result—compressed photo or video data that can be recorded to memory.

> **6.    Claim 25 [E]: "a recording circuit which records compressed data, said compressed data including a moving image signal, and a still image signal"**

195.    In my opinion, each of the Accused Apple Products includes "a recording circuit which records compressed data, said compressed data including a moving image signal, and a still image signal."  Setting aside the evidence cited below, my testing of the Accused Apple Products demonstrates that each product captures photos and videos and stores them in compressed digital form. Therefore, each Accused Apple Product must contain a memory and an interface thereto "which records compressed data, said compressed data including a moving image signal, and a still image signal."

196.    Section 1.2 of the ███ User's Manual is a block diagram (*see* APL630DEF-WH0001749909), a portion of which is shown below.  This portion of the ██████████ diagram depicts the █████████████," which is connected to the "██████████████ and is used with ██████████████."  In my opinion, this ██████████████ ██████████ provide a ██████████████████████████████ ██████████████████████████████.

that each product captures photos and videos and stores them in compressed digital form.  Each

product also displays or plays back the compressed photos and videos.  Therefore, each Accused

Apple Product must contain a decompressor as claimed.

208.    Section 2.5 of the ███ User's Manual describes ██████████████████" and

includes a diagram of the ███████ portion of the █████, which is shown below. (*See*

APL630DEF-WH0001749928.)  The ████████ block of the ███ includes a ████████

██████████████████████ The ███████ block of the ███ includes

██████████████, which are used to ████████████████████████

███████████████████ which is used to

████████████████████████████████████████████

███████████████ portion of the █████████████████████

███████████ which are functions performed by the ████████████████ in

FIG. 4 of the '449 patent.



209.    Section 2.5.4 of the ▮▮▮ User's Manual further describes the ▮▮▮▮▮▮▮,
which is used to ▮▮▮▮▮▮▮▮▮▮. (*See* APL630DEF-WH0001749934.) Apple
engineer Tim Millet stated the ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮ (*See* Millet Tr. 65:11-17.)



210.    The ▮▮▮ block used in the ▮▮▮▮ portion of the ▮▮▮ is further
described in section 2.5.1 of the ▮▮▮ User's Manual as providing features including ▮▮▮
▮▮▮▮▮▮▮ (*See* APL630DEF-WH0001749929.)  Apple engineer Tim Millet
stated that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮ (Millet Tr. 66:1-3.)

211.    The H.264 standard used to compress and decompress videos uses a very different
compressing method than the JPEG baseline compression standard used to compress and
decompress photos.  For example, the H.264 standard includes variable block size motion
compensated interframe coding, while the JPEG baseline standard uses only intraframe coding
using a fixed block size.  Therefore, different decompressing methods must be used in order to
decompress the JPEG and H.264 still and moving image signals.

212.    The ▮▮▮ used in the iPhone 4S is described in the ▮▮▮ User's Manual. (*See*
APL630DEF-WH0001738776 – 1744368.)  Section 2.5 of this document describes ▮▮▮▮

██████████ and includes a diagram of the ██████████ portion of the ████████. (*See*
APL630DEF-WH0001738810.)  The ██████████ portion of the ████████ includes a
████████████████████████████████████████████ portion of the
████████ includes a "██████████" block, which is used to ████████████████
████████████████████████████████████████████████████
block, which is used to ████████████████████████████████████████
██████████████████████████

213.    Apple engineer Tim Millet stated that "the ████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████ (Millet Tr. 29:6 -
31:6-8.)

214.    The ██████████ used in the iPod Touch (4th Gen) is described in the ██ User's
Manual. (*See* APL630DEF-WH0001726602 – 1732790.) Section 5.6 of the ██ User's Manual
describes the ██ portion of the ██. (*See* APL630DEF-WH0001726691-93.) The ██
portion of the ██ includes a ████ block which is a ████████████████████
████████████████████████████████████████████████████
██████████ as shown in Table 11. (*See* APL630DEF- WH0001726692-93.)  In addition, the H3P
User's Manual states that the ██████████ included in the ██████████ "performs all functions
required for ████████████████████████████████████████
██████████████████." (*See* APL630DEF-WH0001726689).  In my opinion, the
██████████ portions of the ████████████████████████



215.    The ███████ used in the Apple iPhone 3GS is described in the ███ User's Manual. (*See* APL630DEF-WH0001708681 - 1712045).  The features of the ███████ include ████████████████████████████." (*See* APL630DEF-WH0001708699.)  ████████████████████████████ of the ███████ in the ███ User's Manual includes a ████████████." (*See* APL630DEF-WH0001708700).  The ████████████ includes an ████████████████████████████████ ██████ (*see* APL630DEF-WH0001711190-1365) and a ████████████████████████ ████████████ (*See* APL630DEF-WH0001711131-189.)  In my opinion, the ████████ ██████████████████████████████████████████████ ████████████████████

**(a)      Response To Apple Non-Infringement Arguments**

216.    As with the compressor limitation, Apple argues that ████████████████ ████████████████████████████ (*See* Apple Inc.'s Further Supplemental Objections And Responses To Samsung's First Set Of Interrogatories To Apple (No. 12), dated July 15, 2013, pp. 164-169.)  To the extent Apple argues that this is somehow a non-infringement argument, I disagree.

217.    First, I note that the plain language of the claim does not require that the "decompressor" limitation must to correspond to a "single component," or that it must be a separate and distinct component from the claimed "compressor."  Nothing in the claims, specification or file history of the '449 Patent prevents the "decompressor" limitation from being met, for example, by more than one logic circuit, including logic circuits that also perform compression.  Moreover, in the Accused Apple Products, ████████████████████████ ████████████████████████████████████████████ For

example, video and still image decompression functionality is included in the ███████ portion

of the ████ as Apple engineer Tim Millet testified. (Millet Tr. At 65-66.).  The ████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████ in FIG. 4 of the '449

patent.



**(b)**      **Doctrine Of Equivalents Opinion**

218.     To the extent the Accused Apple Products are determined not to meet the

"compressor" limitation of claim 25 literally, it is my opinion that each Accused Apple Product

meets the limitation under the doctrine of equivalents.  Each ████████████████ or

corresponding block in each Accused Apple Product performs the function of the claimed

"decompressor"—decompressing compressed image data using a different compressing method

for moving or still images, in the same way—by executing a different decompression algorithm

for still images or video, to obtain the same result—decompressed photo or video data that can

be reproduced for display.

**8.      Claim 25 [G]: "a reproducing circuit which reproduces a moving**
**image signal, a sound signal in synchronous to said moving image**
**signal, and a still image signal"**

219.     In my opinion, each of the Accused Apple Products includes "a reproducing

circuit which reproduces a moving image signal, a sound signal in synchronous to said moving

image signal, and a still image signal."  Setting aside the evidence cited below, my testing of the

Accused Apple Products demonstrates that each product captures photos and videos and stores

them in compressed digital form.  Each product also displays or plays back the compressed

photos and videos.  In order to render and display photos and videos with audio, each product

must include a reproducing circuit as claimed.

# Exhibit 10

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

# REPORT OF DAN SCHONFELD, PHD.
# REGARDING INFRINGEMENT OF U.S. PATENT NOS. 5,579,239 AND 7,577,757

*Apple Inc. v. Samsung Elecs. Co. Ltd. et al*,

Case No. 12-CV-00630 LHK (N.D. Cal.)

August 12, 2013

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

43.     I understand that all structures include equivalents, and the claim constructions I

identify below also necessarily include all equivalents.  Apple's proposed constructions are taken

from Apple's response to Samsung's interrogatory 12.

| '239 Patent | | |
|---|---|---|
| **Claim Term** | **Samsung Proposed Construction** | **Apple Proposed Structure** |
| (Claim 1)<br><br>"means for storing said composite signal" | **Structure**: Memory, such as a hard disk or random access memory<br><br>**Function**: storing said composite signal | **Structure**: a Hard disk drive and the software identified at 3:1-5, 4:52-57, and 6:14-16 *See* Apple's Further Supplemental Responses to Samsung's First Set of Interrogatories (No. 12) (Rog 12 Resp.) at 102. |
| (Claim 1)<br><br>"means for receiving at least one composite signal transmitted by the remote unit" | **Structure**: One or more modems connected to one or more cellular telephones, telephone lines, or radio receivers<br><br>**Function**: receiving at least one composite signal transmitted by the remote unit | **Structure**: One or more modems, corresponding to the number of modems used in the remote unit, connected to one or more cellular telephones, telephone lines, and/or radio transmitters and File Reception Software Sequence E (*See* '239 patent at 10:33-61, 11:28-12:8). *See* Rog 12 Resp. at 111. |
| (Claim 1)<br><br>"means for exchanging data with the host unit" | **Structure**: A network or wired interface for communication between host and playback units<br><br>**Function**: exchanging data with the host unit | **Structure**: A 16-bit Ethernet card, Novell Netware Lite software and Host Boot Software Sequence D. *See* Rog 12 Resp. at 113. |
| (Claim 1)<br><br>"means for storing the composite signal received by the host unit" | **Structure**: Memory, such as a hard disk or random access memory<br><br>**Function**: storing the composite signal received by the host unit | **Structure**: a hard disk drive and the software identified at 11:5-8, 12:19-22, and 12:48-51. *See* Rog. 12 Resp. at 114. |
| (Claim 1)<br><br>"means for decompressing said | **Structure**: A video card and an audio card<br><br>**Function**: decompressing | **Structure**: a "video decompression card" ('239 patent at 12:3) that is "similar to the video card installed in the |

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

| composite signal" | said composite signal | remote unit 2 with the exception that the capture module is not necessary" ('239 patent at 12:37-42) and an "audio decompression card" ('239 patent at 12:3-4). *See* Rog 12 Resp. at 115. |
|---|---|---|
| (Claim 15)<br><br>"means for transmission of said captured video over a cellular frequency" | **Structure**:  One or more modems connected to one or more cellular telephones or cellular radio transmitters<br><br>**Function**:  transmission of said captured video over a cellular frequency | **Structure**: "one or more modems connected to one or more cellular telephones, and software performing a software sequence of initializing one or more communications ports on the remote unit, obtaining the stored data file, and transmitting the stored data file." *See* Rog 12 Resp. at 118. |

44.     The constructions I propose above are based on the claim language, patent specification, with guidance from the Court's initial claim construction order.

45.     It is my opinion that Apple's proposed constructions are not correct.  They consistently narrow the structure to cover functions not identified in the claim language. Moreover, Apple's proposed constructions do not appear to follow the rationale set forth by the Court in the initial Claim Construction order.

46.     I have applied the proposed constructions for the "means-plus-function" claim terms by both sides throughout the analyses in my Report.

**B.     "means for storing said composite signal" (Claim 1)**

47.     It is my opinion that the structure for "means for storing said composite signal" should be "memory, such as a hard disk or random access memory."   This construction is supported by the specification.

48.     The function is "storing said composite signal."   Therefore, I have identified structure disclosed in the specification that can store data.  The specification discloses memory,

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

and specifically, it discloses two different types of memory:  a hard disk, and random access memory.

49.     The '239 patent discloses both types of memory:  "A permanent capture file is stored on the hard disk of the remote unit and is called up into the remote unit's RAM where an input video signal is captured."  '239 patent at 4:52-54.

50.     Likewise, the patent discloses storing the memory in RAM:  "The digitized and compressed audio file is then made and captured in the computer's random access memory (RAM) for transmission to the host unit."  '239 patent at 4:62-66.  This passage is particularly relevant because it is consistent with the Court's construction of "means for transmitting the composite signal."  The Court construed "means for transmitting" to include "obtaining the stored data file."  This passage of the '239 patent indicates that the "means for transmitting" should "obtain the stored data file" from RAM.

51.     It is my opinion that Apple's proposed construction is too narrow because it ignores these key portions of the specification.  Moreover, Apple's construction proposes software limitations that are both unnecessary and confusing.  The function of the "means for storing said composite signal" is "storing said composite signal."  No specific algorithm is necessary, nor does the specification disclose any particular algorithm.  I

52.     It is my opinion tha the portions of the specification identified by Apple at 3:1-5 and 4:52-57 do not provide any additional structure.  At best, these citations merely say that the structure should store the composite signal.  At worst, the citation at 4:52-57 incorporates limitations that are not found in the claim, such as requiring the storage location to have a 10 Mb default size.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

53.     The citation at 6:14-16 ("The remote unit then stores the digitized and compressed video signal as a data file with a .cap extension on the hard disk.") adds additional limitations that are not part of the claim.  There is nothing in the function that requires storing the signal with a ".cap" extension.

### C.     "means for receiving at least one composite signal transmitted by the remote unit" (Claim 1)

54.     It is my opinion that the structure for "means for receiving at least one composite signal transmitted by the remote unit" should be "one or more modems connected to one or more cellular telephones, telephone lines, or radio receivers."   This construction is based on the Court's construction for "means for transmitting the composite signal."   However, as the software limitations for " means for transmitting," do not apply to the receiving side, and the patent does not require any software, it is my opinion no software is needed.

55.     The specification supports my construction.  The specification states:

> Host unit 3 also has up to four (4) modems connected to up to four (4) separate telephone lines to receive a signal transmitted from each cellular telephone of the remote.  It is not necessary to install cellular telephones in host unit 4 unless it will be transported from location to location.  In the general application, however, host unit 3 will be installed at a single location and wired to one to four telephone lines.

> The number of modems in host unit 3 corresponds to the number of modems used in the remote unit 2.  If radio transmitters are used in remote unit 2 instead of telephones, radio receivers would be installed in host unit 3 so that there is a corresponding radio receiver for each radio transmitter. Each radio receiver in host unit 3 is set to the same frequency as the radio transmitter in remote unit 2 from which it will receive transmitted data files.

'239 patent at 33-49.

56.     It is my opinion that based on the specification, the host unit does not have to have the same number of modems as the remote unit to infringe the patent.  Notably, the specification indicates the following:

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

> One host unit can support as many as thirty (30) remote units. The host unit can only receive a transmitted data file from one remote unit at any given time, however.

'239 patent at 11:14-16.

57.     One of ordinary skill in the art would recognize that each of the 30 remote units may not have the precise number of modems as the single host unit that supports the 30 remote units. Therefore, the specification discloses the use of a host unit with a number of modems different from the number of modems in the remote unit.

58.     Finally, it is my opninion that the specification does not require any software for the "means for receiving" limitation. Apple points to approximately 3 columns of specification, none of which specifies any algorithm that performs "receiving at least one composite signal transmitted by the remote unit."

59.     In my opinion, Apple's proposed construction incorporates structure for limitations that are not part of this function. For example, Apple incorporates 10:33-61 into its construction, but this merely describes the hardware structure that Apple proposed. Moreover, this section incorporates combining a split data file – the patent makes clear that this is an optional function. *See also* 48-49. Apple's proposed structure also includes using "DDE," which the patent admits does not relate to receiving data, but rather to multiple applications in a windows environment. '239 patent at 11:33-37.

### D.     "means for exchanging data with the host unit" (Claim 1)

60.     It is my opinion that the proper structure for "means for exchanging data with the host unit" is "a network or wired interface for communication between host and playback units."

61.     It is important to note that the host unit and playback unit may be separate or combined. Dependent Claim 2 envisions a situation where the two are combined:

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

> 2.   An apparatus according to claim 1 wherein the host unit and the playback unit are combined in a single computer.

'239 patent at 18-19.

62.    The speciifcation indicates that the playback unit is actually an interface between capturing video and outputing the signal for playback. '239 patent at 11:62-12:8.  Moreover, the specification indicates that the host unit and playback unit are networked together:

> Host unit 3 and playback unit 4 are networked together.

'239 patent at 10:57-58.

63.    Although the interface between components is networked together even when they are part of the same computer, this is likely to be a wired network interface.  The interface is therefore a network or wired interface, to account for the two different embodiments disclosed in the '239 patent.

64.    Apple's construction blatantly excludes the embodiment disclosed in Claim 2 of the patent.  One of ordinary skill in the art would recognize that it would not be feasible to use an ethernet card to communicate internal in a single computer.  Moreover, there is nothing in the specification that indicates the ethernet card in the playback unit is even necessary to communicate with the host unit, let alone interface with it. *See* '239 patent at 11:62-12:8.  It is merely listed as a component that may be part of the playback unit computer.

65.    Finally, the software Apple points to ("Host Boot Software Sequence D") once again addresses limitations not involved with "exchanging data."  Most notably, that software sequence does not even relate to the playback unit, it relates to the host unit. '239 patent at 10:63-11:24.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

### E.  **"means for storing the composite signal received by the host unit" (Claim 1)**

66.  It is my opinion that the correct construction of "means for storing the composite signal received by the host unit" is "memory, such as a hard disk or random access memory." It is my opinion that because both "means for storing" limitations involve storing data, that one of ordinary skill in the art would read the specification and recognize the different "means for storing" that are disclosed. ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████  Therefore, all disclosed structure where data can be stored should be incoporated into this structure. My analysis above with respect to "means for storing said composite signal" applies equally to this limitation. *Also see* '239 patent 12:43-51.

67.  As with the other "means for storing" limitation, the software Apple points to for its proposed construction does not have to do with "storing." The software sections identified by Apple merely identifies a particularly drive in addition to the function "storing the composite signal received by the host unit." '239 patent at 11:5-8, 12:19-22. It is my opinion that labeling a drive does not have to do with storing. It is my opinion that there is no software disclosed (or necessary) to perform the limitation "means for storing the composite signal received by the host unit."

### F.  **"means for decompressing said composite signal" (Claim 1)**

68.  It is my opinion that the correct structure for "means for decompressing said composite signal" is "a video card and an audio card." My construction is based both on the specification and the Court's guidance by construing the term "means for capturing, digitizing, and compressing at least one composite signal."

69.  The specification discloses a structure similar to that in the remote unit for "means for capturing, digitizing, and compressing at least one composite signal":

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Playback unit 4 has a video card installed in an expansion slot.  This video card is similar as the video card installed in remote unit 2 with the exception that the capture module is not necessary.  When a data file is retrieved by playback unit 4 for output to the master comntrol, the video card decompresses the file and converts the digitized data to VGA.

'239 patent at 12:37-42.

70.    Moreover, the specification indicates that the Playback unit has an audio card at 12:3.  As mentioned above, because the specification states that these are similar (12:37-42), ███ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████ it is my opinion that the structure for this limitation should be similar to that of "means for capturing, digitizing, and compressing at least one composite signal" except that a capture module is not necessary for the structure.

71.    Apple's construction is similar to Samsung's, except that Apple narrows the video and audio cards to video and audio "decompression" cards.  It is my opinion that these constructions are not that different, in that video and audio "decompression" cards are a subset of video and audio cards.  It is my opinion that Apple's construction is not correct because it does not account for the similarities between the remote and host/playback units as the specification does.

**G.    "means for transmission of said captured video over a cellular frequency" (Claim 15)**

72.    It is my opinion that the correct structure for "means for transmission of said captured video over a cellular frequency" is "one or more modems connected to one or more cellular telephones or cellular radio transmitters."

73.    First, although it is my opinion that the Court's construction for "means for transmitting said composite signal" is proper to address for guidance, the function for "means for transmission of said captured video over a cellular frequency" is different.  First, the function

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

uses a noun, "transmission" instead of a verb, "transmitting."  Second, what is being transmitted

is "video," as opposed to a "composite signal."  Finally, the function in Claim 15 indicates that

the transmission occurs over a "cellular frequency."  It is my opinion that the differences in the

claim terms necessitate a different claim construction.

74.     The construction I propose is correct because it is based on the specification:

> Files may be transmitted using telephone lines, cellular, radio and other
> telemetric frequencies.  In the preferred embodiment, cellular telephones
> are integrated with the remote unit to allow transmission of files from
> areas which are inaccessible to standard telephone lines.  It may be
> desirable, in certain specialized applications, to transmit from a single
> remote location or locations where standard telephone lines are accessible.
> The remote unit may still be portable as long as a telephone jack is
> available for transmission.  In that even, the cellula telephones are omitted
> from the remote, and the modems connected to standard telephone jacks,
> using standard telephone connectors and wiring.
>
> In areas which are inaccessible to standard telephone lines and outside
> cellular telephone "cell," files can be transmitted using radio frequencies

'239 patent at 9:25-37.

75.     The two disclosed means for transmision are (1) cellular telephones and (2)

cellular radio transmitters, as radio transmitters can operate over cellular frequencies and still

perform the function in the limitation.   Apple's construction excludes the cellular radio

transmitters.

76.     Moreover, cellular radio transmitters should be included because of dependent

Claim 16, which reads:

> 16. The apparatus of claim 15 wherein the means for transmission of said
> captured video over a cellular frequency includes:
>
> at least two interfaces operating in conjunction with said computer;
>
> a cellular telephone connected to seach said interface.

'239 patent at 14:22-28.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

77.     Claim 16 is dependent on Claim 15, and specifically identifies a cellular telephone, which is not identified in Claim 15.  Instead, Claim 15 claims "means" that should encompass every disclosed method of transmission over a cellular frequency.

78.     It is my opinion that the specification does not require software for the limitation "means for transmision of said captured video over a cellular frequency."   "Means for transmi*ssion*" is different from "means for transmi*tting*."  Notably, "transmitting" is a verb, where "transmission" is a noun.  Therefore, it is my opinion that "means for transmission" does not require any "actions" such as the software steps incorporated into the "means for transmitting" limitation.

79.     Next, the software steps not only do not make sense in the context of Claim 15, they improperly import additional limitations that are not necessary.  The step "obtaining *the* stored file" has antecedent basis back to the limitation "means for storing said composite signal."  But, that is not a limitation in Claim 15, and storing the file is not a limitation of Claim 15.  Therefore, the software steps do not make sense.

80.     Also, because there is no required storage, there is no need for a "file."  Claim 15 does contemplates sending "video."  That video does not need to be stored, and hence does not require creation of a file, which Apple improperly incorporates into its structure.

81.     It is also my opinion that the limitation "means for transmission of said captured video over a cellular frequency" contains more structure built into the function than the limitation "means for transmitting said composite signal," and therefore, does not need the software limitations.  The "means for transmission" limitation contemplates transmission "over a cellular frequency," which provides this additional structure.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

### 2.     Ports

181.    Ports denote an application or process software in an operating system and are generally associated with a host's address and communication protocol (typically transport-layer protocol).  The most common use of ports is in relation to an IP address identifying the host device and the TCPT or UDP protocols.

182.    Ports associated with a specific host address and protocol are identified by a port number.  Higher-level protocols and applications can use the port number to specify applications and processes.[31]

### 3.     Socket

183.    Sockets, sometimes called network sockets, refer to end-points in a communication network.  The most common reference to sockets is in relation to IP networks.  Application programs rely on an interface, commonly known as an application programming interface (API), to allow application programs to use sockets.  A socket address—formed by the combination of an IP address and a port number—is used to deliver data between sockets and application processes or threads.

### 4.     Routing

184.    Packet-switched networks do not establish a fixed connection for communication sessions as is commonly done in traditional circuit-switched networks.  It is therefore necessary to navigate or route individual packets from the source to destination.

185.    In packing-switching networks, routers rely on addressing to forward packets from the source through intermediate nodes towards the destination.  All network entities,

---

[31] Some of the more common port numbers used on media communications include port 80 for HTTP using TCP, port 554 for RTSP using TCP/UDP, port 1234 is the default port for RTP using UDP, port 5060 for SIP using TCP/UDP, etc.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

quantized to form a digital image. CCD image sensors are used to capture an entire frame at a time and therefore result in superior images for high-quality imaging applications.

240. CMOS image sensors rely on an active-pixel sensor (APS), formed by an array of photodetectors and active amplifiers on an integrated circuit that is typically used to capture an image one row at a time. The electronic circuitry converts the light energy detected into voltage that is then sampled and quantized to form a digital image. CMOS image sensors (unlike CCD image sensors) can incorporate image processing functions within the same integrated circuit which makes them particularly suitable for low-power, low-cost applications such as cell phone cameras.

241. When analog video signals are provided, digital video is obtained by using a video capture card that samples and quantizes the analog signal and converts into a digital video signal. The video capture card will then encode the digital video signal into a digital video format.

242. The display of multimedia information is the reversal of multimedia acquisition: digital multimedia signals are converted into signals that can be sensed by human observers. For example, digital audio signals are transmitted to loud speakers which are transducers producing acoustic sound waves in response to electrical signals. Sound is typically generated by the axial (i.e. back-and-forth) mechanical movement of a diaphragm or cone along with a coil, in response to a magnetic field created by current in the coil, when an electrical signal is applied to the coil.

243. Visual display provides for presentation of digital images on display screens. Cathode ray tube (CRT) displays were the main device used for visual display in television and computer screens for several decades. Over the past couple of decades, however, we had witnessed tremendous technological advances in the field of electronic display which have now

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

largely replaced CRTs with superior visual displays including light-emitting diode (LED) displays, plasma display panels (PDPs), liquid crystal displays (LCDs), and more recently, organic light-emitting diode (OLED) displays.  The release of new emerging display-screen technologies is imminent and will further improve the visual experience of viewers.

### 3.  Multimedia Data Storage

244.    Virtually all digital systems today, and certainly all digital computer systems, rely on sequential logic (i.e. the output of the logic circuit depends on values of the input both at present and in the past) and therefore require a means for storage (i.e. memory).[46]  Over the years, digital computer systems have used various forms of memory for data storage including read-only memory (ROM), random access memory (RAM), punch cards, magnetic tape, floppy disks, hard disk drives, flash drives, solid state drives, compact discs (CDs), laser discs, digital video discs (DVDs), and Blu-ray discs.

### 4.  Ports

245.    Ports on a computer device refer to the physical interfaces allowing for data exchange between the computer device and external devices including other computer and peripheral devices (e.g. scanner, printers, etc.).  It refers to the physical outlet used to connect cords and plugs to computer devices.[47]  The more common ports on a computer device include an Ethernet, serial port, parallel port, video graphics array (VGA) connector, digital visual interface (DVI), small computer system interface (SCSI), universal serial bus (USB), IEEE 1394

---

[46] In contrast, combinational logic (i.e. the output of the digital logic circuit depends only on values of the current input) does not require a means for storage (i.e. memory).

[47] An antenna is used to facilitate an interface for wireless data exchange over the air between a computer device and external devices; and, therefore, the antenna serves the role of a computer port in wireless communications (e.g. Wi-Fi and Bluetooth networks).

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

(Firewire) Interface, high-definition multimedia interface (HDMI), DisplayPort, Mini DisplayPort (MDP) and Thunderbolt.

### 5.   Modems

246.   Modem (an abbreviation of the term "modulator-demodulator") is used to encode and decode digital information for transmission as an analog signal over a communication medium.  The goal of a modem is to efficiently transmit digital data to a receiver and reliably reproduce the transmitted data at the receiver.  Analog signals used for digital data transmission over a communication medium can include various signals such as electrical signals, radio signals, light signals, and more.

247.   Numerous modulation techniques including pulse amplitude modulation (PAM), Gaussian frequency-shift keying (GFSK), binary phase-shift keying (BPSK), quadrature phase-shift keying (QPSK), quadrature amplitude modulation (QAM), digital multitone (DMT) modulation as well as coded orthogonal frequency-division multiplexing (COFDM) and orthogonal frequency-division multiplexing (OFDM) are used in various modem standards; e.g., telephone modems, DSL modems, cable modems, cellular modems, Wi-Fi modems, and Ethernet modems.

### H.   Multimedia Computer Services

248.   As multimedia computer systems evolved, services were introduced providing users with a better multimedia experience.  Such services included the ability to transmit and receive multimedia files, exchange audio and video streams, and engage in videoconference sessions.  I shall now briefly describe several examples of some of the more popular multimedia services:

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION
(SAMNDCA630-00832604-605).

356.    It is my opinion that these remarks did not result in the disclaimer of any subject matter.

357.    The Applicant addressed the 103 rejections that the claims were unpatenable over Gattis in view of Dykes and Guillou. (SAMNDCA630-00832605-607).  The Applicant argued that Gattis lacked the "capture" element of the claims. (SAMNDCA630-00832605-606). Instead, Gattis dsiclosed the use of a frame grabber.  (SAMNDCA630-00832605-606).  Unlike the '239 invention, Gattis contemplates an uninterrupted stream of information digitized on a line by line of resolution basis that will ultimately be a series of still pictures. (SAMNDCA630-00832605-606).  The '239 invention instead contemplates creating video signal information. (SAMNDCA630-00832605-606).

358.    It is my opinion that Gattis is quite different from the '239 invention and Apple's implementations.  As explained by the applicant, Gattis contemplated an uninterrupted, continuous stream of information that will form "pictures," as opposed to video.  The '239 invention, however, contemplates capturing video and then transmitting it at various speeds.  The Apple implementations do not use a continuous stream of information, but rather uses real video data.  For example, in the Facetime implementation, the video is captured by the video cameras on the devices, and then stored on a video frame by frame basis.  It is not assembled on a line by line resolution basis as before being transmitted.  It is therefore my opinion that the Applicant did not disclaim any subject matter at issue in this case with these Remarks.

359.    The Applicant's remarks are as follows:

> 4. Claims 1-15 have been rejected in the Office Action under 35 U.S.C.
> §103 as being unpatentable over Gattis et al ('136) in view of Dykes et al
> ('671) and Guillou ('483). Claims 1, 3, and 12 have been amended, and
> claims 8, 9, 11, and 15 have been canceled in this Amendment and

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Response. Reconsideration and allowance of claims 1-7, 10, and 12-14 is hereby respectfully requested.

The Gattis et al ('136) patent lacks a significant element contained within Applicants' independent claims I and 12 which is not supplied by Dykes et al or Guillou. Specifically, amended claim 1 requires 'means for capturing, compressing, digitizing, storing, and transmitting at least one composite signal" (emphasis added). Claim 12 recites "a remote unit being a personal computer, including: a.) a video card having a video capture module to capture, compress, and digitize said signal into a data file."

Significantly, Gattis et al as referenced on page 7 of the Office Action, and in column 3, line 67 - column 4, line 3, of Gattis, discloses the usage of a frame grabber 24A. This device only contemplates an uninterrupted, continuous stream of information digitized on a line by line of resolution basis that ultimately represent a sequence of "pictures." Gattis does not contemplate the creation of full-motion composite signal video information into digitized files which can be stored, transmitted, played or replayed. This is a very significant difference. Under Gattis the video quality is depicted by the available connection speed, and the lower the speed the lower the quality of the frames grabbed. Moreover, the system disclosed in Gattis even fails if the connection is not a continuous link sufficiently fast to provide "an acceptable picture." Gattis, column 8, line 66. Thus, Gattis does not disclose the creation of a data file as required by Applicants' claims. Also, Gattis does not contemplate the ability to provide a high quality full-motion picture with lower band width connections and cannot take into account the actual variables encountered in video data transmissions (whether analog or digital) including: variable baud rates; interference; line loss and the like. However, in Applicants' invention, fullmotion composite signal is captured into digitized files and transmitted over narrow (slow) and/or intermittent band widths while and still maintaining the original captured quality of the video.

