# EXHIBIT 6

**REDACTED VERSION**

**OF DOCUMENT SOUGHT TO BE**

**SEALED**

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | | |
|---|---|---|
| APPLE INC., a California corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 12-CV-00630-LHK |
| v. | ) | |
| | ) | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity, SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |
| _____ | ) | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity, SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | ) ) ) ) ) ) ) | |
| Counterclaim-Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| APPLE INC., a California corporation, | ) | |
| | ) | |
| Counterclaim-Defendant. | ) | |
| _____ | | |

**EXPERT REPORT OF DR. THOMAS E. FUJA**
**REGARDING NON-INFRINGEMENT OF U.S. PATENT NOS. 7,756,087 AND 7,551,596**

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

**D.    Asserted Claims**

114.    Dr. Min opines that the Accused Products infringe claims 1 and 13.

**1.    Claim 1**

115.    Claim 1 is directed to a particular process for forming a PDU transmitted to a

Node B.  The claim provides:

> A method for transmitting control information for an uplink packet
> data service in a mobile communication system, the method
> comprising the steps of:
>
> [a] forming a first protocol data unit (PDU) including uplink
> packet data;
>
> [b] forming a control service data unit (SDU) including control
> information for an uplink packet data service;
>
> [c] forming at least one first header part corresponding to the first
> PDU by using a data description indicator (DDI) field representing
> the first PDU and an N field representing the number of uplink
> packet data included in the first PDU;
>
> [d] forming a second header part corresponding to the control SDU
> by using a DDI field set as a predetermined specific value
> representing that the control SDU is transmitted; and
>
> [e] forming a second data packet unit (PDU) by concatenating a
> header and a payload, and transmitting the second PDU to a Node
> B, wherein the header includes the header parts, and the payload
> includes the first PDU and the control SDU.

116.    Claim 1 is directed to "[a] method for transmitting control information for an

uplink packet data service in a mobile communication system."  The "control information" is

transmitted by including it in a "second data packet unit (PDU)" that is transmitted to a Node B.

Most of the claim limitations relate to steps in a specific method for forming the "second data

packet unit (PDU)" in which control information is included.

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**

117.   The method entails *first* forming the constituent header and payload parts of the "second data packet unit (PDU)" and *then* forming the "second data packet unit (PDU)" by concatenating the header and payload.

118.   Claim 1 recites four separate "forming" steps for forming the constituent parts, in short: (1) "a first protocol data unit (PDU)," (2) "a control service data unit (SDU)," (3) "at least one first header part," and (4) "a second header part."

119.   Claim 1 recites a fifth "forming" step that finally forms the "second data packet unit (PDU)" by using a concatenation operation: "forming a second data packet unit (PDU) by concatenating a header and a payload, and transmitting the second PDU to a Node B, wherein the header includes the header parts, and the payload includes the first PDU and the control SDU."

120.   The method recited in claim 1 is generally consistent with the method described in the specification for forming the MAC-e PDU, in which its constituent parts are formed before the MAC-e PDU is formed.  This means that to perform the "concatenation" step of the claim, the header and payload must already have been formed.  S.H. Kim, Samsung's corporate representative and a named inventor of the '596 patent, agreed that the concatenation of two parts requires the two parts to already exist:

> Q:    Is it fair to say that before being concatenated together, the
>       first PDU and the control SDU must first be formed?
>
> A:    Yes, I think that's correct.

(S.H. Kim 6/13/13 Dep. at 59:16-19.)

121.   Claim 1 also requires "transmitting the second PDU to a Node B."

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

### 2.    Claim 13

122.    Claim 13, directed to "[a] user equipment (UE) for transmitting control information for an uplink packet data service in a mobile communication system," is basically an apparatus counterpart to claim 1.  As can be seen in the table below, claim 13 recites three structures for the claimed UE for performing the same steps as in claim 1.

| Claim 1 | Claim 13 |
|---|---|
| 1. A method for transmitting control information for an uplink packet data service in a mobile communication system, the method comprising the steps of: | 13. A user equipment (UE) for transmitting control information for an uplink packet data service in a mobile communication system, the UE comprising: |
| [a] forming a first protocol data unit (PDU) including uplink packet data; | [a] **at least one block for** forming a first protocol data unit (PDU) including uplink packet data; |
| [b] forming a control service data unit (SDU) including control information for an uplink packet data service; | [b] **a control unit for** forming a control service data unit (SDU) including control information for an uplink packet data service; and |
| [c] forming at least one first header part corresponding to the first PDU by using a data description indicator (DDI) field representing the first PDU and an N field representing the number of uplink packet data included in the first PDU; | [c] **a multiplexing and transmission sequence number (TSN) setting unit for**<br><br>forming at least one first header part corresponding to the first PDU by using a data description indicator (DDI) field representing the first PDU and an N field representing the number of uplink packet data included in the first PDU, |
| [d] forming a second header part corresponding to the control SDU by using a DDI field set as a predetermined specific value representing that the control SDU is transmitted; and | [d] forming a second header part corresponding to the control SDU by using a DDI field set as a predetermined specific value representing that the control SDU is transmitted, and |
| [e] forming a second data packet unit (PDU) by concatenating a header and a payload, and transmitting the second PDU to a Node B, wherein the header includes the header parts, and the payload includes the first PDU and the control SDU. | [e] forming a second data packet unit (PDU) by concatenating a header and a payload, the header including the header parts, the payload including the first PDU and the control SDU, wherein the second PDU is transmitted to a Node B. |

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

123.     Claim 13 does not recite any limitations for any of the structures apart from the performance of the same steps recited in claim 1.  That is, the apparatus of claim 13 is characterized only by its function of performing the method of claim 1.  Of particular note is that the third structure, the underlined multiplexing and transmission sequence number (TSN) setting unit, cannot form the second PDU until the constituent parts of the second PDU—its header and payload—are first formed by the first two structures.

124.     Claim 13 also requires that "the second PDU is transmitted to a Node B."

## X.     '596 PATENT AND THE 3GPP STANDARDS

### A.     Samsung's Standards-Based Infringement Theory

125.     I am informed and understand that Samsung's infringement allegations as to the '596 patent are based on Apple's alleged compliance with the 3GPP TS 25.321 standard.  In particular, Samsung alleges that its claims cover the formation and structures for formation of the MAC-e PDU described in the standard.  Dr. Min states in his report that 3GPP TS 25.321 provides a basis for his opinion that the Accused Products infringe the '596 patent.

126.     The standard illustrates a MAC-e PDU as follows:



**Figure 9.1.5.2a: MAC-e PDU**

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**

(attributed to Samsung) and an approach that "[r]estrict[s] the number of HARQ processes the UE is allowed to use for autonomous transmission" (attributed to Lucent).

315.    In summary, the Accused Products do not infringe the asserted claims of the '087 patent because the UMTS standards specify that autonomous transmissions shall be restricted to a subset of HARQ processes while the asserted claims of the '087 patent disclose limiting autonomous transmission to a subset of TTIs.  Those two limitations are neither identically the same nor (as I explain in more detail below) are they equivalent.  That they are not identical is self-evident; one is a process distributed between processors at the UE and the Node B, while the other is a unit of time.  They are not equivalent because while there are exactly eight (or four) HARQ processes, there is an unlimited number of TTIs, and specifying k of every N TTIs requires a phase index that specifying k of N HARQ processes does not.  Moreover, contemporaneous with the filing of the '087 patent, other UMTS participants drew a clear distinction between these two different means of controlling rise-over-thermal due to autonomous transmission – and they attributed the HARQ-process-based scheme to Lucent, not to Samsung.

