# EXHIBIT 8
# (Part 2 of 2)

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

(ii)     Camera Roll Is Not A "Classification"

324.    Mr. Parulski contends that "Camera Roll is a classification for photos and videos captured by the user." *See* Parulski Rep. ¶ 248.  This interpretation of the term "classification" is inconsistent with both the plain meaning of "classification" and the '449 specification.

325.    As shown below, the '449 distinguishes the folder containing "all" images (outlined below in yellow) from folders of images that indicate a particular "classification" (outlined below in blue):



'449 Patent at Fig. 6 (annotation added); see also *id.* at 67:3-7 ("A mark 608 for indicating all data items at a batch indicates the total number of the data items on the 'unclassified' row 601, the 'first classified' row 605, the 'second classified' row 606, and the 'third classified' row 607.").  The '449 patent never refers to the "ALL" folder as a classification.

171

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

326.    Like the folder containing all recorded data items shown in Figure 6, Camera Roll contains all of the images and videos that have been recorded using the device's front or back camera components.  *See, e.g.*, Titi Dep. at 29:20-21 ("The Camera Roll contains all the photos and videos taken with that device."); iPhone User Guide for iOS 6.1 [APL630DEF-WH0001758342] at APL630DEF-WH0001758411.

327.    Neither Camera Roll nor the "ALL" folder provide the purported advantage of claimed '449 the invention: allowing the user to search within a folder that contains a subset of images on the device to make retrieval easier than having to scroll through every single file.  *See, e.g.*, '449 patent at 8:9-12 ("Since the user may optionally change the classifying destination according to his or her purpose, ***the user's retrieval work for the destination data is made simpler and more efficient***.") (emphasis added).  Viewing the contents of the Camera Roll or the "ALL" folder could force the user to "browse through 3,000 JPEG still images to find a particular one," which is the very problem the '449 patent purports to solve.  Parulski Rep. ¶ 70.

328.    Indeed, it would be nonsensical to refer to a folder containing every single image as a "classification."  The plain meaning of "classification" implies a way to distinguish one item from another.  A folder containing every image recorded with the camera does not enable a user to know which "classification" an image belongs to or whether a particular image is even classified at all.

329.    Mr. Parulski equates albums with "classifications" and contends that Camera Roll is an album.  I disagree.  As Apple engineer Justin Titi confirmed, Camera Roll is not an album.  Titi Dep. at 100:17-20 ("Q. Now, is the Camera Roll actually the same as an album? [A.] No.").  As Mr. Titi explained, Camera Roll is functionally different from an album in many ways.

172

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

330.    First, the process for adding a photo to Camera Roll differs from the process for

adding a photo to an album.

> Q.    Okay.  So in terms of adding a photo to the Camera Roll versus adding it
> to an album, is there a difference?
>
> A.    Yes. The process is different.

Titi Dep. at 19:14-17.

331.    Second, if a user removes a photo or video from Camera Roll, it is removed from

the device entirely.  Removing a photo or video from an album, on the other hand, will not result

in its deletion from the device (i.e., Camera Roll):

> Q.    What are the differences between the Camera Roll and what qualifies as
> an album in the accused iOS devices?



Titi Dep. at 101:3-14.



> Q.    Okay.  So is the difference that you cannot remove a photo from the
> Camera Roll, but you can remove it from the albums?

173

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

A.      That's not strictly correct.  When you remove a photo from the Camera Roll, it is removed from the device.

Q.      Okay.  So you can remove a photo from the Camera Roll.  It's just that then it will not exist in any form on the device; is that right?

A.      That's correct.

Titi Dep. at 18:17-19:13 (emphasis added).

332.    Third, users cannot rename the Camera Roll:

Q.      Any other differences that come to mind?

A.      Users can also rename albums.  They're not able to rename the Camera Roll.  Users are able to rearrange photos within an album but are not allowed to rearrange photos in the Camera Roll.

Titi Dep. at 101:16-20.

333.    In contrast, users can rename albums:

Q.      A user can change the name of an album; right?

A.      Albums created on the device by the user can have their names changed by the user.

Titi Dep. at 63:19-22.

334.    Fourth, users cannot rearrange photos within the Camera Roll.

Q.      Any other differences that come to mind?

A.      Users can also rename albums.  They're not able to rename the Camera Roll.  Users are able to rearrange photos within an album but are not allowed to rearrange photos in the Camera Roll.

Titi Dep. at 101:16-20.

335.    In contrast, users can add and remove photos or videos to an album, arrange the

order of the photos and videos within that album, and reorder the albums they have created:

Q.      What other changes can a user make to an album?

174

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

A.      The user can add or remove photos or videos to an album and also arrange the order of the photos and videos within that album.

Q.      Anything else that the user can change or modify about the albums?

A.      The user can also reorder albums that they've created on the device.

Titi Dep. at 63:23-64:6; *see also* Titi Dep. at 101:16-20.

336.    Fifth, a user cannot create the Camera Roll like he or she could create an album.

Q.      Can a user create the Camera Roll in the same way in which he or she could create an album?

A.      No.

Titi Dep. at 103:10-12.

337.    These difference are reflected in the source code.  For example, the below excerpt from ██████████████ of iOS version 6.0 demonstrates that Camera Roll—referred to in the source code as ████████████████—can delete and create content, whereas regular albums—referred to in the source code as ██████████████—can perform any function (e.g., renaming the album or re-ordering images or videos) except deleting content:

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

338.　　　　　　　　　　　　from iOS version 5.0 includes the same distinctions:

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

**9.     The Accused Apple Products Do Not Record Each Image With Data Indicating The Album Or Albums That Contain The Image**

339.

*See, e.g.*, Titi Dep. at 11:4-12.                                    , the accused Apple products do not record each image "with classification data" as required by the asserted claims of the '449 patent.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

340.   Accordingly, the accused Apple products do not have a recording circuit that "records each one of said plurality of image signals with classification data," as the asserted claims require.

### 10.   Doctrine of Equivalents

341.   Mr. Parulski provides a single conclusory paragraph regarding his contention that the accused Apple products record "each one of said plurality of image signals with classification data" under the doctrine of equivalents.  Parulski Rep. ¶ 249.  I understand that Samsung was previously precluded from arguing that the accused Apple products meet any limitation of claim 25 of the '449 patent under the doctrine of equivalents.

342.   Nevertheless, to the extent that Mr. Parulski is permitted to testify regarding the doctrine of equivalents, I disagree that the accused Apple products record "each one of said plurality of image signals with classification data" under the doctrine of equivalents.  Placing all recorded images and videos in a default location such as Camera Roll does not perform substantially the same function as classifying images and videos for ease of retrieval.  As Samsung itself has explained, "[b]rowsing through 3000 JPEG photos to find a particular image stored in the digital camera was impractical" and the '449 patent purported to solve this problem "*by allowing images to be organized into different classifications or albums within the digital camera*."  Samsung's Response to Interrogatory No. 15, July 15, 2013, at 34-35 (emphasis added); *see also*, Parulski Rep. ¶ 70 ("existing techniques did not provide a way to retrieve and playback these recorded photos and videos quickly and easily"); *id*. ("if a user is forced to browse through 3,000 JPEG still images to find a particular one, and just the decompression of each image takes about one second, the process may take about an hour."); Parulski Rep. ¶ 71

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

("The display is also used to classify images and display a list of classifications, thereby improving the speed of retrieving the photos and videos that are captured…").

343.    Samsung's contention that Camera Roll—which can contain upwards of 3000 JPEG photos—is a "classification" is inconsistent with Samsung's own description of the alleged invention: "Rather than browse through the entire collection of images to find a particular image, a user can organize and retrieve images from albums."  Samsung's Response to Interrogatory No. 15, July 15, 2013, at 35.  Camera Roll does not provide the user with a function to avoid "brows[ing] through the entire collection of images to find a particular image. . . ."  *Id*.  Indeed, Camera Roll poses the same problems that the "classifications" described by the '449 patent were intended to solve.

344.    Further, the way in which Camera Roll functions not substantially similar to a classification.  Images and videos deleted from the Camera Roll are deleted from the device entirely, whereas classifications as described in the '449 patent allow images to be completely removed from a default location and placed in another classification.

345.    Finally, the result is obtained by using Camera Roll is not substantially similar to a classification.  The result of recording images with classification data in accordance with the '449 patent is easier retrieval of images from among all images recorded with the device.  Camera Roll is a default location where *all* images and videos are placed when recorded, and therefore does not provide the user with a subset of all images from which to retrieve a particular image.

179

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

427.    The inventors' commercial embodiment product (from the product brochure) is

shown below:



FirstLook Video Brochure [SAMNDCA630-00828677] at 2.

**E.    Claim Construction**

428.    I set forth my opinions regarding the constructions for the means-plus-function

claim terms that have not yet been construed by the Court in Section VI., F. of my Initial Report.

Below I respond to Dr. Schonfeld's proposed constructions for these terms.

**1.    "means for capturing, digitizing, and compressing at least one
composite signal"**

429.    The Court construed the structure for this limitation to be an audio capture card

and a video card having a video capture module.  Throughout this report, I have used the term

231

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

"video capture card" interchangeably with "video card having a video capture module" (as does Dr. Schonfeld in paragraph 241 of his report).  One of ordinary skill in the art would understand that the term "video capture card," as used in the'239 patent, is the same thing as a "video card having a video capture module" because a video capture card is a video card with a video capture module therein.  Both terms – and others – are used interchangeably in the patent specification to describe the component that performs the capture, digitization, and compression of the composite signal.  *See, e.g.*, '239 patent at 2:63-3:1 ("Computer software loaded on a hard disk drive in the remote unit instructs it **to capture** the input signal to a **video capture card** within the remote unit. The **video capture card takes the audio/visual signal**, **digitizes it** into a computer data file, and **compresses** that data file."), 4:39-40 ("The video signal input into the remote unit **is received by** a **video card having a capture module therein**.") (all emphasis added). 

ActionMedia II Product Brief [SAMNDCA630-00830181] at SAMNDCA630-00830185 (describing the capture module as a daughter card).

### 2.    "means for storing said composite signal" (claim 1)

430.    As stated in Section VI., F. of my Initial Report, it is my opinion that the function for this limitation is "storing said composite signal," and that the structure disclosed in the specification for performing the claimed function is a hard disk drive and the software identified at 3:1-5, 4:52-57, and 6:14-16.  Initial Report ¶ 663.

232

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

431.    Dr. Schonfeld and I agree about the function for this limitation, but we disagree as to the disclosed structure for carrying out the function.  In particular, Dr. Schonfeld contends that the structure is "[m]emory, such as a hard disk or random access memory."  Schonfeld Report ¶ 43.

432.    Dr. Schonfeld fails to provide any analysis linking his asserted structure to the recited function.  It is my understanding that under the analysis of a means-plus-function limitation must begin with the recited function, which is "storing said composite signal."  Next, one should identify the structure disclosed in the specification that performs the recited function.  The portion of the function "said composite signal" indicates that the thing stored by the remote unit is the composite signal referenced in the means for capturing.  This limitation also appears within the remote unit, and therefore the disclosed structure must be structure disclosed within the remote unit.  Dr. Schonfeld's analysis fails to distinguish between structures that are merely related to capturing, and structure that actually performs the function of storing the composite signal.

433.    The Summary of the Invention distinguishes between capturing a data file into memory and storing a data file on the hard disk: "Once digitized and compressed, the data file is *captured* in the computer's memory by a capture module on the video capture card.  A software sequence then instructs the computer central processing unit to *store* the captured data file on the computer's hard disk drive."  '239 patent at 3:1-6 (emphasis added).

434.    Further, as detailed in the Detailed Description of the Preferred Embodiment, it is the hard disk drive that performs the storage function, whereas the RAM is merely related to capturing: "A permanent capture file is *stored* on the hard disk of the remote unit and is called up into the remote unit's RAM where an input video signal is *captured*."  '239 patent at 4:52-54

233

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

(emphasis added).  This is explained further: "[T]he video card in the remote unit **captures** the input video signal to its memory.  Capture includes digitizing the input video signal to form a binary data file and then compressing that file.  The file is compressed in order to conserve memory space and reduce transmission time.   The remote unit then **stores** the digitized and compressed video signal as a data file with a .cap extension **on the hard disk**."  *Id.* at 6:9-16 (emphasis added).

435.    The additional passage cited by Dr. Schonfeld in paragraph 50 fails to support his position that the composite signal is stored in RAM.  That passage merely describes capturing to RAM before transmission, not storage: "The digitized and compressed data file is then named and **captured** in the computer's random access memory (RAM) for transmission to the host unit."[21]  *Id.* at 4:62-66 (emphasis added).

436.    This distinction between capture to RAM and storage to a hard disk drive is appropriate.  RAM is non-persistent memory, and therefore when RAM loses power, any information within the RAM is lost.  Therefore, it would not be considered storage.  A hard disk drive, on the other hand, will retain data stored within it, despite its power state.  Files stored to a hard disk drive can be played, replayed, transmitted, and retransmitted, even after the device is turned-off.  Data in RAM would not be re-usable after shut-down.  Moreover, because it is much faster than persistent storage, RAM is used for buffering data between operations, such as between digitizing and compressing, or as it is being read from the hard disk and queued for transmission.

---

[21]    Dr. Schonfeld's report appears to have inadvertently misquoted the passage.  I have used the correct quotation here.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

437.    Dr. Schonfeld also suggests that the passage describing capture to RAM "for transmission to the host unit" is consistent with the Court's identified structure for the means for transmitting the composite signal.  Schonfeld Report ¶ 50.  I disagree.  As discussed above, that passage only discloses buffering of the stored data file as it is read from the hard disk in preparation for transmission. The "storing" of the "stored data file" referred to in the Court's construction is described as storing on a hard disk:

> After the video sequence is captured, it may be viewed, edited, or transferred to the host unit.  Each bit map file box 22 has a 'VIEW' selection button 24 and a "TRANSFER" selection button 26. Upon selection of "VIEW" button 24, a captured video data file may be retrieved from the remote hard disk and the video sequence run. The video sequence is displayed in its respective bit map file box 22. . . . Selection of "TRANSFER" button 26 initiates the transfer software sequence B and file splitting software sequence C, discussed below. The captured, digitized and compressed data file is then automatically transmitted to the host unit.

'239 patent at 6:24-39.  The only time storage is described in the remote unit, it is described as storing in a hard disk.

438.    Dr. Schonfeld is also incorrect that software is not required by the '239 patent for this means-plus-function limitation.  The specification clearly links software to the storage function: "A software sequence then instructs the computer central processing unit to store the captured data file on the computer's hard disk drive."  '239 patent  at 3:3-6.  Because the specification links software to the storage function, software for storage is required structure.

### 3.    "means for receiving at least one composite signal transmitted by the remote unit" (claim 1)

439.    As stated in Section VI. F of my Initial Report, it is my opinion that the function for this limitation is "receiving at least one composite signal transmitted by the remote unit," and that the disclosed structure for performing the claimed function is one or more modems

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

corresponding to the number of modems used in the remote unit and connected to one or more

cellular telephones, telephone lines, and/or radio receivers[22] and File Reception Software

Sequence E as described in the '239 patent at 10:33-61 and 11:18-12:8.  Initial Report ¶ 665.

440.    Dr. Schonfeld and I agree on the function but disagree as to the correct structure.

Specifically, Dr. Schonfeld contends that the structure is "[o]ne or more modems connected to

one or more cellular telephones, telephone lines, or radio receivers."  Schonfeld Report at ¶ 43.

Notably, Dr. Schonfeld fails to identify any software as required structure for carrying out the

claimed function.

441.    As the Court described in its Order Construing Disputed Claim Terms, "whether

software algorithms are a required structure depends on whether the software included in the

specification is required for the hardware to perform the claimed function."  Claim Construction

Order [Docket No. 447] at 67.  Dr. Schonfeld ignores the numerous columns of the '239 patent

specification that describe software for receiving, include the large portions of the specification

under the header "File Reception Software Sequence E."  '239 patent at 11:26-12:9.

442.    The '239 patent describes "File Reception Software Sequence E" as a sequence

that "automates each telephone line end modem of the host unit 3 to obtain communication with

each cellular telephone of remote unit 2 and receive the transmitted data file in 10K files and

recombine the data file for storage on the hard disk drive of playback unit 4."  '239 patent at

11:19-24.  Without Software Sequence E, the host unit could not communicate with the remote

unit, and therefore the data file could not be transmitted or received.  Because Software

Sequence E is required to perform the claimed function of "receiving at least one composite

---

[22]    I have replaced "transmitters" with "receivers" in my proposed construction to correct an
inadvertent error in my Initial Report.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

signal transmitted by the remote unit," it is required for the structure of this means-plus-function limitation.

### 4.    "means for exchanging with said host unit" (claim 1)

443.    As set forth in Section VI. F. of my Initial Report, it is my opinion that the function of this limitation is "exchanging data with said host unit," and the structure disclosed in the '239 patent specification for performing the function is a 16-bit Ethernet card, Novell Netware Lite software, and Host Boot Software Sequence D identified at 10:62-11:24.

444.    Dr. Schonfeld and I agree about the function for this limitation, but do not agree as to the structure for carrying out the recited function.  Dr. Schonfeld contends that the structure is "a network or wired interface for communication between the host and playback units."  *See* Schonfeld Report at ¶ 60.  In support of his position, Dr. Schonfeld points to claim 2 of the '239 patent, which recites that the host unit and playback unit are combined in a single computer, as requiring the more general non-disclosed structure he proposes.  I disagree.

445.    First, non-asserted claim 2 does not disclose another embodiment for the means for exchanging limitation.  It only adds an alternative arrangement for the host unit and playback unit.  Indeed, Dr. Schonfeld does not and cannot point to any disclosure in the '239 patent that supports the notion that a different "means for exchanging" is employed when the host unit and the playback unit are physically located in a single computer.  In any event, Dr. Schonfeld admits that in this configuration, "the interface between components is networked together even when they are part of the same computer," which he says "is likely to be a wired network interface." Schonfeld Report ¶ 63.  Of course, an Ethernet network *is* a wired network.  Dr. Schonfeld does not explain how a network can be created without the specialized hardware – such as an Ethernet card – to do so.

237

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

446.     Second, the support for the structure I identified for this limitation is, among others: "Data files received from remote unit 2 are stored on hard disk drive of playback unit 4. Host unit 3 and playback unit 4 are networked together. A pier-to-pier [sic] network, such as 'Novell LiteTM' by Novell® is particularly suitable for this purpose." '239 patent at 10:55-59. The only disclosure of network capability for the host unit and playback unit is the 16-bit Ethernet card and Novell Netware Lite software. *See* '239 patent at 10:31-32 (host unit) and 12:2-5 (playback unit).

447.     Third, my construction does not "blatantly exclude the embodiment disclosed in Claim 2 of the patent" as Dr. Schonfeld contends. Schonfeld Report at ¶ 64. Contrary to Dr. Schonfeld's conclusory statement, it is technically feasible to include a host unit and a playback unit in a single computer and use the disclosed structure of a 16-bit Ethernet card and Novell Netware Lite software to exchange data between them. The '239 patent discloses no other way to interconnect the units so data can be exchanged. There is no technical limitation that prevents an Ethernet link from working when two units are housed within the same physical structure.