Neither Dykes et al, nor Guillou supply this important deficiency of Gattis et al. Claims 1-7, 10, and 12-14 must be allowed at least for this reason and is respectfully requested. Claims 2-7 and 10 depend upon claim 1 and Claims 13-14 depend upon claim 12 and are all allowable at least for the reasons set forth above with regard to claims 1 and 12.

Further, claims 5, 12, 13, and 14 all require "means for splitting and organizing the digitized, compressed, composite signal prior to transmission." As discussed above with regard to the rejections under 35 U.S.C. §1112, the means for splitting and organizing the digitized, compressed composite signal prior to transmission includes splitting the captured, organized, and compressed composite signal according to the present application (p. 22, line 18 -p. 24, line 14). Gattis does not disclose

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

splitting the file prior to transmission. In fact, Gattis recognizes the problem of transmission speed. In column 4, lines 9-13, Gattis states, "Efficient transmission of such signals without overloading the transmission channel requires the use of a compressed code. A compressed code also reduces the amount of memory required to store each frame." Although the present invention employs compression technology, transmission speed is increased by splitting and then simultaneously transmitting the portions of the split file. Gattis, column 4, lines 21-22, states:

> 'The video signal fed into the encodler/compressor 30A should be a standard black and white signal."

Capture of full motion color video with audio produces a much larger digitized data file. Transmission of that large file in real time necessitates the splitting function described by Applicants.

(SAMNDCA630-00832605-607).

360. The Applicant finally addressed the newly added claims:

> Applicants have added new claims **16-21.** New claims **16-21** do not include new subject matter. The arguments contained herein in response to the rejections under **35 U.S. C.** §112, 102(a) and **103** apply to new claims **16-20.** Allowance is respectfully requested.

> The application as originally filed had **15** claims, including two independent claims. In this Amendment four dependent claims have been canceled. One independent claim and five dependent claims have been added. This totals **3** independent claims, and 14 dependent claims. Therefore, it is not believed any additional filing fee is necessary. However, the Commissioner is hereby authorized to credit any overpayment or debit any additional fees which may be due in connection with this Amendment to the deposit account of the undersigned, No. **03-1127.**

> In view of the above comments and amendments to the claims which clearly distinguish the claims for the prior art, it is respectfully requested that the Office Action be reconsidered and that the application be allowed.

(SAMNDCA630-00832607-608).

361. On March 28, 1996, the PTO mailed a second non-final office action, rejecteing claims 1-7, 10, 12-14, and 16-21 (all of the claims still pending in the application). (SAMNDCA630-00832609-616).

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

35 U.S.C. §103 is believed overcome.   Allowance of claim 19 is
respectfully requested.

Claims 20 and 21 depend upon claim 19 and are deemed allowable at least
for the reasons set forth above.  Reconsideration and allowance of claims
20 and 21 is respectfully requested.

(SAMNDCA630-00832628-629).

375.    The Applicant finally addressed the proposed new claims:

New claims 23-38 have been added.  New claims 22-38 do not include any
new matter which would require an additional search.  Consideration and
allowance of claims 22-30 is respectfully requested.

(SAMNDCA630-00832629).

376.    The Applicant submitted a final version of the office action previously faxed as a

draft on May 21, 1996. (SAMNDCA630-00832632-646).  The claim amendments and remarks

were similar to the draft sent before the Examiner Interview.

377.    The Applicants made the following amendments:

1. (Twice Amended)   An apparatus for transmission of data, comprising:

a mobile remote unit including:

a.)      means for capturing, digitizing, and compressing [,
digitizing, storing and transmitting] at least one composite signal;

b.)      means for storing said composite signal;

c.)      means for transmitting said composite signal;

a host unit including:

a.)      means for receiving at least one composite signal
transmitted by the remote unit;

a playback unit including:

a.)      means for exchanging data with said host unit;

b.)      means for storing the composite signal received by the host
unit;

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

   c.)    means for decompressing said composite signal.

2. (Amended) An apparatus according to claim 1 wherein the host unit and the playback unit are combined in a single [personal] computer.

5. (Amended) An apparatus according to claim 1 wherein the means for capturing, digitizing, and compressing [and digitizing] said [audio and video] composite signal includes a video [card with a] capture [module] device installed in said remote unit to capture said composite signal in real time.

6. (Amended) An apparatus according to claim 5 wherein the means for capturing, compressing and digitizing said [audio and/or video] composite signal includes an audio [card] capture device installed in said remote unit.

7. (Amended) An apparatus according to claim 3 wherein the means for transmitting the [video] composite signal includes:

at least one interface installed in conjunction with said remote unit,

a cellular telephone connected to each said interface.

12. (Twice Amended) An apparatus for transmission of data from a remote location to a host location, comprising:

   a remote unit capable of receiving a composite signal;

said remote unit being a [personal] computer, including:

   a.) a video [card having a video] capture module to capture, digitize and compress[, and digitize] said composite signal into a data file;

   b.) at least [one] two computer [interface] interfaces;

   [c.) means for transmitting said data file;]

   c.)    means for splitting said data file into pieces;

   [d.) means for splitting and organizing said data file prior to transmission;]

   d.)    means for tagging said pieces in sequential order

   e.) means for storing said data file;

   f.)    means for transmitting said sequentially tagged pieces through said interfaces;

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

a host unit;

said host unit being a [personal] computer, including:

a.) at least [one] two computer [interface] interfaces for receiving said sequentially tagged pieces transmitted from said remote unit wherein said interfaces being connected correspondingly with said interfaces in said remote unit;

b.) means for recombining the [split] sequentially tagged pieces into their original order to form a second data file;

a playback unit;

said playback unit being a personal computer, including:

a.) means for exchanging data with said host unit;

b.) means for storing the second data file received by the host unit;

c.) [a decompression card] means for decompressing said second data file;

d.) [a scan converter card] means for converting said second data file to a broadcast signal.

19. (Amended)        An apparatus for transmission of data, comprising:

a [personal] computer including a [video card having a] video capture module to capture and compress video in real time;

means for transmission of said captured video over a cellular frequency.

20. (Amended)        The apparatus of claim 19 wherein the means for transmission of said captured video over a cellular frequency includes at least [one] two interfaces [interface] operating in conjunction with said computer, a cellular telephone [or land telephone line] connected to each said interface.

21. (Amended)        The apparatus of claim 20 [wherein the captured video is split] further including means for splitting the captured video into pieces for [prior to] transmission through said interfaces.

(SAMNDCA630-00832632-636).

378.    The difference between the draft amended claims and the final amended claims is

that the Applicant deleted the "video card" from two claims, including Claim 19 (now asserted

141

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Claim 15).  (SAMNDCA630-00832636).   It is my opinion that given this change, Claim 15

claims subject matter broader than a video card.

379.    The Applicant added the following new claims 22-38:

22.    An apparatus according to claim 1 including means for converting said composite signalto a broadcast signal.

23.    The apparatus of claim 12 wherein said remote unit is mobile.

24.    The apparatus of claim 12 wherein said video capture module on said video card captures, digitizes and compresses said composite signal in real time.

25.    An apparatus according to claim 12 wherein the remote unit includes a telephone line connected to each computer interface.

26.    An apparatus according to claim 12 wherein said interfaces capable of simultaneous transmission.

27.    An apparatus according to claim 12 including means for converting said composite signal to a VGA signal.

28.    An apparatus according to claim 27 further including means for converting said VGA signal to a broadcast signal.

29.    An apparatus according to claim 12 including means for converting said composite signal to a broadcast signal.

30.    An apparatus for transmission of data from a remote location to a host location, comprising

a remote unit, including:

a.) video capture device to capture and digitize said composite signal into a data file;

b.) at least two computer interfaces;

c.) means for splitting said data file into pieces;

d.) means for tagging said pieces in sequential order;

f.) means for transmitting said tagged pieces through said interfaces wherein said interfaces are capable of simultaneous transmission;

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

a host unit, including:

> a.) at least two computer interfaces for receiving said tagged pieces transmitted from said remote unit wherein said interfaces are capable of simultaneous data reception;

> b.) means for recombining the tagged pieces into their original sequential order.

31.     The apparatus of claim 30 wherein the composite signal is transmitted over telephone lines, cellular, radio, or other telemetric frequencies.

32.     The apparatus of claim 30 wherein the data file is compressed prior to transmission by the remote unit.

33.     An apparatus according to claim 30 including means for converting said composite signal to a VGA signal.

34.     An apparatus according to claim 33 further including means for converting said VGA signal to a broadcast signal.

35.     An apparatus according to claim 30 including means for converting said composite signal to a broadcast signal.

36.     An apparatus according to claim 30 wherein the tagged pieces are transmitted from said remote unit to said host unit over telephone lines, cellular, radio or other telemetric frequencies.

37.     An apparatus according to claim 30 wherein said remote unit is mobile.

38.     An apparatus according to claim 30 wherein said remote unit captures and digitizes the composite signal in real time.

(SAMNDCA630-00832636-639).

380.    The Applicant included a brief description of the invention. (SAMNDCA640).

That description was as follows:

> The present invention includes an apparatus capable of capturing a full-color, full motion composite signal in real time; digitizing that composite signal into a data file; compressing the data file and transmitting it through a computer interface via telephone lines, cellular, radio, and other telemetric frequencies from a remote unit to a host unit. Additionally, the data file may be split into pieces and tagged for simultaneous transmission

143

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

through a plurality computer interfaces. Once received by the host unit, the tagged pieces are recombined into their original order for storage, playback, or broadcast.

The remote unit may be a mobile device capable of receiving a composite signal at a remote location away from electrical utilities wherein the composite signal is captured, digitized, and compressed in real-time (while a video camera is recording) for immediate transmission to the host unit. The host unit is generally located at a central location, such as a television broadcast station wherein the data file is immediately broadcast, viewed, or stored for later use.

In the Office Action, claims 1-7, 10, 12-14, and 16-21 are rejected under 35 U.S.C. §103 as being unpatentable over Yurt et al ('273) in view of Gattis et al ('136) or Palmer et al ('068).

In view of the above amendments, reconsideration of claims 1-7, 10, 12-14, and 16-21 is respectfully requested.

(SAMNDCA630-00832640).

381.   The Applicant next described the amendments that were made:

Independent claim 1 has been amended to describe the remote unit as being mobile. As used herein, the term "mobile" is defined to include an apparatus that may be stationary or not used without regard to location using an external power supply or internal power source without regard to the type of current supplied by the available power source.  As described above, Applicants' claim 1 includes a mobile remote unit which could be used in a remote location regardless of the power source available. For example, if available, the remote unit could be operated in a location where it is plugged into a conventional alternating current power source provided by an electrical utilities provider or in th event such "power sources" is unavailable, the remote unit could operate by battery or by a power source supplied by a vehicle (direct current). In this way, the remote unit of the present invention could be operated from a stationary location or while being transported such as by a motor vehicle so as to capture, digitize, and compress a composite signal of a live-action event.

(SAMNDCA630-0083240-641).

382.   In addition to the arguments in the draft, the Applicant indicated that the remote unit may be "stationary."  Therefore, the remote unit may either be in a stationary location, or mobile.  It is my opinion that all of the Apple Accused Products meet this description.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

383.    The Applicant next addressed the 103 rejection made by the Examiner.  None of

the cited references disclosed a mobile device. (SAMNDCA630-00832641).   The Applicant

explained that Yurt actually taught away from the invention because Yurt transmits archived data

from a very large storage facility, but the '239 invention relates to transmission from a remote

location. (SAMNDCA630-00832641).   The Applicants' proposed arguments with respect to

claims 1, 2-7, 10 and 22 were as follows:

> A mobile device is not disclosed by Yuri at al, Gattis at al, or Palmer et al.
> The library and transmission means described in Yurt is a very large data
> storage faciilty from which archived data is transmitted from this central
> storage location to a remote subscriber.   The mobile remote unit of
> Applicants' claim 1 contemplates the opposite philosophy-transmission of
> video data files from a potentially isolated remote location to a host
> location for further processing and/or broadcast.  There is nothing in Yurt
> which would suggest or contemplate modifying the library and
> transmission means so as to be mobile.   The rejection in the Office Action
> claim 35 U.S.C. §103 is, therefore, believed overcome. Reconsideration
> and allowance of claim 1, as amended, is respectfully requested.
>
> Claims 2-7, 10, and now claim 22 are dependent claims which depend
> upon independent claim 1 all and are allowable at least for the reasons set
> forth above. Reconsideration and allowance of claims 2-7, 10, and new
> claim 22 is respectfully requested.

(SAMNDCA630-00832641-642).

384.    The Applicant addressed Claim 12 and claims dependent from Claim 12 as

follows:

> Claim 12 has been amended to recite at least two computer interfaces
> installed in each remote and host unit as well as splitting the data file into
> pieces and tagging the pieces in sequential order in the remote unit prior to
> transmission. Transmission of the tagged pieces of the data file is done
> through the multiple interfaces.
>
> Yurt does not disclose such a device. Yurt discloses only **a** single
> communications channel from its transmission system to its reception
> system. Yurt does not disclose breaking the data file into pieces and
> transmitting the pieces over a <u>plurality **of**</u> communications channels. This
> is significant- Transmission of the pieces according to Applicants' claim

145

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

12 decreases transmission time. Neither Gattis nor Palmer supply this deficiency in Yurt. Accordingly, claim 12, as amended above **must be** allowed.   Reconsideration and allowance of claim 12 is respectfully requested.

Claims **13,** 14, **16, 17, 18,** and new claims 23-29 depend upon claim 12 and are thereby allowable at least for the reasons set forth above. Reconsideration and allowance of claims **13,** 14, **18,17, 18,** and **23-29** are respectfully requested.

(SAMNDCA630-00832642).

385.   The Applicant then addressed Claim 19.  It was amended to describe capturing visual information in an "apparent simultaneous fashion" including capturing a composite signal as previously stored as well as "capture of a composite signal occurring as the event is taking place" ("real-time") (SAMNDCA630-00832642).   An example of this is Apple's FaceTime application, or the capability of recording a video with the Accused Devices.  The applicant explained that Yurt did not do this, as well as citing previously described arguments. (SAMNDCA630-00832642-43).  The arguments were as follows:

Claim 19 as amended describes an apparatus for transmission of data comprising a computer including a video capture module to capture video in real time. As used herein, the term "real time" includes the capture of information in an apparent simultaneous fashion.  This would include synchronous capture of a composite signal previously stored as well as capture of a composite signal occurring as the event is taking place (live action).

Real time capture is significantly different than the method described by Yurt. Yurt contemplates a system which takes a video sequence such as a motion picture of known length characteristics and then subjecting that signal to a complex mathematical algorithm which captures, digitizes, and compresses that signal. This method disclosed by Yurt is very time consuming and requires complex and expensive hardware to accomplish. As stated above, the Yurt disclosure contemplates a storage library Of known files. This library is precompressed (col. 7, line 47-col. 8, line 26). In the Yurt disclosure, it is desirable to perform this substantive precompression so as obtain a data file which is as small as possible so as to reduce transmission time. Yurt does not disclose the use of a video card including a video capture module in order to accomplish its-capture. The

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

> frame grabber technology of Gatis and Palmer is likewise significantly different from a video card having a video capture module as recited in claim 19. The differences between a video card and frame grabber were discussed in Applicant's Amendment and Response to the Office Action dated August 2, 1995, incorporated herein by reference, in light of the fact that a video capture card having a video capture module is not contemplated by Yurt nor Gattis or Palmer, the rejection of claim 19 under 35 U.S.C. §103 is believed overcome.   Allowance of claim 19 is respectfully requested.

> Claims 20 and 21 depend upon claim 19 and are deemed allowable at least for the reasons set forth above.  Reconsideration and allowance of claims 20 and 21 is respectfully requested.

(SAMNDCA630-00832642-643).

386.    Notably, the Applicant removed the "video capture" card from the first paragraph – consistent with the changed amendment, it is my opinion that the Applicant intended to claim only a video capture module, which is broader than a video card.

387.    The Applicant finally addressed the proposed new claims:

> New claims 23-38 have been added.  New claims 22-38 do not include any new matter which would require an additional search.  Consideration and allowance of claims 22-30 is respectfully requested.

(SAMNDCA630-00832643-644).

388.    The Applicant addressed "Amendments in Response to Interview with Examiner on May 21, 1996." (SAMNDCA630-00832644-645).  Notably, the Applicant indicated that it deleted "reference to a 'video capture card.'"  The Applicants' statement was as follows:

> As a result of the Interview with the Examiner on May 21, 1996, claim 3 has been amended to correct a typographical error in Applicants' Amendment and Response to the Office Action Dated August 2, 1995. Specifically, a misplaced bracket was deleted in line 2 before "telephone".

> Further, as discussed, claim 19 has been amended to clarify that the captured video is compressed in real time. Additionally, line 2 has been amended to delete reference to a video capture card leaving reference to a video capture module. Likewise, claim 12 has been amended in the same fashion in order to delete reference to a 'video capture card".

147

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

establishing a connection to the cellular data network if no Wi-Fi connection is available. This code includes souce code file "████████████ [APL630DEF-WH-SC-A07248–7267], "████████████ [APL630DEF-WH-SC-A07268], which includes the function ████████████████ [lines 622-738] and the call to function ████████████ at line 675. The function ████████████ is defined in file ████████" [APL630DEF-WH-SC-A07269 - 7287].

1327. In addition, all of the '239 Accused Products have operating system and application software that is used to retrieve a stored data file representing the composite signal from a memory storage device (e.g. DDR SDRAM, Flash drive or hard drive). The stored data file representing the composite signal consists of various representations of the combined audio and video signals including a container of the combined audio and video signal, a group of audio windows and video frames, a collection of audio and video packets, etc.

1328. Below, in the source code section, I have identified specific software corresponding to the software structural limitation for "obtaining the stored data file." The following applies to all infringing features of the Accused Products, including FaceTime and sending audio and video over email or text messages. Additional software that meets this structural limitation is located below in my source code description.

1329. For FaceTime, after the ████████████ it is stored in a memory called ████████████ The file is retrieved by code in the file "████████████ (APL630DEF-WH-SC-A001689-1719.) At line 1539 of that file, the function ████████████" calls another function called ████████████ This function is called to ████████████ ████ The code obtains the ████████ from the memory ████████████ which is one of the inputs to the function:

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

source code running in this ███████████████████████████████████

███████████████████████   This includes source code files include ███████████████

[APL630DEF-WH-SC-A07229–7232], which includes function call "████████████████████

There is also source code for establishing a connection to ██████████████████████

███████████████████   This code includes souce code file █████████████" [APL630DEF-

WH-SC-A07248–7267], █████████████" [APL630DEF-WH-SC-A07268], including the

function ████████████████████████" [lines 622-738] and the call to function

███████████████████" at line 675.  The function ████████████████ is defined in file

██████ [APL630DEF-WH-SC-A07269 - 7287].

### (b)   FaceTime

1547.   As explained above, there are a number of different ways that the Accued devices

will "initialize one or more communications ports on the remote unit."  First, it is important to

realize that there are both hardware and logical ports.  All of these ports have to be initialized

prior to transmission for the transmission to occur without error.

1548.   FaceTime communicates using ████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████   At the start of a FaceTime conversation,

there are █████████████████████████████████████████.  For example,

at the beginning of a FaceTime conversation, in source code file ████████████████

[APL630DEF-WH-SC0001986 – 2036, APL630DEF-WH-SC-A04059-5018] there is a call to

████████████████ (line 4508 – 4536), which in turn will call  the call to software function

████████████████, which is defined in source code file █████████[APL630DEF-WH-

SC0001813 – 1862].  The FaceTime application will utilize the ██████████████████████

955

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

means receiving an analog audio and video signal to the remote unit | computer from a separate video recording device. (See, e.g., '239 patent at Fig. 1, 2:26-28 ("It is the purpose of the present invention to provide a method and means for capturing full-color, fullmotion audio/video signals . . . ."), 4:28-34 ("The video signal received by the remote unit can be of any generally known format, such as NTSC, PAL, and Y/C video (or S video)."), 4:39-40 ("The video signal input into the remote unit is received by a video card having a capture module therein."), 5:44-46 ("An audio capture card installed in the remote unit captures the audio of an input signal."); SAMNDCA630-00832632 [5/20/96 Amend.] at 9, 12; Boss 6/19/13 Tr. at 96:14-21; 97:6-15; M.C. Freeman 6/19/13 Tr. at 71:6-16; R. Freeman 6/18/13 Tr. at 95:5-9, 153:9-20; ZINGERMANNDCA630-00000149; APL630DEF-WH-A0000032341; APL630DEF-WHA0000032199- 201; APL630DEF-WH-A0000020896; SAMNDCA630-00830180; SAMNDCA630-00829683-84; SAMNDCA630-00829773; SAMNDCA630-00829896-97; SAMNDCA630-00829903; SAMNDCA630-00831181; SAMNDCA630-00831182; SAMNDCA630-00831185-88; SAMNDCA630-00831190; SAMNDCA630-00831474; SAMNDCA630-00831478; SAMNDCA630-00831775; SAMNDCA630-00832131; SAMNDCA630-0082155; SAMNDCA630-00828677; SAMNDCA630-00828679; APL630DEF-WH-A0000004783- 940; APL630DEF-WH-A0000004704 at 13; APL630DEFWH- A0000004734 at 36.)

1597. I disagree. First, it is my opinion that Apple is improperly reading the term "capture" to cover a "completely separate" video recording device. I assume Apple means "completely external" when it says "completely separate." I understand that this term was construed during claim construction, and both parties agreed that the function of the term was "capturing, digitizing, and compressing at least one composite signal." I understand neither party asked for a specialized meaning of the term. Therefore, I am applying it's plain meaning. Indeed, the term "capture" does not only cover a "separate" video or audio recording device. There is nothing in the specification, file history, or the claims that narrows this term to cover only a "completely separate" device. Moreover, there is nothing in the claims that prevents the camera and microphone from being external from the remote unit. In fact, claim 1 is silent about where the camera is located.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

1598.   Moreover, assuming Apple does not mean "completely external," the accused products still infringe even under Apple's incorrect interpretation of the term "capture."   As explained above, the image sensor and audio codecs capture the video and audio from the camera and microphone.   All of these different components are incorporated into the accused devices, but are "completely separate" components, as can be demonstrated by the BOMs and other documents that list all of the different components and are identified above in this report.

1599.   Moreover, to the extent Apple is found to be correct on this argument, Apple still infringes under the doctrine of equivalents.   A "completely separate" recording device, and the accused functionality for purposes of "receiving an analog audio and video signal" is substantially the same and any differences are insubstantial.   Indeed, both perform substantially the same function of receiving the video and audio signals from a recording device.   This is both explained above, and demonstrated in the attached videos that show a video being recorded. Above I explain that the video is being captured.   Both do this in substantially the same way of receiving the video and audio signals and converting them to a digital format.   Indeed, as explained above, the image sensors use a CMOS sensor to capture the video from an analog signal and then convert it to a digital format. And both obtain substantially the same result of "capturing" the video.   Indeed, as explained above, and in my report, the accused devices capture the video that is taken.   That is the same result set forth in the patent, as I have explained and descibed above in my description of the '239 patent.   Indeed, the only differences for the purposes of Apple's argument is whether the video camera or microphone are part of the remote unit or external to the remote unit.

1600.   Apple states:

A "composite signal" is an analog signal that contains the components of a full-motion video that has already been created. In other words, the video

972

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

must already exist before it is captured. (*See, e.g.*, '239 patent at Abstract ("The audio/visual signal can either be NTSC, PAL, or Y/C."), 2:26-28 ("It is the purpose of the present invention to provide a method and means for capturing full-color, full-motion audio/video signals . . ."), 4:31-34 ("The video signal received by the remote unit can be of any generally known format, such as NTSC, PAL, and Y/C video (or S video)."); SAMNDCA630-00832590 [Affidavit] ¶ 2 (describing invention as an apparatus that captures, digitizes and compresses a "full motion composite signal"); SAMNDCA630-00832592 [¶ Ex. A to Affidavit] ("Remote unit digitizes and compresses video/audio NTSC signal"); SAMNDCA630-00832596 [2/2/96 Amend.] at 6; Docket No. 447 [Claim Const. Order] at 51-52; APL630DEF-WH-A0000036852 at 54.) A CMOS image sensor has thousands of individual pixels, each containing a photodetector, arranged in an array that receive light through a lens. (*See, e.g.*, Millet Tr. at 14:13-15:11 (image sensor captures photons of light).) The light received by each pixel is converted into a digital value. These values are then compiled into a stream of image (pixel) data. (*See, e.g.*, APL630DEF-WH0005226539 ███████████████ Datasheet]; APL630DEF-WH0005224613 ███████████ Datasheet]; APL630DEFWH0000097566 ██████████ Datasheet]; APL630DEF-WH0000097306; APL630DEF-WH0000097401; APL630DEF-WH0000097728; APL630DEF-WH0000097835; APL630DEF-WH0000097942; APL630DEF-WH0000098046; APL630DEF-WH0000098144; █████ 0001 – 1281 and other image sensor data sheets listed below.) A CMOS image sensor cannot receive a composite signal from an external device, as required by the term "capture" in the patent, nor is the CMOS sensor capable of receiving an audio signal. The "processor with a graphical processing unit (GPU)" also cannot receive a composite signal from an external device. Moreover, FaceTime does not use GPUs as Samsung claims.

1601. I disagree. First, I understand this term was construed during claim construction, and Samsung and Apple both agreed that the function is "capturing, digitizingm, and compressing at least one composite signal." I understand that Apple did not offer an alternate constructuion at that time. Apple now appears to be offering a specialized claim construction of the term "composite signal." There is nothing in the Parties' agreed construction of this term that requires it have any specialized meaning.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

1602.   Moreover, even if it were to be afforded a specialized meaning, as I explain above during my summary of the file history, the Applicant defined the term "Composite signal" during prosecution.  Specifically, the Applicant defined "composite signal" as follows:

> The term "composite signal" is generally known to mean a signal which includes components such as audio and/or video.

SAMNDCA630-00832600-604.

1603.   Therefore, composite signal does not have the meaning that Apple is alleging it has, even if it were subject to a different construction.

1604.   Moreover, nothing in the statements Apple cites requires that the "video must already exist before it is captured."  The statements Apple cites from the patents just say that the "capture" is of a video signal.  That is precisely what the Accused Devices do, as explained above.  Therefore, Apple's non-infringement defense is not credible.

1605.   Apple next describes a CMOS image sensor, however, it omits important parts of how a CMOS image sensor works.  The image sensor transforms light into a series of electrons. this voltage is an analog signal representating the video that is then passed through an analog to digital converter and digitized into a digital signal.  This functionality, including the analog to digital conversion, is memorialized in the image sensor documents as described in the Infringement section of my report, above.  Therefore, as I explain above, the image sensors capture the video and digitize it in every one of the infringing implementations.  Therefore, Apple infringes the patent literally.

1606.   Moreover, even if Apple's arguments are found to be correct, Apple still infringes under the doctrine of equivalents.  The functionality of the accused products is substantially the same as the claim and there are no insubstantial differences.  Both the Accused functionality and the claim describes the same function of capturing a video signal from a camera.  Both the

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Accused Functionality and the claim perform this function in the same way.  Namely, they receive a digital signal recorded by a camera, and capture and digitize that signal.  Finally, they both have the same result.  The video signal is captured and digitized by both the Accused Products and the claim such that it can be compressed.

1607.  Moreover, as I explained above, there is nothing in the claim that requires an external device.  Apple is reading in a limitation that does not appear eithe rin the claims or in the patent itself.  Should Apple be found to be correct, Apple still infringes under the doctrine of equivalents.  An external recording device, is substantially as an internal recording device and any differences are insubstantial.  Indeed, both perform substantially the same function of recording video signals.  This is both explained above, and demonstrated in the attached videos that show a video being recorded.  Above I explain that the video is being captured by the image sensor.  Both internal and external devices do this in the same way of recording video using a camera.  And both obtain substantially the same result of recording video that is ultimately captured, digitized,a dn compressed.

1608.  Apple also mentions that FaceTime does not use "███████ as Samsung claims, but Apple fails to explain what the ██████ are not used for.  As explained above, for FaceTime, the image sensors capture and digitize the video, and then the █████████████████████████ ███████████████████████

1609.  Apple states:

> Moreover, even under Samsung's apparent construction of "capture," the accused components do not perform the identical function of "capturing, digitizing, and compressing at least one composite signal." The light received by the CMOS image sensor and the image stream it creates are not "composite signals," nor do they have any audio component. In fact, no video yet exists during the creation and processing of the image stream. (*See, e.g.*, Millet Tr. at 14:13-15:11 (image sensor captures photons of light), 48:24-49:16 (output of image sensor is not a video signal).) In

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

addition, because the claimed function requires digitization of the composite signal, that signal is necessarily analog; otherwise, there would be no need for the composite signal to be digitized. None of the accused components is capable of receiving an analog composite signal and digitizing and compressing that signal. The accused devices also do not use a separate "A/D converter" as Samsung contends. ███████████████ *(See, e.g.,*
Millet Tr. at 16:15-17:3; APL630DEFWH0005226539 ██
██████ Datasheet]; APL630DEF-WH0005224613 ████
Datasheet];   APL630DEF-WH0000097566 ███████
Datasheet];       APL630DEF-WH0000097306;       APL630DEF-
WH0000097401;       APL630DEF-WH0000097728;       APL630DEF-
WH0000097835;   APL630DEF-WH0000097942;   APL630DEF-
WH0000098046; APL630DEF-WH0000098144; ████001 – 1281 and
other image sensor data sheets listed below.)

1610.  I disagree.  First, Apple now appears to argue that the "composite signal" must be a combined video and audio signal.  First, this is inapposite to the definition provided by the Applicant during prosecution.  Moreover, Apple failed to raise this as an issue during the claim construction process.  Next, Apple's argument is contradicted by the Court's construction of the structure for the term.  The Court construed the means plus function structure as "an audio capture card and a video card having a video capture module."  The Court therefore construed the audio and video portions of the structure as separate items, as they are in the Apple accused products described above.  Because the structure is construed as two separate components, the audio and video necessarily will have to be separated into its audio and video components, precisely as the accused devices do in all of the infringing embodiments as described above.  Therefore, Apple's argument fails.