316.    Claim 10 of the '087 patent requires, through its base claim 9, "a receiver receiving non-scheduled transmission information indicating k transmission time intervals (TTIs) for transmitting non-scheduled data via the E-DCH." The language "receiver receiving" requires actual receiving, rather than just capability of receiving.  I have not found, and Dr. Min has not presented, evidence that demonstrates an Accused Product actually receiving non-scheduled transmission information indicating k transmission time intervals (TTIs) for transmitting non-scheduled data via the E-DCH.

SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information

317.    At paragraphs 470-472, Dr. Min suggests that the 2ms non-scheduled transmission grant HARQ process allocation bitstring set forth in TS 25.331 corresponds to the "non-scheduled transmission information indicating k transmission time intervals (TTIs) for transmitting non-scheduled data via the E-DCH" recited in asserted claim 10.  The Accused Products do not literally infringe claim 10 for at least two reasons.  First, as set forth above, there is no evidence that the HARQ allocation bitmap is ever conveyed, so there cannot be a "receiver receiving" as required by claim 10.  Second, even if the HARQ allocation bitmap were to be sent, the HARQ allocation bitmap indicates HARQ processes rather than transmission time intervals as claim 10 requires.  The Accused Products therefore do not literally infringe claim 10 of the '087 patent.

318.    Finally, claim 10 requires "a transmitter transmitting data on at least one TTI of the k TTIs within the period."  As I set forth above, there is no evidence that shows the Accused Products receiving non-scheduled transmission information indicating "k transmission time intervals (TTIs)."  It then follows that the Accused Products cannot include a transmitter transmitting data on at least one TTI of "the k TTIs" within the period, since non-scheduled transmission information indicating "the k TTIs" was never received.

### 2.    The Intel Based Products Do Not Infringe

319.    At paragraph 474 of his Opening Report, Dr. Min correctly describes that, according to TS 25.331, the default for the "2 ms non-scheduled transmission grant HARQ process allocation" is non-scheduled transmissions being allowed in all HARQ processes.  Dr. Min, however, goes on to make the following incorrect statement:

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**



321.    At paragraph 474 of his report, Dr. Min explains that the "2ms non-scheduled transmission grant HARQ process allocation" is designated by TS 25.331 as "MD."  Dr. Min goes on to describe how TS 25.331 explains the meaning of "MD" as well as a number of similar acronyms pertaining to Information Elements.  Table 10.1 of TS 25.331 further explains the meaning of each of these acronyms.  The description for "MD" is copied below.

| 3GPP TS 25.331 version 6.21.0 Release 6 | 394 | ETSI TS 125 331 V6.21.0 (2009-04) |
|---|---|---|

Table 10.1: Meaning of abbreviations used in RRC messages and information elements

| Abbreviation | Meaning |
|---|---|
| MP | Mandatory present<br>A value for that information is always needed, and no information is provided about a particular default value. If ever the transfer syntax allows absence (e.g., due to extension), then absence leads to an error diagnosis. |
| MD | Mandatory with default value<br>A value for that information is always needed, and a particular default value is mentioned (in the 'Semantical information' column). This opens the possibility for the transfer syntax to use absence or a special pattern to encode the default value. |

(SAMNDCA630-07589643.)

322.    The last sentence of the "Meaning" block of Table 10.1 states that a Mandatory Default (MD) designation ". . . opens the possibility for the transfer syntax to use absence or a special pattern to encode the default value."  The drafters of the TS 25.331 standard thus

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**

embraced the idea of allowing a receiving entity to employ a default value in the event that no

information is sent.



**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**



**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**



328.     On the other hand, no evidence has been presented that shows actual use of the 2 ms non-scheduled transmission grant HARQ process allocation bitstring.  There is no evidence that the Intel-based Accused Products include a "receiver receiving non-scheduled transmission information indicating k transmission time intervals (TTIs) for transmitting non-scheduled data via the E-DCH."  In fact, the evidence shows that existing networks operate without conveying "non-scheduled transmission information" as required by claim 10.  For at least this reason, the Intel-based Accused Products do not literally infringe claim 10.

### 3.     The Qualcomm Based Products Do Not Infringe

329.     Similarly for the Qualcomm-based products, Dr. Min fails to take into account what processing occurs when the 8-bit bitmap is not received.

SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information



**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**



### 4. There is no Actual Use of the Claimed Technology

337.    I disagree with Dr. Min's conclusion that the Accused Products receive non-scheduled transmission information from the network.  (Min 8/12/13 Report ¶ 686.)  As I discussed in my opening report, I am not aware of any evidence that any of the Accused Products with a receiver receives a HARQ process allocation or that any Accused Products use that allocation to limit the number of HARQ processes for non-scheduled transmission.

338.    I am informed and understand that when the language of a claim is discussing actual operation rather than mere capability, it is not enough to show that the Accused Products are capable of infringing in the described mode.  I further understand that this standard also applies to apparatus claims when those apparatus claims require actual operation rather than reciting only capability.  Here, the claim language of claim 10 requires a "receiver receiving" rather than a "receiver for receiving" and a "transmitter transmitting" rather than a "transmitter for transmitting."  My opinion is that a person of ordinary skill in the art reading these claims in

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

light of the specification and file history would understand that these claims require actual receipt of the claimed non-scheduled transmission parameter, and transmission on a subset of TTI's per the non-scheduled transmission parameter.  In other words, the apparatus claims of the '087 patent describe active states of a UE device with a receiver receiving and a transmitter transmitting, not mere capabilities of those devices.

339.    That the claims of the '087 patent describe active states is demonstrated within the claims themselves.  In particular, the claims describe a receiver that is actively "receiving" data, rather than a receiver that is "for receiving" data, or "configured to receive" data.  Similarly, the "transmitter" of the claims is "transmitting," it is not "for transmitting" or "configured to transmit" (or some other manner of describing capabilities of the transmitter).

340.    A person of ordinary skill in the art reading the specification of the '087 patent would understand that any invention described in that specification pertained to a method of controlling non-scheduled data, as well as UEs in active states of operation, but not to mere capabilities of UEs.  For example, the Summary of the Invention section of the '087 patent also describes the "apparatus" of the invention in terms of a UE in an active state: "an apparatus…comprising a *receiver receiving* non-scheduled transmission information…and a *transmitter transmitting* data…." ('087 patent, 4:48-58 (emphasis added).)  Further, each of the figures of the '087 patent depicts a method of operation, or a UE device in an active state.  Figures 1-3 describe "Related Art" showing UEs in active communication with a Node B, as well as the flow of information between a UE and Node B.  Figures 4 and 7 depict flow charts showing the determination of non-scheduled transmission information at the base station.  Figures 5, 6, and 9 depict slices of time for UEs in active states of operation, wherein E-DCH

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**

channels have been set up and non-scheduled transmission parameters have been sent to and received by the UEs.  Finally, Figure 8 depicts "a block diagram illustrating an exemplary apparatus for performing non-scheduled transmissions in the UE."  ('087 patent, 11:37-39).  But even that figure shows the apparatus in an active state.  First, the figure shows not only the components of the UE, but uses arrows to depict the transmission of information between those components.  Second, the apparatus of Figure 8 is described as a device in actual operation. ('087 patent, 11:44-55 ("In FIG. 8, a *receiver of the UE receives,* from the RNC, non-scheduled transmission parameters….  The E-DCH data rate determiner 803 *obtains* [and]…. *determines*…. ," etc.) (emphasis added).)