448.     Finally, Dr. Schonfeld is incorrect in his assertion that the Host Boot Software Sequence D "does not even relate to the playback unit." *Id.* ¶ 65. In that software sequence, the host unit logs onto the network and "stores data files received from remote unit 2" on drive F, which "is the subdirectory on the hard disk drive of playback unit." '239 patent at 11:5-8. The Playback Boot Software Sequence F is nearly identical to the Host Boot Software Sequence F, except that it receives the file that the host unit has placed on drive F. *Id.* at 12:12-26. This is unsurprising:  in order to form a network, both units must have networking software. For this same reason, Dr. Schonfeld is incorrect that software is not required.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

**5.      "means for storing the composite signal received by the host unit"
(claim 1)**

449.     As stated in Section VI. F of my Initial Report, it is my opinion that the function of  this limitation is "storing the composite signal received by the host unit," and that the disclosed structure for performing the claimed function is a hard disk drive.  Initial Report ¶ 669.

450.     Dr. Schonfeld and I agree about the function for this limitation but disagree as to the structure.  Specifically, Dr. Schonfeld states that the structure is "[m]emory, such as a hard disk or random access memory."  Schonfeld Report at ¶ 43.

451.     Dr. Schonfeld fails to provide analysis linking RAM to the agreed function.  Here, the function is "storing the composite signal received by the host unit."  Because this limitation appears within the portion of the claim that describes the playback unit, the structure must be part of the playback unit.

452.     The portions of the specification that clearly describe the storage structure of the playback unit state:  "Driver [sic] letter F: is mapped as 'Save Here.'  This is the subdirectory on the hard disk drive of playback unit 4 wherein the host unit 3 stores data files received from remote unit 2."  '239 patent at 11:5-8.  *See also id.* at 12:20-24, 12:47-51.   This supports my opinion that the correct structure is a hard disk drive.

453.     ███████████████████████████████████████████████
███████████████████████  It is my understanding that the inventor's testimony is irrelevant to a means-plus-function analysis.  The analysis focuses on what is actually disclosed in the patent specification—and the '239 patent does not describe any structure other than a hard disk drive for storing in the playback unit.

239

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

### 6.   "means for decompressing said composite signal" (claim 1)

454.   In Section VI.F. of my Initial Report, I stated my opinion that the function for this means-plus-function limitation  is "decompressing said composite signal," and the structure disclosed in the specification for performing the claimed function is a video decompression card and an audio decompression card.  *See* Initial Report ¶ 671.

455.   Dr. Schonfeld and I agree on the recited function but appear to disagree as to the disclosed structure.  In particular, Dr. Schonfeld contends that the proper structure is a video card and an audio card.  *See* Schonfeld Report at ¶ 68.  I understand the patent to be using the term "video card" and "video decompression card" interchangeably.  The same is true for "audio card" and "audio decompression card."

### 7.   "means for transmission of said captured video over a cellular frequency" (claim 15)

456.   As stated in Section VI.F. of my Initial Report, it is my opinion that the function of this limitation is "transmission of said captured video over a cellular frequency," and that the disclosed structure for performing the claimed function is one or more modems connected to one or more cellular telephones, and software performing a software sequence of initializing one or more communications ports on the remote unit, obtaining the stored data file, and transmitting the stored data file.  Initial Report ¶ 673.

457.   Dr. Schonfeld and I agree about the function for this limitation, but once again disagree about the corresponding structure.  In particular, Dr. Schonfeld states that the structure is one or more modems connected to one or more cellular telephones or cellular radio transmitters.  I disagree.

458.   Dr. Schonfeld fails to provide a means-plus-function analysis for this claim limitation.  Here, the function is the transmission of said captured video over a cellular

240

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

frequency.  But Dr. Schonfeld's proposed construction is incorrect because it identifies "cellular radio transmitters," which never appear in the specification.  It is my understanding that it is improper to infer a possible structure for carrying out the claimed function.  Instead, the structure must actually be disclosed in the specification.

459.    Indeed, the portion of the specification cited by Dr. Schonfeld to support his view that "cellular radio transmitters" are part of the structure illustrates why "cellular radio transmitters" cannot be the structure for this limitation.  The specification states that in "areas which are . . . outside cellular telephone 'cell[s],' files can be transmitted using radio frequencies."  '239 patent at 9:38-39.  It would make little sense to replace the cellular telephone with a "cellular radio transmitter," when the goal is to achieve transmission outside of the range of a cellular telephone cell.  Thus, the specification actually discloses that radio transmitters other than "cellular radio transmitters" are alternatives to the cellular telephones disclosed by the specification.  Because claim 15 requires transmission over a cellular frequency, radio transmitters discussed in the specification cannot be part of the structure.

460.    Dr. Schonfeld also relies on claim 16 as evidence that "cellular radio transmitters" should be included in the structure.  However, claim 16 adds the limitation of two interfaces with a cellular telephone connected to each interface.  It says nothing about "cellular radio transmitters" and, therefore, has no impact on the proper construction of claim 15.

461.    The Court already identified the structure disclosed in the '239 patent for transmitting in claim 1.  That same structure performs the function of transmission in claim 15, with the exception that the structure is limited to those structures that perform the function over a cellular frequency.  The only hardware structures disclosed for performing the function of

241

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

transmission of a video data file over a cellular frequency are modems connected to cellular

telephones.

462.     Dr. Schonfeld claims that the use of "transmission" rather than "transmitting" in

claim 15 means that there are no "actions" required by claim 15, and as a consequence, "means

for transmission" does not include the software sequence construed as part of the structure of the

means for transmitting claim term in claim 1.  This mischaracterizes the Court's construction.

Claim 1 is not a method claim, and the software steps disclosed are not "actions" but rather

structure for performing the recited function.  Dr. Schonfeld claims (at ¶ 78) that "'transmitting'

is a verb, where 'transmission' is a noun," and that this means no software steps are part of the

structure for "means for transmission of said captured video over a cellular frequency."   In fact,

"transmitting" is a gerund, not a verb.  A gerund serves the role of a noun in a sentence, and

therefore "means for transmitting" means the same thing as "means for transmission."  See

MERRIAM WEBSTER, *Gerund*, http://www.merriam-webster.com/dictionary/gerund (last visited

September 12, 2013) ("an English noun formed from a verb by adding – ing").  Moreover, claim

1 is directed to "[a]n apparatus for transmission of data" in which the "transmission" is

accomplished by a "means for transmitting."  In other words, the patent makes no distinction

between the two terms, nor does Dr. Schonfeld cite any distinction in the patent.  The same is

true for "composite signal" in claim 1 and "video" in claim 15 – the specification does not even

use the term "composite signal," and Dr. Schonfeld does not make any distinction between the

terms in his infringement analysis.

### F.     The Accused Products

463.     I understand that Samsung has accused the iPhone 4, iPhone 4S, iPhone 5, iPad 2,

iPad 3rd generation, iPad 4th generation, iPad mini, iPod touch 4th generation, and iPod touch

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

### 1. "means for capturing, digitizing, and compressing at least one composite signal" (claim 1)

529. The Court has construed this limitation as a means-plus-function limitation, in which the function is "capturing, digitizing, and compressing at least one composite signal" and the corresponding structure that performs this function is "an audio capture card and a video card having a video capture module." Claim Construction Order [Docket No. 447] at 64.

530. For this limitation, Dr. Schonfeld states that "Samsung has accused the iPhone 4, iPhone 4S, iPad 2, iPad 3, iPad 4, iPad Mini, iPod Touch 4th Generation, and iPod Touch 5th Generation as infringing mobile remote units for purposes of infringing Claims 1 and 7." Schonfeld Report ¶ 1301. Dr. Schonfeld asserts that the ████████████████████ ████████████████ using either FaceTime application or the Camera application, and that ███████████████████████████████████████████████ ████████████████████████████. *Id.* ¶¶ 509, 514, 1304. He also asserts that "[t]he application processor System-on-Chip (SoC) includes ██████████████ ████████████████████████████████████████████ ██████████████." *Id.* ¶ 1305. According to Dr. Schonfeld, these components constitute a "video card having a video capture module" and an "audio capture card" because the accused products ██████████████████████████████████ ████████████████████████████ and/or ████████████████ (or ████████████████████████████████████ and "also contains an application processor Systems-on-Chip (SoC) that includes ████████████████ ████████████████████████████ ████████████████." *Id.* ¶ 1307. As discussed in detail below, I disagree with Dr. Schonfeld.

274

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

531.    In Section VI.C. above, I described the components and operation of video and audio capture cards and image sensors.  As discussed in detail below, the accused products do not have capture cards or anything like them, nor do the accused components have the ability to perform the claimed functions.  Samsung and Dr. Schonfeld are accusing a completely different functionality – recording a video – and structure – an image sensor in a camera – from what is claimed.  Although a video camera is disclosed in the specification, it is not part of the structure as construed by the Court that performs the function.  *See, e.g.*, '239 patent at Figure 1, 3:66-67 ("FIG. 1 depicts the components and the sequence of the process of the present invention."), 4:7-8 ("The drawings represent the present invention . . . ."), 4:28-32 ("A signal is input into remote unit 2 from any device having the capacity to output a video signal 1, such as a video camera, video cassette recorder/player, laser disc player, etc.  The video signal received by the remote unit can be of any generally known format, such as NTSC, PAL, and Y/C video (or S video)."), 4:39-41 ("The video signal input into the remote unit is received by a video card having a video capture module therein.  Such a card is available commercially from IBM/Intel."); *see also* '239 File History, 2/2/96 Aff. [SAMNDCA630-00832590] ¶ 2 (describing Ex. A as "our invention"), Ex. A (depicting video camera as distinct from the claimed remote unit).  Even Dr. Schonfeld's discussion of the technology in his report treats capture cards and image sensors separately and as distinct devices with different functions and purposes.  *See, e.g.*, Schonfeld Report ¶¶ 238-241.  Yet Dr. Schonfeld never explains the patent's disclosures, or even mention whether the accused products can  perform the claimed functions in the way that the required captures do

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

(and as described in the patent).  Dr. Schonfeld is essentially attempting to eliminate the

requirement of an audio capture card and a video card having a video capture module.

> a) *The accused products do not have an "audio capture card and video card having a video capture module" or equivalent structure*

532.    The accused iOS products do not have the required audio capture card or video

card having a video capture module.  As discussed above in Section VI.C.1, audio and video

capture cards are optional, add-on components that can be inserted into an expansion slot in a

computer to add video or audio (or both) capture functionality.  The iOS devices do not have any

expansion capabilities and are not shipped with audio or video capture cards, as evidenced by the

fact that none of the Bills of Materials for any of the accused products lists any capture cards (or

video capture modules).  *See, e.g.*, iPhone 5 Bill of Material [APL630DEF-WH0005313660].

*See* Storer Exhibit 1 for an exemplary list of Bills of Material.  *See also*

http://www.apple.com/iphone/specs.html; http://www.apple.com/ipad-mini/specs/;

http://www.apple.com/ipad/specs/; http://www.apple.com/ipod-touch/specs.html.  Nor do any

schematics for the accused products identify any capture cards (or video capture modules).

533.    Nor do the accused components in the accused iOS devices constitute an audio

capture card.  First, none of the accused components – a "logic board," ████████████████

████████████████████████████████████████████████ and

applications processor ████████████████████████████████████

████████████████ – is an audio capture card.  Nor are these components collectively an audio

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

capture card.  *See* Schonfeld Report ¶ 1307.[30]  As discussed above in Section VI.C.1, an audio capture card is an optional, add-on component for computers.  It is installed in an expansion slot of the motherboard of a computer and contains all the hardware needed to add specialized functionality to the computer – namely, the ability to capture, digitize, and compress audio signals from an analog device and decompress and play those audio signals.  An audio capture card connects to the motherboard and therefore is a distinct component; it is not also a motherboard.  As shown in the images of audio capture cards in Section VI.C.1 above, an audio capture card adds external connectors to the device to allow connection to an audio source.  In contrast, the accused main logic board of the accused products and the other accused components are not the same structure as an audio capture card.  The main logic board is not an optional, add-on component – in fact, it is essential to the product and the product would not operate without it.  There is also no way to remove it or any of the other accused components without destroying the device.  The main logic board contains the main processor and many other integrated components, and provides connectivity to all the components in the product, as well as connectivity to all the peripherals and other components that are not on the board.  The board does not have any connectors for connecting an analog video source to the product.  Moreover, as discussed in detail below in Section VI.G.1.b, the accused components are not capable of performing the capture, digitization, and compression function of an audio capture card.  To the extent the audio codec and audio subsystem are accused as an audio capture card without the

---

[30]     Dr. Schonfeld asserts that the logic board "contains" an audio codec and "camera sensor," and that the ████████████████████████.  Schonfeld Report ¶ 1307.  It is unclear from these statements whether Dr. Schonfeld is actually accusing the logic board as part of the required audio capture card or video card having a video capture module and the microphone as part of the audio capture card.  I have addressed the alternative arguments, to the extent they are understood, in this section and in Sections G.1.d and G.1.f.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

main logic board (either with or without the microphone), they do not form an audio capture card

for the similar reasons:  they are not add-on components, do not provide the connectors required

for audio capture, and do not perform the claimed functions (as discussed in detail below in

Section VI.G.1.b).

534.    The fact that the collection of components are not audio capture cards can also be

illustrated by viewing the components.  For the iPhone 5, █████████████████

███████████████████████████████

█████ .  The other two components – █████████████████

███████████████ .

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

279

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Only a portion of the SOC is accused.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

████ User's Manual APL630DEF-WH0001749889] at APL630DEF-WH0001749090.  This

collection of components and portion of the main processor is not an audio capture card.  In

addition to the reasons already discussed, an audio capture card includes components for capture

and playback functionality, and does not have functions unrelated to audio capture, digitization,

or compression on it.  Nor does an audio capture card contain a general purpose processor, such

as the SOC.  *See, e.g.*, ActionMedia II Product Brief [161DOC000324] at 1-2 (includes i750

VideoProcessor and audio digital signal processor).  Dr. Schonfeld does not even attempt to

explain how these components (and subcomponents), scattered throughout the product with

many components between them, form an audio capture card.

535.    The same is true of the components in the accused products that allegedly

constitute a "video card having a video capture module."  None of the accused components – a

"logic board," "camera sensor(s)," and "application processor Systems-on-Chip (SoC) that

includes . . .  a dedicated compression module for performing video compression" – is a video

card having a video capture module.  Nor are these components collectively a video card having

a video capture module.  *See* Schonfeld Report ¶ 1307.  As discussed above in Section VI.C.1, a

video capture card is an optional, add-on component for computers.  It is installed in an

expansion slot of the motherboard of a computer and contains all the hardware needed to add

specialized functionality to the computer – namely, the ability to capture, digitize, and compress

video signals from an analog device and decompress and play those video signals.  A video

capture card connects to the motherboard and therefore is a distinct component; it is not also a

motherboard.  As shown in the images of video capture cards above, the card adds external

connectors to the device to allow connection to the video source device.  In contrast, the accused

main logic board of the accused products and the other accused components are not the same

281

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

structure as a video card having a video capture module for the same reasons discussed in

connection with "audio capture card."  Moreover, as discussed in detail above in Section

VI.G.1.b, the accused components are not capable of performing the capture, digitization, and

compression function of a video capture card.  To the extent the image sensor and ▮▮▮▮▮▮

are accused of being a video card having a video capture card without the main logic board, they

do not form an audio capture card for the similar reasons:  they are not add-on components, do

not provide the connectors required for video capture, and do not perform the claimed functions

(as discussed in detail below in Section VI.G.1.b).

536.    The fact that the collection of components are not video capture cards can also be

illustrated by viewing the components. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

But again, only a portion of the ███ is accused – the ██████████, which is outlined in

blue below:

██████ User's Manual APL630DEF-WH0001749889] at APL630DEF-WH0001749090.  This

collection of components and portion of the main processor is not a video capture card.  In

284

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

addition to the reasons already discussed, a video capture card includes components for capture

and playback functionality, and does not have components unrelated to capture, digitization, and

compression on it.  Nor does a video capture card contain a general purpose processor, such as

the SOC.  *See, e.g.*, ActionMedia II Product Brief [161DOC000324] at 1-2 (includes i750

VideoProcessor and audio digital signal processor).  Dr. Schonfeld does not even attempt to

explain how these components (and subcomponents), scattered throughout the product with

many components between them, form a video card having a video capture module.[31]

537.    For each of these reasons, the accused components are not the same structure

required by claim 1, namely an audio capture card and a video card having a video capture

module.

538.    The accused components are also not structures equivalent to an audio capture

card and a video card having a video capture module because they do not perform the identical

function of the limitation in substantially the same way as the required structure to achieve

substantially the same result.  First, the accused components were not available at the time of the

invention.  ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

Moreover, digital video cameras that compressed video had just been introduced, and also were

not yet integrated into computers or handheld devices.  It is my understanding that because the

---

[31] ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

accused products use after-arising technology, they cannot literally infringe, even as equivalent structure.

539.     In addition, for the reasons discussed above in Section VI.G.1.b, the accused components are incapable of performing the identical function of "capturing, digitizing, and compressing at least one composite signal."

540.     Moreover, the accused components do not perform any function in substantially the same way as the audio and video capture cards.  As already discussed, ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████ . *See* ████ User's Manual APL630DEF-WH0001749889] at APL630DEF-WH0001749920-21 (describing camera subsystem).  Once the data is processed, ████████████

████████████████████████████ .  The microphone captures sound, converts the sound into electrical signals, and sends them to the audio codec to be digitized.  The image sensor and microphone do not capture any kind of analog electrical signal, and none of the components captures a composite signal.  In contrast, the claimed composite signal is captured by connecting a computer to an external video source.  The video and audio capture cards first capture and digitize a complete image (a frame) and associated audio from the analog electrical signal (the composite signal) into random access memory in the computer by the video and audio capture cards, and then compresses the frame of video.  *See, e.g.*, Understanding PC Video (Intel) [161DOC000570] at 6 (describing the process).  These differences are substantial, as shown by the fact that the '239 patent itself discloses both a video camera and the video and audio capture

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

cards:  there would be no need to disclose both if they performed the same or equivalent

function.

>    b)    *The accused components do not perform the function of*
>           *"capturing, digitizing, and compressing at least one composite*
>           *signal"*

541.    The accused components in the accused iOS devices do not perform the function

of "capturing, digitizing, and compressing at least one composite signal" because they cannot

capture a composite signal.  A person of ordinary skill in the art would understand "capture" to

mean to receive information as an input into the device.  That is what the patent describes.  For

example, the '239 patent describes the process of "capturing" as receiving a composite signal

into the video capture card and audio capture card in the mobile remote unit "from any device

having the capacity to output a video signal 1, such as a video camera, video cassette

recorder/player, laser disc player, etc."  '239 patent at 4:28-32; *see also id.* at 4:39-40 ("The

video signal input into the remote unit is received by a video card having a video capture module

therein."), 2:59-61 ("In one preferred embodiment, an audio/visual signal is input into the remote

unit from a video camera at a remote location."), 5:44-46 ("An audio capture card installed in the

remote unit captures the audio of an input signal.");

.  The input is the composite

signal, which is an analog electrical signal with both video and audio components, such as those

that conform to a standard such as NTSC.  *See* '239 File History, 2/2/96 Amend.

[SAMNDCA630-00832596] at 6 ("The term 'composite signal' is generally known to mean a

signal which includes components such as audio and/or video.  With regard to the present

invention, the composite signal which is captured by the remote unit may have both audio and

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

video components as is commonly known to be a 'composite signal.'"); '239 patent at claim 1 (requiring digitization of the composite signal). The composite signal is an analog electrical signal created and output by the "device having the capacity to output video signal 1," such as the image sensor in the video camera. '239 patent at Abstract ("The audio/visual signal can either be NTSC, PAL, or Y/C."), 2:26-28 ("It is the purpose of the present invention to provide a method and means for capturing full-color, full-motion audio/video signals . . ."), 4:31-34 ("The video signal received by the remote unit can be of any generally known format, such as NTSC, PAL, and Y/C video (or S video)."); Digital Video in the PC Environment (Intel / McGraw-Hill) [161DOC002786] at 21 (discussing composite signal formats NTSC, PAL, and SECAM). That analog electrical signal is received by the video and audio capture cards in the mobile remote unit when the video camera is attached to the unit. As discussed above in Section VI.C.1, this is how video and audio capture cards work. Dr. Schonfeld agrees with this description. *See* Schonfeld Report ¶ 241 ("When analog video signals are provided, digital video is obtained by using a video capture card that samples and quantizes the analog signal and converts into a digital video signal. The video capture card will then encode the digital video signal into a digital video format.").