1611.  Moreover, even if Apple is found to be correct with this argument, Apple still infringes under the doctrine of equivalents.  The Accused Products's use of a separate video and audio component to process video and audio is substantially the same as Apple's interpretation of the claims to require a combined video and audio signal, and there are no insubstantial

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

differences.   The two perform substantially the same function of capturing video and audio signals.   They perform this function in substantially the same way by receiving and capturing video and audio signals at the same time.   Finally, the same result is obtained:  The video and audio signals are captured, digitized, and ultimately compressed and transmitted.

1612.   Apple next argues that the signal must be "necessarily analog."  Apple also seems to argue that a "separate" A/D converter is necessary.   There is nothing in the claims, patent, and specification that require a "separate" A/D converter.[133]  Moreover, Apple never requested that a "separate" A/D converter should be required for the claim construction.   Instead, Apple agreed that the function is "capturing, digitizing, and compressing at least one composite signal."   The plain meaning of this function does not even require an analog signal – only that the signal is "digitized," which it must be for the encoding and compression to occur.

1613.   Moreover, although Apple claims there is no analog signal, it admits in its non-infringement argument listed above refutes this fact.   Apple admits that the image sensor contains an ██████████████████████████████████████████████████████████ ████████████████████████ – and nowhere in Apple's non-infringement argument do they refute this fact.   Nor can they, because an A/D converter is an "analog to digital converter."  The nature of an A/D converter is exactly as it is named:  it takes an analog signal and converts it to a digital signal.   Therefore, even if Apple is correct that you must begin with an analog signal, it still infringes.   Also, Apple never proposed any specialized construction for the term "digitized" in the function, and in fact agreed that it needed no construction.

---

[133]   I do not contend that the A/D converter must be "separate" from the image sensor as Apple claims.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

1614.   Based on my understanding of Apple's argument, I understand they are saying, to infringe the claims, you must have an external A/D converter that takes an analog signal. Assuming they are found to be correct in this argument, then Apple still infringes under the doctrine of equivalents. The internal A/D converter that takes in the analog voltage operates is substantially the same as an external A/D converter and there are no insubstantial differences. First, they perform the same function of digitizing a signal (either video or audio). They perform this function in the same way. The A/D converters in the image sensors covert the signal to a digital signal in substantially the same way as an external A/D converter because they both convert signals to digital signals. Finally the result is the same – a digital signal.

1615.   Apple states:

> Samsung also cannot prove that the accused components constitute the same structure required by the Court. Samsung asserts only that the components listed above "infringe this claim both literally and under the doctrine of equivalents," but fails to explain how any of these components (or combinations thereof) is an audio capture card, a video card having a video capture module, or both. Nor are the accused components the same structure. The audio capture card and video card with video capture module identified by the Court as the corresponding structure that performs the claimed function are (outdated) add-on components for personal computers that can be connected to an external device (such as a video camera) and used to receive ("capture") a "composite signal" representing a full-motion video as input from that device. The accused components, by contrast, are chips (or blocks on chips) integrated into the accused iOS devices, not add-on cards, as Samsung admits. (*See, e.g.*, Samsung's Third Am. Infr. Contentions at 10 (describing the components as "chips")**;**   APL630DEF-WH0005226539 ████████ Datasheet];   APL630DEF-WH0005224613 ████ █████ Datasheet];   APL630DEF-WH0000097566 ██████████ Datasheet]; APL630DEFWH0000097306; APL630DEF-WH0000097401; APL630DEF-WH0000097728;            APL630DEFWH0000097835; APL630DEF-WH0000097942;            APL630DEF-WH0000098046; APL630DEFWH0000098144; █████ 0001 – 1281; APL630DEF-WH0001749889 ████ User's Manual); APL630DEF-WH0001738776 ████ User's Manual); APL630DEF-WH0003890052 █████ User's Manual); APL630DEF-WH0001732791; APL630DEF-WH0004002318 █████ User's Manual); APL630DEF-WH0005307879 █████ User's

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Manual);     APL630DEF-WH0001708681          User's     Manual);
APL630DEF-WH0001726602 ███ User's Manual).) Samsung has also
failed to identify any audio components of any kind in its amended
infringement contentions.

1616.  I disagree.  Above, I have identified the precise parts of the accused product that constitute the construed structure by the Court.  As I explained above, the products infringe literally because they contain components that meet the language of the structure precisely.  Apple tries to argue that they are "outdated" add-on components, apparently stating that the components cannot be a part of the device – there is nothing in the Court's structure that says that the components are "add-on" components, and it therefore appears that Apple is attempting to reconstrue the Court's claim construction.   In fact, the patent contradicts Apple's new construction.  The dependent claims contradict that argument.  For example, claims 5 and 6, both dependent on claim 1, say that the "means for capturing, digitizing, and compressing" is "installed in said remote unit."  So, the patent itself contradicts Apple's new construction.

1617.  Next, Apple repeats the same arguments it has tried to read into the function that I discussed above. However, Apple's proposed new constructions of the terms are also not part of the Court's construed structure.  Nothing in the construction "audio capture card, and a video card having a video capture module" demands that they must be connected to an "external device," and in fact, using a camera internal to the remote unit is the same as using a camera external to the remote unit.  Apple did not request a construction that the structure be limited to connecting to an external device, nor does the Court's construction require an external device.  I have addressed Apple's arguments regarding what a "composite signal" is above.  Like the function, the Court's construed structure does not contain anything that requires Apple's definition of a "composite signal."  On the contrary, the Court's construction envisions a "video card" and an "audio card."  Apple claims that the components in the Court's construction are

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

"outdated." There is nothing in the Court's construction that restricts the structure to components that were only made in 1994 and are no longer made today. On the contrary, a modern component that meets the Court's construction also infringes. Therefore, it envisions the type of structure that I have described above in Apple's products.

1618. Apple also states:

> Samsung similarly cannot prove that the accused components are structures equivalent to the audio capture card and video card having a video capture module under 35 U.S.C. § 112, ¶ 6. The accused components were not in existence at the time of the filing of the '239 patent application, and therefore cannot be equivalents under 35 U.S.C. § 112, ¶ 6. (*See* Docket No. 447 [Claim Constr. Order] at 60, n.13 (citing *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1099-1100 (Fed. Cir. 2008)).) Moreover, the accused components do not perform the identical claimed function in substantially the same way to achieve substantially the same results as the audio capture card and video card having a video capture module. As discussed above, the accused components cannot perform the identical function of "capturing, digitizing, and compressing at least one composite signal." Samsung also has not demonstrated that the accused devices perform any functions in substantially the same way as the required structure. Samsung contends only that the "way" is "providing chips within the Mobile Remote Units that perform these limitations," but provides no explanation of the way those "chips" "perform these limitations" or how that way is substantially similar to the way the audio capture card and video card with video capture module perform the claimed functions.3 As described above, the accused CMOS image sensor receives light through a lens, converts the light into digital values, and creates a stream of image (pixel) data that is further processed by the processor and video encoder to create compressed video. By contrast, the video card with video capture module and audio capture card receive existing video and audio signals from an external device, which are functions the accused components cannot perform. These differences are not insubstantial. Indeed, the '239 inventors recognized these differences: although the patent discloses the video camera from which the video card having a video capture module "receives" the "video input signal," the video camera is never described as part of the structure that performs the claimed functions. Only the cards are described as performing the claimed functions in both the patent and its prosecution history. (*See, e.*g., '239 patent at Figure 1, 4:29-31; SAMNDCA630-00832632 [5/21/96 Amend.] at 12.) During prosecution, the inventors emphasized that the cards perform the claimed functions when arguing that a prior art reference cited by the examiner "did not disclose the use of

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

a video card including a video capture module in order to accomplish its capture" with no mention of the video camera. (*Id.*) For these reasons, the video camera disclosed in the '239 patent is not part of the corresponding structure that performs theclaimed functions. Finally, the results achieved by the accused components are not substantially the same as the results of the cards in the corresponding structure. Samsung incorrectly states that the result is "generating captured, digitized, and compressed data." As discussed above, the claim requires capturing an existing composite signal – not "generating data" – and digitizing and compressing the composite signal. In any event, as discussed above, none of the accused components captures, digitizes, or compresses (or "generates" or creates) a composite signal.

1619. I disagree. Even if Apple is found to be correct as it argues above, Apple still literally infringes because the structures it identifies are equivalents under 112 ¶ 6. The Accused Products perform the same function as Samsung and Apple agreed was the proper construction: "capturing, digitizing, and compressing the composite signal."  I have addressed the Accused Components practicing the parties' agreed function above.  They perform this same function in substantially the same way.  The Accused Product components capture the signal and convert it into a digital form.  That is the same way that Apple has described its interpretation of the components in the Court's construction.  The only difference is that Apple claims the components in the Court's construction are "outdated" and connect to "external devices."  There is nothing in the Court's construction that restricts the structure to components that were only made in 1994 and are no longer made today.  On the contrary, a modern component that meets the Court's construction also infringes.  But even if the Court meant the structure to only apply to 1994 components, the video and audio cards from 1994 still receive video and audio signals (composite signals) in the same way the Accused Devices receive a video signal from the camera and an audio signal from the microphone.  The only difference, which is insubstantial. is that under Apple's interpretation, the audio and video card must take an external full video and audio

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

signal.  The result is the same for both the accused products and Apple's interpretation of the structure.  The result in both cases is captured, digitized, and compressed video and audio.

1620.  Even if Apple is legally correct that "the accused components were not in existance at the time of the filing of the '239 patent application, and therefore cannot be equivalents under 35 U.S.C. § 6," Apple is incorrect.  Apple admits that the accused components are "chips."  Namely, one of ordinary skill in the art would know that processor SoCs, image sensors, and audio codecs were around at the time of the invention.  Although the technology may have developed over time, includig becoming cheaper and smaller, they were still in existence, and therefore, are equivalents.  Namely, one of ordinary the first system on a chip was developed as early as the mid-1970s.[134]  One of ordinary skill in the art would know that image sensors were developed in the late 1970s, and were developed in the early 1990's.[135]  And audio compression reaches back to the 1960s.[136]  However, the components in the Apple devices were not around in their current and exact form.  This is because technology advances, and the reduction in cost for components such as those now permit them to be mass produced and used in small devices such as the accused products.  I assume that this is what Apple means when it argues the components were not around before the invention.  If Apple is successful in this argument and is successful in arguing that the structure is not infringed literally as identfied by the Court, then the structure infringes under the Doctrine of Equivalents, as I have also set forth below in response to Apple's DOE arguments.

---

[134]     *See, e.g.* http://www.computerhistory.org/semiconductor/timeline/1974-digital-watch-is-first-system-on-chip-integrated-circuit-52.html.

[135]     *See, e.g.*
http://www.olympusmicro.com/primer/digitalimaging/cmosimagesensors.html.

[136]     *See, e.g.* http://www.pha.jhu.edu/~sundar/intermediate/history.html.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

1621.   Apple claims that the accused products do not perform the same function, but as I explained above, Apple is seeking to reconstrue a construction it has already agreed to.  But even if they are correct, the Accused Products still perform the exact same function.  Apple has not provided any explanation as to why the accused products do not perform the function in the exact same way, and as I explained above, they do.  To the extent they do not, the differences are insubstantial, and based on Apple's misinterpretation of the Court's construction.  Moreover, as I explained above, the voltage that is converted to a digital signal by the CMOS sensor is an analog signal.  This is the same as Apple's explanation of the cards receiving an analog signal – they are both analog signals.  Apple just ignores the fact that the voltage is also an analog signal (despite the fact that Apple admits that an Analog to Digital converter converts the voltage to a digital signal).

1622.   Apple tries to argue that the fact that the camera itself is not described as part of the structure that means the differences are substantial.  First of all, even if Apple is correct, above, I don't contend that the camera is part of the structure.  The camera is connected to the image sensor, which I do contend is part of the structure.  Second, it is unclear how the reference or lack thereof of the video camera makes the differences substantial because Apple has provided no explanation.  Indeed, to ever capture video at a remote location, a video camera is necessary at some point otherwise video cannot be received.  However, it is the image sensor that actually captures the video that the lenses in the camera receive.  Apple finally claims that the accused components do not achieve substantially the same results.  By making this argument that the composite signal has to be "existing."  I have addressed Apple's argument that the composite signal has to be generated external to the structures above.  It is incorrect.  But even if Apple is correct, the end result of a captured, compressed and digitized signal is exactly the same result

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

that comes about from an external signal. In both cases an analog signal comes from a camera, and is captured, digitized, and compressed into a digital signal. Whether this end signal is "generated" or is considered the same as the received analog signal converted to a digital form depends on your choice of words. In both cases, an analog signal comes in, and operations are performed on that analog signal that result in a compressed digital form of the same information that is in that analog signal.

1623. Apple states:

> Furthermore, Samsung also cannot prove that the accused Apple products satisfy this limitation under doctrine of equivalents. Samsung asserts only that the accused products infringe "because they capture, digitize, and compress data in substantially the same way by receiving data and capturing, digitizing, and compressing it, to obtain substantially the same result, of providing a component of the remote device to perform the claimed function." This conclusory statement merely recites the claim language for both the "function" and "way" prongs of the test, with no analysis or support whatsoever, and then asserts the circular argument that "providing components" for performing the "claimed function" is the result. Because Samsung has failed to provide a specific analysis of any prong or even describe how either the claimed components or accused components work, Samsung cannot demonstrate that any accused Apple product infringes under the doctrine of equivalents. In any event, as described in detail above, the accused Apple products do not perform substantially the same function in substantially the same way for substantially the same result as claim 1 requires for at least the reasons set forth above.

1624. I disagree. Even if Apple is found to be correct as it argues above, Apple still infringes under the doctrine of equivalents. The Accused Products perform the same function as Samsung and Apple agreed was the proper construction: "capturing, digitizing, and compressing the composite signal." I have addressed the Accused Components practicing the parties' agreed function above. They perform this same function in substantially the same way. The Accused Product components capture the signal and convert it into a digital form. That is the same way that Apple has described its interpretation of the components in the Court's construction. The

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

only difference is that Apple claims the components in the Court's construction are "outdated"

and connect to "external devices."  There is nothing in the Court's construction that restricts the

structure to components that were only made in 1994 and are no longer made today.  On the

contrary, a modern component that meets the Court's construction also infringes.  But even if the

Court meant the structure to only apply to 1994 components, the video and audio cards from

1994 still receive video and audio signals (composite signals) in the same way the Accused

Devices receive a video signal from the camera and an audio signal from the microphone.  The

only difference, which is insubstantial. is that under Apple's interpretation, the audio and video

card must take an external full video and audio signal.  The result is the same for both the

accused products and Apple's interpretation of the structure.  The result in both cases is captured,

digitized, and compressed video and audio.

1625.  Apple identifies no real reasons why it claims it does not infringe under the

Doctrine of Equivalents, aside from conclusorily citing to "the reasons set forth above."  I have

addressed all of Apple's alleged non-infringement arguments above.  Apple claims that the

accused products do not perform the same function, but as I explained above, Apple is seeking to

reconstrue a construction it has already agreed to.  But even if they are correct, the Accused

Products still perform the exact same function.  Apple has not provided any explanation as to

why the accused products do not perform the function in the exact same way, and as I explained

above, they do.  To the extent they do not, the differences are insubstantial, and based on Apple's

misinterpretation of the Court's construction.  Moreover, as I explained above, the voltage that is

converted to a digital signal by the CMOS sensor is an analog signal.  This is the same as

Apple's explanation of the cards receiving an analog signal – they are both analog signals.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Apple just ignores the fact that the voltage is also an analog signal (despite the fact that Apple admits that an Analog to Digital converter converts the voltage to a digital signal).

1626.   Apple tries to argue that the fact that the camera itself is not described as part of the structure that means the differences are substantial.  First of all, even if Apple is correct, above, I don't contend that the camera is part of the structure.  The camera is connected to the image sensor, which I do contend is part of the structure.  Second, it is unclear how the reference or lack thereof of the video camera makes the differences substantial because Apple has provided no explanation.  Indeed, to ever capture video at a remote location, a video camera is necessary at some point otherwise video cannot be received.  However, it is the image sensor that actually captures the video that the lenses in the camera receive.  Apple finally claims that the accused components do not achieve substantially the same results.  By making this argument that the composite signal has to be "existing."  I have addressed Apple's argument that the composite signal has to be generated external to the structures above.  It is incorrect.  But even if Apple is correct, the end result of a captured, compressed and digitized signal is exactly the same result that comes about from an external signal.  In both cases an analog signal comes from a camera, and is captured, digitized, and compressed into a digital signal.  Whether this end signal is "generated" or is considered the same as the received analog signal converted to a digital form depends on your choice of words.  In both cases, an analog signal comes in, and operations are performed on that analog signal that result in a compressed digital form of the same information that is in that analog signal.

1627.   Apple states:

> Finally, Samsung is estopped from asserting the doctrine of equivalents
> with respect to this limitation for videos taken with FaceTime.  FaceTime
> uses buffering and never creates or stores a data file. (*See, e.g.*, Garcia Tr.
> at 42:4-14, 44:21-45:5, 46:12-47:4.)  The applicants relinquished this

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

subject matter during prosecution. During prosecution of claim 1, the examiner rejected the claim as obvious, citing U.S. Patent No. 5,062,136 ("Gattis"). The examiner described Gattis as "#1 or #2 desktop computer 26A or 26B in combination with the videocamera 22A or 228, the frame grabber, the CODECs, the modem, and the encryptor/decryptor" – in other words, with the same or very similar hardware as the '239 patent. (SAMNDCA630- 00832570 [8/2/95 Office Action] at 6-7.) The applicants responded by arguing that the frame grabber (which performs the capture in the Gattis device) "only contemplates an uninterrupted, continuous stream of information digitized on a line by line of resolution basis that ultimately represents a sequence of 'pictures.' Gattis does not contemplate the creation of full-motion composite signal video information into digitized files which can be stored, transmitted, played or replayed. . . . [I]n Applicants' invention, full-motion composite signal is captured into digitized files . . . ." (SAMNDCA630-00832596 [2/2/96 Amend.] at 10-11; *see also* SAMNDCA630-00832632 [5/20/96 Amend.] at 9 ("The present invention includes an apparatus capable of capturing a full-color, full motion composite signal in real time; digitizing that composite signal into a data file; compressing the data file and transmitting it through a computer interface via telephone lines, cellular, radio, and other telemetric frequencies from a remote unit to a host unit.").) Through these argument, the applicants relinquished any device that does not create a data file, such as FaceTime.

1628.   Apple is wrong.  I have addressed this argument already in my discussion of the file history above.  As I concluded in my summary of the file history, Samsung did not disclaim any material in arguing around Grattis.  Initially, I disagree with Apple that FaceTime does not store a "file."  On the contrary, FaceTime does store a file by storing video frame data prior to transmission.  The code then initializes a port, obtains that stored file, and transmits the file as I've described above.  This is described above.

1629.   But more importantly to Apple's argument here, the applicants did not relinquish this subject matter at all, and in particular the Applicant did not relinquish storing the file in a buffer.[137]  In fact, even examining the quote that Apple identified, it does not use the word

---

[137]   A buffer is merely a name for a memory.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

memory or buffer, or files.  Instead, it has do with the way the frame grabber works (which, conincidentally, is significantly different from the FaceTime process.  Indeed, as described by the Applicant during prosecution, the frame grabber "grabs" "an uninterrupted, continuous stream of information ***digitized by a line by line of resolution*** basis that ***ultimately represents*** a sequence of 'pictures.'" (emphasis added).  This is very different from what the inventors contemplated.  The frame grabber of Gattis received information line by line, and then had to engage in other operations to hopefully obtain a single picture.  This is not what the invention was meant to do.  As the Applicants stated, the invention captured full video frames that were ultimately saved into files.  FaceTime does precisely what the inventors described their invention does.  I've explained how FaceTime works above.  The Accused Products do not synthesize information on a line by line basis and then potentially assemble them into pictures.  Instead, the image sensors capture and digitize the full-motion video frames on a frame by frame basis.  The video frames are stored as files in a memory, and then ultimately transmitted to the host device.  The file history does not disclaim anything related to buffers, or memory, and does not provide any restriction on what a "file" is.  Instead, if anything, and as conceded by Apple in its quotes, the applicant merely distinguished the way a frame grabber worked from what the invention was.  And Apple's use of image sensors is consistent with the invention – not Apple's incorrect interpretation of what the Applicant argued.  To the extent there is even any dispute over what the Applicant meant in its argument, █████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████  ████████████

███████████████████████████████████████████████

████████████████████████████

La

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

C. **"means for storing said composite signal" (Claim 1)**

1630. Apple states:

> Samsung contends that the "Mobile Remote Unit has a means for storing the composite signal, such as a NAND flash module or RAM." But Samsung has failed to provide a means plus function analysis for this limitation. The only corresponding structure disclosed in the '239 patent for performing the function required by the "means for storing" limitation is a hard disk drive and the software identified at 3:1-5, 4:52-57, and 6:14-16. None of the Apple iOS devices has a hard disk drive, and neither NAND flash memory nor RAM is a hard disk drive. (*See, e.g.,* APL630DEF-WH0005285127;  APL630DEF-WH0001809981; APL630DEF-WH0001593264; and other Bills of Material for iOS devices cited below.) Moreover, both the NAND flash memory and RAM store only digital data and does not store a "composite signal." (*See, e.g.*, Millet Tr. at 53:2-17.) Samsung has also failed to identify any software in the accused products that satisfy the software limitations of the corresponding structure. The accused iOS devices do not have any software that saves videos to a hard disk drive.

1631. Apple's argument is based on its claim construction.  This term has not been construed by the Court.  As I explained above, the proper structure for this term is "memory, such as a hard disk or random access memory."  If the Court construes the term correctly based on my construction, then there is no question that Apple's non-infringement argument fails.  I have explained the way Apple infringes above.

1632.  Apple also contends that the software identified at 3:1-5, 4:52-57, and 6:14-16 must be incorporated into the structure, and claims that Samsung has failed to identify any software in the accused functions that satisifies these software limitations.  Software is not necessary for this limitation.  However, even if Apple is correct, Apple does not identify precisely what it contends these software limitations are.  If Apple contends that the software limitations are "storing said composite signal," then the devices do precisely this when the data is stored in the memories identified above.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

1633.   At 3:1-5, the '239 patent states:  "Once digitized and compressed, the data file is captured in the computer's memory by a capture module in the video capture card.  A software sequence then instructs the computer central processing unit to store the captured data file on the computer's hard disk."  I have explained above how the data is stored in the memory location. Such a software step must exist for the storage take place.

1634.   At 4:52-57, the '239 patnet states: "A permanent capture file is stored on the hard disk of the remote unit and is called up into the remote unit's RAM where an input video signal is captured.  This permanent capture file has a 10 Mb default, however, in the event a larger file is created, the capture file will expand to the requisite size."  It is not clear what Apple contends is the software step, if any, that must be incorporated into the structure.  In any event, this statement just says that the memory has to be a certain size and can be expanded.  It does not tie the size of the memory to 10MB.  The Apple memory has a memory size, as it must to be able to store data.

1635.   At 6:14-16, the '239 patent states: "The remote unit then stores the digitized and compressed video signal as a data file with a .cap extension on the hard disk."  It is not clear what Apple is contending is the software step that must be incorporated into the structure.  To the extent Apple contends that the file must have an extension of ".cap," I disagree.  The step of "storing the composite signal" has nothing to do with assigning a particular file extension. Should the Court adopt this construction, Apple still infringes because the Accused Products are an equivalent.  The Accused Products perform the same function of "storing the composite signal."  They do this in the same way as the claims by storing the data to a memory location, and the result is the same – the data is stored.  To the extent there are any differences, they are

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

insubstantial, because assigning any particular file extension, or no file extentsion, does not

affect the storage of the data.

1636. If, however, Apple wins its construction, then saving the video and audio signals

to the RAM or NAND is an equivalent under Section 112 ¶ 6.[138]   The function for this claim

term is "storing said composite signal."  Both the hard disk (as Apple contends), and all memory

used by Apple store the video and audio digitized signals.  Moreover, they perform this function

in the same way – by providing memory space where the bits of the digitized signal are stored.

Finally, the result is the same – a storage location for the digitized data.  Finally, the result is the

same.  The result is that the data is stored in a precise location.

1637. If Apple successfully argues that equivalents under 112 ¶ 6 do not apply, Apple

still infringes under the doctrine of equivalents.  Both the hard disk (as Apple contends), and all

memory used by Apple store the video and audio digitized signals.  Moreover, they perform this

function in the same way – by providing memory space where the bits of the digitized signal are

stored.  Finally, the result is the same – a storage location for the digitized data.  Finally, the

result is the same.  The result is that the data is stored in a precise location.

1638. Apple states:

> In addition, with respect to FaceTime, the accused products do not contain
> the software portion of the corresponding structure, which requires that
> "the digitized and compressed video signal [be stored] as a data file."
> ('239 patent at 6:14-16, 3:1-5, 4:52-57; *see also e.g. id.* at Figure 3, 2:26-
> 38, 2:46-58, 2:66-3:21, 3:26-60, 4:42-46, 4:52-5:7, 5:46-54, 6:9-18, 6:27-
> 29, 6:31-39, 7:21-33, 8:17-40, 9:3-24, 9:65-10:54, 11:1-8, 11:11-14,
> 11:26-12:23, 12:27-51; SAMNDCA630-00832596 [2/2/96 Amend.] at 10-
> 11; SAMNDCA630-00832632 [5/20/96 Amend.] at 9; Docket No. 447

---

[138]   Different memories were available at the time of the invention, including RAM,
which is explicitly mentioned in the patent.  However, the cost of memory has decreased over the
years.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

[Claim Const. Order] at 64.) FaceTime uses buffering and never creates or
stores a data file. (*See, e.g.*, Garcia Tr. at 42:4-14, 44:21-45:5, 46:12-47:4.)

1639.   I disagree.  First of all, Apple did not even say that the statement "the digitized
and compressed video signal [be stored] as a data file] needs to be part of the construction.
Apple is once again asking for yet another construction.  This time, they are asking for a
construction of the word "file," which is already in the Court's construction for "means for
transmitting."  And it is not clear what kind of construction they are asking for, because it fails to
explain why it contends FaceTime is not storing the data as a file.  On the contrary, Apple does
store the data as a file in the buffer location (Apple admits that FaceTime stores the signal in a
buffer).  The file is the collection of video frame data stored in the buffer.  This file is no
different from any other file of data that is stored and obtained, and Apple does not articulate any
reason why it is different.  Nor can it.  There is no difference between storage of files in any
particular memory location.  Indeed, digital data is always stored as "1s" and "0s" that can be
retrieved at a later point by the device, which is precisely what FaceTime does, as explained
above.

1640.   To the extent Apple is successfully able to argue that FaceTime does not store as
a "file," Apple still infringes either as an equivalent under 112 Par. 6 or under the doctrine of
equivalents (as it is not clear whether Apple contends this is part of the structure or function of
the claim term).  Both perform the same function of storing a composite signal (video and audio).
Both do this in the same way as providing a memory space where data can be stored.  And the
result is the same.  The video and audio data are stored in a storage location.

**D.**     **"Means for transmitting said composite signal" (Claim 1)**

1641.   Apple states:

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

The Court has construed this limitation to be a means-plus-function claim limitation for which the corresponding structure is "one or more modems connected to one or more cellular telephones, telephone lines, and/or radio transmitters, and software performing a software sequence of initializing one or more communications ports on the remote unit, obtaining the stored data file, and transmitting the stored data file." As discussed in detail below, Samsung has failed to identify any modem connected to any cellular telephone, telephone line, or radio transmitter, any communications port, or any software to perform the required sequence of steps. Because Samsung has failed to articulate its infringement theory with respect to each requirement of this limitation, Samsung cannot prove infringement of claim 1 and Apple cannotfully respond to Samsung's infringement contentions. In any event, none of Apple iOS devices uses a modem, a modem connected to a cellular telephone, telephone line, or radio transmitters, or communications ports, or any equivalent of the required structure. Because the required components and any equivalents do not exist in the accused Apple iOS devices, Apple does not infringe.

1642. I disagree. As outlined in detail above, I have identified modems connected to cellular telephone and/ a radio transmitter, as well as identified the sequence of software steps. Moreover, I have identified source code that performs the steps, and shown various ways that certain steps are performed. Moreover, Apple's contention that the required components do not exist is incorrect. They are all identified above in great detail.

1643. Apple states:

But Samsung has failed to demonstrate that the accused components constitute the same structure required by the Court. For example, Samsung has failed to identify any specific hardware component within the accused iOS devices, failed to explain how any of the (unidentified) hardware components listed in its contentions correspond to the required structure, and failed to identify any portions of any of the listed applications that it believes correspond to the required software sequence. In addition, Samsung states that "[t]he components above are one or more modems connected to one or more cellular telephones, telephone lines, and/or radio transmitters," but fails to specify which "components above" it is referring to for each element of the structure. Because Samsung has failed to articulate its infringement theory with respect to each requirement of this limitation, Samsung cannot prove infringement of claim 1 with respect to this limitation, and Apple cannot fully respond to Samsung's infringement contentions.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

1644.   I disagree.    Above, I have identified significant hardware and software components within the devices, and also explain in great detail how these hardware and software components correspond to the Court's constructions.

1645.   Apple states:

> In any event, none of the accused iOS products has "one or more modems connected to one or more cellular telephones, telephone lines, and/or radio transmitters" and therefore do not have the same structure as required by the Court. All hardware components in the corresponding structure required by the Court's construction are stand-alone, external components that can be connected to a personal computer. Neither the baseband chip nor the Wi-Fi chip is a "modem" as that structure is disclosed in the patent, nor is either chip "connected to" "one or more modems," as the Court's construction also requires. (*See, e.g.*, Claim Constr. Order at 60; SAMNDCA630-00832507 ['239 patent] at 4:17-27, 8:3-4, 8:35-42, 8:61-9:2, 9:34-37; SAMNDCA630-00832595 [Ex. D. to Affidavit]; SAMNDCA630-00828677-78 [FirstLook Video brochure].) Both chips are integrated into the iOS devices and neither is connected to the iOS device using a communications port as disclosed in the patent. As recognized by Samsung, some of the accused iOS devices – the iPod touch and the iPads without cellular – do not even have baseband chips. The applications processor, which is also a chip integrated into the iOS devices, is not connected to the iOS devices using a communications port and is not a modem, cellular telephone, telephone line, or radio transmitter. The applications processor does not perform any of the functions of the required components. In addition, the iOS devices not have any "cellular transmitters" or "radio transmitters" connected to a modem as that structure is disclosed in the '239 patent, nor has Samsung identified any such component.