341.    Further, a person of ordinary skill in the art would understand from a review of the file history of the '087 patent that the inventors intended to claim only receivers and transmitters in active states of operation.  Indeed, the original claims filed in the application for the '087 Patent recited "receiver for receiving," "controller for controlling" and "transmitter for transmitting," and affirmative steps were taken during prosecution to change the claim language from reciting capability to reciting actual operation.

342.    Specifically, in response to the Office Action dated August 28, 2008, Claim 9 was amended to change "a receiver for receiving" to "a receiver receiving."  Claim 9 was also amended to change "a transmitter for transmitting" to "a transmitter transmitting," among other changes:

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**

> 9. (Currently amended) An apparatus for performing ~~autonomous~~non-scheduled transmission in a user equipment (UE) of a mobile communication system for supporting an enhanced uplink dedicated channel (E-DCH), comprising:
>
> a receiver for receiving ~~autonomous~~non-scheduled transmission information indicating k possible ~~autonomous~~ transmission time intervals (TTIs),~~points~~ wherein non-scheduled transmissions can be performed during the k TTIs within ~~an autonomous transmission~~a period ~~N~~;
>
> ~~a data buffer for storing data to be transmitted through the E-DCH;~~
>
> ~~a controller for identifying data to be used for non-scheduled transmission from the data stored in the data buffer; and~~
>
> a transmitter ~~for~~ transmitting ~~the identified~~ data ~~through the E-DCH~~on at least one TTI of the k TTIs~~possible autonomous transmission time points~~ within the ~~autonomous transmission~~ period ~~N~~,
>
> wherein the k is an integer greater than 0 and less than or equal to a positive integer N.

(SAMNDCA630-00834792.)  Similarly, claim 27 was amended at the same time to remove the word "the" between "receiver/receiving" and "transmitter/transmitting."

343.    Because the claims, specification, and file history all make clear that the asserted claims require UEs in active states of operation, in order to show that Apple infringes, Samsung and Dr. Min needed to demonstrate that the Accused Products actually receive non-scheduled transmission information from the network and transmit on a subset of TTIs pursuant to that non-scheduled transmission information.  As I explain below, Dr. Min did not demonstrate this. Because the claimed technology is not actually used, claim 10 is not infringed.

344.



**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**



Dr. Min does not address the testimony from the Alcatel-Lucent corporate witness or any evidence relating to the transmission of non-scheduled transmission information by Ericsson or Alcatel-Lucent base stations.

SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information



**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**



**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**



Finally, I have seen no evidence that any Accused Product has ever received any HSUPA non-scheduled transmission information from a Nokia Siemens base station on the T-Mobile network, or any other network.



**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**



351.    In sum, Dr. Min relies upon a single Nokia Siemens document, but neither that

document, nor any other evidence cited by Dr. Min, tells us: (i) whether the document describes

an actual piece of equipment on the T-Mobile network (or any other network); (ii) whether the

document describes the actual operation, rather than potential capabilities, of any network

equipment; (iii) whether the equipment actively supports 2ms TTIs for non-scheduled

transmissions; or (iv) whether any bitmap containing a HARQ process allocation for non-

scheduled transmissions was ever sent to any Accused Product.

### 5.    No Doctrine of Equivalents

352.    As I set forth in detail in Section VII(B), claim 10 is not entitled to infringement

under the doctrine of equivalents, due to amendments made during prosecution of the '087

patent.  In particular, I do not believe any scope of equivalents should be accorded to the term

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

"transmission time intervals (TTIs)" or any term related to or associated with "transmission time intervals (TTIs)."

353.    Earlier in this section, I described how the identity of a HARQ process can be inferred from the TTI in which its data is transmitted.  The fact that the identity of a HARQ process can be inferred from the TTI in which its data is transmitted or received does not make a HARQ process equivalent to a TTI.  A HARQ process is not equivalent to a TTI.  One way to show equivalence (i.e., to support infringement under the doctrine of equivalents), a claim element and the corresponding aspect of the Accused Product must (i) perform substantially the same function, (ii) in substantially the same way (iii) to obtain substantially the same results.

354.    ███████████████████████████████████████████████████████████████
███████████████████████████████████████████ while the claim element recites controlling interference by limiting the TTIs for which a non-scheduled transmission may occur.  A HARQ process and a TTI do not perform substantially the same function.  A HARQ process is a mechanism for increasing the likelihood that transmitted data reaches its terminus without error through retransmission,  error correction and other techniques.  A TTI does not perform the same function.  A TTI defines an amount of time during which a particular transmission may occur.

355.    Since a HARQ process and a TTI do not perform substantially the same function, they cannot perform in substantially the same way to obtain substantially the same results.  Thus claim 10 cannot be infringed under the doctrine of equivalents.

SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information

B.      Claim 35 of the '087 Patent

1.      The 3GPP Standard Do Not Establish Infringement of Claim 35

356.    For at least the reasons outlined above in Section XII. A.1, I disagree with Dr. Min's conclusion that the 3GPP standard infringes the '087 patent.  At paragraph 578 of his opening report, Dr. Min identifies "Scheduled transmission information" as the claimed "scheduling assignment information."  The existence of a parameter in an Information Element set forth in a 3GPP standard, however, does not satisfy the "receiver receiving" requirement of claim 35.

357.    Further, as I explained with respect to claim 10, there is no evidence that the 2ms non-scheduled grant HARQ process allocation bitmap is ever sent to an Accused Product.  The "transmitter transmitting" requirement of claim 34 cannot be satisfied when information about the "k TTIs" is not received, as I explained with respect to claim 10.

2.      The Intel Based Products Do Not Infringe

358.    For at least the reasons outlined above in Section XII. A.2, I disagree with Dr. Min's conclusion that the Intel-based Accused Products infringe the '087 patent.

3.      The Qualcomm Based Products Do Not Infringe

359.    For at least the reasons outlined above in Section XII. A.3, I disagree with Dr. Min's conclusion that the Qualcomm-based Accused Products infringe the '087 patent.

4.      There is no Actual Use of the Claimed Technology

360.    For at least the reasons outlined above in Section XII. A.4, I disagree with Dr. Min's conclusion that the Accused Products receive non-scheduled transmission information from the network or that they transmit uplink data based on that non-scheduled transmission information.

- 113 -

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**

       **5.**      **No Doctrine of Equivalents**

361.      For at least the reasons outlined above in Section XII. A.5, I do not believe Claim

35 is entitled to infringement under the doctrine of equivalents.

     **C.**      <u>**Claim 40 of the '087 Patent**</u>

       **1.**      **The 3GPP Standard Do Not Establish Infringement of Claim 40**

362.      For at least the reasons outlined above in Sections XII. A.1 and XII.B.1, I

disagree with Dr. Min's conclusion that the 3GPP standard infringes the '087 patent.

       **2.**      **The Intel Based Products Do Not Infringe**

363.      For at least the reasons outlined above in Section XII. A.2, I disagree with Dr.

Min's conclusion that the Intel-based Accused Products infringe the '087 patent.

       **3.**      **The Qualcomm Based Products Do Not Infringe**

364.      For at least the reasons outlined above in Section XII. A.3, I disagree with Dr.

Min's conclusion that the Qualcomm-based Accused Products infringe the '087 patent.

       **4.**      **There is no Actual Use of the Claimed Technology**

365.      For at least the reasons outlined above in Section XII. A.4, I disagree with Dr.

Min's conclusion that the Accused Products receive non-scheduled transmission information

from the network or that they transmit uplink data based on that non-scheduled transmission

information.

       **5.**      **No Doctrine of Equivalents**

366.      For at least the reasons outlined above in Section XII. A.5, I do not believe Claim

35 is entitled to infringement under the doctrine of equivalents.