542.    But the components in the accused products (the "mobile remote units") that Dr. Schonfeld identifies as performing the claimed function – a microphone, ████████████████████ ██████████████████████████████, and main processor ("SoC" or "applications processor") – cannot capture a composite signal, and they do not perform the functions of a video card having a video capture module or an audio capture card. The only accused components that receive any kind of input into the accused device that will eventually become part of a video are the image sensor and the microphone, and neither receives a composite signal

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

as input.  A person of ordinary skill in the art would understand that an image sensor receives

light and a microphone receives sound.  As discussed above in Section VI.C.2, ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████ Sasson

7/31/13 Tr. at 170:13-171:10; Millet Tr. at 14:13-21 (image sensor captures photons of light).

543.    The light and sound received by the accused components are not "composite

signals."  Composite signals are well known.  A "composite signal" is an analog electrical signal

that represents the series of frames that make up a full-motion video, as well as the audio

component.  Known composite signal standard formats are NTSC (National Television System

Committee), which is the analog television standard used in the United States, and PAL (Phase

Alternating Line), which is the analog television standard in other countries.  The patent explains

that the signal received by the audio and video capture cards can be one of these formats or S-

video.  *See, e.g.*, '239 patent at Abstract ("The audio/visual signal can either be NTSC, PAL, or

Y/C."), 2:26-28 ("It is the purpose of the present invention to provide a method and means for

capturing full-color, full-motion audio/video signals . . ."), 4:31-34 ("The video signal received

by the remote unit can be of any generally known format, such as NTSC, PAL, and Y/C video

(or S video).").  *See also* '239 File History, 2/2/96 Affidavit [SAMNDCA630-00832590] ¶ 2

(describing invention as an apparatus that captures, digitizes and compresses a "full motion

composite signal"), claims 1 and 9 (requiring digitization of the composite signal); '239 File

289

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

History, 2/2/96 Affidavit, SAMNDCA630-00832592] at Ex. A ("Remote unit digitizes and
compresses video/audio NTSC signal"), 2/2/96 Amend. at [SAMNDCA630-00832596] at 6
("With regard to the present invention, the composite signal which is captured by the remote unit
may have both audio and video components as is commonly known to be a 'composite signal.'");
Claim Construction Order [Docket No. 447] at 51-52 (requiring composite signal to have both
video and audio components); Microsoft Press Computer Dictionary [APL630DEF-WH-
A0000036852] at 54.  A composite signal is a viewable image output from a video source, such
as a video camera or VCR.  *See* Sasson 7/31/13 Tr. at 165: 7-20, 171:16-172:17; '239 File
History, 5/21/96 Amend. [SAMNDCA630-00832632] at 11 (arguing that real-time capture
includes "capture of a composite signal previously stored").[32]

At no time during this process is
there ever a viewable frame represented by analog signals.  For audio capture, the microphone
captures the sound accompanying the scene and then converts that sound into electrical signals.

For these reasons, the function of "capturing" using an image
sensor and a microphone is very different from capturing a composite signal.

---

[32]       The fact that a composite signal represents viewable frames is inherent in the fact that it
is produced by a video camera, VCR, or other video output device.  The inventors also
acknowledged this when stated during prosecution that real-time capture includes "capture of a
composite signal previously stored."  '239 File History, 5/21/96 Amend. [SAMNDCA630-
00832632] at 11.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

544.    It appears that even Dr. Schonfeld agrees with the above description of how

image sensors and microphones work.  *See, e.g.*, Schonfeld Report ¶ 240 ███████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████ (emphasis added), ¶ 237 ("Audio data acquisition using a

microphone, which serves as a transducer that converts an acoustic signal conveying sound into

an electrical signal. The essential principle in the design of microphones is the conversion of

mechanical vibration into electrical signals."); *see also* Expert Report of Kenneth A. Parulski

Regarding Infringement of U.S. Patent No. 6,226,449 at 57 (noting "the number of megapixels

used for ***capturing photos*** in the Apple Accused Products, which requires that the product

include an imaging device having at least the number of megapixels listed"), 58 ("Apple

engineer Tim Millet also confirmed that 'the camera sensor is capturing the light, capturing the

image.'").

545.    For each of these reasons, the accused components do not perform the claimed

function and therefore do not infringe claim 1.

> c)    *The accused components do not meet this limitation under the*
> *doctrine of equivalents*

546.    The accused components also do not perform the same or substantially the same

function of "capturing, digitizing, and compressing at least one composite signal" under the

doctrine of equivalents.  First, as discussed at length above, ████████████████████████

███████████████ and the accused microphone captures sound, neither of which is part of a

composite signal.  The image sensor and microphones cannot capture a composite signal nor do

they create a composite signal.  A composite signal is an analog electrical signal that represents

291

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

viewable video frames output from an analog video source such as a video camera or VCR, whereas no video yet exists when the image sensor and microphone capture photons and sound waves. These differences are substantial, as shown by the fact that the '239 patent itself discloses both a video camera and the video and audio capture cards:  there would be no need to disclose both if they performed the same or equivalent function.

547.   Moreover, for the reasons just discussed in the previous section, the accused components do not perform any function in substantially the same way as the audio and video capture cards or achieve substantially the same result.

548.   In addition, Samsung is estopped from asserting the doctrine of equivalents with respect to FaceTime.  As discussed above in Section VI.D.2, during prosecution, the examiner rejected claim 1 as obvious light of Gattis, Dykes, and Guillou.  Gattis discloses "[a] teleconferencing system include[ing] desktop computers, external cameras and [p]eripheral apparatus to allow interconnection of two or more terminals to engage in teleconferencing via digital data networks."  U.S. Patent No. 5,062,136 ("Gattis") at Abstract.  The "video signal" received by the computer in Gattis is digitized, compressed and transmitted in "a continuous fixed rate binary digital data stream" without creating a data file.  *Id*. at 3:33-44, 5:36-37.  The applicants argued that:

> The Gattis et al ('136) patent lacks a significant element contained within Applicants' independent claims 1 and 12 which is not supplied by Dykes or Guillou. . . . .
>
> Gattis does not contemplate the creation of full-motion composite signal video information into ***digitized files which can be stored, transmitted, played or replayed***.  This is a ***very significant difference***. . . . Thus, Gattis does not disclose the creation of a data file as required by Applicants' claims. . . .  [I]n Applicants' inventions, full motion composite signal ***is captured into digitized files*** and transmitted over narrow (slow) and/or intermittent band

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

widths while and still maintaining the original captured quality of
the video.

'239 File History, 2/2/96 Amendment [SAMNDCA630-00832596] at 10-11 (emphasis added).

Through these arguments, the applicants relinquished the ability to assert that at least claim 1

(and its dependent claims) cover any device that does not create a full-motion composite signal

video data file that can be "stored, transmitted, played or replayed," such as the accused Apple

products when running FaceTime.  As discussed in Section VI.F.4, FaceTime creates packets

containing the video frames (or portions thereof) and audio, not files, and discards them

immediately after sending so they cannot be replayed.

> d)    *Dr. Schonfeld has failed to demonstrate that the accused products*
> *have an "audio capture card and a video card having a video*
> *capture module" or equivalent structure*

549.    Dr. Schonfeld has failed to identify an audio capture card or a video card having a

video capture module in any of the accused products.  Although he baldly states that "the '239

Accused Products have an audio capture card and video card having a video capture module," he

does not cite any evidence of any such card.  The same is true for the components Dr. Schonfeld

claims are an audio capture card – the main logic board in the accused products, ██████████

████████████████████████" and "various processors (e.g. ARM and DSP)" on the main

processor – and a video card having a video capture card – an image sensor and "dedicated

compression module for performing video compression" on the main processor.[33]  He states that

these components are the required cards, but he does not explain why they are cards, cite any

evidence that they perform the same function as the cards, or even show them.  As an example,

in footnote 78 of his report, Dr. Schonfeld states that he uses the term "application processor

---

[33] It is unclear whether Dr. Schonfeld intends to include a microphone as an accused component.

293

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Systems-on-Chip" to refer to "the Intel or other main processor, in conjunction with with [sic] a graphics unit when configured with that option, for Mac OS X." Dr. Schonfeld never identifies any processor in the Mac computers, never identifies the "graphics unit" in any Mac computer, and never explains how they are purportedly the required cards. Nor could he – the accused components are not cards, as explained above. Moreover, Dr. Schonfeld does not identify any Mac hardware component that performs audio compression. As discussed above, Macs perform audio compression entirely in software.

550.     Rather than limit his analysis to what audio capture cards and video capture cards are and how they operate, Dr. Schonfeld improperly accuses camera and audio components that perform completely different functions – as demonstrated by the fact that the '239 patent discloses both a video camera and capture cards but only describes the cards as performing the capture, digitization, and compression functions. As discussed above in Section VI.C.1 (and as is clear from the patent), the terms "audio capture card" and "video card having a video capture module" refer to well-known, specific components that perform specialized functions, and they are required structure. The terms are not merely labels that they can be applied to any collection of components (or subcomponents).

551.     For similar reasons, Dr. Schonfeld is wrong to equate a main logic board containing or connected to the accused components with the required audio capture card and video card having a video capture module. The main logic board in the accused products contains the main processor – which performs thousands of functions unrelated to producing video – as well as many specialized chips that have nothing to do with video. It is not a specialized, optional card as the required cards are, and it is not removable. For these same

294

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

reasons, the fact that the accused components are either on or connected to the main logic board does not turn the collection of components into a card.

552.    Dr. Schonfeld has also failed to demonstrate that the accused components are equivalent structures to the required cards.  First, Dr. Schonfeld's discussion of this issue consists of five sentences containing nearly identical, conclusory statements that merely repeat the claimed function several times, contains no analysis whatsoever, and misstates how the accused components operate.  I also disagree with his conclusions.

553.    As an initial matter, it is my understanding that Samsung is barred from asserting that the accused components are equivalent structure because the components are after-arising technology.[34]  As discussed above, the accused camera modules and image sensors were not available at the time of the invention, and therefore constitute after-arising technology that cannot literally infringe as equivalent structure.

554.    Nor are Dr. Schonfeld's other assertions correct.  Dr. Schonfeld first asserts that the "'239 Accused Products perform substantially the same function" as the required card.  First, Dr. Schonfeld treats the entire accused device as the structure, rather than just the accused components.  This is improper:  Dr. Schonfeld must identify the purportedly equivalent structure and demonstrate that it is an equivalent.  He has not done so.  Second, it is my understanding that this is the wrong test for showing literal infringement by structural equivalents:  the accused components must perform the identical function.  Dr. Schonfeld has not even attempted to show

---

[34]    The Court recognized this issue in the claim construction order and in the order on Samsung's Motion for Leave to File Amended Infringement Contentions.  *See* Claim Construction Order [Docket No. 447] at 60, n.13; Order re Motion for Leave [Docket No. 636] at 14, n.36 ("The Court notes that . . . [Samsung] does not specify whether it believes the components existed at the time of the patent issuance or are after-arising."), 17, n.44 ("Samsung again fails to explain whether it believes the components were in existence at the time of the patent issuance or were after-arising.").

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

that the accused components perform the identical function as the claimed cards.  Moreover, as

discussed above, the accused components do not perform the identical function as the claimed

cards.  Dr. Schonfeld admits as much in his description of CMOS image sensors and video

capture cards in paragraphs 240 and 241 of his report.

555.    Dr. Schonfeld next asserts in two sentences that the accused components are

insubstantially different from the required cards and perform the claimed function in

substantially the same way as the required cards because "the '239 Accused Products and the

claimed structure capture, digitize, and compress audio and video signals on devices that reside

on at least one card in the mobile remote unit."  Schonfeld Report ¶ 1308 (sentences 2 and 4).

As with his other literal infringement discussion, Dr. Schonfeld provides no explanation or

evidence to support this conclusion.  He does not even assert that the accused *components*

perform the claimed substantially the same way, relying instead on the accused *products*.  I also

disagree with this conclusion.  As discussed at length above in Section G.1.b, the accused

components (and the accused products) do not perform the claimed functions at all, and the

functions Dr. Schonfeld has identified are performed very differently from the functions

performed by required cards.[35]  The accused components perform camera functions – described

above – and do not have the ability to capture a composite signal from an analog video device

and digitize and compress that signal.

556.    Finally, Dr. Schonfeld asserts that "the '239 Accused Products achieve

substantially the same results" because "both the '239 Accused Products and the claimed

structure generate compressed digital audio and video signals in the mobile remote unit."  Again,

---

[35]    As already mentioned, video capture cards do not perform camera functions and audio
capture cards do not perform the functions of a microphone.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Dr. Schonfeld provides no explanation or evidence to support this conclusion.  He is also wrong – as discussed above in Sections VI.C. and VI.G.1b, the accused components capture very different information than the audio capture card and video card having a video capture module, and therefore produce very different results.  Dr. Schonfeld has not shown otherwise.

>    e)   *Dr. Schonfeld has failed to demonstrate that the accused components perform the function of "capturing, digitizing, and compressing at least one composite signal"*

557.   Dr. Schonfeld has also failed to demonstrate that any accused component performs the identical function of "capturing, digitizing, and compressing at least one composite signal" for several reasons.  First, he has not identified any evidence that contradicts any of the facts discussed above, or cited any evidence that the accused components perform the same "capture" function as the required capture cards.  Indeed, the evidence he cites in other parts of his report supports my opinion, not his.  Dr. Schonfeld even describes the accused image sensor and required video capture card as having different functions and inputs.  Because he admits that the accused components perform functions different from the required components, Dr. Schonfeld cannot demonstrate that the accused products literally infringe claim 1 of the '239 patent.

558.   Dr. Schonfeld's infringement "analysis" for this limitation is fundamentally flawed because he compares the functions of the accused components to the "capture" functions of a video camera – which is disclosed but neither claimed nor described in the patent – rather than the functions that the required video card having a video capture module and audio capture card actually do perform.  *See* '239 patent at 4:28-32, Figure 1; Claim Construction Order [Docket No. 447] at 64.  In other words, he is treating the structure as requiring a video camera while ignoring the capture cards.  This approach is impermissible.  The Court has already

297

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

construed this limitation to require an audio capture card and a video card having a video capture

module.  Thus, any infringement analysis must compare the accused components to the functions

of the required structure.  But Dr. Schonfeld never even discusses how capture cards perform the

claimed functions.[36]

559.    Dr. Schonfeld also misstates the claimed function when he asserts that "all

handheld devices (including all iPhone, iPad, and iPod Touch devices) and laptop computers

(including MacBook Air and MacBook Pro devices) are mobile remote units that capture,

digitize, and compress,  combined audio and video signals *to form* composite signals."

Schonfeld Report ¶ 1303 (emphasis added).  I disagree:  that is not the claimed function.  Rather,

the claim function is "capturing, digitizing, and compressing *at least one* composite signal."

Because a composite signal that does not already exist cannot be captured, I understand the term

"at least one composite signal" to mean that the composite signal must already have been

formed.  This understanding is consistent with the patent's description of "capturing" as

receiving a composite signal into the mobile remote unit "from any device having the capacity to

output a video signal 1, such as a video camera, video cassette recorder/player, laser disc player,

etc."  '239 patent at 4:28-32; *see also id*. at 4:39-40 ("The video signal input into the remote unit

is received by a video card having a video capture module therein."), 2:59-61 ("In one preferred

embodiment, an audio/visual signal is input into the remote unit from a video camera at a remote

location."), 5:44-46 ("An audio capture card installed in the remote unit captures the audio of an

input signal.").  Moreover, the patent does not describe "forming" a composite signal.  Dr.

---

[36]    Because these components are distinct from a video camera and the video camera is not
part of the required structure that performs the claimed function, the functions of the video
camera are irrelevant.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Schonfeld cannot prove that the accused components perform the claimed function by rewriting

the function.

560.    Dr. Schonfeld has failed to demonstrate that the accused components can capture

a composite signal.  He asserts that "[c]apture and digitization of audio signals in the Accused

Mobile Remote Units is performed by a ███████████████████████████

████████████████████████████████████," and that "[c]apture and

digitization of video signals is performed by an ██████████████████ (or ███████

█████████████████████████████████████████████████████████████

██████████."  Schonfeld Report ¶ 1304.  First, Dr. Schonfeld does not describe the "audio

signal" and "video signal" he refers to in these sentences.  To the extent "audio signal" means the

audio portion of the composite signal and "video signal" means the video portion of the

composite signal, I disagree with his statements.  Second, as discussed above in Section

VI.G.1.a, █████████████████ and the microphone captures sound waves – as Dr.

Schonfeld himself admits – not a composite signal or any portion of a composite signal.  *See,*

*e.g., id.* ¶¶ 237, 239, 240, 763.

561.    Dr. Schonfeld also misstates the function of the accused components.  For

example, he asserts that "[t]he image sensor for the camera will capture and digitize the video

frame that is recorded, and then the Applications Processor SoC, and in particular a hardware

encoder on that Applications processor SoC will compress the FaceTime video frame."

Schonfeld Report ¶ 509.  This is incorrect.  Unlike a video capture card, the image sensor does

not capture a "video frame that is recorded": ██████████████████████████████

██████████████    In addition, Dr. Schonfeld states that "[c]apture and compression" of

audio and video signals "is performed by" the main processor of the accused components.  *Id.* ¶

299

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

1305.  Again, I disagree.  As discussed above, the only components that capture any information that can become part of a video into the device are the image sensor and a microphone, and they are not capable of capturing a composite signal as the claim requires.  The main processor does not receive an analog electrical signal representing the video – i.e., "capture" a "composite signal" – as required by the claim.  To the extent the main processor receives any information that will become part of a video, it is received from another component and it is already digitized.

> f)  *Dr. Schonfeld has failed to rebut Apple's non-infringement contentions or to demonstrate that the accused components meet this limitation under the doctrine of equivalents*

562.  In a section of his report entitled "Apple's Non-Infringement Arguments Do Not Change My Opinions," Dr. Schonfeld purports to rebut Apple's response to Samsung's Interrogatory No. 12, which is Apple's non-infringement contentions in response to Samsung's infringement contentions.  Dr. Schonfeld has failed to rebut Apple's non-infringement contentions.  In many cases, he does not even address Apple's argument, and in others, he mischaracterizes Apple's contention.  For example, Samsung's infringement contentions failed to provide any means-plus-function analysis for the many means-plus-function terms that have not been construed by the Court.  In response to Apple's mention of this issue, Dr. Schonfeld merely says he disagrees and refers to the claim constructions in his report.  *See, e.g.*, Schonfeld Report ¶ 1589 ("I disagree.  Above, I have set forth the proper claim construction for each means plus function term.").  He does the same for many other contentions, such as Samsung's failure to identify any evidence of that the accused components are capture cards and failure to identify an audio capture card or video card having a video capture module in any of its infringement contentions, including those filed after the Court's claim construction requiring this structure.