1646.   I disagee.  First of all, there is nothing in the Court's construction that states that the identified components must be "stand-alone, external components."   Moreover, Apple did not request that the Court construe the structure to have "stand-alone, external components." Apple first claims that the baseband and Wi-Fi chip are not "modems" as the structure is identified in the patent.   However they modulate and demodulate, and are even identified as "modems" by the manufacturers.   This is identified above.   Apple apparently also seeks to reconstrue the term "connected to" when it claims that the baseband chip and Wi-Fi chip are not

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

connected to a modem.  Under a true interpretation of the Court's construction, the hardware meets these limitations.  The limitations are met because the modem and cellular telephone and radio transmitters are connected as described in detail above.

1647.   Apple appears to want to reconstrue the term to say, not that the modem has to be connected to the cellular phone or radio transmitter as the construction requires, but rather Apple seeks to have both components "connected to" a specific communications port.  Apple, therefore, is trying to reconstrue the term as follows:   "One or more modems connected to <u>a communications port</u> and one or more cellular telephones, telephones lines, or radio receivers <u>connected to the same communications port</u>."  This is not what the Court construed.  If Apple is correct in this misinterpretation, however, the Accused Devices still infringe this limitation because there is a communication port between the modem and the cellular telephone and the radio transmitter.  I have decscribed in detail how the components are present in the accused devices above.  Moreover, the claim itself even envisions the "means for transmitting" to be part of the remote unit (as opposed to external) because the claim reads "a mobile remote unit ***including*** . . . "means for transmitting said composite signal."  Apple's interpretation that there must be an external communications port connected to an external modem connected to an external cellular telephone is therefore contrary to the language of the claim.

1648.  As explained above, even if the accused device does not have a baseband processor, they all have WiFi chips.  The WiFi chip is a modem because it modulates and demodulates a signal, and it is connected to a radio transmitter that transmits the signal.  This is all explained above.  It is not clear what Apple means when it says the products "do not even have baseband chips."  Apple claims the devices do not have "cellular transmitters" or "radio transmitters," but I have identified these precise components above.  Indeed, the devices transmit

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

either cellular signals and/or WiFi signals – to do this, they must have a cellular transmitter or WiFi radio transmitter.[139]   One of ordinary skill in the art would recognize that for these devices to transmit a signal, it must be modulated, and for it to receive a signal, it must be demodulated. Since a Modem stands for "**Mo**dulator" and "**Dem**odulator," this is, by definition, a modem.

1649.   Apple states:

> Nor do any of the applications and functions identified by Samsung constitute the required "software performing a software sequence of initializing one or more communications ports on the remote unit, obtaining the stored data file, and transmitting the stored data file." First, a "communications port" in the required structure and as described in the patent connects the modem to the remote unit. Samsung improperly lists numerous components -- "a modem, a port on the modem, an antenna, and/or a port on the phone" – without choosing any or identifying any of these components in any accused iOS device. In any event, the accused products do not have a "communications port": because all the accused functionalities in each iOS device are integrated into a single device, there is no need for a "communications port" to connect a modem to the device.

1650.   I disagree.  First of all, I identified a number of communications ports above, but I disagree that it is part of the structure.  The Court's structure only includes "initializing one or more communications ports on the remote unit."  The structure does not necessarily include (nor does it disclaim) a communications port as part of the structure.  The only way it is part of the structure is if the structure is rewritten as I have identified above.  The only requirement is that one or more communications ports on the remote unit (whether or not they are part of the structure for this means plus function term) are initialized.   Above, I have identified both software and hardware ports that are initialized.  Indeed, in order to transmit data, initialization must occur.  Apple also once again argues that the communications port has to connect to an

---

[139]   A cellular transmitter is a radio transmitter.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

external device.  I have repeatedly explained why this is not part of the construction, and why

this is not a proper interpretation of the term.

1651.   Apple identifies other reasons why it claims this term is not met.  I will address

each one in turn.  Apple states:

> None of the applications or functions "initialize[s] a communications
> port." Indeed, Samsung has failed to identify any portion of any of the
> applications or functions that satisfies the required software sequence.

1652.   I disagree.  Above, I have identified several different communications ports –

both software and hardware – that exist on the accused devices.  All of these communications

ports are initialized when data is transmitted.   In fact, ports must be initialized when

communications occur in order for the transmission to be made correctly, and for the information

to be received and processed correctly.  The identifications made above apply to this limitation.

1653.   Apple states:

> As discussed above, FaceTime uses buffering and never creates or stores a
> data file, and therefore cannot "obtain" or "transmit" the stored data file.
> (*See, e.g.*, Garcia Tr. at 42:4-14, 44:21-45:5, 46:12-47:4.) In addition,
> FaceTime encrypts the packets before they are transmitted. Thus, even if
> the packets could be considered a "stored data file" after they are encoded,
> FaceTime does not transmit those encoded packets (the "stored data file").
> (Garcia Tr. at 58:10-23, 89:12-25, 121:8-122:3.)

1654.   I have addressed this argument above as well.  Apple's argument is apparently

that FaceTime does not create a "file."  I disagree, and I also disagree with Apple's attempt to

assign a new construction to the term "file."  As I have already explained, Apple does store the

data as a file in the buffer location (Apple admits that FaceTime stores the signal in a buffer).

The file is the collection of video frame data stored in the buffer.  This file is no different from

any other file of data that is stored and obtained, and Apple does not articulate any reason why it

is different.  Nor can it.  There is no difference between storage of files in any particular memory

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

location.  Indeed, digital data is always stored as "1s" and "0s" that can be retrieved at a later point by the device, which is precisely what FaceTime does, as explained above.  The file in the buffer is obtained, and transmitted, as explained above.

1655.   Apple also makes an argument that because the FaceTime file is encrypted before transmission, "the" stored file is not transmitted.  This argument is also wrong.  First of all, the claim uses the term "comprising," and it is my understanding that when a claim uses the term "comprising," it does not prevent additional steps to be included.  Second, there is nothing in the patent or the prosecution history to prevent the encryption of the file before transmission, and in any case, the Court did not construe the term to disclaim encrypting before transmission.  Third, the encrypted file is the same file that is stored – it is the same data file, just put into an encrypted form.  The alteration of the data into an encrypted form does not change the fact that it is the exact same data file that is stored, and transmitted.

1656.   To the extent Apple is successfully able to argue that FaceTime does not store as a "file," Apple still infringes either as an equivalent under 112 Par. 6 or under the doctrine of equivalents (as it is not clear whether Apple contends this is part of the structure or function of the claim term).  Both perform the same function of storing a composite signal (video and audio), and then obtaining it and transmitting it.  We can conclude that this happens by merely looking at the attached videos.  Apple *admits* it is stored in the buffer.  For the data to be received as we can see in the attached videos, it must be obtained, and it must be transmitted.  In fact, Apple admits that the data is obtained when it says that it is encrypted above.  Both do this in the same way as providing a memory space where data can be stored, and obtained from before transmission.  And the result is the same.  The video and audio data are stored in a storage location, obtained, and transmitted.  This is demonstrated by the attached videos, and all of my opinions above.

998

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

1657. The same is true with respect to Apple's argument that "the" data file is not transmitted because it is encrypted before it is transmitted. Even assuming Apple is correct that the file becomes a completely new and different file after it is encrypted, there are no substantial differences between transmitting the file as stored initially, and encrypting it before transmission. Both perform the same functions of obtaining data and transmitting data. They do this the same way except FaceTime encrypts the data between obtaining and transmitting the data. This is insubstantial because the encryption is for a completely separate purpose – it is for making sure the data is not stolen during transmission, since it will be decrypted by the recipient. And the result is the same. The data is transmitted to be received by the remote unit for playback.

1658. Apple states:

> The accused Voice Memos, Camera and Photos applications do not perform any of the functions of the required software. To the extent that Samsung's contentions are based on the Share button of those apps, these applications merely use the same mechanisms of the Mail and Messages applications.

1659. As explained above, these applications are merely mechanisms on the accused devices by which the accused devices permit transmission of videos via email, messaging, or MMS, and therefore, they are examples of ways that the accused devices infringe.

1660. Apple states:

> The accused Contacts application does not perform any of the functions of the required software. To the extent that Samsung's contentions with respect to Contacts are based on the FaceTime button in Contacts, that button merely launches FaceTime. Regardless of how FaceTime is started, the same code is executed to start a video call.

1661. The Contacts application is a way the Accused Devices launch FaceTime, and hence, infringe the claims. I have described this above.

1662. Apple states:

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Moreover, the accused iOS products without cellular capabilities (discussed above) do not have a Phone application.

1663.   The existence or lack thereof of the Phone application does not render the claims not infringed, and the infringement is described above.  It is unclear what Apple means by this statement.

1664.   Apple states:

> Finally, there are no applications called Email, iTunes or iPod on the accused iOS devices.

1665.   To the extent Apple is referring to infringement contentions, it must be referring to descriptions of the applications that exhibit infringing behavior.  To the extent these are not the names of applications as Apple calls them internally, they are certainly commonly recognizable descriptions of applications on the iOS devices.  "Email" would refer to the mail application, or the application that allows a user to retrieve and send their email.  The iTunes or iPod application would refer to the music player or applications that permit a user to buy music, access music, and play music.

1666.   Apple states:

> Samsung similarly cannot prove that the accused hardware and software components are structures equivalent to those required by the Court under 35 U.S.C. § 112, ¶ 6. First, the accused components were not in existence at the time of the filing of the '239 patent application, and therefore cannot be equivalents under 35 U.S.C. § 112, ¶ 6. (*See* Docket No. 447 [Claim Constr. Order] at 60, n.13 (citing *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1099-1100 (Fed. Cir. 2008)).) Moreover, Samsung has failed to demonstrate that the accused components perform the identical claimed function in substantially the same way to achieve substantially the same result as the hardware and software components required by the Court. Samsung contends that the "way" is "using transmitters and means as construed by the Court," but provides no explanation of the way any accused component performs any function or how that way is substantially similar to the way the required hardware and software components. Samsung also fails to explain how the only component it mentions – an undefined "transmitter" – corresponds to the required structure of one or

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

more modems connected to one or more cellular telephones, telephone lines, and/or radio transmitters." To the extent the "transmitter" is a "radio transmitter," Samsung still fails to identify any of the other elements of the structure. Samsung also states that "[t]he components identified above are modems" or equivalent to a modem, without any analysis or identification of how any other element of the required structure is satisfied by any component of the accused iOS devices. Samsung does not mention software at all.

1667.   Even if Apple is legally correct that "the accused components were not in existance at the time of the filing of the '239 patent application, and therefore cannot be equivalents under 35 U.S.C. § 6," Apple is incorrect.   The accused components include applications processors, cellular baseband modems, Wi-Fi chips and cellular and WiFi transmitters.  One of ordinary skill in the art would know that all of these existed in 1994.[140]

1668.   If Apple is successful in this argument and is successful in arguing that the structure is not infringed literally as identfied by the Court, then the structure infringes under the Doctrine of Equivalents, as I have also set forth below in response to Apple's DOE arguments.

1669.   The identified structures, including the baseband processor, WiFi processors, cellular and WiFi transmitters, and applications processor (and applicable software) perform the exact agreed function of "transmitting the composite signal."   This is evident by the fact that in all infringement cases, the captured, digitized, and compressed video and audio is transmitted to the host unit, and received.   Therefore, the identified structure must perform this function.   It performs the function in substantially the same way.   It does this by performing the steps identified by the Court and identified above.  It initializes a port, as did the components long ago

---

[140]      Cellular phones were around at least in the 1970s.  http://news.cnet.com/8301-1035_3-57577704-94/the-first-call-from-a-cell-phone-was-made-40-years-ago-today/.  Wi-Fi has been available since 1991.  http://www.wilcorpinc.com/wifi_history.htm.   I addressed SoCs above.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

in 1994.  It also obtains the stored file as described in the patent.  Finally, it transmits that stored

file.  To the extent it does not do this through external components like Apple contends, I

explained above why the construction does not require external components.  But in any case,

that difference is insubstantial, because the location of the components does not alter the fact that

the effect is transmission of the compressed video and audio.  Finally, the result is exactly the

same – the video is trnasmitted.  Therefore, the Accused Products also infringe because the

structure is an equivalent pursuant to 112 ¶ 6.

1670.  Apple identifies several reasons why it says the transmission is not performed in

substantially the same way.  I will address each of these in turn.  Apple states:

> To transmit the composite signal (stored in a data file), the software must
> first 'initializ[e] one or more communications ports on the remote unit."
> But the accused iOS devices do not have a communications port or any
> similar structure to which a modem is connected, nor do any of the
> accused applications and functions initialize such a port. The lack of any
> hardware structure or software sequence comparable to the required
> devices and software sequence is substantial.

1671.  This argument is based on Apple's attempt to add an external communications

port to the construction.  I have addressed this argument above.  I disagree with Apple that this

difference is substantial.  On the contrary, whether the modem and transmitter is internal or

external to the remote device is completely irrelevant to the function.  The function just requires

transmission of the signal.  There is nothing to say that the means for transmission must be

internal or external.  Moreover, Apple doesn't explain why this is substantial because there is no

substantial difference.  In fact, to the extent it is not already mentioned above, the claim itself

even envisions the "means for transmitting" to be part of the remote unit (as opposed to external)

because the claim reads "a mobile remote unit *including* . . . "means for transmitting said

composite signal."

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

1672.   Apple states:

> As described above, FaceTime uses buffering and never creates or stores a
> data file, and therefore cannot "obtain" or "transmit" the stored data file.
> (*See, e.g.*, Garcia Tr. at 42:4-14, 44:21-45:5, 46:12-47:4.)

1673.   I have explained in detail how FaceTime literally infringes the claim.  To the extent that Apple is correct that a "file" is different than a data file stored in a buffer, first, it doesn't even explain what a file is if it does not include the data file stored in the buffer and transmitted in FaceTime.  To the extent Apple claims that data in the buffer is just data and not a file, then the differences are insubstantial because a file is just a collection of data, and a collection of data is a file.  Therefore, there are no real differences.  Ultimately, the video frames are still transmitted the same way.

1674.   Apple claims:

> Buffering of video and audio streams is substantially different from a
> stored data file: a stored data file can be manipulated, edited, and retrieved
> at any time – including long after it has been created – for transmission. In
> contrast, the buffered video used by FaceTime only exists as long as is
> needed to transmit it. (Garcia Tr. at 47:20-48:4.) Moreover, the stored data
> file described in the patent contains the entire video, whereas the
> FaceTime buffers contains only portions of video. FaceTime never creates
> a full video of the call.

1675.   In this argument, Apple is apparently trying to construe the claim to require that a data file be able to be "manipulated, edited, and rertrieved at any time."   According to Apple then, a file can never be deleted.  But Apple's argument fails,  the buffered data is data stored for the time period – whether considered a long period or a temporary period.  that data is obviously retrieved because it is ultimately transmitted.  There is no difference at all between the data that is stored in the buffer, and a file that is stored elsewhere longterm.  Whether or not Apple has programmed its system to "manipulate" or "edit" the data when it is stored in the buffer is not relevant because Apple *can* manipulate and edit that data.  Even a "file" under Apple's apparent

1003

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

definition can be deleted, and no longer "manipulated, edited, and retrieved at any time – including long after it has been created."  Indeed, Apple has not defined the length of time a file must be in existence to be a file.  That is because it is a file as soon as the data is stored, such in FaceTime.  Moreover, there is nothing in the claim that requires the file to be the *entirety* of the transmission.  In fact, the claim itself and the dependent claims, such as claim 4, that claim splitting the file into pieces contradict this argument.  If that claim were implemented, then it would only be transmitting a portion of a file.  The Court's cosntruction permits this because it covers "***one or more***" modems connected to cellular phones, lines or radio transmitters. ███

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ But even if Apple's argument can overcome all of this evidence, the differences are insubstantial because transmitting a portion of video is substantially the same as transmitting the "full" video, because the transmission still transmits the full video until the callers are finished with their call.

1676.   Apple states:

> None of the accused applications and functions performs the step of "transmitting the stored data file."

1677.   Apple has not explained what it means in this argument, and I therefore refer Apple to my arguments responsive to its more developed arguments.

1678.   Apple states:

> Modems connected to cellular telephones, telephone lines, and/or radio transmitters are substantially different from the components in the accused iOS devices. For example, communications with a modem as described in the patent are accomplished use Hayes AT (Attention) commands originating in the PC. ('239 patent at 8:61-9:2; APL630DEF-WH-A0000026969,    APL630DEF-WHA0000033941,    APL630DEF-WH-A0000033781.) Before the stored data file could be begin, the

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

communications port connected to the modem must be initialized (as required by the Court), which is also accomplished by AT commands. ('239 patent at 8:61-9:2.) The modem can then dial the telephone number of the host unit, which would establish a dedicated connection to the host. AT commands were used to dial the number. ('239 patent at 8:23-30 ("Transfer software sequence B contains all of the instructions necessary to initialize the communications ports on the remote, obtain a cellular connection with each cellular telephone to the host unit . . ."), 11:19-24; M.H. Freeman 6/20/13 Tr. at 101:11-22.) For transmitting, the modem uses a modem protocol such as – ZMODEM ('239 patent at 9:1-2), XMODEM or YMODEM – which transmits the data in a series of packets. In contrast, the accused iOS devices do not have ports to be initialized, and use very different protocols for transmission (such as LTE for cellular and 802.11 for Wi-Fi).

1679. It is my understanding that Apple requested the Court construe the claims to incorporate this particular portion of the patent, but the Court properly determined that it was not necessary to perform the claimed function of "transmitting the composite signal."  In any case, Apple is wrong that the iOS devices do not have ports, as I have explained above.  To the extent Apple is correct that this "old" way of initializing a port is substantilly different of the way the current products initialize a port, I disagree.  Indeed, in both cases, the initialization occurs so that communication can occur properly.  It is a "setup" of the communcations.  The same process occurs with respect to the currnet products, and it must.  There must be a setup of communications in many different ways for communications to occur correctly.  This happens at the software level, even at the levels of the IP and TCP protocols, and this also happens at a hardware level when the applications processor prepares the baseband processor for transmission.  There are no substantial differences between these processes because the purpose is to ready the components to transmit data accurately, and that is most often (absent any other issues) the result.

1680.  Apple states:

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

The accused iOS devices do not establish a connection with the host unit (the recipient of the video) in order to transmit video, as a modem does. When an accused iOS device with cellular capabilities comes in range of a base station that it can connect to, it will connect to a base station in the cellular network (assuming the cellular capabilities are enabled). Similarly, when an accused device with its Wi-Fi capabilities enabled comes in range of a Wi-Fi network that it can connect to, it will connect to the Wi-Fi network, which is connected to an Internet Service Provider via a local Wi-Fi access point. When a video is sent via the Messages, Mail, or FaceTime applications or uploaded to YouTube, the video is routed through the network to a server – a carrier server for MMS, an Apple iMessage server for iMessages, ███████████████ a YouTube server for YouTube upload, or a mail server for Mail. ██████ ██████████████ the video remains on the server until the recipient retrieves it. ██████████████████████████ The device sending the video never connects to the device receiving the video, as is required with a modem described in the patent. Given the complexities of the routing that must occur that are not present in a modem, these differences are not insubstantial.

1681.   Here, once again, Apple is incorporating a new limitation into the claim that was not part of the Court's construction of the structure. Here, Apple's addition is "connecting to the host unit." That is not necessary to infringe the claim, and it is also not even clear what part of the construction of the "means for transmitting" term Apple is trying to attach it to. In any event, it appears Apple's argument is that, because the cellular device sends data to a base station, and a Wi-fi device sends data to the Wi-fi hotspot it connects to, it is not meeting the "means for transmitting term." Although this is not a part of the claim in any respect, they are also completely contrary to the patent. The patent explicitly claims transmitting over celluar. Cellular networks in 1994, as well as all commonly used cellular networks (and all cellular networks on Apple products) require connection through a base station – there is no common peer-to-peer cellular networks. The same is true with radio transmission that require connections to a particular radio network. In any event, even if the video is retrieved from a central server,

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

there is no restriction of this in the claims, and particular, this claim limitation, that merely claims "transmitting the composite signal."

1682.   If Apple is correct in this argument, the differences are not substantial.  The video in all cases is transmitted, and ultimately received by the host unit for playback.  The fact that an intermediary server stores the data before it is received is no different from the data being temporarily "stored" in the form of waves as it is propagated between the remote and host devices.

1683.   Apple states:

> The baseband and Wi-Fi chips are not "modems connected to" a cellular telephone – they are part of the cellular telephone (the accused iOS devices).  The chips are not standalone devices as are the modems described in the '239 patent.

1684.   Apple here is trying to construe the term "connected to."  If they wanted a different meaning than the term "connected to" in their construction, it did not propose it during the claim construction phase.  Apple is not correct that the modems are not connected to the cellular telephones.  The cellular telephone is in fact part of the baseband processor.[141]  That in itself renders the cellular telephone to be connected to the modem.  Moreover, if, as Apple is now arguing, the entire device is the cellular telephone, then the modem is connected to the cellular telephone through the many connections made in the physical device.[142]  To the extent

---

[141]   Even if Apple is correct in its new interpretation of the term "connected to," the baseband processors and Wi-Fi chips are still connected to "radio transmitters" which is still a way to meet the requirements of the claims.

[142]   If, as Apple contends, the "accused iOS devices" are all complete "cellular telephones," then the iPod Touches are also "cellular telephones" because the iPod Touch contains the components of an iPhone without a baseband processor.  Therefore, under Apple's interpretation, an iPod Touch would also infringe claim 15, which is limited to cellular frequencies.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Apple is correct, this is not a substantial difference.  Integrating the modem into the cellular telephone does not change the function of the modem or the cellular telephone.  It merely changes the position of the devices – which is the same for all of Apple's arguments that certain components must be "external."

1685.  Apple states:

> Samsung also cannot prove that the accused Apple products satisfy this limitation under he doctrine of equivalents. Samsung asserts only that the accused products infringe "by using a mdem or substantially equivalent component, and performing the Court's software sequence, to otain substantially the same result of transmitting the video and audio data." As with quivalents under § 112, ¶ 6, Samsung's conclusory statement fails to provide any analysis, fails to identify which components it is accusing, and fails to even mention most of the required structure. Because Samsung has failed to provide a specific analysis of any prong or even describe how either the claimed components or accused components work, Samsung cannot demonstrate that any accused Apple product infringes under the doctrine of equivalents. In any event, as described in detail above, the accused Apple products do not perform substantially the same function in substantially the same way for substantially the same result as claim 1 requires for at least the reasons set forth above.

1686.  I disagree.  Apple has not set forth any substantial arguments, but, to the extent Apple succeeds with any of its non-infringement arguments, it is my opinion that Apple infringes this claim under the doctrine of equivalents for the same reasons I set forth above with respect to my opinion that Apple infringes the structure as an equivalent, and I therefore refer Apple to those opinions.

1687.  Apple states:

> Finally, for the same reason discussed above with respect to "means for capturing, digitizing, and compressing, Samsung is estopped from asserting the doctrine of equivalents with respect to this limitation for videos taken with FaceTime.

1688.  It is not clear what Apple is arguing.  If Apple is arguing that Samsung is estopped from asserting the doctrine of equivalents for the same argument that it made with

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

respect to the "Gattis" reference that I addressed above, then, for the same reasons that I set forth above in response to Apple's argument in the "means for capturing, digitizing, and compressing" limitation, it is my opinion that Apple is incorrect. I refer Apple to my opinions above for reference with this limitation.

### E. "means for receiving at least one composite signal transmitted by the remote unit" (Claim 1)

1689. Apple states:

> Samsung asserts that "[o]n information and belief," the accused devices "each have a computer interface(s) for receiving a composite signal transmitted by the remote unit either over cellular or Wi-Fi frequencies," and that the accused iOS devices each have a baseband chip and a wireless chip "for receiving the compressed composite video." Samsung has also identified Wi-Fi sync with iTunes and FaceTime as "software [that] . . . works in conjunction with that computer interface(s) to allow a host unit to receive information from a Mobile Unit such as an iPad mini." Samsung has failed to provide a means plus function analysis for this limitation. The only corresponding structure disclosed in the '239 patent for performing this limitation is one or more modems, corresponding to the number of modems used in the remote unit, connected to one or more cellular telephones, telephone lines, and/or radio transmitters, and File Reception Software Sequence E. (*See* '239 patent at 10:33-61, 11:18-12:8.) But Samsung has failed to identify any such structure in the accused devices. Because Samsung has failed to articulate its infringement theory with respect to each requirement of this limitation, Samsung cannot prove infringement of claim 1 and Apple cannot fully respond to Samsung's infringement contentions.

1690. I disagree. As set forth above, I have identified a specific structure for this limitation, and I have further identified the structure in each of the accused devices that meet this limitation. I note that this limitation is part of the host/playback device, and the host/playback devices include all of the accused remote devices, as well as Apple's computer products.

1691. Apple states:

> In any event, for the same reasons discussed above with respect to the "means for transmitting" limitation, none of the accused iOS devices has the required hardware structure. In addition, Samsung cannot prove

1009

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

infringement with respect to this limitation by Wi-Fi sync with iTunes because it is incapable of syncing videos taken by the iOS device using the camera (Samsung's theory of "capturing" "at least one composite signal") with iTunes or by FaceTime because it does not use data files. ('239 patent at 6:14-16, 3:1-5, 4:52-57; *see also e.g. id.* at Figure 3, 2:26-38, 2:46-58, 2:66-3:21, 3:26-60, 4:42-46, 4:52-5:7, 5:46-54, 6:9-18, 6:27-29, 6:31-39, 7:21-33, 8:17-40, 9:3-24, 9:65-10:54, 11:1-8, 11:11-14, 11:26-12:23, 12:27-51; SAMNDCA630-00832596 [2/2/96 Amend.] at 10-11; SAMNDCA630-00832632 [5/20/96 Amend.] at 9; Docket No. 447 [Claim Const. Order] at 64 (requiring transmission of the "stored data file").) FaceTime uses buffering and never creates or stores a data file. (*See, e.g.*, Garcia Tr. at 42:4-14, 44:21-45:5, 46:12-47:4.) Nor do any of the accused Mac computers satisfy this limitation. The accused Mac computers do not have a baseband chip. For the same reasons discussed above with respect to the "means for transmitting" limitation, the Wi-Fi chip in the accused Mac computers do not satisfy this limitation. In addition, Samsung cannot prove infringement with respect to this limitation by Wi-Fi sync with iTunes because it is incapable of syncing videos taken by the iOS device using the camera (Samsung's theory of "capturing" "at least one composite signal") with iTunes or by FaceTime because it does not use data files. ('239 patent at 6:14-16, 3:1-5, 4:52-57; *see also e.g. id.* at Figure 3, 2:26-38, 2:46-58, 2:66-3:21, 3:26-60, 4:42-46, 4:52-5:7, 5:46-54, 6:9-18, 6:27-29, 6:31-39, 7:21-33, 8:17-40, 9:3-24, 9:65- 10:54, 11:1-8, 11:11-14, 11:26-12:23, 12:27-51; SAMNDCA630-00832596 [2/2/96 Amend.] at 10-11; SAMNDCA630-00832632 [5/20/96 Amend.] at 9; Docket No. 447 [Claim Const. Order] at 64 (requiring transmission of the "stored data file").) FaceTime uses buffering and never creates or stores a data file. (*See, e.g.*, Garcia Tr. at 42:4-14, 44:21-45:5, 46:12-47:4.) Because the required components do not exist in the accused Mac computers or iOS devices, Apple does not infringe.

1692. Because Apple states that "for the same reasons discussed above with respect to the 'means for transmitting' limitation none of the accuseed iOS devices has the required hardware structure," I therefore refer Apple to my opinions as to why they are incorrect with respect to the "means for transmitting" limitation.  To the extent Apple makes any of these same arguments with respect to the "means for receiving" limitation, I incorporate by reference all of my opinions with respect to "means for transmitting," including my opinions that Apple's structure is an equivalent under § 112 ¶6, and that Apple infringes under the doctrine of

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

equivalents. This includes my opinions regarding FaceTime and Files/buffering, including those opinions that appear in the "means for capturing, digitizing, and compressing" limitation.

1693. I do not contend that the Mac computers have a baseband chip. Because Apple says that "[f]or the same reasons discussed above with respect to the 'means for transmitting' limitation, the Wi-Fi chip in the accused Mac computers do not satisfy this limitation." I refer Apple to my opinions as to why they are incorrect with respect to the "means for transmitting" limitation. To the extent Apple makes any of these same arguments with respect to the "means for receiving" limitation, I incorporate by reference all of my opinions with respect to "means for transmitting," including my opinions that Apple's structure is an equivalent under § 112 ¶6, and that Apple infringes under the doctrine of equivalents. This includes my opinions regarding FaceTime and Files/buffering, including those opinions that appear in the "means for capturing, digitizing, and compressing" limitation.

1694. Apple states:

> Samsung also cannot prove infringement with respect to this limitation for composite signals "transmitted by the remote unit" using Mail, Messages or YouTube. Samsung has failed to identify any structure that performs corresponding functionality on the accused Mac computers for receiving videos transmitted by Mail, Messages, or YouTube. To the extent Samsung is allowed to accuse Mail, Messages, or YouTube upload of satisfying the software structure required to perform the claimed function, those applications do not infringe for the same reasons as discussed with respect to the "means for transmitting" limitation.

1695. I disagree. As outlined above, I have identified the specific components in the Mac computers that receive signals transmitted by the remote unit using Mail and Messages.

1696. Apple states:

> Samsung has also failed to articulate any theory of equivalents under 35 U.S.C § 112 ¶ 6 or the doctrine of equivalents, and the accused devices do not contain the equivalent of the disclosed structure. For this reason, Samsung cannot prove infringement under any theory of equivalents.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

1697.  I disagree.  Apple has only referenced back to its non-infringement arguments with respect to the "means for transmitting" limitation above.  Above, I have responded to those arguments and set forth reasons why, if Apple is correct, it still infringes under the doctrine of equivalents, or equivalents under §112 ¶6.  To the extent Apple successfully makes any of those same arguments, my opinions under the doctrine of equivalents, or equivalents under §112 ¶6 apply here.

### F.   "a playback unit including means for exchanging data with said host unit" (Claim 1)

1698.  Apple states:

> Samsung contends only that "[o]n information and belief," the accused products "each have a playback unit for playing the composite signal and displaying it to the user" but fails to identify any such unit in any of the accused Mac computers. Because Samsung has failed to articulate its infringement theory with respect to each requirement of this limitation, Samsung cannot prove infringement of claim 1, and Apple cannot fully respond to Samsung's infringement contentions.

1699.  I disagree.  Above, I have identified the components in the accused devices that meet this element.  I refer Apple to my opinions above.