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

### D.    Apple Does not Indirectly Infringe the '087 Patent

367.    Dr. Min's indirect infringement analysis relies upon his direct infringement analysis and fails for the same reasons.  I am informed and understand that indirect infringement requires that an act of infringement occur and, as I explain above, there is no direct infringement because the Accused Products themselves do not infringe and because there is no actual use of the claimed technology.  Because the Accused Products do not directly infringe, Apple cannot indirectly infringe the '087 patent.

368.    I disagree with Dr. Min's conclusion that operating one of the Accused Products on a network with HSUPA capabilities is sufficient to infringe and that use of the Accused Products on the AT&T or T-Mobile networks infringes.  (Min 8/12/13 Report ¶¶771-772.)  As I explained earlier, Samsung and Dr. Min have not demonstrated that any base station on any carrier network in the United States conveys non-scheduled transmission information limiting either TTIs or HARQ processes to a UE.  I disagree with Dr. Min's conclusion that Apple's advertisements of the Accused Products' wireless capabilities on its website or publishing and distributing user guides for the Accused Products induces infringement of the '087 patent.  (Min 8/12/13 Report ¶773.)  I have reviewed the documents cited by Dr. Min and none of Apple's advertisements and user guides discuss non-scheduled transmission.  They merely discuss using Apple's Accused Products on various networks and, as I've previously explained, the networks do not use the claimed technology.

369.    Dr. Min does not cite any evidence that Apple had an affirmative intent to cause anyone to infringe the '087 patent, nor does  he cite any evidence to support his claim of "willful blindness."  Although he cites manuals and advertising materials for the Accused Products, he

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**

does not discuss or even identify any information provided in those materials that demonstrate any intent to actually cause infringement. In addition, I have been informed and understand that Samsung cannot prove inducement if Apple has reasonable defenses to Samsung's infringement allegations, even if those defenses ultimately prove to be unsuccessful. As noted above and in my opening report, it is my opinion that the asserted claims of the '087 patent are both invalid and not infringed. Therefore, in my opinion, Samsung cannot prove inducement for this reason as well.

370.    I disagree with Dr. Min's conclusion that the Accused Products are "not staple articles of commerce" and have "no substantial noninfringing uses." (Min 8/12/13 Report ¶775.) First, Apple's Accused Products do not infringe. Second, many substantial non-infringing uses exist. For example, as I explained in my opening report and elsewhere in this report, the default under the standard is to allow non-scheduled transmissions on all HARQ processes. (Fuja 8/12/13 Report, Part 4, Section I.B.2.) The 3GPP standard specifically states that the use of a default value facilitates "transfer syntax to use absence or a special pattern to encode the default value." (*see, e.g.*, Section XII.A.2). I have presented examples of network operators that have specifically chosen to not transmit the 2ms non-scheduled grant HARQ process allocation bitmap, and therefore rely on the UE to implement the default value of "all HARQ processes allowed." (*see, e.g.,* Section XII.A.2). Therefore, as I explained above, the HSUPA networks do not necessarily practice the '087 patent, and the evidence indicates that they do not. Third, the deposition testimony from Apple employee Louie Sanguinetti does not support Dr. Min's argument. In the testimony Dr. Min cites, Mr. Sanguinetti testified that chips supporting HSUPA were used in the iPhone 4 because HSUPA gives end users "better uplink throughput"

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

(Sanguinetti 2/15/2012 Dep. at 69:4-20) and that for the baseband processor used in the iPhone 4 on the AT&T network, "Apple verified that a number of test cases relevant to HSUPA functionality successfully passed." (Sanguinetti 2/15/2012 Dep. at 95:11-17.) Mr. Sanguinetti did not state that the "[w]ithout the HSUPA capabilities that the Accused Products provide, the products would not be adequate for the purposes for which they are marketed to its customers," which is how Dr. Min characterizes Mr. Sanguinetti's testimony. His testimony also had nothing to do with any of the specific functionality allegedly covered by the '087 patent - functionality that is at most a small portion of HSUPA and is in fact not practiced. Fourth, the Accused Products are multi-system devices that perform many functions in addition to their HSUPA capabilities. Apple customers use their iPhones and iPads for many different activities other than the cellular network, such as playing games creating and editing documents, taking photographs, and listening to music. They may also use the devices' other wireless capabilities, such as Wi-Fi, LTE, or GSM. In addition, HSUPA only affects the uplink and there are many non-infringing uses of the Accused Products that make use only of the downlink, such as streaming music and watching YouTube videos. Fifth, the Accused Products work on non-HSUPA networks. All of the Accused Products work on the GSM network, and the iPhone 5, iPad 3, iPad 4, and iPad mini work on the LTE network. (*See* www.apple.com/ipad/LTE.)

## XIII.   '596 PATENT NON-INFRINGEMENT ANALYSIS

371.    I disagree with Dr. Min's opinion that the Accused Products infringe claims 1 and 13 of the '596 patent. As I set forth below, the relevant evidence establishes that the Accused Products do not infringe these claims.

SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information

A.    <u>Claim 1 of the '596 Patent</u>

372.    As I discussed above, claim 1 is directed to a particular process for forming a PDU.  Dr. Min has not demonstrated that the claimed process is implemented or used in the Accused Products.  In fact, the Accused Products implement processes for forming MAC-e PDUs that are different—and better—than the claimed process.

**1.    The 3GPP Standards Do Not Establish Infringement of Claim 1**

373.    Dr. Min cites 3GPP TS 25.321 throughout his report to support his infringement opinion, but the standard does not establish infringement.  Similarly, it is also not sufficient to establish infringement to point out that the Accused Products "can communicate on the HSPA, HSUPA, and/or HSPA+ cellular network."

374.    *First*, the standard does not require the occurrence of Scenario 2 to which Dr. Min's infringement opinion is limited.  I recognize that the standard states that *if* a sufficient number of bits (24 bits or more) remaining in the transport block after quantization, Scheduling Information and $DDI_0$ are to be included in the MAC-e PDU.  (3GPP TS 25.321 § 9.2.4.2.)  However, the standard does not require that sufficient bits remain in the transport block in any particular instance, nor does it provide any guidance on how frequently this situation would arise.  Dr. Min does not demonstrate how frequently Scenario 2 arises, if at all, in the operation of the Accused Products.

375.    *Second*, the standard does not require that MAC-e PDUs be formed using the claimed process or apparatus.  The standard simply sets forth requirements for the format and contents of the MAC-e PDU, but does not impose restrictions as to how it is created by the UE.  Dr. Min refers in numerous places in his report to the following figures from the standard

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

seemingly depicting fully formed MAC-d PDUs *descending* into a MAC-es PDU and fully

formed MAC-es PDU then "descending" into a MAC-e PDU:



**Figure 9.1.5.1 MAC-es PDU**



**Figure 9.1.5.2a: MAC-e PDU**

(3GPP TS 25.321 § 9.1.5.)  Describing these figures, the standard states:

> In the case of E-DCH there are two MAC sublayers, MAC-e and
> MAC-es. MAC-es sits on top of MAC-e and receives PDUs
> directly from MAC-d. MAC-es SDUs (i.e. MAC-d PDUs) of the
> same size, coming from a particular logical channel are
> multiplexed together into a single MAC-es payload.