300

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

*See id*. ¶¶ 1592-95.  Similarly, Dr. Schonfeld repeatedly attempts to attribute arguments to Apple that were actually Samsung's contentions.  *See, e.g.*, Schonfeld Report ¶ 1608 (GPUs in Samsung's contentions but not mentioned in Dr. Schonfeld's report), ¶ 1612 (Samsung's apparent contention that the ███████████████████████████████ is a separate device), ¶ 1615 (Samsung's failure to identify any capture cards in the accused products).

563.    In this section, Dr. Schonfeld also repeatedly fails to acknowledge what audio capture cards and video capture cards are – despite having described them, albeit briefly, when describing the art.  For example, in paragraphs 1616 and 1617, Dr. Schonfeld states that "there is nothing in the Court's structure that says that the components are 'add-on components'" or that the structure "must be connected to an 'external device.'"  I disagree – the Court's identification of an audio capture card and a video card having a video capture module requires exactly those characteristics.  As I discussed in detail above in Section VI.C.1, these cards are add-on components that receive input from an external device.  The patent itself describes them in this manner, and Dr. Schonfeld has not identified any evidence to contrary.  Moreover, as described below, Dr. Schonfeld repeatedly argues that the camera can be external to the accused product, but fails to explain how that fact has anything to do with the required cards.  *See, e.g., id*. ¶¶ 1597, 1617, 1619, 1622.

564.    Where Dr. Schonfeld does address Apple's arguments, he fails to rebut those arguments and often contradicts the patent, the file history, the Court's claim construction, and his own report.  Many of Dr. Schonfeld's arguments are also unclear and contradictory.

565.    For example, in response to Apple's argument that the accused components do not perform the identical function of the required capture cards, Dr. Schonfeld first states that the Court already construed the term "capture" and that neither party "asked for a specialized

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

meaning of the term." Schonfeld Report ¶ 1597. Dr. Schonfeld is incorrect: the Court only construed the term "means for capturing, digitizing, and compressing at least one composite signal" and "means for transmitting said composite signal," and did not construe the term "capture."

566.    Moreover, it is unclear what Dr. Schonfeld means by the assertion that "Apple is improperly reading the term 'capture' to cover a 'completely separate' video recording device," nor has Apple made such a statement. *Id*. ¶ 1597. Rather, Apple merely stated what the patent describes and what video and audio capture cards do – capture analog audio and video signals as input *from* a video source such a video camera or VCR. Neither Apple nor I suggest any "specialized meaning" of any term. Apple and I have applied the plain meaning of the term "capture" and the Court's construction requiring an audio capture card and video card having a video capture card to perform the claimed functions. That plain meaning merely reflects how capture cards work, as Dr. Schonfeld has acknowledged. *See* Schonfeld Report ¶¶ 240, 241.

567.    Dr. Schonfeld also asserts that "there is nothing in the claims that prevents the camera and microphone from being external from the remote unit." *Id*. ¶ 1597; *see also id*. ¶ 1617 ("using a camera internal to the remote unit is the same as using a camera external to the remote unit"), ¶ 1622 ("to ever capture video at a remote location, a video camera is necessary at some point otherwise video cannot be received"). Dr. Schonfeld is correct: in fact, an external video camera is what the patent depicts and describes. But it also irrelevant: the Court's construction required an audio capture card and a video card having a video capture module. The video camera – which is disclosed in the fpatent and presumably also has a microphone – is not part of the structure required by the Court's construction to perform the claimed functions. Samsung never requested inclusion of the video camera in the structure, nor does Dr. Schonfeld

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

cite anything in the specification or provide any explanation why the video camera (and its

image sensor and microphone) has any relevance to the required structure.  He simply ignores

the required structure and attempts to rewrite the construction to require completely different

components.  It is also unclear how the fact that the patent describes an external camera and

microphone supports Dr. Schonfeld's opinions.  He does not say.

568.    Dr. Schonfeld next asserts that "the image sensor and audio codecs capture the

video from the camera and microphone.  All of these different components are incorporated into

the accused devices but are 'completely separate' components."  Schonfeld Report ¶ 1598; *see

also id*. ¶¶ 1622, 1626.  First, I disagree with the statement that "the image sensor . . . capture[s]

the video from the camera."  The image sensor is not a distinct component from the camera – it

essentially *is* the camera.  The camera module in the accused devices contains a lens and the

image sensor, and the ISP connects to the camera module.  ███████  User's Manual [APL630DEF-

WH0001749889] at APL630DEF-WH0001750045; iPhone 5 Main Camera MCO [APL630DEF-

WH0008481151] (depicting lens and image sensor in camera).  The image sensor captures light

through the lens.  Even Dr. Schonfeld refers to the image sensor as a "camera sensor" throughout

his report.  Schonfeld Report ¶ 1121 (citing Millet testimony:  "The camera sensor is capturing

the light, capturing the image."), ¶ 1125 ("Millet discussed the image sensor, the image stream

coming from the camera sensor"), ¶ 1304 ("Capture and digitization of video signals is

performed by an ██████████████████████████ (or ████████████████████████

████████████████████████████████████████), ¶ 1307

("the logic board in the '239 Accused Products also contains ████████████████████

████████ (or ██████████████████████████████████████

██████████████████████").  Dr. Schonfeld does not explain how the image sensor

303

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

can capture from itself.  Second, as discussed above in Sections VI.C. and VI.G.1.a-b, the image

sensor and microphone do not capture video or a composite signal as required by the claim.

Finally, I do not understand the relevance of Dr. Schonfeld's assertion that "[a]ll of these

different components are incorporated into the accused devices but are 'completely separate'

components."  Although Dr. Schonfeld attempts to attribute the phrase "completely separate" to

Apple, Apple made no such assertion.

569.    Dr. Schonfeld next asserts that "to the extent Apple is correct on this argument,

Apple still infringes under the doctrine of equivalents" because "[a] 'completely separate'

recording device, and the accused functionality for purposes of 'receiving an analog audio and

video signal' is substantially the same and any differences are insubstantial."  Schonfeld Report ¶

1599.  Again, I do not understand what Dr. Schonfeld means by this statement.  First, Apple has

never argued that a "completely separate recording device" is part of the claim.  Second, the

structure required by the Court's claim construction is an audio capture card and a video card

having a video capture module to perform the claimed function.  For this reason, to the extent

that Dr. Schonfeld is comparing the accused components to an image sensor and microphone in a

video camera – as the last sentence in paragraph 1599 suggests – that comparison is irrelevant

because the video camera is not part of the structure.[37]  Dr. Schonfeld reasserts similar arguments

in paragraphs 1607, 1619, 1620, 1622, 1624, 1625, and 1626, and my response is the same.

570.    To the extent that Dr. Schonfeld is comparing the accused components to the

required audio capture card and video card having a video capture module in paragraph 1599, he

---

[37]    Dr. Schonfeld's apparent attempt to incorporate the image sensor and microphone from
video camera into the structure also fails because other devices that do not have these
components are also described in the patent, including a VCR and laser disc player.  *See* '239
patent at 4:28-31.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

has failed to demonstrate that the accused components meet this limitation under the doctrine of

equivalents.  First, Dr. Schonfeld's "analysis" has several errors and omissions.  He first asserts

that "both perform substantially the same function of receiving the video and audio signals from

a recording device."  I disagree.  The image sensor and microphone capture light and sound from

a live scene, not from any recording device.  For this same reason, his statement that "the image

sensors use a CMOS sensor to capture the video from an analog signal" is incorrect.  Dr.

Schonfeld also asserts that the result is that "the accused devices captures the video that is taken"

but fails to explain how the ***accused components*** compare to the required structure.  Nor does

Dr. Schonfeld explain how the accused components capture the "composite signal," a claim term

that he does not mention.  Finally, his statement that "the only difference for the purposes of

Apple's argument is whether the video camera or microphone are part of the remote unit or

external to the remote unit" makes no sense, and is irrelevant to the question of the whether the

accused components are equivalent to the required capture cards.  Second, for the reasons

discussed above in Section VI.G.1.a-b, the accused components do not meet this limitation under

the doctrine of equivalents.

571.    With respect to the term "composite signal," Dr. Schonfeld again asserts that the

Court has already construed the term and that Apple is offering a specialized construction.

Schonfeld Report ¶¶ 1601-04.  Neither assertion is correct.  As discussed above, "composite

signal" is a well-known concept.  A composite signal is an analog electrical signal with both

video and audio components, such as those that conform to a standard such as NTSC.  '239 File

History, 2/2/96 Amend. [SAMNDCA630-00832596] at 6 ("The term 'composite signal' is

generally known to mean a signal which includes components such as audio and/or video.  With

regard to the present invention, the composite signal which is captured by the remote unit may

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

1   have both audio and video components as is commonly known to be a 'composite signal.'").

2   Composite signals are output by video devices such as video cameras and VCRs, and are

3   viewable images.  Notably, Dr. Schonfeld does not explain what he understands the term

4   "composite signal" to mean.

5        572.   Dr. Schonfeld next asserts that "Apple infringes the patent literally" because

6   ████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████

8   ████████████████████   Schonfeld Report ¶ 1606.  Dr. Schonfeld is incorrect.  First, there

9   is no single voltage that represents the video.  As discussed above, █████████████

10  █████████████████████.  In addition, I disagree with Dr. Schonfeld's conclusion for

11  the reasons discussed throughout this report.  In fact, Dr. Schonfeld does not even mention any

12  of the required components of the analysis, including "composite signal," audio capture card, or

13  video card having a video capture module, much less explain how they exist in the accused

14  products.

15       573.   In paragraph 1606, Dr. Schonfeld asserts:

16          Moreover, even if Apple's arguments are found to be correct,
17          Apple still infringes under the doctrine of equivalents. The
18          functionality of the accused products is substantially the same as
        the claim and there are no insubstantial differences. Both the
19          Accused functionality and the claim describes the same function of
20          capturing a video signal from a camera. Both the Accused
        Functionality and the claim perform this function in the same way.
21          Namely, they receive a digital signal recorded by a camera, and
22          capture and digitize that signal. Finally, they both have the same
        result. The video signal is captured and digitized by both the
23          Accused Products and the claim such that it can be compressed.

But Dr. Schonfeld provides no analysis or support whatsoever for his assertions.  He does not

24  even identify the accused components, referring instead to "accused products," "accused

25

26                        306

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

functionality," and "they."  And again, Dr. Schonfeld does not even mention any of the required components of the analysis, including "composite signal," audio capture card, or video card having a video capture module, much less explain how they exist in the accused products.  It is impossible to know what Dr. Schonfeld is comparing.  In any event, I disagree with Dr. Schonfeld's conclusions.  As already discussed, the accused components do not "receive a digital signal recorded by a camera."  Moreover, the accused components do not infringe under the doctrine of equivalents, as discussed in Section VI.G.1.C.  For these same reasons, Dr. Schonfeld has failed to demonstrate that the accused components infringe under the doctrine of equivalents in paragraphs 1611, 1614, 1619, 1620, 1624, 1625, and 1626.

574.    In paragraph 1610, Dr. Schonfeld argues that the term "composite signal" does not require "a combined video and audio signal" because "this is inapposite to the definition provided by the Applicant during prosecution" and "contradicted by the Court's construction of the structure for the term."  According to Dr. Schonfeld, "the audio and video necessarily will have to be separated into its audio and video components."  I disagree.  First, the applicants actually confirmed during prosecution that a composite signal could have both audio and video components when they argued that with regard to the present invention, the composite signal which is captured by the remote unit may have both audio and video components as is commonly known to be a 'composite signal.'"  *See* '239 File History, 2/2/96 Amend. [SAMNDCA630-00832596] at 6.  Second, although the Court did not construe the term "composite signal," the Court expressly rejected Samsung's argument that the composite signal need only contain audio *or* video.  Claim Construction Order [Docket No. 447] at 51.  Finally, there is nothing in the Court's identification of required structure that requires two separate cards, as Dr. Schonfeld states.  In fact, it was known in the art at the time of the invention that a single capture card (such

307

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

as an ActionMedia II Capture Module, discussed above in Section VI.C.1,) could capture both video and audio signals.  In any event, even if Dr. Schonfeld is correct that the Court's construction requires two separate cards, he has still failed to prove infringement by the accused components for the same reasons already discussed.  In fact, Dr. Schonfeld does not even identify two distinct sets of components – he identifies the main logic board for both cards in the structure.

575.    In paragraph 1612, Dr. Schonfeld argues that the input signal does not need to be analog because "[t]he plain meaning of [the claimed] function does not even require an analog signal – only that the signal is 'digitized' . . . ."  I disagree.  First, Dr. Schonfeld misquotes the claim:  the claim requires the function of "digiti*zing*," not the end result of a digitized signal.  There is no need to digitize a signal that is not analog.  Second, Dr. Schonfeld again ignores the term "composite signal," which is an analog signal, as explained above.  As with most of his opinions, Dr. Schonfeld never explains the meaning of this term.  Dr. Schonfeld then argues that the "voltage captured by the image sensor is a[n] analog signal."  I disagree: ███████████ ███████████████████████████████████████████████ ██████████████.

576.    In paragraph 1620, Dr. Schonfeld attempts to argue that the accused components were in existence at the time of the alleged invention, but at the same time admits that "the components in the Apple devices were not around in their current and exact form."  Dr. Schonfeld is correct.  As Dr. Schonfeld states, "technology advances, and the reduction in cost for components such as those now permit them to be mass produced and used in small devices such as the accused products."  Technology advances and resource expenditures that permitted the development of the cameraphone were substantial, as evidenced by the fact that the first

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

cameraphone was sold in 2000, years after the purported invention.  Moreover, merely shrinking an image sensor and a system-on-a-chip is not sufficient to create the accused products.  Each component must be designed to work with each, and integrated a fully-functional handheld or table smartphone system.  All these technologies arose long after the purported invention of the '239 patent.[38]

577.    Finally, Dr. Schonfeld advances numerous arguments that Samsung is not estopped from asserting the doctrine of equivalents against FaceTime by the applicants' arguments during prosecution of the '239 patent.  I disagree with his arguments.

578.    First, Dr. Schonfeld asserts that FaceTime stores a file by "storing video frame data prior to transmission."  Schonfeld Report ¶ 1628.  Dr. Schonfeld is incorrect:  as discussed in Section VI.F.4, FaceTime packetizes the video and audio frames, but never creates or stores a file.  FaceTime has no need to store a file because the packets are discarded after transmission.  Dr. Schonfeld has not provided any evidence to the contrary.

579.    Second, Dr. Schonfeld argues that the "the Applicants did not relinquish storing the file in a buffer" and that the quote Apple identified "does not use the word memory or buffer, or files."  Schonfeld Report ¶ 1629.  Again, Dr. Schonfeld is incorrect.  The Applicants argued to the examiner "Gattis does not contemplate the creation of full-motion composite signal video information *into digitized files* which can be stored, transmitted, played or replayed.  This is a very significant difference. . . . *[I]n Applicants' invention*, full-motion composite signal is captured *into digitized files* . . . ."  '239 File History, 2/2/96 Amend. [SAMNDCA630-00832596] at 10-11 (emphasis added).  In the next amendment, the applicants again argued that

---

[38]     The web site that Dr. Schonfeld cites in support of his assertion that a system-on-a-chip existed at the time of the invention is for a watch.  He does not explain how this cite supports his argument.

309

"*[t]he present invention* includes an apparatus capable of capturing a full-color, full motion composite signal in real time; digitizing that composite signal *into a data file*; compressing *the data* file and transmitting it through a computer interface via telephone lines, cellular, radio, and other telemetric frequencies from a remote unit to a host unit." '239 File History, 5/20/96 Amend. [SAMNDCA630-00832632] at 9 (emphasis added).  It is unclear why Dr. Schonfeld asserts that the quotes do not use the term "files."  In fact, in the same paragraph, Dr. Schonfeld states that "[a]s the Applicants stated, the invention captured full video frames that were ultimately saved into files."  In short, Dr. Schonfeld admits that any accused product (like FaceTime) that does not store in a data file cannot meet  this limitation.  As explained in Section VI.F.4, FaceTime does not store a data file.

### 2.       "means for storing said composite signal" (claim 1)

580.    The parties agree that the function of this limitation is "storing said composite signal."  In addition, under Apple's construction, the required structure is a hard disk drive and the software identified at 3:1-5, 4:52-57, and 6:14-16 in the '239 patent.  Under Samsung's construction, the required structure is "memory, such as a hard disk or random access memory." Schonfeld Report ¶ 1310.

581.    For the reasons discussed below, it is my opinion that the accused components identified by Dr. Schonfeld – "DDR SDRAM as well as a NAND flash memory" – do not satisfy this limitation, either literally or under the doctrine of equivalents.  Schonfeld Report ¶ 1312.

> a)      *The accused components are not hard disk drives, literally or under the doctrine of equivalents*

582.    The accused DDR SDRAM and NAND flash memory are not hard disks, nor do any of the accused iOS devices contain a hard disk.  Rather, all the accused iOS devices use a NAND flash memory.  There is no hard disk listed in the Bills of Materials for any iOS device.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

*See, e.g.*,  [APL630DEF-WH0005285127; APL630DEF-WH0001809981; APL630DEF-WH0001593264].[39]  *See also* Exhibit 1.

583.    Nor can the accused components be structural equivalents of a hard disk drive. Dr. Schonfeld has provided no evidence that they existed in the form used by the accused iOS devices at the time of the alleged invention.  At that time, both SDRAM and NAND flash memory were new technologies, and handheld and tablet devices had not yet been developed. Moreover, DDR SDRAM was not developed until the late 1990s.  At the time of the filing of the '239 patent, NAND flash memory of the size and structure utilized by Apple iOS devices and Mac computers was unavailable.  It was not until long after the filing of the '239 patent that NAND flash memory could be utilized for long term persistent storage of video data in mobile consumer devices,.  For these reasons, the accused components are after-arising technology and therefore do not qualify as structural equivalents.  The DDR SDRAM incorporated in Apple iOS devices computers cannot be a structural equivalent for the same reasons.

584.    The accused components also cannot be equivalent structure because they are substantially different from a hard disk drive.  First, as discussed below, they do not perform the same function as the hard disk drive – because the accused devices are incapable of receiving a composite signal, the information stored on the NAND flash memory by the Camera app and the packets buffered in the DDR SDRAM by FaceTime is not a digitized and compressed version of a composite signal.  In addition, the accused components function in a substantially different way than a hard disk drive.  A hard disk drive contains a rapidly rotating disk that uses magnetic heads to store digital data.  NAND flash memory stores information in an array of memory cells

---

[39]    Due to the volume of Bills of Materials produced by Apple, I have not separately listed the Bates number of each.  I may use any or all of them to support my opinions.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

made from floating gate transistors.  Because NAND flash memory is solid state, it performs any similar function in a different way than a hard disk drive.  DDR SDRAM is an array of storage cells consisting of capacitors and transistors.  The data buffered on SDRAM is lost whenever the device is powered down.  Finally, the result achieved by FaceTime's use of SDRAM is different.  Any information in SDRAM is lost on power down, and the information that FaceTime buffers into SDRAM is not in a file structure.  It is therefore not accessible by the user for later playback.  These differences are substantial.  For example, a person of ordinary skill in the art designing a product that allowed replay of video would not choose volatile storage such as SDRAM.  Moreover, a hard disk drive is not feasible for video calls because it is not fast enough.  For these same reasons, the accused components do not perform substantially the same way to achieve substantially the same results as a hard disk drive, and therefore do not satisfy this limitation under the doctrine of equivalents.

585.     For these reasons, the accused iOS devices do not literally infringe under Apple's construction.

> b)     *The accused components do not perform the function of "storing said composite signal"*

586.     As discussed above in Section VI.G.1.b, the accused devices cannot capture a composite signal, nor is the information received by the image sensor and microphone a digitized and compressed form of a composite signal.  For this reason, the NAND flash memory and DDR SDRAM do not store a composite signal.