1700.  Apple states:

> For the "means for exchanging data with said host unit," Samsung asserts that "[o]n information and belief," the accused products "each have a circuit for exchanging the data received by the host computer's interface with the playback unit" and "Apple's software, such as QuickTime and FaceTime, works in conjunction with that computer interface(s) and the circuit to allow a host unit to receive data from an iPhone . . . and transmit it to playback unit." But Samsung has failed to identify any such "circuit" or "interface" or software in any purported playback unit that "exchanges data with the host unit." Because Samsung has failed to articulate its infringement theory with respect to each requirement of this limitation, Samsung cannot prove infringement of claim 1, and Apple cannot fully respond to Samsung's infringement contentions.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

1701.   I disagree.  Above, I have identified the components in the accused devices that meet this element.  I refer Apple to my opinions above.

1702.   Apple states:

> Samsung has also failed to provide a means plus function analysis for this limitation. To the extent this limitation is definite, the only structure disclosed in the specification for "exchanging data with said host unit" is a16-bit Ethernet card, Novell Netware Lite software, and Host Boot Software Sequence D. But Samsung has failed to identify any such card or software. Moreover, Samsung cannot identify any such components because none of accused products uses the required components. Video playback functionality is incorporated into the accused products, thereby eliminating any need for networking components for exchanging data between a "host unit" and "playback unit" within the accused products. Because the required components do not exist in the accused Mac computers, Apple does not infringe claim 1.

1703.   I disagree.  Above, in the claim construction section, I have set forth the proper structure for this claim, and I have also explained why Apple's proposed construction is wrong. If Apple successfully argues for their incorrect construction, however, it is my opinion that this limitation is infrined because the structure in the Accused Devices is an equivalent under § 112 ¶ 6.  Both Apple's structure and the accused products' structure perform the same function of "exchanging data with said host unit."  They do this in substantially the same way of creating a communications connection between the difference components to enable the exchange of data. To the extent there are differences, it is because Apple attempts to incorporate very specific and older mechanisms for this same communication.  Moreover, the result is the same – an exchange of data for eventual possible playback.

1704.   To the extent Apple successfully argues that it is not an equivalent, Apple infringes under the doctrine of equivalence for the same reasons.  Both Apple's structure and the accused products' structure perform the same function of "exchanging data with said host unit." They do this in substantially the same way of creating a communications connection between the

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

difference components to enable the exchange of data.  To the extent there are differences, it is because Apple attempts to incorporate very specific and older mechanisms for this same communication.  Moreover, the result is the same – an exchange of data for eventual possible playback.

1705.   Apple states:

> Samsung has also identified QuickTime and FaceTime as "[o]n information and belief" "working in conjunction with that computer interface(s) and the circuit to allow a host unit to receive data [from an iOS device] and transmit it to playback unit for [the] playback unit." Samsung has failed to articulate a theory of how QuickTime and FaceTime on a playback unit exchanges data with the host unit. Moreover, neither QuickTime nor FaceTime exchanges data between a host unit and a playback unit, either using an Ethernet card and Novel Netware Lite or otherwise. Because the required components do not exist in the accused Mac computers, Apple does not infringe claim 1.

1706.   I note that Apple does not say that QuickTime and FaceTime do not exchange data with the host unit – only that they do not under Apple's construction.  Above, I have set forth my opinions with respect to this limitation.  To the extent Apple is successful in this argument, Apple still infringes under the doctrine of equivalence or equivalents under 112 ¶ 6 as outlined above.

## G.   "means for storing the composite signal received by the host unit" (Claim 1)

1707.   Apple states:

> Samsung asserts only that "[o]n information and belief" the accused products "each have a hard drive or NAND flash module for storing the composite signal that is received by the host unit's interface from a Mobile Remote Unit and then exchanged with the playback unit." Samsung has failed to provide a means plus function analysis for this limitation. The only corresponding structure disclosed in the '239 patent for performing the function required by the "means for storing the composite signal received by the host unit" limitation is a hard disk drive and the software identified at 11:5-8, 12:19-22 and 12:48-51. The storage devices in the Mac computers store only digital data and cannot store an analog

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

"composite signal." For these reasons, Samsung cannot prove infringement of claim 1 with respect to this limitation.

1708. I disagree. First, I have set forth my analysis of the proper structure, and how the accused devices meet this structure above. I refer Apple to that analysis, as well as why Apple construction is incorrect.

1709. Apple seems to argue now that a composite signal must be analog. There is nothing in the construction that requires the composite signal to be analog, nor is there anything in the intrinsic record that requires that. In fact, it is contrary to the claims because the claim requires decompressing the composite signal, which necessarily requires that it still be in digital form. Apple's own construction also contradicts this, because an analog signal would not be stored on a hard drive – it would more likely be stored on a tape or other medium like that. To the extent Apple makes this argument, it is my opinion that Apple infringes either because the structure is an equivalent under 112 ¶6, or under the doctrine of equivalents. Storing an analog signal for eventual playback performs the same function as storing a digital signal for eventual playback – namely, "storing the composite signal." It does this in the same way, by providing memory for storing that particular signal. And the result is the same. The signal is stored and can eventually be played back.

1710. Apple states:

> Samsung also identifies FaceTime and iTunes Wi-Fi sync as part of the "means for storing." As discussed above, the FaceTime application does not store a data file in NAND flash memory, and iTunes Wi-Fi sync does not sync videos taken on the devices and therefore cannot store them on a playback unit. For these reasons, Samsung cannot prove infringement of claim 1 by FaceTime or iTunes Wi-Fi sync with respect to this limitation.

1711. Apple appears to reference back to its arguments for regarding FaceTime "files" and "buffers." Because Apple does not repeat its arguments, I refer Apple to my opinions as to

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

why its arguments are not correct.  It is my opinion that Apple infringes all of the limitations for

the same reasons noted above, and if Apple is successful with respect to any of these arguments,

Apple still infrinegs under the doctrine of equivalence or equivalents under 112 ¶ 6.

1712.  Apple states:

> Samsung also asserts that "composite signals that are received by the host unit via email [or] messaging" satisfy this limitation. But as discussed above, Samsung has failed to identify Mail or Messages as a "means for receiving" the composite signal transmitted by the remote unit. Because Samsung has failed to articulate its infringement theory with respect to this limitation, Samsung cannot prove infringement of claim 1, and Apple cannot fully respond to Samsung's infringement contentions.

1713.  I disagree.  As I have outlined above, I have identified precisely how each of the

accused products infringe this limitation.  I refer Apple to my opinions above.

### H.    "means for decompressing said composite signal" (Claim 1)

1714.  Apple states:

> Samsung asserts that "[o]n information and belief" the accused products "each have a graphical processing unit such as a video card, including a video decoder, for decompressing the compressed composite signal for playback" and also identifies FaceTime as "software [that] . . . decompresses the composite signal." Samsung has failed to provide a means plus function analysis for this limitation. The only corresponding structure disclosed in the '239 patent for performing the claimed function is a "video decompression card" ('239 patent at 12:3) that is "similar to the video card installed in the remote unit 2 with the exception that the capture module is not necessary" ('239 patent at 12:37-42) and an "audio decompression card" ('239 patent at 12:3-4). But Samsung has failed to identify any video decompression card or audio decompression card in the accused Apple products. Nor does any accused product use a video card or audio card. Because the required components do not exist in the accused products, Apple does not infringe claim 1.

1715.  I disagree.   Above, I have set forth my analysis regarding this limitation,

including my proposed construction, why Apple's construction is incorrect, and how the Apple

products meet this limitation.

1016

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

1716.   Apple has not set forth any particular reasons why it does not infringe this patent. However, it appears that it may be making the same arguments with respect to "decompression card" as it did for the "cards" in the construction for "means for capturing, digitizing, and compressing" above with respect to the remote unit.   For those reasons, I incorporate by reference all of the arguments I stated as to why Apple still infringes with respect to that limitation – they apply equally in this sense, as decompression can be thought of as a reverse operation of compression.   I also incorporate by reference my opinions that Apple infringes under the doctrine of equivalence or equivalents under 112 ¶ 6.

1717.   Moreover, to the extent there is any doubt, if Apple is successful with their arguments, it infringes under the doctrine of equivalence or equivalents under 112 ¶ 6 because both the accused products and the "cards" mis-described by Apple perform the same function: decompressing the composite signal received by the host unit."   They do this in the same way, by performing a reverse operation to decompress the data that was compressed at the remote unit. And the result is the same.   The data is decompressed for eventual playback.

I.   **"wherein the means for transmitting the composite signal includes: at least one interface installed in conjunction with said remote unit; a cellular telephone connected to each said interface" (Claim 7)**

1718.   As an initial matter, Apple states:

> Claim 7 is a dependent claim that depends on claim 1. The accused Apple devices do not infringe claim 7 at least for the reasons set out above for claim 1.

1719.   For the reasons I set forth above, I disagree, and refer Apple to all of the analysis in response to their arguments above.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

1720.   I also note that claim 7 is dependent on claim 3, but Apple has not set forth any

reasons why the Accused Devices do not infringe claim 3.  Therefore, I understand Apple does

not disagree that this claim is met.

1721.   Apple states:

> Samsung contends that the accused products "have at least one interface
> installed that is connected to a cellular telephone" and that Apple "informs
> its customers that the baseband processor on some models of the [iOS
> device] allows it to interface with multiple cellular networks." But the
> only "interface" disclosed in the specification – and required by the Court
> – is a "modem," and Samsung has failed to identify a modem in the
> accused products. (Docket No. 447 [Claim Constr. Order] at 60.)
> Moreover, as discussed above, the accused iOS devices do not use
> modems as that structure is disclosed in the patent. The baseband
> processor identified by Samsung is neither a modem nor "a cellular
> telephone connected to [an] interface" or modem." Because the required
> components do not exist in the accused products, Apple does not infringe
> claim 1.

1722.   I have addressed each of these arguments above with respect to Apple's identical

arguments above.  Apple does have modems, and Apple does infringe literally.  I incorporate by

reference each of those opinions.  I also incorporate by reference my opinions above with respect

to the "means for transmitting" limitation, that Apple infringes under the doctrine of equivalence

or literally under equivalents under 112 ¶ 6.  As this limitation merely limits the "means for

transmitting" limitation to cellular frequencies, all of the opinions, DOE opinions, and 112 ¶6

equivalents opinions also apply to claim 7.

1723.   **"a computer including a video capture module to capture and compress
video in real time" (Claim 15)**

> In any event, Samsung cannot prove infringement with respect to this
> limitation because the components Samsung identifies – a CMOS image
> sensor that "uses an A/D converter," a processor with a graphical
> processing unit, and a video encoder – do not constitute a video capture
> module. A video capture module is an (outdated) add-on component for
> personal computers that is used to receive video signals ("capture") from

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

an external device (such as a video camera). (*See* '239 patent at 4:28-31, 4:39-40, 5:44-46, 12:37-42; SAMNDCA630- 00832632 [5/21/96 Amend.] at 12 ("Yurt does not disclose the use of a video card including a video capture module in order to accomplish its capture. The frame grabber technology of Gattis and Palmer is likewise significantly different from a video card having a video capture module as recited in claim 19. The differences between a video card and frame grabber were discussed in Applicant's Amendment and Response to the Office Action dated August 2, 1995, incorporated herein by reference. In light of the fact that a video capture card having a video capture module is not contemplated by Yurt nor Gattis or Palmer, the rejection of claim 19 under 35 U.S.C. §103 is believed overcome.").)4 For the same reasons discussed above with respect to "means for capturing, digitizing, and compressing," the accused products do not have a "video capture module" under either party's construction of "capture."[143]

1724.   Apple appears to be making a claim construction argument, but Apple does not explain what it is construing "capture module" to be, nor does it explain how the accused devices do not have a "capture module."  I have applied the plain meaning for this claim term, which I understand is proper in light of the fact that it has not been construed.  Applying the plain meaning of the term, Apple clearly infringes as explained above, because one of ordinary skill in the art would recognize that a video capture module could be the capture hardware or software in a computer to capture and compress video.  I have identified these components above.

1725.   Apple appears that it may be making the same arguments that it did with respect to the "video card" above, in conjunction with the limitation "means for capturing, digitizing, and compressing at least one composite signal" in claim 1.  This is not a means plus function term, nor is it the same term.  But, to the extent Apple is making the same arguments it did with respect to that term, I incorporate by reference my opinions from above in response to this

---

[143]   In a previous interrogatory response, Apple sets forth arguments that are nearly identical to those set forth for claim 1, including Apple's "external" argument.  My opinions respond to these arguments equally applying to claim 15 as to claim 1.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

limitation.  I also incorporate by reference my opinion that Apple infringes under the doctrine of equivalence, to the extent Apple is able to successfully make any of its non-infringement arguments.

1726.   Apple cites to the same portions of the specification and file history that it did above to try to define what a capture module is, but it does not provide any clarification as to what Apple contends the term means.  Notably, the portions of the file history Apple cites to refer to the "video card" or "video capture card" and not a video capture module alone.  In fact, the video capture module is a component of the video card.  Claim 15 specifically does not claim a video card and as I explain above, claim 15 was amended so that it did not claim a video card. Apple is wrong to conflate the two, but as I stated in the previous paragraph, to the extent it succeeds in this argument, I incorporate by reference all of my arguments from the claim 1 "means for capturing, digitizing, and compressing" limitation.

1727.   Apple states:

> Although the applicants amended the claim to remove the "video card" from the claim, they disclaimed any construction of the term "video capture module" other than those that can be included on video cards by arguing that the prior art did not disclose a video card including a video capture module. Through this argument, the applicants defined the type of "video capture module" they intended to claim.

1728.   This statement was in a footnote.  I disagree with this statement.  In fact as I explained above, between the "draft" arguments that were submitted to the PTO before the interview, and the "official" submission made in response, the applicant removed the "video card" from the first paragraph of the argument Apple cites to.  It is obvious to one of ordinary skill in the art that the Applicant intended to remove the "video card" from all of the arguments since it was also removed from claim 15.  Moreover, I have explained in previous paragraphs why the arguments do not depend on it being a "video card" and the fact that the Apple devices

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

do not behave like the prior art.  Therefore, to the extent anything was disclosed (and it is my opinion that nothing was), nothing relevant to the accused products was disclosed.  In any case, I refer Apple back to my arguments with respect to claim 1, which are equally applicable here should it make this argument.

1729.   Apple states:

> Samsung also cannot prove infringement with respect to to this limitation for   Moreover, FaceTime does not use  as Samsung claims.

1730.   I do not understand this argument.  Nothing in this claim limitation requires decoding.  To the extent Apple can clarify it, I reserve the right to supplement these opinions at that time.

**J.**   **"means ofr transmission of said captured video over a cellular frequency" (Claim 15)**

1731.   Apple states:

> Samsung contends that the accused products "allow[] for the transmission of a captured video over a cellular frequency in a variety of ways," states that "[o]n information and belief, the Accused Devices have at least one cellular antenna and supporting hardware and software, including a baseband chip, for transmitting the captured video over a cellular frequency," and also identifies Mail, Message, FaceTime, and YouTube applications. But Samsung fails to provide a proper means plus function analysis. The only corresponding structure disclosed in the '239 patent for performing the claimed function is "one or more modems connected to one or more cellular telephones, and software performing a software sequence of initializing one or more communications ports on the remote unit, obtaining the stored data file, and transmitting the stored data file."

1732.   Here, Apple adopts the Court's construction for a completely different claim term that is inappropriate for this term because it incorporates claim terms that are not in claim 15, and the term is different from the "measn for transmitting" term that was construed.  I have explained

1021

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

what the proper construction should be, and the reasons my proposed construction is correct (and

how Apple's construction is wrong) above.  I incorporate that claim construction analysis here to

respond to Apple's argument.

> 1733.   Apple states:

> > Samsung also states that "[t]o the extent Apple argues that the term
> > 'means for transmission' in claim 15 is the same as 'means for
> > transmitting' in claim 1, Samsung's amended contentions set forth with
> > respect to claim 1 apply in a similar manner to this term. But for the same
> > reasons discussed above with respect to "means for transmitting,"
> > Samsung cannot prove infringement of claim 15 with respect to this
> > limitation. In addition, the accused Mac products do not have baseband
> > chips.

> 1734.   Apple states that "for the same reasons discussed above with respect to "means

for transmitting," Samsung cannot prove infringement of claim 15 with respect to this limitation.

Because Apple is in fact (as predicted) arguing that this different term means the same thing as

the claim in 1, I incorporate all of my opinions set forth above with respect to the claim 1 term

"means for transmitting said composite signal."  As part of that incorporation, I incorporate all of

my opinions that Apple infringes under the doctrine of equivalents and under equivalents as

defined in Section 112 ¶ 6.[144]

> 1735.   Apple states:

> > Samsung also cannot prove infringement with respect to this limitation by
> > FaceTime because, as discussed above, FaceTime does not use stored data
> > files and therefore cannot "obtain" or "transmit" "the stored data file."

> 1736.   I addressed this argument above in conjunction with my opinions responding to

Apple's non-infringement arguments set forth for claim 1.  To the extent Apple is able to make

---

[144]   In all of the situations where I refer back to other sections of my report, and/or
incorporate by reference, I decline to repeat the same opinions for ease of space.  However, all of
my opinions should apply equally to any similar argument made by Apple.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

this argument, I incorporate by reference all of my arguments that address this same argument, including all of my opinions that Apple infringes under the doctrine of equivalents and under equivalents as defined in Section 112 ¶ 6.  In addition, I note that Apple is attempting to read in a limitation that does not exist.  There is no limitation that a "file" must be created in claim 15, nor is there any limitation stating "means for storing said composite signal" or any "means for storing" limitation.  Therefore, this argument of Apple's is not relevant to claim 15.

1737.   Apple states:

> Finally, Samsung is estopped from asserting the doctrine of equivalents with respect to this limitation for videos taken with FaceTime for the same reasons discussed above for the "means for transmitting" limitation. Applicants added claim 15 (original claim 19) in the same Amendment in which the limiting argument was made, and stated "[t]he arguments contained herein in response to the rejections under 35 U.S.C. §112, 102(a), and 103 apply to new claims 16-20." (SAMNDCA630-00832596 [2/2/96 Amend.] at 12; *see also* SAMNDCA630-00832632 [5/20/96 Amend.] at 9 ("The present invention includes an apparatus capable of capturing a fullcolor, full motion composite signal in real time; digitizing that composite signal into a data file; compressing the data file and transmitting it through a computer interface via telephone lines, cellular, radio, and other telemetric frequencies from a remote unit to a host unit.").) Thus, the applicants relinquished any argument that a device that does not create a data file, such as FaceTime, infringes claim 15 as well. Therefore Samsung cannot prove infringement of claim 15 by FaceTime.

1738.   I have addressed this argument above in conjunction with claim 1.  I incorporate my opinions responding to Apple's arguments into this section.  Moreover, I disagree that the applicants "relinquished any argument that a device that does not create a data file" does not infringe claim 15.  Notably, the Applicant in that case was referring to claims other than 15.  Although the Applicant said that the arguments made also apply to new claims (like 15), as I mentioned above, there are other reasons why the argument distinguished the "frame grabber."  For example, the Frame Grabber did not operate the same way the invention (and the accused products) operated, as explained above.  This is independent of whethere there was a "file" or

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL-OUTSIDE ATTORNEYS' EYES ONLY-SOURCE CODE
INFORMATION
CONTAINS INFORMATION DESIGNATED AS THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

not.  Moreover, the Examiner in this case accepted the Applicants arguments, and issued claim 15 as patentable over the prior art even though claim 15 did not require a "file."  If the Examiner had believed a file was required by claim 15, then it would have required an amendment to involve a "file."

1739.   Apple states:

> Samsung has also failed to articulate any theory of infringement of equivalents under 35 U.S.C § 112 ¶ 6 or the doctrine of equivalents, and the accused devices do not contain the equivalent of the disclosed structure. For this reason, Samsung cannot prove infringement under any theory of equivalents.

1740.  I disagree.   Apple is arguing that this claim term should be construed nearly identical to that of claim 1.   I set forth opinions that claim 1 infringes under the doctrine of equivalents and under 112 ¶ 6 in conjunction with those same arguments, and I incorporate them by reference here.

## VIII.   SAMSUNG PRACTICES CLAIM 15 OF THE '239 PATENT

1741.   It is my opinion that Samsung's mobile devices and phones practice Claim 15 of the '239 Patent.  I understand that Samsung has asserted that the following devices practice Claim 15 of the '239 Patent: Galaxy Tab; Acclaim; Captivate; Continuum; Droid Charge; Epic 4G; Exhibit 4G; Fascinate; Galaxy Ace; Galaxy Prevail; Galaxy S 4G; Gem; Indulge; Infuse 4G; Intercept; Mesmerize; Nexus S; Replenish; Showcase Galaxy S; Sidekick; and Vibrant.

1742.   It is my opinion that all of the devices identified above practice Claim 15 because they have the capability of capturing and compressing video in real time, and then transmitting the compressed video via email or MMS.  Moreover, these devices also practice the patent with video chat capabilities such as Google Hangouts and Skype, or any other application that permits

# Exhibit 11

REDACTED VERSION OF DOCUMENT
SOUGHT TO BE SEALED

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL–OUTSIDE ATTORNEYS' EYES ONLY–SOURCE CODE INFORMATION

# REPORT OF PAUL S. MIN, PH.D.
# REGARDING INFRINGEMENT OF U.S. PATENT NOS. 7,756,087 AND 7,551,596

*Apple Inc. v. Samsung Elecs. Co. Ltd. et al,*

Case No. 12-CV-00630 LHK (N.D. Cal.)

August 12, 2013

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL–OUTSIDE ATTORNEYS' EYES ONLY–SOURCE CODE INFORMATION

Intentionally Omitted from Exhibit/Record

686.    I understand that Apple argues that the Accused Products do not infringe claims 9

and 34 because Apple claims that ███████████████████████████████████████

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL–OUTSIDE ATTORNEYS' EYES ONLY–SOURCE CODE INFORMATION

███████████████████████████████████████████████████

████████████████████████████. I disagree with this argument.  I have not seen any

definitive evidence to show one way or the other that ██████████████████████████

██████████████████████████████████████ Contrary to Apple's

argument, the evidence I reviewed demonstrates that ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████__As explained below, transmitting non-

scheduled transmission information has many important benefits that are important for creating

an efficient 3G network.  Cho (Jun. 10, 2013) Dep. 109:7-22; Exhibit CC, Kwak (May 30, 2013)

Dep. 93:17-95:13, 141:25-142:13. ████████████████████████████████

████████████████

      687.    However, ████████████████████████████████████████

the Accused Products still infringe claims 9 and 34.  I understand from counsel that to infringe an

apparatus claim, the Accused Product only need to be *capable* of infringing.  The Intel and

Qualcomm source code, documentation, and transcripts that I reviewed all confirm that the

Accused Products each contains source code that demonstrate that these products are each

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL–OUTSIDE ATTORNEYS' EYES ONLY–SOURCE CODE INFORMATION

capable of receiving non-scheduled transmission information and transmitting non-scheduled

data according to the received non-scheduled transmission information as set forth in claims 9

and 34.  The source code I identified in the preceding paragraphs is evidence of this functionality

in the Accused Products.  Therefore, it is my opinion that the Accused Products infringe claims 9

and 34 even if the network carriers do not transmit non-scheduled transmission information,

because each Accused Product is capable of receiving this information.  Mennchen (Intel) Dep.

51:17-54:6; Hutchison (Qualcomm) Dep. 178:7-25.

Intentionally Omitted from Exhibit/Record

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL–OUTSIDE ATTORNEYS' EYES ONLY–SOURCE CODE INFORMATION
Intentionally Omitted from Exhibit/Record

1137.  I understand that Apple may argue that the Accused Apple Products do not

infringe because ███████████████████████████████████ I

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL–OUTSIDE ATTORNEYS' EYES ONLY–SOURCE CODE INFORMATION

disagree with this argument.  One of ordinary skill in the art reading claims 1 and 13 would understand that these claim elements do not need to be formed in a specific order.  So even if the Accused Products create a MAC-es PDU at the same time they create a MAC-e PDU, the Accused Products would still infringe.  Van Lieshout (Jun. 18, 2013) Dep. 40:3-17 (testifying that the manner in which to form a MAC-e PDU is flexible and can comprise hardware or software as decided by a given vendor).  To the extent the Court determines that the claims require "forming a first protocol data unit" before "forming a second data packet unit," it is my opinion the Accused Products still infringe, because ███████████████████████████

████████████████████████████████████████████████████

███████████████████████████

1138.   I understand that Apple may argue that the Accused Products do not infringe because Apple claims that ██████████████████████████████████

████████.  I disagree with this argument.  As I have explained throughout this report, Scheduling Information is very important information that the network needs to use to determine the size of the scheduling grant to allocate to a device communicating on its network.  Soeng-Hun Kim (Jun. 13, 2013) Dep. 112:19-124:10 ("I believe that not using the scheduling information, thereby wasting resources, is something that can rarely happen.").  I have not seen any definitive evidence to show that ███████████████████ ████ ██████████

████████████████  Apple points to a handful of documents that only demonstrate that

████████████████████████████████████████████████

████████████████████████████  Contrary to Apple's claims, ██████████████████████████████████ ████

████████████████████████████████████████████████

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL–OUTSIDE ATTORNEYS' EYES ONLY–SOURCE CODE INFORMATION

It is my opinion that

1139.  Furthermore,

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL–OUTSIDE ATTORNEYS' EYES ONLY–SOURCE CODE INFORMATION





1140.   Apple claims that ████████████████████████████████

████████████████████████████ I disagree with this argument.

The happy bit is a single bit that merely tells the Node B whether the UE is happy or not happy.

It does not provide the detailed information that the Scheduling Information provides to the Node

B.  Using just the happy bit creates an inefficient network and would require the UE to keep

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL–OUTSIDE ATTORNEYS' EYES ONLY–SOURCE CODE INFORMATION

sending the happy bit until it is happy.  On the other hand, by transmitting the Scheduling Information, the UE has sent the Node B all the information it needs to inform the Node B of UE's requirements.  Furthermore, the evidence I describe above, shows that ███████████ ██████████████████████ .

1141.   However, █████████████████████████████████ ████████████ the Accused Products still infringe because the asserted claims only require the Accused Products to transmit the Scheduling Information to the Node B.  The claims do not require that the Scheduling Information be used by the Node B.  Claims 1 and 13 require a control service data unit for uplink packet data service.  As I explained above, the Accused Products create Scheduling Information that is transmitted in the uplink to the Node B.   The use of the Scheduling Information after it is transmitted is not a claimed limitation in the asserted claims.

1142.   I understand that Apple may argue that it does not infringe because sending Scheduling Information and $DDI_0$ (Special DDI) is an optional feature in TS 25.321 standard.  I disagree with this argument.  Figure 9.1.5.2a in TS 25.321 states that the $DDI_0$ and Scheduling Information are "opt" because the $DDI_0$ and Scheduling Information do not have to be sent in *every* transmitted MAC-e PDU.  However, as I explained throughout this report, Scheduling Information is very important information that the Accused Products *must* transmit to the Node B.  Just because the $DDI_0$ and Scheduling Information are not sent in every MAC-e PDU does not mean the Accused Products do not infringe.  The Accused Products transmit MAC-e PDUs in four different scenarios, which I described above.  Soeng-Hun Kim (Jun. 13, 2013) Dep. 134:11-25 (testifying that the case when DDI would not be necessary is "a very exceptional case").  ████████████████████████████████████

340

████████████████████████████████████████████.  While unnecessary to my infringement analysis, it is my opinion that Accused Products transmit frequently using Scenario 2.

1143.   I understand that Apple may argue that the Accused Products do not infringe the asserted claims because the Accused Products do not "concatenate" the MAC-e header and MAC-e payload.  I disagree with this argument.  As I explained above, ████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████  Therefore, it is my opinion that the Accused Products concatenate the MAC-e header and payload as required by the claims.

1144.   I understand that Apple may argue that the Accused Products do not infringe the asserted claims because the data that forms the control service data unit (SDU) does not originate from a higher layer.  I disagree with this argument.  The claims do not specify from *where* the data must originate.  The claims only require that the Accused Products create an SDU including control information for an uplink packet data service, which they do.  Simply because the information is packaged as an SDU does not mean that the data must originate from a higher

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL–OUTSIDE ATTORNEYS' EYES ONLY–SOURCE CODE INFORMATION

layer, which is a relative concept.  Soeng-Hun Kim (Jun. 13, 2013) Dep. 48:3-49:3; Gert Jan Van

Lieshout (Jun. 18, 2013) Dep. 134:10-25.  Layers are simply an illustration to help people

understand the OSI structure.  However, during implementation, these layers are not as black and

white as Apple requires.  The layering can happen in different ways in the implementation of a

device.  Soeng-Hun Kim (Jun. 13, 2013) Dep. 50:1-8; 116:18-117:14.  For example, MAC-es

and MAC-e could be considered separate layers or all within the same MAC layer.  The decision

to differentiate between layers is up to the manufacturer.  Therefore, there is no requirement that

the data that make up the control service data unit be from a "higher" layer.

1145.   I understand that Apple may argue that the claimed "block," "control unit," and

"multiplexing and transmission sequence number (TSN) setting unit" are purely hardware

structures ███████████████████████████████████████

████████████████████████████████████████████

████████   I disagree with this argument.  Nothing in the '596 patent limits the claimed "block,"

"control unit," and "multiplexing and transmission sequence number (TSN) setting unit" to a

purely hardware structure.  One of ordinary skill in the art would understand that these structures

can be implemented in either hardware or software (or a combination of both) to perform a

relevant operation.  Soeng-Hun Kim (Jun. 13, 2013) Dep. 60:2-61:25 (testifying that any

combination of software and/or hardware can comprise a "block," "TSN setting unit," or

"control unit," and that there is "no particular difference" between a block and a unit); Van

Lieshout (Jun. 18, 2013) Dep. 38:9-40:17; Exhibit CM, Computer Technology Encyclopedia at

SAMNDCA630-07869658; Exhibit CN, Webster's New World Computer Dictionary, 10th Ed.

In this case the relevant operation is to form a first protocol data unit, a control service data unit,

and second data packet unit. ████████████████████████

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL–OUTSIDE ATTORNEYS' EYES ONLY–SOURCE CODE INFORMATION

██████████████████████ the Accused Products infringe the "block," "control unit," and "multiplexing and transmission sequence number (TSN) setting unit" limitations in claim 13.