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

(*Id.*)  These figures and their associated discussion in the standard are *conceptual* in nature, to aid in the understanding of the format of the MAC-e PDU and the UE's "external" behavior.  It does not state or imply a requirement as to the internal processes or structures used by UEs to make a MAC-e PDU.  As Samsung engineer Mr. Van Lieshout testified:

> Q.    You would agree with me that the standard simply defines the format of a MAC-e PDU; correct?
>
> A.    So I think there's two important things that a standard specifies. One is how the information is coded, right, the structure and bits, what is the meaning of the individual bits. The second part is the behavioral part. So the mobile device has to have a  certain behavior, as seen from the outside. That is the second part.
>
> Q.    And how those two things are accomplished is an implementation decision made by the person designing products for the standard; correct?
>
> A.    So how you realize the coding, the correct coding on the radio interface and the behavior on the interface both as specified in the specification, how you realize that in your implementation is an implementation choice.

(Van Lieshout 6/18/13 Dep. at 40:20-41:11.)  ████████████████████████

████████████████████████████████

The internal implementations of devices supporting the standards can be very different. ████

████████████████████████████████████████

████████████████████████████  And as I discuss

below, the Accused Products do not use the claimed process or apparatus.

376.    *Third*, the PDU format of the claim differs from that of the MAC-e PDU in the standard; in particular, the N field of the claims ("number of uplink packet data included in the

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

first PDU") differs from the N field of the standard ("Number of MAC-d PDUs").  (3GPP TS 25.321 § 9.2.4.2)  As I discuss below, the Accused Products do not form the claimed N field.

377.     *Fourth*, the standard does not require that a UE form a "control SDU" including Scheduling Information and include the "control SDU" in the MAC-e PDU.  The standard does not use the "control SDU" language anywhere.  It simply illustrates Scheduling Information as a field within the MAC-e PDU.  As I discuss below, the Accused Products do not form the claimed "control SDU."

378.     *Fifth*, the standard does not impose any requirements on Node Bs to use any Scheduling Information that may be received from UEs.  As I discuss below, where Scheduling Information is not used by a Node B to control data transmissions, one could view it as not constituting "control information for an uplink packet data service."

### 2.     The Accused Products Do Not Perform the Claimed Process

379.     As I have explained, claim 1 is directed to a specific process for forming the constituent parts of the "second PDU" and then concatenating those parts to form the "second PDU" (which Dr. Min contends covers the MAC-e PDU).  The process entails first forming constituent parts of the second PDU, including "forming a first protocol data unit (PDU) including uplink packet data" (which Dr. Min contends to cover a MAC-es PDU included in the MAC-e PDU), and then forming the second PDU by concatenating a header and a payload.

380.     Accordingly, to prove infringement of claim 1, Samsung must demonstrate that the Accused Products use the process claimed by the '596 patent to establish infringement.  It is insufficient to rely on the 3GPP standards to prove infringement because the standards do not require UEs to use any particular process for forming the MAC-e PDU.  In other words,

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**

Samsung must show more than that the Accused Products form a MAC-e PDU having the same parts or arrangement of parts as the "second PDU" of claim 1; Samsung must show that the Accused Products form the MAC-e PDU using the particular process recited by claim 1.

381.    Dr. Min fails to make this showing.  Contrary to his stated opinions, the Accused Products do not use the claimed process to form a MAC-e PDU.  In particular, claim 1 requires forming a "first PDU" as a standalone unit before the concatenation operation that forms the "second PDU."  As applied to the MAC-e PDU, the claim requires that a MAC-es PDU be formed before it is combined with other payload parts and concatenated to form a MAC-e PDU.

382.    3GPP TS 25.321 depicts a MAC-es PDU as follows:



**Figure 9.1.5.1 MAC-es PDU**

383.    The MAC-es PDU is a string of bits arranged in accordance with the standard. The header of the MAC-es PDU includes a TSN field comprising 6 bits.  That is, the first 6 bits of the MAC-es PDU are understood to constitute the TSN field.  The remaining bits are understood to constitute the payload of the MAC-es PDU, made up of MAC-d PDUs from one logical channel.  (3GPP TS 25.321 § 9.1.5.)  Claim 1 requires forming a MAC-es PDU as a

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

standalone unit, and combining it with other parts to make a payload, before the MAC-e PDU is formed.  That is, claim 1 requires that the bitstring constituting a MAC-es PDU be assembled before a header (a bitstring) and a payload (another bitstring) are concatenated to form the MAC-e PDU.

384.    The Accused Products do not form MAC-e PDU using the claimed process.  The claimed process is directed to a series of operations involving bitstrings: to form the final bitstring (the "second PDU") by forming constituent bitstrings and concatenating them.  The claimed process is in some sense inefficient because it may require the manipulation of multiple bitstrings containing the same data and having to keep those bitstrings in working memory.  For instance, a UE using the claimed process would form multiple MAC-es PDUs and keep them all in working memory in order to combine them (and optionally the Scheduling Information and/or padding) into a payload.  It would do the same with the parts of the header (the DDI, N, and optionally the $DDI_0$ field).  It would then need to keep the header and payload in working memory in order to concatenate them into the MAC-e PDU.

385.    The Accused Products use a fundamentally different approach for forming the MAC-e PDU. Although more conceptually complicated than the

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

claimed method, the approach taken by the Accused Products is more efficient and requires less processing and fewer memory accesses.  This type of approach is nowhere discussed in the '596 patent, nor is it claimed.

386.    In the subsequent subsections, I discuss the particulars of the Intel and Qualcomm implementations.

> a)    **The Intel Implementation Does Not "Form[] a First Protocol Data Unit (PDU)"**

387.    I disagree with Dr. Min's stated opinion that "[t]he Intel-based Accused Products each comprises Intel source code that performs the step of forming a first protocol data unit (PDU) including uplink packet data."  (Min 8/12/13 Report ¶ 795.)  He has not shown this to be the case, and the relevant documents indicate that it is not the case.

388.    None of the Intel source code cited by Dr. Min forms a MAC-es PDU as a standalone unit as required by the claim.

389.    Dr. Min's discussion of the source code in the portion of his report dealing with this claim limitation closely mirrors his earlier general discussion of the Intel source code.



**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**



392.    Accordingly, this claim limitation is not met.

> **b)    The Intel Implementation Does Not "Form[] a Second Data
> Packet Unit (PDU) By Concatenating a Header and a Payload"**

393.    I disagree with Dr. Min's stated opinion that "[t]he Intel-based Accused Products each comprises Intel source code that performs the step of forming a second data packet unit (PDU) by concatenating a header and a payload, and transmitting the second PDU to a Node B, wherein the header includes the header parts, and the payload includes the first PDU and the control SDU." (Min 8/12/13 Report ¶ 941.)  He has not shown this to be the case, and the relevant documents indicate that it is not the case.

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

394.     In order to form the MAC-e PDU by concatenating a header and a payload, the

MAC-e header and MAC-e payload must have been formed as standalone units prior to the

concatenation operation.    Here, that means that individual bitstrings must have been formed for

the MAC-e header and the MAC-e payload.   It is self-evident that, in order to concatenate two

things, those things must themselves be formed first – i.e., they must exist before they can be

concatenated.   This common-sense observation was agreed to by a named inventor of the '596

patent as well.  (S.H. Kim 6/13/13 Dep. at 59:16-19.)