587.     In addition, with respect to FaceTime, the accused products do not use persistent storage, nor do the accused products contain the software portion of the corresponding structure, which requires that "the digitized and compressed video signal [be stored] as a data file." ('239 patent at 6:14-16, 3:1-5, 4:52-57; *see also, e.g., id.* at Figure 3, 2:26-38, 2:46-58, 2:66-3:21, 3:26-

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

60, 4:42-46, 4:52-5:7, 5:46-54, 6:9-18, 6:27-29, 6:31-39, 7:21-33, 8:17-40, 9:3-24, 9:65-10:54,

11:1-8, 11:11-14, 11:26-12:23, 12:27-51; SAMNDCA630-00832596 [2/2/96 Amend.] at 10-11;

SAMNDCA630-00832632 [5/20/96 Amend.] at 9; Docket No. 447 [Claim Const. Order] at 64.)

As explained above, FaceTime ███████████████████████████████████

███████████████████████████████████. *See, e.g.*, Garcia

Tr. at 42:4-14, 44:21-45:5, 46:12-47:4. *See also* ███████████████

██████████ at ln. 889-1214); ███████████ at ln. 3464-3515; █████████

████████ at ln. 1371-1843); ██████████ at ln. 26; ██████████ at ln. 728-808;

at ln. 22-50, ██████████ at ln. 133-???.  Furthermore, when FaceTime transmits video

packets, it ████████████████████. *See* ██████████████████████

at ln. 654-762); ████████████████████████ at ln. 384-803);

████████████████████ at ln. 650-702). ████████████████

████████████████████████████████████████████

███████████████████████████████████████

██████

588.   The ███████████████████████████████. As

explained in ██████████ at lines 141 to 209, █████████████████████

████████████████████ This is an example

of why a person of ordinary skill in the art would recognize that a █████ is not file storage:

FaceTime ████████████████████████████.

Files typically only allow a single writer at a time.  In addition, in source code, files are declared

differently than █████ and treated differently than █████.  Files are not the same as █████ in

source code.

313

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

589.   As also discussed above in Section VI.D.2, the applicants relinquished any subject matter involving video calls during prosecution of claim 1.  For this reason, the accused components cannot infringe this claim under the doctrine of equivalents with respect to FaceTime.

c)   *Dr. Schonfeld has failed to demonstrate that the accused components satisfy this limitation*

590.   In his argument that the accused components are structures equivalent to the hard disk drive required under Apple's construction, Dr. Schonfeld asserts that accused components perform substantially the same function as a hard disk drive because they "write the composite signal into a memory storage device," perform in substantially the same way because "write the composite signal into a memory storage device in the mobile remote unit," and achieve substantially the same result because "the composite signal can be read from a memory storage device in the mobile remote unit at a later time."  Schonfeld Report ¶ 1316. I disagree with Dr. Schonfeld's assertions and his conclusions.  First, as he does throughout his report, Dr. Schonfeld uses the wrong legal standard for structural equivalents.  As stated above in Section III.A, a structural equivalent must perform an identical function, not "substantially the same function."   As discussed above, the NAND flash memory and DDR SDRAM in the accused iOS devices do not perform the identical function required by this limitation, nor do they perform any function in substantially the same way to achieve substantially the same result as a hard disk drive.  These different components are used for different purposes for good reasons.  Yet Dr. Schonfeld fails to provide any analysis explaining why DDR SDRAM and NAND flash memory are equivalent to a hard disk drive.  NAND flash memory and DDR SDRAM are also after-arising technologies that cannot be a structural equivalent.  For these reasons and those discussed above, Dr. Schonfeld has failed to demonstrate literal infringement.

314

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

591.    Dr. Schonfeld also identifies some FaceTime source code that he alleges relates to storing a composite signal.  Specifically, Dr. Schonfeld asserts that ████████ illustrates storage in "a memory called ████████,"[40]  Schonfeld Report ¶¶ 1538-39.  It is unclear how this illustrates software for storing to a hard disk drive.  The source code Dr. Schonfeld cites ████████, and has nothing to do with storage to a hard disk drive.  Furthermore, the source code ████████.  This process is ████, not storing a composite signal to memory or anywhere else.  A person of ordinary skill in the art would not understand ████ to be "storing."  Moreover, Dr. Schonfeld identifies no other application software and therefore provides no analysis for how Mail or Messages includes software for storage.

592.    As explained above in Section VI.F.4, the ████████ used by FaceTime also cannot meet this limitation under the doctrine of equivalents.  None of the accused iOS devices and Mac computers performs the same function of "storing said composite signal."  Further, the ████████ performed by FaceTime is not a substantially similar function.  ████ ████████ When FaceTime ████ audio and video data, ████████ ████████ at ln. 650-702).  Nor does FaceTime's use of ████████ perform the

---

[40]    Dr. Schonfeld appears to be citing the following files:

████████

████████

315

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

function in substantially the same way.  A hard disk drive contains a rapidly rotating disk that stores digital data using magnetic heads.  Data stored on a hard disk drive is persistent.  DDR SDRAM is an array of storage cells consisting of capacitors and transistors.  The data stored on SDRAM is lost whenever the device is powered down.  It thus does not utilize the same way of storing information.  Finally, the result achieved by FaceTime's use of ███████ is different.  Any information in ███████ is lost on power down, and the information that FaceTime ███████ ████████████████████████, and therefore not accessible by the user for later playback.

593.    In his purported rebuttal of Apple's non-infringement contentions, Dr. Schonfeld asserts that "the file is the collection of video frames stored in the buffer."  Schonfeld Report ¶ 1639.  Dr. Schonfeld is incorrect.  There is no file.  Frames are briefly buffered as they are packetized, and packets (which contain a portion of a video frame or audio data) are transmitted immediately through a buffer.  A person of ordinary skill in the art would not understand this process to be storing a data file.  As explained above, buffering frames is very different than storing in a data file.

### 3.    "means for transmitting said composite signal" (claim 1)

594.    The parties have agreed that this limitation is a means-plus-function limitation, in which the function is "transmitting said composite signal."  The Court has identified the corresponding structure that performs this limitation as "one or more modems connected to one or more cellular telephones, telephone lines, and/or radio transmitters, and software performing a software sequence of initializing one or more communications ports on the remote unit, obtaining the stored data file, and transmitting the stored data file."

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

595.    For the reasons discussed below, in my opinion Dr. Schonfeld has not demonstrated that the accused products meet this limitation.[41]

a)    *The accused products do not have one or more modems connected to one or more cellular telephones, telephone lines, and/or radio transmitters or equivalent structure*

596.    For the required structure, Dr. Schonfeld identifies "a Wi-Fi module that is connected to a radio-frequency (RF) transceiver and antenna," "[t]he Wi-Fi module . . . includes a modem because it modulates and demodulates signals for transmission and reception," and "a baseband processor combined with a mobile data modem that are connected to a radio-frequency (RF) transceiver and antenna as well as cellular telephones."  Schonfeld Report ¶ 1323.  Dr. Schonfeld has failed to show that these components (to the extent they exist) meet the Court's construction.[42]

597.    First, it is unclear what Dr. Schonfeld means by "Wi-Fi module."  The Broadcom documents he relies on in other sections of his report identify numerous hardware modules in the Wi-Fi chip, but Dr. Schonfeld has not identified any specific hardware module.  Moreover, the documents do not use the term "Wi-Fi module."

---

[41]    Dr. Schonfeld also mentions that MacBook Pro devices have the ability to use Ethernet networks.  I understand that Dr. Schonfeld is not contending Mac computers satisfy the "remote unit" limitations.  *See* Section VI.F.; Schonfeld Report, nn.99-102.

[42]    In an introductory paragraph, Dr. Schonfeld also asserts that "the Wi-Fi network transmitter includes a Wi-Fi module and radio-frequency (RF) transceiver and antenna for all handheld devices (including all iPhone, iPad, and iPod Touch devices) . . . [and] [t]he cellular network transmitter includes a baseband processor combined with a mobile data modem and radio-frequency (RF) transceiver and antenna for all cellular enabled iPhone and iPad devices."  *Id.*  ¶ 1322.  It is unclear what Dr. Schonfeld considers to be a "Wi-Fi network transmitter."  He only uses the term in paragraph 1322, and once in connection with unasserted claim 3.  It is never explained.

317

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

598.    To the extent that Dr. Schonfeld means that the entire chip is a Wi-Fi module, I disagree that it is a "modem" as one of ordinary skill in the art would understand the term in the context of the '239 patent.  First, the modem described in the patent is the type that connects to a communications port on a computer (e.g., COM1) and to a telephone line or cellular telephone, uses AT commands and the Z-Modem protocol, and directly dials and establishes a connection with a modem on the receiving end.  *See, e.g.*, '239 patent at 8:40-47 ("Each modem interfaces through a different communications port. . . . The first program called for a communications port (COM1) controls the transfer process."), 8:67-9:2, 8:23-30 ("Transfer software sequence B contains all of the instructions necessary to initialize the communications ports on the remote, obtain a cellular connection with each cellular telephone to the host unit . . .").  All these characteristics were common at the time of the alleged invention, but are not used in the accused Wi-Fi chips.  Second, Wi-Fi chips are not disclosed in the '239 patent.  The '239 patent contains no disclosure of any characteristic that could be considered to describe Wi-Fi, such as the implementation of the 802.11 standard, the need to connect to a wireless local area network in order to transmit and receive data, the ability to connect to wireless access points (and to the Internet through the access point), the ability to route data using email and IP addresses (rather than telephone numbers), or the ability to create a wireless local area network with a wireless access point and other nearby devices.  Indeed, Wi-Fi chips in their current form did not exist at the time.  Although the first wireless networking device (WaveLAN) was in existence at the time, it was based on the Ethernet standard and not the 802.11 standard (which did not exist), operated on a different frequency (915 MHz) than the Broadcom chips (2.4 GHz and 5 GHZ), transmitted at only 2 Mbps, and was not a chip that could be installed on a main logic board of

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

the accused products.[43]  The Court has already rejected Samsung's attempt to cover transmission components that are not disclosed in the patent.  *See* Claim Construction Order [Docket No. 447] at 59.

599.    It is also unclear what Dr. Schonfeld means by his assertion that the "Wi-Fi module" "is connected to" a radio-frequency (RF) transceiver and antenna.  He has not identified any such connection or attempted to explain how it satisfies the required structure.  If the "Wi-Fi module" is the entire chip, it is not "connected to" a radio-frequency transceiver and antenna.

600.    Dr. Schonfeld also identifies "a baseband processor combined with a mobile data modem that are connected to a radio-frequency (RF) transceiver and antenna as well as cellular telephones" in "cellular-enabled iPhone and iPad devices" as constituting the required structure for this claim limitation.  Schonfeld Report ¶ 1323.  I disagree.  First, I do not understand what Dr. Schonfeld means by "as well as cellular telephones."  It is unclear where the "cellular telephones" fit into this purported structure – are they "connected to" the baseband processor, "connected to" a "mobile data modem," "combined with the baseband processor," or simply contained in the accused products along with a baseband processor?  In any event, the baseband chip in the accused products cannot be "connected to a cellular telephone;" it *is* the cellular telephone.  Similarly, Dr. Schonfeld has not identified any "cellular telephone" that the "mobile data modem" "connects to."  Indeed, no such structure exists in the accused products because there is no need for a modem connected to a cellular telephone.

---

[43]    Dr. Schonfeld implicitly acknowledges the relevance of these differences when he asserts that the accused products "have operating system and application software that is compatible with the Wi-Fi communication standard and is used to enable communications between the Wi-Fi modules on the transmitting and receiving devices and thus allow the transmitter to send data over the antenna."  Schonfeld Report ¶ 1324.  As discussed above, the first 802.11 Wi-Fi standard was not released until 1997, years after the alleged invention.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

b)   *The accused components do not have software performing a
software sequence of initializing one or more communications
ports on the remote unit, obtaining the stored data file, and
transmitting the stored data file.*

601.    In several paragraphs, Dr. Schonfeld purports to "identify" "specific software corresponding to the software structural limitations" required by the Court, namely, initializing one or more communications ports on the remote unit, obtaining the stored data file, and transmitting the stored data file.  I have organized the source code that Dr. Schonfeld identifies in the following three categories, each of which I will discuss in turn:

- Shared Operating System Code (such as ███████████ for iOS)

- FaceTime (for iOS or OS X)

- iOS Mail or iOS Messages

602.    Dr. Schonfeld has failed to illustrate that the accused products meet this software structure.  As discussed below, Dr. Schonfeld's "analysis" of the source code he cites is both superficial and inaccurate.

(i)    Initializing One or More Communications Ports on the
Remote Unit

603.    The "communications port" in the required structure is a physical hardware port on the remote unit (a personal computer) that connects the modem to the remote unit.  Dr. Schonfeld agrees that "port" "refers to the physical outlet used to connect cords and plugs to computer devices," and asserts that the accused products have a "number of hardware ports through which the communications occur."  Schonfeld Report ¶¶ 245, 1549.  But he fails to identify any such port for transmitting a composite signal.  For example, Dr. Schonfeld asserts that "there is a port between the applications processor and the baseband processor, and another port between the applications processor and the Wi-Fi chip," but does not identify any evidence

320

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

that any connections between these components are "ports." Under his own definition, they are not: they do not provide a physical outlet or an interface to any external device. Instead, these are internal connections between different chips within the accused products. Indeed, in other parts of his report, he calls these very same connections "wires and busses." *See, e.g., id.* ¶ 1547. He similarly fails to provide any evidence that "there is a port on the remote unit where the modulated data is transmitted through the antenna" which "must also be initialized before transmission can occur," or that "[t]he baseband processor port or Wi-Fi chip port is initialized when a connection is made via ██████████████████████."[44]

604.    Nor has Dr. Schonfeld identified any software that initializes these alleged "ports." Dr. Schonfeld claims to identify "specific software corresponding to the software structural limitation for 'initializing one or more ports on the mobile remote unit.'" In the infringement analysis section, he identifies two groups of software: (1) ████████████ ███████████████████████████ and (2) ████████████████████ ████████████. Schonfeld Report ¶¶ 1325-26. In the source code section, he identifies (3) ████████████████████████████, *id.* ¶ 1548, and (4) ████████████████ ████████████████████████████, *id.* ¶¶ 1550-54. As discussed in detail below, none of the source code identified by Dr. Schonfeld contains

---

[44]    In paragraph 1650 of his report, Dr. Schonfeld asserts that the structure required by the Court "does not necessarily include (nor does it disclaim) a communications port as part of the structure." I disagree. The Court required that the software initialize "one or more communications ports on the remote unit." I also disagree with Dr. Schonfeld's assertion that Apple wants to reconstrue the Court's construction to add connections to the communications port. Schonfeld Report ¶ 1647. Apple has made no such argument. The Court has already implicitly required these connections with the "one or more modems" and "one or more communications ports" language, as well as the required software. The number of ports correspond to the number of modems, and there would be no need to initialize the ports if the modems were not connected to them.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

instructions for "initializing one or more communications ports on the remote unit" as required

by the Court's construction.

(ii)     Initializing One or More Communications Ports on the
         Remote Unit: Shared Operating System Code

605.   The shared operating system source code identified by Dr. Schonfeld is not

software for "initializing one or more communications ports on the remote unit."

606.   Dr. Schonfeld asserts that the █████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████   Schonfeld Report ¶ 1325.  First, Dr. Schonfeld does not identify "the port" he

mentions.  Nor does Dr. Schonfeld provide any analysis of how the source code performs those

functions, when this code is used, and whether it is used at all for transmitting a composite

signal.  He does not even explain how those functions meet the required structure of "initializing

a communications port on the remote unit."  In any event, the █████████████████ does

not meet the required structure ███████████████████████████████

███████████████████████████████████████████████

████████████████

607.   Dr. Schonfeld also asserts that applications interact ████████████

█████████████████████████████████████████████████████████████

█████████████████████████.  Schonfeld Report ¶¶ 1325, 1545.[45]  But sending and

receiving data is not  "initializing a communications port on the remote unit," and in fact,

--------

[45]     These paragraphs contain the sentence fragment "Applicants that send/receive data across
the baseband processor utilize a ██████████████████████ in order."  I assume the missing
words are "to do so" or similar phrase.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

sending data is the third step in the required structure.  Dr. Schonfeld has not shown how the

cited source code shows any type of initialization—much less initializing a communications port

on the remote unit.  Indeed, Dr. Schonfeld cites approximately 100 pages from four different

source code files that contain dozens of functions, without ever identifying or explaining which

function or functions allegedly perform the initialization.

608.    Finally, Dr. Schonfeld also asserts that the ████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████ Schonfeld Report ¶¶ 1326, 1546.

Again, Dr. Schonfeld fails to identify "the port" he mentions, provides no analysis for how the

source code performs those functions or when it is used, or explain how those functions meet the

required structure of "initializing a communications port on the remote unit."  Interfacing data

traffic through the Wi-Fi module or through the cellular baseband processor is not initializing a

communications port on the remote unit.  Indeed, Dr. Schonfeld has cited functions that have

nothing to do with port initialization.  For instance, Dr. Schonfeld mentions

██████████████████████████████████████████████████████████

██████████████████████████████████████████.  Dr. Schonfeld also

mentions ██████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████.

(iii)    Initializing One or More Communications Ports on the
Remote Unit: FaceTime

609.    The FaceTime source code identified by Dr. Schonfeld is also not software for

"initializing one or more communications ports on the remote unit."  Dr. Schonfeld argues that

████████████████████████████████████████████████████████ and that

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

██████████████████████████████████████████████████████

████████████████████████████   Schonfeld Report ¶ 1548.  This is incorrect.  First, there

is no such thing as an "Internet socket port."  An Internet socket is an endpoint that identifies the

destination for the data transmitted by a system.  The socket is defined by an IP address

(identifying the specific destination computer) and a port number (identifying the process on that

computer to receive the transmission).[46]  Second, opening an internet socket is not initializing a

port.  Rather, opening a socket merely identifies the computer and process to which the

transmission will be sent.  It is merely defining the destination for its communications—not

initializing a port on the remote unit (the sender).  These logical concepts bear no resemblance to

the physical hardware port used to connect a modem to the remote unit, as explained by the '239

patent.  *See* '239 patent at 8:61-63 ("The modems interfacing each communication port execute

the dialing director file discussed above and obtain a connection with the telephone line on the

host unit.").

     610.    Dr. Schonfeld also asserts that there are "a number of hardware ports through

which the communications occur," including a port between the applications processor and

baseband processor, and a port between the applications processor and the Wi-Fi chip, and

asserts that those ports are initialized ████████████████████████████████

████████████   Schonfeld Report ¶¶ 1549-50.  As discussed above, I disagree that Dr. Schonfeld

has identified any ports.  Moreover, the source code that Dr. Schonfeld cites does not illustrate

initialization of any hardware port, and Dr. Schonfeld fails to identity exactly where this port is

located.  Dr. Schonfeld cites the source code ████████████████████████.  But the mere

---

[46]    Dr. Schonfeld agrees:  "Ports denote an application or process software in an operating
system and are generally associated with a host's address and communication protocol . . . ."
Schonfeld Report ¶ 181.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

611.    Dr. Schonfeld's reliance on comments in the code is likewise insufficient to show that the accused devices initialize a port.  Dr. Schonfeld claims that a ███████████

████████████████████████████████████████

████████████████████████████████████████

████████████    Schonfeld Report ¶ 1554.  ████████████████████

████████    *Id*.  But Dr. Schonfeld's analysis does not explain how that code meets the limitations of the Court's construction.  ████████████████████

████████    Second, Dr. Schonfeld does not show ████████████████████.