### D.   <u>Doctrine of Equivalents for Claims 1 and 13</u>

1146.   It is my opinion that the Accused Products each literally infringes claims 1 and 13 of the '596 patent.  However, to the extent the Court finds the Accused Products do not literally satisfy claims 1 and 13, it is my opinion that the Accused Products also satisfy claims 1 and 13 under the doctrine of equivalents.  It is my opinion that the difference between each of the Accused Products and claims 1 and 13 is insubstantial.  They each perform substantially the same function of forming a first protocol data unit, a control service data unit, a first header part, a second header part, and a second data packet unit for transmitting control information for an uplink packet data service in a mobile communications system, in substantially the same way of multiplexing control information with data while using the same header structure for both and achieves substantially the same result of transmitting control information to the Node B in an efficient manner that minimizes the impact on the network.  It is thus my opinion that the Accused Products satisfies claims 1 and 13.

1147.   Specifically, I understand that Apple may argue that the Accused Products do not infringe claims 1 and 13 because Apple claims that ████████████████████████ ██████████████ As I explained above, I disagree with this argument. ████████████ ██████████████████████████d as required by the claims. However, to the extent the Court finds that the Accused Products do not literally infringe this limitation, it is my opinion that the Accused Products satisfy this limitation under the doctrine of equivalents. ████████████████████████████ ████████████████████████████████████. The difference between ████████████████████████████████████████ and concatenating

343

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL–OUTSIDE ATTORNEYS' EYES ONLY–SOURCE CODE INFORMATION

header and payload parts in the claim is not only insubstantial, it is not different at all.

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████

1148.   I understand that Apple may argue that the Accused Products do not infringe claims 1 and 13 because Apple claims that ████████████████████████████████████ █t.  As I explained above, I disagree with this argument.  ████████████████████ ████████████████████████████, as required by the claims.  However, to the extent the Court finds that the Accused Products do not literally infringe this limitation, it is my opinion that the Accused Products satisfy this limitation under the doctrine of equivalents ████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████  The difference between ████████ ████████████████████████████████r and forming a first protocol data unit as set forth in the claims is not only insubstantial, it is not different at all.  ████████████████

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL–OUTSIDE ATTORNEYS' EYES ONLY–SOURCE CODE INFORMATION

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████

1149.   I understand that Apple may argue that the Accused Products do not infringe

claims 1 and 13 because Apple claims that ███████████████████████████████████

████████████████████████████████████████████████r.  As I explained above, I disagree

with this argument.  Soeng-Hun Kim (Jun. 13, 2013) Dep. 48:3-49:3; Gert Jan Van Lieshout

(Jun. 18, 2013) Dep. 134:10-25.  The Accused Products all form a control service data unit as

required by the claims.  However, to the extent the Court finds the Accused Products do not

literally infringe this limitation, it is my opinion that the Accused Products satisfy this limitation

under the doctrine of equivalents.  ████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████    ███████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

# Exhibit 14

REDACTED VERSION OF DOCUMENT
SOUGHT TO BE SEALED

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| APPLE INC., a California corporation, | |
| Plaintiff, | |
| vs. | Civil Action No. 12-CV-00630-LHK |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity, SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Defendants. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity, SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Counterclaim-Plaintiffs, | |
| v. | |
| APPLE INC., a California corporation, | |
| Counterclaim-Defendant. | |

**CORRECTED EXPERT REPORT OF JAMES A. STORER, PH.D.
REGARDING NON-INFRINGEMENT OF THE ASSERTED CLAIMS OF
U.S. PATENT NOS. 5,579,239 AND 6,226,449**

**VOLUME I**

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

### 2. Dr. Schonfeld Incorrectly States That The Inventors Did Not Relinquish Any Claimed Subject Matter During Prosecution

407.    In his discussion of the '239 patent prosecution history, Dr. Schonfeld offers the opinion that the named inventors did not abandon or disclaim any subject matter based on arguments they advanced. *See* Schonfeld Report ¶¶ 349, 354, 356 and 358.  I note that he reaches these conclusions but does not provide any support or explanation.  I disagree with Dr. Schonfeld's conclusions.

408.    First, Dr. Schonfeld addressed an amendment and argument the named inventors made to overcome an indefiniteness rejection regarding the use of "audio and/or video" in the claims.  *See* Schonfeld Report ¶ 349.  The term "composite signal" replaced "audio and/or video."  Yet Dr. Schonfeld concludes that composite signal means at least audio and/or video, and therefore did not give up any subject matter.  I disagree.  The Court said that they *necessarily* gave up audio alone or video alone when they amended to overcome the 112 rejection.  Claim Construction Order [Docket No. 447] at 51 ("[C]onstruing "composite signal so broadly completely disregards the Examiner's reason for initially rejecting Claim 1, which was to avoid covering 'audio and/or visual signal' and thereby render the claim 'vague and indefinite.'").

409.    Dr. Schonfeld also argues in paragraph 358 of his report that U.S. Patent No. 5,062,136 ("Gattis"), cited by the examiner during prosecution, is different from the '239 patent because Gattis "contemplates capturing video and then transmitting it at various speeds."  Dr. Schonfeld concludes that "the Applicant did not disclaim any subject matter at issue in this case with their Remarks" about Gattis.  I disagree.

410.    The examiner rejected claim 1 as obvious, citing Gattis, among others.  Gattis discloses capturing, digitizing, and compressing video and transmitting that video using a modem and telephone line, just like the '239 patent.  *See, e.g.*, Gattis at 3:63-5:7.  But the system

217

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

disclosed in Gattis does not store the video in a file because it is a videoconferencing system. Rather, the system immediately transmits the frames without storing them in files, and indeed, Gattis does not mention files.  The receiver in Gattis receives a full video so it can be played. *See, e.g.,* Gattis at Abstract ("A teleconferencing system includes desktop computers, external cameras and peripheral apparatus to allow interconnection of two or more terminals to engage in teleconferencing via digital data networks."), 4:25-31 ("The encoded and compressed signals may then be input to an encryptor 32A. The encryptor 32A is used if encryption is desired to prevent unauthorized access to the signals being transmitted. After encryption, the signals to be transmitted are then input to a modem 34A, which then performs the operations necessary to send the signals on a telephone line."), Fig. 2.  The examiner also described Gattis as "#1 or #2 desktop computer 26A or 26B in combination with the video camera 22A or 228, the frame grabber, the CODECs, the modem, and the encryptor/decryptor" – in other words, with very similar hardware to that described in the '239 patent.  '239 File History, 8/2/95 Office Action [SAMNDCA630-00832570] at 6-7.

411.    In response to the rejection, the applicants argued that Gattis in view of Dykes and Guillou lacked the means for capturing, compressing, digitizing, storing, and transmitting at least one composite signal as recited in claim 1.  Specifically, the applicants argued:

> The Gattis et al ('136) patent lacks a significant element contained within Applicants' independent claims 1 and 12 which is not supplied by Dykes et al or Guillou. . . .
>
> Significantly, Gattis et al as referenced on page 7 of the Office Action, and in column 3, line 67 – column 4, line 3, of Gattis, discloses the usage of a frame grabber 24A.  This device only contemplates an uninterrupted, continuous stream of information digitized on a line by line of resolution basis that ultimately represent a sequence of "pictures."  Gattis does not contemplate the creation of full-motion composite signal video information into digitized files which can be stored, transmitted, played or replayed.

218

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

> This is a very significant difference. . . . Thus, Gattis does not
> disclose the creation of a data file as required by Applicants'
> claims. . . .  [I]n Applicants' invention, full motion composite
> signal is captured into digitized files and transmitted over narrow
> (slow) and/or intermittent band widths while and still maintaining
> the original captured quality of the video.

'239 File History, 2/2/96 Amendment [SAMNDCA630-00832596] at 10-11.  The applicants

emphasized that the "significant difference" between claims 1 and 12 and Gattis was that "Gattis

does not contemplate the creation of full-motion composite signal video information into

digitized files which can be stored, transmitted, played or replayed."  *Id.*; *see also id.* at 11

("Gattis does not disclose the creation of a data file as required by Applicants' claims").  The

applicants also discussed claim 1 and claim 12 as if they had the same scope, even though claim

12 contained the "data file" limitation that claim 1 lacked.  *See id.* at 10 ("The Gattis et al ('136)

patent lacks a significant element contained within Applicants' independent claims 1 and 12

which is not supplied by Dykes et al or Guillou.").  Through these arguments and the similarity

between Gattis and the '239 patent, it is my opinion that the applicants relinquished the ability to

assert that at least claim 1 (and its dependent claims) cover any device that does not create a full-

motion composite signal video data file, such as the accused Apple products when running

FaceTime.[17]

412.     In addition, I disagree with Dr. Schonfeld that Gattis does not encode "real video

data."   Gattis discloses a teleconferencing system including exactly that.  *See, e.g.,* Gattis at

Abstract ("A teleconferencing system includes desktop computers, external cameras and

peripheral apparatus to allow interconnection of two or more terminals to engage in

---

[17] Dr. Schonfeld also asserts that the "FaceTime implementation" somehow supports his opinion
that the applicants did not relinquish subject matter.  *See* Schonfeld Report ¶ 358.  It is unclear
what Dr. Schonfeld means – FaceTime is irrelevant to what occurred during prosecution.  *See
also* Schonfeld Report ¶ 385.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

teleconferencing via digital data networks.").  In Gattis, live video is compressed and transmitted from sender to receiver.  *See, e.g.,* Gattis at 4:15-31.[18]  Furthermore, unlike the '239 patent, which claims  real-time compression but does not describe real-time transmission, Gattis describes a real-time compression and transmission system.

413.    In this same amendment, Applicants also added asserted claim 15 (original claim 19), and asserted that "[t]he arguments contained herein in response to the rejections under 35 U.S.C. §112, 102(a), and 103 apply to new claims 16-20."  '239 File History, 2/2/96 Amendment [SAMNDCA630-00832596] at 12.  In a second amendment on May 21, 1996, the applicants reaffirmed that they were disclaiming video calls with similar language:  "The present invention includes an apparatus capable of capturing a full-color, full motion composite signal in real time; digitizing that composite signal ***into a data file***; compressing the data file and transmitting it through a computer interface via telephone lines, cellular, radio, and other telemetric frequencies from a remote unit to a host unit."  '239 File History, 5/21/96 Amendment [SAMNDCA630-00832632] at 9 (emphasis added).  Thus, the applicants also relinquished the ability to assert that claim 15 covers any device that does not create a full-motion composite signal video data file, such as the accused Apple products when running FaceTime.

414.    This makes sense in the context of the '239 patent as it is replete with references to storing the video in a data file before transmission, which is inconsistent with video conferencing or video calls.  *See, e.g.*, '239 patent at Abstract, 2:26-31, 2:35-39, 2:46-58, 2:66 – 3:21, 3:29-60,  4:6-16, 4:41-45, 4:49-58, 4:62 – 5:6, 5:11-16, 5:21 – 6:18, 6:24-61, 7:4-10, 7:17-

---

[18]    Gattis also discloses using a "standard video signal" of "about 200,000 pixels," which is consistent with NTSC signals.  Gattis at 4:5-7; *see also id.* at Background of the Invention (discussing NTSC signals throughout).  The FirstLook Video system also captured NTSC signals.  FirstLook Video Brochure [SAMNDCA630-00828677] at 1 ("NTSC, S-Video or PAL input / output").

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

30, 8:13-30, 8:38-40, 8:46-49, 8:55-60, 9:3-29, 9:39-41, 9:46-48, 9:61-67, 10:4-61, 11:1-8,

11:11-32, 11:45-61, 12:5-8, 12:15-23, 12:27-34, 12:40-51.  For this same reason, I disagree with

Dr. Schonfeld's assertion that the alleged invention is consistent with "video conferencing"

because it can handle "infinite" videos.  Neither video conferencing nor "infinite" videos are

described in the '239 patent.  Although the length of a video that is being recorded by a camera is

not predetermined and can be captured by a video capture card, that video is still stored in a data

file as it is captured and compressed. Once the recording stops, the file is then of determinate

length.  It is then stored and can be played, replayed, edited, split, or transmitted.  That is all that

is disclosed in the '239 patent, and it is in nearly every paragraph (see previous set of citations).

415.    The applicants also relinquished additional subject matter – i.e., devices without a

video capture module that is not on or integrated into a video card – during prosecution of issued

claim 15.  In response to the examiner's rejection of the claim 19 (issued claim 15) as obvious

over U.S. Patent No. 5,253,275 (Yurt et al.) in view of Gattis et al. or U.S. Patent No. 5,375,068

(Palmer et al.), the applicants argued the importance of a video card having a video capture

module to the invention:

> Real time capture is significantly different than the method
> described by Yurt.  Yurt contemplates a system which takes a
> video sequence such as a motion picture of known length
> characteristics and then subjecting that signal to a complex
> mathematical algorithm which captures, digitizes, and compresses
> that signal. This method disclosed by Yurt is very time consuming
> and requires complex and expensive hardware to accomplish.  As
> stated above, the Yurt disclosure contemplates a storage library of
> known files.  This library is precompressed (col. 7, line 47--col. 8,
> line 26). In the Yurt disclosure, it is desirable to perform this
> substantive precompression so as obtain a data file which is as
> small as possible so as to reduce transmission time.  Yurt does not
> disclose the use of a ***video card including a video capture module***
> in order to accomplish its capture. The frame grabber methodology
> of Gattis and Palmer is likewise significantly different from ***a
> video card having a video capture module*** as recited in claim 19.

221

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

meeting, that fact does not change my opinion.  The video capture module on the video card

actually performs the capture.  It does not change what a video capture module is, as confirmed

by the patent and the file history.  There is no description in the patent of any other type of video

capture module.  Only a video capture module on a video card is described.[20]

### 3.       The '239 Patent Does Not Describe Video Calls or Streaming

418.     Dr. Schonfeld is incorrect that the '239 patent covers streaming and video calls.

*See* Schonfeld Report ¶¶ 409-11.  Not only did the applicants relinquish videoconferencing and

video calls during prosecution, as discussed above, the patent teaches away from this subject

matter.  As I also explained above, the '239 patent repeatedly describes transmitting a stored data

file, and not a video stream.  Indeed, the '239 patent's discussion that adding audio will require a

bigger file and require longer transmission time further supports that videoconferencing was not

contemplated because it would not be useful without audio.  *See* '239 patent at 5:46-51 ("Capture

with audio makes the data file longer since the audio signal must also be digitized, compressed,

and stored in the remote unit's hard disk.  It is evident that the longer the data file, the longer the

time required for transmission of the entire data file from the remote unit to the host unit.").  In

addition, the '239 patent's explanation that the remote unit could be used to edit the captured

video file, to store the captured video file on the hard drive, and to split the captured video file --

all are inconsistent with video calls.  *See, e.g.,* '239 patent at 3:6-7 ("After the video file has been

captured, it may be edited as desired prior to transmission to the host unit."); 3:3-6 ("A software

sequence then instructs the computer central processing unit to store the captured data file on the

---

[20]       Dr. Schonfeld asserts in paragraph 386 that "it is my opinion that the Applicant intended
to claim only a video capture module, which is broader than a video card."  It is unclear what Dr.
Schonfeld means by this assertion – the applicants never claimed a video card alone.  In any
event, as discussed above, in my opinion the claim cannot be broader than the what is described
in the patent or than what they argued to overcome the rejection over Gattis, Palmer, and Yurt.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

computer's hard disk drive."); 3:12-14 ("The data file is split and organized so as to reduce the amount of time of transmission of the data file.").

419.     Figure 2 of the '239 patent also demonstrates that streaming and video calls are not covered by the '239 patent.  As that figure indicates,

> [a]fter the video sequence is captured, it may be viewed, edited, or transferred to the host unit.  Each bit map file box 22 has a "VIEW" selection button 24 and a "TRANSFER" selection button 24.  Upon selection of "VIEW" button 24, a captured video data file may be retrieved from the remote hard disk and the video sequence run.  The video sequence is displayed in its respective bit map file box 22. . . .
>
> Selection of "TRANSFER" button 26 initiates the transfer software sequence B and the file splitting software sequence, discussed below.  The captured, digitized, and compressed data file is then automatically transmitted to the host unit.

'239 patent at 6:24-39.  These TRANSFER buttons are outlined in red below:

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION



**Fig. 2**

This figure also shows that "[t]he remote unit is capable of storing and displaying up to (8) bit map files." *Id.* at 5:29-31. The file history further shows the need to be able to replay a video file. For example, the applicants attempted to distinguish Gattis by arguing that "Gattis does not contemplate the creation of full-motion composite signal video information into digitized files which can be *stored*, transmitted, played or *replayed*. This is a very significant difference." '239 File History, 2/2/96 Amendment [SAMNDCA630-00832596] at 10-11 (emphasis added); *see also* '239 File History, 2/2/96 Aff. [SAMNDCA630-00832590] ¶ 2 (describing Ex. A and FirstLook Video product in Exs. C and D as "our invention"), Ex. C ("Just plug the camera into the unit, and you can edit the tape frame-by-frame with a mouse. . . . The average 15-second file takes two to three minutes to transmit"), Ex. D ("The system is capable of storing eight different clips of varying lengths in its database, all of which can be quickly retrieved and edited."). The

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

ability to edit and replay video and to save up to eight video clips are all inconsistent with streaming video and video calls, as is the need to select a TRANSFER button before the video is sent and the slow speed of the transmission.

420.    Conversely, there is no disclosure in the '239 patent of transmission of video as it is being captured and compressed, as would be required for video streaming, or any disclosure of two-way sending and receiving, as would be required by video calls.  There is no discussion of the host unit or any other receiving unit being able to send back a video.  In fact, the host unit does not even have the ability to participate in a video call, as Dr. Schonfeld himself admits – because it does not include the capture module.  *See, e.g.,* Schonfeld Report ¶ 70.  The '239 patent also does not disclose any software displaying video of the participants in the call on the remote unit and the host unit or for managing the call.

421.    The documents describing the named inventors' FirstLook Video product support this understanding.  The FirstLook Quick Start Guide provides step-by-step operating instructions for the FirstLook Video from power up, connecting a camera to a video capture cable to capture video, and clicking on a "Transfer" button to transfer any of the last eight recorded video clips back to the Host.  The Guide contains the same screen as shown in Figure 2 of the patent, with video clips in the VIEW screens:

227

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION



Fonet Quick Start Guide [SAMNDCA630-00832075] at SAMNDCA630-00832091.  The guide also describes how to transmit video:

### Sending a Video Clip

a. To transfer any of the last eight (8) video clips back to the Host Unit, position the mouse pointer on the Transfer button directly beneath the desired clip and click the left mouse button once. This macroplexes the files and dials the Host Unit automatically, requiring no further interface by the user.

*Id*. at SAMNDCA630-00832095.  The FirstLook Video brochure describes how many minutes it took to transmit video clips – far longer than the video play time.  FirstLook Video Brochure [SAMNDCA630-00828677] at 1 ("Field Test Sample Results":  "Time delay video transfer over cellular of a 15-second clip at 7 frames per second – *5 minutes*").  All these disclosures are

228

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

### 1. "means for capturing, digitizing, and compressing at least one composite signal" (claim 1)

529.    The Court has construed this limitation as a means-plus-function limitation, in which the function is "capturing, digitizing, and compressing at least one composite signal" and the corresponding structure that performs this function is "an audio capture card and a video card having a video capture module."  Claim Construction Order [Docket No. 447] at 64.

530.    For this limitation, Dr. Schonfeld states that "Samsung has accused the iPhone 4, iPhone 4S, iPad 2, iPad 3, iPad 4, iPad Mini, iPod Touch 4th Generation, and iPod Touch 5th Generation as infringing mobile remote units for purposes of infringing Claims 1 and 7." Schonfeld Report ¶ 1301.  Dr. Schonfeld asserts that the "image sensor for the camera" captures and digitizes video signals using either FaceTime application or the Camera application, and that "a ▮▮▮▮▮▮▮▮▮▮▮▮ that interfaces to a microphone and includes an Analog-to-Digital Converter (ADC)" captures and digitizes audio signals. *Id.* ¶¶ 509, 514, 1304.  He also asserts that "[t]he application processor System-on-Chip (SoC) includes ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 1305.  According to Dr. Schonfeld, these components constitute a "video card having a video capture module" and an "audio capture card" because the accused products ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that interfaces to a microphone and includes an Analog-to-Digital Converter (ADC)," "also contains an ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ CMOS image sensor) that includes an image array (with sample/hold circuitry) and an Analog-to-Digital Converter (ADC)," and "also contains an application processor Systems-on-Chip (SoC) that includes ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 1307.  As discussed in detail below, I disagree with Dr. Schonfeld.

274

531.     In Section VI.C. above, I described the components and operation of video and audio capture cards and image sensors.  As discussed in detail below, the accused products do not have capture cards or anything like them, nor do the accused components have the ability to perform the claimed functions.  Samsung and Dr. Schonfeld are accusing a completely different functionality – recording a video – and structure – an image sensor in a camera – from what is claimed.  Although a video camera is disclosed in the specification, it is not part of the structure as construed by the Court that performs the function.  *See, e.g.*, '239 patent at Figure 1, 3:66-67 ("FIG. 1 depicts the components and the sequence of the process of the present invention."), 4:7-8 ("The drawings represent the present invention . . . ."), 4:28-32 ("A signal is input into remote unit 2 from any device having the capacity to output a video signal 1, such as a video camera, video cassette recorder/player, laser disc player, etc.  The video signal received by the remote unit can be of any generally known format, such as NTSC, PAL, and Y/C video (or S video)."), 4:39-41 ("The video signal input into the remote unit is received by a video card having a video capture module therein.  Such a card is available commercially from IBM/Intel."); *see also* '239 File History, 2/2/96 Aff. [SAMNDCA630-00832590] ¶ 2 (describing Ex. A as "our invention"), Ex. A (depicting video camera as distinct from the claimed remote unit).  The patent does not describe the function of the video camera.  *See* R. Freeman 6/18/13 Tr. at 148:6-12 (████████ ███████████████████████████████████████).  Even Dr. Schonfeld's discussion of the technology in his report treats capture cards and image sensors separately and as distinct devices with different functions and purposes.  *See, e.g.*, Schonfeld Report ¶¶ 238-241.  Yet Dr. Schonfeld never explains the patent's disclosures, or even mention whether the accused products can  perform the claimed functions in the way that the required captures do

(and as described in the patent).  Dr. Schonfeld is essentially attempting to eliminate the requirement of an audio capture card and a video card having a video capture module.

a)  *The accused products do not have an "audio capture card and video card having a video capture module" or equivalent structure*

532.    The accused iOS products do not have the required audio capture card or video card having a video capture module.  As discussed above in Section VI.C.1, audio and video capture cards are optional, add-on components that can be inserted into an expansion slot in a computer to add video or audio (or both) capture functionality.  The iOS devices do not have any expansion capabilities and are not shipped with audio or video capture cards, as evidenced by the fact that none of the Bills of Materials for any of the accused products lists any capture cards (or video capture modules).  *See, e.g.*, iPhone 5 Bill of Material [APL630DEF-WH0005313660]. *See* Storer Exhibit 1 for an exemplary list of Bills of Material.  *See also* http://www.apple.com/iphone/specs.html; http://www.apple.com/ipad-mini/specs/; http://www.apple.com/ipad/specs/; http://www.apple.com/ipod-touch/specs.html.  Nor do any schematics for the accused products identify any capture cards (or video capture modules).

533.    Nor do the accused components in the accused iOS devices constitute an audio capture card.  First, none of the accused components – a "logic board," an audio codec that "interfaces to a microphone and includes an [a]nalog-to-[d]igital [c]onverter (ADC)," and applications processor ███████████████████████████████████████ ████████████████████ is an audio capture card.  Nor are these components collectively an audio

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

capture card.  *See* Schonfeld Report ¶ 1307.[30]  As discussed above in Section VI.C.1, an audio capture card is an optional, add-on component for computers.  It is installed in an expansion slot of the motherboard of a computer and contains all the hardware needed to add specialized functionality to the computer – namely, the ability to capture, digitize, and compress audio signals from an analog device and decompress and play those audio signals.  An audio capture card connects to the motherboard and therefore is a distinct component; it is not also a motherboard.  As shown in the images of audio capture cards in Section VI.C.1 above, an audio capture card adds external connectors to the device to allow connection to an audio source.  In contrast, the accused main logic board of the accused products and the other accused components are not the same structure as an audio capture card.  The main logic board is not an optional, add-on component – in fact, it is essential to the product and the product would not operate without it.  There is also no way to remove it or any of the other accused components without destroying the device.  The main logic board contains the main processor and many other integrated components, and provides connectivity to all the components in the product, as well as connectivity to all the peripherals and other components that are not on the board.  The board does not have any connectors for connecting an analog video source to the product.  Moreover, as discussed in detail below in Section VI.G.1.b, the accused components are not capable of performing the capture, digitization, and compression function of an audio capture card.  To the extent the audio codec and audio subsystem are accused as an audio capture card without the

---

[30]     Dr. Schonfeld asserts that the logic board "contains" an audio codec and "camera sensor," and that the audio codec "interfaces" the microphone.  Schonfeld Report ¶ 1307.  It is unclear from these statements whether Dr. Schonfeld is actually accusing the logic board as part of the required audio capture card or video card having a video capture module and the microphone as part of the audio capture card.  I have addressed the alternative arguments, to the extent they are understood, in this section and in Sections G.1.d and G.1.f.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

main logic board (either with or without the microphone), they do not form an audio capture card

for the similar reasons:  they are not add-on components, do not provide the connectors required

for audio capture, and do not perform the claimed functions (as discussed in detail below in

Section VI.G.1.b).

534.    The fact that the collection of components are not audio capture cards can also be

illustrated by viewing the components.  For the iPhone 5, there are ████████████████████

████████████████████████████████████████████████████████████

████   The other two components – ████████████████████████████████

████████████████████



CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

279

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Only a portion of the SOC is accused.

280

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

User's Manual APL630DEF-WH0001749889] at APL630DEF-WH0001749090.  This collection of components and portion of the main processor is not an audio capture card.  In addition to the reasons already discussed, an audio capture card includes components for capture and playback functionality, and does not have functions unrelated to audio capture, digitization, or compression on it.  Nor does an audio capture card contain a general purpose processor, such as the SOC.  *See, e.g.*, ActionMedia II Product Brief [161DOC000324] at 1-2 (includes i750 VideoProcessor and audio digital signal processor).  Dr. Schonfeld does not even attempt to explain how these components (and subcomponents), scattered throughout the product with many components between them, form an audio capture card.

535.    The same is true of the components in the accused products that allegedly constitute a "video card having a video capture module."  None of the accused components – a "logic board," "camera sensor(s)," and "application processor Systems-on-Chip (SoC) that includes . . .  a dedicated compression module for performing video compression" – is a video card having a video capture module.  Nor are these components collectively a video card having a video capture module.  *See* Schonfeld Report ¶ 1307.  As discussed above in Section VI.C.1, a video capture card is an optional, add-on component for computers.  It is installed in an expansion slot of the motherboard of a computer and contains all the hardware needed to add specialized functionality to the computer – namely, the ability to capture, digitize, and compress video signals from an analog device and decompress and play those video signals.  A video capture card connects to the motherboard and therefore is a distinct component; it is not also a motherboard.  As shown in the images of video capture cards above, the card adds external connectors to the device to allow connection to the video source device.  In contrast, the accused main logic board of the accused products and the other accused components are not the same

281

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

structure as a video card having a video capture module for the same reasons discussed in

connection with "audio capture card."  Moreover, as discussed in detail above in Section

VI.G.1.b, the accused components are not capable of performing the capture, digitization, and

compression function of a video capture card.  To the extent the image sensor and ███████

are accused of being a video card having a video capture card without the main logic board, they

do not form an audio capture card for the similar reasons:  they are not add-on components, do

not provide the connectors required for video capture, and do not perform the claimed functions

(as discussed in detail below in Section VI.G.1.b).

        536.    The fact that the collection of components are not video capture cards can also be

illustrated by viewing the components.  ████████████████████

██████████████████████████████

██████████████████████████████

███

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION



CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

But again, only a portion of the ▮ is accused – the ▮▮▮▮ which is outlined in

blue below:

User's Manual APL630DEF-WH0001749889] at APL630DEF-WH0001749090.  This

collection of components and portion of the main processor is not a video capture card.  In

284

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

addition to the reasons already discussed, a video capture card includes components for capture and playback functionality, and does not have components unrelated to capture, digitization, and compression on it.  Nor does a video capture card contain a general purpose processor, such as the SOC.  *See, e.g.*, ActionMedia II Product Brief [161DOC000324] at 1-2 (includes i750 VideoProcessor and audio digital signal processor).  Dr. Schonfeld does not even attempt to explain how these components (and subcomponents), scattered throughout the product with many components between them, form a video card having a video capture module.[31]

537.    For each of these reasons, the accused components are not the same structure required by claim 1, namely an audio capture card and a video card having a video capture module.

538.    The accused components are also not structures equivalent to an audio capture card and a video card having a video capture module because they do not perform the identical function of the limitation in substantially the same way as the required structure to achieve substantially the same result.  First, the accused components were not available at the time of the invention.  For example, the technology was not yet available in 1994 to integrate a camera into a handheld device.  *See* Boss 6/19/13 Tr. at 157:25-158:9 ████████████████████

████████████████████████████████████████████████████

Moreover, digital video cameras that compressed video had just been introduced, and also were not yet integrated into computers or handheld devices.  It is my understanding that because the

---

[31] ████████████████████████████████████

285

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

accused products use after-arising technology, they cannot literally infringe, even as equivalent structure.

539.    In addition, for the reasons discussed above in Section VI.G.1.b, the accused components are incapable of performing the identical function of "capturing, digitizing, and compressing at least one composite signal."

540.    Moreover, the accused components do not perform any function in substantially the same way as the audio and video capture cards.  As already discussed, each row of photodetectors in the image sensor captures light that is immediately digitized by each analog-to-digital converter associated with each pixel column.  This process occurs on a rolling basis – that is, a row may be digitizing while the next row is being captured. █████████████████████████████████████████████████████████████████████████

████████ *See* ███ User's Manual APL630DEF-WH0001749889] at APL630DEF-WH0001749920-21 (describing camera subsystem).  Once the data is processed, ███████████ ██████████████████████████████ The microphone captures sound, converts the sound into electrical signals, and sends them to the audio codec to be digitized.  The image sensor and microphone do not capture any kind of analog electrical signal, and none of the components captures a composite signal.  In contrast, the claimed composite signal is captured by connecting a computer to an external video source.  The video and audio capture cards first capture and digitize a complete image (a frame) and associated audio from the analog electrical signal (the composite signal) into random access memory in the computer by the video and audio capture cards, and then compresses the frame of video.  *See, e.g.*, Understanding PC Video (Intel) [161DOC000570] at 6 (describing the process).  These differences are substantial, as shown by the fact that the '239 patent itself discloses both a video camera and the video and audio capture

286

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

cards:  there would be no need to disclose both if they performed the same or equivalent

function.