395.     For instance, suppose you wish to form the string 12345ABCDE.  One way to

form the string would be to form the string 12345 and the string ABCDE, and then concatenate

them.  This is essentially the approach required by claim 1.  But there could be any number of

other ways to form the string that do not require this concatenation operation.  For instance, one

could form the string 12345 and then individually append the characters A, B, C, D, and E in

separate operations.   One could also form the string by adding one number and one letter at once

as follows: 1----A----, then 12---AB---, then 123--ABC--, then 1234-ABCD-, and then

12345ABCDE.  As another example, one could form the desired string in a series of steps each

adding one letter – i.e., form 5, then 5A, then 45A, then 45AB, then 345AB, then 345ABC, then

2345ABC, then 2345ABCD, then 12345ABCD, and finally "12345ABCDE.  In all three cases,

the final result is in the desired format, but it was formed without concatenating the string 12345

and the string ABCDE.

- 126 -

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**



**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**



SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information



**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**



**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**



**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**



402.    Accordingly, this claim limitation is not met.

> **c)**    **The Qualcomm Implementation Does Not "Form[] a First
>         Protocol Data Unit (PDU)"**

403.    I disagree with Dr. Min's stated opinion that "[t]he Qualcomm-based Accused

Products each comprise Qualcomm source code that performs the step of forming a first protocol

data unit (PDU) including uplink packet data."  (Min 8/12/13 Report ¶ 812.)  He has not shown

this to be the case, and the relevant documents indicate that it is not the case.

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**



**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**



410.    Accordingly, this claim limitation is not met.

> **d)    The Qualcomm Implementation Does Not "Form[] a Second
> Data Packet Unit (PDU) By Concatenating a Header and a
> Payload"**

411.    I disagree with Dr. Min's stated opinion that "[t]he Qualcomm-based Accused
Products each comprises Qualcomm source code that performs the step of forming a second data
packet unit (PDU) by concatenating a header and a payload, and transmitting the second PDU to
a Node B, wherein the header includes the header parts, and the payload includes the first PDU
and the control SDU."  (Min 8/12/13 Report ¶ 952.)  He has not shown this to be the case, and
the relevant documents indicate that it is not the case.



413.    In order to form the MAC-e PDU by concatenating a header and a payload, the
MAC-e header and MAC-e payload must have been formed as standalone units prior to the
concatenation operation.   Here, that means that individual bitstrings must have been formed for

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**

the MAC-e header and the MAC-e payload.  As I have already noted, it is self-evident, and a named inventor of the '596 patent agrees, that two things cannot be "concatenated" unless those two things already exist (i.e., were already formed).  (S.H. Kim 6/13/13 Dep. at 59:16-19.)  In my opinion, this is how a person of ordinary skill would have understood the claim limitation.



SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information



**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

418.    In sum, the relevant Qualcomm source code shows that the MAC-e PDU is not

formed by concatenating a MAC-e header and a MAC-e payload.

419.    Dr. Min then contends:

(Min 8/12/13 Report ¶ 968.)  As can be seen from this excerpt, Dr. Min cites no Qualcomm

documents to support his assertions.

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

███████████████████████████████████████████████ I do not

see how it supports Dr. Min's assertions regarding the Accused Products containing Qualcomm

chipsets.

420.     Accordingly, this claim limitation is not met.

### 3.     The Accused Products Do Not Form the Claimed N Field

421.     The Accused Products do not infringe claim 1 of the '596 patent because they do

not practice the step of "forming at least one first header part corresponding to the first PDU by

using . . . an N field representing the number of uplink data included in the first PDU."

422.     The apparent premise for Dr. Min's assertion that the Accused Products satisfy

this limitation is that the N values calculated by the Accused Products are the same as the N field

described in the standard.  However, the N field of the asserted claims differs from the N field of

the standard, and the Accused Products do not use the N field of the claims.

423.     Dr. Min, for example, asserts without any explanation that the claim "N field

representing the number of uplink data included in the first PDU" means "the number of

consecutive MAC-d PDUs" in a MAC-es PDU as stated in the standard.  (Min 8/12/13 Report ¶¶

870-871, 878, 885, 890-891. ████████████████████████████████



**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**



424.     Dr. Min's infringement theory is founded on a shaky ground.  Dr. Min apparently

interprets the claimed "N field representing the number of uplink data included in the first PDU"

as covering "the number of consecutive MAC-d PDUs" in a MAC-es PDU.  Dr. Min's

interpretation of the claim language is in error.

425.     First, Dr. Min's interpretation is contrary to the plain meaning of the relevant

claim language.  The plain meaning of the language advises that the claimed N field is for

holding a value that represents "the number of uplink packet data included in the first PDU."  As

Dr. Min reads "first PDU" on the MAC-es PDU, the claimed N field then must represent the

"number of uplink packet data" included in a MAC-es PDU.  A person of ordinary skill would

understand that data is fundamentally enumerated in bits or bytes.  Therefore, the plain meaning

of the term "number of uplink packet data" included in a MAC-es PDU is the number of bits or

bytes contained in that MAC-es PDU.  I do not believe that Dr. Min's apparent interpretation of

the term "number of uplink packet data" as "number of PDUs" is supportable..

426.     Dr. Min's reading of the claimed "N field representing the number of uplink data

included in the first PDU" is inconsistent with the claim language.  The asserted claims recite

only two PDUs: a "first PDU" and a "second PDU," where the first PDU is included within the

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

second PDU.  The claims do not recite a "zeroth PDU" or multiple PDUs included within the first PDU, and there is no suggestion in the claim that the first PDU comprises PDUs.  Instead, the claims recite the first PDU as "including uplink packet data."  Thus, there is no antecedent for the claimed N field to refer to the number of PDUs within the "first PDU."

427.    In contrast, the 3GPP standards describe a MAC structure for HSUPA with three different kinds of PDUs: MAC-d PDU, MAC-es PDU, and MAC-e PDU.  As described in 3GPP TS 25.321, MAC-d PDUs are components of MAC-es PDUs, and MAC-es PDUs are components of a MAC-e PDU.



**Figure 9.1.5.1 MAC-es PDU**

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**



Figure 9.1.5.2a: MAC-e PDU

(3GPP TS 25.321 § 9.1.5.)

428.    The N field of the MAC-e PDU is found in the MAC-e header and is associated with a MAC-es PDU in the payload of the MAC-e PDU.  The N field indicates how many of the MAC-d PDUs are contained in the associated MAC-es PDU.

429.    The N field of a MAC-e PDU of the standard thus relies on the existence of MAC-d PDUs and MAC-es PDUs to give them meaning.

430.    The asserted claims recite only a "first PDU" and a "second PDU."  Dr. Min associates the "first PDU" with a MAC-es PDU and the "second PDU" with a MAC-e PDU. There is no other "PDU" in the claim that can be mapped onto a MAC-d PDU.  However, as noted above, it is the MAC-d PDU that gives the N value meaning within the context of the UMTS standards.

431.    As the asserted claims of the '596 patent do not recite any PDUs within the "first PDU," it defines its N field without reference to the number of PDUs, but simply as "representing the number of uplink packet data included in the first PDU."  If the named inventors of the '596 patent had intended the claimed N field to represent the number of PDUs

- 141 -

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

within the "first PDU," they could have easily drafted the claims to do so.  It does not make sense to interpret the claimed N field contrary to its plain and ordinary meaning in order to capture that which was not claimed.

432.    In contrast, the N field of the standard does not indicate "the number of uplink packet data" included in the associated MAC-es PDU.  That is, the N field of the standard does not indicate the number of bits or bytes of data in the MAC-es PDU; to ascertain that, one would need both the N field of the standard (which indicates the number of MAC-d PDU) but also the size of each MAC-d PDU, which is given in the DDI field.  Additionally, the N field of the standard is only six bits in length.  A 6-bit field would not be very useful to indicate the number of bits or bytes of data in a PDU because the biggest size it could represent would be 64 bits or bytes.