Finally, the source code Dr. Schonfeld cites at lines 47 through 49 ████████████████

████████████████████████.  Dr. Schonfeld never shows ████████

████████████████████████████████████

████████████████████.

612.    Dr. Schonfeld also asserts that ████████

████████████████████████████████████

████████████████████████████████████

████████████.  Schonfeld Report ¶ 1555.  And again, ████████████████

████████████████████.  Dr. Schonfeld never shows ████████████

████████████████████████████.  Thus, even if the function were used in the way Dr. Schonfeld alleges, ████████████████████

████████.

325

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

(iv)     Initializing One or More Communications Ports on the
Remote Unit: Messages and Mail.

613.     Dr. Schonfeld does not mention any software associated with Photos, Messages, or Mail – applications that he asserts are part of this limitation – for initializing a communications ports on the remote unit.  Thus, Dr. Schonfeld has not demonstrated that Photos, Mail and Messages satisfy this structural limitation.

(v)     Obtaining the Stored Data File

614.     Dr. Schonfeld also fails to identify any software for "obtaining the stored data file."  Dr. Schonfeld defines the "stored data file" as the "various representations of the combined audio and video signals including a container of the combined audio and video signal, a group of audio windows and video frames, a collection of audio and video packets, etc." Schonfeld Report ¶ 1327.  The definition is not consistent with how a person of ordinary skill in the art would understand a data file, or the meaning asserted by the named inventors during prosecution of the '239 patent.

615.     First, it is unclear what Dr. Schonfeld means by "a container of the combined audio and video signal."  I assume that this phrase means a file containing video and audio that can be played and replayed, because that is what the patent describes.  Indeed, the named inventors of the '239 patent explained the properties of a data file.  "[D]igitized files . . . can be stored, transmitted, played or replayed." '239 File History, 2/2/96 Amendment [SAMNDCA630-00832596] at 10-11.

616.     But Dr. Schonfeld is incorrect that any group of video and audio data in memory is a "stored data file."  Such a definition would include data that is currently being processed by the system and that is only in existence for mere fractions of a second before being overwritten. A person of ordinary skill in the art would not understand that group of data to be a "file."

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

617.   A collection of audio and video packets also would not be considered a file.  A data packet is used in network communications to break large data files into small pieces for transmission.  A data packet is composed of a header and payload, and is usable only for communications.  Indeed, a file can be split into packets for transmission, and one would not call an individual subset of packets *the* file.  Further, packets are only in existence briefly during creation, transmission, and reception.  Once used, the packet is destroyed.

> (vi)   Obtaining the Stored Data File: Shared Operating System Software

618.   For shared operating system code, Dr. Schonfeld appears to rely on his assertion that "all of the '239 Accused Products have operating system and application software that is compatible with the Wi-Fi communication standard and is used to transmit the stored data file and send the data over the antenna."  *Id.* ¶ 1333.  He also states: "In addition, all of the '239 Accused Products have operating system and application software that is compatible with the cellular communication standard and is used to transmit the stored data file and send the data over the antenna."  *Id.*  He concludes:  "all of the '239 Accused Products have operating system and application software that is compatible with the data communication protocols (e.g. TCP/UDP/IP) that are used to transmit the stored data file."  *Id.*  He does not cite any particular software to illustrate these points.  In any event, I disagree:  FaceTime does not store a data file, and therefore there is no software for "obtaining a stored data file" containing FaceTime video.

> (vii)   Obtaining the Stored Data File: FaceTime

619.   Dr. Schonfeld asserts that FaceTime obtains a stored data file because "[f]or FaceTime, ██████████████████████████████████████████████████ ███████████████████████████████████████████████████  Schonfeld Report ¶ 1329; *see also id.* ¶ 1556.  Dr. Schonfeld's description of this code is not accurate.

327

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

620.    FaceTime does not contain source code for ███████████████

████████████████████████████. As explained above in Section

VI.F.4 FaceTime operates ████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████. *See, e.g.*, Garcia Tr. at 42:4-14, 44:21-45:5, 46:12-47:4.

621.    Once the FaceTime call connects to the receiving device, ████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████

██   ████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

328

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

623.

Therefore, Dr. Schonfeld's assertion that such FaceTime buffering activity creates and transmits a data file is wrong, and inconsistent with the person of ordinary skill's understanding of a data file, inconsistent with the intrinsic evidence of the '239 patent, and inconsistent with the commercial embodiment of the '239 patent.

624.    As discussed above in Section VI.D.2, the inventors expressly disclaimed video conferencing when distinguishing their invention from the prior art cited by the examiner. During prosecution, the inventors of the '239 patent distinguished Gattis by arguing that Gattis "only contemplates an uninterrupted, continuous stream of information digitized on a line by line resolution basis that ultimately represents a sequence of 'pictures.'  Gattis does not contemplate the creation of full-motion composite signal video information *into digitized files which can be stored, transmitted, played or replayed.  This is a very significant difference.*"  '239 File History, 2/2/96 Amend. [SAMNDCA630-00832596] at 11-12 (emphasis added).  FaceTime has

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

██████████████████████████ that the inventors used to distinguish their alleged invention: █

███████████████████████████████████████████████████

██████████

625.    The named inventors also emphasized other limitations of streaming systems—namely, that video quality degrades during the video conference, and that video will stop all together should bandwidth become too limited.  Describing this feature, the named inventors stated, "[u]nder Gattis the video quality is depicted by the available connection speed, and the lower the speed the lower the quality of the frames grabbed.  Moreover, the system disclosed in Gattis even fails if the connection is not a continuous link sufficiently fast to provide 'an acceptable picture.'"  *Id.* ██████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████

626.    The named inventors contrasted these video quality adjustments to transmission of a data file: "Gattis does not disclose the creation of a data file as required by Applicants' claims. . . .  [I]n Applicant's invention, full-motion composite signal is captured into digitized files and transmitted over narrow (slow) and/or intermittent band widths while and still maintaining the original captured quality of the video."  '239 File History, 2/2/96 Amend. [SAMNDCA630-00832596] at 11.  This difference is significant because a data file, when transmitted and received, maintains the original quality of the video, despite temporary problems in the connection. ████████████████████████████████████████████

██████████

330

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

627.   In paragraphs 1629 and 1639, Dr. Schonfeld asserts that the named inventors' argument about Gattis had to do with the way "the frame grabber works" and implies that the argument had nothing to do with a saving video into a data file.  Of course, this ignores the extensive discussion of data files described above.

(viii)   Obtaining the Stored Data File: Photo (Mail and Messages)

628.   Dr. Schonfeld also cites source code that he contends are for "1) sending an MMS message, or 2) sending an E-Mail."  Schonfeld Report ¶ 1330.  However, Dr. Schonfeld's analysis of that source code is flawed.

629.   As Dr. Schonfeld agrees, ██████████████████████████████████████████████ ████████████████████ ██████████████████████████ ████████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ███████████████████████ Dr. Schonfeld also states that ██████████████████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████ ████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████

331

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

630.    Dr. Schonfeld also asserts that ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████ Schonfeld Report ¶ 1331. ████████████

█████████████████████████████████████████████ Second, the

source code that Dr. Schonfeld cites is ██████████████████████

█████████████████████████████████████████████

████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████

██████████████████████████████

██████████████████████████████████████ Indeed, Dr. Schonfeld

has cited no ████████████████████.

631.    Finally, Dr. Schonfeld fails to analyze the operation of iMessage, and therefore

has not shown that it meets this limitation.

(ix)    Transmitting the Stored Data File: FaceTime

632.    For FaceTime, Dr. Schonfeld identifies FaceTime's use of ███████████████

████████████████████████████████

██████████████████ *id.* ¶¶ 1335-36, 1557-58.  As explained above regarding the

████████████████████████████████████████████████████████

██████████████████████████████ software structure.  Thus, the source code Dr.

Schonfeld cites do not support his allegations that FaceTime ████████████████.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

633.    Dr. Schonfeld also asserts that "[e]vidence that the transmission occurs is also clear by the fact that the devices can and do transmit FaceTime data," and that "when FaceTime is used, the audio and video files are received by the host unit – they could not have been received if they were not obtained and transmitted."  Schonfeld Report ¶¶ 1340-41.  These statements do nothing to demonstrate that FaceTime "transmits the stored data file."

(x)    Transmitting the Stored Data File: Photo (Mail and Messages)

634.    Dr. Schonfeld's analysis for Mail and Messages is identical to his analysis for obtaining the stored data file.  The same flaws that I pointed out above in Section VI.G.3.b.viii therefore apply.

*a)    The accused products do not perform the identical function of transmitting said composite signal*

635.    The accused components in the accused products do not perform the identical function of "transmitting said composite signal."  As explained above in Section VI.G.1.a-b, a composite signal is an analog signal consisting of audio and video information.  The accused devices do not capture, digitize, or compress a composite signal, and therefore cannot transmit a captured, digitized, and compressed composite signal.

*b)    The accused components are not equivalent to required structure*

636.    Dr. Schonfeld asserts that the accused products perform substantially the same function as the required components because they "are used for transmission of a composite signal," that they perform the function in substantially the same way as the required structure because they "transmit a composite signal (i.e. a combined audio and video signal) from a mobile remote unit using a modem over a communication network to a modem on the host unit,"

333

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

and that they achieve substantially the same result because "the host unit received a composite signal."  I disagree.[47]

637.    First, Dr. Schonfeld provides no analysis whatsoever, and instead merely repeats the claimed function for the first two parts of the test and provides a conclusory assertion for the third.  This is insufficient to demonstrate infringement by the components as equivalent structure.

638.    Second, as explained above, Wi-Fi chips were not available in their current form at the time of the invention.  It is therefore after-arising technology and cannot be as a structural equivalent.[48]

639.    Third, the Wi-Fi components identified by Dr. Schonfeld do not perform the claimed function in substantially the same way as the required structure.  The modems described in the '239 patent operate on a dial-up basis.  They directly connect to the host computer and transfer a single data file at a time.  *See*, *e.g.*, ProComm Manual [APL630DEF-WH-A0000026969] at [APL630DEF-WH-A0000027132] (describing the ZMODEM protocol).  Wi-Fi operates uses TCP/IP and packetizes the data so that it need not directly transfer the file to the host computer.  Instead, the packets can take any number of routes to the host computer.  It

---

[47]    Dr. Schonfeld again uses the wrong test for structural equivalents by claiming that the components and software identified "performs substantially the same function" as the Court's construction.

[48]    *See* IEEE, *IEEE Standard for Information Technology- Telecommunications and Information Exchange Between Systems-Local and Metropolitan Area Networks-Specific Requirements-Part 11: Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications* (Jun. 26, 1997), http://ieeexplore.ieee.org/xpl/freeabs_all.jsp?isnumber=14251&arnumber=654749&count=1&index=0.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

operates according to the 802.11 specification, which allows multiple users in the network to use the wireless channel at one time.

640.    The accused baseband chip is not structurally equivalent to the required modem. The baseband processor in the accused devices uses the data services (as opposed to voice) of the cellular network to send data such as video.  The modems described in the '239 patent, however, modulate the digital video data so that it can be transmitted over the voice frequencies in telephone lines and cellular networks available at the time.  These differences are substantial, as evidence by the number of years that were required to develop and implement cellular data services that were capable of reliably handling high data throughput required by uses such as video calls.

641.    For each of the above reasons, the accused components do not literally meet this limitation.

> c)    *The accused devices do not infringe under the doctrine of equivalents*

642.    For the reasons discussed above, the accused hardware components are not equivalent to the required structure.

643.    FaceTime's ██████████ is also not equivalent to transmission of a data file, as Dr. Schonfeld asserts.  Schonfeld Report ¶ 1656.  FaceTime's ██████████ does not perform substantially the same function of "transmitting said composite signal."  FaceTime ████████████████████████████████████████████████████ ██████████████████████.  FaceTime's ██████████ also does not accomplish that function in substantially the same way.  As the inventors' explained, a data file can be "*stored, transmitted, played or replayed.*"  '239 File History, Feb. 2. 1996 Amend. [SAMNDCA630-00832500] at 12.  ████████████████████████████████

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Finally, the result is different.  As discussed above in Section VI.D.4, the patent explains that "[t]he remote unit is capable of storing and displaying up to eight (8) bit map files."  '239 patent at 5:29-31.  This description is consistent with the inventors' description of their invention during prosecution when they sought to overcome the examiner's rejection of the claim based on videoconferencing prior art.  But FaceTime cannot operate in this manner.  It does not store video in a data file, and therefore there is no way for up to eight separate videos to co-exist at one time and to be viewable, as the patent describes.  A person of ordinary skill in the art would understand that creating a data file for storage is very different than buffering data for a video call.  A video of a scene is recorded precisely to preserve it for later use, whereas the purpose of a video call is for short term, two-way communications (just like a telephone call), not for memorializing a scene.  Once the call ends, there is no video and therefore no memorialization of the call.

644.    In addition, as explained above in section VI.D.3, Samsung is estopped from asserting the doctrine of equivalents over FaceTime because of the named inventors' arguments to overcome the videoconferencing system of Gattis.

645.    For each of these reasons, the accused components do not satisfy this limitation under the doctrine of equivalents.

### 4.    "a host unit"

646.    Dr. Schonfeld has failed to identify a "host unit" in any of the accused products.  In paragraph 1344, Dr. Schonfeld merely asserts that "all of the '239 Accused Products are host units because they can and are used to receive signals from mobile remote units."  This is

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

insufficient to satisfy claim 1.  The host unit and playback unit must be distinct units because the

claim also requires that the playback unit have a "means for exchanging data with said host unit.

By asserting that the entire device is both a host unit and a playback unit (*see* Schonfeld Report ¶

1354), Dr. Schonfeld is effectively attempting to eliminate the "means for exchanging"

limitation.  For these reasons, Dr. Schonfeld has failed to demonstrate that the accused products

infringe claim 1 with respect to this this limitation.

### 5. "means for receiving at least one composite signal transmitted by the remote unit" (claim 1)

647.   The parties have agreed that this limitation is a means-plus-function limitation

and that the function for this limitation is "receiving at least one composite signal transmitted by

the remote unit."  In my opinion, the corresponding structure disclosed by the specification is

"one or more modems, corresponding to the number of modems used in the remote unit,

connected to one or more cellular telephones, telephone lines, and/or radio receivers, and File

Reception Software Sequence E (*see* '239 patent at 10:33-61, 11:18-12:8)."  Dr. Schonfeld

agrees with the hardware portion of this construction, but does not believe that the structure

requires software.

648.   For the reasons discussed below, it is my opinion that the accused products do not

meet this limitation under either party's construction.

*a)   The accused components do not perform the claimed function of the limitation*

649.   The accused Apple products do not perform the function of receiving at least one

composite signal transmitted by the remote unit.  As explained above, the composite signal is an

analog signal representing a video, and the accused components are not capable of capturing,

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

digitizing, and compressing a composite signal.  Thus, there is no digitized and compressed

version of a composite signal to transmit or receive.

<em>b)     The accused products do not have the required structure</em>

650.    Dr. Schonfeld asserts "all handheld devices (including all iPhone, iPad, and iPod

Touch devices) and laptop computers (including MacBook Air and MacBook Pro devices) have

a Wi-Fi module that is connected to a radio-frequency (RF) transceiver and antenna" and that

"the cellular-enabled iPhone and iPad devices have a baseband processor combined with a

mobile data modem that are connected to a radio-frequency (RF) transceiver and antenna as well

as cellular telephones."  Schonfeld Report ¶ 1349.  Dr. Schonfeld also asserts that "[t]he Ethernet

network receiver includes an Ethernet modem for all MacBook Pro devices."[49]  *Id*. ¶ 1348.

651.    For the same reasons discussed above in Section VI.G.3 with respect to "means

for transmission," Dr. Schonfeld has failed to demonstrate that the accused cellular and Wi-Fi

components satisfy this limitation or have equivalent structure.

652.    Dr. Schonfeld also fails to show how the Ethernet capabilities of the accused Mac

computers meet the requirement of "one or more modems connected to one or more cellular

telephones, telephone lines, or radio receivers."  Dr. Schonfeld states that "the Ethernet network

receiver includes an Ethernet modem," but does not explain what an Ethernet network receiver

is, identify the Ethernet modem, or explain how either of these (unidentified) components are

connected to one or more cellular telephones, telephone lines, or radio receivers.  Nor does the

Ethernet chip in the Macs use cellular telephones, telephone lines, or radio receivers.  In

addition, an Ethernet modem connects computers in an Ethernet network to the Internet over

---

[49]    Dr. Schonfeld does not identify any components in iMacs, Mac Minis or Mac Pros.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

1  cable or DSL.  It is not a computer component.  The accused MacBook Pro computers do not

2  have Ethernet modems.

3        653.    Under Apple's construction, the structure that performs the claimed function

4  requires software in addition to the hardware.  Dr.  Schonfeld cites source code from FaceTime,

5  Mail, and Messages.  To show that FaceTime includes software related to reception, Dr.

6  Schonfeld relies on the fact that the accused devices operate with FaceTime.  Schonfeld Report ¶

7  1565.  ████████████████████████████████████████████████

8  ████████████████████████████████████████████████

9  ██████████████████████████████████████████████████

10 ████████████████████████████████████████████

11 ██████████████████████████████████████

12 ████████████████████████████

13 ████████████████████████████

14 ████████████████████████████████████

15 ██████████████████.

16               (i)      Software: FaceTime

17        654.    The FaceTime source code that Dr. Schonfeld relies on does not illustrate

18 software for receiving at least one composite signal transmitted by the remote unit.  As explained

19 in the "means for transmission" section, FaceTime does not ████████████████████

20 ██████████████████████ as required by Software Sequence E.  As Dr.

21 Schonfeld notes, FaceTime uses the ██████████████████████

22 ████████████████████████████████████████

23 ██████████████████████████████████████████.

24 The code Dr. Schonfeld cites for ████████████████████████

25

26

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

█████████████████████████████████████████████████████

██████████████████████

655.    Dr. Schonfeld also fails to identify source code for connecting to the remote unit. That is because FaceTime does not connect directly to the transmitting unit.  Instead, FaceTime connects to a relay to receive RTP packets.

(ii)    Software: Mail and Messages

656.    Dr. Schonfeld identifies the function ████████████████████████ ████████████████████████████████.  The source code Dr. Schonfeld analyzed is only for iMessage—not for Mail or MMS features.  See

█████████████████████

██████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

657.    Dr. Schonfeld does not identify any source code for OS X, Mail, or MMS.  As explained above, the accused devices do not have the required source code for receiving the data file transmitted by the remote unit because none of the devices connects to a remote unit.  In the case of Mail, the accused host units connect to a mail server.  In the case of MMS, the accused cellular devices connect to the carrier's server to download the video.  Further, only cellular devices have the ability to receive MMS messages.

c)    *The accused components are not structural equivalents*

658.    The accused components are also not structural equivalents to either Dr. Schonfeld's construction or Apple's construction because they do not perform the identical

340

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

function of the limitation in substantially the same way as the required structure to achieve

substantially the same result.  First, for the reasons discussed above in Section VI.G.1.b, the

accused components are incapable of performing the identical function of "receiving at least one

composite signal transmitted by the remote unit."  Moreover, the accused components do not

perform any function in substantially the same way as either "one or more modems connected to

one or more cellular telephones, telephone lines, or radio receivers" or "one or more modems,

corresponding to the number of modems used in the remote unit, connected to one or more

cellular telephones, telephone lines, and/or radio receivers, and File Reception Software

Sequence E (*see* '239 patent at 10:33-61, 11:18-12:8)."  The modems described in the patent

connect directly to the modems on the remote unit to receive the data file.  *See*, *e.g.*, '239 patent

at 8:25-30 ("obtain a cellular connection with each cellular telephone to the host unit"); *id.* at

11:19-24 ("File reception software sequence [E] automates each telephone line end modem of

host unit 3 to obtain communication with each cellular telephone of remote unit 2 and receive the

transmitted date file. . . .").  As explained above, the accused components do not connect directly

to the modems in the accused remote units.  The software identified by Dr. Schonfeld likewise

operates in a different way than the required software.  ██████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████  The result of the

accused components and software is also different.  The '239 patent describes transmitting a

video data file directly from a remote unit to a host unit, which receives the video data file.  But

Mail and Messages do not receive the video from the remote unit.  Rather, the video is uploaded

to a server where it is later retrieved by the recipient at some later time, rather at the exact

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

moment required by the remote unit.  There is never a connection between the sender and

recipient of an email or text message with a video attachment.  ████████████████████

████████████████████████████████████████████████ A person of

ordinary skill in the art would understand that ███████████████████████████████

███████████████████████.  A video of a scene is recorded precisely to preserve it for

later use, whereas the purpose of a video call is for short term, two-way communications (just

like a telephone call), not for memorializing a scene.  Once the call ends, there is no video and

therefore no memorialization of the call.[50]

> d)  *The accused products do not meet this limitation under the
> doctrine of equivalents*

659.    The accused components also do not perform the claimed function of "receiving

at least one composite signal transmitted by the remote unit" under the doctrine of equivalents.