> b)  *The accused components do not perform the function of*
> *"capturing, digitizing, and compressing at least one composite*
> *signal"*

541.   The accused components in the accused iOS devices do not perform the function

of "capturing, digitizing, and compressing at least one composite signal" because they cannot

capture a composite signal.  A person of ordinary skill in the art would understand "capture" to

mean to receive information as an input into the device.  That is what the patent describes.  For

example, the '239 patent describes the process of "capturing" as receiving a composite signal

into the video capture card and audio capture card in the mobile remote unit "from any device

having the capacity to output a video signal 1, such as a video camera, video cassette

recorder/player, laser disc player, etc."  '239 patent at 4:28-32; *see also id.* at 4:39-40 ("The

video signal input into the remote unit is received by a video card having a video capture module

therein."), 2:59-61 ("In one preferred embodiment, an audio/visual signal is input into the remote

unit from a video camera at a remote location."), 5:44-46 ("An audio capture card installed in the

remote unit captures the audio of an input signal."); *see also* R. Freeman 6/18/13 Tr. at 91:3-11,

94:20-95:19 ██████████████████████████████████████

██████████████████████████).  The input is the composite

signal, which is an analog electrical signal with both video and audio components, such as those

that conform to a standard such as NTSC.  *See* '239 File History, 2/2/96 Amend.

[SAMNDCA630-00832596] at 6 ("The term 'composite signal' is generally known to mean a

signal which includes components such as audio and/or video.  With regard to the present

invention, the composite signal which is captured by the remote unit may have both audio and

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

video components as is commonly known to be a 'composite signal.'"); '239 patent at claim 1 (requiring digitization of the composite signal). The composite signal is an analog electrical signal created and output by the "device having the capacity to output video signal 1," such as the image sensor in the video camera. '239 patent at Abstract ("The audio/visual signal can either be NTSC, PAL, or Y/C."), 2:26-28 ("It is the purpose of the present invention to provide a method and means for capturing full-color, full-motion audio/video signals . . ."), 4:31-34 ("The video signal received by the remote unit can be of any generally known format, such as NTSC, PAL, and Y/C video (or S video)."); Digital Video in the PC Environment (Intel / McGraw-Hill) [161DOC002786] at 21 (discussing composite signal formats NTSC, PAL, and SECAM). That analog electrical signal is received by the video and audio capture cards in the mobile remote unit when the video camera is attached to the unit. As discussed above in Section VI.C.1,  this is how video and audio capture cards work. Dr. Schonfeld agrees with this description. *See* Schonfeld Report ¶ 241 ("When analog video signals are provided, digital video is obtained by using a video capture card that samples and quantizes the analog signal and converts into a digital video signal. The video capture card will then encode the digital video signal into a digital video format.").

542.     But the components in the accused products (the "mobile remote units") that Dr. Schonfeld identifies as performing the claimed function – a microphone, a ██████████████ ████████  or ████████████████████  and main processor ("SoC" or "applications processor") – cannot capture a composite signal, and they do not perform the functions of a video card having a video capture module or an audio capture card. The only accused components that receive any kind of input into the accused device that will eventually become part of a video are the image sensor and the microphone, and neither receives a composite signal

288

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

as input.  A person of ordinary skill in the art would understand that an image sensor receives

light and a microphone receives sound.  As discussed above in Section VI.C.2, an image sensor

has an array of pixels containing photodetectors that samples a scene by scanning the scene and

capturing light, converting the light at each pixel into a voltage representing the pixel value, and

converting the voltage to a digital signal, one row at a time.  7/17/13 Cheng Tr. at 9:14-12:8

███████████████████████████████████████████████████████ 0866 at

2-1 – 2-2, 3-1 ███████████████████████████████████████████

███████████████████████████████████████████████ Sasson

7/31/13 Tr. at 170:13-171:10; Millet Tr. at 14:13-21 (image sensor captures photons of light).

543.    The light and sound received by the accused components are not "composite

signals."  Composite signals are well known.  A "composite signal" is an analog electrical signal

that represents the series of frames that make up a full-motion video, as well as the audio

component.  Known composite signal standard formats are NTSC (National Television System

Committee), which is the analog television standard used in the United States, and PAL (Phase

Alternating Line), which is the analog television standard in other countries.  The patent explains

that the signal received by the audio and video capture cards can be one of these formats or S-

video.  *See, e.g.*, '239 patent at Abstract ("The audio/visual signal can either be NTSC, PAL, or

Y/C."), 2:26-28 ("It is the purpose of the present invention to provide a method and means for

capturing full-color, full-motion audio/video signals . . ."), 4:31-34 ("The video signal received

by the remote unit can be of any generally known format, such as NTSC, PAL, and Y/C video

(or S video).").  *See also* '239 File History, 2/2/96 Affidavit [SAMNDCA630-00832590] ¶ 2

(describing invention as an apparatus that captures, digitizes and compresses a "full motion

composite signal"), claims 1 and 9 (requiring digitization of the composite signal); '239 File

289

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

History, 2/2/96 Affidavit, SAMNDCA630-00832592] at Ex. A ("Remote unit digitizes and

compresses video/audio NTSC signal"), 2/2/96 Amend. at [SAMNDCA630-00832596] at 6

("With regard to the present invention, the composite signal which is captured by the remote unit

may have both audio and video components as is commonly known to be a 'composite signal.'");

Claim Construction Order [Docket No. 447] at 51-52 (requiring composite signal to have both

video and audio components); Microsoft Press Computer Dictionary [APL630DEF-WH-

A0000036852] at 54.  A composite signal is a viewable image output from a video source, such

as a video camera or VCR.  *See* Sasson 7/31/13 Tr. at 165: 7-20, 171:16-172:17; '239 File

History, 5/21/96 Amend. [SAMNDCA630-00832632] at 11 (arguing that real-time capture

includes "capture of a composite signal previously stored").[32]  In contrast, the light received and

output by an image sensor is not a viewable image.  The light is contained in photons, which

become a voltage at each photodiode site that represents a pixel value.  Each row of charges is

converted into a digital stream and sent to the ISP one by one.  At no time during this process is

there ever a viewable frame represented by analog signals.  For audio capture, the microphone

captures the sound accompanying the scene and then converts that sound into electrical signals.

The audio codec then converts the electrical signals to a digital signal.  *See* ███████████

███████████████████████████████████████████████████████████

████████████████.  For these reasons, the function of "capturing" using an image

sensor and a microphone is very different from capturing a composite signal.

---

[32]     The fact that a composite signal represents viewable frames is inherent in the fact that it
is produced by a video camera, VCR, or other video output device.  The inventors also
acknowledged this when stated during prosecution that real-time capture includes "capture of a
composite signal previously stored."  '239 File History, 5/21/96 Amend. [SAMNDCA630-
00832632] at 11.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

544.    It appears that even Dr. Schonfeld agrees with the above description of how

image sensors and microphones work.  *See, e.g.*, Schonfeld Report ¶ 240 ("CMOS image sensors

rely on an active-pixel sensor (APS), formed by ***an array of photodetectors*** and active amplifiers

on an integrated circuit that is typically ***used to capture an image*** one row at a time.  The

electronic circuitry converts the light energy detected into voltage that is then sampled and

quantized to form a digital image.") (emphasis added), ¶ 237 ("Audio data acquisition using a

microphone, which serves as a transducer that converts an acoustic signal conveying sound into

an electrical signal. The essential principle in the design of microphones is the conversion of

mechanical vibration into electrical signals."); *see also* Expert Report of Kenneth A. Parulski

Regarding Infringement of U.S. Patent No. 6,226,449 at 57 (noting "the number of megapixels

used for ***capturing photos*** in the Apple Accused Products, which requires that the product

include an imaging device having at least the number of megapixels listed"), 58 ("Apple

engineer Tim Millet also confirmed that 'the camera sensor is capturing the light, capturing the

image.'").

545.    For each of these reasons, the accused components do not perform the claimed

function and therefore do not infringe claim 1.

c)    *The accused components do not meet this limitation under the
doctrine of equivalents*

546.    The accused components also do not perform the same or substantially the same

function of "capturing, digitizing, and compressing at least one composite signal" under the

doctrine of equivalents.  First, as discussed at length above, the accused image sensors capture

light (photons), and the accused microphone captures sound, neither of which is part of a

composite signal.  The image sensor and microphones cannot capture a composite signal nor do

they create a composite signal.  A composite signal is an analog electrical signal that represents

291

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

viewable video frames output from an analog video source such as a video camera or VCR, whereas no video yet exists when the image sensor and microphone capture photons and sound waves. These differences are substantial, as shown by the fact that the '239 patent itself discloses both a video camera and the video and audio capture cards:  there would be no need to disclose both if they performed the same or equivalent function.

547.    Moreover, for the reasons just discussed in the previous section, the accused components do not perform any function in substantially the same way as the audio and video capture cards or achieve substantially the same result.

548.    In addition, Samsung is estopped from asserting the doctrine of equivalents with respect to FaceTime.  As discussed above in Section VI.D.2, during prosecution, the examiner rejected claim 1 as obvious light of Gattis, Dykes, and Guillou.  Gattis discloses "[a] teleconferencing system include[ing] desktop computers, external cameras and [p]eripheral apparatus to allow interconnection of two or more terminals to engage in teleconferencing via digital data networks."  U.S. Patent No. 5,062,136 ("Gattis") at Abstract.  The "video signal" received by the computer in Gattis is digitized, compressed and transmitted in "a continuous fixed rate binary digital data stream" without creating a data file.  *Id*. at 3:33-44, 5:36-37.  The applicants argued that:

> The Gattis et al ('136) patent lacks a significant element contained within Applicants' independent claims 1 and 12 which is not supplied by Dykes or Guillou. . . . .
>
> Gattis does not contemplate the creation of full-motion composite signal video information into ***digitized files which can be stored, transmitted, played or replayed***.  This is a ***very significant difference***. . . . Thus, Gattis does not disclose the creation of a data file as required by Applicants' claims. . . .  [I]n Applicants' inventions, full motion composite signal ***is captured into digitized files*** and transmitted over narrow (slow) and/or intermittent band

292

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

widths while and still maintaining the original captured quality of
the video.

'239 File History, 2/2/96 Amendment [SAMNDCA630-00832596] at 10-11 (emphasis added).

Through these arguments, the applicants relinquished the ability to assert that at least claim 1

(and its dependent claims) cover any device that does not create a full-motion composite signal

video data file that can be "stored, transmitted, played or replayed," such as the accused Apple

products when running FaceTime.  As discussed in Section VI.F.4, FaceTime creates packets

containing the video frames (or portions thereof) and audio, not files, and discards them

immediately after sending so they cannot be replayed.

> d)    *Dr. Schonfeld has failed to demonstrate that the accused products
> have an "audio capture card and a video card having a video
> capture module" or equivalent structure*

549.    Dr. Schonfeld has failed to identify an audio capture card or a video card having a

video capture module in any of the accused products.  Although he baldly states that "the '239

Accused Products have an audio capture card and video card having a video capture module," he

does not cite any evidence of any such card.  The same is true for the components Dr. Schonfeld

claims are an audio capture card – the main logic board in the accused products, an audio codec

that "interfaces with a microphone," and "various processors (e.g. ARM and DSP)" on the main

processor – and a video card having a video capture card – an image sensor and "dedicated

compression module for performing video compression" on the main processor.[33]  He states that

these components are the required cards, but he does not explain why they are cards, cite any

evidence that they perform the same function as the cards, or even show them.  As an example,

in footnote 78 of his report, Dr. Schonfeld states that he uses the term "application processor

---

[33] It is unclear whether Dr. Schonfeld intends to include a microphone as an accused component.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Systems-on-Chip" to refer to "the Intel or other main processor, in conjunction with with [sic] a graphics unit when configured with that option, for Mac OS X." Dr. Schonfeld never identifies any processor in the Mac computers, never identifies the "graphics unit" in any Mac computer, and never explains how they are purportedly the required cards. Nor could he – the accused components are not cards, as explained above. Moreover, Dr. Schonfeld does not identify any Mac hardware component that performs audio compression. As discussed above, Macs perform audio compression entirely in software.

550.     Rather than limit his analysis to what audio capture cards and video capture cards are and how they operate, Dr. Schonfeld improperly accuses camera and audio components that perform completely different functions – as demonstrated by the fact that the '239 patent discloses both a video camera and capture cards but only describes the cards as performing the capture, digitization, and compression functions. As discussed above in Section VI.C.1 (and as is clear from the patent), the terms "audio capture card" and "video card having a video capture module" refer to well-known, specific components that perform specialized functions, and they are required structure. The terms are not merely labels that they can be applied to any collection of components (or subcomponents).

551.     For similar reasons, Dr. Schonfeld is wrong to equate a main logic board containing or connected to the accused components with the required audio capture card and video card having a video capture module. The main logic board in the accused products contains the main processor – which performs thousands of functions unrelated to producing video – as well as many specialized chips that have nothing to do with video. It is not a specialized, optional card as the required cards are, and it is not removable. For these same

294

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

reasons, the fact that the accused components are either on or connected to the main logic board does not turn the collection of components into a card.

552.    Dr. Schonfeld has also failed to demonstrate that the accused components are equivalent structures to the required cards.  First, Dr. Schonfeld's discussion of this issue consists of five sentences containing nearly identical, conclusory statements that merely repeat the claimed function several times, contains no analysis whatsoever, and misstates how the accused components operate.  I also disagree with his conclusions.

553.    As an initial matter, it is my understanding that Samsung is barred from asserting that the accused components are equivalent structure because the components are after-arising technology.[34]  As discussed above, the accused camera modules and image sensors were not available at the time of the invention, and therefore constitute after-arising technology that cannot literally infringe as equivalent structure.

554.    Nor are Dr. Schonfeld's other assertions correct.  Dr. Schonfeld first asserts that the "'239 Accused Products perform substantially the same function" as the required card.  First, Dr. Schonfeld treats the entire accused device as the structure, rather than just the accused components.  This is improper:  Dr. Schonfeld must identify the purportedly equivalent structure and demonstrate that it is an equivalent.  He has not done so.  Second, it is my understanding that this is the wrong test for showing literal infringement by structural equivalents:  the accused components must perform the identical function.  Dr. Schonfeld has not even attempted to show

---

[34]    The Court recognized this issue in the claim construction order and in the order on Samsung's Motion for Leave to File Amended Infringement Contentions.  *See* Claim Construction Order [Docket No. 447] at 60, n.13; Order re Motion for Leave [Docket No. 636] at 14, n.36 ("The Court notes that . . . [Samsung] does not specify whether it believes the components existed at the time of the patent issuance or are after-arising."), 17, n.44 ("Samsung again fails to explain whether it believes the components were in existence at the time of the patent issuance or were after-arising.").

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

that the accused components perform the identical function as the claimed cards.  Moreover, as

discussed above, the accused components do not perform the identical function as the claimed

cards.  Dr. Schonfeld admits as much in his description of CMOS image sensors and video

capture cards in paragraphs 240 and 241 of his report.

555.    Dr. Schonfeld next asserts in two sentences that the accused components are

insubstantially different from the required cards and perform the claimed function in

substantially the same way as the required cards because "the '239 Accused Products and the

claimed structure capture, digitize, and compress audio and video signals on devices that reside

on at least one card in the mobile remote unit."  Schonfeld Report ¶ 1308 (sentences 2 and 4).

As with his other literal infringement discussion, Dr. Schonfeld provides no explanation or

evidence to support this conclusion.  He does not even assert that the accused *components*

perform the claimed substantially the same way, relying instead on the accused *products*.  I also

disagree with this conclusion.  As discussed at length above in Section G.1.b, the accused

components (and the accused products) do not perform the claimed functions at all, and the

functions Dr. Schonfeld has identified are performed very differently from the functions

performed by required cards.[35]  The accused components perform camera functions – described

above – and do not have the ability to capture a composite signal from an analog video device

and digitize and compress that signal.

556.    Finally, Dr. Schonfeld asserts that "the '239 Accused Products achieve

substantially the same results" because "both the '239 Accused Products and the claimed

structure generate compressed digital audio and video signals in the mobile remote unit."  Again,

---

[35]    As already mentioned, video capture cards do not perform camera functions and audio
capture cards do not perform the functions of a microphone.

296

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Dr. Schonfeld provides no explanation or evidence to support this conclusion.  He is also wrong – as discussed above in Sections VI.C. and VI.G.1b, the accused components capture very different information than the audio capture card and video card having a video capture module, and therefore produce very different results.  Dr. Schonfeld has not shown otherwise.

> *e)*     *Dr. Schonfeld has failed to demonstrate that the accused components perform the function of "capturing, digitizing, and compressing at least one composite signal"*

557.   Dr. Schonfeld has also failed to demonstrate that any accused component performs the identical function of "capturing, digitizing, and compressing at least one composite signal" for several reasons.  First, he has not identified any evidence that contradicts any of the facts discussed above, or cited any evidence that the accused components perform the same "capture" function as the required capture cards.  Indeed, the evidence he cites in other parts of his report supports my opinion, not his.  Dr. Schonfeld even describes the accused image sensor and required video capture card as having different functions and inputs.  Because he admits that the accused components perform functions different from the required components, Dr. Schonfeld cannot demonstrate that the accused products literally infringe claim 1 of the '239 patent.

558.   Dr. Schonfeld's infringement "analysis" for this limitation is fundamentally flawed because he compares the functions of the accused components to the "capture" functions of a video camera – which is disclosed but neither claimed nor described in the patent – rather than the functions that the required video card having a video capture module and audio capture card actually do perform.  *See* '239 patent at 4:28-32, Figure 1; Claim Construction Order [Docket No. 447] at 64.  In other words, he is treating the structure as requiring a video camera while ignoring the capture cards.  This approach is impermissible.  The Court has already

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

construed this limitation to require an audio capture card and a video card having a video capture

module.  Thus, any infringement analysis must compare the accused components to the functions

of the required structure.  But Dr. Schonfeld never even discusses how capture cards perform the

claimed functions.[36]

559.    Dr. Schonfeld also misstates the claimed function when he asserts that "all

handheld devices (including all iPhone, iPad, and iPod Touch devices) and laptop computers

(including MacBook Air and MacBook Pro devices) are mobile remote units that capture,

digitize, and compress,  combined audio and video signals *to form* composite signals."

Schonfeld Report ¶ 1303 (emphasis added).  I disagree:  that is not the claimed function.  Rather,

the claim function is "capturing, digitizing, and compressing *at least one* composite signal."

Because a composite signal that does not already exist cannot be captured, I understand the term

"at least one composite signal" to mean that the composite signal must already have been

formed.  This understanding is consistent with the patent's description of "capturing" as

receiving a composite signal into the mobile remote unit "from any device having the capacity to

output a video signal 1, such as a video camera, video cassette recorder/player, laser disc player,

etc."  '239 patent at 4:28-32; *see also id*. at 4:39-40 ("The video signal input into the remote unit

is received by a video card having a video capture module therein."), 2:59-61 ("In one preferred

embodiment, an audio/visual signal is input into the remote unit from a video camera at a remote

location."), 5:44-46 ("An audio capture card installed in the remote unit captures the audio of an

input signal.").  Moreover, the patent does not describe "forming" a composite signal.  Dr.

---

[36]    Because these components are distinct from a video camera and the video camera is not
part of the required structure that performs the claimed function, the functions of the video
camera are irrelevant.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Schonfeld cannot prove that the accused components perform the claimed function by rewriting

the function.

560.     Dr. Schonfeld has failed to demonstrate that the accused components can capture

a composite signal.  He asserts that "[c]apture and digitization of audio signals in the Accused

Mobile Remote Units is performed by a ███████████████ that interfaces to a

microphone and includes an Analog-to-Digital Converter (ADC)," and that "[c]apture and

digitization of video signals is performed by an ████████ or ███████████ (or CMOS

image sensor) that includes an image array (with sample/hold circuitry) and an Analog-to-Digital

Converter (ADC)."  Schonfeld Report ¶ 1304.  First, Dr. Schonfeld does not describe the "audio

signal" and "video signal" he refers to in these sentences.  To the extent "audio signal" means the

audio portion of the composite signal and "video signal" means the video portion of the

composite signal, I disagree with his statements.  Second, as discussed above in Section

VI.G.1.a, the image sensor captures light and the microphone captures sound waves – as Dr.

Schonfeld himself admits – not a composite signal or any portion of a composite signal.  *See,*

*e.g., id.* ¶¶ 237, 239, 240, 763.

561.     Dr. Schonfeld also misstates the function of the accused components.  For

example, he asserts that "[t]he image sensor for the camera will capture and digitize the video

frame that is recorded, and then the Applications Processor SoC, and in particular a hardware

encoder on that Applications processor SoC will compress the FaceTime video frame."

Schonfeld Report ¶ 509.  This is incorrect.  Unlike a video capture card, the image sensor does

not capture a "video frame that is recorded":  it captures the light representing a scene during

each exposure period.  In addition, Dr. Schonfeld states that "[c]apture and compression" of

audio and video signals "is performed by" the main processor of the accused components.  *Id.* ¶

299

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

1305.  Again, I disagree.  As discussed above, the only components that capture any information that can become part of a video into the device are the image sensor and a microphone, and they are not capable of capturing a composite signal as the claim requires.  The main processor does not receive an analog electrical signal representing the video – i.e., "capture" a "composite signal" – as required by the claim.  To the extent the main processor receives any information that will become part of a video, it is received from another component and it is already digitized.

> f)    *Dr. Schonfeld has failed to rebut Apple's non-infringement contentions or to demonstrate that the accused components meet this limitation under the doctrine of equivalents*

562.    In a section of his report entitled "Apple's Non-Infringement Arguments Do Not Change My Opinions," Dr. Schonfeld purports to rebut Apple's response to Samsung's Interrogatory No. 12, which is Apple's non-infringement contentions in response to Samsung's infringement contentions.  Dr. Schonfeld has failed to rebut Apple's non-infringement contentions.  In many cases, he does not even address Apple's argument, and in others, he mischaracterizes Apple's contention.  For example, Samsung's infringement contentions failed to provide any means-plus-function analysis for the many means-plus-function terms that have not been construed by the Court.  In response to Apple's mention of this issue, Dr. Schonfeld merely says he disagrees and refers to the claim constructions in his report.  *See, e.g.*, Schonfeld Report ¶ 1589 ("I disagree.  Above, I have set forth the proper claim construction for each means plus function term.").  He does the same for many other contentions, such as Samsung's failure to identify any evidence of that the accused components are capture cards and failure to identify an audio capture card or video card having a video capture module in any of its infringement contentions, including those filed after the Court's claim construction requiring this structure.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

*See id*. ¶¶ 1592-95.  Similarly, Dr. Schonfeld repeatedly attempts to attribute arguments to Apple that were actually Samsung's contentions.  *See, e.g.*, Schonfeld Report ¶ 1608 (GPUs in Samsung's contentions but not mentioned in Dr. Schonfeld's report), ¶ 1612 (Samsung's apparent contention that the analog-to-digital converter in the image sensor is a separate device), ¶ 1615 (Samsung's failure to identify any capture cards in the accused products).

563.    In this section, Dr. Schonfeld also repeatedly fails to acknowledge what audio capture cards and video capture cards are – despite having described them, albeit briefly, when describing the art.  For example, in paragraphs 1616 and 1617, Dr. Schonfeld states that "there is nothing in the Court's structure that says that the components are 'add-on components'" or that the structure "must be connected to an 'external device.'"  I disagree – the Court's identification of an audio capture card and a video card having a video capture module requires exactly those characteristics.  As I discussed in detail above in Section VI.C.1, these cards are add-on components that receive input from an external device.  The patent itself describes them in this manner, and Dr. Schonfeld has not identified any evidence to contrary.  Moreover, as described below, Dr. Schonfeld repeatedly argues that the camera can be external to the accused product, but fails to explain how that fact has anything to do with the required cards.  *See, e.g., id*. ¶¶ 1597, 1617, 1619, 1622.

564.    Where Dr. Schonfeld does address Apple's arguments, he fails to rebut those arguments and often contradicts the patent, the file history, the Court's claim construction, and his own report.  Many of Dr. Schonfeld's arguments are also unclear and contradictory.

565.    For example, in response to Apple's argument that the accused components do not perform the identical function of the required capture cards, Dr. Schonfeld first states that the Court already construed the term "capture" and that neither party "asked for a specialized

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

meaning of the term." Schonfeld Report ¶ 1597. Dr. Schonfeld is incorrect: the Court only construed the term "means for capturing, digitizing, and compressing at least one composite signal" and "means for transmitting said composite signal," and did not construe the term "capture."

566.    Moreover, it is unclear what Dr. Schonfeld means by the assertion that "Apple is improperly reading the term 'capture' to cover a 'completely separate' video recording device," nor has Apple made such a statement. *Id.* ¶ 1597. Rather, Apple merely stated what the patent describes and what video and audio capture cards do – capture analog audio and video signals as input *from* a video source such a video camera or VCR. Neither Apple nor I suggest any "specialized meaning" of any term. Apple and I have applied the plain meaning of the term "capture" and the Court's construction requiring an audio capture card and video card having a video capture card to perform the claimed functions. That plain meaning merely reflects how capture cards work, as Dr. Schonfeld has acknowledged. *See* Schonfeld Report ¶¶ 240, 241.

567.    Dr. Schonfeld also asserts that "there is nothing in the claims that prevents the camera and microphone from being external from the remote unit." *Id.* ¶ 1597; *see also id.* ¶ 1617 ("using a camera internal to the remote unit is the same as using a camera external to the remote unit"), ¶ 1622 ("to ever capture video at a remote location, a video camera is necessary at some point otherwise video cannot be received"). Dr. Schonfeld is correct: in fact, an external video camera is what the patent depicts and describes. But it also irrelevant: the Court's construction required an audio capture card and a video card having a video capture module. The video camera – which is disclosed in the fpatent and presumably also has a microphone – is not part of the structure required by the Court's construction to perform the claimed functions. Samsung never requested inclusion of the video camera in the structure, nor does Dr. Schonfeld

302

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

cite anything in the specification or provide any explanation why the video camera (and its

image sensor and microphone) has any relevance to the required structure.  He simply ignores

the required structure and attempts to rewrite the construction to require completely different

components.  It is also unclear how the fact that the patent describes an external camera and

microphone supports Dr. Schonfeld's opinions.  He does not say.

568.    Dr. Schonfeld next asserts that "the image sensor and audio codecs capture the

video from the camera and microphone.  All of these different components are incorporated into

the accused devices but are 'completely separate' components."  Schonfeld Report ¶ 1598; *see

also id*. ¶¶ 1622, 1626.  First, I disagree with the statement that "the image sensor . . . capture[s]

the video from the camera."  The image sensor is not a distinct component from the camera – it

essentially *is* the camera.  The camera module in the accused devices contains a lens and the

image sensor, and the ISP connects to the camera module. ███ User's Manual [APL630DEF-

WH0001749889] at APL630DEF-WH0001750045; iPhone 5 Main Camera MCO [APL630DEF-

WH0008481151] (depicting lens and image sensor in camera).  The image sensor captures light

through the lens.  Even Dr. Schonfeld refers to the image sensor as a "camera sensor" throughout

his report.  Schonfeld Report ¶ 1121 (citing Millet testimony:  "The camera sensor is capturing

the light, capturing the image."), ¶ 1125 ("Millet discussed the image sensor, the image stream

coming from the camera sensor"), ¶ 1304 ("Capture and digitization of video signals is

performed by an ███████ or ████████████ (or CMOS image sensor) that includes an

image array (with sample/hold circuitry) and an Analog-to-Digital Converter (ADC).", ¶ 1307

("the logic board in the '239 Accused Products also contains an ██████ and/or ████████

████████ or CMOS image sensor) that includes an image array (with sample/hold circuitry) and

an Analog-to-Digital Converter (ADC)").  Dr. Schonfeld does not explain how the image sensor

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

can capture from itself.  Second, as discussed above in Sections VI.C. and VI.G.1.a-b, the image

sensor and microphone do not capture video or a composite signal as required by the claim.

Finally, I do not understand the relevance of Dr. Schonfeld's assertion that "[a]ll of these

different components are incorporated into the accused devices but are 'completely separate'

components."  Although Dr. Schonfeld attempts to attribute the phrase "completely separate" to

Apple, Apple made no such assertion.

569.    Dr. Schonfeld next asserts that "to the extent Apple is correct on this argument,

Apple still infringes under the doctrine of equivalents" because "[a] 'completely separate'

recording device, and the accused functionality for purposes of 'receiving an analog audio and

video signal' is substantially the same and any differences are insubstantial."  Schonfeld Report ¶

1599.  Again, I do not understand what Dr. Schonfeld means by this statement.  First, Apple has

never argued that a "completely separate recording device" is part of the claim.  Second, the

structure required by the Court's claim construction is an audio capture card and a video card

having a video capture module to perform the claimed function.  For this reason, to the extent

that Dr. Schonfeld is comparing the accused components to an image sensor and microphone in a

video camera – as the last sentence in paragraph 1599 suggests – that comparison is irrelevant

because the video camera is not part of the structure.[37]  Dr. Schonfeld reasserts similar arguments

in paragraphs 1607, 1619, 1620, 1622, 1624, 1625, and 1626, and my response is the same.

570.    To the extent that Dr. Schonfeld is comparing the accused components to the

required audio capture card and video card having a video capture module in paragraph 1599, he

---

[37]    Dr. Schonfeld's apparent attempt to incorporate the image sensor and microphone from
video camera into the structure also fails because other devices that do not have these
components are also described in the patent, including a VCR and laser disc player.  *See* '239
patent at 4:28-31.

304

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

has failed to demonstrate that the accused components meet this limitation under the doctrine of

equivalents.  First, Dr. Schonfeld's "analysis" has several errors and omissions.  He first asserts

that "both perform substantially the same function of receiving the video and audio signals from

a recording device."  I disagree.  The image sensor and microphone capture light and sound from

a live scene, not from any recording device.  For this same reason, his statement that "the image

sensors use a CMOS sensor to capture the video from an analog signal" is incorrect.  Dr.

Schonfeld also asserts that the result is that "the accused devices captures the video that is taken"

but fails to explain how the ***accused components*** compare to the required structure.  Nor does

Dr. Schonfeld explain how the accused components capture the "composite signal," a claim term

that he does not mention.  Finally, his statement that "the only difference for the purposes of

Apple's argument is whether the video camera or microphone are part of the remote unit or

external to the remote unit" makes no sense, and is irrelevant to the question of the whether the

accused components are equivalent to the required capture cards.  Second, for the reasons

discussed above in Section VI.G.1.a-b, the accused components do not meet this limitation under

the doctrine of equivalents.

571.    With respect to the term "composite signal," Dr. Schonfeld again asserts that the

Court has already construed the term and that Apple is offering a specialized construction.