433.    To accept Dr. Min's read with respect to this limitation, the phrase "number of uplink packet data included in the first PDU" must be interpreted as meaning the number of PDUs contained in "the first PDU," but this does not make sense in the context of the claims because the claims do not provide any indication as to what those PDUs are and or that the "first PDU" is even made up of PDUs.  Dr. Min's view of the claim requires one to posit the existence of a structure unmentioned in the claim language—PDUs within the "first PDU"—and interpret the claim language in reference to that unmentioned structure.  In my opinion, a person of ordinary skill would not interpret the claim language in this way.

434.    The specification of the '596 patent does not support Dr. Min's interpretation of the relevant claim language.  I surmise that Dr. Min may try to find support for his interpretation by pointing to the discussion in the '596 patent of an N field that "contains information about the

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

number of RLC PDUs ... contained in the MAC-es PDU." ('596 patent, 9:3-4.)  Under this view, the MAC-es PDU of the patent would be the "first PDU" and the RLC PDUs would be the PDUs within the "first PDU."  However, it is my opinion that such discussions in the patent actually support my view of the claim, because they show conclusively that the named inventors (1) could have but chose not to include claim limitations as to PDUs included within the "first PDU" and (2) could have but chose not to recite the claimed N field in terms of number of PDUs included with the "first PDU."  Where the inventors intended to recite PDUs, they did, with the "first PDU" and the "second PDU."  And where the inventors intended to describe an N field as indicating the number of PDUs, they did (in the specification).  In drafting the claims of the '596 patent, the named inventors determined not to describe the claimed N field as it is used in the 3GPP standards (of which they were well aware); the inventors instead described it in an alternative way different from the standards.  And the alternative way chosen by the inventors for describing the claimed N field has a perfectly clear and ordinary meaning: the number of bits or bytes included in the first PDU.

435.    For at least these reasons, I disagree with Dr. Min's assertion that the Accused Products meet this limitation.

### 4.    The Accused Products Do Not Form the Claimed "Control SDU"

436.    The Accused Products do not practice the step of "forming a control service data unit (SDU) including control information for an uplink packet data service."

437.    The premise for Dr. Min's assertion that the Accused Products meet this limitation is that the Scheduling Information defined in 3GPP TS 25.321 constitutes a "control

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

service data unit (SDU) including control information for an uplink packet data service" and the

Accused Products make the Scheduling Information defined in the standard.

438.     It is well known in the art that the term "service data unit (SDU)" refers to a data

unit that is passed down to a network layer after it is generated at a higher layer.  This is shown,

for example, in the OSI Reference Model document cited in Dr. Min's report:



**Figure 9 – An illustration of mapping between data-units in adjacent layers**

(ITU-T Rec. X.200 (1994 E) at 16.)  It can be seen in the figure above that a PDU at one level is

mapped onto an SDU to the next lower level.

439.     One of the named inventors of the '596 patent confirmed that an SDU is a data

unit derived from a higher layer.  For instance, Mr. van Lieshout testified as following during his

deposition:

- 144 -

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

> Q.     Now, for the MAC-e layer of the UMTS standards, the
>        SDUs are data units from higher layers, such as the MAC
>        layer or the RLC layer; correct? …
>
> A.     Yeah, depends a bit on . . .  So we could consider, for
>        example, data coming from RLC.  An RLC PDU we could
>        consider an SDU for the MAC data.

(Van Lieshout 6/18/13 Dep. at 134:13-25.)

440.    The 3GPP standards themselves also teach that an SDU is a data unit derived

from a higher layer.  For example, as illustrated in the figure below, a PDU at the MAC-d layer

is an SDU at the lower MAC-es layer:



**Figure 9.1.5.1 MAC-es PDU**

(3GPP TS 25.321 § 9.1.5.)

441.    As I have already noted, the standard does not require a "control SDU" to be

formed.  That term is used nowhere in the standard.  It merely illustrates Scheduling Information

as part of a MAC-e PDU.  The standard does not impose any requirements as to the layer in

which Scheduling Information is to be formed.  The standard standing alone therefore does not

establish that this limitation is satisfied by the Accused Products.

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

442.     Rather, Samsung must demonstrate that the specific implementations of the Accused Products generate Scheduling Information at a higher layer than the layer that creates MAC-e PDUs.  Dr. Min fails to make this showing.  He merely asserts that the Accused Products create Scheduling Information.

443.     Dr. Min's report also fails to show or describe physical structures and/or components in the Apple Accused Products that are used to generate the Scheduling Information.



445.     For at least these reasons, I disagree with Dr. Min's assertion that this limitation is satisfied by the Accused Products.

### 5. Unused Scheduling Information Does Not Constitute "Control Information for an Uplink Packet Data Service"

446.     The standard describes Scheduling Information and the Happy Bit as "control information ... used by UEs to indicate to their serving E-DCH Node-B the amount of resources they require."  (3GPP TS 25.321 § 9.2.5.3.)  It specifically describes Scheduling Information as follows:

> The Scheduling Information is located at the end of the MAC-e
> PDU and is used to provide the serving Node B with a better view

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**

> of the amount of system resources needed by the UE and the
> amount of resources it can actually make use of.

(3GPP TS 25.321 § 9.2.5.3.2.)

447.    A Node B may use Scheduling Information received from UEs in making

scheduling determinations for E-DCH.  However, 3GPP TS 25.321 does not require Node B to

use Scheduling Information in any particular fashion, or at all.  (*See* 3GPP TS 25.321 § 11.8.2.3.)

448.    If the Scheduling Information is not used by a Node B, then the Scheduling

Information that may be included in a MAC-e PDU would have no meaning and no utility to the

Node B.  If the Node B simply ignores or discards the Scheduling Information, then the unused

Scheduling Information does not constitute "control information for an uplink packet data

service" because it is not utilized for controlling anything.

449.    As I discussed in my invalidity report and elsewhere in this report, ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████    (Fuja 8/12/13 Report, Part 4, Section II.B.2.)  Thus, any

Scheduling Information that may be transmitted by an Accused Product on these networks would

not constitute "control information for an uplink packet data service."  This is another reason

why the Accused Products do not infringe the asserted claims.

450.    ████████████████████████████████████████████████████

██████████████████████████████.  (Min 8/12/13 Report ¶ 1138.)  As I

discussed in my opening report, ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**

Dr. Min

does not address the testimony from the Alcatel-Lucent corporate witness or any evidence

(Min 8/12/13 Report

¶ 1138.)  I do not agree that these documents support Dr. Min's conclusion.

Dr. Min does not address the Alcatel-Lucent

testimony in his report.

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**



**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**

(black redaction box)

458.    I also disagree with Dr. Min's conclusions regarding the contents of the

documents. (redacted) The cited

excerpts do not support that proposition.

459.    (redacted) This statement does not

does not prove that the NSN hardware *uses* the Scheduling Information (redacted)

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**



**B.    Claim 13 of the '596 Patent**

461.    As I noted previously, claim 13 does not recite any limitations for any of the structures apart from the performance of the steps recited in claim 1.  That is, the apparatus of claim 13 is characterized only by its function of performing the method of claim 1.

462.    As I explained above, the Accused Products do not implement the method of claim 1 for forming MAC-e PDUs.  It follows that the Accused Products do not contain structures for performing the method of claim 1.  Therefore, the Accused Products do not infringe claim 13 for all of the same reasons they do not infringe claim 1.