First, the accused FaceTime features do not perform the substantially same function. ██

████████████████████████████████████████████████ As the

inventors themselves noted during prosecution, "[t]his is a very significant difference."  '239 File

History, 2/2/96 Amendment [SAMNDCA630-00832596] at 10-11.  Second, the accused

components do not transmit a composite signal.  As discussed above, a composite signal is an

analog electrical signal that represents viewable video frames output from an analog video

source such as a video camera or VCR.  Because the accused components cannot capture a

composite signal, they also cannot receive a digitized and compressed version of a composite

signal.  Moreover, for the reasons just discussed in the previous section, the accused components

---

[50]     Dr. Schonfeld again applies the incorrect analysis by determining that the "'239 Accused
Products perform substantially the same function."  Schonfeld Report ¶ 1350.  The components
must perform the identical function, and because they do not, they are not structurally equivalent.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

do not perform any function in substantially the same way as the structure required by the '239

patent.

660.    In addition, as discussed above, Samsung is estopped from asserting the doctrine

of equivalents to apply this claim limitation to FaceTime.

### 6.    "a playback unit" (claim 1)

661.    Dr. Schonfeld has failed to identify a "playback unit" in any of the accused

products.  In paragraph 1354, Dr. Schonfeld merely asserts that "all of the '239 Accused

Products are playback units because they can and are used for data storage and display."  This is

insufficient to satisfy claim 1.  The host unit and playback unit must be distinct units because the

claim also requires that the playback unit have a "means for exchanging data with said host unit.

By asserting that the entire device is both a host unit (*see* Schonfeld Report ¶ 1344) and a

playback unit, Dr. Schonfeld is effectively attempting to eliminate the "means for exchanging"

limitation.  For these reasons, Dr. Schonfeld has failed to demonstrate that the accused products

meet this limitation.

### 7.    "means for exchanging data with said host unit" (claim 1)

662.    The parties agree that the function is "exchanging data with said host unit."

Under Apple's construction, the required structure is a 16-bit Ethernet card, Novell Netware Lite

software, and Host Boot Sequence D software.  Dr. Schonfeld's construction is "a network or

wired interface for communications between host and playback units."  *Id*. ¶ 1355.

663.    Dr. Schonfeld asserts that this limitation is met by the accused products under

either party's construction of the term, and regardless of whether accused products "are a

combined host unit and playback unit" or the host unit and playback unit "are distinct devices."

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Schonfeld Report ¶¶ 1356, 1357.[51]  Under the "single device" theory, Dr. Schonfeld asserts that

the accused "iPhone and iPad devices have an internal communication system (e.g. data wires

and busses) between the Wi-Fi module and baseband processor, DDR SDRAM and Flash drive,

and application/computer processor System-on-Chip (SoC)" and the accused "MacBook Pro,

iMac, Mac Mini, and Mac Pro have an internal communication system (e.g. data wires and

busses) between the Wi-Fi module and Ethernet modem, DDR SDRAM and Flash drive or hard

drive, and application/computer processor System-on-Chip (SoC)" under both parties'

construction.[52]  Schonfeld Report ¶¶ 1358, 1360.  Under the "distinct device" theory, Dr.

Schonfeld asserts that "all of the Accused Products have a Wi-Fi module and radio-frequency

(RF) transceiver and antenna for data communication over Wi-Fi networks," "cellular-enabled

iPhone and iPad devices have a baseband processor combined with a mobile data modem and

radio-frequency (RF) transceiver and antenna for data communication over cellular networks,

"MacBook Pro, iMac, Mac Mini, and Mac Pro have an Ethernet modem for data communication

over Ethernet networks," and that "[t]he USB or wired port, Wi-Fi module, baseband processor,

mobile data modem, Ethernet modem, radio-frequency (RF) transceiver, and/or antenna is a

network interface for communication between the USB or wired port, Wi-Fi module, baseband

processor, mobile data modem, Ethernet modem, radio-frequency (RF) transceiver, and/or

antenna in the host unit and the corresponding circuits and devices in the playback unit" under

both parties' constructions.  *Id*. ¶¶ 1363, 1365.

---

[51]      Dr. Schonfeld also describes one of the theories as a host unit and a playback unit that are
"combined in a single device."  Schonfeld Report ¶ 1356.  This suggests that the two units are
separate devices but housed together, and contrasts to the theory in which an accused product is
both a host unit and a playback unit.  Dr. Schonfeld bases his infringement analysis on this latter
theory, as discussed above.

[52]      Dr. Schonfeld does not mention the MacBook Air or iPod touch.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

664.    As discussed in detail below, in my opinion, Dr. Schonfeld has failed to demonstrate infringement under any theory.

a)    *The accused products do not have a 16-bit Ethernet card, Novell Netware software or Host Boot Sequence D or equivalent structure*

665.    Under Apple's construction of the term, the required structure for this limitation is a 16-bit Ethernet card, Novell Network Lite software, and the Host Boot Sequence D software described in the '239 patent.  These components are not literally present in the accused iOS devices or Macs.

666.    First, none of the iOS devices has an Ethernet card, Novell Netware software, or Host Boot Sequence D.  In fact, the iOS devices do not have any Ethernet capability at all.  As shown above in Section VI.F., there is no adapter on the iOS devices that would allow an Ethernet cable to be connected to the device.  The Bills of Materials        and schematics for the devices do not show an Ethernet card or adapter.  *See* Exhibit 1 for a list of Bills of Material.  The same is true for the MacBook Air and the MacBook Pro with Retina Display ███████ ██████████.  *Id.*  Moreover, although some Macs have Ethernet capability, the component providing that capability is a chip on the main logic board, not a card.  A card is an add-on component that can be inserted into an expansion slot of a motherboard by the user.  In contrast, the Ethernet chip in the accused Macs is integrated into the main logic board and is not removable.  An example of the Ethernet chip from an iMac ███████ is shown below, outlined in yellow:

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

667.     Second, the "wires and busses" that allegedly exist between the accused

components are not Ethernet cards.  The connections between "the Wi-Fi module and Ethernet

modem, DDR SDRAM and Flash drive or hard drive, and application/computer processor

System-on-Chip (SoC)," to the extent they exist, have no ability to form an Ethernet network, or

a network of any kind.  A network connects separate computers (or "stations"), each of which

has an address in the network, to each other using cables and specialized hardware (such as

Ethernet cards) that implement specific protocols (such as Ethernet) and allow the computers to

share resources such as printers and Internet access.  Networking software, such as Novell

Netware Lite, implements the network protocol between the computers and performs the

transmission and receipt of data in conjunction with the network card.  In contrast, the "wires and

busses" between components in the accused devices only shuttle data between internal

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

components.  They have no ability to connect separate computers, and in fact, are internal to the accused devices.

668.    Nor do the "wires and busses" constitute structure equivalent to an Ethernet card, Novell Netware Lite, and Host Boot Sequence D.  The accused "wires and busses" do not exchange data between computers, and therefore do not perform the same function as the Ethernet components.  Moreover, these components do not perform any function in substantially the same way to achieve substantially the same result as Ethernet components.  They are not capable of connecting distinct computers to form a network that can share resources.  The wires and buses are used to transfer data between internal components, and how that transfer is performed depends on the type of components.

669.    For these reasons, in my opinion the accused products do not literally satisfy this limitation under Apple's construction, regardless of whether the host unit and playback unit are combined in a single device or are distinct devices.

### b)    The accused components do not perform the claimed function

670.    Under the theory in which each accused product is "a combined host unit and playback unit," the accused components do not perform the claimed function of "exchanging data with said host unit."  The accused components are not capable of "exchanging data" with themselves, nor does this theory make sense.

### c)    Dr. Schonfeld has failed to demonstrate that the accused components meet this limitation

671.    As discussed above, Dr. Schonfeld advances two theories, one in which each accused device is a combined host unit and playback, in which the accused components are "wires and busses" between numerous components, and the other in which the host unit and playback unit are distinct devices, in which he asserts that there are numerous structures that

347

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

perform the function.  As he has done with other claim limitation, Dr. Schonfeld includes a laundry list of components without ever explaining how any of them satisfy the limitations, or even specifically identifying any of the accused components.  He also uses the same components and arguments for both parties' constructions of this limitation.  Dr. Schonfeld has failed to demonstrate that the accused components satisfy this limitation under any theory.

672.     For example, for his theory in which the host unit and playback unit are the same device, Dr. Schonfeld asserts that "iPhone and iPad devices have an internal communication system (e.g. data wires and busses) between the Wi-Fi module and baseband processor, DDR SDRAM and Flash drive, and application/computer processor System-on-Chip (SoC)" and the accused "MacBook Pro, iMac, Mac Mini, and Mac Pro have an internal communication system (e.g. data wires and busses) between the Wi-Fi module and Ethernet modem, DDR SDRAM and Flash drive or hard drive, and application/computer processor System-on-Chip (SoC)" under both parties' construction.  Schonfeld Report ¶¶ 1358, 1360.  But he fails to specify which of these accused components are the "playback unit" and which are the "host unit" in any device, or explain how or why any component satisfies these limitations.  Rather, it appears that he is asserting that each device is both.  But that theory makes no sense – the device cannot exchange data with itself.  Dr. Schonfeld appears to be attempting to eliminate the "means for exchanging" limitation.

673.     Dr. Schonfeld similarly fails to identify any "wire or bus" in any device, or explain how it satisfies this limitation under either party's construction.  He merely states that "[t]he internal communication system (e.g. data wires and busses) is a wired interface for communication between the Wi-Fi module, baseband processor, and/or Ethernet modem in the host unit and the DDR SDRAM, Flash drive, hard drive, and/or application/computer processor

348

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

System-on-Chip (SoC) in the playback unit," with no explanation.  For example, he asserts that

the accused products "have" a 16-bit Ethernet card, Novell Netware Lite software and Host Boot

Software Sequence D," and then discusses "wires and busses," without ever attempting to

explain how any wire or bus (or collection thereof) can be a set of Ethernet components.  As

discussed above in Section VI.G.7.a, they are not an Ethernet card.  Dr. Schonfeld makes no

attempt to identify any software that satisfies Apple's construction.  It is also unclear what Dr.

Schonfeld means by "Ethernet modem."  An Ethernet modem connects computers in an Ethernet

network to the Internet over cable or DSL.  It is not a computer component.  The accused

products do not have Ethernet modems.

674.    The same is true for Dr. Schonfeld's analysis of the accused components as

structural equivalents:  his analysis consists of conclusory statements without any explanation.

He even uses the same language for all three parts of the test for equivalents by merely repeating

the claimed function.  For example, for both parties' construction, he states that components

"perform[] substantially the same function" because both the '239 Accused Products and the

claimed structure "***exchange data*** between the host unit and playback unit," they perform in

substantially the same way because both "***exchange data*** using a wired interface between the

host and playback unit," and they achieve substantially the same result because "***data is***

***exchanged*** between the host unit and playback unit . . . ."  Schonfeld Report ¶¶ 1359, 1361

(emphasis added).  This is not a sufficient analysis to demonstrate infringement by the accused

components as equivalent structure.  In addition, Dr. Schonfeld again uses the wrong test for

structural equivalents:  the equivalent structure must perform the identical function as the

required structure, not "substantially the same" function.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

675.    Dr. Schonfeld's analysis of the "distinct devices" theory is similarly flawed.  For example, for both his construction and Apple's, Dr. Schonfeld asserts that

> the '239 Accused Products have a network or wired interface for communication between host and playback units. More specifically, all of the '239 Accused Products have a cable such as a USB cord for data communication between devices. In addition, all of the '239 Accused Products have a Wi-Fi module and radio-frequency (RF) transceiver and antenna for data communication over Wi-Fi networks.  Moreover, cellular-enabled iPhone and iPad devices have a baseband processor combined with a mobile data modem and radio-frequency (RF) transceiver and antenna for data communication over cellular networks.  Further, MacBook Pro, iMac, Mac Mini, and Mac Pro have an Ethernet modem for data communication over Ethernet networks.  The USB or wired port, Wi-Fi module, baseband processor, mobile data modem, Ethernet modem, radio-frequency (RF) transceiver, and/or antenna is a network interface for communication between the USB or wired port, Wi-Fi module, baseband processor, mobile data modem, Ethernet modem, radio-frequency (RF) transceiver, and/or antenna in the host unit and the corresponding circuits and devices in the playback unit.

Schonfeld Report ¶¶ 1363, 1365.  Dr. Schonfeld again simply recites a laundry list of components, but makes no attempt to explain how any of these components constitute the Ethernet card required by Apple's construction or even identify any software.  As discussed above in Section G.7.a, none of the accused components is an Ethernet card, and none of the accused products has an Ethernet card.  Moreover, there is no "USB cord" that can be used "for data communications" between two iOS devices or two Mac computers.  Finally, there is no way to determine what Dr. Schonfeld means by "the corresponding circuits and devices in the playback unit."

676.    Finally, even under Dr. Schonfeld's construction, FaceTime █████████████████████████████████████████████████████████████████████████ █████████████████████████ .

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

677.    Dr. Schonfeld's analysis of structural equivalents under the "distinct devices" theory is the same as his analysis under the "combined device" theory, and equally deficient. Once again, Dr. Schonfeld repeats the claimed function as a substitute for analysis by asserting that the accused components perform substantially the same function as the claimed structure because they "exchange data using a network interface between the host unit and playback unit on the distinct devices," they perform in substantially the same way because they "exchange data using a network interface between the host unit and playback unit on the distinct devices," and they achieve substantially the same result because "data is exchanged between the host unit and playback unit on the distinct devices."  Schonfeld Report ¶¶ 1365, 1366.  Dr. Schonfeld also lists numerous components, using "and/or" in between, and never explains what components constitute the playback and host units "on the distinct devices."  Again, this is not sufficient to demonstrate infringement.

> d)    *Dr. Schonfeld has failed to rebut Apple's non-infringement contentions*

678.    Dr. Schonfeld purports to rebut Apple's response to Samsung's Interrogatory No. 12, which is Apple's non-infringement contentions in response to Samsung's infringement contentions.  Dr. Schonfeld has failed to rebut Apple's non-infringement contentions.

679.    In paragraph 1703, Dr. Schonfeld again asserts that "the structure in the Accused Devices is an equivalent under § 112 ¶ 6" to the 16-bit Ethernet card, Novell Netware software, and Host Boot Software Sequence D in Apple's construction.  But again, Dr. Schonfeld's analysis consists only of conclusory statements that the accused components perform "in substantially the same way of creating a communications connection between the difference [sic] components to enable the exchange of data" and that "the result is the same – and exchange of data for eventual possibly playback."  Dr. Schonfeld repeats this paragraph in his doctrine of

351

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

equivalents paragraph.  Schonfeld Report ¶ 1704.  Dr. Schonfeld provides no explanation, does not identify any software, and does not even identify which "device" theory he is applying.  As explained above, this is not sufficient to show infringement.  He also states that "[t]o the extent there are differences, it is because Apple attempts to incorporate very specific and older mechanism for this same communication."  *Id*. ¶ 1704.  Apple's construction incorporates the only structure disclosed in the patent for performing the claimed function – as it is required to do for a means-plus-function claim.  In any event, as explained above in Section VI.G.7.a, none of the accused products has the required structure of Apple's construction.

680.    Finally, in response to Apple's argument that Samsung failed to articulate a theory regarding how FaceTime and QuickTime – the only components identified in Samsung's infringement contentions – Dr. Schonfeld states that he has "set forth my opinions with respect to this limitation."  Schonfeld Report ¶ 1706.  Dr. Schonfeld has not shown that FaceTime or QuickTime satisfy this limitation.  The only statement he makes with respect to this limitation and FaceTime is "evidence that data is exchanged with the host unit is evidenced in that in . . . FaceTime . . . the audio and video are received, and can be played back."  Schonfeld Report ¶ 1367.  This statement is devoid of any analysis and does not demonstrate infringement.  In addition, Dr. Schonfeld does not mention QuickTime in his infringement analysis in his report.

### 8.    "means for storing the composite signal received by the host unit" (claim 1)

681.    The parties agree that the function of this limitation is "storing the composite signal received by the host unit."  Under Apple's construction, the required structure is a hard disk drive and the software identified in the patent at 11:5-8, 12:19-22, and 12:48-51.  Under Samsung's construction, the required structure "memory, such as a hard disk or random access memory."  Schonfeld Report ¶ 66.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

682.   Dr. Schonfeld has identified DDR SDRAM and NAND flash memory on the iOS

devices and DDR SDRAM and "Flash drive or hard disk drive" on the MacBook computers as

accused components.  For the same reasons as discussed in Section VI.G.2, above with respect to

"means for storing said composite signal," Dr. Schonfeld has not demonstrated that the accused

components satisfy this limitation, either literally or under the doctrine of equivalents.

### 9.   "means for decompressing said composite signal" (claim 1)

683.   As discussed above in Section VI.E.6 discussing claim construction, the parties

agree that the claimed function for this limitation is "decompressing said composite signal," and

the structure for performing that function is a video card and an audio card.

684.   For this limitation, Dr. Schonfeld states that "[d]ecompression of audio signals is

performed by an application processor System-on-Chip (SoC) to decode AAC compressed audio

signals," "[d]ecompression of video signals is performed by the application processor System-

on-Chip (SoC) to decode H.264 compressed video signals," and "[t]he application processor

System-on-Chip (SoC) ███████████████████████████████████

███████████████████████████████████

███████"  Schonfeld Report ¶ 1378.  According to Dr. Schonfeld, these components

constitute a "video card" and an "audio card" because the accused products "have a logic board

that contains an application processor System-on-Chip (SoC) ████████████████

███████████████████████████████████████

████████████████"  *Id*. ¶ 1379.  As discussed in detail below, I disagree with

Dr. Schonfeld.

353

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

    a)    *The accused products do not have a "video card" or an "audio card," literally or under the doctrine of equivalents*

685.    The accused iOS and Mac products do not have the required video card or audio card.  As discussed above in Section VI.C.1, video and audio cards are optional, add-on components that can be inserted into an expansion slot in a computer to add video or audio (or both) playback functionality.  With the exception of the Mac Pro, the accused products do not have any expansion capabilities and are not shipped with audio or video cards, as evidenced by the fact that none of the Bills of Materials for the accused products lists any cards.  *See, e.g.*, iPhone 5 Bill of Material [APL630DEF-WH0005313660].  *See* Storer Exhibit 1 for list of Bills of Material. *See also* http://www.apple.com/iphone/specs.html; http://www.apple.com/ipad-mini/specs/; http://www.apple.com/ipad/specs/; http://www.apple.com/ipod-touch/specs.html.
████████████████████████████████████████████  Moreover, the Mac Pro does not ship with a video card or audio card.