Schonfeld Report ¶¶ 1601-04.  Neither assertion is correct.  As discussed above, "composite

signal" is a well-known concept.  A composite signal is an analog electrical signal with both

video and audio components, such as those that conform to a standard such as NTSC.  '239 File

History, 2/2/96 Amend. [SAMNDCA630-00832596] at 6 ("The term 'composite signal' is

generally known to mean a signal which includes components such as audio and/or video.  With

regard to the present invention, the composite signal which is captured by the remote unit may

have both audio and video components as is commonly known to be a 'composite signal.'").

Composite signals are output by video devices such as video cameras and VCRs, and are viewable images.  Notably, Dr. Schonfeld does not explain what he understands the term "composite signal" to mean.

572.    Dr. Schonfeld next asserts that "Apple infringes the patent literally" because "[t]he image sensor transforms light into a series of electrons. [T]his voltage is an analog signal representating [sic] the video that is then passed through an analog to digital converter and digitized into a digital signal."  Schonfeld Report ¶ 1606.  Dr. Schonfeld is incorrect.  First, there is no single voltage that represents the video.  As discussed above, each photodiode contains a voltage representing a pixel value.  In addition, I disagree with Dr. Schonfeld's conclusion for the reasons discussed throughout this report.  In fact, Dr. Schonfeld does not even mention any of the required components of the analysis, including "composite signal," audio capture card, or video card having a video capture module, much less explain how they exist in the accused products.

573.    In paragraph 1606, Dr. Schonfeld asserts:

> Moreover, even if Apple's arguments are found to be correct, Apple still infringes under the doctrine of equivalents. The functionality of the accused products is substantially the same as the claim and there are no insubstantial differences. Both the Accused functionality and the claim describes the same function of capturing a video signal from a camera. Both the Accused Functionality and the claim perform this function in the same way. Namely, they receive a digital signal recorded by a camera, and capture and digitize that signal. Finally, they both have the same result. The video signal is captured and digitized by both the Accused Products and the claim such that it can be compressed.

But Dr. Schonfeld provides no analysis or support whatsoever for his assertions.  He does not even identify the accused components, referring instead to "accused products," "accused

306

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

functionality," and "they."  And again, Dr. Schonfeld does not even mention any of the required components of the analysis, including "composite signal," audio capture card, or video card having a video capture module, much less explain how they exist in the accused products.  It is impossible to know what Dr. Schonfeld is comparing.  In any event, I disagree with Dr. Schonfeld's conclusions.  As already discussed, the accused components do not "receive a digital signal recorded by a camera."  Moreover, the accused components do not infringe under the doctrine of equivalents, as discussed in Section VI.G.1.C.  For these same reasons, Dr. Schonfeld has failed to demonstrate that the accused components infringe under the doctrine of equivalents in paragraphs 1611, 1614, 1619, 1620, 1624, 1625, and 1626.

574.    In paragraph 1610, Dr. Schonfeld argues that the term "composite signal" does not require "a combined video and audio signal" because "this is inapposite to the definition provided by the Applicant during prosecution" and "contradicted by the Court's construction of the structure for the term."  According to Dr. Schonfeld, "the audio and video necessarily will have to be separated into its audio and video components."  I disagree.  First, the applicants actually confirmed during prosecution that a composite signal could have both audio and video components when they argued that with regard to the present invention, the composite signal which is captured by the remote unit may have both audio and video components as is commonly known to be a 'composite signal.'"  *See* '239 File History, 2/2/96 Amend. [SAMNDCA630-00832596] at 6.  Second, although the Court did not construe the term "composite signal," the Court expressly rejected Samsung's argument that the composite signal need only contain audio *or* video.  Claim Construction Order [Docket No. 447] at 51.  Finally, there is nothing in the Court's identification of required structure that requires two separate cards, as Dr. Schonfeld states.  In fact, it was known in the art at the time of the invention that a single capture card (such

307

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

as an ActionMedia II Capture Module, discussed above in Section VI.C.1,) could capture both video and audio signals. In any event, even if Dr. Schonfeld is correct that the Court's construction requires two separate cards, he has still failed to prove infringement by the accused components for the same reasons already discussed. In fact, Dr. Schonfeld does not even identify two distinct sets of components – he identifies the main logic board for both cards in the structure.

575.     In paragraph 1612, Dr. Schonfeld argues that the input signal does not need to be analog because "[t]he plain meaning of [the claimed] function does not even require an analog signal – only that the signal is 'digitized' . . . ." I disagree. First, Dr. Schonfeld misquotes the claim: the claim requires the function of "digiti*zing*," not the end result of a digitized signal. There is no need to digitize a signal that is not analog. Second, Dr. Schonfeld again ignores the term "composite signal," which is an analog signal, as explained above. As with most of his opinions, Dr. Schonfeld never explains the meaning of this term. Dr. Schonfeld then argues that the "voltage captured by the image sensor is a[n] analog signal." I disagree: the image sensor captures light, and converts the light in each pixel into a voltage representing the pixel value, as discussed above.

576.     In paragraph 1620, Dr. Schonfeld attempts to argue that the accused components were in existence at the time of the alleged invention, but at the same time admits that "the components in the Apple devices were not around in their current and exact form." Dr. Schonfeld is correct. As Dr. Schonfeld states, "technology advances, and the reduction in cost for components such as those now permit them to be mass produced and used in small devices such as the accused products." Technology advances and resource expenditures that permitted the development of the cameraphone were substantial, as evidenced by the fact that the first

308

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

cameraphone was sold in 2000, years after the purported invention.  Moreover, merely shrinking an image sensor and a system-on-a-chip is not sufficient to create the accused products.  Each component must be designed to work with each, and integrated a fully-functional handheld or table smartphone system.  All these technologies arose long after the purported invention of the '239 patent.[38]

577.    Finally, Dr. Schonfeld advances numerous arguments that Samsung is not estopped from asserting the doctrine of equivalents against FaceTime by the applicants' arguments during prosecution of the '239 patent.  I disagree with his arguments.

578.    First, Dr. Schonfeld asserts that FaceTime stores a file by "storing video frame data prior to transmission."  Schonfeld Report ¶ 1628.  Dr. Schonfeld is incorrect:  as discussed in Section VI.F.4, FaceTime packetizes the video and audio frames, but never creates or stores a file.  FaceTime has no need to store a file because the packets are discarded after transmission.  Dr. Schonfeld has not provided any evidence to the contrary.

579.    Second, Dr. Schonfeld argues that the "the Applicants did not relinquish storing the file in a buffer" and that the quote Apple identified "does not use the word memory or buffer, or files."  Schonfeld Report ¶ 1629.  Again, Dr. Schonfeld is incorrect.  The Applicants argued to the examiner "Gattis does not contemplate the creation of full-motion composite signal video information ***into digitized files*** which can be stored, transmitted, played or replayed.  This is a very significant difference. . . . ***[I]n Applicants' invention***, full-motion composite signal is captured ***into digitized files*** . . . ."  '239 File History, 2/2/96 Amend. [SAMNDCA630-00832596] at 10-11 (emphasis added).  In the next amendment, the applicants again argued that

---

[38]    The web site that Dr. Schonfeld cites in support of his assertion that a system-on-a-chip existed at the time of the invention is for a watch.  He does not explain how this cite supports his argument.

"*[t]he present invention* includes an apparatus capable of capturing a full-color, full motion composite signal in real time; digitizing that composite signal *into a data file*; compressing *the data* file and transmitting it through a computer interface via telephone lines, cellular, radio, and other telemetric frequencies from a remote unit to a host unit." '239 File History, 5/20/96 Amend. [SAMNDCA630-00832632] at 9 (emphasis added).  It is unclear why Dr. Schonfeld asserts that the quotes do not use the term "files."  In fact, in the same paragraph, Dr. Schonfeld states that "[a]s the Applicants stated, the invention captured full video frames that were ultimately saved into files."  In short, Dr. Schonfeld admits that any accused product (like FaceTime) that does not store in a data file cannot meet  this limitation.  As explained in Section VI.F.4, FaceTime does not store a data file.

### 2.    "means for storing said composite signal" (claim 1)

580.    The parties agree that the function of this limitation is "storing said composite signal."  In addition, under Apple's construction, the required structure is a hard disk drive and the software identified at 3:1-5, 4:52-57, and 6:14-16 in the '239 patent.  Under Samsung's construction, the required structure is "memory, such as a hard disk or random access memory." Schonfeld Report ¶ 1310.

581.    For the reasons discussed below, it is my opinion that the accused components identified by Dr. Schonfeld – "DDR SDRAM as well as a NAND flash memory" – do not satisfy this limitation, either literally or under the doctrine of equivalents.  Schonfeld Report ¶ 1312.

>    a)    *The accused components are not hard disk drives, literally or under the doctrine of equivalents*

582.    The accused DDR SDRAM and NAND flash memory are not hard disks, nor do any of the accused iOS devices contain a hard disk.  Rather, all the accused iOS devices use a NAND flash memory.  There is no hard disk listed in the Bills of Materials for any iOS device.

310

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

b) *The accused components do not have software performing a
software sequence of initializing one or more communications
ports on the remote unit, obtaining the stored data file, and
transmitting the stored data file.*

601.    In several paragraphs, Dr. Schonfeld purports to "identify" "specific software corresponding to the software structural limitations" required by the Court, namely, initializing one or more communications ports on the remote unit, obtaining the stored data file, and transmitting the stored data file.  I have organized the source code that Dr. Schonfeld identifies in the following three categories, each of which I will discuss in turn:

- Shared Operating System Code (such as ██████████ for iOS)

- FaceTime (for iOS or OS X)

- iOS Mail or iOS Messages

602.    Dr. Schonfeld has failed to illustrate that the accused products meet this software structure.  As discussed below, Dr. Schonfeld's "analysis" of the source code he cites is both superficial and inaccurate.

(i)    Initializing One or More Communications Ports on the
Remote Unit

603.    The "communications port" in the required structure is a physical hardware port on the remote unit (a personal computer) that connects the modem to the remote unit.  Dr. Schonfeld agrees that "port" "refers to the physical outlet used to connect cords and plugs to computer devices," and asserts that the accused products have a "number of hardware ports through which the communications occur."  Schonfeld Report ¶¶ 245, 1549.  But he fails to identify any such port for transmitting a composite signal.  For example, Dr. Schonfeld asserts that "there is a port between the applications processor and the baseband processor, and another port between the applications processor and the Wi-Fi chip," but does not identify any evidence

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

that any connections between these components are "ports."  Under his own definition, they are

not:  they do not provide a physical outlet or an interface to any external device.  Instead, these

are internal connections between different chips within the accused products.  Indeed, in other

parts of his report, he calls these very same connections "wires and busses."  *See, e.g., id.* ¶ 1547.

He similarly fails to provide any evidence that "there is a port on the remote unit where the

modulated data is transmitted through the antenna" which "must also be initialized before

transmission can occur," or that "[t]he baseband processor port or Wi-Fi chip port is initialized

when a connection is made via the ███████████████."[44]

604.    Nor has Dr. Schonfeld identified any software that initializes these alleged

"ports."  Dr. Schonfeld claims to identify "specific software corresponding to the software

structural limitation for 'initializing one or more ports on the mobile remote unit.'"  In the

infrastructure analysis section, he identifies two groups of software:  (1) ████████████

████████████████████ and (2) ████████████████████

████████████ Schonfeld Report ¶¶ 1325-26.  In the source code section, he identifies (3)

████████████████████ *id.* ¶ 1548, and (4) ████████████████

████████████████████████ *id.* ¶¶ 1550-54.  As

discussed in detail below, none of the source code identified by Dr. Schonfeld contains

---

[44]      In paragraph 1650 of his report, Dr. Schonfeld asserts that the structure required by the
Court "does not necessarily include (nor does it disclaim) a communications port as part of the
structure."  I disagree.  The Court required that the software initialize "one or more
communications ports on the remote unit."  I also disagree with Dr. Schonfeld's assertion that
Apple wants to reconstrue the Court's construction to add connections to the communications
port. Schonfeld Report ¶ 1647.  Apple has made no such argument.  The Court has already
implicitly required these connections with the "one or more modems" and "one or more
communications ports" language, as well as the required software.  The number of ports
correspond to the number of modems, and there would be no need to initialize the ports if the
modems were not connected to them.

321

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

operates according to the 802.11 specification, which allows multiple users in the network to use the wireless channel at one time.

640.   The accused baseband chip is not structurally equivalent to the required modem. The baseband processor in the accused devices uses the data services (as opposed to voice) of the cellular network to send data such as video.  The modems described in the '239 patent, however, modulate the digital video data so that it can be transmitted over the voice frequencies in telephone lines and cellular networks available at the time.  These differences are substantial, as evidence by the number of years that were required to develop and implement cellular data services that were capable of reliably handling high data throughput required by uses such as video calls.

641.   For each of the above reasons, the accused components do not literally meet this limitation.

> c)   *The accused devices do not infringe under the doctrine of equivalents*

642.   For the reasons discussed above, the accused hardware components are not equivalent to the required structure.

643.   FaceTime's ███████████ is also not equivalent to transmission of a data file, as Dr. Schonfeld asserts.  Schonfeld Report ¶ 1656.  FaceTime's ███████████ does not perform substantially the same function of "transmitting said composite signal."   FaceTime ████████████████████████████████████████████████████████ ██████████████████████████.  FaceTime's ███████████ also does not accomplish that function in substantially the same way.  As the inventors' explained, a data file can be "*stored, transmitted, played or replayed.*"  '239 File History, Feb. 2. 1996 Amend. [SAMNDCA630-00832500] at 12.  ████████████████████████████████

335

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████ .

Finally, the result is different.  As discussed above in Section VI.D.4, the patent explains that

"[t]he remote unit is capable of storing and displaying up to eight (8) bit map files."  '239 patent

at 5:29-31.  This description is consistent with the inventors' description of their invention

during prosecution when they sought to overcome the examiner's rejection of the claim based on

videoconferencing prior art.  But FaceTime cannot operate in this manner.  It does not store

video in a data file, and therefore there is no way for up to eight separate videos to co-exist at

one time and to be viewable, as the patent describes.  A person of ordinary skill in the art would

understand that creating a data file for storage is very different than buffering data for a video

call.  A video of a scene is recorded precisely to preserve it for later use, whereas the purpose of

a video call is for short term, two-way communications (just like a telephone call), not for

memorializing a scene.  Once the call ends, there is no video and therefore no memorialization of

the call.

644.    In addition, as explained above in section VI.D.3, Samsung is estopped from

asserting the doctrine of equivalents over FaceTime because of the named inventors' arguments

to overcome the videoconferencing system of Gattis.

645.    For each of these reasons, the accused components do not satisfy this limitation

under the doctrine of equivalents.

### 4.    "a host unit"

646.    Dr. Schonfeld has failed to identify a "host unit" in any of the accused products.

In paragraph 1344, Dr. Schonfeld merely asserts that "all of the '239 Accused Products are host

units because they can and are used to receive signals from mobile remote units."  This is

# Exhibit 16

REDACTED VERSION OF DOCUMENT
SOUGHT TO BE SEALED

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| APPLE INC., a California corporation, | |
| Plaintiff, | |
| vs. | Civil Action No. 12-CV-00630-LHK |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity, SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Defendants. | |
| | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity, SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Counterclaim-Plaintiffs, | |
| v. | |
| APPLE INC., a California corporation, | |
| Counterclaim-Defendant. | |

**EXPERT REPORT OF JAMES A. STORER, PH.D.
REGARDING INVALIDITY OF THE ASSERTED CLAIMS OF
U.S. PATENT NOS. 5,579,239 AND 6,226,449**

**VOLUME I**

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

installed and used most of these components in the computers I have used over the years both

personally and in my research.

### 2. Video Cards and Video Cards with Capture Modules

584. The use of multimedia (such as audio or video) on personal computers was

popular with computer users for many years prior to the alleged invention of the '239 patent.

Access to multimedia on personal computers became simpler with introduction of lower-cost

video cards, both with and without capture modules, in the early 1990s.  One example of a video

card with a video capture module (which I will occasionally refer to as a "video capture card") is

the ActionMedia II Delivery Board with Capture Module ("ActionMedia II") marketed by

Intel/IBM.  *See*, *e.g.*, ActionMedia Product Delivery Brief [SAMNDCA630-00831231];

ActionMedia II Product Brief [SAMNDCA630-00830181] at SAMNDCA630-00830186-187.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ ; *see also* '239 patent at 4:40-41 (describing a video capture card

"available commercially from Intel/IBM" that performs video capture, digitization, and

compression). ████████████████████████████████████████████████

██████████████████████ *See* RT Video Developer's Kit Product Brief [SAMNDCA630-

00831185] at SAMNDCA630-00831193; ████████████████████████████████

585. Even short videos can be quite large in size when uncompressed, and at the time

of the alleged '239 invention, the storage capacity of the hard disk drives on computers and other

media was relatively limited, making storage of uncompressed full-motion videos impractical.

*See, e.g.*, DVI Article [SAMNDCA630-00830339] at 5 ("Quantifying and storing complex

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

analog information with any degree of fidelity quickly snowballs into a Herculean ordeal.

Digitizing a mere 30 seconds of video, for example, piles up more than 600 megabytes of digital

information – more than most computer hard drives can store.")   Moreover, transmission of a

larger data file required a much longer transmission time, which was exacerbated by the low

bandwidths of the frequencies and modem speeds available at the time.  *See, e.g.*, '239 patent at

5:47-51; Sasson 7/31/13 Tr. at 93:17-94:18.  Thus, compression of video was critical.  Video

signals generated by external recording devices such as video cameras were also analog, whereas

a computer generally only handled digital data.  For this reason, importing video to a computer

required digitization of the video.

586.    Video capture cards were used for both of these tasks.  A user could attach a

standard cable between the computer and a video input device, such as a video camera or VCR,

to provide a composite signal to his or her computer.  Then, using available software compatible

with the video capture card, the user could operate the computer to capture a video from the

external input device and then digitize and compress it into a video data file, which is then stored

on the computer's hard disk.  I have used video capture cards similar to those discussed in this

report to perform video capture in my research.  *See, e.g.*, '239 patent at 4:28-6:35.  The video

data file can then be edited or decompressed and played back by the cards.  *See, e.g.*, '239 patent

at 12:28-42.  One example of third-party software used to accomplish these tasks is Microsoft's

Video For Windows software application, which is mentioned in the '239 patent for this purpose.

*See, e.g., id.* at 4:41-45; *see also* Video for Windows Manual [APL630DEF-WH-A0000004783].

Popular video data file formats at that time included AVI, MPEG, and QuickTime.  Both the

ActionMedia II and the RT Video video capture cards used Video for Windows for capturing

and compressing video from an external video camera or VCR.  *See, e.g.*, Intel Indeo Video

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Brochure [SAMNDCA630-00831209] at SAMNDCA630-00831213-15; RT Video

[SAMNDCA630-00831185] at SAMNDCA630-00831193.

587.    This combination of video capture card and Video for Windows could capture and

compress video in "real time" – in other words, as the video is captured and digitized, it is

immediately compressed without being stored between the two steps.  *See, e.g.*, Product

Brochures [SAMNDCA630-00831185] at SAMNDCA630-00831193 ("[T]he RT Video

Developer's Kit compresses full-motion video at 30 frames-per-second (fps) in real-time – while

it is being captured.  No additional compression and storage step is required."), SAMNDCA630-

00831229-35 (ActionMedia II), SAMNDCA630-00831213 (Indeo Video component of Video

for Windows).  Previous technology required a two-step process in which the computer would

capture and store an uncompressed video data file, and then would compress the stored video

data file into smaller size.  Due to the small size of standard hard disks at that time, the computer

would be limited in how much video it could capture by the size of the uncompressed video data

file.  Single-step capture and compression avoided the bottle neck caused by the uncompressed

video and allowed the computer to more effectively use storage space.

588.    These cards were also used for video playback.  *See, e.g.*, ActionMedia Product

Delivery Brief [SAMNDCA630-00831185] at SAMNDCA630-00831205 ("The ActionMedia II

Delivery Board is used in both development and playback systems, and may be used alone if

audio and video capture are not required as part of the application.").  For playback, the card

would decompress the digitized, compressed video data, convert it to an analog signal, and play

the video on the computer's monitor.  *See id.* ("The i750 Video Processor [on the board]

performs compression and decompression, manipulates digital video data, and handles screen

control functions, all in real time.").  A user who wanted to playback video but did not need the

306

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

ability to capture video could purchase the card without the video capture module.  *Id.*

(describing the capture module as optional).

589.    The composite signals captured by video capture cards were well-known to

persons of ordinary skill in the art.  Composite signals are analog amplitude-time representations

of the signal produced by a television camera, the camera-control unit, the sync generator, and

for color operation, the color encoder.  *See* Television Engineering Handbook [APL630DEF-

WH-A0000036679] at APL630DEF-WH-A0000036689.  The composite signal therefore

includes information related to the image and synchronization information that is used to

determine the start and stop of a frame.  Therefore, a composite signal is full-motion analog

video information that includes audio.  A well-known example of a composite signal cited in the

'239 patent is an NTSC (National Television System Committee) signal.  *See, e.g.*, '239 patent at

Abstract, 4:31-33, 12:51-60.  NTSC is a long-standing standard for television broadcast signals.

Video cameras and VCRs could output NTSC signals.  *See* Experimental Evaluation of a Video

Capture Board (2/93) [APL630DEF-WH-A0000032228] at 7, n.2 ("A[n] NTSC video output is

available from any commercial video camera or VCR.").

590.    Video capture cards generally include hardware blocks designed to capture,

digitize, and compress composite signals.  As shown below, a typical video capture card has the

following basic blocks: an analog-to-digital converter (ADC), buffering, logic to control

sampling and synchronization, a bus or network interface, compression.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION



Figure 1: Video Board Block Diagram

*Id*. at 6, Figure 1.  The sampling and synchronization logic reads the synchronization information in the composite signal to determine when to sample the signal.  *Id*. at 8-9.

591.    By the time of the alleged '239 invention, compression methods for images, video, and audio were known.  For example, the first JPEG standard was published in 1992.  That standard, which is based on the Discrete Cosine Transform ("DCT") algorithm, had been in development and was known years before its publication.  In fact, the Kodak SV9600 (described more fully below) used DCT in the 1980s, and the description of the compression algorithm in the 1989 Hadley article (also described below) about the SV9600 essentially describes JPEG and would be easily recognized as such by one of ordinary skill in the art at the time.  The basic idea of DCT followed by quantization follow by the zig-zag followed by run-length / Huffman coding was the most prominent approach in the late 1980s to early 1990s.  ActionMedia II used JPEG and other video compression algorithms, and could be used to create AVI video files.  *See, e.g.*,

308

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

ActionMedia II SDK Product Brief [SAMNDCA630-00831233] at SAMNDCA630-00831235

("Multiple video compression algorithms:  PLV 2.0, RTV 2.0, JPEG, PIC 2.0"); ]; Microsoft

Video For Windows Manual [APL630DEF-WH-A000004783] at 3-43 (specifying Indeo

compressor for use with ActionMedia II), 3-48 (files saved in AVI format); Indeo Brochure

[SAMNDCA630-00831209] at SAMNDCA630-00831213 ("Uses standard AVI file format).

ActionMedia II also used PCM and ADPCM to compress audio and stored the audio with the

video in the AVI file.  *See, e.g.,* ActionMedia II SDK Product Brief [SAMNDCA630-00831233]

at SAMNDCA630-00831235 ("Multiple audio algorithms:  PCM (stereo and mono), ADPCM").

592.    Video cards with capture modules were widely available in the early 1990s, and

persons of ordinary skill in the art were well aware of their existence.  For example, in addition

to the articles cited above, the article "Microsoft Goes Hollywood with Video for Windows"

describes the Video for Windows software package and discloses the use of the ActionMedia II

board to "accept and capture an analog video signal from a camcorder, VCR, or laserdisk

player."  Microsoft Goes Hollywood (Jan. 12, 1993) [APL630DEF-WH-A0000020896] at 38.

The article states that the ActionMedia II card with capture module allows a user to "capture

video in real time."  *Id.*  Another article, "ShareView Transforms Phones," describes a video

telephony system that "operates over analog telephone lines."  ShareView Transforms Phones

(Feb. 1, 1993) [APL630DEF-WH-A0000020907] at APL630DEF-WH-A0000020908.  The

ShareView system described in the article includes a "video capture and video codec card, and

an audio and data communications card."  *Id.*  Many other video capture cards were available on

the market.  For instance, the Video Blaster by Creative Labs provided users the ability to

connect a VCR or camcorder to a personal computer, and save the captured video to the hard

drive.  *See, e.g.*, Multimedia PC (Feb. 1993) [APL630DEF-WH-A0000032199] at 94.

309

VideoSpigot—another video capture card—offered similar capabilities as the Video Blaster and ActionMedia II cards.  VideoSpigot allowed users to "capture digital motion video" by "hook[ing] up to a VCR, laserdisc player, or camcorder."  VideoSpigot Pours Full-Motion Video Into Your PC (January 26, 1993) [APL630DEF-WH-A0000032317] at 50.  Numerous other video capture cards were available in the early 1990s.  *See* Multimedia Madness (1994) [APL630DEF-WH-A00000032371] at APL630DEF-WH-A00000032410-17 (describing various video capture cards), APL630DEF-WH-A00000032457-483 (same).

593.    I understand that the inventors' own files included multiple examples of publicly available video capture cards in addition to ActionMedia II, including VideoLinx: NTSC Video Display and Capture Card [SAMNDCA630-00829683–84], M&M Pro [SAMNDCA630-00829773], Ventek Model VIP 630C Color Video Image Processor [SAMNDCA630-00829896–97], SuperVIA [SAMNDCA630-00829903], SNAPPlus Video Capture Card [SAMNDCA630-00831388], Pro Movie Spectrum Video Capture Card [SAMNDCA630-00831474–79], D/VISION DVI Capture System [SAMNDCA630-00831505-16], D/VISION PRO Capture System [SAMNDCA630-00831578], Intel Smart Video Recorder [SAMNDCA630-00832153–59, SAMNDCA630-00831775–76], MegaMotion Video Capture Card [SAMNDCA630-00831864], and QuickVia Digital Video Recorder [SAMNDCA630-00832131–32].

### 3.    JPEG Compression

594.    Digital images may be represented by an array of "picture elements," or "pixels."  Pictures taken by a digital camera may store images with millions of pixels. In the mid-1990s when digital cameras first started having significant consumer use, it was typical to acquire images on the order of a digital VGA resolution of 480 x 640 pixels, 3 bytes per pixel (for each

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

### 4.    Audio Cards and Audio Capture Cards

603.    Like video capture cards, audio cards and audio capture cards were popular add-on components for personal computers in the early 1990s.  Such cards were widely available, and easy to install.  For instance, the article "Dedicated and Programmable ICs Tackle Low-Cost Audio" describes numerous audio capture cards.  *See* EDN (June 17, 1993) [APL630DEF-WH-A0000032204].  The article "Fast Windows, Part III: Ease into Multimedia Excitement" describes the Sound Blaster Pro audio card, an audio capture card that could be installed in a PC. *See* Computer Shopper (Jan. 1, 1993) [APL630DEF-WH-A0000032263] at APL630DEF-WH-A0000032264.  Audio capture cards allowed a computer to receive analog audio signals from an external source, and digitize, compress, and store those signals into digital files.  *See* Multimedia Madness (1994) [APL630DEF-WH-A00000032371] at APL630DEF-WH-A00000032373-83 (describing the capabilities of sound cards, and in particular describing the Roland SCC-1, Turtle Beach MultiSound, Pro Audio Spectrum, Media Vision Audioport, Thunderboard, and Sound Blaster Family), APL630DEF-WH-A00000032437-56 (describing various sound cards).

604.    Audio capture cards were frequently combined with video capture cards to create video data files with audio.  Indeed, many video capture cards either suggested or required such additional audio capture cards to provide sound for the captured movies.  *See, e.g.*, Video for Windows takes on QuickTime (Feb. 1 1993) [APL630DEF-WH-A0000032359] ("Minimum hardware requirements are a 386 PC, VGA graphics, a multimedia PC-compliant audio board, and a big hard disk or CD-ROM drive."); Ready for Action: Five Video-Capture Boards Bring Motion Video to Your PC (Feb. 1 1994) [APL630DEF-WH-A0000032339] at APL630DEF-WH-A0000032348 ("Remember that your PC will need a sound card in order to capture the audio from your camcorder, since most entry-level video-capture cards lack this capability.");

313

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Fast Windows, part III: Ease into Multimedia Excitement [APL630DEF-WH-A0000032263] at APL630DEF-WH-A0000032265 ("Once you have your sound card in, you're primed for a video capture card like Creative Labs' Video Blaster.").  Other manufactures sold combination video and audio capture cards that could perform both functions.  *See, e.g.*, CEI's Video Clipper makes video and audio capture smooth sailing (Sept. 1, 1993) [APL630DEF-WH-A000032196-97] ("Video Clipper offers three input sockets, each of which accepts stereo audio and video signals from a video cassette recorder, videodisc player, or camcorder.").  Such video data files with audio could be manipulated in the same way as any type of data file on a computer.  The ActionMedia II card discussed above was another such combination card.  *See, e.g.*, ActionMedia II Product Brief [SAMNDCA630-00831185] at SAMNDCA630-00831231.

605.    As with video cards, audio cards could be purchased without the audio capture capability and used for playback only.  These cards decompressed the digital audio, converted it to analog signal, and played the audio through the speakers on the computer.  *See, e.g.*, ActionMedia Product Delivery Brief [SAMNDCA630-00831185] at SAMNDCA630-00831205 ("Simultaneous playback of video . . . and accompanying audio").

### 5.    Modems

606.    Modems, including cellular modems, were widely available on the market in the early 1990s.  For instance, I understand that the named inventors of the '239 patent had within their files a pamphlet for the ZyXEL modem with cellular options.  *See* ZyXel U-1496 Portable Modem/Fax with Cellular Capabilities [SAMNDCA630-008313810–11] (describing the ZyXEL U-1496P).  The ZyXEL modem was available prior to the alleged invention of the '239 patent. *See, e.g.*, Data Packets, Network World (Nov. 16, 1992) [APL630DEF-WH-A0000020603] at APL630DEF-WH-A0000020604 ("The ZyXEL cellular modem is available now as a $200

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

system for electronically transmitting and receiving NTSC-quality color video images using the public dial-up telephone network." *Id*.



639.    According to the Hadley article, the video input "can be any source of NTSC composite or RGB video in still or motion form" and the video output "can be connected to any device that accepts NTSC composite or RGB video." *Id*.

640.    The figure on page 239 of the Hadley article, reproduced below, is a block diagram of the hardware components of the system. *Id*. at 239.