463.    Specifically in apparatus terms, the Accused Products: (1) lack "at least one block for forming a first protocol data unit (PDU) including uplink packet data"; (2) lack "a multiplexing and transmission sequence number (TSN) setting unit for ... forming a second data packet unit (PDU) by concatenating a header and a payload"; (3) lack "a multiplexing and transmission sequence number (TSN) setting unit for forming at least one first header part corresponding to the first PDU by using ... an N field representing the number of uplink packet data included in the first PDU"; and (4) "a control unit for forming a control service data unit (SDU) including control information for an uplink packet data service."

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**

### C.     No Doctrine of Equivalents

464.    As I have already stated, I disagree with Dr. Min's opinion that the Accused Products literally infringe the claims.

465.    Further, I do not believe that Dr. Min has established infringement under the doctrine of equivalents for claims 1 and 13 of the '596 patent.  Dr. Min's assertions regarding the doctrine of equivalents are contained in paragraphs 1146-1149 of his report.  Dr. Min specifically asserts infringement under the doctrine of equivalents for the "concatenation," "forming a first protocol data unit (PDU)," and "control SDU" limitations.  For the reasons expressed in my literal non-infringement analysis and below, I do not believe that Dr. Min has established infringement under the doctrine of equivalents for any of these limitations.

466.    Regarding the "concatenation" limitation, I explained above why Dr. Min has not established that the Accused Products concatenate a header and payload to form a MAC-e PDU. Nor has he shown that the manner in which MAC-e PDUs are formed in the Accused Products are equivalent to concatenating a header and a payload.  As a further point of elaboration, there are a number of different ways one can imagine forming a MAC-e PDU.  Here are two:

- Form the header of the MAC-e PDU from its constituents parts (i.e., the requisite DDI fields, the requisite N fields, and potentially the $DDI_0$ field) and form the payload of the MAC-e PDU from its constituent parts (i.e., MAC-es PDUs—or, alternately, the constituent parts of the MAC-es PDUs, i.e., the MAC-d PDUs and the TSNs—and potentially Scheduling Information and padding bits).  Then, form the MAC-e PDU by concatenating the MAC-e header and the MAC-e payload.

- 

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

467. The first approach is the one claimed by claims 1 and 13 of the '596 patent, and the second approach is the one carried out in the Accused Products. In his report, Dr. Min asserts that these two approaches are the same or, at least, equivalent. I disagree.

468. Clearly, they are not literally the same. The first approach requires the formation of a MAC-e header and a MAC-e payload before they are concatenated—joined together—to form a MAC-e PDU. The second approach ███████████████████████████████████ ███████████████████████████████

469. Both approaches can be carried out to produce a string of bits that satisfies the MAC-e PDU format specified by the UMTS standards; however, that does not make them either literally the same or equivalent, any more than two different approaches that produce the same physical structure must, as a result, be the same or equivalent. (A handcrafted box might be indistinguishable from a box formed by a machine using a mold, but that does not mean that building a box by hand is the same as building it by machine; they are different processes.)

470. I disagree with Dr. Min's opinion that the Accused Products infringe the "concatenation" limitation of claims 1 and 13 under the doctrine of equivalents.

471. Dr. Min's report asserts that



**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

███████████████████████████████

(Min 8/12/13 Report ¶ 1147.)

472.     Dr. Min's opinion on equivalence essentially is that any device that makes a

MAC-e PDU having the format illustrated in the 3GPP standard (limited to Scenario 2) infringes

the asserted claims, and that the method used by the device to make the MAC-e PDU does not

matter to the infringement analysis.  This is why Dr. Min can opine that "concatenating" does not

require concatenating, and say that ████████████████████████████████

████████████████████████████████████████████

███████████████████████████     (Min 8/12/13 Report ¶ 1147.)

473.     Dr. Min's opinion reads out all of the method limitations out of the claims.  He

effectively opines that the claims cover the format of the MAC-e PDU, regardless of how it is

formed.  The claims are not so broad.  As I have already explained, claim 1 requires a particular

method for forming the claimed "second PDU" and claim 13 is directed to an apparatus that

performs that same particular method.  If the named inventors of the '596 patent had had the

broad view of the scope of the claims that Dr. Min is now ascribing to them, they would have

sought to obtain claims covering that broad scope (i.e., covering a "second PDU" with a

particular format or sequence/arrangement of fields) instead the claims as issued (which are

limited to a particular way of making that "second PDU").

474.     Dr. Min states that the result of the asserted claims is "forming a full MAC-e PDU

with multiplexed control and data information."  (Min 8/12/13 Report ¶ 1147.)  The Accused

Products do not form a MAC-e PDU by performing substantially the same function in

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**

substantially the same way as the claims.  The result may be the same, but the function and way in which that result were reached are not the same.

475.    As I have described, the claims require the "second PDU" to be formed by concatenating a header and a payload.  A PDU is a string of bits, so this means that the claims require a header bitstring and a payload bitstring to be made and then concatenated together.  As Samsung's corporate representative and named inventor admitted, the concatenation of two parts requires the two parts to already exist:

> Q:      Is it fair to say that before being concatenated together, the
> first PDU and the control SDU must first be formed?
>
> A:      Yes, I think that's correct.

(S.H. Kim 6/13/13 Dep. at 59:16-19.)  In order to make the header and payload, the claims require forming the various constituent parts of the header and payload, including the "first PDU."

476.    The Accused Products use a fundamentally different method to build MAC-e PDUs  The methods used in the Accused Products therefore constitute the performance of different functions in different ways from the claims.

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**



478.     Not only are the methods used in the Accused Products not equivalent to the claimed method, they are superior.  The claimed method is inefficient and memory-intensive because it requires bitstrings representing parts of the header and payload (e.g., the "first PDU") to be formed and kept in working memory for the concatenation operation.  To first form a MAC-e header and a MAC-e payload and then concatenate them to form a MAC-e PDU requires a storage location for the intermediate results; i.e., the processor needs to have a place to store the MAC-header and the MAC-e payload prior to their concatenation into (yet another) location.  Although the header may not be very large, the payload parts certainly can be sizable.  The need to store the intermediate bitstrings thus may significantly increase the memory footprint needed to perform the claimed method.



**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**
**Contains Apple, Samsung, and Third Party Confidential Business Information**



480.     Regarding the "first protocol data unit (PDU)" limitation, Dr. Min argues that, in

the Accused Products:



(Min 8/12/13 Report ¶ 1148.)  I disagree that there is no difference, as Dr. Min contends,



**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains Apple, Samsung, and Third Party Confidential Business Information**



483.    Regarding the "control SDU" limitation, Dr. Min argues that "whether the Scheduling Information comes from a higher layer or comes from the same layer that forms the PDU, is an insubstantial difference because the Scheduling Information that forms the control service data unit is the same." (Min 8/12/13 Report ¶ 1149.)  I disagree.  A person of ordinary skill in the art would understand from reading the claims that the inventors of the '596 patent sought to claim two PDUs (the first and second PDUs), as well as one SDU, and that the SDU, *because it is explicitly labeled as an SDU*, would come from a higher layer than the first and second PDUs.  Both the OSI model to which Dr. Min refers and HSUPA is organized into layers for, among other reasons, efficiency purposes and to allow for ease of communications between different components at the UE and the Node B/RNC.  A person of ordinary skill would understand from the deliberate use of the term "SDU" that the inventors expressed a clear intent to distinguish the control "SDU" from the first and second "PDUs."

   **D.    Apple Does Not Indirectly Infringe the '596 Patent**

484.    Dr. Min's indirect infringement analysis relies upon his direct infringement analysis and fails for the same reasons.  I am informed and understand that indirect infringement requires that an act of direct infringement occur and, as I explain above, there is no direct infringement because the Accused Products themselves do not infringe and because there is no