686.    Nor do the accused components in the accused products constitute an audio card.  First, none of the accused components – a ███████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████ – is an audio card.  Nor are these components collectively an audio card.  As discussed above in Section VI.C.1, an audio card is an optional, add-on component for computers.  It is installed in an expansion slot of the motherboard of a computer and contains all the hardware needed to add specialized functionality to the computer – namely, the ability to decompress and play audio signals.  An audio card connects to the motherboard and therefore is a distinct component; it is not also a motherboard.  In contrast, the accused main logic board of the accused products and the other accused components are not the same structure as an audio card.  The main logic board is not an optional, add-on component – in fact, it is essential to the

354

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

product and the product would not operate without it.  There is also no way to remove it or any

of the other accused components without destroying the device.  The main logic board contains

the main processor and many other integrated components, and provides connectivity to all the

components in the product, as well as connectivity to all the peripherals and other components

that are not on the board.  The accused products would not function without the main logic

board.

687.    Moreover, with the exception of the iPod touch 4th Generation and iPhone 4 (i.e.,

SoC), none of the accused products uses

.

688.    The same is true of the components in the accused products that allegedly

constitute a "video card."  None of the accused components – a

– is a video card.  Nor are these components collectively a

video card.  As discussed above in Section VI.C.1, a video card is an optional, add-on

component for computers.  It is installed in an expansion slot of the motherboard of a computer

and contains all the hardware needed to add specialized functionality to the computer – namely,

the ability to decompress and play video signals.  A video card connects to the motherboard and

therefore is a distinct component; it is not also a motherboard.  In contrast, the accused main

logic board of the accused products and the other accused components are not the same structure

as a video card for the same reasons discussed in connection with "audio card."  To the extent

355

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

the image sensor and H.264 encoder are accused as a video card having a video capture card

without the main logic board, they do not form an audio capture card for the similar reasons:

they are not add-on components, do not provide the connectors required for video capture, and

do not perform the claimed functions (as discussed in detail below in Section VI.G.9.b).  In

addition, none of the accused products has a "System-on-Chip" that includes "a dedicated

compression module for performing decompression." ███████████████████████

███████████████████████████████

689.    The fact that the collection of components are not video capture cards can also be

illustrated by viewing the components.  For example, a photograph of the main logic board of a

MacBook Pro 13" with the CPU outlined in red is shown below.



A photograph of the main logic board of an iMac 21" with the ███████████ outlined in

red and the █████████ outlined in blue is shown below.

356

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION



Photographs of an earlier iMac ███████ are shown below with the ███ outlined in blue and the ███ outlined in red:

357

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION



A photograph of an iPhone 5 ███ with the ███ containing the ███████ outlined in red is shown below:

The block diagram below shows the ██████ (used in the iPhone 5) with the ████████ ███ outlined in blue:

359

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

User's Manual APL630DEF-WH0001749889] at APL630DEF-WH0001749090.  These components are not video cards or audio cards.  In addition to the reasons already discussed, they are not add-on components.  In fact, the products would be inoperable without them.  Dr. Schonfeld does not even attempt to explain how these components (and subcomponents), scattered throughout the product with many components between them, form a video card having a video capture module.

690.    For each of these reasons, the accused components are not the same structure required by this limitation, namely an audio card and a video card.

691.    The accused components are also not structures equivalent to an audio card and a video card because they do not perform the identical function of the limitation in substantially

360

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

the same way as the required structure to achieve substantially the same result.  First, the accused

components were not available at the time of the alleged invention.  For example, the technology

was not yet available in 1994 to perform audio decompression solely in software.  It is my

understanding that because the accused products use after-arising technology, they cannot

literally meet this limitation, even as equivalent structure.

692.    Moreover, the accused components do not perform any function in substantially

the same way as audio cards.  As already discussed, ████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████.  A programmer does not need any knowledge of how to design or program

circuitry, and an electrical engineer does not need to know any high level programming

languages.  These differences are substantial.

693.    For each of these reasons, the accused components do not perform the claimed

function and therefore do not m, literally or under the doctrine of equivalents.

                        *b)*       *Dr. Schonfeld has failed to demonstrate that the accused products have an "audio card" and a" video card" or equivalent structure*

694.    Dr. Schonfeld has failed to identify an audio card or a video card.  Although he

baldly states that "the '239 Accused Products have an video card and audio card," he does not

cite any evidence that shows the products include such a card.  The same is true for the

components Dr. Schonfeld claims are an audio card – a ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

1   ██████████████   He states that these components are the required cards, but he does not explain

2   why they are cards, cite any evidence that they perform the same function as the cards, or even

3   show them.  He does not even name the "dedicated compression module for performing video

4   compression."

5          695.   ████████████████████████████████████████████████

6   ███████████████████████████████████████████████████████████████

7   ██████████████████████████████████████████   Dr. Schonfeld has not

8   addressed any of these components.

9

10         696.   Dr. Schonfeld is wrong to equate a main logic board containing or connected to

11  the accused components with the required audio card and video card.  The main logic board in

12  the accused products contains the main processor – which performs thousands of functions

13  unrelated to producing video and audio – as well as many specialized chips that have nothing to

14  do with video or audio.  It is not a specialized, optional card as the required cards are, and it is

15  not removable without rendering the system inoperable.  For these same reasons, the fact that the

16  accused components are either on or connected to the main logic board does not turn the

17  collection of components into a card.

18         697.   Dr. Schonfeld has also failed to demonstrate that the accused components are

19  equivalent structures to the required cards literally or under the doctrine of equivalents.  Dr.

20  Schonfeld's discussion of the three-part test to show equivalents each merely repeat the function.

21  According to Dr. Schonfeld, the accused products perform "substantially the same function" as a

22  video card and audio card because they:  "decompress audio and video signals," they perform

23  substantially the same function because they "decompress audio and video signals on devices

24  that reside on at least one card in the playback unit," and they achieve substantially the same

25

26                                              362

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

result because they "generate decompressed digital audio and video signals in the playback unit."

Schonfeld Report ¶ 1380. Dr. Schonfeld's doctrine of equivalents argument is even more brief.

*See* Schonfeld Report ¶ 1717. This is not a proper analysis sufficient to show that the accused

components meet this limitation as structural equivalents or under the doctrine of equivalents. In

addition, as discussed above in Section VI.G.9.a, the accused components are not equivalents of

the required video card and audio card.

> **10.** **"An apparatus according to claim 3 wherein the means for transmitting the composite signal includes: at least one interface installed in conjunction with said remote unit; a cellular telephone connected to each said interface" (claim 7)**

698. It is my understanding that the "interface" required by claim 7 is a modem, and

therefore claim 7 requires that the "means for transmitting" include at least one modem, and a

cellular telephone connected to a modem.

699. Dr. Schonfeld identifies the same components as satisfying the structure for this

limitation as he did for the "means for transmitting" limitation in claim 1, including Wi-Fi

components. *Id.* ¶ 1391. Claim 7 depends from and incorporates the limitations of claim 3,

which depends from and incorporates the limitations of claim 1. Therefore, for the reasons set

forth above regarding claim 1, the accused products do not infringe claim 7.

700. In addition, I do not agree that the Wi-Fi components can satisfy this limitation,

literally or under the doctrine of equivalents, because the claim expressly requires a cellular

telephone. Further, a Wi-Fi module does not perform the identical function of a cellular

telephone—as it does not connect to a cellular network, and therefore is not structurally

equivalent to a cellular telephone. Finally, a Wi-Fi module's function is substantially different

than a cellular telephone, performs its function in a substantially different way than a cellular

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

telephone, and has a different result than a cellular telephone.  Moreover, Dr. Schonfeld fails to explain how Wi-Fi components can satisfy this limitation.[53]

> **11.    "An apparatus for transmission of data, comprising: a computer including a video capture module to capture and compress video in real time" (claim 15)**

701.    For this limitation, Dr. Schonfeld appears to be relying on the same contentions he asserted for claim 1, and in fact refers back to his opinions for claim 1.  Schonfeld Report ¶ 1463.  For example, Dr. Schonfeld asserts that "[c]apture of video signals in the Accused Devices is performed by ████████████████████████████████████████ ████████████████████████████████████████████████████████████ as explained above," and "[c]apture and compression of video signals is performed by the application processor System-on-Chip (SoC) to encode H.264 compressed video signals."  *Id.* ¶¶1465-66.[54]  I disagree with Dr. Schonfeld.

> *a)    The accused components do not satisfy this limitation*

702.    The accused components – an image sensor and video encoder on the SOC of the iOS devices – are not a "video capture module."  A person of ordinary skill in the art would understand the term "video capture module" to be a module either attached to or integrated into a video card for capturing signals from an analog video device.  First, the specification only uses the term "video capture module" in conjunction with "video card."  *See, e.g., id.* at 3:51-54 ("The video card in the playback unit is similar to the video card in the remote unit with the exception that the card in the playback unit does not have a capture module."), 4:23-24 (the remote unit 2

---

[53]    The inclusion of Wi-Fi components appears to be result of an erroneous copying of prior paragraphs for other claim limitations.

[54]    As explained above, it is my understanding that Dr. Schonfeld is only accusing iOS devices with cellular capability of infringing claim 15.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

has a "video capture card with capture module"), 4:39-40 ("The video signal input into the

remote unit is received by a video card having a capture module therein."), 12:37-40 ("Playback

unit 4 has a video card installed in an expansion slot.  This video card is similar as the video card

installed in remote unit 2 with the exception that the capture module is not necessary.").

703.    The prosecution history confirms my understanding.  In response to the

examiner's rejection of the claim 19 (issued claim 15) as obvious over U.S. Patent No. 5,253,275

(Yurt et al.) in view of Gattis et al. or U.S. Patent No. 5,375,068 (Palmer et al.), the applicants

argued the importance of a video card having a video capture module to the invention:

> Yurt does not disclose the use of a ***video card including a video
> capture module*** in order to accomplish its capture. The frame
> grabber methodology of Gattis and Palmer is likewise significantly
> different from ***a video card having a video capture module*** as
> recited in claim 19.  The differences between a ***video card*** and
> frame grabber were discussed in Applicant's Amendment and
> Response to the Office Action dated August 2, 1995, incorporated
> herein by reference. In light of the fact that ***a video card having a
> video capture module is not contemplated by Yurt nor Gattis***, or
> Palmer, the rejection of claim 19 under 35 U.S.C. §103 is believed
> overcome.

'239 File History, 5/21/96 Amend. [SAMNDCA630-00832632] at 12 (emphasis added).  This

passage shows that the "video capture module" in the claim is the same as the video capture

module on the video card described in the patent specification and required by claim 1.  Not only

did the applicants say as much in this paragraph, they also referred the examiner to the

arguments they made with respect to claim 1 explaining the "differences between a video card

and frame grabber."  In doing so, the applicants confirmed that the "video capture module" is a

video capture module on a video card.

704.    The applicants' arguments when viewed in their entirety also show that they were

relying on commercial video capture cards in the above arguments.  In the argument above, the

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

applicants were distinguishing Yurt over the invention because Yurt did not disclose real-time

capture:

> The present invention includes an apparatus capable of capturing a
> full-color, full-motion composite signal in real time; digitizing that
> composite signal into a data file; compressing the data file and
> transmitting it through a computer interface via telephone lines,
> cellular, radio, and other telemetric frequencies from a remote unit
> to a host unit. . . .

> Claim 19 as amended describes an apparatus for transmission of
> data comprising a computer including a video capture module to
> capture video in real time.  As used herein, the term "real time"
> includes the capture of information in an apparent simultaneous
> fashion including the continuous updating of the captured
> information.  This would include synchronous capture of a
> composite signal previously stored as well as capture of a
> composite signal occurring as the event is taking place (live
> action).

> Real time capture is significantly different than the method
> described by Yurt.  Yurt contemplates a system which takes a
> video sequence such as a motion picture of known length
> characteristics and then subjecting that signal to a complex
> mathematical algorithm which captures, digitizes, and compresses
> that signal. This method disclosed by Yurt is very time consuming
> and requires complex and expensive hardware to accomplish.  As
> stated above, the Yurt disclosure contemplates a storage library of
> known files.  This library is precompressed (col. 7, line 47--col. 8,
> line 26). In the Yurt disclosure, it is desirable to perform this
> substantive precompression so as obtain a data file which is as
> small as possible so as to reduce transmission time. ***Yurt does not
> disclose the use of a video card including a video capture module
> in order to accomplish its capture.***

*Id*. at 9, 12 (emphasis added).  In this argument, the applicants admitted that the system disclosed

in Yurt captures, digitizes, and compresses a video signal.  *Id.*  But Yurt did not disclose ***real

time*** capture.  In other words, Yurt disclosed capturing, digitizing, and compressing a video

signal, but did not disclose the real-time capture feature of the commercially-available video

capture cards.  In addition, as discussed above in Section VI.D.2, the three references cited by

366

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

the examiner – Yurt, Gattis, and Palmer – disclosed all aspects of this limitation (which the applicants appear to admit), with the sole exception of a video card having a video capture module.  The applicants, through these arguments, thereby relinquished a "video capture module" that is not on or attached to a video card.  The inventors also acknowledged that video cards having a capture module were required when they described real-time capture as including "synchronous capture of a composite signal *previously stored*" – i.e., such as from a VCR.  *Id.* at 11 (emphasis added).  That is how video cards having video capture modules work:  they can capture video previously stored such as from a VCR, as well as while a camera is taping.

705.    Finally, there is no description in the patent of any type of video capture module other than one attached to or incorporated in a video card.  Only a video card having a video capture module is described.  To construe the term in any other way would not be supported by the written description or enabled.

706.    Moreover, there is no component called a "video capture module" in the accused products.  The Bills of Material and schematics do not list or show such a component, nor has Dr. Schonfeld cited any such component in those documents.  *See* Exhibit 1.

707.    For these reasons and those set forth above in Section VI.G.1 with respect to claim 1, the accused components do not meet this limitation.

> b)    *Dr. Schonfeld has failed to demonstrate that the accused components satisfy this limitation literally or under the doctrine of equivalents*

708.    As discussed above, Dr. Schonfeld relies on the same arguments and evidence he used with respect to claim 1.  For the same reasons as discussed in Section VI.G.1, Dr. Schonfeld has failed to demonstrate that this limitation is met, either literally or under the doctrine of equivalents.

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

709.     Nor has Dr. Schonfeld shown this limitation is met under the doctrine of equivalents or rebutted any of Apple's non-infringement contentions.  First, Dr. Schonfeld states that he has applied the plain meaning of the term "video capture module" and that "Apple clearly infringes."  But nowhere does Dr. Schonfeld explain what his "plain meaning" is.  In fact, it appears to be whatever components he has identified as infringing – as evidenced by his admission that "one of ordinary skill in the art would recognize that a video capture module **could be** the capture hardware and software in a computer to capture and compress video.  I have identified these components above."  Schonfeld Report ¶ 1724.  In my opinion, this is not a proper analysis.

710.     Dr. Schonfeld also points to the amendment in which the applicants removed the video card from claim 15 to support his argument.  *Id.* ¶ 1726.  That fact does not change my opinion.  The video capture module on the video card actually performs the capture – removal of the video card from the claim does not mean that a video capture module is not part of a video card.  As Dr. Schonfeld admits and the patent explains, "the video capture module is a component of the video card."  *Id.*  Moreover, the applicants sent a draft amendment to the examiner in which the claim had not been amended, and discussed that amendment with the examiner during an in-person meeting.  '239 File History, 5/20/96 Draft Amend. [SAMNDCA630-00832618] at 4; '239 File History, Interview Summary [SAMNDCA630-00832617].  Dr. Schonfeld cannot now claim that the video capture module means something other than what the applicants described to the examiner, i.e., that it must be part of a video card.  For this same reason, I also disagree with Dr. Schonfeld's statement that "[i]t is obvious to one of ordinary skill in the art that the Applicant intended to remove the 'video card' from all of the arguments since it was also removed from claim 15."  *Id.* ¶ 1728.  I do not read the prosecution

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

history as Dr. Schonfeld suggests.  The applicants never stated a reason they removed video card from the claim language, much less suggested that a video capture module was not attached to or incorporated in a video card.  I am also not aware of any legal principle that allows an argument to be treated as if it were never made.  Moreover, the applicants were perfectly capable of deleting the argument had they intended to do so.  They did not.[55]

711.     Finally, as also discussed with respect to claim 1, Samsung is estopped from asserting the doctrine of equivalents to cover FaceTime.  As discussed above, the applicants disclaimed video transmission systems that do not store the video in a data file and are incapable of being replayed when they distinguished Gattis to overcome the examiner's rejection of claim 1.  Those arguments apply to claim 15 (application claim 19) because the applicants stated that they do:

> Applicants have added new claims 16-12.  New claims 16-21 do not include new subject matter.  The arguments contained herein in response to the rejections under 35 U.S.C. § 112, 102(a) and 103 apply to new claims 16-20.  Allowance is respectfully requested.

'239 File History, 2/2/96 Amend. [SAMNDCA630-00832596] at 12.  In addition, the applicants also described the invention in this amendment in the same manner as they did with respect to claim 1, i.e., as requiring a data file:  "The present invention includes an apparatus capable of capturing a full-color, full-motion composite signal in real time; digitizing that composite signal into a data file; compressing the data file and transmitting it . . . ."  '239 File History, 5/20/96 Draft Amend. [SAMNDCA630-00832618] at 9.

---

[55]     Dr. Schonfeld also states that "I have explained in previous paragraphs why the arguments do not depend on it being a 'video card' . . . ."  Schonfeld Report ¶ 1728.  I do not understand what paragraphs or argument Dr. Schonfeld is referring to.

369

CONTAINS INFORMATION DESIGNATED AS APPLE AND
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

**12.**     **"means for transmission of said captured video over a cellular frequency" (claim 15)**

712.     It is my opinion that under either my understanding of the structure for this limitation, or Dr. Schonfeld's understanding, the accused Apple devices do not satisfy this limitation.

713.     Apple's construction of this limitation is the same as its construction of the "means for transmitting" limitation of claim, with the exception that it does not include telephone lines or radio transmitters (because this term is limited to cellular frequency).  In addition, Dr. Schonfeld incorporates all his arguments from claim 1 to show infringement by the accused devices.  Therefore, for the same reasons discussed with respect to claim 1, it is my opinion that the accused products do not satisfy this limitation either literally or under the doctrine of equivalents.

714.     Under Dr. Schonfeld's construction of this limitation, the structure is "one or more modems connected to one or more cellular telephones or cellular radio transmitters."  Even under this erroneous construction, Dr. Schonfeld has not shown infringement.  First, Dr. Schonfeld asserts that "the cellular-enabled iPhone and iPad devices have a baseband processor combined with a mobile data modem that are connected to a radio-frequency (RF) transceiver and antenna as well as cellular telephones."  Schonfeld Report ¶ 1474.  This contention is identical to his contention for iPhones and cellular-enabled iPads with respect to "means for transmitting" in claim 1, and fails for the same reasons I discussed above with respect to that limitation.

**H.     Direct Infringement**

715.     Dr. Schonfeld asserts that "Apple infringes claims 1 and 7 directly when (1) it tests FaceTime and sending and receiving video via email or text message; and (2) when its

370